UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AVIGAIL LEWIS BITON, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 01-0382 (RMC) |
| ) | |
| THE PALESTINIAN INTERIM SELF- ) | |
| GOVERNMENT AUTHORITY, *et al.*, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION

Avigail Lewis Biton, individually and on behalf of her children, and Rachel Asraf bring suit under the Antiterrorism Act of 1991 ("ATA"), 18 U.S.C. § 2333, and various tort theories against the Palestinian Interim Self-Government Authority, also known as the Palestinian Authority or the Palestinian National Authority ("PA") and the Palestine Liberation Organization ("PLO").[1] Pending before the Court are Defendants' Supplemental Motion to Dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure and Plaintiffs' Motion for Partial Summary Judgment.[2] By Order entered on April 18, 2005, the Court deemed the record closed.

---

[1] In an earlier decision, this Court dismissed claims against Yasser Arafat, former president of the PA and chairman of the PLO; two senior members of the Palestinian Preventive Security Service ("PPSS"); two members of the Palestinian Police Service (PPS); and 99 John Does. *See Biton v. Palestinian Interim Self-Government Authority*, 310 F. Supp. 2d 172 (D.D.C. 2004).

[2] On May 24, 2004, the Court granted Defendants' Motion for Limited Reconsideration Upon a Supplemented Record of the Court's Conclusions on Palestinian Statehood, Sovereignty and Immunity In Its Memorandum Opinion and Order of March 18, 2004. Pursuant to the Court's grant of Defendants' Motion for Limited Reconsideration, Defendants submitted a Supplemental Motion to Dismiss on August 18, 2004. It is that motion upon which the Court will render its decision.

# I. BACKGROUND

The underlying facts of this case may be simply stated: at approximately 7:30 a.m. on November 20, 2000, a roadside device exploded near a bus that was transporting elementary school children and their teachers from Kfar Darom, a former Israeli settlement in the southern Gaza Strip, toward Gush Katif. The bombing took the life of Plaintiff Biton's husband, Gabriel Biton, and injured Plaintiff Rachel Asraf. Plaintiffs contend that Defendants are responsible for this bombing and the resulting deaths and injuries. The bombing is believed by the Defendants to have been part of the "al-Aqsa Intifada," a series of violent demonstrations and clashes between Palestinians and Israeli Defense Forces that ensued following (now-Israeli Prime Minister) Ariel Sharon's controversial visit to the Temple Mount/Haram al-Sharif in Jerusalem in September 2000. *See* Defendants' First Motion to Dismiss ("Defs.' Mem."), Ex. 1.

The Defendants' Supplemental Motion to Dismiss seeks dismissal on grounds of sovereign and governmental immunity based on Palestine's asserted statehood and Defendants' roles as "essential core elements of Palestine." Defendants' PA and PLO Supporting Memorandum of Points and Authorities in Support of Their Supplemental Rule 12(b) Motion ("Defs.' Supp. Mem.") at 1-2. They also argue that this action raises nonjusticiable questions and that the school bus bombing was an "act of war" as defined in 18 U.S.C. § 2331 and therefore the suit is barred by 18 U.S.C. § 2336(a). Although the Plaintiffs styled their pleading a "Motion for Partial Summary Judgment," it directly addresses each of the points raised in Defendants' Supplemental Motion to Dismiss and will be treated as a formal response to which the Defendants have filed no reply.

## II. LEGAL STANDARDS

Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, which governs motions to dismiss for lack of subject matter jurisdiction, Plaintiffs bear the burden of establishing by a preponderance of the evidence that the Court possesses jurisdiction. *See Shekoyan v. Sibley Int'l Corp.*, 217 F. Supp. 2d 59, 63 (D.D.C. 2002); *Pitney Bowes, Inc. v. USPS*, 27 F. Supp. 2d 15, 19 (D.D.C. 1998). It is well established that, in deciding a motion to dismiss for lack of subject matter jurisdiction, a court is not limited to the allegations set forth in the complaint, "but may also consider material outside of the pleadings in its effort to determine whether the court has jurisdiction in the case." *Alliance for Democracy v. Fed. Election Comm'n*, 362 F. Supp. 2d 138, 142 (D.D.C. 2005); *see Lockamy v. Truesdale*, 182 F. Supp. 2d 26, 30-31 (D.D.C. 2001).

