# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

MARK I. SOKOLOW, et al.

Plaintiffs,

v.                                                    1:04-cv-00397-GBD

THE PALESTINE LIBERATION ORGANIZATION, et al.

Defendants.

**SUPPLEMENTAL MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION
TO ENTER DEFAULT, SCHEDULE AN INQUEST ON DAMAGES
<u>AND ENTER JUDGMENT BY DEFAULT</u>**

## <u>Introduction</u>

This is a civil action pursuant to the Antiterrorism Act ("ATA"), 18 U.S.C. §2331 *et. seq.* and supplemental causes of action, brought by United States citizens, and by the guardians, family members and the personal representatives of the estates of United States citizens, who were killed and injured in seven terrorist attacks carried out by defendants Palestine Liberation Organization ("PLO") and Palestinian Authority ("PA"), between January 8, 2001 and January 29, 2004.

On January 26, 2006, this Court entered an Order finding that the PLO and PA have failed to answer or otherwise respond to the First Amended Complaint (despite having sought and received three enlargements of time over a period of six months) and authorizing plaintiffs to file a formal motion for default judgment.

Accordingly, on February 21, 2006, plaintiffs filed a Motion to Enter Default, Schedule an Inquest on Damages and Enter Judgment by Default.

Defendants PA and PLO responded by filing a Memorandum in Opposition to Plaintiffs' Motion for the Entry of Default Judgment ("Defs. Memo"), arguing that default judgment should not enter because the Court purportedly lacks subject-matter jurisdiction.

On October 4, 2006, the Court held a conference, at the conclusion of which it ordered the parties to brief defendants' subject matter jurisdiction argument, and ruled that if the Court determines that it has subject matter jurisdiction defendants will have 30 days to file an answer or default judgment will be entered.

Plaintiffs therefore submit the instant Supplemental Memorandum regarding the Court's subject-matter jurisdiction in this action.  As shown below, the Court's subject-matter jurisdiction in this matter is indisputable.

## I.    THE STATUTORY BASIS FOR SUBJECT-MATTER JURISDICTION IN THIS ACTION

The First Count of the First Amended Complaint in this case is a cause of action for "international terrorism" pursuant to §2333 of the ATA, which creates a federal cause of action for U.S. citizens, and their estates, survivors and heirs, for death and personal injuries caused by an act of "international terrorism".  First Amended Complaint at ¶¶ 126-134.

The Court therefore has original subject-matter jurisdiction over this case pursuant to 28 U.S.C. §1331.

Additionally, the First Amended Complaint asserts supplemental claims for wrongful death, pain and suffering, battery, assault, loss of consortium and solatium, negligence and infliction of emotional distress. See id. at ¶¶ 135-201.  These supplemental causes of action are all based on the same terrorist attacks as the federal claim brought under 18 U.S.C. §2333 and are thus derived from the same nucleus of operative fact as the §2333 claim.  This Court therefore has subject-matter jurisdiction over these supplemental causes of action pursuant to 28 U.S.C. §1367.  See Estates of Ungar v. Palestinian Authority, 153 F.Supp.2d 76, 86 (D.R.I. 2001) (Holding that federal and

supplemental causes of action arising from same terrorist attack are derived from the same nucleus of operative fact and that court therefore has supplemental jurisdiction over non-federal claims under 28 U.S.C. § 1367); <u>Biton v. Palestinian Interim Self-Government Authority</u>, 310 F.Supp.2d 172, 182-183 (D.D.C. 2004) (same).

The statutory basis of the Court's subject matter jurisdiction in this action is therefore established for all counts of the First Amended Complaint.

## II.    DEFENDANTS' BASELESS JURISDICTIONAL CHALLENGES HAVE ALREADY BEEN UNANIMOUSLY REJECTED BY A FEDERAL COURT OF APPEALS AND SEVEN DIFFERENT FEDERAL JUDGES IN FOUR FEDERAL DISTRICTS

Defendants seek to challenge the Court's subject-matter jurisdiction on three grounds:

1)    Defendants assert that the instant action presents non-justiciable questions;

2)    Defendants assert that they enjoy sovereign immunity;

3)    Defendants assert that the terrorist attacks which killed or injured plaintiffs constitute "acts of war" under §2336(a) of the ATA.

Defs. Memo pp. 5-48.

This case is one of eight civil actions brought against the PA and PLO under the ATA by American citizens killed or injured in terrorist attacks carried out by the PA and PLO over the past decade. The other ATA actions against the PA and PLO were brought in this Court, and in the federal district courts for the District of Rhode Island, the District of Columbia, and the Southern District of Florida.[1]

---

[1] <u>See</u> <u>Knox v. Palestine Liberation Organization</u>, (Civ. No. 03-4466) (S.D.N.Y.); <u>Ungar v. Palestinian Authority</u>, (Civ. No. 00-105) (D.R.I.); <u>Biton v. Palestinian Interim Self-Government Authority</u>, (Civ. No. 01-0382) (D.D.C.); <u>Gilmore v. Palestinian Interim Self-Government Authority</u>, (Civ No. 01-853) (D.D.C.); <u>Klieman v. Palestinian Authority</u>, (Civ. No. 04-1173) (D.D.C.); <u>Shatsky v. Syrian Arab Republic et al.</u>, (Civ. 02-2280) (D.D.C.); <u>Saperstein v. Palestinian Authority</u>, (Civ. No. 04-20225) (S.D.Fla.).

As shown below, the very same challenges to subject-matter raised by defendants in this action were asserted by them in the other ATA actions, where they were thoroughly analyzed and resoundingly and unanimously rejected by the seven different federal judges hearing those actions and by the Court of Appeals for the First Circuit.

### III.   THIS ACTION IS FULLY JUSTICIABLE

Defendants assert, as they did unsuccessfully in all of the seven other ATA cases pending against them, that the instant action presents non-justiciable political questions. Defs. Memo at 33-37.

While defendants' argument is not the picture of clarity, their basic assertion is that adjudicating this action would somehow require the Court to determine political issues related to the Israeli-Palestinian conflict.  Id.

Defendants neither explain how or why the Court would need to make such determinations, nor point to a single sentence of the complaint that raises a political issue, because they cannot.

This case arises out of the following seven terrorist attacks carried out by defendants and their operatives:

(1)    On the evening of January 8, 2001, plaintiff Varda Guetta was driving her 12 year-old son, plaintiff Joseph Guetta, home from soccer practice.  The two were traveling in their family car on a public highway near Jerusalem.  Defendants' operatives opened fire with machine-guns on the Guetta vehicle, striking and seriously wounding plaintiff Joseph Guetta.  First Amended Complaint at ¶¶ 54-60.

(2)    In the afternoon of January 22, 2002, plaintiffs Shayna Gould and Shmuel Waldman, who were then in Israel to attend religious seminaries, were present on Jaffa Street in downtown Jerusalem.  Defendants' operative opened fire with a M-16 machine-gun

on random passersby, killing two elderly women and wounding over 45 people including plaintiffs Shayna Gould and Shmuel Waldman.  Id. at ¶¶ 61-76.

(3)     At about midday on January 27, 2002, plaintiffs Mark I. Sokolow, Rena M. Sokolow, Jamie A. Sokolow and Lauren M. Sokolow, who were visiting Israel as tourists, were walking on Jaffa Street in downtown Jerusalem.  Defendants' operative set off a powerful explosive device, killing an 81 year-old man and wounding over 150 other persons, including plaintiffs Mark I. Sokolow, Rena M. Sokolow, Jamie A. Sokolow and Lauren M. Sokolow.  Id. at ¶¶ 77-85.

(4)     In the afternoon of March 21, 2002, plaintiff Dr. Alan J. Bauer and his minor son plaintiff Yehonathon Bauer were walking on King George Street in downtown Jerusalem.  Defendants' operative set off a powerful explosive device, which killed three innocent passersby and wounded more than 80, including plaintiffs Dr. Alan J. Bauer and Yehonathon Bauer.  Id. at ¶¶ 86-99.

(5)     On the evening of June 19, 2002, plaintiff Shaul Mandelkorn was standing near a crowded bus stop at the French Hill intersection in Jerusalem. Defendant's operative set off a powerful explosive device, which killed seven innocent persons and wounded over 50 more, including plaintiff Shaul Mandelkorn. Id. at ¶¶ 100-107.

(6)     In the afternoon of July 31, 2002, decedents Janis Ruth Coulter, Diane (Dina) Carter, Benjamin Blutstein and David Gritz were in or near a cafeteria on the campus of the Hebrew University in Jerusalem. Defendants' operatives detonated a powerful explosive device, which they had previously planted in the cafeteria, which killed nine persons including decedents Janis Ruth Coulter, Diane ("Dina") Carter, Benjamin Blutstein and David Gritz.  Id. at ¶¶ 108-117.

(7)     On January 29, 2004, decedent Stuart Scott Goldberg was riding a public bus in the Rehavia neighborhood of downtown Jerusalem. Defendants' operative detonated a powerful explosive device on the bus, which killed eleven persons including decedent Stuart Scott Goldberg. Id. at ¶¶ 118-125.

Thus, this case does not implicate, much less require the Court to reach, any political questions whatsoever.  The sole question presented in this case is whether defendants are liable in tort under 18 U.S.C. §2333 and the supplemental causes of action for the harm caused by these seven specific attacks.  Defendants have not even attempted to articulate – because they cannot – how the respective merits or demerits of the Palestinian-Israeli conflict could possibly be relevant or necessary to this determination.

Indeed, this entire argument is no more than a straw man of the defendants' own making. In a vain and transparent attempt to artificially "politicize" this tort action, defendants have devoted pages upon pages of their memorandum to political statements, "supported" by newspaper clippings and other immaterial documents, the irrelevancy of which is glaringly obvious.

This is not the first time that defendants have claimed in this Court that terrorist attacks on American citizens overseas are beyond the judicial ken of the courts of the United States.  In Klinghoffer v. S.N.C. Achille Lauro, 937 F.2d 44 (2nd Cir. 1991) the PLO raised the identical claim which was resoundingly rejected.  The reasoning and holdings of the Second Circuit are fully applicable to this action:

> The PLO next argues that this case constitutes a non-justiciable political question because is "raises foreign policy questions and political questions in a volatile context lacking satisfactory criteria for judicial determination." However, the doctrine "is one of 'political questions,' not one of 'political cases.'" *Baker v. Carr*, 369 U.S. 186, 217, 7 L. ed. 2d 663, 82 S. Ct. 691 (1962). The fact that the issues before us arise in a politically charged context does not convert what is essentially an ordinary tort suit into a non-justiciable political question.

6

Id. at 49 (emphasis added).

The Klinghoffer holding was reiterated in an action brought against the Bosnian-Serb leader Radovan Karadzic by Croat and Muslim victims of atrocities in the former Yugoslavia. The district court dismissed the action, accepting Karadzic's claim that the allegations charging him with vicarious liability for various atrocities, including rape, torture, and summary execution, were nonjusticiable. The Second Circuit reversed on appeal, holding that:

> Karadzic maintains that these suits were properly dismissed because they present nonjusticiable political questions. We disagree. Although these cases present issues that arise in a politically charged context, that does not transform them into cases involving nonjusticiable political questions. "[T]he doctrine 'is one of "political questions," not one of "political cases."'" Klinghoffer, 937 F.2d at 49 (quoting Baker, 369 U.S. at 217).

Kadic v. Karadzic, 70 F.3d 232, 249 (2nd Cir. 1995).

Klinghoffer, unlike the instant action, was not brought under a specific federal cause of action for terrorism, but involved common law torts. Nonetheless, the Court of Appeals explicitly found that it had judicially discoverable and manageable standards to resolve the action:

> Here, we are faced with an ordinary tort suit, alleging that the defendants breached a duty of care owed to the plaintiffs or their decedents . . .
>
> [T]he common law of tort provides clear and well-settled rules on which the district court can easily rely, this case does not require the court to render a decision in the absence of "judicially discoverable and manageable standards."

Klinghoffer, 937 F.2d at 49.

Similarly, the supplemental causes of action pled against the PLO and PA in this suit are standard tort claims for wrongful death, pain and suffering (survival damages), battery, assault, loss of consortium and solatium, negligence and infliction of emotional distress. As in Klinghoffer, these tort claims provide "clear and well-settled rules on which the district court can easily rely, this case

does not require the court to render a decision in the absence of 'judicially' discoverable and manageable standards." Id.

Furthermore, in contrast to Klinghoffer, this suit is primarily brought under the specific federal cause of action for "international terrorism" codified at 18 U.S.C. §2333. The finding in Klinghoffer that the common law provides the Court with judicially discoverable and manageable standards to hear an action for overseas terrorist attacks, applies *a fortiori* to the §2333 claim of "international terrorism."

Section 2331 provides a detailed, meticulously defined list of the elements which comprise "acts of international terrorism" actionable under §2333. The definitions in §2331 are so standardized as to make their application almost mechanistic. Subsection §2331(1)(A) defines the actual behavior which constitutes the federal tort of "international terrorism," while subsections §§2331(1)(B) and (C) add, respectively, conditions relating to the purpose and intent, and the geographical circumstances, of the terrorist behavior.

The "behavioral component" of the tort of international terrorism, defined in §2331(1)(A), consists of two elements. The behavior must be 1) violent or dangerous to human life and 2) a criminal violation of federal or state law, or would constitute such a violation if committed within the U.S. Thus, in enacting this provision, Congress did not attempt to narrowly define tortious behavior. Rather, any violent or dangerous behavior violative of any U.S. or state criminal provision is deemed international terrorism (provided it also meets the conditions of §2331(1)(B) and (C)). On the other hand, Congress balanced the broad, virtually unlimited scope of behaviors deemed tortious, by setting a high threshold for the flagrancy of the behavior: only criminal behavior is tortious under §2331(1).

Section 2331(1)(B) requires that the behavior must appear to be intended to intimidate or coerce a civilian population, to influence the policy of a government by intimidation or coercion or to affect the conduct of a government by mass destruction, assassination or kidnapping.

Finally, §2331(1)(C) provides that defendants' behavior must occur primarily outside the United States or transcend national boundaries, in terms by which it is accomplished, the persons intended to be intimidated or coerced, or the locale where the perpetrators operate or seek asylum.

Therefore, the PLO and PA will be found liable under §2333(a), if the Court finds that their behavior (a) was dangerous to human life, (b) violated the criminal laws of the United States or of any state, or would be a criminal violation if committed within the United States, (c) appears to be intended to intimidate a civilian population, or to influence or affect the policy of a government by intimidation, coercion or assassination, and (d) occurred primarily outside the United States.  Clearer judicially discoverable and manageable standards than those codified in §2331 could hardly be imagined.

In enacting §2333, Congress gave federal courts the judicial standards necessary – and the mandate – to hear actions such as the instant suit.

Indeed, significantly, in rejecting the PLO's claim that foreign terror attacks were not justiciable, the Second Circuit specifically cited the (then-recent) enactment of the very federal cause of action under which this suit is brought, 18 U.S.C. §2333(a), as proof that Congress had "expressly endorsed the concept of suing terrorist organizations in federal court."  Klinghoffer, 937 F.2d at 49-50.[2]

---

[2] The legislative history demonstrates that the ATA was enacted as a specific response and remedy to jurisdictional and procedural hurdles raised by the PLO in Klinghoffer. That action commenced in 1985.  Twelve years later, in 1997 (when the parties reached an out of court settlement), the suit was still mired in pretrial discovery. Klinghoffer v. S.N.C. Achille Lauro, 739 F.Supp. 854 (S.D.N.Y. 1990), 921 F.2d 21 (2nd Cir. 1990), 937 F.2d 44 (2d. Cir. 1991), 795 F. Supp. 112 (S.D.N.Y. 1992), 816 F. Supp. 930 (S.D.N.Y. 1993).  The mind-boggling delay in Klinghoffer was caused by protracted pre-trial proceedings stemming from threshold claims raised by the PLO, including lack of personal and subject-matter jurisdiction, insufficient service of process and lack of capacity to be

The rule set down by the Second Circuit in <u>Klinghoffer</u> has been applied by the federal courts in all the cases brought against the PA and PLO under the ATA.  For example, in <u>Ungar v. Palestinian Authority</u>, the court rejected defendants' non-justiciability argument on the following grounds:

> The plaintiffs in the case before this Court brought a cause of action in tort under federal law seeking damages. As the Second Circuit in *Klinghoffer* stated, an ordinary tort suit in which the plaintiffs allege that the defendants breached a duty of care owed to the plaintiffs or their decedents is an issue which has been "constitutionally committed ... [to] none other than our own – the Judiciary." 937 F.2d at 49.  Thus, it is evident that simply because the events which resulted in the filing of this case took place in a politically volatile area in which the United States has a strong foreign policy interest does not transform what is otherwise an ordinary tort action into a non justiciable political question.

<u>Ungar v. Palestinian Authority</u>, 228 F.Supp2d 40, 44-45 (D.R.I. 2002); <u>see also</u> <u>Ungar v. Palestine Liberation Organization</u>, 402 F.3d 274, 279-282 (1st Cir. 2005).

---

sued. In response, Congress enacted the ATA  specifically in order to ensure that no future American victim of terrorism would have to undergo the ordeal endured by the <u>Klinghoffer</u> family in their suit against the PLO:

> This legislation will allow American victims of terrorism to bring civil suits in U.S. Federal court.
>
> The need for this legislation couldn't be clearer.  While Congress has passed laws providing for the criminal prosecution of terrorists, victims of terrorism face incredibly difficult legal hurdles in pursuing claims against terrorists.  The recent case of the Klinghoffer family is a glaring example of this gap in our efforts to develop a comprehensive legal response to international terrorism.
>
> Leon Klinghoffer, a passenger on the Achille Lauro cruise liner, was executed and thrown overboard during the 1985 terrorist attack.  His widow, Marilyn Klinghoffer, and family took their case to the courts in their home State of New York.  Only by virtue of the fact that the attack violated certain admiralty laws and that the organization involved—the Palestine Liberation Organization—had assets and carried on activities in New York, was the court able to establish jurisdiction over the case.
>
> A similar attack occurring on an airplane or in some other locale might not have been subject to civil action.  The Anti-Terrorism Act of 1991 would fill in this gap in our laws.

Remarks of Congressman Edward F. Feighan, co-sponsor of the ATA, Cong. Rec., May 2, 1991, p. E1538.

Similarly, Judge Marrero of this Court rejected defendants' identical non-justiciability argument in another recent ATA action:

> Defendants urge the Court to dismiss the case on the ground that it raises non-justiciable political questions. Specifically, Defendants assert that this case will require the Court to "assess[ ] the Palestinian-Israeli conflict over the years" and to "adjudicate history in progress." (Def. Mem. at 26-27.) The Court disagrees. As explained more fully above, the Court will not, and need not, endeavor to answer or otherwise lend its views towards these broader and intractable political questions which form the backdrop to this lawsuit. This lawsuit will simply adjudicate whether and to what extent the Plaintiffs may recover against Defendants under certain causes of action for the violence that occurred in Hadera, Israel on the night of January 17, 2002.
>
> In this connection, the Court cannot ignore the incongruity and conflict with statutory intent that the Defendants' argument would countenance. Plaintiffs' claims allege unprovoked savagery that encompasses even murder. Defendants' view essentially would ask the Court to hold that, even if the facts were to verify the accusations here, a wanton massacre of innocents would still be "non-justiciable." This proposition cuts against the grain of what compels the business of the courts. It would rub every syllable of justice out of the concept of justiciability and do equal violence to the ATA. …
>
> The Second Circuit in *Klinghoffer* squarely addressed this issue when the PLO (represented by the same lawyers as in this lawsuit) unsuccessfully sought to dismiss that case on virtually the same grounds. *See* 937 F.2d at 49-50. In *Klinghoffer*, four persons hijacked an Italian cruise liner in the Mediterranean Sea, and, in the course of the hijacking, an American citizen was thrown overboard and killed. *Id.* at 47. The victim's estate brought common law tort causes of action against various defendants, who impleaded the PLO. Id. The PLO unsuccessfully argued that the case raised non-justiciable "foreign policy questions and political questions in a volatile context lacking satisfactory criteria for judicial determination." *Id.* at 49.
>
> First, the Circuit Court emphasized that "the doctrine 'is one of "political questions," not one of "political cases." ' " Id. (quoting *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)). The "politically charged context" did not convert what was "essentially an ordinary tort suit into a non-justiciable political question." Id. Second, the Circuit Court concluded that all six of the considerations put forth in *Baker*, the leading Supreme Court case on the issue, militated against applying the political question doctrine. *Id.* Most importantly, *Klinghoffer* noted that common law tort claims are

> "constitutionally committed" to the judicial branch. *Id.* Moreover, the Circuit Court cited ATA § 2333, under which Plaintiffs have sued in the instant case, and pointed out that Congress had "expressly endorsed" these types of lawsuits. *Id.* at 49-50. …

> Defendants here fail to distinguish (or even cite) *Klinghoffer* or *Ungar* I. Accordingly, the Court concludes that the case will not be dismissed on the alleged ground that it raises non-justiciable political questions.

Knox v. Palestine Liberation Organization, 306 F.Supp.2d 424, 448-449 (S.D.N.Y. 2004).

