**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

_____

                  )

MARK I. SOKOLOW, *et al.*,    )

                  )

        Plaintiffs,    )

                  )

v.                   )       Civil Action No. 04cv397 (GBD)

                  )

THE PALESTINE LIBERATION    )

ORGANIZATION, *et al.*,    )

                  )

        Defendants.    )

                  )

_____)

## THE PALESTINIAN NATIONAL AUTHORITY'S AND THE PALESTINE LIBERATION ORGANIZATION'S SUPPLEMENTAL MEMORANDUM REGARDING SUBJECT MATTER JURISDICTION

Pursuant to the Court's Order of July 17, 2007, granting the parties' Joint Motion for Order Modifying Briefing and Hearing Schedule Regarding Jurisdictional Issues, Defendants the Palestinian [National] Authority and the Palestine Liberation Organization, by counsel, respectfully submit this Supplemental Memorandum on the Court's subject matter jurisdiction over this matter.

## PROCEDURAL BACKGROUND

In their First Amended Complaint, filed May 23, 2005 [Dkt. No. 4], plaintiffs seek $1 billion in compensatory damages ($3 billion after trebling) under the Anti-Terrorism Act of 1991 ("ATA"), 18 U.S.C. § 2331 *et seq.*, for injuries to themselves or their family members resulting from seven separate alleged terrorism incidents occurring in or near Jerusalem over a three-year period. Plaintiffs are suing the Palestinian Authority (hereinafter the Palestinian National Authority or "PNA"), the Palestine Liberation Organization ("PLO"), and John Does 1-99.

The undersigned counsel appear *pro hac vice* on behalf of the PNA/PLO pursuant to this Court's June 13, 2007, Order.  [Dkt. No. 40].  The withdrawal of predecessor counsel for defendants, Ramsey Clark and Lawrence Schilling, was granted on June 28, 2007.  [Dkt. No. 42].  Defendants file this supplemental brief on the question of the Court's subject matter jurisdiction pursuant to the Court's July 17, 2007, grant [Dkt. No. 43] of a joint motion by the parties to give new counsel an opportunity to present additional arguments on subject matter jurisdiction to those raised by predecessor counsel in Defendants' reply [Dkt. No. 35] to Plaintiff's Supplemental Memorandum of Law [Dkt. No. 31] on subject matter jurisdiction, and in Defendants' opposition brief [Dkt. No. 26] to Plaintiffs' motion for entry of default.  [Dkt. No. 22].

Should this Court not dispose of this case on jurisdictional grounds, Defendants fully intend to defend this case on the merits.

## ARGUMENT

The seven shooting and bombing incidents described in the first amended complaint were deplorable and deeply tragic for all of the families involved.  These particular incidents are not, however, appropriately remedied in U.S. courts through the Anti-Terrorism Act, 18 U.S.C. § 2331 *et seq.* ("the ATA"), because its application in this instance exceeds the jurisdictional limitations under customary international law.  Where Congress has not clearly expressed its affirmative intent to abrogate rules of customary international law, such an intention cannot be inferred.

The evolving question of the legal status of the PNA and PLO also creates a number of issues for this Court.  Defendants maintain their sovereignty.  But, if sovereignty is rejected by this Court, then the PNA is appropriately considered a political subdivision of Israel as it is

773520.1

exercising governmental functions delegated by the state of Israel.  The PLO and PNA have also been deemed to be unincorporated associations within U.S. law, which precludes the filing of non-federal pendent claims against them under New York law.  Finally, the question of the PNA and PLO's delicate status with respect to Israel and the impact on U.S. foreign policy from this attempt to hold the governing entities for the state of Palestine liable for the actions of individuals constitute nonjusticiable political questions.

## I.     THE EXTRATERRITORIAL APPLICATION OF THE ATA IS LIMITED BY RULES OF CUSTOMARY INTERNATIONAL LAW

Although Congress may abrogate rules of international law, its "affirmative intention" to do so must be "clearly expressed."  *McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 21-22 (1963).  *Accord F. Hoffman - LaRoche Ltd. v. Empagran S.A.*, 542 U.S. 155, 164 (2004); *United States v. PLO*, 695 F. Supp. 1456 (S.D.N.Y. 1988).  The legislative history of the ATA clearly shows Congressional intent to legislate within the parameters of international law.  No affirmative intent to abrogate international law was expressed.  Therefore, the ATA's application to acts by foreign nationals on foreign soil should be limited to those instances in which application is consistent with customary international law limits on jurisdiction.

### A.     The ATA Should Be Interpreted in a Manner Consistent with International Law

1.     *Congress Intended to Legislate Within the Bounds of International Law*

The Senate Report clearly indicates the intent of Congress to legislate within the bounds of customary international law.  The possible conflict between the customary international law rules of jurisdiction and the ATA's application to conduct on foreign soil not targeted at U.S. interests or U.S. citizens was never raised and no clear expression of affirmative intent to

abrogate international law appeared.  In contrast, Congress repeatedly expressed its intention to comply with international law.

The bill reviewed by the Senate in 1990 contained no exclusion for actions by states or state officials.  This was identified by the State Department as inconsistent with international law and was corrected.  *See* Hearing Before the Subcomm. on Courts and Administrative Practice of the Comm. on the Judiciary, 101st Cong., S. Hrg. 101-1193 at 12 (July 25, 1990) ("Senate Hearing" -- attached hereto as "Exhibit A").  Section 2337 of the bill considered by the House in 1992 specifically precludes actions against foreign states, state agencies, and officers and employees of foreign states, as does the current text of the statute.  *See* Hearing Before the Subcomm. on Intellectual Property and Judicial Administration of the Comm. on the Judiciary, 102nd Cong. 8 (Sept. 18, 1992) ("House Hearing" -- attached hereto as "Exhibit B").  Legislators also expressed their satisfaction that the bill complied with the Act of State doctrine, which arises out of international law's respect for state sovereignty.[1]  See Opening Statement by Strom Thurmond, Senate Hearing at 4 ("this legislation complies with the Act of State Doctrine").  Thus, legislative intent to comply with customary rules of international law is prevalent.

As explained below, international law would support the extension of the ATA to acts on foreign soil <u>if</u> U.S. interests or U.S. citizens were targeted, so as to implicate the protective or passive personality bases of jurisdiction, or <u>if</u> there was no local forum available, so as to make the exercise of universal jurisdiction appropriate if the conduct at issue violated the law of

---

[1] Although the Act of State Doctrine is a doctrine of U.S. law, it arises out of international law principles of sovereignty and ensuring its application is consistent with upholding international law.  *See Oetjen v. Central Leather Co.*, 246 U.S. 297, 304 (1918) ("To permit the validity of the acts of one sovereign State to be reexamined and perhaps condemned by the courts of another would very certainly 'imperil the amicable relations between governments and vex the peace of nations.'").

773520.1

nations.  Application of the protective and passive personality principles of jurisdiction were clearly the focus of the ATA at the time of its enactment.  The legislation was prompted by the 1985 Achille Lauro incident in which New York resident Leon Klinghoffer was executed and thrown overboard a cruise ship during a terrorist attack because he was an American.  Senate Hearing at 1.  Senator Grassley, the main proponent of the bill, began the Senate discussions by pointing out:

> We must understand that the victims of Pan Am 103, Mr. Klinghoffer and others, were victims *because they were Americans*.  They died *because they were Americans*.  We must do all that we can to assist and comfort the families of American victims, and it also seems to me that we ought to make it clear to the world how we feel about taking the lives of Americans.

Senate Hearing at 2 (emphasis added).  The Department of Justice representative's statement on the legislation was to the same effect:  "As with all terrorist attacks against U.S. citizens, while the assaults were against individuals, they were directed at the U.S. government."  *Id.* at 33 (Written Statement of Steven R. Valentine, Deputy Assistant Attorney General Civil Division).  The legislation was codified in Title 18, the criminal code, making the Department of Justice's contemporaneous statement, as a chief sponsor of the bill, particularly telling.

There is ample justification to conclude that Congress intended the ATA to be in full compliance with customary international law.

> 2.    *Courts Will Not Infer an Intent by Congress to Abrogate International Law*

If Congress intends to supersede international law by enactment of a statute, its "affirmative intention" to do so must be "clearly expressed."  *McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 21-22 (1963).  *Accord F. Hoffman - LaRoche Ltd. v. Empagran S.A.*, 542 U.S. 155, 164 (2004); *United States v. PLO*, 695 F. Supp. 1456 (S.D.N.Y. 1988).  The rule, as characterized by the Third Restatement of Foreign Relations is:

773520.1

> An act of Congress supersedes an earlier rule of international law or a provision of an international agreement as law of the United States *if the purpose of the act to supersede the earlier rule or provision is clear or if the act and the earlier rule or provision cannot be fairly reconciled*.

RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES (The

"Restatement") § 115(1)(a) (emphasis added).

> The courts do not favor a repudiation of an international obligation by implication and require clear indication that Congress, in enacting legislation, intended to supersede the earlier agreement or other international obligation. The fact that an act of Congress does not expressly exclude matters inconsistent with international law or with a United States agreement does not necessarily imply a Congressional purpose to supersede the international law or agreement as domestic law.

*Id.* at Comment a.

Courts will avoid construing the extra-territorial reach of a statute in a manner that is inconsistent with international law whenever possible. *United States v. Clark*, 435 F.3d 1100, 1106 (9th Cir. 2006). As the Supreme Court observed in *Weinberger v. Rossi*, "[i]t has been a maxim of statutory construction since the decision in *Murray v. The Charming Betsy*, 2 Cranch 64, 118 (1804), that 'an act of congress ought never to be construed to violate the law of nations, if any other possible construction remains.'" 456 U.S. 25, 32 (1982). *Accord* Restatement § 402 cmt. i (1987) (statutes should, where fairly possible, be interpreted consistently with international law principles regarding jurisdiction).

The Restatement affirms the application of that canon of statutory construction, referenced by the Supreme Court in 1804 in *The Charming Betsy* and reaffirmed in *Weinberger v. Rossi* in 1982, to the jurisdictional principles of international law. "Since it is presumed that Congress does not intend to violate international law, § 114, statutes should, where fairly possible, be interpreted consistently with this section and § 403." Restatement § 402, Bases of Jurisdiction to Prescribe, Comment i.

Justice Scalia has also noted that the *Charming Betsy* canon of statutory construction:

773520.1

is relevant to determining the substantive reach of a statute because 'the law of nations,' or customary international law, includes limitations on a nation's exercise of its jurisdiction to prescribe.  See Restatement (Third) §§ 401-416. Though it clearly has constitutional authority to do so, Congress is generally presumed not to have exceeded those customary international-law limits on jurisdiction to prescribe.

Consistent with that presumption, this and other courts have frequently recognized that, even where the presumption against extraterritoriality does not apply, statutes should not be interpreted to regulate foreign persons or conduct if that regulation would conflict with principles of international law.

*Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 815 (1993) (J. Scalia, dissenting)

Courts will go to great lengths to interpret a statute in a manner consistent with international law.  The cases of *Roeder v. Iran*, 333 F.3d 228 (D.C. Cir. 2003) and *United States v. PLO*, 695 F. Supp. 1456 (S.D.N.Y. 1988), and the Supreme Court precedent on which they rely, clearly indicate that Congress' intent -- not just to accomplish a specific result -- but to abrogate an existing rule of international law must not only be clear, it must be found within language that was voted on by Congress.  In the absence of such specific intent by Congress, courts will carve out exceptions to otherwise clear statutory language.

*Roeder v. Iran* was a class action suit arising out of the 1979-1980 Iranian Hostage Crisis. The plaintiff class consisted of the hostages themselves and their family members.  Plaintiffs' first attempts to sue Iran were dismissed on sovereign immunity grounds between 1983 and 1985.  In 1996, Congress passed the 1996 Anti-Terrorism Act and the Flatow Amendment, waiving sovereign immunity and creating a cause of action for those injured by state-sponsored acts of terrorism.  Plaintiffs then brought a new cause of action and requested a default judgment in 2001.  Immediately before a damages trial was set to begin, the State Department attempted to intervene, vacate the judgment, and dismiss the suit based on the 1980 Algiers Accords, by which the hostages' release was secured and the U.S. agreed to a prohibition on lawsuits arising

out of the hostage incident.  The State Department argued that the 1996 ATA and Flatow

Amendment had not specifically abrogated the Algiers Accords.

    In response, Congress amended the FSIA by adding a provision in an appropriations act

stating that the immunity provision would not apply if the act is related to Case Number

1:00CV03110(ESG) -- the same class action suit in *Roeder*.  The joint explanatory statement of

the Committee of Conference did not reference the Algiers Accords, but did state that the

amendment "'quashes the State Department's motion to vacate the judgment obtained by

plaintiffs in [this case]' and that the United States is not required to 'make any payments to

satisfy the judgment.'"  333 F.3d at 237 (citing H.R. Conf. Rep. No. 107-278, at 170 (2001)).

Congress then passed a second amendment correcting a typographical error in the case number

referenced in the first amendment.  The joint explanatory statement relating to the second

amendment explained:

> The provision . . . acknowledges that, *notwithstanding any other authority*, the
> American citizens who were taken hostage by the Islamic Republic of Iran in
> 1979 have a claim against Iran under the Antiterrorism Act of 1996 and the
> provision specifically allows the judgment to stand. . . .

*Id*. (citing H.R. Conf. Rep. No. 107-350, at 422-23 (2001).  The D.C. Circuit noted that such a

statement "is the type of language that might abrogate an executive agreement - if the statement

had been enacted."  *Id.*  But, since the joint explanatory statement was neither voted on by

Congress nor signed into law by the President, it was not sufficient to abrogate an existing

executive agreement.  Plaintiffs' claims were thus properly dismissed.  *Id.* at 239; 2003 U.S.

App. LEXIS 22946 (D.C. Cir., Nov. 7, 2003) (rehearing en banc denied); 2003 U.S. App. LEXIS

22947 (D.C. Cir., Nov. 7, 2003) (rehearing denied); 542 U.S. 915 (2004) (cert. denied).

    The second case, *United States v. PLO*, involved the interpretation of the Anti-Terrorism

Act of 1987.  695 F. Supp. 1456 (S.D.N.Y. 1988).  In October 1986, members of Congress

773520.1

requested the State Department close the PLO offices in the U.S.  Proving unsuccessful, Congress enacted the 1987 ATA without committee hearings as a rider to an act providing funding for State Department operations.  The 1987 ATA forbids the establishment or maintenance of PLO offices in the United States.  The day the ATA took effect, the U.S. brought suit to close the PLO mission in New York.  The court found that such a literal interpretation of the ATA so as to require the closing of the PLO mission to the United Nations would "fly in the face of the Headquarters Agreement, a prior treaty between the United Nations and the United States."  *Id.* at 1464.

Acknowledging that Congress has the power to abrogate the Headquarters Agreement, the court maintained that "unless the power is clearly and unequivocally exercised, this court is under a duty to interpret statutes in a manner consonant with existing treaty obligations."  *Id.* at 1465 (citing the Charming Betsy rule as articulated in *Weinberger v. Rossi*, 456 U.S. at 32).  "We believe the ATA and the Headquarters Agreement cannot be reconciled except by finding the ATA inapplicable to the PLO Observer Mission."  *Id.*

The court then looked to the events surrounding the ATA's enactment and its legislative history to determine if Congress clearly and unequivocally abrogated the Headquarters Agreement.  While Congress was considering the ATA, the State Department conveyed its view that the Headquarters Agreement required the U.S. to allow PLO representatives access to and presence in the vicinity of the United Nations.  The UN Secretariat also requested an advisory opinion from the ICJ to protect its rights under the Headquarters Agreement.  *See United Nations v. United States*, 1988 ICJ No. 77 (Apr. 26, 1988).

Looking at the legislative history, the Court noted that most who addressed the subject of conflict between the ATA and the Headquarters Agreement "denied that there would be a

conflict: in their view, the Headquarters Agreement did not provide the PLO with any right to maintain an office." *United States v. PLO*, 695 F. Supp. at 1469.  Because Congress provided no specific intent to abrogate the Headquarters Agreement, the court refused to give it such effect.

> There were conflicting voices both in Congress and in the executive branch before the enactment of the ATA.  Indeed, there is only one matter with respect to which there was unanimity -- the condemnation of terrorism.  This, however, is extraneous to the legal issues involved here.
>
> . . .
>
> The record contains voices of congressmen and senators forceful in their condemnation of terrorism and of the PLO and supporting the notion that the legislation would close the mission.  There are other voices, less certain of the validity of the proposed congressional action and preoccupied by problems of constitutional dimension.  And there are voices of Congressmen uncertain of the legal issues presented but desirous nonetheless of making a 'political statement.'
>
> . . .
>
> Yet no member of Congress, at any point, explicitly stated that the ATA was intended to override any international obligation of the United States.

*Id.* at 1469-70 (footnotes omitted).

The court in *United States v. PLO* also provided an excellent summary of precedent on the question of the level of ambiguity required before a court will interpret a statute in accordance with existing rules of international law.

