# EXHIBIT A (Part 1)

S. Hrg. 101–1193

# ANTITERRORISM ACT OF 1990

# HEARING

BEFORE THE

## SUBCOMMITTEE ON
## COURTS AND ADMINISTRATIVE PRACTICE

OF THE

# COMMITTEE ON THE JUDICIARY
# UNITED STATES SENATE

### ONE HUNDRED FIRST CONGRESS

SECOND SESSION

ON

# S. 2465

A BILL TO PROVIDE A NEW CIVIL CAUSE OF ACTION IN FEDERAL LAW
FOR INTERNATIONAL TERRORISM THAT PROVIDES EXTRATERRITOR-
IAL JURISDICTION OVER TERRORIST ACTS ABROAD AGAINST UNITED
STATES NATIONALS

JULY 25, 1990

Serial No. J–101–87

Printed for the use of the Committee on the Judiciary



Legislative
Library
Jones, Day, Reavis & Pogue

U.S. GOVERNMENT PRINTING OFFICE

37–716 ≡≡    WASHINGTON : 1991

For sale by the Superintendent of Documents, Congressional Sales Office
U.S. Government Printing Office, Washington, DC 20402

## COMMITTEE ON THE JUDICIARY

JOSEPH R. BIDEN, JR., Delaware, *Chairman*

| | |
|---|---|
| EDWARD M. KENNEDY, Massachusetts | STROM THURMOND, South Carolina |
| HOWARD M. METZENBAUM, Ohio | ORRIN G. HATCH, Utah |
| DENNIS DeCONCINI, Arizona | ALAN K. SIMPSON, Wyoming |
| PATRICK J. LEAHY, Vermont | CHARLES E. GRASSLEY, Iowa |
| HOWELL HEFLIN, Alabama | ARLEN SPECTER, Pennsylvania |
| PAUL SIMON, Illinois | GORDON J. HUMPHREY, New Hampshire |
| HERBERT KOHL, Wisconsin | |

MARK H. GITENSTEIN, *Chief Counsel*
DIANA HUFFMAN, *Staff Director*
TERRY L. WOOTEN, *Minority Chief Counsel*
R.J. DUKE SHORT, *Minority Staff Director*

---

### SUBCOMMITTEE ON COURTS AND ADMINISTRATIVE PRACTICE

HOWELL HEFLIN, Alabama, *Chairman*

| | |
|---|---|
| HOWARD M. METZENBAUM, Ohio | CHARLES E. GRASSLEY, Iowa |
| HERBERT KOHL, Wisconsin | STROM THURMOND, South Carolina |

KAREN KREMER, *Chief Counsel*
SAM GERDANO, *Minority Chief Counsel*

(II)

# CONTENTS

## STATEMENTS OF COMMITTEE MEMBERS

Page

Grassley, Hon. Charles E., a U.S. Senator from the State of Iowa .......................... 1
Thurmond, Hon. Strom, a U.S. Senator from the State of South Carolina .......... 3
Heflin, Hon. Howell, a U.S. Senator from the State of Alabama .......................... 49

## PROPOSED LEGISLATION

S. 2465, a bill to provide a new civil cause of action in Federal law for international terrorism that provides extraterritorial jurisdiction over terrorist acts abroad against United States nationals .................................................. 5

## CHRONOLOGICAL LIST OF WITNESSES

Panel consisting of Alan J. Kreczko, Deputy Legal Adviser, Department of State, Washington, DC; and Steven R. Valentine, Deputy Assistant Attorney General, Civil Division, U.S. Department of Justice, Washington, DC, accompanied by Lloyd Green, counselor to the Assistant Attorney General, Civil Division, and John De Pue, Criminal Division .......................................... 11
Panel consisting of Lisa and Ilsa Klinghoffer, New York, NY, on behalf of the Leon and Marilyn Klinghoffer Memorial Foundation, Anti-Defamation League; Rosemary Wolfe, Alexandria, VA; and Paul S. Hudson, chairman, Families of Pan AM Fight 103/Lockerbie, New York, NY .............................. 56
Panel consisting of Joseph A. Morris, president and general counsel, Lincoln Legal Foundation, Chicago, IL; Daniel Pipes, director, Foreign Policy Research Institute, Philadelphia, PA; and Wendy Collins Perdue, professor, Georgetown University Law Center, Washington, DC .................................. 78

## ALPHABETICAL LIST AND MATERIAL SUBMITTED

De Pue, John:
    "International Terrorism—Significant Accomplishments," document showing indictments or complaints against terrorists in the international context .......................................................................................... 53
Hudson, Paul S.:
    Testimony ...................................................................................................... 70
    Prepared statement ...................................................................................... 72
Klinghoffer, Ilsa and Lisa:
    Testimony ...................................................................................................... 56
    Prepared statement of the Leon and Marilyn Klinghoffer Memorial Foundation of the Anti-Defamation League .......................................... 58
    Responses to questions submitted by Senator Heflin .............................. 62
Kreczko, Alan J.:
    Testimony ...................................................................................................... 11
    Prepared statement ...................................................................................... 14
    Responses to questions submitted by:
        Senator Grassley ...................................................................................... 21
        Senator Heflin ........................................................................................... 24
Morris, Joseph A.:
    Testimony ...................................................................................................... 78
    Prepared statement ...................................................................................... 80
    Chronology of terrorist sets against U.S. Citizens, 1975–90 .................. 92

(III)

IV

|                                                                      | Page |
|----------------------------------------------------------------------|------|
| Perdue, Wendy Collins:                                               |      |
| Testimony                                                            | 119  |
| Prepared statement                                                   | 120  |
| Responses to questions submitted by Senator Heflin                   | 132  |
| Pipes, Daniel:                                                       |      |
| Testimony                                                            | 109  |
| Prepared statement                                                   | 111  |
| Responses to questions submitted by Senators Thurmond and Heflin     | 118  |
| Valentine, Steven R.:                                                |      |
| Testimony                                                            | 25   |
| Prepared statement                                                   | 28   |
| Responses to questions submitted by:                                 |      |
| Senator Heflin                                                       | 40   |
| Senator Grassley                                                     | 42   |
| Wolfe, Rosemary:                                                     |      |
| Testimony                                                            | 64   |
| Prepared statement                                                   | 66   |
| Letters to the Editor, from the Washington Post, July 13, 1990       | 68   |
| Response to question                                                 | 69   |

# ANTITERRORISM ACT OF 1990

### WEDNESDAY, JULY 25, 1990

U.S. SENATE,
SUBCOMMITTEE ON COURTS AND ADMINISTRATIVE PRACTICE,
COMMITTEE ON THE JUDICIARY,
*Washington, DC.*

The subcommittee met, pursuant to notice, at 2:09 p.m., in room SD-226, Dirksen Senate Office Building, Hon. Charles E. Grassley presiding.

Also present: Senators Heflin and Thurmond.

### OPENING STATEMENT OF HON. CHARLES E. GRASSLEY, A U.S. SENATOR FROM THE STATE OF IOWA

Senator GRASSLEY. In the absence of Senator Heflin, the distinguished chairman of this subcommittee, I will proceed based upon the go-ahead from his staff. There is a very important vote on the product of peanuts as part of the farm bill, and that is a very important crop in the State of Alabama. That is what is detaining him, but he said he would come by just as soon as he could.

One morning, a father leaves for work, a mother prepares for a holiday meal, a brother shovels snow from the sidewalk, a teenager anticipates a reunion with a sister, daughters wave good-bye to their parents. It is pretty much a typical American day in a typical American life.

But then something happens that forever changes this life. Life will never be the same again. A terrorist, for reasons nobody understands, for reasons beyond the concept of humanity, blows a plane out of the air or hijacks a ship or shoots a father, murders a wife, husband, sister or brother. Today, this committee will hear the testimony of witnesses whose lives have been forever changed as a result of acts of terrorism.

We all remember the hijacking of the *Achille Lauro* cruise liner. PLO terrorists took 97 passengers captive, including Marilyn and Leon Klinghoffer. The terrorists surrounded the passengers with guns and explosives. They also took the wheelchair-bound Mr. Klinghoffer to the side of the ship where they shot him and pushed him into the sea.

