# EXHIBIT A (Part 2)

40



U.S. Department of Justice
Office of Legislative Affairs

_____

Office of the Assistant Attorney General                Washington, D.C. 20530

SEP 2 5 1990

Honorable Howell Heflin
Chairman
Subcommittee on Courts and
    Administrative Practice
Committee on the Judiciary
United States Senate
Washington, DC  20510

Dear Mr. Chairman:

        Thank you for your letter of August 2, 1990, with which you
enclosed two additional questions for Deputy Assistant Attorney
General Steven R. Valentine as a follow-up to his testimony on
S. 2465, "The Anti-Terrorism Act of 1990." Your questions are
set forth in bold type below.  Our answers follow.

        **One of your Department's suggested changes to the
legislation is that where an indictment has been returned
charging a criminal offense arising out of the incident that is
the subject of the civil suit or where the action impedes
national security interests, the Attorney General can, upon good
cause shown, request the court where the civil litigation is
pending to stay that litigation until either completion of the
criminal proceedings, or elimination of the predicate national
security interest concern.  Which of these would usually occur
first?**

        It is quite difficult to predict which would occur first
with the greater frequency.  We do not believe, however, that
situations in which a national security concern that is unrelated
to the criminal prosecution involved, and that would be
sufficiently serious as to cause the Attorney General to seek a
stay of related civil proceedings, would arise very often.  In
cases in which such national security interests are involved,
though, it is quite possible that they would continue to exist
even after the completion of the criminal trial of a particular
defendant.  For example, there may be situations in which
unapprehended participants in a given terrorist incident remain
at large and are the subjects of initiatives by the United States
to find and to gain custody over them.  Information that might be
likely to be disclosed in the course of pending civil proceedings
might well demonstrate that the United States is aware of the
identities of such individuals or that we are in the process of
undertaking initiatives to gain custody over them.  The

41

disclosure of such information might well result in causing the terrorists involved to seek asylum in some country that would provide them with a safe haven from such efforts by the United States.

    In your judgment, how long would it take to complete criminal proceedings for a typical incident of terrorism?

    In cases in which the suspect is in custody, we would estimate that the period of time from apprehension to trial would tend to average between twelve and eighteen months.  This estimate is based upon our experience in <u>United States v. Fawaz Yunis</u>, in which the defendant was arrested for air piracy and related offenses in September, 1987, and his criminal trial was completed in March, 1989.  This period was prolonged by the intervention of two interlocutory appeals.  The intervention of such litigation, however, is something that we must anticipate in cases such as these, where issues, resulting from our anti-terrorism policies and restrictions on the disclosure of classified information, arise.

    In cases in which the terrorist defendant has been formally charged, but remains a fugitive, it is, of course, impossible to predict the period of time that would be necessary to prosecute the criminal proceedings to completion.  This will depend exclusively upon the ability of our investigators to locate the defendant, to arrange with the country in which he is residing for the United States to obtain custody, or to take legally permissible actions to acquire such custody.  In this regard, we note that Mohammed Rashid, who is charged with the August, 1982, terrorist bombing of a Pan Am aircraft, has been the subject of an extradition request by the United States since June 2, 1988.  The Greek government continues, however, to be unable to reach a final determination as to whether Rashid will be extradited to the United States to stand trial for murder and other offenses committed in the course of the terrorist bombing.

    Thank you for providing us with the opportunity to respond to your thoughtful additional questions.  Please do not hesitate to contact the Department again if we can provide you with any further information or views regarding this important anti-terrorist legislation.

                        Sincerely,

                        Bruce C. Navarro
                        Deputy Assistant Attorney General



**U.S. Department of Justice**

Office of Legislative Affairs

---

Office of the Assistant Attorney General

*Washington, D.C. 20530*

December 6, 1990

Honorable Howell Heflin
Chairman
Subcommittee on Courts
    and Administrative Practice
Committee on the Judiciary
United States Senate
Washington, D.C.  20510

Dear Senator Heflin:

Your staff asked us to provide you with the Department's position on two issues that arose during the question-and-answer exchange that occurred between the Subcommittee's Ranking Minority Member, Senator Grassley, and Deputy Assistant Attorney General Valentine at the Subcommittee's hearing on S. 2465, the Antiterrorism Act of 1990, on July 25, 1990.

Senator Grassley asked Mr. Valentine whether S. 2465 should be amended to provide the United States with a right to sue on behalf of U.S. nationals who are victims of terrorist acts overseas.  As Mr. Valentine responded at the July 25 hearing, the Administration has not taken a position on that proposal. Although we are, of course, quite supportive of the objective of providing the United States with the fullest possible array of prosecutorial and civil litigative weapons with which to fight the war against international terrorism, our reluctance to endorse such an amendment to S. 2465 at this time stems from our concern that the creation of such a civil cause of action for the United States might unintentionally tend to interfere with our criminal investigations and prosecutions of terrorist acts.  We will stand ready, however, to work with you, Senator Grassley, and your staffs in the next Congress to address this concern if you continue to be interested in amending the bill in such fashion.

Senator Grassley also asked Mr. Valentine why Italy had enough evidence against terrorist Abu Abbas to convict him for criminal terrorist acts but the United States did not.  Mr. Valentine answered by saying that we would be happy to respond for the record "in as much detail as we can...."  A full explanation for our decision not to press criminal charges

- 2 -

against Abbas in the matter to which Senator Grassley referred is under seal with the United States District Court for the District of Columbia and therefore it would not be appropriate for us to elaborate fully about this matter on the public record. As a general matter, however, we can tell you that although the evidence available to the United States was regarded as sufficient to support an arrest warrant, that evidence was not in a form that would have been admissible at trial to establish a criminal case against Abbas and to secure his conviction. It was with the greatest reluctance, as well as a profound sense of disappointment and frustration, therefore, that we concluded not to proceed.

I hope this information is helpful to you. Please do not hesitate to contact me if I can be of further assistance.

Sincerely,

W. Lee Rawls
Assistant Attorney General

44

Senator GRASSLEY. Senator Thurmond, I would defer to you to ask the first questions, if you would like to.

Senator THURMOND. Thank you very much, Mr. Chairman.

Mr. Kreczko and Mr. Valentine, provisions contained in Senate bill 2465 will supplement current criminal procedures and allow private citizens to seek payment for civil damages resulting from terrorist acts. Assuming Senate bill 2465 is enacted, in your opinion, could we as a nation expect retaliatory action on the part of foreign governments or, more importantly, from independent terrorist organizations?

Mr. KRECZKO. Senator, I would not be in a position to rule out the possibility that a terrorist organization would retaliate in the event that this bill were enacted and implemented. I think it is a risk any time that we take action against terrorist groups that they will seek to retaliate against us. We cannot allow that possibility to deter us from taking necessary action against terrorists.

Mr. VALENTINE. Senator, I would certainly concur with my colleague from the State Department in that regard.

Senator THURMOND. Mr. Kreczko, under the principal of sovereign immunity, our courts have no jurisdiction to adjudicate claims arising from torts committed by other countries that occur outside the United States. What effect will the provisions contained in Senate bill 2465 have upon traditional notions of sovereign immunity, and how will other countries view such legislation?

Mr. KRECZKO. Senator, we would like to clarify that this bill will not have any impact upon traditional notions of sovereign immunity. We would like to make explicit in the legislation——

Senator THURMOND. Speak into your microphone. We can't hear you.

Mr. KRECZKO. Yes, Senator. We would like to clarify and make explicit in the legislation that the bill will not have any effect upon traditional notions of sovereign immunity. We believe that any other result would obtain a very negative reaction from foreign States and could, in fact, undercut our efforts to maintain multilateral cooperation in the fight against terrorism.

Senator THURMOND. Now, Mr. Valentine, in your testimony you stated that there may be situations in which a civil suit brought under proposed section 2333 of this bill would impede a criminal prosecution under section 2332. Could you please describe a situation where the civil suit could cause difficulties in the criminal process?

Mr. VALENTINE. I would like to defer, Senator, to Mr. De Pue from the Criminal Division, who is much more familiar than I am with this concern.

Mr. DE PUE. Thank you, Mr. Valentine.

Our primary concern is that typically the civil litigation will have to rely very heavily upon evidence developed in a parallel criminal investigation. And as has recently occurred in the investigation of Pan Am flight 103 and the civil litigation brought by the plaintiffs in that, an effort will be made to obtain our classified investigative files, to discover our files for purposes of use in the civil litigation.

This can have several quite deleterious consequences. First, much of that information has been received in confidence from for-

45

eign States, from foreign intelligence agencies, from foreign law enforcement agencies, under the understanding that it will be kept in confidence by the United States and by our investigative and intelligence-gathering agencies. If, during that discovery process, this material is released or revealed, our confidences will be compromised.

Second, it has the effect, as it did in this particular instance that I have cited, of tying up our investigators, our analysts, our intelligence people to seek to respond to the civil litigation, to the discovery demand, and to do whatever is necessary to comply with it, as it has in this case, thereby distracting them from the conduct of their criminal investigation.

So it is these two ways—a distraction from the criminal investigation and a compromise of our investigative material—that we are concerned that it will impact on the criminal investigation, Mr. Thurmond.

Mr. VALENTINE. And I would emphasize, Senator, that we certainly believe that an amendment can be crafted that would take care of the concerns that Mr. De Pue has expressed without detracting from the objectives of the bill.

Senator THURMOND. Are you all going to prepare such an amendment and send it to the committee?

Mr. VALENTINE. Certainly, Senator, we would be happy to work with the committee staff in that regard.

Senator THURMOND. I imagine Senator Grassley would be glad to consider it.

Senator GRASSLEY. Yes. In fact, Mr. Chairman, we have been working with State and Justice on this.

