# EXHIBIT A (Part 3)

80

## THE LINCOLN LEGAL FOUNDATION

100 WEST MONROE STREET
CHICAGO, ILLINOIS 60603

TELEPHONE. (312) 606-0951

STATEMENT
of
JOSEPH A. MORRIS,[1]
President and General Counsel of
THE LINCOLN LEGAL FOUNDATION,[2]
Before the
SUBCOMMITTEE ON COURTS AND ADMINISTRATIVE PRACTICE
of the
COMMITTEE ON THE JUDICIARY
of the
UNITED STATES SENATE,
in Support of
S. 2465,
THE ANTITERRORISM ACT OF 1990.

July 25, 1990

Mr. Chairman and Members of the Subcommittee:

I am honored to appear before you today on behalf of The

Lincoln Legal Foundation to testify in support of S. 2465, the bill

---

[1]   Mr. Morris, a partner in the law firm of Morris, Rathnau
& De La Rosa, serves *pro bono publico* as LLF's President and
General Counsel.  He is a former General Counsel of the United
States Information Agency;  General Counsel of the U.S. Office of
Personnel Management;  and Director of the Office of Liaison
Services of the U.S. Department of Justice.  An ampler biographical
sketch is attached.

[2]   LLF is a nonprofit, nonpartisan, public-interest law
center which undertakes litigation, legal research, and educational
activities in matters promoting political, economic, and civil
liberties;  preserving constitutional government;  defending the
rights of innocent victims of crime;  and seeking to advance the
rule of law in protecting human rights around the world.  LLF's
program is supported by a membership and a network of *pro bono*
counsel deriving primarily from Illinois, Indiana, Iowa, Michigan,
Minnesota, Ohio, and Wisconsin.
    Chairman of LLF's Board of Trustees is Henry L. Pitts of
Chicago, a partner in Rooks, Pitts & Poust and a former President
of the Illinois State Bar Association.

- 2 -

introduced by Senators Grassley and Heflin and a long, distinguished, and bipartisan list of their colleagues in the Senate, that would become the AntiTerrorism Act of 1990.

The Lincoln Legal Foundation established its Project on Law and Terrorism well over a year ago to examine how the rule of law, both at home and in the world at large, could assist governments and citizens in better protecting themselves against acts of terrorism.[3] We were privileged to have been called upon to play a role in the drafting of this bill.

Four years ago, Harold Hongju Koh, an assistant professor at Yale Law School, told a forum on terrorism convened in New York by the American Bar Association's Standing Committee on Law and National Security, that there are three modes of response to terrorism: "Countering terrorism" by which he meant direct action by governments, including through diplomatic and military measures, against terrorism; "making terrorists pay", meaning law enforcement and the remedies of criminal law; and "making

---

[3]    The Lincoln Legal Foundation gratefully acknowledges the assistance in its Project on Law and Terrorism of student interns James B. Pratt, then a student in the Law School of The University of Chicago and now an attorney at Roche, Carens & De Giacomo in Boston, Massachusetts; and Bradford L. Beatty, a student at the New York University School of Law.
    The Project was especially advised and encouraged by a Trustee of The Lincoln Legal Foundation, Morris I. Leibman of Chicago. Mr. Leibman, a partner in Sidley & Austin, was a founder, together with Lewis Powell, of the American Bar Association's Standing Committee on Law and National Security. He currently serves, with the advice and consent of the Senate, as a member of the Board of Directors of the United States Institute of Peace. In 1981 he received the Presidential Medal of Freedom in recognition of his lifelong work in matters of national security and the law.

82

- 3 -

terrorists pay up", meaning civil remedies.[4] It is this last area -- the possibilities for civil relief against acts of international terrorism -- that have become the focus of LLF's work in the area.

Congress in recent years has enacted several important and helpful laws intended to extend the reach of American criminal jurisdiction to acts of terrorism.[5] These have included provisions for the criminal prosecution of terrorists who commit their crimes outside the territory of the United States. Criminal jurisdiction may be assertable, for example, when terrorist acts -- including hostage-taking -- occur under the American flag, as on a ship or aircraft or at a diplomatic post, or against the person or property of an American national. Key successes have already been achieved with these new legal weapons, among them the case of Fawaz Younis, the Middle Eastern airline hijacker who was arrested by American agents in international waters of the Mediterranean and brought to the United States by American military and law enforcement personnel without the assistance or intervention of any other government, and without transit through the national territory or air space of any other country. Younis has been convicted in a United States court for his crimes and has been sentenced to 30

---

[4]    Professor Koh's statement was expanded and published as Koh, "Civil Remedies for Uncivil Wrongs: Combatting Terrorism Through Transnational Public Law Litigation," 22 Tex. In'l L.J. 169 (1987). It is an excellent survey of the legal obstacles heretofore confronting American civil recoveries against international terrorists.

[5]    Especially important among them are the Comprehensive Crime Control Act of 1984 and the Omnibus Diplomatic Security and Anti-Terrorism Act of 1986. See especially 18 U.S.C. § 2331.

- 4 -

years in prison.  The aggressive and purposive manner of Younis's arrest,  the vigor with which he was prosecuted.,;  and the firmness of the judiciary in his case have sent important, deterring messages to terrorists the world over.

But little civil relief has been available, however, to the victims of terrorism.

American victims seeking compensation for physical, psychological, and economic injuries naturally turn to the common law of tort.  American tort law generally would speak quite effectively to the facts and circumstances of most terrorist actions not involving acts of state by foreign governments.  But, for a variety of reasons, the American legal system has proved inadequate in dealing with the thorny procedural and jurisdictional issues involved.  Victims who have attempted to sue terrorists have encountered numerous jurisdictional hurdles and have found courts reluctant, because of profound uncertainty regarding the propriety of their roles, to go very far in accepting jurisdiction.  The case of *Klinghoffer v. Palestine Liberation Organization*, in which victims of the assault on the S.S. *Achille Lauro* won judgment after persuading a Federal District Court that it had jurisdiction of this case of shipboard murder, kidnapping, and other crimes under the authority of existing American admiralty law, is a rare success story.  The existing framework of Federal courts' jurisdiction in the area, beyond admiralty, is murky at best;  more fairly stated, it is non-existent.

