# EXHIBIT A (Part 4)

111

# PLO WEALTH

by Daniel Pipes

July 25, 1990

Testimony prepared for the Subcommittee on Courts
and Administrative Practice

Committee on the Judiciary

**United States Senate**

Daniel Pipes is director of the Foreign Policy Research
Institute in Philadelphia and editor of *Orbis*, the Institute's
quarterly journal of world affairs.  Two of his books, *The
Rushdie Affair* and *Greater Syria*, have been published this
spring.

I would like to start by praising this Subcommittee for consideration of S.2465, the Anti-Terrorism Act of 1990. It is an important, timely, and innovative idea that can do much to further both the security interests of the United States and the personal safety of American citizens abroad.

My specific task is to consider the question of assets belonging to terrorist groups.

Historically, terrorist groups have been fly-by-night organizations disposing of meager assets. Pursued by the police and harassed by rival groups, they were hardly in a position to amass property or invest in the financial markets.

But this changed with the advent of state-sponsored terrorism. Starting about twenty years ago, governments discovered the benefit of patronizing terrorist groups, rather than engaging in terrorist activities on their own. Not only is it cheaper and more flexible to contract out dirty work, but there is less possibility of being found out and held responsible. The Syrian and Libyan governments appear to hold the world championship in terms of the numbers of groups they sponsor — several dozen in each case, ranging geographically from Europe to the South Pacific. Over the years, the North Korean, Soviet, East European, Iranian, Iraqi, and Cuban states have also hosted a wide range of groups.

In return for faithful service, the states have provided many benefits for the groups, including safe houses, the smuggling of people and materiel, and intelligence. Most important of all, of course, governments provide funding. The money can take the form of direct subventions or indirect aid. It has ranged from hundreds of thousands to hundreds of millions of dollars.

While a great number of groups, including the Irish Republican Army, the Red Brigades, and M-19, have benefited from state support, by far the greatest flow of funds has gone to the Palestine Liberation Organization (PLO). As long ago as 1977, *Time* called the PLO "probably the richest, best-financed revolutionary-terrorist organization in history"[1] — and that was well before its real financial build-up took place. Today one can drop

---

[1]     *Time*, 18 July 1977.

113

2

the "probably" and say that the PLO stands by itself in the accumulation of wealth. Accordingly, I shall devote the rest of my time to surveying the funding and assets of the PLO.

I shall answer three questions: How much money does the PLO have? Where does it come from? What is it used for? The conclusion then provides some information on PLO assets in the United States.

Before starting, however, I would like to point out that public information on the PLO is murky. This is, of course, no accident; much effort is expended to keep the wealth off the books. Therefore, I cannot vouch for every fact in the following presentation, though I have confidence in the general tenor of my report.

### How much money does the PLO have?

The size and extent of PLO wealth has attracted a great deal of attention, and a number of estimates have been offered on total PLO assets. (Unless otherwise indicated, all figures in this paragraph refer to 1986.). *Forbes* has the lowest estimate of PLO holdings, $1 billion. James Adams, author of *The Financing of Terror*, suggests $5 billion. *Der Spiegel* and Israeli intelligence say $6 billion. A private source of mine puts it at $6.5 billion in 1990. *The Economist* comes in around $9 billion. *October*, an Egyptian magazine, and the Swiss *Tages Anzeiger* (1988) count $14 billion. Unwilling to commit themselves, some observers offer wide ranges. *The Wall Street Journal* estimates it anywhere between $2 and $14 billion, while Neil C. Livingstone and David Halevy, authors of *Inside the PLO*, place 1989 assets somewhere between $8 and $14 billion. Others go beyond mere numbers and enter the realm of hyperbole. Walid Jumbalat, the Druze militia leader, has declared that 'Arafat "has enough money to buy half of Lebanon, not to say all of it."[2]

Estimates for annual income range as widely. *Forbes* and *The Wall Street Journal* come in with $154 and $156 million, respectively. *The Economist* says $250 million. Livingstone and Halevy come in (for 1989) at $675 million and James Adams reckons it no less than $1.25 billion a year.

In response to these speculations, the PLO has not breathed a word about assets. But in 1987 it did go public with a budget, which it pegged at $197 million. However, like Soviet budgets over the past decades, this figure should be seen as very partial, representing the official portion of the income. The unofficial

---

[2]    *Al-Majalla*, 10-16 December 1986.

114

3

portion, variously known as the Chairman's Secret Fund, or the Fatah Fund, is thought to be much larger. Abu Musa, a one-time ally of 'Arafat's, put it this way in 1983: "Saudi Arabia gives him tens, hundreds of millions, to corrupt not to develop the revolution. It does not appear in the books. It is much more than the official contributions."[3]

My estimate is that total income for the PLO probably exceeds $500 million a year.

### Where does the money come from?

These huge sums come from several sources, and most notably the following six.

(1) The <u>Arab states</u> and the Soviet bloc have offered extraordinary support to the PLO for up to a quarter-century. Since 1973, the PLO has received at least $100 million a year from the Arab states, and usually closer to $250 million. Depending on the state, these funds are either given freely, or as a kind of protection money. By far the largest amounts have come from Saudi Arabia; the PLO's representative in Riyadh announced in 1988 that the Saudi authorities had over the previous decade contributed $855 million to his organization.[4]

(2) Palestinians living in Arab countries are required to pay a <u>tax on income</u> to the PLO that ranges between 3 and 6 percent of their salaries. Some of this money never reaches the Organization, but the levy still provides a significant source of income.

