# EXHIBIT E



**GEOTEXT**
Translations, Inc.

STATE OF NEW YORK )
) ss
COUNTY OF NEW YORK )

<u>**CERTIFICATION**</u>

This is to certify that the attached translation is, to the best of my knowledge and belief, a true

and accurate translation from Hebrew into English of the attached decision of Judge Boaz Okun,

dated April 23, 2006.

Evan Finch, Project Manager
Geotext Translations, Inc.

Sworn to and subscribed before me

this 29 day of May , 2007 .

EMERSON HORE
NOTARY PUBLIC-STATE OF NEW YORK
No. 01HO6152437
Qualified in Kings County
My Commission Expires September 11, 2010

New York  259 West 30th Street, 17th Floor, New York, NY 10001, U.S.A. tel 212.631.7432 fax 212.631.7778
San Francisco  220 Montgomery Street, 3rd Floor, San Francisco, CA 94104, U.S.A. tel 415.576.9500 fax 415.520.0525
London  107-111 Fleet Street, London EC4A 2AB, United Kingdom tel +44.(0)20.7936.9002 fax +44.(0)20.7990.9909
Hong Kong  20th Floor, Central Tower, 28 Queen's Road, Central, Hong Kong tel +852.2159.9143 fax +852.3010.0082
translations@geotext.com  I  www.geotext.com

*Civil Application (J-m) 1008/06*                    *Elon Moreh Seminary Society v. State of Israel*

## The Courts

**The Jerusalem District Court**                    **Civil Application 1008/06**
                                                     **In Main File: Civil File 4049/02**

**Before:**      **The Honorable Judge Boaz Okun**        **Date: April 23, 2006**

**In the matter of:**          **Elon Moreh Seminary Society**

                    Represented by:      Moshe Glick et al.

                                                                   Plaintiff

                                           **v.**

                    **1. The State of Israel**
                    **2. The Legal Aid Custodian**
                    **3. The Minister of Justice**
                    **4. The Palestinian Authority**

                    Represented by Legal Counsel:
                                        1-3.  Jerusalem District Attorney's Office
                                        4.     Yosef Amon, Adv.

                                                                   Defendants

Mini-ratio:
- Public international law – Occupied territories – Enforcement of judgments in areas of the Palestinian Authority
- Execution proceedings – Judgment – Execution

A ruling was made in favor of the Plaintiff against the estate of a person who resided in Area A of the Palestinian Authority. The person's estate ignored the ruling and did not pay, as a result of which the Plaintiff sought to execute the ruling.

The hearing revolved around the question of whether the authorities of the State of Israel or the Palestinian Authority could be sued, as a result of difficulties in enforcing Israeli judgments in areas within the control of the Palestinian Authority?

The District Court dismissed the claim summarily with prejudice and ruled as follows:

According to an interim accord signed between Israel and the Palestinian Authority (hereinafter: the "Interim Agreement"), the powers of judgment execution in Area A rested with the Palestinian Council. Israel and the Palestinian Council would enforce judgments rendered by judicial bodies of each of the parties as if they had been made by their own judicial bodies. Israel enacted the Implementation of the Interim Agreement Regarding the West Bank and Gaza Strip Law (Jurisdictional Authorities and Other Provisions) (Legislative Amendments) Law, 5756-1996 (hereinafter: the "Implementing Law"). The Implementing Law set forth mechanisms for legal

1

assistance which were intended to comply with, *inter alia*, the requirement to execute reciprocal enforcement proceedings of judgments between the Palestinian Authority and Israel. The Plaintiff asserts that the Palestinian Authority does not enforce judgments rendered by Israel and, therefore, the Interim Agreement was entered into negligently, that the Plaintiffs breached a statutory duty, and that it should assume the legality of a third party in favor of whom the Interim Agreement was made. Therefore, the Plaintiff petitions for indemnification by the State of Israel and the Palestinian Authority in respect to the damages sustained by it.

The Occupied Territories were not part of Israeli sovereignty, but were subject to Israeli military control and the military commander was the supreme power. The Interim Agreement changed the status of the Occupied Territories by transferring a portion thereof to the control of the Palestinian Authority, control which was accompanied by indicators of sovereignty.

Since the Occupied Territories were not part of the State of Israel, the enforcement of judgments was not automatic. In order to give effect to Israeli judicial decisions in the Occupied Territories, a dual activity was required: the provision of training in Israeli law to Israeli executory bodies in performing activities relating to the Occupied Territories, and, in tandem, enactments by the IDF commander, by virtue of which such activities were valid in the Territories.

In a similar vein, the law applicable to the Territories, at that time, enabled the execution of Israeli judgments within a certain framework, as a result of a combination of provisions of the "internal" law and the law which was applied by the military commander in the Occupied Territories.

The Interim Agreement changed this situation. In this regard, the Occupied Territories became more closely identified with the status of territory "outside of Israel." In the Interim Agreement Israel recognized the fact that it had no power to perform acts of execution in those territories under the control of the Palestinian Authority, absent a permit for such acts from the Palestinian Authority.

What is the significance of the change from the perspective of the Israeli litigants? The Israeli litigants had no rights to perform acts of execution in the areas of the Palestinian Authority. A change in the method of execution in the Occupied Territories is a change which is outside of the reach of residents of Israel and its citizens, who can, *prima facie*, raise no claim in this regard.

Does a cause of action exist as a result of these changes to the law? Legislative acts performed in Israel do not generate, per se, a cause of action. Nor does there exist any inherent right that a statutory instrument will last forever or will not be changed. The legislative act can even apply, within certain limitations, retroactively, and there is no difficulty in actively applying a change in the legislation in general and in civil legislation in particular.

That said, legislative acts are not immune to judicial review. Residents of the Territories and of Israel can challenge a law if it violates basic rights and does not comply with the provisions of the limitation clause. In the case at hand, the change does not violate basic rights of the individual in Israel.

No claim can be made according to which the Implementing Law violates basic rights of the Plaintiff and it goes without saying that the Plaintiff is not able to attack the law or the legislator, or raise any claim against them on grounds of negligence, breach of statutory duty or breach of contract in favor of a third party.

*Civil Application (J-m) 1008/06*                    *Elon Moreh Seminary Society v. State of Israel*

## Ruling

1.      Can authorities of the State of Israel or of the Palestinian Authority be sued, as a result of difficulties in enforcing Israeli judgments in areas subject to the control of the Palestinian Authority? This question was raised by Defendant 4, the Palestinian Authority, in a motion filed by it for summary dismissal of the claim without prejudice. Defendants 1-3, the State of Israel and functionaries therein, raised a similar claim in their statements of defense. I have therefore ordered the Plaintiff, at my own initiative, to file a written response also in respect to the claim made by these Defendants (see: Application for Leave to Appeal 4286/01 *Gil v. Ayalon*, Supreme Court Compendium 2001(4), 621). The Defendant did so and noted that the claim required factual clarification.

*The alleged cause of action – failure of enforcement in the occupied territories*

2.      The Plaintiff is a non-profit organization which engaged in the acquisition of lands in the area of Judea and Samaria. The Plaintiff concluded three land purchase transactions involving property situated in the Lavad village in Area A of the territories of Judea and Samaria. The transactions were executed in reliance on a declaration made by the village sheikh to the effect that the sellers were the lawful owners of the land. In the course of time, it became apparent that these representations were false. The transactions were not carried out. The Plaintiff sued the sheikh and requested reimbursement, *inter alia*, for the money paid over in consideration for the land purchase.

The Tel Aviv District Court accepted the claim. On September 27, 2000, a ruling was made against the estate of the sheikh, who had died in the interim. The sheikh's estate ignored the ruling and did not pay. The Plaintiff sought to execute the ruling.

3.      According to an interim accord signed between Israel and the Palestinian Authority on September 28, 1995 (the "Interim Agreement"), the powers of judgment execution in Area A, in which the late sheikh lived, resided with the Palestinian Council. In Article IV(3) of the legal supplement to the Interim Agreement, it was determined that Israel and the Palestinian Council would execute judgments rendered by the judicial organs of each of the parties as if they had been made rendered by their own judicial organs. Israel enacted the Implementation of the Interim Agreement Regarding the West Bank and Gaza Strip Law (Jurisdictional Authorities and Other Provisions) (Legislative Amendments) Law, 5756-1996 (hereinafter:

3

the "Implementing Law"). The Implementing Law amended the supplement to the Extension of the Emergency Regulations Law (Judea and Samaria and Gaza Strip – Jurisdiction in Offenses and Legal Aid), 5738-1977 (the "Legal Aid Law") and set forth mechanisms for legal assistance which were intended to comply, *inter alia*, with the requirement to execute reciprocal enforcement proceedings of judgments between the Palestinian Authority and Israel.

4.    In practice, the Plaintiff found itself helpless. The Plaintiff claims that the Palestinian Authority does not enforce judgments rendered in Israel. On this basis, the Plaintiff considers that the execution of the Interim Agreement was performed negligently, because it did not contain adequate guarantees for the enforcement of judgments rendered in Israel. The Plaintiff even considers that the Defendants breached a statutory duty, emanating from the Implementing Law and the Legal Aid Law. Moreover, the Plaintiff claims that it should assume the legality of a third party in whose favor the Interim Agreement was made. Therefore, the Plaintiff petitions for indemnification by the State of Israel and the Palestinian Authority in respect to the damages sustained by it.

For the purpose of the summary motion to dismiss the action with prejudice, the factual claims of the Plaintiff will be accepted in full. On the basis of these claims, an examination will be made of the legal status in the Occupied Territories in general and in the field of enforcement in particular.

*The status of the "territories" – from occupied territory to quasi-sovereign territory*

5.    Area A was never part of the territory of the State of Israel. It formed part of territories which were occupied by Israel. In these territories, a different legal system was in place, other than that which existed in Israel. Concepts such as the application of Israeli law or rights of Israelis by virtue of Israeli law are not relevant in these territories (Civil Appeal 300/84 *Abu Attia v. Arabtisi*, IsrSC 39(1) 365; Civil Appeal 1432/03 *Yinon Manufacture and Marketing of Food Products Ltd. v. Majada Quaran*, Supreme Court Compendium 2004(3) 1988). Such application is only possible by virtue of an express piece of Israeli legislation, which would then bind the courts of Israel.

Israel enjoyed effective control of the Occupied Territories. This control was attained through the Israel Defense Forces. As a result, the forces of the ruling power which commanded these

territories prior to their seizure by Israel were suspended, and the Israel Defense Forces military commander assumed the powers of the previous authority (High Court of Justice 337/71 *Al-Jamaya v. Minister of Defense*, ISrSC 26(1) 574). In this manner, the military governor became the source of power in those territories. In the words of Justice Vitkun in High Court of Justice 302/72 *Abu Hilo v. Government of Israel*, IsrSC 27(2) 169:

> We must recognize, above all, the fact that both according to Israeli law and according to international law the supreme military commander in the Territory, and no other person, constitutes the sovereign legislator (due to the suspension of the sovereignty of the foreign sovereign so long as the Territory is occupied by the military).

