# EXHIBIT F

## EXHIBIT F

## History and Creation of the PNA

A.   **Israel's Occupation of the Territory**

Israel seized the West Bank and the Gaza Strip (the "Territory") during the 1967 Arab-Israeli War. *See* Exhibit I[1], United Nations Dep't of Pub. Info., *The Question of Palestine & The United Nations* at 18, U.N. Doc. DPI/2276, U.N. Sales No. 04.I.15 (2003) (hereinafter "Question of Palestine"). In response, the United Nations ("UN") issued a resolution calling for the "withdrawal of Israeli armed forces from territories occupied in the recent conflict." S.C. Res. 242, U.N. SCOR, 22d Sess., Resolutions and Decisions, at 8, U.N. Doc. S/INF/22/Rev.2 (1967) (hereinafter "Resolution 242"). Israel accepted Resolution 242, but stated that withdrawal could only be achieved through directly negotiating with the Arab states and concluding a comprehensive peace treaty. Question of Palestine at 19. At the same time, Egypt and Jordan accepted Resolution 242 and considered Israeli withdrawal a precondition to negotiations. *Id*. Syria rejected Resolution 242, and the PLO strongly criticized it. *Id*. Israel, therefore, continued occupation of the Territory.

That same year, the Israeli government established the Civil Administration to fund and manage public services, including education and health systems, in the Territory. Policy Brief, Claude Bruderlein, Legal Aspects of Israel's Disengagement Plan under Int'l Humanitarian Law, Program on Humanitarian Policy and Conflict Research (Nov. 2004). Through the Civil

---

[1] Exhibits referenced in this document refer to the exhibits to the accompanying document, namely Defendants Palestinian National Authority and The Palestine Liberation Organization's Supplemental Memorandum Regarding Subject Matter Jurisdiction filed July 30, 2007.

Administration, Israel provided the budget for public services in the Territory. *Id.* The Civil Administration served as the Israeli governmental administrator over the Territory until 1993.

The 1967 War also fostered international discussion of the Palestinian political question. Question of Palestine at 31. In 1974, the UN issued a resolution recognizing the Palestinian right to self-determination, national independence and sovereignty and requesting the Secretary-General to establish contact with the PLO on matters concerning Palestine. G.A. Res. 3236 (XXIX), U.N. Doc. A/RES/3236 (Nov. 22, 1974) (Resolution 3236). Resolution 3236 has been reaffirmed every year since 1974. Question of Palestine at 32. The UN also granted the PLO General Assembly observer status in 1974. G.A. Res. 3237 (XXIX), U.N. Doc. A/RES/3237 (Nov. 22, 1974). This status has since been extended to cover all UN bodies. Question of Palestine at 32. Observer status was also extended in 1998 to include participation privileges in the UN and international conferences. *Id.* at 33. These privileges include the right to participate in the general debate held at the start of each session of the General Assembly, the right of reply, the right to co-sponsor resolutions and the right to raise points of order on Palestinian and Middle East issues. G.A. Res. 52/250, U.N. Doc. A/RES/52/250 (July 7, 1998).

B.   **Formation of the PNA**

After years of failed diplomacy, PLO acknowledged Israel's statehood, and Israel acknowledged the PLO as the representative of the Palestinian people in 1993. Question of Palestine at 47. This led to the formation of the PNA through a series of agreements called the Oslo Accords ("the Accords"). Shimon Peres and Mahmoud Abbas signed the first Accords for Israel and the PLO, respectively. *See* Exhibit M, Declaration of Principles on Interim Self-Government Arrangements, Sept. 19, 1993, Isr.-P.L.O, 31 I.L.M. 1525 (hereinafter "DOP"). The DOP established an elected "Council" (Council is the name used in the Oslo Accords to refer to

the PNA) to serve as the interim Palestinian authority until Israeli withdrawal from the Territory, as addressed in Resolution 242. *Id.* art. 1. It immediately transferred authority from the Civil Administration to interim Palestinian authorities and called for the negotiation of the Interim Agreement to specify the structure and duties of the PNA. *Id.* art. 6-7. The DOP further elaborated that the transitional period addressed by the Interim Agreement shall not exceed five years, when a permanent settlement based on Resolution 242 shall eventuate. *Id.* art. 1.

Israel and the PLO further developed the structure of the PNA in 1994. *See* Agreement on the Gaza Strip and the Jericho Area, May 4, 1994, Isr.-PLO, art. IV, 33 I.L.M. 622, 628 (hereinafter "Gaza-Jericho Agreement"). Signed by Yasser Arafat (PLO) and Yitzhak Rabin (Israel), the Gaza-Jericho Agreement established the PNA and determined its powers and responsibilities. *Id.* art. 3, 6. This Agreement also determined the commencement of the five-year transitional period referenced in the DOP. *Id.* art. 23. On September 28, 1995, Israel and the PLO signed the 1995 Interim Agreement on the West Bank and the Gaza Strip ("Interim Agreement"). Isr.-P.L.O., Sept. 28, 1995, 36 I.L.M. 551. The Interim Agreement reaffirmed the five-year deadline for establishing a permanent agreement. The deadline came and passed with no permanent agreement.

C.  **Scope of the PNA's Authority and Relationship with Israel**

The Interim Agreement set forth the parameters of the PNA's powers and responsibilities and Israel's remaining authority over the Territory. The Interim Agreement dissolved the Civil Administration and set forth a plan for gradual withdrawal of the Israeli military government commensurate with a transfer of powers and responsibilities to the PNA. Question of Palestine at 50. The Interim Agreement also divided the West Bank into three areas, each with varying degrees of Israeli authority. *Id.* Palestine gained complete authority over Area A civilian

3

security, while Israel retained overriding security responsibility over Area B and sole security responsibility over Area C. *Id.* Area C includes all Israeli settlements, military bases and state lands. *Id.* The Gaza Strip was not divided, and the PNA exercised uniform authority over the entire area except for Israeli settlements and the Israeli Military Installation Area. Gaza-Jericho Agreement, art. 5.

