# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK


MARK I. SOKOLOW, et al.

                         Plaintiffs,

         v.                                              1:04-cv-00397-GBD


THE PALESTINE LIBERATION ORGANIZATION, et al.

                         Defendants.


**RESPONSE MEMORANDUM IN FURTHER SUPPORT OF PLAINTIFFS' MOTION
FOR JUDGMENT BY DEFAULT AND IN OPPOSITION TO DEFENDANTS' MOTION
<u>TO DISMISS FOR LACK OF SUBJECT-MATTER JURISDICTION</u>**

### <u>Introduction</u>

Further to the Court's Order of July 17, 2007, plaintiffs respectfully submit this

Memorandum in response to the subject-matter jurisdiction arguments asserted by defendants.[1]

As was shown in plaintiffs' previous papers, and as will be further shown below, this Court

clearly has subject matter jurisdiction over this action. Accordingly, plaintiffs' motion for default

---

[1] The Court's order specified that the current briefing address subject-matter jurisdiction, a fact that defendants acknowledge in their Supplemental Memorandum Regarding Subject Matter Jurisdiction of July 30, 2007. *See id*. at 1 (defendants' "respectfully submit this Supplemental Memorandum on the Court's subject matter jurisdiction over this matter"). Despite the clear directive of the Court, pages 21-25 of defendants' memorandum raise arguments that have nothing to do with subject-matter jurisdiction: i.e., that plaintiffs' non-federal supplemental claims should be dismissed for failure to state a claim because the defendants are unincorporated associations which cannot be sued in their own name under New York law. In light of the Court's specific instructions, and the fact that these non-jurisdictional arguments raise a factual issue (i.e. whether defendants are indeed unincorporated associations) on which plaintiffs are entitled to discovery in the normal course, this memorandum does not address these non-jurisdictional arguments. We would clarify for the record that plaintiffs dispute these arguments and will respond to them at such time as the Court so directs. We would also point out that, as defendants admit on page 12 of their memorandum, this whole issue can be obviated by the simple expedient of amending the complaint to assert the supplemental causes of action against the defendants' president or treasurer, and we would be amenable to such a solution at the appropriate time, if the Court so directs.

judgment should be granted and defendants' motion to dismiss for lack of subject-matter should be denied.

## I.    INTERNATIONAL LAW DOES NOT DEROGATE FROM THE COURT'S SUBJECT-MATTER JURISDICTION

Defendants argue at length that international law prohibits exercise of U.S. extraterritorial jurisdiction over terrorist attacks not aimed not specifically directed at American citizens, that the federal cause of action under which this action is brought, § 2333 of the Antiterrorism Act ("ATA") should be construed to conform to international law, and that the Court therefore lacks subject-matter jurisdiction under the ATA in this action. Supplemental Memorandum Regarding Subject Matter Jurisdiction of July 30, 2007 ("Defs' Memo") at 3-21.

The identical argument was raised by defendants in *Biton v. Palestinian Interim Self-Government Authority*, Civ. No. 01-0382 (D.D.C.), and resoundingly rejected by that court in a decision issued just last week. *See Biton v. Palestinian Interim Self-Government Authority*, -- F.Supp.2d --, 2007 WL 2783171 (D.D.C. September 26, 2007).

Since defendants have litigated and lost this very argument, they are collaterally estopped from pursuing it in this Court, and this Court can and should reject it summarily. *See Estate of Klieman v. Palestinian Authority*, 424 F.Supp.2d 153, 159-160 (D.D.C. 2006) (holding that the instant defendants are collaterally estopped from relitigating other challenges to subject-matter jurisdiction previously rejected by other federal courts) *Biton v. Palestinian Interim Self-Government Authority*, 412 F.Supp.2d 1, 4 (D.D.C. 2005) (same).

Nonetheless, out of an abundance of caution in the event that this Court does not preclude this argument on the basis of the recent decision in *Biton*, plaintiffs will respond to it on the merits.

As shown below, this argument fails both because it misconstrues the relevant principles of international law and because, even assuming *arguendo* that a conflict existed between the language of the ATA and international law, the former trumps the latter.

### A.    Under International Law U.S. Courts May Exercise Extraterritorial Jurisdiction Over Actions Arising From Terrorist Attacks in Which U.S. Nationals Are Harmed

As shown below, the exercise of jurisdiction in this case conforms to both the passive personality and universal theories of jurisdiction under international law.

