UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AVIGAIL LEWIS BITON, et al.,

        Plaintiffs,

                                            01-00382(RMC)(JMF)

    v.

THE PALESTINIAN INTERIM SELF-GOVERNMENT AUTHORITY, et al.,

        Defendants.

**DECLARATION OF DANIEL REISNER ADV.**

I, Daniel Reisner, Adv., of Tel Aviv, Israel, declare pursuant to 28 U.S.C. § 1746, as follows:

**A.    Professional and Academic Background**

    1.    I am a graduate of the Tel-Aviv University Faculty of Law and a member of the Israeli Bar since 1987.

    2.    For 19 years I served as a legal adviser in the Military Advocate General Corps of the Israel Defense Forces ("IDF"), which is the equivalent of the Judge Advocate General's Corps in the United States armed forces.

    3.    Between 1995 and 2004, I held the position of Head of the International Law Department in the Advocate General Corps of the IDF. In this capacity I was responsible for advising the IDF General Staff and other senior IDF officers, the Ministry of Defense and the Prime Minister's Office on a wide variety of legal issues relating, *inter alia*, to the Middle-East peace process, Israel's activities *vis-à-vis* the Palestinians and neighboring Arab States, and counter-terrorism operations.

4. In addition to the above, between 1994 and 2000 I served as a senior member of Israel's peace delegations with both Jordan and the Palestinians, working in the triple role of negotiator, legal advisor and drafter of the agreements, including those under the Oslo Peace Process between Israel and the PLO. In this capacity, I advised Prime Ministers Rabin, Peres, Netanyahu and Barak, and participated in all of the negotiation sessions and summits, including those in Amman, Wye River, Camp David and Taba.

5. I retired from the IDF with the rank of Colonel in 2004. Since leaving the IDF, I continue to advise senior members of the Israeli government on a variety of issues relating to the legal aspects of the Middle East peace process and security issues.

6. Parallel to my professional career I pursue an active academic career, and serve as a lecturer in several law schools. I have also published articles and lectured on a variety of legal issues, including the Arab-Israeli conflict and peace process; legal aspects of terrorism; the laws of armed conflict; international criminal law; the law of transboundary water resources; general public international law; and international negotiations.

7. Since 2005, I have worked in my own law office in Tel-Aviv which specializes in representing international clients in their business activities both in Israel and abroad. Currently, I am also a Senior Fellow at the Jewish Planning and Policy Institute in Jerusalem and a Research Fellow at the Israel Democracy Institute, which are two of Israel's leading private research centers. In addition, I continue to teach courses at several universities.

8. A true copy of my curriculum vitae is attached hereto as Exhibit "A".

9. My testimony presented herein is based on my many years of professional experience and knowledge regarding Israeli and international law, the provisions of the Oslo

Accords (which were negotiated and drafted in significant part by me personally), and the origin, legal status and capacities of the Palestinian Authority.

### B. The Palestinian Authority and PLO Assert Before the Israeli Courts That Israel Is Not a Proper Forum for Civil Suits Against Them

10. There are currently a number of civil actions pending in the Jerusalem District Court against the Palestinian Authority ("PA") and Palestine Liberation Organization ("PLO"), which were brought in recent years by victims of terrorist attacks that took place in Israel, the West Bank or the Gaza Strip. *See* C.A. 2538/00 *Noritz et al. v. Palestinian Authority et al.*, D.D. 5762(2) 776, 787 (Jerusalem District Court 2003) *aff'd sub nom.* P.C.A. 4060/03 *Palestinian Authority et al. v. Dayan et al.* (Supreme Court July 17, 2007) (listing cases).

11. On February 11, 2002, the President of the Jerusalem District Court convened a special three-judge panel to hear and make a consolidated determination in respect to five threshold defenses that had been asserted by the PA and the PLO in these suits. *See Noritz* at 786-787.

12. One of the five threshold defenses raised by the PA and PLO in these suits was the defense of *forum non conveniens*. *Id.* at 788. Specifically, the PA and PLO asserted before the Israeli district court that:

> The proper forum to hear the suits is not the Israeli courts, but rather international dispute resolution mechanisms, as provided in the agreements, and even that only after exhausting the proceedings and remedies of the courts of the defendant state, i.e. the territory of the PA, which should adjudicate the suits pursuant to their own law.

*Id.* at 788 (emphasis added).

