# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

LESLYE KNOX et al.,

        Plaintiffs – Judgment Creditors,

        v.                              03 Civ. 4466 (VM)(THK)

PALESTINE LIBERATION ORGANIZATION et al.,

        Defendants – Judgment Debtors.

## DECLARATION OF DR. LEONARD M. HAMMER

I, Dr. Leonard M. Hammer, declare pursuant to 28 U.S.C. § 1746, as follows:

### A.      Professional Background

1.      I hold a Ph.D. in international law from the University of London - SOAS (1997), an LL.M. degree in public international law from New York University (1993), and a J.D. degree from Georgetown University Law Center (1988).

2.      For the past decade I have taught law at several law schools in Israel, and published and lectured extensively on a wide variety of legal topics. I have also served as a consultant to the Israeli Ministry of Justice. A copy of my curriculum vitae is attached hereto as Exhibit 1.

### B.      The PA and PLO Are Seeking to Dismiss the Civil Suits Brought Against Them by Terrorism Victims in Israeli Courts on *Forum Non Conveniens* and Other Threshold Grounds

3.      As discussed in the Declaration of Daniel Reisner submitted in the matter of *Biton v. Palestinian Interim Self-Government Authority*, Civ. No. 01-0382 (D.D.C.), the Palestinian

Authority ("PA") and Palestine Liberation Organization ("PLO") have for years been seeking to dismiss the suits brought against them in Israeli courts by terrorism victims on grounds of *forum non conveniens*, and in July 2007 the Israeli Supreme Court ruled (in P.C.A. 4060/03 *Palestinian Authority v. Dayan*) that no general rule can be fashioned in respect to the *forum non conveniens* defense and that the various trial courts hearing these suits would therefore have to rule on the application of that defense based upon the specific facts of each respective case. *Id.* at ¶¶ 10-17.

4.      Soon after the decision of the Israeli Supreme Court in *Dayan*, the PA and PLO began submitting papers to the trial courts in which the cases against them are pending, stating (correctly) that under *Dayan* they are free to continue to assert their *forum non conveniens* defense, and that they intend to file motions to dismiss the cases on that and other grounds.

5.      Thus, for example, on July 30, 2007, the PA submitted a "Notice to the Court" in the matter of C.A. 2276/03 *Nathan Peled et al. v. Palestinian Authority et al.* pending in the Tel Aviv District Court. The plaintiffs in *Peled* are the family of an Israeli murdered in a terrorist attack for which the PA is alleged to be responsible. In that Notice (which I have examined) the defendants state that:

> In respect to the *forum non conveniens* question … the Supreme Court refused to rule on this question and held that it would be heard by the trial courts …

Notice to the Court in *Peled*, at ¶ 3.

6.      The Notice also states that the Supreme Court declined to rule on other threshold defenses asserted by the defendants, including non-justiciability, "act of state", "act of war" and the claim that the law of the PA rather than Israeli law should govern the cases. *Id.* at ¶¶ 4, 6.

7.      The Notice concludes by stating that the defendants intend to file a motion to dismiss on all these grounds:

> Accordingly, and in light of the Supreme Court's explicit holding that that the path is clear for the defendants to raise all their arguments before the trial courts, they intend to submit to the honorable court, in the coming weeks, <u>a threshold motion in the context of which all the threshold questions discussed above will be heard and determined.</u>

*Id.* at ¶ 8 (emphasis added).

8.      Likewise, on August 6, 2007, the PA filed a "Response to Motion to Set a Trial Date" in the matter of C.A. 2538/00 *Noritz et al. v. Palestinian Authority et al*, which is pending in Jerusalem District Court. The *Noritz* plaintiffs are the family of an Israeli alleged to have been abducted and murdered by PA policemen.

9.      Using language identical to the PA's Notice in *Peled*, the PA's Response in *Noritz* (which I have examined) states that the PA intends to soon file a motion to dismiss asserting *forum non conveniens,* non-justicability, "act of state", "act of war" and (apparently in the alternative) that the case should be governed by the law of the PA and not by Israeli law.

10.      Since the decision in *Dayan*, the PA and PLO have filed substantively identical papers in the other terrorism cases pending against them in Israel, asserting their intention to move to dismiss on *forum non conveniens* grounds and the other grounds detailed above. It would seem unnecessarily repetitious to survey all these essentially identical filings, but if requested I would be prepared to do so.

**C.      Aharon Ellis Was Murdered by a Team of PA Security Officers and PLO Operatives**

11.      In May 2003, the Tel Aviv District Court convicted Nasser Awis of the murder of Aharon Ellis. S.C. 1137/02 *State of Israel v. Nasser Mahmoud Ahmed Awis* (Tel Aviv District Court May 1, 2003) (hereinafter: "*Israel v. Awis*"). In December 2002, an Israeli military court convicted Ahmed Abu Khader of the murder of Aharon Ellis. F.N. 6088/02 *Military Prosecutor*

*v. Ahmed Ali Mahmoud Abu Khader* (Samaria Military Court December 23, 2002) (hereinafter: "*Prosecutor v. Abu Khader*").

