# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| MARK I. SOKOLOW, *et al.*,    ) <br>        ) <br>     Plaintiffs,  ) <br>        ) <br>    v.       ) <br>        ) <br> THE PALESTINE LIBERATION  ) <br> ORGANIZATION, *et al.*,  ) <br>        ) <br>     Defendants.  ) | Civil Action No. 04cv397 (GBD) (RLE) |

## MEMORANDUM OF LAW IN SUPPORT OF THE PALESTINIAN AUTHORITY'S AND THE PALESTINE LIBERATION ORGANIZATION'S RENEWED MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(2)

Richard A. Hibey
Mark J. Rochon
MILLER & CHEVALIER CHARTERED
655 15th St., N.W., Suite 900
Washington D.C. 20005-6701
Ph. (202) 626-5800
Fax: (202) 626-5801

*Counsel for Defendants Palestinian Authority and Palestine Liberation Organization*

966675.1

# TABLE OF CONTENTS

**Page**

PROCEDURAL BACKGROUND ................................................................... 1

ARGUMENT

I.  Plaintiffs Have the Burden of Establishing *Each* Defendant Has Sufficient
    Jurisdictional Contacts with the United States When the Lawsuit Began ................ 2

II. The Plaintiffs Cannot Meet Their Burden of Establishing That Either the
    PA or the PLO Has Sufficient Contacts with the United States to Warrant
    the Court's Exercise of Personal Jurisdiction. ........................................... 4

    A.  The Court Lacks Specific Jurisdiction over the PA and PLO Because
        the Alleged Incidents Were Not Targeted at the United States ..................... 5

    B.  Plaintiffs Cannot Establish that Either the PA or the PLO Has Sufficient
        Continuous and Systematic Contacts with the United States to
        Warrant the Court's Exercise of General Jurisdiction ................................. 7

        1.  The PLO's U.S. Contacts Are Insufficient to Establish General
            Jurisdiction ....................................................................... 8

            a.  The PLO's D.C. Office .......................................... 9

            b.  The PLO's New York Office ................................... 10

            c.  The Contacts Associated with the PLO's U.S. Offices Cannot
                Be Considered for Purposes of Establishing Personal
                Jurisdiction .................................................. 11

            d.  Public Appearances by Heads of the Mission Offices Do Not
                Create General Jurisdiction Over the PLO ........................ 15

        2.  The PA's Contacts Are Insufficient to Establish
            General Jurisdiction ........................................................... 17

III. Even If Plaintiffs Could Establish that Either the PA or PLO Had Sufficient
     Continuous and Systematic, Non-Exempt Contacts with the United States,
     Personal Jurisdiction Should Nonetheless Not Be Exercised Here ..................... 19

CONCLUSION ............................................................................. 25

966675.1

**MEMORANDUM OF LAW IN SUPPORT OF THE PALESTINIAN
AUTHORITY'S AND THE PALESTINE LIBERATION ORGANIZATION'S
<u>RENEWED MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(2)</u>**

Defendants the Palestinian Authority and the Palestine Liberation Organization renew

their motion to dismiss this action pursuant to Federal Rule of Civil Procedure 12(b)(2).

## PROCEDURAL BACKGROUND

Plaintiffs commenced this action in 2004, seeking $1 billion in compensatory damages

($3 billion after trebling) under the Anti-Terrorism Act of 1991 ("ATA"), 18 U.S.C. § 2331 *et*

*seq.*, for injuries to themselves or their family members resulting from seven separate alleged

terrorism incidents occurring in or near Jerusalem, Israel, over a three-year period. Dkt No. 4.

On July 30, 2007, the Palestinian Authority ("PA") and the Palestine Liberation Organization

("PLO") filed a motion to dismiss this suit for lack of personal jurisdiction. Dkt. No. 45.

In its Memorandum and Order of September 30, 2008, the Court held that "[p]ersonal

jurisdiction must be determined on a case-by-case basis because it is dependent upon the

defendants' contacts with the State at the time the lawsuit was commenced." Dkt. No. 58 at 13

(citing *Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 52 (2d Cir. 1991)). The Court then

concluded that "limited personal jurisdictional discovery is warranted, prior to determining

defendants' motion to dismiss for lack of personal jurisdiction." *Id.* The Court therefore denied

Defendants' motion to dismiss without prejudice to renew and referred the matter to Magistrate

Judge Ronald L. Ellis for the purpose of supervising jurisdictional discovery. *Id.*

On December 1, 2008, Plaintiffs served personal jurisdiction interrogatories and requests

for documents on Defendants. Defendants served their objections and responses to this

discovery and produced documents on January 29, 2009. On May 13, 2009, Magistrate Judge

Ellis approved the parties' proposed joint order setting a briefing schedule for the renewed motion to dismiss.   Dkt. No. 65.

## ARGUMENT

**I.    Plaintiffs Have the Burden of Establishing *Each* Defendant Has Sufficient Jurisdictional Contacts with the United States When the Lawsuit Began.**

Federal Rule of Civil Procedure 4(k)(2) allows the exercise of personal jurisdiction by a federal district court when three requirements are met: (1) the claim must arise under federal law; (2) the defendant must not be subject to jurisdiction in any state court; and (3) the exercise of jurisdiction must be consistent with the United States Constitution. *Porina v. Marward Shipping Co.*, 521 F.3d 122, 127 (2d Cir. 2008).  For purposes of Rule 4(k)(2), whether the exercise of jurisdiction is consistent with the Constitution turns on whether that exercise comports with the Due Process Clause of the Fifth Amendment. *Id.*  For a plaintiff to establish that the court's exercise of jurisdiction over defendant is permissible under the Fifth Amendment's Due Process Clause, plaintiff must show the court that the defendant (i) had sufficient minimum contacts with the judicial forum during the relevant time period, and (ii) that the exercise of jurisdiction over defendant would be reasonable under the circumstances of the particular case. *Id.*

On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing that the court has jurisdiction over the defendant. *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996). *See also Hoffritz for Cutlery, Inc v. Amajac, Ltd.*, 763 F.2d 55, 57 (2d Cir. 1985) ("The burden of establishing jurisdiction over a defendant, by a preponderance of the evidence, is upon the plaintiff.").  Where "the parties have conducted extensive discovery regarding the defendant's contacts with the forum state, but no evidentiary hearing has been held -- 'the plaintiff's *prima facie* showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by [the ultimate

966675.1

trier of fact], would suffice to establish jurisdiction over the defendant.'" *Metro. Life Ins. Co.*, 84 F.3d at 567 (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir.), *cert. denied*, 498 U.S. 854 (1990)).

