# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

MARK I. SOKOLOW, *et al.*,

      Plaintiffs,

      v.

THE PALESTINE LIBERATION
ORGANIZATION, *et al.*,

      Defendants.

Civil Action No. 04cv397 (GBD) (RLE)

---

**MEMORANDUM OF LAW IN SUPPORT OF THE PALESTINIAN AUTHORITY'S
AND THE PALESTINE LIBERATION ORGANIZATION'S
RENEWED MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(2)**

Mark J. Rochon
Richard A. Hibey
Laura G. Ferguson
MILLER & CHEVALIER CHARTERED
655 15th St., N.W., Suite 900
Washington D.C. 20005-6701
Ph. (202) 626-5800
Fax: (202) 626-5801

*Counsel for Defendants Palestinian Authority and
Palestine Liberation Organization*

1040517.1

# TABLE OF CONTENTS

**Page**

PROCEDURAL HISTORY ................................................................. 1

ARGUMENT

I.   Plaintiffs Have the Burden of Establishing *Each* Defendant Had Sufficient
     Jurisdictional Contacts with the United States During the Relevant Period.............. 3

II.  Plaintiffs Cannot Meet Their Burden of Establishing That Either the
     PA or the PLO Had Sufficient Contacts with the United States During the Relevant
     Period to Warrant the Court's Exercise of Personal Jurisdiction. ............................ 4

     A.   The Court Lacks Specific Jurisdiction over the PA and PLO Because
          the Alleged Incidents Were Not Targeted at the United States ..................... 5

     B.   Plaintiffs Cannot Establish that Either the PA or the PLO Had Sufficient
          Continuous and Systematic Contacts with the United States to
          Warrant the Court's Exercise of General Jurisdiction .................................. 7

          1.   The PLO's U.S. Contacts Were Insufficient to Establish General
               Jurisdiction........................................................................... 8

          2.   The PA's U.S. Contacts Were Insufficient to Establish General
               Jurisdiction........................................................................... 17

III. Even If Plaintiffs Could Establish that Either the PA or PLO Had Sufficient
     Continuous and Systematic, Non-Exempt Contacts with the United States,
     Personal Jurisdiction Should Nonetheless Not Be Exercised Here .......................... 19

IV.  Defendants' 12(b)(6) Motion to Dismiss Plaintiffs' Non-Federal Law Claims ........ 24

CONCLUSION.................................................................................. 25

1040517.1

### MEMORANDUM OF LAW IN SUPPORT OF THE PALESTINIAN AUTHORITY'S AND THE PALESTINE LIBERATION ORGANIZATION'S RENEWED MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(2)

The Palestinian Authority ("PA") and the Palestine Liberation Organization ("PLO") renew their motion to dismiss this action pursuant to Federal Rule of Civil Procedure 12(b)(2) and the Court's order of March 11, 2010.  Dkt. No. 79.  After conducting personal jurisdiction discovery for over one year, Plaintiffs remain unable to establish that either the PA or PLO has sufficient contacts with the United States to warrant the Court's exercise of personal jurisdiction.

### PROCEDURAL HISTORY

Plaintiffs commenced this action in 2004, seeking $1 billion in compensatory damages ($3 billion after trebling) under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, for injuries to themselves or their family members resulting from seven separate alleged terrorism incidents occurring in or near Jerusalem during the 2001-2004 period.  Dkt. No. 4.  On July 30, 2007, the PA and PLO filed a motion to dismiss for lack of personal jurisdiction.  Dkt. No. 45.  Plaintiffs moved for summary denial or, in the alternative, for jurisdictional discovery to "build the factual record showing defendants' contacts with the United States."  Dkt. No. 50 at 11.

On September 30, 2008, the Court granted Plaintiffs' request to conduct personal jurisdiction discovery and denied Defendants' motion to dismiss without prejudice to renew. Dkt. No. 58.  In its Memorandum Decision, the Court recognized that "[p]ersonal jurisdiction must be determined on a case-by-case basis because it is dependent upon the defendants' contacts with the State at the time the lawsuit was commenced."  *Id.* at 13 (citing *Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 52 (2d Cir. 1991)).  The Court then concluded that "limited personal jurisdictional discovery is warranted, prior to determining defendants' motion to

dismiss for lack of personal jurisdiction." *Id.* Accordingly, the Court referred the matter to

Magistrate Judge Ronald L. Ellis for the purpose of supervising jurisdictional discovery. *Id.*

Following the Court's decision, the Plaintiffs conducted personal jurisdiction discovery

for over one year. On December 1, 2008, Plaintiffs served their discovery (interrogatories,

requests for documents, and two deposition notices) to which Defendants responded on January

29, 2009. With respect to the depositions noticed on December 1, 2008 -- relating to the former

heads of the Washington, D.C. and New York offices of the PLO -- Plaintiffs ultimately declined

to schedule them.

Following Plaintiffs' receipt of Defendants' interrogatory answers and document

production, Plaintiffs then sought to keep personal jurisdiction discovery open pending their

review of Defendants' renewed motion to dismiss. On May 13, 2009, Magistrate Judge Ellis

approved the parties' proposed joint order setting a briefing schedule for the renewed motion to

dismiss and establishing a procedure and timetable for resolving any outstanding discovery

issues. Dkt. No. 65.

On May 29, 2009, Defendants filed their renewed motion to dismiss. Dkt. Nos. 66, 67.

Plaintiffs then sought to depose two additional individuals, but Magistrate Judge Ellis concluded

during a September 11, 2009, telephonic hearing that such depositions were not warranted. Dkt.

No. 75. Plaintiffs also filed a motion to compel production but subsequently withdrew the

motion. *See* Dkt. Nos. 69, 70, 72, 77. On March 11, 2010, the Court denied Defendants'

renewed Motion to Dismiss without prejudice to renew after the completion of personal

jurisdiction discovery. Dkt. No. 79. The Court further directed that "Defendants may

supplement and/or re-file their motion to dismiss no later than thirty (30) days after Magistrate

Judge Ellis indicates that all jurisdictional discovery is complete." *Id.* On March 16, 2010,

1040517.1

Magistrate Judge Ellis entered an order stating "that personal jurisdiction discovery in this case is complete." Dkt. No. 80. Defendants' motion to dismiss is now therefore ripe for consideration.

