# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

MARK I. SOKOLOW, et al.

                          Plaintiffs,

       v.                                         Civ. No. 04-00397-GBD

THE PALESTINE LIBERATION ORGANIZATION, et al.,

                          Defendants.

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' RENEWED MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(2)

### Introduction

Plaintiffs respectfully submit this memorandum of law in opposition to the Renewed Motion to Dismiss filed by defendants Palestine Liberation Organization ("PLO") and Palestinian Authority ("PA"). Dkt. # 81-82.

As shown below, this Court clearly has personal jurisdiction over both defendants, and their motion to dismiss should be denied so that this case can proceed to discovery and trial.

### RELEVANT BACKGROUND

This is a civil action pursuant to the Antiterrorism Act ("ATA"), 18 U.S.C. § 2333 and supplemental causes of action, brought by U.S. citizens, and the guardians, family members and the personal representatives of the estates of U.S. citizens, who were killed and injured in seven terrorist attacks carried out by the defendants between January 8, 2001 and January 29, 2004.

In September 2008 this Court denied defendants' motion to dismiss for lack of subject-matter jurisdiction with prejudice, and denied their motion to dismiss for lack of personal jurisdiction without prejudice to renewal after limited jurisdictional discovery. *Sokolow v. Palestine Liberation Organization*, 583 F.Supp.2d 451 (S.D.N.Y. 2008).

Plaintiffs then served defendants with requests for production of documents and interrogatories regarding their contacts in the United States.

Defendants produced some of the documents sought (many of which were duplicates), but claimed that numerous important documents requested by plaintiffs never existed or no longer exist. *See* dkt. # 82, Ex. 4 at 5 (claiming that defendants' office in Washington D.C. "did not retain books and records for the 1998-2001 time period, nor does it have books and records for the May 2002 period"); at 6 (claiming that employment agreements for only two of defendants' many D.C. employees have been located); at 7 (claiming that the PLO's New York office "does not have copies of any written employment agreements with its employees"); and at 12 (claiming that there are no records, calendars, schedules or diaries that lists the public activities of the head of the PLO's New York office at the time, Nasser Al-Kidwa). *See also* dkt. # 82, Ex. 3 at 12-13 (claiming that neither defendants' D.C. office nor the PLO's New York office maintained records of news interviews, press conferences, and public lectures, debates and/or panel discussions in which defendants' employees have participated).

Defendants provided only partial answers to some of plaintiffs' interrogatories. Moreover, at a hearing before Magistrate Judge Ellis, it emerged that the persons who swore to defendants' interrogatory answers had "no personal knowledge" of the information, and that the answers had been prepared by defendants' counsel in purported reliance on documents and interviews with employees. Exhibit A at 4:15; 9:25-10:3. *See also* dkt. # 78, Ex. 7, Jadallah Decl. at ¶ 6, Abed Rabbo Decl. at ¶ 7.

While an organizational defendant may technically be allowed to provide interrogatory answers prepared in this third-hand manner, the fact is that defendants' answers contain several demonstrably inaccurate statements, as shown below.

Because of the peculiar fashion in which defendants' answers were prepared, Magistrate Judge Ellis ordered them, on September 11, 2009, to provide declarations – "in short order" – from the persons who had affirmed the interrogatory answers, attesting to the manner in which the answers had been prepared. *Id* at 11-12.

Defendants failed to provide these declarations "in short order" as Magistrate Judge Ellis order in September 2009, and produced them only in March 2010. *See* dkt. # 78, Ex. 7.[1]

On April 15, 2010, defendants filed their renewed Rule 12(b)(2) motion.

## **ARGUMENT**

As defendants concede, because no evidentiary hearing has been held regarding their jurisdictional contacts, the plaintiffs need only make out a prima facie case to defeat defendants' motion. Dkt. # 82 at 3 (quoting *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2nd Cir. 1996)). *See also e.g. Porina v. Marward Shipping Co., Ltd.*, 521 F.3d 122, 126 (2nd Cir. 2008) ("Where, as here, a district court relies on the pleadings and affidavits, and chooses not to conduct a full-blown evidentiary hearing, plaintiffs need only make a prima facie showing of personal jurisdiction over the defendant.") (internal quotation marks omitted).

As shown below, plaintiffs easily make such a showing.[2]

---

[1] Thus, defendants' claim that "the Plaintiffs conducted personal jurisdiction discovery for over one year" (dkt. # 82 at 2) is completely false. In fact, plaintiffs received only a single batch of discovery responses, in January 2009. Between January-September 2009 the parties jousted over plaintiffs' request for additional discovery and various procedural issues, and between September 2009 and March 2010 the proceedings were stalled due to defendants' failure to produce the declarations ordered by Magistrate Judge Ellis in September 2009. Notably, the declarations that defendants finally produced in March 2010 are dated from December 2009 and early February 2010 – which indicates that defendants intentionally withheld the declarations for months even after they had been signed.

[2] Indeed, plaintiffs believe that their showing meets the "preponderance of the evidence" test.

