UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

THE ESTATE OF YARON UNGAR, et al.

v.

C.A. No.: 00-105L

THE PALESTINIAN AUTHORITY, et al.

**EXHIBITS TO PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR JUDGMENT BY DEFAULT PURSUANT TO FED.R.CIV.P. 55(b)(2) AGAINST DEFENDANTS THE PALESTINIAN AUTHORITY AND THE PALESTINE LIBERATION ORGANIZATION**

A.    Affidavit of David J. Strachman

B.    Curriculum vitae of Hasan Abdel Rahman, Chief Representative of he PLO and the Palestinian Authority in the United States.

C.    New York Times article of October 16, 2000.

D.    Washington Post article of Thursday, October 12, 2000.

E.    Report of the Attorney General to Congress of the United States on the Administration of Foreign Agents Registration Act of 1938, as amended, for the six months ending June 26, 1999, October 31, 1999, September 30, 2001 and April 28, 2002.

F.    Washington Post article of Thursday, January 20, 2000.

G.    Forward article.

H.    Int'l Techs. Integration, Inc. v. Palestine Liberation Organization, 66 F. Supp. 2d 3 (D.D.C. 1999).

I.    Int'l Techs. Integration, Inc. v. Palestine Liberation Organization, 98-00756 (CKK) order of July 2, 1999.

J.    Affidavits of Norfork County Deputy Sheriff Peter J. Morin.

K.    Affidavit of Process Server Freeman R. Woodbury.

L.    Declaration of Mr. Marwan Jilani.

M.    Declaration of Hasan Abdel Rahman.

N.    Short Form Listing of Registrant's Foreign Agents

O.    Damages Memorandum

P.    Proposed Findings of Law and Fact

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


THE ESTATE OF YARON UNGAR, et al.

v.                                    C.A. No.: 00-105L

THE PALESTINIAN AUTHORITY, et al.


<u>AFFIDAVIT OF DAVID J. STRACHMAN</u>


I, David J. Strachman, affirm and declare:

The attached documents, Exhibits B through N, are true and accurate copies of originals obtained by counsel as indicated:

B.     Curriculum vitae of Hasan Abdel Rahman, Chief Representative of the PLO and the Palestinian Authority in the United States. This document, prepared by Mr. Rahman, indicates that he is the Chief Representative of both the PLO and the Palestinian Authority in the United States. This document was obtained directly from Mr. Rahman's office by a public relations agency and provided to plaintiffs' counsel.

C.     New York Times article of October 16, 2000. This article contains Mr. Rahman's admissions and indicates his role as "representative of the Palestine Liberation Organization and Palestinian National Authority," and that he employs nine staff members in his Washington office. This document was obtained by plaintiffs' counsel from the New York Times website archive.

D.     Washington Post website of Thursday, October 12, 2000. This document is a transcript of an online live chat with Mr. Rahman and was obtained by plaintiffs' counsel from the Washington Post website archive.

E.     Reports of the Attorney General to Congress of the United States on the Administration of Foreign Agents Registration Act of 1938, as amended, for the six months ending June 26, 1999, October 31, 1999, September 30, 2001 and April 28, 2002. These documents indicate that both the Palestine Liberation Organization and Palestinian Authority have had a fully staffed Washington office for many years, spend hundreds of thousands of dollars per annum in the United States, and retain counsel and a public relations firm in the U.S. For example, for the six-month period ending March 31, 1999, the office expended $200,132.74 on

activities ranging from conducting interviews, giving lectures, and contacting the media. See Report of the Attorney General to the Congress of the United States on the Administration of the Foreign Agents Registration Act of 1938, as amended, for the Six Months Ending June 30, 1999, available at http://www.doj.gov/criminal/fara/faralst99/COUNTRY/PALESTIN.HTM.  These documents were obtained by counsel from the Department of Justice website, www.doj.gov/criminal/fara.

F.    Washington Post article of Thursday, January 20, 2000.  This article is a profile of and contains admissions from Edward B. Abington of the public relations and lobbying firm of Bannerman & Associates, an agent of the PLO and PA.  It indicates that PA and PLO activities in the United States include advocacy training and developing a public relations campaign. The three year budget for these activities was $2.25 million. This article was obtained by plaintiffs' counsel from the Washington Post's website archive.

G.    Forward article, January 2000. This article provides information about and admissions from Edward B. Abington, PLO and PA agent in the United States. This article was obtained by plaintiffs' counsel from the Forward website archive.

H.    Int'l Techs. Integration, Inc. v. Palestine Liberation Organization, 66 F.Supp. 2d 3 (D.D.C. 1999).  This decision details some of the commercial activities of the PLO and PA in the United States.

I.     Int'l Techs. Integration, Inc. v. Palestine Liberation Organization, 98-00756 (CKK) order of July 2, 1999.  This order reveals that the PA and the PLO maintain several bank accounts in New York at three U.S. banks with deposits totaling approximately $18 million dollars.  This document is a true and accurate copy of the original order filed in the U.S. District Court for the District of Columbia.

J.     Affidavits of Norfork County Deputy Sheriff Peter J. Morin.  This proof of service on the PA and PLO indicates service was made in Brookline, Massachusetts.

K.    Affidavit of Process Server Freeman R. Woodbury.  This proof of service on Mr. Rahman on behalf of the PA and PLO indicates that service was made in Washington, DC.

L.    Declaration of Mr. Marwan Jilani. This declaration indicates that he acknowledges participating in political and public relations activities on behalf the PLO and PA in the United States and that both maintain an office in New York. This document was provided to the Court by defendants' counsel.

M.    Declaration of Hasan Abdel Rahman. The declaration of Mr. Rahman establishes that he is the Chief Representative of the PLO in the United States. This document was provided to the Court by defendants' counsel.

N.    Short Form Listing of Registrant's Foreign Agents. This document proves that Mr. Rahman is one of three registered agents of the PLO in the United States. This document was obtained by plaintiffs' counsel from the Department of Justice Website. ("Short Form Listing of Registrant's Foreign Agents", available at http://www.usdoj.gov/criminal/fara/faralst99/SHRTFORM/ SHRTFORM.HTM).

David J. Strachman

STATE OF RHODE ISLAND
PROVIDENCE, SC.

Subscribed and affirmed to before me in Providence on the _3O_ day of May, 2003.

Notary Public

My Commission Expires_10/10/04_

# EXHIBIT B

Biography

## HASAN ABDEL RAHMAN

Chief Representative of the P.L.O. and the P.N.A. in the United States

Since 1994, Mr. Hasan Abdel Rahman has headed the Palestinian Mission in the United States as Chief Representative of the Palestine Liberation Organization (P.L.O.) and the Palestinian National Authority (P.N.A.).

From 1992 to 1993, Mr. Abdel Rahman served as Chief of the Palestinian Mission in Canada. Between October 1991 and September 1993, Mr. Abdel Rahman served as Senior Political Advisor to the Palestinian Delegation to the Madrid Peace Conference and the peace talks in Washington, D.C.

From 1988 to 1992, he was Director of the Palestine Affairs Center in Washington, D.C.

From 1982 to 1988, Mr. Abdel Rahman served as the Director of the Palestine Information Office in Washington, D.C.

From 1974 to 1982, he served as Deputy Permanent Representative of the P.L.O. to the United Nations where he represented the P.L.O. on the Special Political Committee of the General Assembly and the Security Council.

Mr. Abdel Rahman has given presentations on Palestinian issues and the Israeli-Arab conflict at universities, thinktanks and clubs in the United States and abroad. He has represented the P.L.O. and the P.N.A. at various international conferences and other forums. He is a frequent guest on television news programs on CNN, NBC, CBS and ABC. His interviews have been printed in the U.S., Arab and Latin American press. Mr. Abdel Rahman is fluent in Arabic, English, Spanish and Portuguese.

In 1972, he obtained a Master of Arts degree in Public Administration from the University of Puerto Rico. In 1971, he received a Bachelor of Arts degree in Political Science from the Catholic University of Puerto Rico. From 1972 until 1974, Mr. Abdel Rahman was a doctoral candidate in Comparative Politics at the City University of New York.

# EXHIBIT C

# National

*The New York Times*
ON THE WEB

October 16, 2000                              ✉ E-Mail This Article

PUBLIC LIVES

# Reflecting the Palestinian Viewpoint in a World of Images

**By PHILIP SHENON**

WASHINGTON -- Hasan Abdel Rahman, the de facto Palestinian ambassador to the United States, understands the power that a single photograph can wield. When he thinks of the Vietnam War, he says, "I am always reminded of that image of the young Vietnamese girl running down the street after being burned by the napalm."

So in explaining the violence that has pushed the Middle East back to the brink of war, Mr. Abdel Rahman found an early ally in the camera's lens, especially in the haunting image of a 12-year-old Palestinian boy slumped against his father after the boy was shot and killed last month by Israeli soldiers in the Gaza Strip.



Susana Raab for The New York Times
Hasan Abdel Rahman has represented Palestinian interests in Washington since 1994.

Mr. Abdel Rahman, who has been the Washington representative of the Palestine Liberation Organization and Palestinian National Authority since 1994, said he received more than 100 phone calls about the photograph of the dead boy, many from Jewish Americans who wanted "to express their shame."

But the camera is fickle, and on Friday Mr. Abdel Rahman picked up his newspaper with well-justified trepidation. Splashed across the

Case 1:04-cv-00397-GBD-RLE    Document 84-2    Filed 05/28/10    Page 11 of 58

front page was another horrifying photo, this one of a Palestinian man with his hands in the air, apparently dripping with the blood of an Israeli soldier murdered on the West Bank.

"It was awful," Mr. Abdel Rahman said. "Nobody in his right mind would accept the lynching of another human being."

But while the photograph is being cited by some Israelis and their American supporters as proof of Palestinian savagery, Mr. Abdel Rahman said he saw something else in the image of the man with bloodstained hands.

"I'm not trying to justify it," he said. "But I felt very sorry for him, and I'll tell you why. I think the Israelis have turned our young people into this — 32 years of occupation." He said the result of "this culture of violence" is a young man "who is so mad, so angry, so frustrated, that he's capable of doing something like this."

For now, Mr. Abdel Rahman seems to be losing the battle for support among Americans who make and influence Middle East policy. He sat at his desk beneath a large framed photograph of Yasir Arafat, the Palestinian leader, and patted a stack of clippings, many of them newspaper editorials blaming Mr. Arafat for the bloodshed.

"I feel a sense of frustration that all of this seems to be orchestrated in such a way to put the blame on the Palestinian Authority and on Chairman Arafat," he said. "I read what is being written. And it's very superficial and unfair."

"Yes, there were two Israelis killed," he said of the soldiers who were stabbed and stomped to death after their car turned into the funeral procession for a Palestinian man killed by Israelis earlier in the week.

"But you also have to remember there were 100 Palestinians killed over the last two weeks," he said. "The Israelis have made a declaration of war against the Palestinians. What is war? When you use tanks, when you use helicopters, when you use mortars."

While Prime Minister Ehud Barak of Israel may have gone further than his predecessors in pursuit of peace, his offers "still fall short of what is necessary to reach an agreement," Mr. Abdel Rahman said. "We cannot live with what he has offered us."

"We are not here to assess the character of Mr. Barak," he continued. "The kind of agreement we need to reach with Israel has to be a good agreement that future generations of Palestinians and Israelis can live with, not one custom-tailored to suit Mr. Barak's needs."

This compact, intense 56-year-old Palestinian is used to being outgunned in the battles of public relations.

His staff of nine works in a small suite of offices in a nondescript building near the White House. His "adversary," as he calls it, is the large Israeli Embassy and its lobbying and press operation. "I am not supported by the network that Mr. Barak has," he said.

Case 1:04-cv-00397-GBD-RLE    Document 84-2    Filed 05/28/10    Page 12 of 58

Mr. Abdel Rahman has lived nearly half his life in the United States. The fifth of nine children of a West Bank farmer, he said he left home as a teenager in search of adventure and wound up in Rio de Janeiro. "I loved Latin America, Latin culture," he said.

He said he wanted to learn Spanish (he is fluent in both Spanish and Portuguese, the language of Brazil) and was accepted for studies at the Catholic University of Puerto Rico. In 1972, he left for the United States, where he was a doctoral candidate in politics at the City University of New York.

GLOBAL politics interrupted his studies in 1974, when he was hired by the P.L.O. to help prepare for a visit by Mr. Arafat to the United Nations. When the organization received formal observer status later that year, Mr. Abdel Rahman became its deputy representative in New York.

At a time when the word Palestinian was often equated with the word terrorist, Mr. Abdel Rahman learned firsthand of the potential threat when his offices on Park Avenue were attacked in October 1974 by a group of Jewish American extremists. "I had a few stitches in my head," he said, rubbing the area on his scalp where he was hit.

