# EXHIBIT P

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

THE ESTATE OF YARON UNGAR, et al.

v.

C.A. No. _____
(Formerly C.A. 00-105L)

HAMAS - ISLAMIC RESISTANCE MOVEMENT, et al.

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

This is a civil action pursuant to 18 U.S.C. §2333 *et seq.* brought by the heirs, survivors

and the administrator of the estates of U.S. citizen Yaron Ungar and his wife Efrat Ungar, who

were killed in a shooting attack on June 9, 1996, in Israel.  The defendants in this action are

HAMAS - Islamic Resistance Movement ("HAMAS") and five HAMAS members who

participated in the murder of decedents: Abdel Rahman Ismail Abdel Rahman Ghanimat, Jamal

Abdel Fatah Tzabich Al Hor, Raed Fakhri Abu Hamdiya, Iman Mahmud Hassan Fuad Kafishe,

and Ibrahim Ghanimat ("individual HAMAS defendants").[1]

HAMAS and the five individual HAMAS defendants were served with summonses and

complaints in this action but none has filed a responsive pleading.  Default was entered against

HAMAS and the individual HAMAS defendants on September 7, 2000.  Plaintiffs have moved

for entry of default judgment against these defendants pursuant to Fed.R.Civ.P. 55(b).

---

[1] This action was also originally brought against The Palestinian Authority ("PA") and The Palestine Liberation Organization ("PLO"). On _____, 2002, this Court granted plaintiffs' motion to sever the action against HAMAS and the individual HAMAS defendants from the action against the PA and the PLO, pursuant to Fed.R.Civ.P. 21. The action against HAMAS and the individual HAMAS defendants therefore proceeds separately.

Plaintiffs' motion for default judgment against HAMAS and the individual HAMAS defendants was referred by Judge Ronald R. Lagueux, and on July 12 and 15, 2002, the Court heard testimony and received evidence relating to plaintiffs' quantum of damages against HAMAS and the individual HAMAS defendants. On the basis of the testimony and evidence submitted by plaintiffs, the Court makes the following findings of fact and conclusions of law.

## I.    LIABILITY

Plaintiffs' detailed complaint adequately pleads the elements of liability under 18 U.S.C. §2333 and defendants' default relieves plaintiffs of proving these elements. Quirindongo Pacheco v. Rolon Morales, 953 F.2d 15 (1st Cir. 1992), Au Bon Pain Corp. v. Artect Inc., 653 F.2d 61, 65 (1st Cir. 1981), see also Wright, Miller & Kane §2688 ("If the court determines that the defendant is in default, the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true.") In any case, core facts such as the murder of Yaron and Efrat Ungar in a drive-by shooting and Yaron's U.S. citizenship have been established by the plaintiffs through sworn testimony and the documentary evidence submitted by plaintiffs.

## II.    PERSONAL JURISDICTION

Despite defendants' default, before entering judgment this Court must nonetheless consider whether it may exercise in personam jurisdiction over the defendants. See System Pipe v. Kurnatovskiy, 242 F.3d 322, 324 (5th Cir. 2001), citing In re Tuli, 172 F.3d 707 (9th Cir. 1999), Dennis Garberg & Assoc., Inc. v. Pack-Tech Int'l Corp., 115 F.3d 767 (10th Cir. 1997) and Williams v. Life Savings and Loan, 802 F.2d 1200, 1203 (10th Cir. 1986). For the reasons stated below, the Court concludes that the exercise of personal jurisdiction over defendants conforms with both the Federal Rules of Civil Procedure and constitutional due process requirements.

### A.    HAMAS

#### 1. This Court has personal jurisdiction over HAMAS through domestic service of process pursuant to 18 U.S.C. §2334(a)

##### a.        Conditions for establishing personal jurisdiction

A district court hearing a federal question case may exercise personal jurisdiction over a defendant served within the United States:

> When the district court's subject-matter jurisdiction rests wholly or in part on the existence of a federal question, the constitutional limits of the court's personal jurisdiction are drawn in the first instance with reference to the due process clause of the Fifth Amendment. The physical scope of the court's constitutional power is broad. It is clear that the fifth amendment 'permits a federal court to exercise personal jurisdiction over a defendant in a federal question case if that defendant has sufficient contacts with the United States as a whole,' Whistler Corp. v. Solar Electronics, Inc., 684 F. Supp. 1126, 1128 (D. Mass. 1988), citing Trans-Asiatic Oil Ltd. S.A. v. Apex Oil Co., 743 F.2d 956, 959 (1st Cir. 1984), and that sufficient contacts exist whenever the defendant is served within the sovereign territory of the United States. Johnson Creative Arts, Inc. v. Wool Masters, Inc., 743 F.2d 947, 950 n. 3 (1st Cir. 1984), Driver v. Helms, 577 F.2d 147, 156 n. 25 (1st Cir. 1978).

Lorelei Corp. v. County of Guadalupe, 940 F.2d 717, 719-720 (1st Cir. 1991).

However, service of process in such a case must be authorized by a federal nationwide service of process provision:

> Fed.R.Civ.P. 4(e) authorizes extraterritorial service, but only in two prescribed circumstances. The first is where a United States statute provides for such service, as in the number of laws that allow nationwide service of process in suits stating particular causes of action.

Id.                                    .

Similarly:

> When a district court's subject matter jurisdiction is founded upon a federal question, the constitutional limits of the court's personal jurisdiction are fixed, in the first instance, not by the Fourteenth Amendment but by the Due Process Clause of the Fifth Amendment. See Lorelei Corp. v. County of Guadalupe, 940 F.2d 717, 719 (1st Cir. 1991) (per curiam); Whistler Corp. v.

3

<u>Solar Elecs., Inc.</u>, 684 F. Supp. 1126, 1128 (D.Mass. 1988). Inasmuch as the federalism concerns which hover over the jurisdictional equation in a diversity case are absent in a federal question case, a federal court's power to assert personal jurisdiction is geographically expanded. In such circumstances, the Constitution requires only that the defendant have the requisite 'minimum contacts' with the United States, rather than with the particular forum state (as would be required in a diversity case). See <u>Lorelei</u>, 940 F.2d at 719; <u>Trans-Asiatic Oil Ltd. v. Apex Oil Co.</u>, 743 F.2d 956, 959 (1st Cir. 1984).

Nevertheless, while courts in federal question cases have found "that sufficient contacts [to justify the assertion of personal jurisdiction] exist whenever the defendant is served within the sovereign territory of the United States," <u>Lorelei</u>, 940 F.2d at 719 (citing cases), the basis for service of process returnable to a particular court must be grounded within a federal statute or Civil Rule. See, e.g., id. at 719-20; <u>Johnson Creative Arts, Inc. v. Wool Masters, Inc.</u>, 743 F.2d 947, 950 (1st Cir. 1984).

<u>United Electrical Workers v. 163 Pleasant Street Corp.</u>, 960 F.2d 1080, 1085 (1st Cir. 1992)

The federal rule permitting extraterritorial service (which at the time of <u>Lorelei</u> was contained in Fed.R.Civ.P. 4(e)) is codified today in Rule 4(k)(1)(D), which provides that "Service of a summons or filing a waiver of service is effective to establish jurisdiction over the person of a defendant . . . when authorized by a statute of the United States."

In numerous decisions during the past decade, this Court has ruled that in federal question actions, personal jurisdiction is obtained over defendants who lack minimum contacts with Rhode Island and are not amenable to service of process under its long-arm statute whenever service is effected pursuant to a nationwide service provision. For example,

Where a federal court has subject matter jurisdiction over an action pursuant to a federal statute, it may exert personal jurisdiction over the defendant in one of two ways: pursuant to an express authorization for nationwide service in the federal statute, or pursuant to the long arm statute of the state in which the court sits. <u>United Elec. Workers v. 163 Pleasant Street Corp.</u>, 960 F.2d 1080, 1085-86 (1st Cir. 1992).

<u>Barry v. Mortgage Servicing Acquisition Corporation</u>, 909 F. Supp. 65, 72 (D.R.I. 1995).

Likewise:

> This Court concludes that it does have in personam jurisdiction over [defendant] on the basis of the nationwide service of process provision found in section 1965(d) of RICO. This exercise of jurisdiction is constitutionally proper even though [defendant's] activities do not subject him to service of process under the Rhode Island long-arm statute.

Bridge v. Invest America, Inc., 748 F. Supp. 948, 949 (D.R.I. 1990), see also Omni Video Games, Inc. v. Wing Co., 754 F. Supp. 261, 263 (D.R.I. 1991), McAleer v. Smith, 818 F. Supp. 486 (D.R.I. 1993) affirmed 57 F.3d 109 (1st Cir. 1995), U.S. v. Davis, 1997 U.S. District LEXIS 22243 (D.R.I. 1997), Jonette Jewelry Company vs. Merlite Industries, Inc., 1998 U.S. Dist. LEXIS 9706 (D.R.I. 1998).

Other district courts in this circuit have held similarly,

> Under the Due Process Clause the defendant need only have 'sufficient contacts' with the United States, not necessarily the forum state . . . That standard is low, and would easily be met here: if the defendant is served 'within the sovereign territory of the United States,' then sufficient contacts exist.

Burke v. Town of Walpole, 2000 U.S. Dist. LEXIS 10422 (D.Mass. 2000)(citing Lorelei and United Electrical Workers).

> The Fifth Amendment, unlike the Fourteenth Amendment, permits the court to exercise personal jurisdiction over a defendant if that defendant has 'minimum contacts' with the United States as a whole . . . The necessary 'minimum contacts' exist whenever the defendant is served within the sovereign territory of the United States.

McArdle v. Freeman, 1997 U.S. Dist. LEXIS 17410 (D.Me. 1997), see also Snow v. American Morgan Horse Assoc., Inc., 1994 U.S. Dist. LEXIS 13602 (D.N.H. 1994).

