# EXHIBIT 5

# IN THE APPEALS CHAMBER

**Before:**
**Judge Claude Jorda, President**
**Judge Mohamed Shahabuddeen**
**Judge Mehmet Güney**
**Judge Asoka de Z. Gunawardana**
**Judge Theodor Meron**

**Registrar:**
**Mr. Hans Holthuis**

**Decision of:**
**11 December 2002**

## PROSECUTOR
## v.
## RADOSLAV BRDJANIN
## MOMIR TALIC

_____
### DECISION ON INTERLOCUTORY APPEAL
_____

**Counsel for the Appellant Jonathan Randal:**

Mr. Geoffrey Robertson
Mr. Steven Powles

**Counsel for the Prosecution:**

Ms. Joanna Korner
Mr. Andrew Cayley

**Counsel for Radoslav Brdjanin:**

Mr. John Ackerman

**Counsel for the *Amici Curiae*:**

Mr. Floyd Abrams
Mr. Joel Kurtzberg
Ms. Karen Kaiser

## I. Background

1. The Appeals Chamber of the International Criminal Tribunal for the Prosecution of Persons Responsible for Serious Violations of International Humanitarian Law Committed in the Territory of the Former Yugoslavia since 1991 ("Appeals Chamber" and "International Tribunal" respectively) is seised of the "Motion to Appeal the Trial Chamber's 'Decision on Motion on Behalf of Jonathan Randal to Set Aside Confidential Subpoena to Give Evidence'" filed on 26 June 2002 ("Appeal") by counsel for Mr. Jonathan Randal ("Appellant"), pursuant to Rule 73 of the Rules of Procedure and Evidence of the International Tribunal ("Rules").

2. The Appeal concerns a subpoena issued by Trial Chamber II to compel the testimony of a war correspondent concerning an interview he conducted while reporting on the conflict in the former Yugoslavia. The questions presented are whether this International Tribunal should recognize a qualified testimonial privilege for war correspondents, and, if so, whether the privilege requires the quashing of the subpoena.

3. The Appellant served as a correspondent for the *Washington Post* in Yugoslavia. On 11 February, 1993, the *Washington Post* carried a story ("Article") by the Appellant containing quoted statements attributed to Radislav Brdjanin, one of the Accused, about the situation in Banja Luka and the surrounding areas.[1] The Article described Brdjanin as a "housing administrator" and "avowed radical Serb nationalist." He was quoted as saying that "those unwilling to defend [Bosnian Serb territory] must be moved out" so as "to create an ethnically clean space through voluntary movement." According to the article, Brdjanin said that Muslims and Croats "should not be killed, but should be allowed to leave – and good riddance." The article also quoted Brdjanin as saying that Serb authorities paid "too much attention to human rights" in an effort to please European governments and that "[w]e don't need to prove anything to Europe anymore. We are going to defend our frontiers at any cost . . . and wherever our army boots stand, that's the situation." The Article claimed that Brdjanin said that he was preparing laws to expel non-Serbs from government housing to make room for Serbs. The Appellant, who does not speak Serbo-Croatian, carried out the interview with the assistance of another journalist, who does speak Serbo-Croatian.

4. Brdjanin was charged in a 12-count indictment with, among other things, crimes against humanity and grave breaches of the Geneva Conventions of 1949 involving deportation, forced transfer, and appropriation of property. The Prosecution sought to have the Article admitted into evidence, claiming that it was relevant to establishing that the Accused possessed the intent required for several of the crimes charged. The Defense objected on several grounds, including that the statements attributed to Brdjanin were not accurately reported. The Defense stated that, if the article were admitted, they would seek to examine the Appellant so as to call into question the accuracy of the quotations noted above. The Prosecution then requested that the Trial Chamber issue a subpoena ("Subpoena") to the Appellant, and the Trial Chamber complied on 29 January 2002.

5. On 26 and 28 February 2002, 1 March 2002 and 18 March 2002, the Subpoena was discussed during sessions in the Trial Chamber. At these sessions, the Prosecution informed the Trial Chamber that the Appellant had refused to comply with the Subpoena

. On 9 May 2002, the Appellant filed a written motion to set aside the Subpoena.[2] On the same day, the Prosecution filed its response.[3] On 10 May 2002, the Trial Chamber heard oral argument on this motion. On 7 June 2002, the Trial Chamber rendered its decision ("Impugned Decision"). Refusing to recognise a testimonial privilege for journalists when no issue of protecting confidential sources was involved, the Trial Chamber upheld the Subpoena. It also found that the *Article* was admissible.

