UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

MARK SOKOLOW, et al.,

        Plaintiffs,

                                                                                         Civ. No. 04-397 (GBD) (RLE)

  v.

THE PALESTINE LIBERATION ORGANIZATION, et al.,

        Defendants.

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO BBC'S MOTION TO QUASH SUBPOENA AND IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL**

**INTRODUCTION**

    Plaintiffs respectfully submit this memorandum in opposition to the Motion to Quash Subpoena filed by the British Broadcasting Corporation ("BBC") (DE 148) and in support of their motion to compel BBC to comply with the subpoena served on it by plaintiffs.

    The subpoena served by plaintiffs on BBC seeks three types of discovery:

        (1)    An authentic copy of a BBC documentary entitled "Arafat Investigated";

        (2)    Authentic copies of certain, specific recordings created while preparing the documentary but not included in the documentary (i.e. "outtakes"); and

        (3)    Foundational deposition testimony from a knowledgeable employee of BBC regarding the authenticity of the documentary and the outtakes, and the manner in which they were created and stored by BBC, for the purpose of establishing their admissibility as "business records" (i.e. a standard "records-keeper deposition")

*See* Exhibit A.

As discussed *infra*, virtually all of the issues raised by BBC's motion to quash and plaintiffs' motion to compel have already been resolved – against BBC – in the related case of *Saperstein v. Palestinian Authority*, 2010 WL 1371384 (E.D.N.Y. 2010). Exhibit B.

For the reasons set forth below, and in *Saperstein*, the BBC's motion to quash should be denied and the plaintiffs' motion to compel should be granted, both *in toto*.

Solely in the alternative, in the event that the Court finds that the outtakes are privileged, BBC should be compelled to produce the documentary as broadcast, as well as a records-keeper to confirm its authenticity and the facts relevant to its admissibility as a business record.

## RELEVANT BACKGROUND

This is a civil action pursuant to the Antiterrorism Act ("ATA"), 18 U.S.C. § 2333, and pendent causes of action, brought by U.S. citizens, and the guardians, family members and personal representatives of the estates of U.S. citizens, who were killed and injured in seven terrorist attacks in or near Jerusalem, Israel, between January 8, 2001 and January 29, 2004.[1]

Plaintiffs' First Amended Complaint alleges that defendants Palestine Liberation Organization ("PLO") and Palestinian Authority ("PA") are liable for their injuries, *inter alia*, because the attacks at issue were carried out by defendants' officials, agents and employees and/or by terrorist units operating with the defendants' material support. DE 4 at ¶¶ 49-125.

Specifically relevant here, plaintiffs identify the "Al Aqsa Brigades," also known as the "Al-Aqsa Martyrs Brigades" or "Martyrs of Al Aqsa" (hereinafter: "Al-Aqsa"), as one of the terrorist units responsible for the attacks. *Id*. at ¶¶ 51-53.

---

[1] Defendants have filed and the Court has denied three motions to dismiss this case. *See Sokolow v. PLO*, 583 F.Supp.2d 451 (S.D.N.Y. 2008) (subject-matter jurisdiction); *Sokolow v. PLO*, 2011 WL 1345086 (S.D.N.Y. 2011) (personal jurisdiction); Order, June 2, 2011, DE 122 (venue).

While Al-Aqsa was involved to some degree in most of the attacks at issue in this case, its role was particularly pronounced in respect to the June 19, 2002 bombing in which plaintiff Shaul Mandelkorn was maimed (DE 4 at ¶¶ 100-107) and the January 29, 2004 bombing in which decedent Stuart Goldberg was murdered (*id.* at ¶¶ 118-125). Al-Aqsa openly took "credit" for the June 19, 2002 bombing. *See* Exhibit C ("Al Aksa Martyrs Brigade, a militant offshoot of Mr. Arafat's Fatah movement, claimed responsibility for today's suicide bombing."). And an Al-Aqsa operative, Ahmed Salah, was convicted of carrying out the January 29, 2004 bombing and Mr. Goldberg's murder. *See* Exhibit D at Second Count, Fifth Count and Eight Count (Salah's indictment for membership in Al Aksa and for carrying out the January 29, 2004 bombing); Exhibit E (Salah's conviction and sentencing order).[2]

