UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
MARK I. SOKOLOW et al.,

                                                         04-CV-00397 (GBD)(RE)

                     Plaintiffs,

             -against-                        **ECF Case**

THE PALESTINIAN LIBERATION ORGANIZATION
et al.,

                    Defendants.
------------------------------------------------------------------------x

## **DECLARATION OF JEAN-FRANCOIS JULLIARD**

JEAN-FRANCOIS JULLIARD declares, pursuant to 28 U.S.C. §1746 as follows:

    1.    I am the Secretary General to Reporters Without Borders. I submit this declaration in support of the British Broadcasting Corporation ("BBC"), which has moved to quash a subpoena seeking outtakes and testimony relating to its conflict reporting in the Middle East, filed in the above referenced action.

    2.    Reporters Without Borders ("RWB") is a French-based press organization present in all five continents through its national branches (in Austria, Belgium, Canada, France, Germany, Italy, Spain, Sweden and Switzerland), its offices in London, New York and Washington, and the more than 150 correspondents it has all over the world. The organization also works closely with local and regional press freedom groups that are members of the Reporters Without Borders Network, in Afghanistan, Bangladesh, Belarus, Burma, Democratic Congo, Eritrea, Kazakhstan, Honduras, Iraq, Mexico, Pakistan, Peru, Romania, Russia, Somalia, the United States, Zimbabwe, Lebanon and Tunisia. Founded in 1985, Reporters Without Borders defends jailed journalists, provides practical help for journalists and news outlets working in difficult conditions, offers safety resources for war

reporters (insurance, loan of vests and helmet, handbooks …) and fights for press freedom throughout the world.

3. Protecting journalists working in dangerous situation is one of its main goals. For instance in 2006, RWB collaborated with the French Foreign Ministry to get the United Nations Security Counsel Resolution 1738 adopted. This Resolution is a reminder to all states of their obligation under international law. Point 9 of the text stresses the necessity for "all parties involved in situations of armed conflict to respect the professional independence and rights of journalists, media professional and associated personel".  (A copy of Resolution 1738 is available at http://www.un.org/News/Press/docs/2006/sc8929.doc.htm (last visited November 14, 2011)).

4. We were informed that the Plaintiffs in this litigation have subpoenaed the BBC for unpublished footage from and testimony relating to its 2003 documentary "Arafat Investigated." We understand that the documentary covers aspects of the Palestinian-Israeli conflict from around that period of time. We believe how the Court applies the journalist privilege to the war-zone coverage by the BBC may set a precedent not only in this court, but also in the field. If the BBC material is compelled, it may affect the safety of war correspondents as well as their access to both confidential and non-confidential sources on the ground. The symbolic harm of making journalists appear to be an investigative arm of the Plaintiffs could easily translate into real harm elsewhere for the BBC and for other news organizations covering conflicts worldwide.

5. The media provides the public with crucial information about wars – such as competing viewpoints between conflicting parties – which may lead the public to support or oppose those conflicts.  Media coverage brings to the attention of the international community the horrors and reality of conflicts.  Moreover, war reporting exposes violations and provides essential material which, once broadcasted, are historical documents. That's why the Medellin Declaration, adopted by UNESCO in May 2007, stated that freedom of information is an important issue during conflicts. The declaration adds that "this press freedom can only be enjoyed when media professionals are free from intimidation,

2

pressure and coercion, whether from political, social, economic forces." (A copy of the Medellin declaration is available at

http://portal.unesco.org/ci/en/files/24544/11787900951declaration_engl.pdf/declaration%2Bengl.pdf (last visited November 15, 2011)).

6. However, this journalistic independence is at stake in this litigation. The benefits from such reporting are gathered under dangerous circumstances. News organizations through their people on the ground face grave and increasing dangers when covering conflict zones like the Middle East. This intensity of the violence against foreign journalists in Egypt, Libya and Syria this year served as a reminder that media can become targets when they are covering unrest. Journalists in conflict zones face harassment, threats, restrictions on their movement, imprisonment and even death by parties seeking to limit independent coverage of sensitive issues. Indeed, we understand that the United Nations High Commissioner on Human Rights, Navi Pillay, has repeatedly voiced her concern regarding the escalating trend of violence against journalists worldwide, particularly in the Middle East. See Office of the High Commissioner of Human Rights, "Journalism - one of the world's most dangerous professions," (October 5, 2011). https://www.ohchr.org. (last visited November 15, 2011)

7. Litigants that pursue the unpublished materials of news organizations covering conflicts, however sympathetic their personal situation, fail to consider the unique physical hazards these news people face on the ground. Few journalists must travel to work wearing bulletproof vests within armored vehicles, as they do. And unlike most journalists, war correspondents must sometimes ward off suspicions that they are spies – suspicions that could get them killed. Litigants fail to consider that by pursing the disclosure of unpublished investigative materials and testimony of news organizations, confidential or otherwise, they make newsgathering collectively more difficult to complete and more dangerous in general.

8. At their very best, journalists are objective reporters of the news who are perceived by their sources, as neutral observers exercising control over their newsgathering materials. They are not

3

perceived as tools of private litigants, serving up their materials to courts for evidentiary purposes. If news organizations were viewed as such, their credibility and independence would be imperiled. Sources would view them with a higher level of suspicion and would be more reluctant to give them an opportunity to interview, observe or report safely from conflict-torn regions. The perceived utility of journalists to a source looking to influence the court of public opinion would invariably be offset by the harm journalists could be perceived to bring to that source in a court of law. In 2002, the press freedom decision before the Hague, <u>Prosecutor v. Brdjanin</u>, gave Reporters Without Borders the opportunity to recall these principles. We submitted with 33 other journalistic organizations an amicus curiae in support of war correspondent Jonathan Randal's appeal over a decision compelling his testimony before the tribunal. We wrote a letter of protest to the Tribunal's Chief Prosecutor explaining that: "If journalists working in war zones are now to be seen as aides to international courts, the already very dangerous job of war correspondent will soon become impossible (…) Reporters give evidence about world events, but in real time and for the benefit of international public opinion."

9. It should be further noted that the harm to a media company under compulsory process for their conflict reporting, even for non-confidential information, would not be limited to a particular time or place. That company and its news people would face distrust from sources in a region long after a conflict has ended and security returned, such as in the West Bank. Meanwhile, the taint of distrust would follow that media company wherever its men and women reported in world.

10. Litigants and courts must also understand that the symbolic and real harm that would befall one media company from compulsion for its conflict reporting would not be isolated to that company. When a journalist is compelled to testify or produce unpublished material, he or she appears to the outside world as an advocate to the subpoenaing party in a case. That appearance, which could be projected throughout the world through 24-hour satellite television, would have the effect of undermining the credibility of other journalists that strive to remain independent. As a result,

knowledgeable sources in conflict zones who would otherwise talk to journalists or grant them safe passage back to their bureaus, may choose not to do so.

11. There is a strong public interest in the objectivity of the press and a free flow of information to the public. Courts have recognized a lurking and subtle threat to journalists if disclosure of outtakes, notes, and other unused information, even if non-confidential, was compelled. This threat should become only more apparent in the context of war reporting when news companies are putting their men and women directly in harm's way.

12. For all these reasons, and on behalf of journalists enduring great costs to bring to the public stories from conflict zones, we request that the Court strike the right balance in its applying the journalist privilege to this case by granting the BBC's motion to quash Plaintiffs' subpoena.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Paris, France on November 15, 2011

Jean-Francois Julliard