1                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK
2

3    ------------------------------------------X
                                              :
4    SOKOLOW, et al,                          : 04-CV-397
                                              :
5                        Plaintiffs,          : November 17, 2011
                                              :
6               v.                            : 500 Pearl Street
                                              : New York, New York
7    PALESTINE LIBERATION ORGANIZATION, et al, :
                                              :
8                        Defendants.          :
     ------------------------------------------X
9

10           TRANSCRIPT OF CIVIL CAUSE FOR CONFERENCE
                BEFORE THE HONORABLE RONALD L. ELLIS
11                 UNITED STATES MAGISTRATE JUDGE

12
     APPEARANCES:
13

14   For the Plaintiff:          ROBERT J. TOLCHIN, ESQ.
                                 AARON SOLOMON, ESQ.
15                               Berkman Law Office
                                 111 Livingston Street
16                               Brooklyn, NY 11201

17
     For the Defendants:         BRIAN A. HILL, ESQ.
18                               Miller & Chevalier, Chtd.
                                 655 15th Street, North West #900
19                               Washington, DC 20005

20

21
     Court Transcriber:          MARY GRECO
22                               TypeWrite Word Processing Service
                                 211 N. Milton Road
23                               Saratoga Springs, NY 12866

24

25


     Proceedings recorded by electronic sound recording,
     transcript produced by transcription service

2

```
 1              THE CLERK:  In the matter of Sokolow, et al v.

 2   Palestine Liberation Organization, et al.  Will counsel, please

 3   identify yourselves for the record?

 4              MR. TOLCHIN:  Good morning, Your Honor.  Robert

 5   Tolchin for the plaintiffs.  With me is Aaron Solomon, my

 6   associate.

 7              THE COURT:  Good morning.

 8              MR. SOLOMON:  Good morning, Your Honor.

 9              MR. HILL:  Good morning, Your Honor.  Brian Hill for

10   the defendants.

11              THE COURT:  Good morning.  Okay.  My first comment is

12   that I'm never quite sure how much you're agreeing and not

13   disagreeing.  And also while I appreciate any advance notice,

14   it's probably not very helpful to get stuff the day before

15   because we're trying to figure out what it is that we're going

16   to be doing and what disputes the parties have.  So right now

17   I'm not exactly sure what you agree on and disagree on, so

18   who's going to tell me and assuage my fears that this case may

19   live on beyond my tenure on the bench?

20              MR. TOLCHIN:  Point of information, Judge, when is

21   that?

22              THE COURT:  What?

23              MR. TOLCHIN:  When is that?

24              THE COURT:  I'm not sure that's the answer I was

25   looking for.  I do have five more years.
```

1          MR. TOLCHIN:  Well Judge, I just appeared two days

2     ago in front of Judge Jack Weinstein and he's been on the bench

3     there since before I was born.  There's plenty of future.

4          THE COURT:  Well, magistrate judges don't have the

5     same life tenure as district judges.

6          MR. TOLCHIN:  That's true.

7          THE COURT:  But in any case --

8          MR. HILL:  Your Honor, I'm happy to go first since

9     they sent a letter that I assume you got yesterday or this

10    morning.

11         THE COURT:  Okay.

12         MR. TOLCHIN:  Could we talk about the first point in

13    the letter first because that's the easiest?

14         THE COURT:  Well first of all, because I've gotten

15    this, I had my deputy put you together so that you could agree

16    on what you disagreed on.  You do agree on what you disagree on

17    now; right?

18         MR. TOLCHIN:  To some extent.

19         MR. HILL:  I believe we do.  We talked through some

20    of the issues before Your Honor came on the bench, not all of

21    the ones from yesterday's letter.

22         MR. TOLCHIN:  Do you agree about the Hague request?

23         MR. HILL:  Yes, that's been coming for some time and

24    I think we consent to it with the caveat in the letter that the

25    court received that because we think one of the persons has

4

1   nothing to do with the case as near as we can tell, we don't

2   want the plaintiffs to come back later and say they want more

3   depositions because they're taking somebody that we don't think

4   is relevant which is the topic Your Honor is addressing for our

5   conferences in the case.

6           THE COURT:  Okay.  Well, my first question is the

7   letter that we just received, is that all the issues that we

8   should be addressing or what else should we be addressing?

9           MR. HILL:  No, Your Honor.  I have five things on my

10  list.  Maybe I should just enumerate them and we can go from

11  there.  The first one is the Rule 35 motion which is now fully

12  briefed.  That's a holdover from our last conference.

13          THE COURT:  Okay.  And my recollection on that is

14  that we didn't have all the information from the plaintiff

15  about where the plaintiffs were located.

16          MR. HILL:  That's correct, Your Honor.

17          THE COURT:  And now you do.

18          MR. HILL:  Yes, Your Honor.  What's happened, I don't

19  know if Your Honor has had a chance to read the briefing, we

20  filed the motion on the schedule the court set for us last

21  time.  The plaintiffs filed an opposition at the end of October

22  essentially conceding the relief sought that all of the

23  plaintiffs will come to New York City for their Rule 35

24  examinations.  We filed our reply brief to that as well, so

25  it's fully briefed now.  I think having conceded the relief

 1  that we sought the court, I'd just go ahead and memorialize

 2  that in an order.

 3          The plaintiffs have asked that conditions be attached

 4  to the order, specifically that they only come once for

 5  depositions and Rule 35 exams.  We're obviously willing to try

 6  and coordinate this as much as possible but we don't think that

 7  should be ordered because it would essentially give the

 8  plaintiffs a veto over the ability to proceed with the case in

 9  an orderly fashion and we're still waiting on a lot of material

10  from the plaintiffs about their damages.  So at this point I'm

11  uncertain as to when depositions and Rule 35 exams are going to

12  happen.

13          THE COURT:  Okay.  With respect to that, do you have

14  a disagreement?

15          MR. TOLCHIN:  There's a lot in there.  We agree about

16  coming to New York, we agree about that we would like them to

17  only have to make one international flight for their deposition

18  and examination.  There are a few plaintiffs who it's not as

19  big an issue for because they're much more local.  It's one

20  thing to fly in from Israel, it's another thing to come in from

21  New Jersey.  I would not stick to the you only have to make one

22  trip obviously for people who are more local.

23          As to the damages information, we provided the

24  defendants with medical records that we had but those were

25  gathered several years ago.  Aaron here has been methodically

6

1    attempting to communicate with each and every plaintiff which

2    is easier said than done because quite a few of the plaintiffs

3    have emotional difficulty dealing with this case because of the

4    nature of the case.  But we have pared down claims removing,

5    you know, we've advised the defendant we've removed, for

6    example, people who decided that, for example, lost wages

7    claims are not worth pursuing for whatever reason.  We are

8    gathering information about what additional medical providers

9    there may be that we didn't know about that we didn't have

10   records from what was gathered several years ago.  We are well

11   in the process of obtaining from each of the plaintiffs medical

12   record authorizations so that we could obtain those additional

13   documents and we will be providing the defendant with

14   authorizations so that they could obtain them as well whether

15   by subpoena or just by request.  That process is well under

16   way.

17           So it depends on doctors' offices.  I can't tell you

18   we will have all the documents by X date because really it's

19   documents from doctors' offices, but they do deal with --

20   doctors' offices do field requests for medical records all the

21   time and it's not going to go on forever.

22           THE COURT:  Okay.  I'm not sure which point you were

23   addressing there to tell you the truth.  He was talking about

24   the Rule 35 and the deposition.  The damages information,

25   you're talking about that as a prelude to the deposition?

7

1          MR. TOLCHIN:  Well, I'm sure that with the usual

2    thought process from the defendant's perspective is that their

3    doctor doesn't want to examine a plaintiff until he's had an

4    opportunity to see the medical records.  Frequently, the

5    defendants will also say that they want to take the plaintiff's

6    deposition to clarify what exactly the plaintiff is complaining

7    about before they have their doctors exams.  Usually it's the

8    records are produced followed by the deposition followed by the

9    medical exam.

10          THE COURT:  I think that was my question.  Your

11    response to his statement about trying to coordinate the

12    depositions and the Rule 35s is that you're busily trying to

13    gather the information that he'll need to do an adequate

14    deposition.

15          MR. TOLCHIN:  Yes.

16          THE COURT:  Okay.  I didn't know he had questioned

17    whether or not you were doing that.

18          MR. HILL:  Right.  I didn't mean to, Your Honor.  The

19    only issue I think that's left on the Rule 35 motion is whether

20    the motion will be granted and just require them to come here

21    for Rule 35 exams or whether it will be attached to a condition

22    that we schedule these so they occur contemporaneously with the

23    depositions or at certain times that the plaintiffs have

24    requested.  I would just ask that the motion be granted that

25    they come here.  It's essentially been conceded.  We'll work

8

1  out the other issues on an individual basis if we need to.  We

2  can always come back to Your Honor if we can't agree.

3          THE COURT:  That's what I understood you to say.  And

4  if you don't -- whether you [unintelligible] and whether or not

5  you have a proposed order since it appears that that issue is

6  conceded the order will require that the plaintiffs appear here

7  for the Rule 35.  I agree with defendants that there's

8  currently no need to include in the order that there be only

9  one because to the extent that there are difficulties in

10  coordination, that's a separate issue and it depends on who I

11  think needs to give on that.  So certainly I would expect you

12  to try to coordinate it, but as in any case where there are

13  parties who have to travel, if the coordination presents an

14  issue, the parties can bring that to me and I can determine

15  whether or not it's compelling enough so that the deposition

16  will be held up or that we'll require them to show up.  I think

17  it's a valid point that you don't want anybody to be able to

18  veto sort of a pocket veto by saying you can't coordinate

19  things.  But by the same token, I expect you both to be

20  reasonable.  If you think that he's being unreasonable in the

21  scheduling, you can bring that up to me and I will consider

22  that in a nature of a protective order.  But right now they'll

23  come to New York and that resolves that issue.

24          MR. HILL:  Yes, Your Honor.  The next item on my

25  agenda --

9

1          THE COURT:  And as to the -- and since you've already

2  started the process of asking for the medical records, you're

3  right.  I mean in a lot of different kinds of cases with

4  medical records some doctors are cooperative, some aren't, but

5  they obviously get lots of requests.  If you got the right

6  releases it shouldn't be any issues.  So given the pace at

7  which the case is going I suspect that you'll get -- that won't

8  be the limiting factor in terms of the discovery in this case,

9  the medical records.

10          Let's move on to the next issue then.

11          MR. HILL:  Your Honor, the next --

12          MR. TOLCHIN:  Do you want me to address the Hague

13  request?  That's a quick one.

14          THE COURT:  Okay.

15          MR. TOLCHIN:  We submitted a request for letters --

16          THE COURT:  Yes.  And I have a question for you.  I

17  understand that the defendants haven't opposed it per se and

18  they just don't want you to get any undo advantage, but since

19  the Hague request is a request from the court, the court also

20  has an independent obligation don't you think to determine

21  whether or not it's appropriate to do a Hague request and that

22  you have the burden of demonstrating to me that it's

23  appropriate under the circumstances to go to what is an

24  extraordinary proceeding frankly.

25          MR. TOLCHIN:  Yes.

10

1          THE COURT:  And do you think you've made that with

2     respect to [inaudible]?

3          MR. TOLCHIN:  I don't have a copy of the cover letter

4     with me but I believe so.  We have -- the individuals in

5     question are individuals who are in prison in Israel in

6     connection with attacks that are at issue in this case.  They

7     were previously arrested by the defendants themselves and were

8     turned over to -- there were arrested, they were turned over to

9     Marwan Barghouti who is also himself now in prison in Israel

10    but was a political figure in the Palestinian Authority at the

11    time.  And they then went and carried out more terrorist

12    attacks.  They definitely have information.  If they would

13    testify candidly, they have plenty of information directly

14    relevant to this case.  There's no way for us to obtain their

15    deposition other than by having -- other than a Hague request

16    asking the Israeli court to direct them to appear for

17    depositions.  I will say that the process takes some time

18    because the Hague request then has to be presented to the

19    court.  A judge in Israel has to review it.  Since these are

20    prisoners, they have to be transferred up to the court to

21    supervise the deposition.  It does take some time.  Does Your

22    Honor have any specific questions about these witnesses?

23          THE COURT:  Okay.  Was your presentation going to be

24    to ask me if I had any questions?  Because I see that's what's

25    in your letter also.  Was there anything that you wanted to

1  supplement?  But you believe you've made the showing that's

2  necessary.

3        MR. TOLCHIN:  I believe that we have.  If I failed to

4  cover something, I'd be happy to address it either verbally or

5  in a supplemental writing.  I'm just at a loss to know what I

6  might not have addressed.  I apologize.

