No. 11-88

In The

# Supreme Court of the United States

————

Asid Mohamad, Individually and for the
Estate of Azzam Rahim, Deceased, *et al.*,
*Petitioners,*

v.

Palestinian Authority, *et al.*,
*Respondents.*

————

## On Writ of Certiorari
to the United States Court of Appeals
for the District of Columbia Circuit

————

## BRIEF FOR RESPONDENTS

————

| | |
|---|---|
| Jeffrey A. Lamken | Laura G. Ferguson |
| Robert K. Kry | *Counsel of Record* |
| Martin V. Totaro | Richard A. Hibey |
| MoloLamken LLP | Mark J. Rochon |
| The Watergate, Suite 660 | Dawn E. Murphy-Johnson |
| 600 New Hampshire Ave., NW | Miller & Chevalier Chtd. |
| Washington, D.C. 20037 | 655 15th St. NW, Suite 900 |
| (202) 556-2000 | Washington, D.C. 20005 |
| | (202) 626-5800 |
| | lferguson@milchev.com |

*Counsel for Respondents*

————

Wilson-Epes Printing Co., Inc. – (202) 789-0096 – Washington, D.C. 20002

**QUESTION PRESENTED**

Whether the Torture Victim Protection Act of 1991, 28 U.S.C. § 1350 note, which authorizes actions against an "individual" who commits acts of torture or extrajudicial killing, permits actions against defendants that are not natural persons.

ii

## PARTIES TO THE PROCEEDINGS BELOW

Petitioners, who were plaintiffs-appellants below, are Asid Mohamad, individually and for the Estate of Azzam Rahim, Shahid Mohamad, Said Mohamad, Shahed Azzam Rahim, Mashhud Rahim, Mohamad Rahim, and Asia Rahim.

Respondents, who were defendants-appellees below, are the Palestinian Authority (also known as the Palestinian Interim Self-Government Authority) and the Palestine Liberation Organization. Jibril Rajoub, Amin Al-Hindi, and Tawfik Tirawi were named as defendants but were voluntarily dismissed and were not parties in the court of appeals.

TABLE OF CONTENTS

|  | Page |
|---|---|
| Question Presented | i |
| Parties to the Proceedings Below | ii |
| Preliminary Statement | 1 |
| Statement | 2 |
| I. Statutory Framework | 2 |
| II. Background and Proceedings Below | 4 |
| A. Factual Background | 4 |
| B. District Court Proceedings | 9 |
| C. The Court of Appeals' Decision | 10 |
| Summary of Argument | 12 |
| Argument | 14 |
| I. The Plain Meaning of the TVPA's Text Limits Liability to Natural Persons | 14 |
| A. The Ordinary Meaning of "Individual" Is a Natural Person or Human Being | 15 |
| B. Statutory Context Confirms That the TVPA Subjects Only Natural Persons to Liability | 23 |
| C. The Legislative History Confirms That Congress Deliberately Used the Term "Individual" To Limit the TVPA to Natural Persons | 28 |
| D. The TVPA's Extraterritorial Reach Cautions Against Departing from the Ordinary Meaning of "Individual" | 31 |

iv

## TABLE OF CONTENTS—Continued

Page

II. Petitioners' Attempts To Evade the
Ordinary Meaning of "Individual" Are
Unpersuasive........................................................ 33

    A. Limiting the TVPA's Scope to
Individuals Does Not Produce
Absurd Results ............................................ 33

    B. Construing the TVPA Consistent
with Its Plain Meaning Serves the
Act's Underlying Purposes ...................... 37

    C. Neither the *In Pari Materia* Canon
Nor Background Legal Principles
Supports Petitioners' Position................. 43

    D. Legislative History Provides No
Basis for Disregarding the Statute's
Plain Meaning ............................................ 48

Conclusion.................................................................. 53

Appendix – Relevant Statutory Provisions.............. 1a

v

## TABLE OF AUTHORITIES

Page

CASES

*Aetna Cas. & Sur. Div. of Aetna Life &
Cas. Co. v. Sandy Hill Corp.*, 54 A.D.2d
222 (N.Y. App. Div. 1976).................................. 27

*Aldana v. Del Monte Fresh Produce,
N.A.*, 416 F.3d 1242 (11th Cir. 2005) ..... 22, 23, 46

*Am. Elec. Power Co. v. Connecticut*, 131
S. Ct. 2527 (2011)................................................ 46

*Arce v. Garcia*, 434 F.3d 1254
(11th Cir. 2006) .................................................... 38

*Arndt v. UBS AG*, 342 F. Supp. 2d 132
(E.D.N.Y. 2004).................................................... 22

*Astoria Fed. Sav. & Loan Ass'n v.
Solimino*, 501 U.S. 104 (1991) .......................... 48

*Atl. Cleaners & Dyers, Inc. v. United
States*, 286 U.S. 427 (1932)................................ 25

*Aziz v. Alcolac, Inc.*, 658 F.3d 388
(4th Cir. 2011) ...................................................... 22

*Beanal v. Freeport-McMoRan, Inc.*,
969 F. Supp. 362 (E.D. La. 1997),
*aff'd on other grounds*, 197 F.3d 161
(5th Cir. 1999)...................................................... 22

*Bowoto v. Chevron Corp.*, 621 F.3d 1116
(9th Cir. 2010) ............................................ 22, 23, 35

*Braswell v. United States*, 487 U.S. 99
(1988)....................................................................... 38

*Brecht v. Abrahamson*, 507 U.S. 619
(1993)....................................................................... 23

*Brown v. Gardner*, 513 U.S. 115 (1994) ............ 23, 24

vi

## TABLE OF AUTHORITIES—Continued

Page

*Budget Serv. Co. v. Better Homes of Va.,
Inc.*, 804 F.2d 289 (4th Cir. 1986) .................... 35

*Chapman v. Griffith-Consumers Co.*,
107 F.2d 263 (D.C. Cir. 1939) .......................... 27

*Chavez v. Carranza*, 559 F.3d 486
(6th Cir. 2009) ................................................. 37

*City of Rancho Palos Verdes v. Abrams*,
544 U.S. 113 (2005) .......................................... 46

*Clinton v. City of New York*, 524 U.S. 417
(1998) ...................................................... 13, 19, 34

*Conn. Nat'l Bank v. Germain*, 503 U.S.
249 (1992) .............................................. 15, 45

*Corr. Servs. Corp. v. Malesko*, 534 U.S. 61
(2001) ............................................. 36, 37, 47

*Corrie v. Caterpillar, Inc.*, 403 F. Supp.
2d 1019 (W.D. Wash. 2005), *aff'd on
other grounds*, 503 F.3d 974
(9th Cir. 2007) ................................................. 22

*Crawford & Co. v. Apfel*, 235 F.3d 1298
(11th Cir. 2000) ............................................... 17

*Croxton v. Crowley Maritime Corp.*,
758 P.2d 97 (Alaska 1988) .............................. 27

*Doe v. Exxon Mobil Corp.*, 393 F. Supp.
2d 20 (D.D.C. 2005), *appeal dismissed*,
473 F.3d 345 (D.C. Cir. 2007) .......................... 22

*Doe v. Nestle, S.A.*, 748 F. Supp. 2d 1057
(C.D. Cal. 2010) ............................................... 22

*Doe v. Saravia*, 348 F. Supp. 2d 1112
(E.D. Cal. 2004) ............................................... 38

vii

TABLE OF AUTHORITIES—Continued

Page

*EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244 (1991)............................................... 31

*Enahoro v. Abubakar*, 408 F.3d 877 (7th Cir. 2005) ........................................ 46

*Erlenbaugh v. United States*, 409 U.S. 239 (1972).................................................. 43

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155 (2004) ........................ 32

*FCC v. AT&T Inc.*, 131 S. Ct. 1177 (2011)........................................... 15, 21, 24

*Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980)................................ *passim*

*Forti v. Suarez Mason*, 672 F. Supp. 1531 (N.D. Cal. 1987) ................................. 50

*Friedman v. Bayer Corp.*, No. 99-CV-3675, 1999 WL 33457825 (E.D.N.Y. Dec. 15, 1999) .................................. 22

*Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581 (2004)............................... 25

*Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846 (2011)..................... 16

*Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186 (1974)................................... 29

*Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432 (1999)............................................. 15

*In re Agent Orange Prods. Liab. Litig.*, 373 F. Supp. 2d 7 (E.D.N.Y. 2005), *aff'd on other grounds*, 517 F.3d 104 (2d Cir. 2008)........................................ 22

viii

TABLE OF AUTHORITIES—Continued

Page

*In re Atl. Bus. & Cmty. Corp.*, 901 F.2d
325 (3d Cir. 1990) .................................................. 35

*In re Chateaugay Corp.*, 920 F.2d 183
(2d Cir. 1990) ......................................................... 17

*In re Goodman*, 991 F.2d 613
(9th Cir. 1993) ....................................................... 17

*In re Jove Eng'g, Inc.*, 92 F.3d 1539
(11th Cir. 1996) ..................................................... 17

*In re Just Brakes Corp. Sys., Inc.*,
108 F.3d 881 (8th Cir. 1997) ................................ 17

*In re North*, 12 F.3d 252 (D.C. Cir. 1994) ........... 17

*In re Spookyworld, Inc.*, 346 F.3d 1
(1st Cir. 2003) ................................................. 17, 35

*In re Terrorist Attacks on Sept. 11, 2001*,
392 F. Supp. 2d 539 (S.D.N.Y. 2005),
*aff'd on other grounds*, 538 F.3d 71
(2d Cir. 2008) ......................................................... 22

*INS v. Cardoza-Fonseca*, 480 U.S. 421
(1987) ..................................................................... 29

*Jean v. Dorelien*, 431 F.3d 776
(11th Cir. 2005) ..................................................... 38

*Katz v. Comm'r*, 335 F.3d 1121
(10th Cir. 2003) ..................................................... 24

*La Reunion Aerienne v. Socialist
People's Libyan Arab Jamahiriya*,
533 F.3d 837 (D.C. Cir. 2008) ............................. 27

*Marks v. United States*, 161 U.S. 297
(1896) ..................................................................... 43

*Meyer v. Holley*, 537 U.S. 280 (2003) ............... 47, 48

ix

TABLE OF AUTHORITIES—Continued

Page

*Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437 (2007)................................................ 31, 32

*Milner v. Dep't of the Navy*, 131 S. Ct. 1259 (2011)........................................... 48

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)................................................. 47

*Morrison v. Nat'l Australia Bank Ltd.*, 130 S. Ct. 2869 (2010).......................... 31

*Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1164 (C.D. Cal. 2005)............ 22

*Ngiraingas v. Sanchez*, 495 U.S. 182 (1990)............................................... 31

*Nixon v. Mo. Mun. League*, 541 U.S. 125 (2004)........................................... 35

*Pfizer, Inc. v. Gov't of India*, 434 U.S. 308 (1978)........................................... 30

*Powerex Corp. v. Reliant Energy Servs.*, 551 U.S. 224 (2007)............................ 24

*Rodriguez v. United States*, 480 U.S. 522 (1987)........................................... 38

*Romero v. Drummond Co.*, 552 F.3d 1303 (11th Cir. 2008).............................. 23

*Russello v. United States*, 464 U.S. 16 (1983)................................................. 29

*Shafi v. Palestinian Auth.*:
686 F. Supp. 2d 23 (D.D.C. 2010)................... 22
642 F.3d 1088 (D.C. Cir. 2011)..................... 22, 51

*Shell Petroleum N.V. v. Kiobel*, 132 S. Ct. 248 (2011)........................................... 47

x

TABLE OF AUTHORITIES—Continued

Page

*Sosa v. Alvarez-Machain*, 542 U.S. 692
(2004).................................................. *passim*

*Tel-Oren v. Libyan Arab Republic*,
726 F.2d 774 (D.C. Cir. 1984) ................ 49, 51, 52

*Ungar v. Palestine Liberation Org.*,
402 F.3d 274 (1st Cir. 2005) ........................... 9

*United States v. Bean*, 537 U.S. 71 (2002)........... 44

*United States v. Cooper Corp.*, 312 U.S.
600 (1941).................................................. 30

*United States v. Granderson*, 511 U.S. 39
(1994)........................................................ 44

*United States v. Middleton*, 231 F.3d 1207
(9th Cir. 2000) ......................................... 35

*United States v. Perry*, 479 F.3d 885
(D.C. Cir. 2007)...................................... 35

*Vt. Agency of Natural Res. v. United
States ex rel. Stevens*, 529 U.S. 765
(2000)........................................................ 30

*Walters v. Metro. Educ. Enters., Inc.*,
519 U.S. 202 (1997)................................. 47

*Whitfield v. United States*, 543 U.S. 209
(2005)........................................................ 48

*Will v. Mich. Dep't of State Police*,
491 U.S. 58 (1989).................................. 30

STATUTES AND RULES

1 U.S.C. § 1 .......................................... 19, 20, 31

5 U.S.C. § 552a(a)(2)................................. 17

15 U.S.C. § 1692a(6) ................................. 48

15 U.S.C. § 1692k(a)................................. 48

xi

TABLE OF AUTHORITIES—Continued

Page

18 U.S.C. § 2331(1) .................................................   45

18 U.S.C. § 2333(a) ...............................................   27, 44

18 U.S.C. § 2337(2) ........................................   30, 44, 45

20 U.S.C. § 5602(3) ...............................................   17

28 U.S.C. § 1350 ................................................. *passim*

Torture Victim Protection Act of 1991,
    Pub. L. No. 102-256, 106 Stat. 73 (1992)
      (codified at 28 U.S.C. § 1350 note):
          28 U.S.C. § 1350 note § 2(a) ................... *passim*
          28 U.S.C. § 1350 note § 2(a)(2) ...................   26
          28 U.S.C. § 1350 note § 2(b) ................   4, 26, 46
          28 U.S.C. § 1350 note § 2(c) .........................   4, 46
          28 U.S.C. § 1350 note § 3 ...........................   4
          28 U.S.C. § 1350 note § 3(b)(1) ...................   24
          pmbl., 106 Stat. at 73 ...............................   2

