# EXHIBIT 2



**UNITED NATIONS**
Office for the Coordination of Humanitarian Affairs
occupied Palestinian territory

SPECIAL FOCUS
March 2011

# EAST JERUSALEM
## KEY HUMANITARIAN CONCERNS



P.O. Box 38712 East Jerusalem 91386 | tel +972 (0)2 582 9962 | fax +972 (0)2 582 5841 | ochaopt@un.org | www.ochaopt.org

## Acknowledgements

OCHA would like to thank the many partners – Palestinian, Israeli and international – who contributed to, and commented on, this report. Particular gratitude is due to those portrayed in the case studies. OCHA would also like to thank its donors for their generous contribution towards OCHA's work, namely the European Union (ECHO), Sweden, Norway, Canada, Switzerland, Ireland and Iceland.

Front cover photo: House demolition in At Tur, Mahfouz Abu Turk, 2009
Back cover photo: Ar Ram, JC Tordai, 2009

# TABLE OF CONTENTS

PAGE

EXECUTIVE SUMMARY ............................................................................................... I

CHANGING BOUNDARIES OF JERUSALEM

Corpus Separatum - The UN Partition Plan of 1947 ........................................... 6

The 1949 Armistice Agreement: the 'Green Line'. ................................................ 7

The 1967 War and the expanded municipal boundary. ....................................... 8

Settlements and the Barrier. ................................................................................... 9

## CHAPTER 1: RESIDENCY RIGHTS OF PALESTINIANS IN EAST JERUSALEM

Key Points ................................................................................................................. 12

1. Background ........................................................................................................... 13

2. Revocation of Residency ................................................................................... 14

CASE STUDY: RESIDENCY REVOKED ................................................................. 17

3. Family Unification ............................................................................................... 18

CASE STUDY: FAMILY UNIFICATION FROZEN ................................................ 20

4. Registration of Children .................................................................................... 22

CASE STUDY: REGISTRATION OF CHILDREN REFUSED ............................. 24

Recommendations ................................................................................................... 26

## CHAPTER 2: PLANNING, ZONING AND DEMOLITIONS IN EAST JERUSALEM

Key Points ................................................................................................................. 28

1. Background: Understanding the Phenomenon of 'Illegal' Construction ... 29

2. The Jerusalem Local Outline Plan 2000 ('Master Plan'). ............................. 32

CASE STUDY: MASS DEMOLITIONS PENDING IN AL BUSTAN AREA OF SILWAN ....... 34

3. The Extent of 'Illegal' Construction. ................................................................ 36

4. House Demolitions and Displacement .............................................................. 38

5. Impact of Displacement ...................................................................................... 38

CASE STUDY: AFTER THE DEMOLITION. ......................................................... 40

CASE STUDY: PLANNING CHALLENGES IN AL 'ISAWIYA ........................... 42

6. Prospects for, and Constraints on, Current Planning Efforts. .................... 44

CASE STUDY: THE HIGH COST OF RENTING IN EAST JERUSALEM ........ 46

Recommendations ................................................................................................... 48

## CHAPTER 3: SETTLEMENTS IN EAST JERUSALEM

Key Points ................................................................................................................. 50

1. Background ........................................................................................................... 51

2. Settler Activity in Palestinian Residential Areas: Means of Expropriation and Control ....... 54

2.1 The Absentee Property Law ........................................................................ 54

2.2 Appropriation of alleged pre-1948 Jewish Property from Palestinian Residents ....... 56

2.3 Purchase from Palestinian Owners ............................................................ 57

2.4 Appropriation of Public Space and Historical Narrative ....................... 57

2.5 The Open Spaces Project. ............................................................................. 58

3. Impact of Settlements and Related Infrastructure on Palestinians .......... 60

3.1 Restrictions on Public Space and Residential Growth ........................... 60

3.2 Restrictions on Freedom of Movement and Intrusion on Private Space ........ 60

3.3 Friction and Violence. ................................................................................... 60

CASE STUDY: TESTIMONY OF RIFQA AL KURD .............................................. 61

3.4 Forced Displacement ..................................................................................... 62

CASE STUDY: THE FINANCIAL COST OF AN EVICTION. .............................. 63

Recommendations ................................................................................................... 64

## CHAPTER 4: THE BARRIER IN THE JERUSALEM AREA

Key Points ................................................................................................................. 66

1. Background ........................................................................................................... 67

