# RESIDENCY REVOKED

**CASE STUDY**

My name is Ishraq Abu-Arafeh. I am 56 years old and was born in Jerusalem before the Israeli occupation of 1967. In 1973, my only opportunity to study medicine was abroad, as there were no medical schools in the West Bank, so I attended university in Jordan and qualified in 1980. During those seven years I returned to Jerusalem at least twice a year.

On qualifying, I returned to Jerusalem but I soon realised that my career was limited, so in 1983, when I was offered training in the UK by the British Council I took the opportunity. I spent some time in Leeds and later moved to Scotland where I'm now living.

All these years abroad, I maintained my connections with my family and Jerusalem. On one of my visits home to Jerusalem I met a Palestinian woman. We got married and have two children. I returned every year with my wife and children to maintain our residency status in Jerusalem. We followed every letter of the ever-changing written and unwritten rules and regulations. We renewed our ID cards whenever possible, we took permits to travel and to re-enter and paid whatever fees we were asked to pay.

In 1993, we had to employ an Israeli lawyer to enable us register our second son on our ID cards, as the Interior Ministry office initially refused our application. In 2001, we applied for our eldest son to have his own Jerusalem ID card but we were refused. Again we had to pay an Israeli lawyer to argue our case and win for our son the right to residency and a blue Jerusalem ID card.

In 2009, while we were back in Jerusalem, we applied for our second son to have his ID card, but he was refused. We consulted many lawyers, but none could help. We were told that our son can't have an ID card although he is legally registered. What is worse, we were also told that our own ID cards have expired and can't be renewed, because we've been living abroad for more than seven years and because we have British nationality. While Israeli Jews are allowed to have more than one nationality, we lose our residency if we obtain a foreign passport.

If we want to try and get our residency back we would have to come back on tourist visas on our British passports and live in Jerusalem for at least two years before being able to apply for new Jerusalem ID cards. We explained to the Ministry of Interior staff that we have jobs abroad and what would we do for work? In fact, where would we live? My family are refugees from 1948 and live in Sheikh Jarrah, in a house given to us by UNRWA and the Jordanian government in 1956. The settlers want to take over our whole neighbourhood, including our house, and already have evicted about ten families and moved in (see Chapter, *Settlements in East Jerusalem*).

We were put under extreme pressure to make a most difficult decision. In the end we had to go back to Scotland, resulting in the four of us losing our right to reside in Jerusalem. This was the hardest decision I ever had to make. It was most painful because they made us feel as if it was our choice to forfeit our residency rather than a case of blackmail. Knowing that our case is not unique – as many Palestinian families have been through the same experience – does not make it any less painful.

My sister has the same problem. She has been living in Chicago for more than 30 years, married a US national and received US citizenship, and as a result her Jerusalem ID card was revoked.[28]





Protestors in Sheikh Jarrah, photo by JC Tordai, 2010

7

## 3. Family Unification

Residents of East Jerusalem who marry persons who are not permanent residents or citizens of Israel must apply for family unification on their behalf to the Interior Ministry, in order that they can live together in East Jerusalem. The Interior Ministry has the discretion to grant or deny such requests and, as with the issue of revocation of residency, the policy has changed over the years.

Historically, social and family connections, including marriages, were common between Palestinians from East Jerusalem and other areas of the West Bank and continued after 1967, with little regard for the unilaterally-imposed municipal boundary and the distinction in residency status between East Jerusalem and the remainder of the occupied Palestinian territory. Movement between East Jerusalem and the West Bank and Gaza Strip was generally unimpeded and non-Jerusalem partners could live 'illegally' in the city with their spouses and children without applying for family unification. This changed in the early 1990s with the imposition of permit requirements for West Bank and Gaza Strip Palestinians to enter East Jerusalem and Israel, making it difficult for 'mixed residency' couples to live together. Consequently, Palestinians began to apply for family unification, in many cases years after they had married.

Until March 1994, the Interior Ministry only accepted applications for family unification by East Jerusalem males. Requests by female residents were ineligible on the grounds that in Palestinian society, 'the wife follows her husband, and there was, therefore, no reason to grant a status in Israel to the male spouse residing in the Occupied Territories.'[29] The policy changed following a petition by the Association for Civil Rights in Israel. Consequently, thousands of female residents of East Jerusalem filed requests for family unification on behalf of their spouses, including women who had married many years earlier and already had children.

