# EXHIBIT 4

American Bar Association
www.supremecourtpreview.org

No. 10-699

# In the Supreme Court of the United States

MENACHEM BINYAMIN ZIVOTOFSKY, BY HIS PARENTS
AND GUARDIANS ARI Z. AND NAOMI SIEGMAN
ZIVOTOFSKY, PETITIONER

*v.*

HILLARY RODHAM CLINTON, SECRETARY OF STATE

*ON WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT*

### BRIEF FOR THE RESPONDENT

DONALD B. VERRILLI, JR.
  *Solicitor General*
    *Counsel of Record*
TONY WEST
  *Assistant Attorney General*
EDWIN S. KNEEDLER
  *Deputy Solicitor General*
GINGER D. ANDERS
  *Assistant to the Solicitor*
  *General*
DOUGLAS N. LETTER
LEWIS S. YELIN
  *Attorneys*

HAROLD HONGJU KOH
  *Legal Adviser*
  *Department of State*
  *Washington, D.C. 20520*

  *Department of Justice*
  *Washington, D.C. 20530-0001*
  *SupremeCtBriefs@usdoj.gov*
  *(202) 514-2217*

## QUESTIONS PRESENTED

Pursuant to longstanding policy, the President, through the actions of his Secretary of State, has recognized no state as having sovereignty over the city of Jerusalem, and has designated that highly sensitive issue as a matter to be resolved through negotiations by the foreign parties to that dispute. In order to implement that policy, the Secretary of State lists "Jerusalem" instead of "Israel" as the place of birth in passports, and in consular reports of births abroad, of U.S. citizens born in that city. In 2002, Congress enacted the Foreign Relations Authorization Act, Fiscal Year 2003, Pub. L. No. 107-228, 116 Stat. 1350, Section 214(d) of which states that "[f]or purposes of the registration of birth, certification of nationality, or issuance of a passport of a United States citizen born in the city of Jerusalem, the Secretary [of State] shall, upon the request of the citizen or the citizen's legal guardian, record the place of birth as Israel." 116 Stat. 1366. The questions presented are:

1. Whether the political question doctrine renders nonjusticiable petitioner's claim seeking to enforce Section 214(d) and compel the Secretary of State to record "Israel" as his place of birth in his United States passport and consular report of birth abroad; and

2. Whether Section 214 of the Foreign Relations Authorization Act, Fiscal Year 2003, impermissibly infringes the President's power to recognize foreign sovereigns.

(I)

# TABLE OF CONTENTS

Page

Opinions below . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Constitutional and statutory provisions involved . . . . . . . . . . 2
Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Summary of argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

   I.    The Constitution grants the President the exclusive
        power to recognize foreign sovereigns and to
        determine passport content insofar as it pertains to
        such recognition determinations . . . . . . . . . . . . . . . . 18

        A.  The Constitution assigns exclusively to the
             Executive Branch the authority to recognize
             foreign states and foreign governments, and
             to determine the territorial boundaries of
             foreign states . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

             1.  The Executive Branch has consistently
                 exercised sole authority to recognize foreign
                 states, and Congress has acquiesced in that
                 practice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

             2.  The courts have long acknowledged the
                 Executive's exclusive power to recognize
                 foreign sovereigns . . . . . . . . . . . . . . . . . . . . . . 24

             3.  The President's recognition power
                  includes the authority to determine the
                 territorial limits of foreign states . . . . . . . . . . 29

        B.  The Executive has inherent constitutional
             authority to determine the content of
             passports to implement foreign policy . . . . . . . . . 31

  II.   The State Department's passport policy implements
        the President's decision not to recognize any state
        as having sovereignty over Jerusalem . . . . . . . . . . . . 37

(III)

IV

Table of Contents—Continued:                              Page

III. Petitioner's claimed right to have "Israel" listed as
the place of birth in his passport presents a
nonjusticiable political question . . . . . . . . . . . . . . . . . . 41
   A. The political question doctrine holds that
   courts may not review discretionary
   decisions that are textually committed to a
   political Branch . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
   B. A plaintiff's reliance on a statutory right
   cannot overcome a constitutional
   commitment of a decision to a political
   Branch . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
   C. Petitioner's claim based on Section 214(d)
   presents a nonjusticiable political question . . . . . 48
IV. Section 214(d) impermissibly infringes the
President's power to recognize foreign
sovereigns . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
Appendix  --  Constitutional and statutory provisions . . . . . 1a

## TABLE OF AUTHORITIES

Cases:

*American Ins. Ass'n* v. *Garamendi*, 539 U.S. 396
   (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
*Baker* v. *Carr*, 369 U.S. 186 (1962) . . . . . . . . . . . . . . . *passim*
*Banco Nacional de Cuba* v. *Sabbatino*, 376 U.S. 398
   (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 27
*Boumediene* v. *Bush*, 553 U.S. 723 (2008) . . . . . . . . . . . . 28
*Bowsher* v. *Synar*, 478 U.S. 714 (1986) . . . . . . . . . . . . . . . 53
*Buckley* v. *Valeo*, 424 U.S. 1 (1976) . . . . . . . . . . . . . . . . . . 53
*Cherokee Nation* v. *Georgia*, 30 U.S. (5 Pet.) 1 (1831) . . . 28

V

Cases—Continued:                                        Page

*Chicago & S. Air Lines* v. *Waterman S.S.
    Corp.*, 333 U.S. 103 (1948) . . . . . . . . . . . . . . 40, 43, 44, 46

*Coleman* v. *Miller*, 307 U.S. 433 (1939) . . . . . . . . . . . . . . . 42

*El-Shifa Pharm. Indus. Co.* v. *United States*, 607
    F.3d 836 (D.C. Cir. 2010), cert. denied, 131 S. Ct.
    131 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 46, 47, 50

*Freytag* v. *Commissioner*, 501 U.S. 868 (1991) . . . . . . . . . 55

*Gilligan* v. *Morgan*, 413 U.S. 1 (1973) . . . . . 42, 43, 44, 47, 52

*Guaranty Trust Co. of New York* v. *United States*,
    304 U.S. 126 (1938) . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

*Haig* v. *Agee*, 453 U.S. 280 (1981) . . . . . . . . 14, 31, 32, 33, 35

*INS* v. *Chadha*, 462 U.S. 919 (1983) . . . . . . . . . . . . . 45, 51, 53

*Japan Whaling Ass'n* v. *American Cetacean Soc'y*,
    478 U.S. 221 (1986) . . . . . . . . . . . . . . . . . . . . . . . 41, 44, 48

*Jones* v. *United States*, 137 U.S. 202 (1948) . . . . . . . . . 28, 31

*Kennett* v. *Chambers*, 55 U.S. (14 How.) 38 (1852) . . . 25, 30

*Loving* v. *United States*, 517 U.S. 748 (1996) . . . . . . . . . . . 53

*Luther* v. *Borden*, 48 U.S. (7 How.) 1 (1849) . . . . . . . . . . . 25

*Medellín* v. *Texas*, 552 U.S. 491 (2008) . . . . . . . . . . . . . . . 32

*Mistretta* v. *United States*, 488 U.S. 361 (1989) . . . . . . 24, 50

*Myers* v. *United States*, 272 U.S. 52 (1926) . . . . . . . . . 53, 55

*National City Bank* v. *Republic of China*, 348 U.S.
    356 (1955) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Nixon* v. *United States*, 506 U.S. 224
    (1993) . . . . . . . . . . . . . . . . . . . . . . . . . 12, 42, 43, 45, 47

