v. *Hutchings*, 26 F. Cas. 440, 442 (C.C.D. Va. 1817). In 1838, Justice Story concluded that "[i]t is very clear, that it belongs exclusively to the executive department of our government to recognise, from time to time, any new governments." *Williams* v. *Suffolk Ins. Co.*, 29 F. Cas. 1402, 1404 (C.C.D. Mass. 1838); cf. *Luther* v. *Borden*, 48 U.S. (7 How.) 1, 44 (1849) ("In the case of foreign nations, the government acknowledged by the President is always recognized" by courts.). And in *Kennett* v. *Chambers*, 55 U.S. (14 How.) 38 (1852), this Court held that "the question whether Texas had or had not at that time become an independent state, was a question for that department of our government exclusively which is charged with our foreign relations." *Id.* at 46-48, 50-51.

This Court reached the same conclusion in its leading decisions addressing the President's recognition power, which arose out of the United States' recognition of the Soviet Union. See *United States* v. *Bank of New York & Trust Co.*, 296 U.S. 463 (1936); *United States* v. *Belmont*, 301 U.S. 324 (1937); *Guaranty Trust Co.* v. *United States*, 304 U.S. 126 (1938); *United States* v. *Pink*, 315 U.S. 203 (1942). In 1933, the Executive Branch normalized relations with the Soviet Union, entering into an agreement with its government to resolve all claims between them. *Belmont*, 301 U.S. at 326-327. In subsequent litigation concerning that agreement, the Court "accept[ed] as conclusive * * * the determination of our own State Department" as to what government represents "the Russian State." *Guaranty Trust*, 304 U.S. at 138; *Pink*, 315 U.S. at 230 ("We would usurp the executive function if we held that [the recognition] decision was not final and conclusive in the courts."); *Belmont*, 301 U.S. at 330. In reliance on the President's

26

authority to recognize foreign governments and to take actions without which "the power of recognition might be thwarted," the Court held that the claims-resolution agreements preempted inconsistent state law.[7]  See *Pink*, 315 U.S. at 229-230; *Belmont*, 301 U.S. at 330-332.

Although these decisions held that the President had "sole" authority to recognize a foreign government, *Belmont*, 301 U.S. at 330, and that such action is "conclusive" on the courts, *Guaranty Trust*, 304 U.S. at 138, they did not specifically concern the constitutionality of a congressional attempt to constrain the President's exercise of his recognition power.  In light of Congress's historical acquiescence in the Executive's exclusive exercise of the recognition power, however, it is unsurprising that the Court had no occasion to address a dispute between the Branches.  And the Court's repeated statements throughout the nineteenth and early twentieth centuries that the recognition power is vested exclusively in the President are significant.  The exchanges between the Legislative and Executive Branches over congressional attempts to share or constrain the President's recognition authority, and Congress's ultimate acquiescence in Executive authority, were well publicized and recurring.  Yet the Court never suggested that Congress might have a role in recognizing foreign states or governments, or even that it was an open question whether Congress had any role.  In addition, the Court's locating of the exclusive recognition power in the Presi-

---

[7]  Petitioner contends (Br. 39) that the Court's affirmation of Executive authority in these cases was dicta.  To the contrary, the Court upheld the United States' exercise of rights under an assignment from the Soviet government based on the Court's understanding that the assignment was a component part of the Executive Branch's recognition of the Soviet government.  *Pink*, 315 U.S. at 229-230.

dent necessarily follows from the Court's affirmation of the "plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations" and its emphasis on the importance of avoiding conflicting foreign-policy pronouncements among the three Branches. *United States* v. *Curtiss-Wright Export Corp.*, 299 U.S. 304, 319-320 (1936) (citing John Marshall's statement that "[t]he President is the sole organ of the nation in its external relations, and its sole representative with foreign nations"); *Belmont*, 301 U.S. at 330; *Williams* v. *Suffolk Ins. Co.*, 38 U.S. (13 Pet.) 415, 420 (1839).

In the decades following the *Pink* line of decisions, moreover, the Court has often reaffirmed that the recognition power is exclusively vested in the Executive. See, *e.g.*, *National City Bank* v. *Republic of China*, 348 U.S. 356, 358 (1955) ("The status of the Republic of China in our courts is a matter for determination by the Executive and is outside the competence of this Court."); *Banco Nacional de Cuba* v. *Sabbatino*, 376 U.S. 398, 410 (1964) ("Political recognition [of a foreign government] is exclusively a function of the Executive."); *Baker* v. *Carr*, 369 U.S. 186, 212 (1962); *United States* v. *Lara*, 541 U.S. 193, 218 (2004) (Thomas, J., concurring in the judgment).

b. Petitioner contends that the recognition power is not exclusive because "dicta in this Court's opinions * * * assign the recognition power jointly to the President and to Congress." Pet. Br. 39. That is incorrect. The decisions on which petitioner relies do not involve the power to recognize foreign governments. Rather, they concern territories controlled or acquired by the United States, which are subject to Congress's Article IV power to legislate regarding "the Territory or other

28

Property belonging to the United States."[8]  See U.S. Const. Art. IV, § 3, Cl. 2; Henkin 72.  Thus, in *Jones* v. *United States*, 137 U.S. 202 (1890), the Court observed that whether certain islands were "in the possession of the United States" was a determination for the "legislative and executive departments."  *Id.* at 212, 216-217.  In *Vermilya-Brown Co.* v. *Connell*, 335 U.S. 377 (1948), the Court observed that whether the United States exercised sovereignty within a leasehold in British territory depended on action by the "legislative and executive departments."  *Id.* at 378, 380-381.  In *Boumediene* v. *Bush*, 553 U.S. 723, 753 (2008), the Court discussed the United States' plenary control over territory at Guantanamo Bay, observing that "questions of sovereignty are for the political branches to decide."[9]  These decisions thus acknowledge Congress's role in determining the United States' sovereignty over its territories, but they have no bearing on the Executive's authority to determine whether to recognize a foreign state or its sovereignty over particular territory when the United States claims no property interest in the land.

---

[8]  Petitioner's reliance (Br. 39-40) on the Hare-Hawes-Cutting Act, ch. 11, § 10, 47 Stat. 761, 768 (1933), and the Tydings-McDuffie Act, ch. 84, § 10(a), 48 Stat. 456, 463 (1934), is misplaced for the same reason. In those statutes, Congress relinquished the United States' interest in the Philippines.  See Proclamation of Dec. 10, 1898, 30 Stat. 1754, 1755.

