UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

MARK I. SOKOLOW, et al.,                          :        04 Civ. 00397(GBD)(RLE)

                                Plaintiffs,              :

           -against-                              :        <u>ECF CASE</u>

                                                 :

PALESTINE LIBERATION ORGANIZATION, et al.,   :

                          Defendants.             :

------------------------------------------------------------------------x

**OBJECTIONS OF THE BRITISH BROADCASTING CORPORATION TO
SEPTEMBER 6, 2012 MEMORANDUM OPINION & ORDER OF MAGISTRATE
JUDGE ELLIS DENYING ITS MOTION TO QUASH SUBPOENA AND
<u>PARTIALLY GRANTING PLAINTIFFS' CROSS MOTION TO COMPEL</u>**

MILLER KORZENIK SOMMERS LLP
488 Madison Avenue Suite 1120
New York, New York 10022-5702
(212) 752-9200
lsommers@mkslex.com
Attorneys for the British Broadcasting Corporation

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND ................................................................................................................. 3

    The Program .................................................................................................................. 3

    The Repeated Subpoenas to the BBC ......................................................................... 3

    Location of Potential BBC Witnesses and Subpoenaed Materials ............................. 5

    The Undue Burden Imposed By Disclosure ................................................................ 5

    The Motions and Sept. 6 Order ................................................................................... 7

        *Misstatement of Relevant Fact* ............................................................................. 7

        *Misapplication of the Test for Journalist Privilege* .............................................. 8

        *Failure to Consider Rule 45's Territorial Limitation, Principles of Comity or
        Admissibility in Ordering Production of Outtakes and Affidavits* ......................... 9

ARGUMENT ...................................................................................................................... 10

  I. THE SEPT. 6 ORDER EXCEEDED THE MAGISTRATE JUDGE'S
     AUTHORITY IN ERRONEOUSLY COMPELLING FOREIGN
     WITNESS AFFIDAVITS AND U.K. - BASED OUTAKES ....................................... 10

    A. The Court Lacks Power to Modify the Subpoena to
       Compel Foreign Witness Affidavits ........................................................................ 10

    B. BBC's UK-Situate Outtakes Should
       Not Be Compelled ................................................................................................... 13

  II. THE SEPT. 6 ORDER ERRONEOUSLY RULED THAT THE
      BBC's QUALIFIED PRIVILEGE HAD BEEN OVERCOME .................................. 13

    A. The Sept. 6 Order Relied on an Overbroad Standard of
       Relevance Based on a Mistaken Assumption and Improper
       *Ex Parte* Discussion ............................................................................................... 15

    B. The Sept. 6 Order Improperly Disregards Plaintiffs'
       Concessions and Other Proof that Reasonably Available
       Alternate Sources Exist, and Imposes an Erroneous Burden

on the BBC, Which the BBC, In Any Event, Satisfied ............................................. 18

    *Available Alternate Sources* ........................................................................... 18

    *Available Sources – Defendants* .................................................................... 19

    *Available Sources – Zumaidi and Abu Rumaileh* ........................................... 19

    *Available Sources – Others Plaintiffs Conceded* ........................................... 20

    *Available Sources – Even More* ..................................................................... 20

    *The Additional Burden on BBC, Imposed In Error, Was Satisfied* ................ 21

  C. The Negative Effect on a Free Press Outweighs
    Speculative Relevance and Witness Unavailability .................................................. 22

III.  THE SEPT. 6 ORDER ERRED IN ORDERING
    PRODUCTION WHERE THE COMPELLED
    DISCLOSURE IS NOT ADMISSIBLE ...................................................................... 23

CONCLUSION ................................................................................................................ 25

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page**

ATSI Communications, Inc. v. Shaar Fund, Ltd. 547 F.3d 109 (2d Cir. 2008) .................................. 8

Barber v. Page, 390 U.S. 719 (1968) ................................................................................................ 25

Black v. USA Travel Auth., Inc., 99 CIV. 11278, 2001 WL 761070 (S.D.N.Y. July 6, 2001) ........ 12

Blum v. Schlegel, 150 F.R.D. 42 (W.D.N.Y. 1993) .......................................................................... 18

Carter v. City of New York, 2004 WL 193142, 2004 U.S. Dist. LEXIS 1308
  (S.D.N.Y. Feb. 2, 2004) ............................................................................................................ 13, 21

Concerned Citizens v. Belle Haven Club, No. 3:99 CV 1467, 2004 U.S. Dist.
  LEXIS 27335 (D. Conn. June 21, 2004) ........................................................................................ 23

EM Ltd. v. Republic of Argentina, 11-4065-CV L, 2012 WL 3553367
  (2d Cir. Aug. 20, 2012) .................................................................................................................. 11

Estate of Klieman v. Palestinian Auth., CIV.A. 04-1173 PLF, 2012 WL 1744737
  (D.D.C. Apr. 10, 2012) ................................................................................................................... 13

Fox Indus., Inc. v. Gurovich, 323 F. Supp. 2d 376, 382, order clarified,
  323 F. Supp. 2d 383 (E.D.N.Y. 2004) ........................................................................................... 24

Georgia-Pac. LLC v. Am. Int'l Specialty Lines Ins. Co., 2:08-CV-950, 2010
  WL 420036, 2010 U.S. Dist. LEXIS 14220 (S.D. Ohio Jan. 29, 2010) .......................................... 4

Gonzales v. NBC, Inc., 194 F.3d 29 (2d Cir. 1999) ................................................................... passim

In re Edelman, 295 F.3d 171 (2d Cir. 2002) ..................................................................................... 10

In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig., 249 F.R.D. 8 (D. Mass. 2008) ........... 10

In re British Broadcasting Corporation (Sokolow v. PLO), No: 1:11-mc-00547-NGG-JO
  (E.D.N.Y.) ........................................................................................................................................ 4

In re Subpoena to Goldberg (Saperstein v. Palestinian Authority) 694 F. Supp.2d.81 (D.D.C.
  2010) ............................................................................................................................................... 22

Ings v. Ferguson, 282 F.2d 149 (2d Cir.1960) .................................................................................. 12

Krase v. Graco Children Prods., Inc. (In re Application to Quash Subpoena to Nat'l Broad. Co.,
  Inc.),79 F.3d 346 (2d Cir. 1996) ............................................................................................... 13, 18

Laker Airways Ltd. v. Pan Am. World Airways, 607 F. Supp. 324 (S.D.N.Y. 1985) ..................... 13

Liberty Mut. Ins. Co. v. Diamante, 194 F.R.D. 20 (D. Mass. 2000) .................................. 4

Mandal v. City of New York, No. 02CIV1234, 2004 WL 2375817
    (S.D.N.Y. October 21, 2004) ......................................................................... 23

Miller v. Holzmann, 471 F. Supp. 2d 119 (D.D.C. 2007) ................................................ 13

The Nissan Fire & Marine Ins. Co., Ltd v. Fortress Re, Inc., No. 1:02CV00054, 2002 WL
    1870084, 2002 U.S. Dist Lexis 14928, at *9 (S.D.N.Y.  Aug 14, 2002)..................................10-12

NML Capital, LTD. v. Republic of Arg., 03 CIV. 8845 TPG, 2011 U.S. Dist. LEXIS 99502,
    2011 WL 3897828 (S.D.N.Y. Sept. 2, 2011), aff'd sub nom and on other grounds, EM Ltd. v.
    Republic of Argentina, 11-4065-CV L, 2012 WL 3553367 (2d Cir. Aug. 20, 2012). ..................... 11

Power Auth. of State of N.Y. v. F.E.R.C., 743 F.2d 93 (2d Cir. 1984)............................................ 17

Price Waterhouse LLP v. First American Corp., 182 F.R.D. 56 (S.D.N.Y. 1998)..................... 10, 11

Prosecutor v Brdjanin, Case No.: IT-99-36-AR73.9, Decision on Interlocutory Appeal
    (Dec. 11, 2002)(International Criminal Tribunal for the Former Yugoslavia, The Hague) ........... 23

Rafter v. Bank of Am., 04 CIV. 3341 JSR KNF, 2011 WL 2897331
    (S.D.N.Y. June 28, 2011)....................................................................................... 24

Rotheram v. Manpower Demonstration Research Corp., No. 88 Civ. 0774(JMW),
    1989 U.S. Dist. LEXIS 13728 (S.D.N.Y. Nov. 20, 1989) ........................................... 24

Saperstein v. Palestinian Authority, 1:09-mc-00619-SLT-ALC (E.D.N.Y. Dec. 16, 2010) ............ 21

Sikelianos v. City of New York (In re Subpoena Directed to the AP), No. 05 Civ. 7673, 2008
    WL 2465120, 2008 U.S. Dist. LEXIS 47560 (S.D.N.Y. June 18, 2008) .................................. 14, 16

