UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------x

MARK I. SOKOLOW, et al.,                          :        04 Civ. 00397(GBD)(RLE)

                                    Plaintiffs,   :

                     -against-                    :        ECF CASE

                                                  :

PALESTINE LIBERATION ORGANIZATION, et al.,        :

                                    Defendants.   :

-----------------------------------------------------------------------x

## APPENDIX

### TO

### OBJECTIONS OF THE BRITISH BROADCASTING CORPORATION TO SEPTEMBER 6, 2012 MEMORANDUM OPINION & ORDER OF MAGISTRATE JUDGE ELLIS DENYING ITS MOTION TO QUASH SUBPOENA AND PARTIALLY GRANTING PLAINTIFFS' CROSS MOTION TO COMPEL

MILLER KORZENIK SOMMERS LLP
488 Madison Avenue Suite 1120
New York, New York 10022-5702
(212) 752-9200
lsommers@mkslex.com
Attorneys for the British Broadcasting Corporation

*Sokolow v. Palestine Liberation Organization*, 04 Civ. 397 (GRB)(RLE)

# APPENDIX
## <u>TABLE OF CONTENTS</u>                                                                <u>page</u>

MEMORANDUM OPINION AND ORDER Filed September 6, 2012 (Hon. Ronald L. Ellis, M.J.) ...............1

NOTICE OF MOTION OF BBC TO QUASH SUBPOENA ...................................................8

DECLARATION OF NICOLA CAIN ......................................................................10

    Exhibit A - Subpoena to Testify At a Deposition in a Civil Case (S.D.N.Y.)......................14

DECLARATION OF STEPHEN MITCHELL...............................................................20

DECLARATION OF LOUISE SOMMERS.................................................................23

    Exhibit 1 - Subpoena to Testify in a Civil Case (E.D.N.Y.) ....................................29

    Exhibit 2 - Order of Magistrate Judge Orenstein filed August 8, 2011............................35

    Exhibit 3 - Robert Tolchin's letter to Court dated August 8, 2011 .............................39

    Exhibit 4 - Magistrate Judge Orenstein's August 8, 2011 Order...................................41

    Exhibit 5 - Decision in *Prosecutor v. Brdjanin* .............................................45

DECLARATION OF ITAI MAYTAL .....................................................................60

MEMORANDUM OF LAW OF THE BRITISH BROADCASTING CORPORATION
IN SUPPORT OF MOTION TO QUASH SUBPOENA .....................................................62

DECLARATION OF DR. YEZID SAYIGH .................................................................91

    Appendix A - Published Works of Dr. Yezid Sayigh.............................................108

    Appendix B - Articles from Haaretz.com .....................................................112

DECLARATION OF JEAN-FRANCOIS JULLIARD.........................................................114

REPLY MEMORANDUM OF THE BRITISH BROADCASTING CORPORATION
IN SUPPORT OF MOTION TO QUASH SUBPOENA AND MEMORANDUM
IN OPPOSITION TO PLAINTIFFS' CROSS MOTION TO COMPEL ......................................119

LETTER FROM LOUISE SOMMERS to Magistrate Judge Ronald Ellis dated Dec. 13, 2011 ....................148

SUR-REPLY OF THE BRITISH BROADCASTING CORPORATION IN OPPOSITION
TO PLAINTIFFS' CROSS MOTION TO COMPEL.........................................................150

THE BBC'S COUNTER NOTICE TO CORRECT MISSTATEMENTS MADE BY
PLAINTIFFS IN THEIR "NOTICE" FILING OF JANUARY 24, 2012 ...................................157

    Exhibit 1- News Articles from Haaretz.com .................................................164

LETTER FROM LOUISE SOMMERS to Magistrate Judge Ronald L. Ellis dated April 11, 2012................168

    Memorandum Order in <u>Klieman v. The Palestinian Authority,</u> Cv. No. 04-1173 (PLF/JMF) (D.D.C.),
    filed April 10, 2012 ......................................................................169

TRANSCRIPT OF CONFERENCE BEFORE THE HONORABLE
RONALD L. ELLIS US MAGISTRATE JUDGE dated January 24, 2012...................................172

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9-6-12

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MARK I. SOKOLOW, et al.,                    :

                  **Plaintiffs,**              :

              **- against -**                    :

PALESTINE LIBERATION ORGANIZATION, et al.,  :

                 **Defendants.**             :

**MEMORANDUM**
**OPINION & ORDER**
**04 Civ. 397 (GBD) (RLE)**

**RONALD L. ELLIS, United States Magistrate Judge:**

## I. INTRODUCTION

Before the Court is a Motion to Quash a Subpoena to Testify at a Deposition brought by

non-Party the British Broadcasting Corporation ("the BBC"). (Doc. No. 148.) Plaintiffs seek to

compel the BBC to comply with its subpoena, served on August 9, 2011, to provide the

following to Plaintiffs: (1) an authentic copy of a BBC documentary entitled "Arafat

Investigated"; (2) authentic copies of certain specific recordings created while preparing the

documentary but not included in the documentary (i.e., "outtakes"); and (3) foundational

deposition testimony from a knowledgeable employee of BBC regarding the authenticity of the

documentary and the outtakes, and the manner in which they were created and stored by BBC,

for the purpose of establishing their admissibility as "business records" (i.e., a standard "records-

keeper deposition"). (Pls.' Mem. in Opp. To BBC's Mot. to Quash Subpoena and in Supp. Of

Pls.' Mot. to Compel ("Pls.' Mem."), Doc. No. 158.) The BBC objects to the subpoena on

several grounds, but primarily because the subpoena violates the territorial restrictions under

Federal Rule of Civil Procedure 45. The BBC further asserts that compelling compliance with

the subpoena would compromise its independent editorial judgment, and disrupt its news-

gathering functions. (Mem. of Law of BBC in Supp. of Mot. to Quash Subpoena ("BBC

Motion"), Doc. No. 148 at 7.) For the reasons set forth below, the BBC's Motion to Quash the Subpoena is **DENIED**, in part. Plaintiffs' Cross-Motion to Compel compliance with the subpoena is **GRANTED,** in part, and **DENIED**, in part.

## II. BACKGROUND

The Court assumes general familiarity with the facts of the above-captioned matter. Plaintiffs are U.S. citizens who were killed or injured in several terrorist attacks in or near Jerusalem, Israel, and bring a civil action pursuant to the Antiterrorism Act, 18 U.S.C. § 2333, and other causes of action, against Defendants Palestine Liberation Organization ("PLO") and Palestinian Authority ("PA"). (Doc. No. 4 at ¶¶ 49-125.) Primarily, Plaintiffs assert that the PA and PLO funded the terrorist organizations, namely "Al-Aksa Brigades," that were involved in the alleged terrorist attacks, and that these terrorist organizations were effectively Defendants' officials, agents, and employees. (*Id.*) Plaintiffs also assert that Al-Aksah is operated by the Fatah faction of the PLO and that the PA and the PLO, under the leadership and direction of Yasser Arafat, are liable for the attack. (*Id.*)

The British Broadcasting Corporation is a British public service provider, and its "independent news programs are among the many types of programming it provides." (BBC Mot. at 2.) In 2003, the BBC broadcast a program titled "Arafat Investigated," which broadcast interviews with several individuals, including Ata Abu Rumaileh, the leader of Fatah in the West Bank city of Jenin, and with Zakaria Zubaidi, an alleged Al-Aksa Brigades terrorist leader in Jenin. *Id.* In these published interviews, both individuals made statements about Al-Aksa Brigades being a part of Fatah and of Yasser Arafat controlling Al-Aksa Brigades. (Pls.' Mem. at 3-5.)

2

## A.    The First Subpoena

Plaintiffs originally issued the subpoena from the Eastern District of New York,
ostensibly because Plaintiffs' counsel's offices are located in Brooklyn and, thus, the subpoena
had to be issued from the court in the district in which the deposition is to take place. (Pls.'
Mem. at 6, n. 4.)  The BBC filed its Motion to Quash the Subpoena in the Eastern District, and
then-Magistrate Judge Andrew L. Carter granted Plaintiffs' subpoena in *Saperstein v.
Palestinian Auth.*, 09-MC-00619 SLT ALC, 2010 WL 1371384 (E.D.N.Y. Apr. 6, 2010),
vacated (Dec. 16, 2010).  The order was vacated on December 16, 2010 after Plaintiffs withdrew
the subpoena and issued it from this District. (*Id.*)

## B.    The Instant Subpoena

Plaintiffs then proceeded to serve the subpoena at issue on August 9, 2011, noticed for
August 25, 2011, from the Southern District of New York.  The subpoena, which is nearly
identical to the proposed subpoena in the Eastern District, seeks the complete, unedited
interviews of Abu Rumaileh and Zubaidi ("outtakes"), as well as the deposition of a witness to
establish that "both the documentary and the outtakes (a) are true copies of the original records
and (b) were generated, stored and copied in such a manner as satisfies the business records
exception under Fed.R.Evid. 803(b)." (Pls.' Mem. at 7.)    Plaintiffs assert that the outtakes are
requested because, if the Plaintiffs were to introduce the documentary interviews as evidence at
trial, "defendants will undoubtedly seek to object on the grounds that the interviews appearing in
the documentary are not complete recordings but merely segments." (Pls.' Mem. at 7.)
According to the Plaintiffs, the outtakes of the interview footage are relevant to the issue of
whether Fatah and Al-Aqsa are one in the same entity.  If Fatah, which is part of the PLO, is
connected to Al-Aqsa's activities, then the Plaintiffs can obtain relief from the Defendants.

3

Plaintiffs claim the outtakes may be relevant to establishing this connection to the case. (Pls.'

Mem. at 5-6.) Accordingly, Plaintiffs claim the outtakes are needed because the interviews

contain "extremely probative statements that are highly relevant to plaintiffs' case." (*Id.*) BBC

objects strenuously to production of the outtakes footage as falling under the journalist privilege.

BBC has already produced the broadcast version of the program to Plaintiffs, but has claimed the

journalist privilege, arguing that allowing for disclosure of the outtakes sought would disrupt

BBC's newsgathering activities and compromise its independent editorial judgment. (BBC Mot.

at 7-8.)

With regard to the deposition of a BBC records-keeper, Plaintiffs claim that they require

testimony from "a knowledgeable employee of BBC regarding the authenticity of the

documentary and the outtakes" to establish that the documentary and outtakes are true copies of

the original records and to establish the material as business records under Federal Rule of

Evidence 803(6). (*Id.*) The BBC asserts that the deposition of one of its employees for the

purpose of establishing the business records exception is burdensome and would violate the

territorial restrictions found in Federal Rule of Civil Procedure 45.

### III. DISCUSSION

**A.** **The BBC outtakes are non-confidential information and Plaintiffs have shown sufficient relevance and necessity of the outtakes to overcome the journalist privilege.**

Federal Rule of Civil Procedure 45 allows the court to modify or quash a subpoena

served on a third party that requires disclosure of privileged or other protected material.

Journalists enjoy a qualified privilege that protects newsgathering efforts. *See Gonzales v.*

*National Broadcasting Co.*, 194 F.3d 29 (2d Cir. 1999). Issuing subpoenas to journalists and

news organizations on a regular basis would "preempt the otherwise productive time of

4

journalists and other employees but measurably increase expenditures for legal fees." *Id.* at 33-34.

The privilege extends to both confidential and non-confidential information, but the standard for overcoming the journalist privilege for non-confidential information is much less stringent. *Id.* at 36. Confidential information will not be disclosed absent a "clear and specific showing" by the requesting party that the information is: (1) "highly material and relevant"; (2) necessary or critical to the maintenance of the claim"; and (3) "not obtainable from other available sources." *In re Petroleum Products Antitrust Litig.*, 680 F.2d 5, 7 (2d Cir. 1982). Non-confidential information also has some measure of protection from disclosure by the journalist privilege. The litigant seeking the information must show that the materials are: (1) "of likely relevance to a significant issue in the case"; and (2) "not reasonably obtainable from other available sources." *Gonzales*, 194 F.3d at 36. Therefore, when the journalist privilege is invoked, the Court must first determine whether the information sought is confidential or non-confidential. Then, it must apply the applicable test for determining whether the party seeking the information has met the burdens imposed to overcome the journalist privilege.

Here, the outtakes requested are not confidential material, because the BBC is free to disseminate any portions of the interviews, and the BBC has not asserted the outtakes to be confidential. The outtakes are of "likely relevance" because the footage in question may contain information that links Fatah to Al-Aqsa. Although the Court is skeptical of a "smoking gun" presenting itself in these outtakes, the standard for relevance to overcome the journalist privilege for non-confidential materials is low, and the outtakes meet this lower standard of "likely relevance" to a significant issue in the case.

Further, the material sought is "not reasonably obtainable from other available

5

resources." The BBC asserts that Plaintiffs have not exhausted other resources for material, and claim Defendants themselves would be in possession of the information sought, including the interviewees at issue.

The Plaintiffs have agreed to limit the subpoena to the outtakes of those two individual interviews specifically, and the BBC has not detailed how burdensome the production of the outtakes would be. The BBC is directed to produce the outtakes.

**B.    A deposition is precluded under Rule 45 Territorial Restrictions, and would be unnecessarily burdensome to the BBC.**

Federal Rule of Procedure 45(c)(3)(A)(ii) provides that "the issue court must quash or modify a subpoena" that "requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed or regularly transacts business in person." This restriction is imposed to protect non-party witnesses from being subjected to burdensome and excessive discovery in litigation in which the witnesses have little or no interest. *In re Edelman*, 295 F.3d 171, 178 (2d Cir. 2002).

Here, the BBC has asserted it does not have any witnesses in the United States who may speak to the authenticity of the documentary or the outtakes. (BBC Mot. at 11.) Additionally, any witnesses would be at least 100 miles outside of Rule 45's territorial restrictions. Despite Plaintiffs' willingness to conduct the deposition in London, the Court does not find sufficient necessity to compel production of an individual's testimony to be taken in another country. This would be burdensome to non-party BBC, and is unnecessary. Rather, the BBC is directed to produce an affidavit confirming the authenticity of the outtakes and as business records.

## IV. CONCLUSION

For the foregoing reasons, the BBC's Motion to Quash the Subpoena is **DENIED**, and

6

the Plaintiffs' Cross-Motion to Compel BBC to Comply is **GRANTED**, in part, and **DENIED**, in part. BBC is directed to produce the outtakes of the interviews with the specified individuals. It is not compelled to produce a witness to testify as to the authenticity of the documentary or outtakes. However, BBC shall furnish the outtakes with written affidavits from knowledgeable witnesses as to the authenticity of the documentary and outtakes. The outtakes and the accompanying affidavit(s) shall be provided to the Plaintiffs on or before **September 17, 2012**. This Order resolves Docket # 143 and Docket # 157.

**SO ORDERED this 6th day of September 2012**
**New York, New York**

The Honorable Ronald L. Ellis
United States Magistrate Judge

7

MILLER KORZENIK SOMMERS LLP
David S. Korzenik
Louise Sommers
Itai Maytal
488 Madison Avenue 11th Floor
New York, New York 10022-5702
(212) 752-9200
dkorzenik@mkslex.com
lsommers@mkslex.com
*Attorneys for The British Broadcasting Corporation*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------x

MARK I. SOKOLOW et al.,                          :        04-CV-00397 (GBD)(RE)
                                                 :
                              Plaintiffs,        :
               -against-                         :
                                                 :        **NOTICE OF MOTION**
                                                 :
THE PALESTINIAN LIBERATION ORGANIZATION,   :
et al,                                           :        ECF CASE
                              Defendants.        :
                                                 :
----------------------------------------------------------------------x

PLEASE TAKE NOTICE that, upon the annexed declarations of Stephen Mitchell dated

September 6, 2011, Nicola Cain, dated September 6, 2011, Itai Maytal, dated September 6, 2011,

and Louise Sommers dated September 6, 2011, the accompanying Memorandum of Law, the

Subpoena to Testify at a Deposition in a Civil Action dated August 9, 2011 (Exhibit "A" to

Declaration of Nicola Cain), and all prior proceedings, the undersigned will move this Court

before the Hon. George Daniels, U.S.D.J. at the United States District Court for the Southern

District of New York, 500 Pearl Street, New York, New York 10007-1312, as soon as counsel

can be heard, for an Order, pursuant to Rule 45(c)(1) and (c)(3) of the Federal Rules of Civil

Procedure, quashing the Subpoena issued by Plaintiffs Mark I. Sokolow *et al.* to The British

1

Broadcasting Corporation, and granting such other and further relief as the Court may deem just and proper.

PLEASE TAKE FURTHER NOTICE that opposing affidavits and memoranda of law, if any, must be served upon the undersigned pursuant to stipulation by September 22, 2011 and must be filed with the Court in accordance with applicable rules.

Dated:   New York, New York          MILLER KORZENIK SOMMERS LLP
         September 8, 2011

                                    By _____
                                          Louise Sommers
                                          David S. Korzenik
                                          Itai Maytal
                                    488 Madison Avenue Suite 1120
                                    New York, New York 10022-5702
                                    212-752-9200
                                    lsommers@mkslex.com
                                    dkorzenik@mkslex.com
                                    Attorneys for The British Broadcasting Corporation

2

MILLER KORZENIK SOMMERS LLP
David S. Korzenik
Louise Sommers
Itai Maytal
488 Madison Avenue 11th Floor
New York, New York 10022-5702
(212) 752-9200
dkorzenik@mkslex.com
lsommers@mkslex.com
*Attorneys for The British Broadcasting Corporation*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------x
MARK I. SOKOLOW et al.,                          :
                                                 :  04-CV-00397 (GBD)(RE)
                              Plaintiffs,         :
                                                 :
          -against-                              :  **DECLARATION OF**
                                                 :  **NICOLA CAIN**
                                                 :
THE PALESTINIAN LIBERATION ORGANIZATION          :
et al.,                                          :  ECF CASE
                              Defendants.         :
                                                 :
----------------------------------------------------------------------x

NICOLA CAIN declares, pursuant to 28 U.S.C. §1746 as follows:

1.      I am a Barrister with The British Broadcasting Corporation (the "BBC"), a British

public service broadcaster, headquartered in the City of Westminster, London. As part of the

BBC's litigation department, I regularly advise the news company's management and program

makers in all aspects of media and information law, which includes the protection of journalistic

information. I am fully familiar with the facts and circumstances herein and make this

declaration based on personal knowledge in support of the BBC's motion to quash the Subpoena

directed to it by counsel for the Plaintiffs (the "Subpoena") in the underlying action.

1

2. Annexed as Exhibit A hereto is a true and correct copy of the Subpoena served on the BBC in New York County, Southern District of New York. It directs the BBC to designate a person or persons to testify on its behalf in the Southern District of New York on August 25, 2011 in connection with this case, in which the BBC is not involved.

