### *Regarding Reasonable Alternative Sources*

18.    I understand the Plaintiffs have represented that the statements of Zubaidi and Abu Rumaileh made to the BBC "are more probative on this issue [that Fateh and al-Aqsa are the same] than any other evidence which Plaintiff can reasonably procure." (Plaintiffs Memorandum in Opposition to BBC's Motion to Quash Subpoena and In Support of Plaintiff's Motion to Compel, p. 14). In my professional opinion, there are an extremely large number of alternative sources, including original documents, addressing this issue that are reasonably accessible to the public and far more probative than the BBC's interviews. Examples of some of those sources are detailed below. (See ¶¶29-40).

## OPINIONS RELATING TO THE RUBIN DECLARATION

19.    Based on my background, experience and expertise, it is my professional opinion that the opinions offered in the Rubin Declaration, particularly as to whether Abu Rumaileh and Zubaidi would volunteer or be compelled for a deposition, either through an Israeli court, or the PA, if the PA controls them, are based on faulty or speculative assumptions as detailed below. They should not be credited in determining whether it would be useful to attempt to compel their testimony.

20.    The portrayal in the Rubin Declaration of "loyalty" in the PA/PLO dictating Zubaidi's actions ignores the complex and changing relationships between the PA, the PLO, Fateh, and/or the AMB. (See Rubin Decl. ¶13). AMB militants may have been loyal to any or all of these in a general sense, but at the same time also challenged their authority when it was in their direct, immediate interest to do so. AMB militants such as Zubaidi repeatedly resorted to strong-arm tactics to compel Arafat and/or the PA to recognize their supremacy and impunity within localities such as Jenin, to release funds, or to repeal unwelcome measures such as the

appointment of unpopular local officials. For example, as shown on the BBC documentary,

AMB militants under Zakaria Zubaidi's command kidnapped the acting Palestinian governor of

Jenin for several hours in mid-July 2003, during which time he was beaten. So the suggestion

that loyalty automatically and necessarily would preclude behavior by AMB militants that might

have displeased the PA, the PLO, or Fateh does not hold true, particularly eight years after these

statements were made.

21.     The depiction in the Rubin Declaration of Fateh official Ata Abu Rumaileh as

"enjoy[ing] support and protection of the PA and PLO" (Rubin Decl. ¶13) and therefore having

"no reason to be concerned about an order issued by a court in Israel," no longer holds true, if it

ever did, because the PA does not have the last word here. Israel does. That depiction disregards

completely that the Israeli Defense Forces ("IDF") continue to enter PA-controlled cities at will

to apprehend terror suspects and for other reasons, under standing arrangements with the PA,

thereby lessening the influence of the PA in its controlled area of the West Bank. Were the IDF

to enforce an order of an Israeli court against Rumaileh, the PA would not necessarily be in a

position to stop it.

22.     The Rubin Declaration opines that "Abu Rumaileh would not – and could not, *on

pain of losing his position or suffering a worse fate* – testify in a case against the PA and PLO"

(emphasis added), and that Zubaidi likewise would not be deposed in a "lawsuit against the PA

and PLO seeking damages from a terrorist attack.". (Rubin Decl. ¶13, 14).  This assumes,

without any basis, that what Abu Rumaileh, or Zubaidi would say if ultimately deposed, would

be adverse to PA or PLO interests, or be viewed that way by Abu Rumaileh or Zubaidi. It

moreover assumes that what is true of Zubaidi is also true of Abu Rumaileh, whereas each of

them held different positions and engaged in different activities: Zubaidi was an armed AMB

militant who has still not received a full Israeli pardon despite being amnestied, whereas Abu
Rumaileh was and remains the Secretary of the local Fateh branch and was not named in the
amnesty agreement as he had not been implicated or indicted by Israel of armed conflict. The
Rubin Declaration does not purport any familiarity with either of these men, or for that matter,
with anything that may have occurred in the last two years, as it is dated in 2009.

23.     Further to the statement about Abu Rumaileh "losing his position or suffering a
worse fate," my extensive familiarity with the historical record of Fateh, the PLO, and the PA
fails to identify a single instance where a Palestinian official suffered that a "worse fate" for
testifying – an act falling so far short of espionage. To the contrary, there are numerous instances
of open defiance to Arafat and/or the PA or Fateh by their own members, let alone armed AMB
militants, which did not lead to those individuals losing their positions let alone "suffering a
worse fate." For example, AMB militants have repelled by force PA police seeking to make
arrests or impose public law and order in various parts of the West Bank without experiencing
negative consequences. Such risk as there might be to Abu Rumaileh or Zubaidi would more
likely take the form of social ostracism, or come from parties such as Hamas or other militants
rather than from Fateh or the PA. Zubaidi has already been pilloried repeatedly by such parties
for accepting the amnesty agreement in July 2007 and subsequently laying down his arms, but
this has had no apparent effect on his statements or behaviour. So while I cannot assert that
testifying would pose no risks, the categorical portrayal in the Rubin Declaration is not the case.

24.     The opinion in the Rubin Declaration "that Israel would be extremely reluctant to
take any step that might disrupt the amnesty agreement" (Rubin Decl. ¶16) distorts reality by
portraying the issue as one in which the PA might retaliate by withdrawing from, or abrogating,
an amnesty agreement that expressly favors it. Israel has the upper hand in this matter entirely,

and in its view gave the PA a major concession by agreeing to an amnesty for the fugitive AMB militants. Furthermore, the PA has been since 2007, and remains, under very serious constraints to demonstrate its adherence to its security obligations and to cooperation with Israel. This adherence survived the Israeli "Operation Cast Lead" in Gaza in Winter 2008-2009, the killing of Hamas militants by PA police in the West Bank city of Qalqilya on 4 June 2009, and other highly sensitive situations that could have been expected to prompt the PA to renege on its security commitments, but did not do so. It is therefore additionally inconceivable that the PA would risk the entire arrangement in protest against the issuing of an Israeli court order commanding Zubaidi to appear at a deposition.

25.     The statement in the Rubin Declaration that "Zubaidi is dependent on the goodwill of the PA to ensure that his "wanted" status is not restored" (Rubin Decl. ¶15) likewise misconstrues the political realities in the West Bank. It is Israel, and Israel alone, that determines whether Zubaidi is on its "wanted" list or not, and Israel will not change his status from amnestied to wanted simply in order to please the PA. On the other hand, the amnesty is part of a larger agreement that the PA sought for its people to ensure its domestic legitimacy when the cessation of conflict was achieved between it and Israel. There would be no motivation for the PA to change the status of one person to wanted and risk damaging that legitimacy, since such action would lay it open to charges of "collusion" with Israel.

26.     The argument in the Rubin Declaration that Zubaidi or other beneficiaries of the amnesty with Israel might "return to active terrorism" in response to the issuance of an Israeli court order (Rubin Decl. ¶16) is inconsistent with the available facts. It wholly disregards what is known about Zubaidi: in an interview with Israeli journalist Avi Issacharoff in April 2008, he expressed thorough despair and disillusionment with military action and with the PA/PLO. Avi

Issacharoff, "Marching toward total ruin," Haaretz (April 2008)(Attached as Appendix B to this

Declaration). Zubaidi has continued since the amnesty agreement to live in Jenin, the city to

which he is generally confined under the amnesty agreement, unarmed and without bodyguard

according to Israeli and other foreign-national journalists who have interviewed him in person,

most recently in April 2011. See, e.g., Orly Castel-Bloom, "Lifestyle of the hunted and haunted"

Haaretz (June 2011) http://www.haaretz.com/print-edition/news/lifestyle-of-the-hunted-and-

haunted-1.367764; Gideon Levy, Twilight Zone / Mer's last show, Haaretz (April 2011),

http://www.haaretz.com/weekend/week-s-end/twilight-zone-mer-s-last-show-1.354849; Joseph

Krauss, "Weary West Bank fighters watch Gaza assault from afar", Jordan Times (January

2009), http://www.jordantimes.com/?news=13544;  Zubaidi has been permitted to leave Jenin

temporarily by prior arrangement with Israel, as he did in 2008 to undergo eye surgery in

Ramallah and in 2009 to attend a political conference in Bethlehem. There is no reason than to

believe that he would resort to arms and risk almost certain death over an Israeli court order.

      27.     The Rubin Declaration also concludes that the PA would not voluntarily comply

with an American court order regarding the compelled testimony of Abu Rumaileh or Zubaidi

(Rubin Decl. ¶17). This argument ignores that the PA is a defendant in this American action and

presumably is subject to orders of this American court. If the PA were in control of those

individuals, they would be subject to an American order regarding their testimony.

      28.     It should be noted, as demonstrated above through the various press accounts, that

Zubaidi has made himself accessible to non-Palestinians, including Israelis. It is not

inconceivable that he could give evidence if interviewed in Jenin, as could Abu Rumaileh.

Journalists, investors, and members of the international community and the U.S. consul regularly

go to Jenin, which has been made into a showcase of the improved security and economic

situation of the Palestinian in the West Bank. In recognition of improved security in Jenin, Israel

has allowed Arab citizens of Israel to resume going there for shopping and other commercial

business. Civil litigants likewise could go to Jenin for their depositions, upon request to the

interviewees or through a formal notification to the Palestinian Authority. Other places in the

West Bank, such as Ramallah would also be safe places for these civil litigants to hold

depositions of Zubaidi or Abu Rumaileh, who does not appear constrained by travel restrictions.

Ramallah is the seat of the PA government and contains many foreign consulates and aid

missions, as well as other foreign nationals who visit in their individual capacity.

## OPINIONS RELATING TO ALTERNATE SOURCES

29.     If Plaintiffs intend to prove that AMB is indistinguishable from Fateh or the PA,

the most direct and obvious place to obtain such information is from the Defendants themselves.

30.     However, there are an exceedingly large number of other sources that address

whether there exists such an identity of organizations.  Among these sources are:

- Documents seized by the IDF from Arafat's headquarters in Ramallah during its "Operation Defensive Shield" in April 2002
- Statements of Palestinians held in Israeli custody, their indictments, and/or court ruling
- Depositions of Palestinian prisoners held in Israeli custody, including the perpetrator of  the 2004 attack which the Plaintiffs note.
- The Israel Security Agency website, which offers its own official assessment of the Fateh-AMB relationship.

31.     First, the IDF seized a cache of documents, whose total number is estimated at

500,000,[1] from Arafat's headquarters compound in Ramallah, West Bank, and from other PA

headquarters installations in seven out of the eight major cities under the control of the

Palestinian Authority in the West Bank during its "Operation Defensive Shield" in April 2002. A

---

[1] Number of documents seized given in IMRA Newsletter –
http://www.kokhavivpublications.com/2002/israel/07/0207301518.html

considerable representative sample of these documents - which address any relationships between AMB, Fateh and the PA/PLO - is accessible to the public in original Arabic and as translations (English, Russian, Farsi and Hebrew) on the website of the Israeli Ministry of Foreign Affairs ("the MFA"). The plaintiff could also apply to the IDF directly for documents identified on the MFA site, but no longer available there. In addition, there are other non-governmental sources for this information, which include Kokhaviv Publications (www.kokhavivpublications.com), and the documentary appendices to Ronen Bergman's book, *Authority Granted: Corruption and Terrorism in the Palestinian Authority,* (Vehareshu Netunah 2002).

32.     Second, another set of sources is found in the statements of Palestinians held in Israeli custody, their indictments, and/or court rulings. The IDF and the Israeli Security Agency have routinely been extremely effective at identifying and apprehending Palestinian suspects involved in terror or other attacks. These include not only suicide bombers or direct perpetrators of attacks who were killed, but also those Palestinians involved in commanding, planning, equipping, training and instructing, transporting, and hiding them, many of whom survived and were taken into Israeli custody. Each and every one of them has been presented to a military or other Israeli court, and for each and every one of them there are written statements, indictments, and court rulings. These constitute primary documents, contain considerable information addressing the relationships, if any, between organizations and are available online on the MFA website or through requests made to Israeli authorities. An example of such a request is the PA's Letter Request of International Judicial Assistance to the Israeli Government [Case 1:04-cv-00397-GBD -RLE Dkt# 136, So Ordered 08/16/11]

33.     Examples of these materials on the MFA website include the court rulings in

"State of Israel vs. Marwan Barghouti: Ruling by Judge Zvi Gurfinkel, District Court of Tel

Aviv and Jaffa, Dec 12, 2002, and a report entitled "Senior Fateh Leaders Describe Arafat's Link

to Terrorism Communicated by Israeli Security Sources), May 2, 2002."

34.     Third, as noted above, the IDF and the Israel Security Agency (formerly Shin Bet

or the Shabak) have routinely been extremely effective at identifying and apprehending

Palestinian suspects involved in terror or other attacks. Plaintiffs have already identified an

individual named Ahmed Saleh as a perpetrator of one of the al-Aqsa attacks of which they

complain and have submitted his indictment in support of their opposition to the BBC motion to

quash. See Indictments from "The Military Prosecutor vs Ahmed Salah Ahmed Salah"

(submitted by the Plaintiffs as 11-10-17 Dkt# 159-4 - Exhibit D to Plaintiff's Memo of Law in

Support of Motion to Compel and In Opposition to Motion to Quash)." Mr. Saleh and any other

of those arrested on charges of undertaking attacks or of being involved in commanding,

planning, equipping, training and instructing, transporting, and/or hiding them may presumably

be deposed and asked about whether al-Aqsa and Fateh or the PA or PLO are the same. Finally,

litigants may also examine the Israel Security Agency's website on this matter, as it has its own

assessment of the relationship between these institutions.

**Comparative Assessment of Sources**

35.     It is also my professional opinion that the authority, reliability, and credibility of

these examples alone exceed by a very wide margin that of the statements made to the BBC in its

program "Arafat Investigated." I acknowledge the importance of interviews generally, and

indeed have conducted over 1,000 interviews as part of my own research and consultancy work

(see publications list) and have also used interviews in my academic and professional career.

36.     While interviews are important investigative techniques and are as much a part of

my academic research as they are a part of the BBC's newsgathering effort, they have their

limitations as a method for researching and substantiating facts. They may tell more about an

interviewee's perceptions than about the underlying facts they are disclosing, which must always

be triangulated with primary sources and other interviews. It has become firmly established in

all academic disciplines that interviews are shaped by factors innate to the subject ("the

interviewee") and to the context of place and time. Such factors may include selective memory,

general reliability (or lack thereof), the immediate intentions or longer-term expectations of the

interviewee, his values, personal or social status, and a subjective sense that the manner in which

he presents himself on this occasion may affect how he is subsequently regarded by others or

placed in a collective historical narrative. This is especially true in a context of nationalist

politics and armed conflict.

37.     The statements made to the BBC must be viewed through the relationship

between then Palestinian leader Yasser Arafat, the PA, PLO on the one hand, with either Fateh

officials such as Abu Rumaileh or armed AMB militants such as Zubaidi. These relationships

have routinely involved complex calculations and often proceeded through the mutual exercise

of pressure.

38.     For example, AMB militants used various means to pressure Arafat, the PA, or

other senior officials in order to obtain an objective or demonstrate their strength, as occurred

when they abducted temporarily the PA governor in Jenin under Zubaidi's leadership in July

2003. The militants also used public statements in a similarly manipulative manner. For

instance, a report by the Intelligence and Terrorism Information Center (Israel) published on 19

March 2006, makes the point explicitly that Zakaria Zubaidi studiously avoided confirming that

the AMB were receiving any material support from the Lebanese Hezbullah when questioned

about this in an interview in 2004, but then confirmed the receipt of support in another interview in 2006, at a time when the AMB had an interest in promoting its own militant credentials in the face of the major gains made by Hamas. (SOURCE: http://www.terrorism-info.org.il/malam_multimedia/English/eng_n/pdf/zakaria_zubeidi_e.pdf)

39.     In contrast, primary documents and testimony enjoy a certain innate veracity. This is especially true of documents that are written for purely internal use within an organization or institution, with the expectation that they will not be seen outside that organization or institution and are not likely to be modified by selective memory, altered perceptions, or changing intentions.

40.     In this specific case, the original documents contained in the above-mentioned alternative sources have far greater intrinsic value as sources of objective information than interviews. A large proportion of the original documents related to internal administrative matters, such as funding requests and responses. The factual information these documents provide is unaffected by subjective perceptions and intentions that likely inform the statements to the BBC, allowing a more reliable and credible assessment of such matters as chain of command and control. Furthermore, the sheer volume of the documentary sources means that patterns and relationships may be discerned and determined with great reliability, as the margin for error diminishes statistically.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Beirut, Lebanon on November 14 2011.

Dr. Yezid Sayigh

APPENDIX Page 107

17

**APPENDIX A – Published Works of Dr. Yezid Sayigh**

1. Provided below is a list of works that I have authored on Palestinian politics, military and security affairs, and organization (listed in chronological order, starting with the most recent) in my professional careers as an academic and as a practitioner and consultant.

    a. *"We serve the people": Hamas policing in Gaza*, Brandeis University: Crown Center for Middle East Studies (2011);

    b. *Policing the People, Building the State: Authoritarian transformation in the West Bank and Gaza*, Washington D.C. and Beirut: Carnegie Middle East Center (2011);

    c. "Hamas Rule in Gaza: Three Years On", Middle East Brief, No. 41, Brandeis University: Crown Center for Middle East Studies (2010);

    d. "The West Bank & Gaza Strip", Working Paper commissioned for World Development Report 2011, World Bank (2010);

    e. *"Fixing Broken Windows": Security Sector Reform in Palestine, Lebanon, and Yemen*, Washington D.C. and Beirut: Carnegie Middle East Center, No. 17, (2009);

    f. *Security Sector Reform in the Arab Region: Challenges to Developing an Indigenous Agenda*, Paris: Arab Reform Initiative (2007);

    g. "Inducing a failed state in Palestine", *Survival*, London: International Institute for Strategic Studies, 49:3 (2007);

    h. "Hamas coup in Gaza", *Strategic Comments*, London: International Institute for Strategic Studies, 13:5 (2007);

    i. "Governing Palestine: internal struggle, external coercion", *Strategic Comments*, London: International Institute for Strategic Studies, 12:2 (2006);

    j. "Changing Dynamics in Palestinian Politics", *The International Spectator*, Rome:

1

Istituto Affari Internazionali, No. 2 (2006);

k. "Putting the Israeli-Palestinian Peace Process Back on Track", in Ivo Daalder and Philip Gordon (eds), *The Crescent of Crisis: U.S.-European Strategy for the Greater Middle East*, Brookings Institution Press and The EU Institute for Security Studies (2006);

l. "Closing window of opportunity for the two-state solution?", *The Arab World Geographer*, 8:3 (2005);

m. "A Sisyphean Task: Putting the Israeli-Palestinian Peace Process Back on Track", *The International Spectator*, Rome: Istituto Affari Internazionali, No. 4 (2004);

n. "The Palestinian Strategic Impasse", *Survival*, London: International Institute for Strategic Studies, 44:4 (2002-03);

o. "The Palestinian Paradox: statehood, security, and institutional reform", *Journal of Conflict, Security & Development*, London, No. 1 (2001);

p. "Security-sector reform", *The Conflict, Security & Development Group Bulletin*, London, No. 8 (2001);

q. "Arafat and the Anatomy of a Revolt", *Survival*, London: International Institute for Strategic Studies, 43:3 (2001);

r. "Palestine's Prospects", *Survival*, London: International Institute for Strategic Studies, 42:4 (2000-01);

s. "War as Leveller, War as Midwife: Palestinian Political Institutions, Nationalism, and Society since 1948", in Steve Heydeman (ed.), *War, Institutions, and Social Change in the Middle East*, Berkeley: University of California Press (2000);

t. *Report of the Independent Task Force on Strengthening Palestinian Public*

2

*Institutions*, New York: Council on Foreign Relations (1999);

u.  "A Non-State Actor as Coercer and Coerced: The PLO in Lebanon, 1969-1976", in

    Lawrence Freedman (ed.), *Strategic Coercion*, Oxford: Oxford University Press

    (1998);

v.  "Escalation or Containment? Egypt and the Palestine Liberation Army, 1964-1967",

    *International Journal of Middle Eastern Studies*, 30:1 (1998);

w.  "The Palestinian Armed Struggle and State-Building", in Moshe Ma'oz and Avram

    Sela (eds), *The PLO and Israel: From Conflict to Peace, 1964-1994*, New York: St

    Martin's Press (1998);

x.  "The Palestinians", in Yezid Sayigh and Avi Shlaim (eds), *The Cold War and the

    Middle East*, Oxford: Oxford University Press (1997);

y.  *Armed Struggle and the Search for State: The Palestinian National Movement, 1949-

    1993*, Oxford: Oxford University Press (1997);

z.  "Armed Struggle and State Formation", *Journal of Palestine Studies*, 26:4 (1997);

    "Palestinian Threat Perceptions and Security", in *National Threat Perceptions in the

    Middle East*, New York and Geneva: UNIDIR (1995);

aa.  "The Multilateral Middle East Peace Talks: Reorganizing for Regional Security and

    Cooperation", in Steven Spiegel (ed.), *Practical Peacemaking in the Middle East:

    Arms Control and Regional Security*, New York: Garland (1995);

bb.  "Redefining the Basics: Sovereignty and Security of the Palestinian State", *Journal of

    Palestine Studies*, 24:4 (1995);

cc.  "A Cooperative Approach to Arab-Israeli Security" (with Ephraim Karsh), *Survival*,

    London: International Institute for Strategic Studies, 36:1 (1994);

3

dd. "La securité de l'Etat palestinien", *Politique Étrangère*, Paris: l'Ifri, No. 4 (1992);

ee. "The role of the armed struggle and the uprising in the Palestinian national struggle", *Shu'un `Arabiyya*, Cairo: League of Arab States, No. 67 (1991);

ff. "Palestinian Preparations for the 1982 War", *Majallat al-Dirasat al-Filastiniyya*, No. 12 (1992);

gg. "Turning Defeat into Opportunity: The Palestinian Guerrillas after the June 1967 War", *Middle East Journal*, Washington D.C., 46:2 (1992);

hh. "Reconstructing the Paradox: the Arab Nationalist Movement, Armed Struggle, and Palestine, 1951-1967", *Middle East Journal*, Washington D.C., 45:4 (1991);

ii. *The Palestinian Military Experience, 1965-1985*, Palestinian Encyclopedia Series, Vol. V, Beirut and Tunis: Palestinian Encyclopedia Institute (1990);

jj. "Structure of Occupation: The Economic and Social Impact of Israeli Policy in the West Bank and Gaza Strip and the System of Population Control, 1967-1987", *Arab Affairs*, No. 9, Summer 1989);

kk. "The Intifadah Continues: Legacy, Dynamics and Impact", *Third World Quarterly*, 11:3 (1989);

ll. "Struggle Within, Struggle Without: The Transformation of PLO Politics since 1982", *International Affairs*, 65:2 (1989);

mm. "The politics of Palestinian exile", *Third World Quarterly*, 9:1 (1987);

nn. *Jordan and the Palestinians*, London: Riyad el-Rayyes Books (1987);

oo. "Palestinian Military Performance in the 1982 War", *Journal of Palestine Studies*, 12:4 (1983).

4

# HAARETZ.com

Home    News    National

Published 00:00 03.04.08 | Latest update 00:00 04.04.08

## 'Marching toward total ruin'

**Not long ago, he headed the Al-Aqsa brigades in Jenin and was wanted by Israel. Today, Zakariya Zubeidi has put down his arms, but he does not foresee a peaceful future. The Palestinian people, he declares, 'is finished.'**

By Avi Issacharoff

Tags: Jenin

JENIN - "When you see Zakariya, maybe you'll be surprised, but he looks like just any other Palestinian man now. Without armed men, without a weapon, just an ordinary guy," related an acquaintance of Zakariya Zubeidi, until not long ago the commander of the Al-Aqsa Martyrs' Brigades in Jenin.

Though Zubeidi is no longer hiding from the Israel Defense Forces, for a number of hours the people at the theater where he works tried to find him. Zubeidi didn't answer his mobile phone even when the commander of the Palestinian security forces in Jenin, Suleiman Umran, called him. In the end, a woman who works at the theater explained that he usually sleeps late and maybe that's what he was doing.

In the past, Zubeidi used to show up briefly at his house, in the Jenin refugee camp, together with his wanted colleagues, before disappearing for fear that Israelis would ambush him. The only reminder of those days are the framed pictures of the "martyrs" killed recently in the camp, and the huge poster of Saddam Hussein posted in one of the alleys leading to Zubeidi's home. The door is opened by his son Mohammed, who immediately summons his father. He comes down in sandals and a black T-shirt, and promises that in a few minutes he will come to the theater offices. Zubeidi arrives in his officer's "battle" jacket and mountaineering shoes, but without a weapon and without his erstwhile colleagues from the brigades.

