**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

MARK I. SOKOLOW, *et al*.,

              Plaintiffs,

                             Civil Action No. 04-397 (GBD) (RLE)

v.

PALESTINE LIBERATION ORGANIZATION, *et al*.,

              Defendants.

**PLAINTIFFS' RESPONSE TO OBJECTIONS OF THE BRITISH
BROADCASTING CORPORATION TO SEPTEMBER 6, 2012
<u>MEMORANDUM AND ORDER OF MAGISTRATE JUDGE ELLIS</u>**

Plaintiffs, by their attorneys, hereby submit this response (the "**Response**") to the

Objections of the British Broadcasting Corporation ("**BBC**") (DE 258) to the September 6, 2012

Memorandum Opinion & Order of Magistrate Judge Ellis (the "**September 6 Order**") (DE 255)

denying its Motion to Quash Subpoena (DE 143) and Partially Granting Plaintiffs' Cross Motion

to Compel (the "**Objection**") (DE 157) and in support hereof, respectfully state as follows:

<u>**INTRODUCTION**</u>

At the outset, it should be clear that through their Rule 45 subpoena (the "**Subpoena,**"

attached hereto as **Exhibit A**), plaintiffs seek three types of <u>limited</u> discovery from BBC, as

follows:

        (1)       An authentic copy of a BBC documentary entitled "Arafat Investigated";

        (2)       Authentic copies of certain, specific recordings created while preparing

                the documentary but not included in the documentary (i.e. "outtakes"); and

(3)    Foundational deposition testimony from a knowledgeable employee of
BBC regarding the authenticity of the documentary and the outtakes, and
the manner in which they were created and stored by BBC, for the purpose
of establishing their admissibility as "business records" (i.e. a standard
"records-keeper deposition").

There seems to be no dispute that BBC is required to turn over an authentic copy of the
Arafat Investigated documentary.[1]   Any claim that the actual documentary is somehow protected
by the journalistic privilege is belied by the facts that the documentary was aired on international
television and BBC indeed produced a copy of that documentary to the *Saperstein* plaintiffs in
accordance with Judge Carter's decision on these same issues in that case.   *See Saperstein v.
Palestinian Authority*, 2010 WL 1371384 (E.D.N.Y. Apr. 6, 2010), *vacated* 2010 U.S. Dist.
LEXIS 143465 (E.D.N.Y. Dec. 16, 2010), attached hereto as **Exhibit B**.   Thus, irrespective of
the Court's decision on any other aspect of plaintiffs' Motion to Compel, there is simply no basis
for BBC to withhold production of the actual documentary from the instant plaintiffs.

Moreover, the documentary and the outtakes are clearly relevant to a crucial issue in
plaintiffs' case against defendants, *i.e.*, whether Al-Aqsa (as defined below), a terrorist
organization that was involved in most of the attacks at issue in this case, is just another name for
Fatah, one of the factions of defendant PLO.   This is because pursuant to § 2333 of the ATA and
case law promulgated thereunder, if plaintiffs can prove that defendants provided funding to
Fatah prior to these attacks and that Fatah and al-Aqsa are the same, defendants will be liable to
plaintiffs.   As discussed in greater detail below, the transcript of the documentary contains
statements directly probative of this issue by Ata Abu Rumaileh and Zakaria Zubaidi, *i.e.*, that

---

[1] The September 6 Order appears to assume that these plaintiffs already have a copy of the documentary since it was
turned over to the *Saperstein* plaintiffs in that case.   DE 255 at 4.   However, the instant plaintiffs are not in
possession of an authentic copy of the documentary and, therefore require the BBC to provide them with one.

Fatah and al-Aqsa are in fact one and the same and that all of their activities were directed by Yasser Arafat. Based on these probative statements, the chances that the outtakes contain additional support for plaintiffs' theory of liability are extremely high. Plaintiffs do not have another source for this material.

Having failed twice to convince a court that it should not be required to produce the material at issue in the Subpoena, BBC is now attempting to take a third bite at the apple by its objection to Judge Ellis's September 6 Order. Indeed, more than two years ago, Judge Carter, sitting as a magistrate judge in the Eastern District of New York, ruled in favor of the *Saperstein* plaintiffs on the exact same issues raised by the instant Subpoena. *See Saperstein*, 2010 WL 1371384. Contrary to BBC's innuendo (DE 258 at 8), Judge Carter's order was later vacated, solely on procedural grounds, because BBC had managed to delay its production long enough so that the *Saperstein* case in Florida was dismissed and Judge Carter's order was thus mooted.

Lacking any meritorious argument to support its Objection, BBC has resorted to ignoring a crucial threshold argument concerning whether BBC, as a foreign entity whose entire investigation for the Arafat Investigated documentary was conducted abroad, even has any First Amendment rights under the United States Constitution, stooping to personal attacks against Judge Ellis, wrongly claiming that his order was based on improper *ex parte* communications with plaintiffs' attorney (DE 258 at 16-17) and reading the imposition of some kind of "added burden" into Judge Ellis's factual summary of where the parties' stand with respect to the discovery at issue (DE 258 at 21-22).

As explained below, there is simply no basis to vacate Judge Ellis's September 6 Order. Judge Ellis considered all of BBC's arguments and properly rejected them with the exception of

modifying the Subpoena to require BBC to produce a foundational affidavit rather than a foundational witness, a very reasonable compromise.

## RELEVANT BACKGROUND

### I.    BACKGROUND CONCERNING PLAINTIFFS' NEED FOR THE DISCOVERY AT ISSUE

This is a civil action pursuant to the Antiterrorism Act ("**ATA**"), 18 U.S.C. § 2333, and pendent causes of action, brought by U.S. citizens, and the guardians, family members and personal representatives of the estates of U.S. citizens, who were killed and injured in seven terrorist attacks in or near Jerusalem, Israel, between January 8, 2001 and January 29, 2004.[2]

Plaintiffs' First Amended Complaint alleges that defendants Palestine Liberation Organization ("**PLO**") and Palestinian Authority ("**PA**") are liable for their injuries, *inter alia*, because the attacks at issue were carried out by defendants' officials, agents and employees and/or by terrorist units operating with the defendants' material support. DE 4 at ¶¶ 49-125.

Specifically relevant here, plaintiffs identify the "Al Aqsa Brigades," also known as the "Al-Aqsa Martyrs Brigades" or "Martyrs of Al Aqsa" (hereinafter: "**Al-Aqsa**"), as one of the terrorist units responsible for the attacks. *Id*. at ¶¶ 51-53.

