UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

MOSHE SAPERSTEIN, et al.,

    Plaintiffs,

v.                                                         09-mc-00619-SLT -ALC

THE PALESTINIAN AUTHORITY et al.,

    Defendants.

## DECLARATION OF PROFESSOR BARRY RUBIN

I, Barry Rubin, declare pursuant to 28 U.S.C. § 1746, as follows:

### A.    Professional Background

1. I am the director of the Global Research in International Affairs Center (GLORIA) at the Interdisciplinary Center (IDC) in Herzliya, Israel, and a member of the IDC's faculty. I am also a senior fellow at the IDC's International Policy Institute for Counter-Terrorism. I hold a doctorate from Georgetown University, a master's degree from Rutgers University, and a bachelor's degree from Richmond College.

2. Throughout my academic career I have held a number of professorships worldwide, including a position at the Hebrew University, Israel, 1994-1995; visiting professor, Middle East Technical University, Ankara, Turkey (Summer 1995); and professor of Political Science, Bar-Ilan University, Israel (1995-1996). From 1994-2002, I was Deputy Director of the Begin-Sadat Center for Strategic Studies, Bar-Ilan University. More recently, I was the Seymour & Lillian Abensohn Visiting Professor in Israel Studies, American University (2005-2006).

3. In addition to these positions, I have served as a visiting fellow at several academic and policy institutes, including a National Defense Foreign Language Fellowship in

Arabic (1977-78); a senior fellowship in Middle East Studies, Georgetown University Center for Strategic & International Studies (1978-1985); senior fellowship, Washington Institute for Near East Policy (1988-1991); senior fellowship and professorship, Foreign Policy Institute, Johns Hopkins University SAIS, (1986-1993); and a Fulbright fellowship, Haifa and Tel Aviv Universities (1990-1991).

4. I have been the recipient of numerous grants from a variety of institutions, including a grant from the U.S. Institute of Peace to study the Arab-Israeli peace process (1989-1991); a research grant from the Harry Guggenheim Foundation to study PLO policy (1990); a grant from the Leonard Davis Center, Hebrew University for research on U.S. Middle East policy (1993-1994); a grant from the Begin-Sadat Center at Bar-Ilan University for research on Israel's Middle East policy (1994-95); and three grants from Bradley Foundation, for a study of American allies (1998-1999), on armed forces of the Middle East (2000-2001), and on Anti-Americanism (2002-2003).

5. From 1985-1986, I served as the foreign policy adviser for United States Senator Gary Hart.

6. At present, I am the editor and publisher of the *Middle East Review of International Affairs*. I am also a member of the editorial board of the *Middle East Quarterly*. I edit the Palgrave Macmillan's *Middle East in Focus* series and the Taylor & Francis Middle East military/strategic series. I am a syndicated Middle East columnist for the *Jerusalem Post*.

7. Palestinian politics, the PLO and the Palestinian Authority have been for years and remain today a central focus of my research, writing and teaching, and I have developed an extensive expertise regarding these topics. I have authored the followings works on Palestinian politics and the PLO: *The Arab States and the Palestine Conflict*, Syracuse University Press

(1981); *Cauldron of Turmoil: America in the Middle East*, Harcourt, Brace, Jovanovich (1992); *Revolution Until Victory?: The Politics and History of the PLO*, Harvard University Press (1994); *The Transformation of Palestinian Politics*, Harvard University Press (1999); *The Tragedy of the Middle East*, Cambridge University Press (2002); *Yasir Arafat: A Political Biography*, Oxford University Press (2003); "Egypt and the Palestine Question, 1922-1939," in *Essays on Israel and Palestine*, Wiener Library (1978); *The PLO's Intractable Foreign Policy*, Washington Institute for Near East Policy (1986); *The PLO – A Declaration of Independence?*, Washington Institute for Near East Policy, Policy Focus No. 8 (November 1988); *Inside the PLO: Officials, Notables, and Revolutionaries*, Washington Institute for Near East Policy, Focus No. 12 (December 1989); *The PLO's New Policy: Evolution Until Victory?* Washington Institute for Near East Policy, Policy Paper #13 (June 1989); "The Origins of PLO Terrorism," in Barry Rubin, *Terrorism and Politics*, St. Martins Press (1991); "The PLO After the Gulf Crisis," in Rob Satloff, *The Politics of Change in the Middle East*, Westview (1993); *The PLO Between Anti-Zionism and Antisemitism*, Hebrew University Sassoon Center (1993); "The United States and Iraq" and "The PLO and Iraq" in Amatzia Baram and Barry Rubin, *Iraq's Road to War*, St. Martins (1994); *The Palestinian Charter: Prospects for Change and Options for Israel*, BESA Center (1996); "Misperceptions and Perfect Understanding: The US and the PLO," in Avram Sela and Moshe Ma'oz, *The PLO and Israel, From Armed Struggle to Political Settlement*, St. Martins Press, (1997); "Israel, The Palestinian Authority, And the Arab States," *MERIA Journal*, Vol. 1 No. 4 (December 1997); "After Arafat: Succession and Stability in Palestinian Politics," *Middle East Review of International Affairs*, Vol. 2 No. 1 (March 1998); *Israel, The Palestinians, and The Arab States*, BESA Center (1998); "The Future of Palestinian Politics: Factions, Frictions, and Functions," *Middle East Review of International*

3

*Affairs*, Vol. 4, No. 3 (September 2000); "The Palestinian Movement: From Catastrophe to Disaster," in Robert O. Freedman *The Middle East Enters the 21st Century*, University of Florida Press, (2002); "Geopolitique du territoire controverse et d'un eventual Etat Palestinien," in *Frontieres Palestiniennes Regards Croises des Geographes*, Geographes Associes (2004); "The Decline and Fall of the Palestinian Nationalist Movement," in Barry Rubin, *Political Islam*, Vol. II, Routledge (2007); and "Israel and the Palestinians," in Robert O. Freedman, *Contemporary Israel*, Westview Press (2008).

