# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

MARK SOKOLOW, et al.,

        Plaintiffs,

                            Civ. No. 04-397 (GBD) (RLE)

    v.

THE PALESTINE LIBERATION ORGANIZATION, et al.,

    Defendants.

## <u>DECLARATION OF ROBERT J. TOLCHIN</u>

Robert J. Tolchin declares pursuant to 28 U.S.C. § 1746, as follows:

1.      I am an attorney licensed to practice law in the State of New York and in this Court, and counsel for the Plaintiffs in the above-referenced action. I make this declaration in order to provide details of the difficulties Plaintiffs have encountered for more than one year in obtaining discovery responses that Defendants have *agreed* to provide.[1]

2.      As the facts recited herein will show, Defendants have engaged in an ongoing pattern of discovery abuses whereby they claim they are "investigating" and "searching" for documents or information responsive to a particular request, and then later produce – in partial and incremental fashion, dragged out over intervals of weeks, months or more – responsive documents or information from their files, which clearly were in their possession all along. In

---

[1] This declaration deals only with the many instances wherein Defendants agreed to investigate and/or search, or otherwise represented that they would produce discovery responses. There are also requests in response to which Defendants refused to produce discovery at all. Plaintiffs will address those instances of refusal via separate filings.

many instances, such documents and information were produced only after Plaintiffs confronted Defendants with proof from other sources showing that Defendants *must* be in possession of responsive documents or information concerning a particular request. In other words, it has become apparent that to a great extent, the scope of Defendants' responses is a function of their fear of being caught withholding documents or information.

3.    Throughout this process, Plaintiffs have acted in good faith and relied on Defendants' representations that they were continuing to search for responsive documents and information. Unfortunately, time has shown that Defendants' conduct adds up to a consistent pattern of glacial and incomplete production, accompanied by empty promises to "keep looking."

4.    Thus, with the approaching deadline for the close of fact discovery and Defendants still claiming they are "investigating" and searching for documents and information responsive to Plaintiffs' discovery requests, and with many of Defendants' partial productions having been made after extraordinary delays which in turn slowed plaintiffs' ability to propound follow-up discovery, it is clear that Plaintiffs will not be able to effectively prepare their case if the discovery deadlines are not expanded. Moreover, irrespective of whether Defendants' delays were intentional or merely reckless, the bottom-line fact is that they have prevented Plaintiffs from obtaining crucial discovery, and an expansion is therefore necessary.

## A. Discovery Relating to the March 2002 Bombing that Maimed the Bauer Plaintiffs

5.    For a period of more than one year, Defendants have continuously claimed that they are investigating the answers to the Bauer Plaintiffs' first interrogatory, but they have yet to produce complete responses:

a)    On August 26, 2011, Plaintiffs served Defendants with an interrogatory requesting all employment information relating to the four terrorists convicted of involvement in

2

the March 21, 2002, suicide-bombing carried out by Mohammed Hasheika ("Hasheika"), who set off a massive shrapnel-laden bomb in downtown Jerusalem, maiming Plaintiff Dr. Alan Bauer and his minor son, Plaintiff Y.B. The bombing was initiated and planned by two officers in Defendant PA's security services, Abdel Karim Ratab Yunis Aweis ("Aweis") and Nasser Jamal Mousa Shawish ("Shawish"), both of whom freely and proudly confessed and were convicted by an Israeli court for their roles in the attack. Two women, Sana'a Muhammed Shehadeh ("Shehadeh") and Kaira Said Ali Sadi ("Sadi") assisted in the bombing and were also convicted by the Israeli court.

   b) The purpose of that August 2011 interrogatory[2] was to obtain information showing that the perpetrators of the bombing were officers and employees of the Defendants. This fact is highly relevant both to Plaintiffs' claims that the Defendants provided direct "material support" for the bombing and they are liable under *respondeat superior*. Clearly, PA employment documents are within Defendants' possession and should be easily accessible.

   c) In response to this interrogatory, *over the course of an entire year*, Defendants have trickled cherry-picked documents to Plaintiffs without actually providing a complete or genuine response. For example, in their objections and responses to the interrogatory, served on October 3, 2011 (attached hereto as **Exhibit A**), Defendants claimed that "Based on an investigation conducted to date … Defendants have identified documents that provide some of the information sought by this Interrogatory," which would be produced only after a confidentiality order was entered by the Court.

---

[2] For the purpose of efficiency, and so the exhibits to this declaration do not become too bulky, plaintiffs will not attach the discovery request where the response is being attached. Because the response always contains the request, this will prevent duplicative exhibits.

d)      More than a month later, on November 11, 2011, Defendants served supplemental objections and responses to that same interrogatory, (attached hereto as **Exhibit B**), stating that certain of the documents had been translated and that the translations were being withheld under a claim of work-product privilege. *See* **Exhibit B** at 8.

e)      Notwithstanding Defendants October 3 admission that they had already identified documents, no documents were produced until November 17, 2011, when Defendants delivered to Plaintiffs a paltry three pages in Arabic (marked Bates 4473-4475), bearing a caption from the Central Financial Directorate of Defendant PA's Ministry of the Interior and National Security, containing a chart listing salary payments from the PA to convicted bomber Aweis between January 2000 and December 2002. Notably, this document bears what appears to be a print date of September 26, 2011. Thus, Defendants located these documents even before serving their first responses and objections to the interrogatory on October 3 and continued to withhold them from the Plaintiffs for nearly two months. Even if Defendants only began translating the documents on or about November 11 when they served their supplemental objections, the translation process for three pages should not take more than a few hours. Moreover, Plaintiffs doubt that the PA has no other documents regarding Aweis, an employee of at least three years.

f)      On December 22, 2011, more than two and a half months after Defendants' October 3 claim that they had identified documents, Defendants mailed Plaintiffs three more pages in Arabic (marked Bates 4497-4499). Like the Aweis documents, these documents bear a caption from the Central Financial Directorate of Defendant PA's Ministry of the Interior and National Security, and contain a chart listing salary payments from the PA to convicted bomber Hasheika between January 2000 and January 2002. This document shows

what appears to be a print date of December 1, 2011. Defendants obviously had the ability to locate these documents when they located the Aweis documents, months earlier. Moreover, the print date reveals that Defendants withheld these documents from the Plaintiffs for over three weeks after having printed them (and then mailed them to Plaintiffs by regular U.S. mail immediately before Christmas, creating a further week of delay). Moreover, both these documents and the Aweis documents, which reflect payments made by Defendant PA circa 2000-2002, quite obviously could and should have been located, printed and produced within 30 days after the service of the Bauer Plaintiffs' August 26, 2011 discovery request.

g)    Some three months after the Hasheika production, on March 16, 2012 – nearly *seven months* after the Bauer Plaintiffs served their interrogatory request – Defendants served Plaintiffs with a single page in Arabic (marked Bates 6034) purporting to be an "administrative order" dated February 1, 2002, terminating Hasheika's employment as a PA policeman. It is noteworthy that Defendants were able to "magically" locate a document purporting to help their case, but not other documents relating to Hasheika's employment or that of the others involved.

h)    Together with that March 16, 2012 one page production, Defendants served their "Second Supplemental Objections and Responses" to the Bauers' August 26, 2011 interrogatory (attached hereto as **Exhibit C**), in which they incredibly proclaim that, "Defendants' investigation is continuing," and they "will supplement [their] answer to the extent required by Rule 26(e)(1)." **Exhibit C** at 8.

i)    Since Defendants' March 2012 supplemental responses in which they claimed that the investigation is continuing, no further documents concerning the PA's

employment of Aweis or Hasheika, for whom the PA must have files, has been produced. Promises of a "continuing investigation" remain, but appear to be disingenuous.

