1                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK
2

3    ----------------------------------------X
                                            :
4    SOKOLOW, et al,                        : 04-CV-397 (GBD)
                                            :
5                    Plaintiffs,            : November 20, 2011
                                            :
6              v.                           : 500 Pearl Street
                                            : New York, New York
7    PALESTINE LIBERATION ORGANIZATION, et al, :
                                            :
8                    Defendants.            :
     ----------------------------------------X
9

10            TRANSCRIPT OF CIVIL CAUSE FOR CONFERENCE
               BEFORE THE HONORABLE RONALD L. ELLIS
11                UNITED STATES MAGISTRATE JUDGE

12   APPEARANCES:

13   For the Plaintiffs:          DAVID I. SCHOEN, ESQ.
                                  David I. Schoen, Attorney at Law
14                                2800 Zelda Road, Suite 100-6
                                  Montgomery, Alabama  36106
15
                                  AARON NATHANIEL SOLOMON, ESQ.
16                                The Berkman Law Office, LLC
                                  111 Livingston Street
17                                Brooklyn, New York  11201

18   For the Defendant:           BRIAN A. HILL, ESQ.
                                  MARK JOHN ROCHON, ESQ.
19                                Miller & Chevalier, Chtd.
                                  655 15th Street NW, #900
20                                Washington, D.C.  20005

21

22   Court Transcriber:           RUTH ANN HAGER, C.E.T.**D-641
                                  TypeWrite Word Processing Service
23                                211 N. Milton Road
                                  Saratoga Springs, NY 12866
24

25


     Proceedings recorded by electronic sound recording,
     transcript produced by transcription service

2

```
 1            THE CLERK:  In the matter of Mark Sokolow, et al., v.
 2   the Palestine Liberation Organization, et al.
 3            All counsel, please identify yourself for the record.
 4   Please stand when addressing the Court.
 5            MR. SCHOEN:  David Schoen, Your Honor, with Alan
 6   Bauer for the plaintiffs.
 7            MR. SOLOMON:  Aaron Solomon, Brooklyn, New York for
 8   the plaintiffs.
 9            THE COURT:  Good afternoon.
10            MR. HILL:  Good afternoon, Your Honor.  Brian Hill
11   for defendants.
12            MR. ROCHON:  And Mark Rochon for the defendants.
13   Good afternoon, Your Honor.
14            THE COURT:  Good afternoon.  I note, first of all,
15   that I was handed this from the plaintiffs.  I want to say as
16   an initial matter, it's bad form to give the judge something
17   like this as he's coming into a conference regardless of the
18   subject matter, but we will talk about that in due course.  I
19   assume the defendants got a copy today also.
20            MR. HILL:  We received a copy by ECF last night
21   around 8:00 o'clock.
22            THE COURT:  And you've totally digested it, no doubt.
23            MR. HILL:  Your Honor, we're prepared to address it
24   today.  I think it's properly denied on any number of grounds.
25   And to cut to the chase, we'd ask you to deny it today or at
```

1    least put the plaintiffs on notice that they're not going to

2    get an automatic grant by doing what they did, which is filing

3    something on the eve of the hearing that didn't comply with the

4    Local Rule, that didn't comply with Judge Daniels' direction to

5    have a pre-hearing conference with Your Honor, and it did not

6    even follow meet and confer with us about either the substance

7    of the motion or the things that are complained about in the

8    motion.  Sort of a transparent effort to grant themselves an

9    extension by giving you something they hope you won't be able

10   to rule on quickly enough and, therefore, will find some -- an

11   automatic extension.  We can talk about this in as much detail

12   as Your Honor wants.

13           THE COURT:  All right.  Well, we'll get to that.

14           First, with respect to the things that were pending

15   this morning before I came in or at least before Sandy struck,

16   there's a question of the defendants' request for sanctions

17   based upon the plaintiffs' response to interrogatory seeking to

18   identify witnesses with knowledge about arrest, release from

19   detention by the PA of five individuals.  I don't think it's

20   necessary to impose sanctions, although my review indicates

21   that the responses have the same general broad brush that I had

22   found issue with before and that is that it just -- it was not

23   basically designed to identify individuals who could be called

24   as witnesses because they had firsthand knowledge.

25           And therefore, since it appeared there was not an

4

1    attempt to divide people into categories of people who would

2    be -- who would have that firsthand knowledge to the extent

3    that the individuals who have been identified by the plaintiffs

4    who have been identified so broadly, I'm -- I considered those

5    identifications a nullity and I -- what I will order is that to

6    the extent that there are individuals that are listed, they are

7    precluded from being witnesses since the idea is to identify

8    people who could be deposed.  It did not do that for me and so

9    if -- it's just not going to happen.

10           With respect to the defendants' motion to preclude

11   the plaintiffs from deposing Interzar Al-Wahzier [Ph.], that

12   motion by the defendants is granted.  I don't see anything that

13   indicates that the particular witness is a high enough

14   individual such that their deposition would be necessarily

15   ordered and frankly the letter of reference to Palestinian

16   martyrs doesn't really give me any traction that it's likely to

17   lead to any relevant evidence.

18           With respect to the defendants' motion to compel the

19   production of any documents concerning Janice Coulter's

20   reported involvement with a vehicular homicide when she was a

21   youth, that motion is denied.  And similar to my ruling with

22   respect to the other witness who there may have been something

23   in their past, again, I don't see any indication that this is

24   likely to lead to relevant evidence concerning the particular

25   presentation by the plaintiffs as a basis for the damages for

5

1   that particular witness.

2        With respect to the defendants' request to preclude

3   plaintiffs from deposing someone on the factual basis for the

4   defendants' affirmative defense, the defendants have

5   represented that they, in fact, did respond and they did not

6   object and they pointed to documents in their initial

7   disclosures.  Is this a factual dispute that I'm going to have

8   to resolve?

9        MR. HILL:  I wouldn't think so, Your Honor.  We have

10  now produced all of the documents that we would be relying on

11  to make the affirmative defense lack of capacity for both the

12  defendants.  I mean, obviously if we locate additional

13  documents or think of additional documents we'll produce them,

14  but we've produced at this point everything that we're going to

15  rely on, including publicly available materials, so I don't

16  think there's any reason at this point to be taking a 30(b)(6)

17  on that subject.

18       And as we suggested in the cases that we've cited,

19  including this one decided by Your Honor, the discovery when I

20  was doing the research, the much less burdensome practice in a

21  situation like this is to have the party answer contention

22  interrogatories so the lawyers can describe what the evidence

23  is and how they'll make the argument as opposed to trying to

24  educate the witness to essentially give the closing argument on

25  behalf of a lawyer.

1    And the other point I would make is that the response
2 by Mr. Schoen indicated that they might not be pursuing this
3 30(b)(6) topic on behalf [indiscernible].  Obviously they're
4 not going to pursue the topic.
5    THE COURT:  Well, let --
6    MR. HILL:  There's no point in having a ruling at
7 this point, so --
8    THE COURT:  Well, let me -- I don't know if they're
9 planning to pursue it, but my ruling on a situation such as
10 this would be that to the extent that you have not identified
11 any evidence either by pointing to it or responding to it,
12 you'd be precluded from presenting such evidence.
13    To the extent that you have responded that you have
14 given all of the evidence and pointed it out to the plaintiffs,
15 then you need not worry.
16    MR. HILL:  Your Honor, a point of clarification.  I
17 don't at this point have an interrogatory that would require me
18 to point out the specific documents in my production that we
19 rely on.  As I've suggested, we're happy to answer such
20 interrogatory or if you want me to informally do that, I'm
21 happy to do that just so there's no question about --
22    THE COURT:  I mean --
23    MR. ROCHON:  -- a subset of production as pertinent
24 to this issue.
25    THE COURT:  Okay.  Although I think you said that the

1  information is in your initial disclosures.

2          MR. HILL:  In a supplemental production set.

3          THE COURT:  Okay.  Again, as I said with respect to

4  the discovery as to the plaintiffs, the whole idea is that the

5  party who is seeking information has all the information that's

6  likely to see the light of trial and they can determine whether

7  or not they want to get more documents or if they have all the

8  documents they need, but nobody comes in and discovers new

9  documents without explaining it to the trial judge.

10         MR. HILL:  Understood, Your Honor.

11         MR. SCHOEN:  May I be heard on this, please?

12         THE COURT:  Sure, go ahead.

13         MR. SCHOEN:  I'm not sure if we're discussing now

14  both aspects of this, that is, the 30(b)(6).  They filed a

15  motion to -- for protective order to preclude a 30(b)(6)

16  witness on the unincorporated association or lack of capacity

17  and we filed a cross-motion or premotion letter compelling

18  discovery -- written discovery -- responses to our written

19  discovery requests on this issue.  His answer --

20         THE COURT:  Okay.  They are -- all right.  They are

21  required to respond to your discovery requests, if that's your

22  question.

23         MR. SCHOEN:  Well, that's -- yeah, that's part of it,

24  but I think we only discussed half the equation so far.  That

25  is, we're not limited, of course, to the documents that the

1  defendants intend to submit in support of their defense.  What

2  we've requested are the documents that Judge Daniels told us we

3  should request in engaging discovery on this, the documents

4  that refute the claim that they're an unincorporated

5  association for lack of capacity.  Things like lawsuits they

6  brought in their own name, all the things we laid out in our

7  letter.

8         So it's really only -- the idea that -- and I don't

9  suggest the Court raise this idea, but the idea that their

10  obligation is over once they've submitted what they intend to

11  use on their behalf either by way of disclosure or otherwise

12  certainly doesn't answer the question.

