CBJ7SOKM

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   MARK I. SOKOLOW, individually
    and as a natural guardian of
4   Plaintiff Jamie A. Sokolow,
    et al.,
5
                    Plaintiffs,
6
            v.                          04 Civ. 397 (GBD)
7
    PALESTINE LIBERATION
8   ORGANIZATION, et al.,

9                   Defendants.

10  ------------------------------x

11                                      November 19, 2012
                                        2:30 p.m.
12
    Before:
13
                    HON. GEORGE B. DANIELS
14
                                        District Judge
15
                        APPEARANCES
16
    DAVID I. SCHOEN
17  AARON SOLOMON
        Attorneys for Plaintiffs
18
    MILLER & CHEVALIER CHARTERED
19      Attorneys for Defendants
    BY:  BRIAN A. HILL
20
    MILLER KORZENIK SOMMERS LLP
21      Attorneys for Movant
    BY:  DAVID S. KORZENIK
22       ITAI MAYTAL

23

24

25

CBJ7SOKM

```
 1              (Case called)

 2              (In open court)

 3              MR. KORZENIK:  Your Honor, my name is David Korzenik

 4    with Miller Korzenik & Sommers, and we appear for the BBC, the

 5    British Broadcasting Corporation, a nonparty seeking to quash a

 6    subpoena served on us.

 7              THE COURT:  Good afternoon.

 8              MR. SCHOEN:  David Schoen for the plaintiffs, and with

 9    me is Aaron Solomon.

10              MR. HILL:  Good afternoon, your Honor.  Brian Hill for

11    the defendants the Palestine Liberation Organization and the

12    Palestinian Authority.

13              MR. KORZENIK:  And we left out my associate.

14              MR. WOLFSON:  Itai Maytal for the nonparty BBC.

15              THE COURT:  Good afternoon.

16              Mr. Korzenik, why don't I hear from you with regard to

17    the motion to quash.

18              MR. KORZENIK:  Thanks.  I should say, your Honor, I

19    have not ever appeared before your Honor, but I remember a long

20    time ago we were adversaries in a case that was probably the

21    most strange one to you and the most strange one to me, if you

22    remember the Castle Bono matter, where I think we were

23    collegial and professional adversaries, and it was a quite long

24    and unusual case.

25              THE COURT:  So does Chief Judge Amon of the Eastern
```

CBJ7SOKM

1    District.  It was the last case she tried as a magistrate.

2              See, you have just dated yourself.

3              MR. KORZENIK:  I did.  I want that stricken from the

4    record.

5              Your Honor, we were served, the BBC in New York, with

6    a subpoena in this case by the plaintiffs.  They sought, as

7    your Honor probably knows, both the copy of a broadcast that we

8    made entitled Arafat Investigated.  It was broadcast in 2003.

9    They sought outtakes as well, in other words, parts of the

10   interview of two particular individuals, one Zakaria Zubeidi

11   and another individual Rumaileh.  We objected on journalist

12   privilege grounds, and we also objected on Rule 45 grounds.

13   And I want to just basically touch on those two issues, and I

14   want to talk about -- and I should also mention on

15   admissibility, but I'm going to raise that as well.

16             There is one case that came down on the admissibility

17   issue from Judge Weinstein that I'd like to just hand out.  We

18   could not cite it because it was only decided I think well

19   after all the papers came in.  It was November 6 of 2011 and

20   it's called Gill v. Arabac.  It's a similar ATA type claim, but

21   in that Judge Weinstein decided against the admissibility of

22   these particular kinds of statements that we think are quite

23   similar to the thing that Zubeidi and Rumaileh offered.

24             THE COURT:  Let me just start right there and see if

25   we really need to discuss that further.  I understand your

CBJ7SOKM

1    argument with regard to admissibility, but this is not an issue

2    of admissibility.  This is not a trial subpoena for --

3           MR. KORZENIK:  No, it's not.

4           THE COURT:  -- for admissible evidence.  This is the

5    discovery process which is usually governed by a different

6    standard, that the information sought is either admissible or

7    may lead to admissible evidence.

8           MR. KORZENIK:  I think your Honor is correct.  The way

9    though that I think that it's germane is not so much through

10   the Rule 45 prong of our discussion, but it does engage the

11   issues of the privilege. since one of the issue is the degree

12   of its likely relevance and its value to the plaintiff, and the

13   degree to which that showing that they make -- if they have

14   made any showing -- is enough to outweigh the public interest

15   that the journalists have in developing this information and

16   preserving it independently.  So, I will get into that later.

17   I consider it a tertiary issue for us.

18          THE COURT:  Yes, because it's technically it's not an

19   admissibility issue.  It's an issue as you just described it:

20   One, whether they have sought relevant evidence, and, two, if

21   it is relevant evidence, whether that evidence in weighing the

22   request and whether that evidence can be obtained from a

23   different source.

24          MR. KORZENIK:  From a different source.  Now, what is

25   interesting is there are cases relating to the journalist

CBJ7SOKM

1    privilege where courts have considered the admissibility of the

2    material.  We have cited it in our brief, and your Honor can

3    see that.

4         THE COURT:  I could see that in a trial subpoena

5    context, if you are subpoenaing material because you say it's

6    material to be produced as evidence in a trial and, therefore,

7    you must produce it with or without a witness to be presented

8    at the trial.  I can see the argument then, well, you are not

9    entitled to have a trial subpoena enforced to obtain any

10   admissible evidence in a proceeding.

11        I'm he not sure whatever context you say the cases

12   stand for the proposition that a request, a discovery request

13   for material, which is not a trial subpoena for admissible

14   evidence at trial but a discovery subpoena to obtain either

15   admissible evidence or material that would lead to admissible

16   evidence, I'm not sure I know of any cases that said if it's

17   admissible evidence in and of itself it's proper.  If it's not

18   admissible evidence, it's improper.

19        MR. KORZENIK:  As to general discovery, that's true,

20   but in terms of the journalist privilege, it has been in a

21   number of cases viewed as one of the factors that affects the

22   weight of the material that the plaintiffs seek.

23        THE COURT:  The factors in terms of what?  Because it

24   seems to me, if I'm not simplifying it too much, there are only

25   two issues:  Whether it's relevant, whether it's available from

CBJ7SOKM

1    another source.  What is its admissibility --

2         MR. KORZENIK:  I was going to say actually while we

3    typically speak of two prongs for the journalist privilege,

4    there actually are three.  The first one, of course, is what

5    your Honor related to, its likely relevance and particularized

6    need as to that, number one.  Number two, the reasonable

7    availability of alternative sources for the information at

8    issue.  And then third there is a balancing that ultimately is

9    taking place.  So that I would say that in these reporter

10   privilege cases you do at the end, once the showing has been

11   offered by the party seeking the subpoena -- issuing the

12   subpoena -- once they have shown relevance and unavailability,

13   then they still have to show that their showing outweighs the

14   public interest that the journalists have in their independent

15   reporting, in their ability to develop the news independently

16   and without the interference of litigants.

17        So, it does weigh into the balancing factor, and

18   that's how I think it comes into play.  Your Honor is correct

19   to say that it doesn't affect the first two directly, but it

20   affects the balancing for sure.

21        THE COURT:  And can I put aside, or do we still have

22   to debate the issue of whether or not you are willing and

23   prepared to give them what is in fact an authenticated copy of

24   the document as it has aired?  Is that an issue?

25        MR. KORZENIK:  That is, in the sense that we have in

CBJ7SOKM

1    the past already given them a copy of the video.  They

2    purchased it through us.  We would object to authentication.

3              THE COURT:  Well, you object to a representation that

4    that is in fact responsive to what they asked for?

5              MR. KORZENIK:  Well, there is this issue.  The thing

6    that concerns us is, number one, they are looking for outtakes.

7              THE COURT:  I am trying to put aside the non-outtake,

8    because there seems to be some discussion, and didn't see it

9    being a genuine issue as either side was arguing it.  Is there

10   really some issue with regard to the edited document as it

11   aired --

12             MR. KORZENIK:  As it aired.

13             THE COURT:  -- and your providing that to them and

14   indicating that this is in fact the edited?

15             MR. KORZENIK:  Yes, and I'll tell you why.  There was

16   an issue that did come up there.  At first we were exploring

17   the possibility of being able to authenticate simply by an

18   affidavit, and it became evident that the defense would not

19   accept that solution, would require our testimony, and we did

20   not wish to do that.

21             THE COURT:  Well, I will ask them whether that's still

22   from their perspective part of the issue, but forget about what

23   their position is.  Is it a problem for you at this point to

24   ensure that they have the documentary as it aired, and to

25   represent to them that in fact you have produced the

CBJ7SOKM

1    documentary as it aired?

2              MR. KORZENIK:  As it aired?  I would want, your Honor,

3    to have an opportunity to revisit that.  That was something

4    that we discussed a long time ago.

5              We would, if your Honor wanted us to do so, revisit

6    it, but we would need to know, one, that we were spared the

7    risk of having to provide outtakes, spared the risk that we

8    would have to testify.  And if we did not have to testify, and

9    we simply had to submit an authentication document for the

10   program itself, then that is something that I would want to

11   revisit with my clients in London and consider as a resolution.

12             THE COURT:  Well, how could I guarantee you that you

13   wouldn't have to testify as to the authenticity of the

14   documentary as it aired?  I am not even sure any under

15   circumstances you have that legal right.

16             MR. KORZENIK:  That's one of the reasons why we are in

17   this position where we need to assert both the privilege and

18   the 45 rule which we think is dispositive --

19             THE COURT:  Of the --

20             MR. KORZENIK:  -- of all requests.

21             THE COURT:  Well, why does the 45 rule have anything

22   to do with your producing or being willing to produce the -- I

23   mean I guess I'm trying to practically and reasonably, if I can

24   start that way, try to figure out what your genuine dispute is

25   and what you are generally legitimately concerned about.

CBJ7SOKM

1          MR. KORZENIK:  Right.

2          THE COURT:  It is difficult for me to understand how

3    you are legitimately and genuinely concerned about producing

4    the documentary as it aired and indicating that in fact in fact

5    this is a true copy of the documentary as it aired.  I can't

6    understand in any balancing test why you would be entitled to

7    protection from being able to do that.

8          MR. KORZENIK:  OK.  Let me explain.  I'll make the

9    argument, and then you can probe the various elements of it.

10          First, I want to look at Rule 45, because that we

11    think is the first independent basis for saying that we should

12    be spared from having to testify or provide an affidavit on

13    anything that we've done here.

14          Rule 45 is intended of course to protect nonparty

15    witnesses against the various kinds of burdens that are imposed

16    by them.  That applies whether they are journalists or not.

17    And the drive behind it seems to be two things:  One, to

18    protect the nonparty witness outside of the jurisdiction from

19    interference and burden; and then the second part of it seems

20    to be a drive to protect and honor the comity of the foreign

21    courts.

22          Now, in this case we don't have a subpoena that was

23    actually served on the individuals who have knowledge of this

24    program.

25          THE COURT:  That's not necessary.

CBJ7SOKM

1          MR. KORZENIK:  No, well, let me --

2          THE COURT:  That's absolutely not necessary.  You have

3    to explain to me, just as you would explain to me in a

4    situation where I said, all right, I understand that someone

5    gave you Exhibit A, and you are in possession of Exhibit A, I

6    am serving you with a subpoena to give me a copy of Exhibit A,

7    and to make yourself available to testify that this is a true

8    copy of Exhibit A of what you received.  You are in New York,

9    you are a resident of New York, and it would not be a

10   legitimate argument for you to say I gave Exhibit A to my

11   brother who took it with him to China.

12         MR. KORZENIK:  But that is not what happened here.

13         THE COURT:  Well, but, yeah --

14         MR. KORZENIK:  That is not what happened here.

15         THE COURT:  But if the BBC has and owns this

16   documentary, I don't understand your argument that simply the

17   guy who has it in his pocket is the one that's got to be

18   subpoenaed to turn it over.

19         MR. KORZENIK:  OK, well then I want to address that

20   because that is the distinction.

21         Rule 45, what the plaintiff has done is has cited to

22   party cases, 30(b)(6) type cases.  And when parties are

23   involved, your Honor is absolutely right, if the court has

24   jurisdiction over that party, it doesn't really matter where

25   those documents are held.  If they're overseas, it doesn't

CBJ7SOKM

1    matter.  If the witnesses who are knowledgeable of those

2    documents are overseas, it does not matter when you are dealing

3    with a party or you are dealing with 30(b)(6).

4         But if you are dealing with Rule 45, then there is a

5    distinction between the parties who have knowledge and the

6    party who is served.

7         So, there are two groups of cases here.  One of them

8    are cases in which the company is served --

9         THE COURT:  Right.

10         MR. KORZENIK:  -- but the employees are in another

11    country.

12         THE COURT:  Right.

13         MR. KORZENIK:  And there are other group of cases in

14    which the actual employees who have knowledge and control of

15    those documents are noticed, served, and there is jurisdiction

16    over them in this jurisdiction.

17         Now, in the first set of cases --

18         THE COURT:  But I'm trying to understand the

19    distinction you are drawing.  You are saying that's relevant as

20    to the production of the physical material --

21         MR. KORZENIK:  Yes.

22         THE COURT:  -- or relevant as to the testimony of the

23    individual?

24         MR. KORZENIK:  It's relevant as to both.

25         THE COURT:  But wait.

CBJ7SOKM

1      MR. KORZENIK:  I will tell you why.

2      THE COURT:  Slow down, because I don't understand --

3 or if I understand your argument -- I don't understand the

4 legal basis for your argument.

5      If I send a nonparty subpoena to Microsoft for them to

6 give me a copy of their software, their original software that

7 they produced to make their original Windows, it would not be

8 an appropriate response by Bill Gates that I sent the original

9 over to China, so I'm not giving it to you.  You are not

10 arguing that that would be an appropriate response, are you?

11      MR. KORZENIK:  I am arguing that if control over the

12 document and comity between the UK and the US calls for it,

13 then the Second Circuit will not require -- in this case you

14 are giving Microsoft as an example, they are a U.S. company --

15 but let's assume --

16      THE COURT:  But BBC has a presence here in this

17 District.

18      MR. KORZENIK:  But it has a limited one, and I want to

19 explain what that is.  The BBC in the United States has a news

20 bureau, and it also has a business office in which it probably

21 does some licensing or advertising, but it has no involvement

22 with or control over that program.  It did not create the

23 program; it does not control the records for the program.

24      THE COURT:  But that's not the case here.

25      MR. KORZENIK:  But now --

CBJ7SOKM

1          THE COURT:  The case here is that BBC has the control

2     over this document.

3          MR. KORZENIK:  No, the BBC in London has control.

4          THE COURT:  When you say in London, is that a

5     different entity?

6          MR. KORZENIK:  It is -- no, it's the same one.

7          THE COURT:  All right.

8          MR. KORZENIK:  But here, let me give you -- in the

9     Ings case, the Second Circuit said very clearly -- and this is

10    an important precedent -- the company was served in the United

11    States, the subpoena in this case was a subpoena duces tecum

12    for documents; it was not for deposition but it was under 45.

13    And the court, Second Circuit, said you may get documents from

14    this company in New York --

15         THE COURT:  Right.

16         MR. KORZENIK:  -- and I will modify it so you just get

17    those documents in New York, but you may not have the documents

18    from Canada that you seek even though you have jurisdiction

19    over the company.  It said importantly that they quashed

20    limited to documents in possession of New York agencies of the

21    banks but not the documents from those banks or their agencies

22    in Canada.

23         THE COURT:  But you are not arguing here -- you are

24    not reasonably arguing here that there is no copy of this

25    documentary in the United States or in New York.  You are not

CBJ7SOKM

 1     arguing that, are you?

 2          MR. KORZENIK:  I am arguing that the only copy that

 3     exists is the one that I gave to the plaintiff.

 4          THE COURT:  Then why are we fighting about it here?

 5     Why are we fighting about it again if you have already given it

 6     to the plaintiff?

 7          MR. KORZENIK:  We're not fighting over that.  I gave

 8     it to them.

 9          THE COURT:  Well, that's my first question.  Can I put

10     that aside and go to the outtakes?

11          MR. KORZENIK:  I have given that to them.

12          THE COURT:  Because I have to first figure out,

13     particularly in the context where you want me to weigh the

14     burdens and the balance of hardships here, I'm trying to figure

15     out -- I mean is your argument that we don't want to give them

16     nothing, go away, leave me alone; or is your argument generally

17     over the outtakes?

18          Because it doesn't seem to me to be a particularly

19     compelling argument that you shouldn't have to give them a copy

20     of the documentary that you are in a position to say, yes, to

21     the best of your knowledge this is the exact copy of the

22     documentary that aired, if you say you have already given it to

23     them.  I mean you don't have much of a --

24          MR. KORZENIK:  I have already given that to them.

25          THE COURT:  All right.

CBJ7SOKM

1          MR. KORZENIK:  And then the question about our

2     offering up an affidavit was an effort to compromise the

3     result.

4          THE COURT:  Are you still willing to compromise that

5     issue?

6          MR. KORZENIK:  We would be willing to do that.

7          THE COURT:  So, in what way?

8          MR. KORZENIK:  As long as -- in other words --

9          THE COURT:  What is the compromise?

10          MR. KORZENIK:  I want to run to the privilege now and

11     I want you to understand what the stakes are for us here,

12     because I don't want your Honor to think it is purely an issue

13     of just a procedural thing and, hey, leave us alone.

14          THE COURT:  Yes, because the privilege has nothing to

15     do with the documentary as it aired, because that's not a

16     discussion I intended to spend even this much time on.

17          MR. KORZENIK:  I tell you how it does.  I am going to

18     ask your Honor to indulge this discussion.  The law that would

19     apply in the UK, if they sought this material there, and the

20     law that I think is instructive here, is a -- and it also

21     illustrates very well the kind of interest that journalists

22     have in war reporting, conflict zone reporting, which is much,

23     much more serious than many other settings in which journalists

24     do their work.  Many journalists are killed when they cover war

25     zones for a variety of reasons.  In the Randal case, an

CBJ7SOKM

1    important case involving the Washington Post, they were called

2    upon to testify in front of the War Crimes Tribunal in Europe

3    related to Bosnia, Herzegovina and Serbia and the war crimes

4    there.  Jon Randal was the reporter, he covered some of the war

5    crimes events, and the prosecution wanted him to testify and to

6    provide his outtakes, provide his articles, and to testify to

7    the truth of the articles that were published and also to

8    testify as to outtakes and other things that he got.  A

9    sympathetic plaintiff, one that on a lot of levels one would

10   want to assist.

11           And I will say this, I was on a panel on the

12   reporter's privilege at Brooklyn Law School discussing just

13   this issue.  Adam Liptek put that case out there, and he said

14   what do you do in that case?  The answer is what those

15   journalists did, what Randal did to get that story out of that

16   war zone was very important.  The prosecutors, the rest of the

17   world would not have known of those war crimes but for the risk

18   to which those journalists and Randal put themselves.

