UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 04-20225-CIV-SEITZ/O'SULLIVAN

MOSHE SAPERSTEIN, et al.,

       Plaintiffs,

v.

THE PALESTINIAN AUTHORITY;
THE PALESTINE LIBERATION
ORGANIZATION,

       Defendants.

_____/

## AMENDED JOINT PROPOSED SCHEDULE

### Introduction

Plaintiff Moshe Saperstein ("plaintiff") and Defendants Palestinian Authority ("PA") and Palestine Liberation Organization ("PLO") hereby respectfully submit this Amended Joint Proposed Schedule pursuant to the Court's order of August 6, 2009.

This document is being filed in amended form to include language in the first footnote which was requested by the plaintiff as Defendants were filing the original document.

The parties are pleased to inform the Court that they have reached an agreement on a proposed revised discovery, pre-trial and trial schedule in this matter, which is set forth at Part III *infra*, which the parties respectfully request the Court to endorse.

The plaintiff believes that before proceeding to detail the actual proposed discovery schedule, it would be highly appropriate and very helpful to the Court to provide an orderly

984572.2

overall framework for explaining the relevance and the necessity of the discovery sought by plaintiff, in light of the specific factual and legal claims asserted in this action.[1]

The plaintiff believes that it would be extremely inefficient, if not impossible, for the Court and the parties to consider and formulate a productive and logical discovery schedule, without a clear understanding of what plaintiff is seeking to prove in this case.

This is a civil action under 18 U.S.C. § 2333(a). Therefore, the plaintiff will first present, in Part I, *infra*, his position regarding (i) the elements of a § 2333(a) claim in general and as applied to the facts of this case and (ii) the types of discovery he generally requires and is seeking in order to prove each element of his claim.

In Part II, *infra*, the defendants present their points of disagreement with plaintiff's positions as set forth in Part I.

The specifics of the parties' Joint Proposed Schedule, including their points of agreement and disagreement and their respective discovery priorities, are presented below in Parts III-V.

**I.     The Plaintiff's Statement Regarding the Elements of a § 2333 Claim – in General and As Applied to the Facts of This Case – and the Categories of Discovery Required and Sought by the Plaintiff in Order to Prove the Elements of His Claim**

**a.     The Facts of the Attack in Which Plaintiff Was Harmed**

In a nutshell, the plaintiff's Second Amended Complaint alleges that the plaintiff was injured in a terrorist attack carried out by the so-called "Al-Aksa Brigades," that the defendants

---

[1]     Nothing in this filing should be construed as waiver of plaintiff's rights to make additional allegations, assert additional legal theories and/or to seek and submit other discovery or evidence, which are not referenced herein.  Furthermore, this section was prepared by the plaintiff and furnished to the defendants, who then prepared their response, which was provided to the plaintiff's counsel less than one hour before the filing deadline. Plaintiff disagrees with many of defendants' characterizations of his position as set forth in this Part I and of his discovery requests. However because of time constraints plaintiff was unable to modify this Part I in response to what he views as defendants' mischaracterizations of his position and of his discovery requests.

984572.2

provided financial and other support for the "Al-Aksa Brigades," that the defendants advocated, supported, encouraged, incited and facilitated terrorist attacks such as that in which the plaintiff was injured and that the defendants are civilly liable to plaintiff under the Antiterrorism Act ("ATA"), 18 U.S.C. § 2333(a). *See* DE 8, *passim*.

Plaintiff intends to prove at trial that the so-called "Al-Aksa Brigades" carried out the attack in which he was injured, that the name "Al-Aksa Brigades" is nothing but a *nom de guerre* used by the Fatah faction of the PLO when it carries out terrorist attacks, and that the attack in which plaintiff was harmed was thus in fact carried out by Fatah.

Two members of Fatah's "Al-Aksa Brigades," Naim Mutzran ("Mutzran") and Nizar Dahliz ("Dahliz"), were convicted by an Israeli military court in the Gaza Strip of both membership in the "Al-Aksa Brigades" and of carrying out the attack in which the plaintiff was injured (and Ahuva Amergi murdered) and were sentenced to lengthy prison terms.

To date, the plaintiff and his counsel have neither seen nor been able to obtain copies of these convictions, although they expect to have such copies in the near future.[2] Plaintiff intends to introduce the convictions at trial pursuant to Rule 803(22) of the Federal Rules of Evidence in order to prove that the attack was carried out by the so-called "Al-Aksa Brigades."

Upon receiving and studying the convictions, the plaintiff will decide whether there is a need to depose Mutzran, Dahliz and/or the Israeli policemen who took their statements, in order

---

[2]     The military court which convicted Mutzran and Dahliz was closed following the Israeli withdrawal from Gaza in 2005 and all the court files were sent to an archive, and must be ordered from the archive via the main Israeli military court in the West Bank, located in Camp Ofer (near Jerusalem). Plaintiffs' counsel have ordered the Mutzran and Dahliz files in order to obtain copies of their convictions but the military bureaucracy has moved slowly and the files have not yet arrived at Camp Ofer from the archive. However, plaintiffs' counsel were recently informed that the files are due to arrive at Camp Ofer and will be available for copying within the coming days. Plaintiff's prior counsel obtained copies of the court decisions **sentencing** Mutzran and Dahliz, which they submitted to the Court and to the defendants earlier in these proceedings.

3

to obtain further proof that the attack was carried out by the "Al-Aksa Brigades." In that event, plaintiff will apply to the Court for issuance of a letter of request pursuant to the Hague Convention, requesting that the Israeli authorities facilitate the depositions.

