```
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK
 2

 3  ----------------------------------------X
                                            :
 4  SOKOLOW, et al,                         : 04-CV-397 (GBD)
                                            :
 5                 Plaintiffs,              : May 17, 2013
                                            :
 6           v.                             : 500 Pearl Street
                                            : New York, New York
 7  PALESTINE LIBERATION ORGANIZATION, et al, :
                                            :
 8                 Defendants.              :
    ----------------------------------------X
 9

10       TRANSCRIPT OF CIVIL CAUSE FOR DISCOVERY DISPUTES
             BEFORE THE HONORABLE RONALD L. ELLIS
11              UNITED STATES MAGISTRATE JUDGE

12  APPEARANCES:

13  For the Plaintiffs:        ROBERT TOLCHIN, ESQ.
                               RACHEL WEISER, ESQ.
14                             The Berkman Law Office, LLC
                               111 Livingston Street
15                             Brooklyn, New York  11201

16                             KENT YALOWITZ, ESQ.
                               PHILIP HORTON, ESQ.
17                             TAL MACHNES, ESQ.
                               Arnold & Porter
18

19  For the Defendant:         BRIAN A. HILL, ESQ.
                               Miller & Chevalier, Chtd.
20                             655 15th Street NW, #900
                               Washington, D.C.  20005
21

22
    Court Transcriber:         SHARI RIEMER
23                             TypeWrite Word Processing Service
                               211 N. Milton Road
24                             Saratoga Springs, NY 12866

25


    Proceedings recorded by electronic sound recording,
    transcript produced by transcription service
```

2

1   [Telephone recording fades in and out.]

2          THE COURT: Good morning.  This is Judge Ellis.  Can

3   I have your appearances beginning with the plaintiffs?

4          MR. TOLCHIN:  Good morning, Your Honor.  This is

5   Robert Tolchin from the Berkman Law Office for the plaintiff.

6   With me on the phone is Kent Yalowitz and Phil --

7          MR. YALOWITZ:  Good morning, Your Honor.  Kent

8   Yalowitz from Arnold & Porter.  My colleagues Phil Horton and

9   Tal Machnes are on the line.  Mr. Horton has a pro hac

10  application pending --

11         THE COURT: For me?

12         MR. YALOWITZ: Well, you just file it in the case.  I

13  don't know if it's before you or Judge Daniels but we were

14  relieved to see that the clerk's office has approved it as non

15  deficient.  So it looks like it's ready to be acted on by the

16  Court.

17         THE COURT: Okay.

18         MR. HILL: Your Honor, it's Brian Hill for the

19  defendants.

20         THE COURT: This is a conference in <u>Sokolow v.</u>

21  <u>Palestine Liberation Organization, et al.</u>, 04-CV-397.  It is

22  Friday, May 17th at approximately eleven a.m.

23         The first thing I want to do is I want to remind the

24  parties that it's not a good practice to be sending things a

25  day or two before the conference.  Your assumption is that we

3

1  have nothing else to do and we'll drop everything and look at
2  those papers so that we can be prepared for the conference.
3  It doesn't work that way.  We make every effort to look at
4  anything that comes in but as you might imagine a lot of paper
5  comes into chambers.  So if you really want something to be
6  considered you really need to get it in more advance than the
7  date for or the day of.
8        MR. HORTON: Your Honor, this is Phil Horton.  We
9  certainly understand that.  We got these papers in as quickly
10 as you can.  As you know we are -- my firm is new to the case.
11 Two of the papers we filed yesterday are responses to letters
12 filed by Mr. Hill.  The other two are new requests for relief
13 by us which we certainly did not anticipate that the Court
14 would be reviewing and picking up today.  We just wanted to go
15 ahead and file them since they were ready to file.
16        THE COURT: Indeed to the extent that they raise new
17 issues we didn't actually really look at those.  We did
18 determine that some of them were responsive to other things
19 that had been filed and try to incorporate that into the
20 rulings today.
21        Before I get to the rulings, there was one issue
22 that was raised by the parties that I wanted -- it may not be
23 the most -- it may not be the biggest issue that I have to
24 decide but it concerns these 15 photos.  I'm not exactly sure
25 what exactly the parties' positions were.  Is it that the

4

1   defendants have asked for information about the source of the

2   photos and the plaintiffs have declined to provide that

3   information?  Is that the gist of it?

4          MR. HILL: Your Honor, this is Brian Hill.  I think

5   you have the gist right.  We have served both document

6   requests and interrogatories that would have required the

7   production or if a claim of privilege is made a log of any

8   communications about when plaintiff's counsel got these photos

9   or where they came from and to date the plaintiffs have said

10  that they're not going to tell us -- they're not going to give

11  us the communications and they're not going to log them.  So

12  we're asking that as a consequence of that they not be allowed

13  to use the photos.

14         We're also asking, as the letter pointed out, that

15  they not be allowed to use the photos because they were not

16  produced prior to the close of discovery.

17         THE COURT: I don't recall actually seeing a very

18  specific response of the plaintiffs on this.

19         MR. HILL: I don't believe one has been served, Your

20  Honor.

21         THE COURT: What is the plaintiff's response?

22         MR. YALOWITZ:  Your Honor, this is Kent Yalowitz.

23  As I understand the situation there are no responsive

24  communications to the requests that the defendant has made and

25  the source of the photos is work product and the plaintiffs

5

1    are not prepared to share the -- to create documents or

2    information in order to prove the defendants with that

3    information.

4            THE COURT: You're claiming that the photos are work

5    product. [Inaudible - phone cuts out] kind of work product are

6    we talking about?

