1                    UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF NEW YORK
2

3    ----------------------------------------X
                                            :
4    SOKOLOW, et al,                        : 04-CV-397 (GBD)
                                            :
5                      Plaintiffs,          : April 24, 2013
                                            :
6              v.                           : 500 Pearl Street
                                            : New York, New York
7    PALESTINE LIBERATION ORGANIZATION, et al, :
                                            :
8                      Defendants.          :
     ----------------------------------------X
9

10        TRANSCRIPT OF CIVIL CAUSE FOR DISCOVERY DISPUTES
               BEFORE THE HONORABLE RONALD L. ELLIS
11               UNITED STATES MAGISTRATE JUDGE

12   APPEARANCES:

13   For the Plaintiffs:          ROBERT TOLCHIN, ESQ.
                                  RACHEL WEISER, ESQ.
14                                The Berkman Law Office, LLC
                                  111 Livingston Street
15                                Brooklyn, New York  11201

16

17   For the Defendant:           BRIAN A. HILL, ESQ.
                                  MARK ROSHAN, ESQ.
18                                Miller & Chevalier, Chtd.
                                  655 15th Street NW, #900
19                                Washington, D.C.  20005

20

21

22   Court Transcriber:           SHARI RIEMER
                                  TypeWrite Word Processing Service
                                  211 N. Milton Road
23                                Saratoga Springs, NY 12866

24

25

     Proceedings recorded by electronic sound recording,
     transcript produced by transcription service

2

1          THE COURT: Good afternoon.  This is Judge Ellis.

2    Can I have your appearances beginning with the plaintiffs?

3          MR. TOLCHIN: Good afternoon, Your Honor.  This is

4    Robert Tolchin for the plaintiff and with me on the line is

5    Rachel Weiser.

6          MR. HILL: Good afternoon, Your Honor.  Brian Hill

7    and Mark Roshan for the defendants.

8          THE COURT: This is a conference in Sokolow v.

9    Palestine Liberation Organization, et al., 04-CV-397.  It is

10   Wednesday, April 24th at approximately 2:30 p.m.

11         There are a number of issues raised by the parties

12   concerning expert discovery and I have received -- I have

13   received the parties submissions and I assume nobody tried to

14   send me anything in the last 24 hours.

15         MR. HILL: Nothing from us, Your Honor.

16         THE COURT: Let me give you some overall

17   considerations so that the parties would understand the

18   context of the rulings.  First of all, ruling on the experts

19   and discovery in general takes place in the context in which

20   the parties do not have a set trial date.  Obviously the rules

21   are designed so that all discovery is completed sufficiently

22   in advance of discovery including -- in advance of the trial

23   including expert discovery.  While it is true that the Court

24   has continued to set deadlines in an effort to get discovery

25   completed as expeditiously as possible it is also true that

3

1   the typical district judge in the district prefers to have the

2   discovery completed and done on the merits as opposed to based

3   on procedural issues.

4           With that in mind, let me address the issues as I

5   have understood them raised by the parties not in any

6   particular order but the first one in part because I think we

7   may have left off our last conversation with that concerns the

8   defendant's application to strike the Sudray [Ph.] expert

9   deposition, expert report pursuant to an October order that I

10  had directed the parties.  I think I said in our last

11  conference I was somewhat disappointed that the issue that

12  caused the concern about the Sudray report specifically

13  Loustein's ability to function as a teacher given the

14  convictions that were on his record and I expressed in our

15  last conversation that I thought that I would have -- I

16  thought it would have been expected that the plaintiffs would

17  have conveyed that information to the expert.

18          Notwithstanding that, given the status that we have

19  here I don't see the -- any inherent prejudice in the redoing

20  of the report.  I might say that, again, consistent with my

21  introductory remarks is that while I have endeavored to set

22  deadlines and they are true deadlines it's certainly my

23  expectation that the deadlines would not be an impediment to

24  granting extensions in a case where there's a significant

25  number of experts to be deposed and who's supposed to be

4

1  prepared.

2          One of the things that's obvious is that we're going

3  to have to adjust the deadlines that the parties have in order

4  to have discovery done reasonably and completely.  So in that

5  context to the extent that the Sudray report is done and

6  redone I think we can do that without delaying the proceedings

7  in general.

8          Mr. Tolchin, if I understand the report correctly,

9  it should not -- the redoing of the report taking into account

10  this restriction should not cause -- should not take very

11  long.  Have you talked with --

12          MR. TOLCHIN: It was done already, Your Honor.

13          THE COURT: Then you -- I guess that answers that

14  question.  And you've resubmitted it -- have you resubmitted

15  it to the defendants?

16          MR. TOLCHIN: We did and we submitted a copy of it to

17  Your Honor also although I understand that with the flurry of

18  papers I'm sure it's -- you may not have realized.

19          THE COURT: All right.  Then you have my permission

20  to resubmit to defendants.  To the extent that you have we'll

21  consider it submitted to the defendants.

22          MR. TOLCHIN: Thank you, Your Honor.

23          THE COURT: There were a number of applications

24  concerning the plaintiff's liability and defendant's expert.

25  Let me try to categorize them.  First of all, there were

5

1  complaints about the failure of the experts to present

2  detailed and complete calculations, specifically the Weinstein

3  and Sudray reports.  It is -- with respect to those reports, I

4  understood the plaintiff's position to have been that the

5  defendants had not pointed out any different number to such

6  that it would require the plaintiffs to respond.  That's not

7  the standard.  I have looked at the reports and what I expect

8  an expert report to do is to give specific detailed

9  calculations that can be followed by the person who's reading

10  the report with numbers and at least one example so that you

11  know not only the parameters that were used but the actual

12  numbers that were selected and the calculations that followed

13  the numbers.

14         So the reports that I saw did not conform to that

15  requirement.  Mr. Tolchin, you -- have you been in contact

16  with your experts about those reports?

17         MR. TOLCHIN: Let me answer like this.  First of all,

18  me personally no.  I will defer on this issue to Rachel Weiser

19  who's on the phone with us who is the attorney who is handling

20  the nuts and bolts of this but --

21         THE COURT: Before you continue, when I say you

22  either side.  I obviously don't mean the individual particular

23  attorney.  When I say you I --

24         MR. TOLCHIN:  Okay.  I appreciate that.  So let me

25  say one thing that I think I can contribute and then I will

6

1  defer to Rachel.  Our position with -- Your Honor stated what

2  our position was and I wanted to correct it.  I don't think

3  that you stated our position accurately.  Just to be clear

4  what we said is that we are willing to work with the defendant

5  and if there is anything that the defendant brings to our

6  attention which the defendant believes is not clear or is

7  missing or needs to be clarified or supplemented we are

8  willing to do that.  All we asked is that they should tell us

9  we don't understand how this calculation -- how this

10 particular calculation was done and then we'll know exactly

11 what we need to answer and go to the expert and get it

12 answered.

