# EXHIBIT  A

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 07/26/13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARK I. SOKOLOW, et al.,

Plaintiffs,

- against -

PALESTINE LIBERATION ORGANIZATION, et al.,

Defendants.

**ORDER**

**04 Civ. 397 (GBD) (RLE)**

**RONALD L. ELLIS, United States Magistrate Judge:**

The Court held a telephone conference with the Parties on June 17, 2013. The Court issued a number of rulings at that conference, which are set forth below.

**1. Plaintiffs' Application Regarding Defendants' Rule 30(b)(6) Depositions**

On December 3, 2012, Defendants filed a premotion letter asking the Court to enter a protective order against Plaintiffs' proposed Rule 30(b)(6) depositions. During a December 20, 2012 telephone conference, the Court found that the topics in the deposition notices as then drafted were not contemplated or appropriate for a 30(b)(6) witness, and were overly broad and unduly burdensome. (DE 293-1 at 5: 6-8.) The Court granted the protective order but allowed Plaintiffs an opportunity to propose, or for the Parties to propose jointly, either an agreement about how to give Plaintiffs appropriate discovery or an application from Plaintiffs for discovery which did not run afoul of the Court's ruling. (DE 16:18 - 17:3.) Plaintiffs renewed their motion on January 7, 2013, to have the Court order Defendants to produce witnesses under Rule (30)(b)(6), or by such other method as the Court deemed proper regarding certain topics. (DE 295; DE 296.) Plaintiffs explained that the Parties had conferred as directed, but were unable to reach agreement. (DE 296 at 1-2.) The Court held a telephone conference on February 13, 2013, and denied Plaintiffs' motion on the grounds that the matters designated as

Rule 30(b)(6) topics were again, not appropriate, and could have been the subject of an interrogatory or a request to admit. (2/13/13 Tr., 4: 17-26.) Plaintiffs requested permission to recast their Rule 30(b)(6) topics as interrogatories, and the Court ordered that if Plaintiffs wished to make such an application, they would first have to provide a submission detailing why the information they sought had not originally been submitted as a request to admit or as an interrogatory. (*Id.* at 32: 12-20.) The Court further explained that the submission should explain why Plaintiffs had not challenged Defendants' objections earlier in the fact discovery period. (*Id.* at 33: 15-21.)

On May 16, 2013, Plaintiffs submitted a letter-application to the Court that followed up on the February 13 telephone conference. In their letter, Plaintiffs explain that when Defendants "resisted" Plaintiffs' discovery by way of interrogatories and requests for admissions, Plaintiffs attempted to meet and confer. (5/16/13 Letter at 1.) Plaintiffs stated that most of those efforts were fruitless, and as a result, Plaintiffs ultimately sought the information through Rule 30(b)(6). (*Id.*) Plaintiffs explain that they did not raise Defendants' objections with the Court in an attempt to avoid "burdening the Court with a series of motions to compel." (*Id.* at 2.) In their letter-application, Plaintiffs also detail the responses Defendants provided in response to Plaintiffs' interrogatories and requests for admission that Plaintiffs perceive as either "inadequate" (*id.* at 4), or "clearly unsupportable" (*id.* at 5).

Plaintiffs' application is **DENIED**. During the Parties' June 17, 2013 telephone conference, the Court first explained that as the fact discovery cutoff was in December 2012, any current application requesting a modification to the discovery period had to demonstrate good cause and seek modification for a specific purpose. The Court further explained that it did not find that Plaintiffs' articulated reasons for choosing to seek information through Rule 30(b)(6)

constituted "good cause" under Rule 16(b)(4). Additionally, after reviewing certain of Plaintiffs' interrogatories and requests for admission, the Court does not share Plaintiffs' belief that Defendants' responses evidence "recalcitrance" (*id.* at 3), the existence of "more responsive information and documents" than what was provided to Plaintiffs (*id.* at 5), or "unsupported denials" (*id.*).

**2. Defendants' and Plaintiffs' Applications Regarding Plaintiff Varda Guetta**

Before the Court at its June 17, 2013 telephone conference were: (1) Defendants' application to have fifteen photographs and related testimony from Plaintiff Varda Guetta excluded from evidence (Defs.' 6/7/13 and 6/14/13 Letters); and (2) Plaintiffs' application to allow Plaintiffs to serve document discovery relating to Fawzi Murar including: "(1) Murar's martyr file; (2) Murar's PA personnel file and any payment records; (3) any photographs of Murar, including a color copy of his PA identification card; and (4) Murar's GIS, PSS, NSF, MI, Force 17, and PAP files" (Pls.' 6/13/13 Letter). On November 19, 2012, Plaintiffs requested a premotion conference with the Court to compel Defendants to produce all documents responsive to the Guetta Plaintiffs' First and Second Document Requests. (DE 284-6.) The document requests, served on October 27 and November 1, 2011, sought "[a]ll documents (including without limitation all photographs and all video recordings) constituting or containing still and/or moving images of " seventeen individuals identified by Plaintiffs as having been convicted of carrying out similar attacks, in an effort to determine the identity of one of the gunmen in this matter. (*Id.* at 7-12.) Defendants objected to Plaintiffs' documents requests, and on December 5, 2012, the Court denied Plaintiffs' application on the grounds that the production was not reasonably calculated to lead to the discovery of admissible evidence in the form of a future reliable eyewitness identification. (DE 286 at 13.) After the Court's ruling, Plaintiffs

maintain that they began a fresh investigation to try to identify Guetta's shooters involved in the Givon Junction attack, through which they obtained fifteen photographs. (Pls.' 6/13/13 Letter.) From the fifteen photographs, Guetta identified Murar as one of the four shooters involved in the attack. (*Id.*) Plaintiffs state that PA records reveal that Murar was a Lieutenant in the PA's Presidential Security Force. (*Id.*) Plaintiffs disclosed the Murar identification to Defendants on February 19, 2013, and provided Defendants with the photographs [which Plaintiffs assert to be of Murar] that Plaintiffs allege Guetta viewed in making the identification. (*Id.*) Plaintiffs made an application to the Court to allow them to serve document discovery relating to Murar. (*Id.*) Defendants objected and sought exclusion of the fifteen photographs and related testimony because they argue: (1) Plaintiffs failed to produce those photographs during the fact discovery period; (2) Plaintiffs failed to provide discovery responsive to Defendants' interrogatory seeking communications regarding those photographs; and (3) Guetta's selection of the photograph that Plaintiffs' counsel claim is Murar would be inadmissible at trial, and even if it were not, there is no admissible evidence that the person depicted in the photograph Guetta chose is Murar. (Defs.' 6/14/13 Letter.)

Defendants' application is **DENIED**. During the June 17 telephone conference, the Court held that it does not consider the Guetta photograph issue to be a discovery issue, but rather, an evidentiary issue. (*See also* 5/17/13 Tr.; DE 320 at 2-9.) Plaintiffs' application is also **DENIED**. In line with its view that the Guetta photograph admissibility issue is one to be decided for trial, the Court held that there is no justification for belated discovery regarding the photographs.

**3. Plaintiffs' Application Regarding Defendants' PA General Intelligence Service Files**

Plaintiffs made an application to the Court to compel production of documents listed on Defendants' March 19, 2013 privilege log. The documents listed in the log are dossiers created by Defendant Palestinian Authority's General Intelligence Service ("GIS") regarding thirty-one individual terrorists. (Pls.' 5/16/13 Letter.) Plaintiffs argued the log failed to provide the information required by Local Civil Rule 26.2, including a description of the type of document, author, addresses and a description of the general subject matter. (*Id.*) Plaintiffs also challenged Defendants' contention that the documents are protected by the state secrets and law enforcement privileges. (*Id.*)

Plaintiffs' application is **GRANTED**. During the June 17 telephone conference, the Court explained that foreign privileges may be invoked during litigation that may conflict with disclosure under the Federal Rules of Civil Procedure, but that the Court may take the asserted privileges into account. The Court further explained that the burden remains with the party asserting a privilege to adequately demonstrate that it applies. Plaintiffs properly raised the absence of certain prerequisites to claiming privilege which Defendants' log failed to detail. Defendants therefore have failed to justify the redactions in their privilege log.

