# EXHIBIT  E

# Paying salaries for the employees has become a burden on the Palestinian Authority

**\* 272 million Shekels is what was paid in May.**

"Hayat (Life) and Souk (Market)" has obtained an official document in which it states that the amount the Palestinian Authority pays for salaries is higher than what it is actually believed.

According to the document, the total amount the Palestinian Authority paid for the past month of May reached 727287824 Shekels.

"Hayat and Souk" has analyzed the document in order to identify the categories of people receiving the money and what their shares are. Further, the analysis will provide the average rate of salaries within every category (Please see enclosed charts)

In examining the document, a number of questions have manifested. For instance, the question regarding the number of representatives in the parliament, what is the exchange rate that was considered and whether such exchange rate fluctuated. Another question is the raise of the One Thousand Shekels Pension which the total amount increased by 3.5 million Shekels. All these questions are discussed below and we hope that the officials will provide us with the answers. We are committed to publishing these answers and we will give them greater importance.

The document shows that public officials receive the largest share with the total amount of 293435045 Shekels (That is a percentage exceeding %40). The number of public officials receiving such amount is 101802 in which 3/4 of them are from the West Bank.
The average income of a public official  working for the Palestinian National Authority is 2882 Shekels. It should be noted that the change in this amount (and other amounts discussed below) is unknown. Therefore, it is difficult to know to  what extent the difference between categories with high income salaries and categories with low income salaries are. Furthermore, it is difficult to know the number of employees in each of these categories.

Military officials came second on the document with almost %24 and a total amount reaching 172873226 Shekels and surprisingly military officials from the Gaza strip covered more than %55 of this amount. The average income of a military official working for the Palestinian National Authority is 2704 Shekels.

In addition,  %19 of the amount paid by the Palestinian Authority to cover  salaries of employees is used to pay other additional incomes in the form of insurance, retirements, compensations and loans. The total amount of such additional incomes is 140507010 Shekels.

The Palestinian  Authority transfers abroad around %7 of the total amount of the income paid and this occurs  in the form of salaries to officials working in embassies, the National Fund, and the Palestinian Liberation Organization and its institutions.  The total amount for such transfers is 51872446 Shekels.

Meanwhile detainees receive about %2.5 of the income paid by the Palestinian Authority in the form of salaries with an amount reaching 17678247 Shekels. On the other hand, families of martyrs either inside the country or abroad receive about %3.5 of the income paid with a total amount of 26458137 Shekels.

The West Bank received the largest share of salaries designated for detainees. The average income a detainee receives is 3129 Shekels. The Gaza strip, on the other hand, received the largest share of salaries designated for the families of martyrs.

About %2 of the total amount for salaries paid by the Palestinian Authority, 12428 people benefited from the so-called One Thousand Shekels Pension with the total amount reaching 15965383 Shekels (Gaza strip received %91 of this amount).
It is important to note that the total amount received by the beneficiaries of this pension (1000 Shekels **x** the number of beneficiaries) is short by more than 3.5 million Shekels from the actual amount paid.

The salaries of the representatives of the Legislative Council (the Palestinian parliament) represents %0.5 of the total amount of salaries paid which is 3272316 Shekels. The interesting thing is that the number of representatives paid was 325 parliamentarians while the known real number is 203 parliamentarians (the number of representatives in the actual Legislative Council is 132 **plus** 88 representatives from the previous council **minus** 17 representatives who served in both terms). The average income of a parliamentarian has reached 10000 Shekels.

In addition, The document reported a sum of 3022987 Shekels in form of costs to support salaries and the budget.

On the other hand, the document contained detailed items of projects, contracts, and employees receiving their income in dollars. The total amount of these items is 2198022 Shekels which represents less than % 3 of the total income paid by the Palestinian Authority.

**Abd Alkareem: "1.5 Billion dollars every Year"**

The economy expert Dr. Nassar Abd Alkareem commented on these numbers. He said: " the document shows that the monthly net bill to cover the salaries exceeds $200 million a month, that is 1.5 billion dollars every year"

According to Abd Alkareem, this "number is extremely high and shows clearly that the National Authority will not be able to cover all salaries". He added: " It is clear that the biggest chunk of salaries goes to public officials and military officials. The military officials receive about 1/3 of these salaries. This demonstrates what is commonly known that 1/3 of the Palestinian National Authority's budget goes to the security sector. Meanwhile the public sector will be affected by 2/3 plus the parliamentarians, the detainees, the missions, and the embassies abroad"

