# EXHIBIT  K

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

MARK SOKOLOW, et al.,

Plaintiffs,

v.

Civ. No. 04-397 (GBD) (RLE)

THE PALESTINE LIBERATION ORGANIZATION, et al.,

Defendants.

**PLAINTIFFS' NOTICE TO THE PLO OF TAKING DEPOSITIONS PURSUANT TO FED.R.CIV.P. 30(b)(6)**

**PLEASE TAKE NOTICE** that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, the plaintiffs' counsel will take the deposition of the defendant, the Palestine Liberation Organization ("PLO"), beginning on December 10, 2012, at 9:00 a.m. at the American Colony Hotel in Jerusalem. The deposition will continue from day to day thereafter until completed. The PLO is hereby directed, pursuant to Rule 30(b)(6), to designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf at the time and place stated above, regarding the following matters:

1) The full details of the organizational, political and financial relationship between the PLO and Fatah between January 1, 1998 and January 29, 2004, including without limitation:

a) The identity of all PLO Executive Committee members who belonged to Fatah, and their respective positions, titles, roles and responsibilities in Fatah.

b) The identity of all PLO Executive Committee members who did not belong to Fatah, and the factions, if any, to which they belonged.

c)        The rules and procedures governing decision-making by the PLO Executive Committee; or, if such rules and procedures did not exist and/or were not always followed, the manner in which the PLO Executive Committee actually made decisions.

d)        The identity of all PLO members who served in the Fatah Central Committee and/or the Fatah Revolutionary Council, and their respective positions, titles, roles and responsibilities in those bodies.

e)        Fatah's participation in PLO activities and Executive Committee meetings.

f)        Fatah's duties, obligations and rights vis-à-vis the PLO.

g)        The PLO's duties, obligations and rights vis-à-vis Fatah.

h)        The constitution, charter, program, policies and goals of the PLO; and the differences, if any, between the constitution, charter, program, policies and goals of the PLO and the constitution, charter, program, policies and goals of Fatah.

i)        The provision of material support or resources to or for the benefit of Fatah by the PLO (including the Palestine National Fund ("PNF")) and/or by the Palestinian Authority ("PA") at the behest of the PLO, including: (i) the types of material support or resources provided (ii) the amounts or values (in dollars or any other currency) of the material support or resources provided (iii) the dates on which the material support or resources were provided (iv) the manner in which the material support or resources were provided including, in the case of funding (A) whether the funds were drawn from PLO accounts, PNF accounts, PA accounts, or from some other accounts and if so – which accounts and (B) whether the funds were paid to Fatah accounts or to some other accounts and if so – which accounts.

2)      The constitution, charter, program, policies, goals and activities of Fatah between January 1, 1998 and January 29, 2004.

3)      Fatah's budget between January 1, 1998 and January 29, 2004.

4)      Fatah's sources of funding between January 1, 1998 and January 29, 2004.

5)      All facts relating to the Fourth Affirmative Defense asserted by the PLO in the Answer filed by the PLO in this action,[1] including:

       a)      All facts relating to the claim by the PLO that it is an "unincorporated association" under New York law.

       b)      The process, procedure and manner, if any, through which a person can become a "member" of the PLO (as that term is used in *Martin v. Curran*, 101 N.E. 2d 683 (N.Y. 1951)) and the process, procedure and manner, if any, through which a person can cease to be a "member" of the PLO.

       c)      The identity of any persons who were "members" of the PLO (as that term is used in *Martin v. Curran*, 101 N.E. 2d 683 (N.Y. 1951)) at any time between January 8, 2001 and the present day, and the date on which each such person became a "member" of the PLO.

6)      The full details of any and all searches conducted by the PLO for documents and information responsive to each of the discovery requests served by plaintiffs on the PLO in this action (including, without limitation, any and all searches conducted by the PLO for information responsive to the topics listed in the instant notice of deposition).

---

[1]      Plaintiffs seek this information without derogating from their position that the PLO has waived any lack of capacity defense.

7)    In respect to any documents or information responsive to the discovery requests served by plaintiffs in this case that the PLO contends were lost, destroyed, or removed from its possession, custody, or control since the date of the filing of this action: the full identifying details of any and all such documents or information, and the full details of when and how such documents or information were lost, destroyed, or removed from the PLO's possession, custody, or control.

8)    In respect to all documents produced or disclosed by the PLO in this action on or before December 21, 2012: (i) when and how the document produced or disclosed came into the possession, custody or control of the PLO, the locations in which the document was kept and/or located since it came into the possession, custody or control of the PLO, and the identities, titles and positions of all custodians of the document since it came into the possession, custody or control of the PLO; (ii) whether the document produced or disclosed is an authentic copy of an original document; (iii) when and how such original document came into the possession, custody or control of the PLO; (iv) the date and place that such original document was created and/or generated; (v) the circumstances in which and reasons that such original document was created and/or generated; (vi) the identities, titles and positions of all persons who took part in creating and/or generating such original document, and the role or part of each such person in creating and/or generating such original document; (vii) the locations in which such original document was kept and/or located since its creation and/or generation; (viii) the identities, titles and positions of all custodians of such original document since its creation and/or generation.

9)    The full details and substance of all communications between the PLO (including any employee, agent or attorney of the PLO) and Abdullah Barghouti (including any attorney for Abdullah Barghouti) concerning this case and/or Abdullah Barghouti's deposition in this case.

Plaintiffs request that the PLO provide (1) the names and titles of the persons it will designate to give testimony regarding the matters above and (2) summaries of the areas in which each such designated person will give testimony.

The term "material support or resources" as used herein has the meaning given that term in 18 U.S.C. § 2339A at the relevant time periods.

These depositions are being taken for the purpose of discovery, for use at trial, or for such other purposes as are permitted under the Federal Rules of Civil Procedure and the rules of court.

These depositions will be recorded by audiovisual and stenographic means.

November 28, 2012

Plaintiffs, by their Attorney,

Robert J. Tolchin
111 Livingston Street, Suite 1928
Brooklyn, New York 11201
(718) 855-3627
Fax: (718) 504-4943
rjt.berkman@gmail.com

David I. Schoen
David I. Schoen, Attorney at Law
2800 Zelda Road, Suite 100-6
Montgomery, Alabama 36106
(334) 395-6611
DSchoen593@aol.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on November 28, 2012, a true copy of the foregoing was served by email and U.S. mail on the PLO's counsel of record listed below:

Brian A. Hill
Miller & Chevalier Chartered.
655 Fifteenth Street, N.W., Suite 900
Washington, DC 20005-5701

Robert J. Tolchin

# EXHIBIT L
# EXCERPTED

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------X

SOKOLOW, et al, : 04-CV-397 (GBD)

Plaintiffs, : February 13, 2013

v. : 500 Pearl Street
: New York, New York

PALESTINE LIBERATION ORGANIZATION, et al, :

Defendants. :

-----------------------------------------X

TRANSCRIPT OF CIVIL CAUSE FOR DISCOVERY CONFERENCE
BEFORE THE HONORABLE RONALD L. ELLIS
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiffs: ROBERT TOLCHIN, ESQ.
The Berkman Law Office, LLC
111 Livingston Street
Brooklyn, New York 11201

For the Defendant: BRIAN A. HILL, ESQ.
Miller & Chevalier, Chtd.
655 15th Street NW, #900
Washington, D.C. 20005

Court Transcriber: SHARI RIEMER
TypeWrite Word Processing Service
211 N. Milton Road
Saratoga Springs, NY 12866

Proceedings recorded by electronic sound recording,
transcript produced by transcription service

expert discovery deadline when we -- unless it's specifically brought up is because it's not -- it's not true in all cases that the expert discovery is necessarily going to be delayed while we address the factual disputes that have not been resolved after the expert -- after the fact discovery deadline has closed.

However, there could be any number of reasons why one or other of the parties may seek to have the expert discovery deadline changed and you're certainly free to make application. Frankly I think that as regards to typical -- as regards to judges, I'm probably liberal in the changing of deadlines as opposed to some judges who are more rigid in their deadlines. I don't know what issues your experts have in preparing discovery. I don't know what their availability is but clearly issues can arise with respect to experts which are separate and apart from what happens in fact discovery.

With respect to the factual disputes that were not resolved, first regards the plaintiff's motion which is a follow up to the December 20th order concerning the 30(b)(6) request from the plaintiffs, I have reviewed the reformulations that the plaintiffs have with regard to the 30(b)(6) topics and it served to confirm my belief that the matters that have been designated as 30(b)(6) topics are not appropriate topics for 30(b)(6) and should have been the subject of either interrogatories or request to admit and that

given the broad scope of the information sought while it is true that in a 30(b)(6) a party is obligated to bring someone up to speed on the topics, and I believe I expressed this before that the 30(b)(6) is more designed for a witness who can talk about policies and to just fill an empty vessel with factual information is not an appropriate way to use 30(b)(6). So that request is denied for 30(b)(6) designation.

With respect to the defendant's request to compel substantive answers to the request to admit, that request for relief from the defendant is denied. While I think requests to admit are a good vehicle for narrowing the issues that are going to be the subject of trial and certainly for aiding such issues as to whether or not documents are authentic, the specific kinds of things that the defendant sought the plaintiff to admit I find are not appropriate. That is that to submit documents to the plaintiffs and say now admit that we are corporations or partnerships or unincorporated is not an appropriate use of admissions, that admissions are basically a way to as I said narrow the factual disputes that the parties have but it's useful when there are discrete and non controversial factual matters as I said perfectly suitable for documents, perfectly suitable for facts that are dates or names or other things that are not subjective. So I find that the request to admit in this case got the kind of response that one gets when one asks those kinds of questions.

THE COURT: And I'm not sure because I haven't seen what was in the request to admit whether or not the defendants were making a distinction between admitting the factual underpinnings of admissibility or admitting admissibility because I can see someone receiving requests to admit saying we're not going to admit the legal issues; we're just going to admit the factual issues. Because admissibility is a tricky thing to admit.

But I'm not familiar with what the questions were. I'm not familiar with what the responses were and I'm not even sure whether or not the things that the defendants admitted is as much as you could have gotten from a witness. So, for example, you would never ask a witness is it admissible. You would -- regardless of the basis you're trying to get it in you would establish the legal underpinnings of it, you know, is it -- did you keep it in the ordinary course of business, is it your business to keep -- you don't then ask at the end is it admissible. So if they don't admit the admissibility but they admit all of the underpinnings of it that seems to me -- admissions are for facts and not necessarily for law. So you might get a response which equivocates because lawyers don't want to concede anything.

