# Exhibit C



MILLER
CHEVALIER

Brian A. Hill
Member
(202) 626-6014
bhill@milchev.com

June 14, 2013

VIA EMAIL AND FEDERAL EXPRESS
Hon. Ronald L. Ellis
United States Magistrate Judge
United States District Court for the Southern District of New York
500 Pearl Street
New York, NY 10007-1312

Re: *Sokolow v. Palestine Liberation Organization et al.* — 04-CV-397(GBD) (RLE)

Dear Judge Ellis:

I write in reply to Plaintiffs' letter dated June 13, 2013, which responds to our letters dated May 14, 2013 and June 7, 2013, in which Defendants requested that certain photographs and related testimony from Varda Guetta be excluded from evidence as a sanction for Plaintiffs' failure to produce those photographs during fact discovery and their violation of the Court's Order requiring them to provide discovery about communications regarding those photographs. Plaintiffs' June 13 letter also contains yet another request to reopen fact discovery, and requests leave to serve document requests regarding "Fawzi Murar," a person who Plaintiffs' counsel claim is depicted in the photograph that Ms. Guetta selected from the photographs about which Plaintiffs have refused to provide the discovery ordered by the Court. For the reasons stated in our letter dated May 14 and below, Plaintiffs should be precluded from offering the photographs at issue or Ms. Guetta's testimony about them in this matter, and discovery should not be reopened for additional document requests related to Mr. Murar.

As made clear in our prior letters, this entire episode is a product of tardy efforts by Plaintiffs in discovery, which have now yielded Ms. Guetta's purported, but entirely unreliable and inadmissible, identification of a photo provided to her by counsel. As Plaintiffs admit, those efforts did not begin until sometime after "Judge Daniels overruled plaintiffs' objections on January 16, 2013," when Plaintiffs "began a fresh investigation to try to identify the shooters, through which these 15 photographs were obtained." Yalowitz June 13, 2013 Ltr. at 2. No one can conduct an investigation for documents outside their possession without communications. Indeed, the fact of such communications is tacitly confirmed by Plaintiffs' counsels' repeated assertion that the person who is depicted in the photograph selected by Ms. Guetta is named "Fawzi Murar," since counsel must have obtained that name from somewhere, and Ms. Guetta has testified that she did not know the names of anyone depicted in the photos, including that of the person whose photo she selected. Ex. A at 478:9-19. There are almost certainly communications about the other photos as well because it is difficult to imagine that Plaintiffs' counsel included the other photographs in the array without knowing whom they depicted. Nor is it disputable that such communications were responsive to Defendants' Interrogatory No. 23, which required Plaintiffs to "[i]dentify and describe in detail all communications that the Plaintiffs, their agents (including Plaintiffs' attorneys) or family members have had with any person relating to the facts, events, circumstances, allegations, claims or defenses contained in the First

Miller & Chevalier Chartered

655 Fifteenth Street, N.W., Suite 900 · Washington, D.C. 20005-5701 · 202-626-5800 · 202-626-5801 FAX · millerchevalier.com



Hon. Ronald L. Ellis
June 14, 2013
Page 2

Amended Complaint, the Answer, or the Civil Action." *See* Hill May 14, 2013 Ltr. Ex. 6 at 8. Communications about photographs that Plaintiffs seek to use as the primary proof of their claims are unquestionably "communications . . . relating to . . . claims . . . in the First Amended Complaint." However, despite their obvious responsiveness, and despite the fact that the Court has already ordered the Plaintiffs to answer Interrogatory 23, Plaintiffs have neither answered the interrogatory nor provided a privilege log asserting a claim of privilege over the communications at issue. Having refused to answer an interrogatory calling for communications about the photographs, and disobeyed the Court's order requiring them to do so, Plaintiffs should now be precluded from offering the photographs or testimony based upon them in this matter under Rule 37(b)(2)(A)(ii) and (d)(1)(A)(ii).

