# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

REUVEN GILMORE, *et al.*,   )
)
Plaintiffs,   )
v.   )   Civil Action No. 01-cv-853 (GK)
)
PALESTINIAN INTERIM SELF-   )
GOVERNMENT AUTHORITY, *et al.*,   )   <u>Next Event</u>:   No events scheduled.
)
)
Defendants   )

## DEFENDANTS' REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants the Palestinian Authority and Palestine Liberation Organization respectfully submit their reply to the Plaintiffs' opposition to Defendants' motion for summary judgment.

### Introduction

Defendants filed their motion for summary judgment on August 9, 2012. Dkt. No. 285. Plaintiffs' long-awaited opposition suffers from a host of procedural and substantive deficiencies. The following list is illustrative, not exhaustive:

1.    Plaintiffs' 8-page brief (DE 329-5, DE 336-1) provides no citation to their Counter-Statement of Material Facts and cites only two exhibits, despite inundating the Court and Defendants with roughly 100 exhibits totaling over 2500 pages. Having taken over a year to respond to Defendants' motion for summary judgment, Plaintiffs leave for the Court and the Defendants the task of sorting out what portions of the 2500 pages are relevant to Plaintiffs' opposition. Plaintiffs' skeletal argument, with an absence of citation to the record, provides ample basis for the grant of Defendants' motion for summary judgment. *See Bombard v. Fort Wayne Newspapers*, 92 F.3d 560, 562 (7th Cir. 1996) ("It is not our function to scour the

1

record in search of evidence to defeat a motion for summary judgment; we rely on the

nonmoving party to identify with reasonable particularity the evidence upon which he relies.");

*United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("A skeletal 'argument', really

nothing more than an assertion, does not preserve a claim. . . . Judges are not like pigs, hunting

for truffles buried in briefs.").

       2.     Plaintiffs' Counterstatement of Material Facts (DE 335-4) is riddled with

citation problems, including the following:  (a) Plaintiffs make numerous allegations for which

they provide no citation whatsoever (*see id.* Pls.' Additional Material Facts ¶¶ 7, 9, 11, 12, 21,

23, 24, 26, 29, 34, 35); (b) Plaintiffs fail to provide exhibit cites for several sources, even

though they are in fact exhibits (*see, e.g., id.* n. 1, 2, 8-11, 13); (c) in some cases, Plaintiffs cite

the wrong exhibit numbers, missing exhibits, or phantom footnotes, reflecting a failure to

engage in the most basic cite checking (*see, e.g., id.* ¶¶ 20, 27; *id.* n. 19, 21); and (d) most

troubling of all, Plaintiffs mischaracterize the content of exhibits (*see, e.g., id.* ¶¶ 22, 27, 36).

Defendants' response to Plaintiffs' Counterstatement is attached as Exhibit 1.

       3.     A substantial portion of the exhibits on which Plaintiffs rely were produced by

Plaintiffs after the close of discovery.  Many – including Israeli military court files and an

Israeli police report of the shooting at issue in this case – were provided to Defendants for the

first time as exhibits to Plaintiffs' opposition.  These include the following exhibits to the

Tolchin Declaration:  1, 2, 3, 5, 6, 20A, 24, 46, 55, 56, 56A, 57, 58, 59, 62, 64, 65, 65A, 65B.

In his declaration, Plaintiffs' counsel states that copies of the court files and police report were

made at his direction but does not state when he obtained the documents or explain why they

were not produced in response to Defendants' discovery requests or as Federal Rule of Civil

Procedure ("Rule") 26(a) disclosures.  *See* DE 329-1 (Tolchin Decl.) ¶¶ 12, 25.  Additional

1355081.1

exhibits were produced in March or April 2013, long after discovery closed and Defendants had filed their motion for summary judgment. These include the following exhibits to the Tolchin Declaration: 37-45, 47-53. Of the 86 numbered exhibits attached to the Tolchin Declaration, 35 (40%), must be excluded under Federal Rule of Civil Procedure 37(c)(1).[1]

4.    In their most recent motion for extension, Plaintiffs sought an additional lengthy extension (from July 9 to October 1) to file their opposition, in part because "the documents that will accompany the declarations are being put into authenticated and admissible form for summary judgment, as necessary and appropriate." DE 316-1 at 6. According to that filing: "Many of the documents originate overseas, and are being authenticated by plaintiffs using the Hague Convention Abolishing the Requirement of Legalisation for Foreign Public Documents, which involves a two-step, time consuming process requiring both an Israeli notary public and obtaining apostille certificates from the Israeli Justice Ministry." *Id.* Yet, despite having over a year to authenticate documents, Plaintiffs rely on numerous exhibits that have not been authenticated. Notably, of the foreign documents bearing apostille certificates, all of the certificates are dated September 30, 2013, the eve of Plaintiffs' October 1 filing deadline. As to the Israeli Military Court case files, many are not authenticated, despite Mr. Tolchin's representation to the contrary. *See* DE 329-1 (Tolchin Decl.) ¶¶ 12, 15. *See* DE 331-8, 9, 16-20; DE 332-1-4, 6.

5.    Turning to the substance of their arguments, Plaintiffs devote much of their brief and two expert declarations to arguing why custodial statements of Mustafa Misalmani and Bashar Al Khatib, inculpating third party Abu Halawa, should be admitted under Federal

---

[1] That rule provides: "If a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."

1355081 1

Rule of Evidence 804(b)(3). Plaintiffs, however, fail to cite a Supreme Court case directly on point, which treats such statements as inadmissible. *Williamson v. United States*, 512 U.S. 594, 600-01 (1994). Moreover, Plaintiffs fail to address the arguments Defendants made in their opening brief regarding the non-admissiblity of the evidence on which Plaintiffs rely. As set forth in Argument Part I, none of the evidence on which Plaintiffs rely in their opposition would be admissible at trial. *See also* DE 285 (Defs.' Mem.) at 21-24.

