# David I. Schoen

Attorney at Law

Admitted in | 2800 Zelda Road
Alabama | Suite 100-6
Maryland | Montgomery, AL 36106
New York |
District of Columbia | Telephone
| 334.395.6611

Facsimile
917.591.7586

Email
david@schoenlawfirm.com

November 30, 2012

The Honorable George B. Daniels
United States District Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007-1312    *    Via FedEx: 876893093390    *

Re:    Sokolow v. PLO (04-0397) (GBD) (RLE), Subpoena to BBC

Dear Judge Daniels:

I write pursuant to your Honor's direction at the November 19, 2012 hearing on Objections to Magistrate Judge Ellis's September 6, 2012 Order filed by the British Broadcasting Corporation ("BBC"). (DE 255) As Your Honor is aware the underlying matter concerns Plaintiffs' subpoena to the BBC for, *inter alia*, production of the "Arafat Investigated" documentary and the outtakes for two of the interviewees - Ata Abu Rumaileh, then leader of Fatah in the West Bank city of Jenin, and Zakaria Zubaidi, then an Al-Aqsa terrorist leader in Jenin.

While we do not yet have the transcript from the November 19, 2012 hearing, counsel for BBC and I understand Your Honor to have directed the following two things as a follow-up to the hearing:

First, I was to send Your Honor a letter addressing our request for Your Honor to review the outtakes *in camera*. Counsel for BBC is to file a response to that by December 14, 2012. Secondly, I was to contact counsel for BBC to present him with what we would like in an affidavit which would accompany the production of the documentary, in trying to reach a compromise with respect to the affidavit ordered by Judge Ellis at pages 6 and 7 of DE 255. Your Honor directed me to write a letter to the Court if we were unable to agree, so that Your Honor could evaluate the matter.

With respect to the second matter, I have had an opportunity to present counsel for BBC with an outline of what we would like such an affidavit or declaration to say and we have since had a chance to talk at some length on the phone about the matter. Accordingly, I am prepared to address that issue in this letter also, with the hope that this is the most efficient way of proceeding. The long and short of it on this second issue is that, although our exchange of emails and our phone conversation were most pleasant, certainly in good faith, and we talked out all of the issues, I must report, with Mr. Korzenik's authorization, that BBC "cannot at this time agree to providing any affidavit" on this subject, although Mr. Korzenik is "willing to revisit the issue" at some point.

1

I will first address Plaintiffs' position as to why the outtakes should be produced for an *in camera* review by Your Honor. To be clear on this issue, Plaintiffs maintain their position that the outtakes should be produced directly to us by BBC per Judge Ellis's Order; but we raised as an alternative suggestion, without in any way waiving our position, the idea of an *in camera* review, as we believe the Second Circuit has directed should occur in the event a Court is considering not having outtakes produced directly in a situation like this. This part of the letter is addressed solely to the question of an *in camera* review; for that is what I understood Your Honor's directive to provide. I will not, therefore, address any of the other issues raised in this matter and will stand on our arguments on those issues as made before Judge Ellis and in the papers and orally in response to BBC's Objections to DE 255.

In the second part of the letter, I will set out what it is we asked BBC to provide in an affidavit, consistent with Judge Ellis's Order that BBC provide an affidavit for authenticity and business records purposes. (DE 255 at 6 & 7).

## Introduction and Background

This is a civil action pursuant to the Antiterrorism Act ("**ATA**"), 18 U.S.C. § 2333, and pendent causes of action, brought by U.S. citizens, and the guardians, family members and personal representatives of the estates of U.S. citizens, who were killed and injured in seven terrorist attacks in or near Jerusalem, Israel, between January 8, 2001 and January 29, 2004. As explained in Plaintiffs' filings on this issue and in Court at the hearing, Plaintiffs seek the discovery from the BBC to prove a critical element of their material support claims against Defendants, the Palestinian Authority and the Palestine Liberation Organization under the ATA. Namely that Al-Aqsa and Fatah are one and the same such that by funding Fatah, Defendants also funded Al-Aqsa, the entity that actually carried out two of the attacks at issue in this case and was involved in the other attacks.

