Page 6

| | QUESTIONS INSTRUCTED |
|---|---|
| | NOT TO ANSWER |
| | PAGE    LINE |
| 4 | 43       19 |
| 5 | 43       23 |
| 6 | 44       2 |
| 7 | 44       6 |
| 8 | 44       22 |
| 9 | 45       15 |
| 10 | 45       19 |
| 11 | 47       17 |
| 12 | 47       20 |
| 13 | 53       11 |
| 14 | 55       1 |
| 15 | 55       9 |
| 16 | 55       22 |

Page 7

1  PROCEEDINGS
2
3    (The following section of the proceedings
4    was conducted only in English, unless otherwise
5    indicated, and until page 8.)
6
7    MR. YALOWITZ: Before we begin, I just want
8  to reiterate, we've advised the defendants that there's
9  a section of Mr. Eviatar's expert report that we're
10 withdrawing. It's the part of the report dealing with
11 the interrogations.
12
13    RINA NE'EMAN,
14    the Official Hebrew Interpreter, was
15    duly affirmed to translate from English
16    to Hebrew and from Hebrew to English.
17
18    ALON EVIATAR,
19    called as a witness, being first duly
20    affirmed, was examined and testified
21    as hereinafter set forth.
22
23    MR. HILL: The record should reflect that
24 that was not interpreted.
25

Page 8

1           EXAMINATION
2  BY MR. HILL:
3    Q.  Do you speak English?
4    A.  Yes, I speak English.
5    Q.  Do you have any difficulty understanding me?
6    A.  Sometimes. I prefer in Hebrew.
7    Q.  Have you been educated in the English
8  language, sir?
9    A.  Yes.
10     MR. YALOWITZ: Let her interpret for you.
11     THE WITNESS: Okay.
12
13     (The following section of the proceedings was
14     conducted through the Official Hebrew Interpreter,
15     unless otherwise indicated.)
16
17    Q.  BY MR. HILL: Do you feel like you need an
18 interpreter to understand the questions and answers
19 today?
20    A.  Yes.
21    Q.  Then we will proceed with the interpreter,
22 sir. If at any point during the course of the day
23 you think there's been a misinterpretation, please
24 do let us know. Okay?
25    A.  (In English.) Okay.

Page 9

1    Q.  State your name.
2    A.  Alon Eviatar.
3    Q.  Of what country or countries are you a
4  citizen?
5    A.  Israel.
6    Q.  Have you ever been a citizen of any other
7  country?
8    A.  No.
9    Q.  What's your address?
10    A.  I live in the town of ▓▓▓▓▓▓▓▓
11 ▓▓▓▓▓▓▓▓
12    Q.  Do you live in a settlement?
13    A.  No.
14    Q.  Is your home within the 1948 borders of
15 Israel?
16    A.  I do not know.
17    Q.  Are you familiar with something called the
18 Green Line?
19    A.  I'm familiar with it.
20    Q.  Is your home east or west of the Green Line?
21    A.  To the best of my knowledge, it's to the
22 west of the Green Line.
23     MR. HILL: Let's mark this as 420.
24     (Defendants' Exhibit 420 marked.)
25    Q.  BY MR. HILL: Mr. Eviatar, I'm handing you

Page 10

1  what we've marked as Defendants' Exhibit 420.
2  Have you ever seen this document before?
3  A. (Examining.) Yes.
4  Q. Turn to the last page.
5  Is that your name?
6  A. Yes.
7  Q. Are you prepared to sign this document
8  under oath and penalty of perjury under the laws
9  of the United States today?
10 A. Yes.
11 Q. Is everything in this document true and
12 correct?
13 A. Yes.
14 Q. How do you know?
15 A. I am a full partner in the drafting of
16 this report. This report is my report, and I stand
17 behind every sentence that's included in this report.
18 Q. Turn to page 17. Look at paragraph 1 on
19 page 17. The first sentence says:
20 "While I have not personally been involved
21 in the interrogation of terrorists, I am familiar
22 with such interrogations from, inter alia, my work
23 at the Israel Security Agency."
24 Do you see that?
25 A. I see that.

