JEFFREY ADDICOTT DEPOSITION    October 2, 2013    Sokolow v. the PLO

Page 6

1    P-R-O-C-E-E-D-I-N-G-S
2    (Defendants' Deposition Exhibit Number
3    238 was premarked for identification.)
4    WHEREUPON --
5    JEFFREY ADDICOTT,
6    a Witness called for examination, having first
7    been duly sworn, was examined and testified as
8    follows:
9    EXAMINATION
10   BY MR. WISE:
11   Q.  Good morning.
12   A.  Good morning.
13   Q.  Can you state your name for the
14   record, please?
15   A.  Jeffrey Frank Addicott.
16   Q.  And, Professor Addicott, what is your
17   home address?
18   A.  Currently I'm at ▮▮▮▮▮▮▮▮▮▮▮▮
19   ▮▮▮▮▮▮
20   Q.  And your Social Security Number?
21   A.  ▮▮▮▮▮▮▮▮

Page 7

1    Q.  I'm going to show you what has been
2    marked as Defendants' Deposition 238.  Do you
3    recognize that document?
4    A.  I do.
5    Q.  And what is it?
6    A.  This is a copy of my expert opinion
7    report that's dated 22 March, 2013.
8    Q.  On Page 27 of the document, is that
9    your signature?
10   A.  It is.  It is my signature.
11   Q.  And you signed this on March 22nd,
12   2013?
13   A.  Yes, I did.
14   Q.  And it appears that you had the
15   original notarized; is that right?
16   A.  Yes.
17   Q.  Declaring under penalty of perjury
18   that the foregoing is true and correct?
19   A.  Absolutely.
20   Q.  Let me start by asking you what
21   portions of this report did you personally write?

Page 8

1    A.  What portions of it?  Well, the report
2    was given to me as a draft, and I made
3    corrections on the draft.  Of course, looking at
4    it right now, I can't really recall exactly where
5    the corrections were.  So that's my answer.
6    Q.  The draft that was provided to you,
7    who provided it to you?
8    A.  It was provided by Rachel Weiser, I
9    think is her last name.
10   Q.  And what office does she work with?
11   A.  I'm not really sure.
12   Q.  Are you familiar with a person named
13   Nitsana Darshan-Leitner?
14   A.  I have not met her, but I've seen some
15   e-mails with her name on it, yeah.
16   MR. WISE:  Can we mark this as 239.
17   (Defendants' Deposition Exhibit Number
18   239 was marked for identification.)
19   BY MR. WISE:
20   Q.  Professor, that's Exhibit 239.
21   A.  Okay.  I see it.

Page 9

1    Q.  239 is an e-mail from Ms.
2    Darshan-Leitner to you, correct?
3    A.  Yes.
4    Q.  And the e-mail address,
5    Jaddicott@stmarytx.edu, that is your St. Mary's
6    University Law School e-mail address, correct?
7    A.  Yes, it is.
8    Q.  Looking at Exhibit 239, was that your
9    first contact with Ms. Darshan-Leitner?
10   A.  I can't really recall.
11   Q.  What do you recall about your first
12   contact with her?
13   A.  Well, I was contacted by several
14   individuals, and they asked me to look at a draft
15   and sent me that draft to see what I thought
16   about the draft, and that was my first contact.
17   But I don't, you know, exactly remember.  I look
18   at the dates here, March, it appears to be
19   approximately the time that they contacted me.
20   Q.  You said a few people contacted you?
21   A.  I think Rachel contacted me and this

Page 10

1  other individual contacted me. I've never met
2  either of them in person, so I can't put a face
3  to a name.
4      Q.  And when they contacted you initially,
5  was it by telephone or was it by e-mail?
6      A.  Telephone.
7      Q.  Do you know how they came to know
8  about you?
9      A.  I do not know. I would assume, and
10 this is just an assumption, that they'd heard
11 about the Center For Terrorism Law, where I'm the
12 director and the founder. We're an
13 internationally recognized institute at the law
14 school, so I assume that they probably came
15 across my name in media reports or something of
16 that nature.
17     Q.  The substance of the first phone call,
18 what do you remember about what they asked you to
19 do?
20     A.  Well, I mean, the main point was to:
21 Would I be willing to look over a draft or to

