JEFFREY ADDICOTT DEPOSITION     October 2, 2013                    Sokolow v. the PLO

### Page 10

1. other individual contacted me. I've never met
2. either of them in person, so I can't put a face
3. to a name.
4.    Q.   And when they contacted you initially,
5. was it by telephone or was it by e-mail?
6.    A.   Telephone.
7.    Q.   Do you know how they came to know
8. about you?
9.    A.   I do not know. I would assume, and
10. this is just an assumption, that they'd heard
11. about the Center For Terrorism Law, where I'm the
12. director and the founder. We're an
13. internationally recognized institute at the law
14. school, so I assume that they probably came
15. across my name in media reports or something of
16. that nature.
17.    Q.   The substance of the first phone call,
18. what do you remember about what they asked you to
19. do?
20.    A.   Well, I mean, the main point was to:
21. Would I be willing to look over a draft or to

### Page 11

1. write an expert opinion piece on the subject.
2. And as I recall, they had a rather short time
3. line, and I said that I would be willing to do
4. so.
5.    Q.   How long after that phone call did you
6. receive the draft that they had referenced?
7.    A.   Again, if you looked at my CV, you can
8. see that I do about a hundred -- well, between 50
9. and a hundred media interviews each month. I do
10. like five to ten speeches each month. I'm a
11. full-time law professor, so a lot of activity
12. going on. So I really don't recall, but it was a
13. short period. Perhaps days, but I can't recall.
14.    Q.   When they said that they wanted to
15. know whether you would be willing to read a draft
16. or write a draft about "the subject," what was
17. "the subject" as they identified it to you?
18.    A.   Well, it was concerning the issue of
19. the Second Intifada and the role that the PLO and
20. Yasser Arafat and the PA had played in the
21. violence associated with that event in history.

### Page 12

1.    Q.   Looking at 239, the e-mail, you'll see
2. on the bottom of that two attachments.
3.    A.   Right.
4.       MR. WISE:  So let me ask the court
5. reporter to mark this document as Exhibit 240.
6.       (Defendants' Deposition Exhibit Number
7. 240 was marked for identification.)
8.       MR. WISE:  And this as 241, and I will
9. show them to you together.
10.       (Defendants' Deposition Exhibit Number
11. 241 was marked for identification.)
12.       BY MR. WISE:
13.    Q.   Professor, looking at Exhibit 240, do
14. you recognize that as the Word document attached
15. to Ms. Darshan-Leitner's March 21 e-mail titled
16. Expert Report - Americans Killed.doc?
17.    A.   I believe that's correct.
18.    Q.   And do you recognize 241 as the Word
19. document titled Expert Report PA Sponsorship of
20. Terrorism.doc?
21.    A.   Yes, I believe that's correct as well.

### Page 13

1.    Q.   The two Word documents, Exhibit 240
2. and 241, you did not write these drafts, correct?
3.    A.   No, I didn't pen these drafts; that's
4. correct.
5.    Q.   Those were written by someone
6. presumably associated with Ms. Darshan-Leitner,
7. correct?
8.    A.   I do not know, but I know that she
9. sent me those drafts and asked me to look at
10. them, to research them, and I did so.
11.    Q.   Do you know who did pen them?
12.    A.   I have no idea.
13.    Q.   Did you ask her who wrote them?
14.    A.   No.
15.    Q.   Do you have any reason to believe that
16. you received 240 and 241 prior to the e-mail that
17. is marked as 239?
18.    A.   Well, again, I don't think so, but I
19. don't know. I see the name on the e-mail. It
20. looks vaguely familiar, and I'm assuming that
21. that e-mail -- that these two documents as

Page 110

1   A.  Okay.  Citation Number 8?
2   Q.  Number 8.
3   A.  Okay.
4   Q.  Whereas the report states, "Documents
5   seized from PA offices by the Israeli military
6   during Operation Defensive Shield (2002) further
7   demonstrated that Fatah, the dominant faction of
8   the Palestinian Authority, bankrolled nearly
9   every aspect of the AAMB's terrorist
10  operations-from explosives to guns and gas money.
11  Footnote 8."
12       What is the source -- what portion of
13  the document that you have as 203 supports that
14  contention in your report?
15  A.  It's cumulative.  As you see, there's
16  no page number cited.  If you look at the
17  document and read it, that's the conclusion that
18  I came to.
19  Q.  When you say that's the conclusion you
20  came to, you didn't write that sentence, right?
21  A.  Everything in this report I adopt as

Page 111

1   my own.  It reflects my professional opinion.  I
2   didn't pen it, but I adopt it as 100 percent
3   reflecting my professional opinion based on these
4   documents and my knowledge of the organization,
5   operation and behavior of terrorist
6   organizations.
7   Q.  And you don't know who penned that
8   sentence?
9   A.  No, I don't know who did the draft.
10  Q.  It was provided to you by plaintiffs'
11  counsel, correct?
12  A.  This draft was provided to me.  I
13  carefully reviewed it, I made changes and I've
14  adopted it exactly as my own.
15  Q.  And you signed off on it the next day?
16  A.  Well, I don't know -- no, it wasn't
17  the next day, no.  I spent some time looking
18  through this document.
19  Q.  Let's go back to Exhibit 239.  Do you
20  still have that in front of you?
21  A.  239.  I don't see it -- oh, yes, I do

Page 112

1   see it.  Okay.  Yes.
2   Q.  This is the e-mail we discussed before
3   from Nitsana Darshan-Leitner to you attaching the
4   two Word documents, correct?
5   A.  Yes.
6   Q.  Dated March 21st, 2013, right?
7   A.  Correct.
8   Q.  And you signed the report on March
9   22nd, correct?
10  A.  That is correct.
11  Q.  The next sentence on Page 15?
12  A.  The next sentence on Page 15, okay.
13  Q.  That ends with Footnote 9 is a
14  quotation from the report that is Exhibit 203,
15  correct?
16  A.  Yes.
17  Q.  What is the unequivocal proof cited in
18  that sentence?
19  A.  "The captured documents proved
20  unequivocally that the Fatah organization and the
21  Al-Aqsa Martyrs Brigade are one and the same and

Page 113

1   they cannot be separated."
2   Q.  My question is what is the unequivocal
3   proof cited in that report?
4   A.  I'm not sure I follow the question.
5   Q.  The sentence that's in quotations
6   states that, "The captured documents proved
7   unequivocally that the Fatah organization and the
8   Al-Aqsa Martyrs Brigade are one and the same and
9   they cannot be separated," correct?
10  A.  That's what the document states, yes.
11  Q.  Based on your review of the document,
12  what is the unequivocal proof?
13  A.  You're asking me to find the cite
14  where that came from in the quotation?
15  Q.  No, I'm asking you to tell me in your
16  words what the unequivocal proof is that Fatah
17  and Al-Aqsa are one and the same.
18  A.  That's a quotation from the Israeli
19  report.
20  Q.  So the quotation is lifted verbatim
21  from the Israeli report and dropped into the