REDACTED - PUBLICLY FILED VERSION

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

MARK I. SOKOLOW, *et al.*,

                Plaintiffs,

    vs.

THE PALESTINE LIBERATION
ORGANIZATION, *et al.*,

                Defendants.

No. 04 Civ. 00397 (GBD) (RLE)

---

## MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANTS' MOTION FOR RECONSIDERATION

ARNOLD & PORTER LLP
399 Park Avenue
New York, New York 10022
(212) 715-1000

*Attorneys for Plaintiffs*

March 21, 2014

REDACTED - PUBLICLY FILED VERSION

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.   DEFENDANTS REPEATEDLY WAIVED THEIR OBJECTION TO
     PERSONAL JURISDICTION.............................................................................. 1

     A.   Procedural Background Relating to Defendants' Waivers ..................................... 1

     B.   Defendants Repeatedly Waived Their Arguments Concerning Personal
          Jurisdiction........................................................................................................... 4

II.  DEFENDANTS DO NOT HAVE CONSTITUTIONAL DUE PROCESS
     RIGHTS ...................................................................................................................... 8

     A.   Governments Do Not Have Constitutional Due Process Rights............................ 8

     B.   Defendants Do Not Have Constitutional Rights Because They Stand Outside
          the Structure of the Union ..................................................................................... 9

          1.   The PLO......................................................................................................... 10

          2.   The PA ........................................................................................................... 11

III. *DAIMLER* AND *GOODYEAR* DID NOT CHANGE "CONTROLLING LAW"............ 11

          1.   *Daimler* and *Goodyear* Concerned Fourteenth Amendment Rights,
               Not Fifth Amendment Rights......................................................................... 12

          2.   *Daimler* Arose in a Different Factual Context, and the Difference
               Matters ........................................................................................................... 16

          3.   *Daimler* Did Not Address the Method of Service by Which
               Jurisdiction Attached in This Case .............................................................. 17

IV.  THIS COURT HAS SPECIFIC PERSONAL JURISDICTION OVER
     DEFENDANTS UNDER THE FIFTH AMENDMENT.................................................. 19

     A.   Facts Relating to Specific Jurisdiction................................................................ 19

          1.   Background of the U.S. Involvement in the Conflict ............................... 19

          2.   Defendants' Public Relations Campaign to Alter U.S. Public
               Opinion and Policy ..................................................................................... 21

          3.   Overview of Defendants' Terrorist Campaign ......................................... 24

               a.   Defendants' Incitement of Terrorism........................................... 25

b.      Defendants' Direct Involvement in Terrorism.............................. 27

c.      Defendants' Provision of Material Support to Terrorists ............. 29

B.      Analysis:  Defendants Have Minimum Contacts with the United States ............. 30

1.      The Relationship Between Defendants' "Overall Activity" Within
        the United States and the ATA Claim Satisfies Minimum Contacts ........ 31

2.      Defendants' Extraterritorial Actions Satisfy Minimum Contacts
        Under the "Effects Test" .......................................................... 33

V.      IF THE COURT DOES NOT REJECT THE JURISDICTIONAL CHALLENGE,
        IT MUST DEFER THE FACT ISSUES TO TRIAL........................................................ 34

CONCLUSION.................................................................................................................... 35

REDACTED - PUBLICLY FILED VERSION

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

C<span style="font-variant: small-caps;">ASES</span>

*Abelesz v. OTP Bank,*
   692 F.3d 638 (7th Cir. 2012) ..................................................3

*Absolute Activist Master Value Fund, Ltd. v. Ficeto,*
   2013 WL 1286170 (S.D.N.Y. Mar. 28, 2013) (Daniels, J.).....................7

*Alliance for Env't Renewal, Inc. v. Pyramid Crossgates Co.,*
   436 F.3d 82 (2d Cir. 2006)....................................................34

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,*
   305 F.3d 120 (2d Cir. 2002)...................................................31

*Bendix Autolite Corp. v. Midwesco Enters., Inc.,*
   486 U.S. 888 (1988)..........................................................17

*Bennett v. City of Holyoke,*
   362 F.3d 1 (1st Cir. 2004)....................................................6

*Best Van Lines, Inc. v. Walker,*
   490 F.3d 239 (2d Cir. 2007)..................................................30

*Boit v. Gar-Tec Prods., Inc.,*
   967 F.2d 671 (1st Cir. 1992).................................................35

*Burnham v. Superior Ct.,*
   495 U.S. 604 (1990)..........................................................18

*Burton v. N. Dutchess Hosp.,*
   106 F.R.D. 477 (S.D.N.Y. 1985) ..............................................5

*Chavez v. Dole Food Co.,*
   947 F. Supp. 2d 438 (D. Del. 2013)...........................................3

*Chew v. Dietrich,*
   143 F.3d 24 (2d Cir. 1998)..........................................12, 13, 30, 31

*City of E. St. Louis v. Circuit Ct. for Twentieth Judicial Circuit, St. Clair Cnty., Ill.,*
   986 F.2d 1142 (7th Cir. 1993) ...............................................9, 11

*City of Sault Ste. Marie, Mich. v. Andrus,*
   532 F. Supp. 157 (D.D.C. 1980)...............................................9, 11

*CML-NV Civic Ctr., LLC v. Gowan Indus., LLC,*
   2011 WL 6752406 (D. Nev. Dec. 23, 2011).....................................3

*Daimler AG v. Bauman*,
    134 S. Ct. 746 (2014) ........................................................................... *passim*

*Del Ponte v. Universal City Dev. Partners, Ltd.*,
    2008 WL 169358 (S.D.N.Y. 2008) ...................................................................31

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*,
    722 F.3d 81 (2d Cir. 2013)...............................................................................34

*Eastman Chem. Co. v. Alphabet, Inc.*,
    2011 WL 6004079 (D. Del. Nov. 4, 2011) ........................................................3

*El Paso Cnty. Water Imp. Dist. No. 1 v. Int'l Boundary and Water Comm'n*,
    701 F. Supp. 121 (W.D. Tex. 1988)...............................................................9, 11

*Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*,
    582 F.3d 393 (2d Cir. 2009)............................................................................8, 9

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
    131 S. Ct. 2846 (2011) ........................................................................ *passim*

*Hamilton v. Atlas Turner, Inc.*,
    197 F.3d 58 (2d Cir. 1999)..................................................................................7

*Handley v. Ind. & Mich. Elec. Co.*,
    732 F.2d 1265 (6th Cir. 1984) .........................................................................14

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
    466 U.S. 408 (1984)..........................................................................................30

*Hershman v. Muhlenberg College*,
    2013 WL 5929849 (D. Conn. Nov. 4, 2013) ......................................................3

*Holocaust Victims of Bank Theft v. Magyar Nemzeti Bank*,
    807 F. Supp. 2d 699 (N.D. Ill. 2011) .................................................................3

*Holzsager v. Valley Hosp.*,
    646 F.2d 792 (2d Cir. 1981)................................................................................5

*In re Grand Jury Subpoena Directed to Marc Rich & Co.*,
    707 F.2d 663 (2d Cir. 1983).............................................................................13

*In re Hohorst*,
    150 U.S. 653 (1893)..........................................................................................17

*In re Roman Catholic Diocese of Albany, New York, Inc.*,
    2014 WL 485948 (2d Cir. Feb. 7, 2014)............................................................6

*In re Scott Cable Commc'ns, Inc.*,
  259 B.R. 536 (D. Conn. 2001) ................................................................................9

*In re Terrorist Attacks on Sept. 11, 2001*,
  714 F.3d 659 (2d Cir. 2013)..................................................................................7

*In re Terrorist Attacks on Sept. 11, 2001*,
  349 F. Supp. 2d 765 (S.D.N.Y. 2005),
  *recons. on other grounds*, 392 F. Supp. 2d 539 (S.D.N.Y. 2005) ..........................12

*In re Terrorist Attacks on Sept. 11, 2001*,
  538 F.3d 71 (2d Cir. 2008),
  *abrogated on other grounds by* 560 U.S. 305 (2010) ..............................................14

*Inso Corp. v. Dekotec Handelsges, mbH*,
  999 F. Supp. 165 (D. Mass. 1998) .........................................................................5

*J. McIntyre Mach., Ltd. v. Nicastro*,
  131 S. Ct. 2780 (2011).........................................................................6, 30, 34

*Johnston v. Mut. Reserve Life Ins. Co.*,
  104 A.D. 550 (1st Dept. 1905)..............................................................................18

*Keeton v. Hustler Magazine, Inc.*,
  465 U.S. 770 (1984)..............................................................................................30

*Koninklijke Phillips Elecs. v. Digital Works, Inc.*,
  358 F. Supp. 2d 328 (S.D.N.Y. 2005)....................................................................5

*Landoil Res. Corp. v. Alexander & Alexander Servs., Inc.*,
  77 N.Y.2d 28 (1990) .............................................................................................18

*Licci v. Lebanese Canadian Bank*,
  673 F.3d 50 (2d Cir. 2012)....................................................................................7

*Licci v. Lebanese Canadian Bank, SAL*,
  732 F.3d 161 (2d Cir. 2013)....................................................................31, 33, 34

*Lindsey v. Cargotec USA, Inc.*,
  2011 WL 4587583 (W.D. Ky. Sept. 30, 2011) ......................................................3

*Magnetic Audiotape Antitrust Litig.*,
  334 F.3d 204 (2d Cir. 2003)..................................................................................13

*Marcial Ucin, S.A. v. SS Galicia*,
  723 F.2d 994 (1st Cir. 1983)..................................................................................5

*Mariash v. Morrill*,
496 F.2d 1138 (2d Cir. 1974)...........................................................................................12

*Max Daetwyler Corp. v. R. Meyer*,
762 F.2d 290 (3d Cir. 1985)............................................................................................14

*Meetings & Expositions, Inc. v. Tandy Corp.*,
490 F.2d 714 (2d Cir. 1974)..............................................................................................5

*Mendelsohn v. Meese*,
695 F. Supp. 1474 (S.D.N.Y. 1988).................................................................................10

*Merrill Lynch, Pierce, Fenner & Smith v. Lecopulos*,
553 F.2d 842 (2d Cir. 1977)..............................................................................................5

*Mohamad v. Rajoub*,
2011 WL 3664462 (Aug. 19, 2011)...................................................................................3

*Monistere v. Losauro*,
2013 WL 6383886 (E.D. La. Dec. 4, 2013)........................................................................3

*Moss v. Atl. Coast Line R.R. Co.*,
157 F.2d 1005 (2d Cir. 1946)..........................................................................................17

*Nw. Nat'l Ins. Co. v. Frumin*,
739 F. Supp. 1307 (E.D. Wis. 1990)..................................................................................5

*Palestine Inf. Office v. Shultz*,
674 F. Supp. 910 (D.D.C. 1987), *aff'd*, 853 F.2d 932 (D.C. Cir. 1988)...........................10, 11

