**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| RIVKA LIVNAT, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>THE PALESTINIAN AUTHORITY,<br><br>Defendant. | Civil No. 1:13cv498-GBL/TCB |

**MEMORANDUM OF LAW IN SUPPORT OF**
**<u>THE PALESTINIAN AUTHORITY'S MOTION TO DISMISS</u>**

TABLE OF CONTENTS

Page

INTRODUCTION .......... 1

ARGUMENT .......... 3

I. PLAINTIFFS RIVKA LIVNAT, RACHEL LUZ, ODEYA GORDON, YEHUDA LIVNAT, AND NAVAH LIVNAT FAIL TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED UNDER THE ANTI-TERRORISM ACT .......... 3

A. Overview of Rule 8(a) Pleading Standard .......... 3

B. The Complaint Fails to Allege a Cognizable Injury to a U.S. National .......... 4

C. The Complaint Does Not Adequately Plead an Act of International Terrorism .......... 9

D. The PA Cannot Be Held Vicariously Liable for the Acts of Sergeant Saabneh .......... 11

II. PLAINTIFFS' REMAINING CLAIMS MUST BE DISMISSED .......... 15

A. Claim Two Must Also Be Dismissed Because There is No Civil Liability for Aiding and Abetting Under the ATA .......... 15

B. Because the Court Does Not Have Original Jurisdiction Under the ATA, It Should Decline to Exercise Supplemental Jurisdiction Over the State Law Claims, or, Alternatively, Dismiss the Claims for Lack of Capacity .......... 16

III. THE COURT LACKS PERSONAL JURISDICTION OVER THE PALESTINIAN AUTHORITY .......... 18

A. The PA Has No Jurisdictionally Significant Contacts with the United States .......... 20

B. It Is Unreasonable for the Court to Exercise Personal Jurisdiction Over the PA .......... 22

C. The Case Should Be Dismissed on the Merits Rather than Subjecting the PA to Personal Jurisdiction Discovery .......... 25

IV. PLAINTIFFS' COMPLAINT MUST BE DISMISSED UNDER RULES 12(B)(3) AND 12(B)(5) ..... 26

A. Because the PA Has No Contacts with the United States, No District Court Has Venue Over This Case ..... 26

B. The PA Was Not Properly Served with Process ..... 27

V. THE COMPLAINT MUST BE DISMISSED FOR LACK OF SUBJECT-MATTER JURISDICTION ..... 28

CONCLUSION ..... 29

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acree v. Republic of Iraq*,
271 F. Supp. 2d 179 (D.D.C. 2003) .......... 8

*Asahi Metal Industry Co. v. Superior Court of California*,
480 U.S. 102 (1987) .......... 23, 24

*Asemani v. Gov't of Islamic Republic of Iran*,
276 Fed App'x 287 (4th Cir. 2008) .......... 4

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 3

*Baker v. Carr*,
369 U.S. 186 (1962) .......... 28

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 3

*Board of County Commissioners of Bryan County v. Brown*,
520 U.S. 397 (1997) .......... 12

*Boim v. Holy Land Found. for Relief & Development*,
511 F.3d 707 (7th Cir. 2007) .......... 11

*Boim v. Holy Land Foundation for Relief & Development, et al.*,
549 F.3d 685 (7th Cir. 2008) .......... 16

*Boim v. Quranic Literacy Inst.*,
291 F.3d 1000 (7th Cir. 2002) .......... 5

*Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*,
334 F.3d 390 (4th Cir. 2003) .......... 25

*Carter v. Morris*,
164 F.3d 215 (4th Cir. 1999) .......... 13, 14, 17

*Cellutech, Inc. v. Centennial Cellular Corp.*,
871 F. Supp. 46 (D.D.C. 1994) .......... 21

*Cent. Bank, N.A. v. First Interstate Bank, N.A.*,
511 U.S. 164 (1994) .......... 15, 16

*Cent. States, Southeast & Southwest Areas Pension Fund v. Reimer Express World Corp.*,
230 F.3d 934 (7th Cir. 2000) ........ 25

*Doe v. Israel*,
400 F. Supp. 2d 86 (D.D.C. 2005) ........ 28

*Dooley v. United Technologies Corp.*,
786 F. Supp. 65 (D.D.C. 1992) ........ 22

*EEOC v. Arabian Am. Oil Co.*,
499 U.S. 244 (1991) ........ 8

*Eplus Tech., Inc. v. Aboud*,
313 F.3d 166 (4th Cir. 2002) ........ 19

*Estate of Klieman v. Palestinian Auth.*, 467 F. Supp. 2d 107 (D.D.C. 2006) ........ 17

*Estate of Klieman v. Palestinian Auth.*, 547 F.Supp.2d 8 (D.D.C. 2008) ........ 21

*Estates of Ungar v. Palestinian Auth.*,
304 F. Supp. 2d 232 (D.R.I. 2004) ........ 5, 21

*Fandel v. Arabian American Oil Co.*,
345 F. 2d 87 (D.C. Cir 1965) ........ 22

*Feinstein v. Resolution Trust Corp.*,
942 F.2d 34 (1st Cir. 1991) ........ 25, 26

*Gill v. Arab Bank*,
PLC, 893 F. Supp. 2d 474 (E.D.N.Y. 2012) ........ 5

*Goldberg v. UBS AG*,
660 F. Supp. 2d 410 (E.D.N.Y. 2009) ........ 10

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
131 S. Ct. 2846 (2011) ........ 19, 20, 22

*Haim v. Islamic Republic of Iran*,
784 F. Supp. 2d 1 (D.D.C. 2011) ........ 10

*Hoggard v. City of Richmond*,
200 S.E. 610 (Va. 1939) ........ 17

*Intec USA, LLC v. Engle*,
No. 1:05CV468, 2005 U.S. Dist. LEXIS 38490 (M.D.N.C. Sept. 8, 2005) ........ 25

*Jenco v. Islamic Republic of Iran*,
154 F. Supp. 2d 27 (D.D.C. 2001) ........ 7, 8

*Keeton v. Hustler Magazine, Inc.*,
465 U.S. 770 (1984) .......... 21

*Kiobel v. Royal Dutch Petro. Co.*,
133 S. Ct. 1659 ( 2013).......... 9

*Klinghoffer v. S.N.C. Achille Lauro*,
937 F.2d 44 (2d Cir. 1991) .......... 21

*Lee v. City of Richmond*,
No. 3:12cv471, 2013 U.S. Dist. LEXIS 38085 (E.D. Va. Mar. 19, 2013) .......... 13

*Lohdi v. Fairfax County / Board of Supervisors*, No. 1:12-cv-1108, 2012 U.S. Dist. LEXIS 181176 (E.D. Va. Dec. 21, 2012) .......... 13

*Masselli & Lane, PC v. Miller & Schuh, PA*,
No. 99-2440, 2000 U.S. App. LEXIS 11932 (4th Cir. May 30, 2000) .......... 19

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*,
84 F.3d 560 (2d Cir. 1996) .......... 24

*Microsoft Corp. v. AT&T Corp.*,
550 U.S. 437 (2007) .......... 9

*Monell v. Dep't of Social Services*,
436 U.S. 658 (1978) .......... 12

*Morgan v. Foretich*,
846 F.2d 941 (4th Cir. 1988) .......... 7

*Morrison v. National Australia Bank Ltd.*,
130 S. Ct. 2869 (2010).......... 8, 9

*Muniz*,
*v. Fairfax County* Police Dep't, No. 1:05cv466, 2005 U.S. Dist. LEXIS 48176 (E.D. Va. Aug.2, 2005) .......... 18

*New Wellington Fin. Corp. v. Flagship Resort Dev. Corp.*,
416 F.3d 290 (4th Cir. 2005) .......... 19

*Norton v. Mathews*,
427 U.S. 524 (1976) .......... 26

*Proprietors of Strata Plan No. 36 v. Coral Gardens Resort Management, Ltd.*,
No. 1:09-cv-550, 2009 U.S. Dist. LEXIS 97704 (E.D. Va. Oct. 16, 2009) .......... 21

