

PLAINTIFF'S
EXHIBIT
359

Date: 1 Av 5763
July 30, 2003

Case No.: 3459/02

## The Military Court

### - Yehuda -

### - Transcript -

Court hearing dated: July 30, 2003

Before the Presiding Judge: LTC Netanel Benishu
Judge: Captain Menachem Lieberman
Judge: Captain Shlomo Katz

The military prosecution: Captain Michael Kotlik and Captain Raid Shanan
Defense counsel: Adv. Ahmed Safia – Present

**Defendant: Ahmed Taleb Moustafa Barghouti  Identity No.: 994466860 / Israel Prison Service – Present**

Interpreter: Staff Sergeant Mohamed Nasraladin

Stenographer: Corporal Sivan Shemesh

**The Presiding Judge opens the meeting and identifies the Defendant**

## Course of Hearing

Prosecutor: There is no evidence for sentencing.

Defense counsel: There is no evidence for sentencing.

Prosecutor's summation: Today a task lies before the Court that is not a straightforward one, which is to sentence the Defendant. This task, which is never easy, today is many times more difficult. The Defendant, who is standing before the Court today, caused, through his acts, the death of 12 innocent civilians. As a result of the acts of the Defendant, many dozens of civilians have been injured. The person who is standing trial today is as of today only 27 years old. A 27 year old man who in the course of two years took the lives of 12 other people of different ages.

[Stamp] P 5: 210

3

The Defendant headed one of the terrorist organizations in the Area, an organization that appeared only after the Second Intifada broke out, which is the Al Aqsa Martyrs' Brigades; the Defendant commanded the organization in the Ramallah area. The Defendant took care to supply money and weapons to the operatives of the organization in order for them to use them to carry out deadly attacks on the roads of the Area near Ramallah and inside Jerusalem. From the beginning of 2002 to the beginning of Operation Defensive Shield, during which the Defendant was arrested, the Defendant acted with great zeal to execute suicide attacks inside the State of Israel. In some of the attacks, the Defendant succeeded, if one could define the death of innocent civilians as a success, and some of the attacks were not carried out for various reasons. The military prosecution asks to sentence the Defendant to a separate prison sentence for each of the civilians whose lives the Defendant took. In addition, the military prosecution asks to sentence the Defendant to an additional, separate sentence of life imprisonment for all of the other offenses for which he has been convicted, including the injuring of dozens of people. In other words, the military prosecution petitions for a sentence of 13 life imprisonment terms, which are to be served cumulatively. The request of the prosecution relies both on the case law of the Supreme Court in Israel, and the case law of this Court, which regrettably frequently has to hear the cases of various terrorists. I wish to refer the Court to the verdicts on the matter of Nidal Zaloum and Ami Popper v. the State of Israel (Criminal Appeal 399/89, Criminal Appeal 1742/91) and to the verdicts that were handed down by this Court in Case 3250/02 and in […]

[Stamp] P 5: 210 [continued]

Date: 1 Av 5763                                          Case No.: 3459/02
       July 30, 2003

[…] Case 3251/02. On the matter of accumulation of the sentences, the military prosecution refers the Court to Criminal Appeal 6535/01 of the Supreme Court in Israel. It is obvious that no sentence that the Court will hand down will bring the murdered victims back to life, restore the casualties to good health or soothe the pain of the bereaved families. The Court is still the only entity in the world that can render justice and that can express in its sentence the attitude of society at large towards the Defendant and towards people who are like him. The military prosecution asks for the Court to examine each of the many acts that the Defendant has committed. The military prosecution asks for the Court to take into account that 12 people are no longer alive in this world. The Court cannot exact vengeance for their blood, but the Court can express, through its sentence, the sanctity of human life, which is frequently talked about when a person is alive, but this value is stressed all the more so after another person takes his life maliciously. I can only refer to the statements of Honorable Justice Hashin in the case of Ami Popper. The military prosecution repeats its request to sentence the Defendant to 13 terms of life imprisonment that are to be served cumulatively.

Defense counsel's summation: The Defendant contended at the beginning of his trial that he does not recognize the authority of the Court to judge him. A decision has been made by the Court. The Defendant has asked me not to plead today for sentencing. He still stands behind what he asserted at the beginning of his trial. I hope that these days will pass and there will be peace between the peoples.

The Defendant in his last address: I say that Sharon must be given a death sentence in this Court. I have no regrets.

[Stamp] P 5: 211

Date: 1 Av 5763
July 30, 2003

Case No.: 3459/02

## The Military Court

### Yehuda

### - Transcript -

Court hearing dated: July 30, 2003

Before the Presiding Judge: LTC Netanel Benishu
Judge: Captain Menachem Lieberman
Judge: Captain Shlomo Katz

**Defendant: Ahmed Taleb Moustafa Barghouti  Identity No.: 994466860 / Israel Prison Service – Present**

## Sentence

An amended indictment was filed against the Defendant on October 1, 2002, in which not less than fifty three counts, covering thirty four pages, were attributed to him.

Initially, the Defendant denied the authority of this Court and it appeared, after we rejected his preliminary contentions on that matter, that he intended to deny the charges that were attributed to him. However, on May 5, 2003, the Defendant and his attorney announced that they asked to plead guilty to the indictment as worded.

Therefore, the Defendant was convicted according to his admission, and the only thing left for us to do is to prescribe his sentence.

We have heard very attentively the contentions of the prosecutor. The prosecutor stated that despite the fact that the Defendant is only 27 years old, through his actions as the head of the Al Aqsa Martyrs' Brigades in the Ramallah area, he had the opportunity to sow a great deal of destruction. The prosecutor has stressed the need to attribute great importance to the value of the sanctity of life and express the loss that the Defendant has caused through his acts, resulting from which twelve Israelis lost their lives and dozens more were injured, through a fitting sentence. Therefore, the prosecutor has asked for the Defendant to be sentenced to 13 cumulative terms of life imprisonment.

[Stamp] P 5: 212

The defense counsel was taciturn and stated that at the behest of the Defendant, he abstained from pleading for the sentencing. However, he stated that the Defendant stands behind his assertion that he does not recognize the authority of this Court to judge him.

The Defendant, in his last address, announced that he does not regret his actions.

