Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

## The Courts

**Tel Aviv – Jaffa District Court**                    **Felony Case 001137/02**

**Before:**      **The Hon. Judge S. Timan – Presiding Judge**          **May 1, 2003**
             **The Hon. Judge N. Achituv**
             **The Hon. Judge O. Salomon-Czerniak**

**In the matter of:**          **State of Israel**
                     **represented by Counsel:**   **Adv. Devora Chen and**
                                          **Adv. Tamar Anis**

v.

**Nasser Mahmoud Ahmad Aweis**
**represented by Counsel:**   **Adv. Bulus**

The State of Israel is arguing that these organizations are terrorist organizations, pursuant to their definition in the Prevention of Terrorism Ordinance, and that the Defendant, who played a senior role therein as described, initiated, organized and launched murderous terrorist attacks against Israeli targets in the State of Israel and in the Judea and Samaria region, and that his activity included, *inter alia,* the purchase and production of weapons of various kinds and the transfer thereof, whether directly or indirectly, to the terrorists who actually perpetrated the terrorist attacks on behalf of the terrorist organization.

## Verdict

### Judge O. Salomon-Czerniak:

### The charge

The State of Israel is arguing that, during the period of time that is relevant to the events that are described in the indictment, the Defendant was the Commander of the Nablus and Northern Samaria area of the Tanzim-Fatah organization, as well as the commander of the *Kitaab Shuhadaa al-Aqsa* (al-Aqsa Martyrs' Brigades) organization in that area.

The State of Israel is arguing that these organizations are terrorist organizations, according to the definition thereof in the Prevention of Terrorism Ordinance, 5708 – 1948, and that the Defendant, who played a senior role therein as described, initiated, organized and launched murderous terrorist attacks against Israeli targets in the State of Israel and in Judea and Samaria, and that his activity included, *inter alia,* the purchase and production of weapons of various kinds and the transfer thereof, whether directly or indirectly, to the terrorists who actually perpetrated the terrorist attacks on behalf of the terrorist organization.

[Stamp] P 5: 237

1



The State of Israel is arguing that, as a result of the Defendant's actions, many civilians were murdered, wounded and injured, and it is seeking to convict him, as set forth in the eight counts that are included in the indictment, of the offenses that are attributed to him, which are: Membership and activity in a terrorist organization – offenses in contravention of Sections 2 and 3 of the Prevention of Terrorism Ordinance, 5708 – 1948.

Acts of conspiracy to commit a crime – offenses in contravention of Section 499 of the Penal Code, 5737 – 1977.

Acts of murder and attempts to perpetrate such acts – offenses in contravention of Sections 300 (a) (2) and 305 (1) of the Penal Code, 5737 – 1977.

Acts of aggravated assault and attempts to perpetrate such acts – offenses in contravention of Sections 329 (1) and 329 (1) [sic] in combination with Section 25 of the Penal Code, 5737 – 1977.

Unlawfully carrying a weapon – offenses in contravention of Section 144 (b) of the Penal Code, 5737 – 1977.

### The Defendant's line of defense

In the initial stage, the Defendant hired the services of Adv. Bulus and cooperated with him.

The defense attorney received all of the investigative material, and even filed a notice that he would raise various preliminary arguments on behalf of the Defendant, including the argument of the absence of jurisdiction.

A first harbinger of the future line of defense of the Defendant is to be found in the transcript of the session which took place on September 10, 2002. At that session, the defense attorney (before another panel of judges) argued, *inter alia,* that: "After I had explained the matter to him, he said that he did not want an attorney, that he was representing himself. We hope that, within a short time, we will be able to push the deliberations forward – a period of at least two weeks."

At the same session – as may be seen in the transcript – the Defendant said to his attorney, and through the interpreter: "Do not speak on my behalf. I am my own lawyer; I am representing myself." Even at that stage, the Court ruled that: "Adv. Bulus' firm will continue to represent the Defendant, even if the latter decides to conduct the hearing on his own."

At the session which took place on January 22, 2003 (before the other panel), the defense attorney gave notice as follows: "We withdraw from the argument of an absence of jurisdiction. I agree that there was a ruling that a summation be filed within 30 days with

[Stamp] P 5: 238

2

regard to the argument of the absence of jurisdiction. However, in light of the developments which took place on the subject of Barghouti and in view of the decision on the part of the District Court to reject the argument, we have decided to withdraw the argument of an absence of jurisdiction in this case."

The defense attorney subsequently filed a petition to release him from representation, and the petition was denied in our ruling of March 2, 2003.

The trial began, continued and concluded in the presence of the Defendant and his attorney, and was fully translated into Arabic. The Defendant and his attorney remained silent throughout. They did not file a response to the indictment (we considered that as tantamount to a plea of not guilty on all counts). They did not raise any preliminary arguments, they did not cross-examine any witnesses and they did not raise any legal arguments. The Defendant did not testify and no witnesses were brought forth on his behalf. They even chose not to present a summation.

This position shall be examined against the background of the notice given in writing by the defense attorney, as follows:

[Stamp] P 5: 238 [continued]

3

"... 4. The undersigned spoke with the Defendant on several occasions and attempted to convince him to accept legal representation by an attorney. However, the Defendant has chosen not to be represented by an attorney.

5.    The undersigned explained to the Defendant that he is supposed to represent his interests at the trail. In response, the Defendant clarified that he had decided not to take an active part in the trial proceeding. He is entitled to make his own choices and to take the actions which he has chosen for himself, including by means of a passive line of defense of silence throughout his trial.

6.    The Defendant has requested that, if the Court forces us to appear at sessions, the only thing that we may do is to remain silent.

7.    On March 11, 2003, and following the ruling by the Honorable Court, the undersigned again explained to the Defendant the ruling by Their Honor and his own situation, as well as the fact that, if a legal argument is raised in the course of the session, it is fitting and proper for the undersigned to address it. The Defendant, however, ruled out that possibility and repeated his former statement, to the effect that he is not interested in cooperating and that he does not consider us to be his defense attorneys, and again asked us to remain silent...

