perpetrating a terrorist attack which was intended to intentionally cause the death of many Israeli civilians. Within the framework of this organization, which was headed by the Defendant, and in order to carry out [the terrorist attack], Shahadi and Said were recruited, equipped with an M-16 rifle, 12 clips of bullets and two hand grenades, photographed reading their wills and holding an M-16 rifle, and transported to the scene of the terrorist attack. After the terrorist attack and in accordance with the typical pattern, the Defendant called the media and informed them that the Terrorist Organization was responsible for the terrorist attack and had carried it out.

The admission by the Defendant is as follows:

P/5:

"6.    I delivered weapons for the perpetration of a terrorist attack in Netanya."

[Stamp] P 5: 266 [continued]

P/7:

"Q.    Did you have any involvement with a shooting attack in Netanya?

A.    Yes, I was involved with a shooting attack in Netanya, which was carried out by terrorists whose names I do not know. About two days before that terrorist attack, Ahmad Abu Khadr called me and told me that he would be able to bring two people into Israel, in order for them to carry out a suicide attack, and I contacted Mahmoud Titi and asked him if he could bring in suicide attackers, and he answered in the affirmative. Then I gave Ahmad two grenades and Mahmoud Titi gave them two M-16 weapons, and Ahmad Abu Khadr photographed them and explained to them about the terrorist attack. Then Ahmad Abu Khadr went with them as far as Baqa al-Sharqiya and left them, and they walked along a dirt road into Israel and went from there to Netanya, and Ahmad went back to Nablus. After a few hours, we heard on television that there had been an exchange of fire between the suicide attackers and police forces near a hotel in Netanya, and that civilians and policemen had been wounded in the terrorist attack, and that two people had been murdered and two others had been killed by the police. I called the media and took responsibility for the attack.

Q.    Do you have anything to add about the terrorist attack in Netanya?

A.    No."

The "additional item" is as follows:

Ahmad Abu Khadr (Witness No. 6 for the prosecution), in P/13:

"I confess that, about a month ago, Nasser Aweis told me that he intended to send two suicide attackers to the city of Netanya, in order to carry out a suicide attack, and asked me to help transport the suicide attackers from Nablus to Kafr Rai, and of course, I agreed.

Q.    Who are those two suicide attackers?

A.    The first suicide attacker is Shadi [sic] al-Najmi, a resident of the Ein Beit Alma camp, and the second one's name is Said Bata, a resident of the Ashar camp ... and both of them were wounded in a terrorist attack. That day, Nasser Aweis told me that Shadi Najmi [sic] had worked in Netanya and was familiar with the area. Q. [A.] Nasser Aweis told me that Mukadi Mukaher, a resident of al-Ain, 28 years old and married, was working for the naval police [sic] in Nablus, and that he was an activist in *Kitaab Shuhadaa al-Aqsa*. Mukadi is Nesser's and my accomplice in planning and sending the suicide attackers to Netanya, and Nasser asked me to take the two suicide attackers in the stolen Pontiac with Israeli license plates from Nablus to Kafr Rai, and I agree. On the day of the terrorist attack, I went out at about 3:00 p.m., in a taxi, to the area of Jabal Shamali in Nablus, and there, Mukadi Mukaher and the two

[Stamp] P 5: 267

60

suicide attackers were waiting for me in the Pontiac. Shadi was wearing blue jeans and a black shirt, and Said was wearing green pants. There, Mukadi said goodbye to them and I took them to Kafr Rai in the Pontiac. Q. What weapons did the suicide attackers have? A. Each one of them had an M-16 rifle. I saw Shadi holding a black plastic bag with an explosive charge in it, and after we got to Kafr Rai, I called Nasser Aweis and told him that we had arrived. Nasser asked to speak to Shadi, and I heard Shadi telling Nasser that he knew the way from there. Then Shadi gave the mobile phone to me, and Nasser instructed me to go back to Nablus in the taxi, and that is what I did. When I got back to Nablus, I heard on the news about the terrorist attack in Netanya, in which the two suicide attackers had been killed, and I remember they talked about a terrorist attack in a hotel in Netanya."

    P/18:

    "Q.    In the second testimony which you gave, you talked about a suicide attack in Netanya, which took place a month before you gave the testimony, and you claimed that your job was to take the two suicide attackers from Nablus to Kafr Rai. Exactly where did you take them from, and do you know whether they were photographed before they went out to perpetrate the terrorist attack?

[Stamp] P 5: 267 [continued]

Nevo Publishing Ltd.       nevo.co.il       The Israeli Legal Database

A.    In addition to taking the two suicide attackers, Shadi and Said, I confess that, the day before the terrorist attack, Nasser Aweis asked me to come to the town square in Nablus and pick up Shadi and Said, and then to come to his home in the refugee camp, so that he could give me a will which he had prepared for the two suicide attackers. He also asked me to take the two suicide attackers home, photograph them, and wait for instructions.

That is what I did:  I picked them up, took the will from Nasser along with a video camera, and when I got home, I filmed the two of them, each holding an M-16 in their hands, with Shadi reading the will.

Q.    From whom did they get the weapons?

A.    I took the will and the camera from Nasser.  He gave me two M-16 weapons and 12 clips full of bullets and a hand grenade, and I gave them to them."

### Count No. 5:

On March 30, 2002, the terrorists Majdi Hanfar and Fathi Amiri (hereinafter "Majdi and Fathi") were on their way to carry out a terrorist attack in Israel, armed with an M-16 rifle, hand grenades and an explosive charge.  Majdi and Fathi ran into a force of Border Patrol police near Baqa al-Gharbiya, fired on the policemen and threw a fragmentation grenade.

