
PLAINTIFF'S
EXHIBIT
384

**Date: June 2, 2005**                                1                        **Case No.: 5398/03**

### The Military Court

### Samaria

### – **Transcript** –

| | | |
|---|---|---|
| Court hearing:<br>June 6, 2005 | Before a panel: | Lt. Col. Erez Hasson – **President of the Court**<br>Major Eliyahu Nimni – **Judge**<br>Captain Erez Seri - **Judge** |

Prosecutor: Captain Irit Deitsh

Defense Counsel: Adv. Darawshe

**Defendant: Majed Ismail Mohamed Masri, Identity No. 904460862**

Stenographer: Sergeant Alina

Interpreter: Sergeant Baha

**- The President of the Court has identified the Defendant -**

## Verdict

Owing to the large scale of this case, the arguments for the verdict are still being written. However, we shall now provide a summary of the verdict.

We have seen fit to convict the Defendant of the offenses that have been attributed to him in the indictment, with the exception of Count No. 4, which the prosecution has withdrawn. The Defendant is convicted of the following offenses:

**Membership in an illegal organization**, an offense pursuant to Regulation 85(1) (A) of the Defense Regulations (Time of Emergency), 1945.

**Holding of an office**, an offense pursuant to Regulations 85(1) (B) of the Defense Regulations (Time of Emergency), 1945.

**Shooting at a person**, an offense pursuant to Section 58(A) of the Defense Regulation (Time of Emergency) 1945.

[Stamp] P 6: 11

**Attempt to shoot at a person**, an offense pursuant to Section 58(A) of the Defense Regulation (Time of Emergency) 1945 and Sections 19, 20 of the Rules of Liability for an Offense Order (Judea and Samaria (No. 225), 5728-1968.

**Causing intentional death**, an offense under Section 51 of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 **(10 counts)**.

**Attempt to cause intentional death**, an offense under Section 51 of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Sections 19, 20 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968 **(3 counts)**.

**Conspiring to cause intentional death**, an offense under Section 51 of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Sections 21, 22 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

It shall be clarified that on the matter of the primary counts of the indictment, i.e. the offenses of murder, the Defendant is convicted as a primary accomplice, in view of his senior status in the organization; the fact that he was involved in operative stages of executing the murders, including the filming of the suicide terrorist; financing the attack and delivering the weapon that was used in it.

Issued and notified this day, June 2, 2005, in public and in the presence of the parties.

| [Signature] | [Signature] | [Signature] |
|:---:|:---:|:---:|
| **Judge** | **President of the Court** | **Judge** |

[Stamp] P 6: 11 [continued]

2

**Date: June 2, 2005**                                 **2**                                 **Case No.: 5398/03**

**Evidence for sentencing**

P: There is no evidence for sentencing.

D: There is no evidence for sentencing.

**The Prosecutor summates**:

Today, the Defendant is standing trial for his responsibility as the primary perpetrator of the act of causing the deaths of 10 human beings. Alongside this, the Defendant has been convicted of severe, extensive security activity, actions which, when examined, make clear the single aim and purpose of his determination – the taking of human life. While the Defendant is the last to stand trial, after all the "protagonists", i.e. the perpetrators of the attack in Metzer and in Hermesh, to my mind, in many respects, he may be considered the first and foremost of them.

As an aspect of the severity, it is not possible to ignore his senior status in the Tanzim Organization. We have learned to our regret that although terrorism often strikes out against random victims, it also has its own rules, or to be more precise, interests, which involve cynicism surrounding human life. It is often convenient to carry out one particular attack or another, on a certain occasion, with certain timing, in a certain settlement, on either side of the Green Line. Here, in the view of the prosecution, the Defendant had a pivotal role in passing judgment of sorts on the lives of future unknown victims; if he wanted it, a murder would be carried out; if he did not, the lives of the victims would be spared.

I shall emphasize that prior to the attack in Hermesh, the explicit consent of the Defendant was required for arch-murderer, Mohamed Naifa, to carry out the attack. The consent of the Defendant was given, and only afterward did the next stages take place, which as we might recall led to the death of three human beings. The Defendant went further after carrying out the attack; possibly as a sign of its success, the Defendant transferred money to Mohamed Naifa, exactly because of the "success" of the attack. And if anybody wonders at this, this is no accident, as the Defendant served in a capacity in which he transferred money on different occasions and with routine regularity to key operatives in the organization.

The action of the Defendant had a pivotal contribution to the commission of the attack in Metzer too, as he was the one who effectively transferred the weaponry to the murderers involved. Regarding this contribution it is certainly not necessary to describe at length the causal relationship between his acts here and the outcome.

[Stamp] P 6: 12

With respect to the attack in Jaffa Street in Jerusalem, the Defendant served as the photographer of the suicide terrorist prior to his departure for the attack. The prosecution asserted on more than one occasion before this Honorable Court the cardinality that it finds in this action. I shall briefly emphasize that another severe aspect of the suicide attacks that were unleashed against us is the media coverage that follows them, whose effect is intimidation, incapacitation and sowing of terror in the lives of every Israeli, whoever and wherever he may be. The death images of those suicide attackers are a major contributing factor in that they serve as a graphic example to people who will follow in their footsteps. Moreover, the prosecution contends that the act of photographing [the perpetrator] serves to facilitate directly, in the end, the commission of the offense itself by that suicide attacker inasmuch as this act constitutes encouragement of that suicide attacker and reinforces his decision to depart to carry out the attack.

The prosecution will refer in this matter its pleadings in the case of Iad Nasser, Court Case 5572/03. In that case, the Defendant was sentenced to life imprisonment, but not for the reason that the prosecution requested, which was participation in the photographing of the suicide attacker, but due to the many offenses that were attributed to him. However, I must point out that the prosecution filed an appeal against his case and it is still pending in the Appellate Court.

I also wish to refer to the case of Kamil Shaablu, who was tried in this Court, in which the Court accepted the position of the prosecution with respect to the genuine contribution of the act of the photographing of the suicide attacker.

