**The Courts**

| | |
|---|---|
| **In the Tel Aviv-Jaffa District Court** | Serious Crime Case 1158/02 |

**Before the panel:**

The Honorable Judge Sarah Sirota, Deputy Presiding Judge
The Honorable Judge Avraham Tal
The Honorable Judge Dr. Amiram Benyamini

The State of Israel                                            **The Prosecution**
The Department for Criminal and Security Manners and
Special Affairs in the Office of the State Attorney
Represented by Counsel, Adv. D. Chen, Adv. R. Hazan and
Adv. A. Bar-Natan

- v. -

Marwan Bin Khatib Barghouti                             **The Defendant**
Born in 1959, Identity No. 959251745
of Ramallah (in detention since April 15, 2002)
Represented by the Office of the Public Defender

**Verdict**

[Stamp] P 7: 000371



PLAINTIFF'S
EXHIBIT
451

# Table of Contents

**Part I: Introduction**                                                            p. 2

**Part II: The Evidence**                                                           p. 6

    **A.**    **The Fatah, the Tanzim and the al-Aqsa Martyrs Brigade as Terrorist**
          **Organizations**                                                   p.6

    **B.**    **The Status of the Defendant and His Position in Terrorist Organizations**
          **and His Support for Terrorist Attacks on Israel**                p. 8

    **C.**    **Testimony of Fatah Terrorism Operatives with Respect to Their**
          **Relationship with the Defendant, His Involvement in Terrorist Attacks**
          **and the Defendant's Responses to This**                          p. 16

        (1)  Nasser Aweis ................................................. p. 16

        (2)  Nasser Naji Abu Hamid ...................................... p. 20

        (3)  Ahmed Barghouti ............................................ p. 22

        (4)  Mohamed Maslah (Abu Satha) ................................. p. 27

        (5)  Jamal Ahawil ............................................... p. 28

        (6)  Nasser al-Shawish .......................................... p. 30

        (7)  Ali Aidiya ................................................. p. 30

        (8)  Ismail Radaida, Muhannad Abu Halawa and Khamal Abu Wahr ...... p. 34

        (9)  Nasser (Haloum) Naji Abu-Hamid ............................. p. 34

      (10)  Ziyad Hamuda .............................................. p. 35

      (11)  Riad Amor ................................................. p. 35

      (12)  Nasser Haj ................................................ p. 36

      (13)  Tahrir Barghouti .......................................... p. 37

      (14)  Ahmed Musafar ............................................. p. 37

      (15)  Sharif Naji ............................................... p. 37

      (16)  Amid Abu Radaha ........................................... p. 37

      (17)  Ashraf Jabar .............................................. p. 39

[Stamp] P 7: 000372

**D.** **Statements of the Defendant During His Interrogation and Other Evidence with Respect to His Role and Involvement in Terrorist Attacks Against Israel** p. 40

  (1)  The liability of the Defendant for the activity of the terrorist cells and the degree of his control over them....................................................p. 40

  (2)  The Defendant's personal involvement in the terrorist attacks that have been carried out by the cells under his command ............................p. 44

      (aa)  Terrorist attack at the gas station in Givat Ze'ev.......................p. 47

      (bb)  Murder of the Greek Orthodox monk in Ma'ale Adumim ........p. 48

      (cc)  Terrorist attack on the Seafood Market Restaurant in Tel Aviv ...............................................................................................p. 48

      (dd)  Attempted terrorist attack near the Malha Mall in Jerusalem....p. 49

  (3)  Provision of funds, weapons and explosives for carrying out terrorist attacks ........................................................................................................p. 49

  (4)  Assistance for wanted men and the families of the people arrested or killed ..........................................................................................................p. 51

  (5)  Recruiting and training operatives for terrorist organizations.................p. 52

  (6)  The Defendant's public calls to perpetrate terrorist attacks against Israel ...........................................................................................................p. 53

[Stamp] P 7: 000372 [continued]

E. **The Connection of the Defendant to the Terrorist Attacks that are the Subject of the Indictment** ........................................................................... p. 56

(1) Murder of Talia and Binyamin Kahane, of blessed memory, near Ofra ........................................................................................................... p. 56

(2) Murder of Akiva Pashkos, of blessed memory, in the Atarot industrial area ............................................................................................. p. 57

(3) Murder of the Greek Orthodox monk Tsibouktzakis Germanos, of blessed memory, in Ma'ale Adumim ........................................................ p. 59

(4) Murder of Yaniv and Sharon Ben-Shalom, of blessed memory, and Doron Yosef Sviri, of blessed memory, on Route 443 .............................. p. 59

(5) Murder of Meir Weissboiz, of blessed memory, on Route No. 9 in Jerusalem ................................................................................................... p. 61

(6) Murder of Eliahu Cohen, of blessed memory, in the shooting terrorist attack on Route 443 near Givat Ze'ev ..................................... p. 62

(7) Murder of Yoela Chen, of blessed memory, near the Givonim gas station on Route 443 ................................................................................. p. 63

(8) Murder of six people in David's Palace Banquet Hall in Hadera ............ p. 64

(9) Murder of two women in the shooting terrorist attack at the corner of Jaffa Road and Lunz Street in Jerusalem .................................................. p. 66

(10) Shooting terrorist attack in the Neve Ya'akov neighborhood in Jerusalem, in which police officer Galit Arbiv, of blessed memory, was killed ..................................................................................................... p. 66

(11) Murder of Gad Rejwan, of blessed memory, in the Bashkevitz factory in Atarot ......................................................................................... p. 69

(12) Terrorist attack in the Seafood Market restaurant in Tel Aviv ................ p. 70

(13) Shooting terrorist attack in the Jeremy Hotel in Netanya ........................ p. 72

(14) Murder of Constantine Danilov, of blessed memory, in Baka al-Garbiyeh ................................................................................................... p. 73

(15) Shooting terrorist attack between Ateret and Bir Zeit ............................ p. 74

(16) Attempted terrorist attack in the Biancini Pub in Jerusalem ................... p. 75

(17) Shooting terrorist attack on Route No. 9, near French Hill in Jerusalem ................................................................................................... p. 77

(18) Attempted suicide terrorist attack in Beit Hanina in Jerusalem .............. p. 78

(19) Shooting terrorist attack on the Beit El-Psagot Road ............................. p. 78

(20) Attempted terrorist attack in the Malha Mall in Jerusalem ..................... p. 79