Conversely, a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the adequacy of a complaint on its face, testing whether the plaintiffs have properly stated a claim. "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). Plaintiffs need not plead the elements of a *prima facie* case in the complaint. *See Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000). In deciding a 12(b)(6) motion, the Court "may only consider the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002) (citation omitted).

Defendants' Supplemental Motion to Dismiss relies on both Rules 12(b)(1) and 12(b)(6).

### III.  ANALYSIS

A.  <u>Sovereign Immunity</u>

The PA and PLO seek dismissal on the grounds that they both meet the definition of "foreign state" under the Foreign Sovereign Immunity Act ("FSIA"), 28 U.S.C. § 1604 and/or under 18 U.S.C. § 2337, and are therefore immune from suit.  The instant litigation is only one of at least five lawsuits against the PA and PLO in which these Defendants have raised the same issues of fact and law with respect to Palestinian statehood, sovereignty and immunity.  Two of the other suits have reached the point of decision: *Ungar v. Palestine Liberation Organization*, 402 F.3d 274 (1st Cir. 2005); *Knox v. Palestine Liberation Organization*, 306 F. Supp. 2d 424 (S.D.N.Y. 2004).[3]  In both cases, after thorough consideration and discussion, the court rejected Palestine's claims of statehood.  Plaintiffs argue that the doctrine of collateral estoppel precludes Defendants from re-litigating their immunity claims here.  The Court agrees.

Under the doctrine of collateral estoppel,

> [A] final judgment on the merits in a prior suit precludes subsequent relitigation of issues actually litigated and determined in the prior suit, regardless of whether the subsequent suit is based on the same cause of action.

*Next Wave Pers. Communications, Inc. v. FCC*, 254 F.3d 130, 147 (D.C. Cir. 2001) (internal citation and quotation marks omitted), *aff'd*, 537 U.S. 293 (2003).  The purposes of collateral

---

[3] The remaining cases are *Gilmore v. Palestine Liberation Organization,* No. 01-cv-0853 (GK) (D.D.C.); and *Shatsky v. Palestine Liberation Organization*, No. 02-cv-2280 (RJL) (D.D.C.) (and the instant matter).

estoppel are to save a party from the burden of litigating an issue that the opponent has already lost, save the court system the burden of deciding the same issue repeatedly, and increase respect for judicial determinations by avoiding inconsistent results. *Southern Pacific v. AT&T*, 740 F.2d 1011, 1019 (D.C. Cir. 1984). The doctrine applies when:

> (I) the issue previously adjudicated is identical with that now present, (ii) that issue was actually litigated in the prior case, (iii) the previous determination of that issue was necessary to the end-decision then made, and (iv) the party precluded was fully represented in the prior action.

*Thomas v. General Services Admin.*, 794 F.2d 661, 664 (Fed. Cir. 1986) (internal quotations omitted). There can be little doubt that the decisions in *Ungar* and *Knox* should be accorded full preclusive effect. In each, the District Court[4] fully and carefully examined the question of Palestine's statehood and reached an extremely persuasive conclusion that Palestine is not a state; the First Circuit's decision is equally meticulous and persuasive on the point. *See* Restatement (Second) of Judgments § 13 ("for purposes of issue preclusion . . . 'final judgment' includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect."). Should Defendants wish to pursue the question, they can appeal *Ungar* to the Supreme Court; starting over again in this Court, however, is not appropriate. *See Rimsat Ltd. v. Hilliard*, 207 B.R. 964 (D.D.C. 1997).

Defendants acknowledge that each of these actions [*Ungar, Knox, Biton, Gilmore, Shatsky*] raises the same issues of fact and law concerning the statehood of Palestine and the immunity of the PLO and PA. *See* Memorandum of Defendants PA and PLO In Support of Their Motion for Limited Reconsideration Upon a Supplemented Record ("Memo for

---

[4] The District Court decision in *Ungar* is reported at *Ungar v. Palestinian Authority*, 315 F. Supp. 2d 164 (D.R.I. 2004).

Reconsideration") at 1. In fact, the evidence submitted by Defendants in conjunction with their Supplemental Motion in this litigation consists entirely of the same Affidavit of Nasser Al-Kidway dated June 13, 2003, and attached exhibits, upon which they relied in *Ungar*. Memo for Reconsideration at 3-4. Defendants have not rebutted any of the Plaintiffs' arguments in this regard and the Court deems the matter conceded.