The United States District Court for the District of Columbia rejected defendants' non-justiciability argument on the same grounds:

> Defendants fail to address the fact that this lawsuit was brought under a statute specifically designed to provide a civil cause of action in federal court for terrorist acts taken against American nationals abroad. …

> Enactment of the ATA makes it clear that both Congress and the Executive have "expressly endorsed the concept of suing terrorist organizations in federal court," and therefore this Court need not delve into an in-depth political question analysis here. *Klinghoffer v. S.N.C. Achille Lauro*, 937 F.Supp.2d 44, 49 (2d Cir.1991). Moreover, through the express language of the ATA and the application of common law tort principles, the Court has clear and manageable standards by which to properly adjudicate Plaintiffs' claims. *See Ungar v. The Palestinian Authority*, 402 F.3d 274, 281 (1st Cir. 2005).

> The courts which have addressed this precise issue have squarely held that ATA claims brought against the PLO and the PA do not constitute non-justiciable political questions. *See, e.g., Biton v. Palestinian Interim Self- Government Authority*, 310 F.Supp.2d 172, 184-85 (D.D.C. 2004); *Ungar*, 402 F.3d at 282; *Klinghoffer*, 937 F.2d at 49-50; *Knox v. Palestine Liberation Organization*, 306 F.Supp.2d 424, 448-49 (S.D.N.Y. 2004). Defendants fail to discuss, no less distinguish, any of these cases. …

> As the Second Circuit noted in Klinghoffer, in which the PLO made nearly the exact same non-justiciability argument, the doctrine "is one of 'political questions,' not one of 'political cases.' The fact that the issues before us arise in a politically charged context does not convert what is essentially an ordinary tort suit into a non-justiciable political question." 937 F.2d at 49 (citing *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)). As in *Klinghoffer*, this case "is essentially an ordinary tort suit," despite its tragic facts.

Consequently, Defendants' Motion with respect to non-justiciability must be denied.

Gilmore v. The Palestinian Interim Self-Government Authority, 422 F.Supp.2d 96, 99-100 (D.D.C. 2006). See also Biton v. Palestinian Interim Self- Government Authority, 310 F.Supp.2d 172, 184-85 (D.D.C. 2004) (same); Estate of Klieman v. Palestinian Authority, 424 F.Supp.2d 153, 161-162 (D.D.C. 2006) (same); Saperstein v. Palestinian Authority, (Civ. No. 04-20225) (S.D.Fla.), Order Granting in Part and Denying in Part Motion For Default Judgment, entered July 11, 2006, (Exhibit A), at p. 11 (same); Shatsky v. Syrian Arab Republic et al., (Civ. 02-2280) (D.D.C.), Minute Order entered February 7, 2005, denying defendants' motion to dismiss (dkt. # 26, 28) on grounds *inter alia* of non-justiciability.

Defendants cite two cases from the District of Columbia, a concurrence in Tel-Oren v. Libyan Arab Republic, 726 F.2d 774 (D.C.Cir. 1984) and the decision in Doe v. Israel, 400 F.Supp.2d 86 (D.D.C. 2005), in purported support of their justiciability argument, but – as another federal court confronted with the identical argument by the PA and PLO recently concluded – neither of these cases are apposite to an ATA case:

> Asserting without elaboration that the instant case touches upon every *Baker v. Carr* factor, defendants' basic argument is that the prosecution of this lawsuit will burden "the long running Middle East peace process." Def. Mem. at 31.
>
> The Court finds defendants' argument unconvincing and the authority on which defendants rely inapposite. For example, Judge Robb's concurring opinion in *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 823 (D.C.Cir. 1984) (Robb, J., concurring), on which defendants primarily rely, while similarly involving an armed attack on a civilian bus in Israel, does not support defendants' position that this case presents non-justiciable political questions because that decision predated the enactment of the ATA, which expressly provides, in Section 2333(a), a civil remedy in federal court for United States nationals injured by acts of international terrorism. *See Tel-Oren v. Libyan Arab Republic*, 726 F.2d at 822 (Bork, J., concurring) (although the Alien Tort Claims Act, 28 U.S.C. § 1350, does not authorize the courts "to enter into sensitive areas of foreign policy,"

only a statute or treaty expressly creating a cause of action "[c]ould direct courts to entertain cases like this one").

Defendants' reliance on Judge Bates' opinion in *Doe v. Israel*, 400 F.Supp.2d 86 (D.D.C. 2005), also is misplaced. In that case, the court merely concluded that the political question doctrine constituted an alternative ground to dismiss claims against the State of Israel, Israeli government entities, and Israeli officials-all of which (and whom) the court already had determined to be immune from suit under the FSIA. See id. at 111. As demonstrated above, defendants here have no such immunity. <u>Moreover, unlike defendants in the present case, the defendants in *Doe v. Israel* were not being sued under the ATA</u>.

<u>Estate of Klieman v. Palestinian Authority</u>, 424 F.Supp.2d 153, 161-162 (D.D.C. 2006) (emphasis added).

Furthermore, a perusal of the decision in <u>Doe v. Israel</u> makes clear that the <u>Doe</u> plaintiffs (unlike the instant plaintiffs) were indeed seeking to have that court make political rulings:

> Plaintiffs would have this Court adjudicate the rights and liabilities of the Palestinian and Israeli people, making determinations on such issues as <u>to whom the land in the West Bank actually belongs</u>.
>
> ***
>
> The Court cannot find that plaintiffs state a RICO claim unless the Court implicitly determines that <u>the Israeli settlement activities are illegal or tortious</u>. That, as discussed above, is a foreign relations determination to be made by the Executive or Legislative Branches, and the Court would usurp the roles of those coordinate branches if it were to intrude. Such a conclusion would also implicitly condemn American foreign policy by suggesting that the support of Israel is wrongful.

<u>Doe v. Israel</u>, 400 F.Supp.2d at 112.

In the instant case, no such political questions are presented.

Here, the only question is whether defendants' actions – shootings and bombings against innocent civilians, including women and children, walking down the street, standing at a bus stop, eating at a university cafeteria, riding a public bus, and driving home from soccer practice – fulfill

the conditions set forth by Congress for civil liability under 18 U.S.C. § 2333 and/or for civil liability under the garden variety torts pled as supplementary causes of action.

Simply put, acts of terrorism require no assessment of their "legitimacy" or illegitimacy beyond that already expressly provided and mandated by Congress when it enacted 18 U.S.C. §2331 *et. seq.*[3]

Indeed if defendants' argument – that a foreign political context renders an action nonjusticiable – were to prevail, no action could <u>ever</u> be brought under §2333, since (i) §2331 requires that the act of "international terrorism" actionable under §2333 must take place primarily abroad, i.e. in a foreign context; (ii) §2331 also requires that the act be intended to influence a government or population; and (iii) virtually every incident of international terrorism takes place in a political context (a fact of which the Court may properly take judicial notice).

Thus, like the actions in <u>Ungar</u>, <u>Knox</u>, <u>Biton</u>, <u>Gilmore</u>, <u>Klieman</u>, <u>Shatsky</u> and <u>Saperstein</u>, the instant action was committed by Congress to this Court for adjudication under a specific federal statute, and is therefore readily and eminently justiciable.

## IV.    NEITHER DEFENDANT IS A FOREIGN STATE

### A.    <u>Defendants Are Collaterally Estopped From Re-Litigating Their Sovereign Immunity Claims</u>

Defendants assert that they constitute a "foreign state" and are therefore immune from this action pursuant to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602-1611, and §2337 of the ATA.  Defs. Memo at 5-33.

Defendants made the same statehood and sovereign immunity argument in each of the other seven ATA cases pending against them.

---

[3] As one federal court has noted, "As terrorism has achieved the status of almost universal condemnation, as have slavery, genocide, and piracy, and the terrorist is the modern era's *hosti humani generis* – an enemy of all mankind …".  <u>Flatow v. Islamic Republic of Iran</u>, 999 F.Supp. 1, 23 (D.D.C. 1998).

The first two ATA cases to consider defendants' statehood argument were <u>Knox v. Palestine Liberation Organization</u>, 306 F.Supp.2d 424 (S.D.N.Y. 2004) and <u>Ungar v. Palestinian Authority</u>, 315 F. Supp.2d 164 (D.R.I. 2004) (denying a Rule 12(b) motion to dismiss), 325 F. Supp.2d 15 (D.R.I. 2004) (entering final judgment) <u>aff'd</u> 402 F.3d 274 (1st Cir. 2005).

Both <u>Knox</u> and <u>Ungar</u> thoroughly considered defendants' statehood argument, and resoundingly rejected it. The <u>Ungar</u> and <u>Knox</u> decisions conclusively establish that the PA and PLO are not immune from suit under the FSIA or 18 U.S.C. §2337. <u>See</u> <u>also</u> <u>Gilmore v. The Palestinian Interim Self-Government Authority</u>, 422 F.Supp.2d 96 (D.D.C. 2006) (same); <u>Shatsky v. Syrian Arab Republic et al.</u>, (Civ. 02-2280) (D.D.C.), Minute Order entered February 7, 2005, denying defendants' motion to dismiss (dkt. # 26, 28) on grounds *inter alia* of sovereign immunity.

The doctrine of collateral estoppel therefore precludes defendants from re-asserting and re-litigating their immunity claims in this action. Under the doctrine of collateral estoppel:

> [A] final judgment on the merits in a prior suit precludes subsequent relitigation of issues actually litigated and determined in the prior suit, regardless of whether the subsequent suit is based on the same cause of action.

<u>Next Wave Pers. Communications, Inc. v. F.C.C.</u>, 254 F.3d 130, 147 (D.C. Cir. 2001) (internal citation and quotation marks omitted), *aff'd,* 537 U.S. 293 (2003).

One Court of Appeals has explained the rationale behind the doctrine as follows:

> Collateral estoppel serves three main purposes. It protects litigants from the burden of relitigating an issue which the other party has already litigated and lost. It promotes judicial economy by preventing needless litigation. Finally, it fosters reliance on judicial action by minimizing the possibility of inconsistent decisions.

<u>Southern Pacific v. AT&T</u>, 740 F.2d 1011, 1019 (D.C. Cir. 1984) (internal quotes and citations omitted) (citing <u>Parklane Hosiery Co. v. Shore</u>, 439 U.S. 322, 326 (1979) and <u>Montana v. United States</u>, 440 U.S. 147, 154 (1979)).

Collateral estoppel will apply when:

> (i) the issue previously adjudicated is identical with that now presented, (ii) that issue was actually litigated in the prior case, (iii) the previous determination of that issue was necessary to the end-decision then made, and (iv) the party precluded was fully represented in the prior action.

Thomas v. General Services Adman., 794 F.2d 661, 664 (Fed. Cir. 1986) (internal quotations omitted).

These conditions are clearly met here.  First, the issues adjudicated in Ungar and Knox – defendants' claims to "foreign state" status under the FSIA and 18 U.S.C. §2337 – are identical to those before this Court.  Second, that issue was "actually litigated" in the exhaustive, treatise-like decisions in Ungar and Knox.  Third, the rejection of defendants' sovereignty claim was clearly necessary to the decisions in Ungar and Knox, which denied defendants' motions to dismiss those actions and permitted those courts to enter final judgment. Finally, defendants were of course fully and vigorously represented in both Ungar and Knox by the same capable and experienced counsel as represent them here, as indicated in the captions of those decisions.

Therefore, defendants are collaterally estopped from re-litigating their statehood and immunity claims in this Court.

Indeed, three federal courts have expressly held that the defendants are collaterally estopped from re-litigating their statehood and immunity claims:

> The PA and PLO seek dismissal on the grounds that they both meet the definition of "foreign state" under the Foreign Sovereign Immunity Act ("FSIA"), 28 U.S.C. § 1604 and/or under 18 U.S.C. § 2337, and are therefore immune from suit. The instant litigation is only one of at least five lawsuits against the PA and PLO in which these Defendants have raised the same issues of fact and law with respect to Palestinian statehood, sovereignty and immunity. Two of the other suits have reached the point of decision: *Ungar v. Palestine Liberation Organization*, 402 F.3d 274 (1st Cir. 2005); *Knox v. Palestine Liberation Organization*, 306 F.Supp.2d 424 (S.D.N.Y. 2004). In both cases, after thorough consideration and discussion, the court rejected Palestine's claims of statehood. Plaintiffs argue that the doctrine of collateral estoppel precludes Defendants from re-litigating their immunity claims here. The Court agrees.

Biton v. Palestinian Interim Self-Government Authority, 412 F.Supp.2d 1, 4 (D.D.C. 2005).

Likewise:

> The Court … concludes that the doctrine of collateral estoppel precludes relitigation of the issues surrounding defendants' assertion of sovereign immunity. This case is one of at least six ATA lawsuits currently pending against defendants; in all six cases the defendants are represented by the same attorneys; and in all six cases they have raised the same issues of fact and law – even relying on the same Al-Kidwa affidavit – with respect to Palestinian statehood. And in every case that has reached the point of decision, the court either has rejected their sovereign immunity argument on the merits, *see Ungar v. Palestine Liberation Org.*, 402 F.3d at 282-92; *Gilmore v. Palestinian Interim Self-Gov't Auth.*, 422 F.Supp.2d 96, 100-102, 2006 WL 711264, at *3-5 (D.D.C. 2006); *Estates of Ungar v. Palestinian Auth.*, 315 F.Supp.2d 164, 174-87 (D.R.I. 2004); *Biton v. Palestinian Interim Self-Gov't Auth.*, 310 F.Supp.2d 172, 180-81 (D.D.C. 2004) ("Biton I"); *Knox v. Palestine Liberation Org.*, 306 F.Supp.2d 424, 430-48 (S.D.N.Y. 2004), or has done so under the doctrine of collateral estoppel. *See Biton v. Palestinian Interim Self-Gov't Auth.*, 412 F.Supp.2d 1, 4-5 (D.D.C. 2005).

Estate of Klieman v. Palestinian Authority, 424 F.Supp.2d 153, 159-160 (D.D.C. 2006).

Notably, the "same Al-Kidwa affidavit" referred to in the above quote from Klieman, bearing the caption of the Ungar case, is the fulcrum of defendants' argument in the instant action as well.  See Defs. Exhibit 1.

Similarly,

> The PA and the PLO contend that the court lacks subject matter jurisdiction because they are "foreign states" and thus immune from suit under the Foreign Sovereign Immunities Act ("FSIA"). However, at least two courts have thoroughly considered and rejected Defendants' position in previous lawsuits. *See Ungar Palestine Liberation Organization*, 402 F.3d 274 (1st Cir. 2005); *Knox v, Palestine Liberation Organization*, 306 F. Supp. 2d 424 (S.D.N.Y. 2004). Accordingly, the doctrine of collateral estoppel precludes the PA and the PLO from re-litigating their immunity claims here. *See Biton v. Palestinian Interim Self-Government Authority*, Case No. 01-0382 (RMC) (D.D.C.) (Aug. 22, 2005, Memorandum Opinion) (giving "full preclusive effect" to the decisions in *Ungar* and *Knox* and holding that the PA and the PLO cannot claim statehood).

Saperstein v. Palestinian Authority, (Civ. No. 04-20225) (S.D.Fla.), Order Granting in Part and Denying in Part Motion For Default Judgment, entered July 11, 2006, (Exhibit A), at p. 10.

Defendants will no doubt argue here – as they did in Biton, Klieman and Saperstein – that their legal status is a function of ever-changing facts and circumstances, and thus not properly subject to collateral estoppel on the basis of previous decisions. Indeed, defendants have already foreshadowed this argument. See Defs. Memo at 4.

This argument fails on multiple grounds:

First, the defendants' objection to the application of collateral estoppel to their statehood claim has already been considered and rejected by the federal courts. See Klieman, 424 F.Supp.2d at 159-161 (rejecting defendants' opposition to the application of collateral estoppel to their sovereign immunity claim, and granting partial summary judgment denying their sovereign immunity claim on the basis of collateral estoppel); Biton, 412 F.Supp.2d at 4-5 (rejecting defendants' sovereign immunity claim on grounds of collateral estoppel).

Since the propriety of applying collateral estoppel to defendants' statehood claim has already been fully adjudicated twice on the merits, defendants are collaterally estopped from contesting the application of collateral estoppel here.

Second, the decisions in Knox and Ungar, which analyzed and rejected defendants' sovereign immunity claim on the merits and which underlie the subsequent finding of collateral estoppel made by the Klieman and Biton courts, based their rejection of the sovereign immunity claim both on the finding that the PA does not meet the four recognized criteria of statehood and on the wholly independent and alternate ground that a sovereign immunity defense is unavailable to the defendants because they are not recognized as a "foreign state" by the Executive Branch. See Knox, 306 F.Supp.2d at 438-448 ("even if Defendants presented sufficient evidence that Palestine and the PA and PLO regime satisfy the criteria for statehood, this Court would decline to give effect

19

to the foreign state and governmental immunities Defendants invoke" because the Executive Brach does not recognize a Palestinian state.); Ungar, 315 F.Supp.2d at 186-187 ("Even assuming, without deciding, that a State of Palestine exists, the PA and PLO are still not entitled to sovereign immunity because there is no evidence that the United States has recognized or otherwise treated Palestine as a sovereign state.")

Thus, even assuming purely *arguendo* that there had been some recent change in circumstances that brought the PA within the quadripartite definition of statehood (which as shown below there has not), and further assuming *arguendo* that such a change could have some relevance at this stage of the proceedings (which as shown below it cannot), the defendants could not even attempt to relitigate their immunity claim in this Court unless they could also demonstrate that the Executive Branch has now recognized a Palestinian state.

Therefore, unless and until defendants can show that there has been such Executive Branch recognition, they remain estopped by the holdings in Ungar and Knox that the absence of such recognition precludes any claim of sovereign immunity, and cannot even begin to demand any reexamination of this claim – irrespective of any other purported change in circumstance.

Of course, defendants do not even attempt to argue that the United States has recognized a Palestinian state because it has not.[4]

Third, as the Supreme Court recently established, the determination of whether a defendant has "foreign state" status, like all other factual predicates of subject-matter jurisdiction, is relevant only to the time the suit is filed.  See Dole Food Co. v. Patrickson, 538 U.S. 468, 478 (2003) (noting "the longstanding principle that the jurisdiction of the Court depends upon the state of things at the

---

[4] On the contrary, in light of Hamas' electoral victory in the Palestinian Authority in January 2006, United States recognition of a Palestinian state is currently unimaginable. In fact, in response to the Hamas takeover of the PA, the Executive Branch has placed the PA on the list of entities whose assets are blocked under the Department of the Treasury's terrorism sanctions program. *See* "Recent OFAC Actions – April 12, 2006", Exhibit B, available at http://www.ustreas.gov/offices/enforcement/ofac/actions/20060412.shtml

time of the action brought.  It is well settled, for example, that federal-diversity jurisdiction depends on the citizenship of the parties at the time suit is filed.") (internal quotations and citations omitted).

Thus, precisely contrary to defendants' position, a sovereign immunity claim is <u>not</u> open to constant reconsideration in light of alleged changes in circumstances.  Defs. Memo at 4.  Rather, the examination of a defendant's claim to "foreign state" status, and of the court's subject-matter jurisdiction over the action against that defendant, relates to only one point in time – the date the suit was filed.

This action was filed on January 16, 2004, <u>prior</u> to the decisions in <u>Ungar</u> and <u>Knox</u> (given on April 23, 2004, and March 1, 2004, respectively) rejecting defendants' sovereignty claim.

Thus, the decisions in <u>Ungar</u> and <u>Knox</u>, which found that no Palestinian state had come into existence as of March-April 2004, per force reflected "the state of things at the time of the action brought" by the instant plaintiffs, in January 2004.  <u>Dole Food</u>, 538 U.S. at 478.[5]

<u>Fourth</u>, the <u>Ungar</u> and <u>Knox</u> courts rejected defendants' claim to meet the four-part test of statehood because the PA's constituent instrument, the Oslo Accords, severely limits the powers of the PA, which limitations those courts enumerated and analyzed in detail.  <u>See Ungar</u>, 315 F.Supp.2d at 177-186; <u>Ungar</u>, 402 F.3d at 291-292; <u>Knox</u>, 306 F. Supp. 2d at 433-438.

Thus, in order to demonstrate that there has been a change in circumstances that renders <u>Knox</u> and <u>Ungar</u> obsolete, defendants would have to assert and show – and this Court would have to find – that there has been a change in the provisions of the Oslo Accords.

Defendants make no such claim because they cannot.  The Oslo Accords have not been modified, much less abrogated, since the decisions in <u>Ungar</u> and <u>Knox</u>.

Indeed, as recently as September 5, 2006, defendants <u>themselves</u> informed the United States District Court for the District of Columbia that:

---

[5] In fact, the decision of the First Circuit in <u>Ungar</u>, which analyzed defendants' statehood claim *de novo* and in detail, and rejected it, was entered on March 31, 2005.

> The Palestinian Authority … is specifically prohibited by <u>its founding charter from engaging in foreign relations</u> and maintaining foreign offices. See e.g. Article VI of the Agreement on the Gaza Strip and Jericho, dated May 4, 1994: "2.a. In accordance with the Declaration of Principles, The Palestinian Authority will not have powers and responsibilities in the sphere of foreign relations…".