> The lengths to which our courts have sometimes gone in construing domestic statutes so as to avoid conflict with international agreements are suggested by a passage from Justice Field's dissent in *Chew Heong* [v. U.S.,]*, 112 U.S.* [536,] *560-61 (1884)*:
>
> "I am unable to agree with my associates in their construction of the act . . . restricting the immigration into this country of Chinese laborers.  That construction appears to me to be in conflict with the language of that act, and to require the elimination of entire clauses and the interpolation of new ones.  It renders nugatory whole provisions which were inserted with sedulous care.  The change thus produced in the operation of the act is justified on the theory that to give it any other construction would bring it into conflict with the treaty; and that we are not at liberty to suppose that Congress intended by its legislation to disregard any treaty stipulations."
>
> The principles enunciated and applied in Chew Heong and its progeny, e.g. Trans World Airlines, [466 U.S. 243, 252]; Weinberger v. Rossi, [456 U.S. at 32];

Menominee Tribe of Indians, [391 U.S. at 413]; McCulloch v. Sociedad de Marineros, [372 U.S. at 21-22]; Pigeon River [291 U.S. at 160]; Cook v. United States [288 U.S. at 119-20], require the clearest of expressions on the part of Congress. We are constrained by these decisions to stress the lack of clarity in Congress' action in this instance.

695 F. Supp. at 1468.

**B.      Customary International Law Does Not Support The Extraterritorial Extension of U.S. Jurisdiction in This Case Because U.S. Interests Were Not Targeted and Because Claims Are More Appropriately Brought in Israel**

Under customary international law, the jurisdiction to prescribe is the right of a state to make its law applicable to the activities, relations, the status of persons, or the interests of persons in things. *See* Restatement § 401(a). The Restatement, widely recognized as the leading authority on international law as it applies in the United States, sets forth the various limitations international law places on a state's jurisdiction to prescribe. The state must satisfy one of four accepted bases for the exercise of its jurisdiction to prescribe: territorial, national, protective, and passive personality. Section 404 of the Restatement recognizes a fifth basis, known as the "universality principle." *See also United States v. Hill*, 279 F.3d 731, 739 (9th Cir. 2002) (listing the five principles). The exercise of jurisdiction also must pass a reasonableness test. Restatement § 403.

Territoriality, the most common basis for the jurisdiction to prescribe, encompasses (1) conduct taking place "wholly or in substantial part" within the territorial boundaries of the state exercising jurisdiction, or (2) the "status of persons, or interests in things, present within its territory." Restatement § 402(1)(a), (b).[2] The nationality basis permits a state to extend

---

[2] In addition, Restatement § 402(1)(c) recognizes a state's jurisdiction over "conduct outside [the state's] territory that has or is intended to have substantial effect within its territory." This "effects principle" is an "aspect of jurisdiction based on territoriality, although it is sometimes viewed as a distinct category." Restatement § 402 cmt. d.

773520.1

jurisdiction over "the activities, interests, status, or relations of its nationals outside as well as within its territory." *Id.* § 402(2). Neither of these bases applies here because the incident did not occur in the United States and the plaintiffs seek to apply the statute to Palestinian entities (not U.S. nationals).

The protective principle permits a state to extend extraterritorial criminal jurisdiction over conduct "directed against the security of the state or against a limited class of other state interests." *Id.* § 402(3). This principle "recognizes the right of a <u>state</u> to <u>punish</u> a limited class of offenses committed outside its territory by persons who are not its nationals--offenses directed against the security of the state or other offenses threatening the integrity of governmental functions that are generally recognized as crimes by developed legal systems, e.g., espionage, counterfeiting of the state's seal or currency, falsification of official documents, as well as perjury before consular officials, and conspiracy to violate the immigration or customs laws." Id. § 402(3), § 402 cmt. f. (Emphasis added). *See United States v. Pizzarusso*, 388 F.2d 8 (2d Cir. 1968 (protective principle applicable to false statement under oath in visa application). This principle would not apply to a civil suit by private plaintiffs, as they are not pursuing an injury to the United States.[3]

The only two jurisdictional bases that arguably could apply to acts committed outside of the United States by non-U.S. nationals, and not directly harming the United States, are the passive personality principle and the universality principle. The passive personality principle

_____

[3] Defendants express no opinion on whether the United States could properly bring a criminal action under the protective principle for terrorism that was not directed at the U.S. government or U.S. citizens. *Cf. United States v. Perlaza*, 439 F.3d 1149, 1162 (9th Cir. 2006) (rejecting the argument that U.S. security interests in preventing drug smuggling was sufficient to invoke the protective principle to prohibit "foreigners on foreign ships 500 miles offshore from possessing drugs that . . . might be bound for Canada, South America, or Zanzibar").

"asserts that a state may apply law -- particularly criminal law -- to an act committed outside its territory by a person not its national where the victim of the act was its national."  Restatement § 402 cmt. g.  The Restatement comment explains that the principle "has not been generally accepted for ordinary torts or crimes, but it is increasingly accepted as applied to terrorist and other organized attacks on a state's nationals by reason of their nationality . . . ."  *Id.*  Addressing the passive personality principle in *United States v. Yunis*, the D.C. Circuit explained that the principle allows a state to "punish non-nationals for crimes committed against its nationals outside of its territory, *at least where the state has a particularly strong interest in the crime*." 924 F.2d 1086, 1091 (D.C. Cir. 1991) (emphasis added).

Under the universality principle, a state has jurisdiction "to define and prescribe punishment for certain offenses recognized by the community of nations as of universal concern, such as piracy, slave trade, attacks on or hijacking of aircraft, genocide, war crimes, and perhaps certain acts of terrorism, even where none of the bases of jurisdiction indicated in § 402 is present."  Restatement § 404.  As explained in further detail below, neither the passive personality nor the universality principle justifies the exercise of jurisdiction in this instance because neither U.S. interests nor U.S. nationals were targeted, and the courts of another State (Israel) are available with a principal basis for jurisdiction.  *See* Restatement part 4, ch. 1, Introductory Note ("Territoriality and nationality remain the principal bases of jurisdiction to prescribe").

> 1.  *The Passive Personality Principle Provides No Support for Jurisdiction Where U.S. Nationals Were Not Targeted Because of Their Nationality.*

The facts of these cases, as alleged, strongly suggest that the incidents were targeted at Israeli interests due to Israel's presence in the occupied territories.  Plaintiffs have not alleged any facts to support the proposition that they were targeted as a result of their U.S. citizenship.

Where courts have used the passive personality principle as the basis for the exercise of jurisdiction over the extra-territorial conduct of non-U.S. nationals, they consistently have considered evidence that U.S. citizens were targeted *because of their nationality* as the dispositive factor justifying the exercise of jurisdiction.  For example, in *United States v. Yousef*, the Second Circuit found the exercise of jurisdiction "consistent with the 'passive personality principle' of customary international jurisdiction because each of these counts involved a plot to bomb United States-flag aircraft that would have been carrying United States citizens and crews and that were destined for cities in the United States."  327 F.3d 56, 96 (2d Cir. 2003). Similarly, in *United States v. Rezaq*, 134 F.3d 1121 (D.C. Cir. 1998), the hijacker of an airplane was alleged to have segregated the Israeli and American passengers, moved them to the front of the plane, and then shot them first when his demands were refused.  Finding sufficient evidence to support jurisdiction on the passive personality theory, the D.C. Circuit noted that the victim "was a United States citizen, and there was abundant evidence that she was chosen as a victim because of her nationality."  *Id.* at 1133.

The Ninth Circuit noted that "[m]ore recently, the passive personality principle has become increasingly accepted as an appropriate basis for extra-territoriality when applied to terrorist activities and organized attacks on a state's nationals because of the victim's nationality."  *United States v. Vasquez-Velasco*, 15 F.3d 833, 841 (9th Cir. 1994).  Underscoring the principle that the victim must be targeted because of his or her nationality in order to warrant the exercise of passive personality jurisdiction, the court explained that "a random murder of an American tourist is unlikely to qualify as terrorist activity or an organized attack, indicating that extraterritoriality would be inappropriate even under this standard."  *Id.*

14

In 1995, Abraham Sofaer testified before Congress in connection with the Comprehensive Anti-Terrorism Act of 1995.  Mr. Sofaer served as legal advisor to the Department of State from 1985 to 1990.  He testified:

> I doubt, however, that the mere fact that a U.S. national was or "would have been" aboard an aircraft that is attacked is a sufficient basis for jurisdiction.  Even if it is technically sufficient, it would seem preferable as a matter of comity and practicality to restrict the cases in which the U.S. asserts jurisdiction to those in which the American National is actually targeted because he or she is an American.