Mrs. Klinghoffer wanted justice, so she instructed her attorney to file suit against those responsible for the murder of her husband. As I understand the story, that was when Mr. Jay Fischer, the Klinghoffers' attorney, turned to the Manhattan telephone book for some help and there he found the Palestine Liberation Organization listed in bold letters. Well, the rest is history. The Klingh-

(1)

2

offer daughters are with us today to tell their story and how they have fought back against terrorists.

Paul Hudson and Rosemary Wolfe are here today representing the Families of Pan Am 103. Paul Hudson's 16-year-old daughter, Melina, and Rosemary Wolfe's 20-year-old stepdaughter, Miriam, were among the 270 people who lost their lives when a terrorist planted a bomb on a New York-bound Pan Am flight from London. Eleven Scottish residents perished on the ground when the plane crashed into the town of Lockerbie.

This was a tragedy that shook America in the winter of 1988. It was the worst security-related disaster in U.S. civil aviation history—all those lives taken from us. The Americans on board represented some of the finest people our country has to offer—young students, diverse and talented, just embarking on life; a Justice Department attorney, whose job it was to track down Nazi criminals and bring them to justice; State Department officials serving their country abroad; American soldiers en route to visit their loved ones for the holidays; a 3-year-old girl in a red dress.

Families of Pan Am 103 is one of three groups that formed after the bombing. This group not only provides a source of support for the families, but it has mobilized into an integral force in the ongoing investigations, lobbying Members of Congress and working for strengthened airport security worldwide.

The President's Commission on Aviation Security and Terrorism and the Commission's May 15, 1990, report are due in no small part to the families' efforts. They have suffered an unspeakable tragedy, but they have somehow found the strength to work so that others will not suffer the same fate in the future.

The President's Commission's report consisted of an evaluation of the existing aviation security system and options for handling terrorist threats, but it also devoted study to the treatment of families of victims of terrorist acts. We must understand that the victims of Pan Am 103, Mr. Klinghoffer and others, were victims because they were Americans. They died because they were Americans. We must do all that we can to assist and comfort the families of American victims, and it also seems to me that we ought to make it clear to the world how we feel about taking the lives of Americans.

A good place for Congress to start is with Senate bill 2465, the Grassley-Heflin bill which I introduced last April. This bill is co-sponsored by the distinguished chairman, Senator Heflin, along with Senators Hatch, Humphrey, Biden, Specter, Simon, Levin, Lieberman, Murkowski, DeConcini, Coats, Boschwitz, Metzenbaum, and Helms.

Currently, victims have no express right to recover damages for acts of international terrorism. While Congress has enacted several laws extending American criminal jurisdiction to acts of international terrorism against our citizens, our civil justice system provides really little relief.

Title 18, U.S.C. 2331, provides for extraterritorial criminal jurisdiction for acts of international terrorism. The bill before us would fill the gap by providing the civil counterpart to the existing criminal statute. This legislation is, in part, symbolic. It sends a strong and clear message to the world on how the American legal system

3

deals with terrorists. But the Klinghoffers have proved that there is more than symbolism involved; there is substance.

On June 7, a Federal judge ruled that the U.S. courts have jurisdiction over the PLO. The Klinghoffers have laid the groundwork; they have set the precedent. They didn't listen to the skeptics. The New York district court ruling is a landmark case and a victory. I, for one, am glad that the skeptics didn't deter the Klinghoffers from seeking justice.

Their victory is, however, but one ruling by one Federal district court in the Nation. It is not definitive. Senate bill 2465 is definitive. Senate bill 2465 empowers the victims of terrorism to seek justice. It gives them the right to have their day in court to prove who is responsible for all the world to see.

Senate bill 2465 is clear, express, and unequivocal. This legislation reaffirms our commitment to the rule of law. With this law, the people of the United States will be able to bring terrorists to justice the American way, by using the framework of our legal system to seek justice against those who follow no framework or defy all notions of morality and justice. It also sends a strong warning to terrorists to keep their hands off Americans and an eye on their assets.

For months, we have worked closely with the Department of State on this legislation. In fact, the bill before us reflects changes suggested by the State Department that not only address concerns expressed by them, but, in fact, in many ways have made Senate bill 2465 a much better bill.

I am pleased to hear the Department testify in support of the bill. It is my hope that we can continue to work together to resolve outstanding concerns and enact this legislation into law. We have also sought to work closely with the Department of Justice, and I hope to continue to work together with them toward passage of this bill.

Of course, I must give my sincere thanks, and also due regard, to the chairman of the subcommittee, Senator Heflin, for without his help as lead cosponsor—more importantly, making it possible to hold this hearing—we wouldn't be bringing all this evidence before the public today.

I welcome all the witnesses and thank them for being here, and call on Senator Thurmond.

### OPENING STATEMENT OF HON. STROM THURMOND, A U.S. SENATOR FROM THE STATE OF SOUTH CAROLINA

Senator THURMOND. Thank you, Mr. Chairman.

Mr. Chairman, today we are here to consider Senate bill 2465, the Antiterrorism Act of 1990, introduced by Senator Grassley and Senator Heflin. This legislation will provide a new civil cause of action in Federal court for acts of international terrorism directed at U.S. nationals.

Generally, this bill will amend section 2331 of title 18 of the United States Code. Currently, this title provides for criminal prosecution of terrorists. The legislation we are considering today will provide civil sanctions as a counterpart to the criminal statute.

4

Specifically, the bill defines terrorism as "violent acts or acts dangerous to human life directed toward a civilian population and not directed against military personnel or installations." Any national of the United States injured by an act of international terrorism may sue in U.S. district court and seek treble damages, attorney's fees and costs.

In order to effectuate these civil remedies, this legislation will provide extraterritorial jurisdiction in Federal court over terrorist acts abroad against U.S. nationals. This bill sets a 3-year statute of limitations for those bringing suit under this new provision. Finally, this legislation complies with the Act of State Doctrine, which limits lawsuits against foreign countries by creating an exception for injury or loss related to an act of war arising from official acts of foreign governments.

Acts of international terrorism against our Nation's citizens, like the recent brutal murders of Col. William Higgins and Leon Klinghoffer, must not be permitted to go unpunished. Terrorism, the heinous, politically motivated acts carried out against the world's innocent, must be brought to an end. We must not allow these vicious murderers to hide behind a false veil of political struggle and spill American blood without facing civil and criminal punishment. Terrorism of any kind cannot be tolerated. That is why I joined Senator Specter in supporting legislation to provide the death penalty for terrorist murders against U.S. nationals abroad. The legislation we are considering today will extend the rights of the victims of terrorist acts to pursue civil damages against those who wrongfully injure U.S. nationals.

I look forward to hearing from the distinguished panels of witnesses we have assembled before the subcommittee today.

Thank you, Mr. Chairman.

[A copy of S. 2465 follows:]

5

II

101ST CONGRESS
2D SESSION

# S. 2465

To provide a new civil cause of action in Federal law for international terrorism
that provides extraterritorial jurisdiction over terrorist acts abroad against
United States nationals.

---

## IN THE SENATE OF THE UNITED STATES

APRIL 19 (legislative day, APRIL 18), 1990

Mr. GRASSLEY (for himself, Mr. HEFLIN, Mr. HATCH, Mr. HUMPHREY, Mr.
BIDEN, Mr. SPECTER, Mr. SIMON, Mr. LEVIN, Mr. LIEBERMAN, Mr. MUR-
KOWSKI, and Mr. DECONCINI) introduced the following bill; which was read
twice and referred to the Committee on the Judiciary

---

# A BILL

To provide a new civil cause of action in Federal law for
international terrorism that provides extraterritorial jurisdic-
tion over terrorist acts abroad against United States nation-
als.

1      *Be it enacted by the Senate and House of Representa-*

2  *tives of the United States of America in Congress assembled,*

3  SECTION 1. SHORT TITLE.

4      This Act may be cited as the "Antiterrorism Act of

5  1990".