Senator THURMOND. Mr. Valentine, you mentioned that Senate bill 2465 should be amended to provide that the Attorney General, upon a showing of good cause, may request the court where civil litigation is pending to stay this litigation until completion of the criminal proceeding on the same matter. In your opinion, what impact would the stay included in your proposed amendment have on the pending civil litigation?

Mr. VALENTINE. Senator, the amendment that we have in mind would allow the Attorney General, if he saw fit, to file a certification with the court requesting a stay of the civil proceedings until the completion of the criminal prosecution. If, in the judgment of the court, the Attorney General demonstrated such good cause, the civil proceedings would, in fact, be stayed.

Senator THURMOND. Mr. Valentine, you suggest——

Mr. VALENTINE. I think Mr. De Pue has something to add to that.

Mr. DE PUE. The purpose here, Senator Thurmond, is to protect ourselves in those limited cases where the witnesses in the civil litigation are also going to be our witnesses in the criminal litigation. That is what we were thinking of when we made this proposal, and I think the impact would be minimal on the civil proceeding.

First, the duration of the stay that we have requested is only until we either complete our prosecution or dismiss it. It only runs from the time we obtain an indictment. And, second, as Mr. Valentine has mentioned previously, the civil litigation benefits greatly

46

from our successful criminal litigation because of the estoppel provision, because the civil litigants get a judgment as a result of our conviction and our successful prosecution.

Senator THURMOND. Mr. Valentine, you suggest expanding the definition of "U.S. national" to include the estate of the decedents, survivors, and heirs. It is my understanding that implicit within the right to sue contained in Senate bill 2465 was the ability of family members to bring a lawsuit on behalf of a slain or injured relative. Do we need to expand the definition in order to make certain the ability of family members to file a lawsuit on behalf of a slain or injured relative?

Mr. VALENTINE. Mr. Green will address that issue.

Mr. GREEN. We believe it would be beneficial. It would make clear that which is already implied in the bill. It would remove any doubt that anyone would have as to whether or not they could bring the litigation.

Senator THURMOND. Are you going to suggest such an amendment and get it to the committee?

Mr. GREEN. We have discussed this with the committee beforehand and we would be glad to provide language.

Senator THURMOND. You have discussed it with committee staff members already?

Mr. GREEN. Yes, we have; Senator Grassley's staff.

Senator THURMOND. That is all. Thank you, Mr. Chairman.

Senator GRASSLEY. Well, my questioning will proceed in the spirit that Mr. Valentine suggested as he ended his remarks that we want to have dialog on this issue and maybe we can work out these differences.

Of course, at the start I am pleased to hear that the Department of State and the Department of Justice support this legislation and believe that it will help deter terrorism. I understand that we have a few concerns that need to be addressed.

First, there is the concern over who constitutes a defendant or who can be sued. Second, Justice has an additional concern regarding potential effects they believe civil suits will have on pending criminal investigations, pending criminal suits, and the national security interests, and Mr. De Pue has expressed those well.

So, Mr. Valentine, I guess my first question is specifically what language would the department like to see added to Senate bill 2465 that would protect the pending criminal cases. Is that the language you pointed out to Senator Thurmond.

Mr. VALENTINE. Yes. We have had some discussions with members of the subcommittee staff regarding preliminary discussions regarding the kind of language that we think would be helpful. I outlined in my testimony the basic proposals, which would include a limitation on discovery that would protect criminal proceedings, and a provision that would allow the Attorney General to ask for a stay of civil proceedings pending the outcome of a criminal prosecution.

Senator GRASSLEY. I appreciate your coming forward with that language. I guess my reaction is that it reaches far beyond the interest of protecting pending criminal cases. The language provides that the Attorney General could certify discovery of its investigative files or potential witnesses that would not only present a risk

to criminal investigation of the incident, but to the national security in general, or even a subsequent prosecution.

Moreover, the suggested language would give the Attorney General the power, upon the showing of good cause, to stay an entire civil proceeding due to a claim of national security interest not involved in any pending criminal prosecution of the same incident for which the civil suit is filed.

Wouldn't this be setting a very far-reaching precedent? What other laws give the Attorney General unfettered discretion to certify discovery materials as well as to allow him to, upon showing of good cause, hold a civil suit in abeyance?

Mr. VALENTINE. Senator, I would emphasize that the discussions we have had regarding specific language are preliminary and general at this stage. But our principal concern is that in compelling circumstances, serious situations in which, in the judgment of the Attorney General, a pending criminal investigation or a national security operation were threatened by a civil proceeding under this act, he could, if he saw fit, seek to stay discovery of government investigative materials or to stay a civil proceeding, and I emphasize that if the Attorney General saw fit, given the circumstances, and I would anticipate that those would be under compelling circumstances.

Senator GRASSLEY. Well, of course, that is the purpose of this hearing and the purpose of followup discussions that we will have with you, but it seems like sweeping. I don't think there are any existing precedents that mandate such discretion. You didn't give me any now. I don't know whether you can give us any or whether now is not the time to give them. I don't know.

Mr. VALENTINE. Well, Senator, I think, in general, that under the Classified Information Procedures Act, there are situations like that that are contemplated, and Mr. De Pue is more familiar than I am with the provisions of CIPA.

Senator GRASSLEY. Would you like to speak to that?

Mr. DE PUE. I don't think there is any direct parallel to what we have sought, Senator Grassley. Situations such as these are relatively rare. They have just begun to arise in the antiterrorism context, and we have just begun to appreciate the significance of civil litigation on our criminal initiatives as the result of what has been going on in Pan Am flight 103.

I would emphasize that the stay provision that we have formulated and submitted to your staff yesterday——

Senator GRASSLEY. Would you stop, please?

Mr. DE PUE. Surely.

Senator GRASSLEY. And then I will let you continue, because he is on a real tight schedule.

Mr. Chairman?

Senator HEFLIN. I regret that I have been unable to be here and that I will have to leave, but I just finished a matter on the farm bill on the peanut program, being very important to my State, and I have to handle the Durenberger ethics matter as chairman of the Ethics Committee. I have to be there very shortly, so I have to get ready for that.

I have an opening statement that I would like to put into the record. I support and am a cosponsor of this bill. I appreciate Sena-

48

tor Grassley agreeing to go ahead and chair it, but there was no way we would have been able to have the hearing today. It would have been postponed if it hadn't been for Senator Grassley's willingness to chair it, and I appreciate that.

I wish I could stay, but time constraints and other duties sometimes conflict.

Senator GRASSLEY. In your absence, I already thanked you for holding the hearing, permitting us to have the hearing, and second, and more importantly, your cosponsorship.

Senator HEFLIN. Thank you.

[The prepared statement of Senator Heflin follows:]

49

STATEMENT OF SENATOR HOWELL HEFLIN
HEARING ON
THE ANTI-TERRORISM ACT OF 1990
BEFORE THE SENATE JUDICIARY SUBCOMMITTEE ON COURTS
AND ADMINISTRATIVE PRACTICE
JULY 25, 1990


GOOD AFTERNOON.  I WOULD LIKE TO WELCOME YOU TO THE SENATE
JUDICIARY SUBCOMMITTEE ON COURTS AND ADMINISTRATIVE PRACTICE
HEARING ON S. 2465, THE "ANTI-TERRORISM ACT OF 1990."

THIS LEGISLATION WILL PROVIDE A NEW CIVIL CAUSE OF ACTION
IN FEDERAL LAW FOR ACTS OF INTERNATIONAL TERRORISM, BY
ESTABLISHING EXTRATERRITORIAL JURISDICTION OVER TERRORIST ACTS
ABROAD AGAINST UNITED STATES NATIONALS.

THERE HAVE BEEN SEVERAL ALARMING TRENDS IN TERRORIST
ATTACKS AGAINST UNITED STATES CITIZENS OVER THE COURSE OF THE
LAST TEN YEARS, DURING WHICH TIME APPROXIMATELY 384 AMERICAN
CITIZENS WERE KILLED.  THE FIRST TREND IS THE RISE IN ATTACKS
INVOLVING INNOCENT BYSTANDERS, AND THE SECOND IS AN INTENT TO
CAUSE MASS CASUALTIES.

IN RECENT YEARS, CERTAIN INCIDENTS OF TERRORISM AGAINST
AMERICAN CITIZENS HAVE BEEN PARTICULARLY HORRIFIC.  FOR
EXAMPLE, ON OCTOBER 7, 1985, FOUR PALESTINIAN GUNMEN HIJACKED
THE ITALIAN CRUISE SHIP "ACHILLE LAURO" OFF ALEXANDRIA, EGYPT.
WHILE OFF THE SYRIAN PORT OF TARTUS, THE TERRORISTS KILLED
WHEELCHAIR-BOUND AMERICAN LEON KLINGHOFFER.  ON DECEMBER 21,
1988, PAN AM FLIGHT 103, JUST OUT OF LONDON EN ROUTE TO NEW
YORK CITY, EXPLODED IN THE AIR OVER LOCKERBIE, SCOTLAND.  THERE
IS OVERWHELMING EVIDENCE THAT A BOMB IN THE CARGO HOLD OF THE
PLANE CAUSED THE CRASH.

THE BOMBING OF PAN AM FLIGHT 103 AND THE LOSS OF ALL 289
PASSENGERS ON BOARD MAY HAVE SIGNALED THE BEGINNING OF A NEW
IRANIAN TERRORIST CAMPAIGN AGAINST THE UNITED STATES.  THERE IS
ALSO A THREAT THAT IMPROVED PROSPECTS FOR PEACE NEGOTIATIONS
BETWEEN ISRAEL AND PALESTINIAN GROUPS WILL GENERATE A NEW ROUND
OF TERRORISM BY RADICAL ARAB GROUPS.  HISTORICALLY, THOSE WHO
OPPOSE PEACE TALKS WITH ISRAEL HAVE USED TERRORIST TACTICS TO
UNDERMINE THE PEACE PROCESS WHENEVER THERE ARE SIGNS OF
PROGRESS BETWEEN THE GROUPS.  IF THIS HAPPENS, WE COULD SEE A
RISE IN MIDDLE EAST TERRORISM.