The leading case in this area, *Tel-Oren* v. *Libyan Arab*

- 5 -

*Republic*,[6] saw three Circuit Judges issuing three separate opinions agreeing only that the victims could not maintain their action.

This state of the law is unfortunate for several reasons. Most victims of terrorism have gone uncompensated for their losses. That is regrettable because many of them have sustained grievous injuries that demand compensation. Some have resorted to pressing to collect from "deep pockets" such as airlines or tour operators who had the misfortune of connection with the travel involved in the incident. This is unsatisfactory, because it merely shifts the economic burden of the loss from one innocent victim to another.

This state of the law is also disquieting because of the subtly encouraging message it may send to terrorists themselves. The absence or limpness of legal sanctions can be conspicuous.

Practitioners of terrorism have become increasingly sophisticated in their crafts, commanding extraordinary kinds and amounts of resources; carrying out their operations with utter contempt for national boundaries and laws; and employing remarkably advanced technologies, not just in weaponry and explosives, but in communications, transport, and, it would appear, the ability to store and retrieve information. International terrorism has become, in many respects, an industry. It rests on a foundation of money. Money is often more important to the masters of terrorism than are people. That they care little for their victims goes without saying; but it is instructive that many

---

[6]    726 F.2d 774 (D.C.Cir. 1984).

- 6 -

terrorist organizations appear to care little for their own operatives, treating them as fungible and expendable. It is *financial* resources that terrorist organizations seem to husband.

S. 2465 would accomplish two vital goals. First, it would allow the law to catch up with contemporary reality by providing victims of terrorism with a remedy for a wrong that, by its nature, falls outside the usual jurisdictional categories of wrongs that national legal systems have traditionally addressed.

Second, by its provisions for compensatory damages, treble damages, and the imposition of liability at any point along the causal chain of terrorism, it would interrupt, or at least imperil, the flow of terrorism's lifeblood: money.

The bill would enhance the war against terrorism by permitting terrorism's victims to seek redress by seizing the assets of those who organize, execute, support, and harbor terrorist operations. Admittedly, execution of such civil judgments may prove difficult. But even if the bill had no greater impacts than to deter terrorists from choosing American targets and from keeping their assets where Americans might reach them, it would make profound contributions to the antiterrorism struggle. Drying up terrorism's financial support in the United States would be an important step forward.

The essential features of the bill are straightforward. First, it supplies a three-pronged definition of "international terrorism" that is drawn from the Foreign Intelligence Surveillance Act, 50 U.S.C. § 1801(c). It consists of activities that (a) are

- 7 -

acts of violence that would, if committed in the United States, violate State or Federal criminal laws;  (b) appear to be intended to intimidate or coerce a civilian population or a government or to affect, through assassination or kidnapping, a government's conduct;   and (c) occur primarily outside the territorial jurisdiction of the United States or in ways that transcend national boundaries.[7]

Second, the bill would allow any United States national who has been injured in his person, property, or business by an act of international terrorism to bring an appropriate action in a United States District Court.  The substance of such an action is not, and need not be, defined by the statute, for the fact-patterns that may give rise to such suits may be as varied and numerous as those found in the law of torts, and it is essentially to the existing, well-developed American State and Federal body of common and statutory tort law that this bill opens the door.  This section is intended to be broad enough to allow indirect victims, such as common carriers, to sue for damage to property, for indemnity, and for lost profits.

Third, it supplies civil jurisdiction that heretofore has lacked, save in exceptional circumstances, such as where existing

_____

[7]   Other definitions in the bill are also drawn from other existing statutes, so as to build upon a framework of known and tested law.  "National of the United States" is inspired by the Omnibus Diplomatic Security and Antiterrorism Act of 1986, 18 U.S.C. § 2331;  "person" reflects the experience of the Racketeer-Influenced and Corrupt Organizations (RICO) statute, 18 U.S.C. § 1961(3);  and "act of war" recurs to the War Hazards Compensation Act, 42 U.S.C. § 1711(c).

- 8 -

admiralty doctrines have furnished the reach.  The law of nations has long been argued to underwrite much of the jurisdiction that this bill would confirm.[8]  Experience in applying the law of nations to the problems engendered by the growth of "modern" international terrorism, however, is quite minimal.[9]  S. 2465, while preserving all existing predicates for civil jurisdiction that are implied in the Constitution and required by the Due Process Clause of the Fifth Amendment, would add a very important one:  It would extend the same jurisdictional structure that undergirds the reach of American criminal law to the civil remedies that it defines.  Put otherwise, it would confer upon civil relief in American courts the dignity of national policy;  civil actions brought by victims would trail in the wake of seas plowed by the criminal law, made more muscular in the international setting by its standing as an expression of the sovereign will of our national government.  If this feature of the proposed statute would be strengthened by providing that civil actions under it may be brought by private persons on relation in the name of the United

---

[8]    See Talbot v. Jansen, 3 Dall. 133, 161 (1795);  The Rapid, 8 Cranch 155, 162 (1814);  Fremont v. United States, 17 How. 542, 557 (1854);  United States v. Arjona, 120 U.S. 479, 488 (1886);  The Paquete Habana, 175 U.S. 677 (1900);  and MacLoud v. United States, 224 U.S. 416, 434 (1913).  As the Second Circuit, citing Chief Justice Marshall in The Nereide, 9 Cranch 388, 422 (1815), recently observed, "in the absence of Congressional enactment, United States courts are 'bound by the law of nations, which is a part of the law of the land.'"

[9]    See, e.g., Tel-Oren, supra, 726 F.2d at 813, where Judge Bork quotes Blackstone to invoke the law of nations.

88

- 9 -

States,[10] that is a modest adjustment to the bill that might well be advisable.