(3) The PLO ran an autonomous <u>state-within-a-state</u> in Lebanon between 1970 and 1982. It engaged in a great number of commercial activities, many of them based on the organization's power. For example, the Popular Front for the Liberation of Palestine ran the Modern Mechanical Establishment, an iron and steel company south of Sidon, which took advantage of its tax-free patron to engage in predatory pricing. After forcing the competition to go out of business, it then raised prices.

(4) Diverse <u>illegal activities</u> are a major source of funds, including drug-trafficking, protection rackets, robberies, training of foreign terrorists, and hijackings. Perhaps the most spectacular examples took place in 1975 and 1976. The December 1975 capture of OPEC oil ministers reportedly netted the PLO $20 million; a few months later, the PLO participated in the biggest bank robbery of all time and received one-third of the loot, some $33 million, from the Beirut branch of the British Bank of the

---

[3]  *The Guardian*, 4 July 1983.
[4]  *Ash-Sharq al-Awsat*, 25 February 1988.

4

Middle East. To the extent that the PLO relies on illegal activities, it should be seen as resembling an international crime syndicate.

(5) Individual supporters, almost all Palestinian, make contributions, especially at times of crisis. These range from the very small (the purchase of "Arab Liberation Stamps") to large sums of money. In some cases, timely threats encourage generosity.

(6) Interest and dividends from billions in assets. The Palestine National Fund, sometimes called the PLO's finance ministry, manages its capital by tapping the skills and networks Palestinians have built up, using state-of-the-art computers. Investments are made around the world, but especially in the West. Investments in the West are always covered by front names, once from a Luxembourg base, now mostly from Zurich. Gold reserves have been established, too.

Most investments are apolitical business deals, but not all. "Friendship" projects include factories and farms in places like Syria, Guinea, the Maldive Islands, and Poland. Funds are on occasion loaned to allies in need, such as $12 million to the Nicaraguan government in 1981 and $100 million to Iraq in 1986.

Over time, the relative importance of these sources has changed. State help provided the great majority of PLO funding until the mid-1970s, but this has been overtaken by interest and dividends from assets.

## What is the money used for?

PLO wealth provides Yasir 'Arafat with a number of very important benefits.

(1) It gives him control over some twenty thousand gunmen, conventional and irregular.

(2) It allows him to act independently of his state sponsors. The major Arab states have a long history of trying to control the Palestinian movement, often with success. Not needing money from the governments permits 'Arafat more room to pursue his own policies.

(3) Great resources make it that much more unlikely that a rival Palestinian organization will challenge his leadership. Hamas, the only serious candidate, has indicated that it wishes to join the PLO. Half a year after the *intifada* erupted, the PLO responded by offering $50 million — a clear attempt to bring an unruly upstart under company control.

(4) Lavish provisioning of social, welfare, economic, cultural, and educational services makes it possible for the PLO to win the allegiance of many Palestinians. Accordingly, about three-quarters of the PLO budget goes for such projects.

(5) Moving assets around allows 'Arafat to influence states. He has the means to pressure the recalcitrant and reward friends. He reportedly moved $700 million out of Jordan when he was displeased with King Husayn's policies in 1986; in contrast, he moved $200 million into Tunisia. 'Arafat now dispenses money like a caliph of old, especially on trips to poor countries; he can also do favors, such as the $15 million he is said to have paid fundamentalist Muslims to free three Soviet hostages in Beirut in 1985.

(6) Subsidies to publications can win their friendship. A dramatic example of this occurred in February 1986, when a payment of some $150,000 to the pro-Jordanian *Al-Quds* newspaper of Jerusalem rapidly turned around that paper's editorial stance.

(7) Not to be overlooked is the opulent way of life adopted by the PLO leadership. Talk of 'Arafat's abstemious ways notwithstanding, he lives like a Middle East despot, in luxury and with his every whim provided for. He and the other leaders have put aside sizeable nest eggs for their personal use.

To maintain close control over PLO finances, 'Arafat personally makes deposits and personally signs large checks. While this highly centralized control leads to gross inefficiencies and resentments, it also makes 'Arafat indispensable. As one Jordanian official put it, "They have to keep Arafat because if he goes, no one will know where the money is."[5]

Wealth has become a central feature of the PLO's presence and influence. Sometimes it looms larger than military considerations. Abu Musa, a former member of the 'Arafat entourage, has stated that the PLO had as much as $1 billion in Lebanese banks in 1982, and other reports indicate $400 million of that was lost. According to James Adams, PLO leaders leaving Lebanon "feared the Israeli seizure of their assets more than they did a military defeat."[6] This heavy dependence on large amounts of money has taken its toll. As one unnamed Jordanian official put it: "The PLO isn't a revolution. It's a corporation."[7]

Given the size and sophistication of the PLO financial apparatus, it constitutes a key power center of the Organization. Abu Musa, who broke away from Yasir 'Arafat's Fatah, has stated this publicly: "Money is his only weapon at present. Distributing it in millions to guerrillas, notables, mayors, tribes. Many things."[8] One can go further and say that while foiling attacks and capturing

5    *The Wall Street Journal,* 21 July 1986.
6    James Adams, *The Financing of Terror* (New York: Simon & Schuster, 1986), p. 100.
7    *The Wall Street Journal,* 17 March 1983.
8    *The Guardian,* 4 July 1983.