Justice Vitkun was a minority opinion in that case, but this position was accepted by the bench and even Justice Landoi noted that "(e)xternally, i.e. in terms of the world's legal systems, it is clear that acts of the military governor outside of the Territory subject to the law of the State of Israel—both executory acts and legislative acts—originate in the conventional laws of war..." The power of an Israeli court to examine such acts emanated from the fact that the military governor constitutes, being in Israeli territory, part of the Israeli executive authority, enabling the validity of its acts as an administrative authority to be examined. In other words, the military commander wears two hats: when acting in the Territories he serves as the supreme lawmaker, while when acting in Israel he serves as an administrative authority subject to judicial review. From this point on, the assumption was that the IDF and its commanders "carry in their bosom," to borrow a phrase from Justice Barak, the Israeli administrative law (High Court of Justice 7015/02 *Ajuri v. Commander of IDF Forces in West Bank*, IsrSC 56(6) 352), and they did so even while fulfilling the task of "sovereign" or, more precisely, alternate and temporary sovereign.

6.     The Israel Defense Forces military commander of the Occupied Territories issued a proclamation, known as the Law and Administration Proclamation (Judea and Samaria) (No. 2), 5727-1967. The proclamation set forth the law applicable to the area (the "Proclamation"). The provisions of the Proclamation were also consistent with regulation 43 of the Supplement to the 1907 Hague Regulations Regarding the Law and Customs of War On Land, viz. The Fourth Hague Convention (see High Court of Justice 393/82 *Jam'iat Askan Elma'almoon v.*

*Commander of the IDF Forces in Judea and Samaria*, IsrSC 37(4) 785, at p. 793). The Proclamation determined that the law that existed in the area prior to June 7, 1967 would remain in force so long as it did not contradict any statutory instrument enacted by the military commander for the Territories. These provisions, and not Israeli law, constituted the binding legislation in the Occupied Territories. The occupied territory itself did not form part of the area of the State of Israel and the principles of governance there were outside of the jurisdictional competence of the Israeli courts (for a detailed description, see A. Kanor "Israel and the Territories: Private International Law, Public International Law and What Lies Between Them," *Law and Administration* 5 (5765) 551, 563; Civil Appeal 179/77 *Bank Leumi Le'Israel v. Hirschberg*, IsrSC 32 (1) 617).

7.      This was the situation commencing from 1967. It did not confer any rights on Israeli governing authorities to act in the Occupied Territories without any express provision in the internal law of the Territories and an appropriate provision in Israeli law.

8.      The Interim Agreement and the Implementing Law related to the "status of the Occupied Territories," according to the objects clause of the Law. They changed the normative state of these areas in a fundamental manner. A portion of the Territories was thenceforth defined as "areas of the Palestinian Council." In this manner, recognition was given to the status of the "Palestinian Authority" in these Territories (section 1 of the Supplement to the Legal Aid Law). There is no need to consider, in the case at hand, the question of the exact legal status of the said Palestinian Authority. It is a complicated matter. It is enough to say that the Palestinian Authority, at least in the territory of Area A, was granted certain prerogatives belonging to the sovereign. Even this statement is not simple. First, the Authority was not granted all of the powers accorded to a sovereign. Secondly, the expression "granted" needs to be divested of its usual connotations, because the status of the Palestinian Authority is not dictated only by the internal law of Israel. The Palestinian Authority is not a creation of this law, and is not governed by it, as we are not dealing with an internal legal persona, like a non-profit organization or a company.

At the same time, it is clear that the Interim Agreement changed the status of the Palestinian Authority in Israeli law, by its very recognition of its competence in respect to parts of the Occupied Territories. The recognition of this status has numerous legal ramifications. In practice, the Palestinian Authority acquired the status of a quasi-sovereign body, in control, de facto, of a parcel of the State's land. One of the salient manifestations of this is the

6

establishment of a Palestinian Police Force (see section 1 of the Supplement to the Legal Aid Law). Another indicator is a determination which limits Israeli juridical authority, transferring the powers of government in respect to those who are not Israeli, even if the matter is not stated expressly, to the Palestinian legal authorities (section 2(d) of the Supplement to the Legal Aid Law).

9.    This status of the Palestinian Authority became more and more pronounced with Israel's departure from the Gaza Strip, and its relegation of the control of that area to the said Palestinian Authority (J. A. Frowein, "De Facto Regime," in R. Bernhardt (ed.), Encyclopedia of Public International Law (1992) Vol. I, 966; E. Benvenisti, "The Status of the Palestinian Authority" in E. Cotran and C. Mattat (eds.), The Arab-Israeli Accords: Legal Perspectives (1996), 47; A. Kanor "Israel and the Territories: Private International Law, Public International Law and What Lies Between Them," *Law and Administration* 5 (5765) 551, 568). Practically speaking, the Palestinian Authority complies—even if only in a weak and haphazard way—with the main requirements which constitute a state, including territory, population and government (or the enforcement of its sovereignty on the population). Notwithstanding this, the Authority is not recognized as a state by most countries of the world. But the question of recognition is primarily one of declarative significance. Moreover, international law operates in the substantive plane and not the formal plane. Therefore, the greater the number of elements of sovereignty by the Palestinian Authority, including the establishment of elected institutions, international standing, territory subject to its sole control, police forces, independent currency, etc., the greater the similarity becomes between it and a political entity, and the greater will be the tendency to apply to the Authority the laws that relate to a state, even without such formal recognition.

*An equal has no authority over an equal*

10.    The recognition of the Palestinian Authority as possessing sovereign qualities in respect to a portion of the Occupied Territories requires a response also in terms of customary international law. The Palestinian Authority exercises policing and juridical powers in those areas subject to the authority of the Palestinian Council under the Interim Agreement. It exercises such powers also in the areas of the Gaza Strip. The delegation of such responsibility implies also the grant of powers. It is not possible for the Palestinian Authority

to be thrown into no-man's land where it will receive responsibility but not the authority to exercize powers and the right to demand a sovereign status vis-à-vis a different sovereign power. The demand for such powers derives from the very act of conferring the signs of sovereignty. Thus, in the old case of *Underhill v. Hernandez* 168 U.S. 250 (1897), the following determination was made (at p. 252):

> Every sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to... sovereign powers as between themselves.

These rules do not apply directly to the Palestinian Authority, so long as it has not been recognized as a state. However, it is not possible to ignore those aspects of sovereignty which have been granted to the Authority and its Territory. Some of these receive explicit expression in the Interim Agreement and the Implementing Law, by the very act of reigning in Israeli legal powers in the Territories. Even those spheres which do remain under its jurisdiction, for instance in the criminal domain, derive not from the military commander or Israeli law, but the Interim Agreement itself. The significance of this is that even if full sovereignty has not been recognized, the Interim Agreement adopts, as a matter of practice, in relations between Israel and the Palestinian Authority, the rule in customary international law according to which "an equal has no authority over an equal" (par in parem non habet imperium), meaning that one sovereign state does not exercize dominion over, and does not sit in judgment against, another sovereign state. Concededly, there is no express adoption of this rule in the Interim Agreement, but it serves as a starting point as a result of which Palestinian consent was required for any activity of Israel liable to violate sovereignty, including the execution or enforcement of criminal judgments.

11.     Moreover, the origin of this rule is in customary international law. In the words of Emmerich de Vattel, The Law of Nations or the Principles of Natural Law (1758) (at p. 137):

> Nature has established a perfect equality of rights among independent Nations. In consequence, no one

> of them may justly claim to be superior to the others.
> All the attributes which one possesses in virtue of its
> freedom and independence are possessed equally by
> the others.

See, in this regard, also S. Wasserstein Pessburg, "Report of the Public Committee to Prepare an Immunity Law for Foreign States" (Ministry of Justice, Foreign Ministry, 2005) on p. 4 (the "Committee Report").

It emerges that there is no need for any special provision of law in order to invoke the operation of the "parity rule." In its original form, this rule applies to "equals," viz. sovereign states. An argument can be made that because immunity is a state's prerogative, this rule applies only to states. However, the standing of the Palestinian Authority and its quasi-sovereign status in all or part of the Occupied Territories mean that the logic of immunity applies to it. And, indeed, international convention shows that the courts in various countries have not always stuck rigidly to the requirement of a "state" as a condition for exercizing immunity. This is especially true in those cases involving state entities with whom a special political connection exists with the state forum or where there exists a difficulty in defining the other sovereign body. The difficulty that at times exists in answer to the question "who is a foreign country" requires the adoption of a functional approach, which determines that the question of immunity will be derived from the functional, governing aspect of the relevant act and not from the formal aspect of its executor (p. 5 of the Committee Report). Accordingly, a political unit was also recognized within a state as a state for the purpose of acquiring immunity. The functional test leads to the conclusion according to which a state which does not even recognize a different entity as a state is not discharged from upholding rights bestowed on that other entity under international law. Therefore, for the purpose of exercizing immunity, "[t]he court should not be subject to a rigid statutory definition or to dictates of the executive authority" (p. 7 of the Committee Report). Such an examination reveals that the Palestinian Authority enjoys immunity. This was the situation even without the Interim Agreement, and this is certainly the case by virtue of this Agreement. The Agreement itself determines that the powers of the State of Israel in those territories are now the product of the arrangement reached by the parties, and this is the legitimate source for Israel's activities in these territories (alongside other rules of international law). This conclusion is required by virtue of the plethora of elements of sovereignty in the workings of the Palestinian Authority,

9

which find expression in effective control of at least certain parts of the Occupied Territories (ibid., para. 9).

12.    To summarize this point: The Occupied Territories were not part of Israeli sovereignty. They were subject to Israeli military control. The military commander was sovereign. The Interim Agreement changed the status of the Occupied Territories. It transferred part of the Territories to the control of the Palestinian Authority. This control was accompanied with elements of sovereignty. The Implementing Law accorded Israeli recognition to this status of the Palestinian Authority. This recognition does not mean recognition of the Authority as a state. Such recognition is dependent on a formal act of the Government of Israel and such an act was not performed (Civil File (Jerusalem) 2538/00 *Nuritz v. The Palestinian Authority*, Tak-Meh 2003(1) 4968, at p. 4975). However, even without such recognition, the Palestinian Authority enjoys the application of appropriate rules of customary international law, including that of immunity. The application of this rule has nothing to do with the answer to the question of whether the Palestinian Authority constitutes a state. It is enough to say that it is a sovereign or quasi-sovereign body which imposes its authority on an area regarded by Israel as "outside of Israel." The application of immunity to the Palestinian Authority is also derived from a reading of the aims of the Interim Agreement and the Implementing Law.

We will now proceed to examine the question of the enforcement of Israeli judgments in the Territories.

*Enforcement of judgments*

13.    Because the Occupied Territories did not form part of the State of Israel, the enforcement or execution of judgments in those Territories was not automatic. In order to give effect to Israeli judicial decisions in the Occupied Territories a dual activity was required: the provision of training in Israeli law to Israeli executory bodies in performing activities relating to the Occupied Territories, and, in tandem, enactments by the IDF commander, by virtue of which such activities were valid in the Territories. Similarly in respect to the service of documents: the Rules of Procedure (Service of Documents to the Occupied Territories), 5730-1969, determined that documents could be served in the area in the same manner as service

10

could be effected in Israel. The area was defined as "each of the territories occupied by the Israel Defense Forces." This was not sufficient. The commander of the Judea and Samaria area promulgated an Order Concerning Legal Assistance (Judea and Samaria) (Number 348), 5730-1969, in which he authorized the service of a document which was dispatched from an Israeli court in this manner. Only when this dual activity was performed was it possible, according to Israeli law, to perform service according to law in the Occupied Territories (see also B. Bracha, "Service of Process to the Occupied Territories" *Mishpatim* D (5732) 119).