1. *Israel's Transfer of General Powers and Responsibilities to the PNA*

Pursuant to the Interim Agreement, Israel transferred authority from the Israeli Civil Administration to the PNA. Article I transfers "powers and responsibilities" from Israel to the PNA with Israel retaining control over the non-transferred powers and responsibilities. Interim Agreement, Ch.1, art. 1. Article I also establishes civil committees, subcommittees and liaison offices to coordinate between PNA and Israel. *Id.* The PNA has since established government ministries for health, education, economy and trade, culture, environment, finance and social affairs. Question of Palestine at 68. Pursuant to Article 9 of the Interim Agreement, the PNA may not establish embassies abroad or permit their establishment in the Territory or exercise diplomatic functions. Interim Agreement, Ch.1. art. 9. The PLO, however, may conduct negotiations and sign agreements with states or international organizations for the PNA. *Id.* This authority is limited to economic and development plan agreements specified within the DOP and Interim Agreement, agreements with donor countries assisting the PNA, and cultural, scientific and educational agreements. *Id.*

2. *Israel's Transfer of Security Authority to the PNA*

Several Interim Agreement terms delegate security authority to the PNA. The Interim Agreement redeploys Israeli military forces commensurate with the implementation of a Palestinian Police force, responsible for internal security and public order. *Id.* Ch. 2, art. 10.

Israel remains responsible for external security and the overall security of Israelis. *Id.* External security includes border protection and protection from sea and air threats, or security responsibilities affecting Israel and the Territory. *Id.* Ch. 2, art. 12. The Interim Agreement also affirms that Israel has "the overriding responsibility for security." *Id.* Ch. 2, art. 13.

### 3.  *Israel's Transfer of Civil Jurisdiction to the PNA*

Pursuant to the Interim Agreement, Israel granted the PNA limited civil jurisdiction over the Territory. Interim Agreement, Ch. 2, art. 11. For instance, the PNA is responsible for zoning and planning in Areas A and B. *Id.* The PNA also gained responsibility for population registry and documentation. *Id.* App. 1, art. 28. Israel recognized the validity of Palestinian passports or travel documents. *Id.* The Interim Agreement also granted the PNA the right to grant permanent residency in the Territory to investors, spouses and children of Palestinian residents and other people whose presence will promote family reunification. *Id.* Permanent residency is subject to Israeli approval. *Id.*

Israel retains default jurisdiction over all areas not under PNA territorial jurisdiction. *Id.* Ch. 3, art. 17. Furthermore, Israel retains jurisdiction over "a. issues that will be negotiated in the permanent status negotiations: Jerusalem, settlements, specified military locations, Palestinian refugees, borders, foreign relations and Israelis; and b. powers and responsibilities not transferred to the Council." *Id.* Also, Israel retains jurisdiction over all Israeli persons, regardless of their location. *Id.*

The first Palestinian Legislative Council ("PLC") elections were held in 1996. Question of Palestine at 68. The Agreement grants the PLC authority to draft legislation but limits it by declaring as void any legislation that amends or abrogates existing laws or military orders,

5

exceeds its jurisdiction or is inconsistent with the Declaration of Principles. *Id.* Ch. 3, art. 18. Further, Israel requires notification of all legislation. *Id.*

### 4. *Palestinian Election Procedure*

The Interim Agreement provides for "direct, free and general political elections" of the PNA so that the "Palestinian people of the West Bank and the Gaza Strip may govern themselves according to democratic principles." Interim Agreement, Ch. 1, art. 2. Palestinians in the West Bank, Jerusalem and the Gaza Strip may vote. *Id.* Ch. 1, art. 3. Annex II to the Interim Agreement, the Protocol Concerning Elections, authorizes the PNA to create an election law setting forth elections procedure and to appoint the Palestinian Central Election Commission to administer the elections. Interim Agreement, Annex II, art. 1, para. 2-3. Annex II also stipulates who may participate in PNA elections. *Id.* art. 2. In order to vote, one must be Palestinian, at least 18 years old, residing in the polling district where one is registered, entered in the PNA population register and a holder of a Palestinian identification card. *Id.* at para. 1f(1)-(4), (5). Israeli citizens are explicitly excluded from the Electoral Register. *Id.* at para. 1e. Annex II also provides a bypass around the population register requirement if individuals can provide evidence that they had lived continuously in the Territory for three or four years prior to the Interim Agreement's effective date. *Id.* at para. G(1)-(2).

### D.   **Israeli Financial Support of the PNA.**

The Interim Agreement provided a transfer of the remaining Civil Administration budget and an additional lump sum of 12 million New Israeli Sheqel ("NIS") to the PNA. Interim Agreement, annex 5. The Protocol on Economic Relations, Annex IV of Gaza-Jericho Agreement, established the NIS as one of the official currencies of the Territory. Ann. 4, art. 4. The Agreement also established that Israel will collect import and other indirect taxes on goods

6

leaving Palestine and entering Israel, and transfer the revenue to the PNA. *Id.* Israel provided this revenue until the January 2006 elections, when Hamas won a majority of the seats in the Palestinian parliament. Following Hamas' removal from the PNA in June, Israel resumed transfer of the revenue to the PNA. *Israel Releases Palestinian Funds*, BBC, July 1, 2007, http://news.bbc.co.uk/1/hi/world/middle_east/6258824.stm.