### 1.    Passive Personality Jurisdiction

Defendants assert that under the "passive personality" principle recognized in international law, this Court can exercise subject-matter jurisdiction only when a terrorist attack is directed at a U.S. citizen. Defendants purport to base this argument on §§ 402-403 of the Restatement (Third) of the Foreign Relations Law of the United States.

The identical argument was raised and rejected in *Wyatt v. Syrian Arab Republic*, 362 F.Supp.2d 103 (D.D.C. 2005), which found that terrorist attacks against American citizens implicate the passive personality principle of jurisdiction. *See id*. at 115-116 (D.D.C. 2005) (citing *Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1, 15 n. 7 (D.D.C. 1998)).

While the actions in *Wyatt* and *Flatow* were brought under 28 U.S.C. § 1605(a)(7), rather than the ATA, that is a distinction without any difference. Indeed, *Flatow*, exactly like the case at bar, involved terrorism which was ***not*** directed at the American victim.

Moreover, the Reporter's Notes to § 403 of the Restatement state that:

> The United States in effect applied the "passive personality" principle in a law directed at terrorism, § 1202 of the Omnibus Diplomatic Security and Antiterrorism Act of 1986, 18 U.S.C. § 2231.

*Id*. at Note 3.

Significantly, this provision (formally 18 U.S.C. § 2231) is codified today as 18 U.S.C. § 2332, and is thus the criminal counterpart of the very civil provision (§ 2333) under which the instant action is brought.

Furthermore, this provision – which the Restatement identifies as enshrining passive personality jurisdiction – does ***not*** require that the American victim be intentionally targeted. 18 U.S.C. § 2332. The statute requires only that the Attorney General or his subordinate certify "that, in the judgment of the certifying official, such offense was intended to coerce, intimidate, or retaliate against a government or a civilian population." § 2332(d). The conference report for this provision states explicitly that:

> The term 'civilian population' includes a general population as well as other specific identifiable segments of society such as the membership of a religious faith or of a particular nationality, to give but two examples. ***Neither the targeted government nor civilian population, or segment thereof, has to be that of the United States***.

H.R. Conf. Rep. 99-783, 1986 U.S.C.C.A.N. 1926, 1986 WL 31900 (Leg.Hist.) at 88 (emphasis added).

Thus, precisely contrary to defendants entire theory here, § 403 of the Restatement cites to a provision which grants extraterritorial jurisdiction over conduct which is ***not*** specifically directed at Americans, as an example of passive personality jurisdiction as recognized under international law.

The case law follows suit. Thus, for example, in *U.S. v. Hill*, 279 F.3d 731, 740 (9th Cir. 2002), the Ninth Circuit held that the passive personality theory permitted exercise of extraterritorial criminal jurisdiction where the victims of the crime were United States citizens, despite the fact that they were not victimized or targeted because of their U.S. citizenship.

Since exercise of even **criminal** extraterritorial jurisdiction is permitted under the passive personality theory irrespective of whether the conduct was directed at an American, the exercise of merely **civil** jurisdiction – as here – is permitted *a fortiori* in those circumstances. *See Neely v. Club Med Management Services, Inc*. 63 F.3d 166, 185 n. 17 (3rd Cir. 1995) (under passive personality theory extraterritorial civil jurisdiction may be exercised more liberally than extraterritorial criminal jurisdiction).

Defendants cite to several cases applying the passive personality theory where, as it so happened, the victims were targeted as Americans, but none of those cases held that the targeting of Americans is a *sine qua non* of passive personality jurisdiction. Since on the facts of those cases Americans were in fact targeted, no such holding was necessary.

Defendants' citation to *U.S. v. Vasquez-Velasco*, 15 F.3d 833 (9th Cir. 1994) is unavailing for several reasons. First, like the Restatement, *Vasquez-Velasco* points to § 2332 of the ATA (then codified as § 2331) as an example of passive personality jurisdiction, and thereby defeats defendants' entire argument here. Second, the comment in *Vasquez-Velasco* quoted by defendants is pure dicta. Third, the Ninth Circuit's later decision in *U.S. v. Hill*, 279 F.3d at 740 repudiated the *dicta* in *Vasquez-Velasco sub silentio.* Fourth, in *U.S. v. Neil*, 312 F.3d 419, 423 (9th Cir. 2002), the Ninth Circuit expressly limited the very dictum in *Vasquez-Velasco* upon which defendants seek to rely.

Tellingly, defendants have not pointed to a single case in which jurisdiction was ***declined*** because an American was not targeted.