13. On March 30, 2003, the three-judge panel in *Noritz* entered a decision on the five threshold defenses raised by the PA and PLO. The panel unanimously held that no across-the-

board rule could be established regarding the propriety of an Israeli forum, and that the *forum non conveniens* defense asserted by the PA and PLO would have to be determined on a case-by-case basis, in light of the facts and circumstances of each case, by the respective trial judges. *Id.* at 813, 818.

14. The PA and PLO moved for leave to file an interlocutory appeal of the *Noritz* decision before the Israeli Supreme Court, and leave to appeal was granted. *See* P.C.A. 4060/03 *Palestinian Authority et al. v. Dayan et al.* (Supreme Court July 17, 2007) (hereinafter: "*Dayan*").

15. On July 17, 2007, the Supreme Court entered a judgment denying the interlocutory appeal of the *Noritz* decision in all respects. *See Dayan, passim.*

16. In respect to the *forum non conveniens* defense raised by the PA and PLO, the Supreme Court held in *Dayan* that:

> Regarding question C – the question of the propriety of the forum – the petitioners argue that the proper forum to hear the suits that were filed against them, if at all, is not an Israeli court but rather an authorized court in the territory of the Palestinian Authority or alternatively another dispute resolution mechanism (the petitioners propose adjudicating the suits "by means of a general settlement by mutual agreement or by means of an agreed mediation or arbitration mechanism which will be established between the State of Israel and the Palestinian Authority pursuant to the Declaration of Principles and the Interim Agreements").
>
> However, it is clear that in respect to the *forum non conveniens* question, too, the district court did not find it necessary to make firm findings, and left the issue to particularized analysis in each and every suit. In its words: "The question of the appropriateness of the forum is a function of each and every suit, and no general answer can be provided for all the suits". The petitioners nonetheless take issue with the statement of the lower court that "…in the clear majority of cases, it does not appear that the *forum non conveniens* argument is appropriate to the actions as filed". We believe that this statement-dictum does not justify a full

4

    adjudication of the issue of the propriety of the forum   since, as stated, the district court itself refrained from ruling on this issue, and it is clear from its method of analysis and the result at which it arrived that the path is clear for the petitioners to raise all their arguments in respect to this issue before the trial courts.

*Dayan* at ¶ 6 (ellipsis in the original).

  17. Thus, in light of the Supreme Court's decision in *Dayan*, it is clear that the PA and PLO are free to continue to assert their *forum non conveniens* defense before the Israeli courts, and that that defense will be determined by the Israeli trial courts in light of the specific facts of any given case.

### C. The Implementation of the Disengagement Plan Did Not Change the Legal Status of the Palestinian Authority

  18. Between August – September, 2005, as part of a "Disengagement Plan" adopted by the Israeli Cabinet, Israel unilaterally evacuated all its military and civilian personnel in the Gaza Strip (Israel had maintained a presence in approximately 20% of the Gaza Strip subsequent to the Gaza-Jericho Agreement of 1994, which also established the Palestinian Authority) as well as the residents of four small settlements in the north of the West Bank.

  19. As explained below, Israel's implementation of the Disengagement Plan did not change the legal status of the Palestinian Authority.[1]

  20. In the West Bank, under the 1995 Interim Agreement between Israel and the PLO, all the West Bank territory was divided into three classifications: Areas A, B and C respectively. All Israeli settlements are in Area C. Under the relevant provisions of the Interim Agreement, the PA has no territorial jurisdiction or security authority in Area C, and Israel retains full security

---

[1] I do not address the issue of the facts on the ground in the West Bank and Gaza Strip following the implementation of the Disengagement Plan, but it is common knowledge that the PA's authority in Gaza weakened progressively after September 2005, and that Hamas ousted the PA from Gaza in June 2007.

5

powers therein and control thereof. *See* Israeli-Palestinian Interim Agreement on the West Bank and the Gaza Strip of September 28, 1995 ("Interim Agreement") at Article XVII(2)(a) and Annex I, Article V(3). Upon completion of the evacuation of the four settlements in the northern West Bank, the Israeli government officially announced that the status of the territory of the evacuated settlements would remain unchanged, i.e. as "Area C". That territory has remained defined as "Area C" until today.

21. Thus, implementation of the Disengagement Plan granted the PA no new powers or authority whatsoever in the West Bank.