12.    I have been requested by counsel for plaintiffs in the above-captioned matter to examine the decisions and court files in *Israel v. Awis* and *Prosecutor v. Abu Khader* (which run to many hundreds of pages) and to respond to the assertion made by the PA and PLO in their papers in the above-captioned matter, that Aharon Ellis was murdered by a "lone gunman".

13.    The facts summarized below, which clearly show that Mr. Ellis was murdered by a team of PA security officers and PLO operatives, are all contained in (i) the *Israel v. Awis* decision and/or (ii) the written statements made to the Israeli police by Nasser Awis and Ahmed Abu Khader and admitted into evidence by the Tel Aviv District Court in *Israel v. Awis*:

      i.    The shooting attack carried out at the David's Palace hall in Hadera, Israel on January 17, 2002, in which Aharon Ellis and five Israelis were murdered, was initiated, planned and carried out pursuant to the instructions of Nasser Awis.

      ii.    Nasser Awis also planned and/or personally carried out, and was convicted of, numerous other terrorist attacks, including other murders.

      iii.    At the time of Mr. Ellis' murder, Nasser Awis was serving as an officer with the rank of captain in the PA security services and as the leader of an armed unit of the PLO in Nablus.

      iv.    Nasser Awis received instructions to carry out terrorist attacks from senior PA and PLO officials, based on the political needs of the PA: when the political situation "deteriorated" and became "bad" from the point of view of the PA leadership, Awis was instructed to launch attacks and did so; when the PA leaders felt that negotiations were favorable Awis was directed to halt attacks and did so.

v.     Nasser Awis received tens of thousands of dollars from senior officials of the PA and PLO for the explicit purpose of carrying out terrorist attacks, and many of these payments were personally approved by Yasser Arafat.

vi.    At the time of Mr. Ellis' murder, Ahmed Abu Khader was serving as an officer in the PA security services in Nablus and as a member of an armed unit of the PLO, and had often assisted Nasser Awis to plan and carry out terrorist attacks.

vii.   Sometime prior to January 17, 2002, another PA security officer in Nablus, Abdel Salam Hassuna, approached Ahmed Abu Khader and informed him that he (Hassuna) was willing to carry out a suicide attack in Israel.

viii.  Abu Khader informed Awis of Hassuna's willingness to carry out a suicide attack.

ix.    Awis subsequently provided Abu Khader within an M-16 automatic rifle and eight clips of bullets, and instructed Abu Khader to train Hassuna on the M-16 in preparation for carrying out a shooting attack.

x.     Abu Khader trained Hassuna as instructed.

xi.    Shortly thereafter, Abu Khader and Hassuna traveled to Awis' home. There, Abu Khader videotaped and photographed Hassuna while the latter posed with Awis' M-16 and read aloud a "martyr's will" prepared for him by Awis. The photos and videotape were kept by Awis, in order to be distributed to the news media following the attack.

xii.   Later that evening, following the video recording of Hassuna's "will", Awis and Abu Khader provided Hassuna with an M-16, six clips of bullets, two hand grenades and 400 shekels. Hassuna partially disassembled the M-16 and placed it in a bag along with the clips and the grenades.

5

xiii.    Abu Khader then sent Hassuna to the city of Tulkarem by taxi.

xiv.    In Tulkarem, Hassuna was met by another PA security officer, Mahmoud al-Titi.

xv.    Mahmoud al-Titi had assisted Awis to carry out numerous terrorist attacks in the past, and Awis phoned al-Titi while Hassuna was en route to Tulkarem and asked him to meet Hassuna and help him infiltrate into Israel.

xvi.    With al-Titi's assistance Hassuna entered Israel and reached the city of Hadera, where he carried out the shooting attack in which Mr. Ellis was killed using the weapon provided him by Awis and Abu Khader.

xvii.    Hassuna was killed by Israeli police at the scene.