Where, as here, there are multiple defendant, the plaintiff may not aggregate the contacts of all defendants to establish sufficient minimum contacts with the forum as to one of the defendants. *Each* defendant must have the requisite contacts. *Rush v. Savchuk*, 444 U.S. 320, 331-32 (1980) (the "requirements of *International Shoe* . . . must be met as to each defendant"). *Accord Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n.13 (1984) ("Each defendant's contacts with the forum State must be assessed individually."); *Langenberg v. Sofair*, No. 03-cv-8339, 2006 U.S. Dist. LEXIS 65276, at *21 (S.D.N.Y. Sept. 11, 2006) ("jurisdiction cannot be implied or imputed from one defendant to another"); *Estate of Klieman v. Palestinian Authority (Klieman II)*, 467 F. Supp. 2d 107, 111  (D.D.C. 2006) (a plaintiff may not "aggregate factual allegations concerning multiple defendants in order to demonstrate personal jurisdiction over any single defendant").

When the PA's and PLO's contacts with the United States are analyzed separately, it is evident that neither defendant has sufficient contacts with the U.S. to warrant the Court's exercise of jurisdiction over it.  The PA had virtually no contacts with the United States during the relevant time period.  Most of the PLO's contacts with the United States during the relevant period were in relation to its United Nations mission office in New York and its United States mission office in Washington, D.C..  Under the government contacts exception, the activities of those offices cannot be used to establish jurisdiction over the PLO.  The government contacts exception applies to the PLO's government relations activities with the U.S. government and,

966675.1

under *Klinghoffer v. S.N.C. Achille Lauro*, extends to the PLO's UN-related activities.  937 F.2d 44, 51-52 (2d Cir. 1991).

Even if the Defendants' individual contacts with the United States were sufficient to confer personal jurisdiction, the exercise of jurisdiction would not be reasonable under the circumstances of this particular case.  It would be extremely burdensome to hale the Palestinian Authority, which is responsible for governing millions of Palestinians, into a New York federal court to litigate a case involving seven separate incidents, all of which occurred over five years ago in and around Jerusalem.  The discovery burdens of the case alone would be so disruptive of the government's operations as to raise substantial foreign policy concerns.

## II.    The Plaintiffs Cannot Meet Their Burden of Establishing That Either the PA or the PLO Has Sufficient Contacts with the United States to Warrant the Court's Exercise of Personal Jurisdiction.

In analyzing a defendant's minimum contacts, courts distinguish between specific and general jurisdiction.  Where "the claim arises out of, or relates to, the defendant's contacts with the forum" -- i.e., specific jurisdiction -- minimum contacts exist "where the defendant 'purposefully availed' itself of the privilege of doing business in the forum and could foresee being 'haled into court' there."  *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co. Ltd.*, 241 F.3d 135, 152 (2d Cir. 2001); *accord Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-76 (1985).  A forum may assert "general jurisdiction" -- *i.e.*, jurisdiction irrespective of whether the claim arises from or relates to the defendant's forum contacts -- only where these contacts are "continuous and systematic."  *U.S. Titan, Inc.*, 241 F.3d at 152; *accord Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415-16 (1984).

4

A.    **The Court Lacks Specific Jurisdiction Over the PA and PLO Because the Alleged Incidents Were Not Targeted at the United States.**

The claims before this Court occurred entirely in Israel and do not arise out of, nor do they relate to, Defendants' contacts with the United States. As such, this Court cannot assert specific personal jurisdiction over Defendants.

*Mwani v. Bin Laden* is not to the contrary. In *Mwani v. Bin Laden*, the D.C. Circuit held that a U.S. court could exercise specific jurisdiction over a foreign defendant despite the lack of any physical contact with the U.S. where the defendant engages in unabashedly malignant actions directed at and felt in the United States. 417 F.3d 1, 12-13 (D.C. Cir. 2005). In *Mwani*, the plaintiffs alleged that the defendants orchestrated the bombing of the U.S. embassy in Nairobi, "not only to kill both American and Kenyan employees inside the building, but to cause pain and sow terror in the embassy's home country, the United States." *Id.* at 13. The complaint also "described an ongoing conspiracy to attack the United States, with overt acts occurring within this country's borders," including "the 1993 World Trade Center bombing, as well as to the plot to bomb the United Nations, Federal Plaza, and the Lincoln and Holland Tunnels in New York." *Id.*

In contrast to the allegations of intent to harm the United States present in *Mwani*, here the Complaint alleges that "defendants PLO and PA authorized, ordered, instructed, solicited and directed their terrorist units . . . to organize, plan and execute a series of terrorist attacks against civilians in Israel and the West Bank." First Amended Compl. [Dkt. No. 4] at ¶ 53. Plaintiffs do not allege that U.S. property or citizens were targeted in the attacks; rather, Plaintiffs allege only that it was foreseeable that U.S. citizens would be killed as a result of acts of terrorism. *Id.*

As the court explained in *Nikbin v. Islamic Republic of Iran*, "acts of terror or torture . . . *standing alone*, can support personal jurisdiction only if the defendant expressly intended the

966675.1

effects of the act to be felt in the United States." 471 F. Supp. 2d 53, 73 (D.D.C. 2007). Here,

there are insufficient allegations of intent to cause injury in the United States to warrant the

exercise of specific jurisdiction over the PA or PLO. The acts identified in the Complaint are

generally associated with the Second Intifada, a local Palestinian uprising against the Israeli

Occupation. To the extent the perpetrators of the attacks (identified only as John Does 1-99) had

a political objective, it would have been to influence the policies of the Israeli government by

causing injury to Israel, not to cause injury to the United States.