## ARGUMENT

**I.    Plaintiffs Have the Burden of Establishing *Each* Defendant Had Sufficient Jurisdictional Contacts with the United States During the Relevant Period.**

Federal Rule of Civil Procedure 4(k)(2) allows the exercise of personal jurisdiction by a federal district court when three requirements are met: (1) the claim must arise under federal law; (2) the defendant must not be subject to jurisdiction in any state court; and (3) the exercise of jurisdiction must be consistent with the United States Constitution. *Porina v. Marward Shipping Co.*, 521 F.3d 122, 127 (2d Cir. 2008). For purposes of Rule 4(k)(2), whether the exercise of jurisdiction is consistent with the Constitution turns on whether that exercise comports with the Due Process Clause of the Fifth Amendment. *Id.* For a plaintiff to establish that the court's exercise of jurisdiction over defendant is permissible under the Fifth Amendment's Due Process Clause, plaintiff must show the court that the defendant (i) had sufficient minimum contacts with the judicial forum during the relevant time period, and (ii) that the exercise of jurisdiction over defendant would be reasonable under the circumstances of the particular case. *Id.*

On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing that the court has jurisdiction over the defendant. *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996). *See also Hoffritz for Cutlery, Inc v. Amajac, Ltd.*, 763 F.2d 55, 57 (2d Cir. 1985) ("The burden of establishing jurisdiction over a defendant, by a preponderance of the evidence, is upon the plaintiff."). Where "the parties have conducted extensive discovery regarding the defendant's contacts with the forum state, but no evidentiary hearing has been held -- 'the plaintiff's *prima facie* showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by [the ultimate

trier of fact], would suffice to establish jurisdiction over the defendant.'" *Metro. Life Ins. Co.*, 84

F.3d at 567 (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir.),

*cert. denied*, 498 U.S. 854 (1990)).

Where, as here, there are multiple defendants, the plaintiff may not aggregate the contacts

of all defendants to establish sufficient minimum contacts with the forum as to one of the

defendants. *Each* defendant must have the requisite contacts. *Rush v. Savchuk*, 444 U.S. 320,

331-32 (1980) (the "requirements of *International Shoe* . . . must be met as to each defendant").

*Accord Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n.13 (1984) ("Each defendant's

contacts with the forum State must be assessed individually."); *Langenberg v. Sofair*, No. 03-cv-

8339, 2006 U.S. Dist. LEXIS 65276, at *21 (S.D.N.Y. Sept. 11, 2006) ("jurisdiction cannot be

implied or imputed from one defendant to another"); *Estate of Klieman v. Palestinian Authority*

*(Klieman II)*, 467 F. Supp. 2d 107, 111  (D.D.C. 2006) (a plaintiff may not "aggregate factual

allegations concerning multiple defendants in order to demonstrate personal jurisdiction over any

single defendant").

**II.     Plaintiffs Cannot Meet Their Burden of Establishing That Either the PA or the PLO
Had Sufficient Contacts with the United States During the Relevant Period to
Warrant the Court's Exercise of Personal Jurisdiction.**

In analyzing a defendant's minimum contacts, courts distinguish between specific and

general jurisdiction.  Where "the claim arises out of, or relates to, the defendant's contacts with

the forum" -- i.e., specific jurisdiction -- minimum contacts exist "where the defendant

'purposefully availed' itself of the privilege of doing business in the forum and could foresee

being 'haled into court' there." *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co. Ltd.*, 241

F.3d 135, 152 (2d Cir. 2001); *accord Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-76

(1985).  A forum may assert "general jurisdiction" -- *i.e.*, jurisdiction irrespective of whether the

claim arises from or relates to the defendant's forum contacts -- only where these contacts are "continuous and systematic." *U.S. Titan, Inc.*, 241 F.3d at 152; *accord Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415-16 (1984).

**A.     The Court Lacks Specific Jurisdiction Over the PA and PLO Because the Alleged Incidents Were Not Targeted at the United States.**

The claims before this Court occurred entirely in Israel and do not arise out of, nor do they relate to, Defendants' contacts with the United States. As such, this Court cannot assert specific personal jurisdiction over Defendants.

*Mwani v. Bin Laden* is not to the contrary. In *Mwani v. Bin Laden*, the D.C. Circuit held that a U.S. court could exercise specific jurisdiction over a foreign defendant despite the lack of any physical contact with the U.S. where the defendant engages in unabashedly malignant actions directed at and felt in the United States. 417 F.3d 1, 12-13 (D.C. Cir. 2005). In *Mwani*, the plaintiffs alleged that the defendants orchestrated the bombing of the U.S. embassy in Nairobi, "not only to kill both American and Kenyan employees inside the building, but to cause pain and sow terror in the embassy's home country, the United States." *Id.* at 13. The complaint also "described an ongoing conspiracy to attack the United States, with overt acts occurring within this country's borders," including "the 1993 World Trade Center bombing, as well as to the plot to bomb the United Nations, Federal Plaza, and the Lincoln and Holland Tunnels in New York." *Id.*

In contrast to the allegations of intent to harm the United States present in *Mwani*, here the Complaint alleges that "defendants PLO and PA authorized, ordered, instructed, solicited and directed their terrorist units . . . to organize, plan and execute a series of terrorist attacks against civilians in Israel and the West Bank." First Amended Compl. [Dkt. No. 4] at ¶ 53. Plaintiffs do

not allege that U.S. property or citizens were targeted in the attacks; rather, Plaintiffs allege only that it was foreseeable that U.S. citizens would be killed as a result of acts of terrorism. *Id.*

As the court explained in *Nikbin v. Islamic Republic of Iran*, "acts of terror or torture . . . *standing alone*, can support personal jurisdiction only if the defendant expressly intended the effects of the act to be felt in the United States." 471 F. Supp. 2d 53, 73 (D.D.C. 2007). Here, there are insufficient allegations of intent to cause injury in the United States to warrant the exercise of specific jurisdiction over the PA or PLO. The acts identified in the Complaint are generally associated with the Second Intifada, a local Palestinian uprising against the Israeli Occupation. To the extent the perpetrators of the attacks (identified only as John Does 1-99) had a political objective, it would have been to influence the policies of the Israeli government by causing injury to Israel, not to cause injury to the United States.