## I.      This Court Has General Personal Jurisdiction Over the Defendants

This action is brought under 18 U.S.C. § 2333. Rule 4(k)(1)(C) of the Federal Rules of Civil Procedure provides that service of process "establishes personal jurisdiction over a defendant ... when authorized by a federal statute." Under 18 U.S.C. § 2334(a) nationwide service of process is permitted in actions under § 2333. Accordingly, personal jurisdiction in this action exists if (i) service of process was effected and (ii) the defendants each have sufficient minimum contacts with the United States as a whole. *See Ungar v. Palestinian Authority*, 325 F.Supp.2d 15, 48 (D.R.I. 2004) (Personal jurisdiction is established in § 2333 actions whenever "[d]efendants have minimum contacts with the United States as a whole and … were served with process pursuant to the nationwide service of process provisions of 18 U.S.C. § 2334(a) and Fed.R.Civ.P. 4(k)(1)(D) [now Rule 4(k)(1)(C)]"); *Biton v. Palestinian Interim Self-Government Authority*, 310 F.Supp.2d 172, 179-180 (D.D.C. 2004) (same); *Klieman v. Palestinian Authority*, 467 F.Supp.2d 107, 112 (D.D.C. 2006) (same).[3]

Plaintiffs served process in this action on the PA and PLO through service on Mr. Hassan Abdel Rahman at his home in Virginia. *See* Exhibit B. Mr. Abdel Rahman served (until he subsequently left the United States) as the Chief Representative of the PA and PLO in the United States, and has repeatedly been found to be a valid agent for service of process on the PA and PLO under Fed.R.Civ.P. 4(k)(1)(D) and 4(h). *See Ungar*, 325 F.Supp.2d at 55-59 ("[T]he court finds the evidence overwhelming that Mr. Abdel Rahman is an agent of both the PLO and the PA and that as their Chief Representative in the United States he exercises independent judgment in

---

[3] In Part IV *infra*, plaintiffs argue in the alternative, purely out of an overabundance of caution, that as a foreign government defendant PA is not entitled to Due Process protections and that it is therefore subject to the Court's jurisdiction by virtue of service, irrespective of its jurisdictional contacts. While plaintiffs address the PA's contacts in Part I and Part II <u>as if</u> the PA were entitled to Due Process rights, they do so without derogating from their alternative argument that the PA has no such rights.

the performance of his duties such that it is fair, reasonable, and just to imply his authority to accept service on behalf of both the PLO and PA."); *Biton*, 310 F.Supp.2d 172, 179-180 (D.D.C. 2004) (finding service on Abdel Rahman valid service on the PA and PLO). *See also Klieman v. Palestinian Authority*, 547 F.Supp.2d 8, 13-14 (D.D.C. 2008) (finding that service on Abdel Rahman's successor was valid service on the PA and PLO).

Service of process on defendants has therefore been effectuated. Indeed, defendants do not raise, and so have waived, any challenge to service.

The remaining question, therefore, is the sufficiency of each defendant's jurisdictional contacts with the United States as a whole. "In general jurisdiction cases, district courts should examine a defendant's contacts … over a period that is reasonable under the circumstances – up to and including the date the suit was filed – to assess whether they satisfy the 'continuous and systematic' standard." *Metro. Life*, 84 F.3d at 569.

While the "determination of what period is reasonable in the context of each case should be left to the court's discretion" the Second Circuit has found six years to be a reasonable period. *Id*. at 569-570 (collecting cases).

Likewise, as the defendants point out, in the context of conducting jurisdictional discovery "the parties agreed the relevant period was the six-year period preceding the filing of the Complaint (January 16, 1998 to January 16, 2004)." Dkt. # 82 at 7-8.

Accordingly, this Court should analyze defendants' contacts with the United States for the six-year period prior to the filing of the complaint, i.e. January 16, 1998 to January 16, 2004.

The fact that defendants each had sufficient contacts with the United States during the first part of this period was already conclusively established in *Ungar v. Palestinian Authority*.

*Ungar* conducted an extraordinarily detailed analysis of the PA's and PLO's U.S. contacts and concluded that plaintiffs had demonstrated minimum contacts by <u>a preponderance of the evidence</u>. *Ungar*, 325 F.Supp. 2d at 47-59. Specifically, *Ungar* found that:

> 1)      Notwithstanding defendants' claims to the contrary, the so-called "PLO Mission" office in Washington, D.C. serves as the office of both the PLO and the PA;

> 2)      Notwithstanding defendants' claims to the contrary, Hassan Abdel Rahman, the head of defendants' D.C. office in Washington, D.C. was the Chief Representative of the PLO and the PA in the United States;

> 3)      Notwithstanding defendants' claims to the contrary, Abdel Rahman's deputy, Khalil Foutah, also acted on behalf of both the PLO and the PA;

> 4)      Notwithstanding defendants' claims to the contrary, the PA and PLO each had constitutionally sufficient contacts with the United States, even if their governmental contacts were excluded from the jurisdictional analysis.

*Ungar*, 325 F.Supp. 2d at 47-59. [4]

Defendants are collaterally estopped from contesting *Ungar*'s factual and legal findings:

> Federal principles of collateral estoppel, which we apply to establish the preclusive effect of a prior federal judgment, require

---

[4] There were two decisions in *Ungar* that discussed defendants' minimum contacts, *Ungar v. PA*, 153 F. Supp. 2d 76 (D.R.I. 2001) and *Ungar v. PA*, 325 F.Supp.2d 15 (D.R.I. 2004). The latter decision is far more detailed, and found personal jurisdiction by a preponderance of the evidence. The defendants have claimed in the past that the latter decision was not the basis for the final entry of judgment in *Ungar*. That claim is false. The analysis contained in *Ungar*, 325 F.Supp. 2d at 47-59 is part of a Report and Recommendation prepared by a magistrate judge that was adopted *in toto* by the district court in *Ungar*: "this Court overrules each of the PA's and PLO's objections to Judge Martin's Report and Recommendation, adopts that Report and Recommendation *in toto* and attaches it hereto." *Ungar*, 325 F.Supp. 2d at 21-22. *See also id.* at 25 ("This Court adopts *in toto* Judge Martin's March 31, 2004 Report and Recommendation and publishes it with this Memorandum and Order.").