It is a sign of how much has changed for Palestinians and for Mr. Abdel Rahman that today he is married to an American-born lawyer of Lebanese descent, and that their four children, aged 14 to 21, consider themselves dual citizens and proudly carry American passports.

"They live in America, they were born in America, they are as American as any other kids," he said. "But they are still Palestinians." And not once, he said, have the children been taunted over their Palestinian roots. "No, they are very assertive," he said. Like their father, he said, "they wouldn't take nonsense from anyone."

 E-Mail This Article



Ask questions about National News and tell other readers what you know in Abuzz, a new knowledge network from The New York Times.

**Home | Site Index | Site Search | Forums | Archives | Shopping**

**News** | Business | International | National | New York Region | NYT Front Page |

Reflecting the Palestinian View — lit in a World of Images                    Page 4 of 4

Obituaries | Politics | Quick News | Sports | Science | Technology/Internet | Weather
Editorial | Op-Ed

**Features** | Arts | Automobiles | Books | Cartoons | Crossword | Games | Job Market |
Living | Magazine | Real Estate | Travel | Week in Review

Help/Feedback | Classifieds | Services | New York Today

**Copyright 2000 The New York Times Company**

# EXHIBIT D

**washingtonpost.com**

| News | OnPolitics | Entertainment | Live Online | CameraWorks | Marketplace | onwash |



**LIVE** ONLINE

*With PLO Ambassador Hasan Abdel Rahman*
**Thursday, Oct. 12, 2000; Noon EDT**

**Hasan Abdel Rahman**, the chief Representative of the Palestinian Liberation Organization and the Palestinian National Authority in the United States, will be live online to talk about the crisis in the Middle East on **Thursday, Oct. 12, at Noon EDT**.

Hasan Abdel Rahman

Abdel Rahman has represented the PLO and PNA in the United States since 1994, was a senior political adviser to the Palestinian delegation to the Madrid peace conference and the peace talks in Washington, D.C. Before that he served as director of the Palestine Affairs Center.

Mideast Special Reports
World Section
Talk: World news message boards
World Live Online Archive
Live Online Transcripts

Get New Responses

Automatically Update Page

Submit Question

A graduate of the Catholic University of Puerto Rico, he has a masters degree in public administration from the University of Puerto Rico.

**Submit your questions** now or during the live hour.

---

**washingtonpost.com:** Our guest today is Hasan Abdel Rahman, chief representative of the Palestinian National Authority and Palestine Liberation Organization, in the United States.

**So. California:** I don't think most people understand the shear frustration, anguish and trauma Palestinians have experienced in 52 years of occupation and severe displacement.

This may not excuse some Palestinian behavior in the last few weeks, but considering that their every move and behavior is controlled by checkpoints and military surveillance, this sort of eruption is inevitable. ...

• Frequently Asked Questions

Would you say this helps us Americans understand the Palestinian perspective?

• Contact Us

• About the site

**Hasan Abdel Rahman:** There is no doubt that the conditions that the Palestinian people are living in are very difficult, both inside and outside the homeland, whether under occupation or as refugees. There was a hope, after so many years of deprivation and uprooting, that the peace process would bring a qualitative improvement to the lives of the Palestinian people and end those decades of expulsion and refugee life

• Advertisers

VII

a liv
tha
pl
iss
co
a

**Shop**

Stop
wonde
get yo
online
report

$7.9

Ast

**Our R**
Carolyn
nonsen
for the
ridden
crowd.



experts
nothing

T
Live

and allow them to live a dignified and free life. But after seven years of peace process the average Palestinian's life has not changed. On the contrary, except in certain circumstances it has worsened. The Israeli occupation continued, the humiliation of the Palestinians persisted. Israel continued to behave toward the Palestinians as an occupying power, notwithstanding the agreements we had with signed with them. These conditions were tolerated, as long as there was a hope that the final status negotiations would change them.

But in the last few months, Israeli behavior around the negotiating table did not support this hope that Palestinians had. On the contrary, Israelis wanted to have sovereignity in Jerusalem over al-Aqsa mosque and al-Haran Shareef. Out of the 22 percent of historic Palestine that the Palestinians wanted for their new homeland, Israel wanted 11 percent. Also Israel did not want to accept any legal or moral responsiblity for millions of Palestinian refugees in West Bank and Gaza and Arab countries. This is what created the frustrated.

The straw that broke the camel's back was Mr. Sharon's provocative visit to al-Haran Shareef.

**Cincinnati, OH:** The Palestinians have not kept faith with any ONE of their agreements with Israel since Oslo. With the brutal murder of two Israeli soldiers inside a Palestinian Authority prison at the most tense time of peace negotiations, why should anyone think that Arafat and the PA want to make peace with Israel? What has been done to show that a Palestinian state desires PEACE, and not war?

**Hasan Abdel Rahman:** I believe this question turns the truth upside down. The truth is that Israel has not kept its promises or implemented the agreement we signed with Israel. For example, the release of Palestinian political prisoners, the redeployment of Israeli troops from West Bank and Gaza. There are 35 items which we submitted to the United States that Israel had not implemented.

As for the two Israeli soldiers in Ramallah, the Palestinian police tried to protect them but they were overpowered by the masses who have been subjected to Israeli bombardment and killing. Over 100 Palestinians have been killed and over 3,000 wounded. So notwithstanding the Palestinian police effort to save those soldiers, who were in civilian clothes and were sent by their commanders to assassinate certain leaders of the demonstrations. So the masses were very angry.

That does not in any way justify Israel's bombardment of Arafat's headquarters and other Palestinian installations.

When 100 Palestinians were killed, the Palestinians did not bombard Mr. Barak or the Israeli Defense Ministry.

**Los Angeles:**
I am a Palestinian American with family in Ramallah. What is the situation today at home after the Israeli attack? What can you tell us?

**Hasan Abdel Rahman:** The situation is very tense. Until a few minutes ago, Israel was bombarding certain sectors of Ramallah. There are demonstrations and expressions of anger by the Palestinian people.

Case 1:04-cv-00397-GBD-RLE    Document 84-2    Filed 05/28/10    Page 17 of 58

**Fairfax, Va.:** The picture of the young Palestinian man holding up his hands covered with the blood of the recently executed Israeli soldiers to the cheers of the crowd below is one of the most disturbing images I've ever seen. How does the Palestinian Authority ever hope to garner sympathy, to paint the Israelis as the oppressors, when "neutral" people such as myself continue to get a stronger and stronger opinion that the Palestinians aren't interested in peace? That they are, in fact, still in a revolutionary mindset? What a mess! How do we end centuries of hatred? Where do we go from here?

**Hasan Abdel Rahman:** You are getting the wrong impression. You have to look at what has happened in the last two weeks, and even before. Israel faces the peaceful demonstrators with artillery fire, helicopter-launched rockets, sniper bullets and sharpshooters. That is why we have suffered over 100 martyrs and 3,000 people wounded. Because Israel understands only the language of force when it deals with the Palestinians and the Arabs.

In fact, Israel was condemned by the international community for the excessive and inhumane attacks on the Palestinians.

**washingtonpost.com:** There has been a lot of talk about the UN resolution on the Mideast crisis. How do you respond to people who say it is one-sided?

**washingtonpost.com:** "There has been a lot of talk about the UN resolution on the Mideast crisis. How do you respond to people who say it was one-sided?

**Hasan Abdel Rahman:** The resolution assessed the situation came to the conclusion that Israel has violated international law and has been using excessive force in dealing with Palestinian civilian protestors. And this excessive force led to a very high number of civilian casualties. Thus the Security Council for its behavior and called for the establishment commission of inquiry to investigate.
Of course, Israel did not agree to submit to investigation by a neutral international commission. The United States, being an ally of Israel, wanted this resolution to be watered down or withdrawn. Finally, the United States allowed the resolution to pass by abstaining.
The presidential candidates are competing for Jewish money and votes and that's why they have to appease Israel by calling this resolution a one-sided resolution.

**Skokie, IL:** Why hasn't Arafat made a public appeal to his own people for trying to calm their anger down? If Arafat can't control his own people why should Israel negotiate with him?

**Hasan Abdel Rahman:** First of all, Israel is responsible for the violence and not the Palestinians. Why am I saying this? Israel is firing at Palestinians in Palestinian town and villages. Palestinians are not attacking Israelis in Israeli towns or villages. Here is a clear cut aggressor and a clearcut victim. Therefore Yasser Arafat cannot ask the Palestinian people not to defend themselves or protest Israeli aggression. If Israel was serious and willing to end violence, all Israel has to do is

withdraw its army from Palestinian territories.

**Rockville, Maryland:** Do the Palestinian Authority agree to the UN being in charge of the Holy sites in Jerusalem?

**Hasan Abdel Rahman:** This is a very complex question. The issue is not only of the holy places, but it is also the issue of East Jerusalem which was occupied in 1967 where Moslem and Christian holy places are located. We and the international community--including the United States by the way--believe that Israel's unilateral annexation of East Jerusalem was illegal and was rejected by all the countries of the world, including the U.S. So the issue of the holy places falls in this context. You cannot deal with the issue separately from the national sovereignty issue. That's why the answer to your question cannot be answered yes or no.

**Laurel, MD:** What what I understand, Barak offered to split Jerusalem at the Camp David summit. This was farther then any Israeli leader has ever gone, but Arafat would not match him. Why is that?

**Hasan Abdel Rahman:** Jersulem has two sides. One side was under Israeli control before 1967, West Jerusalem. And there is East Jerusalem, which was under Palestinian, Arab control until 1967. The Israelis wanted to keep their exclusive control over the West Side and divide what is ours between them and us.

We proposed to Israel that we are willing to recognize their control over West Jerusalem, if Israel recognized our sovereignty over East Jerusalem, and that the two sections of the city could be united in an open city that would be united, accesible and open to all people. The west side of Jerusalem would be recognized as the capital of the state of Israel and East Jerusalem would be the capital of Palestine.

Israel refused.

**Washington, DC:** The peace process, like any negotiation, requires compromise on both sides to reach a just and fair conclusion. Israel has handed over to the PA much of the West Bank and Barak is reported to have offered virtually the whole of the West Bank plus the Arab and Armenian quarters of Jerusalem.

Are prepared to renounce, as a representative of the Palestinian people, all claims on Israel inside the "Green Line"?

**Hasan Abdel Rahman:** We agreed with Israel and proposed to Israel that the 1967 borders would be the borders of the state of Palestine. This includes the West Bank and Gaza, which constitute only 22 percent of the historic land of Palestine. And we accepted Israel on 78 percent of the land of Palestine. So we have made a historic compromise that is unprecedented for the sake of peace.

But Israel wanted to retain the 78 percent and share with us part of the 22 percent. And this is why it was not possible to reach an agreement at

Camp David.

**Reston, VA:** You claim that the Israelis are firing on "peaceful protesters" (to use your own words). How can you call rock-thowing, fire-bombing mobs and AK-47-toting gunment "peaceful demonstrators?"

**Hasan Abdel Rahman:** The demonstrations are in the face of an Israeli army with tanks and rockets. Any objective observer will note the difference between a tank and a civilian with a stone in his hand. That civilian is absolutely an unarmed civilian. People express their anger by throwing stones at Israeli. If someone throws stones at the police in the United States, the United States does not bring in tanks and helicopters to kill those demonstrators.

**San Francisco, CA :** Mr. Rahman:

Do you believe that the U.S. has been an honest broker in the negotiations, as was cliamed by both Mr. Gore and Gov. Bush?

**Hasan Abdel Rahman:** The United States is a very important broker but the United States is not impartial or objective because the United States is an ally of Israel. So the United States, by definition, is not impartial. It is an important broker and we recognize the importance of its role.

**Reston, Va.:** Sir, how can you justify the violence being committed by your people as we speak? And secondly, are you suprised by the violence and uprest among Israeli Arabs?

**Hasan Abdel Rahman:** I have spoken of the conditions under which the Palestinian people live which led inevitably to the frustration and the explosion which has taken place. The cause has been the Israeli use of firepower, initiated on Sept. 29 in Arab Jerusalem, when Israel fired at the demonstrators killing 6 people and wounding 200, and then the execution style killin of the 12 year old boy on the lap of his father and many other killings. So the Palestinian masses are furious and the Israel serial killing of Palestinians is continuing.

As far as the protests of Palestinians inside Israel, although they are Israeli citizens they have suffered decades of discrimination, in all aspects of their lives, and they felt that Sharon's visit to al-Aqsa mosque was provocative. What added insult to injury for them was that when they protested they were fired at by their own police.