### b.    18 U.S.C. §2334(a) authorizes nationwide service of process in actions under 18 U.S.C. §2333

Plaintiffs' suit is brought under 18 U.S.C. §2333(a), which provides a federal cause of action for American citizens and their estates, survivors and heirs who were injured by an

act of international terrorism.  Section 2334(a) provides:

> Any civil action under section 2333 of this title against any person may be instituted in the district court of the United States for any district where any plaintiff resides or where any defendant resides or is served, or has an agent. <u>Process in such a civil action may be served in any district where the defendant resides, is found, or has an agent.</u>

Thus, Congress clearly and unequivocally provided that process in actions brought under §2333 may be served anywhere within the United States.  Therefore, whenever such service is effected, "the personal jurisdiction power of this Court is coextensive with the boundaries of the United States . . . " <u>Omni Video Games, Inc., v. Wing Co.</u>, 754 F. Supp. at 263 (internal quotation marks omitted).

### c.  Service of process was effected on defendant HAMAS within the United States

On June 21, 2000, plaintiffs personally served Mr. Mohammed Salah of Bridgeview, Illinois, with a summons to HAMAS and with a copy of plaintiffs' complaint.[2]  Fed.R.Civ.P. 4(h)(1) provides that service on a foreign or domestic corporation or unincorporated association may be effected by serving "an officer" and/or "a managing or general agent" of the corporation or association.  The Court finds that the service of process on Mohammed Salah was effective service on HAMAS, because Salah is "an officer" and/or "a managing or general agent" of HAMAS within the meaning of Fed.R.Civ.P. 4(h)(1).

The affidavit testimony submitted by plaintiffs, and the findings made by the U.S. District Court for the Southern District of New York in <u>In the Matter of the Extradition of Mousa Mohammed Abu Marzook</u>, 924 F. Supp. 565, 587 (S.D.N.Y. 1996), indicate that Mohammed

---

[2] The summons bearing the return of service was appended as Exhibit A to plaintiffs' Motion To Enter Default Judgment Against Defendants HAMAS and HAMAS Operatives.

Salah headed and organized defendant HAMAS' activities in the United States for at least the past decade.  Salah's duties and activities on behalf of HAMAS have included, *inter alia*: recruitment and training of HAMAS members, channeling and transferring hundreds of thousands of dollars of HAMAS funds originating in Europe and the Middle East through U.S. banks and into real estate transactions in the U.S., the transfer of substantial funds to HAMAS members in Israel, the West Bank and Gaza Strip, and repeated travel to the Middle East to organize and fund HAMAS activities.

Salah was apprehended by Israeli authorities and convicted in 1995 by an Israeli court for his activities on behalf of HAMAS.  Salah was released from Israeli custody and returned to the United States in late 1997.

While under arrest in Israel, Salah gave statements to Israeli authorities detailing his HAMAS activities.  Additionally, Salah composed a comprehensive written account of his HAMAS activities, which he passed to fellow prisoners whom he believed to be HAMAS members.  This document, written in Arabic in Salah's hand, was obtained by Israeli authorities and provided to U.S. law enforcement agencies.  See In the Matter of the Extradition of Mousa Mohammed Abu Marzook, 924 F. Supp. 565 (S.D.N.Y. 1996).[3]

Salah's HAMAS activities are detailed in an affidavit submitted to the U.S. District Court for the Northern District of Illinois by Special Agent Robert Wright of the FBI's Counter-

---

[3] Salah's summary of his activities also implicated HAMAS leader Musa Abu Marzook, and was expressly relied upon by the District Court hearing the matter of Abu Marzook's extradition:

> Israel has submitted statements of a co-conspirator named Abu Ahmad, also known as Muhamad Salah, who admitted to being the head of the military wing of HAMAS. One particular statement is especially damning, not only because it directly implicates Abu Marzook, but also because it was hand-written by Abu Ahmad to give to persons whom he thought were members of HAMAS.

Id.

Terrorism Task Force:

> Salah . . . divulged that his activities for HAMAS, domestically and internationally, included recruiting and training new candidates for membership in HAMAS military cells in the Israeli Occupied Territories and to perform terrorist acts, primarily in the State of Israel. Salah told Israeli authorities that his recruitment activities included, among other things, conducting interviews and background checks, as well as identifying and sorting prospective candidates on the basis of expertise and skills relating to, among other things, knowledge of chemicals, explosives and the construction of terrorist devices that might be used in HAMAS military operations in Israel and elsewhere. His training activities for HAMAS, according to Salah, included mixing poisons, development of chemical weapons, and preparing remote control explosive devices.

> Salah also admitted having served as a financial conduit for HAMAS operations. Relatedly, he admitted to directly financing domestic and international travel and terrorist training for new HAMAS members.

Affidavit of FBI Special Agent Robert Wright, June 8, 1998, §§12-13, submitted in U.S. v. One 1997 E35 Ford Van, 50 F. Supp.2d 789 (N.D.Ill. 1999)(hereinafter "FBI Affidavit")[4].

Salah's U.S. based financial activities on behalf of HAMAS are also under investigation by the FBI:

> The Chicago FBI Terrorist Task Force has been conducting an investigation into activity dating back to 1989 and continuing to the present involving the transfer or transmission of money from Europe and the Middle East to a network of individuals and organizations in the United States, including, in the Chicago area, Mohammad Salah . . . There is probable cause to believe that some of these transfers or transmissions have been of money intended for use in support of domestic and international terrorist activities . . .

FBI Affidavit, §2.

> The illegally transferred funds . . . were used to generate income (in the form of rent and sales profits) to facilitate the activities of Mohammad Salah and others in the HAMAS conspiracy involving past and continuing violent terrorist attacks . . .

---

[4] Appended as Exhibit B to plaintiffs' Motion To Enter Default Judgment Against Defendants HAMAS and HAMAS Operatives.

FBI Affidavit, §68.

Moreover, on June 9, 1998, the United States began forfeiture proceedings in the United States District Court for the Northern District of Illinois against funds and assets held by Mohammed Salah, which are intended to be used for HAMAS terrorist activities:

> The funds in the Salahs' bank accounts . . . each of which is currently frozen pursuant to order of the Office of Foreign Asset Control, U.S. Department of Treasury, as authorized under Executive Order 12947 and based on reason to believe that Mohammad Salah acted on behalf of and in concert with the HAMAS terrorist organization . . . are moneys transferred, or traceable to moneys transferred from outside the United States, into the United States, with the intent of supporting HAMAS in the commission of specified unlawful activity, involving extortion, kidnapping and murder . . .

FBI Affidavit, §70.  These forfeiture proceedings are still pending.  See U.S. v. One 1997 E35 Ford Van, 50 F. Supp.2d 789 (N.D.Ill. 1999).

On the basis of his HAMAS activities, in 1995 the United States government designated Mohammed Salah a "Specially Designated Terrorist" pursuant to the International Emergency Economic Powers Act (50 U.S.C. §1701 et seq.) and Executive Order 12947.[5]

Additionally, the FBI has identified Mohammad Salah as: "a high-level HAMAS military operative."  FBI Affidavit at §11.

Moreover, the United States District Court for the Southern District of New York has found, on the basis of his own statements to Israeli authorities and handwritten summary of his HAMAS activities, that Salah has, "admitted to being the head of the military wing of HAMAS." In the Matter of the Extradition of Mousa Mohammed Abu Marzook, 924 F. Supp. 565, 587

---

[5] See 60 Fed. Reg. No. 155, p 41153, August 11, 1995 and "Terrorism - What You Need to Know About U.S. Sanctions", October 26, 2000, published by the Office of Foreign Assets Control of the U.S. Treasury, p. 8, appended as Exhibits C and D, respectively, to plaintiffs' Motion To Enter Default Judgment Against Defendants HAMAS and HAMAS Operatives.

(S.D.N.Y. 1996). <u>See also</u> Affidavit of Yehudit Barsky (hereinafter "Barsky Affidavit"),[6] and further details and corroboration of Salah's activities on behalf of HAMAS in <u>U.S. v. Alwan</u>, 279 F.3d 431 (7th Cir. 2002).

The facts and findings described above clearly demonstrate that Mohammed Salah is "an officer" and/or "a managing or general agent" of defendant HAMAS within the meaning of Rule 4(h)(1). <u>See</u> <u>Klinghoffer v. S.N.C. Achille Lauro</u>, 739 F. Supp. 854 (S.D.N.Y 1990). Therefore service on Salah for defendant HAMAS was effective service of process on HAMAS consistent with the nationwide service of process provision contained in 18 U.S.C. §2334(a).

Because "sufficient contacts exist whenever the defendant is served within the sovereign territory of the United States," the requirements of the 5th Amendment have been met.[7] <u>Lorelei Corp. v. County of Guadalupe</u>, 940 F.2d at 719, <u>United Electrical Workers v. 163 Pleasant St., Corp.</u>, 960 F.2d at 1085. This Court, therefore, has <i>in personam</i> jurisdiction over HAMAS.

Finally, the Court notes that in addition to the notice of this action given HAMAS by service of process, HAMAS has provided public confirmation that it has actual notice of this suit. Plaintiffs have submitted an article which appeared in June, 2000, in the official HAMAS organ, "Filastin Al-Muslimah," which reported in detail on the current action.[8] The status of "Filastin Al-Muslimah" as an official organ of HAMAS was recognized in <u>In the Matter of the Extradition</u>

---

[6] Appended as Exhibit E to plaintiffs' Motion To Enter Default Judgment Against Defendants HAMAS and HAMAS Operatives.

[7] Moreover, though a showing of further contacts is not required by <u>Lorelei</u>, HAMAS has a widespread network of extensive and continuous contacts with the United States, as described <i>infra</i>.