6. On 14 June 2002, the Appellant sought certification for leave to appeal from the Trial Chamber.[4] The Trial Chamber granted it on 19 June 2002.[5] On 26 June 2002, the Appellant filed the Appeal. On 4 July 2002, the Appellant filed written submissions in support of the Motion to Appeal.[6] The Prosecution responded on 15 July 2002 and the Appellant replied on 6 August 2002.[7]

7. On 1 August 2002, pursuant to Rules 74 and 107 of the Rules, the Appeals Chamber granted the request of 34 media companies and associations of journalists to file a brief as *Amici Curiae* supporting the Appellant, which was filed on 16 August 2002.[8] On 4 September 2002, the Appeals Chamber issued a scheduling order granting the request made in the briefs of the Appellant and the *Amici Curiae* for an oral hearing.[9] On 3 October 2002, the Appeals Chamber heard the arguments of the parties and of the *Amici Curiae*.[10]

## II. Impugned Decision and Submissions of the Parties and the *Amici Curiae*

(a) The Impugned Decision

The Trial Chamber acknowledged that "'journalists reporting on conflict areas play a vital role in bringing to the attention of the international community the horrors and realities of the conflict'"[11] and that they should not be "subpoenaed unnecessarily."[12] It took the view, however, that, whatever the proper approach when confidential materials or sources are at issue[13], when the testimony sought concerns already published materials and already identified sources, compelling the testimony of journalists poses only a minimal threat to the news gathering and news reporting functions. Indeed, the Trial Chamber found that a published article is the equivalent of a public statement by its author and that when such a statement is entered in evidence in a criminal trial and its credibility challenged, the author, like anyone else who makes a claim in public, must expect to be called to defend its accuracy.[14]

In determining whether to issue a subpoena to compel the testimony of a journalist concerning already public materials and sources, the Trial Chamber thus held that it is sufficient if the testimony sought is "pertinent" to the case.[15] The Trial Chamber also considered whether requiring the Appellant to testify would place him in physical danger. Noting that the Appellant was retired from being a war correspondent and was living in France, the Trial Chamber found that he faced no prospect of harm from testifying about the contents of his article. The Trial Chamber thus upheld the validity of the Subpoena.

(b) The Appellant

The Appellant seeks the reversal of the Impugned Decision and the setting aside of the Subpoena. The Appellant submits that the Trial Chamber erred: (i) in not recognising a qualified testimonial privilege for journalists; and (ii) in not finding, on the facts of this case, that the Appellant should not be compelled to appear for testimony.

11. With regard to the first ground, the Appellant submits that the Trial Chamber erred in law by not recognising a qualified privilege for journalists. Such a privilege is warranted, the Appellant contends, in order to safeguard the ability of journalists to investigate and report effectively from areas in which war crimes take place. Without a qualified privilege, journalists may be put at risk personally, may expose their sources to risk, and may be denied access to important information and sources in the future. The result, in the Appellant's view, will be less journalistic exposure of international crimes and thus the hindering of the very process of international justice that international criminal tribunals such as this Tribunal are designed to serve. In support of these contentions, the Appellant submits statements from two journalists, the general secretary of the International Federation of Journalists, and the publisher of the *Washington Post*.

12. The Appellant suggests that the International Tribunal has recognised testimonial privileges for certain other classes of individuals. Rule 97 establishes a privilege for communications between attorneys and their clients. In *Simic*,[( footnote 16 )] a Trial Chamber afforded an absolute immunity from testifying to a former employee of the International Committee of the Red Cross ("ICRC") in order to protect the impartiality of the ICRC. Trial Chambers have also granted or recognized privileges against testifying to employees and functionaries of the ICTY[17] and to the Commander in Chief of the United Nations Protection Force.[18]

13. The Appellant also points to certain international legal materials in support of the qualified privilege he urges the Tribunal to adopt. He recalls that Rule 73 of the International Criminal Court ("ICC") recognises that certain relationships and classes of professionals should be granted some form of testimonial privilege. He suggests that Article 79 of the 1977 Protocol I Additional to the Geneva Conventions recognises that journalists are exposed to great dangers and thus have a special position in conflict zones, as do several documents produced by the European Council's Committee of Ministers to Member States on the Protection of Journalists in Situations of Conflict and Tension. He also contends that the decision of the European Court of Human Rights in *Goodwin* v. *United Kingdom*, supports the establishment of a qualified privilege.[19]

14. The Appellant claims that certain judicial decisions from the United States and the United Kingdom support the establishment of a qualified privilege for journalists. The Appellant also draws the Tribunal's attention to the internal guidelines of the United States Department of Justice visualising that subpoenas will be issued against members of the news media. Those guidelines, in the Appellant's view, recognize the importance of seeking subpoenas against members of the press only as a last resort when the information sought is crucial to the case and cannot reasonably be acquired by other means.