As the case law applying § 2333 of the ATA makes clear, if the plaintiffs can prove that the defendants provided funding to Al Aqsa prior to these attacks, the defendants will be liable to the plaintiffs under § 2333 of the ATA. *See e.g. Boim v. Holy Land Foundation*, 549 F.3d 685 (7th Cir. 2008); *Linde v. Arab Bank*, 384 F.Supp.2d 571 (E.D.N.Y. 2005).

Plaintiffs intend to prove that defendants provided such funding by showing: (1) that the name "Al-Aqsa" is simply a *nom de guerre* used by the "Fatah" faction of the PLO when it carries out terrorism, and does not denote a separate entity; and (2) that under the leadership of the late Yasser Arafat defendants funded Fatah – and so Al Aqsa – prior to these attacks.[3]

---

[2] Mr. Goldberg is referenced in the indictment and sentencing by his Hebrew name, "Yehezkel."

[3] The PLO is an umbrella organization comprised of several factions, of which Fatah is the dominant and largest faction.

Importantly, defendants do not dispute, and indeed openly admit, that they fund Fatah. *See* Exhibit F at 18-19 ("[T]here is a money flow from the PA to the PLO and from the PLO to Fatah … Fatah … ought to be funded by the PLO, and it is.").

Thus, since defendants admit to funding Fatah, in order to prove this theory of liability plaintiffs require evidence demonstrating that "Al-Aqsa" is indistinguishable from Fatah.

In 2003, BBC broadcast a documentary entitled "Arafat Investigated." A transcript of that documentary (Exhibit G) indicates that the documentary included interviews with Ata Abu Rumaileh, the leader of Fatah in the West Bank city of Jenin, and with Zakaria Zubaidi, an Al-Aqsa terrorist leader in Jenin. During his interview, Fatah leader Abu Rumaileh confirmed that Fatah and Al-Aqsa were the same entity, and led by the late PA and PLO leader Yasser Arafat:

> JEREMY BOWEN [BBC interviewer]
> So explain to me, Fatah and the Al-Aqsa Martyrs Brigade, are they part of the same organisation? Are you separate, are you together, how close are you?
>
> ATA ABU RUMAILEH (translation)
> Fatah has two sections: a military wing, led by the military and a political wing led by the politicians. **But there is no difference between Fatah and the Al-Aqsa Martyrs Brigades**.
>
> JEREMY BOWEN
> And who is in charge of both of these two parts of the organisation, is it Arafat?
>
> ATA ABU RUMAILEH
> Yasser Arafat

Exhibit G at 18-19 (emphasis added).

Likewise, Al-Aqsa leader Zakaria Zubaidi confirmed in his interview that he took orders directly from Arafat:

>JEREMY BOWEN
>When you captured the Governor of Jenin, did Yasser Arafat speak to you directly telling you to release him?
>
>ZAKARIA ZUBAIDI (translation)
>Yes.
>
>JEREMY BOWEN
>What did he say?
>
>ZAKARIA ZUBAIDI (translation)
>We don't question his decisions. They're carried out first, and discussed later.

*Id*. at 16.

Zubaidi also confirmed that Arafat controlled the Al-Aqsa's terrorist activities:

>JEREMY BOWEN
>So, do you believe then that suicide operations, suicide bombs against Israeli civilians ought to continue. There should be more of them?
>
>ZAKARIA ZUBAIDI (translation)
>Of course. Martyrdom operations inside Israel are not the strategy of the Palestinian people.
>
>ZAKARIA ZUBAIDI (translation)
>They're of no use to us politically. But they do have some advantage for our people, who are being killed every day. They want retaliation, revenge for the massacres committed by Israel. This is why we have martyrdom operations.
>
>JEREMY BOWEN
>So if Arafat said stop these attacks, would the Al-Aqsa Brigades stop?
>
>ZAKARIA ZUBAIDI (translation)
>Of course. But he won't order us to do this until Israel stops the assassinations.
>
>JEREMY BOWEN
>But do you continue with them because he says continue with them?