7        THE COURT:  Let me ask you this.  One of the things

8  you mentioned today was were they to testify truthfully.  Is

9  there any reason to believe that either of them would cooperate

10  in the deposition and why would they --

11        MR. TOLCHIN:  If they are compelled to testify by a

12  judge and they have to sit in this chair and answer questions,

13  you know, I guess any hostile witness may have an inclination

14  not to testify candidly.  But one would hope that they'd

15  testify.

16        THE COURT:  Well, we have people even here who won't

17  testify in depositions in civil cases.

18        MR. TOLCHIN:  If you bring a man to a room and ask

19  him a question and he refuses to answer a question, we'll cross

20  that bridge when we come to it as to what we do with that.  You

21  know, there may arise an issue that if these people are --

22  depending on their relationship with the defendant that their

23  refusal to testify may or may not have consequences for the

24  defendant.  There may be implications that can be drawn from

25  it.  It could also be these people will testify candidly

12

1  because as sick as it seems, they're actually quite proud of

2  what they've done.  So I don't know what they'll do.

3           THE COURT:  Okay.

4           MR. HILL:  Can I respond briefly?

5           THE COURT:  Yes.

6           MR. HILL:  As far as I know, there's no connection

7  between either of these individuals and the defendant.  As I

8  understand the plaintiffs, again, this is information coming

9  from them, these are people affiliated with Hamas which is not

10  part of the PLO and is in fact a rival to the PLO and the PA.

11  So there's no reason to think their testimony or refusal would

12  implicate either of my clients.  And to go to Your Honor's

13  point about whether a showing has been made, obviously Abdullah

14  Barghouti apparently from press reports we found was convicted

15  in connection with one of the attacks.  The other individual,

16  Belal Barghouti, plaintiffs have told me they have no evidence

17  that he's connected with any of the attacks in the case.  And

18  the reason that's stated in the letter for calling him would be

19  to testify to things that his brother Abdullah did.  So that

20  appears to me to be cumulative for what that's worth as the

21  court considers whether it's justified.

22           THE COURT:  Do you dispute what he just said?  Which

23  parts of what he said do you dispute?

24           MR. TOLCHIN:  Well, both of these five individuals

25  were turned over after having committed a attack and being

13

1    taken into custody by the Palestinian authority from my

2    understanding.  These people were then turned over, released

3    from jail to the custody and responsibility of Marwan

4    Barghouti, that's a third individual with the same last name,

5    who by all accounts was an influential faction head within the

6    PA PLO.  Marwan Barghouti himself is presently in jail on I

7    think seven counts or seven life sentences or something like

8    that.  Marwan Barghouti certainly is tied to the defendants.

9    In fact, his name is constantly being put out there even though

10   he was in jail as a candidate for the presidency of the

11   defendant.  He outfitted these two individuals to carry out

12   further terrorist attacks including the bombing at the Hebrew

13   University cafeteria.  So you know --

14           THE COURT:  A specific point raised by counsel as to

15   whether or not any of the events alleged in this complaint has

16   any -- he's implicated in -- I understand you can't just say

17   he's a bad guy or he's done other stuff.  With respect to the

18   events that are at issue in this case, do you --

19           MR. TOLCHIN:  He was convicted of it.

20           THE COURT:  He was convicted of...?

21           MR. TOLCHIN:  Carrying out one of the attacks that's

22   at issue in this case.  He couldn't be more directly relevant.

23           MR. HILL:  Well, there's two people.

24           THE COURT:  Yes.

25           MR. HILL:  Abdullah Barghouti, as I understand it,

14

1  was convicted.

2       THE COURT:  Was convicted.  Now we're talking about

3  Belal; right?

4       MR. TOLCHIN:  I'm talking about -- one was convicted.

5  The fact that another individual may not have personally done

6  things but he knows things but his brother did it, he is a

7  source of information.  That's a perfectly valid deposition to

8  take.  We're talking about -- I don't know what will be

9  admissible at trial but your brother --

10       THE COURT:  I'm sorry, are you suggesting --

11  forgetting for the moment the context in which this case takes

12  place, all right, are you saying that if you sued person X for

13  events that they've done, you could interview brother Y because

14  you say that he must know what brother X did?

15       MR. TOLCHIN:  Let me put it in a hypothetical.  In a

16  case against Bernie Madoff, we're taking the deposition of his

17  son who worked with him in the company but may or may not have

18  been directly involved in the scam.  Would that be a valid

19  deposition to take?

20       THE COURT:  Yes, but if he didn't work in the company

21  the question is would it be a valid deposition in the case?

22       MR. TOLCHIN:  This fellow is also in jail for

23  carrying out terrorist attacks in the same time frame.

24       THE COURT:  Okay.  Okay.  The analogy would be if you

25  had a son of Bernie Madoff who had done some other scam and you

15

1  say he was involved in some bad stuff.  Can you depose him in

2  the thing that Madoff was involved in?  The answer seems to me

3  as no.

4           MR. TOLCHIN:  No.  But in this case, it's this other

5  fine Barghouti is not in jail for running a numbers racket in

6  Gaza.  He's in jail for terrorist attacks in the same time

7  frame funded, financed and planned from the same mechanism and

8  what's directly relevant in this case is who was giving the

9  orders, who was funding it, where did you get the guns from,

10 where did you get the bombs from, who arranged the logistics,

11 who drove you to the scene of the suicide bombing, who was in

12 charge, who was issuing the orders, what was the organizational

13 structure.  These issues are all common.

14           THE COURT:  Well, they're alleged to be common.

15           MR. TOLCHIN:  Sure.  But there's certainly enough

16 there that we have a valid ground to ask the man questions.

17           THE COURT:  Well, the only comment I'll make is that

18 whenever a lawyer says certainly, I wonder because if it's so

19 certain --

20           MR. TOLCHIN:  I thought that was clearly.

21           MR. HILL:  Just so the record is clear, I'm not aware

22 of a factual basis for the representations Mr. Tolchin has made

23 about common planning or common funding and so forth.  I

24 haven't seen it.

25           THE COURT:  Well, I'll review --

16

1          MR. TOLCHIN:  Oh, come on.  There was an organized

2   intifada of day in day out attacks.  It's our theory of the

3   case that all these attacks were linked by a common --

4          THE COURT:  So that's in your --

5          MR. TOLCHIN:  -- common plan to --

6          THE COURT:  That's in your complaint, so when we

7   review it, that's what it'll say.

8          MR. TOLCHIN:  For sure.

9          THE COURT:  Okay.

10          MR. TOLCHIN:  The Palestinian Authority, the PLO and

11   Hamas too, the Palestinian establishment at that period of time

12   decided to carry out numerous rampant extensive horrifying

13   attacks on the Israeli public to achieve a political advantage

14   and terrorize the Israeli population.

15          THE COURT:  Again, adding adjectives doesn't change

16   the discovery issue.  I mean I --

17          MR. TOLCHIN:  Sure.

18          THE COURT:  Okay.  So I understand your argument and

19   I'll review -- but we'll still review this the way we do any

20   discovery and that is whether or not -- and you brought up the

21   example of Madoff or any other civil case in which you have a

22   potential witness, whether or not that witness reasonably has

23   evidence that would be or could lead to admissible evidence in

24   the case.  I've heard everything that you've said.  We'll take

25   that into account.

17

1          MR. TOLCHIN:  Thank you.

2          THE COURT:  Next issue?

3          MR. HILL:  Your Honor, the next issue I'd like to

4   raise is the one that was raised by my partner, Mark Rochon, in

5   his letter dated October 14th.  And there's a response from the

6   plaintiff which is dated October 24th, and then a letter from

7   me dated November 14th.  The issue is when discovery opened in

8   the case we served the plaintiffs, each of the seven groups of

9   plaintiffs for the seven cases involved here, with very similar

10  interrogatories which are allowed by the local rule asking them

11  to identify persons they knew or believed had knowledge of

12  particular facts alleged in the operative complaint.  We

13  received uniformed responses from the plaintiffs objecting to

14  those interrogatories and providing no responses at all.

15         The plaintiffs apparently have some responsive

16  information but to this point, notwithstanding the requirement

17  of Rule 33 that you respond to the interrogatory to the extent

18  you're not objecting to it, have provided us with no responses

19  at all.  We've conferred both by telephone and by email to try

20  and get interrogatory responses from the plaintiffs and at this

21  point they are not committed to responding to the

22  interrogatories in any fashion.  We therefore ask the court to

23  either allow me to file a motion to compel those interrogatory

24  answers or if you don't think a motion is necessary, as I tend

25  to not think, order them to do so today so we can get the

1   identity of the persons that the plaintiffs know have knowledge

2   about the attacks.

3         The prior discussion we just had about Belal

4   Barghouti points out the need for this.  I mean at this point I

5   don't have any evidence that that person was involved.  They

6   seem to think he's worth deposing.  I'd like to get the names

7   of everybody they think knows about the case and I think it's a

8   legitimate discovery request.

9         THE COURT:  Okay.  How do you say that your response

10  is in accordance with the rules?

11        MR. TOLCHIN:  This is the issue that we've had and

12  we're trying to -- it's a little more broad than this one

13  interrogatory.  It's from the department of what's sauce for

14  the goose is sauce for the gander.

15        When we serve discovery demands on the defendants,

16  and it's not our only case together, we typically get back we

17  object to your question, it's too broad, it's too broad in

18  scope, it's burdensome, et cetera, et cetera, but here are some

19  documents that we think are responsive, but we may or may not

20  have more.  We've just limited it to what we thought was

21  reasonable.  And the frustration that we have is they never

22  tell us how they're limited.  For example, if you thought it

23  was too burdensome for us to ask for all documents, so did you

24  limit it to the last five years?  Was that the criteria that

25  you used?  Did you limit it to all documents from somebody's

19

1    file?  Did you limit it to whatever you found in the first ten

2    minutes of looking?  There's no rhyme or reason.  And it's

3    frustrating for us because, you know, if they told us we only

4    looked for the last five years so we know what we're dealing

5    with and then we can make a decision should we press the point

6    to try to get, you know, from the last eight years instead of

7    the last five years.  Or if they told us they only looked from

8    somebody's file then we can decide should we ask for more.

9            We've told them as to this item, you know, you asked

10    for all people who know about this incident.  Well, all people.

11    These incidents were widely reported in the media.  Millions of

12    people know something about these incidents.

13            THE COURT:  Okay.  Well let me stop you, okay,

14    because I see right away that -- all right, I don't know what

15    your prior experience with any other judicial officer is but

16    first of all, I agree with you.  If you serve them

17    interrogatories or request production and they gave you a

18    partial and didn't indicate why it was partial, if they didn't

19    say well we think that 2010 is too broad and we've only gone to

20    2008 and you came to me, I would say you got to tell them what

21    it is so they know what it is.  I agree with you on that.

22            That does not excuse you in this case with what

23    you're saying about it being too broad.  In fact, your

24    complaint about him is you're telling me what you should have

25    done.  What you should have done is you should have responded

1   to him and told him what limitations you're making.

2          MR. TOLCHIN:  But we've told him that we -- what our

3   response was was that we'll be happy to provide a further

4   response if we can agree on a scope.

5          THE COURT:  Okay.  I don't think that's an

6   appropriate way to do it in part because well, to be honest

7   with you, I'm not sure how long it would take you two to agree

8   on anything.  When I say you two, you two sides.  So I don't

9   think that's an appropriate way to do it.  If you want to limit

10  it and he doesn't think the limit is appropriate, put the

11  burden on him.  That's the appropriate way to do it.  And

12  talking about --

13         MR. TOLCHIN:  I respect that, Your Honor.  If we can

14  have a ground rule --

15         THE COURT:  Let me just say -- okay.  Getting back to

16  your analogy, let's use the Bernie Madoff case.  Okay?  If he

17  asks you everybody that knew something about the fraud and you

18  said well it was widely publicized and therefore well everybody

19  knows about it, well that's true.  And I wouldn't expect you to

20  answer everybody that you didn't know about because there's no

21  way for you to know it.  But the rule does require you to give

22  things that are in your knowledge.  And so you don't need to

23  know everybody that read an article about Madoff.  You don't

24  need to know everybody that read an article about the PLO or

25  Hamas.  But if there's something within the purview of you and

21

1   your side, you should give him that and you tell him that

2   that's what you're limiting it to.  Since you framed the issue

3   so perfectly, I don't understand why you're making an argument

4   here.