28 U.S.C. § 1603(a) ...............................................   44

28 U.S.C. § 1605A ................................................   44, 45

29 U.S.C. § 1301(a)(14)(C)(ii)(V)...........................   17

33 U.S.C. § 933(b) .................................................   27

42 U.S.C. § 1983 ......................................   43, 44, 45, 47

42 U.S.C. § 1985 ....................................................   48

42 U.S.C. § 3602(d) ..............................................   48

42 U.S.C. § 3605(a) ...............................................   48

43 U.S.C. § 390bb(4) ............................................   18

46 U.S.C. § 30104 .................................................   48

46 U.S.C. § 30302 .................................................   48

49 U.S.C. § 1134(d) ..............................................   20

49 U.S.C. § 20505.................................................   20

xii

TABLE OF AUTHORITIES—Continued

Page

49 U.S.C. § 41741 ...................................................... 20

Pub. L. No. 102-229, § 214, 105 Stat. 1701,
1719 (1991) (codified at 29 U.S.C.
§ 1301(14)(C)(ii)(V)).............................................. 18

Pub. L. No. 102-282, § 2, 106 Stat. 149, 150
(1992) (codified at 21 U.S.C.
§ 335a(a)(1)) ........................................................... 19

Pub. L. No. 103-272, 108 Stat. 745 (1994) ............ 20

*Revision of the United States Statutes as
Drafted* (1872) ....................................................... 31

Fed. R. Civ. P. 4(e) .................................................. 16

Fed. R. Civ. P. 4(h) ................................................. 16

Fed. R. Civ. P. 4(j) .................................................. 16

Ala. Code § 5-26-3(4) .............................................. 18

Alaska Stat. § 15.13.400(11) ................................... 18

Alaska Stat. § 23.30.015(c)...................................... 27

Ariz. Rev. Stat. § 43-104(12) .................................. 18

Ark. Code § 26-18-104(7) ........................................ 18

Cal. Civ. Code § 1798.3(d) ...................................... 18

Colo. Rev. Stat. § 7-90-102(31.5)............................. 18

Colo. Rev. Stat. § 10-2-103(3)................................. 19

Conn. Gen. Stat. § 1-91(i)........................................ 18

D.C. Code § 31-1131.02(4A) .................................... 18

Del. Code tit. 5, § 2403(5) ....................................... 18

Fla. Stat. § 501.603(7) ............................................ 19

Fla. Stat. § 608.402(13) .......................................... 18

Ga. Code § 48-1-2(12) .............................................. 18

Haw. Rev. Stat. § 171-14.5(a)................................. 19

xiii

TABLE OF AUTHORITIES—Continued

Page

Haw. Rev. Stat. § 414-3 ........................................... 18

Idaho Code § 11-601(1) ........................................... 19

Idaho Code § 26-31-303(4) ...................................... 18

410 Ill. Comp. Stat. 520/2(e) .................................. 18

415 Ill. Comp. Stat. 5/22.2(h)(2)(F) ....................... 19

Ind. Code § 23-17-2-15 ............................................ 18

Iowa Code § 422.4(9) ............................................... 19

Iowa Code § 535D.3(5) ............................................ 18

Kan. Stat. § 79-32,109(b) ....................................... 18

Ky. Rev. Stat. § 271B.1-400(14) ............................. 18

La. Rev. Stat. § 22:1692(5) ..................................... 18

Mass. Gen. Laws ch. 255F, § 1 ............................... 18

Md. Code, Ins. § 9-401(g) ....................................... 18

Me. Rev. Stat. tit. 13-C, § 102(18) ......................... 18

Mich. Comp. Laws § 333.1105(1) ........................... 18

Minn. Stat. § 13.02 .................................................. 19

Miss. Code § 79-29-105(l) ....................................... 19

Mo. Rev. Stat. § 355.066(19) .................................. 19

Mont. Code § 30-14-1702(4) .................................... 19

N.C. Gen. Stat. § 53-244.030(14) ........................... 19

N.D. Cent. Code § 13-10-02(4) ............................... 19

N.H. Rev. Stat. § 397-A:1(VIII-b) .......................... 19

N.J. Stat. § 17:11C-2 ............................................... 19

N.M. Stat. § 57-1-6(C) ............................................ 19

N.M. Stat. § 58-21-2(G) .......................................... 19

N.Y. Banking Law § 599-b(5) ................................. 19

N.Y. Workers' Comp. Law § 29(2) ......................... 27

xiv

TABLE OF AUTHORITIES—Continued

Page

Neb. Rev. Stat. § 21-1711 ........................................  19

Nev. Rev. Stat. § 679A.097 ....................................  19

Ohio Rev. Code § 1322.01(S) ..................................  19

Okla. Stat. tit. 24, § 162(5) ....................................  19

Or. Rev. Stat. § 60.001(21).....................................  19

1 Pa. Cons. Stat. § 1991 .........................................  19

R.I. Gen. Laws § 7-1.2-106(9)................................  19

S.C. Code § 40-11-20(16).......................................  19

S.D. Codified Laws § 10-43-1(8) ...........................  19

Tenn. Code § 45-13-105(8)......................................  19

Tex. Bus. Orgs. § 1.002(38)....................................  19

Utah Code § 20A-12-301(5) ...................................  19

Va. Code § 13.1-603 ...............................................  19

Vt. Stat. tit. 8, § 2200(8) ........................................  19

W. Va. Code § 33-12-2(c)........................................  19

W. Va. Code § 46A-2A-101(5)................................  19

Wash. Rev. Code § 19.215.010(3)...........................  19

Wash. Rev. Code § 30.22.040(9)............................  19

Wis. Stat. § 126.01(15)............................................  19

Wyo. Stat. § 17-16-140(a)(xviii).............................  19

LEGISLATIVE MATERIALS

H.R. 4756, 99th Cong. (1986).................................  28

H.R. Rep. No. 102-280 (1991) ................................  20

H.R. Rep. No. 102-367 (1991)........................  *passim*

S. Rep. No. 102-249 (1991)...............................  *passim*

S. Rep. No. 102-410 (1992) .....................................  20

xv

TABLE OF AUTHORITIES—Continued

Page

132 Cong. Rec. 12,950 (1986) ................................. 28

135 Cong. Rec. 22,717 (1989) ................................. 40

136 Cong. Rec. 36,193 (1990) ................................. 42

137 Cong. Rec. 2671 (1991) ................................. 40, 41

137 Cong. Rec. 2255 (1991) ................................. 18

137 Cong. Rec. 34,785 (1991) ............................... 40

138 Cong. Rec. 4176 (1992) ................................. 3, 40

138 Cong. Rec. 4177 (1992) ................................. 41

*Hearing and Markup on H.R. 1417 Before
the H. Comm. on Foreign Affairs,*
100th Cong. (1988) .......................................... 28, 29

*Torture Victim Protection Act of 1989:
Hearing Before the Subcomm. on
Immigration and Refugee Affairs
of the S. Comm. on the Judiciary,*
101st Cong. (1990)............................... 3, 32, 33, 42

EXECUTIVE MATERIALS

7 C.F.R. § 1.302(l) ..................................................... 18

10 C.F.R. § 13.2........................................................ 18

10 C.F.R. § 1008.2(f)............................................... 18

12 C.F.R. § 261a.2(c) .............................................. 18

14 C.F.R. § 1264.101(j) ........................................... 18

15 C.F.R. § 25.2....................................................... 18

16 C.F.R. § 4.13(b)(1) ............................................. 18

20 C.F.R. § 355.2..................................................... 18

20 C.F.R. § 401.25................................................... 18

22 C.F.R. § 35.2(j) ................................................... 18

28 C.F.R. § 71.2....................................................... 18

xvi

TABLE OF AUTHORITIES—Continued

Page

29 C.F.R. § 22.2(j) ................................................... 18

31 C.F.R. § 16.2 ...................................................... 18

34 C.F.R. § 33.2 ...................................................... 18

38 C.F.R. § 42.2 ...................................................... 18

40 C.F.R. § 27.2 ...................................................... 18

41 C.F.R. § 105-70.002(h) ...................................... 18

43 C.F.R. § 35.2(i) .................................................. 18

45 C.F.R. § 79.2 ...................................................... 18

47 C.F.R. § 1.1918(a) ............................................. 18

49 C.F.R. § 31.2 ...................................................... 18

Nat'l Security Council, *The National
    Security Strategy of the United States
    of America* (2002) ............................................. 36

*Remarks Following a Meeting with
    President Mahmoud Abbas of the
    Palestinian Authority*, 2010 Daily
    Comp. Pres. Doc. 472 (June 9, 2010) ............... 6

U.S. Dep't of State, *2010 Country Reports
    on Human Rights Practices: Brazil*
    (2011) ................................................................. 8

U.S. Dep't of State, *2010 Country Reports
    on Human Rights Practices: Italy* (2011) ...... 8

U.S. Dep't of State, *2010 Country Reports
    on Human Rights Practices: Spain*
    (2011) ................................................................. 8

U.S. Dep't of State, *Israel, the West
    Bank and Gaza: Country Specific
    Information*, http://travel.state.gov/
    travel/cis_pa_tw/cis/cis_1064.html ................... 6

xvii

TABLE OF AUTHORITIES—Continued

Page

INTERNATIONAL MATERIALS

Agreement on the Gaza Strip and the
    Jericho Area, Isr.-PLO, May 4, 1994,
    33 I.L.M. 622:
        art. III, 33 I.L.M. at 628 ............................ 5
        art. VIII, 33 I.L.M. at 631 ........................... 5
        art. IX, 33 I.L.M. at 632 ............................. 5

Convention Against Torture and Other
    Cruel, Inhuman or Degrading
    Treatment or Punishment, Dec. 10, 1984,
    1465 U.N.T.S. 85, 23 I.L.M. 1027, *as
    modified by* 24 I.L.M. 535 ............................... 41
        art. 14, 23 I.L.M. at 1030 ........................... 41

Declaration of Principles on Interim Self-
    Government Arrangements, Isr.-PLO,
    Sept. 13, 1993, 32 I.L.M. 1525:
        pmbl., 32 I.LM. at 1527 .............................. 4
        art. I, 32 I.LM. at 1527 ............................. 4
        art. V, 32 I.LM. at 1528 ............................. 5

Geneva Convention Relative to the
    Treatment of Prisoners of War art. 3,
    Aug. 12, 1949, 6 U.S.T. 3316, 3318 ................... 43

Interim Agreement on the West Bank and
    the Gaza Strip, Isr.-PLO, Sept. 28, 1995,
    36 I.L.M. 551 ........................................... 5
        art. I, 36 I.L.M. at 558 ............................. 5

Permanent Observer Mission of
    Palestine to the United Nations,
    *PLO: Introduction*, http://www.un.int/
    wcm/content/site/palestine/pid/12003 ............... 8

xviii

TABLE OF AUTHORITIES—Continued

Page

PLO Palestine Nat'l Council, *Political
    Communique and Declaration of
    Independence*, 27 I.L.M. 1660 (1988) .............    9

*Sadiq Shek Elmi v. Australia*, U.N. Comm.
    Against Torture Commc'n No. 120/1998,
    U.N. Doc. CAT/C/22/D/120/1998
    (May 25, 1999)........................................    42

U.N. Comm. Against Torture, General
    Comment No. 2, U.N. Doc. CAT/C/GC/2
    (Jan. 24, 2008) .....................................    42

OTHER AUTHORITIES

Appellees Br. in *Aldana v. Del Monte
    Fresh Produce, N.A.*, No. 04-10234, 2004
    WL 4976697 (11th Cir. May 17, 2004) .............    23

*Black's Law Dictionary* (6th ed. 1990) ...............    15

B. Garner, *A Dictionary of Modern Legal
    Usage* (1987)........................................    16

Int'l Bar Ass'n, *Report of the Task Force on
    Extraterritorial Jurisdiction* (2009)...............    42

Int'l Monetary Fund, *Macroeconomic and
    Fiscal Framework for the West Bank
    and Gaza: Seventh Review of Progress*
    (2011)...............................................    6

*Random House Dictionary of the English
    Language* (2d ed. 1987) ............................    15

N. Singer, *Statutes and Statutory
    Construction* (6th rev. ed. 2000) ..................    26

N. Singer & J.D. Singer, *Sutherland
    Statutes & Statutory Construction*
    (7th ed. 2008).......................................    44

xix

TABLE OF AUTHORITIES—Continued

Page

*Webster's Third New International
    Dictionary* (1986)...................................................  15

World Bank, *Sustaining Achievements in
    Palestinian Institution-Building and
    Economic Growth* (2011) ..................................  6

U.S. Br. in *Kiobel v. Royal Dutch
    Petroleum Co.*, No. 10-1491 ..........................  42, 45

In The

## Supreme Court of the United States

————

No. 11-88

————

Asid Mohamad, Individually and for the
Estate of Azzam Rahim, Deceased, *et al.*,

*Petitioners,*

v.

Palestinian Authority, *et al.*,

*Respondents.*

————

**On Writ of Certiorari
to the United States Court of Appeals
for the District of Columbia Circuit**

————

**BRIEF FOR RESPONDENTS**

————

**PRELIMINARY STATEMENT**

The Torture Victim Protection Act of 1991 ("TVPA" or
the "Act") provides that "[a]n individual who * * * sub-
jects an individual" to torture or extrajudicial killing un-
der color of foreign law shall be liable "to that individual"
or "to that individual's legal representative, or to any
person who may be a claimant in an action for wrongful
death." 28 U.S.C. § 1350 note § 2(a).  The question in this
case is whether the term "individual" in that statute
means what it almost invariably means in ordinary and

2

legal usage—a natural person or human being. That question all but answers itself. While "person" often encompasses corporations and similar entities, "individual" does not. Indeed, Congress replaced the word "person" in an earlier draft of the statute with "individual" precisely to exclude organizations from liability.

The TVPA brings certain international human rights violations within the civil jurisdiction of U.S. courts. Mindful that it was creating a private cause of action with extraordinary extraterritorial reach, Congress proceeded carefully, tailoring the statute to achieve a limited but important purpose. By imposing liability on the responsible "individual," the Act prevents human rights violators from seeking safe haven in the United States. But by precluding suit against organizations alleged to be responsible for the individual's conduct (often the state itself), Congress limited the risk of international discord and potential interference with the Executive's conduct of foreign policy. Giving "individual" its ordinary meaning respects the careful balance Congress struck. The judgment of the court of appeals should accordingly be affirmed.

## STATEMENT

### I. STATUTORY FRAMEWORK

The Torture Victim Protection Act seeks to "protect[ ] * * * human rights by establishing a civil action for recovery of damages from an individual who engages in torture or extrajudicial killing." Pub. L. No. 102-256, pmbl., 106 Stat. 73, 73 (1992). It provides:

An individual who, under actual or apparent authority, or color of law, of any foreign nation—

(1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual; or

3

> (2) subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death.