2. Humanitarian Impact ......................................................................................... 69

2.1 East Jerusalem Communities on the 'West Bank' Side of the Barrier ........ 69

CASE STUDY: IMPACT OF THE BARRIER ON KAFR 'AQAB ......................... 70

2.2 West Bank Communities on the 'Jerusalem' Side of the Barrier ............. 72

CASE STUDY: A WEST BANK FAMILY ON THE 'JERUSALEM' SIDE OF THE BARRIER .................................................. 74
    2.3 West Bank Communities/Jerusalem Suburbs Severed from their Historic Ties to the Urban Centre ..................... 76
    2.4 Communities with Restricted Access to Agricultural Land ........................................................................ 77
CASE STUDY: BIDDU AGRICULTURAL GATES – REGULATIONS AND OPERATION ................................................. 79
Recommendations ................................................................................................................................ 80
CASE STUDY: ACCESS TO RELIGIOUS SITES IN EAST JERUSALEM ............................................................... 81
CHAPTER 5: RESTRICTIONS ON ACCESS TO EDUCATION
Key Points ......................................................................................................................................... 84
1. Background ..................................................................................................................................... 85
2. Key concerns .................................................................................................................................. 87
    2.1 Shortage of Classrooms and Substandard Conditions ............................................................................ 87
CASE STUDY: SHU'FAT BOYS' SCHOOL ............................................................................................... 88
    2.2 Lack of Pre-school Educational Facilities ........................................................................................ 89
    2.3 Access Problems for Teachers and Pupils ........................................................................................ 90
CASE STUDY: SNEAKING INTO EAST JERUSALEM ................................................................................... 92
CASE STUDY: TESTIMONY OF UM IBRAHIM AND HER FAMILY FROM THE BEDOUIN COMMUNITY OF TEL ADASA ......... 94
    2.4 Access to University ................................................................................................................ 95
CASE STUDY: INTERVIEW WITH DR. SULEIMAN RABADI .......................................................................... 97
    Recommendations ............................................................................................................................ 98
CHAPTER 6: RESTRICTIONS ON ACCESS TO HEALTH
Key Points ....................................................................................................................................... 100
1. Background ................................................................................................................................... 101
CASE STUDY: UM AL ASAFIR ............................................................................................................ 103
2. Palestinian Patients with West Bank ID Cards ..................................................................................... 105
3. Palestinian Patients from the Gaza Strip ........................................................................................... 106
CASE STUDY: A SICK CHILD FROM GAZA ............................................................................................. 107
4. Access to East Jerusalem Hospitals in cases of Medical Emergency .......................................................... 108
5. Restrictions on Access to, and Employment in, East Jerusalem Hospitals for West Bank Medical Staff ............... 109
CASE STUDY: RESTRICTIONS ON HOSPITAL EXPANSION, MEDICAL EQUIPMENT AND PHARMACEUTICALS .................. 110
Recommendations .............................................................................................................................. 111
CASE STUDY: LIFE IN AN ENCLAVE ................................................................................................... 112
CONCLUSION .................................................................................................................................... 116
Endnotes ........................................................................................................................................ 119

# FIGURES

                                                                 PAGE
Revocation of ID cards, 1967-2008 ...................................................................................................... 14
Zoning in East Jerusalem ................................................................................................................... 29
Demolitions in East Jerusalem, 2000 – 2010 ........................................................................................... 31
Settlement population in 2008 ............................................................................................................. 50
Impact of the Barrier: categories of communities affected .......................................................................... 68
Selected indicators For West Bank suburbs Of East Jerusalem before and after the Barrier ................................... 77
Education providers in East Jerusalem .................................................................................................... 85
Waqf schools with demolition orders/fines in Jerusalem governorate .............................................................. 89

# MAPS

                                                                  PAGE
Jerusalem 1947 ............................................................................................................................... 6
Jerusalem 1949 ............................................................................................................................... 7
Jerusalem 1967 ............................................................................................................................... 8
Settlements in Jerusalem 1967, 1973, 1987, 2005 .................................................................................... 9
East Jerusalem: Al-Bustan, Silwan ......................................................................................................... 35
Demolitions in 2010 ......................................................................................................................... 37
Settlement Layers in the Jerusalem Area .................................................................................................. 52
East Jerusalem: Settlements in Palestinian Residential Areas .......................................................................... 55
East Jerusalem: Open Spaces Project ...................................................................................................... 59
Services Provided By The Six Specialized Hospitals In East Jerusalem ............................................................... 104

# FOREWORD

**Jerusalem** is a profoundly important issue for Israelis and Palestinians, and for Jews, Muslims and Christians worldwide. The two parties, the Government of Israel and the Palestine Liberation Organization, have agreed that Jerusalem is a permanent status issue that must be resolved through negotiations between them. Within the framework of Security Council resolutions and the terms of reference of the Middle East peace process, such a solution must end the 1967 occupation and realize the two State solution, and resolve all permanent status issues, including Jerusalem. The UN Secretary-General believes that a way must be found for Jerusalem to emerge from negotiations as the capital of two States, with arrangements for the holy sites acceptable to all.





Dome of the Rock, photo by Patrick Zell, 2010

# EXECUTIVE SUMMARY

This report focuses on East Jerusalem and forms part of a series by OCHA which examines the humanitarian impact of Israeli measures, such as the Barrier, settlements and planning and zoning restrictions, on Palestinians in the occupied Palestinian territory (oPt). The report mainly focuses on the area unilaterally annexed to Israel and included within the municipal boundary of Jerusalem following the 1967 war. This annexation is not recognized by the international community, and the Security Council has resolved that all legislative measures and actions taken by Israel to alter the character and status of Jerusalem are null and void (see, inter alia, Security Council resolutions 252, 267, 471, 476 and 478).