> As highlighted by the Human Rights Committee, these polices entail a grave violation of the International Covenant on Civil and Political Rights (ICCPR) which provides for the protection of the family as the natural and fundamental group unit of society, and recognizes the right of the family to enjoy protection by society and the state and the right of men and women of marriageable age to marry and found a family.[30] Specifically, according to the Human Rights Committee's concluding observations on this law, 'The State party should revoke the Nationality and Entry into Israel Law (Temporary Order) of 31 July 2003, which raises serious issues under articles 17, 23 and 26 of the Covenant.'[31]

Until 1996, if the Interior Ministry approved the request for family unification, it granted permanent-resident status to the spouse. However, in early 1997, the Ministry announced a new 'graduated procedure', whereby permanent-resident status would only be granted five years and three months from the day of approval of the request for family unification. Following approval of the request itself, the non-Jerusalem spouse was granted a permit to stay and work in East Jerusalem, but without benefit of social rights or health insurance.[32] These permits were given for periods of between six months to a year and were renewable up to twenty-seven months. In the three-year period that followed, the spouse received temporary-resident status, renewable annually, and this time with entitlement to social rights and health insurance. 'On average, it took ten years from the day a request for family unification was submitted to the day that the spouse from the Occupied Territories received a permanent status in Israel – if the Interior Ministry approved the request.'[33]

A change in the procedure was introduced in 2002, with the issuance of *Executive Order 1813* which froze applications for family unification for residents of the West Bank and Gaza Strip. This was enshrined in statute a year later by the *Nationality*

*and Entry into Israel Law (Temporary Order) 6753-2003* which, citing 'security concerns,'[34] cancelled the procedures for family reunification between Israeli citizens and permanent residents of East Jerusalem and their spouses from elsewhere in the West Bank and the Gaza Strip and prohibits them from living with their spouses in Israel, including East Jerusalem.[35] Those spouses who had already received temporary permits under the 'graduated procedure' could continue to receive such permits, but 'the spouse is not allowed to continue to the next stage of the arrangement, or to receive permanent status in Israel.'[36] In addition to separating families, the new law condemns many spouses to a cycle of uncertainty and occasional illegality between the expiry of one temporary permit and its renewal, during which time the person cannot officially reside in East Jerusalem (see Case Study, *Family Unification Frozen*). Although temporary, the law has been renewed annually, most recently in July 2010.[37]

The Law was amended in 2005, whereby women aged over 25 and men over 35 are eligible to apply for family unification and can receive military permits; however, there is no possibility of an 'upgrade' to the status of either temporary or permanent resident. In 2007, the Knesset amended the law again to allow for certain specific cases outside the eligible category above to be reviewed by a committee and to be considered for family unification based on 'exceptional Humanitarian grounds.' However, the maximum status that may be granted under this amendment is temporary residency status and only if a 'family member' of the applicant – spouse, parent or child – is staying in Israel or in East Jerusalem legally.[38] By early 2010, the 'Humanitarian Committee' had received 600 requests and reviewed 282 of these, of which only 33 were granted temporary 'military' permits which, unlike temporary residency, does not entitle the recipient to social benefits.[39] The impact of this on countless Palestinians, such as the woman portrayed in the case study below, is that they remain in a state of continual familial and social limbo, uncertain as to whether they will ever be able to carry on a normal life with their families in East Jerusalem.

### PROCEDURES AT THE MINISTRY OF THE INTERIOR

'Jerusalemites have long complained about the inhuman conditions that they experience at the office of the ministry of interior. These conditions contradict existing Israeli law, and contravene internationally accepted standards of respect for economic and social rights and the principles of equality and impartiality.

Palestinian residents report mistreatment and arbitrary procedures by the staff of the ministry. Israeli residents receive certain services by mail, while most permanent residents do not. When they appear in ministry offices, Israelis are never asked to show documentation proving their residency or citizenship.

Palestinians, on the other hand, are asked to provide innumerable documents to prove their 'center of life' in the city. Individuals report queuing for long hours, or being turned away arbitrarily because 'working hours are over'. Information about public services is often misleading or absent.

As a result, Palestinians often lack information on the fees required, types of documents they should enclose with their application, or working hours (which are only in the morning in contrast to West Jerusalem offices which remain open in the afternoon).

Furthermore, Hebrew is used most of the time, despite Arabic being Israel's second official language. Many Palestinians do not understand Hebrew, which makes communicating with the ministry a frustrating process. Many must use documents without understanding the contents.'[40]

# FAMILY UNIFICATION FROZEN

**CASE STUDY**

My name is Rimaz Kasabreh, I am 33 years old, and I'm from the northern West Bank. In 1996, I married my husband who is a resident of Jerusalem and moved to Beit Hanina in East Jerusalem. We have three children. My husband and I were aware that family unification application was not going to be easy, which is why we didn't submit an application for a few years. When we did, it took years for the Israeli authorities to process our application.