*Occidental of Umm al Qaywayn, Inc.* v. *A Certain
    Cargo of Petroleum*, 577 F.2d 1196 (5th Cir. 1978),
    cert. denied, 442 U.S. 928 (1979) . . . . . . . . . . . . . . . . . . . 30

*Percy* v. *Stranahan*, 205 U.S. 257 (1907) . . . . . . . . . . . . . 31

VI

Cases—Continued:                                        Page

Powell v. McCormack, 395 U.S. 486 (1969) ......... 45, 50

Regan v. Wald, 468 U.S. 222 (1984) ................... 41

Sierra Club v. Morton, 405 U.S. 727 (1972) ............ 43

United States v. Arredondo, 31 U.S. (6 Pet.) 691
    (1832) ........................................... 52

United States v. Bank of New York & Trust Co.,
    296 U.S. 463 (1936) ............................. 25

United States v. Belmont, 301 U.S. 324
    (1937) ................................. 25, 26, 27, 30

United States v. Curtiss-Wright Export Corp.,
    299 U.S. 304 (1936) ...................... 27, 33, 34

United States v. Hutchings, 26 F. Cas. 440 (C.C. Va.
    1817) ........................................... 24

United States v. Lara, 541 U.S. 193 (2004) ............. 27

United States v. Laub, 385 U.S. 475 (1967) ............ 31

United States v. Munoz-Flores, 495 U.S. 385 (1990) .... 41

United States v. Pink, 315 U.S. 203
    (1942) ...................................... passim

Urtetiqui v. D'Arcy, 34 U.S. (9 Pet.) 692 (1835) ......... 32

Vermilya-Brown Co. v. Connell, 335 U.S. 377 (1948) .... 28

Vieth v. Jubelirer, 541 U.S. 267 (2004) ................ 44

Wang v. Masaitis, 416 F.3d 992 (9th Cir. 2005) ......... 30

Williams v. Suffolk Ins. Co.:
    38 U.S. (13 Pet.) 415 (1839) ................ 14, 27, 30
    29 F. Cas. 1402 (C.C. Mass. 1838) .................. 25

Youngstown Sheet & Tube Co. v. Sawyer,
    343 U.S. 579 (1952) ........................ 3, 32, 54

VII

Constitution, treaty, statutes and regulations:

  U.S. Const.:

    Art. I, § 8:

      Cl. 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 34, 35

      Cl. 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 35

      Cl. 5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      Cl. 10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

      Cl. 11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      Cl. 14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

      Cl. 18 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

    Art. II:

      § 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      § 2, Cl. 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      § 3 (Reception Clause) . . . . . . . . . . . . . . . . . . . 4, 14, 18

    Art. IV:

      § 3, Cl. 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Declaration of Principles on Interim
  Self-Government Arrangements, art. V,
  Isr.-P.L.O. team, *done* Sept. 13, 1993,
  http://2001-2009.state.gov/p/nea/rls/22602.htm . . . . . . . . 5

Proclamation of Dec. 10, 1898, 30 Stat. 1754 . . . . . . . . . . . 28

  30 Stat. 1755 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

U.N. GAOR, 5th Emergency Sess., 1554th plen.
  mtg. at 10, U.N. Doc. A/5/PV.1555 (July 14, 1967) . . . . 5

U.N. G.A. Res. 194 (III), U.N. Doc. A/PV.186
  (Dec. 11, 1948) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Act of Apr. 30, 1790, ch. 9, § 28, 1 Stat. 118 . . . . . . . . . . . 35

Act of Feb. 28, 1803, ch. 9, § 8, 2 Stat. 205 . . . . . . . . . . . . 35

Act of Feb. 4, 1815, ch. 31, § 10, 3 Stat. 99 . . . . . . . . . . . . 35

VIII

Statutes and regulations—Continued:                    Page

Act of May 22, 1918, ch. 81, 40 Stat. 559:

§ 1, 40 Stat. 559 ................................. 35

§ 2, 40 Stat. 559 ................................. 35

Act of Aug. 18, 1856, ch. 127, 11 Stat. 60 .............. 33

Departments of Commerce, Justice and State, the
    Judiciary, and Related Agencies Appropriations
    Act, 1992, Pub. L. No. 102-140, 105 Stat. 782 (1991) .. 36

§ 503, 105 Stat. 820 ............................ 36

Foreign Relations Authorization Act, Fiscal Year
    1979, Pub. L. No. 95-426, § 124, 92 Stat. 971 (1978) ... 36

Foreign Relations Authorization Act, Fiscal Years
    1992 and 1993, Pub. L. No. 102-138, 105 Stat. 647
    (1991):

§ 129(d), 105 Stat. 662 ......................... 36

§ 129(e), 105 Stat. 662 ......................... 36

Foreign Relations Authorization Act, Fiscal Years
    1994 and 1995, Pub. L. No. 103-236, § 132, 108 Stat.
    382, 395 (1994), as amended by Act of Oct. 25, 1994,
    Pub. L. No. 103-415, § 1(r), 108 Stat. 4299, 4302
    (1994) ......................................... 39

Foreign Relations Authorization Act, Fiscal
    Year 2003, Pub. L. No. 107-228, 116 Stat.
    1350 (2002) ................................. 3, 9, 17

§ 214, 116 Stat. 1365 ....................... 3, 9, 49

§ 214(a), 116 Stat. 1365 ......................... 9

§ 214(b), 116 Stat. 1366 ......................... 9

§ 214(c), 116 Stat. 1366 ........................ 10

§ 214(d), 116 Stat. 1366 ................... *passim*

IX

Statutes and regulations—Continued:                     Page

Hare-Hawes-Cutting Act, ch. 11, 47 Stat. 761 .......... 28

§ 10, 47 Stat. 768 ................................. 28

Jerusalem Embassy Act of 1995, Pub. L.
No. 104-45, 109 Stat. 399:

§ 3(a), 109 Stat. 399 ........................... 9

§ 3(b), 109 Stat. 399 ........................... 9

§ 7, 109 Stat. 400 ............................. 9

Joint Resolution For the recognition of the
independence of the people of Cuba, 30 Stat. 738 ..... 23

Tydings-McDuffie Act, Pub. L. No. 73-127, 48 Stat.
456 .............................................. 28

8 U.S.C. 1185(b) (Supp. I 2007) ...................... 35

10 U.S.C. 2602 ..................................... 36

22 U.S.C. 211a .................................. 34, 35

22 U.S.C. 212 ...................................... 35

22 U.S.C. 212a (Supp. II 2008) ...................... 35

22 U.S.C. 213 ...................................... 36

22 U.S.C. 214 ...................................... 36

22 U.S.C. 214a ..................................... 36

22 U.S.C. 217a ..................................... 36

22 U.S.C. 218 ...................................... 36

22 U.S.C. 2714 ..................................... 35

28 U.S.C. 530D ..................................... 10

42 U.S.C. 652 ...................................... 35

Rev. Stat. § 4075 (1875) ............................ 33

X

Regulations—Continued:                                        Page

22 C.F.R.:
    50.2 ............................................... 10
    51.1-51.74 ........................................ 34