[9]  In *Cherokee Nation* v. *Georgia*, 30 U.S. (5 Pet.) 1 (1831), the Court held that an Indian nation is not a "foreign state" within the meaning of Article III, as Indian nations "are considered as within the jurisdictional limits of the United States." *Id.* at 17.

### 3. The President's recognition power includes the authority to determine the territorial limits of foreign states

The President's recognition power is "not limited to a determination of the government to be recognized"; rather it "includes the power to determine the policy which is to govern the question of recognition" and the power to ensure that recognition policy is consistent with the United States' foreign-policy interests. *Pink*, 315 U.S. at 229. That broad authority is necessary to ensure the President's "[e]ffectiveness in handling the delicate problems of foreign relations." *Ibid.*

The determination of foreign territorial borders for purposes of United States law is an essential component of the recognition power and therefore falls within the President's exclusive authority. See Henkin 43; 1 Hackworth § 66, at 446-447. The ability to recognize the existence of a foreign state must include the subsidiary power to determine the United States government's position as to the boundaries of that state. The determination of territorial sovereignty may have foreign-policy consequences fully as significant as the determination whether to recognize the state itself, and weighing those consequences is part of "the historic conception of the powers and responsibilities of the President in the conduct of foreign affairs." *Pink*, 315 U.S. at 230; cf. Hale Memorandum, 29 Cong. Rec. at 679. Moreover, the President's power to recognize a foreign state would be rendered ineffective if Congress could undermine that recognition by enacting a statute that refused to accept the state's territorial boundaries recognized by the President, or that purported to extend recognition of broader

territorial sovereignty.[10] See *Pink*, 315 U.S. at 230. Any such exercise of congressional authority would also undermine the Executive's ability "to speak as the sole organ of [the national] government" with regard to recognition. See *Belmont*, 301 U.S. at 330.

This Court has long acknowledged that the authority to determine the territorial limits of foreign states is essential to the effective exercise of the President's recognition power. In *Williams*, for instance, insurance coverage turned, in part, on whether the Falkland Islands came within the jurisdiction of the government of Buenos Ayres. 38 U.S. at 419. The Court held that "when the executive branch of the government, which is charged with our foreign relations, shall in its correspondence with a foreign nation assume a fact in regard to the sovereignty of any island or country, it is conclusive on the judicial department." *Id.* at 420. As a result, the Executive's determination that the islands were not part of Buenos Ayres was "obligatory on the people and government of the Union." *Ibid.* Since *Williams*, courts have consistently held that Executive Branch determinations of foreign territorial boundaries are binding as a matter of United States law. See, *e.g.*, *Kennett*, 55 U.S. at 50-51; *Baker*, 369 U.S. at 212; *Occidental of Umm al Qaywayn, Inc.* v. *A Certain Cargo of Petroleum*, 577 F.2d 1196, 1203 (5th Cir. 1978), cert. denied, 442 U.S. 928 (1979); *Wang* v. *Masaitis*, 416 F.3d 992, 995 (9th Cir. 2005).[11]

_____

[10] A foreign state's territorial boundaries also may be recognized by treaty. See, *e.g.*, *Kennett*, 55 U.S. at 46. Whether to enter into a treaty, however, remains within the Executive's sole discretion.

[11] Petitioner contends (Br. 40) that this Court has suggested that Congress may determine "the borders of a sovereign that has been recognized." The decisions on which petitioner relies are inapposite, as

31

### B. The Executive Has Inherent Constitutional Authority To Determine The Content Of Passports To Implement Foreign Policy

This Court has acknowledged that a passport is an instrument of foreign policy and national security. See *Haig* v. *Agee*, 453 U.S. 280, 294 (1981). The Executive Branch has constitutional authority to issue passports and to determine their form and content in the exercise of the President's broad power to conduct the Nation's foreign relations. Although Congress may enact legislation pertaining to passports that is necessary and proper to implement its own enumerated foreign-affairs powers, it may not regulate passports in a manner that constrains the President's exclusive authority to determine the content of passports insofar as it pertains to the conduct of diplomacy and the Nation's foreign policy.

1. A passport, this Court has explained, is an instrument of diplomacy, see *Agee*, 453 U.S. at 292-293, through which the President, on behalf of the United States, "in effect request[s] foreign powers to allow the bearer to enter and to pass freely and safely, recognizing the right of the bearer to the protection and good offices of American diplomatic and consular officers," *United States* v. *Laub*, 385 U.S. 475, 481 (1967). Thus, although a passport functions on one level as a "travel control document" that provides "proof of identity and proof of allegiance to the United States," it is also an official communication "by which the Government vouches for the bearer and for his conduct." *Agee*, 453 U.S. at 293; 3 Hackworth § 268, at 499 ("A passport is

---

they concerned whether certain land was within United States territory. See *Jones*, 137 U.S. at 216; *Percy* v. *Stranahan*, 205 U.S. 257, 263 (1907).

32

not merely evidence or prima facie evidence of citizenship. * * * [T]he passport is a request for the good offices of the foreign government."); see also *Urtetiqui* v. *D'Arcy*, 34 U.S. (9 Pet.) 692, 699 (1835) (passport is "addressed to foreign powers, * * * and is to be considered rather in the character of a political document").

Because a passport is a diplomatic document through which the President communicates with foreign sovereigns, the Executive's authority to issue passports historically has been understood to flow directly from its constitutional power over "the national security and foreign policy of the United States." *Agee*, 453 U.S. at 293. From the time of the Founding, the Department of State routinely issued passports to citizens, even though no statute addressed the Executive Branch's authority to do so until 1856. See, *e.g.*, Department of State, *The American Passport* 8-21 (1898) (*American Passport*) (collecting examples); *Urtetiqui*, 34 U.S. (9 Pet.) at 699. The State Department also determined the content of the passports it issued, see *American Passport* 77-86, an authority that flowed naturally from passports' character as instruments of official communication to other nations. Because "[t]he President's authority to act, as with the exercise of any governmental power, 'must stem either from an act of Congress or from the Constitution itself," *Medellín* v. *Texas*, 552 U.S. 491, 524 (2008) (quoting *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U.S. 579, 585 (1952)), that early practice is evidence of the President's constitutional authority. This Court has recognized that this practice reflected the contemporary and "generally accepted view" that passport issuance fell within "the province and responsibility of the Executive" for foreign affairs. *Agee*, 453 U.S. at 293-294.