St. Paul Fire & Marine Ins. Co. v. Royal Ins. Co. of Am., No. 91 Civ. 6151,  1993 WL 267347,
    1993 U.S. Dist. LEXIS 9415 (S.D.N.Y. July 12, 1993) .................................................. 12

U.S. v. Grant, 2004 U.S. Dist. LEXIS 28176 (S.D.N.Y. Nov. 17, 2004).................................. passim

U.S. v. Harwood, 998 F.2d 91 (2d Cir. 1993)................................................................... 23

U.S. v. Hubbard, 493 F.Supp. 202 (D.D.C.1979)............................................................... 25

United Mizrahi Bank Ltd. v. Sullivan, No. 97 Civ. 9282, 2000 WL 1678040
    (S.D.N.Y. Nov.6, 2000) .......................................................................................... 12

U.S. v. Bahadar, 954 F.2d 821 (2d Cir. 1992) ................................................................. 24

von Bulow by Auersperg v. von Bulow, 811 F.2d 136 (2d Cir. 1987).............................. 14

## Statutes and Rules

Fed. R Evid. 801(d)(2) ........................................................................................... 24

Fed. R. Evid. 801(d)(2)(C) .................................................................................... 24

Fed. R. Evid. 801(d)(2)(D) .................................................................................... 24

Fed. R Evid. 804(b)................................................................................................ 24

Fed. R. Civ. P. 26(b)(2)(C) ..................................................................................... 19

Fed. R. Civ. P. 45 ...........................................................................................passim

Fed. R. Civ. P. 45(c)(1) ...................................................................................... 4, 19

Fed. R. Civ. P. 45(c)(3)(A)(ii) ................................................................... 7, 10,11,12

Fed. R. Civ. P. 45(c)(3)(A)(iv) .................................................................................4

Fed. R. Civ. P. 72 ...................................................................................................1

28 U.S.C.§636(b)(1) ................................................................................................1

## Other Authorities

Amira Hass, Palestinian protests in West Bank highlight link between economy and security Haaretz (Sept. 18, 2012), available at http://www.haaretz.com/news/diplomacy-defense/palestinian-protests-in-west-bank-highlight-link-between-economy-and-security.premium-1.465460#.UGH8OlHgMws.email ...................................................... 20

Avi Issacharoff, Palestinian Authority arrest former militant Zakaria Zubeidi. Haaretz (May 5, 2005), available at http://www.haaretz.com/news/diplomacy-defense/palestinian-authority-arrests-former-militant-zakaria-zubeidi-1.428403 ........................................................... 20

BBC News – Programme – Correspondent, "Arafat Investigated," http://news.bbc.co.uk/nol/shared/spl/hi/programmes/correspondent/transcripts/arafat_investigated_09_11_03.txt ...................................................................................................... 5

Canon 3(A)(4) of the Code of Judicial Conduct for United States Judges, promulgated by the Judicial Conference, available at http://www.uscourts.gov/RulesAndPolicies/CodesOfConduct/CodeConductUnitedStatesJudges.aspx ........................................................................................................................... 17

*Security Council Condemns Attacks Against Journalists in Conflict Situations - Unanimously Adopting Resolution 1738*, U.N. Department of Public Information, (2006), available at http://www.un.org/News/Press/docs/2006/sc8929.doc. htm ............................................................ 6

Office of the High Commissioner of Human Rights, "Journalism - one of the world's most dangerous professions," (October 5, 2011), available at https://www.ohchr.org .............................. 6

U.S. Dep't of State, United Kingdom Judicial Assistance, at http://travel.state.gov/law/judicial/judicial_671.html. ..................................................................... 12

Weinstein's Federal Evidence § 804.06(4)(d)(iii) (2011) ............................................................... 25

**OBJECTIONS OF THE BRITISH BROADCASTING CORPORATION TO SEPTEMBER 6, 2012 MEMORANDUM OPINION & ORDER OF MAGISTRATE JUDGE ELLIS DENYING ITS MOTION TO QUASH SUBPOENA AND PARTIALLY GRANTING PLAINTIFFS' CROSS MOTION TO COMPEL**

Under Fed. R. Civ. P. 72  and 28 U.S.C.§636(b)(1), the British Broadcasting Corporation ("the BBC") objects to the Memorandum Opinion & Order of Magistrate Judge Ellis dated September 6, 2012 (the "Sept. 6 Order")(Dkt No. 255) insofar as it denied the BBC's motion to quash Plaintiffs' deposition subpoena for BBC testimony and accompanying documents (Dkt Nos. 143-148, 164-166), and granted, in part, Plaintiffs' cross Motion to Compel (Dkt No. 158). [1]

The Sept. 6 Order clearly erred in compelling (i) U.K.-based BBC personnel, outside the Court's jurisdiction, to execute foreign affidavits for submission by the BBC in modification of a subpoena that violates Fed. R. Civ. P. 45; and (ii) the BBC to produce outtakes of two interviews (the "Outtakes") included in a 2003 broadcast news program "Arafat Investigated."  This compulsion exceeds the Court's authority.  It is precluded by (i) Rule 45's territorial limitations and comity principles, and (ii) the qualified privilege from compelled disclosure granted to journalists' unpublished newsgathering under federal law and/or the First Amendment. Plaintiffs failed to show, as they must to overcome that privilege, that the information sought was "likely relevant" and no reasonably available alternative sources exist. See pp. 10-23, infra.

The Sept. 6 Order correctly ruled that Rule 45's extraterritorial limitation precluded the deposition sought of U.K.-based BBC personnel – a ruling these objections do not challenge. But it clearly erred by failing to apply that restriction and comity principles to preclude production of the Outtakes, and the subpoena modification mandating foreign discovery. See pp. 10-13, infra.

Likewise, the Sept. 6 Order correctly ruled that the BBC had a journalist privilege – not disputed here. But it clearly erred in holding that the privilege was overcome. It was apparently shaped by (i) improper *ex parte* colloquy as to the Outtakes' relevance by the Court and Plaintiffs'

---

[1] Copies of the Sept. 6 Order, materials submitted by the BBC on the motions, and relevant transcript pages are contained in the accompanying Appendix, cited as "App." followed by the relevant page number(s).

1

counsel *in the absence of the BBC* – a nonparty, not alerted that the motions would be addressed and not offered a chance to address the record; and (ii) mistaken facts in the Sept. 6 Order, regarding Plaintiffs' previous Eastern District subpoena to the BBC and the same counsel's *failed* attempt to subpoena the same BBC Outtakes in an earlier, unrelated case. See pp. 15-17, <u>infra</u>.

In concluding, out of hand, both likely relevance and lack of other sources for the information sought, the Sept. 6 Order mistakes surmise for absent fact. It also disregards a bounty of alternate sources, largely undisputed – many conceded by Plaintiffs themselves – and unexhausted. Among them is the BBC interviewee whose outtakes are sought, who remains reasonably available in physical custody of Defendant Palestinian Authority ("PA"), and who could provide directly what Plaintiffs seek indirectly from the BBC.  See pp. 18-21, <u>infra.</u>

Moreover, in requiring the BBC to "detail" how "burdensome" production would be, the Sept. 6 Order misconceives the standard for overcoming BBC's privilege.  It places a burden on the BBC that the law does not impose – and that is contrary to the *raison d'etre* of journalist protection. The BBC need only show – as it has – that, as a news organization reporting a matter of public concern, it is subject to the privilege.  The only burden, then, is on the Plaintiffs to overcome that privilege, not on the BBC to prove the burdensomeness that the law assumed in granting it protection in the first place.  Even so, the BBC detailed how burdensome production would be, which the Sept. 6 Order, in error, failed to credit.  See pp. 15, 21-22, <u>infra</u>.

The Sept 6 Order also erred in failing to balance the effect of disclosure on the public interest in a free press, particularly in conflict zone correspondents and their special safety concerns. And it erred in compelling futile acts, by failing to consider that the compelled materials would not be admissible and thus would not be of probative value, in any event. See pp. 23-25, <u>infra</u>.

Accordingly, the Sept. 6 Order denying the BBC's motion to quash and partially granting Plaintiffs' motion to compel should be reversed.  The BBC's Motion to Quash should be granted, and Plaintiff's cross Motion to Compel should be denied in *all* respects.

## BACKGROUND

The BBC is a public service broadcaster headquartered in England, whose many types of programming include independent news programs.  It is a total stranger to this litigation and the acts on which it is based, notably seven attacks that occurred in Jerusalem, Israel during 2001, 2002 and 2004, for which Plaintiffs seek to hold Defendants PLO and PA liable.  Complaint ¶¶126-222.