3. The Subpoena also directs the BBC witness to bring "authentic, complete and unedited copies of all the Recordings" related to the BBC news program "Arafat Investigated," broadcast by the BBC on November 9, 2003 (the "Program"). The term "Recordings" is defined to include both broadcast and unpublished material: (a) a copy of the Program as broadcast, and (b) "all audiovisual recordings recorded during the preparation and making of the Program and/or for the purpose of preparing and making the Program that include audio and/or video recordings of Ata Abu Rumaileh and/or Zakaria Zubaidi, including all such recordings which were not ultimately included in the Program as broadcast." Ex. A. App. B. A copy of the Program as broadcast has been previously furnished to Robert Tolchin, who is counsel for Plaintiffs.

4. The Subpoena instructs the BBC to "designate a person or persons to testify on its behalf regarding" the following four topics (the "Topics"): (i) "the authenticity of the Recordings"; (ii) n "the manner in which the Recordings were copied in order to produce a copy to the plaintiff pursuant to the instant subpoena"; (iii) "the place and manner in which the Recordings were stored, held and maintained between the dates on which the Recordings were originally created and the date on which the Recordings were copied in order to produce a copy to the plaintiff;" and (iv) "the manner in which the BBC generally stored, held and maintained audiovisual recordings of this type during the period between the dates on which the Recordings

2

were created and the date on which the Recordings were copied in order to produce a copy to the plaintiff pursuant to the subpoena." Ex. A, App. A.

5.        I have made a diligent inquiry regarding those individuals with knowledge of the Topics who could potentially be designated by the BBC to testify on its behalf. Based on that inquiry, I have determined that there is no potential witness with knowledge of those Topics in New York, and that any potential witness would be required to travel more than 100 miles from where that witness resides, is employed, or regularly transacts business in person if required to appear and testify pursuant to Subpoena. No such potential witness is a party to the underlying case in the Southern District of New York, or a party's officer.

6.        It may be the case, moreover, that the necessary knowledge does not reside in one person, but that more than one witness would be needed to respond to all the Topics. In that case, the Subpoena poses a double burden as it would also be extremely disruptive to the business of the BBC to have more than one (much less, one) of its employees distracted by compelled testimony in a foreign case in which the BBC is a stranger.

7.        In any event, the only individuals from the BBC with knowledge of the Topics in the Subpoena are based in the United Kingdom.

8.        As well, the BBC does not maintain in the United States any requested document that would be responsive to the Subpoena.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in London, United Kingdom on September 06, 2011.

_____
Nicola Cain

3

APPENDIX Page 012

# EXHIBIT A

AO 88A (Rev. 06/09) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of New York

| | |
|---|---|
| Mark I. Sokolow, et al., | ) |
| *Plaintiff* | ) |
| v. | ) |
| The Palestine Liberation Organization, et al. | ) Civil Action No.  04-397 (GBD) |
| *Defendant* | ) (If the action is pending in another district, state where: |
| | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:  The British Broadcasting Corporation

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization that is *not* a party in this case, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

See Appendix A

| Place: Miller Korzenik Sommers LLP | Date and Time: |
|---|---|
| 488 Madison Avenue Suite 1120 | |
| New York NY 10022-5702 | 08/26/2011 9:00 am |

The deposition will be recorded by this method:  Stenographically

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material:

See Appendix B

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date:  08/09/2011

CLERK OF COURT

OR

_____          _____
Signature of Clerk or Deputy Clerk                    Attorney's signature

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*  Mark Sokolow et al

Robert J. Tolchin, Berkman Law Office, LLC, 111 Livingston Street, Suite 1928 Brooklyn, New York 11201, who issues or requests this subpoena, are:
rjt.berkman@gmail.com (718) 855-3627

APPENDIX Page 014

AO 88A (Rev. 06/09) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No. 04-397 (GBD)

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)*

was received by me on *(date)*

☐ I served the subpoena by delivering a copy to the named individual as follows:

on *(date)* ; or

☐ I returned the subpoena unexecuted because:

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of
$

My fees are $ for travel and $ for services, for a total of $ 0.00

I declare under penalty of perjury that this information is true.

Date:

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 88A (Rev. 06/09) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), and (e) (Effective 12/1/07)

**(c) Protecting a Person Subject to a Subpoena.**

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*

(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) *Quashing or Modifying a Subpoena.*

(A) *When Required.* On timely motion, the issuing court must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information;

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

(iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

(1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) *Claiming Privilege or Protection.*

(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Contempt.** The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

## Appendix A

Pursuant to Rules 30(b)(6) and 45 of the Federal Rules of Civil Procedure, the British Broadcasting Corporation ("BBC") is required, in accordance with the definitions and instructions set forth herein, to designate a person or persons to testify on its behalf at the deposition regarding: the authenticity of the Recordings (as defined below); the manner in which the Recordings were copied in order to produce a copy to the plaintiff pursuant to the instant subpoena; the place and manner in which the Recordings were stored, held and maintained between the dates on which the Recordings were originally created and the date on which the Recordings were copied in order to produce a copy to the plaintiff; and the manner in which BBC generally stored, held and maintained audiovisual recordings of this type (i.e. audiovisual recordings similar in origin to the Recordings) during the period between the dates on which the Recordings were created and the date on which the Recordings were copied in order to produce a copy to the plaintiff pursuant to this subpoena.

## Appendix B

Pursuant to Rules 34 and 45 of the Federal Rules of Civil Procedure, BBC is required, in accordance with the definitions and instructions set forth herein, to produce (on DVD or other appropriate medium) authentic, complete and unedited copies of all the Recordings.

## DEFINITIONS

The definitions and rules of construction set forth in Rule 34 of the Federal Rules of Civil Procedure are hereby incorporated and apply to this request for the production.

1.  The term "Recordings" used herein refers to and includes all of the following:

    a.  An authentic, complete and unedited audiovisual copy of the BBC program titled "Arafat Investigated" which was broadcast by BBC on or about November 9, 2003 (hereinafter: the "Program"); and

b. Authentic, complete and unedited audiovisual copies of all audiovisual recordings recorded during the preparation and making of the Program and/or for the purpose of preparing and making the Program that include audio and/or video recordings of Ata Abu Rumaileh and/or of Zakaria Zubaidi, including all such recordings which were not ultimately included in the Program as broadcast.

## INSTRUCTIONS

1. In answering and responding to these requests, you shall produce all of the materials requested, wherever located, which are in your possession, custody or control.

2. If you withhold the Recordings, or any portion of the Recordings, under a claim of privilege, you shall produce, in accordance with Rule 26 of the Federal Rules of Civil Procedure, a written privilege log that sets forth the nature of the privilege asserted.

3. The Recordings are to be produced in their entirety without redaction. If a portion of the Recordings is withheld under claim of privilege, any non-privileged portion of the Recordings must be produced, with the portion claimed to be privileged redacted.

4. If in answering these requests you claim any ambiguity in a request or a definition or instruction applicable thereto, identify in your response the language you consider ambiguous and state the interpretation you are using in responding.

5. In the event that multiple copies of the Recordings exist, produce every non-identical copy.

#1176 P.006 /006



MILLER KORZENIK SOMMERS LLP
David S. Korzenik
Louise Sommers
Itai Maytal
488 Madison Avenue 11th Floor
New York, New York 10022-5702
(212) 752-9200
dkorzenik@mkslex.com
lsommers@mkslex.com
*Attorneys for The British Broadcasting Corporation*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x

MARK I. SOKOLOW et al.,                                : 04-CV-00397 (GBD)(RE)
                                                       :
                              Plaintiffs,              :
                                                       :
                                                       : **DECLARATION OF**
              -against-                                : **STEPHEN MITCHELL**
                                                       :
                                                       :
THE PALESTINIAN LIBERATION ORGANIZATION:                  ECF CASE
et al,                                                 :
                              Defendants.              :
                                                       :
                                                       :
-------------------------------------------------------------------------x

STEPHEN MITCHELL declares, pursuant to 28 U.S.C. §1746 as follows:

1.     I am the Deputy Director of News and head of Multimedia Programmes at

the British Broadcasting Corporation (the "BBC"), a British public service broadcaster,

headquartered in the City of Westminster, London, where I am employed. I have

responsibility for the BBC's news, current affairs and investigative journalism

programming across the BBC's radio and television channels and for the team which

commissioned and broadcast the 2003 news program "Arafat Investigated" (the

"Program"). I am fully familiar with the facts and circumstances herein and make this

declaration in support of the BBC's motion to quash the Subpoena directed to it by

1

counsel for Plaintiffs (the "Subpoena") with respect to a case in the Southern District of New York.

2.      I have reviewed the Subpoena, which seeks unpublished information and materials from the Program. Disclosure of any of the unpublished information from the Program would unduly hamper the BBC's ability to function in its independent editorial role. Among other things, were the BBC to be drawn into private disputes as a result of favorable or unfavorable coverage of persons and topics on which it reports, its impartiality among sources would be compromised. This would in turn impair the BBC's ability to report on important stories. Even non-confidential sources, as well as viewers, expect journalists to be independent chroniclers of events, not investigative functionaries for private litigants and the government.

3.      BBC sources who agree to appear on camera have a reasonable expectation that use of their footage will be subject to BBC's independent editorial judgment and will not be taken out of context, passed on to third parties or employed outside of the broadcast in which they agreed to participate. If the BBC's judgment to publish, or not to publish, certain footage was wrested from the BBC by private litigants for private purposes, that expectation would not be met, sources would be far less inclined to speak candidly with BBC reporters, if at all, and significant news relationships could be impaired.

4.      This issue is of particular concern here where war reporting is involved. Disclosure of the nature sought by Plaintiffs would jeopardize the security of BBC reporters who must cover stories in war zones or other areas of armed conflict, like the

2

Middle East, and depend upon their neutrality for access and safe passage back to their bureaus. Individuals in conflict zones would be more likely to question the neutrality of BBC reporters if they thought we would routinely be called to testify against them or their associates in litigation later.

5.     Compulsion under the subpoena also unduly disrupts the BBC's newsgathering activities in general. Given the breadth of topics the BBC covers internationally, if its reporters, editors and managers were required to provide unpublished evidence in any civil or criminal matter merely because of a topic or subject the BBC covered, the BBC would be spending its time and attention as professional witnesses, rather than as professional journalists.

6.     I have also reviewed the various topics listed in the Subpoena as to which Plaintiffs intend to elicit information from a BBC witness. To my knowledge, any potential witness for the BBC with knowledge of these topics does not live or work in New York and would be required to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person if required to testify in that State.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in London, United Kingdom on September 06, 2011.

STEPHEN MITCHELL

3

MILLER KORZENIK SOMMERS LLP
David S. Korzenik
Louise Sommers
Itai Maytal
488 Madison Avenue 11th Floor
New York, New York 10022-5702
(212) 752-9200
dkorzenik@mkslex.com
lsommers@mkslex.com
*Attorneys for The British Broadcasting Corporation*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x    04-CV-00397 (GBD)(RE)
MARK I. SOKOLOW et al.,                                     :
                                         Plaintiffs,        :    **DECLARATION OF**
                                                            :    **LOUISE SOMMERS**
                      -against-                             :
                                                            :    ECF CASE
THE PALESTINIAN LIBERATION ORGANIZATION,   :
 et al,                                                     :
                                    Defendants.             :
-------------------------------------------------------------------x

     LOUISE SOMMERS declares, pursuant to 28 U.S.C. §1746 as follows:

     1.     I am a partner in the Law firm of Miller Korzenik Sommers LLP, attorneys for

The British Broadcasting Corporation (the "BBC"). I am fully familiar with the facts and

circumstances herein and make this declaration based on personal knowledge, except where

indicated on information and belief, in support of the BBC's motion to quash the Subpoena To

Testify at A Deposition In a Civil Action dated August 9, 2011 (the "Second Subpoena"),

directed to it by counsel for the Plaintiffs.

     2.     This Subpoena seeks testimony and documents related to a 2003 news program

broadcast by the BBC entitled "Arafat Investigated" (the "Program") and unpublished materials

that include recordings of two Program interviewees. The BBC has previously provided Mr.

Tolchin with a copy of an audiovisual recording of the Program as broadcast. A transcript of the

Program is publicly available online at the BBC News website at

http://news.bbc.co.uk/nol/shared/spl/hi/programmes/correspondent/transcripts/arafat_investigate

d_09_11_03.txt.

     3.    This Subpoena is the second subpoena that Plaintiffs have served on the BBC for

the same information. The first subpoena was noticed in and issued from the Eastern District,

despite that the BBC was served in Manhattan and this case is pending here. Annexed hereto as

Exhibit 1 is a true and correct copy of that first subpoena dated July 8, 2011 (the "First

Subpoena").

     4.    I, and other counsel for the BBC, dealt in good faith with counsel for Plaintiffs in

attempting to resolve the subpoena issues, but have been unsuccessful to date.

     5.    Counsel for the BBC repeatedly advised counsel for Plaintiffs that the BBC could

not appear for deposition on the noticed date of the First Subpoena, July 26, 2011 or thereafter,

as the BBC advised that it did not have a witness in New York or the United States that was

knowledgeable about the topics listed in the First Subpoena on which Plaintiffs sought to elicit

testimony.

     6.    On July 14, 2011 my partner, David Korzenik first advised Robert Tolchin,

counsel for Plaintiffs of this. He contacted Mr. Tolchin to discuss the First Subpoena, explain the

BBC's concerns and determine if issues could be resolved without motion or objection.

     7.    He also asked Mr. Tolchin to consider moving the First Subpoena to, or

substituting it with one issued from, the Southern District of New York, where this case was

pending, the BBC was served, and the Court was most familiar with the issues in the case. As the

First Subpoena implicated issues of admissibility, relevance and privilege from compelled

disclosure of non-broadcast information, this Court, not the Eastern District, would be most

familiar with those issues and, in our view,  the most cost-effective and efficient forum for determining them. Mr. Tolchin was unwilling to consider any adjustment of his position.

8.      I also spoke with Mr. Tolchin about these issues on July 20, 2011. Mr. Tolchin continued to be unwilling to relieve the BBC of the burden of testifying, to move the First Subpoena or to have the issues raised by it heard by this Court.

9.      I discussed with Mr. Tolchin the scope of the outtakes Plaintiffs were seeking, which would affect the BBC's position with respect to its journalist privilege. He was aware that the BBC considered the subpoenaed outtakes protected by the journalist privilege, and believed that the underlying information sought could be obtained from more direct alternate sources, most notably, the defendants in this case. There seemed sufficient time for Plaintiffs to pursue those more appropriate alternative sources.

10.      I also asked Mr. Tolchin whether he would grant the BBC the courtesy of adjourning the deposition and agreeing to an extension of time for the BBC to object or move with respect to the First Subpoena.  Mr. Tolchin got back to me on Friday July 22, 2011 and advised me that Plaintiffs were narrowing the outtakes sought to two interviewees shown in the BBC news program at issue, Ata Abu Rumailleh and Zakaria Zubaidi. Although fact discovery in this case had over a year to go, he advised me of his or his clients' refusal to adjourn the deposition, or otherwise agree to an extension of time for the BBC to object or to move against the First Subpoena.  He would only agree to an extension if the BBC agreed to testify and produce the outtakes sought – in which case, the BBC would not have needed the requested extension to move in the first place.  As the deposition was noticed for July 26, it was necessary to make a motion on the next business day in order for it to be timely.

11.     To do so, the BBC opened a miscellaneous case in the Eastern District with a motion to quash the First Subpoena, or alternatively, to transfer the Subpoena to this case in the Southern District. Plaintiffs' counsel then filed a wasteful and ultimately fruitless letter motion to strike the BBC motion. Counsel contended that the BBC had failed to comply with a local rule requiring that a party write a 3-page letter before filing a motion – an act impossible to achieve since no case was pending in which to file such a letter prior to the filing of the BBC's motion to quash, which opened the miscellaneous case. Plaintiffs also attempted to have the matter heard by the Magistrate Judge of their choice.

12.     These tactics were rebuffed by the Court. Attached hereto as Exhibit 2 is a true and correct copy of the Order of Magistrate Judge Orenstein, the Magistrate Judge to whom the motion was referred, denying Plaintiffs' motion to strike the BBC's motion and directing the parties to agree on a briefing schedule for the BBC's motion addressed to the First Subpoena.

13.     Unhappy with this result, on August 4, 2011 Mr. Tolchin asked the BBC to agree to drop its argument based on Rule 45's territorial restriction if the deposition were conducted in London. I advised him that the BBC could not agree to this proposal. He then told me that he intended to serve a second subpoena on the BBC, this time issued from the Southern District – even though he had earlier rejected the BBC's request to do so, and already caused the BBC to commence an Eastern District case and engage in costly, wasteful motion practice there.

14.     I requested that instead of increasing the costs and burdens on the BBC by requiring the BBC to start over with a deadline and a new motion here, Plaintiffs simply agree to the BBC's existing motion insofar as it requested a transfer to this Southern District case.

15.     Instead of agreeing, Plaintiffs' counsel attempted to extract conditions for an agreement to do so, and then claimed to be concerned that the BBC might argue "on appeal to

the Second Circuit" that the Southern District lacks subject matter jurisdiction over the transfer, even though the BBC had requested it. Then, without disclosing to the Court that Plaintiffs intended to serve yet a second subpoena on the BBC, Plaintiffs' counsel unilaterally represented to the Eastern District Court that "[h]aving given careful thought and consideration to certain arguments raised by the defendants [sic] in their motion, we have decided to withdraw the subpoena..." and "the BBC's motion is now moot." On receipt of that representation, the Court immediately denied the BBC's motion as moot. Annexed hereto as Exhibits 3 and 4, respectively, are true and correct copies of Mr. Tolchin's August 8, 2011 letter to the Court, and Magistrate Judge Orenstein's August 8, 2011 Order.

16.    Plaintiffs then served the Second Subpoena on the BBC.

17.    Annexed hereto as Exhibit 5 is a true and correct copy of the decision reached in a war tribunal prosecution in The Hague, the International Criminal Tribunal for the Former Yugoslavia, in  Prosecutor v Brdjanin, Case No.: IT-99-36-AR73.9, Decision on Interlocutory Appeal (Dec. 11, 2002), in which the tribunal, during a prosecution of a former Bosnian Serb official, refused to compel testimony from a former Washington Post reporter who had interviewed that official.


I declare under penalty of perjury that the foregoing is true and correct.

Executed in New York, New York on September 6, 2011.