What are you doing these days?

Zubeidi: "Nothing special. We've shut down the Al-Aqsa brigades and I haven't yet received a full pardon from Israel. I'm at home a bit, at the theater a bit."

Why haven't you received a pardon?

"They lied to us, Israel and the Palestinian Authority. The PA promised us that after we spent three months in PA facilities and if we didn't get involved in actions, we would receive a pardon. The three months ended and nothing happened. We still need to sleep at the headquarters of the security organizations. They promised us jobs and they haven't materialized either. Some of us are getting a salary of NIS 1,050 a month. What can you do with that? Buy Bamba for your children? They lied to everyone, they made a distinction between those who were really in the Al-Aqsa Brigades, whom they screwed, and groups that called themselves by that name, but in fact were working on behalf of the PA."

So why have you stopped?

"In part because of the conflict between Fatah and Hamas. Look, it's perfectly clear to me that we won't be able to defeat Israel. My aim was for us, by means of the 'resistance' [code for terror attacks], to get a message out to the world. Back in Abu Amar's day [the nom de guerre of Yasser Arafat], we had a plan, there was a strategy, and we would carry his orders."

In effect, are you saying what Amos Gilad and intelligence always said, that Arafat planned everything?

"Right. Everything that was done in the intifada was done according to Arafat's instructions, but he didn't need to tell us the things explicitly. We understood his message."

And today there is no leadership?

"Today I can say explicitly: We failed entirely in the intifada. We haven't seen any benefit or positive result from it. We achieved nothing. It's a crushing failure. We failed at the political level - we didn't succeed in translating the military actions into political achievements. The current leadership does not want armed actions, and since the death of Abu Amar, there's no one who is capable of using our actions to bring about such achievements. When Abu Amar died, the armed intifada died with him."

What happened? Why did it die?

"Why? Because our politicians are whores. Our leadership is garbage. Look at Ruhi Fatouh, who was president of the PA for 60 days, as Yasser Arafat's replacement. He smuggled mobile phones. Do you understand? We have been defeated. The political splits and schisms have destroyed us not only politically - they have destroyed our national identity. Today there is no Palestinian identity. Go up to anyone in the street and ask him, 'Who are you?' He'll answer you, 'I'm a Fatah activist,' 'I'm a Hamas activist,' or an activist of some other organization, but he won't say to you, 'I am a Palestinian.' Every organization flies its own flag, but no one is raising the flag of Palestine."

Are you, who used to be a symbol of the intifada, saying, "We have been defeated, we have failed, the intifada is dead?"

"Even Gamal Abdel Nasser admitted his defeat, so why not me? Come on, I'll tell you something. On Saturday there was a ceremony to mark the killing of one of our martyrs. They asked me to say a few words. What could I say? I can no longer promise that we will follow in the martyr's footsteps, as is customary, because I would be lying. So then one of the heads of Fatah came over to me and said, 'We are following in the footsteps of the martyrs, we are continuing the resistance.' And I told him that he is a liar.

"I feel that they have abandoned us, the Al-Aqsa activists. They have left us behind and forgotten us. We are marching in the direction

of nowhere, toward total ruin. The Palestinian people is finished. Done for. Hamas comes on the air on its television station and says 'Fatah is a traitor.' That is to say, 40 percent of the nation are traitors. And then Fatah does the same thing and you already have 80 percent traitors."

Is that why you are at home?

"I got tired. When you lose, what can you do? We, the activists, paid the heavy price. We've had family members killed, friends. They demolished our homes and we have no way of earning a living. And what is the result? Zero. Simply zero. And when that's the result, you don't want to be a part of it any more. Lots of other people, as a result of the frustration, and because Fatah doesn't have a military wing any more, have joined the Islamic Jihad. Those activists are still willing to pay the price.

"And look at what the PA does to those who are keeping at it. If a PA person is killed in a battle with the Israelis, the stipend paid to his family will amount to NIS 250 a month, even though he had been earning about NIS 2,000. Why? So that he won't even think about carrying out terror attacks. This is the only plan that the PA has these days: Israeli security. The security of the occupation before the security of [Palestinian] citizens.

"When an occupation jeep comes into a refugee camp, the PA doesn't do anything, and if someone shoots at the jeep, they'll go and arrest him immediately. Today the president of the Palestinian people is General Dayton [Keith Dayton, the U.S. security coordinator]. They're all working for him, he is the boss. A PA no longer exists."

**Forecast: war**

Zubeidi relates that for him, the theater is a refuge from the bleak political reality that the Palestinians are facing. "Here there's no politics, no religion. I still feel free here." From time to time he talks with Tali Fahima [the Israeli woman who spent time in prison for her contacts with Zubeidi], and Jewish friends come to visit him at the theater. As to the future of the region, Zubeidi's forecast is very grim.

"Abu Mazen's mistake," he says, referring to PA President Mahmoud Abbas, "is that he is gambling everything on the negotiations. And what happens if the talks fail? What is his plan then? I'm telling you that if by the end of 2008 a Palestinian state isn't established, there is going to be a war here. Not against Israel, or between Hamas and Fatah, but against the PA. The citizens are going to throw the PA out of here. Today the PA is doing what Dayton and Israel are telling it to do, but at the end of the year, when Israel doesn't give the Palestinians a state, the PA is going to be thrown out. There's going to be an all-out war here, for control of the West Bank."

Zubeidi is not the only one who's feeling pessimistic about the future of the PA. Similar remarks can be heard everywhere in the West Bank these days. Senior American and Israeli officials who have spoken recently with Palestinian Prime Minister Salam Fayyad are saying that his despair is obvious. Some of Fayyad's bitterness derives from Israel's scornful attitude toward the PA. However, it appears that Fayyad is frustrated to the same extent by the endless conflict with Fatah people, who urge him to appoint cabinet ministers from their movement and at the same time are lying in wait for him to fail.

Some of the criticism of Fayyad's government, which has no Fatah people, is justified. The Palestinian prime minister, his many successes notwithstanding, is by no means a miracle worker, nor can he by himself change the face of the reality. The group of cabinet ministers he has appointed are considered technocrats, for better or worse, and they are not succeeding in implementing a substantial change in the government sector.

The heads of the Tanzim, the senior Fatah people who were supposed to have become the organization's leaders of the future, are also making little effort to conceal their despair. They watch as their movement marches toward annihilation: without real reforms, without substantive change, but with endless talk about elections in Fatah and a war on corruption. Even the heads of some of the security organizations are critical of the stuttering actions of the PA against Hamas and the Islamic Jihad in the West Bank. And while Hamas indirectly conducts indirect negotiations with Israel on a cease-fire, the PA, as Zubeidi says, has "zero achievements" to show: limping negotiations, Israeli unwillingness to help, corruption and the absence of reforms. In the view of some Tanzim people, the PA is on a sure path to disintegration. Not in a swift and sharp way, but rather in a prolonged process, at the end of which it will disappear from the West Bank and will be replaced by the Israeli occupation and Hamas. Nearly the only scenario that could change the face of things is, of course, a political agreement or a framework agreement between the PA and Israel. But who can trust the Israelis?

This story is by:

 Avi Issacharoff

APPENDIX Page 113

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

MARK I. SOKOLOW et al.,          :
          :
          :   04-CV-00397 (GBD)(RE)
          Plaintiffs,  :
          :
      -against-      :   **ECF Case**
          :
          :
THE PALESTINIAN LIBERATION ORGANIZATION  :
et al.,          :
          :
          Defendants.  :

-------------------------------------------------------------------x

## DECLARATION OF JEAN-FRANCOIS JULLIARD

JEAN-FRANCOIS JULLIARD declares, pursuant to 28 U.S.C. §1746 as follows:

1.      I am the Secretary General to Reporters Without Borders. I submit this declaration in

support of the British Broadcasting Corporation ("BBC"), which has moved to quash a subpoena

seeking outtakes and testimony relating to its conflict reporting in the Middle East, filed in the above

referenced action.

2.      Reporters Without Borders ("RWB") is a French-based press organization present in all

five continents through its national branches (in Austria, Belgium, Canada, France, Germany, Italy,

Spain, Sweden and Switzerland), its offices in London, New York and Washington, and the more than

150 correspondents it has all over the world. The organization also works closely with local and

regional press freedom groups that are members of the Reporters Without Borders Network, in

Afghanistan, Bangladesh, Belarus, Burma, Democratic Congo, Eritrea, Kazakhstan, Honduras, Iraq,

Mexico, Pakistan, Peru, Romania, Russia, Somalia, the United States, Zimbabwe, Lebanon and

Tunisia. Founded in 1985, Reporters Without Borders defends jailed journalists, provides practical

help for journalists and news outlets working in difficult conditions, offers safety resources for war

reporters (insurance, loan of vests and helmet, handbooks …) and fights for press freedom throughout the world.

3.      Protecting journalists working in dangerous situation is one of its main goals. For instance in 2006, RWB collaborated with the French Foreign Ministry to get the United Nations Security Counsel Resolution 1738 adopted. This Resolution is a reminder to all states of their obligation under international law. Point 9 of the text stresses the necessity for "all parties involved in situations of armed conflict to respect the professional independence and rights of journalists, media professional and associated personel".  (A copy of Resolution 1738 is available at http://www.un.org/News/Press/docs/2006/sc8929.doc.htm (last visited November 14, 2011)).

4.      We were informed that the Plaintiffs in this litigation have subpoenaed the BBC for unpublished footage from and testimony relating to its 2003 documentary "Arafat Investigated." We understand that the documentary covers aspects of the Palestinian-Israeli conflict from around that period of time. We believe how the Court applies the journalist privilege to the war-zone coverage by the BBC may set a precedent not only in this court, but also in the field. If the BBC material is compelled, it may affect the safety of war correspondents as well as their access to both confidential and non-confidential sources on the ground. The symbolic harm of making journalists appear to be an investigative arm of the Plaintiffs could easily translate into real harm elsewhere for the BBC and for other news organizations covering conflicts worldwide.

5.      The media provides the public with crucial information about wars – such as competing viewpoints between conflicting parties – which may lead the public to support or oppose those conflicts.  Media coverage brings to the attention of the international community the horrors and reality of conflicts.  Moreover, war reporting exposes violations and provides essential material which, once broadcasted, are historical documents. That's why the Medellin Declaration, adopted by UNESCO in May 2007, stated that freedom of information is an important issue during conflicts. The declaration adds that "this press freedom can only be enjoyed when media professionals are free from intimidation,

2

pressure and coercion, whether from political, social, economic forces." (A copy of the Medellin

declaration is available at

http://portal.unesco.org/ci/en/files/24544/11787900951declaration_engl.pdf/declaration%2Bengl.pdf

(last visited November 15, 2011)).

6.      However, this journalistic independence is at stake in this litigation. The benefits from

such reporting are gathered under dangerous circumstances. News organizations through their people

on the ground face grave and increasing dangers when covering conflict zones like the Middle East.

This intensity of the violence against foreign journalists in Egypt, Libya and Syria this year served as a

reminder that media can become targets when they are covering unrest. Journalists in conflict zones

face harassment, threats, restrictions on their movement, imprisonment and even death by parties

seeking to limit independent coverage of sensitive issues. Indeed, we understand that the United

Nations High Commissioner on Human Rights, Navi Pillay, has repeatedly voiced her concern

regarding the escalating trend of violence against journalists worldwide, particularly in the Middle

East. See Office of the High Commissioner of Human Rights, "Journalism - one of the world's most

dangerous professions," (October 5, 2011). https://www.ohchr.org. (last visited November 15, 2011)

7.      Litigants that pursue the unpublished materials of news organizations covering

conflicts, however sympathetic their personal situation, fail to consider the unique physical hazards

these news people face on the ground. Few journalists must travel to work wearing bulletproof vests

within armored vehicles, as they do. And unlike most journalists, war correspondents must sometimes

ward off suspicions that they are spies – suspicions that could get them killed. Litigants fail to consider

that by pursing the disclosure of unpublished investigative materials and testimony of news

organizations, confidential or otherwise, they make newsgathering collectively more difficult to

complete and more dangerous in general.

8.      At their very best, journalists are objective reporters of the news who are perceived by

their sources, as neutral observers exercising control over their newsgathering materials. They are not

3

perceived as tools of private litigants, serving up their materials to courts for evidentiary purposes. If news organizations were viewed as such, their credibility and independence would be imperiled. Sources would view them with a higher level of suspicion and would be more reluctant to give them an opportunity to interview, observe or report safely from conflict-torn regions. The perceived utility of journalists to a source looking to influence the court of public opinion would invariably be offset by the harm journalists could be perceived to bring to that source in a court of law. In 2002, the press freedom decision before the Hague, Prosecutor v. Brdjanin, gave Reporters Without Borders the opportunity to recall these principles. We submitted with 33 other journalistic organizations an amicus curiae in support of war correspondent Jonathan Randal's appeal over a decision compelling his testimony before the tribunal. We wrote a letter of protest to the Tribunal's Chief Prosecutor explaining that: "If journalists working in war zones are now to be seen as aides to international courts, the already very dangerous job of war correspondent will soon become impossible (…) Reporters give evidence about world events, but in real time and for the benefit of international public opinion."

9.      It should be further noted that the harm to a media company under compulsory process for their conflict reporting, even for non-confidential information, would not be limited to a particular time or place. That company and its news people would face distrust from sources in a region long after a conflict has ended and security returned, such as in the West Bank. Meanwhile, the taint of distrust would follow that media company wherever its men and women reported in world.

10.      Litigants and courts must also understand that the symbolic and real harm that would befall one media company from compulsion for its conflict reporting would not be isolated to that company. When a journalist is compelled to testify or produce unpublished material, he or she appears to the outside world as an advocate to the subpoenaing party in a case. That appearance, which could be projected throughout the world through 24-hour satellite television, would have the effect of undermining the credibility of other journalists that strive to remain independent. As a result,

knowledgeable sources in conflict zones who would otherwise talk to journalists or grant them safe passage back to their bureaus, may choose not to do so.

11.    There is a strong public interest in the objectivity of the press and a free flow of information to the public. Courts have recognized a lurking and subtle threat to journalists if disclosure of outtakes, notes, and other unused information, even if non-confidential, was compelled. This threat should become only more apparent in the context of war reporting when news companies are putting their men and women directly in harm's way.

12.    For all these reasons, and on behalf of journalists enduring great costs to bring to the public stories from conflict zones, we request that the Court strike the right balance in its applying the journalist privilege to this case by granting the BBC's motion to quash Plaintiffs' subpoena.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Paris, France on November 15, 2011

Jean-Francois Julliard

5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

MARK I. SOKOLOW et al.,                    :
                                            :        04-CV-00397 (GBD)(RE)
                        Plaintiffs,         :
                                            :
            -against-                       :        ECF CASE
                                            :
                                            :
THE PALESTINIAN LIBERATION ORGANIZATION,   :
et al,                                      :
                        Defendants.         :
                                            :
------------------------------------------------------------------x

# REPLY MEMORANDUM OF THE BRITISH BROADCASTING CORPORATION IN SUPPORT OF MOTION TO QUASH SUBPOENA AND MEMORANDUM IN OPPOSITION TO PLAINTIFFS' CROSS MOTION TO COMPEL

MILLER KORZENIK SOMMERS LLP
Louise Sommers
David S. Korzenik
Itai Maytal
488 Madison Avenue 11th Floor
New York, New York 10022-5702
(212) 752-9200
dkorzenik@mkslex.com
lsommers@mkslex.com
*Attorneys for The British Broadcasting Corporation*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT .......................................................................................... 1

ARGUMENT ........................................................................................................................ 3

I.  RULE 45 PRECLUDES DISCLOSURE ....................................................................... 3

    A.  Any BBC Witness Is Beyond the Territorial Subpoena Power ....................... 3

    B.  BBC's UK-Situate Documents Are Subject to Comity Concerns ................... 6

    C.  Plaintiffs Have Not Established Relevance ..................................................... 7

    D.  Production Would Be Duplicative and Cumulative,
        and the Information Is Obtainable From Defendants and
        Other Sources without Burdening the BBC ..................................................... 9

II. PLAINTIFF HAVE FAILED TO OVERCOME
   THE BBC'S PRIVILEGE ........................................................................................... 13

    A.  The BBC's Privilege Protects Its Outtakes and Testimony
        From Disclosure ............................................................................................. 13

    B.  Plaintiffs Have Not Shown Relevance Or Particularized Need .................... 15

    C.  Plaintiffs Have Failed to Show A Lack of Alternate Sources ....................... 16

    D.  Reasons of Policy Outweigh Compulsion ..................................................... 18

III.   THE PROGRAM AND OUTTAKES ARE NOT ADMISSIBLE .............................. 20

CONCLUSION ................................................................................................................... 23

# TABLE OF AUTHORITIES

**Cases**

1920 Enters. v. Hartford Steam Boiler Inspection, No. 06-3780-HGB-SS, 2007 WL 1521019,  2007 U.S.
    Dist. LEXIS 40180, 2007 WL 1521019 (E.D. La May 22, 2007) ................................................ 4

ATSI Communications, Inc. v. Shaar Fund, Ltd. 547 F.3d 109 (2d Cir. 2008).............................. 3

Barber v. Page, 390 U.S. 719 (1968) ......................................................................................... 22

Blum v. Schlegel, 150 F.R.D. 42 (W.D.N.Y. 1993) ................................................................... 17

Bulgartabac Holding AD v. Republic of Iraq, 08 CIV 6502 RJH, 2010 WL 3633501
    (S.D.N.Y. Sept. 20, 2010) ...................................................................................................... 19

Bullfrog Films, Inc. v. Wick, 646 F. Supp. 492 (C.D. Cal. 1986)
    aff'd, 847 F.2d 502 (9th Cir. 1988) ......................................................................................... 14

Carter v. The City of New York, No. 02 Civ. 8755, 2004 WL 193142, 2004 U.S. Dist. LEXIS 1308
    (S.D.N.Y. Feb. 2, 2004) ......................................................................................................... 17

Cates v. LTV Aerospace Corp., 480 F.2d 620 (5th Cir. 1973) ..................................................... 5

Comm-Tract Corp. v Northern Telecom, Inc., 168 F.R.D. 4 (D. Mass. 1996) ............................. 6

Concerned Citizens of Belle Haven v. The Belle Haven Club, CIV. 3:99CV1467(AHN),
    2004 WL 3246719 (D. Conn. Mar. 22, 2004) ......................................................................... 15

Coryn Group II, LLC v. O.C. Seacrets, Inc., 265 F.R.D. 235 (D. Md. 2010)............................... 5

Ecclesiastes 9:10-11-12, Inc. v LMC Holding Co., 497 F. 3d 1135 (10th Cir. 2007) .................. 5

First American Corp. v. Price Waterhouse LLP, 154 F.3d 16 (2d Cir. 1998) .............................. 7

Fischer v. McGowan, 585 F. Supp. 978 (D.R.I. 1984) ............................................................... 16

Function Media, LLC v.  Google, Inc., 2010 WL 276093 (E.D. Tex. Jan. 15, 2010) .................. 5

Gonzales v. NBC, Inc., 194 F.3d 29 (2d Cir. 1999)................................................. 15, 17, 18, 20

Great Am. Ins. Co. of N.Y. v. Vegas Const. Co., 251 F.R.D. 534 (D. Nev. 2008) ....................... 5

Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co., 970 F.2d 1138 (2d Cir. 1992) .................. 3

In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig., 249 F.R.D. 8
    (D. Mass. 2008) ...................................................................................................................... 9

In re British Broadcasting Corporation (Sokolow v. PLO) 1:11-mc-00547-NGG-JO (E.D.N.Y.)............... 3

In re Application for Order (The Nissan Fire & Marine Ins. Co., Ltd v. Fortress Re, Inc.),
      No. 1:02CV00054, 2002 WL 1870084, 2002 U.S. Dist Lexis 14928
      (S.D.N.Y. Aug 14, 2002) ........................................................................................................ 6

In re Subpoena to Goldberg (Saperstein v. Palestinian Authority),
      693 F.Supp.2d (D.D.C. 2010) ....................................................................................... 14,18

Krase v. Graco Children Prods., Inc.,79 F.3d 346 (2d Cir. 1996) ...................................... 15, 17

Laker Airways Ltd. v. Pan American World Airways, Inc.,
      559 F. Supp. 1124 (D.D.C. 1983) aff'd sub nom, Laker Airways Ltd. v. Sabena, Belgian World
      Airlines,731F.2d 909   (D.C. Cir 1984 ................................................................................... 14

Laker Airways Ltd. v. Pan American World Airways, Inc.,
      604 F. Supp. 280 (D.D.C. 1984) ............................................................................................ 13

Laker Airways Ltd. v. Pan American World Airways, Inc.,
      607 F. Supp. 324 (S.D.N.Y. 1985)........................................................................................... 7

Linde v. Arab Bank, 269 F.R.D. 186 (E.D.N.Y. 2010) ........................................................... 18

Mandal v. City of New York, No. 02CIV1234(WHP)(FM), 2004 WL 2375817
      (S.D.N.Y. October 21, 2004) ................................................................................................ 20

Matthias Jans & Assocs. Ltd v Dropic, 2001 WL 1661473
      (W.D. Mich. 2001).................................................................................................................. 6

McIntyre v. Reynolds Metals Co., 468 F.2d 1092 (5th Cir. 1972)............................................22

Morgan Guar. Trust Co. of New York v. Republic of Palau, 924 F.2d 1237
      (2d Cir. 1991) ....................................................................................................................... 19

Plyler v. Doe, 457 U.S. 202 (1982) ......................................................................................... 14

Price Waterhouse LLP v. First American Corp., 182 F.R.D.56 (S.D.N.Y. 1998) ...................... 4

Rotheram v. Manpower Demonstration Research Corp., No. 88 Civ. 0774(JMW),
      1989 U.S. Dist. LEXIS 13728 (S.D.N.Y. Nov. 20, 1989) ...................................................... 21

Saperstein v. Palestinian Authority, 04-20225 Civ. (S.D.Fla.) ..................................... 2, 10, 12

Saperstein v. Palestinian Authority, 09-mc-00619 (SLT)(ALC) (E.D.N.Y.) ........................... 3, 8

St. Paul Fire & Marine Ins. Co. v. Royal Ins. Co. of Am., No. 91 Civ. 6151,
      1993 WL 267347, 1993 U.S. Dist. LEXIS 9415 (S.D.N.Y. July 12, 1993) ............................. 6

Stanford v. Kuwait Airlines Corp., No. 85 Civ. 0477, 1987 WL 26829
      1987 LEXIS 10981 (S.D.N.Y. Nov. 25, 1987).................................................................... 4, 5

Strauss v. Credit Lyonnais, 242 F.R.D. 199 (E.D.N.Y. 2007).................................................. 18

Strauss v. Credit Lyonnais, 249 F.R.D. 429 (E.D.N.Y. 2008) ................................................. 18

The Nissan Fire & Marine Ins. Co., Ltd v. Fortress Re, Inc.), No. 1:02CV00054, 2002 WL
    1870084, 2002 U.S. Dist Lexis 14928 (S.D.N.Y. Aug 14, 2002) ...................................... 6

Tiffany (NJ) LLC v. Qi Andrew, 2011 WL 3135850, 2011 U.S. Dist. LEXIS 80677,
    (S.D.N.Y. July 25, 2011) .................................................................................................... 7

U.S. v. Bahadar, 954 F.2d 821 (2d Cir. 1992) .................................................................... 21

U.S. v. Burke, 700 F.2d 70 (2d Cir. 1983) ........................................................................... 15

U.S. v. Grant, No. 04 Cr. 207, 2004 U.S. Dist. LEXIS 28176 (S.D.N.Y. Nov. 17, 2004) ...... 17

U.S. v. Hubbard, 493 F.Supp. 202 (D.D.C.1979) ................................................................ 23

U.S v. Kehm, 799 F. 2d 354 (7th Cir. 1986) ....................................................................... 22

U.S. v. LeFevour, 798 F.2d 977 (7th Cir. 1986) .................................................................. 16

U.S. v. Lopez, 777 F.2d 543 (10th Cir. 1985) ..................................................................... 22

U.S. v. Marcos, No. SSSS 87 CR. 598 JFK, 1990 WL 74521 (S.D.N.Y. June 1, 1990) .......... 16

U.S. v. Terrazas-Montano, 747 F.2d 467 (8th Cir.1984) ..................................................... 22

U.S. v. Verdugo-Urquidez, 494 U.S. 259 (1990) ................................................................. 14

Ungar v. Palestinian Authority, 715 F. Supp. 2d 253 (D.R.I. 2010) .................................... 18

W. Coast Life Ins. Co. v. Life Brokerage Partners, LLC, 09-126-SLR,
    2010 WL 181088, 2010 U.S. Dist. LEXIS 3774 (D. Del. January 19, 2010) ....................... 4

Weiss v. Nat'l Westminster Bank, 242 F.R.D. 33 (E.D.N.Y. 2007) ....................................... 18

**Statutes and Rules**

Fed. R. Civ. P. 25 (a) ......................................................................................................... 8

Fed. R. Civ. P. 26(a)(1)(A) ................................................................................................. 8

Fed. R. Civ. P. 26(b)(2)(C) ............................................................................................. 1, 9

Fed. R. Civ. P. 26(b)(2)(C)(i) ............................................................................................. 9

Fed. R. Civ. P. 30(b)(6) ..................................................................................................... 1

Fed. R. Civ. P. 45(b)(2) ..................................................................................................... 6

Fed. R. Civ. P. 45(c) .......................................................................................................... 4

Fed. R. Civ. P. 45(c) (1) ............................................................................................ 9

Fed. R. Civ. P. 45(c) (3)(A)(ii) ............................................................................ 4,5, 6

Fed. R. Civ. P. 803(6) ............................................................................................... 16

Fed. R. Evid. 106 ...................................................................................................... 16

Fed. R. Evid. 801(c) .................................................................................................. 20

Fed. R. Evid. 801(d)(2) ............................................................................................. 21

Fed. R. Evid. 802 ...................................................................................................... 20

Fed. R. Evid. 804(b) .................................................................................................. 21

Fed. R. Evid. 804(b)(3) ............................................................................................. 21

Fed. R. Evid. 805 ...................................................................................................... 20

Red. R. Evid. 807 ...................................................................................................... 22

## Other Authorities

Anglo-American Treaty of July 3, 1815, 8 Stat. 228 (1815)
  extended indefinitely on August 6, 1827, 8 Stat. 361). ....................................... 14

Office of the High Commissioner of Human Rights,
  "Journalism - one of the world's most dangerous professions,"
(October 5, 2011) https://www.ohchr.org ..................................................................... 19

Security Council Condemns Attacks Against Journalists in Conflict Situations
  - Unanimously Adopting Resolution 1738 U.N. Department of Public Information,
  (2006) http://www.un.org/News/Press/docs/2006/sc8929.doc. htm ...................................... 19

Weinstein's Federal Evidence § 804.06(4)(d)(iii) (2011) ........................................... 21

**REPLY MEMORANDUM OF THE BRITISH BROADCASTING
CORPORATION IN SUPPORT OF MOTION TO QUASH SUBPOENA AND
MEMORANDUM IN OPPOSITION TO PLAINTIFFS' CROSS MOTION TO COMPEL**

The British Broadcasting Corporation ("the BBC") submits this reply memorandum in

support of its Motion to Quash Plaintiffs' Second Subpoena and as its memorandum in

opposition to Plaintiffs' Cross Motion to Compel.