While Al-Aqsa was involved to some degree in most of the attacks at issue in this case, its role was particularly pronounced in respect to the June 19, 2002 bombing in which plaintiff Shaul Mandelkorn was maimed (DE 4 at ¶¶ 100-107) and the January 29, 2004 bombing in which decedent Stuart Goldberg was murdered (*id*. at ¶¶ 118-125). Al-Aqsa openly took "credit" for the June 19, 2002 bombing. *See* **Exhibit C** ("Al Aksa Martyrs Brigade, a militant

---

[2]Defendants have filed and the Court has denied three motions to dismiss this case. *See Sokolow v. PLO*, 583 F.Supp.2d 451 (S.D.N.Y. 2008) (subject-matter jurisdiction); *Sokolow v. PLO*, 2011 WL 1345086 (S.D.N.Y. 2011) (personal jurisdiction); Order, June 2, 2011, DE 122 (venue).

offshoot of Mr. Arafat's Fatah movement, claimed responsibility for today's suicide bombing."). And an Al-Aqsa operative, Ahmed Salah, was convicted of carrying out the January 29, 2004 bombing and Mr. Goldberg's murder. *See* **Exhibit D** at Second Count, Fifth Count and Eight Count (Salah's indictment for membership in Al Aqsa and for carrying out the January 29, 2004 bombing); **Exhibit E** (Salah's conviction and sentencing order).[3]

As the case law applying § 2333 of the ATA makes clear, if the plaintiffs can prove that the defendants provided funding or other material support to Al Aqsa prior to these attacks, the defendants will be liable to the plaintiffs under § 2333 of the ATA. *See, e.g., Boim v. Holy Land Foundation*, 549 F.3d 685 (7th Cir. 2008); *Linde v. Arab Bank*, 384 F.Supp.2d 571 (E.D.N.Y. 2005).

Plaintiffs intend to prove that defendants provided such funding by showing: (1) that the name "Al-Aqsa" is simply a *nom de guerre* used by the "Fatah" faction of the PLO when it carries out terrorism, and does not denote a separate entity; and (2) that under the leadership of the late Yasser Arafat, defendants funded Fatah – and so Al Aqsa – prior to these attacks.[4]

Importantly, defendants do not dispute, and indeed openly admit, that they fund Fatah. *See* **Exhibit F** at 18-19 ("[T]here is a money flow from the PA to the PLO and from the PLO to Fatah … Fatah … ought to be funded by the PLO, and it is.").

Thus, since defendants admit to funding Fatah, in order to prove this theory of liability, plaintiffs intend to prove that "Al-Aqsa" is indistinguishable from Fatah. Plaintiffs have a right to seek and obtain all evidence on this issue.

---

[3]Mr. Goldberg is referenced in the indictment and sentencing by his Hebrew name, "Yehezkel."

[4]The PLO is an umbrella organization comprised of several factions, of which Fatah is the dominant and largest faction.

In 2003, BBC broadcast a documentary entitled "Arafat Investigated." A transcript of that documentary (**Exhibit G**) indicates that the documentary included interviews with Ata Abu Rumaileh, the leader of Fatah in the West Bank city of Jenin, and with Zakaria Zubaidi, an Al-Aqsa terrorist leader in Jenin.  During his interview, Fatah leader Abu Rumaileh confirmed that Fatah and Al-Aqsa were the same entity, led by the late PA and PLO leader Yasser Arafat:

> JEREMY BOWEN [BBC interviewer]
> So explain to me, Fatah and the Al-Aqsa Martyrs Brigade, are they part of the same organisation? Are you separate, are you together, how close are you?
>
> ATA ABU RUMAILEH (translation)
> Fatah has two sections: a military wing, led by the military and a political wing led by the politicians. **But there is no difference between Fatah and the Al-Aqsa Martyrs Brigades**.
>
> JEREMY BOWEN
> And who is in charge of both of these two parts of the organisation, is it Arafat?
>
> ATA ABU RUMAILEH
> Yasser Arafat

**Exhibit G** at 18-19 (emphasis added).

Likewise, Al-Aqsa leader Zakaria Zubaidi confirmed in his interview that he took orders directly from Arafat:

> JEREMY BOWEN
> When you captured the Governor of Jenin, did Yasser Arafat speak to you directly telling you to release him?
>
> ZAKARIAZUBAIDI (translation)
> Yes.
>
> JEREMY BOWEN
> What did he say?
>
> ZAKARIAZUBAIDI (translation)

We don't question his decisions. They're carried out first, and discussed later.

*Id.* at 16.

Zubaidi also confirmed that Arafat controlled the Al-Aqsa's terrorist activities:

JEREMY BOWEN
So, do you believe then that suicide operations, suicide bombs against Israeli civilians ought to continue. There should be more of them?

ZAKARIAZUBAIDI (translation)
Of course. Martyrdom operations inside Israel are not the strategy of the Palestinian people.

ZAKARIAZUBAIDI (translation)
They're of no use to us politically. But they do have some advantage for our people, who are being killed every day. They want retaliation, revenge for the massacres committed by Israel. This is why we have martyrdom operations.

JEREMY BOWEN
So if Arafat said stop these attacks, would the Al-Aqsa Brigades stop?

ZAKARIAZUBAIDI (translation)
Of course. But he won't order us to do this until Israel stops the assassinations.

JEREMY BOWEN
But do you continue with them because he says continue with them?

ZAKARIAZUBAIDI (translation)
We pay close attention to what he says. When Arafat calls for a ceasefire, we will respect his decision and stop.

*Id.* at 37-38.

Thus, BBC's documentary contains explicit evidence – the statement from Fatah leader Abu Rumaileh –that Fatah and Al-Aqsa are one and the same entity.

Likewise, the above-quoted statements by Abu Rumaileh and Zubaidi confirming that PA/PLO leader Arafat led and controlled Fatah/Al-Aqsa, and personally gave orders directly to Al-Aqsa leader Zubaidi, further support plaintiffs' theory that the PA and PLO are liable for terrorist attacks carried out by Fatah/Al-Aqsa.

Accordingly, plaintiffs served a subpoena on BBC[5] seeking three _limited_ types of discovery:

### 1.   **The Documentary**

Plaintiffs requested a true and complete copy of the "Arafat Investigated" documentary. *See* **Exhibit A** at Appendix B, Definition 1(a).

### 2.   **Outtakes**

Plaintiffs requested true copies of audiovisual recordings of Abu Rumaileh and Zubaidi created while preparing the documentary but not ultimately included in the documentary ("outtakes"). *See* **Exhibit A** at Appendix B, Definition 1(b).