8. For many years now, until today, I closely follow developments in the West Bank and Gaza Strip though, *inter alia*, the Palestinian print and electronic news media, the official publications and websites of the Palestinian Authority and of the PLO and the PLO's various factions, and personal contacts and discussions with Palestinian political leaders and academics.

9. A copy of my curriculum vitae is attached hereto as Appendix "A".

B. **The Nature of This Declaration**

10. I have been asked by counsel for the plaintiff in the above-captioned case to provide my professional opinion as to whether: (a) Ata Abu Rumaileh and/or Zakaria Zubaidi would voluntarily appear to be deposed by attorneys for the plaintiff in this case; (b) Abu Rumaileh and/or Zubaidi would comply with an order from an Israeli court directing them to appear to be deposed by attorneys for the plaintiff in this case; and (c) The Palestinian Authority would voluntary comply with a request from an American court that it compel Abu Rumaileh and/or Zubaidi to appear to be deposed by attorneys for the plaintiff in this case.

### C. Opinion

11. In my professional opinion, based on my deep and intimate familiarity with the Palestinian political sphere, the Palestinian Authority ("PA") and the PLO and its constituent factions, the answer to all three questions is unquestionably negative, for the reasons below.

12. Ata Abu Rumaileh is the Secretary General of "Fatah" in the Jenin area. Fatah is the main faction of the PLO. While the PLO has several factions, Fatah is the overwhelmingly dominant faction and effectively controls the PLO. The Fatah leadership also makes up the leadership of the PA, and thus effectively controls the PA as well.

13. Abu Rumaileh could not hold his position as Fatah leader in Jenin unless he was a loyal supporter of the PLO and the PA. There is therefore no chance that Abu Rumaileh would voluntarily appear to be deposed by a plaintiff seeking damages from the PLO and PA. For the same reason it is inconceivable that Abu Rumaileh would obey an order from an Israeli court to appear for a deposition in this case. As a resident of the PA and as a senior Fatah official who by dint of his position enjoys the support and protection of the PA and PLO, Abu Rumaileh would have no reason to be concerned about an order issued by a court in Israel. Even if he had such a concern, Abu Rumaileh would not – and could not, on pain of losing his position or suffering a worse fate – testify in a case against the PA and PLO.

14. Zakaria Zubaidi served for many years as leader of the "Al Aqsa Martyrs Brigades" (a group engaged in armed struggle including terrorism which is part of Fatah) in Jenin, and he was wanted by Israel for numerous terrorist attacks. As part of an amnesty negotiated by Israel and the PA, Israel agreed to remove Zubaidi from its wanted list provided that he lay down his arms and remain in Jenin. The thought that Zubaidi, for years wanted in

5

connection to terrorist attacks himself, would agree to be deposed by the plaintiff in lawsuit against the PA and PLO seeking damages from a terrorist attack is absurd.

15. Likewise, it is impossible to imagine that Zubaidi would appear at such a deposition as the result of an order from an Israeli court. Aside from his long-time political loyalty to Fatah and the PLO, Zubaidi is dependant on the goodwill of the PA to ensure that his "wanted" status is not restored. If Zubaidi were to act in a manner that displeases the PA – and appearing at a deposition in this case would certainly qualify as such conduct – he would be risking his protected status.

16. I would add that in my opinion it would be very unlikely that Israeli authorities would authorize or that an Israeli court would issue an order commanding Zubaidi to appear at a deposition. The amnesty granted to Zubaidi (and other Fatah members wanted on terrorism charges) was worked out through lengthy negotiations between Israel and the PA, and Israel would be extremely reluctant to take any step that might disrupt the amnesty agreement (which in turn could lead to a return to active terrorism by Zubaidi or other beneficiaries of the amnesty). The PA and/or Zubaidi himself might well perceive the issuance of such an order as breaching the amnesty agreement, and for that reason it is unlikely, if not farfetched, that Israel would do so.

17. Nor in my opinion is there any likelihood that the PA would voluntarily comply with a request from an American court to compel Abu Rumaileh or Zubaidi to be deposed in this case. Since (as I have been informed by plaintiff's counsel) compliance with requests of this nature is voluntary and discretionary and the PA would not face any legal sanction for declining the request, there is simply no compelling reason for it to do so.

6

18. Even assuming that declining the request would somewhat tarnish the PA's image in the United States (and I do not opine on whether this would be the case) the PA and PLO frequently conduct themselves in a manner that causes <u>serious</u> harm to their reputation in the United States. In my opinion, the risk of such reputational damage, which would be relatively minor here if it exists at all, would not motivate the PA to comply with such a request.

I declare, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct.

December 20, 2009

Barry Rubin

7