6.    Defendants' response to the Bauer Plaintiffs' second interrogatory is even more outrageous:

a)    Following the March 21, 2002, bombing, it was widely reported that the suicide bomber, Mohammed Hasheika, had been detained by the PA (pursuant to an Israeli demand) in mid-February 2002 while wearing an explosive belt and en route to a bombing, but had been released by the PA soon thereafter to continue his terrorist activities – and then proceeded to blow up Dr. Bauer and his son.

b)    Therefore, on October 3, 2011, the Bauers served the Defendants with Interrogatory no. 2, seeking the identities and employment details of past and current employees of the PA or PLO with knowledge of Hasheika's detention and interrogation by the PA, and the causes and circumstances of Hasheika's release from PA custody.

c)    Seeking information regarding people with knowledge of the salient facts of the lawsuit is, of course, a well-recognized primary purpose for an interrogatory, served in nearly every lawsuit. It was made even more reasonable here, in that it was limited to information regarding Hasheika. Nevertheless, following their pattern with respect to the Bauers' first interrogatory, on November 7, 2011, Defendants responded with their standard five pages of baseless objections to this single interrogatory, (attached hereto as **Exhibit DD,** at pp. 7-8). Most notably, however Defendants specifically objected that: (a) The information is irrelevant, when the request clearly seeks information about individuals with *relevant knowledge*; and (b) asserted that terms such as "positions and/or jobs" and "work or employment" are somehow vague and ambiguous. These objections are clearly disingenuous smokescreens. Notwithstanding their

6

baseless objections, Defendants then proceeded with the incredible claim that they could not find a single piece of responsive information, but, as always, would continue to look.

      d)     Nearly *six months* later – on April 29, 2012 – Defendants served "second supplemental objections and responses" to that second interrogatory (attached hereto as **Exhibit D**), in which they identified one Maher Rashed Abdel-Jalil Dweikat ("Dweikat") as a person having relevant knowledge without any further explanation. *Id***.** at 7. While Defendants failed to provide any information about Dweikat, an internet search conducted by Plaintiffs (which could only be done in Arabic) shows that Dweikat is a senior regional commander in Defendant PA's security and police forces, who at last report held the rank of Colonel. Thus, after representing (subject to penalties provided in Rule 26(g)) on November 7, 2011 that they were unable to identify even a single person with the knowledge of the events at issue – though "Defendants' investigation is continuing" – Defendants proceeded to delay for nearly half a year before admitting that a Colonel in their security services – who was obviously known and available to Defendants all along – has the requisite knowledge. Plainly, Defendants either (i) made no real effort to gather the information – notwithstanding their explicit representation that they would do so – or (ii) intentionally withheld this information.[3]

      e)     One month after that, on May 29, 2012, Defendants served yet another supplemental response and objection (attached hereto as **Exhibit E**), in which they identified one Mohammed Al-Ghoul as possessing relevant information to the Bauers' second interrogatory. Here again, Defendants provide no information regarding Al-Ghoul, but an internet search

---

[3] Again, Plaintiffs at all times have worked diligently and in good faith to try to convince Defendants to comply with their discovery obligations, trying for months to do everything possible to get compliance without having to trouble the Court. This is how Plaintiffs believe the discovery process is intended to proceed, but they have been unsuccessful. In any event, intentional or not, Defendants' actions have caused delay in this matter.

reveals that he was a member of the PA's Preventive Security Service – meaning that Defendants could have provided his name a year or more ago. Furthermore, in their two "supplemental objections and responses" served on April 29, 2012 (Exhibit D) and May 29, 2012 (Exhibit E at 8), Defendants represented that their "investigation is continuing" and that they will supplement at some undefined time in the future.

f)    Since then, Defendants have neither provided a supplemental answer, nor claimed that their putative "investigation" has been exhausted – thereby allowing themselves to continue their tactic of doling out scraps of information from time to time as they please. Meanwhile, as Defendants well know, the fact discovery deadline comes ever closer. Thus, without this Court's intervention, Defendants' gamesmanship will succeed.

7.    Defendants have been just as evasive in responding to – or more accurately, in *promising* but *failing* to respond to – the Bauers' requests for production of documents:

a)    On March 23, 2012, the Bauers served Defendants with fifteen requests for production of documents concerning (i) requests made to the PA to arrest Hasheika, Shawish and Aweis in the period before the bombing (ii) any custodial questioning of Hasheika, Shawish and/or Aweis by the PA during that period and (iii) the circumstances of the PA's release from custody of Hasheika, Shawish and Aweis prior to the bombing.

b)    Plaintiffs served these requests in light of the fact that shortly before the bombing, the PA had detained Hasheika, Shawish and Aweis at the demand of the Israeli and U.S. governments – which had identified the three men as dangerous terrorists who had carried out and were planning additional terrorist attacks – but quickly released them, thereby allowing them to carry out the March 21, 2002 attack in which the Bauers were injured. Moreover, in the case of Aweis, the PA continued to employ him as a security officer, and to pay his salary, even

after receiving a demand for his arrest from the U.S. government. The purpose of these document requests was to obtain critical evidence of the PA's aforementioned conduct and knowledge, which is relevant to liability herein.

c)    On April 23, 2012, Defendants' served objections and responses to the Bauer Plaintiffs' document requests (**Exhibit F**), asserting in response to *each* request that "Defendants have been unable to identify any documents within their possession, custody, or control that are responsive" to the request, but representing, once again, that "*Defendants' investigation is continuing, and Defendants will supplement [their] response as required by Rule 26(e)(1),*" (emphasis added). *See* **Exhibit F** at pp. 6-22.