13         And in terms of 30(b)(6) witnesses, it may be that we

14  do have to take -- obviously we don't if the Court says we

15  don't, but it may be from our perspective that we do have to

16  take a 30(b)(6) witness's deposition on this issue to flesh out

17  what we get in the written discovery and to examine that

18  witness about what the facts are that that witness claims on

19  behalf of these defendants makes that wit -- these defendants

20  lack the capacity to sue or be sued.

21         THE COURT:  Okay.  Well, I'm not precluding a

22  30(b)(6) now.  I guess we're not sure where you're going to go

23  with that.  But as to the specific question of whether or not

24  the plaintiffs are entitled to answer to the question of

25  information or documents which would refute the defendants'

9

 1  position, the defendants are required to answer those

 2  questions.

 3          MR. HILL:  Your Honor, just so I'm clear, at this

 4  point there are no questions; there are document requests to

 5  which we had lodged objections.  The particular document

 6  requests that Mr. Schoen is referring to is the request that

 7  would literally require the PA to produce every document in

 8  every criminal case it's brought in the West Bank or Gaza to

 9  the extent it can assess it for the last 12 years.  That would

10  be unduly burdensome and frankly a complete waste of time.  If

11  the purpose is to establish that the PA brings actions in its

12  own courts that is a fact that is conceded.  There would be no

13  point in going through the unduly burdensome exercise of going

14  into every courthouse in the West Bank and every prosecutor's

15  office copying every Arabic language document and every

16  criminal prosecution in the West Bank.

17          MR. SCHOEN:  Judge, let me shortcut that, then.

18  We're willing to forego documents regarding criminal

19  prosecution brought in the name of the PA.  Let's get the other

20  documents.  Let's get documents about lawsuits the PA or the

21  PLO have brought.

22          THE COURT:  Where?

23          MR. SCHOEN:  In the Palestinian courts in their name,

24  in Israeli courts in their name or have been sued in either of

25  those courts in their name, and any court anyplace because

1  their position is they don't have the -- they lack the capacity

2  to sue or be sued.

3          And as we've discussed with Judge Daniels -- and we

4  may have a disagreement over that -- our position on the law

5  is, one factor to consider is, do they perceive themselves to

6  be able to sue or be sued and have they been recognized as

7  sued -- having the right to sue or be sued.

8          For example, we took the dep -- 30(b)(6) deposition

9  on this question in another case, a case pending in Washington,

10 D.C., and the witness there testified that their cases are --

11 brought in their name are regularly dismissed in the Israeli

12 courts.  We believe they're dismissed on standing grounds, not

13 lack of capacity.  But there may be papers they filed in those

14 kinds of cases in which they argue that they do have the

15 capacity to be sued or to sue.  This is the only way we can get

16 discovery on this.

17         THE COURT:  I'm sorry.  So the -- in judging the

18 burden versus the benefit, you're not interested in a legal

19 ruling about their capacity; you're interested on whether or

20 not they've represented they had the capacity.

21         MR. SCHOEN:  I'm interested also in legal relief.

22 That's not what we've requested.  What we've requested are the

23 documents -- we relay that in our thing [ph.], but the

24 documents that are specified in our request, documents which we

25 believe give rise to evidence that they perceive themselves to

1  have the right to sue or be sued, that they have been

2  treated -- or that they have been treated as if they have the

3  right to sue or be sued because they brought those actions or

4  because they made the arguments that they have --

5         THE COURT:  But what's your response to the

6  burdensomeness argument?

7         MR. SCHOEN:  Well, I would say, let's get started.

8  We don't have any idea about what kind of numbers they're

9  talking about.  In terms of the civil actions brought by the

10 PLO, I don't know if there are any.  In terms of civil action

11 brought by the PA, on the one hand it may be the position there

12 aren't any; on the other hand, there may be there is a lot.

13        Let's start with a town, for example.  Pick a town.

14 We have no reason to believe it's burdensome.  He just said why

15 the -- Mr. Hill just said why the production of criminal case

16 documents would be burdensome.  I say, let's forego that, but

17 let's have the civil cases where the PA has brought an action

18 or hasn't or make some showing that it's [inaudible] because

19 the number is so great.  And if the number is so great of cases

20 which have been brought in the name of the PA or against the PA

21 in the name of the PLO or against the PLO in those capacities,

22 then maybe that's some answer.  Maybe that indicates that they

23 have -- maybe that they have the capacity to sue or be sued or

24 that they perceive themselves to, but let's get the numbers or

25 let's get the documents.

12

1        THE COURT:  So what would you have them do in order

2   to get the answer to your question?

3        MR. SCHOEN:  Respond to the --

4        THE COURT:  No.  What would you have them do?  How

5   would you suggest they go about doing it?

6        MR. SCHOEN:  Well, specifically I would say that they

7   should produce to us for starters a list of case names and

8   courts every case that the PA or the PLO has brought.  Again, I

9   don't know that the PLO has ever brought a lawsuit in its name,

10  so we may be talking about frankly nonsense here if there is no

11  such thing.  That certainly wouldn't be a burdensome response.

12  I don't know the answer to it.  I'm entitled to an answer to

13  it, frankly.  And so I think they ought to submit the documents

14  that -- from lawsuits.  Like in any case, we ask normally

15  interrogatories or requests for production, give us any lawsuit

16  you have filed in the past.

17        In this case, there's a more specific reason for it.

18  They have taken the affirmative defense that they don't have

19  the capacity to sue or be sued.  If they file a lawsuit in

20  their name, then we respectfully submit that would refute that.

21        THE COURT:  Hold on a second.

22             [Pause in the proceedings.]

23        Okay.  Now, which -- what's the case that you cited

24  that stands for the proposition that their perception of their

25  ability to initiate a lawsuit is a factor to be considered?

13

1          MR. SCHOEN:  I don't know if I did cite a case on

2    that, Your Honor.  If they've held themselves out on their

3    papers as having the capacity or sue or be sued that would

4    directly undercut their representation to this Court.  Who --

5    by the way, what Judge Daniels said specifically was up until

6    now you all have taken the position that you're a stake [ph.].

7    Are you dropping that today and saying you're an unincorporated

8    association, lack of capacity.  They effectively said yes.  We

9    said, well, we need to get some discovery on this, then.  Said

10   a couple of times.  I'm sure Your Honor is aware on that

11   August 14th hearing.

12          So one of the things to consider, you know, we say if

13   in their own jurisdiction there is -- as the Massachusetts case

14   we cited, is there own jurisdiction they -- they're the

15   government.  As the government if they give themselves the

16   right to sue or be sued.  We say that's an important factor to

17   consider whether they should be treated as having the right

18   capacity to sue or be sued before this Court.

19          Now, they had this thought that we -- you know, we

20   had those legal issues resolved before Judge Daniels with --

21   you know, had a long argument he had over that and he rejected

22   their position at that time subject to taking discovery --

23   rejected the position at that time that they should be

24   dismissed as parties because of their lack of capacity subject

25   to taking your discovery and refile a motion.  That's what

14

1  they --

2      THE COURT:  Well, I don't think that ultimately

3  answers the dispute that's here before the Court.  I mean,

4  there's discovery and then there's discovery.

5      MR. SCHOEN:  Judge, in my view on my issue this is as

6  basic as it gets, lawsuits that they have filed or been for --

7  been sued -- had sued against them.

8      THE COURT:  Okay.  But if I understand you correctly,

9  you're not limiting it to situations in which they've actually

10 prevailed on their claim that they had capacity sue.

11     MR. SCHOEN:  That's right.  I wouldn't limit it to

12 that.

13     THE COURT:  And why is that?

14     MR. SCHOEN:  Because they have argued elsewhere that

15 they have the capacity to sue or be sued.  We're entitled to

16 know about those arguments because it directly refutes the

17 position they're taking here and what were the reasons --

18     THE COURT:  And --

19     MR. SCHOEN:  Sorry.

20     THE COURT:  -- it directly refutes it, but -- and

21 therefore what?  I mean --

22     MR. SCHOEN:  What reasons have they given for why

23 they --

24     THE COURT:  I know, but I mean, let's assume they

25 took a -- let's assume that they've been trying to sue and

1  they're being rejected and now they've -- they're here and they

2  say they're unincorporated.  The fact that they've taken a

3  different position in other cases, what's the relevance of that

4  here?  I mean, aside from it being contradictory what's the

5  legal relevance of it?

6         MR. SCHOEN:  I think that makes it legally relevant,

7  that they've argued other facts other places.

8         THE COURT:  Under what theory?

9         MR. SCHOEN:  I suppose on the same theory that Judge

10  Daniels was interested in --

11         THE COURT:  No, no.  Now we're on this question of if

12  you take a position that's different, what's the legal

13  significance of that in this case?

14         MR. SCHOEN:  Might they be estopped from raising a

15  different position in this case before another court, they've

16  taken that position that they --

17         THE COURT:  Estopped?

18         MR. SCHOEN:  Yeah.  That's a legal relevance.

19         THE COURT:  I mean, you think that the -- why would

20  they be estopped in this case?  Why would there -- I mean,

21  well, first of all, let -- I mean, if we talk about claim

22  preclusion and issue preclusion as opposed to estopped, which

23  they used to talk about when I was in lawsuit, estoppel used to

24  be issue preclusion.  All right.  What's the -- what would stop

25  them from changing their position, vis-a-vis you because you

16

1  weren't in the other lawsuits?  So where would estoppel come

2  in?

3          MR. SCHOEN:  I think if they made the argument under

4  oath if they had the capacity -- let's say in Israeli courts

5  their lawsuit was dismissed and in responding to the papers it

6  said why those -- the lawsuit ought to be dismissed.  They

7  responded as the -- all of the facts and legal bases for why

8  they should have -- why they do have the capacity to sue.

9  That's exactly the kind of thing we talked about on

10 August 14th.  We need to know what position are you taking in

11 different places.