19           If war journalists -- not just BBC but others -- are

20   seen to testify, are seen to provide evidence for private

21   litigants, or for prosecutors and so on, they will be

22   understood in those difficult places when the war gets tough,

23   when the war gets intense, and where parties are violent, they

24   will be seen as delivering evidence for parties and for

25   prosecutors later on, and they will be more at risk, and the

CBJ7SOKM

1    story will be less likely to get out.

2            THE COURT:  I know, but that's -- I understand your

3    argument, and we are moving into the outtake part of the

4    argument.  That's your argument as to the reporter himself --

5            MR. KORZENIK:  So --

6            THE COURT:  -- and that's your argument as to

7    reporting.  That is not an independent argument in any case law

8    that exists in the United States that says that alone prevents

9    any party from getting a copy of the documentary that's already

10   publically aired, and who they get that documentary from makes

11   some representation that it is what it purports to be in

12   response to the subpoena.  There is absolutely no case law that

13   says that the BBC would be protected from that.

14           If you say, yeah, you shouldn't have to produce the

15   reporter, maybe you're right, it's not necessary to produce.

16   But there is no case law --

17           MR. KORZENIK:  Your Honor.

18           THE COURT:  -- that says that if I write a newspaper

19   article in The New York Times tomorrow, and everybody reads it

20   tomorrow, and then the next day there is a lawsuit going on and

21   someone says, you know, it's important for me to have a

22   complete, accurate copy of the article that you wrote

23   yesterday, and so I have a trial next week so I'm asking you,

24   The New York Times, to give me a copy of that article and to

25   assure me that that's an accurate copy of the article.  There

CBJ7SOKM

1    would be no protection against that under any of the case law

2    that you cited.

3            MR. KORZENIK:  In the ones that I have litigated,

4    sometimes a court will order that and sometimes they will not.

5            THE COURT:  But there is no legal blanket protection

6    for the organization itself that has possession of something

7    that has already been publicly aired to somehow not produce

8    that because they are somehow protecting what?  I don't know

9    what they are protecting.

10           MR. KORZENIK:  Understand that when the journalist

11   offers up an affidavit or offers up testimony --

12           THE COURT:  Nobody asked your journalist to offer up

13   an affidavit.

14           MR. KORZENIK:  I thought that's what you were asking

15   me.

16           THE COURT:  No, I never mentioned your journalist.  I

17   said is the BBC prepared to produce a copy of the documentary

18   that's already been aired, with a representation by the BBC, an

19   appropriate representation that this is in fact a true copy of

20   the documentary that aired.  That has nothing to do with the

21   reporter.

22           MR. KORZENIK:  The answer to it is yes with

23   qualification.  Understand, your Honor, please, that when we do

24   something like that it does compromise our position because we

25   are being asked to provide validation and to be a witness for a

CBJ7SOKM

1    particular party in a particular case.  And I don't think that

2    people in war zones or people who are partisans in those

3    settings are able to make the distinction that you and I are

4    able to make.

5              THE COURT:  But we're not here discussing about

6    whether you are going to be a witness in a proceeding.  We

7    haven't had that conversation.  Nobody has forced either your

8    reporter or your non-reporter.  No court has even decided or

9    addressed the question of whether you would have to produce

10   somebody at a trial.

11             The only question is they asked you for the

12   documentary.  You say that, one, you already turned it over to

13   them -- so I don't know what the big deal is -- and I assume

14   you turned it over to them under circumstance which you

15   intended to make them rely upon the fact that what they asked

16   you for, that what you gave them was responsive to that.

17             MR. KORZENIK:  Right, I understand what your Honor is

18   saying.

19             THE COURT:  I don't see why the BBC would have any

20   hesitancy to say, yes, this is the program as it aired, and we

21   are producing it to them, and we are assuring you that, yes,

22   this is an accurate copy of what aired.

23             Now, whether or not they want you to do that at a

24   trial, and whether or not you want to oppose a trial subpoena

25   to testify about the documentary, that doesn't seem to be the

CBJ7SOKM

1    issue at this point.

2              MR. KORZENIK:  Let's do this.  I am most concerned

3    about outtakes --

4              THE COURT:  Right.

5              MR. KORZENIK:  -- and your Honor should be aware we

6    did sort of talk about that kind of thing.  We are still

7    fearful and concerned about what even the stepping forward of

8    that sort would do.  But we understand that it is less

9    problematic.

10             THE COURT:  It's more than less problematic.  That's

11   not what the case law --

12             MR. KORZENIK:  Remember, once we open the door to it,

13   then the other argument is, well, once you provided an

14   affidavit to this, why don't you provide an affidavit as to the

15   outtakes, or what was is in or not in.

16             THE COURT:  Maybe, maybe not.  I mean you may have the

17   same or different argument to make with regard to that, but

18   this isn't a slippery slope argument.

19             The question is what you are really entitled to

20   withhold --

21             MR. KORZENIK:  Right.

22             THE COURT:  -- and what they are legally entitled to

23   obtain.

24             MR. KORZENIK:  Well, we are actually --

25             THE COURT:  It's clear to me that they are legally

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

CBJ7SOKM

1  entitled to obtain a copy of the aired documentary.  You would

2  agree with that?  You don't have any case law that says that

3  they're not legally entitled to a copy of the aired documentary

4  if it had relevant information in it that might be admissible

5  or lead to admissible evidence.

6          MR. KORZENIK:  I'm not going to say that's necessarily

7  so.  We sold it to them because it was at the time generally

8  available to people.

9          THE COURT:  Right.  So, you have no legal argument to

10  say that you could give it generally available to everybody but

11  them.  I mean that wouldn't be your argument.

12          MR. KORZENIK:  Right.  I would ask your Honor as to

13  that point, let's bracket that, because I don't want to lose a

14  lot of the discussion time with your Honor on that.

15          THE COURT:  All right.

16          MR. KORZENIK:  So, you understand that we did raise

17  it, we did consider it.  There is an issue then about, well,

18  what happens later if the defendant doesn't accept that, are we

19  then in for more.

20          THE COURT:  I don't know the answer to that question,

21  nor at this stage do I care about the answer to that question,

22  nor do I think anything that I'm saying here is determinative

23  of that question.  But you can understand that I will give you

24  this much, that if you have already turned it over to them and

25  told them that this is in fact what you asked for, you are in

CBJ7SOKM

1    no better position to argue that there is some prejudice to you

2    to have to supply somebody to do that than you were when you

3    originally produced the original document.

4        MR. KORZENIK:  Remember, if we're in a series of door

5    openings that become perilous to our most guarded and concerned

6    position, then I would feel there is something at stake.  I

7    would like to go to this, and then I'm going to walk away from

8    the program itself.

9        Rule 45 still has great restrictions on what a court

10   can do with employees of any third party nonparty.

11       THE COURT:  There is no subpoena against any of your

12   employees.

13       MR. KORZENIK:  None.

14       THE COURT:  None.  None of your employees have been

15   ordered to do anything.  That's the BBC's responsibility to

16   figure out who they want to physically respond to their

17   obligation to respond to the subpoena.

18       MR. KORZENIK:  Right.  Understand this.  There aren't

19   --

20       THE COURT:  You telling me the guy who does this is in

21   China, so I can't do it for you, that's not an appropriate

22   response.

23       MR. KORZENIK:  You are thinking what I thought as

24   well, which is we all think 30(b)(6) -- we all think that if a

25   corporation has a presence here, then they are subject to the

CBJ7SOKM

```
 1      power of the court.
 2                  THE COURT:  I understand.
 3                  MR. KORZENIK:  And that is not true.
 4                  THE COURT:  I agree with you, it's not a 30(b)(6)
 5      determination.  It's a corporate entity determination.
 6                  MR. KORZENIK:  You're saying if the corporation is
 7      subject to jurisdiction then it doesn't matter where --
 8                  THE COURT:  No, I'm saying if the corporation is
 9      validly served with a subpoena, and they have --
10                  MR. KORZENIK:  -- jurisdiction over them.
11                  THE COURT:  No, I didn't think that was an issue.  You
12      are not saying that the BBC doesn't have an obligation to
13      respond to subpoenas unless the subpoena is specifically to the
14      mail guy who holds the mail.  That's not what you are saying.
15                  MR. KORZENIK:  No, we are saying we have to respond to
16      the subpoena but, we do not have to -- Rule 45, if you look at
17      the NML case, there was in that case -- so, first off look at
18      the Ings case, Ings v. Ferguson.  Second circuit says subpoena
19      duces tecum served on a company over whom the court has
20      jurisdiction in this country, because of comity we are not
21      going to compel production of documents controlled by that
22      company overseas; we are not going to permit the production of
23      the Canadian documents.  If you want to take the documents from
24      this bank that are in New York, you can do that, but if you
25      want documents held --
```

CBJ7SOKM

1          THE COURT:  That's kind of an artificial distinction

2     you are trying to draw.  You are saying to me that the only

3     copy of the documentary that exists is outside of the United

4     States?  That's not what you are arguing.

5          MR. KORZENIK:  The only copy of the outtakes now.

6          THE COURT:  I am not talking about the outtakes.  You

7     are talking about a blanket Rule 45 rule that says -- and

8     you're citing these cases for the proposition not for outtakes.

9     These cases have nothing to do with outtakes.

10          MR. KORZENIK:  Your Honor, I can't get a documentary

11     from the New York office of the BBC; they don't hold this

12     stuff.  They are a news bureau that reports about events --

13          THE COURT:  So, you're saying determinative of where

14     this documentary is, that's determinative of whether you should

15     have an obligation to produce it?

16          MR. KORZENIK:  Yes.  Because, for example, the Hague

17     Convention speaks about Hague-identified witnesses and

18     documents.  In this case when they served the BBC, they knew

19     that this program had been taped and recorded in the West Bank.

20          THE COURT:  But it's in control of the BBC.

21          MR. KORZENIK:  It's not in --

22          THE COURT:  The BBC has it.

23          MR. KORZENIK:  The fact that the BBC has it does not

24     mean that a court has the power to require an overseas employee

25     of the BBC to generate a document, because those are the only

CBJ7SOKM

1    ones --

2            THE COURT:  No, because you see that's where your

3    argument fails.  Nobody is requiring an overseas employee to do

4    anything.

5            MR. KORZENIK:  That's correct.

6            THE COURT:  The subpoena requires the BBC to respond

7    and produce the physical evidence in their possession.

8            MR. KORZENIK:  No.

9            THE COURT:  Now your argument is coming back and

10   saying I'm not going to produce it, or I can't produce it

11   because most of the copies are kept in --

12           MR. KORZENIK:  Not most of them.  All of them.

13           THE COURT:  Well, I assume you have a copy here in

14   your office.

15           MR. KORZENIK:  That's correct.

16           THE COURT:  All right.  Well, I guess that's not the

17   answer.

18           MR. KORZENIK:  I am talking about whether the BBC

19   does.  But more importantly --

20           THE COURT:  But the BBC does.  They gave it to you.

21   You are the BBC; you are their lawyer.

22           MR. KORZENIK:  But just remember in their subpoena and

23   in what they would require to authenticate it, they couldn't

24   have me authenticate it.  They could not have --

25           THE COURT:  Then maybe it won't be admissible.  I

CBJ7SOKM

1    don't know.

2           MR. KORZENIK:  No, there is nobody in the United

3    States who has the kind of knowledge that would have the

4    foundation for that kind of authentication.

5           THE COURT:  Well, when you say that kind of

6    authentication, the problem is that you are trying to use an

7    admissibility standard at trial, and I'm not addressing that.

8           MR. KORZENIK:  No, that's not --

9           THE COURT:  No, wait.  We are engaged in lawyer talk

10   here.  If I had 12 people sitting here, and I asked them to

11   figure out what the problem is, they will say, oh, the problem

12   is very simple, these people got the tape, they just don't want

13   to turn it over.  That's what it comes down to.

14          MR. KORZENIK:  No, it is not that simple.

15          THE COURT:  It is that simple, because you might have

16   it with you now, and you don't want to turn it over.

17          MR. KORZENIK:  I don't.  Your Honor --

18          THE COURT:  I mean, you know, but that wouldn't make a

19   difference in terms of your argument.

20          MR. KORZENIK:  I already gave them a copy of it.

21          THE COURT:  All right.  So, what are we fighting

22   about?

23          MR. KORZENIK:  We are fighting about whether --

24          THE COURT:  So, you are not fighting about whether or

25   not you should be entitled to withhold a copy of the

CBJ7SOKM

1    documentary from them.

2              MR. KORZENIK:  No.

3              THE COURT:  OK.

4              MR. KORZENIK:  I'm not.

5              THE COURT:  Because you can't legitimately make that

6    argument.

7              MR. KORZENIK:  I'm not, and I didn't.

8              THE COURT:  No stretch of credulity could make that

9    argument, because you have already given them a copy.  So,

10   that's not the issue.  The issue is not whether or not they

11   should be in possession of an accurate copy of what aired in

12   terms of the documentary.  Right?  That's not the issue.

13             MR. KORZENIK:  Right.  So, now the question is --

14             THE COURT:  So, I assume in your producing it to them

15   you have at least represented to them that it is in fact what

16   you purport it to be.  Right?

17             MR. KORZENIK:  I can't say that I actually said that,

18   but I sold it to them.

19             THE COURT:  But I assume if that's what you produced

20   in response to their request, that's what you intended.

21             MR. KORZENIK:  I understand what your Honor is trying

22   to say, but I want your Honor to understand this one feature of

23   Rule 45, which is not artificial, it is not simply procedural.

24   When Rule 45 says that it is not going to compel the foreign

25   employees of a nonparty to generate evidence or to provide

CBJ7SOKM

material, it does so for good and sound policy reason; it does
so because it is saying those people, whether it's in Italy, in
London, wherever they may be, they live under a different
regimen, a different legal system with different privileges.

THE COURT:  They who?

MR. KORZENIK:  The reporters and the people in the
BBC, the employees in the offices of the BBC in London.

THE COURT:  Why are they even relevant to this?

MR. KORZENIK:  Because they are the ones --

THE COURT:  Nobody is requiring them to do anything.
Nobody has asked the reporter to do anything with regard to the
original documentary.  Nobody has asked any employee in England
to generate some document.  Their only request is it's
probably -- you know what I should say to them when they get
up, is, look, why don't you just go down to the corner store
and buy yourself a copy, because I'm sure there are copies of
the documentary somewhere in New York that you could probably
purchase just like, you know, PBS has --

MR. KORZENIK:  Right.  We have not opposed that.  What
I'm saying is that those people in the BBC in London live under
the protections of certain privileges.

THE COURT:  Which people?  Which person are we
protecting?

MR. KORZENIK:  The people who --

THE COURT:  Who?

CBJ7SOKM

```
 1              MR. KORZENIK:  The reporter Jeremy Bowen.
 2              THE COURT:  Nobody has asked the reporter to do a
 3     thing.
 4              MR. KORZENIK:  The people who --
 5              THE COURT:  Wait a minute.  Let's stop.  I assume the
 6     reporter is not the one who has custody and control of BBC's
 7     documentary.
 8              MR. KORZENIK:  Yes.  And let's get to that next point.
 9     The people who --
10              THE COURT:  The reporter is the one who has custody
11     and control of the BBC documentary?
12              MR. KORZENIK:  No, no.  I was about to go to the next
13     step.
14              THE COURT:  Well, all right.  Well, then --
15              MR. KORZENIK:  The people who have custody and control
16     over it are British subjects and are people in London.
17              THE COURT:  No, they are employees of BBC.
18              MR. KORZENIK:  That's correct, they are employees of
19     the BBC.
20              THE COURT:  Oh, OK.  Let's go past that argument,
21     because, you know, I think it's such an artificial argument
22     that you should not be able to produce a copy of the aired -- I
23     mean, you know, the reality is the BBC can take the copy that
24     they gave you, put it in a copy machine, copy it and give them
25     a copy and say this is the copy, which in fact pretty much you
```

CBJ7SOKM

1    have told me you have already done.

2            So, to make a lawyer's argument that the thing you

3    have already done without a problem is somehow a problem for

4    you, and somehow the law says that you are not supposed to

5    respond to this subpoena --

6            MR. KORZENIK:  But your Honor -- well, look, no, no,

7    no.  Your Honor is actually making a broader point.  You are

8    saying that since you gave them a copy of it, you should also

9    now provide an affidavit.

10           THE COURT:  No, I'm saying the same reasons you gave

11   him the copy of it before, I assume without objection, are the

12   same reasons you should have no objection to giving them a copy

13   now.  The only argument you are making is that I shouldn't have

14   to produce somebody who assures them that what I gave them is

15   in fact what I purport it to be.

16           MR. KORZENIK:  Sure, I will give them another copy.

17   That's not an issue here.

18           THE COURT:  I assume that that's not the issue.  You

19   made it the issue.  You said that somehow some of these cases

20   say that you have protection from giving them a copy, and

21   somehow you have protection from telling them that this is in

22   fact what is responsive to your request.

23           MR. KORZENIK:  Right.  I am -- here is what I'm

24   objecting to.  I am saying that if the custodian of those

25   records -- the person who has the kind of knowledge that will

CBJ7SOKM

1    allow the authentication that your Honor is talking about --

2    resides in London, then the privileges that apply to people in

3    London should be permitted to apply to them.  They should be

4    able to invoke those privileges when they are brought to the

5    fore in a British court, and that's what the comity feature of

6    45 is about.

7                THE COURT:  I know, but that doesn't -- I mean, look,

8    if I was going to fashion a more creative solution to this

9    problem than I think is warranted here, I would simply say to

10   you tell your client here in New York to get a copy, and let

11   that client indicate the process in an affidavit that they went

12   through to get that, so that that affidavit will be a

13   reasonable assurance that they in fact got the true copy and

14   that you are in fact turning over a copy that you purport it to

15   be.  That has nothing to do with a British citizen.  OK?

16                Now, if he wants to say this is the copy, this is the

17   true copy, I have seen it myself, I have seen it before, it's

18   the copy that I saw when it aired; or I called my guy in

19   London, he sent me a copy, I got the copy from him, he assured

20   me that this was the accurate copy that we aired, and your

21   person here in New York turned that over, tell me what rule

22   that violates.

23                MR. KORZENIK:  It probably is something that neither

24   the plaintiff nor the defendant would go along with.

25                THE COURT:  Well, that's their problem; that's not

CBJ7SOKM

1    your problem.  But that wouldn't violate any rule that you are

2    citing to me.

3         MR. KORZENIK:  I tried to work out some compromise

4    along those lines, your Honor.  I am not trying to resist that.

5         THE COURT:  Well, I'm just trying to figure out

6    whether a compromise is necessary other than a logical legal

7    approach to this.