Plaintiff will prove that the name "Al-Aksa Brigades" is simply an alias for Fatah on the basis, *inter alia*, of admissions by leading officials of the PA, the PLO and Fatah, saying exactly that, i.e.: that the "Al-Aksa Brigades" is another name for Fatah itself.

These admissions were recorded, *inter alia*, in various television interviews with the PA, PLO and Fatah officials involved, and in reports published by the PA on its official websites.

Unfortunately, none of the television channels which created and hold this footage are headquartered in the United States, and the plaintiff has therefore been constrained to seek to obtain admissible copies of these audiovisual recordings in several different ways: (a) by serving third-party subpoenas on those of the channels which have a U.S. presence (i.e. Al-Jazeera and BBC); (b) by serving third-party subpoenas on a U.S.-based transcription firms that have copies of and/or produced transcripts of the broadcasts; and (c) by requesting copies of the broadcasts from Israeli NGO's that specialize in monitoring the Arabic-language news media. While at least one such NGO has agreed to provide copies of the broadcasts (as well as a witness who will establish that the broadcast was recorded and kept in the ordinary course of the NGO's business), another NGO holding relevant material has not yet indicated whether it will do so voluntarily, and the plaintiff may therefore need to seek those materials via a Hague Convention request.

Though plaintiff is optimistic that he will be able to obtain most or all of these audiovisual recordings in admissible form in the ways described above, if plaintiff is unable to obtain an admissible copy of any such recording he will seek to establish the foundation therefor by deposing the PA, PLO or Fatah official appearing in the broadcast.

984572.2

In respect to the admissions that the "Al-Aksa Brigades" is an alias for Fatah, which appeared on the PA's own website, plaintiff will request that the PA produce the original web pages or the computer files which constitute the relevant web pages.

In brief, that is how plaintiff intends to prove that he was injured by Fatah. On that basis, plaintiff will also prove that the defendants are liable for his injuries under 18 U.S.C. § 2333(a).

**b.      The Elements of a Claim Under § 2333(a) of the ATA**

Section 2333(a) of the ATA creates a federal civil cause of action for a U.S. national "injured in his or her person, property, or business by reason of an act of international terrorism" and for the estate, survivors, and heirs of such a person. 18 U.S.C. § 2333(a).

The term "international terrorism" used in § 2333(a) is defined in § 2331 of the ATA as "activities" that meet four cumulative conditions: ***First***, the activities must "involve violent acts or acts dangerous to human life"; ***Second***, the activities must involve "acts ... that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State"; ***Third***, the activities must "appear to be intended: (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping"; and ***Fourth***, the activities must "occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum." § 2331(1).

Briefly, the plaintiff intends prove his § 2333 claim in the instant action as follows:

**i.      Acts Dangerous to Human Life**

As noted, to qualify as "international terrorism" a defendant's conduct must involve either violent acts or "**acts dangerous to human life**." § 2331(1)(A) (emphasis added).

984572.2

Plaintiff will demonstrate that the defendants' conduct was "dangerous to human life," because for several years prior to the attack on plaintiff they provided massive funding to Fatah (both in the name "Fatah" and under its alias "Al-Aksa Brigades") with actual knowledge that during that period Fatah was carrying out extensive terrorist attacks in Israel, the West Bank and the Gaza Strip (both in its own name and using the *nom de guerre* "Al-Aksa Brigades").

Providing funds to a group which carries out terrorist attacks is an act "dangerous to human life" under § 2331(1)(A). *See Boim v. Holy Land Foundation*, 549 F.3d 685, 690 (7th Cir. 2008) ("Giving money to Hamas, like giving a loaded gun to a child (which also is not a violent act), is an 'act dangerous to human life'" within the meaning of § 2331(1)(A)").

Plaintiff will prove defendants' provision of funding to Fatah, *inter alia*, using defendants' own financial records. Documents captured and published by Israel show that the PA was using at least two of its putative "salary" accounts (the specific details of which appear in the captured documents) to provide funds to Fatah during the relevant period, and public statements by various PLO officials have identified at least one specific PLO account through which the PLO transferred funds to Fatah. Additionally, the PA Minister of Civil Affairs, Hussein al-Sheikh, who was deposed in this matter, revealed in his testimony that the PA also provides Fatah with a regular budget.

Accordingly, the plaintiff has served defendants with requests for production seeking documents relating to the **specific** PA and PLO accounts used to channel funds to Fatah, documents relating to **any other** PA and PLO accounts used to transfers funds to Fatah, and documents relating to the regular budget provided Fatah by the PA, the existence of which was revealed by Minister al-Sheikh.

To date, the defendants have not produced these documents (even after plaintiff significantly narrowed the scope of the requests in an attempt to reach agreement with

984572.2

defendants), and the plaintiff has therefore noticed a conference with Magistrate Judge O'Sullivan for August 25 to seek leave to move to compel the production of these documents. If and when defendants produce these documents, plaintiff may also depose knowledgeable officials of the PA and PLO about their content.

Plaintiff will also prove defendants' provision of funding to Fatah on the basis of televised statements of senior PA and PLO officials admitting such support. Plaintiff is seeking to obtain admissible copies of these television broadcasts in the same varied ways (described above) that he is seeking to obtain the broadcasts containing the admissions that the "Al-Aksa Brigades" is merely an alias used by Fatah. If plaintiff is unable to obtain admissible copies of any of these broadcasts he will seek to depose the relevant PA or PLO official involved, in order to lay a foundation to admit the broadcast.