7            MR. YALOWITZ:  No, sir, not the photos.  The source,

8    the investigative source.  So where we got them, how we got

9    them, from whom we got them.  Attorney work product.

10           THE COURT: Those that were shown to a witness for

11   purpose of identification?

12           MR. YALOWITZ: Not the photos themselves.  The photos

13   themselves are not work product.  They've been produced.

14           THE COURT: No, no, I understand but I want to

15   know -- you don't want to give the source of the photos.  I

16   want to know how relevant the photos are, the source of the

17   photo be.  So what --

18           MR. YALOWITZ: The photos themselves are certainly

19   relevant because the witness ID'd the shooter based on the

20   photos and obviously it's our burden to link the names of

21   the -- to link the identity of the shooter back to the photo.

22   So they're important.  It's an important photo.

23           THE COURT: I recognize that.  My concern is that to

24   the extent that you have that burden how does the defendant

25   get to respond to your attempts to do that linkage if they

6

1   don't have any information about the source?

2          MR. YALOWITZ: Well, I think that we have to -- I

3   think we're going to have to come forward with, either with a

4   witness or with some basis to -- for the jury to conclude that

5   the shooter in the photo or the individual in the photo is who

6   we say he is and so -- for example, as I understand it,

7   there's something called a martyr file and this fellow had a

8   Palestinian Authority martyr file which the defendants have

9   produced and people can compare that photograph, the jury can

10  compare the photograph in the martyr file with the photograph

11  that we've produced and reach their own conclusion about

12  whether he is or is not the shooter.  There also may be fact

13  witnesses who could look at the photo and ID the individual

14  but we're -- to the extent we have any documents they

15  obviously have to be produced and we're not planning to rely

16  at trial on documents relating to this individual if we don't

17  produce the documents in advance.

18         THE COURT: And rightfully so.  But -- and so you do

19  recognize that this may become an issue at trial as to whether

20  or not you can use the photograph?

21         MR. YALOWITZ: Yes, I've been thinking about that.

22         THE COURT: Apart from the issue that we're

23  discussing because obviously the means that you're talking

24  about authenticating who's in the photo leaves something to be

25  desired.

7

1          MR. YALOWITZ: It does.  One might conclude that,

2     Your Honor.

3          THE COURT: Well --

4          MR. HILL: Your Honor, could I briefly be heard?  I

5     think there is an independent relevance to the source

6     regardless of connecting the dots of whether the person in the

7     photo is who the plaintiff's lawyers have claimed they are,

8     and that is -- Your Honor disallowed discovery from the

9     defendants of these sorts of photographs.  If the plaintiffs

10    have in fact obtained them from my client there's a whole host

11    of issues that are raised there and I think we're entitled to

12    discovery on that issue.  I mean there may be a violation of

13    the no contact rule.  At this point we have no idea of the

14    providence of these photographs other than Mr. Tolchin showed

15    up at a home in Brooklyn in February and gave them to Ms.

16    Gueda.

17          The notion that there are no communications I think

18    there may be a bit of a dodge here.  There may be no written

19    communications but surely these documents did not just appear

20    in Mr. Tolchin's custody at some point prior to February 17th

21    with no knowledge by any agent of the plaintiffs as to how he

22    obtained them or how that particular group of photographs was

23    selected.  I mean we are preparing an expert on the

24    reliability of the photo array that Ms. Gueda observed that

25    Mr. Tolchin provided to her, and what went into the photo, the

8

selection, who the other people in the array are which has not

been disclosed to us is all relevant to the reliability of

this photograph selection by Mrs. Gueda.  So independent of

whether there will be some way of proving that the photo she

picked is who they say it is, all of this is relevant

discovery and should be allowed.

THE COURT: Well, I hear what you're saying although

I don't -- I don't quite follow how the source of the

photograph is particularly relevant to whether or not the

array is appropriate.

MR. HILL: It may reflect a violation of the Court's

order.  The Court sustained our objection to the production of

these materials.  If what has happened is that the plaintiffs

have outside of the Court and contrary to the Court's order

obtained these from my clients that would be a very serious

issue.  It would be a violation of the Court's order and a

violation of the no contact rule of the attorney ethics rules.

MR. YALOWITZ: It doesn't sound like it would be a

violation of any order for --

THE COURT: The prob --

MR. YALOWITZ: I'm sorry, Your Honor.

THE COURT: The issue -- we can speculate about a lot

of things but as I understand it you -- what you're

suggesting, Mr. Hill, would require a number of violations and

other than your stating that that's a possibility that it

9

1  could have happened I don't see any evidence to suggest that

2  anything was done that was violative of any of orders.

3         MR. HILL: Well, exactly, Your Honor, and that's

4  precisely the point.  I mean there's no log indicating who was

5  communicated with or when.  We just have an unvarnished claim

6  of attorney work product.  Frankly, it may not be a privilege

7  and I might be entitled to get that but I don't even have a

8  log so I can move to compel the communications at this point.

9         THE COURT: Well, we'll get to that.

10        Let me address the issues that have been raised.

11 The overriding issue, the overarching issue, the main issue

12 has to do with to me the scheduling of the expert depositions

13 and I've reviewed what the parties have said and basically

14 tried to figure out what's going to cause the fewest

15 complications in terms of the issues that have been raised.

16 Since some of the issues to me depend on the scheduling of the

17 depositions I am -- I'm going to agree with the plaintiffs on

18 the scheduling, that is it seems to me that the subsidiary

19 issues that have been raised concerning where the deposition

20 is taking place, the timing of the production of documents,

21 the preparation of the parties respective experts would be

22 more efficiently done if the depositions were taken after the

23 reports had been finished by all the parties.