13         What we were having frustration with was just being

14 told your report is deficient and not -- without a specific

15 about what it was that they thought needed to be clarified but

16 with that being said, Rachel -- are you there, Rachel?

17         MS. WEISER: Yes, I'm here.  Your Honor, I have

18 reached out to the experts.  I assume that you're talking

19 about the economic reports.

20         THE COURT: That's correct.

21         MS. WEISER: Okay.  I have reached out to the

22 experts.  I have not yet spoken to them.  I am scheduled to

23 speak to one of them tomorrow and I'm waiting to hear back

24 from the other one.  I did ask defense counsel to give me some

25 more specifics about what it is [inaudible] calculation that

7

1    they have issue with.  We did discuss it in our meet and

2    confer but I actually I think I need to get some more

3    information from Brian and while he did provide to me a follow

4    up email to our meet and confer he didn't include any

5    information in that email about calculations that were still

6    needed.  So I'm not sure what he still needs but the answer in

7    a nutshell, Judge, is I will both speak to Brian and confer

8    with our experts and get whatever is needed.

9                MR. HILL: Your Honor, if I could be heard on this

10   briefly.  The issue here is whose responsibility it is to

11   comply with the rule.  I don't think I should be required to

12   tell the plaintiffs what's wrong with their reports when Your

13   Honor has looked at them and you can't follow the calculations

14   either.  I'm happy to do whatever Your Honor wants in the

15   spirit of working to accommodate counsel's concerns but it's

16   their job to give us a report that complies with the rule and

17   details the bases for the opinions and that's not been done

18   here.  So I don't think I should bear the burden of going

19   through all these reports and preparing a detailed list of

20   where their expert didn't do what the rule requires.   I think

21   if Your Honor is going to give them another chance they ought

22   to get a deadline to do it and they ought to produce them and

23   if they don't that ought to be it.  We shouldn't have to keep

24   going through this process of me improving their expert

25   reports which they didn't comply with the rule in the first

8

1 place.

2     THE COURT: Let -- this is for Ms. Weiser who's going

3 to be talking with the experts.  For example, I'm looking at

4 the expert report opinion with respect to Shawl Mandelcorn.

5 Within the report it talks about methodology.  It lists what

6 appear to be seven items listed A through G.  I don't know if

7 you have it there but -- or if you're familiar with it to know

8 what I'm talking about.  Actually --

9     MS. WEISER: I don't have it in front of me, Judge,

10 but --

11     THE COURT: What the expert said is the calculation

12 consists of nine steps applied as follows.  Then he says A)

13 determination of the valuation date.  Now, with respect to

14 that there's a date selected which is mid 2013.  That seems

15 self-explanatory.  I think even B and C might be self-

16 explanatory although I'm not exactly sure but it says, for

17 example, life expectancy and it says that Mandelcorn's life

18 expectancy is 82.1 years and reference -- see Reference 2.  I

19 don't know that it gives any information -- well, I'm not sure

20 whether defendants are in any better position than I am but I

21 know that if this report is submitted to the district judge,

22 the district judge is going to want to know how did one

23 determine that his life expectancy was 82.1 and the beginning

24 stages of that is at least we should know how old he is and

25 what table was used and where in the table it indicates that

9

1  his life expectancy is 82.1.

2          You have estimation of retirement age and it says

3  the customary retirement age of 67 according to Israel law

4  retirement age 2004.  I assume that -- that's again to

5  Reference 3.  That -- assuming that that reference is just a

6  table then that should be something which you could walk the

7  defendants through.

8          The next item is where I started to have problems

9  that were more serious and it talks about estimation of income

10  after retirement, and it states the income after retirement

11  was determined based on rates prescribed the mandatory pension

12  law in Israel that requires every employee to contribute to a

13  provident fund for their employees.  The deposits include an

14  old age pension and coverage in case of disability and death.

15  Nowhere is there a number that even tells me any of these,

16  what numbers are gotten by the expert, how they're fit into a

17  formula, what the law says.  So at this point I have no idea

18  what was going into the formula.

19          MR. HILL: Your Honor, just for the record.  Those

20  are the same -- actually two of the same exact concerns I

21  raised with the plaintiffs on Friday.

22          If I could, Your Honor, there is one related issue

23  which is this Reference 3 which Your Honor has just referenced

24  is the source of some of this information.  This is entirely

25  in Hebrew and we think this is an independent reason why the

1   report is not in compliance with the rule because it's not

2   transparent to an English reader what the source of the

3   information is not only from the text itself, not correlating

4   the reference, but the reference itself you can't verify the

5   assertion in the text.  So that's one of the reasons we asked

6   that it be stricken or alternatively at the very least that we

7   get an English version of this material that's appended to the

8   report.

9          THE COURT: Okay.

10          MR. TOLCHIN: You're talking about the life

11   expectancy, the Israeli life expectancy tables published by

12   the Israeli government?

13          MR. HILL: No.  This is a law, Mr. Tolchin.  This is

14   Exhibit 3.  It's the --

15          MR. TOLCHIN: The Israeli fact sheet.

16          THE COURT: Mr. Tolchin, do you have a question for

17   me there?

18          MR. TOLCHIN: I'm just trying to clarify what

19   document Mr. Hill was referring to.

20          THE COURT: Well, it says Reference 3 and I admit I

21   was unable to read it.  So I this instance it's also a

22   question of what are going to be the plaintiffs or anybody's

23   obligation with respect to any translation or the production

24   of any exhibits that accompany the report.  And in this case

25   this suffers from two problems.  One is, obviously I could not

11

1  read the exhibit and then I don't know even what they would

2  have -- even if the exhibit were in English I would still

3  expect to have more than a reference to an exhibit.  I'd like

4  to know what would the result of reference to the exhibits so

5  I could know what number they came up with and how they came

6  up with it.

7         But at the very least I think this is one instance

8  in which I agree with Mr. Hill that if you're going to present

9  an exhibit it needs to be something that can be followed by

10 the person who's reviewing the expert's work.