**IT IS HEREBY ORDERED** that time to object to the Court's June 17, 2013 rulings shall run from the date of this Order.

**SO ORDERED this 26th day of July 2013**
**New York, New York**

**The Honorable Ronald L. Ellis**
**United States Magistrate Judge**

# EXHIBIT  B
# EXCERPTED

**EXPERT REPORT OF ISRAEL SHRENZEL IN SOKOLOW V. PALESTINIAN AITHORITY, CASE NO. 04-397 (S.D.N.Y.)**

## I. EDUCATIONAL BACKGROUND AND PROFESSIONAL QUALIFICATIONS

I was born in 1958 and currently reside in Tel Aviv, Israel. I have an M.A. in Middle Eastern Studies (1987) and a B.A. in Arabic Language and Literature and Modern Middle Eastern Studies (1979) from Tel Aviv University. I am fluent in Hebrew and Arabic and in English reading and comprehension. I also have an intermediate-level (or better) knowledge of French, Spanish and Russian.

Between 1980 and 1985, I served as a research officer in the Intelligence Branch of the Israel Defense Forces ("IDF"), with an expertise in Palestinian and Syrian affairs.

Between 1988 and 2004, I served as an intelligence analyst in Israel's General Security Service ("GSS"), which is Israel's main domestic intelligence and security agency, roughly equivalent in its role and tasks to the FBI in the United States.

During most of my period of service in the GSS I was a Department Head in the GSS Research Division and held a GSS rank equivalent to Colonel. I reported to my Division Head above whom were only two people – the Department Head and the Head of the GSS. In that position I was responsible (among other things) for supervising the work of GSS research and assessment personnel in various fields relating to Palestinian affairs, drafting and presenting research and policy papers concerning Palestinian affairs, and appearing before and providing briefings to senior governmental and military forums regarding Palestinian affairs. I supervised approximately 15-20 people. As part of my position I also provided numerous briefings about Palestinian affairs, in Israel and abroad, to foreign officials.

In the course of my services in the GSS, I received and read many thousands of intelligence items – including raw intelligence data obtained from electronic and human sources, as well as analyses and summaries compiled from such raw data, many of which my team prepared under my supervision – relating to the activities of the Palestinian Authority (the "PA"), the Palestine Liberation Organization (the "PLO") and the full range of Palestinian groups, organizations, institutions and personalities.

Since leaving the GSS, I have taught at Tel Aviv University as an Adjunct Professor of Modern Islamic Thought in the Arabic and Islamic Studies Department. I have also edited a number of books, some of which are relevant to the Palestinian issue, including <u>Hamas Lexicon</u> (Ma'arachot 2008) and <u>Ticking Bomb</u> (Ma'arachot 2006) (a collection of articles dealing with suicide bombings). I also served as language editor for a new Hebrew-language translation of the Quran published by Professor Uri Rubin (Tel Aviv University Press 2005). During 2007, I

Regarding the longest letter of support – 150 meters – composed in Bethlehem in honor of the prisoners in the Occupation's prisons. Present was Issa Qaraqe, member of the Parliament.

> Qaraqe stated that this letter indicates the political, humanitarian and moral importance of international society, which is silent in face of the suffering of the prisoners. The father of prisoner Hilmi Hamash addressed his letter to the Arab peoples and to human society, and called on them to stand by the prisoners, and strengthen their stand against the attacks on their rights by the Israeli prison authorities.

Al-Ayyam – September 5, 2010:

http://www.al-ayyam.com/article.aspx?did=148479&date=9/5/2010

> Issa Qaraqe visited the home of the family of prisoner Hilmi Hamash, accompanied by a delegation from his department and from the Fatah in the Daheisheh Refugee Camp, as part of the program of visits to the families of prisoners, launched by the Ministry of Prisoners' Affairs.

**Conclusion and Comments**

The Palestinian Police took Hamash into its ranks, although it knew of his violent past, both in the terror sphere and in the criminal sphere. The police kept him in their ranks, notwithstanding the recommendation of the upper echelon to dismiss him from the service, and in spite of his undisciplined and disparaging conduct. The police allowed him to conduct terror activities within its ranks. Finally, following the terrorist attack, the Palestinian Police showed a warm, supportive attitude to the terrorist himself and to his family, including financial support and promotion through the ranks.

## Other Individuals Involved in the Attack

Three other men – Ali Abu Haliel (a Fatah operative), Ahmed Saad and Mohammed Maali – were convicted of involvement in this terrorist attack. The documents produced by the PA indicate that these men have been receiving benefits from the PA during their imprisonment. The PA's payment of these benefits further support the conclusion that the PA had and has a positive and supportive policy vis-à-vis this, and other terrorist attacks.

## VI. The January 8, 2001 shooting attack near Givat Zeev

On January 8, 2001, a machine-gun attack was carried out on the new Givon – Givat Ze'ev road, approximately 6 miles north of Jerusalem, against two Israeli vehicles.[322] The

[322] See police memoranda titled "Inspection of white Daihatsu vehicle" dated January 8, 2001 and "Action report-seizure and marking", signed by First Sergeant Shabi Ovadia, also dated January 8, 2001.

gunfire, from AK-47 assault rifles (typically used by PA security forces), resulted in damage to the vehicles and the wounding of Oz Guetta, who is a plaintiff in this case, along with his mother, Varda Guetta.

This shooting attack was one of a large number of shooting attacks against Israeli targets on the roads in the area north of Jerusalem, within a radius of approximately 15 miles, during that period (December 2000 to March 2002), all of which have similar characteristics. Israeli vehicles that were driving on the road were shot at from vehicles that drove past them or from positions overlooking the road, affording the attackers an opportunity to hit road users. In each of those attacks one or more of the shooters was a PA security or police officer.

A list of some of the attacks that had similar characteristics to those of the attack of January 8, 2001 follows: [323]

1)      An attack on December 21, 2000 on Highway 443 – gunfire at a vehicle, one person killed, Ahmed Ghandor, a member of the Palestinian Security Forces, participated.

2)      A shooting attack on December 31, 2000 on Highway 60 near Ofra – two persons killed, Ahmed Barghouti, a member of the Palestinian Security Forces, participated.

3)      A shooting attack on January 25, 2001, Atarot area – shooting attack, one person killed, Ahmed Barghouti, and Mohammed Mousleh, members of the Palestinian Security Forces, participated.

4)      A shooting attack on June 12, 2001, Ma'ale Adumim – Jerusalem highway, one person killed, Muhanad Abu Halawa, a member of the Palestinian Security Forces, participated.

5)      A shooting attack on August 25, 2001, Highway 443 next to the Dor Energy fuel station – 3 persons killed, Ahmed Barghouti, and Mohammed Mousleh, members of the Palestinian Security Forces, participated.

6)      A shooting attack on September 15, 2001, Highway No. 9 (northern Jerusalem) – one person killed, Ahmed Barghouti, Mohammed Mousleh and Khaled Shawish, members of the Palestinian Security Forces, participated.

---

[323] The list of attacks is taken from the verdict of Marwan Barghouti, the Fatah commander in the West Bank and a member of the Palestinian Legislative Council, at the District Court in Tel Aviv, Case 1158102, dated May 20, 2004, and from the website of the Ministry of Foreign Affairs http://www.mfa.gov.il/MFA/MFAArchive/2000_2009/2002/8/Marwan%20Barghouti%20Indictment%20-%20Appendix-%20Terrorist

7) A shooting attack on February 25, 2001, Atara Bridge (Highway 443) – one person severely injured, Ahmed Barghouti, Mohammed Mousleh and Khaled Shawish, members of the Palestinian Security Forces, participated.

8) A shooting attack on October 3, Highway 9 (towards the French Hill – northern Jerusalem) – 6 persons injured, Ahmed Barghouti, and Mohammed Mousleh, members of the Palestinian Security Forces, participated.

9) A shooting attack on March 17, 2002, Beit El – Psagot road, Ahmed Barghouti, a member of the Palestinian Security Forces, participated.

Apart from these attacks, there are a number of attempted attacks that were not carried out for various reasons, but all of which were aimed at attacking persons who were traveling on the roads in and around the area in which the Guettas were attacked.