Furthermore, Abd Alkareem criticizes the amount of  monthly salaries the detainees receive. He says: " this number is lower in comparison to what the detainees are experiencing"

Dr. Abd Alkreem believes that "the real number is the number of civilian and military employees. This number cannot be disagreed upon and there is no going backwards" and he emphasizes that " the most difficult point facing the Financial Administration of the National Authority is how we re-examine our view regarding spending  so we can reduce our reliance on (international) aids especially since our salaries consume more than %75 of our budget…. This is the main question, the rest is less important"

In addition, Abd Alkareem questions the costs that are designated for contracts and projects in which they exceed two million Shekels. He says: " where are these contracts? And how were people appointed in order to receive these costs especially since the Palestinian Authority has stopped, in its budget of 2011, any new appointments? And why these contract?... perhaps the income coming form  these contracts is outside the scope of the law of public service, and perhaps these contracts were made according to unknown and unfamiliar assumptions". He adds: " the  Palestinian Authority is operating by appointing people in huge numbers and for short term contracts…. And this is problematic because the contracts will remain outside the scope of accountability and transparency".

Finally. Abd Alkareem said that " it is remarkable how the distribution of salaries is made, according to the document. %60 for the West Bank and %40 for the Gaza strip which contradicts, in somehow,  what has been said that the Palestinian Authority spends between %60 to %85 from its budget on Gaza".

CITY OF WASHINGTON      )
                                 ) ss.
DISTRICT OF COLUMBIA    )


I, <u>Chafik Leblalta</u>, hereby certify that the document **"Paying salaries for the employees has become a burden on the Palestinian Authority"** is to the best of my knowledge and belief, a true and accurate translation from Arabic into English.

                                      Chafik Leblalta

Sworn to before me this
6 day of August, 2013.

_____
Notary Public

Eva S. Pinkney
District of Columbia, Notary Public
My Commission Expires
February 15, 2015




الحياة الجديدة

الأحد 19 حزيران (17 رجب) 2011 العدد 5615

بحث

أخبار عاجلة    الحياة === نص خطة الاقتحام والتطوير للحكومة الاسرائيلية

الحياة الاقتصادية

فاتورة الرواتب «تنهد حبل» السلطة
* 727 مليون شيقل مجموع الرواتب في أيار

حياة وسوق–إبراهيم ابو كامل وعبد الرحيم عبد الله – تكشف وثيقة رسمية حصل «حياة وسوق» على نسخة منها أن فاتورة الرواتب أعلى بكثير مما كان الجميع يعتقد. فحسب الوثيقة، بلغ مجموع الرواتب الشهرية المدفوعة خلال شهر أيار الماضي 727.287.824 شيقلا. دفعت جميعها من خزينة السلطة الوطنية.

وأُفضحت «حياة وسوق» الوثيقة للمعالجة الإحصائية لإيجاد حصص الفئات المختلفة من فاتورة الرواتب، ومعدل الرواتب في كل من تلك الفئات، وتوزيعاتها على الضفة والقطاع. (إرجم الاطلاع على الجدول والأشكال البيانية المرفقة).

وتطرح القراءة الصحفية للوثيقة مجموعة من التساؤلات حول عدد النواب المذكور فيها، وسعر صرف العملات المعتمد، وكيف تلك السعر، ووجود زيادة بحوالي 3.5 مليون شيقل في مجموع استحقاقات منحة الآلاف شيقل عن المجموع الذي تفرضه الحسبة الأولية. وهي جميعها تساؤلات نوردها أدناه، راجين من المسؤولين أن يقدموا اجاباتهم عنها، ومتعهدين بنشر تلك الاجابات ومنحها أكبر قدر من الاهتمام.

بينت الوثيقة أن الموظفين المدنيين يحصلون على نصيب الأسد من فاتورة الرواتب بنسبة تجاوزت 40 %. وبقيمة اجمالية بلغت 293.435.045 شيقلا، استفاد منها801.802 موظفا مدنيا، حولي ثلاثة أرباعهم من الضفة.

وبلغ متوسط راتب الموظف المدني في السلطة الوطنية 2882 شيقلا. ومن المهم الإشارة إلى أن قيمة الانحراف المعياري لهذا الرقم (وفيرة من الأرقام الواردة أدناه) غير معروفة. وبالتالي من غير المعروف مدى التباين بين رواتب الفئات العليا والدنيا، وعدد الموظفين في كل من تلك الفئات.