Again, I'm only speculating. I don't know what was in Mr. Hill's mind or whoever answered the request for admissions but I do know that in many of the responses people

have been very, very careful about not giving away anything that they didn't have to give away. As to --

MR. TOLCHIN: -- [inaudible] tell Your Honor, [inaudible] 400 or 500 documents there's obviously been no requests for admission and now custodian of records deposition because just got them. Those newly produced Arabic documents there's certainly -- there's been nothing done about them because just of the timing of when they provided them to us. That's the other --

THE COURT: They might be in a different category from other documents in terms of what you could follow up on.

MR. TOLCHIN: I would like to make an application and I'm happy to make it verbally or in writing. I would like to follow up on our 30(b)(6) topics to recast them as interrogatories and serve them. I'd like the defendants to be required to respond to them. I think that doing so is a key thing would be overriding objective which is that this case should ultimately be decided based on the facts and the merits and not by who ran out the clock as to one particular type of discovery or another.

THE COURT: If you want to make such an application then you still have to -- you need to submit to me why they were not submitted as interrogatories first. I know you said some of that now but I need to see exactly what the problem was and make a determination as to whether under the

# EXHIBIT  M

ARNOLD & PORTER LLP

**Kent A. Yalowitz**
Kent.Yalowitz@aporter.com

+1 212.715.1113
+1 212.715.1399 Fax

399 Park Avenue
New York, NY 10022-4690

May 16, 2013

**BY HAND**

Hon. Ronald L. Ellis
United States Magistrate Judge
United States District Court
for the Southern District of New York
500 Pearl Street
New York, New York 10007-1312

Re: *Sokolow et al. v. Palestinian Liberation Organization et al.*
Docket No. 04-CV-397 (GBD) (RLE)

Dear Judge Ellis,

This letter follows up on the discovery conference held by the Court on February 13, 2013.[1] At that conference, Your Honor declined to allow plaintiffs to take certain depositions pursuant to Rule 30(b)(6). The Court stated, however, that it would allow plaintiffs to make a submission seeking this information through other means. The Court also stated that this submission could exceed three pages, but plaintiffs have nonetheless only summarized the issues herein rather than providing all the detail—including all of the back-up documentation for the facts discussed below and a detailed history of plaintiffs' attempts to obtain this discovery—that a full motion might entail. Plaintiffs would be happy to submit such documentation and any other information that the Court believes would be useful.

## I. Plaintiffs' Efforts To Obtain The Discovery Sought

Plaintiffs have attempted diligently to obtain the discovery at issue. In every case, plaintiffs first sought the information through interrogatories, document requests and/or requests for admissions. And, when defendants resisted that discovery, plaintiffs attempted to meet and confer with defendants to work out their disputes. Most of those efforts were fruitless, so plaintiffs ultimately turned to Rule 30(b)(6) in an effort to obtain the information

[1] The timing of this submission has been affected by the fact, discussed in Part II.A below, that defendants produced hundreds of pages of documents following the close of discovery—many of which were produced after the February 13 conference. These documents, which were in Arabic, had to be translated and reviewed before plaintiffs could make this submission.

without burdening the Court with a series of motions to compel. While we recognize that the Court believes that Rule 30(b)(6) was not the best vehicle for this discovery, we believe that we have acted reasonably in using multiple discovery vehicles and in attempting to negotiate these issues.

In an attempt to respond to the concerns expressed by the Court and to obtain this information in the most efficient way possible, plaintiffs have carefully tailored this submission to seek the following relief: (1) an order to respond to modified requests for admissions and companion interrogatories regarding the authenticity and admissibility of documents produced by defendants; (2) an order to compel the production of documents previously sought; (3) a request to submit an interrogatory in lieu of certain of plaintiffs' 30(b)(6) topics; and (4) a request to take the depositions of individuals identified by defendants as persons with knowledge on very specific topics or, in the alternative, to serve interrogatories on those topics.

## II. Description Of The Specific Topics As To Which Plaintiffs Seek Discovery

### A. Authenticity And Admissibility Of Documents Produced By Defendants

One component of plaintiffs' 30(b)(6) notices involved their attempt to establish the admissibility of documents defendants produced *from their own files*. Many of these documents are key to this case; for example, some of them show not only that the defendants provided direct financial support to the terrorists involved in the attacks at issue in this case, but also that they did so *because* those terrorists carried out their attacks.

Plaintiffs filed requests for admissions in November 2012 as to the authenticity and admissibility of a number of such documents. Defendants, for the most part, admitted that the documents produced from their files were authentic, but they denied that they are "records of a regularly conducted activity" under Rule 803(6) of the Federal Rules of Evidence–often referred to as the "business records" exception to the hearsay rule.[2]

Plaintiffs then asked defendants to stipulate that these documents, which were produced by defendants, are business records. Defendants refused, even though it is apparent that many of the documents are official PA and/or PLO documents— most are on PA and/or PLO letterhead and many appear to be official PA forms, including "Martyr Forms" that reflect the payment of monetary support to suicide terrorists and their families. Other forms come from the PA ministry with authority for paying benefits to incarcerated terrorists, and others are PA personnel/employment files, many of which involve the perpetrators of the attacks at issue here. These are exactly the kinds of documents that should be admissible as business and/or public records under FRE 803(6) and (8). Unless defendants can articulate good faith reasons why these documents are not covered by these exceptions to the hearsay rule—and, to date, they have not—they should have stipulated that those exceptions apply.[3]

---

[2] Def.'s Objections and Resp. to Pl.'s First Req. for Admis. to Defs. (to the Mandelkorn Pls.), dated December 21, 2012 (hereinafter "Defs.' Objections and Resp. to Pls.' RFA"), Req. Nos. 21-26, 32-36, 44-45, 57-59, 60, 62-68, 89-90, 104-06, 108, 129, 135-36.

[3] Indeed, courts have refused to allow defendants to contest admissibility when they did not make appropriate discovery on that issue. In *Klieman v. PA*, Civil No. 04-1173 (PLF/JMF), DE

Faced with defendants' recalcitrance, plaintiffs served 30(b)(6) notices to depose the custodian(s) of these documents.[4] Although the Court declined to allow the depositions, the reasonableness of plaintiffs' requests is shown by the multiple decisions holding that 30(b)(6) depositions are appropriate for establishing authenticity and admissibility.[5]

This issue has now become even more important. Following the close of fact discovery, defendants made several late productions of over 600 pages of documents—including about 120 pages that were produced around of after the February 13 conference. Thus, plaintiffs have never had any opportunity to establish the authenticity and admissibility of these documents. This is important to ensure—as this Court has observed—that this case is ultimately decided on the merits.

Accordingly, plaintiffs request that they be allowed to serve a revised set of requests for admissions to establish the authenticity and admissibility of these documents. During the February 13 conference, the Court indicated that plaintiffs' original requests to admit were inappropriate because they asked the defendants to admit that the documents were admissible as a matter of law, rather than asking them to admit the underlying facts that would establish the applicability of an exception to the hearsay rule. Although plaintiffs believe that their

---

No. 190, p. 7 (D.D.C. Feb. 11, 2013), Magistrate Judge John M. Facciola made this exact ruling, under similar circumstances, regarding Arabic language documents produced by defendants. Specifically, he stated: ("I am not going to permit the defendants to play dog in the manger and object to the authenticity or hearsay nature of these documents while denying plaintiffs the means of overcoming those objections through discovery[.]"

[4] Ex. A, ¶6-8, Plaintiffs' Notice To The PLO Of Taking Depositions Pursuant To Fed.R.Civ.P. 30(B)(6), dated November 28, 2012.

[5] *See, e.g., Guest v. Carnival Corp.*, Case No. 11-23662-CIV, 2012 WL 6879069, at *1 (S.D. Fla. Nov. 7, 2012) ("Plaintiff may be able to establish, authenticate and attribute [the] statements [at issue] to the Defendant through a Rule 30(b)(6) deposition"); *Abudiad v. City and Cnty. of San Francisco*, No. CV 09-1778 JSW (NJV), 2011 WL 5520943, at *3 (N.D. Cal. Nov. 14, 2011) ("[I]f the City will not stipulate to the authenticity of documents it produced, the Court will order a limited deposition of a 30(b)(6) deponent for that purpose alone."); *Halbach v. Great-West Life & Annuity Ins. Co.*, No. 4:05CV02399-ERW, 2007 WL 2153569, at *1 (E.D. Mo. July 19, 2007) ("The Court does not believe that it is unreasonable to request a witness who can identify and authenticate documents provided by the opponent in the course of discovery, so that they can be admitted in a future proceeding."); *High Five Investments, LLC v. Floyd Cnty. Ga.*, 239 F.R.D. 663, 666 (N.D. Ga. Jan. 10, 2007) ("[C]ontrary to Defendant's arguments, Plaintiffs are entitled to inquire concerning the 'origin, timing and authenticity of all materials relied upon for the enactment of said Ordinance,' if only to ensure that those materials, many of which Defendant submitted to the Court, are authentic."); *Sanyo Laser Prods., Inc. v. Arista Records, Inc.*, 214 F.R.D. 496, 503 (S.D. Ind. 2003) ("Rule 30(b)(6) . . . . testimony is particularly important . . . considering the designated witness may authenticate documents [the plaintiff] may produce in discovery"); *McKesson Corp. v. Islamic Republic of Iran*, 185 F.R.D. 70, 81 (D.D.C. 1999) (requiring defendant either to (1) produce the designated 30(b)(6) witness to be "properly depose[d]," or (2) make the designated witness "available from Iran for a telephonic deposition and stipulate to the authenticity and admissibility of all documents produced by Iran").

requests were proper,[6] we are happy to recast them by seeking admissions regarding the factual requirements in the relevant rules. Since the documents are from defendants' files, and since most of them appear to be official records and forms, the burden to respond to such requests is not great.

In addition, in order to lessen the chances of ongoing disputes regarding defendants' response to such requests to admit, plaintiffs also request leave to accompany their revised requests with interrogatories requiring defendants to explain the basis for any denials they may make to the revised requests.

Finally, as noted above, since defendants failed to produce a substantial majority of these documents until after the discovery cut-off, plaintiffs need to serve new requests to admit (and accompanying interrogatories) with respect to these newly produced documents relating to both authenticity and the factual requirements to establish hearsay exceptions. These documents, of course, could not be included in plaintiffs' earlier requests to admit, and it would be extremely unfair to deprive plaintiffs' of the ability to establish their authenticity and admissibility simply because defendants produced them late.