For these same reasons, the Court should not permit Plaintiffs to reopen fact discovery and serve new document requests related to Mr. Murar. Under Rule 16(b)(4), a "scheduling order may not be modified except upon a showing of good cause," which "depends on the diligence of the moving party." *G Investors Holding LLC v. Lincoln Benefit Life Co.*, No. 09 Civ. 2980 (ALC) (KNF), 2012 U.S. Dist. LEXIS 140676 , at *6 (S.D.N.Y. Sept. 25, 2012). "A party does not satisfy the good cause standard when the proposed amendment rests on information that the party knew, or should have known, in advance of the deadline." *Id.* at *6-7. Here, Plaintiffs' counsel were not diligent, as they inexplicably waited to conduct their "investigation" and show Ms. Guetta the photographs until February of this year. Plaintiffs make no claim that anything prevented Plaintiffs' counsel from doing so earlier, before the close of fact discovery. Moreover, to the extent Plaintiffs are claiming that it was reasonable to wait to conduct the investigation until they secured a ruling on their attempt to seek have the Defendants produce photographs (other than that of Mr. Murar) for review by Ms. Guetta, the Court must remember that Plaintiffs unreasonably delayed in seeking such a ruling until the close of fact discovery. The document requests upon which Your Honor ruled in December 2012 (which was affirmed by Judge Daniels in January 2013), were served by Plaintiffs a year earlier in October and November of 2011. Plaintiffs should not now be allowed to reopen fact discovery after having unreasonably delayed in seeking discovery about the photographs, and unreasonably delayed in conducting their own "investigation." To do so would be to allow Plaintiffs' counsel to arrogate to themselves the right to take discovery regardless of the deadlines imposed by the Court.

The fact that Defendants took a second deposition of Ms. Guetta earlier this year is irrelevant to Plaintiffs' present request. Defendants took that deposition to mitigate the prejudice to them from Plaintiffs' counsels' failure to show the photographs at issue to Ms. Guetta prior to her deposition in June of 2012. At her second deposition, Ms. Guetta described how Mr. Tolchin gave her the photographs in February of 2013, how she looked at the photos with Mr. Tolchin immediately but failed to make identification, how she studied them overnight, and how she eventually picked a photograph which had been marked with a certain letter of the alphabet. Ex. A at 407:3-408:10, 415:9-420:18. However, she testified that she did not know the name of the person depicted in the photograph. *Id.* at 478:12-15. Thus, her deposition testimony provides no predicate for serving a document request regarding Mr. Murar. Plaintiffs should not be allowed to use Defendants' efforts to address the prejudicial late disclosure as a basis for even more late discovery.

Furthermore, regardless of timing, Plaintiffs should not be allowed to now take discovery regarding Mr. Murar when they have refused, despite this Court's order that they do so, to provide

1337884.2



Hon. Ronald L. Ellis
June 14, 2013
Page 3

discovery about what they now posit as the predicate for the discovery they wish to pursue, *i.e.*, the representations of Plaintiffs' counsel that the photograph Ms. Guetta picked from the array provided by Mr. Tolchin depicts Mr. Murar. Plaintiffs should not be allowed to take new untimely discovery about a person when they have themselves refused to provide discovery which is allegedly about that same person, despite timely discovery requests and a Court order requiring them to do so.