6.      In their June 13, 2013 request for an extension, Plaintiffs sought an additional 12 weeks to file their opposition so that their six retained experts could prepare their reports. DE 316-1 at 5. Plaintiffs represented that they had retained the following experts: "Dr. Matthew Levitt, Prof. Jeffrey Addicott, Nicholas Kaufman, Prof. Israel Shrenzel, Col. (Res.) Arieh Spitzen, and Itamar Marcus." *Id.* In their October 1 filing, however, Plaintiffs submitted declarations from only one of the six – lawyer Nicholas Kaufman, who provides an irrelevant opinion that the Ofer Military Court "correctly stated the law," specifically "Article 10B of the Israeli Evidence Ordinance 1971," in the trial of non-party Mustafa Misalmani, a trial unrelated to the Gilmore shooting at issue here. *See* DE 329-3 (Kaufman Decl.) ¶ 27.

7.      Plaintiffs hang their hat on the declaration of former Israel Defense Forces ("IDF") employee, Alon Eviatar, whose identity they did not previously disclose to Defendants. Remarkably, Plaintiffs take the position they can establish a triable issue of material fact by having a former Israel Defense Forces employee review the same four items of inadmissible hearsay on which Plaintiffs seek to rely and conclude: "in my professional opinion, it is very likely, and certainly more likely than not, that Muhanad Abu Halawa carried out the October 30, 2000 murder of Mr. Gilmore." DE 329-2 at 13. For the reasons discussed in Argument Part II, this opinion is inadmissible. Mr. Eviatar is not offering specialized

1355081 1

knowledge that will "assist the trier of act to understand the evidence or to determine a fact or issue." *See* Fed. R. Evid. 702.  Rather, he is being offered as a finder of fact, but one who uses rules of reliability rejected by the U.S. Federal Rules of Evidence.

**Argument**

**I.     Plaintiffs Lack Admissible Evidence that Abu Halawa Shot Gilmore**

Plaintiffs acknowledge that their case depends on establishing that Abu Halawa shot Gilmore.  *See* DE 336-1 at 2-7 (arguing that there is a triable issue of fact that Abu Halawa shot Gilmore and that Defendants are liable for Abu Halawa's actions).  Plaintiffs identify the following "items of evidence identifying Abu Halawa as the murderer," which they claim are admissible:  (1) March 2001 and March 2002 Israeli Ministry of Foreign Affairs webpages reporting information communicated by an IDF spokesman; (2) the account of Avi Issacharoff's interview with Abdel Karim Aweis in the Seventh War; (3) unidentified testimony of Bashar Al Khatib at an Israeli military tribunal proceeding allegedly adopting statements made in 2002 custodial statements; and (4) a 2001 custodial statement of Mustafa Misalmani.  DE 336-1 at 2-5.  None of these items of evidence is admissible; each is unreliable.

**A. The Ministry of Foreign Affairs Webpages Are Not Admissible to Establish That Abu Halawa Shot Gilmore.**

Plaintiffs claim that "March 2001 and March 2002 Israeli government reports identify[] Force 17 and Abu Halawa having executed the murder," and that those reports are "admissible under F.R.E. 803(8)(C)."  DE 336-1 at 2.  In addition to citing a non-existent rule – there is no Rule 803(8)(C) – Plaintiffs provide no citation to the documents they reference.  Plaintiffs appear to be referencing Exhibits 60 and 61 to the Tolchin Declaration.  *See* DE 333-19 (March 2001 Ministry of Foreign Affairs webpage, captioned "Force 17 Background Material"); DE

5

333-20 (March 2002 Ministry of Foreign Affairs webpage).  Both documents are webpages

from the Israel Ministry of Foreign Affairs, which purport to summarize information from an

unidentified "IDF Spokesman."  The March 2001 webpage makes no reference to Abu Halawa.

  Neither webpage is admissible under Federal Rule of Evidence 803(8).  To qualify

under the public records exception to the hearsay rule, the record or statement of a public office

must set out "the office's activities" or "a matter observed while under a legal duty to report."

Fed. R. Evid. 803(8)(A).  The Ministry of Foreign Affairs webpage referencing Abu Halawa

purports to relay information from an unidentified "IDF Spokesman."  *See* DE 333-20 at 2.  At

best, the Ministry of Foreign Affairs webpage is relaying hearsay statements of the IDF.  It

therefore does not come close to meeting the requirements of the public records exception, and

Plaintiffs' one-sentence argument offers no analysis or case law to support the application of

the exception.  *See id.*

  Moreover, Tolchin Declaration Exhibit 61 is not admissible because "the sources of

information or other circumstances indicate lack of trustworthiness."  *See* Fed. R. Evid.

803(8)(B).  The Ministry of Foreign Affairs webpage reflects a public relations effort by the

IDF to justify its extrajudicial killing of 22 year-old Abu Halawa and two other Palestinians.

*See* DE 333-20 at 2.  Such killings were part of a pattern of conduct detailed by the U.S. State

Department in its 2003 Country Reports on Human Rights Practices for Israel and the

Occupied Territories 2003 (dated Feb. 25, 2004) (excerpts attached as Exhibit 2).  Among the

U.S. State Department's findings:

- "IDF soldiers shot and killed suspects who were avoiding arrest, but in a number of cases who posed no apparent mortal threat to the soldiers at the time of the incidents."

- "IDF soldiers fired without warning on unarmed Palestinian trespassers in or near restricted areas, on several occasions killing Palestinians."

1355081 1

- "Israeli security forces put large numbers of Palestinian civilian lives in jeopardy by undertaking targeted killings in crowded areas where civilian casualties were likely."

- "During the year, the IDF targeted for killing at least 44 Palestinians suspected of involvement in terrorism. In the process, IDF forces killed more bystanders than targeted individuals, including children."

- "In practice, however, the IDF targeted some leaders of terrorist organizations considered not to be directly involved in carrying out attacks."

Exhibit 2 at 18. Whether one agrees with the State Department's findings, a webpage posting hearsay from an unidentified "IDF spokesman" fails to meet the standard for admissibility and reliability under Rule 803(8)'s public records exception.