## The Outtakes Must At Least Be Produced For An *In Camera* Review

The documentary itself contains explicit evidence in the form of statements by Abu-Rumaileh and Zubaidi that Fatah and al-Aqsa are indeed the same and that Arafat directed al-Aqsa's activities. Such statements provide a crucial evidentiary link in Plaintiffs' case that the attacks were carried out by Defendants' officials, agents and employees and/or by terrorist units operating with the Defendants' material support. Based on these statements, Plaintiffs have a good faith basis to conclude that the outtakes for Abu Rumaileh and Zubaidi contain additional evidence concerning the relationship between Fatah and al-Aqsa and Arafat's role in directing their activities, including further details concerning the relationship between Fatah, al-Aqsa and Arafat, their goals and activities during the time period of the attacks [and specific information about the terrorist attacks that are the subject of this lawsuit or other similar attacks which would show a pattern of conduct.][1] These are the kinds of things we would ask Your Honor to be mindful of if Your Honor were to conduct an *in camera* review of the outtakes.

---

[1] Whether or not the outtakes concern any of the terrorist attacks at issue in this case, a point raised repeatedly by the BBC, is not the deciding factor here. This is because the crucial evidentiary issue established in the documentary is not related to the attacks themselves, but to Defendants' provision of material support to the individuals and

While Your Honor accurately noted that the statements we have identified in the documentary itself are particularly compelling and direct on the connection between the groups and on the fact that they took their orders from Arafat, the outtakes could well provide further details and independent support, with other examples or more specifics about their activities and Arafat's involvement with them, as well as how the groups were founded and run, how their connection arose and so on – all clearly relevant and not somehow rendered less relevant because they are less direct than the statements on the documentary.

Judge Ellis, of course, got the standard for ordering the production of outtakes exactly right in his Order, when he wrote that for such non-confidential information as is at issue here, to overcome the "qualified privilege," the requesting party need only show that the information at issue is: (1) "of likely relevance" and (2) "not reasonably available from other available sources." (DE 255 at 5). Plaintiffs more than meet these thresholds to at least as or greater than the requesting parties in the cases below in which the outtakes were produced or at least reviewed *in camera*.

There is no question that outtakes can be and have been ordered to be produced directly to the requesting party when the standard for overcoming any applicable journalistic privilege is met. *See, e.g., Gonzales v. National Broadcasting Co.*, 194 F.3d 29, 36 (2nd Cir. 1998) (ordering production of outtakes from Dateline program concerning pattern of police behavior to detain minorities for traffic violations in Louisiana without probable cause and finding that   no reasonably alternative sources existed to the outtakes which contained "unimpeachably objective evidence of [defendant's] conduct."); *Chevron Corp. v. Pallares*, 2010 U.S. Dist. LEXIS 47034, *37-39 (S.D.N.Y. May 10, 2010) (ordering production of outtakes from documentary film, finding "raw footage…would be unimpeachably objective evidence of any misconduct on the part of plaintiff's counsel, expert witnesses or the GOE."); *In re Cutler*, 6 F.3d 67, 74 (2nd Cir. 1993) (ordering production of outtakes to defendant, former attorney for John Gotti, accused of making public statements to sway the jury and in violation of court orders, where reporters had reported on defendant lawyer's statements in the Gotti case); *Don King Productions, Inc. v. Douglas*, 131 F.R.D. 421 (S.D.N.Y. 1990) (in suit between boxer and his promoter, court ordered production of outtakes from mini press conference containing statements by promoter, which "may prove critical" to success of one of boxer's defenses).

Tellingly, while it is *dicta* since the Court ultimately ordered that the outtakes be directly produced to the requesting party, in *Cutler*, the Second Circuit wrote directly to the issue of the appropriateness of an *in camera* review of outtakes. The Court considered the producing party's

organizations that perpetrated the attacks. Federal courts have unanimously held that an ATA plaintiff does *not* need to show that the funding or other material support provided by the defendant was used for the specific attack from which the case arises. *See Abecassis v. Wyatt*, 785 F.Supp.2d 614 (S.D.Tex. 2011) (collecting cases and concluding that the "courts agree that 'but for' causation is not required"). In addition, even if the interviews took place after the terrorist attacks, they are still relevant because the fact that Defendants continued to provide material support to Fatah even *after* the attacks is admissible as "bad acts evidence" under Rule 404(b) of the Federal Rules of Evidence and is highly relevant to establishing the Defendants' malicious "motive" and "intent" when they Fatah in the period before the attacks and that Defendants' provision of such financial support to Fatah was part of a "plan." *See e.g. U.S. v. Long*, 328 F.3d 655, 661 (D.C.Cir. 2003) (Bad acts evidence may be used "to show a pattern of operation that would suggest intent and that tends to undermine the defendant's innocent explanation.") (quotation marks omitted).