Page 11

1  Q. That's not a true statement, is it?
2  A. The intent of that sentence is from my work
3  with the Israel Security Agency.
4  Q. Okay. You never worked at the Israel Security
5  Agency, did you?
6  A. No.
7  Q. That sentence doesn't say "my work with the
8  Israel Security Agency," does it?
9  A. Correct.
10 Q. Are you familiar with the difference between
11 the word "at" and "with" in the English language?
12 A. Yes.
13 MR. HILL: Let's mark this as Exhibit 421.
14 (Defendants' Exhibit 421 marked.)
15 Q. BY MR. HILL: I'm showing you what we've
16 marked as Exhibit 421.
17 Have you ever seen this before?
18 A. (Examining.) Yes.
19 Q. Is that your signature?
20 A. Yes.
21 Q. When did you sign it?
22 A. On the date that appears there.
23 Q. You're saying you signed this on June 14th,
24 2013?
25 A. To the best of my recollection, yes.

Page 12

1  Q. When did you deliver that signature to the
2  plaintiffs' lawyers in this case?
3  A. At the moment that my counsel advised me
4  or requested that I do so.
5  Q. Did you review all of Exhibit 420 before
6  you signed Exhibit 421?
7  A. Yes.
8  Q. Did you understand it?
9  A. Yes.
10 Q. You did not write Exhibit 420; correct?
11 A. That is not correct.
12 Q. Are you saying you wrote Exhibit 420, the
13 report that's in front of me?
14 A. I wrote part of it.
15 Q. Somebody else wrote part of it, too; right?
16 A. Correct.
17 Q. Who wrote the part that you didn't write?
18 A. Ronni Shaked.
19 Q. How do you know that?
20 A. My counsel told me that.
21 Q. Have you ever spoken to Mr. Shaked?
22 A. Yes.
23 Q. Did you talk to him about this report?
24 A. Yes.
25 Q. When?

Page 13

1  A. After I received the report from my counsel.
2  Q. Did you ever start to write your own report?
3  A. Yes.
4  Q. What happened to that document?
5  A. The report that I wrote was the rebuttal.
6  Q. So when did you first -- when were you first
7  asked to prepare a report in this case?
8  A. I was requested to read this report and to
9  make amendments to it.
10 Q. So no one ever asked you to write a report
11 in May of 2013; correct?
12 A. Correct.
13 Q. Who told you to take Ronni Shaked's report
14 and make amendments to it?
15 A. My attorney.
16 Q. What was the name of that person?
17 A. Nitsana Darshan-Leitner.
18 Q. When did you first speak to Nitsana
19 Darshan-Leitner about being an expert witness in
20 this case?
21 A. She spoke to me in the month of May.
22 Q. What date?
23 A. I do not recall.
24 Q. Do you have any way of telling me which
25 week in May this was?

Page 34

1  Q. And have you submitted a bill for your work
2  in the Gilmore case?
3  A. No.
4  Q. What rate are you charging for your work
5  in that case?
6  A. $100 per hour.
7  Q. And approximately how many hours of work
8  have you done for Shurat HaDin on the Gilmore case?
9  A. Approximately 100 hours.
10 Q. Has Shurat HaDin asked you to do any work
11 other than work on this case and the Gilmore case?
12 A. No.
13 Q. Setting aside whether it was Shurat HaDin,
14 has anyone associated with Shurat HaDin asked you to
15 do any other work?
16 A. I performed one small project for Arieh
17 Spitzen.
18 Q. Okay. And did you get paid for that project?
19 A. No.
20 Q. Are you expecting to get paid for that
21 project?
22 A. Certainly.
23 Q. How much do you expect to be paid for that
24 project?
25 A. My request for payment includes work in the