Page 11

1  write an expert opinion piece on the subject.
2  And as I recall, they had a rather short time
3  line, and I said that I would be willing to do
4  so.
5      Q.  How long after that phone call did you
6  receive the draft that they had referenced?
7      A.  Again, if you looked at my CV, you can
8  see that I do about a hundred -- well, between 50
9  and a hundred media interviews each month. I do
10 like five to ten speeches each month. I'm a
11 full-time law professor, so a lot of activity
12 going on. So I really don't recall, but it was a
13 short period. Perhaps days, but I can't recall.
14     Q.  When they said that they wanted to
15 know whether you would be willing to read a draft
16 or write a draft about "the subject," what was
17 "the subject" as they identified it to you?
18     A.  Well, it was concerning the issue of
19 the Second Intifada and the role that the PLO and
20 Yasser Arafat and the PA had played in the
21 violence associated with that event in history.

Page 12

1      Q.  Looking at 239, the e-mail, you'll see
2  on the bottom of that two attachments.
3      A.  Right.
4          MR. WISE:  So let me ask the court
5  reporter to mark this document as Exhibit 240.
6          (Defendants' Deposition Exhibit Number
7  240 was marked for identification.)
8          MR. WISE:  And this as 241, and I will
9  show them to you together.
10         (Defendants' Deposition Exhibit Number
11 241 was marked for identification.)
12         BY MR. WISE:
13     Q.  Professor, looking at Exhibit 240, do
14 you recognize that as the Word document attached
15 to Ms. Darshan-Leitner's March 21 e-mail titled
16 Expert Report - Americans Killed.doc?
17     A.  I believe that's correct.
18     Q.  And do you recognize 241 as the Word
19 document titled Expert Report PA Sponsorship of
20 Terrorism.doc?
21     A.  Yes, I believe that's correct as well.

Page 13

1      Q.  The two Word documents, Exhibit 240
2  and 241, you did not write these drafts, correct?
3      A.  No, I didn't pen these drafts; that's
4  correct.
5      Q.  Those were written by someone
6  presumably associated with Ms. Darshan-Leitner,
7  correct?
8      A.  I do not know, but I know that she
9  sent me those drafts and asked me to look at
10 them, to research them, and I did so.
11     Q.  Do you know who did pen them?
12     A.  I have no idea.
13     Q.  Did you ask her who wrote them?
14     A.  No.
15     Q.  Do you have any reason to believe that
16 you received 240 and 241 prior to the e-mail that
17 is marked as 239?
18     A.  Well, again, I don't think so, but I
19 don't know. I see the name on the e-mail. It
20 looks vaguely familiar, and I'm assuming that
21 that e-mail -- that these two documents as

Page 14

1  attachments are the two documents that reflect
2  that they are attached in the e-mail.
3     Q.  When you say that you looked at the
4  drafts and researched them, what did you do to
5  research them?
6     A.  Well, the first thing I did, of
7  course, is looked at the footnotes, and I've got
8  that here. I went through each footnote,
9  reproduced a hard copy to look at the footnotes,
10 read the paper. I did make some changes to the
11 draft, and -- so that's what I did, yeah.
12    Q.  When you made changes to the draft,
13 did you do it in pen and ink, or did you do it on
14 the computer?
15    A.  That's a good question. I do not
16 recall whether I did it on the paper and scanned
17 it and sent it back, or whether I typed it and
18 sent it back. I don't recall.
19    Q.  And then tell me how the process
20 worked after you sent your edits back to them,
21 what was the next step?