*Puerto Rico Pub. Hous. Admin. v. U.S. Dep't of Hous. & Urban Dev.*,
59 F. Supp. 2d 310 (D.P.R. 1999)..................................................................................9, 11

*Pugh v. Socialist People's Libyan Arab Jamahiriya*,
290 F. Supp. 2d 54 (D.D.C. 2003)...................................................................................15

*Richardson Greenshields Secs., Inc. v. Metz*,
566 F. Supp. 131 (S.D.N.Y. 1983)....................................................................................4

*Russell v. SNFA*,
987 N.E.2d 778 (Ill. 2013)................................................................................................3

*SEC v. Straub*,
921 F. Supp. 2d 244 (S.D.N.Y. 2013)..........................................................................12, 31

*SEC v. Unifund SAL*,
910 F.2d 1028, 1033 (2d Cir.),
*reh'g denied*, 917 F.2d 98 (2d Cir. 1990)........................................................................13

*Shaffer v. Heitner*,
  433 U.S. 186 (1977)...................................................................................30

*Smolik v. Phila. & Reading Coal & Iron Co.*,
  222 F. 148 (S.D.N.Y. 1915) (L. Hand, J.) ...............................................18

*Sokolow v. Palestine Liberation Organization*,
  583 F. Supp. 2d 451 (S.D.N.Y. 2008)..............................................11, 32

*South Carolina v. Katzenbach*,
  383 U.S. 301 (1966),
  *abrogated on other grounds by* 133 S. Ct. 2612 (2013) .............................8

*St. Clair v. Cox*,
  106 U.S. 350 (1882)..................................................................................17

*State of Wash. v. Superior Ct.*,
  289 U.S. 361 (1933)..................................................................................17

*Strauss v. Credit Lyonnais, S.A.*,
  249 F.R.D. 429 (E.D.N.Y. 2008)...............................................................16

*United States v. Al Kassar*,
  660 F.3d 108 (2d Cir. 2011)...........................................................13, 14, 34

*United States v. Yousef*,
  327 F.3d 56 (2d Cir. 2003)........................................................................13

*Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*,
  956 F.2d 1245 (2d Cir. 1992).......................................................................1

*Virgin Islands v. Miller*,
  2010 WL 1790213 (V.I. Super. May 4, 2010)............................................9

*Walden v. Fiore*,
  134 S. Ct. 1115 (2014)..............................................................30, 32, 33, 34

*Wultz v. Bank of China Ltd.*,
  910 F. Supp. 2d 548 (S.D.N.Y. 2012)........................................................16

**RULES AND REGULATIONS**

Fed. R. Civ. P. 4(k) ...........................................................................12, 17, 18

Fed. R. Civ. P. 12(g) .....................................................................................8

Fed. R. Civ. P. 12(h) .....................................................................................8

**STATUTES**

18 U.S.C. § 2331(1)(B)(ii) ...........................................................................................................32

18 U.S.C. § 2334 .......................................................................................................................17, 19

Pub. L. 100–204, § 1002 (codified at 22 U.S.C. § 5201) ............................................................19

**OTHER AUTHORITIES**

Allan R. Stein, "*The Meaning of 'Essentially at Home' in Goodyear Dunlop*," 63 S.C. L.
    Rev. 527, 532 (2012) .............................................................................................................3

Wright & Miller, *Federal Practice and Procedure* § 1068.1 ..................................................12, 14

As relevant here, a party seeking reconsideration must show that its motion is timely and that there has been "an intervening change of controlling law." *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992). Defendants claim that a new Supreme Court case, *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014), constitutes an "intervening change in controlling law." Mot. for Recons. at 7-8 (Jan. 31, 2014), Docket Entry ("DE") 421.

This Court should deny the motion for reconsideration for five independent reasons. *First*, defendants expressly submitted to the jurisdiction of this Court and repeatedly waived their "essentially at home" defense. *Second*, defendants are not "persons" protected by the Due Process Clause of the Fifth Amendment and, thus, are not entitled to invoke its "minimum contacts" test. *Third*, defendants are simply incorrect that *Daimler* constitutes a change in "controlling law." *Fourth*, the uncontroverted evidence establishes that defendants have far more than the minimum contacts necessary to justify specific jurisdiction. *Fifth*, the jurisdictional issue and the merits are intertwined, so any factual dispute about jurisdiction must be presented to the jury.

## I.    DEFENDANTS REPEATEDLY WAIVED THEIR OBJECTION TO PERSONAL JURISDICTION

Defendants invoke the "essentially at home" test to argue that general jurisdiction over them is unconstitutional. Defendants waived that objection, first by stipulating in March 2011 "to allow the case to proceed before this Court," and then by litigating the case on the merits for years after the Supreme Court announced the "essentially at home" test in June 2011.

### A.    Procedural Background Relating to Defendants' Waivers

Defendants moved to dismiss this case for lack of personal jurisdiction in 2007, again in 2009, and a third time in 2010. DE 45, 66, 81. The Court denied defendants' motion on March 30, 2011. DE 87. Three weeks later, defendants challenged personal jurisdiction again—this

REDACTED - PUBLICLY FILED VERSION

time, in a motion to dismiss the case based on lack of venue.  Defendants argued that venue was improper and that this "also means that the Court lacks personal jurisdiction over the Defendants."  Mem. in Supp. of Mot. to Transfer or Dismiss (Apr. 20, 2011) at 1, DE 94.  Plaintiffs cross-moved to transfer the case to the Eastern District of New York.  DE 106.

On May 26, 2011, the Court held a hearing and asked defendants:  "If I don't grant your motion to transfer it to DC and I grant the plaintiffs' motion to transfer, or if I am inclined to grant the plaintiffs' motion to transfer it to Brooklyn, do you even want the opportunity to waive venue and stay in this district?"  Appendix Exhibit ("Ex.") F at 59.  Defendants then sent a letter to the Court stating that they would "waive their objection to venue in the Southern District of New York and allow the case to proceed" here.  Ex. A.1.[1]  The Court then denied defendants' motion to transfer venue but did not act on plaintiffs' cross-motion.  Order of June 2, 2011, DE 122.  The next day, defendants wrote the Court another letter.  Ex. A.2.  Defendants reiterated that they "waive[d] their objections to venue in the Southern District of New York *in order to allow the case to proceed before this Court*."  *Id.* (emphasis added).  The Court then issued an order stating:  "Upon Defendants' indication that they are waiving any claim of improper venue, Plaintiffs withdrew their motion to transfer to the Eastern District of New York."  DE 123.

On June 27, 2011—three weeks after defendants knowingly and voluntarily represented to the Court that they would "allow the case to proceed before this Court"—the Supreme Court decided *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846 (2011).  *Goodyear*

---

[1] Exhibits A, C and H within the accompanying Appendix are collections of documents referred to in this Memorandum: Exhibit A collects certain letters that were previously submitted to the Court; Exhibit C comprises relevant expert opinions; Exhibit H contains documents that have been designated as trial exhibits by the parties.  Each document follows a numbered tab in the Appendix, and citations to that document reflect both the Exhibit letter and tab number.  Thus, "Ex H.1" refers to the document behind the first tab within Exhibit H; "Ex H.2" refers to the document behind the Tab 2 within Exhibit H; etc.

REDACTED - PUBLICLY FILED VERSION

announced the "essentially at home" test, which was a "noticeable shift," because the Court "significantly altered its viewpoint regarding the importance of where a corporation is 'at home,' referencing domicile, state of incorporation, and principal place[] of business." *CML-NV Civic Ctr., LLC v. Gowan Indus., LLC,* 2011 WL 6752406, at *6 (D. Nev. Dec. 23, 2011).

Courts and commentators quickly recognized *Goodyear*'s "essentially at home" test as new. *See, e.g.*, Allan R. Stein, "*The Meaning of 'Essentially at Home' in Goodyear Dunlop,*" 63 S.C. L. Rev. 527, 532 (2012) ("[T]he essentially at home standard does not appear in any prior federal or state judicial decision").[2] As the Seventh Circuit explained, "[a] corporation is 'essentially at home' both where it is incorporated and where its principal place of business is located." *Abelesz v. OTP Bank*, 692 F.3d 638, 654 (7th Cir. 2012). Recognizing the change in law, many litigants took prompt steps to obtain the benefit of the new standard.[3]

Defendants (represented by their usual counsel) themselves cited *Goodyear* and its holding in a brief to the U.S. Supreme Court on August 19, 2011. *Mohamad v. Rajoub*, 2011 WL

---

[2] *Monistere v. Losauro*, 2013 WL 6383886, at *3 (E.D. La. Dec. 4, 2013) ("[Defendants] are both incorporated in Florida and both have their principal place of business in Florida. It is clear that Defendants are not subject to general personal jurisdiction in Louisiana based on their domicile, incorporation, or principal places of business."); *Hershman v. Muhlenberg College*, 2013 WL 5929849, at *2 (D. Conn. Nov. 4, 2013) ("[Muhlenberg] is not 'essentially at home' anywhere except Pennsylvania, its state of incorporation, principal place of business, and site of its only campus."); *Chavez v. Dole Food Co.*, 947 F. Supp. 2d 438, 443 (D. Del. 2013) ("Chiquita's activity in Delaware does not come close to rising to the level of the principal place of business, that 'quintessential paradigm' for general jurisdiction. Indeed, while Chiquita's contacts with Delaware are regular, and may be economically substantial, they are not of the 'at home' variety.") (citation omitted); *Eastman Chem. Co. v. Alphabet, Inc.*, 2011 WL 6004079, at *14 n.16 (D. Del. Nov. 4, 2011) ("[T]he U.S. Supreme Court recently clarified that general jurisdiction over foreign corporations is proper if and only if 'their affiliations with the State are so 'continuous and systematic' as to render them *essentially at home in the forum* State.'") (emphasis in original).

[3] *See Lindsey v. Cargotec USA, Inc.*, 2011 WL 4587583, at *1(W.D. Ky. Sept. 30, 2011) (requesting supplemental briefing on personal jurisdiction in light of *Goodyear*); *Holocaust Victims of Bank Theft v. Magyar Nemzeti Bank*, 807 F. Supp. 2d 699, 704 (N.D. Ill. 2011) (citing *Goodyear* in argument that court should reconsider prior personal jurisdiction ruling); *Russell v. SNFA*, 987 N.E.2d 778, 783-84 (Ill. 2013) (directing reconsideration of earlier jurisdictional decision in light of *Goodyear*).

3664462, at \*17 (Aug. 19, 2011) (quoting *Goodyear*:  "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home.").