*Rich v. KIS Cal., Inc.*,
121 F.R.D. 254 (M.D.N.C. 1988) .......... 25

*Rothstein v. UBS AG*,
708 F.3d 82 (2d Cir. 2013) .......... 16

*Saudi v. Northrop Grumman Corp.*,
427 F. 3d 271 (4th Cir. 2005) .......... 18, 19

*Sisso v. Islamic Republic of Iran*,
No. 1:05-CV-394, 2007 U.S. Dist. LEXIS 48526 (D.D.C. July 5, 2007) .......... 10

*Smart v. Suntrust Bank*,
No. 4:09cv00015, 2009 U.S. Dist. LEXIS 51688 (W.D. Va. June 18, 2009) .......... 17

*Smith v. Ray*,
409 Fed. App'x 641 (4th Cir. 2011) .......... 12

*Sokolow v. Palestine Liberation Organization*,
2011 WL 1344086 (S.D.N.Y. June 2, 2011) .......... 21

*Sokolow v. PLO*,
No. 04 CV 00397, 2011 U.S. Dist. LEXIS 36022 (S.D.N.Y. Mar. 30, 2011) .......... 21

*Sutherland v. Islamic Republic of Iran*,
151 F. Supp. 2d 27 (D.D.C. 2001) .......... 7, 8

*Ticketmaster-New York, Inc. v. Alioto*,
26 F.3d 201 (1st Cir. 1994) .......... 23

*Tracy v. Islamic Republic of Iran*,
2003 U.S. Dist. LEXIS 15844 (D.D.C. Aug. 21, 2003) .......... 12

*Ungar v. Palestinian Authority*,
325 F. Supp. 2d 15 (D.R.I. 2004) .......... 21

*Ungar v. PLO*,
402 F.3d 274 (1st Cir. 2005) .......... 20

*Unspam Tech., Inc. v. Chernuk*,
No. 11-2406, 2013 U.S. App. LEXIS 9070 (4th Cir. May 3, 2013) .......... 25

*Wag More Dogs, LLC v. Cozart*,
680 F.3d 359 (4th Cir. 2012) .......... 3

*Wultz v. Bank of China, Ltd.*,
811 F. Supp. 2d 841 (S.D.N.Y. 2011) .......... 10

*In Re: XE Services Alien Tort Litigation*,
665 F. Supp. 2d 569 (E.D. Va. 2009) .......... 4

**Statutes**

18 U.S.C. § 2331(1) .......... 9

18 U.S.C. § 2331(1)(A) .......... 11

18 U.S.C. § 2332 .......... 11

18 U.S.C. § 2333(a) .......... 4, 16

18 U.S.C. § 2334(a) .......... 18, 26, 27

18 U.S.C. § 2337(2) .......... 28

18 U.S.C. § 2339A .......... 11

28 U.S.C. § 1367(c)(3) .......... 2, 16

28 U.S.C. § 1608 .......... 27

42 U.S.C. § 1983 .......... 13

Anti-Terrorism Act, 18 U.S.C. § 2333 .......... *passim*

Foreign Sovereign Immunities Act, 28 U.S.C. § 1605(a)(7) .......... 12

**Other Authorities**

Assembly Resolution A/67/L.28 .......... 17

Dan B. Dobbs, *The Law of Torts* § 307 (2000) .......... 7

Fed. R. Civ. P. 4(h)(1)(B) .......... 28

Fed. R. Civ. P. 4(j)(1) .......... 27

Fed. R.Civ.P. 4(k) .......... 18

Fed. R. Civ. P. 8(a) .......... 3

Fed. R. Civ. P. 8(a)(2) .......... 3

Fed. R.Civ.P. 12(b)(1) .......... 28

Fed. R.Civ.P. 12(b)(2) .......... 18, 24, 29

Fed. R. Civ. P. 12(b)(3) .......... 26, 29

Fed. R. Civ. P. 12(b)(4) .......... 27

Fed. R. Civ. P. 12(b)(5) .......... 27, 29

Fed. R. Civ. P. 12(b)(6) .......... 26, 29

Fed. R.Civ.P. 17(b) .......... 16

Fed. R. Civ. P. 17(b)(3) .......... 17

Fed. R. Civ. P. 17(b)(3)(A) .......... 18

Restatement (Second) of Torts § 46(2)(a) .......... 6, 7

Restatement (Second) Torts § 313(2) .......... 6

## Introduction

Defendant the Palestinian Authority ("PA") respectfully moves the Court to dismiss the Complaint [DE 1] pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(1), (2), (3), (5) and (6). On April 24, 2011, Israeli Ben-Yosef Livnat ("Benyo Livnat," or "Livnat"), a follower of extremist Rabbi Eliezer Berland, was killed while leading a group of Breslov Hasidim on an unauthorized, early-hours raid into Palestinian-controlled territory to visit a site known as Joseph's Tomb, or Yousef's Tomb, located in the West Bank town of Nablus. Plaintiffs, the personal representative of Livnat's estate and a dozen family members, allege that Livnat was shot by a low-level PA employee, Sergeant Mohammed Saabneh, who was serving on duty as a member of the security force guarding Joseph's Tomb. Complaint ¶¶ 47-54.

Livnat's mother and four of his adult siblings (who allege U.S. nationality) bring suit against the PA under the civil liability provision of the U.S. Anti-Terrorism Act ("ATA") for their emotional injuries and loss of income. *See* First and Second Claims for Relief, DE 1 at 13-17. The remaining Plaintiffs, including Livnat's estate, widow, four minor children, and an adult sibling, bring a host of supplemental non-federal law tort claims. *See* Third-Ninth Claims for Relif, *id.* at 17-22. Plaintiffs do not allege whether these claims arise under Palestinian law, Israeli law, or Virginia law. *See id.* The Anti-Terrorism Act plaintiffs seek automatic treble damages against the Palestinian Authority, *see id.* at 17 (Complaint ¶ 79), 23 and all of the plaintiffs seek punitive damages (*id.* at 23).

Plaintiffs' lawsuit must be dismissed for failure to state a claim, as well as on several jurisdictional and procedural grounds. Rivka Livnat (Benyo's mother) and the four adult siblings do not state a claim for relief under the Anti-Terrorism Act, because their claims derive from the injury of a non-U.S. national. In addition, the Complaint does not allege an "act of international

terrorism." At most, it alleges that a security guard used excessive force when surprised by a nighttime raid of 17 men at an "extremely sensitive place" (Complaint ¶ 44), *i.e.*, a site over which Israeli settlers illegally lay claim in an area that is indisputably within the territorial jurisdiction and security control of the Palestinian Authority. Moreover, the Complaint fails to allege a basis for imposing vicarious liability on the PA (including Plaintiffs' claims for treble and punitive damages) for the unauthorized lethal use of force by a low-level security employee. The remaining supplemental law claims should be dismissed pursuant to 28 U.S.C. § 1367(c)(3).

The lawsuit also must be dismissed for lack of personal jurisdiction because the lawsuit does not arise out of the PA's contacts with the United States and because the PA has insufficient presence in the United States to permit the exercise of general jurisdiction. In addition, the PA was not served with process. Plaintiffs served the Head of the PLO Delegation to the United States (Maen Rashid Areikat), who is not an agent of the PA. For the same reason, venue also does not lie in this jurisdiction; Plaintiffs sole basis for asserting that venue is proper in this Court is that Areikat's personal residence is in this district. Complaint ¶ 10. Finally, in the alternative, the Complaint must be dismissed for lack of subject-matter jurisdiction because this case presents nonjusticiable political questions, requiring the Court to address Plaintiffs' inflammatory (and unsupported) allegation that the PA in 2011 had a policy of encouraging Palestinians to use "violence again[st] Jewish and Israeli targets to achieve the political goal of ending that occupation," to resolve whether defense of the homeland against unauthorized incursions by radical settler groups is "terrorism," and whether the PA is entitled to immunity now that the United Nations has elevated its status to non-member observer State status.