It shall immediately be said that we have already spoken considerably about the contention of the Defendant that we are not competent to hear his case. After we have analyzed the provisions of international law and the provisions of the applicable domestic law, it has been found unequivocally that not only is this Court competent to try the Defendant, who has committed terrorist acts in places that fall under the jurisdiction of this Court, but also that he is not eligible for the status of prisoner of war, in view of the fact that the actions that he has committed were carried out in complete contravention of the rules of conduct in war, having been directed against innocent civilians. In any case, the attempts of the Defendant to portray his terrible actions in romantic colors of a political struggle are doomed to fail. Terrorism is terrorism and the murder of innocent civilians is intolerable.

[Stamp] P 5: 212 [continued]

Date: 1 Av 5763                                                              Case No.: 3459/02
     July 30, 2003

The severity of the acts of the Defendant is so great that it seems that words, however piercing, would fail to express the bad feeling experienced by one reading their description in the indictment.

We have repeatedly read during this trial, and in particular prior to its last proceeding, which is the sentencing, the description of the terrible acts of the Defendant, and the more we delved into it, the more we felt that, like all other members of human society, we were standing helpless, for there may be no punishment, however severe, that can turn back the wheel and restore the dead to life and the casualties to their health.

The Defendant served, from 1996 until his arrest, as the driver and bodyguard of Marwan Barghouti, who is the head of the Tanzim of the Fatah Organization. Within this capacity, the Defendant became the right-hand man of his employer, had close ties with the heads of the Al Aqsa Martyrs Brigades, the military arm of the Tanzim throughout the Area, and also served as the contact man between them and Marwan Barghouti.

But it would be natural, in view of this status, for the Defendant to quickly become the address for supplying materiel and weapons for terrorists who asked to carry out attacks against Israelis. In particular, the Defendant forged close ties with a number of operatives from the Ramallah area, who operated as a cell that carried out, with the active assistance of the Defendant, terrorist attacks on the roads of Jerusalem and on roads near it. Thus, the Defendant involved himself, initially in the murder of the late Elazar Akiva Fashkos, who was shot near the Atarot Industrial Zone on January 25, 2001; a month after that in the severe wounding of Yosef Cohen, in the Atara area; in causing the death of the late couple Sharon and Yaniv Ben-Shalom, the wounding of one of their girls, and the killing of the late Doron Yosef Sviri on August 25, 2001; on Highway 443, the murder of the late Meir Weisshaus and the severe wounding of his friend, Moshe Weiss, when they drove near the Ramat Shlomo neighborhood in northern Jerusalem on September 15, 2002; the injuring of Malka and Pinchas Cohen on October 3, 2001, when they drove on the same road; and the murder of the late Yoela Chen and the injury of Rachel Eini, when the two stopped at the fuel station near Givat Ze'ev. Between these incidents, the Defendant was involved, in an identical manner, in the firing of mortar bombs and automatic gunfire at the settlement Psagot, an attempt to carry out a shooting attack at French Hill and firing at a private vehicle on Begin Road in Jerusalem.

[Stamp] P 5: 213

8

The Defendant also provided the weapons that three other Tanzim operatives used to carry out a shooting attack on the Beit El- Psagot Road on March 17, 2002, in which attack Samir Karash was severely injured. Needless to say, in many of the cases, the Defendant acted with the knowledge and blessing of his commander, Marwan Barghouti.

But if initially the Defendant made do with extending logistic support to the murder cells of the Al Aqsa Martyrs' Brigades, it seems that these acts, however severe they were, were not sufficient to satisfy his wish for destruction. Therefore, the Defendant rapidly deepened his involvement in terrorism and became the originator, planner and executor of deadly suicide attacks.

It was early January 2002 when the Defendant approached a senior operative in the Al Aqsa Martyrs' Brigades from the Nablus area, Nasser Aweis, and asked him to transfer to his responsibility a person who wanted to carry out a suicide attack. A few days later, Sa'id Ramadan arrived and informed the Defendant that he had been sent to carry out such an attack; the Defendant made sure that the man was not in want of anything, provided him weapons and ammunition and arranged his transport by individuals who answered to him, while instructing him, having arrived in Jerusalem, on how to open fire at civilians with the intent of causing their deaths until he himself would be killed. At the end of the necessary preparations, the Defendant's men drove the suicide attacker to Jaffa Street in Jerusalem, where he fired dozens of rounds at passersby, resulting in the death of the late Ora Sandler and the late Sarah Hamburger and the wounding of more than 45 others.

[Stamp] P 5: 213 [continued]

Date: 1 Av 5763                                                                    Case No.: 3459/02
     July 30, 2003

A few days later, the Defendant found another candidate to carry out a similar suicide attack in Jerusalem. Consequently, the Defendant again started the necessary preparations. The Defendant contacted other operatives in the Al Aqsa Martyrs' Brigades with whom he was in contact, and concluded with them that they would transfer the suicide terrorist, who would be equipped with an M-16 assault rifle, to Jerusalem in order that he, too, could carry out such shooting. The Defendant provided his colleagues with a vehicle and they in turn set out in the company of the suicide terrorist with the blessing of the Defendant. Upon reaching the Shuafat area, the terrorist stated that he wanted to pray in a mosque before carrying out the attack. Consequently, he entered a mosque that was on the way and the drivers continued to the Givat Shaul neighborhood in order to find a suitable place for executing the attack. However, when they returned to pick up the attacker, they found that he had left the site.

This was not the only occasion on which the plans of the Defendant did not succeed from his perspective, and in February 2002 alone, the Defendant's attempts to send four more suicide terrorists failed after one of them absconded, two were arrested by the security forces and in another case, it was the fellow conspirators of the Defendant who were arrested.

However, the Defendant's killing spree was not over, and in mid-February 2002, he got his hands on another young man who expressed his willingness to carrying out a suicide attack. After the Defendant prepared him for executing this act, filmed him with a video camera, equipped him with an automatic weapon and a hand grenade and had him driven by his henchmen to the Neve Yaakov neighborhood in Jerusalem, the latter opened fire indiscriminately, resulting from which the late police officer Galit Arviv was killed when she rushed towards him, and eight other people were wounded.