10.    The Defendant is perfectly well aware of the meaning of all this. He is not legally incompetent and he has the mental and intellectual capacity to choose how to conduct the trial...

13.    In the absence of cooperation by the Defendant, and [in view of] his instructions to the defense attorney to remain silent throughout the trial, not to examine witnesses and/or raise legal and/or other arguments, not to speak on his behalf and/or to raise factual and/or legal arguments, the undersigned has no choice but to hold his tongue, and will be enjoined from doing otherwise, for obvious reasons originating in the rules of ethics which bind any attorney at law..."

We are convinced, on the basis of that which has been set forth in the notice, oral statements made to us in the matter, and the behavior of the Defendant and his attorney prior to and at all times throughout the trial, that the Defendant has adopted a position which reflects a line of defense which he selected knowingly, deliberately and of his own free will.

What is before us is a choice which results from a calculated, deliberate, conscious, intentional and manipulative move made by a Defendant would understands perfectly well, and who is quite aware of, all of the implications thereof.

The Defendant was given, at all times, every possibility of taking an active role in the deliberations. We even attempted to urge his attorney to do his job in any way he could, even in the absence of any cooperation by the Defendant, and at the very least, where purely legal argumentation was involved.

[Stamp] P 5: 239

4

The distinguished defense attorney explained, yet again, that he would not intervene in the deliberations, even where legal argumentation was involved, because he was bound by the line of defense adopted by his client.

In other words, we are not looking at an unintentional failure to act, or at indifference to the consequences, but rather, at a clear and definitive line of defense.

The Defendant and his defense attorney may be presumed to have been aware, from the outset, of the legal consequences of this line of defense.

### The Defendant's confessions

The Defendant confessed to the offenses that were attributed to him in the indictment, within the framework of his statements to the police.

[Stamp] P 5: 239 [continued]

5

Felony Case (Tel Aviv) 1137/02                    State of Israel v. Nasser Mahmoud Ahmad Aweis

Statements P/5 dated April 21, 2002, P/6 dated April 28, 2007, P/7 dated April 30, 2002, P/8 dated May 1, 2002 and P/9 dated May 14, 2002, were written on the basis of the testimony of Witness No. 5 for the prosecution, an interrogator in the Hostile Terrorist Activity Unit, Roni Amar, in Arabic, in the Defendant's handwriting and after he had explained to the Defendant in Arabic the charges that were being attributed to him and had duly warned him. According to the interrogator's testimony, after the Defendant had confirmed to him that he understood the charges and the nature of the warning, he asked to write the statements in his own handwriting and did so of his own free will.

According to the interrogator's testimony, the Defendant signed the statements before him. The interrogator translated the statements from Arabic to Hebrew (the translation of each statement into Hebrew, P/5A through P/9A, is attached to the respective statement).

Statement P/22, dated June 27, 2002, was taken by Witness No. 7 for the prosecution, interrogator Hadi Halabi, who explained that he took the testimony in the Arabic language, in which he is fluent, after the Defendant had been duly warned, had understood the nature of the interrogation and the warning, and had given his statements of his own free will and volition. The Defendant signed the statement that the interrogator had recorded in Arabic. This interrogator also translated the statement into Arabic  and the translation is appended to the statement: (P/22A).

The circumstances under which the statements were taken down in the manner described above, the fact that the overwhelming majority thereof (five out of six statements) were written by the Defendant in his own handwriting, and the fact that the Defendant again confirmed before a military judge (see the transcript of the Court session at which his arrest was extended, P/23, and the testimony by Witness No. 5 for the prosecution) that "I confirm that the assertions and the confessions which I gave in my interrogation in Arabic are true and correct, and that I read them and that I signed them. It is true that I was involved in all of the actions and the terrorist attacks to which I confessed – 'everyone has his job to do'. I do not object to the extension of my arrest as requested." all indicate that this evidence is admissible. There is no reason to suspect that the Defendant was subjected to external pressure which led him to confess to the perpetration of acts in which he had no part.

Examination of the content of the statements, including the confessions, indeed shows that what they contain is a true reflection of the actual state of affairs, on the basis of clear, lucid and logical thinking by a person of sound and settled mind. These statement and confessions carry heavy internal weight which, in and of itself, bears out their veracity.

Obviously, the Defendant's confession before a judge in arrest court, and under the supervision of that judge, was given without any pressure or influence and, as that confession implies severe consequences for the Defendant, it constitutes material corroboration of evidence and carries a special weight, which increases the force of his previous admissions, over and above its strength as an independent item of evidence (see Additional Hearing 3081/91, Kuzali v. State of Israel, PD 45 (4) 441, Criminal Appeal 6613/99, Stephen Smirek v. State of Israel, PD 56 (3) 529, and Criminal Appeal 3338/99, PD 54 (5) 667).

[Stamp] P 5: 240

6

The requirement for an additional "item," which allays the suspicion that the Defendant was led to confess by internal pressure, has been completely fulfilled by the assertions that have been made in writing, out of court, by other witnesses, which we accept as admissible and credible evidence, as shall be set forth below.

### The accomplices

Witnesses for the prosecution Ahmad Abu Khadr (Witness No. 6 for the prosecution), Muhammad Yadak (Witness No. 21 for the prosecution), Ahmad Barghouti (Witness No. 23 for the prosecution) and Yasir Abu Bakr (Witness No. 25 for the prosecution), are the Defendant's accomplices in the offenses committed by him (hereinafter: the "Four"). With the exception of Witness No. 6 for the prosecution, Ahmad Abu Khadr, who was convicted and sentenced before he testified (see the respective protocols of his conviction and sentencing, jointly marked at P/11), the other three were called upon to testify before their own trial ended, and the question arose as to whether their testimony was admissible, in view of the Kinzi doctrine

[Stamp] P 5: 240 [continued]