The two succeeded in intentionally causing the death of a Border Patrol policeman, Master Sergeant Konstantin Danilov of blessed memory, and in wounding another policeman, Senior Master Sergeant Amil Ibrahim. (See the testimony of Witness No. 27 for the prosecution, Amir Sher, Witness No. 18 for the prosecution, Chief Superintendent Farid Ghanam, Witness No. 19 for the prosecution, Tal Vermot, P/49 (report on the seizure of exhibits), P/72-P/73 (expert opinions), P/74-P/75 (photographs), P/76 (expert opinion).

According to an argument that was set forth by the State, the Defendant – who as set forth above, was one of the senior commanders of the Terrorist Organization – entered into a conspiracy with Titi and Khadr (Witness No. 6 for the prosecution), for the purpose of perpetrating a terrorist attack which was intended to intentionally cause the death of many Israeli civilians.  Within the framework of this organization, which was headed by the Defendant, and in order to carry out [the terrorist attack], Majdi and Fathi were recruited, equipped with an M-16 rifle, hand grenades and an explosive belt.  The Defendant also gave instructions to arrange for the arrival of the two in Israel, transferred an amount of money totaling NIS 3500 which was intended for the purchase of a stolen car to be used for transporting them, and instructed Khadr to accompany them part of the way.  After the terrorist attack, the Defendant called the media and informed them that the Terrorist Organization was responsible for the terrorist attack and had carried it out.

The admission by the Defendant is as follows:

P/5:

[Stamp] P 5: 268

62

Felony Case (Tel Aviv) 1137/02                State of Israel v. Nasser Mahmoud Ahmad Aweis

"10.    I delivered weapons for the execution of a shooting attack, a sacrifice attack (note by the interrogator; a suicide attack), which was supposed to be carried out in Hadera, but the terrorist attack did not succeed and people were killed in the vicinity of Baqa al-Gharbiya."

P/6:

"Q.    Yes, Yasir and I worked together, to send out suicide attackers with Mahmoud Titi and Ahmad abu Khadr from Silat al-Dhaher, and if we needed anything, such as photographing the suicide attackers or distributing posters, we would use Yasir. About two weeks before the army came into Nablus, I asked Yasir to try to obtain an explosive belt for a suicide bomber, in order to carry out a terrorist attack within Israel. Yasir, in fact, brought an explosive belt, and we gave it to a suicide bomber, who traveled with another person in order to perpetrate a terrorist attack in Israel, and when he got to Baqa al-Gharbiya, soldiers shot at him and they were both killed, and during these exchanges of fire, a Border Patrol policeman was killed in Baqa.

Q.    Where was the terrorist attack that you are talking about supposed to have been carried out?

A.    In Hadera, and we did not define a target, and according to the plan, one of the suicide attackers was supposed to shoot and the other was supposed to blow himself up ...

Q.    What kind of vehicle did the suicide attackers travel in?

A.    I do not know, but I gave Ahmad NIS 3,500 in order for him to buy a stolen car to transport the suicide attackers, and Ahmad went with them to Tulkarm and showed them the way and came back by public transportation."

P.7:

"After the four of them were arrested on their way to Ramallah, Mahmoud Titi contacted me and told me that he wanted to carry out a suicide attack next to Israeli soldiers, and he asked me for an M-16 weapon, and I had an explosive belt in my possession, and I did give him an M-16. We agreed that the attack would be carried out within Israel, next to soldiers, and that after [one] suicide attacker blew himself up, another one would fire. According to what Muhammad said, he did succeed in locating two people who would carry out the terrorist attack, one from Nablus and the other one from Jiyus.

Q.    How did Mahmoud Titi get to know the two people who were supposed to carry out the terrorist attack next to the soldiers?

A.    According to what he told me, Ahmad Abu Khadr was the one who introduced him to the man from Nablus, and Mahmoud Titi already knew the one from Jiyus.

[Stamp] P 5: 269

63

Q.    Who brought the suicide attackers into Israel?

A.    A man named Mansour Sharim from Tulkarm.

Q.    How did they get in, and how was the terrorist attack carried out in Israel?

A.    They got in with a car, which had been stolen by Mansour Sharim, and after they had entered Israel and were on their way to Hadera in order to carry out the terrorist attack, a few hours later, we heard on the radio that the Israeli police had suspected the car, and that there had been an exchange of fire with the suicide attackers and they had been killed, and two of the police had been wounded, as far as I know.

Q.    How did the exchange of fire with the police take place?

A.    On the way to Hadera, a police car suspected that the car was stolen and asked them to stop, but they started shooting.  After that, the policemen succeeded in killing them. After I heard on the radio that they had been killed, I called the media and informed them that the terrorist attack had been carried out by *Kitaab [Shuhadaa]al-Aqsa*."

[Stamp] P 5: 269 [continued]

64

The "additional item" is as follows:

Ahmad Abu Khadr (Witness No. 6 for the prosecution), P/13:

" … That same day, I reported to Nasser Aweis that I had a suicide attacker with me, and Nasser asked to meet that terrorist. The next day, I took Majdi to a studio in Nablus to have his picture taken, and from there to Nasser Aweis's house, and I left him there. Two days later, Nasser asked me to purchase a car with Israeli license plates, and I bought a stolen black Mitsubishi for NIS 3,500 from a resident of Tubas. I got the money for the car from Nasser Aweis. After I bought the car, I went to Nasser's house with the car, and there I met Nasser and Majdi and Juad Hanfar, and I was surprised to find another person there, named Fathi Amiri, a resident of Nablus, about 20 years old, and that was the first time that I saw that young man. And then Nasser Aweis told me that those two people, Majdi Hanfar and Fathi Amiri, were about to go out and perpetrate a suicide attack in Israel. At that point, Nasser gave Majdi an M-16 weapon, and he gave Fathi two hand grenades, and the plan was for the two of them to enter Israel, wherever they could, and to carry out a suicide attack, shooting with the M-16 and throwing grenades, and after we prepared them, I took them to Kafr Rai and I handed them over to Ziad Asasa. This was the same Ziad who had transported the suicide attacker that I talked about before. On that day, I got to Kafr Rai at around 11:00 a.m. … And an hour later, Ziad called and said that he had heard that the two of them had been killed in Baqa, after wounding a Border Patrol policeman."