Today, a circle has been closed. The blood of the victims of the Defendant calls out to the Court and the prosecution will request that he be sentenced to 10 consecutive terms of life imprisonment for each life that he has taken. The prosecution will also request another term of imprisonment, set in years, for the other offenses for which the Defendant has been convicted.

[Stamp] P 6: 12 [continued]

4

**Date: June 2, 2005**                          **3**                          **Case No.: 5398/03**

<u>**Defense counsel summates**</u>:

The Defendant has denied all along everything that has been attributed to him in the indictment, but his conviction today before the Court constitutes a grievous blow to the Defendant and to his family. The Defendant, in the direct examination and cross examination in the Court and in his interview by the police alike condemned acts of violence against the State of Israel.

This is a defendant who has been subjected to a miscarriage of justice in the legal proceeding before the Court.

The Defendant is a 32 year old man. He is the sole supporter of his family, and has two children. His wife is here and his sick mother is with us too. The Defendant has a great deal of debts and a mortgage. Prior to the event that is the object of the indictment, the Defendant worked as an officer in the Palestinian Police. He worked with devotion and loyalty. The financial situation of the Defendant is very bad. His small children are learning at school and they need their father to support them financially and it is important for their father to with them.

The Defendant is a sick man; he has problems with his legs.

I have other arguments, as I have not yet received the reasons. The Defendant has no blood on his hands – that is what he has contended throughout the proceeding. Even the conduct of the Defendant is not like that of the other defendants, who would have admitted the acts that they had committed, but the Defendant is not doing this.

We ask for the Court to consider the circumstances.


Defendant:

I have brought the evidence to the Court form the outset. The prosecution has sealed my fate from the outset. I have said that I am not scared, except of God alone, and that I am against the murder of Israeli and Palestinian civilians. I was an officer in the Palestinian Police and I have been framed by car thieves. I have respected the Court until now. I hope that you take into account all these things; you care for your children; I have children, too.

[Stamp] P 6: 13

**Date: June 2, 2005**                                   **4**                                   **Case No.: 5398/03**

## Sentence

The Defendant has been convicted, as set forth in the verdict, of the offenses that are attributed to him in the indictment (except for the fourth count, which the prosecution withdrew). This is a list of vicious, grave offenses, of unparalleled severity, which reveal the responsibility of the Defendant for the murder of ten human beings, and a list of additional offenses, including attempt to cause intentional death, shooting and more.

The Defendant assumed the function of the head of the Al Aqsa Brigades in the Nablus area, in which capacity he orchestrated many attacks that were dispatched under his guidance, with his financing, with his blessing and using weapons that he had provided.

The Defendant was involved in a series of suicide attacks, in which he and his fellow bloodthirsty organization members dispatched one suicide attacker after another, who sowed murder and death in the streets of Israel's cities. The facts of the indictment, for which the Defendant was convicted, describe at length the detailed stages that preceded the dispatch of the murderers to the scene of the carnage.

The Defendant, in his senior role, was the one who orchestrated this shameful death industry and gave instructions to the operatives who answered to him to send attackers to mass murders. However, the Defendant did not make do with a merely "ministerial function", but was also a full accomplice in dispatching the actual attackers, including the photographing of a suicide attacker in one case, the financing of another attack and the supplying of the instruments of murder in a third event.

This is the place to emphasize facts that also arise in the verdict, that the full responsibility of the Defendant for the acts is also learned both from the degree of his "operative" involvement, and his senior status that arises throughout the evidence material. It has been found that in the Nablus area, the Defendant handed down judgment on matters on life and death, and exploited his authority over others to dispatch murderers. The Defendant is the one who hastened to take responsibility for the murders before the media, as well.

[Stamp] P 6: 14

The Defendant is the one who is responsible, along with his fellow murderous gang members, for the bloody attack in Jaffa Street in Jerusalem, in the settlement of Hermesh and in Kibbutz Metzer. As a result of his acts, ten human beings met their deaths, including two small children in Kibbutz Metzer, whose mother was murdered with them; two residents of the kibbutz, girls who were murdered a short distance from their home in the settlement of Hermesh; and women who walked down the street in Jaffa Street in Jerusalem. The bloody attacks in Jaffa Street, in the settlement of Hermesh and in Kibbutz Metzer shocked the country with their cruelty and vileness

The Defendant did not put an end to his acts, even when his victim count increased, and even when the ages of the victims decreased. In the wake of the murder of little children, the Defendant did not rest from his acts and continued to spin the webs of death through his acts. The Defendant unhesitatingly ordered the human animal, the murderer Sirhan Sirhan, to carry out another murder, which fortunately was not completed.

Indeed, apart from the many murders for which he has been convicted, and apart from the injuries that he has caused to those who survived the terrible attacks of the attackers whom he dispatched, the Defendant also engaged in acts of shooting and attempted shooting.

[Stamp] P 6: 14 [continued]

**Date: June 2, 2005**                              **5**                              **Case No.: 5398/03**

As we have stated in the verdict, we have found that the role of the Defendant is one of a full accomplice. Indeed, the fact that the Defendant acted with cowardice and hid behind the video camera and dispatched others to kill and be killed, that he hid behind orders that he gave to others, that he wrapped his cowardice in wads of money, that he took responsibility for the acts of others, the fact of the cowardice of the Defendant does not mean that he will escape the sentence that befits him and others like him. The Defendant is fully responsible for the deaths of ten innocent human beings, and he shall not evade his culpability with respect thereto.