[Stamp] P 7 :000373

**Part III: Evaluation of the Evidence and Its Significance**                    p. 81

**Part IV: Legal Analysis and Conclusions**                                      p. 92

   **1.**   <u>**Activity and Membership in a Terrorist Organization**</u>            p. 92

   **2.**   <u>**Liability of the Joint Perpetrator, the Solicitor and the Accessory and the Differences Between Them**</u>                                                    p. 94

       A.   The Joint Perpetrator in Comparison to the Accessory ............................p. 96

       B.   The Crime of the Accessory ..................................................................p. 104

       C.   The Crime of Solicitation and the Distinction Between the Joint Perpetrator and the Solicitor ..................................................................p. 112

       D.   The Liability of the Leader of the Criminal Group as a Joint Perpetrator or as a Solicitor ..................................................................p. 117

   **3.**   <u>**Conclusions with Respect to the Defendant's Liability as a Joint Perpetrator, Solicitor and Accessory**</u>                                         p. 123

       A.   The Murderous Terrorist Attack at the Gas Station in Givat Ze'ev .......p. 135

       B.   Murder of the Greek Orthodox monk Tzibouktzakis Germanos, of blessed memory, in Ma'ale Adumim........................................................p. 136

       C.   Murderous Terrorist Attack in the Seafood Market Restaurant in Tel Aviv ......................................................................................................p. 138

       D.   The Attempted Terrorist Attack Near the Malha Mall In Jerusalem......p. 139

**Part V: Summation**                                                           p. 139

### <u>Verdict</u>

**Part I:**      <u>**Introduction**</u>

[Stamp] P 7: 000373 [continued]

1.  On August 14, 2002, an indictment was filed against Defendant, which charged him with several counts of **premeditated murder**, in accordance with Section 300 (a) (2) of the Penal Code, 5737 – 1977 **(hereinafter: "the Penal Code")**; **Accessory to murder**, in accordance with Section 300 (a) (2), together with Section 31 of the Penal Code; **Incitement to murder**, in accordance with Section 300 (a) (2), together with Section 30 of the Penal Code; **Attempted murder**, in accordance with Section 305(1) of the Penal Code; **Conspiracy to commit a crime**, in accordance with Section 499 of the Penal Code; **Activity and membership in a terrorist organization**, in accordance with Sections 2 and 3 of the Prevention of Terrorism Ordinance 5708 – 1948.

2.  The indictment charges the Defendant with participation in [and] the organization and execution of acts of terrorism against Israeli targets, which commenced in September 2000, within the framework of the events that are referred to as the "al-Aqsa *Intifada*" (hereinafter – the "*intifada*"). According to that which has been alleged in the indictment, the Defendant headed terrorist organizations in the region of Judea and Samaria: the "Fatah" Organization (hereinafter – the "**Fatah**"), the "Tanzim" Organization (hereinafter – the "**Tanzim**") that is part of Fatah, and the "al-Aqsa Martyrs Brigades" Organization, which includes the groups of Tanzim terrorism operatives that perpetrate acts of terrorism against Israeli targets (hereinafter – "**al-Aqsa Martyrs Brigades**"). The Defendant was the one who coordinated between and communicated with the senior operatives in the field in all three of these organizations (which shall jointly be called the "**Terrorist Organizations**") that were responsible for the perpetration of acts of terrorism against Israeli targets.

    The indictment lists the names of eight senior terrorism operatives, who acted under the Defendant's leadership and who perpetrated acts of terrorism. They are Nasser Aweis (hereinafter – "**Aweis**"), Ahmed Barghouti, Nasser Abu Hamid (hereinafter – "**Abu Hamid**"), Ra'ed Karmi (hereinafter – "**Karmi**"), Muhannad Diria (Abu Halawa), (hereinafter – "**Muhannad**") Mohamed Maslah (Abu Satha) (hereinafter – "**Abu Satha**"), Manzur Sharam (hereinafter – "**Sharam**") and Mahmoud Titi (hereinafter – "**Titi**").

    The Defendant and the field commanders recruited operatives for the terrorist organizations, deployed them and supplied them with weapons, explosives and money. The Defendant was also involved in training the terrorism operatives for their purpose and raising funds for terrorist organizations. In addition, the Defendant solicited and encouraged the terrorism operatives to wage offensives against the State of Israel through the media, at various conferences and by way of the distribution of inflammatory posters.

[Stamp] P 7: 000374

**Sections 8-15** of the indictment charge the Defendant with involvement in and liability for the perpetration of 37 terrorist attacks and acts of terrorism, most of which were perpetrated within the borders of the State of Israel, by the field commanders and operatives during the period of time from December 2000 through April 2002, in which many civilians and soldiers of the State of Israel lost their lives and many more were injured. Some of the acts of terrorism have been set forth in the indictment and most of them have been set forth only in the appendix to the indictment.

3.   **The Prosecution's evidence includes** the testimony of officials from the defense establishment, Israel Security Agency interrogators and police officers who were involved in the interrogation of the Defendant; testimony by civilians and other entities who were witness to the terrorist attacks that are the subject of the indictment, documents that were seized by the Israeli Defense Forces at the offices of the Fatah and at the office of the Defendant; Expert Opinions from specialists from the defense establishment with respect to the activities of the terrorist organizations and the status and the role of the Defendant in them; testimony that was given by operatives in the terrorist organizations and the information that they provided during their interrogations by the Israel Security Agency and the police; statements by the Defendant that were documented by Israel Security Agency personnel in written reports and, in some cases, were recorded and transcribed; statements that Defendant made to agents who were planted in his cell during the course of the interrogation, as well as to his close associate, Ahmed Barghouti, who was arrested with him; statements that were made by the Defendant to the media prior to his arrest and the statements of the Defendant to the police.

The transcripts of the interrogation of the Defendant by the Israel Security Agency were submitted by the Israel Security Agency interrogators who conducted the interrogation, which was recorded, and who identified the voice of the Defendant in the recording ("Mofaz", on p. 58, "Nadav", on p. 79, "Smith", on pp. 85 – 86, and "Danny", on p. 90). The Defendant's conversation with Ahmed Barghouti was submitted by an interrogator by the name of "Robert" (on p. 65). The recordings from the interrogation of the Defendant and the interrogations of agents John Doe No. 1 and John Doe No. 3 were transcribed by Natan Basso (on p. 174).

The Israel Security Agency interrogators who testified confirmed that the content of the transcript written during the course of the interrogation of the Defendant is accurate (Transcript Prosecution/6 – Prosecution/96). This refers to reports that were recorded in Hebrew, and which pertained to an interrogation that was conducted in Hebrew and in Arabic

[Stamp] P 7: 000374 [continued]

(the Defendant speaks Hebrew well), in which the main points of the statements that were made by the Defendant were taken down (see the interrogator by the name of "Steve", on p. 53, the interrogator by the name of "Emil", on p. 55 and the interrogator by the name of "Ron", on p. 60).