Because collateral estoppel precludes re-litigation of the issues surrounding Palestine's asserted statehood, summary judgment on this claim will be granted to the Plaintiffs.

B. <u>Justiciability</u>

Defendants argue that the Court would be required "to assess the Israeli-Palestinian conflict and the illegality of Israel's oppressive actions in its occupation of the West Bank and Gaza" to determine whether their alleged actions constitute "international terrorism" under the ATA. Defs.' Mem. at 13. They continue,

> The context provided by the Israeli-Palestinian conflict would include the many factors that govern the motivation and intent with which defendants' [sic] allegedly acted. . . . These factors include defendants' need to address and take into account the continuing oppression, poverty, malnutrition and humiliation of the Palestinian people, Israel's violation of the Palestinian people's human rights by excessive military force and other means, and relative popular support of the people from time to time for the Palestinian government, militant factions and violence – all of which are directly affected by Israel's oppressive and illegal conduct.

*Id.* p. 17.

Section 2331 of the ATA defines "international terrorism" actionable under § 2333 as activities that "appear to be intended . . . to intimidate or coerce a civilian population [or] to influence the policy of a government by intimidation or coercion." 18 U.S.C. § 2331. This Court has previously ruled that the question of whether Defendants' intention met the

-6-

requisite element of apparent intent under § 2331 "is a disputed question of material fact," and that, "[o]n a motion to dismiss, the Court will not determine the [D]efendants' intent in allegedly committing the bus bombing." *Biton*, 310 F. Supp. 2d at 185. The same result pertains here. Whether presented as an argument concerning "apparent intent" or "nonjusticiability," Defendants misperceive the status of the case. Plaintiffs complain that Defendants' actions caused them injury; while the ATA provides jurisdiction for the suit in federal court, the basic elements of the claim lie in tort, not in the relations between Palestine and Israel.

    Defendants argue that this Court is the wrong forum to explore and evaluate the alleged "oppression" of Palestinians by Israel and the validity of Palestinian efforts to establish their own government through force; in other words, the Israeli-Palestinian conflict raises political questions beyond the purview of a United States District Court. In *Baker v. Carr*, 369 U.S. 186 (1962), the Supreme Court identified six factors to distinguish a political question that is nonjusticiable:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.* at 217; *see Ungar*, 402 F.3d at 280. The First Circuit again leads the way with its analysis. "This is a tort suit brought under a legislative scheme that Congress enacted for the express purpose of providing a legal remedy for injuries or death occasioned by acts of international

terrorism." *Ungar*, 402 F.3d at 280. There is no flaw in this Court's ability to address Plaintiffs' claims: Congress explicitly committed these issues to the federal courts under the ATA. Similarly, the Court has access to "judicially manageable standards for resolving the issue[s] before it," *id.*, from both existing ATA caselaw and traditional tort caselaw. The "initial policy determination" involved here has already been made by the U.S. Congress: Americans injured by terrorist acts can sue their attackers in U.S. courts and the Court can manage this case to resolution of Defendants' alleged liability without "expressing lack of the respect due coordinate branches of government." *Baker*, 369 U.S. at 217. The fifth and sixth factors from *Baker v. Carr* do not apply because a decision in this individual case will have no consequences concerning "political decision[s] already made" and will raise only the question of Defendants' alleged liability regarding this single bombing of a bus. Thus, nothing in *Baker v. Carr* counsels against having this case proceed.

Finding that this case does not present claims that are not justiciable, the Court will deny Defendants' Supplemental Motion to Dismiss on this basis.

C. "Act of War"

The more complex question is whether the alleged actions of Defendants are not subject to litigation in a U.S. court because they were "acts of war" over which the ATA does not extend jurisdiction. 18 U.S.C. § 2336(a) provides that "[n]o action shall be maintained under section 2333 of this title for injury or loss by reason of an act of war." "Act of war" is defined in § 2331 as "any act occurring in the course of – (A) declared war; (B) armed conflict, whether or not war has been declared, between two or more nations; or (C) armed conflict between military forces of any origin." Defendants limit their arguments to (C), asserting that the bombing of the

school bus was an act of war occurring in the course of armed conflict between military forces of any origin.[5] Plaintiffs contend that attacks against civilians are not countenanced in U.S. law as "acts of war" that would allow terrorists to escape the judgment for which the ATA was adopted. Plaintiffs urge the Court to decide, as a matter of law, that bombing civilian targets is not an action that occurs "in the course of" war, as that term is construed by U.S. courts.