Defendants Memorandum in Reply to Plaintiffs Opposition and in Further Support of Defendants Rule 12(b) Motion, filed on September 5, 2006, in <u>Klieman v. Palestinian Authority</u>, Civ. No. 04-11173 (PLF) (D.D.C.), Exhibit C, at 1-2 (emphasis added).

The "Agreement on the Gaza Strip and Jericho" referred to here by defendants as the PA's "founding charter" is part of the Oslo Accords.  <u>See Ungar</u>, 402 F.3d at 287; <u>Knox</u> 306 F. Supp. 2d at 433.

Moreover, the limitation on foreign relations capacity which the defendants here admit is still in force today (in a pleading filed by them on September 5, 2006) is sufficient, standing alone, to doom defendants' claim to statehood, because the capacity to conduct foreign relations is one of the four cumulative conditions for statehood under international law, as discussed at length in <u>Ungar</u> and <u>Knox</u>.  <u>See Ungar</u>, 315 F.Supp.2d at 181-182; <u>Ungar</u>, 402 F.3d at 287; <u>Knox</u> 306 F. Supp. 2d at 438.

Indeed, in <u>Gilmore</u>, once the court determined that the defendants lack capacity to conduct foreign relations, it decided that there was no point in even examining the other cumulative conditions of statehood:

> Defendants fail to establish that Palestine has the capacity to engage in formal relations with other sovereign states.  …
>
> In light of Defendants' failure to satisfy one of the criteria for statehood, it is not necessary for the Court to examine Plaintiffs' remaining arguments for why Palestine does not possess the attributes of statehood as outlined in the Restatement.

<u>Gilmore</u> 422 F.Supp.2d at 101.

This Court, too, need go no further.  Defendants' admission on September, 5, 2006, that the PA still lacks the capacity to conduct foreign relations – a lack of capacity which Knox and Ungar correctly found to defeat statehood – clearly shows that defendants remain estopped by the holdings in Knox and Ungar.

Therefore, defendants' demand that this Court revisit their statehood claim is not only baseless but frivolous, since the limitations on the PA's capacities set forth in the Oslo Accords, which limitations the Ungar and Knox courts found to negate any claim to "foreign state" status, are still in force – as defendants themselves have expressly admitted to other federal courts.[6]

Fifth, even assuming purely arguendo that defendants were not precluded from re-litigating their statehood claim, the burden would be on them to make a factual showing that there has been some relevant change in the facts since the decisions in Knox and Ungar. "[T]he party who alleges sovereign immunity has the burden of proving that status". Ungar, 402 F.3d at 289 (citing Drexel Burnham Lambert Group, Inc. v. Comm. of Receivers, 12 F.3d 317, 325 (2nd Cir. 1993)).

Defendants utterly fail to meet this burden, as shown below:

Defendants claim that there are three circumstances that were "not addressed by prior decisions in ATA cases," Defs. Memo at 4, and which purportedly demonstrate their statehood.

---

[6] The argument made by defendants in their memorandum in Klieman, i.e. that their lack of capacity to conduct foreign relations means that they cannot have a presence in the United States for "minimum contacts" purposes, was made by them in Ungar and expressly rejected by that court. See Ungar, 325 F.Supp.2d at 54 (rejecting the identical argument, and finding that "while the PA is prohibited from conducting 'foreign relations' … there is nothing in the Oslo Accords, as Plaintiffs point out, which prohibits the PA 'from conducting other non-diplomatic activities (such as commercial, public relations, lobbying, or educational activities) through its representatives, officers and agents abroad' … It is precisely these types of activities which have caused this court to find that both the PA and PLO have sufficient minimum contacts with the United States to allow the exercise of personal jurisdiction.  Thus, the fact that the PA cannot conduct foreign relations does not mean that it cannot have minimum contacts with the United States. As Plaintiffs note, there are thousands of individuals and corporations, which like the PA are unable to conduct foreign relations, but which have sufficient minimum contacts with this country to allow the exercise of personal jurisdiction over them.") (internal cite omitted).

The first circumstance cited by defendants is Israel's withdrawal of settlers from the Gaza Strip which, they claim, resulted in "the fully independent exercise of governmental functions and power" by the PA.  Id.

But the sole "evidence" adduced for this claim of "fully independent exercise of governmental functions" is a French news clipping from September 3, 2005, attached as Exhibit 5 to defendants' memorandum.  Id.  Aside from the fact that this news report says not a single word about the PA's powers and authority, this anonymous third-hand report has no evidentiary weight and is inadmissible.

Thus, defendants provide no evidence whatsoever of their claim to have achieved sovereignty in Gaza.  They have not, because they cannot. The plain fact is that since the decisions in Ungar and Knox in 2004, and especially since Israel withdrew its settlers from the Gaza Strip in 2005, there has been a severe deterioration in the PA's already-limited measure of control within the Gaza Strip and West Bank.  Though plaintiffs have no burden whatsoever to make a showing on this point, even the briefest survey of the undisputed public record easily demonstrates that the PA's control in Gaza and the West Bank has only weakened, and that chaos and anarchy have set in:

On September 15, 2005, the chairman of the PA complained of "the security anarchy, the armed chaos" plaguing Gaza.  Exhibit D.

The same day, the Washington Post noted that "the Gaza Strip is on the verge of anarchy." Exhibit E.

On September 21, 2005, the head of Israel's security service warned that the "Palestinian Authority is crumbling". Exhibit F.

On October 17, 2005, the New York Times reported in detail on the "disintegration of the Palestinian Authority".  Exhibit G.

November 23, 2005, "a senior Palestinian Authority official … admitted that the PA has failed to take control of the former settlements in the Gaza Strip," and that local gangs and clans were in control.  Exhibit H.  Officials of the PA made similar statements on November 2, 2005.  Exhibit I.

Likewise, the Palestinian Centre for Human Rights has repeatedly reported – as recently as December 19, 2006 – on the "security chaos" and the "chronic failure" of the PA to exercise governmental control in Gaza.  Exhibits J, K, L, P.

On December 16, 2006, Secretary of State Rice noted the "lawlessness that is there in the Gaza, which largely derives from Hamas's inability to govern."  Exhibit Q.

Moreover, defendants' own papers note the fact that Israel continues to operate freely in Gaza even now.  Defs. Memo at 4.

Furthermore, the underline defendants themselves have repeatedly and publicly made clear over the two years since Ungar and Knox that no state of Palestine exists and that Israel's removal of its settlers from the Gaza Strip has effected no change in the status of that area, and that Gaza has descended into anarchy.

For example, the PLO published a detailed legal analysis explaining that Israel's withdrawal from the Gaza Strip did not change its legal status as "occupied" territory.  Exhibit M.  This document is currently published on the official PLO website at www.nad-plo.org/inner.php?view=facts_gaza_GAZA%20STILL%20OCCUPIED.[7]

Likewise, on August 27, 2006, the official spokesman of the PA published an article stating that "Gaza is suffering under the yoke of anarchy" and from "unimaginable chaos". Exhibit N.

---

[7] Indeed, it appears that the sole forum in which defendants allege the existence of a Palestinian state, is in the courts of the United States.  Defendants' argument before this Court is thus made in gross bad faith, since it contradicts their own public statements and admissions.

On December 19, 2006, a PA governmental official described the situation in Gaza as "anarchy".  Exhibit R.

Thus, the PA is further than ever from the "sovereign governmental control" required as a condition of statehood (Ungar, 315 F.Supp.2d at 180) and it is patently clear that defendants have presented no evidence in support of their claim to a change in circumstances because in fact developments since Ungar and Knox have only distanced them from statehood.[8]

Next, defendants refer to a decision of an Israeli judge which, they claim, "recognized" that the PA satisfies the criteria of statehood. Defs. Memo at 4.

In support of this argument, defendants attach two news reports about a decision issued on April 23, 2006, by a judge of the Jerusalem District Court, and a Hebrew-language copy of the decision – with no translation!  Defs. Exhibits 2-4.

Defendants refrained from attaching a translation of the Israeli decision because the decision does not say what defendants claim it does:

In response to an identical attempt by defendants to rely on this Israeli decision in the Klieman matter, the Klieman plaintiffs filed an affidavit from an Israeli law expert explaining that

---

[8] Furthermore, as noted above and as discussed in detail in Knox and Ungar, the extent of the PA's authority is limited as a matter of law by its constituent instrument, the Oslo Accords.  Thus, in order to prove that the PA exercises sovereign governmental powers anywhere, defendants would have to prove (which they cannot) that the Oslo Accords have been modified or abrogated.  Not only do defendants make no such claim , both the Al-Kidwa affidavit submitted as Exhibit 1 of their memorandum and the papers filed by them on September 5, 2006, in Klieman, confirm the continued force of the Oslo Accords.

Additionally, the Oslo Accords provide that the parties "view the West Bank and Gaza Strip as a single territorial unit, the integrity and status of which will be preserved during the interim period", and that "Neither side shall initiate or take any step that will change the status of the West Bank and the Gaza Strip pending the outcome of the permanent status negotiations."  Israeli-Palestinian Interim Agreement on the West Bank and the Gaza Strip, 36 I.L.M. 551, at Articles XXXI(7) and  XXXI(8). Thus, in asking this Court to find that the status of the Gaza Strip is different from that of the West Bank, or that "the status of the West Bank and the Gaza Strip" together has changed, defendants are effectively asking this Court to breach the provisions of the Oslo Accords.

the Israeli judge had <u>expressly refrained</u> from determining the PA's status, and had found that the PA was immune from certain proceedings in Israeli courts based on provisions of the Oslo Accords <u>and Israeli domestic law</u> governing the bilateral relationship between the PA and Israel. <u>See</u> Declaration of Avraham Colthof, Adv., filed in <u>Klieman v. Palestinian Authority</u> C.A. No. 04-1173 (D.D.C.), Dkt. # 57, Exhibit O.  Moreover, that Israeli decision is non-final, is on appeal, and in any case is contradicted by a three-judge panel decision of the same court expressly holding that the PA does not meet the criteria of statehood and has no immunity. <u>Id</u>.

Thus, contrary to defendants' misrepresentation to this Court, the Israeli decision does not find that the PA has achieved statehood, and in any case is founded on provisions of the Oslo Accords and <u>Israeli domestic law</u> which govern <u>the bilateral relationship between Israel and the PA</u> and which are obviously irrelevant to actions brought in U.S. courts.

Finally, defendants point to the recent elections in the PA (in which Hamas came to power) as somehow proving that the PA is a state.  This argument is absurd.  The Elks' Lodge also holds elections, that does not make the Elks' Lodge a state.  Furthermore, the PA previously held such elections, in January 1996, some eight years before the <u>Knox</u> and <u>Ungar</u> courts determined that the PA is not a state.

Therefore, for the reasons set forth above, the Court should preclude defendants from re-litigating their immunity claims in this Court on the basis of collateral estoppel, and adopt the holding in <u>Knox</u> and <u>Ungar</u> that the defendants are not immune from suit under the FSIA or 18 U.S.C. §2337.

**B.    <u>Alternatively, Defendants' Sovereign Immunity Claims Should Be Rejected on the Merits</u>**

Solely in the alternative, if the Court does not agree that defendants are collaterally estopped from re-litigating their sovereign immunity claims, the Court should reject those claims on the merits, for the reasons set forth below.

1.    **Defendants' Argument**

While defendants claim sovereign immunity from suit under the FSIA and §2337 of the ATA, they do not claim that either the PA or the PLO is a "foreign state" within the meaning of those provisions.  Rather, defendants admit that "Neither the PA nor the PLO are, of themselves, states" (Defs. Memo at 17) and assert only that the PA and PLO are "essential elements" of an alleged third entity, a "State of Palestine" purported to have existed at least since 1949.[9]

As demonstrated by <u>Knox</u> and <u>Ungar</u>, and as shown below, the "State of Palestine" of which defendants claim to be part is a wholly non-existent figment of defendants' pleadings.

Indeed, in order to bridge the gap between their argument and empirical reality, and to create a semantic "State of Palestine" where none exists on the ground, defendants' memorandum employs the term "Palestine" interchangeably to connote at least five different meanings:

1) As a geographic term which refers, alternately, to ancient Canaan,[10] to the area of the Mandate for Palestine administered by the League of Nations and United Nations,[11] and to the West Bank, Gaza Strip and East Jerusalem;[12]

2) As a synonym for the Arab state envisioned by UN resolution 181 in 1947 but never established;[13]

3) As a synonym for Egypt, Jordan and Syria;[14]

---

[9] <u>See</u> <u>e.g.</u> Defs. Memo at 10: "The armistice border between the <u>two states</u> was called the Green Line . . . The area retained by the <u>Palestinian state</u> within the Mandate territory was reduced to approximately 23% of the total." (emphasis added).

[10] Defs. Memo at 18.

[11] <u>Id</u>. at 5-10.

[12] <u>Id</u>. at 10-12.

[13] <u>Id</u>. at 8-9.

[14] <u>Id</u>. at 10 ("*in the summer of 1967, Israel launched a major military attack against Palestine*").

4) As a synonym for the PLO;[15]

5) As a synonym for the PA;[16]

Thus, by employing the term "Palestine" to encompass whatever they wish whenever they wish, defendants attempt to establish a "State of Palestine" based entirely on a rhetorical tautology.

Similarly, defendants' memorandum employs "creative capitalization" in order to mislead an unwary reader into believing that certain phrases ("State of Palestine," "Government of Palestine") are generally recognized proper nouns or defined terms of art.  Defendants refer, for example, to "*the Territory of Palestine as defined in S.C. Res. 242*" (Defs. Memo at 17), falsely implying that "*Territory of Palestine*" is a defined term of art.  In fact, neither that phrase, nor the term "Palestine," nor any definitions at all, appear in Resolution 242.

Nor do defendants eschew blatant historical fabrications, such as their claim that the PLO was a party to the 1978 Camp David Accords.  (Defs. Memo at 13).[17]

Defendants' prestidigitation notwithstanding, neither the PA nor the PLO is part of a "State of Palestine" because no such state exists beyond the four corners of defendants' pleadings.

**2.**    **Klinghoffer Disposes of Defendants' Pre-1991 Arguments**

Defendants claim that a "State of Palestine" (of which defendants are allegedly "essential elements") existed long before the PA and the PLO were created, since as early as 1947 when the UN voted to partition Mandatory Palestine and/or since 1949 when Egypt and Jordan occupied the West Bank and Gaza and/or since Israel occupied these areas in 1967 (Defs. Memo at 7-13) and/or since 1988 when the PLO "*declared the independence of the State of Palestine,*" which was "acknowledged"

---

[15] See Id. at 13, at (b) and (c) where defendants describe the Oslo Accords as an agreement between Palestine and Israel.  In fact, of course, the PLO was the signatory to the Oslo Accords, as acknowledged in (d) on the very same page.

[16] Id. at 23-25.

[17] The only parties to the Accords were Israel and Egypt.

by the UN and a number of countries, and resulted in the re-designation of the PLO as "Palestine" in the UN system.  Id. at 29.

The trouble with this entire theory is that in 1991—subsequent to and despite the events cited by defendants—the Second Circuit considered and rejected these selfsame claims and held it "quite clear" that no "State of Palestine" existed. Klinghoffer v. S.N.C. Achille Lauro, 937 F.2d 44, 47-49 (2nd Cir. 1991).

Thus, Klinghoffer disposes of defendants' assertion that a "State of Palestine" existed in 1947, 1967 or at any other time prior to 1991.

As demonstrated below, the establishment of the PA, which was the sole salient event in the West Bank and Gaza since 1991, did not create a State of Palestine.

3.    **The PA Does Not Meet Any of the Criteria of Statehood; No "State of Palestine" Exists**

a.    **All Governmental Control in the West Bank and Gaza Strip Is Shared by Israel and the PA**

The PA was created and constituted by, and functions within the normative framework of, the provisions of two agreements between the PLO and Israel, the Declaration of Principles on Interim Self-Governing Arrangements of September 13, 1993 ("DOP") and the "Israeli-Palestinian Interim Agreement on the West Bank and the Gaza Strip" ("Interim Agreement" or "IA") of September 28, 1995.  See Exhibit S, Declaration of Professor Ed Morgan filed in Ungar v.

Palestinian Authority, (C.A. 00-105L D.R.I.), §§8–14 (herein after "Morgan").[18]  These agreements are commonly known as the "Oslo Accords."[19]

DOP Article 1 provides for the establishment of an elected "Palestinian Interim Self-Government Authority" (the PA), to which would be transferred limited powers from the Israeli military government and civilian administration that have governed the West Bank and the Gaza Strip since 1967. 32 I.L.M. 1525.  This arrangement will remain in effect until the conclusion of negotiations on the permanent status of these areas.  Article V, 32 I.L.M. at 1529.

The general framework for limited self-government sketched in the DOP was implemented in full detail by the IA which delineates and controls the specific scope and substance of the powers and capacities granted to the PA.  Morgan §14.

According to former PLO legal advisor Omar Dajani:

> The powers, structure, and jurisdiction of the PA are defined by the Israeli-Palestinian Interim Agreement on the West Bank and the Gaza Strip (IA), which was concluded in Washington, D.C. on September 28, 1995, pursuant to Article VII of the DOP.

Dajani at 61 (footnotes omitted).

Professor Geoffrey Watson of Catholic University School of Law similarly explains:

> The Interim Agreement is a comprehensive document that today still governs virtually all aspects of the relations between Israel and the Palestinian Authority . . . for all practical purposes, the Interim Agreement is now the centrepiece of the Oslo Accords.  It is the 'Basic Law' that governs the Israeli-Palestinian relationship.

Watson at 46 (emphasis added).[20]

---

[18] See also generally Watson, The Oslo Accords: International Law and the Israeli-Palestinian Peace Agreement, Oxford University Press (2000) ("Watson"); Dajani, "Stalled Between Seasons: The International Legal Status of Palestine During the Interim Period," 26 Denv. J. Int'l L. & Pol'y 27 (1997) ("Dajani").

Dajani served as PLO legal adviser to the PLO during the 1999-2000 peace talks. See Dajani, "On a Better Road This Time in the Mideast?" Washington Post, May 4, 2003, p. B01.

[19] The Oslo Accords also include various ancillary agreements. See Morgan, footnotes 5, 8.

Thus, "the IA and the DOP are the <u>constituting instruments</u> of the PA, and the provisions of these agreements delineate the powers and capacities of the PA." Morgan, §25 (emphasis added).

The DOP provides that the PA's territorial, functional and personal jurisdiction will be restricted to "*the agreed powers, responsibilities, spheres and authorities transferred to it,*" by Israel's military government and Civil Administration in the West Bank and Gaza Strip, and that the powers not transferred to the PA are retained by Israel.[21]

The IA fully adopts and reflects these principles of the DOP providing for the PA's limited competence and capacity and maintaining residual Israeli authority:

> Israel shall transfer powers and responsibilities <u>as specified in this Agreement</u> from the Israeli military government and its Civil Administration to the Council[22] in accordance with this Agreement. Israel shall continue to exercise <u>powers and responsibilities not so transferred.</u>

IA Article I (emphasis added).[23]

Thus, under the DOP and the IA, the PA possesses only those powers specifically transferred to it. <u>See</u> Morgan, §§15 – 20, 32 – 34.

The PLO has expressly recognized this limitation of authority and conceded that:

> The Palestinian Authority is a government of extremely limited jurisdiction. Its powers are strictly defined by the Interim Agreement, and all residual powers are reserved to Israel.

---

[20] Significantly, Watson made this unequivocal statement long <u>after</u> the originally planned date for the conclusion of the interim period, i.e. May 4, 1999. He also notes "*the parties' mutual agreement to continue the [Oslo] Accords in force after 4 May, 1999*" and therefore concludes: "*thus the Accords remain in force. Indeed, there is no reason that they cannot remain in force for a long time.*" <u>Id</u>. p. 249.

[21] 36 I.L.M. 551 at 558. <u>See also</u> Agreed Minutes to Articles IV and VII(5).

[22] In both the DOP and the Interim Agreement, the PA is also denominated as "the Council" or "the Palestinian Council." <u>See</u> <u>e.g.</u> Article I of the DOP and Preamble to the Interim Agreement.

[23] <u>See also</u> <u>e.g.</u> IA Articles I(5), XVII(1), and XVII(4)a-b.

Third Submission of the Palestine Liberation Organization to the Sharm El-Sheikh Fact-Finding Committee,[24] April 3, 2001 (Exhibit T, p 10)

In sum, all governmental authority in the West Bank and Gaza Strip is shared by Israel and the PA, and all powers not specifically transferred to the PA are retained by Israel. Thus, no Palestinian entity other than the PA – no "State of Palestine" – is vested with any governmental authority whatsoever in the West Bank or Gaza.

Thus, the Court can end its inquiry right here. Since the defendants have conceded that, "Neither the PA nor the PLO are, of themselves, states" (Defs. Memo at 17) and base their entire sovereign immunity argument on the claim that the PA and PLO are "essential elements" of an alleged third entity (a "State of Palestine"), and since plaintiffs have shown above that all governmental authority in the West Bank and Gaza is held by Israel and the PA only – not by any third party State of Palestine – it is clear that defendants' entire argument collapses at the starting gate and should be rejected as not only wrong but downright frivolous.