Prepared Testimony of Abraham D. Sofaer, Testimony Before the Committee on the Judiciary House of Representatives (June 12, 1995), *transcript available at* http://www.globalsecurity.org/security/library/congress/1995_h/h950612-3sa.htm (last visited July 30, 2007).

Among the seven incidents at issue in this case, Plaintiffs have not alleged a single instance where the victims were targeted because they were Americans.  Instead, the circumstances suggest that Israelis and Israeli interests were targeted in each of these attacks.  Thus, jurisdiction in this case is not properly founded on the passive personality principle.

2.      *Universal Jurisdiction Does Not Support the Exercise of Jurisdiction Over Incidents Involving Terrorist Acts on Foreign Soil, Especially Where There is an Available Local Forum.*

The Restatement § 404 provides that a state has universal jurisdiction to "define and prescribe punishment for certain offenses recognized by the community of nations as of universal concern."  Although the Restatement suggests that universal jurisdiction "perhaps" applies to "certain" acts of terrorism, the use of the universality principle as a basis for jurisdiction over terrorist acts has been rejected by the Second Circuit.  *United States v. Yousef*, 327 F.3d 56, 106-08 (2d Cir. 2003); *but see Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 14 (D.D.C. 1998) (stating that "international terrorism is subject to universal jurisdiction").

15

The Restatement provides examples of offenses recognized by the community of nations as of universal concern: "piracy, slave trade, attacks on or hijacking of aircraft, genocide, war crimes, and perhaps certain acts of terrorism." Restatement § 404. Reviewing this list, the Second Circuit in *Yousef* concluded "that terrorism -- unlike piracy, war crimes, and crimes against humanity -- does not provide a basis for universal jurisdiction." *Yousef*, 327 F.3d at 108.

As the Second Circuit explained in *Yousef*, there is no international consensus on the definition of terrorism:

> We regrettably are no closer now than eighteen years ago to an international consensus on the definition of terrorism or even its proscription; the mere existence of the phrase "state-sponsored terrorism" proves the absence of agreement on basic terms among a large number of States that terrorism violates public international law. Moreover, there continues to be strenuous disagreement among States about what actions do or do not constitute terrorism, nor have we shaken ourselves free of the cliche that "one man's terrorist is another man's freedom fighter."

Id. at 106-07 (footnotes omitted). By way of example, the court noted that "each side of the Israeli-Palestinian conflict charges the other with 'terrorism,' sentiments echoed by their allies." *Id.* at 107 n.41. Given the lack of consensus on what acts constitute terrorism -- particularly as to the Israeli-Palestinian conflict -- the universality principle cannot be invoked to support the United States' exercise of extra-territorial jurisdiction over alleged terrorist acts carried out by non-U.S. nationals.

Even if this court were not to follow Yousef's holding that acts of terrorism cannot give rise to universal jurisdiction, the exercise of universal jurisdiction is proper only if there is no available forum in a state with one or both principal bases of jurisdiction to prescribe (*i.e.*, territoriality and nationality). *See* Restatement part 4, ch. 1, Introductory Note ("Territoriality and nationality remain the principal bases of jurisdiction to prescribe"). This is reflected in the

773520.1

origin of the concept of universal jurisdiction in prosecutions of piracy, "which States and legal scholars have acknowledged for at least 500 years as a crime against all nations both because of the threat that piracy poses to orderly transport and commerce between nations and because the crime *occurs statelessly* on the high seas." *United States v. Yousef*, 327 F.3d at 104 (citing *United States v. Smith, 18 U.S. (5 Wheat) 153, 163* (1820) (Story, J.)) (emphasis added). Thus, the exercise of universal jurisdiction was not considered to impinge on another sovereign's right to exercise its principal bases of jurisdiction.

Because Israel has both territorial and nationality bases to exercise jurisdiction, the United States cannot properly exercise universal jurisdiction. The United States recognizes the primacy of domestic courts to adjudicate acts arising within the exercise of their territorial and nationality bases of jurisdiction. One recent example of this is holding Saddam Hussein in U.S. custody until the Supreme Iraqi Criminal Tribunal was established and was able to take jurisdiction. *See* The Law Library of Congress website on the Trial of Saddam Hussein, *available at* http://www.loc.gov/law/public/saddam/saddam.html (last visited July 28, 2007). As former Deputy Assistant Attorney General, Victoria Toensing, testified in 1984 before Congress in connection with the Act for the Prevention and Punishment of the Crime of Hostage-Taking, "most perpetrators of hostage-taking outside of the United States will and should be dealt with by the foreign government where the crime occurred." S. Hrg. 1078, 98th Cong. (1984). Israeli courts are, therefore, the proper forum to address these claims.

The customary international law rules providing for primacy of local courts, when effectively available, for actions giving rise to universal jurisdiction have been addressed through judicial means such as forum non conveniens as well as exhaustion requirements. In *Sosa v.*

773520.1

*Alvarez-Machain*, the European Commission argued for an exhaustion requirement in the

ATCA.  The Supreme Court noted:

> the European Commission argues as *amicus curiae* that basic principles of
> international law require that before asserting a claim in a foreign forum, the
> claimant must have exhausted any remedies available in the domestic legal
> system, and perhaps in other fora such as international claims tribunals. See Brief
> for European Commission as *Amicus Curiae* 24, n 54 (citing I. Brownlie,
> Principles of Public International Law 472-481 (6th ed. 2003)); cf. Torture Victim
> Protection Act of 1991, § 2(b), 106 Stat 73 (exhaustion requirement). We would
> certainly consider this requirement in an appropriate case.

542 U.S. 692, 733 n.21.  Where Israeli courts remain willing and able to assume jurisdiction, the

application of universal jurisdiction is improper.

3.    *Even If the Court Finds a Basis for Jurisdiction, the Exercise of that
      Jurisdiction Would Not Pass the Reasonableness Test.*

Even when a basis exists for the exercise of jurisdiction in a particular instance, "a state

may not exercise jurisdiction to prescribe law with respect to a person or activity having

connections with another state when the exercise of such jurisdiction is unreasonable."

Restatement § 403(1).  The Restatement identifies eight factors for determining whether the

exercise of jurisdiction is unreasonable.  *Id.* § 403(2).[4]  For the Court's benefit and for ease of

reference, a summary of the seven incidents at issue in this case is attached hereto at Exhibit C.

The first factor is "the link of the activity to the territory of the regulating state."

*Id.* § 403(2)(a).  An activity has the requisite link if it "takes place within the territory" or "has

substantial, direct, and foreseeable effect upon or in the territory."  *Id.*  Here, the seven incidents

---

[4] Although there is overlap between the judicial inquiry into reasonableness and the inquiry to determine
forum non conveniens, the reasonableness test is necessary to establish jurisdiction, while forum non
conveniens assumes the existence of this jurisdiction and then examines where the case is appropriately
raised.  *See United States v. Vasquez-Velasco*, 15 F.3d 833, 840 (9th Cir. 1994) (even if jurisdiction is
proper under the protective principle or other bases of jurisdiction, the exercise of jurisdiction "still
violates international principles if it is 'unreasonable'.").

773520.1

occurred in Israel or the occupied territories.  They did not occur in the United States or otherwise have "substantial, direct, and foreseeable effect upon" the United States.

The second factor is "the connections, such as nationality, residence, or economic activity, between the regulating state and the person principally responsible for the activity to be regulated, or between that state and those whom the regulation is designed to protect." *Id.* § 403(2)(b).  The individual defendants in the first complaint are alleged to be Palestinian, most of whom lack sufficient minimum contact with the United States for the court to exercise personal jurisdiction over them.  Many of the plaintiffs likely are Israeli residents and have strong connections to Israel.[5]

The third factor is "the character of the activity to be regulated, the importance of regulation to the regulating state, the extent to which other states regulate such activities, and the degree to which the desirability of such regulation is generally accepted."  *Id.* § 403(2)(c).  The incidents at issue occurred in Israel or the occupied territories and primarily affected Israeli interests.  Israel not only regulates this activity in general, it has exercised jurisdiction over a number of similar issues in the same timeframe.  See Statement of Indictment, *Israel v. Barghouti*, District Court of Tel Aviv and Jaffa, Criminal Case No. 092134/02, *available at* www.israelemb.org/articles/2002/August/Barghouti1.doc (last visited July 29, 2007).

The fourth factor is "the existence of justified expectations that might be protected or hurt by the regulation."  *Id.* § 403(2)(d).  The individuals who are alleged to have committed the incidents before this Court were not U.S. citizens or U.S. nationals and could not have foreseen

---

[5] This is not to argue that U.S. citizens with strong connections to Israel deserve any less protection under U.S. law; it is only to argue that international law properly takes all factors into account in determining whether U.S. jurisdiction -- over incidents that happened in Israel and were targeted at Israeli interests -- is reasonable.