★(Star Print)

6

2

1  SEC. 2. TERRORISM.

2      (a) TERRORISM.—Chapter 113A of title 18, United

3  States Code, is amended—

4          (1) in section 2331 by striking subsection (d) and

5      redesignating subsection (e) as subsection (d);

6          (2) by redesignating section 2331 as 2332 and

7      striking the caption for section 2331 and inserting the

8      following:

9  "§ 2332. Criminal penalties";

10          (3) by inserting before section 2332 as redesig-

11      nated the following:

12  "§ 2331. Definitions

13      "As used in this chapter—

14          "(1) the term 'international terrorism' means ac-

15      tivities that—

16              "(A) involve violent acts or acts dangerous

17          to human life that are a violation of the criminal

18          laws of the United States or of any State, or that

19          would be a criminal violation if committed within

20          the jurisdiction of the United States or of any

21          State;

22              "(B) appear to be intended—

23                  "(i) to intimidate or coerce a civilian

24              population;

25                  "(ii) to influence the policy of a govern-

26              ment by intimidation or coercion; or

●S 2465 IS1S

7

3

| | |
|---|---|
| 1 | "(iii) to affect the conduct of a govern- |
| 2 | ment by assassination or kidnapping; and |
| 3 | "(C) occur primarily outside the territorial |
| 4 | jurisdiction of the United States, or transcend na- |
| 5 | tional boundaries in terms of the means by which |
| 6 | they are accomplished, the persons they appear |
| 7 | intended to intimidate or coerce, or the locale in |
| 8 | which their perpetrators operate or seek asylum; |
| 9 | "(2) the term 'national of the United States' has |
| 10 | the meaning given such term in section 101(a)(22) of |
| 11 | the Immigration and Nationality Act; |
| 12 | "(3) the term 'person' means any individual or |
| 13 | entity capable of holding a legal or beneficial interest |
| 14 | in property; and |
| 15 | "(4) the term 'act of war' means any act occur- |
| 16 | ring in the course of— |
| 17 | "(A) declared war; |
| 18 | "(B) armed conflict, whether or not war has |
| 19 | been declared, between two or more nations; or |
| 20 | "(C) armed conflict between military forces |
| 21 | of any origin.". |
| 22 | (4) by adding immediately after section 2332 as |
| 23 | redesignated the following new sections: |

•S 2465 IS1S

8

4

1 "§ 2333. Civil remedies

2     "(a) ACTION AND JURISDICTION.—Any national of the

3 United States injured in his person, property, or business by

4 reason of an act of international terrorism may sue therefor in

5 any appropriate district court of the United States and shall

6 recover threefold the damages he sustains and the cost of the

7 suit, including attorney's fees.

8     "(b) ESTOPPED UNDER UNITED STATES LAW.—A

9 final judgment or decree rendered in favor of the United

10 States in any criminal proceeding under section 1116, 1201,

11 1203, or 2332 of this title or section 1472 (i), (k), (l), (n), or

12 (r) of title 49 App. shall estop the defendant from denying the

13 essential allegations of the criminal offense in any subsequent

14 civil proceeding under this section.

15     "(c) ESTOPPED UNDER FOREIGN LAW.—A final judg-

16 ment or decree rendered in favor of any foreign state in any

17 criminal proceeding shall, to the extent that such judgment or

18 decree may be accorded full faith and credit under the law of

19 the United States, estop the defendant from denying the es-

20 sential allegations of the criminal offense in any subsequent

21 civil proceeding under this section.

22 "§ 2334. Jurisdiction and venue

23     "(a) GENERAL VENUE.—Any civil action under section

24 2333 of this title against any person may be instituted in the

25 district court of the United States for any district in which all

26 plaintiffs reside or the defendant resides, is found, or has an

●S 2465 IS1S

9

5

1 agent. Process in such a civil action may be served in any

2 other district of which the defendant is an inhabitant or wher-

3 ever the defendant may be found.

4    "(b) SPECIAL MARITIME OR TERRITORIAL JURISDIC-

5 TION.—If the actions giving rise to the claim occurred within

6 the special maritime and territorial jurisdiction of the United

7 States, as defined in section 7 of this title, then any civil

8 action under section 2333 of this title against any person may

9 be instituted in the district court of the United States for any

10 district in which all plaintiffs reside or the defendant resides,

11 is found, or has an agent.

12    "(c) CONVENIENCE OF FORUM.—The district court

13 shall not dismiss any action brought under section 2333 on

14 the grounds of the inconvenience or inappropriateness of the

15 forum chosen, unless the action may be maintained in a more

16 convenient or more appropriate foreign court that has juris-

17 diction over the subject matter and over the defendant or

18 defendants.

19 "§ 2335. Limitation of actions

20    "(a) IN GENERAL.—Subject to subsection (b), a suit for

21 recovery of damages under section 2333 of this chapter shall

22 not be maintained unless commenced within 3 years from the

23 date the cause of action accrued.

24    "(b) CALCULATION OF PERIOD.—The time of the ab-

25 sence of the defendant from the United States or from any

•S 2465 IS1S

10

6

1 jurisdiction in which the same or a similar action arising from

2 the same facts may be maintained by the plaintiff, or any

3 concealment of his whereabouts, shall not be reckoned within

4 this period of limitation.

5 "§ 2336. Other limitations

6     "No action shall be maintained under section 2333 of

7 this chapter for injury or loss by reason of an act of war.";

8 and

9         (5) by amending the table of sections to read as

10     follows:

"CHAPTER 113A—TERRORISM

"Sec.
"2331. Definitions.
"2332. Criminal penalties.
"2333. Civil remedies.
"2334. Jurisdiction and venue.
"2335. Limitation of actions.
"2336. Other limitations.".

11     (b) TABLE OF CONTENTS.—The table of contents of

12 part 1, title 18, United States Code, is amended by striking:

"113A. Extraterritorial jurisdiction over terrorist acts abroad
            against United States nationals.............................. 2331"

13 and inserting in lieu thereof:

"113A. Terrorism ................................................................ 2331".

11

Senator GRASSLEY. Thank you, Senator Thurmond.

We will now call on Mr. Kreczko, Deputy Legal Adviser, Department of State, here in Washington. Rick Valentine is Deputy Assistant Attorney General, Department of Justice, Office of Immigration Litigation, here in Washington, DC.

Mr. Valentine, you have two people at the witness table that I will let you introduce as well. Would you proceed? I think we will start as I introduced, please.

PANEL CONSISTING OF ALAN J. KRECZKO, DEPUTY LEGAL ADVISER, DEPARTMENT OF STATE, WASHINGTON, DC; AND STEVEN R. VALENTINE, DEPUTY ASSISTANT ATTORNEY GENERAL, CIVIL DIVISION, U.S. DEPARTMENT OF JUSTICE, WASHINGTON, DC, ACCOMPANIED BY LLOYD GREEN, COUNSELOR TO THE ASSISTANT ATTORNEY GENERAL, CIVIL DIVISION, AND JOHN DE PUE, CRIMINAL DIVISION

STATEMENT OF ALAN J. KRECZKO

Mr. KRECZKO. Thank you, Mr. Chairman. Mr. Chairman, with your permission, I will limit my introductory comments to a few comments and allow my statement to be submitted in the record.

Senator GRASSLEY. OK. On the advice, and I think it is good advice, of a former distinguished chairman and the ranking Republican of this committee, Senator Thurmond, I should remind you of our general rule that we have 5 minutes for summarizing, and we will put your entire statement in the record. That would be applicable for each of the witnesses, please, and I guess it is probably a little more important today because the entire Senate is going to hear the case of Senator Durenberger at 3:30, and most of us should be there at the time of that.

So would you proceed, Mr. Kreczko?

Mr. KRECZKO. Yes, sir. Thank you, Mr. Chairman, for the opportunity to testify today concerning Senate bill 2465, a bill that will add to the arsenal of legal tools that can be used against those who commit acts of terrorism against U.S. citizens abroad.

I also want to thank you for giving us the opportunity to discuss earlier drafts of the legislation with your staff, and for revising the bill to accommodate many of our concerns. I strongly endorse your invitation to continue this close collaboration.

Senator, we support this legislation as a useful addition to our efforts to strengthen the rule of law against terrorists. The keynote of our counterterrorism policy has been to treat terrorists as criminals, regardless of their motives, and, in cooperation with other countries, to use the law to bring terrorists to justice.

Recent Federal legislation has established Federal criminal jurisdiction over certain terrorist acts against Americans overseas. These domestic laws implement and are buttressed by international conventions on antihijacking and other terrorist acts.

This legal framework, together with increased international cooperation against terrorism, has begun to pay off. Figures show some decline in the overall level of international terrorism. These figures do not mean we have won the battle against terrorism, but they show that we are making progress.

12

While we have made a start in prosecuting the perpetrators of terrorist acts, it is still unfortunately the case that the victims of terrorism generally remain uncompensated.