WHILE CONGRESS HAS ENACTED VARIOUS LAWS AIMED AT EXTENDING
AMERICAN CRIMINAL JURISDICTION FOR ACTS OF INTERNATIONAL
TERRORISM AGAINST OUR CITIZENS, THERE ARE CURRENTLY NO LAWS
EXPRESSLY PROVIDING FEDERAL CIVIL REMEDIES AGAINST THESE
OUTRAGEOUS ACTS.  THEREFORE, THIS BILL WOULD AMEND TITLE 18
UNITED STATES CODE SECTION 2331 BY PROVIDING A PLAINTIFF A
CIVIL CAUSE OF ACTION IN UNITED STATES DISTRICT COURT FOR
INJURIES CAUSED BY ACTS OF INTERNATIONAL TERRORISM.

THE TIME HAS COME TO PROVIDE VICTIMS OF TERRORISM WITH A
MEANS OF CIVIL REDRESS, AND I AM PROUD TO JOIN IN SUPPORTING
THIS LEGISLATION.

I LOOK FORWARD TO HEARING FROM OUR DISTINGUISHED
WITNESSES.  IN THE INTEREST OF TIME, I WOULD LIKE TO REMIND THE
WITNESSES TO SUMMARIZE THEIR PREPARED STATEMENTS, WHICH WILL BE
PLACED IN THE RECORD IN THEIR ENTIRETY.  THANK YOU.

50

Senator GRASSLEY. You can continue, but I think that when you said that there isn't any precedent, that is really what I would like to hear you say. I think that means that there is a possibility, then, for further dialog and some accomplishment out of that so we can reach a compromise.

Mr. DE PUE. Oh, absolutely, Senator.

Senator GRASSLEY. OK.

Mr. DE PUE. Our proposed language is not cast in stone and we are willing to work you and your staff on it.

Senator GRASSLEY. OK. What are the parameters of national security interest, and in what context could the Attorney General hold an entire case in abeyance? Would the security interest have to be related to the incident that is subject to the suit? This language seems to say so.

Mr. DE PUE. That is the situation that we contemplate in the normal situation, yes, Senator, where the same terrorist incident somehow impacts upon national security.

Senator GRASSLEY. What if the Department of Justice intentionally or unintentionally does not institute an investigation on the matter or less than expeditiously pursues an investigation of a case? At what point can the victim proceed in spite of what may be perceived as a slow-moving bureaucracy, or in spite of indecision on behalf of the Government on whether to take action?

Mr. DE PUE. Well, I hope that that doesn't characterize our terrorism efforts to date, Senator Grassley, but I would remind you simply of two things. First, the discovery materials under such circumstances that he would seek would be nonexistent; we would have nothing to protect because we haven't investigated.

Second, the bar to trial provision that we have proposed doesn't go into effect until we have filed an indictment. So our protection there doesn't attach until we are pretty well down the road and we have indicated the case.

Senator GRASSLEY. It is really a realistic concern that the families of the terrorist acts have, and it kind of gets down to the point of whether or not their civil suits ought to be held hostage while the government decides what to do.

Mr. DE PUE. Well, to that, I would simply point out that your estoppel provision in this legislation seems to propose that in the vast majority of cases they are going to try to get the benefit of our conviction and use that to obtain a civil judgment.

Senator GRASSLEY. That is a voluntary exercise.

Mr. DE PUE. Yes, that is certainly correct, but it would certainly be most helpful to them if we got our conviction first because they wouldn't have to do anything then.

Senator GRASSLEY. Now, in the *Klinghoffer* case, the plaintiffs' attorneys deposed the PLO's permanent observer at the United Nations. This lengthy deposition has been characterized as the most important piece of discovery in the case. Of course, the United States dropped the indictment of the alleged perpetrators in this case.

How would the proposed language have affected this case? If this language had been the law at the time, could the Attorney General have barred this discovery? For that matter, if this language were

51

adopted, would the Attorney General have the power to ask the court to hold the case in abeyance?

Mr. DE PUE. One, I don't perceive it as impeding that effort at all because the purpose of this is to prevent discovery of our investigative materials. From what I have been told, the identity of that individual was found entirely independently, and I don't think that this contemplates the protection of that.

As to your second question, inasmuch as there was no criminal proceeding pending in this case, it would not preclude a civil suit on the part of the plaintiffs in the *Klinghoffer* case.

Senator GRASSLEY. What about if the Attorney General thought it was a national security interest?

Mr. DE PUE. The Attorney General under those circumstances, under our proposal, could seek a stay, but I would remind you that that stay could be granted only upon a showing of good cause before a district judge, and the threshold might be quite high under those circumstances.

Senator GRASSLEY. Well, I don't think this last point I made is hypothetical because the Klinghoffers could amend their pleadings and claim recovery under the bill if it is enacted.

Should Senate bill 2465 provide the United States with a right to sue on behalf of the victims? Of course, this would allow the Government to use its vast resources and access to information to pursue civil action.

Mr. VALENTINE. Senator, the administration has not taken a position on that proposal, but we would be happy, in the context of our discussion about the improvements to Senate bill 2465, to look at that issue.

Senator GRASSLEY. OK, then maybe submit that for answer in writing.

Mr. VALENTINE. Yes.

[The information referred to follows:]

Senator Grassley asked Mr. Valentine whether S. 2465 should be amended to provide the United States with a right to sue on behalf of U.S. nationals who are victims of terrorist acts overseas. As Mr. Valentine responded at the July 25 hearing, the Administration has not taken a position on that proposal. Although we are, of course, quite supportive of the objective of providing the United States with the fullest possible array of prosecutorial and civil litigative weapons with which to fight the war against international terrorism, our reluctance to endorse such an amendment to S. 2465 at this time stems from our concern that the creation of such a civil cause of action for the United States might unintentionally tend to interfere with our criminal investigations and prosecutions of terrorist acts. We will stand ready, however, to work with you, Senator Grassley, and your staffs in the next Congress to address this concern if you continue to be interested in amending the bill in such fashion.

Senator GRASSLEY. Mr. Valentine, you recited our Government's prosecution against terrorists. How many ongoing terrorist cases is the Department currently investigating or prosecuting, and what specific terrorist incidents are involved in these cases?

Mr. VALENTINE. I would like Mr. De Pue to respond.

Mr. DE PUE. I believe that we have brought approximately 32 indictments or complaints against terrorists in the international context, as my colleague has pointed out. A number of these indictments or complaints are sealed and I can't discuss the facts or the

52

potential defendants here in open session, but I can give you a very brief rundown on a number of them if you are interested.

Senator GRASSLEY. Do you have it there so it can be submitted for the record?

Mr. DE PUE. Yes.

Senator GRASSLEY. And does that include what specific terrorist incidents are involved with each investigation?

Mr. DE PUE. Of the ones I have enumerated, yes.

Senator GRASSLEY. OK.

Mr. DE PUE. The ones I have enumerated, Senator Grassley, involve instances where we have had some signal success in bringing the people to justice.

[The document referred to follows:]

53

INTERNATIONAL TERRORISM -- SIGNIFICANT ACCOMPLISHMENTS

August 1982 bombing of Pan Am Airliner en route from Tokyo to Honolulu resulting in death of Japanese youth and injuries to other passengers -- On July 14, 1987 a grand jury of the District of Columbia returned a sealed indictment charging three Palestinian nationals with murder and other offenses.  On May 30, 1988 one of the named defendants, Mohammod Rahid, was arrested by Greek authorities attempting to enter the country on a forged passport. After the indictment was unsealed in his case, the United States requested his extradition.  The Greek Supreme Court has ruled favorably on the request and we await a final decision by Greek political authorities.  Federal prosecutors have now interviewed scores of witnesses in eight counties for the purpose of perfecting a criminal case and are now prepared to go to trial.  The two co-defendants remain at large.

June 11, 1985 hijacking of Jordanian Airlines Flight 402 with two American passengers on board -- Following his arrest on the high seas, Fawaz Yunis, a Lebanese national, was convicted in the U.S. District Court for the District of Columbia of air piracy, hostage taking and conspiracy and sentenced to 30 years' imprisonment.  His appeal is pending.  Other known participants remain at large.

June 14 1985 hijacking of TWA Flight 847 and murder of Navy diver Robert Stethem -- Mohammod Ali Hamadei, Ali Atwa and Hassan Izz-al-din were indicted in the District of Columbia for air piracy and murder. Following Hamadei's arrest in West Germany and denial by that country of the United States' extradition request, he was convicted of murder, hijacking, assault and related offenses.  The West German court sentenced him to life imprisonment.  The successful prosecution by the West German government was based almost exclusively on evidence developed by the FBI and Justice Department prosecutors.  In fact, the FBI's case agent assisted the West German prosecutor throughout the proceedings in presenting the case.  The co-defendants remain at large.

June 19, 1985 murder of four U.S. Marine Embassy Guards in El Salvador --  Largely as the result of evidence developed by the FBI, Salvadoran authorities arrested William Celio Rivas Bolanos and charged him with murder.  He remains incarcerated in El Salvador awaiting trial in that country for the murders.  We have undertaken initiatives, through the State Department, to obtain custody of Rivas.

April 21, 1989 murder of Colonel James N. Rowe of the Joint Military Advisory Group in Manila -- As the result of investigative efforts by the FBI, the Philippine government has arrested Juanito Itaas and Donald Continente for offenses resulting from their alleged participation in the murder.  Itaas went on trial for the offense in April 1990 and the proceedings are continuing.