Fourth, while not requiring that any civil action be preceded by American or foreign criminal prosecution of the terrorists guilty of the act in question, it would create a rule of estoppel that would permit civil plaintiffs to introduce evidence of criminal conviction to establish conclusively civil liability for the same act. This provision is broader than the counterpart section found in the RICO statute, 18 U.S.C. § 1964(d), which raised estoppel only in subsequent civil actions brought by the United States based on criminal convictions under United States law. This breadth does no injury to fairness, however, for the standard of proof in civil cases (usually preponderance of the evidence) is always lower than prevailing in criminal cases (beyond a reasonable doubt). The extension of the estoppel doctrine to foreign criminal convictions is without an existing statutory analogue, but it relies on the same principle. Assuming that foreign proceedings comply with some cognizable notion of due process, there should be no barrier to the use of the result for estoppel in American proceedings.[11]

---

[10]    For example, as *United States of America ex rel. Klinghoffer* v. *Palestine Liberation Organization.*

[11]    The assertion by a defendant in a civil case brought under this bill that his conviction of crime in a foreign court was achieved without due process of law, and that the conviction should not therefore work an estoppel in the American civil case, presents a question that an American court can fairly decide. It is not an unfamiliar problem to American courts. Should the defendant prevail on the issue, the civil case would not be dismissed; the plaintiff would be required, however, to prove the facts for which

89

- 10 -

Fifth, it provides not only for the recovery of compensatory damages, but also for treble damages, costs of suit, and attorney's fees, with all the additional deterrent power that such sanctions may have.

Sixth, it excludes from the scope of any such civil action a claim brought on account of an "act of war". A goal of this provision is to bar actions for injuries that result from military action by recognized governments as opposed to terrorists, even though governments also sometimes target civilian populations. Specifically, injuries received by non-combattants as a result of open, armed conflict, including civil war, should not be actionable. This bill should not become a vehicle for attempts to litigate American foreign policy decisions or to interpose the American judiciary into international conflicts or foreign civil wars. At the same time, however, the bill should reach the assets of private or quasi-public business enterprises, even though controlled by foreign states, if they have been involved in executing of funding terrorist acts as the bill defines them. This provision of the bill is thus intended to exclude litigation over "state terrorism" *per se*, but merely by codifying the Act of State doctrine under which courts will not entertain challenges to official acts of a government. Vindication of human rights in other nations is best addressed through political and diplomatic channels rather than through the courts. But by limiting the

---

his pleadings relied upon the estoppel effect of the foreign criminal conviction.

- 11 -

exclusion to true acts of state, rights of action against the more egregious abuses of terrorism would be preserved. For example, an action on the facts of *Filartiga* v. *Pena-Irala*,[12] involving torture by a Paraguayan policeman in violation of Paraguayan law, could still be maintained. This bill would leave open the question of whether or not state terrorism is actionable under the Alien Tort Statute, 28 U.S.C. § 1350, and would not affect current case law, notably *Filartiga*, on the application of that statute.

Seventh, it establishes reasonable venue rules that take into account the unusual mobility of terrorists, their organizations, and their financiers.

Eighth, it provides for a three-year statute of limitations but, again in recognition of the peculiar characteristics of terrorism, it tolls the limitation during any periods when the terrorists have concealed their acts or identities or remain outside the United States.

The history of the last few decades discloses a sad and chilling record of the increased targeting of innocent Americans by foreign terrorists.[13]   Recent events, including the self-liberation of many peoples in Eastern and Central Europe, and the success of democratic forces in Africa and Latin America, give cause for hope that the global tide has turned against the terror

---

[12]    630 F.2d 876 (2d Cir. 1980).

[13]    Attached to this statement is a chronological compendium, derived from public sources, of major incidents in recent decades of acts of international terrorism directed against American persons and property, public and private.

- 12 -

network. It is clear, at a minimum, that terrorists will no longer
be able to look to the government of East Germany or its appendages
for guidance, shelter, and resources. These same happy trends,
however, may perforce result in closer contacts between terror
movements and lunatic regimes in places such as Iran, Libya, Cuba,
and North Korea. They may also lead to radical shifts in the way
that terrorist groups do business, abandoning some of their prior
political causes in favor of new ones, perhaps finding pockets of
succor among the very populations that are their targets. These
possibilities are very real, and, until it is clear that the
globe's newly worldwide democratic consensus can unite in
successful opposition to terrorism, vigilance is our only option.

     This bill would make a substantial contribution to the fight
joined by the United States and other civilized nations against
terrorism's worldwide scourge. It would enlist the American people
in that war, and would arm them with legal weapons to permit them
to take their own civilized actions, consistent with the rule of
law, against terror should they ever become its victims.

     Thank you for your excellent work and kind attention. I will
be happy to answer your questions.

92

## CHRONOLOGY OF TERRORIST ACTS
## AGAINST U.S. CITIZENS 1975-1990

### 1975

February 17--Beirut, Lebanon--Robert Walker, the president of the American University of Beirut, and his son were slightly injured when a grenade taped to the side of their car exploded. It is thought that the Popular Front for the Liberation of Palestine (PFLP) was responsible.

February 26--Cordoba, Argentina--John Patrick Egan, a U.S. consular agent, was kidnapped by the Montoneros, a left wing terrorist group. He was subsequently shot and killed.

May 21--Tehran, Iran--Two U.S. Air Force officers were shot as they were walking along the street. The Iranian Student Association claimed responsibility.

June 29--Beirut, Lebanon--Colonel Ernest R. Morgan of the U.S. Army was kidnapped by the PFLP-General Command. He was released thirteen days later unharmed.

July 4--Jerusalem, Israel--A bomb placed by Fatah exploded in Zion Square. Two Americans, Marck Katz and Deborah Levine, were injured in the blast.

July 14--Kagnew, Ethiopia--Two American civilians were kidnapped from the U.S. Navy's Kagnew station trnasmitter by members of the Eritrean Liberation Front-Revolutionary Council. Steve Campbell and Jim Harrill were technicians working on the station, and they were released one year later.

August 2--Beirut, Lebanon--Constance Stransky, a U.S. citizen, was kidnapped by the PFLP, but was released eleven days later unharmed.

August 4--Kuala Lampur, Malaysia--Five members of the Japanese Red Army broke into the U.S. consulate and held the 53 people there as hostages for 79 hours. A coordinated effort between the Malaysian and Japanese governments was able to bring about their release.

August 15--Medellin, Colombia--Donald E. Cooper, and executive for Sears, was kidnapped by members of the Movement of April 19 (M-19). He was released four months later.

October 26--Lebanon, Beirut--Philip Caputo, a staff correspondent of the Chicago Tribune, was shot in both ankles and his back as he attempted to flee from leftist gunmen in the streets of Beirut.

November 13--Jerusalem, Israel--An American woman was injured by a bomb for which Fatah claimed responsibility.