6

foot soldiers will always remain important, the only way to hobble and eventually end PLO terrorist operations is to hit it where it counts most — in the wallet.

## PLO holdings in the United States

Finally, a few words about PLO holdings in the United States. The only known official PLO bank account in this country is at the Chemical Bank branch at the United Nations, which presumably is used to pay for staff salaries.

Fearing liens and other legal problems, the PLO has gone out of its way not to own properties officially. 'Atallah 'Atallah, the PLO's former intelligence chief, has observed that Yasir 'Arafat uses "Mafia techniques [designed] not to leave a trace,"[9] and this comment certainly applies to PLO dealings in the United States. To take one prominent example, the building at 115 East 65th Street in Manhattan, which houses the PLO's observer mission to the United Nations, is formally owned not by the PLO but by Zehdi Terzi, its observer.

Other properties are even better hidden. The most important of them by far is the Arab Bank, with some $14 billion in assets, and with a branch at 520 Madison Avenue in New York City. The bank is in large part owned by the PLO and handles the Organization's working accounts. The key investments appear to be made by the Zurich branch of the Arab Bank, many of them by two men in particular, Hasib Sabbagh and Sa'id Khuri. On occasion, these individuals make public grants of money, for example to endow chairs at American universities.

Other banks also hold PLO funds, including the National Bank of Kuwait, the Gulf Bank, and the Central Bank of Algeria. Unfortunately, owing to a 1975 pledge by the U.S. government to keep Arab investments in this country out of the public eye, little information on the disposition of PLO funds in this country is available.

This information gives you some idea just how much the PLO does not want you to pass S. 2465.

---

[9]    *The Wall Street Journal,* 21 July 1986.

118

FOREIGN POLICY RESEARCH INSTITUTE
3615 Chestnut Street
Philadelphia, Pennsylvania 19104
(215) 382-0685  Fax (215) 382-0131


August 23, 1990


U.S. Senate Judiciary
Subcommittee on Courts and Administrative Practice
223 Hart SOB
Washington, DC 20510
Attn: Becky Ward

Dear Ms. Ward:

In response to the questions enclosed with Senator Heflin's letter to me of August 2, I can provide the following answers:

Senator Thurmond's questions

1. How does a plaintiff execute judgment and actually obtain PLO assets?  Critical in this regard would be (1) either to acquire a list of PLO assets in the United States or (2) to establish conclusively that the Arab Bank is partially owned by the PLO.  Toward this end, I would suggest that you subpeona staff and papers of the Arab Bank branch in New York City.

2. How to locate and seize the assets of a terrorist organization?  This is not a subject I have much familiarity with.  My supposition is that getting an insider to reveal information is critical.  In this respect, a terrorist organization might resemble an organized criminal group; in both cases, the key lies in finding a source who will lead investigators to their quarry.

You might also take a close look at the Prevention of Terrorism Act (1989) passed by the British parliament and specifically designed to cut off funds to the IRA.  From what I understand, the act (which is the first of its kind anywhere in the world) has worked very effectively.

3. Information on the Irish Republican Army, Red Brigades, and Islamic Jihad?  On the first two groups, I recommend James Adams, *The Financing of Terror* (New York:  Simon & Schuster, 1986), which provides a thorough account.  To the best of my knowledge, Islamic Jihad does not possess substantial assets, but lives hand-to-mouth on money it receives from the Iranian authorities and extracts in Lebanon.

Senator Heflin's questions

1. How much PLO money in the United States?  I cannot answer with any precision at all.  Investments are probably not very extensive, for the unfriendly climate in this country is reason for the PLO to keep away.

2. Can S. 2465 help cripple the PLO through monetary damages?  In my view, S. 2465 can complicate the PLO's existence but it cannot cripple the organization.  Ultimately, the PLO rises or falls as a result of political factors more than financial ones.  And the really decisive financial factors concern income.  For example, the Iraqi invasion of Kuwait means the PLO will probably no longer receive funding from Kuwait or Saudi Arabia.  Over the years, these two states may have supplied the PLO with as much as $10 billion, so the difference will be very much felt.

I hope these responses are satisfactory for your purposes.  With best wishes,

Yours sincerely,

Daniel Pipes

119

Senator GRASSLEY. Thank you, Mr. Pipes.
Ms. Perdue.

### STATEMENT OF WENDY COLLINS PERDUE

Ms. PERDUE. My apologies for being a few moments late. I had to feed my meter.

Senator GRASSLEY. All you missed was your introduction.

Ms. PERDUE. My role here is simply to talk a little bit about some of what I think we would call procedural concerns that exist in the statute. My written testimony addresses some technical concerns about venue and the forum non conveniens clause.

The somewhat broader question or potential problem is personal jurisdiction is a potential limitation on the ability to get jurisdiction over defendants. It won't be an insurmountable one in all cases, and my written testimony elaborates some on the sorts of circumstances when personal jurisdiction would be available.

Assuming you get personal jurisdiction, the real question is, will you get a judgment that you will be able to enforce, and enforcement in the United States against assets in the United States will not be a problem, assuming there was personal jurisdiction, but enforcement overseas is problematic, at best.