In a similar vein, the law applicable to the Territories, at that time, enabled the execution of Israeli judgments within a certain framework (the provision in section 4 of the Order Concerning Legal Assistance (Judea and Samaria) Number 348, 5730-1969). This execution was not the result of the actual military control, but was a combination of provisions of the "internal" law and the law which was applied by the military commander in the Occupied Territories.

14.    The Interim Agreement changed this situation. In this regard, the Occupied Territories became more closely identified with the status of territory "outside of Israel." In the Interim Agreement Israel recognized the fact that it had no power to perform acts of execution in those territories under the control of the Palestinian Authority, without receiving a permit for such acts from the Palestinian Authority. Such a permit can be either blanket and general in nature by virtue of the Interim Agreement or specific, in respect to each individual case (see the Supplement to the Legal Aid Law, section 3B and section 9, respectively). Limitations on Israel's power to perform acts of execution in this territory derive not only from the ruling authority conferred on the Palestinian Authority in the Occupied Territories, but also from internal limitations which prescribe the powers of the legal authorities in Israel.

15.    What is the significance of the change from the perspective of the Israeli litigants?

We have seen that the Israeli litigants had no rights to perform acts of execution in the areas of the Palestinian Authority. To the extent that such powers were entrusted to Israeli judicial authorities, they were the product of Israeli law and in tandem of the law that applied in the Occupied Territories. Even if the Israeli litigants have influence over the Israeli legal system, they did not have, and never had, any direct influence on the legal system in the Occupied Territories. This system was managed by the military governor, who was subject to Israeli administrative supervision and to international law. Therefore, a change in the method of

execution in the Occupied Territories is a change which is outside of the reach of residents of Israel and its citizens, who can, *prima facie*, raise no claim in this regard. The changes to the execution proceedings, which were made in the framework of the Interim Agreement, were not dependent solely on the desire of Israel, but also on the wish of the other sovereign power, first the military governor who replaced the sovereign who was suspended upon the military conquest, and now the "quasi-sovereign," who replaced the military commander for this purpose.

16.    Does a cause of action exist as a result of these changes to the law?

Legislative acts performed in Israel do not generate, per se, a cause of action (High Court of Justice 975/89 *Nimrodi Land Development Ltd. v. Dov Shilanski, Knesset Chairman*, IsrSC 45(4) 153, at p. 157). Nor does there exist any inherent right that a statutory instrument will last for ever or will not be changed. The legislative act can even apply, within certain limitations, retroactively (Prisoner's Petition Appeal 1613/91 *Arbib v. State of Israel*, IsrSC 46(2) 765, p. 775), and there is no difficulty in actively applying a change in the legislation in general and in civil legislation in particular. Limitations on the application of laws in this manner will be imposed only if they have the effect of punishing a certain sector of the public (*Dobbert v. Florida* 97 SCt 2290 (1973)). In any event, neither citizens nor residents are entitled to request the continuation of the legal status quo and to sue the State on such a ground, just as they are unable to sue the State for not changing a legal status which is to their detriment. Just as residents of the Territories are not able to sue the State for enacting laws which enable the execution of Israeli judgments in the Occupied Territories, so, too, are residents of Israel unable to sue the State for changing this state of affairs.

17.    That said, legislative acts are not immune to judicial review. Residents of the Territories could challenge legislation in the Territories by administrative means, if it controverted the principles of customary international law. Residents of the Territories and Israel alike can challenge a law if it violates basic rights and does not comply with the provisions of the limitation clause (see, for example, High Court of Justice 1715/97 *Bureau of Investment Managers in Israel v. Minister of Finance*, IsrSC 51(4) 367). In the case at hand, the change does not violate basic rights of the individual in Israel. Even if we regard the right of execution as subsumed under the right to property in the wider sense, the constitutional change does not violate any inherent right, because the ability to execute judgments in the

Nevo Publishing House Ltd.    nevo.co.il    The Israeli Legal Database

Occupied Territories was suspended in mid-air and was the product not only of Israeli law but also of the law that applied to the Occupied Territories in relation to which residents of Israel have no direct say, in any material manner. The change performed via the Implementing Law could also have been performed by an order of the military commander. Even then the Plaintiff would have had no cause of action against the military commander or against the Israeli authorities.

18.    Indeed, someone who performs land transactions in an area subject to the control of the military governor, whose legal status has not yet been finalized, and as a result is also forced to have recourse to execution proceedings in those territories, took a calculated risk ab initio. His risk is like the risk of one who performs a land transaction abroad. He was dependent on legislation that applied in those territories and had no basis to reason that this legislation would remain in force or that as a result of its change he would be entitled to a cause of action against Israeli governing bodies. It follows from this that no claim can be made according to which the Implementing Law violates basic rights of the Plaintiff and it goes without saying that the Plaintiff is not able to attack the law or the legislator, or raise any claim against them on grounds of negligence, breach of statutory duty or breach of contract in favor of a third party.

The above reasoning leads me to dismiss the claim summarily with prejudice against all of the Defendants.

*The Palestinian Authority*

19.    The Interim Agreement was signed by the Palestinian Authority not in its capacity as an internal legal entity in the Israel politic. The Palestinian Authority is a legal entity which operates pursuant to international law, by virtue of which it enters into international agreements. The Interim Agreement accorded to this entity, also vis-à-vis Israel, the status of a sovereign or quasi-sovereign authority, in Area A. This status of the Palestinian Authority was reinforced with the conclusion of the disengagement plan. It is not possible to ignore clear signs of sovereignty in the Occupied Territories, such as elections, policing, independent international law relations etc.

20.    The status of the Authority as a quasi-sovereign body does not block the possibility of a claim being made against it in Israel. It blocks such a claim only if the Authority acted as a

quasi-sovereign body (Leave to Civil Appeal 7092/94 *Her Majesty the Queen in Right of Canada v. Edelson*, Supreme Court Compendium 97(2) 292, at p. 309). Execution is a clear manifestation of a sovereign act, which is distinct from an act in the private sphere. It is conventional to state that the immunity from execution is contained in the hard core of immunity. It follows that the Palestinian Authority cannot be sued in Israel on this basis, because the principle that there is no coercion between equals applies to it.

21.    However, even if we were to assume that such proceedings could be commenced, it cannot be asserted that the Palestinian Authority was negligent vis-à-vis the Plaintiff, by seeking to rely on the applicability of the principles of sovereignty, which prevent "direct-dial" style execution. The assumption of elements of sovereignty by the Palestinian Authority, including in the sphere of execution of foreign judgments, forms part of the essence of the agreement which was made and part of a legitimate interest from the perspective of the Palestinian Authority.

22.    The same applies in respect to a breach of statutory duty. International agreements, interim agreements included, are not integrated as a matter of course and do not become part of the applicable law in Israel so long as they have not been adopted by way of legislation (High Court of Justice 2717/96 *Eli v. Minister of Defense*, IsrSC 50(2) 848). To this end, the Implementing Law was enacted and the Legal Aid Law was amended. These laws regulate the manner of performing undertakings by the State of Israel towards the Palestinian Council by virtue of the Interim Agreement, and they therefore contain debts owed only by Israel and not by the Palestinian Authority. The latter is admittedly committed to the provisions of the Interim Agreement; however, this Agreement does not impose on it any statutory duty according to Israeli law.

23.    The assertion according to which the Interim Agreement constituted a contract in favor of a third party, under which the citizens of Israel are the beneficiaries, within the meaning of section 34 of the Contracts (General Part) Law, 5733-1973, vis-à-vis the Palestinian Authority, is similarly unable to stand up to scrutiny. Concededly, the possibility that international agreements may confer direct rights on residents of various countries cannot be ruled out. This is the situation in respect to some of the international treaties which protect human rights, and even in respect to the European Community Treaty. Thus, Article 234 of the Treaty of Nice enables private individuals to directly rely on provisions of the European Community Treaty before national courts (Case 26/62 *Van Gend & Loos v. Nederlandse*

14

*Administratie Der Belastingen,* [1963] E.C.R. 1). However, this is the exception, not the rule (J. H. H. Weiler, "The Transformation of Europe," 100 Yale Law Journal (1991) 2403). This exception does not apply to the Interim Agreement. This Agreement aspired to weaken, if not to annul, the military governor's link with the Occupied Territories, and it does not come within the remit of a contract in favor of a third party. On all matters concerning execution, the arrangement did one thing only. It replaced one legal system, which had its origins in the power of the military governor, with another legal system, which originated in the sovereignty of the Authority in Area A. It cannot therefore be regarded as conferring either a benefit or a detriment.

24.    Patently, the above words are not able to validate evasion from international obligations or to praise a tactic of avoiding execution, if such exists. But a poor grade of activity of another state or body or quasi-sovereign body is unable to serve as the basis for the initiation of legal proceedings against that body. In order for the courts to fulfill this task, a provision of law must be found which enables the filing of claims of this sort. Such provisions of law can also validate the freezing of funds or their transfer to private claimants who were injured by the act of the foreign sovereign. Without such a provision, the default position conventional in international law applies, according to which this type of proceeding is not permitted.

*The State of Israel and the functionaries therein*

25.    The Plaintiff asserted in the statement of claim that Defendants 1-3 were negligent in their drafting of the Interim Agreement and the execution thereof, in that they failed to ensure that Annex IV to the Interim Agreement would be executed in practice by Defendant 4 and in their failure to take precautionary measures to safeguard the rights of the Plaintiff and similar organizations, who have been awarded judgments against residents of the Palestinian Authority. The Plaintiff further asserted that Defendant 1 could have stopped the payment of funds transferred to the Palestinian Authority and used them to pay out lawsuits.

It is possible to understand, in everyday parlance, claims raised by a creditor who has been prevented from recovering a debt, but such claims are incapable of substantiating a legal action. Thus, the claim that the State was negligent in this regard departs from the assumption that the legal *status quo ante* was dependent solely on the State. In practice, however, the legal status relating to execution within the areas of the Occupied Territories is not dependent on the State, but on the international standing of these Territories. So long as the Territories

15

were within the domain of the military governor, the military governor was entrusted with this area. The arrangements prescribed by the military governor accorded the Israeli legal authorities a certain power (in the Hoppleian sense) in domains in these areas. They did not accord the Plaintiff a direct right, and in any event did not accord it a right to ensure that these arrangements would remain intact. The change in the status of the Territories occupied by Israel generated a change in the legal system as a matter of course. It is not possible to pigeonhole such a change into negligence and international agreements cannot be reduced to civil wrongs.

26.    The question of the nature of the arrangements set forth in the Interim Agreement is a question whose dominant aspect is political, and in the normal course of affairs will not be subject to the laws of torts (cf. High Court of Justice 4481/91 *Bargil v. Government of Israel*, IsrSC 47(4) 210; High Court of Justice 910/86 *Resler v. Minister of Defense*, IsrSC 42(2) 441; High Court of Justice 1635/90 *Jerzhevski v. Prime Minister*, IsrSC 45(1) 749). The reason for this derives from the absence of any conceptual duty of care of the State of Israel towards its citizens in this regard. Such a duty of care does not even exist, save in extremely exceptional cases (see, infra, at para. 27), on all matters relating to the signing of international agreements. From this it follows that an offense of negligence cannot be imputed to the State of Israel in this regard.