### 2.   <u>Universal Jurisdiction</u>

Defendants argue that universal jurisdiction does not exist here because there is no agreed definition of "terrorism" under international law. That may be so, but there ***is*** universal

jurisdiction over war crimes and crimes against humanity, and the suicide bombings and other terrorist attacks committed against the plaintiffs in this case constituted both a war crime and a crime against humanity. *See Almog v. Arab Bank*, 471 F.Supp.2d 257 (E.D.N.Y. 2007) (Palestinian bombings and shootings of civilians actionable as crimes against humanity despite the absence of agreed definition of "terrorism") *Estate of Klieman v. Palestinian Authority*, 424 F.Supp.2d 153, 166 (D.D.C. 2006) ("An armed attack on a civilian bus" violates "established norms of warfare and armed conflict under international law").

Defendants also assert that the United States cannot exercise universal jurisdiction, and that exercise of both passive personality and universal jurisdiction would be unreasonable, because plaintiffs have an alternative forum in Israel or in the West Bank and Gaza Strip. But defendants' claim that the plaintiffs can seek relief in an Israeli court is nothing but a bad-faith attempt to mislead this Court. The fact is that the instant defendants are currently seeking to dismiss all actions brought against them in Israeli courts by victims of terrorism, on the ground that Israel is ***not an appropriate forum***, and on other threshold grounds. *See* Declaration of Daniel Reisner (submitted in the matter of *Biton v. Palestinian Interim Self-Government Authority*, No. 01-0382 (D.D.C.)), Exhibit A, at ¶¶ 10-17; Declaration of Dr. Leonard Hammer, (submitted in the matter of *Knox v. Palestine Liberation Organization*, No. 03-4466 (S.D.N.Y)), Exhibit B, at ¶¶ 3-10.

Thus, defendants' repeated references to the existence of an Israeli forum are just a cynical attempt to deceive this Court.

Since the existence of an Israeli forum is thus at best an uncertainty (see Exhibit A, at ¶¶ 10-17, Exhibit B at ¶¶ 3-10) and since the defendants themselves actively dispute the propriety

and jurisdiction of that forum, they cannot now be heard to challenge the jurisdiction of this court by pointing to the Israeli courts.

Defendants' bald and passing reference to the "local courts of ... the Occupied Territories" (Defs' Memo at 21) is no less misleading. The State Department has issued standing travel advisories which warn U.S. citizens against entering the West Bank or Gaza due to danger of attack or abduction. Plaintiffs have no intention of being victimized a second time by the defendants.

### B.    The Plain Language of the ATA Trumps International Law, Assuming Any Conflict Existed

Assuming, *arguendo*, that some conflict existed between the terms of the ATA and international law, there is no question that the former must prevail.

> Customary international law comes into play only "where there is no treaty, and no controlling executive or legislative act or judicial decision." *The Paquete Habana*, 175 U.S. 677, 700, 20 S.Ct. 290, 44 L.Ed. 320 (1900); see J. Goldsmith & E. Posner, *The Limits Of International Law* 77 (2005) ("political branches have the final say about whether and how [customary international law] applies in the United States and whether or not the United States will comply with it"). ***Never does customary international law prevail over a contrary federal statute***.

*TMR Energy Ltd. v. State Property Fund of Ukraine*, 411 F.3d 296, 302 (D.C. Cir. 2005) (emphasis added).[2]

Indeed, as the Second Circuit has emphasized:

---

[2] Defendants' citation to and analysis of *Roeder v. Iran*, 333 F.3d 228 (D.C. Cir. 2003) and *United States v. PLO*, 695 F. Supp. 1456 (S.D.N.Y. 1988) (Defs' Memo at 7-11) is a complete *non sequitur*. Those cases dealt with the construction of statutes which potentially violated a **treaty** of the United States – a sphere of statutory construction which has rules all its own, under which courts do indeed go to great lengths to avoid a construction which conflicts with a treaty. Here, by contrast, we are dealing with a purported conflict between a federal statute and **customary** international law, where entirely different rules of construction apply. Thus, *Roeder* and *U.S. v. PLO* are utterly irrelevant to this case.

> As long as Congress has ***indicated its intent*** to reach [overseas] conduct, a United States court is ***bound to follow the Congressional direction*** unless this would violate the due process clause of the Fifth Amendment.

*U.S. v. Yousef*, 327 F.3d 56, 86 (2ⁿᵈ Cir. 2003) (emphasis added) (internal quotation marks omitted).