22. In the Gaza Strip, the evacuation of Israeli military personnel and civilians pursuant to the Disengagement Plan provided the PA with the opportunity to exercise in the approximately 20% of Gaza interior evacuated by Israel, the same powers granted the PA in the rest of Gaza in 1994

23. The Israeli government and the IDF were extremely concerned, in light of the PA's lengthy track record of failure to enforce order and security in Gaza (and in the West Bank for that matter), that Gaza would descend into disorder and become a launching pad for further terrorism following the Disengagement.[2]

24. Accordingly, during and following the evacuation from Gaza in August-September 2005, the government and the IDF repeatedly announced (and issued several communiqués so stating) that following the Disengagement the PA would be solely and fully responsible for maintaining order and security in Gaza and for preventing Palestinian terror attacks. These statements reflected Israel's hope and demand – that the PA enforce law and

---

[2] In retrospect, given the unceasing rocket attacks from Gaza against Israeli towns and villages since the evacuation, Israel's concerns were well-founded.

6

order in the areas to be evacuated. These statements did not effect or represent a transfer of any new authority to the PA. On the contrary, the Israeli evacuation from Gaza was not accompanied by any agreements with the Palestinians about the transfer of further powers. Simply stated, the implementation of the Disengagement Plan in Gaza did not provide the PA with any new powers or authority, but merely allowed the PA to expand laterally in the remaining 20% of the interior of the Gaza Strip – the exercise of the same powers it had been granted in 1994.[3]

25. More fundamentally, the implementation of the Disengagement Plan did not change the legal status of the PA because the Disengagement Plan did not derogate from or annul the provisions of the Oslo Accords (and primarily the 1995 Interim Agreement). Since the powers and authority of the PA are defined in the Oslo Accords, as a matter of law the status of the PA cannot change unless and until the parties to the Oslo Accords – Israel and the PLO – mutually agree to modify the provisions of the Accords. That has not occurred.

### D. The Decision in *Elon Moreh* Is Based on Demonstrable Errors of Fact and Law and Has Been Superseded by Contrary Authority

26. In my opinion, as an expert in international law in general and the Oslo Accords in particular, the decision of former Judge Boaz Okun in C.A. 4049/02 *Elon Moreh Seminary Society v. State of Israel* (Jerusalem District Court April 23, 2006), holding that the PA enjoys immunity from suit, is erroneous both in its analysis of the Oslo Accords and the nature of the PA, and in its conclusion that the PA is immune from suit.

27. In addition, as discussed below (¶¶ 40-50), the decision in *Elon Moreh* contradicts a three-judge special panel decision of the same court which was very recently affirmed in the July 17, 2007 decision of the Israeli Supreme Court in *Palestinian Authority et al. v Dayan et*

---

[3] To the misfortune of all sides, the PA was unable to utilize this opportunity, and did not succeed in imposing authority in the evacuated areas.

7

*al.*. Accordingly, an extensive analysis of *Elon Moreh* would be somewhat pointless. Nevertheless, I will address several clear errors of fact and law on which the decision in *Elon Moreh* was based:

28. First, Judge Okun states in several places that the Palestinian Authority was a party and a signatory to the Interim Agreement, and so concludes that the PA conducts "international relations". *See Elon Moreh at* ¶¶ 3, 19.

29. In fact, however, the PA was neither a party nor a signatory to the Interim Agreement – or to any of the other instruments that comprise the Oslo Accords. The PLO – not the PA – signed and was a party to the Interim Agreement and the rest of the Oslo Accords. The PA is merely the <u>object</u> of those agreements, under which it was created and its powers are defined. It should be stressed that this legal structure was not unintentional, as it was fully agreed and understood between the two sides that the PLO, and not the newly-established PA, would be Israel's sole counterpart in the negotiations and the agreements. The PA was intended to serve solely as the internal Palestinian administration, without any external role. Therefore, Judge Okun's assumption – i.e. that the PA was a party to the Oslo Accords and so conducts international relations – is erroneous as a matter of empirical fact.

30. Furthermore, Judge Okun's conclusion runs directly contrary to the express provisions of the Interim Agreement itself. In Article IX (5) of the Interim Agreement, which prescribes the powers and capacities of the Palestinian Authority, the PLO and Israel agreed that the PA would not have "powers and responsibilities in the sphere of foreign relations". Additionally, the PLO and Israel explicitly agreed in Article XVII(1)(a) of the Interim Agreement that the jurisdiction of the PA excludes foreign relations, and that the matter of foreign relations

8

is reserved for future negotiations on a permanent status arrangement (which has not yet occurred).