14.    I believe the facts summarized above speak for themselves, and demonstrate that defendants' claim that Mr. Ellis was murdered by a "lone gunman" is highly misleading to say the least.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

October 1, 2007

_____
Dr. Leonard Hammer

6

Exhibit 1

# Leonard M. Hammer
## Curriculum Vitae

## EDUCATION

**University of London - SOAS, Ph.D., 1997**
    Honors:
        University of London Edmund Davis Postgraduate Fellowship Trust
        Competitive grant to support Ph.D. studies.
    Thesis: Theoretical Approaches to the International Human Right to Freedom of
        Conscience

**New York University, LL.M., Public International Law, 1993**

**Georgetown University Law Center, J.D., 1988**
    Honors:
        Dean's List, 1985-1987
        Lawyers Co-operative Publishing Award, International Law
        Semi-finalist, Samuel Polsky National Moot Court Competition

**Yeshiva University, B.A. *magna cum laude*, 1985**
Major, Political Science; Minor, Communications
    Honors:
        Aron Margalith Award, Excellence in Political Science
        Rockland Community College Scholarship

## PROFESSIONAL EXPERIENCE

**Safed College,** Senior Lecturer, 2005-present
Assisted with formation of new Law School in the North. Developed curriculum, proposed programs, and instigated development projects.

**Israeli Ministry of Justice, International Division,** Consultant, 2004-2005
Consultant in areas of public international law and international human rights.
Issues included separation fence case and preparing core document for human rights treaties.

**Inter-Disciplinary Center**, Hertzliya, Lecturer, 2004-present
Courses: Public International Law, International Organizations and NGOs, Human rights and Conflict

**Hebrew University**, Rothberg International School, Lecturer 1999-present
<u>Courses</u>: International Human Rights, Public International Law

**Academic Law Institute**, Ramat Gan, Lecturer, 1998-2003
<u>Courses</u>: Private International Law, International Arbitration, Minority and Aboriginal Peoples' Human Rights in Canada and International Law, International Judicial Mechanisms
<u>Seminars</u>: Human Right to Freedom of Religion and Conscience, International Rights of Minorities, The New Media and International Human Rights
<u>Co-Chair</u>, Research Committee. Approved research projects and oversaw disbursement of College funds. Endorsed proposals and provided funds for conferences and seminars.

**Bar Ilan University**, Department of Political Studies, Lecturer, 1999-2002
<u>Courses</u>: International Human Rights, Public International Law
<u>Seminars</u>: Human Right to Freedom of Religion and Conscience, The New Media and International Human Rights

**University of East London (Israel)**, Lecturer 2001-2002
<u>Course</u>: International Human Rights

**UN for Taiwan Alliance,** Researcher, New York, 1993

**New York Supreme Court**, Judge J. Hornblass, Court Attorney, New York, 1991-93
Drafted opinions, conducted research, and managed the docket. Cases centered on criminal law and procedure.

**Graubard, Mullen, Moskowitz**, Associate, New York, 1990
Litigation research and drafted briefs.

**Israel Supreme Court**, **Justice M. Elon**, Law Clerk, Jerusalem, 1989-90
Drafted opinions and conducted research.

**Sanford T. Colb**, Associate, Ramat Gan, 1988-89
Trademark litigation and research.

## <u>RESEARCH GRANTS</u>

**Open Society Institute, 2006-2008**
International Scholar, Baku State University, Azerbaijan
Curriculum and faculty enrichment in human rights and minority rights courses, and program development with surrounding civil society infrastructure. Developed LLM in International Human Rights.

**Accademia Nazionale dei Lincei, 2006**
Research trip to Italy for program and exchange development.

**Foreign Ministry of Norway, 2006-2008**
Holy Places in an International Context
Using Israeli research as a foundation, will engage in comparative studies (with US colleague). Funding also received for an international conference in Europe.

**United States Institute of Peace, 2004-2006**
Holy Places in Israel and Palestine
Joint project with US and Arab colleagues on the issue of holy places in Israel from a comparative, socio-political, perspective.

**Israel Academy of Sciences and Humanities, 2002**
University of Padua, Italy.
Referred to current understanding of culture within social science literature to expand upon international human right to culture and its significance. Contrasted multicultural and intercultural approach.

**Canada-Israel Research Exchange Program, 2002**
Research regarding minority rights and indigenous peoples in Canada. Conducted interviews, on-site meetings, and attended conferences to clarify problems and issues and contrast the situation to minorities in Israel.

**Hague Academy of International Law and International Relations, 2001**
Research Program, Water and International Law. Worked in tandem with other international scholars, via joint presentations and critique, to consider water issues pertaining to 1997 UN Convention, matters of enforcement and implementation, and current structure in international law. Personal focus concerned the human right to water and indigenous peoples.

**Carnegie Council on Ethics and International Affairs, 2000-2001**
Non-residential Fellow. Engaged in broad range of research regarding migrant workers' standing in Israel, specifically focusing on their manner of internal organization, and operations with NGOs, unions, and other state and non-state actors. Organized an Israeli conference regarding migrant workers that included local representatives, governmental officials, and Israeli NGOs.

**Hebrew University, Post-doctorate, 1997-1998**
      **Lady Davis Trust Fellowship, Israel**
      **Lord Hailsham Fellowship, England**
Received funding to support research. Research involved issues in international law and human rights, including avenues for domestic enforcement and relation between domestic and international law.