Further, for a court to exercise specific jurisdiction, "a defendant must have 'fair

warning' that his activities could subject him to the jurisdiction of the United States." *Nikbin*,

471 F. Supp. 2d at 72 (quoting *Mwani*, 417 F.3d at 11). Even assuming *arguendo* that the PA or

PLO had any connection whatsoever with the unidentified individuals responsible for the seven

attacks identified in the Complaint, Plaintiffs do not specifically allege any acts by the PA or

PLO in relation to the John Does 1-99 or the seven incidents that would give the PA or PLO fair

warning that their actions would subject them to the jurisdiction of the United States.[1]

Accordingly, this Court cannot invoke specific personal jurisdiction.

---

[1] Vague and conclusory allegations that the PA and PLO operate "terrorist units" and orchestrated or directed these attacks cannot provide a basis for asserting specific jurisdiction over the Defendants. *See, e.g.*, First Amended Compl. ¶ 51. *See Burnett v. Al Baraka Inv. & Dev. Corp. (In re Terrorist Attacks)*, 349 F. Supp. 2d 765, 813 (S.D.N.Y. 2005) (dismissing complaint as to defendant where plaintiffs "have not presented any specific facts from which this Court could infer [the defendant's] primary and personal involvement in, or support of, international terrorism and al Qaeda" and holding that conclusory allegations "do not suffice"); *Atlantigas Corp. v. Nisource, Inc.*, 290 F. Supp. 2d 34, 42 (D.D.C. 2003) ("[P]laintiff must allege specific facts on which personal jurisdiction can be based; it cannot rely on conclusory allegations.").

966675.1

**B.    Plaintiffs Cannot Establish that Either the PA or the PLO Has Sufficient Continuous and Systematic Contacts with the United States to Warrant the Court's Exercise of General Jurisdiction.**

Where, as here, the cause of action does not arise out of the defendant's contact with the jurisdiction in which plaintiff filed suit, the plaintiff must establish that the defendant's contacts with that jurisdiction are "continuous and systematic" such that it would be reasonable to exercise general jurisdiction over the defendant. *U.S. Titan*, 241 F.3d at 152.  Because general jurisdiction is not related to the events giving rise to the suit, the minimum contacts test for general jurisdiction is more stringent than that for specific jurisdiction and requires sufficiently continuous and systematic contacts to justify haling the defendant into a court in the forum. *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996).   Sporadic and insubstantial contacts with the forum do not suffice.  In *Helicopteros Nacionales de Colombia, S.A.*, for example, the Supreme Court held that defendant corporation's contacts with the forum, consisting of the chief executive officer's trip to the forum, accepting checks drawn from a bank in the forum, purchasing equipment from a company in the forum, and sending employees to the forum for training, did not constitute continuous and systematic contacts.  466 U.S. at 416-18.

In determining the time period for assessing the contacts with the forum, the "determination of what period is reasonable in the context of each case should be left to the court's discretion."  *Metro. Life Ins. Co.*, 84 F.3d at 570.  According to the Second Circuit, "district courts should examine a defendant's contacts with the forum state over a period that is reasonable under the circumstances -- up to and including the date the suit was filed -- to assess whether they satisfy the 'continuous and systematic' standard."  *Id.* at 569-70.  For purposes of discovery, the parties agreed the relevant period was the six-year period preceding the filing of the Complaint (January 16, 1998 to January 16, 2004).

Defendants now address the PA's and PLO's "contacts" with the United States in the years immediately preceding the filing of the January 16, 2004, Complaint.   As discussed in Part II.B.1. immediately below, almost all of these contacts arise out of presence of two PLO offices in the United States -- the New York City office of the Permanent Observer Mission of Palestine to the United Nations and the District of Columbia Office of the PLO Mission to the United States.   As discussed in Part II.B.2, the diplomatic and government-relations activities of these offices cannot be counted as "contacts" with the United States for purposes of establishing personal jurisdiction.   While these two offices, especially the D.C. office, also engage in public affairs activities on behalf of the PA and PLO, these activities -- even assuming they could be considered as jurisdictional contacts -- are insufficient to confer general personal jurisdiction.

      1.    *The PLO's U.S. Contacts Are Insufficient to Establish General Jurisdiction.*

The Palestinian Authority was established in the mid-1990s through a series of agreements between Israel and the PLO known as the Oslo Accords.   One of the Oslo agreements -- The Interim Agreement on the West Bank & the Gaza Strip, Sept. 28, 1995, Isr.-P.L.O., 36 I.L.M. 551 -- enumerated those powers and responsibilities to be transferred to the PA.   Article IX of the Interim Agreement, however, denied the PA authority over foreign relations, including the establishment of embassies, the hiring of diplomatic staff, and the exercise of diplomatic functions. *Id.* at 561.   Instead, the Interim Agreement permitted the PLO to conduct limited foreign affairs activities on behalf of the PA. Those activities pertained only to economic, cultural, scientific, and educational matters. *Id.* at 560-61; *accord Ungar v. Palestine Liberation Organization*, 402 F.3d 274, 287, 291 (1st Cir. 2005).   Consistent with the arrangement struck in the Interim Agreement, it is the PLO, not the PA who maintains offices in the United States -- specifically the UN office in New York and the U.S. mission office in

966675.1

Washington, D.C.. *See also* Exh. 1 (June 22, 1994, Letter from the U.S. Department of State Office of Foreign Missions to Hasan Abdel Rahman designating the U.S. PLO office as a foreign mission pursuant to the Foreign Missions Act); Exh. 2 (United Nations General Assembly Resolution 3237, U.N. GAOR, 29th Sess., Supp. No. 31, at 4, U.N. Doc. A/9631 (1974) (granting the PLO observer status at the United Nations)).