Further, for a court to exercise specific jurisdiction, "a defendant must have 'fair warning' that his activities could subject him to the jurisdiction of the United States." *Nikbin*, 471 F. Supp. 2d at 72 (quoting *Mwani*, 417 F.3d at 11). Even assuming *arguendo* that the PA or PLO had any connection whatsoever with the unidentified individuals responsible for the seven attacks identified in the Complaint, Plaintiffs do not specifically allege any acts by the PA or PLO in relation to the John Does 1-99 or the seven incidents that would give the PA or PLO fair warning that their actions would subject them to the jurisdiction of the United States.[1] Accordingly, this Court cannot invoke specific personal jurisdiction.

---

[1] Vague and conclusory allegations that the PA and PLO operate "terrorist units" and orchestrated or directed these attacks cannot provide a basis for asserting specific personal jurisdiction over the Defendants. *See, e.g.*, First Amended Compl. ¶ 51. *See Burnett v. Al Baraka Inv. & Dev. Corp. (In re Terrorist Attacks)*, 349 F. Supp. 2d 765, 813 (S.D.N.Y. 2005) (dismissing complaint as to defendant where plaintiffs "have not presented any specific facts from which this Court could infer [the defendant's] primary and personal involvement in, or support of, international terrorism and al Qaeda" and holding that conclusory allegations "do not suffice"); *Atlantigas Corp. v. Nisource, Inc.*, 290 F. Supp. 2d 34, 42

(footnote continued on next page)

**B.      Plaintiffs Cannot Establish that Either the PA or the PLO Had Sufficient Continuous and Systematic Contacts with the United States to Warrant the Court's Exercise of General Jurisdiction.**

Where, as here, the cause of action does not arise out of the defendant's contact with the jurisdiction in which plaintiff filed suit, the plaintiff must establish that the defendant's contacts with that jurisdiction are "continuous and systematic" such that it would be reasonable to exercise general jurisdiction over the defendant. *U.S. Titan*, 241 F.3d at 152.  Because general jurisdiction is not related to the events giving rise to the suit, the minimum contacts test for general jurisdiction is more stringent than that for specific jurisdiction and requires sufficiently continuous and systematic contacts to justify haling the defendant into a court in the forum. *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996).   Sporadic and insubstantial contacts with the forum do not suffice.  In *Helicopteros Nacionales de Colombia, S.A.*, for example, the Supreme Court held that defendant corporation's contacts with the forum, consisting of the chief executive officer's trip to the forum, accepting checks drawn from a bank in the forum, purchasing equipment from a company in the forum, and sending employees to the forum for training, did not constitute continuous and systematic contacts.  466 U.S. at 416-18.

In determining the time period for assessing the contacts with the forum, the "determination of what period is reasonable in the context of each case should be left to the court's discretion."  *Metro. Life Ins. Co.*, 84 F.3d at 570.  According to the Second Circuit, "district courts should examine a defendant's contacts with the forum state over a period that is reasonable under the circumstances -- up to and including the date the suit was filed -- to assess whether they satisfy the 'continuous and systematic' standard."  *Id.* at 569-70.  For purposes of

_____

(footnote continued from previous page)
(D.D.C. 2003) ("[P]laintiff must allege specific facts on which personal jurisdiction can be based; it cannot rely on conclusory allegations.").

1040517.1

discovery, the parties agreed the relevant period was the six-year period preceding the filing of

the Complaint (January 16, 1998 to January 16, 2004).

     1.    *The PLO's U.S. Contacts Were Insufficient to Establish General Jurisdiction.*

     The Palestinian Authority was established in the mid-1990s through a series of

agreements between Israel and the PLO known as the Oslo Accords.  One of the Oslo

agreements -- The Interim Agreement on the West Bank & the Gaza Strip, Sept. 28, 1995, Isr.-

P.L.O., 36 I.L.M. 551 -- enumerated those powers and responsibilities to be transferred to the

PA.  Article IX of the Interim Agreement, however, denied the PA authority over foreign

relations, including the establishment of embassies, the hiring of diplomatic staff, and the

exercise of diplomatic functions.  *Id.* at 561.  Instead, the Interim Agreement permitted the PLO

to conduct limited foreign affairs activities on behalf of the PA.  Those activities pertained only

to economic, cultural, scientific, and educational matters.  *Id.* at 560-61; *accord Ungar v.*

*Palestine Liberation Organization*, 402 F.3d 274, 287, 291 (1st Cir. 2005).  Consistent with the

Interim Agreement, it is the PLO, not the PA who maintains offices in the United States --

specifically the United Nations office in New York and the U.S. mission office in Washington,

D.C..  *See also* Exh. 1 (June 22, 1994, Letter from the U.S. Department of State Office of

Foreign Missions to Hasan Abdel Rahman designating the U.S. PLO office as a foreign mission

pursuant to the Foreign Missions Act); Exh. 2 (United Nations General Assembly Resolution

3237, U.N. GAOR, 29th Sess., Supp. No. 31, at 4, U.N. Doc. A/9631 (1974) (granting the PLO

observer status at the United Nations)).

     a.    <u>The PLO's D.C. Office</u>

     During the January 1998 to January 2004 period, the PLO Mission to the United States

(the "D.C. Office") had a total of 14 employees, not all of whom were employed at any one time.

*See* Exh. 3 (Defs.' Objs. & Answers to Pls.' Personal Jurisdiction Interrogs.) at 5-6.[2]  In addition

to the Head of the Mission, at various times, the D.C. Office employed a Deputy Chief, a

Consular Affairs Officer, a Congressional Affairs Officer, an Information Officer, an attorney, an

accountant, a researcher, a commercial attaché, and a receptionist. *Id.* at 9, 12 (Defs.' Answer to

Interrog. #3).  In addition, the D.C. Office employed a driver, a cook and a secretary who

assisted the Head of the Mission. *Id.*

During this period, the PLO Mission to the United States rented office space in the

District of Columbia.  At the time the suit was initiated, the PLO rented a small office at 1320

18th Street, N.W., Suite 200. *Id.* at 16 (Defs.' Answer to Interrog. #5).  As would be expected,

the D.C. Office had relationships with, or purchased supplies or services from, a number of

vendors and service providers as necessary to carry out the routine operations of the office. *See*

Exh. 4 at 8-11 (Defs.' Objs. & Resps. to Pls.' Personal Jurisdiction Req. for Docs. #4).