> that (1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits.

*Ball v. A.O. Smith Corp.*, 451 F.3d 66, 69 (2nd Cir. 2006) (internal quotation marks omitted).

All of these conditions are met here: in *Ungar* the parties litigated the identical question at issue here (whether the PA and PLO each had constitutionally sufficient minimum contacts with the United States as a whole); this issue was actually – indeed, vigorously – litigated and decided in *Ungar*; the defendants were represented by experienced counsel and so had a full and fair opportunity to litigate the issue (which they aggressively did)[5]; and the resolution of the jurisdictional issue was necessary to support a valid and final judgment on the merits (*see Ungar* at 45-46: "A court which is asked to enter default judgment should assure itself that it has jurisdiction both over the subject matter and the parties …Consequently, this court examines both subject matter and personal jurisdiction.").

Thus, defendants are precluded from challenging the conclusion in *Ungar* that they each had constitutionally sufficient contacts with the United States.[6]

Furthermore, the instant plaintiffs have obtained new evidence that was not presented to the *Ungar* court, which directly supports the finding in *Ungar* that Hassan Abdel Rahman was the Chief Representative of both the PLO and the PA. Specifically, the instant plaintiffs have obtained a copy of Rahman's business card, a letter written by him to a congressman, and a letter

---

[5] Though as a technical matter *Ungar* resulted in a default judgment because defendants refused to conduct discovery or defend on the merits, defendants vigorously contested both personal and subject-matter jurisdiction, as detailed in the decision.

[6] In case this Court wishes to examine the evidence underlying *Ungar* the instant plaintiffs are submitting herewith all the documents evidencing defendants' jurisdictional contacts that were submitted to and referred to by *Ungar*. *See* Declaration of David J. Strachman at ¶ 2, internal Exhibit 1.

written to him from the State Department, all of which identify Rahman as the Chief Representative of both the PLO and the PA during the relevant period. Exhibits C, D and E. Additionally, in Arabic-language correspondence from senior PA officials produced by defendants, Rahman is addressed as both the Ambassador of the "State of Palestine" (defendants' aspirational name for the PA) and as the representative of the PLO. *See* Declaration of Marwan Abdel Rahman ("Abdel Rahman Decl.") at Appendices 1 and 3.

Defendants will likely argue that since *Ungar* was filed in March 2000, the findings regarding their U.S. contacts relate to earlier years, and are therefore irrelevant to the jurisdictional analysis in this case, which was filed in January 2004.[7]

The Court should reject this argument because the findings in *Ungar* create a presumption of continuity in respect to defendants' minimum contacts, which shifts the burden to the defendants to demonstrate a change in circumstances:

> There is a "general presumption of the continuance of a status or condition once proved to exist." *McFarland v. Gregory*, 425 F.2d 443, 447 (2d Cir. 1970); *McCormick on Evidence* § 344, at 976-77 (3d ed. 1984). In *McFarland* we held that a presumption of continuity is a reasonable grounds "on which to draw inferences where (1) a situation or the circumstances surrounding it do not go through an apparent material change and (2) the lapse of time is not great enough to suggest that unknown circumstances or causes, in the normal course of events, will have changed the situation." *McFarland*, 425 F.2d at 447.

*Jund v. Town of Hempstead*, 941 F.2d 1271 (2nd Cir. 1991).

---

[7] Defendants may also argue, as they have in the past, that *Ungar* was wrongly decided because it purportedly aggregated the contacts of the PA and PLO. However, a simple reading of *Ungar* reveals that that court did no such thing. Rather, the *Ungar* court found – on the basis of extensive documentary evidence and despite defendants' claims to the contrary – that the so-called "PLO Mission" in Washington, D.C., and its leadership and staff, serve and act for both the PLO and the PA. *See Ungar*, 325 F.Supp.2d at 47-59. Obviously, where, as here, two defendants use the same office and act through the same agents, the activities are attributable to both defendants.

Notably, in *Klinghoffer v. S.N.C. Achille Lauro*, 795 F.Supp. 112 (S.D.N.Y. 1992), this court found that plaintiffs who filed suit against the PLO in 1988 would have been able to rely on a presumption of continuity regarding the jurisdictional contacts of the PLO in 1985, but for the intervening passage of the Antiterrorism Act, which barred the PLO from conducting any activities in the United States. *Id.* at 115. *See also e.g. Founding Church of Scientology v. Webster*, 802 F.2d 1448, 1455-6 (D.C. Cir. 1986) (applying presumption of continuity to find that individual remained a managing agent of corporation); *U.S. v. Oregon State Medical Society*, 343 U.S. 326, 333, (1952) ("When defendants are shown to have settled into a continuing practice ... courts will not assume that it has been abandoned without clear proof.").

Thus, the defendants bear the burden to prove that their U.S. contacts have changed since *Ungar*. But the defendants have failed to assert – much less show – any such change.