**washingtonpost.com:** Many questioners blame the violence on the Palestinians. You have repeatedly replied that virtually all of the victims, dead and wounded, are Palestinians. Is there anything you can say to the critical questioners to help bridge the difference in perceptions

**washingtonpost.com:** Many questioners are blaming the violence on the

Palestinians. You have repeatedly replied that virtually all of the victims, dead and wounded, are Palestinians. Is there anything you can say to the critical questioners to get them to see the reality of the situation from your point of view?

**Hasan Abdel Rahman:** I think the American people have been subjected to biased coverage of the events, which is not the case in the international media. It is only in the American media. I believe that the repeated allegations by Israel has been internalized to the point that the only voice that is being heard is the Israeli voice, not the Palestinian voice.

People are being subjected to a campaign of misinformation.
But any neutral observer would look at footage of young Palestinians with stones or sticks in their hands facing the Israeli army which is the strongest army in the region. So it is conceivable that the young Palestinian civilians, maybe throwing stones, is the aggressor while the Israeli tanks and the Israeli sharpshooters are the victims.

It is really a perverted logic to even raise the question. How can any Palestinian stone reach a helicopter firing rockets at a crowd?

**Silver Spring, MD:** I think that any armed conflict between people who have to occupy the same realestate is unfortunate. However, I have a problem about the children. I am a mother of 3 (now) adult children. If there had been rioting in the streets of my town, I would never have allowed them outside of the house. How can you condemn Israel for harming children when someone is allowing those children to be outside in the thick of all the fighting?

**Hasan Abdel Rahman:** Palestinian parents don't send their children to the street. Palestinian children are like any other children. They children go to school, go to the supermarket, walk in the streets. So instead of condemning them for being there, we need to condemn those who fire at them indiscriminately.

The boy who was killed yesterday in Gaza was carrying his books and coming home from school.
The boy who was killed in the lap of his father was being protected by father.
So it is not the distortion of the Israelis that we send our children. You cannot excuse under any circumstances, the criminal behavior of Israeli soldiers and the ease by which they fire at children, or adults for that matter.

**Arlington, VA:** Do you belive that the Arab nations will intervene in aiding the defense of the Palestinian people? If so, at what point of escalation of this situation will the Arab nations intervene? ...Do you believe, if the situation escalates, that the Arab summit on Oct. 21 will be of any use in avoiding a direct confrontation?

**Hasan Abdel Rahman:** The Arab masses are very angry at what is happening to their Palestinian brothers. So I think the Arab summit will

take decisions to support the Palestinian people but I don't know how those are going to be formulated.

**washingtonpost.com:** Is it possible for the Palestinian and Israeli governments and negotiating teams to talk each with the minimal level of trust and respect that is needed for the peace process?

**Hasan Abdel Rahman:** Until recently we have had very cordial relations between the Palestinian and Israeli negotiators. There was mutual respect until two weeks ago when Israel started shooting at Palestinian civilians and killing them. Since then there has been an escalation of confrontation and attack.

We hope the Israeli government will stop the logic of force and resort to the force of logic instead so we can return to the negotiations to try to reach an agreement, if it is not too late.

**washingtonpost.com:** Is it too late?

**Hasan Abdel Rahman:** I think with bombardment of the headquarters of Yasser Arafat and the attack on other Palestinian installations, Israel is declaring a war. The ramifications of this aggression is going to be assessed. To be honest with you, I don't know how it is going to affect the possibility of resuming the negotiations.

Automatically Update Page    |    Get New Responses    |    Submit Question

© Copyright 2000 The Washington Post Company


News    OnPolitics    Entertainment    Live Online    Camera Works    Marketplace    onwash

# EXHIBIT E

# PALESTINE



Return to the Country Listing

Palestine Arab Delegation, #1459
Palestine Liberation Organization, #5244
Stroock & Stroock & Lavan, #5141

Palestine Arab Delegation, #1459

    Grand Central Station
    Post Office Box 608
    New York, NY 10163

    Arab Higher Committee for Palestine

The registrant engaged in meetings at the United Nations for the purpose of winning support of the United Nations Delegations for the cause of the Palestine Arab people.

$24,000.00 for the six month period ending June 26, 1999

Palestine Liberation Organization, #5244

    1730 K Street, N.W.
    Suite 1004
    Washington, DC 20006

    Palestine Liberation Organizations Office

The registrant conducted interviews, gave lectures, and contacted the media on behalf of the foreign principal. The registrant also contacted various U.S. Government agencies and departments on behalf of the foreign principal.

$200,132.74 for the six month period ending March 31,1999

Stroock & Stroock & Lavan, #5141

180 Maiden Lane
New York, NY 10038 -4982

Palestinian National Authority

The registrant provided representation in various infrastructure projects and pension matters.

$335,083.50 for the six month period ending April 30,1999

---

Return to the FARA Home Page
Return to the Registrant Listing
Return to the Short Form Listing
Return to the Country Listing

---

# PALESTINE



Return to the Country Listing

Bannerman & Associates, Inc., #3964
Palestine Arab Delegation, #1459
Palestine Liberation Organization, #5244
Stroock & Stroock & Lavan, #5141

Bannerman & Associates, Inc., #3964

888 - 16th Street, N.W.
7th Floor
Washington, DC 20006

Palestinian Authority

The registrant agreed to contact members of Congress, congressional staffers, and U.S. Government officials in order to educate them on the concerns of the Palestinian Authority including issues affecting foreign policy, foreign assistance, defense, and trade. The registrant also agreed to arrange international visits of representatives of the Palestinian Authority.

Finances: None Reported

Palestine Arab Delegation, #1459

Grand Central Station
Post Office Box 608
New York, NY 10163

Arab Higher Committee for Palestine

The registrant engaged in meetings at the United Nations for the purpose of winning support of the United Nations Delegations for the cause of the Palestine Arab people.

$24,000.00 for the six month period ending June 26,1999

Palestine Liberation Organization, #5244

1717 K Street, N.W.
Suite 407
Washington, DC 20036

Palestine Liberation Organizations Office

The registrant conducted interviews, gave lectures, and contacted the media on behalf of the foreign principal. The registrant also contacted various U.S. Government agencies and departments on behalf of the foreign principal.

$352,894.79 for the six month period ending September 30,1999

Stroock & Stroock & Lavan, #5141

180 Maiden Lane
New York, NY 10038 -4982

Palestinian National Authority

The registrant provided representation in various infrastructure projects and pension matters.

$693,305.00 for the six month period ending October 31,1999

---

Return to the FARA Home Page
Return to the Registrant Listing
Return to the Short Form Listing
Return to the Country Listing

---

# PALESTINE



Return to the Country Listing

Bannerman & Associates, Inc., #3964
Palestine Liberation Organization, #5244

Bannerman & Associates, Inc., #3964

888 - 16th Street, N.W.
Suite 250
Washington, DC 20006

Palestinian Authority

The registrant met with members of Congress, congressional staffers, and U.S. Government officials in order to educate them on the concerns of the Palestinian Authority including issues affecting foreign policy, foreign assistance, defense, and trade.

Finances: None Reported

Palestine Liberation Organization, #5244

1717 K Street, N.W.
Suite 407
Washington, DC 20036

Palestine Liberation Organizations Office

The registrant conducted interviews, gave lectures, attended conferences, forums and symposiums on behalf of the foreign principal.

$211,381.60 for the six month period ending September 30,2001

Return to the FARA Home Page
Return to the Registrant Listing
Return to the Short Form Listing
Return to the Country Listing

# PALESTINE



Return to the Country Listing

Bannerman & Associates, Inc., #3964
Palestine Liberation Organization, #5244

Bannerman & Associates, Inc., #3964

888 - 16th Street, N.W.
Suite 250
Washington, DC 20006

Palestinian Authority

The registrant contacted members of Congress, congressional staffers, and U.S. Government officials to discuss all facets of the bilateral relationship including, but not limited to, defense, trade, foreign assistance, and international visits of governmental officials.

$374,984.00 for the six month period ending April 28, 2002

Palestine Liberation Organization, #5244

c/o 1100 17th Street, N.W.
Suite 602
Washington, DC 20036

Palestine Liberation Organizations Office

Activities: None Reported

Finances: None Reported

Return to the FARA Home Page
Return to the Registrant Listing
Return to the Short Form Listing
Return to the Country Listing

# EXHIBIT F









News Home Page
Photo Galleries
Politics
Nation

# Tightening the Arafat Connection

*By John Lancaster*
Washington Post Staff Writer
Thursday, January 20, 2000; Page A21

E-Mail This Article
Printer-Friendly Version

**Perhaps no foreign diplomat was on friendlier terms with Yasser Arafat
than Edward G. Abington. A mild-mannered Texan who served as the top
U.S. envoy to Jerusalem from 1993 to 1997, Abington was in constant
touch with the temperamental Palestinian leader, joining him for long
lunches at Arafat's seaside headquarters in Gaza and fielding his phone
calls any time, day or night.**

When a Jewish extremist gunned down Israeli Prime Minister Yitzhak
Rabin in 1995, it was Abington who delivered the news to Arafat.

Now their relationship has taken a new twist.

Since leaving the State Department last month after almost 30 years,
Abington, 55, has worked for Arafat's Palestinian Authority as its first-
ever Washington lobbyist. One of his first assignments has been
preparing the ground for Arafat's scheduled meeting here today with
President Clinton, who is trying to push Israel and the Palestinians
toward a "framework" peace accord by mid-February.

Metro
Business/Tech
Sports
Style
Education
Travel
Health
Opinion
Weather
Weekly Sections
News Digest
Classifieds
Print Edition
Archives
News Index
**Help**
Partner Sites:
**Newsweek.com**
**BRITANNICA.COM**

Abington's new employer--the D.C. lobby shop of Bannerman &
Associates--is being paid $2.25 million over three years for its work for
the Palestinians, a reward that has not gone unnoticed by critics of the
former diplomat's career shift.

"It gives the appearance at least of inviting corruption of the diplomatic
service if those posted to . . . countries can then turn around and become
lobbyists for them," said Malcolm Hoenlein, executive vice chairman of
the Conference of Presidents of Major American Jewish Organizations.

But an official at another major American Jewish group saw no cause for
alarm. As consul general in Jerusalem, Abington played "a constructive
role in the peace process by educating Arafat about what would be
required if he wanted to have a constructive relationship with President
Clinton," said the official, who spoke on condition of anonymity. "If he
can continue that type of influence, then that would be positive."

Abington notes that he is hardly the first ex-diplomat to trade on his
former contacts. He also says he has not worked on the Palestinian
account since leaving the region more than two years ago--his last job at
the department was deputy assistant secretary for intelligence and
research--and, in any event, government ethics rules bar him from



lobbying the administration for one year.

**On the Web**

"I know what I'm doing is controversial," he says. But with Arafat having made the transition from guerrilla chieftain to peace partner and regular guest at the White House, Abington suggests, the Palestinians are entitled to a little professional advice.



Post A Job

"My conception of what we're doing is to try to help the Palestinians understand what's happening in Washington, but also to help people here understand what the Palestinians are concerned about," he said.

Abington's close ties to Arafat are in some respects a function of the unique role of the Jerusalem consulate, which reports directly to Washington rather than through the embassy in Tel Aviv. As a result, the consulate traditionally has served as the main U.S. liaison to the Palestinians.

Abington worked hard at strengthening the partnership. He cultivated ties to Arafat and his senior lieutenants. He paid a sympathy call to the family of a Palestinian youngster killed in a clash with Israeli settlers. He was a fixture in Gaza and the West Bank, sometimes turning up at confrontations between Israeli soldiers and stone-throwing Palestinian youths.

"They knew I was conveying their concerns back to Washington, but I also was carrying pretty tough messages" to them, Abington said. "They always understood that the objective was representing American interests and trying to push the peace process."

Abington's outspoken style--he was a favorite of foreign journalists in Jerusalem--did not always endear him to his superiors in Washington. In May 1997, for example, Abington told the New York Times that Israeli settlement-building under then-Prime Minister Binyamin Netanyahu was "ideologically driven," a comment that earned him a reprimand from Secretary of State Madeleine K. Albright.

But Abington says he did not mince words with the Palestinians, either. When a Palestinian bus bombing jolted him awake early one morning, he hurried to the scene--spotting a severed hand along the way--and called Arafat from his mobile phone to insist that he crack down on terrorism.

The Palestinians have been trying for several years to hire a lobbyist in Washington; according to Abington, none of the big firms was willing. But Abington expressed confidence that helping the Palestinians navigate the shoals of Washington policymaking can only serve the larger interests of Middle East peace.

"I wouldn't do it otherwise," he says.

Players

Edward Gordon Abington

Title: Principal associate, Bannerman & Associates.