[8] <u>See</u> Affidavit of Yehudit Barsky and accompanying English translation of the article.

of Mousa Mohammed Abu Marzook, 924 F. Supp. 565, 581-585 (S.D.N.Y. 1996).[9] The publication of this article indicates clearly that HAMAS has actual knowledge of this suit.[10]

**2.    This Court may also exercise personal jurisdiction over HAMAS pursuant to Fed.R.Civ.P. 4(k)(2)**

Even assuming, *arguendo*, the absence of domestic service on HAMAS, the Court may exercise *in personam* jurisdiction over HAMAS in this case pursuant to Fed.R.Civ.P. 4(k)(2), which provides that,

> If the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service is also effective, with respect to claims arising under federal law, to establish personal jurisdiction over the person of any defendant who is not subject to the jurisdiction of the courts of general jurisdiction of any state.

On July 27, 2000, plaintiffs served HAMAS with a summons and complaint in this action pursuant to the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters of 1965 ("Hague Convention"). Fed.R.Civ.P. 4(f)(1) and 4(h)(2) permit service of process outside the United States on corporations and

---

[9] The district court found that several specific terrorist attacks were committed by HAMAS, on the basis of statements claiming responsibility for the attacks which were published in "Filastin Al-Muslimah".

[10] HAMAS was also served a summons and complaint at their offices in Damascus, Syria via Federal Express which was accepted and signed for on July 15, 2000. Plaintiffs have provided the Court with a Federal Express "proof of delivery" as Exhibit G to their Motion To Enter Default Judgment Against Defendants HAMAS and HAMAS Operatives.

Moreover, while Fed.R.Civ.P. 55(b)(2) does not require the Court or plaintiffs to provide notice to a defendant in default, plaintiffs have consistently provided notice to the HAMAS defendants of their attempts to obtain judgment. For example, subsequent to entry of default, plaintiffs provided the following notice to the HAMAS defendants: November 29, 2000 of their motion to enter default judgment; January 29, 2002 of their motion requesting a ruling on their motion to enter default judgement; June 25, 2002 via international overnight delivery of this Court's June 20, 2002 notice scheduling this matter for July 12, 2002. Packages, including copies of Plaintiffs' November 29, 2000 motion, were sent to two HAMAS addresses and to the individual defendants, Abdel Rahman Ismail Abdel Rahman Ghanimat, Jamal Abdel Fatah Tzabich Al Hor, Raed Fakhri Abu Hamdiya, Ibrahim Ghanimat and Iman Mahmud Hassan Fuad Kafishe; July 5, 2002, plaintiffs sent all defendants copies of their exhibits. Despite these repeated notices, defendants have failed to respond, contest the proceedings or appear in Court.

unincorporated associations by means of the Hague Convention.[11]  This service is sufficient to establish personal jurisdiction over HAMAS under Rule 4(k)(2), provided that HAMAS is not subject to the jurisdiction of any state and has sufficient contacts with the United States as a whole:

> [A] plaintiff who seeks to invoke Rule 4(k)(2) must make a prima facie case for the applicability of the rule.  This includes a tripartite showing (1) that the claim asserted arises under federal law, (2) that personal jurisdiction is not available under any situation-specific federal statute, and (3) that the putative defendant's contacts with the nation as a whole suffice to satisfy the applicable constitutional requirements.  The plaintiff, moreover, must certify that, based on the information that is readily available to the plaintiff and his counsel, the defendant is not subject to suit in the courts of general jurisdiction of any state.

United States v. Swiss American Bank, Ltd., 191 F.3d 30, 41 (1st Cir. 1999).

This civil action is brought under federal law (18 U.S.C. §2333), and thus the first prong of the Swiss American test is satisfied.

The assumption (which we make *arguendo* for the purpose of analyzing this alternative basis for personal jurisdiction) that the domestic service of process on HAMAS pursuant to §2334(a) was ineffective, clearly implies that HAMAS is not amenable to service under §2334(a) and that personal jurisdiction over HAMAS is therefore unavailable under any situation-specific federal statute.  Thus the second prong of the Swiss American test is satisfied as well.

As required by Swiss American, plaintiffs have also affirmed "based on the information that is readily available" to them and their counsel that HAMAS is not subject to suit in the courts of general jurisdiction in any state.

---

[11] A certificate of service of process on HAMAS was issued by the Israeli Directorate of Courts (which is the "Central Authority" designated by Israel pursuant to Article 2 of the Hague Convention) and was filed with the Court on September 1, 2000. Documents accompanying the certificate of service returned by Israel indicate that HAMAS was served at its Gaza City address by local registered mail (a signed receipt was returned).

Finally, the Court also finds that HAMAS' contacts with the U.S. as a whole suffice to satisfy due process requirements. In order to meet due process requirements for general personal jurisdiction,[12] plaintiffs must show that defendants have engaged in "continuous and systematic activity, unrelated to the suit" in the forum. Noonan v. Winston, 135 F.3d 85, 89 (1st Cir. 1998) (citing United Elec., Radio & Mach. Workers of America v. 163 Pleasant St. Corp., 960 F.2d 1080, 1088 (1st Cir. 1992) and Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 –16, n. 9.)

The relevant "forum" when personal jurisdiction is established under Rule 4(k)(2) is the entire United States. United States v. Swiss American Bank, Ltd., 191 F.3d 30, 41 (1st Cir. 1999). HAMAS has continuous, systematic and extensive activity and contacts within the United States, far in excess of the "minimum contacts" required by the due process clause of the Fifth Amendment.

HAMAS' contacts with and activities in the United States are carried out, *inter alia*, by Mohammad Salah, whose extensive and continuous HAMAS activities in the United States were described above and are documented in detail in the Affidavit of FBI Special Agent Robert Wright and in the decision of the District Court for the Southern District of New York. In the Matter of the Extradition of Mousa Mohammed Abu Marzook, 924 F. Supp. 565, 587 (S.D.N.Y. 1996).

Moreover, Salah conducted but a.small part of HAMAS' U.S. activities:

> HAMAS has had extensive operations in the United States since the late 1980's. HAMAS maintains in the United States a sophisticated organizational infrastructure and leadership core involved in all aspects of the HAMAS

---

[12] The "sufficient contacts" analysis described in Swiss American reiterates the rule regarding specific personal jurisdiction. It is irrelevant to this action which does not arise out of defendants' contacts with the United States.

movement. The leadership has directed HAMAS activities in Gaza and the West Bank.  By taking advantage of its sophisticated technological apparatus, it has maintained direct communication with its local leadership in Gaza and the West Bank.

HAMAS has consistently conducted extensive fundraising, operational planning, recruitment, propaganda, public relations, money laundering, investment, and communication activities in at least six states (Texas, Louisiana, Missouri, Virginia, Illinois, New York) and Washington, DC over at least the past 12 years.

Barsky Affidavit.

HAMAS activities in the United States are carried out by numerous activists:

The role played by HAMAS leader Dr. Marzook exemplifies the widespread activities of HAMAS in the United States.

Dr. Marzook is the former director of the United Association for Studies and Research, a HAMAS front organization in Washington, DC.  Dr. Marzook's membership and leading role in HAMAS is not in dispute.  For example, at his extradition hearing, he admitted that he has been a member and leader of HAMAS since 1992 and that he raised money for HAMAS in various states . . .

Dr. Marzook has directed and participated in numerous transfers of funds from the United States to HAMAS operatives in Israel.

Dr. Marzook maintained HAMAS bank accounts at the First American Bank in McLean, Virginia and Ruston State Bank in Louisiana . . .

Another American-based HAMAS leader, Selim Elbarrasee, served as a HAMAS fundraiser and activist, and maintained a joint bank account with Dr. Marzook in Ruston State Bank in Louisiana, from which checks were drawn for the transfer of funds to HAMAS activists in Gaza. According to FBI records, he transferred $300,000 from his First America Bank of McClean, Virginia to Salah's LaSalle Bank account.  Salah directed a wire withdrawal of $200,000 of these funds for distribution to HAMAS in Israel.

Salah has indicated that thirty-one charitable organizations plus many more mosques in the United States have raised money for HAMAS.

On many occasions, HAMAS has sent money raised in the United States to the West Bank and Gaza by several couriers including Muhammad Salah, Dr. Marzook, and Juma'ah Ibrahim and Muhammed Jarad.  Salah and Muhammad Jarad were convicted in Israel of distributing more than a half million dollars to

14

> HAMAS activists in Israel, the West Bank and Gaza. The money was raised in the United States.
>
> Salah Arouri, a HAMAS operative in Chicago, helped Dr. Marzook and Mr. Saleh coordinate the transfer to HAMAS activists in Israel of funds raised in the United States.
>
> Abu Hani, a HAMAS activist in Chicago, conducted HAMAS organizational activities in Illinois.

Barsky Affidavit.

Further, the details of HAMAS' U.S. activities during the past decade, particularly the broad scope of HAMAS' financial transactions in the United States, are documented at length in the Affidavit of Special Agent Wright of the FBI's Counter-Terrorism Taskforce. Special Agent Wright summarizes:

> HAMAS . . . has been engaged in a more than decade-long campaign of subversive and violent activity--commonly denominated as terrorist activity— undertaken primarily in Israel, and supported in part by illegal activities in the United States . . .

FBI Affidavit, p. 4, n. 1.

Finally, a recent decision of the U.S. district court for the District of Columbia found "ample support" for the conclusion that from 1989 until the present, HAMAS has operated a sophisticated and professional fund-raising apparatus in the United States. <u>Holy Land Foundation v. Ashcroft</u>, C.A. No. 02-442 (GK), 2002 U.S. Dist. LEXIS 14641 at 38, (D.D.C. 2002).

In light of the above, HAMAS clearly has continuous, extensive and systematic contacts with the United States as a whole sufficient to satisfy Fifth Amendment requirements. Moreover, as noted above, HAMAS has actual notice of this proceeding. This Court may therefore exercise personal jurisdiction over HAMAS pursuant to Fed.R.Civ.P. 4(k)(2).