15. The Appellant submits that in determining whether to issue a subpoena to a journalist, it is not sufficient merely to find, as the Trial Chamber did, that the evidence is "pertinent" to the case. Rather, he asserts that a Trial Chamber should issue a subpoena only if it determines that the compelled journalist's testimony would provide admissible evidence that: (1) is "of crucial importance" to determining a defendant's guilt or innocence; (2) cannot be obtained "by any other means or from any other witness"; (3) will not require the journalist to breach any obligation of confidence; (4) will not place the journalist, his family, or his sources in reasonably apprehended personal danger; and (5) will not serve as a precedent that will "unnecessarily jeopardise the effectiveness or safety of other journalists reporting from that conflict zone in the future."[20]

16. The Appellant's second contention is that the Trial Chamber erred in fact when it found the Appellant's testimony to be pertinent to the Prosecution's case . According to the Appellant, his testimony cannot materially assist the Prosecution or the Defence. He does not speak Serbo-Croatian, and the interview in question was thus conducted through another journalist, who does. Hence, the Appellant asserts that he can only comment on *Brdjanin's* demeanor during the interview and cannot vouch for the accuracy of the translations of *Brdjanin's* statements as they appeared in his Article.

17. Moreover, the Appellant asserts that the Trial Chamber should have undertaken a careful analysis of the importance of the Appellant's testimony before issuing the subpoena, not just after the fact.

(c) The *Amici Curiae*

The *Amici Curiae* make largely the same arguments as the Appellant concerning the importance of a qualified privilege to ensuring journalists' ability to investigate in and report from areas where war crimes are taking place. Compelling journalists to testify against their own sources, confidential or otherwise, will make news sources less likely to come forward, less likely to speak freely, and more likely to fear that journalists are acting as possible agents of their future prosecutor . It will rob war correspondents of their status as observers and transform them into participants, undermining their credibility and independence and thus their ability to gather information. The *Amici Curiae* contend that this will curtail the important benefits that journalists provide to the public and to the courts.

The *Amici Curiae* assert that the Trial Chamber on the basis that the evidence need merely "be pertinent", permits the Tribunal to compel journalists to testify even when the relevance of their testimony is uncertain. According to the *Amici Curiae,* the standard applied by the Trial Chamber is so vague that it will inevitably lead to unease and confusion in the journalistic community and result in journalists being subpoenaed unnecessarily.

20. Those arguments lead the *Amici Curiae* to offer a simpler and somewhat less demanding test for the proposed qualified privilege than does the Appellant . According to the *Amici Curiae*, a Trial Chamber should not issue a subpoena to compel the

testimony of a journalist unless the Trial Chamber determines that : (1) the testimony is essential to the determination of the case; and (2) the information cannot be obtained by any other means. For the testimony to be essential , "its contribution to the case must be critical to determining the guilt or innocence of a defendant."[21]

21. Applying this test, the *Amici Curiae* assert that the Appellant should not be compelled to testify. His testimony, in their view, is not absolutely essential to the case. Even if it were, the Prosecution has not demonstrated that his testimony is the only means of obtaining the same information.

(d) The Prosecution

22. The Prosecution submits that the Trial Chamber: (i) correctly declined the Appellant's invitation to create a precise journalistic privilege; and (ii) correctly determined , on the facts of this case, that the Appellant should be compelled to testify.

23. The Prosecution argues that, whatever beneficial effects a privilege for the protection of confidential sources and confidential information may have in promoting vigorous reporting and thus ultimately the cause of international justice , no such benefits accrue from a privilege protecting testimony concerning published materials and openly identified sources. The Prosecution stresses that this case fits in the latter category. In the Prosecution's view, what creates the admittedly significant risks for journalists operating in war zones – of physical harm and of loss of access to sources – is the publication of their stories exposing the conduct of parties to the conflict, not the later possibility that they might be called to testify about matters they have already revealed to the public in their stories.[22]

24. The Prosecution maintains that adoption of the privilege advocated by the Appellant would undermine the International Tribunal's ability to reach accurate judgements by requiring the exclusion of essential evidence. Moreover, the Prosecution contends that too generous a privilege could compromise the due process rights of accused persons.[23]

25. The Prosecution argues that the testimonial privileges extended by the International Tribunal to certain other classes of persons are distinguishable from the journalists' privilege proposed here. Those other privileges rest on concerns about confidentiality (ICRC), have long-established roots in national legal systems (attorney-client), or have independent bases in international law (ICRC, functional immunity for state officials). By contrast, according to the Prosecution, a privilege for journalists concerning non-confidential matters would be unprecedented in international or national legal systems.

26. The Prosecution asserts that the Trial Chamber was correct in interpreting the decision of the European Court of Human Rights in *Goodwin*[24] and the case law from the United States and the United Kingdom as being concerned largely, if not exclusively, with the protection of confidential sources.