5

> ZAKARIA ZUBAIDI (translation)
> We pay close attention to what he says. When Arafat calls
> for a ceasefire, we will respect his decision and stop.

*Id*. at 37-38.

Thus, the BBC's documentary contains explicit evidence – the statement from Fatah leader Abu Rumaileh – that Fatah and Al-Aqsa are one and the same entity.

Likewise, the above-quoted statements by Abu Rumaileh and Zubaidi confirming that PA/PLO leader Arafat led and controlled Fatah/Al-Aqsa, and personally gave orders directly to Al-Aqsa leader Zubaidi, further support plaintiffs' theory that the PA and PLO are liable for terrorist attacks carried out by Fatah/Al-Aqsa.

Accordingly, plaintiffs served a subpoena on BBC[4] seeking three types of discovery:

### 1. The Documentary

Plaintiffs requested a true and complete copy of the "Arafat Investigated" documentary. *See* Exhibit A at Appendix B, Definition 1(a).

### 2. Outtakes

Plaintiffs requested true copies of audiovisual recordings of Abu Rumaileh and Zubaidi created while preparing the documentary but not ultimately included in the documentary ("outtakes"). *See* Exhibit A at Appendix B, Definition 1(b).

---

[4] Because the offices of plaintiffs' counsel are in Brooklyn and Rule 45(a)(2)(B) requires a subpoena seeking a deposition to be issued from the court in the district in which the deposition is to take place plaintiffs originally issued the subpoena from the Eastern District. After BBC filed papers contesting venue in the Eastern District plaintiffs withdrew that subpoena and issued the instant subpoena from this Court (setting the deposition in BBC's counsel's office in Manhattan) in order to moot the venue dispute. Surprisingly, BBC now expends pages of its motion complaining about the proceedings in the Eastern District and accusing the plaintiffs of "forum shopping." While these baseless charges rankle, they are irrelevant and plaintiffs will not waste the Court's or their own resources responding thereto. Whether plaintiffs are entitled to the discovery sought does not turn on BBC's complaints about prior proceedings; indeed, if BBC had a meritorious argument it could have sought costs in the Eastern District.

Plaintiffs requested the outtakes for two distinct and important reasons:

*First*, if plaintiffs attempt to introduce as evidence at trial the interviews of Abu Rumaileh and Zubaidi as they appear in the documentary, the defendants will undoubtedly seek to object on the grounds that the interviews appearing in the documentary are not complete recordings but merely segments. *See* Fed.R.Evid. 106. Therefore, plaintiffs need and seek copies of the **complete** interviews with Abu Rumaileh and Zubaidi

*Second*, the segments of the Abu Rumaileh and Zubaidi interviews included in the documentary contain extremely probative statements that are highly relevant to plaintiffs' case. It is therefore very likely that the complete interviews contain additional such statements.

### 3.  Records-Keeper Deposition

Plaintiffs also requested deposition testimony of a knowledgeable employee of BBC regarding the authenticity of the documentary and the outtakes, and the manner in which they were created and stored by BBC. Exhibit C at Appendix A.

The purpose of this deposition is simply to establish that both the documentary and the outtakes (a) are true copies of the original records and (b) were generated, stored and copied in such a manner as satisfies the business records exception under Fed.R.Evid. 803(6).

## ARGUMENT

As shown below, BBC's motion to quash is without merit and should be denied, and plaintiffs' motion to compel should be granted.