5              MR. TOLCHIN:  I'll tell you this.  The ground rule

6   that I would like to see for this case --

7              THE COURT:  I understand what you --

8              MR. TOLCHIN:  -- and I'll live with is that whoever

9   responds to -- I'll be happy to supplement a response and I'll

10  put in the response this is the scope we're limiting it to.

11  But I'd like that to be the rule for everybody in this case.

12  You want to limit the scope, you're only giving me the last

13  five years for example, tell me that.  Don't just say I object,

14  here's two pages of objections, and here's a stack of documents

15  without telling me what criteria were used to select this stack

16  of documents that you're giving me.

17             THE COURT:  And you're saying they did that in this

18  case?

19             MR. TOLCHIN:  It's done in response to every demand.

20             THE COURT:  They did that in this case?

21             MR. TOLCHIN:  Yes.

22             THE COURT:  And what did you do?  Did you come to me

23  and say I don't understand what they're doing?.

24             MR. TOLCHIN:  Indirectly I'm raising it now because I

25  want this to be the ground rule.

22

1          THE COURT:  Look, it's really not a question of what
2   you want the ground rule to be.  It is appropriate that if
3   somebody asks you something in discovery that you answer the
4   question according to the rules.  If you're going to answer it
5   in any way that's limiting, it's appropriate that you indicate
6   what limits you're making on it.  And if they didn't do that,
7   you should have brought it to my attention.  And if you have an
8   example of them doing that, you could still bring it to my
9   attention.
10          MR. TOLCHIN:  Okay.
11          THE COURT:  But that doesn't mean that you -- if you
12   think they were stonewalling, the appropriate response is not
13   that you stonewall.
14          MR. TOLCHIN:  No, we told them, we offered to meet
15   and confer to talk about what would be an agreed upon scope.
16   But I agree with Your Honor that the likelihood we'll ever come
17   to an agreement about the scope is slim going forward.  I will
18   first serve a supplemental answer and I will say that we are
19   limiting the response along X, Y, Z criteria.
20          THE COURT:  Okay.  But understand there are really
21   two different kinds of issues here.  One is obviously written
22   in every request to a party is that you're only asking about
23   within the party's knowledge and control.  I mean so that's
24   different from the scope that you're talking about which is
25   you're not only limited to think in your possession, control

23

1    and knowledge, but you're also limiting either temporally or

2    with respect to some kind of an issue.  So there are two

3    different kinds of issues of limitation.

4            Now, the issue you started to raise about so many

5    people knowing about it is a broader issue and it seems to me a

6    simple issue.  You should never interpret any request to

7    include anything other than within your own personal knowledge

8    and scope.

9            MR. TOLCHIN:  But you know, take a person who is

10   injured in a terrorist attack.  There were police officers

11   involved, there were doctors involved, there were family

12   members who know about it.  The circles that you could draw

13   around the question, there's many layers.

14           THE COURT:  And they are totally irrelevant.  You

15   could only answer the question with respect to what's in your

16   own personal knowledge and control.  I mean, you know, if he

17   asked you for all documents relevant to the issue, you can't

18   produce documents that the New York Police Department has.

19   They're not in your custody and control.  You cannot interpret

20   discovery that way.  And I don't see how that's even equivalent

21   to the question of somebody saying we're going to limit the

22   temporal scope.  Any question asked of a party is only asked of

23   the party.  And if you don't know what -- there's no way that

24   you could interpret that to mean that you have to know

25   everybody on earth that knows about this.  That's just -- that

24

1  interpretation to me is just, it has no relevance within the

2  rules of civil procedure.  And I don't see how you could

3  interpret -- and if you gave everything that was in your

4  custody, control and knowledge, he would have no leg to stand

5  on in complaining about it.

6          This is very simple and you just have to interpret it

7  that way.  I mean no matter what -- and I don't care if he says

8  every document.  Implicit in that, every document that you know

9  about.  If he says every person, it's every person you know

10  about.  When your initial disclosures, when I say give the

11  names of witnesses, you can only give the witnesses you know

12  about.

13          MR. HILL:  I don't know if Your Honor wants to hear

14  further from me.  We've submitted the interrogatories to Your

15  Honor.  They in fact expressly say identify all persons who you

16  know have knowledge or who you believe may have knowledge.  You

17  is a defined term as the group of plaintiffs that it's served

18  to.  So it's expressed that we're not seeking information

19  beyond what the plaintiffs have.

20          THE COURT:  I see no basis for you not to answer that

21  question.

22          MR. TOLCHIN:  I told Your Honor we will answer it.

23  We will define whatever limitations we feel are necessary to

24  place in answering it.  And the only thing that I'm asking is

25  that it be reciprocal going forward.  Any discovery response

25

1  that's limited in scope in any way less than what the question

2  asks for, they should spell out what criteria we use to limit

3  it.  I'll abide by it.  I'd like them to abide by it.

4       THE COURT:  Okay.  The only reason I'm hesitant is I

5  don't do the quid pro quo.  I only answer the question that's

6  been presented to me.  And it's not my practice to be held

7  hostage by the notion that, you know, somebody didn't, for

8  example --

9       MR. TOLCHIN:  This was raised, Your Honor, in my

10 letter of October 24th.

11      THE COURT:  What was raised?  That they had not --

12      MR. TOLCHIN:  The issue about the scope of requests

13 and the problem of parties unilaterally deciding how to limit

14 the scope.

15      THE COURT:  But what was raised?  Tell me what you

16 said.

17      MR. TOLCHIN:  I said it's far more efficient if

18 production is made pursuant to a specifically defined scope for

19 these requests that is agreed upon in advance by the parties

20 rather than the plaintiffs unilaterally deciding what scope

21 they believe is proper and then having the defendants challenge

22 the scope of production.  As a result of discussing it and

23 hearing Your Honor's rulings, I've evolved from that position

24 to saying that rather than discussing each scope in advance

25 which would require us to reach agreement, we should -- what

26

1  Your Honor has observed probably would not be fruitful and said

2  fine, let each side decide on their scope but say what scope

3  they're applying.  Then the opposite party would be in a

4  position to decide whether they can live with the definition

5  that the other side used or is it something that has to be

6  raised with the court.

7          THE COURT:  Well first of all, I don't think that

8  statement that you read put me on notice that this was the

9  issue.  But secondly, as to your request that whatever rule be

10  applicable to both sides, I don't think there's a need to say

11  it's applicable to both sides in part because that's the way

12  it's supposed to be.  I mean if you get asked some questions,

13  you answer the questions.  If you don't think that he's fully

14  answered the questions, then you bring it to me.  This is not

15  where I'd say well, if you don't fully answer the questions, I

16  don't expect people not to be fully answering questions.  So

17  I'm not going to have a rule that says if you don't fully

18  answer questions, tell me what the limitation is.  My first

19  response is I expect people to fully answer the questions.  If

20  you meet and confer and he says I don't intend to do anything

21  beyond a certain year, beyond a certain geographic scope, then

22  you'll be put on notice and you'll send me a missive and I'll

23  say okay, we need to talk about this.  But as to the first

24  thing, the first rule isn't going to be if you're going to

25  limit it, tell the person what you're limiting to.  The first

27

1    rule is you answer the interrogatory request productions fully

2    according to the rules.

3            MR. TOLCHIN:  The question, Your Honor, is if I

4    happen to serve a demand saying list all the people who have

5    ever been employed by the PA and they serve a response saying

6    that's over-broad and unduly burdensome and seeks material not

7    relevant to this case and all the boilerplate objections and

8    then they say subject to and without waiving this objection we

9    produce the following 25 pieces of paper.  Now, how do I know

10   are they giving me everything?  Because they said they're

11   claiming that the question was over-broad and burdensome.  Are

12   they giving me everything?  Are they giving me the last two

13   years?  Are they giving me whatever was in the computer and

14   they didn't look through paper files?  Are they giving me

15   whatever they happen to have?  Are they giving me whatever was

16   in Mr. Fiad's [Ph.] office but they didn't look in somebody

17   else's office?  I don't know.  They're telling me it's too

18   burdensome.  They're telling me the scope is too far.  But if

19   they're giving me everything then they don't have to say

20   anything.  But if they're limiting it in some way, if they're

21   unilaterally saying well I'm only giving you the last five

22   years because I think that's reasonable, they should just tell

23   me that's what they did.

24           THE COURT:  And you're right, they should.

25           MR. TOLCHIN:  Okay.  Then we're done.  Then we're in

1  agreement.

2          THE COURT:  Well, I just answered the one question

3  that you asked.  I asked you whether or not we're in agreement.

4  I'm not sure --

5          MR. HILL:  All I would ask is that the court not

6  order me to do something in a vacuum.  I've been working in

7  good faith with mr. Tolchin to respond to his requests, a

8  number of which have many objections.

9          THE COURT:  All I'm saying is --

10         MR. HILL:  We'll deal with them in the context that

11 we need to.

12         THE COURT:  Counsel, the specific question I was

13 asked, the specific hypothetical I said hey, that sounds right.

14 You know, you shouldn't just guess.  But if you got that

15 specific response in that situation, I would expect that you'd

16 call him and say I don't understand what you're doing.

17         MR. TOLCHIN:  See what I'm trying to avoid by this is

18 I'd hate to come to Your Honor with a letter motion saying

19 here's this interrogatory and this is what I asked and this is

20 the response I got, and I don't know how they're limiting it.

21         THE COURT:  No, no, what's supposed to happen is if

22 he gives you an interrogatory answer that you think is

23 confusing, inappropriate, unclear, whatever, you call them up

24 and say okay, I don't quite understand why this is so and I

25 just want to make sure before I call the court and make an

1    issue of it.  And either he answers you or he doesn't.  If he

2    doesn't answer you, you can come to me.  That's why they pay me

3    the big bucks.

4              MR. TOLCHIN:  The problem we get into there is that

5    there's so many.  You could make a career out of that because

6    every interrogatory in this case is really seven

7    interrogatories because there's seven cases.  And these meet

8    and confer sessions turn into hours long marathons that reach

9    no conclusion because everybody has to look into it and agree

10   to get back.  It takes --

11             THE COURT:  Well, okay --

12             MR. TOLCHIN:  To get to a straight answer --

13             THE COURT:  Counsel, you understand that now you're

14   telling me something which doesn't seem to be consistent with

15   the hypothetical you had.  The hypothetical you had is you get

16   an answer to an interrogatory and it says it's over-broad,

17   notwithstanding that, here's an answer.  If that takes hours to

18   respond to, I'm not sure why.

19             MR. TOLCHIN:  To get clarity as to what was used to

20   select the information of the documents that he gave me is a

21   moving target.  I just don't understand why they shouldn't --

22   why everybody just shouldn't have to say if you limited your

23   response just say so.  Instead of saying objection, over-broad

24   and leaving me to guess what you're talking about, just tell me

25   we thought it was too big temporally and we're giving you the

30

1  last five years.

2         THE COURT:  Okay.  I'll put it to you again.  All

3  right.  What you do is you get the interrogatory, you call

4  them.  You don't have to talk to them for hours because if you

5  call me, whatever it is, if you explain it that way and if you

6  had this hypothetical and you brought that to me, I'm not sure

7  what he would say in response that would satisfy me.  But I

8  can't do it in the abstract.  The example you present seems to

9  be so straightforward I don't know why it would cause any long

10 delay if it's -- I don't even know why it would be a moving

11 target.

12        MR. HILL:  I don't know if Your Honor wants me to

13 address the hypothetical.  I don't think we need to.

14        THE COURT:  No.  I mean look, you answer the question

15 and you produce the documents.  If somebody doesn't do it

16 fully, then that's what I'm here for.  I don't know what

17 particular problems you're having or why it takes hours to

18 resolve this but I don't seem to have any difficulty

19 understanding what the problem is and I will tell you if you

20 presented that to me, I would tell them to tell you that or

21 face the consequences.

22        MR. TOLCHIN:  Okay.  We'll --

23        THE COURT:  And if he did that more than once, then

24 he'd face the consequences.

25        MR. TOLCHIN:  We'll address it as it arises and

1  perhaps --

2          THE COURT:  But I do expect that you will, again, I

3  expect you to answer the questions fully.  I mean nobody's

4  filed with me any request for protective orders about -- nobody

5  said, you know, these questions should be stricken because

6  they're over-broad or relevant or whatever.  But you know, you

7  file what you have.  The other side responds to it fully.  If

8  the other side limits it, you've got your right to call and say

9  what do you mean you're limiting it?  Why are you limiting it,

10  how are you limiting it?  And if they won't give you a straight

11  answer to that, then that's where I come in.  I do expect this

12  to be a fairly straightforward simple answer.

13          MR. HILL:  Your Honor, to return to the letter that

14  is at issue currently, I understand the plaintiffs to say they

15  will now answer the interrogatories.  Can Your Honor give us a

16  date by which we'll get the answers?