28 U.S.C. § 1350 note § 2(a).

The TVPA was enacted to establish an express cause of action for certain claims previously brought under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350. The ATS was enacted in 1789 but lay largely dormant until 1980, when the Second Circuit decided *Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980). *Filartiga* held that the ATS provided jurisdiction over a claim arising out of a Paraguayan police inspector-general's torture and killing of a Paraguayan citizen. *Id.* at 878. "[A]n act of torture committed by a state official against one held in detention," the court ruled, "violates established norms of the international law of human rights, and hence the law of nations." *Id.* at 880.

Congress enacted the TVPA in 1992 to "establish an unambiguous and modern basis" for claims of official torture and extrajudicial killing of the sort brought in *Filartiga*. H.R. Rep. No. 102-367, at 3 (1991). The State and Justice Departments had expressed concerns about allowing suits for "acts of foreign governments or officials which take place in their own countries." *Torture Victim Protection Act of 1989: Hearing Before the Subcomm. on Immigration and Refugee Affairs of the S. Comm. on the Judiciary*, 101st Cong. 11-16, 22-29 (1990) ("*1990 Hearings*"). But Congress concluded that legislation was appropriate to "deny torturers a safe haven in this country." 138 Cong. Rec. 4176 (1992) (Sen. Specter).

Congress sought to "[s]trik[e] a balance between the desirability of providing redress for a victim and the fear

4

of imposing additional burdens on U.S. courts." H.R.
Rep. No. 102-367, at 4. Accordingly, the Act carefully de-
lineates the cause of action it creates. It specifically de-
fines torture and extrajudicial killing. 28 U.S.C. § 1350
note § 3. It imposes a state-action requirement, providing
redress only for torture or extrajudicial killing "under
actual or apparent authority, or color of law, of any for-
eign nation." *Id.* § 2(a). It contains an exhaustion require-
ment. *Id.* § 2(b). And it prescribes a statute of limita-
tions. *Id.* § 2(c). Most importantly here, the Act provides
a cause of action only against "individual[s]." *Id.* § 2(a).

## II. BACKGROUND AND PROCEEDINGS BELOW

### A. Factual Background

This case arises from petitioners' claim that Azzam
Rahim was detained, tortured, and killed by "the security
forces of the Palestinian Authority" in late 1995, C.A.
App. A25-A31, ¶¶ 18-32, 65, 70, around the time the Pal-
estinian Authority assumed responsibility for certain ter-
ritories pursuant to internationally brokered peace agree-
ments.

1. The Palestinian Authority had its genesis in the
1993 Oslo Accords, in which Israel and the Palestine Lib-
eration Organization ("PLO") agreed that it was "time to
put an end to decades of confrontation and conflict, rec-
ognize their mutual legitimate and political rights, and
strive to live in peaceful coexistence and mutual dignity
and security and achieve a just, lasting and comprehen-
sive peace settlement." Declaration of Principles on In-
terim Self-Government Arrangements, Isr.-PLO, pmbl.,
Sept. 13, 1993, 32 I.L.M. 1525, 1527. In the Oslo Accords,
the parties agreed "to establish a Palestinian Interim
Self-Government Authority * * * for the Palestinian peo-
ple in the West Bank and the Gaza Strip, for a transi-
tional period" until a permanent resolution could be

5

reached. *Id.* art. I, 32 I.LM. at 1527. The framework established by the Accords was to be implemented through later agreements negotiated by the parties. *See id.* art. V, 32 I.L.M. at 1528-1529.

Under the first of those agreements, signed in 1994, the Israeli Civil Administration transferred most of its authority over civil affairs in the Jericho Area of the West Bank and the Gaza Strip to the Palestinian Authority. *See* Agreement on the Gaza Strip and the Jericho Area, Isr.-PLO, art. III, May 4, 1994, 33 I.L.M. 622, 628. Israel remained responsible for the security of Israelis and Israeli settlements, but responsibility for public order and the internal security of Palestinians in those areas was transferred to the Palestinian Directorate of Police Force, operating under the auspices of the Palestinian Authority. *See id.* arts. VIII, IX, 33 I.L.M. at 631-632.

The second implementation agreement, the 1995 Interim Agreement, further delineated the division of civilian and security responsibilities and set forth the basic structure and scope of the Palestinian Authority's executive, legislative, and judicial functions. *See* Interim Agreement on the West Bank and the Gaza Strip, Isr.-PLO, Sept. 28, 1995, 36 I.L.M. 551. That agreement also provided for the dissolution of the Israeli Civil Administration and the withdrawal of Israeli military forces from additional areas of the West Bank not covered by the earlier agreement, as well as for a scheduled transfer of certain powers and responsibilities to the Palestinian Authority. *See id.* art. I, 36 I.L.M. at 558-559.

Although a permanent resolution has not been achieved in the 20 years since the Oslo Accords, the Palestinian Authority continues to fulfill a critical role in promoting economic development and security for West Bank residents. Continuing the policies of his predeces-

6

sor, President Obama has commended Palestinian Authority President Mahmoud Abbas and Prime Minister Salam Fayyad for their ambitious campaign of reform, economic development, and institution-building, observing that their "hard work and dedication" in the face of nearly insurmountable obstacles is "strengthening the security as well as improving the economic situation for [their] people." *Remarks Following a Meeting with President Mahmoud Abbas of the Palestinian Authority*, 2010 Daily Comp. Pres. Doc. 472 (June 9, 2010). International organizations have echoed those views.[1] Moreover, Palestinian Authority security forces—trained by the United States and other Western powers—play a pivotal role in preventing violence and terrorism in the region.[2]

2. Because this case arises on a motion to dismiss, the complaint's well-pleaded factual allegations are taken as true. According to the complaint, Azzam Rahim was kidnapped, tortured, and killed by "the security forces of the Palestinian Authority." C.A. App. A30-A31, ¶¶ 65, 70. Specifically, the complaint alleges that on September 27, 1995, Rahim was abducted from a West Bank village by "plain clothes men who identified themselves as security police" and took him "to a prison in Jericho" where he

---

[1] *See, e.g.*, World Bank, *Sustaining Achievements in Palestinian Institution-Building and Economic Growth* 13-31 (2011); Int'l Monetary Fund, *Macroeconomic and Fiscal Framework for the West Bank and Gaza: Seventh Review of Progress* 29-32 (2011).

[2] Palestinian Authority security forces have now been "deployed in all major cities of the West Bank, and violence in these areas has decreased markedly since a series of PA security campaigns that started in 2007." U.S. Dep't of State, *Israel, the West Bank and Gaza: Country Specific Information*, http://travel.state.gov/travel/cis_pa_tw/cis/cis_1064.html; *see also* World Bank, *supra*, at 13 ("The PA has made major progress in bringing safety and security to the West Bank * * * .").

7

was "tortured." *Id.* at A24-A25, ¶24.  Two days later, an ambulance delivered Rahim's body to the village.  *Id.* at A26, ¶32.

The complaint named the Palestinian Authority and PLO as defendants, as well as Jabril Rajoub, identified as "head of the Palestinian Preventive Security Force in the West Bank," and two other individuals identified as senior Palestinian security officials.  C.A. App. A23, ¶¶10-14. Other than the claim that "[l]ocal villagers * * * recognized the security police officers who seized Azzam Rahim * * * as agents of defendant Jibril Rajoub," *id.* at A24, ¶25, the complaint alleges no facts indicating that any of the individual defendants had any involvement in Rahim's alleged torture or death.[3]

More importantly, the complaint provides only the most conclusory allegations of respondents' culpability. It alleges that Rahim was tortured and killed by "the security forces of the Palestinian Authority," C.A. App. A30-A31, ¶¶61, 65, 70, but it nowhere suggests that the Palestinian Authority had any role in, or knowledge of, the alleged misconduct.  Instead, liability is premised on the assertion that the acts were "carried out pursuant to a general policy of the Palestinian Authority and the PLO's leadership that is designed to terrorize the Palestinian population and to ensure that an elite Palestinian leadership circle is able to maintain power at all costs." *Id.* at A29, ¶57; *see also id.* at A28, ¶¶52-53 (alleging other "human rights abuses by the Palestinian Authority").

The U.S. State Department's *Human Rights Report for Israel and the Occupied Territories* (1995), C.A. App. A82-A100, provides a different perspective.  That report

---

[3] Ultimately, petitioners voluntarily dismissed their claims against the individual defendants; only the Palestinian Authority and the PLO remain as defendants. C.A. App. A148-A149.

8

identifies Rahim as one of "[f]ive Palestinians * * * who died in the custody of PA security officers" that year. *Id.* at A85.[4] But the report recounts that "one of the deaths was accidental and another due to pre-existing medical conditions." *Id.* It also explains that "[s]everal Palestinian officials have been sentenced for their role in some of these cases," and that "[t]hree intelligence officers were sentenced for their role" in Rahim's case. *Id.* at A85-A86.

Although the complaint also names the PLO as a defendant, that organization's alleged role is unclear. The PLO is an umbrella organization for various political parties and factions that are dedicated to establishing a Palestinian state. *See* Permanent Observer Mission of Palestine to the United Nations, *PLO: Introduction*, http://www.un.int/wcm/content/site/palestine/pid/12003. The Oslo agreements do not confer any authority on the PLO for the operation of security forces or prisons in the West Bank. *See* pp. 4-5, *supra.* Moreover, the complaint alleges that Rahim was detained by "security forces of the *Palestinian Authority*" and "died while being held in the custody of the *Palestinian Authority*." C.A. App. A28, A30, ¶¶ 52, 61 (emphasis added). Although the complaint asserts that the misconduct was carried out by defendants pursuant to a general PLO policy of "terroriz[ing] the Palestinian population," *id.* at A29, ¶ 57, and that the

---

[4] While any death in custody is regrettable, that statistic is not out of line with those of many long-established governments operating in less challenging circumstances. *See, e.g.*, U.S. Dep't of State, *2010 Country Reports on Human Rights Practices: Brazil* 8 (2011) (reporting deaths of at least six prisoners caused by police in two days); U.S. Dep't of State, *2010 Country Reports on Human Rights Practices: Spain* 3 (2011) (noting that "11 persons died while in police custody" and "28 died in jail" in 2009); U.S. Dep't of State, *2010 Country Reports on Human Rights Practices: Italy* 4 (2011) (noting 160 deaths in custody, including 61 by suicide, over 11 months).

9

individual defendants were "high ranking official[s]" of both the Palestinian Authority and the PLO, *id.* at A23, ¶¶ 12-14, it is devoid of specific factual allegations that the PLO was involved in the events at issue.[5]

## B. District Court Proceedings

Ten years after Rahim's death, petitioners (Rahim's widow and sons) brought this action in the U.S. District Court for the Southern District of New York seeking damages under the TVPA. C.A. App. A48.[6] The case sat dormant for nearly two years until June 2007, when the clerk entered a default. *Id.* at A12. Respondents then retained U.S. counsel, sought vacatur of the default, and moved to dismiss, asserting both lack of personal juris-

---

[5] Notwithstanding the purely legal nature of the question before the Court, petitioners and *amici* reach back into an earlier period in the PLO's history in an attempt to disparage respondents. Those efforts are neither relevant nor well-founded. For example, petitioners and *amici* cite a 1987 congressional finding and the PLO's alleged role in a 1978 attack. *See* Pet. Br. 46-48; API Br. 5. But those events preceded the PLO's renunciation of violence in the Algiers Declaration in 1988, *see* PLO Palestine Nat'l Council, *Political Communique and Declaration of Independence*, 27 I.L.M. 1660, 1670 (1988), as well as its reaffirmation of that commitment to peace in the 1993 Oslo Accords. *Amici* also assert that courts have found that the PLO "engaged in brutal acts of terrorism and torture," API Br. 5; *see also* Pet. Br. 13-14, but the cited case affirmed entry of a *default* judgment based on a shooting by Hamas, not the PLO. *Ungar v. Palestine Liberation Org.*, 402 F.3d 274, 276 (1st Cir. 2005). That default judgment was later vacated. *See* Dkt. No. 657 in *Estate of Yaron Ungar v. Palestinian Auth.*, No. 1:00-cv-105L (D.R.I. Feb. 14, 2011).

[6] The complaint also asserted claims under the ATS and federal common law. C.A. App. A56-A58, ¶¶ 73-96. But petitioners eventually conceded that they could not proceed under the ATS, Pet. App. 16a n.1, and the district court and court of appeals rejected their common law claims, *id.* at 11a-13a, 19a-21a. Petitioners do not seek review of those rulings here.

10

diction and failure to state a claim. *See id.* at A9-A10; Pet. App. 4a.

At petitioners' request, the case was transferred to the U.S. District Court for the District of Columbia. C.A. App. A18. That court vacated the default and granted the motion to dismiss, ruling that the TVPA, by providing a cause of action only against "individual[s]," restricted liability to natural persons. Pet. App. 14a-21a. "A plain reading of the statute and the applicable case law," the court explained, "leads this Court to overwhelmingly conclude that the term 'individual' includes only human beings." *Id.* at 17a. "Simply stated, Congress's plain intent as reflected in the text (which specifies only individuals) and the legislative history (which could not be clearer) was to confine liability for acts of torture and extrajudicial killing to private individuals." *Id.* at 18a (quotation marks omitted).[7]

### C. The Court of Appeals' Decision

The court of appeals (Ginsburg, Tatel & Garland, JJ.) affirmed. Pet. App. 1a-13a. Like the district court, the court of appeals began with the TVPA's plain text. *Id.* at 6a-8a. Because the TVPA does not define "individual," the court explained, that term must be "give[n] its ordinary meaning, * * * which typically encompasses only natural persons and not corporations or other organizations." *Id.* at 7a. Canvassing decisions of this Court and other federal courts, the court of appeals observed that

---

[7] The district court did not address respondents' challenge to personal jurisdiction. C.A. App. A79. Petitioners are thus mistaken in asserting that the court exercised personal jurisdiction over respondents. Pet. Br. 6. Nor did the court address respondents' argument that TVPA's requirement that the alleged acts be committed under authority or color of law of a "foreign nation" was not met. C.A. App. A78.

11

courts had repeatedly concluded that "individual" refers only to natural persons. *Id.* at 7a-8a.

The court of appeals rejected petitioners' argument that "the term 'individual' is at least ambiguous" as well as their claim that the term should be given the same meaning as "person" in other statutes. Pet. App. 8a. The "structure of the TVPA," the court held, "confirms what the plain text of the statute shows: The Congress used the word 'individual' to denote only natural persons." *Id.* The TVPA "uses the word 'individual' five times in the same sentence—four times to refer to the victim of torture or extrajudicial killing, which could be only a natural person, and once to the perpetrator of the torture or killing." *Id.* at 8a-9a (citing 28 U.S.C. § 1350 note § 2(a)). "The Rahims advance no cogent reason, and we see none, to think the term 'individual' has a different meaning when referring to the victim as opposed to the perpetrator." *Id.* at 9a.