In the years since 1967, Israel has undertaken measures – in particular land confiscation, settlement building and construction of the Barrier – which serve to alter the status of East Jerusalem, contrary to international law. Government and municipal policies have also negatively impacted the estimated 270,000 Palestinians in East Jerusalem.[1] As this report demonstrates, these policies affect their residency status, their access to education and health services, and their ability to plan and develop their communities. This report is designed to document the impact of these measures on the Palestinian population in East Jerusalem, in order to raise awareness, offer recommendations, and contribute to an enhanced response to humanitarian, early recovery and development needs.

Combined, these policies significantly increase the humanitarian vulnerability of the Palestinian residents of East Jerusalem. Although Palestinians are remaining in the city, in the long term, failure to address these 'push factors' risks undermining the Palestinian presence in East Jerusalem.

East Jerusalem has traditionally served as the focus of political, commercial, religious and cultural life for the entire Palestinian population of the oPt. Following the 1967 annexation, Palestinians from the remainder of the West Bank and the Gaza Strip have been prevented from residing within the Israeli-defined municipal boundary, other than through the increasingly restrictive process of 'family unification.' Since the early 1990s, non-Jerusalem Palestinians have been compelled by the Israeli authorities to obtain permits just to access the city, including to places of worship during Ramadan and Easter. The number of such permits granted is limited, and access of permit holders into East Jerusalem is restricted to four checkpoints. The majority of checkpoints leading into the Jerusalem area have been incorporated into the Barrier, which is itself compounding the separation of East Jerusalem from the rest of the West Bank.

In addition to this administrative and physical separation, the Palestinian Authority is not allowed, under the Oslo Accords, to operate in East Jerusalem and the closure of Palestinian institutions, such as Orient House, is continually renewed, notwithstanding Israel's commitments under the Roadmap. This has led to a political and institutional vacuum which, in addition to restrictive residency and access policies, is resulting in East Jerusalem becoming increasingly separated from the remainder of the occupied Palestinian territory – physically, politically, socially and culturally.

Pending a final status agreement, East Jerusalem remains an integral part of the occupied Palestinian territory and the Palestinian population of the territory should have the right to access East Jerusalem, including for specialized health and education, work, social, cultural & family relationships and for worship at the Muslim and Christian holy places. Therefore, while primarily focusing on the issues facing the Palestinian residents of East Jerusalem, this report will also emphasize the continuing importance of the city as a centre of life for Palestinians throughout the oPt, at a time when East Jerusalem is becoming increasingly separated from the remainder of the occupied Palestinian territory.

**More specifically, the report addresses the following concerns:**

## Residency Status of Palestinians in East Jerusalem

Following the war of 1967, the Government of Israel unilaterally annexed some 70 km² of the occupied area to Israel, which included East Jerusalem, as defined under Jordanian rule (six km²), as well as 64 km² of surrounding West Bank territory; the annexed area was subsequently added to the Municipality of Jerusalem. The right to reside in East Jerusalem was restricted to those Palestinians who were recorded as living within this expanded municipal boundary. However, East Jerusalem Palestinians were defined as permanent residents of Israel rather than citizens, and their residency status is conditional on their proving that their 'centre of life' lies within the Israeli-defined municipal boundary or in Israel proper. Extended stays by Jerusalem Palestinians outside of the city or Israel, including in the remainder of the oPt, can result in the revocation of their Jerusalem ID cards. Approximately 14,000 East Jerusalem Palestinians have had their residency revoked since 1967, of which over 4,500 were revoked in 2008.

Permanent residency status is not automatically transferred through marriage, so a Palestinian resident of East Jerusalem who wishes to reside in the city with a spouse from the remainder of the oPt, must apply for family unification. The application process for family reunification for residents of East Jerusalem is onerous and has become virtually impossible since 2003, when Israel introduced the *Nationality and Entry into Israel Law* (Temporary Order).

Permanent residency status is also not passed on to the holder's children 'by right', resulting in difficulties in registering the children of such 'mixed residency' status marriages.

## Planning, Zoning and Demolitions in East Jerusalem

Since 1967, Israel has failed to provide Palestinian residents of East Jerusalem with the necessary planning framework to meet their basic housing and infrastructure needs. Only 13 percent of the annexed municipal area is currently zoned by the Israeli authorities for Palestinian construction, much of which is already built-up. It is only within this area that Palestinians can apply for building permits, but the number of permits granted per year to Palestinians does not begin to meet the existing demand for housing and the requirements related to formal land registration prevent many from applying.

As a result, Palestinian residents of East Jerusalem find themselves confronting a serious shortage in housing and other basic infrastructure. Many residents have been left with no choice other than to build structures 'illegally' and therefore risk demolition and displacement. The *Jerusalem Local Outline Plan* 2000 ('Master Plan'), instead of providing a solution to this housing crisis, appears designed to preserving a demographic majority of Jewish residents vis-à-vis Palestinians in the city.