At the time I was working at a private school in the centre of the city although I didn't have a Jerusalem ID card or a permit. I needed to cross the Ar Ram checkpoint, located in Beit Hanina, to get to work and over the years, this became more difficult with my West Bank ID card: it happened many times that the soldiers at the checkpoint turned me back. The school issued me a card to show I was employed by them but it didn't help much. To avoid the checkpoint I used dirt roads and climbed over hills. I rarely made it to school in time. In winter I would arrive completely wet and cold, in the summer hot and sweaty.

In 2003, with the new (*Nationality and Entry into Israel*) law it became more difficult. It's illegal for taxi and bus drivers from Jerusalem to take passengers from the West Bank. Taxi and minibus drivers would ask every passenger about their ID card. It became more and more difficult for me to go to work or anywhere in Jerusalem. I couldn't go shopping, I couldn't visit my friends, I couldn't take the children to school, or to a doctor or to summer camps where other children their age went. This affected my children. They were too young to understand why their friends' mothers did things with them while I couldn't.

Very often I took risks. One day, when I was nine months pregnant, the police stopped the mini bus I was on and when they found out my status they took the driver's name and license number and warned him next time he was caught with someone from the West Bank they would confiscate his vehicle. I was released after they checked my records and found out I was married to a person from Jerusalem. They made me sign a piece of paper pledging I will not move or work within the State of Israel, which of course according to their definition includes East Jerusalem.

In October 2003, I was caught again in a taxi. It was the third time the driver was caught driving a West Banker so the police confiscated his taxi for three months and took away his driving license. The taxi driver blamed me and demanded compensation. He used to wait for me outside the school gate and shout at me that if I didn't pay him the money I would be in trouble. In the end, my husband paid him money. After this incident I quit my job. Most taxi drivers in Jerusalem recognized me and refused to take me. I was confined to the house and hardly ever left except to go to the neighbours' house. It was very hard for me. I was not used to staying at home. My family could not visit me because they're from the West Bank. They only come at Christmas and Easter, when Christians are given special permits to celebrate the feasts in Jerusalem.

About three-and-a-half years ago the Ministry of Interior finally accepted my application for family unification. They gave me a paper valid for one year, with which I could apply for a permit to stay in Jerusalem. Although this didn't mean I was a resident yet, at least it meant I could take a taxi and go places. I've renewed this paper four times now. Each time my husband and I have to provide evidence that we're living together in Jerusalem. We have to show that we pay water and electricity bills, the municipal tax and that our children go to schools in Jerusalem. It takes weeks, even months, just to get through to the Ministry of Interior for an appointment. They don't pick up the phone. When delays in the permit renewal occur I live in Jerusalem illegally all over again. I often took

the risk and ask my husband to drive me around. I wouldn't ask for rides from friends and relatives, as I know the consequences if they're caught with me in their car.

The third permit expired in December 2008. Although I requested an appointment in time and submitted all the evidence they requested, it took them months to get back to me. During this time I was confined to the house once again. They told me they were checking my security record and that of my family, including my parents, my brothers and sisters and their families, as well as my husband's family. The same happened in May 2009, when I applied to renew my permit, which I didn't get until August. My husband and I employed a lawyer to speed up the family unification process. After we paid him a large amount of money he told us the Ministry of Interior is not approving applications any more. I have no idea how long this situation will go on for.

My husband and I have been married for over 13 years now and I'm still unable to live a normal life with him and the children. When we enter Jerusalem from the West Bank my husband is allowed to cross by car, while I have to cross on foot. I can't benefit from Israeli health care, so I go to Ramallah whenever I need health services. Luckily I have never been in an emergency while I was living in Jerusalem 'illegally'.

I still cannot apply for a job. Nobody will employ me knowing that I am in Jerusalem on short-term permits which I have to renew every year. Everybody knows that renewal is not guaranteed. It could happen again that I will spend months without a permit before the authorities process my request. I feel I am losing the best years of my life sitting at home. Many of my friends are in the same situation.[41]

Rimaz Kasabreh, photo by JC Tordai, 2010

21

## 4. Registration of Children

Children of citizens of Israel can be registered in the Israeli Population Registry and automatically obtain Israeli citizenship, even if they are born abroad. The situation for the children of permanent residents is less certain, especially for the offspring of 'mixed residency' couples, and if the children are born outside of East Jerusalem, including in the West Bank and Gaza Strip.