Miscellaneous:

32 Annals of Congress (1817-1818):
    pp. 1468-1469 ..................................... 20
    p. 1500 ........................................... 22
    p. 1539 ........................................... 21
    p. 1570 ........................................... 21
    p. 1646 ........................................... 22
37 Annals of Congress (1821):
    p. 1082 ........................................... 22
    pp. 1091-1092 ..................................... 22
*American Embassy in Israel:  Hearing Before the*
    *Senate Comm. on Foreign Relations*, 98th Cong.,
    2d Sess. (1984) ................................... 7, 8
Bill to Relocate United States Embassy from Tel
    Aviv to Jerusalem, 19 Op. Off. Legal Counsel 123
    (1995) ............................................ 9
Hillary Rodham Clinton, Sec'y of State:
    *Remarks at the 2010 AIPAC Policy Conference*
        (Mar. 22, 2010), http://www.state.gov/
        secretary/rm/2010/03/138722.htm ............... 6
    *Remarks on Libya & Syria* (July 15, 2011),
        http://www.state.gov/secretary/rm/
        2011/07/168656.htm ........................... 20
*Congress Powerless*, N.Y. Times, Dec. 20, 1896 ........ 23

XI

Miscellaneous—Continued:                                    Page

   29 Cong. Rec.:

      (1867):

         p. 663 ........................................21

         p. 664 ........................................51

         p. 672 ........................................21

         p. 673 ........................................21

         p. 679 ........................................29

      (1896):

         p. 326 ........................................22

         p. 332 ........................................22

   31 Cong. Rec. (1898):

      3902 ..........................................23

      3988 ..........................................23

   Department of State, *The American Passport* (1898) ..32

   *Digest of Int'l Law* (Green Haywood Hackworth ed.):

      Vol. 1 (1940) ...........................20, 21, 29

      Vol. 3 (1942) ...............................30

   76 Fed. Reg. 35,713 (2011) ...........................9

   7 *Foreign Affairs Manual* 1300 (1987) ................34

      1383 ..........................................38

      1383.1 ........................................7

      1383.5-1 ......................................38

      1383.5-2 ......................................39

      1383.5-5 ......................................7

      1383.5-6 ......................................7

      1383.6 ........................................39

XII

Miscellaneous—Continued:                                   Page

7 *Foreign Affairs Manual* 1360, App. D, Birth in
    Israel, Jerusalem, and Israeli-Occupied Areas
    (2010), http://www.state.gov/documents/
    organization/94675.pdf ........................... 7

6 Foreign Relations of the United States 1949: The
    Near East, South Asia, and Africa (1977) ........... 4

Ulysses S. Grant, *Second Annual Message to
    Congress, December 5, 1870,* 9 Comp. Messages &
    Papers of the Presidents (n.s. 1897) ............... 20

Alexander Hamilton:

    *Pacificus No. 1* (June 29, 1793)*, reprinted in*
        15 *The Papers of Alexander Hamilton*
        (Harold C. Syrett & Jacob E. Cooke eds., 1969) ... 19

    The Federalist No. 69 ........................... 19

Louis Henkin, *Foreign Affairs and the United
    States Constitution* (2d ed. 1996) ........ 19, 24, 28, 29

*Issues Raised by Provisions Directing Issuance of
    Official or Diplomatic Passports,* 16 Op. Off.
    Legal Counsel 18 (1992) ......................... 37

Thomas Jefferson, *Notes on Washington's Questions
    on Neutrality and the Alliance with France, in 25
    The Papers of Thomas Jefferson* (John
    Catanzariti, ed., 1992) .......................... 20

Letter from Eric H. Holder, Jr., U.S. Att'y Gen., to
    Morgan Frankel, Senate Legal Counsel, Mar. 21,
    2011 ........................................ 10, 49

XIII

Miscellaneous—Continued:                                          Page

Letter from George P. Shultz, Sec'y of State, to Hon.
    Charles H. Percy (Feb. 13, 1984), *in American
    Embassy in Israel: Hearing Before the Senate
    Comm. on Foreign Relations*, 98th Cong., 2d Sess.
    (1984) ............................................. 7

Letter from Woodrow Wilson to Sen. Albert B. Fall
    (Dec. 8, 1919), *in* S. Doc. No. 285, 66th Cong., 2d
    Sess. (1920) ...................................... 24

William McKinley, *Message to Congress*, Apr. 11,
    1898, 13 Comp. Messages & Papers of the
    Presidents (n.s. 1909) ........................... 23

*Memoirs of John Quincy Adams* (Charles Francis
    Adams ed., 1875):
        Vol. 4 ....................................... 22
        Vol. 6 .................................... 20, 22

Memorial of Captain Meigs, 8 Op. Att'y Gen. 462
    (1860) ........................................... 55

*President Bush Discusses the Middle East* (July 16,
    2007), http://georgewbush-whitehouse.
    archives.gov/news/releases/2007/07/
    20070716-7.html ................................... 5

Robert J. Reinstein, *Recognition: A Case Study on
    the Original Understanding of Executive Power*,
    45 U. Rich. L. Rev. 801 (2011) ................ 19, 20

*Remarks by President Obama in Address to the
    United Nations General Assembly* (Sept. 21, 2011)
    http://www.whitehouse.gov/the-press-office/2011/
    09/21/remarks-president-obama-address-united-
    nations-general-assembly ......................... 6

XIV

Miscellaneous—Continued:                                   Page

*Remarks by the President on the Middle East and
    North Africa* (May 9, 2011), http://www.
    whitehouse.gov/the-press-office/2011/05/19/
    remarks-president-middle-east-and-north-africa .....6

Restatement (Third) of the Foreign Relations Law of
    the United States (1987) ...........................19

Staff of Senate Comm. on Gov't Operations,
    86th Cong., 2d Sess., *Reorganization of
    the Passport Functions of the Dep't of State*
    (Comm. Print 1960) ...............................33

*Statement on Signing*, 2002 Pub. Papers 1697 (Sept.
    30, 2002) ....................................10, 55

*Statement on Signing*, Pub. Papers 1344-1345
    (Oct. 21, 1991) ..................................36

S. 2031, 98th Cong., 2d Sess. (1984) ...................8

S. Doc. No. 285, 66th Cong., 2d Sess. (1919) ...........23

Harry Truman, *Statement by the President
    Announcing Recognition of the State of Israel*,
    1948 Pub. Papers 258 (May 14, 1948) ...............20

*George Washington to the Cabinet, April 18, 1793,
    reprinted in 25 The Papers of Thomas Jefferson*
    (John Catanzariti ed., 1992) .......................19

*Wilson Rebuffs Senate on Mexico*, N.Y. Times Dec. 8,
    1919 .............................................24

# In the Supreme Court of the United States

No. 10-699

MENACHEM BINYAMIN ZIVOTOFSKY, BY HIS PARENTS
AND GUARDIANS ARI Z. AND NAOMI SIEGMAN
ZIVOTOFSKY, PETITIONER

*v.*

HILLARY RODHAM CLINTON, SECRETARY OF STATE

*ON WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT*

### BRIEF FOR THE RESPONDENT

#### OPINIONS BELOW

The opinion of the court of appeals (Pet. App. 1a-43a) is reported at 571 F.3d 1227. A prior opinion of the court of appeals (Pet. App. 77a-90a) is reported at 444 F.3d 614. The opinion of the district court (Pet. App. 55a-77a) is reported at 511 F. Supp. 2d 97. A prior opinion of the district court is unreported but is available at 2004 WL 5835212.