33

Congress has historically "endorsed not only the underlying premise of Executive authority in the areas of foreign policy and national security, but also its specific application to the subject of passports." *Agee*, 453 U.S. at 294. When Congress enacted the first Passport Act in 1856, it did so not to provide authority that was previously lacking, but rather to "confirm[] an authority already possessed and exercised by the Secretary of State" and to establish that the Secretary's authority was exclusive of local governments. Staff of Senate Comm. on Gov't Operations, 86th Cong., 2d Sess., *Reorganization of the Passport Functions of the Dep't of State* 13 (Comm. Print 1960); *Agee*, 453 U.S. at 294 & n.27. Accordingly, the 1856 statute, using "broad and permissive language," *Agee*, 453 U.S. at 294, provided that "the Secretary of State shall be authorized to grant and issue passports * * * under such rules as the President shall designate."[12] Act of Aug. 18, 1856, ch. 127, 11 Stat. 60; see Rev. Stat. § 4075 (1875) (replacing "shall be authorized" with "may").

2. Because a passport is a diplomatic instrument addressed to other nations, the Executive Branch has the sole authority to determine the content of passports insofar as it pertains to the President's exclusive authority to conduct foreign relations. See *Curtiss-Wright*, 299 U.S. at 319 (the President is the sole "representative of the nation" in foreign affairs); see also *Agee*, 453 U.S. at

---

[12] In light of this history, and this Court's explanation of the Executive Branch's inherent authority over the issuance of passports, amici Members of Congress are mistaken in asserting that "Congress has sole and exclusive authority under the Constitution" over passports and that Congress "has expressly delegated day-to-day administration to the Secretary of State." Members of the U.S. Senate and the U.S. House of Representatives Amicus Br. 6.

34

292-294. Congress, of course, has the constitutional authority to regulate passports in furtherance of its enumerated powers, including its powers over immigration and foreign commerce. But Congress may not regulate passports in a manner that interferes with the President's exclusive authority over passports insofar as they pertain to his representation of the Nation in foreign-relations matters.

This conclusion is reinforced by the Branches' practice with respect to passport regulation. The current Passports Act continues to provide that the Secretary of State "may grant and issue passports * * * under such rules as the President shall designate and prescribe," 22 U.S.C. 211a, and the issuance of United States passports, and the content thereof, are primarily governed by State Department regulations and rules. See 22 C.F.R. 51.1-51.74; 7 *FAM* 1300. Congress has passed relatively few statutes governing passports, and those statutes overwhelmingly regulate matters that fall within Congress's powers without impinging on the Executive's authority to use passports as diplomatic communications or instruments of foreign policy. On the rare occasion when Congress has attempted to use passport regulation to interfere with the President's exclusive authority to speak for the Nation in foreign-relations matters, see *Curtiss-Wright*, 299 U.S. at 319, the Executive has declined to enforce the provisions.

a. Passport legislation generally comes in two varieties, both of which are ancillary to the Executive's control over passports' communicative foreign-relations function. *First*, Congress has enacted legislation that furthers Congress's enumerated powers without touching on passports' uses as instruments of foreign relations. See U.S. Const. Art. I, § 8, Cls. 3, 4, 18. For example,

35

Congress has enacted travel control statutes that require U.S. citizens to have passports for certain travel. 8 U.S.C. 1185(b) (Supp. I 2007); see, *e.g.*, Act of Feb. 4, 1815, ch. 31, § 10, 3 Stat. 199; Act of May 22, 1918, ch. 81, §§ 1, 2, 40 Stat. 559. These statutes implement Congress's authority to control the borders under its powers over foreign commerce and the exclusion of aliens, but they are premised on the Executive's authority to issue and deny passports. See *Agee*, 453 U.S. at 294; U.S. Const. Art. I, § 8, Cls. 3, 4. Similarly, Congress has used its foreign commerce power, among others, to restrict the ability of U.S. citizens who have been convicted of certain sexual tourism and drug trafficking offenses, or who are delinquent in child support payments, to obtain passports, in order to control their travel outside of the United States. 22 U.S.C. 212a (Supp. II 2008), 2714; 42 U.S.C. 652. Congress has also limited the issuance of passports to aliens abroad in aid of its control over immigration and naturalization. Act of Feb. 28, 1803, ch. 9, § 8, 2 Stat. 205; see 22 U.S.C. 212. Finally, Congress has historically criminalized violations of passports and safe conducts in aid of its authority to "define and punish * * * Offences against the Law of Nations." U.S. Const. Art. I, § 8, Cl. 10; see Act of Apr. 30, 1790, ch. 9, § 28, 1 Stat. 118. None of these statutes encroaches upon the Executive's authority to determine passports' content in furtherance of the United States' foreign-policy interests.

*Second*, Congress has enacted passport legislation that assists the Executive in implementing its authority over passports. See U.S. Const. Art. I, § 8, Cl. 14. For instance, Congress has prohibited the issuance of passports by anyone but the Secretary of State. 22 U.S.C. 211a. It has also limited imposition of geographic travel

36

restrictions in passports to implement provisions of the Helsinki Accords, which President Ford signed on behalf of the United States. *Ibid.*; see Foreign Relations Authorization Act, Fiscal Year 1979, Pub. L. No. 95-426, § 124, 92 Stat. 971 (1978). Similarly, provisions requiring verification of passport applications, 22 U.S.C. 213, and regulating fees, 22 U.S.C. 214 and 214a, 10 U.S.C. 2602, time limits, 22 U.S.C. 217a, and notification of the Secretary of passports issued abroad, 22 U.S.C. 218, also facilitate the State Department's administration of passports.

b. On occasion, Congress has enacted legislation that encroaches on the President's constitutional foreign-affairs authority over the issuance and content of passports. When that has happened, the Executive Branch has declined to enforce the offending provision.