### The Program

On November 9, 2003 the BBC broadcast a program entitled "Arafat Investigated" (the "Program"), as part of its news mission to prepare and disseminate information of public concern. App. 20 (¶1).  The Program, reported by a Middle East correspondent, focused on the isolation of former Palestinian leader Yasir Arafat by Israel and the U.S., and his status and relationship to the Palestinian people. Among its many interviewees were Ata Abu Rumaileh, identified as a Fatah official in the West Bank city of Jenin, and Zakaria Zubaidi, identified as the leader of Jenin's Al-Aqsa Brigades ("Al-Aqsa"), a terrorist group.  None of the alleged attacks in issue in this case were subjects of, or mentioned in, the BBC Program, two of those attacks were alleged to be by Al-Aqsa in another city (Jerusalem), and at least one such attack post-dated the Program.  App. 61 (¶¶4-5).

### The Repeated Subpoenas to the BBC

Plaintiffs first issued a subpoena to the BBC for the same information in July 2011 (the "First Subpoena") from the Eastern District of New York. App. 24 (¶3), 28-33 [2] After Plaintiffs' counsel, Robert Tolchin, refused the BBC's requests to have the issues heard by this Court rather than a court unfamiliar with the case, or to adjourn the imminent noticed deposition date to permit an orderly motion schedule, the BBC moved to quash that subpoena.  App. 24-25 (¶¶4-10). Plaintiffs responded by seeking to strike the BBC's motion, or have it heard by then-Magistrate Judge Carter, who had addressed an earlier attempt in an unrelated case by the same counsel (but

---

[2] Plaintiffs agreed to narrow the broader outtakes sought in the First Subpoena to those, as sought here, that showed Abu Rumaileh and Zubaidi.  App. 25 (¶10).

not the same Plaintiffs) to subpoena the BBC for the same outtakes. The assigned Magistrate Judge James Orenstein rebuffed Plaintiffs' tactics, denied their request to strike, ordered the parties to agree on a briefing schedule for the BBC's motion to quash, and stayed compliance with the Subpoena. In re British Broadcasting Corporation (Sokolow v. PLO), No: 1:11-mc-00547-NGG-JO (E.D.N.Y.), Dkt Nos. 3, 4, 5, 6, 7, and Order entered 8/2/11. Unhappy with their forum-shopped result, Plaintiffs withdrew that subpoena, effectively causing Magistrate Judge Orenstein to deny the BBC's motion to quash as moot. Id., Order dated 8/8/2011 (Dkt. No. 8).

Plaintiffs then issued a second subpoena in August 2011 from this Court – even though they earlier refused the BBC's request to do just that – causing the BBC to move a second time, here. App. 26 (¶¶11-16), 34-43.[3] This second, instant Subpoena (the "Subpoena") likewise noticed the BBC's deposition, requesting the witness to bring the Program and unpublished

> authentic, complete and unedited audiovisual copies of all audiovisual recordings recorded during the preparation and making of the Program and/or for the purpose of preparing and making the Program that include audio and/or video recordings of Ata Abu Rumaileh and/or Zakaria Zubaidi, including all such recordings which were not ultimately included in the Program as broadcast ["collectively, "Outtakes"].

App. 11 (¶¶2, 3), 13-19, 23 (¶2). The BBC was commanded to designate a testifying witness regarding four topics: (i) "the authenticity" of the Program and Outtakes; (ii) the manner in which they were copied to produce copies to Plaintiffs; (iii) the place and manner in which they were stored, held and maintained; and (iv) the manner in which the BBC generally stored, held and maintained them and others "similar in origin" during specific periods of time (collectively, the "Topics"). App. 11 (¶4), 13-19.

---

[3] Fed. R. Civ. P. 45 affirmatively requires that "a party or attorney responsible for issuing or serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena" – especially if the recipient is a non-party – and that the court must enforce this duty. Fed. R. Civ. P. 45(c)(1). Similarly, Rule 45(c)(3)(A)(iv) mandates a court to quash or modify a subpoena that "subjects a person to undue burden." Here, Plaintiffs' counsel did the opposite of what the Rules require and unnecessarily burdened the BBC and two courts with costly motions, using purposeful maneuvers for tactical gain. The instant Subpoena should be quashed on this ground alone. Liberty Mut. Ins. Co. v. Diamante, 194 F.R.D. 20, 23 (D. Mass. 2000); Georgia-Pac. LLC v. Am. Int'l Specialty Lines Ins. Co., 2:08-CV-950, 2010 WL 420036, at *2, 2010 U.S. Dist. LEXIS 14220, at *4 (S.D. Ohio Jan. 29, 2010).

**Location of Potential BBC Witnesses and Subpoenaed Materials**

No potential BBC witness or witnesses knowledgeable about the Topics resides, works or regularly transacts business in person in New York and any witness (es) with any such knowledge would have to travel more than 100 miles from his/her or their residence, place of employment or place where he/she or they regularly transacts business in person in the United Kingdom in order to comply with the Subpoena. App. 12 (¶¶ 5-7), 22 (¶6). Likewise, the Outtakes sought are controlled by the BBC in the U.K. and are not in the U.S. App. 12 (¶8). The Program itself had been previously provided to Plaintiffs' counsel, Robert Tolchin, as correctly recognized in the Sept. 6 Order. App. 4, 11 (¶3), 23 (¶2). [4]

**The Undue Burden Imposed By Disclosure**

The BBC demonstrated that production of the Outtakes would unduly burden its editorial functions, disrupt its newsgathering activities and jeopardize the safety – and necessary perceived neutrality – of its war and conflict-zone correspondents. Were the BBC drawn into private disputes as a result of cameos in its news coverage, its impartiality among sources would be compromised, and its ability to report important stories, impaired. Even non-confidential sources, like viewers, expect journalists to be independent chroniclers of events, not the eyes and ears of private litigants. App. 21 (¶2).

BBC sources that agree to appear on camera have a reasonable expectation that use of their footage will be subject to BBC's independent editorial judgment as to what to publish, and will not be taken out of context, passed on to third parties or used outside the broadcast in which they agreed to participate. If that judgment were co-opted by private litigants for private purposes, sources would be far less inclined to speak candidly with BBC reporters, if at all, and significant news

---

[4] A transcript of the Program, which is publicly available online at the BBC website, was provided to the Court by Plaintiffs. See BBC News – Programme – Correspondent, "Arafat Investigated," http://news.bbc.co.uk/nol/shared/spl/hi/programmes/correspondent/transcripts/arafat_investigated_09_11_03.txt (last visited Sept. 27, 2012).

relationships could be impaired.  App.  21 (¶3).

This issue is of particular concern, as here, where war/armed conflict reporting is involved. Media coverage brings to the attention of the international community the horrors and reality of conflict, and provides the public with crucial information, about the conflicting viewpoints. Disclosure of the nature sought here would compromise the ability of the BBC to achieve that, as it would jeopardize the security of BBC reporters in war or armed conflict zones, as presented in the Program.  App. 21 (¶4); 115 (¶¶4, 5).

The benefits provided by the reporting here – which Plaintiffs recognize by virtue of their subpoena – are garnered under grave and increasing dangers on the ground. [5]  News men and woman are subject to unique physical hazards, and risk harassment, threats, movement restrictions, imprisonment and even death by parties seeking to limit or control independent coverage of sensitive issues.  These correspondents depend upon their credibility and neutrality for news access and safe passage back to their bureaus. App.  21 (¶4); 114, 115 (¶¶4, 5).

But that neutrality and credibility would more likely be questioned by conflict zone sources who might otherwise disclose information or grant safe passage, but may not do so if they knew that they could be aiding a possibly adverse litigant through future subpoena.  This is particularly so, if their story is presented out of context or differently than it would be by the reporter entrusted. Such distrust from sources could spread and follow journalists to other parts of the world, compounding the danger to them, and continuing long after security returned to a region. App.  21 ¶4; 114, 116-117 (¶¶6-10).

Compulsion under the subpoena also unduly disrupts the BBC's newsgathering activities at

---

[5] The Court may take judicial notice of the United Nations resolution condemning the escalating trend of violence against journalists in conflict zones. See *Security Council Condemns Attacks Against Journalists in Conflict Situations - Unanimously Adopting Resolution 1738*, U.N. Department of Public Information, (2006) http://www.un.org/News/Press/docs/2006/sc8929.doc. htm  (last visited September 27, 2012). See also Office of the High Commissioner of Human Rights, "Journalism - one of the world's most dangerous professions," (October 5, 2011) https://www.ohchr.org.

home. Given the breadth of topics the BBC covers internationally, if its reporters, editors and managers were required to search for unpublished news or create testimonial evidence in any civil matter merely because of something said or suspected in BBC coverage – particularly, as here, nearly a decade old – the BBC would be spending its time and attention as professional researchers, paralegals or witnesses, rather than as journalists. App. 22 (¶5).