_____
Louise Sommers

# EXHIBIT 1

AO 88A (Rev. 06/09) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Eastern District of New York

| | |
|---|---|
| Mark I. Sokolow, et al. | ) |
| *Plaintiff* | ) |
| v. | )    Civil Action No.   04-00397 |
| The Palestine Liberation Organization, et al. | ) |
| | )   (If the action is pending in another district, state where: |
| *Defendant* | )      Southern District of New York    ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To: The British Broadcasting Corporation

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization that is *not* a party in this case, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

See Appendix A

| Place: The Berkman Law Office | Date and Time: |
|---|---|
|      111 Livingston Street, Suite 1928 | |
|      Brooklyn, New York 11201 |    07/26/2011 11:00 am |

The deposition will be recorded by this method:    _stenographically_

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material:

See Appendix B

     The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date:    _07/08/2011_

         *CLERK OF COURT*

                                     OR

       _Signature of Clerk or Deputy Clerk_                       *Attorney's signature*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*    Mark I. Sokolow et al. _____ , who issues or requests this subpoena, are:

Robet J. Tolchin, The Berkman Law Office, 111 Livingston Street, Suite 1928 Brooklyn, New York 11201
RJT@tolchinlaw.com (718) 855-3627

## Appendix A

Pursuant to Rules 30(b)(6) and 45 of the Federal Rules of Civil Procedure, the British Broadcasting Corporation ("BBC") is required, in accordance with the definitions and instructions set forth herein, to designate a person or persons to testify on its behalf at the deposition regarding: the authenticity of the Recordings (as defined below); the manner in which the Recordings were copied in order to produce a copy to the plaintiff pursuant to the instant subpoena; the place and manner in which the Recordings were stored, held and maintained between the dates on which the Recordings were originally created and the date on which the Recordings were copied in order to produce a copy to the plaintiff; and the manner in which BBC generally stored, held and maintained audiovisual recordings of this type (i.e. audiovisual recordings similar in origin to the Recordings) during the period between the dates on which the Recordings were created and the date on which the Recordings were copied in order to produce a copy to the plaintiff pursuant to this subpoena.

## Appendix B

Pursuant to Rules 34 and 45 of the Federal Rules of Civil Procedure, BBC is required, in accordance with the definitions and instructions set forth herein, to produce (on DVD or other appropriate medium) authentic, complete and unedited copies of all the Recordings.

## DEFINITIONS

The definitions and rules of construction set forth in Rule 34 of the Federal Rules of Civil Procedure are hereby incorporated and apply to this request for the production.

1.    The term "Recordings" used herein refers to and includes all of the following:

   a.    An authentic, complete and unedited audiovisual copy of the BBC program titled "Arafat Investigated" which was broadcast by BBC on or about November 9, 2003 (hereinafter: the "Program"); and

b.      Authentic, complete and unedited audiovisual copies of all audiovisual recordings recorded during the preparation and making of the Program and/or for the purpose of preparing and making the Program, including all such recordings which were not ultimately included in the Program as broadcast.

## INSTRUCTIONS

1.      In answering and responding to these requests, you shall produce all of the materials requested, wherever located, which are in your possession, custody or control.

2.      If you withhold the Recordings, or any portion of the Recordings, under a claim of privilege, you shall produce, in accordance with Rule 26 of the Federal Rules of Civil Procedure, a written privilege log that sets forth the nature of the privilege asserted.

3.      The Recordings are to be produced in their entirety without redaction. If a portion of the Recordings is withheld under claim of privilege, any non-privileged portion of the Recordings must be produced, with the portion claimed to be privileged redacted.

4.      If in answering these requests you claim any ambiguity in a request or a definition or instruction applicable thereto, identify in your response the language you consider ambiguous and state the interpretation you are using in responding.

5.      In the event that multiple copies of the Recordings exist, produce every non-identical copy.

AO 88A (Rev. 06/09) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.   04-00397

## PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)*   The British Broadcasting Corporation

was received by me on *(date)*   7/8/11   .

☐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____   on *(date)*   7/8/11   ; or

☐ I returned the subpoena unexecuted because: _____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$   40.00   .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date:   7/8/11

_____
*Server's signature*

william   Utsey
*Printed name and title*


_____
*Server's address*

Additional information regarding attempted service, etc:

THE BERKMAN LAW OFFICE, LLC
OPERATING ACCOUNT

8526

1-1357/660

DATE 7/8/11

PAY TO THE ORDER OF _BRITISH BROADCASTING CORPORATION_ $ 40.00

_FORTY DOLLARS_ DOLLARS

Signature

SIGNATURE BANK
Private Client Group #35
26 Court Street
Brooklyn, NY 11242

FOR _Deposition Subpoena - Sokolow case_

# EXHIBIT 2

**From:** ecf_bounces@nyed.uscourts.gov [mailto:ecf_bounces@nyed.uscourts.gov]
**Sent:** Tuesday, August 02, 2011 4:44 PM
**To:** nobody@nyed.uscourts.gov
**Subject:** Activity in Case 1:11-mc-00547-NGG-JO InRe: British Broadcasting Corporation Order on Motion to Strike

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.
***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

## U.S. District Court

## Eastern District of New York

### Notice of Electronic Filing

The following transaction was entered on 8/2/2011 at 4:43 PM EDT and filed on 8/2/2011
**Case Name:**       InRe: British Broadcasting Corporation
**Case Number:**     1:11-mc-00547-NGG-JO
**Filer:**
**Document Number:** No document attached

**Docket Text:**
**ORDER denying [3] Motion to Strike -- The plaintiff's motion, docket entry ("DE") [3], asking the court to strike the motion of the British Broadcasting Corporation ("BBC") to quash a subpoena, DE [1], as well as the BBC's supporting memorandum of law, DE [2], is denied. Regardless of the best reading of Local Civil Rule 37.3 in the context of Rule 45 Subpoena, the issues raised in the BBC's motion warrant resolution on the merits. The plaintiff may respond to the merits of the motion to quash in the format of its choice (a letter of up to three pages, or a longer memorandum of law), and the BBC may submit a reply on the merits, also in the format of its choice. The parties shall meet and confer and submit, no later than August 9, 2011, a proposed schedule for such submissions, as well for oral argument. Compliance with the underlying subpoena is stayed pending the resolution of the motion to quash. Ordered by Magistrate Judge James Orenstein on 8/2/2011. (Lardo, Melissa)**

**1:11-mc-00547-NGG-JO Notice has been electronically mailed to:**

Robert Joseph Tolchin rjt@tolchinlaw.com

Louise Sommers lsommers@mkslex.com, dkorzenik@mkslex.com

**1:11-mc-00547-NGG-JO Notice will not be electronically mailed to:**

David Seth Korzenik
Miller Korzenik Sommers LLP
488 Madison Avenue, 11th Floor
New York, NY 10022

**Full docket text:**

ORDER denying [3] Motion to Strike -- The plaintiff's motion, docket entry ("DE") [3], asking the court to strike the motion of the British Broadcasting Corporation ("BBC") to quash a subpoena, DE [1], as well as the BBC's supporting memorandum of law, DE [2], is denied. Regardless of the best reading of Local Civil Rule 37.3 in the context of Rule 45 Subpoena, the issues raised in the BBC's motion warrant resolution on the merits. The plaintiff may respond to the merits of the motion to quash in the format of its choice (a letter of up to three pages, or a longer memorandum of law), and the BBC may submit a reply on the merits, also in the format of its choice. The parties shall meet and confer and submit, no later than August 9, 2011, a proposed schedule for such submissions, as well for oral argument. Compliance with the underlying subpoena is stayed pending the resolution of the motion to quash. Ordered by Magistrate Judge James Orenstein on 8/2/2011. (Lardo, Melissa)

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 08/08/2011 18:20:20 | | | |
| PACER Login: | mk1942 | Client Code: | |
| Description: | History/Documents | Search Criteria: | 1:11-mc-00547-NGG-JO |
| Billable Pages: | 1 | Cost: | 0.08 |

# EXHIBIT 3

# THE BERKMAN LAW OFFICE, LLC

111 Livingston Street, Suite 1928
Brooklyn, New York 11201

Tel: (718) 855-3627

Fax: (718) 855-4696

August 8, 2011

**BY ECF**
Hon. James Orenstein
United States Magistrate Judge
United States District Court for the Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: *In Re British Broadcasting Corp.*
E.D.N.Y. Docket no. 11-mc-547 (NGG) (jo)

Dear Magistrate Judge Orenstein,

We represent the plaintiff in the above referenced matter.

Presently pending before this Court in this miscellaneous
proceeding is the motion of the non-party subpoena recipient British
Broadcasting Corporation to quash a subpoena served by the plaintiff herein.

Having given careful thought and consideration to certain
arguments raised by the defendants in their motion, we have decided to
withdraw the subpoena, and have informed defendant of same earlier today.

Since the subpoena has been withdrawn, the BBC's motion is now
moot.

Respectfully yours,

S/*Robert J. Tolchin*

Robert J. Tolchin

Cc: Counsel of record by ECF

# EXHIBIT 4

Case 1:04-cv-00397-GBD-RLE Document 146-4 Filed 09/09/11 Page 2 of 4

---

**From:** ecf_bounces@nyed.uscourts.gov [mailto:ecf_bounces@nyed.uscourts.gov]
**Sent:** Monday, August 08, 2011 6:50 PM
**To:** nobody@nyed.uscourts.gov
**Subject:** Activity in Case 1:11-mc-00547-NGG-JO InRe: British Broadcasting
Corporation Order on Motion to Quash


This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT
RESPOND to this e-mail because the mail box is unattended.
***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States
policy permits attorneys of record and parties in a case (including pro se litigants) to
receive one free electronic copy of all documents filed electronically, if receipt is required
by law or directed by the filer. PACER access fees apply to all other users. To avoid later
charges, download a copy of each document during this first viewing. However, if the
referenced document is a transcript, the free copy and 30 page limit do not apply.

### U.S. District Court

### Eastern District of New York

## Notice of Electronic Filing

The following transaction was entered on 8/8/2011 at 6:49 PM EDT and filed on 8/8/2011
**Case Name:**       InRe: British Broadcasting Corporation
**Case Number:**     1:11-mc-00547-NGG-JO
**Filer:**
**Document Number:** No document attached


**Docket Text:**
**ORDER denying as moot [1] Motion to Quash -- Non-party British Broadcasting
Corporation's motion to quash is denied as moot.** *See* **Docket entry [8]. Ordered
by Magistrate Judge James Orenstein on 8/8/2011. (Konkoly, Antonia)**


**1:11-mc-00547-NGG-JO Notice has been electronically mailed to:**

Robert Joseph Tolchin rjt@tolchinlaw.com

Louise Sommers lsommers@mkslex.com, dkorzenik@mkslex.com

**1:11-mc-00547-NGG-JO Notice will not be electronically mailed to:**

David Seth Korzenik

Miller Korzenik Sommers LLP
488 Madison Avenue, 11th Floor
New York, NY 10022

**Full docket text:**

ORDER denying as moot [1] Motion to Quash -- Non-party British Broadcasting Corporation's motion to quash is denied as moot. *See* Docket entry [8]. Ordered by Magistrate Judge James Orenstein on 8/8/2011. (Konkoly, Antonia)

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 08/11/2011 17:46:04 | | | |
| PACER Login: | mk1942 | Client Code: | |
| Description: | History/Documents | Search Criteria: | 1:11-mc-00547-NGG-JO |
| Billable Pages: | 1 | Cost: | 0.08 |

# EXHIBIT 5

# IN THE APPEALS CHAMBER

**Before:**
**Judge Claude Jorda, President**
**Judge Mohamed Shahabuddeen**
**Judge Mehmet Güney**
**Judge Asoka de Z. Gunawardana**
**Judge Theodor Meron**

**Registrar:**
**Mr. Hans Holthuis**

**Decision of:**
**11 December 2002**

### PROSECUTOR
v.
### RADOSLAV BRDJANIN
### MOMIR TALIC

---

## DECISION ON INTERLOCUTORY APPEAL

---

**Counsel for the Appellant Jonathan Randal:**

**Mr. Geoffrey Robertson**
**Mr. Steven Powles**

**Counsel for the Prosecution:**

**Ms. Joanna Korner**
**Mr. Andrew Cayley**

**Counsel for Radoslav Brdjanin:**

**Mr. John Ackerman**

**Counsel for the *Amici Curiae*:**

**Mr. Floyd Abrams**
**Mr. Joel Kurtzberg**
**Ms. Karen Kaiser**

## I. Background

1. The Appeals Chamber of the International Criminal Tribunal for the Prosecution of Persons Responsible for Serious Violations of International Humanitarian Law Committed in the Territory of the Former Yugoslavia since 1991 ("Appeals Chamber " and "International Tribunal" respectively) is seised of the "Motion to Appeal the Trial Chamber's 'Decision on Motion on Behalf of Jonathan Randal to Set Aside Confidential Subpoena to Give Evidence'" filed on 26 June 2002 ("Appeal") by counsel for Mr. Jonathan Randal ("Appellant"), pursuant to Rule 73 of the Rules of Procedure and Evidence of the International Tribunal ("Rules").

2. The Appeal concerns a subpoena issued by Trial Chamber II to compel the testimony of a war correspondent concerning an interview he conducted while reporting on the conflict in the former Yugoslavia. The questions presented are whether this International Tribunal should recognize a qualified testimonial privilege for war correspondents , and, if so, whether the privilege requires the quashing of the subpoena.

3. The Appellant served as a correspondent for the *Washington Post* in Yugoslavia . On 11 February, 1993, the *Washington Post* carried a story ("Article") by the Appellant containing quoted statements attributed to Radislav Brdjanin, one of the Accused, about the situation in Banja Luka and the surrounding areas.[1] The Article described Brdjanin as a "housing administrator" and "avowed radical Serb nationalist." He was quoted as saying that "those unwilling to defend [Bosnian Serb territory] must be moved out" so as "to create an ethnically clean space through voluntary movement." According to the article, Brdjanin said that Muslims and Croats "should not be killed, but should be allowed to leave – and good riddance." The article also quoted Brdjanin as saying that Serb authorities paid "too much attention to human rights" in an effort to please European governments and that "[w]e don't need to prove anything to Europe anymore. We are going to defend our frontiers at any cost . . . and wherever our army boots stand, that's the situation." The Article claimed that Brdjanin said that he was preparing laws to expel non-Serbs from government housing to make room for Serbs. The Appellant, who does not speak Serbo-Croatian, carried out the interview with the assistance of another journalist , who does speak Serbo-Croatian.

4. Brdjanin was charged in a 12-count indictment with, among other things, crimes against humanity and grave breaches of the Geneva Conventions of 1949 involving deportation, forced transfer, and appropriation of property. The Prosecution sought to have the Article admitted into evidence, claiming that it was relevant to establishing that the Accused possessed the intent required for several of the crimes charged . The Defense objected on several grounds, including that the statements attributed to Brdjanin were not accurately reported. The Defense stated that, if the article were admitted, they would seek to examine the Appellant so as to call into question the accuracy of the quotations noted above. The Prosecution then requested that the Trial Chamber issue a subpoena ("Subpoena") to the Appellant, and the Trial Chamber complied on 29 January 2002.

5. On 26 and 28 February 2002, 1 March 2002 and 18 March 2002, the Subpoena was discussed during sessions in the Trial Chamber. At these sessions, the Prosecution informed the Trial Chamber that the Appellant had refused to comply with the Subpoena

. On 9 May 2002, the Appellant filed a written motion to set aside the Subpoena.[2] On the same day, the Prosecution filed its response.[3] On 10 May 2002, the Trial Chamber heard oral argument on this motion. On 7 June 2002, the Trial Chamber rendered its decision ("Impugned Decision"). Refusing to recognise a testimonial privilege for journalists when no issue of protecting confidential sources was involved, the Trial Chamber upheld the Subpoena. It also found that the *Article* was admissible.

6. On 14 June 2002, the Appellant sought certification for leave to appeal from the Trial Chamber.[4] The Trial Chamber granted it on 19 June 2002.[5] On 26 June 2002, the Appellant filed the Appeal. On 4 July 2002, the Appellant filed written submissions in support of the Motion to Appeal.[6] The Prosecution responded on 15 July 2002 and the Appellant replied on 6 August 2002.[7]

7. On 1 August 2002, pursuant to Rules 74 and 107 of the Rules, the Appeals Chamber granted the request of 34 media companies and associations of journalists to file a brief as *Amici Curiae* supporting the Appellant, which was filed on 16 August 2002.[8] On 4 September 2002, the Appeals Chamber issued a scheduling order granting the request made in the briefs of the Appellant and the *Amici Curiae* for an oral hearing.[9] On 3 October 2002, the Appeals Chamber heard the arguments of the parties and of the *Amici Curiae*.[10]

## II. Impugned Decision and Submissions of the Parties and the *Amici Curiae*

### (a) The Impugned Decision

The Trial Chamber acknowledged that "'journalists reporting on conflict areas play a vital role in bringing to the attention of the international community the horrors and realities of the conflict'"[11] and that they should not be "subpoenaed unnecessarily."[12] It took the view, however, that, whatever the proper approach when confidential materials or sources are at issue[13], when the testimony sought concerns already published materials and already identified sources, compelling the testimony of journalists poses only a minimal threat to the news gathering and news reporting functions. Indeed, the Trial Chamber found that a published article is the equivalent of a public statement by its author and that when such a statement is entered in evidence in a criminal trial and its credibility challenged, the author, like anyone else who makes a claim in public, must expect to be called to defend its accuracy.[14]

In determining whether to issue a subpoena to compel the testimony of a journalist concerning already public materials and sources, the Trial Chamber thus held that it is sufficient if the testimony sought is "pertinent" to the case.[15] The Trial Chamber also considered whether requiring the Appellant to testify would place him in physical danger. Noting that the Appellant was retired from being a war correspondent and was living in France, the Trial Chamber found that he faced no prospect of harm from testifying about the contents of his article. The Trial Chamber thus upheld the validity of the Subpoena.

### (b) The Appellant

The Appellant seeks the reversal of the Impugned Decision and the setting aside of the Subpoena. The Appellant submits that the Trial Chamber erred: (i) in not recognising a qualified testimonial privilege for journalists; and (ii) in not finding , on the facts of this case, that the Appellant should not be compelled to appear for testimony.

11. With regard to the first ground, the Appellant submits that the Trial Chamber erred in law by not recognising a qualified privilege for journalists. Such a privilege is warranted, the Appellant contends, in order to safeguard the ability of journalists to investigate and report effectively from areas in which war crimes take place. Without a qualified privilege, journalists may be put at risk personally, may expose their sources to risk, and may be denied access to important information and sources in the future. The result, in the Appellant's view, will be less journalistic exposure of international crimes and thus the hindering of the very process of international justice that international criminal tribunals such as this Tribunal are designed to serve. In support of these contentions, the Appellant submits statements from two journalists, the general secretary of the International Federation of Journalists , and the publisher of the *Washington Post*.

12. The Appellant suggests that the International Tribunal has recognised testimonial privileges for certain other classes of individuals. Rule 97 establishes a privilege for communications between attorneys and their clients. In *Simic* ,*( footnote 16 )* a Trial Chamber afforded an absolute immunity from testifying to a former employee of the International Committee of the Red Cross ("ICRC") in order to protect the impartiality of the ICRC. Trial Chambers have also granted or recognized privileges against testifying to employees and functionaries of the ICTY[17] and to the Commander in Chief of the United Nations Protection Force.[18]

13. The Appellant also points to certain international legal materials in support of the qualified privilege he urges the Tribunal to adopt. He recalls that Rule 73 of the International Criminal Court ("ICC") recognises that certain relationships and classes of professionals should be granted some form of testimonial privilege . He suggests that Article 79 of the 1977 Protocol I Additional to the Geneva Conventions recognises that journalists are exposed to great dangers and thus have a special position in conflict zones, as do several documents produced by the European Council's Committee of Ministers to Member States on the Protection of Journalists in Situations of Conflict and Tension. He also contends that the decision of the European Court of Human Rights in *Goodwin* v. *United Kingdom*, supports the establishment of a qualified privilege.[19]

14. The Appellant claims that certain judicial decisions from the United States and the United Kingdom support the establishment of a qualified privilege for journalists . The Appellant also draws the Tribunal's attention to the internal guidelines of the United States Department of Justice visualising that subpoenas will be issued against members of the news media. Those guidelines, in the Appellant's view, recognize the importance of seeking subpoenas against members of the press only as a last resort when the information sought is crucial to the case and cannot reasonably be acquired by other means.