In attempting to avoid Rule 45's territorial restriction, Plaintiffs confuse nonparties such

as the BBC, which are subject to that limitation, with parties – which are not.  That restriction

precludes the disclosure sought, even if the nonparty is a corporation present in New York, and

cannot be evaded by invoking Rule 30(b)(6).  And as Plaintiffs do not deny that their counsel

was provided with the BBC Program, there is no need to address its production in any event.

Nor is the BBC stripped of its journalist privilege merely because it is British and

covered international news. Its New York presence alone – conceded by Plaintiffs – underscores

its entitlement to the same protections afforded domestic news organizations.  Those protections

extend to reporting overseas. And even litigants asserting Anti-Terrorism Act ("ATA") actions

must overcome that privilege when seeking to compel unpublished discovery from a nonparty

news organization.  That privilege is particularly important here, as the public has a significant

interest in maintaining an independent and objective press where conflict reporting is involved.

Since Plaintiffs have not even attempted to overcome BBC's journalist privilege – and cannot do

so – their subpoena for the BBC's protected Outtakes and testimony should be quashed on this

ground as well.

Whether as a matter of Rules 26(b)(2)(C), 45 or journalist protections, disclosure should

not be compelled as the BBC information sought is not relevant, is unreasonably cumulative and

is available from many other sources without burdening non-party BBC.  Plaintiffs own

submissions contradict the claimed relevance and significance of the statements of Zakaria Zubaidi and Ata Abu Rumaileh to the BBC.  And Plaintiffs admit that qualifying the BBC materials as business records will not render those statements admissible. As Plaintiffs have failed to overcome their inherent hearsay, compelling disclosure would be unavailing.

Plaintiffs have more than one year left to pursue discovery in this action. There is no reason why, in all that time, they cannot seek to obtain the underlying information – proof of whether the Al-Aqsa Martyrs Brigades ("Al-Aqsa") and Fatah or the PLO are the same organization – directly from Defendants PLO and PA, or from the numerous other witnesses with first-hand information, rather than second-hand from the BBC.

Among these sources are **(i)** Zubaidi and Abu Rumaileh themselves, who are not "unavailable" but are accessible in the West Bank, where security has improved and circumstances have changed in the eight years since their interviews with the BBC were broadcast; **(ii)** Ahmed Saleh, named by Plaintiffs as the incarcerated perpetrator of the 2004 Al-Aqsa attack in issue, and statements of other perpetrators of the attacks alleged by Plaintiffs, which statements have already been requested in this case of the Israeli government; **(iii)** other witnesses specifically named in Plaintiffs' initial disclosures as having information on the underlying issues;  **(iv)** original documents made public by Israel addressing the relationships among the organizations in issue; and **(v)** testimony on this issue already taken in the case of Saperstein v. Palestinian Authority, 04-20225-Civ, (S.D. Fla), which Plaintiffs have disclosed that they have and intend to use.  Indeed, there is no indication that the information sought will not merely be cumulative, given the availability and number of even this sampling of other reasonably available sources.

Finally, Plaintiffs flatly misrepresent the subpoena proceedings in Saperstein v.

Palestinian Authority, 09-mc-00619 (SLT)(ALC) (E.D.N.Y.). They fail to disclose that, upon

reconsideration, (i) the Subpoena served on the BBC in that case was *quashed*, and (ii) the non-

final "decision" Plaintiffs cite was *vacated* on the merits. 2010 U.S. Dist. LEXIS 143465

(E.D.N.Y. Dec. 16, 2010)("ORDER granting [Docket Entry #25] Motion for Reconsideration;

granting [Docket Entry #31] Motion to Quash. The 4/6/10 Memorandum and Order [Docket

Entry #23] is hereby vacated."). Indeed, Plaintiffs' exhibit improperly *omits* the red flag "Order

Vacated" designation shown on the vacated decision at 2010 WL 1371384 in Westlaw. That

vacated decision is legally non-existent and cannot collaterally estop the BBC here.[1] Nor is the

closed <u>Saperstein</u> case "related." This is particularly so, as this case involves different incidents

and a different procedural posture, and raises additional Rule 45 restrictions that alone warrant

the relief the BBC seeks.

Accordingly, the BBC's motion to quash should be granted in its entirety and Plaintiffs'

Cross Motion to Compel should be denied.

## <u>ARGUMENT</u>

### I. <u>RULE 45 PRECLUDES DISCLOSURE</u>

#### A. <u>Any BBC Witness Is Beyond the Territorial Subpoena Power</u>

As there is no BBC witness in this country that has knowledge of the subpoenaed

---

[1] <u>See</u>, <u>e.g.</u>, <u>ATSI Communications, Inc. v. Shaar Fund, Ltd.</u> 547 F.3d 109, 113 n.5 (2d Cir. 2008)
("[V]acatur does have the effect, in a concrete and practical way, of removing [vacated decisions] from
the reservoir of legal thought upon which the bench and bar can subsequently draw."); <u>Harris Trust &</u>
<u>Sav. Bank v. John Hancock Mut. Life Ins. Co.</u>, 970 F.2d 1138, 1146 (2d Cir. 1992), <u>aff'd</u>, 510 U.S. 86
(1993)("It is well-settled in this circuit that a vacated order has no collateral estoppel effect"). This is
Plaintiffs' second attempt to misuse that vacated decision – the first, unsuccessful, caused them to
withdraw their first BBC subpoena after the Court in the Eastern District apparently rebuffed their attempt
by denying their motion to strike the BBC's motion to quash that subpoena.  <u>In re British Broadcasting</u>
<u>Corporation (Sokolow v. PLO)</u>, No: 1:11-mc-00547-NGG-JO (E.D.N.Y.), Dkt Nos. 3, 4, 5, 6, 7, and
Order entered 8/2/11. See also Declaration of Louise Sommers dated Sept. 6, 2011 ("Sommers
Decl.")(Dkt #141-4)¶¶11-12 and Ex. 2.

materials, Plaintiffs cannot avoid the 100-mile territorial restriction of Rule 45(c)(3)(A)(ii)
merely by contending that the subpoenaed non-party is a corporation. Pl. Opp. 14.[2] Plaintiffs are
incorrect in excluding non-party corporations, even ones with New York offices, from the 100-
mile restriction, and in contending that <u>Price Waterhouse LLP v. First American Corp.</u>, 182
F.R.D.56 (S.D.N.Y. 1998) supports that erroneous view. To the contrary, <u>Price Waterhouse</u>
specifically approved <u>Stanford v. Kuwait Airlines Corp.</u>, No. 85 Civ. 0477, 1987 WL 26829, at
*3, 1987 LEXIS 10981, at *7 (S.D.N.Y. Nov. 25, 1987), which quashed a subpoena served on a
corporation *through* its New York office, because it lacked a knowledgeable witness within 100
miles. <u>PriceWaterhouse.</u>, <u>supra</u>, 182 F.R.D. at 62. <u>See</u> <u>also</u> <u>W. Coast Life Ins. Co. v. Life</u>
<u>Brokerage Partners, LLC</u>, 09-126-SLR, 2010 WL 181088, *2, 2010 U.S. Dist. LEXIS 3774, *
(D. Del. January 19, 2010)(subpoena on corporation served through in-state agent quashed under
the 100-mile restriction); <u>1920 Enters. v. Hartford Steam Boiler Inspection</u>, No. 06-3780-HGB-
SS, 2007 WL 1521019 at * 2, 2007 U.S. Dist. LEXIS 40180**,** 2007 WL 1521019 at *2 (E.D. La
May 22, 2007)(subpoena on corporation served through secretary of state quashed under the 100-
mile restriction). There is no question but that the territorial restrictions extend to the non-party
BBC.

     Plaintiffs are likewise incorrect in contending that the BBC would be required by Rule
30(b)(6) to "create" an individual witness who could testify here. Pl. Opp. 15-16. They fail to
refute BBC's authorities that hold that to so apply Rule 30(b)(6) "flies in the face of the intent"
of Rule 45(c) and would improperly strip Rule 45 of meaning or efficacy, thereby subjecting
non-parties to burdensome travel and discovery that the rule's express language was intended to

---

[2] Plaintiffs' Memorandum in Opposition to BBC's Motion to Quash Subpoena and In Support of
Plaintiffs' Motion to Compel (Dkt #159) and Memorandum of Law of the British Broadcasting
Corporation in Support of Motion to Quash Subpoena (Dkt #142) are cited as "Pl. Opp." and "BBC
Mem.," respectively, followed by the relevant page number(s).

avoid. Price Waterhouse, supra, 182 F.R.D. at 62-63. See also Cates v. LTV Aerospace Corp.,

480 F.2d 620, 623-24 (5th Cir. 1973); Stanford v. Kuwait Airlines Corp, supra, 1987 WL 26829,

at *3, 1987 LEXIS 10981, at *7. See BBC Mem.10.

The cases on which Plaintiffs rely (Pl. Opp. 15-16) fail to support their argument in any

respect, as none of them concern Rule 30(b)(6) in the context of a Rule 45 non-party witness.

Rather, they all concern depositions of corporate *parties,* which under Rule 45's express

language, are not subject to the 100-mile restriction in the first place.[3] Fed. R. Civ. P. 45(c)

(3)(A)(ii)("'the issuing court must quash or modify a subpoena that requires a person *who is

neither a party nor a party's officer* to travel other than 100 miles from where than person

resides..." etc.)(emphasis supplied). Plaintiffs' cases are thus inapplicable to non-party witnesses

like the BBC, to which the 100-mile restriction specifically applies. See BBC Mem. 10-11.

That the BBC has not named any knowledgeable witness abroad (Pl. Opp. 16) is a red

herring, since the issue under Rule 45 is whether there is any knowledgeable witness *here* that

could be designated. The BBC has attested that there is none. Declaration of Nicola Cain (Dkt

#141-1) ("Cain Decl.") ¶¶5, 7; Declaration of Stephen Mitchell (Dkt #141-3) ("Mitchell Decl.")

¶6. Accordingly, the BBC is not, as Plaintiffs contend (Pl. Opp. 16), "thwart[ing] the subpoena

by naming a witness outside of 100 miles." Pl. Opp. 16. It has no witness *within* 100 miles. As

shown supra, it need not "educate," "prepare" or "create" a witness here, where no one

knowledgeable within 100 miles exists.

Plaintiffs likewise mistake the power of this Court in asking it to modify the subpoena to

require the BBC to produce a witness in London. Pl. Opp. 17. Plaintiffs do not dispute the

---

[3] See Pl. Opp. 15-16: Ecclesiastes 9:10-11-12, Inc. v LMC Holding Co., 497 F. 3d 1135 (10th Cir. 2007)(plaintiff); Function Media, LLC v. Google, Inc., 2010 WL 276093 (E.D. Tex. Jan. 15, 2010)(defendant); Coryn Group II, LLC v. O.C. Seacrets, Inc., 265 F.R.D. 235 (D. Md. 2010)(third-party defendant); Great Am. Ins. Co. of N.Y. v. Vegas Const. Co., 251 F.R.D. 534 (D. Nev. 2008)(defendant).

established authority in this Circuit that holds that this Court *lacks* the power to modify a subpoena to compel a party to appear in a *foreign country*. See cases cited in BBC Mem.12. Plaintiff's own authority agrees – regardless of whether Rule 45(b)(2) permits modification of a subpoena within a district or state, it does not permit modification of a subpoena so as to require an appearance in a *foreign country*. Thus, in In re Application for Order (The Nissan Fire & Marine Ins. Co., Ltd v. Fortress Re, Inc.), No. 1:02CV00054, 2002 WL 1870084 at *3, 2002 U.S. Dist Lexis 14928, at *9 (S.D.N.Y. Aug 14, 2002) ("Nissan Fire") (Pl. Opp. 17), the Court *quashed* rather than modified the subpoena, doubting that it had the power to change the location from New York to Tokyo.[4] See also St. Paul Fire & Marine Ins. Co. v. Royal Ins. Co. of Am., No. 91 Civ. 6151, 1993 WL 267347, at *1, 1993 U.S. Dist. LEXIS 9415, at *2 (S.D.N.Y. July 12, 1993)("Rule 45(c)(3)(A)(ii) appears to *require* the quashing of a subpoena" if travel exceeding 100 miles is required)(emphasis supplied). Accordingly, Plaintiffs' Second Subpoena on the BBC could not be modified to require BBC to appear for a deposition in London. Rather, it should be quashed.

### B. BBC's UK-Situate Documents Are Subject to Comity Concerns

Nor should the BBC be required to produce its UK-situate documents. See BBC Mem.

---

[4] Indeed, although Nissan Fire noted the decision of the Massachusetts district court in Comm-Tract Corp. v Northern Telecom, Inc., 168 F.R.D. 4 (D. Mass. 1996) (Pl. Opp. 17), which modified a subpoena to order the defendant's employee to a videotaped deposition in Hong Kong, Nissan Fire instead ruled

> it is not clear, however, that the authority granted in Rule 45(c)(3)(A)(ii) to modify a subpoena extends to the kinds of modifications that would be required to permit the subpoena to comply with these requirements by functioning as the equivalent of a letter rogatory or a court order authorizing a U.S. consular offer to take the deposition. Even less clear is how this Court would be able to modify the subpoena...so as to require [the witness] Sasaki to "consent" to his deposition in Japan. But even if such authority did exist under Rule 45, prudential, international comity-based considerations counsel that the Court refrain under the circumstances of this case.

2002 WL 1870084 at *3 , 2002 U.S. Dist Lexis 14928, at *15. Matthias Jans & Assocs. Ltd v Dropic, 2001 WL 1661473 *3 (W.D. Mich. 2001)(Pl. Opp. 17) is also of no help to Plaintiffs, as it merely required a change in deposition location in the *same district* as the Court.

11-12. Plaintiffs concede (Pl. Opp. 7, 14) that these materials will not be admissible – and thus cannot be used – without the accompanying deposition of a BBC witness. As that deposition cannot be compelled, the documents are of no probative value here.

Plaintiffs' reliance on Tiffany (NJ) LLC v. Qi Andrew, 2011 WL 3135850, 2011 U.S. Dist. LEXIS 80677, (S.D.N.Y. July 25, 2011), and First American Corp. v. Price Waterhouse LLP, 154 F.3d 16 (2d Cir. 1998) (Pl. Opp. 9), is unavailing. In Tiffany, under comity, the Court did *not* compel production, which should be the result here. And in First American, while the Court ordered disclosure, it did so because the U.S. financial interest in that lawsuit, to which the British court had yielded, outweighed any competing British interests, and the documents could not be sufficiently identified to comply with the Hague Convention. Here there are no comparable circumstances.[5] See also, Laker Airways Ltd. v. Pan Am World Airways, 607 F. Supp. 324, 326 (S.D.N.Y. 1985)(disclosure not ordered where "...service of the subpoenas in New York is a transparent attempt to circumvent the Hague Convention..."). Plaintiffs' disregard of established issues of comity here should not be excused. See BBC Mem. 11. Their Second Subpoena should be quashed.

**C. Plaintiffs Have Not Established Relevance**

Disregarding that neither alleged Al-Aqsa attack in issue is mentioned in the BBC materials, Plaintiffs claim relevance based on their alleged need to show funding of Al-Aqsa by Defendants, and thus that Al-Aqsa and the PLO were the same, "prior to" the attacks in issue. Pl. Opp. 3. However, the statements by Abu Rumaileh and Zubaidi were made in September 2003, broadcast in November 2003 – well *after* the 2002 Al-Aqsa attack alleged by Plaintiffs. Thus,

---

[5] Thus in First American, the U.S. was to receive the proceeds of any award or settlement of the fraud claims involved and the British interests favored proceeding – a British court had already held that its interest in enforcing its laws gave way to the public interest in uncovering the frauds alleged in First American. Id. at 22.

those statements could not be relevant or probative with respect thereto or to other pre-2003 attacks at issue by Al-Aqsa, if any.

Even so as to the 2004 Al-Aqsa attack that Plaintiffs allege, however, Plaintiffs own submission belies their claim of relevance, and contradicts their representation that the Zubaidi and Abu Rumaileh statements to the BBC are "more probative on this issue [that Fatah and Al Aqsa are the same] than any other evidence which plaintiffs can reasonably procure." Pl. Opp. 14.

Thus, Plaintiffs served their initial disclosures in this action on July 27, 2011 – *after* they had served their first Subpoena, dated July 8, 2011, on the BBC for the same information, and *well after* their counsel unsuccessfully attempted to obtain that information from the BBC in the Saperstein action the previous year. See Pl. Initial Rule 26(a)(1)(A) Disclosures ("Pl. Initial Disclosures"), attached as Ex. A. to Defendants Memorandum of Law in Support of its Motion to Compel Rule 25 (a) Examinations Within the Southern District of New York, (Dkt #155-1, filed 9/27/11) p. 10. Despite this prior knowledge of Plaintiffs and their counsel, Plaintiffs did not name either the BBC or Zubaidi or Abu Rumaileh as a witness in their initial disclosures as "likely to have discoverable" – much less relevant – "information that Plaintiffs may use to support their claims or defenses, unless the use would be solely for impeachment." See Pl. Initial Disclosures at pp. 2-5. [6] The only conclusion that can be drawn from this omission is that the BBC witness and information sought lack the relevance and probative value that Plaintiffs now profess.

---

[6] Here, of course, Plaintiffs contend that they need the BBC information and the Zubaidi and Abu Rumaileh statements to directly prove their case in chief (Pl. Opp. 6). But see p. 15, n. 10, infra. And they pointed out in their disclosures that they do "not suggest that Plaintiffs have the ability to make the individual available or will call the individual to testify at trial." See Pl. Initial Disclosures p. 2.

### D.  Production Would Be Duplicative and Cumulative, and the Information Is Obtainable From Defendants and Other Sources without Burdening the BBC

Plaintiffs do not deny that the BBC previously provided their counsel with the Program. BBC Mem. 1 n. 1; Sommers Decl.¶2; Cain Decl. ¶3.  The BBC should not be compelled to duplicate that production. See, e.g., Fed. R. Civ. P. 26(b)(2)(C)(i)(Court is required to limit discovery sought that is "unreasonably cumulative or duplicative.").

Moreover, as to the underlying information sought from the BBC– alleged proof of whether Al-Aqsa and Fatah or the PLO are the same entity or received funding from Defendants "prior to" the attacks in issue, and whether the PA and PLO are liable for the Al-Aqsa attacks (Pl. Opp. 3, 6) – the subpoenaed information, even if admissible (which it is not, see Point III, infra, p. 20) would be unreasonably cumulative.  The underlying information is available – and may have even already been obtained – from the many other sources that could address these issues directly, without burdening non-party BBC. And with discovery extending for another year, Plaintiffs should have ample opportunity to obtain the information sought from these sources.  As such available other sources exist, the disclosure sought should be denied under Rule 26 (b)(2)(C)(i) as well as Rule 45, for this reason alone. See, e.g., In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig., 249 F.R.D. 8, 11 (D. Mass. 2008)(Fed. R. Civ. P. 26(b)(2)(C) "initially governs enforcement of a Rule 45 subpoena."); Fed. R. Civ. P. 26(b)(2)(C)(i), (ii)(Court is required to limit discovery sought that is "unreasonably cumulative or duplicative," "can be obtained from some other source that is more convenient, less burdensome or less expensive" or where there has been "ample opportunity to obtain the information by discovery in the action"); Fed. R. Civ. P.  45(c)(1) (affirmatively mandates a party serving a subpoena "to take reasonable steps to avoid imposing an undue burden or expense" on a nonparty recipient).

9

Plaintiffs do not contend that they have not obtained this information, or cannot obtain it in discovery in this case or elsewhere. For example, Plaintiffs insist that Defendants have already admitted that they fund Fatah (Pl. Opp. 4) and Plaintiffs have not shown that additional discovery from Defendants in this action will fail to produce proof on the identity issue. Indeed, Plaintiffs submit the Amended Joint Proposed Schedule from the <u>Saperstein</u> case (04-20225-Civ (S.D. Fla.)) (Pl. Opp. Ex. F) which specifically refers to information on this issue that could be obtained from Defendants.  That includes "the admissions that 'Al-Aksa Brigades' is an alias for Fatah, which allegedly appeared on the PA's own website" and in reports published by the Palestinian Authority ("PA") (Ex. F. pp. 4, 5);  "documents captured and published by Israel" and deposition testimony from the PA Minister of Civil Affairs that  allegedly reveal that the PA was funding Fatah (Ex F. p. 6); and statements on PA website by "PA and PLO and their senior officials" allegedly admitting that the "wave of Palestinian terror" in 2000-2002 "was intended to intimidate the Israeli public and government to accept defendants' political demands..."(Ex F. p. 13).

In addition, Zubaidi and Abu Rumaileh themselves would have the direct information that Plaintiffs seek indirectly from the BBC. Pursuing these witnesses is not the futile exercise that Plaintiffs portray it to be (Pl Opp.12 and n.6; Pl. Ex. 1 [Declaration of Professor Barry Rubin "Rubin Decl."]), particularly given that circumstances have changed in the eight years since Zubaidi and Abu Rumaileh made those statements. See Declaration of Dr. Yezid Sayigh dated November 14, 2011, incorporated herein by reference ("Sayigh Decl.") ¶¶20, 22-28.[7] Plaintiffs' assessment through the 2009 Rubin Declaration of the availability and accessibility of those

---

[7] Dr. Sayigh is an internationally acknowledged expert in Palestinian politics and security matters, who has served as a diplomat and consultant as well as a scholar and writer in these fields. Sayigh Decl. ¶¶1-16. His opinions on this issue are presented in detail at ¶¶19-28.

witnesses is unreliable as it rests on faulty assumptions, disregards the current political realities

in the West Bank and presents an overly simplistic account of the complex relationships between

the PA, the Palestinian Liberation Organization ("PLO"), Fatah and/or al-Aqsa. It is not an

accurate assessment of the likelihood of either one appearing for deposition, whether compelled

or otherwise. Sayigh Decl. ¶¶17, 19-28 (detailed discussion).