Plaintiffs requested the outtakes for two distinct and important reasons:

*First*, if plaintiffs attempt to introduce as evidence at trial the interviews of Abu Rumaileh and Zubaidi as they appear in the documentary, the defendants will undoubtedly seek to object on the grounds that the interviews appearing in the documentary are not complete recordings but merely segments. *See* Fed. R. Evid. 106. Therefore, plaintiffs need and seek copies of the **complete** interviews with Abu Rumaileh and Zubaidi.

---

[5]Because the offices of plaintiffs' counsel are in Brooklyn and Rule 45(a)(2)(B) requires a subpoena seeking a deposition to be issued from the court in the district in which the deposition is to take place plaintiffs originally issued the subpoena from the Eastern District. After BBC filed papers contesting venue in the Eastern District plaintiffs withdrew that subpoena and issued the instant subpoena from this Court (setting the deposition in BBC's counsel's office in Manhattan) in order to moot the venue dispute. Surprisingly, both in its original motion papers and in its Objection to the September 6 Order, BBC expends pages complaining about the proceedings in the Eastern District of New York and accusing the plaintiffs of "forum shopping." While these baseless charges rankle, they are irrelevant and plaintiffs will not waste the Court's or their own resources responding thereto. Whether plaintiffs are entitled to the discovery sought does not turn on BBC's complaints about prior proceedings.

*Second*, the segments of the Abu Rumaileh and Zubaidi interviews included in the documentary contain extremely probative statements that are highly relevant to plaintiffs' case. It is therefore very likely that the complete interviews contain additional such statements.

### 3.    Records-Keeper Deposition

Plaintiffs also requested deposition testimony of a knowledgeable employee of BBC regarding the authenticity of the documentary and the outtakes, and the manner in which they were created and stored by BBC. **Exhibit A** at Appendix A.

The purpose of this deposition is simply to establish that both the documentary and the outtakes (a) are true copies of the original records and (b) were generated, stored and copied in such a manner as satisfies the business records exception under Fed. R. Evid. 803(6).

## II.    BACKGROUND CONCERNING THE PRIOR PROCEEDINGS

Cognizant of the ultimate result in *Saperstein* caused by BBC's delays in complying with substantially the same subpoena that is at issue here, early on in the discovery period, on August 9, 2011, plaintiffs served the instant Subpoena on BBC seeking the three limited types of discovery referred to above.  BBC filed its Motion to Quash and supporting Memorandum of Law on September 9, 2011 ("**Motion to Quash**") (DE 143, 148).  Plaintiffs filed their Objection and Cross Motion to Compel and supporting Memorandum of Law on October 17, 2011 ("**Motion to Compel**") (DE 157, 158).  Subsequently, BBC filed a Reply (DE 164) and the matter was fully briefed as of November 30, 2011 when plaintiffs filed the reply affidavit of Jeremy Stern (DE 168).

On September 6, 2012, Judge Ellis issued his Memorandum Opinion & Order, in which he noted that BBC had already produced a copy of the published documentary to the plaintiffs in the *Saperstein* case and directed BBC to produce the outtakes for Abu Rumaileh and Zubaidi and

to provide a foundational affidavit with respect to both the documentary and the outtakes.  *See September 6 Order* (DE 255).[6]   Judge Ellis's order is fully consistent with Judge Carter's April 6, 2010 order in *Saperstein*.    Indeed, in *Saperstein*, Judge Carter went even further than Judge Ellis did here and ordered a foundational deposition to take place in London.  *See Saperstein*, 1371384 at *3.

### A.    Judge Ellis Did Not Conduct Any Improper Ex Parte Communications with Plaintiffs' Counsel

Even though their arguments have already been overruled twice, by Judge Carter and Judge Ellis, BBC continues this exercise in futility to try to deprive plaintiffs of evidence to which they are unquestionably entitled under the Federal Rules of Civil Procedure.  Lacking any meritorious argument, BBC has resorted to, *inter alia*, personal attacks against Judge Ellis, wrongly claiming that he engaged in *ex parte* communications with plaintiffs' counsel at a conference on January 19, 2012, which BBC claims Judge Ellis improperly relied upon in reaching his decision.  DE 258 at 16-17.  As is clear from the transcript of that January 19 conference (DE 191), in response to questions from the Court concerning the BBC material, plaintiffs' counsel stated that he was not prepared to argue the BBC motion and that it would not be fair to discuss it without the presence of BBC's counsel.  DE 191 at pp. 7:19-21; 8:14-23. Judge Ellis responded with an explicit statement that he would not base his decision on plaintiffs' counsel's statements at that conference and further: "[o]bviously I'll take into account the arguments that the parties have…"  DE 191 at p. 9:203.  Moreover, it is patently clear from his September 6 Order that Judge Ellis did not rely on any supposedly *ex parte* communications,

---

[6] Apparently, Judge Ellis intended an affidavit of the type referred to in Fed. R. Evid. 902(11) and (12) for the purpose of authenticating documents as business records under Fed. R. Evid. 803(6).  It is clear that courts have authority to modify a subpoena to require a record keeper's affidavit in place of live deposition testimony.  *See, e.g., Davis S R Aviation LLC v. Rolls-Royce Deutschland Ltd.*, 2011 WL 5999332, *6 (W.D. Tex. 2011) (denying motion to compel deposition and ordering records custodian declaration instead).

but based his decision on the parties' arguments in their court filings. Any claim to the contrary is nothing more than a cheap and baseless attempt to discredit Judge Ellis because BBC lacks any substantive basis to challenge his order.

## ARGUMENT

### I.    STANDARD OF REVIEW

A discovery order of a Magistrate Judge shall be set aside only when it has been shown to be "clearly erroneous" or "contrary to law." *See Fed. R. Civ. P. 72*; *Siani v. State University of New York at Farmingdale*, 2011 U.S. Dist. LEXIS 69173, *6 (E.D.N.Y. 2011); *Weiss v. La Suisse, Societe d'Assurances Sur La Vie*, 161 F. Supp. 2d 305, 321 (S.D.N.Y. 2001) ("[a] magistrate judge's resolution of discovery disputes deserves substantial deference"). The same standard applies to a discovery order compelling discovery from a non-party. *See, e.g.*, *Verso Paper, LLC v. HireRight, Inc.*, 2012 WL 2376046, *4 (S.D.Miss. June 22, 2012) (collecting cases) (Magistrate Judge Order concerning subpoena against a non-party would be reviewed for clear error); *In re Out of District Subpoena*, 2008 U.S. District LEXIS 67909, *2 (W.D. Mich. Sept. 9, 2008) (same); s*ee also Arista Records, LLC v. Doe 3*, 604 F.3d 110, 116 (2nd Cir. 2010) (decision on defendants' motion to quash subpoena against non-party was not dispositive and would be reviewed for clear error).