d)    Nearly *six months* have passed since then, but Defendants have neither produced any documents nor claimed that their putative "investigation" has been exhausted. It is impossible that Defendants possess <u>no</u> documents concerning the arrest, questioning and released of these terrorists. Indeed, the fact of Hasheika's arrest prior to the bombing was widely publicized and admitted by the PA, as noted above. Moreover, after the bombing, in a March 24, 2002, Fox News interview with Saeb Erekat (attached hereto as **Exhibit G**), the chief PLO negotiator, Erekat acknowledged that the PA had arrested Hasheika before the bombing. **Exhibit G** at 3. Thus, these arrests were well known to high-level PA officials. Therefore, Defendants must have some documentation, and should have answered Plaintiffs' discovery requests on this one year ago, when propounded. Defendants' "investigation" is, therefore, clearly suspect.

e)    It is also important to note that in response to the Bauers' second interrogatory discussed *supra*, Defendants never identified Erekat as someone with knowledge relating to Hasheika's arrest. This is true even though Erekat is a senior PLO official and publicly proclaimed that he has knowledge regarding Hasheika's arrest. Not only did Defendants

never identify Erekat, but at a conference with the Court, Defendants falsely represented that they were not withholding any names, when so clearly they were withholding at least one – Erekat. *See* Transcript 3/20/12, **Exhibit H**, at p. 45.

        f)     Moreover, in a May, 2002 interview with the New York Times (**Exhibit I**), Aweis admitted that he carried out an earlier terrorist attack in late November 2001 and was then arrested for a few weeks by the PA and released after he promised "not to resume his violent activities." Aweis very quickly went on to plan two more bombings, including the one that injured the Bauers. **Exhibit I**, p.2. In a December, 2001 New York Times article (attached hereto as **Exhibit J**), Arafat admitted receiving a list of wanted men from U.S. envoy, Anthony Zinni. **Exhibit J** at 1. And, according to the attached Israeli Foreign Ministry document (**Exhibit K**), Aweis was on that list. It is therefore clear that Aweis was on the December 2001 Zinni list and was arrested by the PA but then released – whence he carried out the Bauer bombing (while the PA continued to pay his salary). Thus, it is evident that Aweis's arrest, questioning and release were important matters in which top PA leaders were involved and which must have left a paper trail, that Defendants could and should have answered Plaintiffs discovery requests on this issue timely, and that they either are making no effort to search for responsive documents or are intentionally withholding such documents**.**

## B.  Discovery Regarding the July 31, 2002 Hebrew University Bombing

    8.     Defendants have employed the same tactics in response to the interrogatories related to the July 31, 2002 bombing at the Hebrew University ("HU") in which the Blutstein, Carter, Coulter and Gritz Plaintiffs' decedents were murdered:

        a)     Abdullah Barghouti built the HU bomb and was involved in numerous previous attacks in which U.S. citizens were murdered. On multiple occasions, the Israeli

government and then U.S. Secretary of State, Colin Powell, demanded that the PA arrest Abdullah Barghouti. Omri Sharon, an Israeli official and then Prime Minister of Israel's son, personally handed Arafat a list of terrorists known to be planning imminent attacks, which included Barghouti. (**Exhibit L**, p. 18). As proof that the PA was capable of arresting these terrorists, Barghouti was in fact arrested, but the PA released him shortly afterwards. He then carried out the HU bombing.

b)      In October 2011, Plaintiffs served interrogatories upon Defendants similar to those served by the Bauers discussed *supra*, seeking the identification of persons with knowledge of Barghouti's arrest, interrogation and release by the PA. Again, this is a very basic discovery request.

c)      Not surprisingly, Defendants objected on November 10, 2011 (with their standard baseless claim, among other things, that the information sought was irrelevant and vague) and responded, as is their pattern, that they "have been unable to identify any information responsive to this interrogatory," but that "Defendants investigation is continuing and Defendants will supplement to the extent required by Federal Rule of Civil Procedure 26(e)(1)." **Exhibit M** at 7.

d)      In light of the repeated, high-level requests for Barghouti's arrest, it is clear that this was an important matter, which many people in the PA must have known about. Nevertheless, following their typical pattern, five months after serving their objections in which they stated that their investigation is continuing, in March 2012, Defendants suddenly identified first one and then three people with knowledge relevant to the Barghouti interrogatory, all of whom are believed to be senior PA security officers who Defendants clearly could and should have disclosed back in November 2011. Thus, it appears that Defendants are making no effort to

timely locate responsive information or are purposely delaying. In addition, aside from disclosing the names and identification numbers for these three individuals, Defendants provided no other information, completely ignoring the remainder of the interrogatory seeking, among other things, the individuals' relationship with Defendants and the scope of their knowledge.

9.     Defendants have been similarly obstructive in responding to the HU bombing Plaintiffs' document requests ("RPD's"):

a) Having been unsuccessful in receiving timely responses to their interrogatory on the highly relevant subject of Abdullah Barghouti's arrest by the PA, the HU Plaintiffs' first RPD dated March 23, 2012, sought, *inter alia*, "All documents concerning all requests made to the PA between September 1, 2000 and July 31, 2002, by any person or entity, to question, detain or arrest Abdullah Barghouti." Defendants served their standard five pages of objections on April 23, 2012. **Exhibit N**. Then, in the specific responses to *all ten requests*, Defendants represented that they "have been unable to identify any documents…that are responsive to a reasonable interpretation of Request No. 1," but "Defendants investigation is continuing…" See Exhibit N at 6-16.

b) While Defendants' "investigation" into the matter of Abdullah Barghouti's arrests by the PA has been continuing for more than one year, several months ago, Plaintiffs' counsel learned that in a civil suit arising from a different terrorist attack which is currently pending against the PA and PLO in an Israeli court, *Goldman et al. v. PA et al.,* Civ. No. 1137/05 (Tel-Aviv District Court), the PA and PLO submitted a copy of an official August 2001 request by the Israeli government to the PA to arrest a number of terrorists. **Exhibit O**. Defendants PA and PLO submitted that Israeli request to the *Goldman* court because it purportedly contains a

handwritten notation from Yasser Arafat to arrest the terrorists listed therein (which Defendants present as evidence that they opposed terrorism).[4]

c) Because this Israeli request is dated August 2001, which is exactly when (according to multiple news reports) the U.S. and Israeli governments were demanding that the PA arrest Abdullah Barghouti, it is very likely that this document included a request to arrest Abdullah Barghouti. Unfortunately, however, not only is the document only partially legible, it is missing page 2, which is exactly where Barghouti's name would appear.[5]

d) In light of the above, on July 20, 2012, the Plaintiffs served the Defendants with a 6th document request for production of "A complete, full and legible copy of" this Israeli request for detention of terrorists. Moreover, in effort to speed things along and to help Defendants' U.S. counsel locate a complete, legible copy of the document, Plaintiffs' counsel pointed out to Defendants' counsel via email that the multiple fax headers on the document indicated that it had been faxed in 2010 between several internal PA offices, and then on to the PA's Israeli counsel, and that a complete and legible copy could therefore easily be obtained

---

[4] Plaintiffs have sought copies of the U.S. and Israeli requests for the arrest of the perpetrators of the terrorist attacks in this case, and Defendants have responded by claiming that they cannot find them. Yet, when they wanted to impress the Israeli court in *Goldman* with Arafat's notation on exactly such a request, they had no trouble. Clearly, the Defendants have no trouble finding exculpatory documents from this time period, which they seek to use to support their position. It is only inculpatory documents they seem unable to find unless and until they fear they will be caught withholding them. Then they still only produce what they believe they can get away with and withhold what they apparently believe Plaintiffs will not otherwise find on their own.