12         THE COURT:  Yeah, but, you know, if you allege that

13 certain facts create a certain legal conclusion that doesn't

14 bind you from an estoppel point of view.

15         MR. SCHOEN:  That's all I have to offer on it, Judge.

16         THE COURT:  Oh, okay.  But by the same token, what

17 did you want to say, Mr. Hill?

18         MR. HILL:  Yes, Your Honor.  Let me take us back to

19 sort of first principles if I may and that has to do with

20 choice of law.  So this is a federal court; we're governed by

21 the Federal Rules of Civil Procedure.  Federal Rule 17, as I'm

22 sure Your Honor knows, says that if you're a corporation or an

23 individual, your ability, your capacity or sue or be sued is

24 determined by either domicile or your place of the corporation.

25         The PA and the PLO are not individuals.  The United

1  States Supreme Court held that in the last term.  They are

2  neither corporations.  They have not been incorporated by any

3  state, local or foreign.  So these are, in our view,

4  unincorporated associations.

5           Every court other than Judge Daniels who has

6  considered this issue has held that the PA and the PLO for the

7  purposes of Federal Rule 17 and the rules of service, including

8  the rules of service under which we were served the process in

9  this case, is properly treated as an unincorporated

10 association.  Rule 17, as Your Honor knows, says for entities

11 that are not individuals or corporations, their capacity to sue

12 or be sued is determined by the law of the Court, the law of

13 the state in which the court sits.  So in this case it's New

14 York State law.

15          So the issue that will ultimately have to be decided

16 by Judge Daniels as to whether or not we have capacity for the

17 non-federal claims in this case because Rule 17 goes on to say,

18 as you know, in the case of an unincorporated association they

19 can be sued as allowed by federal statute.  Okay.  So we're

20 talking about the pendant claims in this case.  Whether or not

21 we have the capacity to be sued will be determined by New York

22 State law.

23          Now, the New York State law says that the

24 corporations you look to the place of incorporation.  Well,

25 that doesn't apply here because we're not a corporation.  And

1   what the plaintiffs have argued is that because the PA -- and

2   I'm not sure if they're making this point about the PLO or not;

3   let's put that to the side -- has a governing nature.  It's a

4   governing entity.  They say, well, in that case, if it's a

5   governing entity you look to the place where it was

6   incorporated.  Well, the issue here is that the PA is not

7   incorporated anywhere.

8          And so the cases the plaintiffs are citing are

9   completely inapplicable.  The cases that are applicable are the

10  ones we cited in my letter, which say that if you have an

11  unincorporated government agency under New York State law it

12  lacks the capacity to sue or be sued.

13         So the discovery the plaintiffs want to take about

14  whether the PA or the PLO has sued or been sued in foreign

15  jurisdictions is completely irrelevant for the following

16  reasons.  Number one, the only jurisdiction whose law is

17  relevant is the State of New York.  If you want cases where

18  we've been sued in New York, they're publicly available.

19  They've all been in this courthouse, I believe.  We have not

20  brought any lawsuits in the state of New York.  And that, in

21  our view, is the only discovery that would conceivably be

22  relevant to the issue of whether we have capacity to sue or be

23  sued under New York law because we're not incorporated and

24  we're not individuals.

25         So all this about whether we brought lawsuits in

19

1   Israel or in our own territories is completely irrelevant, but

2   let's set that aside for a moment.  Talking about

3   burdensomeness versus relevance.  If the point the plaintiffs

4   desire to make is that the PA has brought lawsuits in its own

5   courts that point is conceded.  There is no need for further

6   discovery on it.  If the point they want to make is that the

7   PLO has occasionally participated in actions before foreign

8   forum that is also conceded.  We cited in my letter and since

9   when the PLO participated before the Court of International

10  Justice of the Hague in an action that the U.N. General

11  Assembly initiated about the wall in the West Bank.

12        So there's no need to go find documents in Palestine

13  or Israel and produce them in response to this discovery

14  request.  Is they want to establish that the PA or the PLO has

15  been sued in its own name in a foreign jurisdiction that can be

16  so much more easily accomplished through a request for

17  admission or an interrogatory that poses that question.

18  There's just no reason for us to go search courthouses in the

19  West Bank to produce documents or Jerusalem or Tel Aviv or

20  wherever else in this case.  It's a totally unduly burdensome

21  compared to the marginal and I think total irrelevance in the

22  discovery [indiscernible].

23        THE COURT:  Well, you sort of glossed over one

24  particular thing and that is that every court except Judge

25  Daniels, but this is Judge Daniels we're talking about.

1          MR. HILL:  Of course.  And that's why we're having

2    this issue about what the discovery is and what the proper

3    scope is.

4          THE COURT:  Well, but once Judge Daniels makes a

5    legal ruling on the issue doesn't that determine the scope of

6    discovery?

7          MR. HILL:  All he said is that there needs to be

8    discovery and all Judge Daniels said, in all candor, Your

9    Honor, was that I had to produce what I was going to rely on

10   and I've done that.  And that's what they said they were

11   seeking in these discovery requests in their letter to you.

12   They said they wanted us to be required to turn over all the

13   documents we were going to rely on and I have already done

14   that.  So in terms of what Judge Daniels ordered, as far as the

15   scope of the discovery he contemplated, we are in total

16   compliance with what he has directed.

17         THE COURT:  Okay.

18         MR. HILL:  The question now is whether additional

19   discovery beyond what he directed should be allowed.

20         THE COURT:  All right.  Well, I'll confess that I

21   have not seen the transcript of Judge Daniels' conference with

22   you, even though it goes back to August.

23         MR. HILL:  August 9th.

24         THE COURT:  So I -- it's certainly -- well, it is my

25   position that to the extent that Judge Daniels makes a legal

1    ruling that circumscribes the scope of discovery unless you get

2    Judge Daniels to change it because, you know, different judges

3    have different views and I don't agree with all of my

4    magistrate judge colleagues.  In fact, the District judges

5    don't agree with the Court of Appeals but, you know, there's a

6    pecking order.

7                Do either of you have a copy of Judge -- of the

8    transcript?

9                MR. SCHOEN:  I have a copy, Your Honor.

10                THE COURT:  I'm not going to read it right now, but

11    I --

12                MR. HILL:  I've got copies of it.  It's got my

13    highlights on it and notes.

14                THE COURT:  Yeah.  Well, why don't -- send me a copy.

15    I mean, I just -- I'm not going to try to rush through the

16    ruling.  I might even want to discuss with Judge Daniels what

17    he meant when I read what he said.

18                MR. SCHOEN:  Judge, I'd like to be clear about one

19    thing.  This is like instant replay and it's not appropriate.

20    We had a long argument session fully briefed before Judge

21    Daniels and he rejected the exact argument that this fellow

22    raised the first half of his discussion today and he rejected

23    the cases on which they relied.

24                So we've already been down this road and it's not

25    appropriate to reinitiate that issue here in support of their

22

1   argument.

2          THE COURT:  Well, if, in fact, that's what Judge

3   Daniels did I'll get that when I read it, wouldn't I?

4          MR. SCHOEN:  Thank you, Your Honor.

5          MR. HILL:  I disagree, but Your Honor will read the

6   transcript.

7          And the point I will make is this.  Even if Judge

8   Daniels has disagreed with me about the relevance of discovery

9   beyond lawsuits in New York, even if you think lawsuits outside

10  of New York or even outside the United States aren't relevant,

11  the burdensomeness of the particular discovery that is sought

12  here, which is every document filed in every case initiated by

13  the PA or PLO anywhere in the world obviously outweighs the

14  relevance of what the plaintiffs seek to prove is that we

15  brought lawsuits somewhere else.

16         THE COURT:  Well, again, that might mean that we'd

17  have to start taking baby steps, but it does --

18         MR. HILL:  All I'm suggesting is that if Your Honor

19  does think that this is relevant discovery that you use your

20  discretion, in fact, what's required by the rule and direct

21  that it be had in a manner that is less burdensome such as an

22  interrogatory or request for admission.

23         THE COURT:  Well, I'll figure out how to do it if I

24  so -- and as plaintiffs' counsel points out, you know, to some

25  extent we can't really deal with the burdensome issue of the

1  documents unless we know what we're dealing with in terms of

2  cases.  And I mean, I think the likely scenario might be for

3  the defendants to give some idea of the number of cases that

4  we're dealing with.

5           MR. HILL:  Just to make my point just clearer, Judge.

6  Is there is one case where the PA or PLO has been a plaintiff

7  and that's a relevant fact.  Doing more than producing one case

8  is a waste of time.  If the relevant fact is that we've been

9  sued in another forum, doing more than admitting that we've

10  been suing in another forum is a waste of time.  If the fact is

11  that we've been sued and we've brought a lawsuit that can be

12  established so much easier than producing foreign language

13  documents from another forum.

14           THE COURT:  And what is the benefit of producing more

15  than one, by the way?  Even if it's a -- let's say they

16  contradicted themselves and they did it in one case.  Why would

17  you need more than one case?

18           MR. SCHOEN:  Well, first of all, I suppose to face

19  the argument, which I can guarantee you will come, we did that

20  one time.  We did that one time.  We've taken another position

21  on different occasions.  We need to see what's out there.  We

22  need to see how many times they've done it.  Again, let's see

23  the numbers.

24           Judge, from our experience over there -- now, I have

25  no -- I really have no firm way of saying, we're aware of two

24

1  law firms that generally represent the PA or the PLO over

2  there.  It's Idelle [Ph.] Freij and the Carnellie Arnon [Ph.]

3  firm.  Start with them.  I mean, they know these guys very

4  well.  They know these lawyers very well.