8         It doesn't seem to me that you have any legal basis to

9    say that if the BBC is subpoenaed here in New York, that you

10   don't have an obligation to produce the documentary, unless you

11   have some other argument.  You have a separate argument with

12   regard to the outtakes that apply to the documentary.  And you

13   don't have any legal argument to say that the person who was

14   given that assignment here in New York to get a copy of the

15   videotape, produce it back to you so you can give it to them,

16   if that person verifies what he did to obtain a true copy, and

17   that is sufficient to assure us that it is a true copy, I don't

18   know of any legal argument you have that somehow foreign law,

19   you know, controls it.

20        MR. KORZENIK:  But look at what your Honor is doing.

21   And I appreciate what your Honor is doing to try to work around

22   it, but understand that Rule 45 has policy justification for

23   what it is doing.  And I would ask you to look and consider

24   these cases.

25        In the Price Waterhouse case, for example, the company

CBJ7SOKM

1   is subpoenaed, seeks documents only, and they are UK-located

2   documents.  The court did not want to allow those UK documents

3   of a U.S.-based jurisdiction company to be turned over unless,

4   it turned out, they said we will allow it in this case because

5   a British court in a related case said that it waived its legal

6   interest and said the U.S. has greater interest in this fact,

7   these issues, than we do.

8           THE COURT:  What is the British law that you say is in

9   conflict with you turning over the documentary?  Is there a

10  British law that you can cite to me?

11          MR. KORZENIK:  Yes.  The British have their own press

12  privilege.

13          THE COURT:  Well, what's --

14          MR. KORZENIK:  They have their own take on the press

15  privilege.  It's not exactly the same as our own.

16          THE COURT:  So, what part of their press privilege

17  conflicts with your obligation here to give them a copy of the

18  aired documentary?

19          MR. KORZENIK:  The Randal case.

20          THE COURT:  And which law stands for the proposition

21  that you don't have to turn over --

22          I assume you are not making the argument if this was a

23  British lawsuit in London that if someone said let's go

24  subpoena the BBC and get a copy of the tape that aired, that

25  you would quote me some British law that would protect them

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

CBJ7SOKM

1    from something to turn over that copy.

2            MR. KORZENIK:  What I am citing is Rule 45, that

3    protects foreign employees from discovery burdens, whether they

4    be testimony, or production, or authentication of documents.

5    It protects those people, those employees, even if their

6    company resides here and the court has jurisdiction over their

7    company.  That is something I can't conceive because I don't

8    believe that that's what the law is.

9            THE COURT:  So, why did you turn over the documentary

10   in the first place?  What rule did you violate?  You violated

11   Rule 45 when you turned over the original documentary?

12           MR. KORZENIK:  No, because Rule 45 protects me, but I

13   chose to produce that.  I chose to produce that at the outset

14   in order to try to come to a resolution.  Because, remember --

15           THE COURT:  Well, wouldn't you have at least waived

16   that argument?

17           MR. KORZENIK:  No, because what happened --

18           THE COURT:  Did you condition that production on some

19   preservation of some argument that you could get it back?

20           MR. KORZENIK:  No, because I chose to take a position

21   where I thought that my position was reasonable.  I mean keep

22   in mind --

23           THE COURT:  So, why are you taking a different

24   reasonable or unreasonable position here?

25           MR. KORZENIK:  Because I'm taking the view that I'm

CBJ7SOKM

1    happy to provide it, and I understand that I might be compelled

2    to do it; I might be able to resist it, but I'm not going to

3    try to do that.

4            Remember, when these subpoenas hit, the first thing

5    that I do as a press lawyer is to call the other side, and as

6    part of our obligation under the rule, before we make a motion

7    to quash, all right, what are you looking for?  Can you narrow

8    this?  Can you open this?  Can you, etc.?  What can we do to

9    resolve this?  And sometimes just to get the ball rolling, to

10   try to get things resolved, you say, OK, you need a copy, here

11   is a copy.

12           THE COURT:  OK.  But as I look at the subpoena, why

13   isn't the simple statement about the documentary as it aired,

14   that part of the subpoena, why isn't your simple response to

15   that part of the subpoena that seeks a copy of the documentary

16   that aired, why isn't your simple response to that simply that

17   it is moot because I have already turned it over to them?  Why

18   isn't that just the end of that conversation with regard to

19   producing the documentary as it aired?

20           MR. KORZENIK:  I mean I did it, and I will do it again

21   if need be.

22           THE COURT:  But I mean isn't that moot at this point?

23           MR. KORZENIK:  Yeah.

24           THE COURT:  I mean there is no debate about whether

25   you should turn over or not turn over --

CBJ7SOKM

1          MR. KORZENIK:  -- the documentary.

2          THE COURT:  Right.  They subpoenaed it.  Your response

3     is I already gave it to you, right?

4          MR. KORZENIK:  I would say I already gave it to you,

5     and you bought it and --

6          THE COURT:  Well, that part of the subpoena need not

7     be enforced, right?

8          MR. KORZENIK:  Correct.

9          THE COURT:  We don't need to be arguing about that

10    part of the subpoena.

11         MR. KORZENIK:  That's correct.

12         THE COURT:  Because you have already given it to them.

13    They are asking for something that you have already produced to

14    them.

15         MR. KORZENIK:  Correct.

16         THE COURT:  OK.  Now we can put aside the authenticity

17    part of it for now, but then let's go to the outtakes.

18         You know, I assume your primary argument about the

19    outtake -- well, you see, you had two arguments.  With regard

20    to the general standing of considering the relevance and

21    whether or not it's available through another source -- and why

22    don't I just quote it specifically.  They have to show that the

23    materials at issue are of likely relevance to a significant

24    issue in the case and are not reasonably obtainable from other

25    available sources.  That's primarily what I am focused on.

CBJ7SOKM

1          Now, the other issues in terms of the balancing of the

2     interests, and I give you -- clearly if the only thing that I

3     am considering is whether or not this nonconfidential material,

4     that there are compelling reasons that journalists who were

5     doing their job in dangerous situations, and journalists in

6     general, the presumption should be that they are not doing this

7     in anticipation of individual parties in litigation, and should

8     not be dragged into that, and there are compelling reasons why

9     the press should have a free opportunity to do what job the

10    press does independent of people's individual interests and not

11    be used in that manner.  So, I understand that argument.

12         But I am not sure you make a compelling argument that

13    what they seek is not likely relevant to a significant issue in

14    this case.  They seek information showing the connection

15    between these two individuals and the organizations and the

16    defendants.

17         MR. KORZENIK:  OK.

18         THE COURT:  And that's clearly relevant.  That

19    information is clearly relevant to a significant issue in this

20    case.  I want to first find out whether you have some

21    compelling argument to make that that's not relevant to this

22    case.

23         MR. KORZENIK:  I do, and let me --

24         THE COURT:  -- Because it seems to me your primary

25    argument is based on that they could get it from someplace else

CBJ7SOKM

```
 1    and that you have a compelling privilege interest.

 2              MR. KORZENIK:  I do want to address that, because when

 3    a party comes into court and says that they want materials that

 4    are subject to the qualified privilege, they have to make some

 5    kind of showing that it's important, not just that it might be

 6    helpful.  In other words, it's not that vague.  What you have

 7    here is normally, and in most of these cases -- certainly those

 8    that I have seen and those that are reported in the cases --

 9    usually have some kind of video clip, or outtake, or interview

10    that really relates to the event that is specifically at issue

11    in the case.

12              In this case you have outtakes which the plaintiffs

13    themselves told magistrate Judge Ellis, well, we don't know

14    what's in them, and Judge Ellis acknowledged and understood in

15    the colloquy that they don't know what is contained in it; in

16    fact, this stuff could be quite unhelpful.  Because when you

17    look at the transcript and you see what it is these two people

18    are saying, it's highly ambiguous stuff.  They are kind of

19    talking about their relationship with Arafat in a way that kind

20    of both suggests that they're extorting him, using their

21    leverage, boasting that they are kind of tough guys who can

22    sort of force him to give them accommodations of various kinds.

23              Remember -- and we will go into more about what they

24    say.  These guys --

25              THE COURT:  Are you talking about the outtakes or are
```

CBJ7SOKM

1    you talking about what aired?

2              MR. KORZENIK:  No, I am talking about both -- if you

3    see what aired, you can see that it's ambiguous, and you can

4    also see that the plaintiffs say, well, we don't know what's in

5    them, we have no idea what's in them.

6              THE COURT:  Well, no, they don't say that.

7              MR. KORZENIK:  They do.

8              THE COURT:  They say we don't know what's in there.

9    But given the fact that the parts you aired were specific

10   references to their relationship to the PLO and the Palistinian

11   Authority and Yasser Arafat and the other organizations at

12   issue, given what they said on the tape, their argument is that

13   there is likely to be more of that kind of conversation on the

14   outtakes.

15             MR. KORZENIK:  Well, but let me just emphasize

16   something very important, your Honor.  They say -- and they

17   said in the hearing -- that they don't know.  Now, that's

18   pretty unusual.

19             THE COURT:  They don't know --

20             MR. KORZENIK:  They don't know what's in those.

21             THE COURT:  Well, that's not unusual at all.  That's

22   not unusual at all.

23             MR. KORZENIK:  No, that's not unusual in this --

24             THE COURT:  In most cases they are going to know

25   what's in the documentary but they are not going to know what's

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

CBJ7SOKM

1   in the outtake.

2           MR. KORZENIK:  No, I disagree with that.  In most

3   cases that I have litigated, or those that I have seen and

4   taught, the stuff that is sought in outtakes is more obviously

5   known.  In other words, for example, there may be -- as in the

6   Gonzales case -- you have videotapes of reporters being stopped

7   by a particular police officer, and there are more videotapes

8   of more stops, and those show his modus operandi.

9           THE COURT:  But there is nothing in those cases that

10  say that the party subpoenaing the information were aware of

11  exactly what was in the outtake.  In most cases that's not the

12  case.

13          MR. KORZENIK:  But in most cases they do know what the

14  outtakes are about.  They know that the camera was in X place,

15  and they know it was recording certain events at a baseball

16  game as to an accident that occurred, etc.

17          When the party comes into court, and the court is

18  willing to simply say "could be," well, then that privilege is

19  diminished by that standard.

20          THE COURT:  But, see, it's also controlled by what

21  you -- how you want to argue its content.  It makes it a whole

22  lot easier obviously if we were sitting here and you were

23  saying to me, Judge, the relevant information they want is the

24  information that shows the connection between these individuals

25  and these entities.  There is no such further information in

CBJ7SOKM

1      the outtakes that's relevant to that.

2                  MR. KORZENIK:  I would emphasize this:  When a party

3      comes to a journalist and says we want to see your outtakes

4      because there could be stuff in there that could be helpful to

5      us, then you are talking about a sifting case.  You are talking

6      about a party, a litigant, coming to the journalist and saying

7      we want to go through your files to see if there is anything in

8      there that could be helpful to our case.  And when parties do

9      that, as here, where they said -- this is the word they used --

10     they have no idea what is contained in those outtakes, when a

11     party comes in with "no idea" about what is contained in those

12     outtakes beyond the kind of speculation that there must be more

13     of the same, that is not the grounds under which a court should

14     allow them now to go through the journalist's files and sift

15     through those outtakes to see if there is something that might

16     be helpful to them.  If that's what the privilege does, it's

17     not much of a privilege.  But remember --

18                 THE COURT:  No, but it focuses on the information, not

19     on the general outtakes.

20                 The question really is is that we know that the

21     significant issue is whether or not there is a connection on

22     the documentary.  There are specific statements that

23     specifically talk about a connection.

24                 MR. KORZENIK:  But, your Honor --

25                 THE COURT:  The only thing that they have articulated

CBJ7SOKM

1    that they are interested in is not what they had for lunch that

2    day but whether or not -- they want the further evidence in the

3    outtakes that would reflect that connection.

4              MR. KORZENIK:  Here is something interesting.

5              THE COURT:  So --

6              MR. KORZENIK:  At the very beginning when they were

7    asked -- not in the beginning but later on in the case they

8    were putting in a witness list, they didn't include these

9    witnesses or these tapes.  So, in their own mind this is not

10    important.

11              THE COURT:  Well, I can't say --

12              MR. KORZENIK:  Well, I mean that says something about

13    the way they regarded it.  And keep in mind they even asked us,

14    well, is there anything in there that is bad for us.

15              They had no idea.  What they said is absolutely

16    correct.  If a privilege is broken by that kind of speculation,

17    or by that kind of hope, then it is a pretty weak privilege.

18    And the problem that journalists are facing is that there are

19    two ways to read these two prongs.  One of them is the way that

20    we are now discussing, about saying, well, if there is a

21    speculative thing, based on what the show had, there could be

22    more of the same, and we want to see if that exists.  You will

23    see in other cases there really are more grounds for saying

24    that they know what those outtakes are before they take them.

25              So, I ask your Honor not to allow that privilege to be

CBJ7SOKM

 1    broken so easily.  So that's my first concern about it.  It's

 2    troubling weak from the point of view of the press in a lot of

 3    ways, and it's because of that kind of reading that

 4    occasionally it provides not the kind of protection that is

 5    deeply, deeply needed.  So, that goes as to the first prong.

 6         I would also ask you to consider the thoughtful

 7    analysis of our expert Dr. Sayigh, who has been an expert who

 8    has advised the State Department, the World Bank, the Rand

 9    Corporation, Council on Foreign Relations on the Middle East,

10    and was involved in the Middle East peace process himself, so

11    he really knows the different parties and what the

12    relationships are and the complexity of the relationship

13    between the two.

14         And he really illustrates I think very clearly, if you

15    would take a closer look at his affidavit because it's very

16    instructive both as to the second prong but also as to what it

17    is that these particular witnesses are saying.  Their kind of

18    swagger about what they do, who they are and what they can do

19    to Arafat is very empty.  And remember this is --

20         THE COURT:  But that's not a determination for you, or

21    I, or him to make.  That's a credibility issue for a jury to

22    determine if there is a trial.

23         MR. KORZENIK:  Because it goes to the --

24         THE COURT:  You think that even his opinion on this

25    would be admissible evidence to demonstrate that what they are

CBJ7SOKM

1   really saying, they're simply bragging out of thin air and are

2   not really talking about a genuine connection?  He is not in a

3   position to testify to that.

4           MR. KORZENIK:  Yes, it is, and I'll tell you why.  I

5   am talking about the first prong now.  If we are in the

6   business of speculating what might be in that --

7           THE COURT:  But we're not in that business.  That's

8   the whole point.  You want me to speculate on the other side,

9   and you want me to argue we're not in the business of --

10          MR. KORZENIK:  I don't want that speculation, but if

11  we look at some other things about those people, you are

12  talking about a guy, Zubaidi, who before he gave up and was

13  given amnesty by the Israelis, and was doing theater, and

14  before he was imprisoned by the PA -- I mean this is another

15  thing that's remarkable about it, and again it relates to the

16  second prong, so I want to stay on the first.

17          If we are speculating about what those things contain,

18  then it is worth looking over what Sayigh says.  You are

19  dealing with a guy who was adverse to the PA in a lot of

20  different ways, and his people arrested and kidnapped a PA

21  mayor from Jenin.

22          THE COURT:  But you see, you know what's inconsistent

23  with that -- I mean I have not had an opportunity to review the

24  entire documentary, but that's not even the way your reporter

25  reports it.  OK?  Your reporter doesn't say, oh, look, we're

CBJ7SOKM

1    going to have this guy talk about how he is real connected and

2    he is taking orders for Arafat but, by the way, he is really

3    just fooling around, it's not true.

4            You didn't even present the story that way.  Your

5    expert is now saying something the opposite of the impression

6    that you were trying to give the public when you -- that's not

7    the thrust of that documentary.

8            MR. KORZENIK:  I want to correct something.  That's

9    important.  No.

10           THE COURT:  The documentary says -- you have the guy

11   quoted as saying on the documentary that there is no difference

12   between Fatah and the Al-Aksa Martyrs' Brigade.  You don't say

13   that -- you don't have your guy, expert, come right on after

14   and say, you know, he is only kidding.  That's --

15           MR. KORZENIK:  No, the kidnapping was reported in the

16   documentary.  But there is something more important, your

17   Honor.  It's a mistake if what one thinks is that this

18   documentary shows that there is some connection between Al-Aksa

19   and --

20           THE COURT:  How do you know?

21           MR. KORZENIK:  What the documentary was doing was

22   Arafat Investigated, it was looking at him at the time that he

23   was held captive in his headquarters in Ramallah by the U.S.

24   and by Israel.  And what it was doing, it was polling, it was

25   talking to Palestinian people, a variety of different people

CBJ7SOKM

1    about what do you think about Arafat.  It wasn't sort of trying
2    to establish some particular thing; it was just interviewing
3    people about --
4            THE COURT:  But it was making the point that Arafat
5    was the person in charge giving these people orders.
6            MR. KORZENIK:  No, it was an interview.  No, you have
7    to read the transcript to see what it was doing.  It just
8    interviews these guys, and they talk about what they do and
9    what they think of Arafat.
10           THE COURT:  All right.
11           MR. KORZENIK:  But it is -- in other words, the
12   documentary --
13           THE COURT:  And the edited portions that were
14   presented were people saying they were taking orders from
15   Arafat.
16           MR. KORZENIK:  No, it does not speak about orders from
17   Arafat; it just talks about what they were doing and what they
18   think of Arafat.
19           THE COURT:  Well, now that's a mischaracterization,
20   even the quotes that I have.
21           MR. KORZENIK:  Well, that's how they --
22           THE COURT:  Who is in charge of both of these two
23   parts of the organization?  Is it Arafat?  And Rumaileh says
24   Yasser Arafat.  And you don't come behind that and say, well,
25   but we have an expert who says he is really kidding.

CBJ7SOKM

1          MR. KORZENIK:  But what I'm saying is this.  The

2     report says in context what it says.

3          THE COURT:  Right.

4          MR. KORZENIK:  I'm not asking to alter that.

5          THE COURT:  Well, you are asking to alter that.  Now

6     you are putting up an expert to try to argue that these guys

7     really weren't -- they were really adverse to Arafat, really

8     were trying to undermine him and --

9          MR. KORZENIK:  Absolutely not.  That's not why I

10    raised it.  What I was talking about is what does it say is

11    that they say they have no idea what the outtakes contain, and

12    they admit that.  And I'm just saying that if we're going to

13    allow speculation on the outtake to be the basis for breaking

14    the privilege, that's an unfair disadvantage to the journalist,

15    and it would not be a fair way to read this privilege.

16          THE COURT:  OK.

17          MR. KORZENIK:  I then was pointing to Sayigh simply to

18    say that if one is trying to look at other things to speculate

19    about what might be in or might not be in those things, I would

20    point out to take a look at what he says.  I think they would

21    suggest that the outtakes are probably not informative.

22          But the more important thing is the plaintiff says

23    they have no idea what it contains.  And when people say they

24    have no idea what it contains, it doesn't appear in their

25    witness list, then that shows what they think the outtakes

CBJ7SOKM

1    contain, and that privilege has not been broken.