Plaintiff intends to prove that while defendants were funding Fatah they had **actual knowledge** that Fatah was carrying out terrorist attacks in numerous ways, including: (a) the PA's official television station broadcast communiqués from Fatah taking credit for terrorist attacks and threatening further attacks; (b) PA and PLO officials made statements on television acknowledging that Fatah was carrying out such attacks; (c) the PA's Ministry of Prisoner Affairs provided millions of dollars in financial support to many scores (possibly hundreds) of Fatah operatives arrested and convicted by Israel for carrying out terrorism during this period. During his deposition Minister al-Sheikh explained that the PA provides such financial support specifically on the basis of factional membership – i.e. convicted terrorists in Israeli prisons (and their families) receive support from the PA specifically due to their membership in Fatah; and (d) Fatah leaders publicly and repeatedly praised, called for and threatened terrorist attacks during this period in broadcasts televised on the major Arabic-language stations.

984572.2

Plaintiff has therefore requested that the PA produce relevant documents from its Ministry of Prisoner Affairs which will demonstrate that the PA was providing funding to Fatah operatives who committed terrorism during this period. To date, the PA has not produced these documents. If and when the PA provides these documents, plaintiff may also depose a knowledge official from the Ministry of Prisoner Affairs. Plaintiff will also request from the PA copies of the broadcasts on the PA's official television in which Fatah communiqués were reported and/or announced. Plaintiff is seeking to obtain the televised broadcasts in which PA and PLO officials acknowledged that Fatah was carrying out terrorism, using the same means employed by plaintiff in respect to the other broadcasts discussed *supra*.

### ii.       Acts That Are Criminal

A defendant's conduct constitutes "international terrorism" if it violated "the criminal laws of the United States or of any State, or … would be a criminal violation if committed within the jurisdiction of the United States or of any State." § 2331(1)(A).

Thus, to satisfy this requirement, a § 2333 plaintiff need only point to ***any*** federal or State criminal provision that was violated by the defendant's conduct, or that ***would*** have been violated had the defendant acted within the jurisdiction of the U.S. or the State concerned.[3]

The plaintiff will prove that this "criminality" requirement is met because defendants' conduct violated, *inter alia*, the provisions of 18 U.S.C. §§ 2339A, 2339B and 2339C.[4]

---

[3]       Many § 2333 actions brought to date have sought to satisfy this criminality requirement by alleging that the defendant violated one or more of the criminal provisions of the ATA itself (i.e. the criminal prohibitions set forth at 18 U.S.C. §§ 2332 - 2339). *See e.g. Boim*, 549 F.3d 685 (7th Cir. 2008); *Linde v. Arab Bank*, 384 F.Supp.2d 571 (E.D.N.Y. 2005); *Weiss v. National Westminster Bank*, 453 F.Supp.2d 609 (E.D.N.Y. 2006); *Strauss v. Credit Lyonnais*, 2006 WL 2862704 (E.D.N.Y. 2006). However, the plain language of § 2331(1)(A) makes clear that the criminality requirement can be based on a violation of ***any*** federal – or even state law – criminal provision.

984572.2

Section 2339A criminalizes the provision of "material support or resources" (defined by § 2339A(b)(1) to include "any property … including currency or monetary instruments"), when the provider knows or intends that the "material support or resources" are to be used in preparation for, or in carrying out, a violation (*inter alia*) of 18 U.S.C. §§ 2332 (homicide of or infliction of serious bodily harm on a U.S. national outside the United States), 2332b (acts of terrorism transcending national boundaries) and 2332f (bombing of places of public use).

As discussed above in respect to the "dangerousness" prong of "international terrorism" the plaintiff will prove that in the years prior to the attack on plaintiff defendants provided funding to Fatah with actual knowledge that during that period Fatah was carrying out extensive terrorist attacks in Israel, the West Bank and the Gaza Strip.

Since under § 2339A it is sufficient if the provider of the funds knows (irrespective of intent) that the funds will be used to prepare for or to carry out terrorist attacks, by proving the "dangerousness" element of his claim (i.e. that defendants' gave funds to Fatah knowing Fatah was carrying out terrorism) plaintiff will *per se* also prove that defendants violated § 2339A.[5]

However, plaintiff will not limit himself to showing defendants' mere **knowledge** of Fatah's terrorist activities; rather, plaintiff will also prove that the defendants' provided funds to Fatah with the **intent** of facilitating Fatah terrorist attacks.

Plaintiff will prove defendants' intent to advance Fatah terrorism – indeed, terrorism in general – on the basis, *inter alia*, of televised admissions made by senior PA and PLO officials. Some of these broadcasts appeared on the PA's official television station, and plaintiff has

---

[4]      Plaintiff reserves the right to demonstrate that defendants' conduct violated other federal or state criminal provisions, or would have violated such provision had defendants' acted within the United States or within the state concern.

[5]      Notably, plaintiff's reliance on defendants' violation of §2339A to satisfy the "criminality" requirement of § 2331(1)(A) is supported by the recent decision in *Boim*, 549 F.3d 685 ("Giving money to Hamas ... violates ... § 2339A(a)"). *Id*. at 690.

984572.2

requested that the PA produce those recordings (but to date the PA has failed to do so), and will soon request production of additional such broadcasts. Other such admissions were recorded and broadcast by various Arabic-language television stations, and plaintiff is currently attempting to obtain admissible copies of these broadcasts using the methods discussed above in regard to the other television broadcasts plaintiff is seeking. Here, again, if all else fails, plaintiff will lay the foundation for these broadcasts by seeking to depose the PA or PLO officials involved.