24        To the extent that the plaintiffs have raised the

25 issue concerning the fact that some of their expert opinions

1  might change after the deposition of the plaintiff's experts,

2  what I will grant the plaintiffs in this case is the ability

3  to supplement their reports after the plaintiffs' experts have

4  been taken so that -- if necessary.  I don't know if there

5  would be a need to do any supplementation after the

6  depositions but I will allow the defendant to raise that as an

7  issue and although it's not provided for now if the defendants

8  can indicate -- can show that something that was said in a

9  deposition is cause for revision then they can make that known

10 to me.  They will have my ear.

11        MR. HILL: Your Honor, this is Brian Hill.  I think I

12 either misheard you or maybe you misspoke although I hesitate

13 to suggest that.  Are you saying that if after the defendants

14 depose the plaintiff's experts --

15        THE COURT: Correct.

16        MR. HILL:  -- defendant's experts wish to submit a

17 supplemental report they can do so?

18        THE COURT: That's correct.

19        MR. YALOWITZ: Well, upon a showing of good cause.

20        THE COURT: It's not an absolute because the issue

21 that you raised I consider to be a real concern, that is if

22 there's a need to adjust the defendant's report because of

23 something that's said in the deposition then you can make that

24 known to me.  You'll -- you get the benefit of a doubt but it

25 won't -- I don't expect you to ask for it unless it's

11

1  necessary because I'll be obviously reviewing it to make sure

2  that it was occasioned by the testimony.

3          MR. HILL: Understood.  Thank you, Your Honor.

4          THE COURT: This also addresses the question of where

5  the depositions are to take place.  I think in general given

6  the location of those eight experts, my inclination now is

7  that the depositions will take place in Israel and that the

8  plaintiffs -- the attorneys will travel rather than the

9  experts rather than us trying to figure out all of the

10 logistics of the travel of the experts.  Again, you'll take

11 the experts -- you'll look at the report.  You may decide you

12 want to take all of them, you don't want to take all of them.

13 We'll know the full scope of who the experts are and we'll

14 address [inaudible – phone cuts out] in the context of knowing

15 exactly who's going to be deposed but that requires the

16 parties to coordinate at least the lawyers and try to get

17 those experts all thinking about a good time frame.

18         With respect to the plaintiff's application for an

19 extension of time to bring their expert reports into

20 compliance, I'm still not exactly sure how I rule on the

21 question of compliance although I know the submissions by the

22 parties don't quite agree on whether or not the -- there's a

23 total deficiency or whether or not some of it --

24         MR. HORTON: Your Honor, this is Phil Horton.  If I

25 can help.  I think where we are, there's been a tremendous

12

1   back and forth between the two sides on the expert reports.

2   We had provided a tremendous amount.  Mr. Hill has taken the

3   position with respect to some of the reports that we still

4   haven't done enough.  We've continued to send the materials on

5   some of the issues where he thinks we haven't done enough.  We

6   think we have and he just sent a number -- a second series of

7   emails just the other day raising numerous questions, things

8   such as well, I don't quite understand what the expert says

9   here, you need to clarify your report, frankly which is all

10  the sort of thing which we think should be done in

11  depositions, not by trying to nitpick the language of reports.

12          But what I would say is that we are substantially

13  completed this process although we may end up in disagreement

14  with them but we're sort of down to what in construction you

15  might call a punch list.  The house is built and he's

16  complaining this tile is not quite in place or you didn't --

17  you failed to paint that corner and we're trying to come to

18  closure on that.  I think that's a good description of where

19  we are now.

20          THE COURT: Mr. Hill, you need not comment on the

21  analogy.

22          MR. HILL: Okay.  Because I would have a different

23  one as Your Honor could expect.  Let me give you some facts

24  instead of an analogy.  For Mr. Karsh whose report was served

25  on March 25th, we still do not have 98 out of 110 footnote

1  sources of his material, and even though we raised this with

2  the plaintiffs and we complained about it to Your Honor on

3  April 17th, a month ago today.  We have received nothing on Mr.

4  Karsh and, Your Honor, one of the fundamental differences

5  between the parties is that we think your orders matter and

6  your deadlines matter and these plaintiffs have not served

7  their requests in January when they were due.  They asked for

8  an extension until March.  They served reports that were not

9  in compliance with the rule.  They asked for time to bring

10  them into compliance.  They've blown their own deadline and

11  with Mr. Karsh they've given us nothing at all.  They haven't

12  given us any of the documents we've asked for from these

13  footnotes.  They've given us none of the documents we asked

14  for in his deposition notice.

15        Your Honor, enough is enough.  We're asking Your

16  Honor to enforce what Rule 37(c)(1) says which is that you

17  don't comply with the expert disclosure rule you don't get to

18  use the expert.

19        Let me take two other examples that are on the high

20  end of the egregious list.  Mr. Sudra and Mr. Weinstein.  You

21  previously directed them to provide new reports that would

22  allow an objective reader to trace through their calculations

23  and determine how they came up with their numbers and you

24  directed that at our hearing on August the 24th.  We have

25  gotten what purport to be supplemental reports from both of

14

these gentlemen and they are still riddled with problems that

prevent us from replicating their calculations.  Enough is

enough.  We're asking Your Honor to exclude these experts.  As

you'll see from the letter that I sent on the 15th and the

emails that we attach to it as exhibits that detail the

problems with these reports and the inability to replicate the

calculations that are contained therein.  It's appropriate at

this point two months after this material is due on March 25th

to exclude these experts from testifying in the case.  The

plaintiff should not be able to indefinitely violate your

orders, violate the rules and keep getting do overs.