11        MR. TOLCHIN: We would -- we think the issue is more

12 complicated than that, Your Honor, and we would appreciate an

13 opportunity to present Your Honor with cases and authorities

14 but in general experts -- experts can rely on many things and

15 the things that the experts rely on are not necessarily

16 exhibits for the jury.  If it were being presented to the jury

17 I would have no doubt that it would need to be translated but

18 when an expert opining about a person's work life expectancy

19 or pension benefits available in Israel refers to a primary

20 source which is an Israeli statute or an Israeli life

21 expectancy table it's natural that those things will be in

22 Hebrew.  I would presume that the defendant's expert opining

23 on the same things will refer to the same sources and --

24        THE COURT: Well --

25        MR. TOLCHIN:  -- the trans --

12

1          THE COURT:  -- first of all, you're making

2   assumptions that I'm not making.  First of all, I'm not

3   assuming that the defendants would necessarily do anything in

4   terms of their experts.  They might not disagree with your

5   experts on life expectancy.

6          MR. HILL: Your Honor, the problem is --

7          MR. TOLCHIN: When we had this issue when we all

8   appeared in front of Judge Daniels this past summer -- I  wish

9   I had the transcript right here but this exact issue came up

10  and Judge Daniels -- I could dig it out and submit it to Your

11  Honor but Judge Daniels said very clearly that experts

12  [inaudible] and a lot of it is going to be in foreign

13  languages and if there's a problem about reading it people

14  need to get a lawyer who reads it or get somebody who can read

15  it.  If you can't --

16          THE COURT: If Judge Daniels has made general

17  statements -- I don't disagree with the general statement that

18  sometimes if there are references to foreign things you may

19  need to get somebody to do it.  I'm talking about this very

20  specific thing.  This is not a reference.  This is a reliance.

21  This is not a situation where a lawyer might say or an expert

22  would be asked well, how did you form that opinion and they

23  could say well, my general reading of Robert Conrad or

24  something in Russian or whatever it is and that's the

25  background material that I read.  But if you're going to rely

13

1  on a table that's different in kind, and if you think that --

2  if you think that Judge --

3        MR. TOLCHIN: This is more on the lines of if you

4  rely on the -- if the expert says that taxes will have to be

5  withheld pursuant to the Internal Revenue Code you wouldn't

6  expect that you'd have to translate the entire Internal

7  Revenue Code.

8        THE COURT: And we're not asking anybody to do the

9  entire anything.  We're just asking for a table.  If you're

10  relying -- if you're referring as opposed to relying, and

11  that's a difference -- I mean this is not someone who's saying

12  that I have general background and I've read it and I'm

13  familiar with it because -- you could have -- you could have a

14  scientist for example and a scientist who does a lot of

15  scientific information is in different languages and they

16  could say I've read information about gastroenteritis affects

17  somebody's mental state and I read it because there was a

18  Russian report on it.  Well, that's fine.  You could do that

19  and I would say well, if he's done that and he's read that in

20  Russian that's good because he can read it in Russian because

21  a lot of the information is in Russian.

22        But if he has a table such as this in which he says

23  I looked at this table and here's what I got from this table,

24  that's different.  If you think Judge Daniels ruled on that

25  then you have two choices.  One, you can rely on the fact that

14

1  you think Judge Daniels relied on it and you can do whatever

2  you think is appropriate or you can go ahead and produce the

3  translation because I tell you if you don't produce the

4  translation I'm going to find that you have not -- your expert

5  report is inadequate.  Then you can find out if Judge Daniels

6  actually ruled in your favor.

7          MS. WEISER: Your Honor, this is Rachel if I may.

8  I'm not sure that we have a major issue with this translating

9  the tables.  I don't think that is going to be difficult but I

10  think there's a broader problem here because the defendants

11  are taking a position that everything that our experts relied

12  upon in a foreign language has to be translated for them and

13  that is contrary to the position they've taken across the

14  board in this case beforehand and everything they've ever

15  produced to us.  And we don't have translations and we're

16  talking about hundreds of pages and --

17          THE COURT: And now you're getting ahead of yourself.

18          MS. WEISER: I don't --

19          THE COURT: This issue now and -- as I said, with

20  respect to this issue, if you're talking about referring to a

21  table this is not general reliance.  This is referring to a

22  table and as far as that is concerned you can't just say I

23  refer to this -- I refer to a table and it's in a foreign

24  language, if you want it, go get it translated.  That's not

25  going to work with respect to tables.

15

1      MR. TOLCHIN: Okay.

2      THE COURT: Who said okay?

3      MR. TOLCHIN: That was Bob Tolchin.

4      THE COURT: Understand that with respect to these

5  calculations I think it's important, and I think this would be

6  important whether or not it -- as I said, it doesn't matter to

7  me that -- well, over and above the question of whether or not

8  the tables are in a foreign language, with respect to

9  calculations the party who has received the report ought to

10 know what numbers went into the calculation and where -- and

11 where they were derived from.  In this case the report doesn't

12 even say what number was derived.  It just refers to the

13 table.  So it's deficient on a more basic level of what the

14 translation would say.  So with respect to --

15      MS. WEISER: Your Honor, [inaudible].

16      THE COURT: So with respect to that, I know that with

17 respect to Weinstein and Sudray there were problems.

18      Let me move on to some of the general issues so that

19 we can try to have this done in some reasonable amount of

20 time.

21      MR. HILL: Your Honor, I don't want to detain us but

22 someone was typing and I may have missed something that you

23 said.  Have you ruled that the plaintiffs are going to have to

24 produce new reports for Mr. Sudray and Mr. Weinstein?

25      MR. TOLCHIN: I don't know if they have to be new

16

reports over all but the Weinstein and Sudray reports need to

have translations of any tables that are referred to and the

actual numbers that are derived from the table.  That is, it's

not enough to just translate the tables but to actually

indicate from the table which numbers were selected.

MR. HILL: Thank you, Your Honor.

MR. TOLCHIN: One issue is translating whatever was

in Hebrew on the table but the other issue is have the experts

specify [inaudible] went to the 49 year old line and came

across to column C and that's the number I used.

THE COURT: Correct.  Now, with respect to the

footnotes that are referenced in the various reports, did the

parties make any progress on their own?

MR. HILL: Yes, Your Honor.  I can give you an update

on that.  So we have conferred and I have now given the

plaintiffs lists for all five of the reports about which we

complained in my letter of April 17th.  We have at the

plaintiff's request also gone over our lists to make sure we

have -- we cannot in fact find these materials and as of right

now of the 762 footnotes in these five reports there are 251

footnotes for which we cannot find the material that the

plaintiffs have referenced.  They're not evenly distributed so

I don't want the Court to conclude that it's 50 in each one of

them.