Counsel for the plaintiffs have informed me that Mrs. Guetta has identified one of the terrorists in the cell that opened fire towards her as Fawzi Murar, a member of the Palestinian Security Forces – Force 17 – Arafat's presidential guard. Murar enlisted people to carry out shooting attacks against vehicles in Israel, participated in person in shooting attacks, dispatched a terrorist to carry out a suicide bombing in Israel and was killed in an IDF airstrike on March 5, 2003. In addition to being an officer in Force 17, Murar also belonged to Fatah.[324]

Murar became known after his death as a martyr of the al Aqsa Intifada and his family members have been supported by the Palestinian Authority. Murar's terrorist activity while serving as an officer in the Palestinian Security Forces, was known to the Palestinian Authority, but it did nothing to prevent it (see Murar's profile below).

**In conclusion, the characteristics of the attack on the Guettas are identical to the characteristics of many attacks that were carried out in that area at that time by PA security officers, and the weapons used in the attack – Kalashnikov assault rifles – are primarily used by the Palestinian Security Forces. It is therefore very likely that the attack on the Guettas, too, was carried out by PA security forces.**

**Moreover, for this reason, it is unsurprising that Mrs. Guetta has identified Fawzi Murar, an officer in Force 17, as one of her attackers.**

## FAWZI HAMDI MUSTAFA MURAR

### Introduction

[324] See the profile below for all details with respect to Fawzi Murar.

Fawzi Hamdi Mustafa Murar, Identity No.: 951023845, date of birth: March 23, 1975, married to two women and a father of four children. He lived in Ramallah / Ein Misbah. He served as an officer of Mulazim rank in the Palestinian Security Apparatus / Force 17 / Arafat's Presidential Guard and in the Palestinians' liaison unit with Israel [325] (joint patrols[326]).

Murar enlisted people to carry out shooting attacks against Israeli vehicles in the Ramallah area and dispatched a terrorist to carry out a suicide bombing in Israel. He was killed in an Israel Defense Forces airstrike on March 5, 2002 with two other persons, all of whom were activists of the al Aqsa Martyrs Brigades – the military arm of the Fatah Movement.[327]

**Chronology**

**Additional criminal and terrorist record**

Freij Adwan's testimony indicates that Fawzi Murar was the right hand man and a lieutenant of Abu Halawa, a member of Force 17 / Arafat's Presidential Guard, who was also responsible for a number of deadly terrorist attacks, and was killed with Murar in the Israeli attack on the vehicle in which they were traveling. The testimony indicates that he was involved in vicious attacks (see above), in the sale of arms and ammunition and in the theft of vehicles for which he was wanted by Israel for serving a prison sentence.

His martyr file indicates that he was arrested previously by Israel, and his record contains a photocopy of a member's card of the Palestinian Prisoner Club[328], which alludes to a previous incarceration.

**His official status in the institutions of the Palestinian Authority before the attack**

He was an officer (Mulazim – Second Lieutenant) in Force 17 and served in the liaison unit and in joint patrols.[329]

**The Palestinian Authority's support for Murar after his death**

---

[325] See the 'martyr file' of Fawzi Murar, pp. 3, 6, 10 and more.

[326] See the police statement of Freij Adwan dated April 8, 2002 in Jerusalem, p. 6, rows 6-7.

[327] See the two sources above for all information on Fawzi Murar. In his statement, Adwan said that Fawzi had confirmed to him that he had secured the weapons that were used for the shooting attack from the Tanzeem of the Fatah, to which he belonged. See the lists of eligible payees of the Martyrs' Institution for another confirmation of Murar's Fatah membership.

[328] See the 'martyr file' of Murar, p. 9.

[329] See the 'martyr file' of Murar, pp. 3, 5, 9, 10 and the police statement of Freij Adwan dated April 8, 2002, p. 6.

After his death, the Palestinian Authority recognized Murar as one of the martyrs of the al Aqsa Intifada and it was decided to provide financial support to his relatives via the institution for caring for families of martyrs and prisoners.

a. Documents indicating the Palestinian Authority's awareness of his involvement in terrorism

Freij Adwan's testimony indicates that a shooting attack at Israeli vehicles in which Fawzi Murar took part was filmed on videotape. Muhanad Abu Halawa, who also participated in the shooting attack, passed the videotape to Tawfik Tirawi, the Commander of the General Intelligence in the West Bank, and the videotape may have reached the knowledge of Arafat himself.

**Conclusions and comments**

The case of Fawzi Murar underscores the degree of involvement of Palestinian Authority Security Forces members in terrorist activity, including shooting at targets such as Israeli vehicles, dispatching suicide bombers and arms trafficking, to name a few. Murar was an officer in an elite unit of the Palestinian Authority, Force 17, which served as the guard of the President of the Authority, and while he was serving in this unit, he participated in diverse terrorist activity.

April 10, 2013

_______________________________
Israel Shrenzel

# EXHIBIT  C

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*
www.legaltrans.com

July 14, 2003 [illegible] 1 February 10, 2002 Tsuri

**Statement of:** **Israel [Emblem] Police** **Statement 2 Sheet 1**

| Identity No. 0400996514 | First name Issa | Last name Natshe | Name in Roman characters | | |
|---|---|---|---|---|---|
| Previous name | Marital status ☒ married ☐ single ☐divorced ☐ widower | | | Sex Male | Religion Muslim |
| Date of birth February 16, 1981 | Place of birth Jerusalem | Home telephone number 2953541 | Business telephone number | | |
| Home address Ramallah | | Business name and address Transportation driver/ gold plant | | | |
| Mobile telephone No. 054-780762 | Father's name Grandfather Abdallah / Issa | Parents' address _Ramallah | | | |

| Date | Time | Location | | Badge No. | Rank | First name | Last name |
|---|---|---|---|---|---|---|---|
| Feb 4, 2002 | 7:50 p.m. | Jerusalem Police Station | Investigator | 100835-8 | SSM | Yitzhak | Yakobov |

I saw the above named individual before me and I said to him: I, Police Officer Yitzhak Yakobov, Badge No. 100835-8, hereby inform you that you are suspected of activities against the security of the region. You are not obliged to say anything unless you wish to do so but anything that you do say shall be written down by me and may be used as proof against you [Arabic signature] [Signature] Yitzhak Yakobov. After I read out the content of the above out loud and translated it for the above named individual he told me the following: ---
Q. Have you understood that of which you are suspected? ---
A. Yes, I have understood. ---
In my previous testimony to the police, I told you that Fawzi sent me to Taibeh in order to bring something. I want to tell you that I knew that I was going to Taibeh in order to bring a an Uzi rifle [sic] to Fawzi but when I reached Taibeh and met the person in Taibeh whom I mentioned in the previous testimony, I pretended that I did not know what it was all about and later on I contacted Fawzi Murar and I said to him that I do not want any trouble and that I am afraid to take the rifle. I then returned to Ramallah without the weapon. In my previous statement to the police I only related that Fawzi came to my home early in the morning and told me that he wanted me to take him and his friends to Beit Hanina to carry out a shooting attack and that Fawzi told me that ultimately he did not go with them and they were caught in Beit Hanina. I want to add that Fawzi told me that he did not go with them because his leg [Translator's note: could be foot; unclear] was injured. Also, Fawzi told me that one of the young men that went to carry out the attack, Salah Sarsur, who is about 25 years old and a resident of Ramallah, ran away. Another young man by the name of Salah was caught and there is another young man, Abed, who is still hiding in Beit Hanina. Subsequently, Fawzi asked me for my cell phone and spoke to Abed, who was hiding in Beit Hanina. Fawzi spoke to Abed and asked him where to send the driver and Abed replied to Fawzi that he would call him later on. Fawzi told me that he understood from Abed that he, Abed, was hiding water tank [sic]. Also Fawzi Murar told me that had the three young men carried out the shooting attack, each of them would have received 5000 dollars from Marwan Barghouti. Fawzi asked me to go and bring Abed from Beit Hanina but I refused. I left for work in my van and then Fawzi contacted me and asked me

Time of completion of statement

M.3007 D.M. J'lem 219470 (11.2000)10.000x50x2

[Arabic signature]