بدورهم، حل الموظفون العسكريون ثانيا على فاتورة الرواتب بنسبة قاربت الـ24 %. وبقيمة اجمالية بلغت 172.873.226 شيقلا. ومن المهاجين أن قطاع غزة من أكثر من 55 % من فاتورة رواتب الموظفين العسكريين.

وبلغ متوسط راتب الكادر العسكري في السلطة الوطنية 2704 شوقل.

وتدفع السلطة أكثر من 19 % من فاتورة الرواتب لاستحقاقات اضافية للموظفين على شكل تحويلات للتأمين والمعاشات وتعويضات نهاية خدمة وبسلف بقيمة اجمالية بلغت 140.507.010 شوقل.

وتحمل السلطة حوالي 7 % من فاتورة الرواتب للخارج على شكل رواتب لكوادر السفارات والصندوق القومي والساحات الخارجية وقوات منظمة التحرير ومؤسساتها بقيمة اجمالية بلغت 51.872.446 شيقلا.

أما الأسرى فيحصلون على حوالي 2.5 % من فاتورة الرواتب، على شكل رواتب واستحقاقات اجمالية بقيمة 17.678.247 شيقلا، فيما تمثل رعاية أسر الشهداء في الداخل والخارج حوالي 3.5 % من فاتورة الرواتب بقيمة اجمالية بلغت 26.458.137 شيقلا.

وحصلت الضفة على نصيب الأسد من استحقاقات ورواتب الأسرى، أما القطاع فحصل على نسبة أكبر من مخصصات اعانة أسر الشهداء.

وبلغ متوسط راتب الأسير 3129 شيقلا.

ودفعت السلطة حوالي 2 % من فاتورة رواتبها على شكل منحة بألف شيقل للـ12.428 مستفيدا بقيمة اجمالية بلغت 15.965.383 شيقلا، حصل قطاع غزة على حوالي 91 % منها.

ومن المهم الإشارة إلى أن مجموع استحقاقات المستفيدين (مبلغ ألف شيقل مضروبا بعددهم) ينقص بأكثر من 3.5 مليون شيقل عن المبلغ المصروف.

أما نواب المجلس التشريعي المعطل فمثلت رواتبهم حوالي 0.5 % من مجموع فاتورة الرواتب بمبلغ اجمالي بلغ 3.272.316 شيقلا. المثير أن عدد النواب في فاتورة الرواتب بلغ 325 نائبا فيما يبلغ عدد المستحقين المعروف 203 نواب (عدد نواب المجلس التشريعي الحالي 132 نائبا مضاف اليهم 88 نائبا في المجلس التشريعي السابق إذا 17 نائبا خدموا في الدورتين).

وبلغ متوسط راتب النائب حوالي عشرة آلاف شيقل.

وأوردت الوثيقة مبلغا بقيمة 3.022.987 شيقلا على فاتورة رواتب أيار، كتكاليف لدعم الرواتب والموازنة. من جانب آخر، اشتملت الوثيقة على عدد بنود تفصيلية لرواتب المشاريع والعقود ولموظفين يتلقون رواتبهم بالدولار، وبلغ مجموع تلك البنود 2.198.022 شيقلا ما يمثل أقل من ثلث بالمئة من مجموع فاتورة الرواتب.

عبدالكريم: مليار ونصف المليار دولار سنويا

ويطالب الخبير الاقتصادي د. نصر عبد الكريم على ضوء هذه البيانات بالقول: «تظهر هذه الوثيقة أن صافي التكلفة الشهرية للرواتب تجاوزت 200 مليون دولار شهريا، وهذا يترجم سنويا لحوالي مليار ونصف المليار دولار».

بحسب عبدالكريم، فإن «هذا رقم كبير للغاية ويظهر بوضوح أن الايرادات الذاتية للسلطة الوطنية لن تستطيع تغطية هذه الرواتب».

وأضاف: «واضح تماما أيضا أن الجزء الأهم من الرواتب هم للمدنيين والعسكريين، ويتقاضى العسكريون حوالي ثلث هذه الرواتب، وهذا يؤكد ما كان سائدا بأن ثلث موازنة السلطة الوطنية يذهب للقطاع الامني. أما القطاع المدني فيستأثر حوالي الثلثين، اضافة للنواب والاسرى والمهام والسفارات في الخارج».

ويتابع عبدالكريم الخافض قيمة الحوالات الشهرية للأسرى، قائلا: «هذا الرقم ضئيل مقارنة بعدد ووقع الاسرى».