**B. Defendants' Release Of/Refusal To Detain Active Terrorists**

Plaintiffs contend that one of the reasons the PA bears responsibility in this case is that, after it reluctantly acceded to requests from the U.S. and Israel to detain known, active terrorists who were planning additional attacks, the PA detained and then quickly released those men, who subsequently carried out two of the attacks at issue. In one case, the PA apparently never detained the individual at all, and instead continued to pay his salary as a PA security officer, enabling him to carry out another of the attacks from which this action arises. Accordingly, plaintiffs served defendants with document requests, interrogatories and requests for admission on this subject.

After defendants' responses proved inadequate, plaintiffs sought a 30(b)(6) witness with knowledge of the details with respect to four such persons who carried out attacks on certain of the plaintiffs: Abdallah Barghouti, Abdel Karim Aweis, Nasser Shawish and Mohammed Hashaika, as well as one person (Nasser Aweis) whom the PA evidently declined to detain at all.[7] Plaintiffs now seek orders compelling further responses to their written discovery requests, as well as deposition testimony regarding two of these five attackers.

---

6 Rule 36(a)(1)(A), which governs the scope of requests to admit, provides that a party can request admissions relating to "facts, *the application of law to facts*, or opinions about either" (emphasis added). The Advisory Committee note to the 1970 amendment that added this language confirms that it "eliminates the requirement that matters be 'of fact,'" that requests to admit "matters involving 'mixed questions law and fact' [are] proper under the rule," and that requests are improper only if they seek "admissions of law unrelated to the facts of this case." Asking whether a specific document satisfies the requirements of an exception to the hearsay rule clearly seeks an admission as to "the application of law to facts."

7 Ex. B, ¶1,3; Plaintiffs' Amended Notice To The PA Of Taking Depositions Pursuant To Fed.R.Civ.P. 30(B)(6), dated December 2, 2012.

Although defendants provided little information in response to plaintiffs' written requests, the information they did provide makes clear that they are withholding additional information. For example, in response to requests for admissions, defendants admitted that Mohammed Hashaika was arrested by the PA before the bombing directed at the Bauer plaintiffs.[8] Defendants also admitted that the PA was asked by Israel and/or the United States between September 1, 2000 and July 31, 2002 to detain or arrest Abdullah Barghouti, who built the bomb used in the July 2002 Hebrew University attack that affected ten of the plaintiffs, and who was released by the PA before carrying out that bombing.[9] Notwithstanding these admissions, defendants provided no information or documents in response to plaintiffs' interrogatories or requests for production involving these individuals. Plaintiffs' requests for production specifically sought all documents concerning requests made to the PA to question or detain these individuals and plaintiffs' interrogatories sought information regarding persons with knowledge of the arrests, interrogations or releases.[10] Defendants eventually supplemented their interrogatory responses to provide the names of five senior PA officials with knowledge of the PA's release, questioning and arrest of Abdullah Barghouti and Mohammed Hashaika.[11] Defendants failed to provide the "information and files" where they found this information, and failed to provide the further detailed information sought in plaintiffs' interrogatories including the PA officials' job history and titles and the basis of their knowledge. The information defendants admitted and provided in response to interrogatories plainly demonstrates that they have more responsive information and documents.

In addition, a number of defendants' denials in response to requests for admissions are clearly unsupportable. Specifically, defendants denied, allegedly for lack of knowledge, requests for admissions that: (1) Arafat received a list of wanted men from U.S. envoy Anthony Zinni and that Nasser Aweis and Abd el Karim Aweis was on the list; (2) Colin Powell demanded that the PA arrest Abdullah Barghouti prior to the Hebrew University bombing; and (3) the PA was provided a list of terrorists known to be planning imminent attacks prior to the Hebrew University bombing and Barghouti was on that list.[12]

---

[8] Defs.' Objections and Resp. to Pls.' RFA, Req. No. 30, dated December 21, 2012.

[9] Defs.' Objections and Resp. to Pls.' RFA, Req. No. 42, dated December 21, 2012.

[10] Ex. C, Gould and Waldman Pls.' Second Req. to Produce Docs. and Things, dated November 21, 2012, ¶ 11; Blutstein, Carter, Coulter and Gritz Pls.' First Req. to Produce Docs. and Things, dated March 23, 2012, ¶¶ 1-5; *see also generally* Bauer Pl.'s First Req. to Produce Docs. and Things, dated March 23, 2012.; Blutstein, Carter, Coulter and Gritz Pls.' First Set of Interrogs., dated October 3, 2011, Interrog. No. 1; Bauer Pls.' Second Set of Interrogs., dated October 3, 2011, Interrog. No. 2.

[11] Defs.' Second Supplemental Objections and Resp. to the Blutstein, Carter, Coulter and Gritz Pls.' First Set of Interrogs., dated March 16, 2012, Interrog. No. 1; Defs.' Second Supplemental Objections and Resp. to the Bauer Pls.' Second Set of Interrogs., dated May 29, 2012, Interrog. No. 2.

[12] Defs.' Objections and Resp. to Pls.' RFA, Req. Nos. 31, 41, 43, dated December 21, 2012.

Independent evidence demonstrates that these denials are not credible. For example, in a May 2002 interview with the New York Times, Aweis admitted that he carried out a terrorist attack in late November 2001, was arrested for a few weeks by the PA and released after he promised "not to resume his violent activities."[13] Moreover, in a December 2001 television interview,[14] Arafat admitted to receiving a list of wanted men from U.S. envoy Zinni, and according to an Israeli Foreign Ministry document, both Nassar Aweis and Abd el Karim Aweis were on that list.[15] Similarly, Secretary of State Colin Powell spoke publicly about U.S. demands that the PA arrest terrorists.[16] According to published reports, in August 2001, an Israeli official personally gave Arafat a list of terrorists—including Barghouti—believed to be planning attacks.[17] In addition to showing why their responses to the requests to admit are inappropriate, these independent facts show that defendants' claim that they have no documents with respect to these attackers is highly suspect.

Accordingly, the Court should compel defendants (1) to conduct an appropriate investigation of the facts in their possession and provide new responses to requests for admission 31, 41 and 43 (including an explanation for the basis of any continued denials); and (2) to produce documents in response to the following requests: Blutstein, Coulter, Carter and Gritz Plaintiffs' First Request for Production of Documents ¶¶ 1-5, the Gould and Waldman Plaintiffs' First Request for Production of Documents ¶¶ 1-5, the Bauer Plaintiffs' First Request for Production of Documents in its entirety, and Plaintiffs' Sixth Request for Production of Documents, ¶ 23.[18]

Plaintiffs note, however, that defendants may respond, as they have in other contexts, that they no longer have responsive documents because those documents were allegedly taken by the Israelis. If that is the case, it underscores the need, as discussed below, for plaintiffs to take depositions on this topic.

Specifically, defendants' interrogatory responses provided the names of five senior PA officials with knowledge of the PA's release, questioning and arrest of Abdullah Barghouti and Mohammed Hashaika.[19] Rather than burden themselves or defendants with depositions of all

---

13 Joel Greenberg, *Mideast Turmoil: Palestinian; Suicide Planner Expresses Joy Over His Missions*, N.Y. TIMES (May 9, 2002).

14 James Bennet, *Israel Attacks Again in Gaza; Arafat Condemns U.S.*, N.Y. TIMES (December 8, 2001).

15 Status Report, Israel Ministry of Foreign Affairs, Most Wanted Terrorists (April 22, 2002).

16 Derk Kinnane Roelofsma, *CIA Relayed Information to Arafat Before Pizzeria Bombing*, U.P.I. (August 17, 2001).

17 Richard Sale, *Arafat Ignored CIA Warning*, U.P.I. (August 17, 2001).

18 These requests for admission and for the production of documents are attached at Ex. D.

19 Defendants' Second Supplemental Objections and Responses to the Bauer Plaintiffs' Second Set of Interrogatories, dated May 29, 2012; Defendants' Second Supplemental Objections and Responses to the Blustein, Carter, Coulter and Gritz Plaintiffs' First Set of Interrogatories, dated March 16, 2012.

five officials, plaintiffs sought a single 30(b)(6) deposition on this issue.[20] This is a discrete topic of the kind that plaintiffs believe is appropriate for such a deposition. We recognize, of course, that the Court has previously declined to allow plaintiffs to proceed on the basis of Rule 30(b)(6), but we respectfully request that the Court reconsider that ruling due to the specificity of this topic. Since defendants have identified a limited number of people with knowledge, it should not be difficult for them to prepare one of the five senior officials to submit to a 30(b)(6) deposition. Moreover, if plaintiffs simply picked one of these individuals to depose, and that person had not been prepared as a 30(b)(6) witness, it is very likely that he will claim limited knowledge, requiring other depositions.

Otherwise, plaintiffs seek leave to depose one or more of the five individuals designated as being knowledgeable on this topic, with the total number of depositions to be based on the extent to which the initial deponent(s) are able to supply the necessary information. Finally, and in the alternative, if the Court does not allow depositions, plaintiffs request leave to serve interrogatories on this topic.

### C. <u>Defendants' Provision Of "Safehouses" To Hamas</u>

Plaintiffs sought both the production of documents and a 30(b)(6) witness regarding the existence of facilities in PA territory that were used by the terrorist organization Hamas.[21] This is a critical component of defendants' liability for providing "material support or resources" to terrorists in violation of the Anti-Terrorism Act (the "ATA"). *See* 18 U.S.C. §§ 2339A, 2339B. The PA's actions in knowingly permitting a terrorist organization to operate facilities in its territory constitutes provision of a "safehouse" in violation of the ATA.[22]

The PA has admitted that it allowed Hamas to operate facilities in the West Bank and Gaza during the relevant time period. Indeed, in December 2001, the PA publicly claimed that it intended to shut down a number of facilities in those areas that were being used by Hamas and Islamic Jihad. Unfortunately, that came to naught and in 2007 the PA announced that it was shutting down over 100 Hamas-associated groups. Thus, by the PA's own admission, Hamas was operating in its territory during the relevant period.[23]

---

[20] Ex. B, ¶1,3.

[21] Ex. E, Pls.' Seventh Req. to Produce Docs. and Things by All Pls. (No. 24-46), dated August 28, 2012, ¶¶ 32-40; Ex. B, ¶20.