Finally, the Court's prior ruling disallowing discovery about the persons Plaintiffs previously sought photographs of applies with equal force here. The Court disallowed that discovery because it concluded that any identification by Ms. Guetta from a photo array thirteen years after the fact would not be admissible, and that the photos would therefore not lead to admissible evidence. *See* DE 291 at 14-19. The rationale for that ruling has not changed now that Plaintiffs have shown Ms. Guetta a photo array they assembled from unknown sources, and that consisted of unknown individuals, which Plaintiffs have refused to identify despite the pending discovery requests, and which may well have consisted entirely of individuals that Plaintiffs would consider to be suspects in the shooting. Indeed, if it is true that the array had more than a single suspect, that would be yet another reason why any identification produced by it was unreliable. *See State v. Henderson*, 27 A. 3d 872, 897-98 (N.J. 2011) ("The way that a live or photo lineup is constructed can also affect the reliability of an identification. Properly constructed lineups test a witness' memory and decrease the chance that a witness is simply guessing. A number of features affect the construction of a fair lineup. . . . [L]ineups should not feature more than one suspect. As the Special Master found, "if multiple suspects are in the lineup, the reliability of a positive identification is difficult to assess, for the possibility of 'lucky' guesses is magnified."). Ms. Guetta's recent deposition testimony also undermined further the reliability of her claimed identification in other ways, including her admission that she had given multiple press interviews soon after the shooting. Ex. A. at 330:18-334:9. These interviews show that Ms. Guetta originally told reporters the shooting came from "a vehicle" which was "probably a van" – an admission that further undermines her later testimony that the shooting came from a "car" not a "van," which was likely infected by her exposure to the police investigation into the shooting. *See* Ex. B at 2; Ex. C at 12:11-13. As a result, Ms. Guetta's selection of the photo that Plaintiffs' counsel claim is Mr. Murar will still be inadmissible at trial, and even if it were not, there is no admissible evidence that the person depicted in the photo she chose is Mr. Murar. Accordingly, there is no reason to reopen fact discovery now, six months after it closed, to obtain documents that will not be relevant or admissible at trial because there is no admissible evidence connecting Mr. Murar to the shooting in which the Guettas were involved.

We are willing to address any questions or concerns the Court may have regarding the foregoing during the June 17, 2013 teleconference or at any other time convenient for the Court.

Sincerely,

*[signature]*

Brian A. Hill

cc:    Robert J. Tolchin, Esq., David I. Schoen, Esq., Kent Yalowitz, Esq.

Miller & Chevalier Chartered

1337884.2

# EXHIBIT A

266

```
 1

 2    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 3    -------------------------------------------X
      MARK I. SOKOLOW, et al.,
 4
                                    PLAINTIFFS,
 5

 6         -against-               Case No:
                                   04 cv 397
 7                                 (GBD)(RLE)

 8
      THE PALESTINE LIBERATION ORGANIZATION,
 9    et al.,

10                                 DEFENDANTS.
      -------------------------------------------X
11

12                      DATE: May 7, 2013

13                      TIME: 11:10 A.M

14

15             CONTINUED VIDEOTAPED DEPOSITION

16    of the Plaintiff VARDA GUETTA, taken by the

17    Defendants, pursuant to Order and to the

18    Federal Rules of Civil Procedure, held at

19    the offices of Morrison & Foerster, 1290

20    Avenue of the Americas, New York, New York

21    10104, before Robert X. Shaw, CSR, a Notary

22    Public of the State of New York.

23

24

25
```

DIAMOND REPORTING    (718) 624-7200    info@diamondreporting.com

330

```
  1                    VARDA GUETTA
  2    car went after it drove off?
  3         A.    No.  They told me that it went
  4    straight to the Bido village.
  5         Q.    And when you say "they," who is
  6    "they"?
  7         A.    The guards.  The guard who was
  8    present.  And the police.
  9               And they said that they went to
 10    Bido village.  Because there's nowhere else
 11    to go from there.  They didn't drive in
 12    reverse.  They drove straight to the
 13    village.  Since then, the village has been
 14    closed to the entry of vehicles.
 15         Q.    You talked about the shooting a
 16    lot.
 17               THE INTERPRETER: I am sorry?
 18         Q.    You have talked about the
 19    shooting with a lot of people?
 20               MR. TOLCHIN:  Objection to the
 21          form of the question.  That's not a
 22          question.
 23         A.    Yes.  And we were approached by
 24    a lot of people, we were on television, we
 25    were on the radio, we were interviewed in
```

331

                        VARDA GUETTA

1
2     the newspapers.  We were approached by a
3     lot of people, so we talked about it.
4          Q.     So, you were approached by
5     television reporters?
6          A.     Of course.
7          Q.     And you went on television in
8     2001?
9          A.     Yes.
10         Q.     And do you remember what you
11    said on television in 2001?
12         A.     No.
13         Q.     Do you remember what channels
14    you were on?
15         A.     There are only two channels in
16    Israel.
17         Q.     What are the two?
18         A.     Channel 1 and Channel 2.
19         Q.     Do you remember whether it was
20    Channel 1 or Channel 2?
21         A.     No.  I only know that everybody
22    was approaching me and I, at a certain
23    point, I reached a state where I was
24    incapable of talking about it anymore.
25                So, I told them that I couldn't