### B. The Seventh War Excerpt Is Not Admissible to Establish that Abu Halawa Shot Gilmore.

Plaintiffs assert that an excerpt from Israeli journalist Avi Issacharoff's book The Seventh War is admissible. The key portion of the excerpt states: "Abu Halawa told [Abdel Karim] Aweis that he wanted to announce to the media that he assumed responsibility for the East Jerusalem attack on behalf of the new military wing of Fatah." DE 333-12 at 3. According to Plaintiffs, this passage from The Seventh War is admissible "because (a) what Abu Halawa told Aweis and what Aweis told Issacharoff are both statements against penal interests (involving murder and being an accessory after the fact to a murder) by unavailable witnesses pursuant to F.R.E. 804(b)(3)." DE 336-1 at 3. As Plaintiffs acknowledge, the account in The Seventh War is based on Issacharoff's interview with Aweis. Id. As set forth below, The Seventh War is not admissible to show what Aweis told Issacharoff, let alone to show what Abu Halawa supposedly told Aweis.

1355081.1

1. *The Seventh War Is Not Admissible as a Recorded Recollection.*

First, The Seventh War is itself hearsay.  Plaintiffs claim it is admissible under Federal

Rule of Evidence 803(5) as a recorded recollection.  *See id.*  The Seventh War, however, is not

a recorded recollection of Abu Halawa's alleged statement to Aweis.  Because Issacharoff has

no personal knowledge of the Abu Halawa-Aweis alleged conversation, the book excerpt is not

"on a matter the witness once knew about." *See* Fed. R. Evid. 803(5)(A).  Moreover, the book

excerpt is not admissible as a recorded recollection to establish what Abu Halawa told Aweis

because Aweis has not confirmed the accuracy of The Seventh War.  As a leading evidence

treatise explains:  "When a witness's statement is recorded by another, both the witness and the

person who transcribed the statement must testify as to the accuracy of the report to establish

that the statement is the witness's past recollection recorded."  5 *Weinstein's Federal Evidence*

§ 803.07[3][c] (2d ed. 2013).  *See also id.* at § 803.07[3][d] (the accuracy of the statement

"must be vouched for by each participant in the chain").  Here, in his deposition, Aweis

testified that he did not discuss the Gilmore shooting with Abu Halawa.  DE 285-7 at 4.

Issacharoff also testified that he did not confirm the accuracy of The Seventh War excerpt with

Aweis, although he has done that sort of accuracy check on other occasions with other sources.

DE 330-9 at 120.

In addition, the book excerpt is not a recorded recollection of Issacharoff's interview

with Aweis.  First, the book does not quote Aweis.  *See* DE 333-12 at 3.  The situation

presented here is thus readily distinguishable from the case on which Plaintiffs rely, *Mandal v.*

*City of New York*, 2006 WL 3405005, at *4 (S.D.N.Y. 2006), where the newspaper articles

provided direct quotes and the declarants did not deny making the statements attributed to

them.  Second, Issacharoff testified that he took contemporaneous notes of his interview.  DE

8

330-9 at 74. Although those notes may or may not have constituted a recorded recollection, Issacharoff no longer has them. *Id.* at 75. He later "commit[ted]" the information in those notes to his computer, but he does not recall when, and "[i]t took a while." *Id.* Moreover, at his deposition, Issacharoff did not testify to the content of the notes. And Plaintiffs cite no deposition testimony to support their claim that Issacharoff "testified at his deposition in this case that he wrote his book on the basis of his contemporaneous notes from his interview with Aweis." *See* DE 336-1 at 3. The most Issacharoff acknowledged at his deposition was that "the scope of the interview," not Aweis's statement, was fresh in his mind when he "entered the information" into his computer. DE 330-9 at 75. The actual published book that Plaintiffs seek to introduce as a recorded recollection was many steps removed from the notes Issacharoff took during the interview. *See id.* at 109-10 (Issacharoff acknowledging that there were earlier drafts of the book, but that he no longer has those either). In sum, The Seventh War does not qualify as a recorded recollection of either Abu Halawa's statement to Aweis or Aweis's statement to Issacharoff.

> 2. *Aweis's Alleged Statement to Issacharoff Is Not a Statement Against Penal Interest.*

Second, Abdel Karim Aweis's alleged statement to Issacharoff is itself hearsay, even if Plaintiffs could prove its content. Plaintiffs claim that it is admissible under Federal Rule of Evidence 804(b)(3). That hearsay exception applies only if the declarant is unavailable. Abdel Karim Aweis provided deposition testimony in this case and so does not meet the unavailability requirement. *See* DE 330-7. Plaintiffs respond that Aweis is unavailable because he testified he "could not recall his conversations." DE 331-1 at 3. That is incorrect; Aweis testified that he recalled having a conversation with Issacharoff about the Intifada in Jenin, and that he could not recall discussing Abu Halawa with Issacharoff. DE 285-7 at 3. As

9

to the conversation Plaintiffs want to admit into evidence – the alleged Abu Halawa statement to Aweis – Aweis did not testify to any lack of memory. To the contrary, he testified that he did not discuss the Gilmore shooting with Abu Halawa and did not even meet Abu Halawa until December 2001, over a year after the shooting. *Id.* at 4.

Plaintiffs' assertion that Aweis's alleged statements to Issacharoff was a statement against penal interest is even more far-fetched. Aweis's alleged statement inculpated Abu Halawa, not Aweis. It is well-established that statements inculpating a third party (Abu Halawa), as opposed to self-inculpating statements, are not treated as statements against interest under Federal Rule of Evidence 804(b)(3)'s hearsay exception. *Williamson v. United States*, 512 U.S. 594, 600-01 (1994). Moreover, under Rule 804(b)(3) a statement against penal interest is a statement "a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it . . . had so great a tendency . . . to expose the declarant to . . . criminal liability." Issacharoff interviewed Aweis while Aweis was in prison, serving multiple life sentences. DE 335-4, at 11; DE 329-2 at 21, ¶ 61. Plaintiffs' position that Aweis faced additional criminal liability as "an accessory after the fact to a murder," DE 336-1 at 3, for disclosing an alleged conversation with Abu Halawa about whether Abu Halawa should use the name "[t]he Fatah Militias or the Al Aqsa Martyrs Brigade," *see* DE 333-12 at 3, is untenable. Because Aweis is not unavailable and because his statement to Issacharoff did not expose him to criminal liability, his statement is not admissible under Rule 804(b)(3).