argument that the district court should have conducted an *in camera* review of the outtakes prior to ordering them produced to Cutler. The Second Circuit rejected that proposition and found no error in the direct production of the outtakes. However, it noted that, based on precedent from the case it described earlier in its decision as the "guiding precedent in this circuit" for these issues, *United States v. Burke*, 700 F.2d 70 (2d Cir.), *cert. denied*, 464 U.S. 816, 78 L. Ed. 2d 85, 104 S. Ct. 72 (1983), an *in camera* review of outtakes is "encouraged" before a definitive ruling to exclude access to such "assertedly privileged materials", especially when the materials are not voluminous. *Cutler*, 6 F.3d at 74. If Your Honor is considering not ordering the production directly to Plaintiffs of the outtakes, we respectfully submit that the Court should follow the guidance or "encouragement" from the Second Circuit and review the outtakes *in camera*.

As in the cases cited above, the information in the outtakes is not available from alternative sources. The BBC has repeatedly claimed that Plaintiffs can seek this same information directly from Abu Rumaileh and Zubaidi who reside within the Palestinian Authority. However, there is no procedure under either U.S. or Israeli law by which Plaintiffs can depose PA residents and Plaintiffs are not aware of any such procedure under PA law either. *See* Affidavit of Jeremy Stern [DE 168] and Declaration of Professor Barry Rubin [DE 159 - I]. In addition, the BBC's claim that Plaintiffs should be able to depose or otherwise speak with Zubaidi because he is "in the physical custody and undeniable control of Defendant PA" is wholly unsupported by any law. Under our law, the PA has no obligation to produce any witness other than an officer, director or managing agent and the BBC has not offered any contrary legal authorities. In this regard, Plaintiffs also note that the plaintiffs in another case pending in the District of Columbia District Court (*Klieman v. PA*, Civ. Action No. 04-1173 (PLF) (JMF)) seeking production of the same documentary and outtakes from the BBC attempted to speak directly with Zubaidi in February 2011. At that time, Zubaidi refused to confirm any of his prior statements and indeed threatened the Klieman plaintiffs' counsel. Information on this already is in the record in this case. Moreover and in any event, Abu Rumaileh and Zubaidi would certainly not now provide the same "unimpeachably objective" evidence that is recorded in the outtakes.

Other witnesses (including convicted terrorists and their henchmen) suggested by the BBC as possible alternative sources are purely speculative and many suffer from the very same difficulties as Abu Rumaileh and Zubaidi - Plaintiffs have no way of compelling the depositions or guaranteeing that the witnesses will provide the "unimpeachably objective" testimony that they need. Indeed, Judge Carter recognized the difficulties inherent in seeking cooperation from terrorists when he wrote:

It would be difficult, if not impossible, for Plaintiff to find Rumaileh and Zubaidi who are residents of a foreign state with knowledge about a terrorist organization and to ask them about what they said to BBC for the documentary. As BBC mentioned during oral arguments, interviewing individuals with sensitive knowledge is dangerous and difficult. *It is also doubtful that individuals associated with terrorist organizations would continue to speak freely about the subject.*

*Saperstein v. Palestinian Authority*, 2010 WL 1371384, *3 (E.D.N.Y. Apr. 6, 2010), *vacated* 2010 U.S. Dist. LEXIS 143465 (E.D.N.Y. Dec. 16, 2010). (emphasis added). The "Arafat

Investigated" documentary establishes that Abu Rumaileh and Zubaidi have already made statements directly relevant for the issue Plaintiffs seek to prove. There is simply no valid or rational basis to put Plaintiffs to the burden of trying to obtain similar statements from others who may or may not cooperate.