Page 35

1  scope of 17 hours and is in the amount of $1,700.
2  Q. Apart from the work that we've already
3  discussed that you've done for Shurat HaDin and
4  Mr. Spitzen, have you done any other work for any
5  of the people that you've spoken to in connection
6  with Exhibit 420?
7  A. No.
8  Q. Have you been asked to do any work for any
9  of those people, other than what we've already talked
10 about?
11 A. No.
12 Q. Do you know someone named Israel Shrenzel?
13 A. Yes.
14 Q. How do you know Mr. Shrenzel?
15 A. I met him within the framework of my work
16 for Shurat HaDin.
17 Q. So is there anyone else that you've met
18 within the framework of your work for Shurat HaDin
19 that you haven't told me about yet?
20 A. No.
21 Q. Did you know Mr. Shrenzel before you met
22 him in the context of your work for Shurat HaDin?
23 A. No.
24 Q. Did you speak to him before you signed
25 Exhibit 421?

Page 36

1  A. I told him "hi." I said "hello" to him.
2  Q. Any other conversations before you signed
3  Exhibit 421, other than saying "hello"?
4  A. No.
5  MR. YALOWITZ: I think we've been going
6  more than an hour, and I suspect some in the group
7  might appreciate a break.
8  MR. HILL: Let me ask about three more
9  questions on this line, and we'll finish up.
10 MR. YALOWITZ: I think somebody in the
11 room would appreciate a break. I think we should
12 take a break.
13 Q. BY MR. HILL: Have you spoken to --
14 MR. YALOWITZ: When your witnesses asked
15 for a break or when you asked for a break, I said
16 "sure." I didn't say we'll wait more time. I think
17 you should extend the same courtesy.
18 MR. HILL: Well, I have like three more
19 questions. Counsel, if you don't mind, I'll close
20 out this line, and we can move on.
21 Q. BY MR. HILL: (Not translated.) Have you
22 spoken to Mr. Shrenzel after you signed Exhibit 421?
23 (Comment in Hebrew by the witness.)
24 (Court reporter clarification.)
25 MR. ROCHON: It wasn't translated.

Page 37

1  MR. HILL: The question was: Had you
2  spoken to Mr. Shrenzel after you signed the report?
3  He answered in English "no." And Mr. Rochon said
4  it wasn't translated.
5  MR. YALOWITZ: He said "lo." He didn't say
6  "no."
7  OFFICIAL INTERPRETER NE'EMAN: Tell me when
8  you're ready for me to interpret.
9  MR. HILL: I don't think it's necessary.
10 All right. We'll take a break.
11 (Recess from 10:12 a.m. to 10:25 a.m.)
12 Q. BY MR. HILL: Did you speak to Mr. Shrenzel
13 about his report before you signed Exhibit 421?
14 A. No.
15 MR. HILL: Mark this as Exhibit 422.
16 (Defendants' Exhibit 422 marked.)
17 Q. BY MR. HILL: Mr. Eviatar, I'm showing you
18 what we've marked as Exhibit 422, which is a document
19 entitled:
20 "Expert Report of Israel Shrenzel in Sokolow
21 versus Palestinian Authority, Case No. 04-397."
22 Have you ever seen this before?
23 A. (Examining.) No.
24 Q. Lay Exhibit 422 side by side with Exhibit 420,
25 if you would, please. If you could, align the pages

Page 38

1  so that the last paragraph of Exhibit 420 is next to
2  the fourth paragraph of Exhibit 422.
3     A.  The last one in 420, next to?
4     Q.  On the first page of each document, align
5  the last paragraph of 420 with the fourth paragraph
6  of 422.
7        Do you have the two documents side by side,
8  sir?
9     A.  Yes.
10    Q.  Look, if you will, at 420, the last paragraph
11 on the first page. The third sentence of that paragraph
12 says:
13       "In that position, I was responsible (among
14 other things) for supervising the work of IDF research
15 and assessment personnel in various fields relating to
16 Palestinian affairs, drafting and presenting research
17 and policy papers concerning Palestinian affairs, and
18 appearing before and providing briefings to senior
19 governmental and military forums regarding Palestinian
20 affairs."
21       And that's in the exhibit that you eventually
22 signed; right?
23    A.  Yes.
24    Q.  Then look at Exhibit 422 and look at the
25 fourth paragraph on the first page.