Page 15

1     A.  Well, I don't have the e-mails in
2  front of me, obviously, but I would assume that
3  my changes were incorporated into the draft, and
4  it was sent back to me to look at again, and
5  that's what occurred.
6     Q.  Your report -- well, before you signed
7  it on the 22nd of March, what did you do to
8  review the document to make sure that the changes
9  that you had made had been incorporated?
10    A.  I read the document.
11    Q.  And do you recall whether you read it
12 and compared side-to-side the edits that you had
13 sent?
14    A.  I believe I did because I'm not going
15 to sign something unless I adopt it as my
16 professional opinion, so I'm pretty meticulous
17 about what I sign, so yes.
18        It would be my habit to do so. Again,
19 I've written over 60 periodicals. I do a lot of
20 writing all the time. But I do not sign anything
21 unless I can affirm that it reflects my

Page 16

1  professional opinion.
2     Q.  The materials in the footnotes, you
3  said you compiled those?
4     A.  Yeah. Well, I -- yeah, I researched
5  them. I mean, I printed them out, looked at
6  them, checked to make sure that they're accurate.
7  Yeah.
8     Q.  Did Ms. Darshan-Leitner send you any
9  of the source materials that were cited in the
10 footnotes?
11    A.  Not that I recall.
12    Q.  Do you recall whether there were any
13 materials that you were unable to locate?
14    A.  Well, I think there was one footnote
15 that I was unable to recall, yeah, one that I was
16 not able to locate. I think that would be
17 Footnote Number 1, which was a YouTube video.
18    Q.  And so what did you do when you
19 couldn't locate Footnote 1?
20    A.  What do you mean what did I do?
21    Q.  Did you strike that citation from the

Page 17

1  report?
2     A.  No, because it was consistent with
3  other, you know, videos that I'd seen, so I
4  couldn't locate that precise one, but I did not
5  strike that one footnote.
6     Q.  What were the other videos that you
7  had seen that were consistent with that YouTube
8  video?
9     A.  Well, they're listed in the footnotes.
10 I mean I can read them through with you if you
11 want.
12    Q.  Other footnotes in the report, you're
13 saying, are consistent with Footnote Number 1?
14    A.  Well, not just -- yeah, I mean there's
15 a mosaic that fits together. So that one
16 footnote, though, I couldn't locate the YouTube
17 video. I did not view that YouTube video.
18    Q.  And that's the only source that you
19 did not view before you signed your report?
20    A.  That's the only source that I did not,
21 could not obtain, that I recall. Let me just

Page 26

1  A. I've heard the name. I'm trying to
2  associate it.
3  Q. Where do you think you heard it?
4  A. Probably in the context of this issue
5  somewhere.
6  Q. By "this issue," what do you mean?
7  A. The draft.
8  Q. Were you ever told that Avi Leitner
9  was the person who wrote the draft that you
10 received?
11 A. No. I was never told who drafted it.
12 I have no idea who drafted it.
13 Q. Looking at 242, which is your invoice,
14 I take it that is your signature at the bottom?
15 A. Yes.
16 Q. And is there a stamp that's been
17 affixed to it next to your signature?
18 A. Yes.
19 Q. And who affixed that stamp?
20 A. I did.
21 Q. That is a stamp, I take it, you had

Page 27

1  created for the Center?
2  A. Yes, one of our stamps.
3  Q. I think you said before that as you
4  sit here today, you can't tell us exactly which
5  portions of this document, and by "this", I mean
6  Exhibit 238, you edited and what was sent to you,
7  correct?
8  A. I know one portion I did edit.
9  Q. Okay. Which portion is that?
10 A. That would be -- I've got my copy; now
11 I'm trying to identify the page on your copy so
12 we can be on the same copy. Give me a second
13 here.
14     On Page 13, four lines down from the
15 top, I inserted that sentence where it says,
16 "Nevertheless, even if one accepts the view that
17 the 'spark' was not orchestrated, it is clear
18 that Arafat utilized the incident as an excuse to
19 orchestrate his planned al-Aqsa Intifada."
20 Q. So that sentence was not in the draft
21 that was sent to you on March 21st?