Although defendants knew of *Goodyear*, they made no new challenge to personal jurisdiction.  Instead, they embarked on a broad-ranging and contentious course of discovery and merits litigation.  Defendants sought and received the issuance of letters of request.  DE 134-36.  They conducted physical examinations and took depositions of virtually every plaintiff and all of plaintiffs' experts.  DE 154.  They obtained discovery rulings on countless topics.  *See, e.g.*, DE 198, 219, 231-37, 337.

On January 4, 2012, defendants submitted a substantial portion of the case to the Court for judgment on the merits in a Rule 12(c) motion for partial judgment on the pleadings.  DE 187.  The Court denied the defendants' motion on August 10, 2012.  DE 251.  On January 22, 2014, the parties submitted a joint pre-trial order for the Court's consideration.

Defendants finally raised their "essentially at home" argument on January 31, 2014.

## B.    Defendants Repeatedly Waived Their Arguments Concerning Personal Jurisdiction

Defendants first waived their jurisdictional arguments by giving written consent "to allow the case to proceed before this Court."  Defendants made this stipulation for the sole purpose of avoiding a decision on *plaintiffs*' motion to change venue to the Eastern District of New York.  DE 93-94.  Defendants' express consent to proceed before the Court was a strategic decision made with full knowledge of their rights; defendants had themselves argued that venue implicated the Court's power to exercise personal jurisdiction over them.  A knowing and voluntary waiver of objections to venue is also sufficient to waive personal jurisdiction objections.  *Rich-*

*ardson Greenshields Secs., Inc. v. Metz*, 566 F. Supp. 131, 133 (S.D.N.Y. 1983) ("A waiver of

objection to venue would be meaningless…if it did not also contemplate a concomitant waiver of

objection to personal jurisdiction.") (citing *Merrill Lynch, Pierce, Fenner & Smith v. Lecopulos*,

553 F.2d 842, 844 (2d Cir. 1977)).[4] This rule has special force here, where defendants claimed

that improper venue also defeated personal jurisdiction but then waived their venue objection "to

allow the case to proceed before this Court."

    Defendants then cemented their written waiver by repeatedly submitting to the Court's

jurisdiction even though they knew that the Supreme Court had announced the "essentially at

home" test in June 2011.  A party may waive otherwise valid personal jurisdiction arguments by

proceeding with litigation, participating in the action, and not raising objections to the assertion

of the court's jurisdiction.  *See Meetings & Expositions, Inc. v. Tandy Corp.*, 490 F.2d 714, 717

(2d Cir. 1974) (so-ordered pre-answer stipulation of settlement was a submission to jurisdiction

binding on defendant even though plaintiff later defaulted on the settlement).[5]  To be sure, a

change in controlling law may excuse an otherwise fatal delay, but only if a party conscientious-

ly brings the change to the court's attention.  *See Holzsager v. Valley Hosp.*, 646 F.2d 792, 796

(2d Cir. 1981).  A party is expected to act promptly after announcement of a "new decision indi-

---

[4] *Koninklijke Phillips Elecs. v. Digital Works, Inc.*, 358 F. Supp. 2d 328, 330-33 (S.D.N.Y. 2005) (agreement that "[a]ny disputes between the parties hereto in connection with this Agreement...shall be submitted to any state or federal courts in The State of New York" amounted to submission to personal jurisdiction of New York courts) (emphasis omitted); *Inso Corp. v. Dekotec Handelsges, mbH*, 999 F. Supp. 165, 167 (D. Mass. 1998) (written assent to "proper forum" construed to "amount[] to consent to personal jurisdiction"); *Nw. Nat'l Ins. Co. v. Frumin*, 739 F. Supp. 1307, 1310 (E.D. Wis. 1990) ("[W]hen a party consents to venue in a particular court, it implicitly consents to the exercise of personal jurisdiction by that court.").

[5] *See, e.g.*, *Marcial Ucin, S.A. v. SS Galicia*, 723 F.2d 994, 996-97 (1st Cir. 1983) (by participating in extensive discovery and waiting to move for dismissal, defendant waived objection based on lack of personal jurisdiction); *Burton v. N. Dutchess Hosp.*, 106 F.R.D. 477, 480-82 (S.D.N.Y. 1985) (same).

REDACTED - PUBLICLY FILED VERSION

cating that such a defense *might* exist." *Id.* (emphasis added). Thus, a delay is only excused where the defense would have been "futile under binding precedent." *Bennett v. City of Holyoke*, 362 F.3d 1, 7 (1st Cir. 2004).

Here, defendants' personal jurisdiction argument stems from *Goodyear.* The *Daimler* Court itself said that *Goodyear* was the "pathmarking opinion" and that "the Court made plain in *Goodyear* and repeats here [that] general jurisdiction requires affiliations 'so "continuous and systematic" as to render [the foreign corporation] essentially at home in the forum State,' *i.e.*, comparable to a domestic enterprise in that State." 134 S. Ct. at 758 n.11, 760 n.16 (quoting *Goodyear*). The Second Circuit has also explained that the "essentially at home" standard was "set forth in *Goodyear"* and merely "clarified in *Daimler*." *In re Roman Catholic Diocese of Albany, New York, Inc.*, 2014 WL 485948, at *5 (2d Cir. Feb. 7, 2014). Defendants concede as much, claiming only that *Daimler* "clarified" *Goodyear.* DE 421 at 10. Everything that defendants argue in their motion for reconsideration, they could have argued from *Goodyear.* The *Goodyear* Court explained that a "corporation's continuous activity of some sorts within a state…is not enough to support the demand that the corporation be amenable to suits unrelated to that activity." *Goodyear*, 131 S. Ct. at 2856. Instead, a court "may assert general jurisdiction over foreign (sister-state or foreign-country) corporations…when their affiliations with the State are so 'continuous and systematic' as to render them *essentially at home* in the forum State." *Id.* at 2851 (emphasis added). The Court in *Goodyear* explained that a corporation "is fairly regarded at home" in a place "equivalent" to an "individual's domicile." *Id.* at 2853-54, 2857. And, in a case decided the same day, the Court cited *Goodyear* as holding that "incorporation or principal place of business…indicates general submission to a State's powers." *J. McIntyre Mach.,*

*Ltd. v. Nicastro*, 131 S. Ct. 2780, 2787 (2011).[6]

Defendants not only cited *Goodyear* in 2011, but they also moved to dismiss for lack of

personal jurisdiction in another case, arguing in that case that they are not "at home" in the Unit-

ed States.  Mem. in Supp. of Mot. to Dismiss, dated June 5, 2013, *Livnat v. Palestinian Authori-*

*ty*, 13-cv-00498 (E.D. Va.), DE 6 at 19-20 (arguing that, in *Goodyear*, "the Court explained that

general jurisdiction permits a court to hear any and all claims against a foreign entity 'when their

affiliations with the State are so 'continuous and systematic' as to render them essentially at

home in the forum state.'").  Ex. G.

Here, defendants actively litigated this case for two-and-a-half years after *Goodyear*

came out, participating in extensive discovery, seeking a judgment on the merits, and even sub-

mitting a joint pre-trial order.  Having waited more than two-and-a-half years to raise their de-

fense, defendants have waived it.  *Hamilton v. Atlas Turner, Inc.*, 197 F.3d 58, 61-63 (2d Cir.

1999) (defendant forfeited its objection to personal jurisdiction by failing to litigate objection

over four-year period and engaging in extensive pre-trial litigation).

Defendants are also barred from asserting their personal jurisdiction objection because

they failed to include it in their Rule 12(c) motion for judgment on the pleadings, filed in January

---

[6] To be sure, the concurrence in *Daimler* criticized the majority for announcing in *Daimler* a "new rule
that in order for a foreign defendant to be subject to general jurisdiction, it must not only possess
continuous and systematic contacts with a forum State, but those contacts must also surpass some
unspecified level when viewed in comparison to the company's 'nationwide and worldwide' activities."
*See* 134 S. Ct. at 770.  However, the eight-justice majority did not agree.  It explained that *Goodyear*
"made plain" the "essentially at home standard," *id.* at 758 n.11, said that its decision was "[i]nstructed by
*Goodyear*," *id.* at 751, and expressly rejected the concurrence's critique that it was departing from prior
cases by assessing "nationwide and worldwide" activities.  *See id.* at 762 n.20.  Courts repeatedly cited
*Goodyear* for the "essentially at home" test even before *Daimler*. *See In re Terrorist Attacks on Sept. 11,
2001*, 714 F.3d 659, 674 (2d Cir. 2013); *Licci v. Lebanese Canadian Bank*, 673 F.3d 50, 60 n.9 (2d Cir.
2012); *Absolute Activist Master Value Fund, Ltd. v. Ficeto*, 2013 WL 1286170, at *11 (S.D.N.Y. Mar. 28,
2013) (Daniels, J.).

2012—six months after *Goodyear* came out. Rule 12(g) provides in relevant part that "a party

that makes a motion under this rule must not make another motion under this rule raising a de-

fense or objection that was available to the party but omitted from its earlier motion." Fed. R.

Civ. P. 12(g). And Rule 12(h) provides that a party waives any defense based on personal juris-

diction that is omitted from a Rule 12(c) motion. Fed. R. Civ. P. 12(h).

## II.    DEFENDANTS DO NOT HAVE CONSTITUTIONAL DUE PROCESS RIGHTS

As foreign governmental and political bodies, defendants have no due process rights. For

an entity that has no constitutional due process rights, *Daimler* is utterly irrelevant. *Daimler* did

not and could not speak to the availability of general jurisdiction, only to its *constitutionality*.

Put another way, defendants' sole challenge is that their *constitutional* due process rights are be-

ing violated. But defendants do not have constitutional due process rights.

### A.    Governments Do Not Have Constitutional Due Process Rights

In the Second Circuit, foreign states do not have due process rights. *Frontera Res. Azer-*

*baijan Corp. v. State Oil Co. of Azerbaijan Republic*, 582 F.3d 393, 398-400 (2d Cir. 2009). In

*Frontera*, the court explained that "a 'foreign State lies outside the structure of the Union.'" 582

F.3d at 399 (quoting *Principality of Monaco v. Miss.*, 292 U.S. 313, 330 (1934)). The Court

therefore held that "we 'are unwilling to interpret the Due Process Clause as conferring rights on

foreign nations that States of the Union do not possess.'" *Id.* (quoting *Price v. Socialist People's*

*Libyan Arab Jamahiriya*, 294 F.3d 82, 99 (D.C. Cir. 2002)).