## ARGUMENT

### I. PLAINTIFFS RIVKA LIVNAT, RACHEL LUZ, ODEYA GORDON, YEHUDA LIVNAT, AND NAVAH LIVNAT FAIL TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED UNDER THE ANTI-TERRORISM ACT.

#### A. Overview of Rule 8(a) Pleading Standard.

Under Rule 8(a), to state a claim for relief, the Complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Supreme Court has interpreted this rule to require a plaintiff to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (dismissing complaint when plaintiffs had "not nudged their claims across the line from conceivable to plausible"). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 663. This standard "asks for more than a sheer possibility that a defendant has acted unlawfully[,]" and "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* at 678 (internal quotations and citations omitted).

In the years since the Supreme Court pronounced this heightened pleading standard, courts in this circuit have further expounded on its precise requirements. As the Fourth Circuit has explained, a court "need not accept legal conclusions couched as facts or 'unwarranted inferences, unreasonable conclusions, or arguments.'" *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012). And, as particularly pertinent here, a plaintiff must plead sufficient



1336780.1

facts to create a plausible inference that each element necessary to state a claim for relief is met. *See In Re: XE Services Alien Tort Litigation*, 665 F. Supp. 2d 569 (E.D. Va. 2009).

Thus, Plaintiffs' Complaint must be dismissed unless it pleads facts that create a plausible inference that each element of the civil liability provision of the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, is met. That section provides as follows:

> Any national of the United States injured in his or her person, property or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

Distilled to its elements, the ATA requires Plaintiffs to prove that (1) a U.S. national was injured in his or her person, property or business; (2) by an act of international terrorism; and (3) the Palestinian Authority caused the injury. Because the complaint fails to plead facts sufficient to plausibly infer that any of these requirements are satisfied, it must be dismissed.

**B. The Complaint Fails to Allege a Cognizable Injury to a U.S. National.**

No claim may lie under the ATA unless a "national of the United States [was] injured in his or her person, property or business." 18 U.S.C. § 2333(a); *see also Asemani v. Gov't of Islamic Republic of Iran*, 276 Fed App'x 287, 287 (4th Cir. 2008) (affirming district court's order that plaintiff lacked standing under the ATA when he failed to establish he was a national of the United States). The Complaint does not allege that Benyo Livnat is a U.S. national, nor does it allege that his widow and four children are U.S. nationals. *See* Complaint ¶¶ 2-5. Instead the Complaint alleges that his mother Rivka Livnat and adult siblings Yehuda Livnat, Rachel Luz, Odeya Gordon, Navah Livnat (the "ATA Plaintiffs") are U.S. nationals (*id.* ¶ 5) who "suffer severe physical, psychological, emotional and financial injuries from the assault, shooting and the murder of Benyo Livnat" (*id.* ¶ 70). The Complaint does not adequately allege what

physical, psychological, emotional and financial injuries Plaintiffs allegedly suffered, other than to include a catalog of categories of damages claims, most of which have no apparent relevance to claims of the parent of an adult child or to claims of adult siblings: "loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; pecuniary and financial loss, including the loss of income." *Id.*

With respect to the ATA plaintiffs' emotional distress claim, the statute's requirement that the plaintiff be injured in "his or her person," must be construed to disallow suits where the only injury to a U.S. national is his or her emotional distress at the killing of a non-U.S. national. The civil liability provision of the ATA operates as a tort statute. *See Gill v. Arab Bank*, PLC, 893 F. Supp. 2d 474, 483-84 (E.D.N.Y. 2012) (explaining that, in enacting § 2333, Congress "constructed a new federal substantive tort," which is "essentially a subspecies of the common-law tort of battery"). Here, the ATA plaintiffs have not alleged injuries that would constitute the tort of battery.

Even assuming arguendo, the phrase "in his or her person" could be construed to allow recovery for emotional distress, under traditional tort law, plaintiffs who were not present at the terrorist attack have no standing to sue. Courts have interpreted the ATA's legislative history as "evidenc[ing] an intent by Congress to codify general common law tort principles and to extend civil liability for acts of international terrorism to the full reaches of *traditional tort law*." *Boim v. Quranic Literacy Inst.*, 291 F.3d 1000, 1010 (7th Cir. 2002) (emphasis added). *See also Estates of Yaron Ungar v. Palestinian Auth.*, 304 F. Supp. 2d 232, 238 (D.R.I. 2004) ("S.2465 gave victims of terrorism the remedies of *traditional American tort law*, including treble damages and attorney's fees.") (emphasis added). Under the Restatement (Second) of Torts, in order to recover for intentional infliction of emotional distress where the conduct was directed at

a third person, the plaintiff must be "a member of such person's immediate family who is present at the time." Restatement (Second) of Torts § 46(2)(a). Under traditional tort law, adult siblings are not treated as members of the immediate family, where, as here, the deceased victim has a surviving spouse and surviving children. Thus, Yehuda Livnat is not entitled to recover for his emotional distress over the death of Benyo Livnat. The remaining ATA plaintiffs have no direct cause of action because they were not present.

Restatement Illustration 20, Cmt. I, explains that the presence requirement is intended to limit the scope of recovery, particularly where an incident may result in the distress of many individuals:

> The limitation may be justified by the practical necessity of drawing the line somewhere, since the number of persons who may suffer emotional distress at the news of an assassination of the President is virtually unlimited, and the distress of a woman who is informed of her husband's murder ten years afterward may lack the guarantee of genuineness which her presence on the spot would afford.

*Id.*[1]

A leading treatise on torts reiterates the presence requirement and emphasizes the distinction between witnessing an incident and learning of the incident shortly thereafter:

> Ordinarily recovery . . . is limited to plaintiffs who are not only present at the time, but are known by the defendant to be present, so that the mental effect can reasonably be anticipated by the defendant. The distinction between the wife who sees her husband shot down before her eyes, and the one who hears about it five minutes later, may be a highly artificial one; but an argument in justification is the obvious necessity of drawing a line somewhere short of the widow who learns of the decease ten years afterward, when the genuineness and gravity of her distress may very reasonably be doubted.

---

[1] A similar principle arises under Restatement (Second) Torts § 313(2), which applies to claims for negligent infliction of emotional distress and which limits recovery to those who are within the zone of danger. *See* Restatement (Second) Torts § 313(2).



1336780.1

Prosser and Keeton on Torts § 12 (Infliction of Mental Distress, Acts Directed at a Third Person). Thus, in most instances, third parties may recover for emotional distress only where they are physically present at the time of the underlying incident.

At a basic level, the presence requirement is a proxy for intent by the tortfeasor to cause the claimant's emotional distress. *See* Dan B. Dobbs, *The Law of Torts* § 307 (2000) ("[T]he Restatement, in allowing a claim by one who is present, probably assumes that the defendant is aware of that presence and that his conduct demonstrates that he intends to harm in the substantial certainty sense."). The Restatement leaves open the "possibility of situations in which presence at the time may not be required," but does not identify the types of situations that might fall into that category. *See* Restatement (Second) of Torts § 46(2) Illustration 20, cmt. I. But even in rare circumstances where a showing of presence is not required, a substantially certain showing of intent remains a key prerequisite to recovery in intentional infliction of emotional distress claims.