Two weeks had not passed and another suicide terrorist, who had been dispatched by a Tanzim operative from Nablus, reached the Defendant. The Defendant also prepared him for his lowly task; after seeing to clothing and a haircut for him and filming him using a video camera, he sent him on his way armed with an automatic weapon and hand grenades and accompanied by his people, to whom he ordered that he be taken into the territories of the State of Israel. The city of Tel Aviv was chosen this time as the target. Upon arriving at the Sea Food Market restaurant, the transporters provided the suicide terrorist with a knife and let him out of the vehicle. The suicide terrorist threw the grenades, fired at the restaurant and stabbed civilians who were there. As a result of these acts, three people were murdered – the late Master Sergeant Salim Barakat, the late Yosef Habi and the late Eliyahu Dahan, and dozens more were injured.

[Stamp] P 5: 214

In early March, Nasser Aweis contacted the Defendant again and asked him to meet Louis Ouda, who had been discharged from the prison of the Preventive Security a short time earlier. In this meeting, Louis asked the Defendant to provide him with an explosive belt and find a lodging place for a suicide terrorist that he had. For his part, Louis saw to the transport of the suicide attacker to Jerusalem and set the possible objectives for an attack in the Ramat Eshkol neighborhood. The Defendant lodged the terrorist in an apartment that he had rented. On March 8, 2002, the Defendant provided him with an explosive belt and sent him, accompanied by another person, in a taxi towards Jerusalem. When they reached the Beit Hanina neighborhood, the two were stopped by Border Guard police and when the terrorist tried to detonate the explosive belt that he was wearing, he was shot dead by the security forces.

Later, the Defendant found another person who was prepared to carry out a suicide act, but the arrest of the Defendant and of Nasser Aweis, who was also involved in the planning of this attack, prevented it from being carried out.

The Defendant also traded in war materiel on a large scale, financed the manufacturing of explosive devices and lodged the two Hamas operatives who were behind the bombing attack of the Sbarro Restaurant in Jerusalem after they had been released from the prison of the Palestinian Authority, and these acts were also carried out with the knowledge, blessing and assistance of his commander, Marwan Barghouti.

[Stamp] P 5: 214 [continued]

11

Date: 1 Av 5763
    July 30, 2003

Case No.: 3459/02

We are living in difficult times, and since the violent events erupted in September 2000, the hatred and killing that our enemies are spreading on roads and in cities have intensified. We are facing an enemy with no conscience that lusts after indiscriminate murder. This is how the Defendant acted when he started a carefully planned killing spree whose end nobody could see had he not been arrested by the security forces.

The Defendant headed a well-oiled killing machine, which he constantly fed, sometimes using technical assets only and sometimes using human fuel, with the sole aim of destroying, killing and exterminating Israelis wherever they are. The Defendant stooped to all measures, did not have mercy on anyone and exercised the tentacles of his notorious organization spread around the Area to enlist and to operate as many attackers as possible.

So intense was the will of the Defendant to attack innocent civilians – women, men and children – without mercy, that we doubt whether he is a human being or whether his thirst for bloodletting has reduced him to such a low level that he is no longer fit for this title.

The acts of the Defendant are no acts of heroism, as some of the residents of the Area may mistakenly think, but lowly acts of cowardice that sought to harm, time and time again, the most unprotected people of all without taking any risk, as he made cynical use of members of his own people.

An arch-criminal such as the Defendant, despite having not stained his own hands with blood, has no lesser and possibly greater culpability than those whom he dispatched to carry out attacks (and see the words of Maimonides, *With a Strong Hand, the Laws of Murderers and the Protection of Life*, Chapter B, Halacha B).

And we have already dealt extensively with the especial severity of the offense of murder, which we state as having:

> **"... the destruction of the development of the world... and whoever has a hand in such a transgression is completely evil".**
>
> **(Maimonides, *ibid*, Chapter D, Halacha H)**

[Stamp] P 5: 215

12

We must further emphasize, in accordance with the tradition of civilized man from days of antiquity, that unlike the Defendant, for us, the sanctity of life is a supreme value, which considers man to be a whole world, as a creation with wishes and desires, an opinion and view, ambitions, dreams as well as hopes and a vision, whose premature end is an unforgiveable crime. And it would be enough were we to mention the known statement of Hazal [Our Sages of Blessed Memory], whereby:

> **"For this reason was man created alone, to teach you that whosoever destroys a single soul, it is as though he had destroyed a complete world."**

> **(Sanhedrin Tractate, Folio 37)**

We have been constantly seeking in the case before us a single trace of humanity on the part of the Defendant, but our efforts have been to no avail. Depriving twelve innocent civilians of life and the defiance of the Defendant whereby he has no regrets for his actions have ended our attempts in this regard.

In view of that which has been set forth, we se no difficulty in granting the request of the military prosecution.

[Stamp] P 5: 215 [continued]

Date: 1 Av 5763                                              Case No.: 3459/02
     July 30, 2003

What has been done cannot be undone, but we cannot be able to stay indifferent to the the blood of our brothers calling out to us from the ground. In view of the terrible suffering that he has inflicted upon the victims, the casualties and their families, we may only ponder out loud whether it would be fitting to reward him an eye for an eye and bring an end to his life, whose adult portion was in part devoted to cruel destruction of human society.

This call, despite remaining merely theoretical in the current case in which the provisions of Section 47 (A) (8) of the Security Provisions Order, 5730-1970, prevent the full, fitting punishment of the Defendant, is not a single voice. In another instance, this Court pronounced as follows:

> **"Hard days are the days in which we live, centered by an increasing phenomenon of many people having sanctified the taking of life and transformed it from something taboo, lowly and abominable to something fitting and praiseworthy in their own eyes and also in the eyes of some of the public in the area. This transformation of values requires, in our opinion, rethinking of the foundations of sentencing doctrine that the Courts in the Area have employed.**
>
> **... Would it not be fitting, after hundreds of innocent civilians having lost their lives to criminals who lack any basic human emotion, to treat their murderers to the same fate?"**
>
> **(Beit El Case 3255/02)**

And the Military Court in Samaria also pronounced in the trial of the planners of the attack against the Park Hotel in Netanya as follows:

> **"We have asked ourselves foremost whether the time is not ripe to exercise the authority that is bestowed upon the Military Court by sentencing the Defendants to the punishment befitting the offense that they have committed – the death penalty.**

[Stamp] P 5: 216

14

**... If this case does not justify inflicting the death penalty prescribed for it, what case would? It is time to examine, in the opinion of those judges, whether that which is set forth beside Section 51 has not become a "dead letter" (in more ways than one)".**

**(Samaria Case 6115/02)**

We have therefore reached the view that universal human morality binds us, in view of the atrocity, to inflict upon the Defendant a punishment that will have a degree of eternity and retribution, and which will be akin, albeit on the tiniest scale, to the suffering and the cruel fate that were inflicted upon the victims and their families.