(Criminal Appeal 194/75, Menahem Kinzi v. State of Israel, PD 30 (2) 477), a doctrine which has admitted no flexibility to date (see Criminal Appeal 1774/02, Shimon Kadosh v. State of Israel), which holds that "one defendant should not be made to testify before another defendant, even if separate indictments were filed against them, as long as there is any suspicion that the witness is likely to expect the benefit of reduction of his sentence, in a trial which is still pending against him. This can be avoided either by completing [the witness's] trial before the testimony is given or by transforming him into a State's witness and arranging for a stay of the proceedings, or a declaration by the prosecution that the trial against him will be canceled upon the conclusion of his testimony …"

The State of Israel mapped out its course in accordance with that which has been set forth in Criminal Appeal 579/88, Suissa v. State of Israel, PD 44 (1) 529. As the State of Israel would have it, the Defendant did not object to having those witnesses testify, although he knew very well, as did his defense attorney, that their trial was not over. He did not bar – as he could have done, from the procedural standpoint – his accomplices' way to the witness stand. By failing to do so, he knowingly waived his right to object to having their testimony heard, and he can no longer attack the admissibility of this evidence, which is *a priori* acceptable testimony under law (Section 2 of the Evidence Ordinance (New Version), 5731 – 1971), and all that is left to decide is the weight of that evidence.

This is indeed a foreseeable outcome, in accordance with the line of defense selected by the Defendant, and Counsel for the State of Israel should not be found at fault.

Because this is a foreseeable and probable outcome of the line of defense intentionally adopted by the Defendant, Counsel for the State of Israel is correct in stating that the responsibility for that outcome rests with the Defendant.

We questioned Counsel for the State of Israel in this matter, because we believed that she might raise the matter in order to "open the way." Let us recall, however, that the State of Israel declared, at the beginning of each testimony, that none of the above mentioned witnesses had been promised any benefit whatsoever, and that it did not intend to use their testimony against them in any way whatsoever.

In any event, each of the Four was declared a hostile witness, and with regard to the testimony given by each of the above mentioned witnesses, we were asked to act in accordance with the provisions of Section 10A of the Evidence Ordinance (New Version), 5731 – 1971 (hereinafter, the "Evidence Ordinance") and to give preference to his statement in writing, relative to his oral testimony.

There is accordingly some doubt as to whether the Kinzi doctrine applies under these circumstances, when the risks which underlie the doctrine do not exist.

[Stamp] P 5: 241

8

The manner in which the Four testified in Court, as shall be set forth below, was hostile to the State of Israel.

Witness No. 6 for the prosecution, Ahmad Abu Khadr, entered the courtroom, exchanged smiles with the Defendant and saluted him. From that point on, he expressed, both in words and in his behavior, his intention of not cooperating and not answering questions.

That is what he did, although he addressed us once, on his own initiative, and stated that, "I know the Defendant here and I put him above me." Furthermore, he answered a question by Counsel for the State of Israel: "Q. On December 23, 2002, were you in the military court, and did he [should read: did you] confess to this indictment, which I have now filed before this Court, including your involvement in the terrorist attack in Hadera?" "A. We wanted to stop the military operations, and they murdered the leader, Raad al-Kamal, and they murdered Palestinian children, and that is what drove me to do this thing." Previously, he had argued that the indictment against him was falsified.

[Stamp] P 5: 241 [continued]

Witness No. 21 for the prosecution, Muhammad Yadak, began his statement with the words: "I do not want to speak; I do not want to testify." He subsequently answered questions on matters of marginal importance, but did not cooperate with regard to material details. Thus, for example, he answered questions such as "When did you make the acquaintance of the Defendant?" or "In which military operation did you participate together with the Defendant?" or "Who was a member of the military squad of which [you were] also a member?" with the following response: "That is my own private business and it is of no concern to the Court." At the same time, after he was declared a hostile witness, he answered the following questions in this manner:

"Q.     Were you a member, from the beginning of the intifada, of a squad which carried out terrorist attacks, and, among other things, was the Defendant, Nasser Aweis, the person who was in charge of that squad?

A.     What is wrong with those things?  What is forbidden about those things?

Q.     Did you tell the police that Nasser Aweis was the one who used to plan the implementation of the terrorist attacks, and that he was the one who used to supply the weapons to all of the squad members?

A.     I have no answer.

Q.     Did you tell the police that you participated in at least 10 shooting attacks against the Army in the Nablus area?

A.     That is my right.

Q.     Did you also tell them exactly where the shooting attacks were directed, toward the settlement of Elon Moreh, toward the IDF roadblock near Hawara?

A.     I refuse to stand before this Court and be judged.  There is nothing for which I must be judged.  Whether I did or did not do – even if I did these things, there is nothing wrong with them.

Q.     You are not the one being judged.  You are testifying here and you have to give answers.

A.     I refuse [to allow] Nasser to be judged for these things.

[Stamp] P 5: 242

10

Felony Case (Tel Aviv) 1137/02                State of Israel v. Nasser Mahmoud Ahmad Aweis

Q.    For which things?

A.    For his struggle against the occupation.

Q.    Did you, on the instruction of Nasser Aweis, plan to carry out a terrorist attack by laying an explosive charge, in the territories near Nablus?

A.    That is of no interest to anyone.

Q.    Did you tell the police that you used to help Nasser Aweis transfer weapons from this activist to that activist?

A.    I did not say those things in order to be judged for them.

Q.    For what purpose did you say them?

A.    That was what they asked me and that was what I told them."

From that point on, he was silent or refused to answer.

Witness No. 23 for the prosecution, Ahmad Barghouti, also clarified, immediately after taking the witness stand, that "I understand what the interpreter said and I will say nothing." He also made it clear, in the course of his examination – both in words and in his behavior – that he would not cooperate, and that is what he did.

Witness No. 25 for the prosecution, Yasir Abu Bakr, did not deviate from the course that was set by the others. In response to every question, he referred Counsel for the State to his attorney, or alternatively, continued to claim that everything he had said had been forced out of him under pressure by Israel Security Agency personnel, who had spilled tea on him, spit on him, slapped him and kept him tied up for several days.

As we have seen, the testimony of the Four fulfills the condition set forth in Section 10A (a) (3) of the Evidence Ordinance.