### Count No. 6:

During the al-Aqsa intifada, on an unknown date, two terrorists whose identities are not known were on their way to carry out a terrorist attack in Jerusalem, armed with Kalashnikov rifles and hand grenades. The terrorists were caught at an IDF roadblock by the security forces, thus miraculously avoiding a murderous terrorist attack with multiple casualties, which the two had set out to perpetrate, with the intent of deliberately causing the death of many Israeli civilians.

According to an argument that was set forth by the State, the Defendant – who, as set forth above, was one of the senior commanders of the Terrorist Organization – entered into a conspiracy with Ahmad Abu Khadr and Ahmad Barghouti and additional activists, for the purpose of perpetrating a terrorist attack which was intended to intentionally cause the death of many Israeli civilians. Within the framework of this organization, which was headed by the Defendant, the terrorists were recruited, equipped with Kalashnikov rifles and hand grenades, and transported on the way to the scene of a terrorist attack.

The admission by the Defendant is as follows:

P/7:

[Stamp] P 5: 270

65

" ... At about that time, Ahmad Abu Khadr from *Kitaab Shuhadaa al-Aqsa* contacted me and said that there were two people who wanted to carry out a terrorist attack in Israel, and I agreed to that. I informed Ahmad Barghouti of the matter and asked him if he would be able to bring them in, and it was agreed with Ahmad Abu Khadr that Alaa Abu Mustafa and Ayman Badr would take the two *mustashhids* to Ramallah. After that, I called Ahmad Barghouti and told him that the people were on their way to him. I should note that Ahmad Abu Khadr contacted me because I am responsible for *Kitaab Shuhadaa al-Aqsa*.

Q.      Did Ayman Badr and Alaa Abu Mustafa know about the terrorist attack?

A.      Ayman works as a driver of a public vehicle, and Alaa is a friend of Ahmad Abu Khadr, and I do not know whether they knew about the terrorist attack.

[Stamp] P 5: 270 [continued]

66

Q.      Where was it agreed that they would meet in Ramallah?

A.      According to what was agreed, Ahmad Abu Khadr was supposed to be in contact with the four, and when they got to the Ramallah area, he would call me and I would call Ahmad Barghouti and let him know where they were, so that he could meet them.

Q.      Which weapons did they take with them, and how was he [sic] supposed to carry out the terrorist attack?

A.      A shooting attack which included grenade-throwing, and Ahmad Abu Khadr gave the suicide attackers two hand grenades, and according to what was agreed, Ahmad Barghouti was supposed to give them two Kalashnikov rifles.

Q.      Where was he [sic] supposed to carry out the terrorist attack?

A.      In West Jerusalem.

Q.      Was the terrorist attack carried out?

A.      The four of them were arrested at a roadblock on their way to Ramallah.

The "additional item" is as follows:

Ahmad Abu Khadr (Witness No. 6 for the prosecution), P/17:

"In addition, we planned to carry out a suicide attack inside Jerusalem, and we sent the suicide attackers to Ramallah to get an explosive belt, but they were arrested on the way. The two who wanted to carry out the suicide attack are (1) Saadi Maqbul of Nablus, about 20 years old, a bachelor and unemployed, (2) Alaa Khalafwad, a resident of Nablus, about 20 years old, a bachelor who worked as a vehicle mechanic. Aswad was his *nom de guerre*. This was about four or five months ago. Nasser Aweis planned this terrorist attack along with me ... for us to carry out a terrorist attack in the Ministry of Defense in Tel Aviv. I talked about it with Nasser Aweis and Mahmoud Titi, and we decided to look for skilled activists who would carry out such a terrorist attack. In the end, we did not look for activists and we did not carry it out. With regard to the two suicide attackers, Saadi Maqbul and Alaa al-Aswad, who were on their way to Ramallah to get explosive belts so that they could go on to Jerusalem and carry out a suicide bombing, I talked about that in my second testimony. I would like to add a few points which I did not mention ... As I said, I filmed them with a video camera, reading the will, and I put a flag of the *Kitaab Shuhadaa al-Aqsa* behind them, and during the filming, he [sic] waved a Beretta weapon which I had given him. I gave the cassette [to] Nasser Aweis later. That night, the three of us slept in the apartment, and the next morning, I called Ayman the taxi driver – let me correct myself. I called a friend of mine named Awla

[Stamp] P 5: 271

67

Mustafa, and I asked him to send me a taxi to the apartment where I was with the young men, and he sent me a taxi driver named Ayman. When he arrived, at 10:00 a.m. the two young men got into the taxi. I asked them to call me the moment they got to Ramallah. According to the plan, I would then call Nasser Aweis and he would arrange to send the people who were supposed to supply the explosive belts to them. I forgot to mention that I gave them a hand grenade, which I had received from Nasser Aweis for them to use. The intention was to throw the grenade before blowing up the explosive belts. The two young men did not reach Ramallah; they were arrested on the way. As soon as the two young men got into the taxi, I informed Nasser Aweis."