**We sentence the Defendant to 10 consecutive sentences of life imprisonment.**

**Right of appeal pursuant to law from the day of provision of the reasons for the verdict to the parties**

Issued and notified, February 6, 2005, in public and in the presence of the parties.

| [Signature] | [Signature] | [Signature] |
|:---:|:---:|:---:|
| **Judge** | **President of the Court** | **Judge** |

[Stamp] P 6: 15

8

Date: June 28, 2005                    1                    Case No.: 5398/03

## The Military Court

### Samaria

### - Transcript –

Before a panel:    Lt. Col. Erez Hasson – **President of the Court**
Major Eliyahu Nimni – **Judge**
Captain Erez Seri - **Judge**

Prosecutor: Captain Irit Deitsh
Defense Counsel: Adv. Darawshe

**Defendant: Majed Ismail Mohamed Masri, Identity No. 904460862**

**- The President of the Court identifies the Defendant -**

## Verdict

**The charges and the arena of the dispute**:

On February 6, 2005, we handed down the verdict of the Defendant and sentenced him. As promised, our full reasons for the verdict are as follows.

A grave and lengthy indictment was filed against the Defendant, regarding both the severity and the scope of the offenses. The Defendant is charged with having served in 2002 as the head of the Al Aqsa Brigades in the Nablus area, in which capacity he orchestrated the execution of a number of attacks – including the bloody attack on Jaffa Street in Jerusalem, in the settlement Hermesh and in Kibbutz Metzer – in which 10 people met their deaths, including two toddlers and their mother, and dozens of others were injured. The Defendant is also charged with acts of shooting and attempting to shoot at a person and conspiring to cause intentional death.

The Defendant pled not guilty to all the charges attributed to him, both in his answer to the indictment and (for most charges attributed to him) in his police interview, and the indictment against him is based on many incriminatory statements made by his colleagues and fellow organization members and murderers. It must be noted initially that the central issue in this case pertains to the identification of the Defendant, who is usually referred to by his colleagues as "Bazbaz" – which alias the Defendant denies.

[Stamp] P 6: 16

1

Alongside the Defendant's denial of his involvement in the acts of murder, there is no genuine dispute concerning the occurrence of the events (in view of the consent of the defense to the submission of the technical evidence material[1]), or, it seems, concerning the part of the other persons involved, most of whom have already been tried and convicted for their acts.

### The evidence:

### The statements of the Defendant:

The witness before us, First Sergeant Matanes Hadad, took two of the statements of the Defendant. His testimony indicates that the interviewing of the Defendant took place in an ordinary manner. Indeed, no procedural arguments were made by the Defendant, not in the general sense or towards the witness Hadad in particular, and the defense also consented to the submission of the statements of the Defendant that were taken by the witness.

In its summations, the defense asked that it be determined that the statements of the Defendant should be given less weight, owing to the fact that the statement was not written in Arabic, that it had not been recorded and that the witness did not conduct an identity line-up involving the Defendant.

[Stamp] P 6: 16 [continued]

---

[1] See transcript of September 2, 2003, page 1.

**Date: June 28, 2005**                    **2**                    **Case No.: 5398/03**

We have not seen fit to accept the arguments of the defense in this regard. A reading of the two statements of the Defendant makes it clear that the Defendant was offered a chance for his statements to be written in his own handwriting, but he refused to do so, and also refused to sign [them]. It shall be noted that in the first statement, the Defendant also explained this refusal by saying that he did not "recognize the legality of the judicial proceedings of the Israeli occupation". It shall be further noted that the act of the offer to write the statement and the refusal thereof were carried out by police investigator Hadad in the presence of his colleague, First Sergeant Lutuf Marai. In view of these things, it is not clear what the advantage of writing the statement in Arabic or Hebrew would have been.

The Defense Counsel did not show us the statutory source of the alleged duty of the investigator to record the interview and why the statement should allegedly be disqualified for this reason. An inspection of the statements and the testimony of the statement taker indicates that the conditions of the "Regulations of Judges", which assess the admissibility of statements, were upheld, including giving a warning as required by law, giving an opportunity to write and sign the statement, reading out the translated statement at the end of the interview and so on. The recording of the investigation is not a condition for the admissibility of the statement according to the laws of the Area, and does not diminish its weight.

Concerning the identity line-up, as the Prosecutor declared[2], the taker of the statement was not in charge of the overall interviewing of the Defendant, and questions on the alleged deficiencies in the interviewing must be addressed to his investigators. We shall attend to the issue of the duty of conducting an identity line-up below.

Concerning the weight of the statements, we have not found any reason to give them less weight. On the contrary, the statements indicate that the interview was conducted in a positive atmosphere, during which the Defendant was also offered a cup of tea and a cigarette and he went out for lunch.[3] The Defendant confirmed that he felt well. In the statements, the Defendant confirmed his relations with the other witnesses of the prosecution, who will be discussed below.

[Stamp] P 6: 17

---

[2] *Ibid*, page 2 lines 22-24.
[3] See **P / 1**, page 2 line 1; page 5 lines 25-26.

3

The Defendant gave detailed descriptions of money transfers that he made, his relations – which had ups and downs – with other operatives, addresses of websites that he used and other such details that seemed to have come from firsthand knowledge.

Concerning the arguments of the defense in its summations whereby "the Defendant denied that which was attributed to him in the indictment, cooperated with his investigators in his police interview, gave full details and full information, but throughout his interview by the police and his examination in the Honorable Court, the Defendant did not admit the acts that were attributed to him" (Section C of the summations of the defense) – it would have been better for these words, which are completely detached from reality, never to have been written, inasmuch as a simple reading of the statement would have spared the defense the need to write them.

In conclusion – we have seen fit to accept the statements of the Defendant and give them full weight.

**Prosecution witness Mohamed Naifa**:

The witness Mohamed Naifa testified before us on September 2, 2003, and his testimony effectively consisted of the direct examination only, in view of the refusal of the witness to continue his testimony, as set forth on page 6 of the transcript on that day. There is no genuine dispute that he was the person responsible for the bloody attack in the settlement Hermesh and in Kibbutz Metzer.