4.    With respect to the statement of the Defendant to the police: indeed the Defendant declared throughout the course of his interrogations by the police, in contrast to his behavior during the course of his interrogation by the Israel Security Agency, that he denies the right of the police to interrogate him and that he therefore refused to answer the questions by interrogators (see Statements Prosecution/99 – Prosecution/109). Therefore, the statements of the Defendant include many questions that were presented to him by interrogators and which he refused to answer. In a very few cases, the Defendant briefly related to what the interrogator said to him and, on those occasions, he completely denied all of the claims that were presented to him, including those to which he had confessed while being interrogated by the Israel Security Agency. The Defendant denied that he was a leader of the al-Aqsa Martyrs Brigade or the Tanzim (Statement Prosecution/101 on p. 6, Statement Prosecution/105 on p. 2, Statement Prosecution/106 on p. 3); he denied that he was acquainted with the terrorist operatives who testified that they were in contact with him (as shall be described below) and even denied that he was acquainted with Ra'ed Karmi (Prosecution/104 on p. 8). All of these points were proven, as will be clarified below, not only by the statements by the field operatives but also by those of the Defendant himself, and the documents that were seized in his office, to which the Defendant denied any connection during the course of his interrogation, and claimed that his handwriting does not appear on any of them (see Statement Prosecution/108 – Prosecution/109).

The statements of the Defendant were submitted by interrogators by the name of David Zrihan and Rafi Nuriel (on pp. 38 and 113), who explained that the Defendant had refused to sign the warning and the statement, and that he had been questioned in Hebrew. Zrihan even testified that the Defendant refused to give fingerprints or to be photographed. In his Statement Prosecution/106, the Defendant stated in general that all of the charges against him are incorrect and that he is innocent of any guilt.

[Stamp] P 7: 000375

5. At the outset of his trial, the Defendant set forth preliminary arguments with respect to the authority of this Court to try him, and these arguments were denied in the decision that was handed down by the Court, which was dated January 19, 2003 (on pp. 1 – 34 of the transcript). The Defendant chose not to receive the assistance of the services of a defense attorney and even strenuously and consistently rejected every attempt that was made by the Court to convince him to receive the assistance of the Office of the Public Defender or a defense attorney on his own behalf.

In spite of this, the Court did assign the Office of the Public Defender to represent the Defendant, despite its repeated requests to be released from his representation, and for practical purposes, it does represent the Defendant even today and was present at all of the Court sessions. Notwithstanding, the Office of the Public Defender did choose to accede to the request of the Defendant that it not set forth any arguments whatseover on his behalf during the trial, including legal arguments, and that it not even examine the witnesses.

The proceedings were conducted in this manner as per the wishes of the Defendant, who continues to deny the jurisdiction of this Court to try him . For this reason, the Defendant also chose not to respond to the indictment. In addition, the Defendant refrained from testifying himself or from bringing forth witnesses on his own behalf. In spite of this, the Defendant did occasionally respond to statements that were made by the witnesses or to arguments that were set forth by Counsel for the Prosecution during the course of the hearing, and his statements were recorded in the transcript verbatim. In addition, the Defendant responded orally to the summations of the Prosecution (which were filed in written form, as well), in the context of the defense speech that he delivered within the framework of the oral summations, however he did not relate in a material manner to the essence of the charges that had been set forth against him. It would be superfluous to note that the Defendant received, through the Office of the Public Defender itself, all of the evidence, transcripts and summations.

[Stamp] P 7: 000375 [continued]

6.  The majority of the offenses that are the subject of the indictment are "domestic crimes" that pertain to terrorist attacks that have been perpetrated in Israel, and some of them are "external crimes" that have been carried out in the Region (in other words: in Judea and Samaria). However, as we have clarified in the decision that was handed down with respect to the preliminary arguments of the Defendant, Israeli Courts have the authority to hear cases of external crimes against the security of the state or against an Israeli citizen or resident, regardless of the venue where the crime may have taken place (see Section 13 (a) – (b) of the Penal Code, 5737-1977). This is the same "protective application" that was intended in order to protect Israeli citizens and residents against acts of terrorism that have been carried out with the sponsorship and support of other countries (S. Z. Feller and M. Kremnitzer, "Response to Article Condemning the Nationalist Application of a the Penal Code" in *Plilim* 5.1 (1996) 65, on p. 83, and compare with the Expert Opinion of Y. Shoham, *op cit.,* on p. 5). Further, we have ruled in the decision that was handed down in response to the preliminary arguments of the Defendant that the conditions that have been set forth within the framework of Section 14 (b) of the Penal Code do not appear to be relevant to this matter, if they apply at all to the protective jurisdiction in Section 13 of the Penal Code (in contrast with the

[Stamp] P 7: 000375 [continued]

personal jurisdiction in Section 14) insofar as the Palestinian Authority is not a state. The offenses that have been attributed to the Defendant in the indictment are offenses against the security of the state, and against its citizens and residents, Therefore, they fall within the purview of Section 13 of the Penal Code, and this Court is competent to hear them.

## Part II:    The Evidence

### A.    The Fatah, the Tanzim and the al-Aqsa Martyrs Brigade as Terrorist Organizations

7.    During the course of his testimony (on p. 38), the head of the Research Division of the Intelligence Branch of the Israeli Defense Forces, Brigadier General Y. Cooperwasser, filed an Expert Opinion in which he addressed the operations of the Fatah, the Tanzim and the al-Aqsa Martyrs Brigade (Prosecution/1). Appended to the expert opinion were captured documents that had been seized by the Israeli Defense Forces during Operation Defensive Shield that are pertinent in this regard. Since the "Fatah" (the inverted Arabic acronym of its name "The Movement for the Liberation of Palestine") was founded by Yasser Arafat in 1959, it has espoused armed struggle against Israel, which has manifested in the form of the perpetration of terrorist attacks against Israeli targets in Israel and abroad. After the Oslo Accords were signed, the principle of "armed struggle" took on a marginal role, however it remained as an option for the achievement of the goals of the organization, in the event that negotiations with Israel were to prove unsuccessful. When the second *intifada* broke out in September 2000, the Fatah led the terrorist attacks in the territories, by way of the two Supreme Committees that manage its operations, one of them in the Judea and Samaria region and the second one in the Gaza Strip region. The Defendant headed the Supreme Committee in the Judea and Samaria region up until the day of his arrest (Sections 1 – 3 of the Expert Opinion).