The parties do not dispute that there was an "armed conflict" in the southern Gaza Strip in November 2000, as the nightly news also demonstrated to Americans during that time.

> There was armed conflict between military forces in Gaza and other occupied Palestinian [areas] at all relevant times.
>
> The armed conflict is shown on this motion by numerous newspaper articles reporting on day-to-day fighting and violence as it occurred, often characterizing the conflict as war or reporting remarks to this effect by Israelis or Palestinians. Many such articles are included in defendants' exhibits on this motion. . . .
>
> Israel has repeatedly and consistently reported the fighting between the IDF and Palestinians to be armed conflict, and, at times, armed conflict short of war. The latter would of course be within the statutory definition of 'act of war.'

Defs.' Supp. Mem. at 20. However, while Plaintiffs do not dispute that there was an "armed conflict" as a matter of fact, they disagree as to whether an "armed conflict" existed as a matter of law for purposes of the ATA. Memorandum in Support of Plaintiffs' Motion for Partial

---

[5] *See* Defs.' Supp. Mem. at 12. This limitation is sensible. Subsections (A) and (B) do not apply. There is no "declared war" between Israel and Palestine and, as found earlier, since Palestine is not a state, the armed conflict between the two entities does not constitute a conflict "between two or more nations." 18 U.S.C. § 2336(a). Defendants previously took the position that the bombing of a school bus full of children and teachers "may well be" an act of war but that the "facts cannot be determined." Defs.' Mem. at 22-24. For that reason, the Court declined to reach the issue. *See Biton*, 310 F. Supp. 2d at 185. Defendants now appear to argue that the precise facts are irrelevant and that modern warfare properly includes attacks on civilian targets, for which the aggressors cannot be tried as terrorists.

Summary Judgment Against Defendants Palestinian Authority and Palestine Liberation Organization ("Pls.' Mem.") at 24 ("[A]ttacks on civilians are excluded as a matter of law from being considered part of an armed conflict even when they are a part of such conflict as a matter of fact.").

1. Applying the Phrase "In the Course of"

Plaintiffs' argument begins with the accurate statement that "[u]nder § 2331(4), 'acts of war' include only acts 'occurring in the course of' declared war or armed conflict." Pls.' Mem. at 16. While there appears to be no precedent interpreting § 2331(4), Plaintiffs argue

> [I]n numerous other contexts, the courts have consistently interpreted the phrase "in the course of" as a "gatekeeper" phrase that is intended to exclude as a <u>matter of law</u> a subset of conduct which – because of its nature and substance – deviates from and/or is insufficiently related to the general set of conduct governed by the provision in question.

*Id.* at 17 (emphasis in original). The Controlled Substances Act prohibits the distribution of narcotics, 21 U.S.C. § 829, except, *inter alia*, by a licensed "practitioner" as defined, including doctors who dispense "a controlled substance in the course of professional practice . . . ." 21 U.S.C. § 802(21). "Manifestly the language 'in the course of professional practice' is intended to limit the immunity of a licensed practitioner . . . [who] is expected to prescribe or dispense drugs within the bounds of his professional practice of medicine." *United States v. Collier*, 478 F.2d 268, 272 (5th Cir. 1973). "[T]he phrase 'in the course of professional practice' . . . has been in the statute books since 1914. . . . The language clearly means that a doctor is not exempt from the statute when he takes actions that he does not in good faith believe are for legitimate medical purposes." *United States v. Rosenberg*, 515 F.2d 190, 197-198 (9th Cir. 1975) (citing *Jim Fuey Moy v. United States*, 254 U.S. 189, 194 (1920) (doctor must act "strictly within the appropriate

bounds of a physician's professional practice"); *United States v. Behrman*, 258 U.S. 280, 287 (1922) (immunity confined to dispensing narcotics in "the regular and lawful course of professional practice"); *Boyd v. United States*, 271 U.S. 104, 105 (1926) ("good faith in the course of his professional practice")).