Nevertheless, purely out of extreme thoroughly (and in light of defendants' unfortunate proclivity for switching positions midstream), plaintiffs will proceed to demonstrate below that the limited authority granted to the PA itself leaves it far short of statehood.

b.    **The PA Possesses Only Municipal Non-Sovereign Powers**

The four well-established criteria of statehood are set out in Restatement (Third) of the Foreign Relations Law of the United States §201. Defendants agree that these criteria govern the disposition of their claim to statehood. (Defs. Memo at 15-17).

Section 201 provides:

> Under international law, a state is an entity that has a defined territory and a permanent population, under the control of its own

---

[24]This committee was established by President Clinton in 2000.

<u>government</u>, and that engages in, or has the capacity to engage in, formal relations with other such entities.

In other words, "an entity which has a '*defined territory and a permanent population*' will not be defined as a state unless it <u>also</u> possesses sufficient governmental control over its territory and population."  Morgan, §29.  Fulfillment of this criterion "requires the exercise of sovereign control."  <u>Id.</u> §30.

> There must . . . be a sovereign government.  Sovereignty is supreme authority, which on the international plane means . . . legal authority which is not in law dependent on any other earthly authority.  Sovereignty in the strict and narrowest sense of the term implies, therefore, independence all round, within and without the borders of the country.

1 <u>Oppenheim's International Law</u> 122, 9th ed. (1992).[25]

To satisfy this standard, a state must possess, "*the sole right of decision in all matters economic, political, financial or other.*"[26]  Or, in other words, "*a coherent system of authority regulating all aspects of life within the territory under that government's control.*"[27]

The degree of control required for statehood must be absolute and not subordinate: "*the government, in exercising its power, must be capable of acting independently of foreign governments.*"[28]

Moreover, "*[t]here must not be even nominal subordination to an outside governmental authority.*"[29]

The PA fails to satisfy this criterion of statehood because it enjoys only limited powers of local government which it exercises subject to numerous restrictions.

---

[25] As Professor Morgan demonstrates, the authorities are unanimous on this matter.  Morgan §§30-31.

[26] <u>Austro-German Customs Union Case</u>, P.C.I.J. Series A/B No. 41, at 45 (1931).

[27] Wallace-Bruce, <u>Claims to Statehood in International Law</u> 54 (1994).

[28] Doehring, "State," 10 <u>Encyclopedia of Public International Law</u> 423, 426 (1981).

[29] Von Glahn, <u>Law Among Nations</u> 56 (6th ed., 1992).

As discussed, the DOP and IA provide that the PA's territorial, functional and personal jurisdiction are restricted to the specific powers transferred to it under the agreements, and that powers not transferred to the PA are retained by Israel's military government in the West Bank and Gaza Strip.  Morgan, §§15 – 20, 32 – 34.  Indeed, the PLO concedes that:

> The Palestinian Authority is a government of extremely limited jurisdiction. Its powers are strictly defined by the Interim Agreement, and all residual powers are reserved to Israel.

Exhibit T, p. 10.

Thus, since it is a "*government of extremely limited jurisdiction,*" the PA does not enjoy sovereign governmental control in the West Bank or Gaza, and therefore does not meet this criterion of statehood.

Moreover, under the IA, the West Bank and Gaza Strip are divided into a patchwork of non-contiguous geographical areas, and the jurisdiction of the PA is strictly defined and limited in each of these respective areas.  Morgan, §35.

Thus, "the PA exercises its 'maximum' grant of authority under the IA only in an archipelago of jurisdictional 'islands' scattered throughout the West Bank and Gaza.  In most areas of the West Bank and Gaza, the PA exercises less than its maximal authority, or none at all."  Id.

Professor Morgan quotes a description of the PA's jurisdictional limitations which was provided by the PLO:

> In the Interim Agreement, Israel and the PLO devised a system for limited Palestinian self-government during the interim period.  Two key features of this system bear mentioning: First, although the Interim Agreement affirms that both sides regard the West Bank and Gaza Strip as "a single territorial unit," that "unit" is divided into a patchwork of smaller enclaves. In the West Bank, these enclaves fall into one of the following categories:
>
> Area A: (Around 17.2% of the West Bank) The Palestinian Authority has full responsibility for internal security and public order.   It also has wide powers in the civil sphere.

Area B: (Around 23.8% of the West Bank) The Palestinian Authority has responsibility for maintaining public order for Palestinians, as well as powers in the civil sphere like those it holds in Area A.   Israel has overriding security responsibility to safeguard Israelis and combat terrorism.

Area C: (Around 59% of the West Bank) Israel has full responsibility for security and public order, as well as territory-related civil matters (e.g., resource allocation and infrastructure). …

[A]s of the completion of the second phase of Israel's further redeployment in March 2000, only Area C is contiguous; it surrounds and divides Areas A and B. Accordingly, no persons, no vehicles, and no goods can enter areas under Palestinian jurisdiction without first passing through areas under Israel's exclusive control. …

Israel retains responsibility for "safety and security" in the sea off the coast of the Gaza Strip and "may take any measures necessary against vessels suspected of being used for terrorist activities or for smuggling arms, ammunition, drugs, goods, or for any other illegal activity." Thus, like Areas A and B in the West Bank, the areas of the Gaza Strip under Palestinian jurisdiction are surrounded by areas under full Israeli security control.

Second, the territorial jurisdiction regime … is subject to an overriding system of personal jurisdiction.   The Interim Agreement provides that "the territorial and functional jurisdiction of the [Palestinian] Council will apply to all persons, except for Israelis, unless otherwise provided in this Agreement." Israel maintains exclusive personal jurisdiction over Israelis in all criminal matters, even for offenses committed in areas under PA jurisdiction.  Israelis, moreover, only come under the jurisdiction of Palestinian judicial authorities in civil matters when they explicitly consent in writing to that jurisdiction, when they maintain ongoing businesses in territory under Palestinian authority, or when the subject matter of the action is real property located in Palestinian territory.   In sum, the PA's powers extend only over the Palestinian population and other non-Israelis who are within the limited, non-contiguous areas of the Occupied Palestinian Territories that are subject to Palestinian jurisdiction.

Morgan §35 (citations omitted, emphasis added); see Exhibit T pp. 11-13.

Thus, the PA clearly lacks the independent government control that is a sine qua non of statehood.

Furthermore, "the DOP and IA deny the PA <u>precisely those powers which are the basic indicia of a sovereign state</u> even in the areas where it exercises its maximum authority . . . " Morgan §36 (emphasis added).

For example, "one of the fundamental powers of a sovereign state, the responsibility for external security and defense, is denied the PA and expressly vested in Israel." Morgan §37. The IA explicitly provides that:

> Israel shall continue to carry the responsibility for defense against external threats, including the responsibility for protecting the Egyptian and Jordanian borders, and for defense against external threats from the sea and from the air . . . and will have all the powers to take the steps necessary to meet this responsibility.

Article XII(1). [30]

Likewise, another "related prerogative of sovereignty, control over airspace,[31] is expressly denied the PA." Morgan §39. The IA leaves Israel in exclusive control of the airspace above the PA:

> All aviation activity or use of the airspace by any aerial vehicle in the West Bank and Gaza Strip shall require prior approval of Israel. It shall be subject to Israeli air traffic control including, inter alia, monitoring and regulation of air routes . . .

Article XIII(4).

Similarly, in accordance with its exclusive authority over external security, Israel retains responsibility for maritime safety and security off the Gaza coast[32] and for security at border

---

[30] <u>See</u> <u>also</u> Annex II of the Agreed Minutes to the DOP, which provides that "*It is understood that, subsequent to the Israeli withdrawal, Israel will continue to be responsible for external security,*" and DOP, Annex II, which provides that Israel remains responsible for defending against external threats.

[31] As Morgan notes, it is a principle of customary international law that "*every state has complete and exclusive sovereignty over the airspace above its territory.*" (citing Chicago Convention on International Aviation, 15 U.N.T.S. 295 (1944), §1, and <u>Case Concerning Military and Paramilitary Activities in and against Nicaragua (Nicaragua v. U.S.)</u> 1986 I.C.J. 14, 111).

[32] Security Annex, Article XIV. Israeli vessels are also permitted to navigate freely through three maritime zones off the Gaza Coast.

crossings and terminals.[33]  Israel also reserves overall authority for internal security in Area B.[34] Morgan §40.

Moreover, "internally, even in its area of maximum authority, the PA does not have jurisdiction or authority over all persons present in its territory.  The PA has no security or law-enforcement jurisdiction whatsoever over Israeli citizens present anywhere in the territory of the PA."[35]  Furthermore, the PA has almost no civil authority over Israeli citizens even in Area A, where it exercises its maximal authority.[36]

As Morgan notes,

> Under governing principles of international law, every sovereign state has the capacity to define its own nationality rules . . . The authority over nationality, residency, and immigration is, simply put, a basic prerogative of sovereignty.

Morgan §43 (citing cases).

Yet, under the IA, permanent residency in any areas of the PA may only be granted to specified categories of persons and only "*with the prior approval of Israel*."[37]  Thus, the PA lacks the legal authority to grant permanent residency status anywhere within its territory.

---

[33] Security Annex, Articles VIII(2)(b)(1) and VIII(2)(b)(2); Security Annex, Appendix 5, Section C(1).

[34] Article XIII(2)(a); Security Annex, Article V(3).

[35] Morgan §41,  citing Article XI(4) of the IA Security Annex: "*Israelis shall under no circumstances be apprehended or placed in custody or prison by Palestinian authorities;*" "*vehicles bearing Israeli license plates shall not be stopped except for identification, which shall be conducted by a joint [Israeli-Palestinian] patrol;*" " . . . *Israeli military forces, and vehicles of the Israeli military forces, shall not be stopped by the Palestinian Police in any circumstances, and shall not be subject to any identification requirements.*"  and IA Articles X(4), XII, XIII(2)(a).

[36] See Morgan §41.  See also Legal Annex, Article III(2) (limiting the PA's civil jurisdiction in civil actions to which an Israeli is a party and providing when an Israeli citizen is a defendant in a civil action, the courts of the PA lack jurisdiction unless the Israeli defendant consents thereto in writing).

[37] IA, Civil Affairs Annex, Appendix 1, Article 28(11).

Similarly, persons seeking to visit areas of the West Bank and Gaza Strip under PA jurisdiction must obtain permission from Israel,[38] and Israel may refuse permission to anyone who is not already a legal resident of the West Bank or Gaza.[39]

Finally, and perhaps most significantly, IA, Article XVIII(4)a provides that:

> Legislation which exceeds the jurisdiction of the Council or which is otherwise inconsistent with the provisions of the DOP, this Agreement, or of any agreement that may be reached between the two sides during the interim period, shall have no effect and shall be void ab initio.

This provision "expressly restricts the <u>legislative capacity</u> of the PA [and] gives clear, frank and direct expression to the limited and non-sovereign legal capacity and status of the PA."  Morgan §45.[40]

There is no question therefore, in the face of the substance and extent of the limitations on its powers and authority, discussed above, that "the PA does not possess the independent control which is a *sine qua non* of statehood."  Morgan §46.

This analysis of the PA's limited authority has been previously presented, and the identical conclusion drawn, by Watson:

> Even after the Interim Agreement, Israel retained 'residual powers' not exercised by the PA; in the words of the Agreement, 'Israel shall continue to exercise powers and responsibilities not . . . transferred' to the Palestinian Legislative Council. Likewise, the Interim Agreement and other Oslo Accords assert that the 'status' of the territories 'will be preserved during the interim period.'

---

[38] Id., Article 28(13).

[39] IA, Security Annex, Article VIII(3)(f): " . . . each side will have the authority to deny the entry of persons who are not residents of the West Bank and the Gaza Strip."

[40] Morgan notes, too, that the agreements "also control various aspects of the PA's economy. See e.g., in Annex V of the IA: Article III(2) and (10) (import and customs policy, restricted goods); Article III(14) (Israeli customs officials controls); Article IV(10) (Israeli Shekel set as official currency,); Article VIII (restrictions regarding transport of livestock); Article XI (restrictions on the insurance industry). These provisions are inconsistent [with] the PA exercising the control of a sovereign state."  Id.

In more concrete ways, the Gaza-Jericho Agreement and Interim Agreement ensured a continuing and important role for Israel in the 'control' of PA-administered areas. One striking example is law enforcement. The PA lacks criminal jurisdiction over offences committed in the PA's territory by Israelis. Israel retained criminal and, in many cases, civil jurisdiction over Israelis in the PA's territories; indeed, Palestinian authorities even lack the authority to 'arrest Israelis or place them in custody,' though PA police may 'detain' Israeli suspects 'in place' until Israeli police arrive.  As a leading Palestinian lawyer has observed, 'the security arrangements agreed upon substantially limit the jurisdiction of the Palestinian Council in all respects including in Area A,' the area of maximal Palestinian authority.  These examples can be multiplied to include Israeli authority over PA airspace and sea-lanes, Israeli regulation of safe passage between the West Bank and the Gaza Strip, <u>and other Israeli authority over internal matters that no true state would cede to another</u>.  These examples raise continued doubts about any claim that the PA satisfies the requirement that a state be in 'control' of its territory . . .

Watson, pp. 69-71 (footnotes omitted, emphasis added).

The most commonly accepted definition of statehood includes four elements: (1) a defined territory, (2) a permanent population, (3) a government in control of that territory, and (4) the capacity to engage in foreign relations. As of now elements (3) and (4) are both in doubt.  As to element (3), <u>the PA does not have unfettered control over any of its territory, even in Area A, since Israel retains responsibility for borders and external security even as to that Area</u>. As to element (4), the PA now plainly lacks the capacity to engage in foreign relations, since the Oslo Accords forbid it to do so except for certain limited purposes.

Watson, p. 250 (footnotes omitted, emphasis added).

The former PLO legal advisor reached the same conclusion:

[T]he interim character and extraordinarily limited powers of the PA make it impossible to characterize that body as the "effective government" of the OPT.[41]

Dajani, p. 86.

---

[41] Acronym for "Occupied Palestinian Territories," the author's term for the West Bank and Gaza.

In sum then, the PA exercises only limited, municipal authority that does not meet the sovereign and independent governmental control sufficient for statehood.

Indeed, in a formal brief submitted in proceedings before the International Court of Justice (ICJ),[42] the PLO explicitly admitted that the limited municipal authority granted to the PA under the Oslo Accords does not even approach sovereign control, and that this grant of administrative authority did not change the legal status of the West Bank and Gaza:

> During [the 1967] armed conflict Israeli armed forces invaded and occupied, <u>inter</u> <u>alia</u>, the West Bank and the Gaza Strip . . .
>
> The proper characterization of <u>Israel's current status</u> in respect of this territory remains that of an occupier . . . <u>the essential test is one of actual overall control. It does not matter that day-to-day administration may be exercised by local authorities</u>. Territory once occupied remains occupied until a definitive withdrawal from that territory, or a definitive, internationally acceptable settlement. <u>Neither of these events has occurred</u>.

"Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory (Request for an Advisory Opinion) Written Statement Submitted by Palestine"[43] to the ICJ, January 30, 2004, p. 156 (emphasis added).[44]

The PLO emphasized similarly,

---

[42] The proceedings were in the matter of a request by the UN General Assembly for an advisory opinion regarding the "Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory."

[43] The PLO was granted observer status at the UN in 1974. In 1988, the UN General Assembly decided that "*effective as of 15 December 1988, the designation 'Palestine' should be used in place of the designation 'Palestine Liberation Organization' in the United Nations system.*" A/RES/43/177.

However, this change in nomenclature was made "*without prejudice to the observer status and functions of the Palestine Liberation Organization within the United Nations system.*" <u>Id</u>.

In other words, the term "Palestine" in the UN system is a synonym for the PLO and thus the submission to the ICJ by "Palestine" was made by the PLO.

[44] The PLO's 411-page brief is published on the ICJ's website and is available at: <u>http://www.icj-cij.org/icjwww/idocket/imwp/imwpframe.htm</u> at "Written Statements" and "Palestine".

Israel remains in occupation of the West Bank including East
Jerusalem, and the Gaza Strip.  While there has been <u>a partial transfer
of certain powers and responsibilities</u> from Israel to the Palestinian
Authority (the precise features of which need not be examined by the
Court) in respect of some parts of Palestinian territory, <u>Israel remains
in overall control of the Occupied Palestinian Territory</u>, including
East Jerusalem.

<u>Id</u>. at p. 165 (emphasis added).[45]

Likewise, the PLO's brief cites with full approval the conclusion of the UN Special
Rapporteur on the Occupied Palestinian Territory that:  "*The Oslo Accords leave <u>Israel</u> with <u>the ultimate
legal control</u> over <u>all of the OPT</u>*."  <u>Id</u>. (emphasis added).

Thus, defendants admit that the Oslo Accords have effected no legal change in the status of
the West Bank and Gaza, that the PA exercises only limited local authority and that Israel—and not
the PA or a "State of Palestine" – retains "ultimate legal control" over these areas.

Accordingly, faced with these insurmountable facts, defendants' Brief <u>openly concedes that
the PA lacks the sovereign authority</u> required for statehood under the Restatement, and blames this
lack of authority (a) on provisions of the Oslo Accords that "*impose limitations on Palestine that may
appear inconsistent with full sovereignty*" (Defs. Memo at 33) and (b) on Israel's "*illegal military occupation*"
which has prevented "Palestine" from exercising its "*right of statehood*" (Defs. Memo at 27) and is the
cause of the "*limitations and restrictions on the functioning of the Palestinian government to which plaintiffs might
point to argue that Palestine fails to meet the governance element or other aspects of the Restatement's definition of a
state.*" (Defs. Memo at 32-33).

Defendants urge the Court to recognize Palestinian statehood, despite these fatal limitations
on the authority of the PA, on two grounds:

---

[45] The PLO defines the term "Occupied Palestinian Territory" as used in its statement as "the Palestinian territory
of the West Bank, including East Jerusalem, and the Gaza Strip occupied by Israel since 1967 . . . "  <u>Id</u>. at p. 7.

First, defendants urge the Court to disregard the Oslo Accords, which they label "*minor and coerced agreements*" (Defs. Memo at 27), because the "*inherently coercive conditions under which Palestinians negotiated . . . diminish any effect these provisions might possibly have on Palestine's statehood. . . .*" (Defs. Memo at 33).

This argument is preposterous: these "minor" agreements—the Oslo Accords—are the PA's constituent instruments without which it would not exist nor exercise any powers at all.  Defendants do not explain why the Court should favor the provisions of Oslo that <u>grant</u> the PA power, and disregard those provisions that <u>limit</u> its powers.  Moreover, "[t]here is no question that the provisions of the Oslo Accords are binding . . . "  <u>See</u> Exhibit U, Supplemental Affidavit of Prof. Morgan, §5 fn. 1, citing Watson (hereinafter "Supp. Morgan").

Next, defendants argue that the PA's inability to meet the "sovereign control" predicate of statehood is of no account, because Israel illegally prevents the PA from exercising such control. (Defs. Memo at 27).  Essentially, defendants ask the Court to waive the sovereign control requirement and to rule that a State of Palestine has come into existence in the West Bank and Gaza despite the continued Israeli military occupation of these areas.  Defendants purport to base this claim on the rule (set out in the Notes to Restatement §201) that military occupation does not extinguish the pre-existing statehood of the occupied state:

> Military occupation, whether during war or after an armistice, does not <u>terminate</u> statehood, e.g. Germany's occupation of European states during World War II, or the allies occupation of Germany and Japan after that war.

Reporters' Notes, 3, <u>Military Occupation</u>, Restatement §201 (emphasis added).

Defendants raised this same argument in <u>Ungar</u> and it was soundly refuted by the Ungars' expert, Professor Morgan:

> Both the language of the Note (" . . . *terminate statehood* . . . "), and the examples cited therein, make perfectly clear that this rule serves only to <u>preserve</u> the statehood of an occupied nation.  This rule therefore

43

> has nothing to do with the <u>initial creation or establishment of new states</u>. Prior to their capture by Israel in 1967, the West Bank and Gaza Strip were held by Jordan and Egypt, respectively, and no PLO state or Palestinian state ever existed in these areas. Therefore, this rule is completely inapposite to Israel's capture and control of these areas: there simply never was any Palestinian statehood to preserve from "termination."

Supp. Morgan pp.11-2.

Judge Marrero rejected the identical argument in <u>Knox</u>:

> Defendants <u>do not dispute any of these limitations on the PA's control</u>, except to point out that they are the result of Israel's illegal and oppressive occupation. It is true that belligerent occupation does not affect the continuity of the state . . . However, the predicate for this principle is that a sovereign entity satisfying all of the prerequisites for statehood <u>existed prior</u> to the occupation . . . it would be anomalous indeed to hold that a state may achieve sufficient independence and statehood in the first instance while subject to and laboring under the hostile military occupation of a separate sovereign.

<u>Knox</u>, 306 F. Supp.2d at 437 (emphasis added).