773520.1

the exercise of U.S. jurisdiction for this conduct.  Most of the plaintiffs have strong ties with Israel and have access to its courts.

The fifth factor is "the importance of the regulation to the international political, legal, or economic system."  *Id.* § 403(2)(e).  Combating international incidents of terrorism is an important focus for both Israel and the United States.  The attacks at issue in this litigation were likely targeted directly at Israeli interests.

The sixth factor is "the extent to which the regulation is consistent with the traditions of the international system."  *Id.* § 403(2)(f).  The most traditional exercise of jurisdiction is over activity occurring within a state's territorial boundaries, indicating that the exercise of jurisdiction by Israel over the incident is the more reasonable exercise of jurisdiction.  *Id.* § 402 cmt. c ("The territorial principle is by far the most common basis for the exercise of jurisdiction to prescribe, and it has generally been free from controversy.").

The seventh factor is "the extent to which another state may have an interest in regulating the activity."  *Id.* § 403(2)(g).  As demonstrated above, Israel's clear interest in regulating acts of violence or terror within its territory and targeted at Israeli interests, renders the extension of jurisdiction by the United States unreasonable.  *Id.* cmt. d ("The fact that one state has exercised jurisdiction with respect to a given person or activity is relevant in applying Subsections (2)(g) and (h)").

The eighth factor is "the likelihood of conflict with regulation by another state."  *Id.* § 403(2)(h).  This factor does not apply if the actor is capable of complying with both sets of regulations and would not impact a determination of reasonableness in this case.  *Id.* cmt. e.

The exercise of U.S. jurisdiction over these incidents would be unreasonable. They are local incidents, involving local actors, directed against Israeli interests and properly belong in the local courts of Israel or the Occupied Territories.[6]

## II. PLAINTIFFS' PENDENT NON-FEDERAL CLAIMS MUST BE DISMISSED FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED BECAUSE THE PNA/PLO LACK THE CAPACITY TO BE SUED UNDER THE LAW OF THE STATE OF NEW YORK.

### A. Plaintiffs' Pendent Claims

In addition to their federal law Anti-Terrorism Act claims, the Plaintiffs' first amended complaint alleges pendent tort claims for wrongful death (Second Count), battery (Fourth Count), assault (Fifth Count), loss of consortium and solatium (Sixth Count), negligence (Seventh Count), intentional infliction of emotional distress (Eighth Count), and negligent infliction of emotional distress (Ninth Count).[7] Plaintiffs' complaint does not identify the governing law for these claims.

As explained immediately below, plaintiffs may not bring non-federal (whether New York or Israeli) law claims against the PNA and PLO in the State of New York. Courts regularly have treated the PNA and PLO as "unincorporated associations" for jurisdictional purposes. New York law does not permit unincorporated associations to be sued directly.

---

[6] A large number of cases for similar injuries are currently pending in Israeli courts. *See Palestine Authority v. Dayan et al.*, July 17, 2007, Decision by Supreme Court of Israel (uncertified copy attached hereto as Exhibit D) (addressing numerous cases filed in Israel against the PNA for injury resulting from terrorist attacks); *see also* Levush, Compensation for Victims of Terrorist Actions: Israel as a Case Study, 32 Int'l J. Legal Info. 582 (2004).

[7] Plaintiffs' additional counts for pain and suffering (Third Count), civil conspiracy (Tenth Count), aiding and abetting (Eleventh Count), vicarious liability/respondeat superior (Twelfth Count), and inducement (Thirteenth Count), do not appear to constitute independent causes of action, but rather methods of proof. To the extent these relate to non-federal claims, they are appropriately dismissed as pendent claims.

773520.1

### B.    Under Fed. R. Civ. P. 17(b), the Capacity to Sue the PNA/PLO Is Governed by New York Law.

A number of suits have been filed against the PNA/PLO under the Anti-Terrorism Act. The courts consistently have treated the PNA and PLO as unincorporated associations. The District Court in *Klinghoffer v. S.N.C. Achille Lauro*, 739 F. Supp. 854, 858 (S.D.N.Y. 1990), stated that "the PLO is an organization. . . .  For present purposes, it may be treated as an unincorporated association."  This was confirmed by the Second Circuit.  937 F.2d 44, 50-51 (2d Cir. 1991).  More recently, a judge in the U.S. District Court for the District of Columbia held that the PNA and PLO are unincorporated associations for purposes of Fed. R. Civ. P. 4(h). *Estate of Klieman v. Palestinian Auth.*, 467 F. Supp. 2d 107 (D.D.C. 2006).  Judge Friedman explained:

> It has . . . been determined by other federal courts that the PLO qualifies as an unincorporated association under Rule 4(h) of the Federal Rules of Civil Procedure for purposes of service of process, because it is "composed of individuals, without a legal identity apart from its membership, formed for specific objectives."  *Ungar v. Palestinian Authority*, 153 F. Supp. 2d [76,] 89 [D.R.I. 2001]; *see also Klinghoffer v. S.N.C. Achille Lauro Ed*, 739 F. Supp. 854, 858 (S.D.N.Y. 1990).  The PA, which is "not presently recognized as a foreign state by the United States" therefore "also may be categorized as an organization composed of individuals seeking to achieve specific objectives, and which has no legal identity in the United States apart from its membership."  *Ungar v. Palestinian Authority*, 153 F. Supp. 2d at 89.

*Id.* at 113-14.

Federal Rule of Civil Procedure 17(b) provides that the capacity of an unincorporated association to be sued "*shall be determined by the law of the state in which the district court is held*, except (1) that a partnership or other unincorporated association, which has no such capacity by the law of such state, may . . . be sued in its common name for the purpose of enforcing . . . against it a substantive right existing under the Constitution or laws of the United States."  Fed. R. Civ. P. 17(b) (emphasis added).  Plaintiffs' non-federal law claims do not fall

under Rule 17(b)'s exception because they do not arise under the "Constitution or laws of the United States." Therefore, the general rule applies, namely that the law of the forum state (here, New York) must recognize the capacity of unincorporated associations to be sued in a civil action with respect to the non-federal claims.

### C.     Under Controlling New York Law, Unincorporated Associations, Such as the PNA/PLO, May Not Be Sued in Their Own Name.

New York law does not recognize the capacity of unincorporated associations to be sued in their own name. Under section 12 of New York's General Associations Law, an unincorporated association can sue and be sued only through its president or treasurer or in the name of an officer who is the functional equivalent to a president or treasurer. *Arbor Hill Concerned Citizens Neighborhood Ass'n v. City of Albany*, 250 F. Supp. 2d 48, 62 (N.D.N.Y. 2003). Interpreting Federal Rule of Civil Procedure 17(b), a federal court in New York recently concluded: "In New York, it is well-established that an unincorporated association has no life separate and apart from its members. Therefore, unincorporated associations, which are voluntary congregate entities, are accorded the capacity to bring suit through their presidents or treasurers by statute." *Concerned Citizens for Neighborhood Schools v. Pastel*, No. 05-CV-1070, 2007 U.S. Dist. LEXIS 30067, *10 (N.D.N.Y. Apr. 24, 2007) (internal citation and quotation omitted). In *Modeste v. Local 1199, Drug, Hosp. & Health Care Employees Union*, 850 F. Supp. 1156, 1158 (S.D.N.Y. 1994), this Court dismissed pendent state law claims against a labor union because, as an unincorporated association, it lacked the capacity to be sued in a civil action under New York law.

A recent decision for the U.S. District Court for the District of Columbia is squarely on point. In *Sisso v. Islamic Republic. of Iran*, 448 F. Supp. 2d 76, 91 (D.D.C. 2006), the plaintiffs brought an Anti-Terrorism Act suit against Iran and Hamas. Only one of the plaintiffs was a

773520.1

U.S. citizen and thus a proper plaintiff under the Anti-Terrorism Act.  The other plaintiffs were Israeli citizens who brought claims under the Israeli Civil Wrongs Ordinance.  448 F. Supp. 2d at 79.  Ruling on the plaintiffs' motion for entry of default judgment, the court dismissed the plaintiffs' Israeli law claims against Hamas for failure to state a claim for which relief may be granted.  *Id.* at 91.  Citing cases concluding that the PNA and PLO should be treated as unincorporated associations, the court concluded that Hamas also should be treated as an unincorporated association.  *Id.* at 91.  Relying on Fed. R. Civ. P. 17(b), the court then found that the law of the District of Columbia determines Hamas's capacity to be sued for the non-ATA / Israeli law claims.  After reviewing District of Columbia law on capacity of unincorporated associations to be sued, the court held that Hamas could not be sued in its own name for the Israeli law claims.  *Id.*  The court also rejected any notion of "pendent capacity," holding that the capacity of Hamas to be sued for the federal Anti-Terrorism Act claim did not create pendent capacity to be sued over the Israeli law claims.  *Id.* at 91-92 (citing *Caliper Partners, Ltd. v. Affeld*, 583 F. Supp. 1308, 1313-14 (N.D. Ill. 1994) (rejecting plaintiffs' theory of "pendent capacity").