Last month, a Federal district court held that U.S. admiralty laws could be used to sue for terrorist acts on board ships. In *Klinghoffer* v. *The Palestine Liberation Organization,* a Federal court ruled that Mr. Klinghoffer's daughters, as well as other passengers of the *Achille Lauro,* can sue the PLO in Federal court under its admiralty jurisdiction for Abul Abbas' act of terrorism. Just as our criminal laws have sent an important signal to those who would engage in terrorism, this case signals for the first time that individual terrorists and their organizations may be subject to civil liability in the United States.

This bill, Senate bill 2465, expands the *Klinghoffer* opinion. Whereas that opinion rested on the special nature of our admiralty laws, this bill will provide general jurisdiction to our Federal courts and a cause of action for cases in which an American has been injured by an act of terrorism overseas.

The bill is a welcome addition to our arsenal against terrorists. The existence of such cause of action may deter terrorist groups from maintaining assets in the United States, from benefitting from investments in the United States, and from soliciting funds from within the United States. In addition, other countries may follow our lead and implement complementary national measures, thereby increasing obstacles to terrorist operations.

Senator, while the department supports the objectives of the bill, as we have discussed with the committee staff, we favor adding a provision to the bill clarifying that the bill's provisions do not apply in suits against the United States, foreign States, or any officer or employee thereof. The effect of this provision would be to maintain the status quo as regards sovereign States and their officials. No cause of action for international terrorism exists against them.

Use of the U.S. judicial system to bring charges of terrorism against foreign States or officials has obvious potential to create serious frictions and tensions with other nations. Most other foreign States would view the assertion by the United States of such jurisdiction as inconsistent with international law. We are also concerned that unilateral extension of such jurisdiction would undercut our efforts to build multilateral cooperation against terrorism.

We would be concerned about the reciprocal implications of any bill that permitted U.S. courts to adjudicate allegations of terrorism against foreign States or their officials. Moreover, if the bill were to permit civil suits against States or their officials alleging terrorism, individuals, rather than the U.S. Government, would determine the timing and manner of making allegations in official U.S. fora about the conduct of foreign countries and their officers.

We believe that the United States can best manage a complex foreign policy with multiple objectives if the timing and manner of such serious allegations against foreign countries in official fora are left in the hands of persons who are responsible for the conduct of our foreign policy.

To conclude, Mr. Chairman, we support this legislation as a useful addition to the arsenal of legal tools for the fight against ter-

rorism, subject to the concern indicated. We, of course, also urge the committee to consider seriously the concerns and remarks indicated by the Department of Justice.

I look forward to answering any of your questions. Thank you.

[Mr. Kreczko submitted the following material:]

14

STATEMENT OF

ALAN J. KRECZKO

DEPUTY LEGAL ADVISER


INTRODUCTION

Thank you Mr. Chairman.  I am very pleased to have this
opportunity to testify today on behalf of a bill that will add
to the arsenal of legal tools that can be used against those
who commit acts of terrorism against United States citizens
abroad.  I especially want to thank Senator Grassley for giving
us the opportunity to discuss earlier drafts of the legislation
with his staff, and for revising the bill to accommodate many
of our concerns.  We can support the bill if the Committee can
accommodate one additional concern, which I will discuss here,
in a way that helps maximize the counter terrorism impact while
avoiding problems of international law, reciprocity, and
potentially harmful judicial interference in foreign affairs.

THE EXISTING LEGAL FRAMEWORK AGAINST TERRORISM

From a policy viewpoint, we support this legislation as a
potentially useful addition to our efforts to strengthen the
rule of law against terrorists.  The keynote of our
counterterrorism policy has been to treat terrorists as
criminals, regardless of their motives, and, in cooperation
with other countries, to use the law to bring terrorists to
justice by identifying, tracking, apprehending, prosecuting and
punishing them.

Federal legislation enacted in 1986 (the Omnibus Diplomatic
Security and Anti-terrorism Act) establishes federal criminal
jurisdiction over the murder, attempted murder, or conspiracy
to murder or cause serious bodily harm to Americans overseas,

if the act was intended to coerce, intimidate or retaliate against a government or civilian population. In addition, a 1984 law (the Comprehensive Crime Control Act of 1984) provides Federal criminal jurisdiction over the detaining of Americans as hostages, or the threatening to detain, kill or injure an American in order to influence the U.S. Government. It was under this statute that terrorist Fawaz Younis was recently convicted in U.S. court, and sentenced to 30 years imprisonment, for the hijacking of a Royal Jordanian Airliner in 1985. Together, these statutes extend the reach of Federal law enforcement, including the Federal Courts, to a broad range of terrorists activities overseas, where 99 percent of all terrorist attacks against Americans occur.

These domestic laws are buttressed by international Conventions on anti-hijacking, aircraft sabotage, the taking of hostages, crimes against internationally protected persons (such as diplomats), and the protection of nuclear materials. In each of these conventions, the states party to them have agreed either to prosecute suspected violators, or to extradite them to a nation which will prosecute. Two additional conventions dealing with terrorist acts committed at or against airports and terrorist acts committed at or against maritime vessels have recently been concluded. The U.S. Senate gave its advice and consent to ratification of both treaties in November 1989. We will be submitting the implementing legislation to Congress in the near future and encouraging action soon on such legislation.

Other countries have tightened up their legislation and, equally important, have been increasingly putting terrorists on trial and sending them to prison instead of letting them quietly slip away. Last year alone, for example:

--A Swiss court convicted, and sentenced to life imprisonment, Lebanese Shi'ite Hussein Mohammed Hariri for assassination, hijacking, and using explosives in connection

16

with the hijacking of an Air Afrique Flight in 1987.

-- A German court convicted, and sentenced to life
imprisonment, Mohammed Ali Hamadei for the hijacking of TWA
Flight 847, for hostage taking, and for the murder of U.S. Navy
diver Robert Stethem.

-- A Swedish court convicted, and sentenced to life
imprisonment, Mohammed Abu Talb and Marten Imandi for murder,
attempted murder and criminal destruction in connection with
bombing attacks on a synagogue and two airline offices in
Stockholm, Amsterdam and Copenhagen.

The legal framework I have described, together with
increased international cooperation against terrorism, has
begun to pay off.  In 1989, the overall level of international
terrorism declined by almost 38 percent to 528 incidents from
862 terrorist incidents in 1988; those killed in such incidents
decreased by 27 percent, and those injured decreased a full 57
percent.  These figures do not mean we have won the battle
against terrorism, but they show that we are making progress.
And much of that progress may be due to the clear and
unmistakable signal sent by our criminal laws against
terrorism.  The basic underlying theme behind this use of law
is to make clear to terrorists and their sympathizers that
terrorists are committing criminal acts.  Although some may
conjure up romantic images of "freedom fighters" engaged in
"liberation movements," our legal framework firmly rejects this
distorted view.  The fact is, brutal acts of terrorism cannot
be justified or excused for any reason and their perpetrators
must be brought to justice.

THE KLINGHOFFER CASE

While we have made a start in prosecuting the perpetrators
of terrorist acts, it is still unfortunately the case that the
victims of terrorism generally remain uncompensated.  Last

month, a federal district court held that U.S. admiralty laws could be used to sue for terrorist acts on board ships. In Klinghoffer v. Palestine Liberation Organization, a federal court ruled that Mr. Klinghoffer's daughters, as well as other passengers of the Achille Lauro, can sue the PLO in federal court under its admiralty jurisdiction for Abul Abbas' act of terrorism.

Just as our criminal laws have sent an important signal to those who would engage in terrorism, this case signals for the first time that individual terrorists and their organizations may now be subject to civil liability in the United States.

THE BENEFITS OF THE GRASSLEY BILL

This bill, S. 2465, expands the Klinghoffer opinion. Whereas that opinion rested on the special nature of our admiralty laws, this bill will provide general jurisdiction to our federal courts and a cause of action for cases in which an American has been injured by an act of terrorism overseas. It will pave the way for other victims of terrorism to seek justice via the federal courts and the possibility of civil damages may well serve as an economic disincentive to terrorism.