December 19-21 murder, assault and abduction of American nationals in Panama.  As the result of investigative efforts of FBI investigators, which began shortly after cessation of hostilities, 15 Panamanian nationals have been taken into custody and charged with these offenses. We expect that the trials of these individuals will begin shortly after the Panamanian court system is functional.

Senator GRASSLEY. You also mentioned the Rashid extradition case in Greece. As you stated, the Greek judiciary has ordered the extradition of Rashid and we are awaiting a decision by Greek political authorities. With the reportedly more Western government under the new Prime Minister there, are we actively pursuing this with Greece or are we just waiting for some decision to materialize?

I asked Mr. Valentine, but it is probably more appropriately yours.

Mr. KRECZKO. Mr. Chairman, we have pursued the issue, but I can't tell you when we will get a response.

Senator GRASSLEY. So it is something that you are actively pursuing as opposed to sitting back and waiting?

Mr. KRECZKO. Yes, sir.

Senator GRASSLEY. We all know that the mastermind of the *Achille Lauro* attack was Abul Abbas, who sits on the PLO's executive council. We also know that Abbas was convicted in absentia by an Italian court for his despicable crimes, but his case was dropped by our Government because of a lack of evidence.

Could you tell us why Italy had enough evidence for the conviction, but we didn't have enough to pursue the case?

Mr. VALENTINE. Senator, we would be happy to respond for the written record in as much detail as we can in that respect, but none of us here is an expert on that particular case.

Senator GRASSLEY. I understand that Italy, because of its location, might be in a better position to collect evidence, but it is inconceivable to me why an ally like Italy wouldn't be willing to share any information that they have. If there is a problem with information-sharing, then it underscores the fact that there is a problem with international cooperation on the war against terrorism.

That is just my feeling. You don't have to respond to that.

Well, this has been very worthwhile. I have no other questions—I am reminded by staff that I have not asked Mr. Kreczko some questions.

Your Department has expressed the concern that the bill should not apply to suits against the United States or foreign States as defined in the Foreign Sovereign Immunity Act, or any officer or employee thereof. The effect of this provision would be to maintain the status quo as regard sovereign States and their officials, according to the Department's testimony.

I do not believe that it is the intent of this bill to permit such suits. However, the outstanding issues involve so-called officials acting outside of their scope of authority.

The first question: In general, is immunity granted per se to an official of the foreign government? In other words, is the foreign official granted absolute immunity solely by virtue of his or her title?

Mr. KRECZKO. No, sir.

Senator GRASSLEY. In general, is immunity granted even if the official or his employee is acting outside the scope of his or her duties?

Mr. KRECZKO. No, sir.

55

Senator GRASSLEY. The suggested language would preclude suits against those acting within, as well as outside their official capacity. Is that the intent of the department?

Mr. KRECZKO. Yes, sir.

Senator GRASSLEY. There has been some citation to the *Sultany* v. *Reagan* case. My reading suggests that while the lower courts found head-of-state immunity barred the Libyans from suing President Reagan and Prime Minister Thatcher for the American air raid on Libya, which originated from airstrips within Britain, the court seemed to suggest that per se immunity does not apply to all officials or employees.

In finding that immunity barred the suit against other named defendants who were civilian or military officers of the United States, the district court held:

* * * they did so in their official capacity and none other, and plaintiffs do not allege otherwise. The court concludes that each of the other named defendants is similarly entitled to immunity from this suit whether the immunity was absolute or qualified.

Of course, I don't take issue with that decision, and I am well aware of the reliance of the Department of State on that case. But my question is whether the court must answer the threshold question of whether immunity applies even under *Sultany* by first determining whether the officials were acting within their official duties.

Mr. KRECZKO. Senator, that would be one of our concerns, if that distinction is reflected in this legislation. We do not want to invite litigation over the issue of whether a foreign official's involvement in an act of terrorism was within or without the scope of his official duties. That will end up becoming a litigation over the foreign government's policies.

Senator GRASSLEY. If you would pardon me, I am going to submit the rest of the questions for response in writing so that I can get on to the next panel.

Mr. KRECZKO. Yes, sir.

Senator GRASSLEY. Thanks to all of you, and thank you for your cooperation. I look forward to a continued dialog.

Mr. VALENTINE. Thank you, Senator.

Senator THURMOND. We thank you gentlemen for your appearance.

Senator GRASSLEY. I would like to call the next panel, people whose families have been victims of terrorist acts. We would call Lisa Klinghoffer, Ilsa Klinghoffer, Paul Hudson—the first three are from New York—and Rosemary Wolfe, of Alexandria, VA.

First of all, we welcome you. I know it is a tough situation to come here and talk about what you are going to visit about. More importantly, it deprives you of some privacy. And third, I know that it is a difficult job for you to come to Washington, DC, at least for the three of you from New York.

I would ask Lisa first, and then will hear from all of you before we ask questions.

Lisa?

Ms. L. KLINGHOFFER. I would defer to my sister first; she will start.

Senator GRASSLEY. OK, that is very fine.

PANEL CONSISTING OF LISA AND ILSA KLINGHOFFER, NEW YORK, NY, ON BEHALF OF THE LEON AND MARILYN KLINGHOFFER MEMORIAL FOUNDATION, ANTI-DEFAMATION LEAGUE; ROSEMARY WOLFE, ALEXANDRIA, VA; AND PAUL S. HUDSON, CHAIRMAN, FAMILIES OF PAN AM FLIGHT 103/LOCKERBIE, NEW YORK, NY

### STATEMENT OF ILSA KLINGHOFFER

Ms. I. KLINGHOFFER. Good afternoon. My name is Ilsa Klinghoffer, and sitting beside me is my sister, Lisa. Joining us today is Michael Lieberman, the ADL's Washington counsel.

We are here on behalf of the Leon and Marilyn Klinghoffer Foundation of the Anti-Defamation League. On behalf of the foundation and the Anti-Defamation League, we want to commend Senators Heflin and Grassley for your leadership in introducing this important legislation.

We also have a personal interest in today's proceedings. Our father, Leon Klinghoffer, was murdered by terrorists aboard the *Achille Lauro* in 1985. Shot in cold blood in his wheelchair, he was thrown overboard into the Mediterranean Sea. We lost our father; our family was ripped apart.

The Klinghoffer Foundation was established by our mother, Marilyn, just before her death from cancer 5 months after our father was murdered. She established the foundation to help educating the public about the horrors of terrorism. Later, we joined forces with the Anti-Defamation League.

With the resources of the ADL behind us, we have been actively involved in the battle against terrorism by funding educational and research publications, sponsoring symposia, and speaking out at appropriate forums. This is one such occasion.

We are here to lend our voices in support of the Anti-Terrorism Act of 1990, which we feel is a concrete step to opposing international terrorism. We believe that the act serves several important functions. One, it demonstrates our Government's commitment to eradicating terrorism. Two, it sends a clear message that U.S. citizens must be secure from terrorism in the international community. And three, it provides American victims of terrorism with legal remedies.

### STATEMENT OF LISA KLINGHOFFER

Ms. L. KLINGHOFFER. We know that nothing can bring my father back, and mother knew that as well. In her quest to seek justice, in addition to setting up the foundation, my mother initiated a suit against the PLO. This lawsuit was instituted primarily to establish responsibility for the death of my father, but it has provided more than this for us.

Since our father's brutal murder, we have continued to be frustrated by the insanity of the situation. We have watched Abul Abbas continue his reign of terror among innocents, as we were. We have seen Abbas on TV make statements such as maybe my father was trying to swim for it. We have endured an Italian trial where the murderers received life sentences because of their political status—so-called freedom fighters. We have even had to watch

57

our own Government drop charges against Abbas. This is our pain, but all the families experience similar feelings of frustration and futility, and have little or no recourse.

As some of you are aware, after 4½ years, we have recently won jurisdiction allowing us to sue the PLO in a Federal court of New York. While this is a preliminary victory for my family, the uniqueness of our case and set of circumstances might not be applicable to other families, and probably wouldn't be. That is our concern, and why my sister, Ilsa, and I here today.

All Americans deserve the ability to seek justice. The Antiterrorism Act of 1990 will do just that. Any American victim of terrorism will have legal recourse against those terrorists in any U.S. Federal court. My father and my family could be any American family. There is need to provide justice for all American terrorist victims.

Because of its political significance and legal remedies, the Klinghoffer Foundation of the Anti-Defamation League strongly supports enactment of this bill.

We thank you so much for the opportunity to be here. My sister and I are honored. We would be happy to answer any questions. Thank you.

[Ms. Ilsa and Ms. Lisa Klinghoffer submitted the following material:]

58

Statement

of

THE LEON AND MARILYN KLINGHOFFER MEMORIAL FOUNDATION

of

THE ANTI-DEFAMATION LEAGUE


in support of


The Anti-Terrorism Act of 1990

before the

Senate Subcommittee on Courts and Administrative Practice



UNITED STATES SENATE

July 25, 1990

Good afternoon.  My name is Lisa Klinghoffer, and sitting beside me is my sister, Ilsa.  We are here on behalf of the Leon and Marilyn Klinghoffer Memorial Foundation of the Anti-Defamation League.  Joining us today are Jess Hordes, ADL's Washington Representative, and Michael Lieberman, ADL's Washington Counsel.

This committee undoubtedly knows of the brutal murder of our father by terrorists on board the Achille Lauro.  A band of terrorists hijacked that Italian cruise ship in 1984, holding the crew and passengers hostage for several days.  Prior to relinquishing control of the ship, the cold blooded killers shot our father in his wheelchair, and threw his body and the wheelchair overboard.

Before discussing the bill itself, I would like to say a few words about the Klinghoffer Foundation.  Our mother, in the final months of her life, founded the Klinghoffer Foundation, an organization dedicated to combatting the deadly threat of terrorism.   In 1986, we joined with the Anti-Defamation League.  The Foundation actively works to counter terrorism through political, legislative and educational means.  We organize conferences and scholarly symposia to call attention to important developments concerning international terrorism.  The Klinghoffer Award is bestowed periodically upon figures who demonstrate leadership in the fight against terrorism.  Former Secretary of State George Shultz received last year's Klinghoffer Award.