November 18--London, United Kingdom--Two American women, Barbara Matthews and Elizabeth Percy, were injured when an I.R.A. bomb went off in London.

December 22--Kagnew, Ethiopia--Ronald Michelke, a U.S. citizen, was kidnapped by the Eritrean Liberation Front-General Command. He was released six months later unharmed.

December 23--Athens, Greece--Richard S. Welch, the Athens chief of the C.I.A., was killed by three gunmen as he was getting into his car to go to work. Rejectionist Front Palestinians were possibly responsible for the killing.

1976

January 26--Ankara, Turkey--A U.S. military truck was bombed but there were no injuries.

February 27--Athens Greece--The offices of American Express and Chase Manhattan Bank were damaged by homemade bombs.

February 27--Venezuela--William Niehous, 44, president of the Owens-Illinois glassmaking operation in Venezuela was kidnapped from his home. Members of the Venezuelan Revolutionary Party-Armed Forces of National Liberation (PRV-FALN) broke into his home, tied up his wife and two sons, and dragged Niehous away. Niehous was eventually rescued on June 20, 1979 by Venezuelan police.

April 12--Nice, France--U.S. consulate was bombed and there was extensive damage but no injuries. An extreme right-wind nationalist group

94

claimed responsibility for the bombing to protest the fact that some American cities would not let the Concorde land.

June 1--Frankfurt, Federal Republic of Germany--The Baader-Meinnof group claimed responsbility for setting off two bombs at a shopping area and at the officers' clube of the U.S. Army's V Corps. Six U.S. servicemen and four American civilians were injured in the blasts.

June 2--Weisbaden, Federal Republic of Germany--Two U.S. military trucks were destroyed by firebombs. Nobody claimed responsibility for the incident.

June 16--Beirut, Lebanon--Francis E. Meloy, the U.S. Ambassador to Lebanon, and his economic counselor, Robert O. Wary, were kidnapped from their car while on the way to meet with the president of Lebanon. Their bodies were found later that day on the beach. They had been tortured and shot in the head. Fatah was responsible for these assassinations.

June 27--Entebbe, Uganda--Nine U.S. citizens were aboard the Air France plane that was hijacked and brought to Entebbe. The hostages were saved by the Israeli rescue of the airplane.

August 4--Bogota, Colombia--A bomb that exploded at the Summer Linguistics Institute resulted in injuries to five U.S. citizens. It is thought that M19 was responsible.

August 11--Istanbul, Turkey--Two PFLP terrorists threw grenades and fired machine guns at a crowd boarding an El Al flight to Tel Aviv. One American, Harold W. Rosenthal, was killed, and two others were injured.

December 1--Frankfurt, Federal Republic of Germany--The Revolutionary Cells, a part of the Red Army Faction, claimed credit for the firebombing of the United States Air Forces officers' club at Rhein-Main air base. Nine U.S. servicemen were injured and the explosion caused over $1 million in damages.

December 19--Bad Hersfeld, Federal Republic of Germany--A fire in a NCU club on the U.S. Army base resulted in no injuries but $1,040,000 in damages. The blaze was possibly set by the Revolutionary Cells.

1977

95

January 1--Sardinia, Italy--The Armed Proletarian Power firebombed five cars belonging to U.S. Navy personnel. There were no injuries.

January 4--Giessen, Federal Republic of Germany--The Revolutionary Cells set fire to a fuel storage tank at the U.S. Army depot.

February 14-Colombia--Richard C. Starr, a U.S. peace corps volunteer, was kidnapped by the Revolutionary Armed Forces of Colombia (FARC). He was held for three years until a undisclosed ransom was paid.

March 27--Ethiopia--Don McClure, a U.S. missionary, was shot and killed, and his son was injured by members of the Eritrean Liberation Front.

July 30--Athens, Greece--Five U.S. military vehicles were damaged when a bomb exploded. No group claimed credit for the attack.

September 22--San Juan, Puerto Rico--Allan Randall, a lawyer from New York, was shot and killed in the garage of a building in which he was staying. The FALN was responsible.

November 29--Lhobe Suka, Indonesia--Gunmen of the Liberation of Sumatra attacked an airstrip. George Pernicone was killed in the attack, and Ronald Stazer was wounded. The two U.S. citizens were employees of Bechtel Corporation working on a natural gas plant.

## 1978

January 21--Thessaloniki, Greece--The United States Information Agency office was bombed causing extensive damage. Another bomb exploded at the American Express Office. There were no injuries, and no group claimed responsibility for the attacks.

March 11--Israel--Gail Rubin, an American photographer, was shot to death by Fatah terrorists on an Israeli beach. The terrorists landed in small rafts, and asked Rubin where they were before shooting her in the head.

June 3--Jerusalem, Israel--Fatah bombed a bus and a U.S. citizen, Richard Fishman, was killed.

July 23--Bogota, Colombia--The Popular Liberation Army bombed the U.S. embassy which resulted in extensive damage but no injuries.

<u>1979</u>

March 9--Phillipines--Reverend Lloyd G. Van Vacton, a U.S. missionary, was kidnapped by members of the Moro National Liberation Front. On March 28, these Moslem rebels released him.

April 2--Beirut, Lebanon--Two members of the terrorist group Arab People fired rocket-propelled grenades into the U.S. embassy. There were no injuries, but extensive damage.

April 12--Izmir, Turkey--Three masked men shot and killed a U.S. Army officer and wounded another. Edward Claypool was killed and Jeffrey P. Vail was injured. The Turkish People's Liberation Army claimed responsibility.

May 11--Istanbul, Turkey--Four members of the Turkish People's Liberation Front fired machine guns from a speeding into a group of nine U.S. servicemen who were waiting for a bus. Thomas Mosley was killed, and Dwight Muir suffered light wounds in the incident.

July 24--Istanbul, Turkey--The Revolutionary Left bombed the U.S. Wells Fargo Bank causing extensive damage.

July 29--Madrid, Spain--Basque nationalists bombed Barajas International Airport. Two U.S. tourists, Eugene and Terese de Matteo, were injured in the blast.

December 3--San Juan, Puerto Rico--An U.S. Navy bus was ambushed outside of San Juan by Puerto Rican terrorists. Two sailors were killed and ten other were wounded when the terrorists fired automatic weapons into the bus. The Puerto Rican Popular Army claimed responsibility.