We have no treaties with foreign countries requiring that they enforce our judgments. A number of foreign countries disagree with our approach to personal jurisdiction and won't enforce judgments for that reason, and a number of countries take the position that treble damages is a penal award and they do not enforce the penal judgments of other countries.

So getting enforcement overseas would be extremely difficult. That means if you want a realistic mechanism for victims to collect, they have to be able to sue people that have money here.

I am not an expert on terrorism by any means. I teach civil procedure, so I am here to talk about civil procedure. My hunch from reading the newspapers is that the individual terrorists do not have money here. It is the organizations that support terrorism, that fund it and that supply it, who are the ones likely to have assets in this country.

With respect to that, the issue I would raise is it is not clear to me, as this bill is drafted, that liability extends to them. The statute simply says victims may sue and may collect treble damages. It doesn't say who they can sue, and the definition of international terrorism is activities that involve violent acts, and it goes on to elaborate on that.

I don't know whether fundraising for a terrorist is an act of international terrorism. I don't know whether even supplying the guns to a terrorist is an activity that involves violent acts, if you simply sell the guns knowing that is where they are going or you simply finance the activities.

So if you want to provide an effective remedy, liability has to extend to the organizations that have assets in this country and the substantive liability provision has to be written so that that is clear.

I would only add those comments.

[Ms. Perdue submitted the following material:]

120

Testimony of

Professor Wendy Collins Perdue

on S.2465

Before the Subcommittee on Courts and
Administrative Practices

of the

Senate Committee of the Judiciary

July 25, 1990

I am Professor Wendy Collins Perdue of the Georgetown University Law Center. I teach and write in the area of Civil Procedure. I am here today to offer some comments on certain procedural aspects of S.2465, particularly personal jurisdiction and related issues.

I.   Personal Jurisdiction

This bill provides a cause of action to victims of international terrorism. However, personal jurisdiction could be a significant hurdle for many victims seeking to redress under the statute. There are a few circumstances in which personal jurisdiction would not be a problem, such as if the defendant is a United States domiciliary, see Milliken v. Meyers, 311 U.S. 457 (1940); E. Scoles & P. Hay, Conflict of Laws 268-275 (1982), or is served with process while voluntarily in the United States, see Burnham v. Superior Court, 58 U.S.L.W. 4629 (1990). In addition, it may be possible to assert jurisdiction over an entity or corporation with significant and continuous activities in the United States. This latter category of jurisdiction which is commonly referred to as "general jurisdiction", has been recognized by the Supreme Court, but it remains unclear how extensive the operations must be in order to justify jurisdiction. See Helicopteros Nacionales de Columbia, S.A. v. Hall, 466 U.S. 408 (1984); Perkins v. Benguet Consolidated Mining Co., 342 U.S. 437 (1952).

-1-

122

Recently, in the <u>Klinghoffer</u> litigation, the district court held that there was personal jurisdiction in New York over the Palestine Liberation Organization. The court found that the P.L.O. owned a building and maintained a telephone listing, a bank account and a number of permanent employees. The court concluded that these activities were sufficiently substantial and continuous to permit jurisdiction even though the cause of action did not arise out of these activities. It remains to be seen whether this holding will survive on appeal although the holding appears generally consistent with established doctrine on general jurisdiction.

The approach relied on in <u>Klinghoffer</u> will only be available where the defendant is an organization with significant operations in the United States. In the case of international terrorism, it seems that many defendants would not fall into this category. Instead the defendants are likely either to have never been to the United States or to be individuals who were forcibly brought here under extradition to face criminal charges. Both of these situations present difficult personal jurisdiction problems.

A. Defendant Extradited to U.S. and Served with Process Here.

The Supreme Court recently held that a state can constitutionally exercise jurisdiction over a defendant whose only connection with the state is that he was served with process while voluntarily in the state. <u>Burnham v. Superior Court</u>,

-2-

58 U.S.L.W. 4629 (1990)  It is not at all clear, however, that the Court would reach the same conclusion where the defendant had been forcibly brought to the jurisdiction by government authorities.  Justice Brennan, writing for four members of the Court, noted that the defendant was voluntarily present and stresses that "[b]y visiting the forum State, a transient defendant actually 'avails' himself... of significant benefits provided by the State."  Id. at 4638.  By contrast, a defendant extradited to the U.S. for criminal prosecution hardly seems to have availed himself of benefits.  Justice Scalia, writing for three members of the Court, focused on whether the type of jurisdiction in question had been traditionally allowed.  Applying this approach, Justice Scalia might similarly find no civil jurisdiction over an extradited defendant because many states have traditionally prohibited civil jurisdiction over defendants forcibly brought into the forum.  See L. Brilmayer, An Introduction to Jurisdiction in The American Federal System 330 (1987); E. Scoles & P. Hay, supra, et 266.  Thus, there is reason to doubt that the Court would uphold jurisdiction based solely on the fact that the defendant was served with process while forcibly in this country.

B.  Extraterritorial Service.

Under modern personal jurisdiction doctrine, service of process within the forum is not a prerequisite.  Personal jurisdiction will be upheld even as to defendants who have never been physically present in the forum, provided they have

-3-

124

sufficient contacts, ties or relations and jurisdiction is otherwise reasonable.