Even the assertion according to which the State of Israel should have set off from the funds transferred to the Palestinian Authority sums to which Israeli citizens are entitled from a private individual, who does not constitute an organ of the Palestinian Council, must fail. This assertion is spurious also because of the fact that the immunity of assets of a foreign country are regarded "as a fundamental matter, even more so than the immunity of a foreign state from jurisdiction" (p. 113 of the Committee Report). In any event, such a set off does not constitute a right possessed by the State of Israel against the Palestinian Authority and it depends on consent, which was not obtained between those parties.

The same applies, *mutatis mutandes*, in respect of a claim relating to a breach of statutory duty which originates in the Implementing Law, the Legal Aid Law or the Basic Law: Human Dignity and Freedom [sic] They shed light also on the assertion that the Plaintiff is a beneficiary vis-à-vis the State of Israel by virtue of the Interim Agreement. According to this claim, the Interim Agreement and the manner in which it regulates the duty of reciprocal enforcement between Israel and the Palestinian Authority constitutes a contract in favor of a

16

third party, the goal of which is to safeguard the right of third parties to succeed in suing on final judgments made in their favor according to law in the territories of the second party. This is a combination between an arrangement which changes the means of execution in the Occupied Territories and the grant of a right. It is possible that the determination of execution arrangements creates an expectation on the part of Israelis, who have been awarded judgments against residents of the Authority. However, they do not transform the creators of the arrangement into guarantors for the implementation of that arrangement. In other words, a change in the execution arrangement or even its crystallization do not confer a right as required under section 34 of the Contracts (General Part) Law, 5733-1973 (cf. Civil Appeal 253/86 *Hushi v. The Technion*, IsrSC 38(1) 640, 643; High Court of Justice 419/83 *Doron v. Sarig*, IsrSC 38(2) 323, at pp. 336-337).

It is important to emphasize that the usual situation between states is that each state determines its own rules of enforcement. This is a privilege preserved to states to enter into international agreements in order to facilitate enforcement. In practice, the State of Israel has no agreements for the enforcement of foreign judgments with a large number of countries, and Israeli citizens therefore attend to enforcing foreign judgments abroad by themselves.

27.     Furthermore, the arrangement received the force of law. The law itself is not assailable on the grounds that its content is not reasonable. Legislative acts of the Knesset are not examined on the basis of a reasonableness test (see the words of Justice Barak in High Court of Justice 975/89 *Nimrodi Land Development Ltd. v. Dov Shilanski, Knesset Chairman*, IsrSC 45(4) 153). Provided the authorities have acted according to law, they cannot be attacked on the ground of negligence or on any other ground. Judicial review is nourished from a violation of a basic right, which did not exist, and not from an examination of the nature of the arrangement according to criteria of reasonableness and negligence.

And careful note should be taken: There may be cases in which a cause of action will be recognized against the State also in respect of breaches of international agreements. Thus, for example, in the European Community it was expressly determined in Joined Cases C-6/90 and C/9/90 *Francovitch and others v. Italian Republic* [1991] E.C.R. 5357, that a torts action can be filed against a state for failing to properly incorporate Community Law into the national law. However, cases of this sort are limited to those special situations in which the State evades its obligation, pursuant to the Treaty, towards its citizens or residents (supra,

17

para. 23). An argument could be made that such an obligation can be substantiated even where human rights are violated. However, in such a case the legislation is compatible with the Interim Agreement and does not breach it, whereas an attack on the Interim Agreement per se through legal means is not possible (supra, para. 26).

Dismissing the claim against the State necessitates its dismissal also against the organs of the State: the Justice Minister and the Legal Aid Custodian. In the absence of any right to the Plaintiff, no cause of action can be substantiated against these organs either.

28.    And one final "procedural" word: The Plaintiff claims that the motion for summary dismissal without prejudice was filed out of time. The proceedings in this case were delayed by virtue of the decision of Justice Naor on May 26, 2003. President Arad decided on January 26, 2006 that this proceeding would be heard by me, as a result of the consolidation of the hearings in actions against Defendant 4. This decision resulted in the renewal of the hearings in the case and a first pre-trial review meeting was scheduled. The motion by Defendant 4 was filed, therefore, even before the first pre-trial review meeting in the case. The claims of Defendants 1-3 were raised within the framework of their own statements of defense. Therefore, the current stage of the proceeding is the appropriate stage to examine the motion for summary dismissal of the claim with or without prejudice.

I therefore order the summary dismissal of this claim with prejudice. In the circumstances, no order is made as to costs.

**Handed down and announced today, 25 Nissan 5766 (April 23, 2006), *ex parte*.**

**The Secretariat shall serve copies on the parties' attorneys.**

Boaz Okun 54678313-1008/06

**Boaz Okun, Judge**

This version is subject to formatting and editorial changes.

Nevo Publishing House Ltd.    nevo.co.il    The Israeli Legal Database

אגודת מדרשת אלון מורה נ' מדינת ישראל                        בש"א (י-ם) 1008/06

בתי המשפט

בית המשפט המחוזי בירושלים                    בש"א 1008/06                ת"א
                                              בתיק עיקרי:              4049/02

בפני: כב' השופט בעז אוקון                    תאריך: 23/04/2006

בעניין:     אגודת מדרשת אלון מורה

ע"י ב"כ     גליק משה ואח'                              התובעת

נ  ג  ד

1. מדינת ישראל
2. הממונה על העזרה המשפטית
3. שר המשפטים
4. הרשות הפלשתינית
1-3. פרקליטות מחוז ירושלים     ע"י ב"כ עו"ד
4.     עו"ד יוסף ארנון                                 הנתבעים

_____

מיני-רציו:

* משפט בינלאומי פומבי – שטחים מוחזקים – אכיפת פסקי-דין בשטחי הרשות הפלשתינית

* הוצאה לפועל – פסק-דין – ביצועו

התובעת זכתה בפס"ד נגד עוזבנו של אדם שהתגורר בשטחי A. העזבון לא שילם את סכום פסה"ד התובעת ביקשה להוציא את פסק הדין אל הפועל.

הדיון נסב אודות השאלה האם ניתן לתבוע את רשויות מדינת ישראל או את הרשות הפלשתינית, בשל קשיים באכיפת פס"ד ישראלים באזורים הנתונים לשליטת הרשות הפלשתינית?

בית-המשפט המחוזי דחה את התביעה על הסף ופסק כי:

עפ"י הסכם ביניים שנחתם בין ישראל לבין הרשות הפלשתינית (להלן: הסכם הביניים), סמכויות הרשות הישראלית לפעול באזור A נתונות בידי המועצה הפלשתינית. ישראל והמועצה הפלשתינית יאכפו פס"ד שנתנו ע"י גופים שיפוטיים של כל אחד מן הצדדים, כולם ניתנו ע"י גופים שיפוטיים שלהן. ישראל חוקקה את חוק יישום הסכם הביניים בדבר הגדה המערבית ורצועת עזה (סמכות שיפוט והוראות אחרות) (תיקוני חקיקה), התשנ"ו-1996 (להלן: חוק היישום), שקבע מנגנוני עזרה משפטית שנועדו לענות, בין היתר, על הדרישה לבצע אכיפה הדדית של פס"ד בין הרשות

1

_____

הפלשתינית לבין ישראל. התובעת טוענת כי הרשות הפלשתינית אינה אוכפת פס"ד שניתנו
בישראל ולפיכך, החתירמה על הסכם הביניים נעשתה ברשלנות, התובעים הפרו חובה חקוקה, וכי
יש לראותה כצד שלישי שהסכם הביניים נערך לטובתו. על כן, מבקשת התובעת כי מ"י והרשות
הפלשתינית ישפו אותה על הנזקים שנגרמו לה.

השטחים המוחזקים לא היו חלק מהריבונות הישראלית אלא היו נתונים לשליטה צבאית ישראלית
והמפקד הצבאי היה הריבון. הסכם הביניים שינה את מצב השטחים המוחזקים בהעבירו את חלקם
לשליטת הרשות הפלשתינית, שליטה המלווה בסממנים של ריבונות.

הואיל והשטחים המוחזקים לא היו חלק ממדינת ישראל, אכיפת פס"ד כהם לא היתה אוטומטית.
ע"מ שתהיה תחולה להחלטות שיפוטיות ישראליות בשטחים המוחזקים, היה צורך בפעולה
כפולה: הכשרה: של גופי ישראלים בדין הישראלי לבצע פעולה המתייחסת לשטחים
המוחזקים, וחקיקה של המפקד הצבאי, אשר מכוחה אותה פעולה היתה תקפה בשטחים.

באותו אופן, איפשר הדין שחל בשטחים, באותה עת, הוצאה לפועל של פס"ד ישראליים במסגרת
מסורתם, וזאת כתוצאה של צירוף הוראות הצק "הפנימי" ושל הדין שהוחל ע"י המפקד הצבאי
בשטחים המוחזקים.

סכם הביניים שינה מצב זה. בהקשר זה התקרבו השטחים המוחזקים למעמד של שטח "חוץ-
לאר"ץ". בהסכם הביניים הכירה ישראל בכך שאין בכוחה לבצע בשטחים המצרים בשליטת
הרשות הפלשתינית פעולות של הוצאה לפועל, אלא אם כן ניתן היתר לכך ע"י הרשות
הפלשתינית.

מהי משמעות השינוי מבחינתם של בעלי הדין בישראל? בעה"ד בישראל לא היו בעלי זכויות
לבצע הוצאה לפועל בתחומי הרשות הפלשתינית. שינוי בשיטת ההוצאה לפועל בשטחים
המוחזקים הוא שינוי המצער מזורז להישע ידם של תושבי ישראל ואזרחיה, ולכאורה אין הם
יכולים להעלות טענה כלשהי בעניין זה.

האם קיימת עילת תביעה בעקבות שינויים כאלה כדין? פעולות חקיקה הנעשות בישראל אינן
מצמיחות כשלעצמן עילת תביעה. אין לאדם קנויה כי דבר חקיקה ישמר לעד או לא ישונה.
דבר החקיקה אף יכול לחול, בנגבלות שונות, באופן רטרואקטיבי ואין קושי בהנהלה אקטיבית של
שינוי בחקיקה בכלל, ובחקיקה האזרחית בפרט.

ואולם, דבר החקיקה אינו חסין מביקורת שיפוטית. תושבי השטחים וישראל גם יחד יכולים לטעון
נגד החוק, אם הוא פוגע בזכויות יסוד ואינו עונה על תנאי פסקת ההגבלה. במקרה זה, אין בשינוי
כדי לפגוע בזכויות יסוד של הפרט בישראל.

לא ניתן להעלות טענה בהקשר זה לפיה חוק היישום פוגע בזכויות יסוד שיש לתובעת, וממילא אין התובעת
יכולה לתקוף את החוק או את המחוקק ולהעלות כלפיו טענה של רשלנות, הפרת חובה חקוקה או
הפרת חתה לטובת צד שלישי.