There are two overwhelming indicia of Congressional intent that foreclose any attempt to bend § 2333 of the ATA to international law (assuming *arguendo* that some conflict existed):

First, there is not the slightest doubt that Congress intended § 2333 to apply extraterritorially, since "international terrorism" within the meaning of § 2333 is defined as acts that "occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum." 18 U.S.C. 2331(1)(C).

Second, in § 2331(1)(B), Congress set out a detailed definition of the apparent <u>intent</u> of the conduct actionable under § 2333, which does ***not*** include an intent to harm the United States or to harm American citizens. On the contrary, Congress declared actionable conduct which appears to be intended to intimidate, coerce, influence or affect the conduct of ***any*** civilian population and ***any*** government. 18 U.S.C. § 2331(1).

Since Congress' intent is clear, this Court should not interpret a single jot out of the plain language of the statute.

## II.    THE PA IS NOT A POLITICAL SUBDIVISION OF THE STATE OF ISRAEL

Defendants argue that if the PA is not a "foreign state," then it is a "political subdivision" of the State of Israel. Defs' Motion 25-31. This argument, too, was asserted and

rejected in *Biton*, *see Biton*, 2007 WL 2783171 at *3, and is therefore now precluded on grounds of collateral estoppel. Nevertheless, out of an abundance of caution, we will proceed to refute this argument on the merits, which is not difficult:

This argument fails, in the first place, because it has been rejected by both the Israeli government and the Israeli Supreme Court, which found – as a matter of internal Israeli law – that the PA is not a political subdivision, agency or instrumentality of Israel. *See* Exhibit A at ¶¶ 52-61.

It would be absurd, to say the least, for a U.S. court to find that an entity is a political subdivision of a foreign state (here: Israel), when the government of that foreign state disputes that the entity is such, and when the Supreme Court of that foreign state has ruled to the contrary.

Moreover, defendants' entire argument here is built on the faulty either-or premise that since the PA was granted certain powers by the occupier in the West Bank and Gaza, it must either be a full-blown state or a part of the State of Israel. Defendants cite no authority for this proposition, because there is none, and state *ipse dixit* that it "must" be the case. Defs' Memo at 29.

But defendants never explain why a third-party entity cannot be delegated powers in an occupied territory, without becoming a "political subdivision" of the occupier? Imagine, for example, that the United States delegated certain governmental powers in occupied Iraq (e.g. health and education) to a charitable organization or to an agency of the UN: would that render the organization or UN agency a "political subdivision" of the United States?! Hardly.

## III.    THIS CASE IS FULLY JUSTICIABLE

Plaintiffs' earlier brief demonstrated that the instant case is clearly justiciable. *See* Supplemental Memorandum in Support of Plaintiffs' Motion to Enter Default, Schedule an Inquest on Damages and Enter Judgment by Default ("Plaintiffs' Supp. Memo") at 4-15.

Defendants now raise two new nonjusticiability arguments (Defs' Memo at 31-38) which, as shown below, are both entirely meritless.

First, defendants argue that the determination of whether either of defendants is a "foreign state" is a nonjusticiable question. *Id*. Yet, as defendants know full well, this ***identical*** argument was asserted by them and rejected by the First Circuit in *Ungar v. Palestine Liberation Organization*, 402 F.3d 274 (1ˢᵗ Cir. 2005):

> The defendants' position rests on a misunderstanding of the fundamental nature of this action. This is a tort suit brought under a legislative scheme that Congress enacted for the express purpose of providing a legal remedy for injuries or death occasioned by acts of international terrorism. The defendants are organizations that allegedly violated the statute. They have attempted to avoid liability by wrapping themselves in the cloak of sovereign immunity. The question we must answer, then, is whether the defendants have set forth sufficient evidence to support their claim of immunity-no more and no less.
>
> On this view of the case, the plaintiffs easily clear the six *Baker* hurdles.

*Ungar*, 402 F.3d at 280. The First Circuit then proceed to analyze, and reject in turn, each of the *Baker* factors. *Id*. at 280-281.

This Court should reject defendants' argument for the reasons set forth in *Ungar*. Indeed, it would be completely absurd to conclude – as defendants demand that this Court do – that a defendant is entitled to freely ***assert*** a sovereign immunity defense but a plaintiff is not permitted to ***contest*** that defense without creating a nonjusticiable issue. A plaintiffs' challenge to a sovereign immunity defense can be no more and no less nonjusticiable than the assertion of that defense in the first place. Therefore, defendants have got it completely backward here: assuming *arguendo* that their immunity defense did implicate a nonjusticiable issue (which it does not) it

would be that defense – and not plaintiffs' challenge thereto – which would have to be rejected as nonjusticiable.