31.     Judge Okun's decision does not mention much less discuss these provisions (the agreed product of lengthy negotiations between Israel and the PLO) which directly refute his conclusion that the PA conducts "international relations".

32.     Second, Judge Okun's statement that under the Interim Agreement "Palestinian consent was required for any activity of Israel liable to violate sovereignty" (*Elon Moreh at* ¶ 10) has no basis whatsoever in the provisions of the Interim Agreement. On the contrary, there are numerous spheres – spheres in which, by definition, <u>actual</u> sovereign states operate free of external control – in which Israel has maintained full or partial control over the PA and the territory within the PA's jurisdiction.

33.     For example, under the 1995 Interim Agreement, Israel was granted exclusive authority over the external security of the West Bank and Gaza Strip, over maritime security off the Gaza coast and over the airspace above the West Bank and Gaza. *See* Interim Agreement at Article XII(1) and at Annex I, Articles XIV and XIII(4). Additionally, the PA was granted no criminal or security jurisdiction over Israelis present anywhere in the territory of the PA. *See* Interim Agreement, Annex I, Article XI(4). *See also* Interim Agreement at Articles X(4), XII, XIII(2)(a). Similarly, the PA lacks even civil authority over Israeli citizens in except in extremely limited circumstances. *See* Interim Agreement, Article XVII(2)(c). Moreover, the Interim Agreement inherently limits the legislative capacity of the PA, and provides that PA legislation which purports to exceed the PA's jurisdiction, or which is otherwise inconsistent with the Interim Agreement or the other instruments constituting the Oslo Accords, "shall have no effect and shall be void ab initio." Interim Agreement, Article XVIII(4)(a).

9

34. It is clear that these provisions (all of which of course remain in force) negate any claim of the PA to independent "sovereignty". As Oppenheim explains:

> Sovereignty is supreme authority, which on the international plane means ... legal authority which is not in law dependent on any other earthly authority. Sovereignty in the strict and narrowest sense of the term implies, therefore, independence all round, within and without the borders of the country.

1 *Oppenheim's International Law* 122, R. Jennings and A. Watts, eds., (9th edition 1992). *See also* Gerhard von Glahn, Law Among Nations 56 (6th edition 1992) (for an entity to be sovereign, "[t]here must not be even nominal subordination to an outside governmental authority").

35. Thus, Judge Okun's conclusion that the Interim Agreement prevents Israel from imposing upon the PA's "sovereignty" without its consent is, with all due respect, based on a profound misunderstanding either of the Interim Agreement or of the concept of sovereignty as it is recognized under public international law.

36. Third, Judge Okun concluded that the Interim Agreement implicitly recognizes, as between Israel and the PA, the principle of *par in parem non habet imperium. See Elon Moreh* at ¶ 10. This conclusion is wrong both in law and in fact, as is evidenced by the enormous disparities between the respective powers of Israel and the PA under the provisions of the Interim Agreement (some of which are detailed in the preceding paragraphs) as well as by the fact that the entire Interim Agreement only addresses the fate of the West Bank and Gaza Strip territory, but does not at all address Israeli territory, as would be reasonable were the agreement truly being negotiated between international partners of equal footing and standing. Furthermore, on a more general level, Article 1(1) of the Interim Agreement (the opening provision of the agreement) specifically provides that "Israel shall continue to exercise powers and responsibilities not so transferred" to the PA, thus setting out the basic principle of the agreements between Israel and

the PLO, according to which the PA shall have only those specific powers expressly transferred to it by Israel.

37. Judge Okun concedes that the Interim Agreement does not expressly adopt this principle, but states that "it serves as a starting point as a result of which Palestinian consent was required for any activity of Israel liable to violate sovereignty." *Id.*. The problem with this inferred "starting point" is that, as shown above, the Interim Agreement in no way whatsoever required any such "Palestinian consent", and on the contrary, placed Israel in charge of numerous spheres of what would be termed "sovereign" authority if we were dealing with an actual sovereign state. Since that proposition is erroneous, there is no basis for the inference based thereon.

38. Fourth, Judge Okun completely overlooks Article III(3) of Annex IV of the Interim Agreement. That provision grants the State of Israel, and its agencies and instrumentalities, immunity from the courts of the PA:

> The jurisdiction of the Palestinian courts and judicial authorities does not cover actions against the State of Israel including its statutory entities, organs and agents.

Interim Agreement, Annex IV at Article III(3).