**PUBLICATIONS**

**Books:**

<u>A Foucauldian Approach to International Law: Descriptive Thoughts for Normative Issues</u>
Ashgate Press, 2007
Critical approach to international law, re-examining notions of power and knowledge and considering an alternative framework.

<u>The International Human Right to Freedom of Conscience: Suggestions for its Development and Application</u>
Ashgate Press, 2001
Contrasted the right to conscience with religion, noting the provision for conscientious beliefs in human rights treaties and their interpretations.

**Book Chapters:**

<u>World Population</u>
*Encyclopedia of Public International Law* Max Plank Institute, Oxford University Press, 2007 (forthcoming)

<u>Interculturalism and Migrant Workers in Israel</u> 9-12 in Powell, D. and Sze, F., eds., *Interculturalism: Exploring Critical Issues* Inter-Disciplinary Press, 2004

<u>Discerning Israel's Interpretation of the 1993 Holy See-Israel Fundamental Agreement</u> 67-96 in Breger, M., ed., *The Vatican-Israel Accords: Political, Legal, and Theological Contexts* Notre Dame University Press, 2004

<u>The Holy See-PLO Agreement and its Significance for Israel</u> 150-167 in Breger, M., ed., *The Vatican-Israel Accords: Political, Legal, and Theological Contexts* Notre Dame University Press, 2004

**Articles:**

<u>From Public to Private Law in the Occupied Territories – Expanding the Israeli Presence via the Rule of Law</u>
2 IDF Law Review 299-313 (2007)

<u>Selective Conscientious Objection in International Law</u>
36 Israel Law Review 145-171 (2004)

<u>Indigenous Peoples and the Human Right to Water</u>

10 International Journal on Minority and Group Rights 131-162 (2003)

The Human Right to Culture and Migrant Workers in Israel
11 MSU-Detroit College of Law Journal of International Law 427-457 (2003)

Abortion Objection in the UK and the European Convention on Human Rights and Fundamental Freedoms
6 European Human Rights Law Review 564-575 (2000)

Migrant Worker Rights in Israel and Customary International Law
17 Netherlands Quarterly of Human Rights 5-30 (1999)

Reconsidering the Israeli Courts' Application of Customary International Law in the Human Rights Context
5 ILSA Journal of International and Comparative Law 23-41 (1998)

Conscientious Objection in Israel - Does the individual stand a chance?
14 New York Law School Journal of International and Comparative Law 293-316 (1993)

Legal Advertising in Israel - An Overview
5 National Jewish Law Review 37-51 (1990-91)


**PAPER PRESENTATIONS** (outside of Israel)

**Texas Tech University School of Law,** Texas, USA, 2007
Aspects Regarding the "Targeted Killings" case of the Israeli Supreme Court

**Fu-Jen University,** Taipei, Taiwan, 2006
Freedom of Religion in Israel

**University of Hong Kong**, Hong Kong, 2005
"Rights Talk" on International Law in the Occupied Territories

**Critical Issues in Interculturalism**, Milan, Italy, 2003
Notions of the Human Right to Culture

**IVR Conference**, Lund, Sweden, 2003
Foucault and Customary International Law

**University of Georgia**, Athens, Georgia, 2003
Freedom of Religion: Alternative Approaches

**Catholic University**, Washington, DC, 2003
The International Human Right to Freedom of Religion or Belief:

Referring to Foucault to Achieve the Descriptive Moment

**University of Maastricht**, Maastricht, The Netherlands, 2001
Torture in Israel and the Recent Supreme Court Decision

**Soo-Chow University**, Taipei, Taiwan, 1998
Freedom of Expression and the Internet


## PREPARED CONFERENCES

**Current Approaches to Graves and Cemeteries in the Holy Land**, funded by the Norwegian Foreign Ministry and the Kenyon Institute, Jerusalem, 2007
Workshop focusing on current legal issues pertaining to gravesites

**Workshop on Graves and Holy Places**, funded by the Norwegian Foreign Ministry and Search for Common Ground, Jerusalem, 2006
One-day workshop engaging religious, political, and non-governmental actors to discuss and consider issues concerning graves as holy places

**Conference on Holy Places in Israel and Palestine**, funded by the US Institute of Peace, Washington, DC, Ebert Foundation, Haifa University, and Al-Qasemi College, 2006
Presentations by governmental representatives, NGOs, and academics from Israel, US, and Europe. Funding received for publication of proceedings (will serve as a co-editor)

**Conference on Migrant Workers in Israel**, funded by the Carnegie Council on Ethics and International Affairs, Bar Ilan University, 2001
Presentations by migrant worker groups, NGOs, and governmental officials