### a.     The PLO's D.C. Office

During the January 1998 to January 2004 period, the PLO Mission to the United States (the "D.C. Office") had a total of 14 employees, not all of whom were employed at any one time. *See* Exh. 3 (Defs.' Objs. & Answers to Pls.' Personal Jurisdiction Interrogs.) at 5-6.[2]  In addition to the Head of the Mission, Hasan Abdel Rahman, at various times, the D.C. Office employed a Deputy Chief, a Consular Affairs Officer, a Congressional Affairs Officer, an Information Officer, an attorney, an accountant, a researcher, a commercial attaché, and a receptionist.  *Id.* at 9, 12 (Defs.' Answer to Interrog. #3).  In addition, the D.C. Office employed a driver, a cook and a secretary who assisted Mr. Abdel Rahman.  *Id.*

During this period, the PLO Mission to the United States rented office space in the District of Columbia.  At the time the suit was initiated, the PLO rented a small office at 1320 18th Street, N.W., Suite 200.  *Id.* at 16 (Defs.' Answer to Interrog. #5).  As would be expected, the D.C. Office had relationships with, or purchased supplies or services from, a number of vendors and service providers as necessary to carry out the routine operations of the office.  *See* Exh. 4 at 8-11 (Defs.' Objs. & Resps. to Pls.' Personal Jurisdiction Req. for Docs. #4).

---

[2] Two of the individuals employed at the PLO Mission to the United States at certain times during the relevant period were PA employees seconded to the PLO; the other 12 individuals were PLO employees. Exh. 3 at 5-6 (Defs.' Answer to Interrog. #1).

The D.C. Office did not maintain bank account records for the 1998-2001 period, but for the 2002-January 2004 period, Defendants are aware of at least two checking accounts maintained by the D.C. Office. Exh. 3 at 20 (Defs.' Answer to Interrog. #8). These checking accounts maintained balances that were minimally sufficient to fund the basic operations of the office. As reflected in the checking account statements and books and records produced to Plaintiffs, the D.C. Office's checking accounts regularly had to be replenished once the monthly bills and salaries were paid.

Pursuant to the Foreign Agents Registration Act of 1938, the PLO's D.C. Office reported its activities to the U.S. Department of Justice. As reflected in the initial registration statement, the Washington office is an office of the PLO. *See* Exh. 5 at 02:000391. Further, the registration statement avers: the "PLO offices in Washington, D.C. shall represent the PLO and the Palestinian Authority in the United States and will promote peace and development with Israel. The PLO and the Palestinian Authority will pay for the expenses of the office and the salaries of the employees." *Id.* at 02:000393. Thus, though established and run as a PLO office, the PLO Mission to the United States did advocate on behalf of the PA's interests and received some funding and an occasional employee from the PA.

b.    The PLO's New York Office

Throughout the January 1998 to January 2004 period, the New York office of the Permanent Observer Mission of Palestine to the United Nations employed 21 individuals, though not all were employed at any one time. *See* Exh. 3 at 7 (Defs.' Answer to Interrog. #2). One of those individuals at certain times during the relevant period was a PA employee seconded to the PLO's New York Office; the rest were employees of the PLO. *Id.* In addition to the Permanent Representative of Palestine to the United Nations, Nasser Al-Kidwa, the New York Office

966675.1

employed at various times during this period, a Political Officer, a Political Affairs Officer, a

Senior Advisor, a "Second Secretary," a secretary, an administrative assistant, a driver, a

receptionist, a security guard, and cleaning staff. *Id.* at 8-12 (Defs.' Answer to Interrog. #3).

During this period, the PLO owned the New York office and residence used by the

Permanent Observer Mission of Palestine to the United Nations. The office/residence is located

at 115 East 65th Street in New York City. *Id.* at 19 (Defs.' Answer to Interrog. #8). For purposes

of paying salaries, utility bills, and other local operational expenses, the PLO's New York Office

maintained a checking account at Chase Manhattan Bank, the monthly ending balance of which

varied over the period, from a high of @ $143,500 to a low of $837.59. *Id.* at 20 (Defs.' Answer

to Interrog. #8).

As with the D.C. Office, the PLO's New York Office had relationships with, or

purchased supplies or services from a number of vendors and service providers in connection

with the routine operation of the office. Exh. 4 at 11 (Defs.' Response to Req. for Doc. #4).

      c.    <u>The Contacts Associated with the PLO's U.S. Offices Cannot Be</u>
<u>Considered for Purposes of Establishing Personal Jurisdiction.</u>

Under the "government contacts exception," a defendant's non-commercial contacts with

the nation's capital are exempted from consideration when a court determines whether it has

personal jurisdiction over that defendant. *See, e.g., Cellutech, Inc. v. Centennial Cellular Corp.*,

871 F. Supp. 46, 50 (D.D.C. 1994). Citing the government contacts exception, this jurisdiction

has concluded that "the presence of an embassy or consulate alone is insufficient to find general

jurisdiction over a foreign sovereign defendant." *Frontera Res. Azer. Corp. v. State Oil Co.*, 479

F. Supp. 2d 376, 387 n.4 (S.D.N.Y. 2007). *See also Klinghoffer*, 937 F.2d at 51 (jurisdiction

cannot be based on the PLO's UN-related activities in New York). Here, therefore, the presence

of the PLO Mission to the United States and Permanent Observer Mission of Palestine to the

966675.1

United Nations offices in the U.S. is insufficient to confer general jurisdiction. Accordingly, the activities associated with the running of those exempt offices (such as the hiring of employees, leasing of computers and office space, contracting for electricity, telephones and other utilities, and maintaining an operating account at a local bank) cannot be used to establish jurisdiction.

As the court explained in *Cellutech,* the "District of Columbia's unique character as the home of the federal government requires this [government contacts] exception in order to maintain unobstructed access to the instrumentalities of the federal government." 871 F. Supp. at 50. Although this exception is "based in part on the constitutional right to petition the Government for redress of grievances," it also is based on "non-constitutional policy considerations, such as the Judiciary's reluctance to interfere with the smooth functioning of other governmental entities." *Klinghoffer*, 937 F.2d at 51.