The D.C. Office did not maintain bank account records for the 1998-2001 period, but for

the 2002-January 2004 period, Defendants are aware of at least two checking accounts

maintained by the D.C. Office.  Exh. 3 at 20 (Defs.' Answer to Interrog. #8).  These checking

accounts maintained balances that were minimally sufficient to fund the basic operations of the

office.  As reflected in the checking account statements and books and records produced to

Plaintiffs, the D.C. Office's checking accounts regularly had to be replenished once the monthly

bills and salaries were paid.

Pursuant to the Foreign Agents Registration Act of 1938, the PLO's D.C. Office reported

its activities to the U.S. Department of Justice.  As reflected in the initial registration statement,

---

[2] Two of the individuals employed at the PLO Mission to the United States at certain times during the
relevant period were PA employees seconded to the PLO; the other 12 individuals were PLO employees.
Exh. 3 at 5-6 (Defs.' Answer to Interrog. #1).

1040517.1

the Washington office is an office of the PLO.  *See* Exh. 5 at 02:000391.  Further, the registration

statement avers:  the "PLO offices in Washington, D.C. shall represent the PLO and the

Palestinian Authority in the United States and will promote peace and development with Israel.

The PLO and the Palestinian Authority will pay for the expenses of the office and the salaries of

the employees."  *Id.* at 02:000393.  Thus, though established and run as a PLO office, the PLO

Mission to the United States did advocate on behalf of the PA's interests and received some

funding and an occasional employee from the PA.

       b.      The PLO's New York Office

      Throughout the January 1998 to January 2004 period, the New York office of the

Permanent Observer Mission of Palestine to the United Nations employed 21 individuals, though

not all were employed at any one time.  *See* Exh. 3 at 7 (Defs.' Answer to Interrog. #2).  One of

those individuals at certain times during the relevant period was a PA employee seconded to the

PLO's New York Office; the rest were employees of the PLO.  *Id.*  In addition to the Permanent

Representative of Palestine to the United Nations, the New York Office employed at various

times during this period, a Political Officer, a Political Affairs Officer, a Senior Advisor, a

"Second Secretary," a secretary, an administrative assistant, a driver, a receptionist, a security

guard, and cleaning staff.  *Id.* at 8-12 (Defs.' Answer to Interrog. #3).

      During this period, the PLO owned the New York office and residence used by the

Permanent Observer Mission of Palestine to the United Nations.  The office/residence is located

at 115 East 65th Street in New York City.  *Id.* at 19 (Defs.' Answer to Interrog. #8).  For purposes

of paying salaries, utility bills, and other local operational expenses, the PLO's New York Office

maintained a checking account at Chase Manhattan Bank, the monthly ending balance of which

varied over the period, from a high of @ $143,500 to a low of $837.59.  *Id.* at 20 (Defs.' Answer to Interrog. #8).

As with the D.C. Office, the PLO's New York Office had relationships with, or purchased supplies or services from a number of vendors and service providers in connection with the routine operation of the office.  Exh. 4 at 11 (Defs.' Response to Req. for Doc. #4).

   c. <u>The Contacts Associated with the PLO's U.S. Offices Cannot Be Considered for Purposes of Establishing Personal Jurisdiction.</u>

Under the "government contacts exception," a defendant's non-commercial contacts with the nation's capital are exempted from consideration when a court determines whether it has personal jurisdiction over that defendant.  *See, e.g., Cellutech, Inc. v. Centennial Cellular Corp.*, 871 F. Supp. 46, 50 (D.D.C. 1994).  Moreover, the Second Circuit held in *Klinghoffer v. S.N.C. Achille Lauro,* that personal jurisdiction over the PLO cannot be based on its UN-related activities in New York.  937 F.2d 44, 51 (2d Cir. 1991).  Here, therefore, the presence of the PLO Mission to the United States and Permanent Observer Mission of Palestine to the United Nations offices in the U.S. is insufficient to confer general jurisdiction.  Accordingly, the activities associated with the running of those exempt offices (such as the hiring of employees, leasing of computers and office space, contracting for electricity, telephones and other utilities, and maintaining an operating account at a local bank) cannot be used to establish jurisdiction.

As the court explained in *Cellutech,* the "District of Columbia's unique character as the home of the federal government requires this [government contacts] exception in order to maintain unobstructed access to the instrumentalities of the federal government."  871 F. Supp. at 50.  Although this exception is "based in part on the constitutional right to petition the Government for redress of grievances," it also is based on "non-constitutional policy

1040517.1

considerations, such as the Judiciary's reluctance to interfere with the smooth functioning of other governmental entities." *Klinghoffer*, 937 F.2d at 51.

The government contacts doctrine often is applied in instances where a plaintiff seeks to use a defendant's lobbying contacts with Congress or a federal agency to establish personal jurisdiction over a defendant. *See, e.g., Brunson v. Kalil & Co.*, 404 F. Supp. 2d 221, 235 (D.D.C. 2005). But, the doctrine also has been applied to exempt contacts with a wide array of entities residing in the nation's capital. Indeed, as the Second Circuit Court of Appeals has recognized, "[t]he use of jurisdictional immunities," such as the government contacts exception, "to further non-constitutional policy goals is not limited to the context of government lobbying." *Klinghoffer*, 937 F.2d at 52 n.7. Accordingly, in *AGS Int'l Servs. S.A. v. Newmont USA Ltd.*, 346 F. Supp. 2d 64, 76 (D.D.C. 2004), the court exempted a defendant's contacts with foreign embassies from its personal jurisdiction analysis because "the District of Columbia is the only district in the country where these embassies are located." *See also Fasolyak v. Cradle Society, Inc.*, No. 06-01126, 2007 U.S. Dist. LEXIS 52041, at *29-*34 (D.D.C. July 19, 2007) (exempting contact with foreign embassy for purposes of personal jurisdiction analysis). Likewise, in *World Wide Minerals Ltd. v. Republic of Kazakhstan*, 116 F. Supp. 2d 98, 105-106 (D.D.C. 2000), the court refused to consider a defendant's membership in a trade organization located in Washington D.C. and the defendant's participation in conferences held by this trade organization for purposes of asserting personal jurisdiction.