Defendants have not made such a showing because they cannot. Every federal court to have considered the issue in the years since *Ungar* has concluded that the PA and PLO each have sufficient minimum contacts with the United States. *See Biton*, 310 F.Supp.2d at 179-180; *Klieman*, 467 F.Supp.2d at 113; *Saperstein v. Palestinian Authority*, Civ. No. 04-20225 (S.D.Fla.), Order, 07/12/2006, Dkt. # 61, at 13 (denying motion by PA and PLO to dismiss for lack of personal jurisdiction); *Parsons v. Palestinian Authority*, Civ. No. 07-01847 (D.D.C.), Order, 09/30/08, Dkt. # 14, at 3-6 (same). *Cf. Mohamad v. Rajoub*, 2008 WL 4444572 at *3 (S.D.N.Y. 2008) (in case brought under statute requiring minimum contacts with the federal district rather than the United States as a whole, endorsing the findings in *Ungar* regarding defendants' D.C. office and activities).

It would be wasteful in the extreme, if not absurd, to set aside principles of collateral estoppel and the presumption of continuity, and allow defendants to relitigate from scratch, time

and again their repeatedly-rejected personal jurisdiction arguments. *See McKesson Corp. v. Islamic Republic of Iran*, 185 F.R.D. 70, 77, n. 3 (D.D.C. 1999) ("Since this court has already found the existence of a principal-agent relationship, it is appropriate to place the burden on Iran to disprove an inference that this relationship persists, rather than requiring the plaintiffs to once again show the existence of an agency relationship … If the court accepted defendant Iran's theory, it might be forced to hold repetitive hearings regarding control every time plaintiffs sought discovery or pursued their case in any material way. The court finds this preposterous.").

Therefore, since defendants have made no showing of any change in their activities, their motion should be denied summarily.

But if the Court declines to summarily deny the instant motion it should do so on the merits, because defendants' U.S. activities, discussed in *Ungar*, continued until January 2004.

*Ungar* (as well as *Biton*, *Klieman*, *Saperstein*, *Parsons* and *Mohamad*) found that both the PLO and PA have an office in the District of Columbia – i.e., that the "PLO Mission" in D.C. is the office of both the PLO and PA). *See Ungar*, 325 F.Supp.2d at 47-59 (detailing the activities of defendants' D.C. office and finding that it serves both the PA and the PLO).

This finding was based in part on the fact that in March 1998, defendants filed a report with the Department of Justice pursuant to the Foreign Agents Registration Act of 1938 ("FARA") stating that "[t]he PLO Offices in Washington, D.C.[,] shall represent the PLO and the Palestinian Authority in the United States" (*Ungar* at 57) and in the main on a multi-year, multi-million dollar contract between the PA and Bannerman and Associates, Inc., which repeatedly described the D.C. office as an office of the PA. *Id*. at 48 n. 37; 57-58.

A copy of this contract is attached as Exhibit F.

The agreement with Bannerman commenced in October 1999 for a period of three years, to be automatically renewed absent notice of termination. *Id*. at ¶ 11.

Bannerman's FARA filings show that the contract between the PA and Bannerman was renewed continuously through January 2004. *See* Exhibits G-L.[8]

It is therefore clear that the D.C. office remained the office of both the PLO and the PA until the filing of the Complaint in this action, and that the significant jurisdictional contact arising from the contact with Bannerman also continued until that time.

Defendants assert that the PA's contract with Bannerman falls into the "government contacts" exception because Bannerman was hired to conduct lobbying activities, and thus that contract should not be considered in the jurisdictional calculus. Dkt. # 82 at 17-18.

As a threshold matter, the Court should note that this argument is irrelevant to the fact that the Bannerman contract <u>repeatedly describes the D.C. office as a PA office</u>. Thus, it is beyond dispute that the D.C. office <u>remained the office of both the PA and PLO throughout the relevant period and up until the filing of the suit</u>.

Moreover, this argument is meritless for three reasons:

*First*, the Bannerman agreement shows that Bannerman worked closely and directly with the PA office in Washington, D.C. and its staff to plan strategy and provide the PA staff with information and analysis, advocacy training, and assistance in developing and conducting public-relations activities on behalf of the PA, Exhibit F at ¶¶ 2-8. Bannerman also provided the PA and its personnel with "general advice and assistance . . . in the areas of public relations, advertising, marketing, corporate relations, legal and other advice within the expertise of the firm." *Id*. at ¶ 9.

---

[8] The full reports are available at http://www.justice.gov/criminal/fara/links/annualrpts.html.

These provisions of the Bannerman agreement clearly prove that the PA's relationship with Bannerman would not be excluded by the "government contacts" exception (as claimed by defendants) even if that exception was available to the instant defendants as a matter of law (which it is not). The agreement demonstrates that much of Bannerman's activities on behalf of the PA consist of the provision of services, advice and training to the PA itself and to its staff. In other words, the PA's contacts with Bannerman include both the multi-year, multi-million dollar agreement itself, and a continuous, close and direct working relationship in the U.S. between the PA and its personnel and Bannerman and its personnel. This relationship – i.e. Bannerman's provision of services, training and advice in a wide variety of fields directly to the PA and its staff – quite obviously does not constitute "government contacts."

**Second**, it is well-established that contacts with the government performed through an agent do not fall under the "government contacts" exception.  Rather, the exception relates to,

> [D]irect governmental contacts with a federal agency and not contacts with counsel who in turn appear before the agency. In fact, in other cases which have invoked the government contacts doctrine, the contacts in issue have always been direct contacts between the defendant and the "federal instrumentality" and not ones between the defendant and his attorney or agent who later appears before a federal agency . . . [citing cases]

*Chase v. Pan-Pacific Broadcasting, Inc.,* 617 F.Supp. 1414, 1427 (D.D.C. 1985) (emphasis added). *See also Bechtel v. Graceland Broadcasting*, 1994 WL 85047 at *4 (D.C. Cir. 1994) ("Graceland initiated a professional relationship with Bechtel, a District of Columbia law firm, to conduct its FCC business … we find that Graceland's contacts with Bechtel fall outside the protective scope of the government contacts doctrine."). Thus, the entire contractual-commercial relationship between the PA and Bannerman should be viewed as a fully cognizable "contact"

with the United States, which did not fall under the "government contacts" exception, despite any government lobbying which Bannerman may do on behalf of the PA.