Case 1:04-cv-00397-GBD-RLE    Document 84-2    Filed 05/28/10    Page 32 of 58

Age: 55.

Previous job: Deputy assistant secretary, Bureau of Intelligence and Research, State Department.

Education: Bachelor's degree, master's in international relations, University of Florida.

Hobbies: Hiking, bicycling, cooking.

© 2000 The Washington Post Company

◄ Previous Article        Back to the top        Next Article ►



# EXHIBIT G

 

# FORWARD



# Former American Envoy Turns Up on the Payroll of a Lobbyist for Arafat

## *Recently U.S. Consul in Jerusalem, Abington Swings to Arab Side*

### 'This Invites a Corruption of the Diplomatic Service'

By ELI LAKE

FORWARD STAFF

WASHINGTON -- When Yasser Arafat visits Washington next week, he will be backed by the political muscle of a Washington lobbying firm that he recently hired for $2.25 million and whose lobbyists include the State Department official who, from 1993 to 1997, was in charge of representing the American government's interests to Mr. Arafat.

The State Department official, Edward Abington, last month left his post as deputy assistant secretary at the State Department's Bureau of Intelligence and Research to join the lobbying firm Bannerman and Associates, said a Bannerman associate, Mark Habeeb. Also last month, Bannerman and Associates registered itself with the Justice Department as a foreign agent representing the Palestinian Authority, according to public records on file at the Justice Department here.

With Prime Minister Barak and President Clinton pushing to conclude a final status agreement between Israel and the Palestine Liberation Organization before Mr. Clinton's term concludes in one year, the PLO's representation in the American capital is becoming increasingly important. At issue in the final status talks are Jerusalem, Jewish settlements on the West Bank, the disposition of Palestinian-Arab "refugees" and the borders between Israel and areas to be controlled by the PLO. As Mr. Clinton and his aides prepare to mediate the final status talks, which will also be monitored by Congress, Mr. Arafat has apparently decided that it is worth spending $2.25 million to make sure his side of the issues is heard in Washington. The firm has already swung into action, attempting to arrange meetings for congressional aides with Palestinian-Arab officials. Israel has no similar paid lobbyists, relying instead on its embassy and on American Jewish groups.

Bannerman's Mr. Habeeb told the Forward that Mr. Abington's "specific role will be a function of his personal relations with the players on both sides and his intimate knowledge of how the State Department works." Mr. Abington will be one of four principal lobbyists working on the Palestinian Authority account, Mr. Habeeb said; another is the firm's name partner, Graeme Bannerman, who was a top aide to Senator Lugar on the Senate Foreign Relations Committee.

As America's consul general in Jerusalem from 1993 to 1997, Mr. Abington served as the overseas American government official in charge of relations with Mr. Arafat and the PLO. While based in Israel's capital, the consul general functions as a de-facto diplomatic mission to the Palestinian Arabs, reporting directly to the State Department in Washington rather than to the American ambassador to Israel, who is based in Tel Aviv.

Some members of Congress and American Jewish leaders criticized the new arrangement between Mr. Abington and the PLO.

Rep. Eliot Engel, a Democrat from New York, said the arrangement is "inappropriate." The American Consulate in Jerusalem "always seemed pro-Palestinian," Mr. Engel said. "I just felt that the tilt out of that office always seemed to be sympathetic to the Palestinian Arabs and not to the Israelis."

The executive vice chairman of the Conference of Presidents of Major American Jewish Organizations, Malcolm Hoenlein, said, "This invites a corruption of the diplomatic service, if people are employed or can be employed to represent the very countries to which they were posted immediately after their service."

"This type of huge financial pay-off, soon after Abington's government work, should never be permitted," said the president of the Zionist Organization of America, Morton Klein.

Conflict-of-interest laws regarding post-government employment prohibit all former government officials from lobbying the federal government on matters in which they have "participated personally and substantially," according to federal regulations.

Mr. Habeeb said, "Obviously whatever he does will be legal" and that Mr. Abington "was and continues to be in contact with the ethics and legal people at the State Department to make sure he is in compliance" with the law. Mr. Abington was not available for comment; Mr. Habeeb said Mr. Abington had asked him to respond on his behalf.

Other Jewish leaders said they saw no problem with Mr. Abington's involvement and said it could aid efforts to reach a peaceful settlement in the Middle East.

"He's advising someone who is working to make peace with Israel. I would want Mr. Arafat to get the best advice in the peace process. I don't see what the hoo-ha is," said the national director of the Anti-Defamation League, Abraham Foxman.

The founder and political director of Americans for Peace Now, Mark Rosenblum, said, "Ed Abington brings to the table a knowledge of the region and can help the Palestinians not only make their cause look better in America but also provide insight to the Palestinian leadership on the kind of pragmatic policies that will bring a lasting peace."

A copy of the October 15 contract between Bannerman and the Palestinian Authority, on

file at the Justice Department, says one of the American lobbying firm's functions will be to maintain "day-to-day contacts with congressional staff and Administration officials."

The Palestinian Authority will receive advocacy training from Mr. Bannerman's firm, according to the contract. "The firm will work with a designated counterpart team as appointed by the Palestinian Authority, and will continue to build capacity among the team in the areas of communications, writing and lobbying skills in the U.S.," the contract reads. That contract also specifies that Bannerman and Associates will develop a public-relations strategy to "counter negative media coverage of the Palestinian Authority," draft weekly memoranda on developments in Washington and coordinate congressional staff visits to the West Bank and Gaza.

On this last point, Mr. Bannerman's firm has already contacted members of a New York delegation of congressional chiefs of staff visiting Israel on a trip coordinated by the Jewish Community Relations Council of New York.

Bannerman and Associates has also represented Egypt and the United Arab Emirates, Justice Department filings show. Before October 15, the Palestinian Authority employed no formal lobbyists in Washington, relying on a Washington office of the PLO that remained open informally after being closed officially in 1997. However, a New York law firm, Stroock & Stroock & Lavan, is registered with the Justice Department to serve as lawyers for the Palestinian Authority on, among other things, a deal to build a power plant in the Gaza Strip. The interim government has relied in the past on the Palestine Liberation Organization's Washington office and the Palestine Arab Delegation to do its advocacy in Washington.

| community | feedback | home |  archive |

Back to the
FORWARD *home page*

# EXHIBIT H

66 F.Supp.2d 3
(Cite as: 66 F.Supp.2d 3)

Page 1

C

United States District Court,
District of Columbia.

INTERNATIONAL TECHNOLOGIES
INTEGRATION, INC., Plaintiff,
v.
THE PALESTINE LIBERATION
ORGANIZATION and The Palestinian National
Authority,
Defendants.

No. CIV.A.98-00756 (CKK).

June 22, 1999.

Action was brought in state court to confirm
arbitration award. Following removal, defendant
moved to vacate award. The District Court, Kollar-
Kotelly, J., held that: (1) notice of demand to submit
dispute to arbitration was properly served, and (2)
failure to challenge award within ninety days of
receiving notice of award precluded vacation of
award.

Motion to confirm granted.

West Headnotes

[1] Arbitration ⬤➔2.2
33k2.2 Most Cited Cases

Where parties agreed to arbitrate disputes under
American Arbitration Association rules and in
accordance with Virginia law, Virginia's arbitration
law, not Federal Arbitration Act, governed
determinations of validity of arbitration award. 9
U.S.C.A. § 1 et seq.; Va.Code 1950, § 8.01-
581.010.

[2] Arbitration ⬤➔31.11
33k31.11 Most Cited Cases

Under Virginia law, arbitrator must provide
fundamentally fair hearing.

[3] Arbitration ⬤➔23.1
33k23.1 Most Cited Cases

Under Virginia law, minimal requirements of fairness
in arbitration proceedings is right to receive adequate
notice of arbitral proceedings.

[4] Arbitration ⬤➔23.1
33k23.1 Most Cited Cases

Notice of demand to submit dispute to arbitration was
properly served, even though notices were not sent to
address given in contract; party seeking arbitration
sent copies of notice to address listed on opponent's
representatives business cards, notice was sent by
facsimile and registered mail, return-receipt
requested, and notices were otherwise satisfactory.

[5] Arbitration ⬤➔46.4
33k46.4 Most Cited Cases

Party who receives adequate notice of arbitration
proceeding, yet who elects to sit idly by in silence
until arbitration is complete, award has been
rendered, and prevailing party has moved to confirm,
cannot emasculate all that has been done by asserting
technical right for which there has been no
substantive deprivation.

[6] Arbitration ⬤➔46.7
33k46.7 Most Cited Cases

Party that failed to challenge arbitration award within
90 days of receiving notice of award was precluded
under Virginia law from asserting grounds for
vacating award on motion to confirm award.
Va.Code 1950, § 8.01-581.010.

[7] Arbitration ⬤➔72.1
33k72.1 Most Cited Cases

Under Virginia law, court must confirm arbitration
award if no party has filed timely petition to vacate or
modify award. Va.Code 1950, § 8.01-581.010.

[8] Arbitration ⬤➔46.1
33k46.1 Most Cited Cases

Under Virginia law, party who wishes to contest
existence of arbitration agreement must proffer his
objection within 90 days of receiving award.
Va.Code 1950, § 8.01-581.010.
 *4 John David Seiver, Cole, Raywid & Braverman,
L.L.P., Washington, DC, for Plaintiff.

 Walter J. Pozen, I, Stroock & Stroock & Lavan,
Washington, DC, for Defendants.

MEMORANDUM OPINION

KOLLAR-KOTELLY, District Judge.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

66 F.Supp.2d 3                                                                                              Page 2
(Cite as: 66 F.Supp.2d 3)

To resolve a dispute arising under an agreement between the Plaintiff International Technologies Integration, Inc. ("ITI") and the Defendants the Palestine Liberation Organization ("PLO") and the Palestinian National Authority ("PNA"), ITI commenced arbitration by filing a Demand for Arbitration with the American Arbitration Association ("AAA") and forwarding copies of the Demand by both registered mail, return-receipt requested and facsimile to the PNA's president and two ministers.    To neither this Demand nor to numerous other notices of the arbitration proceedings sent by both ITI and the AAA did the Defendants respond.    On October 15, 1997, after conducting an *ex parte* arbitration, an arbitrator found that the PLO and the PNA were liable to ITI in the amount of $18,750,000 for breach of contract.    More than ninety days after the Defendants were served with the arbitrator's award, ITI filed a motion to confirm the award in the District of Columbia Superior Court, which was served on the Defendants by registered mail, return-receipt requested at the same addresses to which all previous arbitral notices had been sent.  Responding to the Superior Court summons, the Defendants removed to this Court pursuant to 28 U.S.C. § 1441(d), and concomitantly raised several affirmative defenses, including lack of notice, in moving to vacate the arbitration award.

Only two issues need be resolved by this Court:  1) did the Defendants receive adequate notice of the arbitration proceedings and 2) if so, are they now precluded from moving to vacate the arbitrator's award.    After reviewing the parties' briefs, exhibits, supplemental responses to this Court's May 27, 1999 Order, and comments at oral argument, the Court answers each issue in the affirmative.    Accordingly, ITI's motion to confirm is granted.

*5 I. BACKGROUND

On September 13, 1993, the PLO, acting as representative of the Palestinian people, and the Government of Israel signed the Declaration of Principles on Interim Self-Government Arrangements, which extended limited political autonomy to Palestinians within the West Bank and the Gaza Strip.    Emerging from this historic accord was the PNA, the political entity in which is reposed the Palestinian executive, legislative, and judicial powers.    Among the PLO's chief developmental objectives was to "rebuild and modernize the telecommunications network in the Palestinian Territory."  Decl. of Mohammed Rachid ¶ 2. [FN1] ITI is an advanced-technology, research, and

engineering firm incorporated in the Commonwealth of Virginia that provides telecommunications services throughout the world.    *See* Decl. of Howard Graff ¶ 2. On October 3, 1993, ITI executed two substantively identical agreements [FN2] with both the PLO and the PNA, under which the PNA [FN3] allegedly granted to ITI the exclusive, non-terminable right to develop a domestic and international communications and telecommunications network in the West Bank, Jericho, and the Gaza Strip.    *See id.* at Exs. A & B.

> FN1. Although counsel for the PNA spells the declarant's name "Rashid," correspondence between the parties, including letters signed personally by the declarant, indicate that his name is spelled "Rachid."

> FN2. Because both agreements are substantively identical, the Court shall collectively refer to them as the "Agreement."

> FN3. Unless the Court specifies otherwise, further references in this Memorandum Opinion to the PNA also include the PLO.