**B.     INDIVIDUAL HAMAS DEFENDANTS**

This Court also has personal jurisdiction over the individual HAMAS defendants pursuant to Rule 4(k)(2). Service of process on the individual HAMAS defendants was effected by Israel pursuant to the Hague Convention between April 16 and August 15, 2000.[13] Plaintiffs have also satisfied the other requirements of <u>Swiss American</u>: (1) this action arises under federal law, (2) personal jurisdiction is not available under any situation-specific federal statute as to the individual HAMAS defendants, since they do not reside in the United States and §2334(a) authorizes only nationwide, and not worldwide service of process, (3) plaintiffs have certified that, based on the information that is available to them, the individual HAMAS defendant are not subject to suit in the courts of general jurisdiction of any state.

Finally, under the due process analysis applied by the federal courts in civil actions arising from international terrorism, the individual defendants have sufficient contacts with the United States to satisfy the Fifth Amendment. In a series of recent decisions interpreting and applying the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA) (28 U.S.C. §1605(a)(7) and §1605 Note), which grants U.S. citizens injured in terrorist acts a civil cause of action against foreign states and their officials who sponsor terrorism, the district courts for the District of Columbia and the Eastern District of New York have developed a due process analysis specially fitted to the unique circumstances of civil actions against foreign terrorists and their sponsors.

In <u>Flatow v. The Islamic Republic of Iran</u>, 999 F. Supp. 1, 22 (D.D.C. 1998) the court found that AEDPA permitted foreign terrorists and their sponsors to be haled into an American

court, based on the rationale that sufficient contacts with the United States are created when a U.S. citizen is harmed or killed. The rule in <u>Flatow</u> was restated and applied in a series of AEDPA decisions. <u>See</u> <u>Eisenfeld v. Islamic Republic of Iran</u>, 172 F. Supp.2d 1, 7 (D.D.C. 2000), <u>Rein v. Socialist People's Libyan Arab Jamahiriya</u>, 995 F. Supp. 325, 330 (E.D.N.Y. 1997), aff'd in part & appeal dismissed in part, 162 F.3d 748 (2d Cir. 1998), <u>Hartford Fire Insurance Co. v. The Socialist People's Libyan Arab Jamahiriya</u>, 1999 U.S. Dist. LEXIS 15035, 11-12, (D.D.C. 1999), <u>Daliberti v. Republic of Iraq</u>, 97 F. Supp.2d 38, 52-53 (D.D.C. 2000), <u>Price v. Socialist People's Libyan Arab Jamahiriya</u>, 110 F. Supp.2d 10, 11-12 (D.D.C. 2000).

Like §2333(a) of the ATA, the AEDPA allows suits against individuals. 28 U.S.C. §1605 Note "Civil Liability for Acts of State Sponsored Terrorism" permits actions against "an official, employee or agent" of a foreign state sponsor of terrorism. In <u>Flatow</u> and <u>Eisenfeld</u>, plaintiffs sued three current and former Iranian officials. The court rendered judgments against those individuals on the basis of the "international terrorism" due process analysis.

Finally, like the AEDPA defendants, HAMAS defendants have been given adequate notice and "'fair warning" that they "may be subject to the jurisdiction of the courts of the United States." <u>Rein v. Socialist People's Libyan Arab Jamahiriya</u>, 995 F. Supp. at 330. Defendants knew that their murder of numerous American citizens would elicit a severe response from the United States. They "cannot now claim surprise at the assertion of jurisdiction by this Court over claims brought in response to its actions." <u>Daliberti v. Republic of Iraq</u>, 97 F. Supp.2d at 53.

The Court therefore finds that the individual HAMAS defendants have sufficient contacts with the United States to satisfy the due process requirements of the Fifth Amendment, and that

---

[13] Hague Convention certificates of service were returned by Israel and filed with the Court.

it may properly exercise *in personam* jurisdiction over these defendants pursuant to Fed.R.Civ.P. 4(k)(2).

## III.   DAMAGES

This is apparently the first judgment given under 18 U.S.C. §2331 *et seq.*, which provisions creates a civil cause of action for acts of international terrorism. In determining the type and scope of remedies available under 18 U.S.C. §2331 *et seq.*, therefore, the Court must necessarily look to the legislative history and intent behind these provisions.

Sections 2331 *et seq.* were enacted as part of the Antiterrorism Act of 1990 ("ATA"), as an entirely new statutory tort.[14] The express goal of the ATA was to "create a new federal cause of action" and "a new civil remedy against terrorists." *Antiterrorism Act of 1990*, Hearing Before the Subcommittee on Courts and Administrative Practice of Committee on the Judiciary, United States Senate, 101st Congress, Second Session July 25 1990 ("Senate Hearing") at 34.

Congress passed the ATA as a direct response to the inadequacy of existing law,

> . . . there are currently no laws expressly providing federal civil remedies against these outrageous acts. Therefore this bill would amend Title 18 United States Code Sections 2331 by providing a plaintiff a civil cause of action in United States District Court for injuries caused by acts of international terrorism.

Id. at 49.

The legislative history makes clear that the ATA was intended to be construed broadly in order to maximize its effectiveness in compensating victims of terrorism. Senator Grassley, the bill's co-sponsor, indicated that "it empowers victims with <u>all</u> the weapons available in civil

---

[14] "Sections 2331 and 2333 were initially enacted in 1990 as the Anti-Terrorism Act of 1990, Pub.L. No. 101-519, §132, 104 Stat. 2250 (1990), but were repealed as the result of a technical deficiency. They were subsequently re-enacted as part of the Federal Courts Administration Act of 1992, Pub.L. No. 102-572, 106 Stat. 4506 (1992)." Boim v. Quranic Literacy Institute, 291 F.3d 1000, 1009 (7th Cir. 2002).

litigation." *Antiterrorism Act of 1991*, Hearing Before the Subcommittee on Intellectual Property and Judicial Administration of the Committee on the Judiciary, House of Representatives, 102[nd] Congress, September 18 1992 at 10 (emphasis added). Thus, Congress intended that the full gamut of legal tools available in civil litigation would be harnessed to the task of providing remedies to victims of terrorism.

Indeed, the legislative history is replete with statements by the congressional sponsors and supporters of the ATA as well as representatives of the executive branch who testified in support of the bill, praising the wide scope and broad effect of the bill's provisions. Nothing in the history or purpose of the ATA suggests that it should be interpreted narrowly. The only circuit court to review a §2333 claim noted that,

> [Its] history, in combination with the language of the statute itself, evidences an intent by Congress to codify general common law tort principles and to extend civil liability for acts of international terrorism to the full reaches of traditional tort law.

Boim v. Quranic Literacy Institute, 291 F.3d at 1010, (emphasis added).

Accordingly, the class of plaintiffs who may bring a civil action under §2333 is broad. The original language of §2333 "was intended to be broad enough to allow indirect victims, such as common carriers, to sue for damage to property, for indemnity and lost profits." Senate Hearing at 86. Yet, because the original language allowed compensation only for "any national of the United States" (possibly excluding family members of terrorism victims), the Justice Department urged Congress to modify the text of the bill to explicitly allow suits by the family members of victims (as "survivors" and "heirs" of the victim). Senate Hearing at 8, 38. Thus,

> The Department supports legislation to provide a new civil remedy against terrorists and a federal forum for the <u>families and relatives</u> of victims to pursue claims for compensatory damages.

Id. at 34. (emphasis added)

During testimony before the Senate Subcommittee on Courts and Administrative Practice, Deputy Assistant Attorney General Steven R. Valentine specifically requested,

> . . . that this provision be amended to include, in addition to the individual directly affected, such additional parties as the estate of the decedent, survivors, and heirs. This will ensure that the bill is fully protective of the interests of all relevant parties to the civil suit.

Id. at 38. In response to a question posed by Senator Thurmond about whether the suggested modification in the language of the bill would "make certain the ability of family members to file a lawsuit," Valentine responded, "It would make clear that which is already implied in the bill. It would remove any doubt that anyone would have as to whether or not they could bring the litigation." Id. at 46

Congress accepted the recommendation of the Justice Department, and modified the language of §2333 to create a cause of action for "any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs . . ."

The expanded language of §2333 reflects the intention of Congress to allow the largest possible class of victims to be made whole. Hence, direct victims, but also family members (survivors and heirs) as well as those not traditionally considered terrorism victims (business and property owners) are able to recover under the act.

Further, by including "survivors" in the class of plaintiffs, Congress permitted recovery under §2333 for the widest scope of damages possible, including both economic damages and

recovery for loss of comfort and society and mental anguish.[15]    Thus, both those personally injured or killed by an act of international terrorism, and their family members and survivors, are entitled to relief under §2333.[16]

Congress' inclusion of family members ("survivors") as claimants under §2333 conforms with the nation-wide legislative tendency in the last few decades,

> [T]hough recovery for loss of society and comfort is denied under some statutes, it is an item usually recognized and made the basis for an award, at times apparently substantial . . .

> Even jurisdictions that have rejected the loss of society or consortium claim, as such, have permitted one form of it, namely a loss of guidance and advice that the decedent would have provided, at least in the case of deceased parents.

Prosser & Keeton on Torts §127 (1984).

In Miles v. Apex Marine Corp, 498 U.S. 19 (1990) the Supreme Court recognized that claims based on a close emotional relationship are permitted, if not specifically precluded or limited by federal statute.   One survey has indicated that "probably a numerical majority of jurisdictions" allow for damages for loss of society and companionship.   Speiser, Recovery for Wrongful Death 2d 3:49.