27. The Prosecution submits that no precise journalists' privilege is warranted. Rather, the Appeals Chamber should endorse the approach of the Trial Chamber, which , in its view, was to balance "the legitimate interests of journalists" against "the interests of the international community and the victims of crime in ensuring the availability of all relevant and probative evidence" and, when appropriate " the interest of the Accused in exercising his right to examine witnesses against him."[25] Engaging in such a balancing , and considering that the statements by the Accused in question have already been published and attributed to him and that the Appellant himself faces no risk of physical harm or loss of journalistic access in the area of the former Yugoslavia , the Trial Chamber correctly found that there was no basis for exempting the Appellant from his duty to testify.

Further, the Prosecution argues that even under the tests proposed by the Appellant and the *Amici Curiae*, the Trial Chamber would still have been correct to issue a subpoena for the Appellant's testimony. First, the statements by the Accused in the Article are essential to the Prosecution's case because they constitute direct evidence of the intent required for the establishment of some of the offences with which he is charged. Secondly, the evidence at issue is unavailable from other sources, as the only other witness to the Accused's statements was the journalist who served as an interpreter for the Appellant.

## III. Discussion

(a) Preliminary Considerations

29. At the outset, the Appeals Chamber notes that, although the parties and the *Amici Curiae* frame the issue before the Appeals Chamber as one concerning journalists in general, it is important to appreciate that the case really concerns a smaller group, namely, war correspondents. It is the particular character of the work done and the risks faced by those who report from conflict zones that it is at stake in the present case. By "war correspondents," the Appeals Chambers means individuals who, for any period of time, report (or investigate for the purposes of reporting) from a conflict zone on issues relating to the conflict. This decision concerns only this group.

30. The issue of compelled testimony by war correspondents before a war crimes tribunal is a novel one. There does not appear to be any case law directly on point. War correspondents who have previously testified at the International Tribunal did so on a voluntary basis.[26] War correspondents are of course free to testify before the International Tribunal, and their testimony assists the International Tribunal in carrying out its function of holding accountable individuals who have committed crimes under international humanitarian law. The present ruling concerns only the case where a war correspondent, having been requested to testify, refuses to do so.

31. Neither the Statute nor the relevant Rules offer much guidance on the issue being considered here. Under Rule 54 of the Rules, a Trial Chamber may, at the request of either party or on its own initiative, issue a subpoena when it finds that doing so is "necessary for the purposes of an investigation or for the preparation or conduct of the

trial." The discretion of the Trial Chambers, however, is not unfettered. They must take into account a number of other considerations before issuing a subpoena. Subpoenas should not be issued lightly, for they involve the use of coercive powers and may lead to the imposition of a criminal sanction.

32. In determining whether to issue a subpoena, a Trial Chamber has first of all to take into account the admissibility and potential value of the evidence sought to be obtained. Under Rule 89(C) of the Rules, a Trial Chamber "may admit any relevant evidence which it deems to have probative value," and under Rule 89(D) may "exclude evidence if its probative value is substantially outweighed by the need to ensure a fair trial." Secondly, the Trial Chamber may need to consider other factors such as testimonial privileges. For instance, Rule 97 of the Rules states that "all communications between lawyer and client shall be regarded as privileged, and consequently not subject to disclosure at trial, unless: (i) the client consents to such disclosure ; or (ii) the client has voluntarily disclosed the content of the communication to a third party, and that third party then gives evidence of that disclosure." Similarly, in the *Simic* case, the Trial Chamber made it clear that the ICRC has a right under customary international law to non-disclosure of information so that its workers cannot be compelled to testify before the International Tribunal .[27]

33. In this decision, the Appeals Chamber will address the factors that need to be considered before the issuance of a subpoena to war correspondents.

(b) Analysis

34. In the Appeals Chamber's view, the basic legal issue presented raises three subsidiary questions. Is there a public interest in the work of war correspondents ? If yes, would compelling war correspondents to testify before a tribunal adversely affect their ability to carry out their work? If yes, what test is appropriate to balance the public interest in accommodating the work of war correspondents with the public interest in having all relevant evidence available to the court and, where it is implicated, the right of the defendant to challenge the evidence against him? The Appeals Chamber will consider each of these questions in turn.

**(i) *Is there a public interest in the work of war correspondents?***

35. The Appeals Chamber is of the view that the answer to the first question is clearly "Yes," as the Trial Chamber expressly recognised. Both international and national authorities support the related propositions that a vigorous press is essential to the functioning of open societies and that a too frequent and easy resort to compelled production of evidence by journalists may, in certain circumstances , hinder their ability to gather and report the news. The European Court of Human Rights has recognised that journalists play a "vital public watchdog role" that is essential in democratic societies and that, in certain circumstances, compelling journalists to testify may hinder "the ability of the press to provide accurate and reliable information."[28] National legislatures and courts have recognised the same principles in establishing laws or rules of evidence shielding journalists from having to disclose various types of information. As one federal court of

appeals in the United States has put it, "society's interest in protecting the integrity of the newsgathering process, and ensuring the free flow of information to the public, is an interest 'of sufficient social importance to justify some incidental sacrifice of sources of facts needed in the administration of justice.'"[29]