### A.  The Importance of Permitting Discovery in ATA Actions

In deciding the motions filed by BBC and the plaintiffs, the Court should take into account the fact that plaintiffs' action is brought under the civil provisions of the Antiterrorism

Act and – as the courts of this Circuit and others have found – the prosecution of ATA cases serves not only plaintiff's personal interest, but the national interest of the United States:

> The legislative history of the ATA … reveal[s] this country's profound and compelling interest in combating terrorism at every level …
>
> Congress has explicitly granted private parties the right to pursue common tort claims against terrorist organizations and those that provide material support or financing to terrorist organizations. Certainly, private tort actions directed at compensating victims of terrorism and thwarting the financing of terrorism <u>vindicate the national and international public interest</u>.

*Weiss v. National Westminster Bank*, 242 F.R.D. 33, 46, 50 (E.D.N.Y. 2007) (emphasis added). *See also e.g. Ungar v. Palestinian Authority*, 715 F.Supp.2d 253, 268 (D.R.I. 2010) ("[T]here is an extremely strong interest in enforcing judgments … entered under the civil provisions of the Antiterrorism Act ("ATA")").

Precisely because of the important public interest vindicated by ATA actions, the courts of this Circuit have repeatedly compelled the production of discovery in ATA cases even when such production violated foreign secrecy laws and placed the producing party in the position of choosing between being penalized abroad or imposition of sanctions. *See e.g. Linde v. Arab Bank*, 269 F.R.D. 186 (E.D.N.Y. 2010); *Weiss*, 242 F.R.D. at 55-56; *Strauss v. Credit Lyonnais*, 242 F.R.D. 199 (E.D.N.Y. 2007); *Strauss v. Credit Lyonnais*, 249 F.R.D. 429 (E.D.N.Y. 2008).

Thus, ATA actions such as this case serve the <u>national</u> interest and this Court – like the other courts in this Circuit – should therefore exercise its discretion to the full extent permitted by the bounds of the law in order to permit plaintiffs to obtain the discovery they need.

**B.     The Documentary Should Be Produced**

BBC asserts three grounds for quashing the subpoena in respect to the documentary as broadcast (i.e. the documentary alone, without the outtakes), all of which are meritless:

*First*, BBC asserts that the documentary is located in the United Kingdom. DE 148 at 11 ("BBC does not maintain in the United States any requested document that would be responsive to the Second Subpoena … Given that all … relevant documents are located outside the United States, it does not matter that the BBC is subject to service here."). This argument is completely baseless: it is black-letter law that "the person subject to the subpoena is required to produce materials in that person's control <u>whether or not the materials are located within the district or within the territory within which the subpoena can be served</u>." *First American Corp. v. Price Waterhouse LLP*, 154 F.3d 16, 21 (2nd Cir. 1998) (quoting Fed.R.Civ.P. 45, Advisory Comm. Notes) (emphasis added). *See also e.g. Tiffany (NJ) LLC v. Andrew*, --- F.R.D. ----, 2011 WL 3135850 at *6 (S.D.N.Y. July 25, 2011) ("The Banks attempt to overcome the presumption that they have custody and control over the documents by asserting that their New York and China branches have separate computer systems, and that their New York personnel cannot compel the China head-quarters to produce account information. These facts are of no moment, however, because the subpoena is directed to the Banks as a whole, not solely the New York branches.").

*Second*, BBC makes an anemic attempt to argue that the documentary is not relevant because "[n]one of the alleged[5] attacks in issue in this case were subjects of, or mentioned in, the BBC Program, and at least one such alleged attack postdated the 2003 Program." DE 148 at 3.

---

[5] It is perturbing that the BBC refers to the attacks at issue, most of which were the subject of condemnation by the U.S. and U.K. governments and were reported by BBC itself, as "alleged" attacks. Indeed, even the defendants do not deny the occurrence of the attacks.

9

This argument is a red herring: as discussed *supra*, the purpose of the subpoena is to obtain evidence showing that Al Aqsa, which carried out the attacks, is identical to Fatah, which defendants admit to funding – and the documentary clearly provides such evidence. *See e.g.* Exhibit G at 19 ("[T]here is no difference between Fatah and the Al-Aqsa Martyrs Brigades."). Likewise, the statements by Abu Rumaileh and Zubaidi regarding PA/PLO leader Arafat's control over and leadership of Al-Aqsa – including even giving personal orders to Zubaidi – further support plaintiffs' claims that the PA and PLO are liable for Al-Aqsa's attacks.