17          THE COURT:  Counsel?  Well, this is for both of you.

18  All right.  I understand that in the process of the parties

19  having the disagreements you'll bring them to me and then at

20  some point if you haven't reasonably agreed, I will make an

21  order.  I expect, however, that in the give and take that

22  nobody's going to come to me with this situation and then say

23  well, I don't know how long it's going to take or I don't know

24  where they are or I don't know whatever it is.  I expect --

25  part of the process of you betting each other is that when we

1  get to the point where I say okay, it's got to be done, I'm

2  going to get some real answers on what it's going to take and

3  that it's not going to take 30 days, just to let you know.

4          Now, how long do you think it will take, counsel?

5          MR. TOLCHIN:  Two weeks?

6          THE COURT:  Okay.

7          MR. TOLCHIN:  It's less than 30; right?

8          THE COURT:  All right.  But understand that I -- I

9  mean I've had people, you know, they'll argue about something

10 and then we get here and then they'll say they have to call

11 somebody to find out what it would take to produce it.  You

12 cannot, if you're going to continue to practice before me, come

13 in and have me resolve an issue that you've been arguing with

14 the other side for several weeks about and not know the answer

15 to how long it's going to take you to produce it.  First of

16 all, you cannot anticipate that I'll give you 30 days to do it.

17 And secondly, I need to know what it's going to take to do it.

18 And so I don't expect the lawyers to be doing this without

19 talking to people who know.

20         Worst case scenario is I had one case, it was a

21 government lawyer, and we were talking about producing some

22 information about prisoners.  They said oh, we think it will

23 take a month to do.  So I said I want an affidavit from the

24 person who put together the information telling me what it

25 would take to pull it together.  The next day -- it turns out

33

1  there was a folder in which they had the information and they

2  had never talked to the person who would be putting it

3  together.  Now, you don't want to be telling a judge that.

4  Okay?  That's just, you know, talk about losing credibility.

5  You need to know what it would take to do what it is that

6  you're being asked to do.  I mean I have people tell me it's

7  going to be burdensome and they don't know what it takes.  You

8  have to understand from my point of view, and you can

9  understand that, right, that does not sound like somebody who'd

10  be an officer of the court.  Anyway, two weeks.

11         MR. HILL:  Your Honor, that resolves the first of the

12  issues in the October 14th letter.  The second one has to do

13  with damages.  And this has two phases to it.  If you'll

14  remember from our prior conference we had asked Your Honor to

15  order the plaintiffs to provide additional information in

16  response to their initial disclosures about damages.  Your

17  Honor did order them to provide additional damages calculations

18  for so-called economic advantages.  Your order required that on

19  September 27th.  On September 28th I received a couple of

20  emails from Mr. Tolchin indicating that some of the plaintiffs

21  had withdrawn their economic damages claim.

22         Subsequently, Mr. Tolchin and I conferred and I

23  pointed out that he was in violation of your order.  He said

24  I'll comply, give me another two weeks till November the 1st.

25  I believe Mr. Tolchin sent you a letter October 12th

34

1    memorializing that agreement.  November 1st passed and I did

2    not receive any more damages calculations for non-economic

3    damages.  And so we're now in a situation where the plaintiffs

4    have been ordered to provide the information.  I've agreed to a

5    reasonable extension of another month beyond what Your Honor

6    previously required and I still don't have this information.

7            And so I'm asking Your Honor to either order that it

8    be produced or what Rule 37 allows which is that these economic

9    damages claims just be stricken because I'm entitled to these

10   calculations.  You've ordered them and I don't have them.

11           THE COURT:  Mr. Tolchin?

12           MR. TOLCHIN:  Your Honor, we have -- it's not coming

13   from me.  We've been having a large number of clients and as

14   I've indicated --

15           THE COURT:  Did you produce any of them?

16           MR. TOLCHIN:  Yes.  And we have significantly pared

17   down the case by withdrawing multiple clients' claims in that

18   area and part and parcel of working with the clients to find

19   out from them about their subsequent medical care, we are also

20   tackling this issue.  But until we've spoken to each client and

21   also prudently obtained something, a written instruction from

22   the client to us, I'm not going to go and withdraw a client's

23   claim based on a telephone call.

24           THE COURT:  Okay.  Mr. Tolchin, what should you have

25   done?

1          MR. TOLCHIN:  We provided as much information as we

2    had.

3          THE COURT:  No, no, what should you have done vis a

4    vis the court?

5          MR. TOLCHIN:  Maybe we should have asked for an

6    extension.

7          THE COURT:  I'm sorry?

8          MR. TOLCHIN:  I imagine we should have asked for an

9    extension.

10          THE COURT:  You imagine?  You imagine that?

11          MR. TOLCHIN:  We should have asked for an extension.

12          THE COURT:  Okay.  And is there a compelling reason

13    why you did not do that?

14          MR. TOLCHIN:  Only that we were doing our best to get

15    the information and provide it as we get it.  We thought that

16    it was something that we would simply work with defense counsel

17    to continue updating.  Maybe I'm wrong, but --

18          THE COURT:  Okay.  Well, let me just say in many

19    respects you're fortunate that you're not before some other

20    judges because you can try to work out stuff with your

21    adversary, and that's great.  But if you have a court order and

22    it requires you to do something, it's still your responsibility

23    to either get the court to relieve you of your responsibility

24    or to get additional time.  The fact that you have a good

25    reason is not sufficient for not requesting the court's

36

1  permission.  You don't think that I would unreasonably withhold

2  an extension of time.  Do you think that if you asked for an

3  extension of time the defendants would object?  And even if

4  they did, would it make a difference?

5          I have people, for example, who have to file a brief

6  or something and it's due on a certain date and it's going to

7  be one day late.  Do they just say oh it's only going to be a

8  day and I'll just file it with the court for that one day

9  extra?  They don't because they understand that the court could

10 just say it's late, too bad, so sad.  You should have done it.

11 Your adversary obviously gives it two possibilities but you

12 don't really have an excuse for doing it.  I gather you're

13 orally going to ask me now for an extension of time.

14          MR. TOLCHIN:  Yes, Your Honor.

15          THE COURT:  And how much time?  Do you have any idea

16 how much time you'll need?

17          MR. TOLCHIN:  May I have a moment to talk to my

18 associate?

19          THE COURT:  You may.

20                    [Pause in proceedings.]

21          MR. TOLCHIN:  I'm being told, Your Honor, that to

22 give you a real drop dead commitment date for everybody the

23 time frame should be about 60 days.

24          THE COURT:  Okay.

25          MR. TOLCHIN:  But as we get responses, information

37

1    from individual people, we will continue to update what we've

2    done on a per client basis.  That's a tremendous advantage

3    because it does allow discovery to go forward.  You know, if

4    we've updated as to one plaintiff and we've given the medical

5    records as to one plaintiff, we can move the process along with

6    doing a deposition or a medical exam for that plaintiff.  We

7    don't have to have all the plaintiffs before the --

8              THE COURT:  And can you give me some idea of how much

9    progress you've made, what percentage, so I can have some idea

10   of how much progress there is?

11             MR. TOLCHIN:  I have to talk --

12             THE COURT:  Why don't you just tell me?

13             MR. SOLOMON:  I can speak to that, Your Honor, since

14   that's been my primary responsibility.

15             We have been in contact, at least I have at least

16   made contact with approximately three-quarters of the

17   plaintiffs in this case.  There's a family in France which has

18   been a little bit difficult to reach.  There is certainly

19   members of the family that are estranged from other members of

20   the families so each family has to be approached differently.

21   At least for one family they have waived their medical and

22   economic claims so they're pretty much done.

23             The process we're doing is to figure out if they're

24   claiming economic damages or medical claims, then to get a

25   power of attorney from them to execute authorizations for all

38

1  of them.  Once they provide a power of attorney, somebody in my

2  office can just sign authorization after authorization and it's

3  no problem.  The issue is just getting these people to be

4  responsive.  Given the difficulties they face emotionally with

5  this case, it's easier said than done.

6          I'm thinking 60 days for me.  I'm thinking if we can

7  do the best we can and have enough time to work with it we

8  should at least have something from everybody by then.

9          THE COURT:  But I want numbers of where -- how many

10  people are we talking about, how many have we done already, how

11  many have you provided for the defendants, how many more left

12  to go?

13          MR. SOLOMON:  One family has waived their claims

14  entirely.

15          THE COURT:  How many?  What are you talking about?

16          MR. TOLCHIN:  One family meaning how many people in

17  that family?

18          MR. SOLOMON:  Two.  Two people in that family.  But

19  you know, families can have five people, two people.  I mean --

20          THE COURT:  How many total people are we talking

21  about and how much information have they gotten?  I mean you

22  used the term three-quarters but I don't know whether that's

23  three-quarters of four people or three-quarters of 40 people.

24          MR. SOLOMON:  Well, if I can just kind of break it

25  down by example.  Take the Sokolow family, for example.  That's

39

1   Mark Sokolow, his wife, three kids.  Okay.  From them we deal
2   with Mark and gave mark the power of attorney and he's sending
3   that back to us for everybody.  So then that whole family will
4   essentially be done.  And then the second family, the Coulters,
5   well that's two people.  They waived all their claims.  So,
6   well, I think it's not the Coulters, Carter and Shaun Coffel,
7   that's a husband and wife.  They waived all their economic and
8   medical claims so they're essentially done.  And then moving
9   forward we've made contact with the Waldman family who are
10  supposed to be sending us everything.  If they come through,
11  they should be done.  I've been talking with Shmuel Waldman, so
12  he was saying okay, I'll do it for everybody.  If he can come
13  through, we'll be okay with that one.  And some families are a
14  little bit difficult like the Gould family.  There's four
15  plaintiffs --
16          THE COURT:  Just give me numbers.  Too much
17  information in terms of --
18          MR. HILL:  Your Honor, if it'll help the court,
19  attached as Exhibit B to our October 14th letter is the list of
20  economic damages that were claimed in the initial disclosures
21  and I've struck through the ones that have been abandoned as of
22  that date.  They're there if Your Honor wants to look at them.
23          THE COURT:  Is it the October 24th letter?
24          MR. HILL:  It's my October -- I'm sorry, Mark
25  Rochon's October 14th letter.  Exhibit B is a chart that has

40

1    strike throughs on it to the extent they have been abandoned

2    previously.

3               THE COURT:  You said October 14th?

4               MR. HILL:  October 14th.

5               THE COURT:  From...?

6               MR. HILL:  From Mark Rochon.

7               THE COURT:  Okay.  I think the exhibit has gotten --

8               MR. TOLCHIN:  I can bring a copy up to the court if

9    that would be helpful.

10              THE COURT:  I have the letter, but the exhibit not --

11   not that there's much paper in this.  Let me take a quick look

12   at it.  Okay.  All right.  That helped us identify.  The

13   exhibits got --

14              MR. TOLCHIN:  Somehow I think when the letter came to

15   me as well it was all unattached exhibits.

16              THE COURT:  All right.  The ones that are crossed out

17   are ones that are abandoned you said?

18              MR. HILL:  Yes, Your Honor.  As of the date of this

19   letter.  And subsequently we have no further information.

20              THE COURT:  Okay.

21              MR. HILL:  If I can address the timing?

22              THE COURT:  Yes.

23              MR. HILL:  60 days is a long time particularly when

24   these were due in July.  Your Honor ordered them for the end of

25   September.

41

1          THE COURT:  Well, I think that goes back to my

2    question of when you make your estimate the first time it might

3    be better to have a good estimate than a bad estimate.

4          MR. TOLCHIN:  I think I was trying to please too much

5    when I said I thought I could do it by then.

6          THE COURT:  Okay.

7          MR. TOLCHIN:  That date was unfortunately my

8    suggestion at the last conference.

9          THE COURT:  But so the bottom line is when you get

10   it, you're producing it?

11         MR. TOLCHIN:  Right.  We're not holding it to the

12   end.

13         THE COURT:  Okay.

14         MR. TOLCHIN:  We're giving it on a rolling basis.

15         THE COURT:  Here's what we're going to do.  We'll set

16   a 60-day outer limit but with the proviso that if there's any

17   question about any of the individuals, you may be called to

18   task to give a chronology of what steps you've taken to get the

19   response.  But that assumes that we don't go 59 days and they

20   don't get anything else.  And you know, if it turns out that we

21   get everybody but two people and -- so that will be the outer

22   limit but we will monitor to make sure.  If you're not getting

23   responses and it looks like the time is about to run -- or

24   actually, you know what --

25         MR. HILL:  We may be seeing you around that time

42

1   anyway.