The court of appeals also observed that the TVPA uses the word "person" rather than "individual" to identify potential claimants: A suit can be filed by the victim, his legal representative, or any "'*person* * * * who may be a claimant in an action for wrongful death.'" Pet. App. 9a (quoting 28 U.S.C. § 1350 note § 2(a)) (emphasis added). Congress's decision to use the expansive term "person" elsewhere in the statute "further support[ed] the significance of the Congress having used 'individual' rather than 'person' to identify who may be sued under the TVPA." *Id.*

The court of appeals then turned to petitioners' argument, raised "for the first time" in their reply brief, that "the defendants are secondarily liable for Rahim's death either pursuant to the principle of respondeat superior or for aiding and abetting his killer(s)." Pet. App. 10a. The

12

court ruled that argument was waived but also observed that it was unpersuasive. *Id.* "[E]ven if we assume some form of vicarious liability is possible, the text of the TVPA still limits such liability to individuals, and we have already seen that in this statute 'individual' comprises only natural persons." *Id.* (quotation marks and citation omitted).[8]

## SUMMARY OF ARGUMENT

I.A.  The TVPA imposes liability only on an "individual" who commits torture or extrajudicial killing under color of foreign law. 28 U.S.C. § 1350 note § 2(a). Dictionaries, common usage, case law, and statutes all make clear that the ordinary meaning of "individual" is a natural person or human being. While the broader term "person" has a specialized legal meaning that encompasses corporations and other entities, "individual" does not.

Petitioners offer no accepted alternative definition. They urge that "individual," when used to "plac[e] * * * emphas[i]s on the *oneness* of something," "comfortably encompass[es]" organizations. Pet. Br. 18. But that definition would also encompass foreign states and state entities, which petitioners admit Congress intended to exclude. Every court of appeals that has meaningfully addressed the issue has agreed that the TVPA applies only to natural persons.

B.  The TVPA's remaining text confirms Congress's intent. The Act's liability provision uses the term "individual" five times to refer to the defendant or the victim. And a victim of torture or extrajudicial killing can only be a natural person. By contrast, the Act uses the broader

---

[8] Having held that respondents were not "individuals" within the meaning of the TVPA, the court of appeals did not reach respondents' alternative argument that the TVPA's state-action requirement was not met. *See* C.A. Br. 40-44.

13

term "person" or "claimant" to refer to potential plain-
tiffs, which may include organizations. Congress's care-
ful word choice makes clear that Congress used "individ-
ual" to refer only to natural persons.

C. Congress did not merely use the term "individual"
rather than "person." It *changed* the term "person" to
"individual" for the express purpose of excluding organ-
izational liability. And while petitioners urge that Con-
gress sought to exclude *state* liability, the way Congress
accomplished that result was by limiting the Act to natu-
ral persons.

D. Finally, the Act's broad extraterritorial sweep
counsels for a narrow construction. As the State and Jus-
tice Departments both warned, an extraterritorial tort
statute has grave potential to disrupt foreign relations.
Limiting the Act to the natural persons who actually
commit or direct the torture or extrajudicial killing re-
duces the risk of friction with foreign governments.

II.A. Petitioners' attempts to avoid the Act's plain
meaning all fail. *Clinton v. City of New York*, 524 U.S.
417 (1998), refutes rather than supports their position.
That case construed "individual" to include organizations
only to avoid an "absurd result"—a result the term's or-
dinary meaning would otherwise have "dictate[d]." *Id.* at
429 n.14. Here, by contrast, Congress had legitimate
reasons to limit the Act to natural persons.

B. Nor is petitioners' construction necessary to avoid
undermining the Act's purpose. No legislation pursues
its purposes at all costs. And Congress passed the TVPA
to prevent the United States from becoming a safe haven
for torturers, not to encourage long-arm jurisdiction over
multinational corporations. Finally, petitioners' reliance
on the Convention Against Torture ignores that treaty's
clear limitations.

14

C.  Petitioners' reliance on *in pari materia* principles is similarly unavailing.  The other statutes they cite all use different language precisely where it counts.  Those differences underscore the importance of giving effect to Congress's word choice here.  And while petitioners advert to background principles of vicarious liability, those arguments are waived and meritless in any event.

D.  Finally, the portions of the legislative history that petitioners cite undermine their position.  That history shows that Congress enacted the TVPA to provide a modern grounding for the sort of claim brought against an individual torturer in *Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980)—not to target entities like the PLO.  The legislative history confirms that Congress meant what it said when it limited the Act's coverage to "individuals."

## ARGUMENT

### I.  THE PLAIN MEANING OF THE TVPA'S TEXT LIMITS LIABILITY TO NATURAL PERSONS

The Torture Victim Protection Act provides that "[a]n individual who, under actual or apparent authority, or color of law, of any foreign nation" "subjects an individual" to torture or extrajudicial killing shall "be liable for damages to that individual" or "to that individual's legal representative, or to any person who may be a claimant in an action for wrongful death."  28 U.S.C. § 1350 note § 2(a).  The ordinary meaning of "individual" is a natural person, as contrasted with a group or organization.  Congress's intent to use "individual" in that ordinary sense is apparent from its repeated use of that term in the same provision to refer to natural persons (the victims of torture and extrajudicial killing) and by its contrasting use of "person" to refer to a class that could encompass non-natural persons (claimants in a wrongful death action).

15

The history of the Act confirms that Congress adopted the term "individual" to make clear that organizations would not be subject to liability.

## A. The Ordinary Meaning of "Individual" Is a Natural Person or Human Being

This Court has "stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-254 (1992). This Court's analysis "begins with 'the language of the statute,'" and "where the statutory language provides a clear answer, it ends there as well." *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999).

The TVPA imposes liability on an "individual." Where, as here, a statute uses a term that it does not define, the term must be given its ordinary meaning. *See FCC v. AT&T Inc.*, 131 S. Ct. 1177, 1182 (2011). As the court below unanimously recognized, the ordinary meaning of "individual" is a natural person, not a legal entity like a corporation. Pet. App. 6a-8a.

1. In ordinary usage, "individual" refers to "a single human being, as distinguished from a group." *Random House Dictionary of the English Language* 974 (2d ed. 1987); *see also Webster's Third New International Dictionary* 1152 (1986) ("a single human being as contrasted with a social group or institution"). Because "individual" does not have a different specialized legal meaning, legal dictionaries define the term in a manner consistent with its ordinary usage: "As a noun, [individual] denotes a single person as distinguished from a group or class, and also, very commonly, a private or natural person as distinguished from a partnership, corporation, or association." *Black's Law Dictionary* 773 (6th ed. 1990). "*[I]ndividual* is best confined to contexts in which the writer

16

intends to distinguish the single (noncorporate) person from the group or crowd." B. Garner, *A Dictionary of Modern Legal Usage* 291 (1987).

We thus use "individual" in both common and legal parlance to make clear that we are referring to a human being and not a group, corporation, or institution. We contrast an individual tax return with a corporate return, individual tax rates with corporate rates, and individual campaign contributions with corporate contributions. We contrast individual responsibility with corporate responsibility, individual defendants with corporate or governmental defendants, individual investors with institutional investors, and an individual mandate with one imposed on businesses. The Federal Rules of Civil Procedure provide rules for service of process on an "individual" that are separate from the rules for serving a "corporation, partnership or association" or a "foreign, state, or local government." Fed. R. Civ. P. 4(e), 4(h), 4(j).

This Court routinely uses "individual" to distinguish a human being from a corporation or other artificial entity. In *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846 (2011), the Court stated that, "[f]or an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home." *Id.* at 2853-2854. And in *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), the Court explained that whether a case may proceed under the Alien Tort Statute depends on whether international law extends liability "to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual." *Id.* at 732 n.20.

Case after case has thus construed "individual" in federal statutes to mean a natural person and not an artifi-

17

cial entity like a corporation.  *See, e.g.*, *In re Spooky-
world, Inc.*, 346 F.3d 1, 7-8 (1st Cir. 2003) (provision al-
lowing claims by an "individual" does not apply to corpo-
rations); *In re Just Brakes Corp. Sys., Inc.*, 108 F.3d 881,
884-885 (8th Cir. 1997) ("plain meaning of the word 'indi-
vidual'" does not apply "to corporate entities"); *In re
Jove Eng'g, Inc.*, 92 F.3d 1539, 1549-1553 (11th Cir. 1996)
("[T]he term 'individual' is limited to natural persons and
does not include corporations or other artificial enti-
ties."); *In re North*, 12 F.3d 252, 255 (D.C. Cir. 1994)
("Had Congress intended to allow corporations to seek
and obtain fee awards, it could have employed language
authorizing application by a 'subject' rather than 'an indi-
vidual who is the subject.'"); *In re Goodman*, 991 F.2d
613, 618-620 (9th Cir. 1993) ("'[I]ndividual' means indi-
vidual, and not a corporation or other artificial entity.");
*In re Chateaugay Corp.*, 920 F.2d 183, 184-187 (2d Cir.
1990) ("[T]he plain meaning of 'individual' * * * would
appear to prevent application of the section to [corpora-
tions]."); *Crawford & Co. v. Apfel*, 235 F.3d 1298, 1304-
1305 (11th Cir. 2000) (upholding agency's "interpretation
of the word 'individual' to mean only human beings and
not businesses").

2.  Precisely because its meaning is so obvious, "in-
dividual" is not frequently defined in the U.S. Code.
When provisions do define the term, they routinely do so
merely to confirm that the term includes only natural
persons (or certain categories of natural persons).  *See* 5
U.S.C. § 552a(a)(2) ("[T]he term 'individual' means a citi-
zen of the United States or an alien lawfully admitted for
permanent residence * * * ."); 20 U.S.C. § 5602(3) ("[T]he
term 'eligible individual' means a citizen or national of the
United States or a permanent resident alien of the
United States * * * ."); 29 U.S.C. § 1301(a)(14)(C)(ii)(V)
("'[I]ndividual' means a living human being * * * ."); 43

18

U.S.C. § 390bb(4) ("The term 'individual' means any nat-
ural person, including his or her spouse, and including
other dependents thereof * * * ."). Those statutes in-
clude legislation passed by the same Congress that en-
acted the TVPA in 1992. *See* Pub. L. No. 102-229, § 214,
105 Stat. 1701, 1719 (1991) (codified at 29 U.S.C.
§ 1301(14)(C)(ii)(V)); *see also* 137 Cong. Rec. 2255 (1991)
("'The term "individual" means a human being.'").

The Code of Federal Regulations reflects the same
consensus: "Individual means a natural person."[9] As one
regulation explains, "[i]ndividual means a citizen of the
United States or an alien lawfully admitted * * * but
does not include proprietorships, businesses, or corpora-
tions." 10 C.F.R. § 1008.2(f); *see also* 20 C.F.R. § 401.25
("Individual * * * means a living person who is a citizen
of the United States or an alien lawfully admitted for
permanent residence. It does not include persons such as
sole proprietorships, partnerships, or corporations.").

Federal law is hardly unique. *Every one* of the 50
States has at least one statute defining "individual" as a
"natural person."[10] And state statutes regularly distin-

---

[9] *See, e.g.*, 7 C.F.R. § 1.302(l); 10 C.F.R. § 13.2; 12 C.F.R. § 261a.2(c);
14 C.F.R. § 1264.101(j); 15 C.F.R. § 25.2; 16 C.F.R. § 4.13(b)(1); 20
C.F.R. § 355.2; 22 C.F.R. § 35.2(j); 28 C.F.R. § 71.2; 29 C.F.R.
§ 22.2(j); 31 C.F.R. § 16.2; 34 C.F.R. § 33.2; 38 C.F.R. § 42.2; 40
C.F.R. § 27.2; 41 C.F.R. § 105-70.002(h); 43 C.F.R. § 35.2(i); 45 C.F.R.
§ 79.2; 47 C.F.R. § 1.1918(a); 49 C.F.R. § 31.2.

[10] *See* Ala. Code § 5-26-3(4); Alaska Stat. § 15.13.400(11); Ariz. Rev.
Stat. § 43-104(12); Ark. Code § 26-18-104(7); Cal. Civ. Code § 1798.3(d);
Colo. Rev. Stat. § 7-90-102(31.5); Conn. Gen. Stat. § 1-91(i); Del. Code
tit. 5, § 2403(5); D.C. Code § 31-1131.02(4A); Fla. Stat. § 608.402(13);
Ga. Code § 48-1-2(12); Haw. Rev. Stat. § 414-3; Idaho Code § 26-31-
303(4); 410 Ill. Comp. Stat. 520/2(e); Ind. Code § 23-17-2-15; Iowa
Code § 535D.3(5); Kan. Stat. § 79-32,109(b); Ky. Rev. Stat. § 271B.1-
400(14); La. Rev. Stat. § 22:1692(5); Me. Rev. Stat. tit. 13-C, § 102(18);
Md. Code, Ins. § 9-401(g); Mass. Gen. Laws ch. 255F, § 1; Mich.

19

guish "individuals" from corporations or other entities.[11]

3. By contrast, the term "person," which also refers to a natural person in ordinary usage, "often has a broader meaning in the law." *Clinton v. City of New York*, 524 U.S. 417, 428 n.13 (1998). The federal Dictionary Act defines "person" to include "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, *as well as individuals*." 1 U.S.C. § 1 (emphasis added). And the same Congress that enacted the TVPA passed another statute prescribing penalties for "person[s] other than an individual," *i.e.*, "[c]orporations, partnerships, and associations." Pub. L. No. 102-282, § 2, 106 Stat. 149, 150 (1992) (codified at 21 U.S.C. § 335a(a)(1)). Those formulations make sense only if the ordinary meaning of "individual" does not encompass legal entities like corporations.