## Settlements in East Jerusalem

Since 1967, the Government of Israel has constructed settlements within the extended municipal boundary of East Jerusalem and in the wider metropolitan area beyond, despite the prohibition, under international law, on the transfer of civilians to occupied territory. Over one third of the area within the extended boundary of East Jerusalem has been expropriated for the construction and expansion of Israeli settlements.

The territory expropriated for settlement building and expansion has resulted in a corresponding reduction in the land and resources available

for Palestinian construction and development. In addition, settler organizations are targeting land and property to create an 'inner' layer of settlements within Palestinian residential areas, in the so-called 'Holy Basin' area. The impact of this settlement activity in Palestinian areas includes restrictions on public space, residential growth and freedom of movement. In the most severe cases – in the Old City, Silwan, and most recently in Sheikh Jarrah – settler expropriation has resulted in the loss of property and the eviction of the long-term Palestinian residents.

Archaeological activity in these areas is augmenting the public space which the settlers control. A government-sponsored 'Open Spaces' project will expand this domain and further constrain Palestinian construction and space in East Jerusalem. An additional declared intention of these settler groups is to thwart a negotiated resolution to the question of Jerusalem by preventing any potential re-division of the city.

## The Barrier in the Jerusalem Area

In summer 2002, the Government of Israel approved construction of a Barrier with the stated purpose of deterring suicide bombers in the West Bank from entering Israel. Construction of the Barrier in the greater Jerusalem area is effectively re-drawing the geographical boundaries, in addition to compounding the separation of East Jerusalem from the rest of the West Bank.

Consequently, certain Palestinian communities in East Jerusalem find themselves on the 'West Bank' side of the Barrier, and residents now need to cross checkpoints to access the health, education and other services to which they are entitled as residents of Jerusalem. Conversely, certain West Bank localities are 'dislocated' to the 'Jerusalem' side of the Barrier, with the result that approximately 2,500 Palestinians in 16 communities face uncertain residency status, impeded access to basic services and potential displacement.

In addition, West Bank neighbourhoods and suburbs of East Jerusalem are severed from their former close connections to the urban centre, with devastating social and economic consequences. The Barrier also separates rural communities from their land in the Jerusalem hinterland, resulting in impeded access for farmers and a decline in agricultural production and livelihoods.

## Restrictions on Access to Education

Education in East Jerusalem is divided between numerous providers - municipal, private, 'recognized unofficial', *Waqf* and UNRWA. Despite the number of providers, there is a chronic shortage of classrooms and existing facilities are substandard or unsuitable. Pupils are often accommodated in rented houses which do not meet basic educational and health standards. Consequently, parents have to resort to fee-paying alternatives although pupils are entitled to free education under Israeli law.

Many pupils are not enrolled in any educational institution. Among those enrolled, many fail to complete secondary school, with an especially high drop-out rate of boys aged 12-14. Zoning and other planning restrictions in East Jerusalem inhibit both new construction and the expansion of existing buildings. As a result, certain *Waqf* schools are threatened by demolition and sealing orders. Preschool facilities are also inadequate in East Jerusalem.

With the increasing isolation of East Jerusalem from the remainder of the oPt, teachers and pupils with West Bank ID cards face difficulties in accessing schools in East Jerusalem because of permit restrictions, checkpoints and the Barrier. The main campus of Al Quds University is also separated from the city by the Barrier and the institution's certificates are not recognized by the Israeli authorities.

## Restrictions on Access to Health

Palestinians who hold Jerusalem ID cards are entitled to the health services provided by the Israeli authorities, which are recognized to be of a high standard, and can also access the six Palestinian-run non-profit hospitals in the city. Residents of the remainder of the oPt also rely on these hospitals for routine, specialised and emergency health services which are unavailable elsewhere in the West Bank and the Gaza Strip. However, the permit regime, checkpoints, the Barrier, and the blockade of Gaza, make access difficult, both for patients who hold West Bank ID cards and for East Jerusalem residents now located on the 'West Bank' side of the Barrier.

Physical and bureaucratic obstacles also hamper the ability of Palestinian medical staff – who comprise the majority of medical personnel in the six East Jerusalem hospitals – to access their workplaces in East Jerusalem, to the detriment of patients and hospitals. The efficient running of East Jerusalem hospitals is also impaired by restrictions on construction expansion, and the entry of medical equipment and pharmaceuticals into East Jerusalem from the remainder of the West Bank.

*****

The impetus for this report arose from a series of meetings convened by OCHA in late 2009, involving key Palestinian, Israeli and international interlocutors in the health, education and other sectors. While aiming to convey a comprehensive overview of the main humanitarian concerns in East Jerusalem, the report is not exhaustive. Certain key issues, in particular, the economy, and social and youth problems, are beyond the scope of this report and require the attention of more specialized agencies.

Each chapter in the report provides an overview of the key sectoral concerns, augmented by case studies, photos and maps which underline the humanitarian impact of the issues raised.