A child born to parents who are both permanent residents will generally receive an identity number at the hospital and then be registered in the Population Registry, provided the birth takes place in East Jerusalem or in Israel. The parents then apply to the Interior Ministry, where the child's name, date of birth and identity number is recorded in the parents' identity cards. The child should then automatically receive a Jerusalem ID card when he/she reaches the age of 16.

For children born in East Jerusalem to parents, of whom only one is a permanent resident, the identity number is not given automatically at the hospital, and the parents must submit a request to the Interior Ministry to register the child. If the parents manage to prove continuous residence in East Jerusalem for a period of two years prior to the application to register the child, and if the child has not lived or been registered elsewhere, he/she will be registered in the Population Registry as a Jerusalem resident.

The above cases are covered by Section 12 of *Entry into Israel Regulations* - 1974. No such regulation governs the registration in East Jerusalem of children who were born abroad which, under this definition, includes those born in other parts of the West Bank and Gaza Strip, regardless of whether one or both parents are permanent residents. For those children, registration is governed by the Interior Ministry's internal procedures.[42] These procedures can result in situations, whereby children in the same family can have different residency status –

> 1. Every child shall have, without any discrimination as to race, colour, sex, language, religion, national or social origin, property or birth, the right to such measures of protection as are required by his status as a minor, on the part of his family, society and the State.
> 2. Every child shall be registered immediately after birth and shall have a name.
> 3. Every child has the right to acquire a nationality.
>
> Article 24, International Covenant on Civil and Political Rights

requiring different and cumbersome registration procedures – or in families being separated.

Regarding these procedures, for children who were born in the West Bank and Gaza Strip of 'mixed residency' unions, registration depends on their age. The Minister of the Interior may grant such children aged up to 14 permanent residency. Children aged between 14 and 18 can obtain military permits only, renewable on a yearly basis. These permits do not entitle them to receive any social benefits, including access to health care and education. In addition, these permits can be revoked from these children if the Ministry of Interior finds that they are a 'security threat', based on their own alleged activities or the activities of a family member.

Moreover, in June 2008, Executive Order 3598 was issued, extending the scope of the (*Nationality and Entry into Israel Law) Temporary Order* to include an absolute prohibition on family unification with residents of Gaza, aged 14 and over. 'In other words, Palestinian residents of East Jerusalem with Gaza spouses and/or children are given no choice but to return to Jerusalem without their loved ones or permanently shift their lives to

Gaza, thereby forfeiting their constitutional right to live in their homeland.'[43]

In addition, if a child of a 'mixed residency' couple is born abroad (that is, outside of the oPt), or is registered abroad although he/she was born in Jerusalem, the child will receive temporary residence for two years and only then permanent residence, assuming he/she has resided in Jerusalem uninterruptedly for two years and still meets the criteria of the Ministry of Interior at the end of the two years.

### PALESTINIANS AT IMMEDIATE RISK OF DISPLACEMENT ON GROUNDS OF LACK OF RESIDENCY

In October 2007, in Government Decision No. 2492, the Government of Israel decreed that Palestinians holding West Bank ID cards, who were born or residing in East Jerusalem for long periods of time, , are no longer eligible for Jerusalem ID cards (i.e. permanent residency). Instead, such people were given until 30 April 2008 to submit applications for temporary (renewable) military permits that would allow them to 'legally' stay in Jerusalem. According to Hamoked, such permits do not provide their bearers with freedom of movement within Jerusalem (nor social rights) but confine them to 'the vicinity of their neighbourhood.'

The burden of proof set in the decision was extremely rigorous. Applicants had to provide documentation proving continuous residence within Jerusalem for each of the previous 20 years, including, but not limited to, rental contracts, receipts of payment of municipal taxes, and an aerial picture certified by the Israel Mapping Center, indicating the precise place of residence.

In February 2011, the Israeli Ministry of Interior rejected 364 of the 841 permit applications submitted. Less than 4 percent (31 applications) were accepted, while the remainder (446 applications) are still being processed. Those rejected were informed that they must leave Jerusalem 'return to their place of residence in the West Bank.'

# CASE STUDY: REGISTRATION OF CHILDREN REFUSED

My name is Salam. I'm from Abu Dis, on the Jerusalem side of the Wall, which cuts our community in two. In 2006, I married Hassan, who's from Nablus and has a West Bank ID card. When we got married, my father bought us a house in Abu Dis, on the Jerusalem side of the Wall, where my extended family lives. Hassan was 29 when he got married and as the minimum age required to apply for family unification was 35, he couldn't apply. A couple of years later, I gave birth to twins, a girl called Razan and a boy called Anan. Getting family unification for Hassan and registering the children is our family's biggest challenge.