#### JURISDICTION

The judgment of the court of appeals was entered on July 10, 2009. A petition for rehearing was denied on June 29, 2010 (Pet. App. 44a-55a). On August 31, 2010, the Chief Justice extended the time within which to file

(1)

2

a petition for a writ of certiorari to and including November 26, 2010. The petition for a writ of certiorari was filed on November 24, 2010, and was granted on May 2, 2011. The jurisdiction of this Court rests on 28 U.S.C. 1254(1).

## CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED

Pertinent constitutional and statutory provisions are set forth in an appendix to this brief. See App., *infra*, 1a-2a.

## STATEMENT

The status of the city of Jerusalem is one of the most sensitive and longstanding disputes in the Arab-Israeli conflict. For the last 60 years, the United States' consistent policy has been to recognize no state as having sovereignty over Jerusalem, leaving that issue to be decided by negotiations between the relevant parties within the peace process. This policy is rooted in the Executive's assessment that "[a]ny unilateral action by the United States that would signal, symbolically or concretely, that it recognizes that Jerusalem is a city that is located within the sovereign territory of Israel would critically compromise the ability of the United States to work with Israelis, Palestinians and others in the region to further the peace process." J.A. 52-53. The Executive similarly does not recognize Palestinian claims to current sovereignty in Jerusalem, the West Bank, or the Gaza Strip, pending the outcome of these negotiations.

One of the ways the State Department has implemented the United States' policy concerning the status of Jerusalem is in its rules regarding place-of-birth designations in passports and consular reports of birth abroad issued to U.S. citizens born in Jerusalem. Be-

3

cause the United States does not currently recognize any country as having sovereignty over Jerusalem, only "Jerusalem" is recorded as the place of birth in the passports and reports of birth of U.S. citizens born in that city. Petitioner challenges this policy, seeking to have "Israel" designated as his place of birth. He relies on Section 214 of the Foreign Relations Authorization Act, Fiscal Year 2003, which is entitled "United States Policy with Respect to Jerusalem as the Capital of Israel," and which purports to require the State Department to make such a designation upon request. Pub. L. No. 107-228, 116 Stat. 1350, 1366.

1. The Constitution distributes the powers of the National Government over external affairs between the Executive and Legislative Branches. Those branches exercise some foreign-affairs powers jointly. For example, the Constitution grants the President the power to make treaties and appoint ambassadors, subject to the advice and consent of the Senate. U.S. Const. Art. II, § 2, Cl. 2. The Constitution assigns other such powers to Congress, including the powers to regulate foreign commerce and the value of foreign currency, *id.* Art. I, § 8, Cls. 3, 5, and the power to declare war, *id.* § 8, Cl. 11.

The Constitution assigns a broad range of foreign-affairs powers, however, to the President alone. Article II provides that "[t]he executive Power shall be vested in a President of the United States of America." U.S. Const. Art. II, § 1. "[T]he historical gloss on the 'executive Power' * * * has recognized the President's 'vast share of responsibility for the conduct of our foreign relations.'" *American Ins. Ass'n* v. *Garamendi*, 539 U.S. 396, 414 (2003) (quoting *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U.S. 579, 610-611 (1952) (Frankfurter, J., concurring)). In addition, and of particular relevance to

4

this case, the Constitution assigns to the President alone the authority to "receive Ambassadors and other public Ministers." *Id.* Art. II, § 3. That power includes the authority to decide which ambassadors the President will receive and, hence, the power to decide with which governments to establish diplomatic relations. See, *e.g., Banco Nacional de Cuba* v. *Sabbatino*, 376 U.S. 398, 410 (1964); *United States* v. *Pink*, 315 U.S. 203, 229 (1942) (same).

2. a. Since the creation of the state of Israel in 1948, the United States has consistently declined to recognize any state's sovereignty over Jerusalem.

When Israel declared independence, President Truman immediately recognized the new state. See *Statement by the President Announcing Recognition of the State of Israel*, 1948 Pub. Papers 258 (May 14, 1948). At the same time, however, the United States did not recognize Israel's sovereignty over any part of Jerusalem. That same year, the United Nations General Assembly, with United States support, passed a resolution stating that Jerusalem "should be accorded special and separate treatment from the rest of Palestine" and should be placed under international control. G.A. Res. 194 (III), ¶ 8, U.N. Doc. A/PV.186 (Dec. 11, 1948). In 1949, when Israel announced its intention to convene the inaugural meeting of its Parliament in the part of Jerusalem that it controlled, the United States declined to send a representative to attend the ceremonies, noting in a State Department cable that "the United States cannot support any arrangement which would purport to authorize the establishment of Israeli * * * sovereignty over parts of the Jerusalem area." 6 Foreign Relations of the United States 1949: The Near East, South Asia, and Africa 739 (1977).

5

In 1967, as a result of the Six Day War, Israel acquired control over the entire city of Jerusalem. In United Nations proceedings, the United States made clear that the "continuing policy of the United States Government" was that "the status of Jerusalem * * * should be decided not unilaterally but in consultation with all concerned." U.N. GAOR, 5th Emergency Sess., 1554th plen. mtg. at 10, U.N. Doc. A/PV.1554 (July 14, 1967) (statement of U.S. Ambassador to the U.N. Arthur Goldberg). Consequently, the United States emphasized that it did not "accept or recognize" any measures taken by Israel as "altering the status of Jerusalem" or "prejudging the final and permanent status of Jerusalem." *Ibid.*

In 1993, with the assistance of the United States, representatives of Israel and the Palestinian people agreed that the status of Jerusalem is one of the core issues to be addressed bilaterally in permanent status negotiations. J.A. 50; Declaration of Principles on Interim Self-Government Arrangements, art. V, Isr.-P.L.O. team, *done* Sept. 13, 1993, http://2001-2009.state.gov/p/nea/rls/ 22602.htm. Since that time, Presidential Administrations have uniformly sought to assist the parties in establishing negotiations on all outstanding issues, including the status of Jerusalem. For example, President George W. Bush encouraged negotiations that would "lead to a territorial settlement, with mutually agreed borders reflecting previous lines and current realities, and mutually agreed adjustments," including resolution of the status of Jerusalem. *President Bush Discusses the Middle East* (July 16, 2007), http://georgewbush-whitehouse.archives.gov/news/releases/2007/07/20070716-7.html. President Obama has similarly explained that once territory and security is-

6

sues are resolved on the basis of outlined principles, "two wrenching and emotional issues will remain [to be negotiated]: the future of Jerusalem, and the fate of Palestinian refugees." *Remarks by the President on the Middle East and North Africa* (May 19, 2011), http://www.whitehouse.gov/the-press-office/2011/05/19/remarks-president-middle-east-and-north-africa; Hillary Rodham Clinton, Sec'y of State, *Remarks at the 2010 AIPAC Policy Conference* (Mar. 22, 2010) (The status of Jerusalem is a "permanent status issue[]" that must be resolved through "good-faith negotiations [between] the parties."), http://www.state.gov/secretary/rm/2010/03/138722.htm; *Remarks by President Obama in Address to the United Nations General Assembly* (Sept. 21, 2011) ("[I]t is the Israelis and the Palestinians * * * who must reach agreement on * * * Jerusalem."), http://www.whitehouse.gov/the-press-office/2011/09/21/remarks-president-obama-address-united-nations-general-assembly.