In 1991, for example, Congress enacted legislation purporting to prohibit the State Department's policy of issuing two passports to United States government officials traveling in the Middle East. Foreign Relations Authorization Act, Fiscal Years 1992 and 1993, Pub. L. No. 102-138, § 129(d) and (e), 105 Stat. 647, 661-662 (1991); Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1992, Pub. L. No. 102-140, § 503, 105 Stat. 782, 820 (1991). The State Department had adopted that policy in response to the practice of many Arab League nations of denying entry to persons with passports indicating travel to Israel. *Ibid.* In signing the legislation, President Bush issued a statement explaining that it could interfere with the Executive's sole constitutional authority to conduct the Nation's diplomacy. *Statement on Signing*, Pub. Papers 1344-1345 (Oct. 21, 1991). Subsequently, in a formal opinion, OLC concluded that the

37

provisions purporting to limit the issuance of duplicate passports impermissibly infringed, among other things, the Executive's exclusive "authority over issuance of passports for reasons of foreign policy or national security." See *Issues Raised by Provisions Directing Issuance of Official or Diplomatic Passports*, 16 Op. Off. Legal Counsel 18, 22 (1992). OLC accordingly advised the President that he was constitutionally authorized to decline to implement the relevant provisions. *Id.* at 26-28; 31-37; see *id.* at 19 n.2.

## II. THE STATE DEPARTMENT'S PASSPORT POLICY IMPLEMENTS THE PRESIDENT'S DECISION NOT TO RECOGNIZE ANY STATE AS HAVING SOVEREIGNTY OVER JERUSALEM

A. The State Department's policy of listing "Jerusalem," not "Israel," as the place of birth in passports and consular reports of birth abroad for U.S. citizens born in Jerusalem implements the United States' policy, as determined by the Executive Branch, of not recognizing any national sovereignty over that city. J.A. 49-50. It is also an exercise of the President's inherent constitutional authority to determine the content of passports insofar as it pertains to his conduct of foreign policy.[13]

The State Department's decision regarding how to signify a place of birth is an exercise of the President's recognition power. The primary function of the place-of-birth entry on a passport or a report of birth abroad is to assist in identifying the passport holder and to distin-

---

[13] Issuance of reports of birth abroad is not an exercise of the President's passport power. The designation of place of birth on a consular report of birth abroad is, however, an implementation of the President's recognition power insofar as it identifies a foreign state having sovereignty over that place.

38

guish the individual from other persons having similar names. J.A. 67; see Pet. Br. 49. But the decision as to how to describe the place of birth—*i.e.*, to list a particular country name, or to designate a particular city or region as being within a country—operates as an official statement of whether the United States recognizes a state's sovereignty over a territorial area. See J.A. 56.

Accordingly, the State Department has issued rules designed to ensure that place-of-birth designations are consistent with the United States' recognition policies. See generally 7 *FAM* 1383. While "[a]s a general rule," the Department lists the "country of the applicant's birth" in passports, the Department's policy is to refrain from listing as a place of birth a country whose sovereignty over the relevant territory the United States does not recognize. See, *e.g.*, 7 *FAM* 1383.5-1. To this end, the State Department maintains detailed rules governing the manner in which the place of birth should be described, so as to be consistent with the President's recognition decisions. See 7 *FAM* 1383 (guidance for designating the place of birth for locations where sovereignty is in dispute or not recognized). The State Department's policy to designate "Jerusalem" as the place of birth in passports and on consular reports of birth abroad is thus a specific—and particularly sensitive—application of the Department's broader policy of ensuring that place-of-birth designations are consistent with United States recognition policy.

Not listing "Israel" as the place of birth in passports of U.S. citizens born in Jerusalem is a "manifestation" of the United States' policy of not recognizing any state's sovereignty over Jerusalem, J.A. 52, because the State Department has determined that listing "Israel" as the place of birth would constitute "an official decision by

39

the United States to begin to treat Jerusalem as a city located within Israel." J.A. 50. That would "represent a dramatic reversal of the longstanding foreign policy of the United States for over half a century, with severe adverse consequences for U.S. national security interests." *Ibid.*

B. Petitioner argues (Br. 34, 43) that the Executive's policy not to designate "Israel" as the place of birth in passports of U.S. citizens born in Jerusalem is not an exercise of the recognition power because place-of-birth designations are not limited exclusively to "sovereigns that the United States has formally recognized." That argument reflects a misunderstanding of the State Department's policy. The policy is not one of listing only a recognized sovereign as a citizen's place of birth; rather, it is one of avoiding listing as a place of birth a country whose sovereignty over the relevant territory the United States does not recognize. As a result, there are many instances in which the State Department's passport rules permit or require listing cities or other geographic regions as the place of birth, see, *e.g.*, 7 *FAM* 1383.5-2 (Disputed Territory); 7 *FAM* 1383.6 (City of Birth Listing). The State Department's policy concerning Jerusalem is fully consistent with that policy.[14]

---

[14]  Contrary to petitioner's argument (Br. 50-52), the State Department's practice with respect to Taiwan is consistent with the overarching policy of describing the place of birth using a geographic area whose designation does not conflict with the United States' recognition policies. In 1994, Congress directed the Secretary of State to permit U.S. citizens born in Taiwan to record "Taiwan" as their place of birth rather than "China." See Foreign Relations Authorization Act, Fiscal Years 1994 and 1995, Pub. L. No. 103-236, § 132, 108 Stat. 382, 395 (1994), as amended by Act of Oct. 25, 1994, Pub. L. No. 103-415, § 1(r), 108 Stat. 4299, 4302; J.A. 153-155. The State Department initially opposed this change. See J.A. 175-176. It subsequently elected to designate Taiwan

40

Petitioner erroneously asserts (Br. 46) that the place-of-birth designation does not implement the President's recognition power because placing "Israel" on passports of U.S. citizens born in Jerusalem would have a "negligible or trivial impact" on U.S. foreign policy.[15] See *id.* at 46-52. The President's recognition power, however, "includes the power to determine the policy which is to govern the question of recognition." *Pink*, 315 U.S. at 229. It is not dependent on a showing that a

---

when requested by the applicant, after determining that doing so would be consistent with the United States' recognition that the People's Republic of China is the "sole legal government of China" and "Taiwan is a part of China." J.A. 154. Accordingly, although the State Department permitted listing "Taiwan," it directed that "[p]assports may not, repeat NOT, be issued showing place of birth as 'Taiwan, China'; 'Taiwan, Republic of China'; or 'Taiwan, ROC'" because such designations would suggest recognition of Taiwan's independence from the People's Republic of China. *Ibid.*

Here, in contrast, the State Department has concluded that designating "Israel" as the place of birth for U.S. citizens born in Jerusalem would take a position on Israel's sovereignty over Jerusalem in a manner that directly conflicts with United States policy. The Department's decisions concerning Jerusalem and Taiwan are each quintessential foreign-policy judgments based on the respective facts of each situation. See *Chicago & S. Air Lines* v. *Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948). Accord Pet. App. 41a-42a (Edwards, J., concurring).