**The Motions and Sept. 6 Order**

By motions filed September 8 and October 17, 2011, the BBC moved to quash the instant Subpoena, and Plaintiffs cross moved to compel compliance, respectively. See Dkt Nos. 143, 157. The BBC demonstrated that (i) Plaintiffs' counsel already had the Program, (ii) the Outtakes and testimony sought were protected from compelled disclosure by the territorial limitation of Rule 45, principles of comity, and by its journalist privilege, and (iii) Plaintiffs could not satisfy their burden of overcoming that latter privilege. Although Plaintiffs challenged the territorial limits of Rule 45, they made no attempt to satisfy their burden of overcoming the BBC's journalist privilege. Instead they argued erroneously that the BBC had no such protection. [6]

The Sept. 6 Order correctly recognized that Rule 45(c)(A)(ii) precludes any deposition of the BBC, whose knowledgeable witness(es) live and work in the U.K., more than 100 miles from the courthouse, and that "a deposition …would be unnecessarily burdensome to the BBC." App. 6. For that reason it properly denied Plaintiffs' motion to compel in part. It also recognized that the BBC had a journalist privilege. However, the rest of the decision, as well as its recitation of relevant fact, were clearly erroneous, and should be reversed.

*Misstatement of Relevant Fact.* The Sept. 6 Order misstated the facts and confused what occurred with the First Subpoena before Magistrate Judge Orenstein with a decision vacated the

---

[6] Plaintiffs also waited until the time for the BBC to file its papers had ended to offer an affidavit of an Israeli lawyer, not previously noticed under Fed R. Civ. P. 44.1, on the content of Israeli law, thus failing to afford BBC any opportunity to reply to the unsupported and/or erroneous assertions it contained. The BBC accordingly requested that Magistrate Judge Ellis disregard it and any arguments based on it, or alternatively, permit the BBC's sur-reply addressing it. App. 148-156. Magistrate Judge Ellis did not rule on this request.

previous year in then-Magistrate Judge Carter's earlier unrelated case in which the same plaintiff's

counsel (but not the same Plaintiffs) sought the same BBC information:

> The BBC filed its Motion to Quash the Subpoena in the Eastern District, and then-Magistrate Judge Andrew L. Carter granted Plaintiffs' subpoena in *Saperstein* v. *Palestinian Auth.*, 09-MC-00619 SLT ALC, 2010 WL 1371384 (E.D.N.Y. Apr. 6, 2010)["*Saperstein*"], vacated (Dec. 16, 2010). The order was vacated on December 16, 2010 after Plaintiffs withdrew the subpoena and issued it from this District. *(ld).* [App. 3]

This recitation erroneously implies that (i) then-Magistrate Judge Carter was involved with

the First Subpoena (which he was not), (ii) the vacated Saperstein decision had some intervening

significance with respect to the First Subpoena (which it did not, having been vacated in 2010,

while the First Subpoena was not served until July 2011), (iii) the First Subpoena may have been

"granted" (which it was not), or (iv) Magistrate Judge Orenstein's decision staying compliance with

the First Subpoena had been vacated (it was not).  Moreover, the vacated Saperstein decision was

superseded by then-Magistrate Judge Carter's order *quashing* the subpoena served on the BBC in

the Saperstein case – an order that remains effective. [7]  To the extent that the Sept. 6 Order was

based on the misimpression that either the subpoena on the BBC in Saperstein, or the First

Subpoena in this case, had been "granted" by a court in the Eastern District, it should be reversed.

***Misapplication of the Test for Journalist Privilege.*** The Sept. 6 Order erroneously ruled

that although the BBC had a journalist privilege, "Plaintiffs have shown sufficient relevance and

necessity of the outtakes to overcome" it under the test established in Gonzales v. NBC., 194 F.3d

29, 36 (2d Cir. 1999). App.  4-5.   It went on to state:

> The outtakes are of "likely relevance" because the footage in question may

---

[7] 2010 U.S. Dist. LEXIS 143465 (E.D.N.Y. Dec. 16, 2010)("ORDER granting [Docket Entry #25] Motion for Reconsideration; *granting [Docket Entry #31] Motion to Quash. The 4/6/10 Memorandum and Order [Docket Entry #23] is hereby vacated.*"). The vacated Saperstein decision is legally non-existent. See, e.g., ATSI Communications, Inc. v. Shaar Fund, Ltd. 547 F.3d 109, 113 n.5 (2d Cir. 2008) ("[V]acatur does have the effect, in a concrete and practical way, of removing [vacated decisions] from the reservoir of legal thought upon which the bench and bar can subsequently draw.").

contain information that links Fatah to Al-Aqsa. Although the Court is skeptical of a "smoking gun" presenting itself in these outtakes, the standard for relevance to overcome the journalist privilege for non-confidential materials is low, and the outtakes meet this lower standard of "likely relevance" to a significant issue in the case.

Further, the material sought is "not reasonably obtainable from other available resources." The BBC asserts that Plaintiffs have not exhausted other resources for material, and claim Defendants themselves would be in possession of the information sought, including the interviewees at issue.

The Plaintiffs have agreed to limit the subpoena to the outtakes of those two individual interviews specifically, and the BBC has not detailed how burdensome the production of the outtakes would be. The BBC is directed to produce the outtakes.

As shown below (pp. 16-24, infra), these rulings are clearly erroneous.

### Failure to Consider Rule 45's Territorial Limitation, Principles of Comity or Admissibility in Ordering Production of Outtakes and Affidavits. After correctly recognizing Rule 45's territorial restrictions that preclude the deposition of a BBC witness, the Sept 6 Order erroneously modified the Subpoena:

Here, the BBC has asserted it does not have any witnesses in the United States who may speak to the authenticity of the documentary or the outtakes. (BBC Mot. at 11.) Additionally, any witnesses would be at least 100 miles outside of Rule 45's territorial restrictions. .. [t]he Court does not find sufficient necessity to compel production of an individual's testimony to be taken in another country. Rather, the BBC is directed to produce an affidavit confirming the authenticity of the outtakes and as business records. [App. 6.]

As shown below (pp. 10-13 infra), this modification relied on no precedent that would permit the Court to compel the creation of foreign affidavits from foreign individuals not shown to be subject to jurisdiction here, or that would admit such affidavits into evidence where, as here, the opportunity for cross examination by Defendants is absent.  As well, it failed to consider either Rule 45 of principles of comity in its order to the BBC to produce the Outtakes. Instead, the Sept. 6 Order concludes with the direction:

However, BBC shall furnish the outtakes with written affidavits from knowledgeable witnesses as to the authenticity of the documentary and outtakes. The outtakes and the accompanying affidavit(s) shall be provided to the Plaintiffs on or before

September 17, 2012 [App. 7]. [8]

Insofar as the Sept. 6 Order clearly erred, it should be reversed.

## ARGUMENT

## I.   THE SEPT. 6 ORDER EXCEEDED THE MAGISTRATE JUDGE'S AUTHORITY IN ERRONEOUSLY COMPELLING FOREIGN WITNESS AFFIDAVITS AND U.K. - BASED OUTTAKES

### A.  The Court Lacks Power to Modify the Subpoena to Compel  Foreign Witness Affidavits

The Sept. 6 Order acknowledges that under Fed. R. Civ. P. 45(c)(3)(A)(ii), "the issuing court *must* quash or modify a subpoena" that "requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed or regularly transacts business in person…" Accepting the BBC's undisputed proof that the BBC "does not have any witnesses in the United States who may speak to the authenticity of the documentary or the outtakes," (App. 6), it correctly ruled that the Court could not compel the deposition of foreign BBC witnesses here, citing In re Edelman, 295 F.3d 171, 178 (2d Cir. 2002). [9]

Nevertheless, the Sept. 6 Order modified the Subpoena by ordering the BBC to furnish "written affidavits from knowledgeable witnesses" to authenticate the Program and Outtakes. As the Sept. 6 Order acknowledges that the only such knowledgeable witnesses are U.K.-based personnel, it has, in effect and in fact, compelled U.K. individuals, over whom the Court lacks personal jurisdiction, to create foreign affidavits for use here. It relies on no legal precedent to support the Court's power to make a modification that coerces such foreign discovery. Indeed, there is none.

It is established that a Court lacks the power to modify a subpoena to change the location of a deposition to a foreign country, or to require a witness – even one subject to the Court's jurisdiction – to submit to deposition in a foreign country.  Price Waterhouse LLP v. First American

---

[8] By order dated September 10, 2012, Magistrate Judge Ellis extended the compliance date to October 1, 2012. Dkt No. 275.

[9] See also Price Waterhouse LLP v. First American Corp., 182 F.R.D. 56, 62 (S.D.N.Y. 1998); The Nissan Fire & Marine Ins. Co., Ltd v. Fortress Re, Inc., No. 1:02CV00054, 2002 WL 1870084 at *3, 2002 U.S. Dist Lexis 14928, at *9 (S.D.N.Y.  Aug 14, 2002)("Nissan Fire").