15. The Appellant submits that in determining whether to issue a subpoena to a journalist , it is not sufficient merely to find, as the Trial Chamber did, that the evidence is "pertinent" to the case. Rather, he asserts that a Trial Chamber should issue a subpoena only if it determines that the compelled journalist's testimony would provide admissible evidence that: (1) is "of crucial importance" to determining a defendant's guilt or innocence; (2) cannot be obtained "by any other means or from any other witness"; (3) will not require the journalist to breach any obligation of confidence; (4) will not place the journalist, his family, or his sources in reasonably apprehended personal danger; and (5) will not serve as a precedent that will "unnecessarily jeopardise the effectiveness or safety of other journalists reporting from that conflict zone in the future."[20]

16. The Appellant's second contention is that the Trial Chamber erred in fact when it found the Appellant's testimony to be pertinent to the Prosecution's case . According to the Appellant, his testimony cannot materially assist the Prosecution or the Defence. He does not speak Serbo-Croatian, and the interview in question was thus conducted through another journalist, who does. Hence, the Appellant asserts that he can only comment on *Brdjanin's* demeanor during the interview and cannot vouch for the accuracy of the translations of *Brdjanin's* statements as they appeared in his Article.

17. Moreover, the Appellant asserts that the Trial Chamber should have undertaken a careful analysis of the importance of the Appellant's testimony before issuing the subpoena, not just after the fact.

(c) The *Amici Curiae*

The *Amici Curiae* make largely the same arguments as the Appellant concerning the importance of a qualified privilege to ensuring journalists' ability to investigate in and report from areas where war crimes are taking place. Compelling journalists to testify against their own sources, confidential or otherwise, will make news sources less likely to come forward, less likely to speak freely, and more likely to fear that journalists are acting as possible agents of their future prosecutor . It will rob war correspondents of their status as observers and transform them into participants, undermining their credibility and independence and thus their ability to gather information. The *Amici Curiae* contend that this will curtail the important benefits that journalists provide to the public and to the courts.

The *Amici Curiae* assert that the Trial Chamber on the basis that the evidence need merely "be pertinent", permits the Tribunal to compel journalists to testify even when the relevance of their testimony is uncertain. According to the *Amici Curiae,* the standard applied by the Trial Chamber is so vague that it will inevitably lead to unease and confusion in the journalistic community and result in journalists being subpoenaed unnecessarily.

20. Those arguments lead the *Amici Curiae* to offer a simpler and somewhat less demanding test for the proposed qualified privilege than does the Appellant . According to the *Amici Curiae*, a Trial Chamber should not issue a subpoena to compel the

testimony of a journalist unless the Trial Chamber determines that : (1) the testimony is essential to the determination of the case; and (2) the information cannot be obtained by any other means. For the testimony to be essential , "its contribution to the case must be critical to determining the guilt or innocence of a defendant."[21]

21. Applying this test, the *Amici Curiae* assert that the Appellant should not be compelled to testify. His testimony, in their view, is not absolutely essential to the case. Even if it were, the Prosecution has not demonstrated that his testimony is the only means of obtaining the same information.

(d) The Prosecution

22. The Prosecution submits that the Trial Chamber: (i) correctly declined the Appellant's invitation to create a precise journalistic privilege; and (ii) correctly determined , on the facts of this case, that the Appellant should be compelled to testify.

23. The Prosecution argues that, whatever beneficial effects a privilege for the protection of confidential sources and confidential information may have in promoting vigorous reporting and thus ultimately the cause of international justice , no such benefits accrue from a privilege protecting testimony concerning published materials and openly identified sources. The Prosecution stresses that this case fits in the latter category. In the Prosecution's view, what creates the admittedly significant risks for journalists operating in war zones – of physical harm and of loss of access to sources – is the publication of their stories exposing the conduct of parties to the conflict, not the later possibility that they might be called to testify about matters they have already revealed to the public in their stories.[22]

24. The Prosecution maintains that adoption of the privilege advocated by the Appellant would undermine the International Tribunal's ability to reach accurate judgements by requiring the exclusion of essential evidence. Moreover, the Prosecution contends that too generous a privilege could compromise the due process rights of accused persons.[23]

25. The Prosecution argues that the testimonial privileges extended by the International Tribunal to certain other classes of persons are distinguishable from the journalists' privilege proposed here. Those other privileges rest on concerns about confidentiality (ICRC), have long-established roots in national legal systems (attorney-client), or have independent bases in international law (ICRC, functional immunity for state officials). By contrast, according to the Prosecution, a privilege for journalists concerning non-confidential matters would be unprecedented in international or national legal systems.

26. The Prosecution asserts that the Trial Chamber was correct in interpreting the decision of the European Court of Human Rights in *Goodwin*[24] and the case law from the United States and the United Kingdom as being concerned largely, if not exclusively, with the protection of confidential sources.

27. The Prosecution submits that no precise journalists' privilege is warranted. Rather, the Appeals Chamber should endorse the approach of the Trial Chamber, which , in its view, was to balance "the legitimate interests of journalists" against "the interests of the international community and the victims of crime in ensuring the availability of all relevant and probative evidence" and, when appropriate " the interest of the Accused in exercising his right to examine witnesses against him."[25] Engaging in such a balancing , and considering that the statements by the Accused in question have already been published and attributed to him and that the Appellant himself faces no risk of physical harm or loss of journalistic access in the area of the former Yugoslavia , the Trial Chamber correctly found that there was no basis for exempting the Appellant from his duty to testify.

Further, the Prosecution argues that even under the tests proposed by the Appellant and the *Amici Curiae*, the Trial Chamber would still have been correct to issue a subpoena for the Appellant's testimony. First, the statements by the Accused in the Article are essential to the Prosecution's case because they constitute direct evidence of the intent required for the establishment of some of the offences with which he is charged. Secondly, the evidence at issue is unavailable from other sources, as the only other witness to the Accused's statements was the journalist who served as an interpreter for the Appellant.

### III. Discussion

(a) Preliminary Considerations

29. At the outset, the Appeals Chamber notes that, although the parties and the *Amici Curiae* frame the issue before the Appeals Chamber as one concerning journalists in general, it is important to appreciate that the case really concerns a smaller group, namely, war correspondents. It is the particular character of the work done and the risks faced by those who report from conflict zones that it is at stake in the present case. By "war correspondents," the Appeals Chambers means individuals who, for any period of time, report (or investigate for the purposes of reporting) from a conflict zone on issues relating to the conflict. This decision concerns only this group.

30. The issue of compelled testimony by war correspondents before a war crimes tribunal is a novel one. There does not appear to be any case law directly on point. War correspondents who have previously testified at the International Tribunal did so on a voluntary basis.[26] War correspondents are of course free to testify before the International Tribunal, and their testimony assists the International Tribunal in carrying out its function of holding accountable individuals who have committed crimes under international humanitarian law. The present ruling concerns only the case where a war correspondent, having been requested to testify, refuses to do so.

31. Neither the Statute nor the relevant Rules offer much guidance on the issue being considered here. Under Rule 54 of the Rules, a Trial Chamber may, at the request of either party or on its own initiative, issue a subpoena when it finds that doing so is "necessary for the purposes of an investigation or for the preparation or conduct of the

trial." The discretion of the Trial Chambers, however, is not unfettered. They must take into account a number of other considerations before issuing a subpoena. Subpoenas should not be issued lightly, for they involve the use of coercive powers and may lead to the imposition of a criminal sanction.

32. In determining whether to issue a subpoena, a Trial Chamber has first of all to take into account the admissibility and potential value of the evidence sought to be obtained. Under Rule 89(C) of the Rules, a Trial Chamber "may admit any relevant evidence which it deems to have probative value," and under Rule 89(D) may "exclude evidence if its probative value is substantially outweighed by the need to ensure a fair trial." Secondly, the Trial Chamber may need to consider other factors such as testimonial privileges. For instance, Rule 97 of the Rules states that "all communications between lawyer and client shall be regarded as privileged, and consequently not subject to disclosure at trial, unless: (i) the client consents to such disclosure ; or (ii) the client has voluntarily disclosed the content of the communication to a third party, and that third party then gives evidence of that disclosure." Similarly, in the *Simic* case, the Trial Chamber made it clear that the ICRC has a right under customary international law to non-disclosure of information so that its workers cannot be compelled to testify before the International Tribunal .[27]

33. In this decision, the Appeals Chamber will address the factors that need to be considered before the issuance of a subpoena to war correspondents.

(b) <u>Analysis</u>

34. In the Appeals Chamber's view, the basic legal issue presented raises three subsidiary questions. Is there a public interest in the work of war correspondents ? If yes, would compelling war correspondents to testify before a tribunal adversely affect their ability to carry out their work? If yes, what test is appropriate to balance the public interest in accommodating the work of war correspondents with the public interest in having all relevant evidence available to the court and, where it is implicated, the right of the defendant to challenge the evidence against him? The Appeals Chamber will consider each of these questions in turn.

### (i) *Is there a public interest in the work of war correspondents?*

35. The Appeals Chamber is of the view that the answer to the first question is clearly "Yes," as the Trial Chamber expressly recognised. Both international and national authorities support the related propositions that a vigorous press is essential to the functioning of open societies and that a too frequent and easy resort to compelled production of evidence by journalists may, in certain circumstances , hinder their ability to gather and report the news. The European Court of Human Rights has recognised that journalists play a "vital public watchdog role" that is essential in democratic societies and that, in certain circumstances, compelling journalists to testify may hinder "the ability of the press to provide accurate and reliable information."[28] National legislatures and courts have recognised the same principles in establishing laws or rules of evidence shielding journalists from having to disclose various types of information. As one federal court of

appeals in the United States has put it, "society's interest in protecting the integrity of the newsgathering process, and ensuring the free flow of information to the public, is an interest 'of sufficient social importance to justify some incidental sacrifice of sources of facts needed in the administration of justice.'"[29]

36. The Appeals Chamber is of the view that society's interest in protecting the integrity of the newsgathering process is particularly clear and weighty in the case of war correspondents. Wars necessarily involve death, destruction, and suffering on a large scale and, too frequently, atrocities of many kinds, as the conflict in the former Yugoslavia illustrates. In war zones, accurate information is often difficult to obtain and may be difficult to distribute or disseminate as well. The transmission of that information is essential to keeping the international public informed about matters of life and death. It may also be vital to assisting those who would prevent or punish the crimes under international humanitarian law that fall within the jurisdiction of this Tribunal. In this regard, it may be recalled that the images of the terrible suffering of the detainees at the Omarska Camp that played such an important role in awakening the international community to the seriousness of the human rights situation during the conflict in Bosnia Herzegovina were broadcast by war correspondents. The Appeals Chamber readily agrees with the Trial Chamber that war correspondents "play a vital role in bringing to the attention of the international community the horrors and reality of conflict."[30] The information uncovered by war correspondents has on more than one occasion provided important leads for the investigators of this Tribunal.[31] In view of these reasons, the Appeals Chamber considers that war correspondents do serve a public interest.

37. The public's interest in the work of war correspondents finds additional support in the right to receive information that is gaining increasing recognition within the international community. Article 19 of the Universal Declaration of Human Rights provides that "Everyone has the right to freedom of opinion and expression; this right includes freedom to hold opinions without interference and to seek, receive and impart information and ideas through any media and regardless of frontiers." This principle is reproduced in all the main international human rights instruments .[32] As has been noted,[33] the right to freedom of expression includes not merely the right of journalists and media organizations freely to communicate information. It also incorporates a right of members of the public to receive information. As the European Court of Human Rights put it in its decision in *Fresso and Roire v. France*: "Not only does the press have the task of imparting information and ideas on matters of public interest: the public also has a right to receive them."[34]

38. Recognition of the important public interest served by the work of war correspondents does not rest on a perception of war correspondents as occupying some special professional category. Rather, it is because vigorous investigation and reporting by war correspondents enables citizens of the international community to receive vital information from war zones that the Appeals Chamber considers that adequate weight must be given to protecting the ability of war correspondents to carry out their functions.

**(ii)** *Would compelling war correspondents to testify in a war crimes tribunal adversely affect their ability to carry out their work?*

39. The Trial Chamber took the view that since the case at hand concerns only published information and not confidential sources, compelling the Appellant to testify posed no threat to the ability of war correspondents to carry out their newsgathering role. Thus, the Trial Chamber held that it "fail[ed] to see how the objectivity and independence of journalists can be hampered or endangered by their being called upon to testify, [. . .] especially in those cases where they have already published their findings."[35]

40. The *Amici Curiae*, by contrast, insist that "[e]ven when findings are published and sources are known, the link between the forced disclosure and the loss of journalist's independence is compelling, as it significantly changes the tone of journalist's work and the willingness of sources to comply with reporters' requests for interviews."[36] The Appellant similarly argues:

> If it becomes known in conflict zones that reporters may be compelled to testify about crimes they may witness or have been incautiously confessed to them by officials, they will not be accorded important interviews and facilities. They will increasingly be excluded from conflict zones and from places or positions where they might witness war crimes. Some guilty parties will cease to boast about criminal acts, or to give interviews at all.[37]

The Appeals Chamber acknowledges that it is impossible to determine with certainty whether and to what extent the compelling of war correspondents to testifying before the International Tribunal would hamper their ability to work. However, in the opinion of the Appeals Chamber, it is not a possibility that can be discarded lightly, as the Trial Chamber found, simply because the evidence sought concerned published information and not confidential sources. The potential impact upon the newsgathering function and on the safety of war correspondents as submitted by the Appellant and the *Amici Curiae* is great.

41. The Appeals Chamber recognises, as did the Trial Chamber, that many national jurisdictions afford a testimonial privilege for journalists only when it comes to protecting confidential sources.[38] It notes, however, that in some countries some privilege from testifying is also given in cases of non-confidential information.[39] In either case, the scope of the privilege rests on the legislature's or the courts' assessment of the need to protect the newsgathering function. By analogy, the Appeals Chamber considers that the amount of protection that should be given to war correspondents from testifying being the International Tribunal is directly proportional to the harm that it may cause to the newsgathering function.

42. The Appeals Chamber considers reasonable the claims of both the Appellant and the *Amici Curiae* that, in order to do their jobs effectively, war correspondents must be perceived as independent observers rather than as potential witnesses for the Prosecution. Otherwise, they may face more frequent and grievous threats to their safety and to the safety of their sources. These problems remain, contrary to what was held by the Trial

Chamber, even if the testimony of war correspondents does not relate to confidential sources.

43. What really matters is the perception that war correspondents can be forced to become witnesses against their interviewees. Indeed, the legal differences between confidential sources and other forms of evidence are likely to be lost on the average person in a war zone who must decide whether to trust a war correspondent with information . To publish the information obtained from an interviewee is one thing -- it is often the very purpose for which the interviewee gave the interview -- but to testify against the interviewed person on the basis of that interview is quite another. The consequences for the interviewed persons are much worse in the latter case, as they may be found guilty in a war crimes trial and deprived of their liberty. If war correspondents were to be perceived as potential witnesses for the Prosecution , two consequences may follow. First, they may have difficulties in gathering significant information because the interviewed persons, particularly those committing human rights violations, may talk less freely with them and may deny access to conflict zones. Second, war correspondents may shift from being observers of those committing human rights violations to being their targets, thereby putting their own lives at risk.

44. In view of the foregoing, the Appeals Chamber is of the view that compelling war correspondents to testify before the International Tribunal on a routine basis may have a significant impact upon their ability to obtain information and thus their ability to inform the public on issues of general concern. The Appeals Chamber will not unnecessarily hamper the work of professions that perform a public interest . In the next section, the Appeals Chamber will determine how the course of justice can be adequately assured without unnecessarily hampering the newsgathering function of war correspondents.

**(iii)** *What test is appropriate to balance the public interest in accommodating the work of war correspondents with the public interest in having all relevant evidence available to the court?*

45. The Appellant proposes a five-part test for the issuance of subpoenas to war correspondents.[40] In the Appeals Chamber's view, that test amounts to a virtually absolute privilege. The *Amici Curiae* propose a more lenient test. In their view, war correspondents should be compelled to testify only if their evidence is essential to the case and cannot be obtained from another source. By "essential" they mean vital to the finding of guilt or innocence of the accused on a given charge.[41] The Prosecution asserts that both of these proposed tests are overly restrictive . For its part, the Trial Chamber in the Impugned Decision justified the issuing of the Subpoena on the ground that the evidence sought was "pertinent" to the Prosecution's case.

46. The Appeals Chamber considers that in order to decide whether to compel a war correspondent to testify before the International Tribunal, a Trial Chamber must conduct a balancing exercise between the differing interests involved in the case . On the one hand, there is the interest of justice in having all relevant evidence put before the Trial Chambers for a proper assessment of the culpability of the individual on trial. On the

other hand, there is the public interest in the work of war correspondents, which requires that the newsgathering function be performed without unnecessary constraints so that the international community can receive adequate information on issues of public concern.

47. The test of "pertinence" applied by the Trial Chamber appears insufficient to protect the public interest in the work of war correspondents. The word "pertinent" is so general that it would not appear to grant war correspondents any more protection than that enjoyed by other witnesses. Thus, the Trial Chamber's test, while supposedly accounting for the public interest in the work of war correspondents, would actually leave that interest unprotected. On the other hand, the test proposed by the Appellant , as noted above, would amount to a virtually absolute privilege. Even the criteria proposed by *Amici Curiae* may be too stringent in that they may lead to significant evidence being left out.

48. In the opinion of the Appeals Chamber, it is only when the Trial Chamber finds that the evidence sought by the party seeking the subpoena is direct and important to the core issues of the case that it may compel a war correspondent to testify before the International Tribunal. The adoption of this criterion should ensure that all evidence that is really significant to a case is available to Trial Chambers . On the other, it should prevent war correspondents from being subpoenaed unnecessarily .

49. Furthermore, if the evidence sought is reasonably available from a source other than a war correspondent, the Trial Chamber should look first to that alternative source. The Trial Chamber did not do that here.

50. In view of the foregoing, the Appeals Chamber holds that in order for a Trial Chamber to issue a subpoena to a war correspondent a two-pronged test must be satisfied . First, the petitioning party must demonstrate that the evidence sought is of direct and important value in determining a core issue in the case. Second, it must demonstrate that the evidence sought cannot reasonably be obtained elsewhere .

51. Finally, the Appeals Chamber will not address the submissions of the parties on the second ground of the appeal, that is, the application of the proper legal test to the facts. Having determined the principles governing the testimony of war correspondents before the International Tribunal, the Appeals Chamber considers that it is the role of the Trial Chamber to apply those principles in the particular circumstances of the case. The Appeals Chambers would, however, offer the following observations.