Indeed, Zubaidi has spoken in news accounts of his disillusionment with his militant past

and has made himself accessible to non-Palestinians, including Israelis, for interviews as recently

as April 2011. Sayigh Decl. ¶¶26, 28. Thus, Zubaidi or Abu Ramaileh can be sought for

deposition in Jenin, where security has improved since the two witnesses made their statements

to the BBC in 2003, or elsewhere in the West Bank, as Zubaidi has been permitted to travel on

occasion and Abu Rumaileh apparently is under no travel restriction. Sayigh Decl. ¶¶26, 28. If,

as Plaintiffs contend, the PA or PLO has control over these individuals, the PA and PLO are

Defendants to this action and subject to court orders here, which could compel those Defendants

to produce those witnesses. [8] Sayigh Decl. ¶30. Further, as to what these Defendants and this

Court would do,  it is the Defendants and this Court – and not Plaintiffs' expert – that are the best

predictors of their own actions.

In any event, Plaintiffs have named a host of alternate sources for the underlying

information sought from the BBC. For example,

- Ahmed Qurei and Yasser Abed Rabbo, each of whom Plaintiffs claim "has knowledge of
Fatah terrorist activities, of the provision of funds by the PA and PLO to Fatah in general
and to Fatah terrorists specifically..."  Pl. Initial Disclosures, p. 4;

- "Al-Aqsa operative, Ahmed Salah," whom Plaintiffs name as a convicted perpetrator of
the 2004 Al-Aqsa attack in issue (Pl. Opp. 3), and whose deposition can be pursued
where he is incarcerated;

---

[8] Whether the PA is subject to the Hague Convention (Pl. Opp. 12 n. 6) is thus beside the point as the PA
is a party directly subject to this Court's authority and order.

- Deposition testimony from the action <u>Saperstein v Palestinian Authority</u>, 04-20225-Civ (S.D. Fla.) which Plaintiffs claim involved the same issue and which they apparently intend to use. Pl. Initial Disclosures p 6.

Other reasonably available alternate sources exist as well. See Sayigh Decl. ¶¶29-40. To name but a few such sources, publicly available on the website of the Israeli Ministry of Foreign Affairs ("MFA"), or from the MFA directly, in original Arabic and English translation, are a considerable representative sample of the some 500,000 documents seized from Arafat's headquarters by the Israeli Defense Forces in 2002, that contain information that addresses whether there are the relationships between the organizations at issue. Statements made in and to Israeli courts by Palestinians suspects and perpetrators in terror attacks are also available either online or through request to Israeli authorities. Such a request has apparently been made by Defendants in this case and the documents also will be available to Plaintiffs. See Defendants' Letter Request of International Judicial Assistance to the Israeli Government, Dkt #136 filed 08/16/11 pp. 9-11. As well, The Israel Security Agency, which has apprehended and identified Palestinian suspects involved in terror attacks, has a website containing its own assessment of the relationships between these organizations. Sayigh Decl.¶ 34.  All of these sources are more credible and authoritative that the second-hand statements sought from the BBC, and they do not depend, as do the Zubaidi and Abu Rumaileh statements to the BBC, on any personal or political agendas sought to be communicated.  Sayigh Decl. ¶¶35-40 (also noting Zubaidi's self serving and contrary positions in 2004 and 2006 interviews at ¶38).

Accordingly, the Subpoenaed materials are at best cumulative, and the underlying information sought is obtainable from other sources that are more direct, first-hand and authoritative than the BBC materials, at less burden and expense to non-party BBC.

## II. **PLAINTIFFS HAVE FAILED TO OVERCOME THE BBC'S PRIVILEGE**

### A. **The BBC's Privilege Protects Its Outtakes and Testimony From Disclosure**

Plaintiffs make no attempt to overcome the BBC's journalist protections. Instead, they assert that the BBC has none. Relying erroneously on <u>Laker Airways Ltd. v. Pan American World Airways, Inc.</u>, 604 F. Supp. 280, 287 (D.D.C. 1984), Plaintiffs contend that the "First Amendment does not protect the overseas news gathering of a foreign corporation such as the BBC." Pl. Opp. 17. But <u>Laker</u> did not deal with journalist privilege, and did not so hold.

<u>Laker</u> was an antitrust action that concerned the "remarkable" and "probably unprecedented" attempt (604 F. Supp. at 286) by defendant British airlines to avoid an injunction by claiming a U.S. constitutional right to petition British legislative and executive authorities for an order preventing the British plaintiff from proceeding against them in that U.S. action. As the Court put it, those British defendants were using the First Amendment "to defeat established constitutional and other rights as well as jurisdiction protected by United States law." 604 F.Supp. at 288. No similar "unprecedented" use of the First Amendment to defeat established federal rights is presented here. Even so, the <u>Laker</u> Court, after considering issues of comity – also present in the instant case – *permitted* the British defendants to proceed with their foreign petition on a limited basis and denied the British plaintiffs' attempt to enjoin them from doing so in any respect. 604 F. Supp. at 293-94.

On its face then, <u>Laker</u> does not support Plaintiffs' argument.  Indeed, the <u>Laker</u> Court expressly recognized with respect to its British defendants, that "[b]y doing business here, defendants voluntarily made themselves subject to... application of United States domestic law; as parties before the Court, they are entitled to the protection of that law…" <u>Id</u>. at 287 n. 21.  So, too is the BBC.

13

Plaintiffs admit that "the BBC is a corporation with its own offices in New York." Pl. Opp. 15.  Indeed, the BBC was served at its news desk in New York. Cain Decl. ¶2. As such, as recognized in Laker, the BBC is subject to U.S. domestic laws and is entitled to protection of those laws. Id. at 287 n. 21. Indeed, our country's "constitutional mandate" – that same U.S. Constitution which permits a journalist privilege – "likewise guarantees to all those residing or doing business in the United States ... due process and the equal protection of the law." Laker Airways Ltd. v. Pan American World Airways, Inc., 559 F. Supp. 1124, 1134 (D.D.C. 1983), aff'd sub nom, Laker Airways Ltd. v. Sabena, Belgian World Airlines, 731 F.2d 909, 943 (D.C. Cir. 1984)(also recognizing that a "corporation operating within the United States…qualifies as an "other person" entitled to the protection of United States law").[9]

Thus, the BBC is entitled to assert its journalist privilege equally as if it were a wholly domestic company covering the same news. And that protection extends to foreign reporting. See, e.g., In re Subpoena to Goldberg (Saperstein v. Palestinian Authority), 693 F.Supp.2d 81, 83 n.2 and 3 (D.D.C. 2010) (quashing subpoena seeking testimony of non-party American journalist concerning his foreign reporting -- interviews held in Israel-- reflected in news article and book submitted at Dkt # 1-2 and 1-3). See also Bullfrog Films, Inc. v. Wick, 646 F. Supp. 492, 502 (C.D. Cal. 1986) aff'd, 847 F.2d 502 (9th Cir. 1988)("...the First Amendment protects communications with foreign audiences to the same extent as communications within our

---

[9] See also U.S. v. Verdugo-Urquidez, 494 U.S. 259, 260 (1990)(aliens enjoy certain constitutional rights "when they have come within the territory of, and have developed substantial connections with, this country."); Plyler v. Doe, 457 U.S. 202, 212 (1982)(The provisions of the Fourteenth Amendment " 'are universal in their application, to all persons within the territorial jurisdiction ...' ). That Congress did not intend for courts to impose different standards upon foreign companies doing business in the U.S. than domestic ones is evident from the country's obligation under its various Bilateral Friendship, Commerce, and Navigation treaties to secure equal treatment of domestic and foreign companies within its jurisdiction. See, e.g., Laker Airways Ltd. v. Pan Am. World Airways, supra, 559 F. Supp. at 1134, n. 44 (referencing Anglo-American Treaty of July 3, 1815 8 Stat. 228 (1815), extended indefinitely on August 6, 1827, 8 Stat. 361).

borders."). Thus, the BBC's nationality and the location of the newsgathering is of no consequence under the journalist privilege, particularly in an action, as here, brought by Plaintiffs in a U.S. federal court in New York.

## B. **Plaintiffs Have Not Shown Relevance Or Particularized Need**

Because they contend that the journalist privilege is inapplicable, Plaintiffs have made no attempt to show that the Outtakes or testimony sought are relevant under Gonzales v. NBC, Inc., 194 F.3d 29, 35 (2d Cir. 1999) – much less, highly relevant and critical under the N.Y. Shield Law, which should also guide the Court. BBC Mem. 13. They simply contend that it is "very likely" that the Outtakes would contain "additional such [highly probative] statements" to those they claim exist in the Program. Pl.Opp. 7.

But there is no basis for that likelihood. Plaintiffs do not contend that every statement made to the BBC by these interviewees concern the relationships they seek to establish. So Plaintiffs' speculation that there are additional such statements in the Outtakes is precisely the type of fishing expedition that the journalist privilege is intended to prevent. See BBC Mem. 18-19. This case is thus unlike Gonzales, where the specific conduct in issue of the defendant was also the subject of the broadcast, so that any outtakes would necessarily show that conduct, and thus be additional "unimpeachably objective evidence of [defendant's] conduct." 194 F.3d at 36.[10]

Plaintiffs' tenuous assertion that the Outtakes are needed to avoid a possible

---

[10] Even were Plaintiffs seeking the Outtakes for impeachment purposes, that would not be a sufficient justification for overriding the journalist privilege either. See, e.g., Krase v. Graco Children Prods., Inc., 79 F.3d 346, 352 (2d Cir. 1996)("[I]mpeachment evidence" not sufficient to overcome the privilege); Concerned Citizens of Belle Haven v. The Belle Haven Club, CIV. 3:99CV1467(AHN), 2004 WL 3246719 (D. Conn. Mar. 22, 2004)(non-confidential, unpublished interview statements of defendant's treasurer "would only be admissible to impeach him at trial [, which is] an insufficient reason to vitiate the privilege"). See also U.S. v. Burke, 700 F.2d 70, 78 (2d Cir. 1983)(materials sought for impeachment purposes not necessary to defense where defendant had much other impeachment material).

"completeness" objection from Defendants if the Program were offered at trial (Pl. Opp. 7),

could not defeat the BBC's privilege. Even were Defendants to make such an objection, it would

not satisfy Plaintiffs' burden in overcoming the BBC's journalist privilege, particularly in an

underlying civil case. U.S. v. Marcos, SSSS 87 CR. 598 JFK, 1990 WL 74521 (S.D.N.Y. June 1,

1990)(government trial subpoena, on non-party news broadcaster for testimony to rebut a

"completeness" challenge, quashed);  Fischer v. McGowan, 585 F. Supp. 978, 987 (D.R.I.

1984)(motion to compel nonparty reporter, to disclose additional privileged source information

for "completeness" purposes, denied). See also U.S. v. LeFevour, 798 F.2d 977, 981 (7th Cir.

1986)("Rule 106 was not intended to override every privilege and other exclusionary rule of

evidence in the legal armamentarium, so there must be cases where if an excerpt is misleading

the only cure is to exclude it rather to put in other excerpts").

Moreover, the deposition testimony regarding the BBC's manner and method of creating

and storing materials *other than* the Program and Outtakes, which Plaintiffs also seek, does not

bear on whether the Program and any Outtakes qualify as BBC business records under Fed. R.

Civ. P. 803(6) – Plaintiff's stated reason for subpoenaing the testimony. [11]

 Accordingly, the outtakes sought, as well as any so-called "foundational" testimony is

not relevant for purposes of overcoming the BBC's qualified privilege from compelled

disclosure.

### C. **Plaintiffs Have Failed to Show A Lack of Alternate Sources**

While the BBC may be the only source of its own outtakes, there are (as shown pp. 11-12

supra), a significant number of other sources from which to obtain the underlying information

Plaintiffs seek. It is the underlying information, and not the video outtakes themselves that

---

[11]And, as shown in Point III, infra, qualifying those materials as business records will not render any
statements of Abu Rumaileh and Zubaidi contained in them admissible, in any event.

control.  See Gonzales v. NBC, Inc., supra, 194 F.3d at 36 (holding that "the outtakes contain
*information* that is not reasonably obtainable from other available sources")(emphasis added).
See also U.S. v. Grant, No. 04 Cr. 207, 2004 U.S. Dist. LEXIS 28176, at *7 (S.D.N.Y. Nov. 17,
2004)("The parties dispute whether the video itself must be available elsewhere or whether
alternative sources of the information captured on it would suffice....While it is true that the
Government cannot obtain further video images of the club from any other source, they have
considerable evidence of drug selling and drug use at the Sound Factory [shown in the video].");
Krase v. Graco Children Prods., Inc., supra, 79 F.3d at 353 ("However, it cannot be said that
pertinent material is not obtainable elsewhere just because it is included in some out-takes");
Blum v. Schlegel, 150 F.R.D. 42, 46 (W.D.N.Y. 1993)("where the source [of the interview
sought] is known and can be deposed, the availability of a deposition is an alternate source that
must be pursued"). [12]

These alternate sources are not exclusive to the BBC, several have been listed or
requested by the parties already and others are publicly available. See discussion in Point I D,
supra, more detailed in Sayigh Decl.¶¶18, 29-40. Plaintiffs should pursue that information from
those other reasonably available sources instead of compelling privileged information and
testimony from non-party BBC. BBC Mem. 20.  Carter v. The City of New York, No. 02 Civ.
8755, 2004 WL 193142 at *1, 2004 U.S. Dist. LEXIS 1308 at *4 (S.D.N.Y. Feb. 2, 2004)
(failure to show that information cannot be obtained elsewhere defeats subpoena on journalist,
particularly where other witnesses exist); U.S. v. Grant, supra, at *8 ("given the availability of

---

[12] Indeed, if the underlying information were not the focus of the Gonzales test and its availability
analysis were limited only to a particular piece of news footage (as opposed to what is in the news
footage), the second prong of that test would be rendered meaningless. Because the news company would
be the only source of the footage, there would never be any alternative source, and the two-prong test
would become, in effect, one-prong.

alternative sources of information and the far more attenuated need for the outtakes," journalist's

privilege not overcome).

### D. Reasons of Policy Outweigh Compulsion

Plaintiffs argue that there is a national interest in permitting discovery in Anti-Terrorism

Act ("ATA") cases. Pl. Opp. 7. This is a significant concern, but not one of the cases Plaintiffs

cite compelled Rule 45 disclosure from a non-party news organization – as opposed to seeking

discovery from a party *defendant* directly charged with aiding terrorists.[13]

Nor does Plaintiffs' authority involve non-party disclosure governed by the journalist

privilege, which, under the Constitution, federal and state law, also serves public and national

interests. Those interests – in maintaining an independent and objective press, and a free flow of

information to the public – are of significant concern here, and as Plaintiffs does not dispute,

have long been recognized and protected by courts and legislatures alike. BBC Mem. 13-14, 21-

23. They require litigants, even those asserting ATA actions against others, to satisfy the

privilege's particular requisites before discovery may be compelled. See, e.g., In re Subpoena to

Goldberg (Saperstein v. Palestinian Authority), supra, (ATA action in which journalist subpoena

quashed).

As shown in the BBC's moving memorandum, the Second Circuit in Gonzales v. NBC,

Inc., supra, recognized that compelled production of privileged information would "risk the

symbolic harm of making journalists appear to be an investigative arm of the judicial system, the

government, or private parties," 194 F.3d at 35. See BBC Mem.13. But such symbolic harm

could easily translate into real harm for the BBC and for other news organizations covering

---

[13] See Pl. Opp. 8: Linde v. Arab Bank, 269 F.R.D. 186 (E.D.N.Y. 2010)(Defendant bank ); Weiss v. Nat'l
Westminster Bank, 242 F.R.D. 33 (E.D.N.Y. 2007)(same); Strauss v. Credit Lyonnais, 249 F.R.D. 429
(E.D.N.Y. 2008)(same): Strauss v. Credit Lyonnais, 242 F.R.D. 199 (E.D.N.Y. 2007)(same); Ungar v.
Palestinian Authority, 715 F. Supp. 2d 253 (D.R.I. 2010)(Defendant PA).

conflicts worldwide if their newsgathering materials were compelled. Declaration of Reporters Without Borders, Jean-Francois Julliard, dated November 15, 2011 ("Julliard Decl."), incorporated herein by reference. ¶4.

Media coverage brings to the attention of the international community the horrors and reality of conflict, and provides the public with crucial information—not only the competing viewpoints between conflicting parties, but also the exposure of violations and provision of essential material for prosecutorial investigations that often lead to the arrest of war criminals. The benefits provided by such reporting – which Plaintiffs recognize here by virtue of their subpoena – are gathered under grave and increasing dangers on the ground, particularly when covering conflict zones like the Middle East. [14] News men and woman are subject to unique physical hazards, and risk harassment, threats, movement restrictions, imprisonment and even death by parties seeking to limit independent coverage of sensitive issues. Julliard Decl. ¶6.

A journalist compelled to testify or produce unpublished material appears to the outside world as an advocate of the subpoenaing party. That compulsion, which might be reported or shown worldwide, effectively undermines journalist credibility. Knowledgeable sources, in conflict zones, who might otherwise talk to or grant journalists safe passage, may not do so. They also might not do so upon learning that a reporter chosen to tell their story had surrendered

---

[14] The Court may take judicial notice of the United Nations resolution condemning the escalating trend of violence against journalists in conflict zones. See *Security Council Condemns Attacks Against Journalists in Conflict Situations - Unanimously Adopting Resolution 1738*, U.N. Department of Public Information, (2006) http://www.un.org/News/Press/docs/2006/sc8929.doc. htm (last visited November 6, 2011); Bulgartabac Holding AD v. Republic of Iraq, 08 CIV 6502 RJH, 2010 WL 3633501 (S.D.N.Y. Sept. 20, 2010)(court took judicial notice that UN sanctions against Iraq began on August 6, 1990.); Morgan Guar. Trust Co. of New York v. Republic of Palau, 924 F.2d 1237, 1244 (2d Cir. 1991)(court took judicial notice of UN Security Council approval of termination of certain trusteeship arrangement). See also Office of the High Commissioner of Human Rights, "Journalism - one of the world's most dangerous professions," (October 5, 2011) https://www.ohchr.org.

his footage to litigants – who could present the material out of context or differently than the trusted reporter.  Julliard Decl. ¶¶7, 10.

Such distrust from sources could extend to other news men and women and their news organizations, and continue long after a conflict has ended and security returned to a region, such as the West Bank. It could likely follow journalists into other parts of the world, compounding the risks and danger to news men and women, and the loss of information to the public. Julliard Decl. ¶9.  These risks far outweigh the tenuous and at best, cumulative, value of the BBC material sought to Plaintiffs' case here.[15]

### III.  THE PROGRAM AND OUTTAKES ARE NOT ADMISSIBLE

Plaintiffs overlook that "in determining whether to quash a subpoena, courts in this Circuit have considered the admissibility of the materials sought from journalists." Mandal v. City of New York, No. 02CIV1234(WHP)(FM), 2004 WL 2375817, at *4 (S.D.N.Y. October 21, 2004)(listing cases). Plaintiffs concede that establishing the BBC materials as business records – Plaintiffs' rationale for seeking BBC testimony – would not be sufficient to render the statements in them admissible.  Pl. Opp. 11.  See, e.g., Fed. R. Evid. 801(c); 802, 805. Yet none of the hearsay exceptions or exclusions that Plaintiffs argue apply.

Although Plaintiffs contend that Abu Rumaileh was a PLO Official whose statements were party admissions (Pl. Opp.  11), the exhibit they cite establishes only that he was a PLO official from 2000 through February 2002 – not in 2003 when his statements were made to the

---

[15] The Second Circuit in Gonzales v. NBC, Inc., supra, 194 F.3d at 35, also was concerned that it would become "standard operating procedure for those litigating against an entity that had been the subject of press attention to sift through press files in search of information supporting their claims." The Court clearly wanted to relieve the "burden" placed on "the press [of] the heavy costs of subpoena compliance...that would impair its duties." Id. Here, of course, the BBC is experiencing that burden, having responded to no less than four subpoenas, three from Plaintiffs' counsel alone, seeking these outtakes and testimony.

BBC. Pl. Opp. Ex. H. p. 10. As Plaintiffs have not shown that Abu Rumaileh and Zubaidi were persons with the authority to make admissions on behalf of Defendant organizations, their statements would not be admissible under Fed. R. Evid. 801(d)(2) as admissions of a party opponent.

Nor have Plaintiffs shown that the statements were "declarations against interest" made by "unavailable" witnesses. Fed. R. Evid. 804(b). Given the politics of the situation, and the opportunity to get their point of view known, Abu Rumaileh's and Zubaidi's statements to the BBC are not "so far contrary" to their respective interests so as to "clearly indicate" truthfulness, as Plaintiffs concede they must. Pl. Opp. 11.

To be sure, neither man spoke under oath and both attempted to promote his own points of view at the time, which may not necessarily have been adverse to him or the PA, as Plaintiffs contend. See generally Sayigh Decl. ¶¶37-38. Statements such as these that at the time further the speaker's own interests do not qualify as admissible under Fed. R. Evid. 804(b)(3). See, e.g., U.S. v. Bahadar, 954 F.2d 821, 828 (2d Cir. 1992)("[R]ule 804(b)(3) requires that the statement—to be admissible—must have been, at the time it was made, so far contrary to the declarant's best interests that a reasonable person would not make the statement unless the declarant believed it to be true."); Rotheram v. Manpower Demonstration Research Corp., No. 88 Civ. 0774(JMW), 1989 U.S. Dist. LEXIS 13728, at *3-4 (S.D.N.Y. Nov. 20, 1989)(statements inadmissible as hearsay as they "were not against [speaker's] interest when made" and "were consistent with his pecuniary interest"). See also 5-804 Weinstein's Federal Evidence § 804.06(4)(d)(iii) (2011)("[i]f the statement or any part of it serves the declarant's interest, it is not admissible as a statement against interest.").

Moreover, Plaintiffs' contention that these statements were "likely" to render Abu Ramaileh and Zubaidi criminally or civilly liable (Pl. Opp. 13) is speculative at best. It is belied by Plaintiffs' failure to show that in the eight years since the statements were made, either man was prosecuted or sued civilly because of those statements to the BBC.

As well, Plaintiffs disregard the law on "unavailability," which requires that they first must have made a reasonable good-faith effort to obtain Zubaidi's and Abu Rumaileh's presences and been unable to obtain to do so. Barber v. Page, 390 U.S. 719, 724 (1968)("In short, a witness is not 'unavailable'…unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial"). As shown, supra, Plaintiffs' predictions of futility (Pl. Opp. 12 and n.6) are based on faulty assumptions. See Sayigh Decl.¶¶20, 22-31 and Point I D, supra). In any event, these predictions do not relieve Plaintiffs of making such an effort. Barber v. Page, supra.

None of Plaintiffs' cited cases (Pl. Opp.12) assist them on this point. None involved statements, as here, by non-parties that had not been deposed or even requested to appear. Rather they dealt with parties, or witnesses who had been deposed and indicated, by sworn or other statement, their unwillingness to appear at trial.[16]

Lastly, the Rumaileh and Zubaidi statements, as they were not made under oath and as they further the speaker's own agendas, have no "circumstantial guarantees of trustworthiness"

---

[16] See Pl. Opp. 12: U.S v. Kehm, 799 F. 2d 354 (7th Cir. 1986)(witness submitted an affidavit that he would not voluntarily come to the U.S. for trial for fear of being indicted, his deposition was taken in the Bahamas and court permitted its use at trial ); U.S. v. Lopez, 777 F.2d 543 (10th Cir. 1985)(indicted co-conspirator failed to appear at trial, jumped bail and search warrant returned unsatisfied); U.S. v. Terrazas-Montano, 747 F.2d 467 (8th Cir.1984)(witnesses gave videotaped depositions while in INS custody and before being deported told INS that they would not return to the U.S. as witnesses). Nor does McIntyre v. Reynolds Metals Co., 468 F.2d 1092 (5th Cir. 1972)(Pl. Opp. 12) help Plaintiffs. In that case, the Court reversed the admission into evidence of a witness' previous recorded statement, because although the witness' deposition was permitted, his recorded statement should have been excluded as hearsay. Likewise, Zubaidi and Abu Rumaileh's recorded statements to the BBC here are hearsay and inadmissible.

under Rule 807, as Plaintiffs content. See Sayigh Decl. ¶¶35-40. Admitting these hearsay statements into evidence here will not further the interests of justice, or serve the public policy behind ATA suits. Pl. Opp. 12. Nor will that policy be harmed by excluding these hearsay statements. This is particularly so, as there exist more direct and first-hand sources for whether the relationships in issue exists that are reasonably available to Plaintiffs. See Point I D supra; Sayigh Decl.¶¶ 35-40.

Accordingly, as Zubaidi and Abu Ramaileh's statements to the BBC are inadmissible, the Second Subpoena should be quashed. See, e.g., U.S. v. Hubbard, 493 F.Supp. 202, 205 (D.D.C.1979) (non-party subpoena quashed because information sought from reporter was hearsay, and since they were available first hand sources, it was "merely cumulative and less than the best evidence available."). See also BBC Mem. 23.