Under the clear error standard, the Court may reverse Judge Ellis's factual findings only if, based on all of the evidence, it "is left with the definite and firm conviction that a mistake has been committed." *La Suisse*, 161 F.Supp. at 321; *Verso Paper, LLC*, 2012 WL 2376046 at *4. That is not the case here with respect to any aspect of Judge Ellis's September 6 Order.

II.     **THE COURT DID NOT ERR IN ORDERING THE REQUESTED DISCOVERY**

A.     **The Importance of Permitting Discovery in ATA Actions**

As a preliminary matter and in response to BBC's argument that principles of comity counsel against discovery here (DE 158 a 12), plaintiffs direct the Court to the fact that plaintiffs' action is brought under the civil provisions of the Antiterrorism Act and – as the courts of this Circuit and others have found – the prosecution of ATA cases serves not only plaintiff's personal interest, but the national interest of the United States:

> The legislative history of the ATA … reveal[s] this country's profound and compelling interest in combating terrorism at every level …
>
> Congress has explicitly granted private parties the right to pursue common tort claims against terrorist organizations and those that provide material support or financing to terrorist organizations. Certainly, private tort actions directed at compensating victims of terrorism and thwarting the financing of terrorism <u>vindicate the national and international public interest</u>.

*Weiss v. National Westminster Bank*, 242 F.R.D. 33, 46, 50 (E.D.N.Y. 2007) (emphasis added). *See also e.g. Ungar v. Palestinian Authority*, 715 F.Supp.2d 253, 268 (D.R.I. 2010) ("[T]here is an extremely strong interest in enforcing judgments … entered under the civil provisions of the Antiterrorism Act ("ATA")").

Precisely because of the important public interest vindicated by ATA actions, the courts of this Circuit have repeatedly compelled the production of discovery in ATA cases even when such production violated foreign secrecy laws and placed the producing party in the position of choosing between being penalized abroad or imposition of sanctions. *See e.g. Linde v. Arab Bank*, 269 F.R.D. 186 (E.D.N.Y. 2010); *Weiss*, 242 F.R.D. at 55-56; *Strauss v. Credit Lyonnais*, 242 F.R.D. 199 (E.D.N.Y. 2007); *Strauss v. Credit Lyonnais*, 249 F.R.D. 429 (E.D.N.Y. 2008). Thus, ATA actions such as this case serve the <u>national</u> interest and this Court – like the other courts in this Circuit – should therefore exercise its discretion to the full extent permitted by the

bounds of the law in order to permit plaintiffs to obtain the discovery they need.  Thus, the BBC's suggestion that principles of international comity would somehow trump the national interests of the Unites States (DE 258 at 12) flies in the face of this established precedent favoring discovery in ATA actions.

B.      **The "Arafat Investigated" Documentary Should Be Produced**

For all of the reasons discussed in plaintiffs' Motion to Compel (DE 159 at 9-14) and herein, the documentary should be produced. [7]

*First*, as a threshold matter, in order for the Court to find that the documentary should not be produced, the Court would have to find that BBC has First Amendment Rights under the United States Constitution.  In its Objection, BBC has ignored this threshold argument raised by plaintiffs in their Motion to Compel (DE 159 at pp. 17-18).  The BBC cannot benefit from any kind of journalistic privilege under the First Amendment for the simple reason that the First Amendment does not protect the <u>overseas</u> news gathering of a <u>foreign</u> corporation such as BBC. "[N]o court has held – at least no decision has been cited to this Court and the Court has found none – that a United States tribunal is compelled by the First Amendment to protect an alien's desire to speak in a foreign country." *Laker Airways Ltd. v. Pan American World Airways, Inc.*, 604 F.Supp. 280, 287 (D.D.C. 1984).  Judge Ellis did not expressly address this argument because he ruled in plaintiffs' favor.

*Second*, there can be no dispute that the documentary itself is not subject to any journalistic privilege and must be produced.  Indeed, it is a published program and has already been turned over in another case.  *See Sept. 6 Order*, DE 255 at 4.

---

[7] Judge Ellis seems to have assumed that these plaintiffs already have a copy of the documentary since it was turned over to the *Saperstein* plaintiffs in that case.  DE 255 at 4.  However, the instant plaintiffs are not in possession of an authentic copy of the documentary and, therefore require the BBC to provide them with one.

### C.    Judge Ellis Did Not Err in Ordering Production of the Outtakes Notwithstanding Any Qualified Privilege BBC May Have

#### 1.    Judge Ellis Did Not Err By Applying an "Overly Broad Relevance Standard" with Respect to the Outtakes (Response to DE 258, Argument II.A)

Judge Ellis acknowledged that journalists enjoy some kind of qualified privilege that extends to newsgathering efforts and gave due consideration to such qualified privilege in his analysis.  DE 255 at 4-5.  As discussed below, Judge Ellis's decision is fully consistent with the consideration to be given to such a qualified privilege and he did not err in ruling that such privilege had been overcome with respect to the outtakes, contrary to BBC's claims (DE 258 at 15-17).

As is clear from the transcript excerpted herein, the documentary itself is plainly relevant – the purpose of the subpoena was to obtain evidence showing that Al Aqsa, which carried out the attacks, is identical to Fatah, which defendants admit to funding – and, contrary to BBC's assertion (DE 258 at 15), the documentary clearly provides such evidence. *See e.g.* **Exhibit G** at 19 ("[T]here is no difference between Fatah and the Al-Aqsa Martyrs Brigades.").  Likewise, the statements by Abu Rumaileh and Zubaidi regarding PA/PLO leader Arafat's control over and leadership of Al-Aqsa – including even giving personal orders to Zubaidi – further support plaintiffs' claims that the PA and PLO are liable for Al-Aqsa's attacks.