[5] The request lists the wanted terrorists by geographic area (first the West Bank and then the Gaza Strip), and then further breaks them down by organization. Page 3 contains the names of three wanted Hamas members in the West Bank, who are numbered sequentially 6-8. *See id*. Thus, missing page 2 includes the names of five Hamas wanted members in the West Bank (numbered 1-5). Given Barghouti's importance and notoriety at this time, it is extremely likely that he is one of these five.

from the PA office that had initiated the chain of faxes in 2010 (or even from one of the other PA offices further down the line on the fax chain).

e) As with their responses to Plaintiffs' Interrogatory and first RPD on this issue, Defendants responded on April 23, 2012, by asserting their usual five pages of objections, with the added baffling objection that the document referenced in the request was vague and ambiguous *even though a copy of the document, which had been produced by these same Defendants in another lawsuit, was attached*, and then disingenuously claimed that they "have been unable to identify the document." **Exhibit P** at 6.

f) It is simply impossible to credit Defendants' claim that they cannot identify a document which has been provided to them and produced by them in another lawsuit. It is simply impossible to credit Defendants' claim that they cannot find a complete, legible copy of this document. Based on Defendants' own representations to the Israeli court in *Goldman*, Defendants received the entire document directly from the Israeli government in 2001. Defendants therefore have the entire document, and can and should produce it. Moreover, the fax captions on the document show that it is partially illegible only because it was faxed multiple times in 2010, and that a legible (and presumably complete) copy exists and can be obtained from the PA office that initiated the fax chain.

g) Plaintiffs' counsel has conferred with Defendants' counsel regarding Defendants' failure to produce a complete and legible copy of the document, but without success. And, again, Defendants have not refused to produce the document but claim, as always, that they are investigating.

10. Moreover, instead of fulfilling their discovery obligations in good faith, Defendants have managed to turn this issue relating to Barghouti's arrests by the PA completely

on its head by filing a motion to compel everything *Plaintiffs* have on this subject, and seeking sanctions to boot. This issue is fully explained in Mr. Schoen's October 12 letter to the Court, but to highlight:

a)    Defendants have demanded that these private individuals turn over everything they have regarding *governmental demands made by Israeli and U.S. officials to the PA* to arrest certain terrorists, including one or more that would eventually become the terrorists in the instant terror attacks.

b)    Clearly, Plaintiffs who are private individuals, have no access to this kind of information. And, clearly, the PA has specific knowledge of these requests (as admitted by Erekat, see para. 4(f) above, and by Arafat himself, see para. 4(g) above).

c)    It appears Defendants filed their motion to compel for the sole purpose of intimidating Plaintiffs and to smoke out any possible information Plaintiffs may have on the subject to be sure that they do not get caught with their pants down when they produce cherry-picked discovery. Plaintiffs are noticing a pattern here, but responded nonetheless and produced all that they had.

As Mr. Schoen wrote it in his letter, Defendants have been engaged in an orchestrated campaign of obstruction and delay, which includes completely baseless motions by Defendants, aimed at making into impossible for Plaintiffs to complete discovery in time.

**C.  Regarding the January 2002 Suicide Bombing that Injured the Sokolow Plaintiffs:**

11.    Defendants' obstruction continued with regard to the Sokolow Plaintiffs' interrogatories:

a)    The Sokolow Plaintiffs were injured by a suicide bomber named Wafa Idris. Munzar Mahmoud Khalil Noor was convicted by an Israeli court of abetting the attack. In

his statement to Israeli police, Noor said that a PA intelligence officer named Mohammed Muhtasib (a/k/a Kamle el Abed) planned the entire bombing and provided the bomb. (Muhtasib was never arrested, and is alive and well in the PA).

   b) During Operation Defensive Shield (Spring 2002) the IDF captured an internal PA intelligence document discussing this bombing, which appears to confirm that the PA had foreknowledge of the attack, and clearly discusses attempts by PA intelligence chief, Tewfiq Tirawi to cover the tracks of the perpetrators.

   c) Accordingly, in September 2011, the Sokolow Plaintiffs served Defendants with interrogatories, seeking information – including details of any employment by the PA or PLO – regarding Idris, Noor, Muhtasib and all persons who sent, received or made notations on the aforementioned internal document captured by the IDF, which was attached.

   d) Following their standard pattern, after serving responses, supplemental responses, and second supplemental responses, without ever providing complete answers to this interrogatory, Defendants waited until March 2012, to serve third supplemental responses (attached hereto as **Exhibit Q**), identifying Ghaled Nobani as someone with knowledge. Since Nobani is a senior PA security officer, it is obvious that Defendants could and should have identified him in their initial responses to the interrogatory, but instead waited six months.

   e) And as usual, in their March 2012 supplement, Defendants state that their "investigation is continuing and Defendants will supplement to the extent required by Federal Rule of Civil Procedure 26(e)(1)." **Exhibit Q at 9.**

  12. The delays also continued with respect to the Sokolow Plaintiffs' document requests:

a)      As noted above, Munzar Noor was convicted by an Israeli court of abetting the Sokolow bombing. Knowing that the PA provides financial and other benefits to convicted terrorists and their families through the PA's Ministry of Prisoners Affairs, on April 23, 2012, the Sokolow Plaintiffs served Defendants with a request, at ¶ 3(i), for production of "documents concerning all payments made to and all benefits provided to Noor and/or his relatives by the PA and PLO at any time after January 27, 2002, in relation to, as a result of, or due to his arrest/imprisonment by Israel."[6]

b)      On May 29, 2012, in response to this request for production, the Defendants produced four pages in Arabic, which appear to be a computer print-out showing that between 2002 (when he was arrested by Israeli police for the Sokolow bombing) and today, the PA has paid Munzar Noor about $42,000 in benefits, by virtue of the fact that he is a convicted terrorist. (The documents are not attached, as they are in Arabic, but can be made available upon request).

c)      On July 6, 2012, Plaintiffs' counsel wrote Defendants' counsel, pointing out that in a deposition in the related matter of *Klieman v. Palestinian Authority*, the PA's witness had testified that the PA's Ministry of Prisoners Affairs has a paper application form and file for each prisoner, and that Noor's paper form and file in the PA's Ministry    of Prisoners Affairs are clearly responsive to the Sokolows request for production regarding Noor, and asking Defendants' counsel to advise "whether the PA will produce the Prisoner Ministry's paper application form and file for Noor, and if so when." **Exhibit R**. In  response to this June 6, 2012