5       MR. HILL:  This just illustrates the point, Judge.  I

6  mean, these lawyers are co-counsel with Israeli lawyers who

7  have brought lawsuits against the PA and the PLO in Israel.

8  The co-counsel in Israel for these very plaintiffs are aware of

9  these very lawsuits because they're the ones that brought them.

10  It's a complete waste of time to make us go to Israeli counsel

11  for the defendants, have them photocopy stuff from their files,

12  and give it to these lawyers when their co-counsel in Israel

13  already had it because the co-counsel in Israel initiated those

14  lawsuits.

15       MR. SCHOEN:  We don't just take on the word that it's

16  burdensome.  Give us the numbers.  Give us the numbers as the

17  Court just said.

18       THE COURT:  Okay.  All right.  I'll look at the

19  transcript, first of all.  Who's sending me the transcript?  Do

20  you have a clean transcript?

21       MR. SCHOEN:  I haven't marked on it.

22       THE COURT:  Okay.  Now, was this -- that's all I had

23  from the prior -- my prior list.  Is there something else that

24  was on your list that I may have missed and then we can get to

25  this couple of inches here.

25

1         Okay.  Now, what is it that the plaintiffs have just

2    filed?  What do they want?  What's this?

3         MR. SCHOEN:  I think we filed two things.  We filed a

4    premotion letter regarding Ms. Guetta and photographs --

5    request an outstanding --

6         THE COURT:  When did you file that?  I'm not --

7         MR. SCHOEN:  Also yesterday.

8         THE COURT:  Okay.  That --

9         MR. SCHOEN:  I didn't anticipate taking it up with

10   you.

11        THE COURT:  No, I just -- it's helpful for me to know

12   what's going on.  What's that all about?

13        MR. SCHOEN:  That's a request that's been made for

14   photographs.  Ms. Guetta was a victim with her family of a

15   shooting attack in an area that was the site of several similar

16   shooting attacks.  In order to -- Ms. Guetta testified that the

17   face of the attacker would be something -- I'm paraphrasing --

18   forever embedded in her mind.  So we -- she needs to be shown

19   the pictures.

20        What we did was to narrow the field.  We going

21   through some research picked out the names of 17 people who are

22   people who operate in this kind of MO in that area during that

23   time period.  Many of whom were their employees.  Security

24   officers and policemen for the PA at the time.  And so in

25   November of last year we served them with requests -- I mean,

26

1  with -- yes, requests for production asking them for pictures

2  of 15 people.  In December we added two people to that.  And

3  what we say in our letter is, we were able to find on our own

4  the picture of one of the people and we showed it to the lady

5  and she wasn't able to identify that person.

6          So we've asked for pictures of these now it would be

7  16 people.  Again, what we say in our letter is if they have a

8  PA ID or to the extent they were policemen they would have a

9  photo with the PA.  And the answer we got was pages of

10  objections.  These are attached to the -- pages of objections,

11  general objections and that sort of thing, and then

12  specifically as to this, this was a -- I think one request,

13  request for production.  After that, other objections like it

14  would be too burdensome --

15          THE COURT:  So what do you --

16          MR. SCHOEN:  -- [indiscernible] --

17          THE COURT:  What do you want to do with the pictures?

18  But what do you want --

19          MR. SCHOEN:  [Indiscernible] the lady, can she

20  identify these people, any one of them as the shooter and with

21  his face that was forever embedded in her mind.

22          THE COURT:  Okay.  Well, okay.  Let me tell you a

23  little anecdote.  I mean, I don't know if any of you follow the

24  capital punishment area.

25          MR. SCHOEN:  I've practiced in that.

27

1          THE COURT:  Okay.  You -- there was a woman who was

2    the victim of a violent rape who was -- whose testimony in

3    opposition to capital punishment was, when she knew it was

4    going to -- you know, she couldn't defend herself she made a

5    point of remembering the face of that person.  She identified

6    the person, he gets convicted.  Turns out it was the wrong

7    person.

8          What -- the fact that somebody says it's indelibly

9    marked, what do you think it -- from a psychological point of

10   view, why should I even consider that to be admissible

11   evidence?  I mean, I -- and I know other situations where

12   people say, you know, "I'll never forget the face" and

13   eyewitness identification has been time and again proven to be

14   reliable.

15         MR. SCHOEN:  And time and again people have been

16   convicted on it.

17         THE COURT:  Right.

18         MR. SCHOEN:  [Indiscernible] know the circumstances.

19   This isn't a trial of visibility issue here, Judge; this is a

20   discovery issue.

21         THE COURT:  And so what do you -- so what -- I'm

22   saying, what do you want to get from this?  So let us say she

23   identifies one of the people.  Then what?

24         MR. SCHOEN:  Then maybe we can show something more

25   about that person, where he was at that time.  I don't know.

1  That he committed X number of similar shooting incidents, that

2  he told somebody he was involved in the shooting incident.

3  Lots of things could come up that would be admissible evidence

4  and useful evidence from that.

5         The alternative is not to show a picture of who

6  potentially could be the shooter if they have pictures of

7  people who potentially could be the shooter and then she's out

8  of court because -- and she really could identify the person?

9  How could that possibly be fair?  Maybe her identification is a

10 reliable one.

11        MR. HILL:  Well, Your Honor --

12        THE COURT:  I don't expect you to give me full

13 arguments because I actually haven't seen the papers yet,

14 but --

15        MR. HILL:  Yeah, so a couple initial points.  One,

16 these requests were served a year ago.  We served our

17 objections a year ago.  This is monumentally stale to be

18 brought to Your Honor's attention now.  This has been sitting

19 out there undiscussed for I think literally a year.  And if

20 this is discovery they wanted to pursue they should have

21 brought this to you a long time ago.  We were first before you

22 in June.  Mr. Schoen and I were here and we made the point

23 that, you know, we need to have meet and confers.  We had a

24 meet and confer about this.  We said we weren't going to

25 produce this stuff for the reasons stated in our objections

1    which included among other things the reliability point Your

2    Honor has just articulated here.  And they have just slept on

3    this and now that we're a month out of discovery they're

4    seeking to compel.  So that's an independent reason to deny

5    this aside from the merits.

6          I'm not going to address the reliability point but I

7    will make this point.  This evidence could only be used to try

8    and establish the very sort of unreliable testimony that you

9    have just articulated.  Think about it.  They have given us a

10   list of people.  Now, we sent discovery to them and said, give

11   us all the documents you have on these people because we wanted

12   to see if any of these people were actually implicated in any

13   evidence, admissible or not, of having any involvement in the

14   shooting of the Guettas.  They sent us some stuff.  They have

15   not one shred of evidence.  They don't even have a newspaper

16   article linking any of these people to the shooting.  There is

17   no evidence at all that these people have anything to do with

18   this shooting.  And tellingly, the person whose photo that they

19   showed to this witness because she said, that's not the guy,

20   that's the person they named in their complaint.  There's one

21   name in the complaint.  It's this guy that their witness has

22   now permanently excluded as being the shooter.

23         So this is an extraordinary fishing expedition.  And

24   once more, it's a fishing expedition where all the fish are

25   designed to make my clients liable.  They've come up with a

30

1  list and they now want to show her people any one of which they

2  will then argue makes us liable in this case.  That testimony

3  could not be admissible for the reasons that you've stated.

4       Now, Mr. Schoen said, "Maybe if she picks somebody we

5  can do further discovery about that person."  That doesn't

6  hunt.  They can already do discovery about these people.  In

7  fact, they have every incentive to do discovery if they

8  actually think these people had something to do with it.  This

9  is clearly an attempt for them to put in front of this woman 12

10  years out of [indiscernible] a photo array of people, any one

11  of which is a good choice from their perspective because it

12  will be viability.  And did we mention that the witness who is

13  making the ID is financially interested in picking one of these

14  people as are he shooter.

15       Twelve years after she saw someone through a car

16  window for a split second who was shooting at her, there's no

17  way that that could be sufficiently reliable testimony and

18  that's the only admissible evidence that could conceivably come

19  out of this document request setting aside the issue of whether

20  we have to toss every office in the West Bank trying to find

21  pictures of these people, most of whom aren't even fully

22  identified.

23       In order to find things in the West Bank for people

24  you need to have either an ID number or all four of their names

25  and in many of these instances we have neither.  This is a

1  tremendously unduly burdensome, irrelevant fishing expedition.

2           THE COURT:  Well, I'll -- let me --

3           MR. HILL:  And you ought to deny it.

4           THE COURT:  Let me see it first before -- I'll see

5  what you say in your -- I assume there's an affidavit from this

6  person in there somewhere.

7           MR. SCHOEN:  I believe there's an affidavit, Judge.

8  There's testimony that she gave in June of this year.

9           MR. HILL:  Right.  And let me make this point.

10  Closer to the event when she was previously deposed in the

11  other lawsuit that she brought against the Arab Bank [Ph.] for

12  these same damages for these same injuries, she said she

13  couldn't identify the person.  In fact, she couldn't even tell

14  whether they were an Arab or an Israeli.

15           MR. SOLOMON:  And Your Honor, that's a

16  misrepresentation.  I think he's stretching her prior

17  testimony.  There was minimal testimony to that point in any

18  event.  I mean, I don't have the transcript with me, but if

19  that's something Your Honor would like to see, we can certainly

20  [indiscernible] --

21           THE COURT:  And what -- and what about the question

22  of -- I mean, there -- I know you weren't here from the

23  beginning, but there have been a number of times when I have

24  said, okay, we've got to come to a point where I know what's

25  going to be the end point.  What are the issues that you want

1  me to decide?  Why is this issue now coming up and why wasn't

2  it brought up sooner?

3           MR. SCHOEN:  First of all, Judge, she was just

4  deposed in June.  Secondly, the whole point of this is to try

5  to work out things without having to come to Court and now

6  we're hearing from them --

7           THE COURT:  That's -- okay, that's not going to make

8  that.