2           THE COURT:  We all know to some extent what it

3    contains.  It contains further conversations between these two

4    witnesses and your journalist with regard to the activities

5    that were the subject of this interview.

6           MR. KORZENIK:  Keep in mind, it could qualify and

7    compromise the stuff that was there.  And you know what, if --

8           THE COURT:  It could.

9           MR. KORZENIK:  -- and if the PA was looking for this

10   stuff, we'd be resisting them too.

11          THE COURT:  I understand that.

12          MR. KORZENIK:  So, again, I want to leave this with

13   the simple point that you should not be able to break this

14   prong of this privilege by saying you have no idea what's

15   contained, because that's wrong.  Some particularized need

16   should be shown, and that's what the case law says.  You don't

17   just come in and say there could be something that might be

18   better for us there.  That's the first one.

19          Now I want to look at the second, because then you are

20   getting into a sifting, sifting through our files to find out

21   if there is something good there.  That's not fair, that's

22   wrong, and that's not what the privilege is about.

23          The second prong is the issue about whether the same

24   information is reasonably obtainable from other sources.  Now,

25   this is a particularly significant prong of the test.  It's

CBJ7SOKM

1    hard to really understand how if you are talking about the

2    relationship between Al-Aksa and the PLO during this particular

3    period of time, how that is something that is so rarefied that

4    only a few people on the earth would know about it, and the

5    only thing that really captures what they know about it is this

6    BBC interview.

7         One of the things that hurts the journalists who

8    assert the privilege is that sometimes courts will say, oh,

9    well, you can't get that video anywhere else but from the

10   person who took the video, so therefore we need that video.

11        THE COURT:  I don't see it that way.  The question is

12   not whether or not you can get the video from someplace else;

13   the question is whether or not you can get the information --

14        MR. KORZENIK:  Precisely.

15        THE COURT:  -- from somewhere else.

16        MR. KORZENIK:  And that's what the Second Circuit does

17   in Grocco, and that's what Judge Jones recognized I think

18   correctly and wisely in Grant, that you have to be talking

19   about the information.

20        So here is where I think there are some very important

21   things to be noted from -- and your Honor knows this litigation

22   in terms of what's going on within it more than I do.  But, for

23   example, Zubaidi was for a period of at least a year in custody

24   of the PA, and during that time the plaintiff seemed never to

25   have bothered to have required of them or asked them for a

CBJ7SOKM

1    deposition of Mr. Zubaidi while he was held in their custody.

2            THE COURT:  Well, again, you know, I mean I can't

3    speculate about that either.  I don't know what you mean by in

4    their custody, but we know that he was not within the subpoena

5    power of this court.  Now, whether or not he was someone who

6    was an employee of the PLO and didn't have the same kind of

7    protections that your British subjects had is a different

8    question.

9            MR. KORZENIK:  He was in indeterminate detention.  I

10   would just ask that your Honor take a close look at the Sayigh

11   affidavit, because the latter part of it deals with the

12   alternative sources.  If there is anything that this expert

13   knows, it's how you could show what the relationship is between

14   Al-Aksa and the PLO.

15           THE COURT:  But your argument is a little different.

16   Your argument is not a direct argument that the information is

17   available to the plaintiff someplace else.  Your argument is

18   that, well, they didn't do anything to see if they could get

19   it.

20           MR. KORZENIK:  Oh, no, my argument --

21           THE COURT:  You have no basis to argue or to state

22   that in fact they could have gotten this information directly

23   from this witness.

24           (Continued on next page)

25

CBJPSOK2

1              MR. KORZENIK:  Well, I want to say that I was pointing

2     really more to the other sources, and I want to review the five

3     other -- at least five other important sources for this kind of

4     information.  But it is also true that, I must say, I'm -- for

5     people who are trying to get to break our privilege on the

6     basis of saying they have no alternative grounds, there are --

7     they -- it seems to me that they have done surprisingly little

8     to try to make a case by other means than news clips and news

9     reports.

10             THE COURT:  Their efforts are not the question.  What

11    the question is whether or not I can affirmatively say the

12    information is available to them to have --

13             MR. KORZENIK:  By other means.

14             THE COURT:  -- by another means.

15             MR. KORZENIK:  Okay.

16             THE COURT:  Now, simply saying that these witnesses

17    were in the custody of the PLO gives me not a strong record to

18    say that they could have squeezed this information out of this

19    witness.

20             MR. KORZENIK:  Just remember, the PLO and the PA are

21    parties in this case.

22             THE COURT:  I understand.

23             MR. KORZENIK:  And if they don't provide stuff, they

24    are subject to preclusion orders and all kinds of things that

25    this Court has.

CBJPSOK2

1          THE COURT:  How would I -- If these witnesses would

2     not testify, how would I conclude inter-sanctions against the

3     defendants in this case because this individual, who you say

4     was in their custody, decided he wasn't going to make himself

5     available for a deposition or answer questions by the

6     plaintiff?  Do you think it's reasonable for me to conclude

7     that somehow that would be the PLO's fault or somehow they

8     could have gotten it anyway?

9          MR. KORZENIK:  Well, it's their fault if they don't

10    provide information or depositions and other kinds of

11    documents.

12         THE COURT:  Whose fault?

13         MR. KORZENIK:  It would be the PA's fault.

14         THE COURT:  But I don't have that record.

15         MR. KORZENIK:  I think that those things are germane,

16    but I want to just go through the sources of information

17    that --

18         THE COURT:  Okay.

19         MR. KORZENIK:  -- are there and that -- whether

20    they've exploited them or not, I don't know, but they are

21    there.

22         THE COURT:  Okay.

23         MR. KORZENIK:  And Dr. Sayigh --

24         THE COURT:  Well, you have to tell me that the

25    information is there.

CBJPSOK2

1          MR. KORZENIK:  The information is there, correct.

2          THE COURT:  So where else do you say that they get

3     this information?

4          MR. KORZENIK:  The Israel defense forces seized the

5     headquarters of the PLO in Ramallah and, at that time, they

6     seized documents from the PLO headquarters and specifically

7     from Arafat, and they took those documents.  This was in 2002

8     under Operation Defensive Shield.  They took those documents,

9     and they put many of those documents up on the Internet.  They

10    had others, and those are available and could be subpoenaed or

11    drawn from --

12         THE COURT:  And what do those documents say that is

13    material to the issue that we're talking about?

14         MR. KORZENIK:  Umm.

15         THE COURT:  Do we know?

16         MR. KORZENIK:  I want to -- I just want to be very

17    clear before I go further.  As to what they did or what they

18    didn't do with them, I don't know, but one thing that's very

19    important and what Magistrate Ellis did that is a serious

20    mistake is that the way he described it was that he was

21    granting this modified subpoena.  First, he says Rule 45 bars

22    any testimony from these people.  Then he says Rule 45, though,

23    still he can modify it and make the overseas people provide --

24         THE COURT:  I understand.

25         MR. KORZENIK:  -- witness statements.  I think there's

CBJPSOK2

1    an inconsistency there.  But he also makes another error that's

2    actually more troubling for the press from a reporter's

3    privilege point of view, and he says we failed to meet our

4    burden of showing that this was burdensome for us.

5              THE COURT:  That's not your burden.

6              MR. KORZENIK:  We have no burden.

7              THE COURT:  I understand.

8              MR. KORZENIK:  And the burden is already -- the

9    privilege relieves us of that burden.  It says it's their

10   burden to show, one, that it's relevant; and, two, that there's

11   no other alternative sources.

12             Now, I'm coming forward with Sayigh to show that there

13   are alternative sources.  They never really addressed this

14   issue except in very conclusory kinds of ways, and we're coming

15   forward with statements from -- there are statements from

16   Palestinians who were held in Israeli custody --

17             THE COURT:  Are you still talking about Israeli sealed

18   documents, or are you going on to something else?

19             MR. KORZENIK:  No, I'm going on to something else.

20             THE COURT:  You said Israeli sealed documents.

21             MR. KORZENIK:  They're not sealed documents.  They're

22   seized.

23             THE COURT:  I'm sorry, seized.

24             MR. KORZENIK:  Seized documents.

25             THE COURT:  And you said those are the first sources.

CBJPSOK2

1           MR. KORZENIK:  Correct.

2           THE COURT:  And what else do you say?

3           MR. KORZENIK:  The other, and I'm just going to open

4    up his --

5           THE COURT:  You said you were going to give me five.

6           MR. KORZENIK:  I'm going to give you five, but there's

7    more.

8           THE COURT:  I want to organize them.

9           MR. KORZENIK:  There's more -- Sayigh's.  Oh, here

10   they are.

11          THE COURT:  If you want me to seize on that, don't you

12   have to tell me what it is?  Where do you say there's available

13   evidence that indicates the connection between these

14   individuals, these entities, and the PLO?

15          MR. KORZENIK:  The IDF took the position, and also the

16   website of the Israeli Security Agency, that's another source,

17   took the position that there was such a link.

18          THE COURT:  Okay.

19          MR. KORZENIK:  And they both wrote about it and

20   documented it, to the best of what -- with ample documents on

21   that website, as well, and they have a trove of documents.

22   They got thousands and thousands of documents out of that, and

23   documents speak more effectively than anything that someone may

24   say.

25          THE COURT:  Well, not all of those thousands of

CBJPSOK2

1    documents address this issue.

2              MR. KORZENIK:  No, but they were looking for that type

3    of document.  In other words, remember, that that's what

4    they -- they came to -- they took a view about it.  They -- I'm

5    just saying, those documents are there.  They're significant.

6    They used those documents, the Security Agency, to make

7    precisely that point.

8              THE COURT:  Okay.

9              MR. KORZENIK:  So those documents are there, made

10   public and revealed by the Security Agency.  That's true also

11   about the IDF, in terms of its putting up those materials,

12   other materials as well.

13             Then there are statements and judicial proceedings in

14   Israel that involve Palestinians, who were involved in

15   terrorist activities or Al-Aqsa-related activities.  They are

16   in custody of the Israeli government, and they are also legal

17   proceedings in which there are indictments, documents, the

18   usual kind of stuff that we have in our courtrooms when there

19   are criminal courts in criminal cases.

20             So all of that stuff is also there to demonstrate

21   those kinds of things.  And one of the people in custody is one

22   of the people who is accused and who was convicted of killing

23   one of the plaintiffs in this case.  So that person is in

24   custody.  In principle, one has access to them to take

25   deposition.  In principle, one can get the documents from that

CBJPSOK2

1    case.

2              THE COURT:  Why do I assume that?

3              MR. KORZENIK:  Well, because that is -- I mean, I

4    don't -- Look, you're saying that I can't speculate on why they

5    didn't get something.

6              THE COURT:  Well, you are saying that they're

7    available to be deposed, and I'm not so sure it's as easy as

8    you would put it.

9              MR. KORZENIK:  Remember, it's their showing.

10             THE COURT:  I understand that, but you've given me a

11   logical argument why they can't make the showing.  And you said

12   that they have to make -- that these witnesses are readily

13   available to them for them to squeeze this information out of

14   them as witnesses.

15             MR. KORZENIK:  Look, it's totally possible that the

16   Israeli government is not comfortable with the case, okay?  And

17   doesn't want to cooperate with them.  I don't really know.

18             THE COURT:  I don't know.  I don't know whether the

19   Israeli government, the witnesses themselves, I mean --

20             MR. KORZENIK:  What I'm saying is --

21             THE COURT:  I'm just saying --

22             MR. KORZENIK:  We're talking about something that

23   involves a lot of human beings not just Mr. Zubaidi and

24   Mr. Rumaileh.

25             THE COURT:  I know, but part of your argument that is

CBJPSOK2

1    not as persuasive as the other part is, don't -- Your argument

2    isn't particularly persuasive to tell me where you think they

3    ought to look to find this information.  Your argument is most

4    persuasive where you can say, look, Judge, X document clearly

5    says what it is that they say they want to prove.

6            MR. KORZENIK:  And you know what --

7            THE COURT:  So it's clearly there --

8            MR. KORZENIK:  Right.

9            THE COURT:  -- in this document.

10           MR. KORZENIK:  And they refer to some of those

11   documents in their papers.

12           THE COURT:  I know.

13           MR. KORZENIK:  So they're mindful of it.  The stuff is

14   on the Internet.  Some of the stuff is available from the

15   government sources.  We know you can get material from the

16   government.  I'm not saying that there aren't obstacles.  I'm

17   not saying they have to use some shoe leather for it.

18           THE COURT:  I understand, but to the extent that

19   you're saying that they have pointed to -- or you have pointed

20   to instances where these -- there's evidence of this specific

21   issue of this link --

22           MR. KORZENIK:  Right.

23           THE COURT:  -- it is available to them from those

24   sources, and they don't have to get it from your source.

25           MR. KORZENIK:  From us, right.

CBJPSOK2

1          THE COURT:  But that can't be the speculation that
2     there's a guy out there who ought to know, so why don't they
3     chase him and see if they can get it from him.
4          MR. KORZENIK:  No, there's --
5          THE COURT:  There's got to be X said it, you know,
6     this time and place.  They have X who said it.  They already
7     have that information or this document contains that
8     information.  They already have that information in this
9     document.  So they don't need it from me.
10          It can't be that 10,000 documents and they should look
11     in there first, or there are a whole bunch of witnesses and
12     they should see whether they can get it out of them first.
13     That's not the argument.
14          MR. KORZENIK:  I can't tell them what to do, but the
15     burden is on them to show that they can't get it.  They can't
16     just shrug and say, eh, can't get it, and then the privilege is
17     broken.  They need to be able to show that they really can't.
18     Now, I'm putting out there, through Sayigh --
19          THE COURT:  The first argument they make that they
20     can't is that there's no evidence that it's someplace else,
21     that they have --
22          MR. KORZENIK:  Well, let me say this.
23          THE COURT:  -- that they have somebody who's already
24     said it that they should use instead, or that they already have
25     some documents that reflect that, that they can get from

CBJPSOK2

1    someplace else.  It's not the speculation about whether it

2    might be there.

3              MR. KORZENIK:  Yeah, but you have to ask the really

4    serious question.  If this case turns on -- is made on press

5    material, they say they have something more, but if this case

6    is based on press material, they don't have a case.

7              THE COURT:  Well, but they're not -- their argument

8    would be, it's not based on press material.  It's based on the

9    individual admissions of the people who are directly involved

10   who happen to have been interviewed by a reporter, and then if

11   I did --

12             MR. KORZENIK:  The real question is -- Okay.

13             THE COURT:  If I get on the 6:00 news and confess to

14   six murders, it could be pretty powerful evidence against me

15   that I made a public confession --

16             MR. KORZENIK:  It could be.

17             THE COURT:  -- about issues that are in dispute in the

18   trial.

19             MR. KORZENIK:  It's not -- Look, I don't know how

20   probative that stuff is, and your Honor says we don't know.

21             THE COURT:  I don't either.

22             MR. KORZENIK:  We step away from it.  It doesn't look

23   particularly probative to me.

24             THE COURT:  If the guy says, I'm taking orders from

25   Arafat, that's at least relevant to a jury's determination as

CBJPSOK2

1  to whether that's reflective of the actuality or if it means

2  something different.

3      MR. KORZENIK:  But, look, the issue is, is the

4  information there by other means, and what I've done is I've

5  just simply said, I don't know why they haven't done anything.

6  It doesn't look to me as if they've done very much.  I'm not

7  asking your Honor to look at their failures.  Their failures

8  perplex me.  But if --

9      THE COURT:  Well, it's easier to get it from you than

10  to get it from someplace else.

11      MR. KORZENIK:  Well, of course.  You just do armchair

12  litigation.

13      THE COURT:  It's right there in admission.

14      MR. KORZENIK:  Yeah, you watch your TV set.  That's

15  what all plaintiffs do with us.  That's how it operates, and --

16      THE COURT:  Some get it and some don't.

17      MR. KORZENIK:  And most of the time they don't, it

18  depends, but it varies.  But, again, I would say here, the

19  stakes for us are urgent, and our people are faced with serious

20  risk themselves.  As much as they say that they face some risk

21  in going to talk to these people, we face risk, too, when the

22  war zone heats up and we have to send our people in to risky

23  territory.  We don't have that choice.

24      right now, in the West Bank, and during the past three

25  years of this litigation, there has been very low risk within

CBJPSOK2

1    those areas.    Mr. Zubaidi is interviewed by Haaretz, the

2    Israeli newspaper.  He's doing theater.  He's gotten amnesty.

3    The Israelis are letting him go to a political conference in

4    2009.  Then they're giving him permission to go get an eye

5    operation.  All of those things are well documented.  He's not

6    a problem for them.

7            They say they have a lawyer who got threatened, and

8    that he was threatened with murder.  He was not -- Read what he

9    said.  You can't conclude that from that.  And the reality is,

10   they can get the PA's assistance to do this, and Israel

11   controls access.

12           THE COURT:  Well, the PA is not -- it's not their

13   co-counsel here.  They have competing interests.  So, you know,

14   I mean, it's not a very compelling argument to say that the PLO

15   is going to go out of their way to help the plaintiffs prove

16   the case against them.

17           MR. KORZENIK:  Not to prove it, but to produce

18   documents and people and -- Look, on Rumaileh, Rumaileh is an

19   officer.  If they don't produce him, then I don't get what's

20   going on.  In other words, they have an arsenal of devices that

21   litigation gives you --

22           THE COURT:  Right.

23           MR. KORZENIK:  -- and that allows you to go beyond the

24   press clips and the press reports that first alert us to issues

25   that we all should be sensitive to.

CBJPSOK2

1          THE COURT:  But I don't think that you want me to

2     assume that somehow it's less dangerous for them to seek this

3     information than it is for your reporters to do their

4     reporting.

5          MR. KORZENIK:  Let's assume that it's equally

6     dangerous.  The real question is, should the reporters'

7     predicament be enhanced when in a committee -- and I ask that

8     you look also at the submission of Reporters Without Boarders,

9     who are very much like a group we're more familiar with in the

10    United States, Committee to Protect Journalists, and the UN

11    statements, and a number of other things.  Let's just talk

12    about the increasing number of deaths among war reporters and

13    conflict zone reporters.

14         THE COURT:  You don't have to convince me of that

15    issue in the abstract.

16         MR. KORZENIK:  And what I'm saying is that when we go

17    into a war zone or a conflict zone, and we attach ourselves to

18    courts and become witnesses, our risk is enhanced.  There's

19    just no question about it.  Our ability -- and assume there's

20    no risk.  Assume that the risk is to be put aside, we still

21    aren't going to get that story.  And people need that story.

22    They need it about what happens in those war zones.

23         Now, so again, I'd ask that your Honor keep in mind,

24    while I'm coming forward with Sayigh, it's not my burden to

25    show that there's alternative stuff, but interestingly enough,

CBJPSOK2

1    Magistrate Judge Ellis doesn't really talk at all about prong

2    No. 2.  He doesn't talk about alternative sources.  He just

3    assumes, and just conclusorily says it is.  And you know why?