Plaintiff will also prove defendants' intention to further Fatah and other terrorism, *inter alia*, using the documents requested from the PA's Ministry of Prisoner Affairs (which the PA has not yet produced), which will demonstrate that the PA subsidizes terrorism by providing benefits for members of the PLO who are convicted of terrorism against Israeli targets (Minister al-Sheikh confirmed in his deposition that the PA only subsidizes **terrorist** prisoners (i.e. not regular criminals) and only those terrorists affiliated with the PLO).

Section 2339B criminalizes the provision of "material support or resources", to a foreign organization if the provider knew that the recipient organization has engaged or engages in terrorist activity and/or terrorism. 18 U.S.C. § 2339B. Thus, by proving that the defendants provided funds to Fatah with the knowledge that Fatah engaged in terrorism during the relevant period – which as discussed above plaintiff will show to satisfy the "dangerousness" element of his claim – will necessarily also prove a violation of § 2339B. Therefore, the discovery required by plaintiff in order to prove the "dangerousness" element of his claim, is equally necessary to proving the criminality of defendants' conduct under § 2339B.

Section 2339C provides that "[w]hoever ... directly or indirectly, unlawfully and willfully provides ... funds with the intention that such funds be used, or with the knowledge that such funds are to be used, in full or in part, in order to carry out ... any ... act intended to cause death or serious bodily injury to a civilian … when the purpose of such act, by its nature or context, is

10

to intimidate a population, or to compel a government … to do or to abstain from doing any act" has committed a crime. 18 U.S.C. § 2339C.

The elements of § 2339C are substantively similar to those of §§ 2339A and 2339B, and the discovery which plaintiff requires in order to prove that defendants violated § 2339C is the same discovery need to prove that they violated §§ 2339A and 2339B.

### iii.     Acts That Appear to Be Intended to Intimidate or Coerce a Civilian Population or Influence the Policy of a Government

A defendant's actions will constitute "international terrorism" if they "**appear to be intended**" to intimidate or coerce a civilian population or influence the policy of a government by intimidation or coercion. § 2331(1)(B).

Thus, under the plain language of § 2331(1)(B), subjective intent does not need to be shown, and a § 2333 plaintiff need only demonstrate that the defendant's actions *appear* to be intended to intimidate or coerce. This conclusion was adopted by the recent *en banc* decision in *Boim*, 549 F.3d 685. In *Boim*, the Seventh Circuit held that § 2331(1)(B) does not impose a subjective "state-of-mind requirement" and requires only an objective "**external appearance** rather than subjective intent." *Id*. at 694 (emphasis added).

Significantly for the instant case, the *Boim* court found that this "external appearance" of intent requirement will be met whenever a § 2333 defendant provides material support to an organization engaged in terrorism with knowledge of the consequences of its actions:

> A knowing donor to Hamas – that is, a donor who knew the aims and activities of the organization – would know that Hamas was gunning for Israelis…that Americans are frequent visitors to and sojourners in Israel, that many U.S. citizens live in Israel (American Citizens Abroad, an advocacy group for expatriates, reports on the basis of State Department data that in 1999 there were about 184,000 American citizens living in Israel, accounting for about 3.1 percent of the country's population, www.aca.ch/amabroad.pdf, visited Nov. 16, 2008), and that donations to Hamas, by augmenting Hamas's resources, would enable Hamas to kill or wound, or try to kill, or conspire to kill

984572.2

> more people in Israel. And **given such foreseeable consequences, such donations would "appear to be intended ... to intimidate or coerce a civilian population" or to "affect the conduct of a government by ... assassination," as required by section 2331(1)** in order to distinguish terrorist acts from other violent crimes, **though it is not a state-of-mind requirement; it is a matter of external appearance rather than subjective intent, which is internal to the intender**.

*Id*. at 693-694 (emphasis added).

In other words, *Boim* held that where a defendant knows that it is providing funds to a group such as Fatah which engages in terrorism, and knows that its provision of such support will "augment[] [Fatah]'s resources" and thereby "enable [Fatah] to kill or wound, or try to kill, or conspire to kill more people" – yet provides those funds despite that knowledge – the court can and will conclude, based on the objective appearance of the defendant's conduct, that the defendant shares the group's goals of intimidating and coercing a government or population within the meaning of § 2331(1)(B).

Plaintiff believes that the Seventh Circuit's holding in *Boim* should be adopted by this Court. If the Court adopts the *Boim* rule, § 2331(1)(B) will be satisfied here by the showing – which, as discussed above, plaintiff intends to make **in any case** in order to prove the "dangerousness" and "criminality" prongs of his claim – that defendants provided funds to Fatah with actual knowledge that Fatah was carrying out terrorist attacks, which showing will create the objective "external appearance" required by § 2331(1)(B) that defendants shared Fatah's goals.

However, because this Court and the Eleventh Circuit are not bound by *Boim*, plaintiff will not rely (exclusively) on *Boim* in proving his case. Rather (without waiving his claim that the *Boim* standard is correct), plaintiff will also prove that the defendants funded Fatah terrorism with the **subjective** intention of intimidating and/or coercing the Israeli civilian population and of influencing the policy of the Israeli government by intimidation or coercion.

The plaintiff intends to prove this intent on the basis, *inter alia*, of statements by the PA and PLO and their senior officials, in which they admitted that the wave of Palestinian terrorism – carried out by Fatah, by other Palestinian groups and by the PA's own security forces – which was launched in September 2000 and continued until the time of the attack on the plaintiff (and well beyond) was intended to intimidate the Israeli public and government to accept the defendants' political demands, and in which they conditioned a halt to the violence on the acceptance of defendants' demands.