THE COURT: The question is -- the plaintiffs can

talk about the specific issue that Mr. Hill raised but to me

the rules always contemplate the question of why before we

determine [inaudible - phone cuts out].  Is there any

explanation for the, for example, the one who's got 110

footnotes and 98 are identified?  What's the story there?

MR. YALOWITZ:  Your Honor, I have Rachel Weiser on

the phone who's been dealing with this.  I suggest that she

speak to it.

MS. WEISER: Yes, Your Honor.  Thank you.  Let me

first say, Judge, you mentioned right at the beginning of this

that you're not sure how you ruled on the issue of compliance,

and I do think it's important that we stress that nothing has

been found to be non compliant.  Most of what we're doing is

1    above and beyond.  For example, the footnotes that we're

2    getting for defendants we're getting because they say they

3    can't find them.  Clearly we couldn't handle that before the

4    reports were submitted.  Those are things that have to be done

5    by definition after the reports [inaudible – phone cuts out]

6    so defendants can tell us what they're having trouble

7    locating.

8          So with regard to the footnotes, I'll start there.

9    We have been working literally at a frenzy pace.  Magistrate

10   Judge, I'm not sure how to describe to you how many people we

11   have working on this full time gathering these things, trying

12   to help our experts.  Our experts are involved trying to get

13   these things done at great expense to us but we're doing it

14   and we're following up as far as we can getting the things as

15   fast as we can.  Professor Karsh is in Finland.  Those

16   footnotes are [inaudible – phone cuts out] don't have a

17   complete set to provide defendants yet which is why I needed

18   some extra time which is why we asked the Court for some extra

19   time but I assure you these things are being worked on.  We've

20   already presented the defendants hundreds of footnotes, many

21   of which were easily opened, were publicly accessible, things

22   that they already had in their possession but we did it

23   anyway.  We took the time to locate these things and produce

24   them even though many of them they should have been able to

25   find on their own.

16

1          So with regard to the footnotes, Judge, I assure you

2    we're working diligently.  We [inaudible - phone cuts out] no

3    less than ten emails on this filled with hundreds of footnotes

4    and we're continuing to work on it and I'm hoping very much

5    that we'll have that done in the next -- by early next week if

6    not by the end of next week which is the time that we

7    requested.

8          With regard to Saldry [Ph.] and Weinstein, the

9    economic expert reports, Your Honor, I went back to those

10   experts.  I explained your concerns very clearly.  They both

11   shared with me that they both testified in federal court.

12   Their reports were always sufficient.  They would do the best

13   they could to try to make some more clear but that certainly

14   any questions that defense counsel had they would be able to

15   answer quite clearly at deposition.  That's how it always has

16   been done.  Regardless, I asked them to please write

17   supplemental reports with more detail and they did.  I got an

18   email back from Mr. Hill explaining some of the things they

19   still don't understand and I have a call scheduled with the

20   expert early next week to go over those things.

21          So the most I can tell you, Judge, is that we are

22   working as hard as we can and as fast as we can.

23          MR. YALOWITZ: Your Honor, it's Kent Yalowitz.  If I

24   could just add one thing.  We're new to the case and so I've

25   been observing a lot of the email traffic and obviously I'm on

17

1   one side.  So I have the perspective of the plaintiffs but I

2   have to say in my 25 years of practicing law I have never seen

3   the degree of demand from the defense side or from any side

4   for that matter for every little thing where a lot of it was

5   publicly available.  I noticed one thing where the defense was

6   saying we can't find this document and it was some

7   congressional budget office document.  I said well, how can

8   they not be able to find a congressional budget office and I

9   went on the internet and Googled it and I found it in about 30

10  seconds.  So I'm sure that both sides here are operating in

11  good faith here.  I have no doubt about it but to come in and

12  yell about the Court's orders are being flaunted, that's just

13  not the reality of what's going on here and I'm sort of

14  surprised that Miller & Chevalier would be taking that

15  position frankly.

16          MR. HILL: Well, Your Honor, the email that were sent

17  are all attached to my letters.  The Court can review them and

18  determine whether we're doing anything unreasonable or

19  inappropriate.  I invite the Court or the Court's clerk to

20  look at the footnotes particularly in the Karsh report and see

21  if they can locate them online because they are so diminimus

22  as to be useless and that does not comply with Rule 26 which

23  required the reports to disclose the facts or data considered

24  by the witness in forming the opinions.  That was the basis

25  for our requests a month ago.  It's still the basis for our

18

1    request today.  We'd ask the Court to not allow the plaintiffs
2    to continue to be able to dictate what the schedule in the
3    case is going to be and exclude these witnesses so we can
4    proceed.

5           THE COURT: Well, let me again remind you of the one
6    thing that was -- I said in the beginning.  That is that we
7    have not reached the legal issue of whether or not the
8    compliance with Rule 26 requires the footnote disclosure that
9    we're talking about.  Obviously experts go and rely on a lot
10   of different things, some of which can be found; some of which
11   can't be; some of which is just a matter of experience that
12   the experts have.