For Mr. Atticott we're down to one document where we

17

1    can't find the footnote.  For Mr. Levitt we're down to 13

2    documents but for the other three it's still a very

3    substantial number of documents.  For Mr. Karsh we cannot find

4    98 out of the 110 sources that are included in its footnotes.

5    For Mr. Shockhead we can't find 62 out of 177 footnoted

6    sources and for Mr. Shrexnell we can't find 77 out of 329

7    sources.

8           As Your Honor knows, our position is that this is

9    material that was required to be either produced, the

10   documents had to be produced or at the very least we had to

11   have references that we could find the documents for on the

12   day the reports were due and that therefore they're not in

13   compliance with Rule 26 and our request is that Your Honor

14   exclude the witnesses for that reason.

15          THE COURT: Let me first say I'm glad you made some

16   progress but also state clearly what my position is with

17   respect to this.  I think the latter position that Mr. Hill

18   took is closer to where I am.  That is, to the extent that

19   there are footnotes or references to publicly available

20   information, for example if somebody referenced a *Law Review*

21   article or an article in the *New York Times* or the *New York*

22   *Law Journal* and said they relied on that, to the extent that

23   it's available and the other party can reference it either

24   online or otherwise that seems to me to be fine because I

25   wouldn't expect any more than if somebody were referring to

1    cases for someone to be required to put copies of it.  But to

2    the extent that they are not readily available and the other

3    side cannot and specifically says to their opponent you've got

4    these references, we cannot find them, then it is incumbent

5    upon the expert and the party who retained that expert to make

6    sure that the other party has copies of the referenced

7    material.  That is my position.

8            Now, I understand that Mr. Hill does want these

9    things stricken but as I said I think when the issue is first

10   presented as to whether or not information in footnotes need

11   to be presented I don't think as a general rule that it's

12   necessary but obviously I had no idea how difficult it might

13   be to find some of the sources or whether or not they were

14   readily available.  But before I would strike anybody I would

15   certainly give the party whose expert it is an opportunity to

16   see how much of this would be remedied and then I would make a

17   ruling in terms of the total context of the circumstances.

18           MR. TOLCHIN:  Your Honor, this is Bob Tolchin.  We

19   have been working towards that goal.  We've made it clear to

20   the defendants that we will work with them to help them find

21   every one of the sources.

22           By the way, one of the reasons why the list of

23   sources that they couldn't find when found was that some of

24   the citations that they had said were no good actually turned

25   out to be good.  There was nothing wrong with them.  We found

1  them readily and we are -- we -- I should say Rachel is hot on

2  the trail of the rest and it's just a question of working with

3  the experts, making them go back to their -- to whatever their

4  sources are and pull out those articles or links or cites or

5  whatever they are so that we can square them away but it's not

6  something that can be done in a minute because of the volume

7  but we are working on it assiduously.

8           Somebody seems -- there seems to be somebody with

9  cross talk on this line.

10          THE COURT: There's some garbling on the line.  Is

11  that any of the attorneys or just -

12          MR. TOLCHIN: Mr. Hill, are you still there?

13          MR. HILL: I'm still here, Your Honor, and I can hear

14  you.

15          MS. WEISER: I'm here.

16          THE COURT: I think some feed --

17          MR. TOLCHIN: I don't know what that was.

18          THE COURT: I think that's feedback from one of the

19  phones.

20          MR. TOLCHIN: That could be.  So I hope you heard --

21  I hope everything I said came through.  We are working

22  assiduously to remedy -- what is that?  We're working

23  assiduously to remedy the defects.

24          THE COURT: Actually I think, Mr. Tolchin, it's your

25  actual feedback that's being -- it's coming -- after you talk

20

1   it just -- it does a delay and then there's the feedback.

2              MR. TOLCHIN: I think I'm being persecuted by the

3   phone company.

4              THE COURT: So you understand what it is that I

5   require in order for compliance.  At the end we'll have to

6   total all of this up.

7              But with respect to documents -- to some extent

8   the -- hold on a second.

9                    [Pause in proceedings.]

10             THE COURT: I'm back.  I'm sorry about that.  Is

11  everybody still there?

12             MR. HILL:  The defendants are here, Your Honor.

13             MR. TOLCHIN: Yes, Your Honor.

14             MS. WEISER: Yes.

15             THE COURT: Okay.  Now I think we've come to the

16  issue that Ms. Weiser wanted to raise concerning documents

17  that are in Hebrew.  If I understand correctly the assertion

18  by the plaintiffs is that they do not have translations.

19             MR. TOLCHIN: That's correct.  Our experts who worked

20  with documents in foreign languages worked with them directly

21  in the original language.

22             MR. HILL: Your Honor, this is Brian Hill.  Could I

23  be heard very briefly on this particularly with respect to Mr.

24  Kaufman because I think there is a data point Your Honor may

25  not have because I spared actually sending you the appendices

21

1  to his report.

2         Mr. Kaufman is the principal offender in -- with

3  respect to this particular issue.  In his report on Page 7 he

4  says "Each case corresponds to an annex contained in the table

5  below and the materials made available to me are appended to

6  my opinion as an integral part thereof."  Then he lists on the

7  pages that follow 7, 8 and 9, 21 appendices pertaining to 21

8  individuals.  I had a hard copy set of these appendices made

9  so I could work with them.  I'm looking at them right now in a

10 box in my conference room.  They consist of four three-inch

11 binders of material that are double sided.  So this is well in

12 excess of 3,000 and perhaps 4,000 pages of appendices that Mr.

13 Kaufman has indicated are an integral part of his opinion.

14 Only 23 pages of those three or 4,000 pages of material are in

15 English.

16        It is our position that this does not comply with

17 the requirement of Rule 26 because I cannot, and I didn't send

18 them to you, but you cannot read these materials that the

19 expert has said are an integral part of his opinion.

20 Moreover, the way he's using the materials is he's reviewing

21 them and then he's opining that the documents, these

22 materials, these appendices indicate that these proceedings

23 comported with due process.  It is impossible for us to test

24 that opinion without knowing what these integral documents in

25 the appendices say, and it's for that reason it is our

22

1   position that this does not conform with Rule 26 and that Mr.

2   Kaufman's testimony ought to be excluded.

3          MR. TOLCHIN: Your Honor, may I be heard?

4          THE COURT: Yes, go ahead.

5          MR. TOLCHIN: I'll -- again, I will say what I have

6   to say but also defer to Rachel if she has something to add.