[Signature] Yitzhak Yakobov

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*
www.legaltrans.com

**Statement of:** **Israel [Emblem] Police** **Statement 2 Sheet 2**

| Identity No. 0400996514 | First name Issa | Last name Natshe | Name in Roman characters |
|---|---|---|---|
| Previous name | Marital status ☐ married ☐ single ☐divorced ☐ widower | Sex | Religion |
| Date of birth | Place of birth | Home telephone number Continued from previous page | Business telephone number |
| Home address | | Business name and address | |
| Mobile telephone No. | Father's name Grandfather Abdallah / Issa | Parents' address | |

| Feb 4, 2002 | 8:10 p.m. | Jerusalem Police Station | Investigator | 100835-8 | SSM | Yitzhak | Yakobov |
|---|---|---|---|---|---|---|---|
| Date | Time | Location | | Badge No. | Rank | First name | Last name |

about the situation on the road between Ramallah and Jerusalem and I told Fawzi that there were roadblocks and police in the Beit Hanina region. At around noon, I ran into Fawzi in Ramallah, by chance. He was with another young man by the name of Faraj, who is around 29 years old and is a resident of Ramallah who worked at the D.C.O. together with Fawzi Murar. Salah Sarsur was also with them. Fawzi told me that he thought that Abed had been caught because his cell phone was off. Fawzi called me again at night [illegible; crossed out] and told me that that Abed had tried to escape from Beit Hanina in a Subaru automobile that belongedto someone else, but he was caught. About two days later, Fawzi was arrested in the Palestinian Authority. In my previous statement to the police, I told you about the stolen vehicles that I would deliver from Lod to Ramallah. I wish to add that when I would come to Lod I would contact Fawzi and then Fawzi would give my number to one of the following people: (1) Assad al-Khayat, who is about 22 years of age and a resident of Lod. (2) Amir Kaban, who is about 33 years of age; he is a Jewish drug addict. (3) "Juha", who is an Israeli Arab about 33 years of age. (4) Ramzi, who is an Israeli Arab about 22 years of age. Subsequently, one of these people would call me and I would meet him in Lod. I would take delivery of the stolen vehicle and deliver it to Ramallah. There was someone by the name of Sami, who is about 26 years of age and a resident of Ramallah, who used to deliver stolen vehicles for Fawzi from Lod to Ramallah. I drove Sami to Lod twice and then he was arrested. This was approximately one year ago. ---

Q. Do you have anything to add? ---

A. No. ---

This is my statement that was read out loud to me and translated into Arabic and certified as accurate by my signature. ---

[Arabic signature] [sig.] [illegible] Yitzhak Yakobov. Badge No. 100835-8, SSM

[Signature] [Yakobov]

Time of completion of statement

M.3007 D.M. J'lem 219470 (11.2000)10.000x50x2



27 Brookhill Road
East Brunswick, NJ 08816
732 432 0174
www.legaltrans.com

**Certificate of Accuracy**

I, Rina Ne'eman, hereby certify that the document "Issa Natshe Statement Implicating Fawzi Murar - February 4 2002" is to the best of my knowledge and belief, a true and accurate translation from Hebrew into English. We are a company specialized in Hebrew translation, with over 30 years of translation expertise.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on August 8, 2013.

[signature]

04/2/02 11/4/03

משטרת ישראל

הודעתי של:
הודעת נאשם / עד / חשוד

הודעה מספר: 2 מספר עותק: 1

| מס' זהות رقم الهوية | שם פרטי الاسم الشخصي | שם משפחה اسم العائلة | שם באותיות לטיניות الاسم في حروف انكليزية |
|---|---|---|---|
| 040099654 | עיסא | נתשה | |

| שם קודם الاسم السابق | מצב משפחתי الحالة الاجتماعية | מין الجنس | דת الدين |
|---|---|---|---|
| | נשוי متزوج ☒ | זכר | מוסלמי |

| תאריך לידה تاريخ الولادة | מקום לידה مكان الولادة | טל. בבית التلفون في البيت | טל. בעבודה التلفون بمكان العمل |
|---|---|---|---|
| 16.2.81 | ירושלים | 2953541 | |

| מען מגורים العنوان | שם ומען מקום העבודה اسم وعنوان مكان العمل |
|---|---|
| ראס עמוד | [illegible] |

| מס' טלפון נייד رقم الهاتف اللاسلكي | שם האב اسم الأب | כתובת ההורים العنوان الأب |
|---|---|---|
| 054-780762 | עבדאללה / עיסא | ראס עמוד |

| תאריך التاريخ | שעה الساعة | מקום המקום مقام المكان | החוקר المحقق: מס' אישי الرقم الشخصي | דרגה الرتبة | שם פרטי الاسم الشخصي | שם משפחה اسم العائلة |
|---|---|---|---|---|---|---|
| 4.2.02 | 19:50 | מ. ירושלים | 1008358 | רס"מ | יצחק | יעקובוב |

ראיתי את הנ"ל בפני ואמרתי לו: אני איש משטרה יצחק יעקובוב מ.א. 1008358 ומודיע לך כי אתה חשוד בפעילות נגד בטחון המדינה. אינך חייב לומר דבר אלא אם הנך רוצה בכך, אולם כל אשר תאמר יירשם על ידי ועשוי לשמש כראיה נגדך.

عيسى عبد الله عيسى النتشة ✍ יצחק יעקובוב

לאחר שהקראתי ותרגמתי לו את תוכן האזהרה הנ"ל אמר לי בתשובה:

שאלה- האם הבנת את האזהרה שלך?

תשובה- כן אני הבנתי.

בזמן החקירה שעברתי במשטרה אני סיפרתי לך שפאדי שלח אותי לישיבה [illegible] [illegible] אני רוצה לומר לך שאני [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible]

שעת סיום גביית ההודעה

عيسى عبد الله عيسى النتشة ✍

יצחק יעקובוב

219470 (11.2000) 10.000 x 50 x 2 ה.ב.י.ת.

3007ם

משטרת ישראל

הודעתו של: / اعلان من:

הודעה מס' / اعلان رقم: 2 — גליון מספר / نسخة رقم: 2

| מס' זהות رقم الهوية | שם פרטי الاسم الشخصي | שם משפחה اسم العائلة | שם באותיות לטיניות الاسم في حروف انكليزية |
|---|---|---|---|
| 040099651 | עיסא | [illegible] | |

| שם קודם الاسم السابق | מצב משפחתי الحالة الاجتماعية: נשוי متزوج ☐ רווק اعزب ☐ גרוש مطلق ☐ אלמן ارمل ☐ | מין الجنس | דת الدين |
|---|---|---|---|
| | | | |

| תאריך לידה تاريخ الولادة | מקום לידה مكان الولادة | טל. בבית التلفون في البيت | טל. בעבודה التلفون بمكان العمل |
|---|---|---|---|
| | [illegible] | | |

| מען מגורים العنوان | שם ומען מקום העבודה اسم وعنوان مكان العمل |
|---|---|
| | |

| מס' טלפון נייד رقم الهاتف اللاسلكي | שם האב اسم الاب | כתובת ההורים العنوان الاب |
|---|---|---|
| | עבדאללה / עיסא | |

| תאריך التاريخ | שעה الساعة | מקום المكان | החוקר المحقق: מס' אישי الرقم الشخصي | דרגה الرتبة | שם פרטי الاسم الشخصي | שם משפחה اسم العائلة |
|---|---|---|---|---|---|---|
| 4.2.02 | 20:00 | [illegible] | 1008358 | רס"ר | יצחק | [illegible] |

[illegible] ... D.C.O ... [illegible]

[illegible] ... 22 ... 33 ... [illegible]

[illegible] ... 26 ... [illegible]

שאלה – האם יש לך מה להוסיף?

תשובה – לא

כל הדברים שהוקראו בפני [illegible]

عيسى عبد الله [illegible] — [illegible] 1008358 רס"ר

# EXHIBIT  D
# EXCERPTED

# EXPERT REPORT OF ALON EVIATAR

## *SOKOLOW V. PALESTINIAN LIBERATION AUTHORITY*, CASE NO. 04-397 (S.D.N.Y.)

## I. INTRODUCTION

### A. Credentials

I was born in 1967 and currently reside in Maccabim, Israel. I have an M.A. in Public Policy from Bar Ilan University (2011). I have a B.A. in Middle Eastern Studies and Political Science from Bar Ilan University (1994). I am fluent in Hebrew and Arabic and in English reading and comprehension.

Between 1986 and 1997, I served as an intelligence officer in the Intelligence Branch of the Israel Defense Forces ("IDF"), engaged in information gathering and analysis, with an expertise in military affairs.