ويعتقد د. عبد الكريم أن الرقم الخاص بمنحة الـ4000 لموظفي المدنيين والعسكريين، وإن لا يرجعه عن هذا الاتفاق، ويوكد: «في ظل البطالة فإن عدة العقد بالنسبة لإدارة المالية للسلطة الوطنية هي حيث نعيد النظر في حجم الاتفاق حتى نقلل من الاعتمادية على المساعدات في ظل رواتب تستهلك أكثر من 75 % من السؤال المركزي وباقي الامور هامشية».

ويتساءل عبدالكريم عن الرواتب المخصصة للعقود والمشاريع والتي تبلغ أكثر من مليوني شيقل، ويقول: «أين هذه العقود؟ وكيف يتم تعيين أصحابها خاصة وأن السلطة أوقفت في موازنتها العامة للعام 2011 التعيينات الجديدة؟ ولماذا هذه العقود... وقد تكون الرواتب هنا خارج قانون الخدمة المدنية، وقد تكون وفق اعتبارات غير معروفة وغير مألوفة». ويضيف: «السلطة تعمل بتعيينات هائلة وعقود غير مستدامة... وهذه اشكالية فاتغفور تبقى خارج المساءلة والشفافية».

وقال عبد الكريم: «من الملفت للنظر في هذه الوثيقة كيف انها توزع الرواتب بين الضفة وقطاع غزة. وهي تتحدث عن حولي



الحياة الاقتصادية

الحياة فتنش القاتلين الآن

الحياة الجديدة تحت صفر صفر

شائع الحياة الرياضية ... صباح كل خميس

الرياضية

أهلا بريشلونة

Welcome Barcelona

شائع نجوم رسول الاعلى ... صباح كل خميس

حياة وسوق

تصويت

تصويت    نتيجة

جدول الطقس
| | |
|---|---|
| 18 | 7 | القدس |
| 19 | 8 | رام الله |
| 21 | 9 | نابلس |
| 16 | 7 | الخليل |
| 21 | 9 | جنين |
| 17 | 7 | بيت لحم |
| 21 | 9 | طولكرم |
| 21 | 9 | قلقيلية |
| 26 | 11 | أريحا |
| 20 | 12 | غزة |

أسعار العملات
| | |
|---|---|
| دولار أمريكي | 3.585 | 3.535 |
| يورو | 4.830 | 4.630 |
| دينار أردني | 5.075 | 4.955 |
| دينار إسترليني | 0.710 | 0.707 |

كاريكاتير

2013-08-04

الحياة في صور



60 % للضفة و40 % لقطاع غزة. وهذا يخالف بعض الشيء ما كان يقال عبر السنوات الماضية من أن السلطة تنفق من 60 % إلى 85 % على قطاع غزة».

ويؤكد عبد الكريم ان التخلص من الاعتماد على الآخرين غير ممكن، وبالتالي فالتصريحات الصادرة بهذا الشأن غير واقعية على الاطلاق.

Copyright © 2013 alhayat-j .All Rights Reserved.                                        Site By  InterTech

# EXHIBIT F

FILED UNDER SEAL
PURSUANT TO PROTECTIVE ORDER

# EXHIBIT G

FILED UNDER SEAL
PURSUANT TO PROTECTIVE ORDER

# EXHIBIT H

FILED UNDER SEAL
PURSUANT TO PROTECTIVE ORDER

# EXHIBIT  I

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK


MARK SOKOLOW, et al.,

      Plaintiffs,

                                  Civ. No. 04-397 (GBD) (RLE)

      v.

THE PALESTINE LIBERATION ORGANIZATION, et al.,

      Defendants.

### PLAINTIFFS' FIRST REQUEST FOR ADMISSIONS TO DEFENDANTS

Pursuant to Fed. R. Civ. P. 36 all Plaintiffs in the instant matter, by and through undersigned counsel, serve Defendants Palestinian Authority ("PA") and the Palestine Liberation Organization ("PLO") with the following requests for Admissions which Defendants shall answer in writing within thirty (30) days of the service of these Requests.

### INSTRUCTIONS & GENERAL DEFINITIONS

1.      Defendants shall respond to these interrogatories as required by the Federal Rules of Civil Procedure and the Local Rules of this Court.

2.      The full text of the rule set forth in Local Civil Rule 36 is incorporated by reference herein and governs these interrogatories.

### SPECIFIC DEFINITIONS

1.      "PA" means and refers to defendant The Palestinian Authority and any ministry, agency, division, bureau, department or instrumentality thereof.

2.      "PLO" means and refers to defendant The Palestine Liberation Organization and any agency, division, bureau, department or instrumentality thereof.