[22] *Rux v. Republic of Sudan*, 461 F.3d 461, 471 (4th Cir. 2006) ("[i]nsofar as the government of the Republic of Sudan affirmatively allowed and/or encouraged al-Qaeda and Hizbollah to operate their terrorist enterprises within its borders, and thus provided a base of operations for the planning and execution of terrorist attacks ... Sudan provided a 'safehouse' within the meaning of 18 U.S.C. §2339A") (*quoting Owens v. Republic of Sudan,* 412 F.Supp.2d 99, 108 (D.D.C. 2006).

[23] *See e.g.* Reuters, *PA to Shut Down 103 Charities in Attempt to Weaken Hamas*, Haaretz, August 28, 2007, http://www.haaretz.com/news/pa-to-shut-down-103-charities-in-apparent-attempt-to-weaken-hamas-1.228330; Staff, *Arafat Shuts Down Hamas Offices*, CNN, December 16, 2001, http://edition.cnn.com/2001/WORLD/meast/12/16/mideast.hamas/index.html

Plaintiffs' request for production of documents on the "safehouse" issue asked for documents regarding several specific geographic locations in the West Bank and Gaza where Hamas facilities were known to exist.[24] Although defendants asserted that they were unable to locate any responsive documents, that assertion is not credible in view of the PA's public statements that it not only knew about many such facilities but that it intended to close them. Thus, plaintiffs request an order requiring defendants to conduct a diligent search for responsive documents and to produce them.

While we believe that a 30(b)(6) deposition on the safehouse issue would also be appropriate, in view of the Court's prior ruling we ask, in the alternative, for leave to serve interrogatories on this subject. Again, to the extent that defendants claim that documents on this issue are no longer in their possession, custody or control, that underscores the need to use some other discovery vehicle.

**D. The January 27, 2002 Suicide Bombing**

Plaintiffs request that defendants be ordered to respond to discovery requests regarding the January 27, 2002 suicide bombing in downtown Jerusalem that severely injured the Sokolow family. First, plaintiffs seek an order compelling the production of documents regarding the January 27, 2002 bombing. In response to plaintiffs' document requests,[25] defendants produced just a few pages of documents evidencing payments to the terrorists and their families after the bombing, but produced nothing from before the attacks. There is very clear evidence, however, that the PA was directly involved in this attack and surely must have additional responsive documents.

Specifically, the suicide bomber in this attack was assisted by a man named Munzar Noor, who was later arrested, confessed, and convicted by Israel for the attack. In his confessions, Noor described in detail how the bombing was planned and carried out at the direction of a PA intelligence officer known (among other aliases) as Abu Talal. Indeed, Noor stated that Talal not only planned the attack; he also provided the bomb and was on the telephone to suicide bomber Wafa Idris directing her until just minutes before she detonated the bomb. Moreover, Noor also admitted that he was interrogated by the PA after the bombing. Additionally, Noor explained that at the time of the bombing he and Idris were working as confidential informants for PA intelligence under the guidance of Talal, and that the bombing grew out of that relationship. Given these facts, it is not credible to assert that defendants have no documents regarding this attack, and no documents regarding Noor and Idris, apart from the documents reflecting post-bombing payments to the families of the terrorists.

In addition, plaintiffs seek deposition testimony based on an internal PA memorandum regarding this attack that was obtained by Israeli law enforcement.[26] This memorandum, which

---

24 Ex. E, ¶¶ 32-40.

25 Ex. F, Sokolow Family Plaintiffs' First Req. to Produce Docs. and Things (Nos. 1-4), dated April 23, 2012, Req. Nos. 1, 2a-g.

26 Ex. B, ¶26.

was from the PA's Preventive Security Service ("PSS"), describes how the commander of PA intelligence forces attempted to cover up its involvement in the bombing and concludes that PA intelligence was involved in the affair. This memorandum, and the facts it discusses, are directly relevant to the PA's liability for the attack on the Sokolows, and combined with the confession of Noor, clearly justifies deposition testimony regarding the PA's involvement.

Plaintiffs served interrogatories asking about persons with knowledge of the PA memorandum, and six months later defendants identified four PSS officers. Plaintiffs attempted to avoid the burdensome method of taking four different individual depositions by seeking a single 30(b)(6) deposition, and plaintiffs continue to believe that such a 30(b)(6) deposition is the most effective and efficient way to proceed. As in the case of plaintiffs' request regarding the PA's release of the men who carried out certain of the attacks, plaintiffs respectfully request that the Court reconsider its decision denying a 30(b)(6) deposition on this discrete topic as well since the burden of preparing one of these four individuals should not be great. In the alternative, plaintiffs ask that they be allowed to depose one or more of these individuals. Finally, if the Court does not allow depositions, plaintiffs request leave to serve interrogatories on this topic.

**E. Defendants' Knowledge Of/Involvement In Fatah's Terrorist Policies And Activities**

Plaintiffs also sought both the production of documents and deposition testimony regarding the policies and activities of Fatah, which was long headed by Yasser Arafat. Fatah is the largest faction of the PLO and was involved in all of the attacks at issue in this case. These requests also sought information regarding the al-Aqsa Martyrs Brigades, the so-called "military" (*i.e.*, terrorist) arm of Fatah. Plaintiffs assert that defendants' provision of material support to Fatah, at a time and with the knowledge that Fatah was planning and carrying out terrorist attacks, violated the ATA. Therefore, we ask for the Court's assistance with respect to discovery on two issues.

First, plaintiffs' requests for production of documents sought *inter alia*, "all charters, constitutions, by-laws and political platforms of Fatah that were in force between January 1, 1994 and January 29, 2004."[27] Although defendants objected to these requests, they are clearly relevant to plaintiffs' ability to prove that defendants, in supporting Fatah, were aware that Fatah's aims and activities included terrorism. This is significant because defendants have already admitted to funding Fatah during this period, but indicated their intent to claim that Fatah is a legitimate political group.

Second, plaintiffs sought both documents and a 30(b)(6) witness with knowledge of the military and/or paramilitary training provided to Fatah by the PA between January 1, 1998 and January 29, 2004; and (b) the yearly amounts of funding provided by defendants to or for the

27 Ex. G, Plaintiffs' First Request for Production of Documents, Request No. 2, dated September 2, 2011.

benefit of Fatah between January 1, 1998 and January 29, 2004.[28] The provision of funding and military training to a group carrying out terrorism is squarely within the definition of "material support or resources" set forth in 18 U.S.C. § 2339A, and is thus grounds for liability under the ATA.

Plaintiffs need this information as it relates to defendants' liability under the ATA for the attacks that were carried out with the participation of Fatah and its al-Aqsa Martyrs Brigades. There is no doubt that such training and support occurred; indeed, as the plaintiffs have previously shown, its existence was reported in an official PA publication. Thus, it is obvious that such documents exist. Accordingly, plaintiffs ask that the Court (1) order defendants to conduct a diligent search for responsive documents and to produce them; and (2) grant plaintiffs leave to serve interrogatories based on its 30(b)(6) requests on this topic.

## III. Discovery Regarding Ibrahim Abdel Hai

In late December 2012, plaintiffs learned for the first time of the identity of an additional perpetrator in the January 22, 2002 machine gun shooting in Jerusalem that injured the Gould, Rine and Waldman plaintiffs. That perpetrator, Ibrahim Abdel Hai, was a PA naval police officer who helped plan the attack and recruited the actual gunman—fellow PA naval police officer Said Ramadan.

On January 4, 2013, plaintiffs obtained and disclosed to defendants court materials evidencing Abdel Hai's conviction for his role in the January 22, 2002 attack. Plaintiffs requested that defendants produce Abdel Hai's file from the PA Ministry of Detainees, which would show benefits paid by defendants to Abdel Hai as a result of the attack, along with other documents regarding Abdel Hai that are responsive to certain of plaintiffs' document requests.[29] This request was timely served on November 21, 2012, prior to the discovery cut-off. Defendants said that they would look into the matter, but have not produced any documents concerning Abdel Hai to date. Accordingly, plaintiffs ask the Court to order defendants to produce these documents.

Additionally, after learning of Abdel Hai's involvement, on January 7, 2013, plaintiffs served defendants with a request for production of documents concerning Abdel Hai by *name*. Although most of the documents responsive to plaintiffs' January 2013 request were also requested in plaintiffs' November 21 request (for documents concerning the *attack*), plaintiffs served the January 7, 2013 request to ensure that they had obtained all responsive documents. Regardless, defendants have failed to produce any documents in response to either request. Therefore, plaintiffs request that the Court

---

[28] Ex. H, Plaintiffs' Fifth Request for Production of Documents, Request Nos. 21 and 22, dated April 24, 2012; Ex. B, ¶7,11.

[29] Ex. I, Gould and Waldman Pls.' Second Req, for Prod. of Docs. (Nos. 6-13), dated November 21, 2012.

direct defendants to respond to do the January 7 request. As always, we thank you for Your Honor's time and consideration.[30]

Respectfully yours,

Robert J. Tolchin
The Berkman Law Office, LLC
*Co-counsel for Plaintiffs*

Respectfully yours,

Kent Yalowitz
Arnold & Porter, LLP
*Co-counsel for Plaintiff Varda Guetta, and incoming co-counsel for Plaintiffs*

cc: Brian Hill, Esq.

---

30 Ex. J, Gould and Waldman Pls.' Third Req, for Prod. of Docs. (No. 14), dated January 7, 2013.

# EXHIBIT  N

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**ESTATE OF ESTHER KLIEMAN, *et al.*,**

**Plaintiffs,**

**v.** **Civil No. 04-1173 (PLF/JMF)**

**THE PALESTINIAN AUTHORITY, *et al.*,**

**Defendants.**

**MEMORANDUM ORDER**

This case involves an effort by the survivors and heirs of Esther Klieman, an American citizen, to recover damages from the defendants who allegedly aided and abetted, financially and otherwise, the terrorist group that killed her. This case is in its eighth year of active litigation and, unfortunately, proceedings have now become enmeshed in the Israeli courts. This has occurred because this court has issued letters of requests at the plaintiffs' behest, letters that call for the taking of depositions in Israel, and the production of information by Israeli government agencies. However, the deadline for fact discovery in this case, a deadline which has been extended numerous times, was December 31, 2012. Order [#174] at 1. Therefore, plaintiffs have now filed Plaintiffs' Motion to Extend the Deadline for the Completion of Pending Fact Discovery Matters [#186].