333

                    VARDA GUETTA

 1
 2   happened at 8 o'clock at night.  I think
 3   they already talked about it on the news,
 4   on the 12 p.m. edition, the 12 a.m. edition
 5   of the news.
 6        Q.    And then they interviewed you
 7   pretty soon after that; is that right?
 8        A.    Perhaps that same day, but I
 9   don't recall.
10        Q.    So, if we got the broadcast
11   from January of 2001, you would be on
12   there, for Channel 1 and Channel 2?
13        A.    I don't recall whether it was
14   both of them.  It was certainly one of
15   them.
16        Q.    And you said that you talked to
17   the radio.  Do you remember which radio
18   stations?
19        A.    No.  I felt like a movie star.
20   They kept courting me.  I started rejecting
21   people.  I don't want that one.  I don't
22   want that one.  I don't have the strength
23   to speak to that one.
24        Q.    How about newspaper reporters,
25   did you talk to newspaper reporters?

```
1                      VARDA GUETTA
2           A.    The next day, I think there was
3     already an article in the newspaper.  And
4     then in a local newspaper there was a large
5     article on Oz, about his soccer, and that's
6     it.
7           Q.    Did you keep any of the
8     newspaper articles?
9           A.    I have some of them.
10          Q.    Have you given them to your
11    lawyers?
12  DI             MR. YALOWITZ:  Objection.
13          Instruction not to answer.
14               MR. HILL:  Are you instructing
15          her not to answer the question
16          whether she gave you the newspapers?
17               MR. YALOWITZ:  Yes.
18               MR. HILL:  What's the basis?
19               MR. O'TOOLE:  What's the basis?
20               MR. YALOWITZ:  Attorney/client
21          communication.
22               MR. O'TOOLE:  I'm not asking
23          about any communications.  I'm asking
24          whether she handed to her lawyers at
25          the time the newspaper articles.
```

407

```
 1                    VARDA GUETTA
 2        A.    Yes.
 3        Q.    About what time did Mr. Tolchin
 4   come over?
 5        A.    Around 5, 5:30, in the
 6   afternoon.
 7        Q.    And he's with his daughter?
 8        A.    Yes.
 9        Q.    And you put the photos to the
10   side because you were with your grandson?
11        A.    No.  We looked at them quickly.
12        Q.    Who is "we"?  You and Mr.
13   Tolchin looked at the photos?
14        A.    Yes.  Quickly.  And then my
15   grandson was crying, and he had to eat, and
16   I had said that I would look at them later
17   on.
18        Q.    When you and Mr. Tolchin looked
19   at the photos, that's different than from
20   what you said before the break; right?
21        A.    I was holding my grandson and I
22   looked through the pictures really quickly.
23   He was crying, and I had to -- I said that
24   I would look at them later on.
25        Q.    Did you -- you looked through
```

```
 1                     VARDA GUETTA
 2    them quickly, one by one, or did you look
 3    at them all side by side?
 4         A.    One by one.  Had I laid them
 5    out one next to the other, my grandson
 6    would have wrecked them all.
 7         Q.    So, you looked one by one, and
 8    you didn't make an identification of anyone
 9    of these?
10         A.    No.
11         Q.    Now, you said before that Mr.
12    Tolchin didn't say anything to you about
13    the photos.  Is that still your testimony?
14         A.    Yes.
15         Q.    Nothing.  He said no words at
16    all to you about any of the photos?
17         A.    He told me that he was bringing
18    me pictures, that I should try and see
19    whether I could identify them.
20         Q.    And that was for the purpose of
21    the lawsuit; is that correct?
22         A.    I assume that it was.
23         Q.    And then, after you didn't
24    identify anyone, he left, did he say keep
25    the photos and look through them later, or
```

```
 1                      VARDA GUETTA
 2    this, but do you drink alcohol?
 3           A.      Extremely occasionally.
 4           Q.      Had you had any alcohol that
 5    evening?
 6           A.      There was no reason to do so.
 7                   I have a drink at a wedding, or
 8    when there's a reason for a party.
 9           Q.      So, it was about 9 o'clock at
10    night, you are sitting on the bed; is that
11    correct?
12           A.      Yes.
13           Q.      You pulled the photos out
14    again; is that correct?
15           A.      Yes.
16           Q.      One by one?  Did you lay them
17    aside on the bed?
18           A.      First, I took all of them out
19    of the envelope.  And I started to look at
20    them one by one by one.  And there were
21    people who I ruled out from the outset.
22           Q.      Why did you rule them out?
23           A.      Because it wasn't them.
24           Q.      Now, did all of them have
25    moustaches?
```