### 3. *Aweis's Statement to Issacharoff Is Not a Party Admission.*

Plaintiffs also claim that Aweis's statement to Issacharoff is admissible under Federal Rule of Evidence 801(d)(2)(D), which treats as non-hearsay a statement " made by the party's

1355081 1

agent or employee on a matter within the scope of that relationship and while it existed." As noted, there is no Aweis statement; The Seventh War does not quote Aweis. Moreover, Aweis was in prison serving six life sentences when he was interviewed by Issacharoff, so was not speaking to Issacharoff as an agent for the Palestinian Authority or as part of any job responsibilities for the PA. DE 330-7 at 39-40.

In addition, Plaintiffs lack any foundation for their claim that Aweis spoke with Abu Halawa within the scope of the former's employment relationship with the PA, even if one assumes Aweis spoke to Abu Halawa despite Aweis's denial and despite the Plaintiffs' inability to prove the conversation took place. The Seventh War excerpt describes Aweis as a leader of a Fatah cell that had been carrying out shooting attacks. DE 333-12 at 3. Abu Halawa's alleged conversation with Aweis – a conversation Aweis in sworn testimony denied having – about whether to claim responsibility for the shooting in the name of the "Fatah Militias" or the Al Aqsa Martyrs Brigades more logically related to Aweis's alleged role with Fatah, not his employment relationship with the PA.

Plaintiffs' claim that it was Aweis's job "to learn and obtain information about terrorist activity, such as the murder of Mr. Gilmore," DE 336-1 at 4, is made up out of whole cloth. The Declaration of Majed Faraj, which Plaintiffs cite, describes the general function of the General Intelligence Service, not Aweis's job function. See DE 336-1 at 4 (citing DE 336-2 at ¶¶ 4-6). At his deposition, Aweis testified only that, as a member of the PA's General Intelligence Service he "was in charge of the Jenin camp and six or seven villages round the camp area, near the camp." DE 330-7 at 35. Plaintiffs did not ask any follow-up questions to lay the foundation for admitting Aweis's statement to Issacharoff as being on a matter within the scope of Aweis's employment relationship with the PA.

1355081.1

Finally, Plaintiffs seek to use Aweis's alleged statement as proof that Abu Halawa was responsible for the Gilmore shooting. Aweis's statement is not admissible under Rule 801(d)(2)(D) for that purpose. To the extent the agent/employee's statement is merely recounting the statement of a third party, it is not admissible for the truth of what the third party said, absent some showing the agent/employee adopted the third party's version of the facts. *See, e.g., Rock v Huffco Gas & Oil Co.*, 922 F.2d 272, 281 (5th Cir. 1991) ("It is obvious from the depositions of [employees] Christian and Gardner that they were simply documenting Rock's account of the alleged accidents. Nothing in the accident reports, themselves, indicates that the defendants adopted the version of the facts as reported by Rock."). The statement of the third party "represents an additional level of hearsay that would require its own basis for admission." *Weinstein's Federal Evidence* § 801.33[3].

Here, Abu Halawa is not even alleged to have claimed that he carried out the shooting, only that he wanted to take responsibility in the media. And, The Seventh War does not attribute to Aweis the statement that Abu Halawa carried out the shooting. Aweis in sworn testimony denied any knowledge of the shooting. DE 285-7 at 4. Therefore, even if The Seventh War were admissible and even if Plaintiffs had laid the foundation for treating Aweis's statement as by a PA employee on a matter within the scope of employment, it nonetheless would not be admissible under Rule 801(d)(2)(d).

In sum, The Seventh War is not admissible to show that Abu Halawa shot Gilmore or even to show that Abu Halawa allegedly told Aweis that he wanted to announce to the media that he assumed responsibility for the Gilmore shooting. Plaintiffs are traveling on triple hearsay and their reliance on Rules 803(5), 804(b)(3) and 801(d)(2) lacks any principled legal basis. Even if Plaintiffs could get past the fact that the statement they want to rely on (Abu

1355081.1

Halawa's to Aweis) is embedded in two layers of inadmissible hearsay (<u>The Seventh War</u>, and Aweis's statement to Issacharoff), they still have the problem that Abu Halawa's statement to Aweis is hearsay.

Plaintiffs claim that Abu Halawa's statement is against his penal interest and therefore admissible under Rule 804(b)(3). But <u>The Seventh War</u> does not have Abu Halawa confessing to murdering Abu Halawa; instead, it provides an account of Abu Halawa telling Aweis he "wanted to announce to the media that he assumed responsibility." DE 333-12 at 3. Such a statement, even assuming Plaintiffs could establish it was made, would not be admissible under Rule 804(b)(3). Public claims of responsibility for terrorist attacks are not admissible to show responsibility because such claims are inherently unreliable. *See Gill v. Arab Bank*, 893 F. Supp. 2d 542, 570 (E.D.N.Y. 2012).[2] In *Gill*, the court held that a claim of responsibility by Hamas for an alleged terrorist shooting was not admissible to establish Hamas responsibility for the shooting. The court cited "the need for 'favorable' publicity by many terrorist groups and concluded that "[t]his distorted view of these killer-groups overrides the benign motives that the Federal Rules of Evidence relies on as an indicator of reliability." *Id.*

Plaintiffs' Abu Halawa → Aweis→ Issacharoff → notes → draft(s) → <u>The Seventh War</u> theory of admissibility for the alleged Abu Halawa claim of responsibility fails on many levels. Plaintiffs cannot prove the content of either the Abu Halawa or Aweis statement, <u>The Seventh War</u> cannot fill that gap, and, even if Plaintiffs could prove the content of the statements, the statements are inadmissible hearsay.