In light of the foregoing, Plaintiffs maintain that the outtakes for Abu Rumaileh and Zubaidi should be produced. However, if the Court has any doubt, it is well within its discretion to review the outtakes *in camera* prior to making a final decision. *See, e.g., In re Cutler*, 6 F.3d 67, 74 (2nd Cir. 1993) (noting the Court's authority to review outtakes *in camera*, but finding such review not needed in that case since outtakes were clearly relevant and must be produced); *States v. Burke*, 700 F.2d 70, 78, n. 9 (2nd Cir. 1983) (in upholding lower court's ruling that *in camera* review of journalist's materials was not necessary under the circumstances, court stated "we encourage the courts to inspect potentially sensitive documents, especially in situations where, as here, the record reveals that the [magazine's] work papers were not sufficiently voluminous to render *in camera* review impracticable."); *United States v. LaRouche Campaign*, 841 F.2d 1176, 1183 (1st Cir. 1988) (affirming lower court's decision to inspect outtakes of journalist's interview with prosecution witness *in camera* prior to ordering production); *John Doe, Esq. v. Kohn, Nast & Graf, P.C.,* 853 F. Supp. 147, 149-50 (E.D. Pa. 1994) (in ordering *in camera* review of outtakes of journalists' interviews with plaintiff in his action for wrongful termination, court found that the interviews were relevant as they concerned the underlying allegations in the law suit, would be admissible as admissions and could be used for impeachment purposes). Plaintiffs here certainly have as strong a good faith basis as the requesting parties had in the cases cited herein, both for the proposition that the outtakes should be directly produced to Plaintiffs and for the proposition that, at a minimum, they must be produced for an *in camera* review.

Based on the foregoing, Plaintiffs respectfully request the Court to review the outtakes in camera prior to making a final determination with respect to the outtakes.

## BBC Should Provide An Affidavit For The Purposes Judge Ellis Directed

As Your Honor is aware, Plaintiffs sought, through their subpoena, the deposition of a witness from BBC who could competently authenticate the documentary and the outtakes. As an alternative, to avoid any unnecessary burden for BBC, Judge Ellis modified the subpoena to order written affidavits from BBC to meet these purposes. (DE 255 at 6 & 7). We will not address here again the "jurisdictional" issues nor Judge Ellis's authority to modify a subpoena; rather we will rest on our prior submissions and oral argument. Here this letter is focused solely on providing the Court with what it is we asked BBC to provide an affidavit or declaration on, presented here without argument.

I understood the Court simply to ask us to advise the Court of what we had asked BBC to provide in affidavit form, fleshing out, in a sense, the general directive in Judge Ellis's Order, in the event, as is the case, BBC declined to agree to the affidavit we proposed. Here, of course, as indicated above, BBC has indicated that "at this time" there is no formulation of an affidavit in this matter for the purposes of authentication of the documentary (or the outtakes) or to establish them as business records.

5

The following is what I have asked BBC to have provide a competent affiant address in an affidavit on, as Judge Ellis put it, "authentication" and "business records:"

1. For the videotape, as a videotape, an affiant who can certify that it is a true and accurate depiction of what was before the camera. This certainly does not have to be the videographer; but we need some competent person who can provide such information and his/her basis for being able to so certify. It should be someone who is in a position to know that the people and voices depicted in the video are the people (and voices) that were there and speaking and saying what the video depicts them saying. *See e.g.*, FRE 901 generally and 901(5).

2. It would also be appropriate to have the affiant be able to certify the chain of custody with respect to the original recording and the manner in which duplicates were made consistent with that chain of custody, since we will be using a duplicate and would like to cover all bases, including FRE 1003.

3. With respect to the business records aspect of the videotape, kept as a business record by the BBC, we would like the affiant to be able to certify the factors set forth in FRE 803(6) and we would like for the affidavit to comport with the necessary certification under FRE 902(11) or (12), as appropriate, and as called for under FRE 803(6).

I indicated in my correspondence with Mr. Korzenik that we wanted to work together to come up with a mutually acceptable formulation that would meet the desired purpose; but he candidly advised, as noted above, that he was not in a position "at this time" to agree to any formulation for an affidavit or declaration on the subjects at issue. We discussed some possible creative alternatives; but could not come to any agreement and we believe we are entitled to an affidavit or declaration on this subject from BBC as to the documentary (and outtakes, if produced) which BBC clearly owns and controls.

Nothing in this submission should be construed as our evaluation as to what absolutely is required for the admission into evidence of the documentary (or the outtakes); but we respectfully submit, without arguing the point further here, that what we have requested with respect to the affidavit or declaration is that to which we are entitled.

Respectfully yours,

David I. Schoen

cc: David Korzenik, Esq.
    Brian Hill, Esq.
    (by Fedex)