Page 39

1        Do you see that the third paragraph, the
2  third sentence of that paragraph, contains exactly
3  the same language I just read to you, except that in
4  420 it says "IDF" and in 422 it says "GSS"?
5     A.  I see that.
6     Q.  Do you see, sir, that the next sentence on
7  420 says:
8        "I supervised approximately 50 people."
9     A.  I see that.
10    Q.  And on Exhibit 422, it says:
11       "I supervised approximately 15 to 20 people."
12       Do you see that?
13    A.  Yes.
14    Q.  And would you agree with me that the last
15 sentence of the paragraph we've been looking at on
16 420 and 422 both say:
17       "I also provided numerous briefings about
18 Palestinian affairs, in Israel, to foreign officials."
19    A.  Yes.
20    Q.  There is a slight difference in that in 422
21 it also says "and abroad"; right?
22    A.  Correct.
23    Q.  The next paragraph in 420 says:
24       "In the course of my services in the IDF,
25 I received and read many thousands of intelligence

Page 40

1  items - including raw intelligence data obtained
2  from electronic and human sources, as well as analyses
3  and summaries compiled from such raw data, many of which
4  my team prepared under my supervision - relating to the
5  activities of the Palestinian Authority (the 'PA'), the
6  Palestine Liberation Organization (the 'PLO'), and the
7  full range of Palestinian groups, organizations,
8  institutions, and personalities."
9        Do you see that, sir?
10    A.  Yes.
11    Q.  And you would agree with me that the exact
12 same language appears in the fifth paragraph on the
13 first page of Exhibit 422, except that in Exhibit 422
14 it says "GSS" instead of "IDF"?
15       Right?
16    A.  I would like to examine that.
17       (Examining.) Yes.
18    Q.  Do the sentences that we've just read together
19 have the same author?
20    A.  No.
21    Q.  Who wrote the sentences that we've just read
22 in Exhibit 420?
23    A.  I did.
24    Q.  Is it your testimony that no one other than
25 you wrote the sentences we've just read aloud together

Page 41

1  in Exhibit 420?
2     A.  Yes.
3     Q.  Can you explain how the sentences that you
4  wrote on Exhibit 420 are so close to the sentences that
5  appear on Exhibit 422?
6     A.  I do not know.
7     Q.  Turn, if you will, to the last page of
8  Exhibit 422.
9        Do you see that that page is dated April 10th,
10 2013?
11    A.  Yes.
12    Q.  Turn to the last page of Exhibit 420.
13       Do you see how that page is dated June 14th,
14 2013?
15    A.  Yes.
16    Q.  Look at Exhibit 421.
17       That's the document that has your signature
18 on it; right?
19    A.  Yes.
20    Q.  And you've previously testified that you
21 signed that document on or about June 14th, 2013; right?
22    A.  Correct.
23    Q.  Do you have any explanation for how
24 Mr. Shrenzel, in a report dated April of this year,
25 could have chosen almost exactly the same language

Page 42

1  as the language you claim to have written in June
2  of this year?
3      A.  I have no idea.
4          (Defendants' Exhibit 423 marked.)
5      Q.  BY MR. HILL: Mr. Eviatar, I'm handing you
6  what we've marked as Defendants' Exhibit 423.
7          Have you seen this document before?
8      A.  (Examining.) Yes.
9      Q.  What is this document?
10     A.  This is my report.
11     Q.  Turn, if you will, to page 17 of Exhibit 423,
12 and lay that page side by side, if you would, to page 17
13 of Exhibit 420.
14         Do you see, sir, that in paragraph 1 on
15 page 17 of Exhibit 423, certain text has been struck
16 through?
17     A.  Yes.
18     Q.  And in particular, the text that has been
19 struck through reads:
20         "From, inter alia, my work at the Israel
21 Security Agency."
22         Correct?
23     A.  Yes.
24     Q.  And we have been told by plaintiffs' counsel
25 that this is a corrected version of your report.