Page 28

1  A. I'd have to look at the draft again,
2  but I think I'm recalling that I either reworded
3  it or added that sentence. Easy to solve if we
4  look at the draft.
5  Q. So let's take a look at 241.
6  A. Yeah, it looks like I -- again,
7  obviously it would fit somewhere before the
8  Arafat launch, but, I mean, I recall that
9  sentence because, you know, I'm looking at both
10 sides of the issue from a scholarly perspective.
11 There's arguments on both sides about what
12 sparked, you know, the uprising, so that is one
13 sentence that sticks out in my mind.
14 Q. Any other sentences that you recall
15 adding?
16 A. That would be a substantive issue
17 because I didn't agree with the draft, you know,
18 putting the issue on one side. I felt, from my
19 scholarship, that there's two sides to it. There
20 were other changes. I just don't recall what
21 they were.

Page 29

1  Q. So your view was that the initial
2  draft was too one-sided?
3  A. Well, that particular paragraph.
4  Q. And so you added that sentence to even
5  it out?
6  A. I recall adding that sentence. I
7  obviously made other changes to the structure of
8  various sentences and grammar and things like
9  that. That's just the one that sticks out in my
10 mind.
11 Q. Well, let's turn to the substance of
12 the report, and maybe we can identify other
13 areas.
14     On Page 11 there is a paragraph with
15 the header "Opinion," correct?
16 A. Yes.
17 Q. The document that you are looking at,
18 is that a document you brought with you?
19 A. Yes, this is a copy of the one that I
20 submitted. It appears to be the same one that
21 you have shown me. I've got this one obviously

Page 74

1   Q. But you can't cite to me a single
2   scholarly source where another academic has said
3   the Palestinian Authority is part of radical
4   Islam, right?
5   A. I could, but I can't do it right at
6   this second.
7   Q. What would you need to do to be able
8   to do it right at this second?
9   A. Well, it wouldn't be at this second.
10  I'd have to go back and research the issue and
11  compile them. You've got a lot of literature
12  that talks about the connection of the PA.
13  You've got -- as I've got in my white paper,
14  we've got seized documents, a lot that the
15  Israelis seized that show a connection between
16  those two links. You've got congressional
17  resolutions that would make certain findings of
18  fact that I've put out in my white paper. You've
19  got media reports that cover the topic by a
20  variety of sources.
21  Q. So you're referring to the sources

Page 75

1   that are cited either in this initial report or
2   in your rebuttal report, correct?
3   A. Well, some of the sources. There's
4   many, many more. If you're going to research
5   that particular issue, then I imagine you could
6   write hundreds of pages on the topic.
7   Q. Are their other sources of scholarship
8   or evidence that you are aware of that you
9   omitted from either this report or your rebuttal
10  report?
11  A. Am I aware of other sources that I
12  omitted?
13  Q. That you omitted?
14  A. There are hundreds of other sources
15  that I've not put in the report.
16  Q. You've personally reviewed these
17  sources?
18  A. It's pretty much common knowledge.
19  Q. You personally reviewed these sources?
20  A. Well, I haven't read every word in
21  every source that's out there, no. No one has.

Page 76

1   Q. Professor Addicott, are you saying
2   that there are bases for your opinion that you
3   have omitted from your report or your rebuttal
4   report that support your conclusion?
5       MR. YALOWITZ: Object to the form.
6   Objection.
7   A. Well, I would say that, you know, as a
8   scholar, I look at a lot of different sources
9   and, again, I plug that information, whether it
10  comes from -- I've just got a selected, you know,
11  group of sources in these reports. If I had the
12  time, I could produce a greater volume of
13  material with obviously many, many more sources,
14  but I was not asked to put every source that is
15  out there in this report. That would encompass a
16  lot of time.
17      So I'm satisfied that the sources that
18  I have developed are enough to convince the
19  reasonable person that these facts are correct
20  and my conclusions are correct.
21  Q. Let's turn to your initial report.