The Second Circuit's decision is consistent with a line of cases holding that States of the

Union, executive agencies, foreign governments, political subdivisions, and municipalities have

no due process rights. *See, e.g.*, *South Carolina v. Katzenbach*, 383 U.S. 301, 323-24 (1966)

(stating that States of the Union are not "persons" within the ambit of the Fifth Amendment), *ab-*

*rogated on other grounds by Shelby Cnty., Ala. v. Holder*, 133 S. Ct. 2612 (2013); *City of E. St. Louis v. Circuit Ct. for Twentieth Judicial Circuit, St. Clair Cnty., Ill.*, 986 F.2d 1142, 1144 (7th Cir. 1993) ("Municipalities cannot challenge state action on federal constitutional grounds because they are not 'persons' within the meaning of the Due Process Clause."); *In re Scott Cable Commc'ns, Inc.*, 259 B.R. 536, 543 (D. Conn. 2001) ("Government entities have no right to due process under the Fifth Amendment's due process clause."); *El Paso Cnty. Water Imp. Dist. No. 1 v. Int'l Boundary and Water Comm'n*, 701 F. Supp. 121, 123-24 (W.D. Tex. 1988) (dismissing plaintiff's constitutional claim because the Fifth Amendment was "inapplicable" to it); *City of Sault Ste. Marie, Mich. v. Andrus*, 532 F. Supp. 157, 167-68 (D.D.C. 1980) (rejecting argument that municipality could assert due process rights under Fifth Amendment because "a state cannot confer a constitutional status…which the state does not itself enjoy").

Notably, this rule applies as well to governmental entities that are neither foreign sovereign states, nor part of the States of the Union.  *See Puerto Rico Pub. Hous. Admin. v. U.S. Dep't of Hous. & Urban Dev.*, 59 F. Supp. 2d 310, 325 (D.P.R. 1999); *Virgin Islands v. Miller*, 2010 WL 1790213, at *5 (V.I. Super. May 4, 2010) ("[T]he Government [of the Virgin islands] is not a person for purposes of [having] due process [protections]….").

### B.    Defendants Do Not Have Constitutional Rights Because They Stand Outside the Structure of the Union

Although defendants are not foreign sovereigns, they are the kind of entities that stand "outside the structure of the Union."  *See Frontera*, 582 F.3d at 399 (quoting *Principality of Monaco*, 292 U.S. at 330).  They assert that they are a "foreign government."  *See* Letter from Mark Rochon to Hon. George B. Daniels (Feb. 26, 2014) at 4, DE 433.

1.    **The PLO**

The PLO holds itself out as "the embodiment of the Palestinian national movement."[7] The PLO Constitution provides for an elected National Assembly (Art. 5), an Executive Committee headquartered in Jerusalem (Art. 17), a Palestine Liberation Army (Art. 22), a Palestine National Fund (Art. 18), and Departments, such as the Department for Political and Information Affairs. Ex. H.123. In 1993, Israel recognized the PLO "as the representative of the Palestinian people" and commenced negotiations with the PLO. Israel and the PLO have since entered into a series of bilateral agreements.

These facts make the PLO the kind of entity that stands "outside the structure of the Union." In fact, two cases have so held specifically. In *Mendelsohn v. Meese*, 695 F. Supp. 1474, 1480-81 (S.D.N.Y. 1988), Judge Palmieri of this Court agreed with the Attorney General's argument that the PLO is "a foreign power with no constitutional rights." The Court explained: "A 'foreign state lies outside the structure of the Union.' The same is true of the PLO, an organization whose status, while uncertain, lies outside the constitutional system. It has never undertaken to abide by United States law or to 'accept the constitutional plan.' No foreign entity of its nature could be expected to do so." *Id.* at 1481 (quoting *Principality of Monaco*, 292 U.S. at 330). Similarly, in *Palestine Inf. Office v. Shultz*, 674 F. Supp. 910, 919 (D.D.C. 1987), *aff'd*, 853 F.2d 932 (D.C. Cir. 1988), the District Court held that a "foreign political entity" such as the PLO "has no due process rights under our Constitution." On appeal, the D.C. Circuit affirmed. It held that the appellants—a group of U.S. citizens and resident aliens—had no constitutional right "to represent the PLO." 853 F.2d at 941. It allowed that as "American citizens," appellants

---

[7] *See* Ex. H.122, "About the Palestinian Liberation Organization," at website of Permanent Observer Mission of the State of Palestine to the United Nations, *available at* http://palestineun.org/about-palestine/palestine-liberation-organization/.

had limited due process rights (which were not violated), *id.* at 942, but it did not disturb the District Court's holding that a foreign political entity has no constitutional rights.

### 2. The PA

The Palestinian Authority is a non-sovereign government created by an agreement between the PLO and Israel, entered into on May 4, 1994. Its powers are currently defined by the Israeli-Palestinian Interim Agreement on the West Bank and the Gaza Strip (the "Interim Agreement"), entered into September 28, 1995.

The Interim Agreement established executive, legislative and judicial functions for the PA and transferred specified "powers and responsibilities" from the Israeli military government to the PA. Art. 1.1. Among its powers and responsibilities, the PA can "sue and be sued and conclude contracts." Art. 9.2. Under the Interim Agreement, the PA provides many government services, including local policing and civil authority over matters such as agriculture, banking, employment, environmental protection, unclaimed property, health, labor, zoning, postal services, social welfare, telecommunications, transportation, water and sewage. Interim Agreement, Annex III. As this Court has noted, defendants acknowledge that they are "performing core governmental functions." *Sokolow v. Palestine Liberation Organization*, 583 F. Supp. 2d 451, 457 (S.D.N.Y. 2008).

The PA is the kind of government that courts have routinely held does not have due process rights. *See, e.g.*, *City of E. St. Louis*, 986 F.2d at 1144; *Puerto Rico Pub. Hous. Admin*, 59 F. Supp. 2d at 325; *El Paso Cnty. Water Imp. Dist. No. 1*, 701 F. Supp. at 123-24; *City of Sault Ste. Marie*, 532 F. Supp. at 167-68.

### III.    *DAIMLER* AND *GOODYEAR* DID NOT CHANGE "CONTROLLING LAW"

*Daimler* and *Goodyear* do not control this case. Defendants' brief simply *assumes* that

*Daimler* and *Goodyear* apply here.  They do not, however, for three reasons.  *First*, *Daimler* and *Goodyear* applied the Fourteenth Amendment, not the Fifth Amendment, which imposes fewer limits on the United States than the Fourteenth Amendment imposes on the States.  *Second*, *Daimler* and *Goodyear* concerned a factually distinct situation from this case—international commerce, rather than international terrorism.  *Third*, *Daimler* expressly left for another day a determination of whether one of the means by which this Court obtained personal jurisdiction over defendants—service of an agent within the territorial jurisdiction of the United States—is consistent with due process.  In reality, defendants are asking this Court to make new law by extending *Daimler* and *Goodyear* to a very different situation.  Such a request is not an appropriate basis for seeking reconsideration.

### 1.    *Daimler* and *Goodyear* Concerned Fourteenth Amendment Rights, Not Fifth Amendment Rights

*Daimler* and *Goodyear* were decided under the Fourteenth Amendment, not the Fifth Amendment, which controls here.[8]  "[A]n inquiry into fairness under the Due Process Clause of the Fifth Amendment tends to focus on the same factors considered under the minimum contacts test, but is often applied with more flexibility than under the Fourteenth Amendment analysis." Wright & Miller, *Federal Practice and Procedure* § 1068.1 (3d ed.).  Thus, although the Second

---

[8] Although defendants do not discuss which "Due Process" Clause they invoke, it is the Fifth Amendment that would apply, because defendants are being sued under a federal statute, and the Due Process Clause of the Fourteenth Amendment applies only to the states.  *See, e.g.*, *Chew v. Dietrich*, 143 F.3d 24, 27-28 & n.4 (2d Cir. 1998) (applying Fifth Amendment in case under Jones Act); *Mariash v. Morrill*, 496 F.2d 1138, 1143 (2d Cir. 1974) (same, for Securities Exchange Act case); *SEC v. Straub*, 921 F. Supp. 2d 244, 252-53 (S.D.N.Y. 2013) (same); *In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765, 806 (S.D.N.Y. 2005) (applying Fifth Amendment in case under Anti-Terrorism Act), *recons. on other grounds*, 392 F. Supp. 2d 539 (S.D.N.Y. 2005); *see generally* 1993 Advisory Comm. Notes to Fed. R. Civ. P. 4(k) ("[C]onstitutional limitations on the exercise of territorial jurisdiction by federal courts over persons outside the United States…arise from the Fifth Amendment rather than from the Fourteenth Amendment[.]").

REDACTED - PUBLICLY FILED VERSION

Circuit has said that the Fifth and Fourteenth Amendment analyses are "basically the same," *Chew v. Dietrich*, 143 F.3d 24, 28 n.4 (2d Cir. 1998), it has applied the minimum contacts test under the Fifth Amendment to permit jurisdiction over defendants acting entirely overseas. In *SEC v. Unifund SAL*, the court exercised personal jurisdiction in a civil case arising out of insider trading made through a foreign affiliate of a U.S. broker because insider trading "has serious effects that can reasonably be expected to be visited upon United States shareholders where…the securities are those of a United States company traded exclusively on a United States exchange." 910 F.2d 1028, 1033 (2d Cir. 1990). In *Magnetic Audiotape Antitrust Litig.*, the Second Circuit said that minimum contacts could be satisfied by attending a single meeting in a foreign country "in which price-fixing activities took place." 334 F.3d 204, 207-08 (2d Cir. 2003).[9]

In the terrorism context, the Second Circuit has been especially protective of the power of the United States to exercise personal jurisdiction over defendants acting abroad. In *United States v. Yousef*, the court upheld, against a Fifth Amendment due process challenge, the prosecution of individuals who bombed a Philippine Airlines flight en route from Manila to Japan—even though no U.S. national was injured—because it was a "test-run" in furtherance of a larger conspiracy to "inflict injury on [the United States] and its people and influence American foreign policy[.]" 327 F.3d 56, 112 (2d Cir. 2003). In *United States v. Al Kassar*, the court rejected a Fifth Amendment due process challenge to a prosecution of individuals who conspired to sell arms "with the understanding that they would be used to kill Americans and destroy U.S. property," because "the aim therefore was to harm U.S. citizens and interests and to threaten the security of the United States." 660 F.3d 108, 118 (2d Cir. 2011). The fact that the "sting operation"

---

[9] *See also In re Grand Jury Subpoena Directed to Marc Rich & Co.*, 707 F.2d 663, 666-68 (2d Cir. 1983) (enforcing grand jury subpoena to investigate Swiss corporation's alleged evasion of U.S. tax laws).