In *Morgan v. Foretich*, 846 F.2d 941, 950 (4th Cir. 1988), for example, the Fourth Circuit (applying Virginia law) affirmed the district court's refusal to dismiss the intentional infliction of emotional distress claim brought by a mother arising from the father's alleged physical abuse of their minor child – even though she was not present for the alleged abuse. In addition, some courts have treated hostage cases as justifying waiver of the presence requirement. The courts' rationale has been that hostage circumstances are inherently intended to inflict emotional distress on the hostage victim's family. Thus, the rationale suggests, intent can be proved with substantial certainty without a showing of presence. *See Sutherland v. Islamic Republic of Iran*, 151 F. Supp. 2d 27 (D.D.C. 2001); *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27, 36

(D.D.C. 2001); *Acree v. Republic of Iraq*, 271 F. Supp. 2d 179 (D.D.C. 2003). In *Sutherland*, for example, the court explained:

> The Court finds that, when an organization takes someone hostage, it is implicitly intending to cause emotional distress among the members of that hostage's immediate family. Further, the Court finds that an organization taking someone hostage implicitly believes that such emotional distress is substantially certain to result. *These conclusions are based on the logical inference that a hostage without loved ones -- that is, a hostage without those who will be emotionally distressed by his absence -- is of no value at all to a hostage-taker.*

151 F. Supp. 2d at 50 (emphasis added). *See also Jenco*, 154 F. Supp. 2d at 36 ("[H]ostage cases are unique in that they implicitly involve a physical separation of the plaintiff from the victim of the outrageous conduct. As a matter of fact, a plaintiff's lack of presence is the *exact source* of his emotional distress."). Thus, it is precisely the separation between the hostage and his or her family that provides the hostage taker with leverage to secure his or her demands. Because of the nature of the hostage/demand dynamic, presence is not necessary to evidence with substantial certainty the tortfeasor's intent to inflict emotional distress on the hostage's family. No such considerations are present here.

The emotional impact of acts of international terrorism reach far and wide; if every U.S. national who claimed emotional distress from acts of international terrorism they did not personally experience could bring suit under the ATA, the extraterritorial reach of the U.S. courts' jurisdiction would expand far beyond that contemplated by Congress. The Supreme Court has long recognized a presumption against extraterritorial application of federal law. *See, e.g., EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991). For the same reasons, the Supreme Court has held that even expressly extraterritorial statutes should not be extended beyond their precise terms. In *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010), for example, the Court held that, "when a statute provides for some extraterritorial application,

the presumption against extraterritoriality operates to limit that provision to its terms." *Id.* at 2883. And in *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437 (2007), the Court confirmed that, where a statute "specifically . . . extend[s] the reach of United States . . . law to cover certain activity abroad," courts must "resist giving the language . . . an expansive interpretation." *Id.* at 442, 455-56. The Court affirmed this principle earlier this year in *Kiobel v. Royal Dutch Petro. Co.*, 133 S. Ct. 1659, 1665 ( 2013), where it held that the principles underlying the presumption against extraterritoriality constrain courts exercising their power under the Alien Tort Statute.

**C. The Complaint Does Not Adequately Plead an Act of International Terrorism.**

The Complaint also fails to allege facts creating a plausible inference that the ATA plaintiffs were injured by reason of "an act of international terrorism." In order to constitute an act of international terrorism, among other requirements, the act must

> (B) appear to be intended –
> (i) to intimidate or coerce a civilian population;
> (ii) to influence the policy of a government by intimidation or coercion; or
> (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and

18 U.S.C. § 2331(1) (statutory definition of "act of international terrorism"). The facts alleged in the Complaint plainly do not give rise to a plausible inference that Livnat's death happened in furtherance of any of these objectives.

The Complaint alleges that at approximately 5:40 am on April 24, 2011, Livnat and 16 other men arrived at Joseph's Tomb, a site located in Palestinian-controlled territory and under PA security control. Complaint ¶ 45, 47. Saabneh and "at least three other PA security officers" were posted at the site. *Id.* ¶ 43. When the 17 trespassers entered the Palestinian building where the tomb is located, the officers "began firing their weapons in the air." *Id.* ¶ 49. According to the Complaint, "Livnat and the other worshippers immediately raced out of the building and ran



1336780.1

to the[ir] vehicles, and attempted to drive off." *Id.* ¶ 50. The Complaint then alleges that Livnat was killed when machine gun fire struck his vehicle. *Id.* ¶¶ 51-52. Notably, the Complaint does not allege that U.S. or Israeli authorities have labeled the shooting as a "terrorist" attack; nor does it allege that Livnat had authorization to arrive in Palestinian-controlled territory at 5:40 am with 16 other men taking the four security officers on duty by surprise. Indeed, Livnat's nighttime arrival with 16 other men at an "extremely sensitive place" (id. ¶ 44) was inherently provocative. The Complaint is entirely devoid of any allegation that Sergeant Saabneh planned the attack or acted with the requisite intent to intimidate or coerce a civilian population or influence the policy of a government.

This incident stands in stark contrast to other ATA cases, which typically involve what are alleged to be planned attacks targeting civilians in public spaces. *See, e.g.*, *Wultz v. Bank of China, Ltd.* 811 F. Supp. 2d 841, 844 (S.D.N.Y. 2011) (ATA claim arising out of suicide bombing that killed 10 and injured many more); *Haim v. Islamic Republic of Iran*, 784 F. Supp. 2d 1, 3-4 (D.D.C. 2011) (claim under the state-sponsored terrorism exception of the Foreign Sovereign Immunities Act for injuries arising out of suicide bombing of a bus that killed eight and wounded dozens); *Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 416 (E.D.N.Y. 2009) (ATA claim arising out of suicide bombing of Jerusalem bus that killed 11 and wounded 50 others); *Sisso v. Islamic Republic of Iran*, No. 1:05-CV-394, 2007 U.S. Dist. LEXIS 48526, at *1 (D.D.C. July 5, 2007) (ATA and other claims arising out of suicide bombing of Tel Aviv bus that killed six and injured 84 others)

In addition to failing to allege that Sergeant Saabneh acted with the requisite intent, the ATA plaintiffs also fail to allege the requisite predicate criminal act. The ATA defines "international terrorism" as activities that "involve violent acts or acts dangerous to human life

that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State." 18 U.S.C. § 2331(1)(A). Here, the ATA plaintiffs allege that Defendant PA violated 18 U.S.C. § 2339A, which makes it a crime to "provide[] material support or resources . . . knowing or intending that they are to be used in preparation for, or in carrying out, a violation of" specific violent crimes, including 18 U.S.C. § 2332, which prohibits the killing of a United States national outside the United States. But, here, a U.S. national was not killed. Plaintiffs do not cite to any provisions of the ATA or to federal or state criminal laws, which would treat the PA's alleged intentional or negligent infliction of emotional distress as a criminal act, nor have they alleged any conduct by the PA which could be characterized as involving "violent acts or acts dangerous to human life."

**D. The PA Cannot Be Held Vicariously Liable for the Acts of Sergeant Saabneh.**

The PA cannot be held liable under the ATA unless its wrongful conduct caused the injury of a U.S. national. *See Boim v. Holy Land Found. for Relief & Development*, 511 F.3d 707, 739 (7th Cir. 2007) ("[R]ecovery under section 2333 is conditioned on proof of causation in fact"). Plaintiffs rely on a theory of vicarious liability, alleging that Saabneh and other PA security personnel carried out the attack "within the scope of their employment by the PA" and "the PA is vicariously liable for the attack." Complaint ¶ 64. But the PA cannot be held liable under the ATA and subjected to treble and punitive damages simply because a low-level employee shot Mr. Livnat. Plaintiffs have not adequately pled that wrongful conduct of the PA (rather than Sergeant Saabneh) caused Plaintiffs' alleged injuries.

Case 1:04-cv-00397-GBD-RLE Document 476-14 Filed 04/23/14 Page 21 of 39

Plaintiffs allege that the PA is a "non-sovereign municipal government." *Id.* ¶ 7. Under *Monell v. Dep't of Social Services*, 436 U.S. 658, 691 (1978), "a municipality cannot be held liable solely because it employs a tortfeasor." Rather, plaintiffs must establish that their injury resulted from an official policy or custom. *Id.* at 694 ("[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible"); *see also Board of County Commissioners of Bryan County v. Brown*, 520 U.S. 397, 403-04 (1997) ("[A] plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights"). This principle has been applied in terrorism cases. *See Tracy v. Islamic Republic of Iran*, 2003 U.S. Dist. LEXIS 15844, at *23-24 (D.D.C. Aug. 21, 2003) (in a case brought under the state-sponsor of terrorism provision of the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605(a)(7), holding that in order for an employee's unlawful conduct to be imputed to a government, the government "must have engaged in the wrongful conduct, either deliberately or permissively, as a matter of policy or custom") (citing *Monell*, 436 U.S. at 694-95).