Only by imposing cumulative life imprisonment sentences can we adequately reflect the deprivation of the life of every person that was prematurely taken by the Defendant.

[Stamp] P 5: 216 [continued]

Date: 1 Av 5763                                        Case No.: 3459/02
        July 30, 2003

In view of our statements above, we have decided unanimously to sentence the Defendant as follows:

For the murder of **the late Elazar Akiva Fashkos**, life imprisonment.

For the murder of **the late Sharon and Yaniv Ben-Shalom**, two terms of life imprisonment.

For the murder of **the late Doron Yosef Sviri**, life imprisonment.

For the murder of **the late Meir Weisshaus**, life imprisonment.

For the murder of **the late Yoela Chen**, life imprisonment.

For the murder of **the late Ora (Svetlana) Sandler**, life imprisonment.

For the murder of **the late Sarah Hamburger**, life imprisonment.

For the murder of **the late police officer Galit Arviv**, life imprisonment.

For the murder of **the late policeman Salim Barakat**, life imprisonment.

For the murder of **the late Yosef Habi**, life imprisonment.

For the murder of **the late Eliyahu Dahan**, life imprisonment.

For the remaining offenses of which the Defendant has been convicted, life imprisonment.

In total we therefore sentence the Defendant to **13 terms of life imprisonment, to be served cumulatively.**

**Right of appeal within 30 days of today.**

**Handed down and announced this day, July 30, 2003, in public and in the presence of the parties.**


| ___[Signature]___ | ___[Signature]___ | ___[Signature]___ |
|:---:|:---:|:---:|
| **Judge** | **Presiding Judge** | **Judge** |

[Stamp] P 5: 217

16

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

MARK I. SOKOLOW, *et al.*,

Plaintiffs,

vs.

THE PALESTINE LIBERATION
ORGANIZATION, *et al.*,

Defendants.

No. 04 Civ. 00397 (GBD) (RLE)

## DECLARATION OF RINA NE'EMAN

Rina Ne'eman hereby certifies as follows:

1.  The attached translation from Hebrew to English is an accurate representation of the document received by Rina Ne'eman Hebrew Language Services, to the best of my knowledge and belief. The document is designated as P 5:210-17.

2.  I am a professional translator with a B.A. in International Relations from the Hebrew University of Jerusalem (Israel) and 30 years of translation experience. I am fluent in Hebrew and English, and I am qualified to translate accurately from Hebrew to English.

3.  To the best of my knowledge and belief, the accompanying text is a true, full and accurate translation of the Hebrew-language document designated bearing the bates number P 5:210-17.

Dated: March 6, 2014

Rina Ne'eman

ss.: New Jersey

On the _6_ day of March, 2014 before me, the undersigned, personally appeared Rina Ne'eman, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is signed to this Declaration and acknowledged to me that he executed the same in his capacity, and that by his signature on this Declaration, the individual executed the Declaration.

Sworn to me this
_6_ day of March, 2014

Notary Public

LEONOR TROVANO
ID # 2365530
NOTARY PUBLIC OF NEW JERSEY
Commission Expires 5/8/2014

מספר התיק : 3459/02

תאריך : א' אב, תשס"ג
30 יולי, 2003

בית המשפט הצבאי

- י ה ו ד ה -

פ ר ו ט ו ק ו ל

דיון בימ"ש מיום : 30/07/2003

בפני אב"ד : סא"ל נתנאל בנישו
שופט : סרן מנחם ליברמן
שופט : סרן שלמה כ"ץ

התביעה הצבאית : סרן מיכאל קוטליק וסרן ראיד שנאן
סניגוריה : עו"ד אחמד צפיה - נוכח

נאשם : אחמד טאלב מוצטפא ברגותי    ת.ז : 994466860 / שב"ס - נוכח

מתורגמן : סמ"ר מוחמד נסראלדין
רשמת : רב"ט סיון שמש

אבה"ד פותח את הישיבה ומזהה את הנאשם.

מהלך הדיון

תובע : אין ראיית לעונש.

סניגור : אין ראיית לעונש.

תובע מסכם : היום עומדת בפני בית המשפט משימה לא קלה והיא לגזור את דינו
של הנאשם. משימה זו, אינה קלה אף פעם, אבל היום היא קשה פי כמה וכמה.
מפשע. כתוצאה ממעשי הנאשם נפצעו עשרות רבות של אזרחים. מי שעומד היום
לדין, הוא נכון להיום, בן 27 אשר במהלך שנתיים קטל חיים של 12
אנשים נוספים בגילאים שונים. הנאשם עמד בראש אחד ארגוני הטרור באיזור,
ארגון שהופיע רק לאחר תחילת אירועי גאות ושפל, הכוונה לגדודי יחללי אלאקצא'.
הנאשם פיקד על הארגון באיזור רמאללה. הנאשם דאג לספק כספים וכלי נשק
לרמאללה ובתוך ירושלים. החל מתחילת שנת 2002 ועד לתחילת מבצע חומת מגן
אשר במהלכו נעצר הנאשם, הנאשם פעל במרץ רב על מנת לחזציא אל חפועל פיגועי
התאבדות בתוך מדינת ישראל. בחלק מן הפיגועים, הנאשם הצליח, אם אפשר
להגדיר מותם של אזרחים חפים מפשע כהצלחה, וחלק מן הפיגועים לא בוצעו
מסיבות שונות. התביעה הצבאית מבקשת להשית על הנאשם עונש מאסר נפרד בגין
כל אחד ואחד מן האזרחים שאת חיי קטל הנאשם. כמו כן, התביעה הצבאית
מבקשת לחשיית על הנאשם עונש מאסר עולם נוסף ונפרד בגין כל יתר העבירות בהן
הורשע, וביניהן, פציעתם של עשרות אנשים. דהיינו, התביעה הצבאית עותרת לעונש
של 13 מאסרי עולם אשר ירוצו באופן מצטבר זה לזה. בקשתה של התביעה
מסתמכת הן על פסיקתם של ביהמ"ש העליון בישראל, הן על פסיקתם של ביני"ש זה,
אשר לצערנו נאלץ לדון לא פעם בעניינם של מחבלים כאלה ואחרים. ברצוני להפנות
399/89, ע"פ 1742/91) וכן לגזור דין שנתנו ע"י בימ"ש זה בתיק 3250/02 ובתיק