[Stamp] P 5: 242 [continued]

11

The Four were witnesses at the trial, and the parties were given the opportunity to examine them. This constitutes compliance with the condition that was set forth in Section 10A (a) (2) of the Evidence Ordinance (see Additional Criminal Hearing 4390/91, State of Israel v. Hajj Yihya, PD 47 (3) 679).

The policemen who had taken the statements testified as to the circumstances under which the testimony by the Four had been taken.

Statements P/12 and P/13 were taken from the witness Abu Khadr by Witness No. 28 for the prosecution, Lutuf Mari. According to testimony by the latter, he interrogated Abu Khadr in Arabic and wrote down the answers in Hebrew, after having duly warned Abu Khadr and after having explained to him the nature of the charges against him. According to Mari's testimony, he offered Abu Khadr the opportunity of writing down the statement himself in Arabic, but Abu Khadr explained to him that he was not good at reading and writing and that he did not object to his statement being taken down in Hebrew. According to Mari's testimony, Abu Khadr's statement was made of his own free will.

Statements P/14 and P/15 were taken from the witness Abu Khadr by Witness No. 34 for the prosecution, Aouni Matar. According to Matar's testimony, he introduced himself to Abu Khadr as a member of the police force. He, like Lutuf Mari, interrogated the witness in Arabic and translated the testimony into Hebrew simultaneously, after having warned Abu Khadr and having explained to him the nature of the offenses that had been attributed to him. The latter's statements were made of his own free will.

The person who took down Statement P/16 was not among the witnesses for the prosecution. We shall discuss this fact below.

Statements P/17, P/18 and P/19 were taken from Abu Khadr by Witness No. 29 for the prosecution, Gamal Shakur. This witness also introduced himself to Abu Khadr as a member of the police force, explained his rights and the nature of the charges against him, duly warned him, and informed him that he was entitled to write down the statement himself in Arabic. This witness as well testified that Abu Khadr told him that he did not know how to write in Arabic, and that he did not have a problem with the statement being taken down in Hebrew.

Statement P/20 was taken from Abu Khadr by Witness No. 33 for the prosecution, Harb Madi. Madi explained that the testimony was taken after he "accused" Abu Khadr of the offenses of which he was suspected, warned him, translated the content of the warning for him, informed him that he was entitled to write down [the statement] in his own handwriting in Arabic. However, because Abu Khadr claimed that he did not know how to write, he took down the statement in Arabic [sic] and then translated what he had written into Arabic.

As Abu Khadr, according to all of the testimony, claimed that he did not know how to read and write in Arabic, the fact that the statements were written down in Hebrew is of no importance whatsoever, because, even had they been written down in Arabic, Abu Khadr would

[Stamp] P 5: 243

have signed them on the basis of what he was told by the persons who were taking the statements.

We believe the testimony by the policemen who took down statements P/12 through P/20, inclusive, to be credible, and we determine that they were taken from the witness Abu Khadr according to proper legal procedure, with his rights respected, and that Abu Khadr gave his statements of his own free will.

More precisely: Abu Khadr himself does not claim that the process of his interrogation was defective in any way. His answer to the prosecuting attorney's question, "I will tell you about all of the operations which you performed with Nasser Aweis, according to instructions by Aweis, in the course of the intifada," in the following words, "All of the things you say are falsified," appears, in light of his behavior and his utterances before us, to be a vaguely defiant statement,

[Stamp] P 5: 243 [continued]

13

which is diametrically opposed to his full confession with regard to all of the counts of which he was accused in the amended indictment, dated August 7, 2002 before the three judges on the panel of the military court (see P/11).

We shall add to this the fact that the Defendant refrained from cross-examining these witnesses, and in so doing, augmented the weight of their testimony.

We rule that the making of the assertions that are included in the statements has been proven as required pursuant to Section 10A (a) (1) of the Evidence Ordinance.

Given that all of the conditions required pursuant to Section 10A (a) of the Evidence Ordinance have been fulfilled, we rule that the assertions by Abu Khadr constitute admissible evidence.

The circumstances under which statement P/16 was taken have not been proven. The person who took down the statement was not among the witnesses for the prosecution. Notwithstanding that which has been set forth above, Counsel for the State of Israel – although we do not understand her actions in doing so – did not refrain from including that statement among the statements which she claimed to be admissible (see pp. 80-81) of the "Summation by the Prosecution – Outline," which was filed before us in writing). We are ignoring this item of evidence (P/16), which has not been proven to be admissible, and are excluding it from the body of evidence which we took into account.

We may assume, with a great degree of certainty, that Abu Khadr's full confession of the offenses that have been attributed to him, before a panel of three judges, substantiates the veracity of his assertions to the police, just as it indicated the admissibility of those assertions, from the standpoint of the circumstances under which they were taken down.

In the course of his testimony in court, insofar as he attempted to distance himself from his assertions in writing, by various means, Abu Khadr's testimony was not consistent. From time to time, for one brief moment, the truth emerged – for example, at the very beginning of his testimony, in response to a question by the prosecuting attorney, he answered "The things that I did, and what drove me to do them, were because of the war criminals, Sharon and Mofaz." Subsequently, he added: "We wanted to stop the military operations, and they murdered the leader, Raad al-Kamal, and they murdered Palestinian children, and that is what drove me to do this thing," and afterwards: "all of the things that you are saying are fake. Go ask about the causes of these things." And also: "To this very moment, the only people who are under occupation are the Palestinian people, and all of the international laws allow me to struggle against the occupation. Do not exhaust yourself. Do not ask me any questions," and "I know Hasuna; he is a friend of mine, and he served with me in the Authority, and the occupation is what drove Hasuna to do what he did."

[Stamp] P 5: 244

The salute which Abu Khadr gave the Defendant when he entered the courtroom, and his declaration to the effect that he knows the Defendant and puts him above himself, attest to the veracity of the Defendant's assertions concerning the hierarchical relationship between them. This relationship is described, *inter alia*, in P/12: "Nasser Aweis is a resident of the Balata camp … also known as al-Hajj Rawaq, and he is one of the people in charge of the *Kitaab Shuhadaa al-Aqsa*, and he was my superior in the organization, and Nasser works for the National Security in Nablus and belongs to Tanzim Fatah …"

We give preference to the assertions that were made by Abu Khadr in writing, in his above mentioned statements, which were made out of court, over his testimony in the courtroom.