### Count No. 7:

During the al-Aqsa intifada, on an unknown date, a terrorist whose identity is not known was arrested on his way to perpetrating a suicide attack in Jerusalem. The man was armed, with a view to intentionally causing the death of many civilians. While he was on his way to the scene of a terrorist attack, near Beit Hanina, that terrorist was arrested by policemen and shot to death.

[Stamp] P 5: 271 [continued]

Nevo Publishing Ltd.          nevo.co.il      The Israeli Legal Database

State of Israel v. Nasser Mahmoud Ahmad Aweis

According to an argument that was set forth by the State, the Defendant – who, as set forth above, was one of the senior commanders of the Terrorist Organization – entered into a conspiracy with Titi for the purpose of perpetrating a terrorist attack which was intended to intentionally cause the death of many Israeli civilians.    Within the framework of this organization, which was headed by the Defendant, and in order to carry out [the terrorist attack], the terrorist was recruited and supplied with weapons.

The admission by the Defendant is as follows:

P/6:    "Q.    Do you know a man named Luay Odeh?

A.    Yes, I met him at the al-Najah University, and he belonged to the Popular Front, and I recruited him into the *Kitaab Shuhadaa al-Aqsa* about two months ago, and the purpose of recruiting him into the *Kitaab Shuhadaa al-Aqsa* was in order for him to assist us in terrorist attacks in the Jerusalem area, and in order for him to introduce suicide attacks [*mustashahids*] into Jerusalem. I also asked Luay to teach us how to manufacture explosives that were stronger than the explosives we were using, and Luay explained to me over the phone how to produce a certain material [*umm al-abd*], and I told him that we already knew how to produce *umm al-abd* … About a month and a half ago, I asked Luay to check out a way of bringing a suicide bomber into Jerusalem, and he said that he would check it out. According to the plan, Mahmoud Titi was the one who located a suicide attacker, and my role was to coordinate between Mahmoud and Luay, in order to bring the suicide attacker into Jerusalem. That terrorist attack was carried out, but without success, because policemen shot the suicide attacker before the terrorist attack, and he was killed at the entrance to Jerusalem from the direction of Ramallah, and I do not know the suicide attacker's name."

The "item":

No direct and separate "item" was found for the admission on this count.

However, the facts which have been proven – the fact that the Defendant was a leader in a Terrorist Organization, with the purpose of perpetrating acts of violence which were intended to cause the death and injury of persons, and the fact that the Defendant had a clear motive for carrying out such acts and had an opportunity to carry them out, and even accomplished many of them, as has been proven in each of the other counts – substantiate a conclusion that the cumulative "items" which were found for each of the admissions of the other counts may be considered as the "item" required for this count. It is necessary to consider the circumstances of the matter, and, for that purpose, the series of offenses in which the Defendant was involved, as a single unit.

### Count No. 8:

According to an argument that was set forth by the State in Count No. 8:

[Stamp] P 5: 272

69

"A.      On an unspecified date after the outbreak of the al-Aqsa intifada, the Defendant entered into a conspiracy with additional activists in the Terrorist Organization, for the perpetration of shooting attacks directed against an IDF guard post which was manned with Israeli soldiers, in the vicinity of Joseph's Tomb in Nablus.

On unknown dates during the subsequent period of time, the Defendant, together with additional activists in the Terrorist Organization, perpetrated shooting attacks against an IDF position which was located in the vicinity of Joseph's Tomb.

B.       Shortly before the month of May 2001, the Defendant entered into a conspiracy with additional activists in the Terrorist Organization, for the perpetration of shooting attacks directed against an IDF guard post which was manned with Israeli soldiers, on Mt. Gerizim, and against additional IDF positions in adjacent areas.

For the purpose of promoting the objectives of the conspiracy, the Defendant supplied the additional activists who had joined the conspiracy with M-16 rifles.

During the month of May 2001, on a number of occasions, on unknown dates, the Defendant, together with additional activists in the Terrorist Organization, perpetrated shooting attacks.

The shooting attacks were perpetrated by the Defendant and the additional activists, armed with M-16 rifles, against the military position on Mt. Gerizim, against the Ein Beit camp and against army patrols which were patrolling in the area of the Balata camp, as well as against military targets in the area of the Hawara camp.

C.       On an unknown date, after the outbreak of the al-Aqsa intifada, the Defendant entered into a conspiracy with additional activists in the Terrorist Organization, for the perpetration of terrorist attacks against Israeli citizens and IDF soldiers.

Within the framework of the conspiracy and for the purpose of promotion thereof, the Defendant supplied weapons to the activists in the Terrorist Organization for the purpose of carrying out the terrorist attacks.

The activists in the Terrorist Organization, who joined forces in order to carry out the conspiracy, made use of weapons which were supplied to them by the Defendant, in the terrorist attacks set forth below:

1.      The shooting attack on the settlement of Homesh.

2.      Placing an explosive charge on the Zuata-Asira bypass road.

[Stamp] P 5: 273

70

       3.    A shooting attack with an M-16 rifle against a military patrol in Deir Sharaf.

       4.    Placing an explosive charge in Sarah."

The State goes on to claim that, in these actions, the Defendant was unlawfully attempting to cause the death of many persons, and that these actions, *inter alia*, are in the nature of a conspiracy to commit a crime, attempted murder, and unlawfully carrying a weapon.

The admission by the Defendant is as follows:

P/5A: "2.    I carried out a shooting attack directed against a military position on Mt. Gerizim in Nablus …

       3.    I carried out a shooting attack directed against military vehicles in the vicinity of the Hawara camp, near Nablus.

       4.    I carried out a shooting attack directed against military vehicles in the vicinity of Nablus, on the west side, near Zuata …"

"13.    I supplied Abd al-Rahman Abdallah with two explosive charges plus a Kalashnikov, which he placed near Kafr Sara, Nablus.