First, we must address the argument of the defense that the Defendant has fallen victim to a distortion of justice insofar as the cross examination of the witness was not completed and that in such a state of affairs his statements must not be admitted pursuant to Section 10 A. Indeed, the witness was brought in to give testimony and the Court and the parties convened in order to hear his testimony in full. This testimony was interrupted solely due to the wish of the witness, who refused to continue to answer the questions that he was asked. The Court took a list of steps in order to continue the hearing of the testimony, including calling the Defense Counsel of the witness, but the witness persisted with his defiance (see the course of events on pages 6-7 of the transcript of that hearing, including our decision that ended the testimony).

[Stamp] P 6: 17 [continued]

4

It is well known that since the Supreme Court handed down its famous verdict on the matter of Haj-Yahya, in Additional Criminal Hearing 4390/91, **State of Israel v. Haj Yahya**, PD 47 (3) 661, there has been a rule in effect concerning the status of "the silent witness", a rule which was handed down by an expanded panel of justices of the Supreme Court, which also considered a silent witness to be a witness whom the parties were given an opportunity to examine. As a result, the way is open to filing his statements according to Section 10 A of the Evidence Ordinance. See also on this matter **Judea and Samaria Appeal 114+99/00**, which is also referred to in our decision on that day. The Defense Counsel cited in his summations a list of references from which it may, according to his claim, be learned that in the absence of a cross examination, the weight of the testimony should be canceled altogether, but these are very old judgments, from the 1970s and earlier, all of which were before the Haj-Yahya rule was accepted, and some of which were handed down even before the amendment to Section 10A of the Evidence Ordinance was passed.

[Stamp] P 6: 17 [continued]

**Date: June 28, 2005**                          **3**                          **Case No.: 5398/03**

The other conditions underlying Section 10A have been fulfilled, including the fact that the witness confirmed the giving of his statements[4] and the existence of material contradictions between the testimony and the statement (the Prosecutor stated a long list of contradictions in her summations without the defense having disputed this in its summations. We must mention, for example, the differences in accounts between the testimony and the statement concerning the identification of the Defendant, the background to receiving the sum of $3,000 from him and more).

After we found that the conditions for the admissibility of the statements of Mohamed Naifa pursuant to Section 10A of the Evidence Ordinance had been fulfilled, we also saw fit to prefer the statements of the witness over his partial testimony before us. We shall explain why below:

- Firstly, it is important to point out in general that even from the partial, arbitrary testimony of the witness before us, the witness confirms the highlights of his incrimination of the Defendant in his statement. The witness confirms in his testimony before us, albeit after being evasive several times, that he had received[5] a weapon from a person called "Bazbaz" and had also received from him an amount of $3,000 after the Hermesh attack. However, the witness contended that the Defendant was not the same Bazbaz, but this does not add or diminish anything, because his testimony does not indicate that he had met that "Bazbaz" in any case, but contacted him based on a telephone number that he had received by way of inheritance from Raed Karmi, when he took his place as the head of the Al Aqsa Brigades in the Tulkarm area. He did not receive the weapons and money from "Bazbaz" directly either, but through couriers. This account of the Defendant's, in his statement, albeit partial, also indicates that the transfers of money and weapons from him to the witness were through couriers. This means that even based on the limited account of the witness, his incrimination of the Defendant still remains unchanged.

[Stamp] P 6: 18

---

[4] See transcript of the statement of Mohamed Naifa dated September 2, 2003, page 5 lines 14-30.
[5] *Ibid*, page 3 line 46 to page 4 line 13; page 5 lines 42-45.+

6

- In his various statements, the witness elaborates further than the limited account that he provided in his partial testimony before us. We have seen fit to accept the statements of the witness. Inspection of the statements reveals them to be of very great weight. The witness wrote one of the statements in his own handwriting and started to write the other one, but stopped writing it of his free will. The statements were given by the witness after he was duly warned and he signed the bottoms of the statement pages. In the statements, the witness assumes responsibility for vicious, terrible murderous acts, while providing extensive details on the circumstances that preceded their execution. A comparison of the content of the statements to the rest of the evidence material before us, including the statements of the Defendant, which confirms his acquaintance with the witnesses and the transfer of the weapon and the money to him, further supports the weight of the statements of the witness.

Therefore, we have seen fit to accept the statements of the witnesses, both by virtue of the adoption of their content in general, by the witness during his testimony, and by virtue (to the extent that this relates to the contradictions between the account of the witnesses and the written content of his statements) of Section 10A, for the reasons set forth above.

**Prosecution witness Mansour Sharim:**

This witness, who testified before us on November 30, 2003, also bears his share of guilt and is also responsible for a list of vicious murders.

Firstly, we shall address the issue of the request of the prosecution in its summations to accept the statement of the witness pursuant to Section 10A. The request of the prosecution indicates that it had forgotten to submit the statement during the hearing of June 14, 2004, and it now wishes to correct the error. The Defense Counsel objects to submission of the statement at present, because the request is being made after the end of the prosecution case and this represents infringement of the defense of the Defendant.

[Stamp] P 6: 18 [continued]

We can only address, once again, the reference **Judea and Samaria Appeal 114+99/00**, which was mentioned earlier in this verdict in another context, and is also cited by the learned prosecution in its summations. The Appellate Court cites the well-known statements of the late Honorable President Zamora, which seem to have found their place in the pantheon of criminal procedure since having been uttered – as early as in the first criminal appeal that was heard by the Supreme Court of the State of Israel!! Indeed, President Zamora tells us that a criminal procedure is not the same as a chess game in which one wrong move is enough to settle its outcome forever. The Appellate Court has recognized the possibility of summoning witnesses or filing evidence on the part of the prosecution after the end of the procedural stage, even if this means that such motions may be permitted restrictively, even if the prosecution must avoid this, subject to the qualification that this must not impair the defense of the defendant.