The operational echelon of the Fatah included the movement's field operatives – the Tanzim ("the organization" in Arabic). The Tanzim operatives make up the forefront of the Fatah's terrorist activity against Israel. The "al-Aqsa Martyrs Brigades" is a cover name for the terrorist organizations of the Fatah, which assume public responsibility for the acts of terrorism. Members of the al-Aqsa Martyrs Brigades are actually Fatah operatives and the majority of these organizations consider the Defendant to be a central source of authority for their operations (Sections 4 – 5 of the Expert Opinion).

[Stamp] P 7: 000376

The Tanzim and the al-Aqsa Martyrs Brigades constitute, in accordance with the Expert Opinion of Brigadier General Cooperwasser, the unofficial military arm of the Fatah, which was headed by the Defendant. A captured document that is appended to the Expert Opinion of Brigadier General Cooperwasser as Appendix A is a letter that was jointly signed by both the Tanzim and the al-Aqsa Martyrs Brigades.

Other captured documents that have been appended to the Expert Opinion show that the al-Aqsa Martyrs Brigades asked Yasser Arafat for financial support (Document 2) and that the Fatah and al-Aqsa Martyrs Brigades are signatories to proclamations that were issued in praise of terrorist operations that have been carried out within the borders of Israel (Documents 3 – 5). Document 6, which was appended to the Expert Opinion, and which was sent on May 8, 2001, by the al-Aqsa Martyrs Brigades to the Defendant, lists the operations of the al-Aqsa Martyrs Brigades in the Jenin district (including a terrorist attack in Um el-Faham) and asks for assistance in the form of weapons, explosives and money, in order to continue in the perpetration of such operations. Other documents of the al-Aqsa Martyrs Brigades, which were addressed to Yasser Arafat, include requests for assisting wanted men who were being pursued by Israel and the families of operatives who had been killed (Appendix B and Documents 2 – 4 to this Appendix). Some of these documents had been written by the Defendant. It should be noted that the Defendant's nickname, based on the name of his eldest son was "**Abu Alkasam**" (Defendant's statement Prosecution/107, on p. 1, and the manner in which Aweil addresses the Defendant on p. 164).

8. According to the Expert Opinion of Brigadier General Cooperwasser, Fatah operatives have perpetrated more than 1200 terrorist attacks against Israel (as of August 18, 2002) in which 176 Israelis have been killed and many more have been injured. These terrorist attacks included suicide [attacks] [and] the firing of mortar shells and light weapons. During the course of the *intifada*, the terrorist organizations of the Fatah moved increasingly towards the perpetration of suicide terrorist attacks within the borders of Israel (see Section 5 of the Expert Opinion). In the months that preceded Operation Defensive Shield, the al-Aqsa Martyrs Brigades perpetrated suicide terrorist attacks in Hadera, Jerusalem, Tel Aviv, Mehula, [Israeli Defense Forces Military] Base No. 80, the Maccabim roadblock, Netanya, Ashdod, Kfar Saba and Efrat. As a result, it was included in the American list of terrorist organizations that was dated March 27, 2002 (see Section 10 of the Expert Opinion and Appendix C, which lists the suicide terrorist attacks that have been perpetrated by the Fatah movement).

9.    With respect to the Expert Opinion of Brigadier General Goldwasser, it should be noted that pursuant to the Rules of Evidence, we are not permitted to rely on intelligence assessments and conclusions that are based on various sources of information that have not been brought before the Court, insofar as these constitute hearsay testimony. We are allowed to rely on this Expert Opinion only to the extent that it is compatible with other admissible evidence that has been brought before us. Nevertheless, the terrorist operations of the three above mentioned organizations that are under the auspices of the Fatah, emerge clearly from a great deal of the direct evidence that has been presented in Court, including the confessions that the Defendant and other terrorist operatives have given during the course of their interrogations, as shall be set forth later on in this verdict, below.

Nasser Abu Hamid, who was one of the senior field commanders in Judea and Samaria, said in his statement to the police (Prosecution/149 (8), on pp. $2 - 3$, $7 - 8$, $13 - 17$) that the al-Aqsa Martyrs Brigades was established on January 1, 2001, in order to serve as a militia for the Fatah and to carry out terrorist attacks against settlers and soldiers in the Israel Defense Forces. In the above mentioned statement, as well as in Statement Prosecution/149 (c)), he specified the terrorist attacks that had been perpetrated by his operatives against Israeli civilian and military targets, under the leadership and with the assistance of the Defendant (as shall be set forth below).

10.    It is also possible to learn about the operations of the above mentioned terrorist organizations from statements that were made by the Defendant during the course of his interrogation, as well as documents that were written in his handwriting. The Defendant explained the manner in which the cells that are called as "al-Aqsa Martyrs Brigades" operated, and which he said had carried out "military operations" (Prosecution/19 Section 14, which was filed and approved by an interrogator by the name of by the name of "Mofaz", on p. 58). In the same manner, the Defendant explained, during the course of his interrogation, the manner in which the al-Aqsa Martyrs Brigades had been formed in the Judea and Samaria region, and how it and worked in an uncentralized fashion, He claimed that the Fatah did not supervise their activity; but he also admitted that these cells approached him in order to receive money because they considered him "**the person who was in charge of the Fatah in the West Bank**" (Transcript Prosecution/98 (e), on pp. $60 - 61$). As shall be explained below, the terrorism operatives from the al-Aqsa Martyrs Brigades directed their requests for financial assistance for the purchase of weapons and the perpetration of terrorist attacks to the Defendant, who would subsequently approach the chairman of the Palestinian Authority and leader of the Fatah, Yasser Arafat, in their name and on their behalf. Hence, this makes the relationship between the al-Aqsa Martyrs Brigades and the Fatah clear, as well as the relationship between the Defendant and the al-Aqsa Martyrs Brigades.

[Stamp] P 7: 000377

**B.    The Status of the Defendant and His Position in Terrorist Organizations and His Support for Terrorist Attacks on Israel**

11.    In his testimony, Brigadier General Goldwasser presented an additional Expert Opinion, which pertained to the involvement of the Defendant in terrorism [sic] (Prosecution/2). A series of appendices are attached to this Expert Opinion, which includes interviews that were conducted with the Defendant by different media outlets, as well as documents that were written by the Defendant or that were found in his office. This Expert Opinion is also subject to the note that has been set forth in Section 9 above, with respect to the admissibility of intelligence assessments that rely on information sources that have not been specified and that have not been brought before the Court. Therefore, in this respect as well, we shall require independent, admissible evidence that has been set forth in Court.