Similarly, the protections afforded a seaman under the Jones Act, 46 App. U.S.C.A. § 688, are limited to recovery for injury or death suffered "in the course of his employment." This phrase refers to "the nature of the service and its relationship to the operation of the vessel plying in navigable waters" that led to injury or death, not the physical location of the seaman when injured. *O'Donnell v. Great Lakes Dredge & Dock Co.*, 318 U.S. 36 (1943); *see also Vincent v. Harvey Well Service*, 441 F.2d 146, 147 (5th Cir. 1971); *Magnolia Towing Co. v. Pace*, 378 F.2d 12 (5th Cir. 1967). As a result, the question of whether a given injury occurred "in the course of" a seaman's employment is primarily a question of law, not fact. *Colon v. Apex Marine Corp.*, 832 F. Supp. 508, 515 (D.R.I. 1993), *aff'd*, 35 F.3d 16 (1st Cir. 1994), *cert. denied*, 514 U.S. 1018 (1995).

The Warsaw Convention (reprinted following 49 U.S.C. § 40105), an international treaty governing air carrier liability, also contains the phrase "in the course of" which has been interpreted by U.S. courts in a limiting fashion. Specifically, Article 17 of the Convention provides that an air carrier:

> [S]hall be liable for damages sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger if the accident which caused the damage so sustained took place on board the aircraft or *in the course of* any of the operations of embarking or disembarking.

*Id.* (emphasis added). As with the interpretations of the same phrase in the Jones Act, courts look

to the nature of the passenger's activity, under whose control or direction the passenger was acting, and the location of the passenger's activity to determine whether the damage or injury occurred "in the course of" embarking or disembarking. *Day v. Trans World Airlines, Inc.*, 528 F.2d 31 (2d Cir. 1975); *see also Dazo v. Globe Airport Security Services*, 268 F.3d 671, 677 (9th Cir. 2001); *Kalantar v. Lufthansa German Airlines*, 276 F. Supp. 2d 5 (D.D.C. 2003). "Location should not be considered alone . . . when determining if plaintiff was in the course of embarking upon defendant's flight. In addition to the location of the accident, the nature of the activity in which the plaintiff was engaged must be examined to determine if that activity can fairly be considered part of 'the operations of embarking.'" *Abu Hamdeh v. American Airlines, Inc.*, 862 F. Supp. 243, 248 (E.D. Mo. 1994) (quoting *Evangelinos v. Trans World Airlines, Inc.*, 550 F.2d 152, 155 (3rd Cir. 1977)).

From these precedents, Plaintiffs argue that the phrase "in the course of" armed combat excludes from its scope an attack on a civilian bus because such an attack on civilians violates the rules of war and cannot occur "in the course of" war as a matter of law.

2. <u>Rules of War</u>

Although Rules of War and the carnage of battle appear to be incongruous, attacks on civilian noncombatants have been reviled for centuries. In *Henry II*, Shakespeare will not let us forget the French attack on the English baggage boys at Agincourt. Many still remember the American revulsion to the My Lai massacre during the Vietnam War, even as we sympathized with the soldiers facing a hidden enemy. Plaintiffs build on this tradition to argue that the November 20, 2000, attack on the school bus from Kfar Darom violated the Rules of War and could not, as a matter of law, come within the exception to the ATA.

-12-

Plaintiffs turn to the "political offense exception" to extradition to make their point. "Most [extradition] treaties list categories of crimes or specific offense[s] for which extradition may be requested. There usually are, however, exceptions . . . . Many treaties include 'political crimes' among those exceptions," without further defining the term. *Fain v. Wilkes*, 642 F.2d 504, 512 (7th Cir. 1981), *cert. denied*, 454 U.S. 894 (1981). In developing a definition, U.S. courts have limited "political crimes" to "acts committed *in the course of* and incidental to a violent political disturbance such as a war, revolution or rebellion." *Id.* at 518 (emphasis added). *See also Garcia-Guillern v. United States*, 450 F.2d 1189, 1192 (5th Cir. 1971), *cert. denied*, 405 U.S. 989 (1972) (offense must occur "in the course of or incidental to" hostilities). Even more to the point, the question for extradition purposes is not just whether there was a war in fact, but whether the offense occurred "in the course of and incidental to" that war, depending upon the nature and circumstances of the violent act and the identity of the victims.