Moreover, defendants' demand that this Court recognize their "statehood" is really a demand that this Court abrogate the Oslo Accords. The Accords provide that the parties "view the West Bank and Gaza Strip as a single territorial unit, the integrity and status of which will be preserved during the interim period" (IA, Article XXXI(8)), and that "Neither side shall initiate or take any step that will change the status of the West Bank and the Gaza Strip pending the outcome of the permanent status negotiations." <u>Id</u>. at XXXI(7).

Thus, as Watson explains, "the question of Palestinian statehood is the quintessential 'permanent status' issue" that the PLO itself has agreed to defer "pending the outcome of the permanent status negotiations" on the West Bank and Gaza. Watson at 25.

In conclusion – and as defendants themselves recognize – neither the PA nor any other Palestinian entity exercises the sovereign control necessary for statehood, and there is no Palestinian state.

### c.    The PA Lacks Capacity to Conduct Foreign Relations

Restatement §201 provides that "*a state is an entity that . . . engages in, or has the capacity to engage in, formal relations with other such entities.*"

Section 201 at Comment (e) states that:

> An entity is not a state unless it has <u>competence, within its own constitutional system</u>, to conduct international relations with other states, as well as the political, technical, and financial capabilities to do so.

(emphasis added).

In other words, "an entity that is denied the capacity to engage in foreign relations by its own 'constitutional system' is by definition not a state."  Morgan §24.[46]

Among the powers <u>expressly denied</u> the PA by both the DOP and the IA is the capacity to conduct foreign relations:

(a) DOP Annex II, Article 3(b) excludes foreign relations from the powers of the PA;

(b) IA, Article IX (5), prescribing the powers and capacities of the PA, provides:

> In accordance with the DOP, the Council will not have powers and responsibilities in the sphere of foreign relations, which sphere includes the establishment abroad of embassies, consulates or other types of foreign missions and posts or permitting their establishment in the West Bank or the Gaza Strip, the appointment of or admission of diplomatic and consular staff, and the exercise of diplomatic functions.

(c) IA, Article XVII(1)(a) states clearly that the authority of the PA excludes foreign relations, and that the matter of foreign relations is reserved for future negotiations on a permanent status arrangement.

---

[46]Citing Crawford, <u>The Creation of States in International Law</u> 47 (1979) ("Crawford").  Defendants also agree that this criterion requires the "*<u>capacity</u> to conduct foreign relations.*"  Defs. Memo at 30 (emphasis added).

Thus, the instruments which constitute the PA and control its authority and capacities (i.e. its "*constitutional system*") expressly deny it the capacity to engage in foreign relations.[47]   This is expressly recognized by public international law scholars such as Professor Watson:

> The Interim Agreement starkly forbids the PA to engage in even the most fundamental aspect of foreign relations, the establishment of diplomatic relations via embassies and consulates.   This type of limitation is obviously inconsistent with the suggestion that the PA now has the 'capacity to engage in foreign relations.'

Watson, p. 71 (footnote omitted).

Defendants also concede, as they must in light of the above, that the "*Oslo Accords prohibit the Palestine Authority from engaging in relations with other states.*"  Defs. Memo at 30.

Indeed, as noted above, the defendants recently expressly informed another federal court that, "The Palestinian Authority … is specifically prohibited by its founding charter from engaging in foreign relations … ".  Exhibit C, at 1-2.

Therefore, as Morgan concludes: "Since the PA constitutionally lacks the capacity to conduct foreign relations, it is not and cannot be a state."  Morgan §27.  Watson agrees: "*statehood includes . . . the capacity to engage in foreign relations  . . . the PA now plainly lacks the capacity to engage in foreign relations . . .*"  Watson, p. 250.

---

[47]The express limitation on the PA's capacity to conduct foreign relations "was the deliberate product of intensive negotiations between Israel and the PLO." Morgan §28 fn. 19 (citing a chief draftsman of the Oslo Accords, in Singer, "Aspects of Foreign Relations Under the Israel-Palestinian Agreements On Interim Self-Government Arrangements For the West Bank and Gaza," 28 Israel Law Review Nos. 2-3 (1994), p. 283; Singer, "The West Bank and Gaza Strip: Phase Two," Justice, No. 7 (1995) p. 13).

Even more significantly, "[T]he Oslo Accords deny the PA the capacity to conduct foreign relations with the specific intention of preventing the PA from achieving (or claiming) state status." Id. (emphasis added).

The former PLO legal advisor concurs with Morgan:

> Through these provisions [that negate the PA's capacity to conduct foreign relations] the IA expressly disallows the PA from participating in the international process in any way that could influence its international status.

Dajani, p. 68 (emphasis added).

Hence, the PA does not engage in foreign relations because it lacks the constitutional capacity to do so, and it is therefore not a sovereign state.[48]

### d.    Lack of a "Defined Territory"

Restatement §201 provides that a state must have a "defined territory" under its control. As discussed, neither the PA—nor any other Palestinian entity—enjoys sovereign control anywhere in the West Bank or Gaza Strip. Therefore, the PA

> cannot meet this criterion [of defined territory] since it does not have sovereign control over <u>any</u> area. Without any territory under its control, the PA cannot be said to have "defined territory."

Morgan, §51.

Dajani reaches the very same conclusion:

> [T]he defined-territory criterion does not require the legal demarcation of a state's boundaries. Indeed, the international community has on several occasions extended recognition to states whose territorial borders remained in dispute. What appears central, instead, is the putative state's exercise of independent governmental authority over a territory.

> It is in that last respect that <u>Palestine, as presently constituted, fails to meet the defined territory criterion</u> . . .

---

[48] Morgan points out that,

> Since the PA lacks the capacity to conduct foreign relations, any attempt by the PA to purport to engage in foreign relations would be <u>ultra</u> <u>vires</u> its own constitutional powers . . . and would therefore be void ab initio."

Morgan §28, fn. 19.

Moreover,

> In fact, since its establishment, the PA has avoided engaging in foreign relations. As noted, the parties to the Oslo Accords are Israel and the <u>PLO</u>. Mahmoud Abbas, who serves as Secretary-General of the PLO Executive Committee as well as Head of the Negotiations Affairs Department of the PLO, negotiated and signed both the DOP and the Interim Agreement "*for the PLO*." <u>Id</u>., signature pages.

<u>Id</u>.

What is an impediment is the fact that <u>a Palestinian government does not yet exercise independent authority over a defined territory</u>. As discussed above, agreements between Israel and the PLO severely limit the territorial, functional, and personal jurisdiction of the PA. While the PA has significant municipal authority over areas of the OPT[49] it does not possess sovereignty over them in any practical sense. Israel retains authority to review all legislation governing the administration of the territories, it has personal jurisdiction over all Israelis in the territories, it exercises control over most aspects of economic development and security in the territories, and it continues to regulate movement between the Palestinian administrative enclaves. As a result, <u>it cannot be said that a Palestinian government exercises independent authority over any territory at all</u>.

Dajani, pp. 83-84 (emphasis added).

The PA fails to meet the "defined territory" criterion for an additional reason. While this criterion can be satisfied even when the precise borders of a state have not been finally set, "nevertheless, when the doubts as to the future frontiers are of a serious nature, statehood becomes in doubt." Morgan, §52.[50] The IA expressly provides that the territorial borders of the PA's jurisdiction will remain undefined until a final status agreement is achieved, as these boundaries are subject to change through future Israeli redeployments.[51] Therefore, Morgan concludes, "the territory of the PA is intentionally 'defined as undefined' and cannot meet this criterion of statehood." <u>Id</u>.

In conclusion, neither the PA, nor any alleged "State of Palestine," has a "defined territory" within the meaning of §201.[52]

---

[49] Acronym for "Occupied Palestinian Territories," the author's term for the West Bank and Gaza.

[50] Citing Lauterpacht, <u>Recognition in International Law</u> 30 (1947) (quotation marks and brackets omitted).

[51] IA, Article XXXI(5); Article XI. <u>See also</u> Article V(3) of the DOP.

[52] Defendants argue at length that the territory of the purported "State of Palestine" is "*established by S.C. Res. 242 (1967) which fixes the boundary between Israel and Palestine*" as the pre-1967 armistice line and that "*Every action by the United Nations since 1967 has recognized the "Territory of Palestine" as defined in S.C. Res. 242.*" Defs. Memo at 17, and generally at 12-14.

### e.    Lack of a "Permanent Population"

Foreign states within the meaning of the FSIA are limited to entities that have a "permanent population" under their sovereign governmental control.  Restatement §201; Klinghoffer, 937 F.2d at 47.  However, neither the PA nor any other Palestinian entity exercises effective and independent governmental control over a defined territory.  An entity that "does not have a defined territory" under its sovereign control "cannot have a permanent population" within the meaning of §201.  Id. at 47-48.  For this reason as well, no "State of Palestine" exists.[53]

---

This claim has no support whatsoever in the record and is blatantly false. Resolution 242 contains no mention of the "Territory of Palestine" and moreover,

> Resolution 242 . . . made no specific reference to the Palestinians except insofar as it affirmed the necessity of "achieving a just settlement of the refugee problem" . . . it made no reference to a Palestinian role in the peace process or to Palestinian national rights.

Dajani at 42. Building on this fiction, defendants also claim that "*Every negotiated agreement between Israel and Palestine since 1967 has recognized the binding nature of S.C. Res. 242 which defines the territory of Palestine*" (Defs. Memo at 18) and that "*Palestine and Israel have recognized and formally agreed in all the key negotiations for peace since 1967 that the boundary fixed by S.C. Res. 242 is the boundary between the two states. Israel has never claimed sovereignty over occupied Palestine.*" (Defs. Memo at 13).

These claims are also unsupported by the record and false.  Israel has never "recognized" the "territory of Palestine" much less a Palestinian "state:"

> The agreements concluded between the PLO and Israel pursuant to the DOP are silent with regard to Palestinian self-determination.  The U.N. Security Council resolutions to which the agreements refer make no direct reference to the issue of self-determination or even name the Palestinian people . . .

Dajani at 45.  Morgan also notes that, "Under the Oslo Accords, both the Palestinians and the Israelis are free to seek sovereignty in the West Bank and Gaza as an future goal, i.e. as the ultimate outcome of the negotiations on the permanent status of these areas," and cites IA Article XXXI(6) which provides that "*Nothing in this Agreement shall prejudice or preempt the outcome of the negotiations on the permanent status to be conducted pursuant to the DOP. Neither Party shall be deemed, by virtue of having entered into this Agreement, to have renounced or waived any of its existing rights, claims or positions.*" Supp. Morgan pp. 13-14.  Thus, defendants' assertion that Israel has waived any claim to sovereignty over these areas is untrue.  As Morgan points out, Israel's own position it that it "*has a claim to sovereignty over these areas.*" Supp. Morgan pp. 13-14.

In any case, since no Palestinian government has sovereign control over any part of the West Bank and Gaza, defendants' "defined territory" arguments are irrelevant.

[53] Defendants argue that this criterion of statehood is met by the millions of Palestinians living the West Bank, Gaza and East Jerusalem.  Defs Memo at 18-19.

4.    **The PLO Does Not Meet Any Criterion of Statehood**

Klinghoffer established that the PLO meets none of the criteria of statehood and "[t]here has been no change in circumstances that would alter or affect that holding."  Morgan, §54.  Indeed, the PLO's former legal advisor emphasizes that: "*[N]either the establishment of the 'State of Palestine' in 1988 or the PA in 1994 has altered the PLO's international role and status . . .*".  Dajani, p. 57.

The powers and authorities created under the Oslo Accords were granted to the PA, not to the PLO.  As discussed, *supra*, the powers exercised by the PA do not even approximate the independent control required for statehood.  Thus,

> [E]ven if the PLO would claim to exercise some vicarious and indirect authority in the West Bank and Gaza through its relationship with the PA, this indirect authority would necessarily be no greater than that enjoyed by the PA itself – which fails to meet the requirements of statehood.

Morgan, §56.  In other words, the PA's lack of sovereign control over any territory applies a fortiori to the PLO.

Moreover, as discussed *supra* regarding the PA, without sovereign control over any territory, the PLO necessarily lacks a "defined territory" and a "permanent population" within the meaning of §201.

Indeed, defendants do not even assert that the PLO has a "defined territory" or "permanent population" under its "sovereign control."  Rather, defendants' sole claim regarding the PLO is that it conducts and has the capacity to conduct "foreign relations" on behalf of "Palestine."  (Defs. Memo at 27-31).

This claim is meritless for several reasons:

---

Defendants miss the point: the existence of a permanent population in the geographical region known (inter alia) as "Palestine" is irrelevant, since neither the PA, the PLO, nor a purported "State of Palestine" has sovereign control over that population.

First, "capacity" to conduct foreign relations within the meaning of §201 requires "*legal competence to participate in the international process <u>and to carry its international obligations into effect on the domestic level</u> . . . the foreign relations requirement is essentially a synthesis of the government and independence criteria . . .*" Dajani at 86 (emphasis added) (citing Crawford).

The PLO's lack of governmental control is precisely the reason that <u>Klinghoffer</u> held that it does not have the capacity to engage in foreign relations:

> [D]espite the fact that some countries have 'recognized' the PLO, the PLO does not have the capacity to enter into <u>genuine formal relations</u> with other nations. This is true primarily because, <u>without a defined territory under unified governmental control, the PLO lacks the ability actually to implement the obligations that normally accompany formal participation in the international community</u>.

<u>Klinghoffer</u>, 937 F.2d at 48 (emphasis added).

This holding remains completely valid today, after the establishment of the PA, because the Oslo Accords granted no governmental authority to the PLO and it therefore remains "without a defined territory under unified governmental control" and so "lacks the ability actually to implement the obligations that normally accompany formal participation in the international community." <u>Id</u>.

As Dajani states:

> Although the PLO has demonstrated its capacity to enter into foreign relations on behalf of the <u>Palestinian people</u>, the <u>legal and functional separation of the PLO and the PA prevent the PLO from independently implementing international obligations in the territory</u> and with regard to the population of Palestine.

Dajani, p. 87 (emphasis added).

> The creation of the PA has not . . . altered the international status of the PLO or, more broadly, of Palestine . . . The legal and functional separation of the PLO and the PA erected by the DOP and subsequent agreements maintains the independence of the PLO, despite Israeli control of the O[ccupied] P[alestinian] T[erritories]. It also serves, however, as a barricade against changes in the status of either public body: it denies the PLO effective authority over the territory it claims for the Palestinians, and it denies the PA

> independence and access to the international decision-making
> process.

Dajani, p. 91.

Thus, the PLO "lacks the legal capacity to '*carry its international obligations into effect*' in the West Bank and Gaza, since the PLO is not empowered to exercise any governmental authority in these areas." Morgan, §58.

Secondly, the PLO's claim to conduct "foreign relations" is precluded by the Oslo Accords themselves. Article IX(5) of the IA restricts the international activities of the PLO to making international agreements in several limited spheres (specified economic matters, culture, science and education), and expressly provides that these limited dealings "shall not be considered foreign relations."

Incredibly, defendants demand that the Court simply ignore these express provisions of the Oslo Accords (which collapse their "foreign relations" argument) since they "are at most contracts which can be rescinded." (Defs. Memo at 30). This argument is absurd: the PLO itself agreed to these provisions and "[t]here is no question that the provisions of the Oslo Accords are binding . . . ". Supp. Morgan, p1. n. 1, citing Watson.

Moreover, under the accepted criteria of statehood, a state must have the "*capacity* to enter into the full range of international relations . . . " Crawford at 47 (underline added). But Article IX(5) authorizes the PLO to enter agreements only in an extremely limited number of areas which are light years from "the full range of international relations" required for statehood. Therefore, as Morgan explains, the provision stating that these limited dealings are not foreign relations,

> does not (merely) enshrine an agreement between the PLO and Israel
> about how to define the substantive nature of this limited power, but
> rather adopts into the Oslo Accords the objective legal status of this
> power.

Supp. Morgan §41.[54]

Finally, defendants argue that a state that voluntarily delegates its foreign affairs authority to another state does not cease being a state.  Defs. Memo at 30.

As Morgan explains in detail, this doctrine is irrelevant to the PA and PLO since "the existence of statehood is a <u>condition precedent</u> of the delegation of foreign relations authority . . . because the capacity to conduct foreign relations is a  'consequence' of statehood that is 'a conflation of the requirements of government and independence.'"  Supp. Morgan p. 15, fn. 15 (citing Restatement §201 Note 4 and Crawford at 47-48).

Thus, the "question is whether the entity in question willfully delegated the foreign affairs powers it otherwise possessed, or contrarily, whether it never possessed those powers in the first place . . . Since no Palestinian state has ever arisen, neither the PLO nor the PA has ever possessed any 'foreign relations capacity' to delegate in the first place."  (<u>Id</u>. noting that Watson has also addressed and rejected this same argument).

## 5.    The Overwhelming Scholarly Consensus Confirms and Defendants Themselves Admit That No Palestinian State Exists

Numerous scholars of international law have examined the status of the PA and PLO in light of the Restatement criteria and the Oslo Accords and reached the unequivocal conclusion that neither is a state.

---

[54]Morgan further explains that: "non-state entities are commonly granted a degree of limited power to make international agreements, and '[s]uch treaty making power is most often restricted to economic, cultural, social, and similar matters . . . '" (quoting Hannum and Lillich, 'The Concept of Autonomy in International Law,' 74 Am. J. Int'l L. 858 (1980)) Supp. Morgan §40.

Thus, Morgan points out, "the enumerated spheres in which the PLO is authorized to conclude agreements (i.e. economic, cultural, scientific and educational matters) conform perfectly with the international practice regarding <u>non-state</u> entities." <u>Id</u>.

<u>See</u> <u>also</u> Harris, *Cases and Materials on International Law* 144 (5th ed.) (identifying the PLO as a non-state entity, able to sign agreements and to join international organizations despite its lack of sovereign state status).

Thus, Watson, author of the most comprehensive legal study of the Oslo Accords published to date, concluded after a lengthy analysis of the PLO and PA in light of the Restatement criteria that, "*neither the PLO nor the PA has yet acquired statehood.*"[55]

Likewise, former PLO legal advisor Dajani published a thorough academic study of the legal status of the PLO and PA. Applying the Restatement's criteria for statehood, he unequivocally found, inter alia, that "*neither the establishment of the 'State of Palestine' in 1988 or the PA in 1994 has altered the PLO's international role and status,*"[56] that "*the creation of the PA has not . . . altered the international status of the PLO or, more broadly, of Palestine,*"[57] and that "*the interim character and extraordinarily limited powers of the PA make it impossible to characterize that body as the 'effective government' of*" the West Bank and Gaza.[58]

Similarly, Professor Adrien Wing of the University of Iowa, a former PA legal consultant,[59] has repeatedly stated that, "*Palestine is not a state and may not become a state,*"[60] that "*no independent nation called Palestine currently exists,*"[61] and that the PA "*is still not a country, but rather an autonomous entity . . .*"[62]

Professor George Bisharat of Hastings College of Law, another PA legal consultant,[63] is equally absolute: "*Clearly, neither Oslo I* [the DOP] *nor Oslo II* [the Interim Agreement] *awarded*

---

[55] Id. at 68.

[56] Dajani at 57.

[57] Id. at 91.

[58] Id. at 86.

[59] See "Remarks by Adrien K. Wing," 93 ASIL Proc. 214, 241 (2000) ("Remarks") and Wing "The Palestinian Basic Law: Embryonic Constitutionalism," 31 Case W. Res. J. Int'l L. 383, 385 (1999) ("Wing").

[60] Wing at 411.

[61] Wing, "Reno v. American-Arab Anti-Discrimination Committee: A Critical Race Perspective," 31 Colum. Human Rights L. Rev. 561, 574 (2000).

[62] "Remarks" at 242.

[63] Bisharat was a PA legislative consultant in the late 1990s. See Bisharat, "Peace and the Political Imperative of Legal Reform In Palestine," 31 Case W. Res. J. Int'l L. 253, 255 (1999).

*sovereignty over the West Bank and Gaza Strip to the Palestinians.*"[64]  Likewise: "*the P.A. is not a state, it is ineligible to become a party to international agreements . . .*"[65]

The UN Commission on Human Rights is also of the opinion that, "*Palestine . . . still falls short of the accepted criteria of statehood.*" [66]

Last but not least, in oral arguments in the proceedings before the ICJ, the PLO representative expressly admitted that no Palestinian state exists:

> [T]he United Nations has a permanent responsibility . . . for the question of Palestine until the question is resolved in all its aspects . . . It is, after all, the General Assembly that, in accordance with the Charter of the United Nations, dealt with mandated Palestine, deciding on 29 November 1947, in resolution 181 (II), to partition Palestine into two States, one Jewish and one Arab.  <u>The Arab State has, of course, not yet been realized; and thus the Palestinian people have been unable to exercise their right to self-determination.</u>[67]

This crystal-clear admission that no Palestinian state exists was delivered by PLO representative Nasser Al-Kidwa, whose affidavit forms the backbone of the defendants' motion. (see Defendants' Exhibit 1).  Al-Kidwa's ICJ statement impeaches his sworn affidavit and completely contradicts and collapses defendants' statehood and immunity claims.