The only case to address the PNA's or PLO's capacity to be sued under Rule 17(b) acknowledged that, for non-federal claims brought in federal courts in New York, the PLO could not be sued in its own name.  *Klinghoffer v. S.N.C. Achille Lauro*, 739 F. Supp. 854, 866 (S.D.N.Y. 1990) ("Under New York law, the PLO cannot be sued in its own name, but only in the name of its president or treasurer.  However, since plaintiffs and third-party plaintiffs assert claims under federal law, Rule 17(b)(1) permits them to sue the PLO in its own name.").

773520.1

Although defendants PNA and PLO continue to maintain that they are entitled to immunity, the courts have treated them as "unincorporated associations."  As such, they may not be sued for non-federal claims, including Plaintiffs' pendent tort claims.

**III.    IF PALESTINE IS NOT A "FOREIGN STATE" FOR PURPOSES OF THE ANTI-TERRORISM ACT, THE PNA IS NONETHELESS ENTITLED TO IMMUNITY AS A POLITICAL SUBDIVISION OF ISRAEL.**

Predecessor counsel for the PNA and PLO extensively briefed the reasons sovereign immunity renders the PNA and PLO immune from suit in this action.  *See* Memorandum of Defendants PA and PLO In Opposition to Plaintiffs' Motion for the Entry of Default Judgment (the "Default Opposition") [Dkt. No. 26], June 30, 2006, at 1-33.  As set forth in the Default Opposition, Palestine constitutes a state as defined under international law because, *inter alia*, it has a defined territory, a permanent population that lives in that defined territory under the control of its own institutions of government, and a government that engages in, or has the capacity to engage in, formal relations with other states.  *See id.*  Indeed, this fact that Palestine exercises sovereign functions and should accordingly maintain immunity, was recognized by an Israeli District Court in *Elon Moreh Seminary Society v. State of Israel*, No. 4049/02 (Jerusalem District Court, Apr. 23, 2006) (a certified translation of this decision is attached hereto as Exhibit E).[8]  Should this Court decide that the PNA and PLO do not enjoy independent sovereign immunity, the PNA and PLO are immune from suit on the alternative basis that it is a political subdivision of Israel.

---

[8] As noted above, the Israeli Supreme Court recently considered, among other issues, whether the PNA is immune for purposes of fifteen lawsuits filed against it by victims of terrorist attacks.  *See Palestinian Authority v. Dayan et al.*, Exhibit D.  The Israeli Supreme Court instructed district courts considering this issue to defer to the Minister of Foreign Affairs for the official position of the state of Israel.

773520.1

The Anti-Terrorism Act ("ATA") prohibits actions against "a foreign state, an agency of a foreign state, or an officer or employee of a foreign state or an agency thereof acting within his or her official capacity or under color of legal authority." 18 U.S.C. § 2337(2). The ATA does not define those terms, but the courts have concluded that the term "foreign state" should have the same meaning under the ATA as it does under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1604. *See e.g., Ungar v. PLO*, 402 F.3d 274 (1st Cir. 2005) (ATA and FSIA are to be read in *pari materia*); *Knox v. PLO*, 306 F. Supp. 2d 424, 430 (S.D.N.Y. 2004) (legislative history of the ATA indicates that Congress intended that "ordinary principles of sovereign immunity, as codified by FSIA, would apply"). *See also* S. Rep. No 102-342, at 37 (1992) ("This section [2337] . . . maintains the status quo, in accordance with the Foreign Sovereign Immunities Act, with respect to sovereign states and their officials: there can be no cause of action for international terrorism against them").

### A.    Treatment of Political Subdivisions Under the FSIA.

The FSIA defines a foreign state to include a "political subdivision of a foreign state or an agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a). The statute further defines "an agency or instrumentality as any entity which (1) "is a separate legal person, corporate or otherwise, and (2) "is an organ of a foreign state or political subdivision thereof, or a majority of whose share or other ownership interest is owned by a foreign state or political subdivision thereof," and (3) "is neither a citizen of a State of the United States . . . nor created under the laws of any third country." 28 U.S.C. § 1603(b).

Although both subdivisions and agencies or instrumentalities are included in the definition of "foreign state" for general immunity under FSIA, the Act treats foreign states and political subdivisions differently from agencies or instrumentalities for purposes of certain

provisions of the FSIA.[9]  The ATA does not draw a similar distinction and any entity within the FSIA definition of "foreign state" (e.g., political subdivision, agency, or instrumentality) as well as an officer or employee of a foreign state or an agency thereof is exempt under the Act.  18 U.S.C. § 2337(2).

According to FSIA's legislative history, political subdivisions are "all government units beneath the central government, including local governments."  H.R. Rep. No. 94-1487, at 15 (1976).  In contrast, "entities which meet the definition of an 'agency or instrumentality' could assume a variety of forms, including a state trading corporation, a mining enterprise, a transport organization such as a shipping line or airline, a steel company, a central bank, an export association, a governmental procurement agency or a department or ministry which acts and is suable in its own name."  *Id.* at 15-16.

Based on the legislative history, the Court of Appeals for the District of Columbia has adopted the "core functions" test to determine whether an entity is a political subdivision or an agency or instrumentality.  *Transaero, Inc.  v. La Fuerza Aerea Boliviana*, 30 F.3d 148 (D.C. Cir. 1994).  Under the core functions test, an entity that is an "integral part of a foreign state's political structure" is to be treated as the foreign state itself, whereas an entity the structure and core function of which are commercial is to be treated as an "agency or instrumentality" of the state.  *Id.* at 151.  This "core functions" test was adopted by the Second Circuit in 2006 in *Garb v. Poland*, 440 F.3d 579, 593-94 (2d Cir. 2006).

---

[9] For example, the FSIA requires different processes for service depending on whether the defendant is a foreign state or political subdivision, on one hand, or an agent or instrumentality, on the other hand.  28 U.S.C. § 1608(a) and (b).  If a foreign state, political subdivision, agency, or instrumentality is exempt from FSIA immunity, only an agency or instrumentality shall be liable for punitive damages.  28 U.S.C. § 1606.

773520.1

Applying the core function test, the Second Circuit and others have found entities such as the Polish Ministry of Treasury, Iranian Ministry of Affairs, the Bolivian Air Force, and Russian Ministry of Culture, to be the equivalent of foreign states and political subdivisions. *See e.g., Garb v. Republic of Poland*, 440 F.3d 579, 594 (2d Cir. 2006) (Ministry of Treasury is a foreign state and not an agency or instrumentality of Poland); *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 234 (D.C. Cir. 2003) (Ministry of Foreign Affairs is a foreign state and not an agency or instrumentality of Iran); *Transaero v. La Fuerza Aerea Boliviana*, 30 F.3d 148 (D.C. Cir. 1994) (Air Force is a political subdivision of Bolivia); *Magness v. Russian Federation*, 247 F.3d 609, 613 n.7 (5th Cir. 2001) (Russian Ministry of Culture is a political subdivision of Russia). Agencies and instrumentalities typically include corporations a majority of whose shares are owned by a foreign state or political subdivision and governmental entities otherwise engaging in commercial activities. *See e.g.*, *Bayer & Willis Inc., v. Republic of Gambia*, 283 F. Supp. 2d 1, 4 (D.D.C. 2003) (finding a telecommunications company 99% owned by the Republic of Gambia to be an agency or instrumentality); *Cassirer v. Kingdom of Spain*, 461 F. Supp. 2d 1157, 1163-64 (C.D. Cal. 2006) (applying core functions test to determine that a state-funded art museum is an agency or instrumentality of Spain).

**B.     The PNA Functions as a Political Subdivision of Israel.**

Assessing whether Palestine has attained statehood or whether the PNA remains a political subdivision of Israel requires a close examination of the history of the Palestine-Israeli conflict. Prior pleadings have provided significant detail regarding this history. For ease of reference, Defendants attach a brief summary of the relevant facts. *See* Exhibit F. The Exhibit provides background regarding Israel's occupation of the Territory and the negotiations leading to the 1995 Interim Agreement on the West Bank and the Gaza Strip ("Interim Agreement") between Israel and the PLO, Sept. 28, 1995. 36 I.L.M. 551.