We view this bill as a welcome addition to the growing web of law we are weaving against terrorists. It may be that, as a practical matter, there are not very many circumstances in which the law can be employed. To our knowledge few terrorists are likely to travel to the United States and few terrorist organizations are likely to have cash assets or property located in the United States that could be attached and used to fulfill a civil judgment. The existence of such a cause of action, however, may deter terrorist groups from maintaining assets in the United States, from benefiting from investments in the U.S. and from soliciting funds within the U.S. In addition, other countries may follow our lead and implement

18

complimentary national measures, thereby increasing obstacles to terrorist operations.

Moreover, the bill may be useful in situations in which the rules of evidence or standards of proof preclude the U.S. government from effectively prosecuting a criminal case in U.S. Courts. Because a different evidentiary standard is involved in a civil suit, the bill may provide another vehicle for ensuring that terrorists do not escape justice.

CONCERNS OF THE DEPARTMENT

The Department has worked closely with the Committee to ensure that the Bill creates a new weapon against terrorists without opening the door to lawsuits that would hamper U.S. foreign policy. As we have discussed with the Committee's staff, we favor adding a new provision, § 2336(b), to the Bill. This provision would state that the Bill's other provisions shall <u>not</u> apply in suits against the United States, foreign states as defined in the Foreign Sovereign Immunities Act, or any officer or employee thereof. The effect of this provision would be to maintain the status quo as regards sovereign states and their officials: no cause of action for "international terrorism" exists against them.

The Department opposes creating this civil cause of action against foreign states. Use of the U.S. judicial system to bring charges of terrorism against foreign states or officials has obvious potential to create serious frictions and tensions with other nations. Most if not all foreign states would view the assertion by U.S. courts of jurisdiction to review allegations against them of committing or aiding terrorist acts outside the United States as inconsistent with international law. Under established principles of sovereign immunity, the courts of one country have no jurisdiction to adjudicate claims arising from torts allegedly committed by other countries that

occur outside the territory of the forum state.  The Supreme Court last year emphatically confirmed that this is the law in the United States.  (Amerada Hess.)  Indeed, though personal injuries and damages are the usual consequence of military acts, states are not generally held answerable even in the domestic courts of the countries where the acts occur. Depriving foreign states of this immunity would represent a fundamental change in the law of sovereign immunity.  We also believe that the provisions of this Bill should not apply to suits against foreign officials.  This is necessary to prevent plaintiffs from circumventing the immunity of foreign states by alleging terrorism against foreign government officials.

We believe it would be unwise to initiate such a change in sovereign immunity law.  First, we would be concerned about the reciprocal implications of any bill that permitted U.S. courts to adjudicate allegations of terrorism against foreign states or their officials.  Such legislation could lead to enactment of reciprocal legislation in countries that perceive themselves as targets of such suits, and to retaliation against U.S. officials travelling abroad for actions of the U.S. government.  Courts in hostile states might then entertain suits alleging that legitimate U.S. military activities constitute "terrorism."

Moreover, if the Bill were to permit civil suits against states or their officials alleging terrorism, individuals -- rather than the U.S. government -- would determine the timing and manner of making allegations in official U.S. fora about the conduct of foreign countries and their officers.  We believe that the United States can best manage a complex foreign policy with multiple objectives -- among the most important of which is combatting terrorism -- if the timing and manner of such serious allegations against foreign countries in official fora are not left in the hands of persons who are not responsible for the conduct of our foreign policy.

Finally, we are concerned over the prospect of nuisance or harassment suits brought by political opponents or for publicity purposes, where allegations may be made against foreign governments or officials who are not terrorists but would nonetheless be required to defend against expensive and drawn-out legal proceedings. Many foreign states are unlikely to enter the courts of other countries to defend against charges of intentional wrongdoing. This would exacerbate the problem of default judgments that exists under current law.

CONCLUSION

To conclude, Mr. Chairman, we support this legislation as a potentially useful addition to the arsenal of legal tools for the fight against terrorism. We share the Committee's determination to protect American citizens and to redress wrongs perpetrated by politically motivated criminals.

21

QUESTIONS FOR ALAN KRECZKO
DEPUTY LEGAL ADVISER, DEPARTMENT OF STATE
SUBMITTED BY SENATOR CHARLES E. GRASSLEY

Question 1

SHOULD GOVERNMENT OFFICIALS AND EMPLOYEES BE GRANTED IMMUNITY
FOR EVERYTHING THEY DO, SOLELY BECAUSE THEY HOLD OFFICIAL
TITLES OR ARE EMPLOYED BY A GOVERNMENT?

No.  Government officials are not, and should not be,
immune for everything they do solely because of their status as
government officers or employees.  Only in special
circumstances, where the functions government officials (such
as diplomats and heads of state) perform require extensive
protection, are they entitled to nearly complete immunity.

No U.S. official is entitled to absolute immunity from the
jurisdiction of U.S. courts.  Even the President has absolute
immunity only with respect to "acts within the 'outer
perimeter' of his official responsibility."  Nixon v.
Fitzgerald, 457 U.S. 731, 756 (1982).  No U.S. official or
employee is immune, solely by virtue of his or her position or
employment, from U.S. jurisdiction over suits unconnected with
his official acts.

Government officials are entitled to more extensive
immunity from the jurisdiction of foreign courts under both
U.S. and international law.  Diplomats, for example, are
entitled to absolute immunity from the criminal jurisdiction of
the state to which they are accredited and to virtually
complete immunity from civil jurisdiction.  Sitting heads of
state have been held immune to other states' jurisdiction even
in suits that have no connection to their official functions or
position.

Most other foreign officials (non-diplomats), however, are
accorded immunity by U.S. courts only for acts performed in the
exercise of their official functions.  In the U.S., the
juridical basis for this conclusion has varied.  Some courts
have held that the immunity of foreign officials derives from
general principles of international law.  See, e.g., Chuidian
v. Philippine National Bank, No. CV 86-2255-RSWL (D.C. Cal.
1988).  We believe this view is correct, and have so informed
the courts on occasion.  Other courts have found that the
Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1602 et
seq., applies to individual officers of foreign states, despite
legislative history suggesting the opposite conclusion.  See,
e.g., Kline v. Kaneko, 685 F.Supp. 386 (S.D.N.Y. 1988); Rios v.
Marshall, 530 F.Supp. 351 (S.D.N.Y. 1981); American Bonded
Warehouse v. Compagnie Nationale Air France, 653 F.Supp. 861
(N.D. Ill. 1987).

Thus, under current law diplomats and heads of state are
accorded immunity for nearly everything they do because of the
special status functions they perform.  Most foreign officials,
however, are granted immunity only for their official acts.
U.S. officials have even less immunity in U.S. courts.

Question 2

ON PAGE SIX AND SEVEN OF THE TESTIMONY, THE DEPARTMENT PROPOSES
ADDING A PROVISION TO THE BILL THAT WOULD

"STATE THAT THE BILL'S OTHER PROVISIONS SHALL NOT APPLY IN
SUITS AGAINST THE UNITED STATES, FOREIGN STATES AS DEFINED

22

IN THE FOREIGN SOVEREIGN IMMUNITIES ACT, OR ANY OFFICER OR EMPLOYEE THEREOF.  THE EFFECT OF THIS PROVISION WOULD BE TO MAINTAIN THE STATUS QUO AS REGARDS SOVEREIGN STATES AND THEIR OFFICIALS:  NO CAUSE OF ACTION FOR INTERNATIONAL TERRORISM EXISTS AGAINST THEM."

S. 2465 CREATES A NEW CAUSE OF ACTION, BUT IT IS NOT THE INTENT OF THE BILL TO CREATE NEW FORMS OF IMMUNITY; THIS BILL SHOULD BE CONSISTENT WITH EXISTING LAW.  THE SUGGESTED LANGUAGE APPEARS TO CREATE A NEW STRAIN OF "PER SE" IMMUNITY THAT WOULD IN FACT CHANGE THE STATUS QUO IN REGARD TO TRADITIONAL NOTIONS OF IMMUNITY.  IS THE SUGGESTED LANGUAGE CONSISTENT WITH TRADITIONAL NOTIONS OF SOVEREIGN IMMUNITY?  WOULD NOT THIS LANGUAGE CHANGE THE STATUS QUO?