Supporting legislative measures such as the Anti-Terrorism Act of 1990 numbers among the most important activities of the Foundation.  Legislation represents the kind of concrete steps which are essential to opposing international terrorism.

We believe that the Anti-Terrorism Act serves several important functions, both symbolic and practical.  In the domestic arena, it demonstrates that Congress shares with the other branches of government a commitment to eradicating terrorism.  At the international level, enacting effective civil

remedies to supplement existing criminal penalties for overseas acts of terrorism against Americans would send a clear and unmistakable message overseas that our country's citizens must be secure from terrorism in the international community. Beyond its political significance, however, the Anti-Terrorism Act of 1990 provides American victims of terrorism with vital legal remedies to the harms caused by international terrorists.

The Achille Lauro incident highlights the need for and value of the Anti-Terrorism Act. The terrorists who hijacked the Achille Lauro attack were tried in Italy. Abul Abbas, the mastermind of that operation was convicted and sentenced in absentia, but he continues to elude the international law enforcement community. Indeed, when asked to comment on my father's murder at a 1988 press conference in Algiers, Abbas joked about the killing, saying that maybe my father "was trying to swim for it."

My family and others are suing the PLO in an effort to hold that organization responsible for the terrorism aboard the Achille Lauro. Without an explicit statutory remedy available to us under federal law, however, we have been bogged down in litigation over procedural issues. As you may be aware, we recently obtained a significant but preliminary victory when the United States District Court for the Southern District of New York ruled that it had jurisdiction over the PLO in Manhattan.

In determining that it could assert jurisdiction over the PLO in New York, the court was forced to rely upon the fact that the harms occurred on the high seas and the fact that the PLO has offices in New York. Fortunately, the court was able to assert its jurisdiction under the particular circumstances of our case. The court's ruling, however, illustrates the need for a federal remedy uniformly available to Americans who suffer harms at the hands of terrorists overseas.

Since the crimes took place on a ship, the court was able to find jurisdiction over the subject matter of this case under the

61

court's statutory maritime jurisdiction and under the Death on
the High Seas Act.  If the killing had taken place upon an
aircraft or on another nation's soil, the court may well have
rejected our attempt to recover from the PLO for the harms
inflicted upon my family.

In addition to finding jurisdiction over the subject matter
of our claims, the court also struggled with the question of
personal jurisdiction over the PLO as a defendant in a lawsuit in
this country.  Applying New York law, the court concluded it
could assert its authority over the PLO based on the PLO's
activities in that state.  This conclusion rested on the fact
that the PLO has established "a permanent and extensive presence
in New York."  Again, while we are pleased that our lawsuit has
been allowed to proceed in New York, we are troubled by the
indication that Americans living in other jurisdictions or those
victimized by other terrorist groups would have difficulty
seeking recovery for the harms inflicted upon them outside the
United States.

The Anti-Terrorism Act would cure these deficiencies in our
legal system.  It would provide explicit statutory authority for
American citizens such as those involved in the Achille Lauro
matter to bring suit in this country not only against the
terrorists who harm them overseas, but also against the states
which sponsor international terrorism.  It would facilitate
bringing suit against foreign terrorists by allowing the action
to be filed in any district of this country in which the
defendant might have a representative.  Finally, the Act would
encourage this appropriate use of our legal system by allowing
plaintiffs to recover three times their actual damages along with
attorney's fees.

In sum, the Anti-Terrorism Act would do more than send the
important political signal that this nation will not tolerate
terrorism against American citizens travelling overseas;
experience teaches that the Act would serve a much-needed

37-716 O - 91 - 3

62

practical purpose. If one such as Abul Abbas or his agents can be found within our borders, he could be made to answer for his deeds. The government and officials of any nation which may have aided him could also be required to pay for their actions. American citizens deserve this kind of legal protection.

The Leon and Marilyn Klinghoffer Memorial Foundation of the Anti-Defamation League strongly supports the enactment of S.2465. Ilsa and I would be happy to answer any questions.

SENATOR HOWELL HEFLIN

QUESTIONS

THE KLINGHOFFERS

o    NOW THAT YOU HAVE OVERCOME THE JURISDICTIONAL ISSUES IN YOUR PENDING LAWSUIT AGAINST THE P.L.O., WHAT ADDITIONAL HURDLES DO YOU ANTICIPATE?

o    WHAT DO YOU BELIEVE IS THE MOST IMPORTANT POTENTIAL EFFECT OF S. 2465?

63

ADL
Anti-Defamation League
of B'nai B'rith

August 17, 1990

The Honorable Howell Heflin
U.S. Senate Judiciary
Subcommittee on Courts &
   Administrative Practice
223 Hart SOB
Washington, DC 20510
Attention: Becky Ward

Dear Senator Heflin:

   This is in response to your August 2 letter enclosing two
additional questions regarding the Klinghoffer Foundation's
perspective on S.2465, the Anti-Terrorism Act of 1990. We have
asked our attorney, Jay Fischer, to respond to your first inquiry,
regarding anticipated hurdles in our lawsuit against the PLO since
he is in a better position to provide that information.

   Your second question asks what potential effect of S.2465 is
the most important. As we indicated in our testimony, the Anti-
Terrorism Act would serve vital practical and symbolic purposes. As
a practical matter, it would establish a standardized framework to
obtain legal redress for the harms inflicted by international
terrorist groups and their sponsors. Our lawsuit against the PLO
highlights the need for such a mechanism. Without explicit
statutory jurisdiction, the court was willing to assert jurisdiction
over the PLO in our case only because the PLO happens to have
offices and other contacts in New York. S.2465 would provide a
uniform procedure which would guarantee terrorism victims an
opportunity to recover damages from the responsible parties.

   Overall, however, we feel that greatest importance of the
Anti-Terrorism Act lies in its symbolic effect. The Act sends the
message at home and abroad that the United States will resist
international terrorism. American citizens will take comfort
knowing that Congress has provided extraordinary measures to protect
their rights if they suffer from acts of terrorism overseas. In
addition, the Act serves notice upon the international community
that our country condemns terrorism and to hold responsible
those who perpetrate it. Hopefully, the Anti-Terrorism Act will
serve as a model to other nations, inspiring them to implement
effective legal responses to terrorism.

   Thank you for allowing us the opportunity to express our
support for the Anti-Terrorism Act. Please feel free to call on us
if we can provide any additional assistance in supporting the bill
or in contributing to the battle against terrorism in the future.

Sincerely,

Lisa Klinghoffer

Ilsa Klinghoffer

cc:  Jay D. Fischer
     Michael Lieberman

Senator GRASSLEY. Mr. Hudson.

Mr. HUDSON. Thank you, Mr. Chairman. I would like to defer to Rosemary Wolfe at this point.

Senator GRASSLEY. OK.

## STATEMENT OF ROSEMARY WOLFE

Ms. WOLFE. Mr. Chairman and members the subcommittee.

Senator GRASSLEY. You may have to pull that just a little closer. You have to put it square in front of you.

Ms. WOLFE. OK, thank you.

Mr. Chairman and members of the subcommittee, I want to thank you for giving me the opportunity to testify here today. I want to thank you, Senator Grassley, for your opening remarks, and you, Senator Thurmond, for your remarks and for your support.

My name is Rosemary Wolfe. My stepdaughter, Miriam Wolfe, a musical theater student at Syracuse University, was only 20 years old when she was murdered, along with 269 others, by terrorists who blew Pan Am 103 out of the skies over Lockerbie on December 21, 1988.

Their lives were erased by a brutal, deliberate political act—terrorism directed against the United States through the murder of innocent civilians. Since that day, many of us, the families and friends of the victims, have been working not only to prevent this from happening again through a strong airline security system, but also to ensure that the truth be known and that those responsible be brought to justice. None of these goals has been realized.

There have been partial attempts, partial truths, partial facts, but most of all there has been a total denial on the part of our Government about the nation States and individuals responsible. There has been no political or judicial response.

Recently, the Washington Post published my letter to the editor asking why our Government continues to deny Iran's role in the bombing of Pan Am flight 103 and continues to deal with Iran. The letter, which I have attached to this testimony, was in response to an op ed column by Abraham Sofaer, legal adviser to the Secretary of State from June of 1985 until he resigned last month. Mr. Sofaer acknowledged Iran's involvement in the Pan Am 103 bombing. To my knowledge, Mr. Sofaer was the first U.S. official to make this acknowledgement publicly.

In my letter, I asked why Iran's involvement can only be acknowledged by U.S. officials only once they have resigned. I ask you as lawmakers, as well as our Nation's leaders, why our policies do not acknowledge and reflect Iran's role and pave the way for the capture and punishment of the terrorist perpetrators of the bombing.

Syria continues to maintain a safe haven for Ahmed Jibril, who has been most directly linked to the bombing. What actions have we taken to have Jibril expelled or extradited from Syria? What actions did we take to recently prevent the Government of Sweden from releasing from incarceration and arrest and deporting to Syria two Palestinians who were reported to have spent 1 month with the terrorists captured during the West German raid on the

65

Neuss apartment in October 1988? They had left just 2 or 3 days before that raid and were smuggled into Sweden.

We do not have a cohesive policy against nation States supporting terrorism. Our policies against terrorism seem to be politically driven. A recent incident regarding this is the release of Orlando Bosch, the anti-Castro terrorist. Our Government had him under arrest and now he is released under house arrest.

We have to have cohesive policies against all kinds of terrorists if we are going to stop this. That is why the legislation that you have introduced here today is vitally needed. It allows judicial response to terrorists in the absence of political will.