December 4--Istanbul, Turkey--U.S. Army sergeant James Smith and three U.S. civilians working for Boeing aircraft were shot as they got out of their car. The Turkish People's Liberation Front is thought to be responsible for the shootings.

<u>1980</u>

January 31--La Paz, Bolivia--Unidentified terrorists threw two sticks of dynamite at the U.S. embassy causing extensive damage but no injuries.

February 18--Izmir, Turkey--The home of an official at the U.S. embassy was bombed, and two cars belonging to U.S. servicemen were set on fire. .

April 16--Istanbul, Turkey--Three members of the Marxist-Leninist Armed Propaganda Unit shot and killed Master Chief Botswain's mate Sam A. Novello as he entered his car at 6:30 A.M.

April 17--Tegucigalpa, Honduras--Arnold Quiroz, a U.S. citizen and the regional vice president for Texaco, was kidnapped and taken to the Nicaraguan embassy by an unknown terrorist group. Later in the day, he was able to escape from his captors.

May 2--West Bank, Israel--Terrorists belonging to the PLO's Fatah branch threw two grenades and fired upon a group of Jewish religious students. Two Americans, Mordechai Shivat and Allon Gasserman, were injured.

June 17--Santa Cruz de la Sierra, Bolivia--Members of the rightist terrorist group Falange Socialista Boliviana attacked and burned the U.S. consular office.

July 31--Izmir, Turkey--Unidentified terrorists threw two Molotov cocktails into the apartment of U.S. Air Force Sergeant Ruminen. He had burns on over 25 percent of his body.

August 2--Bologna, Italy--Two U.S. citizens, Jeff Davis and William S. Davis, were wounded in a bombing of a train station. The Red Brigades claimed credit for the 200 pounds of TNT.

August 7--El Zapote, Guatemala--George Frank Rials, a U.S. citizen building roads for petroleum exploration was shot and killed by unknown terrorists.

September 12--Manila, Phillipines--Annie Kuznuk, a U.S. citizen, was killed while she was shopping in a supermarket by a bomb planted by the April 6 Liberation Movement.

98

September 16--Athens, Greece--Five cars belonging to the U.S. military were destroyed by firebombs. The Revolutionary Left claimed credit for the incident.

September 26--Munich, Federal Republic of Germany--A hand grenade planted in a trash can outside of the Oktoberfest festival exploded injuring seven Americans. A neo-Nazi paramilitary group, the Military Sports Group Hofman, claimed responsibility.

October 19--Manila, Phillipines--The April 6 Liberation Movement bombed a convention of the American Society of Travel Agents. Seven U.S. citizens were injured in the blast.

November 15--Adana, Turkey--U. S. Air Force sergeant William C. Herrington was shot and killed by two gunmen of the Marxist-Leninist Armed Propaganda Unit.

December 31--Nairobi, Kenya--Kenneth Moyer, a U.S. citizen, was killed and eight other Americans were injured when a bomb planted by the PFLP exploded in the Norfolk Hotel.

### 1981

January 19--Bogota; Colombia--The terrorist group M19 kidnapped Chester Allen Bitterman, a U.S. citizen. His body was later found inside a van.

March 17--San Jose, Costa Rica--A member of the Carlos Aguero Echeverira Command shot a bazooka at a van carrying the U.S. marine guards for the embassy. Three of the marines were injured.

March 29--Giessen, Federal Republic of Germany--A terrorist group known as in the Heart of the Beast bombed the U.S. Army Intelligence building causeing over $50,000 in damage.

March 30--Frankfurt, Federal Republic of Germany--The RAF firebombed the U.S. Army personnel office. There was extensive damage but no injuries.

April 4--Athens, Greece--Four cars belonging to U.S. military personnel were destroyed by firebombs. The Revolutionary Left claimed credit for the attack.

August 31--Lima, Peru--Sendero Luminoso bombed the U.S. embassy causing $50,000 in damage. Bank of America and a Coca Cola bottling plant were also bombed.

August 31--Ramstein, Federal Republic of Germany--The RAF bombed the headquarters of U.S. Air Force operations injuring 18 servicemen and causing extensive damage.

September 23--Tegucigalpa, Honduras--Gunmen belonging to the Cinchoneros group fired at two U.S. servicemen from a taxi. One of the soldiers was injured.

December 17--Verona, Italy--Brigadier General James Dozier, senior U.S. official at NATO headquarters in souther Europe, was kidnapped by the Red Brigades. He was rescued after 42 days in captivity by Italian police.

<u>1982</u>

January 18--Paris, France--Lieutenant Colonel Charles R. Ray was shot in the head as he walked to his car. The Lebanese Armed Revolutionary Faction claimed credit for the assassination.

March 19--Thessalonika, Greece--Bombs destroyed two cars belonging to U.S. military personnel.

June 1--Nuremberg, Federal Republic of Germany--A neo-Nazi terrorist shot and killed two black Americans at a night club.

June 1--Federal Republic of Germany--The Revolutionary Cells claimed responsibility for bombings at U.S. officers' clubs at Hanover, Gelnhausen, and Bamberg. Another bomb at 5th Army Corps Headquarters in Frankfurt caused $110,000 in damage.

July 19--Beirut, Lebanon--David Dodge, acting president of American Univeristy in Beirut, was kidnapped by the Shiite Moslem Militia. He was released one year later.

July 23--Bulawayo, Zimbabwe--Kevin Ellis and Brett Baldwin, two U.S. citizens, were kidnapped by the Zimbabwe African Peoples Union. Their bodies were eventually discovered.

August 5--Stuttgart, Federal Republic of Germany--Incendiary devices destroyed two U.S. military vehicles. The PLO claimed credit.

August 9--Paris, France--Two gunmen, believed to have been members of Abu Nidal's Black June organization, walked into a kosher restaurant and opened fired with Polish-made machine pistols. Two Americans were killed and two were wounded in the restaurant.

November 1--Giessen, Federal Republic of Germany--A bomb placed under an automobile exploded in an U.S. army housing area. There were no injuries and $40,000 in damage.

December 14--Frankfurt, Federal Republic of Germany--Two U.S. servicemen, Captain Howard Bromberg and Rick Seius, were serious injured when the cars they were driving exploded. A right wing group was blamed for the bombings.