The Court has sometimes found sufficient contacts based on the effects of the defendant's conduct in the forum. In Calder v. Jones, 465 U.S. 783 (1984), the Supreme Court upheld jurisdiction in California over the Florida writer and editor of a defamatory article about a California citizen. The Court explained that the defendants' "intentional, and allegedly tortious, actions were expressly aimed at California" and that "they knew that the brunt of that injury would be felt by respondent in the State in which she lives and works and in which [the newspaper in which the article appeared] has its largest circulation." Id. at 789-790.

Some cases of international terrorism might be analogized to Calder. The cases that are most likely to fit the analogy would be those in which Americans are singled out because they are Americans or cases where the clear purpose of the terrorism is to affect directly the policies of the United States.

Even if the Court finds that the effects of a terrorist act were sufficiently directed at the United States to be a purposeful "contact" with the U.S., that does not end the personal jurisdiction inquiry. The Supreme Court in Asahi Metal Industry Co. v. Superior Court, 480 U.S. 102 (1987), made clear that in addition to the defendant having purposeful contacts, jurisdiction must be reasonable. Asahi involved an attempt by California to assert jurisdiction over a Japanese corporation. The Court

-4-

125

held that under the particular facts of the case jurisdiction was not reasonable. In so holding the Court stressed that "[t]he unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." Id. at 114. Asahi will not necessarily preclude jurisdiction over foreign defendants. That case involved an attempt to assert jurisdiction over an impleaded third party and the Court stressed that under the circumstances the interest of the plaintiff and the forum were "slight." Id. Moreover, the Court explained that its careful inquiry into reasonableness was motivated by a desire to protect "the Federal government's interest in its foreign relations policies." Id. at 115. This concern about protecting a federal interest in foreign relations would not seem to be relevant where Congress has made a foreign policy judgment. Nonetheless, while I think Asahi can be distinguished, it will present an additional burden which plain-tiffs will have to overcome in order to get jurisdiction.

II. Enforcement

A judgment is not worth anything unless it can be enforced. Many individual terrorist defendants will not have any assets. Even assuming that the defendant does have assets, the plaintiff must have a mechanism to enforce the judgment against these assets. If the defendant's assets are in the United States, this will not be a problem. However, it seems likely that in many

-5-

cases, all assets of the terrorist defendant will be located in other countries. Enforcement of the judgment under these circumstances is highly problematic. We have no treaties with other nations requiring enforcement of our judgments and nations vary in their willingness to do so. Most nations consider transient jurisdiction to be exorbitant and refuse to enforce judgments that rely on mere presence as the basis for personal jurisdiction. While it is possible other nations would enforce judgments in which jurisdiction was based on an effects test, this is far from certain. Moreover, many nations refuse to enforce treble damage awards because they consider them to be "penal". In conclusion, enforcement of a judgment under this statute is likely to be very difficult and uncertain except where the defendant has assets located in the United States.

III. <u>A Right to Sue Whom?</u>

As the foregoing discussion of enforcement demonstrates, a plaintiff will have a realistic likelihood of actually recovering money only from a defendant who has assets which are located in the United States. The individuals who actually carry out terrorist acts are unlikely to fall into this category. It is the organizations, businesses and nations who support, encourage and supply terrorists who are likely to have reachable assets. Would a claim under this statute reach these organizations? The language of the bill is very unclear on this. The statute provides that a victim of international terrorism "may sue" and

-6-

"may recover" treble damages, but it says nothing about <u>who</u> the victim can sue.

    I realize of course that the question of whether to extend liability to organizations that knowingly supply and support terrorists raises difficult domestic and international concerns. I will not offer a view on whether it would be good policy to extend liability to nations or other entities which are responsible for or support terrorist activities.  However, if you want to provide victims with any meaningful remedy, liability must extend beyond the few individuals who actually execute the terrorist act.  Should you seek to extend liability to foreign governments or government-run enterprises that engage in or support terrorism, some amendments to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1604.  Under current law, a foreign government, even one directly responsible for a terrorist act is immune from suit.  <u>See</u> <u>Lockerwood v. State of Iran</u>, 617 F.Supp. 311. (D.C.D.C. 1985).

IV.  <u>Some Technical Issues</u>

    A.  Venue [§2334(a)].

      1.  Where All Plaintiffs or Any Plaintiff Resides.  The bill provides that venue is proper, among other places, where "all the plaintiffs reside."  It seems to me that this is unnecessarily narrow and may have the undesirable effect of requiring plaintiffs with virtually identical cases to sue

separately.  I would recommend that the language be changed to make venue proper "where _any_ plaintiff resides."

Many types of terrorism such as bombings or hijackings are likely to have multiple victims who are unrelated and reside in different states.  Yet, where you are dealing with terrorist activity outside the United States, there is no reason to believe that common domicile of all the victims is a more appropriate location for litigation than the domicile of any individual victim.  Suppose, for example, a passenger from New York and one from New Jersey are both injured in the same hijacking incident. It would seem sensible and efficient for these two passengers to join together in one suit and if they did join into one suit there is no reason why they should not be able to sue in either New York or New Jersey.  As the statute is currently drafted, however, venue in the posed case would not be proper in either New York or New Jersey but only where "the defendant resides, is found, or has an agent."  This means that if the defendant were not in the United States then it would be impossible for the New Jersey and New York passengers to join together in one suit because there would be no place where venue was proper.