## פסק דין

2

1.    הניתן לתבוע את רשויות מדינת ישראל או את הרשות הפלשתינית, בשל קשיים
באכיפת פסקי דין ישראלים באזורים הנתונים לשליטת הרשות הפלשתינית? שאלה זו
הועלתה על ידי הנתבעת 4, הרשות הפלשתינית, בבקשה שהוגשה על ידה למחיקת
התביעה על הסף. נתבעים 1 - 3, מדינת ישראל ובעלי תפקידים בה, העלו בכתב הגנתם
טענה דומה. לפיכך, הוריתי לתובעת מיוזמתי להגיש תגובה בכתב גם לטענת נתבעים אלה
(ראו: רע"א 4286/01 גיל נ' אילוז, תק-על 2001(4), 621). הנתבעת עשתה כן, וציינה כי
הטענה מחייבת בירור עובדתי.

עילת התביעה הנטענת – כשל אכיפה בשטחים המוחזקים

2.    התובעת היא עמותה שעסקה ברכישת קרקעות באזור יהודה ושומרון. התובעת
ביצעה שלוש עסקאות של רכישת מקרקעין מאדמות הכפר לבד שבאזור A בשטחי יהודה
ושומרון. העסקאות בוצעו על סמך הצהרת מוכתר הכפר, לפיה המוכרים הם בעליהם
החוקיים של המקרקעין. לימים הסתבר כי הצהרות אלה היו כוזבות. העסקאות לא בוצעו.
התובעת תבעה את המוכתר וביקשה, בין היתר, כי הכספים ששילמה בתמורה לרכישת
המקרקעין יושבו לה.

בית המשפט המחוזי בתל-אביב קיבל את התביעה. ביום 27.9.00 ניתן פסק דין נגד עובנו
של המוכתר, שבינתיים נפטר. עיזבון המוכתר לא שילם את הסכומים בהם חוייב בפסק
הדין. התובעת ביקשה להוציא את פסק הדין אל הפועל.

3.    על פי הסכם ביניים שנחתם בין ישראל לבין הרשות הפלשתינית ביום 28.9.95
("הסכם הביניים"), סמכויות ההוצאה לפועל באזור A, בו התגורר המוכתר המנוח, נתונות
בידי המועצה הפלשתינית. בסעיף IV (3) לנספח המשפטי של הסכם הביניים נקבע, כי
ישראל והמועצה הפלשתינית יאכפו פסקי דין שניתנו על ידי גופים שיפוטיים של כל אחד
מן הצדדים, כאילו ניתנו על ידי גופים שיפוטיים שלהן. ישראל חוקקה חוק מיוחד, חוק
יישום הסכם הביניים בדבר הגדה המערבית ורצועת עזה (סמכות שיפוט והוראות אחרות)
(תיקוני חקיקה), התשנ"ו-1996 ("חוק היישום"). חוק זה תיקן את התוספת לחוק
להארכת תוקפן של תקנות-שעת-חירום (יהודה והשומרון וחבל עזה - שיפוט בעבירות

3

עזרה משפטית), תשל"ח-1977 ("חוק העזרה המשפטית") וקבע מנגנוני עזרה משפטית
שנועדו לענות, בין היתר, על הדרישה לבצע אכיפה הדדית של פסקי דין בין הרשות
הפלשתינית לבין ישראל.

4.      בפועל, מצאה עצמה התובעת בפני שוקת שבורה. לפי הטענה, הרשות הפלשתינית
אינה אוכפת פסקי דין שניתנו בישראל. על יסוד זה התובעת סבורה, כי התחיימה על הסכם
הביניים נעשתה ברשלנות, הואיל ולא נקבעו בו ערובות מספיקות לאכיפת פסקי דין
שניתנו בישראל. התובעת אף סבורה, כי הנתבעים הפרו חובה חקוקה שמקורה בחוק
היישום ובחוק העזרה המשפטית. עוד טוענת התובעת, כי יש לראותה כצד שלישי שהסכם
הביניים נערך לטובתו. על כן, מבקשת התובעת כי מדינת ישראל והרשות הפלשתינית
ישפו אותה על הנזקים שנגרמו לה.

את הטענות העובדתיות של התובעת, לצורך הבקשה לדחיית התביעה על הסף, יש לקבל
כמות שהן. על יסודן יש לגשת לבדיקת המצב המשפטי בשטחים המוחזקים בכלל, ובתחום
האכיפה במיוחד.

מעמד "השטחים" – משטח מוחזק לשטח הנתון במעין ריבונות

5.      אזור A לא היה מעולם חלק משטחה של מדינת ישראל. הוא היה חלק משטחים
שהוחזקו על ידי ישראל. בשטחים אלה נהגה מערכת משפט שונה מזו הנוהגת בישראל. לא
ניתן לדבר בשטחים אלה על תחולתו של הדין הישראלי או על זכויות שיש לישראלים מכוח
הדין הישראלי (ע"א 300/84 אבו עטיה נ' ערבטיסי, פ"ד לט(1) 365; ע"א 1432/03 ינון
יצור ושיווק מוצרי מזון בע"מ נ' מאג'דה קרעאן, תק-על 2004(3) 1988). תחולה כזו יכולה
היתה להיעשות רק מכוח דבר חקיקה ישראלי מפורש, אשר היה מחייב את בתי המשפט
של ישראל.

ישראל היתה בעלת השליטה האפקטיבית בשטחים המוחזקים. שליטה זו הושגה באמצעות
הצבא: כתוצאה מכך, כוחותיו של השלטון שחלש על שטחים אלו עד לתפיסתם על-ידי
ישראל הושבו, ומפקד כוחות הצבא הוא שנטל לידיו את סמכויותיו של השלטון הקודם

4

(בג"ץ 337/71 אלג'מעיה נ' שר הבטחון, פ"ד כו(1) 574). כך הפך המושל הצבאי להיות
מקור הסמכות באותם שטחים. אומר השופט ויתקון בבג"ץ 302/72 אבו חילו נ' ממשלת
ישראל, פ"ד כ"ז(2) 169:

> עלינו להכיר, קודם כל, בעובדה שהן לפי המשפט הישראלי
> והן לפי המשפט הבינלאומי המפקד הצבאי העליון שבשטח
> הוא ולא אחר, המחוקק הריבוני (בהיות ריבונותו של הריבוח
> הזר מותלה כל עוד השטח מוחזק בידי הצבא).

השופט ויתקון היה בדעת יחיד באותה פרשה, אך עמדה זו היתה מקובלת על המותב וגם
השופט לנדוי ציין, כי "כלפי חוץ, כלומר מבחינת משפט העמים, ברור שפעולות הממשל
הצבאי מחוץ לשטח שעליו חל משפט מדינת ישראל – הן פעולות ביצוע והן פעולות חקיקה
– מקורן בדיני המלחמה המנהיגים...". סמכותו של בית המשפט בישראל לבחינת פעולות
אלה נבעה מכך שהממשל הצבאי מהווה, בהיותו בשטח ישראל, חלק מן הרשות המבצעת
הישראלית, ועל כן ניתן היה לבחון את כשרות פעולותיו כרשות מינהלית. במילים אחרות,
המפקד הצבאי חובש שני כובעים; בפעלו בשטחים המוחזקים הוא המחוקק הריבוני, ואילו
בפעלו בישראל הוא רשות מינהלית הנתונה לביקורת בתי המשפט. מכאן והלאה ההנחה
היתה, כי הצבא ומפקדיו "נושאים בתרמילם", אם לשאול את מונחי הנשיא ברק, את
המשפט המינהלי הישראלי (בג"ץ 7015/02 עג'ורי נ' מפקד כוחות צה"ל בגדה המערבית, פ"ד נו
(6) 352), והם עשו כן בעת שמילאו תפקיד של "ריבון", או ליתר דיוק חלופי ריבון
רומני.

6.   מפקד כוחות צה"ל בשטחים המוחזקים הוציא מנשר, הידוע כמנשר מספר 2 בדבר
סדרי שלטון ומשפט (יהודה ושומרון), תשכ"ז-1967. המנשר קבע מהו המשפט שחל
באזור ("המנשר"). הוראות המנשר תאמו גם את הוראות המשפט הבינלאומי הפומבי, ואת
תקנה 43 לתוספת לאמנת האג בדבר דיניה ומנהגיה של המלחמה ביבשה, משנת 1907,
היא אמנת האג הרביעית (ראו בג"ץ 393/82 ג'מעית אסכאן אלמעלמון נ' מפקד כוחות צה"ל
באזור יהודה והשומרון, פ"ד לז(4) 785, בע' 793). המנשר קבע כי המשפט שהיה קיים
באזור עד יום 7.6.67 יעמוד בעינו עד כמה שאין בו סתירה לדבר חקיקה שיינתן על ידי

נבו הוצאה לאור בע"מ nevo.co.il  המאגר המשפטי הישראלי
C:\Documents and Settings\sherds\Local Settings\Temporary Internet Files\OLK13B\Hebrew ד 5 ספר חדש (2).doc

מפקד כוחות צה"ל בשטחים. הוראות אלה, ולא הדין הישראלי, הן אשר חייבו בשטחים
המוחזקים. השטח המוחזק עצמו לא היה חלק משטח מדינת ישראל וסדרי הדין בו היו
מחוץ לתחום השיפוט של בית משפט ישראלי (ראו בצורה מפורטת: א' קנאור, "ישראל
והשטחים: על משפט בינלאומי פרטי, משפט בינלאומי פומבי ומה שביניהם", משפט וממשל
ה (תשס"ה) 551, 563; ע"א 179/77 בנק לאומי לישראל נ' הירשברג, פ"ד לב(1) 617).

7.     זה היה המצב החל משנת 67'. אין בו משום הקניית זכויות לרשויות ממשל
ישראליות לפעול בשטחים המוחזקים ללא הוראה מפורשת בדין הפנימי של השטחים
והוראה מתאימה בדין הישראלי.

8.     הסכם הביניים וחוק היישום נגעו ל"מעמדם של השטחים המוחזקים", כפי שמצהיר
סעיף המטרה של החוק. הם שינו את המצב הנורמטיבי של שטחים אלה מיסודו. חלק
מהשטחים הוגדר מעתה כ"שטחי המועצה הפלשתינית". בתוך כך, הוכר מעמדה של
"הרשות הפלשתינית" בשטחים אלה (סעיף 1 לתוספת של חוק העזרה המשפטית). אין
צורך להידרש, במקרה זה, לשאלה מהו מעמדה המשפטי המדויק של אותה רשות
פלשתינית. זהו עניין סבוך. די לומר כי הוקנו לרשות הפלשתינית, לפחות בשטחי אזור
A, סמכויות מסוימות המוקנות לריבון. אפילו אמירה זו אינה פשוטה. ראשית, לרשות לא
הוקנו כל הסמכויות הנתונות בידי ריבון. שנית, יש לעקר את הביטוי "הוקנו" ממשמעניו
הרגילים, שכן מעמדה של הרשות הפלשתינית אינו מוכתב רק על ידי הדין הפנימי
הישראלי. הרשות הפלשתינית אינה יציר של דין זה, ואינה נשלטת על ידיו, היות ואין
מדובר באישיות משפטית פנימית, כמו עמותה או חברה.