Defendants also falsely assert in the context of their nonjusticiability argument that there has been a change in U.S. policy in recent months, and that the United States now supports the creation of a Palestinian state whereas previously it did not. Defs' Memo at 31-33. This assertion is a complete fiction. In April 2003 – long before the decision in *Ungar* -- the United States adopted the "Performance-Based Roadmap to a Permanent Two-State Solution to the Israeli-Palestinian Conflict," which calls for the eventual establishment of a Palestinian state. *See* http://www.state.gov/r/pa/prs/ps/2003/20062.htm.

As recently as September 23, 2007, Secretary of State of Rice confirmed that the Roadmap remains fully valid:

> [T]he roadmap is still a reliable guide that is supported by the entire international community on how a Palestinian state gets established.
>
> ***
> So the roadmap remains in place. The roadmap remains a reliable guide. It also remains a document to which the international community is committed through a Security Council resolution. It is going to be critical that the roadmap obligations be met if the Palestinian state is going to be established,

*See* statement of Secretary Rice at UN Headquarters, September 23, 2007, Exhibit C.

Thus, precisely contrary to defendants' claims, United States policy remains today exactly what it was at the time of *Ungar*, and what it has been for the past four and a half years: a Palestinian state should eventually be established, once the benchmarks and conditions in the Roadmap are achieved.

Moreover, the Executive Branch says loud and clear that no Palestinian state exists today:

> [I]t is absolutely the case that you are not going to be able to establish a Palestinian state if you don't have a commitment to end terror, if you don't have a commitment to end settlement activity, if you don't have a commitment to nonviolence. All of those things have to be achieved.
>
> ***
>
> All of these things are integral and essential for the establishment of a Palestinian state. So the roadmap remains in place …. It is going to be critical that the roadmap obligations be met if the Palestinian state is going to be established

Exhibit C.

Since the Executive Branch minces no words that there is no Palestinian state (and will not be one absent fulfillment of various conditions) a decision of this Court determining that defendants are not a "foreign state" would fully comport with the position of the Executive, and thus would "not signify a lack of respect for, or conflict with, the wishes of the political branches." *Ungar*, 402 F.3d at 281 (noting that the Executive did not recognize a Palestinian state).

Defendants' second new nonjusticiability argument is equally meritless. Defendants assert that the U.S. government has stated that the new PA government is a partner in the war against terrorism, and that therefore holding defendants liable for the terrorist attacks in which the instant plaintiffs were harmed would somehow contradict this position of the government. Defs' Memo at 36-38.

This argument is nothing short of absurd. The attacks at issue here all occurred between January 2001 and January 2004, when Yasser Arafat headed both the PA and the PLO. It is a matter of public record that the United States government repeatedly condemned the PA and PLO during this period for their involvement in terrorism. The new Abbas-Fayyad government in the PA was appointed only in the last few months, some three and a half years after the last of

the attacks at issue in this suit. Clearly then, this suit has nothing whatsoever to do with the current Palestinian leadership and there is and can be no possible conflict here with any statements of support or praise made by the Executive in respect to that new leadership.

Defendants' new justiciability arguments are therefore entirely baseless.

## V.    NEITHER IMPLEMENTATION OF THE DISENGAGEMENT PLAN NOR THE DECISION IN *ELON MOREH* DETRACT FROM THE PRECLUSIVE EFFECT OF *UNGAR* AND *KNOX*

In their earlier briefing, plaintiffs asserted that this Court should adopt the holdings of numerous other courts that the defendants are collaterally estopped from asserting sovereign immunity in this case by the decisions in *Knox v. Palestine Liberation Organization*, 306 F.Supp.2d 424 (S.D.N.Y. 2004) and *Ungar v. Palestinian Authority*, 315 F. Supp.2d 164 (D.R.I. 2004) (denying a Rule 12(b) motion to dismiss), 325 F. Supp.2d 15 (D.R.I. 2004) (entering final judgment) *aff'd* 402 F.3d 274 (1st Cir. 2005). *See* Plaintiffs' Supp. Memo 15-27. Alternatively, plaintiffs asked the Court to reject defendants' immunity arguments on the merits. *Id*. at 27-57.