39. Significantly, neither the Interim Agreement nor any other provision of the Oslo Accords limits the jurisdiction of Israeli courts over the PA or grants the PA immunity from suit in Israeli courts. The absence of any such parallel provision limiting Israel's jurisdiction over the PA clearly gives rise to a negative inference, on the basis of the principle *expressio unius est exclusio alterius*, that Israeli courts may indeed exercise jurisdiction over the PA. Yet, *Elon Moreh* does not even mention, much less discuss, this extremely salient provision.

40. Fifth, *Elon Moreh* contradicts, without discussion or explanation, the previous recent decision of a special panel of the Jerusalem District Court in *Noritz v. Palestinian Authority*. As discussed above, the *Noritz* panel was appointed by the President of the Jerusalem District Court to make consolidated determinations regarding five threshold defenses that had been asserted by the PA and the PLO in the suits pending against them in that court. *See Noritz* at 786-787. One of the threshold defenses raised by the PA and PLO in those suits was the defense of sovereign immunity. *Id.* at 788.

41. The Attorney General of the State of Israel filed papers with the *Noritz* court asserting that the PA is an entity of limited authority that does not meet the four widely-recognized criteria of statehood recognized in public international law, that the determination of whether a foreign entity is entitled to sovereign immunity in an Israeli court is the exclusive prerogative of the Executive Branch (specifically the Foreign Ministry), and that such determination is final and binding on the Judiciary. *Id.* at 788-789.

42. The *Noritz* panel split on the issue of sovereign immunity. Two of the judges (Gal and Mizrahi) ruled as a matter of first impression in Israel that (as the Attorney General had asserted) the question of whether a foreign entity is entitled to sovereign immunity in Israeli courts is to be determined solely by the Foreign Ministry. *Id.* at 803-808. The third judge (Drori) disagreed with this approach, and held that the determination of whether a foreign entity is entitled to sovereign immunity is within the authority of the Judiciary, and should be carried out by applying the four traditional criteria of statehood reflected in the Montevideo Convention on the Rights and Duties of States, 1933. *Id.* at 820-834. After an extremely detailed analysis, Judge Drori found – as the Attorney General had argued – that the PA did not meet any of these criteria. *Id.* at 834-851.

43. Thus, under the rule established by the majority in *Noritz*, exclusive authority to determine the PA's claim to sovereign immunity in Israeli courts is vested in Israel's Foreign Ministry.

44. Under Israeli law, district court decisions do not generally have binding authority over other district courts. The only court the decisions of which are automatically authoritative in relation to all Israeli courts is the Supreme Court. However, Israeli law does recognize that lower court rulings may have an issue-preclusive effect, binding on the Parties to such cases. Unless and until subsequently overruled by the Supreme Court, such decisions have full estoppel effect. *See e.g.* C.A. 199/82 *Snitovsky v. Electric Co.*, P.D. 39(1) 225, 232; C.A. (T.A.) 117/86 *Barkley Investments Ltd. v. First International Bank of Israel Ltd.*, D.D. 51(1) 195, 210; C.A. (Naz.) 765/80 *Rubenstein v. Rosenberg*, D.D. 42(1), 133.[4] Moreover, Israeli law further recognizes that courts may make rulings in relation to the <u>status</u> of objects, individuals or entities. Such rulings (for example the determination of personal status, bankruptcy etc.) once given, are binding and authoritative *erga omnes*, unless subsequently reversed or amended by higher authority. *See* C.A. 421/54 *Atia v. Barda* P.D. 9, 1205 and C.A. 431/80 *Rosenberg v. Hazan* P.D. 35(2), 742. One of the essential conditions for the classification of a specific ruling as a binding "status" ruling is that the ruling was given by a court in special session, dedicated specifically to the status issues.[5] Thus, rulings on issues of personal or other status given as part of "regular" court proceedings cannot be deemed as having such standing. As has been previously been explained, the *Noritz*

---

[4] In certain cases, non-mutual offensive collateral estoppel is also recognized. *See e.g.* C.A. *Fichtenboim v. Land Registrar*, P.D. 44(2) 576, 580-581; C.A. 1041/97 *Sararo v. Tomers' Shoes Ltd*, P.D. 54(1) 642, 655; C.A. 2590/90 *Nisim v. Danieli*, P.D. 48(3) 846, 850.