The government contacts doctrine often is applied in instances where a plaintiff seeks to use a defendant's lobbying contacts with Congress or a federal agency to establish personal jurisdiction over a defendant. *See, e.g., Brunson v. Kalil & Co.*, 404 F. Supp. 2d 221, 235 (D.D.C. 2005). But, the doctrine has been applied to exempt contacts with a wide array of entities residing in the nation's capital. Indeed, as the Second Circuit Court of Appeals has recognized, "[t]he use of jurisdictional immunities," such as the government contacts exception, "to further non-constitutional policy goals is not limited to the context of government lobbying." *Klinghoffer*, 937 F.2d at 52 n.7. Accordingly, in *AGS Int'l Servs. S.A. v. Newmont USA Ltd.*, 346 F. Supp. 2d 64, 76 (D.D.C. 2004), the court exempted a defendant's contacts with foreign embassies from its personal jurisdiction analysis because "the District of Columbia is the only district in the country where these embassies are located." *See also Fasolyak v. Cradle Society, Inc.,* No. 06-01126, 2007 U.S. Dist. LEXIS 52041, at *29-*34 (D.D.C. July 19, 2007)

966675.1

(exempting contact with foreign embassy for purposes of personal jurisdiction analysis). Likewise, in *World Wide Minerals Ltd. v. Republic of Kazakhstan*, 116 F. Supp. 2d 98, 105-106 (D.D.C. 2000), the court refused to consider a defendant's membership in a trade organization located in Washington D.C. and the defendant's participation in conferences held by this trade organization for purposes of asserting personal jurisdiction.

In applying the government contacts exception, courts have distinguished between offices set up in Washington to generate commercial business with the U.S. government and those offices set up to deal with the federal government as policy maker and regulator. *See Nalls v. Rolls-Royce Ltd.*, 1980 U.S. App. LEXIS 21294, at *5 (D.C. Cir. Jan. 17, 1980) ("Cases that have applied the government contacts exception have done so where a company is present in the District of Columbia to deal with federal government qua regulator or policymaker, not with the government qua consumer."). In *Fandel v. Arabian American Oil Co.*, 345 F. 2d 87 (D.C. Cir. 1965) -- the case that helped establish the government contacts exception -- the D.C. Circuit held that the government contacts exception should apply whenever a defendant's contacts with the nation's capital are derived from the "special needs for a continuous and ponderable physical presence there, which needs are not those customarily associated with strictly commercial operations." *Id.* at 89.

*Fandel* merits special attention because the facts of that case are analogous to those present here. In *Fandel*, the defendant (Aramco) was in the business of selling oil and gas in the Middle East, particularly, in Saudi Arabia and Lebanon. *Id.* at 88. To support these business efforts, Aramco maintained a six-room office in Washington D.C. staffed by five employees. *Id.* Aramco's Washington D.C. office was not established to solicit sales or engage in commercial transactions for the company. Instead, as the *Fandel* court explained:

966675.1

> What [Aramco] does do in the District is to maintain continuing relationships with the State Department and other executive agencies of the United States Government, with diplomatic missions accredited to that Government, and with educational and international organizations, private and public, interested in, or informed about, the Middle East generally and Saudi Arabia in particular. Information about [Aramco] and its operations and experience in Saudi Arabia is made available to these entities, and information received from them is reported to the executive staff directing business operations in Saudi Arabia.

*Id.* The court characterized Aramco's Washington D.C. office as its "state department" and noted that it was established to act as Aramco's "diplomatic and intelligence apparatus." *Id.* The court pointed out that the only reason Aramco had established this office in Washington D.C. "[is] simply because of what Washington is, namely the capital city where public and private persons, with interests or responsibilities in the Middle East, foregather and make their contribution, real or fancied, to the formulation of official policies." *Id.* Under these circumstances, the court held that it lacked jurisdiction over Aramco sufficient to "expos[e] it to suit [in Washington D.C.] by Californians in respect of personal injuries sustained in an accident in Saudi Arabia." *Id.* at 89.

Under *Fandel* and its progeny, a federal district court should not exercise general jurisdiction over a defendant based on the defendant's "presence" in Washington D.C. when that presence has been established solely to facilitate relations of a "diplomatic rather than business nature." *Dooley v. United Technologies*, 786 F. Supp. 65, 76 (D.D.C. 1992) (citing *Fandel*). Such a presence is "not the type . . . worthy of consideration for jurisdictional purposes." *AGS Int'l. Servs.*, 346 F. Supp. 2d at 76. *See also Fasolyak*, 2007 U.S. Dist. LEXIS 52041, at *31 (citing *Fandel* as "controlling precedent recognizing that general jurisdiction is inappropriate when a defendant's presence in this particular forum is necessitated by virtue of the fact that this is the only place where federal agencies, embassies, and other such instrumentalities are located").

966675.1

Just as the PLO's U.S. mission office in Washington, D.C. cannot be used to establish general jurisdiction, nor can the PLO's United Nations mission office in New York be used as a source of jurisdictional contacts. In *Klinghoffer*, the Second Circuit Court of Appeals recognized that "basing jurisdiction on the PLO's participation in UN-related activities would put an undue burden on the ability of foreign organizations to participate in the UN's affairs," 937 F.2d at 51, and held that such contacts could not be used to establish jurisdiction over the PLO. The same concerns animating recognition of the government contacts exception "militate against basing jurisdiction over the PLO on its UN-related activities." *Id.* at 51-52.

> d.    Public Appearances by Heads of the Mission Offices Do Not Create General Jurisdiction over the PLO.

In connection with their effort to build support for Palestinian statehood among U.S. and U.N. policy-makers, senior employees of both the U.S. and U.N. mission (usually the heads of the missions) gave speeches and interviews and made other public appearances. *See* Exh. 3 at 12-15 (Defs.' Answer to Interrog. #4). In addition, the public relations activities of the PLO's D.C. office are detailed in the FARA registration statements submitted to the Department of Justice and provided to the Plaintiffs in discovery. *See* Exh. 4 at 11-12 (Defs.' Resp. to Req. for Doc. #5).

Plaintiffs likely will cite the Second Circuit's decision in *Klinghoffer*, 937 F.2d at 52, as support for their position that the PLO's public speaking activities in the United States are sufficient to confer personal jurisdiction. In *Klinghoffer*, the court noted that members of the PLO's Mission to the United Nations "[spoke] in public and to the media in New York in support of the PLO's cause" and engaged in "other proselytizing and fund-raising activities." *Id.* In dicta, the court stated: "*Taken together*, we believe these activities would suffice to meet the doing business standard [of New York's personal jurisdiction statute]." *Id.* (emphasis added).