In applying the government contacts exception, courts have distinguished between offices set up in Washington to generate commercial business with the U.S. government and those offices set up to deal with the federal government as policy maker and regulator. *See Nalls v. Rolls-Royce Ltd.*, 1980 U.S. App. LEXIS 21294, at *5 (D.C. Cir. Jan. 17, 1980) ("Cases that

have applied the government contacts exception have done so where a company is present in the District of Columbia to deal with federal government qua regulator or policymaker, not with the government qua consumer."). In *Fandel v. Arabian American Oil Co.*, 345 F. 2d 87 (D.C. Cir. 1965) -- the case that helped establish the government contacts exception -- the D.C. Circuit held that the government contacts exception should apply whenever a defendant's contacts with the nation's capital are derived from the "special needs for a continuous and ponderable physical presence there, which needs are not those customarily associated with strictly commercial operations." *Id.* at 89.

Fandel merits special attention because the facts of that case are analogous to those present here. In *Fandel*, the defendant (Aramco) was in the business of selling oil and gas in the Middle East, particularly in Saudi Arabia and Lebanon. *Id.* at 88. To support these business efforts, Aramco maintained a six-room office in Washington D.C. staffed by five employees. *Id.* Aramco's Washington D.C. office was not established to solicit sales or engage in commercial transactions for the company. Instead, as the *Fandel* court explained:

> What [Aramco] does do in the District is to maintain continuing relationships with the State Department and other executive agencies of the United States Government, with diplomatic missions accredited to that Government, and with educational and international organizations, private and public, interested in, or informed about, the Middle East generally and Saudi Arabia in particular. Information about [Aramco] and its operations and experience in Saudi Arabia is made available to these entities, and information received from them is reported to the executive staff directing business operations in Saudi Arabia.

*Id.* The court characterized Aramco's Washington D.C. office as its "state department" and noted that it was established to act as Aramco's "diplomatic and intelligence apparatus." *Id.* The court pointed out that the only reason Aramco had established this office in Washington D.C. "[is] simply because of what Washington is, namely the capital city where public and private persons, with interests or responsibilities in the Middle East, foregather and make their

1040517.1

contribution, real or fancied, to the formulation of official policies." *Id.* Under these circumstances, the court held that it lacked jurisdiction over Aramco sufficient to "expos[e] it to suit [in Washington D.C.] by Californians in respect of personal injuries sustained in an accident in Saudi Arabia." *Id.* at 89.

Under *Fandel* and its progeny, a federal district court should not exercise general jurisdiction over a defendant based on the defendant's "presence" in Washington D.C. when that presence has been established solely to facilitate relations of a "diplomatic rather than business nature." *Dooley v. United Technologies*, 786 F. Supp. 65, 76 (D.D.C. 1992) (citing *Fandel*). Such a presence is "not the type . . . worthy of consideration for jurisdictional purposes." *AGS Int'l. Servs.*, 346 F. Supp. 2d at 76. *See also Fasolyak*, 2007 U.S. Dist. LEXIS 52041, at *31 (citing *Fandel* as "controlling precedent recognizing that general jurisdiction is inappropriate when a defendant's presence in this particular forum is necessitated by virtue of the fact that this is the only place where federal agencies, embassies, and other such instrumentalities are located").

Just as the PLO's U.S. mission office in Washington, D.C. cannot be used to establish general jurisdiction, nor can the PLO's United Nations mission office in New York be used as a source of jurisdictional contacts. In *Klinghoffer*, the Second Circuit Court of Appeals recognized that "basing jurisdiction on the PLO's participation in UN-related activities would put an undue burden on the ability of foreign organizations to participate in the UN's affairs," 937 F.2d at 51, and held that such contacts could not be used to establish jurisdiction over the PLO. The same concerns animating recognition of the government contacts exception "militate against basing jurisdiction over the PLO on its UN-related activities." *Id.* at 51-52.

14

1040517.1

d.    <u>Public Appearances by Heads of the Mission Offices Do Not</u>
<u>Create General Jurisdiction over the PLO.</u>

In connection with their effort to build support for Palestinian statehood among U.S. and

UN policy-makers, senior employees of both the U.S. and United Nations mission (usually the

heads of the missions) gave speeches and interviews and made other public appearances. *See*

Exh. 3 at 12-15 (Defs.' Answer to Interrog. #4). In addition, the public relations activities of the

PLO's D.C. office are detailed in the FARA registration statements submitted to the Department

of Justice and provided to the Plaintiffs in discovery. *See* Exh. 4 at 11-12 (Defs.' Resp. to Req.

for Doc. #5).

Plaintiffs likely will cite the Second Circuit's decision in *Klinghoffer*, 937 F.2d at 52, as

support for their position that the PLO's public speaking activities in the United States are

sufficient to confer personal jurisdiction. In *Klinghoffer*, the court noted that members of the

PLO's Mission to the United Nations "[spoke] in public and to the media in New York in

support of the PLO's cause" and engaged in "other proselytizing and fund-raising activities." *Id.*

In dicta, the court stated: "*Taken together*, we believe these activities would suffice to meet the

doing business standard [of New York's personal jurisdiction statute]." *Id.* (emphasis added).

The court was quick to point out, however, that "evidence in the record concerning the PLO's

non-UN activities is limited to deposition testimony taken before the end of 1987, when

Congress passed the [Anti-Terrorism Act ("ATA")]," which placed restrictions on the PLO's

operations in the United States. *Id.* (footnote omitted). The court noted that, "[i]n light of the

ATA, it is quite possible that the PLO was forced to cease its non-UN activities in New York

some time after 1987," and "personal jurisdiction over the PLO may be lacking with respect to

those complaints that were filed after 1987." *Id.*

1040517.1

*Klinghoffer* thus does not support the exercise of general jurisdiction based solely on the PLO's public-speaking appearances. In *Klinghoffer*, the court held only that public-speaking, *when combined with* proselytizing and fundraising activity, could be sufficient to establish minimum contacts with the U.S. under New York's personal jurisdiction statute. *Id.* *See also Metro. Life Ins. Co.*, 84 F.3d 560, 570 n.9 (explaining that, "[i]n *Klinghoffer* the district court's exercise of jurisdiction over the [PLO] was premised upon evidence of certain *fundraising and 'proselytizing' activities* antedating the 1987 passage of the Anti-Terrorism Act, which made most PLO activity in the United States unlawful") (emphasis added).