**Third**, defendants' attempt to rely on the "government contacts" exception is frivolous as a matter of law. That doctrine is based upon the First Amendment right to petition the government and, possibly, concerns about turning the D.C. courts into "national supercourts." *Monster Cable Products, Inc. v. Euroflex S.R.L.*, 642 F.Supp.2d 1001, 1009 (N.D.Cal. 2009).

Since this rule is based on the right to petition the government it applies only to the "government contacts" of U.S. citizens. *Monster Cable*, 642 F.Supp.2d at 1009 (D.C. government contacts exception did not apply to Italian corporation because "First Amendment concerns are not implicated in the context of [a] foreign defendant.") (Citing *Envtl. Research*, 355 A.2d at 813 as holding that the right to petition applies only to the "national citizenry").[9]

The PLO and PA are foreign entities, not U.S. citizens, and they do not have a "right" (constitutional or otherwise) to petition or lobby our government.[10] Nor are any concerns about

---

[9] *See also e.g. Zeneca v. Mylan Pharmaceuticals*, 173 F.3d 829, 831 (Fed. Cir. 1999) (government contacts exception arises from "need for unfettered access to federal departments and agencies for the entire national citizenry.") (quoting *Environmental Research Int'l, Inc. v. Lockwood Greene Eng'rs, Inc.*, 355 A.2d 808, 813 (D.C. 1976) (en banc)) (emphasis added); *Mallinckrodt Medical v. Sonus Pharmaceuticals*, 989 F.Supp. 265, 271 (D.D.C. 1998) ("because it is important that all citizens from all parts of the country have unfettered access to petition their government, the courts of this jurisdiction have long recognized 'a government contacts' exception")(emphasis added); *Zeneca v. Mylan Pharmaceuticals*, 968 F.Supp. 268, 275 (W.D. Pa. 1997) ("The exception exists to protect the citizenry's right to petition the government, free from fear of exposure to jurisdiction at the situs of the government") (emphasis added). *Bechtel*, 1994 WL 85047 at *3 ("The doctrine has its roots in the right of citizens to petition the federal government for redress of grievances.") (emphasis added); *Atlantigas v. Nisource*, 188, 2003 WL 22387136 at *7 (D.D.C.) ("Because it is vital that all citizens from all parts of the country have unfettered access to petition their government, the courts of this jurisdiction have long recognized 'a government contacts' exception.") (emphasis added).

[10] It is true that there are cases applying the government contacts exception to foreign entities. However, in none of those cases was the argument raised here by the plaintiffs – that the exception does not extend to foreigners – raised or adjudicated. The only case to address this issue is *Monster Cable*, which found, as plaintiffs assert, that foreigners are not covered by this doctrine.

flooding the D.C. courts implicated here, since this action is brought in New York under a nationwide service of process provision.

In any event, even assuming *arguendo* that Bannerman's lobbying activities were covered by the government contacts exception such activities are but a part of the total services performed by Bannerman for defendants, as shown *supra*, and Bannerman's total services themselves constitute only a small fraction of defendants' other contacts and activities in the U.S. which do not include petitioning the government. It is elementary that the government contacts exception exempts a defendant from an assertion of personal jurisdiction only "if the <u>sole contact</u> with the District consists of dealing with a federal instrumentality." *Zeneca*, 968 F.Supp. at 275 (emphasis added, internal quotes omitted). Defendants easily have sufficient contacts with United States even if Bannerman's strictly lobbying activities are disregarded.[11]

In *Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 52 (2nd Cir. 1991) the Second Circuit held that public speeches, media interviews and similar proselytizing (i.e. public relations and advocacy) activities by PLO personnel gave rise to personal jurisdiction over the PLO.

An examination of defendants' FARA filings regarding their D.C. office shows that during the relevant period (January 1998-January 2004) the D.C. office received millions dollars in funding from the PA Ministry of Finance and that personnel from the D.C. office engaged in <u>180 public interviews, speeches and similar events in the United States,</u> only 24 of which could

---

[11] *See Ungar*, 325 F.Supp.2d at 53 ("[T]he activities of the Washington Office of the PA and PLO go well beyond contact with the official branches of the federal government … Thus, even if the court excludes from its consideration contacts by the Washington Office of the PLO with the federal government, the other activities of that office are sufficient to allow this court to find minimum contacts."); *Mohamad*, 2008 WL 4444572 at *3 n. 4 ("Defendants argue that the diplomatic activities of the PLO/PA Mission are not jurisdictional contacts because they fall within the government contacts exception ... I reject this argument for the same reasons it was rejected in *Ungar*: 'the activities of the Washington Office of the PA and PLO go well beyond contact with the official branches of the federal government.'").

possibly be considered "governmental contacts." *See* Declaration of David J. Strachman ("Strachman Decl.") at ¶¶ 6-16, internal Exhibits 2-12.