Three discrete provisions in the Agreement, which will receive more elaborate examination later, warrant brief attention at the outset.    First, in Article 2.1 of the Agreement, the parties elected to resolve all disputes by submitting them to binding arbitration in Washington, D.C. under the aegis of the AAA. Second, Article 3 specified that the Agreement was to be interpreted and enforced in accordance with and governed by the laws of the state of Virginia.    And lastly, Section 8.2 of the Conditions of Contract for Telecommunication Concession (Sharing) Agreement--Gaza Strip/West Bank ("Conditions of Contract"), a document annexed to the Agreement, specified that

> [a]ny notice, demand or other communication required or permitted to be given pursuant to the Agreement shall be in writing and shall be (i) personally delivered to an individual then designated as a party's representative ... (ii) transmitted by postage prepaid registered mail (airmail if international), or (iii) transmitted by telefax or telex (with answerback confirmation).

Conditions of Contract, § 8.2 (Decl. of Graff at Ex.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

C). Section 8.2 further provided that notices to the PNA were to be addressed to the PNA in Jericho, Palestine, directed to the attention of "H.E. The President." Beyond these specifications, however, Section 8.2 was silent, if not cryptic. Although it indicates that a post office box is part of the address, there is merely a blank line following the "P.O. Box" line. Moreover, where there should be numbers or other data, only blank lines follow such categories as "Telex Number," "Answerback," and "Fax." *See* Conditions of Contract, § 8.2, at 16.

At the time that the parties entered into the Agreement, Chairman Arafat was residing in Tunis, Tunisia, where, in fact, the contract was signed. *See* Decl. of Dennis F. Schonacher ¶ 2; Decl. of Graff at Exs. A (Agreement between ITI and the PLO indicating that "[t]his AGREEMENT is made and entered into in Tunisia on the Third day of October 1993 ...."); *id.* at Ex. B (Agreement between ITI and the PNA indicating that "[t]his AGREEMENT is made and entered into in Tunisia on the third day of October 1993 ...."). Once Chairman Arafat permanently moved to Palestine, ITI directed all written correspondence with the Office of the President *6 of the PNA to the Gaza address. *See* Decl. of Schonacher ¶ 4; *id.* at Ex. 1 (various letters sent by ITI to the Office of President in Gaza). Moreover, ITI conducted all telephone and facsimile communications with the Office of the President by dialing Gaza phone numbers. *See id.* ¶ 4. Indeed, it was in Gaza that Chairman Arafat, accompanied by representativesfrom ITI, MCI, and Bezeq, an Israeli telecommunications company, announced a formal transfer of the telecommunications system in Palestine from Bezeq to ITI. *See id.* ¶ 5.

Approximately three years after the parties executed the Agreement, ITI concluded that the PNA wrongfully terminated the Agreement, and, pursuant to Article 2.1 of the Agreement, commenced arbitration by filing a Demand for Arbitration ("Demand") with the AAA on November 12, 1996. ITI, in turn, served copies of the Demand on Yasser Arafat, Chairman of the Executive Committee of the PLO and President of the PNA, His Excellency Eng. Imad Al Falouji, Minister of Post and Communication, and His Excellency F. Abu-Medein, Minister of Justice. For each of the three PNA officials on whom ITI served a copy of the Demand, ITI employed both registered mail, return-receipt requested and facsimile transmission--totaling six separate notices to the PNA. [FN4] All three facsimiles were transmitted successfully, *see* Decl. of Graff ¶ 7 and Exs. F, G, & H (copies of facsimile confirmations to all three recipients), and a stamped

return-receipt indicates that the Minister of Post & Communications received the Demand on November 28, 1996. *See id.* at Ex. I (copy of stamped return-receipt to H.E. Imad Al Falouji); *see also id.* at Ex. J (copy of the Affidavit of Service of Lynn Wiegand (original was submitted to the Arbitrator), attesting that the Demand was served on each of the three PNA officials by registered mail, return-receipt requested and by facsimile). Copies of the Demand were served on each of the three PNA officials at the Gaza addresses that ITI had consistently used to communicate successfully with the PNA. Despite these notices, the PNA never contacted ITI.

> FN4. In addition to authorizing parties to service notice on each other by mail and by personal service, Rule 40 of the AAA's Commercial Arbitration Rules, which is incorporated into the parties' arbitration agreement, *see* AAA Rule 1, provides that "[t]he AAA and the parties may also use facsimile transmission, telex, telegram, or other written forms of electronic communication to give the notices required by these rules." AAA R. 40. The requirements and mechanics of Rule 40 are examined in greater detail *infra*.

Meanwhile, the AAA administrator, Luis M. Martinez, was taking preliminary steps to orchestrate ITI's arbitration demand. On December 5, 1996, he sent a letter to both parties to advise them that the AAA had received ITI's Demand, that the PNA had forty-five days from that point to file a statement of defense and counter-claims, and that he hoped to schedule an administrative conference. *See* Decl. of Luis M. Martinez ¶ 3 & Ex. A. AAA documents indicate that a facsimile of Martinez' letter was successfully transmitted to the PNA's Ministry of Post and Communication. *See id.* at Ex. B. A stamped copy of the Martinez letter that was sent to Minister Imad Al Falouji bears an official PNA stamp that reads, according to the certified translation: "The Palestinian National Authority, Ministry of Post and Communication, Office of the Minister." *See* Decl. of Graff ¶ 8 & Ex. K (containing stamped-copy of letter and certified translation). The translation also indicates "American Arbitration Association No. 266/26" and the date of "12/12/96." The PNA did not respond.

Two months later, Martinez sent another letter to ITI and the PNA's Minister of Post and Communication. *See* Decl. of Martinez ¶ C. While notifying the

66 F.Supp.2d 3                                                                                          Page 4
(Cite as: 66 F.Supp.2d 3)

parties of prospective arbitrators and requesting their
preferences, Martinez also used this opportunity to
admonish the PNA about the consequences of failing
to participate in the upcoming arbitration:

> *7 Failure to [submit a list of preferred arbitrators]
> will be deemed an acceptance of the entire list.
> Please note that this Association has not received a
> response from the Respondent.    It is our policy
> that absent a Court Order or an agreement by the
> parties, the arbitration will proceed as to all parties.
> If one party fails to participate the arbitration will
> proceed exparte [sic], meaning one party.    In the
> event that any party does not participate it is
> advised that they attend the hearings because
> failure to attend will not prevent the arbitrator from
> issuing an award that can be enforced in either
> country.

Decl. of Martinez at Ex. C. As he did with his
December letter, Martinez faxed a copy of his letter
to the PNA's Minister of Post and Communication.
Likewise, AAA records indicate that the fax was sent
successfully, *see id.* at Ex. D, and the stamp affixed
to the fax cover sheet has been translated as: "Stamp
of The Palestinian National Authority, Ministry of
Post and Communication, Office of the Minister."
Decl. of Graff at Ex. L. Having received no response
from the PNA, the AAA designated Biagio Civale as
Arbitrator, and through Martinez, issued a Notice of
Hearing for March 28, 1997. *See* Decl. of Martinez
at Ex. E. Once again, a stamp on the facsimile cover
sheet sent to the PNA reads:    "Stamp of The
Palestinian National Authority, Ministry of Post and
Communication, Office of the Minister." Handwritten
notations also indicate that the facsimile was
"Received 03/26/--- 7." Decl. of Graff at Ex. M.

Presumably concerned about the PNA's absence,
Arbitrator Civale ordered ITI to contact the Office of
the PLO in Washington, D.C. about the pending
arbitration.  *See* Decl. of Graff ¶ 17.  On April 8,
1997, Counsel for ITI complied by sending a brief
letter to Minister Imad Al Falouji by facsimile and
registered mail, return-receipt requested to both the
Gaza address as well as the Office of the PLO in
Washington, D.C., in care of Mr. Said Hamad, the
Deputy Chief Representative of the PLO. *See id.*  A
stamp on the facsimile cover sheet sent to the Office
of the PLO in Washington, D.C. reads: "Stamp of
The   Palestinian   Liberation   Organization."
Handwritten in English on the face of the document
appear the words: "Received APR 11, 1997." *See
id.* at Ex. N. This letter also failed to precipitate a
response from the PNA. Accordingly, pursuant to the
AAA's rules, the Arbitrator conducted the proceeding
*ex parte.*

To substantiate its claim, ITI submitted a number of
affidavits and other written documentation to the
Arbitrator between April and October of 1997. *See*
Decl. of Graff ¶ 19.   Notwithstanding the PNA's
absence, Arbitrator Civale directed ITI to serve the
PNA with copies of every submission that it tendered
to him.   *See id.* ¶ 20.    Significantly, ITI served
copies of its arbitral submissions on the PNA's
President, Yasser Arafat, the Minister of Justice, F.
Abu-Medein,  and  the  Minister  of  Post  and
Communication, Imad Al Falouji at their Gaza
addresses. *See id.*  Because the question of notice
assumes dispositive significance in this litigation, it is
essential to chronicle ITI's various submissions:

. Three returned receipts to President Arafat,
Minister F. Abu-Medein, and Minister Imad Al
Falouji acknowledge that the PNA received ITI's
April 25, 1997 letter to Arbitrator Civale
containing ITI's witness list and suggested
testimony. *See id.* at Ex. O.

. Three facsimile confirmations sent to President
Arafat, Minister F. Abu- Medein, and Minister
Imad Al Falouji indicate that ITI's April 25, 1997
letter was transmitted successfully. *See id.* at Ex.
P.

. Three DHL Shipment Airwaybills indicate that
ITI mailed its initial submissions to President
Arafat, Minister F. Abu-Medein, and Minister
Imad Al Falouji on May 12, 1997. *See id.* at Ex.
Q.

*8 . A DHL log indicates that ITI's May 12, 1997
initial submissions were delivered to H.E. Eng.
Imad Al Falouji.

. DHL Airwaybill 9146324924, which contained
ITI's May 12, 1997 initial submissions that were
mailed to President Arafat, was received on May
20, 1997 by "Yousra."   ITI maintains, and the
PNA has not suggested to the contrary, that
"Yousra" refers to Yousra Jamil Hassanat, who
works in the PNA Presidential Office in Gaza, and
who is responsible for President Arafat's "In" &
"Out" mail. *See id.* at Ex. S.

. DHL Airwaybill 9146325134, which contained
ITI's May 12, 1997 initial submissions that were
mailed to Minister F. Abu-Medein, was received
on May 20, 1997 by "Nahed."   Unchallenged by
the PNA, counsel for ITI has averred that "Nahed"
refers to Nahed Ichtaouie, who serves as the private
secretary to Minister F. Abu-Medein.  *See id.* at
Ex. T.

. DHL Airwaybill 9100955861, which contained
ITI's subsequent May 15, 1997 submission that was
mailed to Minister F. Abu-Medein, was received
on June 2, 1997 by "Rahada Bsaiso."  Counsel for
ITI maintains that Rahada Bsaiso is the assistant to

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

the private secretary to Minister F. Abu-Medein. *See id* at Ex. U. The PNA does not suggest anything to the contrary.

. DHL Airwaybill 9100955846, which contained ITI's subsequent May 15, 1997 submission that was mailed to Minister Imad Al Falouji, was received. *See id.* at Ex. V.

. A document that is purportedly from DHL confirms that ITI's subsequent May 15, 1997 submission that was mailed to President Arafat was received on or about May 26, 1997.

Having never received from the PNA a responsive submission or even so much as a request for an extension of time, Arbitrator Civale rendered his arbitration award ("Award") on October 15, 1997. Although he found that "the Defendants have breached their obligations to perform under the contracts," he declined to award ITI the full value of its expectation damages. *See* Decl. of Graff at Ex. X (written Award of Arbitration). Concluding that "[t]he award of money to ITI, as compensation for work initially performed, during almost one tenth of the life of the agreement, cannot be greater than one tenth of the value assigned by the experts for a 25 years performance," Arbitrator Civale awarded $18,750,000 (inclusive of all expenses attendant with prosecuting the arbitration) to ITI. *See id.*

After the Award was filed on November 13, 1997, Luis M. Martinez of the AAA sent the Award to the PNA via United Parcel Service ("UPS"). *See* Decl. of Martinez ¶ 8; Decl. of Graff ¶ 24. As with all previous correspondence sent from the AAA, the Award was addressed to H.E. Eng. Imad Al Falouji, Minister of Post and Communication, in Gaza. *See* Decl. of Graff ¶ 24. Martinez subsequently received a UPS Delivery Notification that indicated that the Award was delivered on November 26, 1997, and was signed for by "Shalom." In paragraph 25 of his declaration, which the PNA has not rebutted, counsel for ITI avers that Ihab Rassem El Ghoul, an assistant to Yousra Hassanat in the PNA Presidential Office in Gaza, routinely signs delivery receipts with the word "Shalom." *See id.* ¶ 25.; *see also* Decl. of Martinez at Ex. L (copy of the UPS Delivery Notification indicating that one parcel was delivered on 11/26/97 at 3:52 P.M. and that the shipment was signed for by "SHALOM").