Several courts have recognized that the failure to allow loss of society damages to family members is outdated and immoral.   Disallowing such damages is a "barbarous concept . . . [and

---

[15] This is consistent with similar state statutes that allow both estates as well as  heirs and survivors to maintain separate claims. See e.g. Channel 20. v. World Wide Towers Services, 607 F. Supp. 551, 556 (S.D. Texas 1985)(construing wrongful death and survival statutes, "it is clear that the estate of a deceased person is a legal entity which is separate and distinct from those of the widows and other survivors of the deceased.")

[16] This interpretation of 18 U.S.C. §2333 is consistent with the jurisprudence concerning other federal causes of action, such as the Death on the High Seas Act, 46 U.S.C. §762, the Federal Employers' Liability Act, 45 U.S.C. §51, and the Jones Act, 46 U.S.C. App. §688. For instance, the Supreme Court has indicated that when damages are not statutorily  limited to "pecuniary losses," family members of the victim may be awarded damages for loss of society. Miles v. Apex Marine Corp, 498 U.S. 19, 31 (1990)("This explicit limitation forecloses recovery for nonpecuniary loss, such as loss of society in a general maritime action.")

a] reproach to justice." <u>Hopkins v. McBane</u>, 427 N.W.2d 85 (N.D. 1988) (citing <u>Wycko v.</u> <u>Gnodtke</u>, 361 Mich. 331, 105 N.W.2d 118,121 (1960)).  Upon certification from the Eleventh Circuit Court, the Florida Supreme Court stated that denial of damages for loss of society is based on "antiquated perception" of the familial relationship as being one of master and servant. <u>United States v. Dempsey</u>, 635 So.2d 961, 963 (Fla. 1994).  Further, the court stated that,

> Certainly, in 1973, when this Court set forth the elements of damages that a parent of an injured child is entitled to recover, it was apparent that a child's companionship and society were of far more value to the parent than were the services rendered by the child.  Thus, there was an obvious need to recognize this element of damages to fully compensate the parent for the loss suffered because of a negligent injury to the child.  The recognition of the loss of companionship element of damages clearly reflects our modern concept of family relationships.

<u>Id.</u> at 964, see also <u>Letelier v. Republic of Chile</u>, 502 F. Supp. 259 (D.D.C. 1980).  Similarly, a leading treatise has noted,

> . . . it has almost always seemed unjust to say that a child, or nonworking wife or mother, or an aged person is worth nothing to his survivors, and juries have at times rendered substantial verdicts in such cases.

<u>Prosser & Keeton on Torts</u> §127 (1984).

Indeed, numerous states and federal courts have interpreted wrongful death statutes to include such claims by heirs and survivors, even when an applicable statute does not explicitly provide for such relief.  <u>Wellborn v. Sears, Roebuck & Co.</u>, 970 F.2d 1420,1429 (5th Cir. 1992) (compensation for mother of deceased 14 year old daughter: "Awards for mental anguish should compensate for the 'emotional pain, torment and suffering' experienced due to the death of a family member."), see also <u>LaForest v. Autoriad de Las Fuentes</u>, 536 F.2d 443 (1st Cir. 1976)(applying Puerto Rican law).

The Model Survival and Death Act §3(d)(3) provides that a deceased's "closely related survivors" are entitled to recover "reasonable compensation for mental anguish and loss of companionship." See also Carter v. University of Medicine and Dentistry of New Jersey, 838 F. Supp. 957, 967 (D.N.J. 1993)(noting "the recent propensity of some courts, in New Jersey and elsewhere to recognize a *per quod* claim in the parent-child setting" which is "the more progressive jurisprudential trend" and allows recovery for a child's loss "by analogy with the right of a spouse to recover damages for the loss of consortium."), Enochs v. Brown, 872 S.W.2d 312 (Tx. 1994), see also Gallimore v. Children's Hospital Medical Center, 67 Ohio St.3d 244, 617 N.E.2d 1052, 1056 (1993)("We can find no specific common-law impediments to recovery for such losses. If there were any, they would be devoid of rational justification in the modern law."), Garner v. Houck, 312 S.C. 481, 435 S.E.2d 847 (1993).

The modern trend allowing recovery for loss of society and companionship and for mental anguish is expansive, extending to adult children, those who have no actual knowledge of the deceased and to relatives of surviving victims. For example, the parent of an injured adult child may make a claim for loss of consortium. Masaki v. General Motors, 780 P.2d 566, 577 (Haw. 1989)(citations omitted),

> We realize that a number of courts which recognize the parents' cause of action for loss of consortium of their injured children restrict the action to minor children. This rule is generally premised on the rationale that upon emancipation, parents are no longer entitled to the services and earnings of their children. We find such reasoning outmoded and illogical. At common law, the child, like the wife, was relegated to the role of a servant and considered an economic asset to the family. In the modern family, however, children have become less of an economic asset and more of a financial burden to their parents. Today children are valued for their society and companionship.

An unborn child of a deceased may also make such a claim. In <u>Artache v. Autoridad de Energia Electria</u>, 924 F. Supp. 346 (D.P.R. 1996) the court found that a child unborn at the time of her father's death had a sufficient cause of action,

> Jessica has lost a biological parent she will never know. A jury could reasonably find that she has and will suffer emotional distress as a result.

<u>Id</u>. at 351. Parents can similarly recover for the loss of society of a stillborn fetus. <u>Riley v. Koneru</u>, 228 Ill. App.3d 883, 593 N.E.2d 788 (Ill. 1993).

Permitting recovery for loss of society and companionship and for mental anguish is particularly appropriate in suits arising from acts of terrorism, and is consistent with the remedies available under other federal statutes allowing civil actions for terrorism and torture.[17] It fulfills the goal of allowing recovery to all those who are impacted by terrorism.[18] The circumstances surrounding the death of a victim of terrorism normally inflict severe mental anguish and suffering on the victim's survivors, thereby mandating an appropriate remedy,

> This type of action deserves a reply in damages that will fully compensate for the truly terrible emotional suffering of the surviving parents and siblings.

<u>Eisenfeld v. Islamic Republic of Iran</u>, 172 F. Supp.2d at 8.

---

[17] All of the federal provisions dealing with civil claims against terrorists and their sponsors recognize recovery by relatives of the victims. In addition to 18 U.S.C. §2333(a), both the Foreign Sovereign Immunities Act, 28 U.S.C. §1605(a)(7) and §1605 note, and the Torture Victim's Protection Act, 28 U.S.C. §1350 note (expanding claim beyond the direct victim to include "any person who may be a claimant in an action for wrongful death.") allow relatives of victims to seek damages.

[18] Congress clearly intended to allow all measures of damages to victims, as the bill "empowers victims with all the weapons available in civil litigation . . ." Remarks of Senator Grassley, Senate Journal p. S4511 April 16, 1991. (emphasis added). As noted above, the language of the ATA was specifically modified in order to clarify that claims of family members would be recognized.

Thus, the Court finds that §2333 allows recovery for both pecuniary damages and for non-economic damages, including loss of consortium and society and mental anguish experienced by the victim's surviving family members.

### A.    THE ESTATE OF YARON UNGAR

#### 1.    BACKGROUND

Yaron Ungar, an American citizen, was born in New York in 1970. As a child he resided in New York, Houston, and Philadelphia as well as Israel. Yaron was married to Efrat, with whom he had two children. Efrat was an artist who illustrated and wrote a series of popular children's comics which appeared on a regular basis in an Israeli newspaper.

On June 9, 1996, Yaron and Efrat Ungar were murdered in a machine-gun attack near Beit Shemesh, Israel, while driving home from a wedding. Their son plaintiff Yishai Ungar, then nine months old, survived the attack unscathed. The Ungars' other child, plaintiff Dvir Ungar, then 2 years old, was not in the car. At the time of the terrorist attack, Efrat was two months pregnant with the couple's third child. Four members of HAMAS, defendants Abdel Rahman Ismail Abdel Rahman Ghanimat, Jamal Abdel Fatah Tzabich Al Hor, Raed Fakhri Abu Hamdiya and Iman Mahmud Hassan Fuad Kafishe, were convicted by an Israeli court for their roles in carrying out the attack in which the Ungars were murdered. A fifth suspect, defendant Ibrahim Ghanimat, has not been apprehended.

At the time of his death, Yaron was working as a schoolteacher in Israel. He had completed three and a half years of rabbinical studies working toward ordination, obtained a teacher-training certificate and would shortly receive his bachelors degree. He authored two books on religious topics.

## 2.    **LOST EARNINGS**

The simplest measure of damages is the claim of the Estate of Yaron Ungar for the economic losses caused by his wrongful murder.  In regard to their damage evidence, plaintiffs are entitled to "all reasonable inferences from the evidence offered."  <u>Au Bon Pain Corp. v. Artect Inc.</u>, 653 F.2d at 65.  This Court may "accept as true the plaintiffs' uncontroverted evidence." <u>Elahi v. Islamic Republic of Iran</u>, 124 F. Supp.2d at 100 citing <u>Alejandre v. Republic of Cuba</u>, 996 F. Supp. 1239, 1243 (S.D.Fla. 1997).

Dr. Adrian Ziderman, an expert economist, testified as to the lost economic damages suffered as a result of the murder of Yaron Ungar.

Yaron was a young teacher, already qualified with a teaching certificate and about to complete his Bachelor of Education degree.  He had studied three and a half years toward rabbinic ordination and co-authored two works on Jewish religious topics.  Yaron was likely to follow a fairly standard career pattern for someone with his background.  He would likely have completed his rabbinic studies, obtained ordination, and eventually obtained a masters degree and ultimately become principal of a religious school.  pp. 69-71, Exhibit 6.

Dr. Ziderman calculated the loss of accretions to the estate caused by Yaron's murder using a standard method of calculating income over Yaron's expected career trajectory, and discounting lifetime earnings to present value.  Exhibit 6.  Dr. Ziderman concluded that the loss of income, in U.S. dollars, discounted to present value would be $1,273,028.  p. 81, Exhibit 6.