36. The Appeals Chamber is of the view that society's interest in protecting the integrity of the newsgathering process is particularly clear and weighty in the case of war correspondents. Wars necessarily involve death, destruction, and suffering on a large scale and, too frequently, atrocities of many kinds, as the conflict in the former Yugoslavia illustrates. In war zones, accurate information is often difficult to obtain and may be difficult to distribute or disseminate as well. The transmission of that information is essential to keeping the international public informed about matters of life and death. It may also be vital to assisting those who would prevent or punish the crimes under international humanitarian law that fall within the jurisdiction of this Tribunal. In this regard, it may be recalled that the images of the terrible suffering of the detainees at the Omarska Camp that played such an important role in awakening the international community to the seriousness of the human rights situation during the conflict in Bosnia Herzegovina were broadcast by war correspondents. The Appeals Chamber readily agrees with the Trial Chamber that war correspondents "play a vital role in bringing to the attention of the international community the horrors and reality of conflict."[30] The information uncovered by war correspondents has on more than one occasion provided important leads for the investigators of this Tribunal.[31] In view of these reasons, the Appeals Chamber considers that war correspondents do serve a public interest.

37. The public's interest in the work of war correspondents finds additional support in the right to receive information that is gaining increasing recognition within the international community. Article 19 of the Universal Declaration of Human Rights provides that "Everyone has the right to freedom of opinion and expression; this right includes freedom to hold opinions without interference and to seek, receive and impart information and ideas through any media and regardless of frontiers." This principle is reproduced in all the main international human rights instruments .[32] As has been noted,[33] the right to freedom of expression includes not merely the right of journalists and media organizations freely to communicate information. It also incorporates a right of members of the public to receive information. As the European Court of Human Rights put it in its decision in *Fresso and Roire v. France*: "Not only does the press have the task of imparting information and ideas on matters of public interest: the public also has a right to receive them."[34]

38. Recognition of the important public interest served by the work of war correspondents does not rest on a perception of war correspondents as occupying some special professional category. Rather, it is because vigorous investigation and reporting by war correspondents enables citizens of the international community to receive vital information from war zones that the Appeals Chamber considers that adequate weight must be given to protecting the ability of war correspondents to carry out their functions.

**(ii)** *Would compelling war correspondents to testify in a war crimes tribunal adversely affect their ability to carry out their work?*

39. The Trial Chamber took the view that since the case at hand concerns only published information and not confidential sources, compelling the Appellant to testify posed no threat to the ability of war correspondents to carry out their newsgathering role. Thus, the Trial Chamber held that it "fail[ed] to see how the objectivity and independence of journalists can be hampered or endangered by their being called upon to testify, [. . .] especially in those cases where they have already published their findings."[35]

40. The *Amici Curiae*, by contrast, insist that "[e]ven when findings are published and sources are known, the link between the forced disclosure and the loss of journalist's independence is compelling, as it significantly changes the tone of journalist's work and the willingness of sources to comply with reporters' requests for interviews."[36] The Appellant similarly argues:

If it becomes known in conflict zones that reporters may be compelled to testify about crimes they may witness or have been incautiously confessed to them by officials, they will not be accorded important interviews and facilities. They will increasingly be excluded from conflict zones and from places or positions where they might witness war crimes. Some guilty parties will cease to boast about criminal acts, or to give interviews at all.[37]

The Appeals Chamber acknowledges that it is impossible to determine with certainty whether and to what extent the compelling of war correspondents to testifying before the International Tribunal would hamper their ability to work. However, in the opinion of the Appeals Chamber, it is not a possibility that can be discarded lightly, as the Trial Chamber found, simply because the evidence sought concerned published information and not confidential sources. The potential impact upon the newsgathering function and on the safety of war correspondents as submitted by the Appellant and the *Amici Curiae* is great.

41. The Appeals Chamber recognises, as did the Trial Chamber, that many national jurisdictions afford a testimonial privilege for journalists only when it comes to protecting confidential sources.[38] It notes, however, that in some countries some privilege from testifying is also given in cases of non-confidential information.[39] In either case, the scope of the privilege rests on the legislature's or the courts' assessment of the need to protect the newsgathering function. By analogy, the Appeals Chamber considers that the amount of protection that should be given to war correspondents from testifying being the International Tribunal is directly proportional to the harm that it may cause to the newsgathering function.

42. The Appeals Chamber considers reasonable the claims of both the Appellant and the *Amici Curiae* that, in order to do their jobs effectively, war correspondents must be perceived as independent observers rather than as potential witnesses for the Prosecution. Otherwise, they may face more frequent and grievous threats to their safety and to the safety of their sources. These problems remain, contrary to what was held by the Trial

Chamber, even if the testimony of war correspondents does not relate to confidential sources.