*Third*, BBC argues that it should not be required to produce the documentary because the statements contained therein are purportedly hearsay. DE 148 at 23. This argument can and should be <u>summarily</u> rejected, since "admissibility is not a prerequisite to discoverability, and the scope of relevance under Rule 26 is broader than under the Rules of Evidence." *Conopco, Inc. v. Wein*, 2007 WL 1040676 at *5 (S.D.N.Y. 2007) (quotation marks omitted). Indeed, the ultimate decision regarding admissibility may rest on other pieces of evidence yet to be discovered. Moreover, even assuming, *arguendo*, that admissibility is a relevant consideration where a privilege has been asserted, BBC cannot assert and has not asserted any privilege in respect to the documentary. Accordingly, the Court should not even consider the question of admissibility.

In any case the materials sought are admissible. There is no question that a recording can be a "business record" subject to the hearsay exception. *See e.g. LeRoy v. Sabena*, 344 F.2d 266, 272-273 (2nd Cir. 1965) (radio transmission admissible under "business records" exception). Indeed, Fed.R.Evid. 803(6) specifically mentions "data compilation[s]," which includes electronically-stored audiovisual recordings. The purpose of the deposition sought by plaintiffs is to establish that the documentary (and the outtakes) are admissible under Rule 803(6).

True, because the audiovisual recordings sought here record the statements of persons unaffiliated with BBC – i.e. Abu Rumaileh and Zubaidi – it is not enough for plaintiffs to show that the recordings are business records. In order for the recordings to be admissible to prove the truth of the statements made by Abu Rumaileh and Zubaidi, under Rule 805 ("hearsay within hearsay") plaintiffs must also show that the statements themselves are not hearsay or meet one of the exceptions to hearsay. *See e.g. Rhead v. Mundy*, 2005 WL 5994165 at *11-13 (S.D.Cal. 2005) (admitting recording of 911 call since it was both a business record and an "excited utterance" under Rule 803(2)). There are several ways in which plaintiffs can make this showing:

First, defendants have admitted that during the relevant period Abu Rumaileh was (in addition to his position in Fatah) an official of defendant PLO. *See* Exhibit H. Thus, his statement constitutes an admission by party-opponent under Rule 801(d)(2) and is not hearsay.

Additionally or alternatively, Rule 804(b)(3) provides in relevant part that a statement made by a person who is "unavailable" is admissible if it is a "statement which was … so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability … that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." Rule 804(b)(3). A declarant is "unavailable" if the proponent of the statement "has been unable to procure the declarant's attendance (or in the case of a hearsay exception under subdivision (b)(2), (3), or (4), the declarant's attendance or testimony) by process or other reasonable means." Rule 804(a)(5).

Thus, in order for Abu Rumaileh's and Zubaidi's statements to be admissible under Rule 804(b)(3), plaintiffs need to show (i) that Abu Rumaileh and Zubaidi are "unavailable" (ii) that the statements were against Abu Rumaileh's and Zubaidi's own interests. Both of these conditions can be easily demonstrated here:

Abu Rumaileh and Zubaidi reside in Jenin in the West Bank and are thus beyond the subpoena power of the U.S. courts. It is well established that in such circumstances, a witness is considered "unavailable" within the meaning of Rule 804(a)(5), and the proponent of the statement is not required to make any efforts to secure the testimony. *See e.g. U.S. v. Kehm*, 799 F.2d 354, 360-361 (7th Cir. 1986) ("Futility excuses a request" and Rule 804(a)(5) therefore does not require the proponent of the statement "to butt his head against a wall just to see how much it hurts ... a request in this case was exceptionally unlikely to make [the declarant] available as a witness. Rule 804 does not require pointless gestures."); *U.S. v. Terrazas-Montano*, 747 F.2d 467, 469 (8th Cir. 1984) (Because the declarants were located outside of the U.S. "[t]hey were undoubtedly beyond the reach of process … We think it evident that the witnesses were unavailable … To require the government to show that it was unable to procure the attendance of the witnesses under Rule 804(a)(5) of the Federal Rules of Evidence would compel a useless act."); *McIntyre v. Reynolds Metals Co.*, 468 F.2d 1092, 1093 n. 2 (5th Cir. 1972) (witness declared unavailable because he "was beyond the subpoena power of the District Court … and refused to appear voluntarily to testify."); *U.S. v. Lopez*, 777 F.2d 543, 554 (10th Cir. 1985) ("The Government argues that defendant Lopez could not satisfy Rule 804(a)(5) because he failed to show that he attempted to procure Jaramillo's attendance by process or other reasonable means. The law does not require the doing of a useless thing … Jaramillo failed to appear at trial and was subsequently indicted for bail jumping … Under these circumstances, resort to process cannot be effective [therefore] Jaramillo was unavailable under Rule 804(a)(5).").[6]

---

[6] There is no chance that Abu Rumaileh and Zubaidi would voluntarily agree to testify in this case, which is brought mainly by Jews, many of whom live in Israel, against the PA and the PLO. *See* Declaration of Professor Barry Rubin, Exhibit I ("Rubin Decl."), at ¶¶ 10-14. Nor is there any mechanism by which Abu Rumaileh and Zubaidi could be compelled to appear for a deposition. Jenin is under the
*(continued...)*

Nor is there any doubt that Abu Rumaileh's and Zubaidi's statements were strongly contrary to their interests: Abu Rumaileh admitted that Al Aqsa and Fatah are the same entity. Exhibit G at 18-19. This statement is extremely harmful to Abu Rumaileh's interests because Al Aqsa has been designated by the United States as a "Foreign Terrorist Organization." *See* 67 F.R. 14761, March 27, 2002. Thus, by admitting that Fatah and Al Aqsa are the same entity, Abu Rumaileh – who is a Fatah leader – thereby effectively admitted that he is a leader of a designated Foreign Terrorist Organization, with all the legal consequences attached thereto. *See* 31 CFR § 597.301(a)(2). Moreover, that admission is likely to render Abu Rumaileh criminally and/or civilly liable for terrorist attacks carried out in the name of Al Aqsa.

Likewise, Zubaidi spoke in support of suicide bombings against Israeli civilians and stated that the Al Aqsa – of which he is a leader – would continue with such attacks until Arafat ordered a halt. Exhibit G at 37-38. Clearly, these statements can render Zubaidi criminally and/or civilly liable for such attacks.

Abu Rumaileh's and Zubaidi's statements are thus admissible per Rule 804(b)(3).

Finally, Abu Rumaileh's and Zubaidi's statements are admissible under Rule 807. It cannot be seriously argued that these videotaped statements were not made or that Abu Rumaileh or Zubaidi had any reason to speak falsely, and the statements therefore have circumstantial

---

jurisdiction of PA. The PA (which is not a state) is not a party to the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters or any other convention pursuant to which a U.S. court could request that the PA compel the appearance of Abu Rumaileh and Zubaidi. Issuing a free-standing letter rogatory to the PA requesting that PA authorities compel Abu Rumaileh and Zubaidi to appear for depositions would also be a vain exercise. Even assuming *arguendo* that internal PA law permits the PA to compel the appearance of a PA resident for a deposition (an assumption that plaintiffs have no reason to believe is true) the PA would obviously have full discretion to decline such a request. There is no chance whatsoever that the PA would agree to carry out such a request. *See* Rubin Decl. at ¶¶ 17-18.

guarantees of trustworthiness equivalent to other hearsay exception. Likewise, for the reasons discussed above, the statements are offered as evidence of a material fact (that Fatah and Al Aqsa are the same) and are more probative on this issue than any other evidence which plaintiffs can reasonably procure. Finally, the general purposes of the Rules of Evidence and the interests of justice would be well served by admission of the statements into evidence. *See Weiss*, 242 F.R.D. at 50 (ATA suits "vindicate the national and international public interest.").