2           THE COURT:  I'd like a report in a month as to what

3   the progress is so that if there's a problem I can start to

4   address it.  So I'll require, Mr. Tolchin, that you tell me in

5   a month what -- and you can do this in conjunction with the

6   defendant, but I want to know who's still left on this exhibit

7   and who you haven't produced information for.  So that would be

8   --

9           MR. TOLCHIN:  December 17th?

10          THE COURT:  December 16th.

11          MR. TOLCHIN:  16th.

12          MR. HILL:  Your Honor, that's two of the three issues

13  in the October 14th letter.  The last one is related to the

14  sheet you have in front of you as the column that's listed as

15  intangible damages.  We served each of the seven groups of

16  plaintiffs with the standard interrogatory asking for them to

17  individually state the categories of damages the allegedly

18  suffered, the amount of damages for each category, and the

19  methods of computation for each category of damages.

20          Now, as Your Honor will recall from our prior

21  hearing, I had previously asked you to require the plaintiff to

22  provide more information about what they've labeled as their

23  intangible damages in response to their initial disclosures.

24  Your Honor denied that at the time but without prejudice to me

25  raising it again later.  And I am raising it again today, and I

43

1  would like the court to require the plaintiffs to tell us

2  within these amalgamated claims for what they call intangible

3  damages, which are in the tens of millions of dollars for each

4  plaintiff, what that consists of.

5         And if you'll see there's a footnote at the very top

6  of the chart for intangible damages, Footnote 2.  And when you

7  read it it says, and this is from the plaintiff's initial

8  disclosures, "Intangible damages means damages for past,

9  present, and future physical pain and suffering, physical

10 disabilities and disfigurement, emotional and mental pain,

11 grief, anguish, and distress, psychological injury, trauma, and

12 disabilities and loss of consortium, society guidance and

13 solatium."  So there's a lot of stuff in those numbers.

14        And the reason I would ask the court to require an

15 answer to the interrogatory that breaks it out is that the

16 claims in the case are both anti-terrorism claims under the

17 federal statute but also pendant claims under I think the

18 choice of law analysis is going to indicate Israeli law.  Some

19 of these categories of damages are not available under Israeli

20 law for certain claims or any claims at all and we believe it

21 would be very helpful in trying to figure out which claims are

22 going to go forward for past summary judgment and so forth to

23 know, you know, is Mark Sokolow claiming damages for future

24 psychological injury because I don't know today.  All I know is

25 that he's claiming $20 million.  And so in order for us to be

44

1   able to effectively manage the multiple pendant claims the

2   plaintiffs have made in the case, we would like the plaintiffs

3   to be ordered to provide us for each category the amount they

4   claim.  And because there are 16 categories in this big group

5   called intangible damages, we would ask that they be required

6   to distribute those in whatever way -- and this is important

7   too because some of these people are not physically injured.

8   Some of them were not even present at the events.  And so I

9   assume for those people the claim for pain and suffering is

10  zero, but that's only an assumption on my part.  I would really

11  like to know what the basis for the claims are and which

12  different categories of intangible damages are being claimed by

13  which plaintiffs and I ask the court to order that.

14          THE COURT:  Mr. Tolchin?

15          MR. TOLCHIN:  Your Honor already denied this

16  application at the last conference.  The last time we were

17  here, he wanted us to particularize and show our calculations

18  about how we figured out our claims for intangible damages.

19  Your Honor ruled that we do not have to do that.  So now he has

20  an interrogatory asking for the same information and he wants

21  the same information that Your Honor already said we don't have

22  to provide?  You know, the issue about can this plaintiff claim

23  loss of consortium or loss of solatium or pain and suffering,

24  these are issues -- it sounds like we're talking about a charge

25  conference.  These are all overlapping.  Pain and suffering and

45

1  emotional damage, the pain and suffering component and the

2  emotional damage for emotional distress claim for being

3  disfigured is overlapping.  There is no -- the basis for Your

4  Honor's ruling last time is there is no mathematical

5  calculation that can be set forth.  That's the nature of

6  intangible damages.

7         THE COURT:  It is true that as we talked about trying

8  to put a number on these things I indicated that that would be

9  problematic although I understand there are two parts to the

10 defendant's request.  One is that the plaintiffs identify which

11 kinds of intangibles they're claiming and the other is to put a

12 dollar amount to it.  The former does seem to be something

13 which would be relevant so that they could know which inquiries

14 they're going to make if they're going to ask them any

15 questions.  I still don't see any particular basis for anybody

16 trying to come up with the actual amount.  But for example, if

17 somebody is not claiming -- I mean maybe it won't turn out to

18 be that there'll be very many things eliminated but if they're

19 not claiming physical pain and suffering, the defendant ought

20 to know that.  If they're not claiming psychological injury,

21 the defendant ought to know that.  I don't exactly what the

22 interrogatories say.  But as to the amount, I don't think

23 that's --

24        MR. TOLCHIN:  So to be clear, you want me to tell

25 them we're claiming pain of suffering, loss of consortium and

46

1   emotional distress for this one and we're claiming loss of

2   solatium or whatever that is for that one but not we're

3   claiming X dollars for each category?

4           THE COURT:  That's correct.

5           MR. HILL:  Actually, the interrogatory is segregable

6   that way.  The interrogatory asks for each of the individual

7   plaintiffs to individually state the categories of damages

8   allegedly suffered.  So I understand the court to be saying

9   that part should be answered.

10          THE COURT:  That part I think is discoverable.

11          MR. HILL:  The next part is the amount of damages for

12  each category of damages and what the court is saying for

13  intangible damages you don't have to provide that amount.

14          THE COURT:  That's correct.

15          MR. HILL:  For economic ones, that'll be covered by

16  what we talked about earlier.

17          THE COURT:  That's correct.

18          MR. HILL:  Okay.  And then the methods of computation

19  of each category of damages again not required for intangibles

20  but required for economic to the extent they're going to pursue

21  it.

22          THE COURT:  That's correct.

23          MR. HILL:  Okay.  Thank you, Your Honor.  That

24  resolves the issues from my October 14th letter.

25          The next item I have is the request for a

47

1  confidentiality order.  As Your Honor knows, when we last

2  appeared before you I related how we've been trying to agree to

3  this since July of this year.  Your Honor ordered us to confer

4  and submit either an agreed proposal or competing proposals by

5  October 7th.  After that hearing on September the 13th, on

6  September 28th the plaintiffs sent me a proposed protective

7  order.  This was not redlined to what I had sent them in July.

8  This was a whole new proposal from the plaintiffs.

9         We responded to it.  We had negotiations.  We

10 narrowed our areas of disagreements to four items and those are

11 numerated in the October 7th letter that we sent to the court.

12 I don't know if the court has that one handy.  And the

13 plaintiffs, for whatever reason at that time, did not submit,

14 did not make a submission to the court on October the 7th which

15 was required by the court's order.  I think maybe the initial

16 direction, if I can ask for the Court, is this.  The plaintiffs

17 have, as you know, sent you yesterday their own proposal which

18 contains disagreements beyond those that existed on October

19 7th.  So in my view, the plaintiffs have sort of moved

20 backwards.  They've now disagreed about things after the date

21 the court required an agreement by as to things that they had

22 agreed to before.  And in some instances, as to things they had

23 proposed to us on September 28th.

24         So I seek the court's guidance on whether you want me

25 to address things as they existed on October 7th at which point

48

1   this really should have been done or as they exist today.

2          THE COURT:  Mr. Tolchin, talk about moving targets,

3   what's the story here?

4          MR. TOLCHIN:  I have an email from Brian Hill of

5   November 15th responding to a previous email, the ongoing

6   discussion of the contents of the confidentiality order.

7          MR. HILL:  I'm not suggesting I didn't continue to

8   try and reach an agreement after October 7th.

9          MR. TOLCHIN:  Right.

10          MR. HILL:  What I am suggesting is I think it's a

11   little unfair to have the court now decide issues that were

12   agreed on as of the date you had required us to either agree or

13   submit.  But I defer to the court on what the court wants to

14   do.

15          THE COURT:  Well, I'm talking to you, Mr. Tolchin.  I

16   mean when we got the October 7th letter in which these things

17   were outlined, are you saying that this was inaccurate?  That

18   there were other things that you had disagreed on?

19          MR. TOLCHIN:  I'm not sure I follow the question,

20   Your Honor.  I'm sorry.

21          THE COURT:  It states that there were four areas of

22   disagreement between the parties.  I will tell you we thought

23   you'd almost worked this out so --

24          MR. TOLCHIN:  I'm sorry, I didn't hear.

25          THE COURT:  We thought you'd almost worked it out and

49

1   we saw that there were four areas of disagreement.  There

2   seemed to be more areas of disagreement in your November 16th

3   letter than there are in the October 7th letter.

4           MR. TOLCHIN:  Yes, but not that many more.  It's not

5   exactly a moving target but as one thing changes, it raises an

6   issue in another area.  And sometimes you review something and

7   you say wait a second, I didn't notice that this time.

8           THE COURT:  Well, I hope that doesn't happen too

9   often.

10          MR. TOLCHIN:  Well, we're all human.  But the issues

11  that we see are the issues -- the issues that we see, that line

12  in the sand, no new issues is what we wrote out in our November

13  16th letter.  That's the final product of all the back and

14  forth.  We're not raising anything new.

15          THE COURT:  Okay.  So you concede that there are

16  things in the November 16th letter that are different from what

17  the defendants raised in the October 7th letter?

18          MR. TOLCHIN:  I think that's the case, yes.

19          THE COURT:  Okay.  And you do understand that my

20  recollection is that he's correct that I had told you to tell

21  me what you disagreed on and then we would resolve the things

22  that you disagreed on, and to the extent that you added things,

23  that is a step backwards?

24          MR. TOLCHIN:  I see how you can see it that way but

25  we also were still talking about it.

50

1          THE COURT:  Beyond my deadline.

2          MR. TOLCHIN:  We were still making efforts until two

3   days ago.  We were going back and forth with emails about this

4   paragraph and that paragraph and these various issues.  And I

5   think some of the issues were resolved in that process.  In

6   other words, we've come to an agreement as to some things.

7          THE COURT:  Okay.  So even after October 7th some of

8   the things that appear to be agreed to you put back in play?

9          MR. TOLCHIN:  No, I said the opposite.  Some things –

10  –

11         MR. HILL:  I think it's both, Your Honor.  I think we

12  did agree on two of the four items that were shown as

13  disagreements in the October 7th letter and then, I'm not sure

14  of the exact count, but maybe three or four of the items in

15  yesterday's letter are new disagreements about which we had

16  previously agreed as of October 7th.

17         THE COURT:  But when did they become disagreements?

18  That's what I'm not --

19         MR. HILL:  I learned of those disagreements on

20  November the 10th.

21         THE COURT:  Okay.  That's a month after the October

22  7th letter.  You hadn't been discussing it between October 7th

23  and November 10th?

24         MR. HILL:  I don't want to make a misrepresentation.

25  There were some emails.  I did not get a proposed new order

51

1   from them until November the 10th.  I responded on I think the

2   following Monday with our reactions to that.  So I was trying

3   to work it out so that we can get here and tell Your Honor we

4   had an agreement.  We're in fact now further from an agreement

5   than we were on October 7th.  I need the court to tell us how

6   you want to proceed with resolving it.

7           MR. TOLCHIN:  I don't think we're -- you know, I

8   think that we have principle things that we disagree on and if

9   Your Honor would rule on those principles I think we can work

10  out the agreement.  It's just, you know, for example, how

11  should the agreement deal with showing -- I'll just pick one

12  out of the hat.  If I obtain the documents from some non-party

13  source, whoever it is, a private investigator finds in a

14  library, a witness gives it to me, some method that didn't

15  involve it being produced by the defendant.  The defendant

16  wants to be able to designate the document as confidential.

17          THE COURT:  Well, do you concede that you may have a

18  document that you got from some other source that should have

19  been confidential?

20          MR. TOLCHIN:  I'm not sure I follow the question.  I

21  don't have any such document at this moment.

22          THE COURT:  Well, Wikileaks.  Okay.  I mean --

23          MR. TOLCHIN:  Perfect example.

24          THE COURT:  If you got a document that was a

25  government document and then the attorney general comes and

52

1  says this is confidential.  And you say well we didn't get it

2  from the government, we got it from some other source --

3          MR. TOLCHIN:  Well, you know, I'm sorry, Wikileaks is

4  not a good example because everything Wikileaks has is -- it's

5  quite questionable whether it was stolen.  So that's not a good

6  example.  I take that back.