---

Comp. Laws § 333.1105(1); Minn. Stat. § 13.02; Miss. Code § 79-29-105(l); Mo. Rev. Stat. § 355.066(19); Mont. Code § 30-14-1702(4); Neb. Rev. Stat. § 21-1711; Nev. Rev. Stat. § 679A.097; N.H. Rev. Stat. § 397-A:1(VIII-b); N.J. Stat. § 17:11C-2; N.M. Stat. § 58-21-2(G); N.Y. Banking Law § 599-b(5); N.C. Gen. Stat. § 53-244.030(14); N.D. Cent. Code § 13-10-02(4); Ohio Rev. Code § 1322.01(S); Okla. Stat. tit. 24, § 162(5); Or. Rev. Stat. § 60.001(21); 1 Pa. Cons. Stat. § 1991; R.I. Gen. Laws § 7-1.2-106(9); S.C. Code § 40-11-20(16); S.D. Codified Laws § 10-43-1(8); Tenn. Code § 45-13-105(8); Tex. Bus. Orgs. § 1.002(38); Utah Code § 20A-12-301(5); Vt. Stat. tit. 8, § 2200(8); Va. Code § 13.1-603; Wash. Rev. Code § 19.215.010(3); W. Va. Code § 46A-2A-101(5); Wis. Stat. § 126.01(15); Wyo. Stat. § 17-16-140(a)(xviii).

[11] *See, e.g.*, Colo. Rev. Stat. § 10-2-103(3) ("'Individual' means any private or natural person as distinguished from a partnership, corporation, association, or any foreign or domestic entity * * * ."); Fla. Stat. § 501.603(7); Haw. Rev. Stat. § 171-14.5(a); Idaho Code § 11-601(1); 415 Ill. Comp. Stat. 5/22.2(h)(2)(F); Iowa Code § 422.4(9); N.M. Stat. § 57-1-6(C); Wash. Rev. Code § 30.22.040(9); W. Va. Code § 33-12-2(c).

20

Notably, at the same time Congress enacted the TVPA, it was in the midst of revising part of the U.S. Code to "conform [it] to common contemporary usage" (without "substantive change"). S. Rep. No. 102-410, at 3-4 (1992). One of the "standard changes" Congress decided to make was to "substitute[ ]" the "word 'individual' * * * for 'person' when referring to a human being." *Id.*; *see also* H.R. Rep. No. 102-280, at 4 (1991). Congress enacted those changes soon after, replacing "person" with "individual" in provisions such as 49 U.S.C. §§ 1134(d), 20505, and 41741. *See* Pub. L. No. 103-272, 108 Stat. 745, 755, 884, 1152 (1994). The notion that Congress moved the opposite direction in the TVPA by using "individual" to refer to organizations is implausible.

4. Petitioners argue that "[w]ords that refer in common usage only to natural persons typically encompass organizational entities in the context of tort statutes." Pet. Br. 17. But they do not identify a single tort statute that uses "individual" to refer to organizations. Indeed, in the two examples petitioners cite, the statutory terms are "person" and "whoever." *See id.* The Dictionary Act defines both terms to encompass "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." 1 U.S.C. § 1.

Citing the TVPA's legislative history, petitioners acknowledge that Congress intended to exclude certain organizations—"'foreign states or their entities'"—from liability. Pet. Br. 20-21. According to petitioners, "individual," in contrast to "person," "more clearly excludes states, but still encompasses other non-natural entities." *Id.* at 20. Petitioners thus ask the Court to define "individual" to include natural persons and non-state organizational entities (who nonetheless must meet the TVPA's state action requirement) but not state entities.

21

But petitioners do not and cannot offer any accepted definition of "individual" that fits the definition they propose: They identify no definition that excludes states but does not likewise exclude other entities like corporations. Citing *Webster's*, petitioners propose definitions such as "a single or particular being or thing or group of beings or things," "a single object or thing * * * regarded as a unit," or "a group considered as a unit." Pet. Br. 18 (quotation marks omitted). Those definitions, they contend, "plac[e] * * * emphas[i]s on the *oneness* of something"— an emphasis that "comfortably encompass[es]" organizations like respondents. *Id.* But that "emphas[i]s on the *oneness* of something" just as comfortably encompasses "one nation" such as Norway or France, entities petitioners agree are excluded from the term "individual."

Petitioners' own definition would thus impose liability on the very organizations—foreign states and their entities—they claim the term "individual" was designed to exclude. By contrast, the ordinary meaning of "individual" excludes foreign governments while excluding other organizations as well. Petitioners' position thus reduces to either the claim that Congress deliberately chose the word "individual" to exclude foreign states but included them nonetheless, or the claim that "individual" has a meaning (natural persons plus artificial entities but not state entities) that departs from any accepted understanding of the term. Neither contention is plausible. "[C]onstruing statutory language is not merely an exercise in ascertaining 'the outer limits of [a word's] definitional possibilities.'" *AT&T*, 131 S. Ct. at 1184. Much less is it an exercise in going far beyond those outer limits, the course petitioners chart here.

5. Every court of appeals that has carefully evaluated the TVPA's text—the D.C., Fourth, and Ninth Cir-

22

cuits—has come to the same conclusion: "[T]he term 'individual' in the TVPA," consistent with its "ordinary meaning, * * * encompasses only natural persons and not corporations or other organizations." Pet. App. 7a; *see also Aziz v. Alcolac, Inc.*, 658 F.3d 388, 392-393 (4th Cir. 2011) (the "TVPA admits of no ambiguity" and "[t]he plain and ordinary meaning of 'individual' is 'a single human being'"); *Bowoto v. Chevron Corp.*, 621 F.3d 1116, 1126, 1127 (9th Cir. 2010) (because "the word 'individual' in a statute refers to natural persons and not corporations," it "is evident that Congress drafted the TVPA in such a manner as to limit liability to natural persons"). The overwhelming weight of authority in the district courts agrees.[12]

The only court of appeals that has reached the opposite result never analyzed the meaning of "individual" or offered any reason to construe it to encompass organizations. In *Aldana v. Del Monte Fresh Produce, N.A.*, 416 F.3d 1242 (11th Cir. 2005), the Eleventh Circuit allowed a suit against a corporation without addressing whether

---

[12] *See Shafi v. Palestinian Auth.*, 686 F. Supp. 2d 23, 28 (D.D.C. 2010), *aff'd on other grounds*, 642 F.3d 1088 (D.C. Cir. 2011); *Doe v. Nestle, S.A.*, 748 F. Supp. 2d 1057, 1116-1118 (C.D. Cal. 2010); *Corrie v. Caterpillar, Inc.*, 403 F. Supp. 2d 1019, 1026 (W.D. Wash. 2005), *aff'd on other grounds*, 503 F.3d 974 (9th Cir. 2007); *Doe v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20, 28 (D.D.C. 2005), *appeal dismissed*, 473 F.3d 345 (D.C. Cir. 2007); *In re Terrorist Attacks on Sept. 11, 2001*, 392 F. Supp. 2d 539, 565 (S.D.N.Y. 2005), *aff'd on other grounds*, 538 F.3d 71 (2d Cir. 2008); *Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1164, 1175 (C.D. Cal. 2005); *In re Agent Orange Prods. Liab. Litig.*, 373 F. Supp. 2d 7, 55-56 (E.D.N.Y. 2005), *aff'd on other grounds*, 517 F.3d 104 (2d Cir. 2008); *Arndt v. UBS AG*, 342 F. Supp. 2d 132, 141 (E.D.N.Y. 2004); *Friedman v. Bayer Corp.*, No. 99-CV-3675, 1999 WL 33457825, at *2 (E.D.N.Y. Dec. 15, 1999); *Beanal v. Freeport-McMoRan, Inc.*, 969 F. Supp. 362, 381-382 (E.D. La. 1997), *aff'd on other grounds*, 197 F.3d 161, 169 (5th Cir. 1999).

the TVPA extends to such entities. Indeed, the defendants in that case never challenged the notion of corporate liability. *See* Appellees Br. in No. 04-10234, 2004 WL 4976697 (11th Cir. May 17, 2004); *Bowoto*, 621 F.3d at 1126. When the issue of corporate liability was raised in *Romero v. Drummond Co.*, 552 F.3d 1303 (11th Cir. 2008), the court of appeals declared that *Aldana*—merely by allowing a suit against a corporation—had established "the law of [the] Circuit." *Id.* at 1315. *But see Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993) (*stare decisis* does not apply to decisions that "at most assume[ ]" an answer to a question without "squarely address[ing]" it). That the only circuit to read "individual" in the TVPA to encompass legal entities offered no reason for doing so speaks volumes about the implausibility of that interpretation.

## B. Statutory Context Confirms That the TVPA Subjects Only Natural Persons to Liability

This Court does not read statutory terms in a vacuum. It examines words within their "statutory context." *Brown v. Gardner*, 513 U.S. 115, 118 (1994). Here, both the TVPA's repeated use of "individual" to mean natural person, and its contrasting use of "person" or "claimant" to encompass other entities, make Congress's intent particularly clear.

1. As the D.C. Circuit observed (Pet. App. 8a), the TVPA provision at issue uses the term "individual" no fewer than five times to describe either who may be held liable or who may be a victim:

> An *individual* who, under actual or apparent authority, or color of law, of any foreign nation—
>
> > (1) subjects an *individual* to torture shall, in a civil action, be liable for damages to that *individual*; or

24

> (2) subjects an *individual* to extrajudicial killing
> shall, in a civil action, be liable for damages to
> the *individual*'s legal representative, or to any
> person who may be a claimant in an action for
> wrongful death.

28 U.S.C. § 1350 note § 2(a) (emphasis added). The TVPA
also uses "individual" six more times to refer to the vic-
tim in defining "torture." *Id.* § 3(b)(1).

Only a natural person can be a victim of extrajudicial
killing or torture. In that context, therefore, "individual"
can refer only to a natural person. And a "standard prin-
ciple of statutory construction provides that identical
words and phrases within the same statute should nor-
mally be given the same meaning." *Powerex Corp. v. Re-
liant Energy Servs.*, 551 U.S. 224, 232 (2007); *see also
AT&T*, 131 S. Ct. at 1184-1185. Accordingly, the TVPA's
use of "individual" to define who may be sued should en-
compass only natural persons as well.

While petitioners demote that canon to a mere "intui-
tion," Pet. Br. 27, the canon carries particular force here.
The "presumption that a given term is used to mean the
same thing throughout a statute" is "surely at its most
vigorous when a term is repeated within a given sen-
tence." *Brown*, 513 U.S. at 118. In *Brown*, this Court
found it "virtually impossible" to read "'injury'" as "lad-
en with fault" when the same term was used elsewhere in
the same sentence in a manner that implied no fault. *Id.*
The inference of consistency is even stronger here, where
Congress used "individual" four other times in the same
sentence to refer to natural persons. *See Katz v.
Comm'r*, 335 F.3d 1121, 1128 (10th Cir. 2003) ("We think
it is not asking too much of the drafters of our nation's
laws to say that if they use a term three times in the

25

same sentence, they should be sure that they intend to give it the same meaning each time.").

Petitioners urge that the canon "readily yields" to evidence of contrary congressional intent. Pet. Br. 27. But they point to no evidence comparable to that present in the cases they cite. In *Atlantic Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427 (1932), this Court held that "trade" had different meanings in two sections of the Sherman Act because the sections represented exercises of different congressional powers. *See id.* at 435. The Court deemed itself "free to interpret § 3 dissociated from § 1 as though it were a separate and independent act." *Id.* In *General Dynamics Land Systems, Inc. v. Cline*, 540 U.S. 581 (2004), the Court construed "age" to have different meanings in two separate provisions of the Age Discrimination in Employment Act. The Court explained that the *Atlantic Cleaners* exception to the presumption of uniform usage applies only where "'there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in *different parts of the act* with different intent.'" *Id.* at 595 (quoting *Atlantic Cleaners*, 286 U.S. at 433) (emphasis added). In that context, the Court held, the presumption of uniform usage should "relent[ ] when a word used has several commonly understood meanings among which a speaker can alternate in the course of an ordinary conversation, without being confused or getting confusing." *Id.* at 595-596.

Neither case involved a statute remotely like this one. The TVPA does not use the word "individual" in "different parts" of a lengthy statute. It uses the word *five times in one sentence*. Moreover, petitioners' construction hardly avoids "being confused or getting confusing." To the contrary, it would be very confusing to use the

26

term "individual" in a single sentence to refer alternately
to natural persons and organizations. And unlike the two
uses of "age" in the Age Discrimination in Employment
Act, which both reflected "commonly understood mean-
ings," the definition of "individual" that petitioners pro-
pose—natural persons and organizations excluding gov-
ernmental entities—is not an accepted meaning of the
term.

2.   The conclusion that the TVPA uses "individual" to
mean natural person is reinforced by the Act's contrast-
ing use of the broader terms "person" and "claimant"
when describing who may sue. Under the TVPA, poten-
tial plaintiffs include "any *person* who may be a claimant
in an action for wrongful death." 28 U.S.C. §1350 note
§2(a)(2) (emphasis added). And the Act requires dis-
missal if "the *claimant* has not exhausted adequate and
available remedies." *Id.* §2(b) (emphasis added). "'[W]hen
the legislature uses certain language in one part of the
statute and different language in another,'" courts should
"'assume[] different meanings were intended.'" *Sosa*,
542 U.S. at 711 n.9 (quoting 2A N. Singer, *Statutes and
Statutory Construction* §46:06, at 194 (6th rev. ed.
2000)). Here, Congress used the broader terms "person"
and "claimant" to describe potential plaintiffs but the
narrower term "individual" to describe defendants and
victims. Construing "individual" to mean natural persons
rather than all "persons" or "claimants" respects Con-
gress's decision to use different terms to describe differ-
ent categories.

Petitioners contend that "no useful contrast can be
drawn between the TVPA's uses of 'individual' and 'per-
son'" because, they assert, only natural persons can be
plaintiffs in wrongful death actions. Pet. Br. 29. Peti-
tioners are mistaken. Employers paying compensation

27

for injury or death under the Longshoremen's and Harbor Workers' Compensation Act receive an assignment of any right "to bring an action for such wrongful injury or death." *Chapman v. Griffith-Consumers Co.*, 107 F.2d 263, 264-265 (D.C. Cir. 1939) (citing 33 U.S.C. § 933(b)). State statutes similarly allow employers to pursue wrongful death claims. *See* N.Y. Workers' Comp. Law § 29(2) (automatically assigning claim to "the person, association, corporation, or insurance carrier" paying the decedent's benefits); Alaska Stat. § 23.30.015(c) (payment of compensation "operates as an assignment to the employer of all rights of the representative of the deceased to recover damages"); *Aetna Cas. & Sur. Div. of Aetna Life & Cas. Co. v. Sandy Hill Corp.*, 54 A.D.2d 222, 223 (N.Y. App. Div. 1976); *Croxton v. Crowley Maritime Corp.*, 758 P.2d 97, 98 (Alaska 1988). And in *La Reunion Aerienne v. Socialist People's Libyan Arab Jamahiriya*, 533 F.3d 837 (D.C. Cir. 2008), a partnership representing a group of insurers brought wrongful death claims against Libya under the terrorism exception to the Foreign Sovereign Immunities Act. *See id.* at 840-841.