Specific recommendations are proposed at the end of each chapter, as interim steps to mitigate the key concerns: inevitably, the most important steps that can and need to be taken are by the Government of Israel. The *Conclusion/ Way Forward* provides more general observations regarding changes to the character and status of East Jerusalem since 1967 and their impact on Palestinians, while emphasizing that only a full implementation of relevant UN resolutions, in the context of a negotiated solution, will fully address the concerns outlined in the report and lead to a lasting and peaceful solution to the question of Jerusalem.



CHANGING
BOUNDARIES OF
JERUSALEM

## Corpus Separatum - The UN Partition Plan of 1947

In April 1947, the General Assembly established the United Nations Special Committee on Palestine (UNSCOP), made up of 11 Member States, to investigate all questions relevant to the problem of Palestine and to recommend solutions to be considered by the General Assembly. The majority of the members of UNSCOP recommended that Palestine be partitioned into an Arab State and a Jewish State, with a special international status for the city of Jerusalem under the administrative authority of the United Nations. The three entities were to be linked together in an economic union.

On 29 November 1947, the General Assembly adopted resolution 181 (II), which approved, with minor changes, the Plan of Partition with Economic Union as proposed by the majority in UNSCOP. The Partition Plan envisaged an international regime for Jerusalem (including the city of Bethlehem), the Corpus Separatum. A demilitarized Jerusalem would be administered as a separate entity by the United Nations Trusteeship Council, which would draft a statute for Jerusalem and appoint a Governor. A legislature would be elected by universal adult suffrage. This statute would remain in force for 10 years and would then be duly examined by the Trusteeship Council, with citizens' participation through a referendum.

The Jewish Agency accepted the resolution, while the plan was opposed by the Palestinian Arabs and Arab States.

Following the outbreak of the First Arab-Israeli War of 1948, Israel occupied the western sector of the Jerusalem area, and Jordan occupied the eastern sector, including the Old City, resulting in a de facto division of Jerusalem. The General Assembly, however, in resolution 194 (III) of 11 December 1948, reaffirmed the principle of internationalization of Jerusalem, resolving 'that, in view of its association with three world religions, the Jerusalem area, including the present municipality of Jerusalem plus the surrounding villages and towns...should be accorded special and separate treatment from the rest of Palestine and should be placed under effective United Nations control.'[2]



JERUSALEM 1947

Corpus Separatum
The UN Partition
Plan of 1947

Shu'fat

Ein Karem

Abu Dis

British Mandate
Jerusalem Municipal
and City Boundary

Bethlehem

DISCLAIMER: The designations employed and the presentation of material on this map do not imply the expression of any opinion whatsoever on the part of the Secretariat of the United Nations concerning the legal status of any country, territory, city or area or of its authorities, or concerning the delimitation of its frontiers or boundaries. Reproduction and/or use of this material is only permitted with express reference to "United Nations OCHA oPt" as the source.

## The 1949 Armistice Agreement: the 'Green Line.'

Between February and July 1949, under United Nations auspices, armistice agreements were signed between Israel and Egypt, Jordan, Lebanon and Syria. These agreements accepted the establishment of the armistice as an indispensable step towards the restoration of peace in Palestine. They also made clear that the purpose of the armistice was not to establish or recognize any territorial, custodial or other rights, claims or interests of any party.

In April 1949, as part of the armistice agreement between Israel and Jordan, the de facto division of Jerusalem was formalized, with the 'Green Line' or Armistice Line separating the two parts of the city. The parties disagreed about the demarcation of the ceasefire line in certain sections, resulting in two 'Green Lines' in some areas, with a 'no man's land' in between subject to neither Israeli nor Jordanian control. This agreement also recognised the special status of Mount Scopus, site of the Hebrew University and Hadassah Hospital, and provided for the 'resumption of the normal functioning of the cultural and humanitarian institutions on Mount Scopus and free access thereto.'

On 23 January 1950, Israel declared Jerusalem its capital and established government agencies in the western part of the city. Jordan, for its part, moved to formalize its control of the Old City; however, Jordanian legislation indicated that this action did not prejudice the final settlement of the Palestinian issue.[3]



DISCLAIMER:

The designations employed and the presentation of material on this map do not imply the expression of any opinion whatsoever on the part of the Secretariat of the United Nations concerning the legal status of any country, territory, city or area or of its authorities, or concerning the delimitation of its frontiers or boundaries. Reproduction and/or use of this material is only permitted with express reference to "United Nations OCHA oPt" as the source.

## The 1967 War and the expanded municipal boundary

In the wake of the 'Six Day War' of June 1967, Israel occupied the Gaza Strip and West Bank, including East Jerusalem. Immediately after the end of the war, the Government of Israel declared that 'Israeli law, jurisdiction and administration' would apply to some 70 km² of the occupied area, which included East Jerusalem, as defined under Jordanian rule (6 km²), as well as 64 km² of surrounding West Bank territory, most of which belonged to 28 Palestinian villages.[4] This decision resulted in the de-facto annexation of this area to Israel. The annexed area was subsequently added to the Municipality of Jerusalem.