In our neighbourhood, there are four families of West Bank ID holders who, after the Wall was built, are stuck on the Jerusalem side without Jerusalem ID cards or permits to stay in Jerusalem. Until the end of 2009, they could go to Ash Shayyah checkpoint where their names were kept on a list so that they could cross into the West Bank and back again. We managed to persuade the Civil Administration to include Hassan's name on the list. When the Ash Shayyah checkpoint was removed at the end of 2009, these West Bank residents, including Hassan, were given one month renewable permits. However, in March 2010, the Civil Administration stopped issuing these permits.

Hassan's last permit expired on 25 February 2010. Because he could not quit his job at Al Quds University, on the other side of the Wall, and he didn't want to be caught living in Jerusalem illegally, as that would have spoiled the family unification file, he had no choice but to leave the family temporarily and move to the other side of the Wall.

He hasn't been home for more than six months now. I usually bring the children to the other side of the Wall once a week to meet their father. Now that Ramadan has started, I try to take them there every day. I also work in Abu Dis on the West Bank side of the Wall so after work, I go and pick up the children from home, which takes around half an hour, then drive back to Abu Dis where my husband is staying, and start cooking for the *iftar*, the meal breaking the fast. A couple of hours later, we have to leave Hassan and go home to the other side of the Wall. The children have a hard time separated from their father. Every time they say a prayer, they ask God to give their father a permit to bring him back to them. However, I can't risk my or the children's status by moving to the West Bank to live with him.

Now we're also facing problems registering the two children. During the first month of our marriage, while we were completing some renovation work on our future house in Jerusalem, we were living in Abu Dis on the West Bank side of the Wall. The Ministry of Interior took this as a proof that our

24

residence was in the West Bank. They refused to register the children on my ID card, so that one day they can get Jerusalem ID cards, even though they were born in Jerusalem and have always lived there. After we were notified of the refusal and filed a petition, the Border Police came to the house to check whether our centre of life is in Jerusalem. It was morning and we were both at work. Following that visit, we received an official letter stating that as it was proven we were not living in Jerusalem, the children aren't eligible to be registered on their mother's ID card.

As of today, they only have a certificate of live birth. After appealing twice, we're trying to bring the case to court. Next year the children will need to go to kindergarten, and after that to school and it will be very hard for them to be admitted without being registered.[44]



Razan and Anan, photo by JC Tordai, 2010

25

## Recommendations

The unilateral annexation of East Jerusalem to Israel contravenes international law and is not recognized by the international community which considers East Jerusalem part of the occupied Palestinian territory. The Government of Israel, therefore, should revoke all related legislation and guarantee that the entire Palestinian population of the oPt has the right to reside in, and access, the city:

Pending full compliance with Security Council resolutions on Jerusalem, and pending a political solution to Jerusalem in the context of a final status agreement, the Government of Israel, as the occupying power, should:

- Cease revoking the residency status of Palestinian residents of East Jerusalem for any reason, regardless of the length of their residence in other parts of the oPt, or abroad.

- Restore the permanent residency status of those East Jerusalem Palestinians whose status has been revoked.

- Renew and expedite family unification for 'mixed residency' status couples in East Jerusalem.

- Register all children of 'mixed residency' unions in East Jerusalem.



House demolition in Silwan, photo by Mahfouz Abu Turk, 2009

# CHAPTER 2
# PLANNING, ZONING AND DEMOLITIONS IN EAST JERUSALEM

## Key Points

- Since the beginning of its occupation in 1967, Israel has failed to provide Palestinian residents of East Jerusalem with planning that meets their basic housing and development needs. As a result, residents find themselves confronting a serious shortage in housing and other basic infrastructure.

- Over one third of East Jerusalem has been expropriated for the construction of Israeli settlements, despite the prohibition under international law against the transfer of civilians to the occupied territory.

- Only 13 percent of East Jerusalem is currently zoned by the Israeli authorities for Palestinian construction, within which Palestinians have the possibility of obtaining building permits. However, much of this land is already built-up and it is very difficult to obtain such permits; the application process is complicated and expensive and the number of permits granted per year to Palestinians does not meet the existing demand for housing. Difficulties related to land registration and fear that land ownership rights will not be respected by the Israeli authorities deter many landowners from even applying.

- Consequently, unauthorized or 'illegal' construction has been widespread, both within the 13 percent, and in other areas, where Palestinian construction is completely prohibited. Those who have built 'illegally' face the threat of demolition, displacement, and other penalties, including costly fines, confiscation of building equipment, and possible prison sentences.

- After decades of neglect, there are entire neighbourhoods that are unplanned, under-serviced, and face the threat of wide-scale demolitions.