Within this "highly sensitive" and "potentially volatile" context, "U.S. Presidents have consistently endeavored to maintain a strict policy of not prejudging the Jerusalem status issue and thus not engaging in official actions that would recognize, or might be perceived as constituting recognition of, Jerusalem as either the capital city of Israel, or as a city located within the sovereign territory of Israel." J.A. 53. This policy is rooted in the Executive's longstanding assessment that any "action by the United States that would signal, symbolically or concretely," recognition of Israeli sovereignty over Jerusalem, J.A. 52-53, would "undercut[] and discredit[] our facilitative role in promoting a negotiated settlement," which would be "damaging to the cause of peace and * * * therefore not * * * in the interest of the United

7

States," Letter from George P. Shultz, Sec'y of State, to Hon. Charles H. Percy (Feb. 13, 1984), *in American Embassy in Israel: Hearing Before the Senate Comm. on Foreign Relations*, 98th Cong., 2d Sess. 13-14 (1984) (*Embassy Hearing*). This assessment affects a range of United States actions. In particular, "[t]he United States, like nearly all other countries, maintains its embassy in Tel Aviv." J.A. 52.

b. United States policy concerning the status of Jerusalem is reflected in the State Department's policies for preparing passports and reports of birth abroad of U.S. citizens born in Jerusalem. As a general rule in passport administration, the country that the United States recognizes as having sovereignty over the place of birth of a passport applicant is recorded in the passport. See 7 *Foreign Affairs Manual* (*FAM*) 1383.1 (1987).[1] Because the United States does not currently recognize any country as having sovereignty over Jerusalem, only "Jerusalem" is recorded as the place of birth in the passports of United States citizens born in that city. 7 *FAM* 1383.5-6, exh. 1383.1. Similarly, because the United States recognizes no state as having sovereignty over the territories of the West Bank and Gaza Strip, State Department rules mandate recording "West Bank" and "Gaza Strip" in the passports of United States citizens born in those locations. 7 *FAM* 1383.5-5.[2]

---

[1] Relevant provisions of the *FAM* are reprinted in the Joint Appendix. See J.A. 106-146.

[2] In 2008 and 2010, the State Department revised the *FAM* provisions governing the place-of-birth designation of U.S. citizens born in Israel, Jerusalem, and Israeli-occupied areas. See 7 *FAM* 1360, App. D, Birth in Israel, Jerusalem, and Israeli-Occupied Areas, http://www.state.gov/documents/organization/94675.pdf. These revisions made no change in policy.

8

The State Department's policy concerning the re-cording of Jerusalem as the place of birth reflects its determination that "U.S. national security interests would be significantly harmed at the present time were the United States to adopt a policy or practice that equated to officially recognizing Jerusalem as a city lo-cated within the sovereign state of Israel." J.A. 49. Re-cording "Israel" as the place of birth of United States citizens born in Jerusalem would be perceived interna-tionally as a "reversal of U.S. policy on Jerusalem's sta-tus" dating back to Israel's creation that "would be im-mediately and publicly known." J.A. 55. That reversal would "cause irreversible damage" to the United States' ability to further the peace process and end violence against Israel and Israelis. J.A. 53.

3. a. Congress has occasionally attempted to con-strain the Executive Branch's ability to implement its recognition policy with respect to Jerusalem. In 1984, Congress considered legislation that would have re-quired the U.S. Embassy in Israel to move to Jerusalem. See S. 2031, 98th Cong., 2d Sess. The Reagan Adminis-tration opposed the bill on the ground that it would re-quire the President to recognize Israeli sovereignty over Jerusalem, thereby harming United States interests in the region and raising "serious constitutional questions" by encroaching on "the President's exclusive constitu-tional power * * * to recognize and to conduct ongoing relations with foreign governments." *Embassy Hearing* 13-14, 58-59. The bill was not enacted.

In 1995, Congress passed the Jerusalem Embassy Act of 1995, which states that the "[p]olicy of the United States" is that "Jerusalem should be recognized as the capital of Israel," and which purports to condition a por-tion of State Department funding on moving the U.S.

9

Embassy to Jerusalem. Pub. L. No. 104-45, § 3(a) and (b), 109 Stat. 399 (enacted into law without President's signature). While Congress was considering the bill, the Office of Legal Counsel (OLC) advised the President that the bill would unconstitutionally infringe the President's recognition power. See Bill to Relocate United States Embassy from Tel Aviv to Jerusalem, 19 Op. Off. Legal Counsel 123 (1995). As enacted, the statute contains a waiver provision that permits the President to suspend the funding restriction for six months at a time to "protect the national security interests of the United States." § 7, 109 Stat. 400. Since the provision's enactment, Presidents Clinton, Bush, and Obama have repeatedly made the necessary finding to invoke the waiver provision and maintain the U.S. Embassy in Tel Aviv. See, e.g., 76 Fed. Reg. 35,713 (2011).

b. In 2002, Congress passed and the President signed the Foreign Relations Authorization Act, Fiscal Year 2003, Pub. L. No. 107-228, 116 Stat. 1350. Section 214 of that Act, entitled "United States Policy with Respect to Jerusalem as the Capital of Israel," contains various provisions relating to Jerusalem.

Subsection (a) "urges the President * * * to immediately begin the process of relocating the United States Embassy in Israel to Jerusalem." § 214(a), 116 Stat. 1365. Subsection (b) states that none of the funds authorized to be appropriated by the Act may be used to operate the United States consulate in Jerusalem unless that consulate "is under the supervision of the United States Ambassador to Israel." § 214(b), 116 Stat. 1366. Subsection (c) states that none of the funds authorized to be appropriated may be used for publication of any "official government document which lists countries and their capital cities unless the publication identifies Jerusalem

10

as the capital of Israel." § 214(c), 116 Stat. 1366.  And Subsection (d), on which petitioner relies, states that, "[f]or purposes of the registration of birth, certification of nationality, or issuance of a passport of a United States citizen born in the city of Jerusalem, the Secretary [of State] shall, upon the request of the citizen or the citizen's legal guardian, record the place of birth as Israel." § 214(d), 116 Stat. 1366.

At the time of enactment, President Bush stated that if Section 214 were construed to impose a mandate, it would "impermissibly interfere with the President's constitutional authority to formulate the position of the United States, speak for the Nation in international affairs, and determine the terms on which recognition is given to foreign states." *Statement on Signing the Foreign Relations Authorization Act, Fiscal Year 2003*, 2002 Pub. Papers 1697, 1698 (Sept. 30, 2002).[3]  Even though it was accompanied by a Presidential Statement making clear that "U.S. policy regarding Jerusalem has not changed," *ibid.*, Section 214 provoked strong condemnation in the Middle East and confusion about United States policy toward Jerusalem. See, *e.g.*, J.A. 223-231.