[15] Petitioner maintains that no adverse consequences have followed when State Department officials mistakenly list "Israel" as the place of birth in passports and reports of birth of U.S. citizens born in Jerusalem, as occasionally happens. Pet. Br. 50; see Zionist Org. of Am. Amicus Br. (documenting erroneous references to "Jerusalem, Israel" by Executive Branch agencies). But "these clerical errors have not had an adverse impact on the foreign policy interests of the United States because they are just that—clerical errors, and did not constitute official statements of United States policy." Pet. App. 76a. When the State Department becomes aware of such errors, it seeks to correct them.

41

particular recognition policy is necessary to avoid adverse foreign-policy consequences. In any event, petitioner's argument seeks to supplant the Executive's foreign-policy judgments with his own. That he cannot do. See, *e.g.*, *Regan* v. *Wald*, 468 U.S. 222, 242-243 (1984). For over six decades, the Executive has followed a policy of not recognizing any state's sovereignty over Jerusalem, precisely because of the unique sensitivity surrounding the issue. The State Department's passport practice implements that policy, and deviation from that longstanding position would cause grave adverse foreign-relations and national-security consequences. J.A. 48-56.

III.  **PETITIONER'S CLAIMED RIGHT TO HAVE "ISRAEL" LISTED AS THE PLACE OF BIRTH IN HIS PASSPORT PRESENTS A NONJUSTICIABLE POLITICAL QUESTION**

A.  **The Political Question Doctrine Holds That Courts May Not Review Discretionary Decisions That Are Textually Committed To A Political Branch**

The political question doctrine is "primarily a function of the separation of powers," *Baker*, 369 U.S. at 210, and "is designed to restrain the Judiciary from inappropriate interference in the business of the other branches of Government," *United States* v. *Munoz-Flores*, 495 U.S. 385, 394 (1990). The doctrine "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n* v. *American Cetacean Soc'y*, 478 U.S. 221, 230 (1986). A ruling that a plaintiff's claim presents a political question is thus a conclusion that the "final determi-

nation" of the issue should be left to the political Branches. *Coleman* v. *Miller*, 307 U.S. 433, 454-456 (1939) (application of the doctrine turns on the "appropriateness under our system of government of attributing finality to the action of the political departments and also the lack of satisfactory criteria for a judicial determination"); *Gilligan* v. *Morgan*, 413 U.S. 1, 10 (1973).

In *Baker*, this Court identified six characteristics "[p]rominent on the surface of any case held to involve a political question." 369 U.S. at 217. At issue here is the first *Baker* factor: whether there is "a textually demonstrable constitutional commitment of the issue to a coordinate political department." *Ibid.* Determining whether a case implicates the first *Baker* factor calls for the court first to ascertain the issue that the plaintiff's complaint seeks to have the court resolve, and then to consider whether that issue is one for which the Constitution vests "ultimate responsibility * * * in branches of the government which are periodically subject to electoral accountability." *Gilligan*, 413 U.S. at 10. The inquiry thus entails "interpret[ing] the [constitutional] text in question and determin[ing] whether and to what extent the issue is textually committed" for final determination by a political branch of government. *Nixon* v. *United States*, 506 U.S. 224, 228 (1993); see *id.* at 238 (determining the existence and extent of textual commitment "is itself a delicate exercise in constitutional interpretation, and is a responsibility of this Court as ultimate interpreter of the Constitution" (quoting *Baker*, 369 U.S. at 211)).

Accordingly, when a court determines that the plaintiff's claim seeks judicial review of the exercise of a discretionary power that is textually committed for final resolution to a political Branch, or seeks relief that

43

would require the court to overturn a textually commit-ted decision, the court must decline to adjudicate that question. See *Nixon*, 506 U.S. at 228-229 (declining to review a challenge to the constitutionality of the Sen-ate's procedures for impeachment trial, because the Im-peachment Trial Clause commits resolution of that issue to the Senate's sole discretion); *Gilligan*, 413 U.S. at 9-10 (case presented a political question where granting relief would entail overturning the military's existing training and weaponry standards, which reflected "the type of governmental action that was intended by the Constitution to be left to the political branches"); *Baker*, 369 U.S. at 217.

### B. A Plaintiff's Reliance On A Statutory Right Cannot Overcome A Constitutional Commitment Of A Decision To A Political Branch

1. When the Constitution assigns final resolution of a question to a political Branch, Congress may not over-ride that assignment—and thereby convert an otherwise nonjusticiable political question into a matter to be adju-dicated in court—by enacting a statute that purports to confer a right to have the courts resolve the issue. See *Sierra Club* v. *Morton*, 405 U.S. 727, 732 n.3 (1972) ("Congress may not confer jurisdiction on Art. III fed-eral courts * * * to resolve 'political questions,' be-cause suits of this character are inconsistent with the judicial function under Art. III." (internal citation omit-ted)). Thus, for example, this Court has held that a stat-utory right to judicial review did not render justiciable a challenge to an agency order that became final only after the President had concluded that it was consistent with foreign-policy and national-security considerations. *Chicago & S. Air Lines* v. *Waterman S.S. Corp.*, 333

44

U.S. 103, 114 (1948). That presidential determination, the Court held, was an "executive decision[] as to foreign policy" and thus was "in the domain of political power not subject to judicial intrusion or inquiry," even though Congress had enacted a statute that on its face could be read to authorize judicial review of the President's decision. *Id.* at 111 (citing *Coleman*, 307 U.S. at 454, and *Curtiss-Wright*, 299 U.S. at 319-321); see also *Vieth* v. *Jubelirer*, 541 U.S. 267, 278 (2004) (plurality opinion) (citing *Waterman* for the proposition that "'[t]he judicial Power' created by Article III, § 1, of the Constitution is not * * * *whatever* Congress chooses to assign" to the courts (citations omitted)).

At the same time, "one of the Judiciary's characteristic roles is to interpret statutes, and [courts] cannot shirk this responsibility merely because [their] decision may have significant political overtones." *Japan Whaling*, 478 U.S. at 230. The interpretation of statutes is, moreover, a "recurring and accepted task for the federal courts." *Ibid.* Accordingly, a court must undertake a careful inquiry into the nature of the plaintiff's statutory claim and the interaction of that claim with the constitutional commitment at issue in order to determine whether the claim raises a political question. See *Baker*, 369 U.S. at 217 (determination of whether a case involves a political question requires a "discriminating inquiry into the precise facts and posture of the particular case").