Corp., supra, 182 F.R.D. at 63-64 and n.7 (where knowledgeable corporate employees are outside the United States, court lacks the power to modify the subpoena to change the location to a foreign city or to require witness to submit to a deposition in a foreign country). Thus in Nissan Fire, supra, 2002 WL 1870084 at *3, 2002 U.S. Dist Lexis 14928 at *9, the Court *quashed* rather than modified the subpoena, doubting that it had the power to change the location to a foreign country, noting:

> it is not clear, however, that the authority granted in Rule 45(c)(3)(A)(ii) to modify a subpoena extends to the kinds of modifications that would be required to permit the subpoena to comply with these requirements by functioning as the equivalent of a letter rogatory or a court order authorizing a U.S. consular offer to take the deposition.

It is equally the case that a court lacks the power to compel a foreign individual witness – even one subject to the Court's jurisdiction – to create other forms of foreign discovery for use here. See, e.g., NML Capital, LTD. v. Republic of Arg., 03 CIV. 8845 TPG, 2011 U.S. Dist. LEXIS 99502, 2011 WL 3897828 (S.D.N.Y. Sept. 2, 2011) aff'd sub nom and on other grounds, EM Ltd. v. Republic of Argentina, 11-4065-CV L, 2012 WL 3553367 (2d Cir. Aug. 20, 2012). In NML Capital, the court quashed a Rule 45 subpoena on an individual served in New York rather than modify it to permit deposition by written questions to be answered in Switzerland with documents shipped to New York. It held that with written questions:

> … neither [foreign witness] Caruana nor anyone else at BIS would be required to travel more than 100 miles. ***However, the court does not believe that Rule 45 is a device for having the discovery rendered in a foreign country, as plaintiffs suggest.*** [Id. at *3 ].

If subpoena modification to compel foreign discovery is impermissible where the Court has jurisdiction over the putative witness, it is certainly improper where, as here, the Court lacks jurisdiction over the U.K.-based BBC personnel who must create and execute the compelled affidavits. [10] As the Sept. 6 Order recognized, Rule 45's 100-mile "restriction

---

[10] That the BBC is subject to jurisdiction in this Court does not subject its U.K.-based personnel to personal jurisdiction here. See, e.g., Black v. USA Travel Auth., Inc., 99 CIV. 11278, 2001 WL 761070 (S.D.N.Y.

is imposed to protect non-party witnesses from being subjected to burdensome and excessive discovery in litigation in which [they] have little or no interest." (App. 6). Compelling the creation of foreign discovery from extra-jurisdictional foreign non-parties is precisely the type of "excessive discovery burde[n]" that Rule 45 seeks to avoid.

Indeed, where, as here, a subpoena requires a foreign witness to travel over 100 miles, the *only* option of the Court is to quash, not modify, that subpoena.  See, e.g., St. Paul Fire & Marine Ins. Co. v. Royal Ins. Co. of Am., No. 91 Civ. 6151,  1993 WL 267347, at *1, 1993 U.S. Dist. LEXIS 9415, at *2 (S.D.N.Y. July 12, 1993)("Rule 45(c)(3)(A)(ii) appears to *require* the quashing of a subpoena" if travel exceeding 100 miles is required)(emphasis supplied).

Even so, international comity-based considerations counsel that the Court refrain from compelling testimonial affidavits in circumstances involving foreign witnesses. [11]  See generally Ings v. Ferguson, 282 F.2d 149, 152 (2d Cir.1960)("Upon fundamental principles of international comity, our courts dedicated to the enforcement of our laws should not take such action as may cause a violation of the laws of a friendly neighbor or, at the least, an unnecessary circumvention of its procedures."). Nissan Fire, supra, 2002 WL 1870084 at *3, 2002 U.S. Dist Lexis 14928, at *15 ("But even if such authority did exist under Rule 45, prudential, international comity-based considerations counsel that the Court refrain under the circumstances of this case").

Accordingly, the Sept. Order was in error in compelling foreign witness affidavits. That decision should be reversed.

---

July 6, 2001); United Mizrahi Bank Ltd. v. Sullivan, No. 97 Civ. 9282, 2000 WL 1678040, at *3 (S.D.N.Y. Nov.6, 2000).

[11] Indeed, the U.S. State Department advises that U.K.-based witnesses outside the jurisdiction of a U.S. court, as here, cannot be compelled to give testimonial evidence in the U.K. in support of U.S. litigation without the involvement and consent of a U.K. court or governmental body. See U.S. Dep't of State, *United Kingdom Judicial Assistance, at* http://travel.state.gov/law/judicial/judicial_671.html (last accessed Sept. 26, 2012).

### B.  BBC's UK-Situated Outtakes Should Not Be Compelled

The BBC's Outtakes were subpoenaed as an adjunct to a deposition that cannot be ordered consistent with Rule 45's territorial restrictions, and they are located and controlled from outside this country. App. 12 (¶8). As such, the order to produce the Outtakes was in error and they should not be compelled, whether or not the BBC is subject to service here.  See, e.g., Laker Airways Ltd. v. Pan Am. World Airways, 607 F. Supp. 324, 326 (S.D.N.Y. 1985)(subpoena duces tecum on non-party witness vacated where documents and records designated in it were regularly maintained within the United Kingdom and not within the judicial district); Miller v. Holzmann, 471 F. Supp. 2d 119, (D.D.C. 2007) ("[T]he limitation in Rule 45 unequivocally applies both to attending a deposition to testify and to being required to produce documents at a distance more than 100 miles from one's home."); Estate of Klieman v. Palestinian Auth., CIV.A. 04-1173 PLF, 2012 WL 1744737 (D.D.C. Apr. 10, 2012) (Court quashed subpoena on BBC for testimony and documents as those sought here as violative of Rule 45's territorial restrictions)(App. 130-131).

### II.  THE SEPT. 6 ORDER ERRONEOUSLY RULED THAT THE BBC'S QUALIFIED PRIVILEGE HAD BEEN OVERCOME

As the Sept 6 Order found – unchallenged by these Objections – the BBC's unpublished newsgathering information, including the outtakes and testimonial evidence compelled here, are subject to a qualified privilege from compelled disclosure. Gonzales v. NBC, Inc., 194 F.3d 29, 35 (2d Cir. 1999).[12] See also App. 4. The Court of Appeals for the Second Circuit articulated the *raison d'etre* for the privilege.  It recognized, "the pivotal function of reporters to collect information for public dissemination" and "the paramount public interest in the maintenance of a vigorous, aggressive and independent press capable of participating in robust, unfettered debate over controversial matters" require protection of the ability of press and broadcasters to freely collect,

---

[12] Krase v. Graco Children Prods., Inc. (In re Application to Quash Subpoena to Nat'l Broad. Co., Inc.), 79 F.3d 346, 351 (2d Cir. 1996) (subpoena seeking outtakes quashed);  U.S. v. Grant, 2004 U.S. Dist. LEXIS 28176 (S.D.N.Y. Nov. 17, 2004)(subpoena for video outtakes of program shown on MTV quashed);  Carter v. City of New York, 2004 WL 193142, 2004 U.S. Dist. LEXIS 1308 (S.D.N.Y. Feb. 2, 2004)(subpoena for deposition testimony of reporter quashed).

edit and publish and broadcast news, unhampered by subpoenas seeking their newsgathering

materials:

> If the parties to any lawsuit were free to subpoena the press at will, it would likely become standard operating procedure for those litigating against an entity that had been the subject of press attention to sift through press files in search of information supporting their claims. The resulting wholesale exposure of press files to litigant scrutiny would burden the press with heavy costs of subpoena compliance, and could otherwise impair its ability to perform its duties... . Incentives would also arise for press entities to clean out files containing potentially valuable information... . And permitting litigants unrestricted, court-enforced access to journalistic sources would risk the symbolic harm of making journalists appear to be an investigative arm of the judicial system, the government, or private parties.

Gonzales v. NBC, Inc., supra, 194 F.3d 29, 35.

Although the privilege against compelled disclosure of non-confidential news-related

information is qualified, "Gonzales makes clear that requiring the press to surrender materials

gathered in the course of doing its job is not to be done lightly." U.S. v. Grant, 2004 U.S. Dist.

LEXIS 28176 at *8-*9.  A litigant "will not be granted unfettered access to 'sift through

[journalists'] files in search of information supporting [his] claims,' because such access would

undermine the public's perception of the press as an independent institution and foster the view,' as

the Second Circuit noted, 'that it is 'an investigative arm of the judicial system, the government, or

private parties.' " Id. (citations omitted).

The burden of overcoming the privilege rests squarely on the party seeking disclosure.