52. First, contrary to the Trial Chamber's apparent fear,[42] even if the Trial Chamber were to decide that the Appellant should not be subpoenaed to testify, that need not mean that the Article must be excluded (and the Prosecution disadvantaged to that extent). The admissibility of the Article depends principally on its probative value under Rule 89(C) and the balance between that probative value and its potential to undermine the fairness of the trial under Rule 89(D). Because the Article is hearsay, the Trial Chamber will also want to examine what indicia of reliability or unreliability it carries.[43] As with many pieces of hearsay evidence, the inability of a party to challenge its accuracy by cross-

examining the declarant (in this case the Appellant) does not mean that it must be excluded.[44] Rather, that inability would diminish the confidence the Trial Chamber could have in its accuracy and thus the weight the Trial Chamber would give it.

53. At the same time, and contrary to the Trial Chamber's apparent counterbalancing fear,[45] admitting the Article without subpoenaing the Appellant need not prejudice the Accused. The Defence may still question the Article's accuracy, and the Trial Chamber will have to take account of the unavailability of the Appellant in determining how much weight to give the Article.

54. Finally, whatever evidentiary value the Article may have, it is the Trial Chamber's task to determine whether the Appellant's testimony *itself* will be of direct and important value to determining a core issue in the case. The Defence has offered two justifications for seeking the Appellant's testimony. The first is that his testimony will enable the Defence to challenge the accuracy of the statements attributed to Brdjanin in the Article. The second is that the Appellant may place Brdjanin's statements in a context that will cast them in a more favourable light for the Defence . With regard in particular to the first justification -- concerning accuracy -- given that the Appellant speaks no Serbo-Croatian, and thus that he relied on another journalist for interpretation, the Appeals Chamber finds it difficult to imagine how the Appellant's testimony could be of direct and important value to determining a core issue in the case.[46] In any event, determining whether the Appellant's testimony on either score may have direct and important value to a core issue in the case requires a factual determination that is properly left to the Trial Chamber.

55. Therefore, should the Prosecution (or the Defence) still desire that the Appellant be subpoenaed to testify before the International Tribunal, it will have to submit a new application before the Trial Chamber to be considered in the light of the principles set out in the present decision.

<u>Disposition</u>

56. For the foregoing reasons, the Appeals Chamber:

1. allows the Appeal;

2. reverses the Impugned Decision;

3. consequently, sets aside the Subpoena.


Done in both English and French, the French text being authoritative.

_____
Claude Jorda
Presiding Judge

Judge Shahabuddeen appends a separate opinion.

Dated this 11th day of December 2002
At The Hague,
The Netherlands.

**[Seal of the Tribunal]**

---

1 - Jonathan C. Randal, "Preserving the Fruits of Ethnic Cleansing; Bosnian Serbs, Expulsion Victims See Process as Beyond Reversal", Washington Post, Feb. 11, 1993, p. A34. The quotations in this paragraph are from the article. See also *Prosecutor v. Brdjanin and Talic*, Case No. IT-99-36-T, "Decision on Motion to Set Aside Confidential Subpoena to Give Evidence", 7 June 2002, para. 28.A.ii.

2 - *Prosecutor v. Radoslav Brdjanin and Momir Talic*, Case No.: IT-99-36-T, "Written Submissions on Behalf of Jonathan Randal to Set Aside 'Confidential Subpoena to Give Evidence' Dated 29 January 2002", 9 May 2002.

3 - *Prosecutor v. Radoslav Brdjanin and Momir Talic*, Case No.: IT-99-36-T, "Prosecution's Response to 'Written Submissions on Behalf of Jonathan Randal to Set Aside "Confidential Subpoena to Give Evidence" Dated 29 January 2002;', 9 May 2002.

4 - *Prosecutor v. Radoslav Brdjanin and Momir Talic*, Case No.: IT-99-36-T, "Application for Certification from Trial Chamber to Appeal 'Decision on Motion to Set Aside Confidential Subpoena to Give Evidence'", 14 June 2002.

5 - *Prosecutor v. Radoslav Brdjanin and Momir Talic*, Case No.: IT-99-36-T, "Decision to Grant Certification to Appeal the Trial Chamber's 'Decision on Motion to Set Aside Confidential Subpoena to Give Evidence'", 19 June 2002.

6 - *Prosecutor v. Radoslav Brdjanin and Momir Talic*, Case No.: IT-99-36-AR73.9, "Written Submissions in Support of Motion to Appeal Trial Chamber's 'Decision on Motion on Behalf of Jonathan Randal to Set Aside Confidential Subpoena to Give Evidence'", 4 July 2002.

7 - *Prosecutor v. Radoslav Brdjanin and Momir Talic*, Case No.: IT-99-36-AR73.9, "Appellant's Reply to 'Prosecution's Response to Written Submissions in Support of Motion to Appeal Trial Chamber's "Decision on Motion on Behalf of Jonathan Randal to Set Aside Confidential Subpoena to Give Evidence" Filed 4 July 2002'", 6 August 2002.

8 - *Prosecutor v. Radoslav Brdjanin and Momir Talic*, Case No.: IT-99-36-AR73.9, "Décision relative à la requête aux fins de prorogation de délai et autorisant à comparaître en qualité d'*amici curiae*",1 August 2002.

9 - *Prosecutor v. Radoslav Brdjanin and Momir Talic*, Case No.: IT-99-36-AR73.9, "Scheduling Order", 4 September 2002.

10 - Mr. Ackerman, counsel for the accused, had informed the Appeals Chamber that he would attend the hearing. Without explanation, he failed to appear.

11 - Impugned Decision, para. 25.

12 - *Id.* para. 27.

13 - The Trial Chamber implied that a qualified privilege was warranted to protect journalists from having to reveal confidential sources or materials. *Id.* para. 31.

14 - *Id.* para. 26.

15 - *Id.* para. 32.

16 - *Prosecutor v. Simic et al.*, "Decision on The Prosecution Motion Under Rule 73 for a Ruling Concerning the Testimony of a Witness", Case No.: IT-95-9-PT, 27 July 1999 ("ICRC Decision").

17 - *Prosecutor v. Delalic et al.*, Case No.: IT-96-21-T, "Decision on the Motion *Ex Parte* by the Defence of Zdravko Mucic Concerning the Issue of a Subpoena to an Interpreter", 8 July 1997.

18 - *Prosecutor v. Blaskic*, Case No.: IT-95-14-T, "Decision of Trial Chamber I on Protective Measures for General Philippe Morillon, Witness of the Trial Chamber", 12 May 1999.

19 - *Goodwin v. United Kingdom*, Judgement of 22 February 1996, 22 EHRR 123.

20 - Para. 18.

21 - Para. 43.

22 - Paras. 6-8, 25.

23 - Para. 26.

24 - *Supra* n.14.

25 - Para. 58.

26 - E.G. Martin Bell (BBC), Jacky Rowland (BBC), and Ed Vulliamy (The Observer/Guardian).

27 - *Supra* n.11, in particular paras 73-74 and disposition.

28 - *Supra* n.14, para. 40.

29 - *Schoen v. Schoen*, 5 F.3d 1289, 1292 (9th Cir. 1993).

30 - Impugned Decision at para 25.

31 - *See, e.g.*, Exhibit A to *Amici* Brief, Affidavit of Elizabeth Neuffler.

32 - Article 10 of the Convention for the Protection of Human Rights and Fundamental Freedoms of 3 September 1953; Article 19 of the International Covenant on Civil and Political Rights of 23 March 1976; Article 13 of the American Convention on Human Rights of 18 July 1978; and in Article 9(1) of the African Charter on Human and Peoples Rights of 26 June 1981.

33 - Weramantry C.G., "Access to Information: A New Human Right. The Right to Know", Asian Yearbook of International Law, Vol. 4, 1995, pp. 99-111.

34 - See *Fresso and Roire v. France*, Judgement of 21 January 1999, ECHR, para 51, *Erdogdu and Ince v. Turkey*, Judgement of 8 July 1999, ECHR, para 48 and *Sener v. Turkey*, Judgment of 18 July 2000, ECHR, para 41-42;

35 - Impugned Decision at para 26.

36 - *Amici* Brief at para. 36.

37 - Appellant's Brief at para. 9.

38 - *See, e.g.*, Contempt of Court Act 1981, Section 10, (United Kingdom); *Code de Procedure Penale Art.109* (France) and *Codice di Procedura Penale Art. 200(2)* (Italy).

39 - *See Strafprozessordnung § 53* (Germany), as amended on 15 February 2002; *United States v. LaRouche Campaign*, 841 F.2d 1176, 1181-82 (1st Cir. 1988); *United States v. Cuthbertson*, 630 F.2d 139, 147-48 (3d Cir. 1980) (United States). The Appeals Chamber also notes that the United States Department of Justice has established internal guidelines cautioning federal prosecutors to seek subpoenas against members of the media only when the information sought is essential and cannot reasonably be acquired from non-media sources. The guidelines appear to apply to subpoenas for non-confidential as well as confidential materials. *See* 28 C.F.R. § 50.10 (2002)."

40 - *See supra* para. 13; Appellant's Brief, para. 18.

41 - *See supra* para. 17; *Amici* Brief, para. 43.

42 - Impugned Decision, para. 32.

43 - *See Prosecutor v. Dario Kordic and Mario Cerkez*, Case No. IT-95-14/2-AR73.5, Decision on Appeal Regarding Statement of A Deceased Witness, paras. 23-24.

44 - *See, e.g., Prosecutor v. Zlatko Aleksovski*, Case No. IT-95-14/1-AR73.5, Decision on Prosecution's Appeal on Admissibility of Evidence, para. 27.

45 - Impugned Decision, para. 32.

46 - The Appeals Chamber makes this observation while recognising that the Appellant's inexplicably inconsistent claims concerning his ability to vouch for the accuracy of the quoted statements in the Article left the Trial Chamber in an unenviable position.

MILLER KORZENIK SOMMERS LLP
David S. Korzenik
Louise Sommers
Itai Maytal
488 Madison Avenue 11th Floor
New York, New York 10022-5702
(212) 752-9200
dkorzenik@mkslex.com
lsommers@mkslex.com
*Attorneys for The British Broadcasting Corporation*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------x

MARK I. SOKOLOW et al.,                    :        04-CV-00397 (GBD)(RE)
                                           :
                        Plaintiffs,        :
                -against-                  :        **DECLARATION OF**
                                           :        **ITAI MAYTAL**
                                           :
THE PALESTINIAN LIBERATION ORGANIZATION,   :
et al,                                     :        ECF CASE
            Defendants.                    :
                                           :

-------------------------------------------------------------------------x

ITAI MAYTAL declares, pursuant to 28 U.S.C. §1746 as follows:

1.      I am an associate in the law firm of Miller Korzenik Sommers LLP, attorneys for

The British Broadcasting Corporation (the "BBC"). I am fully familiar with the facts and

circumstances herein and make this declaration based on personal knowledge in support of the

BBC's motion to quash the Subpoena To Testify at A Deposition In a Civil Action dated August

9, 2011 (the "Subpoena"), directed to it by counsel for the Plaintiffs in this action.

2.      That Subpoena seeks testimony and documents related to a 2003 news program

broadcast by the BBC entitled "Arafat Investigated" (the "Program") and unpublished materials

that include recordings of two Program interviewees.

1

3. The Complaint in this action seeks damages in connection with seven alleged attacks in or near Jerusalem, Israel in 2001, 2002 and 2004.

4. I have viewed the Program, which was reported by a Middle East correspondent. It is focused on the isolation at that time of former Palestinian leader Yasir Arafat ("Arafat") by Israel and the U.S., and Arafat's status and relationship to the Palestinian people. There were a number of persons interviewed in that program, among them persons who identified themselves, for example, as various officials, academics, militants and/or residents of the area.

5. My review revealed that none of the alleged attacks at issue in this case were subjects of, or mentioned in, the BBC Program, and at least one such alleged attack postdated the 2003 Program.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in New York, New York on September 6, 2011.

Ital Maytal

2

MILLER KORZENIK SOMMERS LLP
David S. Korzenik
Louise Sommers
Itai Maytal
488 Madison Avenue 11th Floor
New York, New York 10022-5702
(212) 752-9200
dkorzenik@mkslex.com
lsommers@mkslex.com
*Attorneys for The British Broadcasting Corporation*

UNITED STATES DISTRICT COURT
S DISTRICT OF NEW YORK

------------------------------------------------------------------------x

MARK I. SOKOLOW et al.,      :    04-CV-00397 (GBD)(RE)
     :
     :
           Plaintiffs,    :
     :
     -against-      :     <u>ECF CASE</u>
     :
     :
THE PALESTINIAN LIBERATION ORGANIZATION, :
et al,      :
           Defendants.   :
     :

------------------------------------------------------------------------x

## MEMORANDUM OF LAW OF THE
### BRITISH BROADCASTING CORPORATION
<u>IN SUPPORT OF MOTION TO QUASH SUBPOENA</u>

Miller Korzenik Sommers LLP
488 Madison Avenue, Suite 1120
New York, NY 10022
(212) 752-9200
dkorzenik@mkslex.com
lsommers@mkslex.com
*Attorneys for The British*
*Broadcasting Corporation*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ ii

PRELIMINARY STATEMENT ........................................................................... 1

BACKGROUND ................................................................................................. 2

      THE BBC PROGRAM ................................................................................. 3

      THE FIRST SUBPOENA .............................................................................. 3

      THE SECOND, AND INSTANT, SUBPOENA .......................................... 6

      EFFECTS OF DISCLOSURE ...................................................................... 6

      LOCATION OF POTENTIAL WITNESSES AND DOCUMENTS .......... 7

ARGUMENT - THE SECOND SUBPOENA SHOULD BE QUASHED ........... 7

I. THE SECOND SUBPOENA VIOLATES THE
   TERRITORIAL LIMITS OF RULE 45 ........................................................... 8

II. THE SECOND SUBPOENA SEEKS
    PROTECTED PRIVILEGED INFORMATION ............................................. 12

    A. New York's Shield Law Protects the BBC's
       Non-Confidential Outtakes
       and Testimony From Disclosure ............................................................ 14

    B. The First Amendment and Federal Law Protects
       the BBC's Unpublished Information From
       Disclosure ............................................................................................. 18

       1. Federal Test Can Be Satisfied Here ................................................. 19

       2. Policy Considerations Also Outweigh Compulsion Here ................. 21

III. THE SUBPOENAED INFORMATION CONTAINS INADMISSIBLE
    HEARSAY AND SHOULD NOT BE COMPELLED ................................. 23

CONCLUSION ................................................................................................... 24

i

# TABLE OF AUTHORITIES

## Cases

Carter v. City of New York, No. 02 Civ. 8755, 2004 WL 193142, 2004 U.S. Dist. LEXIS 1308
(S.D.N.Y. Feb. 2, 2004) .................................................................................... 18, 20

Cates v. LTV Aerospace Corp., 480 F.2d 620 (5th Cir. 1973) .................................... 10

Chevron Corp. v. Berlinger, 629 F.3d 297 (2d Cir. 2011)........................................... 21

Concerned Citizens v. Belle Haven Club, No. 3:99 Civ 1467,
2004 U.S. Dist. LEXIS 27335 (D. Conn. June 21, 2004)......................................... 23

Doe v. Cummings, No. 91-346, 1994 WL 315640,
22 Media L. Rep. [BNA] 1510 (Sup. Ct. St. Lawrence Co. Jan. 18, 1994) ............ 16

Gonzales v. NBC, Inc., 194 F.3d 29 (2d Cir. 1999) ........................................... passim

Georgia-Pac. LLC v. Am. Int'l Specialty Lines Ins. Co., 2:08-CV-950, 2010 WL 420036, 2010
U.S. Dist. LEXIS 14220 (S.D. Ohio Jan. 29, 2010) ................................................. 6

Flynn v. NYP Holdings Inc., 235 A.D.2d 907, 652 N.Y.S.2d 833 (3d Dept. 1997) ................... 16

Krase v. Graco Children Prods., Inc. (In re Application to Quash Subpoena to Nat'l Broad. Co.,
Inc.), 79 F.3d 346 (2d Cir. 1996) .......................................................................... 16, 18

Ings v. Ferguson, 282 F.2d 149 (2d Cir.1960) .............................................................. 16

In re Edelman, 295 F.3d 171 (2d Cir. 2002) .................................................................. 9

In re Subpoena Duces Tecum to American Broadcasting Companies, Inc., 189 Misc.2d 805,
735 N.Y.S.2d 9191 (Sup. Ct. NY Co. 2001) ..................................................... 15-16

Laker Airways Ltd. v. Pan Am. World Airways, 607 F. Supp. 324 (S.D.N.Y. 1985) ................. 11

Liberty Mut. Ins. Co. v. Diamante, 194 F.R.D. 20 (D. Mass. 2000) .............................. 6

Matter of Beach v. Shanley, 62 N.Y.2d 241, 476 N.Y.S.2d 765, 465 N.E.2d 304 (1984) .......... 17

N.Y. Times Co. v. Gonzales, 459 F.3d 160 (2d Cir. 2006) .......................................... 23

O'Neill v. Oakgrove Construction, Inc., 71 N.Y.2d 521, 523 N.E.2d 277,
528 N.Y.S.2d 1 (1988) ...................................................................................... 14, 17

Price Waterhouse LLP v. First American Corp., 182 F.R.D. 56 (S.D.N.Y. 1998) ................. 9-12

ii

Prosecutor v Brdjanin, Case No.: IT-99-36-AR73.9, Decision on Interlocutory Appeal (Dec. 11, 2002)(International Criminal Tribunal for the Former Yugoslavia, The Hague) ..................... 22

Sikelianos v. City of New York (In re Subpoena Directed to the AP), No. 05 Civ. 7673, 2008 WL 2465120, 2008 U.S. Dist. LEXIS 47560 (S.D.N.Y. June 18, 2008) ........................... 18, 20

Sokolow v. Palestine Liberation Org., No. 04 Civ. 00397 (GBD), 2011 WL 1345086, 2011 LEXIS 36022 (S.D.N.Y. Mar. 30, 2011) ................................................................................ 3

Stanford v. Kuwait Airlines Corp., No. 85 Civ. 0477, 1987 WL 26829, 1987 LEXIS 10981 (S.D.N.Y. Nov. 25, 1987) ................................................................................................. 10-11

St. Paul Fire & Marine Ins. Co. v Royal Ins. Co., No. 91 Civ. 6151 1993 WL 267347, 1993 LEXIS 9415 (S.D.N.Y. July 12, 1993) .................................................................................. 11

The Nissan Fire & Marine Ins. Co., Ltd v. Fortress Re, Inc., No. 1:02CV00054, 2002 WL 1870084, 2002 U.S. Dist Lexis 14928 (S.D.N.Y. Aug 14, 2002) ........................................... 9

U.S. v. Grant, No. 04 Cr. 207, 2004 U.S. Dist. LEXIS 28176 (S.D.N.Y. Nov. 17, 2004) .................................................. 18-21

U.S. v. Harwood, 998 F.2d 91 (2d Cir. 1993) ................................................................................ 23

von Bulow by Auersperg v. von Bulow, 811 F.2d 136 (2d Cir. 1987) .................................. 13, 19

## Statutes

N.Y. Civ Rts. L. §79-h ...................................................................................... 12, 14-15, 17

Fed. R. Civ. P. 30(b)(6) ........................................................................................................... 10

Fed. R. Civ. P. 45 .............................................................................................................. passim

Fed. R. Civ. P. 45(b)(2) ............................................................................................................. 9

Fed. R. Civ. P. 45(c)(1) ............................................................................................................. 5

Fed. R. Civ. P. 45(c)(3) ............................................................................................................. 5

Fed. R. Civ. P. 45(c)(3)(A)(ii) .................................................................................................. 9

Fed. R. Civ. P. 45(c)(3)(A)(iii) ............................................................................................... 12

Fed. R. Civ. P. 45(c)(3)(A)(iv) ................................................................................................. 5

iii

Fed. R. Civ. P. 45(d)(2)................................................................................................ 10

Fed. R. Evid. 801(d)(2)(C) ......................................................................................... 23

Fed. R. Evid. 801(d)(2)(D) ......................................................................................... 23

## Other Authorities

Article 79 of the Protocol Additional to the Geneva Conventions of 12 August 1949 and Relating
to the Protection of Victims of International Armed Conflicts (Protocol I), 8 June 1977, 1125
U.N.T.S. 3 ............................................................................................................. 22

BBC News – Programme – Correspondent, "Arafat Investigated,"
http://news.bbc.co.uk/nol/shared/spl/hi/programmes/correspondent/transcripts/arafat_investiga
ted_09_11_03.txt (last visited Sept. 8, 2011) ................................................................. 1

Committee to Protect Journalists, http://cpj.org/killed/ (last visited Sept. 7, 2011) ..................... 22

iv

## MEMORANDUM OF LAW OF THE BRITISH BROADCASTING CORPORATION IN SUPPORT OF MOTION TO QUASH SUBPOENA

### PRELIMINARY STATEMENT

This memorandum of law is submitted on behalf of the British Broadcasting Corporation ("the BBC") in support of its motion to quash the Subpoena to Testify at a Deposition in a Civil Action dated August 25, 2011 (the "Second Subpoena") issued on behalf of Plaintiffs.  This Subpoena – the second served by Plaintiffs on the BBC in a two month span – seeks a deposition witness to testify with respect to the 2003 BBC news program "Arafat Investigated" (the "Program"), accompanied by certain  non-broadcast information ("Outtakes"). [1]

The BBC, headquartered in England, is a total stranger to this litigation and the acts on which it is based. Plaintiffs assert some thirteen federal and state claims against the Palestinian Liberation Organization ("PLO"), the Palestinian Authority ("PA"), and John Doe defendants, seeking to recover for alleged injuries and death suffered by victims of seven attacks in or near Jerusalem, Israel in 2001, 2002 and 2004. None of those acts are the subject of the BBC Program, and one alleged attack postdated the broadcast.