## CONCLUSION

For the foregoing reasons and those in the BBC's moving memorandum, the BBC's Motion to Quash the Subpoena should be granted in its entirety, and Plaintiffs' Motion to Compel should be denied in all respects.

Dated:   New York, New York        MILLER KORZENIK SOMMERS LLP
         November 18, 2011

By _____
              Louise Sommers
              David S. Korzenik
              Itai Maytal
         488 Madison Avenue Suite 1120
         New York, New York 10022-5702
         Phone 212-752-9200  Fax 212 688 3996
         lsommers@mkslex.com
         Attorneys for The British Broadcasting Corporation

# MILLER KORZENIK SOMMERS LLP

488 MADISON AVENUE • NEW YORK, NEW YORK 10022-5702
TEL 212.752.9200 • FAX 212.688.3996 • WWW.MKSLEX.COM

December 13, 2011

By Federal Express

Hon. Ronald L. Ellis
Magistrate Judge, S.D.N.Y.
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St., Rm. 18D
New York, NY 10007-1312

Re:    Sokolow et. al. v. The Palestinian Liberation Organization et. al., 04-CV-00397
       (GBD)(RLE)

Dear Magistrate Judge Ellis:

We represent the British Broadcasting Corporation (the "BBC") in the above captioned action.
Presently pending is the BBC's Motion to Quash the Subpoena issued on behalf of Plaintiffs
seeking BBC testimony and materials, including outtakes of two BBC interviewees from the
program "Arafat Investigated," and Plaintiffs' Cross Motion to Compel.

As their reply submission on their Cross Motion to Compel, Plaintiffs have submitted the
Declaration of Jeremy Stern, a Jerusalem lawyer, which purports to set forth for the first time
"dispositive issues of Israeli law" (Stern Decl. ¶3), presumably to contend that the BBC
interviewees – neither of which are alleged to have participated in the attacks at issue in this case
– cannot be reached in the West Bank. Yet Plaintiffs have not complied with Fed.R.Civ. P. 44.1,
as is requisite. They did not give reasonable notice that they intended to raise an issue about
Israeli law, so as to prevent unfair surprise to the BBC, particularly on a reply as the last word.
The BBC has not had the opportunity to evaluate and offer the opinion of its own foreign legal
expert as to Israeli law. Accordingly, the Stern Declaration should be disregarded. See, e.g., In re
Magnetic Audiotape Antitrust Litigation, 334 F. 3d 204 (2d Cir. 2003).

The Stern Declaration should be disregarded in any event as it contains new matter improperly
offered for the first time on reply. It purports to rebut legal opinion of BBC's expert Dr. Yezid
Sayigh, but Dr. Sayigh, who is not a lawyer, *never offered any legal opinion*. All of Dr. Sayigh's
opinions rebutted *political* issues raised by Plaintiffs' expert Professor Barry Rubin, or showed
the practical existence of the interviewees and others as alternative sources for the information
sought from the BBC. Indeed, the opinion offered by Plaintiffs' political expert Rubin *assumed*
that Israeli courts could issue the type of order compelling testimony (Rubin Decl.¶10) that Stern
now asserts is neither permitted nor enforceable under Israeli law. See Stern Decl.¶¶5-9.

Hon. Ronald L. Ellis                    2                         December 13, 2011
Magistrate Judge, S.D.N.Y.

The Stern Declaration is improper as well, as it is based entirely on purported self-translated excerpts of Israeli case law, which, according to Stern (¶¶6 n.1, 7, 11, 16), is in Hebrew and requires an Israeli database subscription. That case law has not been provided to the BBC or the Court, much less in a requisite certified independent English translation. Moreover, the law according to the Stern Declaration is contradicted by Israeli government communiques and policy, as well as Stern's own closing statements.

Accordingly, the Stern Declaration and all arguments premised thereon should be disregarded out of hand. Alternatively, the BBC respectfully requests that the Court grant it leave to file the enclosed Sur-reply.

Respectfully submitted,

*Louise Sommers*

Louise Sommers

enc.

cc:      Robert J. Tolchin, Esq. (by Federal Express)
         The Berkman Law Office, LLC
         111 Livingston Street, Suite 1928
         Brooklyn, New York 11201
         *Attorneys for Plaintiffs Mark I. Sokolow et al.*

         Brian A. Hill, Esq. (by Federal Express)
         Miller & Chevalier, Chartered
         655 Fifteenth Street, N.W.
         Suite 900
         Washington, DC 20005
         *Attorneys for Defendants PLO and PA*

UNITED STATES DISTRICT COURT
S DISTRICT OF NEW YORK

----------------------------------------------------------------------x

MARK I. SOKOLOW et al.,                            :    04-CV-00397 (GBD)(RE)
                                                   :
                                                   :
                              Plaintiffs,          :
                                                   :
              -against-                            :        ECF CASE
                                                   :
                                                   :
THE PALESTINIAN LIBERATION ORGANIZATION,  :
et al,                                             :
                              Defendants.          :
                                                   :
----------------------------------------------------------------------x

### SUR-REPLY OF THE
### BRITISH BROADCASTING CORPORATION
### IN OPPOSITION TO PLAINTIFFS' CROSS MOTION TO COMPEL

Miller Korzenik Sommers LLP
488 Madison Avenue, Suite 1120
New York, NY 10022
(212) 752-9200
lsommers@mkslex.com
*Attorneys for The British*
*Broadcasting Corporation*

## SUR-REPLY OF THE BRITISH BROADCASTING CORPORATION
## IN OPPOSITION TO PLAINTIFF'S CROSS MOTION TO COMPEL

The British Broadcasting Corporation (the "BBC") submits this Sur-reply in further opposition to Plaintiff's Cross Motion to Compel, occasioned by the Declaration of Jeremy Stern ("Stern Decl.") presented for the first time as Plaintiffs' reply submission. Plaintiffs' Motion to Compel should be denied.

### ARGUMENT

### I.    THE STERN DECLARATION SHOULD BE DISREGARDED

**A. *The Stern Declaration Violates Fed. R. Civ. P. 44.1.***    Under Rule 44.1, "[a] party who intends to raise an issue concerning the law of a foreign country shall give notice by pleadings or other reasonable written notice." The Stern Declaration purports to set forth "dispositive issues of Israeli law" (Stern Decl. ¶¶3; 5, 6-8, 11-15), presumably to contend that the two BBC interviewees Zakaria Zubaidi and Ata Abu Ramaileh – neither of whom is alleged to have participated in the attacks at issue in this case – cannot be reached in the West Bank. Yet Plaintiffs failed to give notice that they intended to raise Israeli law before submitting this reply.

As provided by Rule 44.1, a party must supply the opposing party with *reasonable notice* that an issue concerning foreign law will be raised. See, e.g., In re Magnetic Audiotape Antitrust Litigation, 334 F. 3d 204 (2d Cir. 2003); Trabucco v. Intesa Sanpaolo, S.p.A., 695 F. Supp. 2d 98, 107 (S.D.N.Y. 2010). As the rule is intended to avoid "unfair surprise," reasonable notice is determined by factors such as "the stage which the case had reached at the time of the notice, the reason proffered by the party for his failure to give earlier notice, and the importance to the case as a whole of the issue of foreign law sought to be raised." Fed. R. Civ. P. 44.1, Advisory Committee Notes (1966). If a party fails to give reasonable notice, the Court need not apply or consider the foreign law later raised. See, e.g., In re Magnetic Audiotape Antitrust Litigation, supra, 334 F. 3d at 209; Trabucco v. Intesa Sanpaolo, S.p.A., supra, 695 F. Supp. at 106 n.1.

1

Here, Plaintiffs gave no reasonable written notice to the BBC or the Court that they would raise issues concerning Israeli law before doing so on reply, thereby affording the BBC no right to respond. And although they raise Israeli law under the guise of rebutting opinions of BBC's expert, Dr. Yezid Sayigh (See Stern Decl. ¶3), Dr. Sayigh is not a lawyer and, as shown (subpoint B. infra), he did *not* offer any legal opinions. Moreover, the use of Israeli law would not relieve Plaintiffs of their obligation to pursue the information sought from the BBC from other available sources.[1] Thus, the BBC has suffered the very type of unfair surprise Rule 44.1 was designed to avoid.

Indeed, any consideration of the Stern Declaration would invite the kind of "battle-by-affidavit of international legal experts" inquiry that the Second Circuit has discouraged when dealing with discovery involving foreign tribunals. See, e.g., Euromepa S.A. v R. Esmerian, Inc., 51 F3d 1095, 1099 (2d Cir 1995)("We think that it is unwise… for district judges to try to glean the accepted practices and attitudes of other nations from what are likely to be conflicting and, perhaps, biased interpretations of foreign law.").[2] Having failed to comply with Rule 44.1 and provide reasonable notice of its intent to raise foreign law – which is all the Stern Declaration purports to do – the Stern Declaration should be disregarded.

**B. *The Stern Declaration Improperly Presents New Matter on Reply.*** To prevent unfairness to litigants, courts apply a general rule that "new arguments may not be made in a reply brief." Ernst Haas Studio, Inc. v. Palm Press, Inc., 164 F.3d 110, 112 (2d Cir.1999) (citation omitted). When present, such new arguments are deemed improper and disregarded. See, e.g., Export-Import Bank of U.S. v Hi-Films S.A. de C.V., 09 CIV 3573 PGG, 2010 WL

---

[1] See BBC Reply Memorandum of Law in Support of Motion to Quash Subpoena and in Opposition to Plaintiffs' Cross-Motion to Compel (Dkt#164) ("BBC Reply Mem") pp. 16-18.

[2] Should the Court consider the Stern Declaration, the BBC respectfully requests an opportunity to respond to its legal assertions through its own Israeli law expert.

2

3743826, at *12 n.4, 2010 U.S. Dist. LEXIS 100927, at *35 n.4 (S.D.N.Y. Sept. 24, 2010).

Scherer v Equit. Life Assur. Socy. of U.S., 01 CIV. 10193(CSH), 2004 WL 2101932, at *5 n.1,

2004 U.S. Dist. LEXIS 18875, at *14 n.1 (S.D.N.Y. Sept. 21, 2004). Here, the Stern Declaration

contains nothing but new matter, asserted for the first time on reply.

Plaintiffs proffer the Stern Declaration pretextually, claiming that it rebuts the response

offered by BBC's expert, Dr. Yezid Sayigh (Dkt #165), to opinions of Plaintiffs' expert,

Professor Barry Rubin. Stern Decl. ¶3. However, neither Dr. Sayigh nor Professor Rubin, both

non- lawyers, offered opinions regarding the content and restrictions of Israeli law. This is new

matter offered by the Stern Declaration for the first time. It thus should be disregarded. [3]

Indeed, in asserting for the first time that Israeli law (i) does not permit Israeli courts to

compel testimony from West Bank Palestinians, and (ii) recognizes the inability to enforce court

orders and process against such residents (Stern Decl. ¶¶5-8), the Stern Declaration directly

contradicts the stated basis of an opinion earlier offered by Plaintiffs' expert Professor Rubin.

Rubin purported to offer his political opinion "whether... Abu Rumaileh and/or Zubaidi would

comply with an order from an Israeli court directing them to appear to be deposed by attorneys

for the plaintiff in this case." See Exhibit I to Plaintiffs' Reply Memorandum of Law In Support

of Its Cross-Motion to Compel - Declaration of Professor Barry Rubin (Dkt#159-9) ("Rubin

Decl.") ¶10. That question was obviously based on the assumption that Israeli courts had the

power to issue an enforceable order compelling testimony. Otherwise, Rubin's political opinion

would have been pointless. See Rubin Decl. ¶¶11, 15-17.

Now, however, after the BBC's expert, Dr. Sayigh, has shown Rubin's political opinion

to be faulty (Sayigh Decl.¶¶17, 19-28), Plaintiffs attempt to rehabilitate their position by

switching theories on their reply, claiming now as a legal matter that Israeli courts do not permit

---

[3] Dr. Sayigh's demonstration of the faulty opinions offered in Professor Rubin's Declaration is otherwise unchallenged by Plaintiffs.

3

and cannot enforce the very order on which they based Rubin's political opinion in the first place. Stern's legal assertions are clearly new matter, improper on reply.

Nor did Dr. Sayigh opine on the legal question that an Israel court could compel Palestinians in the West Bank to testify, as Stern asserts. Stern Decl. ¶¶4, 9. To the contrary, Dr. Sayigh was quite clear that he was refuting the Rubin Declaration's faulty assumptions as to the *political motivations and activities* of Israeli or Palestinian authorities, or potential witnesses and their *practical accessibility.* Sayigh Decl. ¶¶2, 17-18, 20, 24, 26. The Stern Declaration, which mischaracterizes the Sayigh Declaration (Stern Decl. ¶¶3-9) and then attacks the resulting straw man, is new matter for this reason as well and should be disregarded.

In any event, the new matter raised by the Stern Declaration cannot be assessed on its merits as it relies on self-translated excerpts of Israeli cases that have not been provided to the parties or the Court, and are, according to Stern, available only in Hebrew to subscribers of an Israeli database. See Stern Decl. ¶6-7, 11, 16.[4] The Stern Declaration fails to provide not only full copies of those cases to be considered in their entirety, but also certified English translations from an independent translation service. As it stands, the BBC cannot accept the representation that the excerpts of Israeli decisions are "accurate translations of the original Hebrew." See Stern Decl. ¶6 n.1. The Court should not, either. See, e.g., Shapiro v. Ferrandina, 478 F.2d 894, 912 (2d Cir. 1973)(Court denies extradition on a particular charge because "the certified translation of Israeli law in the record contains no translation of the applicable criminal provision.").[5] Thus,

---

[4] The Stern Declaration indicates that the cases it references are published in "Nevo." An Internet search for "Nevo" revealed Nevo Press Ltd, (www.nevo.co.il), which, according to the U.S. Law Library of Congress is an Israeli commercial legal database available only in Hebrew. See Law Library of Congress, http://loc.gov/law/help/israel.php (last visited December 5, 2011).

[5] Weiss v. La Suisse, Societe D'Assurances Sur La Vie, 293 F. Supp. 2d 397, 404 n.2 (S.D.N.Y. 2003)("Citations to page numbers in Swiss decisions is, in all cases, to the certified translation provided to this Court."). See also Amvest Corp. v. Mayoral Amy, 778 F. Supp. 2d 187, 200, n.10 (D.P.R. 2011).(District Court was unable to consider Puerto Rico state law cases cited by plaintiff, where cases

4

the completeness, accuracy and substance of the Stern Declaration cannot be evaluated on the merits. For this reason too, the Stern Declaration should be disregarded in its entirety.

## II. THE STERN DECLARATION IS FAULTY

The Stern Declaration is in any event faulty, and does not relieve Plaintiffs of their obligation to pursue alternative sources for the information they seek from the BBC.

First, the Stern Declaration's argument that "an Israeli court could not compel testimony from Palestinians in the West Bank for use in this case" (Stern Decl. ¶9) is contradicted by the basis for political opinions offered by Plaintiffs' expert Professor Rubin. See pp. 3-4, supra.

Second, the Stern Declaration's pronouncement that Israeli law bars Israelis and non-Israelis holding Israeli entry visas are barred from entering West Bank cities (Stern Decl. ¶11), does not square with Israeli government communiqués and policy. The Court can take judicial notice of a communiqué posting by the Israeli Ministry of Foreign Affairs that shows that the Israeli government has permitted Israeli Arabs to visit West Bank cities since 2009. Israeli Ministry of Foreign Affairs, *Jalama/Gilboa crossing upgraded for vehicular traffic*, Nov. 11, 2009, http://www.mfa.gov.il/MFA/Government/Communiques/2009/Gilboa_crossing_upgraded_11-Nov-2009.htm. Given that the Israeli government's own posting shows that Israel opened up the passage to Jenin so that Israeli Arabs, tourists and others can shop and visit, it strains credulity to accept the Stern Declaration's contrary assertions. [6]

---

were only available in Spanish language and plaintiff failed to provide Court with certified English translations of cases.).

[6] See also Office of the Quartet Representative Tony Blair, *Quartet Representative Tony Blair visits Nazareth and Jenin, travelling along the Nativity Route*, June 20, 2011, http://www.tonyblairoffice.org/quartet/news-entry/quartet-representative-tony-blair-visits-nazareth-and-jenin-travelling-alon/ ("While the most positive economic impact of the [2009 opening of the Jalameh] crossing stems from Arab-Israelis visiting Jenin, the crossing is also now accessible to foreign tourists travelling along the Nativity Route").

5

Third, even so, the Stern Declaration itself nevertheless provides a clear path for U.S. visitors to proceed into the West Bank. It concedes that they could do so with a "special permit" obtained from "the Israeli military commander of the West Bank or his authorized subordinate," or through "travel to the West Bank via Jordan." See Stern Decl. ¶¶15, 16.

Lastly, the Stern Declaration's assertions that the BBC interviewees in the West Bank are beyond reach under Israeli law, even if accurate – which, as shown, is doubtful – is not dispositive. As the BBC has clearly demonstrated, the *information* that Plaintiffs seeks from them is available from numerous other sources, many of which are primary and available outside the West Bank – or even outside Israel. See examples at BBC Reply Mem. pp. 11-12, 16-18. These other sources should be pursued – not the BBC, whose materials and interviews do not address and are not linked to the attacks in issue here, and are thus neither unique nor relevant. See Decision and Order, December 9, 2011 (Dkt#171) (Plaintiffs did not satisfy Rule 26 relevance standard in seeking Court-issued Hague letter to depose witness not linked to or shown to have participated in attacks in issue). The BBC materials and testimony sought should not be compelled.

## CONCLUSION

For the foregoing reasons and those in the BBC's principal memorandum, Plaintiff's Cross Motion to Compel should be denied.

Dated:   New York, New York      MILLER KORZENIK SOMMERS LLP
         December 13, 2011

By_____
         Louise Sommers
         David S. Korzenik
         Itai Maytal
         488 Madison Avenue Suite 1120
         New York, New York 10022-5702
         212-752-9200
         lsommers@mkslex.com
         Attorneys for The British Broadcasting Corporation

6

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

| | | |
|---|---|---|
| MARK I. SOKOLOW et al., | : | 04-CV-00397 (GBD)(RE) |
| | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| -against- | : | ECF CASE |
| | : | |
| | : | |
| THE PALESTINIAN LIBERATION ORGANIZATION, | : | |
| et al, | : | |
| Defendants. | : | |
| | : | |

-------------------------------------------------------------------x

**THE BBC'S COUNTER NOTICE TO CORRECT MISSTATEMENTS MADE BY
PLAINTIFFS IN THEIR "NOTICE" FILING OF JANUARY 24, 2012**

Miller Korzenik Sommers LLP
488 Madison Avenue, Suite 1120
New York, NY 10022
(212) 752-9200
lsommers@mkslex.com
*Attorneys for The British
Broadcasting Corporation*

**THE BBC'S COUNTER NOTICE TO CORRECT MISSTATEMENTS MADE BY
PLAINTIFFS IN THEIR "NOTICE" FILING OF JANUARY 24, 2012**

The British Broadcasting Corporation (the "BBC") opposes Plaintiffs' "Notice of

Relevant Facts Concealed by the BBC" ("Pl. Notice"), which misrepresents the facts it purports

to assert. As shown, Plaintiffs' charge that the BBC "concealed" relevant facts is false and

disingenuous. Plaintiffs have misrepresented (i) the Declaration they now purport to proffer, as

well as any significance to the matters at issue here, (ii) the BBC's position, made plain in its

Motion to Quash, and (iii) the controlling standards that mandate a grant of the BBC's Motion to

Quash Plaintiffs' Subpoena, and a denial of Plaintiffs' Cross Motion to Compel.

- **The BBC did not "Conceal" the Heideman Declaration, Which Neither Indicates
Nor Implies that Heideman was "Almost Murdered In the Process" of Interviewing
Zakaria Zubaidi.** Plaintiffs assert that the BBC somehow "concealed" from the Court that

Richard D. Heideman, Esq. ("Heideman"), an attorney for the plaintiffs in Klieman v. Palestinian

Authority, Civ No. 04-1173 (D.D.C.), had claimed in a Declaration submitted in the Klieman

case that he met with Zakaria Zubaidi ("Zubaidi"), one of the BBC interviewees, in the West

Bank and "was almost murdered in the process." Pl. Notice ¶3. This assertion is plainly false.

The Declaration in question does not state or imply in any respect that Heideman was

"almost murdered in the process" of interviewing Zubaidi. He asserts only that after speaking

with Zubaidi on a variety of topics, he was threatened with a warning to leave and not return. He

does not indicate that his life was in any immediate danger or that he was threatened with any

bodily harm, much less that he was "almost murdered." See Exhibit A to Pl. Notice.

Nor did the BBC "conceal" that Declaration or its contents from the Court.

First, the BBC did not learn about this Declaration or its contents until after the BBC

filed its last permitted submission on the subpoena motions. Thus, that Declaration is dated

1

November 30, 2011, almost two weeks after the BBC filed its November 18, 2011 reply brief on

its Motion to Quash. See BBC Reply Memorandum of Law in Support of Motion to Quash And

Memorandum in Opposition to Plaintiffs' Cross Motion to Compel (Dkt#164) ("BBC Reply").

Second, that Declaration raises more questions than it answers. It reveals only some facts

surrounding the Zubaidi interview, and does not disclose the entirety of what was said or even its

precise date in February.[1] Nor does it reveal how the interview was obtained. What it does make

clear, however, as shown below, is that Zubaidi was accessible in the West Bank, thereby

contradicting Plaintiffs' position here.

Third, Plaintiffs contend that <u>Klieman</u> is a "related" case (Pl. Notice ¶3). Presumably

then, they or their counsel (unlike the non-party BBC) were apprised of Heideman's February

2011 interview with Zubaidi within the nine months since it occurred and/or of the Declaration

itself. They could have timely raised that matter in their submissions on the subpoena motions

here, if they deemed it relevant. They did not do so.

In light of the circumstances here, it is disingenuous for Plaintiffs to claim that the BBC

concealed any relevant matter from this Court. It did not.

- **<u>The Heideman Declaration is Not "Salient" to this Matter, Except Insofar As it
Demonstrates, Contrary To Plaintiffs' Contentions, That Zubaidi Could Be Reached in the
West Bank, and That Israeli Law Does Not Preclude Such Travel There</u>**. The Heideman

Declaration lends no support whatsoever to Plaintiffs' Motion to Compel. If anything, it refutes

Plaintiffs' reply Declaration of Jeremy Stern, which claimed that Israeli law precluded reaching

Zubaidi by traveling to the West Bank. See Declaration of Jeremy Stern dated November 30,

---

[1] Indeed, Plaintiffs are no doubt aware that the Palestinian Authority wrote a letter dated December 12, 2011 to the <u>Kleiman</u> Court noting that the <u>Klieman</u> plaintiffs had failed to provide it with full discovery regarding the circumstances of the Heideman/Zubaidi interview in the nine months since it occurred. Civ No. 04-1173 D.D.C., Dkt#138, Ex. B.

2011 (Dkt#168), ¶¶10-16. [2] Taken on its face, the Heideman Declaration demonstrates that Heideman traveled to the West Bank and interviewed Zubaidi.

Nevertheless, that Declaration and that attorney's informal interview with Zubaidi in February 2011 are simply not "salient" here, where proper discovery channels are available to Plaintiffs. And, as Plaintiffs are aware (See January 11, 2012 Letter to Magistrate Judge Ellis from Louise Sommers for the BBC), at some point after the briefing concluded on the pending subpoena motions, Zubaidi surrendered himself to the custody of the Defendant PA. See, e.g., Avi Issacharoff, *Palestinian Pardoned By Israel Put Back on Wanted List*, HAARETZ.COM (Dec. 29, 2011); Gil Ronan & Elad Benad, *Top Terrorist Turns Himself In After Pardon Cancelled*, ISRAELNATIONALNEWS.COM (Dec. 29, 2011), annexed hereto as Exhibit 1.

Accordingly, contrary to Plaintiffs' contentions in their Notice and submissions on the pending motions, Zubaidi is no longer (if he ever was) at any place where Plaintiffs could not reach him for testimony, or where he could theoretically pose a threat to any visitor. He is rather under the physical custody and undeniable control of Defendant PA, a party to this lawsuit subject to the jurisdiction of this Court. That party can be ordered to produce him for an interview or testimony upon a proper showing.