Of course, plaintiffs cannot know what is in the outtakes[8], but based on those portions of the interviews published in the documentary itself, it is more than reasonable to conclude that the outtakes contain highly relevant evidence.  Indeed, both Judge Carter and Judge Ellis have

---

[8] While *U.S. v. Grant*, 2004 U.S. Dist. LEXIS 28176, *6-7 (S.D.N.Y. 2004), cited by BBC (DE 258 at 16), also addressed the production of outtakes, the court there found that the government had already gathered sufficient evidence during four years of surveillance of defendant night club to prove whatever information might be found in the outtakes.  Clearly, that is not the case here where Plaintiffs are seeking to use the outtakes to prove a connection between Fatah and al-Aqsa, which neither defendants themselves, nor any individual affiliated with Fatah or al-Aqsa, is likely to admit to in the context of this legal proceeding, as discussed below.

already reached this conclusion.  *See* DE 255, at 5; *Saperstein, supra*, 2010 WL 1371384 at *2.[9] In the event this Court has any doubt, solely as an alternative, plaintiffs request the Court to order BBC to submit the outtakes for an *in camera* inspection, prior to the Court making its final determination.  *See Forstmann Leff Assoc., Inc. v. American Brands, Inc*., 1991 U.S. Dist. LEXIS 213, *6 (S.D.N.Y. 1991) (in a slightly different context, ordering *in camera* review of documents alleged to be protected by the official information privilege).

2.     Judge Ellis Did Not Improperly Disregard Proof That Reasonably Available Alternate Sources Exist (Response to DE 258, Argument II.B)

The BBC continues to argue that the information sought (*i.e.*, evidence linking Fatah and al-Aqsa Brigades) is available from alternate sources, including Abu Rumaileh and Zubaidi themselves.  DE 258 at 18-20.  This argument has already been rejected twice – by Judge Ellis and Judge Carter.  In rejecting this argument in *Saperstein*, Judge Carter explained:

> It would be difficult, if not impossible, for Plaintiff to find Rumaileh and Zubaidi who are residents of a foreign state with knowledge about a terrorist organization and to ask them about what they said to BBC for the documentary. As BBC mentioned during oral arguments, interviewing individuals with sensitive knowledge is dangerous and difficult. It is also doubtful that individuals associated with terrorist organizations would continue to speak freely about the subject.

*Saperstein, supra*, 2010 WL 1371384 at *3.

Notwithstanding the contrary findings of Judge Carter and Judge Ellis, BBC would have this Court accept the outrageous premise that because Abu Rumaileh and Zubaidi reside within the Palestinian Authority, defendant the PA can be compelled to produce them as witnesses for a deposition.  DE 258 at 19; DE 165 at ¶ 27.  That would be like saying that if the City of New York is party to a lawsuit, the City of New York can be compelled to produce <u>any individual</u>

---

[9] It should also be noted that the *Saperstein* decision cited by BBC in which the discovery sought by defendants against a journalist was denied does not support their arguments because there, unlike here, the Court expressly found, *inter alia*, that the information sought was not relevant to the case and, in any event, was cumulative. *Saperstein v. Palestinian Authority*, (*In re Godlberg*), 693 F.Supp.2d 81, 86 (D.D.C. 2010).

resident within its boundaries to testify as a witness in the case.  However, the Federal Rules only provide for compelling the production of documents, not people.  *See Fed. R. Civ. P. 37(a)*. The only people that a party can be compelled to produce for a deposition are the party itself or its 30(b)(6) designee, not any individual that happens to reside within its boundaries.  *See Fed. R. Civ. Pro. 37(a)(3)*.  This argument is even more frivolous than BBC's personal attack on Judge Ellis.

In addition, BBC completely ignores the affidavit of Jeremy Stern (DE 168) filed by plaintiffs in response to the declaration of Yezid Sayigh filed by BBC (DE 165) explaining that there is no procedure under Israeli law by which plaintiffs can compel testimony from Abu Rumaileh or Zubaidi.  Nor has BBC even attempted to show that plaintiffs would be able to obtain such testimony under PA law.  In this regard, plaintiffs also refer the Court to the discussion in note 10, *infra*.

These same arguments apply equally to the other "alternate sources" that BBC baselessly claims could provide the needed evidence (DE at 20), including defendants themselves.  The sources BBC contends that Plaintiffs have "conceded" do not in any way show the key link between Fatah and al-Aqsa that is apparent in the BBC documentary.  Also, BBC's suggestion of other potential sources is based purely on speculation because BBC cannot know what information any of these sources would actually provide.  Moreover, BBC fails to take into consideration the unfortunate reality recognized by Judge Carter that "[i]t is also doubtful that individuals associated with terrorist organizations would continue to speak freely about the subject."  *Saperstein, supra*, 2010 WL 1371384 at *3.  In any event, plaintiffs are entitled to use what they believe to be the most compelling evidence on this subject.  There simply is no substitute for video of a Fatah leader unequivocally declaring in his own words that Fatah and al-

Aqsa are the same.  Certainly, BBC has no right to impose a less effective alternative on Plaintiffs, especially considering the important national interests in ATA cases discussed above.

Having already been rejected twice in this regard and lacking any legitimate grounds to challenge Judge Ellis's order, grasping at straws, BBC grossly overstates the significance of Judge Ellis's benign comment that:

> The Plaintiffs have agreed to limit the subpoena to the outtakes of those two individual interviews specifically, and BBC has not detailed how burdensome the production of the outtakes would be.

DE 255 at 6; DE 258 at 21.  After completing his legal analysis and properly applying the legal standard to the facts, as discussed above, the Court simply noted the fact that plaintiffs had reasonably limited their request while BBC had failed to claim that there was any physical impediment to their production of those limited items (i.e., the documentary and the outtakes for Abu Rumaileh and Zubaidi).

**D.    Judge Ellis Did Not Ignore BBC's Argument Concerning Whether the Information Compelled Would Ultimately be Admissible (Response to DE 258, Argument III)**

BBC repeats its argument, which was clearly considered and rejected, that it should not be required to produce the subpoenaed information because the statements contained therein are purportedly hearsay. *See* DE 258 at 23-24. This argument was properly rejected for several reasons.

*First*, whether or not the discovery sought is admissible is not relevant since "admissibility is not a prerequisite to discoverability, and the scope of relevance under Rule 26 is broader than under the Rules of Evidence." *Conopco, Inc. v. Wein*, 2007 WL 1040676 at *5 (S.D.N.Y. 2007) (quotation marks omitted).  BBC is in essence asking the Court to make an *in*

*limine* determination with respect to the admissibility of evidence at trial when the trial is still far away and BBC is not even a party to the case. Indeed, the ultimate decision regarding admissibility may rest on other pieces of evidence yet to be discovered. Moreover, even assuming, *arguendo*, that admissibility is a relevant consideration where a privilege has been asserted, BBC cannot assert and has not asserted any privilege in respect to the documentary itself.