_____

[6] In the month of September 2012 alone the PA paid 18,932,000 Israeli shekels (about $5 million) to imprisoned terrorists. *See* Ministry of Prisoners Affairs, at 2 (transfer expenditure) downloadable from: http://www.pmof.ps/news/plugins/spaw/uploads/files/accounts/2012/10/table6a_eng.pdf).

request, Defendants' counsel represented that they have been searching for the requested file but have been unable to locate it, *Id* , but – despite repeated requests from plaintiffs' counsel over the 5 months that have passed since then – defendants failed to produce Noor's paper form and file from the PA's Ministry of Prisoners Affairs.

d)      In the meanwhile, on October 5, 2012, defendants' counsel had *admitted* that in the related *Klieman* litigation, the PA has produced the paper form and file from the PA's Ministry of Prisoners Affairs for *another* terrorist (Annan Hashash – who was involved in the murder of U.S. schoolteacher Esther Klieman). **Exhibit S**.

e)      And on October 21, 2012, the defendants produced to the plaintiffs in another ATA action pending against the PA and PLO, *Shatsky v. Syrian Arab Republic, et al.* (who are represented by counsel for the instant Plaintiffs) the paper form and file from the PA's Ministry of Prisoners Affairs for convicted terrorist Ahmed Saadat. Upon receiving that production, Plaintiffs' counsel immediately wrote to Defendants' counsel requesting the latter to: "Please explain why you are purportedly unable to find Noor's prisoner file, when you found and produced such files in Klieman and Shatsky, and please explain what search, if any, you have made for Noor's file, and how that purported search differs from the successful searches you conducted for these files in Shatsky and Klieman." **Exhibit T**. Defendants' counsel has simply ignored that email.

f)      Over six months have passed since Plaintiffs original production request related to Noor. During this time, Defendants counsel produced analogous files regarding other convicted terrorists in the Klieman and Shatsky cases, but have strung the instant Plaintiffs along, representing that they are looking for – but never actually producing – Noor's paper form and file from the PA's Ministry of Prisoners Affairs until it was finally received just a couple of

days ago. Said file identifies Noor as a member of Fatah (the main terrorist faction of the PLO, which was funded by the PA during the relevant period). There is no reason for this delay and is clearly gamesmanship on the part of Defendants to fail to produce this critical evidence until just weeks before the fact discovery cutoff in this matter. And, whether intentional or not, these delayed responses necessarily prejudice Plaintiffs' trial preparations.

**D.  Regarding all of the Plaintiffs in This Matter:**

13.    Defendants' dilatory tactics and gamesmanship extend to their responses regarding well-known, televised spokesman for the PA, Mohammed Dahlan:

a)    Mr. Dahlan served as a senior official of Defendant PA since its inception, and in recent years has made a number of statements, in recorded television interviews (copies of which Plaintiffs have obtained), which support Plaintiffs' claims in this action. For example:

- During a January 22, 2006 television broadcast, Dahlan admitted that during the Second Intifada – i.e., the campaign of Palestinian terrorist violence against Jewish and Israeli targets launched by the Defendants in late 2000, in the context of which the terrorist attacks at issue in this suit were carried out – the PA sheltered Hamas' terrorist leadership, stating that: "**All [Hamas'] military commanders have been protected by the [PA] security establishment throughout this Intifada. They were provided with full protection, and Israel has accused us of this several times, and so has the American administration. I was the prominent person to be accused of this**."Similarly, in a June 16, 2007, television interview Dahlan stated that: "**The Palestinian security forces were those who protected and hid half of the Hamas leadership and of the Hamas military force during the Intifada.**"

- These statements are extremely relevant to this case because the PA's sheltering of Hamas' terrorist leadership constitutes provision of "material support or resources" to a designated Foreign Terrorist Organization ("FTO") under 18 U.S.C. § 2339B and therefore renders the PA civilly liable under the Antiterrorism Act ("ATA"), 18 U.S.C. § 2333, to the families of American citizens killed in Hamas terrorist attacks – such as the July 2002 Hamas bombing at the campus of the Hebrew University in Jerusalem, in which decedents Ben Blutstein, Dina Carter, Janis Coulter and David Gritz were murdered.[7]

- In that June 16, 2007 interview Dahlan also stated that: **"Forty percent of the martyrs in this Intifada belonged to the Palestinian security forces."**[8]

  This statement is highly relevant because at least five of the seven terrorist attacks at issue in this case were planned and carried out by, or with the active assistance

---

[7] Hamas was designated as an FTO in 1997. Section 2339B criminalizes the provision of any "material support or resources" to an FTO. "Material support or resources" is a term of art defined in 18 U.S.C. § 2339A as including virtually every type of asset or benefit imaginable, including a "safehouse." Sheltering an FTO, as Dahlan confirmed the PA did Hamas, constitutes provision of a "safehouse" under § 2339A. *See e.g. Rux v. Republic of Sudan*, 461 F.3d 461 (4th Cir. 2006); *Owens v. Republic of Sudan*, 826 F.Supp.2d 128 (D.D.C. 2011). And the PA's violation of § 2339B by sheltering Hamas renders the PA civilly liable to the Plaintiffs under the ATA for Hamas' terrorist attacks. *See e.g. Boim v. Quranic Literacy Inst.*, 291 F.3d 1000, 1015 (7th Cir. 2002) ("If the Plaintiffs could show that [Defendants] violated … section 2339B, that conduct would certainly be sufficient to meet the definition of 'international terrorism' under" the civil liability provisions of the ATA); *Almog v. Arab Bank*, 471 F.Supp.2d 257, 268 (E.D.N.Y. 2007) ("[V]iolations of section 2339B(a)(1) … can serve as predicate crimes giving rise to liability under the ATA"); *Linde v. Arab Bank*, 384 F.Supp.2d 571 (E.D.N.Y. 2005) (provision of funds to an FTO renders provider civilly liable under the ATA for attacks carried out by that FTO); *Weiss v. National Westminster Bank*, 453 F.Supp.2d 609 (E.D.N.Y. 2006) (same); *Strauss v. Credit Lyonnais*, 2006 WL 2862704 (E.D.N.Y. 2006) (same); *In re Chiquita Brands*, 690 F.Supp.2d 1296 (S.D.Fla. 2010) (same).

[8] In PA/PLO parlance the term "martyr" includes suicide bombers and other terrorists killed in the act.

of, members of the PA's security forces. The fact, confirmed here by Dahlan, that huge numbers of PA security personnel were involved in terrorist attacks during the relevant period reinforces Plaintiffs' contention that the PA had a practice, policy and custom of supporting such attacks, and that the PA is thus liable under the ATA and under respondeat superior principles for the terror attacks carried out by its personnel in this case. In other words: this admission by Dahlan collapses Defendants' claim that the attacks at issue here were executed by "rogue" security officers.