9           MR. SCHOEN:  We had a [indiscernible] --

10          THE COURT:  Okay.  Understand.  I think you're

11 missing the predicate to what I said.  We've had a number of

12 situations, a number of conferences in which I said, okay, we

13 want to make sure all of the issues are on the table.  Okay.

14 So the only question I'm asking you is this.  Why wasn't it

15 brought sooner?  If you say it was -- and so I'm looking for

16 temporal issues.  You said she was only deposed in June.

17          MR. HILL:  End of June, Your Honor.

18          THE COURT:  All right.  Although that may not answer

19 the question of why this was not an issue because we are

20 talking about identifying somebody for the purpose of, you

21 know, proceeding in the lawsuit.  It seems to me this is not

22 necessarily an issue that only would have come up after the

23 deposition.

24          MR. SCHOEN:  Well, I --

25          THE COURT:  Well, think about it because, as I said,

33

1   I haven't seen the papers.  I haven't seen any response from

2   the defendants, but I'll be looking for something which says

3   that -- I mean, aside from the -- I mean, we have some legal

4   issues, some practical issues, and then we have -- you know,

5   even if we're going to be extending discovery, we're not

6   extending discovery for the purpose of opening up everything up

7   for new stuff.  We're -- if we extend discovery in this case

8   it's for the purpose of finishing stuff that started, so I

9   don't want anybody to be under the misconception that, you

10  know, if I grant you any extensions of discovery then all of a

11  sudden somebody is going to file some new discovery request.

12  This is all cleanup at this point.

13          What's this one about, Mr. Schoen?

14          MR. SCHOEN:  This one is what we hope to be a

15  comprehensive rendition, Judge, of the pattern of discovery

16  violations that we faced in this case that require the schedule

17  to be extended.

18          Besides all of the things -- we try to list them in

19  sort of painstaking detail, Judge.  We break them down by

20  victim and relevant outstanding requests to them that have been

21  met with things like, well, we're still looking, we will

22  investigate, getting things in dribs and drabs, things that

23  they clearly should have had years ago for the reasons that we

24  state in our papers.

25          Beyond that, Judge, one specific issue is that there

34

have been several Hague Convention deposition requests that were fully briefed as of April. They deposed the deposition requests and we represented to the Court that in similar situations elsewhere we've been able to get those depositions taken within three months of the order granting those depositions.

        As I say, that's one of the issues. Besides --

        THE COURT: When you say "similar situations," what do you mean?

        MR. SCHOEN: Other cases.

        THE COURT: Well, what -- no. When you say "similar," other cases doesn't tell me similar to this sit --

        MR. SCHOEN: Wanting to take depositions in the places where these depositions are sought of people similarly situated to these kinds of people.

        THE COURT: You mean, PLO/PA kind of people?

        MR. SCHOEN: Yes, Your Honor.

        THE COURT: Is that --

        MR. SCHOEN: Yes, Your Honor. That's my understanding of what's meant by it.

        THE COURT: Okay. I just wanted to make sure. You know, I'm not sure what the lawyers think are similar. I just want to -- I don't want to be assuming.

        MR. SCHOEN: I understand. It's all in the briefing papers as I understand it also, Judge.

35

1          THE COURT:  Okay.

2          MR. SCHOEN:  That's one specific issue.  Again, well,

3     they've said they want to discuss it today.  I also --

4          THE COURT:  So what's the bottom line?  What are you

5     seeking?  You want an extension of the discovery deadline?

6          MR. SCHOEN:  Yes, the extension -- an extension of

7     discovery deadline, Your Honor.

8          THE COURT:  And what else?

9          MR. SCHOEN:  What we say in here, Judge, is that the

10    Court carefully considers, as we know it will, the nature of

11    the kinds of violations here that this court thinks is

12    appropriate, that we should have a special master appointed

13    here to consider exactly what kinds of responses we're getting

14    and what they mean when they say they're investigating or

15    they're going to ask another office about it.  And, again, the

16    examples are given here of documents that clearly would have

17    been known, should have been known, and were known to them long

18    ago.  It's this pattern of dragging it out until the end and

19    then say, well, why didn't you raise it earlier.

20         THE COURT:  Can you --

21         MR. SCHOEN:  Well, we raised it all along.

22         THE COURT:  Can you give me a specific example of

23    such a document?

24              [Pause in the proceedings.]

25         MR. SCHOEN:  If Your Honor has the document there,

36

1    I'm just going to give -- I'm picking a random example here.

2    Page 5 of the declaration, paragraph (g), it's the kind of

3    document --

4            THE COURT:  Okay.  What's -- the declaration is --

5            MR. SCHOEN:  It's 269 -- D.E. 269.

6            THE COURT:  Okay.  Declaration.  It's a --

7            MR. SCHOEN:  And I'm picking a random example.  This

8    is the pattern --

9            THE COURT:  This is the Tolchin declaration?

10           MR. SOLOMON:  Yes.

11           MR. SOLOMON:  Tolchin declaration.

12           MR. SOLOMON:  Yes.

13           THE COURT:  Okay.  And what are you pointing to?

14           MR. SCHOEN:  For example, paragraph -- if you take

15   paragraph (f), which starts on page 4, this is the kind of

16   document I was saying before they clearly should have had

17   earlier.  No reason they couldn't have had it.  Then the next

18   paragraph is a different kind of problem we identified here.

19   They are only producing documents who they think will help

20   them, but obviously -- maybe (e) even gives a better example.

21   The document was marked with an earlier date when we got it.

22   Why do they hold these documents so long before producing them

23   after they've located them?  That kind of --

24           THE COURT:  When you say "so long," I mean, at one

25   point -- I mean, are you talking about weeks, months?

37

1          MR. SCHOEN:  In many cases -- that's for

2    [indiscernible].  Judge, we lay out dates all through the

3    motion papers.

4          THE COURT:  And how many examples do you have here?

5          MR. SCHOEN:  I don't know the answer to that, Judge.

6          THE COURT:  I mean, is it like 10, 20?

7          MR. SCHOEN:  Judge, I also have -- this isn't your

8    problem at all -- the Court's problem at all.  I also have

9    papers [indiscernible] since I really can't answer those

10   questions specifically right now.  I can look through the

11   documents with the Court's indulgence, Your Honor.

12         THE COURT:  Okay.  Just --

13         MR. SCHOEN:  Given [indiscernible] --

14         THE COURT:  But let me just paint a picture for you

15   so you understand where I'm coming from on this.

16         Okay.  There's been a lot of claims on both sides

17   about the inability to answer questions.  If you think that the

18   defendants have been stalling and not producing things when

19   they should have and the reason that you've done it is, like

20   you'll say, there's a date on this and clearly they could have

21   done this or some other date -- or they could have done this at

22   some earlier date, when they give me a response and they point

23   to three or -- a couple -- three or four of them and they have

24   an explanation for them, this is over.  You understand what I'm

25   saying?

38

1          MR. SCHOEN:  I think I understand what Your Honor is

2    saying.  Let me say this.

3          THE COURT:  Because, you know, the problem is is that

4    you -- what you want is just the pattern and practice of the

5    defendants doing something based upon your supposition of why

6    they could have done something earlier.  You know, I mean, and

7    the reality is is that, you know, people could ask me why I

8    don't do opinions earlier.  And, you know, the -- when I was on

9    your side I used to wonder why judges couldn't do opinions

10   earlier.  But, you know -- but I used to do discovery and, you

11   know, people would -- you know, there are reasons that it

12   happened and the more documents and the more trans-national it

13   is the more difficult it is, you know, lawyers are doing

14   things.

15          If they have legitimate explanations for some of

16   these things, it undermines your notion that there's a pattern

17   and practice.  You understand?

18          MR. SCHOEN:  Let's see the response, Judge.  And

19   let's see the response because what the nature and tone of this

20   document is that they've been simply stringing us along all of

21   this time, so we wait and we don't file a motion to compel

22   because they're investigating or they're going to get it.  And

23   as we point out here, these are documents that if they turn up

24   turn up as documents.  There's no reason they required any

25   further --

39

1          THE COURT:  And let me ask you this.

2          MR. SCHOEN:  -- investigation [indiscernible].

3          THE COURT:  And although I haven't looked at what

4    you've submitted are you telling me that when you got these

5    documents that were belated you looked at them and said, wow,

6    no wonder they were holding these back.

7          MR. SCHOEN:  On occasion.  There have been emails

8    that said that kind of thing, how is it you're just --

9          THE COURT:  No, I'm just asking because -- I mean, I

10   have cases in which I'll have someone who will say to me,

11   Judge, you know, they were holding this back.  And then I look

12   at it and says, why would they hold this back.  So I -- there

13   are any number of things which I expect will be at play in this

14   but I guess you just got this anyway.

15         MR. ROCHON:  Well, we did, Your Honor.  Mark Rochon

16   on behalf of the defendants.  It's a bit of a frustrating

17   situation, Your Honor, and if you'll indulge me for a second.

18   First of all, counsel keeps on saying that I'm familiar with

19   the papers.  Lead counsel is here.  They filed -- in my view,

20   he filed.  His name is on it, papers accusing either us, our

21   clients or both of obstruction.  And he's not prepared to talk

22   about them.  His name is on them.  He signed them and submitted

23   it to you essentially minutes before we're in court today.

24         Frankly, I think that's a pretty serious allegation

25   that he ought not to have signed off on it if he hasn't even

40

1  read it, as he just admitted.

2          MR. SCHOEN:  I've read it.  I'm not admitting I

3  didn't read it.  I've read it.