4    Because they don't really offer very much themselves.  The

5    plaintiff offers nothing in terms of why there are no other

6    sources except to talk about the Heideman affidavit and the

7    difficulty of getting to Zubaidi.

8           But that's -- Zubaidi, there are tons of other sources

9    of information about a matter of broad concern that involves a

10   lot of people including the IDF, the Israeli government,

11   Israeli prosecutors and so on.  So you've got tons of

12   documents.  You have Israeli Security Agency that I've cited,

13   depositions of Palestinians in -- held by Israel, including the

14   ones involved in the 2004 shooting and -- or bombing.  And even

15   more, if you look at Sayigh's things, he gives more detail

16   about what's just out there generally about what the

17   connections are or possible connections are between the Al-Aqsa

18   Brigade and the PLO and Fatah.

19          So I would -- again, would simply ask that your Honor

20   keep true to what I fear Magistrate Ellis did not, and that is,

21   whose burden is it?  And what is it?  It seems to me your Honor

22   does recognize it's about information.  It's not about an

23   outtake, and the Grecco holding is correct.  But even when it

24   comes to the first prong, as well, the burden is on them to

25   show some kind of particularized need, and they've not done

CBJPSOK2

1    that.  And the burden was put on us and unfairly so.

2              I would then just ask your Honor to give consideration

3    to the fact that, though the privilege speaks of two prongs, it

4    does involve, ultimately, at the end of the day, taking the

5    showing that the plaintiff has made, or the requesting party

6    has made of the two issues, the two prongs, and show that that

7    showing outweighs the public interest, that the journalists and

8    the public have in getting this information out of places that

9    the public really needs to understand what's going on.

10             And if they're correct about the relation between

11   Al-Aqsa and the PLO, people need to know about that, and the

12   avenues need to be opened to allow reporters to get that news

13   out to people.  And it should not be staunched by this kind

14   of --

15             THE COURT:  The way you phrase it, I can't agree with

16   you.  I don't think the balancing test is whether or not it

17   outweighs the public interest to know.  The question is, is the

18   public will have the interest to know, and it clearly doesn't

19   outweigh that, but the question is, is whether or not it shows

20   that and it has a negative effect on that.

21             MR. KORZENIK:  Correct.  Whether it has that impact,

22   and whether the showing -- at least the cases I've seen talks

23   about whether the showing and -- put forth by the requesting

24   party is sufficiently strong to overwhelm that, that privilege.

25             So again, the privilege is in peril if it's seen --

CBJPSOK2

1    the two prongs are read in that weakened way.  And I

2    respectfully request that the Court see those prongs as being

3    true burdens that the plaintiff or the requesting party must

4    meet so that the privilege is not broken, and the interests

5    that are -- we -- public interest that we're trying to protect

6    are in place and secured.

7              THE COURT:  Thank you.  Let me hear from Mr. Schoen.

8              MR. SCHOEN:  Your Honor, David Schoen.  I don't have a

9    great deal to add, frankly, to the discussion, with all due

10   respect to Mr. Korzenik.  I'll just touch on a couple of

11   things.

12             I was struck at the time when Mr. Korzenik said, well,

13   what we have here, the documentary itself -- and I was careful

14   to listen to that -- the documentary itself is ambiguous, at

15   best, and the Court took Mr. Korzenik to task on that

16   immediately, frankly, and grabbed the part that I was going to

17   grab.  And it may just be that Mr. Korzenik is not clear on

18   what it is we want to prove or seek to prove or need to prove

19   on this point, but it bears repeating.

20             There is nothing ambiguous about but there is no

21   difference between Fatah and Al-Aqsa Martyrs' Brigade.  That's

22   the central point we seek to prove through this documentary and

23   the taking of orders from Arafat.  That's what's clear here.

24             And with all due respect, again, maybe, and I'm sure

25   it is because he said so, Mr. Korzenik's view that documents

CBJPSOK2

1    speak louder than words, I respectfully disagree.  And it's our

2    showing that we're going to make, that the leaders of these

3    organizations say that there is no difference between them is

4    much better than just about anything else we could get, and

5    we're entitled to put on the best that we can get.  There is no

6    substitute or duplicate for that.

7                And by the way, it bears pointing out -- and again

8    Mr. Korzenik would have no way of knowing this -- the PA

9    doesn't concede that Al-Aqsa and Fatah are the same because, as

10   Mr. Korzenik I'm sure does know from the papers, and we can

11   prove money going to Fatah, and we believe we can prove Fatah

12   and Al-Aqsa are the same, and that's one variety of material

13   support that we intend to prove in our case.

14               THE COURT:  Well, I don't want to jump the gun on

15   either issue, but let me -- I will start backwards because, as

16   I started the conversation that I think seems to be the more

17   central issue is, you articulate very well what it is you want

18   to prove and the different pieces of evidence that you want to

19   use to prove that.  But if you have all these available ways to

20   prove that, then why is isn't it readily available, from a --

21   reasonably obtainable from other available sources?

22               MR. SCHOEN:  Fist of all, as your Honor pointed out,

23   what we heard from Mr. Korzenik and his expert, not that there

24   are documents that establish that Al-Aqsa and Fatah are the

25   same, we believe it's clear they're the same, and the world

CBJPSOK2

 1   should know that, but the PA denies it.

 2           THE COURT:  Yes, but you believe that based on the

 3   evidence that you've amassed that you believe will be

 4   persuasive to a jury.

 5           MR. SCHOEN:  None of which -- I'm sorry, your Honor.

 6           THE COURT:  Go ahead.

 7           MR. SCHOEN:  None of which is like the leaders of

 8   those organizations telling us.

 9           THE COURT:  I know, but you don't --

10           MR. SCHOEN:  That's why it's not an alternative.  It's

11   not an alternative if it's not as good.

12           THE COURT:  Well, let's put it this way.  I assume

13   that your position has always been, and my best understanding

14   of the nature of your evidence so far and what you anticipate

15   it being, that your position is pretty much that even without

16   this documentary, that you have enough evidence to prove that

17   connection.

18           MR. SCHOEN:  I don't know.  I don't know, Judge.

19           THE COURT:  Well, I think you believe that.

20           MR. SCHOEN:  I hope it.  I hope it.

21           THE COURT:  And I can at least point to -- and you

22   just -- we've already talked about some examples.  But there

23   are these various other sources of proof that you have

24   available to you that you intend to present to a jury that you

25   believe will prove that point, those connections.

CBJPSOK2

1          And so the real question, which remains -- and, quite
2     frankly, I'm not sure -- I mean, you have a double-edged sword.
3     It helps you in one sense to quote this language in the
4     documentary, but the reality is, that's just further evidence
5     that you have it without the outtake.  You have the same right
6     on the documentary.
7          MR. SCHOEN:  Oh, yes.
8          THE COURT:  You want to show the money transactions,
9     you want to show the other connections.  You may have other
10    witnesses who are going to testify to that connection, and on
11    top of that, you've got these guys on TV, in a documentary that
12    everybody has seen, where it's a direct statement that they
13    have that connection.
14         MR. SCHOEN:  Yes, your Honor.
15         THE COURT:  How does that make the outtakes another
16    source of information that's not available to you when they
17    just admitted it on the documentary?
18         MR. SCHOEN:  Great point.  I don't know that we will
19    find anything in the outtakes that is as good as that.  The
20    outtakes are independently relevant, different reasons.  We
21    made here -- We say in the papers, we made here the argument,
22    especially since Mr. Korzenik has said two or three times the
23    outtakes may not be helpful.  They may compromise your case.
24    They may hurt your case.  That may be the PA over there making
25    that argument.

CBJPSOK2

1          I'd like to have a complete record of what happened

2   and the PA might be arguing, well, all we have are what's here,

3   the outtakes available, they had other interviews -- sorry if

4   I'm talking too fast -- maybe they undercut what's in there.

5   So that's one reason we want the outtakes and to put them into

6   context.

7          THE COURT:  But that would be -- That is a more

8   compelling argument outside the context of the journalist's

9   privilege because if you wanted -- I might be more inclined to

10  give you such a fishing expedition if you thought that there

11  might be some evidence someplace that you wanted to pursue to

12  see if there was something there.

13         But the standard here is not, well, you get to fish

14  into their outtakes to see if there's something there that's

15  going to be helpful to you.  It's that you've got to make a

16  showing that the information they have in the outtakes is

17  likely relevant to the significant issue that you've raised and

18  that's not available from a different source.

19         You must admit that there is -- the material that you

20  want to use, the point that you want to make is available from

21  different sources.  That would be true, right?

22         MR. SCHOEN:  Around the margins.  Not this directly,

23  not -- I don't believe --

24         THE COURT:  You say not this directly.  When you say

25  "not this directly," you're referring to what you already have.

CBJPSOK2

1          MR. SCHOEN:  From the documentary, I hear you.  I hear

2     you, Judge, absolutely.

3          THE COURT:  You have to say not this directly as is

4     represented in the outtakes, and you're not in a position to

5     say that.

6          MR. SCHOEN:  Let's focus on the outtakes, your Honor.

7     You're right.  You're right.  You're right.

8          THE COURT:  If I would assume anything, I would assume

9     that the stronger evidence that you have is in the documentary,

10    and that there's no reason to believe that there's something

11    stronger than those direct statements that you have in the

12    documentary in the outtakes.

13         MR. SCHOEN:  I wouldn't go so far as to say no

14    stronger, but I think the Court makes --

15         THE COURT:  Well, articulate for me what you think is

16    likely, you know, obtainable in the outtakes that's stronger

17    than their direct admission in the documentary that there's

18    such a connection.

19         MR. SCHOEN:  Your Honor, I don't have any basis for

20    saying it's likely that it's stronger.  I don't think that's my

21    requirement either, though, for a couple of reasons.  One, I

22    gave the independent reason or reasons that the outtakes are

23    important.  But, two, if we were talking here about

24    confidential materials, No. 1, I think we would have a

25    different inquiry.  Of course we would have a different

CBJPSOK2

1    inquiry, and especially on this prong.

2              But, No. 2, it's not a fishing expedition for the very

3    reason -- first of all, for the very reason that your Honor

4    pointed out, it's not a fishing expedition.  We have what's on

5    the documentary already.  So we know this isn't a random

6    conversation about who's going to win between Notre Dame and

7    U.S.C. this week.  It's not about that.  It's about this

8    subject.  It's about Arafat.  It's about Al-Aqsa Martyrs'

9    Brigade.

10             THE COURT:  But beyond that, you have no idea if

11    there's any other statement in this -- in these outtakes that

12    is relevant evidence that might lead one to the conclusion that

13    you want them to reach --

14             MR. SCHOEN:  I think we have --

15             THE COURT:  -- other than surmising that by the nature

16    of the statements that are already in the document.

17             MR. SCHOEN:  I think your Honor has hit on one central

18    point.  Again, I disagree with Mr. Korzenik, but respect his

19    experience and knowledge.  In my experience, which I'm sure

20    pales compared to Mr. Korzenik's, it is not a question that

21    people know what's in the outtakes when they see the outtakes.

22    They know what we know.  We know what the subject matter was.

23             But like in this Chevron case that Judge Kaplan had,

24    it's found at 2010 U.S. District Lexis 47034, May of 2010.  In

25    that case, they didn't know what was in the outtakes, but they

CBJPSOK2

1    had ample reason to believe it by the nature of the documentary

2    that was made, and that was enough in that case.  And they also

3    had to deal with the counter-interests that the documentary

4    filmmaker had because this was -- in that case, it was directed

5    to him, the subpoena.  It was directed to the documentary

6    filmmaker.

7            Or in the Cutler case, which is another good case, and

8    I don't think either of these are in our brief, by the way, but

9    the Cutler case is 6 F.3d 67.  It's another good case on the

10   outtakes, but in terms of knowing what they are, Cutler makes

11   an important point, your Honor -- Maybe this is a compromise,

12   but it makes an important point.  Where the court is inclined

13   not to give the outtakes -- I hope that's not where we are, but

14   if the Court were inclined, in that case the Court ought to

15   look at the outtakes in camera.  That's what Cutler says.

16           In Cutler it arose in the reverse way.  They said,

17   well should the court look at them -- The news agency said the

18   court ought to take a look at them before they gave them over,

19   and Judge Platt said -- I'm not usually make a practice -- I

20   don't usually make a practice of quoting Judge Platt -- but in

21   any event, Judge Platt said in that case that that's not the

22   way it works and if -- you know, if I'm not inclined to give

23   them, then we turn it over, but anyway --

24           THE COURT:  Well, you know, some of your language is

25   straightforward and candid, seems to not directly address the

CBJPSOK2

1    standard here.  You said that you should have this because the

2    transcript of the documentary, the transcript of the

3    documentary contains statements directly probative of this

4    issue by Ata Abu Rumaileh and Zakaria Zubaidi, i.e. that Fatah

5    and Al-Aqsa are, in fact, one and the same, and that all of

6    their activities are directed by Yasser Arafat.

7            Now, that, obviously, you're quoting directly the

8    language that we just went through about they make those direct

9    statements.  But then you say, "based on these probative

10   statements, the chances that the outtakes contain additional

11   support for plaintiff's theory of liability are extremely

12   high."  That's not the strongest argument to make on this kind

13   of an issue.

14           MR. SCHOEN:  But when you don't --

15           THE COURT:  It's not a question of what the chances

16   are.  It's not a question of whether or not you can get

17   additional information.  Additional means you already have it.

18   All right?  So that doesn't bode well for an argument that

19   somehow it's not reasonably obtainable from a different source.

20   You just say you already had it.  You're looking for additional

21   information.  That's consistent with the direct admissions that

22   you say these individuals are making.

23           And, you know, the words like "chances are" are not

24   any argument that, in fact, that you know the out -- or you

25   have something other than this logic, you have some other

CBJPSOK2

1    reason to believe that there is more material -- that the

2    material -- that the information inside the outtakes will give

3    you something that you don't already have.  That's really --

4    that's my inquiry.

5            I don't see where you are -- you believe the outtakes

6    are going to give you something different than you already

7    have.

8            MR. SCHOEN:  I'll give you an example.

9            THE COURT:  At best, it sounds cumulative.  If, you

10   know -- When you say, well, they directly said it; so there

11   must be some additional stuff and the chances are there's

12   something else said here that's consistent with that, that's

13   the argument that I hear.

14           MR. SCHOEN:  It's possible, your Honor.  But let me

15   give you an example.  It's possible that in the outtakes,

16   speaking freely, they give evidence that supports that Al-Aqsa

17   and Fatah are the same.  Beyond that, they talk about

18   logistics, they talk about how the setup works and so on, and

19   that's the kind of thing in my view, respectfully, that this

20   Chevron case is about.  In Chevron it was about -- it was

21   against Chevron for tearing up the rainforests in Ecuador and

22   that sort of thing, and they knew that the documentary was

23   about that --

24           THE COURT:  Right.

25           MR. SCHOEN:  -- and they sought additional information

CBJPSOK2

1    related to that.  And the Court said, well, there's ample

2    reason to believe that's what the document was about this and

3    who it was commissioned by, that relevant --

4              THE COURT:  In Chevron, they didn't have a Chevron

5    official on TV already admitting it.  They were denying it.

6              MR. SCHOEN:  Well, Judge --

7              THE COURT:  This witness you have on the documentary,

8    on the portion that you already have, readily says exactly what

9    you want him to say.  What makes you think he's going to say

10   something else that's more powerful than the direct statement

11   that he takes orders from Arafat, and they're all one in the

12   same?

13             MR. SCHOEN:  Judge, it's a terrific point on that

14   point, if that were the only thing that we know is relevant to

15   this case from that documentary.  But, again, they may discuss

16   how the two organizations operate together.  They might discuss

17   specific attacks, Al-Aqsa, Fatah engaged in, which from other

18   sources then we would know this is also attributed to Fatah,

19   now we know it's Al-Aqsa.  Again, these are non-confidential

20   materials we're talking about.

21             It's a question of having a smoking gun, if you want

22   to call it.  Something that puts us in the room with this stuff

23   that tells us reason to believe here that these outtakes might

24   have something relevant to the relationship between Al-Aqsa and

25   Fatah, with the relationship of both of those to the PLO and PA

CBJPSOK2

1    with taking orders from Arafat.

2         THE COURT:  Even in that regard, given the nature of

3    these general representations about this interview and the

4    outtakes included, that -- and what you know about this case,

5    there's no reason to believe that these individuals are talking

6    about any one of the instances that are at issue here.  Right?

7         MR. SCHOEN:  Can I point you to any particular reason

8    I have, other than the fact that they know about the incidents

9    here?

10        THE COURT:  Well, I'm saying -- I'm not talking about

11   the evidence in general because, remember, we're not talking

12   about -- the only thing you're talking about is you want to

13   hear further what statements these two individuals made about

14   the relationship.  You know, they could be lying.  They could

15   be wrong.  They could be whatever, but you say they made

16   statements about this.

17        But they did not make -- You don't have any reason to

18   believe, and they represent -- if I had it correct, it was just

19   the opposite, that they made absolutely no statement on

20   these -- in the documentary and in the outtakes about the

21   incidents that are the subject of this lawsuit.

22        MR. SCHOEN:  Well, Judge, I don't think we have that

23   representation at all from BBC.

24        THE COURT:  Maybe I didn't --

25        MR. SCHOEN:  If I'm wrong, then I'm sure Mr. Korzenik

CBJPSOK2

1    will correct me.  I don't think we have a representation from

2    BBC that there's no discussion on either the documentary or the

3    outtakes about incidents in this case or not about incidents in

4    this case.

5              THE COURT:  I thought there was such --

6              MR. KORZENIK:  Well, we haven't made any statements

7    about the outtakes themselves because we wouldn't do that.

8              THE COURT:  I thought that there was some -- and maybe

9    I'll find it as we talk, but -- I read a lot of papers; so I

10   could be wrong.  My recollection is that they -- I thought they

11   made a specific statement that the interviews and the

12   documentary were not about the incidents that are at issue here

13   in this case.  That's what I --

14             MR. KORZENIK:  Not about that.

15             THE COURT:  I thought they made that representation.

16             MR. KORZENIK:  Right.

17             MR. SCHOEN:  Judge?

18             THE COURT:  That's what I'm saying.  I assume they

19   didn't limit that to say just the documentary that you saw

20   itself and try to mislead us into thinking the outtakes had

21   something to do with it.

22             MR. SCHOEN:  No, because --

23             THE COURT:  What I read from that is that you -- what

24   you want to show is the -- what their statements you believe

25   and you had reason to believe what their statements in the

CBJPSOK2

1   documentary indicate is that there is a general connection

2   between the organizations and the defendants, and that it may

3   even indicate a specific relationship between those

4   organizations and the defendants with regard to certain

5   activities.