These statements were broadcast on the PA's official television station as well as on other television stations, and on the official websites of the PA and the PLO.

Plaintiff has already requested from the defendants some of the aforementioned statements which were broadcast by PA TV and will shortly request others, as well as the original web pages (or the files constituting those web pages) appearing on defendants' websites.

In respect to the broadcasts which are not from PA television, the plaintiff is currently seeking admissible copies of those recordings in the ways outlined above. Here, too, if plaintiffs are not successful at obtaining admissible copies of some broadcasts, they will seek to depose the PA or PLO official who made the statement, in order to create a foundation for admissibility.

### iv.     Activities Primarily Outside the United States or Transcend National Boundaries

Section § 2331(1)(C) of the ATA requires that the defendant's actions "occur primarily outside the territorial jurisdiction of the United States …". Obviously, this element of plaintiff's claim cannot be disputed, and no discovery in respect thereto is necessary.

## II.    Defendants' Counter-Description of the Case and Suggested Approach to Discovery

### A.     Introduction

Initially, Defendants did not see the value in having the Plaintiff make a statement regarding his theory of the case in this document in order to give context to his approach to

984572.2

discovery. Now that Defendants have seen Plaintiff's statement, it is clear that the Court must understand the problems in Plaintiff's theory of his case, in order appropriately to limit discovery to efforts that reasonably could lead to admissible evidence.

There are several fundamental flaws in Plaintiff's concept of this case, and those flaws, if not recognized and corrected, will yield an inappropriate approach to discovery. Plaintiff alleges as follows: (1) people associated with the Al Aqsa Martyrs' Brigade carried out the attack that injured him; (2) Fatah and the Al Aqsa Martyrs' Brigade are one and the same; (3) the PA and PLO are liable for Plaintiff's injuries because they provide material support to Fatah; and (4) the PA's and PLO's support for "resistance" shows that they intended to support attacks on civilians by persons associated with Al Aqsa when they provided material support to Fatah. The flaws with Plaintiff's theory, and its resulting impact on discovery, are as follows:

- Plaintiff disregards the important difference between being in an organization and acting at its behest. Not all actions by persons associated with Al Aqsa are Al Aqsa actions. Not all actions by Fatah members are Fatah actions. Plaintiff's open-ended discovery regarding PA and PLO support for Fatah is based on the unsupportable assumption that Fatah is responsible for any acts carried out by individuals who claim allegiance to Al Aqsa or Fatah.

- Plaintiff's material support theory depends on conflating the distinction between Al Aqsa and Fatah, but the United States Department of State recognized this distinction when it designated Al Aqsa as a foreign terrorist organization (after the attack at issue in this case) and declined to so designate Fatah. Again, the lack of nexus between the attack which led to Plaintiff's injuries and Fatah precludes open-ended, burdensome discovery regarding PA and PLO support to Fatah. In any event, Plaintiff's discovery regarding payments to Fatah is unnecessary. Defendants do not contest that the PA funds the PLO or that the PLO funds its constituent political entities, including Fatah.

- In an effort to show that the PA and PLO funded Fatah knowing and intending that the funds would be used for terrorism, Plaintiff seeks to engage in extensive discovery related to video clips in which various Palestinian leaders have spoken of "resistance." Plaintiff ignores the uncontestable right of the Palestinian people to resist Israel's extended occupation of the Palestinian homeland. Because resistance is legitimate, so long as it is not targeted at civilians, efforts to extend discovery to that resistance are completely inappropriate intrusions on legitimate government functions.

14

- Plaintiff seeks discovery to establish civil liability under the ATA by showing that Defendants violated 18 U.S.C. §§ 2339A, B, and C.  Neither § 2339B nor § 2339C applies to this case, however.  Section 2339B applies only to material support of a designated Foreign Terrorist Organization.  Fatah has never been so designated and Al Aqsa was not designated at the time of the attack giving rise to this lawsuit.  Section 2339C is equally inapplicable, having not been enacted until after the events giving rise to the lawsuit.  Discovery efforts directed at either § 2339B or § 2339C are therefore inappropriate.  With regard to § 2339A, Plaintiff cannot show the requisite knowledge and intent to further terrorism either through showing funding to Fatah or by showing support for "resistance."  Therefore, Plaintiff's discovery efforts in those regards are unlikely to lead to discovery of admissible evidence.  Plaintiff must direct his discovery efforts to determining whether any PA or PLO funding of Fatah was made with the intent to further attacks on civilians.  Plaintiff has made no effort to so limit his discovery demands.

Below, Defendants offer a counter description of some of the pertinent facts of the case and address some of the inaccuracies and mistakes in Plaintiff's theory of the case, to the degree that those inaccuracies and mistakes affect an appropriate approach to discovery.  This is not the time or place to fully describe all of the flaws in Plaintiff's view of this case, and the discussion below is therefore circumscribed so as to focus on those flaws that affect the conduct of discovery in this case.

One final introductory comment:  Defendants note that Fatah and any PA/PLO support of Fatah now figures prominently in Plaintiff's theory of the case and in his discovery efforts, which is surprising given that Plaintiff did not sue Fatah, nor did he mention Fatah more than in passing in his Second Amended Complaint.