13          As to whether or not the [inaudible - phone cuts
14   out] orders, that's really my call as to whether or not I
15   believe they are making good faith efforts to respond to the
16   concerns which I've raised and in that regard -- regardless of
17   which parties appear before me I always take a reasonableness
18   approach and I don't see the information that's being sought
19   to be produced as the subject of dilatory tactics by the
20   plaintiff.  If it turns out that there is concrete evidence
21   that the plaintiffs are deliberately delaying that would be
22   certainly something I would listen to but as for now my main
23   concern is that we get all of the relevant information in this
24   as quickly as possible.  I know that sometimes parties are
25   more optimistic about how long it will take them to do things

19

1   [inaudible – phone cuts out] not hold that against a party

2   once they find out that [inaudible – phone cuts out] which

3   they have to deal with.

4           But I will take it that [inaudible – phone cuts out]

5   can in terms of compliance by a week from today.  At that

6   point the parties can draw a line in the sand and [inaudible –

7   phone cuts out] that either the plaintiffs produced enough or

8   the defendants can say you haven't produced enough with it on

9   that basis but I advise both sides to [inaudible – phone cuts

10  out] with caution on this notion about who's to blame because

11  if we're going to do this we're going to do it which means

12  that I will have a hearing.  I will have a hearing at which I

13  will have the parties express their positions with all the

14  evidence that they have and I will hold the attorneys

15  personally responsible for the delay caused by such a hearing

16  by whoever turns out to be at fault.  High stakes with this

17  one.

18          There's a lot of information.  There's a lot of

19  things that the parties have to do.  If you have the

20  [inaudible – phone cuts out] of your convictions you can draw

21  your lines in the sand.  We'll have a hearing.  I'll air it

22  all out and I will hold the attorneys personally responsible.

23  I hope that's clear because I think it will delay us getting

24  to the end of the discovery of the facts and of the experts,

25  and I'm not going to do it based upon either of your

1 representations about whether or not it's [inaudible – phone

2 cuts out] necessary.  I'll have you come in and I'll have you

3 [inaudible – phone cuts out].  Am I making myself clear?

4          MR. HILL: Your Honor, Brian Hill.  I understand.

5          THE COURT: As to the plaintiff's application to

6 replace the expert [inaudible – phone cuts out], obviously at

7 this late date they're always concerned about replacing an

8 expert.  Am I to understand that the plaintiffs have an expert

9 in mind to replace this expert?

10          MR. HORTON: Your Honor, this is Phil Horton.  Yes,

11 we have an expert in mind engaged and working.  He anticipates

12 he will be able to complete his work by the end of the second

13 week of June.  I hope we don't run into the situation that you

14 just mentioned where sometimes people are hopeful they can do

15 more than they can.  Obviously he's new to the case but as

16 soon as Mr. Shockhead [Ph.] withdrew we immediately moved to

17 find a substitute expert to get him to work and that process

18 is happening but he's engaged and he's at work.

19          THE COURT: Then just for the parties to understand,

20 to a large extent the question here is whether or not this

21 particular expert is duplicative of other experts.  I know

22 we're talking about the multiple liability experts but I

23 understand the plaintiffs to be asserting that the particular

24 area that the expert was to opine on was separate and apart

25 from the areas that the other liability experts were going to

21

1    opine on.   Is that correct?

2               MR. HORTON: That is correct, Your Honor.   The

3    situation we face of course is what we were talking about are

4    liability experts.   So they are talking about different facets

5    of the same issue.   Not surprisingly with each expert working

6    independently and producing their own report one sees some

7    duplication in the background sections of the reports.   So --

8    but that's all an issue to be taken up at trial.   We were not

9    going to present duplicative experts.   We're going to present

10   experts who will each have their own area to talk about even

11   though they're -- as I say they are all related issues but

12   just because they're independent reports and have some

13   duplication in them they're not going to stand on those -- get

14   up on the stand and read those reports.   Obviously we will

15   [inaudible - phone cuts out] all of their testimony at trial

16   and that would be the time to deal with any claim of

17   duplication not based on a report.

18               THE COURT: Again, following up on what I said

19   before, it's very difficult given the nature of the expert

20   reports and certainly in the absence of their depositions to

21   know how much overlap there is, whether or not the experts

22   have provided enough information, whether or not their

23   testimony would cause any changes.   I do want the -- I do want

24   it to be clear that when the smoke clears if I find that there

25   have been any improprieties or misrepresentations I will act

22

1   accordingly.  So anything that I say now in terms of going

2   forward is based on the representations that have been made

3   and as I see the case now in terms of the difficulty of just

4   trying to figure out what an expert is saying or doing until

5   you've dotted all the I's and crossed all the T's.  It is my

6   expectation that the depositions of the experts will bring

7   some clarity to what they've been about and how it fits

8   [inaudible - phone cuts out] total [inaudible - phone cuts

9   out] scheme.  So --

10          MR. HORTON: Just to be clear, Your Honor, at

11   depositions I anticipate that defendant's counsel will ask

12   similar questions of multiple experts because these are

13   related issues.  So they now -- they may well get duplicative

14   testimony because that's what they've asked.  That doesn't

15   mean that we're going to put them all on the stand to have

16   each one of them go through the same thing over and over

17   again.

18          THE COURT: Counsel, you're stating the obvious.  You

19   have to give me some credit.

20          MR. HORTON: I'm sorry, Your Honor.

21          THE COURT: I can see the difference between common

22   questions and the need for a particular expert.  Clearly

23   they're talking about incidents that will have some

24   similarities and I expect there to be some similarities and

25   overlap in their testimony but the real question is whether or

1   not they provide a unique aspect that is not covered by the

2   other experts.  I would certainly expect that at trial not

3   only would they testify only about the unique aspects but that

4   the Court wouldn't let them testify otherwise.  I presume that

5   when you -- this number of experts the judge will have you

6   make it clear about which aspects they're going to testify to

7   to make sure that there isn't unnecessary duplication.