7          The issue comes -- the issue arises because of

8   things that people have said or admitted or findings that have

9   been -- testimony that's been given in Israeli court

10  proceedings or findings that have been made by Israeli courts.

11  The documents referred to are court records of Israeli court

12  proceedings and the issue is whether the witness testifying or

13  the person charged and found guilty was afforded something

14  resembling due process rights so that the admission,

15  conviction, et cetera would be useable here.

16         So Mr. Kaufman refers to a document -- he's

17  referring to this proceeding and that proceeding.  His report

18  is only the part that he wrote which is 100 percent in

19  English.  He's referring to the primary source which is the

20  foundation as it were of his opinion.  I think it comes

21  through clearly here that what Mr. Hill is asking is for us to

22  be compelled to translate thousands of pages of court records

23  when the issue that the opinion concerns is whether or not the

24  witness had due process rights.

25         And I know from my experience with another case

23

1  involving -- which also involves Mr. Hill they took the

2  opposite point of view and they have an Israeli lawyer who

3  comes as an expert to say why he thinks that there were no due

4  process rights or why there are defects in the process.

5       MR. HILL: Your Honor, if I can -- I'm sorry, go

6  ahead, Mr. Tolchin.

7       THE COURT: Actually, frankly, I've indulged both of

8  you because I know you wanted to speak but as to this issue

9  I'm still not sure frankly in weighing this issue in terms of

10 the burdens and benefits of it what it is that -- why this is

11 such an issue.  Frankly, the fact that the expert gave summary

12 of the cases seem to me to be sufficient in order to get a

13 sense of what these -- the Hebrew documents were about.  But

14 as to whether or not or not there's -- the only question I

15 asked is whether or not there were translations.  It seems to

16 me that if the answer to that is there are no translations the

17 only question is given what the nature of the expert's opinion

18 and the burden to be placed on anyone in making translations

19 of this I don't see the benefit of having actual translations.

20      MR. HILL: Your Honor, if I could be heard briefly.

21 The disadvantage that this places me at is I can't assess this

22 witness' opinion.  He's saying I've read thousands of pages of

23 documents and they comport with due process and as a lawyer

24 trying to prepare to cross-examine the witness or depose the

25 witness or test the opinion, I don't have any ability to do

24

1   that because the documents are not in English.

2          Your Honor makes the point that he purports to

3   summarize them but I don't know the accuracy of the summary

4   because I can't access the underlying material, and that's the

5   prejudice that the defendants are suffering here.

6          Let me just make one other point, Your Honor, which

7   again may to be clear given that you don't have the documents

8   but these are not documents that were produced to us

9   necessarily in discovery.  We are in the process of trying to

10  correlate this massive collection of Hebrew language documents

11  with the plaintiff's documents production over the course of

12  discovery.  But it is apparent to us from the work we've been

13  able to do so far which involves as Your Honor may appreciate

14  looking at a document that's in a foreign language and trying

15  to see if we have that same document which is also in a

16  foreign language which is very difficult to do.  It's apparent

17  to us though many, many of these documents were not produced

18  to us in discovery.

19         So for the first time after the close of fact

20  discovery we've got a massive production of foreign language

21  documents.  We've got a witness that says I've read them all

22  and they comport with due process and we're supposed to try

23  and respond to these opinions, and our position is it doesn't

24  adequately disclose the facts or data considered by the

25  witness in forming the opinions or frankly the basis or

25

reasons for the opinion because the nature of the expert's

report is I've read the file and it comports with due process.

Well, if we can't read the file we can't understand the basis

for his opinion.

THE COURT: Duly noted but my ruling stands.

The next broad issue that the parties raise concern

where and when the experts would be deposed.  Let me give my

general considerations here.  One, this is not an issue that's

going to be decided by reference to a particular case in the

past.  Each of these experts and in fact any witness, the

question of where and when they will be deposed is a function

of reviewing and considering the circumstances of that

particular expert and the burden and benefits of them being

deposed in one place or another.  It is certainly true that in

many cases witnesses are required to appear here in the

Southern District.  It's also clear that I've had cases in

which none of the witnesses were required to appear in the

Southern District.  I fear that the issue here is not whether

or not the parties can agree on the general proposition that

[inaudible] take depositions at a place and a time that is

efficient under the rules but that you can't agree on too much

of anything.

Now, with respect to these experts, the deficiency I

have here is that the parties seem to think that this is some

legal issue that if you just say okay, this is -- from the

1  plaintiff's point of view the individuals are outside of the

2  United States and it's hard to coordinate their schedules and

3  they have personal issues in general terms.  Therefore, we

4  need to go where they are and the plaintiff seems to think

5  that the case was brought here in the Southern District and in

6  general you take the depositions here, end of story.  Well,

7  it's just not that simple.

8          MR. TOLCHIN: That was the defendant's position.  I

9  think you just misstated that it was the plaintiff's --

10         THE COURT: I should have said defendant's and vice-

11 versa.

12         MR. TOLCHIN: I think you said plaintiffs when you

13 meant defendants.

14         THE COURT: Did I say defendants when I meant

15 plaintiffs or did I just mention one --

16         MR. TOLCHIN: I don't think so.  I don't think so.  I

17 think it was only -- I think you only misspoke once but I

18 apologize for interrupting.

19         THE COURT: I assume everybody understood what I was

20 saying that one side is taking one position and the other is

21 taking another, and that it's just not that simple, Counsel,

22 and I'm sure you know that.  If you really think that the

23 deposition ought to take place in one -- for each of these

24 witnesses you need to tell me why it ought to be for each of

25 these witnesses.  For some of them maybe they should be taken

27

1    someplace else and for others they ought to be required to

2    come here but --

3            MR. HILL: Well, Your Honor, this is Brian Hill.  I

4    can narrow the issue perhaps.  With respect to the three

5    domestic experts they've identified which are Atticott, Levitt

6    and Sudray, the plaintiffs have agreed to produce them either

7    in New York or Washington.  So we don't have an issue there.

8    With respect to one of the eight Israeli experts the

9    plaintiffs have identified, they've represented that Mr.

10   Shockhead's wife has a disease that prevents him from leaving

11   her.  I take that to be a true representation and assuming

12   that it is true we would accommodate Mr. Shockhead's family

13   consideration by either taking him in Israel or taking him

14   remotely.