Between 1998 and 2000, I served as an advisor on Palestinian Affairs in the Coordination and Liaison Administration in Nablus and Bethlehem. In 2000-2001, I studied at the IDF Command School. In the context of this course, I published a paper comparing the great Arab rebellion to the second intifada.

Between 2001 and 2004, I served as Commander of the Coordination and Liaison Administration in Jericho and the Jordan Valley. In this position, I managed communications with official and unofficial Palestinian sources in the region, the exercise of civil jurisdiction authority vis a vis the Palestinian Authority and the local population, the assessment of the situation in the region and provision of assistance to the security forces in fighting terror.

Between 2004 and 2013, I served as Head of the Department for Palestinian Affairs, at different times in Gaza and the West Bank, sometimes in the Civil Administration and sometimes in the Command for Coordination of Government Activities in the Territories ("COGAT"). During this period, I also participated in an intelligence course and I formed a special division dedicated to Hamas's civilian infrastructure (the Dawa).

During the last nine years of my service in the IDF, I was a Department Head in the Department of Palestinian Affairs and held an IDF rank of Lt.Colonel. I reported to the Head of COGAT, above whom were only two people – the Minister of Defense and the Chief of Staff. In that position, I was responsible (among other things) for supervising the work of IDF research and assessment personnel in various fields relating to Palestinian affairs, drafting and presenting research and policy papers concerning Palestinian affairs, and appearing before and providing briefings to senior governmental and military forums regarding Palestinian affairs. I

funds cannot continue to exist, because the dispatch of operatives for the perpetration of terrorist attacks also involves considerable financial expenditures – if only for the purchase of arms and material. A terrorist organization needs the support of sympathizers, who serve as a source of personnel for the terrorist cells and the backbone of the organization. To this end, a terrorist organization requires a well-oiled system of branches, public relations, ideology, activity among youth and student groups, and the like. No less importantly, an organization needs to look after its people who have been imprisoned, sentenced, wounded or killed as well as their family members.

15 My expert opinion covers a series of subjects which have to do with the relationship between the PLO, the PA, Fatah and terrorism within Fatah, in order to illustrate the overlap between them, to point out the ways in which the struggle of terrorism has created a hegemony within Palestinian society, and to emphasize how these organizations operate for the purpose of encouraging and sustaining terrorism and providing the logistics for terrorist activity.

16. The PLO and PA operate funds to provide financial support the families of terrorist inmates.

**17. In my expert opinion, monetary grants and ongoing financial support for the families of terrorists who are killed, incarcerated, wounded or released from Israeli prisons constitute part of a system which promotes terrorism in the struggle against Israel by the PA and the PLO. The grants garner broad-based support among the population for the activities conducted by the PA and the PLO. By providing monetary grants to persons who were active in terrorism, the PA and the PLO convey the positive and supportive attitude for those who are at the forefront of the struggle and that the PA and the PLO will not abandon those who have worked to promote their goals. This gives terrorists an incentive to continue operating, based on the knowledge that, if they die or are wounded, the terrorist incident will not create a burden for their families, but rather the Palestinian leadership will continue to assist them.**

18. There are many sources for the funding that is paid by the PA and the PLO to terrorists who were killed, injured or incarcerated and their families.[39]

## V. PART FOUR - PLO/PA PAYMENTS TO TERRORISTS AND THEIR FAMILIES

1. From time to time, Yasser Arafat used to allocate funds from the presidential budget – as Mahmoud Abbas (hereinafter: "Abu Mazen") does to this day to terrorist activities. On March 3, 2011, Abu Mazen budgeted $2,000 to the family of a martyr, an Islamic Jihad

[39] See *e.g.* a discussion of British funds in: http://www.inn.co.il/News/News.aspx/245979

activist, Salam Mohamed Samoudi, a resident of Aliamoun, who sought to carry out a terrorist attack at an army checkpoint in the Jenin area.

2. The PA budget for payments to the families of *shahid* martyrs and security prisoners is approximately NIS 44 million per month.[40] Of that amount, NIS 18 million per month is spent on inmates' salaries and more than NIS 26 million per month goes to the families of *shahid* martyrs (that is, terrorists) – for a total of more than 6% of its budget.[41] This was the case at least in May 2011.

3. The Welfare Fund for the Families of the *Shahid* Martyrs and the Wounded (hereinafter: the "Welfare Fund") was established by the leadership of the PLO in 1965.[42] It is headed by Umm Jihad whose real name is Intisar al-Wazir. She is the widow of Khalil al-Wazir (the commander of Fatah terrorist operations, who was eliminated by Israel in Tunis in April 1988). The Department was officially affiliated with the PLO in 1971; since then, it has been caring for the families of killed, wounded and incarcerated Palestinians throughout the world.[43] The monies of the Welfare Fund are allocated from the treasury of the PLO, which, since 1993, has been funded from the treasury of the PA. The function of the Department is to ensure the welfare of the families of killed, wounded and incarcerated Palestinians, with respect to both day-to-day existence and assistance in the areas of health and education.

4. Upon the establishment of the PA in 1994, Umm Jihad moved the main office of the Welfare Fund to Ramallah. In addition, the organization has branches in Jordan, Lebanon, Syria, Egypt and Iraq. Between 1994 and 2005, the Welfare Fund was part of the Ministry of Welfare of the PA; in other words, it officially belonged to the PA and was budgeted directly from the PA – specifically, from the budget of the Palestinian Ministry of Welfare, which was headed by Umm Jihad. Since 2005, when Umm Jihad's term as PA Minister of Welfare ended, the organization was again made subordinate to the PLO and now operates under the PLO umbrella. In my expert opinion, the Welfare Fund was returned to the PLO rubric in order to preserve the special status of Umm Jihad and to give her the honor appropriate to the status of her assassinated husband.

5. The Welfare Fund has 17 offices throughout the West Bank and the Gaza Strip. It provides funds and care to approximately 30,000 families of killed and wounded Palestinians in the territories and 23,000 additional families throughout the Arab world.

[40] http://heb.rslissak.com/archives/804

[41] http://www.mako.co.il/news-military/security/Article-142424bb60d8931017.htm

[42] www.youtube.com/watch?v=RW05zgz3JNg

[43] http://askry.net/?action=post&postid=10818

The family of anyone who has been killed or wounded as a result of the conflict is entitled to receive a pension from that Fund.[44]

6.     The organization grants a monthly pension to the families of the killed and wounded; provides medical insurance, in coordination with the Palestinian Ministry of Health; provides free education, including higher education, for the orphans of Palestinians who have been killed, in coordination with the Palestinian Ministry of Education; and sends the children of families under its care to camps during the summer and school vacations.[45] It is emphasized that throughout the years, the Fund has enjoyed the support of the Palestinian leadership (Arafat, Abu Mazen, Salam Fiad) and even merited a budget increase by the PA government.

7.     The definition of the term "*shahid* martyrs" includes scores of terrorists who committed suicide bombing operations, or who were killed while they were engaged in preparations for the perpetration of terrorist attacks.[46]

8.     Thus, for example, payments to the families of *shahid* martyrs, during the month of May 2011, came to a total of NIS 26,458,137.[47]

9.     Saddam Hussein, then-ruler of Iraq, granted monetary awards of up to $25,000 per suicide bomber to the family members of suicide bombers as support for suicide terrorists. That money traveled through Fatah and the PA and constituted a central incentive to terrorist attacks by suicide bombers. Fatah's support in transferring funds is equivalent to the adoption of an official position by the PA, Fatah and the PLO with respect to terrorist attacks by suicide bombers. Senior Fatah officials and members of the public also attended the August 2002 ceremony in Hebron in which these grants from Saddam Hussein were awarded.