1

3.    "Defendants" means and refers collectively to Defendants PA and PLO and any ministry, agency, division, bureau, department or instrumentality thereof.

## REQUEST FOR ADMISSIONS

**ADMIT THE FOLLOWING STATEMENT ARE TRUE:**

1)    The Palestinian Authority TV and Radio, the Palestinian Broadcasting Corporation, ("PBC") are under the direct control of the PA.

2)    The PBC is the official media service of the PA government.

3)    WAFA Palestine News and Information Agency ("WAFA") is the official PA news service.

4)    WAFA is affiliated with the PLO Executive Committee.

5)    The PLO Executive Committee is headed by Mahmoud Abbas.

6)    The newspaper *Al-Hayat Al-Jadida* is the PA's official daily newspaper.

7)    Mohammed Hasheika ("Hasheika"), was the suicide bomber in the Bauer bombing on March 21, 2002.

8)    Abdel Karim Ratab Yunis Aweis ("Aweis") was convicted in Israeli court for his involvement in the Bauer bombing on March 21, 2002.

9)    Nasser Jamal Mousa Shawish ("Shawish"), was convicted in Israeli court for his involvement in the Bauer bombing on March 21, 2002.

10)    Sana'a Muhammed Shehadeh ("Shehadeh") was convicted in Israeli court for her involvement in the Bauer bombing on March 21, 2002.

11)    Kaira Said Ali Sadi ("Sadi") was convicted in Israeli court for her involvement in the Bauer bombing on March 21, 2002.

12)     Hasheika's family, his agents or assigns has/have received benefits, financial or otherwise, from the PA since the Bauer Bombing.

13)     Aweis, his agents or assigns has/have received benefits, financial or otherwise, from the PA since the Bauer Bombing.

14)     Shawish, his agents or assigns has/have received benefits, financial or otherwise, from the PA since the Bauer Bombing.

15)     Shehadeh, her agents or assigns has/have received benefits, financial or otherwise, from the PA since the Bauer Bombing.

16)     Sadi, her agents or assigns has/have received benefits, financial or otherwise, from the PA since the Bauer Bombing.

17)     Aweis was a PA employee, agent or assign from at least 2000 to 2002.

18)     Aweis was a PA employee, agent or assign at the time of the Bauer bombing on March 21, 2002.

19)     Hasheika was a PA employee, agent or assign at the time of the Bauer bombing on March 21, 2002.

20)     Hasheika had been a PA employee prior to the Bauer bombing on March 21, 2002.

21)     The documents produced by Defendants, marked Bates 4473-4475, are genuine and authentic copies.

22)     The documents produced by Defendants marked Bates 4497-4499 are genuine and authentic copies.

23)     The documents produced by Defendants, marked Bates 4473-4475, are records of regularly conducted activity, as defined by Federal Rule of Evidence 803(6).

3

24)    The documents produced by Defendants, marked Bates 4497-4499 are records of regularly conducted activity, as defined by Federal Rule of Evidence 803(6).

25)    The Hasheikah martyr file produced by Defendants is a genuine and authentic copy.

26)    The Hasheikah martyr file is made up of records of regularly conducted activity, as defined by Federal Rule of Evidence 803(6).

27)    Hasheikah was arrested by the PA in February, 2002.

28)    When Hasheikah was arrested he had on his person an explosive device.

29)    Saeb Erekat was the chief Palestinian political negotiator in March, 2002.

30)    In a March 24, 2002 Fox News interview, produced by Plaintiffs on March 14, 2012 via email, Erekat acknowledged that Hasheika had been arrested by the PA before the bombing.

31)    (a) Arafat received a list of wanted men from U.S. Envoy Anthony Zinni in December 2001 ("Zinni List"); (b) Aweis was on the Zinni List.

32)    The documents produced by Defendants, marked Bates 7304-7316, are genuine and authentic copies.

33)    The documents produced by Defendants, marked Bates 7304-7316 are records of regularly conducted activity, as defined by Federal Rule of Evidence 803(6)

34)    The documents produced by Defendants, marked Bates 7317-7328, are genuine and authentic copies.

35)    The documents produced by Defendants, marked Bates 7317-7328, are records of regularly conducted activity, as defined by Federal Rule of Evidence 803(6).

36)     The video produced called "PA TV on Nasswer Aweis" on November 18, 2012 is a genuine and authentic copy of a broadcast aired on PBC.