The following chart summarizes those letters of request, listing the witness' name, relevance to the case, anticipated testimony, and the parties' and the court's understanding of the status of the letters of request within the Israeli courts or government agencies:

| | Name | Relevance to the Case | Anticipated Testimony | Status of Request |
|---|---|---|---|---|
| 1 | Fuad Shabaki | Financier | Palestine Authority ("PA") and Palestine Liberation Organization ("PLO") financing of Al Aqsa | No information given by the parties. |
| 2 | Marwan Barghouti | Head of Al Aqsa | PA's and PLO's financing of Al Aqsa | Deposition held on January 25, 2012, but Barghouti refused to answer any questions. Jerusalem Magistrate's Court declined to issue order compelling the testimony. |
| 3 | Matityahu Kalman | Journalist who has reported on the Second Intifada | PA's and PLO's financing of Al Aqsa | Deposition was approved by Israeli Directorate of Courts ("IDC") but journalist moved to quash and Judge Schneider of the Jerusalem District Court declined to compel his testimony |
| 4 | Khaled Toameh | Journalist who has reported on the Second Intifada | PA's and PLO's financing of Al Aqsa | Deposition was approved by Israeli Directorate of Courts ("IDC") but journalist moved to quash and Judge Schneider of the Jerusalem District Court declined to compel his testimony |
| 5 | Zafer Rimawi | Recruited Tamer Rimawi into Al Aqsa | Recruitment of Tamer Rimawi into Al Aqsa | Letter issued 9/10/12 [#179]. Deposition originally scheduled for 12/19-20/12 but cancelled because defendants identified potentially responsive documents to plaintiffs' previous requests which have not yet been produced and which may be relevant to the deposition. The parties anticipate completing these depositions in February 2013. |
| 6 | Yitzhak Ya'akoboff | Israeli police officer who investigated death of Klieman | Tamer Rimawi's statement that killing Klieman was an Al Aqsa operation | Letter issued 9/27/12 [#182] but still awaiting approval by IDC. |

| | | | | |
|---|---|---|---|---|
| 7 | Annan Hashash | Directly involved in the attack on Klieman | Circumstances of the attack and that it was sponsored by Al Aqsa | Letter issued 9/10/12 [#180]. Deposition originally scheduled for 12/19-20/12 but cancelled because defendants identified potentially responsive documents to plaintiffs' previous requests which have not yet been produced and which may be relevant to the deposition. The parties anticipate completing these depositions in February 2013. |
| 8 | Custodian of Records for 1) the Israeli Defense Forces, 2) the Israeli Ministry of Justice, 3) the Israeli Ministry of Defense, and 4) the Intelligence and Terrorism Information Center | <u>See</u> <u>Plaintiffs' Praecipe Responding to DE 125</u> [#126] | Production and authentication of government documents | Letter issued March 2011 but still awaiting approval by IDC. |

As the above chart indicates, the parties are agreed that some of the depositions should be taken and anticipate setting dates for them, which will necessarily fall after the December 31, 2012 deadline. Additionally, the parties hope that the documents sought from the Israeli government with reference to police officer Ya'akoboff's testimony will soon be produced and that the deposition could be scheduled and conducted by February 15, 2013. Thus, defendants agree that the discovery deadline should be extended to February 15, 2013, to allow for the depositions of 1) Z. Rimawi, 2) Hashash, and 3) Ya'akoboff.

The parties part company, however, with reference to the remaining depositions listed in the chart. As the chart indicates, the remaining persons to be deposed are: 1) a financier of the PA and Al Aqsa (Shabaki), 2) two journalists (Kalman and Toameh), 3) an actual participant in

Case 1:04-cv-01173-PLF-JMF Document 190 Filed 02/11/13 Page 4 of 9

the murder of Klieman (Barghouti), and 4) custodians of records for four Israeli government agencies.

I. Shabaki

The parties have not provided any indication as to the status of efforts to depose Shabaki.

II. Kalman and Toameh

The letter of request issued by this court sought both the journalists' testimony, and their notes pertaining to the interviews they conducted. See [#128-3]. The Jerusalem District Court, however, has now returned the letter of request to this court because the presiding judge, Judge Anna Schneider, accepted the journalists' argument that, in its present form, the letter of request violated Israeli law. See [#186-1].

The parties differ radically as to the meaning of this ruling and its significance as to whether the discovery deadline should be extended. Defendants' view is that Judge Schneider's conclusion that "the Secretariat will transfer the file, on all of its requests and statements of claim, to the courts' administration for its transferring to the Federal Court in the United States" ([#186-1] at 6) is a final denial of the request and there the matter ends. Defendants' Opposition to Plaintiffs' "Motion to Extend the Deadline for the Completion of Pending Fact Discovery Matters" (DE 186) [#187] at 11-12. Plaintiffs, on the other hand, read the decision to mean that "Judge Schneider ruled that the IDC should seek to obtain further clarification from this Court as to whether the Letters of Request which were issued by the Court could be narrowed by the Israeli court, to address the objections lodged by the journalists." Plaintiffs' Reply to Defendants' Opposition to Plaintiffs' Motion to Extend the Deadline for the Completion of Fact Discovery [#188] at 9. Assuming that plaintiffs are right, I am hard pressed to understand how this court can overcome the objections lodged by the journalists.

First, at defendants' behest, I inserted the request for documents into the letter of request and the journalists objected to the production of those documents. I cannot, however, eliminate the request for documents because it would be unfair, as a matter of American law, to allow plaintiffs to use the journalists' testimony against defendants without giving defendants an opportunity to cross examine the journalists as to the accuracy of their reporting. In other words, I cannot, under American law, allow a party to take a deposition without also allowing his opponent to utilize, at the deposition, documents that pertain to that deposition testimony.

Moreover, plaintiffs do not explain how the deposition and any document production by the journalists could be narrowed under the law of Israel to meet the journalists' objections, and I am not about to attempt it. Furthermore, there is nothing in the Federal Rules of Civil Procedure, or any statute of which I am aware, that would permit me to summon these journalists from Israel to show cause why I should not issue a particular letter of request. Instead, the journalists can await the issuance of a letter of request and attack it again in the Israeli courts. Furthermore, my modifying a letter of request in the hope of meeting the journalists' objections, based on my analysis of Israeli law, provides no guarantee that the journalists' objections will not be upheld in the Israeli court. In the absence of some showing by plaintiffs that the journalists' objections may be overcome, under Israeli law, granting plaintiffs more time to resolve those objections is improvident and wasteful.

Finally, while I appreciate from Judge Schneider's order that plaintiffs might be content to do no more than have the journalists verify that they wrote the articles in question, I am not certain that their willingness to do so eliminates the defendants' just need for their notes. In any event, I cannot believe that these parties are ready to cross an ocean to authenticate a newspaper article when newspapers are self-authenticating under Rule 902(6) of the Federal Rules of

Evidence. I therefore must conclude that delaying the end of discovery to secure the testimony of the journalists cannot be justified.

III. Barghouti

Barghouti was sentenced to life imprisonment for his role in the killing of Kleiman. As the matter now stands, and, as the chart indicates, when he was called to testify, he refused. Assuming for the sake of argument that he is found to be in contempt, it is hard to imagine why this sanction would compel him to testify since he is already serving a life sentence. Additionally, it is hard to understand why this man, said to be the leader of the group that killed Kleiman, would assist the Kleiman family in getting damages against the PLO, if one accepted plaintiffs' assertion that the PLO aided, abetted, and supported Al Aqsa. To await his cooperation is truly to wait for something that may never occur.

IV. Custodian of Records

As noted above, the Israeli government has yet to indicate whether the letters of request for both documents and custodian of records testimony will be approved

One letter of request seeks 1) the television and radio broadcasts of interviews with or statements by Marwan Barghouti that were submitted as evidence in his criminal prosecution, 2) the verdict in that trial, 3) the verdict of the military court in the trial of Fuad Hejazi Shubaki, (4) documents reflecting the bases upon which Al Aqsa, Fatah, the Palestinian Liberation Organization, and Tanzim were placed on the Ministry of Defense's List of Declarations and Orders relating to Unlawful Organizations, and 5) custodians to authenticate these records. [#126-1]. A second letter asks the Intelligence and Terrorism Information Center ("ITIC") to produce "full and authentic copies" of documents already in plaintiffs' possession, which are attached to the letter of request. [#126-2]. In each instance, plaintiff seeks what American

Case 1:04-cv-01173-PLF-JMF Document 190 Filed 02/11/13 Page 7 of 9

lawyers would call a Rule 30(b)(6) deposition, in which a representative of the Israeli government will meet any authenticity and hearsay objections by attesting that the documents being produced are authentic copies of the originals on file in an agency of the Israeli government, and were created and kept in the ordinary course of business.

First of all, and as to the broadcasts and the verdicts, I find that there is no real need for so called 30(b)(6) depositions. It is hard to understand how a legitimate authenticity or hearsay objection can be made as to the broadcasts, admitted into evidence, and the verdicts. We are, after all, talking about documents in a public court file that are being produced by a sovereign state at the request of the court of another sovereign state. Pursuant to Rule 902(A) of the Federal Rules of Evidence, if final certification is not received in accordance with subsection (3) of that rule by the date I am setting for the end of discovery, I will order that these documents "be treated as presumptively authentic without final certification." Fed. R. Evid. 902(3)(A).

With respect to the documents attached to the second letter of request, they are in Arabic and I have no idea what they are. By the same token, I am not going to permit the defendants to play dog in the manger and object to the authenticity or hearsay nature of these documents while denying plaintiffs the means of overcoming those objections through discovery. Thus, I will deem the documents attached to the second letter of request ([#126-2]) to be authentic and admissible unless defendants show cause within ten days why they are not.

Finally, the remaining documents, those sought in the first letter of request, are less easy to handle. These are the documents that purportedly led the Israeli Ministry of Defense to place certain organizations, including Al Aqsa and the PLO, on a list of illegal organizations. All we know about these documents is that they may be relevant if they tended to show the PLO's financial or other support of Al Aqsa. On the other hand, we cannot possibly know any more

Case 1:04-cv-01173-PLF-JMF Document 190 Filed 02/11/13 Page 8 of 9

than that and, without knowing more, we cannot assess whether they are so relevant and crucial to this case that any additional delay to await their production is justified in this eight year old case. Moreover, it seems likely (to put it mildly) that the Israeli government would resist producing any documents that, for example, revealed informants' identities and the government's tactics and strategies in meeting what it perceives to be threats of terrorism from various illegal organizations. One can imagine the U.S. government's response to a similar request under the Freedom of Information Act, where a plaintiff sought the documents that led the Department of State to denominate a particular sovereign a state sponsor of terrorism. Surely, such a request would meet with the ferocious opposition of the federal government on the grounds that revealing that information would threaten national security. It is hard to understand why the response of the Israeli government would be any different. Thus, we are left with documents 1) whose relevance to the plaintiff's case cannot be ascertained with certainty, 2) that, even if relevant, may be cumulative of other evidence, and 3) whose production the Israeli government is likely to resist, if and when they respond to the letter of request. While such an uncertain and indefinite delay in securing these documents may have made sense when the case was in its infancy, it can no longer be justified in the eighth year of its litigation.