416

```
 1                     VARDA GUETTA
 2          A.    In the pictures, no.  Some of
 3    them had moustaches.
 4          Q.    You ruled out the ones without
 5    moustaches?
 6          A.    No.  I also ruled out people
 7    with moustaches who, and I also approved
 8    people with a moustache, because moustaches
 9    can be removed.
10          Q.    Now, did you know when these
11    photos were taken?
12          A.    No.
13          Q.    So, you didn't have any idea
14    whether or not the people in the photos
15    were 12 years older than at the time of the
16    shooting; right?
17          A.    No.  I had no idea.
18          Q.    Do you know anything else about
19    the photos?
20          A.    No.
21          Q.    So, you laid them out on the
22    bed.  About how many did you rule out; do
23    you remember?
24          A.    By number, I don't recall.
25                Perhaps three.  I'm not focused
```

```
 1                    VARDA GUETTA
 2    on details like that.  My life is too busy
 3    to, to focus on whether it was two or three
 4    or five.
 5          Q.    About how many photos were in
 6    the envelope?
 7          A.    Perhaps eight, perhaps 10.
 8          Q.    You're not sure; is that right?
 9          A.    No.
10          Q.    Could it have been more than
11    that?
12          A.    No, I didn't count them.  I
13    don't know.
14          Q.    So, it could be more than eight
15    or 10?
16          A.    Perhaps.  I don't recall.
17          Q.    It could be less than eight or
18    10?
19          A.    It's also possible.
20          Q.    Okay.  And you narrowed, you
21    eliminated, did you say, three out of the
22    eight or 10; is that correct?
23          A.    Approximately, yes.
24          Q.    Now, were these photos color or
25    black-and-white?
```

418

                              VARDA GUETTA

1

2          A.     Color.  They were color.

3          Q.     Was there any writing on the

4     photos?

5          A.     There were letters.

6          Q.     There were letters on each

7     photo.  Do you remember what the letters

8     were?

9          A.     I don't recall whether it was

10    A,B,C or something like that.  But there

11    were letters.  There were letters.

12         Q.     Were these Hebrew letters or,

13    or the western alphabet letters?

14         A.     In English.

15         Q.     Okay.  So, you've narrowed it

16    down, you've narrowed three down.  What do

17    you do next?

18         A.     I looked again until I saw that

19    guy with those eyes, and I identified him.

20         Q.     Okay.  And when you're looking,

21    what's the lighting like in your room?

22         A.     Full lighting.

23         Q.     And had you laid the pictures

24    out, the ones that you had not eliminated,

25    you laid them out side by side on your bed

419

                    VARDA GUETTA

1

2   and kept looking at them; is that correct?

3        A.    I don't recall whether I laid

4   them out on the bed, but I looked at them

5   and looked at them.

6        Q.    And I guess, just what I'm

7   asking is, were you looking at them one by

8   one again, or were you laying them side by

9   side?

10            MR. YALOWITZ:  Let her answer.

11       A.    I think that I looked at them

12  one by one by one.

13       Q.    And this is again.

14            So, first -- I just want to be

15  sure that we're clear.  So, you look at

16  them one by one by one, and eliminate some

17  of them; is that correct?