---

[2] Defendants do not concede that the Gilmore shooting was a terrorist attack.

13

**C.** **Bashar Al Khatib's 2009 Testimony at Damara's Trial Is Not Admissible to Establish that Abu Halawa Shot Gilmore.**

Plaintiffs' argument for admission of the Bashar Al Khatib testimony at Mahmoud Damara's Israeli military court trial is a mélange of inaccuracy and incomprehensibility. To be clear, Plaintiffs do not argue that Bashar Al Khatib's 2002 custodial statements implicating Abu Halawa are admissible or create a triable issue of fact. They do not do so for good reason, as the Rule 804 hearsay exceptions do not apply, including 804(b)(3), because Al Khatib testified in this case and is not "unavailable." Instead, Plaintiffs argue: "Bashar Khatib's testimony under penalty of perjury at the trial of Mahmoud Damara admitting that his statements and handwritten accounts to the Israeli police implicating Abu Halawa in the murder were true . . . is admissible under Rule 801(d)(1)(A), because Khatib repudiated that sworn trial testimony in his deposition in his case." DE 336-1 at 4. In short, they seek to gain admission of the unsworn, inadmissible states by claiming that what happened at Damara's trial made them admissible.

As an initial matter, Plaintiffs' argument must be rejected because Plaintiffs fail to provide any citation to the alleged testimony at the Damara trial, or to the deposition testimony in this case that was supposedly inconsistent. *See* DE 336-1 at 4. Plaintiffs thus seek to rely on a supposedly prior inconsistent statement without identifying the statement. In fact, Bashar Al Khatib did not testify at Damara's trial that Abu Halawa was involved in shooting Gilmore, and instead continued to repudiate his custodial statements as they related to the Gilmore shooting. *See* DE 331-18 at 16-17. In addition, the Hebrew transcript from the Damara trial is inadmissible hearsay and does not even contain statements of Bashar Al Khatib. Bashar Al Khatib testified in Arabic and the statements in the Hebrew transcript are those of an IDF soldier serving as an interpreter. *See id.* at 2.

1355081 1

More fundamentally, Bashar Al Khatib's supposed testimony at Damara's trial cannot come in under Federal Rule of Evidence 801(d)(1)(A) as a prior inconsistent statement. The "essential requirements" of Rule 801(d)(1)(A) are that "(1) the declarant testifies at the trial; (2) the declarant is subject to cross-examination concerning the statement; (3) the statement is inconsistent with his present testimony; and, (4) the statement was given under oath." *United States v. Emor*, 2012 U.S. Dist. LEXIS 17697, at *3 (D.D.C. Feb. 13, 2012) (internal citation and quotation omitted). Here, Plaintiffs fail to meet the second essential requirement. Plaintiffs did not cross-examine Al Khatib at his deposition about his allegedly inconsistent statements at the Damara trial. *See* DE 285 (Defs.' Mem.) at 15; *see also* DE 330-5, 30. Plaintiffs' counsel asked Bashar Al Khatib only whether, at the Damara trial he was "asked about these written statements you made." DE 330-5 at 30. Plaintiffs' counsel did not confront Al Khatib with any inconsistent statements from the Damara trial. *See* DE 330-5 at 5 (exhibit list); *id.* at 29-31 (questioning regarding Damara trial). Plaintiffs' claim that "Khatib repudiated that sworn trial testimony in his deposition in his case," is not supported by any citation to Al Khatib's deposition testimony. Nowhere in his deposition does Al Khatib repudiate his sworn trial testimony. *See* DE 330-5. In addition, under Rule 613(b), "[e]xtrinsic evidence of a witness's prior inconsistent statement is admissible only if the witness is given an opportunity to explain or deny the statement." That did not happen here.

Finally, as is evident from Plaintiffs' expert reports, the Bashar Al Khatib statements on which Plaintiffs intend to rely are custodial statements he made in 2002 implicating Abu Halawa. Those statements, however, are inadmissible under Rule 801(d)(1)(A) because they fail to meet the Rule's fourth requirement – they are unsworn. Moreover, they are inadmissible under Rule 804(b)(3) because Al Khatib testified in this case and therefore is not unavailable,

1355081 1

and because the Supreme Court has held that custodial statements that inculpate third parties are not admissible under Rule 804(b)(3). *Williamson v. United States*, 512 U.S. 594, 600-01 (1994) (holding, for reasons independent of the Confrontation Clause, that "Rule 804(b)(3) . . . does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory"); *see also* Fed. R. Evid. 804 advisory committee's note to Exception (3) ("Thus a statement admitting guilt and implicating another person, made while in custody, may well be motivated by a desire to curry favor with the authorities and hence fail to qualify as against interest.").

### D.  The Custodial Statement of Mustafa Misalmani Is Not Admissible.

The last item of evidence on which Plaintiffs rely is the January 18, 2001 unsworn custodial statement of Mustafa Misalmani.  Plaintiffs argue the custodial statement is admissible under Federal Rule of Evidence 804(b)(3) as a statement against penal interest by an unavailable witness.  DE 336-1 at 5.   But Misalmani is not unavailable for purposes of Rule 804; Plaintiffs took his deposition in this case in December 2001, and he denied any knowledge of Abu Halawa's involvement in the Gilmore shooting.  *See* DE 285 at 7-10. Attempting to circumvent Rule 804's unavailability requirement, Plaintiffs argue that Misalmani became unavailable to be deposed *a second time* – to ask him about a 2003 Judea Military Court proceeding.  DE 336-1 at 5.  According to Plaintiffs, at the 2003 proceeding, Misalmani allegedly consented to the admission into evidence of the custodial statement, which, under operation of the military law Israel applies to Palestinian detainees, "constituted an endorsement by Maslamani of all the facts contained in the statement."  DE 336-1 at 5. There are many flaws with Plaintiffs' analysis.