Page 43

1  Is this, in fact, a corrected version of
2  your report?
3      A.  That is quite correct.
4      Q.  Whose idea was it to strike the text on
5  page 17?
6      A.  Mine.
7      Q.  And you wished to have that information
8  struck because it was not true; correct?
9      A.  Correct.
10     Q.  Was that something you overlooked when you
11 were working on Exhibit 420 in June?
12     A.  I noticed it and I corrected it. I don't
13 recall when I corrected it.
14     Q.  Now, at the beginning of our time together
15 today, Mr. Yalowitz indicated that the portion of
16 Exhibit 420 that starts under "III," which is called
17 "Part Two," has been withdrawn; correct?
18     A.  Correct.
19     Q.  Why has that been withdrawn?
20         MR. YALOWITZ: Objection. Instruction not
21 to answer. Attorney work product.
22         Don't answer the question.
23     Q.  BY MR. HILL: Was it your idea to withdraw
24 that section?
25         MR. YALOWITZ: Objection. Instruction not

Page 44

1  to answer. Attorney work product.
2      Q.  BY MR. HILL: Why did you wait until yesterday
3  to withdraw that section?
4          MR. YALOWITZ: Objection. Instruction not
5  to answer. Attorney work product.
6      Q.  BY MR. HILL: When did you first have a
7  conversation with plaintiffs' counsel about whether
8  to withdraw this section?
9          MR. YALOWITZ: Objection. Instruction not
10 to answer. Attorney work product.
11         MR. HILL: I don't want to debate with you,
12 Counsel, but I don't think the timing of the discussion
13 would be privileged. Would you reconsider your
14 instruction?
15         MR. YALOWITZ: I'll reflect on it. I'll
16 step out.
17         MR. HILL: You want to take a break? Sure.
18         (Recess from 10:47 a.m. to 10:48 a.m.)
19         MR. YALOWITZ: Back on the record. We've
20 taken a moment to reflect, and on reflection, we're
21 going to stand on the instruction.
22     Q.  BY MR. HILL: Which lawyers for the plaintiffs
23 did you communicate with about potentially withdrawing
24 "Part Two," regarding terrorist interrogations?
25         MR. YALOWITZ: Objection. Instruction not

Page 45

1  to answer. Attorney work product.
2      Q.  BY MR. HILL: Was anyone present other
3  than plaintiffs' counsel when you communicated
4  with them about potentially withdrawing "Part Two,"
5  entitled "Terrorist Interrogations," from Exhibit 420?
6          MR. YALOWITZ: You can answer.
7          THE WITNESS: No.
8      Q.  BY MR. HILL: What were the names of
9  the plaintiffs' counsel that were present at that
10 communication?
11     A.  Mr. Yalowitz and the lawyer named Dina.
12     Q.  Where did that communication with Dina and
13 Mr. Yalowitz take place?
14     A.  On the computer.
15     Q.  When approximately did you have that computer
16 communication with Mr. Yalowitz and Dina?
17         MR. YALOWITZ: Objection. Instruction not
18 to answer. Attorney work product.
19     Q.  BY MR. YALOWITZ: Did you have a communication
20 with Mr. Yalowitz or Dina about that subject prior to
21 September 16, 2013?
22         MR. YALOWITZ: Objection. Instruction not
23 to answer. Attorney work product.
24         MR. HILL: Again, I don't want to debate
25 with you, Counsel. But you're taking the position

12 (Pages 42 to 45)