Page 77

1   First of all, you did not compile the sources for
2   this initial report, right?
3   A. For the initial report, I didn't pen
4   the initial report, but everything in the initial
5   report I have adopted, and it reflects my
6   professional opinion exactly.
7   Q. But you didn't add a single footnote
8   to the text that was sent to you that makes up
9   your initial report, correct?
10  A. I can't say that. I don't recall. I
11  would say if I did, it wasn't very many.
12  Q. You said you reviewed all of the
13  sources that are cited in this report?
14  A. To my knowledge, except for that one.
15  But, again, it's been awhile, since March. But I
16  did produce all the ones that I could find. The
17  one stands out in my mind, the YouTube video,
18  but -- so I'll just say yes.
19  Q. And did you review them all before you
20  signed it?
21  A. Yes.

JEFFREY ADDICOTT DEPOSITION     October 2, 2013          Sokolow v. the PLO

Page 110

1  A. Okay. Citation Number 8?
2  Q. Number 8.
3  A. Okay.
4  Q. Whereas the report states, "Documents
5  seized from PA offices by the Israeli military
6  during Operation Defensive Shield (2002) further
7  demonstrated that Fatah, the dominant faction of
8  the Palestinian Authority, bankrolled nearly
9  every aspect of the AAMB's terrorist
10 operations-from explosives to guns and gas money.
11 Footnote 8."
12      What is the source -- what portion of
13 the document that you have as 203 supports that
14 contention in your report?
15 A. It's cumulative. As you see, there's
16 no page number cited. If you look at the
17 document and read it, that's the conclusion that
18 I came to.
19 Q. When you say that's the conclusion you
20 came to, you didn't write that sentence, right?
21 A. Everything in this report I adopt as

Page 111

1  my own. It reflects my professional opinion. I
2  didn't pen it, but I adopt it as 100 percent
3  reflecting my professional opinion based on these
4  documents and my knowledge of the organization,
5  operation and behavior of terrorist
6  organizations.
7  Q. And you don't know who penned that
8  sentence?
9  A. No, I don't know who did the draft.
10 Q. It was provided to you by plaintiffs'
11 counsel, correct?
12 A. This draft was provided to me. I
13 carefully reviewed it, I made changes and I've
14 adopted it exactly as my own.
15 Q. And you signed off on it the next day?
16 A. Well, I don't know -- no, it wasn't
17 the next day, no. I spent some time looking
18 through this document.
19 Q. Let's go back to Exhibit 239. Do you
20 still have that in front of you?
21 A. 239. I don't see it -- oh, yes, I do

Page 112

1  see it. Okay. Yes.
2  Q. This is the e-mail we discussed before
3  from Nitsana Darshan-Leitner to you attaching the
4  two Word documents, correct?
5  A. Yes.
6  Q. Dated March 21st, 2013, right?
7  A. Correct.
8  Q. And you signed the report on March
9  22nd, correct?
10 A. That is correct.
11 Q. The next sentence on Page 15?
12 A. The next sentence on Page 15, okay.
13 Q. That ends with Footnote 9 is a
14 quotation from the report that is Exhibit 203,
15 correct?
16 A. Yes.
17 Q. What is the unequivocal proof cited in
18 that sentence?
19 A. "The captured documents proved
20 unequivocally that the Fatah organization and the
21 Al-Aqsa Martyrs Brigade are one and the same and