REDACTED - PUBLICLY FILED VERSION

took place "entirely outside the United States and involv[ed] solely foreign citizens" did not deprive the U.S. courts of jurisdiction. *Id.* The court explained: "For non-citizens acting entirely abroad, a jurisdictional nexus exists when the aim of that activity is to cause harm inside the United States or to U.S. citizens or interests." *Id.*[10]

It makes sense that courts apply a more expansive approach to jurisdiction under the Fifth Amendment than under the Fourteenth. Both Amendments protect defendants from the burdens of litigating in a distant or inconvenient forum, but only the Fourteenth "'ensure[s] that the States, through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system.'" *Handley v. Ind.& Mich. Elec. Co.*, 732 F.2d 1265, 1271 (6th Cir. 1984) (quoting *World-Wide Volkswagen v. Woodson*, 444 U.S. 286, 291-92 (1980)); *accord Max Daetwyler Corp. v. R. Meyer*, 762 F.2d 290, 294 (3d Cir. 1985) (Fourteenth Amendment "reflects territorial limitations on the power of an individual state. Those strictures of [F]ourteenth [A]mendment due process analysis which attempt to prevent encroachment by one state upon the sovereignty of another do not apply with equal force to the adjudication of a federal claim in a federal court."); Wright & Miller, *Federal Practice and Procedure* § 1068.1 ("When a federal court adjudicates a federal question claim, it exercises the sovereign power of the United States and no federalism problem is presented. The Fourteenth Amendment function of protecting the several states' status as coequal sovereigns seemingly ought to be of no relevance to the parallel analysis under the Due Process Clause of the Fifth Amendment….").

The federal government's interests stretch broadly in many areas that are off-limits to the

---

[10] *See also In re Terrorist Attacks on Sept. 11, 2001*, 538 F.3d 71, 93-94 (2d Cir. 2008) ("primary participants" in "terrorist attacks on citizens of the United States" have been held repeatedly to have engaged in "purposeful direction" at the United States), *abrogated on other grounds by Samantar v. Yousuf*, 560 U.S. 305 (2010).

States, including foreign policy, national security, and international law enforcement.  Blindly

extending Fourteenth Amendment rules to cases arising under the Fifth Amendment could have

grave, unintended consequences for prosecutions of international terrorists.  Many of the terror-

ists on the FBI's most-wanted terrorists list committed their crimes outside the territory of the

United States, but otherwise within the jurisdiction of the United States, because they hurt U.S.

citizens or U.S. interests.  For example, Ali Atwa and Mohammed Ali Hamadei are wanted for

hijacking a commercial airliner en route from Athens to Rome, during which a U.S. citizen was

murdered.  Ibrahim Salih Mohammed Al-Yacoub is wanted for conspiracy to kill U.S. citizens

by bombing the Khobar Towers in Saudi Arabia.  Abdullah Ahmed Abdullah is wanted for mur-

dering U.S. nationals in Africa.  And Faouzi Mohamad Ayoub is wanted for using a false U.S.

passport to gain entry into Israel for the purpose of conducting a terrorist bombing there.  *See*

FBI's Most Wanted Terrorists (www.fbi.gov/wanted/wanted_terrorists), Ex. B.  If the narrower

concepts embodied in the Fourteenth Amendment applied to the Fifth Amendment, these and

similar prosecutions would be called into question.

   In *Pugh v. Socialist People's Libyan Arab Jamahiriya*, the court observed that many fed-

eral criminal statutes contemplate "the assertion by a United States court of jurisdiction over a

foreign national for terrorist activities committed abroad, irrespective of the number and nature

of that individual's other 'contacts' with the United States.  It logically follows that if federal

courts may constitutionally exercise criminal jurisdiction over such individuals, the Constitution

should be no bar to those same federal courts, in a civil action for damages, exercising civil *in

personam* jurisdiction over those same individuals for the same acts."  290 F. Supp. 2d 54, 59

(D.D.C. 2003).

REDACTED - PUBLICLY FILED VERSION

### 2.    *Daimler* Arose in a Different Factual Context, and the Difference Matters

Important factual differences separate this case from *Daimler*.  Daimler is a corporation engaged in international commerce.  *Daimler*, 134 S. Ct. at 750-51.  This was important to the *Daimler* Court, which wanted to ensure "greater predictability" in suits against "corporations" through "[s]imple jurisdictional rules."  *Id.* at 750 (quoting *Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010)).  The Court explained that other nations do not approve of general jurisdiction over "corporations" outside their "principal place of business," that "unpredictable applications of general jurisdiction based on activities of U.S.-based subsidiaries could discourage foreign investors," and that such differences between U.S. and foreign law had led to "international friction," according to the branch of government responsible for foreign relations.  *Id.* at 762-63.

This reasoning has no place in deciding whether to exercise jurisdiction over entities engaged in terrorism rather than commerce.  *Daimler* did not seek to provide "greater predictability" to terrorists, and creating "simple jurisdictional rules" for terrorist organizations is not practicable, since terrorists do not often form corporations or announce their principal places of business.  Indeed, the national security concerns in this case take the Court in the opposite direction from the one taken in *Daimler*.

> The legislative history of the ATA, Executive Orders signed by two United States Presidents, and the participation by the United States in international treaties and an international task force, establish this country's profound and compelling interest in combating terrorism at every level….

*Strauss v. Credit Lyonnais, S.A.*, 249 F.R.D. 429, 443-44 (E.D.N.Y. 2008); *accord Wultz v. Bank of China Ltd.*, 910 F. Supp. 2d 548, 559 (S.D.N.Y. 2012) ("When the U.S. interest in fully and fairly adjudicating matters before its courts is combined with its interest in combating terrorism, the U.S. interest is elevated to nearly its highest point....").

### 3.    *Daimler* Did Not Address the Method of Service by Which Jurisdiction Attached in This Case

One method by which plaintiffs obtained jurisdiction over the defendants was serving one of their senior officers in the United States, as permitted by 18 U.S.C. § 2334(a) ("Process in such a civil action may be served in any district where the defendant resides, is found, or has an agent.") and Fed. R. Civ. P. 4(k)(1)(C) ("Serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant…when authorized by a federal statute.").  *See* Return of Serv. on Hassan Abdel Rahman (June 3, 2004), DE 2.  This Court held that "Rahman, based upon the overwhelming competent evidence produced by Plaintiffs, was the Chief Representative of the PLO and the PA in the United States at the time of service" and "was thus a valid agent for service of process on the PLO and the PA."  DE 87 at 5.  Defendants have never argued that Rahman was unauthorized to accept service or otherwise claimed that service on him was invalid.  *See* Answer to Am. Compl. (Apr. 13, 2011), DE 92.

It has long been held that the physical presence of a corporation's agent, suitable for service of process in the forum "subjects the foreign corporation to the general jurisdiction of the [local] courts in matters to which [the forum's] tenuous relation would not otherwise extend." *Bendix Autolite Corp. v. Midwesco Enters., Inc.*, 486 U.S. 888, 892-93 (1988).[11]  The rule has

---

[11] "If a state permits a foreign corporation to do business within her limits, and at the same time provides that in suits against it for business there done, process shall be served upon its agents, the provision is to be deemed a condition of the permission; and corporations that subsequently do business in the state are to be deemed to assent to such condition as fully as though they had specially authorized their agents to receive service of the process."  *St. Clair v. Cox*, 106 U.S. 350, 356 (1882); *see State of Wash. v. Superior Ct.*, 289 U.S. 361, 364-65 (1933) ("It has repeatedly been said that qualification of a foreign corporation in accordance with the statutes permitting its entry into the state constitutes an assent on its part to all the reasonable conditions imposed."); *In re Hohorst*, 150 U.S. 653, 663 (1893) ("The firm of Kunhardt & Co. being the financial agents of the corporation, the office of the firm being in the city of New York, and being the office of the corporation for the transaction of its monetary and financial business in this country, the service of the subpoena in New York upon the head of the firm as general agent of the corporation was a sufficient service upon the corporation."); *Moss v. Atl. Coast Line R.R. Co.*, 157 F.2d 1005, 1007 (2d Cir. 1946) (defendant "was so conducting business in New York by means of such agents

Footnote continued on next page

made general jurisdiction available if the agents or the corporation "engaged in such a continuous and systematic course of 'doing business' here that a finding of its 'presence' in this jurisdiction is warranted." *Landoil Res. Corp. v. Alexander & Alexander Servs., Inc.*, 77 N.Y.2d 28, 33 (1990) (citing cases).

*Daimler* expressly left open the question of whether and how service of process on an agent within the territory for general jurisdiction would comport with due process. 134 S. Ct. at 759 ("[W]e need not pass judgment on invocation of an agency theory in the context of general jurisdiction."). However, to the extent that the *Daimler* Court provided guidance on the agency question, it does not help defendants. *Daimler* left intact the rule that an individual defendant whose only contact with a forum State is a one-time visit will be subject to general jurisdiction if served with process during that visit. *See id.* at 772-73 (Sotomayor, J., concurring) (citing *Burnham v. Superior Ct.*, 495 U.S. 604 (1990)). In *Burnham*, the Supreme Court upheld the exercise of general jurisdiction over a transient, explaining "[t]he distinction between what is needed to support novel procedures and what is needed to sustain traditional ones is fundamental....The short of the matter is that jurisdiction based on physical presence alone constitutes due process because it is one of the continuing traditions of our legal system that define the due process standard of 'traditional notions of fair play and substantial justice.'" 495 U.S. at 619. As noted above, exercising general jurisdiction by serving a suitable agent "doing business" in the jurisdiction is a traditional procedure dating back to the nineteenth century. While *Daimler* rejected

---

Footnote continued from previous page
there resident that valid service could be, and was, made upon it in that state"); *Smolik v. Phila. & Reading Coal & Iron Co.*, 222 F. 148, 150-51 (S.D.N.Y. 1915) (L. Hand, J.) (service on registered agent subjects corporation to general jurisdiction); *Johnston v. Mut. Reserve Life Ins. Co.*, 104 A.D. 550, 556-57 (1st Dept. 1905) ("[P]roof of service on an agent would be *prima facie* evidence that the agent represented the company, and presumptively sufficient[.]").

the Ninth Circuit's *test* for identifying a suitable agent, it left open what the correct test might be.

In sum, the best that defendants can hope for is an extension of *Daimler* to this case. But *Daimler* should not be extended to apply here. Instead, the traditional due process analysis for general jurisdiction should continue to apply by operation of Fed. R. Civ. P. 4(k)(1)(C) and 18 U.S.C. § 2334. As this Court observed in denying defendants' original motion on personal jurisdiction, defendants did "not even dispute that" their contacts "satisfy the traditional due process analysis for general jurisdiction." DE 87 at 4.

## IV. THIS COURT HAS SPECIFIC PERSONAL JURISDICTION OVER DEFENDANTS UNDER THE FIFTH AMENDMENT

Even if defendants had due process rights—and they do not—the exercise of specific jurisdiction over them would easily pass Constitutional muster. Below, we set out the relevant facts relating to specific jurisdiction and then discuss the constitutional test for evaluating specific jurisdiction.

### A.    Facts Relating to Specific Jurisdiction

Plaintiffs were injured by reason of defendants' violent criminal attacks in Israel, which were intended to influence, by intimidation and coercion, U.S. and Israeli policy concerning Israel's control of the West Bank and Gaza. In conjunction with their terrorist activities, and in order to influence government policy, defendants conducted a media relations campaign in the United States publicizing their argument that, in order to end the violence in Israel, the United States must pressure the government of Israel to "end the occupation."