Thus, the PA cannot be held vicariously liable for Saabneh's acts unless they were undertaken as part of an official policy or custom of the PA. A few instances of unlawful conduct cannot establish a policy or custom. *Smith v. Ray*, 409 Fed. App'x 641, 650 (4th Cir. 2011) ("A municipality is not liable for mere 'isolated incidents of unconstitutional conduct by subordinate employees . . . . Rather, there must be numerous particular instances of unconstitutional conduct in order to establish a custom or practice'") (quoting *Lytle v. Doyle*, 326 F.3d 463 (4th Cir. 2003)). Instead, "[m]unicipal policy may be found in written ordinances and



1336780.1

regulations, . . . in certain affirmative decisions of individual policymaking officials, . . . or in certain omissions on the part of policymaking officials that manifest deliberate indifference to the rights of citizens." *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999). Outside of those "formal decisionmaking channels, a municipal custom may arise if a practice is so 'persistent and widespread' and 'so permanent and well settled as to constitute a custom or usage with the force of law.'" *Id.* (quoting *Monell*, 436 U.S. at 691) (internal quotations omitted).

As the Fourth Circuit explained in *Carter*, when a plaintiff claims that a municipality has not directly injured him, but caused an employee to do so, "rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Id.* (internal citation and quotations omitted). In *Carter*, the plaintiff could not establish municipal liability in her 42 U.S.C. § 1983 lawsuit against a city and its police department. Her allegations of general police misconduct failed to establish the existence of a municipal policy or custom that actually caused her specific injuries. *Id.* at 219. While the incidents Carter cited may have tended to show a "specific deficiency" in a city policy or a "known but uncorrected custom or usage" on the part of the police officers, there was no affirmative link between the deficiency suggested by the alleged facts and the particular violations of which she complained. *Id.* Essentially, Carter's claim was that general bad police behavior led to her specific deprivation, which the Fourth Circuit found was a "nebulous chain" failing to meet the rigorous standards for municipality liability. *Id.*[2]

---

[2] While *Carter v. Morris* was decided on summary judgment, courts have also granted motions to dismiss when the complaints did not allege facts sufficient to create a plausible inference of the existence of a custom or policy needed to establish municipal liability. *See, e.g., Lee v. City of Richmond*, No. 3:12cv471, 2013 U.S. Dist. LEXIS 38085, at *8-24 (E.D. Va. Mar. 19, 2013); *Lohdi v. Fairfax County / Board of Supervisors*, No. 1:12-cv-1108, 2012 U.S. Dist. LEXIS 181176, at *6-8 (E.D. Va. Dec. 21, 2012).

Likewise, the Complaint here offers generalized allegations about PA practices, but does not identify an actual, "persistent and widespread" or "permanent and well settled" custom that specifically led to Livnat's death. Nor do Plaintiffs cite to any "written ordinances or regulations," "affirmative decisions of individual policymaking officials" or "omissions on the part of policymaking officials" that created an official PA policy leading to Saabneh's alleged shooting of Livnat. Plaintiffs cannot rely on "scattershot accusations" of violations or on generalized claims of official policy; they must demonstrate a specific practice that directly caused Saabneh's acts. *Id.* at 218. The Complaint's allegations do not meet the standard required to hold the PA vicariously liable for Saabneh's acts.

The Complaint devotes several paragraphs to suggest that the PA maintained the position that the presence of Israelis in the West Bank constituted an illegal occupation, and Palestinians had a right to resist that occupation. *See* Complaint ¶¶ 11-12. Even taking this proposition as true – a proposition supported by international law – it does not plausibly follow that such position produced a policy supporting use of deadly force against Israelis by PA security force personnel. To the contrary, the Complaint alleges that Joseph's tomb "is visited by many Jews, many of whom live nearby," *id.* ¶ 45, and yet does not allege a single other incident in which PA security force employees used force against Jewish visitors to the tomb. And, conclusorily labeling this alleged "policy" as "official, consistent and publicly-stated" (*id.* ¶ 11) does not make it automatically so. Plaintiffs cite to no written ordinance or regulation or affirmative decision of an official policymaker. Rather, Plaintiffs allege anti-Israeli sentiment in textbooks and anti-Israeli statements in the media (*id.* ¶¶ 14-15) , but fail to identify any statements from the relevant time period that could be attributed to the PA, which reflect a policy or custom of using deadly force against Israelis. Plaintiffs claim that, after the attack, a Brigadier General

Damiri justified the attack, but the Complaint quotes only references to "settlers" and "normal people" and notably fails to provide Damiri's actual statement. *Id.* ¶ ¶ 55-57.

The Complaint also describes certain aspects of the PA's social welfare system, including benefits for incarcerated individuals and financial support to the families of deceased Palestinians. *Id.* ¶¶ 18-23. Again, a policy must have *specifically* created the violation to create municipal liability. Neither of these welfare programs plausibly produced a policy of use of deadly force by security force personnel against Israeli civilians.

Finally, Plaintiffs allege that Sergeant Saabneh had a "well-known background of anti-Israel terrorist activity" and therefore "no rational actor" would have posted Saabneh at Joseph's Tomb "unless the intended goal was to encourage, incite and/or authorize violence against the Jewish visitors to the site, virtually ensuring it would occur." *Id.* ¶ 46. The Complaint, however, only alleges that the Israelis convicted Saabneh in 2005 to 20 months for purchasing fertilizer and later detained him for a little over a year for associating with an alleged member of Palestine Islamic Jihad. *Id.* ¶¶ 26-39. Thus, Saabneh had no record of injuring or killing any Israelis. The fact that the Israelis choose to characterize a wide range of behavior as "terrorist" in an effort to control the young male Palestinian population does not mean that the PA was on notice that Saabneh was likely to use deadly force against Israelis visiting Joseph's Tomb.

## II. PLAINTIFFS' REMAINING CLAIMS MUST BE DISMISSED.

### A. Claim Two Must Also Be Dismissed Because There is No Civil Liability for Aiding and Abetting Under the ATA.

The Second Claim for Relief attempts to assign secondary liability against the PA on an aiding and abetting theory. However, as the Supreme Court has explained, "Congress [knows] how to impose aiding and abetting liability when it [chooses] to do so." *Cent. Bank, N.A. v. First Interstate Bank, N.A.*, 511 U.S. 164, 176 (1994). "[W]hen Congress enacts a statute under which

Case 1:13-cv-00498-GBL-TCB Document 6 Filed 06/05/13 Page 25 of 39 PageID# 80

a person may sue and recover damages from a private defendant for the defendant's violation of some statutory norm, there is no general presumption that the plaintiff may also sue aiders and abettors." *Id.* at 182.

Accordingly, because the ATA is silent on aiding and abetting, the PA cannot be held liable on this theory. *See Rothstein v. UBS AG*, 708 F.3d 82, 99 (2d Cir. 2013) ("We doubt that Congress, having included in the ATA several express provisions with respect to aiding and abetting in connection with the criminal provisions, can have intended § 2333 to authorize civil liability for aiding and abetting through its silence"); *Boim v. Holy Land Foundation for Relief & Development, et al.*, 549 F.3d 685, 689 (7th Cir. 2008) ("[S]tatutory silence on the subject of secondary liability means there is none; and section 2333(a) authorizes awards of damages to private parties but does not mention aiders and abettors or other secondary actors"). Claim Two must therefore be dismissed.

**B. Because the Court Does Not Have Original Jurisdiction Under the ATA, It Should Decline to Exercise Supplemental Jurisdiction Over the State Law Claims, or, Alternatively, Dismiss the Claims for Lack of Capacity.**

Finally, Plaintiffs' supplemental non-federal law claims (the Third-Ninth Claims for Relief) must also be dismissed. The Court should decline to exercise supplemental jurisdiction over these claims because Plaintiffs have failed to state a claim under the ATA. *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . (3) the district court has dismissed all claims over which it has original jurisdiction").