תאריך : א' אב, תשס"ג
30 יולי, 2003

מספר התיק : 3459/02

1    3251/02. לעניין הצטברות העונשים, התביעה הצבאית מפנה את ביהמ"ש לע"פ
2    6535/01 של ביהמ"ש העליון בישראל. ברור כי שום עונש אשר אותו יטיל ביהמ"ש
3    לא יוכל להחזיר לנרצחים את חייהם, לא יוכל להשיב לפצועים את בריאותם ולא
4    יוכל להרגיע את כאבם של המשפחות השכולות. עדיין ביהמ"ש הוא הגורם היחידי
5    בעולם אשר יכול לעשות צדק ואשר יכול להביע בגזר דינו את יחסה של החברה
6    כולה כלפי הנאשם ואנשים דומים לו. התביעה הצבאית מבקשת כי ביהמ"ש יסתכל
7    על כל אחד ואחד מן המעשים הרבים אותם ביצע הנאשם. התביעה הצבאית מבקשת
8    כי ביהמ"ש יקח בחשבון ש- 12 אנשים כבר לא חיים באותו עולם. אין ביהמ"ש יכול
9    לנקום את דמם, אך ביהמ"ש יכול בגזר דינו להתייחס לערך של קדושת החיים,
10   שמדברים עליו הרבה, כשאדם חי, אך ערך זה מקבל משנה תוקף לאחר שאדם אחר
11   נוטל את חייו בזדון. אין לי אלא להפנות לדברי כב' השופט חשין בעניינו של עמי
12   פופר. התביעה הצבאית חוזרת על בקשתה לגזור על הנאשם 13 מאסרי עולם אשר
13   ירוצו באופן מצטבר זה לזה.
14

15   סניגור מסכם : הנאשם טען בתחילת משפטו שהוא לא מכיר בסמכות ביהמ"ש
16   לשפוט אותו. נתנה החלטה מטעם ביהמ"ש. הנאשם ביקש ממני לא לטעון היום
17   לעונש. הוא עדיין עומד על מה שטען בתחילת משפטו. אני מקווה שימים אלה יחלפו
18   ויחיה שלום בין העמים.
19

20   הנאשם בדברו האחרון : אני אומר שעל שרון צריך להטיל עונש מוות בבימ"ש זה.
21   אני לא מתחרט.

2

תיק מס׳: 3459/02

תאריך: א׳ אב, תשס״ג
30 יולי, 2003

## בית המשפט הצבאי
### י ה ו ד ה
### - פ ר ו ט ו ק ו ל -

בפני אב״ד: סא״ל נתנאל בנישו
שופט: סרן מנחם ליברמן
שופט: סרן שלמה כץ

דיון בית משפט מיום: 30/07/2003

נאשם: אחמד טאלב מוצטפא ברגותי    ת.ז.: 994466860 / שב״ס - נוכח

1
2
3
4
5
6
7
8
9
10
11
12
13
14

## ג ז ר - ד י ן

נגד הנאשם הוגש, ביום 1/10/02, כתב אישום מתוקן בו יוחסו לו לא פחות
מחמישים ושלושה סעיפי אישום, המשתרעים על פני שלושים וארבעה עמודים.

תחילה, כפר הנאשם בסמכות בית משפט זה ואף נראה היה, לאחר שהחינו את
טענותיו המקדמיות בעניין זה, כי מתכוון הוא לכפור באשמות אשר יוחסו לו. אולם
ביום 15/5/03 הודיע הנאשם ובא כוחו כי מבקשים הם להודות בכתב האישום
כלשונו.

אי לכך, הורשע הנאשם ע״פ הודאתו, וכל שנותר לנו הוא לקבוע את עונשו.

שמיענו בקשב רב את טענות התובע. התובע ציין כי על אף העובדה כי הנאשם הינו
רק בן 27 שנים הספיק במעשיו, כראש גדודי יחללי אלאקצא׳ באיזור רמאללה לזרוע
הרס רב. התובע הדגיש את הצורך לייחס חשיבות רבה לעורך קדושת החיים ולבטא
בענישה ראויה את האובדן לו גרם הנאשם במעשיו, אשר כתוצאה מהם קיפחו
חייהם שניים עשר ישראליים ועשרות נוספים נפצעו. אשר על כן, ביקש התובע כי
יוטלו על הנאשם 13 עונשי מאסר עולם מצטברים.

הסניגור המעיט במילים ומסר כי ע״פ בקשת הנאשם הוא נמנע מלטעון לעניין
העונש. עם זאת, ציין כי הנאשם עומד על טענתו לפיה אינו מכיר בסמכות בימ״ש זה
לשפטו.

הנאשם בדברו האחרון הודיע כי אינו מתחרט על מעשיו.

יאמר מיד כי כבר נתנו את דעתנו בהרחבה אודות טענת הנאשם לפיה אין אנו
מוסמכים לדון בעניינו. לאחר שניתחנו את הוראות הדין הבינלאומי והוראות הדין
הפנימי התגחוור, בצורה שאינה משמעת לשני פנים, כי לא רק שבימ״ש זה מוסמך
לדון את הנאשם, אשר ביצע פעולות טרור במקומות עליהם פורש בימ״ש זה את
סמכותו, אלא שאין הוא אף ראוי למעמד של שבוי מלחמה, לאור העובדה כי
המעשים אותם ביצע, בוצעו בניגוד גמור לדיני מנהגי המלחמה, כאשר הופנו כלפי
אזרחים תמימים. מכל מקום, נסיונותיו של הנאשם לצייר את מעשיו חנוראיים
בצבעים רומנטיים של מאבק פוליטי, לא יצלחו. טרור הוא טרור הוא טרור, ורצח
אזרחים חפים מפשע- לא תסבול הדעת.