[Stamp] P 5: 244 [continued]

15

The statements by the witness Muhammad Yadak, P/40A, B, C were taken down by Witness No. 7 for the prosecution, Hadi Halabi. According to Halabi's testimony, the statements were taken down and written in Arabic, after he had explained to Yadak the offenses of which he was suspected and had duly warned him. According to his testimony, the witness made his statements of his own free will and signed every page of each of the statements before him. Halabi testified that he translated the statements into Hebrew, but that Yadak was asked to sign, and signed, the original only.

Statement P/40D was taken from Muhammad Yadak by Witness No. 35 for the prosecution, Atef Awida, who also testified that he took down the statement in the same way as Halabi.

We believe that both of [the above mentioned witnesses] took down Yadak's statements properly and that the assertions included in those statements were given of Yadak's own free will.

In his testimony before us, Yadak did not argue that his statements had been taken down improperly. He did not want to answer a question as to whether he identified his signature, and did not even want to look at it, but did not deny [that the signature was his]. His negative response to a question as to whether he had been duly warned is not convincing. In this case as well, the fact that the Defendant refrained from examining the persons who had taken the statements reinforces their testimony, and we rule that the making of the assertions has been proven as required pursuant to Section 10A (a) (1) of the Evidence Ordinance.

Yadak's assertions out of court are admissible as evidence in the present proceeding, given that the conditions required pursuant to Section 10A (a) of the Evidence Ordinance have been fulfilled in their entirety.

We give preference to Yadak's assertions, as expressed in his statements P/40A-D, over his testimony in the courtroom. On the basis of Yadak's answers to the questions he was asked, it is easy to discern that his behavior in court reflects his decision not to look like a collaborator, and most of those answers hint at the fact that his assertions as they were made to the police are true.

It would not be superfluous to cite those answers again:

"Q.     When did you make the acquaintance of Nasser Aweis?

A.      That is my own private business and it is of no concern to the Court.

Q.      In which military activity did you participate together with the Defendant?

A.      That is my own private business and it is of no concern to the Court.

[Stamp] P 5: 245

16

Q.    Who was a member of the military squad of which you were also a member?

A.    That is of no concern to the Court.

Q.    Were you a member, from the beginning of the intifada, of a squad which carried out terrorist attacks, and, among other things, was the Defendant, Nasser Aweis, the person who was in charge of that squad?

A.    What is wrong with those things?  What is forbidden about those things?

Q.    Did you tell the police that Nasser Aweis was the one who used to plan the implementation of the terrorist attacks, and that he was the one who used to supply the weapons to all of the squad members?

A.    I have no answer.

Q.    Did you tell the police that you participated in at least 10 shooting attacks against the Army in the Nablus area?

A.    That is my right.

Q.    Those shooting attacks that you talked about were planned by Nasser Aweis and he was the one who supplied the weapons for the shooting?

[Stamp] P 5: 245 [continued]

17

A.      I do not wish to answer.

Q.      Did you also tell them exactly where the shooting attacks were directed, toward the settlement of Elon Moreh, toward the IDF roadblock near Hawara?

A.      I refuse to stand before this Court and be judged.  There is nothing for which I must be judged.  Whether I did or did not do – even if I did these things, there is nothing wrong with them.

Q.      You are not the one being judged.  You are testifying here and you have to give answers.

A.      I refuse [to allow] Nasser to be judged for these things.

Q.      For which things?

A.      For his struggle against the occupation.

Q.      Did you, on the instructions of Nasser Aweis, plan to carry out a terrorist attack by laying an explosive charge, in the territories near Nablus?

A.      That is of no interest to anyone.

Q.      Did you tell the police that you used to help Nasser Aweis transfer weapons from this activist to that activist?

A.      I did not say those things in order to be judged for them.

Q.      For what purpose did you say them?

A.      That was what they asked me and that was what I told them.

Q.      All of the weapons, the rifles, the M-16s, which they transferred, were used for shooting attacks against civilians and soldiers.

A.      I do not want to say anything, and do not go on …"

Statements P/43A and P/43C by Witness No. 23 for the prosecution, Ahmad Barghouti, were taken by Witness No. 32 for the prosecution, David Mizrahi.

According to Mizrahi's testimony, he identified himself to Barghouti as a policeman, warned him and ascertained that he understood the content of the warning.  P/43A was taken in the form of questions and answers and was taken down (as was P/43C) in Hebrew, because the

[Stamp] P 5: 246

18

witness Mizrahi cannot write in Arabic. Barghouti refused to sign P/43A, without explaining his refusal, but signed P/43C. Mizrahi explained that there were no exceptional events during the taking of both statements. He did not notice that Barghouti was injured, ill or tired, because, had this been the case, he would have noted those facts. If there had been anything extremely exceptional, the testimony would not have been taken down, and a memorandum to that effect would have been written. During the taking of P/43C, Mizrahi showed Barghouti an eight page manuscript in Arabic, and the latter confirmed that it was in his handwriting, after having studied the document.

Statements P/43B and P/43D were taken from Barghouti by Witness No. 31 for the prosecution, Yitzhak Yaakovoff. According to Yaakovoff's testimony, the two spoke Arabic, but the testimony was taken down in Hebrew. Barghouti was duly warned but refused to sign the warning or statement P/43B, although he signed P/43D. According to Yaakovoff's testimony, during the taking of both statements, manuscripts were shown to Barghouti which he identified as being in his handwriting, the manuscripts had been given to Yaakovoff by one of the Israel Security Agency interrogators. Barghouti made the statements of his own free will, and with regard to the manuscript which was shown to him during the taking of P/43D, he even answered "Yes, this is my handwriting and I wrote what I have just told you now in the testimony."

Statement P/43E was taken from Barghouti by Witness No. 36 for the prosecution, Moshe Moshe.