       14.    I supplied Majdi Halus with an explosive charge, which he placed on the road to Dir Sharan, against an Israeli patrol."

[Stamp] P 5: 273 [continued]

Nevo Publishing Ltd.          nevo.co.il          The Israeli Legal Database

P/6A: "yes, he participated once, together with me, in carrying out a shooting attack directed against an Israeli military position on Mt. Gerizim …"

Q.    Which terrorist attacks did you speak about with Munir Maqadah?

"A.    I spoke with him about many terrorist attacks, and I remember that I spoke with him about a shooting attack which I had carried out along with Muayad Jamil and Mahmoud al-Titi and Qahid Abu Mustafa near the Hawara camp, directed against a military vehicle. I also spoke with him about placing explosive charges in the vicinity of Zuata; I had participated in those terrorist attacks along with Muayad Jamil and Muhammad Yadak and Mahmoud al-Titi and Ahmad Abu Khadr …"

"Q.    Do you remember all of the terrorist attacks in which you participated directly?

A.    I remember. 1.  A shooting attack directed against a military position on Mt. Gerizim. 2.  A shooting attack directed against a military vehicle in the vicinity of the Hawara camp. 3.  A shooting attack directed at members of the armed forces at Joseph's Tomb. 4.  A terrorist attack at Dir Sharan. 5.  A shooting attack directed at military vehicles … 7.  A shooting attack directed at vehicles.

Q.    Can you give details about the shooting attack directed against the military position on Mt. Gerizim?

A.    Yes, about seven months ago, I participated, together with Majed al-Masri and Yasir al-Bami, in shooting about three times at a military position on Mt. Gerizim …"

"Q.    Do you have any additional details about the shooting attack directed against a military vehicle in the area of the Hawara camp?

A.    About six months ago, I participated, together with Yasir al-Badu, in a shooting attack directed at a jeep in the Hawara camp, and each of us fired about half a clip of bullets, and the soldiers fired back at us.

Q.    Can you give details about the shooting attack directed against a car, which you mentioned above?

A.    Yes, I participated, together with Yasir al-Badu and Muayad Jamil and Qaid Abu Mustafa, in a shooting attack, and we shot at a tank in the area of Hawara (the camp). We were shooting from Kafr Kalil. That day, the attack was carried out at about 4:00 p.m., and each of us fired a clip of bullets at the tank."

[Stamp] P 5: 274

72

" ... And I took two old [anti-] tank missiles from Abu Sharar in order to take the explosives out of them and to use the explosives to make explosive charges, and I used the explosive charges on the bypass road at Zuata-Asira against military vehicles.

Q.    How many charges did you make out of the missiles which Abu Sharar gave you, and how di d you use them?

A.    After I took the missiles from Abu Sharar, I gave them to Mahmoud Titi from the Balata camp, and Mahmoud made a charge out of them, and he was the one who placed the charge on the bypass road.

Q.    Do you remember when he placed the charge and whether people were hurt when the charge exploded?

A.    The charge was placed sometime during the al-Aqsa intifada; I do not remember a date, and according to the information which I received, the army blew up the charge before it exploded."

"I sent Mahdi Marqa to transport Muhammad Qassem and Muayad Jamil and Qaid Abu Mustafa, so that they could place a charge on the road, near Kafr Sara, west of Nablus. In the end, however, they did not place the charge, because it was far away. The brought the charge back and they used it in the area of Zuata against a military vehicle, and I do not know if anyone was hurt in that terrorist attack."

Q.    Did you have any contact with Majdi Halus?

[Stamp] P 5: 274 [continued]

Felony Case (Tel Aviv) 1137/02                    State of Israel v. Nasser Mahmoud Ahmad Aweis

A.    Yes.  About 10 months ago, we took a charge from them, and he placed it on the road in Dir Sharan, and he set off the charge against a military patrol."

" … And I gave him an M-16 weapon, and Yasir carried out a shooting attack with the weapon which I gave him.  The shooting attack was directed at an Israeli vehicle on the bypass road east of Nablus, and according to Yasir, the vehicle was not hit."

"Q.    Can you explain to me about the terrorist attack in Dir Sharan which you mentioned above?

A.    Yes.  About eight months ago, Majdi Samir Hulus [sic] from the Balata camp, who was living in Dir Sharan, came to me and asked me for an explosive charge to carry out at terrorist attack, and I gave him a charge that weighed 15 kg which I had received from Muayad Jamil, and the detonation was with wires.  According to what I know, Majdi placed the charge on the main road at Dir Sharan, and set off the charge at a military patrol, and caused damage to a jeep, and I do not know if people were hurt."

"A.    Yes.  A few months ago, Abd al-Rahman Abdallah, a resident of Sara, suggested to me, while he was studying at al-Najah University, that we carry out a terrorist attack in the area of Sarah, and he [sic] agreed to this.  I gave him two explosive charges and a Kalashnikov, and when I gave him the charges and the weapon, there was a person with him, named Lutfi Abdallah, a resident of Sara, and they set off the charges at a tank in the area of Hawara, and one charge exploded, and after that, they fired at the tank, and after the terrorist attack, they gave me back the weapon."

P/8:    " … And another man from Dir Sharan was with him, and Majdi asked me for an explosive charge, so as to carry out a terrorist attack on an Israeli military patrol, and I agreed, and I gave him an explosive charge which I had received from Muayad Jamil Sansur, and according to the information in my possession, Majdi carried out the terrorist attack against a military patrol in the area of Dir Sharan."