In the circumstances of the matter before us, we have not seen a reason to believe that accepting the request of the prosecution, even in the summations stage, is wrong in any way. **First,** there is no doubt that the request of the prosecution was made in good faith and not out of improper tactics. An inspection of the transcript of the hearing of June 14, 2004 will reveal that the prosecution had filed a list of motions for submitting material pursuant to Section 10

[Stamp] P 6: 18 [continued]

8

**Date: June 28, 2005**                           4                    **Case No.: 5398/03**

A, and there is no doubt that the motion to file the statement of the witness Mansour Sharim had been forgotten inadvertently. **Second**, the request of the prosecution is unsurprising. The prosecution heard the testimony of the witness Mansour Sharim, confronted him with his words in the statement, announced in advance and using clear words its intent to hear the testimony of the taker of his statement Ya'akov Barazani[6], and also heard the testimony of the taker of the statement concerning the circumstances in which the statement was taken (a course that has no other explanation except its wish for the statement of the witness to be submitted pursuant to Section 10A). **Third**, the late motion to submit the statement of Mansour Sharim constitutes no impairment of the defense of the Defendant. The witness testified and was examined by the parties, including a cross examination by Counsel for the Defendant. The Defendant was also given an opportunity to examine the taker of his statement. The Defendant also related in his testimony[7] in the case of the defense to the incrimination of Mansour Sharim **in his statement** and gave an account concerning it. The motion for filing the statement of the witness represents no impairment of the defense of the Defendant.

Having crossed the hurdle of the procedural stage for the filing of the motion, we quickly discover that the conditions prescribed beside Section 10A for admitting the statement are fulfilled in their entirety, for the witness had testified and the parties were given an opportunity to examine him, the giving of the statement was demonstrated, both in the testimony of the witness who identified his statement and the testimony of the taker of the statement, and in view of the existence of material contradictions between the statement and the testimony. We shall now address the question of whether there is reason to prefer the statement over the testimony. Our answer to this question is affirmative and our reasons are as follows:

[Stamp] P 6: 19

---

[6] See transcript of March 30, 2004, page 11 lines 22-23, where it says "taker of the position of Mansour Sharim", should be "statement"

[7] See transcript of the testimony of the Defendant dated June 14, 2004, page 10, lines 12-17

A.  The testimony of Mansour Sharim was also confused to the extent that he was requested to give an explanation for the explicit phrases that incriminated the Defendant in his statement, phrases which he asked not to repeat during his testimony. The witness confirmed that he had signed the statement and that the investigator had also read out its content, but asserted his argument that the investigator had written things that were different to what he had said himself when taking the statement. The witness also purported to state with skepticism that the investigator had added things to his statement after it was written before him, but in answer to the question of the Prosecutor, he was not able to elaborate what these things were.

B.  It is best not to discuss the weight of the witness' denial of the things stated against the Defendant in his statement, which was given during the cross examination while the witnesses was parroting answers to a series of blatantly leading questions in accordance with the account that the Defense Counsel put into his mouth.[8] Strangely, without an explanation except for the desire to repeat the account that had been prepared in advance, the Defendant was transformed, during the testimony of Mansour Sharim, from a friend (in the direct examination) to a bad cop (in the cross examination), who had arrested him for the theft of vehicles and treated him roughly, which caused the witness to nurse hard feelings – which account, unsurprisingly, would recur a few sessions later in the statement of the Defendant. Needless to say, these things did not ring true to us in any way.

C.  The witness confirmed in his own words that he was a member of the Al Aqsa Martyrs Organization, and his statements also indicated that he was responsible for a list of vicious murders for the organization, as the holder of a senior position therein. The witness was also able to provide an exact description of the "change of command" chain of the organization in the Nablus area, from Nasser Aweis, through Mahmoud Titi, but when he was asked about the identity of Titi's successor (whom the prosecution claimed to be the Defendant), he suddenly became afflicted with feigned forgetfulness, contended that he did not know the identity of the head of the organization in the Nablus area (to whom he answered himself) and did not make the effort to find out who he was either.

[Stamp] P 6: 19 [continued]

---

[8] See transcript of the testimony of Mansour Sharim dated November 30, 2003, page4.

D.    Sharim Mansour's statement stands in contrast to his incoherent, biased testimony before us. The weight of his statement arises both from the taker of the statement, First Sergeant Ya'akov Barazani – who testified before us on June 14, 2004, and in his testimony denied the arguments of the witness and said that the statement had been taken according to the ordinary rules – and by inspection of the body of the text of the statement itself, which the witness signed after being warned. A reading of the body of the statement and the testimony of the taker of the statement reveals that the statement was based on things that the witness wrote in his own handwriting. It is regrettable that the witness was not allowed to write his statement in his own handwriting, but in the circumstances of the matter, after it was proved to our satisfaction – both from our impression of the witnesses and from a comparison with the remaining evidence material that was put forth before us – that the written text in the body of the statement reflects the words of the witness, which were read out to him before he signed them, we did not believe that there was any flaw in the weight of the statement (see on this matter also the fascinating judgment of the Honorable Judge Colonel Friedman in Judea and Samaria Appeal 1129 + 1136 + 1130 + 1137/04).

Therefore, we have seen fit to reject the testimony of Sharim Mansour and prefer his statement over it.

**Prosecution witness Fahed Sharia**

This witness testified before us on November 30, 2003 and in his testimony hastened to deny the explicit incrimination statement that he provided against the Defendant, in which he described how he drove the Defendant, along with others, to carry out shooting attacks. When he was requested

[Stamp] P 6: 19 [continued]

11

Case 1:04-cv-00397-GBD-RLE    Document 476-86    Filed 04/23/14    Page 20 of 28

to give an explanation for the explicit incrimination of the Defendant in his statement, he contended that this had been extracted from him using illicit means; that he was forced to sign it; that he was surprised to see the indictment that was filed against him, which included charges to which he had not confessed and so on. We would have made the effort to elaborate the contradictions that arose in the account of the witness on this matter had it not been shown clearly that the witness had kept the procedural arguments concerning the weight of his statements for his testimony in the case of the Defendant only, whereas in his trial[9], he did not raise any of those arguments, and also consented to the submission of his statements, including the statement in question, concerning which he suddenly raised procedural arguments from out of the blue in his testimony. It is also understandable that the procedural arguments of an interviewee concerning his statement, which appear in the trials of others and not in his own trial, are unconvincing.