12.    In the Expert Opinion of Brigadier General Goldwasser, Prosecution/2, it was stated that the Defendant was head of the Fatah Supreme Committee in Judea and Samaria until the time of his arrest and that he accordingly served as the leader of the Fatah in the West Bank. This can be learned from the various documents that the Defendant wrote and which were written to him, and which are appended to Expert Opinions Prosecution/1 and Prosecution/2. In the above mentioned position, the Defendant constituted a central source of authority for senior members of the Fatah and served as a conduit connecting the chairman of the Palestinian Authority, Yasser Arafat, to the movement's field echelons (Sections 1 – 2).

It was further stated in the above mentioned Expert Opinion (see Section 4) that when the *intifada* broke out in September 2000, the Defendant played an extremely central role in leading the [campaign of] terror against Israel that was carried out by members of the Fatah, as well as in a general sense. His involvement manifested in a variety of different ways: **First of all**, the Defendant constituted a source of inspiration and created the policy for the terrorist attacks through personal meetings with terrorist operatives in the Fatah movement and by way of his public statements. **Second**, the Defendant was a source of authority and funding for terrorist operatives in the Fatah movement: he was perceived by the al-Aqsa Martyrs Brigades as the main leader of their operations, who served as a conduit that connected them to the chairman of the Palestinian Authority and who transferred sums of money to them that amounted to tens of thousands of shekels, for the purpose of terrorist activity. **Third**, the Defendant issued direct orders to terrorist operatives, on both the strategic level and on the tactical level, with respect to specific terrorist attacks.

13.  During the course of his interrogation by the Israel Security Agency, the Defendant did not hide his clear position whereby the Fatah movement must be the one to lead "the armed struggle against Israel" and that this is the only way to achieve the goals of the Palestinian people after the failure of the peace process and after the Defendant himself had been a peace activist for many years (Transcript Prosecution/59, Sections 2-5, that was submitted and verified by an interrogator by the name of "Wadi", on p. 96). He made it clear that when he used the term "armed struggle" he was referring to terrorist attacks (Transcript of the Interrogation Prosecution/98 (k), on pp. 2 – 3). The Defendant explained that the Fatah leaders feared a weakening of their power on the Palestinian street, in comparison to the Islamic movements and that this encouraged them to take a position that espoused terrorist attacks against Israel (Transcript Prosecution/21 Section 5, that was submitted and verified by an interrogator by the name of "Robert", on p. 63 (recorded in error in the Transcript Prosecution/41); Transcript Prosecution/23 Section 5, that was submitted and verified by an interrogator by the name of "Danny", on p. 90; Transcript Prosecution/27 Sections 10-12 and Transcript Prosecution/55 Section 3 that were submitted and verified by an interrogator by the name of "Smith", on p. 85; Transcript Prosecution/30 Sections 8-12 and Transcript Prosecution/58 Section 5 that were submitted and verified by an interrogator by the name of "Emile", on p. 54; Transcript Prosecution/40 Section 15 that was submitted and verified by an interrogator by the name of "Mofaz", on p. 58; Transcript Prosecution/70 Section 3 that was submitted and verified by an interrogator by the name of "Steve", on p. 53).

During the course of his interrogation, the Defendant said that "**his declared position is for armed struggle against the Israeli occupation and that anyone who has a weapon should perpetrate terrorist attacks, this is the general position**" (Prosecution/23 Section 5, see also Transcript Prosecution/6 Sections 11 – 12, that was submitted and verified by an interrogator by the name of "Robert", on p. 62). He explained that in accordance with his perspective, terrorist attacks that will be painful for Israel will promote peace and will cause Israelis to understand that they have something to lose (Prosecution/40 Section 15, and Prosecution/70 Section 4). The Defendant made it clear that from his point of view Israelis who live in settlements are an enemy that should be attacked (Transcript Prosecution/63, Section 16, that was submitted and verified by an interrogator by the name of "Naor", on p. 82). He also stated that terrorist attacks against settlers in Judea and Samaria are legitimate even when they involved women and children (Transcript Prosecution/6 Section 13 that was submitted and verified by an interrogator by the name of "Robert", on p. 62; Transcript Prosecution/7 Section 2 that was submitted and verified by interrogators by the names of "Tzadok" and "Ofir", on pp. 83, 87).

[Stamp] P 7: 000378 [continued]

The Defendant reiterated repeatedly during the course of his interrogation that in the debate that was taking place between the Palestinian Authority and the Fatah with respect to the type of terrorist attacks against Israel, Arafat and he espoused a policy whereby terrorist attacks should be focused against the Israeli Defense Forces and the settlers, while other leaders such as Abu Ala and Abu Mazen opposed any type of violence; only a few members of the Fatah supported terrorist attacks within Israel (Prosecution/27 Sections 12 – 13; Prosecution/30 Section 8; Prosecution/70 Section 3). Despite the opposition of Arafat and the Defendant to terrorist attacks within Israel, they lost control of the cells and field operatives during the *intifada* (Transcript Prosecution/55 Section 3 (f), that was submitted and verified by an interrogator by the name of "Smith", on p. 85).

14. The Defendant's position, as it has been set forth above, is also manifested within the framework of his statements during interrogations, which have been transcribed. The Defendant explained his position that suicide terrorist attacks should not be perpetrated within Israel, saying that terrorist attacks against the settlements are the same as terrorist attacks against the army and there was no argument on this point within Fatah. Notwithstanding, he did confess that during the period of time that immediately preceded his arrest, the Fatah did begin to perpetrate suicide terrorist attacks within Israel and even confirmed that the Fatah had been drawn into this activity in order not to leave control of the field in the hands of the Islamic organizations (Prosecution/98 (d), on pp. 27 – 29). The Defendant explained that he personally disagreed with any activity within Israel but that he supported "the armed struggle against the Israeli occupation" and did this publicly on television (Prosecution/98 (g), on pp. 7, 10).

The Defendant confirmed that during the five months that had led up to his arrest, the Fatah had assumed a central role in the escalation of violence and had led the war; the Defendant did not deny that he had taken part in this (Prosecution/98 (l), on p. 35; Prosecution/98 (d), on pp. 3 – 4).

During the course of the interrogation, the Defendant emphasized that he had supported the peace accords and worked on their behalf for 10 years but the escalation in violence was caused, he claimed, by a lack of hope that a political solution could be reached with Prime Minister Sharon (Prosecution/98 (l), on pp. 44 – 45). The Defendant even expressed his opinion that the Palestinians had made a mistake when they rejected Israel's proposal and, especially, the proposal of President Clinton at the Camp David summit, because if they had accepted those proposals, they would now have an independent state (Transcript Prosecution/95 that was submitted and verified by an interrogator by the name of "Ofir", on p. 87).