> In determining whether the "incidental to" prong has been met, federal courts have examined the circumstances of the attack and the victims targeted. *See Ornelas v. Ruiz*, 161 U.S. 502, 511 (1896) (focusing on status of victim, "mode of attack," and "the character of the foray"); *Ahmad v. Wigen*, 910 F.2d at 1066 (attack on civilian passenger bus was not a political offense); *Artukovic v. Rison*, 628 F. Supp. 1370, 1376 (C.D. Cal. 1985) ("[T]he focus of the inquiry is on the circumstances, and on the status of those harmed." [*aff'd* 784 F.2d 1354 (9th Cir. 1986)]).

*Marzook v. Christopher*, 1996 WL 583378, at *2 (S.D.N.Y. Oct. 10, 1996). "A rational nexus between the alleged crimes and the prevailing turmoil must be demonstrated. In searching for such a connection, the focus of the inquiry is on the circumstances, and on the status of those harmed, and not on whether the acts merely were committed during the disorder." *Artukovic*, 628 F. Supp. at 1376.

-13-

### 3. Application to Bombing at Kfar Darom

Kfar Darom – now evacuated by the Israelis – was an Israeli settlement in the southern Gaza Strip, an area originally partitioned by the United Nations in 1947 to be under Palestinian control. The U.N. "formulated a plan that involved the creation of two independent states within the [former United Kingdom] mandate territory: one Jewish, the other Arab." *Ungar*, 402 F.3d at 285. The Palestinians, representing two-thirds of the population, refused to accept the idea of partition. *Id.* at 285. When the British withdrew, Jewish leaders announced the establishment of the State of Israel within the borders set by the United Nations; Arab forces immediately invaded. *Id.* (citing United Nations Dep't of Pub. Info., The Question of Palestine & The United Nations at 11, U.N. Doc. DPI/2276, U.N. Sales No. 04,I.15 (2003)). When this first Arab-Israeli war ended, "Egypt had taken control of the Gaza Strip, Jordan was in control of the West Bank (including East Jerusalem), and Israel had taken command of the remainder of the former mandate territory." *Id.* By the end of the war, nearly three-quarters of a million Palestinian refugees had fled from the areas controlled by Israel. *Id.* Egypt, Jordan and Syria went to war against Israel again in 1967. This conflict lasted six days, at the end of which Israel occupied "the Gaza Strip and the West Bank, as well as the Sinai peninsula (previously under Egyptian rule) and the Golan Heights region of Syria." *Id.* Strenuous efforts to establish a stable peace between Palestine and Israel within separate national borders have progressed and retreated in the years since 1967 without resolution.

This history is important because Kfar Darom was an Israeli settlement in an area that was intended by the United Nations to be under Palestinian control. The entire Gaza Strip is about twice the size of Washington, D.C., yet its population in 2002 was approximately

-14-

1,300,000 Palestinians and 7,000 Israelis. The phenomena of small Israeli towns established in occupied but presumptively Palestinian territory has enormously complicated the peace efforts. Encouraged by their government, Israeli settlers in the Gaza Strip knowingly ventured into lands that the Palestinians claim and that the United Nations partitioned in Palestinian favor. It is not immediately obvious that an attack on a settler, who intentionally went into Palestinian territory to claim it for Israel, would automatically and necessarily be a "terrorist" attack against a "civilian."

The Court does not have to venture a decision on this point. Israel is withdrawing from the Gaza Strip and Kfar Darom is evacuated. Nonetheless, it is clear that children are not the proper targets of war. War should be fought between combatants and not between combatants and children. Defendants do not dispute that the bus from Kfar Darom contained only children and teachers. The *fact* of the settlement at Kfar Darom might be the cause of Palestinian anger; the *settlement itself* might even be an object for attack by Palestinians and defense by Israeli military, during which children might be hurt. But the *children of the settlement* cannot be direct targets of Palestinian force without liability as terrorists. The circumstances of the alleged attack – on a recognized school bus full of students and teachers – and the status of those noncombatants lead the Court to conclude that the attack did not occur "during the course of" an armed conflict as a matter of law. Accordingly, Defendants' Supplemental Motion to Dismiss will be **DENIED**. A memorializing order accompanies this memorandum opinion.

```
        /s/
_____
ROSEMARY M. COLLYER
United States District Judge
```

DATE: August 22, 2005.