The ICJ expressly confirmed that no Palestinian state exists:

> The Court considers that it has a duty to draw the attention of the General Assembly . . . to the need for these efforts [at negotiations] to be encouraged with a view to <u>achieving as soon as possible . . . the establishment of a Palestinian State . . .</u>

---

[64] <u>Id</u>. at 260.

[65] <u>Id</u>. at fn. 33.

[66] UN Commission on Human Rights, Question of the Violation of Human Rights in the Occupied Arab Territories, Including Palestine - Report of the Human Rights Inquiry Commission Established Pursuant to Commission Resolution S-5/1 of 19 October 2000, U.N. ESCOR, 57th Sess., U.N. Doc. E/CN.4/2001/121 (2001).

[67] Verbatim Record of public sitting before the ICJ on February 23, 2004, Testimony of Nasser Al-Kidwa on behalf of the PLO at §6 (emphasis added), available on the website of the ICJ at http://www.icj-cij.org/icjwww/idocket/imwp/imwpframe.htm at "Oral Pleadings".

Advisory Opinion of the ICJ, "Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory" July 9, 2004, at §162 (emphasis added).[68]

**6.    Additionally, Defendants Cannot Assert a Sovereign Immunity Defense Because the Executive Branch Does Not Recognize Any Palestinian State**

As Judge Marrero of this court held in Knox, sovereign immunity is not available to entities not recognized as a "foreign state" by the Executive Branch of the United States.

> [E]ven if Defendants presented sufficient evidence that Palestine and the PA and PLO regime satisfy the criteria for statehood, this Court would decline to give effect to the foreign state and governmental immunities Defendants invoke as a shield from application of the Antiterrorism Act.
>
> ***
>
> A ruling by this Court construing the foreign state exception in the FSIA and ATA as giving warrant to Defendants' claims of jurisdictional immunity on the basis of Defendants' own assertion that they represent the sovereign nation and government of a purported state of Palestine would essentially imply a judicial validation of Defendants' claim of legitimacy as the sovereign and representatives of the people they purport to govern, and that Defendants are thus entitled to be accorded in this country legal privileges and protections that derive solely by virtue of the factual existence of that alleged sovereignty - the very assertion of legitimacy that United States foreign policy has deliberately denied or withheld. Consequently, such a ruling not only would have constitutive effect imbued with domestic legal consequences, but run directly counter to the executive branch's declared public policy of nonrecognition of Palestine and the PLO.

Knox, 306 F.Supp.2d at 444, 447.

Judge Marrero based this conclusion on an extraordinarily thorough analysis of the relevant authorities, see, id., 438-448, and it would be pointless and wasteful for the plaintiffs to recap his findings here.

---

[68] Published at http://www.icj-cij.org/icjwww/idocket/imwp/imwpframe.htm.

Rather, plaintiffs respectfully incorporate herein by reference all the authorities cited and the findings made by the <u>Knox</u> court, and for the reasons set forth therein request that this Court reject defendants' sovereign immunity defense on the additional ground that the Executive Branch does not recognize any Palestinian state.

## V.    THE TERRORIST ATTACKS COMPLAINED OF WERE NOT "ACTS OF WAR"

Section 2336(a) of the ATA provides that "No action shall be maintained under section 2333 of this title for injury or loss by reason of an act of war." 18 U.S.C. §2336(a).  The term "act of war" for the purposes of §2336(a) is defined in §2331 as follows:

> (4) the term "act of war" means any act occurring in the course of –
>
> (A)    declared war;
>
> (B)    armed conflict, whether or not war has been declared, between two or more nations; or
>
> (C)    armed conflict between military forces of any origin;

Defendants argue here, as they have done without success in several of the other ATA cases pending against them, that the terrorist attacks from which this action arises constituted "act[s] of war" and are therefore not actionable under §2333"  <u>See</u> Defs. Memo at 37-48.[69]

Defendants base this claim on the argument that the violence between Israelis and Palestinians in the West Bank and Gaza Strip constitutes "armed conflict" within the meaning of §2331(4).  <u>See</u> Defs. Memo at 39, 43 ("Bringing Israeli's illegal occupation of the Palestinian territories to an end — is widely recognized to be the primary Palestinian purpose … Ending an illegal belligerent occupation is an objective that is not within ATA sec. 2331's definition of

---

[69] Defendants assert that the bar set out in §2336(a) is jurisdictional, rather than an element of a claim under §2333. Defs Memo at 47-48.  Plaintiffs disagree, and maintain that §2336(a) merely limits the cause of action under §2333, and is not jurisdictional. However, the Court need not resolve this issue, because, as shown herein, §2336(a) is inapplicable to the terrorist attacks at issue here.

'international terrorism.'"; "the settlements and bypass roads [present a] provocation to violence … the Israeli settlements in the occupied Palestinian territories [are] 'the primary issue fueling the conflict between the two peoples.'") [70]

This claim fails, as a preliminary matter, because six of the seven terrorist attacks complained of occurred in West Jerusalem, an area which has been part of Israel since 1948, and has nothing to do with the occupation of the West Bank and Gaza Strip which began in 1967.[71]

Thus, defendants' entire argument here (the text of which appears to have been cut-and-pasted from briefs filed by defendants in ATA cases arising from terrorist attacks in the West Bank and Gaza) is nothing but a *non sequitur*.

Furthermore, as shown below, defendants' act of war argument fails because (a) conduct that violates the rules of armed conflict under international law cannot be considered an "act of war" within the meaning of § 2336(a) <u>as a matter of law</u> and (b) violent attacks on civilians, such as those complained of here, violate the rules of armed conflict recognized under international law.

A.    <u>Defendants Are Collaterally Estopped From Re-Litigating Their "Act of War" Argument</u>

Defendants PA and PLO are also defendants in another civil action brought under § 2333 of the ATA, <u>Klieman v. Palestinian Authority</u>, C.A. 04-1173 (PLF), pending in the United States District Court for the District of Columbia.

---

[70] Specifically, defendants rely on §2331(4)(C), which encompasses "*armed conflict between military forces of any origin*". <u>See</u> Defs. Memo at 38. Subsection 4(C) is the only prong of §2331(4) that defendant could even attempt to rely on, since no "*declared war*" within the meaning of §2331(4)(A) has existed in the West Bank or Gaza since the Six Day War of 1967, and the rejection of defendants' statehood claim (<u>see</u> Part IV above) per force disposes of any possibility that the hostilities between defendants and Israel constitute "*armed conflict . . . between two or more nations*" within the meaning of §2331(4)(B).

[71] The shooting attack on plaintiffs Varda and Joseph Guetta took place on a regular public highway traveled daily by thousands of Israelis and Palestinians, at a spot about three miles north of Jerusalem, in the West Bank. Defendants' operatives intentionally machine-gunned Mrs. Guetta and her 12 year-old son Joseph while they were traveling in their private family car on the way home from sports practice. If opening fire with an automatic weapon on a soccer mom and her child is not actionable under §2333, then nothing is.

Like the instant action, <u>Klieman</u> arises from a terrorist attack carried out by defendants' operatives in which American citizens were harmed. <u>See Klieman v. Palestinian Authority</u>, 424 F.Supp.2d 153 (D.D.C. 2006).

As in the instant action, the PA and PLO moved to dismiss the action in <u>Klieman</u> on the ground that the terrorist attack at issue constituted an "act of war" within the meaning of § 2336(a) of the FTA.

> [D]efendants contend that the acts alleged in the complaint are not subject to litigation in this Court because they constitute "acts of war" over which the ATA does not extend jurisdiction. Section 2336(a) of the ATA provides that "[n]o action shall be maintained under section 2333 of this title for injury or loss by reason of an act of war." Section 2331(4), in turn, defines "act of war" as "any act occurring in the course of-(A) declared war; (B) armed conflict, whether or not war has been declared, between two or more nations; or (C) armed conflict between military forces of any origin." Defendants limit their argument to Section 2331(4)(C) by asserting, essentially, that the alleged attack on the public transport bus was an act of war occurring in the course of armed conflict between military forces.

<u>Klieman</u>, 424 F.Supp.2d at 162-163 (citation omitted).

Rather than debate the defendants' claim that an "armed conflict" was in existence where the attack at issue took place (the West Bank), the <u>Klieman</u> plaintiffs urged the court to rule that as a matter of law, an attack on civilians cannot occur "in the course of" an armed conflict within the meaning of §§ 2331(4) and 2336(a):

> Plaintiffs' response is simple: "[A]s a matter of law, an attack on a civilian bus which results in the murder of one or more innocent civilians cannot be deemed to have occurred '*in the course of* ' war between nations or armed conflict within the meaning of § 2331." Pl. Opp'n at 26 (emphasis added) … [P]laintiffs argue that, in numerous other contexts, courts consistently have "interpreted the phrase 'in the course of' as a gatekeeper phrase that is intended to exclude as a matter of law a subset of conduct which-because of its nature and substance-deviates from and/or is insufficiently related to the general set of conduct governed by the provision in question." *Id.* at 19.

<u>Klieman</u>, 424 F.Supp.2d at 164.

After a detailed and thorough analysis, the <u>Klieman</u> court accepted this argument:

> The Court … concludes that the statutory phrase "in the course of" necessarily imposes limitations on what "acts" constitute "acts of war" within the meaning of Section 2333(a) – as defined in Section 2331(4). As a matter of law, an act that violates established norms of warfare and armed conflict under international law is not an act occurring in the course of armed conflict. An armed attack on a civilian bus, such as the one plaintiffs have alleged in the complaint, violates these established norms. *See Kadic v. Karadzic,* 70 F.3d 232, 242 (2d Cir. 1995) (violent acts against civilians, committed in the course of open hostilities, "long have been recognized in international law as violations of the law of war") (citing *In re Yamashita,* 327 U.S. 1, 14, 66 S.Ct. 340, 90 L.Ed. 499 (1946)); *Ahmad v. Wigen,* 726 F.Supp. at 409 (killing civilian on civilian bus "must be characterized as a random act of murderous terrorism, rather than a protected political offense").

<u>Klieman</u>, 424 F.Supp.2d at 166.

Thus, <u>Klieman</u> established <u>as a matter of law</u> that:

(1)     An "act that violates established norms of warfare and armed conflict under international law is not an act occurring in the course of armed conflict" within the meaning of 18 U.S.C. 2336(a); and

(2)     An armed attack on civilians violates these established norms of warfare and armed conflict under international law.

Therefore, since the instant action arises from violent attacks on civilians, <u>as a matter of law</u> those attacks did not occur "in the course of" an armed conflict within the meaning of §2336(a), even assuming purely *arguendo* that an armed conflict existed at the time and place that the attacks occurred.

Moreover, the holding in <u>Klieman</u> not only constitutes on-point precedent, it <u>collaterally estops</u> the PA and PLO from re-litigating their §2336(a) argument in this case.

Under the doctrine of collateral estoppel, a "final judgment on the merits in a prior suit precludes subsequent relitigation of issues actually litigated and determined in the prior suit,

regardless of whether the subsequent suit is based on the same cause of action." Next Wave Pers.

Communications, Inc. v. F.C.C., 254 F.3d 130, 147 (D.C. Cir. 2001) (internal citation and quotation

marks omitted), *aff'd,* 537 U.S. 293 (2003).

It is well established that collateral estoppel will arise from any conclusive decision, whether

or not that decision is a "final judgment" in the technical sense of the term:

> USPS alleges that it can be estopped from contending the facts as
> found by Judge Green only if those facts formed the predicate for a
> final judgment within the meaning of 28 U.S.C. § 1291. This
> contention is devoid of merit. "Under collateral estoppel, once an
> issue is actually and necessarily determined by a court of competent
> jurisdiction, that determination is conclusive …" *Montana v. U.S.*, 440
> U.S. 147, 153, 99 S. Ct. 970, 973, 59 L. Ed. 2d 210 (1979) . . . The
> finality requirement for collateral estoppel is not governed by 28
> U.S.C. § 1291. Rather, it is governed by a rule of reason. As Judge
> Friendly stated for the Second Circuit in *Lummus Co. v. Commonwealth
> Oil Refining Co.*, 297 F.2d 80, 89 (2d Cir. 1961), cert. denied, 368 U.S.
> 986, 82 S. Ct. 601, 7 L. Ed. 2d 524 (1962):
>
>> whether a judgment, not final in the sense of 28 U.S.C.
>> § 1291, ought nevertheless be considered "final" in the
>> sense of precluding litigation on the same issues, turns
>> upon such factors as the nature of the decision (i.e. that
>> it was not avowedly tentative), the adequacy of the
>> hearing, and the opportunity for review. "Finality" in
>> the context here relevant means little more than that the
>> litigation of a particular issue has reached such a stage
>> that a court sees no really good reason for permitting it
>> to be litigated again.
>
> The Second Circuit has consistently affirmed this approach. *See
> United States ex rel. DiGiangiemo v. Regan*, 528 F.2d 1262, 1265 (2d. Cir.
> 1975), cert. denied 426 U.S. 950, 96 S. Ct. 3172, 49 L. Ed. 2d 1187
> (1976), and it has been approved by three other circuits and the
> Restatement (Second) Judgments.

Donovan v. United States Postal Service, 530 F. Supp. 894, 898-899 (D.D.C. 1981). See also

Restatement (Second) of Judgments §13 ("for purposes of issue preclusion … 'final judgment'

includes any prior adjudication of an issue in another action that is determined to be sufficiently firm

to be accorded conclusive effect").

The exhaustive, treatise-like decision of the <u>Klieman</u> court was unequivocal, categorical and clearly intended to be finally dispositive of these defendants' argument under §2336(a). Thus, <u>Klieman</u> is "sufficiently firm to be accorded conclusive effect". Restatement (Second) of Judgments §13.

Collateral estoppel will apply when "(i) the issue previously adjudicated is identical with that now presented, (ii) that issue was actually litigated in the prior case, (iii) the previous determination of that issue was necessary to the end-decision then made, and (iv) the party precluded was fully represented in the prior action." <u>Thomas v. General Services Adman.,</u> 794 F.2d 661, 664 (Fed. Cir. 1986) (internal quotations omitted).

All of these conditions are met here. The issue adjudicated in <u>Klieman</u> – the proper construction of §2336(a) and whether it applies to attacks on civilians – is <u>identical</u> to that facing this Court.  Nor is there any doubt, as a reading of <u>Klieman</u> makes clear, that defendants §2336(a) argument was actually and thoroughly litigated before the <u>Klieman</u> court.  Additionally, in <u>Klieman</u> the disposition of the §2336(a) claim was necessary to the decision of that court to deny the motion to dismiss.  Finally, as the caption of the <u>Klieman</u> decision shows, the PA and PLO were fully represented in <u>Klieman</u> by the same capable and experienced counsel as represent them in the instant action.

Thus, all the conditions for collateral estoppel are met, the defendants are estopped from contesting the holding in <u>Klieman,</u> and the application of that holding in this action clearly establishes that the terrorist attacks on civilians from which this action arises are not "acts of war" within the meaning of §2336(a).

**B.      Alternatively, the Court Should Adopt the Holding in *Klieman* on the Merits**

Purely in the alternative, if the Court rejects plaintiffs' position that defendants are collaterally estopped making their "act of war" argument, the Court should adopt the holding in Klieman on the merits, for the reasons set forth below.

**1.      The "*In the Course Of*" Requirement**

As noted, §2336(a) provides that: "No action shall be maintained under section 2333 of this title for injury or loss by reason of an act of war," and §2331 defines the term "act of war" as follows:

> (4) the term "act of war" means any act occurring in the course of -
>
> (A)  declared war;
>
> (B)  armed conflict, whether or not war has been declared, between two or more nations; or
>
> (C)  armed conflict between military forces of any origin;

Thus, the terrorist attacks from which this action arises would be "act[s] of war" under §§ 2336 and 2331 only if:

> a)      At the time and place of each attack, there existed: "*declared war;*" or "*armed conflict . . . between two or more nations;*" or "*armed conflict between military forces of any origin*"; and
>
> b)      The terrorist attacks occurred "*in the course of*" such "war" or "armed conflict."

**2.      The Phrase "*In the Course Of*" Is a Gatekeeper Provision**

As noted, under §2331(4), "acts of war" include only acts "occurring in the course of" declared war or armed conflict. In numerous other contexts, the courts have consistently interpreted the phrase "in the course of" as a "gatekeeper" phrase that is intended to exclude as a matter of law a subset of conduct which—because of its nature and substance—deviates from and/or is insufficiently related to the general set of conduct governed by the provision in question.

Thus, for example, the Controlled Substance Act, which prohibits the distribution of narcotics, exempts a "practitioner" from its criminal provisions. 21 U.S.C. §829. The term "practitioner" is defined by the Act as:

> [A] physician, dentist, veterinarian, scientific investigator, pharmacy, hospital, or other person licensed, registered, or otherwise permitted, by the United States or the jurisdiction in which he practices or does research, to distribute, dispense, conduct research with respect to, administer, or use in teaching or chemical analysis, a controlled substance <u>in the course of</u> professional practice or research.

21 U.S.C. §802(21) (emphasis added).

On the basis of the "*in the course of*" language contained in §802, courts have consistently held that a person who meets the definition of "practitioner" as a matter of <u>fact</u> (i.e. is in fact a practicing physician "licensed . . . to distribute . . . a controlled substance . . . ") will nevertheless be <u>excluded as a matter of law</u> from the criminal immunity granted a "practitioner" if he distributes a narcotic in violation of the rules of legitimate medical practice:

> Title II of the Comprehensive Drug Abuse Prevention and Control Act of 1970 and the regulations issued pursuant to the act make it illegal for a physician to dispense directly to the ultimate user a schedule II controlled substance other than "in the course of his professional practice."  Appellant contends that those words do not warn the physician of what conduct is proscribed, and that the statute is without objective standards and is subject to diverse interpretation. Although this issue has not been previously determined concerning the present act, the same standard has been judicially interpreted in prior federal drug statutes.  Manifestly <u>the language "in the course of professional practice" is intended to limit the immunity</u> of a licensed practitioner.  It is apparent that a licensed practitioner <u>is not immune from the act solely due to his status</u>, *White v. United States*, 399 F.2d 813 (8th Cir. 1968), but rather, because he is expected to prescribe or dispense drugs <u>within the bounds of his professional practice of medicine</u>.

<u>United States v. Collier</u>, 478 F.2d 268, 270-272 (5th Cir. 1973) (emphasis added). Likewise,

> [T]he phrase "in the course of professional practice" . . . has been in the statute books since 1914 . . . The language clearly means that a doctor is not exempt from the statute when he takes actions that he does not in good faith believe are for legitimate medical purposes.

> The Supreme Court had several occasions to interpret this language
> when it was used in the Harrison Narcotics Law s 2, 38 Stat. 785.
> For example, in *Jin Fuey Moy v. United States*, 254 U.S. 189, 194, 41
> S.Ct. 98, 100, 65 L.Ed.2d 214 (1920) (emphasis added), the Court
> noted that "the phrases 'to a patient' and 'in the course of his
> professional practice only' <u>are intended to confine the immunity of a
> registered physician, in dispensing the narcotic drugs mentioned in
> the act, strictly within the appropriate bounds of a physician's
> professional practice</u> . . . " Two years later the Court again explained
> the meaning of the statute: "(T)he purpose of the exception is to
> confine the distribution of these drugs to the regular and lawful
> course of professional practice." *United States v. Behrman*, 258 U.S.
> 280, 287, 42 S.Ct. 303, 304, 66 L.Ed. 619 (1922) (emphasis added).
> In another case the Court said that "(t)he disputed question was
> whether the defendant issued the prescriptions in good faith in the
> course of his professional practice." *Boyd v. United States*, 271 U.S.
> 104, 105, 46 S.Ct. 442, 90 L.Ed. 857 (1926) (emphasis added).

<u>U.S. v. Rosenberg</u>, 515 F.2d 190, 197-198 (9th Cir. 1975) (emphasis added). Thus, despite the fact that the plain terms of 21 U.S.C. §829 immunize <u>all</u> licensed practitioners from criminal liability, courts have interpreted the "in the course of" language in §802 as excluding from immunity as a <u>matter of law</u> persons who are <u>as a matter of fact</u> licensed medical practitioners, when such persons violate the accepted rules of medical practice.

Similarly, the Jones Act, 46 App. U.S.C.A. §688, permits a seaman (or his personal representative) to bring an action for personal injury or death suffered "in the course of his employment."

It is well-established that the "in the course of" requirement contained in the Jones Act operates <u>to restrict</u> the protection of the Act, and that as a result of the "in the course of" proviso the scope of recovery under the Act is narrower than that allowed seamen under the "maintenance and cure" doctrine. <u>See</u> Colon v. Apex Marine Corp., 832 F.Supp. 508, 513-515 (D.R.I. 1993) <u>aff'd</u> 35 F.3d 16 (1st Cir. 1994) <u>cert.</u> denied 514 U.S. 1018 (1995) (citing cases).

Indeed, Colon emphasized that:  "We cannot ignore the phrase 'in the course of his employment,' because it was intended to mean what it says."  Id. at 514 (quoting Szopko v. Kinsman Marine Transit Co., 426 Mich. 653, 397 N.W.2d 171 (1986), cert. denied, 483 U.S. 1007 (1987)).