The relationship between Israel and the PNA as defined in the Interim Agreement reflects the fact that the PNA is either a foreign state or an affiliated entity of the Israeli Government. To the extent Israel continues to occupy parts of the Palestinian Territory, international agreements require Israel to administer to the Territory's civic needs, and the Interim Agreement delegates these responsibilities to the PNA. *See* Exhibit G (Excerpts of Geneva Convention Relative to the Protection of Civilian Persons in Time of War ("Fourth Geneva Convention") art. 6, Oct. 21, 1950). *See also* Exhibit H (Hague Regulations of 1907 ("Hague Regulations"), Section III). The Fourth Geneva Convention applies "for the duration of the occupation." Exhibit G (Fourth Geneva Convention, art. 6). Therefore, Israel is responsible for administering the Palestinian Territory until its full withdrawal. During this time period, the occupying force must maintain an adequate standard of living for the occupied population. *Id*. At a minimum, the occupying force must ensure "public order and safety." Exhibit H (Hague Regulations, art. 43). For example, the Fourth Geneva Convention obliges the occupying force to provide medical services and educational institutions for children. Exhibit G (Fourth Geneva Convention, art. 50, 55-56).

If the Court concludes that Israel has yet to cede control of the Palestinian Territory, then the PNA must be carrying out some of the duties that are the responsibility of Israel under the Fourth Geneva Convention and the Hague Regulations. Pursuant to the Interim Agreement, the PNA's activities during this transition period are subject to Israeli oversight. As a result, the PNA is an affiliate entity of the sovereign nation of Israel. As noted in the *Elon Moreh* decision, Israel also delegates sovereignty as it delegates control of the region from the Israeli military to the PNA: "The Interim Agreement changed the status of the Occupied Territories. It transferred part of the Territories to the control of the Palestinian Authority. This control was accompanied with elements of sovereignty." Exhibit E (slip op. ¶ 12).

773520.1

As an affiliate of Israel, the next question under the FSIA is whether the PNA is a political subdivision or agency or instrumentality of Israel.  Applying the core functions test, adopted by the Second Circuit, the PNA -- if not sovereign -- is properly considered to be a political subdivision of Israel for these purposes.  *See Transaero, Inc.  v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 151 (D.C. Cir. 1994) (an entity that is an "integral part of a foreign state's political structure" is to be treated as the foreign state itself, whereas an entity the structure and core function of which are commercial is to be treated as an "agency or instrumentality" of the state); *Garb v. Poland*, 440 F.3d 579, 593-94 (2d Cir. 2006).  The PNA was formed to govern and not to engage in commercial activity.

The PNA's status as political subdivision is also consistent with the legislative history of the FSIA which defined political subdivisions as "all governmental units beneath the central government, including local governments."  H.R. Rep. No. 94-1487, 94th Cong., 2d Sess. (1976), p. 15.  Israel's delegation of governing responsibility to the PNA is akin to the delegation of authority from a national government to a local government.  Like a local government, the PNA can make decisions independent of Israel and its members are selected by the local populace.  However, the PNA's power is not limitless and Israel, as an occupying nation, is ultimately responsible for the Territory under the Fourth Geneva Convention and the Hague Regulations.  As one court noted before the *Elon Moreh* decision, the limitations "make it clear that any governmental control exercised by the PA is *subordinate* to the outside *government of* Israel."  *Ungar*, 315 F. Supp. 2d at 180 (citing *Knox v. PLO*, 306 F. Supp. 2d, 424, 437-38 (S.D.N.Y. 2004)) (emphasis added).  Therefore, as an administrative entity within Israel whose responsibilities cover only the Territory and are subordinate to Israeli authority, the PNA is a political subdivision of the foreign state of Israel and exempt from the ATA.  *See e.g., Malewicz*

*v. City of Amsterdam*, 362 F. Supp. 2d 298, 306 (D.D.C. 2005) ("The City of Amsterdam is

clearly a 'political subdivision' of The Kingdom of the Netherlands and is therefore a 'foreign

state' within the meaning of FSIA"); *Hester International Corp. v. Federal Republic of Nigeria*,

681 F. Supp. 371, 377 (N.D. Miss. 1988) ("It is undisputed that Cross River State is one of

nineteen states comprising the Federal Republic of Nigeria and Cross River is a political

subdivision of Nigeria").

## IV.     THE CASE PRESENTS NON-JUSTICIABLE POLITICAL QUESTIONS

The position of the United States Executive Branch with respect to the PLO has changed

dramatically since the days of the Klinghoffer decision.  While that decision was consistent with

the then-U.S. policy of rejecting the idea of Palestinian statehood, the landscape has changed.

*Compare*  United States:  Presidential Statement on U.S. Policy For Peace In The Middle East,

21 I.L.M. 1199 (1982) ("Beyond the transition period, as we look to the future of the West Bank

and Gaza, it is clear to me that peace cannot be achieved by the formation of an independent

Palestinian state in those territories") *with* Interview on Radio Sawa with Samir Nader, Secretary

Condoleezza Rice, Washington, DC, July 25, 2007, *available at*

www.state.gov/secretary/rm/2007/89330.htm (last visited July 28, 2007) ("a Palestinian state

will need to be established").  President Bush has clearly stated his desire and intent to achieve

Palestinian statehood by 2009.  The PLO and PNA have also experienced a change in leadership

and the Bush administration has clearly voiced its support for President Abbas and its desire to

take actions to promote Palestinian confidence in and support for President Abbas.  To the extent

determinations made during the course of this litigation interfere with the goals and efforts of the

Executive branch to achieve Palestinian statehood through the promotion of President Abbas and

the governmental vehicles of the PNA and PLO, then a political question exists and this case

becomes nonjusticiable.

773520.1

The necessity for this Court to determine the evolving question of the defendants' sovereignty and, if sovereignty is found to be lacking, then whether the defendants, in a rapidly changing environment, exercise governmental functions delegated by Israel so as to be considered a political subdivision, render this case nonjusticiable. The judicial standards for determining a political subdivision may be clear, but a determination of the extent to which defendants exercise elements of Israel's governmental functions and the legal relationship between Israel and Palestine are loaded political questions and should be found nonjusticiable by this Court.

### A.    United States Policy on Palestine

On July 16, 2007, President Bush set forth his agenda with respect to Palestine:

> More than five years ago, I became the first American President to call for the creation of a Palestinian state. . . . Since then, many changes have come . . .. Palestinians have held free elections, and chosen a president committed to peace. . . .

> This is a moment of clarity for all Palestinians. And now comes a moment of choice. The alternatives before the Palestinian people are stark. There is the vision of Hamas, which the world saw in Gaza -- with murderers in black masks, and summary executions, and men thrown to their death from rooftops. By following this path, the Palestinian people would guarantee chaos, and suffering, and the endless perpetuation of grievance. They would surrender their future to Hamas's foreign sponsors in Syria and Iran. And they would crush the possibility of any -- of a Palestinian state.

> There's another option, and that's a hopeful option. It is the vision of President Abbas and Prime Minister Fayyad; it's the vision of their government; it's the vision of a peaceful state called Palestine as a homeland for the Palestinian people. . . .

> Only the Palestinians can decide which of these courses to pursue. ***Yet all responsible nations have a duty to help clarify the way forward. By supporting the reforms of President Abbas and Prime Minister Fayyad, we can help them show the world what a Palestinian state would look like -- and act like. We can help them prove to the world, the region, and Israel that a Palestinian state would be a partner -- not a danger.*** We can help them make clear to all Palestinians that rejecting violence is the surest path to security and a better life.

And we can help them demonstrate to the extremists once and for all that terror will have no place in a Palestinian state. . . .

***Ceding any of these struggles to extremists would have deadly consequences for the region and the world.  So in Gaza and the West Bank and beyond, the international community must stand with the brave men and women who are working for peace***.

White House Press Release, President Bush Discusses the Middle East (July 16, 2007), *available at* http://www.whitehouse.gov/news/releases/2007/07/20070716-7.html (last visited July 30, 2007) (emphasis added).

That policy of identifying -- and taking action to promote -- the current Palestinian government as the hopeful vision for the future and the preferred alternative to the terrorist actions of Hamas -- is directly challenged by this litigation against the governing bodies of Palestine, under the leadership of President Abbas and Prime Minister Fayyad.

### B.    *Baker v. Carr* Tests for Political Questions

The Supreme Court identified six tests designed to confirm or negate the existence of a political question in *Baker v. Carr*, 369 U.S. 186 (1962):

[1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.* at 217.  The first, second, fourth, fifth, and sixth tests confirm the existence of political questions in this case.