S. 2465 would change the status quo by creating a new cause of action.  In our view, the question is whether to extend this cause of action to foreign officials, not whether to create a new "strain" of immunity.  As a matter of jurisprudential theory, our proposed change would exempt sovereign states and their officials from the bill's scope, not entitle them to immunity.  Existing law recognizes this distinction; for example, foreign government offices and their foreign employees are now exempt from certain tax and social security requirements, although they are not entitled to immunity from taxation under any treaty.  See 26 U.S.C. § 3401(a)(5) (foreign governments need not withhold income tax from the salaries of their foreign national employees); 26 U.S.C. § 3121(b)(11) (foreign government offices exempt from withholding Social Security taxes from their employees' salaries); and 26 U.S.C. § 3306(a) and (c)(11) (foreign government offices exempt from paying federal unemployment tax on the salaries of their employees).

Existing theories of immunity are generally limited to "official acts" immunity in order to hold an official potentially liable for purely private acts, such as contract or family law disputes, or torts.  Our proposal does not extend immunity into any of these areas; indeed, we note that most if not all "international terrorism" suits could be maintained as traditional tort actions (assault and battery), where a foreign government officials would have only official acts immunity.

Our proposal would, however, exempt foreign officials from this new cause of action.  We believe this is necessary because of the nature of this cause of action:  S. 2465 defines an "act of terrorism" as an intentional tort committed for political ends.  No other tort of which we are aware requires a demonstration of this motivation, or a ruling by our courts of motivation and intent that have such potential to embarrass other states or to interfere in the Executive Branch's ability to conduct foreign affairs.  Moreover, since in most foreseeable actions against a government official the defendant would have been acting in his or her official capacity, adopting our proposed amendment would not deprive plaintiffs of an opportunity to sue that would otherwise have existed.

Question 3

IT IS MY UNDERSTANDING THAT EXISTING NOTIONS OF IMMUNITY DO NOT PROVIDE ABSOLUTE IMMUNITY FOR OFFICIALS OR EMPLOYEES FOR THEIR EVERY ACT SOLELY BECAUSE THEY WORK FOR A GOVERNMENT.  WHY SHOULD THE LAW BE APPLIED ANY DIFFERENTLY UNDER S. 2465?

We have indicated a concern that without an exception for foreign officials, the cause of action provided under S. 2465

23

could become a vehicle for court suits to harass foreign
officials in the United States or to challenge the policies of
foreign governments.  Committee staff have been sympathetic to
this concern.  However, if the exemption is limited to
"official acts" the litigation will still occur.  To maintain
the suit, the plaintiff would only need to allege that the
defendant's terrorist actions were "non-official."  Foreign
officials will be subject to suit, and the litigation will
revolve around whether the official's country has a policy of
terrorism which made his support of terrorism "official" or
"non-official."

Moreover, we are concerned that, unless our amendment is
adopted, most litigation will be brought against officials of
friendly governments.  Far more British or Israeli officials
travel to the United States than Iraqi or Syrian officials.
Some of the practices of these governments in Northern Ireland
and the West Bank respectively have been criticized by some
American groups as "terrorism."  Without an exemption in the
bill, visiting officials of these governments would have to
defend against suits alleging their involvement in terrorism
and would have to defend, _inter alia_, on the grounds that their
acts were "official," thereby bringing into the courts the
policies of their countries.

We do not see sufficient reason to risk this litigation.
We have no reason to believe that acts of terrorism are being
committed against Americans by foreign officials acting in a
non-official capacity.  Furthermore, there is no exemption in
the bill, and we are seeking none, for members of terrorist
organizations.  Exempting officials, including their
nonofficial acts, will not benefit such organizations.


Question 4

HOW ARE THE TERMS "OFFICIAL, OFFICERS, AND EMPLOYEES"
DEFINED, AS USED IN THE SUGGESTED LANGUAGE?  WHAT POSITIONS DO
THESE TERMS CONTEMPLATE?

The use of these terms together is intended to encompass
all persons employed by a foreign government, in whatever
capacity.  "Officers" would in general refer to high-level
individuals who exercise substantial discretion and set policy,
while "employees" would refer to lower level individuals,
including policemen and soldiers, who carry out policies or
orders.

24

QUESTIONS FOR ALAN KRECZKO
DEPUTY LEGAL ADVISER, DEPARTMENT OF STATE
SUBMITTED BY SENATOR HOWELL HEFLIN

Q.  IN YOUR TESTIMONY, YOU REFERRED TO INTERNATIONAL
CONVENTIONS DEALING WITH TERRORIST ACTS.  IN YOUR OPINION,
WOULD IT BE FEASIBLE TO IMPLEMENT AN INTERNATIONAL CONVENTION
ON CIVIL REDRESS FOR CRIMINAL ACTS OF TERRORISM?

A.  As I indicated in my written statement, few terrorists or
terrorist organizations are likely to have cash assets or
property located in the United States that could be attached
and used to fulfill a civil judgment pursuant to S. 2465.
Moreover, foreign countries are unlikely to enforce U.S.
judgments regarding this novel type of U.S. civil
jurisdiction.  An international Convention for mutual
enforcement of civil decrees related to terrorism might get
around this problem.  Such an international Convention,
however, would have to overcome several significant obstacles:

   --First, the world community has tried unsuccessfully in a
   number of different fora since 1972 to come up with an
   acceptable definition of terrorism.  It is for this reason
   that international conventions have been adopted
   proscribing specific acts, which by their nature are
   typically committed by terrorists (e.g., hostage-taking;
   aircraft hijacking and sabotage; acts of violence against
   maritime vessels and fixed platforms; and violence against
   diplomats).

   --Second, other states may not be willing to undertake such
   an obligation to enforce the civil decrees of the United
   States since, unlike most other countries, the decision
   regarding appropriate compensation for a tortious injury is
   made by a jury in the United States rather than by a
   judge.  American monetary awards have tended to be much
   larger than those rendered by foreign courts for similar
   torts.  Foreign states may be reluctant to enter into an
   obligation to enforce these higher awards.

   --Third, we would need to be satisfied that the judgments
   of other countries would comport to our notions of fairness
   and due process before we could undertake to enforce them.

   We note that one recent international convention does
contain a provision on civil redress.  The Torture Convention,
currently before the Senate for its advice and consent,
requires States parties to create a cause of action for acts of
torture committed in their country.  (This Convention does not,
however, contain a provision for mutual recognition of civil
decrees related to such a cause of action.)  We will consider
whether it would be advisable to include a similar provision in
future conventions related to terrorism.


Q.  YOUR WRITTEN STATEMENT MADE NOTE OF THE FACT THAT UNDER THE
COMPREHENSIVE CRIME CONTROL ACT OF 1984, THE TERRORIST
RESPONSIBLE FOR THE HIJACKING OF A ROYAL JORDANIAN AIRLINER WAS
CONVICTED IN U.S. COURT, AND SENTENCED TO 30 YEARS
IMPRISONMENT.  HAVE ANY OTHER INTERNATIONAL TERRORISTS BEEN
CONVICTED UNDER U.S. STATUTES?

A.  Fawaz Younis, the terrorist of which I made note in my
written statement, was the first and, to date, only
international terrorist convicted in the United States for acts
committed abroad under domestic legislation implementing the

25

```
Multinational Anti-terrorism Conventions (e.g., the Hague
Hijacking Convention, the Montreal Sabotage Convention, the
Hostage Taking Convention, and the Internationally Protected
Persons Convention).  However, a number of individuals
belonging to international terrorist groups have been convicted
for terrorism-related offenses committed in the United States.
For example, several members of the Provisional Irish Republic
Army (PIRA) were recently convicted in a Massachusetts court
for attempting to export high-tech military equipment to the
IRA; a member of the Japanese Red Army was convicted last year
and sentenced to thirty years imprisonment for possession of
anti-personnel pipe bombs in the United States; several years
ago, a number of Sikhs were convicted for conspiring to murder
former Prime Minister Ragiv Ghandi when he was in the United
States in 1985; and over the past decade, there have been
several successful federal prosecutions in New York, San
Francisco, Baltimore, and North Carolina of individuals accused
of running weapons to the PIRA.
```

Senator GRASSLEY. Thank you for stopping on time, too.

Mr. Valentine, would you please introduce your colleagues?

## STATEMENT OF STEVEN R. VALENTINE

Mr. VALENTINE. Thank you, Senator Grassley, Senator Thurmond. Accompanying me today are Lloyd Green, who is the counselor to the Assistant Attorney General in charge of the Civil Division, and John De Pue of the Criminal Division of the Justice Department, who is one of the Justice Department's leading legal experts in the field of terrorism.