This legislation is made all the more important by the continuing incidences of terrorism worldwide. According to the State Department's 1989 report "Patterns of Global Terrorism," the United States is the most frequent target of international terrorists.

In 1989 alone, there were 165 attacks directed against the United States. Worldwide, there were 528 international terrorist incidents last year. The single largest incident last year was the downing of the French UTA flight 772. The downing of UTA, which had chilling similarities to the downing of Pan Am flight 103, caused the deaths of 171 persons. Seven were Americans, including an Ambassador's wife.

Americans travel to every region of the globe. Although bombing is now the major form of terrorism worldwide, Americans can also be confronted by other forms of terrorism—arson, armed attack, kidnaping, sabotage, hijacking, or assault. And they can be traveling on a cruise ship like Mr. Klinghoffer was, unsuspecting of any danger.

Terrorism has not gone away. Families of the victims of terrorism need civil recourse in the courts, for this may be our only recourse. I support the principles of Senate bill 2465, the Antiterrorism Act of 1990, and I thank you for all your support.

Thank you for allowing me to be here today.

[Ms. Wolfe submitted the following material:]

66

TESTIMONY OF ROSEMARY WOLFE

Mr. Chairman and Members of the Subcommittee, I want to thank
you for giving me the opportunity to testify here today.  My name
is Rosemary Wolfe.  My stepdaughter, Miriam Wolfe, a musical
theater student at Syracuse University, was only twenty years old
when she was murdered along with 269 others by terrorists who
blew Pan Am 103 out of the skies over Lockerbie on December 21,
1988.  Their lives were erased by a brutal, deliberate,
political act -- terrorism directed against the United States
through the murder of innocent civilians.

Since that day, many of us, the families and friends of the
victims, have been working not only to prevent this from happening
again through a strong airline security system but also to
to ensure that the truth be known and that those responsbile
be brought to justice.  None of these goals has been realized.
There have been partial attempts, partial truths, partial facts.
But most of all there has been a total denial on the part of
our government about the nation states and individuals responsible.
There has been no political or judicial response.

Recently, the Washington Post published my letter to the
editor asking why our government continues to deny Iran's role
in the bombing of Pan Am Flight 103 and continues to deal with
Iran.   The letter, which I have attached to this testimony, was
in response to an op-ed column by Abraham Soafer, legal adviser to
the secretary of state from June of 1985 until he resigned last
month.  Mr. Soafer acknowledged Iran's involvement in the Pan
Am 103 bombing.  To my knowledge,  Mr. Soafer was the first
U.S. official to make this acknowledgment publicly.  In my
letter I asked why Iran's involvement can only be acknowledged by
U.S. officials only once they have resigned.

I ask you as lawmakers as well as our nation's leaders why
our policies do not acknowledge and reflect Iran's role and
pave the way for the capture and punishment of the terrorist
perpetrators of the bombing.  Syria continues to maintain a safe

haven for Ahmed Jibril who has been most directly linked to the bombing.  What actions have we taken to have Jibril expelled or extradited from Syria?  What actions did we take to recently prevent the government of Sweden from releasing from incarceration and arrest and deporting to Syria two Palestinians who were reported to have spent one month with the terrorists captured during the West German raid on the Neuss apartment in October 1988?

We do not have a cohesive policy against nation states supporting terrorism.  Our policies against terrorism seem to be politically driven.  That is why the legislation that you have introduced here today is vitally needed.  It allows judicial response to terrorists in the absence of political will.

This legislation is made all the more important by the continuing incidences of terrorism worldwide.  According to the State Department's 1989 report, Patterns of Global Terrorism, the United States is the most frequent target of international terrorists.  In 1989 alone there were 165 attacks directed against the United States.  Worldwide, there were 528 international terrorist incidents last year.  The single largest incident last year was the downing of the French UTA Flight 772.  The downing of UTA, which had chilling similarities to the downing of Pan Am Flight 103, caused the deaths of 171 persons.  Seven were Americans, including an Ambassador's wife.

Americans travel to every region of the globe.  Although bombing is now the major form of terrorism worldwide Americans can also be confronted by other forms of terrorism-- arson, armed attack, kidnapping, sabotage, hijacking or assault.  And, they can be traveling on a cruise ship like Mr. Klinghoffer was, unsuspecting of any danger.

Terrorism has not gone away.  Families of the victims of terrorism need civil recourse in the courts.  For this may be our only recourse.  I support S. 2465, the "Antiterrorism Act of 1990."

Thank you for allowing me to be here today.

FRIDAY, JULY 13, 1990

# The Washington Post

## AN INDEPENDENT NEWSPAPER

---

# LETTERS TO THE EDITOR

### Denying Iran's Role in Pan Am Flight 103

What Abraham Sofaer's July 10 op-ed column ["No Quick Fix in Iran"] failed to tell us is why, after a decade or more of state-sponsored acts of terrorism by Iran against the United States, our government continues to seek new deals for a rapprochement with Iran when every signal points to the fact that Iran doesn't want to forge a new relationship. We say it isn't so and continue to deny that our goodwill begets nothing but denial and ill will.

Mr. Sofaer, legal adviser to the secretary of state from June of 1985 until last month, acknowledges that Iran had responsibility in the bombing of Pan Am 103 over Lockerbie on Dec. 21, 1988. Yet for the past year and a half our government has refused to point the finger of blame. The madmen who murdered our precious children and all our loved ones, including my stepdaughter Miriam Wolfe, go free and unpunished. And with this has been a denial from our nation's leaders of Iran's involvement. The denial has been communicated to the families on more than one occasion by President Bush. On one occasion, in response to a letter on why our government was releasing the assets of Iran that had been frozen by the United States, President Bush told us that Iran must be brought into the community of nations. In the process, Iran kicks and screams all the way, and it continues to slap the face of its benevolent benefactor. In the process, we refuse to deal with Iran's involvement in the Pan Am 103 bombing.

And in the process, the morality of returning assets and making deals is sacrificed to the "greater good." We continue to ask where these policies will lead us. When swords don't turn into plowshares, do you stop the sword by burying it? Or by removing the blade? I continue to ask: When will the murderers of our loved ones be punished? Can Iran's involvement in the bombing of Pan Am 103 be acknowledged by U.S. officials only once they have resigned?

ROSEMARY WOLFE
Alexandria

69

RESPONSE OF ROSEMARY WOLFE TO QUESTION

**Question**

The Department of State suggests that one of the reasons for
immunizing foreign states and officials from suits is that of
preventing the possibility of reciprocal action by those
foreign states.  How do you respond?

**Answer**

From a moral perspective, the possiblity of reciprocal
action against the United States government and officials is the
least valid of all possible arguments that could be made for
not sanctioning civil action against foreign governments and
officials.

Terrorists do not work alone.  Terrorist events particularly
over the last few years, including the bombing of Pan Am Flight
103 on December 21, 1988 over Lockerbie, Scotland have shown that

nation states and officials connected with those states provide
support and refuge for terrorists, even engaging terrorists in
carrying out foreign policy objectives of nation states.

Taking the Pan Am 103 bombing as a case in point, it is
believed that Iran, with the knowledge of the current head of
state, Rafsanjani, former Interior Minister Mohteshemi, and
other government officials commissioned the bombing of Pan Am 103
in retaliation for the downing by the Vincennes of the Iranian
Airbus.  Ahmid Jabril, believed to have been commissioned by Iran
to carry out the bombing, is being harbored by Syrian President
Assad, who many experts feel had to know about the bombing
because of his relationship with Jabril.

The U.S. government has not yet officially acknowledged the
role of Iran and Syria.  Indictments have not yet been issued
by the United States against those responsible.  Should
indictments be issued, those responsible may be beyond the
reach of U.S. law.  It is also doubtful that former or current
government officials responsible would be named in an indictment.
However, the criminal responsibility of those responsible
could be established in other ways.  For this reason, victims of
terrorist actions should have the right to sue in a civil suit
anyone who may be responsible, including officials and employees
of governments involved.

A moral parallel for this type of action was established by
the Neurenberg Tribunal.  Just as Neurenberg established the
principle of individual responsiblity for actions in war, the
legislation before the Subcommittee should provide the ability to
bring suit against outlaw governments and individuals connected
with those governments.  This would establish individual and
moral accountability.  There would not be a hidden cloak in the
sanctity of the nation state.

What would the United States government have to fear?
The United States is not a terrorist state and does not sanction
terrorist activities by its officials or citizens.  Yet, opening
up civil suits against foreign governments and officials could
set a precedent in law which in turn could perhaps be used by
other nations to bring suit against us in other matters, some of
which may involve covert activity.  My answer to this is that if
U.S. foreign policy is carried out morally and straightforwardly
we have nothing to fear.

Opening up civil suits against foreign governments and
officials could also lead to a cut off in the flow of resources
of the U.S. government and its citizens in those countries.  My
answer to this is that this is the price that we would pay for
dealing with outlaw nations.

In summing up, allowing Americans who are victims of
terrorism to bring civil suit against all terrorists concerned,
including governments and officials involved, would be part of
the American system of checks and balances, providing a moral
force and at the same time sending a clear message to terrorists
and the nation states who sponsor them.

70

Senator GRASSLEY. Thank you, Rosemary.
Mr. Hudson.

## STATEMENT OF PAUL S. HUDSON

Mr. HUDSON. Thank you. Good afternoon, Senator Grassley, Senator Thurmond, and committee staff members. I wish to commend you today for holding hearings on the legislation known as the Antiterrorism Act of 1990.

The Families of Pan Am 103/Lockerbie, with 170 victim family members of the Pan Am 103 terrorist bombing in December 1988, and three families of the French UTA bombing in September of 1989, support, in principal, this legislation which would permit victims of terrorism to file civil actions against terrorists and terrorist organizations.