1983

March 7--Bogota, Colombia--Kenneth Stanley Bishop, an American executive of Texas Petroleum, was kidnapped by the People's Revolutionary Organization. He was released after one month in captivity for an undisclosed ransom.

April 7--Bogota, Colombia--Catherine Wood Kirby, a U.S. citizen, was kidnapped by the Revolutionary Armed Forces of Colombia. She was released on August 15, 1983 after a ransom had been paid.

April 18--Beirut, Lebanon--An U.S. embassy car, that had been stolen, broke through a security barrier and exploded just outside the U.S. embassy. It is estimated that the car was filled with the equivalent of 1,320 pounds of TNT. The blast caused the central section of the building to collapse and resulted in the deaths of seventeen Americans. The Iranian-based Islamic Jihad claimed responsibility for the attack.

August 29--Beirut, Lebanon--Two U.S. marines, 2nd Lieutenant Donald George Losey and Sergeant Alexander M. Ortega, were killed and fourteen other marines were wounded in fighting against the Shiite Moslem Militia around Beirut International Airport.

August 30--Baranquilla, Colombia--Armed terrorists, possibly belonging to M19, stopped a bus and removed the three American who were on board. They then shot the Americans, only one of whom survived.

September 5--Beirut, Lebanon--Corporal Pedro J. Valle and Corporal Randy H. Clark were killed in shelling near the Beirut International Airport. Two other marines were injured.

October 23--Beirut, Lebanon--A yellow truck packed with explosives equivalent to six tons of TNT drove through a barricade and stopped in the lobby of an U.S. barracks. In the subsequent blast, 241 American soldiers were killed and 80 were injured. Islamic Jihad and Hezbollah claimed responsibility.

November 15--Athens, Greece--U.S. Navy captain George Tsantes was assassinated while on his way to work by two gunmen on a motor scooter. Tsantes was hit by four .45 caliber shells in the chest and head. The November 17 Movement is thought to be responsible.

December 17--London, England--An IRA bomb exploded at Harrods, the popular department store. One American, Kenneth Salvesan, was killed and two others were wounded in the blast.

## 1984

January 8--Beirut, Lebanon--Corporal Edward J. Gargano was killed by small arms fire as he boarded a helicopter.

January 18--Beirut, Lebanon--Dr. Malcolm Kerr, president of American University in Beirut, was assassinated gunmen of the Islamic Jihad as he entered his office.

January 30--Beirut, Lebanon--Snipers of the Islamic Jihad killed Lance Corporal George L. Dramis and wounded three other marines.

February 15--Rome, Italy--Leamon R. Hunt, the American director general of the multinational force in the Sinai Penninsula, was assassinated by Red Brigades as he was getting out of his car.

March 16--Beirut, Lebanon--William Buckley, a political advisor at the U.S. embassy and the CIA chief, was kidnapped by the Islamic Jihad. He was later killed.

102

April 3--Athens, Greece--Master Sergeant Robert H. Judd was wounded by two bullets as he was driving in Athens. The 17 November Revolutionary Organization claimed credit for the attack.

May 8--Beirut, Lebanon--Rev Benjamin Weir, a U.S. Presbyterian minister, was kidnapped from his car by members of the Islamic Jihad. He was released sixteen months later.

May 13--Durban, South Africa--Terrorists of the African National Congress bombed a refinery that belonged to the Mobil Oil Company. The blast caused $25,000 in damage.

September 20--Beirut, Lebanon--A truck packed with the explosive equivalent of 1500 kilograms of TNT exploded near the American embassy annex. Two American servicemen were killed, and twenty were injured.

October 2--Brussels, Belgium--A showroom of Litton Industries was bombed by the Communist Combatant Cells in a protest of NATO.

November 25--Lisbon, Portugal--members of the Popular Forces of 25 April threw four grenades at the U.S. embassy. There were no injuries.

December 3--Beirut, Lebanon--Gunmen of the Islamic Jihad kidnapped Peter Kilburn, a U.S. citizen and librarian at American University. On April 17, 1986, his body was found in an alley off the Beirut-Damascus highway.

December 30--Heidelberg and Dusseldorf, Federal Republic of Germany--RAF bombs that exploded on U.S. bases in these two cities resulted in $112,000 in damages and no injuries.

## 1985

January 8--Beirut, Lebanon--Reverend Lawrence Jenco, a U.S. citizen, was kidnapped by the Islamic Jihad. He was released nineteen months later.

February 2--Athens, Greece--The National Front claimed credit for a bombing in a bar near a U.S. military base. 57 Americans were injured, most of whom were military personnel.

103

February 15--Tegucigalpa, Honduras--A bomb exploded at a disco injuring several U.S. servicemen. The Morazanist Front of the Liberation was responsible for the bombing.

March 16--Beirut, Lebanon--Terry Anderson, the Associated Press bureau chief in Beirut, was kidnapped by the Islamic Jihad.

April 13--Madird, Spain--Basque nationalists bombed a restaurant and injured fifteen U.S. servicemen.

May 28--Beirut, Lebanon--David Jacobsen, a U.S. citizen who worked at American University in Beirut, was kidnapped by the Islamic Jihad. he was released in November, 1986.

June 14--Beirut, Lebanon--TWA flight 847 from Athens to Rome was hijacked and brought to Beirut by Shiite Moslems. After flying to Algeria and back, the hijackers killed Robert Dean Stetham, a U.S. navy diver, and dropped his body on the runway. Negotiations eventually resulted in the freeing of the remainder of the hostages.

July 1--Athens, Greece--Three cars belonging to U.S. servicemen were destroyed by bombs, but there were no injuries. The Revolutionary People's Struggle claimed credit for the attack.

August 8--Frankfurt, Federal Republic of Germany--The Red Army Faction with the cooperation of the French anarchists Direct Action, shot and killed Edward F. Pimental, a U.S. serviceman, in order to obtain his military identification. Ther terrorists then drove a car loaded with explosives onto the Rhein-Main Air Base and left it. The subsequent blast killed two Americans, Frank H. Scarton and Becky Jo Bristol, and injured others.

September 6--Heidelberg, Federal Republic of Germany--Three bombs planted by the RAF exploded at the U.S. army headquarters and caused $ one million in damage by destroying several radar units.