2.  How Many Defendants?  The proposed statute provides that venue is also proper where "the defendant resides, is found, or has an agent."  This language seems to assume that there will be only one defendant.  Of course if you revise the language to refer to multiple defendants, it will be necessary to determine whether venue will be proper only where _all_ defendants reside or

-8-

are found or where <u>any</u> defendant resides or is found.  I would
recommend the latter because I can see no reason for limiting a
plaintiff's choice of forum in these types of cases.

      3.  "[I]s found".  Under the bill, venue is proper where
the defendant "is found".  In the context of a venue provision
this choice of words is ambiguous.  The obvious question that the
language invites is "is found <u>when</u>"?  I assume that the proposed
language was intended to make venue proper wherever the defendant
is served with process.  If this is the intent then the word
"found" should be changed to "served".  If something else is
intended that should be made clear.

      4.  Service of process.  The venue section includes a
sentence on service of process.  It states that "process may be
served in any other district of which the defendant is an
inhabitant."  The use of the word "other" is confusing.  It
suggests that service cannot be made in any of the districts
enumerated in the prior sentence concerning venue.  Likewise the
use of the word "inhabitant", standing in contrast to the word
"resides" in the earlier sentence invites confusion about whether
those words have different meanings.  Therefore, I would suggest
that the language be modified to provide for service of process
"in any district where the defendant resides, is found, or has an
agent."

    B.  Forum Non Conveniens [§2334(c)].

    This section appears to be a very brief restatement of
existing law on the doctrine of forum non conveniens.  Yet if its

130

only purpose is to restate the doctrine articulated in <u>Gulf Oil Corp. v. Gilbert</u>, 33 U.S. 501, 508 (1947), it seems to add little in the way of clarity and to risk possible confusion.

Specifically, under existing law, it is generally said that there is a strong presumption in favor of the plaintiff's choice of forum, at least if the plaintiff sues at home, and that therefore a court should not dismiss a suit "unless the balance of factors is strongly in favor of the defendant." E. Scoles & P. Hay, <u>supra</u>, Choice of Law at 366. <u>See</u> <u>Piper Aircraft Co. v. Reyns</u>, 454 U.S. 235, 255-256 (1981). By contrast, the proposed statute refers simply to whether an alternative forum is "more convenient or more appropriate" and thus could be read to alter that traditional burden, making dismissal proper whenever the alternative forum is even a little more convenient or appropriate.

The possibility of a forum non conveniens dismissal is likely to be of great concern to plaintiffs. An award of civil damages by any other nation will almost certainly be substantially less generous than contemplated here because the other country will most likely award less in compensation and not treble the amount. The <u>Piper Aircraft</u> case suggests that the fact that the alternative forum will apply a substantially less favorable law ought not be an important factor in deciding whether to dismiss. If it is your intent to assure victims substantial compensation, you might add language which makes clear that the fact that a plaintiff will likely recover

-10-

131

substantially less in the alternative forum is an important factor to be weighed in deciding whether to dismiss the case.

132



*Georgetown University Law Center*

August 21, 1990

*Wendy Collins Perdue*
*Associate Professor of Law*

The Honorable Howell Heflin
United States Senate
Senate Judiciary Committee
Washington, D.C.   20510

Senator Heflin:

You have submitted the following written question to me:

Taking your suggested changes into account, what is
your overall impression of the plausibility of the bill
in terms of jurisdiction?

It is difficult for me to give you a precise answer to the
question.  As to some prospective defendants I believe juris-
diction would be quite clear, as to others it is quite doubtful,
and as to still others jurisdiction is possible though
problematic.

As I indicated in my earlier testimony, the easiest
situations in which to get personal jurisdiction are those in
which the defendant, whether an individual or an organization, is
voluntarily present within the United States.  I do not know
enough about either terrorism or the intended scope of liability
under this bill to know how common that situation will be.

Where the defendant is not present in the United States,
jurisdiction becomes a much more fact specific inquiry and some-
times jurisdiction will be possible and other times not.  The
critical factor will be the extent to which the conduct was aimed
at the U.S.  Causing injury to U.S. citizens, even when the
citizenship of the victim is known, is probably not alone enough
for personal jurisdiction in the U.S.

Let me contrast two well-known terrorist situations.  In the
case of Pan Am flight 103, there would be a fairly strong case
for personal jurisdiction over the perpetrators (assuming we
identify them).  The act was directed at a U.S. airline carrying
primarily U.S. citizens on a flight to the U.S.  It was
apparently in retaliation for the U.S. government act of shooting
down an Iranian airliner.  In this situation, not only were there
foreseeable effects in the U.S., U.S. interests and citizens
appear to have been the intended target.  By contrast, I believe
it would be more difficult to get personal jurisdiction over
those responsible for the Achille Lauro hijacking (leaving aside
those voluntarily present in the U.S.).  The ship was an Italian
liner in the Mediterranean.  Although there were Americans on
board, it is not clear to me that the terrorism was directed at
the U.S. or U.S. citizens.  Even the killing of Leon Klinghoffer
might be viewed more as an act of senseless brutality than
conduct in any way directed at the U.S.

Finally, I would note that the limitations on personal
jurisdiction stem from the Supreme Court's interpretation of the
due process clause of the Fifth Amendment.  Because the
limitation is constitutional in scope, there is little that can
be done in the drafting of the statute to expand jurisdiction.