עם זאת, כרור כי הסכם הביניים שינה את מעמדה של הרשות הפלשתינית בדין הישראלי,
וזאת מעצם ההכרה בסמכותה בחלקים מתוך השטחים המוחזקים. הכרה במעמד זה נושאת
עמה משמעויות משפטיות רבות. למעשה, רכשה הרשות הפלשתינית מעמד של גוף מעין
ריבוני, השולט בפועל על חלק ארץ מדיני. אחד הסממנים הבולטים לכך הוא הקמת
משטרה פלשתינית (ראו סעיף 1 לתוספת של חוק העזרה המשפטית). סממן אחר הוא
קביעה המצמצמת את סמכויות השיפוט הישראליות, תוך העברת סמכויות השלטון ביחס

6

למי שאינם ישראליים, גם אם הדבר לא נאמר במפורש, לרשויות המשפט הפלשתיניות
(סעיף 2 (ד) לתוספת לחוק העזרה המשפטית).

9.    מעמד זה הרשות הפלשתינית הלך והתגבש עם הסתלקותה של ישראל מרצועת
עזה, והותרת השליטה במקום בידיה של אותה רשות פלשתינית ( De' ,J. A. Frowein
Facto R'gime', in R. Bernhardt (ed.), Encyclopedia of Public International
Law (1992) Vol. I, 966;  E. Benvenisti, 'The Status of the Palestinian
Authority' in E. Cotran and C. Mattat (eds.), The Arab-Israeli Accords:
Legal Perspectives (1996), 47 קנאור, "ישראל והשטחים: על משפט בינלאומי
פרטי, משפט בינלאומי פומבי ומה שביניהם", משפט וממשל ה (תשס"ה) 551, 568).
למעשה עונה הרשות הפלשתינית, גם אם באופן מקוטע ורופף, על עיקרי הדרישות
המרכיבות מדינה, ובהן טריטוריה, אוכלוסיה, וממשלה (או אכיפת הריבונות על
האוכלוסיה). חרף זאת, הרשות אינה מוכרת על ידי מרבית מדינות העולם כמדינה. אך
שאלת ההכרה היא בעלת משמעות דקלרטיבית בעיקרה. יתר על כן, פועלו של המשפט
הבינלאומי הוא בתחום המהותי ולא בתחום הפורמאלי. על כן, ככל שיתרבו הסממנים
הריבוניים של הרשות הפלשתינית, ובהם קיום מוסדות נבחרים, מעמד בינלאומי, שטח
הנתון בשליטה בלעדית, כוחות שיטור, מטבע עצמאי ועוד, כך יגבר הזמין בינה לבין
ישות מדינית, ותגבר הנטייה להחיל על הרשות את הדינים המתייחסים למדינה, אף בלא
הכרה פורמלית כזו.

אין כפיה בין שווים

10.    ההכרה ברשות הפלשתינית כבעלת יכולות ריבוניות בחלק מהשטחים המוחזקים
מחייבת תגובה גם מבחינת המשפט הבינלאומי המבצעי. הרשות הפלשתינית מפעילה
סמכויות שיטור ושיפוט בשטחים הנתונים למרות המועצה הפלשתינית לפי הסכם הביניים.
היא מפעילה סמכות כזו גם בשטחי רצועת עזה. הטלת אחריות זו משמעה גם הקניית
סמכויות. לא יתכן כי הרשות הפלשתינית תקלע לאזור צללים בו תוטל עליה אחריות, אך
לא תינתן לה הרשות להפעיל סמכויות והכות לתבוע מעמד ריבוני ביחס לריבונות אחרת.

7

התביעה לסמכויות כאלה נובעת מעצם הקניית הסממנים הריבוניים. כך    בפרשה
הותיקה Underhill v. Hernandez, 168 U.S. 250 (1897), נקבע (בע' 252):

> Every sovereign state is bound to respect the
> independence of every other sovereign state, and
> the courts of one country will not sit in judgment
> on the acts of the government of another done
> within its own territory. Redress of grievances by
> reason of such acts must be obtained through the
> means open to... sovereign powers as between
> themselves.

כללים אלה אינם חלים במישרין על הרשות הפלשתינית, כל עוד לא הוכרה כמדינה.
ואולם, לא ניתן להתעלם מההיבטים הריבוניים שהוקנו לרשות ולשטחיה. חלקם באים
לביטוי מפורש בהסכם הביניים ובחוק היישום, בעצם סיווג הכוחות המשפטיים הישראליים
בשטחים. גם אותם כוחות שנותרו, למשל בתחום הפלילי, מקורם אינו במפקד הצבאי או
בחוק הישראלי, אלא בהסכם הביניים. המשמעות היא שגם אם לא הוכרה סוברניות מלאה,
הרי הסכם הביניים מאמץ בפועל, ביחסים שבין ישראל לבין הרשות הפלשתינית, את
הכלל הנוהג במשפט הבינלאומי המנהגי לפיו "אין כפיפה בין שווים" ( par in parem non
habet imperium), שמשמעותו היא שמירגית ריבונית אחת איננה שולטת על גוף ריבוני
אחר ואיננה שופטת אותו. אמנם אין אימוץ מפורש של כלל זה בהסכם הביניים, אך הוא
משמש נקודת מוצא שבגללה התבקשה ההסכמה הפלשתינית לכל פעולה של ישראל שיש
בה כדי לפגוע בריבונות, לרבות הוצאה לפועל או אכיפה של פסקי דין פליליים.

11.    ועוד, מקורו של כלל זה הוא במשפט הבינלאומי המנהגי. כך אצל Emmerich de
Vattel, The Law of Nations or the Principles of Natural Law (1758) נאמר
(בע' 137):

> Nature has established a perfect equality of rights
> among independent Nations. In consequence, no
> one of them may justly claim to be superior to
> the others. All the attributes which one possesses

8

in virtue of its freedom and independence are
possessed equally by the others.

ראו לעניין זה גם ס' ורסרשטיין פסברג "דו"ח הועדה הציבורית להכנת חוק הסדרת מדינות
זרות" (משרד המשפטים, משרד החוץ, 2005) בע' 4 ("דו"ח הועדה").

יוצא, שאין צורך בהוראת חוק מיוחדת כדי לטעון להפעלתו של "כלל השוויון". במקורו,
כלל זה חל על "שוויון", כלומר – מדינות ריבוניות. ניתן לגרוס, כי מעצם היות החסינות
זכותה של מדינה, כלל זה חל רק על מדינה. ברם, מעמדה של הרשות הפלשתינית היומנה
מעין ריבון בשטחים המוחזקים או בחלקם, מפעילים עליה את הגיונה של החסינות. ואכן,
הפרקטיקה הבינלאומית מראה כי בתי המשפט במדינות השונות לא תמיד הקפידו על
הדרישה ל"מדינה" כתנאי להפעלת החסינות. הדבר נכון מיוחד באותם מקרים בהם דובר
בישויות מדיניות אשר קיים קשר מדיני מיוחד בינן לבין מדינת הפורום או קיים קושי
בהגדרת הגוף הריבוני האחד. הקושי הקיים לעיתים במענה לשאלה "מי היא מדינה זרה"
מחייב אימוץ גישה פונקציונאלית, הקובעת כי שאלת החסינות תיגזר מההיבט
הפונקציונאלי השלטוני של הפעולה הנדונה ולא מההיבט הפורמאלי של מבצעה (דו"ח
הועדה, בע' 5). בהתאם לכך, הוכרה גם יחידה פוליטית בתוך מדינה כמדינה לצורך רכישת
החסינות. המבחן הפונקציונאלי מוביל לתוצאה, לפיה גם מדינה אשר אינה מכירה ביישות
אחרת כמדינה, אינה פטורה מלכבד את זכויות אותה יישום אחרת מכוח המשפט
הבינלאומי. על כן, לצורך הפעלת החסינות, "אין להכפיף את בית המשפט לא להגדרה
סטטוטורית נוקשה ולא לתכתיבי הרשות המבצעת" (דו"ח הועדה, בע' 7). בחינה כזו
מעלה, שהרשות הפלשתינית נהנית מחסינות. זה היה המצב אף בלא הסכם הביניים, וזהו
ודאי המצב מכוחו של הסכם זה. ההסכם עצמו קובע, כי סמכויות מדינת ישראל באותם
שטחים הן מעתה פרי ההסדר אליו הגיעו הצדדים, וזהו המקור הלגיטימי לפעולה של
ישראל בשטחים אלה (לצד כללים אחרים של המשפט הבינלאומי). מסקנה זו מתחייבת
מריבוי הסמכים הריבוניים בפעולת הרשות הפלשתינית, המתבטאים בשליטה אפקטיבית
לפחות בחלקים מסוימים של השטחים המוחזקים (לעיל, סעיף 9).

9

12. סיכומה של נקודה זו: השטחים המוחזקים לא היו חלק מהריבונות הישראלית. הם היו נתונים לשליטה צבאית ישראלית. המפקד הצבאי היה הריבון. הסכם הביניים שינה את מצב השטחים המוחזקים. הוא העביר את חלקם לשליטת הרשות הפלשתינית. שליטה זו מלווה בסממנים של ריבונות. חוק היישום העניק הכרה ישראלית למעמד זה של הרשות הפלשתינית. הכרה זו אין משמעה הכרה ברשות כמדינה. הכרה כזו תלויה באקט פורמאלי של ממשלת ישראל ואקט כזה לא בוצע (ת"א (ירושלים) 2538/00 נורדי נ' הרשות הפלשתינית, תק-מח 2003(1) 4968, בע' 4975). אך, גם בלא הכרה כזו, בהנחת הרשות הפלשתינית מתחולה של כללים מתאימים של המשפט הבינלאומי המנהגי, ובהם החסינות. החלתו של כלל זה אינה קשורה במתן מענה לשאלה אם הרשות הפלשתינית היא בבחינת מדינה. די בכך שמדובר בגוף ריבוני או מעין ריבוני המפעיל שליטה בשטח הנחשב "חוץ לארץ" מבחינת ישראל. החלתו של הכלל גם מתבקשת מקריאה תכליתית של הסכם הביניים וחוק היישום.

ועתה, לבחינת שאלת אכיפת פסקי דין ישראלים בשטחים.

### אכיפת פסקי דין

13. הואיל והשטחים המוחזקים לא היו חלק ממדינת ישראל, אכיפת פסקי דין או הוצאתם לפועל באותם שטחים לא היתה אוטומטית. על מנת שתהיה תחולה להחלטות שיפוטיות ישראליות בשטחים המוחזקים, היה צורך בפעולה כפולה; הכשרה של גופי ביצוע ישראליים בדין הישראלי לבצע פעולה המתייחסת לשטחים המוחזקים, ובמקביל חקיקה של המפקד הצבאי, אשר מכוחה אותה הפעולה היתה תקפה בשטחים. כך, בכל הנוגע להמצאת מסמכים, נקבע בתקנות סדרי הדין (המצאת מסמכים לשטחים המוחזקים), תש"ל-1969, כי מותר להמציא מסמכים לאזור באותה דרך בה ניתן להמציאם בישראל. האזור הוגדר כ"כל אחד מן השטחים המוחזקים בידי צבא הגנה לישראל". בכך לא היה די. מפקד אזור יהודה ושומרון הוציא צו בדבר עזרה משפטית (יהודה ושומרון) (מספר 348), תש"ל-1969, בו הוא הרשה המצאת מסמך שיצא מבית משפט בישראל בדרך זו. רק כאשר התקיימה פעולה כפולה זו, ניתן היה, לפי הדין הישראלי, לבצע המצאה כדין

בשטחים המוחזקים (ראו גם ב' ברכה, "המצאת כתבי-בי-דין לשטחים המוחזקים, משפטים ד
(תשל"ב) 119).