Defendants argued in response that the implementation of Israel's Disengagement Plan, and the decision of an Israeli court (in the *Elon Moreh* case) finding that the PA enjoyed immunity under Israeli law, constituted a change of circumstances which rendered collateral estoppel inapplicable.

In rebuttal, plaintiffs argued that that neither the Disengagement nor the Israeli decision in *Elon Moreh* had changed defendants' status, and that in any event defendants remain estopped because subject-matter jurisdiction cannot be ousted by a change in circumstances, because *Knox* and *Ungar* rejected immunity on the independent ground that the absence of Executive Branch recognition negated an immunity defense and because there had been no change in the Oslo Accords. *See* Plaintiffs' Supp. Memo at 19-27.

This debate has now been settled by *Biton*. In its recent decision, the *Biton* court held that

neither the Disengagement nor the decision in *Elon Moreh* effected any change in defendants' status, that, to the contrary, the PA has **lost** much of the limited authority it once had in the West Bank and Gaza, and that the defendants remain collaterally estopped by *Knox* and *Ungar* from asserting a sovereign immunity defense. *See Biton*, 2007 WL 2783171 at *1-2.

Thus, defendants are collaterally estopped from claiming sovereign immunity in this action, just as plaintiffs have argued all along. The Court thus can and should dispose of defendants' immunity claim summarily.

Nevertheless, once again out of an abundance of caution, plaintiffs will demonstrate below that no change has occurred in defendants' status, in case the Court desires to consider the issue on the merits.

### A.        The Disengagement Plan

As the result of the implementation of Israel's Disengagement Plan in September 2005, the PA gained no increased authority in the West Bank and lost the limited authority it had had in the Gaza Strip:

### The West Bank

The sole impact of the Disengagement Plan in the West Bank was the evacuation of some 200 Jewish families from four small settlements. *See* Declaration of Brigadier-General Yosef Kuperwasser, (submitted in the matter of *Biton v. Palestinian Interim Self-Government Authority*, No. 01-0382 (D.D.C.)), Exhibit D ("Kuperwasser") at ¶¶ 27-38. The area of those settlements remains under the exclusive authority and control of Israel, Israeli forces continue to operate there freely, and the PA has no presence – much less control – therein. *See* Kuperwasser at ¶¶ 34-38. *See also* Reisner at ¶¶ 18-21.

Moreover, since fall 2000 the PA has not exercised in the West Bank even the limited powers it enjoys under the Oslo Accords, and since spring 2002 it has been unable to exercise those powers. *See* Kuperwasser at ¶¶ 27-33.

Indeed, the PA does not exercise effective authority ***anywhere*** in the West Bank today: since April 2002, Israel has been deployed throughout the West Bank and continues today to operate freely therein – including in Area A, where the PA has its maximum powers under the Oslo Accords. *Id*.

Notably, the analyses in *Ungar* and *Knox* of the PA's authority were based on the provisions of the Oslo Accords, and <u>assumed</u> that the PA did in fact exercise the powers granted to it in those provisions. *Ungar* and *Knox* found that the PA's powers under Oslo, even if exercised in full, did not rise to statehood. Yet, as Brigadier-General Kuperwasser has explained, the fact is that the PA has not exercised even those limited powers for the past seven years – and the Disengagement has done nothing at all to change that. *Id*.

**<u>The Gaza Strip</u>**

Defendants' previous arguments regarding implementation of the Disengagement Plan in the Gaza Strip have been mooted by recent events: it is a matter of public record that in June 2007, the PA was driven out of Gaza by Hamas, and today exercises no authority or power in Gaza whatsoever. *See* Kuperwasser at ¶¶ 23-26.[3]

Thus, today the PA has <u>no governmental control at all</u> over the territory or population of the Gaza Strip, and defendants' claim that the PA meets the "sovereign control" requirement of statehood in Gaza should be dismissed summarily as moot.

---

[3] The Washington Post and New York Times have reported almost daily since June 2007 on the PA's loss of Gaza and its aftermath.

Nor can the defendants claim with a straight face that they achieved sovereign control in the Gaza Strip between September 2005 (when the Disengagement was implemented) and June 2007 (when the PA lost its foothold in Gaza). As Brigadier-General Kuperwasser explains, the PA never succeeded in taking control over the areas of Gaza evacuated by Israel in September 2005, and, moreover, the implementation of the Disengagement Plan triggered a severe, progressive <u>deterioration</u> in the PA's already-weak authority within the Gaza Strip, which culminated in the Hamas coup in June 2007. *See* Kuperwasser at ¶¶ 12-26. *See also* Exhibits D through R to Plaintiffs' Supp. Memo.