[5] See *Dr. Nina Zaltsman, Res Judicata in Civil Proceedings*, Ramot–Tel-Aviv University Publishing (1991) at section 256.

ruling was given by a specially convened three-judge panel, whose sole and specific mandate was to address the procedural and status arguments raised in the various claims against the PLO and the PA. As such, the *Noritz* court meets the "special session" requirement of the rule addressed above. Conversely, Judge Okon's *Elon Moreh* ruling, given in the context of a regular court proceeding, could not be vested with such binding *erga omnes* authority.

45. Therefore, in my professional opinion, the majority decision in *Noritz* given on March 30, 2003 – holding that determination of sovereign immunity is within the exclusive authority of the Foreign Ministry – has preclusive effect vis-à-vis the PA in any other proceedings in Israel. Thus, Judge Okun erred twice in *Elon Moreh*: first - by even considering the PA's immunity claim; and second - by refusing to follow the clear and binding *Noritz* ruling under which the determination of that claim belongs solely to the Foreign Ministry.

46. Furthermore, although the PA and PLO sought and received leave to appeal *Noritz* to the Supreme Court (as discussed above), they did not appeal the holding in *Noritz* that the PA's claim to sovereign immunity is to be determined exclusively by the Foreign Ministry. Accordingly, in its decision of July 17, 2007, denying the appeal of *Noritz*, the Israeli Supreme Court stated that determination of the PA's claim to sovereign immunity would be carried out in the manner "outlined in the judgment of the lower court" in *Noritz*, which the PA and PLO "did not seek to dispute". P.C.A. 4060/03 *Palestinian Authority et al. v. Dayan et al.* (Supreme Court July 17, 2007) at ¶ 4.

47. Thus, the Supreme Court's decision in *Dayan* further confirmed the preclusive effect of *Noritz* on the PA; therefore, *Elon Moreh* is clearly in error.

48. Indeed, even assuming that Judge Okun had had authority to consider the PA's sovereign immunity claim (which under *Noritz* and *Dayan* he did not) his opinion in *Elon Moreh*

14

has (at best) no more weight or precedential force in Israel than that of Judge Drori in *Noritz*, who found (after an analysis far more detailed and thorough than that of Judge Okun) that the PA fulfils <u>none</u> of the four traditional criteria of statehood.[6]

49.  Therefore, the claim by the PA and PLO on page 30 of their Opposition to Plaintiffs' Motion for Entry of Default Judgment in the above-captioned matter, that *Elon Moreh* "provides a clear affirmation of the Israeli Judiciary's view of the status of the PNA" is completely baseless. The decision in *Elon Moreh* reflects nothing more than the opinion of a single judge of a lower court, which is squarely contradicted by the opinion of another judge of the same court (Judge Drori) and which conflicts with a preclusive majority panel decision of that court – which the PA elected not to appeal – holding that the Israeli Judiciary has no authority in the first place to determine whether the PA is entitled to assert immunity.

50.  Finally, I would note that *Elon Moreh* itself is currently on appeal to the Supreme Court. *See* C.A. 5093/06 *Elon Moreh Seminary Society v. State of Israel et al.* (Supreme Court). Significantly, on March 11, 2007, the Supreme Court issued an order staying the appeal of *Elon Moreh* pending disposition of the appeal of *Noritz*. Since *Noritz* was affirmed by the Supreme Court in *Dayan*, it appears likely (unless the Supreme Court finds that it can dispose of the *Elon Moreh* appeal without reaching the immunity issue) that *Elon Moreh* will be vacated and remanding for further proceedings in accordance with *Noritz*.

---

[6] I also agree that the PA does not meet the four criteria for statehood recognized under public international law. However, I am informed by counsel for the plaintiffs in the above-captioned action that it is unnecessary for me to address this issue, because it has already been determined by the United States Court of Appeals for the First Circuit, and the U.S. district courts for the District of Rhode Island and the Southern District of New York. Since, as discussed above, the implementation of the Disengagement Plan effected no change in the legal status of the Palestinian Authority, it could not have derogated from the validity of those U.S. federal decisions.

15

51. To summarize this section: the *Elon Moreh* decision is based on several demonstrably erroneous propositions, and was never, and is not now, good law in Israel.

### E. The Palestinian Authority Is Not a Political Subdivision, Agency or Instrumentality of the State of Israel

52. The claim by the PA and PLO that the Palestinian Authority is a "political subdivision" of the State of Israel (*see* Opposition to Plaintiffs' Motion for Entry of Default Judgment in the above-captioned matter, pp. 40-43), was rejected by the Israeli Supreme Court in H.C.J. 1601/96 *Megidish v. Palestinian Authority et al*, (November 27, 1997 Supreme Court) ("*Megidish*"), as discussed below.