966675.1

The court was quick to point out, however, that "evidence in the record concerning the PLO's non-UN activities is limited to deposition testimony taken before the end of 1987, when Congress passed the [Anti-Terrorism Act ("ATA")]," which placed restrictions on the PLO's operations in the United States. *Id.* (footnote omitted). The court noted that, "[i]n light of the ATA, it is quite possible that the PLO was forced to cease its non-UN activities in New York some time after 1987," and "personal jurisdiction over the PLO may be lacking with respect to those complaints that were filed after 1987." *Id.*

*Klinghoffer* does not support the exercise of general jurisdiction based solely on the PLO's public-speaking appearances. In *Klinghoffer*, the court held only that public-speaking, *when combined with* proselytizing and fundraising activity could be sufficient to establish minimum contacts with the U.S. under New York's personal jurisdiction statute. *Id. See also Metro. Life Ins. Co.*, 84 F.3d 560, 570 n.9 (explaining that, "[i]n *Klinghoffer* the district court's exercise of jurisdiction over the [PLO] was premised upon evidence of certain *fundraising and 'proselytizing' activities* antedating the 1987 passage of the Anti-Terrorism Act, which made most PLO activity in the United States unlawful") (emphasis added).

Whether the public speaking (lectures, interviews, etc.) can be characterized as "proselytizing" or as attempting to influence U.S. and U.N. policy makers is largely in the eye of the beholder. Certainly, Defendants would characterize it as the latter and as covered by the government contacts exception. Here, the public-speaking activities were of a decidedly "diplomatic rather than business nature," *Dooley*, 786 F. Supp. at 76, and should thus be encompassed by the government contacts exception. In *Fandel*, the D.C. Circuit exempted all activities of Aramco's D.C. office even though Aramco "maintain[ed] continuing relationships" with "educational and international organizations, private and public, interested in, or informed

966675.1

about, the Middle East generally and Saudi Arabia in particular," and made information available

to these organizations, including through briefings. 345 F.2d at 88. Like the D.C. Circuit in

*Fandel*, this Court should not countenance an attempt to assert jurisdiction over the PLO simply

because it appeared before educational, news, and think-tank organizations in an effort to

influence U.S. and UN policymakers. These activities are not commercial in nature, so should

not be counted. With respect to fundraising, neither the books and records available from the

1998-2004 period and produced to Defendants nor the FARA statements reflect any significant

fundraising activity on the part of the PLO's D.C. or New York Offices. Indeed, the books and

records show that these offices were funded by Defendants, not third parties.

2.    *The PA's Contacts with the United States Are Insufficient to Establish Personal Jurisdiction.*

Unlike the PLO, the PA does not operate any offices in the U.S., nor does it own any real

estate or maintain any bank accounts here. *See* Exh. 3 at 17-19 (Defs.' Answer to Interrog. #7).

During the January 1998-January 2004 period, three PA employees were seconded, at various

times, to either the PLO's D.C. or New York offices. *Id.* at 6-7 (Defs.' Answers to Interrog. #1,

2). From early 1998 through 2002, the PA owned a Palestinian-based entity called the Palestine

Commercial Services Company ("PCSC"), which, in turn, at certain times during that period

owned or held interests in various entities or funds the assets of which included investments

located or managed from the United States. The U.S.-related entities or funds in which PSCS

held an interest and the value of those entities as of December 31, 2003, are detailed in

Defendants' Answer to Interrogatory #7. *Id.* at 18-19. As of January 1, 2003, a year before this

lawsuit commenced, PCSC, including its ownership of interests in the U.S.-related entities or

funds, was transferred to the Palestine Investment Fund. *Id.* at 18.

966675.1

In addition, during this January 1998-January 2004 period, the PA entered into a few contracts with U.S.-based consultants, including the Bannerman & Associates lobbying firm. *See* Exh. 4 at 8-9 (Defs.' Response to Req. for Doc. #4). Plaintiffs previously have identified the PA's relationship with Bannerman as a contact with the United States for purposes of the personal jurisdiction analysis. *See* Dkt. No. 50 at 10. This relationship, however, cannot be used to establish jurisdiction over the PA. Lobbying members of Congress and other federal instrumentalities is "precisely the type of activit[y] protected by the 'government contacts' exception and cannot serve as the basis for personal jurisdiction." *Atlantigas Corp.*, 290 F. Supp. at 44-45. That the PA employed Bannerman to lobby the United States government, as opposed to engaging in lobbying activities on its own behalf, is of no import for purposes of the government contacts exception. *See In Re: Vitamins Antitrust Litigation*, Misc. No. 99-197, 2001 U.S. Dist. LEXIS 25073, at *40-*41 (D.D.C. Oct. 30, 2001) ("[T]he hiring of a consulting company to assist with the company's regulatory affairs [] fall[s] within the government contacts exception."); *Cellutech, Inc.*, 871 F. Supp. at 50 ("The fact that defendants engaged a District of Columbia attorney to assist with the FCC filing does not change the outcome under the government contacts exception.").

In any event, the PA's few contracts with U.S. consultants does not demonstrate a continuous and systematic presence in the United States. The *Frontera* case from this jurisdiction is squarely on point. In *Frontera Resrouces Azerbaijan Corp. v. State Oil Co.*, 479 F. Supp. 2d 376 (SDNY 2007), plaintiff alleged the following contacts of defendant SOCAR with the United States: (1) SOCAR had entered into seven production-sharing contracts with U.S. oil companies; (2) Exxon Mobil and Chevron were the operators of three production-sharing contracts in Azerbaijan, with a total investment of over $7 billion; (3) at a signing

966675.1

ceremony in Azerbaijan, SOCAR, three U.S. oil companies, and other foreign oil companies

signed a production-sharing contract for development of Azerbaijan's offshore oil fields; and (4)

SOCAR signed a $750 million loan agreement with a syndicate that included U.S. bank

Citibank. *Id.* at 386. The court held that the fact that American oil companies and one bank

have entered into contracts with SOCAR does not approximate a sufficient physical presence in

the U.S. for purposes of establishing personal jurisdiction. *Id.* at 387.[3]

### III. Even If Plaintiffs Could Establish that Either the PA or PLO Had Sufficient Continuous and Systematic, Non-Exempt Contacts with the United States, Personal Jurisdiction Should Nonetheless Not Be Exercised Here.