Whether the public speaking (lectures, interviews, etc.) can be characterized as "proselytizing" or as attempting to influence U.S. and United Nations policy makers is largely in the eye of the beholder. Certainly, Defendants would characterize it as the latter and as covered by the government contacts exception. Here, the public-speaking activities were of a decidedly "diplomatic rather than business nature," *Dooley*, 786 F. Supp. at 76, and should thus be encompassed by the government contacts exception. In *Fandel*, the D.C. Circuit exempted all activities of Aramco's D.C. office even though Aramco "maintain[ed] continuing relationships" with "educational and international organizations, private and public, interested in, or informed about, the Middle East generally and Saudi Arabia in particular," and made information available to these organizations, including through briefings. 345 F.2d at 88. Like the D.C. Circuit in *Fandel*, this Court should not countenance an attempt to assert jurisdiction over the PLO simply because it appeared before educational, news, and think-tank organizations in an effort to influence U.S. and UN policymakers. These activities are not commercial in nature, so should not be counted. With respect to fundraising, neither the books and records available from the 1998-2004 period and produced to Plaintiffs nor the FARA statements reflect any significant

fundraising activity on the part of the PLO's D.C. or New York Offices.  Indeed, the books and

records show that these offices were funded by Defendants, not third parties.

2.    *The PA's U.S. Contacts Were Insufficient to Establish Personal Jurisdiction.*

Unlike the PLO, the PA does not operate any offices in the U.S., nor does it own any real

estate or maintain any bank accounts here.  *See* Exh. 3 at 17-19 (Defs.' Answer to Interrog. #7).

During the January 1998-January 2004 period, three PA employees were seconded, at various

times, to either the PLO's D.C. or New York Offices.  *Id.* at 6-7 (Defs.' Answers to Interrog. #1,

2).  From early 1998 through 2002, the PA owned a Palestinian-based entity called the Palestine

Commercial Services Company ("PCSC"), which, in turn, at certain times during that period

owned or held interests in various entities or funds the assets of which included investments

located or managed from the United States.  The U.S.-related entities or funds in which PCSC

held an interest and the value of those entities as of December 31, 2003, are detailed in

Defendants' Answer to Interrogatory #7.  *Id.* at 18-19.  As of January 1, 2003, a year before this

lawsuit commenced, PCSC, including its ownership of interests in the U.S.-related entities or

funds, was transferred to the Palestine Investment Fund.  *Id.* at 18.

In addition, during this January 1998-January 2004 period, the PA entered into a few

contracts with U.S.-based consultants, including the Bannerman & Associates lobbying firm.

*See* Exh. 4 at 8-9 (Defs.' Response to Req. for Doc. #4).  Plaintiffs previously have identified the

PA's relationship with Bannerman as a contact with the United States for purposes of the

personal jurisdiction analysis.  *See* Dkt. No. 50 at 10.  This relationship, however, cannot be used

to establish jurisdiction over the PA.  Lobbying members of Congress and other federal

instrumentalities is "precisely the type of activit[y] protected by the 'government contacts'

exception and cannot serve as the basis for personal jurisdiction."  *Atlantigas Corp.*, 290 F. Supp.

at 44-45. That the PA employed Bannerman to lobby the United States government, as opposed to engaging in lobbying activities on its own behalf, is of no import for purposes of the government contacts exception. *See In Re: Vitamins Antitrust Litigation*, Misc. No. 99-197, 2001 U.S. Dist. LEXIS 25073, at *40-*41 (D.D.C. Oct. 30, 2001) ("[T]he hiring of a consulting company to assist with the company's regulatory affairs [] fall[s] within the government contacts exception."); *Cellutech, Inc.*, 871 F. Supp. at 50 ("The fact that defendants engaged a District of Columbia attorney to assist with the FCC filing does not change the outcome under the government contacts exception.").

In any event, the PA's few contracts with U.S. consultants do not demonstrate a continuous and systematic presence in the United States. The *Frontera* case from this jurisdiction is squarely on point. In *Frontera Resources Azerbaijan Corp. v. State Oil Co.*, plaintiff alleged the following contacts of defendant SOCAR with the United States: (1) SOCAR had entered into seven production-sharing contracts with U.S. oil companies; (2) Exxon Mobil and Chevron were the operators of three production-sharing contracts in Azerbaijan, with a total investment of over $7 billion; (3) at a signing ceremony in Azerbaijan, SOCAR, three U.S. oil companies, and other foreign oil companies signed a production-sharing contract for development of Azerbaijan's offshore oil fields; and (4) SOCAR signed a $750 million loan agreement with a syndicate that included U.S. bank Citibank. 479 F. Supp. 2d 376, 386 (SDNY 2007), *vacated and remanded on other grounds*, 582 F.3d 393 (2d Cir. 2009).[3] The court held

---

[3] On appeal, the Second Circuit remanded for consideration whether SOCOR is entitled to due process protection as a result of its relationship with Azerbaijan. *Frontera*, 582 F.3d 393, 399-401. The Second Circuit did not take issue with the district court's conclusion that, if SOCOR is entitled to due process, its contacts with the United States are insufficient to permit the exercise of personal jurisdiction. In fact, the Second Circuit held that the district court did not err when it concluded that SOCOR's contacts were insufficient to even justify conducting personal jurisdiction discovery. *Id.* at 401-02.

1040517.1

that the fact that American oil companies and one bank have entered into contracts with SOCAR does not approximate a sufficient physical presence in the U.S. for purposes of establishing personal jurisdiction. *Id.* at 387.[4]

Thus, as there is no basis to assert specific jurisdiction and neither the PA nor the PLO had sufficient cognizable contacts with the U.S. during the relevant period to establish general jurisdiction over them, the requisite degree of minimum contacts with the U.S. is lacking, and this Court must dismiss this case for want of personal jurisdiction over the PA and the PLO.