Thus, the activities of defendants' D.C. office discussed in *Ungar* continued in full force and scope – continuously and systematically – up until the filing of this action.[12]

Likewise, the media and other public appearances of defendants' U.S.-based officials, such as Hassan Abdel Rahman and Nasser Al-Kidwa, which *Ungar* cited as a further basis for personal jurisdiction also continued up until the time of the filing of this action.

The *Ungar* court found the head of defendants' D.C. office, Hassan Abdel Rahman, to be the Chief Representative of both the PLO and the PA in the U.S. on the basis of "overwhelming" evidence, including his official biography, his sworn FARA filings and testimony he gave in the Senate – and that his declaration to the contrary was false. *Ungar*, 325 F.Supp.2d at 55-59.

As noted *supra*, the plaintiffs have obtained additional evidence not considered by the *Ungar* court proving that (until he left the United States subsequent to the filing of this action) Rahman was the Chief Representative of both the PA and PLO. *See* Exhibits C, D and E; Abdel Rahman Decl. at Appendices 1 and 3.

Rahman unquestionably retained this status until the filing of the instant action. In testimony before the Labor, Health and Human Services, Education and Related Agencies Subcommittee of the Senate Appropriations Committee on October 30, 2003 (a mere ten weeks before the filing of this case) Rahman spoke and appeared on behalf of both the PA and PLO. *See* Exhibit M at 1 (identifying Rahman as "Chief Representative, PLO Mission") and at 28

---

[12] In order to operate their D.C. office and conduct its activities throughout the relevant period, the defendants maintained a large staff, bank accounts and an astonishingly large number of telephone lines. Dkt. # 82, Ex. 3.

(Rahman stating: "We do not support suicide bombers. **We, the Palestinian Authority**, made itself very clear on this issue over and over again.") (emphasis added).

A search of the Nexis news database reveals that during the relevant period, Rahman participated in at least 158 media appearances, interviews and public events. *See* Strachman Decl. at ¶¶ 18-19 and internal Exhibit 13. [13]

Thus, Rahman's extensive public activities – which are attributable to both the PA and PLO since he was the Chief Representative and acted for both organizations – continued apace throughout the relevant period and up until the filing of this suit.

Following *Klinghoffer*, the *Ungar* court also cited the non-UN activities of the head of the PLO's UN Mission in New York, Nasser Al-Kidwa, as jurisdictional contacts of the PLO. *Ungar*, 325 F.Supp.2d at 51-52 (noting Al-Kidwa's appearance in 37 television appearances).

A search of Nexis shows that during the relevant period, Al-Kidwa participated in over 80 media appearances and interviews none of which were related to his UN activities. *See* Strachman Decl. at ¶¶ 20-21 and internal Exhibit 14. [14]

Accordingly, Al-Kidwa's frequent and consistent public advocacy on behalf of the PLO continued throughout the relevant period and until the filing of this action.

Plaintiffs note, in respect to both Rahman and Al-Kidwa, that a Nexis search produces only very partial information, since it does not provide any information about events that were not reported in the media, or even all media events. Indeed, defendants' interrogatory answers

_____

[13] While an exact comparison is difficult because of the vague wording of the FARA filings, it appears clear that the vast majority of these appearances were not included in the FARA filings.

[14] None of these activities are included in the FARA filings.

reveal an additional two media appearances by Al-Kidwa (in September 2003 and January 2001) that plaintiffs failed to pick up in their Nexis search. Dkt. # 82, Ex. 3 at 14-15.

In sum, during the relevant period defendants' office in D.C. conducted on-going and widespread public relations activities and maintained its contractual relationship with Bannerman, and defendants' top officials in the U.S. appeared with great frequency in the leading national news media and other public fora.

Therefore, like every other court to have considered the issue, this Court should find that defendants had nationwide contacts sufficient for the exercise of personal jurisdiction.

Aside from their general claim of insufficient, defendants raise several specific arguments against the exercise of general jurisdiction, all of which are meritless.

Defendants claim that their D.C. office must necessarily belong to the PLO and not the PA, because under the Oslo Accords, the PA is barred from conducting foreign relations. This same argument was raised and rejected in *Ungar*: "Defendants ... assert that because the PA is prohibited under the Oslo Accords from engaging in foreign relations this circumstance ... 'generally negates the possibility of systematic and continuous contacts by the PA with the United States' ... The short answer to this argument is that while the PA is prohibited from conducting 'foreign relations' ... there is nothing in the Oslo Accords ... which prohibits the PA from conducting other non-diplomatic activities (such as commercial, public relations, lobbying, or educational activities) through its representatives, officers and agents abroad … Thus, the fact that the PA cannot conduct foreign relations does not mean that it cannot have minimum contacts with the United States …there are thousands of individuals and corporations, which like the PA are unable to conduct foreign relations, but which have sufficient minimum contacts with this country …". *Id* at 54 (internal citations and quotation marks omitted).

Furthermore, the plain fact is, as *Ungar* found based on the Bannerman contract and defendants' own FARA filings, that the D.C. office serves the PA as well.

Indeed, contrary to defendants' claim that the PA provided "some" funding to the D.C. office (dkt. # 82 at 10), the FARA filings make clear that the PA provides almost the entirety of the office's budget. *See* Strachman Decl. at ¶¶ 6-16, internal Exhibits 2-12.

Defendants also claim that the PA provided only an "occasional employee" to the D.C. office. In support of this claim, defendants' interrogatory answers tendentiously characterize virtually all of the office as employees of the PLO rather than the PA. Dkt. # 82, Ex. 3 at 5-6.