On March 2, 1998, ITI filed a Motion to Confirm Arbitration Award in the District of Columbia Superior Court. Pursuant to D.C. Super. Ct. R. 4(f)(2)(C)(ii), the Clerk of the Court served a copy of the summons and ITI's motion by registered mail, return-receipt requested on President Arafat, Minister

F. Abu-Medein, and Minister Imad Al Falouji at the addresses that ITI and the AAA had used to serve all arbitral notices. A copy of the return- receipt mailed to President Arafat indicates that *9 he received the summons and motion on March 16, 1998. Four days later, the PNA's Minister of Finance informed Mohammed Rachid, Economic Advisor to President Arafat, that ITI had brought an arbitration in Washington, D.C., that an award was rendered in ITI's favor in the amount of $18,750,000, and that ITI had commenced legal proceedings in Washington, D.C. to confirm the award. *See* Decl. of Rachid ¶ 21. Defendants timely removed ITI's action to this Court pursuant to 28 U.S.C. § 1441(d) on March 24, 1998.

## II. DISCUSSION

### A. *Virginia's codification of the Uniform Arbitration Act governs this proceeding*

Before turning to the merits, the Court must resolve a question that neither party has raised. While both ITI and the PNA have assumed throughout that this proceeding is governed by the Federal Arbitration Act, 9 U.S.C. § § 1-16, this Circuit's decision in *Ekstrom v. Value Health, Inc.,* 68 F.3d 1391, 1395-96 (D.C.Cir.1995), coupled with the Agreement's choice-of-law provision in Article 3, compels the Court to apply Virginia's codification of the Uniform Arbitration Act, Va. Stat. § 8.01-581.01 *et seq.* In *Ekstrom,* the parties executed a contract in which they agreed to resolve any disputes through binding arbitration. In a "Governing Law" section, the parties further provided that the agreement "shall be governed by and construed in accordance with the internal laws of the State of Connecticut." *Id.* at 1393. After a dispute arose, an arbitrator entered an award in the plaintiff's favor. Within ninety, but more than thirty, days from receiving the award, the defendant moved to vacate the award under the FAA, 9 U.S.C. § 10. While the FAA permits a party to move to vacate an arbitration award within ninety days of its delivery, *see* 9 U.S.C. § 12, Connecticut's arbitration law bars any motion to vacate filed later than thirty days from delivery of the award, *see* Conn. Gen. Stat. Ann. § 52-420(b). Although both parties conceded that Connecticut's substantive law on contracts and arbitrability should govern the agreement, they differed over whether the state's law controlled issues relating to the timeliness of petitions to vacate arbitration awards.

To resolve this inquiry, the D.C. Circuit first observed that "choice of law provisions in contracts are generally understood to incorporate only

66 F.Supp.2d 3
(Cite as: 66 F.Supp.2d 3)

Page 6

substantive law, not procedural law such as statutes of limitation." *Id.* at 1395 (brackets omitted) (quoting *Federal Deposit Ins. Corp. v. Petersen,* 770 F.2d 141, 142-43 (10th Cir.1985)). Yet the Circuit determined that, under Connecticut law, "a statute of limitation is 'substantive' when it applies to a right created by statute, as opposed to a right recognized at common law." *Id.* (citing *Baxter v. Sturm, Ruger & Co.,* 230 Conn. 335, 644 A.2d 1297, 1299 (1994)). Connecticut, like Virginia, has adopted the Supreme Court's rationale in *Davis v. Mills,* 194 U.S. 451, 454, 24 S.Ct. 692, 48 L.Ed. 1067 (1904), that a limitations period is substantive if it is " 'directed to the newly created liability so specifically as to warrant saying that it qualifie [s] the right.' " *Thomas Iron Co. v. Ensign-Bickford Co.,* 131 Conn. 665, 42 A.2d 145, 147 (1945) (quoting *Davis,* 194 U.S. at 454, 24 S.Ct. 692); *see also Jones v. R.S. Jones & Assocs.,* 246 Va. 3, 431 S.E.2d 33, 35 (1993) (adopting the *Davis* formulation); *Overstreet v. Kentucky Central Life Ins. Co.,* 950 F.2d 931, 935 (4th Cir.1991) (same). From there, the Circuit had little difficulty concluding that Connecticut arbitration law governed. [FN5]

> FN5. The D.C. Circuit also examined, and rejected, the defendants' argument that the FAA pre-empted Connecticut's arbitration law. *See Ekstrom,* 68 F.3d at 1395-96. Interestingly, although *Ekstrom* was argued and decided after the Supreme Court issued its opinion in *Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995), *Mastrobuono* is never cited in *Ekstrom.* Moreover, one of the cases that the D.C. Circuit cites in *Ekstrom* to establish that the FAA did not pre-empt Connecticut law was a Second Circuit case whose holding was explicitly overruled by the Supreme Court in *Mastrobuono. See Fahnestock & Co. v. Waltman,* 935 F.2d 512, 517 (2d Cir.1991) (cited in *Ekstrom,* 68 F.3d at 1396), *overruled by Mastrobuono,* 514 U.S. 52, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995). Although the Court follows *Ekstrom,* because there is little substantive difference between the FAA and Virginia's codification of the Uniform Arbitration Act, the Court will examine both statutes where appropriate.

*10 [1] Moreover, several years before *Ekstrom,* Judge Stanley Harris of this Court explicitly held that

where the parties agreed to arbitrate disputes under the AAA and in accordance with Virginia law, Virginia's arbitration law, not the FAA, governed determinations of the validity of the arbitration award. *See Flight Sys. v. Paul A. Laurence Co.,* 715 F.Supp. 1125, 1127-28 (D.D.C.1989). Under both *Ekstrom* and *Flight Systems,* there can be no doubt that ITI's motion to confirm and the PNA's petition to vacate the arbitration award must be analyzed under Virginia law.

B. *The mechanics of vacating arbitration awards under Virginia's arbitration law*

Once an arbitrator has rendered his award, a party may move to vacate that award under a narrow set of circumstances:

> Upon application of a party, the court shall vacate an award where:
> 1. The award was procured by corruption, fraud or other undue means;
> 2. There was evident partiality by an arbitrator appointed as a neutral, corruption in any of the arbitrators, or misconduct prejudicing the rights of any party;
> 3. The arbitrators exceeded their powers;
> 4. The arbitrators refused to postpone the hearing upon sufficient cause being shown therefor or refused to hear evidence material to the controversy or otherwise so conducted the hearing ... in such a way as to substantially prejudice the rights of a party; or
> 5. There was no arbitration agreement and the issue was not adversely determined in proceedings [to compel arbitration] and the party did not participate in the arbitration hearing without raising the objection.

Va. Stat. § 8.01-581.010(1)-(5). [FN6] To promote one of arbitration's virtues--efficiency and swiftness--a party seeking to vacate an award must file an application "within ninety days after delivery of a copy of the award to the applicant." *Id.* § 8.01-581.010. Although a party may either file an application to vacate by initiating its own court action or "raise[ ] reasons supporting vacation in response to another party's petition to confirm that award," the applicant must nevertheless present its arguments to a court of competent jurisdiction within the ninety-day time frame. *See id.*

> FN6. With the exception of subsection 5 of Virginia's codification of the Uniform Arbitration Act, the FAA's four bases for vacating an arbitration award are practically

66 F.Supp.2d 3
(Cite as: 66 F.Supp.2d 3)

identical. *See* 9 U.S.C. § 10(a)(1)- (4).

[2][3] Without doubt, "an arbitrator must provide a fundamentally fair hearing." *Generica Ltd. v. Pharmaceutical Basics, Inc.,* 125 F.3d 1123, 1130 (7th Cir.1997). Among the "minimal requirements of fairness" is a right to receive "adequate notice" of arbitral proceedings. *Id.; accord Iran Aircraft Indus. v. Avco Corp.,* 980 F.2d 141, 146 (2d Cir.1992); *Hoteles Condado Beach v. Union De Tronquistas,* 763 F.2d 34, 40 (1st Cir.1985); *Hall v. Eastern Air Lines, Inc.,* 511 F.2d 663, 663-64 (5th Cir.1975). Speaking generally to the bedrock importance of notice, the Supreme Court observed almost fifty years ago that "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all *11 the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950). Regardless of the temporal limitations set forth in Virginia's arbitration act or the FAA, neither statute would foreclose a court from vacating an arbitrator's award where a party was never served with a single notice, and where that party had no constructive notice or other knowledge of the arbitration. For "when notice is a person's due, process which is a mere gesture is not due process." *Id.* at 315, 70 S.Ct. 652. Insuch extreme circumstances, it would defy logic and fundamental fairness to permit a party to obtain an arbitral award over an opponent by shrouding the proceedings in a cloak of invisibility.

What this Court must determine, therefore, is whether the PNA received adequate notice of the arbitration. For if the PNA was ignorant of the proceedings, that would be all that this Court need determine; such a miscarriage of fundamental fairness would compel vacatur. That said, it is equally obvious that if the PNA, in fact, received adequate, albeit imperfect, notice of the arbitration, little would be left for this Court to do than simply grant ITI's motion to confirm the Award.

*C. The PNA received adequate, if not actual, notice of the arbitration*

By agreeing to arbitrate under the aegis of the AAA, ITI and the PNA incorporated into their Agreement the AAA's Commercial Arbitration Rules. *See* AAA R. 1 ("The parties shall be deemed to have made these rules a part of their arbitration agreement whenever they have provided for arbitration by the American Arbitration Association ...."). Among those is Rule 40, which governs how each party is to serve notice on the other. Divided into two paragraphs, Rule 40 first specifies on whom, at which address, and by which methods notice must be given; its last paragraph expands the methods for service to encompass electronic forms of written communication:

**40. Serving of Notice**
    Each party shall be deemed to have consented that any papers, notices, or process necessary or proper for the initiation or continuation of an arbitration under these rules ... may be served on a party by mail addressed to the party or its representative *at the last known address* or by personal service, in or outside the state where the arbitration is to be held, provided that reasonable opportunity to be heard with regard thereto has been granted to the party.
    The AAA and the parties may also use facsimile transmission, telex, telegram, or other written forms of electronic communication to give the notices required by these rules.

AAA R. 40 (emphasis added).

[4] Straightforward application of Rule 40 to the facts of this case manifestly establishes that ITI properly served the PNA with notice of its Demand. First, ITI's method of service is beyond reproach. It not only sent copies of the Demand by facsimile but also by registered mail, return-receipt requested--a method of service that exceeds Rule 40's modest requirements. The PNA's sole protest is that ITI and the AAA sent notices to Gaza instead of Jericho. According to the PNA, Section 8.2 of the Conditions of Contract established Jericho as the PNA's last known address for purposes of complying with Rule 40. Notably, the PNA does not argue that the service requirements set forth in Section 8.2 of the Conditions of Contract displace or modify Rule 40. [FN7] Rather, it maintains that Section *12 8.2 operates in tandem with Rule 40 by simply designating the "last known address" to which notices should be sent. *See* PNA's Memorandum in Response to the Court's Order of May 27, 1999 at 3-4; *see also* Tr. of Hr'g, May 4, 1999, at 24:24-25:3 ("And it is not a question of whether we are modifying Rule 40 of the AAA. I believe that Rule 40 of the AAA requires them to send it, to make a good faith effort to deliver it to the last known address. I believe that 8.2 tells them the last known address for this purpose.") (statement of counsel for the PNA).

66 F.Supp.2d 3
(Cite as: 66 F.Supp.2d 3)

Page 8

FN7. One certainly might have construed Section 8.2 as a complete displacement or modification of Rule 40. Pursuant to Rule 1 of the AAA's Commercial Arbitration Rules, "[t]he parties, by written agreement, may vary the procedures set forth in these rules." AAAR. 1. Of course, it is not clear that this would alter the Court's decision. Moreover, the Seventh Circuit's decision in *Gingiss International, Inc. v. Bormet,* 58 F.3d 328, 331-32 (7th Cir.1995), held that a provision akin to Section 8.2 merely spoke to notices required by the underlying contract. For notices sent pursuant to arbitration proceedings, the Seventh Circuit found that Rule 40 remained the governing instrument.