The Court finds this calculation to be reasonable and conservative, since Dr. Ziderman did not adjust Yaron's projected earnings for work as a communal rabbi, earnings during sabbaticals, potential earnings in the United States and customary contributions to education funds.  pp. 76 – 80. Exhibit 6.

3.    **PAIN AND SUFFERING**

Dr. Alan Friedman, an expert in trauma medicine, testified about the injuries sustained by Yaron Ungar during the machine-gun attack. On the basis of the coroner's report prepared by Dr. B. Levy of the Israeli Ministry of Health (Exhibit 5) as well as the detailed crime scene report and re-enactment photos prepared by Israeli police (Exhibits 1, 2, 3) Dr. Friedman described the injuries which caused the death of Yaron and Efrat Ungar.

Efrat Ungar was driving, Yaron was riding in the front passenger seat and Yishai was in the back seat when defendants pulled up behind the Ungars' vehicle and began shooting at it from behind. Efrat was struck in the back of the head by one of the first bullets fired and killed instantly. pp. 40, 63, Exhibit 1 (pictures 15 and 16). The first shots fired struck Yaron in several locations, including the left forearm, which injury causes a tremendous amount of pain. pp. 41, 44.

Defendants then pulled alongside the Ungars' vehicle on the left, while continuing to shoot, and fired through the driver's side window, and Yaron was struck with 14 shrapnel wounds in the right side of his chest. These wounds would have caused him significant pain, but would not have rendered him unconscious. Yaron's injuries, on his right side, indicate that he was conscious and able to turn to his left, facing his murdered wife. pp. 44-45, 48.

Yaron was also struck by a bullet in the side of the neck, which missed the trachea and the spinal chord. Dr. Friedman testified that this was a non-fatal injury, and that after sustaining injury Yaron was still conscious and in pain. pp. 54-55.

Next, while still conscious and breathing, Yaron was struck by a bullet on the left side of his nose. The bullet traveled up toward the base of the eye and entered the temple. Dr. Friedman found, on the basis of the coroner's report, that this bullet ultimately killed Yaron Ungar, but not

27

instantaneously. p. 51. Dr. Friedman testified that following this last bullet, Yaron remained conscious (pp. 57, 62) and lost consciousness and died between 3 to 5 minutes later. p. 62.

Dr. Friedman testified that the total time that Yaron was conscious and aware that he and his family were under attack, during which time he turned toward his murdered wife and sustained four painful gunshot injuries, until he ultimately lost unconsciousness following the entry of the last bullet, was approximately 30 seconds. p. 62.

Dr. Friedman testified that Yaron Ungar outlived his wife and witnessed her murder, and was aware that the machine-gun fire might have injured or killed his nine-month old son in the back seat.

The courts have recognized the right to pain and suffering in cases involving less onerous circumstances.

> If Plaintiff presents sufficient evidence of conscious pain and suffering, determination of the compensation has largely been relegated to the discretion of the trier of fact by courts in this jurisdiction based upon factors including the duration and nature of the suffering endured. The United States Court of Appeals for the District of Columbia Circuit has firmly established that the trier of fact has broad discretion in calculating damages for pain and suffering.

Taylor v. Washington Terminal Co., 409 F.2d 145, 150 (C.A.D.C. 1969).

An award is even more warranted in an action for a violent and cruel death by terrorism,

> As the cases clearly indicate, the courts have increasingly been awarding monetary relief for the suffering exacted when a person, in the midst of his normal enjoyment of life, is suddenly and cruelly required to confront his death, as well as to experience it.

Notes, Kimball, Axelrod & Goldstein, Damages in Tort Actions, §21.02[4].

In suits involving acts of terrorism, the federal courts have routinely awarded survival damages to the deceased's estate for the physical and emotional pain and suffering endured by

the victim in the moments before death. The courts have recognized that even very short periods of pain and suffering prior to death in a terrorist attack are compensable. See, e.g., Elahi v. Islamic Republic of Iran, 124 F. Supp.2d 97, 113 (D.D.C. 2000) ($1 million awarded when witness testified that death occurred "at least something like 30 seconds" following shooting); Eisenfeld v. Islamic Republic of Iran, 172 F. Supp.2d 1 ($1 million awarded for each victim of a bombing who survived for "several minutes"); Flatow v. Islamic Republic of Iran, 999 F. Supp. at 29 ($1 million award when "conscious pain and suffering continued for at least three to five hours.")

The physical pain and mental anguish consciously suffered by Yaron Ungar in the final moments of his life were excruciating. Moreover, unique to this case is fact that, before his death, Yaron witnessed the violent murder of his wife, and surely feared for his infant son. The combination of the overwhelming physical pain caused by the terrorists' bullets and the emotional trauma of the attack on his family produced an agonizing end to Yaron Ungar's life.

The Court therefore finds appropriate an award of $1,000,000 for Yaron Ungar's pain and suffering prior to death.

### B.    DVIR AND YISHAI

#### 1.    LOSS OF COMPANIONSHIP, SOCIETY AND GUIDANCE AND MENTAL ANGUISH

At the time of their father's murder, Dvir Ungar was almost two years old and Yishai Ungar was nine months old. As survivors of Yaron Ungar, §2333 provides them with an independent claim for damages for their loss of consortium and parental society and guidance.[19]

---

[19] This standing parallels that granted by the Foreign Sovereign Immunities Act 28 U.S.C. §1605 to the non-Americans relatives of American victims of terrorism, to bring claims for loss of consortium. See e.g. Anderson v. Islamic Republic of Iran, 90 F. Supp.2d 107 (D.D.C. 2000) (allowing claim of Lebanese wife of American hostage),

These unfortunate children will never know their parents.  Despite Yaron and Efrat's many accomplishments and admirable personalities, their children will only know them through the memory of others.  As youngsters, they will never benefit from their father's compassion, teaching skills, religious education and overall guidance.  Also, they have been deprived of the intimacy and companionship of a parental relationship and surely will suffer this absence for their entire lives.  They will carry this loss throughout their lives and will be susceptible to increased risk of mental heath problems.

Compounding their loss is the knowledge of horrible circumstances of their parents' murder.  Throughout their lives, any thought about their parents will surely reflect the gruesome and barbaric manner of their murder.  Thus, besides suffering a lifetime of loss, the knowledge of their parents' last minutes will surely exacerbate their anguish.

Further, the murder of Yaron Ungar is a more devastating loss to his children, because of the murder of their mother Efrat.  The testimony provided by plaintiffs clearly demonstrate the searing impact Yaron's murder has had, and will continue to have, on Dvir and Yishai.  Rabbi Dasberg, the boys' grandfather, testified that the children ask about their parents, and had recently inquired about how Yishai was collected from the hospital on the night his parents were murdered. p. 143.

Judith Dasberg, Yaron's mother-in-law, testified that Yaron and Efrat were very warm, open and positive parents.  Yaron was particularly concerned with educating his children. p. 146. Dvir was particularly close to his father.  In fact on one occasion Efrat had complained to her

---

Cicippio v. Islamic Republic of Iran, 18 F. Supp.2d 62, 68 n. 7 ("The victims . . . were U.S. citizens at the time they were abducted.  Since their husbands were victims, the Court also has jurisdiction over the claims of [their non-citizen spouses].")

30

mother that despite the fact she was with the children all day, she was struck by the fact that they cried out to Yaron and ran to him when returning home.  p. 147.  Even on the night of the murder, Dvir cried out for his father exclusively.  p. 148.

As a reaction to the murder of their parents, the children have become particularly close. Mrs. Dasberg testified that Dvir is dependent on Yishai and that even today, Dvir "has to be where [Yishai] is" and goes to play with younger children (Yishai's friends) so as to constantly be with him.  pp. 148-149.

Dvir has asked why God allowed his parents to be killed and anticipates their resurrection asking, "They've been so long away, when are they going to come back?"  p. 149.

Dr. Alan Brenman, a child psychologist, testified after having interviewed the children and grandparents.  He expressed concern about Dvir's overprotectiveness of Yishai which is at the point of dependency. p. 9.   He also commented on Yishai's temper and anger and Dvir's aggressiveness. p. 10.

Dr. Brenman indicated that the loss of their parents caused the children "psychic trauma," although it is difficult to determine its magnitude and impact.  pp. 12-13, 25.  He also indicated that the children now ask more questions about their parents and will continue to do so, especially because they have no memories of them.  pp. 14,16.  This impacts their ability to mourn for their parents.  p. 17.

The murder of their parents will cause the children to have at least some psychological issues to address their entire life.  For example, the emptiness the children will feel about the loss of their parents may cause them to idealize their parents, which may create additional problems such as feeling that they can not measure up to their standards, are not good enough and will

never have their approval. pp. 17, 18. These problems will exist despite that fact that the children have loving grandparents who are doing a good job raising them. p. 20.

The issues identified by Dr. Brenman will persist throughout adolescence. p. 21. They will become highlighted as the children become more independent. Anxiety problems will be significant, including fear of death, fear of separation and losing other people. pp. 21-22. As adults, Dvir and Yishai may experience difficulty forming relationships, and suffer from mistrust and an inability to become close to others. p. 22.

Although their magnitude and intensity is hard to predict, it is a given that the children will have to struggle during their lifetime with psychological issues. pp. 22-23. Each milestone in life will be bittersweet and will cause Dvir and Yishai to suffer the loss all over again. p. 23. Even the eventual death of their grandparents will have heightened significance because it will "catapult them into being orphaned a second time." p. 23. Previous losses will compound later ones. pp. 23-24.

Even as adults Dvir and Yishai will be susceptible to stress disorders, for instance if they were to review crime scene picture of the murders. p. 24. They are vulnerable to psychological problems such as depression, anxiety and post-traumatic stress disorder in the future. pp. 25, 27. Dr. Brenman expects that at some time in their lives, they will need some kind of psychotherapy. p. 27.