43. What really matters is the perception that war correspondents can be forced to become witnesses against their interviewees. Indeed, the legal differences between confidential sources and other forms of evidence are likely to be lost on the average person in a war zone who must decide whether to trust a war correspondent with information . To publish the information obtained from an interviewee is one thing -- it is often the very purpose for which the interviewee gave the interview -- but to testify against the interviewed person on the basis of that interview is quite another. The consequences for the interviewed persons are much worse in the latter case, as they may be found guilty in a war crimes trial and deprived of their liberty. If war correspondents were to be perceived as potential witnesses for the Prosecution , two consequences may follow. First, they may have difficulties in gathering significant information because the interviewed persons, particularly those committing human rights violations, may talk less freely with them and may deny access to conflict zones. Second, war correspondents may shift from being observers of those committing human rights violations to being their targets, thereby putting their own lives at risk.

44. In view of the foregoing, the Appeals Chamber is of the view that compelling war correspondents to testify before the International Tribunal on a routine basis may have a significant impact upon their ability to obtain information and thus their ability to inform the public on issues of general concern. The Appeals Chamber will not unnecessarily hamper the work of professions that perform a public interest . In the next section, the Appeals Chamber will determine how the course of justice can be adequately assured without unnecessarily hampering the newsgathering function of war correspondents.

**(iii)** *What test is appropriate to balance the public interest in accommodating the work of war correspondents with the public interest in having all relevant evidence available to the court?*

45. The Appellant proposes a five-part test for the issuance of subpoenas to war correspondents.[40] In the Appeals Chamber's view, that test amounts to a virtually absolute privilege. The *Amici Curiae* propose a more lenient test. In their view, war correspondents should be compelled to testify only if their evidence is essential to the case and cannot be obtained from another source. By "essential" they mean vital to the finding of guilt or innocence of the accused on a given charge.[41] The Prosecution asserts that both of these proposed tests are overly restrictive . For its part, the Trial Chamber in the Impugned Decision justified the issuing of the Subpoena on the ground that the evidence sought was "pertinent" to the Prosecution's case.

46. The Appeals Chamber considers that in order to decide whether to compel a war correspondent to testify before the International Tribunal, a Trial Chamber must conduct a balancing exercise between the differing interests involved in the case . On the one hand, there is the interest of justice in having all relevant evidence put before the Trial Chambers for a proper assessment of the culpability of the individual on trial. On the

other hand, there is the public interest in the work of war correspondents, which requires that the newsgathering function be performed without unnecessary constraints so that the international community can receive adequate information on issues of public concern.

47. The test of "pertinence" applied by the Trial Chamber appears insufficient to protect the public interest in the work of war correspondents. The word "pertinent " is so general that it would not appear to grant war correspondents any more protection than that enjoyed by other witnesses. Thus, the Trial Chamber's test, while supposedly accounting for the public interest in the work of war correspondents, would actually leave that interest unprotected. On the other hand, the test proposed by the Appellant , as noted above, would amount to a virtually absolute privilege. Even the criteria proposed by *Amici Curiae* may be too stringent in that they may lead to significant evidence being left out.

48. In the opinion of the Appeals Chamber, it is only when the Trial Chamber finds that the evidence sought by the party seeking the subpoena is direct and important to the core issues of the case that it may compel a war correspondent to testify before the International Tribunal. The adoption of this criterion should ensure that all evidence that is really significant to a case is available to Trial Chambers . On the other, it should prevent war correspondents from being subpoenaed unnecessarily .

49. Furthermore, if the evidence sought is reasonably available from a source other than a war correspondent, the Trial Chamber should look first to that alternative source. The Trial Chamber did not do that here.

50. In view of the foregoing, the Appeals Chamber holds that in order for a Trial Chamber to issue a subpoena to a war correspondent a two-pronged test must be satisfied . First, the petitioning party must demonstrate that the evidence sought is of direct and important value in determining a core issue in the case. Second, it must demonstrate that the evidence sought cannot reasonably be obtained elsewhere .

51. Finally, the Appeals Chamber will not address the submissions of the parties on the second ground of the appeal, that is, the application of the proper legal test to the facts. Having determined the principles governing the testimony of war correspondents before the International Tribunal, the Appeals Chamber considers that it is the role of the Trial Chamber to apply those principles in the particular circumstances of the case. The Appeals Chambers would, however, offer the following observations.

52. First, contrary to the Trial Chamber's apparent fear,[42] even if the Trial Chamber were to decide that the Appellant should not be subpoenaed to testify, that need not mean that the Article must be excluded (and the Prosecution disadvantaged to that extent). The admissibility of the Article depends principally on its probative value under Rule 89(C) and the balance between that probative value and its potential to undermine the fairness of the trial under Rule 89(D). Because the Article is hearsay, the Trial Chamber will also want to examine what indicia of reliability or unreliability it carries.[43] As with many pieces of hearsay evidence, the inability of a party to challenge its accuracy by cross-

examining the declarant (in this case the Appellant) does not mean that it must be excluded.[44] Rather, that inability would diminish the confidence the Trial Chamber could have in its accuracy and thus the weight the Trial Chamber would give it.