For all the reasons above BBC should be ordered to produce the documentary.

C. **The Records-Keeper Deposition Should Be Ordered**

As explained above, plaintiffs' subpoena seeks a records-keeper deposition of a BBC employee to establish the authenticity and admissibility of the documentary (and the outtakes). BBC seeks to quash this prong of the subpoena on the grounds that it has no employees in New York with the requisite knowledge, and requiring it to produce a U.K.-based witness for a deposition in New York would violate Rule 45's 100-mile limit. DE 148 at 8-12. The Court can and respectfully should reject BBC's position for several reasons:

*First*, BBC's entire 100-mile argument is premised on the notion that the "witness" here is not BBC itself but rather its corporate designee. But that notion has no support in precedent. The case on which BBC purports to rely, *Price Waterhouse LLP v. First American Corp.*, 182 F.R.D. 56 (S.D.N.Y. 1998), expressly <u>declined</u> to rule on this issue because the subpoena recipient was a partnership with no presence of its own in New York. *Id*. at 62 ("Whether the 'person' for purposes of Rules 45 and 30(b)(6) is the entity, PW–UK, or the actual witnesses, knowledgeable partners, or employees or PW–UK, 'the place' where PW–UK and its partners and employees "reside," are "employed," or "regularly transact[ ] business in person" is not New York … PW–UK, admittedly does not transact business "in person" but through an agent …

14

PW–UK is not a corporation but a partnership. Unlike a corporation, a partnership has no separate existence or identity of its own.").

Here, by contrast, BBC is a <u>corporation</u> with its <u>own</u> offices in New York. Thus, the rationale employed in *Price Waterhouse* is inapplicable, and granting BBC's motion to quash the deposition would require this Court to first hold that the "witness" is not BBC but its designee. *See Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 218 F.R.D. 423, 424 (D.Del. 2003) (noting that *Price Waterhouse* left this issue unresolved in respect to corporations with a local presence and declining to resolve it). There is no basis for such a holding; moreover adopting such a holding would create the absurd result that corporations are considered a "witness" for purposes of a document subpoena but not for purposes of a deposition subpoena.

*Second*, BBC's argument is also based on the mistaken assumption that a corporation which receives a deposition subpoena need only produce whatever knowledgeable Rule 30(b)(6) designee-witnesses it <u>happens to have available</u>. But nothing could be further from the truth: it is well established that a corporation is obligated to "create" a Rule 30(b)(6) witness if necessary:

> The fact that an organization no longer has a person with knowledge on the designated topics does not relieve the organization of the duty to prepare a Rule 30(b)(6) designee … it is not uncommon to find that a corporation no longer employs individuals who have memory of distant events, or to find that individuals with knowledge are deceased. These problems do not relieve a corporation from preparing its Rule 30(b)(6) designee to the extent matters are reasonably available, whether from documents, past employees, or other sources. A party producing a Rule 30(b)(6) witness must prepare deponents by having them review prior fact witness deposition testimony as well as documents and deposition exhibits.

*Great American Ins. Co. of New York v. Vegas Construction Company*, 251 F.R.D. 534, 539 (D.Nev. 2008) (citations and quotation marks omitted). *See also e.g. Coryn Group II, LLC v.*

15

*O.C. Seacrets, Inc.*, 265 F.R.D. 235, 238 (D.Md. 2010) ("[T]he corporation is expected to *create* a witness or witnesses with responsive knowledge, and in doing so must make a good faith effort to find out the relevant facts – to collect information, review documents, and interview employees with personal knowledge.") (quotation marks omitted); *Ecclesiastes 9:10-11-12, Inc. v. LMC Holding Co.*, 497 F.3d 1135, 1146 -1147 (10th Cir. 2007) ("[T]he view that the duty to educate a person with no prior knowledge is 'prejudicial' to a corporation has not prevailed, and it appears now to be recognized that the Rule 30(b)(6) deponent must be woodshedded with information that was never known to the witness prior to deposition preparation."); *Function Media, L.L.C. v. Google, Inc.*, 2010 WL 276093 at *3 (E.D.Tex. 2010) (noting the "obligation <u>to educate a witness</u> on the noticed 30(b)(6) topic.") (emphasis added).