7          THE COURT:  But my point is it's certainly possible

8  that you get something from some other source that the

9  defendants could legitimately claim should have been

10 confidential and they'd be asking how the heck did you get

11 this?

12         MR. TOLCHIN:  Right.

13         THE COURT:  So you're saying --

14         MR. TOLCHIN:  That could happen but they don't need a

15 confidentiality order to do that.  If I come up with a

16 document that some guy who used to work for them stole from the

17 president's office by shoving it in his coat pocket, they don't

18 need a confidentiality order to raise a fuss about that.

19         MR. HILL:  Your Honor, if I may, there is a specific

20 example where this has already happened in this case where the

21 plaintiffs have produced a document to us that we believe

22 should be treated as confidential and was obtained in violation

23 of what we understand to be or suspect to be confidentiality

24 requirements.  The plaintiffs, when I attempted to designate it

25 as confidential, told me they wouldn't accept the designation.

53

1 I can show it to Your Honor.  I think it might help to put this

2 in context.

3        THE COURT:  Well, I mean I understand it without

4 seeing in context.  I mean --

5        MR. TOLCHIN:  Let me tell you what it is because I

6 think it's exactly --

7        MR. HILL:  Well, hold on.

8        THE COURT:  Okay.  Again --

9        MR. HILL:  I think it's confidential so let's not

10 describe it on the record.

11        MR. TOLCHIN:  No, what it is.  What it is --

12        THE COURT:  The principle of it is this.  I don't

13 know how you get things but I've certainly seen situations in

14 which one party has a document that the other side is totally -

15 - they're oblivious to how they got it, they can't understand

16 how they got it.  They know that it should be confidential.

17 You were starting to say they don't need a confidentiality

18 order for that.  Finish that.  Tell me -- I mean you do concede

19 that there could be some things that come into your possession

20 that should have been confidential?

21        MR. TOLCHIN:  Come into my possession from a non-

22 party.

23        THE COURT:  Yes.

24        MR. TOLCHIN:  Not being produced.

25        THE COURT:  Right.

54

1          MR. TOLCHIN:  So I have some stranger who has a

2    document that he has in a completely legal way --

3          THE COURT:  I'm sorry?

4          MR. TOLCHIN:  I have some stranger, a non-party, who

5    has a document which he's obtained in a completely legal way --

6          THE COURT:  Okay.  Well, I don't know how you

7    obtained it.  I'm just --

8          MR. TOLCHIN:  Well, I'm just assuming.  This is what

9    I'm afraid of.

10         THE COURT:  Okay.

11         MR. TOLCHIN:  I'll get a damaging document from

12   somebody, damaging to them.  And they'll say oh, that's

13   confidential.  Now, when I want to show it to a witness, when I

14   want to use it as an exhibit in a motion, now I have to jump

15   through hoops.  I have to mark it and put it under seal, I have

16   to make people leave the room.

17         THE COURT:  Okay.

18         MR. TOLCHIN:  I have to keep track of who's seen it.

19         THE COURT:  Okay, counsel.  Okay.  So you're assuming

20   that they got it legally.  Let's just -- all I said was it's

21   something that should have been confidential whether they got

22   it because they were friends with somebody, whether they stole

23   it, whether or not somebody on the other side -- assuming that

24   it should have been confidential, you said they don't need a

25   confidentiality order.  I'm just asking you to follow through

55

1  with that.  I wasn't -- how do we deal with that?

2          MR. TOLCHIN:  Well, they would presumably contact me

3  and say how on earth did you get this document?  We don't want

4  you to disseminate this.  We want you to treat it as

5  confidential.  And if I don't agree, they'll contact the court.

6          MR. HILL:  And that's what happened.

7          MR. TOLCHIN:  And the court would make a ruling.

8          MR. HILL:  I sent him an email.  I said this will

9  confirm --

10          THE COURT:  All right.  But that's the way it's

11  supposed to work with a confidentiality -- they seek to

12  designate it, you say no, and then you bring it to me.  So --

13          MR. HILL:  This is the response I got.  That's

14  totally ridiculous, Brian.  Defendants cannot designate as

15  confidential documents not produced or disclosed by them.  We

16  will ignore your faux designation.

17          MR. TOLCHIN:  We have a track record that we get

18  anything remotely useful -- in fact whole boxes of stuff --

19          THE COURT:  Right.  Okay.  But understand.

20          MR. TOLCHIN:  -- marked confidential --

21          THE COURT:  Counsel, this does not stop you -- I mean

22  unless I'm forgetting something, this happens in these cases.

23  Somebody says we'll designate it confidential, the other side

24  says it shouldn't be confidential.  That's a different issue

25  from whether or not they can blankely not even assert that

56

1    it's confidential.  I mean you might -- and then you can bring

2    it to me.  I don't see how them saying that it's confidential

3    should not be in the confidentiality agreement because then I

4    become the arbiter of it and then we can talk about those

5    issues.  I mean you can have the discussion yourself but the

6    fact that you've come into possession of it, I don't see how

7    that means it's impossible that it could be designated as

8    confidential.

9            MR. TOLCHIN:  Your Honor, is that your ruling?

10           THE COURT:  Again, understand --

11           MR. TOLCHIN:  If that's your ruling, I'm prepared to

12   accept it.  I believe that the practice of designating things

13   as confidential is abused.  I believe that the ability to take

14   -- I understand about here, I'm giving you my documents but I

15   don't want to reveal these to you.

16           THE COURT:  Right.  I understand.

17           MR. TOLCHIN:  That I really understand even though I

18   believe it's abused and used too much.

19           THE COURT:  Counsel, I get that regardless of how the

20   other side got the document.  I mean even documents that you

21   got from them, I get a lot of cases in which the parties say

22   they're over-designating things as confidential that they gave

23   us.  So that issue is separate from whether or not there should

24   be a separate category for documents you got from some other

25   place.

57

1          MR. TOLCHIN:  But what's scaring me is I can hire an

2    expert, for example, who studies the Middle East conflict and

3    he may have his own private library of documents that he has

4    accumulated over the years.  And who knows what he has.  Maybe

5    there are documents that have come up in the past, documents

6    from the Palestinian Authority that were seized by the Israeli

7    military during a raid and somehow the expert got a copy of it

8    and he studies those documents.  Now --

9          THE COURT:  Okay.  And they want to designate it as

10   confidential and you said you got it from a legitimate source

11   and you object.  How is that different from them wanting to

12   designate anything that they produce in-house as confidential?

13         MR. TOLCHIN:  The difference is the onus.  It's just

14   far too easy to say everything you got from him, confidential.

15   And now I have to come to the court and say why it should be

16   un-designated whereas when the burden is on them, when I feel

17   the burden should be on them in a very limited number of cases

18   for specific documents to come to the court and say why this

19   should be designated.

20         THE COURT:  So this is just a question of who's going

21   to have the burden to come to me?

22         MR. HILL:  Well actually --

23         MR. TOLCHIN:  It's when you have a confidentiality

24   order that's written the way they want to write it, it just

25   becomes so easy to over-designate that we wind up with almost

58

1  everything of substance being designated.

2          THE COURT:  I don't see this -- you understand what

3  my ruling is.  Anything else?  What's the next issue?

4          MR. HILL:  Which letter would you like me to work off

5  of, Your Honor?  The most recent one or the October one?

6          THE COURT:  Let's do the most recent one since it's

7  hard to put the genie back in the bottle.

8          MR. HILL:  So that resolves the first issue that they

9  had raised.  I believe the next one is whether the protective

10  order will apply to third parties.  When they sent me the draft

11  in September, they proposed that it cover third parties and we

12  agreed to it.  They now want it to cover only parties.  The

13  reason I would ask that it cover third parties is since that

14  time the plaintiffs have made it clear that rather than produce

15  their own medical records which are located in the US, they're

16  going to provide us with the names of their providers and

17  provide releases and we're going to subpoena those documents.

18  I would like those to be covered by this order so I don't have

19  to negotiate with a doctor in Chicago about getting a

20  protective order for responses to subpoenas.  There may well be

21  other instances where that would be useful but I think third

22  party documents should be designatable under the protective

23  order.

24          MR. TOLCHIN:  Your Honor, in light of the ruling that

25  you made on the previous issue, I'm not going to press this

59

1    issue.

2            THE COURT:  Okay.  Then I'll make it official.

3            MR. HILL:  The next issue, Your Honor, is how third

4    party witnesses should be treated.  As I understand it, the

5    plaintiffs are proposing that they can show any confidential

6    document to a third party witness without obtaining the

7    agreement of the witness to be bound by the confidentiality

8    order.  We think that would create a loophole obviously so that

9    someone could get material that's otherwise protected by the

10   order.  I would ask that an order be entered which would

11   require those persons to agree to be bound by the

12   confidentiality order before they receive confidential

13   material.  I understand the plaintiff's concern is this might

14   interfere with the examinations.  There is a provision in the

15   protective order that allows witnesses who have reason to have

16   accessed the information apart from the case the ability to

17   access that without even having to agree to the confidentiality

18   order.  So I think the only situation this occurs is where a

19   witness has no reason to know confidential information but for

20   whatever reason the party wants to show it to them.  Under that

21   circumstance we just submit that it's reasonable that the

22   witness agree to treat it as confidential.

23           MR. TOLCHIN:  Your Honor, I have no way -- I can have

24   my clients agree to a confidentiality order.  I assume that the

25   defendant can have their party witnesses, their officers agree

60

1    to a confidentiality order.  But when we take a deposition of a

2    non-party, for example, a person who's in the jail who's being

3    produced pursuant to a subpoena or a Hague request, I have no

4    way to compel that person to agree to a confidentiality order.

5    I can't control him.  I can't deliver that.  But now to --

6            THE COURT:  That is indeed a fact but --

7            MR. TOLCHIN:  And at trial when the witness is on the

8    stand, I have no way to compel him to agree to a

9    confidentiality order before I show him a document.  Now, what

10   we're being offered as a way out is really ice in the winter

11   because counsel says that if the witness had access to this

12   document before, then we can show it to him notwithstanding

13   that it's been designated as confidential.  I don't know what

14   the witness had access to before.  That in fact might be what I

15   want to ask the witness about.

16           I can think of a very simple hypothetical.  Assume

17   they produce a picture of -- assume I have a picture of this

18   witness planting the bomb.  Just a hypothetical.  But that's

19   been marked confidential.  Now, that picture is certainly

20   something you want to ask the witness about.  Is that you?

21   Does it fairly and accurately depict the circumstances on that

22   day?  Is that a bomb?  But it's not something he would have had

23   access to before.  And by designating it as confidential, I

24   can't confront the witness with a relevant piece of

25   information?  I understand confidentiality.  I understand

61

1   confidentiality orders.  But they do break down.  They are

2   limited when it comes to --

3           THE COURT:  Okay.  Counsel, right, except I think,

4   counsel, what you're really questioning now is whether or not

5   something really should have been designated as confidential.

6   To the extent that it should have been designated as

7   confidential either because of your confidentiality agreement

8   or because the court deems it to be confidential, I understand

9   that we are talking about the party doing a confidentiality

10  agreement but you could independently come to me and I could

11  designate it as confidential.  You're certainly not suggesting

12  that if I had said that it was confidential notwithstanding

13  your confidentiality agreement you could show it to a witness

14  without my permission.  And so to the extent that it's

15  absolutely necessary and a party won't cooperate, I don't know

16  that there's a solution to that.  But if it really is something

17  that ought to be confidential, the confidentiality should not

18  be breached because it hinders discovery.

19          MR. TOLCHIN:  I just don't see that, Judge.  I mean I

20  have -- just a hypothetical.  Let's say one of these witnesses

21  who's in jail, let's say he was in the employ of the defendant

22  and I want to prove that with a payroll record that they've

23  produced to me and designated as confidential.  Now, that

24  payroll record is not something he ever had access to.  He

25  didn't work in the payroll department.  He would never have

62

1  seen this document before.  But I want to ask him were you

2  employed and when he says I wasn't employed, I want to show him

3  this document and say you see how you're listed there on the

4  payroll record?  You sure you weren't employed?  I want to be

5  able to ask him that.  But I won't be able to do that under

6  what they have proposed.

7         THE COURT:  Okay.  I will --

8         MR. TOLCHIN:  And I also won't be able to freely

9  depose the guy because if I do raise it with the court in

10 advance, first of all, it's very cumbersome --

11        THE COURT:  Okay.  Counsel, even taking your

12 hypothetical at face value, if that is the case then yes, you

13 cannot show him and I'd say well, that's the way it goes, you

14 cannot show him.  If there's a legitimate reason for this being

15 confidential, I don't see how you say well I got to be able to

16 ask him.  It doesn't matter whether it's confidential, I've got

17 to be able to ask him.  I mean confidential means confidential.