Moreover, while petitioners insist that an estate "can neither sue nor be sued," Pet. Br. 29, at least one federal statute—one that petitioners contend should be read *in pari materia* with the TVPA, *id.* at 31-32—explicitly allows suits by estates. Under the Anti-Terrorism Act, "[a]ny national of the United States injured in his or her person * * * by reason of an act of international terrorism, *or his or her estate*, survivors, or heirs, *may sue* therefor in any appropriate district court of the United States." 18 U.S.C. § 2333(a) (emphasis added).

Given the potential variation in treatment of wrongful death claims, Congress reasonably could have foreseen that a number of entities might be entitled to bring such

28

claims and crafted the plaintiff-related provisions of the TVPA broadly to accommodate all contingencies. By contrast, Congress used a different and narrower term—"individual"—to describe who may be a victim and who may be sued. Construing that term according to its ordinary meaning gives effect to Congress's drafting decisions. Petitioners' contrary interpretation defies them.

### C. The Legislative History Confirms That Congress Deliberately Used the Term "Individual" To Limit the TVPA to Natural Persons

Consistent with the ordinary meaning of "individual," the legislative history makes clear that Congress deliberately used that term to limit the TVPA's coverage to natural persons. Congress did not merely use the term "individual" rather than "person" in the TVPA. It substituted the word "individual" for "person" for the precise purpose of excluding organizational liability.

1. Earlier versions of the Act provided a cause of action against any "person" who subjected another to torture or extrajudicial killing under color of foreign law. 132 Cong. Rec. 12,950 (1986) (text of S. 2528); *see* H.R. 4756, 99th Cong. (1986). But the House Committee on Foreign Affairs rejected that phrasing because it would have extended liability beyond natural persons. During the committee markup, Representative Leach proposed an amendment to "make it clear we are applying [the Act] to individuals and not to corporations." *Hearing and Markup on H.R. 1417 Before the H. Comm. on Foreign Affairs*, 100th Cong. 87 (1988) ("*1988 Hearings*"). The House counsel responded that this change would require only "a fairly simple amendment," as it would entail only "changing the word, 'person' to 'individuals' in several places in the bill." *Id.* at 88. "[T]he intention [of the amendment]," he noted, was "to limit the application of

29

this civil action so that only individuals who engaged in torture could be the defendants." *Id.* at 87. That change was consistent with Congress's purpose of ensuring that the United States would not become a "safe haven" for human rights violators. *See id.* at 86 (Rep. Yatron); pp. 40-41, *infra*.

The Committee then adopted that amendment by unanimous consent. *1988 Hearings* 88. The TVPA as enacted retained the term "individual," affording a cause of action against the responsible "individual" rather than "person." Pub. L. No. 102-256, § 2(a), 106 Stat. at 73.

There is thus no need to speculate about the reason for Congress's choice of the term "individual." Congress replaced "person" with "individual" to limit the category of those subject to suit under the statute to natural persons. While petitioners belittle the significance of that change, Pet. Br. 44, this Court has not hesitated to rely on such amendments when construing statutes: "Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 442-443 (1987) (quotation marks omitted); *see also Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 200 (1974) (amendment before enactment "strongly militates against a judgment that Congress intended a result that it expressly declined to enact"); *Russello v. United States*, 464 U.S. 16, 23-24 (1983) (deletion of language in earlier version of bill presumed intentional). That canon is all but conclusive here.

2. Petitioners attribute a different rationale to Congress's use of the term "individual"—a desire to exclude *state* entities. Pet. Br. 43-44. As they note, the 1991 Senate Report explains that "[t]he legislation uses the term

30

'individual' to make crystal clear that foreign states or their entities cannot be sued under this bill under any circumstances: only individuals may be sued." S. Rep. No. 102-249, at 7 (1991). And the House Report confirms that "[o]nly 'individuals,' not foreign states, can be sued under the bill." H.R. Rep. No. 102-367, at 4 (1991); *see also* Pet. Br. 44-45 & nn.10-12 (similar floor statements and hearing testimony). But the ordinary meaning of "individual" achieves that goal by limiting the Act to natural persons—thereby excluding *both* state entities *and* other organizations. Congress's deliberate decision to use "individual" to exclude state entities thus confirms that Congress was using the term in that ordinary sense.

If Congress had intended to exclude only foreign state entities, it would have been easy enough to write the liability provision broadly and then explicitly exempt those entities. *See, e.g.*, 18 U.S.C. §2337(2) (barring actions against "a foreign state" or "an agency of a foreign state"). Alternately, Congress could have kept the term "person," which this Court has repeatedly construed not to include sovereigns (at least when referring to potential defendants). *See, e.g.*, *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64-71 (1989); *Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 778-788 (2000); *United States v. Cooper Corp.*, 312 U.S. 600, 604 (1941) ("[T]he term 'person' does not include the sovereign, [and] statutes employing the [word] are ordinarily construed to exclude it.").[13] Indeed, as this Court ex-

---

[13] Petitioners' reliance (at 20) on *Pfizer, Inc. v. Government of India*, 434 U.S. 308 (1978), is misplaced. That case held that foreign states were "persons" entitled *to bring suit*. *Id.* at 315-318. As the Court noted, merely allowing a state to bring suit does not "interfere in sensitive matters of foreign policy." *Id.* at 319. Allowing a state *to be sued*, by contrast, does.

31

plained in *Ngiraingas v. Sanchez*, 495 U.S. 182 (1990), Congress amended the Dictionary Act's definition of "person" in 1874 precisely to make clear that it does not cover sovereigns. *See id.* at 190-191 ("'[T]he [former] provision [which included "bodies politic"] goes further than is convenient. It requires the draughtsman, in the majority of cases of employing the word 'person,' to take care that States, Territories, foreign governments, &c., appear to be excluded.'" (quoting 1 *Revision of the United States Statutes as Drafted* 19 (1872))).

Congress thus had ample means to exclude states, and only states, from the TVPA. Instead, Congress limited the Act's coverage to "individuals." That word choice certainly made it "crystal clear that foreign states or their entities cannot be sued." S. Rep. No. 102-249, at 7. But the way Congress excluded states was by limiting the Act's coverage to "individuals," *i.e.*, natural persons. Petitioners cite no instance in which Congress has used the word "individual" with the expectation that it would exclude foreign states and foreign states alone.

## D. The TVPA's Extraterritorial Reach Cautions Against Departing from the Ordinary Meaning of "Individual"

This Court has long recognized a presumption against extraterritorial application of federal law. *See, e.g.*, *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991). For the same reasons, the Court has held that even expressly extraterritorial statutes should not be extended beyond their precise terms. In *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010), for example, the Court held that, "when a statute provides for some extraterritorial application, the presumption against extraterritoriality operates to limit that provision to its terms." *Id.* at 2883. And in *Microsoft Corp. v. AT&T*

32

*Corp.*, 550 U.S. 437 (2007), the Court confirmed that, where a statute "specifically * * * extend[s] the reach of United States * * * law to cover certain activity abroad," courts must "resist giving the language * * * an expansive interpretation." *Id.* at 442, 455-456.

The Court should likewise resist the "expansive interpretation" petitioners urge here. The TVPA applies only to acts committed under color of foreign law and is thus squarely directed at extraterritorial conduct. *See* 28 U.S.C. § 1350 note § 2(a). By design, it "allow[s] individuals * * * to bring cases in Federal courts for damages resulting from extraterritorial acts." *1990 Hearings* 24. Because the Act addresses conduct under color of government authority, moreover, it routinely targets diplomatically sensitive matters. "[T]his Court ordinarily construes ambiguous statutes to avoid unreasonable interference with the sovereign authority of other nations." *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 164 (2004). And courts should be "particularly wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs." *Sosa*, 542 U.S. at 727.

The TVPA implicates precisely those concerns. As the State Department warned, "no other country has similar legislation," and the Act's "unilateral enactment of extraterritorial jurisdiction may well be perceived by other countries as * * * overreaching." *1990 Hearings* 24, 27. The State Department was "particularly concerned over the prospect of nuisance or harassment suits brought by political opponents or for publicity purposes," which threatened "significant problems for the Executive's management of foreign policy." *Id.* at 28. The Act also raised the prospect of retaliatory legislation by other na-

33

tions. *Id.* at 27-28; *see also id.* at 14-15 (Department of Justice making similar points).

Expanding the TVPA beyond its text to allow suits against legal entities increases those foreign policy risks exponentially. Allowing suits against corporations invites ideologically motivated plaintiffs to sue multinational companies for doing business with regimes they oppose. The risks are even greater where the suit targets a political entity like the Palestinian Authority. It is one thing for a federal court to entertain an action against an individual alleged to have abused authority granted to him by foreign law. It is quite another for a court to adjudicate claims that a political institution engaged in torture and extrajudicial killing as part of "a general policy * * * designed to terrorize [its own] population and to ensure that an elite * * * leadership circle is able to maintain power at all costs." C.A. App. A29, ¶57. Petitioners' construction would embroil courts in international issues they are properly loath to address.

## II. Petitioners' Attempts To Evade The Ordinary Meaning Of "Individual" Are Unpersuasive

Petitioners do not ask this Court to disregard the ordinary meaning of a word in favor of a less common, but still accepted, meaning. They ask the Court to disregard the ordinary meaning of "individual" in favor of an alternative devoid of any support in customary or legal usage—units or groups possessing the attribute of "oneness" *except* state entities. None of petitioners' reasons for discarding ordinary meaning in favor of that gerrymandered alternative withstands scrutiny.

### A. Limiting the TVPA's Scope to Individuals Does Not Produce Absurd Results

Petitioners cite a handful of cases to support their view that the term "individual" includes legal entities.

34

Pet. Br. 19-20. But those cases departed from the term's ordinary meaning only because doing so was necessary to avoid absurd results. Limiting the TVPA's scope to natural persons produces no such results. To the contrary, Congress had legitimate reasons to restrict the Act's coverage to natural persons.

1.  Far from supporting petitioners' view, petitioners' lead case—*Clinton v. City of New York*, 524 U.S. 417 (1998)—forecloses it. *Clinton* addressed the categories of plaintiffs who could seek expedited review of the Line Item Veto Act. The Court agreed that, "in ordinary usage," the term "individual" refers to a human being, while the term "person" is broader: "Although in ordinary usage both 'individual' and 'person' often refer to an individual human being, 'person' often has a broader meaning in the law." *Id.* at 428 n.13 (citations omitted). *Clinton* nonetheless allowed artificial entities to proceed under a provision limited to "individuals" because failing to do so "would produce an absurd result." *Id.* at 429 n.14. Because of that prospect, the Court concluded that "Congress did not intend the result that the word 'individual' would dictate in other contexts." *Id.*

Justice Scalia's concurrence (joined by Justice O'Connor) agreed that "corporations, cooperatives, and governmental entities * * * are not 'individuals' under any accepted usage of that term." 524 U.S. at 454. He merely disagreed that that ordinary meaning produced an absurd result in that case. *Id.* at 454-455. Thus, no member of the Court suggested that the ordinary meaning of "individual" encompasses anything other than natural persons. The only dispute was whether that definition—which the text would otherwise "dictate," *id.* at 429 n.14 (majority opinion)—led to an "absurd result" that would

35

justify disregarding ordinary meaning. *See, e.g., Nixon v. Mo. Mun. League*, 541 U.S. 125, 138 (2004).

Petitioners' court of appeals cases are inapt for similar reasons. *United States v. Middleton*, 231 F.3d 1207 (9th Cir. 2000), interpreted a prohibition on hacking into computer systems of "one or more individuals" to encompass hacking into corporate computers. It did so because a contrary reading would have had the irrational result of exempting a large number of computers used in interstate and foreign commerce, contrary to Congress's intent. *See* 231 F.3d at 1210-1211.[14] The Ninth Circuit had no difficulty distinguishing *Middleton* when it construed the TVPA to exclude corporations in *Bowoto*, 621 F.3d at 1127. And while petitioners also invoke two cases interpreting the Bankruptcy Code's automatic stay provision, Pet. Br. 20, those cases are on the short end of a lopsided circuit split: The First, Second, Eighth, Ninth, and Eleventh Circuits have all rejected their interpretation. *See Spookyworld*, 346 F.3d at 8 (citing cases). Moreover, one of the two cases held that "a narrow construction of the term would defeat much of the purpose of the section," *Budget Serv. Co. v. Better Homes of Va., Inc.*, 804 F.2d 289, 292 (4th Cir. 1986), and the second case followed the first without any further analysis, *see In re Atl. Bus. & Cmty. Corp.*, 901 F.2d 325, 329 (3d Cir. 1990).

2. This case presents no such absurdity. Congress had every reason to exercise restraint by limiting the TVPA to natural persons. That limitation reduces the

---

[14] In addition, the statute in *Middleton* used "individual" and "person" interchangeably. *See* 231 F.3d at 1210. Here, Congress carefully distinguished the two. *See* pp. 23-28, *supra*. Petitioners also cite *United States v. Perry*, 479 F.3d 885 (D.C. Cir. 2007), but the parties there stipulated to *Middleton*'s definition of "individual," so the D.C. Circuit had no occasion to address the issue. *Id.* at 893 n.10.

36

risk that ideologically motivated suits will be filed against corporations or political entities over diplomatically sensitive acts abroad. *See* pp. 32-33, *supra.* It reduces the risk that federal courts will become entangled in matters of foreign policy properly left to the Executive Branch. *See id.* And it helps ensure that American companies are not deterred from doing business in difficult regions where their engagement may serve U.S. foreign policy goals by promoting economic stability and democratic values. *See, e.g.*, Nat'l Security Council, *The National Security Strategy of the United States of America* 17 (2002). As this Court made clear in *Sosa*, great caution is warranted before "claim[ing] a limit on the power of foreign governments over their own citizens" and "hold[ing] that a foreign government or its agent has transgressed those limits." 542 U.S. at 727.

Restricting liability to natural persons also focuses the Act's impact on those who directly engage in the misconduct, and prevents the dilution of responsibility that occurs when liability is shifted. This Court relied on precisely those concerns when it held, in *Correctional Services Corp. v. Malesko*, 534 U.S. 61 (2001), that the implied *Bivens* cause of action does not apply to corporations. "[I]f a corporate defendant is available for suit," the Court noted, "claimants will focus their collection efforts on it, and not the individual directly responsible for the alleged injury." *Id.* at 71. "To the extent aggrieved parties had less incentive to bring a damages claim against individuals, the deterrent effects of the * * * remedy would be lost." *Id.* at 69 (quotation marks omitted).