On 30 July 1980, the Israeli Parliament adopted the Basic Law on Jerusalem, which declared that the entire city of Jerusalem to be 'the complete and united capital of Israel.' These unilateral steps are not recognized by the international community (see inter alia, UN Security Council Resolutions 252, 267, 471, 476 and 478), which maintain that all legislative measures and actions taken by Israel to alter the character and status of Jerusalem are null and void.

The Declaration of Principles, 'Oslo Accords', Article IV, agreed in 1993 between Israel and the Palestine Liberation Organization, provided that during the interim period the jurisdiction of the Palestinian Authority would cover the West Bank and Gaza Strip, except for issues to be negotiated in the permanent status negotiations. Article V provided that Jerusalem was a permanent status issue. At the same time, the parties agreed that the outcome of permanent status negotiations should not be prejudiced or pre-empted by agreements reached for the interim period. In the 'Holst Letter' of 11 October 1993, the Israeli government affirmed that it acknowledged the importance of Palestinian institutions in East Jerusalem and committed to their preservation and to not hampering their activity.



## Settlements and the Barrier

Since 1967, the Government of Israel has constructed settlements within the extended municipal boundary of East Jerusalem and in the wider metropolitan area beyond, despite the prohibition, under international law, on the transfer of civilians to occupied territory. The Oslo Accords defined settlements as a final status issue, but in so doing, did not alter the character of settlements as contrary to international law, nor give any authorization to their continued expansion. In summer 2002, the Government of Israel approved construction of a Barrier with the stated purpose of deterring suicide bombers in the West Bank from entering Israel. Although the expanded municipal border of 1967 remains the official Israeli-defined boundary, the Barrier in the greater Jerusalem area is effectively re-drawing the geographical boundaries, in addition to compounding the separation of East Jerusalem from the rest of the West Bank.

All of the settlements which have been established within the municipal boundary have been included on the 'Jerusalem' side of the









DISCLAIMER: The designations employed and the presentation of material on this map do not imply the expression of any opinion whatsoever on the part of the Secretariat of the United Nations concerning the legal status of any country, territory, city or area or of its authorities, or concerning the delimitation of its frontiers or boundaries. Reproduction and/or use of this material is only permitted with express reference to "United Nations OCHA oPt" as the source.

Barrier. If the Barrier is completed as planned, the large 'metropolitan' settlements in the wider Jerusalem area, located outside the municipal boundary, will be also be encircled and brought onto the 'Jerusalem' side. These comprise the Adummim settlement bloc to the east, the Giv'at Ze'ev settlement in the north; in the south, approximately 64 km² of land in the Bethlehem governorate will be enclosed by the Barrier, including the Gush Etzion settlement block.

It was the route of the Barrier, rather than the structure itself, which was the subject of the International Court of Justice (ICJ) advisory opinion on *the Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory*, in July 2004. The opinion recognised that Israel 'has the right, and indeed the duty, to respond in order to protect the life of its citizens [but] the measures taken are bound nonetheless to remain in conformity with applicable international law.'[5] The ICJ stated that the sections of the Barrier route which ran inside the West Bank, including East Jerusalem, together with the associated gate and permit regime, violated Israel's obligations under international law. The ICJ called on Israel to cease construction of the Barrier 'including in and around East Jerusalem'; dismantle the sections already completed; and 'repeal or render ineffective forthwith all legislative and regulatory acts relating thereto.'[6]



Qalandiya Checkpoint, photo by Patrick Zoll, 2009

CHAPTER 1

RESIDENCY RIGHTS
OF PALESTINIANS IN
EAST JERUSALEM

## Key Points

- Since Israel's occupation of East Jerusalem in 1967, and its subsequent annexation, Palestinian residents of the remainder of the West Bank and the Gaza Strip have been prohibited from residing in East Jerusalem, other than through the 'family unification' process. Since the early 1990s, Palestinian residents of the West Bank and the Gaza Strip have also required permits to enter East Jerusalem and Israel.

- Under Israeli law, the majority of Palestinians living in Jerusalem are 'permanent residents' rather than citizens of Israel, and their residency status is conditional on their proving that their 'centre of life' lies within the Israeli-defined municipal boundary of Jerusalem. Consequently, their residency status can be revoked under the circumstances described in this chapter. Approximately 14,000 East Jerusalem Palestinians had their residency revoked between 1967 and mid-2010 (not including dependent children), with over 4,500 revoked in 2008.

- As permanent residency is not automatically transferred through marriage, a Palestinian resident of East Jerusalem who marries a Palestinian from elsewhere in the oPt, and wishes to reside in the city with his/her spouse must apply for family unification. The application process for family reunification is onerous and has become virtually impossible since 2003, when Israel introduced the Nationality and Entry into Israel Law (Temporary Order). The Law disproportionately impacts residents of East Jerusalem, who are forbidden from family unification not only with their spouses, but with their minor children.