## I. Background: Understanding the Phenomenon of 'Illegal' Construction

One of the key humanitarian issues confronting Palestinian residents of East Jerusalem is the Israeli authorities' demolition of 'illegal' structures built in violation of Israeli zoning requirements. Such construction has been widespread in East Jerusalem, largely because opportunities for authorized construction have been extremely limited due to the Israeli authorities' inadequate and inappropriate planning of Palestinian neighbourhoods.

Of the 70.5 km² of land in East Jerusalem, 35 percent (24.5 km²) has been expropriated for Israeli settlements. According to the Israeli human rights organization B'Tselem, most of this expropriated land was privately-owned Arab property.[45] Another 35 percent (24.7 km²) has planning schemes ('outline plans' or 'master plans') that have been approved by the Jerusalem District Committee for Planning and Building.[46] The remaining 30 percent (21.3 km²) has not been included in any plan approved since 1967 (planning is under way in some areas, but not yet approved).

Of the 24.7 km² that are planned, approximately 15.5 km² (22 percent of all land) are designated as 'green' or 'open' areas – where no construction is allowed – or for public purposes, such as roads and other infrastructure. This leaves only 13 percent of the total East Jerusalem area (9.2 km²) available for Palestinian construction, and much of this is built-up already.[47] Even in the areas where construction is theoretically possible, Palestinian landowners face significant difficulties which hinder their ability to obtain permits.

First, before construction can begin on a vacant piece of land included within the 24.7 km² territory which has an approved planning scheme, a detailed plan of the area must be developed and approved. This plan must show which parts will be allocated for public use (roads and other infrastructure), green areas, and private Palestinian construction.

Although the need to designate part of the land for public use (including 'green' areas) is a necessary planning requirement, the nature of land ownership in East Jerusalem makes accomplishing this task difficult: most of the lands are small, privately-held plots that must be first united in order to ensure the equitable


Zoning in East Jerusalem



Planning, Zoning and Demolitions in East Jerusalem

29

allocation of public and green areas. An inability to resolve these land ownership issues has delayed the development of detailed plans for years in many areas of East Jerusalem.[48]

Second, if public infrastructure (i.e. roads, water) does not exist in an area where a detailed plan has been approved, then construction permits will not be granted. According to the 1965 *Israeli Planning and Building Law*, unlawfully applied to East Jerusalem, no construction is permitted in areas with insufficient public infrastructure. While this is a normal planning requirement, because very few resources have been allocated by the Jerusalem Municipality for the development of public infrastructure in Palestinian areas,[49] new construction in certain neighbourhoods (where construction should be possible) is effectively prohibited.[50]

Third, strict zoning in Palestinian areas of East Jerusalem limits construction density, thereby reducing the number and size of the structures which may be built on any given plot of land. In many cases, the density (known as plot ratio) which is permitted is half (or, in some cases, much less than half) of that permitted in neighbouring Israeli settlements in East Jerusalem, or in West Jerusalem.[51]

In addition to the difficulties outlined above, the financial cost of obtaining a permit is a significant obstacle. The fees for permit applications are the same for all residential construction in both East and West Jerusalem and are calculated on the size of the proposed building and the size of the plot. For example, basic fees for a permit to construct a small 200m² building on a 500m² plot of land amounts to approximately NIS 96,000 (US$ 26,700).[52] Added to this is an additional fee,

### LAND REGISTRATION IN EAST JERUSALEM

One difficulty in obtaining a construction permit relates to land registration. In most East Jerusalem neighbourhoods, Palestinian-owned land is not registered. Following the occupation of East Jerusalem in 1967, Israel froze the land registration project that was undertaken by the Kingdom of Jordan (and before that by the British Mandate authorities). At present, in order for Palestinians to register their land themselves, they must meet Israel's requirements for proving ownership, which can be difficult and which acts as a deterrent for many landowners. Many parcels of land have multiple owners, some of whom may be refugees from the Arab-Israeli wars of 1948 and 1967 and who are considered 'absentees' by the Israeli government. In these cases, the Israeli government may invoke the Absentee Property Law and become a part-owner of the land in question. Consequently, many Palestinians avoid land registration out of fear that their ownership rights will not be respected and that their land, or a portion thereof, may be confiscated by the Custodian of Absentee Property (see Chapter, *Settlements in East Jerusalem*).