4.  Petitioner is a United States citizen born in Jerusalem in 2002. Pet. App. 5a.  Petitioner's mother filed an application for a consular report of birth abroad and a United States passport for petitioner, listing his place of birth as "Jerusalem, Israel."[4]  *Id.* at 6a.  United States

---

[3]  See also Letter from Eric H. Holder, Jr., U.S. Att'y Gen., to Morgan Frankel, Senate Legal Counsel, Mar. 21, 2011, at 2 (Holder Letter) (informing Congress, pursuant to 28 U.S.C. 530D, that "Section 214(d) impermissibly intrudes on the President's constitutional authorities").

[4]  A report of birth abroad is an official record of the citizenship of a U.S. citizen born abroad. 22 C.F.R. 50.2.

11

diplomatic officials informed petitioner's mother that State Department policy required them to record "Jerusalem" as petitioner's place of birth, which is how petitioner's place of birth appears in the documents he received. *Ibid.*

Petitioner's parents subsequently filed this suit on his behalf against the Secretary of State seeking an order compelling the State Department to identify petitioner's place of birth as "Israel" in the official documents.[5]  Pet. App. 6a.

The district court initially dismissed the complaint on standing and political question grounds.  The court of appeals reversed and remanded, concluding that petitioner has standing and that a more complete record was needed on the foreign-policy implications of recording "Israel" as petitioner's place of birth. Pet. App. 77a-90a.

On remand, the State Department explained, among other things, that in the present circumstances, if "Israel" were to be recorded as the place of birth of a person born in Jerusalem, such "unilateral action" by the United States on one of the most sensitive issues in the negotiations between Israelis and Palestinians "would critically compromise" the United States' ability to help further the Middle East peace process. J.A. 52-53.  The district court again dismissed on political question grounds.  Pet. App. 55a-77a.

5.  The court of appeals affirmed.  Pet. App. 1a-43a.  The court relied on the first factor discussed in *Baker* v. *Carr* for identifying the presence of a political question: whether resolution of petitioner's claim would "raise issues whose resolution has been committed to the politi-

---

[5]  Petitioner originally sought an order requiring the Secretary to record "Jerusalem, Israel" as his place of birth, but subsequently modified that request to seek the recordation of "Israel." Pet. App. 80a n.1.

12

cal branches by the text of the Constitution." *Id.* at 8a (citing *Baker* v. *Carr*, 369 U.S. 186, 217 (1962)). The court accordingly began "by 'interpret[ing] the [constitutional] text in question and determin[ing] whether and to what extent the issue is textually committed' to a political branch." *Ibid.* (quoting *Nixon* v. *United States*, 506 U.S. 224, 228 (1993)); see *Baker*, 369 U.S. at 217.

The court framed the "issue" as "whether the State Department can lawfully refuse to record [petitioner's] place of birth as 'Israel' in the face of a statute that directs it to do so." Pet. App. 9a. The court concluded that the President's constitutional authority to "'receive Ambassadors and other public Ministers,' U.S. C[onst.] [A]rt. II, § 3, includes the power to recognize foreign governments," and to decide "which government is sovereign over a particular place." *Id.* at 9a-11a. The State Department's decision to record "Jerusalem" as the place of birth in passports of U.S. citizens born in that city, the court explained, "implements" the President's "exclusive and unreviewable constitutional power to keep the United States out of the debate over the status of Jerusalem." *Id.* at 11a. Because petitioner's request that the court order the State Department to record his place of birth as "Israel" "trenches upon the President's constitutionally committed recognition power," the court held that the claim presents a nonjusticiable political question. *Id.* at 12a. In so concluding, the court explained that, in light of the President's exclusive constitutional authority, the fact that Congress "took a position on the status of Jerusalem and gave [petitioner] a statutory cause of action  *  *  *  is of no moment to whether the judiciary has authority to resolve this dispute between the political branches." *Id.* at 14a.

13

Judge Edwards concurred in the judgment. Pet. App. 16a-43a. He agreed with the majority that, under the Constitution, "[t]he Executive has exclusive and unreviewable authority to recognize foreign sovereigns" and to determine the United States' recognition policy, but he would have held that petitioner "has no viable cause of action," rather than dismiss the case on political question grounds. *Id.* at 32a, 42a-43a. Judge Edwards identified the issue as "[w]hether [Section] 214(d) * * * , which affords [petitioner] a statutory right to have 'Israel' listed as the place of birth on his passport, is a constitutionally valid enactment." *Id.* at 18a. In his view, this question of "statutory and constitutional interpretation" was a "matter[] for the court to decide." *Id.* at 19a. Judge Edwards therefore would have found Section 214(d) unconstitutional because it "impermissibly intrudes on the President's exclusive power to recognize foreign sovereigns." *Id.* at 43a.

## SUMMARY OF ARGUMENT

Petitioner's claim that he is entitled under Section 214(d) to have the Secretary of State designate "Israel" as his place of birth on his passport and consular report of birth abroad should be dismissed on either of two grounds. The claim presents a nonjusticiable political question. But even if the claim is justiciable, Section 214(d) is an unconstitutional encroachment on Executive authority. Both conclusions flow from the Constitution's grant to the President of the exclusive power to recognize foreign sovereigns and determine the extent of their territorial sovereignty, as well as the power to determine the content of passports in connection with the conduct of United States foreign policy.

14

I. A. Longstanding Executive Branch practice, congressional acquiescence, and judicial precedent establish that the President's express constitutional authority to "receive Ambassadors and other public Ministers" encompasses the exclusive power to recognize foreign states and their governments. U.S. Const. Art. II, § 3. Presidents have unilaterally exercised this recognition power since the Washington Administration. And although Members of Congress have occasionally proposed bills that would involve the Legislature in recognition decisions, those efforts have been rebuffed as inconsistent with the Constitution's assignment of such matters to the Executive alone.

Courts, including this Court, have consistently held that the constitutional recognition power belongs exclusively to the President. See, *e.g.*, *United States* v. *Pink*, 315 U.S. 203, 229 (1942). This Court has also held that the recognition power includes all implied authorities necessary to effectuate its exercise. *Id.* at 229-230. One such implied authority is the President's power to determine on behalf of the United States the boundaries of foreign states. See *Williams* v. *Suffolk Ins. Co.*, 38 U.S. (13 Pet.) 415, 420 (1839).

B. The President also has inherent authority to determine the content of passports insofar as it implements United States foreign policy. A passport is an official instrument of foreign policy through which the United States addresses foreign nations. See *Haig* v. *Agee*, 453 U.S. 280, 294 (1981). Historically, the Executive has been assumed to have inherent authority to issue passports and determine their content, in the exercise of the President's constitutional power over national security and foreign relations. See *id.* at 293-294.

15

Today, passport statutes typically further Congress's own enumerated powers or aid the Executive's passport authority, without purporting to constrain the Executive's use of passports as instruments of foreign policy. On the rare occasion when a passport statute encroaches on the Executive's constitutional authorities, the President has declined to enforce it. Although Congress may enact passport legislation that is necessary and proper to implement its own enumerated powers, it may not regulate passports in a manner that constrains the President's exclusive authority to determine the content of passports as it relates to United States foreign policy, including determinations concerning the recognition of foreign states and their territorial sovereignty.