Thus, the court should assess the plaintiff's claim to determine whether it seeks relief that would dictate or set aside a determination that the Constitution commits to a coordinate Branch. See *Gilligan*, 413 U.S. at 10; *El-Shifa Pharm. Indus. Co.* v. *United States*, 607 F.3d 836, 842 (D.C. Cir. 2010) (en banc), cert. denied, 131 S. Ct.

45

997 (2011). Because the Constitution confers on the judiciary the authority to determine whether a statute is constitutional, a suit seeking invalidation of a statute rarely would raise a political question. See *INS* v. *Chadha*, 462 U.S. 919, 943 (1983). But, for instance, a suit challenging the constitutionality of a statute in one of the rare areas in which the Constitution grants Congress or one of its Houses sole authority to determine constitutionality *would* present a political question. Thus, *Nixon*'s holding that a challenge to the constitutionality of a Senate rule governing impeachment trials was a political question presumably would have been the same had the Senate rule been incorporated in a statute, or had Congress enacted a statute that purported to dictate different procedures for the Senate to follow in such trials. 506 U.S. 228-238. Similarly, when a plaintiff seeks to *rely* on a statute to challenge in court a decision by the Executive, the fact that a statute is involved does not determine whether the suit presents a political question; rather, that issue turns on whether the relief sought would require the court to direct or overturn a decision that is the sole constitutional responsibility of the Executive.

In determining whether an issue presents a political question because the Constitution assigns the matter to a coordinate Branch of government, a court must consider not only whether there is a textual commitment, but also the scope of that commitment. See *Powell* v. *McCormack*, 395 U.S. 486, 521 (1969). The court should therefore construe the statute in order to assess whether enforcement of the asserted statutory right would require the court to direct or review a decision

46

taken by another Branch that is within the scope of the textual commitment.[16]

2. When a court, having ascertained the nature of the plaintiff's statutory claim and the existence and scope of a textual commitment, determines that the plaintiff's request for relief requires the court to pass on the validity of a decision constitutionally committed to the discretion of a political Branch, the appropriate disposition is to dismiss the suit. In such a case, the existence of a statutory right does not alter the fundamental characteristic that makes the suit nonjusticiable: the plaintiff's claim asks the court to review and set aside a decision that the court has determined is vested by the Constitution in a political Branch. Congress cannot, by creating a statutory right, confer on the courts the authority to decide a question that the Constitution commits to the Executive. See *Waterman*, 333 U.S. at 111, 114 (despite Congress's enactment of a statute that could be read to authorize judicial review, courts may not review President's determination pursuant to statute regarding foreign air carrier routes because resolution of foreign-policy issues is by nature political, not judicial).

That is equally true when Congress, in purporting to confer statutory authority to consider a question that is textually committed to a political Branch, also delineates

---

[16] In his concurrence in the judgment in *El-Shifa*, Judge Kavanaugh suggested that applying the political question doctrine in a case alleging that the Executive Branch has violated a statute "may *sub silentio* expand executive power in an indirect, haphazard, and unprincipled manner." 607 F.3d at 857. But because the political question inquiry entails considering whether the Executive has exclusive Article II authority over the issue and whether the plaintiff's statutory claim falls within that constitutional assignment, there is little such risk.

standards to guide the court's adjudication of the issue. To be sure, an issue that is textually committed to a political Branch would typically lack discernible standards that the judiciary could use to resolve the issue in any event. See *Nixon*, 506 U.S. at 228-229. Congress's provision of statutory guidelines might appear to simplify the court's task, were it to adjudicate whether the plaintiff was entitled to relief on the merits. Nonetheless, once the court has determined that the Constitution textually commits final resolution of an issue to a political Branch, Congress's provision of standards for the court to apply in reviewing the political Branch's decision would not alter the conclusion that the relief sought is prohibited by the political question doctrine. See *Gilligan*, 413 U.S. at 9-10 (claim seeking judicial "oversight" of military training requirements was a political question, even though the judicial relief might involve "simply order[ing] compliance with the standards set by Congress and/or the Executive") (citation omitted); *El-Shifa*, *supra* (suit challenging President's decision to destroy Sudanese plant presented a political question despite plaintiffs' reliance on Administrative Procedure Act).

Petitioner is thus incorrect in arguing (Br. 30-32) that *Japan Whaling* suggests that a statutory claim cannot present a political question because the court need only interpret the statute in order to grant relief. *Japan Whaling* did not involve a statute that purported to confer authority on the courts to review a discretionary decision textually committed by the Constitution to another Branch. Rather, the plaintiffs claimed that the Secretary of Commerce had a statutory duty to certify that Japanese nationals were conducting fishing operations in a manner that would undermine the effective-

ness of international conservation programs; it was un-
disputed that the Executive's authority and responsibil-
ity to decide whether to certify Japan were themselves
created by a statute—which was enacted pursuant to
Congress's Article I power to regulate commerce with
foreign nations.    478 U.S. at 224-229.    Certain
intervenors in *Japan Whaling* nevertheless argued that
the case presented a political question because of the
"danger of embarrassment" from multiple "pronounce-
ments by various departments."    *Id.* at 229 (citing
*Baker*, 369 U.S. at 217).  The Court rejected that argu-
ment, concluding that the potential "political overtones"
of its decision did not alter the fact that whether the
Secretary had properly exercised his statutory authority
presented a "purely legal question of statutory interpre-
tation." *Id.* at 230. *Japan Whaling* thus has no bearing
on statutes that purport to authorize judicial review of
an Executive decision in an area that is constitutionally
committed to the Executive's sole discretion.

C.  **Petitioner's Claim Based On Section 214(d) Presents A Nonjusticiable Political Question**

1.  Petitioner's claim under Section 214(d) seeks to
overturn the State Department's policy not to list "Is-
rael" as the place of birth in passports of U.S. citizens
born in Jerusalem. Section 214(d), by purporting to give
petitioner the right to have the State Department indi-
cate in petitioner's passport that he was born in Israel,
seeks to effect a reversal of the Executive Branch's rec-
ognition policy with respect to Jerusalem.[17]  Indeed, the

---

[17] As the Attorney General's letter to the Senate explained, although
President Bush directed that Section 214 be construed as advisory,
"[n]either of the courts below construed Section 214(d) as advisory only.
The Department of Justice did not renew that argument in its response

49

evident purpose of Section 214(d) is to establish "United States policy with respect to Jerusalem as the capital of Israel." § 214, 116 Stat. 1365 (capitalization altered). Section 214(d) is thus an attempt, through the indirect means of judicial enforcement of a purported statutory right, to alter Executive Branch policy on a matter of major international sensitivity by requiring the Secretary to represent in passports—official documents addressed to foreign nations—that the United States recognizes Israel's claimed sovereignty over Jerusalem.