Gonzales v. NBC, supra, 194 F.3d at 36; von Bulow by Auersperg v. von Bulow, 811 F.2d 136, 141

(2d Cir. 1987). That party – here, Plaintiffs – must show that the materials sought are (1) "of likely

relevance to a significant issue in the case" and (2) "not reasonably obtainable from other available

sources." Gonzales v. NBC, supra, 194 F.3d at 36. And "likely relevance" requires a showing of a

"particularized need" for the information sought. Sikelianos v. City of New York (In re Subpoena

Directed to the AP), No. 05 Civ. 7673, 2008 WL 2465120, at *1, 2008 U.S. Dist. LEXIS 47560, at

5-6 (S.D.N.Y. June 18, 2008). Moreover, compliance with the two-prong test should be balanced

against the public interest in a free press, with disclosure compelled only where that public interest is outweighed.  U.S. v. Grant, 2004 U.S. Dist. LEXIS 28176, *1, 6 (S.D.N.Y. 2004).

In ordering disclosure here, the Sept. 6 Order not only misconstrued the standard of applicable relevance after considering improper *ex parte* representations.  It also acknowledged, yet improperly disregarded,  numerous reasonably available alternate sources for the information, and imposed on the BBC a prerequisite showing that Gonzales does not require – to "detai[l] how burdensome the production of the outtakes would be." Yet BBC satisfied that showing – although the Sept. 6 Order, in error, disregards that proof. As shown below, Plaintiffs did not overcome the BBC's journalist privilege and the Sept. 6 ruling to the contrary should be reversed.

### A.  The Sept. 6 Order Relied on an Overbroad Standard of Relevance Based on a Mistaken Assumption and Improper *Ex Parte* Discussion

Plaintiffs contended that the Outtakes were sought to establish Defendants' liability insofar as Plaintiffs allege that Al-Aqsa – which allegedly carried out two attacks in issue (in 2002 and 2004) in Jerusalem, was the same as Fatah or was funded by Defendants prior to those attacks. Dkt No. 158 (Plaintiffs' Memorandum on the motions ["Pl. Opp."], pp. 3, 6. Yet Plaintiffs provided no indication in their papers that Abu Rumaileh or Zubaidi discussed any such "links" in the Outtakes sought. [13]  Plaintiffs thus could not satisfy the "likely relevance standard," much less show requisite "particularized need" for any information actually disclosed in the Outtakes.

Thus, the Sept. 6 Order's unsupported conclusion that the BBC's outtakes "'were of likely relevance' because the footage in question *may* contain information that links Fatah to Al-Aqsa" is wholly unsupported in the record. [14] Indeed, the Court stated it was "skeptical of a 'smoking gun'

---

[13] The Court should note, moreover, that the BBC interviews postdated the 2002 attack in issue and there is nothing to indicate that any statements sought in the Outtakes of these two Jenin-based interviewees would apply retroactively to the time of or prior to that attack, or to either the 2002 or 2004 attacks in another city.

[14] It also contradicts Magistrate Judge Ellis' prior ruling in the case refusing to allow discovery of a witness on grounds of lack of relevance where the witness was not linked to the particular attacks in issue. See Decision and Order, December 9, 2011 (Dkt No. 171) (plaintiffs did not satisfy Rule 26 relevance standard in

presenting itself in these outtakes" (App. 5).  Such supposition mixed with skepticism cannot supply

the "likely relevance" required to transform the Subpoena from a fishing expedition the journalist

privilege was intended to prevent.

The "likely relevance" standard simply is not met by a claim that outtakes *may* have *some*

*limited* relevance.  There must be a more particularized need for something that actually exists.

Sikelianos v. City of New York (In re Subpoena Directed to the AP), supra.  As the Court explained

in U.S. v. Grant, supra, "in Gonzales, and in other cases in which the journalists' privilege was

overcome, the video contained images of the tortious conduct or crime itself." 2004 U.S. Dist.

LEXIS 28176 at *7.  Indeed, in Gonzales v. NBC, supra, 194 F.2d at 36, the content of the outtakes

of that video was apparent: the conduct in issue was the defendant deputy officer's pattern and

practice in car stops, and the broadcast showed a car stop by that defendant.  Thus, the outtakes also

could "provide unimpeachably objective evidence of [the defendant's] conduct."  In Grant,

however, the video did not contain comparable images and disclosure was not compelled.

The "likely relevance" finding here is particularly troublesome on another ground.  The

BBC learned, quite belatedly, that at a conference held before Magistrate Judge Ellis on January 19,

2012, in the absence of the BBC (which is not a party to the case, was not alerted that argument

would be heard on the pending motions addressing the third-party subpoena) that Court invited and

held extended discussion with Plaintiffs' counsel on the question of relevance of the BBC Outtakes.

See App. 172, 175-180, 215.  Among other things, the Court asked about the relevance of the

Program to Plaintiffs' claim,  "how do we know there's anything relevant on the cutting room

floor," and "what principles should I [the Court] use in order to determine" this.  App.  178-179.

The Court continued this line of inquiry, even thought it was alerted that the BBC's counsel was not

present, the motions were "not noticed for argument," and Plaintiffs' counsel did not "think it was

---

seeking Court-issued Hague letter to depose witness not linked to or shown to have participated in attacks in
issue).Here, neither the BBC Program, interviewees, nor Outtakes address the particular attacks at issue.

fair to proceed to discuss at this time." App. 179.

Nevertheless, they did proceed, even though the Court acknowledged that

*it certainly wouldn't be fair to the BBC*, but if I were to base my decision just on any questions I asked you, but I'm just looking for some kind of entre into my analysis. Obviously I'll take into account the arguments that the parties have, but *I'm looking for a framework in order to determine if in a situation such as this how should the Court go about doing it*…  [emphasis supplied][App. 179:24-25, 180:1-5].

Yet Plaintiffs' counsel admitted at that time that Plaintiffs are unaware of anything relevant to their claim in the subpoenaed BBC outtakes:

THE COURT…My question really is, how do we know there's anything relevant on the cutting room floor…

MR. TOLCHIN:  We don't. …. [App.  178:1-4].

That should have ended any relevance inquiry, improperly begun, and established that Plaintiffs could not meet the standard of "likely relevance" and "particularized need" here. Instead, the Court considered Plaintiffs' substantive mischaracterizations as to the nature, contents and significance of the Outtakes that the BBC was given no opportunity to rebut.  App. 180:14-21.

Respectfully, such *ex parte* communications are presumptively improper. See, e.g., Power Auth. of State of N.Y. v. F.E.R.C., 743 F.2d 93, 110 (2d Cir. 1984). [15] As Magistrate Judge Ellis indicated that Plaintiffs' counsel's *ex parte* representations were to aid the Court in reaching its decision on relevance (and the BBC was not notified of an opportunity to correct the record), that decision – with a basis abjectly prejudicial to the BBC and plainly lacking in fact – should be reversed.

_____

[15] See Canon 3(A)(4) of the Code of Judicial Conduct for United States Judges, promulgated by the Judicial Conference, which states  "[a] judge should not initiate, permit, or consider ex parte communications or consider other communications concerning a pending or impending matter that are made outside the presence of the parties or their lawyers. If a judge receives an unauthorized ex parte communication bearing on the substance of a matter, the judge should promptly notify the parties of the subject matter of the communication and allow the parties an opportunity to respond, if requested." http://www.uscourts.gov/RulesAndPolicies/CodesOfConduct/CodeConductUnitedStatesJudges.aspx (last visited October 1, 2012)

### B. The Sept. 6 Order Improperly Disregards Plaintiffs' Concessions and Other Proof that Reasonably Available Alternate Sources Exist, and Imposes an Erroneous Burden on the BBC, Which the BBC, In Any Event, Satisfied

The Sept. 6 Order provides no reason for its erroneous holding that the information sought by Plaintiffs is not reasonably available from sources other than the BBC, and even conceded certain of those sources that the BBC showed. As well, in ruling that the BBC failed to detail how burdensome production would be, the decision subjects the BBC to a burden that the journalist privilege does not require for applicability, and erroneously fails to hold that the BBC satisfied that burden consistent with privilege's *raison d'etre*, in any event.

**Available Alternate Sources**. In considering alternative sources, the underlying information *in* the Outtakes sought – not the outtakes themselves – is the focus.[16] See, e.g., Gonzales v. NBC, Inc., supra, 194 F.3d at 36 (holding that "the outtakes contain *information* that is not reasonably obtainable from other available sources")(emphasis added). [17] Here, Plaintiffs argued that the Outtakes are needed to prove their theory that Fatah and Al-Aqsa are the same or received funding from Defendants prior to the attacks in issue. Dkt No. 158 (Pl. Opp.) pp. 3, 6. The focus thus is on evidence of any such "links" in the Outtakes. This underlying information is available, and may have even already been obtained, from other sources, some direct or with first-hand

---

[16] If the underlying information were not the focus of the Gonzales test and the availability analysis were limited only to a particular piece of news footage (as opposed to what is *in* the footage), the news company would always be the only source of the footage and there would be no need for the second prong of the Gonzales test as there would never be any alternative source.