The Second Subpoena should be quashed on numerous grounds.  First, there is no BBC witness with knowledge of the subpoenaed issues, or responsive outtakes, in the United States. Compliance with the Subpoena would require a BBC witness to travel more than 100 miles from where the witness resides, is employed or regularly transacts business in person to testify and produce documents controlled abroad.  As such, the Second Subpoena violates the territorial

---

[1] A copy of the Program previously was provided to Robert Tolchin, counsel for Plaintiffs. Declaration of Louise Sommers dated September 6, 2011 ("Sommers Decl.") ¶2; Declaration of Nicola Cain dated September 6, 2011 ("Cain Decl.") ¶3.  A transcript is publicly available online at the BBC website. Sommers Decl. ¶2; See BBC News – Programme – Correspondent, "Arafat Investigated," http://news.bbc.co.uk/nol/shared/spl/hi/programmes/correspondent/transcripts/arafat_investigated_09_11_03.txt (last visited Sept. 8, 2011)

restrictions of Fed. R. Civ. P. 45.

Second, the testimony and unpublished documents sought by the Second Subpoena are protected from compelled disclosure by the privileges granted journalists' news gathering information. These protections are intended to guard against the unfettered access Plaintiffs seek to sift through non-broadcast BBC information in an attempt to find something, yet unidentified, to assist their federal and state causes of action. At a minimum, as merit discovery in this case has just recently commenced, Plaintiffs will be unable to show – as they must – that they attempted to obtain the underlying information sought from alternate sources, and could not do so.

Third, the information sought in the BBC's non-broadcast information is, in any event, incompetent hearsay and inadmissible in this case.

Accordingly, the Second Subpoena is invalid and seeks inadmissible, burdensome and/or privileged information. The BBC's Motion to Quash should be granted.

## BACKGROUND

The BBC is a British public service broadcaster. Its independent news programs are among the many types of programming it provides. In 2003, the BBC broadcast the Program "Arafat Investigated," as part of its news mission to prepare and disseminate information of public concern. Declaration of Stephen Mitchell dated September 6, 2011 ("Mitchell Decl.") ¶1.

The BBC is a stranger to Plaintiffs' litigation. Plaintiffs seek to hold Defendants PLO and PA liable for injuries and death allegedly sustained during seven attacks that allegedly occurred in Jerusalem, Israel during 2001, 2002 and 2004. Complaint ¶¶126-222. "Plaintiffs assert causes of action for international terrorism...and various state law claims including wrongful death, pain and suffering, battery, assault, loss of consortium, negligence, and infliction

of emotional distress." <u>Sokolow v. Palestine Liberation Org.</u>, No. 04 Civ 00397 (GBD), 2011

WL 1345086, at *1, 2011 LEXIS 36022, at *5 (S.D.N.Y. Mar. 30, 2011).

Despite the extended pendency of this litigation, merit discovery has only recently

commenced and will not be concluded until December 2012. See June 24, 2011 Scheduling

Order [Dkt #131].

**The BBC Program**

The Program was broadcast on November 9, 2003. It was reported by a Middle East

correspondent, and was focused on the isolation at that time of former Palestinian leader Yasir

Arafat ("Arafat") by Israel and the U.S., and Arafat's status and relationship to the Palestinian

people. There were a number of persons interviewed in that program, among them persons who

identified themselves, for example, as various officials, academics, militants and/or residents of

the area. None of the alleged attacks in issue in this case were subjects of, or mentioned in, the

BBC Program, and at least one such alleged attack postdated the 2003 Program.  Declaration of

Itai Maytal dated September 6, 2011 ("Maytal Decl.") ¶¶4-5.

**The First Subpoena**

By Subpoena dated July 8, 2011 (the "First Subpoena") served on the BBC in Manhattan

but issued out of the Eastern District of New York, Plaintiffs noticed the deposition of the BBC

for July 26, 2011 in the Eastern District and tried to compel the same documents sought here.

Sommers Decl. ¶3 and Ex. 1.[2]

This Subpoena raised issues which counsel for the BBC unsuccessfully tried to resolve

with counsel for Plaintiffs in several exchanges. Plaintiffs' counsel refused the BBC's request to

---

[2] Although the outtakes sought in the First Subpoena were originally broader than those sought here, Plaintiffs agreed to narrow them to those that showed Ata Abu Rumaileh ("Rumaileh") and Zakaria Zubaidi ("Zubaidi"), two of the interviewees shown in the Program.  Sommers Decl. ¶10. These are the same outtakes sought by the Second Subpoena.

substitute a subpoena issued from this Southern District or to transfer the subpoena here so that the subpoena issues could be heard by the Court most familiar with the privilege, relevance and admissibility issues implicated. Plaintiffs' counsel was aware that the BBC considered the subpoenaed outtakes protected by the journalist privilege, and believed that the underlying information sought could be obtained from more direct alternate sources, most notably, the defendants in this case. There seemed sufficient time for Plaintiffs to pursue those more appropriate alternative sources. Sommers Decl. ¶¶4-9.

Any BBC witness knowledgeable about the Topics resides or works in the United Kingdom, such that no witness could appear in Brooklyn on the noticed date. Cain Decl. ¶5, Mitchell Decl. ¶6. Despite being informed of this, Plaintiff's counsel insisted that the BBC produce a witness and refused the BBC's request for an adjournment of the noticed date or extension of time to object or move so that there could be an orderly, rather than emergency motion schedule in the Eastern District, as that was the issuing court. Since BBC's counsel was advised of that refusal two business days before the arbitrary deposition notice date, the BBC was required to file a motion addressed to the Subpoena the next business day. Sommers Decl. ¶¶5, 10.

Once the BBC's motion to quash the subpoena, or to transfer it to this case, was filed in the Eastern District of New York – thus commencing a case there – the BBC was compelled to engage in a wasteful and costly fire drill. Plaintiffs made an ultimately fruitless motion to strike the BBC's motion, or have it heard by the Magistrate Judge of Plaintiffs' choice. The Court in the Eastern District rebuffed Plaintiffs' tactics and denied their motion, ordering the parties to agree on a briefing schedule for the BBC's motion to quash. Unhappy with the result of their attempt to forum shop the BBC subpoena issues to the Eastern District, Plaintiffs forum shopped

their way back out. Sommers Decl. ¶¶11-12 and Ex. 2.

Plaintiffs' counsel asked the BBC to drop its argument based on Rule 45's territorial restriction if the deposition was conducted in London. When the BBC could not agree to do so, counsel then announced that he would be serving a second subpoena on the BBC, this time from the Southern District – even though he had earlier rejected the BBC's request to be here, causing the BBC to engage in costly, wasteful motion practice in the Eastern District. Counsel also refused the BBC's request to simply agree to the BBC's existing motion insofar as it requested a transfer to the Southern District, so that the BBC would not have to start all over again here, with deadlines and a new motion. Sommers Decl. ¶¶13, 14.

Instead, Plaintiffs' counsel attempted to extract conditions from the BBC, and then claimed to be concerned that on any appeal to the Second Circuit, the BBC, which had requested the transfer, nevertheless might argue that the Southern District would lack subject matter jurisdiction over the motion. Then, without disclosing to the Court in the Eastern District that Plaintiffs intended to serve a second subpoena on the BBC, Plaintiffs' counsel instead unilaterally represented to that Court that "[h]aving given careful thought and consideration to certain arguments raised by the defendants [sic] in their motion, we have decided to withdraw the subpoena..." and "the BBC's motion is now moot." The Court immediately denied the BBC's motion as moot. Plaintiffs then served a Second Subpoena on the BBC. Sommers Decl. ¶15, 16 and Exs. 3 and 4.[3]

---

[3] Rule 45 affirmatively requires that "a party or attorney responsible for issuing or serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena" – especially if the recipient is a non-party – and that the court must enforce this duty. Fed. R. Civ. P. 45(c)(1). Similarly, Rule 45(c)(3)(A)(iv) mandates a court to quash or modify a subpoena that "subjects a person to undue burden." Here, Plaintiffs' counsel did just the opposite of what the Rules require: he engaged in a series of purposeful maneuvers for tactical gain, unnecessarily involving two courts and two substantively identical subpoenas, burdening the BBC to engage in wasteful and costly motion practice in another district with respect to the first subpoena – later unilaterally withdrawn – only

**The Second, and Instant, Subpoena**

The Second Subpoena was served on the BBC on August 9, 2011 and noticed the

deposition of the BBC for August 25, 2011. Like the First Subpoena, it requested that the witness

bring copies of the same documents requested in the First Subpoena: the Program, as well as

unpublished

> authentic, complete and unedited audiovisual copies of all audiovisual recordings
> recorded during the preparation and making of the Program and/or for the purpose
> of preparing and making the Program that include audio and/or video recordings
> of Ata Abu Rumaileh and/or Zakaria Zubaidi, including all such recordings which
> were not ultimately included in the Program as broadcast ["collectively,
> "Outtakes"].

Cain Decl. ¶¶2, 3 and Ex. A, Sommers Decl. ¶2. The Second Subpoena also commands the BBC

to designate a testifying witness regarding four topics: "the authenticity" of the Program and

Outtakes (referred to in the Second Subpoena as the "Recordings"), the manner in which they

were copied to produce copies to Plaintiffs; the place and manner in which the Recordings were

stored, held and maintained, and the manner in which the BBC generally stored, held and

maintain these Recordings and other "similar in origin" during specific periods of time

(collectively, the "Topics"). Cain Decl. ¶4 and Ex. A. [4]

---

to have to re-commence its efforts here with the second. All of this could have been avoided at the outset
had Plaintiffs' counsel issued the first subpoena out of this court, thereby complying with his duty, but he
refused to do so. The Second Subpoena should be quashed, regardless of whether counsel acted in good
faith in maneuvering. See generally Liberty Mut. Ins. Co. v. Diamante, 194 F.R.D. 20, 23 (D. Mass.
2000)("Subpoena may be issued in 'good faith' but still may be improper if the party serving the
subpoena has failed to 'take reasonable steps to avoid imposing undue burden or expense on the person
subject to the subpoena.'"); Georgia-Pac. LLC v. Am. Int'l Specialty Lines Ins. Co., 2:08-CV-950, 2010
WL 420036, at *2, 2010 U.S. Dist. LEXIS 14220, at *4 (S.D. Ohio Jan. 29, 2010)("So long as the duty to
avoid imposing an undue burden is violated, it is of no consequence that the party or attorney who served
the subpoena acted in good faith.")

[4]The efforts engaged in by counsel for the BBC to resolve the subpoenas with counsel for Plaintiffs are
set forth in this Declaration of Louise Sommers which is incorporated herein by reference.

**Effects of Disclosure**

Disclosure of any of the unpublished information from the Program would unduly hamper the BBC's ability to function in its independent editorial role. Among other things, were the BBC drawn into private disputes as a result of favorable or unfavorable coverage of persons and topics on which it reports, its impartiality among sources would be compromised. This would in turn impair the BBC's ability to report on important stories. Even non-confidential sources, as well as viewers, expect journalists to be independent chroniclers of events, not investigative functionaries for private litigants and the government. Mitchell Decl. ¶2.

BBC sources who agree to appear on camera have a reasonable expectation that use of their footage will be subject to BBC's independent editorial judgment and will not be taken out of context, passed on to third parties or employed outside of the broadcast in which they agreed to participate. If the BBC's judgment to publish, or not to publish, certain footage was wrested from the BBC by private litigants for private purposes, that expectation would not be met, sources would be far less inclined to speak candidly with BBC reporters, if at all, and significant news relationships could be impaired. Mitchell Decl. ¶3.

This issue is of particular concern here where war reporting is involved. Disclosure of the nature sought by Plaintiffs would jeopardize the security of BBC reporters who must cover stories in war zones or other areas of armed conflict, like the Middle East, and depend upon their neutrality for access and safe passage back to their bureaus. Individuals in conflict zones would be more likely to question the neutrality of BBC reporters if they thought reporters would routinely be called to testify against them or their associates in litigation later. Mitchell Decl. ¶4.

Compulsion under the subpoena also unduly disrupts the BBC's newsgathering activities in general. Given the breadth of topics the BBC covers internationally, if its reporters, editors

and managers were required to provide unpublished evidence in any civil matter merely because of a topic or subject the BBC covered, the BBC would be spending its time and attention as professional witnesses, rather than as professional journalists. Mitchell Decl. ¶5.

**Location of Potential Witnesses and Documents**

No potential BBC witness knowledgeable about the Topics listed in the Second Subpoena resides, works or regularly transacts business in person in New York and any witness with any such knowledge would have to travel more than 100 miles from his or her residence, place of employment or place where he or she regularly transacts business in person in the United Kingdom in order to comply with the Second Subpoena. Mitchell Decl. ¶6; Cain Decl. ¶¶ 5,7.

It may be the case, moreover, that the necessary knowledge does not reside in one person, but that more than one witness would be needed to respond to all the Topics. In that case, the Second Subpoena poses a double burden as it would also be extremely disruptive to the business of the BBC to have more than one (much less, one) of its employees distracted by compelled testimony in a foreign case in which the BBC is a stranger. In any event, the only individuals from the BBC with knowledge of the Topics in the Second Subpoena are based in the United Kingdom. Cain Decl. ¶¶ 6, 7.

Likewise, no material responsive to the Second Subpoena is located in the United States. The requested material is controlled by the BBC in the United Kingdom. Cain Decl. ¶8.

## ARGUMENT

### THE SECOND SUBPOENA SHOULD BE QUASHED

**I. THE SECOND SUBPOENA VIOLATES THE TERRITORIAL LIMITS OF RULE 45**

The authority to serve a subpoena under Rule 45 is expressly made "subject to the

provisions of Rule 45(c)(3)(A)(ii).[5] That section provides that on timely motion, "the issuing

court *must* quash or modify a subpoena" that

> requires a person who is neither a party nor a party's officer to travel more than
> 100 miles from where that person resides, is employed or regularly transacts
> business in person ...

(emphasis supplied).   This is the case here. Any witness for the BBC knowledgeable about the

subpoenaed issues would be required to travel more than 100 miles to testify in the Eastern

District. As there is no modification of the subpoena within the court's power that could cure this

violation, Rule 45 is mandatory that the Second Subpoena must be quashed.

The territorial restriction of Rule 45 was included "to protect [non-party] witnesses from

being subjected to excessive discovery burdens in litigation in which they have little or no

interest." In re Edelman, 295 F.3d 171, 178 (2d Cir. 2002)(*citing* Price Waterhouse LLP v. First

American Corp., 182 F.R.D. 56, 62 (S.D.N.Y. 1998)). See also The Nissan Fire & Marine Ins.

Co., Ltd v. Fortress Re, Inc., No. 1:02CV00054, 2002 WL 1870084 at *3, 2002 U.S. Dist Lexis

14928, at *9 (S.D.N.Y.  Aug 14, 2002)(same).  Its "goal is to prevent inconvenience to the flesh-

and-blood human beings who are asked to testify, *not the legal entity for whom those human*

*beings work*." Price Waterhouse LLP v. First American Corp., supra, 182 F.R.D. at 62 (emphasis

supplied). See also Fed. R. Civ. P. 26(c)(protects potential non-party deponents from

burdensome travel "by authorizing a district court to modify or even quash a subpoena in order

'to protect [the] party or person from annoyance, embarrassment, oppression, or undue burden or

expense.'" In re Edelman, supra, 295 F.3d at 178).

It matters not whether the corporate deponent named and served, particularly a nonparty

---

[5] Fed. R. Civ. P. 45(b)(2) provides:

(2) Service in the United States. *Subject to Rule 45(c)(3)(A)(ii),* a subpoena may be served at any place:
(A) within the district of the issuing court.... [Listing other places][emphasis supplied].

like the BBC, is itself subject to jurisdiction in the issuing District, or would be required under

Fed. R. Civ. P. 30(b)(6) to produce either a knowledgeable or educated witness in the district if it

were a *party* to this action. Cates v. LTV Aerospace Corp., 480 F. 2d 620, 623-24 (5th Cir.

1973)("A person designated by an organization pursuant to Rule 30(b)(6) could not be required

to travel outside the limits imposed by Rule 45(d)(2)");  Stanford v. Kuwait Airlines Corp., No.