- **The Heideman Declaration Is Not "Dispositive" of this Subpoena Matter.** The availability of Zubaidi for an interview is not the sole criteria by which disclosure of the BBC footage should be determined. Nor is the availability of Ata Abu Rumailleh, the other BBC

---

[2] The Stern Declaration violates Fed. R. Civ. P. 44.1, as Plaintiffs failed to give reasonable notice that they intended to raise issues of Israeli law, and should be disregarded for that reason alone. See, e.g., In re Magnetic Audiotape Antitrust Litigation, 334 F. 3d 204 (2d Cir. 2003). Even so, it raises new matter improperly offered for the first time on reply, purporting to rebut *legal* opinions of BBC's expert that were never offered. And it is improperly based on self-translated excerpts of Israeli case law in Hebrew that has not been provided to the BBC or the Court, is not available except with an Israeli database subscription and is not in an *independent* certified English translation. It is moreover, contradicted by Israeli government communiques and policy. See Letter dated December 13, 2011 to Magistrate Judge Ellis from Louise Sommers for the BBC.

3

interviewee who, contrary to Plaintiffs' characterization, has not been described as a "terrorist" and was not, in any event, purportedly visited by Heideman. Rather, as the BBC has demonstrated, it is the underlying information sought from the BBC and not its particular footage that is significant. See BBC Memorandum of Law in Support of Motion to Quash Subpoena (Dkt#142) ("BBC Mem.") pp.19-20; BBC Reply Memorandum of Law in Support of Motion to Quash And Memorandum in Opposition to Plaintiffs' Cross Motion to Compel (Dkt#164) ("BBC Reply") pp. 16-18.

Here, the Plaintiffs can obtain the underlying *information* at issue – proof of whether the Al-Aqsa Martyrs Brigades ("Al-Aqsa") and Fatah or the PLO are the same organization – directly from Defendants PLO and PA, or from the numerous other witnesses and documents which can provide first-hand information – rather than second-hand hearsay from the BBC. Many of these sources are primary and available outside the West Bank. See examples at BBC Reply Mem. pp. 11-12, 16-18. See also Reply Declaration of Dr. Yezid Sayigh (Dkt #165) ("Sayigh Decl.") ¶¶18, 35-40. Indeed, the BBC materials and interviews do not address and are not linked to the attacks in issue here, and are thus neither unique nor relevant. See Decision and Order, December 9, 2011 (Dkt#171) (Plaintiffs did not satisfy Rule 26 relevance standard in seeking Court-issued Hague letter to depose witness not linked to or shown to have participated in attacks in issue).

- **The BBC Demonstrated Numerous Grounds for Quashing Plaintiffs' Subpoena.**

Plaintiffs assert that the BBC opposed producing the subpoenaed footage "because plaintiffs' counsel could purportedly travel to the Palestinian-governed areas of the West bank in order to interview the terrorists" interviewed by the BBC. Pl. Notice ¶2. As the BBC's motion to quash demonstrates, however, the BBC provided at least six additional reasons why the compulsion sought by Plaintiffs is not warranted:

4

1. the Subpoena violates the territorial restrictions of Fed. R. Civ. P. 45; [3]

2. Plaintiffs' counsel already has the BBC Program at issue since the BBC previously provided it to Robert Tolchin – a fact that Plaintiffs have not denied; [4]

3. the BBC Outtakes and testimony sought are privileged under Federal and State Law and Plaintiffs have not overcome those privileges; [5]

4. there exists numerous alternative sources for the information sought, including but not limited to those convicted of the relevant attacks, and first hand documentary sources – which Plaintiffs have not denied; [6]

5. the BBC Program and the Outtakes contain inadmissible hearsay; [7] and

6. policy considerations outweigh compulsion.[8]

Plaintiffs have not overcome <u>any</u> of these grounds. Their instant Notice should be disregarded. The BBC's Motion to Quash should be granted and Plaintiffs' Cross-Motion to Compel should be denied.

MILLER KORZENIK SOMMERS LLP

Dated:   New York, New York      By _Louise Sommers_
         January 25, 2012           Louise Sommers
                                    David S. Korzenik
                                       Itai Maytal
                                    488 Madison Avenue Suite 1120
                                    New York, New York 10022-5702
                                    212-752-9200
                                    lsommers@mkslex.com
                                    Attorneys for The British Broadcasting Corporation

---

[3]  See BBC Mem. pp.8-12; BBC Reply pp. 3-9.

[4] See BBC Mem. p.1 n.1; Declaration of Nicola Cain, Barrister with the BBC, (Dkt#144) ¶3.

[5] See BBC Mem. pp. 14-21; BBC Reply pp. 13-17. See also Sayigh Decl. ¶¶18, 35-40.

[6] See BBC Mem. pp. 18-20; BBC Reply pp. 16-18. See also Sayigh Decl. ¶¶18, 35-40

[7] See BBC Mem. p. 23; BBC Reply pp. 20-23.

[8]  See BBC Mem. pp. 20-23; BBC Reply pp. 18-20; See also Reply Declaration of Jean-Francois Julliard, Secretary General to Reporters Without Borders (Dkt#166).

5

# EXHIBIT 1

Like 32k    Subscribe to the Print Edition    Haaretz Store    HAARETZ Toolb

# HAARETZ.com

Wed, January 11, 2012 Tevet 16, 5772

Now! Haaretz on your smartphone
Download the app now for free

Advanced   ⊙ Search Haaretz.com ○ S

NEWS   OPINION   JEWISH WORLD   THEMARKER   TRAVEL IN ISRAEL   CULTURE   PRINT EDITION   WEEKEND   BLOGS   Haaretz Store   Car F



**BREAKING NEWS**    20:38 | Jordan arrests activist for burning picture of King Abdullah (AP)     More Bre

Home   News   Diplomacy & Defense

Published 18:53 29.12.11 | Latest update 18:53 29.12.11

# Palestinian pardoned by Israel put back on wanted list

**Zakaria Zbeidi, the former commander of the Al-Aqsa Martyrs Brigades in Jenin who now runs the Freedom Theater, says he did not know his pardon was canceled.**

By **Avi Issacharoff**

Tags: West Bank   Jenin   Palestinian Authority

Send    76 people
recommend

**Get Haaretz on iPhone**      **Get Haaretz on Android**

Zakaria Zbeidi, the former commander of the Al-Aqsa Martyrs Brigades in Jenin who was pardoned by Israel two years ago, has been added to Israel's wanted list again.

In recent days, Palestinian security services informed Zbeidi that upon Israel's request, he must remain in the Palestinian Authority's detention facilities during all hours of the day and night, otherwise Israel will arrest him.

Print Page

Send to a friend

Comments

Share

Text Size **+** | **–**

Follow us on Twitter

Become a
Haaretz.com
Facebook friend

Zbeidi in Jenin during the second intifada, December 2009.

Photo by: Natasha Mozgovaya

This story is by:

Avi
Issacharoff

# Diplomacy & D

Gilad Shalit thanks France, G
assistance in release

Zbeidi confirmed the report to Haaretz, yet said he did not know why the pardon was rescinded. Last week, Palestinian security forces

arrested one of Zbeidi's brothers, along with one of the workers at Jenin's Freedom Theater, which Zbeidi directs.

In the summer of 2007, Zbeidi was among 200 wanted Fatah militants in the West Bank who turned in their weapons, under an arrangement in which Israel grantedthem effective amnesty as a gesture to PA Chairman Mahmoud Abbas.

**What could happen to the stock market if Republicans take back the White House?**

If you have a $500,000 portfolio, you should download the latest report by *Forbes* columnist Ken Fisher's firm. It tells you what we think may happen in the 2012 elections and why. This must-read report includes research and analysis you can use in your portfolio right now. Don't miss it!

Click Here to Download Your Report!

FISHER INVESTMENTS®

In 2009, actor Juliano Mer Khamis founded the Freedom Theater and appointed Zbeidi as its director. Zbeidi also began working as an official in the Palestinian Authority's prisoners division. The theater's founder, Mer-Khamis, was shot and killed last April. The case has not yet been solved.

33-year-old Zbeidi, one of the symbols of the second intifada, also garnered media attention for his relationship with Israeli left-wing activist Tali Fahima.


New! Haaretz on your android. Download the app now for free

### People who read this article also read:


**Israeli archaeologists find 1,500-year-old kosher 'bread stamp' near Acre**
(Haaretz - News)


**Le Figaro: Israel's Mossad recruiting Iranian dissidents to work against Tehran regime**
(Haaretz - News)


**Egypt tells Israel: Pilgrimage to tomb of Jewish holy man 'impossible' this year**
(Haaretz - News)


Paid Distribution
**Food Stamp Guidelines for Florida**
(eHow)


Paid Distribution
**Navy SEAL Who Punched Jesse Ventura for Anti-American Talk Should Get a Medal**
(The Stir By Cafe Mom)

[?]


vantage
there's a better way to rent
Thousands of NO FEE Renovated Apartments in Queens and Uptown Manhattan
Studio to 4-Bedroom apartments available
888.312.2180 | leasing@vantageliving.com

## Talk**Backs**

**Add a comment**

Name:

Why Facebook Connect?


4 comments


**IDF official: Ira stepping up e Assad regime**
5 comments


**Israel subsidiz Bank housing promise to U.**
96 comments


**Israeli says ex card info in re Saudi hack**
1 comments

## Haaretz Headli


**IDF official: Ira stepping up e Assad regime**
5 comments


**Gilad Shalit th Germany for a release**
4 comments


**Israel Police of into alleged ra Ethiopian imm**
15 comments


**Russia warns attack on Iran**
23 comments



*Protect Peace in the Middle East*


Show your Support for Israel

INTERNATIONAL FELLC OF CHRISTIANS AND J

Нв    Ru    Follow us:    Make n7 your Homepage    Hello Guest. Login/Register    Search    All



**On Super Bowl Sunday**
**Help make Sderot the winning team!**

Special Offer!
**Penthouse in Jerusalem**
for only $12 a month!



**Arutz Sheva 7**
www.IsraelNationalNews.com

| Main | News | Radio | More | Op-Eds | Judaism | Video | News Briefs
Main · Defense/Security · Middle East · Inside Israel · Jewish World · Global Agenda · Israel Sites and Sights

Free Daily Israel Report    Enter your email    Join

Join
The RAV's Siddur can
now be YOUR Siddur



KOREN MESORAT HARAV SIDDUR

**YouReport** Send us News & Updates

**Arutz 7 Most Read Stories**

**Visiting Catholic Bishops
Decide: "Gaza Is a Prison"**
Inside Israel 6:48 AM 1/11/2012

**UK Minister Calls For Divided
Jerusalem**
Global Agenda 10:25 PM 1/10/2012

**Israeli Hackers Publish Saudi
Credit Card Details**
Inside Israel 6:08 AM 1/11/2012

**How To Publish Your Book**
Download a Free Guide to Learn How to Publish
Your Book Affordably.
www.FreeenPress.com/How-to-Publish

**Have You Written A Book?**
Get Your Manuscript Published Now. Request Your
Free Publishing Guide.
www.iUniverse.com

**How To Publish A Book**
Get Your Childrens Publishing Guide Mailed To Your
Doorstep At No Cost.
childrensbook-publishing.com/Guide

**Self Publish Your Book**
No Set Up Fees Or Minimum Order! Create & Print
Your Own Book Online
www.Lulu.com
AdChoices ▷

**Check It Out**
▶ Vacation Rentals in Jerusalem
▶ We Pray For You
▶ Quit Smoking with E-Z
▶ Clary's Wigs
▶ Toralıs, Tefillin & Mezuzot
▶ Sefer Torah Net

Main > News > Defense/Security

## Top Terrorist Turns Himself In after Pardon Cancelled

Fatah terrorist Zakaria Zubeidi turns himself in after the IDF cancels his pardon.
By Gil Ronen & Elad Benari

First Publish: 12/28/2011, 8:42 PM / Last Update: 12/28/2011, 11:33 PM

Zakaria Zubeidi, the former Fatah
leader in Jenin, turned himself in to the
Palestinian Authority on Thursday
evening.

Earlier, Zubeidi told the Ma'an news
agency that Israel had canceled his
pardon and instructed him to hand
himself in to the Palestinian Authority
(PA).

Zubeidi, who headed the Al-Aqsa
Brigades during the murderous terror
war launched by the PLO in 2000, told
the PA-based news agency he had
stuck to all the conditions of the
amnesty deal granted him by Israel three years ago.

Israel news photo: Flash 90

However, he said, Israel informed PA security forces on Thursday that Zubeidi's pardon
had been revoked, and that Israeli forces would detain him if he did not turn himself in.

Zubeidi was admired by an Israeli woman, Tali Fahima, who crossed the lines to
accompany him when he was wanted by the IDF. Fahima, who served jail time for
treasonous activities in the service of Fatah, has since been released and converted into
Islam.

Arutz Sheva has asked the Prime Minister's Office to comment on the report.

Tags: terrorist

**More on this topic**

Saudi Hamas Man Sentenced to 30 Months in Prison
Terrorist Nabbed in Attempted Attack in Samaria
Freed Terrorist: I Want to Finish My University Degree
Stabbing Attack Foiled in Gush Etzion Junction

| Recommend | Tweet | 25 |    6

comment    Send To    print
Friend

**Do You Have A Manuscript?**
Turn Your Good Book Into A Success.
Request Your Free Publishing Guide.
www.iUniverse.com

**Have You Written A Book?**
We'll Find A Publisher For You In 3 Easy
Steps. Start Now!
www.FindYourPublisher.com    AdChoices ▷



**Safiei: The Military
Spells the Haredim**



**IDF Spokesmen: No
Tears for Assassinated
Iranian Scientist**



**IDF to Haredim: No
Need to Watch Female
Singers**

◀                                                                  ▶

Comments  (5)

Currencies
US Dollar 3.840 ▲
More>

Weather Forecast
More>

Halachic Times
A shachar: 05:26
More>

Shabbat Times
16:16-17:35
More>

Support Arutz
Sheva
More>

**YOUR CELL PHONE
COMPANY IN ISRAEL**
1-866-TALKNSAVE




Donate Now!





Jews offering
new
alternatives to
Homosexuality









Learn
**HEBREW**
online
with Israel's
best teachers

**Sign Up**

**Have You Written A Book?** www.iUniverse.com
Get Your Manuscript Published Now. Request
Your Free Publishing Guide.

**Learn How To Self-Publish** www.FriesenPress.com/How-t
Download a Free Guide to Learn How to Bring
Your Book to Market.

**How To Publish A Book** christianbook-publishing.com/Guid
Get Your Childrens Publishing Guide Mailed To
Your Doorstep At No Cost.

**Self Publish Your Book** www.Lulu.com
No Set Up Fees Or Minimum Order! Create &
Print Your Own Book Online



*ilovetorah*
.com

| Post Comment | Open All comments |

**1. Top Terrorist's Pardon Cancelled**
Richard Cartwright, Grevatte, USA (29/12/011)

**2. the Idf must have good reason to revoke his freedom**
Ian, usa (29/12/011)

**3. Just why was he arrested, and not shot?**
Hebrew Handyman, Conway (30/12/011)

**4. We have some hungry alligators in Florida.**
Maxim, ISRAELOAMERICAN (30/12/011)

**5. Tali Fahima**
rick, NYC (2/1/012)







Home page, Contact, Staff, Advertise, Israel Tours, ז ערוץ שבע
© Arutz Sheva, All Rights Reserved

| **Main** | **News** | **More** | **Radio** | **Forums** | **Sites Of Interest** |
|---|---|---|---|---|---|
| Homepage | Send Us Breaking News | Blogs | Live | Main | Judaica Mail - Jewish Gifts. |
| Op-Eds | News Briefs | | Recorded Shows | Favorites | Jewish Gifts |
| Judaism | | | Jukebox | Personal Messages | Learn English - Watch Video. |
| Forecast | | | | | Kippah - Yarmulkes |
| Services | | | | | Jewish Music Video |
| Caricature | | | | | Yeshiva Businesses |
| Israel Pics | | | | | Kotel Cam. |
| | | | | | Israel Videos |
| | | | | | Shlock Rock |

# MILLER KORZENIK SOMMERS LLP

488 MADISON AVENUE • NEW YORK, NEW YORK 10022-5702
TEL 212.752.9200 • FAX 212.688.3996 • WWW.MKSLEX.COM

**By Hand Delivery**

April 11, 2012

Hon. Ronald L. Ellis
Magistrate Judge, S.D.N.Y.
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St., Rm. 18D
New York, NY 10007-1312

Re: Sokolow et. al. v. The Palestinian Liberation Organization et. al., 04-CV-00397 (GBD)(RLE)

Dear Magistrate Judge Ellis:

We represent the British Broadcasting Corporation (the "BBC") in the above captioned action. Presently pending are the BBC's Motion to Quash the Subpoena issued on behalf of Plaintiffs (Dkt#143) and Plaintiffs' cross Motion to Compel (Dkt#157).

We write to call the Court's attention to the enclosed decision handed down yesterday in Klieman v. Palestinian Authority, Civ. No. 1:04-cv-01173-PLF-JMF (D.D.C.), the case which is the subject of Plaintiff's January 24, 2012 Notice filing (Dkt#188)(and to which the BBC's January 25, 2012 Counter Notice filing (Dkt#190) responds). The Plaintiff in Klieman had subpoenaed the BBC for the same deposition testimony and accompanying documents sought by Plaintiffs here. (Compare Klieman Dkt#132 & 132-3 (Ex. B) with Sokolow Dkt #144 & 144-1 (Ex. A)). The BBC cross moved to quash that subpoena on the same grounds as shown here, while the plaintiff moved to compel disclosure.

Magistrate Judge John M. Facciola for the District Court for the District of Columbia granted the BBC's motion and denied Plaintiff's motion, ruling that, as the BBC demonstrated, "the only person [from the BBC] who could [provide the foundational deposition testimony sought by the Plaintiff's subpoena] is not in the United States and certainly not within 100 miles of this Court" (p. 3). The Subpoena was accordingly quashed as violating the territorial restrictions under Fed. R. Civ. P. 45(c)(3)(A)(ii).

Respectfully submitted,

Louise Sommers

enc.

cc:    **By E-mail**
       Robert J. Tolchin, Esq.
       The Berkman Law Office, LLC
       Attorneys for Plaintiffs

       Brian A. Hill, Esq.
       Miller & Chevalier, Chartered
       Attorneys for Defendants

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**ESTATE OF ESTHER KLIEMAN,** *et al.*,

    **Plaintiffs,**

    v.

**THE PALESTINIAN AUTHORITY,** *et al.*,

    **Defendants.**

Civil Action No. 04-1173
(PLF/JMF)

### MEMORANDUM ORDER

This case was referred to me for discovery. Currently pending and ready for resolution are Plaintiffs' Motion for an Order to Compel the Production of Documents Subpoenaed from the British Broadcasting Corporation [#132] and Non-Party British Broadcasting Corporation's Cross-Motion to Quash Subpoena [#137].

Plaintiffs are the survivors and heirs of Esther Klieman, a United States citizen who was killed on March 24, 2002 near Neve Tzuf, Israel. Complaint [#1] ¶ 1. Defendants are 1) the Palestinian Authority (also known as the Palestinian Interim Self-Government and the Palestinian National Authority) ("PA"), 2) the Palestinian Liberation Organization ("PO"), 3) the Al Aqsa Martyrs Brigade (also known as Martyrs of Al Aqsa) ("Al Aqsa"), 4) Fateh, 5) Tanzim, 6) Force 17, 7) Yasser Arafat, 8) Marwan Barghouti, 9) Tamer Rassam Salim Rimawi, 10) Hussam Abdul-Kader Ahemed Halabi, 11) Ahmed Hamad Rushdie Hadib, and 12) Anan Azis Salim Hashash. Id. ¶¶ 8-15. The suit is being brought under the Antiterrorism Act of 1991, 18 U.S.C.

§§2331 *et seq.*[1] ("ATA") as well as under additional statutes. Id.

In plaintiffs' current motion, they seek to compel third-party British Broadcasting

Corporation ("BBC")[2] to comply with a previously issued subpoena, which sought the following:

1)   An authentic, complete and unedited audiovisual copy of
     the BBC program titled "Arafat Investigated" which was
     broadcast by BBC on or about November 9, 2003
     ("Program"); and

2)   Authentic, complete and unedited audiovisual copies of all
     audiovisual recordings recorded during the preparation and
     making of the Program and/or for the purpose of preparing
     and making the Program which relate to the interviews with
     Ata Abu Rumaileh and Zakaria Zubaidi, including all such
     recordings of said interviews with Ata Abu Rumaileh and
     Zakaria Zubaidi which were not ultimately included in the
     Program which was broadcast ("Outtakes"); and

3)   Foundational deposition testimony from a knowledgeable
     employee of BBC regarding the authenticity of the Program
     and the Outtakes, and the manner in which they were
     created and stored by BBC, for the purpose of establishing
     their admissibility as "business records."

[#132-1] at 5-6.

Service of the subpoena was made by plaintiffs on the BBC's Washington, D.C. Bureau

office. [#132-1] at 7. It noticed a deposition *duces tecum* for September 28, 2011 at 9:30 a.m. in

Washington, D.C. Id. On September 26, 2011, the BBC e-mailed plaintiffs' counsel objecting to

the subpoena and stating the following: "We are not aware of any urgency and therefore consider

---

[1] All references to the United States Code or the Code of Federal Regulations are to the
electronic versions that appear in Westlaw or Lexis.

[2] "The BBC is a British public service broadcaster that, among other programming,
provides independent news programs to the global public about issues of international concern."
[#137-1] at 3.

2

that the subpoena does not grant the BBC a reasonable time to comply. Further, we can confirm that there is no employee, officer or other suitable person with knowledge of the relevant matters who works, resides or regularly transacts business within 100 miles of the location of the subpoena/issuing court." Id. On November 9, 2011, plaintiffs filed the instant motion and shortly thereafter, on December 5, 2011, the BBC filed its cross-motion to quash.

The uncontradicted representation by the BBC in that e-mail, now confirmed by statements in BBC's papers, means that the only person who can meet the qualifications of paragraph 3 of the subpoena is not in the United States and certainly not within 100 miles of this Court. Accordingly, the subpoena must be quashed. Fed. R. Civ. P. 45(c)(3)(A)(ii).

It is therefore, hereby,

**ORDERED** that Plaintiffs' Motion for an Order to Compel the Production of Documents Subpoenaed from the British Broadcasting Corporation [#132] is **DENIED** and Non-Party British Broadcasting Corporation's Cross-Motion to Quash Subpoena [#137] is **GRANTED**.

**SO ORDERED.**



Digitally signed by John M. Facciola
DN: c=US, st=DC, ou=District of Columbia,
email=John_M._Facciola@dcd.usco urts.gov, o=U.S. District Court, District of Columbia, cn=John M. Facciola
Date: 2012.04.10 15:57:47 -04'00'

JOHN M. FACCIOLA
UNITED STATES MAGISTRATE JUDGE

3

APPENDIX Page 171

```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF NEW YORK
 2

 3    ------------------------------------X
                                         :
 4    SOKOLOW, et al.,                   : 04-CV-397
                                         :
 5                     Plaintiffs,       : January 19, 2012
                                         :
 6               v.                      : 500 Pearl Street
                                         : New York, New York
 7    PALESTINE LIBERATION ORGANIZATION, :
       et al.,                           :
 8                                       :
                       Defendants.       :
 9    ------------------------------------X

10

11             TRANSCRIPT OF CIVIL CAUSE FOR CONFERENCE
                BEFORE THE HONORABLE RONALD L. ELLIS
12                UNITED STATES MAGISTRATE JUDGE

13    APPEARANCES:

14    For the Plaintiffs:        ROBERT J. TOLCHIN, ESQ.
                                 Berkman Law Office
15                               111 Livingston Street
                                 Brooklyn, NY 11201
16
      For the Defendants:        BRIAN A. HILL, ESQ.
17                               Miller & Chevalier, Chtd.
                                 655 15th Street, North West #900
18                               Washington, DC 20005

19

20    Court Transcriber:         RUTH ANN HAGER, C.E.T.**D-641
                                 TypeWrite Word Processing Service
21                               211 N. Milton Road
                                 Saratoga Springs, NY 12866
22

23

24

25


      Proceedings recorded by electronic sound recording,
      transcript produced by transcription service
```

2

1         THE CLERK:  Parties on the docket, Sokolow, et al. v.

2    PLO.

3         Will all counsel please identify yourselves for the

4    record?

5         MR. TOLCHIN:  Good morning, Your Honor.  Robert

6    Tolchin the Berkman law office, 111 Livingston Street,

7    Brooklyn, for the plaintiffs.

8         THE COURT:  Good morning.

9         MR. HILL:  Good morning, Your Honor.  Brian Hill from

10   Miller & Chevalier in Washington for the defendants, the

11   Palestinian Authority and the PLO.

12        THE COURT:  Good morning.  Okay.  Well, I've

13   identified a number of issues based upon your submissions.  You

14   may have other things that you have in mind, but I'll go

15   through what's on my list and then we'll see what's left over.