*Second*, and in any case the materials sought are admissible. There is no question that a recording can be a "business record" subject to the hearsay exception. *See e.g. LeRoy v. Sabena*, 344 F.2d 266, 272-273 (2nd Cir. 1965) (radio transmission admissible under "business records" exception). Indeed, Fed. R. Evid. 803(6) specifically mentions "data compilation[s]," which includes electronically-stored audiovisual recordings. The purpose of the deposition sought by plaintiffs is to establish that both the documentary and the outtakes are admissible under Rule 803(6).

True, because the audiovisual recordings sought here record the statements of persons unaffiliated with BBC – i.e. Abu Rumaileh and Zubaidi – it is not enough for plaintiffs to show that the recordings are business records. In order for the recordings to be admissible to prove the truth of the statements made by Abu Rumaileh and Zubaidi, under Rule 805 ("hearsay within hearsay") plaintiffs must <u>also</u> show that the statements themselves are not hearsay or meet one of the exceptions to hearsay. *See e.g., Rhead v. Mundy*, 2005 WL 5994165 at *11-13 (S.D. Cal. 2005) (admitting recording of 911 call since it was both a business record and an "excited utterance" under Rule 803(2)). There are several ways in which plaintiffs can make this showing:

First, defendants have admitted that during the relevant period Abu Rumaileh was (in addition to his position in Fatah) an official of defendant PLO. *See* **Exhibit H**. Thus, his statement constitutes an admission by party-opponent under Rule 801(d)(2) and is not hearsay.

Additionally or alternatively, Rule 804(b)(3) provides in relevant part that a statement made by a person who is "unavailable" is admissible if it is a "statement which was … so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability … that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." Rule 804(b)(3).  A declarant is "unavailable" if the proponent of the statement "has been unable to procure the declarant's attendance (or in the case of a hearsay exception under subdivision (b)(2), (3), or (4), the declarant's attendance or testimony) by process or other reasonable means." Rule 804(a)(5).

Thus, in order for Abu Rumaileh's and Zubaidi's statements to be admissible under Rule 804(b)(3), plaintiffs need to show (i) that Abu Rumaileh and Zubaidiare "unavailable" and (ii) that the statements were against Abu Rumaileh's and Zubaidi's own interests. Both of these conditions can be easily demonstrated here:

Abu Rumaileh and Zubaidi reside in Jenin in the West Bank and are thus beyond the subpoena power of the U.S. courts, as discussed above. It is well established that in such circumstances, a witness is considered "unavailable" within the meaning of Rule 804(a)(5), and the proponent of the statement is not required to make any efforts to secure the testimony. *See e.g., U.S. v. Kehm*, 799 F.2d 354, 360-361 (7th Cir. 1986) ("Futility excuses a request" and Rule 804(a)(5) therefore does not require the proponent of the statement "to butt his head against a wall just to see how much it hurts ...  a request in this case was exceptionally unlikely to make [the declarant] available as a witness. Rule 804 does not require pointless gestures."); *U.S. v.*

*Terrazas-Montano*, 747 F.2d 467, 469 (8th Cir. 1984) (Because the declarants were located outside of the U.S. "[t]hey were undoubtedly beyond the reach of process … We think it evident that the witnesses were unavailable … To require the government to show that it was unable to procure the attendance of the witnesses under Rule 804(a)(5) of the Federal Rules of Evidence would compel a useless act."); *McIntyre v. Reynolds Metals Co.*, 468 F.2d 1092, 1093 n. 2 (5th Cir. 1972) (witness declared unavailable because he "was beyond the subpoena power of the District Court … and refused to appear voluntarily to testify."); *U.S. v. Lopez*, 777 F.2d 543, 554 (10th Cir. 1985) ("The Government argues that defendant Lopez could not satisfy Rule 804(a)(5) because he failed to show that he attempted to procure Jaramillo's attendance by process or other reasonable means. The law does not require the doing of a useless thing … Jaramillo failed to appear at trial and was subsequently indicted for bail jumping … Under these circumstances, resort to process cannot be effective [therefore] Jaramillo was unavailable under Rule 804(a)(5).").[10]

Nor is there any doubt that Abu Rumaileh's and Zubaidi's statements were strongly contrary to their interests: Abu Rumaileh admitted that Al Aqsa and Fatah are the same entity. **Exhibit G** at 18-19. This statement is extremely harmful to Abu Rumaileh's interests because Al

---

[10]As Judge Carter previously found in the *Sapertsein* case, there is no chance that Abu Rumaileh and Zubaidi would voluntarily agree to testify in this case, which is brought mainly by Jews, many of whom live in Israel, against the PA and the PLO. *See* Declaration of Professor Barry Rubin, **Exhibit I** ("**Rubin Decl.**"), at ¶¶ 10-14. Nor is there any mechanism by which Abu Rumaileh and Zubaidi could be compelled to appear for a deposition. Jenin is under the jurisdiction of PA. The PA (which is not a state) is not a party to the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters or any other convention pursuant to which a U.S. court could request that the PA compel the appearance of Abu Rumaileh and Zubaidi. Issuing a free-standing letter rogatory to the PA requesting that PA authorities compel Abu Rumaileh and Zubaidi to appear for depositions would also be a vain exercise. Even assuming *arguendo* that internal PA law permits the PA to compel the appearance of a PA resident for a deposition (an assumption that plaintiffs have no reason to believe is true) the PA would obviously have full discretion to decline such a request. There is no chance whatsoever that the PA would agree to carry out such a request. *See* Rubin Decl. at ¶¶ 17-18.

Aqsa has been designated by the United States as a "Foreign Terrorist Organization." *See* 67 F.R. 14761, March 27, 2002. Thus, by admitting that Fatah and Al Aqsa are the same entity, Abu Rumaileh – who is a Fatah leader – thereby effectively admitted that he is a leader of a designated Foreign Terrorist Organization, with all the legal consequences attached thereto. *See* 31 CFR § 597.301(a)(2). Moreover, that admission is likely to render Abu Rumaileh criminally and/or civilly liable for terrorist attacks carried out in the name of Al Aqsa. In addition, such a statement would surely be contrary to Abu Rumaileh's pecuniary interest as an employee of the PLO as it "threatens the loss of employment, or reduces the chances for future employment." *Gichner v. Antonio Troiano Tile & Marble Co.*, 410 F.2d 238, 242 (D.C.Cir. 1969).

Likewise, Zubaidi spoke in support of suicide bombings against Israeli civilians and stated that the Al Aqsa– of which he is a leader – would continue with such attacks until Arafat ordered a halt. **Exhibit G** at 37-38. Clearly, these statements can render Zubaidi criminally and/or civilly liable for such attacks.