- In a televised interview on July 22, 2009, Dahlan stated, in the context of a discussion on the "proper" use of terrorism, that: "**I lived with Chairman Yasser Arafat for years. Arafat would condemn [terror] operations by day while at night he would do honorable things. I don't want to say any more about this**."

Defendants have indicated that they intend to defend the instant case by showing that Arafat and the PA/PLO leadership condemned terrorist attacks. Dahlan's statement here clearly shows that such condemnations were merely dissimulation and lip service. That statement is therefore very relevant to this case.

      b)      Accordingly, in order to establish that Dahlan's statements are admissible, *inter alia*, as party admissions and/or as admissions against interest, on September 19, 2011, all Plaintiffs served the Defendants with an interrogatory seeking the details of all positions and jobs held by Dahlan in the PA and the PLO and all work and employment performed by Dahlan for the PA and/or the PLO.[9]

---

      [9] Dahlan's employment and professional relationship with the PA and PLO are highly relevant to establishing the admissibility of his statements, because under Fed.R.Evid. 801(d)(2) a statement "made

c)    Defendants served their usual boilerplate objections to this interrogatory, but also responded by providing Dahlan's middle names and offering to produce a few documents upon execution of a confidentiality agreement. **Exhibit U** at 7-8.

d)    On November 11, 2011, Defendants served supplemental objections and responses making essentially the same statements as in their original response. **Exhibit V** at 7-8.[10]

e)    Months passed without the Defendants providing any further information regarding Dahlan. During the first week of June 2012, in a conference between the parties' counsel, Defendants' counsel represented that Defendants did indeed intend to supplement their virtually non-existent response to the Dahlan interrogatory, but were supposedly encountering various delays in providing the information (which defense counsel would not detail). On June 11, 2012, defense counsel represented that, "We are working on this issue. I hope to have it resolved later this week." **Exhibit W**.

---

by the party in [a] representative capacity," a statement "made by a person whom the party authorized to make a statement on the subject," a statement "made by the party's agent or employee on a matter within the scope of that relationship and while it existed" and a statement "made by the party's coconspirator during and in furtherance of the conspiracy" are not hearsay. Additionally, Rule 804(b)(3)(A) provides that a statement that is "contrary to the declarant's proprietary or pecuniary interest" is admissible, which includes statements that "threatens the loss of employment, or reduces the chances for future employment." *Gichner v. Antonio Troiano Tile & Marble Co.*, 410 F.2d 238, 242 (D.C.Cir. 1969).]

[10]    On November 17, 2011, Defendants served Plaintiffs with a two page Arabic-language document bearing the caption of the PA's Finance Ministry, listing what appear to be salary payments to Dahlan from March 2005 through April 2009. Defendants apparently produced these documents in purported reliance on Rule 33(d), which allows a party, when certain conditions are met, to produce business records in lieu of a narrative answer to an interrogatory. However, the two-page Arabic list produced by Defendants contain only a tiny fraction of the information sought in the interrogatory and, moreover, it is well established that Rule 33(d) does not allow production of foreign language documents. "[W]hen a party responds to an interrogatory by producing documents written in a foreign language, Rule 33(d) requires the responding party to provide a translation of those documents." *Nature's Plus Nordic A/S v. Natural Organics, Inc.*, 274 F.R.D. 437, 441 (E.D.N.Y. 2011).

f)    Defendants did not provide a supplemental answer that week, or even that month, and instead delayed until July 30, 2012 – *nearly ten and a half months after first being served with this interrogatory* - containing some, but nowhere near all, of the employment information requested. **Exhibit X**, pp. 7-8.

g)    Dahlan is a very well known, senior PA employee. Defendants certainly did not need ten months to trickle incomplete information and documents to Plaintiffs about him. Thirteen months after the discovery was requested, responses remain incomplete and Plaintiffs are, once again, being told the investigation is ongoing.

14.    Defendants' demonstrated pattern of cherry picking documents and delaying production also extends to discovery requests regarding the funding of martyrs:

a)    Since approximately 1994 until the present day, Defendants PA and PLO have operated and funded a program to provide financial and other benefits to the families of suicide terrorists, known as the "Foundation for the Care of the Families of Martyrs and Wounded." (This program is sometimes also referred to as the "Fund," the "Institute" or the "Establishment" for the families of martyrs).

b)    While the Defendants have attempted to claim that the goals of this program are charitable, and do not evidence an intention on their part to encourage and support terrorism, no less an authority (and friend of the PA) than the World Bank has found that the program is "clearly" *not* of a charitable nature: "[T]he Fund for Families of Martyrs and the Injured is generous. Even the average benefits in 2004 were more than 20 percent of the contemporary poverty line; in 2005 they were 33 percent of the poverty line … The program is *clearly not targeted to the poorest households* … [T]he level of resources devoted to the Fund

for Martyrs and the Injured *does not seem justified from a welfare or fiscal perspective.*" (emphasis added).[11]

   c) Indeed, in sworn testimony given in an Israeli court on December 22, 2010, Yousef Ahmed Jubran, who served as director of Defendants' "martyrs" program between 1996 and 2006, and who appeared as a witness on behalf of the PA, admitted that suicide terrorists are considered "martyrs" whose families are entitled to financial benefits under Defendants' program, because "they fell in the course of the struggle, the fighting, the conflict."[12]

   d) Thus, Defendants' "martyrs" program constitutes clear evidence of Defendants' state of mind – it shows that they encourage and support suicide terrorism, which Defendants view as part of their "struggle." Moreover, Defendants' operation of this program is extremely relevant to the instant action for at least two additional reasons:

  ***First***, it is well established that the systematic provision of financial benefits to the families of suicide terrorists incentivizes terrorism and is therefore a basis for civil liability under the ATA. *See e.g. Linde v. Arab Bank*, 384 F.Supp.2d 571, 584-5 (E.D.N.Y. 2005) (Allegations

---

[11] Available at
https://openknowledge.worldbank.org/bitstream/handle/10986/7807/382071GZ0v2.txt?sequence=2, at 169-170.