4          MR. ROCHON:  Well, he said he just got it.

5          MR. SCHOEN:  That's right.  I just got the papers.

6  I've read it.

7          THE COURT:  Okay.  Counsel, all right.  Before you

8  continue.

9          MR. SCHOEN:  Yes.

10          THE COURT:  Mr. Schoen, I don't allow lawyers to get

11  up and address the other lawyer just because they think they're

12  saying something wrong.  If you do that again, then I'm going

13  to ask you to explain yourself and then we will be talking

14  about sanctions.  Okay.  I don't need cross-talk from the

15  lawyers.  You'll get an opportunity to speak.  And the fact of

16  the matter is, is that this is just argument.  You know, I'm

17  not making a ruling based on anything that counsel is saying.

18  I trust that you all know this that no matter how persuasive

19  you are, if I'm going to make a decision it's going to be based

20  on something that's sworn as an affidavit or an affirmation.

21          The lawyer's representations here are not dispositive

22  and the fact -- and the other fact of the matter is, I hear

23  what's being said.  If his characterization of what you said is

24  going to -- is inaccurate, then it's inaccurate but lawyers do

25  that.  They mishear each other, but I'm not going to base any

41

1  decision on it.

2       MR. ROCHON:  I'll continue.  Your Honor, the reason

3  that we're a little frustrated is we decided the last time that

4  this -- that -- so we were told in mid-October -- the discovery

5  ended December 1st.  Mid-October we started to get a series of

6  emails from plaintiffs telling us to keep our calendars wide

7  open November 1st to 21st, going to have all these depositions.

8  And we said, "Well, tell us when, tell us who, give us some

9  notice."  The emails are attached to Mr. Hill's letter that's

10  dated October 26, 2012 that you have.  And there's a backup --

11  it continues to October 18 insisting we keep the month of

12  November wide open.  I -- this isn't my only case or client.  I

13  move things.  I reschedule things.  They're insisting that we

14  have to keep that whole time period open, which makes sense

15  since we're about near the end of discovery and they've taken

16  two depositions in this entire case.  They never notice

17  anything.

18       We come to you today and essentially the night before

19  the hearing with discovery to end in 30 days.  They filed this

20  seeking a general extension of discovery without any dates in

21  the expectation we point out that a responsible jurist won't

22  want to rule on that and just have it dropped on you.  And

23  it's -- for the record with attachments it's at least two

24  inches or more thick.  I don't want to overstate it.  It's

25  thick.  It's a lot of papers with an extensive declaration

42

1  putting you in a position, I would suggest, that unless you

2  rule on the procedural defects with it immediately, which I

3  think perhaps, Judge, can be a risky thing to do if you don't

4  have a chance to review it, they will criticize you simply for

5  ruling promptly.

6       So the Court is stuck we think unfairly.  The Court

7  is capable of defending itself if the Court feels it's been

8  treated unfairly, but we are treated unfairly by this because

9  it's essentially amounts to a *de facto* extension of discovery.

10  If you take the time that is necessary to rule on this, then

11  they're not going to try to do any depositions in the meantime,

12  apparently.  And then they'll come and it's like a game of

13  chicken and expect, well, there's no way if the Court would

14  just not allow us any depositions 30(b)(6) and so it's a

15  gamesmanship that we find problematic.

16       THE COURT:  Okay.  Well, let me be clear.  If, in

17  fact, somebody is not scheduling discovery in a hope that we'll

18  have an extension, that's not going to work.  Let me -- I'll

19  reiterate what I said before.  We don't -- I don't give general

20  extensions.  I give extensions for you to complete what you

21  tried to do during a period of the discovery and were unable to

22  complete.  So that, for example, you can complete a deposition

23  for which somebody was unavailable during the discovery period

24  and you have to do it afterwards, but you can't for the first

25  time try to schedule it and say, okay, we have a week left and

1  we tried to schedule them for November 28th and they weren't

2  available.  That doesn't work.

3          And by the same token, you'll have to show that you

4  tried to schedule it during the discovery period before you'll

5  get to do it after the discovery period.  There won't be any

6  new things happening.  I hope you all understand that.

7          MR. ROCHON:  We do.  The defendants definitely

8  understand that it's the point that I'm --

9          THE COURT:  Okay.  Well, we're all on notice now that

10 there will -- if you -- if there are any depositions that you

11 want to take -- first of all, it seems to me as *prima facie*

12 that before you ask for an extension you have to show that you

13 tried to do the discovery during the discovery period and when

14 they were unable to do it if you never tried to schedule

15 anything that's not going to work.

16         MR. SCHOEN:  May I respond to that, Judge?

17         THE COURT:  To me?

18         MR. SCHOEN:  Yes, Your Honor.

19         THE COURT:  You could.  It won't change my mind.

20         MR. SCHOEN:  Okay.  Your Honor, to be clear, though,

21 about the facts we -- all that's described in this document is

22 outstanding discovery requests in which we say we've been

23 strung along.

24         With respect to the depositions we've attached as

25 Exhibit CC relevant -- the relevant exchange on this.  We sent

44

1  them notice ahead of time that we would like to take the

2  30(b)(6) depositions in November.  I'm referring the Court now

3  to page 32 of the declaration, paragraph 19.  And over the next

4  couple of weeks they were sent topics for the depositions.

5  They took the position -- defendants took the position -- and

6  this is either borne out in the attachment or it's not --

7  defendants took the position that they would not make a witness

8  available on any given date until they had a complete list of

9  all subjects of the 30(b)(6) topics.

10      MR. ROCHON:  That's not -- well, obviously you're

11  going to read this.  Here's what we said.  What was said was,

12  we want to know all the topics before we designate our

13  witnesses and who we're going to use.  If they had 40 topics

14  and one witness could address 15, we used that witness.  If

15  there's topics that aren't there, you might use a different

16  witness.  You don't know who you're going to designate or use

17  as a witness until you get your 30(b)(6) notice.

18      We gave them the only dates that we were blocked out

19  for November and encouraged them to get us the notice as soon

20  as possible.  The email chain question is attached to our

21  letter to you dated October 26th.  They never sent us any

22  notices, is the bottom line for any dates in November, even

23  though we gave them a wide array of dates of availability and

24  asked them who they wanted to depose.

25      They also said they wanted to depose non-30(b)(6)

1   witnesses.  They never sent any notices for those or told us

2   the names of those people.  They said they wanted to depose

3   some foundational witnesses.  They never sent us those notices.

4   That's fine.  If they don't want to take discovery, fine.  What

5   we don't want to have happen is to have them blame us for their

6   failure to do their discovery.

7            THE COURT:  Well, let me say this about 30(b)(6)

8   witnesses.  I think it's a good practice if you're going to do

9   30(b)(6) you do it in a unified notice so that we don't have a

10  situation, for example, where -- as counsel describes where you

11  give them 15 topics and then you give them 15 more and it turns

12  out that the 15 more would have been the same witness.  That

13  would not be a very efficient thing to do.

14           By the same token, if the 15 more would have meant

15  another witness would have been more appropriate, this just

16  creates problems at the end.  I don't know if this is happening

17  but, you know, the net result for me is that if you've not been

18  efficient in your 30(b)(6) then the burden is on the people --

19  person trying to do the 30(b)(6) then you may be precluded from

20  doing any more than the one that you've noticed timely and

21  that's just a fact of the matter.

22           MR. ROCHON:  Your Honor, I know that we're not going

23  to be able to argue the full motion today, but even looking at

24  what they directed you and because we'll respond in writing and

25  you'll rule -- even when you look at what they directed to you

1   today they're complaining about discovery that they say is so

2   late and is so prejudiced on the very page they're looking at,

3   they say that three months after initial production on

4   March 16, 2012, we supplemented our production.  They keep on

5   claiming that we're -- our representation that we're continuing

6   to investigate is bad.  We understand the Federal Rules to

7   require us to continue to investigate so that if we discover

8   additional responsive documents we produce them.  If they want

9   us to stop investigating, fine.  But then they complain that we

10  haven't found something.

11          In any event, we found something and sent it to them

12  March 16, 2012.  Eight months ago.  Now they're here saying

13  they need a discovery extension because of that.  I think

14  sometime in the 240 days since they got it they could have

15  shown up here.  We didn't meet and confer on this.  This just

16  popped into my email last night while I was eating pizza with

17  my kids before coming up here.  This is an effort to extend

18  discovery without giving you a chance to rule on it.

19          Here's what we're concerned is going to happen next.

20  We've got a lot to say about this motion.  Won't give it all to

21  you today because we'll respond in writing.  The Court has

22  already told them not -- don't rely on getting an extension.

23  If there is an extension it will be for already initiated

24  discovery.  Parties understand your admonition in that regard,

25  so I'm going to walk out of here and I'm going to get some kind

47

1    of deposition notices because they probably anticipated that

2    the Court would fall for this.  And they're going to be over

3    broad or have problems.

4          I'd ask you to schedule a telephonic hearing for

5    Monday in this case so that if they serve us with those notices

6    we can already be on your calendar to discuss them because

7    we -- there are other cases between the parties.  In the

8    Schatski [Ph.] litigation in D.C. they tried to extend

9    discovery and not take depositions.  Judge Leon said, "Order

10   them to do the depositions."  It was the last month of

11   discovery.  There was a lot of fighting between the parties,

12   but the second he set a schedule then we got all the notices

13   and then we did the depositions on short notice and there

14   wasn't an ability to engage with the Court promptly to deal

15   with issues.

16         This is a case in which I would ask the Court to

17   consider setting now a telephonic conference for early next

18   week unless they say they're not going to serve us with some

19   notices in the meantime, but they now have to.  And so I don't

20   want to have haphazard sort of situation here.  I think it

21   makes sense --

22         THE COURT:  Well, assuming that they did serve you,

23   what makes you think that we'd be in a position to have you to

24   make a presentation to me that would be helpful?