6           But the activities that are at issue in this case,

7   there's no reason to believe that they discussed the specific

8   incidents that are at issue that caused injury and death in

9   this case.  And what I read from the representations, that

10  that's not what the discussion was about.

11          MR. SCHOEN:  Judge, let me --

12          MR. KORZENIK:  I'll just say one thing.  They all

13  precede the event except for one.

14          THE COURT:  Right.

15          MR. KORZENIK:  So they all happened before the

16  interviews occurred.

17          THE COURT:  Well, I'm sorry, what all happened before

18  the --

19          MR. KORZENIK:  I'm sorry, there the -- the report

20  is -- Some of them are on either side of the effect.

21          MR. SCHOEN:  That's what we're talking about.

22          MR. KORZENIK:  They are not about -- We made a

23  statement about -- I don't have it in front of me.

24          THE COURT:  Yeah, it struck me.  I remember that

25  statement.

CBJPSOK2

1          MR. SCHOEN:  You're a hundred percent right.

2          THE COURT:  He's not here on the tape confessing that

3     he was involved in these incidents and he was acting on behalf

4     of the PLO or the Palestinian Authority when he took acts that

5     caused injury to these plaintiffs or deaths.

6          MR. SCHOEN:  That's right, which made me come to the

7     conclusion that, with all due respect to Mr. Korzenik, didn't

8     understand our purpose, frankly, by making that representation.

9     But I understood the point he wanted to make.

10          But, frankly, Judge, if we're basing this on the

11     representations, which I believe to be a hundred percent true

12     representation that this document -- they wouldn't be likely to

13     find these kinds of things because the documentary wasn't

14     really about that.  Well, you know what, the documentary wasn't

15     about that and look what we got?  We got them saying there is

16     no difference between Fatah and Al-Aqsa Martyrs' Brigade in a

17     documentary that wasn't anything about that.

18          So I'd like to think that the outtakes may well give

19     us -- if that's the premise, that we shouldn't find them

20     because it's not about that --

21          THE COURT:  Give me an example of what you hope to

22     find in the outtakes, as specifically as you can, that you

23     don't already have.

24          MR. SCHOEN:  I hope to find a discussion about the

25     specific attacks in which Al-Aqsa and Fatah have been engaged

CBJPSOK2

1    that these guys know about; hopefully, something to do with the

2    attacks in this case.

3           THE COURT:  Okay.  But I assume if I looked at the

4    transcript, I would find no such reference to attacks in this

5    case because that's what they're representing to me.

6           MR. SCHOEN:  Well, they haven't made any

7    representation about the outtakes.  They have not made any

8    representation about the content of the outtakes, if I

9    understand it.  Mr. Korzenik just said we couldn't have because

10   then --

11          THE COURT:  Then I misled myself because I have to

12   look back.  They haven't made any specific reference to the

13   outtakes, but the way they worded it gave me the impression

14   that it was only relevant to their argument because I should

15   know that that's not what they were talking about, these cases.

16          So I shouldn't have any concern that there is that

17   kind of relevant information in these outtakes, as there is not

18   that kind of relevant information in the documentary.  If

19   that's not what they meant to lead me to believe, then I don't

20   know the relevance of that statement, and they can explain it

21   to me.  But it seems to me that, you know, if they're splicing

22   it that fine, and I would assume not, then --

23          MR. SCHOEN:  Judge, all we've heard, frankly -- I

24   didn't mean to cut the Court off, but we heard today from

25   Mr. Korzenik, you know what, there may be things in there that

CBJPSOK2

1   are not helpful to the plaintiff or that might compromise the

2   plaintiff or might be contrary to the plaintiff's position.  So

3   we're hearing a number of things, I suppose, and I think

4   rightly, I suppose, given his position, that Mr. Korzenik is

5   not making any representation -- I'm sorry, did you want to say

6   something about what I'm saying?  Mr. Korzenik?

7          MR. KORZENIK:  I see that.  We say that our review

8   revealed that none of the alleged attacks at issue in this case

9   were the subject of or mentioned in the BBC program, and at

10  least one such alleged attack postdated the 2003 program.

11         THE COURT:  What page are you on?

12         MR. MAYTAL:  Page 61 of the appendix.

13         MR. KORZENIK:  61 of our appendix, which is the last

14  page of Itai Maytal's affidavit.

15         THE COURT:  I read all that.  Page 61?

16         MR. KORZENIK:  Page 61 of the appendix.

17         THE COURT:  It's also in the brief, too.

18         MR. MAYTAL:  Is it?

19         MR. KORZENIK:  Probably, probably.

20         THE COURT:  I think so too because I remember that

21  specific language.

22         MR. KORZENIK:  But I mean, what's interesting is -- if

23  I -- In discussion, what seemed interesting is that you got the

24  show or the program as implying what might be in the tapes.

25  It's clear that the program has no connection at all with any

CBJPSOK2

1    specific attacks.

2              And so if the logic of this speculation is that the

3    show indicates what the tapes will offer, then the show offers

4    no indication that the tapes will include such things as the

5    details of the specific attack.  In other words --

6              MR. SCHOEN:  I hear your point, but respectfully --

7              MR. KORZENIK:  Well, you can't say we hope to find

8    this.

9              THE COURT:  I don't want to interrupt Mr. Schoen.  I

10   understand.

11             MR. SCHOEN:  Respectfully, Judge, the opposite is

12   true, and that could well be why there are outtakes.  Because

13   when someone gives an interview, someone may require that, to

14   the extent they have license to require it, that to the extent

15   they discuss specific incidents or attacks in which they were

16   involved, you may not air those things.  That may be.  That may

17   be how they resulted to be outtakes in the case.

18             THE COURT:  So what would be -- What would be greater

19   evidence in the outtakes of this connection, other than what

20   you already have independently been able to garner, and what

21   the direct statements were with regard to what they said on the

22   documents?

23             MR. SCHOEN:  A description of that relationship.

24   Because let's just say they take the position -- the other side

25   takes the position that Mr. Korzenik articulated today, and

CBJPSOK2

```
1   that is, man, we were just talking.  I didn't really mean it
2   when I said Al-Aqsa and Fatah are the same.  That's just --
3   that's how we talk, but in the outtakes they were
4   giving excellent --
5           MR. KORZENIK:  Is that by veto?
6           MR. SCHOEN:  Not you.
7           MR. KORZENIK:  That was my reporter interview.
8           THE COURT:  No, you're confusing.  Don't interrupt
9   him.
10          MR. KORZENIK:  Okay.  Sorry.
11          MR. SCHOEN:  I meant I was speaking on behalf of
12  Zubaidi and the other one.  In any event, so to counter that
13  argument, if the outtakes were to show that they describe very
14  well that relationship between Fatah and Al-Aqsa, and how they
15  take orders from Arafat, that would be further support in the
16  face of that kind of argument that, the guy said, we're the
17  same; when we said we're the same, we meant we're all brothers.
18          THE COURT:  But you already have things to impeach
19  such testimony.  You have direct financial records.  You have,
20  you know, other witness testimony, if I'm correct.
21          MR. SCHOEN:  But if they intend to challenge the
22  accuracy of what these two said here and I have other
23  statements they made on the outtakes, so they weren't playing
24  any games.
25          THE COURT:  Well, I mean, as they say that may put the
```

CBJPSOK2

1    nail in the coffin, but it doesn't give you the dead body.  I

2    mean, you've already got the -- I mean, you say that I got ten

3    things that I can argue against them, and I hope that this

4    outtake gives me an 11th.  I mean, that's not a compelling

5    argument that the information is -- in there is likely to be

6    material, and it's not any indication that it's not reasonably

7    obtainable from other sources.

8          Your argument is very compelling if I don't have to

9    balance it with the -- as they argue, the significant and

10   valuable policy, public policy, behind the privilege.  And that

11   is that, look, this is -- that's a great argument to make with

12   regard to information in general that people have in their

13   possession, but it is a different argument and a different

14   burden that you have if you want to pull that from reporters

15   who are out in dangerous situations, attempting to gather

16   information to report to the public and you want to say, well,

17   whatever you got out there, I want it because I think it might

18   help me.

19         MR. SCHOEN:  If we were referring to a private

20   conversation with a reporter or the reporter's notes, I think I

21   would agree.  I don't think I agree here because this was a

22   public interview these guys volunteered for, bragging during

23   and so on, and so I think these outtakes for non-confidential

24   materials like this are -- ought to be discoverable.  And in

25   terms of --

CBJPSOK2

1          THE COURT:  But I don't know if a distinction has been

2    that the Courts ever make between outtakes and something else.

3          MR. SCHOEN:  Well, some of the cases, for example,

4    Cutler, distinguishes between a reporter's notes and outtakes.

5          THE COURT:  Well, it doesn't say that you're supposed

6    to use some different standard and somehow it applies to one

7    but it doesn't apply to the other.

8          MR. SCHOEN:  Well, they came down in favor of the

9    discovery of the outtakes and not the notes for the reasons

10   they articulate.  But in terms of the public's interest and the

11   journalist's interest, Judge, the courts have spoken loudly and

12   clearly as to Congress about an overriding public interest

13   under the ATA.  The public has a great interest in knowing what

14   these terrorists are doing, planning and talking about.  That's

15   a great public interest here.  It's been recognized over and

16   over again.

17         THE COURT:  Yeah, but your argument that you want

18   this -- Well, I won't say primarily, that's unfair.  The part

19   of your argument that you want this for impeachment purposes is

20   not particularly compelling for overriding their interest.

21         MR. SCHOEN:  I want to be prepared --

22         THE COURT:  I think I would be the first court to say

23   that you've met your burden simply because you would argue

24   that, well, if he decides to change his statement or explain

25   away the direct admission of the relationship, you want to see

CBJPSOK2

1    if there's something in there to further impeach him, if that

2    should happen.

3        MR. SCHOEN:  Well, I'm not worried about him changing

4    his statement.  I'm worried about the PA and the PLO taking the

5    position those statements were just plying around or weren't

6    accurate or something like that, and I want to have my complete

7    record.  But, Judge --

8        THE COURT:  Well, they can only take that position

9    based on some evidence.  Now, they can get up there and they

10   can say it, but I'm sure you have even stronger arguments to

11   make against any lawyer getting up there and saying, now, I

12   don't, you know --

13       MR. SCHOEN:  Judge, it's not hard to pull someone out

14   of the -- Let me move past that.  Judge, a fair compromise,

15   then, to this would be, as they said in Cutler, for the Court

16   to look at the outtakes in camera.

17       THE COURT:  Well, tell me what I would be looking for.

18   Tell me what I'm supposed to look for.

19       MR. SCHOEN:  Let me say this --

20       THE COURT:  When lawyers suggest that to me, I always

21   say, well, what am I looking for?

22       MR. SCHOEN:  Okay.  Judge, based on what I've seen

23   this morning in terms of your Honor's familiarity with the

24   case, understanding of the issues and all of that, I'm not

25   concerned.  Let me put it that way.  I have ultimate faith that

CBJPSOK2

1    your Honor would recognize something that your Honor understood

2    to be relevant to the issues in this case, but specifically --

3         THE COURT:  Wouldn't it have to be some information

4    that you don't already have?

5         MR. SCHOEN:  Not that we don't already have.  I don't

6    think so, Judge.

7         THE COURT:  Well, why -- how could you overcome the

8    second part of the test, if it's information you already have

9    available?

10        MR. SCHOEN:  Because of the form in which that

11   information is given.  That is, that Zubaidi and Rumaileh say

12   it and talking about it.  People intimately knowledgeable about

13   the details of the subject matter they're discussing is much

14   more valuable, much more important and not dupli- -- can't be

15   duplicated from some other source.  That's my position, Judge,

16   and I'm sticking with it.

17        THE COURT:  Well, you know, I have to agree -- I mean,

18   I -- I spoke and I disclosed -- When I got this, I spoke

19   briefly to Magistrate Judge Ellis and, quite frankly, I've

20   spoken to District Judge Andrew Carter, because I understood

21   that he -- you pointed out that he had some decision, and I got

22   a copy of his decision.

23        I tend to agree with the BBC, though, that there's

24   not -- the second part of that test, I don't see that

25   Magistrate Judge Ellis has directly addressed in terms of its

CBJPSOK2

1    availability elsewhere.

2              MR. SCHOEN:  I mean, certainly addressed, your Honor

3    means as opposed there wasn't any in-depth analysis.

4              THE COURT:  Where does he address it?

5              MR. SCHOEN:  I'm reading from the Lexis decision, but

6    I can pull up the other one.  Anyway, it's towards the end.  It

7    says, "Further, the material sought is not reasonably

8    obtainable from other available resources."  He makes that

9    finding.

10              And, again, we're here on a contrary to law, clearly

11    erroneous standard.  Now, we don't know what he weighed when he

12    weighed the materials, and if this were a different standard,

13    maybe we would.  But we don't have to, either, to be perfectly

14    frank and respectful of Judge Ellis.  The respect, I believe,

15    has to be accorded to him as a matter of law.

16              Judge, we've been here a long time with you.  I don't

17    know that there's anything else I need to say, but I'm happy to

18    answer any questions.  I'm afraid he's going to get up there

19    and say something smart again.

20              THE COURT:  Well, as they say, I accept that on this

21    case it's your burden and you have to overcome what starts out

22    as a presumption that, you know, this kind of material gathered

23    by journalists is, even though non-confidential, is

24    presumptively entitled to some privilege, unless you overcome

25    it.

CBJPSOK2

1          So the question really -- and I say that the thing

2     that I'm struggling with is the -- I think I have some concern

3     about whether or not the first part of the test is sufficiently

4     dealt with, given the fact that it's had to articulate what's

5     in the outtakes that's really relevant to the issue, as you

6     frame it, other than to say, well, if they admitted it in the

7     documentary, there must be something else in there that's

8     consistent with that.

9          But that doesn't -- I mean, I can overcome that, but I

10    have a much more difficult problem with making a finding as

11    Magistrate -- the basis for Magistrate Ellis' finding that it's

12    not reasonably available from other sources.

13          MR. SCHOEN:  Judge --

14          THE COURT:  You've got some -- I mean, I could -- you

15    could probably, not me, but you could probably rundown a list

16    of a dozen ways, a half dozen to a dozen ways that you intend

17    to demonstrate this connection.  I cannot imagine any stronger

18    statement in the outtakes than what you have cited to in the

19    documentary.

20          I mean, they can explain -- attempt to explain it

21    away, but, I mean, the guy is saying, I take orders from Yasser

22    Arafat and Fatah, and the organization are exactly the same,

23    and we're working at the direction of the PLO.

24          Now, they may have an explanation for that.  That may

25    be fine.  Now, there may or may not be some reputation of that

CBJPSOK2

1    explanation that they may have in the outtakes, but that's sort

2    of a little bit removed to sort of say, well, in case they come

3    up with a way to try to squirm out of it, I want to see if

4    there's something there that can make it more difficult for

5    them to do so, other than all the other evidence that I have of

6    the connection and that I intended to demonstrate even before I

7    even heard about this documentary.

8          MR. SCHOEN:  Judge, going in I would have expected,

9    for example, a lot of evidence to come directly from the

10   defendants that would support this saying in documents that

11   Al-Aqsa and Fatah are the same.  I think it ought to be an

12   obvious point.  We don't see that.  So I have to look for every

13   other source that I can to make that argument, and again -- I'm

14   just repeating myself, and I'll do that once and that will be

15   it.

16         It would be a fishing expedition if we didn't know the

17   nature of these statements already.  These statements, to me,

18   lead to the outtakes.  But I am a practical person, Judge, I

19   will say this, I'm not looking to put the Court in an undue

20   quandary.  I think that on the standard of review that we're

21   here for, these orders from Magistrate Judge Ellis ought to be

22   affirmed based on his findings.

23         However, if I were to -- without waiving any position

24   I've taken.  I believe we're fully entitled to the outtakes as

25   a matter of law.  But without waiving that position, if the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

CBJPSOK2

1    outcome of this were that we would get the documentary itself

2    and authentications, which an authentication, like Magistrate

3    Judge Ellis spoke about, and if your Honor would agree to --

4    I'm not asking you to agree.  You don't have to agree with me

5    on anything -- or to decide that your Honor would look at the

6    outtakes, that would be satisfactory to us, frankly, at this

7    point.  And --

8             THE COURT:  Well, let me just go back to something

9    that I probably spent more time than I should have on with

10   that.  You already have the documentary.

11            MR. SCHOEN:  Yeah.

12            THE COURT:  So there's no reason for me to order them

13   to give you another copy of the documentary.

14            MR. SCHOEN:  What they mean by that, of course, is

15   that plaintiff's counsel was the same counsel who was in the.

16   Saperestein case and that fellow was -- also counsel in this

17   case.  That fellow has a documentary they sold to him for I

18   think a $100.

19            THE COURT:  And now you have it.

20            MR. SCHOEN:  I don't, but I'm sure I can get it.

21            THE COURT:  So why should I put them to the burden of

22   giving you another?

23            MR. SCHOEN:  Because I'd like to know that the

24   documentary that we're given in this case comes from the BBC,

25   but I'm not wed to that.  All I need to get is the

CBJPSOK2

1    authentication.

2              THE COURT:  But isn't that an evidentiary issue

3    between you and the defendant?  Why is that an issue between

4    you and the BBC?

5              MR. SCHOEN:  Look, I can accept if -- I can accept

6    that they sold to Mr. Tolchin a documentary for $100, whatever

7    it was, and he gives that to me.  I think I can make that link

8    myself.  I need the authenticity certification.

9              THE COURT:  For what purpose?  To do what with?

10             MR. SCHOEN:  Lay a foundation for its admissibility.

11             THE COURT:  Well, that's what I'm trying -- that's

12    what I assumed where you're going.

13             MR. SCHOEN:  Yes, sir.

14             THE COURT:  I mean, you're trying to demonstrate a way

15    to admit this documentary into evidence.

16             MR. SCHOEN:  As an alternative to taking the

17    deposition, which we subpoenaed, this was a proper modification

18    that Magistrate Judge Ellis made.  I'm not going to make them

19    appear for a deposition.  I'm going to get them to give you an

20    affidavit that it is what it purports to be, that's all, and

21    that's an appropriate business record.

22             THE COURT:  I mean, I guess, at this point, it's the

23    defense that I should turn to and figure out whether or not

24    there's really going to be a genuine issue about the

25    authenticity of the documentary.

CBJPSOK2

1          MR. SCHOEN:  Judge, just I'm preserving my position.

2     I believe it's a perfectly appropriate inquiry, but it is our

3     position, we've taken the papers, that the defendant has

4     absolutely no role in this case, cannot stand as a bar --

5          THE COURT:  I understand that, but he sure can save me

6     some headaches.

7          MR. SCHOEN:  Yes, your Honor.

8          THE COURT:  If -- As they say, if the lawyers -- I

9     always try to get the lawyers to concede the obvious.

10          But, you know, I mean, are you seriously thinking

11     about challenging the authenticity of the documentary itself?