B.    **Establishing that Persons Associated with Fatah or the Al Aqsa Martyrs' Brigade Carried out the Attack, Does Not Make the Attack a "Fatah" or "Al Aqsa Martyrs' Brigade" Attack**

A necessary -- though not sufficient -- element of a "material support" theory of liability under 18 U.S.C. § 2333(a) is that the Defendant provided material support to the group that carried out the attack.  For example, in *Boim v. Holy Land Foundation*, 549 F.3d 685 (7th Cir. 2008) (en banc), a case on which Plaintiff relies, *supra* at 5, 10-12, the trial court determined that

984572.2

Hamas carried out the attack, and the issue was whether the defendants there provided material support to Hamas. *See id.* at 702. The premise of Plaintiff's case is that the Al Aqsa Martyrs' Brigade carried out the attack that injured him. Plaintiff further alleges that the Al Aqsa Martyrs' Brigades and the Fatah movement are essentially one and the same. By allegedly providing material support to Fatah, Defendants -- according to Plaintiff -- are therefore liable for the attack.

There is, however, a fundamental flaw in Plaintiff's theory of liability. Even if Plaintiff *could* establish that the attack was carried out by persons associated with the Al Aqsa Martyrs' Brigade -- or even by Fatah -- Plaintiffs still must establish that the Al Aqsa Martyrs' Brigade or Fatah are responsible for the attack. Not every tortious act by a person associated with an organization creates liability for the organization. Fatah is not liable for the acts of every Fatah member any more than the Republican National Party is liable for every act carried out by a Republican. *See also Boim*, 549 F.3d at 700 ("The defendants in the present case could not be held liable for acts of violence by members of Hamas that were not authorized by Hamas.").

Moreover, even assuming that Plaintiff could establish that the attack was carried out by the Al Aqsa Martyrs' Brigades, as opposed to being carried out by persons claiming Al Aqsa affiliation but acting on their own, Plaintiff cannot establish that the attack is therefore one carried out by Fatah. Plaintiff's efforts to equate Fatah with Al Aqsa -- though essential to his theory of liability -- is untenable, given that the United States government has drawn a clear distinction between Fatah and the Al Aqsa Martyrs' Brigades by designating the latter (Al Aqsa) and not the former as a foreign terrorist organization.

In fact, the U.S. State Department -- the agency responsible for designating foreign terrorist organizations -- expressly differentiates between Al Aqsa and Fatah:

> The al-Aqsa Martyrs Brigade consists of loose cells of Palestinian militants loyal to, *but not under the direct control of, the secular-*

16

984572.2

> *nationalist Fatah movement.* Al-Aqsa emerged at the outset of the
> 2000 Palestinian al-Aqsa intifada as a militant offshoot of the
> Fatah party, attacking Israeli military targets and settlers with the
> aim of driving Israel from the West Bank and Gaza and
> establishing a Palestinian state. Al-Aqsa has no central leadership;
> the cells operate with autonomy, although they remained
> ideologically loyal to Palestinian Authority (PA) President and
> Fatah party head Yassir Arafat until his death in November 2004.

http://www.state.gov/s/ct/rls/crt/2008/122449.htm (emphasis added).   The report goes on to note

that the Al Aqsa Martyrs' Brigades receive funding from Iran, through Hezbollah-related

entities.  *Id.*  Plaintiff's notion that there is an organized entity known as the "Al Aqsa Martyr's

Brigades" operating under the command and control of Fatah, bears no relationship to the facts.

It is important that the Court understand that the premise of a great deal of Plaintiff's

discovery is the unsupportable proposition that Al Aqsa is indistinguishable from Fatah.  Only by

improperly conflating the two does Plaintiff make relevant the support that the PA or PLO

provides to Fatah.

C. **Providing Financial Support to a Group Cannot Create Liability Under the
Anti-Terrorism Act Unless Plaintiff Can Show that Defendants' Conduct
"Involve[s] Violent Acts or Acts Dangerous to Human Life"**

But even assuming Plaintiff could establish that the attack was an "Al Aqsa" attack and

that Al Aqsa and Fatah are one and the same -- factual premises Defendants will vigorously

dispute -- Plaintiff still must show that Defendants should be subjected to civil liability under the

Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333(a), for providing funding to Fatah, the leading

Palestinian political entity.  To be subject to civil liability under the ATA, the defendant must

engage in conduct causally related to the attack -- and with the requisite knowledge and intent --

where such conduct "involve[s] violent acts or acts dangerous to human life."  18 U.S.C.

§ 2331(1)(A).  The conduct of which the PA and PLO are accused is providing funding to Fatah.

*See supra* at 5-7.

The provision of support to the leading Palestinian political entity -- the movement that stands in opposition to the more radical Hamas -- hardly qualifies as an act dangerous to human life.  It is especially untenable to impose liability on Palestinian governing bodies for providing material support to a major political organization in the Occupied Palestinian Territories.  Unlike other material support cases, where the defendants can easily choose not to fund the alleged terror organization, the instant case involves a government entity trying to keep its populace from becoming so radicalized by the Israeli occupation and illegal settlements that they fall sway to extremists.  The PA and the PLO cannot disavow all support for its people or for Fatah to ensure that no funds end up in the hands of someone radicalized and disturbed enough to carry out an attack on a civilian.  Indeed, if the PA and/or the PLO stopped providing funding to Palestinians generally or to Fatah specifically to avoid liability for material support under Plaintiff's theory, the Occupied Palestinian Territories would have been a dramatically more lawless and violent place during the Second Intifada, and Palestine today would be governed by radical forces, funded from other countries.  In short, as government entities, the PA and the PLO end up interacting with all of its citizenry and they cannot be held liable simply because some group of those citizens, even if affiliated with a constituent political entity, engages in terror.  More to the point, the PA and the PLO should not be subject to intrusive discovery into governmental operations simply to prove the obvious points that the PA disburses funds to the PLO, which in turn funds its constituent parties, where such funding cannot create liability under the ATA.