8        MR. HORTON: That's exactly what we would anticipate

9   and how we intend to proceed.

10       THE COURT: With respect to the application to strike

11  the liability expert, the three liability experts that

12  defendants have [inaudible - phone cuts out] that application

13  is denied.  Again, indicated [inaudible - phone cuts out]

14  clear to all the parties I expect [inaudible - phone cuts out]

15  cleared up when the depositions of the experts are taken.

16  That includes some of the issues that have been raised before

17  concerning the understanding of what's in [inaudible - phone

18  cuts out] reports.

19       I don't see a basis for excluding the reports at

20  this point and I don't see anything improper as to the weight

21  that would be accorded or how it will look when it gets to

22  trial.  That certainly is a different issue but --

23       MR. HILL: Your Honor, this is Brian Hill.  If I

24  could just be heard briefly.  The facts I think are

25  undisputed.  Mr. Kaufman's is the most egregious. There were

24

1   2,500 pages of foreign language material that were produced

2   for the first time in the case with his report that were

3   responsive to discovery requests we served in August of 2001

4   and Your Honor put the plaintiffs on notice at least twice

5   during the course of fact discovery that if materials were not

6   produced during fact discovery the experts would not be

7   allowed to rely on them.  These are materials the plaintiffs

8   acquired and could have acquired during fact discovery.  So

9   the whole purpose of having fact discovery before expert

10  discovery was so that the factual record could be fixed so

11  that the parties would know what the factual record was when

12  their experts worked on it.  The plaintiffs have totally

13  violated that premise and violated your direction to produce

14  the material on pain of having the expert precluded.

15          THE COURT: When you do --

16          MR. TOLCHIN: Your Honor, this is Bob Tolchin here.

17          THE COURT: Mr. Hill --

18          MR. TOLCHIN: [Inaudible - phone cuts out] find that

19  Mr. Hill is exaggerating.  This case was filed in 2004.  So

20  surely no discovery demands were served in 2001.

21          THE COURT: Okay.

22          MR. HILL: I meant 2011.  I misspoke if I said 2001.

23          THE COURT: Okay.  Well, first of all, I tried to

24  speak and unfortunately the phone doesn't let me do that.  I

25  think I've made myself clear.  To the extent that [inaudible -

1   phone cuts out] deposing these witnesses, the plaintiffs have

2   made certain claims about the [inaudible - phone cuts out]

3   that have been produced.  It's not my inclination to try to

4   sort that out as to which documents were responsive, which

5   were -- which the expert in his -- in what experts do came up

6   with.  We're dealing with documents that are in foreign

7   languages.  There are lots of issues here and if the

8   deposition doesn't make it clear one way or the other then I

9   don't think that having a hearing before me to try to sort

10  this out is going to be more efficient because for one thing I

11  don't see the efficacy of having the expert who I think would

12  be an important factor in terms of determining how and when he

13  looked at the documents and how they fit in with anything he

14  was told by plaintiff's counsel.

15          MR. HILL: Am I to understand Your Honor then will

16  allow me to revisit this issue once we've deposed the expert

17  and established when they received the materials?  I think

18  it's actually undisputed that the plaintiffs didn't produce

19  the materials before the close of discovery and instead waited

20  to produce them with the expert's report which is I think

21  precisely the scenario Your Honor was warning them against in

22  March of last year.  I don't think there's any dispute about

23  the facts that material responsive to discovery requests was

24  not produced prior to the close of fact discovery and now the

25  expert Kaufman is basing his opinions on that unproduced

26

1  material.

2          MR. TOLCHIN: Your Honor, that is very much in

3  dispute.  The point is we did not have these materials in our

4  custody back then.  These are materials that the expert

5  identified much later in the process after the close of

6  discovery as experts do.  We could not produce in discovery

7  materials that we did not have and that we did not know the

8  expert was going to rely on.  It's as simple as that.

9          MR. HILL: Just to differ with that --

10          MR. YALOWITZ: This is Kent Yalowitz.  I apologize

11  for interrupting.

12          THE COURT: Counsel.  Counsel.  Counsel, hello.

13          MR. YALOWITZ: Yes, sir.

14          THE COURT: Let's be clear.  You all are making my

15  point.  I'm not going to decide this.  I can't decide this

16  based upon the kinds of representations that counsel are

17  making.  If I were to decide this based upon the issues that

18  are being raised by Mr. Hill and disputed by the plaintiffs

19  I'd have to have a hearing.  There would have to be an in

20  depth hearing to determine where all these documents fit.

21  I'll have to have the expert here in order for it to be a

22  complete hearing.  I'm not doing that.

23          MR. HORTON: We understand that, Your Honor.  We're

24  just trying to make sure our position is clear.  That's all.

25          MR. YALOWITZ:  You're absolutely right that we would

27

1  have to go through such a process if it were to be pushed that

2  far.

3          THE COURT: Because we're talking -- to exclude

4  experts, to sanction parties, this is a very serious issue for

5  me and I'm not going to -- I hear what each side is saying but

6  I'll be honest with you.  I know you're all very familiar with

7  this case.  It's not a case where I can just say well, I

8  understand that this is definitely responsive, I understand

9  that this is something that the expert came up.  That's not

10  something that's easy for me to do.  I will have to get you

11  all together.  You'll have to identify the documents.  I'll

12  have to go through them.  My law clerk will have to go through

13  them.  If the expert is implicated I'll have to see how the

14  expert -- how the expert interfaced with [inaudible - phone

15  cuts out] came up with, when did he get them.  This is not a

16  simple process.  If I go through that process, first of all,

17  it would be diverting us from the liability issues and it

18  wouldn't be pretty.