15           But with respect to the seven remaining Israeli

16   experts, the plaintiffs in our view have not offered any

17   reason why they can't come to New York to be deposed apart

18   from two of them allegedly having busy schedules, and it's our

19   position therefore that having chose to proceed in New York

20   the plaintiffs ought to be required to bring their experts to

21   New York to be deposed and the defendants ought not to incur

22   the cost of requiring their lawyers to travel to the Middle

23   East for what would be at least a week and possibly more of

24   these depositions.

25           THE COURT: I understood that to be a position

1  although I wouldn't dismiss out of hand the fact that experts

2  have busy schedules because we're trying to schedule all these

3  depositions.  So that will be a consideration.  For example,

4  I've had experts in medical cases who were surgeons and they

5  have a full range of surgeries scheduled and the question is

6  okay, how do we accommodate the surgery that's going to be

7  done, how are we going to limit the cost, how are we going to

8  do this in the shortest amount of time and still get all of

9  this -- take all these things into account, and it's not as

10 simple as -- it's not even simple to know which is going to

11 cost the most.

12         MR. TOLCHIN: Your Honor --

13         MS. WEISER: Your Honor --

14         MR. TOLCHIN:  -- it's Bob Tolchin and Rachel also

15 wants to say something.  I'm glad that you brought up the

16 issue about a busy surgeon.  In our case, for example, one of

17 our experts is not a surgeon but a physician who has patients

18 who have to waits months for an appointment with him.

19         THE COURT: Okay.  Before --

20         MR. TOLCHIN: In his case --

21         THE COURT: Before you continue, Mr. Tolchin, I want

22 it to be clear I'm not going to decide this based upon the ad

23 hoc arguments from any of you.  What I want you to understand

24 and I want everybody to understand is the discussions you

25 should be having are all these things, the totality of the

29

1  circumstances.  You should not -- and this is the way it's

2  going to go.  If you have any -- if the plaintiffs have

3  reasons why they should be taken other than here in this

4  District all those reasons should be put on the table for the

5  defendants so that they can take them into consideration.

6          Likewise, any reason that the defendants believe

7  that the depositions ought to for any of the individual

8  witnesses ought to take place here, they ought to put all of

9  that on the table because what's going to happen is this.

10  You're going to -- with respect to each of these seven experts

11  you're going to put your cards on the table and when you've

12  done that if you're not able to change the other side's mind

13  you'll present to me only the arguments that you presented to

14  the other side.  No new arguments and based upon that I will

15  dictate where the depositions ought to take place.

16          I understand that some of the considerations may

17  have to do with timing.  If those are the issues you present

18  those issues to me also.

19          MR. HILL: Your Honor, I think we're there.  I think

20  we had this conversation on Friday and we know where we

21  disagree.  We disagree about whether the defendants are

22  allowed or permitted or entitled to take the depositions

23  before the defendant's reports.  The plaintiff's position is

24  we should not take any depositions until after the rebuttal

25  reports, and with respect to the venue I believe we have

1  exchanged the very sort of information Your Honor has

2  outlined.  The plaintiffs have represented to me that Dr.

3  Friedman has patients scheduled for many months and that Mr.

4  Kaufman is a busy lawyer.  That's the information I've got.

5       MR. TOLCHIN: Your Honor, the issue that -- this is

6  Bob Tolchin.  The issue that Mr. Hill just alluded to actually

7  could wind up changing people's respective positions.  Just to

8  clarify --

9       THE COURT: What issue?

10      MR. TOLCHIN: The issue of the timing of the

11  depositions.  Just to say it succinctly, the plaintiffs

12  believe that the depositions of the experts should take place

13  after all expert reports are done, meaning plaintiff's

14  reports, defendant's reports and any rebuttal reports

15  exchanged and then depose the experts.  The defendants on the

16  other hand want to depose the plaintiff's experts before they

17  have to serve their reports and then they potentially want to

18  depose the experts again after they receive rebuttal reports.

19      Now, the reason that I say that clarifying this

20  point might change things is we anticipate -- we expect that

21  at least some of the defendant's experts will also be in

22  Israel and if we are going to depose all the experts after the

23  reports, in other words all the experts closer to the end,

24  then we will be deposing their experts in Israel.  We're not

25  planning to make the experts come here.  We will go there.  So

1    if we would be going there to depose the defendant's experts

2    it would be very -- it would be much more efficient and

3    expedient to use the same trip to depose the plaintiff's

4    experts who are in Israel.

5           The other thing -- so that's one issue that's sort

6    of a threshold issue that might change people's minds.  The

7    other issue that might change people's minds is the issue of

8    travel costs.  Mr. Hill told me that he doesn't believe that

9    the defendant has to pay the travel costs for the experts to

10   travel to New York for their depositions.  As I understand the

11   rule, the defendant has to pay the experts for their time and

12   for their cost of coming.

13          Now, I believe that part of Mr. Hill's insistence

14   that the experts come to New York is based on his belief that

15   that would be on our dime and not on the defendant's dime.  I

16   think if it would be clarified, if the Court would rule that

17   the defendant has to pay that Mr. Hill may well change his

18   mind because he did tell me that he was interested in saving

19   his clients money.

20          MR. HILL: Your Honor, I'm not sure if you want me to

21   respond to that or not.  I'm happy to if you'd like.

22          THE COURT: Is this one of the issues that divided

23   the parties as to who's going to pay what costs for travel?

24          MR. HILL: I would think it would not be appropriate

25   to require the defendants who did not choose to be in New York

32

1   and in fact have resisted being there on a claim that there's
2   no personal jurisdiction over them -- I recognize that Judge
3   Daniels has disagreed with that claim.  It would be unfair to
4   require them having being hailed into court in New York to pay
5   for the experts that the plaintiffs chose from overseas to
6   travel to the forum to be deposed.  I think it's the same
7   issue as it was with the plaintiffs themselves when you
8   required them to come to New York to be deposed because they
9   had chosen the forum and the plaintiffs bore those expenses
10  themselves.
11          It wouldn't be appropriate to charge the defendant
12  for the plaintiff's decision to choose a foreign expert as
13  opposed to hiring a New York expert to do this work.
14          THE COURT: Do you have some authority for your
15  position?
16          MR. HILL: I do, Your Honor, and I apologize I don't
17  have the citation with me but I could email it to your clerk
18  very quickly after we get off the phone or perhaps I'll have
19  my associate run and get it right now.
20          THE COURT: When I say authority, I under -- I know
21  that sometimes people quote, on both sides quote my cases to
22  me but I know of cases in which this is -- in which it's been
23  ordered both ways.
24          MR. HILL: It is clearly within the Court's
25  discretion.  I don't disagree with that.