## VI.  PART FIVE - THE PALESTINIAN MINISTRY OF PRISONERS' AND RELEASED PRISONERS' AFFAIRS

1.     Upon its establishment, the PA created the Ministry of Prisoners' Affairs, which was responsible for making efforts to improve the conditions of incarceration of the Palestinian

---

[44] http://askry.net/?action=post&postid=10818

[45] http://askry.net/?action=post&postid=10818

[46] http://www.inn.co.il/News/News.aspx/240510 July 3, 2012

[47] http://heb.rslissak.com/archives/804

security prisoners in Israeli prisons;[48] looking after their families by paying them a monthly salary; providing assistance to the prisoners' children in the fields of health and education; rehabilitating the released prisoners; and providing the prisoners with legal aid.[49]

2. The security prisoners in the Israeli prisons are considered by the PA as Palestinian civil servants and Palestinian military personnel. Issa Qaraqe, the PA's Minister of Prisoners' Affairs said: "They [the prisoners] are civilian civil servants and military personnel."[50] By virtue of that status, they are paid a salary which is sometimes much higher than that of Palestinian bureaucratic officials. The salary of a terrorist who has been sentenced to several concurrent terms of life imprisonment is likely to be as high as NIS 10,000 (roughly equivalent, in March 2013, to $2600) per month. The salaries are paid to the terrorists' family members and are tax-exempt.

3. Section 3 of the Prisoners' and Released Prisoners Law, which was enacted in 1996 and amended in 2004, establishes the framework for benefits to prisoners:

   a. Fulfilling all of the legal needs in order to assist the prisoner.

   b. Granting the monetary rights to the prisoner and his family, pursuant to the various sections of the Law, and in a matter which is commensurate with the customary pay grade.

   c. Providing the prisoner and his children with the possibility of acquiring an education.

   d. Vocational training for released prisoners.

   e. Securing jobs for released prisoners in accordance with criteria which take into account the years of the sentence served and the prisoner's education.

4. Pursuant to the Prisoners' and Released Prisoners' Law, 2004/19, – "Anyone who is imprisoned in Israel against the background of his participation in the struggle against the occupation" – is entitled to a salary. Until 2011, the salaries were relatively low. Thus, for

---

[48] On the security prisoners in Israeli prisons, see Ronny Shaked, "The Security Prisoners in the Israeli Prisons" [Hebrew], ***Ro'im Shabas***, pp. 26-29. See: http://www.shabas.gov.il/NR/rdonlyres/0947556F-F6D6-49C9-B878-AC8737F8EA1B/0/Asirim_bithony_2326.pdf

[49] http://www.freedom.ps/showRep.php?tbl=aboutus&id=1

[50] Nadav Shragai, "Terrorism Pays" [Hebrew], ***Israel Hayom***, August 26, 2011. http://digital-edition.israelhayom.co.il/Olive/ODE/Israel/Default.aspx?href=ITD/2011/08/26

example, a prisoner who had completed five years of incarceration received a salary of NIS 1,000 per month while a prisoner who had completed 25 years of incarceration received a salary of 4,000 per month. However, starting at the end of 2010, the Law was amended granting prisoners a considerable raise – in some cases, the raise was 300%. In an official document of the PA, signed by Palestinian Prime Minister, Dr. Salam Fayyad, the monthly remunerations were updated. Thus, for example, the update stated that a prisoner who had been incarcerated in an Israeli prison for a period of up to three years would receive a base salary in the amount of NIS 1,400 per month. Anyone serving a sentence of three to five years would receive NIS 2,000 per month – which is almost equivalent to an average salary in the PA. The entitlement to receive money is extended to all prisoners, irrespective of the severity of the offense which they had perpetrated or the organization to which they belong.[51] Pursuant to the Prisoners' and Released Prisoners' Law, every prisoner who is serving a prison sentence of more than 25 years is entitled to a monthly pension of NIS 4,000, a grant in the amount of $10,000 upon his release, and a position with the status of Undersecretary in the PA – that is, a senior position with a high salary.

Following are the amounts of the salaries which the PA pays to security prisoners:[52]

- Terrorist serving 1-3 years: NIS 1,400 per month.

- Terrorist serving 3-5 years: NIS 2,400 per month.

- Terrorist serving 5-10 years: NIS 4,000 per month.

- Terrorist serving 10-15 years: NIS 6,000 per month.

- Terrorist serving 15-20 years: NIS 7,000 per month.

- Terrorist serving 20-25 years: NIS 8,000 per month.

- Terrorist serving 25-30 years: NIS 10,000 per month.

- Terrorist serving 30 years or more: NIS 12,000 per month.

Following are the ancillary payments made by the PA under specified circumstances:

---

[51] http://www.mako.co.il/news-military/security/Article-142424bb60d8931017.htm

[52] http://heb.rslissak.com/archives/804

- Married terrorists receive a supplement of NIS 300 per month.
- Terrorists with children receive a supplement of NIS 50 per child per month.
- Terrorists from East Jerusalem who are incarcerated in Israeli prisons receive a supplement of NIS 300 per month.
- Terrorists who are Israeli Arabs who are incarcerated in Israeli prisons receive a supplement of NIS 500 per month.

5. As noted above, terrorists who hold Israeli citizenship –referred to in the PA as “internal Arabs” – receive higher salaries than those of terrorists with otherwise identical particulars who hold Palestinian citizenship.[53]

6. In May 2011, security prisoners who were detained or serving sentences in Israel received salaries in the total amount of NIS 17,678,247 – an amount which represents approximately 2.5% of the “Salaries” item in the budget of the PA. The allocations to the families of *shahid* martyrs within and outside the PA totaled NIS 26,458,137, 3.5% of the “Salaries” item. The majority of the security prisoners’ salaries were paid in the West Bank; the lion’s share of the allocations to the families of *shahid* martyrs was paid in Gaza. The average monthly salary of a security prisoner is NIS 3,129.

7. The conditions of incarceration which are enjoyed by security prisoners in Israeli prisons include a large number of benefits paid for by the PA Ministry of Prisoners’ Affairs.[54] Among other things, security prisoners benefit from 12 cable TV channels, a television in every cell, extra meat, *baklawa* pastry, fruit and vegetables, prime-quality olive oil and various delicacies, which the PA sends finto the prisons, as well as newspapers and

---

[53] http://www.jcpa.org.il/Templates/showpage.asp?FID=762&DBID=1&LNGID=2&TMID=99&IID=25289

[54] See Amit Cohen, “Feasting and Free Internet: the Good Life of Terrorists in Prison” [Hebrew], ***Maariv***, June 15, 2011. http://www.global-report.com/disillusion/a1135-%D7%90%D7%A8%D7%95%D7%97%D7%95%D7%AA-%D7%A9%D7%97%D7%99%D7%AA%D7%95%D7%AA-%D7%95%D7%90%D7%99%D7%A0%D7%98%D7%A8%D7%A0%D7%98-%D7%97%D7%95%D7%A4%D7%A9%D7%99-%D7%94%D7%97%D7%99%D7%99%D7%9D-%D7%94%D7%98%D7%95%D7%91%D7%99%D7%9D-%D7%A9%D7%9C-%D7%94%D7%9E%D7%97%D7%91%D7%9C%D7%99%D7%9D-%D7%91%D7%9B%D7%9C%D7%90

magazines from all over the world.[55] Security prisoners can earn a secondary school matriculation certificate, at the PA's expense, while incarcerated. In recent years, these benefits have encouraged Palestinian youth to instigate violent activities (stone throwing and throwing of Molotov cocktails) directed at Israeli targets in the West Bank, in order to be arrested and enter the Israeli prisons.[56]

8.  The PA deposits money each month for the benefit of the prisoners, in order to improve their quality of life in prison. The money in question is deposited into the prisoners' accounts in the prisons, and is used by the prisoners to purchase various products.[57]

9.  The PA paid (the practice was stopped recently by Israel)  for higher education for the prisoners. In 2010, 210 security prisoners pursued a higher education through the Open University of Israel.[58] According to a report issued by the PA in 2013, approximately one quarter of the prisoners are studying to complete their secondary school matriculation certificate or are pursuing higher education.[59]

10.  To illustrate, Abdallah Barghouti, a member of Hamas, who murdered 66 Israelis and was the perpetrator in the Hebrew University bombing, is receiving this year NIS 4,000 per month + NIS 300 for being married + NIS 100 for his two children, for a total of NIS 4,400 per month, or NIS 52,800 per year. (That was approximately equivalent to $14,000 in using the conversion rate in March 2013.) In 2012, when he reaches 10 years' imprisonment, his pay will be raised to NIS 6,000 + 300 + 100 = NIS 6,400 per month, or NIS 76,800 per year. (That was approximately equivalent to $21,000 in using the conversion rate in March 2013.)