37)     Abdoullah Barghouti ("Barghouti") was was a PA employee, agent or assign at the time of the Hebrew University bombing on July 31, 2002 ("HU Bombing").

38)     Marwan Bin Khatib "M Barghouti"; was was a PA employee, agent or assign at the time of the HU Bombing..

39)     Barghouti, his agents or assigns has/have received benefits, financial or otherwise, from the PA since the HU Bombing.

40)     M Barghouti, his agents or assigns has/have received benefits, financial or otherwise, from the PA since the HU Bombing.

41)     U.S. Secretary of State, Colin Powell demanded that the PA arrest Abdullah Barghouti prior to the HU Bombing.

42)     The PA was notified by Israel and/or the United States between September 1, 2000 and July 31, 2002 to detain or arrest Abdullah Barghouti.

43)     (a) the PA received a list of terrorists known to be planning imminent attacks prior to the Hebrew University ("HU") bombing on July 31, 2002, and (b)Barghouti was on said list.

44)     The documents attached to Plaintiffs' July 20, 2012 6th Request for Production of Documents are genuine and authentic copies.

45)     The documents attached to Plaintiffs' July 20, 2012 6th Request for Production of Documents are records of regularly conducted activity, as defined by Federal Rule of Evidence 803(6).

46)    The documents attached to Plaintiffs' July 20, 2012 6th Request for Production of Documents are incomplete.

47)    The documents attached to Plaintiffs' July 20, 2012 6th Request for Production of Documents are illegible in whole or in part.

48)    The video produced via email on October 23, 2012, entitled "PA Honors Hebrew University Bombers" is authentic and genuine copy of a broadcast that was aired on PBC.

49)    Wafa Idris ("Idris") was the suicide bomber in the Sokolow bombing in the January, 2002 ("Sokolow Bombing")..

50)    Munzar Mahmoud Khalil Noor ("Noor") was convicted in Israeli court for his involvement in the Sokolow bombing.

51)    Mohammed Muhtasib (a/k/a Kamle el Abed) was a PA employee, agent or assign at the time of the Sokolow bombing.

52)    Noor  was a PA employee, agent or assign at the time of the Sokolow bombing.

53)    Wafa Idris was a PA employee, agent or assign at the time of the Sokolow bombing.

54)    Noor, his agents or assigns has/have received benefits, financial or otherwise, from the PA since the Sokolow Bombing.

55)    Mohammed Muhtasib, his agents or assigns has/have received benefits, financial or otherwise, from the PA since the Sokolow Bombing.

56)    Idris' family, agents or assigns has/have received benefits, financial or otherwise, from the PA since the Sokolow Bombing.

57)    The document relating to Idris and Tirawi produced to Defendants via email on September 18, 2011 is an authentic and genuine copy of a PA intelligence document.

58)     The document relating to Idris and Tirawi produced via email on September 18, 2011 are records of regularly conducted activity, as defined by Federal Rule of Evidence 803(6).

59)     The document produced by Defendants Bates 02:004479-81 is a genuine and authentic copy.

60)     The document produced by Defendants Bates 02:004479-81 is a record of regularly conducted activity, as defined by Federal Rule of Evidence 803(6).

61)     The document produced by Defendants Bates 02:004484-86 is an authentic and genuine copy.

62)     The document produced by Defendants Bates 02:004484-86 is a record of regularly conducted activity, as defined by Federal Rule of Evidence 803(6).

63)     The document produced by Defendants Bates 02:006031-33 is an authentic and genuine copy.

64)     The document produced by Defendants Bates 02:006031-33 is a record of regularly conducted activity, as defined by Federal Rule of Evidence 803(6).

65)     The 4 pages of documents produced by Defendants regarding payments made by the PA to Noor are genuine and authentic copies.

66)     The 4 pages of documents produced by Defendants regarding payments made by the PA to Noor are records of regularly conducted activity, as defined by Federal Rule of Evidence 803(6).ta

67)     The Noor files, produced on or about November 16, 2012 by Defendants, is a genuine and authentic copy of Noor's prisoner file.

68)     The Noor files, produced on or about November 16, 2012 by Defendants are records of regularly conducted activity, as defined by Federal Rule of Evidence 803(6).

7

69)     Noor states in The Noor files, produced on or about November 16, 2012 by Defendants, that he was affiliated with Fatah at the time of the Sokolow bombing.

70)     At the time of the Sokolow bombing, Noor was affiliated with Fatah.

71)     At the time of the Sokolow bombing, the PA provided funding to Fatah.

72)     Mohammad Dahlan was an employee of the PA at least from 2006 to date.