In sum, I will only permit the depositions of 1) Z. Rimawi, 2) Hashash, and 3) Ya'akoboff. These depositions must be completed by April 15, 2013, for on that day, all discovery in this case will end. A point of clarification. If any of the other discovery identified in the above chart can be concluded by that deadline, the parties are permitted to do so. It is therefore, hereby,

**ORDERED** that Plaintiffs' Motion to Extend the Deadline for the Completion of Pending Fact Discovery Matters [#186] is **GRANTED** in part and **DENIED** in part.

**SO ORDERED.**

______________________________
JOHN M. FACCIOLA
UNITED STATES MAGISTRATE JUDGE

# EXHIBIT O

FILED UNDER SEAL
PURSUANT TO PROTECTIVE ORDER

# EXHIBIT  P

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*
www.legaltrans.com

**Statement of:** *June 10, 2003* **Israel Police [Emblem]** **Statement ____ Sheet ______**

| Identity number *410052617* | First name *Freij* | Family name *Adwan* | Name in Roman characters | |
|---|---|---|---|---|
| Previous name | Marital status ☐ married ☒ single ☐ divorced ☐ widower | | Sex *M* | Religion *Muslim* |
| Date of birth *December 18, 1969* | Place of birth *Jordan* | Home telephone number | Business telephone number | |
| Home address *Ramallah* | | Business name and address | | |
| Mobile telephone no. | Father's name *Asad Salem* | Parents' address | | |

| Date | Time | Location | | Badge no. | Rank | First name | Last name |
|---|---|---|---|---|---|---|---|
| April 8, 2002 | *3:52 p.m.* | *Russian Compound Facility* | Investigator | *55035* | *1st Sgt.* | *Zion* | *Avraham* |

*Today, at 3:52 p.m., I saw the above mentioned individual before me at the detention facility in Jerusalem (the Russian Compound) and notified the above mentioned individual that I, a police officer, 1st Sergeant Zion Avraham, am informing you that you are suspected of belonging to a hostile organization and conspiring to commit a crime, carrying out a shooting attack at Israeli vehicles, attempted murder and sale of weapons insofar as during the* [illegible] *year, you belonged to a hostile organization and joined, with others, in carrying out shooting towards Israeli vehicles with the aim of harming Israelis, and you purchased weapons of various types.* [Signature]
*You do not have to say anything, but everything that you do say will be written down me and will be used as evidence. Abstention from responding to questions may reinforce the evidence against you. After he understood the warning, the suspect signed of his own free will and volition.* [Signature]

*I wish to tell you the truth. About nine months to about a year ago, in the afternoon, I do not remember the time, I met Naim Abu Lakak at Café Europa* [illegible] *in Ramallah and Naim asked me: What do you have? I told him that I had a problem, and that I needed money and I wanted 1000 shekels or 200 dinars. I want to go to Jordan. And I asked him to lend me the money, and when I would return from Jordan, I would pay him back the money. And he said to me: I do not have any, and then he went and I stayed there. And then Naim returned after about 10 minutes and told me: You want money? I said to him: Sure I want money. He said to me: Come with me.* [illegible] *I got into his car with him, a silver Mazda, and we drove to the Greenberg Hotel* [Translator's note: as written] *in Ramallah, and there I met: 1. Muhannad Abu Halawa, aged about 25, living in Akraba in Nablus; 2. Abd Abd, aged about 37, living in Ramallah, and there was also Omar Kadan there, from Tul Karm, aged about 22 years, and Fawzi Marar from Ramallah, from Ein Musbah, aged about 25 years. And when we were in the hotel, Naim said to me that we would go to shoot at Israeli vehicles, and we would film the event on video, and after that I shall give you the money, and then I saw Abu Halawa* [Signature]

[Signature]

________________
Time of completion of statement

M.3007 (1.02) 2600 x 50 x 2

[Stamp] P 3: 20

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*
www.legaltrans.com

**Statement of:** **Israel Police [Emblem]** **Statement ____ Sheet ______**

| Identity number | First name *Freij* | Family name *Adwan* | Name in Roman characters | | |
|---|---|---|---|---|---|
| Previous name | Marital status ☐ married ☐ single ☐ divorced ☐ widower | | | Sex | Religion |
| Date of birth | Place of birth *Continued* | Home telephone number | Business telephone number | | |
| Home address | | Business name and address *2* | | | |
| Mobile telephone no. | Father's name | Parents' address | | | |

| April 8, 2002 | *4:15 p.m.* | *Jerusalem detention facility* | Investigator | *55035* | *1st Sgt.* | *Zion* | *Avraham* |
|---|---|---|---|---|---|---|---|
| Date | Time | Location | | Badge no. | Rank | First name | Last name |

*and he had with him a Kalashnikov rifle and 2 M-16 rifles, and we walked about 500 meters. We climbed a hill in Rafat, and there we stood above a road on which Israeli cars were driving, and then Abu Halawa gave me an M-16 rifle and said to me: You will shoot with this at the road. Abu Halawa took the Kalashnikov rifle and Naim took the other M-16, and Fawzi was hitchhiking in the vehicle, and Omar was the driver of the vehicle. And then Abu Halawa fired at the road and Naim fired with him and I lifted up the M-16. I aimed at the road and fired 3 rounds, and then I had a jam, and I took the M-16 and fled from the site, and Omar Kaadan fled with me, and I ran away to Fawzi; and Omar, after that, returned to them and I stayed where I was in Ramallah; and then Fawzi contacted Abu Halawa with a Mirs handset, and told them: Freij is with me. And then we got into a car, Fawzi and I, and we drove to Ramallah and went around there for about an hour; and Naim and Omar and Abu Halawa came in another vehicle, and then when we met, Abu Halawa and all the rest said to me: You ran away; and we argued between us, and then they took the rifle away from me and they did not pay me and they left. And then I went to the Mukata'a, and a month after that I heard and knew that an argument had arisen between Abu Halawa and Naim about the tape that was filmed when we carried out the shooting. And I learned from them that we had fired at that time at a bus. And Abu Halawa wanted the tape. And in the end he took the tape to him, and Abu Halawa took the tape and gave it to Abu Hassin Atrai* [sic], *and he is an employee of the* [Palestinian] *Authority in* [the field of] *security, and he is the commander of the security* [force] *in the Ramallah area; and after that I heard from Abu Halawa that the tape had reached Arafat's hands. And after this incident I stopped going with them anymore, and I had no contact with them for about six months. And then I saw Fawzi at work and in the street. And one day I saw Fawzi in the Mukata'a and he asked me: Where are you going? And I said to him that I was going to call my mother in Jordan; and then Fawzi said to me: Come with me. I said to him: Leave me alone. You go your way and I'll go mine. Each of us* [Signature]

[Signature]

Time of completion of statement

M.3007 (1.02) 2600 x 50 x 2

[Stamp] P 3: 21

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*
www.legaltrans.com

**Statement of:** **Israel Police [Emblem]** **Statement ____ Sheet ______**

| Identity number | First name *Freij* | Family name *Adwan* | Name in Roman characters | | |
|---|---|---|---|---|---|
| Previous name | Marital status ☐ married ☐ single ☐ divorced ☐ widower | | | Sex | Religion |
| Date of birth | Place of birth *Continued* | Home telephone number | Business telephone number | | |
| Home address | | Business name and address *3* | | | |
| Mobile telephone no. | Father's name | Parents' address | | | |

| Date | Time | Location | | Badge no. | Rank | First name | Last name |
|---|---|---|---|---|---|---|---|
| April 8, 2002 | *4:45 p.m.* | *Jerusalem detention facility* | Investigator | *55035* | *1st Sgt.* | *Zion* | *Avraham* |

*has his own way. And then he asked me: Have you heard about the young woman who detonated herself, and I said to him that I had not heard about that. And then he said to me: I took a young woman to Israel, he started to cry and he said to me: I have ruined my home. I asked him how and then he said to me that he had sent a young woman to blow herself up in Israel and also sent two young men with her, the driver was Hafez Al Shanal and with him was his maternal or paternal cousin, a relative of his, a boy, and I asked him: Did they know that you sent with them a young woman to blow herself up in Israel? And he said to me: No, they did not know. I asked him: Why are you scared? And then he said to me: I am scared that the family of the boy will know about me and kill me. I said to him: Are you not ashamed? This is what you did to the boy. And he said to me that Abu Halawa had convinced him to do it, and Abu Halawa said to me that they were talking about me, saying that I am a collaborator, and if I were to commit this action, then I would clear myself and everyone would know that I was not a collaborator. And therefore I sent the young woman with the two young men. And then I said to him: You have five children and Abu Halawa is single, do you not think about your children? I said to him: You have ruined your home, you are wanted for car theft and now you are in trouble; you are married to two wives. You are willing to have your wife or your sister or your child to go to the market and for someone to come and explode all over them with an explosive device, how do you accept that? And then he said to me: Abu Halawa has ruined my home, and Fawzi said to me: You did a good thing by keeping away from us, after the case of the shooting at the bus. I said to him, better that a thousand eyes should cry, rather than my mother's eyes should cry. And then we arrived in Manara Square. There I got out of the vehicle and said goodbye to him.*
*After about a week I met Fawzi in Ramallah, and he was there drinking coffee and then Fawzi asked me: Do you know someone* [word crossed out] *who lives in Israel, who will bring a young man to Israel who will shoot at people? I said to him that I did not know and did not want to hear about it, and Fawzi asked why. And I said to him: Fawzi, I am not a man like you who sends children to Israel to blow themselves up; and then he got angry and left.* [Signature]

[Signature]