18       A.    Yes.

19       Q.    Then do you ever lay them side

20  by side?

21       A.    I don't recall.  I don't

22  recall, no.  Perhaps I spread them out on

23  the floor.  I really don't remember what I

24  did with them.

25       Q.    But then, you said you looked

420

                    VARDA GUETTA

1    again at them one by one by one.  About how

2    long did you do that?

3         A.    It took me a long time.

4         Q.    Do you remember about how long

5    the whole process took?

6         A.    No.

7         Q.    So, once you find the photo, do

8    you remember which letter photo it was?

9         A.    I.

10        Q.    It was I.  Okay.

11                Once you find the photo that

12   was the letter I, what do you do next?

13        A.    I put it aside.  And I got up

14   in the morning and I looked at it again.

15   And I looked at it again, and again, and

16   again, and again.  I wanted to be certain.

17   And then I called Bob and I told him.

18        Q.    Now, how long did you sleep

19   that night; do you know?

20        A.    Perhaps from 11 or midnight

21   until 7.

22        Q.    Okay.  Where did you put the

23   photo while you were sleeping?

24        A.    I have a kind of chair there,

478

```
 1                    VARDA GUETTA
 2        Q.    Did you say anything else?
 3        A.    No.  I gave him the details of
 4   the picture and the letter, and that was
 5   it.
 6        Q.    And what did he say?
 7        A.    Thank you very much.  And that
 8   he would continue to handle it.
 9        Q.    Did he discuss any names of
10   people?
11        A.    No.
12        Q.    Do you have any idea of the
13   name of the person that we're talking
14   about?
15        A.    No.
16        Q.    Had you seen any of the photos
17   that you viewed before, the viewing on
18   February 17th?
19        A.    No.
20        Q.    Did Mr. Tolchin tell you that
21   you had gotten the identification right, or
22   that you had gotten it wrong?
23        A.    He didn't tell me anything.
24        Q.    Did he congratulate you?
25        A.    I told him what I thought, and
```

# EXHIBIT B

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*
www.hebrewtrans.com

# "My career with Beitar is over" – shouted the boy who was injured in the attack

Oz Guetta, age 12 and a half, was lightly injured in the attack next to New Givon Junction.
■ His mother, who drove the car: "It was a miracle that we survived"



"A miracle that we survived." The damaged car, with a bullet riddled engine hood.



Will quickly return to the first lineup. Oz Guetta being taken to Hadassah Ein Kerem Hospital

By Golan Yosifon and Shlomo Tzanza

**"It was a miracle that he survived", said the mother of the 12 and a half year old boy who was slightly hurt in a shooting attack next to the New Givon Junction yesterday evening.**

"Yesterday, the mother, Varda Guetta, recalled for Maariv the moments of anxiety that she had experienced the day before, when she drove with her son on an internal road parallel to Highway 443 from Modi'in to Jerusalem, which in the last two weeks has become a target for shooting attacks. "I stopped at a stop sign at the New Givon Junction, after having picked up my son from

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*
www.hebrewtrans.com

a Beitar Jerusalem soccer practice session. Suddenly a vehicle appeared in front of us, probably a van, and many submachine gun bursts were fired from it. There were flashes. At least four bullets hit the engine and one of the bullets hit my son, Oz, in the left shoulder. He started to scream and I also became hysterical."

Varda, who is a a secretary in a plumbing company, says again that it was a great miracle. "If the bullets had hit the fuel tank of the car, a major tragedy could have ensued."

Large police and army forces arrived at the site of the attack, but were unable to capture the vehicle from which the shots had been fired. IDF sources estimate that the shooters fled in the direction of Ramallah.

The Guetta family has been living in the settlement of Givat Ze'ev for seven years. Oz, the son, is a goalkeeper in the first lineup of the junior team of Beitar Jerusalem. "My career is over", shouted Oz immediately after he was hit. Oz found it difficult to remember those seconds in which the attack occurred and only repeated that he wanted to get back to practice. His coach, Pini Garubi, who came to the hospital with Beitar Jerusalem's marketing manager, Michal Ze'evi, quickly calmed him and told him that he would soon be back in the first lineup.