1355081.1

First, Plaintiffs again fail to provide any citation to Misalmani's military tribunal proceeding, where this supposed endorsement of the Gilmore facts contained in the January 2001 custodial statement occurred. *See id.* at 5-6. They fail even to identify the relevant exhibit. Second, only a portion of the January 18, 2001 alleged custodial statement was deemed admitted by consent at the Israeli proceeding. The Israeli military tribunal quoted in its entirety the portion of the Misalmani custodial statement deemed admitted by consent, and it did not include the portion relating to the shooting of Gilmore at the National Insurance Institute. *See* Exh. DE 331-7 at 5 (identifying the January 18, 2001 statement by Misalmani as exhibit "Prosecution 11"); *id.* at 28-31 ("cit[ing] the statements of the Defendant in Prosecution 11 in their entirety"). Rather, it relates to the shooting of Talia and Binyamin Kahane, for which Misalmani was convicted. *See id.* at. 2, 28-31.

Third, Misalmani did not adopt the custodial statement as a matter of U.S. evidentiary law. The admission of Misalmani's January 18, 2001 custodial statement into evidence in his military tribunal proceeding was deemed "consensual" only by technical operation of Israeli military tribunal procedures. *See id.* at 8-9.[3] Far from adopting the facts in the custodial statement, Misalmani's defense counsel "disputed the opinion of the Prosecution, which asked to give full weight to the statements of the Defendant and the witnesses that were consensually filed," *id.* at 6, and she asked the court to "examine [Misalmani's] statements with a critical eye, to the point of denying their evidentiary weight." *Id.* at 8-9. The Declaration of Israeli lawyer Nick Kaufman opining that the Israeli military tribunal correctly applied "Article 10B

---

[3] In order to contest the admission of the January 18, 2001 statement, Misalmani's counsel had to submit an "account to the contrary." DE 331-7 at 9. But Misalmani contested the military tribunal's right to try him and refused to participate in the proceeding. *See id.* at 4 ("Defendant denied the jurisdiction of the Court."); *id.* at 6 ("Defendant believed, and still believes, that the Court has no jurisdiction to judge him."); *id.* (indicating that Misalmani refused to testify).

17

of the Israeli Evidence Ordinance 1971," DE 329-3 at 13, when it admitted Misalmani's statement into evidence, is irrelevant to whether the custodial statement is admissible under U.S. Federal Rule of Evidence 804(b)(3). Here, in this litigation, Misalmani provided sworn testimony, disavowing his custodial statement. DE 285-8 at 3:10-13.

Similarly irrelevant is Alon Eviatar's bizarre statement that he "tend[s] to believe that the statement provided by Maslamani to the Israeli police was accurate" because the nature of Israeli police interrogations is "more personal, private and calm and less tense" than depositions. DE 329-2 at 20. U.S. law treats sworn testimony as more reliable that unsworn custodial statements. Plaintiffs' expert cannot rewrite that law with his claim that Israeli interrogations of alleged Palestinian terrorism suspects are soothing to the suspects.

Fourth, as previously noted, custodial statements inculpating others are not admissible under Rule 804(b)(3). *See Williamson*, 512 U.S. at 600-01. Plaintiffs improperly seek to introduce into evidence Misalmani's custodial statement inculpating Abu Halawa, without even acknowledging *Williamson*. In sum, Misalmani's custodial statement meets neither the unavailability requirement nor the statement against interest requirement (to the extent it inculpates third party Abu Halawa) of Rule 804(b)(3). The 2003 Israeli military tribunal proceeding and associated declarations of Kaufman and Eviatar do not alter that analysis.

None of the four items of hearsay evidence on which Plaintiffs rely comes close to meeting the standards of admissibility established in the Federal Rules of Evidence. Because Plaintiffs have no reliable, admissible evidence that Abu Halawa shot Gilmore, Defendants are entitled to summary judgment. As discussed in the next Section, Plaintiffs cannot avoid this result by having a former Israel Defense Forces employee serve as fact finder, reviewing the

1355081.1

same four items of evidence, but this time applying a much lower standard of evidence reliability used by the IDF and Israel Defense Ministry.

## II.  Eviatar's Opinion Is Not Admissible to Establish Who Shot Gilmore.

As their last gambit, Plaintiffs claim they "have admissible evidence, in the form of the expert testimony presented in the attached Declaration of Alon Eviatar, that Muhanad Abu Halawa . . . murdered Mr. Gilmore." *See* DE 336-1 at 2.  Eviatar is a former Israeli Defense Forces employee who offers his "professional opinion" that it is "very likely, and certainly more likely than not, that Muhanad Abu Halawa carried out the October 30, 2000 murder of Mr. Gilmore." DE 329-2 at 13.  Eviatar reaches this conclusion based on "four different sources and type of information," which he claims are "reliable for different reasons." *Id.* These four different sources and types of information, will be familiar from Part I:  (1) the Ministry of Foreign Affairs webpages relaying information communicated by the unidentified IDF spokesman; (2) the "fact-checking" conducted by Seventh War author Issacharoff; (3) the custodial statements of Al Khatib and Misalmani; and (4) and Issacharoff's account of Aweis's supposed conversation with Abu Halawa.  *Id.* at 13-21.  According to Eviatar, these four items are the "types of evidence, sources and data that would be considered and relied upon by Palestinian affairs specialists in the IDF and Defense Ministry." *Id.* at 21.

Eviatar's opinion that Abu Halawa shot Gilmore is not admissible.  Eviatar is not applying any particular methodology or specialized expertise to his review of the Plaintiffs' inadmissible hearsay.  Rather, he is reviewing and weighing evidence -- as would a trier of fact -- and applying a different *standard of reliability* -- one that IDF and Defense Ministry personnel use when investigating and prosecuting Palestinians as part of their continuing Occupation of the West Bank.