Page 113

1  they cannot be separated."
2  Q. My question is what is the unequivocal
3  proof cited in that report?
4  A. I'm not sure I follow the question.
5  Q. The sentence that's in quotations
6  states that, "The captured documents proved
7  unequivocally that the Fatah organization and the
8  Al-Aqsa Martyrs Brigade are one and the same and
9  they cannot be separated," correct?
10 A. That's what the document states, yes.
11 Q. Based on your review of the document,
12 what is the unequivocal proof?
13 A. You're asking me to find the cite
14 where that came from in the quotation?
15 Q. No, I'm asking you to tell me in your
16 words what the unequivocal proof is that Fatah
17 and Al-Aqsa are one and the same.
18 A. That's a quotation from the Israeli
19 report.
20 Q. So the quotation is lifted verbatim
21 from the Israeli report and dropped into the

Page 126

1  Department report, later on in the description of
2  the Al-Aqsa Martyrs Brigade, the report states,
3  under the heading External Aid, "In the last
4  year, numerous public accusations suggest Iran
5  and Hizballah are providing support to al-Aqsa
6  elements, but the extent of external influence on
7  al-Aqsa as a whole is not clear." Do you see
8  that?
9      A.   Yes, I do.
10     Q.   Do you know what the numerous public
11 accusations are?
12     A.   Do I know where they got this
13 information to write this sentence? No.
14     Q.   Did you do any independent research to
15 verify the validity of any of the sources that
16 were cited in the initial report?
17     A.   Well, I have a basis of knowledge.
18 For example, Iran, a lot of basis of knowledge
19 about Iran's support to Hizballah, Hamas, other
20 terrorist organizations, so I have a -- you know,
21 just based on my general scholarship on the

Page 127

1  issue, I've got a wide basis. It's not like the
2  issue of terrorism law is something that is
3  foreign to me.
4      Q.   Did you do any independent research to
5  verify the validity of any of the sources cited
6  in the initial report you signed?
7      A.   You mean additional independent --
8      Q.   Yeah.
9      A.   Well, yeah.
10     Q.   And what was that?
11     A.   Well, you'll see some of it reflected
12 in my rebuttal to the Robinson report. I'd have
13 to get the other report out and go through it
14 with you, I guess.
15     Q.   Let's talk about just the initial
16 report. Between when you received the drafts and
17 when you signed it, did you do any independent
18 research regarding the validity of the sources
19 cited in that report?
20     A.   Well, I found that the sources were
21 all mainstream sources, so, you know, you can

Page 128

1  pull TIME Magazine, you can look at the
2  resolutions. I don't really have to double-check
3  whether the resolution is the correct resolution.
4  So, no.
5      Q.   Do you know whether the Al-Aqsa
6  Martyrs Brigade was mentioned in the State
7  Department's 2001 report?
8      A.   I can't recall.
9      Q.   This is an annual report that the
10 State Department puts out, correct?
11     A.   The State Department puts out an
12 annual report.
13     Q.   And have you researched the State
14 Department's subsequent statements about Al-Aqsa
15 Martyrs Brigade?
16     A.   Well, I have, and I can't recall right
17 now precisely which year I looked at and what the
18 language said because I've looked at CSR reports,
19 I've looked at resolutions, bills.
20          MR. WISE: Can you mark that for me,
21 please.

Page 129

1           (Defendants' Deposition Exhibit Number
2  249 was marked for identification.)
3           BY MR. WISE:
4      Q.   Professor, that's 249. I'll ask you
5  if you recognize that as the 2006 version of the
6  State Department report?
7      A.   It says 2007 at the top.
8      Q.   The date that it is produced, do you
9  know what that means in relation to what year the
10 report is covering?
11     A.   My only comment is I don't see where
12 it says 2006 on here.
13     Q.   Do you know, based on how the State
14 Department produces its reports, how the date of
15 publication relates to the time period the State
16 Department is covering?
17     A.   No.
18     Q.   Will you turn to Chapter 6.
19     A.   Do you know what page that would be
20 on?
21     Q.   Well, I'm trying to figure out how the