### 1.    Background of the U.S. Involvement in the Conflict

The PLO's long and bloody history of violence against civilians is well documented. In December 1987, Congress made—and the President signed—statutory findings "that the PLO

and its affiliates are a terrorist organization and a threat to the interests of the United States, its allies, and to international law."  Pub. L. 100-204, § 1002 (codified at 22 U.S.C. § 5201).

By the 1990s, the United States government had become deeply involved in the relationship between the PLO and Israel.  During President Clinton's two terms in office, Yasser Arafat visited the White House more than any other world leader.  *See* Ex. H.124.  The most important of the bilateral agreements between Israel and the PLO were signed at White House ceremonies, including the 1993 "Declaration of Principles" for further negotiations, and the 1995 "Interim Agreement," witnessed personally by President Clinton.  Upon the signing of the 1995 Interim Agreement, President Clinton gave a speech at the White House with Arafat and Yitzhak Rabin at his side.  Addressing them, he said "The United States is proud to stand with [you].  Much remains to be done.  But we will continue to walk each step of the way with those who work and risk for peace."  Ex. H.125 at 2.

By July 2000, the PLO had failed to conclude a comprehensive agreement with Israel, and President Clinton invited Arafat and Israel's Prime Minister, Ehud Barak, to Camp David to continue their negotiations.  The negotiations failed.  Before leaving Camp David, the parties issued a "trilateral statement" in which the PLO and Israel agreed "that the United States remains a vital partner in the search for peace and will continue to consult closely with President Clinton and Secretary Albright in the period ahead."  Ex. H.126.

Beginning in September 2000, the PA and PLO attempted to coerce the government of Israel to cede control of the West Bank and Gaza.  Defendants sought to do this by:  (1) conducting a campaign via media outlets in the United States (and elsewhere) to publicize defendants' thesis that in order to end the violence in Israel, the United States must pressure the government of Israel to "end the occupation" and (2) conducting a relentless campaign of violent attacks on

REDACTED - PUBLICLY FILED VERSION

the civilian population in Israel, including the attacks from which this case arises, in order to make credible their claim that such violence was caused by Israeli control of the West Bank and Gaza, and to intimidate and coerce Israelis and Americans into accepting the defendants' political goal of ending "the occupation."

### 2. Defendants' Public Relations Campaign to Alter U.S. Public Opinion and Policy

As this Court has already found, "the record contains overwhelming evidence that Defendants were primarily in Washington, D.C. pursuing their political interest."  DE 87 at 14.[12] Defendants used their U.S. office, U.S. lobbying firm, and U.S.-based officers and employees to repeat a scripted refrain that violence against civilians in Israel was "caused" by the "occupation" of Gaza and the West Bank, and that such violence would end only if the U.S. government could successfully pressure the government of Israel to withdraw from those territories.  A few examples (out of hundreds in the record) of statements made by Arafat and other PLO and PA representatives between 2000 and 2004 suffice to show the substance of the message:

| Date | Outlet | Statement by PA/PLO Official |
|---|---|---|
| October 17, 2000 | CNN | I tell you how we end all of this.  The Palestinian people have been living under Israeli military occupation for 33 years.…As long as Israel continues to occupy them and to want to impose its will on the Palestinian people by sheer force, I don't think that peace the possible. Ex. H.127 at 260. |
| May 29, 2001 | Forum of the Center for Policy Analysis | Again, the original sin is the occupation.  Occupation is not normal, and therefore occupation provokes resistance, provokes protest, and no one can expect the Palestinians to remain silent when their freedom and their land is being raped and confiscated. Ex. H.129 at 192. |

---

[12] This Court found (consistent with findings by every other court to have considered the issue) that the D.C. office and employees "simultaneously served as an office for the PLO and the PA," and that the activities of the D.C. office were "attributable to both the PLO and the PA."  DE 87 at 8-9.

REDACTED - PUBLICLY FILED VERSION

| Date | Outlet | Statement by PA/PLO Official |
|------|--------|------------------------------|
| December 3, 2001 | CNN | [O]ur problem with Israel is over the 35 years of military occupation forced on the Palestinian people by Israel, denied the Palestinians, inhuman, denied their very basic human and political rights and robbed of their dignity, freedom, right of self-determination and their livelihood through the process of building Jewish settlements in Palestinian territories….This is the cause of all the troubles. Ex. H.128 at 143. |
| January 29, 2002 | CNN | [I]t is difficult to succeed in combatant violence, unless there is a commitment and change of behavior by the Israeli military forces of occupation. Ex. H.130 at 71-72. |
| February 3, 2002 | CNN | The Jewish settlements…have to be removed in order for us to be able to establish the kind of peace that we want to establish with Israel. Ex. H.131 at 60. |
| February 25, 2002 | MSNBC | But in order to achieve peace in our region, there needs to be an end to Israel's 35 years of military occupation of the Palestinians….if the Israeli government continues to want to control the lives of the Palestinians…I don't think that we can expect any peace in the near future. Ex. H.132 at 13. |
| March 18, 2002 | MSNBC | Let's also not forget that the origin of all the problems is the existence of the occupation. And what we are looking for is ending this occupation and reaching a settlement between Palestine and Israel. Ex. H.133 at 451-52. |
| March 18, 2002 | CNBC | We said that if Israel complies with the requirements—and that is to withdraw its troops from the Palestinian cities that it occupied in the last two weeks, yes we are ready to engage in a cease-fire. Ex. H.134 at 336. |
| March 21, 2002 | MSNBC | Thirty-five years of occupation, illegal military occupation….You turned our people into suicide bombers, Mr. Gissin, by the way you behaved towards them. You have to take responsibility for your actions. Ex. H.135 at 429. |
| March 28, 2002 | CNN | If the Israelis move out of our territories and leave us alone, to live in peace, then I assure you that they will have peace. Ex. H.136 at 277. |
| April 3, 2002 | CNN | I'm saying that the cusp of the need for peace is an end of occupation, establishment of a state for security given to Israel. Ex. H.137 at 388. |
| April 7, 2002 | NBC | Can't we defend our country and our nation from an illegal, brutal foreign occupation like the Israeli brutal occupation of our people, who has denied us our very basic liberties and freedoms? Ex. H.138 at 131. |
| April 12, 2002 | CNN | What takes Palestinians to the situation we are in is 36 years of one of the most brutal occupations in modern history. That's what turns people into suicide bombers. Ex. H.139 at 8. |
| April 15, 2002 | Fox | You get the Israelis out of the West Bank and Gaza, and you will have a peace agreement. Ex. H.140 at 37. |

| Date | Outlet | Statement by PA/PLO Official |
|---|---|---|
| May 3, 2002 | Fox | The day the Israelis accept to withdraw their army from the Palestinian territories and take away their Taliban Jewish settlers from the Palestinian territories, we will have peace. Ex. H.141 at 273. |
| May 8, 2002 | CNBC | Occupation is the infrastructure of terrorism, and if Mr. Pinkas and his government are true to what they preach, they have to dismantle the occupation…otherwise we will have violence because occupation is the systematic violence and a system of violence. Ex. H.142 at 251. |
| May 9, 2002 | National Press Club | So occupation generates resistance. And if we [are] to deal with the whole situation of violence in the region, occupation must end. With all that it entails including, of course, the construction of illegal Jewish settlements in the Palestinian territories. Ex. H.143 at 203. |
| May 19, 2002 | CNN | The shortest way to peace and security, to us and to the Israelis is to end the Israeli occupation and to establish a Palestinian state, next to the state of Israel. I believe this is the only way out. Ex. H.144 at 193. |
| June 18, 2002 | Fox | I think that the only way to really reduce the level of violence is to try something that has not been tried, and that is to withdraw its troops from the Palestinian territories, stop illegal occupation, stop illegal construction of Jewish settlements. Ex. H.145 at 161. |
| November 24, 2002 | CNN | Israel is an occupying power. And the only issue that it has to do is to end its occupation, as the United States by the way repeatedly called for, and allow the existence of a Palestinian state—a real one, with full sovereignty over its land and its people. Ex. H.146 at 280. |
| March 5, 2003 | MSNBC | You know how you control it? By getting the hell out of the Palestinian territories and let the Palestinians live free because you cannot have occupation and peace together. Ex. H.147 at 82. |
| September 15, 2003 | CNBC | Well, let me first say before that, it is not only about ending terror. It's about ending terror and ending occupation as well. Ex. H.148 at 131. |
| September 19, 2003 | CNN | [Y]ou have always to remember that the essence of the whole thing is the existence of the Israeli occupation.…For this peace to be achieved, we need to have a different Israeli position, one that says, yes, we want to end this occupation, that says yes, we want to end the colonization of the Palestinian land. Only this could bring hope, and will then open the door for any practical steps on the ground. Ex. H.149 at 226. |

During this period, Arafat met repeatedly with U.S. envoys, including Senator George

Mitchell, General Anthony Zinni, and Secretary of State Colin Powell, to press the defendants'

political agenda. Indeed, in public statements, defendants' representatives repeatedly advanced

the claim that the U.S. government needed to take a greater role in pressuring Israel to accept

their goal of ending the occupation.

| Date | Outlet | Statement by PA/PLO Official |
|---|---|---|
| March 19, 2002 | CNN | We are saying yes, we welcome the efforts of the United States, the engagement of the United States, and we are hopeful that with the efforts of General Zinni and the engagement of Vice President Cheney and the engagement of President Bush that they will lead us into a political horizon that will end Israel's occupation of the Palestinian territories…. Ex. H.150 at 323. |
| March 29, 2002 | PBS | Mr. Colin Powell is missing the point. He should point fingers to Mr. Sharon to move his soldiers, his army, his settlers, from the Palestinian territories….Peace can be achieved only when those guys leave us alone and leave us as a free people. If the situation continues, if the occupation continues…no one can stop the Palestinians. The only way to stop the violence is to eliminate the causes of violence and the cause of violence is the illegal military occupation. Ex. H.151 at 260. |
| April 15, 2002 | CNN | Yasser Arafat essentially told Colin Powell over the weekend that we're not going to talk about any kind of ceasefire until the Israelis pull out of the occupied territories. Ex. H.152 at 333. |
| April 14, 2002 | CNN | I think the involvement of the United States on the site would be very, very helpful because obviously the two parties trust the United States and they want the United States to be involved….We feel that 35 years of foreign, illegal occupation is more than enough. Ex. H.153 at 47. |
| May 9, 2002 | National Press Club | Mr. Bush and Colin Powell both believe that President Arafat is essential for any progress to be made on the Palestinian-Israel track and that his role is very very important to move the process forward. Ex. H.154 at 204. |
| May 9, 2002 | National Press Club | So the United States can and has the possibilities to pressure Sharon. Sharon cannot defy the whole international community. Ex. H.155 at 205. |

### 3.    Overview of Defendants' Terrorist Campaign

Defendants' publicity and media activities in the United States connecting violence to the "occupation" were accompanied by relentless violence against civilians in Israel. Thus, in conjunction with their media campaign, the defendants incited, supported, and directly participated in a continuous string of violent attacks intended to give substance to their assertion that Israel's control of the West Bank and Gaza was causing violence.