In the alternative, the supplemental law claims should be dismissed because the PA lacks the capacity to be sued. Capacity to be sued is governed by Federal Rule of Civil Procedure 17(b). For a party which is not either an individual or corporation, the capacity to be sued is

governed by the law of the state where the court is located. Fed. R. Civ. P. 17(b)(3). The PA is the government of a State, albeit one not yet recognized by the U.S. In November 2012, the United Nations General Assembly voted to accord Palestine non-member observer State status in the United Nations. UN General Assembly Resolution A/67/L.28, Palestine (Nov. 26, 2012). In so doing, the UN General Assembly recognized that "to date, 132 States Members of the United Nations have accorded recognition to the State of Palestine." *Id.*

Even if unrecognized states could be sued under Virginia law, Plaintiffs have alleged that the PA is a "municipal government that provide[s] certain governmental services in parts of the West Bank." Complaint ¶ 7. As a municipal government, the PA cannot be sued. *See Carter*, 164 F.3d at 221 ("In Virginia as a general rule, the sovereign is immune . . . from actions at law for damage . . . [I]t is plain that this protection extends to municipalities in the exercise of their governmental functions . . . one of which is certainly the maintenance of a police force") (internal citations and quotations omitted); *Hoggard v. City of Richmond*, 200 S.E. 610, 611 (Va. 1939) ("In the exercise of these governmental powers a municipal corporation is held to be exempt from liability for its failure to exercise them, and for the exercise of them in a negligent or improper manner"). Though Plaintiffs characterize the PA as a "non-sovereign municipal government," Complaint ¶ 7, this case arises out of Plaintiffs' allegation that the PA, as a municipal government, exercising governmental functions, improperly or negligently supervised its police force. The PA is no less entitled to immunity from suit than are domestic local municipalities operating police forces.[3]

[3] Some courts have treated the PA as an unincorporated association. *See, e.g., Klieman,* 467 F. Supp. 2d 107, 113-14 (D.D.C. 2006). In Virginia, however, the capacity of an unincorporated association to be sued in its own name "is limited to 'voluntary group[s] of persons joined together by mutual consent for the purpose of promoting some stated objective,' such as 'trade unions, fraternal organizations, business organizations, and the like.'" *Smart v. Suntrust Bank*,

## III. THE COURT LACKS PERSONAL JURISDICTION OVER THE PALESTINIAN AUTHORITY.

The Court must also dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(2) because it lacks personal jurisdiction over the PA. Plaintiffs allege this Court has personal jurisdiction over the PA pursuant to 18 U.S.C. § 2334(a) and Federal Rule of Civil Procedure 4(k). Complaint ¶ 9. Section 2334(a), the general venue section of the ATA, states that:

> Any civil action under section 2333 of this title against any person may be instituted in the district court of the United States for any district where any plaintiff resides or where any defendant resides or is served, or has an agent. Process in such a civil action may be served in any district court where the defendant resides, is found, or has an agent.

Federal Rule of Civil Procedure 4(k) "is in essence a federal long-arm statute." *Saudi v. Northrop Grumman Corp.*, 427 F. 3d 271, 275 (4th Cir. 2005). In order to obtain jurisdiction under Rule 4(k), three requirements must be met: (1) the suit must arise under federal law; (2) the defendant must not be subject to personal jurisdiction in any state; and (3) the defendant must have contacts with the United States consistent with the Constitution and laws of the United States. *Id.* The third requirement "is founded upon the Due Process Clause of the Fifth Amendment" and "ensures that a defendant has fair warning before it is subjected to the coercive power of a court." *Id.* To determine whether exercising personal jurisdiction comports with due process, the Court must engage in a two-part inquiry. "In essence, a defendant must have

---

No. 4:09cv00015, 2009 U.S. Dist. LEXIS 51688, at *3-4 (W.D. Va. June 18, 2009) (quoting *Yonce v. Miners Mem'l Hosp. Ass'n*, 161 F. Supp. 178, 186 (W.D. Va. 1958)). *See also Muniz v. Fairfax County* Police Dep't, No. 1:05cv466, 2005 U.S. Dist. LEXIS 48176, at *5 n.2 (E.D. Va. Aug.2, 2005) ("Virginia courts have held that a hospital association, real estate investment trust, racing commission, landowner association, and a labor organization are unincorporated associations . . . It is clear that a county police department is not an unincorporated association"). Thus, even if the PA were deemed an unincorporated association it lacks the capacity to be sued for non-federal law claims. *See* Fed. R. Civ. P. 17(b)(3)(A).

minimum contacts with the forum state, and a court's exercise of jurisdiction must be reasonable." *Eplus Tech., Inc. v. Aboud*, 313 F.3d 166, 176-77 (4th Cir. 2002).

Plaintiffs have the burden of proving the existence of jurisdiction over the PA. *New Wellington Fin. Corp. v. Flagship Resort Dev. Corp.*, 416 F.3d 290, 294 (4th Cir. 2005). In assessing the plaintiff's showing, a court "need not credit conclusory allegations or draw farfetched inferences." *Masselli & Lane, PC v. Miller & Schuh, PA*, No. 99-2440, 2000 U.S. App. LEXIS 11932, at *4 (4th Cir. May 30, 2000) (internal citation and quotations omitted).

A court may exercise specific or general jurisdiction over a defendant. Specific jurisdiction occurs when "the cause of action arises out of the defendant's contacts with the forum." *Northrup Grumman*, 427 F. 3d at 276. Because the cause of action here happened overseas, entirely unrelated to any of the contacts alleged in the Complaint between the PA and the United States, the Court cannot exercise specific jurisdiction over the PA. Rather, Plaintiffs must prove that the Court has general jurisdiction over the PA. As the Supreme Court has recently explained, this requires a substantial showing. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846 (2011).

In *Goodyear*, the Court addressed whether a foreign subsidiary of a U.S. parent corporation was amenable to suit in state court on claims unrelated to any activity of the subsidiary in the forum state. *Id.* at 2850. The Court explained that general jurisdiction permits a court to hear any and all claims against a foreign entity "when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum state." *Id.* at 2851 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 317 (1945)). The Court reversed the North Carolina court of appeals' finding that, because the defendant corporation's products had entered the state's stream of commerce, North Carolina could exercise general jurisdiction.

*Id.* So limited a connection did not "establish the 'continuous and systematic' affiliation necessary to empower North Carolina courts to entertain claims unrelated to the foreign corporation's contacts with the State." *Id.* Applying the *Goodyear* standard here, Plaintiffs must allege that the PA has sufficient contacts with the United States so that the PA is "fairly regarded as at home." *Id.* at 2853-54. Plaintiffs plainly cannot meet this test.

**A. The PA Has No Jurisdictionally Significant Contacts with the United States.**

Plaintiffs allege that jurisdiction is proper over the PA because it allegedly "operates an office and maintains a staff of employees in the United States." Complaint ¶ 9. In fact, the office to which the Complaint refers is the office of the General Delegation of the PLO to the United States, which is a PLO office, not a PA office. *See* Exhibit 1 (Declaration of Ambassador Areikat) at ¶¶ 3-4, 13. Contrary to the allegation in the Complaint (at ¶ 9), Ambassador Areikat does not serve as the PA's official representative in the United States. As set forth in his declaration, he serves as the PLO's representative to the United States and does not act as an agent or spokesperson for the PA. Exh. 1 at ¶¶ 3, 9, 15. The office staff is employed by the PLO and receives its salaries directly from the PLO's Palestine National Fund. *Id.* ¶ 11. The office does not engage in any fundraising or other commercial activities on behalf of the PA. *Id.* ¶ 16. Indeed, the PA is not authorized by international agreement or by U.S. law to have an office in the United States. *See id.* ¶ 13; *Ungar v. PLO*, 402 F.3d 274, 287 (1st Cir. 2005).