15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48

1

עברית

תיק מסי : 3459/02                                    תאריך : א׳ אב, תשס״ג
                                                     30 יולי, 2003

חומרת מעשיו של הנאשם כה רבה עד כי נדמה שלא יהא בכוחם של מילים, נוקבות    1
ככל שיחיו, כדי לבטא את תחושתנו הקשה למקרא תיאורם בכתב האישום.           2
                                                                      3

קראנו חזור ושנו במשך משפט זה ובמיוחד לקראת הליכו האחרון, הוא הוא גזר    4
הדין, את תאור מעשיו הנוראים של הנאשם, וככל שהעמקנו בו, חלקה וגברה        5
תחושתנו האמורה לפיה אנו, כיתור בני החברה האנושית, עומדים חסרי אונים,    6
שהרי לא יהיה בעונש חמור ככל שיהיה כדי להחזיר הגלגל לאחור ולהשיב למתים   7
את חייהם ולפצועים את בריאותם.                                          8
                                                                      9

הנאשם שימש, החל משנת 1996 ועד למעצרו, כנהגו ושומר ראשו של מרואן ברגותי,   10
חלא הוא ראש ה׳תנזים׳ של ארגון הפת״ח. מכח תפקידו זה הפך הנאשם למוציא       11
ולמביא אצל מעבידו, עמד בקשרים הדוקים עם ראשי יגזידי חללי אל אקצא,        12
הזרוע הצבאית של ה׳תנזים׳ ברחבי האיזור, ואף שימש איש הקשר בינם לבין מרואן   13
ברגותי.                                                                14
                                                                      15

אך טבעו היה, לנוכח מעמדו זה, כי הנאשם יחפוך במהרה לכתובת לאספקת         16
אמצעים וכלי נשק לטרוריסטים אשר ביקשו לבצע פיגועים נגד ישראלים. במיוחד    17
קשר הנאשם קשרים הדוקים עם מספר פעילים מאיזור רמאללה, שפעלו כחוליה        18
אשר נהגה, בסיועו הפעיל של הנאשם, לבצע פיגועי ירי בכביש ירושלים וכבבישים   19
הסמוכים לה. כך עירב עצמו הנאשם, תחילה ברציחת אלעזר עקיבא פשקין ז״ל       20
אשר נורה בסמוך לאיזור התעשיה עטרות ביום 25/01/01, חודש לאחר מכן בפציעתו   21
הקשה של יוסף כהן באיזור עטארא, בגרימת מותם של בני הזוג שרון וינ;ז בן שלום  22
ז״ל, פציעת אחת מילדותיהם והריגתו של דורון יוסף סורדי ז״ל ביום 25/08/01    23
בכביש 443, ברציחתו של מאיר וייסבוזי ז״ל ופציעתו הקשה של חברן משה ויים,    24
עת נסע בסמוך לשכונת רמת שלמה בצפון ירושלים ביום 15/09/01, בפציעתם של     25
מלכה ופנחס כהן ביום 03/10/01 כשנסעו באותו הכביש וברציחתה של יואלה חן ז״ל   26
ופציעתה של רחל עיני, כשהשתיים עצרו בתחנת הדלק בסמוך לגבעת זאב, בן לבין    27
היה הנאשם מעורב, בדרך זהה, בירי פצצות מרגמה ויֹרי משטֵח אוטומטי לעבר       28
הישוב פסגות, נסיון לבצע פיגוע ירי בגבעת הצרפתית וירי לעבר רכב פרטי בכביש   29
ע״ש בגין בירושלים. הנאשם אף סיפק את כלי הנשק ששימשו שלושה פעילי ׳תנזים׳   30
נוספים לביצוע פיגוע ירי בכביש בית אל- פסגות ביום 17/03/02, פיגוע בו נפצע קשה   31
סמיר קרש. מיוחד לציין כי בתרבים מן המקרים פעל הנאשם בידיעתו וברברכתו של   32
מפקדו מרואן ברגותי.                                                    33
                                                                      34

אך, אם בתחילת דרכו הסתפק הנאשם במתן סיוע לוגיסטי לחוליות הרצח של גדודי   35
׳חללי אל אקצא׳, נראה כי לא היה בנושאים אלה, חמורים ככל שיחיו, כדי לספק    36
את רצונו להרע. על כן, עד מהרה, העמיק הנאשם את מעורבותו בטרור והפך ליוזם,   37
מתכנן ומוציא אל הפועל של פיגועי התאבדות קטלניים.                        38
                                                                      39

היה זה תחילה בחודש ינואר 2002, עת פנה הנאשם לפעיל בכיר ב׳גדודי חללי אל    40
אקצא׳ מאיזור שכם, נאצר עוויס, וביקש ממנו להעביר לאחריותו אדם החפץ לבצע   41
פיגוע התאבדות. ימים ספורים לאחר מכן התיצב סעד רמדאן והודיע לנאשם       42
שנשלח לבצע פיגוע כאמור, הנאשם דאג לכל מחסורו של האיש, סיפק לו נשק       43
ותחמושת והסדיר את הובלתו ע״י אנשים הסרים למרותו, תוך שהוא מדריך אותו     44
כי בהגיעו לירושלים יהא עליו לפתוח באש לעבר אזרחים בכוונה לגרום למותם עד   45
שהוא עצמו ייהרג. בתום ההכנות והדרישות הובילוה אנשי הנאשם את המתאבד       46
לרחוב יפו בירושלים, שם ירה עשרות כדורים לעבר העוברים ושבים וכתוצאה מכך    47
גרם למותן של אורה סנדלר ז״ל ושרה המבורגר ז״ל ולפציעת למעלה מ-45 נוספים.   48
                                                                      49

2

P 5: 213

תאריך: א' אב, תשס"ג
30 יולי, 2003

תיק מס': 3459/02

ימים מועטים לאחר מכן, מצא הנאשם מועמד נוסף לביצוע פיגוע התאבדות דומה
בירושלים. על כן, החל שוב הנאשם בהכנות הנדרשות. הנאשם פנה לפעילים אחרים
המתאבד שצצווויד ברוס"ר אל אקצא, איתם עמד בקשר וסיכם עמם כי יובילו את המחבל
מסר לחבריו רכב ואלה יצאו לדרכם בחברת המתאבד ובברכת הנאשם. הנאשם
לאיוזר שועטבו הודיע המחבל כי מבקש הוא להתפלל במסגד בטרם יבצע את הפיגוע.
אשר על כן נכנס למסגד שהיה בדרכם והמובילים המוניכו לשכונת גבעת שאול על
מנת לאתר מקום מתאים לחוצאת הפיגוע לפועל. אולם משחזרו לאסוף את המפגע
גילו כי זה עזב את המקום.