According to testimony by the latter, he identified himself to Barghouti as a member of the police force and explained to him that he was about to interrogate him and what he was suspected of. Barghouti made his statements in an orderly manner, and subsequently signed the testimony after his words were translated back to him. According to Moshe's testimony, he interrogated Barghouti after having been given a general background in the form of a memorandum from the Israel Security Agency. In his testimony, however, Barghouti told him many details which [Moshe] could not have known from that memorandum. In his words: "If it is about the circumstances

[Stamp] P 5: 246 [continued]

19

of the relationship, how things occurred and progressed, these are things that he said in his testimony. If they went to an ice cream shop, and what the code was and who set it, this does not appear in the memorandum."

We; believe that the statements made by the witnesses Mizrahi, Yaakovoff and Moshe, with regard to the manner in which the interrogation was conducted and the circumstances under which Barghouti's assertions were taken down, are credible. Barghouti, for his part, does not argue that the assertions were taken down improperly. In this case, as well, the fact that the Defendant refrained from cross-examination strengthens the testimony by those who had taken the statements, and the making of the assertions was proven in the trial as required.

Given that all of the conditions required pursuant to Section 10A (a) of the Evidence Ordinance have been fulfilled, we rule that the assertions made by Barghouti in writing and included in his statements P/43A-E, are admissible as evidence in the present proceeding.

We prefer Barghouti's assertions over his testimony in court. Most of his answers were intended to give the message that he does not recognize the jurisdiction of the Court ("I do not recognize the Court, do not you understand? ... I do not recognize the Court, or Israel either ... I do not recognize the Court"), and not as denial of his assertions.

Nonetheless, from time to time, signs arose in his testimony which indicate that the assertions are true:

"Q.     When did you begin your military activity?

A.      That is none of your business ...

Q.      Is Marwan Barghouti a relative of yours?

A.      That is none of your business. Why are you asking me personal questions?

Q.      Were you Marwan Barghouti's driver and bodyguard from 1996 and up to the day of your arrest?

A.      No, what do you want?

Q.      Is that correct?

A.      How do you ask me such questions? I do not recognize you.

Q.      Those are things that you said.

A.      That thing is not mine.

[Stamp] P 5: 247

20

Q.    You also said that you were arrested together with Marwan Barghouti.

A.    I have no answers at all.  It would be better if you did not ask ...

Q.    You [singular] made sure to prepare Said before the terrorist attack.  You [singular] made sure that there would be someone to drive him to Jerusalem, to the place where you [plural] bought him clothes and shoes and took him to get a haircut.  And you [singular], under the instructions of Nasser Aweis, who was the planner and the organizer, you [singular] also made sure to get an M-16 rifle and clips with bullets for Said Ramadan.

A.    (The witness remains silent and does not answer)

Q.    You yourself told all of those details in your statement.

A.    I say what I want to.  What I feel like saying, I say.

Q.    That is what you felt like saying at the time.

A.    That is not from me, that is not my handwriting.  If Nasser really did all those things, he only wanted to liberate Palestine for us.  That is something to be proud of ...

Q.    Not only did you tell, in your statements, about many instances of shooting attacks and suicide bombings; with regard to all of the terrorist attacks which you have perpetrated, are you sorry for what you did?

[Stamp] P 5: 247 [continued]

Nevo Publishing Ltd.          nevo.co.il        The Israeli Legal Database

A.    If Sharon is sorry for what he did, then I am sorry for what I did.

Q.    Aren't you sorry that you sent terrorists to blow themselves up here in Israel and to kill?

A.    I want to liberate my country, the one that you are conquering …

Q.    I am showing you Statement No. 5 dated September 5. In this statement too, I am showing you the warning, the signature on the warning, and the signature on every page of the statement and the signature at the end of the statement.

A.    I do what I want to. There is no one who can stop me. I will write and say whatever I want …"

It may truthfully be said that the response "I want to liberate my country, the one that you are conquering" is the beginning of an admission.

The following statement, which appears in Criminal Appeal 735/80, Abraham Cohen v. State of Israel, PD 35 (3) 94, also applies to the matter before us: "If Section 10A now states that the Court can prefer the assertion over the testimony in the courtroom, the defense attorney, for his part, could have attempted to strengthen the witness's version in his direct examination, by performing a cross-examination with a view to explaining that the assertion made to the police was a false assertion. The defense attorney, however, did not examine the witness at all."

Statements P/47A-C were taken from the witness Yasir Abu Bakr by Witness No. 31 for the prosecution, Yitzhak Yaakovoff. The witness did not remember the occasion when the testimony was taken, and refreshed his memory on the basis of the assertions. According to his testimony, he identified himself to Abu Bakr as a policeman, conversed with Abu Bakr in Arabic and translated the words for him. According to Yaakovoff's testimony, when he translated what he had written in the statements into Arabic, Abu Bakr could have responded, corrected or refused to sign them. According to his testimony, he wrote down only what Abu Bakr told him, and Abu Bakr confirmed to him that the manuscript which had been written down before the Israel Security Agency interrogators was in his handwriting. According to his testimony, had there been exceptional circumstances, he would have noted them, and had any complaints been made, he would have written them down, as he would have written down any visual signs he might have seen. Yaakovoff explained that, when a suspect reports for a police investigation, he is a free man, "and this is his opportunity to give or not to give his version, irrespective of what happened before that in the Israel Security Agency. If there was any problem at all, I would have written it down, because that is my duty. Everything written down in this testimony was said by the subject." Yaakovoff made it clear that, "both in the previous testimonies and in this testimony, I introduced myself as a policeman. That is the first thing. Above and beyond that, they (the reference is to interrogation subjects such as the witness) make the distinction as to who is a policeman

[Stamp] P 5: 248

22

and who is a Israel Security Agency interrogator. They encounter us when their arrest is extended, and they cannot make mistakes in this matter ..."