"A.    Yes.  About five months ago, Muayad Jamil introduced me to a man named Iyad who knew how to make explosives and charges, and I took five charges from him, and Mahmoud Titi and Muayad Jamil placed the charges near Zuata, and once Muayad and I went out to place a charge.  The soldiers identified us, and we ran away, and Qaid Abu Mustafa was with us, and we left the charge behind when we ran away."

The "additional item" is as follows:

Ahmad Abu Khadr (Witness No. 6 for the prosecution), P/12:

"A.    I confess that, during the month of May in the year 2001, I went out with all those persons to carry out a shooting attack directed against a military position which is located in Mt.

[Stamp] P 5: 275

74

Gerizim. On that day, Nasser Aweis gave me an M-16 weapon, and we all set out for the position. We took up a position in the Dahiya area, in Nablus, from where we fired on the [illegible, probably "military"] position, toward Mt. Gerizim. I personally fired [illegible, probably "about 20"] bullets, and each of the other people fired the weapon in his possession, at the position. This was about 10:00 p.m. And then the army started firing at us, and we fled the scene.

Q.    Did you participate in additional shooting attacks against that military position or against other positions?

A.    I confess that I participated, about six more times, in shooting attacks directed against that position on Mt. Gerizim, with the same people. In addition, I participated, about four times, in shooting attacks directed against an IDF position which is located in Jabal Shamali, above the Ein Beit Alma camp. Also, of course, I participated in shooting attacks directed against army patrols which were patrolling in the area of the Balata camp. All those times, I fired the M-16 that Nasser Aweis had given me."

[Stamp] P 5: 275 [continued]

75

P/13:

" ... And on that day, Amar told me that he intended to carry out a terrorist attack, and accordingly, he asked me to get hold of two explosive charges for him, for the benefit of the terrorist attack. I told Amar that I know [sic] how to manufacture explosive charges, and therefore I took him to Nasser Aweis, in the Balata camp, and I asked Nasser to obtain two charges for me. Then Nasser called Mahmoud Titi and asked him for two charges, and an hour later, Mahmoud Titi came and brought two charges with him, made out of a pipe 30 cm long and 40 cm wide [sic]. Each charge was closed on both sides, and there were white electric [wires] coming out of one side. After that, Amar received the charges, and each of us went home, and three days later, I heard from Amar that a terrorist attack had been carried out against a military jeep in Silat al-Dhaher, during the night, and they had set off the charges against the jeep, but nothing had happened to it."

P/18:

"A.    In my second testimony, I confessed that I – together with my friends, Fadi Abu Ali and Yasir Rakhal – we carried out two shooting attacks against the settlement of Homesh, and this ... is all true, that the three of us perpetrated shooting attacks, on four or five occasions, against the settlement of Homesh. The fire was directed against the watchtower, at the edge of Homesh, from the direction of Silat al-Ladha, and against the houses in the settlement. This took place in the course of the first three months, at the beginning of the al-Aqsa intifada. In all of those cases, we would arrive in the late hours of the night, after 10:00 p.m., and I remember that, in all of those cases, the soldiers fired back from the watchtower. I confess that I was the one who supplied them with weapons in all of the attacks mentioned above, I fired an M-16, and I gave Fadi a Kalashnikov, and I gave Yasir a Glock. I would take those weapons from Nasser Aweis, before going out on each of the terrorist attacks.

Q.    From what distance did you fire at the settlement of Homesh?

A.    From about 1 km away.

Q.    Which other shooting attacks did you participate in?

A.    Approximately in the beginning of 2001, Fadi Abu Ali and Yasir Rakhal and I fired on a security jeep in the settlement of Homesh, from about 500 meters away. This was during the late hours of the night, after 10:00 p.m. I fired an M-16, Fadi fired a Kalashnikov, and Yasir fired a Carlo – the same weapons which we had used in the previous shooting attack against Homesh, the same weapons which I had taken from Nasser Awiss. After he fired, the soldiers fired back, and we fled the scene ... A. He and I did not do anything except what I have already mentioned, but I would like to state that Hakim Jizari asked me for a weapon, three

[Stamp] P 5: 276

months ago, and claimed that he wanted to carry out shooting attacks against IDF soldiers. I agreed to his request and I gave him a Kalashnikov which I had taken from Nasser Aweis, and a week later, Hakim gave me back the weapon, and I do not know if he used it."

Witness No. 25 for the prosecution, Yasir Abu Bakr, P/47B:

"Mahmoud Fares, about 25 years old, a resident of Nablus, and Asad Ismail, about 27 years old, a resident of Beit Iba – we carried out a terrorist attack involving an explosive charge and shooting, on the bypass road near Beit Iba. When we came to the entrance to Beit Iba, I called Nasser Aweis, and he told me that he was sending us people and weapons for the terrorist attack. Half an hour later, Mahmoud Titi and Ahmad Abu Khadr came to the scene. They arrived in a white car. Each of them had an M-16 rifle, and in addition, there was a 250 machine gun in the car, as well as an explosive charge within a fire extinguisher [*atfaya*]. At about 11:30 p.m., we all went out in the white car to carry out the terrorist attack on the bypass road near Beit Iba. Asad Ismail and Ahad Mahmoud Fares placed the explosive charge on the road and connected a wire

[Stamp] P 5: 276 [continued]

77

to the explosive charge. This was a charge which was activated by wires and a battery. As soon as they had connected the wires, suddenly IDF soldiers who were staked out there opened fire on them. Ahad was killed and Asad was wounded in the leg. Mahmoud Titi and Muhammad [sic] Abu Khadr fired at the IDF soldiers. After that, Mahmoud Titi and Muhammad [sic] Abu Khadr and I fled the scene."