For all of these reasons, we have seen fit to dismiss the account of the witness concerning his statement, accept his statement (after the conditions set forth in Section 10A have been fulfilled) and prefer it over his testimony.

**Prosecution witness Nasser Aweis**

This witness testified before us on March 30, 2004. Despite strongly incriminating the Defendant, as his accomplice in dispatching the suicide terrorist who carried out the murder on Jaffa Street in Jerusalem and as an accomplice in shooting acts, the witness denied the things in his testimony. The witness also contended that he knew the Defendant by his first name only, despite just the content of his testimony revealing that his acquaintance with him was much more established (all the more so when his statements and those of the Defendant reveal that the two had close ties, and were even expelled from the Area and spent a period in Jordan and Baghdad – see below). The witness explained the fact that he incriminated the Defendant in his statements by claims that he raised against investigator Roni Amar, who forced him to write things (the witness himself did not remember the investigator who interviewed him and did not identify him, but stated that he was a bald police officer), but he was not able to elaborate what whose arguments were ("There was a problem with that investigator. I do not remember the details[10]"). He further contended that he did not recognize his statements that were shown to him or his own handwriting, but these words did not impress us, as the witness barely made the effort to look at the statements before replying.

[Stamp] P 6: 20

---

[9] See the transcript of the trial of the witness (Samaria 5004/03) dated May 4, 2003 and July 16, 2003 **(P 72 + 73)** and the transcript of the remand hearing of December 12, 2002 **(P/ 71)**. The transcripts from the trial of the witness were accepted at the request of the prosecutor in the hearing of June 14, 2004 after the defense counsel left the question to the discretion of the Court and while the transcripts constituted a public certificate that was acceptable without any testimony from its originator.

[10] See transcript of the testimony of Nasser Aweis dated March 30, 2004, page 3 lines 5-10).

Investigator Roni Amar testified before us that he took the statements of the witness and his testimony seemed completely reliable to us. In his testimony, investigator Amar said that he took the statements of the witness Aweis and that he (Aweis) was the one who wrote his statements in his own handwriting (as also indicated by reading the statements themselves). The investigator also denied the argument of the witness that he had given additional statements in which he said other things, which is also shown by inspecting the statements, which bear serial numbers.

Therefore, the testimony of Nasser Aweis, which was confused, arbitrary testimony ("You have it all written down in your files, there is no need to go into detail", "I don't have to answer anyone"[11]) did not impress us as being reliable. The conditions for the submission of his statements to the police pursuant to Section 10A were fulfilled after the witness testified; the fact that statements were given was proved by the testimony of the taker of the statements Roni Amar; and the witness contradicted his statements in his testimony. We have seen fit to prefer the statements over the testimony. In contrast to the confused, unconvincing testimony, we have found his statements to be reliable and weighty. In accordance with that which has been set forth, a reading of the statements reveals that they were given by the witness after he was duly warned and after he had signed the statements, **which he wrote in his own handwriting.** It is further shown that his statements were taken in a positive atmosphere, and that the witness drank coffee and smoked cigarettes while the statements were being taken. The testimony of Roni Amar also reveals that the statements were taken in a standard manner, in cooperation with the witness. In any case, it is noted that a comparison of the testimony of the witness before us and the content of his statements also reveals that in general, he confirmed his responsibility for the attacks on Jaffa Street and at the "Sea Food Market" restaurant in Tel Aviv, confirmed the names of the suicide terrorists whom he dispatched**, in accordance with the content of his statements. In other words, the witness Nasser Aweis himself confirmed the correctness of his statements, except for the part dealing with the Defendant, without a genuine explanation as to why this part was deficient.**

In view of these things, we have seen fit to prefer the statements over the testimony.

[Stamp] P 6: 20 [continued]

---

[11] *Ibid*, page 2 line 16; lines 47-48.

**Date: June 28, 2005**                         6                         **Case No.: 5398/03**

**Prosecution witness Ibrahim Abdel Hai**

This witness, like the previous witness and most of the witnesses in this case, also confirmed his responsibility for the acts that are attributed to him in his testimony, to which he confessed in his trial and in his statements, he also stated the names of his accomplices, except for one – the Defendant. The prosecution argues that the Defendant acted along with the witnesses in the first stages of the execution of the murderous attack on Jaffa Street (the sixth count of the indictment, Subsections A-E). The witness confirmed, in his testimony, the facts in question in the relevant part of the count of the indictment, except for the part of the Defendant, regarding whom the witness stated that he was not present at the time of filming the suicide terrorist.

It has been found that during his trial, the witness admitted his responsibility for the murderous act on Jaffa Street, and the facts to which he confessed also included the acts that were attributed to him with the Defendant, including the filming of the suicide terrorist. The prosecution asked[12] to file the transcript of the confession of the witness in his trial pursuant to Section 10A, while the Defense Counsel left the request to the discretion of the Court[13]. In our decision of that day, we granted the request to submit the transcript and we shall attach our reasons for doing so below.

The Defense Counsel argued in his summations that the confession of the witness in his trial, in the framework of a plea bargain and without witnesses having been heard, cannot serve as evidence in this trial; however, he did not provide a genuine explanation as to why this was not the case, and did not attach any references to support his argument either. Our opinion in this matter is different. But it is taken as given that an answer of the Defendant to an indictment that is said in the courtroom and that is written in the transcript, constitutes a "statement" of a person in writing that fulfills the conditions of Section 10A (see Y. Kedmi, "**About Evidence**", first part, p. 274, paragraph 4.B.). And not only does the transcript of the confession constitute an outside statement pursuant to Section 10A, but on the face of it, this is a statement of unparalleled reliability that is presumed to have been made freely out of good will and has significant weight, insofar as the witness made it in answer to charges that are directed against him in person while being represented by an advocate. This means that there is no impediment to accepting it pursuant to Section 10A and granting it full weight.