[Stamp] P 7: 000378 [continued]

15. It is also possible to learn about the position of the Defendant with respect to terrorist attacks and his role in the perpetration of terrorist attacks against Israel by the Fatah from the conversations that he had with the agents who were planted in a cell. The agent who was referred to as John Doe No. 1 introduced himself to the Defendant as a Palestinian from Nablus. He reported the things that the Defendant had told him to Israel Security Agency interrogators after the conversations had taken place, and these were recorded in the transcript that was taken down by the Israel Security Agency interrogators who had testified in the trial ("Robert", on p. 154, "Mickey", on p. 155, "Ofir", on p. 156 and "Mofaz", on p. 157). In addition, John Doe No. 1 testified himself (on pp. 101 – 107). John Doe No. 1 testified that he read all of the reports that had been recorded by Israel Security Agency agents with respect to his conversations with the Defendant, and that he had confirmed their content (on p. 105). The agent, John Doe No. 3, operated and was employed in a similar matter. He also identified the voice of the Defendant on the recording Prosecution/124 (b) (see his testimony on pp. 107 – 110 and in the exhibits Prosecution/122 – Prosecution/125).

According to the testimony of John Doe No. 1, the Defendant had told him that he was the one who had established the al-Aqsa Martyrs Brigade and that he was in charge of that organization (on p. 106). In the transcript that was written on the basis of his oral statements (Prosecution/117 that was submitted and verified by an interrogator by the name of "Robert", on p. 154), John Doe No. 1 said that the Defendant told him that the *intifada* had actually been planned because of the political situation, the expansion of the settlements, the continued occupation and pressure from Palestinians in the territories and that the visit of Ariel Sharon on the Temple Mount was only "the straw that broke the camel's back" and ignited the *intifada* that would have happened anyway (see also Transcript Prosecution/25 Section 18, that was submitted and verified by an interrogator by the name of "Mofaz", on p. 58).

[Stamp] P 7: 000379

After the incident on the Temple Mount, the Fatah security apparatus asked Arafat to order the halting of the *intifada,* but Arafat did not respond. The Defendant himself said that he left the meeting in a fury in light of the request that they had made, and that he is hated by the apparatus because he "dragged the people into an escalation of the situation." The Defendant told John Doe No. 1 that the purpose of the *intifada* was to attack soldiers and settlers in order to cause their departure, and in order to prove to the world that the Palestinians are fighting the occupation. However, after Israel had begun its policy of targeted assassinations, and especially after it targeted Ra'ed Karmi, the Fatah began to act within Israel, with the objective of harming civilians and in order to cause damage to the Israeli economy and tourism and to exert pressure on the Israeli street to pressure the government to withdraw from the territories (*op. cit.,* Sections 12 – 13, 17, 20 – 21). Similarly, the Defendant told John Doe No. 1 that, from his perspective, terrorist attacks constitute self-defense for the Palestinians, who are willing to extend a hand in peace, and that suicide terrorist attacks are an outcome of the occupation and the condition of the Palestinians in the territories (Transcript Prosecution/110 Sections 22, 27).

The position of the Defendant in support of the continuation of the *intifada* was further expressed in the letter that he had sent to Yasser Arafat on December 31, 2000 (Prosecution/5 (42a)).

[Stamp] P 7: 000379 [continued]

16. With respect to Fatah's policy on terrorist attacks, the Defendant explained, during the course of his interrogation, that when Arafat was interested in a cease fire he would take pains to convey the guideline to many different people, including the Defendant; but that when he was interested in the continuation of the activity, he would make sure that the operatives, including the Defendant, would understand this from his responses and especially from his non-responses. The Defendant said: "**If he** (Arafat) **for example did not want a cease fire, he would take care of matters differently. He would not say anything at all**" (Transcript Prosecution/24 Section 3 (b) that was submitted and verified by an interrogator by the name of "Smith", on p. 85, and the transcript of the interrogation of the Defendant Prosecution/98 (i), on pp. 32-33). The Defendant said that Arafat had never explicitly ordered him to carry out terrorist attacks. Notwithstanding, he did add that from the fact that Arafat only opposed the perpetration of terrorist attacks within Israel, it was possible to understand that he supported terrorist attacks in the territories and therefore he did not order that they be stopped; on several occasions, Arafat stated in the media that "**a million *shahids* [martyrs] are on their way to Jerusalem**" and the Defendant asked rhetorically whether the statement wasn't a statement of support for terrorist attacks (Transcript Prosecution/60 Section 4-7 that was submitted and verified by an interrogator by the name of "Emile", on p. 54; Transcript Prosecution/61 Sections 1 – 8 that was submitted and verified by an interrogator by the name of "Mickey", on p. 81; Transcript Prosecution/62 Sections 3-5 that was submitted and verified by an interrogator by the name of "Danny", on p. 90).

The Defendant explained that there was no need for direct orders from Arafat in order to carry out terrorist attacks since this was self-evident between the lines (Transcript Prosecution/63 Sections 11-13 that was submitted and verified by an interrogator by the name of "Naor", on p. 82). The Defendant added that even if the *intifada* had not commenced at the order of Arafat, it would not have continued if he did not support it, even though was not necessary for him to give explicit orders with respect to the perpetration of terrorist attacks (Transcript Prosecution/64 that was submitted and verified by an interrogator by the name of "Robert", on p. 62, and Prosecution/66 that was submitted and verified by an interrogator by the name of "Emile", on p.

54). It should also be noted that the Defendant understood that Arafat supported the terrorist attacks from the fact that Arafat would approve the financial requests that he submitted for the Fatah field operatives who were perpetrating the terrorist attacks (Transcript Prosecution/70 Section 17 (h) that was submitted and verified by an interrogator by the name of "Steve", on p. 53). The Defendant described his relationship with Arafat as **"personal and direct"** (Transcription of Conversation Prosecution/98 (h), on p. 55).