Moreover, in the seminal case interpreting the "*in the course of*" employment requirement in the Jones Act, O'Donnell v. Great Lakes Dredge & Dock Co., 63 S.Ct. 488 (1943), the Supreme Court held that "in the course of his employment" refers to, "the nature of the service and its relationship to the operation of the vessel plying in navigable waters."  Id. at 42-43 (emphasis added).

As the Fifth Circuit has noted:

> [T]he Supreme Court in O'Donnell . . . gave a general guideline to determine if the seaman is acting 'in the course of his employment.' The Court declared:
>
> > 'The right of recovery in the Jones Act . . . depends not on the place where the injury is inflicted but on the nature of the service and its relationship to the operation of the vessel plying in navigable waters.' . . .
>
> Although cast initially in terms of jurisdiction the 'nature of the service and its relationship to the operation of the vessel' criterion quite naturally became the test for determining liability as well.

Vincent v. Harvey Well Service, 441 F.2d 146, 147 (5th Cir. 1971) (emphasis added).  See also e.g. Magnolia Towing Co. v. Pace, 378 F.2d 12 (5th Cir. 1967) ("It is now settled that the right of recovery as a seaman under the Jones Act does not depend 'on the place where the injury is inflicted but on the nature of the service and its relationship to the operation of the vessel plying in navigable waters.'")(quoting O'Donnell) (emphasis added).

Therefore, because the "in the course of" requirement contained in the Jones Act goes to the nature of the conduct and its substantive relatedness to the operation of the vessel (rather than place of the injury) the question of whether a given injury occurred "in the course of" employment is primarily a question of law rather than of fact.  See e.g. Colon 832 F.Supp. at 515 ("[O]n the

undisputed facts in this case, plaintiff was not acting 'in the course of his employment' <u>as a matter of law</u> at the time of his injury.") (emphasis added).

The phrase "in the course of" also appears in the Warsaw Convention (reprinted following 49 U.S.C. §40105), a treaty governing air carrier liability that has been much-analyzed by the federal courts.

Article 17 of the Warsaw Convention provides that an air carrier:

> [S]hall be liable for damages sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger if the accident which caused the damage so sustained took place on board the aircraft or <u>in the course of any of the operations of embarking or disembarking</u>.

<u>Id</u>. (emphasis added).

In determining whether an accident occurred "in the course of" embarking or disembarking within the meaning of Article 17, most of the federal circuits have adopted a tripartite test (first set out in <u>Day v. Trans World Airlines, Inc.</u>, 528 F.2d 31 (2nd Cir. 1975)) which examines:

> (1) the <u>nature of the activity</u> the passenger was engaged in; (2) under whose control or at whose direction the passenger was under; and (3) the location of that activity.

<u>Dazo v. Globe Airport Security Services</u>, 268 F.3d 671, 677 (9th Cir. 2001) (citing <u>Day</u>) (emphasis added).

Thus, under <u>Day</u> and its progeny, an accident will not be deemed to have occurred "in the course of" embarking or disembarking when the <u>nature</u> of the passenger's activity at the time of the accident is insufficiently related to the acts of embarking or disembarking, even if that activity occurs in close proximity to embarking or disembarking and while the passenger is under the control of the airline. <u>See</u> <u>e.g.</u> <u>Abu Hamdeh v. American Airlines, Inc.</u>, 862 F. Supp. 243, 248 (E.D. Mo. 1994) ("Location should not be considered alone . . . when determining if plaintiff was <u>in the course of</u> embarking upon defendant's flight. In addition to the location of the accident, <u>the nature of the</u>

<u>activity</u> in which plaintiff was engaged must be examined to determine if that activity can fairly be considered part of 'the operations of embarking.'") (quoting and citing <u>Evangelinos v. Trans World Airlines, Inc.,</u> 550 F.2d 152, 155 (3rd Cir. 1977)(emphasis added, internal citations and quotation marks omitted).

    **3.**    <u>As a Matter of Law an Attack on Civilians Cannot Occur "In the Course Of" War or Armed Conflict Within the Meaning of §2331</u>

Congress limited "acts of war" under §2331 to only those acts "occurring in the course of" declared war or armed conflict, and plaintiffs therefore respectfully submit that in interpreting and applying §2331 this Court "cannot ignore the phrase 'in the course of . . .' because it was intended to mean what it says." <u>Colon v. Apex Marine Corp.,</u> 832 F.Supp. at 514.

As demonstrated above, Congress uses the phrase "in the course of" to exclude from the scope of a statutory provision a subset of conduct which – due to its nature and substance – deviates from and/or is insufficiently related to the general set of conduct governed by that provision.

As a matter of law, an attack on civilians cannot be deemed to have occurred "in the course of" war or armed conflict within the meaning of §2331, for the following reasons:

    **a.**    <u>Acts That Violate the Rules of War and Armed Conflict Cannot Occur "*In the Course Of*" War or Armed Conflict, As a Matter of Law</u>

The very same question presented by §§2331 and §2336(a) – i.e. whether an act of violence committed in the context of a war or an armed conflict should be considered as a matter of law to have occurred "in the course of" that war or armed conflict – has been addressed repeatedly by federal courts in decisions analyzing the "political offense exception" to extradition.

The origin of the "political offense exception" is well known:

> Most [extradition] treaties list categories of crimes or specific offenses for which extradition may be requested.  There usually are, however, exceptions to the crimes contained in the list.  Many treaties include "political crimes" among those exceptions.  The traditional extradition treaty language that deals with the political context of

> crimes excepts from the treaty crimes that are "of a political
> character" . . . [but] does not further define its terms . . .

Eain v. Wilkes, 641 F.2d 504, 512 (7th Cir. 1981), cert. denied 454 U.S. 894 (1981).

Because "traditional extradition treaty language" typically leaves the political offense exception undefined, the federal courts have developed their own test of whether a crime is "political:"

> The operative definition of "political offenses" under extradition
> treaties as construed by the United States limits such offenses to acts
> committed **_in the course of_** and incidental to a violent political
> disturbance such as **_a war, revolution or rebellion_**.

Eain 641 F.2d at 518 (emphasis added). See also e.g. Garcia-Guillern v. United States, 450 F.2d 1189, 1192 (5th Cir. 1971), cert. denied, 405 U.S. 989 (1972) (offense must occur "in the course of or incidental to" hostilities).

Thus, in determining the application vel non of the political offense exception in a given case, the federal courts ask the selfsame question posed by §2331, to wit: Was the violent act committed "in the course of" a war or armed conflict?

Moreover, significantly, in determining whether a criminal act was "committed in the course of and incidental to . . . a war, revolution or rebellion" the federal courts have not employed (as they might have) a simple factual test, e.g. questioning whether – as a plain empirical matter – the act was committed by a party to the conflict and at the same time and place as the conflict.

Instead, for over a century, the federal courts have treated the question of whether an act occurred "in the course of and incidental to" an armed conflict as a matter of law, and looked to the nature and circumstances of the violent act, and to the identity of the victims, in determining whether a given crime should be deemed part of that conflict:

> In determining whether the "incidental to" prong has been met,
> federal courts have examined the circumstances of the attack and the
> victims targeted. See Ornelas v. Ruiz, 161 U.S. 502, 511 (1896)
> (focusing on status of victim, "mode of attack," and "the character of

the foray"); *Ahmad v. Wigen,* 910 F.2d at 1066 (holding that attack on
civilian passenger bus was not political offense); *Artukovic v. Rison,*
628 F.Supp. 1370, 1376 (C.D.Cal. 1985) ("[T]he focus of the inquiry
is on the circumstances, and on the status of those harmed.").

Marzook v. Christopher, 1996 WL 583378 (S.D.N.Y. 1996) at 2.

Therefore, even when a violent act is carried out by a party to a military conflict at the same

time and place and as part and parcel of that conflict, the act will not be considered as having

occurred "in the course of and incidental to" the conflict if it deviates from the legitimate bounds of

warfare.

Thus, for example, in Ornelas v. Ruiz, 161 U.S. 502 (1896), the Supreme Court affirmed a

decision holding that an armed raid conducted as part of an on-going guerrilla campaign aimed at

"the overthrow of the existing government in Mexico" in which 40 Mexican soldiers were attacked,

their barracks burned and their horses and equipment seized, was excluded from political offense

exception specifically because the raiders had also attacked Mexican civilians.

The principle established over a century ago that attacks on civilians are excluded as a matter

of law from being considered part of an armed conflict even when they are a part of such conflict as

a matter of fact remains the law of the land,

> To successfully assert the "political character" defense, respondent
> must show that there was a political uprising or disturbance at the
> time of the offense and that the offense charged was "incidental" to,
> or part of the political disturbance. *Eain v. Wilkes,* 641 F.2d 504, 515-
> 16 (7th Cir. 1981), *cert. denied,* 454 U.S. 894, 102 S.Ct. 390, 70 L.Ed.2d
> 208 (1981); *In re Castioni,* [1891] 1 Q.B. 149.  Evidence of record
> amply supports the finding that uprisings and disturbances, within
> the meaning of the defense exception, existed in Croatia during all
> pertinent times. Nevertheless, respondent cannot avail himself of the
> defense merely because the alleged crimes occurred at the same time
> as a political disturbance.  A rational nexus between the alleged
> crimes and the prevailing turmoil must be demonstrated.   In
> searching for such a connection, the focus of inquiry is on the
> circumstances, and on the status of those harmed, and not on
> whether the acts merely were committed during the disorder.  See
> *Ornelas v. Ruiz,* 161 U.S. 502, 511, 16 S.Ct. 689, 692, 40 L.Ed.2d 787
> (1896), where the Supreme Court concurred in the magistrate's

> refusal to apply the exception "in view of the character of the foray, the mode of attack, *the persons killed or captured,* and the kind of property taken or destroyed." [Emphasis added]

Artukovic v. Rison, 628 F.Supp. 1370, 1376 (C.D.Cal. 1985) aff'd 784 F.2d 1354 (9th Cir. 1986)(emphasis by underline added).

      **Most importantly for the instant case, the federal courts have expressly held, on the basis of <u>Ornelas</u> and its progeny, that any act that violates the rules of warfare and armed conflict – such as a terrorist attack on civilians – is excluded as a matter of law from being deemed to have occurred in the course of or incidental to war or armed conflict.**

      In <u>Matter of Doherty</u>, 599 F.Supp. 270, 274 (S.D.N.Y. 1984), which involved an Irish Republic Army member sought by Britain for an attack on a British military convoy, this Court held that acts which occur as part of warfare or armed conflict but are illegal under international law, cannot be considered as occurring during "*the course of*" such hostilities:

> Were the Court persuaded that all that need be shown to sustain the political offense exception is that there be a political conflict and that the offense be committed during the course of and in furtherance of that struggle, the respondent would clearly be entitled to the benefits of that exception. However, <u>that conclusion is but the beginning and not the end of the analysis</u> that must be made to determine whether in fact Doherty may be properly extradited . . .
>
> How then is the political exception doctrine to be construed and what factors should limit its scope? Not every act committed for a political purpose or during a political disturbance may or should properly be regarded as a political offense. Surely the atrocities at Dachau, Aushwitz, and other death camps would be arguably political within the meaning of that definition. The same would be true of My Lai, the Bataan death march, Lidice, the Katyn Forest Massacre, and a whole host of violations of international law that the civilized world is, has been, and should be unwilling to accept. Indeed, the Nuremberg trials would have no legitimacy or meaning if any act done for a political purpose could be properly classified as a political offense. Moreover, it would not be consistent with the policy of this nation as reflected by its participation in those trials, for an American court to shield from extradition a person charged with such crimes.

The Court concludes therefore that a proper construction of the Treaty in accordance with the law and policy of this nation, <u>requires that no act be regarded as political where the nature of the act is such as to be violative of international law, and inconsistent with international standards of civilized conduct. Surely an act which would be properly punishable even in the context of a declared war or in the heat of open military conflict cannot and should not receive recognition under the political exception to the Treaty.</u> (emphasis added).

As examples of conduct that as a matter of law would <u>not</u> be recognized as part of an armed conflict, <u>Doherty</u> cited "a situation in which a bomb was detonated in a department store, public tavern, or a resort hotel, causing indiscriminate personal injury, death, and property damage" and/or "where the principles embodied in the Geneva Convention have clearly been violated." <u>Id</u>. at 275-276.

The holding in <u>Doherty</u> was adopted and further developed by <u>In re Extradition of Atta</u>, 706 F.Supp. 1032 (E.D.N.Y. 1989). The <u>Atta</u> case involved the extradition of a PLO member charged with attacking an Israel civilian bus in the West Bank with firebombs and automatic weapons fire. Atta argued that he was "*a member of the PLO . . . 'in essence a soldier, with military and political training, in an insurgency war directed against the Israeli occupation of the West Bank territory,'*" and that the attack on the Israeli bus in the West Bank was therefore subject to the "political offense" exception. <u>Id</u>. at 1046, n14. The court held that,

Judge Sprizzo's conclusion [in <u>Doherty</u>] that "an act which would be properly punishable even in the context of a declared war or in the heat of open military conflict" cannot be considered a political offense, provides a "neutral" standard <u>derived from rules governing the conduct of military personnel engaged in military conflict</u> . . .

Under the analysis adopted by Judge Sprizzo, the crime for which the defendant's extradition is sought does not come within the political offense exception to the Treaty. <u>It is undisputed that indiscriminate attacks by military personnel on civilians would be punishable under the rules of engagement</u>. W. Hays Parks, the Chief of the International Law Section in the Office of the Judge Advocate General of the Army, stated that whether an act was a legitimate act of war or a punishable act depended on whether the act was against

> "military personnel and military objects" or against "civilians and civilian objects."

<u>Id</u>. at 1042 (emphasis added).

A subsequent decision by another judge of the E.D.N.Y. denied Atta habeas corpus relief and adopted this holding, but with a slight modification. The court held that the "Law of Armed Conflict," rather than the "Rules of Engagement," should be used to determine whether an act was a legitimate part of military hostilities:

> The appropriate standard by which to define the political offense exception is <u>the Law of Armed Conflict, the body of international law governing all armed conflict and all nations</u>, rather than the Rules of Engagement, which a government establishes over the conduct of its armed forces at a particular time and place. Activities that could be prohibited under particular Rules of Engagement might be permitted under the Law of Armed Conflict. If the Law of Armed Conflict outlaws an act, the Rules of Engagement of a particular country cannot validate that act . . .

> Under the Law-of-Armed-Conflict limitation on the incidence test, a person opposing extradition must <u>prove the acceptability of his or her offense under conventions governing military conduct in the course of armed conflict</u>. Accepting *arguendo* that a petitioner was engaged in a war of self-determination, . . . he or she must still demonstrate that the actions were consistent with Protocol I [to the Geneva Conventions of 12 August, 1949, and Relating to the Protection of Victims of International Armed Conflicts], which states in pertinent part:

>> In order to ensure respect for and protection of the civilian population and civilian objects, the Parties to the conflict shall at all times distinguish between the civilian population and combatants and between civilian objects and military objectives and accordingly shall direct their operations only against military objectives.

> *Protocol I, supra* art. 48, 16 I.L.M. at 1412. . . .

> Most members of the United Nations have had episodes when its armed forces have beaten, killed, starved and otherwise mistreated civilian populations. This dreadful history of abuse does not justify such actions.  The fact that members of national armed forces are seldom punished for such acts does not make them any less illegal. <u>The law has an obligation not to recognize such dark brutality under</u>

either the rules of war or of civilian insurrection or political opposition. Were a civilian to detonate a bomb in a peaceful marketplace or rake peaceful shoppers with a machine gun to make a political point, this and most civilized countries would not consider such indiscriminate violence an unpunishable political act. Equally abhorrent would be the knowing and deliberate firebombing and machine gunning of a civilian bus. Nor, we assume, would any disciplined army condone such inhumane acts in time of war. *See, e.g., U.S. v. Calley,* 22 C.M.A. 534, 544, 48 C.M.R. 19, 29 (1973), *aff'd sub nom. Calley v. Callaway,* 519 F.2d 184 (5th Cir.1975) ("An order to kill infants and unarmed civilians . . . is . . . palpably illegal.") . . .

In a sense, to characterize an act as terrorism is to recognize its political nature while at the same time excluding it from the category of *protected* political crimes.

Ahmad (a/k/a Atta) v. Wigen, 726 F.Supp. 389, 405-407 (E.D.N.Y. 1989) aff'd 910 F.2d 1063 (2nd Cir. 1990) (emphasis by underline added).

Subsequent authority has followed this line of cases and held that terrorist attacks are excluded from "the category of *protected* political crimes" precisely because they violate the rules of armed conflict recognized under international law.

Abu Marzook asserts that "the request for extradition must be denied as the acts charged in this case are of a political character outside the purview of the treaty of extradition." . . .

The charges leveled by Israel clearly bring this matter outside the realm of the political offense exception. The indiscriminate bombing of buses laden with civilians and other such types of attacks targeted at civilians do not advance any political motive other than as terrorist acts. Such attacks have been universally condemned, even when they occur during a declared war, and clearly are less tolerable when committed by terrorists. See Convention Relative to the Protection of Civilian Persons in Time of War, entered into force Oct. 21, 1950, for the United States Feb. 2, 1956, 6 U.S.T. 3516, T.I.A.S. 3365, 75 U.N.T.S. 287 [hereinafter "the Geneva Convention"]. Article 3 of the Geneva Convention states that

Persons taking no active part in the hostilities . . . shall in all circumstances be treated humanely, . . .

To this end, the following acts are and shall remain prohibited at any time and in any place whatsoever with respect to the above-mentioned persons:

> (a) violence to life and person, in particular murder of all kinds, mutilation, cruel treatment and torture.
>
> Id. (emphasis added); see also Kadic v. Karadzic, 70 F.3d 232, 242-43 (2d Cir. 1995), reh'g denied, 74 F.3d 377 (1996).
>
> Indeed, the Court of Appeals for this Circuit has rejected the political offense exception under facts similar to these. *Ahmad v. Wigen*, 910 F.2d 1063 . . . And, in a more recent decision, this Circuit reaffirmed the application of the Geneva Convention to acts of terrorism. See Kadic, 70 F.3d at 242-43 (stating that Article 3 "binds parties to internal conflicts regardless of whether they are recognized nations or roving hordes of insurgents").

Matter of Extradition of Marzook, 924 F.Supp. 565, 577-578 (S.D.N.Y. 1996) (emphasis added, footnotes omitted).

This holding was affirmed by another judge of this Court on habeas corpus review. Marzook v. Christopher, 1996 WL 583378 (S.D.N.Y. 1996) at 3 ("[T]he nature of the crimes charges is not in dispute.  All of the crimes involved attacks on civilian, noncombatants . . . the nature of the crimes charged made clear that they could not possibly qualify as political offenses") (emphasis added).

> **b.**      **The Rationale For Excluding Acts That Violate the Rules Of Warfare and Armed Combat From the Political Offense Exception Applies With Equal or Greater Force To the "*In The Course Of*" Requirement Under §2331**

As demonstrated, the federal courts have interpreted the "political offense" doctrine as excluding terrorist acts that violate the international law of armed conflict.

The courts have explicitly stated that the rationale for this interpretation lies in the threat posed by international terrorism to the United States and its citizens, and the vital interest of the United States in combating terrorism.  See e.g. Eain, 641 F.2d at 520 ("[T]he evidence in this case reveals that the PLO seeks the destruction of the Israeli political structure [but if] that were all that was necessary in order to prevent extradition under the political offense exception . . . Those terrorists who flee to this country would avoid having to answer to anyone anywhere for their

crimes . . . . the political offense exception . . . should be applied with great care <u>lest our country</u>

<u>become . . . an encouragement to terrorists everywhere.</u>") (emphasis added); <u>Atta</u>, 706 F.Supp. at

1041 (adopting statement of State Department official that "Extraditing individuals charged with the

murder of a civilian target and refusing to evoke the political offense exception to extradition is one

of the United State's <u>most important law enforcement tools in terrorist matters</u>. Extraditing the

defendant in this case will help to ensure that the United States . . . becomes viewed as a reliable

partner <u>in the fight against terrorism</u>.") (emphasis added); <u>Ahmad</u>, 726 F.Supp. at 402-408 (holding

that the interpretation of the political offense doctrine must consider strong United States and

international policies against terrorism, and detailing authorities).

This rationale applies with equal or even greater force to the interpretation of the "in the

course of" requirement of §2331.  Deterring and punishing terrorist attacks on Americans is the very

raison d'être of the civil cause of action under §2333,

> The legislative history of 18 U.S.C. §2333 evinces a <u>clear</u>
> <u>congressional intent to deter and punish acts of international</u>
> <u>terrorism</u>.  During the floor debates, Senator Grassley spoke of
> holding terrorists accountable "where it hurts them most: at their
> lifeline, their funds." 136 Cong. Rec. S14279- 01 (1990).  He stated
> that his bill would <u>put terrorists on notice "to keep their hands off</u>
> <u>Americans</u> . . ." 136 Cong. Rec. S14279-01 . . . The Subcommittee on
> Courts and Administrative Practice held a hearing on S.2465 where
> the testimony focused on the bill's deterrent effect on the
> commission of acts of international terrorism against Americans.
> *Antiterrorism Act of 1990: Hearing on S2465 Before the Subcomm. on Cts.*
> *and Admin. Practice of the Comm. on the Judiciary U.S. S.,* 101st Cong.
> (1990) . . .
>
> Thus, the legislative history of Section 2333 shows an unequivocal
> congressional intent to deter acts of international terrorism and
> punish those who commit such acts against American citizens.