773520.1

1.    *The Issue Has Been Constitutionally Committed to the Executive Branch*

At the time of the Klinghoffer decision in 1991, when the Executive Branch had declared a policy that specifically excluded the possibility of Palestinian statehood, claims attributing the terrorist acts of individuals to the governing organizations of Palestine may not have posed a political question.  Now, however, the Executive Branch has identified Palestinian statehood and its active support for President Abbas as consistent with the national security objectives of the United States in its war against terror.  Such foreign policy decisions:

> are delicate, complex, and involve large elements of prophecy.  They are and should be undertaken only by those directly responsible to the people whose welfare they advance or imperil.  They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry.

*Bancoult v. McNamara*, 445 F.3d 427, 433 (D.C. Cir. 2006) (quoting *Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp.*, 333 U.S. 103, 111 (1948)).

Courts have recognized the political delicacy of U.S. foreign policy in the Israeli-Palestinian conflict.  In *Doe v. Israel*, the court noted that:

> It is hard to conceive of an issue more quintessentially political in nature than the ongoing Israeli-Palestinian conflict, which has raged on the world stage with devastation on both sides for decades. The region of the Middle East specifically, and the entire global community generally, is sharply divided concerning these tensions; American foreign policy has come under attack as a result.

400 F. Supp. 2d 86, 112 (D.D.C. 2005).

Courts have distinguished between the applicability of the political question doctrine in cases impacting value determinations of the Executive Branch and the doctrine's inapplicability with respect to tort claims against individuals regardless of the political climate.  In finding claims against the Vatican Bank for war crimes to be nonjusticiable, the Ninth Circuit in *Alperin*

34

*v. Vatican Bank* distinguished the political character of those claims from the individual claims

found justiciable by the Second Circuit in *Kadic v. Karadzic*.

> [T]he claims in *Kadic* focused on the acts of a single individual during a localized
> conflict rather than asking the court to under-take the complex calculus of
> assigning fault for actions taken by a foreign regime during the morass of a world
> war.  The slave labor claims present no mere tort suit.  On the contrary, these
> claims fundamentally rest on "controversies which revolve around policy choices
> and value determinations constitutionally committed for resolution to the halls of
> Congress or the confines of the Executive Branch."

*Alperin v. Vatican Bank*, 410 F.3d 532, 562 (9th Cir. 2005) (quoting *Japanese Whaling Ass'n*,

478 U.S. 221, 230 (1986)).  Now that the Executive Branch has taken a stance in support of

Palestinian statehood and in support of the government under the leadership of President Abbas

as consistent with its national security objectives in the war against terror, the actions at issue in

this case -- when alleged against the governing organizations of Palestine rather than the

individuals involved -- more closely resemble actions of a foreign regime during a war than

actions of a single individual during a localized conflict and therefore present nonjusticiable

questions under the reasoning of *Kadic v. Karadzic* and *Alperin v. Vatican Bank*.

      2.    *There is a Lack of Judicially Discoverable and Manageable Standards*

In determining how the governing organizations of Palestine should be treated under the

FSIA, this court will need to determine the true status of Palestine.  The first step is to determine

which sovereign gained control over the territory after the British mandate ceased and which

sovereign maintains control today.  *See United States v. Curtiss-Wright*, 299 U.S. 304, 317

(1936) ("Sovereignty is never held in suspense.  When, therefore the external sovereignty of

Great Britain in respect of the colonies ceased, it immediately passed to the Union.").  If that

sovereign is not Palestine, then the next step is to determine whether the relationship between the

governing organizations of Palestine and that sovereign entity is one of political subdivision.

773520.1

See discussion of political subdivision, supra.  That is a complex determination with political

consequences.  *See Elon Moreh*, Exh. E, slip op. ¶ 8 ("There is no need to consider, in the case at

hand, the question of the exact legal status of the said Palestinian Authority.  It is a complicated

matter.  It is enough to say that the Palestinian Authority, at least in the territory of Area A, was

granted certain prerogatives belonging to the sovereign.").  During this transition period from

British sovereignty, to arguable Israeli sovereignty, and ultimately to Palestinian sovereignty, the

relationship between Israel and Palestine is evolving and there are no judicially discoverable and

manageable standards with which to clearly identify this relationship within the categories of the

FSIA.

3.  *Independent Resolution by the Court Would Express Lack of Respect Due to the Executive Branch*

The Bush Administration, in connection with its intelligence services, has identified the

PNA and PLO, under the leadership of President Abbas and Prime Minister Fayyad, as partners

in the war against terror, as distinct from Hamas, the organization aligned with terrorism.

Indeed, one incident at issue in this litigation -- the July 31, 2002, bombing of the Hebrew

University -- is specifically attributed to Hamas in a 2005 CRS Issue Brief.  *See* CRS Issue Brief

for Congress, The Middle East Peace Talks, at CRS-5 (Updated February 1, 2005) ("On July 31,

Hamas set off a bomb at the Hebrew University in Jerusalem, killing 7, including 5 Americans,

and wounding 80"), *available at* ww.fas.org/man/crs/IB91137 (last visited July 30, 2007).  If the

allegations in this case against the PNA and PLO for these or other acts of terrorism were to

proceed, it would express a lack of respect for the national security determinations that have been

made by the Executive Branch and for its intended course of action going forward in pursuit of

its anti-terrorism agenda.  If the plaintiffs were successful in obtaining and collecting their

requested relief, such a financial blow to the governing bodies of Palestine would severely

interrupt the Middle East peace process and derail the U.S. policy of achieving Palestinian

statehood through the governing bodies led by President Abbas.

        4.     *There is an Unusual Need for Unquestioning Adherence to a Political Decision Already Made*

The U.S. war on terror is the main issue facing U.S. national security interests.  The

President has declared that "all responsible nations have a duty to help clarify the way forward"

and that is "[b]y supporting the reforms of President Abbas and Prime Minister Fayyad."  July

16, 2007 Press Briefing.  The President has made very clear that failure to support his regime of

choice "would have deadly consequences for the region and the world."  *Id.*  Courts have

recognized the need to evaluate the consequences of judicial decisions on U.S. foreign policy in

the Israeli-Palestinian conflict.  See *Doe v. Israel*, 400 F. Supp. 2d 86, 112 (D.D.C. 2005) ("Such

a conclusion would also implicitly condemn American foreign policy by suggesting that the

support of Israel is wrongful.  Conclusions like these present a potential for discord between the

branches that further demonstrates the impropriety of a judicial decision on these quintessential

political issues.").  It is difficult to imagine a more "unusual need for unquestioning adherence to

a political decision already made."  *Baker v. Carr*, 369 U.S. at 217.

        5.     *There is the Potential for Embarrassment from Multifarious Pronouncements*

The President has clearly articulated the U.S. foreign policy position that the governing

organizations of Palestine constitute the path forward consistent with U.S. national security in

the Middle East.  He has also put forth the U.S. policy that all nations must support the Palestine

government and help Palestinians choose this path over the path of violence and terrorism led by

Hamas.

773520.1

In *Bancoult v. McNamara*, the court noted that the circumstances surrounding the establishment of a military base on Diego Garcia had been the subject of sensitive political debates.  Ultimately, the political branches decided to move forward with base construction despite the relocation of local residents by force because of the value of the base to U.S. national security against the threat of Soviet expansion in the Middle East.  The court found the existence of a political question, noting "[b]y adding its opinion to this medley of concerns, the court will disturb the government's 'single voice' in the realm of foreign military policy and subject the judiciary and the political departments to potential embarrassment."  370 F. Supp. 2d 1, 17 (D.D.C. 2004).

Similarly, the Executive Branch, the branch tasked with tracking terrorist activity, has reviewed the status of the entities, factions, and individuals acting in the Middle East and has determined that its support of the governing bodies of Palestine, as led by President Abbas, is consistent with national security.  To be effective and legitimate governing organizations, the PNA and PLO must function as umbrella organizations that include individuals with divergent views in a political atmosphere of oppression.  Judicial opinion on which individual conduct should or should not be attributed to the governing bodies of Palestine will disturb the "single voice" of the U.S. government in foreign policy in the Middle East.

## CONCLUSION

For the reasons set forth above, Defendants PNA and PLO request that the Court dismiss the complaint as to the PNA and PLO for lack of subject matter jurisdiction.

Respectfully Submitted,

July 30, 2007

/s/ Richard A. Hibey_____
Richard A. Hibey
Mark J. Rochon
Appearing *Pro Hac Vice*
MILLER & CHEVALIER CHARTERED
655 15th St., N.W. Suite 900
Washington D.C. 20005-6701
Ph. (202) 626-5800
Fax: (202) 626-5801
Email: rhibey@milchev.com

*Attorneys for Defendants The Palestine National Authority and The Palestinian Liberation Organization*

773520.1