Senator, sharing, as we do, your continuing concern about the scourge of international terrorism, the Department of Justice appreciates this opportunity to express our views on Senate bill 2465.

The department strongly supports the fundamental objectives of Senate bill 2465. They are of great importance to the United States. The enactment of Senate bill 2465 would bring to bear a significant new weapon against terrorists by providing a means of civil redress for those who have been harmed by terrorist acts. The bill also would provide a means of imposing civil justice on the international outlaws who commit acts of terrorism. We share the firm resolve of the sponsors of Senate bill 2465 to do all that we can to protect American citizens overseas from acts of terrorism.

In the wake of the hijacking of TWA flight 847 en route from Athens to Rome 5 years ago, during which Navy diver Robert Stethem was slain, the barbaric hijacking of the *Achille Lauro* and the brutal murder of Leon Klinghoffer, as well as other terrorist incidents, the Department of Justice aggressively pursued criminal terrorist investigations and prosecutions. We have formally charged 34 individuals with terrorism-related offenses for their roles in various terrorist incidents that have occurred outside this country.

We are steadfastly committed to locating and apprehending all of those so charged and bringing them to justice in our courts. Our efforts thus far have focused on criminal prosecution and support for criminal prosecution by other nations. Senate bill 2465 would supplement our criminal law enforcement efforts by creating a new civil remedy for those injured by terrorist acts.

26

Although we strongly support the major concepts embodied in the bill, we recommend several amendments to improve Senate bill 2465 by preventing any conflict between civil actions by private citizens and the criminal law enforcement activities of the United States.

There may be situations in which a civil suit, under proposed section 2333 of the bill, would impede a criminal prosecution under section 2332. Preparation for a civil suit will typically include efforts by litigants to interview and/or to depose important Government witnesses. Such discovery efforts can compromise the security of an ongoing criminal investigation or prosecution, or adversely affect witness testimony in a subsequent criminal prosecution.

Moreover, pretrial discovery proceedings in such cases could result in compromising sensitive investigative material and would invariably divert the attention of investigators and attorneys from the criminal investigation to respond to civil discovery demands.

Therefore, we would recommend amendment of the bill to include a provision that would enable the Attorney General to certify that discovery of the Government's criminal investigative files on a terrorist incident will compromise the investigation. Such a certification in a civil proceeding brought under the provisions of the bill would preclude the discovery of such governmental investigative materials. But to protect the interests of the civil plaintiffs, such an amendment would provide that the pendency of such certification would bar the granting of a dispositive motion by the defendants in such a suit.

To ensure that pending civil antiterrorist litigation will not impede a criminal prosecution involving the same terrorism incident, we would also recommend an amendment to provide that in cases in which there has been a criminal indictment arising from the incident that is the subject of the civil suit, the Attorney General can, upon good cause shown, ask the court to stay the civil case until completion of the criminal proceedings.

Let me hasten to add that a stay of the civil proceedings would not preclude the initiation of the lawsuit within the 3-year statute of limitations period in proposed section 2335 of the bill. Moreover, in most cases, plaintiffs would find such a stay to be quite desirable because it would allow them to take full advantage of the estoppel provisions of proposed section 2333(b) under the bill.

We also firmly believe that Senate bill 2465 should not apply to suits against any government or government official. The amendment suggested by the Department of State would eliminate foreign relations problems inherent in suits against foreign States and officials and the possibility of reciprocal action by foreign States.

Finally, we recommend that the jurisdiction granted in Senate bill 2465 to the district courts be made exclusive. This provision should state that the district courts have original jurisdiction, exclusive of the courts of the States, over any civil action arising under 18 U.S.C. 2333. This amendment is necessary, in our view, in order to fully effectuate the legislative purpose of providing a comprehensive Federal scheme to cover civil and criminal cases involving terrorist acts abroad against U.S. nationals.

In conclusion, Senator, the Department of Justice strongly supports the creation of a Federal civil cause of action for damages

against those who commit terrorist acts, and we look forward to working with the subcommittee to harmonize Senate bill 2465 with the existing criminal anti-terrorism statutory framework.

My colleagues and I from the Department would be happy to respond to any questions that you have or that Senator Thurmond may have.

Thank you very much.

[Mr. Valentine submitted the following material:]

28



## Department of Justice

_Washington, D.C. 20530_

STATEMENT

OF

STEVEN R. VALENTINE
DEPUTY ASSISTANT ATTORNEY GENERAL
CIVIL DIVISION

BEFORE

THE

SUBCOMMITTEE ON COURTS AND ADMINISTRATIVE PRACTICE
JUDICIARY COMMITTEE
UNITED STATES SENATE

CONCERNING

S.2465
"THE ANTITERRORISM ACT OF 1990"

ON

JULY 25, 1990

29

## Introduction

Mr. Chairman and Members of the Subcommittee:

Given the public and governmental concern about terrorism, I am especially appreciative of the opportunity to appear before you today to discuss the views of the Department of Justice on S. 2465, a bill that would provide a civil remedy for American nationals in United States courts when they have been injured by acts of terrorism abroad.

The Department of Justice supports the aims of S. 2465. The goals of this proposal are of major importance to the United States. The bill provides a major new weapon against terrorists by providing a means of redress for those harmed by terrorist acts. This bill also provides a means of imposing civil justice on those who would be lawless.

We also share the Subcommittee's resolve to ensure the safety of American citizens overseas from terrorism. This bill represents a major step forward in the furtherance of that goal.

## Combatting Terrorism

International terrorism has become a grim aspect of modern-day life. Unfortunately, hardly a season passes in which a terrorist incident does not occur.

The hijacking of TWA flight 847 should serve as a constant reminder of our obligation to combat terrorist acts against Americans abroad. On that flight, the terrorists responsible for the hijacking held the plane's passengers and crew hostage and killed a United States Navy diver, Robert Stethem.

The United States obtained indictments against a number of
individuals responsible for this hijacking, hostage taking and
murder, and has actively sought the apprehension of these
fugitive defendants since 1985.  One of these defendants Mohammod
Ali Hamadei, was arrested in the Federal Republic of Germany in
January of 1987.  The United States immediately requested
Hamadei's extradition from the Federal Republic of Germany, but
that request was ultimately denied in favor of a West German
prosecution.

Following this extradition decision, the Department of
Justice did everything possible to support the West German
government's prosecution of Hamadei, and to ensure that he was
convicted on all charges and received the maximum sentence
possible.  The Department of Justice provided the West German
government with physical evidence collected from the hijacking,
provided demonstrative exhibits for use at trial, arranged for
more than 50 American witnesses to be interviewed in the United
States by West German prosecutors in preparation for trial,
arranged for more than 30 American witnesses to travel to West
Germany to testify at trial, and assisted numerous American
victims who wished to participate in the West German criminal
proceedings as intervening parties, a role established under West
German law.

We must also remember the Achille Lauro.  The Italian
passenger liner was forcibly seized by terrorists in the
Mediterranean Sea; its passengers and crew held hostage.  One of

- 2 -

the passengers, Leon Klinghoffer, was shot; his body thrown into the Mediterranean.  Although the United States expressed a strong interest in obtaining custody of the hijackers in that case, the Italian government decided to hold the hijackers for trial in Italy after they were captured at Sigonella Air Force Base.  The Italian authorities prosecuted the hijackers as well as numerous other individuals charged in conspiratorial acts connected with the hijacking.  Stiff sentences were imposed upon all defendants tried in Italy.

These tragedies reinforce our belief that it is essential that both the Congress and the Executive Branch take measures, such as the present bill, to deter terrorist attacks against American nationals overseas, and to bring the perpetrators to justice and to compensate their victims.  The Administration and the Department of Justice have indicated that they will leave no stone unturned in their efforts to apprehend international terrorists.

The Department of Justice has developed working relationships with other federal agencies involved in combatting international terrorism and have aggressively pursued investigative and prosecutive responsibilities pertaining to pending terrorism cases.  The Department has been engaged in close cooperation with our military and intelligence forces in monitoring terrorist activity abroad.

The Department of Justice has formally charged 34 individuals in sealed and public complaints and indictments with

- 3 -

terrorism-related offenses for their roles in various terrorist incidents that have occurred outside this country.  The Department has not only filed criminal charges against individuals for their terrorist actions, but remains committed to locating and apprehending those charged so that they can be tried in a court of law.