The lack of concerted action by the U.S. Government in the Pan Am 103 case and in most acts of international terrorism against Americans is becoming well known. What is frustrating and even enraging to the victims of terrorism is not only that our Government provides no material and little, if any, moral support to the innocent victims of terrorists, who use innocent civilians as targets for attacks on the U.S. Government, but that our legal system is in some ways part of the problem rather than part of the solution.

The subject legislation is one of many steps that must be taken if the U.S. legal system is to become a weapon against terrorism instead of a shield that inadvertently protects terrorists from U.S. civil and criminal justice.

My experience on this issue extends beyond the fact that I lost my only daughter to a terrorist bomb, apparently planted by a Palestinian terrorist group in retaliation for the accidental shoot-down of an Iranian airliner by a U.S. war ship.

For 10 years, I represented the State of New York in civil actions to enforce the State's so-called Son of Sam law that provides for seizure of profits of notorious criminals for the benefit of victims. My experience and observations lead me to caution the subcommittee to make their legislation as technically perfect as possible, and to provide for Government support, but not control, of the litigation.

Legislation of this type will have its legality and constitutionality thoroughly tested not only by those representing terrorists, but by the civil liberties bar and others. Furthermore, I know of no civil legislation that permits victims to sue criminals, especially powerful criminal groups, that has been successful without Government support. The reasons go beyond lack of resources or technical legal problems faced by the victim plaintiff. The principal problem is that of intimidation or even physical assassination.

Civil RICO, for example, was supposed to empower victims to sue for civil damages. Over the past 15 years, how many cases have been successfully brought against the mafia or other criminal organizations without Government prosecutorial backing? I know of none.

I would hope that you would carefully consider these points before enacting legislation that sends victims on the errand of filing suit against groups such as the PLO or Colombian drug car-

tels with no possible Government support or backing. To do so could create tragedy as well as frustration.

By Government support, however, I do not mean Government control. We urge you to permit U.S. attorneys, State attorneys general, or even local prosecutors to join in these actions ex rel or as coplaintiffs. Do so and I believe this legislation could provide another effective legal weapon to be used against terrorist groups.

I also would like to submit as part of the record a memorandum and a markup of the legislation—some technical comments by our legislative counsel, Michael Lemov, that cover a number of technical points. The only one I will mention verbally is that the statute, we believe, should be retroactive as a procedural civil statute. We believe that is constitutional, so it would apply to the victims of Pan Am 103 as well as to future cases.

Thank you.

[The prepared statement of Mr. Hudson follows:]

72

Testimony of Paul S. Hudson
Chairman, Families of Pan Am
103/Lockerbie before the
Senate Subcommittee on the
Courts and Adminstrative Practice
Senate Judiciary Committee
Dirkson Senate Office Bldg., Rm. 226
Washington, DC
July 26, 1990, 1:30 P.M.

Families of Pan Am 103
Lockerbie
1400 L Street NW
Washington, DC
(202) 371-5934

73

Good Afternoon, Mr. Chairman, Sen. Grassley and other members of the Committee.

I wish to commend you for holding hearings today on the Legislation known as the "Antiterrorism Act of 1990". The Families of Pan Am 103/Lockerbie with 170 victim families members of the Pan Am 103 terrorist bombing in December, 1988 and three families of the French UTA bombing in September, 1989, support in principle this legislation which would permit victims of terrorism to file civil actions against terrorists and terrorist organizations.

The lack of concerted action by the U.S. Government in the Pan Am 103 case and in most acts of international terrorism against Americans abroad is well known. What is frustrating and even enraging to the victims of terrorism is not only that our Government provides no material and little if any moral support to the innocent victims of terrorists who use innocent civilians as surrogate targets for attacks on the U.S. Government, but our legal system is in some ways part of the problem rather than part of the solution. The subject legislation is one of many steps that must be taken if the U.S. legal system is to become a weapon against terrorism instead a shield that inadvertently protects terrorists from U.S. civil and criminal justice.

My experience in this issue extends beyond the fact that I lost my only daughter to a terrorist bomb, apparently planted by a Palestinian terrorist group in retaliation for the accidental shootdown of an Iranian airliner by a U.S. warship in the Persian Gulf in July, 1987. For ten years I represented the State of New York in civil actions to enforce the State's so-called "Son of Sam" Law that provides for seizure of the profits of notorious criminals for the benefit of the victims. My experience and observations lead me to caution the subcommittee to make their legislation as technically perfect as possible and to provide for government support but not control of the litigation.

Legislation of this type will have its legality and constitutionally thoroughly tested not only those representing terrorists but by the civil liberties bar and others.

Furthermore, I know of no civil legislation that permits victims to sue criminals, especially powerful criminal groups, that has been successful without government support. The reasons go beyond lack of resources or technical legal problems faced by the victim plaintiff. The principal problem is that of intimidation or even physical assassination. Civil RICO was supposed to empower victims to sue for civil damages. Over the past 15 years, I know of no cases being successfully brought against the Mafia without government prosecutorial backing.

74

> Please carefully consider these points before enacting legislation that sends victims on the errand of filing suit against groups such as the PLO or Columbian drug cartels with no possible government support or backing. To do so could create tragedy as well as frustration.
>
> By government support, however, I do not mean government control. We urge you to permit U.S. Attorneys, State Attorneys. General or local prosecutors to join in these actions ex rel or as a co-plaintiff. Do so and I believe that this legislation could provide another effective legal weapon to be used against terrorists groups.

Senator GRASSLEY. As far as your request for the memorandum to be submitted in the record, we will take it and consider it as a suggested revision of the bill. Normally, we wouldn't put that in the printed record, but we will make a determination on that. But for sure it will be considered by the staff.

Mr. HUDSON. Thank you.

Senator GRASSLEY. Mr. Thurmond, can you tell me when we were going to have our quorum call?

Senator THURMOND. About 3:15.

Senator GRASSLEY. That is a two-bell quorum call. Do they start out and then go to three?

Senator THURMOND. That is just a quorum.

Senator GRASSLEY. But there is going to be——

Senator THURMOND. We can go ahead for a few more minutes until the bell rings.

Senator GRASSLEY. There will be a period of time here, maybe in 5 minutes or so, when I am going to have to recess for about 7 minutes to go over and help establish a quorum for the Durenberger hearing. Until then, I will go to questions for the witnesses.

I read in a recent article about your family suing the PLO, Ilsa. You were quoting as saying something like this; at least this was what was printed.

> It is beyond what most people would try. People said to us, what, sue the PLO; are you crazy? You have to understand what our mother was like; she would have fought until the very end, and that is what we are doing.

So, now, I hope you will pardon me, but I want to ask you, what, sue the PLO, are you crazy?

Ms. I. KLINGHOFFER. I am my mother's daughter. I would just elaborate on that comment. She was determined to find some accountability, some responsibility, some justice from everything that she went through, and I just feel that I have to continue in her footsteps to at least try to accomplish what she was trying to accomplish.

Senator GRASSLEY. Let me ask you, then, assuming my information is right, why weren't you satisfied by recovering from the *Achille Lauro*'s owners? I hope it is not too personal, but didn't you receive a settlement?

Ms. I. KLINGHOFFER. Yes, there was one, but there were other people who needed to account for this situation beyond the *Achille Lauro*.

Senator GRASSLEY. OK. Now, will you just stay? We will have to take about a 7-minute recess right now. That is about how long it takes me to go over.

Now, if you want to ask questions while I am gone, why don't you do that, Senator Thurmond?

Senator THURMOND. Well, I might ask a couple of questions.

I would just like to ask the Klinghoffers, as victims of the hatred perpetrated by terrorist groups, what effect has this had on your life, and will provisions contained in Senate bill 2465 help to alleviate the pain and suffering you had to endure?

Ms. L. KLINGHOFFER. Our lives have been totally affected by what happened to our father. A day does not go by that we don't suffer from it, and it has taken our family 4½ years to give us the right to sue the PLO. We are hoping that other families in the future won't have to go through the years that we have gone through. They will have that inalienable right. It would make us feel wonderful to be able to have that happen for them.

Senator THURMOND. Now, the provisions contained in Senate bill 2465 will provide civil remedies for those slain and injured by acts of international terrorism. If Senate bill 2465 is enacted, will the ability to file a civil lawsuit bridge the impediments which have arisen in the past concerning the ability of private citizens to hold terrorists accountable for their heinous acts?

It may take a lawyer to answer that question. Are you a lawyer, Mr. Hudson?

Mr. HUDSON. Yes. I am sorry. Could you repeat the question, sir?

Senator THURMOND. The provisions contained in Senate bill 2465 will provide civil remedies for those slain or injured by acts of international terrorism. If Senate bill 2465 is enacted, will the ability to file a civil lawsuit bridge the impediments which have arisen in the past concerning the ability of private citizens to hold terrorists accountable for their heinous acts? In other words, will this act cure some of the impediments?

Mr. HUDSON. It will certainly cure some of the impediments. We think with some of the amendments we have suggested, it could be a very effective tool to bring civil justice to these cases. The U.S. Government has a rather poor record overall in terms of bringing terrorists to the criminal justice bar.

Senator THURMOND. So this act should help?

Mr. HUDSON. This act could be complementary to that. Civil actions generally, of course, have a lower standard of proof, and there are many things that can be done in civil actions that cannot be done in criminal actions. We have seen that in civil as well as criminal prosecutions of domestic organizations that have some of the same characteristics as the terrorist groups internationally.

Senator THURMOND. Ms. Wolfe, are you a lawyer?

Ms. WOLFE. No, I am not, but I would just like to say regarding your question that I do have concerns about the proposed amendments of the Justice Department, as they would affect the ability to bring a civil suit, and also the ability through discovery.

Since I am not an attorney, I don't know the nuances of that, but when you have a situation as the Pan Am 103 investigation, which we are continually told is ongoing, what concerns me is the kind of

relief that we could get through this bill if we had to wait. That is my reaction to that.