October 7--Mediterranean Sea--After the cruise ship Achille Lauro left Genoa, Italy, four hijackers of the Palestine Liberation Front took control and brought the ship off the coast of Syria. The twelve Americans who were on board were brought to the top deck where Leon Klinghoffer was shot in the head. The other Americans were then ordered to throw him overboard. Negotiations eventually resulted in the freeing of the rest of the hostages.

104

November 23--Malta--An Egyptian plane left Athens for Cairo, but it was hijacked by three members of the Egyptian Revolution, a group with ties to Abu Nidal, and was flown to Malta. The hostages were separated by nationality, and the Israeli passengers were brought outside and were shot. The terrorists then took the three American passengers, tied them up, and shot them in the head. Scarlett Rogenkams was killed, and Jackie Nick and Patrick Baker were wounded. An attack by Egyptian commandos finally rescued the hostages.

November 24--Frankfurt, Federal Republic of Germany--A blue BMW parked behind a U.S. post exchange exploded. Nineteen U.S. military personnel and eleven U.S. civilians were injured in the blast. It is believed that Abu Nidal's group was responsible for the bombing.

November 30--Haifa, Israel--A bomb planted by the Union of Galilee Christians exploded on a dock, injuring eight U.S. marines.

December 10--Colombia--Two U.S. engineers working on an oil pipeline were kidnapped by the People's Liberation Army. John Geddes was released after 174 days, but Edward Sohl died in captivity.

December 27--Rome, Italy and Vienna, Austria--Abu Nidal's Belck June terrorist group launched a simoultaneous attack on Rome's Flumicino airport and Vienna's Schwechat airport. In both attacks, a group of four terrorists fired on the El Al ticket counter. In Rome, five Americans were killed by the gunfire: Ronald Moland, Natasha Simpson, John Buonocore, Frederick Gage, and Elena Tommarello. In Vienna, two Americans were wounded in the attack: Dr. Peter Lesley and Donna Kralik.

## 1986

February 18--Lisbon, Portugal--A bomb exploded in a car at the gates of the U.S. embassy. The Popular Forces of 25 April claimed responsibility.

April 2--Athens, Greece--A bomb exploded on flight 840 as it approached Athens. Four U.S. citizens were killed. The Palestinian 15 May Organization is thought to be responsible.

105

April 5--West Berlin, Federal Republic of Germany--La Belle discotechque was bombed by Libyan terrorists. Two American soldiers were killed, and 70 others were injured.

April 17--Khartoum, Sudan--The communications officer of the U.S. embassy was shot and severly wounded by Libyan terrorists.

April 25--Sanaa, North Yemen--The communications officer of the U.S. embassy was shot by Libyan terrorists.

June 25--Machu Picchu, Peru--Sendero Luminoso bombed a tourist train bound for the Incan ruins. Two U.S. citizens were killed in the blast.

July 12--Mindanao, Phillippines--Brian Lawrence, an American missionary, was kidnapped by guerillas opposed to the Aquino government. He was released the following month.

September 5--Karachi, Pakistan--Four Palestinian gunmen belonging to Abu Nidal's group hijacked a Pan Am 747. Two Americans were killed on the plane before it was freed the next day.

September 9--Beirut, Lebanon--Frank Reed, an adviser to the Lebanese International School, was kidnapped by the Revolutionary Justice Organization.

September 12--Beirut, Lebanon--Joseph Cicippio, the deputy comptroller of the American University, was kidnapped by the Revolutionary Justice Organization.

October 21--Beirut, Lebanon--Edward Tracy, a freelance writer, was kidnapped by the Revolutionary Justice Organization.

## 1987

June 18--Beirut, Lebanon--Charles Glass, a former ABC correspondent, was kidnapped by the Shiite Moslem Militia. He escaped on August 18.

July 7--Sudan--Sudanese rebels kidnapped three American aid workers. They released the hostages seven weeks later.

106

August 10--Athens, Greece--A bus carrying U.S. Air Force personnel was bombed. There were minor injuries. The Revolutionary Left claimed responsibility for the attack. They were attempting to drive the U.S. military out of Greece.

October 10--Phillippines--Two U.S. servicemen and one retired U.S. serviceman were shot and wounded outside of Clark Air Base north of Manila. Leftist guerillas are believed to be responsible.

December 28--Barcelona, Spain--Catalonian separatists claimed responsibility for a grenade attack on an USO club. One U.S. sailor was killed and several others were wounded in the attack.

### 1988

February 3--Pampaga, Phillippines--Two Pepsi trucks were stopped by communist rebels and destroyed after the drivers were told to get off.

March 6--Buenos Aires, Argentina--The Che Guevara Brigade bombed a Parke Davis Laboratories Plant causing no injuries and extensive damage.

March 19--Athens, Greece--A bomb exploded at Osacar's Pub injuring four U.S. servicemen and one U.S. civilian. The Revolutionary People's Solidarity claimed responsibility.

March 23--Bogota, Colombia--Members of the 19 April Movement shot a M-72 anti-tank rocket at the U.S. embassy. There were no injuries.

April 14--Naples, Italy--A car bomb exploded in front of the USO club. One U.S. serviceman was killed, and four others were injured. It is believed that the Red Brigades were responsible.

April 15--Humosa, Spain--Libyan terrorists bombed a U.S. Air Force relay station and caused $27,000 in damage.

April 16--Lima, Peru--2 USIS centers were bombed by unknown terrorists.

April 17--San Jose, Costa Rica--A bomb exploded in front of the Costa Rican-American cultural center. Two Americans were injured in the blast.

May 15--Khartoum, Sudan--Three U.S. citizens were injured when a member of the Abu Nidal terrorist organization threw a bomb into the Acropole Hotel.

June 13--Huanayo, Peru--Sendero Luminoso shot a USAID subcontractor. The American citizen was ordered to lie on the ground, and he was shot in the back of the head.

June 24--Savanna de Torres, Colombia--Jacopo Gambini, chief of operations for General Pipe Services and a U.S. citizen, was kidnapped by the National Liberation Army. He was released in November 1988 after an undisclosed ransom was paid.

June 28--Athens, Greece--U.S. defense attache navy captain William E. Nordeen was killed when a car he was driving next exploded. The Revolutionary Organization 17 November claimed responsibility.