I hope this response is helpful.

Sincerely,

Wendy Collins Perdue

133

Senator GRASSLEY. Thank you very much. I would start with you, Ms. Perdue. I noticed on page 4 of your testimony you state that "A judgment is not worth anything unless it can be enforced." Considering the testimony, as well as response to questions of the Klinghoffers, I wonder if you would still hold that view in light of that testimony from those family members that they are not in this business of suing for the money; they are in it to find out who is responsible so that the world will know.

Ms. PERDUE. Well, yes. Certainly, there is symbolic value to judgments, but I take the gist of the testimony that I have heard earlier to be this is an important weapon against terrorism because it hits them where it hurts, in their pockets. Well, it doesn't hit them in their pockets unless it is structured so that that is accomplished.

Certainly, the symbolism of judgments is nice, but litigation is extremely expensive.

Senator GRASSLEY. As a practical matter, identification of terrorists, because they want their secrecy, might discourage terrorism.

Ms. PERDUE. I am sorry. I didn't——

Senator GRASSLEY. In other words, if you can prove through a civil suit who the terrorist is, identification of an individual who is a terrorist, or terrorism generally in their organization, might discourage terrorism in the future. In other words, I am saying it is not just symbolic; there is also a practical end you accomplish, maybe even without getting money.

Ms. PERDUE. Well, yes, you might, although I would point out that the practical problem, I think, comes the other way around. You can't sue them until you identify them. You have to sue someone to get service of process. Who will you name and who will you serve?

Senator GRASSLEY. So you find out who they are and then everybody else knows who they are, and just because you can identify them doesn't mean that the world has identified them. Once you have brought them to justice, the world might know it.

Ms. PERDUE. Sure. I am a believer in symbolic acts. The gist of my testimony is symbolic acts are fine; if that is what you are doing, fine. If you want a practical effect, if you want the litigation to have practical implications, not simply a mechanism for symbolic effect, then it has got to be structured so that there is actually money that you can—Mr. Pipes has discussed the assets of the PLO. Well, if you want to get at that, the liability provisions have to be clear so that you can get at that. Otherwise, it is a symbolic act.

To be honest, I am not sure that if victims come to realize that, yes, they get to sue and, yes, a court will say you are entitled to $1 million, but there is no way you will ever see a dime of it—as that reality settles in, that they will feel so vindicated by the fact of a judgment.

Senator GRASSLEY. Well, I think the Klinghoffers have proven that it is much more than symbolism, and I guess our approach is to first give victims the right to their day in court, and then we will let those people decide whether Senate bill 2465 is mere symbolism.

Ms. PERDUE. Sure. Again, I think the fundamental question is the right to their day in court against whom.

134

Senator GRASSLEY. Mr. Morris, I would like to have you comment—and I assume you heard the State and Justice Department proposals regarding amendments to the bill, amendments that they suggest, particularly the definition of "defendant" and the right of the Attorney General to take action to hold civil suits in abeyance and to restrict discovery.

Mr. MORRIS. I am a former Justice Department official myself, so I have some understanding and some sympathy for their concerns, but I think that they are misplaced in this instance.

First, with respect to the identity of parties, I fear that the position of the Department of State on this issue may be backing us away from what is already the law. There was an important case in this area decided in 1980 by the U.S. Court of Appeals for the Second Circuit, the *Filartiga* case.

It involved, in a sense, the boundary problem of when is an official acting in his official capacity and when is he not. It involved a former Paraguayan police officer who had tortured a Paraguayan citizen in Paraguay, and at this later time both ended up in the jurisdiction of the United States.

The victim brought a civil action in this case against his former torturer, the police officer, in a U.S. district court regarding acts that occurred in Paraguay. The police officer essentially attempted to assert in the defense that he was acting within the scope of his official duties; he was doing what he did as a Paraguayan police officer. The plaintiff in the case argued that his conduct was outside the legitimate scope of a Paraguayan police officer. The court agreed with him and liability attached.

I would not want to see a legitimate concern that the Department of State might have to protect the Act of State Doctrine and not allow this measure to become a way to litigate foreign policy disputes in the court, a just concern, to cause us to retreat from important principles that our law has already established.

So I think that is not broken and I don't think we need to fix it, and I think that the bill as drafted is very careful to preserve the Act of State Doctrine and to insulate genuine governmental decisionmaking from the potential for litigation.

As far as the Justice Department's proposals are concerned, the fact of the matter is I think in the real world government prosecutors and private plaintiffs will probably cooperate with each other a good deal more than they will cross swords. Getting the facts is the crucial thing here, and the system of law ought to be oriented to allow whoever has the best shot at getting to the truth of the matter to have that shot freely.

Often, it is going to be the resources of the government and the prosecutors who will be able best to collect data, especially if the trail leads overseas, as to who is responsible for what. But if that is not that case, if a civil plaintiff is in a better position to blaze the trail in factfinding, our system of law ought to be predisposed to allow that.

If the Government has legitimate and deep-seated concerns regarding the protection of sources, the integrity of methods, the integrity of some ongoing investigation where it sees a direct harm or threat coming from a civil proceeding, it already has available

to it measures where it can seek, on an in camera basis, relief to stay to a limited extent civil proceedings for those purposes.