באותו האופן, איפשר הדין שחל בשטחים, באותה עת, הוצאה לפועל של פסקי דין
ישראליים במסגרת מסוימת (הוראות סעיף 4 לצו בדבר עזרה משפטית (יהודה ושומרון)
מספר 348, תש"ל-1969). הוצאה לפועל זו לא היתה הוצאה של עצם השליטה הצבאית,
אלא של צירוף של הוראות החוק "הפנימי" ושל הדין שהונהל על ידי המפקד הצבאי
בשטחים המוחזקים.

14.     הסכם הביניים שינה מצב זה. בהקשר זה התקרבו השטחים המוחזקים למעמד של
שטח "חוץ-לארץ". בהסכם הביניים הכירה ישראל בכך שאין בכוחה לבצע בשטחים
המצויים בשליטת הרשות הפלשתינית פעולות של הוצאה לפועל, אלא אם כן ניתן היתר
לכך על ידי הרשות הפלשתינית. היתר כזה יכול להיות גורף וכללי מכוח הסכם הביניים או
פרטני ביחס לכל מקרה ומקרה (ראו כהתאמה התוספת לחוק העזרה המשפטית, סעיף 3ב
וסעיף 9). הגבלת כוחה של ישראל לבצע פעולות של הוצאה לפועל בשטח זה מקורה לא
רק בסמכות השלטונית שיש לרשות הפלשתינית בשטחים המוחזקים, אלא גם בהגבלות
הפנימיות הקובעות את סמכותן של רשויות המשפט בישראל.

15.     מהי משמעות השינוי מבחינתם של בעלי הדין בישראל?

ראינו כי בעלי הדין בישראל לא היו בעלי זכויות לבצע הוצאה לפועל בתחומי הרשות
הפלשתינית. ככל שהיו נתונים כוחות כאלה בידי רשויות שיפוט ישראליות, הן היו תולדה
של הדין בישראל ובמקביל של הדין שחל בשטחים המוחזקים. גם אם לבעלי הדין בישראל
יש השפעה על שיטת המשפט בישראל, אין להם, ולא היתה להם, השפעה ישירה על שיטת
המשפט בשטחים המוחזקים. שיטה זו נוהלה על ידי הממשל הצבאי, אשר היה כפוף לפיקוח
מינהלי ישראלי ולמשפט הבינלאומי. לכן, שינוי בשיטת ההוצאה לפועל בשטחים
המוחזקים הוא שינוי המצוי מחוץ ליישוגי יום של תושבי ישראל ואזרחיה, ולכאורה אין הם
יכולים להעלות טענה כלשהי בעניין זה. השינויים בהליכי ההוצאה לפועל, שנעשו במסגרת

11

הסכם הביניים, לא היו תלויים רק ברצונה של ישראל, אלא גם ברצונו של הריבון האחר, תחילה המשל הצבאי שבא במקומו של הריבון שהורשה עם התפיסה הצבאית, ועכשיו ה"מעין ריבון", שבא במקום המפקד הצבאי לצורך זה.

16. האם קיימת עילת תביעה בעקבות שינויים כאלה בדין?

פעולות חקיקה הנעשות בישראל אינן מצמיחות, כשלעצמן, עילת תביעה (בג"ץ 975/89 Nimrodi Land Development Ltd. נ' דב שילנסקי, יו"ר הכנסת, פ"ד מה (4) 153, בע' 157). גם אין לאדם זכות קנויה כי דבר חקיקה ישמר לעד או לא ישונה. דבר החקיקה אף יכול לחול, במגבלות שונות, באופן רטרואקטיבי (ע"א 1613/91 ארביב נ' מדינת ישראל, פ"ד מו(2) 765, ע' 775) אין קושי בהחלה אקטיבית של שינוי בחקיקה בכלל, ובחקיקה האזרחית בפרט. מגבלות על הפעלת חוקים בדרך זו יוטלו רק אם יש בהם משום ענישה המופנית כלפי בני ציבור מסוימים (1973) Dobbert v. Florida 97 S Ct 2290). בכל מקרה, האזרח או התושב אינם רשאים לטעון לשימורו של מצב חוקי קיים ולתבוע בשל כך את המדינה, כשם שאין הם יכולים לתבוע את המדינה בשל אי שינויו של מצב חוקי המכביד עליהם. כשם שתושבי השטחים לא יכולים היו לתבוע את המדינה על חקיקת חוקים המאפשרים הוצאה לפועל של פסקי דין ישראליים בשטחים המוחזקים, כך אין תושבי ישראל יכולים לתבוע את המדינה בשל שינוי במצב זה.

17. ואולם, דבר החקיקה אינו חסין מביקורות שיפוטית. תושבי השטחים יכולים היו לתקוף את החקיקה בשטחים באמצעים מינהליים, אם היא עומדת בניגוד למשפט הבינלאומי המנהגי. תושבי השטחים וישראל' גם יחד יכולים לטעון נגד החוק, אם הוא פוגע בזכויות יסוד ואינו עונה על תנאיה של פסקת ההגבלה (ראו למשל: בג"ץ 1715/97 לשכת מנהלי ההשקעות בישראל נ' שר האוצר, פ"ד נא(4) 367). במקרה זה, אין בשינוי כדי לפגוע בזכויות יסוד של הפרט בישראל. אפילו נראה בהוצאה לפועל חלק מזכות הקניין במובנן הרחב, אין בשינוי החקיקתי כדי לפגוע בזכות מוקנית, שכן היכולת להוציא לפועל פסקי דין בשטחים המוחזקים היתה תלויה על בלימה והיתה תולדה לא רק של הדין הישראלי אלא גם של הדין החל בשטחים המוחזקים, ואשר ביחס אליו אין לתושבי ישראל אמירה ישירה של

12

ממש. השינוי שבוצע באמצעות חוק היישום יכול היה להתבצע גם על ידי הוראה של
המפקד הצבאי. גם אז לא היתה לתובעת עילה כלפי המפקד הצבאי או כלפי הרשויות
בישראל.

18. אכן, מי שמבצע עסקאות במקרקעין באזור הנתון לשליטת הממשל הצבאי, אשר
מעמדם המשפטי טרם הוסדר סופית, ובעקבות זאת גם נאלץ להיזקק להוצאה לפועל
באותם שטחים, לקח עמו סיכון מלכתחילה. סיכון דומה לסיכונו של מבצע עסקת מקרקעין
בתוך לארץ. הוא היה תלוי בחקיקה שנעשתה באותם שטחים, ולא היה לו בסיס לסבור כי
חקיקה זו תיוותר בעינה או כי עקב שינויה תהיה לו עילת תביעה כלפי גוף ממשל
ישראלים. מכאן שלא ניתן להעלות טענה לפיה חוק היישום פוגע בזכויות יסוד שיש
לתובעת, וממילא אין התובעת יכולה לתקוף את החוק או את המחוקק והעלות כלפיו
טענה של רשלנות, הפרת חובה חקוקה או הפרת חוזה לטובת צד שלישי.

דברים אלה מובילים לדחיית התביעה על הסף כלפי כל הנתבעים.

### הרשות הפלשתינית

19. התחימה על הסכם הבינים לא נעשתה על ידי הרשות הפלשתינית כגוף משפטי
פנימי בשיטה הישראלית. הרשות הפלשתינית היא גוף משפטי הפועל במשפט הבינלאומי,
ומכוחו הוא חותם על הסכמים בינלאומיים. הסכם הבינים הקנה לגוף זה, גם כלפי ישראל,
מעמד של ריבון, או מעין-ריבון, בשטח A. מעמד זה של הרשות הפלשתינית התחזק עם
סיום תוכנית ההתנתקות. לא ניתן להתעלם מהסממנים הברורים של ריבונות בשטחים
המוחזקים, כמו קיום בחירות, שיטור, יחסים בינלאומיים עצמאיים ועוד.

20. מעמדה של הרשות כמעין ריבון, אינו חוסם אפשרות תביעה נגדה בישראל. הוא
חוסם תביעה כזו רק אם הרשות פעלה כמעין ריבון (רע"א 7092/94 Her majesty the
queen in Right of Canada נ' אדלסון, תק-על 97 (2) 292, בע' 309). הוצאה לפועל היא
תחום מובהק של פעולה ריבונית, הנבדלת מפעולה במישור הפרטי. מקובל לומר כי
החסינות מפני הוצאה לפועל מצויה בגרעין הקשה של החסינות. מכאן, שלא ניתן לתבוע

13

את הרשות הפלשתינית בישראל על יסוד זה, שכן חל עליה הכלל לפיו אין כפיה בין
שווים.

21.    ואולם, אפילו נניח כי ניתן לפתוח בהליך זה, לא ניתן לטעון שהרשות הפלשתינית
התרשלה כלפי החובעת, כאשר עמדה על יישום כללי ריבונות, המנועים להוצאה לפועל
"בחיוג ישיר". עמידתה של הרשות הפלשתינית על רכישת סממני ריבונות, לרבות בתחום
ההוצאה לפועל של פסקי דין זרים, היא חלק ממהותה של ההסכמה שהורשגה וחלק
מאינטרס לגיטימי מבחינתה של הרשות הפלשתינית.

22.    הוא הדין לעניין הפרת חובה חקוקה. הסכמים בינלאומיים, ובכללם אף הסכם
הביניים, אינם נקלטים אוטומטית, ואינם הופכים לחלק מן הדין החל בישראל, כל עוד לא
אומצו בדרך של חקיקה (בג"צ 2717/96 עלי נ' שר הבטחון, פ"ד נ(2) 848). למטרה זו
נחקק חוק היישום ותוקן חוק העזרה המשפטית. חוקים אלה מסדירים את אופן ביצוע
ההתחייבויות של מדינת ישראל כלפי המועצה הפלשתינית מכוח הסכם הביניים, ולפיכך
הם מחילים חובות רק על ישראל ולא על הרשות הפלשתינית. האחרונה מחויבת אמנם
להוראות הסכם הביניים, ואולם הסכם זה איננו מטיל עליה חובה חקוקה לפי הדין
הישראלי.

23.    גם הטענה לפיה, הסכם הביניים הוא בבחינת חוזה לטובת צד שלישי, שאזרחי
ישראל הם מוטבים לפיו, במובן סעיף 34 לחוק החוזים (חלק כללי), התשל"ג – 1973,
כלפי הרשות הפלשתינית, אינה עומדת במבחן הביקורת. אמנם, אין לשלול אפשרות לפיה
הסכמים בינלאומיים יקבעו זכויות ישירות לתושבי המדינות השונות. זהו המצב ביחס
לחלק מהאמנות הבינלאומיות המגנות על זכויות האדם, ואף ביחס לאמנת הקהילה
האירופית. כך נקבע כי  סעיף 234 לאמנת ניס מאפשר לאנשים פרטיים לסמך באופן
ישיר על סעיפי אמנת הקהילה האירופית בפני בתי משפט לאומיים ( Case 26/62 Van
Gend & Loos v. Nederlandse Administratie Der Belastingen, [1963]
J. H. H. Weiler, "The Transformation of ) E.C.R. 1 אך זהו החריג ולא הכלל
Europe", 100 Yale Law Journal (1991) 2403). חריג זה אינו חל על הסכם

14

הביניים. הסכם זה שאף להחליש את זיקת הממשל הצבאי לשטחים המוחזקים, אם לא
לבטלה, והרא אינו בבחינת הסכם לטובת צד שלישי. בכל הנוגע להוצאה לפועל, פועלו של
ההסדר הוא אחד. הוא החליף שיטה משפטית, שמקורה בכוחו של הממשל הצבאי, בשיטה
משפטית אחרת, שמקורה בריבונות הרשות בשטחי A. אין לראות בו אפוא לא הטבה ולא
גריעה.