In sum, it is patently obvious that the PA not only failed to achieve sovereign control in Gaza following the Disengagement but, on the contrary, lost even the limited authority it had exercised before September 2005.[4]

In this regard it should be noted that, even prior to the Disengagement, the PA was unable to exercise in the Gaza Strip even the limited powers granted to it under the Oslo Accords. *See* Kuperwasser at ¶ 16. Thus, as in the West Bank, the PA's ***actual*** measure of authority in Gaza prior the Disengagement was even less than that granted it under Oslo – which authority the *Ungar* and *Knox* courts assumed the PA actually exercised but nonetheless found insufficient to meet the "control" requirement for statehood.

In sum: the Disengagement provides no basis whatsoever to revisit the holdings in *Ungar* and *Knox*; on the contrary, the PA is <u>further than ever today</u> from the "sovereign governmental control" required as a condition of statehood. *Ungar*, 315 F.Supp.2d at 180.

---

[4] The burden to prove the elements of statehood rests on the defendants. *Ungar*, 402 F.3d at 289 ("[T]he party who alleges sovereign immunity has the burden of proving that status"). Thus, <u>the burden is on the defendants</u> to make a factual showing that there has been some relevant change in the facts since the decisions in *Knox* and *Ungar*.

Furthermore, as discussed in detail in *Knox* and *Ungar*, the extent of the PA's authority is limited as a matter of law by its constituent instrument, the Oslo Accords. Thus, in order to prove that the PA exercises sovereign governmental powers anywhere, defendants would have to prove (which they cannot) that the Oslo Accords have been modified or abrogated. Not only do defendants make no such claim, but in the papers filed by them on September 5, 2006, in *Klieman v. Palestinian Authority*, Civ. No. 04-11173 (D.D.C.) (attached as Exhibit C to Plaintiffs' Supp. Memo) defendants confirmed the continued force of the Oslo Accords. *See also* Exhibit A at ¶ 25.

Additionally, the Oslo Accords provide that the parties "view the West Bank and Gaza Strip as a single territorial unit, the integrity and status of which will be preserved during the interim period," and that "Neither side shall initiate or take any step that will change the status of the West Bank and the Gaza Strip pending the outcome of the permanent status negotiations." Israeli-Palestinian Interim Agreement on the West Bank and the Gaza Strip, 36 I.L.M. 551, at Articles XXXI(7) and XXXI(8).

Thus, in asking this Court to find that "the status of the West Bank and the Gaza Strip" has changed, defendants are effectively inviting this Court to breach the provisions of the Oslo Accords, and to prejudge the outcome of the "permanent status negotiations" which have not yet occurred. The Court should firmly decline that invitation.

## B.        The *Elon Moreh* Decision

Defendants' attempt to challenge to the preclusive effect of *Ungar* and *Knox* on the basis of the Israeli decision in *Elon Moreh* is meritless for multiple reasons:

***First***, as a threshold matter of law, the issuance of the Israeli district court decision in *Elon Moreh* cannot constitute a "change in material facts" which could potentially negate the

application of collateral estoppel. At the very most, that decision could have been proffered by defendants – had it been given prior to the decisions in *Ungar* and *Knox* – as foreign authority in support of the **merits** of defendants' statehood argument.

But that is exactly the point: the **merits** of defendants' statehood argument have already been determined in *Ungar* and *Knox*, and can no longer be contested. The fact that an Israeli judge subsequently issued an opinion reaching a different conclusion is not a change in the "facts" essential to *Ungar* and *Knox* and thus, as a matter of law, *Elon Moreh* cannot not affect the preclusive effect of *Ungar* and *Knox*.

A **clear** change in **controlling** law can sometimes negate the application of collateral estoppel. *See generally North Georgia Elec. Membership Corp. v. City of Calhoun, Ga.*, 989 F.2d 429, 433-435 (11ᵗʰ Cir. 1993) (collecting and analyzing cases). Here, however, it is patently obvious that there has been no change whatsoever in the **controlling law of the United States**. The decision in *Elon Moreh* is a foreign opinion applying foreign law issued by a single judge of a lower court in a foreign country, and is not even persuasive – much less controlling – authority in the courts of the United States.[5]

Therefore – as a threshold matter of law – the *Elon Moreh* decision **cannot** derogate from the preclusive effect of *Ungar* and *Knox*. Indeed, on the contrary, *Ungar* and *Knox* estop the defendants from seeking to rely on *Elon Moreh*.