53. *Megidish* was a petition to the Supreme Court in its capacity as the High Court of Justice, brought under Article 15 of the Basic Law: The Judiciary. That article provides in relevant part that:

> [T]he Supreme Court sitting as a High Court of Justice shall be competent
>
> \*\*\*
>
> (2) to order State and local authorities and the officials and bodies thereof, and other persons carrying out public functions under law, to do or refrain from doing any act in the lawful exercise of their functions ...

Basic Law: The Judiciary, Article 15(d) (emphasis added).

54. Thus, under Article 15, all "State and local authorities and the officials and bodies thereof, and other persons carrying out public functions under law" are subject to the jurisdiction of the Supreme Court sitting as the High Court of Justice.

55. The Supreme Court has construed the phrase "State and local authorities and the officials and bodies thereof, and other persons carrying out public functions under law" very

broadly, and has held that it includes, *inter alia*, all ministries, offices, agencies and instrumentalities of the central government, all local governments and municipalities (e.g. towns, cities, regional councils, etc.) and their respective agencies and departments, as well as other bodies serving the public, such as utility companies and public schools. *See generally e.g.* H.C.J. 731/86 *Micro Daf v. Israel Electric Corporation Ltd.*, P.D. 41(2) 449; H.C.J. 4363/00 *Upper Poriya Board v. Minister of Education*, P.D. 56(4) 203.

56. Thus, there is no question that if the PA were indeed a "political subdivision" of the State of Israel, as the PA and the PLO assert in their Opposition to Plaintiffs' Motion for Entry of Default Judgment in the above-captioned matter, all actions and decisions of the PA would be subject to judicial review by the Israeli High Court of Justice pursuant to Article 15 of the Basic Law: The Judiciary. And that is exactly the proposition that was asserted – and rejected by both the Israeli government and the Israeli Supreme Court – in *Megidish*.

57. The petitioner in *Megidish* was the sister of an Israeli who was murdered in a terrorist attack in the Gaza Strip in March 1993. Israel had identified two suspects in the murder, and requested the PA to transfer them to Israeli custody, but the PA refused. The petition (which I have examined), names the PA as respondent, and seeks an order directing the PA to surrender the suspects to Israeli police. The petition asserts – just as do the PA and the PLO in their Opposition to Plaintiffs' Motion for Entry of Default Judgment in the above-captioned matter – that because the PA had been authorized to exercise certain powers in the West Bank and Gaza Strip, it should be considered part and parcel of the governmental and administrative apparatus of the State of Israel. As part of that apparatus, the petition argues, the PA is by definition subject to the jurisdiction of the Supreme Court (sitting as the High Court of Justice) pursuant to Article 15 of the Basic Law: The Judiciary.

58. The Supreme Court requested the response of the Israeli Attorney General to the petition. The office of the Attorney General then filed a Notice (which I have examined), opposing the relief sought in the petition on the ground that the Palestinian Authority "is not an organ of the State of Israel" and so not subject to the High Court's jurisdiction under Article 15 of the Basic Law: The Judiciary. Notice of Counsel for the Attorney General filed in *Megidish*, dated November 24, 1997, at ¶ 7.

59. The Supreme Court agreed with the position of the Attorney General (which is, *per se*, the official position of the Israeli government) that the PA "is not an organ of the State of Israel", and denied the petition on that ground:

> We understand the feelings of the petitioner. However, regrettably, we cannot offer her relief. Mr. Blass who appeared before us on behalf of the Attorney General at our invitation — correctly stated that the Palestinian Authority is not a body whose decisions are subject to judicial review by this Court.
>
> For this reason, and without entering into the merits of the petition, it must be denied.

*Megidish, id.*.

60. Thus, as a matter of domestic Israeli law as determined by Israel's Supreme Court, and as the official position of the government of Israel, the Palestinian Authority is not a political subdivision — or for that matter an agency or instrumentality - of the State of Israel.

61. Indeed, the Israeli government (whose legal positions are well known to me through my previous and current professional activities) would strongly object to both the PA's claim to be a political subdivision of Israel, and the PA's attempt to shield its activities behind Israel's sovereign immunity.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

September 19, 2007

_____
Daniel Reisner