Even if the Court finds that Defendants have "sufficient minimum contacts, [it must then]

proceed to the second stage of the due process inquiry, and consider whether the assertion of

personal jurisdiction is reasonable under the circumstances of the particular case." *Porina v.*

*Marward Shipping Co.*, 521 F.3d 122, 127 (2d Cir. 2008) (internal quotations omitted). Thus,

even if the Court finds that there are sufficient minimum contacts to establish specific or general

jurisdiction over either the PA or the PLO, the Due Process Clause proscribes the exercise of

personal jurisdiction where haling the defendants into court in the United States would "offend

traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington,* 326 U.S.

310, 316 (1945). The more questionable a plaintiff's showing of defendant's contacts with the

relevant forum, the less demanding defendant's burden of establishing unreasonableness

---

3 *See also* the cases on which the *Frontera* court relied (479 F. Supp. 2d at 387): *Oceanic Exploration Co. v. ConocoPhillips, Inc.,* No. 04 Civ. 332 (EGS), 2006 U.S. Dist. LEXIS 72231 (D.D.C. Sept. 21, 2006) (finding no basis for jurisdiction under Rule 4(k)(2) upon plaintiff's allegation that defendant had sold oil to the United States, signed production-sharing contracts with U.S. companies, and made deposits into bank accounts in New York); *Base Metal Trading v. Ojsc Novokuznetsky Aluminum Factory,* 283 F.3d 208, 216 (4th Cir. 2002) (same where defendant "is a major aluminum producer in Russia and has extensive business contacts inside Russia as well as around the world including in the United States"); *Helicopteros, 466 U.S. at 416* (holding that purchasing in forum, sending personnel for training in forum, and negotiating a contract in forum were not sufficient to establish general jurisdiction).

966675.1

becomes. *Metro. Life Ins. Co.*, 84 F.3d at 568-69, (citing *Ticketmaster-New York, Inc. v. Alioto*, 26 F.3d 201, 210 (1st Cir. 1994) ("We think . . . that the reasonableness prong of the due process inquiry evokes a sliding scale: the weaker the plaintiff's showing [on minimum contacts], the less a defendant need show in terms of unreasonableness to defeat jurisdiction.") (alteration in original)).

In conducting this reasonableness analysis, the court must apply the five-factor test set forth in the Supreme Court's *Asahi Metal Industry Co., v. Superior Court of Cal.*, 480 U.S. 102, 113 (1987). *Metro. Life Ins. Co.*, 84 F.3d at 573. Thus, the Court must balance: (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furtherance of substantive social policies. *Asahi*, 480 U.S. at 113 (quotations omitted). These factors overwhelmingly weigh in favor of the Court declining to exercise personal jurisdiction over the PA and PLO in this case.

     1.    Burden on the Defendants.

"The unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." *Id.* at 114. The exercise of personal jurisdiction over Defendants in this case will impose a substantial burden on Defendants. The bulk of the discovery burden will fall on the Palestinian Authority and its senior officials. These officials play a central role in the Mid-East peace process and in maintaining security and order in an area known for conflict. The PA also is responsible for governing millions of Palestinians, many of whom live in extreme poverty and are dependent on government services. Subjecting the PA to intrusive U.S.-style discovery regarding vague conspiracy and material support theories relating

to seven different incidents -- many of which occurred over seven years ago -- would severely

strain the PA's limited resources and divert its officials from managing the ongoing Israeli-

Palestinian conflict and internal conflict with Hamas. The PA is not a major corporation or a

government with developed institutional structures and a fleet of trained, English-speaking staff

standing ready to deal with U.S. discovery. The litigation would have to be addressed by a

relatively small group of people, all of whom are urgently needed to attend to governing the PA.

The burden of litigating this suit in New York is particularly acute because the events

giving rise to this lawsuit occurred in Israel. With most of the evidence and witnesses located in

Israel and the West Bank / Gaza and most of the documents in Arabic or Hebrew, defending this

lawsuit in the United States poses an unreasonable burden on the PA and PLO. *See Metro. Life*

*Ins. Co.*, 84 F.3d at 574 (finding it significant for purposes of the first *Asahi* factor that no

relevant "records, files, or witnesses with information about the litigation" were located in

plaintiff's chosen forum).

    2.    Interests of the Forum.

The second factor, interests of the forum, also weighs in favor of the United States

declining jurisdiction. The lack of nexus between the forum conducting the personal jurisdiction

inquiry, the incident, and the parties reflects adversely on the forum's interest in resolving the

dispute at hand. *See Asahi*, 480 U.S. at 114. Here, as noted, the incidents took place in and

around Jerusalem during the Second Intifada and arose out of the ongoing Israeli-Palestinian

conflict. Israel has an overriding interest in determining liability and providing redress for such

incidents. The United States' interests are minimal in comparison to those of Israel.

Moreover, the forum's interest in "considerably diminished" when the plaintiff is not a

resident of the forum. *Id.* Notably, the Complaint does not allege the residency of the Plaintiffs

but it is likely that many were residents of Israel.

3.    Interests of the Plaintiffs.

For similar reasons, the third *Asahi* factor -- the Plaintiffs' interest in obtaining

convenient and effective relief -- also does not support this Court's exercise of jurisdiction over

the PA and PLO.  In *Metro. Life Ins. Co.*, the Second Circuit Court of Appeals explained that this

factor is solely concerned with considerations such as the location of evidence or witnesses; that

plaintiff might enjoy certain procedural advantages by bringing suit in the chosen forum is of no

consequence.  84 F.3d at 574 (holding that "choice-of-law considerations," such as whether

plaintiff might enjoy a more generous statute of limitations in the chosen forum, may not be

considered during the jurisdictional inquiry; plaintiff must instead demonstrate that factors such

as the location of evidence or witnesses make the chosen forum more convenient).  Accordingly,

that the United States judicial system might provide greater compensation in the event that

Plaintiffs successfully prove their allegations cannot be taken into account when assessing the

Plaintiffs' interest in litigating in the United States.