**III.    Even If Plaintiffs Could Establish that Either the PA or PLO Had Sufficient Continuous and Systematic, Non-Exempt Contacts with the United States, Personal Jurisdiction Should Nonetheless Not Be Exercised Here.**

Even if the Court finds that Defendants have "sufficient minimum contacts, [it must then] proceed to the second stage of the due process inquiry, and consider whether the assertion of personal jurisdiction is reasonable under the circumstances of the particular case." *Porina v. Marward Shipping Co.*, 521 F.3d 122, 127 (2d Cir. 2008) (internal quotations omitted). Thus, even if the Court finds that there are sufficient minimum contacts to establish specific or general jurisdiction over either the PA or the PLO, the Due Process Clause proscribes the exercise of personal jurisdiction where haling the defendants into court in the United States would "offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945). The more questionable a plaintiff's showing of defendant's contacts with the

---

[4] *See also* the cases on which the *Frontera* court relied (479 F. Supp. 2d at 387): *Oceanic Exploration Co. v. ConocoPhillips, Inc.,* No. 04 Civ. 332 (EGS), 2006 U.S. Dist. LEXIS 72231 (D.D.C. Sept. 21, 2006) (finding no basis for jurisdiction under Rule 4(k)(2) upon plaintiff's allegation that defendant had sold oil to the United States, signed production-sharing contracts with U.S. companies, and made deposits into bank accounts in New York); *Base Metal Trading v. Ojsc Novokuznetsky Aluminum Factory,* 283 F.3d 208, 216 (4th Cir. 2002) (same where defendant "is a major aluminum producer in Russia and has extensive business contacts inside Russia as well as around the world including in the United States"); *Helicopteros, 466 U.S. at 416* (holding that purchasing in forum, sending personnel for training in forum, and negotiating a contract in forum were not sufficient to establish general jurisdiction).

1040517.1

relevant forum, the less demanding defendant's burden of establishing unreasonableness

becomes. *Metro. Life Ins. Co.*, 84 F.3d at 568-69, (citing *Ticketmaster-New York, Inc. v. Alioto*,

26 F.3d 201, 210 (1st Cir. 1994) ("We think . . . that the reasonableness prong of the due process

inquiry evokes a sliding scale: the weaker the plaintiff's showing [on minimum contacts], the less

a defendant need show in terms of unreasonableness to defeat jurisdiction.") (alteration in

original)).

      In conducting this reasonableness analysis, the district court must apply the five-factor

test set forth in *Asahi Metal Industry Co., v. Superior Court of Cal.*, 480 U.S. 102, 113 (1987).

*Metro. Life Ins. Co.*, 84 F.3d at 573.  The *Asahi* test requires the court to consider: (1) the burden

that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state

in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief;

(4) the interstate judicial system's interest in obtaining the most efficient resolution of the

controversy; and (5) the shared interest of the states in furtherance of substantive social policies.

*Asahi*, 480 U.S. at 113 (quotations omitted).  Here, these factors overwhelmingly weigh in favor

of the Court declining to exercise personal jurisdiction over the PA and PLO.

      1.    *Burden on the Defendants.*

      "The unique burdens placed upon one who must defend oneself in a foreign legal system

should have significant weight in assessing the reasonableness of stretching the long arm of

personal jurisdiction over national borders." *Asahi*, 480 U.S. at 114.  The exercise of personal

jurisdiction in this case will impose a substantial burden on the PA and PLO.  The bulk of the

discovery burden will fall on the Palestinian Authority and its senior officials.  These officials

play a central role in the Mid-East peace process and in maintaining security and order in an area

known for conflict.  The PA also is responsible for governing millions of Palestinians, many of

whom live in extreme poverty and are dependent on government services.  Subjecting the PA to

1040517.1

intrusive U.S.-style discovery regarding vague conspiracy and material support theories relating to seven different incidents -- which occurred six to nine years ago -- would severely strain the PA's limited resources and divert its officials from their vital job of creating stability and security in the West Bank and Gaza. The PA is not a major corporation or a government with developed institutional structures and a fleet of trained, English-speaking staff standing ready to deal with U.S. discovery. The litigation would have to be addressed by a relatively small group of people, all of whom are urgently needed to attend to governing the PA.

The burden of litigating this suit in New York is particularly acute because the events giving rise to this lawsuit occurred in Israel. With most of the evidence and witnesses located in Israel and the West Bank / Gaza and most of the documents in Arabic or Hebrew, defending this lawsuit in the U.S. poses an unreasonable burden on Defendants. *See Metro. Life Ins. Co.*, 84 F.3d at 574 (finding significant for purposes of the first *Asahi* factor that no relevant "records, files, or witnesses with information about the litigation" were located in plaintiff's chosen forum).

    2.    *Interests of the Forum.*

The second factor, interests of the forum, also weighs in favor of the United States declining jurisdiction. The lack of nexus between the forum conducting the personal jurisdiction inquiry, the incident, and the parties reflects adversely on the forum's interest in resolving the dispute at hand. *See Asahi*, 480 U.S. at 114. Here, as noted, the incidents took place in and around Jerusalem during the Second Intifada and arose out of the ongoing Israeli-Palestinian conflict. Israel has an overriding interest in determining liability and providing redress for such incidents. The United States' interests are minimal in comparison to those of Israel.

1040517.1

Moreover, the forum's interest is "considerably diminished" when the plaintiff is not a resident of the forum. *Id.* Notably, the Complaint does not allege the residency of the Plaintiffs but it is likely that many are residents of Israel.

        3.    *Interests of the Plaintiffs.*

For similar reasons, the third *Asahi* factor -- the plaintiff's interest in obtaining convenient and effective relief -- also does not support this Court's exercise of jurisdiction over the PA and PLO. In *Metro. Life Ins. Co.*, the Second Circuit Court of Appeals explained that this factor is solely concerned with considerations such as the location of evidence or witnesses; that plaintiff might enjoy certain procedural advantages by bringing suit in the chosen forum is of no consequence. 84 F.3d at 574 (holding that "choice-of-law considerations," such as whether plaintiff might enjoy a more generous statute of limitations in the chosen forum, may not be considered during the jurisdictional inquiry; plaintiff must instead demonstrate that factors such as the location of evidence or witnesses make the chosen forum more convenient). Accordingly, that the United States judicial system might provide greater compensation in the event the plaintiff successfully proves his or her allegations cannot be taken into account when assessing the plaintiff's interest in litigating in the United States.

Here, the location of witnesses and evidence outside the U.S. precludes Plaintiffs from arguing that their interest in obtaining convenient and effective relief warrants the Court's exercise of jurisdiction. Virtually all of the evidence and witnesses (except perhaps some of the Plaintiffs) pertinent to this case would be located in Israel or the West Bank / Gaza and virtually none of the relevant documents will be in English. Moreover, Plaintiffs have not alleged they are U.S. residents. To be sure, some Plaintiffs have alleged U.S. citizenship but many Israeli residents also hold U.S. citizenship, and it is residency, not citizenship, that matters for purposes of the *Asahi* factors. Moreover, Plaintiffs may not attempt to create jurisdiction in the United

States by joining in the same lawsuit incidents involving U.S. residents with otherwise unrelated incidents involving non-U.S. residents for the purpose of establishing the U.S. as a convenient forum.