Thus, defendants classify Rahman, Khalil Footah (a/k/a Foutah) and Jubran Taweel as PLO employees. In fact however, *Ungar* found definitively that Rahman and Foutah acted on behalf of both the PLO and the PA. *Ungar*, 325 F.Supp.2d at 55-59.

Taweel's status as a PA official was confirmed by Said Hamad, another member of the D.C. office staff, in a deposition taken in 2004. Exhibit N at 4.

Thus, whether by design or as a result of the strange fashion in which defendants' interrogatory answers were prepared, the fact is that those answers are inaccurate.

Defendants next argue that the government contacts exception renders their contacts with the U.S. non-cognizable. But as shown above, the vast majority of defendants' contacts have nothing to do with the government – indeed, much of their PR and media activity was not focused on D.C. at all and was either nationwide or took place in other locales – even assuming, *arguendo*, that the government contacts exception applied to a foreign entity (which it does not).

Defendants also mention in passing the Antiterrorism Act of 1987. If defendants are implying that that statute has some relevance to their jurisdictional contacts they are attempting to mislead this Court. *See Ungar* at 52-53 (Rejecting defendants' attempt to rely on the

Antiterrorism Act since the restrictions therein "were suspended in 1994 [and] have not been an obstacle to PLO activities in the United States for almost ten years. The court also notes that the suspension of these restrictions was not disclosed by the Palestinian Defendants.").

Defendants next make the hairsplitting and baseless argument that *Klinghoffer* differentiated between "public speaking" and "proselytizing," and also required "fundraising" in order to establish jurisdiction. Clearly, there is no substantive difference between "public speaking" in support of a cause and "proselytizing," and even if there were, defendants engaged in both activities. Nor is there any basis to believe that absent "fundraising" activities "public speaking" and "proselytizing" are insufficient. Indeed, on remand in *Klinghoffer*, this court disregarded the PLO's fundraising, because the funds had been returned, but upheld jurisdiction nonetheless. *See Klinghoffer*, 795 F.Supp. at 114.

Also, *Klinghoffer* found that public activities were sufficient under the "doing business" standard of C.P.L.R. § 301, which is far stricter than simple "minimum contacts."

Accordingly, this Court can exercise general personal jurisdiction over defendants

## II.     The Court Has Specific Personal Jurisdiction Over Defendants

Additionally and/or alternatively, this Court can and should exercise specific personal jurisdiction over the defendants in this case.  As defendants themselves concede, a U.S. court can "exercise specific jurisdiction over a foreign defendant despite the lack of any physical contact with the U.S. where the defendant engages in unabashedly malignant actions directed at and felt in the United States." Dkt. # 82 at 5 (citing *Mwani v. Bin Laden*, 417 F.3d 1 (D.C. Cir. 2005)).

Defendants argue, however, that plaintiffs cannot assert specific jurisdiction, because they do not allege that defendants' actions were aimed against the United States. *Id*. at 5-6.

In fact, plaintiffs' First Amended Complaint ("FAC") does indeed allege that defendants' actions were aimed at the United States, as this Court previously noted:

> In the amended complaint, plaintiffs allege that defendants are responsible for planning and carrying out a series of terrorist attacks which specifically targeted civilians ... Plaintiffs claim that defendants have carried out and utilized these attacks intending to terrorize, intimidate, and coerce the civilian population of Israel into acquiescing to defendants' political goals and demands, <u>and to influence the policy of the United States and Israeli governments</u> in favor of accepting defendants' political goals and demands.

*Sokolow*, 583 F.Supp.2d at 454 (emphasis added). *See also* FAC at ¶ 128.

Defendants also argue that the exercise of specific jurisdiction would be improper because they did not have fair warning that their conduct would subject them to the jurisdiction of a United States court. In support of this argument, defendants claim that the FAC does not allege that defendants were directly responsible for the attacks, and the actual gunmen and bombers are "identified only as John Does 1-99" and are "unidentified individuals" with whom defendants have no connection. Dkt. # 82 at 6. This of course is a blatant falsehood – plaintiffs' First Amended Complaint identifies <u>21 specific individuals</u> who carried out these attacks at issue upon the instructions of the defendants. Defendants are well acquainted with these individuals, as many of them are former or current PA and PLO officials, while others (those who were imprisoned for their roles in the attacks) receive a monthly stipend from the PA.

The claim that defendants could not have anticipated being haled into a U.S. court is also absurd, in light of the fact that lawsuits were filed against these defendants for their involvement in terrorism as early as 1985 (*Klinghoffer*) and 2000 (*Ungar*).

Thus, because defendants sought to impact and influence the United States through their violent conduct, this Court can exercise specific jurisdiction.

20

Moreover, even if defendants had not directed their conduct at the United States, this Court could exercise specific jurisdiction because:

> [I]t is … entirely foreseeable that an indiscriminate attack on civilians in a crowded metropolitan center such as Tel Aviv will cause injury to persons who reside in distant locales – including tourists and other visitors to the city, as well as relatives of individuals who live in the area. The ripples of harm that flow from such barbarous acts rarely stop at the banks of the Mediterranean Sea or the Jordan River, and those who engage in this kind of terrorism should hardly be surprised to find that they are called to account for it in the courts of the United States – or, for that matter, in any tribunal recognized by civilized peoples.

*Sisso v. Islamic Republic of Iran*, 448 F.Supp.2d 76, 90 (D.D.C. 2006).

## III.    Fairness

Defendants also argue that even if the exercise of jurisdiction is possible, doing so here would "offend traditional notions of fair play and substantial justice." Dkt. # 82 at 19-24.