Such an interpretation of Section 8.2, which the Court assumes to be correct, fails to cast a pall of illegitimacy over ITI's service efforts. As of October 3, 1993, when the Agreement was ratified along with the Conditions of Contract, Jericho may very well have been the PNA's last known address. But if all Section 8.2 is designed to do is notify ITI of a last known address, then there is nothing--not only in the Agreement, but certainly nothing in Rule 40--that would prevent ITI from sending notices to an address that they later come to use and recognize as the PNA's last known address. As the undisputed evidence before the Court dramatizes, from almost the Agreement's inception, ITI successfully communicated with the PNA by directing correspondence to its Gaza address. [FN8] Indeed, the PNA itself provided ITI with business cards on which Gaza, not Jericho, addresses and phone and fax numbers were printed. By way of example, the fax number provided on the personal business card of His Excellency Imad Al Falouji, Minister of Post and Communication, is identical to the one that both ITI and the AAA used to send notices of the arbitration. *Compare* Decl. of Schonacher at Ex. 3 (business card of Imad Al Falouji, Minister of Post and Communication, providing a fax number of 972-7-824555) *with* Decl. of Graff at Ex. F (fax confirmation sheet indicating that Demand was successfully sent to the Ministry of Post and Communication at 972-7-824555). Similarly, the Minister of Justice's business card indicates that his address is in the Abu Khadra Building in Gaza to which ITI sent arbitral notices, *see* Decl. of Schonacher at Ex. 4, while business cards from officials in the Office of the President confirm that ITI sent notices to accurate and functioning addresses and fax numbers, *see id.* at Exs. 5-6. Accordingly, because ITI complied with AAA Rule 40 by sending

**\*13** notice of its Demand for Arbitration to the PNA at its last known address, the Court concludes that the PNA received adequate notice of the pending arbitration.

FN8. Counsel for the PNA takes great liberties with the declaration of Mohammed Rachid, the Economic Advisor to President Arafat, in an attempt to portray Gaza as a city wreaked with chaos and political and economic naivete while heralding Jericho as a sophisticated city accustomed to "day- to-day legal and commercial issues." PNA's Memorandum in Response to the Court's Order of May 27, 1999 at 2. While Rachid underscores a number of infrastructure deficiencies within the Palestinian territories, his declaration speaks to the territories as a whole; none of his comments is unique to Gaza, nor for that matter does he indicate that Jericho is insulated from these same difficulties. *See* Decl. of Rachid ¶ 22. Indeed, some of counsel's statements of "fact" about the PNA, supported nowhere in Rachid's declaration, are patently incorrect. Although counsel boasts that Jericho "is the economic center of Palestine and the seat of the legislative, executive, and judicial branches of the PNA," the reality is that Jericho is a city inhabited by 28,083 while the Gaza area boasts nearly a million persons. *See* The Palestinian National Authority, Ministry of Information, *Basic Information About Palestine* (visited June 8, 1999) < http://www.pna.org/mininfo/general/palestin .html>. Moreover, the Office of the President and the majority of PNA ministries and their ministers, including the Ministry of Justice and the Ministry of Post and Communication, are located in Gaza, not Jericho. *See* Permanent Observer Mission of Palestine to the United Nations, *Ministries of the Palestinian Authority* (visited June 8, 1999) <http://www.palestine-un.org/dir/min.html>. Only the Ministry of Local Government is located in Jericho. *See id.*

Moreover, even if Section 8.2 were construed to constitute an irrevocable designation of the PNA's "last known address," any objection to receiving notice in Gaza is simply to the form of the notice, not

to whether it was adequate to comport with minimal fairness. Indeed, at oral argument counsel for the PNA made an important concession about the sufficiency of the notice that ITI sent to the PNA. Asked whether the notices that ITI sent to the PNA in Gaza would otherwise satisfy Rule 40 if the Conditions of Contract had not contained Section 8.2, counsel responded:

> Your Honor, it's very hard for me to answer that without 8.2 If 8.2 didn't exist and [Gaza] was the last known address, *then they would be fine. I don't have any doubt about that.*

Tr. of Hr'g, June 4, 1999, at 24:20-:23 (emphasis added). Counsel's concession merely made explicit what was implicit throughout the PNA's briefs. At no point has the PNA challenged the methods of delivery that ITI and the AAA used to send notice, it has never denied receiving the numerous facsimile transmissions sent by ITI and the AAA, it has never complained that the notices should have been dispatched to an official other than the three to whom ITI sent notice of its Demand, nor has the PNA contested the validity of the signatures on the return-receipt cards or the authority of those persons to receive mail on behalf of the high-ranking officials to whom those notices were sent. All that the PNA can muster is a cryptic, and ultimately unilluminating, statement from Rachid that "I cannot confirm that the PNA ever received such notice." Decl. of Rachid ¶ 22.

[5] Even when a party timely files a petition to vacate, courts have refused to upset an arbitrator's award on the hyper-technical ground that notice did not conform to the parties' underlying agreement. *See, e.g., Gingiss,* 58 F.3d at 331 ("Inadequate notice is not one of [the] grounds [for vacating an award under the FAA], and the Bormets' claim therefore fails."); *Bernstein Seawell & Kove v. Bosarge,* 813 F.2d 726, 729-30 (5th Cir.1987) (affirming district court's conclusion that defendant had actual notice of arbitration where notice was sent to an address that he was currently using but different from the one specified in the partnership agreement); *Merrill Lynch, Pierce, Fenner & Smith v. Lecopulos,* 553 F.2d 842, 845 (2d Cir.1977) ("[N]o unfairness results from giving effect to the notice they actually received"); *Shamah v. Schweiger,* 21 F.Supp.2d 208, 215 (E.D.N.Y.1998) ("Shamah received actual notice and was not prejudiced by lack of notice via registered or certified mail."). Indeed, any result to the contrary would undermine the advantages that arbitration offers to parties engaged in a commercial transaction: "a quicker, less structured way of resolving disputes." *Dean v. Sullivan,* 118 F.3d

1170, 1173 (7th Cir.1997). A party who receives adequate notice of an arbitration proceeding, yet who elects to sit idly by in silence until the arbitration is complete, the award has been rendered, and the prevailing party has moved to confirm, cannot emasculate all that has been done by asserting a technical right for which there has been no substantive deprivation. Lest there remain any doubt that this is all that animates the PNA's notice objection, counsel's remarks dispel any doubt. Pressed to explain how any one of the many notices that ITI and the AAA sent to Gaza failed to provide the PNA with notice of the proceedings, counsel remarked:

> There is no question that the plaintiff has fax receipts indicating that faxes were received at PNA offices. But I suggest to Your Honor that the PNA *had a right and did take advantage of an opportunity* to have notices at a different location and they were entitled to receive notices at that location.

*14 Tr. of Hr'g, June 4, 1999, at 33:10-:15 (emphasis added). Regardless of whether the PNA ever possessed a "right" to have notices directed to its Jericho address, the contours of that putative right are neither so broad nor so fixed as to permit the PNA to ignore notices that were actually sent to proper officials at otherwise proper addresses. What matters is that the "means employed [to serve notice] must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." *Mullane,* 339 U.S. at 315, 70 S.Ct. 652. The lengths to which ITI and the AAA went to appraise the PNA of the arbitration evince methods that one who genuinely wished to communicate with another would employ--methods that would almost certainly succeed. Accordingly, the Court determines that the PNA received adequate, if not actual, notice of the arbitration proceedings.

*D. Having received notice of the arbitration, the PNA is time-barred from asserting any grounds for vacating the arbitration award*

[6] Having determined that the PNA received notice, the Court must resolve whether the PNA may now assert affirmative defenses to the contract, challenge the arbitrator's jurisdiction, or protest the alleged absence of an agreement to arbitrate. Whatever may be said for the merits of the PNA's potential defenses, pellucid statutory language and judicial precedent provide a clear, unambiguous answer: By ignoring the Demand and failing to petition to vacate the Award within ninety days after receiving it, the PNA may not exploit this summary confirmation

proceeding by litigating now what it should have contested long ago.

Like the FAA, Virginia's arbitration act requires that any petition to vacate an arbitration award be filed "within ninety days after delivery of a copy of the award to the applicant." Va. Stat. § 8.01-581.010; *compare* 9 U.S.C. § 12 ("Notice of a motion to vacate, modify, or correct an award must be served upon the adverse party or his attorney within three months after the award is filed or delivered."). While Virginia law explicitly permits a party to raise arguments that would support vacatur in response to another party's motion to confirm an arbitral award, it carefully qualifies that opportunity by mandating that "such response [be] filed within the prescribed time limits of this section [ninety days]." Va. Stat. § 8.01-581.010. Although the FAA does not speak directly to this issue, federal courts have construed the FAA to do implicitly exactly what Virginia's arbitration act does explicitly. As the Second Circuit has held, a party's "failure to move to vacate the award within the three month time provided [by 9 U.S.C. § 12] precludes him from later seeking that relief when a motion is made to confirm the award." *Florasynth, Inc. v. Pickholz,* 750 F.2d 171, 175 (2d Cir.1984). Far from anomalous, *Florasynth* and its conception of the FAA have garnered the endorsement of at least four other circuits. *See Val-U Constr. Co. v. Rosebud Sioux* Tribe, 146 F.3d 573, 578-79 (8th Cir.1998); *Cullen v. Paine, Webber, Jackson & Curtis, Inc.,* 863 F.2d 851, 853-54 (11th Cir.1989); *Professional Administrators Ltd. v. Kopper-Glo Fuel, Inc.,* 819 F.2d 639, 642 (6th Cir.1987); *Taylor v. Nelson,* 788 F.2d 220, 225 (4th Cir.1986).

[7] Any other result would do violence to the underlying purposes of arbitration in general and the FAA and the Virginia arbitration act in particular. As it is with Virginia's arbitration act, "[a] confirmation proceeding under 9 U.S.C. § 9 is intended to be summary: confirmation can only be denied if an award has been corrected, vacated, or modified in accordance with [FAA]." *Taylor,* 788 F.2d at 225; *accord Cullen,* 863 F.2d at 854. Under Virginia law, it is even clearer that a court must confirm an arbitration award if no party has filed a timely petition to vacate or modify the award:

> Upon application of a party any time after an award is made, the court *shall* *15 confirm an award, unless *within the time limits* hereinafter imposed grounds are urged for vacating or modifying or correcting the award, in which case the court shall proceed as provided in § § 8.01-581.010 and 8.01-581.011.

Va. Stat. § 8.01-581.09 (emphasis added).

Looking at the undisputed facts in this case, it is clear that the PNA's defenses come too late in the proceedings for this Court to entertain them. After the Award was filed, the AAA sent it to the PNA on November 13, 1997. *See* Decl. of Graff ¶ 24; Decl. of Martinez ¶ 8. On November 26, 1997, UPS delivered the Award to the PNA, where it was signed for and received. *See* Decl. of Martinez at Ex. L (copy of the UPS Delivery Notification indicating that the Award was delivered on 11/26/97 at 3:52 P.M., and signed for by "SHALOM"). [FN9] Ninety-six days later, on March 2, 1998, ITI filed its Motion to Confirm Arbitration Award in the District of Columbia Superior Court. The PNA did not remove that action to this Court until March 24, 1998. Because more than ninety days elapsed before the PNA petitioned to vacate the Award, it is foreclosed from raising its affirmative defenses.

> FN9. Again, the PNA has never contested the authenticity of the signatures on the return-receipts nor has it suggested that those who signed for and received notices from ITI and the AAA lacked authority to accept mail on behalf of the PNA or any of its high officials. Of course, under AAA Rule 40, it is not clear that such agency concerns would even be relevant. *See* AAA R. 40 (requiring that notices served by mail only be *addressed* to the party or its representative).

[8] Finally, the PNA suggests that the First Circuit's decision in *MCI Telecommunications Corp. v. Exalon Industries, Inc.,* 138 F.3d 426, 430-31 (1st Cir.1998), permits it to contest whether there existed an agreement to arbitrate regardless of whether the time to move to vacate has elapsed. For two reasons, *MCI* is not the panacea that the PNA hopes it is. At the most obvious level, *MCI* was applying the time limits set forth in section 12 of the FAA. By contrast, this Court is constrained to apply Virginia's arbitration act. While that statute and the FAA have a great deal in common, the Virginia arbitration act, unlike the FAA, expressly addresses whether the ninety-day limitations period applies to challenges based on an absence of an agreement to arbitrate. Among the five bases upon which a party may predicate a petition to vacate an arbitration award is when "[t]here was no arbitration agreement and the issue was not adversely determined in proceedings

66 F.Supp.2d 3                                                            Page 11
**(Cite as: 66 F.Supp.2d 3)**

[to compel arbitration] and the party did not participate in the arbitration hearing without raising the objection." Va. Stat. § 8.01-581.010. In the same section, the Virginia arbitration act provides that "[a]n application under this section shall be made within ninety days after delivery of a copy of the award to the applicant." *Id.* Under Virginia law, therefore, a party who wishes to contest the existence of an arbitration agreement must proffer his objection within ninety days of receiving the award. This the PNA did not do.