Dr. Brenman concluded by stating that, "it's hard to determine exactly how these boys are going to respond in the future, but all I know is they have a huge psychological and emotional battle to deal with in their lifetimes . . . " p. 28.

The nature of death in a terrorist attack, often gruesome and bloody and always unanticipated, inflicts upon the victim's survivors with a uniquely egregious sense of loss, and

"the unexpected quality of death may be taken into consideration in gauging the emotional impact to those left behind." Eisenfeld v. Islamic Republic of Iran, 172 F. Supp.2d at 8.

Death caused in a terrorist attack creates a heightened sense of loss to the surviving family members. The leading case on the subject of loss of consortium and society by family members of terrorist victims indicates that, "When death results from terrorism, the fact of death and the cause of death can become inextricably intertwined, thus interfering with the prospects for anguish to diminish over time." Flatow v. Islamic Republic of Iran, 999 F. Supp. at 31.

Flatow provides the most exhaustive treatment of the loss of consortium and society and mental anguish in the context of a death caused by terrorism:

> "As damages for mental anguish are extremely fact-dependent, claims require careful analysis on a case-by-case basis.

> "It is entirely possible to come to terms with the fact of death, and yet be unable to resolve the sense of anguish regarding the circumstances of death. This is particularly true where the death was sudden and violent. How the claimant learned of decedent's death, and whether there was an opportunity to say good-bye or view the body can be a significant factor contributing to the claimant's anguish . . .

> " . . . Even where the death results from the most extreme forms of negligence, the primary visceral reaction is to the tragedy. This is not the case with deaths resulting from terrorist attacks, in which the tragedy itself is amplified by the malice which inspired the event. The malice associated with terrorist attacks transcends even that of premeditated murder. The intended audience of a terrorist attack is not limited to the families of those killed and wounded or even just Israelis, but in this case, the American public, for the purpose of affecting United States government support for Israel and the peace process. The terrorist's intent is to strike fear not only for one's own safety, but also for that of friends and family, and to manipulate that fear in order to achieve political objectives. Thus the character of the wrongful act itself increases the magnitude of the injury. It thus demands a corresponding increase in compensation for increased injury.

Id. at 30 (citations omitted)(emphasis added).

While the loss of companionship and mental anguish experienced by the family members of a victim of terrorism are obviously difficult to assess, <u>Flatow</u> provides an analytical framework and standards for such an assessment:

Originally, wrongful death acts provided compensation only for the decedent's lost cash income stream. The next evolutionary stage was to recognize the economic value of decedent's personal services to claimant, such as household maintenance and nursing care. Many jurisdictions have now expanded recovery for loss of comfort and society to include all benefits which the claimant would have received had decedent lived. "Society" has evolved to include "a broad range of mutual benefits which 'each family member' receives from the other's continued existence, including love, affection, care, attention, companionship, comfort and protection."

The calculations for mental anguish and loss of society share some common considerations. First, the calculation should be based upon the anticipated duration of the injury. Claims for mental anguish belong to the claimants and should reflect anticipated persistence of mental anguish in excess of that which would have been experienced following decedent's natural death. When death results from terrorism, the fact of death and the cause of death can become inextricably intertwined, thus interfering with the prospects for anguish to diminish over time.

The nature of the relationship between the claimant and the decedent is another critical factor in the solatium analysis. If the relationship is strong and close, the likelihood that the claimant will suffer mental anguish and loss of society is substantially increased, particularly for intangibles such as companionship, love, affection, protection, and guidance. Numerous factors enter into this analysis, including: strong emotional ties between the claimant and the decedent; decedent's position in the family birth order relative to the claimant; the relative maturity or immaturity of the claimants; whether decedent habitually provided advice and solace to claimants; whether the claimant shared interests and pursuits with decedent; as well as decedent's achievements and plans for the future which would have affected claimants.

Finally, unlike lost wages, which can be calculated with a fair degree of mathematical certainty, solatium cannot be defined through models and variables. Courts have therefore refused to even attempt to factor in the present value of future mental anguish and loss of society. While economic losses can be reduced to present value with simple equations to establish the amount of an annuity established today which would have matched the decedent's ostensible income stream, the scope and uncertainty of human emotion renders such a calculation wholly inappropriate. This is the paradox of solatium; although no amount of money can alleviate the emotional impact of a child's or sibling's death, dollars are

the only means available to do so.

Id. at 31-32 (citations omitted).

Applying the standards and guidelines articulated in Flatow, the federal courts have developed a consistent and fixed range of awards for loss of consortium and mental anguish suffered as a result of the death or abduction of a parent in a terrorist attack. In Weinstein v. Republic of Iran, 184 F. Supp.2d 13 (D.D.C. 2002) the court awarded $5 million each to adult children of a HAMAS bombing victim. In Higgins v. Islamic Republic of Iran, 2000 WL 33674311 (D.D.C.) the court awarded $12 million to a high school senior for the loss of society and companionship of her father following his kidnapping and murder. (The Court noted the grown child's "caring relationship with her father . . . She has been bereft of the guidance he would have provided throughout her life.") In Sutherland v. Islamic Republic of Iran, 151 F. Supp.2d 27, 52 (D.D.C. 2001) the court awarded $6.5 million to children who suffered "extensive anxiety, frustration and loneliness" during their father's six-and-a-half years as a hostage. In Alejandre v. Republic of Cuba, 996 F. Supp. at 1251, $7.5 million was awarded to a college-aged student for the death of her father. In Hegna v. Iran, 00-716, January 22, 2000 (D.D.C.) the Court made awards of $3 million and $5 million to adult children for the lost companionship of their father.

The Court will award damages for loss of consortium and mental anguish consistent with the judgments awarded victims of terrorism under the FSIA. As indicated by Flatow, an award of compensatory damages on this scale is demanded by the extreme sense of loss and mental anguish which inevitably accompanies the malicious and horrible circumstances of death in a terrorist attack. The heightened damage award for loss of consortium and mental anguish resulting from terrorism developed in Flatow and its progeny relates to compensatory damages.

35

Because here, as in <u>Flatow</u>, these are awards of compensatory damages, designed to make the plaintiff "whole" after a terrorist attack, the calculation of damages is unaffected by the identity of the defendants, and it makes no difference whether the defendant is a state-sponsor of terrorism, a terrorist group or an individual terrorist.[20]

The Court therefore finds an award of $10,000,000 each to Dvir Ungar and Yishai Ungar appropriate for the loss of parental society, companionship and guidance, and the mental anguish, caused them by the murder of their father.

### 2.    LOSS OF SERVICES

While Dvir and Yishai are more than adequately cared for by their grandparents, the loss suffered by not having the services of Yaron as a caretaker is real. The economic loss of Yaron as a caretaker should not be overlooked merely because the children have grandparents willing to step into Yaron's (and Efrat's) shoes. While most civil actions resulting from terrorism have not addressed this type of relief, in <u>Alejandre v. Republic of Cuba</u>, 996 F. Supp. at 1249 the court awarded $206,388 for "loss of household services."

The testimony provided to the Court clearly demonstrates Yaron's contribution to the children during their short time with him. He was an excellent, caring and involved father. As a result of their father's murder, Dvir and Yishai will no longer be able to receive the benefit of his parental services.

Dr. Adrian Ziderman calculated the cost of lost parental services caused to Dvir and Yishai. Dr. Ziderman testified that the cost of providing a round the clock skilled caretaker for

---

[20] <u>Flatow</u> and progeny employ a separate standard for establishing punitive damages against state-sponsors of terrorism under the FSIA, which is not relevant to this action.

the children, in their home, would be $21,010 per year. p. 87.  Spread over 17 years and discounted to present value, the loss is $325,655.  (Exhibit 6, supplement)

The Court therefore awards the legal guardians of Dvir Ungar and Yishai Ungar $325,655 for the loss of parental services.

## C.   JUDITH AND MEIR UNGAR

Yaron's parents have suffered tremendously following Yaron's murder.  Their *joi de vivre* has been lost.  They constantly experience the loss of their oldest son, even while working hard at trying to maintain their daily routines.[21]  Joyous occasions are diminished because they feel the perpetual loss of Yaron.  Yaron's death is especially poignant given his unique role in the family.

Professor Meir Ungar, Yaron's father, testified at length about Yaron's character and his close, warm and loving relationship with his son.  Meir Ungar recalled how as a young boy, Yaron was very bright and was loved by his classmates, a natural leader who was the center of attention.  p. 92.  As he grew, Yaron became a much-loved boy scout counselor, p. 94, a great helper at home and a good son. p. 92.

When he went to study at a rabbinical seminary, Meir Ungar testified, Yaron became like a spiritual leader in the family, especially to his younger siblings.  They looked up to him, looked

---

[21] Their ability to continue on with life should not be seen as a factor mitigating their suffering,

> Individuals can react very differently even under similar circumstances; while some sink into clinical depression and bitterness, others attempt to salvage something constructive from their personal tragedy.  Such constructive behavior should not be considered as mitigating solatium, but rather as an equally compensable reaction, one in which courage to face their own mental anguish prevails in order to survive, and in some  circumstances, to benefit another.

Flatow v. Islamic Republic of Iran, 999 F. Supp. at 31.

to him for advice, for comfort and as if he was a father. p. 95. As a rabbinic student he traveled to Russia to teach young children. p. 94.

At the time of his death, he was about the finish his bachelors degree and had previously received a senior teachers diploma. p. 94. Yaron became a teacher, in his words because it was his "mission." p. 95. He wanted to raise a new and better generation. p. 94.

Even after he married, Yaron spoke to his parents by phone every other day about his activities, teaching and Dvir and Yishai. p. 92.