53. At the same time, and contrary to the Trial Chamber's apparent counterbalancing fear,[45] admitting the Article without subpoenaing the Appellant need not prejudice the Accused. The Defence may still question the Article's accuracy, and the Trial Chamber will have to take account of the unavailability of the Appellant in determining how much weight to give the Article.

54. Finally, whatever evidentiary value the Article may have, it is the Trial Chamber's task to determine whether the Appellant's testimony *itself* will be of direct and important value to determining a core issue in the case. The Defence has offered two justifications for seeking the Appellant's testimony. The first is that his testimony will enable the Defence to challenge the accuracy of the statements attributed to Brdjanin in the Article. The second is that the Appellant may place Brdjanin's statements in a context that will cast them in a more favourable light for the Defence . With regard in particular to the first justification -- concerning accuracy -- given that the Appellant speaks no Serbo-Croatian, and thus that he relied on another journalist for interpretation, the Appeals Chamber finds it difficult to imagine how the Appellant's testimony could be of direct and important value to determining a core issue in the case.[46] In any event, determining whether the Appellant's testimony on either score may have direct and important value to a core issue in the case requires a factual determination that is properly left to the Trial Chamber.

55. Therefore, should the Prosecution (or the Defence) still desire that the Appellant be subpoenaed to testify before the International Tribunal, it will have to submit a new application before the Trial Chamber to be considered in the light of the principles set out in the present decision.

## Disposition

56. For the foregoing reasons, the Appeals Chamber:

1. allows the Appeal;

2. reverses the Impugned Decision;

3. consequently, sets aside the Subpoena.


Done in both English and French, the French text being authoritative.

_____
Claude Jorda
Presiding Judge

Judge Shahabuddeen appends a separate opinion.

Dated this 11th day of December 2002
At The Hague,
The Netherlands.

**[Seal of the Tribunal]**

---

1 - Jonathan C. Randal, "Preserving the Fruits of Ethnic Cleansing; Bosnian Serbs, Expulsion Victims See Process as Beyond Reversal", Washington Post, Feb. 11, 1993, p. A34. The quotations in this paragraph are from the article. See also *Prosecutor v. Brdjanin and Talic*, Case No. IT-99-36-T, "Decision on Motion to Set Aside Confidential Subpoena to Give Evidence", 7 June 2002, para. 28.A.ii.
2 - *Prosecutor v. Radoslav Brdjanin and Momir Talic*, Case No.: IT-99-36-T, "Written Submissions on Behalf of Jonathan Randal to Set Aside 'Confidential Subpoena to Give Evidence' Dated 29 January 2002", 9 May 2002.
3 - *Prosecutor v. Radoslav Brdjanin and Momir Talic*, Case No.: IT-99-36-T, "Prosecution's Response to 'Written Submissions on Behalf of Jonathan Randal to Set Aside "Confidential Subpoena to Give Evidence" Dated 29 January 2002;', 9 May 2002.
4 - *Prosecutor v. Radoslav Brdjanin and Momir Talic*, Case No.: IT-99-36-T, "Application for Certification from Trial Chamber to Appeal 'Decision on Motion to Set Aside Confidential Subpoena to Give Evidence'", 14 June 2002.
5 - *Prosecutor v. Radoslav Brdjanin and Momir Talic*, Case No.: IT-99-36-T, "Decision to Grant Certification to Appeal the Trial Chamber's 'Decision on Motion to Set Aside Confidential Subpoena to Give Evidence'", 19 June 2002.
6 - *Prosecutor v. Radoslav Brdjanin and Momir Talic*, Case No.: IT-99-36-AR73.9, "Written Submissions in Support of Motion to Appeal Trial Chamber's 'Decision on Motion on Behalf of Jonathan Randal to Set Aside Confidential Subpoena to Give Evidence'", 4 July 2002.
7 - *Prosecutor v. Radoslav Brdjanin and Momir Talic*, Case No.: IT-99-36-AR73.9, "Appellant's Reply to 'Prosecution's Response to Written Submissions in Support of Motion to Appeal Trial Chamber's "Decision on Motion on Behalf of Jonathan Randal to Set Aside Confidential Subpoena to Give Evidence" Filed 4 July 2002'", 6 August 2002.
8 - *Prosecutor v. Radoslav Brdjanin and Momir Talic*, Case No.: IT-99-36-AR73.9, "Décision relative à la requête aux fins de prorogation de délai et autorisant à comparaître en qualité d'*amici curiae*",1 August 2002.
9 - *Prosecutor v. Radoslav Brdjanin and Momir Talic*, Case No.: IT-99-36-AR73.9, "Scheduling Order", 4 September 2002.
10 - Mr. Ackerman, counsel for the accused, had informed the Appeals Chamber that he would attend the hearing. Without explanation, he failed to appear.
11 - Impugned Decision, para. 25.
12 - *Id*. para. 27.
13 - The Trial Chamber implied that a qualified privilege was warranted to protect journalists from having to reveal confidential sources or materials. *Id*. para. 31.
14 - *Id*. para. 26.
15 - *Id*. para. 32.
16 - *Prosecutor v. Simic et al.*, "Decision on The Prosecution Motion Under Rule 73 for a Ruling Concerning the Testimony of a Witness", Case No.: IT-95-9-PT, 27 July 1999 ("ICRC Decision").
17 - *Prosecutor v. Delalic et al.*, Case No.: IT-96-21-T, "Decision on the Motion *Ex Parte* by the Defence of Zdravko Mucic Concerning the Issue of a Subpoena to an Interpreter", 8 July 1997.
18 - *Prosecutor v. Blaskic*, Case No.: IT-95-14-T, "Decision of Trial Chamber I on Protective Measures for General Philippe Morillon, Witness of the Trial Chamber", 12 May 1999.
19 - *Goodwin v. United Kingdom*, Judgement of 22 February 1996, 22 EHRR 123.
20 - Para. 18.
21 - Para. 43.