In light of the above it makes no sense to argue, as BBC does, that because it happens to have no knowledge designee in its New York office it is excused from complying with the subpoena. As the cases above (and scores of other cases) show, BBC has an obligation to educate, prepare and if necessary "create" a knowledgeable witness, and since it objects to producing a London-based employee in New York then it must designate, and educate, prepare and "create" such a witness, from among its employees in New York.

Effectively, BBC is arguing that a corporation located within 100 miles of a federal court can thwart a deposition subpoena issued to it by that court by the simple expedient of designating a witness who lives and works beyond the 100 mile limit. Plainly, this argument is baseless and should be firmly rejected.

Nor can BBC claim that it has a ready-made, knowledgeable witness in London and preparing a witness in New York would be too troublesome: BBC's own declarants concede that BBC has yet to figure out who its witness or witnesses might be. *See* DE 144 at ¶¶ 5-6.

Thus, BBC can and should be directed to prepare a witness or witnesses from its New York staff to serve as the foundational witness sought by the plaintiffs.

*Third*, in the alternative, the Court can simply modify the subpoena to require BBC to produce a witness in London. *See e.g. Matthias Jans & Assocs., Ltd. v. Dropic*, 2001 WL 1661473 at *3 (W.D.Mich. 2001) (modifying subpoena to require its recipient to appear for the deposition "at a place to be agreed upon by all counsel, no greater than 100 miles" from her residence.); *Comm-Tract Corp. v. Northern Telecom, Inc.*, 168 F.R.D. 4, 7 (D.Mass. 1996) (modifying subpoena issued and served in Massachusetts upon a non-party witness who, by the time scheduled for his appearance at trial, was to have commenced work on a three-year expatriate assignment in Hong Kong, concluding that the "just result" was to modify the subpoena to require the witness to submit to a videotape deposition in Hong Kong.). *See also In re Application for Order Quashing Deposition Subpoenas, dated July 16, 2002*, 2002 WL 1870084 at *4 (S.D.N.Y. 2002) ("Given that the rule expressly authorizes the Court to quash *or* modify the subpoena, it seems … odd to conclude that the sensible results ordered by the courts in *Matthias Jans* and *Comm-Tract* were simply unauthorized by law.").

Therefore, the deposition should be ordered.

### D. The Outtakes Should Be Produced

BBC seeks to quash the prong of the subpoena seeking the outtakes on grounds of journalistic privilege. This argument should be summarily rejected because the First Amendment does not protect the <u>overseas</u> news gathering of a <u>foreign</u> corporation such as BBC. "[N]o court has held – at least no decision has been cited to this Court and the Court has found none – that a United States tribunal is compelled by the First Amendment to protect an alien's desire to speak in a foreign country." *Laker Airways Ltd. v. Pan American World Airways, Inc.*, 604 F.Supp.

280, 287 (D.D.C. 1984). BBC's attempt to take shelter in the New York state constitution fails for the same reason, and its attempt to rely on New York's Shield Law should be rejected both because this is a federal question case and because BBC's overseas newsgathering does not fall within the scope of the New York statute.

Thus, all of BBC's privilege claims should be rejected summarily.

Alternatively, BBC's privilege arguments should be rejected on the merits, for the reasons set forth in *Saperstein*. Indeed, BBC's privilege arguments are barred by collateral estoppel on the basis of *Saperstein*.

WHEREFORE, BBC's motion should be denied and plaintiff's motion granted.

Plaintiffs, by their Attorney,

/s/ Robert J. Tolchin
Robert J. Tolchin
111 Livingston Street, Suite 1928
Brooklyn, New York 11201
(718) 855-3627
Fax: (718) 504-4943
rjt.berkman@gmail.com