18 If it should be designated confidential, you shouldn't be

19 showing it to people who shouldn't have access to it.

20        MR. TOLCHIN:  Except that when they are testifying as

21 witnesses in the case their testimony can't be complete.

22 Usually it's a non-party.  I wouldn't say that it necessarily

23 applies but frequently it's a non-party witness who's going to

24 give you the most accurate testimony because he theoretically

25 doesn't have a horse in the race.  And that witness, the

63

1  examination of that witness is then hampered.  You know, I wish
2  he had put it in writing but -- I wish I had a written -- I
3  wish it wasn't a verbal decision but some years ago having the
4  same conversation in front of Judge McMahon in this court.  She
5  was very emphatic.  She says I'm signing this confidentiality
6  order argument.  She looks at the parties and she says you
7  know, when it comes to trial, when it comes to examinations
8  before trial, this breaks down.  You can't have an examination
9  of a witness and you can't show him a document that everybody
10 knows is relevant.  But I mean when it comes to trial can I
11 also not show him the document?  All the confidential documents
12 that get marked in evidence become public.  That's what
13 happens.  That's what happens at trial.
14             THE COURT:  This is not trial.
15             MR. TOLCHIN:  Right, but the deposition is going to
16 be used at trial.
17             THE COURT:  Well again, counsel, what you're -- even
18 the hypothetical that you suggested, that is the potential
19 impeachment, theoretically that's not actually even discovery.
20 That's impeachment.
21             MR. TOLCHIN:  We don't believe these witnesses will
22 come to trial.  We believe that the examinations -- they're in
23 jail in Israel.  They're not coming here.  They can't get here.
24 These examinations, if they're fruitful, will be used at trial.
25             THE COURT:  Counsel, I'll give you this.  Look, if

64

1    you think there's a document that you want to show some

2    witness, you can ask me about it and we'll discuss it.  But in

3    the abstract, the idea that once it's designated as

4    confidential, there's a reason for it being designated.  And

5    unless you show me that it should not have been designated, I

6    don't know why we should be allowing somebody to see it who is

7    not going to keep it confidential.  I don't know.

8              MR. TOLCHIN:  I'll tell you why --

9              THE COURT:  Wait.  Let me put it to you a different

10   way.  Let us say that the defendant wants to show him a

11   document that you've designated as confidential because it has

12   information about some people that you want to keep

13   confidential.  And he says well, I need to show him this and so

14   he'll have to get this information even if he's not going to

15   keep it confidential.  Now you're on the other side of it.  You

16   want him to be able to show any document he wants?

17             MR. TOLCHIN:  Your Honor, I would say this --

18             THE COURT:  Do you?

19             MR. TOLCHIN:  To examine the witness, yes.  It's only

20   fair.  You know, there may be a perfectly valid reason to

21   designate a document as confidential.  You know, if it's a

22   payroll record, let's stick to that example.

23             THE COURT:  A payroll record.

24             MR. TOLCHIN:  You don't want that disseminated.  It

25   has people's salaries, social security numbers and all.

65

1           THE COURT:  Look, the fact of the matter is if you

2   want to show somebody a payroll record and it's been designated

3   as confidential, you can probably anticipate I'll let you do

4   that.

5           MR. TOLCHIN:  Right.  But it's impossible to know --

6           THE COURT:  In the abstract --

7           MR. TOLCHIN:  -- until you're in the room what

8   document is going to be -- every document that's going to be

9   necessary.

10           THE COURT:  Well, let me just say this.

11           MR. TOLCHIN:  It's unfair to put us in the --

12           THE COURT:  Counsel, counsel, as a lawyer it should

13   not be impossible for you to anticipate what you want to show

14   somebody.  I mean it may be over-broad but you should be able

15   to anticipate it.

16           MR. TOLCHIN:  I should be able to anticipate what I

17   might want to show the guy.  It all depends.  It would be --

18           THE COURT:  Might is good enough.

19           MR. TOLCHIN:  It would be very burdensome to have to

20   come to Your Honor in advance of the deposition with a few

21   hundred documents and say let's go over all of these.

22           THE COURT:  I don't know.  Are you saying that --

23           MR. TOLCHIN:  And I respect the idea --

24           THE COURT:  -- there are a few hundred confidential

25   documents you want to show somebody?

66

1          MR. TOLCHIN:  There may well be.  There may well be.
2  Until we've gotten them, I don't know what they're producing.
3          THE COURT:  Okay.  Well, when you have it, then you
4  bring it up again.  I'll deny it without prejudice then.  I
5  mean look, it's either one way or the other.  Either it should
6  be confidential or it shouldn't.  And maybe the payroll record
7  shouldn't be confidential.  I can't think of any reason why it
8  would be confidential in that sense.
9          MR. TOLCHIN:  I can understand it being confidential
10  in the sense that we shouldn't be allowed to freely disseminate
11  it.  But it's not so confidential that you can't show it to a
12  witness in the case.
13          THE COURT:  For some things, that may be so.
14          MR. HILL:  I understand the court to have ruled.
15          THE COURT:  Yes.  Again, not everything that's marked
16  confidential -- the prior conversation we just had ought to
17  make this clear.  Some things are going to be confidential
18  because somebody just doesn't want it disseminated to other
19  people.  Some things are going to be confidential because they
20  are core confidential.  That is you really don't want -- you
21  want to limit who gets to see it.
22          MR. TOLCHIN:  May I suggest that we ought to have two
23  tiers of confidentiality?
24          THE COURT:  Some confidentiality orders have several
25  tiers.  They have highly confidential, they have confidential,

67

1    they have attorneys' eyes only.  I mean it depends on -- I mean

2    the word confidential means somebody might not want --

3            MR. TOLCHIN:  I understand but maybe that -- what I'm

4    afraid of is that I'm going to get a box of documents that's

5    going to have 5,000 pages of which 4,500 will be designated

6    confidential.  And now I'm going to have the impossible burden

7    of coming in to Your Honor and asking Your Honor to review a

8    voluminous amount of stuff.

9            THE COURT:  Oh no, no.  I think you're mistaken

10   there.  When these issues come up, you know, they're usually

11   categories.  That is somebody will -- they've designated a

12   whole bunch of things as confidential and you say these can't

13   be confidential because they are blah dah, you know, and I'll

14   say you know, you can't designate these things as confidential.

15   I'm overruling the designation.  And I'll do it en masse.

16           MR. TOLCHIN:  Maybe we can substantially narrow or as

17   a practical matter limit the issue by having the

18   confidentiality designations be, for example, confidential and

19   highly confidential such that confidential is not for

20   dissemination --

21           THE COURT:  Okay.  Counsel, counsel --

22           MR. TOLCHIN:  -- but can be shown to witnesses.

23           THE COURT:  Let's end this now because first of all,

24   everything so far is hypothetical.  I don't even know what

25   they're going to do.

1          MR. TOLCHIN:  I haven't sent he documents yet

2    because, by the way, we've told them that we will abide by what

3    they had proposed in the first place, their original draft,

4    that we would abide by it until the court rules on the

5    confidentiality order.  They didn't like that idea.  They still

6    have documents they haven't produced.

7          THE COURT:  Well look, if they produce 5,000

8    documents and 4,500 of them are designated as confidential,

9    then I guess we're going to be back here, but --

10          MR. HILL:  The order contemplates a procedure for

11    dealing with this.

12          THE COURT:  And trust me, it'll undoubtedly be a

13    situation in which there'll be a reason that they will

14    designate a category of documents and I'll say, you know, that

15    category is not appropriate for designation.  So for example,

16    they could say well we've done all of the payroll records and

17    I'll say no, this shouldn't be confidential.  But let's do this

18    in the context of something that we have as opposed to the

19    hypothetical.  But as a general rule -- and this does not even

20    rule out the possibility that we might have a special rule for

21    a particular witness.

22          MR. HILL:  In fact, the order contemplates that Your

23    Honor could direct the confidential material be shown to

24    persons in certain situations as well.

25          The next issue about which we're in disagreement is

69

1   the scope of what can be designated confidential.  We have

2   proposed vis a vis areas of disagreement only that we be

3   allowed to designate previously undisclosed financial

4   information as confidential and be allowed to designate

5   employment information as confidential.  This is the sort of

6   thing that's standard in cases, Your Honor.  What I visualize

7   here are things like personnel files and people's salaries and

8   those sorts of things that are ordinarily treated as

9   confidential.  Some of the people that they're seeking

10  discovery on don't, so far as I can tell, have any connection

11  to any of the events in the case.  Their salaries shouldn't be

12  available to be posted on the internet.

13          MR. TOLCHIN:  I'm not sure why.  I mean this is the

14  government.  The defendant purports to be an applicant for UN

15  membership.  Why should a public servant's salary be treated as

16  confidential unless he's embarrassed about it.

17          MR. HILL:  I have a case --

18          THE COURT:  Okay.  Well first of all, I understand

19  that a lot of these confidentiality orders come in the context

20  of a party agreeing to produce stuff so that we don't have to

21  hash out relevance issues.  Are you saying that the salaries

22  are relevant?

23          MR. TOLCHIN:  The employment status is relevant.  The

24  person's rank is relevant and salary  --

25          THE COURT:  Well, my point is this.  We could make

70

1   this very -- we could fine tune it and we could have redactions

2   or you could do it some other way.  I mean I don't have any

3   strong feelings one way or the other about making this more

4   general but if -- and certain parts of the payroll records may

5   be relevant, other parts may not.  They may take more time to

6   redact them.  You may take more time to argue about which ones

7   ought to be redacted.  How you handle this is fine but the

8   question of whether or not some of the information which may be

9   in payroll records ought to be subject to being on the internet

10  seems to me I don't see that it should be.  And so we could do

11  it on a basis of some of the information being produced and

12  others not.  But you're certainly entitled to know like who's

13  the president, who's the vice president and, you know, if

14  there's an organizational chart.  I don't know that salaries

15  are particularly relevant.  And if they're not particularly

16  relevant, I don't know why I would expose them to --

17          MR. TOLCHIN:  Well, the salaries certainly go to bias

18  of witnesses, Your Honor.  If I have an individual, if it's a

19  low level employee, he's less likely to lie for the

20  organization than a bigwig and salary is the quickest indicator

21  of that bias.

22          THE COURT:  Well, interestingly enough, we could

23  argue over this about whether or not the salary is going to be

24  the determinative factor on whether or not somebody is more

25  likely to lie.

71

1        MR. TOLCHIN:  I said indicator, indicator.  I didn't

2  say it was a determining factor.

3        THE COURT:  I think to the extent that you're

4  describing the people involved in this, I don't think that

5  salary is going to be, I could be wrong, but I don't think this

6  is going to turn on somebody's salary as to whether or not

7  you're going to allege that they're biased.  But again, I don't

8  know that it all has to be confidential.

9        MR. HILL:  Well, the only issue now is can I

10 designate it as such or do I have to come back and get another

11 protective order each time we do this?  And I've asked to be

12 allowed to designate it as such.  There's a process for working

13 it out if there's an objection.  There's a process for seeking

14 a ruling from Your Honor --

15        THE COURT:  I don't see any reason to --

16        MR. HILL:  -- if we can't agree.

17        MR. TOLCHIN:  Your Honor, as long as the court --

18 I've been in situations where I disagreed with a designation

19 and I come to the court and bluntly the court was like why are

20 you here?  Just the confidential, why are you bothering me with

21 this?  As long as the court -- if the court wants to do it that

22 they can designate what they want and then we'll --

23        THE COURT:  Well, I didn't say they can designate

24 what they want.

25        MR. TOLCHIN:  -- dispute it -- well, designate

72

1   whatever they think is appropriate and then we'll dispute what

2   we dispute --

3           MR. HILL:  No, we'll designate what the order says.

4           MR. TOLCHIN:  -- and raise the issue with the court.

5   If that's the way the court wishes to proceed, I mean I have a

6   prediction that at some point Your Honor is going to stop the

7   process and say let's have some big picture rule, but that's

8   just a prediction.

9           THE COURT:  Well, I'll have to hash it out with you

10  now or see whether or not there's going to be some --

11          MR. TOLCHIN:  You want to see particulars.  You want

12  to see some examples.

13          THE COURT:  Yes.

14          MR. TOLCHIN:  I hear that.

15          MR. HILL:  What I would suggest --

16          MR. TOLCHIN:  We'll comply.

17          MR. HILL:  -- the court do is enter the language we

18  proposed and obviously if we're behaving inappropriately, the

19  court will be able to straighten me out.