Caution in imposing organizational liability is especially important where the defendant is a political entity, as litigation costs may divert resources from supporting citizens or providing basic infrastructure. Every dollar

37

the Palestinian Authority spends defending this action, for example, is one less dollar available for the education, security, and institution-building necessary to create economic opportunity and lasting stability. This Court exercised caution in declining to extend *Bivens* to corporations in *Malesko*. Congress's similar exercise of caution in declining to extend the TVPA to organizations can hardly be assailed as "absurd."

## B. Construing the TVPA Consistent with Its Plain Meaning Serves the Act's Underlying Purposes

Contrary to petitioners' claims, reading the TVPA to impose liability only on the "individual" responsible for the misconduct amply serves the statute's purposes. In providing a civil remedy for torture and extrajudicial killing, Congress sought to "[s]trik[e] a balance between the desirability of providing redress for a victim and the fear of imposing additional burdens on U.S. courts." H.R. Rep. No. 102-367, at 4. It struck that balance by authorizing suit against only the public officials who actually carry out, authorize, or condone state-sponsored torture and are subject to jurisdiction in U.S. courts—ensuring that those who commit such acts do not find a safe haven from liability here.

1. Petitioners urge that suits against organizations are necessary because victims often cannot identify the responsible individuals. Pet. Br. 38-39. But the 20-year history of TVPA litigation belies that assertion. Even if plaintiffs do not know who personally inflicted the abuse, they often know the identity of more senior officials who authorized or condoned it. When such individuals have sought residence or otherwise appeared in the United States, victims or their families have successfully brought TVPA actions against them. *See, e.g., Chavez v. Carranza*, 559 F.3d 486 (6th Cir. 2009) (affirming a judgment

38

against an officer in the El Salvador armed forces); *Arce v. Garcia*, 434 F.3d 1254, 1258 (11th Cir. 2006) (holding that TVPA claims against El Salvadoran military leaders, which resulted in a $54.6 million jury verdict, were not time-barred); *Jean v. Dorelien*, 431 F.3d 776, 777-778 (11th Cir. 2005) (holding that the statute of limitations on a TVPA claim against a colonel in the Haitian Armed Forces was subject to tolling); Dkt. No. 55 in *Kpadeh v. Emmanuel*, No. 1:09-cv-20050-AJ (S.D. Fla. Feb. 5, 2010) (awarding plaintiffs approximately $22 million against Charles Taylor for atrocities committed during the Liberian civil war); *Doe v. Saravia*, 348 F. Supp. 2d 1112, 1159 (E.D. Cal. 2004) (awarding $10 million in an action against an El Salvadoran "death squad" officer).

Petitioners' position is not that the TVPA, properly construed, provides no meaningful remedies, but that it would provide more *expansive* remedies if it also allowed suits against organizations that have deep pockets and are more readily amenable to U.S. jurisdiction. But even if providing compensation were the Act's primary purpose, "no legislation pursues its purposes at all costs," and it "frustrates rather than effectuates legislative intent simplistically to assume that whatever furthers the statute's primary objective must be the law." *Rodriguez v. United States*, 480 U.S. 522, 525-526 (1987). Congress "[s]tr[uck] a balance" in the Act. H.R. Rep. No. 102-367, at 4. It did so by focusing liability on the individuals responsible for the torture or extrajudicial killing. And while petitioners urge that "[m]ost" acts of official torture and extrajudicial killing "are committed by organized groups rather than natural persons acting alone," Pet. Br. 42, *all* such acts are committed by the individuals through whom those organizations act. *See Braswell v. United States*, 487 U.S. 99, 110 (1988) ("Artificial entities * * * may act only through their agents * * *.").

39

Petitioners' theory that the Act must allow suit against organizations allegedly responsible for torture also defies the undisputed limits on the TVPA's scope. The organizations Congress identified as primarily responsible for state-sponsored torture and extrajudicial killing were *foreign governments themselves*. *See* H.R. Rep. No. 102-367, at 3 ("[M]any of the world's governments still engage in or tolerate torture of their citizens, and state authorities have killed hundreds of thousands of people in recent years."); S. Rep. No. 102-249, at 3 (noting that "more than one-third of the world's governments engage in, tolerate, or condone" torture and extrajudicial killing). Yet petitioners admit that Congress excluded state entities from liability. *See* pp. 20-21, *supra*.

Conversely, while petitioners repeatedly mention drug cartels, private militias, death squads, terrorist groups, and clans operating in failed states, Pet. Br. 35-36, 41-42, the TVPA does not address torture and extrajudicial killing by *private* actors, no matter how heinous. Consistent with *Filartiga*'s holding that it is only "an act of torture committed by a state official against one held in detention" that "violates established norms of the international law of human rights, and hence the law of nations," 630 F.2d at 880, the TVPA requires state action, 28 U.S.C. § 1350 note § 2(a).[15]

Petitioners' complaint thus reduces to the assertion that, although the TVPA excludes foreign states and state entities; although it excludes purely private parties;

---

[15] Moreover, even assuming "death squads" and similar groups are state actors with juridical status, they would rarely have any jurisdictional presence in the United States. Petitioners' claim (at 39) that an expansive reading of the TVPA is necessary to enable suits against organizational defendants is thus unfounded as to the very type of defendants petitioners claim the TVPA intends to reach.

40

and although it always provides a cause of action against the responsible human beings who act for an organization, the TVPA's remedies would be inadequate unless they *also* reached organizations that are not states but nonetheless act under color of state authority. The notion that excluding that category of defendants would defeat the statute's purpose is fanciful.

2.  In any event, petitioners mistake Congress's purpose when they claim that organizational liability is necessary because it is easier to "obtain personal jurisdiction in U.S. courts over organizational defendants than over specific human beings." Pet. Br. 39. Congress did not enact the TVPA so that U.S. courts could exercise long-arm jurisdiction over multinational corporations. It sought to prevent the United States from becoming a safe haven for individuals who engage in state-sanctioned torture or killing and then seek refuge in this country.

Senator Specter explained that the TVPA was "intended to deny torturers a safe haven in this country." 138 Cong. Rec. 4176 (1992) (Sen. Specter). "While human rights violators seldom present themselves to their victims while in the United States, providing victims of gross human rights abuses access to the courts * * * serve[s] notice to individuals engaged in human rights violations that the United States will not shelter human rights violators from being accountable." 137 Cong. Rec. 2671 (1991) (Sen. Specter). Many others echoed those views. *See, e.g.*, 135 Cong. Rec. 22,717 (1989) (Rep. Broomfield) (TVPA "declar[es] the United States off limits to those who would torture or murder their fellow human beings in foreign countries under the authority of foreign governments"); 137 Cong. Rec. 34,785 (1991) (Rep. Mazzoli) (TVPA "puts torturers on notice that they will find no safe haven in the United States").

41

Preventing torturers from seeking refuge here is a goal that sounds in distinctly human terms. It assumes that courts will exercise jurisdiction based on the individual's physical presence. As the Senate Report explains, an "individual must have 'minimum contacts' with the forum state, for example through residency here or current travel." S. Rep. No. 102-249, at 7. That requirement—again cast in distinctly human terms—confirms that Congress sought to reach individuals seeking refuge in this country, not corporations or other organizations operating around the world.[16]

3. Petitioners also invoke the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), Dec. 10, 1984, 1465 U.N.T.S. 85, 23 I.L.M. 1027, *as modified by* 24 I.L.M. 535. Pet. Br. 34-35. But they admit that the CAT "do[es] not [itself] compel relief under the precise circumstances here." Pet. Br. 34. Their claim that the TVPA should nevertheless be construed broadly in light of that treaty is misplaced.

The CAT's civil remedies provision requires only that "[e]ach State Party shall ensure in its legal system that the victim of an act of torture obtains redress and has an enforceable right to fair and adequate compensation." Art. 14, 23 I.L.M. at 1030. Nothing in that language requires that liability extend beyond the individual who engages in or orders the misconduct. In connection with the ATS, the United States urges that international law may define substantive norms but leaves the appropriate

---

[16] Precisely because the TVPA was "a limited measure," its proponents "estimated that only a few of these lawsuits will ever be brought." 137 Cong. Rec. 2671 (1991) (Sen. Specter); *cf.* 138 Cong. Rec. 4177 (1992) (Sen. Simpson) ("[T]his legislation will result in a very small number of cases.").

42

scope of any private cause of action to each state's domestic law. *See* U.S. Br. in *Kiobel v. Royal Dutch Petroleum Co.*, No. 10-1491, at 27-28. Here, Congress addressed that issue by limiting potential defendants to the "individuals" who themselves engaged in or directed the misconduct.[17]

Indeed, the CAT does not require the TVPA's extraterritorial remedies *at all*. The Senate ratified the CAT with the express reservation that "Article 14 requires a State Party to provide a private right of action for damages only for acts of torture committed *in territory under the jurisdiction of that State Party*." 136 Cong. Rec. 36,193 (1990) (emphasis added). And the Executive Branch has been steadfast in its position that, while the CAT may contemplate the exercise of universal criminal jurisdiction, signatories are expected to provide a "private right of action *only* for acts of torture committed in the territory of that State party, not for acts of torture committed in other countries." *1990 Hearings* 26; *see also* Int'l Bar Ass'n, *Report of the Task Force on Extra-*

---

[17] Petitioners' international sources (Br. 35) do not prove that the CAT contemplates organizational liability. *Sadiq Shek Elmi v. Australia*, U.N. Comm. Against Torture Comme'n No. 120/1998, U.N. Doc. CAT/C/22/D/120/1998 (May 25, 1999), stated only that "the members of" a Somali clan could "fall * * * within the phrase 'public officials or other persons acting in an official capacity' contained in article 1." *Id.* ¶ 6.5. And the Committee Against Torture merely listed "private contractors" along with "officials" and "agents" in describing the relationships that might establish conduct under color of law. U.N. Comm. Against Torture, General Comment No. 2, ¶ 15, U.N. Doc. CAT/C/GC/2 (Jan. 24, 2008). Neither source implies that signatories must hold corporations or other legal entities liable. The federal cases petitioners cite (at 35-36) are similarly inapposite: They addressed whether torturers were acting under color of law or with the acquiescence of a foreign government, not whether organizational entities may be sued.

43

*territorial Jurisdiction* 96 (2009) (reporting that the United Kingdom and Canada take the same view).

Petitioners' reliance (at 36) on Common Article 3 of the Geneva Conventions and the International Covenant on Civil and Political Rights ("ICCPR") is even farther afield. The United States has specifically refused to authorize private judicial enforcement of the ICCPR. *See Sosa*, 542 U.S. at 728. And both provisions govern the conduct of state parties—precisely the entities that petitioners agree are excluded from the TVPA. *See, e.g.*, Geneva Convention Relative to the Treatment of Prisoners of War art. 3, Aug. 12, 1949, 6 U.S.T. 3316, 3318-3320.

## C. Neither the *In Pari Materia* Canon Nor Background Legal Principles Supports Petitioners' Position

Petitioners also urge the Court to depart from ordinary meaning based on a supposed "presump[tion] that the word 'individual' in the context of a tort action can and should include organizations." Pet. Br. 12. But that claim inverts rather than invokes standard principles of statutory construction. None of the other statutes petitioners identify uses the term "individual" to define who is liable. The TVPA, by contrast, does. This Court gives effect to Congress's intent by respecting differences in the statutes it enacts, not ignoring them.

1. "The rule of *in pari materia*—like any canon of statutory construction—is a reflection of practical experience in the interpretation of statutes: a legislative body generally uses a *particular word* with a consistent meaning in a given context." *Erlenbaugh v. United States*, 409 U.S. 239, 243 (1972) (emphasis added); *see also Marks v. United States*, 161 U.S. 297, 302 (1896). But the three statutes petitioners cite (at 30-33)—Section 1983, the Anti-Terrorism Act, and the Foreign Sovereign Immuni-

44

ties Act—all use different language from the TVPA precisely where it counts. The TVPA imposes liability on "individual[s]." 28 U.S.C. § 1350 note § 2(a). By contrast, Section 1983 imposes liability on "person[s]." 42 U.S.C. § 1983. The state-sponsor-of-terrorism exception in the Foreign Sovereign Immunities Act permits suits against "foreign state[s]," defined to include political subdivisions, agencies, and instrumentalities. 28 U.S.C. §§ 1603(a), 1605A. And the Anti-Terrorism Act's civil liability provision does not define the class of potentially liable parties at all (although the statute excludes states and their officers from liability). 18 U.S.C. §§ 2333(a), 2337(2). Where, as here, provisions are "differently worded" and thus "of unlike character," the *in pari materia* canon is irrelevant. *United States v. Granderson*, 511 U.S. 39, 51 (1994).

In fact, Congress's deliberate decision to use different terms with different meanings reinforces the conclusion that Congress intended the statutes to have different scopes. "'[W]here a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject is significant to show that a different intention existed.'" 2B N. Singer & J.D. Singer, *Sutherland Statutes & Statutory Construction* § 51:2 (7th ed. 2008); *see also United States v. Bean*, 537 U.S. 71, 76 n.4 (2002) ("'The use of different terms within related statutes generally implies that different meanings were intended.'"). Congress's use of the word "individual" rather than alternative terms from other statutes underscores its intent to give the TVPA a narrower reach. That drafting decision is particularly telling given that Congress was keenly aware of the phrasing and scope of Section 1983 when it enacted the TVPA. *See* S. Rep. No. 102-249, at 8; H.R. Rep. No. 102-367, at 5.

45

Besides, this particular difference in coverage between the TVPA and the statutes petitioners cite is merely one of many.  Under the TVPA and Section 1983, the defendant must be a state actor, 28 U.S.C. § 1350 note § 2(a); 42 U.S.C. § 1983; under the Anti-Terrorism Act, he need not be, *see* 18 U.S.C. § 2331(1).  The FSIA expressly subjects foreign states to suit, 28 U.S.C. § 1605A, while the TVPA and the Anti-Terrorism Act do not, *see* 18 U.S.C. § 2337(2); pp. 29-30, *supra*.  Ultimately, whatever "rift" exists between the TVPA and other statutes (Pet. Br. 33) is one that Congress deliberately devised and codified in the statutory text.  "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there."  *Conn. Nat'l Bank*, 503 U.S. at 253-254.  By asking this Court to read the TVPA as if it used language from other statutes, petitioners ignore that principle.