- Unlike citizenship, permanent residency is not passed on to the holder's children 'by right', and children can only receive permanent residence under certain conditions. This leads to difficulties in the registration of children – where one parent is a Jerusalem resident and the other is a resident of the rest of the West Bank or Gaza Strip – with one source estimating that there are as many as 10,000 unregistered children in East Jerusalem.[7] As a consequence, there are numerous cases of Palestinians residing 'illegally' in East Jerusalem with their spouses, and incidences of separated families where the non-Jerusalem partner is forced to live outside of the city, with or without the children.[8]

- Combined with land expropriation, restrictive zoning and planning, demolitions and evictions, and the inadequate provision of resources and investment in East Jerusalem, described elsewhere in this report, this residency policy not only increases humanitarian vulnerability but risks undermining the Palestinian presence in East Jerusalem.

# I. Background

Following the war of 1967, the Government of Israel unilaterally annexed some 70 km² of the occupied area to Israel, which included East Jerusalem, as defined under Jordanian rule (six km²), as well as 64 km² of surrounding West Bank territory; the annexed area was subsequently added to the Municipality of Jerusalem. The new municipal boundary was 'purposely drawn …to include the maximum territory possible, with the minimum possible Palestinian population.'[9] This unilateral annexation contravenes international law and is not recognized by the international community, which considers East Jerusalem as part of the occupied Palestinian territory.[10]

The right to reside in East Jerusalem was now restricted to those Palestinians who were recorded as living within the new Israeli-defined municipal boundary in a census conducted by the Israeli authorities.[11] The vast majority of the then estimated 66,000 Palestinians living within the municipal boundary were registered not as citizens, but instead as permanent residents of Israel, a legal status defined by the *Entry into Israel Law* of 1952.[12]

A blue Jerusalem ID card entitles the holder to full freedom of movement and permission to work within East Jerusalem and Israel, unlike Palestinians from the West Bank and Gaza Strip who have required permits to enter Israel and East Jerusalem since the early 1990s. Permanent residents also make mandatory contributions to, and can avail of, social services including health and social insurance benefits, and can vote in municipal – but not in national – elections, although the majority choose not to do so.

> *"Permanent residency is the same status granted to foreign citizens who have freely chosen to come to Israel and want to live in the country. Because Israel treats Palestinians like immigrants, they, too, live in their homes at the beneficence of the authorities, and not by right. The authorities maintain this policy although these Palestinians were born in Jerusalem, lived in the city, and have no other home. … Viewing East Jerusalem residents as foreigners who entered Israel is perplexing since it was Israel that entered East Jerusalem in 1967."[13]*

However, the status of a permanent resident expires under Regulation 11a of the *Entry into Israel Law* if that person lives for a period of seven years or more outside of East Jerusalem or Israel, including in any other part of the West Bank or Gaza Strip.[14] Permanent residency also expires if the person obtains citizenship or residency in another country. Thus, while citizens of Israel are permitted to reside abroad indefinitely and obtain residency status or citizenship in other countries, Palestinian permanent residents may have their status revoked for these same actions[15] (see Case Study, *Residency Revoked*). In addition, a permanent resident who marries a non-resident must submit, on behalf of the spouse, a request for family unification. Unlike citizenship, permanent residency is not passed on to the holder's children 'by right', and children can only receive permanent residence under certain conditions.

## 2. Revocation of Residency

In the decades following the occupation of East Jerusalem, the Government of Israel adopted the 'open bridges policy.'[16] According to this policy, Palestinians could continue to travel abroad, either via Jordan on obtaining an exit/return permit valid for three years, or via Ben Gurion Airport, by means of a *laissez-passer* valid for one year. East Jerusalem Palestinians could maintain their permanent residency status as long as they returned to Jerusalem to renew their exit permits at the Interior Ministry.[17] Only a continued stay of more than seven years outside Jerusalem without a renewal of the exit permits could lead to revocation of residency status. Obtaining citizenship or permanent residency abroad did not result in revocation, nor did relocation to the Gaza Strip or to the other areas in the West Bank, including the burgeoning Palestinian neighbourhoods located just beyond the municipal boundary.[18] East Jerusalem Palestinians could and did move to these areas in large numbers, without requiring exit permits and compromising their permanent resident status.[19]

The beginning of a mass revocation of residency from Palestinians in East Jerusalem followed a decision of Israel's High Court of Justice in 1988, *Awad v. the Prime Minister*, where the 'Court ruled that the annexation of East Jerusalem turned East Jerusalem residents into Israeli permanent residents and that such residency 'expires' upon the relocation of the centre of one's life. Specifically, the Court applied the Regulations on Entry into Israel to residents of East Jerusalem.'[20] In practice it was not until December 1995 when, without officially announcing a change in policy, the Interior Ministry began to revoke the residency of those East Jerusalem Palestinians who had moved outside the municipal boundary, irrespective of the fact that those who had travelled abroad had regularly returned to Jerusalem to renew their exit permits. 'The Ministry claimed that permanent residency, unlike citizenship, is a matter of the circumstances in which the individual lives, and when these circumstances change, the permit granting permanent residency expires. Thus, every Palestinian who lived outside the city for a number of years lost their right to live in the city, and the Ministry ordered them to leave their homes.'[21]

Palestinians living in other parts of the West Bank and Gaza Strip, including in the Palestinian neighbourhoods of Jerusalem beyond the municipal

Revocation of ID cards, 1967-2008[22]

**Total: 13,135**



boundary, were affected by this new policy. East Jerusalem Palestinians were now required to prove that their 'centre of life' was in Jerusalem rather than in other parts of the occupied Palestinian territory, by furnishing documents – including *arnona* (municipal tax) receipts, electricity, gas and telephone bills, and school and work certificates – to attest to their continued presence in the city. This policy resulted in a 'quiet deportation', with the residency status of over 3,000 East Jerusalem Palestinians revoked between 1995 and 2000.