In the absence of registration, applicants must demonstrate a 'connection' to the land (through providing tax documents, a statement from a village leader, *mukhtar*, etc.) on which the construction will take place. While many Palestinians have been able to demonstrate a 'connection' in a manner sufficient to meet the criteria for applying for a permit, there are indications that issues related to land registration are becoming increasingly restrictive, with significant impact on the ability to apply for permits. In 2009, the municipality began requiring owners to open a land registration file with the Land Registrar before applying for a permit.[53]

Although this requirement was later rescinded, revisions of the 1965 Israeli *Planning and Building Law* (see below) may make land registration a pre-requisite for obtaining building permits in the future, with the probability of a significant drop in permit applications.[54] According to the Israeli organization Bimkom – Planners for Planning Rights, there has been a decline in the issuance of building permits in recent years, due to 'increasingly strict demands by the municipality in regards to proof of ownership and land registration.'[55]

which varies according to the size of building and income-level of neighbourhood in which the construction will take place; this can increase the cost of the permit by tens of thousands of shekels.[56] In many cases, the fee for the permit can be as much as the cost of the construction in the case of a simple structure, such as an animal barracks or a storage room.

For many Palestinians, these fees are prohibitive. Palestinian construction is generally small-scale, carried out by an individual or a small group of families, with limited resources, rather than the larger-scale housing projects typical of West Jerusalem or of Israeli settlements in East Jerusalem. As a result, there are fewer people to share the permit costs. Furthermore, because of the manner in which fees are structured, applications for permits for smaller buildings (typical of East Jerusalem) have higher per-square-meter fees than larger buildings.

The permit application process can take several years and there is no guarantee of eventual success. According to municipal figures, in the past five years, only 55 percent of applications for new construction in East Jerusalem's Palestinian neighbourhoods have been approved.[57] In addition, each year the Jerusalem Municipality refuses to allow many Palestinians to submit a permit application. According to Bimkom, between 2005 and 2009, 483 Palestinian residents of East Jerusalem were prevented from submitting permit applications, mainly due to difficulties with land registration.[58]

Clearly, the number of permits granted annually does not meet housing demands. According to the Israeli organization Ir Amim, natural growth among Palestinians in East Jerusalem requires the construction of 1,500 housing units per year. However, only an average of 400 new housing units per year are authorized, resulting in a disparity of over 1,000 units per year between housing needs and legally permitted construction.[59] As a result, with each year, housing needs intensify, resulting in 'illegal' construction, over-densification of neighbourhoods, and rising land and housing costs (see Case Study, *The High Cost of Renting in East Jerusalem*).[60]



Demolitions in East Jerusalem, 2000 – 2010[61]

| Year | Demolitions |
|---|---|
| 2000 | 16 |
| 2001 | 41 |
| 2002 | 45 |
| 2003 | 99 |
| 2004 | 133 |
| 2005 | 90 |
| 2006 | 81 |
| 2007 | 75 |
| 2008 | 93 |
| 2009 | 84 |
| 2010 | 82 |

Planning, Zoning and Demolitions in East Jerusalem

31

## 2. The Jerusalem Local Outline Plan 2000 ('Master Plan')

For the first time since the occupation of East Jerusalem in 1967, the Jerusalem Municipality has prepared a 'master plan' which covers both East and West Jerusalem; the last master plan for Jerusalem was deposited in 1959.[62] The *Local Outline Plan 2000* was approved for depositing by the Jerusalem District Committee for Planning and Building, but the process has not progressed since late 2008 and it has yet to be submitted for public review and objections.[63]

Although the *Local Outline Plan* has not been formally finalized, Israeli and Palestinian planners, who reviewed earlier drafts and followed the Committee's review of the plan, have identified a number of shortcomings. The *Local Outline Plan* offers very little in the way of developing Palestinian neighbourhoods in East Jerusalem overall; it deals almost exclusively with housing issues, and fails, for example, to address the massive shortage of school classrooms in East Jerusalem, the absence of sufficient public infrastructure, or the need to create new commercial areas. The *Local Outline Plan* also fails to acknowledge the new geographical realities created by the Barrier or East Jerusalem's historic connections to the remainder of the West Bank.

With respect to housing, planners fear that the *Local Outline Plan* does not sufficiently address the status quo in Palestinian neighbourhoods and will not provide real solutions to the crisis facing East Jerusalem's Palestinian residents. One concern is that it does not provide enough housing units to meet the needs of natural population growth.[64] In addition, the majority of housing units proposed are located in the northern and southern suburbs of East Jerusalem (e.g. Beit Hanina in the north and Jabal al Mukabbir in the south). Only 750 new units are proposed for Palestinian residents in the Old City and its environs, the so-called 'Holy Basin' area, where the Palestinian housing crisis is most intense, and where the need for plans that would 'legalize' existing structures is critical. This is the area where settlement activity in Palestinian residential areas is most concentrated (see Chapter, *Settlements in East Jerusalem*).