II. The State Department's policy not to record "Israel" as the place of birth in the passports or consular records of birth abroad of U.S. citizens born in Jerusalem implements the President's decision not to recognize any state's sovereignty over Jerusalem. That policy is also an exercise of the President's inherent authority to determine the content of passports in furtherance of his conduct of foreign policy. The description of a citizen's place of birth in passports operates as an official statement of whether the United States recognizes a state's sovereignty over the relevant territorial area. For this reason, the State Department has established detailed rules governing place-of-birth designations. Reversing its policy with respect to documents issued to U.S. citizens born in Jerusalem would have grave foreign-relations consequences.

III. Because petitioner's suit seeks to overturn a decision that the Constitution assigns exclusively to the President, it presents a political question. See *Baker* v. *Carr*, 369 U.S. 186, 217 (1962).

16

Petitioner's reliance on an asserted statutory right does not alter that conclusion. Because a basic function of the courts is to interpret statutes and the Constitution, courts presented with a statutory claim that potentially seeks review of a question that the Constitution commits to another Branch should undertake a careful inquiry into the nature of the relief sought and the interaction of that claim with the constitutional commitment at issue. If adjudicating the purported statutory right would entail reviewing or directing a decision that is constitutionally committed to a political Branch, the court should determine that the statute encroaches on the authority vested in that Branch and dismiss the suit. In other words, Congress cannot, by creating a statutory right, confer on the courts the authority to decide a question that the Constitution commits to another Branch.

Section 214(d) cannot be reconciled with the Constitution's grant of the recognition power to the President. By purporting to give petitioner the right to a judicial order directing the State Department to indicate in petitioner's passport that he was born in Israel, the provision seeks to define United States recognition policy. But the President has exclusive constitutional authority not to recognize any sovereignty over Jerusalem and to implement that determination in passports. Petitioner's Section 214(d) claim thus challenges a decision constitutionally committed to the President. The court of appeals therefore correctly dismissed this case as nonjusticiable.

IV.  The question whether Section 214(d) is unconstitutional overlaps to a considerable extent with the question whether petitioner's claim for relief presents a nonjusticiable political question. Should the Court de-

cide as a threshold matter that the case is justiciable, it
should hold that Section 214(d) is unconstitutional be-
cause it encroaches on the President's exclusive consti-
tutional authority to recognize foreign sovereigns.

### ARGUMENT

Petitioner's claim that he is entitled under Section
214(d) of the Foreign Relations Authorization Act, Fis-
cal Year 2003, to have the Secretary of State designate
"Israel" as his place of birth on his passport and con-
sular report of birth abroad fails for two reasons. First,
because petitioner seeks judicial reversal of a determi-
nation that the Constitution commits exclusively to the
President, petitioner's claim presents a nonjusticiable
political question. Second, even if the case is justiciable,
petitioner is not entitled to relief because Section 214(d)
is an unconstitutional encroachment on powers exclu-
sively vested in the President. These two grounds for
dismissing petitioner's claim overlap to a considerable
extent, because both rest on the Constitution's exclusive
grant to the President of the power to recognize foreign
sovereigns and determine the extent of their territorial
sovereignty, as well as the power to determine the con-
tent of passports in connection with the conduct of
United States foreign policy. We explain the constitu-
tional and historical foundations for these conclusions in
Parts I and II, *infra*. We then address the related polit-
ical question and merits arguments in Parts III and IV.

I.  THE CONSTITUTION GRANTS THE PRESIDENT THE
    EXCLUSIVE POWER TO RECOGNIZE FOREIGN SOV-
    EREIGNS AND TO DETERMINE PASSPORT CONTENT
    INSOFAR AS IT PERTAINS TO SUCH RECOGNITION
    DETERMINATIONS

    A.  The Constitution Assigns Exclusively To The Executive
        Branch The Authority To Recognize Foreign States And
        Foreign Governments, And To Determine The Territo-
        rial Boundaries Of Foreign States

    It is firmly established in our constitutional frame-
work that the President has sole authority to recognize
foreign states and their governments.  The Constitution
assigns to the President the power to "receive Ambassa-
dors and other public Ministers," U.S. Const. Art. II, § 3
(Reception Clause), which necessarily includes the au-
thority to decide which ambassadors to receive and
which states and governments to recognize.  Centuries-
long Executive Branch practice, congressional acquies-
cence, and decisions by this Court have solidified the
understanding that the President's exclusive reception
power includes the power to recognize foreign govern-
ments, to determine the policies that govern recognition
questions, and, for purposes of U.S. law, to determine
the territorial boundaries of foreign states.

        1. The Executive Branch has consistently exercised sole
           authority to recognize foreign states, and Congress
           has acquiesced in that practice

    From the Washington Administration to the present,
the Executive Branch has asserted the sole authority to
recognize which government represents a foreign state.
The recognition power did not receive attention during
the ratification debates, rendering post-ratification
practice critical evidence of the nature and scope of the

19

power. Although Alexander Hamilton at first viewed the Reception Clause as "without consequence in the administration of the Government," The Federalist No. 69 (Hamilton), the Clause quickly came to be understood as a substantive grant of exclusive recognition authority to the President. See Louis Henkin, *Foreign Affairs and the United States Constitution* 43 (2d ed. 1996) (Henkin) ("It is no longer questioned that the President does not merely perform the ceremony of receiving foreign ambassadors but also determines whether the United States should recognize or refuse to recognize a foreign government."); Restatement (Third) of the Foreign Relations Law of the United States § 204 (1987); Robert J. Reinstein, *Recognition: A Case Study on the Original Understanding of Executive Power*, 45 U. Rich. L. Rev. 801, 801 (2011) (despite lack of evidence of the Framers' understanding of the Reception Clause, the President's sole recognition authority is "hornbook" law).

a. During the Washington Administration, Hamilton explained that he had come to understand that the power to receive ambassadors "includes th[e power] of judging, in the case of a Revolution of Government in a foreign Country, whether the new rulers are competent organs of the National Will and ought to (be) recognised, or not." See Alexander Hamilton, *Pacificus No. 1* (June 29, 1793), *reprinted in* 15 *The Papers of Alexander Hamilton*, 33, 41 (Harold C. Syrett & Jacob E. Cooke, eds., 1969). Consistent with this view, President Washington and his cabinet unanimously decided that the President could receive the ambassador from the new government of France without first consulting Congress. *George Washington to the Cabinet, in* 25 *The Papers of Thomas Jefferson* 568-569 (John Catanzariti

20

ed., 1992); Thomas Jefferson, *Notes on Washington's Questions on Neutrality and the Alliance with France, in* 25 *The Papers of Thomas Jefferson, supra,* at 665-666; see Reinstein, *supra,* at 840.