The right purportedly granted by Section 214(d) is irreconcilable with the Executive's textually committed authority. The Constitution assigns exclusively to the President the discretion to recognize foreign states, their governments, and their territorial boundaries. See pp. 18-30, *supra*. The President also has the sole power to determine the form and content of passports insofar as they implement such foreign policy determinations that the Constitution commits exclusively to the President. See pp. 31-37, *supra*. And here, the State Department's passport policy is an implementation of the President's decision not to recognize any state as having sovereignty over Jerusalem. See J.A. 52; Pet. App. 35a (Edwards, J., concurring).

Adjudicating petitioner's claim under Section 214(d) would thus entail judicial review of a recognition decision that the Constitution commits to the Executive Branch, and therefore presents a political question beyond the power of the courts to decide. See *Pink*, 315 U.S. at 229 ("Objections to the underlying policy as well as objections to recognition are to be addressed to the

---

to the petition for rehearing en banc in the court of appeals, and the Executive Branch is no longer relying on that argument." Holder Letter 3.

political department and not to the courts."); *Baker*, 369 U.S. at 212 ("[T]he judiciary ordinarily follows the executive as to which nation has sovereignty over disputed territory."). Because "[o]nly the Executive—not Congress and not the courts—has the power to define U.S. policy regarding Israel's sovereignty over Jerusalem and decide how best to implement that policy," Pet. App. 12a-13a, Congress may not confer authority on the courts to set aside the Executive's recognition decision. The fact that Section 214(d) pertains to passports— which Congress has some authority to regulate as necessary and proper to implementing its enumerated powers—does not take the provision outside the scope of the textual commitment to the Executive Branch. Cf. *Powell*, 395 U.S. at 519. The President has exclusive power to determine the content of passports as it relates to foreign policy, including recognition determinations. See pp. 31-37, *supra.*

Accordingly, Section 214(d), by purporting to require the Secretary to alter the contents of passports to implement Congress's view that Jerusalem should be recognized as the capital of Israel, regulates passports in an area that is constitutionally committed to the Executive. See *Mistretta*, 488 U.S. at 382. This Court is presented here with a "rare exception[] in which a statute call[s] for a decision constitutionally committed to the President and hence not subject to judicial review." *El-Shifa*, 607 F.3d at 851-852 (Ginsburg, J., concurring in the judgment).[18]

---

[18] Petitioner argues that the recognition power is shared between the Executive and Congress. Pet. Br. 41-42. That contention is mistaken. See pp. 18-30, *supra.* But even if petitioner were correct, his suit would nevertheless present a political question because there would be no judicially manageable standards by which a court could adjudicate a

51

2. Petitioner contends (Br. 29), relying on separation-of-powers cases, that the "*only* issue" for the Court is "whether Congress has the constitutional authority to enact Section 214(d)." Petitioner's assertion that his reliance on a statute precludes application of the political question doctrine is misplaced for the reasons discussed above. See pp. 43-48, *supra.* Moreover, because petitioner's claim seeks judicial review of a decision that is textually committed to the Executive, his claim is distinguishable from the separation-of-powers decisions on which he relies. In those cases, the question the plaintiff asked the court to decide—namely, whether a particular statutory provision enacted pursuant to Congress's enumerated powers was consistent with the structural provisions of the Constitution—was not committed solely to one political Branch. See, *e.g., Chadha,* 462 U.S. at 941-942 (plaintiff brought constitutional challenge to the one-House veto, which required the Court to determine whether the relevant statute was consistent with Article I, a question that was not textually committed to Congress).

Petitioner also argues that because he asserts the infringement of a supposed "personal right," his suit cannot present a political question. Pet. Br. 33. The "personal right" he asserts, however, is based entirely on a statute, Section 214(d), and as explained above, Congress cannot by statute create an enforceable per-

---

disagreement between the two political Branches with respect to that shared constitutional power. See *Baker,* 369 U.S. at 212; Hale Memorandum, 29 Cong. Rec. at 664 ("[I]f the legislative and executive branches both possessed the power of recognizing the independence of a foreign nation, and one branch should declare it independent, while the other denied its independence, then, since they are coordinate, how could the problem be solved by the judicial branch?").

sonal right to begin with if that right intrudes upon a subject that the Constitution commits to the Executive.

Quite aside from that flaw in his argument, petitioner's categorical view is inconsistent with this Court's precedents. This Court has explained, for instance, that "settlement of boundaries [is not] a judicial but a political question," even "when individual rights depended on national boundaries." *United States* v. *Arredondo*, 31 U.S. (6 Pet.) 691, 711 (1832); see also *Gilligan*, 413 U.S. at 3, 7. More fundamentally, in any suit involving a textually demonstrable commitment of an issue to a political Branch, the question whether an individual has a right to have an issue decided one way rather than the other will depend on the scope of the commitment. Here, petitioner's claimed individual right to have "Israel" listed as his place of birth in his passport is not cognizable because the President has sole discretion to implement his recognition decision concerning Jerusalem through the State Department's passport policy. See Pet. App. 12a-13a; see pp. 31-41, *supra*.

## IV. SECTION 214(d) IMPERMISSIBLY INFRINGES THE PRESIDENT'S POWER TO RECOGNIZE FOREIGN SOVEREIGNS

Because the political question analysis requires the Court to analyze the existence and scope of the textual commitment of exclusive authority to the Executive, the question whether Section 214(d) is unconstitutional because it impermissibly interferes with a power conferred on another Branch overlaps to a considerable extent with the question whether petitioner's claim for relief presents a political question. Nonetheless, whether a case presents a political question because it involves an issue that the Constitution commits to the Executive for

decision is a threshold issue of justiciability. The Court should therefore address that issue before determining whether petitioner is entitled to relief on his statutory claim. See *Chadha*, 462 U.S. at 929, 941-942. But if the Court concludes, contrary to our submission in Part III, that petitioner's claim is justiciable, it should affirm the court of appeals' judgment on the ground that Section 214(d) is an unconstitutional encroachment on the President's sole authority to recognize foreign sovereigns.