[17] See also U.S. v. Grant, No. 04 Cr. 207, 2004 U.S. Dist. LEXIS 28176, at *7 (S.D.N.Y. Nov. 17, 2004)("The parties dispute whether the video itself must be available elsewhere or whether alternative sources of the information captured on it would suffice....While it is true that the Government cannot obtain further video images of the club from any other source, they have considerable evidence of drug selling and drug use at the Sound Factory [shown in the video]."); Krase v. Graco Children Prods., Inc., supra, 79 F.3d at 353 ("However, it cannot be said that pertinent material is not obtainable elsewhere just because it is included in some out-takes"); Blum v. Schlegel, 150 F.R.D. 42, 46 (W.D.N.Y. 1993)("where the source [of the interview sought] is known and can be deposed, the availability of a deposition is an alternate source that must be pursued").

knowledge, without burdening non-party BBC for indirect, second-hand, cumulative information. [18]

**Available Sources – Defendants**. Indeed, Plaintiffs conceded the availability of alternate

sources by insisting that *Defendants here have already admitted that they fund Fatah* (Pl. Opp. (Dkt

No. 158) p.4) and referencing in its submission on the motions other information on this issue that

could be obtained from Defendants PLO and PA, including:

- "the admissions that 'Al-Aksa Brigades' is an alias for Fatah, which allegedly appeared on the PA's own website" and in reports published by the PA;

- "documents captured and published by Israel" and deposition testimony from the PA Minister of Civil Affairs that  allegedly reveal that the PA was funding Fatah;  and

- statements on PA website by "PA and PLO and their senior officials" allegedly admitting that the "wave of Palestinian terror" in 2000-2002 "was intended to intimidate the Israeli public and government to accept defendants' political demands..."

Dkt No. 159-6 (Pl. Opp. Ex. F), pp. 4-6, 13.

**Available Sources – Zubaidi and Abu Rumaileh**. Circumstances have changed in the

decade since Zubaidi and Abu Rumaileh spoke to the BBC.  Zubaidi and Abu Ramaileh (who is still

with Fatah), live and worked in zones now open for travel and commerce – they could have been

sought for interview or deposition in Jenin, where security has improved in the intervening years, or

elsewhere in the West Bank.  Abu Rumaileh apparently is under no travel restriction. Zubaidi, who

spoke over the years in news accounts of his disillusionment with his militant past and made

himself accessible to non-Palestinians, including Israelis, for interviews, *was placed this year under*

*the physical custody and undeniable control of Defendant PA, where he remains*. App. 91-97 (¶¶20,

---

[18] As such available other sources exist, the disclosure sought should be denied under Rule 26 (b)(2)(C)(i) as well as Rule 45. See, e.g., In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig., 249 F.R.D. 8, 11 (D. Mass. 2008)(Fed. R. Civ. P. 26(b)(2)(C) "initially governs enforcement of a Rule 45 subpoena."); Fed. R. Civ. P. 26(b)(2)(C)(i), (ii)(Court is required to limit discovery sought that is "unreasonably cumulative or duplicative," "can be obtained from some other source that is more convenient, less burdensome or less expensive" or where there has been "ample opportunity to obtain the information by discovery in the action"); Fed. R. Civ. P. 45(c)(1) (affirmatively mandates a party serving a subpoena "to take reasonable steps to avoid imposing an undue burden or expense" on a nonparty recipient).

22-28), 99-103 (¶¶20, 22-28); 157, 160, 163-167. [19] Defendants here, who have control over these

individuals, are subject to court order and could be compelled to produce them on a proper showing.

**Available Sources – Others Plaintiffs Conceded**. Plaintiffs have conceded other sources:

- Ahmed Qurei and Yasser Abed Rabbo, each of whom Plaintiffs claim "has knowledge of Fatah terrorist activities, of the provision of funds by the PA and PLO to Fatah in general and to Fatah terrorists specifically..." Dkt. No. 155-1 ( Pl. Initial Disclosures), p. 4;

- "Al-Aqsa operative, Ahmed Salah," whom Plaintiffs name as a convicted perpetrator of the 2004 Al-Aqsa attack in issue (Dkt No. 158 [Pl. Opp.], p. 3), and whose deposition can be pursued where he is incarcerated;

- Deposition testimony from the <u>Saperstein</u> case, which Plaintiffs claim involved the same issue and which they apparently intend to use in this case. Dkt. No. 155-1 (Pl. Initial Disclosures), p 6.

**Available Sources – Even More**: Listing but a few more (see App. 103-107 [¶¶29-40]):

- representative sample of some 500,000 documents seized from Arafat's headquarters by the Israeli Defense Forces in 2002, that contain information that addresses whether there are the relationships between the organizations at issue are publicly available on the website of the Israeli Ministry of Foreign Affairs ("MFA"), or from the MFA directly, in original Arabic and English translation;

- statements made in and to Israeli courts by Palestinians suspects and perpetrators in terror attacks are available on line or through request to Israeli authorities; and

- assessments of the relationships between these organizations by the Israel Security Agency, which has apprehended and identified Palestinian suspects involved in terror attacks, are available on a website set up by that agency.

Plaintiffs did not refute the reasonable availability of most of these numerous alternate

sources that are more credible, direct, first-hand and authoritative than the second-hand BBC

Outtakes. Where, as here, there are numerous unexhausted alternative sources available, the non-

party BBC should not be compelled to produce second-hand information in Outtakes, and their

---

[19] See Avi  Issacharoff, <u>Palestinian Authority arrest former militant Zakaria Zubeidi</u>. Haaretz (May 5, 2005) <u>http://www.haaretz.com/news/diplomacy-defense/palestinian-authority-arrests-former-militant-zakaria-zubeidi-1.428403</u>; Amira Hass, <u>Palestinian protests in West Bank highlight link between economy and security</u> Haaretz (Sept. 18, 2012) <u>http://www.haaretz.com/news/diplomacy-defense/palestinian-protests-in-west-bank-highlight-link-between-economy-and-security.premium-1.465460#.UGH8OlHgMws.email</u> ("Zakaria Zbeidi's continued arrest by the Palestinian authority has a great deal of impact.")(last visited Sept. 25, 2012).

foreign personnel should not be compelled to create and execute foreign affidavits for use here. [20]

The Sept. 6 Order erroneously disregards this overwhelming number of reasonably available alternate sources with its bare conclusion that they do not exist.

**The Additional Burden on the BBC, Imposed In Error, Was Satisfied**. The Sept. 6 Order also errs in requiring, as a prerequisite to attaining journalist protection, a "detailed" showing that the subpoenaed information must be "burdensome to produce."  But Gonzales does not impose any such burden on the press in order to obtain that protection. Indeed, it would not, as the Second Circuit *assumed*, in shaping the privilege, that compliance would be burdensome for the press.

As even the Sept. 6 Order recognizes (App. 4-5), the privilege aims to protect an independent press and free flow of information to the public by freeing the press from the "burden" of "the heavy costs of subpoena compliance...that would impair its duties" – and from the repeated disruptions caused by litigants seeking by subpoenas to rummage through press files for material to aid private causes, resulting in "symbolic harm" by appearing to compromise press independence and objectivity. Gonzales v. NBC, Inc., supra, 194 F.3d at 35. [21] It is for that reason that the burden of overcoming privilege is placed *solely* on the party seeking disclosure, here Plaintiffs, with no unique prerequisite that the press proponent detail the burdensomeness of compliance, in order to gain protection.  The Sept. 6 Order was in clear error in imposing a burden on the BBC that the BBC simply does not have.

---

[20] Carter v. The City of New York, No. 02 Civ. 8755, 2004 WL 193142 at *1, 2004 U.S. Dist. LEXIS 1308 at *4 (S.D.N.Y. Feb. 2, 2004) (failure to show that information cannot be obtained elsewhere defeats subpoena on journalist, particularly where other witnesses exist);  U.S. v. Grant, supra at *8 ("given the availability of alternative sources of information and the far more attenuated need for the outtakes," journalist's privilege not overcome).

[21] The Second Circuit was concerned that it would become "standard operating procedure for those litigating against an entity that had been the subject of press attention to sift through press files in search of information supporting their claims." Gonzales v. NBC, Inc., supra, 194 F.3d at 35. Here the BBC has just that burden, having responded to no less than four subpoenas, three from Plaintiffs' counsel alone, seeking the same Outtakes and testimony. App. 24 (¶3). See also Saperstein v. Palestinian Authority, 1:09-mc-00619-SLT-ALC (E.D.N.Y.) (motion to quash subpoena granted).

Nevertheless, BBC did make such a showing, although it was not required.  It is self-evident, of course, that the BBC would be burdened by having to search its records to produce outtakes of two interviews of the many contained in a decade-old Program. But the BBC, in a detailed *unrefuted* demonstration showed the special gravity, vulnerability and far greater burdens at risk with the conflict-zone reporting involved here. It showed how the "symbolic harm" that concerned the Second Circuit could easily translate into real harm for the BBC worldwide if its newsgathering materials were compelled – unduly wreaking an undue and dangerous burden on its ability to maintain independence and ensure the safety of its war/conflict-zone reporters. That burden is discussed above, pp. 5-7, <u>supra</u>.  The Sept 6 Order erroneously disregarded this showing, which would fully satisfy even the erroneous burden on the BBC imposed in that Order.