85 Civ. 0477, 1987 WL 26829, at *3, 1987 LEXIS 10981,  at *7 (S.D.N.Y. Nov. 25,

1987)(corporation in district not required to gather information for testimony in district, rather

"case law and logic dictate that the [territorial] proscriptions of [Rule 45] also apply to individual

employees who are the subject of a subpoena served upon a corporation.").

Rule 45's territorial restrictions trump Rule 30(b)(6) in this regard.  "Any contention that

a subpoena served pursuant to Rule 30(b)(6) need not comply with the requirements of Rule

45(c) would "fly in the face of the intent of Rule 45( [c] ) which is to 'protect nonparty witnesses

from being inconvenienced by being compelled to travel inordinate distances to have their

depositions taken.'" Price Waterhouse LLP v. First American Corp., supra, 182 F.R.D. at 62

(internal citation omitted).

If the witness knowledgeable about the matter for the corporation would be required to

travel more than 100 miles from where he or she lives or works or "regularly transacts business

in person" in order to comply and testify – regardless of whether the corporation is in the issuing

District – the Subpoena should be quashed. See, e.g., Stanford v. Kuwait Airlines Corp., supra

(court denied motion to compel deposition of corporation doing business in New York to

produce as knowledgeable employees lived, worked or personally transacted business more than

100 miles away); Price Waterhouse LLP v. First American Corp., supra (court granted motion to

quash subpoena on jurisdictionally present British corporation because witnesses with

knowledge lived and worked more than 100 miles away). See also St. Paul Fire & Marine Ins. Co. v Royal Ins. Co., No. 91 Civ. 6151 1993 WL 267347, at *1-*2, 1993 LEXIS 9415, at *2 (S.D.N.Y. July 12, 1993)(subpoena quashed on corporate employee who would be required to travel more than 100 miles from home and work).

Here, the BBC was served at its news desk in Manhattan. However, it has no employee who is knowledgeable about the authenticity of the Program, the Outtakes, or the manner in which the Recordings and other BBC records were copied, stored or maintained during the time periods requested – in short, the matters Plaintiffs intend to elicit at deposition – in Manhattan, in the Eastern District, or indeed within 100 miles therefrom. The only individuals from the BBC with knowledge of the Topics in the Second Subpoena are based in the United Kingdom. Moreover, the BBC does not maintain in the United States any requested document that would be responsive to the Second Subpoena; those are controlled from the U.K. Cain Decl. ¶¶5-8; Mitchell Decl. ¶5.[6] Given that all potential witnesses and relevant documents are located outside the United States, it does not matter that the BBC is subject to service here. Stanford v. Kuwait Airlines Corp., supra; Price Waterhouse LLP v. First American Corp., supra; Laker Airways Ltd. v. Pan Am. World Airways, 607 F. Supp. 324, 326 (S.D.N.Y. 1985)(subpoena duces tecum on non-party witness vacated where documents and records designated in it were regularly maintained within the United Kingdom and not within the judicial district).

Based on the circumstances present here, and the fact that the foreign-controlled documents are requested only as an adjunct to the deposition, the Second Subpoena should be

---

[6] As well, the necessary knowledge may not reside in one person, but may require more than one person's knowledge to respond to all the Topics. In that case, the Subpoena poses a double burden as it would also be extremely disruptive to the business of the BBC to have more than one (much less, one) of its employees distracted if the BBC were compelled to give testimony in a foreign case to which the BBC is a stranger. Cain Decl. ¶6.

quashed in its entirety.  The Court lacks the power to change the location or to compel testimony of a foreign witness abroad. Price Waterhouse LLP v. First American Corp., supra, 182 F.R.D. at 63-64 and n.7 (where knowledgeable corporate employees are outside the United States, court lacks the power to modify the subpoena to change the location to a foreign city or to require witness to submit to a deposition in a foreign country). Even so, international comity-based considerations counsel that the Court refrain from compelling testimony under circumstances involving foreign witnesses. See generally Ings v. Ferguson, 282 F.2d 149, 152 (2d Cir.1960)("Upon fundamental principles of international comity, our courts dedicated to the enforcement of our laws should not take such action as may cause a violation of the laws of a friendly neighbor or, at the least, an unnecessary circumvention of its procedures.").

Since the Second Subpoena violates the territorial limitations of Rule 45, it should be quashed.

## II.  THE SECOND SUBPOENA SEEKS PROTECTED PRIVILEGED INFORMATION

Fed. R. Civ. P. 45(c)(3)(A)(iii) provides that "on timely motion, the issuing court must quash or modify a subpoena" that "requires disclosure of privileged or other protected matter, if no exception or waiver applies...." (emphasis supplied). As shown, that is the case here.

The Second Subpoena requires documents and testimony protected from disclosure by the journalist privilege. Those protections are granted by the New York Shield Law, N.Y. Civ. Rts. L. §79-h, the New York Constitution, the First Amendment and/or federal law in litigations premised on state or federal claims.[7]

---

[7] Where subpoenaed information is sought for state claims, New York state law governs the privilege issue. Fed. R. Evid. 501 ("in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness... shall be determined in accordance with State law"). See also In re NBC (Krase v. Graco Children Products, Inc.), 79 F.3d 346, 351, 24 Media L. Rep. 1599 (2d Cir. 1996) (New York state law governs reporters' privilege where production required in New York from broadcaster with office in New York).

Where evidence is sought for both federal and state claims, the Second Circuit has applied the federal privilege, recognizing however, that the applicable state law should be considered as well. von Bulow by Auersperg v. von Bulow, 811 F.2d 136 (2d Cir. 1987)("in examining the boundaries of the journalist's privilege, we may consider also...New York's so called "Shield Law...Although we are not bound to follow New York law, neither should we ignore New York's policy of giving protection to professional journalists"). Accordingly, should Plaintiffs establish that the BBC Outtakes they seek are relevant to both federal and state claims, the New York Shield Law will nevertheless remains applicable, alongside the federal privilege, to guide the Court. Under both set of privileges, the Outtakes are protected from compelled disclosure.

The Court of Appeals for the Second Circuit has recognized that "the pivotal function of reporters to collect information for public dissemination" and "the paramount public interest in the maintenance of a vigorous, aggressive and independent press capable of participating in robust, unfettered debate over controversial matters" require protection of the ability of press and broadcasters to freely collect, edit and publish and broadcast news, unhampered by subpoenas seeking their newsgathering materials:

> If the parties to any lawsuit were free to subpoena the press at will, it would likely become standard operating procedure for those litigating against an entity that had been the subject of press attention to sift through press files in search of information supporting their claims. The resulting wholesale exposure of press files to litigant scrutiny would burden the press with heavy costs of subpoena compliance, and could otherwise impair its ability to perform its duties... . Incentives would also arise for press entities to clean out files containing potentially valuable information...And permitting litigants unrestricted, court-enforced access to journalistic sources would risk the symbolic harm of making journalists appear to be an investigative arm of the judicial system, the government, or private parties.

Gonzales v. NBC, Inc., 194 F.3d 29, 35 (2d Cir. 1999).

The New York Court of Appeals has raised the same concerns as the Second Circuit about reporters becoming enmeshed in litigation that arises from the events that they cover: "The autonomy of the press would be jeopardized if resort to its resource materials, by litigants seeking to utilize the newsgathering efforts of journalists for their private purposes were routinely permitted. ...The practical burdens on time and resources, as well as the consequent diversion of journalistic effort and disruption of newsgathering activity, would be particularly inimical to the vigor of a free press." O'Neill v. Oakgrove Construction, Inc., 71 N.Y.2d 521, 526-27, 523 N.E.2d 277, 279, 528 N.Y.S.2d 1, 3 (1988).

Whether in the form of testimony or documents, the information sought by the Second Subpoena was gathered in connection with a news program broadcast to the public. The wholesale exposure of its unpublished information to litigant scrutiny for private purposes, regardless of how sympathetic those purposes might be, would indeed "burden the press with heavy costs of subpoena compliance" – including, as here, costs of safety and security of journalists in war zones – and "impair its ability to perform its duties." As a broadcaster responsible for preparing and broadcasting news programming intended for the public, the BBC is entitled to avail itself of its journalistic protections to avoid these results. As shown below, Plaintiffs will be unable to overcome these protections.

Accordingly, disclosure of the subpoenaed information should not be compelled. Instead, the Second Subpoena should be quashed in its entirety.

## A. New York's Shield Law Protects the BBC's Outtakes and Testimony From Disclosure

The New York Shield Law, NYCRL § 79-h, provides that a "newscaster" and his or her news organization, here, the BBC, are protected from compelled disclosure of nonconfidential news or "the source of any such news" received "in the course of gathering or obtaining news for

publication or to be published in a newspaper...." NYCRL § 79-h(a)(6), (b), (f). [8] Plaintiffs could

not meet the burden of overcoming the qualified privilege that attaches to nonconfidential news

under that statute.

NYCRL §79-h (c) allows compelled disclosure of nonconfidential news only a "last

resort." In re Subpoena Duces Tecum to American Broadcasting Companies, Inc., 189 Misc.2d

805, 808, 735 N.Y.S.2d 919, 921 (Sup. Ct. NY Co. 2001). It provides a qualified privilege for

nonconfidential news, but that qualification can only be overcome by a "clear and specific

showing" by the party seeking disclosure – here, Plaintiffs – that the information sought "(i) is

highly material and relevant; (ii) is critical or necessary to the maintenance of a party's claim,

defense or proof of an issue material thereto; and (iii) is not obtainable from any alternative

source. ..." [9]

The second prong of this test would further require Plaintiffs to show "that the claim for

which the information is to be used 'virtually rises or falls with the admission or exclusion of the

---

[8] NYCRL § 79-h(f) provides that the protections so granted "shall apply to ... organization having
authority over the [professional journalist or newscaster]." NYCRL § 79-h(a)(8) defines "news" as
"written, oral, pictorial photographic, or electronically recorded information or communication
concerning local, national or worldwide events or other matters of public concern or public interest or
affecting the public welfare."

[9] NYCRL 79-h(c) provides in pertinent part:

   (c) Exemption of professional journalists and newscasters from contempt: Qualified protection
   for nonconfidential news. Notwithstanding the provisions of any general or specific law to the
   contrary, no professional journalist or newscaster presently or having previously been employed
   or otherwise associated with any newspaper, magazine, news agency, press association, wire
   service, radio or television transmission station or network or other professional medium of
   communicating news to the public shall be adjudged in contempt by any court in connection
   with any civil or criminal proceeding...for refusing or failing to disclose any unpublished news
   obtained or prepared by a journalist...in the course of gathering or obtaining news as provided in
   subdivision (b) of this section, or the source of any such news, where such news was not
   obtained or received in confidence, unless the party seeking such news has made a clear and
   specific showing that the news: (i) is highly material and relevant; (ii) is critical or necessary to
   the maintenance of a party's claim, defense or proof of an issue material thereto; and (iii) is not
   obtainable from any alternative source...

proffered evidence'." <u>Flynn v. NYP Holdings Inc.</u>, 235 A.D.2d 907, 908, 652 N.Y.S.2d 833, 835

(3d Dept. 1997)(citing <u>In re NBC (Krase v. Graco Children Products, Inc.)</u>, 79 F.3d 346, 351 (2d

Cir. 1996)); <u>In re Subpoena Duces Tecum to American Broadcasting Companies, Inc.</u>, <u>supra</u>, 189

Misc.2d at 808, 735 N.Y.S.2d at 922. That test is "not merely whether that the material be

helpful or probative, but *whether or not the defense of the action may be presented without it.*" <u>In</u>

<u>re Subpoena Duces Tecum to American Broadcasting Companies, Inc.</u>, <u>supra</u>, 189 Misc.2d at

808, 735 N.Y.S.2d at 922; <u>Doe v. Cummings</u>, No. 91-346, 1994 WL 315640 *1, 22 Media L.

Rep. [BNA] 1510, 1511 (Sup. Ct. St. Lawrence Co. Jan. 18, 1994)(emphasis supplied).

　　　　Plaintiffs could not meet this tripartite burden here. The BBC is not a party to this case

and has no personal knowledge of the facts underlying it. The Outtakes do not show or concern

the alleged attacks in issue, and indeed, contain only hearsay with respect to this action. See

Point III, <u>infra</u>.  Plaintiffs could not establish that their success in prosecuting this litigation

"virtually rises or falls with the admission or exclusion of," and can not be presented without,

those Outtakes.  As well, Plaintiffs could not show clearly and specifically, as they must, that the

BBC's unpublished information is a "last resort" after exhausting all other alternatives. Indeed,

on this last issue alone, there are other sources and alternatives to burdening the BBC.

　　　　As a start, any information Plaintiffs seek regarding the PLO and PA Defendants in this

case can be obtained directly from knowledgeable, first-hand sources –Defendants themselves.

Yet merit discovery has only recently commenced, and depositions have yet to be taken. Surely,

Plaintiffs must look to parties in their own case before seeking to burden non-parties –

particularly so where compelled discovery from BBC must be a "last resort."

　　　　The Program, presented as part of the BBC's news mission to prepare and disseminate

information of public concern, focused on Arafat's isolation by Israel and the U.S. and his

relationship to the Palestinian people and unquestionably concerned matters of profound

worldwide interest. The attempt by Plaintiffs to compromise the BBC and its sensitive news

gathering activities, and to disrupt its vital press functions, is precisely the conduct against which

the Shield Law is intended to guard. O'Neill v. Oakgrove Construction, Inc., supra, 71 N.Y.2d at

527-29, 523 N.E.2d at 280-81, 528 N.Y.S.2d at 4-5; Matter of Beach v. Shanley, supra, 62

N.Y.2d at 249-50, 465 N.E.2d at 308, 476 N.Y.S.2d at 769.

There is no question but that disclosure of any of the Outtakes sought would do just that,

and unduly hamper the BBC's ability to function in its independent editorial role. Among other

things, were the BBC drawn into private disputes as a result of favorable or unfavorable

coverage of persons and topics on which it reports, its impartiality among sources would be

compromised. This would in turn impair the BBC's ability to report on important stories. Even

non-confidential sources expect journalists to be independent chroniclers of events, not

investigative functionaries for private litigants and the government. Mitchell Decl. ¶2.

Crucially, this issue has particular concern here, as war reporting is involved. Disclosure

of the nature sought by Plaintiffs would jeopardize the security of BBC reporters who must cover

stories in war zones or other areas of armed conflict, like the Middle East, and depend upon their

neutrality for access and safe passage back to their bureaus. Mitchell Decl. ¶4.[10]

These are precisely the type of reasons that journalist information is protected. The

subpoenaed information would be protected from compelled disclosure by the New York Shield

---

[10] The New York Court of Appeals has recognized that the free press guarantees of the N.Y. State
Constitution Article I, Section 8 "independently mandates the protection afforded by the qualified
privilege to prevent undue diversion of journalistic effort and disruption of press functions." O'Neill v.
Oakgrove Construction, Inc., supra, 71 N.Y.2d at 528, 523 N.E.2d at 280, 528 N.Y.S.2d at 4. Indeed, the
"protection afforded by the guarantees of free press and speech in the New York Constitution is often
broader than the minimum required by the First Amendment." Id., 71 N.Y.2d at 529 n.3, 523 N.E.2d at
281 n.3, 528 N.Y.S.2d at 5 n.3. At a minimum then, for the reasons that Plaintiffs will be unable to
satisfy their burden under NYCRL §79-h(c), they cannot meet their burden under the State Constitution.

Law and the Second Subpoena should be quashed on this ground.

### B. The First Amendment and Federal Law Protects The BBC's Unpublished Information From Disclosure

As well, the non-broadcast outtakes and testimony sought is qualifiedly privileged from compelled disclosure under the governing federal law. Gonzales v. NBC, Inc., supra, 194 F.3d at 35; Krase v. Graco Children Prods., Inc. (In re Application to Quash Subpoena to Nat'l Broad. Co., Inc.), supra, 79 F.3d at 351 (subpoena seeking outtakes quashed); U.S. v. Grant, No. 04 Cr. 207, 2004 U.S. Dist. LEXIS 28176, at *9 (S.D.N.Y. Nov. 17, 2004)(subpoena for video outtakes of program shown on MTV quashed); Carter v. City of New York, No. 02 Civ. 8755, 2004 WL 193142, at *2, 2004 U.S. Dist. LEXIS 1308, at *5 (S.D.N.Y. Feb. 2, 2004)(subpoena for deposition testimony of reporter quashed). "Whether a reporter should be required to turn over a videotape of an event or be deposed as to his direct perceptions of that event would appear to raise the identical policy issues that the court in Gonzales relied upon in finding that the qualified privilege for journalists extended to nonconfidential information." Carter v. City of New York, 2004 WL 193142, at *1, 2004 U.S. Dist. LEXIS 1308, at *2.

Although the federal privilege against compelled disclosure of non-broadcast news-related information is qualified, "Gonzales makes clear that requiring the press to surrender materials gathered in the course of doing its job is not to be done lightly." U.S. v. Grant, 2004 U.S. Dist. LEXIS 28176 at *8-*9. A party seeking to overcome an assertion of the journalist's privilege must show a "particularized need" for the information sought. Sikelianos v. City of New York (In re Subpoena Directed to the AP), No. 05 Civ. 7673, 2008 WL 2465120, at *1, 2008 U.S. Dist. LEXIS 47560, at 5-6 (S.D.N.Y. June 18, 2008). Further, the litigant "will not be granted unfettered access to 'sift through [journalists'] files in search of information supporting [his] claims,' because such access would undermine the public's perception of the press as an

independent institution and foster the view,' as the Second Circuit noted, 'that it is 'an investigative arm of the judicial system, the government, or private parties.' " Id. (citations omitted).

The burden of overcoming privilege rests squarely on the party seeking disclosure. Gonzales v. NBC, supra, 194 F.3d at 36; von Bulow by Auersperg v. von Bulow, supra, 811 F.2d at 141. Where non-confidential material is involved, disclosure shall not be compelled unless the party seeking disclosure establishes that the information sought is (1) "of *likely* relevance to a *significant* issue in the case" and (2) "*not reasonably* obtainable from other available sources." Gonzales v. National Broadcasting Co., 194 F.3d at 36 (emphasis added). This showing should be balanced against the public interest in a free press, with disclosure compelled only where that public interest is outweighed. U.S. v. Grant, 2004 U.S. Dist. LEXIS 28176, *1, 6 (S.D.N.Y. 2004).

### 1. The Federal Test Cannot Be Satisfied Here

As indicated above, the BBC, a stranger to this suit, has no personal knowledge to impart that could assist this case. Whatever information and documents the BBC acquired in the course of preparing and gathering news for the Program is neither relevant nor material to this case, nor would any of its information not be available from alternative sources.

Plaintiffs could not satisfy the test under Gonzales to obtain the material sought, even were it of limited relevance. "Limited relevance" to a case is simply not "likely relevance" sufficient to satisfy the test for disclosure of nonconfidential materials. In Gonzales, the issue in the underlying action was whether a deputy sheriff engaged in a practice of stopping and detaining motorists without probable cause or reasonable suspicion. The outtakes sought included a videotaped stop of a network employee by the same deputy sheriff. As the Court in

19

U.S. v. Grant noted in refusing to order disclosure of the videotape sought there, "in Gonzales, and in other cases in which the journalists' privilege was overcome, the video *contained* images of the tortious conduct or crime itself." 2004 U.S. Dist. LEXIS 28176 at *7. (emphasis supplied).