16        The first thing that's on my list is plaintiff's

17   motion for reconsideration regarding the Hague letters.  At

18   least in my looking at what was submitted by the plaintiff as

19   to whether or not they were any facts that were overlooked by

20   the Court or mistakes of fact, the -- I gather the plaintiff

21   noted that we had referred to Ballal [Ph.] and Abdullah as

22   brothers are indicated that the plaintiff had said that they

23   were brothers and then there was some back and forth between

24   the parties about whether or not there was information or

25   evidence that they were brothers.  Doesn't really matter to me.

3

1  It wasn't the basis for the decision, so if that's the -- if

2  that's he factual dispute, you may work it out sometime during

3  the case but it's not -- it's -- as far as the motion for

4  reconsideration under Rule 59, that's not a fact relied on by

5  the Court.  And so it's truth or lack thereof is not going to

6  change the ruling.  So we'll put that in writing and you can do

7  whatever it is that you want to do after that, Mr. Tolchin.

8        MR. TOLCHIN:  Can I be heard for a moment on that,

9  Your Honor?

10        THE COURT:  Excuse me?

11        MR. TOLCHIN:  May I be heard for that -- on that

12  issue for a moment?

13        THE COURT:  I thought you made your record already.

14  What do you want to say?  I'll give you a minute.  No more.

15        MR. TOLCHIN:  Okay.  The issue of whether they were

16  brothers was a red herring that came from defense counsel and

17  as I read Your Honor's honor it was a central issue of the

18  order that just because someone is a brother doesn't mean you

19  get to take his deposition.

20        We want to take his deposition because he's a witness

21  to material facts relevant to this case.  We have a -- I can

22  run through it, if you like, but he was -- he was detained and

23  prevented of detention by the Palestinian Authority because he

24  and Abdullah Barghouti because of their past history of

25  organizing terrorist attacks and carrying them out he was

4

1  detained preventively to prevent him from doing that. And then

2  despite the fact that these people were known bomb makers and

3  terrorists they were released into the personal custody of

4  Marwin Barghouti who was a high-level officer of the

5  Palestinian Authority, who instead of doing anything whatsoever

6  to inhibit them from carrying out terrorist attacks gave them

7  an apartment and money enabling them, aiding -- giving them aid

8  and support. One of them then went on and did the Hebrew

9  University bombing, which is at issue in this case. But Ballal

10 Barghouti is a fact witness to the preventive detention, to

11 their release, to the terms of their release, how it came to be

12 that these known terrorists who had already carried out

13 terrorist attacks and had blood on their hands were -- came to

14 be detained preventively and then released. And Marwin

15 Barghouti furnishing them an apartment and money. And all of

16 those things if established establish the plaintiff's theory of

17 liability in this case.

18        Given those facts and given Ballal Barghouti's

19 knowledge of those facts I can't understand Your Honor's ruling

20 in the slightest as to why Ballal Barghouti is not a proper

21 witness to depose.

22        THE COURT: Okay. You've made your record, thank

23 you. All right. The next thing is the plaintiff's motion to

24 strike or with respect to the letter in opposition that the

25 defendants filed. And this is a -- in regard to your motion to

5

1  compel the BBC and I'm not sure for the actual basis for the

2  motion to strike or the particular need to strike it because

3  this is not a case in which there is not a propr party raising

4  the opposition. I mean, in some cases all I have is a

5  plaintiff and a defendant and there's a third-party deposition

6  and one or the other seeks to raise it. And there can be

7  question about whether or not one of the parties has a standing

8  to raise an opposition to the subpoena. But the BBC is here,

9  so I -- regardless of what it is that the defendants want to

10  say I don't see any need for judicial intervention to strike or

11  not to strike.

12         So as to the BBC's argument we can take that that up

13  but all of your back and forth on whether or not -- or what was

14  said in the letter and what shouldn't have been said in the

15  letter I don't see a need for Court action with regard to

16  striking stuff that's in -- that's been sent or otherwise

17  communicated to the Court. I suppose if anything that the

18  defendant says gets considered by the Court then there might be

19  some issue, but I think the BBC has defended itself

20  sufficiently so that notwithstanding the help offered by Mr.

21  Hill I think the issue has been joined.

22         Now, with respect to the BBC, Mr. Tolchin, I'm -- I

23  would like for you to articulate for me specifically what claim

24  that you have and the tie-in to this BBC documentary and what

25  it is that you want from the documentary and how that would be

6

1  factual information in the documentary that would be of

2  assistance in the claim.

3          MR. TOLCHIN:  I apologize to the Court because I

4  didn't realize that this motion was being argued today and I

5  don't have those papers with me to look it over, but generally

6  speaking the BBC documentary aired a part of an interview and

7  the part of the interview contains statements that are helpful

8  and informative to a certain extent, but it was a part of a

9  longer interview.  Anybody who's been interviewed by a news

10  show knows that they come and interview you for an hour and

11  then use a short portion of it as part of a show.  So since

12  there was this recording we would like to see all the

13  statements.  There's always the claim that the statement that

14  was aired was taken out of context, it didn't show the whole

15  point.

16          THE COURT:  Give me the nub of the statement.  How

17  does the statement relate to your claim and how it suggests

18  that there is more that was on the cutting room floor.

19          MR. TOLCHIN:  Well, we know there's more.

20          THE COURT:  Well --

21          MR. TOLCHIN:  We know there's more because we asked

22  BBC for it and they didn't say we don't have any.  They --

23          THE COURT:  Well, we --

24          MR. TOLCHIN:  -- said "We're not giving it to you."

25          THE COURT:  Okay.  Just to be clear, we know that

7

1    they didn't air every inch of footage they shot.  My question

2    really is, how do we know there's anything relevant on the

3    cutting room floor.  What are indications from --

4            MR. TOLCHIN:  We don't.  We don't, but we also know

5    that we're here about discovery, which is not only governed by

6    irrelevance but what may lead to relevant information.

7            THE COURT:  And that's my question.  What is it about

8    what was said about what you know that indicates that what's on

9    the cutting room floor might be relevant?  I mean, as well as

10   it could be, I mean, is there anything that would indicate that

11   there's relevant information that didn't --

12           MR. TOLCHIN:  Until I've seen the material I can't

13   speak to that.  If that is what is concerning Your Honor,

14   perhaps viewing it in camera might be an option and then, you

15   know, if Your Honor is concerned that we may be seeking to

16   obtain discovery of materials that might not be relevant or

17   might not lead to relevant information, then perhaps that might

18   be a method to address that.  I can't speak to what it contains

19   not having seen it.  If BBC's counsel were here -- and they're

20   the moving party and frankly, it's a -- I do have some concerns

21   about addressing their motion when they're not here.  But, you

22   know, perhaps their counsel has seen it and can speak to that,

23   but --

24           THE COURT:  Okay.  But what I'm -- what I'm concerned

25   about is this.  And this is not just about the BBC, but

8

1    anything that airs on any station what principles should I use

2    in order to determine whether or not if you -- you view -- you

3    know, they have a documentary on Trump and some of it doesn't

4    make the cutting room floor and somebody is suing Donald Trump

5    and they say, well, Donald Trump might have said something in

6    the interview that might be relevant to my case.  I can't see

7    me saying, well, he might have but, I mean, what the courts

8    look for are some kind of guidepost to say if you have A, B,

9    and C that's an indication that you go further.

10            But as far as -- you -- the principle certainly can't

11   be because that, you know, this person is in the same general

12   area and it must be that they -- it's possible that they may

13   have said something.

14            MR. TOLCHIN:  I want to be perfectly clear, Your

15   Honor.  I was not aware that today we were going to be arguing

16   this motion.  It's not noticed for argument; BBC's counsel is

17   not here.  I don't have the papers in front of me.  The

18   statements of the -- the statements contained in the portion

19   that was aired, which I can't quote or discuss in detail for

20   the reasons I've just told you, they are relevant to our case.

21   That's why we're seeking the rest of the interview.  Okay.

22   Beyond that, I don't think it's fair to proceed to discuss at

23   this time.

24            THE COURT:  Well, it certainly wouldn't be fair to

25   the BBC, but if I were to base my decision just on any

9

1  questions I asked you, but I'm just looking for some kind of

2  entre into my analysis.  Obviously I'll take into account the

3  arguments that the parties have, but I'm looking for a

4  framework in order to determine if in a situation such as this

5  how should the Court go about doing it and --

6          MR. TOLCHIN:  Well, Your Honor's example with Donald

7  Trump if you have, you know, Donald Trump said in an interview,

8  "You know, I always cheat my contractors.  Whenever they send

9  me a bill I don't pay them for six months and then I tell them

10  I'm going to pay them 80 cents on the dollar, that's how come I

11  got to be a gazillionaire," and now you have a case involved

12  with the contractor.  And he says, "Hey, I want to see what

13  else Donald Trump said," you know.

14          THE COURT:  Okay.  And you're saying that the

15  statements as you described them in your papers are of that

16  ilk?

17          MR. TOLCHIN:  Of that ilk.  And I had that case once

18  against Donald Trump.

19          THE COURT:  Okay.  All right.  Well, I figured as

20  long as I have somebody in front of me it's always a good time

21  to see what more I can get from them.  The rest of what I have

22  has to do with defendant's complaints about their discovery

23  response to Mr. Tolchin.  And let me begin with the

24  interrogatories.  Okay.  And I looked at your responses to the

25  interrogatories and I can't help but wonder whether or not you

10

1  thought that these answers were in the spirit of the rules.

2          MR. TOLCHIN:  You can't help but wonder?  I'm sorry,

3  Your Honor.

4          THE COURT:  Whether or not you think that the answers

5  that you provided to the interrogatories were in the spirit of

6  the rules.

7          MR. TOLCHIN:  I think they were in the spirit of the

8  rules with the huge underlined caveat that these were some

9  really god-awful questions.  There -- these are not focused

10 interrogatories in the slightest.  They're asking us for

11 everyone who knows about something or whom we believe may know

12 about something.

13         THE COURT:  Okay.  But I was under the impression at

14 the last time we were here in our discussions it was clear you

15 were looking for people that you knew about as opposed to, you

16 know, speculation about other people.  And certainly it did

17 not -- it did not contemplate that you would be naming official

18 of the United States, since you're not in privity to them.

19         MR. TOLCHIN:  But that's not so.  I mean, we're not

20 in privity with the United States, but we know for a fact --

21 for example, we talked about the Barghoutis and why -- and how

22 they were put in preventive detention.  We know from the news

23 reports that the reason they were put in preventive detention

24 is because the Palestinian Authority was receiving intense

25 pressure from the United States Government to do something

11

1    about the string of bombings that was taking place every day in

2    Israel.

3            So there were people -- we know there were people in

4    the United States Government who investigated --

5            THE COURT:  Okay.  All right.

6            MR. TOLCHIN:  -- these things and had information

7    about it.

8            THE COURT:  Perhaps we're not communicating.  All

9    right.  I'll put that on me if we're not communicating.  My

10   preface to this was we're looking for things that the

11   defendants can get from you, not general knowledge.  I mean,

12   the idea that officially the United States knows stuff is not

13   information that the defendants need to get from you; they want

14   to know information that you have.  And if you start naming

15   people that -- I mean, I could have put these answers down.

16   He -- and what would be the point of that?

17           MR. TOLCHIN:  But here's the bind word.  Here's the

18   bind word.  If we -- given the broad question they asked, if we

19   did not give our broad answer as we gave it and then later we

20   found an official in the United States Government who was

21   prepared to come and testify about what the Government knew,

22   they'd say, sorry, you didn't identify him in response to your

23   interrogatory answer.  You only said 1, 2, 3, 4, 5 people.  You

24   didn't mention him and you didn't mention the Government.

25           THE COURT:  Okay.  I'm sorry.  Before you continue,

12

1  let's be clear.  All right.  That they can say almost anything

2  but you have to assume that there's a court officer who's

3  making reasonable decisions.  If he asked you a question about

4  who knows and you know about a United States official, you name

5  that person.  If you don't know about him and don't name him,

6  he doesn't have any quarrel.  And if he comes in and says, you

7  didn't name this person, and you say you just found out about

8  him yesterday, I don't care what he says.  You can only give

9  the information you know at the time that the question is

10 asked.  So he cannot under the rules complain if you find out

11 about somebody later on.

12         MR. TOLCHIN:  If that's Your Honor's ruling --

13         THE COURT:  That's --

14         MR. TOLCHIN:  -- and if that ruling is binding on the

15 trial judge in the appeals court, that will say that we

16 didn't -- I'm prepared to live with that.  But we also -- until

17 Your Honor makes that ruling and that directive and limits his

18 question in that way and narrows --

19         THE COURT:  Okay.

20         MR. TOLCHIN:  -- the response in that way --

21         THE COURT:  All right.  Mist --

22         MR. TOLCHIN:  -- we have to give a broad answer to a

23 broad question.

24         THE COURT:  Mr. Tolchin, I don't know where -- I

25 don't know any judge who'd take the position that if you don't

13

1  know an answer you are required to give a name.

2         MR. TOLCHIN:  No, we don't know a name for sure but

3  we know, for example, that there were officers of the

4  defendants who were unknown to us but they exist.

5         THE COURT:  And, you know, the requirement that asks

6  that you give information -- and I see these questions in

7  cases -- you know, it's only things that under -- under the --

8  that you have under your knowledge and specific knowledge.  I

9  mean, it -- you know, assuming that you had a question in which

10  everybody in this court knew that an United States official was

11  involved and they asked you a question that's here in the

12  interrogatories and you didn't say United States official, I'm

13  having trouble with the idea that you think that somehow that

14  if you found out the name of that person later on some court is

15  going to say, well, you didn't name that person.

16         MR. TOLCHIN:  Judge, I have been --

17         THE COURT:  You --

18         MR. TOLCHIN:  -- burned more times than I care to

19  count by making assumptions that people will be reasonable

20  later, so when we give an answer -- when there's a really broad

21  question that somebody might come later and say, hey, we asked

22  this really broad question and you didn't tell us what you knew

23  at the time and granted, you didn't know the guy's name but you

24  knew that somebody in the Government or some official of some

25  organization and you didn't tell us that you thought there was

14

1   a government official, that can -- we -- my clients can get

2   harmed by that.

3           THE COURT:  Okay.

4           MR. TOLCHIN:  By the potential --

5           THE COURT:  Now --

6           MR. TOLCHIN:  -- for somebody to interpret the

7   question broadly.

8           THE COURT:  I have two choices here, Mr. Tolchin.

9   And we can move on or I can challenge you to show me a judge

10  that's done that because any judge that's done that I don't see

11  how they function because -- I don't see how any party can be

12  asking for information that's not within their knowledge.  And,

13  you know, this generalization that they are an official of the

14  United States, I don't see it.  And, okay, let's move on.  All

15  right.

16          If you want my ruling then these generalizations

17  about official of the United States, members of the media, all

18  that stuff to me that's not -- first of all, I'm not sure that

19  the word "knowledge" even applies to anything that you say

20  there because you don't know anybody.

21          MR. TOLCHIN:  What this response means is upon

22  information and belief **plaintiff** believes there are officials

23  in the U.S. Government who may have knowledge.  That's all it

24  means.  It's --

25          THE COURT:  Okay.  And does that mean that this is --

15

1  I'm more concerned, Mr. Tolchin, so you understand, if you give

2  all these broad answers about the United States and whatever

3  because you think you need to cover yourself.

4          MR. TOLCHIN:  Um-hum.

5          THE COURT:    -- I want to see if after that then you

6  say, okay, all right, in addition to all these broad topics of

7  people who -- on information believe, in addition to that,

8  okay, there is Joe, Frank, Tom, and Larry, because it's not

9  unusual for somebody to answer a question and give a broad

10  answer and it the part -- and notwithstanding our broad answer

11  these specific answers, I don't see that you've done the latter

12  part.

13          MR. TOLCHIN:  Well, the first -- the first broad

14  answer is kind of in a category by itself because we said

15  officials of the defendant.  Now they know -- I don't have

16  access to them, but they know who they are.

17          THE COURT:  Okay.  So you're saying --

18          MR. TOLCHIN:  Yeah.

19          THE COURT:    -- I mean, you're assuming that the

20  defendants know what the defendants are doing.

21          MR. TOLCHIN:  Correct.

22          THE COURT:  I mean, if --

23          MR. TOLCHIN:  We took the deposition of the son of

24  Hamas, you know, the  --

25          THE COURT:  I understand, but Mr. Tolchin, look.  We

16

1  could do this dance all morning but, you know, your answer is,

2  you know, the plaintiff gets asked who knows about

3  discrimination and the deficiency says official, and the

4  plaintiff says --

5          MR. TOLCHIN:  The management of the company.

6          THE COURT:  -- officials of the defendant know about

7  the discrimination and nobody thinks that's going to advance

8  the cause, I mean --

9          MR. TOLCHIN:  Well, I would agree with you completely

10  that by identifying the person that way that's not enough to

11  call them to trial yet.  When we find out who -- which

12  official, which officer, which vice president failed to

13  implement the nondiscrimination policy or whatever, obviously

14  we have to supplement it and --

15          THE COURT:  But you agree that if I get those kinds

16  of answers on a discrimination case it -- the defendant

17  wouldn't have really any information.  He's, I mean --

18          MR. TOLCHIN:  Well --

19          THE COURT:  I mean you can take any case, any kind of

20  topic and what your case -- what your responses amount to is

21  the other side saying, people on your side know the story, I

22  don't have to do it, and I don't -- I don't see the efficacy of

23  that.

24          MR. TOLCHIN:  It's not that I don't have to do it,

17

1    it's just that I don't know who they are.  I have no way to

2    know who they are.  I know what your client did, I know the

3    actions taken by the organization but --

4            THE COURT:  Right, but what's the point of even

5    making that generalization?

6            MR. TOLCHIN:  Well, it --

7            THE COURT:   Be --

8            MR. TOLCHIN:  I would argue what -- what's the point

9    of asking such a broad question.  People who you believe may

10   have knowledge:  that's not really a helpful question.

11           THE COURT:  Well, okay.  But --

12           MR. TOLCHIN:  That's not even a question that would

13   be allowed to in court.

14           THE COURT:  Mr. Tolchin, look I've had people answer

15   questions like that and they always assume that it's -- they're

16   looking for people that you know, not people that he knows.  I

17   mean, what could happen, for example, is you could answer a

18   question like that and you might think, for example, that the

19   mail deliverer knows something because he happened to be there

20   when certain things were said, but you don't know that he knows

21   it.  But they don't want to know the -- you know, just some

22   broad statement.  But even if that's so, in addition to that

23   did you do any identification of anybody beyond the broad

24   pronouncements?  I don't see where you did that.

18

 1          MR. TOLCHIN:  We -- We did not.  We have --

 2          MR. HILL:  Your Honor, just so the record is clear,

 3  two individuals are named by name in the seven sets of

 4  responses I have received.  Two.

 5          THE COURT:  Okay.  And just to be clear, I think

 6  there's a more serious issue here in terms of you talking about

 7  being precluded, if you're saying that the only people that you

 8  know are the two people that you've responded to Mr. Hill --

 9          MR. TOLCHIN:  At this time.

10          THE COURT:   -- then if you come up with any more

11  names, at least for me, you're going to have to show that

12  you -- how you just came up with the names.  You understand

13  what I mean?

14          MR. TOLCHIN:  But you mean if I -- if I discover a

15  new name tomorrow Your Honor would want to see that I learned

16  it tomorrow and I didn't know it yesterday.

17          THE COURT:  That's correct.

18          MR. TOLCHIN:  I agree with you.

19          THE COURT:  Okay.  As I said, putting aside the dance

20  and basically what you're telling Mr. Hill is, as of today the

21  only people that you know that are responsive to the

22  interrogatories are the two names that you gave.

23          MR. TOLCHIN:  Hundred percent.

24          MR. HILL:  Well, if that's the case, Your Honor, I

19

1   would just ask that you memorialize this in an order that no

2   witnesses will be -- the plaintiffs will not be allowed to use

3   any witnesses that would have been responsive to any of these

4   interrogatories other than the two persons that have been

5   identified by name which, for the record, are Abdullah

6   Barghouti, who you've heard a lot about and a gentleman named

7   Mohammed Doan [Ph.].

8           THE COURT:   I don't do that.  I mean, the rules are

9   what the rules -- if he doesn't identify somebody, if he comes

10  up with somebody later on we'll consider it then.

11          MR. HILL:   Right.  Well, the reason I do this is

12  because I have categories of Mr. Tolchin's letter that says

13  hundreds of names.  Actually it's probably hundreds of

14  thousands of names including every employee of the U.S.

15  Government from my mailman to Your Honor to President Obama.  I

16  don't want to later be confronted with a witness in an

17  affidavit or a trial and then have the plaintiffs argue that,

18  oh, well, he's one of the defendants or he's one of the

19  plaintiffs and therefore he can testify about this as an

20  employee of the U.S. Government, therefore he can testify about

21  this.

22          THE COURT:   Okay.  All right.  I'll be clear to both

23  of you.  All right.  All the general names, all the general

24  things that Mr. Tolchin did, it doesn't get any names, okay.

25  If he comes -- if he were to come here tomorrow with somebody

20

1  who is an official of the United States and said, this is a

2  witness, the answers to interrogatories won't get him there.

3  He's got to indicate why he's just identified that person, and

4  if he could have identified him before then he's not going to

5  be able to use that at least from my discovery.  He could -- he

6  could make an issue with somebody else but --

7         MR. TOLCHIN:  Your Honor, I want to qualify this

8  because there's the issue of, you know, employees of the United

9  States Government.  That we discussed at length, but the

10 response that we gave also refers to the persons mentioned in

11 the complaint.  We referred to it that way, we referred to the

12 complaint and said all persons mentioned in the complaint and

13 the amended complaint.

14        THE COURT:  What do you mean all persons mentioned in

15 the --

16        MR. TOLCHIN:  There's persons who -- there's persons

17 who are named in the complaint.  For example, take a look at --

18 if we just look at their -- at the questions they ask that

19 these are responses to, just taking at random interrogatory

20 number eight that was "Identify all persons who you know have

21 knowledge or who you believe may have knowledge that" -- and

22 they're quoting the complaint, "defendants PLO and PA aided and

23 abetted Ahmed Barghouti, Nasser Aweis, Hamas Al-Titi, Mosalla

24 Rahman, Abdullah Ramadan, and the John Doe defendants to carry

25 out the 12/22/02 shooting."

1    So all those people are identified in the complaint.

2  All those people are named in their question, and we said in

3  our answer all the people we named in the complaint are

4  witnesses.  So by -- we certainly are not meaning to limit

5  ourselves to exclude the people who are named in the complaint,

6  but the --

7    THE COURT:  Okay.  All right.  What do you want to

8  say, Mr. Hill?

9    MR. HILL:  Here's the problem, Your Honor.  I've

10  counted seven sets of interrogatories, each one is ten or 11

11  interrogatories long and they go to specific factual

12  allegations made in the complaint.  I mean, just to pick one

13  example, this is interrogatory number one from the

14  interrogatories directed to the Gould and Waldman plaintiffs.

15  "Identify all the person who you know have knowledge or who you

16  believe may have knowledge that the defendants provided Ramadan

17  with an M16 machine gun for the specific purpose of murdering

18  and injuring an innocent passerby on the January 22, 2002

19  shooting as alleged in paragraph 70 of the first amended

20  complaint."

21    The local rule says that to identify when referring

22  to a person needs to give to the extent the person's full name,

23  present or last address.  Okay.  I got a response that it's the

24  same for all of them which says plaintiffs, defendants, the

25  United States, everybody named in a document in the case,

1  everybody named in the complaint, everybody identified in an

2  interrogatory.  That doesn't tell me who knows about the

3  defendants giving the gun to Ramadan, which is the subject of

4  interrogatory number one.  I propounded this interrogatory

5  because I wanted to know which witnesses the plaintiffs believe

6  have this knowledge.  Their answers don't inform me of that,

7  and I'm asking Your Honor to rule that unless they inform me

8  that -- Ramadan, for example, knows about us, I don't know if

9  they believe in those or not.  Somebody is supposed to know,

10 and at this point I can't take any discovery to discover who

11 knows this fact based on these answers.  That's why they're

12 non-answers, that's why they violate the court's order.

13             MR. TOLCHIN:  Your Honor, I would submit that what

14 Mr. Hill just said just shows the gamesmanship that's going on.

15 He seriously is arguing that he doesn't -- that he doesn't know

16 if Ramadan knows who gave him a gun?

17             MR. HILL:  I think Ramadan --

18             MR. TOLCHIN:  Even Ramadan himself wouldn't know,

19 he's saying?