Abu Rumaileh's and Zubaidi's statements are thus admissible per Rule 804(b)(3).[11]

Finally, Abu Rumaileh's and Zubaidi's statements are admissible under Rule 807. It cannot be seriously argued that these videotaped statements were not made or that Abu Rumaileh or Zubaidi had any reason to speak falsely, and the statements therefore have circumstantial guarantees of trustworthiness equivalent to other hearsay exception. Likewise, for the reasons discussed above, the statements are offered as evidence of a material fact (that Fatah and Al Aqsa are the same) and are more probative on this issue than any other evidence which plaintiffs can reasonably procure. Finally, the general purposes of the Rules of Evidence and the interests

---

[11] Plaintiffs also note that the BBC blatantly misrepresents the Rules of Evidence by suggesting that a statement must be made under oath to qualify as a statement against interest under Rule 804(b)(3).  DE 258 at 24.

of justice would be well served by admission of the statements into evidence. *See Weiss*, 242 F.R.D. at 50 (ATA suits "vindicate the national and international public interest.").

      E.    **As Long as BBC is Subject to This Court's Jurisdiction, the Location of the Responsive Documents is Irrelevant (Response to DE 258, Argument I.B)**

Whether the documentary and/or the outtakes are located in the United Kingdom or in New York is not relevant to the analysis because BBC is subject to this Court's jurisdiction and was properly served with the Subpoena.  It is black-letter law that "the person subject to the subpoena is required to produce materials in that person's control <u>whether or not the materials are located within the district or within the territory within which the subpoena can be served</u>." *First American Corp. v. Price Waterhouse LLP*, 154 F.3d 16, 21 (2nd Cir. 1998) (quoting Fed.R.Civ.P. 45, Advisory Comm. Notes) (emphasis added). *See also e.g. Tiffany (NJ) LLC v. Andrew*, --- F.R.D. ----, 2011 WL 3135850 at *6 (S.D.N.Y. July 25, 2011) ("The Banks attempt to overcome the presumption that they have custody and control over the documents by asserting that their New York and China branches have separate computer systems, and that their New York personnel cannot compel the China head-quarters to produce account information. These facts are of no moment, however, because the subpoena is directed to the Banks as a whole, not solely the New York branches.").  In addition, contrary to BBC's claim (DE 258 at 13), the subpoenaed material is not being sought as an "adjunct" to any deposition.  If anything, the deposition is secondary to the material being sought here and as explained below, Judge Ellis acted within his discretion in modifying the deposition part of the Subpoena to require an affidavit instead.

**F.    The Court Did Not Err in Modifying the Subpoena to Require a Record Keepers Affidavit Rather Than a Deposition (Response to DE 258, Argument I.A)**

It was well within Judge Ellis's discretion to modify the Subpoena to require BBC to provide a records keeper affidavit instead of a deposition, even though plaintiffs were (and are) willing to travel to London to take the deposition.  It is clear from the plain language of Rule 45 that a court has the authority to "quash *or modify*" a subpoena.  *Fed. R. Civ. P. 45(c)(3)(A) (emphasis added).*[12]  Other courts have exercised their discretion to modify a deposition subpoena served on a non-party, where the witness is located outside of the 100-mile limit.  *See, e.g., Davis Aviation, supra*, 2011 WL 5999332 at *6 (ordering records keeper declaration); *Estate of Yaron Ungar*, 451 F. Supp. 2d 607, 612 (S.D.N.Y. 2006) (ordering deposition by written questions).  Thus, BBC's argument that the Court's only option was to quash the Subpoena is simply not correct.

Plaintiffs note that Judge Ellis also would have been acting within his discretion had he modified the Subpoena to require BBC to produce a witness in London, as Judge Carter did in *Saperstein. Saperstein, supra*, 2010 WL 1371384 at *3. *See also Matthias Jans& Assocs., Ltd. v. Dropic*, 2001 WL 1661473 at *3 (W.D.Mich. 2001) (modifying subpoena to require its recipient to appear for the deposition "at a place to be agreed upon by all counsel, no greater than 100 miles" from her residence.); *Comm-Tract Corp. v. Northern Telecom, Inc.*, 168 F.R.D. 4, 7 (D.Mass. 1996) (modifying subpoena issued and served in Massachusetts upon a non-party witness who, by the time scheduled for his appearance at trial, was to have commenced work on a three-year expatriate assignment in Hong Kong, concluding that the "just result" was to modify the subpoena to require the witness to submit to a videotape deposition in Hong Kong.); *In re*

---

[12] It is worth emphasizing that the deposition sought by Plaintiffs in the Subpoena was purely for the administrative purpose of establishing the authenticity of the documentary and outtakes as business records and to establish their admissibility at trial.

*Application for Order Quashing Deposition Subpoenas, dated July 16, 2002*, 2002 U.S. Dist. LEXIS 14928 at *15 (S.D.N.Y. 2002) ("Given that the rule expressly authorizes the Court to quash *or* modify the subpoena, it seems … odd to conclude that the sensible results ordered by the courts in *Matthias Jans* and *Comm-Tract* were simply unauthorized by law.").

Contrary to BBC's claims, the so-called 100-mile rule does not excuse BBC from having to comply with plaintiffs' Subpoena, whether in respect of producing a witness for a deposition or providing an affidavit, for at least two reasons.

*First*, BBC's entire 100-mile argument is premised on the notion that the "witness" here is not BBC itself but rather its corporate designee. But that notion has no support in precedent. The case on which BBC purports to rely, *Price Waterhouse LLP v. First American Corp.*, 182 F.R.D. 56 (S.D.N.Y. 1998), expressly <u>declined</u> to rule on this issue because the subpoena recipient was a partnership with no presence of its own in New York. *Id.* at 62 ("Whether the 'person' for purposes of Rules 45 and 30(b)(6) is the entity, PW–UK, or the actual witnesses, knowledgeable partners, or employees or PW–UK, 'the place' where PW–UK and its partners and employees "reside," are "employed," or "regularly transact[ ] business in person" is not New York … PW–UK, admittedly does not transact business "in person" but through an agent … PW–UK is not a corporation but a partnership. Unlike a corporation, a partnership has no separate existence or identity of its own.").