[12] Jubran testified on behalf of the PA in the Tel Aviv District Court in the matter of *Goldman et al. v. PA et al.,* Civ. No. 1137/05, a civil action against the PA and PLO arising from the bombing of a Tel Aviv discotheque on June 1, 2001, in which 21 Israeli teenagers were murdered and 132 injured. Plaintiffs have obtained the original Hebrew-language transcript of Jubran's testimony, but have not yet obtained an English-language translation. However, the undersigned is fluent in Hebrew and confirms that the translation of Jubran's testimony contained herein is accurate.

that bank administered program for transfer of benefits to families of suicide terrorists adequately state ATA claim against bank).[13]

*Second*, among the terrorist "martyrs" whose families have received (and apparently still receive) benefits from Defendants' "martyrs" program are PA policeman Ali Jara'a, the suicide bomber who murdered decedent Stuart Scott Goldberg (husband and father of the Goldberg Plaintiffs), Mohammed Hashaika, the suicide bomber who maimed the Bauer Plaintiffs, Wafa Idris, the suicide bomber who severely injured the Sokolow Plaintiffs, and Sa'id Awada, the suicide bomber who severely injured Plaintiff, Shaul Mandelkorn. The finder of fact could – and should – conclude that Defendants' provision of these benefits to the families of these suicide bombers constituted an incentive for the attacks and/or ratification of the attacks by the Defendants.

e)    Accordingly, Plaintiffs served Defendants with various discovery requests relating to their payment of these martyr benefits. Defendants produced a handful of responsive documents trickled to Plaintiffs over time.

f)    In early September 2012, Plaintiffs' counsel discovered that a doctoral candidate named Bassam Banat had written a 436-page dissertation titled "Palestinian Suicide Martyrs (Istishhadiyin) Facts and Figures." **Exhibit Y**.[14] Significantly here, that dissertation was

---

[13] *Linde* is one of many ATA cases pending against the Arab Bank in the Eastern District. Notably, *Linde* and its related cases involve banks which *transferred* the benefits to the families of suicide terrorists, but did not actually *contribute* the funding. Here, by contrast, the underlying funding is provided by Defendants themselves, via their "martyrs" program. Clearly, then, *Linde* and the other Eastern District cases recognizing the imposition of ATA liability for the provision of benefits to the families of suicide terrorists apply to Defendants PA and PLO *a fortiori*, since they are the originators and the source of the funding.

[14] Due to its size, only relevant excerpts will be attached. Plaintiffs can produce a complete copy if requested.

researched with the active assistance of the staff of the Defendants' "martyrs" foundation/ program: "The names of all Palestinian suicide martyrs (Istishhadiyin) in the West Bank and Gaza Strip (Table no. 79) were obtained from 'Mu'asasat Ri'ayat Usar Ashuhada Wal Jarha" (Foundation Care/Families of Martyrs & Wounded) in Palestine. This took place following coordination between the Institute and the researcher in formal correspondence through the supervisors on the study (Appendixes no. E-G). The Institute president Ms. Intesar Al-Wazeer facilitated my mission and designated a coordinator for my study Ms. Shama Washah – her Office Director in Gaza Strip; this was due to the fact that *this study involves a very important aspect of the Palestinian national struggle.* (Appendix no. H)." *Id*. at 200.

g)    Indeed, in a letter written on PA and PLO stationary on June 23, 2008 (and included as an appendix to the dissertation) the president of the "martyrs" foundation, Ms. Al-Wazeer, confirmed that the foundation had provided Banat with "a list of all the Palestinian Martyrs and the way they implemented the martyrdom operations" – which she described as part of "the Palestinian struggle." *Id*. at 385. The information from the list provided by Defendants to Banat is included in dissertation Table no. 79, which expressly names and provides details regarding Ali Jara'a, Mohammed Hashaika and Wafa Idris – the suicide bombers in this case. *Id*. at 330-332.

h)    On September 10, 2012, immediately upon learning this information, Plaintiffs' counsel immediately wrote Defendants' counsel, conveying a copy of Al-Wazeer's letter (p. 385 of the dissertation) and pointing out that "[t]he PA-generated list of 'Palestinian Martyrs' mentioned in the attached 2008 letter is responsive to several of the *Sokolow* Plaintiffs' requests for production, because, *inter alia*, that list references Wafa Idris, Ali Jara'a and

Mohammed Hashaika" and requesting confirmation that the Defendants would produce that list forthwith. **Exhibit Z.**

i)        Defendants' counsel replied on September 13, 2012, that he would "try and obtain additional information about this document and respond to your email next week." **Exhibit AA**.

j)        Nearly two months have passed since then and still Defendants have not produced this document, which is clearly in their possession and obviously relevant and responsive, *inter alia,* because it references and contains information regarding three of the terrorist bombings at issue in this case and the perpetrators of those bombings and confirms that some of those bombers belonged to the PLO's Fatah faction, which was funded at the time by the PLO. Defendants have not refused to produce, but claim to still be looking.

k)        Ironically, and disturbingly, as in other instances referenced herein, particularly in the Goldberg case in Israel, the Banat dissertation makes clear that when it suits their interest- *i.e.* where, as in the case of Mr. Banat, the materials will be used to publish a study praising and lionizing suicide bombers as "a very important aspect of the Palestinian national struggle" (*id*. at 200) – the Defendants are ready, willing and very able to provide extensive information and documents regarding these terrorists. *See id*. at 200 and 385. This stands in stark contrast to Defendants' conduct in this case where they are dragging their feet and feigning inability to locate information and people.[15]

---

[15] Shortly before the filing the instant motion, Defendants produced what purports to be Jara'a's and Hashaika's martyr files. Plaintiffs cannot yet tell if they are complete or what they contain, but there is no question that these files should have and could have been produced over a year ago. *Indeed, these critical files, indicating for whom the suicide bombers worked and organizations with which they were affiliated, for example) should have been produced during initial disclosures.*

**E.  Regarding the Terrorist Machine Gun Shooting of January 22, 2002, Maiming Gould & Waldman:**

15.    Defendants have also failed to provide meaningful responses regarding the Gould and Waldman Plaintiffs, once again, continuously claiming that they are looking and producing nothing:

a)    On January 22, 2002, a Palestinian terrorist gunman opened fire with a machine gun on a crowd of men, women and children on Jaffa Street in downtown Jerusalem. Some of the bullets ripped into Plaintiffs Shayna Gould and Shmuel Waldman, who were studying in Israel at the time, and left them with severe, permanent physical and emotional injuries. Among their other injuries, Shayna lost a lung and Shmuel suffered a crippling   leg injury that that has left him in chronic pain. The machine gun attack in which Plaintiffs Shayna Gould and Shmuel Waldman were maimed was planned by an officer in one of the PA's security forces, Nasser Aweis, who was serving at that time as a Captain in the PA's National Security Service. The Tel Aviv District Court later convicted Nasser Aweis for planning the January 22, 2002 attack.

b)    As discussed above, on December 5, 2001 – nearly two months before the attack – U.S. Middle East envoy General Anthony Zinni presented PA and PLO leader Yasser Arafat with a list of 33 wanted terrorists to be arrested by the PA. *See,* **Exhibit J.** Nasser Aweis was on that list. *See,* **Exhibit K**.[16]

c)    It is not known to Plaintiffs whether, pursuant to General Zinni's request, the PA arrested and released Aweis, or never arrested him at all. It is known, however, that the PA treated General Zinni's request as a joke. **Exhibit J**, at 1. ("[W]ho cares about the

---

[16] Abdel Karim Aweis, who planned the Bauer bombing, was on the same list.