25         MR. ROCHON:  Even if you weren't able to rule

48

1  clear -- you might be able to provide guidance.  They may

2  notice people that we don't have the ability to produce.

3  They -- for instance, they talk about Mr. Delaunt [Ph.] in

4  their papers here a bunch.  Mr. Delaunt doesn't work for the PA

5  but they complain a lot about our production of discovery as to

6  him.

7            I don't know what they're going to do.  So far we

8  don't have any deposition notices even though we're 30 days out

9  and they've conducted two depositions.  And I know they plan on

10  doing more because they have no case currently so they're going

11  to try to get one through their depositions.  So that's where

12  we seek to -- we ask the Court to consider that.  If you don't,

13  it's fine.  We'll deal with what we get when we get it in the

14  normal course.  It's a request.  Obviously it's at your

15  discretion as to whether to schedule such a hearing.  I think

16  it might be advisable.

17            The only other thing we'd like to state today is on

18  the letter -- this other letter they sent, you know, our client

19  has been dragged into the United States District Court for the

20  Southern District of New York.  The plaintiffs' claim that

21  Ms. Guetta was shot by a name called Palowa [Ph.].  She

22  testified at the Arab Bank litigation well over a year ago she

23  couldn't identify anyone in that incident from ten years ago.

24  She now has excluded Palowa.  And why we've been brought into

25  court -- that's all they had in this case.  There's nothing

49

1  else to connect the PA to that incident.  We've been dragged

2  into court.  We've been running around trying to defend that,

3  responding to discovery requests in the Guetta case, conducted

4  damages discovery over when it turns out they have nothing.

5  And that costs a lot of time and money and distraction for a

6  government that is frankly under a lot of other stressors as

7  well.  And we think that the admission -- the frank admission

8  in their letter -- you'll see it when you read it, Judge --

9  that they don't have a case unless she picks somebody that they

10  can tie to the PA.  Suggest that should never have been here at

11  all.

12      That is -- you know, I realize I just come here as a

13  litigant, but representing a quasi-government and being dragged

14  over here against its will to defend these cases frankly I

15  think the Palestinian Authority can expect a little bit more

16  and we're frustrated by that.  We're frustrated by the effort

17  to get this extension of discovery because it costs our client

18  a huge amount to defend this case.

19      THE COURT:  Okay.  Counsel, I'm sorry that your --

20  the pizza with your kids was disturbed.  That's probably caused

21  me the most angst of anything that you said, but as I said, I

22  have not seen the papers.  I think it's pretty clear that I

23  have some concerns about an eyewitness identification

24  particularly in the circumstances since the lawsuit was already

25  filed.  And I -- so that you're not blindsided, one of the

50

1  things that whirls through my mind is, how is it that we had a

2  misidentification in the beginning.  So if you haven't

3  addressed that, you should be prepared to address it at some

4  time.

5        MR. SCHOEN:  I'll address it, Judge.  I think it's

6  somewhat related to the self-righteousness I'm hearing.  The

7  reason the PA isn't being treated unfairly is because the PA

8  was one after another after another employee standing out a

9  police officer who is a terrorist murderer.  That's why they're

10 not being treated unfairly.  Any idea, Judge, how many attacks

11 have been made by their policemen and we took a deposition on

12 that.  You know why, Judge?  Because their theory was, well, if

13 we take people who have been convicted of terrorism or been in

14 prison and we make them policemen maybe we'll rehabilitate

15 them.  Smart.  Give them guns so they can shoot and kill

16 people, innocent people.

17       And it's also reckless talk.  The lawyer just

18 represented to Your Honor, because I'm sure he's sure Your

19 Honor won't check, that in the case in Washington, the judge

20 finally made us have depositions that they wanted to have.

21 They moved to extend the depositions.  We noticed them from

22 August --

23       THE COURT:  Okay.  Counsel, let me stop you for a

24 moment.  First of all -- and I don't want to have to repeat

25 myself on this -- it really doesn't matter what he represented

51

1   about the case in Washington.  I'm not making any decision

2   based on it.  I actually have the ability to have lawyers talk

3   in front of me and not think that what comes from their mouths

4   is the law.

5           I mean, if I thought what lawyers said about their

6   cases, their prior cases, case they've been in was absolutely

7   factual, my head would explode.  I don't know if what that --

8   if what happened in that other case was important to me, either

9   he'd have to tell me or I'd have to look it up.  You think that

10  I could exist in this job going by representations from

11  lawyers?  That's just a non-issue.

12          But the question I ask you and -- you know, and look.

13  Frankly, guys, if you think that somehow anything that any of

14  you says will have some emotional pull to me, you can forget

15  that too.  I am totally unimpressed by the emotional plays from

16  either side.  I am dispassionate.  You know, whether or not,

17  you know, they're murderers or killers and whether or not

18  they're -- you know, they're being dragged in or not, that's

19  not a legal issue to me.  Okay.

20          So, you know, you're not going to get my soul or my

21  heart.  You know, I'm just interested in facts and the law.

22  And the only thing I asked you about was, how did this person

23  get in the lawsuit in the beginning and I said I was interested

24  in that.  All this other stuff is rhetoric.  Is -- I mean, it's

25  not related to the claims in the case.  Okay.  You know, you

52

1   just can't sway me that way.

2          You can talk to people who know me.  This just does

3   not -- all I hear is, you know, if -- it's like I remember a

4   cartoon.  It was about owners and dogs and it says, what the

5   owner says and the owner says, you know, "Ralph, come here."

6   And it says what Ralph hears and it's blah, blah, blah, blah,

7   blah, blah.  You know, a lot of what lawyers says, you know,

8   it's bouncing off of me, you know.

9          The reality is, and I will reiterate this for -- I

10  mean, you know, we're near the end of discovery -- I'm not

11  going to base any of my legal rulings on anything that you say

12  unless it's backed up by something other than representation by

13  lawyers.  And you're not going to sway me by painting the other

14  side as bad, evil or whatever it is.  Indeed, I'm not even sure

15  that you can even trust lawyers when they say stuff.  So, you

16  know, I feel your pain as lawyers but, you know, if you don't

17  have anything that's legal, you know, you can just can it.

18          MR. ROCHON:  Your Honor, I accept the admonition.  I

19  would like to address, therefore, factual and legal issues as

20  to this most recent extension of discovery requests.  And when

21  the Court looks at it, what the Court will see we feel is that

22  in each instance they complain about the fact that our

23  production has continued after the initial request, which is

24  our obligation.  Any documents that were produced after the

25  initial production were produced many months ago in sufficient

53

1   time for them to take whatever discovery they wished to in

2   response to that.

3          In several instances we've provided them with

4   initially exactly what they looked for.  For example, in the

5   page they directed you to specifically in the declaration on

6   page 5 they're talking about the employment of two Palestinian

7   men who are alleged to be involved in one of the incidents,

8   Hashaika and Abdel Karim Aweis.

9          Within a very short period of time after their

10  initial request, we provided documents that showed that

11  Hashaika had been a Palestinian police officer and Abdel Karim

12  Aweis receives payments pursuant to a government job.  We later

13  supplemented that discovery.

14         But the fact is that what they really wanted and it's

15  what they argue is relevant is evidence showing an employment

16  relationship with the PA.  They got that extremely promptly.

17  Any supplemental information never changed that status except

18  for it turned out Hashaika had been terminated from his

19  employment a month before the incident and we produced a

20  document that showed his termination.  That document showing

21  his termination was produced on March 16, 2012 according to

22  their representation on page 5 of their motion.  March 15, 2012

23  was eight months ago.  They haven't complained about that since

24  in any regard to somehow affecting their case.  They haven't

25  brought that to your attention.

54

1          I mention this be -- and you'll see that throughout.

2     That's one example.  I could give others.  They complain that

3     in October 3rd they provided -- they made discovery requests --

4          THE COURT:  October of 2011.

5          MR. ROCHON:  Excuse me, yes.  Seeking identities and

6     employment details with people of knowledge of the gentleman's

7     detention and interrogation by the PA, this gentleman Hashaika.

8     We haven't found any such information.  We're sorry.  We don't

9     have it.

10         MR. HILL:  Actually, we have disclosed that.

11         MR. ROCHON:  Eventually we disclosed in response to

12    [indiscernible] name of the man who had information, a man

13    named Dwykats [Ph.].  We disclosed that April 29, 2012, a PA

14    person from April 29, 2012.  They didn't seek that position of

15    the man.

16         Now they come -- and so I know we don't have time

17    today to go through all of this, Judge --

18         THE COURT:  Okay.  And you're right.  And -- but

19    that's the kind of thing that I will be looking for, although I

20    think the plaintiffs' representation wasn't simply that you

21    were continuing to produce things, but that you were delaying

22    producing things, which is slightly different.

23         I mean, I understand that you guys differ on it, but

24    I understood them that -- the part that I read.

25         MR. SCHOEN:  Judge, I can confirm that.  We're not

1  complaining that they're following the rules by

2  [indiscernible] --

3          THE COURT:  Right.

4          MR. SCHOEN:  -- discussing it.

5          MR. ROCHON:  I just want to kind of finish the

6  argument and then I'll sit down.

7          THE COURT:  Okay.

8          MR. ROCHON:  So I understand that.  The only thing we

9  would ask the Court to consider is so these cases happened in

10 2001, '02 and '03, the incidents and maybe one that stretched

11 into 2004.  And we'll detail this in our opposition, but the

12 Court should recognize this isn't political talk meant to raise

13 the temperature.  There's no question that we represent a

14 territory that is occupied.  Israel -- that's not a political

15 point.  Israel described itself as occupying the Palestinian

16 territory.  There's no question that Israel in connection with

17 their concerns about alleged act of terror -- and I'm not

18 politicizing this -- have incursions where they deliberately

19 destroyed substantial infrastructure.  The political part is

20 whether it was justified; the fact of it is proclaimed by both

21 sides.