12          MR. HILL:  First of all, for the record, Brian Hill

13     for the defendants.  Your Honor, I've never seen the

14     documentary.  The plaintiffs have never produced it to me.  I

15     don't know what it is, never seen it, no idea if it's an

16     accurate copy of what was or wasn't broadcast by the BBC.

17          I'm not in a position to waive any objections I may

18     have at trial to this thing, including the obvious hearsay

19     nature of it.

20          THE COURT:  Well, that's a different question.

21          MR. HILL:  Okay.  I've never seen it.  I'm not in a

22     position to stipulate on it right now.  Your Honor, while I'm

23     here, can I make two other points and then I'll sit down?

24          MR. SCHOEN:  The answer is no.

25          THE COURT:  He might say something that's going to

CBJPSOK2

1    help you.  I can shut him up if you want.  Just because he's

2    adverse to you, doesn't mean he might not say something that

3    might advance this in your favor.  So if you want me to tell

4    him to sit down --

5          MR. SCHOEN:  I'm not engaging in speculation, your

6    Honor.  This is your courtroom.

7          THE COURT:  Go ahead.

8          MR. HILL:  I just have two brief points, your Honor.

9    You said at the outset we weren't going to talk about

10   admissibility today.  I understand that to be the case, and all

11   my objections to this material are preserved and the fact that

12   I'm not addressing it now is not going to be held in any way to

13   indicate that this thing is or isn't going to come into

14   evidence if and when I ever actually get to see it.

15         And my second point I have, I disagree with a number

16   of things that have been said both by plaintiff's counsel and

17   the BBC's counsel.  I don't think you want me to enumerate them

18   all here today, but I don't want the fact that I haven't

19   engaged on any of these issues to be read in the future as

20   silence, my silence indicating consent.  And that's all I want

21   to say.

22         MR. SCHOEN:  And, your Honor, I don't think that

23   position would be waived because we've taken the affirmative

24   position they have no business being here in this fight.

25         THE COURT:  I understand.  I just -- I understand that

CBJPSOK2

1     you're concerned about the admissibility of the tape.  On that

2     issue, the part about the documentary and the -- That part, I'm

3     going to rule on now, the part about the documentary itself,

4     and their further affidavit or representations about the

5     document, I'm going to -- I'm not going to enforce that part of

6     the subpoena.  I'm going to deny that without prejudice.

7          If it turns out that you need someone from the BBC to

8     provide a witness for authentication for trial, that's a

9     different question.  That's a whole different question.  That's

10    a trial question.  That is not a question now.  They've,

11    obviously, produced, in response to an original subpoena, the

12    tape of the program that they say was responsive to that

13    request.

14         MR. SCHOEN:  Judge, I don't understand it to have been

15    a response to a subpoena, frankly.  They fought the subpoena.

16    They sold him a videotape for $100.

17         THE COURT:  All right.  Okay.

18         MR. SCHOEN:  I believe -- Well, you've made your

19    ruling.  I think we're entitled to know from BBC what they gave

20    him.

21         THE COURT:  Why are you entitled to anything other

22    than trial evidence now?

23         MR. SCHOEN:  For the same --

24         THE COURT:  How does that happen?

25         MR. SCHOEN:  Under Rule 45 we subpoenaed their

CBJPSOK2

1  corporation for exactly this information that we're entitled

2  to, and they're in control of it.  And they're in control of

3  the documentary; therefore, they need to attest to its

4  authenticity.  They need to attest it being a business record.

5          THE COURT:  For what purpose prior to trial?

6          MR. SCHOEN:  Summary judgment.

7          THE COURT:  I don't even know whether this is a

8  contested issue.

9          MR. SCHOEN:  It's a contested issue, your Honor, I

10 represent to you.

11         THE COURT:  About whether or not this is, in fact, an

12 accurate documentary?

13         MR. SCHOEN:  Oh, I thought your Honor meant --

14         THE COURT:  No, I'm talking about what you're asking

15 what we're fighting about.

16         MR. SCHOEN:  That was the purpose of your Honor's

17 inquiry.  We just heard they will not stipulate.

18         THE COURT:  It doesn't mean they're going to win.  It

19 doesn't mean they're going to win.  You know, it doesn't mean

20 that, you know, the -- unless they -- unless we get to a point

21 where that proof is necessary, I mean, you -- I mean, I

22 don't -- quite frankly, I don't have any problem with what you

23 want.  And I ultimately don't have a problem, and I think the

24 BBC should be prepared to produce an appropriate person to do

25 so, either in person or by affidavit, and they could short

CBJPSOK2

1    circuit this if they wanted -- I assume you want it by

2    affidavit.  But I'm not even sure you're getting an affidavit

3    from the BBC, in and of itself, is going to make it admissible.

4        MR. SCHOEN:  I'll take my chances with an affidavit

5    because Mr. Korzenik said they believed they were, at some

6    point, prepared to give it to compromise.  I'm not sure who he

7    meant he was negotiating with at the time.  He said the

8    defendant, but he may have meant something else.  I don't know,

9    but he said --

10        THE COURT:  He wasn't negotiating with you?

11        MR. SCHOEN:  No, sir.  He said as compromise, he was

12    prepared to do the affidavit, but then he wants to know there

13    will be no more.  Again, it's not a negotiation with the Court,

14    but we're entitled to that, Judge, under the subpoena, with all

15    due respect.

16        THE COURT:  Well, I think that -- Well, let's put it

17    this way, I'm not -- you may be entitled to something, but I'm

18    not quite sure that I even agree with the way Judge Ellis has

19    phrased it.  If you're not entitled to a -- If you're not

20    entitled to the deposition testimony -- if he agrees that

21    you're not entitled to the deposition testimony of somebody who

22    is outside of this district, then I'm not sure that you're

23    entitled to an affidavit by somebody who's outside of this

24    district.

25        MR. SCHOEN:  We don't need the affidavit from somebody

CBJPSOK2

1    outside of the district.

2            THE COURT:  Well, that's the way he addressed it.

3    That's the way he addressed it.

4            MR. SCHOEN:  He appropriately modified the subpoena to

5    make it less burdensome to BBC, quite frankly.

6            THE COURT:  It's not a question of burden.  It's a

7    question of whether or not I have the power -- Suppose there's

8    a person in England who refuses to give the affidavit?  What am

9    I supposed to do about that?

10           MR. SCHOEN:  This documentary doesn't belong to that

11   person and entity.  The manner --

12           THE COURT:  Who does it belong to?

13           MR. SCHOEN:  It's up to this corporation, BBC, and

14   that's what Moore says, it's in their control.

15           THE COURT:  Well, then, you know, what you have to do

16   in the fist instance is give me, by letter, what it is that you

17   want someone from the BBC to say.  That's the only way I can

18   resolve this.  Now, if they want to save themselves some time,

19   effort and headache and just get somebody who's an appropriate

20   person who can say what you want them to say and they don't

21   have any problems with that, then they can do that.

22           If they refuse to do that, then I can look at it and

23   say, well, look, do I have to find some guy, you know, in the

24   outskirts of London who's the only person who can give this

25   affidavit?  And if this person says I'm not going to give it,

CBJPSOK2

1    is there anything I can do about it?

2              MR. SCHOEN:  I mean, we can extend discovery for, you

3    know, eight months while we take a Hague deposition and that

4    sort of thing, which isn't in anybody's interest.

5              THE COURT:  I agree, but I mean, my powers are not

6    unlimited.  I'm not the Wizard of Oz here.  You know, there's

7    some restrictions on what I can do to people in England if they

8    decide they want to ignore your subpoena.

9              MR. SCHOEN:  But this modification is a compromise to

10   avoid going to the extreme of a Hague deposition maybe.

11             THE COURT:  Then I would articulate in a letter to

12   them what it is that you want them to say -- you want someone

13   from the BBC to say about this tape, the documentary that you

14   already have.

15             I think with regard to your asking them for another

16   copy, I think that part of the subpoena is moot, unless you can

17   argue that what you have is not what you're looking for, you

18   know.  Now, if you want them to -- if you want to work out with

19   them that they will say that what you have, that they sold you,

20   is exactly what it is that you want them to say about it,

21   that's fine.  If they don't want to say that and they want to

22   give you another copy, then that's fine too.

23             MR. SCHOEN:  I suppose the reason that position took

24   me a little surprised is the same reason I think your Honor had

25   in mind.  We just had a exchange of letters, in which I was

CBJPSOK2

1    virtually called all kinds of names about suggesting that we

2    were entitled to a copy of the documentary itself, since

3    Magistrate Judge had found that we had one already, but I think

4    I'm hearing something a little different.

5             THE COURT:  I'm mean, I'm more of a practical person

6    than that.  I think that part is much ado about nothing.  I

7    understand your concern.  Your concern is not getting a copy of

8    the tape.  You have a copy of the tape.  Your concern is trying

9    to solve admissibility of the document based both on relevance

10   and on its foundation.

11            So, you know, that -- you know, if you need -- It is

12   clear for me to order the BBC to find the appropriate person to

13   make the appropriate representations if you tell me what

14   representations that you want specifically.

15            MR. SCHOEN:  I hope we can work it out.

16            THE COURT:  If you can work it out, I think that's

17   best because I don't think this is something you need the

18   assistance of a judge for, and I don't think it's something

19   that the world is going to come to an end for either one of you

20   if you decide to go ahead and compromise on this.

21            But the bottom line is that, you know, no, you're

22   not -- clearly, you're not entitled to -- for me to try to

23   force the reporter who did this story to give a deposition or

24   to give an affidavit.  You're not entitled to that.

25            Now, you may be entitled to some representation by

CBJPSOK2

1    someone who's knowledgeable in the BBC, who the BBC wants to

2    designate as somebody who will be appropriate for you to have

3    that representation, to make a representation that the tape

4    that you have is, in fact, the tape that was aired on the show,

5    the tape that was made and that was aired on the show.  You

6    know, I don't think that that conflicts with anyone's interest

7    here, depending on what the nature of the representations that

8    you want.

9         To the extent that you can work that out, I suggest

10   that the two of you work that out.  To the extent that you

11   can't work it out, let me see the exact language that you ask

12   them, who you wanted them to make a representation or what kind

13   of person you wanted to make a representation and what

14   representation you want them to make about the tape.

15        MR. SCHOEN:  If we have to do it by letter -- maybe we

16   won't have to, but if we have to, then I would provide the

17   Court with a copy of the letter.

18        THE COURT:  Then I can clearly look at this and I will

19   turn to them and say, well, what's the big deal?  You know,

20   because they're not going to convince me that simply because

21   they got employees all over the world that they get to pick

22   somebody who's outside of this jurisdiction and say he's

23   untouchable.  That's not going to be the nature of their

24   argument, you know.

25        They -- and unless they want to -- The more

CBJPSOK2

1    resistant -- Let's put it this way.  The more resistant they

2    are to doing something reasonable in that regard, the more

3    likely it is that they're going to be sitting in the witness

4    room during this trial with some representative ready to

5    testify.  I mean, that's just the way it works.  If we need

6    somebody, we need somebody.  If they make it more difficult,

7    then, ultimately, I will resolve that.  I'll get the president

8    in here.  I don't care whoever is here, the local, regional

9    New York person and do what needs to be done.  So I think that

10   that part, they can -- depending on how we resolve the other

11   part, I think that that part is going to dissolve away pretty

12   quickly.

13          You know, the only other thing -- you know, quite

14   frankly, I think you still have a heavier task to convince me

15   that you've got something new out of these outtakes that should

16   be made available to you that you don't otherwise have

17   available to you.  And, you know, I'm prepared -- I think I'm

18   prepared to take, depending on how voluminous the transcript is

19   of this --

20          MR. SCHOEN:  Documentary.

21          THE COURT:  -- documentary and the outtakes, I'm

22   prepared to take a look at, you know, the relevant portions, or

23   look at the outtakes before I make a final determination.  But

24   it seems to me that, unless I see something in there that is

25   clearly new information that you don't already have and is

CBJPSOK2

1    information that's not already -- Well, that's all I have to

2    say.  If it's not new information you don't already have, I

3    don't see that there's a compelling interest to give you the

4    same information in another form or at another time that you

5    already have evidence of.

6           And clearly, in this case -- and each case is on its

7    unique facts.  Clearly, in this case, do you not only have the

8    other evidence, it seems to me, from other sources, you have

9    the more direct statements from the witness, whom you want more

10   statements to back up the direct statement.  It's hard for me

11   to imagine that there's anything stronger in any of these

12   outtakes than a statement that you cited and that were

13   published in the documentary.

14          And without that, I think it's going to be difficult

15   for me to be convinced that you should be able to fish through

16   their outtakes, given the competing interest, simply so that

17   you can attempt to find something that might be another way or

18   an additional point to make to support the point that you

19   independently already have evidence to establish that you

20   believe you could establish and that you have more already have

21   direct testimony or direct statements in the documentary itself

22   that go right to the heart of what it is you're attempting to

23   prove by other means, an admission by the individuals of the

24   nature of the relationship that you are trying to prove.

25          So let me just turn back.  Is there some way that I

CBJPSOK2

1    can very quickly review these materials?

2          MR. KORZENIK:  Meaning the documentary itself?

3          THE COURT:  I mean, I don't know what form -- Yeah.  I

4    don't know what form -- Well, I don't even know what form -- Do

5    you have transcripts that I can look at?

6          MR. KORZENIK:  Oh, is your Honor talking about in

7    camera review?

8          THE COURT:  Yeah, I'm talking about in camera review.

9          MR. KORZENIK:  Here's -- I would ask that your Honor

10   not do that because two things.  One is that if -- I don't

11   think that they should be allowed to get in camera review if

12   they can't make the showing at the outset.

13         In other words, the question is not whether we can see

14   if there might be something there, to see if it would allow

15   them to meet the burden because that's upside down.  And so I

16   would ask very strongly that your Honor not command in camera

17   review because it looks like a halfway step, but in fact, what

18   it's really doing is it's saying we're going to take this stuff

19   based on their saying it could do something and then I'll see,

20   the Court will see, whether there's something that might meet

21   the burden of relevance or unavailability.

22         So I think that that would be a mistake to do that,

23   and we would strongly resist that.  As to -- I mean, keep in

24   mind if they're saying that this stuff is cumulative, well,

25   there's a line of cases that makes it very clear that when

CBJPSOK2

1    things are cumulative, they can't break the privilege.

2             And also, if what they're saying is they need it for

3    completeness, well, there's a line of cases that's very clear

4    that completeness doesn't break any privilege, including the

5    reporter's privilege, because the reality is it would destroy

6    any privilege.

7             THE COURT:  Well, the completeness argument we didn't

8    discuss, but I put that aside because, quite frankly, their

9    argument is that somehow it would make it inadmissible if the

10   defendant decided to object to it.  But I don't accept that

11   argument because, quite frankly, given the defendant's

12   position, the rule doesn't say they get to keep it out.

13            The rule says they get to offer the complete document,

14   and they have made no attempt to obtain a complete document.

15   So it's not likely that I'm going to entertain any objection

16   that somehow if you decide to offer these outtakes, that

17   they're not going to be admissible on the sole basis that they

18   don't -- they don't have -- that you didn't present the entire

19   copy of the documentary and the outtakes.  They want the

20   outtakes.  Let them fight for it.  That's their business.

21            MR. HILL:  Your Honor, may I --

22            MR. KORZENIK:  I want to emphasize one point on this,

23   and that is that the only case that's been cited by anybody

24   about in camera review is an in camera review as to a party

25   litigant.  And that may happen more often when people raise

CBJPSOK2

1    different kinds of business privileges and so on.  And in the

2    Forstmann case, which was the only case that they cite on this

3    point, it was a party that plaintiff bank's documents that were

4    subjected to in camera review.

5          So we would strongly resist the in camera review

6    because once that's done, then the privilege is broken.  And

7    the question is, have they met their burden to warrant such an

8    in camera review?  In other words, it shouldn't be that the

9    Court --

10          THE COURT:  Well, the privilege isn't broken by the in

11    camera review.

12          MR. KORZENIK:  Well, it's partly broken by that, for

13    sure.

14          THE COURT:  What breaks the privilege is a public

15    disclosure, not a disclosure to the Court.

16          MR. KORZENIK:  The problem is, once the Courts are

17    looking through the reporter's files in order to ascertain if

18    there's something that would be useful, then that's exactly

19    what I think the privilege is intended to avoid, that the press

20    shouldn't be exposed to that type of revelation of their

21    materials.

22          MR. SCHOEN:  Judge, the Second Circuit feels

23    differently.

24          MR. KORZENIK:  Or to have them submit materials to the

25    Court for review to make sure that it doesn't include something

CBJPSOK2

1    that might be helpful.

2             Now, the reference to Chevron and to Cutler, these are

3    not things that were briefed.  I'll only say this, that

4    certainly as to Chevron, you have an unusual situation there,

5    where -- and now, every plaintiff who's seeking stuff from the

6    press is invoking Chevron every five minutes.

7             There's an allegation that the -- that the documentary

8    that was made there was made in collusion with one of the

9    parties, and that the lawyer for one of the parties in the

10   Chevron main lawsuit had been engineering the documentary.  And

11   so they, therefore, wanted his and other parties' statements.

12   They were party statements that were in collusion with the

13   documentary filmmaker.

14            Everybody and his uncle is now pointing to Chevron in

15   the hope that they can show collusion.  There's nothing of the

16   kind here.  We're not colluding with any of these people in

17   order to create our documentary.  They didn't control our

18   field.  We have no source agreements with them.  We have no

19   deal with the people we interviewed, and that's what Chevron is

20   about.

21            THE COURT:  Well, why don't -- this is what I'm going

22   to do, then.  I'm going to give you an opportunity, Mr. Schoen,

23   just give me a quick letter telling me why you think that in

24   camera review is the appropriate thing at this point.

25            Then you respond to that letter, and tell me why you

CBJPSOK2

1    think that it's inappropriate.  I'll make a decision based on

2    those letters that you give me as quickly as you can.  You give

3    me a letter by next week, and I know Thanksgiving is coming up;

4    so if you can give me a letter by the middle or the end of next

5    week, and then you can respond by the end of the week after.

6            MR. SCHOEN:  He's got all the journalists to help him

7    with letter writing.  I don't have that.

8            MR. KORZENIK:  Okay.

9            THE COURT:  You're more efficient than that.

10           MR. HILL:  Your Honor, may I be heard briefly?

11           THE COURT:  Yes.

12           MR. HILL:  When I stood up last time I made the point,

13    I believe the Court agreed with me, that we weren't going to

14    talk about the admissibility of these materials today.  In the

15    course of the exchange the you just had, an argument was made,

16    sort of on my behalf, that if this documentary was offered into

17    evidence, that the defendants might object under the rule of

18    completeness, that we don't have the complete interview.

19           As I mentioned before, I still have not seen this

20    documentary.  In fairness, your Honor, I don't know if this is

21    an instance where there's a question and a different answer is

22    cut or a different person's voice.  I don't have any idea what

23    this is.