In this regard, Plaintiff has imposed substantial discovery demands, and expresses a desire to impose additional discovery, in an attempt to prove a given:  there is a money flow from the PA to the PLO and from the PLO to Fatah.  This is not surprising, and there is nothing wrong with it.  The PLO is Israel's counter-party in the Oslo accords, and it is recognized as the

legitimate representative of the dispersed Palestinian people.  It ought to be funded, and it is.

Similarly, Fatah is one of the political entities within the PLO, and as such it ought to be funded

by the PLO, and it is.  Plaintiff characterizes this funding as nefarious, but does so only by

ignoring the reality of these organizations as legitimate political entities.

Plaintiff also suggests that he has been thwarted in obtaining evidence of payments made

to prisoners and their families.  In fact, that is not the case.  Defendants have already provided

documentary evidence reflecting such payments, and the Defendants do not deny that the PA and

the PLO have a social welfare network that includes payments made to detained Palestinians and

their families.  Engaging in additional discovery of all payment records from 1994 to present that

relate to payments to Palestinian prisoners is unduly burdensome and unlikely to lead to

discovery of admissible evidence.  Yet this is what Plaintiff seeks in his Fourth Request for

Documents (Request No. 19).  Plaintiff theorizes that these payments encourage acts of terror.

This is nonsense.  The idea that someone would agree to be imprisoned for all, or nearly all, of

their life, simply to get modest payments while they are incarcerated is an idea that evaporates on

viewing.  These payments are part and parcel of a social welfare network in Palestine, not an

inducement to terror.  Because the requests for records regarding payments to prisoners are

unreasonably broad and are unlikely to lead to the discovery of admissible evidence, and because

Defendants do not contest that they provide payments to prisoners, the Court must carefully

manage and limit Plaintiff's discovery regarding prisoner payments.

     D.       **Plaintiff Cannot Establish Liability Under 18 U.S.C. §§ 2339B or 2339C As a Matter of Law, and Therefore Is Not Entitled to Any Discovery Regarding Those Claims**

Plaintiff indicates that he will conduct discovery to prove that the PA and the PLO

violated "the provisions of 18 U.S.C. §§ 2339A, 2339B and 2339C."  *See supra* at 8.  Neither

§§ 2339B nor 2339C has any applicability in this case.   Section 2339A criminalizes providing

984572.2

material support or resources "knowing or intending that they are to be used in preparation for, or in carrying out" specified criminal acts. 18 U.S.C. § 2339A(a). Section 2339B criminalizes the giving of material support to a designated Foreign Terrorist Organization ("FTO"). That section does not have the same intent elements as does § 2339A; it simply criminalizes any support to an FTO. Leaving aside other issues associated with the application of § 2339B to the PA's or PLO's alleged funding of Fatah or Al Aqsa, the statute cannot be applied in this case for the simple reason that Fatah has never been designated as an FTO and Al Aqsa was not designated as such at the time of the incident giving rise to the lawsuit.

For different reasons, but to the same effect, § 2339C also has no relevance here. That section was not even enacted until June 2002, after the instant offense. Defendants will not detail here the workings of the *ex post facto* clause of the Constitution, except to say that it would prohibit use of § 2339C as a basis for liability, and therefore should not be a justification for intrusive discovery.

### E. Plaintiff Cannot Show the Requisite Knowledge and Intent Under § 2339A by Showing that the PA/PLO "Supported" the "Resistance"

In order to be subject to civil liability under 18 U.S.C. § 2333(a) for a violation of 18 U.S.C. § 2339A, the defendant "must have known that the money would be used 'in preparation for or in carrying out the killing or attempted killing of, conspiring, to kill or inflicting bodily injury on, an American citizen abroad.'" *Boim*, 549 F.3d at 691. Plaintiff's discovery efforts (particularly the substantial discovery directed at video clips referencing "resistance") are directed at showing knowledge and intent with respect to "resistance" to the Israeli occupation and illegal settlements, not at showing knowledge or intent with regard to attacks on American civilians or even Israeli civilians. Plaintiff mistakenly equates "resistance" with terrorism, when there are many forms of resistance that do not equate to terrorism and do not give rise to liability under the ATA. Palestinians can support "resistance" without supporting "terrorism."

984572.2

Plaintiff seeks to engage in extensive discovery based on finding videotaped excerpts from interviews posted on the internet wherein various Palestinians have expressed their support for "resistance."  Plaintiff seeks to obtain the entire interview on videotape and, in the likely event that is not available, will likely seek to depose the interviewee.  Review of the pertinent clips shows that these are simply political statements, usually referencing the right of resistance. The very editing of the clips shows that they are the product of anti-Palestinian groups.  For example, in a clip of President Abbas, when he speaks of carrying out "resistance," the media group which has preserved the clip online and translated it includes a bracketed "[terror]" after each time the President uses the word "resistance."  In another clip, a member of Fatah says, in 2008 (six years after the underlying incident), that Fatah should continue armed resistance. Other clips discuss whether the constituent political parties of Palestine must recognize Israel, or whether only the government need do so.

The interview excerpts themselves are not relevant or admissible, and discovery of the more complete interview or depositions of the interviewees similarly are not likely to lead to the discovery of admissible evidence.  There is no dispute that political leaders associated with the PA and PLO spoke in support of "resistance" during the Second Intifada or, even now, endorse the right of "resistance."  Resistance, so long as it is not targeted at civilians, is not terrorism, but is instead a right recognized under international law.  *See, e.g.*, United Nations General Assembly, G.A. Res. 3103, 28 U.N. GAOR at 512, U.N. Doc. A/9102 (1973) (cited by the Court in Dkt. No. 98 at 11 n. 10.  So discovery by video clip as to all these statements supportive of resistance is not necessary, and continuation of such discovery is simply an effort to create distraction and/or default.  Such support has no bearing on whether the PA or PLO provided material support to those persons who carried out the attack on Mr. Saperstein, knowing or intending that the support would be used for attacks on civilians.