19          So, yes, I get to depose the experts and we're

20  talking about doing it at a time when presumably you're going

21  to depose all of the experts but I just can't take these

22  representations and I confess I can't sort them out with

23  sufficient definitiveness to make the ruling depend on the

24  representations that counsel are making concerning when the

25  documents were produced and whether or not they're responsive

1          I might also add that while I know that Mr. Hill has

2  made representations about my former statements, I have not

3  gone back and looked at those statements to see exactly what

4  context they were made in and what it is that I was saying.  I

5  don't have -- some context I'm clear and definitive and then

6  other contexts [inaudible - phone cuts out] not.  So I don't

7  know what we were talking about at the point and [inaudible -

8  phone cuts out] what I was referring to --

9          MS. WEISER: Your Honor --

10          THE COURT: I don't if I meant that to be a blanket

11  statement about or even if it applied to the [inaudible -

12  phone cuts out] we're talking about now.

13          MS. WEISER: Your Honor --

14          THE COURT: Yes.

15          MS. WEISER: I did go back and look at that

16  transcript, Your Honor, and it's completely inapplicable.  In

17  fact, I would go so far as to say that Mr. Hill is actually

18  misleading the Court about what he said.  Your statement

19  relied specifically, directly and only to damages evidence

20  which clearly damages evidence is in the possession, custody

21  and control of the plaintiff and we could understand why the

22  Court would require us to produce that in advance, things like

23  medical records and economic IRS reports and things are like

24  are clearly things that we would need to produce before the

25  close of discovery.  It's absolutely not relevant at all to

29

1    any of these productions that Mr. Hill is complaining about.

2              THE COURT: Okay.  Well, again, I think you're only

3    restating what I said, that is first -- before I took into

4    account whether or not it was violative of any of my orders,

5    I'd go back and look at the context in which I made the

6    statements and see what I meant to order.  As I said, I

7    haven't even done that because it was not my anticipation that

8    I was going to address this on the level that the defendants

9    have [inaudible - phone cuts out] liability experts but that

10   would be my first step.

11             But I don't think that would be efficient under the

12   rules and I don't think that would advance the cause of

13   dealing with the substantive issues that have been raised in

14   the lawsuit.

15             The last issue that I have is the defendant's

16   renewed application for sanctions related to the claims of

17   plaintiffs Oz and Gueda.  I am not prepared to -- I see that

18   the defendants have re-asserted it and I'm not prepared to

19   impose sanctions at this point related to those claims.

20   Again, I will say that when it comes to any application of

21   sanctions that requires me to do a complete review of the

22   rules that might lead to sanctions and I'm not in a position

23   to do that at this point.

24             MR. HILL: Your Honor, I did not hear the last thing

25   you said.  There may have been some noise taking you away.

30

1      THE COURT: I said I'm not in a position to do that

2  at this point.  Sanctions are -- sanctions always require me

3  to first [inaudible - phone cuts out] and find out how much

4  fault there is and who that fault [inaudible - phone cuts

5  out].

6      MR. HORTON:  Thank you, Your Honor.  I believe that

7  should cover everything that was on the plate for today.

8      MR. HILL: Your Honor, I'm very sorry but for some

9  reason I did not hear anything you said other than who is at

10  fault and then there was a long pause.

11      THE COURT: I'm not sure what -- of course the courts

12  don't have the budgets of the big companies.  So government

13  phones are not state of the art.

14      MR. HORTON: Your Honor, I think there may be some

15  interference.  Somebody may be on a cell phone or something or

16  there may be some typing in the background that's --

17      THE COURT: The bottom line is that the -- I'm not

18  imposing sanctions at this time on -- with regard to the

19  claims of Oz and Gueda.

20      MR. HORTON: Thank you, Your Honor.

21      THE COURT: Everything else was just gravy I said but

22  that's the bottom line.

23      MR. HILL: Your Honor, as the person who may at some

24  point be serving expert reports in the case, at this point do

25  we have any new deadlines based on Your Honor's rulings today?

31

1  Hello?

2          THE COURT: Well, the short answer is obviously you

3  do have new deadlines but I think your question was more what

4  would the deadlines be.

5          MR. HILL: Yes, Your Honor, because I have people at

6  work and I need to know when I need to finalize their reports.

7  As I understand it you've allowed the plaintiffs until a week

8  from today to complete their document productions for their

9  prior reports and then I'm not sure we have a date for the new

10  Mr. Shockhead report.  I heard the end of -- the second week

11  of June.  If we could get a date for that perhaps we could go

12  ahead and set a new schedule for our reports 30 days after

13  that date and plaintiff's rebuttals 30 days after that date

14  but I think we're missing the date for when the new expert

15  report would be produced.

16          THE COURT: You're also assuming that I'm going to

17  give you the time based on -- the replaced Mr. Shockhead

18  report.

19          MR. HILL: That is what I had requested.  Obviously

20  Your Honor is in charge of setting the deadline.  So that's

21  why I raised it.

22          THE COURT: While I understand responding to that

23  report requires additional time I don't know that the other --

24  we're talking about a large number of experts and we're

25  talking about replacement.