1    THE COURT: Indeed I -- this is why I have to make

2    clear to the parties that you may not have put all of the

3    considerations before me.  For example, I know of situations

4    where there have been experts who have been required to -- who

5    have been brought here from the west coast or from Kansas City

6    and it costs more than bringing them from Europe but the

7    Court -- do you understand what I'm saying?

8    MR. HILL: Yes, Your Honor.  I don't happen to know

9    what the cost of the airfare from Tel Aviv is but it's -- I

10   don't know that it's substantially less than coming from

11   California.

12   THE COURT: The counterbalance of that is I still

13   don't have a sense of what that would require in terms of the

14   attorneys in terms of them traveling.

15   MR. HILL: Well, Your Honor, just to go with the

16   facts that we have out there so far, we're talking about eight

17   experts.  I know the plaintiffs are not going to depositions

18   on a Saturday no matter where we are.  So that means we're

19   going to be in the Middle East for at least a week and over a

20   weekend if we were to do all these depositions over there.  So

21   the notion that it's going to be a short efficient trip to go

22   over there and do everyone I don't think that's the case at

23   all.  I think we'd be talking several weeks, at least two

24   weeks just to do these eight witnesses that we're talking

25   about and it would be a big expense to our clients to have to

34

1    send us there, keep us over there, have us stay over the

2    weekend and it would be more efficient and less expensive for

3    everyone frankly to have the witnesses come to the states and

4    to be deposed because then counsel would not have to travel or

5    we'd only be traveling from [inaudible] New York which is a

6    much shorter and less expensive trip than [inaudible].

7             MR. TOLCHIN: It's hardly the case, Your Honor.

8             MS. WEISER: [Inaudible]

9             MR. TOLCHIN: Go ahead, Rachel.

10            THE COURT: Hello?

11            MS. WEISER: If I may.  Your Honor, may I respond?

12            THE COURT: Go ahead.

13            MS. WEISER: First of all, the notion that the fact

14   that the plaintiffs filed suit in New York and therefore the

15   experts have to come to New York is frankly contrary to policy

16   and practice that has been going in courts for years now.  We

17   live in a very global world.  I was involved in a lot of

18   malpractice years ago.  Judge, never do experts come to the

19   lawyers.  Lawyers always go to the experts.  Absolutely common

20   practice.  So it would be actually against the norm to require

21   the experts to come.

22            Second of all, clearly [inaudible] lawyers would

23   still have to travel.  I mean the fact that we have counsel in

24   New York doesn't mean that we don't have lawyers in Israel who

25   also are intimately involved in these cases and working with

1  the experts.  So even way lawyers are going to have to travel.

2  The expense of having the experts travel versus the lawyers is

3  enormous because we're talking about -- all of the lawyers can

4  be in one place and all of the witnesses one after another in

5  a week or two.  But if we have to require the experts to go to

6  New York we're talking about disrupting their lives for four

7  or five days.  They have to fly.  They have to get there on

8  time, get over jet lag.  Be prepared to be deposed.  They

9  can't leave that day because we don't know what time the

10 deposition is going to end.  So they have to leave the next

11 day.  So it's at least a four or five day process for the

12 experts, disruption in their life and their practices.

13         THE COURT: Let me -- Ms. Weiser, let me interrupt

14 you because --

15         MS. WEISER: Sure.

16         THE COURT:  -- I'm not sure if counsel is getting my

17 message here.  Each -- I've had three lawyers weigh in and

18 tell me stuff that I've heard for the last 15 or 20 years.  I

19 understand that there are multiple things that can come into

20 play.  I understand that there are practices, there are

21 policies, but when it comes right down to it these are

22 individual determinations that need -- I need to know the

23 factors in this case.  If you cannot agree then all the things

24 that counsel have been saying you present them to me.  I

25 understand the disruptions.  I understand -- I think it should

36

1   be fairly clear that for some experts having the experts come

2   here creates more problems in terms of the disruptions of

3   their practices, their patient's practices, the travel could

4   be complicated, who pays what.  There are a number of issues.

5   I understand that there are lots of issues but I still don't

6   know how they apply in this case.  That's what I want the

7   parties to be telling me, why -- it may be that the plaintiffs

8   will take the position that we have seven experts in Israel

9   and if you put them all together we can do them all in a week.

10          I don't know but I want the parties to be clear on

11  is this.  You tell me what it is that you want me to weigh.

12  You'll be on the record.  I will make a determination.  If you

13  disagree with it there will be enough on the record so that

14  everyone will know what I took into account and what you put

15  on the table.  I don't want anybody to have me make a ruling

16  and then say well, you didn't consider X and we didn't get an

17  opportunity to say that.  I'm giving you the full and fair

18  opportunity to tell me why the deposition should take place in

19  any place.

20          MR. HILL: Your Honor, this is Brian Hill.

21          THE COURT:  Did I lose somebody?

22          MR. HILL: Your Honor, this is Brian Hill.  How do yo

23  want us to convey that information to you?  Would you like a

24  letter from each side or -- what would you like us to do?

25          THE COURT: What I would prefer is one letter in

37

1   which you talked about -- in this case I understand why it

2   might be -- you might have a global answer and then you might

3   have individual answers.  But for each of these witnesses,

4   each of these experts I want to know the pros and cons for

5   each side in one letter why they should be deposed either in

6   New York or in Israel.

7           MR. HILL: Would Your Honor like to set a schedule

8   for those letters and do you have a preference as to who goes

9   first?

10          THE COURT: I would like one letter.

11          MR. HILL: You would like a letter to be joint of the

12  parties positions.  I understand.

13          MR. TOLCHIN: Does Your Honor mean a joint letter?

14          THE COURT: Yes.

15          MR. TOLCHIN: In other words, this is plaintiff's

16  position and this is defendant's position?:

17          THE COURT: That is correct.

18          MR. HILL: We're happy to provide that to Your Honor.

19  Could we get a date?  We'll get it done.

20          THE COURT: You're sure you can do that.  Mr. Hill

21  represented that most of this was already on the table.

22          MR. HILL: I believe it's all been discussed

23  previously, Your Honor, so I'd like to get it done if not by

24  Friday, early next week so that we can move forward on this

25  issue.