11.  Similarly, each of the murderers of the Fogel family – there were five victims, ranging in age from 36 years to just 3 months, each was stabbed to death in their home – from the settlement of Itamar began his sentence with a salary of NIS 1,400 per month from the PA; over time, their incomes will increase to NIS 12,000 per month each.[60]

---

[55] See an illustrative short film at http://www.hakolhayehudi.co.il/?p=54554

[56] See Hamas Terrorists Wanted Jail to 'Earn' PA Salary, Israel National News, February 14, 2012, P1:482.

[57]            http://www.myrights.co.il/%D7%96%D7%9B%D7%95%D7%99%D7%95%D7%AA-%D7%90%D7%A1%D7%99%D7%A8%D7%99%D7%9D-%D7%91%D7%99%D7%98%D7%97%D7%95%D7%A0%D7%99%D7%99%D7%9D/

[58] http://www.nrg.co.il/online/1/ART2/427/535.html

[59] http://www.heskem.org.il/media-view.asp?id=2282&meid=97

[60] http://www.mako.co.il/news-military/security/Article-142424bb60d8931017.htm

12. **In my expert opinion, it is clear (and the statement of PA Minister Issa Qaraqe referred to above confirms) that the prisoner's salary, which is transferred to his family, is not simply a social welfare benefit to relieve economic distress, but is intended as compensation for carrying out the terrorist operation. The salary is derived from the nature of the terrorist operation, the period of imprisonment which was pronounced in the court sentence, and the terrorist's citizenship. It does not vary according to economic need.**

13. In addition, funds which do not come from the treasury of the PA, but which are in the nature of encouragement and support by the PA and the PLO and their leaders, are paid to terrorists, released prisoners and their families. Following are a number of examples:

    a. On November 1, 2005, a festive ceremony took place in the Gaza Strip, in which the "Al-Ansar Charitable Society" distributed the amount of $1 million. This amount was donated by Iran to the families of *shahid* martyrs (that is, terrorists), whose homes had been demolished, and to families of prisoners in the Gaza Strip. The ceremony took place under the patronage of Abu Mazen (AKA PA President Mahmoud Abbas), who was represented by Hisham Abd al-Razaq, a former Minister of Prisoners' Affairs, and was attended by a number of members of the "Legislative Council." Abd al-Razaq gave a speech on behalf of Abu Mazen. The Al-Ansar Society is an Islamic charitable society, which was founded in 2001. Two years later, Israel declared it to be a "proscribed organization". The Society is active in the Gaza Strip, maintains close ties with Iran, and constitutes a Palestinian extension of the Iranian "Casualties' Fund". The Society is subordinate to the "Martyrs' Institution" in Lebanon, which belongs to Hezbollah and funds the families of "martyrs" in the Gaza Strip to this day.

       Nasr al-Sheikh, the Chairman of the Al-Ansar Society, stated at the ceremony that the "Casualties' Fund", which operates in Iran, also extends its patronage to all of the families of *shahid* martyrs who fell in the defense of the Palestinian soil. According to his statement, since the beginning of the conflict, the Society has assisted approximately 3,996 *shahid* martyrs ($5,000 to each of their families) and 200 prisoners ($1,000 to each prisoner). In addition, according to his statement, the Al-Ansar Society pays monthly salaries to the families of 1,940 martyrs, in amounts which range from $75 for the son of a *shahid* martyr to $250 for a *shahid* martyr who was married.[61]

[61] http://www.inn.co.il/News/News.aspx/128434

b.   A member of the Legislative Council on behalf of Fatah, Abbas Zaki, who also serves as a member of the Fatah Central Committee, participated in a ceremony in Hebron in August 2002, in which the amount of $10,000 – a grant from Saddam Hussein, then President of Iraq – was granted to the families of 12 *shahid* martyrs. At the ceremony, Abbas Zaki presented a detailed analysis of the admirable leadership qualities of Saddam Hussein, which, he said, were worthy of imitation. Zaki also analyzed the qualities of militancy and leadership which had characterized the *shahid* martyr Marwan Zaloum (who had been the commander of the al Aqsa Martyrs' Brigades in Hebron), "whose eyes were always raised toward martyrdom and not toward [the attainment of] any position."[62]

c.   A report on the activity of Orient House (i.e. PA/PLO headquarters) in Jerusalem, pursuant to the examination of thousands of documents and recordings which were seized in the building, indicates that the PA, acting through societies administered by Orient House and donations from Saudi Arabia, provided assistance to the families of suicide bombers and served as an incentive to suicide bombing operations.[63]

d.   In June 2001, Arafat granted the amount of $5,000 to the terrorist Lamia Maarouf, a member of Fatah who had been released from prison. She had been detained in connection with the kidnapping and murder of a soldier in 1987.[64]

e.   Marwan Barghouti, the Secretary of Fatah in the West Bank, funded the families of terrorist activists pursuant to requests by Arafat. In his interrogation, he stated that he had forwarded requests for assistance from the families of suicide bombers to Arafat, and even justified his request by saying that there was no difference between the suicide bomber and a person who had been killed; as he saw it, they were all *shahid* martyrs. In addition, Barghouti arranged for funding for the families of detainees and wanted persons who were Fatah activists.[65]

f.   On February 3, 2011, the Governor of Jenin, Qadura Musa, a senior member of Fatah, issued a grant on behalf of the Office of the [Palestinian] President to the

---

[62] http://www.memri.org.il/cgi-webaxy/sal/sal.pl?lang=he&ID=107345_memri&dbid=articles&act=show3&dataid=1339

[63] http://dc.fresh.co.il/Scoops/77651.html

[64] http://www.terrorism-info.org.il/Data/pdf/PDF1/sib5_3_04_202476748.pdf

[65] See Section 70 of the ruling in Criminal Terrorism File 1158/02 (Tel Aviv District Court): http://www.psakdin.co.il/fileprint.asp?filename=/plili/private/ver_bvtn.htm

family of the 24 year old *shahid* martyr Salem Muhammad Samudi from the village of al-Yaamun, west of Jenin. The governor stated that the grant represented financial assistance in the amount of $2,000, "which the President [Mahmoud Abbas] had granted to the family of the casualty, who was shot and killed last month by soldiers at the military checkpoint near the entrance to the settlement of Mevo Dotan, south of Jenin."[66]

g. Each of the prisoners who were released in the Gilad Shalit deal was given a grant in the amount of $5000, allocated from the treasury of the PA. A total of $5 million was paid out.[67] The recipients of the grants included members of Hamas[68] and the Islamic Jihad, who had murdered or wounded Israelis.[69]

14. Palestinian law guarantees certain terrorist prisoners a position in the PA government. Section 3 of the Palestinian Prisoners' Law states as follows:

> Every released prisoner has the right to be promised a position in one of the government ministries or the organizations of the Authority, provided that the following conditions apply to him:
>
> a. He has served a sentence of five years' imprisonment or more as a result of his struggle against the occupation [(*i.e.* Israel)], whether that sentence was served all at once or in separate periods of time.

---

[66] Published in the Palestinian newspaper ***al-Quds***, February 3, 2001. Cited in http://www.jcpa.org.il/JCPAHeb/Templates/showpage.asp?FID=762&DBID=1&LNGID=2&TMID=99&IID=25259

[67] http://hebrew.irib.ir/news/politic/item/162807-5000-%D7%93%D7%95%D7%9C%D7%A8%D7%99%D7%9D-%D7%9C%D7%9B%D7%9C-%D7%90%D7%A1%D7%99%D7%A8-%D7%A4%D7%9C%D7%A1%D7%98%D7%99%D7%A0%D7%99-%D7%9E%D7%A9%D7%95%D7%97%D7%A8%D7%A8

[68] Ziad Abu Ain, Deputy Minister of Prisoners' and Released Prisoners' Affairs in the PA, stated in an interview to the "On the Table" program of the Palestinian television network ***Ma'an*** (***al-Bayan***, December 27, 2009) that the total amount which is allocated by the PA from its salary budget for released prisoners who are members of the Hamas movement comes to approximately NIS 4 million (per month). This amount, according to his statement, accounts for approximately 70% of all salaries and assistance grants which are paid by the Ministry of Prisoners and Released Prisoners in the West Bank. Cited in http://www.maannews.net/arb/ViewDetails.aspx?ID=249973&MARK

[69] Published in ***al-Hayat al-Jadida***, the official journal of the PA, on December 28, 2011. Cited in http://www.palwatch.org.il/main.aspx?fi=448&page=5

b. The period / periods in question must be documented in official documents which are issued by the Red Cross, or documentation by the office in charge of the case, proving the veracity of his imprisonment.

c. Prisoners who were detained in the past, or were detained in Arab prisons, against the background of the struggle on behalf of the [Palestinian] problem, and who are not in possession of official documents issued by the Red Cross, are entitled to obtain [a document] from the Minister which confirms and verifies the detention.

d. The released prisoner does not work for an official or non-government institution, from which he receives a regular salary.

e. He does not have any other source of income, whether from trade or from the operation of a workshop or factory or an office for the provision of services, from which he receives an adequate salary.

f. He does not own any land or real estate or other assets which give him a permanent income that enables him to live with dignity.

g. On an exceptional basis, the same terms shall apply to female prisoners who served a sentence of not less than two and one half years' imprisonment, and this salary shall be stopped when the female prisoner in question obtains employment.