73)     Mohammad Dahlan was a senior official of the PA from at least 2006 to date.

74)     During a January 22, 2006 television broadcast, Dahlan made the statement, "All [Hamas'] military commanders have been protected by the [PA] security establishment throughout this Intifada. They were provided with full protection..."

75)     During a June 16, 2007, television interview Dahlan stated that: "The Palestinian security forces were those who protected and hid half of the Hamas leadership and of the Hamas military force during the Intifada."

76)     During the same June 16, 2007 interview Dahlan also stated that: "Forty percent of the martyrs in this Intifada belonged to the Palestinian security forces."

77)     In a televised interview on July 22, 2009, Dahlan stated, in the context of a discussion on the "proper" use of terrorism, that:  "I lived with Chairman Yasser Arafat for years. Arafat would condemn [terror] operations by day while at night he would do honorable things."

78)     The "Foundation for the Care of the Families of Martyrs and Wounded, aka the "Fund," the "Institute" or the "Establishment" for the families of martyrs, ("the Fund") is funded by Defendants.

79)     The Fund is operated by Defendants.

80)    The average benefits paid by the Fund in 2004 were more than 20 percent of the contemporary poverty line; and in 2005 they were more than 33 percent of the poverty line.

81)    Yousef Ahmed Jubran ("Jubran") served as director the Fund between 1996 and 2006.

82)    Jubran appeared as a witness on behalf of the PA in the Tel Aviv District Court in the matter of *Goldman et al. v. PA et al.,* Civ. No. 1137/05.

83)    Jubran testified under oath there that suicide terrorists are considered "martyrs" whose families are entitled to financial benefits under Defendants' program, because "they fell in the course of the struggle, the fighting, the conflict."

84)    Representatives of Defendants' Fund assisted Bassam Banat with his/her dissertation.

85)    Representatives of Defendants' Fund provided  the names of all Palestinian suicide martyrs (Istishhadiyin).

86)    Defendants' Fund president, Ms. Intesar Al-Wazeer ("Al-Wazeer"), facilitated Banat and designated a coordinator.

87)    Al-Wazeer provided Banat with a list of all the Palestinian Martyrs and the way they implemented the martyrdom operations.

88)    The Palestinian Authority published a 12 volume publication called "Al Aqsa Intifada: Diary and Documents" (انتفاضة الأقصى يوميات ووثائق), some volumes of which are captioned as "Diaries of the Intifada" (يوميات الانتفاضة). (Produced instead via email today, November 21, 2012).

89)    These documents sent by plaintiffs to defendants by email on November 21, 2012 are genuine copies of volume 1 and volumes 4-12 of the PA's publication "Al Aqsa Intifada:

Diary and Documents" (انتفاضة الأقصى يوميات ووثائق), some volumes of which are captioned as "Diaries of the Intifada" (يوميات الانتفاضة)

90)    The document produced to defendants by email on November 21, 2012, at 4:10 am EST, is a genuine copy of a webpage appearing at http://www.palpolice.ps/ar/?p=4830 on November 21, 2012.

91)    The website http://www.palpolice.ps is the official website of the PA Police.

92)    The webpage appearing at http://www.palpolice.ps/ar/?p=4830 on November 21, 2012 was published by the PA Police.

93)    The PA can sue and/or be sued in PA courts.

94)    The PA can sue and/or be sued in Israeli courts,

95)    The PA can be sued in foreign courts.

96)    The PA does not have members.

97)    The PA does not have membership dues.

98)    The PA holds assets in it own name.

99)    The PA can enter into binding contracts inside the Palestinian territory.

100)    The PA can enter into binding contracts outside the Palestinian territory.

101)    Ali Yusuf "Ja'ara" was the suicide bomber in the Goldberg bombing on Janaury 29, 2004.

102)    Ja'ara was a  PA employee, agent or assign at the time of the Goldberg bombing on January 29, 2004.

103)    Ja'ara's family, his agents or assigns has/have received benefits, financial or otherwise, from the PA since the Bauer Bombing.

104)    The video produced via email on October 23, 2012, called "Yasser Arafat Immediately After Goldberg Bombing" is authentic and genuine copy of a broadcast that was aired on PBC.

105)    The Jara'a martyr file produced by Defendants is an authentic and genuine copy.

106)    The Jara'a martye file produced by Defendants are records of regularly conducted activity, as defined by Federal Rule of Evidence 803(6).

107)    Jara'a's service as a policeman was terminated due to his martyrdom.