Time of completion of statement

M.3007 (1.02) 2600 x 50 x 2

[Stamp] P 3: 22

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*
www.legaltrans.com

**Statement of:** **Israel Police [Emblem]** **Statement ____ Sheet ______**

| Identity number | First name *Freij* | Family name *Adwan* | Name in Roman characters | | |
|---|---|---|---|---|---|
| Previous name | Marital status ☐ married ☐ single ☐ divorced ☐ widower | | | Sex | Religion |
| Date of birth | Place of birth *Continued* | Home telephone number | Business telephone number | | |
| Home address | | Business name and address *4* | | | |
| Mobile telephone no. | Father's name | Parents' address | | | |

| April 8, 2002 | *5:05 p.m.* | *Jerusalem detention facility* | Investigator | *55035* | *1st Sgt.* | *Zion* | *Avraham* |
|---|---|---|---|---|---|---|---|
| Date | Time | Location | | Badge no. | Rank | First name | Last name |

*A day or two later, I met Abu Halawa in the street, and then Abu Halawa said to me: Did you meet Fawzi? And I said to him: Yes, and I do not want to know what you and Fawzi want from me. And then he said to me: You work at the DCO, and you work with the Jews. I said to him: Say what you want about me. Keep away from me, leave me alone to live my life and you live yours. And after some time I heard and also saw that Abu Halawa and Fawzi, Omar Kaadan had died and were eliminated in a vehicle when they were together; the Israelis bombed the vehicle that they were in from a helicopter in the air. And that was about a month and a half or two months ago.*
*About a year and two months ago, at 10 p.m., when I was sitting in the street in Ramallah and was waiting for somebody to come and give me a ride home; then Fawzi stopped next to me in his Mazda vehicle, and said to me: Come, get into the vehicle, you want 500 dollars. And then he took money out of his pocket and I asked him: What is this, counterfeit money? He said to me: No, this is real money. And then I said to him: Okay, give me 100 dollars, and I shall give it back to you next month. And then he said to me, What for? Take 500 dollars from me, and for that you have to go next to the Psagot area and you have to shoot at the settlers, and that is it. I said: What, am I crazy? I would go to shoot at settlers for 500 dollars, and then they would shoot me and kill me, so what have I done? Then he said to me: Okay, do something else, and took me in his vehicle .And we arrived at a hill next to the Al-Hashemiya [Translator's note: spelling uncertain] school, a short way after the school there is a hill, and then I stayed in the area, not on the hill, but in the street. And then Fawzi drove, he brought Abd, and we climbed the hill together, which overlooks the road, but it was far away, and we sat there for about two hours. And then we saw lights of a vehicle approaching, but it was far away, and it was raining and cold, and before that Fawzi had taken out two short Kalashnikov rifles and gave them to me and Abd. And when we saw the lights, Fawzi said: Shoot at the vehicle. I said to him that it was far. Why shoot? And Fawzi said: Shoot at the vehicle, it doesn't matter, and then each of us fired 7 rounds.* [Signature]

[Signature]

________________
Time of completion of statement

M.3007 (1.02) 2600 x 50 x 2

[Stamp] P 3: 23

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*
www.legaltrans.com

**Statement of:** **Israel Police [Emblem]** **Statement ____ Sheet ______**

| Identity number | First name *Freij* | Family name *Adwan* | Name in Roman characters | | |
|---|---|---|---|---|---|
| Previous name | Marital status ☐ married ☐ single ☐ divorced ☐ widower | | | Sex | Religion |
| Date of birth | Place of birth *Continued* | Home telephone number | Business telephone number | | |
| Home address | | Business name and address *5* | | | |
| Mobile telephone no. | Father's name | Parents' address | | | |

| Date | Time | Location | | Badge no. | Rank | First name | Last name |
|---|---|---|---|---|---|---|---|
| April 8, 2002 | *5:40 p.m.* | *Jerusalem detention facility* | Investigator | *55035* | *1st Sgt.* | *Zion* | *Avraham* |

*And then we got into Fawzi's vehicle, and he took us to Ramallah, but while we were shooting at the vehicle, which was approaching from a distance, Fawzi was not with us. He hid far away from us. And then before we fired, Abd said to me, let's not shoot, and he cocked the gun twice and extracted cartridges from the magazine and hid* [them], *and said: We can tell them that we fired. I said to him: What are you doing this for? They will find out that we did not fire the guns; and then when the vehicle arrived, each of us fired 7 rounds, as I said earlier, and we went down to the vehicle. There, Fawzi was waiting for us and he picked us up. He dropped me off in Ramallah and he took Abd home, and he took the rifles from us. And Fawzi said to me: Tomorrow I shall pay you. I want to hear the news and I shall come to pay you the money. And then on the following day I met Fawzi in Manara Square. I was drinking coffee there. And Fawzi said to me: You are a liar. You did not shoot. I saw the cartridges that Abd had; you did not shoot at all. Fawzi and I argued, and a problem ensued between me and Fawzi. And I said to him: I thank God that nothing happened, and I said: From this day onward I want nothing to do with you.*
*A few months before this case, I do not remember exactly one, day, I asked Fawzi for his vehicle. He had a Hyundai* car, *a rental car; I wanted to buy food for my home, and then I bought the food in the Ramallah area, and when I came to put the food in the car I opened the vehicle's trunk and then I saw an M1 rifle, a large rifle, and then I took out the rifle and pulled the (trigger) iron piece that was on the rifle and a round was discharged towards a piece of iron that was next to the vehicle. And praise be; nobody was hurt. And the neighbors who were there, when they heard this, went and complained about me to my boss, Amid Rabhi Arafat. And he warned me about going with Fawzi. I remember something else, about 3 years ago, Fawzi came to me and made a suggestion for me to buy from somebody 1500 9mm cartridges for 500 shekels. And I bought* [them] *from him in order to sell them to others and to make a little money; and this young man from whom I bought them goes by the name of Abd. I do not remember the rest of his details* [Signature]

[Signature]

____________________
Time of completion of statement

M.3007 (1.02) 2600 x 50 x 2

[Stamp] P 3: 24

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*
www.legaltrans.com

**Statement of:** **Israel Police [Emblem]** **Statement ____ Sheet ______**

| Identity number | First name *Freij* | Family name *Adwan* | Name in Roman characters | | |
|---|---|---|---|---|---|
| Previous name | Marital status ☐ married ☐ single ☐ divorced ☐ widower | | | Sex | Religion |
| Date of birth | Place of birth *Continued* | Home telephone number | Business telephone number | | |
| Home address | | Business name and address *6* | | | |
| Mobile telephone no. | Father's name | Parents' address | | | |

| April 8, 2002 | *6:00 p.m.* | *Jerusalem detention facility* | Investigator | *55035* | *1st Sgt.* | *Zion* | *Avraham* |
|---|---|---|---|---|---|---|---|
| Date | Time | Location | | Badge no. | Rank | First name | Last name |

*exactly. The one who knows him well is Fawzi. And I gave some of the cartridges to friends. And I fired these cartridges at weddings, and it was a long time ago, a year and a half before the Intifada [Translator's note: Arab uprising].*
*Question: For how long have you known Fawzi and Abu Halawa and all of the other people whom you mentioned in your statement?*
*Answer: I have known Fawzi for about 3 years. He was a driver in joint patrols, and it was there that we became friends, and I got to know Abu Halawa through Fawzi, they are good friends. And Fawzi introduced us to one another, and to Abd. Abd I met in 1990. We were confined together in a Syrian prison. And after that I did not see him. I met him in Ramallah and I met Omar through Fawzi and I met Naim about a year ago at the café in Ramallah.*
*Question: When you carried out the shooting at the vehicle, you together with Naim and Abd and Omar, at what vehicle did you shoot, and were people hurt or killed?*
*Answer: I did not take aim. I raised the rifle overhead and fired towards the road. But after I fled and after some time I understood from Abu Halawa that it was a small bus and one person was killed. I did not see, but Abu Halawa said that.*
*Question: Who filmed the whole event?*
*Answer: The one who filmed the whole event was Abd Abd. And as I said to you, Abu Halawa took the tape and gave it to Abu Hassin Tirawi, who is responsible for the Palestinian security. And Abu Hassin gave the tape to Yasser Arafat.*
*Question: Have you belonged to any hostile organization?*
*Answer: I have not belonged to any hostile organization.*
*Question: Where would Fawzi get the weapons from?*
*Answer: Fawzi told me that he would get the weapons from the Tanzeem Fatah, to which he belonged.*
*This is my statement, which has been read before me and confirmed as accurate by my signature.*
[Signature]

[Signature]

Time of completion of statement

M.3007 (1.02) 2600 x 50 x 2

[Stamp] P 3: 25



27 Brookhill Road
East Brunswick, NJ 08816
732 432 0174
www.legaltrans.com

## Certificate of Accuracy

I, Rina Ne'eman, hereby certify that the document "Freij Adwan Statement April 8, 2002 (Tying Fawzi Murar to Shooting Attacks in Early 2001)" is to the best of my knowledge and belief, a true and accurate translation from Hebrew into English. We are a company specialized in Hebrew translation, with over 30 years of translation expertise.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on August 8, 2013.