The representatives of the team also promised to Oz that they would bring him a new tracksuit to the hospital, instead of the one that was ripped by the gunfire.

Hadassah Ein Kerem Hospital reported last night that Oz's condition was defined as mild. He was injured in the thigh and elbow and is due to undergo surgery.

**Itzik Saban, Itay Asher and Asaf Chaim took part in preparing this report.**



# EXHIBIT C

1338046.1

1

C O N F I D E N T I A L

1               UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK
2
COURTNEY LINDE, et al.                    :
3
                Plaintiffs,               :
4       vs.                               :   CV 04-2799 (NG)(VVP)

5   ARAB BANK, PLC,                       :

6               Defendant.                :
                                          :
7   PHILIP LITLE, et al.                  :

8               Plaintiffs,               :
        vs.                               :   CV 04-5449 (NG)(VVP)
9
    ARAB BANK, PLC,                       :
10
                Defendant.                :
11                                        :
    ORAN ALMOG, et al.                    :
12
                Plaintiffs,               :
13      vs.                               :   CV 04-5564 (NG)(VVP)

14  ARAB BANK, PLC,                       :

15              Defendant.                :
16  ROBERT L. COULTER, SR., FOR ESTATE    :
    ESTATE OF JANIS RUTH COULTER, et al.  :
17
                Plaintiffs,               :
18      vs.                               :   CV 06-1263 (NG)(VVP)

19  ARAB BANK, PLC,                       :

20              Defendant.                :
                                          :
21

22

23

24

25

2

```
 1    GILA AFRIAT-KURTZER, et al.            :
 2              Plaintiffs,                  :
          vs.                                :   CV 05-388 (NG)(VVP)
 3                                           :
      ARAB BANK, PLC,                        :
 4                                           :
              Defendant.                     :
 5    _____:
      MICHAEL BENNETT, et al.                :
 6                                           :
              Plaintiffs,                    :
 7        vs.                                :   CV 05-3183 (NG)(VVP)
                                             :
 8    ARAB BANK, PLC,                        :
                                             :
 9            Defendant.                     :
10    ARNOLD ROTH, et al.                    :
                                             :
11              Plaintiffs,                  :
          vs.                                :   CV 05-3738 (NG)(VVP)
12                                           :
      ARAB BANK, PLC,                        :
13                                           :
              Defendant.                     :
14    STEWART WEISS AND SUSAN WEISS, et al.  :
15              Plaintiffs,                  :
16        vs.                                :   CV 06-1263 (NG)(VVP)
                                             :
17    ARAB BANK, PLC,                        :
                                             :
18            Defendant.                     :
19    JOSEPH JESNER, et al.                  :
20              Plaintiffs,                  :
          vs.                                :   CV 06-3689 (NG)(VVP)
21                                           :
      ARAB BANK, PLC,                        :
22                                           :
              Defendant.                     :
23    _____:
24
25              DEPOSITION OF VARDA GUETTA
```

```
 1                    Varda Guetta - March 18, 2007
 2          A.  I don't know.  We have some Arab villages
 3      around us, all over Jerusalem you have Arab villages
 4      around you.
 5          Q.  But are they in Israel proper, or are they
 6      in Palestinian territories?
 7              MR. STEINGARD:  Objection to the form.
 8              THE WITNESS:  I have no idea.
 9          Q.  BY MR. ROHBACK:  You have no idea?
10          A.  I have no idea.
11          Q.  With regard to the incident, you saw a car
12      or a van, was it?
13          A.  It was a car.
14          Q.  It was a car.  And it was at night?
15          A.  Yeah.
16          Q.  And you saw it coming toward you?
17          A.  If I was sitting -- standing here on the
18      stop sign, it came here.  It was like even not one
19      meter away.
20          Q.  Okay.
21          A.  They came just from this side and they came
22      here and they stopped here and start shooting at us,
23      from the left side.
24          Q.  From a cross street?
25          A.  Yeah, from the left side.  I came from here
```