1355081 1

In *Daubert*, the Supreme Court held that the trial judge must perform a "gatekeeping" function to ensure that the expert testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 597 (1993). Because the purpose of summary judgment is to weed out cases in which there is no genuine issue of material fact, it is "proper for district courts to screen out inadmissible expert testimony on summary judgment." *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 437 (E.D.N.Y. 2013). "This is true even if the exclusion of expert testimony would be outcome determinative." *Id.* (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142-43 (1997)).

Here, Eviatar's opinion is not admissible and does not create a triable issue of fact that Abu Halawa shot Gilmore.

### A. Eviatar's Opinion Is Not Admissible Because He Is Not Applying Specialized Knowledge That Assists the Trier of Fact.

Under Federal Rule of Evidence 702(a), an expert witness may testify only if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Here, Eviatar is not offering specialized knowledge. Eviatar merely considers and weighs evidence, through his IDF lens of reliability. "It has long been the law in this Circuit that 'where the jury is just as competent to consider and weigh the evidence as is an expert witness and just as well qualified to draw the necessary conclusions therefrom, it is improper to use opinion evidence for the purpose.'" *Evans v. Wash. Metro. Area Transit Auth.*, 674 F. Supp. 2d 175, 179-80 (D.D.C. 2009) (quoting *Henkel v. Varner*, 138 F.2d 934, 935 (D.C. Cir. 1943)); *see also United States v. Boney*, 977 F.2d 624, 628 (D.C. Cir. 1992) ("[Expert] testimony should ordinarily not extend to matters within the knowledge of laymen").

1355081 1

Where a party attempts to use an investigator's expert opinion, as Plaintiffs do here, courts are especially vigilant because of the risk of prejudice. In *United States v. Meija*, 545 F.3d 179 (2d Cir. 2008), the Second Circuit vacated the judgment after finding that the admission of expert witness testimony from an investigator with the New York State Police violated Rule 702. The investigator testified about "material well within the grasp of the average juror" such as the number of murders committed by a particular gang. *Id.* at 194. The court observed that expert testimony is not helpful in establishing facts, which must be "proven by competent evidence." *Id.* at 195. "[T]o substitute expert testimony for factual evidence of murder" was unacceptable and constituted a "shortcut around" the government's evidentiary obligation. *Id.* at 195-96. This Court also has expressed caution about "the potential risks of having a law enforcement officer testify as an expert witness, in particular with respect to the risk of testimony straying from the scope of his expertise." *United States v. Eiland*, 2006 U.S. Dist. LEXIS 72019, at *19 (D.D.C. Oct. 2, 2006).

Plaintiffs rely on *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 443-450 (E.D.N.Y. 2013), to support their position that "expert testimony may be used in ATA actions to establish the identity of those responsible for the terrorist attacks at issue." DE 336-1 at 2. Plaintiffs mischaracterize the holding of *Strauss*, which in fact supports the exclusion of Eviatar's opinion. In that case, the court allowed expert testimony regarding the connections among 13 charities and Hamas, where the experts "describe[d] in detail, among other things, the origins of the 13 charities and their personnel overlap with Hamas, all of which is evidence a jury can rely on to find they are Hamas front groups." *Id.* at 438. As the *Strauss* court explained, courts in the Second Circuit have "admitted testimony from experts based upon hearsay analyzing the 'origin, leadership, and operational structure' or terrorist organizations,

21

1355081.1

analogizing such testimony to 'the type of expert testimony regularly permitted by the . . . Circuit in cases involving organized crime families.'" *Id.* at 438-39 (quoting *United States v. Paracha*, 2006 U.S. Dist. Lexis 1 (S.D.N.Y. Jan. 3, 2006)). In finding the expert opinions on admissible in *Strauss*, the court emphasized that the "reports do not only regurgitate the hearsay, but bring to bear their terrorist expertise." *Id.* at 439.

Notably the *Strauss* court excluded significant portions of expert testimony offered by other experts to show Hamas responsibility for the terrorist attacks at issue. With respect to expert Ronni Shaked, the court excluded his proposed testimony because it appeared to "summarize factual, non-technical materials," such as webpages announcing claims of responsibility. *Id.* at 444. According to the court, "attribution testimony cannot be used as an excuse to introduce and summarize straightforward factual evidence that has not been admitted, such as a webpage that says 'Hamas carried out a suicide bombing.'" *Id.* at 445. While an expert "can put factual evidence in context," he or she "cannot be used to establish basic facts in the first place." *Id.* Similarly, the court excluded the portion of another report, which was "nothing more than a recitation of secondary evidence, not all of which is admissible, that Hamas perpetrated the fifteen attacks." *Id.* at 446 (internal citation omitted). This is exactly what Eviatar has done, though in his case, all of the evidence is inadmissible. The use of Eviatar would usurp not only the jury's function but also the Court's gatekeeping function, under which the Court must ensure that evidence that reaches the jury is based on a reliable foundation. *Daubert*, 509 U.S. at 597.

Here, Eviatar does not apply specialized expertise to help the trier of fact understand the organization, leadership, and operation structure of an alleged terrorist organization so that it has the necessary context to evaluate the facts. Instead, he is reviewing a handful of

22

1355081.1

unreliable and inadmissible hearsay documents supplied by Plaintiffs' counsel, regurgitating

their content, and concluding -- without applying any expertise – that it is "more likely than

not" that Abu Halawa was the shooter. *See, e.g.,* DE 329-2 at 13-21. Eviatar's cursory

summation of a handful of documents and reiteration of facts that are understandable to a

layperson is an impermissible use of expert testimony. *See Meija*, 545 F.3d at 196 (testimony

that "simply summarized the results" of an investigation "fell far beyond the proper bounds of

expert testimony"). *See also Estate of Parsons v. Palestinian Auth.*, 715 F. Supp.2d 27, 33

(D.D.C. 2010) ("Expert opinions may be based on hearsay, but they may not be a conduit for

the introduction of factual assertions that are not based on personal knowledge") (*aff'd in part

and rev'd in part on other grounds*, 651 F.3d 118 (D.C. Cir. 2011)).