Yasser Arafat was the terrorist in chief. Arafat controlled the PA and the PLO, as well as

Fatah, the PLO's dominant faction.  *See* Exs. C.6 at 16-18; C.2 at 19-25.  According to defend-

ants' own expert, Glenn Robinson, Arafat "dominated Palestinian politics" and "epitomized one

man rule."  Ex. H.76.  In late 2000, Fatah operatives, "many of whom were employed in the Pal-

estinian Authority's security apparatus" established the al-Aqsa Martyrs Brigades ("AAMB"),

"which were intended to serve as the Fatah's military wing for carrying out terrorist attacks

against Israel."  Ex. H.79 at 8-9; *see also* Exs. C.2 at 43-46; C.4 at 8-19 ("[T]he official U.S.

government position is that the AAMB is the military wing of Fatah."); H.80-82; H.84.  Many of

the senior terrorism operatives of the AAMB were members of the PA security forces, including

several of whom were convicted of perpetrating one or more of the attacks that caused plaintiffs'

injuries in this case.  Ex. H.71; *see also* Exs. H.79 at 9; C.6 at 18-77; C.4 at 9.  Marwan

Barghouti, the AAMB leader responsible for all of the "military operations" of Fatah in the West

Bank, reported directly to Arafat.  Ex. H.71.

   The AAMB initially focused its attacks on Israeli Defense Forces and Israeli civilians in

the West Bank.  *See* Exs. H.71; H.79; C.6 at 73-75.  In January 2001, the Guetta Plaintiffs were

the victims of one such attack, which was perpetrated by members of Arafat's personal security

service known as "Force 17."  *See* Ex. C.6 at 73-77.  Beginning in January 2002, the AAMB ex-

panded its violence to include suicide bombings and shootings of civilians in Jerusalem and other

cities in Israel, causing the United States to designate the AAMB a Foreign Terrorist Organiza-

tion and a Specially Designated Global Terrorist Entity.  *See* Exs. C.6 at 8; C.1 at 14; H.80-81.

According to a Human Rights Watch report relied on by defendants' experts, the attacks created

"widespread fear among the civilian population—as they were intended to do."  Ex. H.74 at 1.

### a.    Defendants' Incitement of Terrorism

   Defendants incited acts of violence at every level of Palestinian society.  Even as they

REDACTED - PUBLICLY FILED VERSION

worked assiduously to promote to Americans the notion that violence in Israel was the result of the Israeli "occupation," the defendants were articulating a very different message in their own media outlets. *See* Exs. C.5; C.6 at 6-15; C.2 at 62-68. A few examples suffice here:

- "Have no mercy on the Jews anywhere in any country: 'Fight them wherever you are, wherever you meet them—kill them.' Wherever you are—kill those Jews and those Americans who are like them and those who stand with them. They are all together against the Arabs and the Muslims." Ex. H.88.

- "The latent Palestinian stored potential remains totally prepared for confronting the American-Israeli projects, and remains able to incite the Arab political street, to restore its absent and subjugated role....And this will only happen with the rock and the brave intifada and the continuation of Palestinian sacrifice." Ex. H.58.

- "[A]ction and greater pressure, letting the United States of America know that the continuation of their flagrant bias toward the interests of the Zionist entity and against the rights of our people, will be an incentive for our Nation's masses to move in earnest to threaten U.S. interests in the region in all their economic, political and security forms. The battle is open, bloody and fierce and nobody can escape its fire except by engaging in it side by side with our inalienable national rights…." Ex. H.115.

- "The [September 11] martyrdom seekers are the finest successors of the finest predecessors. These martyrdom seekers are the salt of the earth and the engines of history….They are more honorable than us all…." Ex. H.121.

- "The Prophet succeeded, through Muslim unity and arousing faith, in overcoming the America of then, just as we will defeat America, as long as it supports our enemy, as long as it adheres to its positions against our people, our issue and our holy places, and against our people and its leadership, as long as it adheres to these wicked positions. We will defeat her, may it be the will of Allah." Ex. H.118

- "A divine blow will be dealt soon to the US and Israel, Allah willing. The believers will rejoice with Allah's victory." Ex. H.117.

Defendants even co-opted the most odious symbols of anti-U.S. terrorism in their call to violence. For example, on September 11, 2002, Al-Hayat Al-Jadida printed a political cartoon depicting "September 11" as two legs chasing Uncle Sam, running in terror. Ex. H.120. Anoth-

REDACTED - PUBLICLY FILED VERSION

er political cartoon in that newspaper depicted Osama Bin Laden smiling and making a "V for Victory" sign on his right hand—with the "V" depicting the smoking twin towers. Ex. H.119. Defendants' own expert testified that "Palestinians understood this newspaper … to be associated with the PA." Ex. D at 58.

Defendants also glorified the acts of terrorists, including the terrorists responsible for injuring the plaintiffs, by portraying them as national heroes through state-sponsored funerals and television programs honoring their "sacrifices."

### b.    Defendants' Direct Involvement in Terrorism

In addition to inciting violence, defendants also directly participated in the terrorist acts. Many of the perpetrators of the violent attacks that injured the plaintiffs were employed as armed "security" officers by the defendants.[13]  More than a dozen individuals convicted of the attacks that injured the plaintiffs were members of the PA security forces, as well as many of the suicide bombers.[14]  These were not isolated cases.  As of November 21, 2012, the PA police force's website proudly listed *ninety-seven* members of its own ranks as being held in custody by Israeli authorities for homicide.  Ex. H.60.  That list included Majid al-Masri, the highest-ranking PA police officer on the list, as well as Ahmad Barghouti and Hilmi Hamash, all of whom were convicted of carrying out attacks at issue in this case.  *Id*.  At the time that these attacks took place, Arafat controlled the security forces; indeed, according to defendants' own expert, Glenn Robinson, Arafat "maintained a firm grip on the authority's security forces until his dying day."  Ex. H.76 at 19.  As one PA official stated during a broadcast on PA state-owned TV:  "Without a

---

[13] *See, e.g.*, Exs. C.6 at 18-77; C.4 at 14-15; H.23; H.47-50; H.52-54; H.56-57.

[14] *See, e.g.*, Exs. C.6 at 18-77; C.3 at 9-32; H.6-7; H.24; H.59 at P 2: 145-47; H.61 at P 2: 314-15; H.62 at P 5: 209; H.63 at P 5: 211; H.64-65 at P 5: 236, 239, 279; H.66-67 at P 5: 40-41, 43; H.68 at P 6: 11; H.69-70 at P 6: 60-61; H.72 at P 8: 51; H.73 at P 8: 70.

doubt, the master of the [armed] resistance is the *shahid* martyr, Yasir Arafat....The greatest

number of prisoners [came] from the security forces.  They are the ones who bore arms and car-

ried out the greatest and most important operations against the Israeli occupation…."  Ex. H.105.

Defendants even released known terrorists from PA jails:  "Arafat and the PA pursued a

policy whereby suspects, when they were detained [by the PA], were not investigated or prose-

cuted, but typically were soon let out onto the street again."  Ex. H.74 at 3.  Indeed, "the PA rou-

tinely failed to investigate, arrest and prosecute persons believed to be responsible for these at-

tacks, and did not take credible steps to reprimand, discipline, or bring to justice those members

of its own security services who, in violation of declared PA policy, participated in such attacks."

Ex. H.74 at 109; *see also* Exs. C.4 at 14; C.6 at 5; C.2 at 38-43.  Several of these individuals

were wanted terrorists who were released by PA officials just prior to carrying out terrorist acts

that injured the plaintiffs in this case.  Exs. C.6 at 18-77; C.4 at 8-13; Ex. H.77.  A recently-

produced document links two of those terrorists to Arafat himself.  *See* Ex. H.116.

Defendants furthered the campaign of violence by ratifying the actions of the perpetra-

tors.  Defendants ██████████████████████████████████████████████████████

██████████████████████████████████████████████████.[15]  Defendants ██████████

██████████████████████████████████████████ as well.[16]  Defendants even des-

ignated as honored "martyrs" perpetrators who were killed, including suicide bombers who died

in the attacks,[17] and ████████████████████████████████████████████ because

---

[15] *See, e.g.*, Exs. H.13-15; H.17-19; H.23; H.27; H.30; H.32-46; C.6 at 18-77.

[16] *See, e.g.*, Exs. H.3; H.9; H.16; H.20-21; H.25-26; *see also* Exs. C.6 at 18-77; C.2 at 27-38.

[17] *See, e.g.*, Exs. H.2; H.4; H.6-8; H.24; H.51; *see also* Exs. C.6 at 18-77; C.2 at 25-77; C.4 at 14.

of these terrorists' supposedly heroic service.[18]

**c.**    **Defendants' Provision of Material Support to Terrorists**

Defendants also provided personnel, weapons, bomb-making equipment, funds, uni-

forms, safe houses, and other material support to terrorist organizations. *See* Exs. C.4 at 8-19;

C.2 at 5-16, 43-72; C.6 at 17-18; H.78; H.83. "Arafat and other senior PA officials, as well as

many rank-and-file Fatah members, ha[d] overlapping identities as employees or officials of the

PA, on the one hand, and as members of Fatah on the other…appear[] to have facilitated the use

of PA resources to fund Fatah activities directly and indirectly, including payments to individual

al-Aqsa Brigades activists." Ex. H.74 at 95.

Terrorist operatives "directed their requests for financial assistance for the purchase of

weapons and the perpetration of terrorist attacks to [Marwan Barghouti], who would subsequent-

ly approach the chairman of the Palestinian Authority and leader of the Fatah, Yasser Arafat, in

their name and on their behalf." Ex. H.71 at ¶10; *see also* Ex. H.74 at 83 ("Barghouti functioned

as a patron on behalf of several al-Aqsa Brigades groups, referring requests for individual finan-

cial assistance to Yassir Arafat."). Another close Arafat advisor, Fuad Shubaki ("Shubaki"), the

head of the PA's Finance Office and a senior member of Fatah, received requests for money

from Marwan Barghouti for the purpose of acquiring weapons for, and paying salaries to, mem-

bers of the AAMB. Shubaki would forward the requests to Arafat and, at Arafat's direction, paid

the money from the PA's Ministry of Finance. Ex. H.114 at 46. Documents produced in this

case show that Arafat personally authorized payments to terrorists. *See* Exs. C.4 at 18-19; C.2 at

5-16, 43-72; C.6 at 17-18; E at 205-209; H.85-87. Defendants also controlled the terrorists' ac-

---

[18] *See, e.g.*, Exs. H.1; H.5; H.10-12; H.28-29; H.31; *see also* Exs. C.6 at 18-77; C.2 at 25-27; C.4 at 14.