The Complaint alleges that jurisdiction should be exercised because other U.S. courts have exercised jurisdiction over the PA. *See* Complaint ¶ 9 (citing *Sokolow v. Palestine Liberation Organization*, 2011 WL 1344086 (S.D.N.Y. June 2, 2011); *Klieman v. Palestinian Authority*, 547 F. Supp. 2d 8 (D.D.C. 2008); *Ungar v. Palestinian Authority*, 325 F. Supp. 2d 15 (D.R.I. 2004)). Personal jurisdiction, however, "depends on the defendant's contacts with the

forum state at the time the lawsuit was filed." *Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 52 (2d Cir. 1991) (citing 4 C. Wright & A. Miller, *Federal Practice and Procedure*, § 1051, at 160-62 (1987); *see also Proprietors of Strata Plan No. 36 v. Coral Gardens Resort Management, Ltd.*, No. 1:09-cv-550, 2009 U.S. Dist. LEXIS 97704, at *18-19 (E.D. Va. Oct. 16, 2009). Moreover, "[t]he Court must resolve personal jurisdiction issues on a case-by-case basis, noting in each the particular activities relied upon by the resident plaintiff as providing the supposed basis for jurisdiction." *Cellutech, Inc. v. Centennial Cellular Corp.*, 871 F. Supp. 46, 49 (D.D.C. 1994).

The complaints in *Sokolow* and *Klieman* were filed almost a decade ago, in 2004, and *Ungar* is even further removed, having commenced in 2000. Furthermore, each of those complaints was filed against the PA and the PLO. The Supreme Court has made clear that each defendant's contacts with the forum state must be assessed individually (*Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n.13 (1984)), and yet, the courts in those cases inappropriately aggregated facts related to the PLO with the PA. *See generally Sokolow v. PLO*, No. 04 CV 00397, 2011 U.S. Dist. LEXIS 36022 at *15-21 (S.D.N.Y. Mar. 30, 2011); *Klieman*, 547 F. Supp. 2d at 13-14; *Ungar*, 325 F. Supp. 2d at 56-59. Indeed, in each lawsuit assessing personal jurisdiction over the PA in the United States, the PA has been sued alongside the PLO.

Here, the PA is the sole defendant, and therefore, the Court must only look to PA contacts as of the time the complaint was filed. And, put simply, there were none. The Complaint claims that the PA conducts "extensive public relations, propaganda, and other activities throughout the United States," yet cites to no examples of such activity aside from the affairs conducted by the PLO through its Washington D.C. office. Complaint ¶ 9. These activities cannot be imputed to the PA, absent a showing that the PA is an alter ego of the PLO,

which the Complaint does not allege. Accordingly, they cannot constitute contacts between the PA and the United States.

Even were the Court to consider the PLO Delegation a PA office, most of the activity of the office is not treated as a jurisdictional contact under the government contacts exception. Under the government contacts exception, courts may not assert personal jurisdiction over non-residents based on their contact with the nation's capital when that contact is derived from the "special needs for a continuous and ponderable physical presence there, which needs are not those customarily associated with strictly commercial operations." *Fandel v. Arabian American Oil Co.*, 345 F. 2d 87, 89 (D.C. Cir 1965). Thus, when a defendant's "presence" in Washington D.C. has been established solely to facilitate relations of a "diplomatic rather than business nature[,]" a federal district court should not exercise general jurisdiction over that defendant. *Dooley v. United Technologies Corp.,* 786 F. Supp. 65, 76 (D.D.C. 1992) (citing *Fandel*, 345 F.2d at 89).

As set forth in Ambassador Areikat's declaration, the focus of the office is on governmental affairs and public affairs, not on commercial activity. Exh. 1 ¶ 14. Specifically, the office "does not engage in fundraising or other commercial activities on behalf of the Palestinian Authority." *Id.* ¶ 16. Thus, the activity conducted by the office simply does not give rise to the "continuous and systematic" contacts required under *Goodyear Tire*. 131 S. Ct. at 2851. Plaintiffs' conclusory statements regarding the PLO's office in the Washington D.C. are clearly insufficient to establish the PA as "at home" in the United States.

**B. It Is Unreasonable for the Court to Exercise Personal Jurisdiction Over the PA.**

The second part of the due process analysis requires the Court to determine that it is reasonable, in this case, to exercise jurisdiction over the PA. Thus, the Court must find that the

exercise of jurisdiction would comport with "traditional notions of fair play and substantial justice." *Asahi Metal Industry Co. v. Superior Court of California*, 480 U.S. 102, 113 (1987) (quoting *Int'l Shoe*, 326 U.S. at 316). And, the more dubious a plaintiff's showing of defendant's contacts with the relevant forum, the less demanding defendant's burden of establishing unreasonableness becomes. *Ticketmaster-New York, Inc. v. Alioto*, 26 F.3d 201, 210 (1st Cir. 1994) ("We think . . . that the reasonableness prong of the due process inquiry evokes a sliding scale: the weaker the plaintiff's showing [on minimum contacts], the less a defendant need show in terms of unreasonableness to defeat jurisdiction").

The Supreme Court has set forth five factors for courts to consider: (1) the burden on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of a controversy; and (5) the shared interests of the states in furtherance of substantive social policies. *Asahi*, 480 U.S. at 113. These factors weigh overwhelmingly in favor of the Court declining to exercise jurisdiction over the PA in this case.

*Asahi* advised that the "unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." *Id.* at 114. And, the burden on the defendant would be substantial. The PA is located in the West Bank of the Palestinian Territories and must attend to a number of pressing affairs of state. The time and resources required to litigate a case in the United States are considerable and would significantly undermine the PA's ability to effectively govern.

The United States has no identifiable interest in the outcome of a law enforcement incident in the Palestinian Territories. No U.S. national was killed. Mr. Livnat's widow and

children are not alleged to be U.S. nationals. The forum's interest is "considerably diminished" when the plaintiff is not a resident of the forum. The lack of nexus between the forum conducting the personal jurisdiction inquiry, the incident, and the parties reflects adversely on the forum's interest in resolving the dispute at hand. *Asahi*, 480 U.S. at 114.

Finally, there is no question that the most efficient resolution of this controversy lies overseas. This issue generally turns on the location of the witnesses and evidence, all of which are located in the West Bank and Israel. *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 574 (2d Cir. 1996). Furthermore, as *Metro. Life* explained, that a plaintiff might enjoy certain procedural advantages by bringing suit in the chosen forum is of no consequence. 84 F.3d at 574 (holding that "choice-of-law considerations," such as whether plaintiff might enjoy a more generous statute of limitations in the chosen forum, may not be considered during the jurisdictional inquiry; plaintiff must instead demonstrate that factors such as the location of evidence or witnesses make the chosen forum more convenient). Accordingly, that the United States' judicial system might provide greater compensation in the event the Plaintiffs successfully prove their allegations cannot be taken into account when assessing their interest in litigating in the United States.

This lawsuit arises from an incident that took place entirely within the Palestinian Territories. All involved parties are residents of Israel or the Palestinian Territories, and the United States has no interest in this case. Under the five-factor *Asahi* test, it would be unreasonable for the Court to exercise personal jurisdiction over the PA. It should therefore dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(2).

**C. The Case Should Be Dismissed on the Merits Rather than Subjecting the PA to Personal Jurisdiction Discovery.**

When a plaintiffs' showing of personal jurisdiction is particularly weak, there is no need to subject defendants to costly jurisdictional discovery. *Unspam Tech., Inc. v. Chernuk*, No. 11-2406, 2013 U.S. App. LEXIS 9070, at *21-22 (4th Cir. May 3, 2013) ("The district court properly recognized the weaknesses of the plaintiffs' arguments for personal jurisdiction and determined that the cost of jurisdictional discovery would not be justified. This is an appropriate exercise of discretion"); *see also Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 402 (4th Cir. 2003) ("When a plaintiff offers only speculation or conclusory assertions about contacts with a forum state, a court is within its discretion in denying jurisdictional discovery"); *Rich v. KIS Cal., Inc.*, 121 F.R.D. 254, 259 (M.D.N.C. 1988) ("[W]here a plaintiff's claim of personal jurisdiction appears to be both attenuated and based on bare allegations in the face of specific denials made by defendants, the Court need not permit even limited discovery confined to issues of personal jurisdiction should it conclude that such discovery will be a fishing expedition"). Moreover, the showing needed to obtain jurisdictional discovery is heightened for foreign defendants. As the Seventh Circuit has held, "[f]oreign nationals usually should not be subjected to extensive discovery in order to determine whether personal jurisdiction over them exists." *Cent. States, Southeast & Southwest Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 946 (7th Cir. 2000); *see also Intec USA, LLC v. Engle*, No. 1:05CV468, 2005 U.S. Dist. LEXIS 38490, at *21 (M.D.N.C. Sept. 8, 2005) ("Courts have repeatedly held that speculation and conclusory allegations are not sufficient bases to subject a foreign defendant to the burdens of jurisdictional discovery").