זו לא היתה הפעם היחידה שתוכניותיו של הנאשם לא צלחו מנוקדת ראות עיניו,
ובחודש פברואר 2002 בלבד כשלו נסיונותיו של הנאשם לשלוח ארבעה מתאבדים
נוספים, לאחר שאחד מהם ברח, שניים נעצרו על ידי כוחות הבטחון ובמקרה נוסף
היו אלו שותפיו של הנאשם למזימה שנעצרו.

עם זאת מסע ההרג של הנאשם לא תם וכבר במחצית חודש פברואר 2002, שם את
ידיו על צעיר נוסף שהביע נכונות לבצע פיגוע התאבדות. לאחר שהנאשם חכינו לשם
ביצוע מעשה זה, צילם אותו במצלמת וידאו, ציידו בנשק אוטומטי וברימון יד
והוביל אותו באמצעות עושי דברו לשכונת נווה יעקב בירושלים, פתח זה האחרון
בירי לכל עבר אשר כתוצאה ממנו נהרגו השוטרת גלית ארביב ז"ל, בעת שהסתתרה
לעברו, ונפצעו שמונה נוספים.

לא חלפו שבועיים ושוב הגיע הנאשם מחבל מתאבד נוסף שנשלח על ידי פעיל תנזים
משכם. גם אותו הכין הנאשם למשימתו תוכלוזה ולאחר שדאג לו לבגדים, לתספורת
וצילם אותו במצלמת וידאו, שלח אותו לדרכו חמוש בנשק אוטומטי וברימון יד
ומלוהו באנשיו, בחגיעם למשיירת היי"סי פוד מרקט", מסרו המובילים
למתאבד סכין והורידו אותו מן הרכב, המתאבד השליך את הרימונים, ירח לעבר
המסערה ודקר אזרחים שהיו במקום. כתוצאה ממעשים אלו נרצחו שלושה- רסי"ר
סלים ברכה ז"ל, יוסף חבי ז"ל ואליהו דהן ז"ל ואף נפצעו עשרות נוספים.

בתחילת חודש מארס פנה שוב נאצר עוויס ממנו וביקש ממנו להפגש עם לואי
עודה שטוחרר מן הכלא של הבטחון המסכל זמן קצר קודם לכן. בפגישה זו ביקש
לואי מן הנאשם למטור לו חגורת נפץ ולמצוא מקום לינה עבור מחבל מתאבד
שנמצא ברשותו. לואי מצידו, דאג לסדרי הובלת המחבל לירושלים וקבע את
היעדים האפשריים לפיגוע בשכנות רמת אשכול. הנאשם הלין את המחבל בדירה
נוסף, במזניון לכיוון ירושלים. בהגיעם לשכונת בית חנינא, נעצרו השניים ע"י שוטרי
משמר הגבול וכאשר ניסה המחבל להפעיל את חגורת הנפץ אותה לבש, נורה ע"י
כוחות הבטחון ונהרג.

בהמשך, איתר שוב הנאשם אדם שהיה מוכן לבצע פעולת התאבדות, אך מעצרם של
הנאשם ושל נאצר עוויס, שהיה גם הוא מעורב בתכנון פיגוע זה, מנע הוצאתו אל
הפועל.

הנאשם אף סחר באמצעי לחימה בהיקף רב, מימן את ייצורם של מטעני חבלה וחליץ
את שני פעילי החמאס שעמדו מאחורי פיגוע התופת במסעדת "סבארו" בירושלים,
לאחר שאלה שוחררו מכלא הרשות הפלסטינית, כשגם כאן מעשים אלה בוצעו
בידיעה, בברכה ובסיוע של מפקדו מרואן ברגותי.

3

P 5: 214

תאריך : א׳ אב, תשס״ג
30 יולי, 2003

תיק מס׳ : 3459/02

ימים טרופים הם הימים העוברים עלינו, ומאז פרצו האירועים האלימים בחודש  1
ספטמבר 2000, הלכו והתגברו השנאה וההרג אשר זורעים בדרכים ובערים.  2
מולנו ניצב אויב חסר מצפון שתאוותו אחת, רצח ללא אבחנה. כך היה הנאשם אשר  3
פתח במסע הרג מתוכנן בדקדקנות שלולא מעצרו ע״י כוחות הבטחון, סופו מי  4
ישורנו.  5
  6
  7

הנאשם עמד בראש מכונת הרג משומנת היטב, אותה דאג להזין כל העת, פעמים  8
באמצעים טכניים בלבד ופעמים בחומר בעזרה אנושי והכל במטרה אחת ויחידה-  9
להשמיד, להרוג ולאבד ישראליים באשר הם. הנאשם לא בחל בשום אמצעי, לא חס  10
על איש והפעיל את זרועות התמנון של ארגונו, חידוע לשמצה, הפרוסות ברחבי  11
האיזור, כדי לגייס ולהפעיל מפגעים רבים ככל שניתן.  12
  13

כה עז היה רצונו של הנאשם לפגוע באזרחים תמימים, נשים, גברים וטף, ללא רחם,  14
עד כי נתערער בנו ספק אם אמנם הינו מבין בני האנוש או שמא צמאונו לשפוך דם  15
הורידו לדרגה כה שפלה שאין הוא ראוי יותר לכינוי זה.  16
  17

לא מעשי גבורה הם מעשי הנאשם, כפי שאולי יטעו חלק מתושבי האיזור לחשוב,  18
אלא מעשים שפלים של מוג לב שחיפש לפגוע, פעם אחר פעם, בתשפים ביותר מבלי  19
שהסתכן כלל ועיקר, מאחר שעשה שימוש עיני באחרים מבני עמו.  20
  21

רב עבריינים כנאשם, על אף שלא הכתים את ידיו בדם, אחריותו אינה נופלת ואולי  22
אף עולה על זו של אלה אותם שלח לפגוע (וראה דברי הרמב״ם ביד החזקה, הלכות  23
רוצח בשמירת נפש, פרק ב׳, הלכה ב׳).  24
  25