Statement P/47D was taken from Abu Bakr by Witness No. 30 for the prosecution, Moshe Levi. According to his testimony, he took down the statement after the suspect had been duly warned, and the statement was taken down in Hebrew, but the interrogation was conducted in Arabic. At the end of the statement, he read Abu Bakr's words back to him and Abu Bakr signed it before him. According to testimony by Levi, who did not specifically remember the case, if Abu Bakr had complained to him, it would have been written down. Levi also clarified that he did not have to recall whether he had identified himself as a policeman, because that was his duty and he does that with every suspect. With regard to the connection between his interrogation as a policeman and the memoranda which are provided to him by the Israel Security Agency, he explained that his interrogation is independent, and that he refers to the memoranda "only in a general way, and if a suspect says that no such thing ever happened, that is what will be written down, at the end of the day – in other words, what he says is what will be written down."

Statements P/47E and P/47F were taken by Witness No. 36 for the prosecution, Moshe Moshe. Because Abu Bakr had already argued before us, *inter alia*, that his statements had been taken under pressure by Israel Security Agency personnel, Moshe gave a more extensive explanation (after the learned prosecuting attorney, and we as well, called his attention to Abu Bakr's arguments), not only with regard to the manner in which this statements were taken, but also about his interrogation of Abu Bakr, in light of a previous investigation which had been held for him, as well as for others, by the Israel Security Agency – an investigation performed for counter-intelligence purposes. According to his statement: "When I receive the memorandum of an investigation which comes from the Israel Security Agency personnel, I check the points that come up in it – what that suspect is suspected of having done. After that, we write the content of the warning, the content of the suspicions, we read it out and explain it and make sure

[Stamp] P 5: 248 [continued]

23

that he really has understood the content of the warning and knows what he is being interrogated about. All of this is in Arabic – I speak Arabic fluently. I do not write or read Arabic, but I speak it. Part of the process is that we read it out. I inform him that I am a member of the police force, and he is aware that I am a member of the police force and that he is about to give testimony to the police. After I check the points that were covered by the Israel Security Agency and what he said to them, I construct the suspicions against him – whether it is belonging to an organization or possession of weapons or, alternatively, assistance to wanted persons, or any other offense – and according to that, I make my preparations from the standpoint of the interrogation itself.

The Israel Security Agency is investigating the issue of prevention. The Israel Security Agency is involved in having to thwart future events, that is, future terrorist attacks. My job as a police officer is to be involved only in the subject of the interrogation, which regards the gathering of evidence against the suspect at the time. In other words, if I interrogate someone, I have to work according to the laws of evidence and to understand the law ..."

When the prosecuting attorney confronted Abu Bakr with the fact that the statements had been taken from him by a policeman, and not by Israel Security Agency personnel, he answered: "I never saw a policeman that I was supposed to speak with. They're all Israel Security Agency officers."

Our impression is that the policeman Moshe Moshe did indeed identify himself to Abu Bakr as a policeman, as the other policemen had done, and that the wording of the statements taken by Moshe and the other policemen (Yaakovoff and Levi) had come from Abu Bakr, of his own free will, and was not the result of the behavior exhibited by the Israel Security Agency interrogators toward him.

The Defendant and his Counsel did not cross-examine the policeman, nor did they ask to summon the Israel Security Agency personnel who had drawn up the memoranda of the interrogations. The Defendant and his Counsel did not cross-examine the witness Abu Bakr, in an attempt to strengthen his version, to the effect that the statements had been taken from him by unworthy means.

Their refraining from cross-examination does not give rise to the presumption that the version given by the policemen is correct. It does, however, further strengthen our impression of the credibility of the witnesses Levi, Yaakovoff and Moshe. Under the circumstances of the case at hand, that is, that the Defendant and his Counsel deliberately and tendentiously refrained – as they emphasized to us, on more than one occasion – from cross-examination or from calling relevant witnesses, and given that this cannot be evaluated in light of other, conflicting testimony, and that, in any event, no such testimony was given, we give preference to the policemen's testimony concerning the manner in which Abu Bakr's assertions were taken out of court, over the version by the latter (see Criminal Appeal 38/61, Moshe Ben David Yitzhak v. Attorney General, PD 16 514, Criminal Appeal 639/79,

[Stamp] P 5: 249

24

Aslan v. State of Israel, PD 34 (3) 561, and Criminal Appeal 2603/90, Alfar v. State of Israel, PD 45 (3) 799).

In any event, as ruled in Criminal Appeal 242/85, Hazan v. State of Israel, PD 41 (1), the very fact that an assertion made by a defendant to the police is not admissible in his trial cannot lead to the conclusion that the same assertion will not be admissible in another trial, which involves the case of that defendant's accomplice, pursuant to the provisions of Section 10 (and, to be precise, we have not ruled that such a possibility ever arose).

The content of Abu Bakr's statements P/47/A-F has been proven in the courtroom, and, given that all of the conditions required pursuant to Section 10A (a) of the Ordinances have been fulfilled, we accept them as admissible evidence.

We give preference to Abu Bakr's assertions over his testimony in court. With regard to most of the questions which set forth the actions committed by Abu Bakr together with the Defendant, Abu Bakr referred the distinguished prosecuting attorney to the Defendant who was seated opposite him – a Defendant who, as stated above, chose not to cross-examine Abu Bakr or any other witness. Abu Bakr's words are set forth below:

"Q.    I refer you to Statement No. 3 … where they ask you when you began your military activity and who recruited you for the military activity, and you stated that, at the beginning of 2001, you were in Nasser Aweis's house in the Balata refugee camp, and then Nasser Aweis suggested that you join the al-Aqsa Martyrs' Brigades for military activity, and you agreed.

[Stamp] P 5: 249 [continued]

Nevo Publishing Ltd.          nevo.co.il       The Israeli Legal Database

A.    These things are not correct, and you can ask him. Look, he is here …

Q.    I refer you to Statement No. 4 … Did you suggest to Nasser Aweis, in the course of your activity, to carry out a terrorist attack on Tel Hashomer Hospital in Israel?

A.    No such thing. Ask him.

Q.    You [plural] planned all of the details, and they [sic] even got hold of a map of the area, and in the end, Nasser said that it would be necessary to wait a while, that it wasn't the right time yet.