Witness 21 for the prosecution, Muhammad Yadak, P/40A:

"A. In the beginning of the al-Aqsa intifada, [illegible, probably "I participated" or "they participated"] in stone-throwing activity directed at Joseph's Tomb in Nablus, and at the [illegible, probably "military"] forces in Nablus. In June [20]02, Mahmoud Titi contacted me and said that he was planning to set up a military squad belonging to Tanzim Fatah. He suggested that I enlist in the military squad, and Mahmoud said that the purpose of setting up the squad was to carry out terrorist attacks against the Israeli army in the Nablus area. I agreed to this and, within the framework of the military squad, I participated in 10 shooting attacks directed against the army in the Nablus area. Participating in the shooting attacks along with me were (1) Mahmoud Titi, (2) Ahmad Abu Khadr, (3) Nasser Aweis, about 35 years old, from the Balata camp, who was in charge of the Tanzim in Nablus …

Q. Who used to plan and prepare for the perpetration of the terrorist attacks in which you participated?

A. Nasser Aweis was the one who used to plan for the perpetration of the terrorist attacks, and he was the one who used to supply us with the weapons.

[Q.] Which Israeli military positions did you shoot at?

A. We carried out shooting attacks directed against a military position on Mt. Alana. We also fired at the settlement of Elon Moreh, and we also fired at the Saqen roadblock near Hawara …

The second terrorist attack, in August 2001: Nasser Aweis contacted me [and] Mahmoud Titi and told us that young men from the Tanzim wanted to place an explosive charge on the bypass road in the area of Beit Ira, and he asked me and Mahmoud Titi to participate in the terrorist attack and to place the charge along with the young men … The tenth terrorist attack was a shooting attack directed against the funeral … The funeral [procession] went from Hawara to Yitzhar, and when they got to the entry to the Hawara camp, Nasser Aweis and Yasir al-Kadawi and Mahmoud Titi and I fired at the participants in the funeral. The army fired back, and Nasser and Mahmoud and Yasir and I fled the scene and headed toward the camp …"

The facts contained in the charges were proven.

[Stamp] P 5: 277

Nevo Publishing Ltd.          nevo.co.il          The Israeli Legal Database

Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

### The offenses of murder, attempted murder, causing severe bodily harm and attempt to cause severe bodily harm

The State ascribes to the Defendant offenses of murder with malice aforethought in the first five counts; offenses of attempted murder in all of the accounts; offenses of causing bodily harm with aggravated intent in the first five counts; the offenses of attempt to cause severe bodily harm in Counts No. 6 and No. 7.

With regard to these offenses, a question arises as to the status of the Defendant.

Section 29 (a) of the Penal Code, 5737 – 1977, tells us that a person who perpetrates an offense together with or through another person shall also be considered as the perpetrator of the offense.

[Stamp] P 5: 277 [continued]

Nevo Publishing Ltd.          nevo.co.il     The Israeli Legal Database

It has been proven to us that the Defendant's mental attitude to these offenses is beyond all doubt. The Defendant wanted and desired to achieve the results of the criminal actions, with every fiber of his being, and was the motivating force in the implementation of a joint plan, carried out together, to intentionally cause the death and injury of his victims, as has been proven.

There cannot be even the slightest doubt that he is the perpetrator of the offenses (see Criminal Appeal 4389/93, Mordechai Vabudi v. the State of Israel, PD 50 (3) 239 and the rulings mentioned there; see also Criminal Appeal 2796/95, John Doe v. the State of Israel, PD 51 (3) 388).

The factual infrastructure which has been revealed to us attests to the fact that the acts of murder were carried out, from beginning to end, with malicious intent, based on the decision and the purpose of causing death, founded on cold blooded thought, controlled behavior and settled mind, and following precise and scrupulous preparation.

We do not have even the slightest doubt that the fundamental elements for the offenses of murder with malice aforethought have been fulfilled, the offenses have been proven, and – as set forth above – the Defendant carried them out.

Obviously, the fundamental elements for the offenses of attempted murder have also been properly proven.

The Defendant's plan of intentionally causing the death of many civilians, and the implementation of that plan as described above, as it has been proven, substantiates the fundamental elements of the less severe offenses of causing bodily harm with aggravated intent and attempt to cause bodily harm with aggravated intent. These offenses as well have been properly proven.

### Unlawfully carrying a weapon

The State also ascribes to the Defendant offenses of unlawfully carrying a weapon, in Counts No. 2, 3 and 8.

It has been proven that the Defendant carried, without a permit under any law, M-16 rifles, ammunition and hand grenades, which are in the nature of "weapons," as this term is defined in Section 144 (c) of the Penal Code, 5737 – 1977. The Defendant has confessed to this, as set forth above, and has also confessed that he used the weapons. It is enough for us to mention that which has been set forth in his statements, as follows:

[Stamp] P 5: 278

Nevo Publishing Ltd.          nevo.co.il          The Israeli Legal Database

"I supplied Said Ramadan with weapons for the perpetration of a suicide attack within Jerusalem … I supplied Abd al-Salaam Hasuna with weapons for the perpetration of a suicide attack within Hadera." (See P/5)

See also the Defendant's confession to the shooting attacks described in detail in Count No. 3, as set forth above.

Because the terrorists Said Ramadan and Abd al Salaam made use of the weapons inside Israel, as has been proven above, and because the facts of Count No. 8 have also been proven, it appears that the fundamental elements of the offenses of possession of weapons have also been proven as required.

[Stamp] P 5: 278 [continued]

81

Nevo Publishing Ltd.          nevo.co.il      The Israeli Legal Database

Felony Case (Tel Aviv) 1137/02             State of Israel v. Nasser Mahmoud Ahmad Aweis

### Summary

Having found that the State has proven all of the actions that have been attributed to the Defendant in the indictment, according to the burden of proof that is incumbent upon it to do so beyond all reasonable doubt, we hereby convict the Defendant of the following offenses:

Membership and activity in a terrorist organization, in contravention of Sections 2 and 3 of the Prevention of Terrorism Ordinance, 5708 – 1948.