[Stamp] P 6: 21

---

[12] See transcript of the hearing dated June 14, 2004, page 3 lines 24-26.
[13] *Ibid*, page 5 lines 36-37.

14

The argument of the witness in his testimony[14] that the indictment had been read to him in general terms, in outlines only and without the names having been mentioned is far from being the truth, as the transcripts from his trial prove. An inspection of the transcript of the trial of the witness in Case 6446/02 dated December 19, 2002 (**P/ 68**) reveals that the indictment had been read to the witness (the defendant in that case) in full, in view of the fact that he was not represented at that stage and refused to accept representation for himself (see the decision of the Court in that hearing, page 2). The witness / Defendant also started to provide a detailed answer, which proved that his testimony before us that the indictment had not been read out to him in full was a complete lie. An inspection of the transcript of the confession of the witness in his case dated June 29, 2003 (**P/ 69**) will reveal that after a few months, the witness changed his mind and confessed to an amended indictment while he was being represented. This time too, the nature of the indictment in our case was made clear to the witness. The witness pled guilty to the indictment in clear words, which were stated both by his Defense Counsel and by him in person. The Defense Counsel asked in his summations to rely on the fact that the witness did not mention the Defendant in the framework of his answer to the indictment, but it is clear that this does not add or diminish anything. A person reading the confession transcript would see that the witness confessed to the indictment and the offenses attributed **and while doing so stated** prominent facts out of that which was attributed to him. A simple reading of the transcript would reveal that the witness's mentioning of the names of his accomplices was alongside his confession to the facts in the indictment that was attributed to him and did not constitute a "closed list".

Alongside the clear weight of the transcript of the trial of the witness, we must point out that his testimony before us was not free of contradictions, for example on the matter of the degree of his acquaintance with the Defendant[15].

**Therefore, we have seen that in his trial, Ibrahim Abdel Hai admitted the facts of the offense of causing intentional death concerning the attack on Jaffa Street, including the part of the Defendant. This transcript represents an "outside statement" of the witness, and we have accepted it and seen fit to prefer it over his testimony before us, from which the part of the Defendant had been omitted.**

[Stamp] P 6: 21 [continued]

---

[14] See transcript of the statement of Ibrahim Abdel Hai dated March 30, 2004, page 7 lines 29-38.

[15] *Ibid*, page 4 line 35; compare *ibid* page 7 lines 10-11.

### Prosecution witness Ahmed Barghouti

It is easy to see that this witness is not the type of witness who comes to tell the truth in his testimony, or to cooperate with the Court while it tries to uncover the truth. As soon as he took the witness stand, the witness covered his ears and refused to answer the questions of the Prosecutor. He answered the questions of the Defense Counsel only after finding out that he was the advocate of the Defendant, and when he did respond, he confirmed only things that were not disputed by the prosecution, i.e. he did not mention the Defendant at all.

Indeed, the prosecution does not contest that the witness did not mention the Defendant at all, and even declared that that was not the reason for which it had brought the witness to testify; rather, it was in order to prove the second part of the sixth count of the indictment, a part which the Defendant did not participate in even according to the indictment. It is an important to know why we have to deal with the question of the testimony of the witness that undisputedly does not incriminate the Defendant, but concerning which, in view of the answer of the Defense Counsel, he did not even agree that the event occurred!![16] This seems to be inescapable.

We did not have to think for long when we came to decide the question of preferring the transcript of the confession from the trial of the witness as a defendant over his so-called "testimony" before us, and in any case, this testimony is not convincing. In contrast to the arbitrary, ridiculous testimony of the witness before us, the transcript of the confession of the witness in his trial, while he was being represented by an advocate, still stands. For the reasons stated above concerning Ibrahim Abdel Hai, we have seen fit to prefer the transcript of the trial over the testimony.

### Prosecution witness Riad Ouda

This witness, like Fahed Sharia, also attributed his decisive incrimination of the Defendant to illicit measures that were employed against him in his trial, but he did not raise, for whatever reason, these arguments in his own trial[17]. For the reasons mentioned above, which are accompanied by the biased, evasive testimony of the witness (he evaded answering the question of whether he knew the Defendant, and also did not know who the object of the question was,

[Stamp] P 6: 22

---

[16] See transcript of the hearing dated March 30, 2004, page 8 lines 31-37.
[17] See transcript of the statement of Riad Ouda dated March 30, 2004, page 10 lines 15-17.

despite only one Defendant being present in the dock), we have seen fit to prefer the statement of the witness over his testimony, which is evidently truthful, including the fact that he wrote it in his own handwriting; that he was duly warned before it was taken; and that he signed the bottom of every page thereof.

**Prosecution witness Ibrahim Habisha**

This witness, when he took the stand, repeated the line of his colleagues and also confirmed what had been written in his statement and the acts written therein, except for a point pertaining to the circumstances of his acquaintance with the Defendant. According to the witness, the investigator forced him to write that he had been injured by Majed Masri (whom he claimed not to know at all) while they were on their way to lay an explosive device for an attack.

When he attempted to keep the Defendant out of his explicit incrimination of him at any price, tarnishing the reputation of his investigator in his process, Ibrahim Habisha forgot the simple fact that his statement did not even mention the Defendant in the context of a planned attack, but it seemed that the injury was within the framework of a "training accident", which occurred when the Defendant started to play with a grenade launcher that he held, during an introductory meeting with various cells in the organization. In other words, the argument of the witness that the investigator tried to force him to admit that he had been injured during preparations for an attack with the Defendant has no foundation, not even from the written statement.

In any event, the account of the witness is thoroughly unconvincing. The witness was not able to provide a genuine explanation on how he was injured. In addition, he did not make the effort to provide a genuine explanation on how the investigator forced him to incriminate the Defendant falsely and why only this part of his statement was false while all the rest was true.

Against the lies of the witness there is his statement, which he wrote in his own handwriting, after being duly warned, and which he signed. The conditions for the fulfillment of Section 10A are fulfilled, as the witness identifies his statement and contradicts its content. In view of the fact that his testimony did not leave us an impression of reliability and that his statement seems to bear signs of the truth, we have seen fit to prefer it over the testimony.