It became evident that the Defendant also had his own way of informing members of the cells of the cessation or renewal of terrorist attacks. During the course of his interrogation, he explained that when he wanted a cease fire he would make contact with the large cells, although it would happen that there would be people who would not obey his order; when the Defendant was interested in renewing fire, he would announce it on television by calling for an "armed struggle." When he was asked how he would announce his desire to renew attacks, the Defendant answered:

> **"I do not want fire, I talk on television if I want peace, meaning I do not call up some random person and say 'Hey, go commit a terrorist attack for us. Hey, do this or that for us.' That is not the way we work. I speak in the name of the movement and I am actually calling for an *intifada* when I call for an armed struggle" (Prosecution/98 (h), on p. 3).**

In spite of these statements on the part of the Defendant, it emerges from the testimony of the terror operative Aweis that the Defendant did instruct him to cease the perpetration of terrorist attacks during the visit of the United States emissary Anthony Zinni (see below). From the testimony of Agent John Doe No. 1 during his questioning, subsequent to his conversations with the Defendant, it transpires that the Defendant had expressed great anger about the fact that Aweis had provided this information during the course of his interrogation (Transcript Prosecution/113 (a), Sections 8-9, Transcript Prosecution/114 (a) Section 8 that were submitted and verified by an interrogator by the name of "Robert", on p. 154). In addition, evidence was set forth with respect to other situations in which the Defendant had issued direct orders to terrorist operatives who were close to him, in order to carry out terrorist attacks against Israelis (see below).

17.  At the outset of his interrogation by the Israel Security Agency, the Defendant denied that he was a leader of the Tanzim and the al-Aqsa Martyrs Brigades, but confirmed that he was the person in charge of the military operations of the Fatah (Transcript Prosecution/17 Section 6, which was submitted and verified by an interrogator by the name of "Arbel", on p. 80, Transcript Prosecution/43 Section 6 that was submitted and verified by an interrogator by the name of "Robert", on p. 62, and a Transcript of the Interrogation Prosecution/98 (a), on pp. 43-44). The Defendant claimed that the Brigades were nothing more than scattered cells throughout the area of the West Bank and that they did not have any orderly organizational structure or central command (Transcript of Conversation Prosecution/98 (e), on pp. 60-61). The Defendant also said during the course of his interrogation that Arafat was effectively his direct commander and his superior and he defined himself as "**responsible for all of the operations of the Fatah in the West Bank itself because he was secretary general of the organization in the West Bank**" (Prosecution/24 Section 3 (b), 5).

The Defendant confirmed that he was the leader of Fatah in the "field" while Yasser Arafat held the position of the head of the Fatah (Transcript of Conversation Prosecution/98 (a), on p. 67). In this manner, the Defendant also explained during the course of his interrogation the fact that members of the cells approached him with requests for money because they considered him the "**commander**" as well as "**the person who was in charge of the Fatah in the West Bank**," insofar as he was the political spokesperson of the movement and because he maintained a policy and a position that supported the continuation of the struggle against the occupation (Transcript of Conversation Prosecution/98 (e), on pp. 3-4, 61; Prosecution/98 (d), on pp. 33-35). The Defendant explained how he was seen in the eyes of cell members when he said: "**I am their commander and they consider me to be their symbol**." He also confirmed that there is no one else whom they consider to be their leader (Prosecution 98 (i), on pp. 6-7).

In statements that he made during the course of his trial, the Defendant claimed more than once that he was "political leader" of the Fatah and emphasized his position as secretary general of the Fatah in the West Bank, as well as the fact that he is a member of the Palestinian Parliament [Legislative Council]. He also made these claims at the outset of his interrogation by the Israel Security Agency. During the course of his interrogation by the police, the Defendant also denied that he was in charge of the Tanzim or the al-Aqsa Martyrs Brigades (Prosecution/106, on pp. 3, 6). Notwithstanding, during the course of his interrogation by the Israel Security Agency, the Defendant admitted that he was the commander of the Fatah in the West Bank and the commander of the Tanzim (Transcript Prosecution/18 Section 3 that was submitted and verified by an interrogator by the name of "Nadav", on p. 78), that he established the al-Aqsa Martyrs Brigades and was responsible for their operations; for this reason he objected to the activity of the security forces belonging to the Palestinian Authority (in accordance with statements by John Doe No. 1 in Transcript Prosecution/117 Section 15, which was submitted by an interrogator by the name of "Robert", on p. 154).

[Stamp] P 7: 000380 [continued]

The Defendant told Agent John Doe No. 3 in their conversation that he was indeed responsible for the Fatah and for the al-Aqsa Martyrs Brigades but that he was "not crazy [enough] to sign" his name on a piece of paper that would contain these written statements; when the agent asked the Defendant if he was, in spite of this, responsible for the acts of the terrorists, the Defendant responded that he was indeed responsible but "not stupid [enough] to tell this to the interrogators" (Transcript Prosecution/123, on p. 2, which was submitted by an interrogator by the name of by the name of "Ofir"). In a meeting between the Defendant and Ahmed Barghouti when they were arrested, which was recorded without their knowledge, the Defendant told Ahmed that he said during the course of his interrogation that he has no connection to the al-Aqsa Martyrs Brigades. The two laughed and Ahmed advised the Defendant to say that only he – Ahmed – had a connection to the Brigades; the Defendant responded that he had said during the course of his interrogation that he would have fired Ahmed if he knew that he had a connection to the al-Aqsa Martyrs Brigades and Ahmed laughed when he heard this (Transcription of Conversation Prosecution/127 (c) on p. 87).

The Defendant confirmed during the course of his interrogation that beyond being a political leader he was also in charge of the military aspects of the Fatah (Transcript Prosecution/59 Section 6 that was submitted and verified by an interrogator by the name of "Wadi", on p. 96). The Defendant defined himself as "**in charge of all of the operations of the Tanzim in the Fatah in his region**" (Transcription of Conversation Prosecution/98 (d) on p. 42). He even confessed that he was "**in charge of everything that was undertaken, including supplying money to the cells, purchasing weapons and carrying out terrorist attacks**" (Transcript Prosecution/29 Section 1 (c) that was submitted and verified by an interrogator by the name of "Smith", on p. 85) and that he was considered as a "**military commander**" and "**in charge of the military aspects of Fatah**," in addition to being a political leader and elected official (Transcript Prosecution/19 Section 2 and Transcript Prosecution/59 Sections 5-6, which were submitted and verified by an interrogator by the name of "Mofaz", on p. 58).

The Defendant said that in the year prior to his arrest, "**I began to find myself more involved in dealing with issues of weapons and explosives and issues of military operations**" (Transcript Prosecution/25 Section 19, which was submitted and verified by an interrogator by the name of "Mofaz", on p. 58; see also Transcript of Conversation Prosecution/98 (d) on p. 15). He explained that he was required to take part in "military operations" in order to control the Palestinian street and to push the Hamas and the Islamic Jihad aside, so that in the future, he could point to himself as someone who had taken action in favor of both peace and war (Transcript Prosecution/52, which was submitted and verified by an interrogator by the name of "Smith", on p. 85).