<u>Ungar v. Palestinian Authority</u>, 304 F. Supp.2d 232, 238-239 (D.R.I. 2004)(emphasis added).

Moreover, "the legislative history indicates that the ATA was to be construed broadly." <u>Id</u>. at

265.

Since the entire purpose of §2333 is to deter and punish terrorist attacks, and it is to be "construed broadly," Congress clearly did not intend the limitation on actions for "acts of war" contained in §2336(a) (as defined in §2331) to exclude from civil liability acts of terrorism that are not legitimate "acts of war" under international law.  Section 2336(a) was necessary for the simple reason that the scope of "international terrorism" actionable under §2333 (as defined in §2331) is broad enough to include any and all types of political violence, including legitimate warfare and military activity conducted in accordance with international law.[72]  Thus, §2331 and §2333 standing alone would have permitted civil suits for any acts of violence occurring as part of such legitimate warfare and armed conflict.  Hence the need for the limitation for "acts of war" contained in §2336(a) (as defined in §2331), which operates to prevent civil actions under §2333 arising from legitimate and legal "acts of war."

However, Congress carefully limited the operation of §2336(a) to legitimate, legal military activity by use of the phrase "in the course of" in §2331.  As shown above, "in the course of" is a gatekeeper provision, which Congress uses to exclude a subset of conduct which, because of its nature and substance, deviates from the general set of conduct covered by the statute at issue.

Indeed, Congress' use of the "in the course of" restriction in §2331 to immunize only legitimate "acts of war" from civil liability under §2333 closely parallels its use of that phrase in 21 U.S.C. §§802 and 829 to immunize only the legitimate distribution of narcotics by physicians.

A licensed doctor who prescribes a dangerous narcotic drug within the accepted rules of medical practice is acting as a "practitioner" and is immune from criminal liability under 21 U.S.C. §829; but a physician who prescribes that narcotic in violation of those rules is as a matter of law not acting within "the course of" his practice and will be criminally liable, though in fact he is a licensed

---

[72] Section 2331 defines the term "international terrorism" as meaning "activities that . . . involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State."

"practitioner." <u>U.S. v. Rosenberg</u>, 515 F.2d 190 (9th Cir. 1975). Exactly so, an armed group that uses deadly violence against legitimate military targets in accordance with the rules of armed conflict recognized under international law is immune from civil liability under §2336(a); but if that group also attacks illegitimate and illegal (i.e. civilian) targets in breach of the rules of armed conflict, such attacks are excluded as <u>a matter of law</u> from being deemed to have occurred "in the course of" armed conflict and the group will face civil liability under §2333, even though <u>in fact</u> the illegal attacks occurred as part of an otherwise legal "armed conflict."

Simply put, when an armed group acts like a terrorist organization it will be liable as a terrorist organization irrespective of its other, legal activities, just as a physician who behaves like a drug pusher will be treated as such, regardless of whether he also has a legitimate medical practice.

Additionally, other federal statutes governing the identical subject-matter (terrorism and violation of international law) strongly support the interpretation of the scope of §2336(a) urged by plaintiffs:

### (i)    18 U.S.C. §2441 - War Crimes

In 1996, Congress enacted 18 U.S.C. §2441, which creates a federal criminal prohibition, punishable by life imprisonment or death, for acts constituting "War Crimes" under international law, when the victim of the War Crime or its perpetrator is an American citizen.

As noted above, §2333 creates a cause of action for American citizens harmed by conduct which violates the criminal laws of the United States.

Therefore, any act that breaches the rules of armed conflict under international law[73] in which an American citizen is injured or killed will constitute a "War Crime" and a criminal violation under §2441, and will therefore be <u>per se</u> civilly actionable under §2333.[74]

---

[73] Section 2441(c) expressly defines a "war crime" as a breach of the instruments establishing the rules of armed conflict under international law, i.e. as any conduct:

If, as plaintiffs maintain, the "in the course of" proviso §2331 excludes from the immunity granted by §2336(a) acts of armed violence that breach the rules of armed conflict recognized under international law, then there is no conflict between §§2331/2333/2336(a) (on the one hand) and §2441 (on the other) of Title 18.  An act which constitutes a "War Crime" under §2441 will be excluded from the immunity granted by §§2331/2336(a) and so civilly actionable under §2333.

By contrast, if §§2331/2336(a) immunize <u>any and all</u> acts of violence committed during a war or armed conflict, then terrorist attacks that constitute criminal violations of §2441 – i.e. War Crimes – will not be actionable under §2333. Such an interpretation would create a conflict between the provisions of §2331 and §2441, because it would single out and exclude §2441 from the criminality component of the definition of "international terrorism" in §2331 which applies by its plain terms to any "violation of the criminal laws of the United States" – including of course §2441.

Moreover, such an interpretation would create an absurd situation wherein persons guilty of War Crimes in which an American is killed would face the death penalty under §2441, but would not face civil liability under §2333.

Congress clearly did not intend such a result.  Indeed, precisely by criminalizing War Crimes, Congress clearly indicated its intention to impose liability under U.S. law on parties to foreign

---

    (1)    defined as a grave breach in any of the international conventions signed at Geneva 12 August 1949, or any protocol to such convention to which the United States is a party;

    (2)    prohibited by Article 23, 25, 27, or 28 of the Annex to the Hague Convention IV, Respecting the Laws and Customs of War on Land, signed 18 October 1907;

    (3)    which constitutes a violation of common Article 3 of the international conventions signed at Geneva, 12 August 1949, or any protocol to such convention to which the United States is a party and which deals with non-international armed conflict; or

    (4)    of a person who, in relation to an armed conflict and contrary to the provisions of the Protocol on Prohibitions or Restrictions on the Use of Mines, Booby-Traps and Other Devices as amended at Geneva on 3 May 1996 (Protocol II as amended on 3 May 1996), when the United States is a party to such Protocol, willfully kills or causes serious injury to civilians.

[74] Obviously, all or virtually all "war crimes" are dangerous to human life and intended to influence or intimidate a government or population, and would therefore easily meet the other definitional requirements of "international terrorism" under §2331.

hostilities, when their conduct violates the rules of armed conflict and results in injury to American citizens.  The proper interpretation of §2331 and §2336(a) must reflect and conform to that clear Congressional intent.

### (ii)    28 U.S.C. §1350 - Violations of the Law of Nations

The Alien Torts Statute grants federal district courts original jurisdiction over civil actions by aliens arising from torts "committed in violation of the law of nations or a treaty of the United States."  28 U.S.C. §1350.

The Supreme Court recently held that §1350 allows civil actions for violations of norms of international law that are defined with specificity and clearly accepted by the civilized world. Sosa v. Alvarez-Machain, 124 S.Ct. 2739 (2004).

The laws of war and armed conflict, which are set out in the Geneva Conventions (particularly Common Article 3 thereto) are doubtless the <u>most</u> clearly defined and universally accepted of all international legal norms:

> It is universally agreed, and is demonstrable in the Convention language itself, in the context in which it was adopted, and by the generally accepted law of nations, that Common Article 3 embodies "international human norms," *Mehinovic v. Vuckovic,* 198 F. Supp.2d 1322, 1351 (N.D.Ga.2002), and that it sets forth the "most fundamental requirements of the law of war." *Kadic v. Karadzic,* 70 F.3d at 232, 243 (2d Cir.1995).  The International Court of Justice has stated it plainly: "There is no doubt that, in the event of international armed conflicts . . . [the rules articulated in Common Article 3] . . . constitute a minimum yardstick, in addition to the more elaborate rules which are also to apply to international conflicts; and they are rules which, in the Court's opinion, reflect what the court in 1949 called 'elementary considerations of humanity.'"  *Nicaragua v. United States,* 1986 I.C.J. 14, 114 (Judgment of June 27).

Hamdan v. Rumsfeld, 344 F. Supp.2d 152, 163 (D.D.C. 2004).

It is well established that non-state actors (such as the instant defendants) can and will be held liable for war crimes under international law for violation of Common Article 3 and the other rules of armed conflict:

> [T]he most fundamental norms of the law of war [are] embodied in
> common article 3, which binds parties to internal conflicts <u>regardless
> of whether they are recognized nations or roving hordes of
> insurgents</u>. The liability of private individuals for committing war
> crimes has been recognized since World War I and was confirmed at
> Nuremberg after World War II, and remains today an important
> aspect of international law.

<u>Kadic v. Karadzic</u>, 70 F.3d at 232, 243 (2nd Cir. 1995) (emphasis added, citations omitted).

It is also incontrovertible that terrorist attacks against civilians committed during armed

conflict violate Common Article 3, which expressly provides that:

> Persons taking no active part in the hostilities . . . shall in all
> circumstances be treated humanely . . . To this end, the following acts
> are and shall remain prohibited at any time and in any place
> whatsoever with respect to the above-mentioned persons:
>
> > (a) violence to life and person, in particular murder of
> > all kinds, mutilation, cruel treatment and torture;

Geneva Convention I art. 3(1).

In sum: terrorist attacks on civilians during an armed conflict violate the fundamental, clearly

defined and universally accepted rules of armed conflict and are therefore actionable under the Alien

Tort Statute, 28 U.S.C. §1350.

However, as noted, actions under §1350 may be brought only by <u>aliens</u>.

It defies all logic to assert that Congress intended in §2336(a) to bar American victims of acts

of terrorist violence carried out in the context of a foreign armed conflict from bringing suit under

§2333, when alien civilians harmed by the very same acts are permitted to bring suit under 28 U.S.C.

§1350.

The absurdity inherent in defendants' interpretation of §2336(a) is neatly illustrated by the

instant case: if the terrorist attacks at issue here are deemed "acts of war" within the meaning of

§2331 and §2336(a), then the suit under §2333 by plaintiffs who are American citizens would be

dismissed; however, non-American plaintiffs would be permitted to bring an action under 28 U.S.C.

§1350 for those same attacks, since attacks on civilians in the course of an armed conflict is unquestionably a "war crime" committed in violation of Common Article 3 of the Geneva Conventions.

Surely, Congress did not intend such a bizarre result, and for this reason as well the immunity provided in §2336(a) must be construed to exclude acts that violate the rules of armed conflict.

Essentially, defendants are now arguing that their decades-long terror campaign[75] was subsumed into an "armed conflict" which broke out in 2000. But if the existence of an armed conflict can eclipse or subsume acts of terrorism that violate the rules of armed conflict, the civil cause of action provided by Congress in §2333 will become a virtual dead letter in most cases.

The Court can take judicial notice of the fact that many, if not most acts of international terrorism, including attacks in which American citizens are murdered or injured, take place in the context of on-going hostilities that constitute "armed conflict" if not open war. The military hostilities in Iraq, Afghanistan and Northern Ireland, all of which have been accompanied by acts of terrorism in which American civilians have been killed or wounded, are obvious examples.

Indeed, it is the position of the United States that the terrorist attacks of September 11, 2001, commenced an "armed conflict" under international law, and this position is supported by much of the international community and scholarly opinion. See Derek Jinks, "September 11 and the Laws of War," 28 Yale J. of Int'l L. 1, Winter 2003.

Thus, if the interpretation of §§2331 and 2336(a) proffered by the PA and PLO were adopted, the civil actions under §2333 brought by thousands of Americans whose family members were killed in those attacks would have to be dismissed.

---

[75] It is undisputed that defendants have carried out terrorism against Americans for decades. See 22 U.S.C.A. §5201 ("[T]he PLO and its constituent groups have taken credit for, and been implicated in, the murders of dozens of American citizens").

Congress intended §2336(a) to provide immunity for legitimate military activity conducted in conformance with the laws of war; it did not immunize terrorist attacks against civilians that violate the rules of war and themselves constitute "war crimes."

### c.    An Attack on Civilians Violates the Rules Of War and Armed Combat Under International Law

International law recognizes certain distinctions between "declared war" and "armed conflict," and between "international armed conflict" and "internal armed conflict."

However, none of these distinctions are relevant or necessary to a determination that an attack on civilians violates the rules of war and armed conflict under international law, for the simple reason that Common Article 3 of the Geneva Conventions, which governs internal armed conflicts, "sets forth the most fundamental requirements of the law of war," and its provisions "constitute a minimum yardstick, in addition to the more elaborate rules which are also to apply to international conflicts." Hamdan v. Rumsfeld, 344 F. Supp.2d 152, 163 (D.D.C. 2004) (internal quotations and citations omitted).

In other words,

> [B]ecause the minimum rules applicable to international and non-international conflicts are identical, there is no need to address the question whether . . . the actions alleged to be violative of Common Article 3 must be looked at in the context of the rules which operate for one or the other category of conflict.

Id. (emphasis added, internal quotations and brackets omitted).

Likewise,

> Common Article 3 prescribes 'minimum mandatory rules applicable to internal armed conflicts . . . [that] reflect elementary considerations of humanity applicable under customary international law to any armed conflict, whether it is of an internal or international character. Therefore, at least with respect to the minimum rules in Article 3, the character of the conflict is irrelevant.'

Mehinovic v. Vuckovic, 198 F. Supp.2d 1322, 1351 n. 9 (N.D.Ga. 2002) (quoting Prosecutor v. Tadic, Case No. IT-94-1, International Criminal Tribunal for the Former Yugoslavia, Decision on the Defense Motion on Jurisdiction (Appeals Chamber, Oct. 2, 1995)).

As noted, Common Article 3 provides that "*Persons taking no active part in the hostilities . . . shall in all circumstances be treated humanely*," and prohibits "*at any time and in any place whatsoever*" the infliction on non-combatants of "*violence to life and person, in particular murder of all kinds, mutilation, cruel treatment and torture.*"

There is therefore no question whatsoever, that a violent attack on civilians constitutes a violation of the laws of war and armed conflict under international law.

Therefore, if the Court rejects plaintiffs' collateral estoppel argument, it should find on the merits, as did the Klieman court, that violent attacks on civilians are excluded from §2336(a) as a matter of law.

**C.**    **Alternatively, Since §2336(a) Is Not Jurisdictional But Merely Delineates the Elements of a §2333 Claim, and Since the First Amended Complaint Clearly States a Claim, Defendants Must Answer or Face Default Judgment**

The factual question of whether an "armed conflict between military forces of any origin" existed at the time and place of each of the terrorist attacks at issue will arise only if the Court rejects both plaintiffs' estoppel or merits arguments above.

Contrarily, if the Court accepts plaintiffs' arguments above, the existence *vel non* of an "armed conflict between military forces of any origin" is irrelevant.

Plaintiffs strongly dispute defendants' factual claim that an "armed conflict between military forces of any origin" existed at that time and place that the terrorist attacks at issue here were perpetrated, or that the attacks occurred – as factual matter – in the course of any such "armed conflict". Plaintiffs also dispute that the terrorist cells deployed by the PA or PLO constitute a "military force". Indeed, even al-Qaeda – which is vastly better armed, trained and organized than

the PA and PLO – has been held <u>not</u> to constitute a "military force" within the meaning of §2331. <u>See</u> <u>Morris v. Khadr</u>, 415 F.Supp.2d 1323, 1334 (D.Utah 2006).

For their part, defendants make only generalized claims about violence in the West Bank and Gaza, and fail to bring an iota of proof that an "armed conflict between military forces" existed anywhere, much less in Israel itself (where six out of the seven attacks here took place) at any time, much less at the specific times and places that each of these attacks were carried out.

Moreover, defendants do not even claim, much less prove, that their terrorist apparatus constitutes a "military force".

The burden to prove that the attacks at issue occurred in the course of "acts of war" within the meaning of §§ 2331 and 2336(a) lies with the <u>defendants</u>. <u>See</u> <u>Morris v. Khadr</u>, 415 F.Supp.2d at 1334 ("Aside from the difficulty of proving a negative, the burden should fall on [the defendant] to prove that his associates were a military force if he wishes to invoke this ATA exclusion."). The instant defendants have utterly failed to meet that burden.

However, this factual dispute (assuming it is not mooted entirely by adoption of plaintiffs' arguments in subparts A and B above) is not an obstacle to entry of default judgment because §2336(a) is <u>not</u> an element of subject-matter jurisdiction as defendants assert, but rather delineates the cause of action set forth at §2333. <u>See</u> <u>Stutts v. De Dietrich Group</u>, 2006 WL 1867060 at *4 (E.D.N.Y. 2006) ("The 'act of war' exemption under § 2336…provides [a] basis on which to dismiss plaintiffs' claim under the ATA for failure to state a claim for relief.")

Thus, defendants' "act of war" argument constitutes nothing more than a challenge to the complaint for "failure to state a claim for relief." <u>Id.</u> Since the First Amended Complaint makes no mention of any "armed conflict between military forces of any origin" it is patently obvious that the complaint facially states a claim under §2333 without implicating §2336(a). "A complaint should not be dismissed for failure to state a claim 'unless it appears beyond doubt that the plaintiff can prove

no set of facts in support of his claim which would entitle him to relief.'" <u>Todd v. Exxon Corp.</u>, 275 F.3d 191, 197-198 (2nd Cir. 2001) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46, (1957)).

Therefore, since §2336(a) is not jurisdictional but merely an element of the §2333 claim, there is no need to resolve at this stage whether an "armed conflict between military forces of any origin" existed at the time and place of each of the terrorist attacks at issue.  Rather, defendants must assert any §2336(a) defense in their answer, and then prove it at trial.  If defendants fail to file an answer, the Court can and should enter default judgment on the basis of the well pleaded allegations of the complaint, which make no mention of any "armed conflict between military forces of any origin" since none existed.  It is well established that "a party's default is deemed to constitute a concession of all well pleaded allegations of liability." <u>Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.</u>, 973 F.2d 155, 158 (2nd Cir. 1992).

> ### D.    Alternatively, If §2336(a) Is Jurisdictional, the Existence Vel Non of an Armed Conflict Cannot Be Determined on the Current Record and Discovery on This Issue Should Proceed

In the alternative, if the Court agrees with defendants that §2336(a) provides an element of subject-matter jurisdiction that must be resolved before judgment can enter (and assuming, once again, that the Court does not accept the arguments above that the attacks on civilians are excluded from §2336(a) as a matter of law), then further fact-finding and discovery will be necessary regarding the question of whether an "armed conflict between military forces of any origin" existed at the time and place of <u>each</u> of the terrorist attacks which gave rise to this action.

The term "armed conflict" is a term of art under international law, and determining whether an "armed conflict" existed at the time and place of each attack, would necessitate significant fact-finding and submission of evidence.[76]

---

[76] For an analysis of the difficulties inherent in determining whether and when an "armed conflict" has arisen <u>see generally</u> Derek Jinks, "September 11 and the Laws of War," 28 Yale J. of Int'l L. 1, Winter 2003.

Likewise, determining whether defendants constitute a "military force" within the meaning of §2331(4)(C) would require very substantial fact-finding, including discovery from the defendants. After all, defendants know best the full extent of their own training, weapons and explosives.

Indeed, if §2336(a) is an element of subject-matter jurisdiction, as argued by defendants, then their "act of war" argument constitutes a <u>factual</u> challenge to subject-matter jurisdiction and plaintiffs would be entitled to jurisdictional discovery as a matter of right.  See <u>e.g. Daventree Ltd. v. Republic of Azerbaijan</u>, 349 F.Supp.2d 736, 761 (S.D.N.Y. 2004) ("A plaintiff should be provided with '"ample opportunity to secure and present evidence relevant to the existence of jurisdiction'" through jurisdictional discovery.") (quoting <u>APWU v. Potter</u>, 343 F.3d 619, 627 (2nd Cir. 2003)); <u>Phoenix Consulting Inc. v. Republic of Angola</u>, 216 F.3d 36, 40 (D.C. Cir. 2000); <u>Kilburn v. Socialist People's Libyan Arab Jamahiriya</u>, 277 F. Supp.2d 24, 33 n. 5 (D.D.C. 2003) <u>aff'd</u> 376 F.3d 1123 (D.C. Cir. 2004).

Thus, if (and only if) the Court rejects all plaintiffs' arguments in subparts A-C above, discovery should proceed on the factual predicates of defendants' "act of war" claim.

## VI.    CONCLUSION

Plaintiffs' motion should be granted.


Plaintiffs, by their Attorneys,


/s/David Strachman
_____
David J. Strachman
McIntyre, Tate, & Lynch LLP
321 South Main Street, Suite 400
Providence, RI 02903
(401) 351-7700
(401) 331-6095 (fax)

Lee Squitieri
Squitieri & Fearon
32 East 57th Street, 12th Floor
New York, NY 10022
(212) 421-6492
(212) 421-6553 (fax)

## **CERTIFICATION**

I hereby certify that on the 20th day of December 2006 I served via ECF and via email a copy of the attached memorandum and exhibits to counsel of record:

Ramsey Clark
Lawrence W. Schilling
37 West 12th St. 2B
New York, NY 10011

　　　　　　　　　 /s/  avid StrachmanD