For example, on September 13, 1987, the FBI arrested Fawaz Yunis in the Mediterranean Sea pursuant to an arrest warrant charging him with hostage-taking and aircraft sabotage for the June 11, 1985 hijacking of a Jordanian aircraft carrying two Americans.  Yunis was tried in the United States District Court for the District of Columbia on a superceding indictment which added a charge of air piracy to the other offenses stated in the original complaint.  He was convicted by a jury on March 14, 1989 of air piracy, hostage-taking and conspiracy.  Yunis is now serving a 30 year prison sentence.

In another terrorist case, the United States obtained an indictment against Mohammod Rashid for the August, 1982, bombing of a Pan American Airlines aircraft en route from Tokyo to Honolulu.  A Japanese teenager was killed and several persons were injured as a result of the explosion.  The United States filed an extradition request with Greece in June of 1988 following the arrest of Rashid in Athens, and the Greek Judiciary has ordered the extradition of Rashid.  We await a decision by Greek political authorities as to whether the extradition will be effected.

- 4 -

33

In another instance, the United States did so by becoming a civil party to a criminal prosecution. In 1986, the United States, the widow of Col. Charles Ray, and Robert Homme became civil parties to the criminal prosecution of Georges Ibrahim Abdallah, the leader of the terrorist group "LARF" under the laws of France. That terrorist group murdered Lt. Col. Ray, who was the military attache at the U.S. Embassy in France. They shot and seriously wounded Robert Homme, a U.S. diplomat. As with all terrorist attacks against U.S. citizens, while the assaults were against individuals, they were directed at the U.S. government. As a civil party, the U.S. government retained legal counsel who was instrumental in the criminal prosecution. Abdallah was convicted and sentenced to life in prison. The court also awarded civil damages.

Simply stated, The United States has used every means available to it to see that terrorist are prosecuted and to fight terrorism through the courts. Hopefully, these efforts have begun to pay off. We note that in 1989, the overall level of international terrorism declined by almost 38 percent to 528 incidents from the 1988 level of 862. In 1988, 193 terrorist attacks targeted Americans. In 1989, that number had declined to 193, a 15 percent drop in attacks against U.S. nationals. Casualties among U.S. citizens also dropped from 192 killed and 40 wounded in 1988 to 16 killed and 19 injured in 1989.

At home, terrorist incidents are minimal. The Federal Bureau of Investigation has prevented a number of incidents from

- 5 -

34

happening.  These favorable trends should not, however, be regarded as a signal that eradication of violent terrorism is close at hand.  Vigilance and perseverance are still needed.

Our efforts have thus far focused on criminal prosecution and support for criminal prosecution by other nations.  S. 2465 provides a means for redress through the American court system for injuries suffered by American nationals at the hands of terrorists.  This measure would supplement our criminal effort with civil remedies for those injured by terrorist activity.

### S. 2465

The bill would supplement 18 U.S.C. § 2331, which provides criminal jurisdiction over terrorist acts abroad against United States nationals.  S. 2465 provides a federal forum for any national of the United States to seek compensation in the form of treble damages for injuries resulting from acts of international terrorism and creates a new federal cause of action for this purpose.  The bill further includes general venue provisions and would authorize service wherever the defendant resides or may be found.

We support the major concepts embodied in S. 2465.  The Department supports legislation to provide a new civil remedy against terrorists and a federal forum for the families and relatives of victims to pursue claims for compensatory damages.  Such a cause of action will assist in compensating victims, and have a deterrent effect on the commission of acts of international terrorism against Americans.

- 6 -

We suggest, however, that several amendments would improve the bill, and in our view, avoid any conflict between civil actions by private citizens and the law enforcement efforts of the United States.

While we are mindful of the fact that the thrust of the bill is directed to the interests of United States nationals and their families, the bill affects governmental interests as well. In this connection, there may be situations in which a civil suit under proposed § 2333 of the bill would impede a criminal prosecution under § 2332. Preparation for a civil suit will typically include efforts by litigants to interview or depose important government witnesses. Such measures can compromise the security of an ongoing investigation or prosecution or adversely affect their testimony in a subsequent criminal prosecution. Moreover, pretrial discovery proceedings in such cases could result in compromising sensitive investigative material and would invariably divert the attention of investigators and attorneys from the criminal investigation to respond to civil discovery demands.

We recommend that the civil remedies section of the proposed legislation be amended to include a provision which would enable the Attorney General to certify that discovery of the government's criminal investigative file in a terrorist incident, that is also the subject of a civil suit brought under this statute, will compromise the criminal investigation or national security interests. Such a certification would, upon submission

- 7 -

to the court where the civil litigation is pending, preclude the discovery of such investigative materials. To protect the interests of the civil plaintiffs, S. 2465 should also provide that the pendency of such a certification by the Attorney General will constitute a bar to the grant of a dispositive motion filed by the defendants.

To ensure that pending civil litigation will not impeded a criminal prosecution involving the same terrorism incident or national security interests, the statute should further be amended to provide that, either where an indictment has been returned charging a criminal offense arising out of the incident that is the subject of the civil suit or where the action impedes national security interests, the Attorney General can, upon good cause shown, request the court were the civil litigation is pending to stay that litigation until completion of the criminal proceedings or the elimination of the predicate national security interest concern.

Such an amendment should not detract from the objectives of the bill. In order to apprise the Attorney General of the filing of the action, the bill should also provide for service of summons and complaint on the Attorney General in accordance with applicable provisions of Rule 4 of the Federal Rules of Civil Procedure, even though he is not a party to the suit. A stay of the civil proceedings would not preclude initiation of the lawsuit within the three year statute of limitations period in proposed § 2335. Moreover, in most cases, the plaintiffs would

- 8 -

37

find the stay desirable in order to take advantage of the
estoppel provisions of proposed § 2333(b).

We also believe that the bill should not apply to suits
against any government or government official.  As presently
drafted, the bill does not precisely define those persons or
entities subject to suit and may be read to include suits against
foreign states and governments as well as government officials
and employees.

Under our Foreign Sovereign Immunities Act, 28 U.S.C. §1602
et seq. ("FSIA"), a foreign state would be immune from suit for
the torts covered by this bill.  FSIA provides for federal court
jurisdiction to award tort damages against a foreign state, but
only "for personal injury, or death . . . occurring in the United
States."  28 U.S.C. §1605(a)(5).  Thus, FSIA confers immunity on
foreign governments for torts committed outside the United
States.  The scope of FSIA should not be limited.

In addition, S. 2465 should be amended so that it does not
cover suits against government officials and officers.  As
drafted, the bill would provide jurisdiction for suits against
foreign government officials and potential liability where, for
example, such officials are derivatively sued for acts of the
foreign state.  There would be foreign relations implications
involved in holding foreign government officials liable for the
same conduct immunized by the Foreign Sovereign Immunities Act.

Further, government officials may be entitled to immunity
for their official acts under various immunity doctrines

- 9 -

38

recognized under United States case law and customary
international law and practice.  The amendment suggested by the
Department of State would eliminate foreign relations problems
inherent in suits against foreign states and officials and the
possibility of reciprocal action by foreign states.

   We further recommend that the jurisdiction granted in S.
2465 to the district courts be made exclusive.  The provision
should state that the district courts have original jurisdiction,
exclusive of the courts of the States, of any civil action
arising under 18 U.S.C. § 2333.  This amendment is necessary in
order to fully effectuate the legislative purpose of providing a
comprehensive federal scheme to cover civil and criminal cases
involving terrorist acts abroad against United States nationals.

   Finally, proposed § 2333 provides that any "national of the
United States" injured by an act of international terrorism may
file a lawsuit under the provisions of the bill.  We suggest that
this provision be amended to include, in addition to the
individual directly affected, such additional parties as the
estate of the decedent, survivors, and heirs.  This will ensure
that the bill is fully protective of the interests of all
relevant parties to the civil suit.

- 10 -

39

<u>Conclusion</u>

Again, the Department of Justice strongly supports the
provision of a federal cause of action for damages for those
involved in terrorist activity, and we look forward to working
with the Subcommittee to improve S. 2465.  I am happy to respond
to the questions that members of the Subcommittee might have.

- 11 -