Senator THURMOND. I want to thank all of you for coming here. I have got to be in a hearing that is going to last about an hour, so I doubt if I will get back. But we appreciate your presence and thank you very much.

Mr. HUDSON. Thank you, Senator.

[Recess.]

Senator GRASSLEY. If I could reconvene the panel, please, I would appreciate it.

Continuing my questioning of the Klinghoffers, many skeptics say that even if one could win a suit such as yours, the kind contemplated by our bill, it would be practically useless because they would never collect a judgment. Do you agree with that argument?

Ms. L. KLINGHOFFER. For us, it is a matter of principle. It is not a judgment, it is not money, it is not a price tag. It is to legally set responsibility for who gave the orders to murder my father, for who gave the orders to hijack the ship. So, for us, that is what it is; it is a search for justice.

Senator GRASSLEY. And, of course, we do know that the PLO does have some assets within the United States, at least within what we call our jurisdiction.

Ms. L. KLINGHOFFER. Right.

Senator GRASSLEY. For Mr. Hudson and Ms. Wolfe, you commented, Mr. Hudson, in your testimony that the Government should be accorded the right to pursue a civil action on behalf of victims. In your opinion, if the Government had this right back when the Klinghoffers filed suit against the PLO, do you think that the United States would have exercised its right to sue?

Mr. HUDSON. Not representing the U.S. Government and not being that familiar with the specifics of the case, I don't know. I feel that there will be many situations where the Secretary of State, perhaps the U.S. Attorney General or the President might feel that actions such as this would somehow impinge or interfere on their prerogatives to conduct foreign policy for the United States.

However, if the legislation is opened up not simply to the top officials, but, as all criminal actions and all similar civil actions are opened up in similar civil forfeiture statutes and civil prosecution statutes, it is not the prerogative of the Attorney General of the United States to stop a murder prosecution. It is not the prerogative of any high official of the United States to stop a civil RICO prosecution, and a number of others.

Those types of things can be brought by many prosecutors with jurisdictions, and we believe our suggestion, by opening it up to perhaps several thousand prosecutors, potentially, in the United States, would ensure that if someone has a strong case there would likely be some prosecutorial backup for them.

Senator GRASSLEY. How do you feel about giving the Attorney General unfettered discretion to certify discovery, and thus protect materials, as well as, upon a showing of good cause stay a pending civil proceeding?

Mr. HUDSON. We totally oppose it. In the Pan Am 103 case, the Justice Department has moved in a civil action for blanket order

77

protection. They presently don't have that right. However, if I understand their proposed amendment correctly, they would have it if it were enacted here.

In the present civil action involving the families of Pan Am 103, the individual victim families who are suing Pan Am, the carrier, the Government as its main defense in not turning over investigatory records—while some are covered under existing statutes involving national security, most are not.

One of the principal arguments made is that it would divert the resources of the FBI and other criminal justice agencies to have to sort through this material. That has been their argument, and so far that has prevailed, and very little, if anything, has been turned over.

Senator GRASSLEY. Would one or both of the Klinghoffers respond to the question, too, about how you feel about the Attorney General having unfettered discretion to certify discovery, and thus protect materials, as well as, upon a showing of good cause, hold the entire civil case in abeyance, whether it be to protect a pending criminal suit or for some other alleged national security interest? This relates to the discussion I had with the State Department and the Justice Department and their fault that they found with the legislation.

Maybe you don't have an opinion. You don't have to have, but I thought I would want you to address it if you could.

Ms. L. KLINGHOFFER. We would have concern about that because isn't there a statute of limitations as far as the bill goes, a certain amount of years presently written down?

Senator GRASSLEY. Yes.

Ms. L. KLINGHOFFER. For instance, it has been 4½ years since—5 years, just about, since the *Achille Lauro,* and I don't think that victims should have to wait.

Senator GRASSLEY. Well, this particular provision wouldn't affect the statute of limitations, but you probably wouldn't know that and that would be a legitimate concern that you would have. But, generally speaking, at least the language that they suggested could in some instances prevent you from suing, or, if you sued, prevent you from moving forward.

Ms. L. KLINGHOFFER. Well, we would be against that.

Senator GRASSLEY. OK. I am going to say thank you. That is the end of my questioning, and even though Senator Thurmond was here, there are three other members who weren't able to be here and sometimes you might get questions in writing. If you do, we generally would like to have those back for the record within 15 days.

Thank you all.

Ms. L. KLINGHOFFER. Thank you very much for having us.

Senator GRASSLEY. I call the last three witnesses: Joseph Morris, president and general counsel of the Lincoln Legal Foundation, Chicago, IL; Daniel Pipes, director, Foreign Policy Research Institute, Philadelphia, PA; and Wendy Perdue, professor, Georgetown University Law Center, here in Washington.

Would you proceed? I didn't explain, but the lights up here indicate the 5-minute rule. The red light indicates that 5 minutes are expired. I find mixed feelings now holding a hearing, trying to give

78

justice for Americans violated by terrorists, and somewhat as a member of the jury in the Durenberger case, not sitting over there listening to everything. That is why I would like to move along.

Go ahead, Mr. Morris.

**PANEL CONSISTING OF JOSEPH A. MORRIS, PRESIDENT AND GENERAL COUNSEL, LINCOLN LEGAL FOUNDATION, CHICAGO, IL; DANIEL PIPES, DIRECTOR, FOREIGN POLICY RESEARCH IN-STITUTE, PHILADELPHIA, PA; AND WENDY COLLINS PERDUE, PROFESSOR, GEORGETOWN UNIVERSITY LAW CENTER, WASH-INGTON, DC.**

### STATEMENT OF JOSEPH A. MORRIS

Mr. MORRIS. Well, thank you very much, Senator Grassley. I would like to express my thanks on behalf of the Lincoln Legal Foundation and our membership and network of pro bono lawyers throughout the Midwest for your leadership and that of the splendid array of bipartisan colleagues who are supporting you in moving this legislation.

As you know, Senator, from your work in the Federal Courts Study Committee, this is not generally a season in which we want to be enlarging the dockets of the Federal courts, but I think that you are correct in your view that this is one area where the U.S. judiciary has an important contribution to make that no other body, political or judicial, can make to apply the rule of law to this problem of terrorism. So I am delighted to be here to speak in support of this bill, Senate bill 2465.

Congress in recent years has enacted several pieces of legislation which have extended the reach of American criminal jurisdiction to reach acts of terrorism. These have included provisions for the criminal prosecution of terrorists who commit their crimes outside the territorial jurisdiction of the United States.

In such circumstances, criminal jurisdiction has been asserted, for example, when terrorist acts, including hostagetaking, occur on board ships under the American flag and at a diplomatic post against the person or property of an American national. There have already been a few successes in the enforcement of these new criminal laws, including the celebrated case of Fawaz Younis, the Middle Eastern airline hijacker who was prosecuted here in the District of Columbia district and sentenced to 30 years in prison a little while ago in connection with his Jordanian Air hijacking incident, in which there were American victims.

But little civil relief has generally been available to victims of terrorist activities. American tort law, generally, as a body of substantive law rules would speak quite adequately in its common law and statutory variance to these problems. But for a variety of reasons, the American legal system has proved inadequate in dealing with these problems from a jurisdictional or technical or procedural standpoint.

Victims who have attempted to sue terrorists have encountered numerous jurisdictional hurdles and have found the courts reluctant to intrude, in the absence of clear statutory mandates showing them what their jurisdictional boundaries are.

The *Klinghoffer* case, which is a very exciting case and a very positive step forward, for this very reason, because it is shedding some light on these jurisdictional problems, was a case really ultimately decided under American admiralty law; that is, the jurisdiction was extended under admiralty principles and then other positive and substantive elements of American law could follow. Unfortunately, the present state of the *Klinghoffer* case represents a success story that is all too rare for this purpose.

The leading case in the area, a case decided by the District of Columbia Circuit in 1984, *Tel-Oren* v. *Libyan Arab Republic,* saw three separate and quite distinguished and quite polished circuit judges issuing three separate opinions in this area of the law, agreeing only on the proposition that they could not clearly see a Federal court's jurisdiction extending into it.

This state of the law is unfortunate for a number of obvious reasons, the most important one of which is that it denies relief to victims, but another important one of which is it bars an important and powerful deterrent factor in the war against terrorism.

Because I think the record of modern times is pretty clear, terrorism in these days is an industry. Its financial resources are phenomenal. Terrorist masters clearly pay a lot more attention to money than they do to the personal well-being of their own troops. People are more expendable to them than money is, and anything that could be done to deter money-raising in the United States, money laundering in the United States, the repose of assets in the United States, and so on, would not only help benefit victims, but would also help deter terrorism.

The bill would enhance the war against terrorism by allowing victims to attack assets. Now, you have heard testimony today regarding a couple of problems in this area. The jurisdiction problem, I think, is one of them. I think what we have an opportunity to do here is to express as a matter of public law of the United States that as a public law tool, the Congress of the United States is going to confer this civil jurisdiction on the Federal courts to allow private plaintiffs to pursue their remedies in the wake of the extended jurisdiction that has been obtained American criminal law, obviously a form of public law.

That, I think, would be a very effective way to trigger the Law of Nations Doctrine that would permit, clearly, Federal courts to have jurisdiction, adequate for all purposes under the due process clause of the fifth amendment, to grant civil relief to private plaintiffs in the wake of this expansion of Federal criminal jurisdiction by an affirmative statement by the U.S. Congress that this expanded civil jurisdiction reflects this aspiration in our public law process, that it is the national policy of the United States to combat terrorism through these tools.

This bill, I think, makes an important contribution in that area, and I am delighted to answer any questions you may have about it.

[Mr. Morris submitted the following material:]