July 17--San Pedro Sula, Honduras--Nine U.S. soldiers left a disco and got into a van to go back to their base. Members of the People's Revolutionary Union threw a grenade under the van, and after it exploded, they opened fire with automatic weapons. Five of the soldiers were injured by bullets and shrapnel.

November 5--San Salvador, El Salvador--Members of the FMLN shot a LAW rocket at the Sheraton Hotel causing extensive damage.

December 1--Machu Picchu, Peru--Sendero Luminoso sabotaged a tourist train bound for the Incan ruins. The train went off its tracks and tumbled down an embankment. Anna Curri, the wife of the mayor of Jersey City, NJ, was killed in the incident.

December 8--Morocco--Two planes carrying U.S. employees of T and G Aviation who were working on a contract for USAID were shot down by heat seeking missiles. Five Americans were killed in the attack by the Polisario Front.

December 21--Lockerbie, Scotland--Pan Am flight 747 blew up shortly after leaving London. 169 U.S. civilians, sixteen U.S. military personnel, and four U.S. government personnel were killed in the blast. No group every claimed credit for the attack.

1989

August 1--Beirut, Lebanon--The terrorists holding Marine Lieutenant Colonel William Higgins claimed to have executed him. The group responsible was a faction of Hezbollah called the Organization for the Oppressed on Earth.

September 19--Bogota, Colombia--Drug traffickers firebombed the U.S. embassy causing extensive damage and no injuries.

November 16--Beirut, Lebanon--The Organization of Just Revenge, a previously unknown group, kidnapped a U.S. woman because of her dangerous activities.

<u>1990</u>

February 2--Panama City, Panama--One U.S. soldier was killed and seven others were wounded in a grenad attack on a discotheque. No group claimed responsibility for the incident.

April 1--Tegucigalpa, Honduras--A bus carrying U.S. airmen was attacked by the leftist Morazano Liberation Front. Eight of the airmen were wounded.

109

Senator GRASSLEY. We will go to Mr. Pipes before we ask questions.

## STATEMENT OF DANIEL PIPES

Mr. PIPES. Thank you, Senator Grassley. I would like to start, like everyone else, by commending the subcommittee for consideration of Senate bill 2465, which I think is an excellent idea.

My specific task is to consider the question of assets belonging to terrorist groups. I would like to start out by pointing to the fact that historically terrorist groups have had very little money. That has changed in the last 20 years as States have adopted terrorist groups as vehicles, as instruments, for the execution of their own policy.

Accordingly, many groups such as M–19, the IRA, the Red Army, and especially the PLO have developed considerable treasuries. By far, the most powerful of these treasuries is that belonging to the PLO, and that is, in fact, the most germane group for our discussions today.

I would like to consider three questions—how much money does the PLO have, where does it come from, what does it do with it—and finally just touch on the question of PLO assets in this country.

The assets of the PLO are a mystery to the outside world. I have gone through a number of efforts by others to estimate what that total might be, and I have come up with estimates ranging from $1 billion to $14 billion. My own guess would be somewhere around $6 billion is their total assets. It is a very substantial amount of money.

On the question of the yearly budget, there is again a wide variance in estimation, with a low of $150 million a year and a high of $2 billion. The details will be in the printed version. The PLO itself has gone public on the question of its yearly budget and, for 1989, has said that that budget was $274. My own estimate would be somewhere about double that.

Where does this money come from? It comes from a whole variety of sources. The Arab States that back the PLO have provided some of the funding. Palestinians living in the Middle East are in some cases required to provide a percentage of their income to the PLO. The PLO, for 12 years, ran a state within a state in Lebanon from 1970 to 1982 and acquired great funds due to their power in Lebanon.

The PLO is mafia-like in some of the illegal activities it is engaged in, such as protection rackets, robberies, the training of foreign terrorists in hijacking. Some of these have led to substantial windfalls of income.

Individual supporters, mostly Palestinians, from time to time donate money to the PLO. Finally, interest and dividends from this 5, 6, who knows how many billions of dollars, is a substantial source of income.

What is the money used for? Well, the money is used for a whole variety of purposes, as you might imagine. Most importantly perhaps, it provides the PLO leadership with control of some 20,000 gun men. Politically, it allows the PLO to act quite independently

of the Arab States that back it, but back it with an intent to control it. If the PLO has its own funding, it cannot be the puppet of some puppeteer.

The enormous funding of the PLO allows it to repress or perhaps coopt potential rivals to itself; that is to say, when a group such as Hamas in Israel in the Israeli-occupied territories attempts to represent Palestinians, it can't be as effective because it doesn't have the kind of resources that the PLO has.

It allows the PLO to win, to buy, to gain favor with many Palestinians by supporting them in a variety of ways. It allows the PLO to put pressure on Arab governments by moving funds, by offering loans, and in some cases by even making grants.

Not to be overlooked is the fact that this extraordinary sum of money allows for a lavish lifestyle among the leadership. Wealth, in short, has become a central feature of the PLO's presence and influence. Indeed, sometimes I would argue it looms larger than the military and diplomatic activities of the organization.

Given the size and sophistication of the PLO financial apparatus, it constitutes a key power center within the organization. Therefore, I would conclude from a policy point of view that it is absolutely critical to go after the funds because he who controls the funds controls the organization. It is not enough simply to go after the footmen, the soldiers, the terrorists, the individuals. One must strike at the heart of the organization, and that means going after the funding.

Finally, just a moment on PLO holdings in the United States. As a former intelligence chief of the PLO, a man called Atallah Atallah, recently observed, Yasir Arafat uses "mafia techniques designed not to leave a trace," and that, in fact, is a fairly accurate analogy.

It is hard to find PLO holdings in the United States. There are some connected to the PLO mission to the United Nations. There also are some quasi-PLO institutions that are funded in this country. By far, the most impressive and powerful of them is the Arab Bank, a bank which is headed by a man named Abdul Magid Shaman who, in the 1960's, was the chairman of finances for the PLO.

There are clear links. I don't know to what extent they can be established as legal links, but the Arab Bank is by far the most powerful financial organization connected or associated with the PLO that is present in the United States, with a branch office at 520 Madison Avenue in New York City.

I think the extraordinary emphasis that has been placed in recent years on the building of a treasury by the PLO gives you some idea of how much the PLO will not want you to pass Senate bill 2465.

Thank you.

[Mr. Pipes submitted the following material:]