I don't think any special presumptions need be created here in order to alter existing relationships. It is important that those kinds of questions be decided by independent magistrates, and I think we set off on a dangerous path if we start conferring on the Attorney General a unilateral power by certificate to stop the forward movement of civil suits.

Senator GRASSLEY. Mr. Pipes, I believe that we have already made the case that the importance and utility of this legislation goes far beyond just satisfying a civil court judgment by attaching assets. However, the potential attachment of assets is an important component of this legislation.

You have underscored the difficulty in locating and actually attaching terrorist property. Of course, even though you have focused on the PLO, this new right of action is intended to be used against all terrorist groups, including the new so-called narcoterrorists, who no doubt have many holdings in this country.

In your testimony, you mentioned a 1975 pledge by the U.S. Government to keep Arab investments in this country secret. How is that pledge enforced?

Mr. PIPES. I am afraid I am not able to help on that.

Senator GRASSLEY. Is the secrecy of the Arab-PLO investment any different from other foreign investments in the United States?

Mr. PIPES. Again, I didn't quite have the time to do all the research I would have liked to.

Senator GRASSLEY. OK.

Mr. PIPES. I believe that the Secretary of the Treasury's agreement in 1975 places Arab investments in a somewhat different category from, say, investments from Japan, Britain, or Holland. How that is and what its exact implications are, I would be glad to look into, but I can't tell you right now.

Senator GRASSLEY. We think it would be valuable if you could submit it for response in writing.

[The information referred to is classified.]

Senator GRASSLEY. Let me move on. There have been some news reports regarding alleged money-laundering schemes that have been operated in the United States by PLO affiliates. There have been reports regarding the use of apparently legitimate businesses as fronts, as well as cases involving welfare fraud. Do you have any comments regarding those reports, assuming you know about them?

Mr. PIPES. I know something about them. My general comment would be that if you have money, there is really only one place—if you have got substantial amounts of money, there is only one area of the world you can put that money, and that is in the West; that is, we and our allies, and most of all we. There is just more you can invest in in the United States, everything from Treasury bills to real estate. So people around the world with money tend to invest here, and I would be very surprised if the PLO was an exception to that.

As for money laundering, I don't really know much about it. I don't quite see the point of it because I think front organizations having other names do the business would probably be enough. But

I suspect from what I know that there is probably a fair amount of PLO investment in this country, and that if the U.S. Government put its mind to ferreting those out, it would probably have considerable success.

Senator GRASSLEY. Ms. Perdue, in your opinion, do you think that the predicted frequency that the rights under a proposed statute will be exercised should determine whether the rights should be established at all?

Ms. PERDUE. Well, in a sense, I would say no. The fact that a right might not be exercised is certainly not a reason not to grant it. A conclusion that a right as granted may only rarely be exercised might be a reason to consider redrafting it so that it was broader and more usable, more likely to be used.

I am not urging that the bill should not be passed because people won't want to use it. Quite the contrary, what I am saying is as it exists now it may only serve symbolic purposes, and if redrafted to make it clear that liability extends to the organizations with assets, then it may be more freely and effectively used and accomplish the broader purposes.

Senator GRASSLEY. Mr. Morris, maybe I would ask you to comment on the point of symbolism.

Mr. MORRIS. Senator, this is a case where you put two lawyers in a room who agree on the generals, but will be sure to disagree on the specifics. I think that the bill as drafted is powerfully broad, and its intention, as I read it, is to bring focus on the problem of terrorism and, reaching behind the terrorist actors to those who fund and guide and harbor them, bring all of the substantive law of the American tort law system.

That tort law system generally tracks, and usefully tracks, criminal law doctrines. There is a notion in the criminal law, for example, of vicarious liability. You may not be the person who pulled the trigger, but if you bought the gun, if you pointed out the victim, if you arranged for the victim to be in a vulnerable place, if you paid the expenses of the hit man, if you encouraged the hit man, all while knowing that that is what the hit man was going to do, then you are criminally liable, and you may be liable as well even if you didn't know for sure, but you had a pretty good idea. You may be criminally liable if you were negligent in your knowledge. You could have known if you tried to find out what he was going to do with the gun, the money, the vulnerable victim, and so forth.

The tort law system has similar rules where liability attaches to those who knowingly or negligently make it possible for some actor grievously to injure somebody else. As section 2333(a) of this bill is drafted, it brings all of that tort law potential into any of these civil suits.

Now, it may be that our experience under this law in short order will show that maybe some clarification or tailoring is necessary, but I think you are right in believing that an experiment is worthwhile. Let us make all the tort law in the country available to see what we can do to sort out these suits, all the doctrines of vicarious and shared liability, joint and several liability, and so forth, and let us see if we can't nail all the tort-feasors down the chain, from the

137

person who starts spending the money to the person actually pulls the trigger.

Senator GRASSLEY. Thank you, Mr. Morris. I thank all the panels. You have been very helpful; all three panels have been very helpful. We look forward to moving forward with this legislation. Hopefully, the record established at this hearing will be such that we will be able to work out differences and finalize the legislation, and that that record will convince our colleagues on the committee and in the Senate that it should pass.

I am going to rush to the Senate floor and leave my staff to do the things I like to do and have some private conversation afterwards. Thank you all very much for participating.

Senator Thurmond will be sending some questions for answer in writing.

The subcommittee stands adjourned.

[Whereupon, at 4:15 p.m., the subcommittee was adjourned.]

○