24.    מוכן שאין בדברים אלה כדי להכשיר התנערות מהתחייבויות בינלאומיות או לשבח
סניקה של הכשלת ההוצאה לפועל, אם זו קיימת. אך ציון לגנאי של פעילות של מדינה
אחרת או גוף ריבוני או מעין ריבוני אחר, אינו יכול לשמש בסיס להנעת הליך משפטי נגד
אותו גוף. על מנת שבתי המשפט ימלאו תפקיד כזה, חייבת להימצא הוראת חוק המאפשרת
הגשת תביעות מעין אלה. הוראת חוק כזו יכולה גם להכשיר הקפאת כספים או העברתם
לידי תובעים פרטיים שנפגעו מפעולת הריבון הזר. בלא הוראה כזו, חלה ברירת המחדל
שמקורה במשפט הבינלאומי, המונעת סוג כזה של הליכים.

מדינת ישראל ובעלי תפקידים בה

25.    התובעת טענה בכתב התביעה, כי נתבעים 3-1 התרשלו בעריכת הסכם הביניים
ובביצועו, בכך שלא וידאו כי נספח IV בהסכם הביניים יבוצע בפועל על-ידי הנתבעת 4
ובכך שלא נקטו אמצעי זהירות על מנת להבטיח את זכויותיה של התובעת ושכמותה,
המחזיקים בפסקי דין נגד תושבי הרשות הפלשתינית. התובעת הוסיפה וטענה, כי הנתבעת
1 יכולה הייתה לעצור תשלום כספים המעוברים לידי הרשות הפלשתינית ולהשתמש בהם
לתשלום פסקי דין.

ניתן להבין, במונחים יומיומיים, טענות המעולות מצד נושה שנבצר ממנו לגרום לפרעון
חוב, ואף על פי כן אין בהן כדי לבסס עילת תביעה משפטית. כך, הטענה כי המדינה
התרשלה בעניין זה, יוצאת מתוך הנחה כי המצב המשפטי הקודם היה תלוי אך ורק
במדינה. ואולם בפועל, המצב המשפטי הנוגע להוצאה לפועל בתחומי השטחים המוחזקים
אינו תלוי במדינה, אלא במעמדם הבינלאומי של שטחים אלה. כל עוד השטחים היו מצויים
בתחום הממשל הצבאי, היה הממשל הצבאי מופקד על תחום זה. ההסדרים שקבע הממשל

15

הצבאי הקנו לרשויות המשפט בישראל כח מסוים (במובן הזוופלדיני) בתחומי אזורים אלה. הם לא הקנו לתובעת זכות ישירה, ומכל מקום לא הוקנתה לה זכות כי הסדרים אלה יעמדו בעינם. השינוי במעמדם של השטחים המוחזקים על ידי ישראל, יצר ממילא שינוי בשיטה המשפטית. שינוי כזה אינו יכול להתכרוך לעילת הרשלנות, ולא ניתן לעשות רדוקציה של הסכמים בינלאומיים לעוולות במשפט האזרחי.

26. שאלת טיב ההסדרים שנקבעו בהסכם הביניים היא שאלה שאופייה הדומיננטי הוא מדיני, וברגיל לא יחלשו עליה דיני הנזיקין (השוו: בג"צ 4481/91 ברגיל נ' ממשלת ישראל, פ"ד מז(4) 210; בג"צ 910/86 רסלר נ' שר הבטחון, פ"ד מב(2) 441; בג"צ 1635/90 זרזבסקי נ' ראש הממשלה, פ"ד מה(1) 749). הטעם לכך נובע מהיעדרה של חובת זהירות מושגית של מדינת ישראל כלפי אזרחיה בעניין זה. חובת זהירות כזו גם אינה קיימת, אלא במקרים יוצאי דופן ביותר (ראו להלן בסעיף 27), בכל הנוגע לקשירת הסכמים בינלאומיים. מכאן, שלא ניתן לייחס למדינת ישראל עוולה של רשלנות בעניין זה.

גם לטענה לפיה, שומה היה על מדינת ישראל לקזז מתוך הכספים המועברים לרשות הפלשתינית סכומים המגיעים לאזרחים ישראלים מידי אדם פרטי, שאינו אורגן של המועצה הפלשתינית, אין מקום. טענה זו נהדפת גם משום שחסינותם של נכסי מדינה זרה נחשבים "כדבר עקרתי אף יותר מחסינותה של מדינה זרה מסמכות שיפוט" (דו"ח הועדה, בע' 113). מכל מקום, קיזוז כזה אינו בבחינת זכות למדינת ישראל כלפי הרשות הפלשתינית והוא תלוי בהסכמה, שלא הושגה בין אותם צדדים.

דברים אלה יפים, בשינויים המחויבים, גם ביחס לטענה הנוגעת להפרת חובה חקוקה שמקודה בחוק היישום, חוק העזרה המשפטית או חוק יסוד: כבוד האדם וחירותו (כך!). הם משליכים גם על הטענה כי התובעת היא מוטב, כלפי מדינת ישראל מכוח הסכם הביניים. לפי טענה זו, הסכם הביניים והאופן בו הוא מסדיר את חובת האכיפה ההדדית של ישראל ושל הרשות הפלשתינית, מהווה הסכם לטובת צד שלישי, שכן מטרתו היא להבטיח את זכותם של צדדים שלישיים להצליח לממש פסקי דין חלוטים, אשר ניתנו לטובתם כדין בשטחי הצד השני. זהו עירוב בין הסדר אשר משנה את דרכי ההוצאה לפועל בשטחים

16

המוחזקים לבין הקנייה זכות. יתכן כי קביעת הסדרי הוצאה לפועל יוצרים צפייה אצל
ישראלים, המחזיקים בפסקי דין נגד תושבי הרשות. ואולם, הם אינם הופכים את יוצרי
ההסדר לערבים לקיומו של אותו הסדר. במילים אחרות, שינויו של הסדר ההוצאה לפועל
או אף גיבושו אינם עולים כדי הקניית זכות כדרישת סעיף 34 לחוק החוזים (חלק כללי),
תשל"ג - 1973 (השוו: ע"א 253/86 חשי ל הסתדכיה, פ"ד לח(1) 640, 643; בג"צ
419/83 דורון נ׳ סריג, פ"ד לח(2) 323, בע' 337-336).

חשוב להדגיש שהמצב הרגיל בין מדינות הוא שכל אחת קובעת את כללי האכיפה שלה. זו
פריבילגיה השמורה למדינות להיכנס להסכמים בינלאומיים כדי להקל את האכיפה. בפועל,
למדינת ישראל אין הסכמי אכיפת פסקי חוץ עם חלק ניכר ממדינות העולם, ולכן אזרחים
ישראלים פונים לאכוף פסקי דין בחו"ל בעצמם.

27.    זאת ועוד, ההסדר קיבל תוקף של חוק. החוק עצמו לא ניתן לתקיפה בטענה
שתוכנו אינו סביר. פעולות החקיקה של הכנסת אינן נבחנות על פי מבחן הסבירות (ראו
דברי הנשיא ברק בבג"ץ 975/89 Nimrodi Land Development Ltd. נ׳ דב שילנסקי,
יו"ר הכנסת, פ"ד מה (4) 153). משהפעלו הרשויות לפי החוק, לא ניתן לתקוף אותן בטענת
רשלנות או טענה אחרת. הביקורת השיפוטית ניוונה מפגיעה בזכות יסוד, שלא היתה, ולא
מבדיקת טיב ההסדר על פי אמות מידה של סבירות ורשלנות.

ודוק: יתכנו מקרים בהם תוכר עילת תביעה נגד המדינה גם בשל הפרות הסדרים
בינלאומיים. כך, למשל, בקהילה האירופית נקבע בפרשת Joined Cases C-6/90 and
C/9/90 Francovitch and others v. Italian Republic [1991] E.C.R. 5357
שניתן להגיש תביעת נזיקין נגד מדינה בגין אי החלת משפט הקהילה כראוי לתוך המשפט
המדינתי. למעשה הוכרה תביעת נזיקין בניזיקין נגד המדינה (במקרים שלא ניתן לסמוך על משפט
הקהילה באופן ישיר), כדי לעודד את המדינות החברות להחיל את משפט הקהילה בתוך
המשפט הלאומי. ואולם, מקרים אלה מצומצמים לאותם מצבים מיוחדים בהם המדינה
מתערבת מחובתה, לפי האמנה, כלפי אזרחיה או תושביה (לעיל, סעיף 23). ניתן לסבור כי
חובה כזו יכולה לצמוח גם כאשר נפגעות זכויות אדם. ואולם, במקרה זה החקיקה עולה

17

בקנה אחד עם הסכם הביניים ואינה מפרה  אותו, ואילו תקיפת הסכם הביניים עצמו באמצעים משפטיים אינה אפשרית (לעיל, סעיף 26).

דחיית התביעה נגד המדינה מחייבת דחייתה גם נגד האורגנים של המדינה, שר המשפטים והממונה על העזרה המשפטית. בהיעדר זכות כלשהי של התובעת, לא נוצרה עילת תביעה גם כלפי אורגנים אלה.

28.    ומילה "דיונית" אחרונה, התובעת טענה כי בקשת המחיקה על הסף הוגשה באיחור. ההליכים בתיק זה עוכבו מכוח החלטתה של השופטת בעור מיום 26.5.03. הנשיאה ארד החליטה ביום 26.1.06 כי הליך זה ידון בפני, וזאת אגב איחוד הדיונים בתביעות נגד הנתבעת 4. החלטה זו הובילה לחידוש הדיונים בתיק ונקבע מועד לישיבת קדם משפט ראשונה. בקשת הנתבעת 4 הוגשה, אם כן, עוד קודם לישיבת קדם המשפט הראשונה בתיק. טענות הנתבעים 3- 1 הועלו עוד בגדר כתב הגנתם. לפיכך, השלב הנוכחי של ההליך הוא השלב המתאים לבחינת הבקשה לדחיית התביעה על הסף או למחיקתה.

אשר על כן, אני מורה על דחיית תובענה זו על הסף. בנסיבות העניין אין צו להוצאות.

ניתן היום כ"ה בניסן, תשס"ו (23 באפריל 2006) בהיעדר הצדדים.

המזכירות תמציא העתקים לב"כ הצדדים.

בעז אוקון-1008/06-54678313

בעז אוקון,

שופט

נוסח מסמך זה כפוף לשינויי ניסוח ועריכה.

נבו הוצאה לאור בע"מ   nevo.co.il   המאגר המשפטי הישראלי
C:\Documents and Settings\edward\Local Settings\Temporary Internet Files\OLK13B\Hebrew הוחד זד דד סשה (2).doc