Accordingly, all of defendants' arguments based on *Elon Moreh* should be dismissed out of hand as precluded by *Ungar* and *Knox*, and the Court can and should end its inquiry here.

**Second**, notwithstanding defendants' best efforts at selective quotation, *Elon Moreh* clearly did **not** find that the PA meets the quadripartite definition of statehood under international

---

[5]  Moreover, as shown below, *Elon Moreh* is not controlling authority – indeed is not good law – even in Israel.

law. On the contrary, the judge who issued that opinion, Judge Okun, specifically stated that he

was not determining whether the PA is a state:

> There is no need to consider, in the case at hand, the question of the exact legal status of the said Palestinian Authority. It is a complicated matter.

*Elon Moreh* at ¶ 8. Moreover, Judge Okun specifically held that:

> [T]he [Palestinian] Authority was not granted all of the powers accorded to a sovereign.

*Id.*

Since the PA "was not granted all of the powers accorded to a sovereign" it is not a "foreign state" under the law of the United States and so not entitled to immunity in this Court (irrespective of whatever immunities it might enjoy under ***Israeli*** law). Thus, *Elon Moreh* actually constitutes authority in support of *Ungar* and *Knox*.

**Third**, *Elon Moreh* is based on law and grounds unique to Israel that are completely inapposite in a United States court. The finding of immunity is based in the main on the relationship between Israel and the PA sketched in the Oslo Accords, and on the domestic statute enacted by Israel to implement the Oslo Accords. *See e.g. Elon Moreh* at ¶ 3; ¶ 8 ("it is clear that the Interim Agreement changed the status of the Palestinian Authority in ***Israeli*** law") (emphasis added); ¶10 ("even if full sovereignty has not been recognized, the Interim Agreement adopts, as a matter of practice, ***in relations between Israel and the Palestinian Authority***, the rule in customary international law according to which 'an equal has no authority over an equal'") (emphasis added); ¶ 12 ("The application of immunity to the Palestinian Authority is also derived from a reading of the aims of the Interim Agreement ***and the Implementing Law***") (emphasis added).

Obviously, these grounds are all entirely irrelevant in a United States court.

Furthermore, the immunity analysis applied in *Elon Moreh* bears no relationship to the four-part test for statehood recognized under international and United States law. Indeed, Judge Okun emphasized that "The application of this rule [of immunity] has nothing to do with the answer to the question of whether the Palestinian Authority constitutes a state." *Id*. at 12. Rather, Judge Okun applied a "functional approach" to immunity that looks ***not*** to the status of the entity – i.e. whether it is a foreign state – but to whether it performs some governmental functions. *Id*. at 11.

Clearly, the legal principles underlying *Elon Moreh* are wholly foreign to the law of the United States.

**Fourth**, as explained by international law expert Daniel Reisner (who was one of the primary negotiators and drafters of the Oslo Accords), *Elon Moreh* is riddled with glaring errors of fact and law. *See* Exhibit A at ¶¶ 26-51.

The most egregious of these mistakes is Judge Okun's erroneous "finding" that the PA was a party and a signatory to the Oslo Accords, and therefore conducts foreign relations. *See* Exhibit A at ¶¶ 28-31. In fact, the Palestinian party to the Oslo Accords was not the PA but the PLO. *Id*.

The surprising number of errors in *Elon Moreh* is probably attributable to the fact that the decision was entered *sua sponte*, and without any briefing or submission of evidence by the parties. *See* Declaration of Avraham Colthof, attached as Exhibit C to Plaintiffs' Supp. Memo., at ¶ 19.

**Fifth**, *Elon Moreh* contradicts a preclusive panel decision of the same Israeli court which was recently affirmed by the Israeli Supreme Court and *Elon Moreh* was therefore never good law even in Israel. *See* Exhibit A at ¶¶ 40-50.

Accordingly, for the reasons stated above, *Elon Moreh* provides no grounds whatsoever to disturb the preclusive effect of *Ungar* and *Knox*.

**VI.     CONCLUSION**

Plaintiffs' motion should be granted and defendants' motion should be denied.

Dated: New York, New York
       October 2, 2007

                          Respectfully submitted,

                          **MCINTYRE, TATE, LYNCH & HOLT**
                          *Attorneys for the plaintiffs*

                          by:    *S/ David Strachman*
                            David Strachman
                        321 South Main Street, Suite 400
                        Providence, Rhode Island 02903
                        (401) 351-7700