Here, the location of witnesses and evidence outside the U.S. preclude Plaintiffs from

arguing that their interest in obtaining convenient and effective relief warrant the Court's

exercise of jurisdiction.  Virtually all of the evidence and witnesses (except perhaps some of the

Plaintiffs) pertinent to this case would be located in Israel or the West Bank / Gaza and virtually

none of the relevant documents will be in English.  Moreover, Plaintiffs have not alleged they are

U.S. residents.  To be sure, Plaintiffs have alleged U.S. citizenship but many Israeli residents

also hold U.S. citizenship, and it is residency, not citizenship, that matters for purposes of the

*Asahi* factors.  Moreover, Plaintiffs may not attempt to create jurisdiction in the United States by

joining in the same lawsuit incidents involving U.S. residents with otherwise unrelated incidents

involving non-U.S. residents for the purpose of establishing the U.S. as a convenient forum.

966675.1

> 4.    Efficient Administration of Justice.

In evaluating the fourth *Asahi* factor, efficient administration of justice, "courts generally consider where witnesses and evidence are likely to be located." *Metro. Life Ins. Co.*, 84 F.3d at 574. Again, other than perhaps some of the Plaintiffs, witnesses and evidence relevant to this case are located in Israel or the West Bank / Gaza, not in the United States. Thus, this factor also does not support the Court's exercise of jurisdiction.

> 5.    Social Policies.

The *Asahi* court "admonished courts to take into consideration the interests of the 'several States,' in addition to the forum state, in the efficient judicial resolution of the dispute and the advancement of substantive policies." 480 U.S. at 115. In the present case, as in *Asahi*, "this advice calls for a court to consider the procedural and substantive policies of other *nations* whose interests are affected by the assertion of jurisdiction." *Id.* (emphasis in original). With respect to this fifth *Asahi* factor, the Supreme Court explained:

> The procedural and substantive interests of other nations in a [U.S.] court's assertion of jurisdiction over an alien defendant will differ from case to case. In every case, however, those interests, as well as the Federal Government's interest in its foreign relations policies, will be best served by a careful inquiry into the reasonableness of the assertion of jurisdiction in the particular case, and an unwillingness to find the serious burdens on an alien defendant outweighed by minimal interests on the part of the plaintiff or the forum State. Great care and reserve should be exercised when extending our notions of personal jurisdiction into the international field.

*Id.* (quotation omitted).

This factor overwhelming weighs against the exercise of jurisdiction over Defendants. First, Israel has a substantially greater interest in providing remedies for acts of terrorism directed at its civilian population and occurring within its borders than does the United States. Given Israel's much deeper connection to the dispute, this Court should decline to exercise jurisdiction over this case.

966675.1

Moreover, the Supreme Court admonished courts to consider the interests of the world community in assessing reasonableness. As previously explained, the vast majority of the contacts that Defendants have with the United States that could arguably be considered in assessing personal jurisdiction over them are those that the PLO has made through certain of its U.S. and U.N. mission activities. On multiple occasions, the U.N. General Assembly has called upon the international community to "accord to the delegations of the national liberation movements . . . accorded observer status by international organizations," such as the Palestine Permanent Observer Mission to the U.N., "the facilities, privileges and immunities necessary for the performance of their functions, in accordance with the provisions of the Vienna Convention on the Representation of States in Their Relations with International Organizations of a Universal Character [("Vienna Convention")]." *See* Exh. 6 (collecting relevant U.N. General Assembly Resolutions). The protections accorded diplomatic missions under the Vienna Convention Article 30 include, *inter alia*, that: "The head of mission and the members of the diplomatic staff of the mission shall enjoy immunity from the . . . civil and administrative jurisdiction" of the host State. Vienna Convention on Diplomatic Relations, signed Apr. 18, 1961 and entered into by the United States Dec. 13, 1972, 23 U.S.T. 3227 (1972).

In sum, given the lack of nexus between Plaintiffs, the events alleged in the Complaint, and the United States; the heavy burden on Defendants that litigating this case in the United States would impose; the fact that any relevant witnesses and evidence would be located in Israel and the Occupied Palestinian Territory; Israel's much stronger interest in adjudicating this dispute; and the caution that the Court must show when extending U.S. notions of personal jurisdiction into the international field, application of the *Asahi* factors leads to the conclusion

that the exercise of jurisdiction over the PA and PLO in the circumstances of this case would be

unreasonable and, consequently, would not comport with due process.

## CONCLUSION

For the reasons set forth above, Defendants PA and PLO request that the Court dismiss

the complaint as to the PA and PLO for lack of personal jurisdiction.

Respectfully Submitted,

May 29, 2009                     _/s/ Mark J. Rochon_____

Mark J. Rochon
Richard A. Hibey
MILLER & CHEVALIER CHARTERED
655 15th St., N.W., Suite 900
Washington D.C. 20005-6701
Ph. (202) 626-5800
Fax: (202)626-5801
Email: mrochon@milchev.com
Email: rhibey@milchev.com

*Counsel for Defendants the Palestinian Authority and the
Palestine Liberation Organization*

966675.1

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 29th day of May, 2009, a true and genuine copy of the foregoing was filed by ECF, which will automatically send notification and a copy of such filing to the following counsel of record:

> David J. Strachman
> McIntyre, Tate & Lynch, LLP
> 321 South Main Street, Suite 400
> Providence, RI 02903
> Phone: (401) 351-7700
> Fax: (401) 331-6095
> Email: djs@mtlhlaw.com

> Olimpio Lee Squitieri
> Squitieri & Fearon, LLP
> 32 East 57th Street, 12th Floor
> New York, NY 10022
> Phone: (212) 421-6492
> Fax: (212) 421-6553
> Email: lee@sfclasslaw.com

> *Attorneys for Plaintiffs*

> /s/ Mark J. Rochon

966675.1