        4.     *Efficient Administration of Justice.*

In evaluating the fourth *Asahi* factor, efficient administration of justice, "courts generally consider where witnesses and evidence are likely to be located." *Metro. Life Ins. Co.*, 84 F.3d at 574. Again, other than perhaps some of the Plaintiffs, witnesses and evidence relevant to this case are located in Israel or the West Bank / Gaza, not in the United States. Thus, this factor also does not support the Court's exercise of jurisdiction.

        5.     *Social Policies.*

The *Asahi* court "admonished courts to take into consideration the interests of the 'several States,' in addition to the forum state, in the efficient judicial resolution of the dispute and the advancement of substantive policies." 480 U.S. at 115. In the present case, as in *Asahi*, "this advice calls for a court to consider the procedural and substantive policies of other *nations* whose interests are affected by the assertion of jurisdiction." *Id.* (emphasis in original). With respect to this fifth *Asahi* factor, the Supreme Court explained:

> The procedural and substantive interests of other nations in a [U.S.] court's assertion of jurisdiction over an alien defendant will differ from case to case. In every case, however, those interests, as well as the Federal Government's interest in its foreign relations policies, will be best served by a careful inquiry into the reasonableness of the assertion of jurisdiction in the particular case, and an unwillingness to find the serious burdens on an alien defendant outweighed by minimal interests on the part of the plaintiff or the forum State. Great care and reserve should be exercised when extending our notions of personal jurisdiction into the international field.

*Id.* (quotation omitted).

This factor overwhelming weighs against the exercise of jurisdiction over Defendants.

First, Israel has a substantially greater interest in providing remedies for acts of terrorism

1040517.1

directed at its civilian population and occurring within its borders than does the United States. Given Israel's much deeper connection to the dispute, this Court should decline to exercise jurisdiction over this case.  Second, given the United States' current relationship with the PA and the Executive Branch's emphasis on supporting the PA's state-building efforts, the "Federal Government's interest in its foreign relations policies," *id.*, will not be well served by subjecting the PA to intrusive and burdensome litigation in the U.S. courts over incidents arising during the Second Intifada, especially where the Plaintiffs have not alleged any PA or PLO direct involvement.

In sum, given the lack of nexus between Plaintiffs, the events alleged in the Complaint, and the United States; the heavy burden on Defendants that litigating this case in the United States would impose; the fact that any relevant witnesses and evidence would be located in Israel and the Occupied Palestinian Territory; Israel's much stronger interest in adjudicating this dispute; and the caution that the Court must show when extending U.S. notions of personal jurisdiction to non-U.S. defendants, especially those with whom the U.S. has an important diplomatic relationship, application of the *Asahi* factors leads to the conclusion that the exercise of jurisdiction over the PA and PLO in the circumstances of this case would be unreasonable and, consequently, would not comport with due process.

## IV.   DEFENDANTS' 12(b)(6) MOTION TO DISMISS PLAINTIFFS' NON-FEDERAL LAW CLAIMS.

In addition to their federal law Anti-Terrorism Act claim, the Plaintiffs' first amended complaint alleges pendent tort claims for wrongful death (Second Count), battery (Fourth Count), assault (Fifth Count), loss of consortium and solatium (Sixth Count), negligence (Seventh Count), intentional infliction of emotional distress (Eighth Count), and negligent

1040517.1

infliction of emotional distress (Ninth Count).[5] Dkt. No. 4. Plaintiffs' complaint does not identify the governing law for these claims. Defendants previously had moved to dismiss Plaintiffs' pendent non-federal law claims. *See* Dkt. No. 44 at 21-25.

In its Memorandum Decision and Order of September 30, 2008, the Court stated that it was "inappropriate" to address Defendants 12(b)(6) argument "until the threshold issue of personal jurisdiction is determined." Dkt. No. 58 at 13 n.9. The Court thus denied the "Rule 12(b)(6) branch of defendants' motion" without prejudice. *Id.* Defendants seek to preserve their 12(b)(6) argument but, pursuant to the Court's September 30, 2008 decision, will not renew it until the Court has ruled on the personal jurisdiction question. Once the Court rules on the personal jurisdiction question, Defendants will seek, as necessary, the Court's guidance on whether Defendants are to file a renewed 12(b)(6) motion or whether the Court wishes to rule on the issue as earlier briefed.

## CONCLUSION

For the reasons set forth above, Defendants PA and PLO request that the Court dismiss the complaint as to the PA and PLO for lack of personal jurisdiction.

---

5 Plaintiffs' additional counts for pain and suffering (Third Count), civil conspiracy (Tenth Count), aiding and abetting (Eleventh Count), vicarious liability/respondeat superior (Twelfth Count), and inducement (Thirteenth Count), do not appear to constitute independent causes of action, but rather methods of proof. To the extent these relate to non-federal claims, they are appropriately dismissed as pendent claims.

1040517.1

Respectfully Submitted,

April 15, 2010                    /s/ Mark J. Rochon
                                 Mark J. Rochon
                                 Richard A. Hibey
                                 Laura G. Ferguson
                                 MILLER & CHEVALIER CHARTERED
                                 655 15th St., N.W., Suite 900
                                 Washington D.C. 20005-6701
                                 Ph. (202) 626-5800
                                 Fax: (202)626-5801
                                 Email: mrochon@milchev.com


                                 *Counsel for Defendants the Palestinian Authority and the Palestine Liberation Organization*

1040517.1

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 15th day of April, 2010, a true and genuine copy of the foregoing was filed by ECF, which will automatically send notification and a copy of such filing to the following counsel of record:

> David J. Strachman
> McIntyre, Tate & Lynch, LLP
> 321 South Main Street, Suite 400
> Providence, RI  02903
> Phone:  (401) 351-7700
> Fax:  (401) 331-6095
> Email:  djs@mtlhlaw.com

> Olimpio Lee Squitieri
> Squitieri & Fearon, LLP
> 32 East 57th Street, 12th Floor
> New York, NY 10022
> Phone:  (212) 421-6492
> Fax:  (212) 421-6553
> Email:  lee@sfclasslaw.com

> *Attorneys for Plaintiffs*

> */s/* Mark J. Rochon _____

27

1040517.1