This argument should be summarily rejected because in *Mariash v. Morrill*, 496 F.2d 1138 (2ⁿᵈ Cir. 1974) the Second Circuit held that "fairness" prong of the Due Process inquiry is inapplicable where, as here, service is accomplished pursuant to a federal nationwide service process statute, and that Due Process is satisfied by the existence of minimum contacts. *See Steinberg v. Bombardier Trust*, 2008 WL 2787720 at *2 (S.D.N.Y. 2008) (citing *Mariash* as holding that "national jurisdiction satisfies due process because it is based on service calculated to inform the defendant of the proceedings in order that he may take advantage of the opportunity to be heard.").

But even assuming *arguendo* that *Steinberg*'s understanding of *Mariash* is incorrect and that the lack of "fairness" can in theory limit the exercise of personal jurisdiction even when Congress has authorized nationwide service of process, it is still "largely academic in non-

diversity cases brought under a federal law which provides for nationwide service of process. To date, while most courts continue to apply the test as a constitutional floor to protect litigants from truly undue burdens, <u>few (and none in this Circuit) have ever declined jurisdiction, on fairness grounds, in such cases</u>. *S.E.C. v. Softpoint, Inc.*, 2001 WL 43611 at *5 (S.D.N.Y. 2001).

Moreover, because this is a civil action for terrorism under § 2333, the issue of "fairness" does not arise, as one federal court held when defendants attempted to raise this argument:

> Nor does the assertion of personal jurisdiction in any way offend notions of fair play and substantial justice, despite the burdens that litigating in the United States will impose upon defendants ... Whatever uncertainty there might be about the weight to be assigned the burden upon the defendant, <u>here it has been resolved legislatively</u>. 18 U.S.C.A. § 2334(d) ("Convenience of the Forum. - The district court shall not dismiss any action brought under section 2333 of this title on the grounds of the inconvenience or inappropriateness of the forum chosen, unless - (1) the action may be maintained in a foreign court that has jurisdiction over the subject matter and over all the defendants; (2) that foreign court is significantly more convenient and appropriate; and (3) that foreign court offers a remedy which is substantially the same as the one available in the courts of the United States.").

*Parsons*, Civ. No. 07-01847 (D.D.C.), Order, 09/30/08, Dkt. # 14, at 5-6 (emphasis added).

Also, it is well established that where, as here, a federal statute is involved "the personal jurisdiction analysis must be give appropriate consideration to the strong federal interests involved." *Hallwood Realty v. Gotham Partners*, 104 F.Supp.2d 279, 285 (S.D.N.Y. 2000).

The federal interest in suits such as this under § 2333 is overwhelming, and easily trumps any considerations of "fairness":

> Congress has explicitly granted private parties the right to pursue common tort claims against terrorist organizations and those that provide material support or financing to terrorist organizations.... [P]rivate tort actions directed at compensating victims of terrorism and thwarting the financing of terrorism vindicate the national and international public interest.

*Weiss v. Nat'l Westminster Bank*, 242 F.R.D. 33, 50 (E.D.N.Y. 2007); *id.* at 53 ("the United States … has a strong national interest in enforcing domestic and international anti-terrorism laws"); *see also In re Islamic Republic of Iran Terrorism Litig.,* 659 F.Supp.2d 31, 79 (D.D.C. 2009) (noting "the federal interest in deterring terrorist attacks and compensating victims").

In any event, these defendants are currently litigating numerous similar cases across the country – quite effectively – and their claim that they will be unfairly burdened by this particular action is therefore frivolous.

## IV.     Alternatively, Defendant PA Has No Due Process Rights

The instant motion proceeds from the assumption that plaintiffs must demonstrate that the defendants have contacts with the United States sufficient to satisfy the Due Process clause.

This assumption is mistaken in respect to defendant PA. In *Frontera Resources v. State Oil Co. of Azerbaijan Republic*, 582 F.3d 393 (2nd Cir. 2009) the Court of Appeals held that foreign states, like the States of the Union, do not enjoy Due Process rights. *Id*. at 398-400.

While the PA is not a not a foreign <u>state</u>, it is a foreign municipal <u>government</u>. *See Sokolow*, 583 F.Supp.2d 451 (finding, like all other courts to consider the issue, that the PA is not a foreign state); *Ungar v. Palestine Liberation Organization*, 402 F.3d 274, 291-292 (1st Cir. 2005) (finding that PA is not a state and discussing its governmental functions).

Accordingly, under the principles set forth in *Frontera* the PA has no Due Process rights, personal jurisdiction was established by service and its motion should be summarily denied.

Plaintiffs make this argument solely in the alternative, i.e. in the event (which plaintiffs respectfully believe to be unlikely) that the Court finds that it lacks general or specific personal jurisdiction over the PA for reasons of Due Process.

**WHEREFORE**, defendants' motion should be denied.

Plaintiffs, by their Attorneys,


/s/David J. Strachman
David J. Strachman
McIntyre, Tate, & Lynch LLP
321 South Main Street, Suite 400
Providence, RI 02903
(401) 351-7700
(401) 331-6095 (fax)
djs@mtlesq.com




    I here by certify that this pleading was sent via ECF on May 28, 2010  to the following counsel of record:


Richard A. Hibey
Mark J. Rochon
Charles F. B. McAleer, Jr.
Laura Ferguson
Miller & Chevalier Chartered
655 Fifteenth Street, N.W., Suite 900
Washington, DC  20005-5701

        /s/David J. Strachman