Moreover, even were the FAA controlling here, *MCI* is distinguishable; more on point is the Seventh Circuit's decision in *Comprehensive Accounting Corp. v. Rudell,* 760 F.2d 138, 140-41 (7th Cir.1985). While in *MCI* there was no written arbitration clause within the body of the parties' agreement, in *Comprehensive Accounting* there clearly was a "signed contract ... [that] contained a standard arbitration clause." *Id.* at 139. Even the First Circuit recognized this salient difference. *See MCI,* 138 F.3d at 431. As Judge Posner wrote for a unanimous panel in *Comprehensive Accounting:*

> The Rudells had that opportunity [to contest the existence of an arbitration agreement] when they were notified of the arbitration, and they let it pass by. It was then too late for them to sit back and allow the arbitration to go forward, and only after it was all done, and enforcement **\*16** was sought, say: oh by the way, we never agreed to the arbitration clause. That is a tactic that the law of arbitration, with its commitment to speed, will not tolerate.

*Comprehensive Accounting,* 760 F.2d at 140. The same can be said of the PNA. Article 3 of the Agreement contains a standard arbitration clause, and both the Agreement executed by the PLO and the one executed by the PNA are signed by Yasser Arafat, PLO Chairman and PNA President. Having received notice of the arbitration and the Award that was eventually filed, the PNA cannot delay ITI's confirmation proceeding at this point. Accordingly, whether under the Virginia arbitration act or the FAA, the PNA is time barred from raising any defense to ITI's motion to confirm--even an objection to the existence of an arbitration clause.

### III. CONCLUSION

For the foregoing reasons, ITI's Motion to Confirm Arbitration Award is granted.

### ORDER

For the reasons expressed in the accompanying Memorandum Opinion, it is, this 22 day of June, 1999, hereby

**ORDERED** that the Motion to Confirm Arbitration Award filed by International Technologies Integration, Inc. ("ITI") shall be, and hereby is, **GRANTED;** and it is

**FURTHER ORDERED** that the Arbitration Award filed with the American Arbitration Association on November 13, 1997, and delivered to the Defendants Palestine Liberation Organization ("PLO") and Palestinian National Authority ("PNA") on November 26, 1997, which awarded $18,750,000 to ITI shall be, and hereby is, **CONFIRMED;** and it is

**FURTHER ORDERED** that **JUDGMENT** shall be, and hereby is, entered in favor of ITI and against the PLO and the PNA in the amount of $18,750,000.

**SO ORDERED.**

66 F.Supp.2d 3

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

# EXHIBIT I

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

INTERNATIONAL TECHNOLOGIES
INTEGRATION, INC.,

    Plaintiff,

    v.

THE PALESTINE LIBERATION
ORGANIZATION and THE PALESTINIAN
NATIONAL AUTHORITY,

    Defendants.

Civil Action No. 98-00756 (CKK)

**FILED**

JUL - 2 1999

NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

6:20 p.m.

ORDER

On June 22, 1999, this Court entered Judgment in the amount of $18,750,000 in favor of

Plaintiff International Technologies Integration, Inc ("ITI") and against Defendants the Palestine

Liberation Organization and the Palestinian National Authority (collectively "PNA"). Late this

Friday afternoon, July 2, 1999, ITI filed an ex parte Motion for Temporary Restraining Order, for

Registration of Judgment, and for Nunc pro Tunc Validation of Registered Judgment. According

to a declaration filed by Neal S. Barlia, counsel for Plaintiff, an ITI representative indicated that

Mohammed Rashid, Economic Advisor to PNA President Yasser Arafat, had traveled to New

York in order to remove or transfer PNA assets located at Citibank and Arab Bank in New York

and brokerage accounts located at Salomon Smith Barney. According to a declaration filed by

John D. Seiver, counsel for Plaintiff, ITI is unaware of PNA assets located in the District of

Columbia sufficient to satisfy the Judgment.

    Based on the allegations set forth in Barlia's and Seiver's declarations, it appears that

"immediate and irreparable injury, loss, or damage will result to" ITI. FED. R. CIV. P. 65(b)(1).

Accordingly, the Court grants the TRO—subject to several conditions. Foremost among these, the TRO shall be in effect for only one business day; it, therefore, shall expire at 6:00 p.m. on Tuesday, July 5, 1999. Second, the TRO is limited to enjoining $18,750,000. Third, ITI shall post a bond or deposit a check into the registry of the Court in the amount of $15,000. By entering this narrowly tailored TRO, the Court intends to preserve the status quo until it can adjudicate Plaintiff's Motion for Registration of Judgment and for Nunc pro Tunc Validation of Registered Judgment. Equity compels this short-term TRO to preserve the assets from being removed to a jurisdiction beyond the reach of any United States court.

By Tuesday, July 5, 1999, at 9:00 a.m., Defendants shall file any opposition to Plaintiff's Motion for Registration of Judgment and for Nunc pro Tunc Validation of Registered Judgment. Specifically, Defendants shall indicate why good cause does not exist for this Court to order the registration of its June 22, 1999 Judgment pursuant to 28 U.S.C. § 1963. On Tuesday, July 5, 1999, the Court shall notify counsel for both parties if an Order has issued or whether the Court will need to conduct a conference call.

**ACCORDINGLY**, it is, this 2 day of July, 1999, hereby

**ORDERED** that, pending the hearing and determination of Plaintiff's Motion for an Order Permitting Registration of the Judgment entered in this Court on June 22, 1999 in United States District Court for the Southern District of New York, and for other relief, Defendants the Palestine Liberation Organization and the Palestinian National Authority (collectively, "PNA") and each of their agents, representatives, employees, officers, servants, governmental instrumentalities or agencies, and all others acting on their behalf, as well as those acting in concert with them, are immediately enjoined and restrained from moving transferring, assigning,

2

hypothecating, interfering with or otherwise disposing of, in any manner whatsoever, money,

securities, bonds, cash, cash equivalents, property, assets of whatever kind or nature whatsoever,

and/or any property in which the PNA has an interest, in any account or accounts located at

Citibank, Arab Bank, or Salomon Smith Barney, in which the PNA or any affiliate,

instrumentality, agency, related entity, representative or agent, including but not limited to an

account in any of the following names:

> PLO
> P.L.O.
> Palestine Liberation Organization
> PNA
> P.N.A.
> Palestinian National Authority
> Palestinian Authority
> Palestinian National Fund
> Palestine Liberation Organization, Palestinian National Fund
> Ministry of Finance
> Palestinian National Authority, Ministry of Finance Account
> Palestine Monetary Fund
> Palestinian National Authority, Palestine Monetary Fund
> Joint Investment Fund
> Palestine Liberation Organization Pension Fund
> Palestinian National Authority Pension Fund
> P.E.C.D.A.R.
> P.C.S.C.
> P.A.
> Palestine Liberation Organization, P.L.O., Palestinian National Fund
> SAMED
> Palestinian National Authority, Palestine Monetary Fund, Joint Investment Fund
> Palestinian National Authority, Palestine Monetary Authority
> P.M.A.
> P.M.A., Investment Department
> Palestinian National Authority, Palestine Monetary Authority, Investment Department;

and it is

**FURTHER ORDERED** that the injunctive relief set forth in the preceding paragraph

shall be limited to preserving $18,750,000 aggregate between the accounts held at Citibank, Arab

Bank, and Salomon Smith Barney; and it is

  **FURTHER ORDERED** that this TRO shall expire in one business day on Tuesday, July

5, 1999, at 6:00 p.m.; and it is

  **FURTHER ORDERED** that Plaintiff shall file a bond or deposit a check into the

registry of the Court in the amount of $15,000 pursuant to FED. R. CIV. P. 65(c); and it is

  **FURTHER ORDERED** that Defendants shall file an opposition to Plaintiff's Motion for

Registration of Judgment and for Nunc pro Tunc Validation of Registered Judgment by no later

than 9:00 a.m. on Tuesday, July 5, 1999, with courtesy copies to be delivered to chambers; and it

is

  **FURTHER ORDERED** that service of a copy of this Order, together with the papers

upon which it is granted shall be made upon Defendants by service on their counsel, Stroock &

Stroock & Lavan LLP, 180 Maiden Lane, New York, New York 10038 by facsimile at (212)

806-6006, on or before July 2, 1999.

  **SO ORDERED.**

COLLEEN KOLLAR–KOTELLY
United States District Judge

4

# EXHIBIT J



*The Commonwealth of Massachusetts*

*County of Norfolk*

## SHERIFF'S DEPARTMENT

Division of Civil Process
P.O. Box 910
15 Bryant St., Suite 201 • Dedham, MA 02026
Tel (781) 326-1787 • Fax (781) 326-0288

**Michael G. Bellotti**
*Sheriff*

**Peter J. Morin**
*Director*

COMMONWEALTH OF MASSACHUSETTS
COUNTY OF NORFOLK

Peter J. Morin _____, BEING DULY SWORN, DEPOSES AND SAYS THAT HE

IS A DEPUTY SHERIFF FOR THE COUNTY OF NORFOLK. HE FURTHER STATES THAT HE

SERVED AN ATTESTED COPY OF THE WITHIN ----- Summons and Complaint ----------------------

-------------------------------------------------------------------------------------------------------

ON March 23, ----------------, 2000 UPON THE WITHIN NAMED The Palestinian Authority

(A.K.A. The Palestinian Interim Self-Goverment Authority) -----------------------------

BY DELIVERING IN HAND TO Marwan Jilani, Deputy Permanent Observer of Palestine

to the United Nations, who accepted service for The Palestinian Authority
(A.K.A. The Palestinian Interim Self-Goverment Authority)
SAID SERVICE WAS MADE AT c/o Temple Ohabei Shalom, 1187 Beacon Street, Brookline
at 7:15 p.m.

NORFOLK COUNTY DEPUTY SHERIFF

SUBSCRIBED AND SWORN TO BEFORE ME
THIS 24th DAY OF March, 2000

NOTARY PUBLIC
MY COMMISSION EXPIRES APRIL 20, 2001



*The Commonwealth of Massachusetts*

*County of Norfolk*

## SHERIFF'S DEPARTMENT
### Division of Civil Process
P.O. Box 910
15 Bryant St., Suite 201 • Dedham, MA 02026
Tel (781) 326-1787 • Fax (781) 326-0288



**Michael G. Bellotti**
*Sheriff*

Peter J. Morin
*Director*

COMMONWEALTH OF MASSACHUSETTS
COUNTY OF NORFOLK

Peter J. Morin _____, BEING DULY SWORN, DEPOSES AND SAYS THAT HE

IS A DEPUTY SHERIFF FOR THE COUNTY OF NORFOLK. HE FURTHER STATES THAT HE

SERVED AN ATTESTED COPY OF THE WITHIN ---- Summons and Complaint _____

---------------------------------------------------------------------------------

ON March 23, _____, 2000 UPON THE WITHIN NAMED The Palestine Liberation

Organization _____

BY DELIVERING IN HAND TO Marwan Jilani, Deputy Pemanent Observer of _____

Palestine to the United Nations who accepted for the Palestine Liberation Organiz

SAID SERVICE WAS MADE AT Temple Ohabei Shalom, 1187 Beacon Street, Brookline
at 7:15 p.m.

_____
NORFOLK COUNTY DEPUTY SHERIFF

SUBSCRIBED AND SWORN TO BEFORE ME
THIS 24th _____ DAY OF March, 2000/

NOTARY PUBLIC
MY COMMISSION EXPIRES APRIL 20, 2001

# EXHIBIT K

## AFFIDAVIT OF
## FREEMAN R. WOODBURY

Now comes Freeman R. Woodbury under oath and states as follows:

1.      On April 13, 2000, having identified Mr. Rahman by a picture of him which I was carrying, I met Mr. Rahman in the elevator of the building located at 1730 K Street, N.W., Washington, DC 20006.

2.      I rode with Mr. Rahman in the elevator and traveled to his suite number 1004.

3.      In the elevator, I introduced and identified myself to him and informed him that I was serving summonses and complaints on him.

4.      When we reached his office, I again informed him that I was serving summonses and complaints on him.

5.      When we walked to his office he refused to accept the documentation so I placed the summonses and complaints on the desk beside him.

_Freeman R. Woodbury_
Freeman R. Woodbury

STATE OF _District of Columbia_
COUNTY OF _Washington_

Subscribed and sworn to before me on the ___8th___ day of September, 2000 under the pains and penalties of perjury.

_Denise O. Delden_
NOTARY PUBLIC

**My commission expires: 11-30-01**