As an adult and even when married, Yaron along with his family would come to his parents' home every other weekend to stay overnight for the Sabbath. p. 92. During those visits he would help his parents with tasks around the house. p. 95.

In reaction to Yaron's murder, his father became more closed, nervous and unhappy. p. 96. He lost interest in many things. He has to force himself to interact with other people. p. 98. He felt that he did not have the right to be happy. He was unable to continue certain hobbies, such as his twice-weekly folk dancing. Yet even when he forced himself to start again, he felt he did not have the right to do it anymore. His joy of life had dissipated. p. 96.

Meir thinks about his son often, during daily prayers and while at the synagogue, causing him to cry. He visualizes the murder site, thinks about Yaron being shot, not knowing what happened to his wife and small child Yishai, whether they were killed or saved. pp. 96-97.

Yaron's death has taken a toll on Meir Ungar's family life. He and his wife constantly need to know where their adult children are at all times. His wife especially has been effected, he described her as being "very, very, nervous about it, very crazy about it. She makes so many phone calls, and she drives the kids crazy about it." p. 99.

Yaron's death has impacted his professional career. Prior to the murder, Meir Ungar published scholarly articles at the rate of one and a half to two a year. Yet in the six years since the murder, he has only been able to publish two articles, one of which was begun prior to the murder. p. 98. As an associate professor, his promotion to full professor is dependent in great part on publishing scholarly articles. Without publishing, there is no way he would be promoted. p. 99.

Yaron's mother, Judith Ungar, testified that Yaron's most characteristic personality trait was his happiness, his joy of life, the delight in his eyes, always laughing and happy and good-natured. pp. 101-102. He was full of life, constantly visiting with friends. p. 101. He was very idealistic, didn't care for money and wanted to give to society. Yaron chose teaching as a matter of idealism, he wanted to educate children to be good citizens and good persons. pp. 104-105.

Judith Ungar recalled that Yaron was very charitable. After his death, the family learned that each month Yaron and Efrat would put aside 10% of their earnings to help pay for a student's tuition in the school in which Yaron taught. In the afternoon, Yaron worked with disadvantaged students in a program similar to Big Brother. pp. 106-107.

Judith described Yaron was very warm and open, and as the center of attention in the family. When he would come home from school, the family would gather around the Sabbath table and listen to Yaron's stories of his friends. The family had a custom to sing together and Yaron would teach them new songs. p. 103.

Judith had a very close relationship with Yaron. Adding to their closeness was the fact that like Yaron, she is a teacher, and they shared professional interests. Yaron would consult with her and discuss his lesson plans. p. 104.

Judith testified that Yaron's death made her feel as if the world was caving in on her. Adding to her distress was the cold, cruel, horrible manner in which he was killed. p. 110.

As a rational person, Judith chose to try to carry on with her life and not stay at home in bed. p. 111. Nonetheless, her outer appearance and actions mask the pain, the terrible weight she feels. She described her life as being like a person eating without tastebuds, "you can't ever enjoy anything you do, even happy stuff." p. 112. This effects her life in many little ways. She doesn't go to sing-a-longs, to her choir. Yaron's death clouds happy occasions such as holidays, Dvir and Yishai's first steps and her daughter's birth of twins. pp.111-112.

Judith is constantly reminded of Yaron. People she sees on the street, music, holidays make her think of Yaron. p. 114.

Judith's family life has suffered. Her younger children pretend that everything is okay but there is a heavy feeling over their home life. p. 113.

Judith testified that the Dvir and Yishai children do not remember their parents, and she is particularly pained by the fact that the boys will not ever know their parents. pp. 114-115.

Michal Cohen, Yaron's older sister, testified that her parents have been particularly effected. Their household is very tense with everyone "walking on eggshells . . . Every petty thing becomes a major issue, and they weren't like that before. They were just a happy family, singing, laughing, and it's not like that anymore." p. 124.

The testimony presented to the Court makes it clear that Yaron's parents, Meir and Judith Ungar, have both suffered and continue to suffer severe mental anguish from Yaron's death, and the loss of his society and companionship.

Several reported cases involve the terrorist murder of emancipated children. The courts have routinely awarded at least $5 million to the surviving parents. See e.g. Eisenfeld v. Islamic

Republic of Iran, 172 F. Supp.2d 1, Flatow v. Islamic Republic of Iran, 999 F. Supp. 1; see also Alejandre v. Republic of Cuba, 996 F. Supp 1239 ($7.5 million awarded to parents of murdered 24 and 29 year old sons).

The Court will therefore award Judith and Meir Ungar damages in the amount of $5,000,000 each for the loss of society and companionship and mental anguished caused them by the death of their son.

### D.   MICHAL COHEN, AMICHAI UNGAR AND DAFNA UNGAR

Each of Yaron's siblings had a special intimate relationship with him. As an older sister, Michal was Yaron's long-standing confidante. Yaron was a guide, teacher and role model to Amichai and Dafna. As their older brother, they looked to him for advice and guidance especially as they were coming to maturity.

Michal testified as to the close relationship she and Yaron had throughout their lives. Growing up together in the U.S. and Israel they were constantly together. p. 120. When they were older, Yaron and Michal shared many interests, such as science fiction. As a young adult, Yaron sought her advice on his future, career and girlfriends. Before he was married, Yaron sought her approval of Efrat as a wife. p. 121.

Even after Michal and Yaron each married, they remained very close. p. 121. For instance, upon Dvir's birth, they shopped for baby clothes together. p. 122.

Yaron's death has been very difficult for Michal. Even happy occasions such as the birth of her twins become sad events as the loss of Yaron is remembered. p. 123. As she is reminded of him during routine day to day activities such as walking in a mall or hearing a song he liked, she becomes paralyzed. p. 124.

Amichai Ungar, Yaron's younger brother, testified that Yaron was his hero and "mental protector." p. 128. Yaron would look after Amichai. When Amichai was 13, Yaron wrote him a letter at the end of the school year urging him to continue his studies and to maintain a proper lifestyle during the summer months. p. 128. The letter impressed so many people that upon Yaron's death it was published in newspapers and distributed to the youth group that Yaron worked for. p. 129.

After Yaron's death, Amichai has assumed responsibility for taking care of Dvir and Yishai every other weekend, bathing them, and putting them to sleep. p. 129. He has curtailed certain activities to be able to take care of them. p. 131.

Amichai acknowledged the toll that Yaron's death has had on the family and particularly their family life. He has a heightened fear for his own safety because he does not want his parents to suffer should anything happen to him. The household is very tense and his relationship with his mother has become strained because of her nervousness. p. 130. The family is unable to talk about Yaron's death. He feels a need to "be a rock" and to keep his feelings inside because to do otherwise would cause pain and hurt to his family. p. 131.

Happy occasions become sad for Amichai. For instance, at a friend's wedding, he started to cry and was unable to join in the dancing. p. 131.

Dafna Ungar, Yaron's younger sister, testified that Yaron was her "big protecting brother." p. 133.

She described Yaron as having an "everlasting smile on his face." p. 133. He was always trying to keep everyone happy. p. 134. Dafna recalls Yaron as always telling jokes, telling funny stories. p. 133.

Dafna is most hurt by Yaron's death in that she never had a chance to interact with him as an adult. After his death, she relates having conversations with him and writing letters to him. She felt as if she had to let him know what was happening with his children, what he was missing. p. 135.

She feels the loss of Yaron frequently when listening to music or eating a snack food that they both enjoyed. p. 135. She testified that his memory "comes to you all the time" and that "in every act that we do we have this on the background of our mind reminding us all the time what [has] happened." p. 136.

Dafna described Yaron as a "great, inspiring" father. He was very patient with Dvir. She described an incident when Dvir broke a vase. Instead of shouting at him, he was "so patient [with] him, and so loving, it would be amazing to see." p. 136.

The testimony makes abundantly clear that Yaron Ungar's murder has inflicted great mental anguish on his siblings, and they have suffered greatly from the loss of Yaron's society and companionship, and will continue to do so.

Damages for loss of society and mental anguish have been awarded to adult siblings of victims of terrorism, and the courts have routinely awarded $2.5 million to each sibling in several such cases. Eisenfeld v. Iran, 172 F. Supp.2d 1, Flatow v. Islamic Republic of Iran, 999 F. Supp. at 32. In Elahi v. Islamic Republic of Iran, 124 F. Supp.2d 97 an adult sibling of an adult terrorism victim was awarded $5 million as they had a particularly close relationship.[22]

---

[22] In Jenco v. Islamic Republic of Iran, 154 F. Supp.2d 27 (D.D.C. 2001) the court awarded damages in the amount of $1.5 million each to adult siblings of a priest who had been held hostage for almost seven years. However, the court distinguished this award from that given in other terrorism judgment rulings because the victim had been ultimately set free and rejoined his family.

43

The Court will therefore award Michal Cohen, Amichai Ungar and Dafna Ungar damages in the amount of $2,500,000 each for the loss of society and companionship and mental anguished caused them by the death of their brother.

### E.    ATTORNEY FEES AND TREBLE DAMAGES

Section 2333 provides that plaintiffs "shall recover threefold the damages he or she sustains and the cost of suit, including attorney fees."

Therefore, the damages awards described above will be trebled as statutorily mandated. In addition, plaintiffs have documented counsel fees and costs in the amount of $68,858.

Plaintiffs, by their Attorney,

David J. Strachman #4404
McIntyre, Tate, Lynch and Holt
321 South Main Street, Suite 400
Providence, RI 02903
(401) 351-7700
(401) 331-6095  fax

### CERTIFICATION

I hereby certify that on the ___16___ day of August, 2002 I mailed a true copy of the within to:

Ramsey Clark
Lawrence W. Schilling
36 East 12th Street
New York, NY 10003

Deming E. Sherman
EDWARDS & ANGELL, LLP
2800 Bank Boston Plaza
Providence, RI 02903