22 - Paras. 6-8, 25.
23 - Para. 26.
24 - *Supra* n.14.
25 - Para. 58.
26 - E.G. Martin Bell (BBC), Jacky Rowland (BBC), and Ed Vulliamy (The Observer/Guardian).
27 - *Supra* n.11, in particular paras 73-74 and disposition.
28 - *Supra* n.14, para. 40.
29 - *Schoen v. Schoen*, 5 F.3d 1289, 1292 (9th Cir. 1993).
30 - Impugned Decision at para 25.
31 - *See, e.g.*, Exhibit A to *Amici* Brief, Affidavit of Elizabeth Neuffler.
32 - Article 10 of the Convention for the Protection of Human Rights and Fundamental Freedoms of 3 September 1953; Article 19 of the International Covenant on Civil and Political Rights of 23 March 1976; Article 13 of the American Convention on Human Rights of 18 July 1978; and in Article 9(1) of the African Charter on Human and Peoples Rights of 26 June 1981.
33 - Weramantry C.G., "Access to Information: A New Human Right. The Right to Know", Asian Yearbook of International Law, Vol. 4, 1995, pp. 99-111.
34 - See *Fresso and Roire v. France*, Judgement of 21 January 1999, ECHR, para 51, *Erdogdu and Ince v. Turkey*, Judgement of 8 July 1999, ECHR, para 48 and *Sener v. Turkey*, Judgment of 18 July 2000, ECHR, para 41-42;
35 - Impugned Decision at para 26.
36 - *Amici* Brief at para. 36.
37 - Appellant's Brief at para. 9.
38 - *See, e.g.*, Contempt of Court Act 1981, Section 10, (United Kingdom); *Code de Procedure Penale Art.109* (France) and *Codice di Procedura Penale Art. 200(2)* (Italy).
39 - *See Strafprozessordnung § 53* (Germany), as amended on 15 February 2002; *United States v. LaRouche Campaign*, 841 F.2d 1176, 1181-82 (1st Cir. 1988); *United States v. Cuthbertson*, 630 F.2d 139, 147-48 (3d Cir. 1980) (United States). The Appeals Chamber also notes that the United States Department of Justice has established internal guidelines cautioning federal prosecutors to seek subpoenas against members of the media only when the information sought is essential and cannot reasonably be acquired from non-media sources. The guidelines appear to apply to subpoenas for non-confidential as well as confidential materials. *See* 28 C.F.R. § 50.10 (2002)."
40 - *See supra* para. 13; Appellant's Brief, para. 18.
41 - *See supra* para. 17; *Amici* Brief, para. 43.
42 - Impugned Decision, para. 32.
43 - *See Prosecutor v. Dario Kordic and Mario Cerkez*, Case No. IT-95-14/2-AR73.5, Decision on Appeal Regarding Statement of A Deceased Witness, paras. 23-24.
44 - *See, e.g., Prosecutor v. Zlatko Aleksovski*, Case No. IT-95-14/1-AR73.5, Decision on Prosecution's Appeal on Admissibility of Evidence, para. 27.
45 - Impugned Decision, para. 32.
46 - The Appeals Chamber makes this observation while recognising that the Appellant's inexplicably inconsistent claims concerning his ability to vouch for the accuracy of the quoted statements in the Article left the Trial Chamber in an unenviable position.