20          The next area of disagreement is whether the

21  protective order should govern all pretrial motions or whether

22  it should not govern summary judgment motions.  This is one of

23  the issues that I feel the plaintiffs ought to be a little

24  estopped on.  The order they sent me in September proposed that

25  all pretrial motions be governed by this order.  Subsequently

1  they said they don't want it to cover summary judgment motions.

2  I just ask that it cover all motions.  If we need to reevaluate

3  at summary judgment, because I don't know at this point what

4  documents will be involved or what issues will be involved, the

5  court's obviously free to do that, but I think rather than

6  creating a situation where the court has to later on do another

7  confidentiality order regarding summary judgment, we might as

8  well just let it cover all motions now.  We can sort it out

9  when we get to that phase of the case.

10           THE COURT:  Well, again, I think these things are

11  always better done in context and I'm not sure why a summary

12  judgment motion would be singled out as a motion that should be

13  treated differently.

14           MR. TOLCHIN:  Because it's a quasi trial.  There's a

15  presumed public right of access to trial materials.  You know,

16  this is not simply a business dispute in this case.  There's

17  also --

18           THE COURT:  Oh, so you're saying --

19           MR. TOLCHIN:  -- a strong element of the principle of

20  the thing and the public should know --

21           THE COURT:  What's happening in the summary judgment

22  motion?

23           MR. TOLCHIN:  The documents attached to the summary

24  judgment motion are like trial exhibits.  It's part of the

25  public record.  The public -- these are cases that the

74

1   incidents that were involved here were widely reported.  The

2   defendant is in the news every day.  Their positions and

3   contentions are debated across the whole world.  And what the

4   evidence in this case brings out is important for the

5   historical record for having the truth out there in the world.

6            THE COURT:  Well, I don't know that I would

7   characterize summary judgment as quasi trial.  It's certainly

8   true in most of the cases where there have been confidentiality

9   agreements they've applied to all pretrial submissions.  Unless

10  there's some --

11           MR. TOLCHIN:  We cited a case in our letter, Lugosch

12  v. Pyramid Company of Onondaga.  You want the citation?  It's -

13  -

14           THE COURT:  Do you have it in your letter?

15           MR. TOLCHIN:  Yes.

16           MR. HILL:  Your Honor, I would just --

17           MR. TOLCHIN:  I mean if Your Honor wants to revisit,

18  you know, defer the issue to the summary judgment time as long

19  as the issue is out there --

20           MR. HILL:  The issue at summary judgment will be

21  whether there is good cause to seal the documents or not.  That

22  will depend on what the documents are and what the issues in

23  the summary judgment motion are.  And so rather than now

24  essentially order that anything can be filed attached to a

25  summary judgment motion be open, we would ask that the court

75

1   keep the procedure in place.  And if it is an issue when we get

2   to summary judgment, we'll address it in the specific context.

3           THE COURT:  I prefer to discuss it in a specific

4   context.  Of course, I'm still waiting to see how much is going

5   to be designated as confidential.  We may hash it out before

6   then depending on how much gets designated.

7           MR. HILL:  Your Honor, I'm pleased to say that I'm

8   prepared to agree to the plaintiff's last issue which is how

9   depositions will be conducted.  So I think practically what I

10  would propose to do is send Your Honor a revised order that

11  reflects your rulings today.  And if I can have until Monday to

12  do that?

13          THE COURT:  Okay.  Monday is fine.

14          MR. HILL:  I have two more items that hopefully --

15          MR. TOLCHIN:  You'll send me a copy of what you --

16          MR. HILL:  I will send it to counsel before to make

17  sure there's no disagreement about what your rulings are.

18          MR. TOLCHIN:  So let me ask that you send it to me by

19  Monday and give me a chance to go over it and send it to the

20  court --

21          THE COURT:  That's fine.

22          MR. HILL:  I'll send it to you on Tuesday.  That's a

23  good transition to my next topic.

24          When we were before Your Honor previously we talked

25  about a gentleman named Mosab Hassan Youseff.  This is the

76

1   individual who's listed on plaintiff's initial disclosure as

2   having an address in San Diego, California.  You'll remember I

3   was asking that the plaintiffs provide me with this

4   information.  They said they don't have it.

5          Since that time the plaintiffs have served him with a

6   deposition issued out of this court and apparently served him

7   on the Island of Manhattan for a deposition that's supposed to

8   happen on November the 28th which is the Monday after

9   Thanksgiving.  Now, the plaintiffs gave us notice of this a few

10  hours before they effected service.  We managed to track down

11  Mr. Youseff in Pittsburgh where he was speaking the next night

12  and serve him with a document subpoena.  The return date for

13  his document subpoenas which we had issued out of the Western

14  District of Pennsylvania, because that's where we could find

15  him, is November the 21st which is Monday.  I have not heard

16  from Mr. Youseff about whether he will make a production in

17  response to my document request.  I understand Mr. Tolchin has

18  not heard form Mr. Youseff about whether he'll be appearing for

19  deposition on November the 28th.

20         I raise this with Your Honor at this time because I

21  obviously want to get the documents before his depositions

22  given that we don't know where he is and that this may end up

23  being a deposition that's used at trial.  However, since I

24  don't know whether I will get the documents, probably won't

25  know until Monday, what I'd like to avoid is the situation

77

1    where I don't get any documents but a deposition proceeds on

2    the 28th.

3            And so what I'm suggesting or maybe requesting is

4    would it be possible for us to speak with Your Honor on

5    Tuesday, I don't know if you're even planning to be in chambers

6    honestly, to help us with the situation?  Because the subpoena

7    was issued from this court, so Your Honor would have the

8    ability to modify the date of the deposition to hypothetically

9    if I don't get documents allow me to compel them and obtain

10   them in advance of the deposition.

11           THE COURT:  So this is essentially you don't want the

12   deposition to go forward unless you have the documents?

13           MR. HILL:  I think it would only be fair.  Otherwise

14   I'll be trying to cross exam him without having had the benefit

15   of information that I might be able to use to develop his

16   testimony particularly if this is going to be de bene esse.

17           THE COURT:  No, I understand your argument.  I just

18   want to make sure I understood what it is that you would be

19   asking me to do.

20           MR. HILL:  You know, I won't know until Monday.  He

21   may give me the documents in which case we'll presumably depose

22   him the day after Thanksgiving.  And of course the obvious

23   selfish reason for everybody involved is we'd like to know

24   whether we're taking the deposition the Monday after

25   Thanksgiving before Thanksgiving.

78

1          THE COURT:  Okay.  Well, I'm not sure what our
2    schedule is for Tuesday and frankly I'm not sure that I would
3    change the deposition date particularly --
4          MR. TOLCHIN:  He's a resistant witness.
5          THE COURT:  Yes.
6          MR. TOLCHIN:  I won't say -- I don't know hostile
7    yet.  That's a term of art.  But he certainly is resistant.
8          THE COURT:  My view is that you get a -- if we have
9    somebody who's resistant and you have them, you get them when
10   you have them.
11         MR. TOLCHIN:  And you ask him what documents might
12   exist.  You ask him.  Maybe he'll have to come back.
13         THE COURT:  But I've had this situation with
14   witnesses who are hard to get and you know you let them go that
15   one time and you spend months trying to get him back in a
16   flurry of things.  So I hear what you're saying.  I understand
17   the point you're making.  I would be reluctant -- if he doesn't
18   produce the documents but he does show up I'd say, you know,
19   you take your best shot at him then and see what you can do
20   with it and I'll appreciate what limitations you're working
21   under.  We'll try to fix that.  But you know, there's a lot of
22   valuable stuff you can get without documents.
23         MR. HILL:  Understood.  Is there a particular time on
24   Tuesday when it will be convenient or inconvenient for us to
25   call if we need to?

79

1          THE COURT:  I don't know.  Michael?  What does

2  Tuesday look like?

3          THE CLERK:  Tuesday we have court from 10

4  [inaudible].  So after 2:30.  3 o'clock?

5          MR. HILL:  So we will call chambers beforehand and

6  let you know if we will be calling jointly at 3.

7          THE COURT:  Okay.  And that will also be our

8  opportunity to tell you whether or not it's still okay.

9          MR. HILL:  Fair enough.  Thank you, Your Honor.

10          THE COURT:  All right

11          MR. HILL:  Finally, there is pending before the

12  court, although I'm not sure if it's Your Honor's issue or

13  Judge Daniels' issue, a motion pertaining to a subpoena the

14  plaintiffs have issued to the non-party, the British

15  Broadcasting Corporation.  It's partially but not yet

16  completely briefed.  And --

17          THE COURT:  I guess it's before us.

18          MR. HILL:  Okay.  I have written a letter to Mr.

19  Tolchin and to the counsel for the BBC because I believe that a

20  factual statement made in the plaintiff's brief is factually

21  inaccurate and asked Mr. Tolchin to correct the statement.

22  He's indicated that he disagrees with my letter.  I want to

23  alert the court to this and figure out how you would like me to

24  communicate this information to you because I obviously want

25  you to have a correct record factually.

80

1          MR. TOLCHIN:  This is a subpoena served on a non-

2    party.  He has no standing to object to it.  It's a non-party's

3    document or materials that we're looking for.  But he wrote

4    them a letter saying here, here's something you can say and now

5    he wants to be able to say it to Your Honor also.

6          THE COURT:  Okay.  I think you've lost me here.

7          MR. TOLCHIN:  Even though he has no official position

8    on the --

9          THE COURT:  Did you put this in a letter?

10         MR. HILL:  I wrote a letter to counsel and I wrote a

11   letter to counsel for the BBC.  What I'm seeking guidance is

12   does the court want me to send you a copy of that letter?  Do

13   you want me to write you a letter?  Would you like me to file a

14   brief?  I just want to make sure the court has an actual

15   factual record.

16         MR. TOLCHIN:  I would say if the BBC thinks that it's

17   relevant to their motion, they'll tell the court about it since

18   he wrote them a letter.  It's not a subpoena --

19         MR. HILL:  It's my case and the statements are being

20   made about my clients that may be not accurate.  I want the

21   court to know.  I just don't know how to tell you and what way

22   you want me to tell you.

23         THE COURT:  Okay.  Send me a copy of the letter that

24   you sent to plaintiff's counsel so I can at least get out of

25   the haze of trying to figure out what it is that we're talking

81

1   about.  If I could see actually what's being said --

2           MR. HILL:  I have a copy if you'd like it now or I

3   could submit it through the mail, whichever the court would

4   prefer.

5           THE COURT:  Oh, why don't you just hand it up?

6           MR. HILL:  So for the record, I'm handing the court

7   my letter to Robert Tolchin dated October 25, 2011.

8           THE COURT:  Anything else?

9           MR. HILL:  Nothing from me, Your Honor.

10          THE COURT:  Okay.  Michael?

11          THE CLERK:  Yes?

12          THE COURT:  What's the current discovery cutoff,

13  guys?

14          MR. HILL:  December of 2012.

15          THE COURT:  Let's put a control date in January on

16  this case.  I'd just like to keep it on the calendar since --

17          MR. TOLCHIN:  By control date, does Your Honor mean a

18  conference or for what?

19          THE COURT:  Well, we'll have you on the calendar and

20  before that date we'll determine whether or not we need to keep

21  the date.  I just don't want to leave without --

22          MR. TOLCHIN:  It's just different judges mean

23  different things by control date.

24          THE COURT:  Okay.  For me it means that we put you on

25  the calendar so that we have you on the calendar.

82

1          MR. TOLCHIN:  So we should be here unless we're told

2     otherwise.

3          THE COURT:  Or unless --

4          MR. TOLCHIN:  Or unless we all think it doesn't --

5     there's nothing to do.

6          THE COURT:  Yes.  I mean we'll determine before then

7     whether or not it's necessary to meet or whether or not we

8     should adjourn the date or whatever.  What do other people mean

9     by a control date?

10         MR. TOLCHIN:  Report to the court, the parties

11    report.  It's not always a conference date.  It may just be a

12    date for the parties to report to the court what the status is

13    or do they need a conference.

14         THE COURT:  I would tell people to give me a status

15    report on that date.  Okay.  But what's the date, Michael?

16         THE CLERK:  Judge, January 19, 2012 at 10 a.m.

17         THE COURT:  Okay.  All right.

18         MR. HILL:  Thank you, Your Honor.

19         MR. TOLCHIN:  Thank you, Your Honor.

20                    *  *  *  *  *  *

21

22

23

24

25

83

1        I certify that the foregoing is a court transcript from an

2    electronic sound recording of the proceedings in the above-

3    entitled matter.

4

5                              _____

6                                        Mary Greco

7    Dated:   December 14, 2011

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25