2.  Petitioners seek to tether this case to *Kiobel v. Royal Dutch Petroleum Co.*, No. 10-1491, in which this Court will address corporate liability under the Alien Tort Statute.  They urge that the TVPA should be construed to permit suits against legal entities if the ATS does so.  Pet. Br. 33-34.  As the United States explains, however, "the TVPA is distinct from the ATS in several respects.  Most significantly, whereas the text of the ATS is silent as to the identity of the defendant, the TVPA confers a private right of action against an 'individual.'" U.S. Br. in No. 10-1491, at 27 n.16.  A ruling allowing corporate liability under the ATS would thus in no way compel a similar interpretation of the TVPA.

Petitioners urge that construing the TVPA more narrowly than the ATS would handicap U.S. citizens, who may sue only under the TVPA.  Pet. Br. 50.  But petitioners err in assuming that aliens may continue to sue for

---

46

torture or extrajudicial killing under the ATS even though Congress has provided an express cause of action addressing such conduct in the TVPA. Where Congress establishes an express cause of action that "'speak[s] directly to [the] question' at issue," courts should not invoke their common law authority to provide different remedies. *Am. Elec. Power Co. v. Connecticut*, 131 S. Ct. 2527, 2537 (2011).[18]  The ATS provides a jurisdictional grant for certain "common law actions derived from the law of nations." *Sosa*, 542 U.S. at 713-714, 721. By enacting the TVPA, however, Congress created an express cause of action for torture and extrajudicial killing under color of foreign law. 28 U.S.C. § 1350 note § 2(a). Congress carefully delineated the cause of action's scope, specifying an exhaustion requirement, a statute of limitations, and other restrictions. *See id.* § 2(a)-(c). That express cause of action displaces whatever common law claims might have been cognizable under the ATS—for aliens and citizens alike. *Compare Enahoro v. Abubakar*, 408 F.3d 877, 884-885 (7th Cir. 2005), *with Aldana*, 416 F.3d at 1250-1251.[19]

---

[18] Even where two *express* causes of action are at issue, a specific cause of action that is subject to limitations not found in a more general one precludes resort to the more general remedy. *See City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 121 (2005).

[19] The TVPA's legislative history confirms that Congress intended the ATS to remain available to address only norms not covered by the TVPA. *See* H.R. Rep No. 102-367, at 4 ("[C]laims based on torture or summary executions do not exhaust the list of actions that may appropriately be covered by section 1350. That statute should remain intact to permit suits based on *other norms* that already exist or may ripen in the future into rules of customary international law." (emphasis added)). Petitioners assert that Congress intended to "enhance and expand" the ATS, Pet. Br. 50, but the "expansion" it envisioned was the provision of a cause of action to U.S. citizens. *See* H.R. Rep. No. 102-367, at 4; S. Rep. No. 102-249, at 5.

47

This Court need not resolve that issue here, however. *Cf. Shell Petroleum N.V. v. Kiobel*, 132 S. Ct. 248 (2011) (denying review on that issue). Whatever the scope of available remedies under the ATS, this case involves only the TVPA, and the TVPA's plain text controls.

3. Petitioners also cite *Meyer v. Holley*, 537 U.S. 280, 285 (2003), for the proposition that Congress intends to incorporate "'ordinary tort-related * * * liability rules'" whenever it enacts a tort statute. Pet. Br. 12. "It is 'well settled' under U.S. law," they assert, that organizations may be held vicariously liable in tort for the acts of their agents. *Id.* at 13.

The short answer is that those arguments are waived. The D.C. Circuit expressly so held: Because petitioners had argued that "the defendants are secondarily liable for Rahim's death either pursuant to the principle of respondeat superior or for aiding and abetting his killer(s)" "for the first time" in "their reply brief," the argument "c[a]m[e] too late" and was "'waived.'" Pet. App. 10a. Petitioners did not argue secondary liability or seek review of that waiver ruling in their petition for certiorari. Nor did they challenge the waiver ruling in their opening brief. They have accordingly lost any right to challenge the ruling in this Court. *See Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202, 205 n.* (1997).

In any event, petitioners overstate the presumption. For example, there is no vicarious liability for *Bivens* actions. *Malesko*, 534 U.S. at 70-71. Nor is there vicarious liability under Section 1983; municipalities are liable only if the challenged action "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers" or reflects a "governmental 'custom.'" *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-691 (1978).

48

More importantly, as petitioners concede, "'courts may take it as given that Congress has legislated with an expectation that the principle will apply *except when a statutory purpose to the contrary is evident*.'" Pet. Br. 12-13 (quoting *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991)) (emphasis added). Here, the TVPA expressly limits liability to "individual[s]," excluding organizations from liability under any theory. 28 U.S.C. §1350 note §2(a). The statute at issue in *Meyer*, by contrast, involved provisions of the Fair Housing Act that prohibited discrimination by "any person or other entity" and defined "[p]erson" to include "individuals, corporations, partnerships, associations, labor unions, and other organizations." 42 U.S.C. §§3602(d), 3605(a). The other statutes petitioners cite (at 14) use similarly expansive language. *See* 46 U.S.C. §30302 ("the person or vessel responsible"); 46 U.S.C. §30104 ("the employer"); 15 U.S.C. §§1692a(6), 1692k(a) ("any person"); 42 U.S.C. §1985 (conspirators liable for any conspiracy between "two or more persons"). If Congress had intended the TVPA—an extraterritorial statute with serious potential foreign policy implications—to reach a similarly broad range of defendants, it would have used similarly broad terms. That Congress deliberately chose not to makes the TVPA's meaning all the more unmistakable.

## D. Legislative History Provides No Basis for Disregarding the Statute's Plain Meaning

Because the text of the TVPA is clear, the Court need not consider the statute's legislative history. *See Whitfield v. United States*, 543 U.S. 209, 215 (2005). "Legislative history, for those who take it into account, is meant to clear up ambiguity, not create it." *Milner v. Dep't of the Navy*, 131 S. Ct. 1259, 1267 (2011). Nonetheless, the TVPA's legislative history is not merely consistent with

49

the statutory text; it demonstrates that Congress used "individual" to exclude organizational liability. *See* pp. 28-31, *supra*. None of petitioners' citations proves otherwise.

1.   Petitioners cite nothing in the House or Senate committee reports that evinces an affirmative intent to subject corporations or other organizations to liability. Nor could they.  In describing the "[n]eed for legislation," the House Report explained that Judge Bork's concurrence in *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774 (D.C. Cir. 1984), had "questioned the existence of a private right of action under the Alien Tort Claims Act." H.R. Rep. No. 102-367, at 3-4.  The Second Circuit had recognized such a cause of action in *Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980), an ATS suit against "a former inspector general of police, who had tortured to death a family member of the plaintiffs, and who was present in the United States." H.R. Rep. No. 102-367, at 3.  While *Filartiga* "met with general approval," Judge Bork had "questioned whether section 1350 can be used by victims of torture committed in foreign nations absent an explicit [congressional] grant of a cause of action." *Id.* at 4.  The TVPA was enacted to "provide such a grant" and to "extend a civil remedy also to U.S. citizens who may have been tortured abroad." *Id.*; *accord* S. Rep. No. 102-249, at 5.

In describing that cause of action, neither committee report suggests an intent to extend liability beyond "individuals" as that term is traditionally understood.  The term "individual," moreover, is used throughout the reports to describe potential TVPA defendants, confirming that Congress's use of the term was deliberate. *See, e.g.*, S. Rep. No. 102-249, at 3 ("The purpose of this legislation is to provide a Federal cause of action against any indi-

50

vidual * * * ."); H.R. Rep. No. 102-367, at 4 (similar).  In
describing who may be liable without directly conducting
the torture or extrajudicial killing, the Senate Report re-
fers only to natural persons:

> [The Act] will not permit a lawsuit against a former
> *leader* of a country merely because an isolated act
> of torture occurred somewhere in that country.
> However, a *higher official* need not have personally
> performed or ordered the abuses in order to be held
> liable.  Under international law, responsibility for
> torture, summary execution, or disappearances ex-
> tends beyond the persons or person who actually
> committed those acts—*anyone with higher author-*
> *ity* who authorized, tolerated or knowingly ignored
> those acts is liable for them * * * .  Finally, *low-*
> *level officials* cannot escape liability by claiming
> that they were acting under orders of superiors.

S. Rep. No. 102-249, at 8-9 (emphasis added).  The Senate
Report then provides examples of cases in which human
beings were subject to liability under a command respon-
sibility theory.  *See id.* at 9.  It also cites *Filartiga* and
another suit against a natural person, *Forti v. Suarez
Mason*, 672 F. Supp. 1531 (N.D. Cal. 1987), with ap-
proval.  S. Rep. No. 102-249, at 4.

Congress's singular focus on natural persons is simi-
larly reflected in the discussions of personal jurisdiction
and limitations periods.  The Senate Report explains
that, "for a Federal court to obtain personal jurisdiction
over a defendant, the individual must have 'minimum
contacts' with the forum state, for example through resi-
dency here or current travel."  S. Rep. No. 102-249, at 7.
Similarly, both reports state that the 10-year limitations
period should be tolled "where the defendant has con-
cealed *his* or *her* whereabouts or the plaintiff has been

51

unable to discover the identity of the offender." *Id.* at 11 (emphasis added); *accord* H.R. Rep. No. 102-367, at 5. Congress was thus clearly legislating with natural persons in mind.

2.  To derive support for the contrary view, petitioners isolate and misread snippets of legislative history. For example, they read the reports' reference to *Tel-Oren v. Libyan Arab Republic*—in which the PLO was one of many defendants—to "demonstrate[] that Congress understood the Act to apply to organizations such as the PLO." Pet. Br. 47-48.  But the lead defendant in that case was a foreign *state*—Libya.  Petitioners acknowledge that Congress excluded foreign states from liability.  *Id.* at 43-44.  Clearly, therefore, Congress did not enact the TVPA to make the particular defendants in *Tel-Oren* liable.

Petitioners' suggestion that Congress targeted the PLO also defies the TVPA's express limitations.  Echoing *Filartiga*'s observation that international law proscribes only "torture perpetrated under color of official authority," 630 F.2d at 878, the TVPA requires state action, imposing liability only for torture effected "under actual or apparent authority, or color of law, of any foreign nation," 28 U.S.C. § 1350 note § 2(a).  But the PLO is not a state or a state actor, as Judge Edwards' concurrence in *Tel-Oren* makes clear.  726 F.2d at 791 ("The Palestine Liberation Organization is not a recognized state, and it does not act under color of any recognized state's law.  In contrast, the Paraguayan official in *Filartiga* acted under color of state law, although in violation of it."); *see also Shafi v. Palestinian Auth.*, 642 F.3d 1088, 1091-1092 (D.C. Cir. 2011).

The committee reports do not "emphasize that the TVPA was intend to facilitate suits similar to *Tel-Oren*."

52

Pet. Br. 46. They emphasize that the TVPA was intended to facilitate suits similar to *Filartiga*, in which a human being was the defendant. H.R. Rep. No. 102-367, at 3-4; S. Rep. No. 102-249, at 4-5. The committee reports discuss *Tel-Oren* in the context of explaining that Judge Bork's concurrence had called into question whether suits similar to *Filartiga* could be maintained. *Id.* Neither report opines on whether the PLO should be subject to suit.

3. Petitioners also assert that Congress expected the Act to apply to "organizations," "groups," and "death squads." Pet. Br. 11, 48-49. But the discussions they cite address the state-action requirement, making it clear that purely private conduct is excluded. *See* H.R. Rep. No. 102-367, at 5 ("The bill does not attempt to deal with torture or killing by purely private groups."); S. Rep. No. 102-249, at 8 ("Consequently, this legislation does not cover purely private criminal acts by individuals or nongovernmental organizations."). Neither report addresses whether the cause of action reaches only the individuals who engage in the conduct or extends further to the organizations for which the individuals act.[20]

In short, the legislative history does no more than confirm what the TVPA's text and every other indicator of congressional intent make clear: "Individual" means "individual"—a natural person.

---

[20] The cited reference to "death squads" is particularly unpersuasive. The quoted passage cites a report that, in 1990 alone, there were 29 extrajudicial killings by death squads. *See* S. Rep. No. 102-249, at 3. But the same report also notes that "one-third of the world's governments engage in, tolerate, or condone such acts." *Id.* Under petitioners' logic, this reference to "the world's governments" would equally evince congressional intent to subject foreign *governments* to liability.

53

## CONCLUSION

The judgment of the court of appeals should be af-firmed.

Respectfully submitted.

JEFFREY A. LAMKEN                   LAURA G. FERGUSON
ROBERT K. KRY                            *Counsel of Record*
MARTIN V. TOTARO                    RICHARD A. HIBEY
MOLOLAMKEN LLP                     MARK J. ROCHON
The Watergate, Suite 660           DAWN E. MURPHY-JOHNSON
600 New Hampshire Ave., NW    MILLER & CHEVALIER CHTD.
Washington, D.C.  20037            655 15th St. NW, Suite 900
(202) 556-2000                            Washington, D.C.  20005
                                                   (202) 626-5800
                                                   lferguson@milchev.com

*Counsel for Respondents*

JANUARY 2012

# APPENDIX
## RELEVANT STATUTORY PROVISIONS

The Torture Victim Protection Act of 1991, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note), provides:

### An Act

To carry out obligations of the United States under the United Nations Charter and other international agreements pertaining to the protection of human rights by establishing a civil action for recovery of damages from an individual who engages in torture or extrajudicial killing.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*,

SECTION 1. SHORT TITLE.

This Act may be cited as the "Torture Victim Protection Act of 1991".

SEC. 2. ESTABLISHMENT OF CIVIL ACTION.

(a) LIABILITY.—An individual who, under actual or apparent authority, or color of law, of any foreign nation—

(1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual; or

(2) subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death.

(b) EXHAUSTION OF REMEDIES.—A court shall decline to hear a claim under this section if the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred.

(1a)

2a

(c) STATUTE OF LIMITATIONS.—No action shall be maintained under this section unless it is commenced within 10 years after the cause of action arose.

## SEC. 3. DEFINITIONS.

(a) EXTRAJUDICIAL KILLING.—For the purposes of this Act, the term "extrajudicial killing" means a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation.

(b) TORTURE.—For the purposes of this Act—

(1) the term "torture" means any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind; and

(2) mental pain or suffering refers to prolonged mental harm caused by or resulting from—

(A) the intentional infliction or threatened infliction of severe physical pain or suffering;

(B) the administration or application, or threatened administration or application, of mind altering

3a

substances or other procedures calculated to disrupt profoundly the senses or the personality;

(C) the threat of imminent death; or

(D) the threat that another individual will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the senses or personality.

Approved March 12, 1992.