Following a petition filed by Hamoked in opposition to the new policy[23] the then Minister of the Interior, Natan Sharansky in March 2000, to some degree alleviated the new policy. According to the 'Sharansky Declaration', residents of East Jerusalem who renewed their exit permits on time would maintain their permanent residency status, even if they lived abroad. Permanent residency status would not be revoked from East Jerusalem residents who moved to neighbourhoods adjacent to Jerusalem or elsewhere in the West Bank.

However, concerning those whose residency had already been revoked; only those affected after 1995, and who visited Israel within the period of validity that was stamped on their exit card, and who lived in Israel for at least two years, could have their permanent residency status reinstated. Those whose residency was revoked prior to 1995 could not reclaim their status; nor could those whose residency was revoked while they were abroad, and who were forbidden to return to East Jerusalem by the Ministry of the Interior. The new procedure also applied only to those whose status was revoked because they had allegedly resided for

a period of more than seven years outside of East Jerusalem, and not to East Jerusalem Palestinians who acquired permanent residence in another country or who received foreign citizenship.[24]

The years subsequent to the 'Sharansky Declaration' witnessed a decrease in the number of revocations: however, as detailed in the following sections, family unification and the registration of children of 'mixed residency' unions became more difficult. In any case, in recent years, the Interior Ministry has again begun revoking permanent-residency status of East Jerusalem Palestinians in large numbers.



East Jerusalem ID card

In 2006, that number revoked, 1,363, was higher than any year of the 'quiet deportation' policy, and the then highest recorded since 1967. Of those revoked, the majority 'involve people who emigrated abroad and acquired foreign citizenship' although the Interior Ministry also cited 'growing efficiency' in detecting those who had moved abroad as a factor.[25] The year 2008 recorded the highest number of residency revocations to date since 1967, involving 4,577 Palestinian residents, including 99 children. The vast majority were Palestinians 'due to continuous residence of more than seven years outside of Israel', who had been identified 'due to an initiated review process.'[26] In thirty-eight cases, status was revoked 'as a result of immigration (sic) to the territories,' i.e. moving to other areas of the occupied Palestinian territory.[27]

## REVOCATION OF SOCIAL SECURITY BENEFITS OF EAST JERUSALEM RESIDENTS

The National Insurance Institute (NII) is the state entity responsible for collecting compulsory social insurance contributions from every adult resident of Israel and East Jerusalem, and paying social insurance benefits to beneficiaries, including retirement, disability, unemployment, poverty and family expansion (child allowances), among others. The NII is also responsible for determining eligibility for national health insurance coverage and for collecting health insurance contributions from beneficiaries.

The main condition for entitlement to NII coverage is to be recognized as a 'resident of Israel'. However, under Israeli legislation and case law, to be recognized as such by the NII a person must actually reside in Israel (or in East Jerusalem) and not just be recognized as a resident by the Ministry of Interior. Therefore, upon submission of a claim, the NII is authorized to conduct an investigation to verify that the relevant conditions are met, including actual residence in Israel (or East Jerusalem).

East Jerusalem residents married to non-residents are particularly vulnerable to denial of their NII rights, acquired through years of compulsory contributions, on the grounds that they could be living outside the municipal boundaries of Jerusalem. As a rule, new claims submitted by Palestinians in this situation are not approved, in the large majority of cases, until an investigation to determine residence is concluded.

According to Hamoked, these investigations are often based on false assumptions and otherwise weighed against the claimants. For example, the NII assumes that women from East Jerusalem who marry non-residents relocate to their husband's place of residence. As a result, even a short-term visit to the husband's family in the West Bank could be interpreted by the NII as evidence of relocation.

The NII also launches investigations targeting beneficiaries of 'mixed marriages' regarding already approved claims, often dating many years back. If the investigation indicates that the beneficiary has relocated outside the city, (s)he is required to reimburse the NII retroactively, exposing families to enormous debts.

Whenever the NII revokes the entitlement of a resident, it is obliged to notify the person concerned in writing. In some cases, however, the notification sent by the NII fails to reach the recipient and the person discovers the revocation by chance, for example, when denied medical assistance at a health clinic. This may occur due to the poor mail services provided in many areas of East Jerusalem, as well as the fact that the notification letters are written only in Hebrew.

East Jerusalem: Key Humanitarian Concerns