The additional housing units for Palestinians included in the *Local Outline Plan* are created by densification or 'thickening' of existing neighbourhoods, and by re-zoning certain areas for expanded residential construction.

*Densification or 'Thickening':* The *Local Outline Plan* allows for the densification of some Palestinian neighbourhoods through the construction of four- and six-storey buildings, in areas where the limit was two-storeys previously. However, the *Plan only* allows for a maximum addition of two storeys to existing buildings. Therefore, while existing two-storey structures can add an additional two floors, one-storey buildings will either be unable to exploit the full four or six-storey potential (given the a maximum of two additional floors) or owners will need to destroy the existing building in order to build four or six-storeys.

In the case of six-storey buildings, additional requirements exist: they must be constructed on a large plot of land (at least 10 dunums) and located next to a road at least 12 meters wide, both of which are exceptional in Palestinian neighbourhoods in East Jerusalem. As a result, the potential for six-storey construction is severely limited.

*Expansion areas:* The *Local Outline Plan* includes a number of 'expansion' areas, to allow for residential construction in a re-zoned area adjacent to an existing residential area. These expansion areas total some 3,450 dunums of land; thus, the area zoned for Palestinian construction would potentially increase to some 12.5 km$^2$, or almost 18 percent of East Jerusalem, as opposed to the 13 percent which is currently zoned.[65] However, many of these areas are already built-

> **CURRENT MUNICIPAL PLANS**
>
> At present, the Jerusalem Municipality is undertaking general planning for a number of Palestinian neighbourhoods in East Jerusalem which have been identified as 'expansion areas' in the Local Outline Plan. These plans are separate from the regular planning process (i.e. they do not go through review by the District Committee) and, according to Bimkom, are policy documents, rather than detailed plans. Affected neighbourhoods will still need to submit detailed plans for approval before permits for construction can be obtained, but no such steps can be taken before the municipality completes its plans. Consequently, if the municipality's planning process is delayed, Palestinian communities are unable to move forward with planning initiatives.

up with unauthorized construction. Therefore, while re-zoning such areas may enable the 'legalization' of existing buildings, significant additional construction will be limited.

As is the case at present, even in those localities where new construction may be possible due to re-zoning, permit opportunities are limited due to the absence of the necessary public infrastructure (e.g. roads, sewage networks, etc.) in Palestinian neighbourhoods. In addition, even with the *Local Outline Plan*, residents will still need to prepare and receive approval for a detailed plan for a specific area before they can apply for a construction permit.

Because the Jerusalem Municipality has largely failed to provide adequate planning for Palestinian areas in East Jerusalem, the responsibility for preparing detailed plans generally falls on individual residents, an onerous requirement, given the need to reach consensus on a range of issues among multiple landowners. Even more difficult is the requirement that the new expansion areas, many of which are disconnected and distant from each another, be planned as-a-whole.

In contrast to the limited housing opportunities offered to Palestinian residents, the *Local Outline Plan* will add 5,000 dunums (or 5 km$^2$) for the expansion of Israeli settlements in East Jerusalem, serving an estimated population of some 200,000 settlers.

Although the *Local Outline Plan* has yet to be submitted for public review and the process for submitting it for official approval is frozen, it is currently used as the basis against which to evaluate detailed plans submitted for approval. According to Bimkom and the Association for Civil Rights in Israel (ACRI), between January 2008 and August 2010, the General Assembly of the Jerusalem District Committee for Planning and Building rejected 11 plans for Palestinian neighbourhoods in East Jerusalem on the grounds that they were inconsistent with the *Local Outline Plan*.[66] These rejections occurred although the Plan underwent changes during that period; for example, according to IPCC, in 2009, the municipality and the Israeli Ministry of Interior requested a change in the plan, which led to the removal of some Palestinians areas where new development had been proposed, such as Khirbet Khamis.

A key concern is the extent to which the *Local Outline Plan* bases planning in Jerusalem on an officially-adopted government policy that seeks to maintain a ratio of 70 percent Jews to 30 percent Arabs within the Israeli-defined municipal boundary. The *Local Outline Plan* explicitly addresses this goal and offers suggestions of how to achieve a 60/40 ratio in East Jerusalem in light of the unlikelihood of meeting the 70/30 target because of the higher birth rate among the Palestinian population.[67] According to ACRI, the planning and housing crisis in East Jerusalem will not be resolved by the *Local Outline Plan* as it 'perpetuates the discriminatory policies [in Jerusalem's planning] by failing to provide adequate housing units, employment sources, and infrastructure in East Jerusalem.'[68]