Since then, the Executive Branch has routinely and unilaterally recognized foreign states and foreign governments. In 1824, for instance, President Monroe determined that "no message to Congress would be necessary" before the President recognized Brazil, because "the power of recognizing foreign Governments was necessarily implied in that of receiving Ambassadors and public Ministers." 6 *Memoirs of John Quincy Adams* 329, 348, 358-359 (Charles Francis Adams, ed., 1875) *(Memoirs).* In 1948, President Truman recognized the creation of the State of Israel and its provisional government minutes after Israel declared independence. See *Statement by the President Announcing Recognition of the State of Israel,* 1948 Pub. Papers 258 (May 14, 1948). And in July 2011, Secretary of State Clinton announced that "until an interim authority is in place, the United States will recognize the [Transitional National Council] as the legitimate governing authority for Libya." Hillary Clinton, *Remarks on Libya and Syria* (July 15, 2011), http://www.state.gov/secretary/rm/2011/07/168656.htm. There are myriad other examples throughout our history.[6]

b. From time to time, Members of Congress proposed legislation that would have created a role for the

---

[6] See, *e.g.,* Ulysses S. Grant, *Second Annual Message to Congress, December 5, 1870,* 9 Comp. Messages & Papers of the Presidents 4050, 4050 (n.s. 1897). See generally 1 *Digest of Int'l Law* 195-318 (Green Haywood Hackworth ed., 1940) (documenting early twentieth-century Executive Branch recognition of numerous foreign states and governments).

21

Legislative Branch in the recognition of foreign states and governments. But the Executive Branch opposed the bills, and most were rejected in Congress as inappropriate incursions into the Executive Branch's constitutional authority. Congress has thus acquiesced in the Executive Branch's exercise of sole recognition authority. See Sen. Hale, *Memorandum upon Power to Recognize Independence of a New Foreign State*, 29 Cong. Rec. 663, 672 (1867) (Hale Memorandum) ("The number of instances in which the Executive has recognized a new foreign power without consulting Congress * * * has been very great. No objection has been made by Congress in any of these instances. The legislative power has thus for one hundred years impliedly confirmed the view that the right to recognize a new foreign government belonged to the Executive."); 1 *Digest of Int'l Law* § 31, at 162 (Green Haywood Hackworth ed., 1940) (Hackworth) ("Congress has exhibited little inclination to contest the prerogative" of the President, "solely on his own responsibility," to recognize foreign states.).

In an important early example, in 1818, Speaker of the House Henry Clay desired that the United States recognize the independence from Spain of certain South American provinces. Hale Memorandum, 29 Cong. Rec. at 673. He proposed appropriating funds to send a diplomatic minister to those provinces, but the bill was opposed on the ground that it interfered with a power constitutionally assigned to the President. See 32 Annals of Congress 1468-1469 (1817-1818); *id.* at 1539 (statement of Rep. Smith) (Congress should permit the President to "exercise the powers vested in him by the Constitution"); *id.* at 1570 (statement of Rep. Smyth) ("[T]he acknowledgment of the independence of a new Power is

22

an exercise of Executive authority; consequently, for Congress to direct the Executive how he shall exercise this power, is an act of usurpation."). Within the Monroe Administration, Secretary of State John Quincy Adams argued that the recognition decision rested exclusively with the Executive, and he declined to receive an emissary from Buenos Ayres on the ground that doing so would have the effect of recognizing the government. 4 *Memoirs* 88, 205-206; see also *id.* at 166-168. Clay subsequently modified his proposal to acknowledge the President's authority to decide whether to send diplomats to the provinces. 32 Annals of Cong. 1500. Nevertheless, the proposal was overwhelmingly defeated. *Id.* at 1646.

In 1821, Speaker Clay introduced a resolution expressing the House of Representatives' "deep interest" in the "success of the Spanish provinces of South America which are struggling to establish their liberty and independence" and relaying the House's readiness to "give its Constitutional support to the President of the United States, whenever he may deem it expedient to recognise the sovereignty and independence of any of the said provinces." 37 Annals of Cong. 1082. That nonbinding resolution, which acknowledged the President's authority to recognize foreign states and governments, passed the House. *Id.* at 1091-1092. In 1822, four years after Clay's original proposal, the President first recognized an independent South American state. See 6 *Memoirs* 23.

A similar situation arose 74 years later, at the inception of the Spanish-American War. In 1896, the Senate Foreign Relations Committee reported to the Senate a joint resolution purporting to recognize "the independence of the Republic of Cuba." 29 Cong. Rec. 326, 332

23

(1896). In response, the Secretary of State publicly stated that "'[t]he power to recognize the so-called Republic of Cuba as an independent State rests exclusively with the Executive,'" and that any joint resolution would have the effect only of "advice of great weight." *Congress Powerless*, N.Y. Times, Dec. 20, 1896 (quoting statement). The Senate did not act on the joint resolution.

When Congress later considered authorizing military intervention in Cuba's fight against Spain, it again proposed to recognize the independence of the Republic of Cuba and its government. See 31 Cong. Rec. 3988 (1898). In response, President McKinley sent a message to Congress noting that Congress had previously left recognition to the discretion of the Executive and explaining that recognition of the Cuban government would not be "wise or prudent." William McKinley, *Message to Congress, April 11, 1898*, 13 Comp. Messages & Papers of the Presidents 6281, 6288 (n.s. 1909). Congress subsequently dropped from the joint resolution the language concerning Cuba's independence and government, choosing instead to express Congress's view that the "people" of Cuba were independent. Joint Resolution For the recognition of the independence of the people of Cuba, 30 Stat. 738 (Apr. 20, 1898); see also 31 Cong. Rec. at 3902 (1898) (statement of Sen. Stewart).

Similarly, in 1919, the Senate considered a proposed resolution recommending "the withdrawal of the recognition" of the existing government in Mexico. Statement, *reprinted in* S. Doc. No. 285, 66th Cong., 2d Sess. 843D. President Wilson wrote to Congress that the resolution would "constitute a reversal of our constitutional practice which might lead to very grave confusion in

regard to the guidance of our foreign affairs," and that "the initiative in directing the relations of our Government with foreign governments is assigned by the Constitution to the Executive, and to the Executive, only." Letter from Woodrow Wilson to Sen. Albert B. Fall (Dec. 8, 1919), *in* S. Doc. No. 285, 66th Cong., 2d Sess. 843D. Shortly thereafter, the Senate dropped the resolution. See *Wilson Rebuffs Senate on Mexico*, N.Y. Times, Dec. 8, 1919.

As a result of events like these, it has been commonly understood since the Washington Administration that "Congress cannot itself (and cannot direct the President to) recognize foreign states or governments, * * * though it may express its 'sense', and can request or exhort the President." Henkin 88; see *Mistretta* v. *United States*, 488 U.S. 361, 401 (1989) ("[T]raditional ways of conducting government give meaning to the Constitution.") (internal quotation marks, citation, and ellipsis omitted).

### 2. The courts have long acknowledged the Executive's exclusive power to recognize foreign sovereigns

a. This Court and individual Justices have repeatedly reaffirmed that the Constitution assigns to the President alone the authority to recognize foreign states and governments.

As early as 1817, Chief Justice Marshall, sitting as Circuit Justice, held that the jury in a criminal case, in deciding whether the defendant was guilty of piracy, could not consider whether the defendant had acted under a commission from the government of Buenos Ayres because "as our executive had never recognized the independence of Buenos Ayres, it was not competent to the court to pronounce its independence." *United States*