"[I]t remains a basic principle of our constitutional scheme that one branch of the Government may not intrude upon the central prerogatives of another." *Loving* v. *United States*, 517 U.S. 748, 757 (1996). In particular, Congress cannot overstep its bounds and exercise a power entrusted by the Constitution exclusively to the President. See *Buckley* v. *Valeo*, 424 U.S. 1, 129 (1976); see also, *e.g.*, *Bowsher* v. *Synar*, 478 U.S. 714, 726 (1986); *Chadha*, 462 U.S. at 954-955; *Myers* v. *United States*, 272 U.S. 52, 161 (1926). Section 214(d) is just such an unconstitutional intrusion on a "central prerogative[]" of the President because it seeks to obtain reversal of the Executive's longstanding recognition policy regarding Jerusalem. *Loving*, 517 U.S. at 757. The Constitution vests exclusively in the President the authority to recognize foreign states, their governments, and their territorial boundaries. See pp. 18-30, *supra*. The State Department's Jerusalem passport policy is an implementation of the President's decision not to recognize any state's sovereignty over that city at this time, as well as an exercise of the Executive's authority to determine the content of passports insofar as it implements such a non-recognition decision. See pp. 31-41, *supra*. Just as the courts cannot override these core foreign-policy determinations by adjudicating individual

54

cases or controversies, so too Congress cannot override them by enacting a statute. Nor is Section 214(d) "appropriate passport legislation," as petitioner argues (Br. 52-53), because it seeks to constrain the President's authority to determine the content of passports in furtherance of his recognition power. See pp. 50, *supra.*

Petitioner's remaining arguments in defense of Section 214(d) are without merit. Petitioner argues (Br. 46), relying on Justice Jackson's concurring opinion in *Youngstown*, that Section 214(d) is constitutional because the President's power is "at its lowest ebb" when he "takes measures incompatible with the expressed or implied will of Congress." 343 U.S. at 637-638. But as Justice Jackson explained, Congress may not act upon a subject that the Constitution commits exclusively to the President. *Ibid.* In such situations, the President may rely on his "exclusive power" notwithstanding Congress's contrary views. *Id.* at 638 n.4. This is such a case: the State Department's passport policy is an implementation of the President's exclusive power to recognize foreign sovereigns and their territorial boundaries, and to determine the content of passports as it pertains to such determinations. Section 214(d), in purporting to direct a change in the State Department's policy, impermissibly encroaches on those exclusive powers.

Petitioner also contends that Section 214(d) "remedies" the State Department's discrimination against supporters of Israel. Pet. Br. 48, 53-54. Petitioner's complaint asserts no discrimination claim. See J.A. 15-18. In any event, the policy operates equally against those who wish to express on their passports their view that Jerusalem is under Palestinian sovereignty or that of any other party. And there can be no serious dispute

that the Executive Branch has refrained from recognizing any nation's sovereignty over Jerusalem not to discriminate against supporters of Israel, but to permit Israel and the Palestinian people jointly to determine the status of that city through negotiations. See, *e.g.*, J.A. 49-50.

Finally, petitioner asks the Court (Br. 57) to "invalidate" President Bush's signing statement, which explained that Section 214(d), if construed as mandatory, impermissibly interferes with the President's recognition power. See 2002 Pub. Papers at 1698. In petitioner's view, because the President did not veto the bill, he was obliged to comply with Section 214(d). Pet. Br. 55-57. There is no call for this Court to pass on that issue or on the validity of the President's signing statement. The court of appeals did not address these questions, and they are outside the questions presented. In any event, it has long been settled that the President need not comply with a statutory provision that infringes his constitutional authority. See, *e.g.*, *Myers*, 272 U.S. 169-170; see also *Chadha*, 462 U.S. at 942 n.13; *Freytag* v. *Commissioner*, 501 U.S. 868, 906 (1991) (Scalia, J., concurring in part and concurring in the judgment); Memorial of Captain Meigs, 9 Op. Att'y Gen. 462, 469-470 (1860).

56

## CONCLUSION

The judgment of the court of appeals should be affirmed.

Respectfully submitted.

DONALD B. VERRILLI, JR.
*Solicitor General*

TONY WEST
*Assistant Attorney General*

EDWIN S. KNEEDLER
*Deputy Solicitor General*

GINGER D. ANDERS
*Assistant to the Solicitor General*

HAROLD HONGJU KOH
*Legal Adviser*
*Department of State*

DOUGLAS N. LETTER
LEWIS S. YELIN
*Attorneys*

SEPTEMBER 2011

## APPENDIX

1. Section 3 of Article II of the United States Constitution provides:

[The President] shall from time to time give to the Congress Information of the State of the Union, and recommend to their Consideration such Measures as he shall judge necessary and expedient; he may, on extraordinary Occasions, convene both Houses, or either of them, and in Case of Disagreement between them, with Respect to the Time of Adjournment, he may adjourn them to such Time as he shall think proper; he shall receive Ambassadors and other public Ministers; he shall take Care that the Laws be faithfully executed, and shall Commission all the Officers of the United States.

2. Section 214 of the Foreign Relations Authorization Act, Fiscal Year 2003, Pub. L. No. 107-228, 116 Stat. 1350, provides:

### UNITED STATES POLICY WITH RESPECT TO JERUSALEM AS THE CAPITAL OF ISRAEL.

(a) CONGRESSIONAL STATEMENT OF POLICY.—The Congress maintains its commitment to relocating the United States Embassy in Israel to Jerusalem and urges the President, pursuant to the Jerusalem Embassy Act of 1995 (Public Law 104-45; 109 Stat. 398), to immediately begin the process of relocating the United States Embassy in Israel to Jerusalem.

(b) LIMITATION ON USE OF FUNDS FOR CONSULATE IN JERUSALEM.—None of the funds authorized to be

(1a)

appropriated by this Act may be expended for the operation of a United States consulate or diplomatic facility in Jerusalem unless such consulate or diplomatic facility is under the supervision of the United States Ambassador to Israel.

(c)  LIMITATION ON USE OF FUNDS FOR PUBLICATIONS.—None of the funds authorized to be appropriated by this Act may be available for the publication of any official government document which lists countries and their capital cities unless the publication identifies Jerusalem as the capital of Israel.

(d)  RECORD OF PLACE OF BIRTH AS ISRAEL FOR PASSPORT PURPOSES.—For purposes of the registration of birth, certification of nationality, or issuance of a passport of a United States citizen born in the city of Jerusalem, the Secretary shall, upon the request of the citizen or the citizen's legal guardian, record the place of birth as Israel.