### C.    The Negative Effect on a Free Press Outweighs <u>Speculative Relevance and Witness Unavailability</u>

The public and national interests served by the journalist privilege – in maintaining an independent and objective press, and a free flow of information to the public – have long been recognized and protected by courts and legislatures alike. See pp.  13-15, <u>supra</u>. They require litigants, even those asserting Anti-Terrorism Act ("ATA") actions such as Plaintiffs, to satisfy the privilege's particular requisites before discovery may be compelled. <u>See, e.g.</u>, <u>In re Subpoena to Goldberg (Saperstein v. Palestinian Authority)</u>, 694 F.Supp.2d 81 (D.D.C. 2010)(ATA action in which journalist subpoena quashed).

They likewise require, in applying the <u>Gonzales</u> test, "balancing the likely relevance of the material sought and its availability from alternative sources against the public interest in a free press" to insure that the latter is outweighed.  <u>U.S. v. Grant</u>, <u>supra</u>, 2004 U.S. Dist. LEXIS 28176 at *6.    Here it is not, and the Sept. 6 Order erred in failing to consider this factor.

As discussed in detail above (see pp.  3, 5-6, <u>supra</u>), in gathering news for the Program, the BBC correspondent was courting significant safety risk in a war zone. To properly serve in this role,

journalists covering such conflicts have a particular need for the judicial protection afforded them from litigation subpoenas from civil litigants such as Plaintiffs, seeking to exploit their newsgathering efforts for personal purposes – however sympathetic. These war zone correspondents may be left with fewer forthcoming sources and exposed to significantly more danger than other journalists if courts stripped them of this protection, and they were viewed, as the Second Circuit feared, "as an investigative arm of the judicial system, the government, or private parties."[22]

This would negate that "paramount public interest" in the "maintenance of a vigorous, aggressive and independent press capable of participating in robust, unfettered debate over controversial matters" that the Second Circuit recognized as playing a particularly vital role here. Plaintiffs' remote, cumulative and speculative need for the Outtakes in its private cause – with a court skeptical of a "smoking gun" – cannot outweigh the broader concerns implicated here.

### III.  THE SEPT. 6 ORDER ERRED IN ORDERING PRODUCTION WHERE THE COMPELLED DISCLOSURE IS NOT ADMISSIBLE

It is settled that compelled disclosure will not be ordered if the information sought would not be admissible in the action.  See, e.g., U.S. v. Harwood, 998 F.2d 91, 97-98 (2d Cir. 1993)(statements to reporter inadmissible hearsay and subpoena to reporter quashed); Mandal v. City of New York, No. 02CIV1234(WHP)(FM), 2004 WL 2375817, at *4 (S.D.N.Y. October 21, 2004) ("in determining whether to quash a subpoena, courts in this Circuit have considered the admissibility of the materials sought from journalists).[23] Yet the Sept. 6 Order failed to consider

---

[22]This was also the conclusion reached in a war tribunal prosecution in The Hague, the International Criminal Tribunal for the Former Yugoslavia. "In war zones, accurate information is often difficult to obtain and may be difficult to distribute or disseminate as well. The transmission of that information is essential to keeping the international public informed about matters of life and death." Prosecutor v Brdjanin, Case No.: IT-99-36-AR73.9, Decision on Interlocutory Appeal at ¶36 (Dec. 11, 2002)(during prosecution of former Bosnian Serb official, tribunal refused to compel testimony from former Washington Post reporter who had interviewed official) App.  44-59. "War correspondents must be perceived as independent observers rather than as potential witnesses for the Prosecution. Otherwise, they may face more frequent and grievous threats to their safety and to the safety of their sources." App. 54 (¶42).

[23] See also Concerned Citizens v. Belle Haven Club, No. 3:99 CV 1467, 2004 U.S. Dist. LEXIS 27335, at *6-7 (D. Conn. June 21, 2004)(subpoena seeking journalist's deposition testimony as to the accuracy of

whether the information compelled was admissible, which it is not.

The BBC Outtakes, like the Program, will not be admissible – and thus cannot be used – unless they are properly authenticated, and the affidavits ordered cannot serve that purpose. Unlike a deposition, prohibited here, those affidavits will not afford Defendants an opportunity to cross-examine the affiants.  Without such an opportunity, absent here, the affidavits are inadmissible. See, e.g., Rafter v. Bank of Am., 04 CIV. 3341 JSR KNF, 2011 WL 2897331 (S.D.N.Y. June 28, 2011)(Court rejected affidavit inasmuch the plaintiff was not afforded an opportunity to cross-examine the affiant and challenge the veracity of his statements.); Fox Indus., Inc. v. Gurovich, 323 F. Supp. 2d 376, 382, order clarified, 323 F. Supp. 2d 383 (E.D.N.Y. 2004) See pp. 9-10, supra.

Even so, the statements of Abu Rumaileh and Zubaidi, in both the Program and any Outtakes, will be inadmissible as incompetent hearsay. They were not shown to be persons with the authority to make admissions on behalf of Defendants to qualify as party admissions under Fed. R Evid. 801(d)(2). Nor would they qualify as "declarations against interest" made by "unavailable" witnesses. Fed. R  Evid. 804(b). Neither man spoke under oath, and both attempted to promote his own points of view and agendas at the time, which would not be indicative of truthfulness and which may not necessarily have been adverse to them or Defendants. See generally App. 106 (¶¶37-38). [24] And Plaintiffs made no reasonable good-faith effort to obtain their presence and been unable

---

magazine article statements was quashed as they were inadmissible hearsay; the plaintiffs failed to show that the source was authorized to speak for the defendant or on the topics under Fed. R. Evid. 801(d)(2)(C), or that the topics were matters within the scope of his authority under Fed. R. Evid. 801(d)(2)(D)).

[24] Statements as these that at the time further the speaker's own interests do not qualify as admissible under Fed. R. Evid. 804(b)(3See, e.g., U.S. v. Bahadar, 954 F.2d 821, 828 (2d Cir. 1992)("[R]ule 804(b)(3) requires that the statement—to be admissible—must have been, at the time it was made, so far contrary to the declarant's best interests that a reasonable person would not make the statement unless the declarant believed it to be true."); Rotheram v. Manpower Demonstration Research Corp., No. 88 Civ. 0774(JMW), 1989 U.S. Dist. LEXIS 13728, at *3-4 (S.D.N.Y. Nov. 20, 1989)(statements inadmissible as hearsay as they "were not against [speaker's] interest when made" and "were consistent with his pecuniary interest"). See also 5-804 Weinstein's Federal Evidence § 804.06(4)(d)(iii) (2011)("[i]f the statement or any part of it serves the declarant's interest, it is not admissible as a statement against interest.").

to do so, as they must have. <u>Barber v. Page</u>, 390 U.S. 719, 724 (1968). [25]

Nor would their statements, made to promote agendas, have any "circumstantial guarantees of trustworthiness" under Rule 807. See App. 105-107 (¶¶35-40). And as there exist more direct and first-hand sources for whether the relationships in issue exists that are reasonably available to Plaintiffs, excluding these statements will have no effect on that policy.. See pp. 19-20, <u>supra</u>; App. 105-107 (¶¶35-40).

As the compelled disclosure from the BBC is inadmissible and thus of no probative value here, the Subpoena should have been quashed. <u>See, e.g.</u>, <u>U.S. v. Hubbard</u>, 493 F.Supp. 202, 205 (D.D.C.1979) (non-party subpoena quashed because information sought from reporter was hearsay, and since there were available first hand sources, it was "merely cumulative and less than the best evidence available").

<strong><u>CONCLUSION</u></strong>

For the foregoing reasons, the Sept. 6 Order should be reversed insofar as it denied the BBC's motion and partially granted Plaintiff's cross Motion. The BBC's Motion to Quash Plaintiffs' Subpoena should be granted, and Plaintiff's cross Motion to Compel should be denied in all respects.

Dated:   New York, New York       MILLER KORZENIK SOMMERS LLP
         October 1, 2012

By _Louise Sommers_ (signature)

Louise Sommers
David S. Korzenik
Itai Maytal
488 Madison Avenue Suite 1120
New York, New York 10022-5702
212-752-9200
lsommers@mkslex.com
Attorneys for The British Broadcasting Corporation

---

[25] Plaintiffs' claim of futility was based on a faulty premise as to the availability of these witnesses. App 91, 98 (¶¶19-20),  99-102 (¶¶22-28).  <u>See also</u>  pp. 19-20, <u>supra</u>.  Even so, futility would not relieve them of making the effort. <u>Barber v. Page</u>, <u>supra</u>.