Here, however, as in U.S. v. Grant, there is no contention that the attacks in issue in this case appear in the Outtakes sought. They do not. And the testimony sought is even more attenuated. To the extent Plaintiffs seek testimony regarding the BBC's storage and maintenance of the Outtakes, as well as its practices concerning the company's storage and maintenance of recordings of other unrelated programs, there is virtually no relevance whatsoever to this case.

Nor is there any indication that the information contained in the Outakes sought is unavailable from alternative sources. To the contrary, any information related to the Defendants in this case can be obtained directly from them, yet they have yet to be deposed. Surely with discovery in their case ongoing until December 2012, Plaintiffs should attempt to obtain what they need from the parties to their case before burdening journalist nonparties. Carter v. City of New York, 2004 WL 193142, at *1, 2004 U.S. Dist. LEXIS 1308, at *4 (quashing subpoena under Gonzales test where defendant did not show that the information sought was "not reasonably obtainable from other sources").

Plaintiffs are simply on a fishing expedition, to try to determine if the BBC has anything that could possibly aid their cause. Under such circumstances, where the Plaintiffs do not know what the material they seek contains, they could not show, as they must, a "particularized need" for the information in the BBC's possession. Sikelianos v. City of New York (In re Subpoena Directed to the AP), supra. Such "unfettered access" to "sift through" the materials sought is precisely what the privilege was intended to guard against. Id. Indeed, compelling the testimony and documents sought here would risk placing the BBC in precisely the situation of burden and

jeopardy that state and federal protections granted a newscaster was intended to avoid. <u>Gonzales v. NBC, Inc.</u>, <u>supra.</u>

### 2. Policy Considerations Also Outweigh Compulsion Here

Moreover, the likely relevance of the nonconfidential material sought and its availability from alternative sources must be balanced against the public interest in a free press.  Where the latter is not outweighed, disclosure will not be compelled. <u>See, e.g.</u>, <u>U.S. v. Grant</u>, 2004 U.S. Dist. LEXIS 28176 at *6 ("Applying the Gonzales standard to this case, in which the prosecution seeks nonconfidential information from a non-party newsgatherer, requires balancing the likely relevance of the material sought and its availability from alternative sources against the public interest in a free press"; disclosure not compelled).

Compelling the BBC to provide outtakes and testimony, "even where there was no issue of betrayal of a promised confidence," would not only negate the precise concerns for press freedom (a "paramount public interest" in the "maintenance of a vigorous, aggressive and independent press capable of participating in robust, unfettered debate over controversial matters" unhampered by subpoenas) that the Court of Appeals for the Second Circuit hoped to promote.  <u>Chevron Corp. v. Berlinger</u>, 629 F.3d 297, 306-7 (2d Cir. 2011)(*citing* <u>Gonzales v. NBC, Inc.</u>, <u>supra.</u>194 F. 3d at 35.)  It would also jeopardize the autonomy of the press, forcing the BBC's professional journalists to become professional witnesses - a result that New York appellate courts have also sought to avoid. Mitchell Decl. ¶5. <u>O'Neill v. Oakgrove Construction, Inc.</u>, <u>supra</u>, 71 N.Y.2d at 526-27, 523 N.E.2d at 279, 528 N.Y.S.2d at 3.  ("[A]utonomy" of the press" is jeopardized by "litigants seeking to utilize the newsgathering efforts of journalists for their private purposes.")

For the BBC, losing its independent editorial status by being forced to comply with the

Plaintiffs' Subpoena could also carry with it the loss of security for its reporters who must cover stories in war zones or other areas of armed conflict. Mitchell Decl. ¶4. The risk to journalists on dangerous assignments – a concern that permeates this motion – is not an abstract one. The Committee to Protect Journalists has identified 871 journalists killed on assignment globally since 1992, of which 34 percent were covering wars. See Committee to Protect Journalists, http://cpj.org/killed/ (last visited Sept. 7, 2011).[11] By reporting in the West Bank and Gaza on the Palestinian-Israeli conflict, the BBC was courting significant risk to the safety of their correspondents. Covering such international conflicts carries with it a particular need for the judicial protection from subpoenas from civil litigants, such as Plaintiffs – however sympathetic they may be – who seek to exploit highly risky newsgathering efforts for personal purposes. The result may be that war zone correspondents – whose reporting is crucial to the public interest – may be left with fewer forthcoming sources, and exposed to significantly more danger than other types of journalists, if they were viewed, as the Second Circuit feared in Gonzalez v. NBC, supra, "as an investigative arm of the judicial system, the government, or private parties." [12]

Plaintiffs' need for the BBC outtakes and testimony for use in this private litigation

---

[11] The Additional Protocol I to the Geneva Convention also recognizes the great danger journalists are exposed to and acknowledges their special status in conflict zones. See Article 79 of the Protocol Additional to the Geneva Conventions of 12 August 1949 and Relating to the Protection of Victims of International Armed Conflicts (Protocol I), 8 June 1977, 1125 U.N.T.S. 3, which sets out specific "Measures of protection for journalists."

[12] This was also the conclusion reached in a recent war tribunal prosecution in The Hague, the International Criminal Tribunal for the Former Yugoslavia. "In war zones, accurate information is often difficult to obtain and may be difficult to distribute or disseminate as well. The transmission of that information is essential to keeping the international public informed about matters of life and death." Prosecutor v Brdjanin, Case No.: IT-99-36-AR73.9, Decision on Interlocutory Appeal at ¶36 (Dec. 11, 2002)(during prosecution of former Bosnian Serb official, tribunal refused to compel testimony from former Washington Post reporter who had interviewed official). Sommers Decl. ¶17 and Ex. 5. In order to bring this information to the public, "[w]ar correspondents must be perceived as independent observers rather than as potential witnesses for the Prosecution. Otherwise, they may face more frequent and grievous threats to their safety and to the safety of their sources." Id. at ¶42.

APPENDIX Page 088

cannot outweigh the broader concerns implicated here. The consequent undermining of the effectiveness of a free press in obtaining the type of vital and sensitive news reported in BBC's Program is far too heavy a price to pay for compelled disclosure in a private civil matter.

The Second Subpoena on the BBC should be quashed.

### III. THE SUBPOENAED INFORMATION CONTAINS INADMISSIBLE HEARSAY AND SHOULD NOT BE COMPELLED

It is settled that compelled disclosure will not be ordered if the information sought would not be admissible in the action.  See e.g., U.S. v. Harwood, 998 F.2d 91, 97-98 (2d Cir. 1993)(statements to reporter inadmissible hearsay and subpoena to reporter quashed); Concerned Citizens v. Belle Haven Club, No. 3:99 Civ 1467, 2004 U.S. Dist. LEXIS 27335, at *6-7 (D. Conn. June 21, 2004)(subpoena seeking journalist's deposition testimony as to the accuracy of magazine article statements was quashed as they were inadmissible hearsay; the plaintiffs failed to show that the source was authorized to speak for the defendant or on the topics under Fed. R. Evid. 801(d)(2)(C), or that the topics were matters within the scope of his authority under Fed. R. Evid. 801(d)(2)(D)).  This is the situation here.

Statements made to the BBC in both the Program and any Outtakes would be incompetent hearsay in this action. As Judge Sack recognized in his dissenting opinion in N.Y. Times Co. v. Gonzales, 459 F.3d 160, 182-183 (2d Cir. 2006)(Sack, CJ, dissenting):

> [L]ittle of what reporters learn is obtained first hand. Most is, in a broad sense, told to them by others. Most is, therefore, "hearsay" when published. When the government seeks information in a reporter's possession, there is almost always someone other than the reporter and somewhere other than the newsroom from whom or from which to obtain it. Under the qualified privilege, a lawyer – for the government or another party – engaged in litigation of any sort who thinks he or she needs information in a journalist's possession, usually can, and then, under the qualified privilege, therefore must, obtain it elsewhere.

Such hearsay should not be compelled.

## CONCLUSION

For the foregoing reasons, the Motion to Quash the Second Subpoena for testimony and

documents addressed to the BBC should be granted in its entirety.

Dated:   New York, New York       MILLER KORZENIK SOMMERS LLP
         September 8, 2011

By _____
         Louise Sommers
         David S. Korzenik
         Itai Maytal
         488 Madison Avenue Suite 1120
         New York, New York 10022-5702
         212-752-9200
         Attorneys for The British Broadcasting Corporation

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------x

MARK I. SOKOLOW et al.,

                            Plaintiffs,

                -against-

THE PALESTINIAN LIBERATION ORGANIZATION
et al.,

                            Defendants.

04-CV-00397 (GBD)(RE)

**ECF Case**

--------------------------------------------------------------------x

### <u>DECLARATION OF DR. YEZID SAYIGH</u>

DR. YEZID SAYIGH declares, pursuant to 28 U.S.C. §1746 as follows:

      1.      I am an internationally acknowledged expert in Palestinian politics and security

matters, having developed this expertise over the course of thirty years in this field as a scholar,

diplomat, consultant, and writer in these fields. As more fully set forth below, in the course of my

professional career I have been commissioned to provide academic analysis and expert

consultancy services in these fields by various government agencies such as the U.S. Department

of State and the U.K.'s Department for International Development, by multilateral international

organizations such as the World Bank and the European Commission, and by for-profit and non-

profit think-tanks such as the RAND Corporation, Centra Technology and the International

Institute for Strategic Studies. I spent the past twenty-one years of my academic career in full-

time employment at the internationally-renowned University of Oxford, University of Cambridge,

and King's College London, besides numerous visiting positions.

      2.      I submit this declaration at the request of the subpoenaed non-party the British

1

Broadcasting Corporation ("BBC") to provide my professional opinions (i) in response to the opinions offered in the Declaration of Professor Barry Rubin ("Rubin Declaration") and (ii) as to whether there are sources other than the statements in BBC interviews that are reasonably accessible to the public and address whether the al-Aqsa Martyrs Brigade ("AMB") was one and the same as the Palestinian Authority ("PA"), Fateh and/or the Palestinian Liberation Organization ("PLO") during the years 2000-2004.

## BACKGROUND AND QUALIFICATIONS

3.      I am a Senior Associate at the Carnegie Middle East Center, Beirut, Lebanon. My duties focus on conducting research and writing for public dissemination and engagement on current affairs, with a particular focus on the future political role of Arab armies, the resistance and reinvention of authoritarian regimes, and the Israel-Palestine conflict and peace process. The Center is part of the Carnegie Endowment for International Peace, headquartered in Washington D.C. I hold a doctorate from King's College London, with which I remain affiliated and a bachelor's degree from the American University of Beirut.

4.      Until August 2011, I was Professor of Middle Eastern Studies at the Department of War Studies, School of Social Science & Public Policy, King's College London. I remain affiliated with King's College London. I previously held the position of Assistant Director of Studies at the Centre of International Studies, University of Cambridge, and of MacArthur Scholar and Research Fellow at St Antony's College, University of Oxford.

5.      I have additionally held numerous positions as a Visiting Professor, Scholar, or Fellow at numerous academic institutions worldwide, most notably including: Institut Barcelona d'Estudis Internacionals (Barcelona, Spain), Crown Center for Middle East Studies (Brandeis University), Center for Middle Eastern Studies (Harvard University), Centre d'Etudes et de

Recherches Internationales (Paris, France), School of Oriental and African Studies (London, UK), and Thomas Watson Institute for International Studies (Brown University). At these institutions I taught, researched, or wrote about "Middle East Armies: Political, Social, and Economic Roles and Impacts", "Arab states: crisis and resilience", "International Politics of the Middle East", "Conflict, Security & Development", "Approaches to War", "Introduction to International Relations", among other subjects.

6.      As an academic I have provided numerous services to the professional community worldwide. I have acted as scientific referee providing academic assessments of research grant applications and/or book manuscripts for, inter alia: Cambridge University Press (UK), The Israel Science Foundation; Economic and Social Research Council (UK); Council for British Research in the Levant (UK); Agence nationale de recherche (France); United States Institute for Peace (Washington DC); Oxford University Press (New York). I have also served on selection committees for the Research and Writing Grants program of the John D. and Catherine T. MacArthur Foundation (Chicago), and for the Global Security & Cooperation Fellowship program of the Social Science Research Council (New York).

7.      I was Director of the Middle East research programme at the International Institute for Strategic Studies in 1998-2003, and Academic Director of the Cambridge Programme for Security in International Society in 2003-2004. I have also served in various capacities in numerous policy institutes, including the Gulf Research Center (Dubai, UAE), Middle East Institute (New Delhi, India), Palestinian Center for Policy Surveys and Research (Ramallah, West Bank), Stockholm International Peace Research Institute (Stockholm), Carnegie Middle Center (Beirut, Lebanon), Institute of Developing Economies (Tokyo, Japan), International Institute for Strategic Studies (London, UK), Chemical and Biological Arms Control Institute (Alexandria,

VA), and British American Security Information Council (Washington D.C., and London, UK).

8.     I have been an invited lecturer to the Naval Postgraduate School (Monterrey, CA) course for Middle East Foreign Area Officers, Royal College for Defence Studies (London, UK), Geneva Centre for Security Policy, Joint Analysis Center/US European Command (RAF Molesworth, UK), NATO European Security Cooperation Course/NATO School (Oberammergau, Germany), and National Defense Academy (Yokosuka, Japan). I have also been invited on several occasions to speak to closed workshops for the U.S. national intelligence community and to the Foreign Service Institute, Department of State (Washington D.C.). I lectured on the Palestinian-Israeli conflict and peace process, Arab civil-military relations, Palestinian politics, and Palestinian and/or Arab security sector reform.

9.     In addition, I have provided consultancy services to the World Bank, United Nations Development Program, Department for International Development (UK), European Commission (Brussels, Belgium), Council on Foreign Relations (New York), Adam Smith Institute (London, UK), RAND Corporation, and the U.S. Department of State, among others. My consultancy services focused on assisting these international organizations and institutions with assessment and/or advice relating to Palestinian Authority reform programs and social and political "drivers-for-change" in the Palestinian Authority, preparation for the Palestinian-Israeli "permanent status negotiations," building a successful and viable Palestinian state, and Palestinian security sector reform.

10.     I have very extensive experience as a practitioner in the Palestinian-Israeli peace process extending over twenty years. I served as an advisor to the Palestinian delegation to the peace talks with Israel 1991-1993. I headed the Palestinian delegation to the multilateral Arab-Israeli peace talks group on "Arms Control and Regional Security" 1992-1994. I was a negotiator

4

in the Palestinian delegation to the peace talks with Israel following the Oslo Accords of September 1993, leading up to the May 1994 "Framework Agreement." As part of the latter assignment I was also a member of the sub-group that drafted the Palestinian-Israeli Security Protocol that formed part of the May 1994 "Framework Agreement." In that context I worked closely with the Palestine Liberation Organization ("the PLO") generals who were part of the delegation or provided support to it.

11.     Also to further the Palestinian-Israeli peace process, between 1999 and 2010 I provided consultancy assistance under contract to Adam Smith International (funded by the UK's Department for International Development, the European Commission and other European governments or international organizations) to the Negotiations Support Unit of the PLO Negotiations Affairs Department. My duties included work on the security file, which entailed consultation with Palestinian Authority ("the PA") security officials, officers, and ministers, as well with representatives of the Government of Israel (including the Deputy Minister of Defense, director and deputy-director of the National Security Council, and others).

12.     In parallel I engaged in "Track-Two" meetings between Palestinians and Israelis starting in 1988 and until the early 2000s. This is a specific kind of informal diplomacy, in which non-officials (academics, former officers or officials, public figures, and social activists) from opposing sides engage in dialogue with the aim of conflict resolution, or confidence-building. One series of Track-Two meetings in which I took part involved former Palestinian and Israeli security officers and provided background to the secret "Oslo channel" talks, resulting in the publication of *Israeli-Palestinian Security: Issues in the Permanent Status Negotiations* by the host organization for these talks, the American Academy of Arts and Sciences (Cambridge MA, 1995). Narrative accounts of these various Track-Two meetings have also been published by Prof.

Shai Feldman (Brandeis University and the Kennedy School, Harvard University), and Mr Yossi Alpher (formerly the Jaffee Center for Strategic Studies, Tel Aviv University).

13.     Since 1998 I have worked on Palestinian reform as a consultant to a wide variety of local and international governments bodies, international agencies, and research institutes. I was a principal author of the Report of the Independent Task Force on Strengthening Palestinian Public Institutions (Council on Foreign Relations, New York, 1999), commissioned by the European Commission and the Government of Norway. I was subsequently commissioned by the World Bank, U.S. Department of State, and Department for International Development (UK) to provide expert assistance on reform in the Palestinian Authority, and in recent years have repeatedly been called on to provide expertise on Palestinian security sector reform, for which purpose I have on repeated occasions interviewed numerous Palestinian security officers, officials of the Ministry of Interior, legal advisors, and successive ministers of the interior.

14.     I am the author of what is regarded as the authoritative account of the PLO's military history until 1993: *Armed Struggle and the Search for State: The Palestinian National Movement, 1949-1993* (Oxford University Press, 1997). In the course of my research I conducted over 400 interviews with PLO leaders, officers, and personnel, and was allowed access to military archives at Arafat's headquarters in Tunis and PLO army headquarters in Cairo. The book has won several awards.

15.     In the course of my professional careers as an academic and as a practitioner and consultant I have worked and written very extensively on Palestinian politics, military and security affairs, and organization. I have listed in Appendix A to this Declaration works I have authored on these subjects (in chronological order, starting with the most recent). Since 1991, I have written numerous op-eds and made on air media appearances, which have included CNN,

BBC and Fox, addressing Palestinian politics. In addition, I was a military affairs correspondent for a number of Arabic-language periodicals, focusing mainly on the Palestinian-Israeli conflict, in 1981-1993: Shu'un Filastiniyya, Rasd al-Idha'ah al-Isra'iliyya, al-Malaf, al-Ofok, al-Tadamon, and Istratijya.

16.    In the course of researching the above publications and consultancy projects over the past thirty years I have interviewed over 1,000 Palestinian leaders, military commanders, government officials, security officers, professionals in various fields (economics, public finances, social affairs, law, education, etc), political activists, and opposition figures, as well as a significant number of Israeli officials and officers, international staff of government and development agencies and international financial institutions, and non-governmental organizations.

## SUMMARY OF OPINIONS

### *Regarding Opinions in the Rubin Declaration*

17.    In my professional opinion, the Rubin Declaration presents an overly simplistic account of the complex and changing relationships between the Palestinian Authority, the Palestine Liberation Organization, Fateh, and/or the al-Aqsa Martyrs Brigades, and offers unsubstantiated assumptions that disregard current political realities, as will be detailed below (See ¶¶19-28). As a result, the opinions offered in the Rubin Declaration as to the likelihood that Abu Rumaileh or Zubaidi would volunteer or could be compelled for a deposition, either by an Israeli court or the PA, if the PA controlled them, should not be relied upon in determining whether it would be useful to pursue this course of action.