20             THE COURT:  Okay.  With that -- okay.  That's

21 latching onto the last part of what he said, but I understood

22 the point he was trying to make about using Ramadan as an

23 example that you didn't list him specific as somebody with

24 knowledge about the gun, but I -- but the defendant is correct

Case 1:04-cv-00397-GBD-RLE Document 258-2    Filed 10/04/12    Page 97 of 118
Case 1:04-cv-00397-GBD-RLE Document 194    Filed 04/27/12    Page 23 of 44

23

1   in this regard.  To the extent that he asked interrogatories

2   that require you to give specific answers, you can't just paint

3   with a broad brush and say all the defendants, any more than

4   again if we're talking about a contract case or an employment

5   case that you could say if you asked who was -- who knows about

6   the alleged discriminatory statement, you can't just say --

7        MR. TOLCHIN:  I'd agree with you if his question were

8   identify any individual whom you know to have knowledge about

9   this fact.  But once he gives this catch-all, everyone you

10  believe may have knowledge, that's so open-ended that I'm

11  compelled to list everybody.  I -- he may have knowledge?

12       THE COURT:  If you believe that you're compelled, we

13  have a disagreement.  I think that at the very least when

14  you're dealing with questions in a -- in a discovery context

15  you have to give more guidance than to say because the

16  question -- because it's possible that anybody might know, I'm

17  going to list everybody.  Your obligation under discovery is to

18  point the defendant in the direction of the people you believe

19  have knowledge, and just because they say who you think may

20  have knowledge doesn't mean that you get to throw everybody

21  else into the stew.  And if this is the best you could come up

22  with that you want to name everybody, I do not find that you

23  have answered the questions in the manner and in the spirit in

24  which the rules require it.  So to the extent that you may come

25  up with somebody later on who on that particular question was

24

1  about the providing of the weapon --

2          MR. HILL:  Are you saying, Your Honor, that we should

3  notwithstanding the way -- the broad way the questions read but

4  based on Your Honor's ruling we should answer it more the I --

5  the alternative way, saying everyone who you know to have

6  knowledge about these facts, never mind that they said believe

7  may have knowledge.

8          THE COURT:  Okay.  All right.  Now see, this is --

9  this is --

10         MR. TOLCHIN:  Because if that's what you're saying,

11 I'll try to meet you on that.

12         THE COURT:  Okay.  I understand -- I understand, Mr.

13 Tolchin.  This is where -- I'm trying to avoid the games

14 playing, okay.  All right.  You're accusing the defendant of

15 that but if you limit it specifically to the word "no" you're

16 not in the spirit of the question because it's not just no in

17 the sense that one has absolute knowledge of something and it's

18 not speculation either; it's people that you reasonably believe

19 can have information that's going to be helpful to the

20 defendant.  And you may not know because who knows, I mean --

21 but you have to -- you at least have to reasonably point him in

22 the direction of people that you reasonably believe have the

23 information, not just anybody who speculatively might have the

24 information.  So it's somewhere between absolute knowledge and

25 it could be anybody else in the world.  But it's not going to

1   be no, because from a philosophical point of view, I mean, a

2   lawyer could -- a lawyer could dance on the head of a pin with

3   that one.  I mean, because the reality is, what do we know, but

4   if you have some information and if you did a complaint you

5   presumably have somebody who's pointed you in the direction

6   that this is a factual assertion that has some legs --

7           MR. TOLCHIN:  We have a source for everything that's

8   alleged --

9           THE COURT:  Then you need --

10          MR. TOLCHIN:  -- whether it's a person or a new

11  reporter or an article.

12          THE COURT:  Then you need to -- you need to point

13  him in the direction of somebody who -- and if you're really

14  concerned about that you should do what some other people do,

15  notwithstanding the answer that we gave the -- we reserve the

16  right to -- and then describe whatever it is that you want to

17  put in, but you at least you could give the defendant the

18  people that you really believe have the information.

19          MR. TOLCHIN:  Your Honor, I'm prepared to redo the

20  responses in keeping with Your Honor's rulings today and see if

21  we can improve things.

22          THE COURT:  Well, it's either you're prepared to do

23  it or we're -- you're going be stuck with answers that aren't

24  going to get you very far.

1          MR. TOLCHIN:  I understand that.

2          THE COURT:  Okay.  Is there any question that you

3 understand what I'm asking you to do?

4          MR. TOLCHIN:  No.  I think I understand, Your Honor.

5          THE COURT:  Okay.  And you understand when I say,

6 no, it involves something more than saying with absolute

7 knowledge, but --

8          MR. TOLCHIN:  I understand that.

9          THE COURT:  -- you know, because the reality is, --

10         MR. TOLCHIN:  I hear you.

11         THE COURT:  -- I'm not sure any of us knows anything

12 about any of these in the sense that scienter means that you,

13 you know, you have knowledge without reservation.  But, you

14 know, as human beings we do a lot of things in which we don't

15 have 100 percent knowledge, but we have enough knowledge to

16 believe that we can act on the information.

17         So if you believe that the information, the fact that

18 you've submitted to Mr. Hill and his client have substance,

19 then you need to provide the person who's -- if it's a person,

20 the person who's provided that substance.  And if there's

21 some -- it may be that official of the United States might know

22 that because they've talked to that person.  I don't know, but

23 that's possible but that's not what they're looking for.  It's

24 certainly not what I'd be looking for.  Two weeks.

27

1          MR. TOLCHIN:  I think I need a little more time for

2     that, Your Honor.

3          THE COURT:   Why would you need more time, Mr.

4     Tolchin?

5          MR. TOLCHIN:  Because there's a lot of -- there's a

6     lot of details to this and I have a lot of other things also.

7          THE COURT:  I mean, am I to understand that with

8     respect to these questions, now broad as they may be, you're --

9     are you representing to me that in those -- in your responses

10    and in preparing the answers, and even though you were cautious

11    to put in these broad descriptions you never got to the point

12    of looking at the specific individuals that might be responsive

13    to these?

14         MR. TOLCHIN:  I'm not saying that but, you see, when

15    we referred -- in our response we referred to all people

16    identified in documents that have been produced, all people

17    named in the complaint, and that's a large body.  And I wanted

18    -- since we're going to be stuck with it, I want to be --

19    make sure that I have enough time to go through it carefully

20    and hit everything.  And it's not holding --

21         THE COURT:  So how much time --

22         MR. TOLCHIN:  -- it's also not holding anything else

23    up right now.

24         THE COURT:  How much time are you asking for, Mr.

28

1  Tolchin?

2          MR. TOLCHIN:  Thirty days.

3          THE COURT:  I mean, this -- you know, this is a 2004

4  case we're talking about.

5          MR. TOLCHIN:  Right, but it's only been -- discovery

6  has only been going on for a much shorter period of time

7  though.

8          MR. HILL:  Your Honor --

9          MR. TOLCHIN:  There's motion practice pending for

10  years.

11          MR. HILL:  Discovery has been going on for seven

12  months, discovery closes in 11 months.

13          MR. TOLCHIN:  Right, but --

14          MR. HILL:  I served these interrogatories at the end

15  of August.

16          MR. TOLCHIN:  But that has nothing to do with 2004.

17          MR. HILL:  And as a result of that I have two names

18  of people that are allegedly percipient witnesses.

19          MR. TOLCHIN:  Okay.  They're --

20          THE COURT:  All right.  Here -- I will give you

21  three weeks.  You got an extra week out of it, don't --

22          MR. TOLCHIN:  I should have asked for six weeks.

23          THE COURT:  Well, you probably still would have only

24  gotten three.  The fact is, I think that you should have had

1    this information when you were preparing the answers the last

2    time.  I'm -- I won't say I'm shocked that you didn't, but I

3    don't see how you could have -- even if you thought that the

4    broad answers were appropriate for caution sake, why you would

5    not have at least -- under the spirit of the rules at least

6    identified specific individuals who would have had the

7    knowledge.  And frankly, three weeks is more time than I think

8    you should get given the circumstances.

9               MR. TOLCHIN:  What date is that?

10              THE COURT:  It is January 19th -- okay.  February

11   9th.

12              MR. HILL:  Your Honor, while we're on this topic of

13   orders and lack of compliance --

14              MR. TOLCHIN:  I thought we were on the topic of the

15   interrogatories.

16              MR. HILL:  -- on Tuesday I received from Mr. Tolchin

17   what purport to be supplemental damages disclosures which

18   purport to be responsive to the order you entered on December

19   9th, requiring calculations of damages -- for economic damages.

20   Would I be able to ask for the court's intervention on this

21   issue as well because I don't have any economic damages

22   calculations notwithstanding the fact that you ordered them

23   twice and I have a copy to show Your Honor.

24              MR. TOLCHIN:  I disagree with the characterization,

30

1  but --

2         THE COURT:  All right.  Send it to me.  As much as

3  it's a joy to have the two of you here I do have other things

4  scheduled, but I gather that you don't have --

5         MR. HILL:  I have no calculations at all.

6         THE COURT:  Okay.

7         MR. HILL:  Should I be -- should I file a motion for

8  sanctions at this point or would the Court like me to send you

9  another letter?

10         MR. TOLCHIN:  There's no basis for --

11         MR. HILL:  Well, I mean, but --

12         MR. TOLCHIN:  It --

13         THE COURT:  Send it to me and we'll look at it and

14  then we'll probably do is we'll get the two of you on the phone

15  and see if we can hatch it out, but I want to look at it first

16  and I don't to be looking at it while we --

17         MR. HILL:  That's perfectly fair for Your Honor.  I

18  guess the other issue is the letter pertaining to the document

19  request.

20         MR. TOLCHIN:  I believe Your Honor said that you had

21  I think five issues that you wanted to address.

22         THE COURT:  I think in our discussions we've come up

23  with those issues.  The last thing was the document request.

24  This is with respect to Mr. Youseff [Ph.].

31

1          MR. TOLCHIN:  Correct.

2          THE COURT:  What kind of documents are we talking

3    about?

4          MR. HILL:  Well, Your Honor, as we related in our

5    letter, this gentleman as you know was subpoenaed for a

6    deposition to happen on the Monday after Thanksgiving.  We

7    served document request.  We asked the plaintiffs to shorten

8    their response time so we could get any documents the

9    plaintiffs had in advance of the deposition.  The witnesses,

10   you know, didn't show up on the 28th of November but did agree

11   to come testify at Mr. Tolchin's office on January the 10th.  I

12   was at his deposition.  And while we were there the witness

13   told us that he had been previously engaged by one of the

14   plaintiffs' Israeli lawyer, who an expert witness; that that

15   lawyer had given him documents which he had reviewed; that he

16   had written a report and sent it to that Israeli lawyer who

17   represents the plaintiffs; and that the plaintiffs' lawyer had

18   paid him between $7,000.00 and $10,000.00.  And when we got

19   that information from the witness I reached out to Mr. Tolchin

20   via email and said, "Did you ever serve responses to our

21   document request?  Did you ever produce these documents?"

22   Excuse me.  "The document request clearly called for them.

23   They called for any communications between Mr. Youseff and you,

24   as that term is defined, which includes the plaintiffs'

25   lawyers."

Case 1:04-cv-00397-GBD-RLE  Document 258-3   Filed 10/01/12   Page 106 of 118
Case 1:04-cv-00397-GBD-RLE  Document 131   Filed 04/27/12   Page 32 of 44

32

1              THE COURT:  So is it that basically you want the

2      documents that was sent to him and --

3              MR. HILL:  The records of payment, the documents he

4      reviewed, the draft report he sent them.

5              THE COURT:  And, Mr. Tolchin, at one point I believe

6      you said that there were no such documents.

7              MR. TOLCHIN:  And I still stay that.  I still say

8      that.

9              THE COURT:  So --

10             MR. TOLCHIN:  And Mr. Hill asked us when the -- the

11     first time that deposition was noticed, he asked us informally

12     could we accelerate responding to his response, not wait the 30

13     days that we had, and we did.  We responded to him right way

14     and told him there's no documents.  He doesn't like the form of

15     the response.  He wants me to write it out with a caption and

16     write "there's no documents" and then say "yours," et cetera,

17     and sign it and put a certificate of service, but I'm telling

18     him right here, there's no documents.  The witness identified

19     that he had been retained as an expert in a completely

20     different case that happened to involve the same attorneys, not

21     only on our side but on his side, too.  Mr. Hill was the

22     defense counsel in that case and the -- there wasn't an expert

23     report written out by the expert, it's a thing they have in

24     Florida called an expert summary.  It's written out by the

25     lawyer similar to 3101(d) in New York where you say this is --

33

1   my expert is expected to testify to, that was served.  The

2   defendants have it.  There was all sorts of motion practice

3   about it.  In fact it was ultimately stricken in that case.  So

4   Mr. Hill was well aware of it.

5          And that -- that is a document that arguably is in

6   possession of one of plaintiffs' attorneys in a different case

7   in the file of a different client.  And we've cited in our

8   letter cases that say just because I'm an attorney representing

9   a client in this case doesn't give the defendant in this case

10  the right to force me to go look in my other clients' files or

11  my personal files.  Where would that end?  Can ask me for my

12  personal documents?  If I'm representing people in this case

13  because they happen to be a student of world history, going to

14  ask me for my personal notes that I took when I attended a

15  lecture once?  No.

16         THE COURT:   Okay.  Just to be clear, actually the

17  question of -- if you say you don't have documents, I do

18  require parties to do a certification if they don't have

19  documents by the parties.

20         MR. TOLCHIN:  Parties, parties.  What he's -- what

21  he's trying to get, he wants me to go to my client's Israeli

22  attorney and say to the Israeli attorney, go into the file that

23  you have from some other case and get documents.

24         THE COURT:   And, Mr. Hill, what --

25         MR. HILL:  Yeah.  Well, here's the problem, Judge.

34

1 We had a deposition of the witness that they supposedly didn't

2 know how to contact that they characterized as a resistant

3 witness.  We get there and we find out that the same lawyers

4 that are representing the plaintiffs in this case have paid

5 between seven and ten grand.  That's information that I think I

6 should have gotten before the deposition and it's shocking to

7 me that it's now being argued that they could with a straight

8 face tell me they didn't have any documents that responded to

9 my request which clearly called for any communications between

10 the plaintiffs' lawyers and this witness.  They told me they

11 had nothing other than the book.  I don't believe that's true.

12 I never even got the Rule 34 response that the Rule requires

13 that says I don't have any documents.

14          And so the notion that because it was in a different

15 case therefore they didn't even have to object to providing it

16 and they can now be excused with the witness showing up and

17 saying, oh, by the way, I did have all these communications

18 with the plaintiffs' lawyers and they did pay me money and I

19 did write some opinions for them, and now we can't discover

20 them in this case because they're technically in some other

21 case.  None of the cases that Mr. Tolchin have cited go for

22 that proposition.  I don't think he can even assert this

23 objection frankly because Rule 34 says if you have objections

24 to a request you have to serve the objections within 30 days

1   and they never did, and that's a waiver of this objection to

2   the extent it was ever a valid objection in the first place.

3            You can look at the cases he cites in his letter.

4   One of them is from 1940, 4-0.  And it involves a decision

5   where the district court judge was apparently just learning

6   what the federal rules required.  He does say its inconceivable

7   that a lawyer would be required to produce something from

8   another client's file.  He also says, though, that it's

9   inconceivable that the defendant would have to produce a prior

10  statement of the plaintiff, which is obviously discoverable

11  under the modern interpretation of the Rule.

12           So I don't think those are good cases.  There's no

13  cases from the Second Circuit or from this court that would say

14  that this sort of thing doesn't have to be provided, and

15  frankly I'm troubled at going to a deposition, finding out that

16  the witness has had communications with plaintiff's counsel and

17  I didn't even know about them beforehand.  And I acknowledge

18  that I did get a document in the Saperstein [Ph.] case that

19  purported to be from counsel.  There was no indication that

20  there had been communications between counsel in that case and

21  the witness.  I always suspected they wrote it without talking

22  to the witness.  It was only when I got to the witness that I

23  found out that there had been these communications and

24  payments.

25           THE COURT:  Okay.  What this really comes down to,

36

1   Mr. Tolchin, is I gather -- you're not saying that there are

2   physically no documents; you're saying that -- you're either

3   saying that the documents are not in your custody and control

4   or that they're not discoverable.

5           MR. TOLCHIN:   I'm saying both.   I'll lay it all out

6   here.   There's a case called Saperstein that was in Florida.

7   That case is dismissed.

8           About two years ago right around the time that Mr.

9   Youseff's book came out plaintiff's Israeli counsel, who

10  happened to also be the Israeli counsel in the Saperstein

11  case -- so it wasn't me, it was the Israeli counsel -- had

12  communication with Mr. Youseff through is literary agent

13  they -- through his publisher.   There was discussion about

14  retaining him as an expert.   He was paid some money by the

15  Israeli counsel.   I believe the sum he testified to was

16  accurate.   A report -- I take back the word "report" -- a

17  summary of his opinion was prepared and served on Mr. Hill and

18  his co-counsel.   It was not drafted by the witness.   It was

19  prepared and shown to the witness after telephone conversation

20  with Israeli counsel.   I have asked -- even though we don't

21  think we're obligated to produce any of this from the

22  Saperstein case, I have asked the Israeli counsel if they have

23  any written correspondence of any substance with the -- with

24  Mr. Youseff and -- no, it was all -- it was done -- the

25  preparation of that was done over the telephone.   The one

37

1   document that exists was that summary which was served and Mr.

2   Hill has.  So for Mr. Hill to say he didn't know about it is

3   ridiculous and he's kind of acknowledged that in the end that

4   he knew about it.

5          It's of note that -- just to document that this is a

6   bit of crocodile tears, at the deposition of Mr. Youseff, other

7   than establishing the fact that he had served as an expert in

8   the Saperstein case, no questions were asked of him about that.

9   They didn't show him that report that they have in their

10  Saperstein file.  They didn't ask him any questions about the

11  opinion he gave.  Mr. Hill says he always suspected it was done

12  without talking to him.  That wasn't explored other than, did

13  you have communications with -- you know, who spoke to you

14  about it, and he identified the Attorney Lightner [Ph.] that he

15  had conversations with, so that's the history of this.

16         I don't have any documents; my clients don't have any

17  documents.  I imagine the one thing I didn't explore is that

18  probably someplace the Lightners have -- the Lightner -- the

19  attorney in Israel has a copy of the check or wire transfer,

20  whatever form of payment was used to pay him.  I don't -- I

21  didn't ask him that question but I assume if money was paid

22  they have a record of it.  But even that is of little substance

23  because the witness -- Mr. Youseff testified that he got paid

24  and said how much.

25         So I don't think that -- in direct answer to Your

38

 1 | Honor's question, I don't think that the Sokolow plaintiffs can
 2 | be said to have in their possession custody or control
 3 | documents that their Israeli attorney may have, if any, based
 4 | on their representation of a different client.  And so that's
 5 | part (a) of Your Honor's question; and (b) even if they had it,
 6 | even if you could say it was somehow in their control, I don't
 7 | think it's discoverable because all of that would be within
 8 | several different privileges of the Israeli counsel and the
 9 | clients in the other case, work product, for example.  But we
10 | don't even have to get to that point because you can't force a
11 | lawyer to go into his other client's file.  Maybe they could
12 | subpoena -- they could ask the witness, they could ask Mr.
13 | Youseff about it.  You --

14 | THE COURT:  Okay.  All right.  Counsel --

15 | MR. TOLCHIN:  -- could ask the other client about it
16 | but --

17 | THE COURT:  -- counsel, again as I said, while --
18 | it's always interesting when you're here.  Two things.  One is,
19 | while I -- I do have questions about how plaintiffs' counsel
20 | approached this.  I'm not sure that the bottom line is that
21 | with regard to the claims in this case the documents that
22 | were -- either existed or didn't exist, were withheld, weren't
23 | withheld, have any particular significance to the claims in
24 | this case.

25 | MR. HILL:  The problem is, Your Honor, I don't know

 1   and I, you know, hesitate to say this because I don't yet have

 2   the transcript, but when the witness described the work he did

 3   it didn't sound to me like the <u>Saperstein</u> case.  Mr. Saperstein

 4   as Mr. Tolchin and I know from having litigating that case was

 5   somebody was shot in the Gaza strip.  The witness described a

 6   shooting that took place in Jerusalem.  This case is about

 7   Jerusalem.  So I don't know whether -- what the witness was

 8   describing was the <u>Saperstein</u> case or not.  And I think we

 9   properly requested these materials.  There was no timely

10   objection be it to lack of custody and control.  Mr. Tolchin

11   just mentioned privilege.  I don't have a privilege log.  I

12   mean there's no timely objection to any production of these

13   materials and they wouldn't be privileged anyway of their

14   communications with an expert witness and between counsel.

15        So I would just ask the Court to order them to be

16   produced.  Let's see what we get and we'll go from there, but I

17   don't think it's appropriate at this point for the Court just

18   to say, okay, well, I'm not going to order it, well, because

19   there's no -- Mr. Tolchin just told us he doesn't exactly know

20   what's in the custody of these Israeli lawyers that's called

21   for by a request.

22        THE COURT:  What I'm saying though, however, is I'm

23   not getting the feel for what it is that -- I mean, assume that

24   there was a -- are you -- you questioned the expert about this?

40

1          MR. HILL:  I asked him some questions.  I didn't have

2    the documents to question him about.

3          THE COURT:  Well, I understand but --

4          MR. TOLCHIN:  Your Honor, in this case, in this case

5    he was a --

6          MR. HILL:  And he may -- he may be here at trial.

7          MR. TOLCHIN:  In this case he was named so at least

8    up to now he's a fact witness.  He's not -- he was not deposed

9    as an expert witness.

10          THE COURT:  Okay.  But understand that it's not even

11    a question of whether or not, as I said, things were produced

12    or not produced.  I'm still not seeing the tie-in to the claims

13    in this case in terms of its relevance in Rule 26.

14          MR. HILL:  Well, they're required -- the witness

15    testified that he wrote a report about an attack in Jerusalem.

16          THE COURT:  And --

17          MR. HILL:  I'd like to get it.  This case is about

18    attacks in Jerusalem.  I don't know if it's about this case or

19    not and I appreciate Mr. Tolchin saying it's about another

20    case, but that's not what the witness said.

21          MR. TOLCHIN:  I can tell you that the only --

22          THE COURT:  Okay.  Sorry, sorry --

23          MR. TOLCHIN:  -- retention of this expert --

24          THE COURT:  Counsel, look.  All right.  And I

41

1 understand that you may have been hampered a little but you

2 just can't leave it like that and then tell me you don't know

3 what it's about. You had him there. You don't -- you didn't

4 ask enough questions so that you could --

5         MR. HILL: Well, I don't have the record now. I

6 think -- I think the record establishes that it's not the

7 Saperstein case but I don't have it yet.

8         THE COURT: Right.

9         MR. HILL: So -- I mean, I don't know what to do in

10 terms of --

11         THE COURT: Do you believe the record --

12         MR. HILL: -- do you want me to file a motion once I

13 get it or --

14         THE COURT: Do you believe that the record

15 establishes that notwithstanding the conversation that we're

16 having now about whether or not it should have been produced or

17 not, whether or not it would be relevant under Rule 26, but

18 that we need to explore it further?

19         MR. HILL: Well, I would think any prior statement of

20 a witness or prior engagement of a witness by counsel for the

21 party in the case would be relevant; if nothing else, the

22 witness's bias.

23         THE COURT: Well, that's not relevant to the claim.

24 Now you're talking -- the Rule doesn't require that anymore.

42

1  And it used to be if it was related to the -- to the subject

2  matter and that included claims about whether or not the

3  person's credibility was involved.  I'm asking whether or not

4  it has anything to do with the claims in the case.  Now --

5           MR. HILL:  I don't know it's the answer because he

6  described the shooting in Jerusalem and those are some of the

7  cases that are before Your Honor in this case.  I don't know

8  whether it's this case or not.

9           THE COURT:  Okay.  Well, for now we'll be adjourned.

10          MR. HILL:  Thank you, Your Honor.

11          THE COURT:  Let me -- Michael, sometime in March.

12          COURT CLERK:  March 20th at 10:00 a.m.

13          MR. TOLCHIN:  What day of the week is that?

14          COURT CLERK:  Tuesday.

15          MR. HILL:  Your Honor, I don't think that is my

16  spring break, but if it is I will let the Court be advised of

17  my plans.

18          THE COURT:  Yes.  As long as you don't wait until 48

19  hours before the --

20          MR. HILL:  Oh, certainly.  I'll know as soon as I get

21  back to my phone.

22          THE COURT:  As soon as you get back to the office.

23          MR. HILL:  Yeah.

24                         * * * * *

43

1

2

3

4

5

6

7

8

9

10

11

12

13

14

44

1        I certify that the foregoing is a court transcript from an

2   electronic sound recording of the proceedings in the above-

3   entitled matter.

4

5                                    _____

6                                    Ruth Ann Hager, C.E.T.**D-641

7   Dated:   January 24, 2012

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25