Here, by contrast, BBC is a <u>corporation</u> with its <u>own</u> offices in New York. Thus, the rationale employed in *Price Waterhouse* is inapplicable, and allowing BBC to avoid its obligations to supply the records keeper certification whether by deposition or by affidavit would require this Court to first hold that the "witness" is not BBC but its designee. *See Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 218 F.R.D. 423, 424 (D.Del. 2003) (noting that

*Price Waterhouse* left this issue unresolved in respect to corporations with a local presence and declining to resolve it); *see also Ungar*, 451 F. Supp.2d at 611 ("I did not intend, by my November 7 decision, to endorse a "modification" [*i.e.*, quashing deposition aspect of subpoena entirely] that amounted to a "nullification" of the essence of what plaintiff-judgment creditor had achieved via constitutionally sufficient service."). There is no basis for such a holding. Moreover, adopting such a holding would create the absurd result that corporations are considered a "witness" for purposes of a document subpoena but not for purposes of a deposition subpoena.

The *NML* and *Nissan* cases, cited by BBC, are similarly inapposite here.[13] *NML* involved a subpoena seeking discovery from a Swiss bank with no office in New York, where the subpoena was addressed to, and served upon, an individual officer of the bank while on a business trip in New York. Thus, the New York courts did not have personal jurisdiction over the Swiss bank. *NML Capital, Ltd. v. Republic of Argentina*, 2011 U.S. Dist. LEXIS 99502, *25-26 (S.D.N.Y. 2011) ("The BIS has no offices, employees, or general agents for service of process in New York; neither owns nor leases any real property in New York; has neither sought to be nor is licensed to do business in New York; and does not advertise or solicit business in New York."). Similarly, *Nissan*, involved a Subpoena addressed to, and served on, an individual who resided and worked in Japan, while he was on a trip to New York for settlement discussions in the case out of which the subpoena was issued. *In re Application for Order Quashing*

---

[13] The cases cited by BBC in its Objection, DE 258, n. 10, are distinguishable for the same reasons. Those cases address the court's underlying personal jurisdiction in situations where an individual, rather than a corporation, is served in his personal capacity. *Black v. USA Travel Auth., Inc.*, 2001 U.S. Dist. LEXIS 9297, *11-12 (S.D.N.Y. 2001); *United Mizrahi Bank Ltd. v. Sullivan*, 2000 U.S. Dist. LEXIS 16157, *8 (S.D.N.Y. 2000). There is no dispute that this Court has personal jurisdiction over the BBC. Plaintiffs served the Subpoena on the BBC at its offices in New York and did not identify any particular individual to be deposed, leaving it to the BBC to supply the appropriate witness. Moreover, as discussed below, since the BBC has indicated that there is no one witness with the knowledge to provide the required testimony, it could just as easily designate a witness in New York as in London.

*Deposition Subpoenas, dated July 16, 2002*, 2002 U.S. Dist. LEXIS 14928 at \*10-12. The Court considered modifying the subpoena to order the deposition in Japan, but ultimately decided not to for other reasons. *Id*. at \*16-18.

*Second*, BBC's argument is also based on the mistaken assumption that a corporation which receives a deposition subpoena need only produce whatever knowledgeable Rule 30(b)(6) designee-witnesses it <u>happens to have available</u>. But nothing could be further from the truth: it is well established that a corporation is obligated to "create" a Rule 30(b)(6) witness if necessary:

The fact that an organization no longer has a person with knowledge on the designated topics does not relieve the organization of the duty to prepare a Rule 30(b)(6) designee … it is not uncommon to find that a corporation no longer employs individuals who have memory of distant events, or to find that individuals with knowledge are deceased. These problems do not relieve a corporation from preparing its Rule 30(b)(6) designee to the extent matters are reasonably available, whether from documents, past employees, or other sources.

A party producing a Rule 30(b)(6) witness must prepare deponents by having them review prior fact witness deposition testimony as well as documents and deposition exhibits. *Great American Ins. Co. of New York v.Vegas Construction Company*, 251 F.R.D. 534, 539 (D.Nev. 2008) (citations and quotation marks omitted). *See also e.g. Coryn Group II, LLC v. O.C. Seacrets, Inc.*, 265 F.R.D. 235, 238 (D.Md. 2010) ("[T]he corporation is expected to *create* a witness or witnesses with responsive knowledge, and in doing so must make a good faith effort to find out the relevant facts – to collect information, review documents, and interview employees with personal knowledge.") (quotation marks omitted); *Ecclesiastes 9:10-11-12, Inc. v. LMC Holding Co.*, 497 F.3d 1135, 1146 -1147 (10th Cir. 2007) ("[T]he view that the duty to educate a person with no prior knowledge is 'prejudicial' to a corporation has not prevailed, and

it appears now to be recognized that the Rule 30(b)(6) deponent must be woodshedded with information that was never known to the witness prior to deposition preparation."); *Function Media, L.L.C. v. Google, Inc.*, 2010 WL 276093 at *3 (E.D.Tex. 2010) (noting the "obligation to educate a witness on the noticed 30(b)(6) topic.") (emphasis added).

Here, BBC has never identified a 30(b)(6) witness with the knowledge needed to authenticate the documentary and outtakes as business records. In light of the above it makes no sense to argue, as BBC does, that because it happens to have no knowledge designee in its New York office it is excused from complying with the Subpoena. As the cases above (and scores of other cases) show, BBC has an obligation to educate, prepare and if necessary "create" a knowledgeable witness either in London or in New York.

Effectively, BBC is asking this Court to accept the premise that a corporation located outside the 100 miles limit can completely thwart a deposition subpoena issued to it by that court by the simple expedient of designating a witness who lives and works beyond the 100 mile limit. Plainly, this argument is baseless and should be firmly rejected. Nor can BBC claim that it has a ready-made, knowledgeable witness in London and preparing a witness in New York would be too troublesome: BBC's own declarants concede that BBC has yet to figure out who its witness or witnesses might be. *See* DE 144 at ¶¶ 5-6.

In his September 6 Order, taking BBC's arguments into consideration, Judge Ellis offered a reasonable compromise by directing BBC to provide the business records authentication in the form of an affidavit rather than live testimony. The bottom line is that Judge Ellis did not err in ordering the records keeper's affidavit and BBC has not provided any basis for the Court to disturb that part of the September 6 Order.

WHEREFORE, the September 6 Order should be affirmed.

Dated:  October 24, 2012                              Plaintiffs, by their Attorneys,

                                                     /s/_____
                                                     Robert J. Tolchin (NY0088)
                                                     111 Livingston Street, Suite 1928
                                                     Brooklyn, New York 11201
                                                     (718) 855-3627
                                                     rjt.berkman@gmail.com

                                                     /s/_____
                                                     David I. Schoen (DS0860)
                                                     David I. Schoen, Attorney at Law
                                                     2800 Zelda Road, Suite 100-6
                                                     Montgomery, Alabama  36106
                                                     (334) 395-6611
                                                     DSchoen593@aol.com

                                                     Counsel for Plaintiffs