Americans?"), and that Aweis was free (if he was ever detained) well before the January 22, 2002 attack on the Goldbergs.

d)　　Moreover, documents in Arabic obtained through discovery show that the PA *continued to pay Aweis his salary* as a Captain in the PA's National Security Service – without any interruption whatsoever – even *after* General Zinni demanded his arrest, even *after* the January 22 attack and even *after* Aweis was finally arrested by Israel in the Spring of 2002.

e)　　In light of the above, on March 23, 2012, the Plaintiffs served the Defendants with requests for production of documents concerning, *inter alia*, (i) all requests made to the PA to arrest Nasser Aweis in the period before the bombing, (ii) any custodial questioning of Nasser Aweis by the PA during that period and (iii) any release of Nasser Aweis from PA custody prior to the bombing.

f)　　In response, Defendants stated, once again, that they "have been unable to identify any documents…that are responsive," but "Defendants' investigation is continuing." **Exhibit BB** at 11.

g)　　Once more, it is clear that the Defendants are either intentionally withholding documents or are not making a real attempt to locate documents. Arafat confirmed, on television, that the PA had received the list of wanted men from General Zinni, and claimed to have acted on it. **Exhibit J**. At a minimum, therefore, Defendants have that list. And if Nasser Aweis was arrested, by the PA pursuant to General Zinni's request, Defendants have responsive documents evidencing that arrest, Aweis' questioning by the PA, and the circumstances of his release by the PA prior to the January 22, 2002 machine-gun attack.[17]

---

[17] Again, in the *Goldman* case in Israel the PA had no trouble finding the request for arrest of terrorists, because it suited their purposes to do so, but they cannot find a single responsive document in the instant matter.

**F.  Additional Examples of Defendants' Discovery Abuses:**

16.    In its ruling this past August, this Honorable Court, allowed Plaintiffs to conduct discovery on Defendants' lack of capacity affirmative defense, and specifically the issue of whether the Defendants are unincorporated associations. In that regard, Plaintiffs have sent relevant requests, for example, relating to whether the PA and/or PLO have been parties to any lawsuits. Defendants have yet to produce responses to such requests and have recently sought to block Plaintiffs from taking any depositions on the subject.

17.    Six months ago, <u>with nine months left until the fact discovery deadline,</u> Plaintiffs asked the court to issue requests to Israel to take Hague depositions in Israel of witnesses who were convicted and are serving prison sentences for the attacks at issue in this action. Clearly, these are critical witnesses with information that will be very harmful to the Defendants. The Defendants filed a completely baseless motion arguing that that it was too late to request said depositions, despite the fact that there were *nine months left in discovery*. Plaintiffs were able to demonstrate under oath that they have arranged multiple Hague convention depositions in the past each time in less than three months. Nevertheless, in an apparent effort to hamstring Plaintiffs, Defendants continued to pursue the argument that Plaintiffs' deposition requests were untimely, even though defense counsel was already in ready contact with the very witnesses Plaintiffs wanted to depose. The issue has been fully briefed since the end of April, 2012. No ruling has yet been issued, and Defendants' meritless efforts have once again caused undue delay and have succeeded in their apparent goal of preventing Plaintiffs from obtaining incriminating evidence against the Defendants. Justice will certainly not be served by denying Plaintiffs' critical depositions sought nine months before the close of discovery simply because the fact

discovery deadline is now upon us. This alone is sufficient basis for Plaintiffs' request to expand the discovery deadline here.

18.    This obstructive, trickle-effect conduct is standard for Defendants in this case and in others, making it patently clear that (a) this pattern of conduct is likely intentional and (b) Plaintiffs are not overreacting in requesting the relief sought in the Motion.

a)    In *Saperstein v. PA and PLO*, 04-20225-CIV-SEITZ/O'SULLIVAN, currently pending in the Southern District of Florida, these same Defendants and their same counsel produced a large number of Arabic-language documents and an Arabic-language audiovisual recording shortly before the discovery deadline and on the eve of ten days of depositions. Plaintiff was unable to have the documents or the recording translated, much less analyzed, prior to the depositions or the deadline. Then, after the discovery deadline, Defendants served Plaintiffs with 27 new Arabic-language documents. These were items that Defendants certainly had all along, many of which were financial records that were simply printed from a computer, and the audiovisual was proven via deposition to have been withheld from Plaintiff for several months.

b)    Similarly, in *Shatsky v. Syrian Arab Republic*, 02-2280-CIV-RJL, currently pending in the District of Columbia, Defendants waited until 30(b)(6) depositions were underway to produce internal Arabic language PA documents obviously relevant to the 30(b)(6) notice which had been served more than one month previously. Moreover, after the close of fact discovery, Defendants produced additional Arabic language internal PA documents concerning many of the 30(b)(6) notice topics, effectively depriving the *Shatsky* plaintiffs of the ability to follow up on that discovery.

19.     Defendants are now capitalizing on these delays to hamstring Plaintiffs with regard to the 30(b)(6) depositions they wish to take. Due to Defendants' delays and ongoing investigations, which have yielded little, Plaintiffs have been unable to identify all topics for their 30(b)(6) depositions. In early October, Plaintiffs notified Defendants of their intention to take 30(b)(6) depositions in November, and over the next couple of weeks provided many relevant topics for those depositions. Defendants have taken the position that they will not make witnesses available or schedule dates unless and until Plaintiffs produce a complete 30(b)(6) notice that may not be supplemented. **Exhibit CC**. Compliance with such a demand would, of course, significantly prejudice Plaintiffs who are still missing crucial information and who are still waiting for investigations promised by Defendants. Plaintiffs have now been placed in a position where they cannot possibly notice all of the 30(b)(6) topics in time to complete depositions before the close of discovery.

20.     Defendants discovery abuses set out in detail herein have been crippling to Plaintiffs' effective investigation and development of their case. Plaintiffs have trusted, in good faith Defendants' claims that they were in fact "investigating." However, as the discovery deadline is fast approaching and Defendants persist in claiming that they are "investigating," even after Plaintiffs directed them in many instances to sources of relevant documents, these promises have proven to be disingenuous. Defendants seem to only provide information when they think they will be caught deliberately withholding documents. And, even then, they wait until the very last minute and only provide the bits and pieces they think they need to in order to stave off Plaintiffs. Discovery is not meant to be a process of one side prying information out of the other with all of their might. Plaintiffs require the Court's assistance in this process and they

require more time so that full discovery can be had, not only in the interests of these Plaintiffs, but in the national interest of ATA cases as well.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

November 19, 2012

/s/ Robert J. Tolchin
Robert J. Tolchin