22          It is difficult for us often to find the kind of

23 documentation that the plaintiffs expect under the

24 circumstances that existed then.  The Court sees it today in

25 the news.  You'll see there's reports about bombing certain

56

1    administrative offices in Gaza.  The fact it's happening is

2    real.  It's political whether it's justified.  I'm not trying

3    to politicize this case or this issue.  The fact of deliberate

4    destruction of the administration infrastructure of our

5    client's security, intelligence, and other bureaucratic

6    entities is a known fact that there's been -- the old question

7    is whether it's justified.  Much of our infrastructure --

8    defined infrastructure was destroyed.  Part of that process is

9    actually -- and says they took documents, actually deliberately

10   seized documents.  Again, ought to be justified.  It's not an

11   issue here for any of us whether that was justified.

12          But the fact is that it is difficult, to say the

13   least, for us to try to find documents from ten years ago under

14   all -- any circumstances, particularly those.  When we find

15   them, we produce them.  We are not withholding responsive

16   documents because of any of that.  We're getting them to the

17   plaintiffs in more than plenty of time for them to have noticed

18   depositions, conducted other discovery or complain to you

19   sometime before last night.  And while detailed aft -- we'd

20   like to set up a schedule to respond to this lengthy paper and

21   get it to you.  In the meanwhile, we all have your admonition

22   that we should not assume anything as to what the ruling will

23   be.

24          MR. SCHOEN:  Judge, very briefly, I hear everything

25   the Court has said about not considering what we say.  I just

57

1   can't sit here and take it every time.  The idea that this

2   fellow would raise the destruction of documents once again

3   knowing that he's sat in Israel during the depositions when one

4   after another witness testified they just couldn't come up with

5   any documents with Kalkilia.  All that -- Israel kept raiding

6   them and taking the documents and destroying until we got

7   another witness, maybe the first honest one who was testifying,

8   "Well, where did you get that information from?"  "The archives

9   from the documents in Kalkilia."  "Archives from documents in

10  Kalkilia?  Documents we just heard were destroyed by all these

11  other witnesses?"  It sounds reasonable to say, you know,

12  "occupied," "Israel came in and destroyed the infrastructure,"

13  et cetera, et cetera.  That stuff sounds reasonable to someone

14  like this, but when we know that the facts from the witnesses'

15  own mouths undercut, it's difficult to understand why they

16  would raise that kind of thing, but we'll have our chance in

17  reply, I'm sure.

18          THE COURT:  How fast can you respond?

19          MR. HILL:  Yes, Your Honor.  We have a holiday coming

20  up.  Our normal response would be due, I think by calculating

21  like a week from Friday.  Is that -- I could try and do it

22  sooner, but I've got just -- you haven't read it yet, but

23  Mr. Tolchin submitted a 33-page declaration about dozens of

24  different issues and I've got to go through emails and come up

25  with a response to all that stuff from what I understand you

1    want us to do.

2            I could suggest a shortcut.  I don't know if the

3    Court is inclined to take it, but let me just call your

4    attention.  I know you haven't read this yet and Mr. Schoen is

5    going to give it to you, but when we were in court with Judge

6    Daniels he actually prohibited this sort of a filing without a

7    prefiling conference with you and this may be the answer that

8    allows us to not have to file an opposition.  Let me just make

9    the point.

10            So this is on page 82 of the transcript before Judge

11   Daniels from August 9th of this year starting at line 15.  He

12   says:

13            "So I think that the appropriate thing is to move

14   forward efficiently with discovery at this point.  I think that

15   I'm not satisfied with the pace of discovery.  I think I told

16   Magistrate Ellis that I expected him to be firm with discovery.

17   I have also indicated to him that any position if I deny the

18   motions that are outstanding here, my issue is going to be that

19   any position is going to be that other than one summary

20   judgment motion after the close of discovery there are to be no

21   other motions filed without first a premotion conference with

22   Magistrate Judge Ellis and that premotion conference must be

23   preceded by no more than a two-page letter indicating what the

24   nature of the motion is that the parties believe are

25   appropriate at this stage of the proceeding and the nature of

1   the motion and the underlying bases for the motion and why the

2   motion is timely made and is not premature in discovery."

3           So that's an expressed direction of the District

4   Court that prevented the filing that was made last night.  In

5   addition to that, there is the Local Rule that requires a

6   prefiling letter and there is the Federal Rule which requires a

7   prefiling conference with opposing counsel which did not happen

8   here.  And so I'm happy to submit a response of whatever

9   schedule the Court wants me to do --

10          THE COURT:  What about the procedural --

11          MR. HILL:  -- in recognition of the fact

12  that [indiscernible] --

13          THE COURT:  What about the procedural issue?

14          MR. SCHOEN:  A couple things, Judge, I guess.  The

15  Court will read it in context.  It's like the little boy who

16  kills his parents and now he's an orphan.  What Judge Daniels

17  was complaining about, the three frivolous motions to dismiss

18  the day of filing.  He didn't want to see any more of those.

19  What he read is accurate language.  That's what precipitated

20  all that.  No one has been following the practice of the two-

21  page premotion letter anyway, and these are ongoing problems in

22  this case.

23          With respect to the Local Rules and the Federal Rule,

24  it's not a discovery motion.  It's a scheduling order motion.

25  That's specifically -- made it a Rule 16 motion and laid that

60

1   out in the beginning of it.  My understanding is that the Local

2   Rule may [indiscernible] Your Honor's individual practices.  I

3   don't recall right now.  Distinguishes between discovery

4   motions and other kinds of motions and specifically said for

5   discovery motions prefiling -- premotion letter and not for

6   nondiscovery motion.  I could be mis-recollecting if the Local

7   Rule is Your Honor's individual practices.  That's my

8   recollection.

9            MR. HILL:  I'll make the point, Your Honor.  This is

10  the only motion that's been filed since August and this is the

11  one that appears to me facially to violate the directive of

12  Judge Daniels and I would submit that you'd be justified in

13  denying it on that ground --

14           THE COURT:  This is the same transcript that you just

15  gave me, though, right?

16           MR. HILL:  Initially.

17           THE COURT:  I'll -- let me look at the transcript.

18  As I said, you know, it's still Judge Daniels's case, so

19  whatever he ruled it's still the law of the land and it's my

20  job to interpret it.

21           MR. HILL:  Let me make one request which is not

22  technically a motion that I technically [indiscernible].

23  Mr. Rochon said a couple times that we're 30 days from the end

24  of discovery.  We're technically 31 days and as you know in the

25  Local Rule 30 days from the close of discovery you're allowed

61

1   to serve contention interrogatories.  We've prepared our

2   contention interrogatories.  I would ask the Court's leave to

3   hand serve them on the plaintiffs today.  If they want to have

4   31 days to respond that's fine with me, but rather than trying

5   to figure out how to serve them tomorrow in New York and

6   Alabama or wherever Mr. Schoen had requested we serve.

7           MR. SCHOEN:  And, Judge, this is what I mean how it

8   goes.  You know, only see half of the equation each time.  The

9   complaint is, they've only taken two depositions all this time.

10  Why are they just now serving their contention interrogatories?

11  This is the same pattern we see in each of these cases.  They

12  wait till the last minute on all sorts of stuff.  Also,

13  complaint --

14          THE COURT:  But you should wait to file contention

15  interrogatories.

16          MR. HILL:  That's what the Local Rule requires.

17          MR. SCHOEN:  Judge, the only discovery has been taken

18  is on damages otherwise.  I'm happy to --

19          THE COURT:  You may file your contention

20  interrogatories.

21          MR. HILL:  Thank you, Your Honor.  Unless you have

22  anything further, we'll --

23          THE COURT:  And not having seen them, that does not

24  prejudice you from -- this will be an issue and we'll resolve

25  it if there are any issues that come up about it, but once it's

62

1  timely done we'll ultimately resolve it whether or not there --

2  you have problems with it or not, so --

3          MR. HILL:  I don't have anything further for Your

4  Honor at this time.

5          THE COURT:  Okay.  By Friday, a week, you'll --

6  I'm interested in seeing what Judge Daniels said.  I'm sure he

7  gave you the message that he wants this to move along, if

8  nothing else.

9          MR. HILL:  Your Honor, unless we had an order from

10  you by a week from Friday, we will file an opposition to the

11  motion.

12          THE COURT:  Fair enough.

13          MR. HILL:  Thank you, Your Honor.

14          THE COURT:  All right.

15          MR. SCHOEN:  Reply one week from then, Judge?

16          THE COURT:  Well, why don't we say that if there's

17  going to be a reply it be done the Wednesday after.  A reply

18  should not take so long.

19          MR. SCHOEN:  Just confirm a date, Judge.

20          THE COURT:  The 30th is a week and then the 5th of

21  December.

22          MR. HILL:  No, I believe it's -- you may be

23  [indiscernible] an extra week.  We'll file on the 30th, yes, at

24  this point.

25          THE COURT:  Right.

63

1          MR. HILL:  Okay.

2          THE COURT:  The 30th and the 5th.

3          MR. HILL:  Yes, Your Honor.

4          MR. ROCHON:  Are we otherwise excused, Your Honor?

5          THE COURT:  You're excused.

6          MR. HILL:  Thank you.

7                         * * * * *

64

1        I certify that the foregoing is a court transcript from an

2   electronic sound recording of the proceedings in the above-

3   entitled matter.

4

5   _____

6                         RUTH ANN HAGER, C.E.T.**D-641

7   Dated:   November 27, 2012

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25