24           And so I would ask the Court not, at this point, to

25    make any rulings about the admissibility of this, including

CBJPSOK2

1    under the rule of completeness because I believe if, in fact,

2    this documentary is offered at trial, if, in fact, the obvious

3    hearsay nature of this is someway overcome, I may well be

4    saying your Honor can't offer this because I don't have the

5    context for this entire interview, and I don't know whether

6    it's spliced or misleading.

7            THE COURT:  That's true, you may make that argument,

8    but you know what my inquiry is going to be.  My inquiry is

9    going to be --

10           MR. HILL:  Yes, your Honor.

11           THE COURT:  -- well, that's fine and dandy, but you

12   knew that this was going to be an issue.  You did nothing.

13   Sure, I may grant your request to allow you to put in the

14   complete document, but if you tell me, oh, I don't have it,

15   then that's not necessarily their fault.

16           MR. HILL:  Right.  So here --

17           THE COURT:  So I'm just saying to you, you know, you

18   guys can go strategically --

19           MR. HILL:  Your Honor, this is why I raised it because

20   the posture that we're in now is the plaintiffs are seeking to

21   compel these outtakes, and I have not sought to compel these

22   outtakes.

23           THE COURT:  I know.

24           MR. HILL:  In candor, I think the BBC has the better

25   of the argument.  Your Honor will ultimately make that ruling

CBJPSOK2

1    or not.  What I don't want is to have my clients prejudiced

2    because we haven't pursued a bad argument before your Honor to

3    try and justify --

4              THE COURT:  No, I don't think it's appropriate for you

5    to make any argument right now.  I'm giving you the benefit of

6    my thinking that, look, you know -- First of all, I can't

7    imagine -- They got a problem with admissibility, independent

8    of that argument, but I don't think that argument is

9    particularly compelling since the rule does not say it's

10   inadmissible because it's incomplete.

11             The rule says that if they admit part of it, that you

12   have the right to admit something that you say makes it

13   complete.  So if you have an argument at the time that you have

14   something that you said makes it complete, I'm very willing to

15   hear you and let you put it in, if you think it's incomplete.

16   But if you're just sitting there saying, well, Judge, they only

17   got part of it; so that makes it inadmissible, that's not the

18   rule.

19             MR. HILL:  And the only point I'm making is this is an

20   argument we'll have some day, if we get to trial on this.

21   Because I think it would be obviously prejudicial to me if the

22   claim of privilege over the balance of the interview is

23   sustained by the Court, and then a potentially misleading

24   excerpt from the interview is admitted by the Court later.

25             I know you don't have to rule on this today.  I just

CBJPSOK2

1    want the record to be clear that you're not ruling that I now

2    need to seek these outtakes myself --

3            THE COURT:  No, but I'm sure --

4            MR. HILL:  -- or run the risk that you'll admit --

5            THE COURT:  -- I'll have pointed questions for you at

6    the time you make that objection, if you make that objection.

7    And depending on how you answer those questions at the time

8    will have something to do with whether or not I think you're in

9    a position to argue that they've unfairly offered only a

10   misleading portion out of context of a tape.

11           Quite frankly, I'm not even sure what your argument

12   would be if you don't know what's on the outtake, if it's

13   somehow misleading and incomplete, but that's not for me to

14   rule at this time.

15           MR. HILL:  And the only reason I made it is we're 32

16   days from the close of discovery here, and so if I need to join

17   in this prophylactically so I have the ability to argue that

18   the incomplete portion can't be offered later, I don't want the

19   Court to put me in a box in that way.

20           THE COURT:  No, you're not placed in a box.  I'm

21   giving you the benefit of my thinking so you can deal with that

22   if you have to deal with it, if it becomes an issue.  My first

23   suggestion would be if they intend to offer even the tape as

24   they have it, if you want it, you should ask for it, and they

25   should make it available.

CBJPSOK2

1          MR. HILL:  Of course.  I have, your Honor, and they

2      would have an obligation to give it to me.  You won't be

3      surprised that we're 17 months into discovery, they've had it

4      the entire 17-month discovery period.  Rule 26(a)(1) required

5      them to give it to me when Judge Ellis entered the scheduling

6      order last June, and they still haven't given it to me, which

7      is another reason why --

8          MR. SCHOEN:  Judge, a bunch of nonsense.  A bunch of

9      nonsense.  And that's why he's here today.  Wait until you see

10     the papers that have been filed and what's been given and what

11     hasn't been given.

12         THE COURT:  I don't need a debate about it.

13         MR. SCHOEN:  We don't need to be cheap shot either.

14         THE COURT:  Look, gentlemen, I don't need to debate

15     about that.  I'm a very practical guy.  There's a lot of cute

16     arguments, but the reality is that you got the tape.  If you

17     intend to use it as evidence, you better make sure, if he's

18     asked for it, that he gets it.  Okay?

19         And you know what the issues are, that -- you know,

20     I'm not responding to you.  I'm responding to them, their

21     argument that somehow I should be persuaded to force them to

22     give the outtakes because you might make the argument that

23     somehow their tape is inadmissible and it's not complete.

24         Well, make that argument out here, but right now, it's

25     not a very persuasive argument to me because I hear of no

CBJPSOK2

1    effort that they're making to get the other portions of the

2    tape that they want played.  And if they say to me it's

3    incomplete, then I will turn to them and say, well, you can

4    play the complete part.  And then they will turn to me and say,

5    I don't have it.  Then I'll say to them, well, what makes you

6    think it's misleading and incomplete?  And they'll say, well,

7    we just assumed that.  And I'll say, well, that's not a good

8    basis for an objection.

9            If your other objection is valid, nevertheless, you

10   have some case law that tells me that's a basis for an

11   objection, and that's not what the rule says.  The rule says

12   that if they offer a portion, then you can offer the other

13   portion.

14           MR. SCHOEN:  Let me say this, Judge.  They knew

15   perfectly well that they were trying to get an authenticated

16   copy here, and that's what we would turn over under Rule 26.

17           Let me be clear.  Mr. Hill is being a little modest

18   when he said we didn't support the plaintiff's position in this

19   because we thought they had the better part of it.  They

20   submitted a letter opposing to the motion to compel.  So he is

21   affirmatively is on record already when he makes that argument.

22   You'll see his November 17th, 2011, letter opposing the

23   production of the documentary.

24           THE COURT:  That's all very interesting, gentlemen,

25   but totally irrelevant to the decision I'm getting ready to

CBJPSOK2

1   make.

2           MR. HILL:  Well, your Honor, it may be relevant in

3   this one respect, and that's why I rose because your Honor

4   suggested you may look at this material in camera.  I don't

5   know if you'll end up doing that or not, but if you do, I think

6   in fairness to the defendants, if the material you review is

7   inconsistent or reveals that it's been edited in some

8   misleading fashion by the BBC -- and, again, I don't know

9   whether it has for not -- you know, your Honor is going to know

10  that and none of us will.  And so that's why -- I don't know

11  whether that means you should review it or not, but I just put

12  that out there.

13          THE COURT:  I'm not sure what your application is.

14          MR. HILL:  Well, I'm not sure what it is either,

15  frankly, your Honor.

16          THE COURT:  All right then.

17          MR. HILL:  I just rise to point this out because if

18  you're going to know what's on these tapes, and I'm not going

19  to know what's on these tapes because you're going to sustain

20  the claim of privilege --

21          THE COURT:  That's the definition of in camera.

22          MR. HILL:  -- then it's potentially problematic for

23  you when you're ruling later on objections about completeness

24  when you know something that the parties don't.  And I don't

25  know whether counsel is in favor of you looking at them or not.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

CBJPSOK2

 1   And I don't know whether that counsel is in favor of you

 2   ordering it to be disclosed if you should.

 3        THE COURT:  That's what I'm say, is there something

 4   you want me to do?

 5        MR. HILL:  Well, your Honor, I want you to consider

 6   the potential prejudice to the defendants as you look at this

 7   material in making your decision about whether or not it should

 8   be turned over because --

 9        THE COURT:  And do what?  Are you telling me you don't

10   want me to turn it over?

11        MR. HILL:  Well, your Honor, I don't -- you're going

12   to rule on whether the BBC has met its privilege or not -- has

13   supported whether it's privileged or not.  My armchair view of

14   that is irrelevant.  But what is relevant to me and my clients

15   is that we not be prejudiced.

16        If, in fact, there is material in the outtakes that

17   would impeach or undercut or otherwise be inconsistent or put

18   into context the material that BBC chose to edit and put in the

19   broadcast, and if the edited broadcast will be admitted into

20   evidence, which is something we don't know because we're not at

21   trial, I would ask the Court to consider whether, in fairness,

22   the balance of that material needs to be produced to the

23   defendants so they may defend themselves at trial.

24        It would be patently unfair for the defendants, when

25   the plaintiffs have sought this for your Honor to sustain a

CBJPSOK2

1    privilege, and then for your Honor to allow a misleading

2    portion of the materials in, particularly if your Honor knows

3    that it's misleading.  That's the only point.

4         THE COURT:  I understand the issue in the abstract.  I

5    think it's highly unlikely that I will find myself in a

6    position to discover such, or to make that kind of

7    determination on your behalf.

8         MR. KORZENIK:  Just one quick case that addresses this

9    issue, and it may be some of some interest that we cite in

10   footnote 8, on Page 7, it's U.S. versus Lefevre, 7th Circuit

11   case.  And there they say Rule 106, which I assume relates to

12   this completeness issue, is not intended to override every

13   privilege and other exclusionary rule of evidence in the legal

14   armamentarium, they say.

15        So there must be cases where if an excerpt is

16   misleading, the only cure is to exclude it rather than to put

17   in other excerpts.  So there is -- that's -- some of the

18   incompleteness line of cases are very reluctant to sacrifice a

19   privilege because of the completeness demand because it would

20   swallow all privileges.

21        THE COURT:  Well, you know, the reality is that I

22   think that my -- if I decide to do an in camera review, it's

23   clear to me that what I would be looking for is relevant --

24   other relevant statements with regard to the substance of the

25   issue that we're discussing.

CBJPSOK2

1          Whether it's relevant statements that are consistent

2     with or inconsistent with the statements during the

3     documentary, would be -- would not be the issue.  If it turns

4     out that there are relevant statements -- quite frankly, if it

5     turns out that there are relevant statements that are

6     inconsistent with it, it's probably more likely that that would

7     be a reason to disclose it to both sides than a reason not to

8     disclose it.

9          But, obviously, you know, if he made some, as I said,

10    unknown or un -- already undisclosed statement with regard to

11    the subject matter that we're discussing, if that is something

12    that is clearly unknown to the parties and is revealed by in

13    camera review, then it's going to, obviously, play a factor in

14    whether or not I think this should be disclosed to the

15    plaintiff.

16         Because, at this point, that's the only application

17    that I have, that they be ordered to respond to the subpoena.

18    If you have some other application that you want to make to me

19    by letter application, fine.  I'll entertain it, but as I

20    understand it, you've taken no position with regard to these

21    issues except to the extent that you've opined that you believe

22    that the plaintiff does not have a basis to compel this

23    disclosure.

24         Now, if you think that you want to take a different

25    position, then you should do so in writing by letter and let

CBJPSOK2

1    them respond to it, but --

2              MR. SCHOEN:  Judge, before we leave, I just want to

3    say, it's not me talking, it's the Second Circuit in Cutler

4    that quotes an earlier decision in in re: Burke, which is found

5    at --

6              MR. KORZENIK:  I have to say that I'm not familiar

7    with that case.  It's not been briefed, and I'd like an

8    opportunity to address it.

9              MR. SCHOEN:  Cutler is probably the best known case in

10   this area by the second circuit.

11             THE COURT:  What point do you want to make?

12             MR. SCHOEN:  What they say, I mean, this is an expert

13   in the field who teaches in the field.

14             THE COURT:  If it was that relevant, it would have

15   been in this volume of documents that I had to read, in the

16   briefs.

17             MR. SCHOEN:  I wish it had a role in the document.

18   United States versus Burke is 700 F.2d 70, Second Circuit,

19   circ. denied, 464 US 816 it's 1983.  What the Cutler court

20   says, "In Burke, we encouraged an in camera review as a

21   precautionary measure before a definitive ruling to exclude

22   access to assertedly privileged materials, especially when the

23   materials are not voluminous."  And we don't know the answer to

24   that last part.

25             And in Burke, by the way, they did the review, and

CBJPSOK2

1    they found that the materials were just cumulative, and my

2    recollection is, they didn't turn them over.

3            THE COURT:  All right.  Well, you know, you can cite

4    Burke and Cutler in your letter, and I will review your letter

5    in furtherance to that application.  And then I'll let them

6    respond to it.  And then I'll make the immediate decision

7    whether I'm going to order in camera review, and if not, I will

8    go ahead and decide whether to enforce or quash the subpoena.

9            MR. SCHOEN:  So should we say by the end of the week

10   my submission?

11           MR. KORZENIK:  Of next week?

12           MR. SCHOEN:  Yes.  And then what do you want?

13           THE COURT:  A week.

14           MR. KORZENIK:  Can you give us -- If you could just

15   maybe run into the Tuesday of the next week.  I'm just not sure

16   what my own schedule is.

17           THE COURT:  Tuesday of which week?

18           MR. KORZENIK:  The following -- In other words, it

19   would be a week -- So you're going to submit something not this

20   coming Friday but the following Friday?

21           THE COURT:  Before the 30th.  On or before the 30th of

22   November.

23           MR. KORZENIK:  Right.  So if they get the two weeks,

24   I'd like a little bit more time.  Can you give us to the middle

25   of the week after so that we have a week and a half?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

CBJPSOK2

1          THE COURT:  December 12th?  That's the Wednesday of

2     them.

3          MR. KORZENIK:  December 12.  If you could make it the

4     13th because I have to be in -- Make it the 13th, if you could.

5          THE COURT:  All right.

6          MR. KORZENIK:  Because I've got a hearing on the 11th.

7          THE COURT:  All right.  13th is fine.  That's Thursday

8     the 13th.

9          MR. HILL:  Your Honor, I'm sorry to be the third

10    world.  It's not clear to me whether you want a submission from

11    me.  If so, when you would like that in the process that was

12    just outlined here?

13         THE COURT:  I don't particularly want anything from

14    you, but if you want something from me, you should do it by

15    the -- If you have a different position on any of these issues,

16    other than your non-position, or to the extent that you've

17    already articulated in your writing, then you should give me a

18    letter telling me what it is you want me to consider.

19         MR. HILL:  And should I do that after the BBC's

20    submission, your Honor?

21         THE COURT:  No, you should do that immediately.

22         MR. KORZENIK:  And, your Honor, just for the --

23         THE COURT:  Your issue has nothing do with their

24    submission.

25         MR. HILL:  Just so I'm clear, what would you like to

CBJPSOK2

1    have a submission from me regarding?

2              THE COURT:  Nothing.  If you want me to do

3    something -- You raised -- you commented on several issues.  If

4    there's some relief you want from me, or you want me to do

5    something, tell me what it is.

6              MR. HILL:  Well, may I submit three days after the

7    BBC's letter, once I've seen their positions so I know whether

8    or not we wish to take a position?

9              THE COURT:  I'm not sure that -- No, I'm not sure that

10   that's fair.  I mean, you don't get to say I'm not weighing in,

11   and then you wait until everybody says what they have to say,

12   and then you want to weigh in.  I mean, you know what the issue

13   is between them.  You've taken the position that you don't --

14   you're not asking me to do one thing or another, but you think

15   that the BBC has a more valid position.  I understand that.

16   What else you want to say to me, I'm not sure.

17             MR. HILL:  All right.  I'll think about it, your

18   Honor.

19             THE COURT:  But if you have some different

20   application, you raised some issues at the end but, you know, I

21   should be concerned about if I'm looking at the documents.

22             MR. HILL:  What I'm thinking about, and I'll do it in

23   a letter, obviously, but what I'm wondering if it would make

24   sense to have a preliminary ruling on the admissibility with

25   respect to the completeness objection.

CBJPSOK2

1          THE COURT:  No.  The answer is no.  I'm not in a

2     position at this point in time to make any ruling on that, nor

3     I think you're in a position to argue that.  I don't know what

4     foundation would ultimately need to be made with regard to its

5     admissibility or what arguments -- or legitimate arguments you

6     might have at the time.

7          It is very premature for me to resolve that issue.

8     You can sit around and start to anticipate what arguments you

9     might want to make, and lay a groundwork to make those

10    arguments, but at this point in time, I have no idea whether or

11    not this tape is going to be relevant, admissible, there's

12    going to be an appropriate foundation laid, how it's going to

13    come in, for what purpose.  So, you know, or whether or not

14    there's going to be a dispute at that time.

15         MR. SCHOEN:  Judge, to be clear.  We're here about the

16    issue of the subpoena, and the cases are clear.  I'm going to

17    cite to O'Brien versus Barrows (phonetic), 2010 U.S. District

18    Lexis 112870.

19         MR. KORZENIK:  Is that in your papers?

20         MR. SCHOEN:  I'm not sure.  It might be.

21         THE COURT:  But I know what you're going to cite to

22    me.  It says the defendants have nothing to do with this.

23         MR. SCHOEN:  Question of standing, plaintiff --

24    defendant generally without standing to contest the subpoena

25    issued to a third party, unless he has his own independent

CBJPSOK2

1  privilege claim.

2          THE COURT:  That was my best guess, you know.

3          MR. KORZENIK:  Just a quick thing on scheduling, your

4  Honor, Itai points out to me that we have this kind of floating

5  problem with this one other case that if we could make it that

6  Friday, I'd be grateful.

7          THE COURT:  That's the 14th?

8          MR. KORZENIK:  Is that the Friday?

9          THE COURT:  Yup.  So give me everything before then,

10  and then I'll deal with this rule.

11          MR. SCHOEN:  Now, we've got less time than you.

12          THE COURT:  I think it's enough time.  As a matter of

13  fact, they should probably get it in even earlier.

14          MR. SCHOEN:  What day of the week is the 30th?

15          THE COURT:  30th is the Friday.  That's why I gave you

16  until Friday, because of the holidays, and I'll give you until

17  two weeks after that.

18          MR. KORZENIK:  The 14th or 15th, whatever is the

19  Friday.

20          THE COURT:  14th.  If there's something you want me to

21  do, you should give me before the 30th.

22          MR. HILL:  Before the 30th, yes, your Honor.

23          THE COURT:  And then they can respond.

24          MR. SCHOEN:  Thank you, your Honor.

25          THE COURT:  All right.  Thanks a lot.  Have a good

CBJPSOK2

1   day.

2              MR. KORZENIK:  Thank you very much, your Honor, for

3   the time you've given us.

4              MR. SCHOEN:  Thank you.

5              THE COURT:  Thanks to the court reporter.

6              (Adjourned)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25