21

984572.2

Moreover, the inevitable course of Plaintiff's discovery, as he more or less admits, is that the full interviews will no longer be available and Plaintiff will claim the need to depose the individual who made the statement. Discovery of Palestinian leaders, such as President Abbas, about their statements regarding resistance, is improper, intrusive, and not designed to lead to admissible evidence. None of the clips supports terrorism, and almost all of them post-date the incident about which this case should be focused. To the degree any of the video clip discovery continues, and Defendants suggest it has already exceed its proper bounds, such discovery ought to be carefully monitored and appropriately limited by the Court.

## III. The Parties' Proposed Detailed Discovery, Pre-Trial and Trial Schedule

The parties are in agreement that the schedule in this matter should be extended, and jointly propose and request that the Court endorse the following case schedule and terms of discovery:

- Mediation on or about **October 30, 2009**

- All objections to any future discovery requests shall be served by the receiving party within ten (10) business days of receipt of the request.

- Except for good cause shown (including a showing that the requesting party could not reasonably have made the request earlier), all interrogatories, requests for documents or requests for admissions under Federal Rules of Civil Procedure 33, 34, 36 or 45, the Hague Convention or any other international process or procedure shall be served no later than **January 8, 2010**

- The Rule 35 Physical and Mental Examination(s) of Moshe Saperstein shall be completed no later than **January 22, 2010**

- Except for good cause shown (including a showing that the requesting party could not reasonably have made the request earlier), all requests for deposition under Federal Rules of Civil Procedure 30, 31 or 45, the Hague Convention or any other international process or procedure shall be served no later than **February 8, 2010**

- The deposition of Moshe Saperstein shall take place no later than **March 3, 2010**

- All discovery shall be completed no later than **March 10, 2010**

- The Plaintiff shall identify his experts (except for rebuttal experts) and provide all Rule 26 expert disclosures and reports no later than **March 10, 2010**

- The Defendants shall identify their experts and provide all Rule 26 expert disclosures and reports no later than **April 14, 2010**

- The Plaintiff shall identify his rebuttal experts (if any) and provide all Rule 26 expert disclosures and reports no later than **April 30, 2010**

- Depositions of experts shall be completed no later than **May 31, 2010**

- *Daubert* motions to be filed no later than **June 15, 2010**

- Pretrial Stipulation **July 13, 2010**

- Pretrial Conference **July 27, 2010**

- Trial **October 19, 2010**

## IV.   The Plaintiff's Discovery Priorities

Plaintiff has no particular discovery priorities, other than compelling defendants to comply immediately and in full with his outstanding discovery requests.

## V.   The Defendants' Discovery Priorities and Proposed Sequence

Defendants have the following Discovery Priorities which they propose to complete in the following order:

A.   Entry of a Protective Order

B.   Responses from Plaintiff on Outstanding Discovery:

    1.   Plaintiff's complete and fully responsive answers to interrogatories

    2.   Any other documents responsive to outstanding document requests within Plaintiff's possession, custody or control that have not been produced

    3.   Production by Plaintiff of an official and accurate transcript of the Hussein Al Sheik deposition taken on April 1, 2009

C.   Physical and Mental Examination(s) of Moshe Saperstein

D.   Depositions of:

    1.   Plaintiff's expert witnesses, Drs. Strous and Friedman

    2.   Leslie Arberman (if he will testify at trial)

    3.   Ari Itzhak Saperstein (if he will testify at trial)

    4.   Tamar Saperstein (if she will testify at trial)

    5.   Dafna Saperstein (if she will testify at trial)

    6.   Jeffrey Goldberg

7. Rachael Saperstein

8. Moshe Saperstein

Dated: August 17, 2009                           Respectfully submitted,


By: /s/ Gary Woodfield
Gary A. Woodfield (Fla. Bar No. 563102)
**Edwards Angell Palmer & Dodge LLP**
gwoodfield@eapdlaw.com
One North Clematis Street
Suite 400
West Palm Beach, FL 33401
Telephone: (561) 833-7700
Facsimile: (561) 655-8719

Richard A. Hibey
rhibey@milchev.com
Mark J. Rochon
mrochon@milchev.com
Charles F. B. McAleer, Jr.
cmcaleer@milchev.com
Timothy P. O'Toole
totoole@milchev.com
Lamia R. Matta
lmatta@milchev.com
Miller & Chevalier Chartered
655 Fifteenth Street, N.W., Suite 900
Washington, DC  20005-5701
Telephone:  (202) 626-5800
Facsimile:  (202) 626-5801

**Attorneys for Defendants PA/PLO**




By: /s/ Isaac M. Jaroslawicz
Isaac M. Jaroslawicz (Fla. Bar No. 979510)
Isaac@MyLawyerIsaac.com
**JAROSLAWICZ LAW OFFICES**
1177 Kane Concourse, #222
Bay Harbor Islands, FL 33154
Telephone:  (305) 398-7739

984572.2

Facsimile:  (786) 206-3575

**Attorneys for Plaintiff Moshe Saperstein**

984572.2

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Joint Proposed Schedule was served by

Electronic Service on August 17, 2009, on all counsel or parties of record on the service list.

__/s/ Gary A. Woodfield___

984572.2