32

1          MR. HILL: Correct, Your Honor.  Not all of my

2    experts would need to respond -- well, I don't know what the

3    new report says yet but presumably not all of my experts would

4    respond to it.  I think it makes sense to keep everybody on a

5    single deadline as opposed to having a deadline for some of my

6    experts and then an different deadline for whoever is

7    responding to that report but obviously we'll do whatever Your

8    Honor prefers.  I think I should have at least in fairness 30

9    days from the completion of the document production but again

10   as Your Honor wishes.

11         THE COURT: Okay.  Can the plaintiff weigh in on, for

12   example, the Shockhead replacement?  You said the second week

13   in June?

14         MR. HORTON: Yes.  He believes he can be done by the

15   end of the second week in June which would put us at June 14th.

16   I certainly hope he can hold to that because he's starting his

17   work -- I mean he has started his work.  So let's -- why don't

18   we go with that if that's acceptable and if there's some

19   difficulty we'll obviously let everybody know as soon as

20   possible.

21         THE COURT: Okay.  While in general I agree with Mr.

22   Hill that it makes sense to have a single deadline, given the

23   history of this case I think we'd be better served if we did

24   the Shockhead replacement on that one on a separate schedule

25   and assume that the plaintiffs will complete their

33

1  supplementation by the 24th of May and Mr. Hill will have 30

2  days from that time to [inaudible – phone cuts out] whoever is

3  responding to the Shockhead replacement.

4          MR. HORTON:  So that would be June 24th which is a

5  Monday.

6          MR. HILL: Your Honor, may I beg the Court's

7  indulgence.  I'm actually scheduled to be on vacation that

8  week of June 24th.  So if I could have at least --

9          MR. HORTON: So you want to do it earlier?

10          MR. HILL: I'd like to do it earlier or later.  It

11  will be very difficult to complete the report --

12          MR. HORTON: Your Honor, we have no desire to make

13  any difficulty for Mr. Hill and his vacation.  If he wants a

14  little bit more time that's fine.

15          MR. HILL: Again, is the Court anticipating that on

16  this -- on our next deadline we would produce reports from all

17  of our experts or just those that won't respond to the new

18  report?  I rather not have an expert do two reports if we

19  don't --

20          THE COURT: The experts who will not be responding to

21  what I'll call the Shockhead report.

22          MR. HILL: Okay.

23          THE COURT: I'm sure if you've been dealing with me a

24  while you understand that I'm not going to impose upon you if

25  you're going to be taking time off.  I know you all work very

34

1  heard.

2         MR. HILL: Well, Your Honor, I'm returning from my

3  vacation for full disclosure on Sunday the 30th of June.  If I

4  could have -- then the next week is the 4th of July.  So if I

5  could have until Monday, July 8th I'd appreciate it.  Now, for

6  what it's worth, that's only a week before the response to the

7  Shockhead report would be due anyway but I would take Monday,

8  July 8th if the Court will allow it or if we could put

9  everything on a unitary schedule on July 15th that's also

10  obviously okay with me but I defer to the Court.

11

12         MR. YALOWITZ:  Perhaps if I may suggest, Your Honor.

13  Perhaps this is the kind of conversation counsel could have

14  with each other.  I know there's been some history but I'm

15  hoping that we might actually be able to agree on some things

16  and we could come to the Court with a proposal.  Maybe that's

17  being unduly optimistic but sometimes counsel in cases

18  actually work scheduling matters out and [inaudible - phone

19  cuts out] Court.

20         THE COURT: In view of the fact that we're really

21  talking about now -- it almost seems that we're talking about

22  a convergence of the date.  Understand that I really don't

23  want any slippage once you've come up with a date now though.

24  I mean --

25         MR. HILL: I don't anticipate difficulty getting

35

1  everything done by July 15th sitting here today.

2          THE COURT: Okay.  Well, who is it that said perhaps

3  the lawyer can propose?

4          MR. YALOWITZ: It was Yalowitz.

5          THE COURT: Mr. Yalowitz, I have a sense of what

6  you'd be proposing but why don't you submit -- why don't the

7  lawyers get together and submit a proposed schedule which

8  takes into account the things that we've just discussed?  It

9  might also be a good opportunity to at least get some momentum

10  where you can agree on something.

11          MR. YALOWITZ: It would be -- obviously we're heading

12  in at this point to vacation season.  Other people will be off

13  so we're all going to need to confer to figure out who's

14  around when to come up with a schedule that makes sense.

15          MR. HORTON:  I think if we can agree on things that

16  would be a step in the right direction here.

17          THE COURT: It's certainly my hope.  Again, the

18  parameters have been tossed around.  If it's nothing

19  particularly different from what we've discussed and I

20  anticipate that I'm -- I'm very much in favor of you working

21  together on anything even if it's just scheduling.

22          MR. YALOWITZ: Who knows?  Peace could break out in

23  the Middle East.

24          THE COURT: I think that in this litigation it would

25  be helpful.

36

1          MR. YALOWITZ: One step at a time.

2          THE COURT: So you'll submit that to me -- by the end

3   of next week is fine.

4          MR. HILL: A proposed schedule by the end of next

5   week?

6          THE COURT: Right.  All right.  We've made some

7   progress at least to making this civil litigation more civil.

8          MR. YALOWITZ: We're all in favor of that, Your

9   Honor.

10         THE COURT: We'll be adjourned.  Thank you.

11         ALL PARTIES: Thank you, Your Honor.

37

1                              * * * * *

2        I certify that the foregoing is a court transcript from

3    an electronic sound recording of the proceedings in the above-

4    entitled matter.

5

6                              _____

7                                        Shari Riemer

8    Dated:   May 19, 2013

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25