38

```
 1              THE COURT: I think --

 2              MR. TOLCHIN: I think realistically it should be a

 3    date next week.  It's already getting late on Wednesday.

 4              THE COURT: I understand that -- and frankly I share

 5    the sentiment that we should do this as quickly as possible

 6    although realistically I'm going to set the date for Tuesday.

 7              MR. TOLCHIN: Understood, Your Honor.

 8              THE COURT: After the timing issue I'd like to fold

 9    that in with this issue because I agree with Mr. Tolchin in

10    that respect that to some extent the answer to how one or

11    where one does the depositions is [inaudible] by when you do

12    the depositions.  But I think Mr. Hill is also right that

13    knowing how lawyers generally do expert depositions I don't

14    know that you will be able to complete even seven experts in

15    one week.

16              MR. HILL: Okay, Your Honor.  We'll submit those

17    issues to you in a joint letter by Tuesday.

18              THE COURT: Okay.

19              MS. WEISER: Your Honor, one quick question.  I

20    understand you want us to include the issue of where the

21    depositions are taking place and also the issue of timing.

22    Did you also want the issue of who covers what expense or is

23    that something that will be dealt with after?

24              THE COURT: Include that also because also understand

25    that who covers the expense while I know each side has weighed
```

1   in on that that still falls into the category of discretion.

2   There may -- in many cases it's done one way because the

3   parties have agreed to do it that way.  These issues often

4   don't come up in situations in which I have two equal parties

5   on either side because they want to -- they decide to bear

6   their own expenses and it works out.  It usually only comes up

7   in which one party is claiming that they don't have the

8   ability to pay but if you want to -- if you have views on that

9   by all means add that in.

10          MR. HILL: Your Honor, I don't know if you've covered

11   all the items on your agenda but [inaudible - breaking up].

12          THE COURT: The telephone made that almost

13   unintelligible.

14          MR. HILL: I beg your pardon, Your Honor.  Your

15   Honor --

16          THE COURT: It's not your fault.  Your echo was over

17   your words.

18          MR. HILL: I don't know if you've addressed all the

19   items on your agenda but as the person who has reports due

20   tomorrow I would prefer to get some guidance on where we are

21   on the schedule and whether the deadlines are going to move

22   and if so what my new deadlines will be.

23          THE COURT: The deadlines are definitely going to

24   move.  As to what your deadlines are, I will -- you should

25   anticipate that you will get one week after I decide this

40

1    issue.

2            MR. HILL: So, Your Honor, let me just be clear about

3    where I'm coming from.  You have directed the plaintiffs today

4    to produce supplemental or new reports for some of their

5    experts.  You have directed them today to produce materials

6    cited in footnotes that we've been unable to locate.  It's my

7    position that I shouldn't be required to tender my expert

8    reports until a reasonable period of time after we in fact get

9    the material that you have held today as required by Rule 26.

10           So I guess what I would propose is that we get a

11   deadline for the plaintiffs to provide these cures or

12   supplementations or whatever the right phrase is to bring

13   their reports into compliance with Rule 26 and then my reports

14   be due at a reasonable date after that, let us call it the

15   third --

16           THE COURT: Well, why don't we do this?  Since I've

17   just made the rulings and you're going to be reporting to me

18   on Tuesday, Ms. Weiser and Mr. Tolchin, I expect that what --

19   one thing that you'll do is is that you will find out how long

20   it will -- or give some estimate with your experts how long

21   it's going to take for them to have compliance with the

22   orders.  Let me know about that and hopefully that means I'll

23   be able to rule on this issue that Mr. Hill has brought up at

24   the same time.  Frankly I don't see the efficacy of making a

25   deadline that I don't know the difficulties of complying with

41

1  because it's just going to create another issue.

2          MR. HILL: So, Your Honor, just for my purposes and

3  for the purposes of my experts, at this point my existing

4  deadlines for reports are adjourned sine die.  Is that

5  accurate?

6          THE COURT: I guess sine die would be the correct

7  term, yes.

8          MR. HILL: Thank you, Your Honor.  I have only one

9  other item I just wanted to alert the Court to.  During our

10  last call we had a discussion about the deposition of Varda

11  Gueda [Ph.].  We have now agreed that that's going to take

12  place on May 7th in New York at eleven a.m.  I just wanted to

13  inquire of whether the Court would be in the office that day

14  in case we needed to reach you telephonically for issues that

15  may arise in that deposition.

16          THE COURT: What day of the week is that?

17          MR. HILL: That is -- I don't have my calendar open.

18  I believe it is a Wednesday or perhaps a Tuesday.

19          THE COURT: May 8th is a Wednesday.

20          MR. HILL: Tuesday, May 7th beginning at eleven a.m.

21          THE COURT: If your question is whether or not we'll

22  be in chambers as opposed to in court?

23          MR. HILL: Yes, Your Honor.  Or if there's a

24  particular time that day if we need to call you.

25          THE COURT: Well, typically we'd be in court except

42

1  during the lunch hour.  So I don't if I could tell you any

2  particular time that would be good but you're usually able to

3  reach somebody in my chambers but typically we'd be in court

4  during the day almost -- sometimes depending on how the

5  afternoon session goes we might go to six or 6:30.

6        MR. HILL: We will obviously only call if we have

7  need.  I just wanted to confirm that you were potentially

8  available if we needed you.

9        THE COURT: We'll be around.  So, Mr. Tolchin, Ms.

10  Weiser, I understand that what I expect is that you will get

11  back to me once you've conferred with your experts about the

12  compliance and how long it would take and if it's just a

13  matter to pulling together, for example, things that they

14  already have maybe it's a short amount of time.  I don't know

15  but I want you to give me some information so I don't --

16        MR. TOLCHIN: My gut tells me, Your Honor, that the

17  bulk of it is going to be in short order but there's going to

18  be some lingering particular items that are more challenging.

19        THE COURT: Well, at least if I know what is produced

20  and what remains I can make a determination of how I want to

21  handle it with respect to Mr. Hill.  I understand Mr. Hill's

22  concern but I do want to make sure that we're not held hostage

23  to something which might be very difficult to complete and

24  might not require the holding up of the other reports.  But

25  I'd like to see what it is that we were dealing with before I

43

1    make that determination.

2            If there's nothing further I'm looking forward to

3    seeing what you produce.

4            MR. HILL: Thank you, Your Honor.

5            MR. TOLCHIN: Thank you very much, Your Honor.

6            THE COURT: We're adjourned.  Thank you.

7            MS. WEISER: Thank you.

8                        * * * * *

44

1          I certify that the foregoing is a court transcript from

2    an electronic sound recording of the proceedings in the above-

3    entitled matter.

4

5                              _____

6                                        Shari Riemer

7    Dated:   July 24, 2013