15. The Ministry of Prisoners' Affairs also arranges for prisoners to be "rehabilitated" after their release. The rehabilitation is provided through monetary grants, which are primarily intended to enable the former prisoner to enter a profession. The principal form of assistance, however, is the granting of positions to security prisoners within the bureaucracy of the PLO, the PA or Fatah, and primarily by recruiting the prisoners into the Palestinian security organizations. The "rehabilitation" is carried out in coordination with the various government ministries. Thus, for example, the PA announced a program for the absorption of released prisoners: on May 26, 2010, the newspaper ***al-Ayam***, which is published in Ramallah, reported on a program by the Minister of Agriculture, Dr. Ismail Daik, in cooperation with the Ministry of Prisoners' and Released Prisoners' Affairs, the purpose of which was to find employment for 2,000 prisoners who had been detained for

periods not in excess of five years. The proposal was put before the Government and its Prime Minister, Dr. Salam Fayyad, for deliberation and decision. The Minister of Agriculture clarified that the program would include the grant of loans to released prisoners, for the purpose of improvement of Palestinian soil, which could then be used to increase the harvest.[70]

16. After the conclusion of his sentence of imprisonment, each released Palestinian prisoner receives a salary for six months, until he is given an official position in the institutions of the PA. Each prisoner who served more than five years' imprisonment receives an allowance in the amount of NIS 1,200-2,000, which continues without interruption until he is given a position.[71]

17, The PA also arranges for accommodations for released prisoners. In November 2011, the PA announced that it would build residential units for released prisoners.[72]

18. The Israel Security Service Agency believes that the monies in question constitute a motive for the perpetration of terrorist acts. A report by the Israel Security Service Agency on suicide bombings stated as follows:

> The headquarters of the terrorist organizations initiate and control terrorist activity by transferring large amounts of money to terrorist activists on the ground, who earn their living by directing terrorist activity and do not necessarily operate on the basis of purely ideological motives. In many cases, the perpetrators who are recruited to carry out suicide bombings are Palestinians with financial or social problems, who agree to carry out the terrorist attack in exchange for a promise that the terrorist organization, in the name of which they were sent out, **would ensure their families' financial welfare after their death**" (emphasis added).[73]

19. **In my expert opinion, money is an incentive for terrorist operations in Palestinian society. When a terrorist knows that, after his death, his family will receive not only honor, but also the payment of a monthly salary and other benefits, he knows he will**

[70] http://www.heskem.org.il/media-view.asp?id=2282&meid=97

[71] http://www.inn.co.il/News/News.aspx/198342

[72] http://www.mako.co.il/news-channel2/Weekend-Newscast/Article-012195aa8457331017.htm

[73] ISA, Pamphlet on Suicide Bombers

**be able to rely on the PA to continue to support his family. The granting of the financial assistance and the considerable public coverage of such grants by the Palestinian media, which is recruited to cover all aspects of such payments, ensure that the payments become a tool for encouraging enlistment in, and assistance of, terrorism.**

20. **In my expert opinion – the monthly salary, the monies paid into the prisoners' canteen accounts, the fact that their families are cared for – as well as the incarceration of several terrorists in a shared cell, in order to reinforce social and organizational cohesion, and the ties existing between security prisoners and their cohorts outside of the prison, all make it easier for prisoners to intensify their ideological commitment and return to terrorist activity upon their release. Between 1993 and 1999, a total of 6,912 terrorists were released, of whom 854 (12.4%) had been previously arrested for murderous terrorist activity (as of August 2003). According to various estimates of the security services, between 40% and 50% of the released terrorists have returned to terror activities of some kind – attacks, financing, logistics, organization and more.**

21. **In my expert opinion, the very fact that official representatives on behalf of the PA participate in the distribution of monies to the families of terrorists who have been killed not only legitimizes terrorism, but also encourages the general public to follow in the footsteps of the killed terrorists.**

22. **In my expert opinion, the support for the families of terrorists to have been killed, wounded and incarcerated expands the support of terrorism and exploits money as a tool for globalization of terrorism and the terror network. A terrorist who perpetrates terrorist attacks is aware that his family will receive money after his imprisonment, death or injury. This knowledge naturally increases young people's motivation and willingness to join the ranks of terrorism.**

23. **In my expert opinion, one of the overt operations carried out by the PA in order to encourage terrorism is the monthly support which is provided to the families of terrorists who are serving sentences in Israeli prisons for terrorist operations. The support is provided in the form of a monthly salary and additional benefits, similar to those received by employees of the PA. The payment makes no distinction among the various organizations. Activists in Fatah, Hamas or al-Qaeda receive similar amounts from the PA treasury. The payment is made by the Finance Department of the Ministry of Prisoners' Affairs in the PA.**

24. **In my expert opinion, the fact that prisoners are guaranteed a fixed salary, which is higher than those of other civil servants in the PA, along with other social benefits,**

**provides incentive and motivation to join, and reward for joining, the ranks of terrorism, especially in the context of a reality which involves living at a low socioeconomic standard and in protracted poverty.**

## VII. PART SIX - THE RELEASE OF TERRORIST PRISONERS BY THE PA – THE "REVOLVING DOOR" POLICY

1. Based on the analysis and statistics discussed herein, it is clear that the PA treats terrorist operatives as freedom fighters, not terrorists. Terrorists who attack Israel or Israelis are not tried for a criminal offense in a PA court; rather, they are prosecuted pursuant to the Harm to Palestinian Interests Law. The PA treats terrorist prisoners differently than it treats criminal prisoners, and the PA releases terrorist prisoners at the earliest possible opportunity, even though the arrest of such prisoners and the demand to put them on trial results from pressure by Israel.[74] In the case referred to in the footnote, the prisoners were sentenced to 7 years in prison for the murder of two Israelis in Wadi Qelt.

2. In cases where arrests have been made by the Palestinians, it is evident that the purpose was to show Israel and the Americans that the Palestinians are engaged in true preventive activity. In actual fact, however, a considerable proportion of the arrested persons are quickly released after superficial handling of their cases and with the imposition of no real deterrence against future terrorist attacks.

3. The PA customarily releases security prisoners within the framework of what has been referred to as a "revolving door" policy. Within the framework of that policy, the security organizations of the PA have frequently arrested terrorist activists in order to misrepresent to Israel and the United States that the PA governmental organizations were engaged in the actual frustration of terrorist operations. However, after a relatively brief period of imprisonment, a considerable proportion of the detainees in question were released following a superficial interrogation and with no real deterrence or frustration of their preparations to carry out terrorist attacks. It should be noted that the PA has come to a decision in principle that it will not extradite terrorist operatives to Israel, notwithstanding a prior agreement to do so, which was signed in 1994.

   Muhammad Dahlan, the former Head of the Preventive Intelligence Service in Gaza, explained:

   > We have come to a decision, and it was reached at our highest level – naturally, with Arafat's agreement – that we will not extradite

---

[74] See *e.g.* page 3 of a report by B'Tselem on the arrest and trial of Popular Front activists: http://www1.idc.ac.il:549/2004/10883.pdf

is proof that the two of them carried out the terrorist operations under the protection of the Palestinian authority.

June 14, 2013

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Alon Eviatar