108)    The video produced on July 3, 2012 called "A Jaara Funeral-PA TV" on July 3, 2012 is a genuine and authentic copy of a broadcast aired on PBC.

109)    Ahmed Taleb Mustapha Barghouti aka Al-Farinsi ("M Barghouti") was a PA employee, agent or assign at the time of the Gould & Waldman Shooting on January 22, 2002 ("Gould shooting").

110)    Nasser Mahmoud Ahmed Aweis aka Abu Mojaked ("Aweis") was a PA employee, agent or assign at the time of the Gould Shooting.

111)    Majid  Al-Masri aka Abu Mojahed ("Al-Masri") was a PA employee, agent or assign at the time of the Gould Shooting.

112)    Mahmoud Al-Titi ("Al-Titi") was a PA employee, agent or assign at the time of the Gould Shooting.

113)    Mahmoud Abdel Rahman Salam Musalah aka Abu Satkhah ("Musalah") was a PA employee, agent or assign at the time of the Gould Shooting.

114)    Faras Sadak Mohammed Ghanem aka Hitawi ("Ghanem") was a PA employee, agent or assign at the time of the Gould Shooting.

115)    M Barghouti, his agents or assigns has/have received benefits, financial or otherwise, from the PA since the Gould Shooting

116)    Aweis, his agents or assigns has/have received benefits, financial or otherwise, from the PA since the Gould Shooting.

117)    Al-Masri, his agents or assigns has/have received benefits, financial or otherwise, from the PA since the Gould Shooting

118)    Al-Titi, his agents or assigns has/have received benefits, financial or otherwise, from the PA since the Gould Shooting

119)    Musalah, his agents or assigns has/have received benefits, financial or otherwise, from the PA since the Gould Shooting

120)    Ghanem, his agents or assigns has/have received benefits, financial or otherwise, from the PA since the Gould Shooting

121)    Abdullah, his agents or assigns has/have received benefits, financial or otherwise, from the PA since the Gould Shooting

122)    Ramadan's family or assigns has/have received benefits, financial or otherwise, from the PA since the Gould Shooting

123)    Al-Masri was convicted in Israeli court for his involvement in the Gould Shooting.

124)    Aweis' name appeared on the Zinni List (defined above).

125)    Aweis was a captain in the PA National Security Service.

126)    The PA continued to pay Aweis his salary without any interruption whatsoever after he appeared on the Zinni List.

12

127)    The PA continued to pay Aweis his salary without any interruption whatsoever after the Gould Shooting.

128)    The PA continued to pay Aweis his salary without any interruption after Aweis was arrested by Israel in Spring 2002.

129)    The video produced on November 19, 2012 called "Al-Masri" is a genuine and authentic copy of a broadcast aired on PBC.

130)    PBC interviewed the daughter of Nasser Al-Shawish on September 22, 2011, (as indicated in the document produced on November 19, 2012).

131)    PBC interviewed the family of Majed Al-Masri on September 22, 2011, (as indicated in the document produced on November 19, 2012).

132)    Mazan Faritach ("Faritach") was the bomber in the June 19, 2002 Mandelkorn Bombing ("Mandelkorn Bombing").

133)    Faritach was an employee, agent or assign of the PA at the time of the Mandelkorn Bombing.

134)    Fartiach, his family, agents, or assigns has received benefits from the PA since the Mandelkorn bombing.

135)    The video called "On PA TV Glorification of Fogel family murderers - PMW Bulletins" produced on January 29, 2012 is a genuine and authentic copy of a broadcast aired on PBC.

136)    The video called "Song dedicated to Palestinian prisoners honors arch-terrorists, on PA TV" on July 3, 2012 is a genuine and authentic copy of a broadcast aired on PBC.

November 21, 2012

Plaintiffs, by their Attorney,

_____

Robert J. Tolchin
111 Livingston Street, Suite 1928
Brooklyn, New York 11201
(718) 855-3627
Fax: (718) 504-4943
RJT@tolchinlaw.com


David I. Schoen
David I. Schoen, Attorney at Law
2800 Zelda Road, Suite 100-6
Montgomery, Alabama  36106
(334) 395-6611
DSchoen593@aol.com

## **CERTIFICATION**

I hereby certify that on November 21, 2012, I caused the within to be served by electronic

mail and by hand on the counsel listed below:


Brian A. Hill
MILLER & CHEVALIER CHARTERED
655 15th Street, NW, Suite 900
Washington D.C. 20005-6701


_____

Robert J. Tolchin

14