[signature]

הודעתו של: / إعلان تبع

משטרת ישראל

הודעה מס' / إعلان رقم ______ גליון מס' / نسخة رقم ______

| מספר זהות رقم الهوية | שם פרטי الاسم الشخصي | שם משפחה اسم العائلة | שם באותיות לטיניות الاسم في حروف انكليزية |
|---|---|---|---|
| 41005261[illegible] | [illegible] | [illegible] | |

| שם קודם الاسم السابق | מצב משפחתי الحالة الاجتماعية | מין الجنس | דת الدين |
|---|---|---|---|
| | ☐ נשוי متزوج ☒ רווק اعزب ☐ גרוש مطلق ☐ אלמן ارمل | [illegible] | [illegible] |

| תאריך לידה تاريخ الولادة | מקום לידה مكان الولادة | טל' בבית التلفون في البيت | טל' בעבודה التلفون بمكان العمل |
|---|---|---|---|
| 18/12/69 | [illegible] | | |

| המען العنوان | שם ומען מקום העבודה اسم وعنوان مكان العمل |
|---|---|
| [illegible] | |

| מס' טלפון נייד رقم الهاتف اللاسلكي | שם האב اسم الاب | כתובת ההורים العنوان الاب |
|---|---|---|
| | [illegible] | |

| תאריך التاريخ | שעה الساعة | מקום المكان | החוקר المحقق | מס' אישי الرقم الشخصي | דרגה الرتبة | שם פרטי الاسم الشخصي | שם משפחה اسم العائلة |
|---|---|---|---|---|---|---|---|
| 3/4/02 | 15:52 | [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] |

[illegible handwritten statement, lines 1–28]

שעת סיום גביית ההודעה

(1.02) 2600×50×2

מ"ח 3007

P 3: 20

**הודעתו של:** / اعلان تبع

משטרת ישראל

הודעה מס' / اعلان رقم ______ גליון מס' / نسخة رقم ______

| מספר זהות رقم الهوية | שם פרטי الاسم الشخصي | שם משפחה اسم العائلة | שם באותיות לועזיות الاسم في حروف انكليزية |
|---|---|---|---|
| | | | |

| שם קודם الاسم السابق | מצב משפחתי الحالة الاجتماعية: ☐ נשוי متزوج ☐ רווק اعزب ☐ גרוש مطلق ☐ אלמן ارمل | מין الجنس | דת الدين |
|---|---|---|---|
| | | | |

| תאריך לידה تاريخ الولادة | מקום לידה مكان الولادة | טל' בבית التلفون في البيت | טל' בעבודה التلفون بمكان العمل |
|---|---|---|---|
| | | | |

| המען العنوان | שם ומען מקום העבודה اسم وعنوان مكان العمل |
|---|---|
| | |

| מס' טלפון נייד رقم الهاتف اللاسلكي | שם האב اسم الأب | כתובת ההורים العنوان الاب |
|---|---|---|
| | | |

תאריך التاريخ: 8/4/02 שעה الساعة: 16:15 מקום المكان: בית אל החוקר المحقق: מס' אישי الرقم الشخصي: [illegible] דרגה الرتبة: [illegible] שם פרטי الاسم الشخصي: [illegible] שם משפחה اسم العائلة: [illegible]

[illegible]

שעת סיום גביית ההודעה

(1.02) 2600×50×2

מ"ה 3907

P 3: 21

**הודעתו של:** / افادة شخص

משטרת ישראל

הודעה מס' / افادة رقم ______ גליון מס' / نسخة رقم ______

| מספר זהות رقم الهوية | שם פרטי الاسم الشخصي | שם משפחה اسم العائلة | שם באותיות לטיניות الاسم في حروف انكليزية |
|---|---|---|---|
| | [illegible] | [illegible] | |

| שם קודם الاسم السابق | מצב משפחתי الحالة الاجتماعية | ☐ נשוי متزوج ☐ רווק اعزب ☐ גרוש مطلق ☐ אלמן أرمل | מין الجنس | דת الدين |
|---|---|---|---|---|
| | | | | |

| תאריך לידה تاريخ الولادة | מקום לידה مكان الولادة | טל' בבית التلفون في البيت | טל' בעבודה التلفون بمكان العمل |
|---|---|---|---|
| | [illegible] | | |

| המען العنوان | שם ומען מקום העבודה اسم وعنوان مكان العمل |
|---|---|
| [illegible] | |

| מס' טלפון נייד رقم الهاتف اللاسلكي | שם האב اسم الاب | כתובת ההורים العنوان الاب |
|---|---|---|
| | | |

| תאריך التاريخ | שעה الساعة | מקום مكان | החוקר المحقق | מס' אישי الرقم الشخصي | דרגה الرتبة | שם פרטי الاسم الشخصي | שם משפחה اسم العائلة |
|---|---|---|---|---|---|---|---|
| 8/4/02 | 16:45 | [illegible] | | 55035 | [illegible] | [illegible] | [illegible] |

יש דרך משפט. ואז הוא שאל אותי שאלה אם יש בחורה [illegible] עצמה ואמרתי לו [illegible] ואז הוא אמר לי אני מכיר בחורה [illegible] ואמר לי [illegible] הבית שלי שאלתי אותו איך ואז הוא אמר לי נשלח בחורה [illegible] ושלח אותה [illegible] שני בחורים [illegible] היא [illegible] בין [illegible] אל בין [illegible] קרוב [illegible]

[illegible handwritten statement text]

שעת סיום גביית ההודעה ______

(02) 2600×50×2

P 3: 22

הודעתו של: / اعلان تبع

משטרת ישראל

הודעה מס' / اعلان رقم ____ גליון מס' / نسخة رقم ____

| מספר זהות رقم الهوية | שם פרטי الاسم الشخصي | שם משפחה اسم العائلة | שם באותיות לטיניות الاسم في حروف انكليزية |
|---|---|---|---|
| | [illegible] | [illegible] | |

| שם קודם الاسم السابق | מצב משפחתי الحالة الاجتماعية: ☐ נשוי متزوج ☐ רווק اعزب ☐ גרוש مطلق ☐ אלמן ارمل | מין الجنس | דת الدين |
|---|---|---|---|
| | | | |

| תאריך לידה تاريخ الولادة | מקום לידה مكان الولادة | טל' בבית التلفون في البيت | טל' בעבודה التلفون بمكان العمل |
|---|---|---|---|
| | | | |

| המען العنوان | שם ומען מקום העבודה اسم وعنوان مكان العمل |
|---|---|
| | |

| מס' טלפון נייד رقم الهاتف اللاسلكي | שם האב اسم الاب | כתובת ההורים العنوان الاب |
|---|---|---|
| | | |

| תאריך التاريخ | שעה الساعة | מקום المكان | החוקר المحقق מס' אישי الرقم الشخصي | דרגה الرتبة | שם פרטי الاسم الشخصي | שם משפחה اسم العائلة |
|---|---|---|---|---|---|---|
| 8/4/02 | 17:05 | [illegible] | 55035 | [illegible] | [illegible] | [illegible] |

[illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible]

שעת סיום גביית ההודעה: 2 בדצמבר

(1.02) 2609×50×2

3307מ"ס

P 3: 23

**הודעתו של:** / إفادة:

משטרת ישראל

הודעה מס' / إفادة رقم ________ גליון מס' / نسخة رقم ________

| מספר זהות رقم الهوية | שם פרטי الاسم الشخصي | שם משפחה اسم العائلة | שם באותיות לטיניות الاسم في حروف انكليزية |
|---|---|---|---|
| | [illegible] | [illegible] | |

| שם קודם الاسم السابق | מצב משפחתי الحالة الاجتماعية: ☐ נשוי متزوج ☐ רווק اعزب ☐ גרוש مطلق ☐ אלמן ارمل | מין الجنس | דת الدين |
|---|---|---|---|
| | | | |

| תאריך לידה تاريخ الولادة | מקום לידה مكان الولادة | טל' בבית التلفون في البيت | טל' בעבודה التلفون بمكان العمل |
|---|---|---|---|
| | [illegible] | | |

| המען العنوان | שם ומען מקום העבודה اسم وعنوان مكان العمل |
|---|---|
| [illegible] | |

| מס' טלפון נייד رقم الهاتف اللاسلكي | שם האב اسم الاب | כתובת ההורים العنوان الاب |
|---|---|---|
| | | |

| תאריך التاريخ | שעה الساعة | מקום المكان | החוקר المحقق מס' אישי الرقم الشخصي | דרגה الرتبة | שם פרטי الاسم الشخصي | שם משפחה اسم العائلة |
|---|---|---|---|---|---|---|
| 8/4/08 | 14:40 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |

[illegible handwritten statement text, 28 lines]

שעת סיום גביית ההודעה

(1.02) 2400x50x2

מ"ט 3007

P 3: 24

**הודעתו של:** / اعلان تبع:

**משטרת ישראל**

הודעה מס' ______ / اعلان رقم

גליון מס' ______ / نسخة رقم

| מספר זהות رقم الهوية | שם פרטי الاسم الشخصي | שם משפחה اسم العائلة | שם באותיות לטיניות الاسم في حروف انكليزية |
| --- | --- | --- | --- |
| | [illegible] | [illegible] | |

| שם קודם الاسم السابق | מצב משפחתי الحالة الاجتماعية | | | | מין الجنس | דת الدين |
| --- | --- | --- | --- | --- | --- | --- |
| | ☐ נשוי متزوج | ☐ רווק اعزب | ☐ גרוש مطلق | ☐ אלמן ارمل | | |

| תאריך לידה تاريخ الولادة | מקום לידה مكان الولادة | טל' בבית التلفون في البيت | טל' בעבודה التلفون بمكان العمل |
| --- | --- | --- | --- |
| | [illegible] | | |

| המען العنوان | שם ומען מקום העבודה اسم وعنوان مكان العمل |
| --- | --- |
| | [illegible] |

| מס' טלפון נייד رقم الهاتف اللاسلكي | שם האב اسم الاب | כתובת ההורים العنوان الاب |
| --- | --- | --- |
| | | |

| התאריך التاريخ | שעה الساعة | מקום المكان | החוקר المحقق | מס' אישי الرقم الشخصي | דרגה الرتبة | שם פרטי الاسم الشخصي | שם משפחה اسم العائلة |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 8/4/08 | 18:00 | [illegible] | | 55035 | [illegible] | [illegible] | [illegible] |

[illegible] אני [illegible] [illegible] [illegible] [illegible]

אחרים. ואני [illegible] את הדברים האלה [illegible] [illegible]

[illegible] 8 [illegible] [illegible] [illegible]

שאלה: ממתי אתה מכיר את פאוזי. ואת אבו [illegible] ואת כל שאר האנשים שהזכרת [illegible]

תשובה: אני מכיר את פאוזי כ-3 שנים [illegible] [illegible] [illegible] [illegible] ושם התחברנו ואת אבו [illegible] הכרתי דרך פאוזי גם [illegible] [illegible] ופאוזי הכיר [illegible] [illegible] [illegible] [illegible] 1990 [illegible] [illegible] [illegible] [illegible] [illegible] אותי [illegible] [illegible] [illegible] [illegible] [illegible] דרך פאוזי [illegible] [illegible] לפני [illegible] לבית הקפה [illegible]

שאלה: [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible]

תשובה: אני לא [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] אחרי [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible]

שאלה: מי סיפרו את כל [illegible]

תשובה: מי שסיפרו את כל [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible]

שאלה: [illegible] [illegible] [illegible] [illegible]

תשובה: [illegible] [illegible] [illegible] [illegible]

שאלה: מאיפה פאוזי [illegible] [illegible] [illegible] [illegible] [illegible]

תשובה: פאוזי אמר לי כי הוא [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] הוא [illegible]

[illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible]

שעת סיום וגביית ההודעה ______ [illegible signature]

(1.02) 2600×50×2

מ"ז 3007

P 3: 25