### B.  Eviatar Cannot Opine on the Reliability of Plaintiffs' Inadmissible Hearsay Evidence.

Although Eviatar's principal role is to serve as a conduit for unreliable and inadmissible

hearsay, at time he offers opinions on the credibility of witnesses or on which witness

statement he finds more credible.  This also is an impermissible use of expert testimony.  An

expert "may not usurp the jury's function to weigh evidence and make credibility

determinations." *United States v. Farrell*, 563 F.3d 364, 377 (8th Cir. 2009).  *See also Sykes v.

Napolitano*, 634 F. Supp.2d 1, 7 (D.D.C. 2009) ("[witness] credibility will be evaluated by the

jury – and not an 'expert' who has no basis to offer such an opinion"); *Bassi v. Patten*, 592 F.

Supp.2d 77, 84 (D.D.C. 2009) ("[A]s a general matter, an expert may not offer opinion

testimony about the credibility of parties or witnesses"); *Halcomb v. Wash. Metro. Area

Transit Auth.*, 526 F. Supp.2d 24, 29 (D.D.C. 2007) ("Rule 702 precludes [the expert witness]

from offering opinion testimony about the credibility of parties or witnesses"); *Nimely v. City

of New York*, 414 F.3d 381, 398 (2d Cir. 2005) ("[T]his court, echoed by our sister circuits, has

1355081 1

consistently held that expert opinions that constitute evaluations of witness credibility, even when such evaluations are rooted in scientific or technical expertise, are inadmissible under Rule 702"). Accordingly, the court in *Farrell* held that the expert witness's references to the government's evidence as "incredible" and "strong" was impermissible. 563 F.3d at 377. Likewise, the court in *Nimely* found improper the expert witness's testimony that certain witnesses were telling the truth. 414 F.3d at 398. The court explained that "[s]uch testimony does not assist the trier of fact, but rather undertakes to tell the jury what result to reach and attempts to substitute the expert's judgment for the jury's." *Id.* (citations and quotations omitted). Similarly, in *Halcomb*, the court prohibited any expert testimony "concerning the credibility, trustworthiness, law-abidingness, character, or state of mind of any party or witness." 526 F. Supp. 2d at 29.

Mr. Eviatar's proffered opinions on Issacharoff, Al Khatib and Misalmani's statements and deposition testimony are likewise inadmissible. They simply urge the trier of fact to believe certain witnesses and to credit some witness statements over others. Eviatar states that Issacharoff is "knowledgeable, thorough, unbiased and honest," and that Eviatar has "no reason to doubt his sworn testimony[.]" DE 329-2 at 16. He continues to assure the Court that he "presume[s] that the interview and information [in Issacharoff's book] are correct." *Id.* at 21. With respect to Al Khatib, Eviatar opines that, during Al Khatib's deposition (at which he was not present), Al Khatib "does not seem to have been a neutral or spontaneous witness" and his "testimony was not continuous and complete." *Id.* at 18. Eviatar thus concludes: "I estimate based on the statements in which al-Khatib implicated Abu Halawa in the NII attack, which are more well founded than his single denial of Abu Halawa's involvement in that attack at his deposition, that al-Khatib's statements implicating Abu Halawa are the more reliable

1355081 1

statements." *Id.* at 19.   Eviatar provides the same credibility assessment to Misalmani, stating, "I tend to believe that the statement provided by Maslamani to the Israeli police was accurate because the circumstances and conditions of the police interrogation were more comfortable for him and, therefore, more likely to lead to the truth." *Id.* at 20.  Eviatar concludes, "[t]herefore, it is my opinion that Maslamani's statement to the police that Abu Halawa is the killer is the correct one." *Id.*   Plainly, none of these opinions would be admissible at trial, and the court should not consider them now.

With respect to Plaintiffs' claim that Defendants are vicariously liable for Abu Halawa's alleged actions, *see* DE 336-1 at 5-7, Plaintiffs rely principally on Eviatar's declaration, which in turn relies on the same sort of unreliable, inadmissible hearsay and lack of methodology as his opinion that Abu Halawa shot Gilmore.  The Court need not decide the vicarious liability issue, however, because there is no triable issue of fact that Abu Halawa shot Gilmore.

### Conclusion

Plaintiffs lack any admissible evidence to support an essential element of their Anti-Terrorism Act and supplemental non-federal law claims against the PA and PLO: namely, their contention that Abu Halawa shot Gilmore.  The handful of documents on which they rely are unreliable and inadmissible hearsay, and Eviatar's opinion (based on those same documents) that Abu Halawa shot Gilmore does not make Plaintiffs' case triable.  Plaintiffs cannot take their case to trial with one witness – who merely tells the jury what to decide.

1355081.1

Dated:  October 25, 2013                    Respectfully submitted,


                                            /s/ Mark J. Rochon
                                            Mark J. Rochon (D.C. Bar No. 376042)
                                            Laura G. Ferguson (D.C. Bar No. 433648)
                                            Brian A. Hill (D.C. Bar No. 456086)
                                            Miller & Chevalier Chartered
                                            655 Fifteenth Street, N.W., Suite 900
                                            Washington, DC  20005-5701
                                            Tel. (202) 626-5800
                                            Fax. (202) 626-5801
                                            Email:  mrochon@milchev.com

                                            *Attorneys for the Palestinian Authority and PLO*

1355081.1

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 25th day of October 2013, a true and genuine copy of the foregoing was filed by ECF, which will automatically send notification and a copy of such filing to the following:

Richard D. Heideman
Noel J. Nudelman
Tracey Reichman Kalik
Heideman Nudelman & Kalik, PC
1146 19th Street, NW
5th Floor
Washington, D.C. 20036
Rdheideman@heidemanlaw.com

Robert J. Tolchin, Esq.
The Berkman Law Office, LLC
111 Livingston Street – Suite 1928
Brooklyn, NY 11201
(718) 855-3627
(718) 855-4696
rjt@tolchinlaw.com

*Attorneys for Plaintiffs*

/s/ Mark J. Rochon
Mark J. Rochon

1355081.1