– 29 –

tivities by managing a supply of weapons given to terrorists.  Ex. H.114 at 43 ("Yasser Arafat gave an instruction that all of the [secretly procured] weapons would be purchased by the Palestinian Authority…so that he himself would be able to control everything that happened.  In this way, Yasser Arafat would be able to control the strength of the intifada.").

### B.    Analysis:  Defendants Have Minimum Contacts with the United States

The facts described above make plain that defendants' numerous contacts with, and conduct directed at, the United States are sufficient to support the assertion of specific personal jurisdiction over the defendants in this case.

In determining whether minimum contacts exist, the courts consider "the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014) (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984), quoting, in turn, *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977)).  Specific jurisdiction thus may be exercised where a claim "arises out of *or relates to* defendants' contacts" with the United States.  *Chew*, 143 F.3d at 28 (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984) (emphasis added)).  "The question is whether a defendant has followed a course of conduct directed at the society or economy existing within the jurisdiction of a given sovereign, so that the sovereign has the power to subject the defendant to judgment concerning that conduct." *J. McIntyre Mach.*, 131 S. Ct. at 2789.

The courts have identified at least two "independent, if conceptually overlapping, methods" of demonstrating minimum contacts":  (1) the defendant's "overall activity" *within* the jurisdiction (here, the United States as a whole); and (2) the "in-state effects" of extraterritorial activity.  *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 243 (2d Cir. 2007).  Either one of the two suffices, but defendants' conduct easily meets both tests.

1.    **The Relationship Between Defendants' "Overall Activity" Within the United States and the ATA Claim Satisfies Minimum Contacts**

Where, as here, a defendant's contacts with the jurisdiction are substantial, a defendant may be subject to specific personal jurisdiction even if its conduct within the forum is merely "related to" the claim. *See, e.g.*, *Chew*, 143 F.3d at 29; *SEC v. Straub*, 921 F. Supp. 2d 244, 253-54 & n.6 (S.D.N.Y. 2013); *see also Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 128 (2d Cir. 2002) ("[W]hile these [New York] contacts may not have directly given rise to the plaintiff's cause of action, they certainly 'relate to' it."). *Del Ponte v. Universal City Dev. Partners, Ltd.*, 2008 WL 169358, at *10 (S.D.N.Y. Jan. 16, 2008) ("If … the defendant has substantial contacts with the forum (even if not sufficient to establish general jurisdiction), the court may accept a more attenuated relation between the defendant's contacts with the forum and the plaintiff's cause of action."). The existence of in-forum "effects" is not a prerequisite to the constitutional exercise of personal jurisdiction over a defendant. *Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 173 (2d Cir. 2013).

Thus, in evaluating the relation between defendants' purposeful conduct within the United States and the claim, this Court should begin with its prior holding that "the PLO and the PA purposely engaged in numerous activities that resulted in both entities having a continuous and systematic presence within the United States." DE 87 at 7. Defendants do not, and cannot, challenge the evidence supporting that conclusion. The Court found that the PLO and the PA "operated a fully and continuously functional office" in Washington, DC (*id.* at 9), staffed it with a dozen PLO employees (*id.* at 8), "retained a consulting and lobbying firm through a multi-year, multimillion dollar contract" which "engaged in numerous political activities on behalf of the PA such as office and lunch meetings with various U.S. government officials and departments" (*id.* at 9), received "consulting and public relations services" (including "weekly memoranda on de-

velopments in Washington which are relevant to the Palestinian Authority") (*id.* at 10), "had a substantial promotional presence in the United States" (*id.*), and "engaged in extensive public relations activities throughout the United States, ranging from interviews and speeches to attending and participating in various public events" (*id.*).

 The relationship between these activities and the litigation is plain. An element of any claim under the Anti-Terrorism Act ("ATA") is that the defendants' conduct "appear to be intended….to influence the policy of a government by intimidation or coercion." 18 U.S.C. § 2331(1)(B)(ii). Indeed, this Court has already explained that plaintiffs intend to prove that the terrorist attacks in this case appeared to be intended "to influence the policy of the United States and Israeli governments in favor of accepting defendants' political goals and demands." *Sokolow*, 583 F. Supp. 2d at 454. In tandem with their campaign of terror and violence in Israel, defendants' extensive public relations activities in the United States appeared to be, and were, intended to pressure the United States into persuading Israel to "end the occupation" of Gaza and the West Bank, based upon the coercive threat that absent withdrawal from those territories, violence against civilians would continue. That intent is obvious from defendants' public statements in the United States—a sampling of which are quoted above—in which defendants claimed (and threatened) that the violence would not end absent withdrawal by Israel from Gaza and the West Bank, and that the United States should pressure Israel to withdraw.

 To be sure, the violence occurred in Israel. But this is not a case about random violence or street crime; it is about terrorism aimed at achieving specific goals. Defendants' U.S. conduct was important to achieving those goals. However horrific a terrorist attack might be, it can achieve its political goals only if those goals are communicated to the governments and democratic populations that it is meant to influence. *Cf. Walden*, 134 S. Ct. at 1123-24 (describing

relationship between libel and the target jurisdiction).[19]  The record leaves no doubt that defendants did just that, conducting a U.S.-based publicity campaign to communicate their political goals to the U.S. government and the U.S. populace.

In short, an element of the ATA claim is that defendants' terrorist campaign appeared to be intended to influence the policy of the United States and Israel by intimidation and coercion. Here, defendants' publicity and lobbying within the United States were inextricably linked with their campaign of violence abroad, as they were intended to channel the reactions of the American public and government to the violence in Israel, to advance the defendants' own objectives.

### 2.    Defendants' Extraterritorial Actions Satisfy Minimum Contacts Under the "Effects Test"

It is well established that "a nonresident's physical presence within the territorial jurisdiction of the court is not required" to satisfy minimum contacts, so long as the "effects" of the terrorism campaign connected the defendants to the United States. *See Walden*, 134 S. Ct. at 1121. Defendants' conduct easily meets this effects test.  "The effects test is a theory of personal jurisdiction typically invoked where…the conduct that forms the basis for the controversy occurs entirely out-of-forum."  *Licci*, 732 F.3d at 173.

Under the "effects" test, the Second Circuit has repeatedly upheld the exercise of jurisdiction in the face of Fifth Amendment challenges in cases where defendants "expressly aimed" their conduct at U.S. citizens or U.S. interests.  As already described above, the Second Circuit

---

[19] As one scholar has explained, suicide terrorist attacks like those at issue in this case "occur in clusters as part of a larger campaign by an organized group to achieve a specific political goal."  Ex. H.75 at 21. Defendants' own expert called this analysis "well-reasoned," Ex. D at 142-46, said that terror campaigns are "a rational effort to achieve political liberation or independence," *id.* at 148, affirmatively agreed that suicide terrorist attacks "happen as part of a larger campaign by an organized group," *id.* at 152, and acknowledged that the "primary goal" of the Al-Aqsa Intifada was "ending the occupation," *id.* at 158.

REDACTED - PUBLICLY FILED VERSION

has upheld jurisdiction against Fifth Amendment challenges where the defendant engaged in insider trading abroad, attended a price-fixing meeting in a foreign country, assisted from abroad in the evasion of U.S. tax laws, placed a bomb on a non-U.S. airliner traveling between non-U.S. cities, and even conspired to sell arms abroad, but "with the understanding that they would be used to kill Americans and destroy U.S. property." *See Al Kassar*, 660 F.3d at 118.

Under the Fourteenth Amendment, the Supreme Court has said that "the plaintiff cannot be the only link between the defendant and the forum" to satisfy the effects test. *Walden*, 134 S. Ct. at 1122. Here, plaintiffs are *not* the only link between the defendants and the United States. As shown above, plaintiffs' claim arises out of a terrorism campaign that killed and injured U.S. citizens, *and* was intended to influence U.S. policy. In any event, the holding in *Walden* cannot be extended indiscriminately to all cases under the Fifth Amendment without jeopardizing the effectiveness of U.S. law enforcement. As the Supreme Court put it in *J. McIntyre Machinery*, defendants "followed a course of conduct directed at the society…existing within the jurisdiction of [the United States]." 131 S. Ct. at 2789. It is fair to ask them to answer for that conduct in a U.S. court of law.[20]

## V.    IF THE COURT DOES NOT REJECT THE JURISDICTIONAL CHALLENGE, IT MUST DEFER THE FACT ISSUES TO TRIAL

Because facts relating to the defendants' efforts to influence U.S. government policy are intertwined with the merits of the case, including the statutory "apparent intent" element of plaintiffs' ATA claims, the Seventh Amendment entitles plaintiffs to present such facts to a jury. *See, e.g.*, *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 87 (2d Cir. 2013); *Alliance*

---

[20] There is a second stage of the due process inquiry, in which the court considers whether the assertion of personal jurisdiction is "reasonable under the circumstances" of the particular case. *See Licci*, 732 F.3d at 173-74. This case follows *a fortiori* from *Licci*.

*for Env't Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 88 (2d Cir. 2006) ("If…the

overlap in the evidence is such that fact-finding on the jurisdictional issue will adjudicate factual

issues required by the Seventh Amendment to be resolved by a jury, then the District Court must

leave the jurisdictional issue for the trial.").  Considerations of efficiency lead to the same result.

*Boit v. Gar-Tec Prods., Inc.*, 967 F.2d 671, 677 (1st Cir. 1992) ("Judicial resources may be more

efficiently deployed if the court holds but one preponderance-of-the-evidence hearing on the

contested facts," with the "additional advantage of allowing a plaintiff, when required to prove

by a preponderance of the evidence, to present proof in a coherent, orderly fashion and without

the risk of prejudicing his case on the merits.") (alterations omitted).

## CONCLUSION

The Court should deny the defendants' motion for reconsideration.

Dated: New York, New York
       March 21, 2014

**ARNOLD & PORTER LLP**

By: _____
    Kent A. Yalowitz
        *KENT.YALOWITZ@APORTER.COM*
    Philip W. Horton
        *PHILIP.HORTON@APORTER.COM*
    Lucy S. McMillan
        *LUCY.MCMILLAN@APORTER.COM*
    Ken L. Hashimoto
        *KEN.HASHIMOTO@APORTER.COM*
    Carmela T. Romeo
        *CARMELA.ROMEO@APORTER.COM*
    Tal R. Machnes
        *TAL.MACHNES@APORTER.COM*

399 Park Avenue
New York, New York 10022
(212) 715-1000