Although "courts should ordinarily satisfy jurisdictional concerns before addressing the merits of a civil action," this "rule is not mechanically to be applied." *Feinstein v. Resolution*



1336780.1

*Trust Corp.*, 942 F.2d 34, 40 (1st Cir. 1991). As the First Circuit explained in *Feinstein*, the "requirement that a court possess *in personam* jurisdiction is a shield to protect the interests of an affected defendant -- and, like most shields, can be discarded by the bearer." *Id.* The court continued: "Where, as here, the affected defendant does not insist that the jurisdictional issue be determined first, and no special circumstances exist, we cannot fault the district court for eschewing difficult jurisdictional and venue-related issues in favor of ordering dismissal on the merits." *Id.* This approach finds support in *Norton v. Mathews*, 427 U.S. 524, 532 (1976), where the Court noted its practice of "reserv[ing] difficult questions of our jurisdiction when the case alternatively could be resolved on the merits in favor of the same party."

Here, the PA maintains that the Plaintiffs have not made a sufficient showing of PA jurisdictional contacts to be entitled to jurisdictional discovery. If this Court concludes otherwise, the PA respectfully requests that the Court first address the Rule 12(b)(6) arguments. This approach is more efficient for the Court, avoids delay in the resolution of the case, and avoids subjecting the PA to burdensome U.S. discovery.

## IV. PLAINTIFFS' COMPLAINT MUST BE DISMISSED UNDER RULES 12(B)(3) AND 12(B)(5).

### A. Because the PA Has No Contacts with the United States, No District Court Has Venue Over This Case.

For these same reasons the Court lacks personal jurisdiction, venue cannot be found in any district court of the United States. Under the ATA's venue provision, suit may be brought "in the district court of the United States for any district where any plaintiff resides or where any defendant resides or is served, or has an agent." 18 U.S.C. § 2334(a). Plaintiffs do not allege they reside in any district in the United States. The PA does not reside in any district in the

United States. Even if the PLO office in Washington, D.C. is deemed a PA office, venue would not lie in this district.

Plaintiffs claim that venue is proper in this Court because the PA "has an agent in this district, specifically its official representative in the United States, Maen Rashid Areikat, resides in this district." Complaint ¶ 10. As explained below, the PA does not reside or have an agent in the Eastern District of Virginia because Ambassador Areikat is not an agent of the PA. *See* Exh. 1 ¶ 9 "(I do not represent, or serve as an agent to, the Palestinian Authority . . . . In addition, I have not been authorized either in my personal capacity, or in my capacity as chief representative of the PLO to the United States, to accept service of process on behalf of the Palestinian Authority."). Because Plaintiffs' fail to satisfy the requirements of the ATA's venue provision, 18 U.S.C. § 2334(a), this suit must be dismissed under Rule 12(b)(4) for improper venue.

**B. The PA Was Not Properly Served with Process.**

Relatedly, the Complaint must also be dismissed under Rule 12(b)(5) because the PA has not been properly served. Service was allegedly effected on May 15, 2013, when a process server left a copy of the Summons with Ambassador Areikat. DE 3. As a state recognized by 132 other state members of the United Nations and accorded non-member observer State status in the United Nations, *see* U.N.G.A. Res. A/67/L.28 (Nov. 26, 2012), the PA is entitled to the rules of service governing service on a foreign state. *See* Fed. R. Civ. P. 4(j)(1), requiring compliance with 28 U.S.C. § 1608. Service on alleged agent Ambassador Areikat at his home in McLean, Virginia is not a method of service authorized by § 1608.

Even assuming arguendo that the PA should be treated as an association for these purposes, the PA nonetheless was not served with process. A corporation, partnership or association may be served "by delivering a copy of the summons and of the complaint to an

officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process[.]" Fed. R. Civ. P. 4(h)(1)(B). Ambassador Areikat is not an officer, managing or general agent of the PA. He has not been appointed an agent for service of process by the PA. Exh. 1 at ¶ 9.

**V. THE COMPLAINT MUST BE DISMISSED FOR LACK OF SUBJECT-MATTER JURISDICTION.**

Finally, the Court must also dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) because it lacks subject-matter jurisdiction over the cause of action. Under 18 U.S.C. § 2337(2), "[n]o action shall be maintained under section 2333 of this title against "a foreign state, an agency of a foreign state, or an officer or employee of a foreign state or an agency." Although a number of courts have previously rejected sovereign immunity claims of the PA, the non-member observer State status at the United Nations, along with the recognition of Palestine as a State by 132 State Members of the United Nations provides grounds for according the PA sovereign immunity at this time as the governing authority of Palestine.

There is an additional ground for dismissal, however, which the PA seeks to preserve. In the event the Court does not dismiss the case on the other grounds, it should dismiss the case as presenting nonjusticiable political questions. *See Baker v. Carr*, 369 U.S. 186, 217 (1962); *Doe v. Israel*, 400 F. Supp. 2d 86, 111-12 (D.D.C. 2005) ("It is hard to conceive of an issue more quintessentially political in nature than the ongoing Israeli-Palestinian conflict, which has raged on the world stage with devastation on both sides for decades."). This case potentially asks the Court to decide rightful sovereignty over Joseph's tomb, whether the PA has a policy and custom of supporting violent attacks on Israeli civilians, what constitutes "terrorism" versus resistance, and how the PA should be characterized for purposes of immunity, service of process, and liability standards.

The Court need not, however, address these issues, because the PA is entitled to dismissal on the other grounds, including under Rules 12(b)(6), 12(b)(2), 12(b)(3) and 12(b)(5).

**CONCLUSION**

For the foregoing reasons, the Palestinian Authority respectfully requests the Court grant its Motion to Dismiss the Complaint.

Respectfully submitted,

Dated: June 5, 2013

/s/ Charles F. B. McAleer, Jr.
Charles F. B. McAleer, Jr. (VSB No. 24430)
Miller & Chevalier Chartered
655 15th Street, N.W., Suite 900
Washington, D.C. 20005
Telephone: (202) 626-5800
Facsimile: (202) 626-5801
Email: cmcaleer@milchev.com

Richard A. Hibey*
Mark J. Rochon*
Laura G. Ferguson*
Mia P. Haessly*
Miller & Chevalier Chartered
655 15th Street, N.W., Suite 900
Washington, D.C. 20005
Telephone: (202) 626-5800
Facsimile: (202) 626-5801

Email: rhibey@milchev.com
mrochon@milchev.com
lferguson@milchev.com
mhaessly@milchev.com

(*) Pro Hac Vice Applications To Be Filed

*Attorneys for Defendant*
*The Palestinian Authority*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on June 5, 2013, a true and genuine copy of the foregoing will be served via ECF, which will then send a notification of such filing (NEF) to the following:

Joy L. Langford
Pamela J. Marple
Abbe David Lowell
Michael Pusateri
Chadbourne & Parke LLP
1200 New Hampshire Ave NW
Washington, DC 20036
(202) 974-5600
jlangford@chadbourne.com
pmarple@chadbourne.com
adlowell@chadbourne.com
mpusateri@chadbourne.com

*Attorneys for the Plaintiffs*

/s/Charles F.B. McAleer, Jr.
Charles F. B. McAleer, Jr. (VSB No. 24430)
Miller & Chevalier Chartered
655 15th Street, N.W., Suite 900
Washington, D.C. 20005
Telephone: (202) 626-5800
Facsimile: (202) 626-5801
Email: cmcaleer@milchev.com

*Attorneys for Defendant*
*The Palestinian Authority*