וכבר עמדו רבותינו על החומרה המיוחדת שבעבירת הרצח, כאשר קבעו כי יש בה :  26
  27

‏״... השחתת יישובו של עולם... וכל מי שיש בידו עוון זה הרי הוא רשע  28
גמור״.  29
  30

(רמב״ם הנ״ל, פרק ד׳ הלכה ח)  31

מוצאים אנו עוד להדגיש, בהתאם למסורת בני התרבות מקדמת דנא, כי בניגוד  32
לנאשם, לנו קדושת החיים מהווה ערך עליון, המעמיד את האדם כעולם מלא, כיציר  33
בעל רצונות ומאויים, דעה והשקפה, שאיפות, חלומות כמו גם תקוות וחזון, אשר  34
קטיעתם בטרם עת חינה פשע בל יסולח. ודי אם נזכיר את אמרתם הידועה של חז״ל :  35
לפיה :  36
  37

‏״לפיכך נברא אדם יחידי ללמדך שכל המאבד נפש אחת מעלה עליו הכתוב  38
כאילו איבד עולם מלא״.  39
  40
  41

(מסכת סנהדרין דף ל״ז)  42

הפכנו והפכנו למצוא בפרשה שלפנינו ולו קורט אחד של אנושיות מצד הנאשם,  43
אולם לאל היו מאמצינו. נטילת חייהם של שניים עשר אזרחים חפים מפשע,  44
והתרסתו של הנאשם כי אינו מתחרט על מעשיו, סתמה את הגולל על נסיוננו זה.  45
  46

לנוכח האמור, איננו רואים כל קושי להעתר לבקשת התביעה הצבאית.  47
  48

4

<div dir="rtl">

תאריך : א' אב, תשס"ג
תיק מס' : 3459/02
30 יולי, 2003

את הנעשה אין להשיב ואולם לא נוכל להשאיר אדישים למשמע קול דמי אחינו
הזועקים אלינו מן האדמה. לנוכח הסבל הנוראי אותו גרם לקורבנות, לפצועים
ולבני משפחותיהם מותר לנו לתמוה בקול, האם לא ראוי היה להשיב לו מידה כנגד
מידה ולהביא אל סיומם של חיים אשר בחלקם הבוגר הוקדשו להרס אכזרי של
החברה האנושית.

קריאתנו זו, על אף שתוותר תאורטית בלבד במקרה הנוכחי בו מוונעות הוראות
סעיף 47(א)(8) לצו בדבר הוראות בטחון, תשי"ל- 1970, מיצוי הדין עם הנאשם, אינה
קול בודד. במקום אחר, קבע בימ"ש זה כדלקמן :

"ימים קשים הם הימים בהם אנו חיים, במרכזם הולכת ופושה תופעה
לפיה קידשו רבים את הפגיעה בנפש והפכוה מפסולה, נלוזה ומתועבת,
לראויה ומשובחת בעיני עצמם ואף בעיני חלק מהציבור באזור. היפוך
יוצרות זה מחייב לדעתינו חשיבה מחודשת באשר למושכלות יסוד בתורת
העונשין כפי שנוהגה בבתי המשפט באזור.

...האין יהא ראוי, לאחר שמאות אזרחים תמו לב קיפחו חייהם בידי בני
עוולה, חסרי כל רגש אנושי בסיסי, כי תבחן בצורה מעמיקה האפשרות
לנהוג עם המרצחים מידה כנגד מידה."

(תיק בית אל 3255/02)

ואף בביהמ"ש הצבאי בשומרון נקבע במשפטם של מותכנני הפיגוע במלון 'פארק'
בנתניה :

"שאלנו עצמנו בעיקר האם האם לא הגיעה השעה לממש את הסמכות הנתונה
בידי בית המשפט הצבאי ולגזור על הנאשמים את העונש הקצוב בצד
העבירה אותה ביצעו, עונש מוות?

...אם מקרה זה אינו מצדיק את הטלת העונש הקצוב בצידו, איזה מקרה כן
ראוי לו? הגיעה השעה לבחון, לדעת אותם שופטים, האם האמור בצד סעיף
51 לא הפך ל"אות מתה" (תרתי משמע)".

(תיק שומרון 6115/02)

הגענו על כן לכלל דעה, כי המוסר האנושי האוניברסלי מחייבנו, לנוכח הזוועה,
להטיל על הנאשם עונש אשר יהא בו מידה של נצחיות וגמול, וידמה, בזעיר אנפין,
לסבל ולגורל האכזר שנגזר על הקורבנות ובני משפחותיהם.

רק בהטלת עונש נאשר עולם מצטברים יהא לבטא בצורה הולמת את קיפוח חיי
כל אדם ואדם, שנגדע בטרם עת ע"י הנאשם.

</div>

P 5: 216

תיק מס': 3459/02

תאריך: א' אב, תשס"יג
30 יולי, 2003

לנוכח דברינו דלעיל, החלטנו, פה אחד, לגזור על הנאשם את העונשים הבאים:

בגין רציחתו של **אלעזר עקיבא פשקוס** ז"ל, מאסר עולם.
בגין רציחתם של בני הזוג **שרון ויניב בן שלום** ז"ל, שני מאסרי עולם.
בגין רציחתו של **דורון יוסף סוורי** ז"ל, מאסר עולם.
בגין רציחתו של **מאיר וייסבויז** ז"ל, מאסר עולם.
בגין רציחתה של **יואלה חן** ז"ל, מאסר עולם.
בגין רציחתה של **אורה (סבטלנה) סנדלר** ז"ל, מאסר עולם.
בגין רציחתה של **שרה המבורגר**, מאסר עולם.
בגין רציחתה של **השוטרת גלית ארביב** ז"ל, מאסר עולם.
בגין רציחתו של **השוטר סלים ברכאת** ז"ל, מאסר עולם.
בגין רציחתו של **יוסף הבי** ז"ל, מאסר עולם.
בגין רציחתו של **אליהו דהן** ז"ל, מאסר עולם.
בגין יתר העבירות בהן הורשע הנאשם, מאסר עולם.

סך הכל אנו מטילים, על כן, על הנאשם **13 מאסרי עולם שירוצו במצטבר.**

**זכות ערעור תוך 30 יום מהיום.**

ניתן והודע היום, **30/07/2003**, בפומבי ובמעמד הצדדים.

שופט                          אב"ד                          שופט

6