A.    No such thing. You can ask him.

Q.    I refer you to the page in … Another of your roles was to assist Nasser Aweis in recruiting more terrorist activists for military activity, so that they would help carry out terrorist attacks.

A.    Nothing like that ever happened. Here he is, ask him …

Q.    You used to report to Nasser Aweis, every time, about a terrorist who you heard was interested in carrying out a terrorist attack.

A.    This is the first time that I have ever heard such things. Aside from that, all of those things belong to the Israel Security Agency. Nasser is here; ask him."

When the prosecuting attorney addressed these questions to Abu Bakr, who referred them on to the Defendant, the Defendant did not provide a version of his own, and we are left with the admissions in his statements and with his confession under the discerning eye of the judge in arrest court, which it is only fitting and proper to repeat here:

"I confirm that the assertions and the confessions which I gave in my interrogation in Arabic are true and correct, that I read them and that I signed them. It is true that I was involved in all of the actions and the terrorist attacks to which I confessed – 'everyone has his job to do' … I do not object to the extension of my arrest as requested."

We shall state that the Defendant himself makes the following statement with regard to Yasir Abu Bakr (see statement P/6 by the Defendant): "After the outbreak of the al-Aqsa intifada, Yasir Abu Bakr enlisted in the *Kitaab Shuhadaa al-Aqsa*, and I asked Yasir to participate in terrorist attacks with us, and Yasir agreed to the proposal, and I gave him an M-16 weapon, and Yasir carried out a shooting attack with the weapon which I had given him. The shooting attack was directed at an Israeli vehicle on the bypass road east of Nablus, and

[Stamp] P 5: 250

26

according to Yasir's statement, the vehicle was not hit." In response to a question as to additional terrorist attacks in which Yasir was involved on behalf of the *Kitaab Shuhadaa al-Aqsa*, the Defendant stated: "The terrorist attack in Hadera which was carried out by Said Ramadan ... terrorist attacks which were carried out in the Nablus area ..."

These facts, in and of themselves, constitute an unimpeachable sign of the accuracy of the assertions made to the police, and accordingly, those assertions should be given considerable weight.

We have found an additional sign of the accuracy of his assertions, in the conflicting versions given by the witness Abu Bakr in court with regard to another assertion which, according to his assertions, had been written down in his own handwriting.

This is a manuscript in Arabic, concerning which Abu Bakr, in his statement P/47A, on page 4, had been asked the following question: "I am showing you a manuscript in Arabic (a total of 10 yellow pages, which I got from the person known as 'Bassam'). Is this your handwriting?

A.      Yes, this is my handwriting and I wrote what I have just told you now in the testimony."

On the other hand, in response to a question by the prosecuting attorney: "Q. I am showing you a statement, which was attached to the statement dated April 15, which is a statement in your handwriting, 10 pages," he replied: "They dictate to people [and make them] write against their will. Take them to court, not us."

[Stamp] P 5: 250 [continued]

27

In response to the question, "Q. That is not your handwriting?" he replied: "That is the handwriting of the Israel Security Agency officers. They wrote those things." Generally speaking, his answers to similar questions were as follows: "Q. Are these things which you wrote yourself? A. When you have tea spilled on you, when you are left for four or five days with no food and no sleep, then you say things just to get out of it. Q. Did you write these things? A. I have an attorney. You have to see how the Israel Security Agency treats people. Q. Do you recognize the handwriting? A. I do not want to answer you. You act like them and you shout at me (answers in Hebrew and English)."

### Summary thus far

We have repeatedly clarified that all of the rules which must be fulfilled in order for the assertions made by the Defendant's accomplices out of court to qualify as evidence under Section 10A of the Evidence Ordinance have been fulfilled. (The above mentioned rules include proving the assertions under law, giving the Defendant an opportunity to examine the witnesses, and the question of whether the testimony in court is substantially different from the words recorded in the statements).

We considered the matter with the requisite care, and we give preference to the assertions made by the four witnesses, the Defendant's accomplices, to the police, over their testimony in the courtroom.

Testimony which requires a supplement may itself serve as a supplement of any kind for any other testimony which requires a supplement. Accordingly, the assertions by the four accomplices can constitute an additional "item" corroborating the Defendant's admissions out of court.

(See Kedmi, *On Evidence*, Part 1; Criminal Appeals 6147/92, State of Israel v. Yosef Cohen, PD 48 (1) 62; Criminal Appeal 6214/94, State of Israel v. John Doe, *Supreme Court Rulings*, Volume XXXVIII, 665; Criminal Appeal 5249/98, State of Israel v. Mirilashvili, PD 53 (3) 550.)

Each of these assertions, including assertions made by one or more of the Four in writing – which should be considered as an integral part of those statements, accordingly (see Criminal Appeal 6411/98, Manbar v. State of Israel, PD 55 (2) 150) – may be relied upon as corroborative evidence, in the form of an additional "item," to be added to other evidence brought against the Defendant, in the form of his own admissions.

As [the Four were] the Defendant's accomplices, and pursuant to the provisions of Section 54A (a) of the Evidence Ordinance, we were required to find "something to reinforce" their testimony.

We were also required to find such a reinforcement pursuant to the provisions of Section 10A (d) of the Evidence Ordinance, which instructs us that a person shall not be

[Stamp] P 5: 251

28

convicted on the basis of an assertion received pursuant to Section 10A of the Evidence Ordinance "unless the evidentiary material contains something to reinforce it."

If we consider the nature of the requirement for reinforcement (the term used is identical in the context of both of the above mentioned sections), it consists of supplementary evidence which verifies [the testimony in question], rather than evidence which embroils [the Defendant]. The reinforcement need not be an independent item of evidence; it may arise from the testimony which requires reinforcement.

We have found such reinforcement, even in excess of that required, in the embroiling evidence which arose from a separate and independent source, as follows:

The Defendant's full confession before the judge in arrest court.

The assertions made by each of the four accomplices with regard to the assertions made by his fellows.

[Stamp] P 5: 251 [continued]

Nevo Publishing Ltd.            nevo.co.il       The Israeli Legal Database