Conspiracy to commit a crime, in contravention of Section 499 of the Penal Code, 5737 – 1977.

Premeditated murder, in contravention of Section 300 (a) (2) of the Penal Code, 5737 – 1977.

Attempted murder, an offense in contravention of Section 305 (1) of the Penal Code, 5737 – 1977.

Causing bodily harm with aggravated intent, in contravention of Section 329 (1) of the Penal Code, 5737 – 1977.

Attempt to cause severe bodily harm, an offense in contravention of Sections 329 (1) of the Penal Code, 5737 – 1977.

Unlawfully carrying a weapon, an offense in contravention of Section 144 of the Penal Code, 5737 – 1977.

_____
**O. Salomon-Czerniak**
**Judge**

### Judge S. Timan, Presiding Judge, and Judge N. Achituv:

We have read the detailed and well-founded opinion by our colleague, the Honorable Judge Czerniak, and we concur with the conclusion that has been reached by her.

_____    _____
**S. Timan**          **N. Achituv**
**Presiding Judge**   **Judge**

[Stamp] P 5: 279

82

Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

It has accordingly been decided to convict the Defendant of all of the offenses ascribed to him in the indictment, as set forth in the opinion by the Honorable Judge Czerniak.

_____    _____    _____
S. Timan, Presiding Judge   N. Achituv, Judge    O. Czerniak, Judge

Handed down and notified on this day, 29 Nisan 5763, May 01, 2003, in the presence of Counsel for the parties and the Defendant.

This version is subject to changes in editing and phrasing.

[Stamp] P 5: 280

Nevo Publishing Ltd.        nevo.co.il     The Israeli Legal Database

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

MARK I. SOKOLOW, *et al.*,

                  Plaintiffs,

                                  No. 04 Civ. 00397 (GBD) (RLE)

vs.

THE PALESTINE LIBERATION
ORGANIZATION, *et al.*,

                  Defendants.

## DECLARATION OF RINA NE'EMAN

Rina Ne'eman hereby certifies as follows:

1.     The attached translation from Hebrew to English is an accurate representation of the document received by Rina Ne'eman Hebrew Language Services, to the best of my knowledge and belief. The document is designated as P 5:237-280.

2.     I am a professional translator with a B.A. in International Relations from the Hebrew University of Jerusalem (Israel) and 30 years of translation experience. I am fluent in Hebrew and English, and I am qualified to translate accurately from Hebrew to English.

3.     To the best of my knowledge and belief, the accompanying text is a true, full and accurate translation of the Hebrew-language document designated bearing the bates number P 5:237-280.

Dated: March _6_, 2014

                                                  Rina Ne'eman

ss.: New Jersey

On the _6_ day of March, 2014 before me, the undersigned, personally appeared Rina Ne'eman, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is signed to this Declaration and acknowledged to me that he executed the same in his capacity, and that by his signature on this Declaration, the individual executed the Declaration.

Sworn to me this
_6_ day of March, 2014

_Leonor Troyano_
Notary Public

LEONOR TROYANO
ID # 2365530
NOTARY PUBLIC OF NEW JERSEY
Commission Expires 8/12/2014

בתי המשפט

| בית משפט מחוזי תל אביב-יפו | | פח 001137/02 |
|---|---|---|
| כב' השופט ש' טימן - אב"ד<br>כב' השופטת נ' אחיטוב<br>כב' השופטת ע' סלומון-צ'רניאק | | 01/05/03 |

בפ<br>ני:

בעניין : מדינת ישראל

ע"י ב"כ עוה"ד        דבורה חן ותמר אניס

נ ג ד

הנאשם    נאסר מחמוד אחמד עוויס

ע"י ב"כ עו"ד        בולוס

המדינה טוענת כי ארגונים אלה הם ארגוני טרור על פי הגדרתם בפקודה למניעת טרור והנאשם אשר מילא בהם תפקיד בכיר כמתואר, יזם, ארגן והפעיל מעשי פיגוע רצחניים כנגד מטרות ישראליות במדינה ובאיו"ש ופעילותו כללה בין השאר גם רכישה וייצור של אמצעי לחימה מסוגים שונים והעברתם בין במישרין ובין בעקיפין לידי המחבלים שביצעו בפועל את הפיגועים מטעם הארגון הטרוריסטי.

**הכרעת דין**

**השופטת ע' סלומון-צ'רניאק:**

**האישום**

המדינה טוענת כי בתקופה הרלבנטית לאירועים המתוארים בכתב האישום, היה הנאשם מפקד אזור שכם וצפון השומרון של ארגון תנזים-פתח וכן מפקד ארגון "כתאאב שהדאא אלאקצא" (גדודי חללי אל אקצא) באזור זה.

המדינה טוענת כי ארגונים אלה הם ארגוני טרור על פי הגדרתם בפקודה למניעת טרור התש"ח-1948 והנאשם אשר מילא בהם תפקיד בכיר כמתואר, יזם, ארגן והפעיל מעשי פיגוע רצחניים כנגד מטרות ישראליות במדינה ובאיו"ש ופעילותו כללה בין השאר גם רכישה וייצור של אמצעי לחימה מסוגים שונים והעברתם בין במישרין ובין בעקיפין לידי המחבלים שביצעו בפועל את הפיגועים מטעם הארגון הטרוריסטי.

1

C:\Users\Owner\Desktop\to bates stamp\Nasser Aweis Conviction.doc

P 5: 237