[Stamp] P 6: 22 [continued]

17

## The defense case

The testimony of the Defendant in the defense case was short, full of contradictions and unconvincing. Firstly, it must be noted that despite the mountains of evidence material on the part of the prosecution, which has been extensively reviewed above, the Defendant opted to provide almost no comments on this evidence, and his testimony in the direct examination was short and laconic.

But there are contradictions even in the testimony of the Defendant. The argument of the Defendant in his direct examination was that there were many people in the Nablus area called Majed Masri, that it was the largest family in the area, and that he himself knew a person whose name was identical to his own, who also worked for the Palestinian Authority. To support this argument, the Defendant stated that even two of the people who incriminated him, Mansour Sharim and Mohamed Naifa, when they were brought before him for a confrontation during the examination, immediately stated that the Defendant was not the same Majed Masri whom they had referred to in their incriminating statements. However, in the cross examination, the Defendant changed his mind and "to be on the safe side" also added the account that the two had incriminated him owing to a previous conflict that he had had with them, in view of the fact that in the course of his duty he had arrested the two for vehicle theft.

It is clear that the two accounts cannot both be true. And if Mohamed Naifa had told his GSS investigators immediately that the Defendant was not the Majed Masri who was the object of his incriminating statements, why did the Defendant not talk to him, in the spirit of "I have nothing to say to someone who would do such a thing to me"[18]?

These contradictions are compounded by the general trend of the Defendant to distance himself, at any price, from any connection to security activity, even concerning things that he has admitted in his statement, and there is no doubt that these can connect him in any way to the severe counts of the indictment that are attributed to him. Thus, the Defendant, in his testimony, denies any general shooting at security forces, which he admitted in his statement, and any money transfers in which he was involved and other subjects, which are extensively elaborated on pages 26-27 of the summations of the claim. The Defendant, in his attempt to extricate himself, also down-played his connections with Nasser Aweis, despite the fact that the two had been together in the early 1990s in Jordan and Baghdad, as his statements indicate.

[Stamp] P 6: 23

---

[18] See transcript of the Defendant's testimony in the defense case from June 14, 2004, page 9 lines 48-52.

See below, in the chapter dealing with the identification of the Defendant concerning the lies of the Defendant, on the existence of another person who answers to his four-part name.

In conclusion, we have not found that the testimony of the Defendant before us gives us any impression of reliability. The Defendant failed, and did not even make the effort, in his testimony, to refute the great evidence of the prosecution and made do with a categorical, laconic denial, even of the few things that he admitted in his statements. During this, the Defendant complicated matters for himself by giving contradicting versions and actual lies, which do not add to the weight of his testimony.

**Interim summation**:

Therefore, we have found that there is reason to prefer the evidence of the prosecution over the testimony of the Defendant in the defense case; and the statements of the prosecution witnesses over their biased, false testimonies, for the reasons that are set forth above extensively. These pieces of evidence complement one another and reveal an orderly, coherent account that shows up the Defendant to be an arch-terrorist who deals, with other accomplices, in the dispatching of suicide terrorists. We shall now examine whether the responsibility of the Defendant for that which has been attributed to him arises from that evidence.

**The identification of the Defendant:**

It seems that the central question in this case pertains to the matter of identification of the Defendant before us as the figure appearing in the many incriminating statements of the witnesses of the prosecution as the great perpetrator to whom the acts described in the indictment are attributed. The various witnesses of the prosecution describe a person called Majed Masri, give various personal details about him and also state the alias by which he is known, "Bazbaz". The Defendant contended that this was not the case, that he had no nickname, and certainly is not called "Bazbaz". The Defendant further contended that the Masri family was a large family in the Nablus area, and that it would be natural for there to be other people who answer to the name Majed. The Defendant contended that there was another person called Majed Masri who worked for the Palestinian Authority. Is the Defendant before us the same "Bazbaz"?

[Stamp] P 6: 23 [continued]

19

**Date: June 28, 2005**                     **9**                     **Case No.: 5398/03**

**First**, it must be noted that the Defendant himself answers this question in his statement[19], in which he confirms his nickname from childhood as "Bazbaz". This is the place to indicate that it is not a common or usual nickname (such as the teknonym-based naming of a person after his firstborn son, such as "Abu Mohamed", of which there are thousands of instances). The uniqueness of this nickname, along with the other personal details of the Defendant, indicates the congruence between him and the Defendant.

But the conviction of the Defendant for the severe offenses that are attributed to him does not rely on this alias only, but also on his personal identification by the witnesses of the prosecution, with whom he had good relations. Concerning the arguments that the prosecution witnesses had "gotten confused" or that they meant another person, extensive examination of the evidence material reveals that there is no substance behind this. The Defendant confirms in his statements his acquaintance with the other "protagonists" of the events, the prosecution witnesses who incriminate him, and also admits to committing security offenses with them. Thus, the Defendant admits[20] his acquaintance with Nasser Aweis and shooting, together with him, at an IDF position, and also performing an attempt at shooting. The Defendant was also expelled with Nasser Aweis from the Area in 1992, and they traveled to Baghdad together[21]. The conjecture that Nasser Aweis did not know the Defendant and had referred to another Majed Masri in his words is truly fallacious in these circumstances. The Defendant further confirms in his statements that he had delivered money to Mansour Sharim and Mohamed Naifa, and that he also confirmed his personal acquaintance with them. He also confirmed the transfer of a Kalashnikov rifle to Mohamed Naifa (according to the account of the Defendant, due to an internal conflict)[22].

[Stamp] P 6: 24

---

[19] **P/ 1**, page 8 lines 22-25.
[20] See **P/ 1**, page 2 lines 5-12.
[21] See **P/ 2**, page 5 lines 13-24.
[22] See **P/ 1**, page 3 line 26 to page 5 line 21.