[Stamp] P 7: 000381

C.  **Testimony of Terrorism Operatives from the Movement for the Liberation of Palestine with Respect to Their Relationship with the Defendant, His Involvement in Terrorist Attacks and the Defendant's Responses to this Testimony**

18.  The Prosecution does not claim that the Defendant initiated or took a direct part in the perpetration of the terrorist attacks that are the subject of the indictment, since it is aware of the fact that the evidence indicates that the field commanders and field operatives were given broad authority and much room for maneuvering when carrying out terrorist attacks, and that they were not required to obtain the Defendant's approval for each terrorist attack. The Prosecution also agrees that the Defendant did not know in advance about each individual terrorist attack: he was aware of the activities of the field commanders and field operatives subordinate to him in a general way, and that they were acting in accordance with the terrorist attack policy that he had helped design; sometimes he was informed before a terrorist attack and sometimes only afterwards (on p. 47 of the Summations of the Prosecution).

As is shown by the evidence described below, the Defendant was the leader of terror cells that were part of Tanzim and al-Aqsa Martyrs Brigades. At least some members of these cells followed his orders and acted in accordance with policy that he set. In addition, it clearly emerges from the evidence that the Defendant assisted the commanders of the cells and terrorism operatives by supplying weapons, explosives and funding. In several cases, the Defendant approved terrorist attacks against Israel in advance. Therefore, this Chapter will examine who the terrorist operatives who acted under the Defendant's leadership were and the relationship of the Defendant to these operatives. The next Chapter will examine the terrorist attacks in which these terrorism operatives were involved and the degree of the Defendant's connection to them.

**(1) Nasser Aweis**

19.  Nasser Aweis (hereinafter – "**Aweis**"), is one of the senior terrorism operatives of the Tanzim in the Nablus region. As result of his activity, he was sentenced by this Court to 14 terms of life imprisonment and another 50 cumulative years in prison (Prosecution/172 (a) – (b)). In his testimony (on pp. 180 – 182), Aweis refused to answer questions, and after he was declared a hostile witness, his police statements were submitted in accordance with Section 10 (a) of the Rules of Evidence (Prosecution/172 – Prosecution/177). The only thing that Aweis was willing to say in his testimony was that everything that was recorded in his statement were lies on the part of the Israel Security Agency and that the handwriting that appears in his statement is also that of Israel Security Agency personnel. He claimed that he had undergone very harsh means of interrogation.

[Stamp] P 7: 000382

The statements that Aweis made to the police were written in his handwriting and translated into Hebrew by the interrogator who took the statements, confirmed having taken them and further testified that the statements were made by Aweis of his own free will (Advanced Staff Sergeant Ronny Amar on pp. 191 – 192). Similarly, reports prepared by the Israel Security Agency of Aweis's statements during interrogation were also submitted (Prosecution/178 (a) – (d)). These were verified by the Israel Security Agency interrogators who testified that Aweis said what he said of his own free will, even though this document is only a summary rather than a word for word transcript of his words ("Ariel", on p. 203, "Adi", on p. 204, "Yoel", on pp. 204 – 205). Transcript Prosecution/178 (c) was recorded by an interrogator by the name of "Zadok" who did not refer to it in his testimony (on pp. 83 – 84) and did not return to testify after Aweis's testimony and therefore should be ignored.

20.   Aweis stated in Statement Prosecution/172 (b) (on pp. 1 – 2), which is written in his own handwriting, that after the al-Aqsa *intifada* began in September 2000, he began to carry out terrorist attacks against Israeli targets while also serving in the Palestinian national security forces in Nablus with the rank of captain (Nakiv). He perpetrated shooting terrorist attacks and other terrorist attacks against Israeli targets in the Judea and Samaria region and also within Israel. In his Statements Prosecution/172 – Prosecution/174, he lists these attacks, which included shooting on military posts and military vehicles; transferring weapons and explosives to others in order for them to perpetrate suicide terrorist attacks in Jerusalem, Netanya and Hadera, etc.

21.   In his statement, Aweis said that he perpetrated the terrorist attacks in the name of the al-Aqsa Martyrs Brigades and explained that this organization belongs to the Fatah movement and the Tanzim Fatah (Prosecution/172 (b), on p. 3). Aweis said that funding for the terrorist attacks came from members of the Tanzim, and that the Defendant himself funded the weapons for the terrorist attacks in which

he, Aweis, was involved – sometimes directly and sometimes through Majad Almitzri – knowing that Aweis carried out terrorist attacks against Israeli targets. In one case, the Defendant gave Aweis a check that had been approved by Chairman Arafat (on pp. 6 – 7). Aweis also said during the course of his interrogation that he was in contact with the Defendant for an extended period of time; when asked if the Defendant knew that he was carrying out terrorist attacks against Israeli targets, he answered (on pp. 4-5):

> **"Yes he knows and my name was also publicized in newspapers, on television and on the radio and I would speak with him occasionally and when the political situation deteriorated and was bad for us, he asked that we continue the terrorist attacks and when Shimon Peres and Omri Sharon met with leaders from the Palestinian Authority, Marwan Barghouti called me and asked us to stop the terrorist attacks... During that period, Zinni was in the area and Marwan said that it would be preferable not to carry out terrorist attacks in the name of the al-Aqsa Martyrs Brigades while General Zinni was meeting with leaders of the Palestinian Authority. It should be noted that when the talks progressed, no terrorist attacks were perpetrated."**

Speaking to Agent John Doe No. 1, the Defendant expressed anger that Aweis had confessed during the course of his interrogation, how the Defendant had behaved during General Zinni's visit to the region (Prosecution/113 (a) Sections 8 – 9, Prosecution/114 (a) Section 8, which were submitted and verified by an interrogator by the name of "Robert", on p. 154; and transcript of the interrogation of the Defendant Prosecution/98 (h), on p. 3).

22. With respect to his relationship with the Defendant, Aweis said in his Israel Security Agency interrogation that he had submitted requests for assistance from several field operatives to the Defendant and that he himself had received money from the Defendant three times (Transcript Prosecution/178 (a) Section 10). The Defendant was a supervisor in the Tanzim and sometimes transferred financial assistance to himself and to other operatives, after receiving approval from Chairman Arafat (Prosecution/178 (b) Section 10). Generally, Aweis received the money from the Defendant through the middleman Majad Almitzri but sometimes the Defendant would send him money directly; Aweis did not usually tell the Defendant the purpose of the money, but throughout the West Bank, the nature of Aweis's activity was well known (Prosecution/178 (d) Section 5 (k)).

[Stamp] P 7: 000383