לביצוע עבירת הרצח עצמה, משום שהשתתף בתכנון והיה מנהיג החבורה, ובלשונו של כב' הנשיא א. ברק "ראש וראשון לכולם".

בע"פ 8469/99 הנ"ל בעניין **אסקין**, הורשע הנאשם כמשדל לביצוע עבירות של הצתה וכניסה ללא רשות למקום פולחן או קבורה, שבוצעו על ידי אדם שהיה כפוף לנאשם וסר למרותו; בית המשפט הדגיש את היותו של הנאשם "מנהיג ומוביל", וכן את העובדה שהנאשם היה זה שנתן את "הסכמתו ואישורו" לביצוע העבירות, וקיבל דיווח לאחר השלמת הביצוע (עמ' 77-81, 84, 90-91). עם זאת, יש לציין כי הנאשם באותו מקרה נטל חלק בתכנון העבירה, וסייע בכסף לביצועה. בנסיבות אלו, העירה כב' השופטת ד. ביניש, אגב אורחא, כי ייתכן שהיה מקום להרשיעו כמבצע בצוותא, ולא רק כמשדל, באומרה (בעמ' 84):

"אף לו היינו אומרים כי עיקר 'תרומתו' של המערער לביצוע העבירה היה במתן 'אישורו' לתוכנית העבריינית ולמימושה, הרי שבנסיבות מיוחדות אפשר ש'הסכמה' לביצוע תהווה השתתפות 'בביצוע עבירה תוך עשיית מעשים לביצועה', כאמור בסעיף 29 לחוק העונשין".

בדבריה אלו הפנתה כב' השופטת ביניש לדברי כב' השופט י. קדמי בע"פ 5589/98 **ביסאן סולטאן נ. מדינת ישראל**, תק-על 99(3) 98, פסקה 9. באותו עניין הורשע המערער בעבירת רצח בכוונה תחילה, כאשר הוכח שנתן את הסכמתו ואישורו לביצוע הרצח, ושלח את המבצע העיקרי להוציא לפועל את הרצח, ואף הנחה אותו לגבי שיטת הביצוע.

השופט קדמי הדגיש שלולא הסכמתו של המערער לא היה הרצח מתבצע, ולכן מתן האישור לבצע את הרצח היה משול "לירית ההזנקה המשלחת ספורטאי למרוץ", והיא עולה כדי "מעשה של השתתפות בביצוע העבירה". לכן הורשע המערער כמבצע בצוותא ולא כמשדל, ובית המשפט הדגיש כי הוא היה מצוי "במעגל הפנימי של הביצוע", כמי שהיה לו תפקיד בביצוע, והיה "המוח של החבורה", בעוד שמשדל מצוי מחוץ למעגל הפנימי של הביצוע.

כב' השופט קדמי הוסיף ואמר כי בנסיבות המתוארות לעיל, כאשר המערער נתן "אור ירוק לרצח" וההנחיות אופרטיביות בדבר דרך הביצוע, היה בהתנהגותו לפחות "מנה גדושה של שידול על דרך העידוד". גם בע"פ 8469/99 הנ"ל בעניין **אסקין**, נפסק כי די היה בכך שהמערער אישר את ביצוע ההצתה, בהיותו המנהיג והמוביל, כדי להגיע למסקנה שהיה במתן אישור זה משום עידוד למבצע העיקרי להוציא את רעיון ההצתה מן הכוח אל הפועל (בעמ' 93).

164.   שאלת אחריותו של מנהיג קבוצת עבריינים, אשר איננו משתתף באופן פיזי בביצוע העבירה בידי אלו הסרים למרותו, התעוררה במלוא חריפותה בדנ"פ 1294/96 הנ"ל בעניין **משולם**. בית המשפט פסק בדעת רוב של ששה שופטים, כי רב-עבריינים אשר מנהיג קבוצת עבריינים המבצעת עבירות בשליחותו ועל-פי תכנונו והנחיותיו, איננו רק משדל: הוא נחשב כמבצע בצוותא בשל השליטה המלאה שיש לו על ביצוע העבירה ועל מבצעיה. כב' השופטת ד. דורנר סברה בדעת מיעוט כי יש לראות באדם שכזה משדל בלבד (עמ' 47-42). דעה אחרת, לפיה יש לראות במנהיג ארגון פשע כ"מבצע באמצעות אחרי" לפי סעיף 29(ג) לחוק העונשין, מובעת במאמריהם של מ. קרמניצר **"המבצע בדיני העונשין קווים לדמותו"**, פלילים-א' (תשנ"ד-1990) 65, בעמ' 72, ומ. גור-אריה, **"צדדים לעבירה-תיקון 39 לחוק העונשין במבחן הפסיקה"**, מגמות בפלילים, עמ' 83. במאמרו של פרופ' קרמניצר נאמר בעמ' 72:

"דומה כי לא צריך להכביר מילים על כך שהמושגים הרגילים של השתתפות עקיפה (סיוע ושידול) אינם הולמים תופעות עברייניות, כגון פשעי מלחמה, פשעים המתבצעים

על ידי מדינה פושעת (פשעי הנאצים) או על ידי ארגון פשע ('המאפיה'). מי שנמצא בעמדת שליטה במערכת כזו (ולא רק ראש ההיררכיה) הנותן פקודה להמית אדם, איננו סתם משדל או מסייע לרצח כאשר פקודתו מתבצעת. האופי המיוחד של מעשהו מתבטא בכך שבעת מתן הפקודה הוא יכול לסמוך על כך שהוראתו תבוצע, מבלי שיהיה עליו להכיר את המבצע הפיזי. הוא

יודע שאם אחד האורגנים הבאים בחשבון לביצוע לא ימלא את המשימה, יבוא אחר במקומו, והעיקר – המשימה תבוצע.

המבצע הישיר שולט אמנם על המעשה (הוא מבצע במו-ידיו את המעשה, מתוך היסוד הנפשי הנדרש, וללא כפייה), ואולם מבחינתו של נותן ההוראה הוא נתפס לגמרי אחרת – כפיגורה אנונימית וניתנת להחלפה, כבורג או גלגל בתוך מנגנון הפעולה של הארגון הנתון בידיו של נותן ההוראה. הפונגיביליות של המבצע הישיר הופכת את השליט בארגון למבצע באמצעות אחר״.

165. בדנ״פ 1294/96 הנ״ל בעניין **משולם**, פסק כב׳ השופט א. מצא כי: ״יש לראות במשתתף כזה – שבידו שליטה מלאה על הביצוע ושעשייתו כוללת לא רק פעולות שידול והכנה, אלא גם הנחיית העבריינים הפועלים ופיקוח על פעילותם - מבצע בצוותא לכל דבר״ (עמ׳ 27). הוא הדגיש כי נוכחות בזירת העבירה איננה יסוד חיוני להיותו של אדם מבצע בצוותא, ואמר (בעמ׳ 30):

״במציאות המשפטית החדשה, התניית האחריות הישירה בנוכחות, פרושה ש׳סנדקים׳ ומנהיגי קבוצות עבריינים, המשלחים לזירת הביצוע את ׳דגי הרקק׳ הסרים למרותם, בעוד הם מנהיגים את הפעילות הפלילית מרחוק, יראו לא כמבצעים בצוותא אלא רק כמשדלים. ואפשרות זו, שבוודאי אינה משקפת את הדין הרצוי, איננה מתחייבת אף מן הדין המצוי״.

כב׳ השופט א. מצא הדגיש לעניין השליטה של המנהיג באנשיו, את העובדה שהנאשם יכול היה להורות לאנשיו לחדול מביצוע העבירה (עמ׳ 32, וראה גם דברי כב׳ השופט קדמי בעמ׳ 63).

כב׳ הנשיא ברק הצטרף לדעתו של כב׳ השופט א. מצא, אך הדגיש גם את העובדה שהנאשם באותו מקרה היה נוכח בזירת ביצוע העבירה עד למעצרו, ובאותה עת הניע את תוכנית העבירה (עמ׳ 50). כב׳ הנשיא ברק פסק (בעמ׳ 51):

״מעמדו של משולם אינו מאפשר לראות בו משדל בלבד. משולם הוא ראש הקבוצה. הוא המנהיג. הוא תכנן את המבצע. זהו מבצע שלו. הוא איננו בעל רעיון עברייני; הוא איננו רק ׳אב רוחני׳ של העבירה. הוא איננו אדם חיצוני המבקש כי מישהו אחר יבצע עבירה. הוא בעל תרומה פנימית לביצוע העברייני... בידיו של משולם, כראש הקבוצה, השליטה האפקטיבית על הארוע העברייני, ואצלו המחשבה הפלילית הנדרשת לגיבוש אחריותו כמבצע בצוותא״.

כב׳ השופט מ. חשין פסק (בעמ׳ 55) אף הוא כי: ״רב-עבריינים פלוני, היוזם, המתכנן, קובע

**משימות והשולח את 'חייליו' לביצוע העבירה"** – נחשב כמבצע בצוותא הגם שאינו נוכח בזירת ביצוע העבירה. הוא הוסיף כי אדם שכזה, שהוא "הרוח הרעה בכל מעשה העבריינות" איננו יכול להחשב כמשדל בלבד, שאחריותו תהיה פחותה מאחריותו של המבצע בצוותא. וכך אמר כב' השופט חשין (בעמ' 59):

"נדע מכאן, כי בסווגנו את רב-העבריינים כמשדל – להבדילו ממבצע-בצוותא – כמו הפחתנו באחריותו והקלנו עימו. 'חיילים' ששלח רב-העבריינים לביצוע מעשה פשע, אלה יישאו באחריות מלאה לעבירה שונה ונוספת שביצעו, ואילו הוא – הרב-מוח והמנהיג העליון – ישא באחריות פחותה, אף כש'אדם מן הישוב יכול היה להיות מודע לאפשרות עשייתה' של אותה עבירה שונה ונוספת. מסקנה זו תמוהה ומוזרה ויקשה עלי לקבלה."

ועוד אמר כב' השופט חשין (בעמ' 59):

"הנקבל כי הרב-מוח יהא זוטר ל'חייליו' עושי-דברו? אכן, אם הרב-מוח אכן רב-מוח הוא – שבלעדיו לא יוכל תמנון-השתתפות-לעבירה להניע את זרועותיו – יקשה עלינו לקבל כי אחריותו תהא פחותה מאחריות המבצע בצוותא. רוחו הרעה של המנהיג שורה על כל המבצע העבריינני, מוחו מילא את הקפיץ מפעיל-העבירה קודם תחילתה, ולעת עשייתה של העבירה הוא 'נמצא' עם העבריינים כמבצע – בצוותא עימהם. הוא ימשיך וי'ימצא' בינותם עד אם יעשה מעשה גלוי לעין למניעת העבירה, לא פחות."

כב' השופט חשין נימק מסקנה זו גם באנלוגיה שהקיש מסעיף 29(ג) לחוק העונשין, בראותו את המנהיג המשלח את "חייליו" לביצוע העבירה כמעין "מבצע באמצעות אחר", ובאומרו: **"'חיילים' ישמעו להוראות מנהיגם עד שיבטלו את רצונם לחלוטין מפני רצונו"** (בעמ' 60). לגבי הנאשם באותו מקרה, הדגיש כב' השופט חשין כי: "אחריותו נגזרת מתוך תכנון וביצוע 'המרד' קודם מעצרו – תכנון וביצוע של מנהיג – ואותה אחריות נמשכה והלכה גם לאחר מעצרו וכל-עוד לא עשה מעשה גלוי לעין לעצור את העגלה המתדרדרת במדרון" (עמ' 61).

כב' השופט י. קדמי פסק ברוח דברים אלו (בעמ' 66-67), באומרו:

"במצב דברים זה, במקום שמעורבותו של מנהיג של חבורה, שהחליטה על ביצועה של עבירה, באה לכלל ביטוי בתכנון, בהנחיה ובחלוקת תפקידים, השאלה אם בפנינו 'מבצע בצוותא' או 'משדל', תוכרע על-פי אופייה של ה'מעורבות': אם היתה זו 'מעורבות' שיש בה תרומה של 'השתתפות' בביצוע; או שמא 'מעורבות' חיצונית של שידול בלבד.

יישומה של ההבחנה האמורה אינו תמיד קל, אך תמיד אפשרי. מכל מקום, כאשר מדובר במנהיג – או בראש חבורה – המציג לנוהים אחריו ולעושי דברו תכנית קונקרטית לביצועה של עבירה, כאשר זו כוללת חלוקת תפקידים ומתן הנחיות בדבר אורח הביצוע, לא יכול להיות ספק כי לא ב'משדל' המדובר, אלא במנהיג ש'השתתפותו' בביצוע באה לכלל ביטוי ב'מעשה התכנון' האמור. 'מעשה של תכנון' – להבדיל מ'מעשה-של-שידול' – מהווה מעשה של 'השתתפות' בביצוע, משום שבפועל יש בו משום שלב ראשון של הוצאה לפועל של התכנית העבריינית, קרי: של הביצוע. זאת, להבדיל מן ה'שידול', שאינו חלק

מן הביצוע, אלא גורם חיצוני המניע את המבצע.

כפי שהוסבר לעיל, ניתן להסתייע בעניין זה, בבחינת קיומה של 'זיקת שליטה'. קיומה של 'זיקת שליטה' תאשר, כי ראש החבורה הינו 'מבצע בצוותא' על כל הנובע מכך; כאשר במקום שבו אין מתקיימת 'זיקת שליטה' כמוסבר לעיל, תהיה אינדיקציה לאפשרות שהמדובר במעורבות המקימה אחריות של 'משדל' בלבד.״

166.    על גישתו דלעיל, חזר כב' השופט י. קדמי בע"פ 4720/98, 5310/98, 5454/98 <u>נחמן כהן ואח' נגד מדינת ישראל</u>, דינים עליון, כרך נ"ז 366. במקרה זה הורשע נחמן כמבצע בצוותא, לאחר שהוכח כי היה היוזם, המזמין והמוביל של מזימת הרצח, ומי שאישר את זהות המתנקש המיועד שהוצג בפניו. כב' השופט י. קדמי אמר (בפסקה 9):

״לשיטתי, אותה הצגתי לא פעם בעבר, 'מנהיגה' של חבורה, היוזם ומוביל לביצועה של עבירה ע"י חבורתו, נמנה בין 'מבצעיה'. המנהיג, 'משתתף' בביצוע העבירה במשמעות שיש לדרישה זו בסעיף 29 לחוק העונשין. גורלו קשור בגורלם של המבצעים בפועל; והוא נושא באחריות לביצוע כאילו היה 'לצידם' של המבצעים בשעת הביצוע. זה דינו של 'המנהיג' וזה דינם של ה'מתכננים' וממלאי 'תפקידים חיוניים' אחרים, שתרומתם לביצוע 'מסתיימת' אמנם פורמלית לפני תחילתו, אך היא נותרת חלק בלתי נפרד ממנו. גורלם של אלה – המנהיג, המתכנן ודומיהם – קשור בגורלם של המבצעים בפועל: הם מהווים גוף אחד, שכל איבריו נושאים באחריות למעשים שעושים 'ידיו'.

לשיטתי, מנהיג של 'חבורה' שחברה לביצועה של עבירה, אינו 'משדל' של חבריו לחבורה, אלא מי שעומד בראשם ו'מוביל' אותם להגשמת מזימתם המשותפת. המשדל מצוי מחוץ למעגל הפנימי של ה'ביצוע'; ומעשה השידול הינו שידול 'נטו', לאמור: מעשה עצמאי ונפרד מן המאמץ הכולל של הביצוע. מי ש'משתתף' בביצוע – ולשיטתי, כמתחייב מן האמור לעיל, יש ליתן למושג 'השתתפות' בהקשר זה משמעות רחבה – אינו יכול להיות 'משדל'. בין ה'משדל' לבין ביצוע העבירה 'חוצץ' המבצע שסימנו 'מילוי תפקיד' בביצוע; ובמקום ש'שידול' מלווה ב'מילוי תפקיד' כאמור – לא 'משדל' ניצב בפנינו, אלא 'מבצע בצוותא'.״

3. **מסקנות בעניין אחריותו של הנאשם כמבצע בצוותא, משדל ומסייע**

167. ניתוח חומר הראיות כמפורט לעיל, מביא למסקנות **העובדתיות** הבאות לגבי חלקו ותפקידו של הנאשם בפיגועים נשוא כתב האישום:

א. הנאשם היה מפקד הפת"ח והתנזים בגדה המערבית. הוא היה מנהיג השטח של הפת"ח בגדה, ואחראי על ה"פעילות הצבאית" של הפת"ח בכל שטחי הגדה. הביטוי בו השתמש הנאשם, קרי: "הפעילות הצבאית", איננו אלא שפה נקיה לפיגועי הטרור כנגד ישראל, שבוצעו על ידי חוליות השטח של הפת"ח, שהתארגנו בתנועת התנזים ובמסגרת גדודי חללי אלאקצא. הנאשם הקים את גדודי חללי אלאקצא, והיה אחראי על פעילותם, בהיותו מנהיגם ומפקדם של אנשי חוליות השטח ומפקדיהם. בפעילותו זו היה הנאשם כפוף באופן ישיר ליו"ר הרשות הפלסטינאית יאסר ערפאת. פעילותו "הצבאית" של הנאשם כמתואר לעיל, נעשתה במקביל לפעילותו הפוליטית כמזכ"ל הפת"ח בגדה, והיותו חבר הפרלמנט הפלסטינאי.

ב. הנאשם החזיק בדעה כי תנועת הפת"ח חייבת להוביל את "המאבק המזוין כנגד ישראל", ולכן תמך בגלוי בביצוע פיגועים כנגד חיילים ומתנחלים. זו היתה עמדתו המוצהרת של הנאשם, אשר הבהיר כי מבחינתו גם נשים וילדים המתגוררים בהתנחלויות נחשבים כאויב שיש לפגוע בו. הנאשם התנגד באופן עקרוני לפיגועים בתוך ישראל, קרי: מעבר לקו הירוק, וכן היה נגד פיגועי התאבדות. ואולם בפועל, הוא לא חדל מלתמוך באנשיו, ולסייע להם באספקת כספים ואמצעי לחימה, גם כאשר נוכח שוב ושוב שהם מבצעים פיגועים, כולל פיגועי התאבדות, בתוך ישראל. בכך הביע הנאשם את הסכמתו לכל סוגי הפיגועים שביצעו אנשי השטח של הפת"ח. עמדתו של הנאשם כמתואר לעיל, באה לידי ביטוי גם בהופעותיו באמצעי התקשורת, בהן עודד את פעילי הפת"ח לבצע פיגועים כנגד ישראל, ואף שיבח את מבצעי הפיגועים – כולל אלו שבוצעו בתוך ישראל.

ג. לנאשם לא היתה שליטה מוחלטת באנשי החוליות ומפקדיהם. אך היתה לו מידה רבה של השפעה עליהם, מכוח היותו מנהיגם, ובשל הסיוע שהגיש להם, אשר התבטא באספקת כספים ואמצעי לחימה. השפעתו של הנאשם על אנשי החוליות ומפקדיהם באה לידי ביטוי בכך שמידי פעם היה מורה להם להפסיק את הפיגועים כנגד ישראל, ולאחר מכן היה קורא לחידוש הפיגועים – בין היתר על פי הנחיות שקיבל מערפאת. יאסר ערפאת לא היה נותן את הנחיותיו בצורה מפורשת, אך דאג שהכפופים לו יבינו היטב מתי הוא מעוניין בהפסקת אש, ומתי הוא מעוניין בפיגועים כנגד ישראל. גם ערפאת ראה עצמו ראה בנאשם כמי ששולט באנשי השטח, ולכן היה נוזף בו כאשר בוצע פיגוע שלא על דעתו של היו"ר.

ד. לאנשי חוליות השטח ולמפקדיהם היתה מידה רבה של עצמאות בביצוע הפיגועים. הם לא נהגו בדרך כלל לערב את הנאשם בתכנון הפיגועים, ואין גם ראיות כי נהגו לדווח לו לפני ביצוע הפיגועים (למעט מקרים בודדים). עם זאת, הנאשם היה מקבל מהמפקדים דיווח לאחר כל פיגוע. מתכונת פעילות זו נבעה מרצונו של הנאשם, כמו גם רצונם של מפקדי החוליות, להגן על הנאשם מפני ישראל, ולשמר אותו כ"דמות פוליטית", שאיננה מעורבת, כביכול, בפיגועי הרצח כנגד ישראל. מטעם זה לא היה לנאשם קשר ישיר עם מבצעי הפיגועים, למעט מקרים חריגים. כך גם נזהר הנאשם שלא ליטול בעצמו אחריות בשם הפת"ח או גדודי חללי אלאקצא לאחר ביצוע הפיגועים, דבר שנעשה על ידי מפקדי החוליות. הנאשם הסתפק בנטילת אחריות באמצעי התקשורת בצורה עקיפה וכוללנית, מבלי להתייחס לפיגוע ספציפי, וזאת על ידי הבעת תמיכה בפיגועים שבוצעו.

ה. לבד מאחריותו הכוללת והעליונה של הנאשם על כל אנשי התנזים וגדודי חללי אלאקצא, בהיותו מפקדם, הוא שלט בצורה טובה יותר בכמה מן החוליות שהתנהלו תחת פיקודם של אנשים שהיו עוזריו הקרובים, ונהנו מסיוע ותמיכה מיוחדת שלו, כמו אחמד ברגותי, עויס, אבו חמיד ואבו סטחה.

הנאשם נטל אחריות בחקירתו לפעילותן של החוליות שפעלו בפיקודו של אנשים אלה (למעט עויס), אם כי טען שהוא היה רק אחת מן "הכתובות" אליהן פנו אנשים אלה לשם קבלת סיוע ומימון, וכי לא היתה לו שליטה מלאה בהם, אלא רק השפעה עליהם.

ו. לנאשם לא היה בדרך כלל קשר ישיר עם אנשי השטח שביצעו את הפיגועים: הקשר היה באמצעות המקורבים לנאשם, שפעלו בסביבתו, ובהם: אחמד ברגותי, עויס, אבו חמיד ואבו סטחה. אנשים אלו, שפעלו בסביבתו של הנאשם ובתמיכתו, תכננו והוציאו לפועל פיגועי רצח, כשהם משתמשים בכספים ובאמצעי הלחימה שהנאשם דאג לספק להם לצורך כך.

ז. הנאשם היה אחראי על אספקת כספים ואמצעי לחימה לחוליות השטח, באמצעות המקורבים אליו, כגון אחמד ברגותי, עויס, אבו חמיד ואבו סטחה. הוא היה מפנה את הבקשות לאישורו של ערפאת, והיה אחראי על רכישות הנשק ואספקתו לאנשי החוליות באמצעות מקורביו. הנאשם גם הגיש סיוע למבוקשים ולמשפחות המפגעים.

ח. למרות שהנאשם, כמו גם אנשיו, נזהרו בדרך כלל שלא לערב אותו באופן אישי בתכנון והוצאה לפועל של פיגועים, הרי שהובאו ראיות חד-משמעיות לגבי ארבעה פיגועים שבוצעו בידיעתו, באישורו ובעידודו של הנאשם, ושניים מהם אף ביוזמתו.

הפיגוע בתחנת הדלק בגבעת זאב, בו נרצחה יואלה חן ז"ל, בוצע על פי הוראתו הישירה של הנאשם לאנשיו, כנקמה על חיסולו של ראיד כרמי, והנאשם הודה בחקירתו באחריות לפיגוע זה.

כך גם בוצע הפיגוע בו נרצח הנזיר היווני ציפוקטקיס גרמנוס ז"ל במעלה אדומים, בעקבות פניה של המפגע רדאידה אל הנאשם לשם ביצוע פיגוע התאבדות.

הנאשם הפנה את רדאידה אל האדם שידריך אותו ויספק לו נשק, והנחה אותו לבצע פיגוע ירי ולא פיגוע התאבדות. כתוצאה מכך יצא רדאידה לביצוע הפיגוע, וירה בנזיר היווני למוות מתוך מחשבה שהוא יהודי.

בנוסף, נתן הנאשם את אישורו לביצוע הפיגוע במסעדת "סי פוד מרקט" בתל אביב, וזאת בטרם יצא המפגע לדרכו. הנאשם אמנם הורה לאנשיו שהפיגוע יבוצע בהתנחלות או במחסום צבאי, ולא בתוך ישראל, אך הוא אישר את הפיגוע עצמו.

כמו כן, אישר הנאשם לאנשיו לבצע פיגוע התאבדות באמצעות פיצוץ מכונית תופת, אם כי הנחה את אנשיו שהפיגוע יבוצע בשטחים הכבושים ולא בתוך ישראל. הפיגוע הסתיים במותם של שני המחבלים ליד קניון מלחה בירושלים, אשר התפוצצו ברכב בדרכם לביצוע הפיגוע.

ט.   זולת ארבעת הפיגועים שפורטו בס"ק ח' לעיל, לא הובאו ראיות הקושרות את הנאשם באופן אישי וישיר למעורבות בפיגועים נשוא כתב האישום. משיחתו של הנאשם עם מקורבו אחמד ברגותי, שהוקלטה ללא ידיעתם, עולה חשש ממשי כי הנאשם ידע הרבה יותר ממה שהוא ואנשיו חשפו בחקירותיהם, אך לא ניתן לקבוע זאת במידת הוודאות הנדרשת במשפט פלילי על סמך הראיות הקיימות.

כך או כך: ברור מן הראיות שהובאו, כי פיגועי רצח לא מעטים מאלו שפורטו בכתב האישום תוכננו והוצאו לפועל על ידי מפקדי השטח שפעלו בקרבת הנאשם ובתמיכתו, תוך שימוש בנשק שהנאשם סייע ברכישתו, ואשר נמסר למפגעים על ידי מפקדי החוליות המקורבים אל הנאשם (אחמד ברגותי, עויס, אבו סטחה ואבו חמיד). הנאשם קיבל מאנשיו דיווחים על פיגועים אלה לאחר ביצועם, ונתן את הסכמתו - לפחות בשתיקה ובהתנהגות - להמשך ביצועם.

168.   ניתוח חומר הראיות כמפורט לעיל, מביא למסקנה הברורה שהנאשם תרם תרומה ממשית לפיגועי הטרור שבוצעו על ידי חוליות הפת"ח, התנזים וגדודי חללי אלאקצא, גם כאשר לא נטל חלק בביצועם.

הסיוע במתן אמצעי לחימה וכספים לאותן חוליות, גיוס פעילי השטח, הטיפול בהדרכתם והסיוע למשפחותיהם - כל אלה יצרו את התנאים שנדרשו לביצוע מעשי הרצח של חוליות הטרור. הנאשם היה מודע, ללא ספק, לעובדה זו, וגם ידע שאנשי השטח הנתמכים על ידו עומדים להמשיך ולבצע פיגועי רצח כנגד ישראל, והוא פעל מתוך מטרה ברורה לסייע להם לפעול בדרך זו. אין מדובר רק בחשד סביר או ב"עצימת עיניים" מצד הנאשם, אלא בידיעה ממשית שאנשי החוליות מבצעים, ועתידים להמשיך לבצע, פיגועי רצח כנגד ישראל, תוך שימוש באמצעי הלחימה והכספים שהעמיד לרשותם למטרה ספציפית זו. יתר על כן: הנאשם לא רק היה מודע למעשי הרצח שמבצעים אנשי החוליות, אלא שהוא העניק להם סיוע, כמפורט לעיל, מתוך מטרה ושאיפה שהם יפעלו בדרך זו.

עם זאת, למעט ארבעה מקרים שיפורטו בהמשך, אין ראיות שהנאשם היה מעורב בתכנון ובביצוע הפיגועים, או כי ידע מראש על הפיגועים העומדים להתבצע על ידי אנשי השטח ומפקדי החוליות שנתמכו על ידו, ושהוא למעשה היה מפקדם. אמנם עלי עיאדיה סיפר בחקירתו כי הנאשם ידע ואישר מראש את כל פיגועי הירי של אנשי התנזים (ראה סעיף 40 לעיל). אך פרט לעדות בודדת זו, מפי אדם שלא היה מקורב לנאשם, אין ראיות אחרות על כך שהנאשם ידע מראש על כל פיגוע העומד להתבצע, והוא עצמו הכחיש טענה זו. גם התביעה אינה טוענת כי הנאשם ידע מראש על כל הפיגועים (ראה עמ' 47 לסיכומיה).

169.   זאת ועוד: מחומר הראיות עולה כי לנאשם לא היתה שליטה מוחלטת במפקדי החוליות ואנשי השטח. אמנם הוא נחשב למנהיגם ומפקדם, והיתה לו השפעה עליהם, אך בכל זאת היתה להם מידה לא מבוטלת של שיקול דעת עצמאי בתכנון הפיגועים וביצועם, ואין כל ראיה שהם היו מתייעצים עם הנאשם בעניין זה. ממכלול הראיות עולה כי גדודי חללי אלאקצא אינם גוף המאורגן תחת הנהגה אחת, אלא מקבץ של חוליות שטח, שלכל אחת מהן יש מפקד משלה. עובדה העולה מחומר הראיות, היא כי אנשיו של הנאשם ביצעו פיגועי התאבדות, ופיגועים בתחומי הקו הירוק, בניגוד לעמדתו המוצהרת של הנאשם, ולעיתים גם בניגוד לדעתו של היו"ר ערפאת. בנוסף, מחומר הראיות עולה שאנשי השטח שהיו מעורבים בביצוע הפיגועים השתדלו להרחיק את הנאשם ולנתקו ממעורבות אישית בפיגועים על מנת להגן עליו מפני ישראל, ולשמרו כ"דמות פוליטית".

גם הנאשם עצמו ביקש להתרחק ככל האפשר מפעילות "צבאית", ומקשר ישיר עם החוליות שביצעו פיגועים, ואלו הופעלו למעשה על ידי מפקדי השטח, שחלקם היו מקורביו של הנאשם, ופעלו תחת שליטתו, בסיועו ובעידודו (כגון, אחמד ברגותי, אבו-חמיד אבו סטחה ועויס). עובדה זו מחזקת את המסקנה שהנאשם לא ידע מראש בדרך כלל על ביצוע הפיגועים, ולא היה מעורב באופן אישי בתכנונם או באישורם, שכן זו היתה מתכונת הפעילות שנבחרה על ידו ועל ידי אנשיו במתכוון.

אכן, התביעה מסכימה בסיכומיה (עמ' 47), כי:

"במסגרת ההיערכות הארגונית של הארגונים הטרוריסטים, הוקנו למפקדים ולפעילי השטח סמכויות נרחבות ומרחב תמרון רב בביצוע פעולות הטרור, והם לא נדרשו לקבל אישור מהנאשם לכל פעילות טרור, שבוצעה בהתאם למדיניות שעיצבו הנאשם והנהגת הארגונים, כאמור לעיל.

לנאשם היתה מודעות לפעילותם של הכפופים לו והוא עודכן בעניין זה, בחלק מהמקרים מראש ולעיתים בדיעבד, וזאת בהתאם לתפיסה על פיה התנהלה הפעילות של הארגונים הנ"ל".

170. ההלכה, כאמור לעיל, היא שהסיוע צריך שיופנה במודע כלפי **עבירה מסויימת בעלת יעוד מוחשי**, ויש להוכיח כי המסייע היה מודע לכך שהמבצע העיקרי עומד לבצע, קרוב לוודאי, עבירה שכזו, קרי: עבירה בעלת יעוד מוחשי; אין די בידיעה של המסייע על נכונות ערטילאית של המבצע העיקרי לבצע עבירה. אמנם אין צורך להוכיח כי המסייע היה מודע לכל פרט מפרטי העבירה, כגון המיקום המדוייק של העבירה (ע"פ 11131/02 הנ"ל בעניין **יוסופוב**), או זהותו של קורבן העבירה וזמן הביצוע (ע"פ 426/67 הנ"ל בעניין **באר**ץ): די בכך שהוא מודע לכך שהמבצע העיקרי עומד לבצע עבירה מסויימת מן הסוג שבוצע בסוף, וחרף כך מסייע לביצועה.

ואולם במקרה דנא – ככל שהדבר נוגע למרבית הפיגועים נשוא כתב האישום, ולמעט ארבעה פיגועים בהם היה הנאשם מעורב אישית - אין כל ראיה שהנאשם ידע על הכוונה לבצעם, במובן של מודעות לכוונה לבצע **עבירה מסויימת בעלת יעוד מוחשי**, כפי שנדרש בפסיקה. היתה לנאשם ידיעה כללית שאנשי השטח המשתייכים לארגון שבהנהגתו מבצעים מעת לעת פיגועי רצח כנגד ישראלים, תוך שימוש באמצעי לחימה וכספים שהוא דאג לאספקתם. אך לא הובאו ראיות כלשהן הקושרות סיוע מצד הנאשם באופן ספציפי לפיגוע זה או אחר (למעט רצח הנזיר היווני שידון בהמשך). אין כל ראיה כי הנאשם סיפק אמצעי לחימה או כספים לצורך ביצוע פיגוע מסוים. אמנם בחלק מן המקרים הוכח שהפיגוע בוצע באמצעות כלי נשק שנמסר למפגע על ידי אחד ממקורבי הנאשם, כמו עויס, אבו חמיד או אחמד ברגותי.

אך על פי הראיות שהובאו, הסיוע שהגיש הנאשם למקורביו בעניין זה היה כללי, ולא התייחס לפיגוע זה או אחר, או למפגע זה או אחר: הנאשם דאג באופן כללי לכך שאנשי השטח יהיו מצויידים באמצעי לחימה ובכספים, וזאת באמצעות מקורביו ומפקדי השטח שסרו למרותו, וביודעו שאמצעי הלחימה והכספים משמשים אותם למטרות פיגועים. ואולם על פי ההלכות שבוארו לעיל, אין די בכל אלו על מנת להרשיע את הנאשם בסיוע לכל אחת מעבירות הרצח שבוצעו על ידי אנשים שנעזרו בסיוע כללי זה, באמצעות מקורביו של הנאשם, לצורך ביצוע פיגועים.

171. אין זה המקרה בו אדם מסייע לאנשים הסרים למרותו, ביודעו כי הם עומדים לבצע עבירה

מסוימת ומוחשית, אלא שהוא רק אינו יודע היכן, מתי, באיזה אופן ועל ידי מי מאנשיו תבוצע העבירה, ומי יהיה קורבנה. מדובר במקרה בו אין כל ראיה הקושרת את הנאשם לביצועה של עבירה מסוימת, הן מבחינת היסוד העובדתי של העבירה, והן מבחינת היסוד הנפשי שלה, שכן לא הוכח שהנאשם ידע כלל על התוכנית לבצעה. בנסיבות אלו, וככל שהדבר נוגע למרבית הפיגועים נשוא כתב האישום, לא ניתן לייחס לנאשם עבירה כוללנית וגורפת של סיוע לרצח בכוונה תחילה בגין כל פיגוע ופיגוע, רק בשל מודעותו הכללית לכך שאנשיו מבצעים פיגועים תוך שימוש בנשק ובכספים שהוא דאג להשיג עבורם.

אין זאת אומרת שהנאשם איננו נושא כלל באחריות פלילית למעשיו, שהביאו לפיגועים שבוצעו תוך שימוש באמצעי הלחימה והכספים שדאג להעביר למפקדי השטח. לשם כך קיימת העבירה הכללית של פעילות בארגון טרוריסטי, שדינה מאסר עד 20 שנה, וכן העבירה הכללית (בה לא הואשם הנאשם), של מתן אמצעים לביצוע פשע לפי סעיף 498 לחוק העונשין התשל״ז-1977. עבירה זו נועדה למקרה של מסירת אמצעים לביצוע פשע **כלשהו**, כאשר לא ניתן להוכיח ידיעה של המוסר על כוונה לבצע עבירה מסוימת (ראה: ע״פ 507/79 **מדינת ישראל נ׳ אליהו אסרף**, פד״י לג(3) 620, בעמ׳ 622-623). זה המקרה שבפנינו.

172. המסקנות דלעיל הנוגעות לעבירת הסיוע, ישימות גם לגבי העבירה של שידול למעשי רצח המיוחסת לנאשם. כשם שלא ניתן להרשיע אדם בישראל בעבירה כללית של סיוע למעשי רצח, כך גם לא ניתן להרשיעו בעבירה כללית של שידול למעשי רצח. כשם שהסיוע חייב להתייחס לעבירה מסוימת בעלת יעוד מוחשי, כך גם חייב השידול להיות בין פרט לפרט, ולהתייחס לשידול לבצע עבירה מסוימת בעלת יעוד מוחשי. מסקנה זו מתבקשת לגבי שידול מקל וחומר, שהרי עונשו של המשדל, שלא כמו המסייע, זהה לעונשו של העבריין העיקרי. כאשר נאשם איננו מודע כלל לכוונה לבצע עבירה מסוימת, לא ניתן להוכיח את גורם הקשר הסיבתי, דהיינו : שהמבצע העיקרי שודל על ידו לבצע את העבירה.

במקרה דנא, וככל שהדבר נוגע למכלול הפיגועים נשוא כתב האישום (פרט לארבעה פיגועים שידונו בהמשך), אין כל ראיה כי הנאשם השפיע על מפקדי השטח שבהנהגתו, או על אנשי החוליות, לבצעם, שהרי אין הוכחה שהנאשם ידע כלל על הכוונה לבצע פיגועים אלו. מן הראיות שהובאו נראה כי איש לא היה צריך לשדל אותם לכך : מפקדי השטח ואנשי החוליות פעלו, בדרך כלל, על פי יוזמה ושיקול דעת עצמאיים, כשהם מקפידים שלא לערב את הנאשם באופן אישי בתכנון או בביצוע הפיגועים. כמו כן, לא ניתן להרשיע את הנאשם בעבירה גורפת של שידול למעשי הרצח נשוא כתב האישום בשל מה שניתן לכנות ״שידול המופנה אל הכלל״, קרי : דברי ההסתה של הנאשם באמצעי התקשורת, בהם קרא לאנשים שתחת הנהגתו, ולאחרים, לבצע פיגועים כנגד ישראל. לשם כך קיימות העבירות הכלליות של הסתה לאלימות או לטרור, פעילות בארגון טרור, וכו׳ (ראה סעיף 161 לעיל).

173. על פי העקרונות המשפטיים וההלכות שפורטו לעיל, גם לא ניתן לראות בנאשם מבצע בצוותא של כל הפיגועים נשוא כתב האישום, יחד עם המפגעים והמתכננים שהוציאו אותם אל הפועל, שכן אין כל ראיה לכך שהוא היה מודע לכוונה לבצעם (פרט לארבעת הפיגועים בהם היה מעורב אישית, כפי שיפורטו בהמשך). חרף הפרשנות הרחבה מאוד שניתנה בפסיקה למילים ״המשתתפים בביצוע עבירה תוך עשיית מעשים לביצועה״, וההלכות הנוגעות לאחריותו של מנהיג חבורת פשע – לא ניתן לקבל את טענת התביעה, לפיה יש לראות בנאשם מבצע בצוותא של כל הפיגועים נשוא כתב האישום. המינימום הנדרש על פי הפסיקה שבוארה לעיל, לצורך הטלת

אחריות של מבצע בצוותא על מנהיג חבורה שאיננו נוכח בזירת העבירה, הוא השתתפות בתכנון העבירה או קשירת קשר לביצועה; מתן הנחיות או אישור לביצוע העבירה; פיקוח על ביצוע העבירה; או העלאת הרעיון לביצוע העבירה בצירוף סיוע או תכנון. כל אחד מאלו עשוי להיחשב על פי הפסיקה כ"עשיית מעשים לביצוע העבירה", אשר מבססת אחריות של מבצע בצוותא. אך אין די בכך שהמנהיג שולט באנשיו, ואלה סרים למרותו, כדי להטיל עליו אחריות של מבצע בצוותא למכלול העבירות שיבצעו אנשיו, כאשר אין כל ראיה הקושרת את המנהיג בדרך כלשהי לתכנונן או לביצוען, ואף אין כל ראיה כי ידע על הכוונה לבצען.

התביעה חייבת להוכיח שהנאשם קשור בדרך זו או אחרת לעבירה **מסוימת** – הן ביסוד העובדתי של העבירה, והן ביסוד הנפשי שלה, וזאת לא הוכיחה פרט לארבעת הפיגועים שיפורטו להלן.

התביעה משליכה את יהבה על ההלכה שנפסקה בדנ"פ 1294/96 הנ"ל בעניין **משולם**, בעתירתה להרשיע את הנאשם כמבצע בצוותא בכל הפיגועים נשוא כתב האישום.

ואולם, **משולם** הורשע כמבצע בצוותא, יחד עם חבורת החסידים שהקיפה אותו ושביצעה עבירות שונות, לאחר שנקבע לגביו כי הוא נתן הנחיות לאנשיו, פיקח על פעילותם, היה בעל שליטה עליהם ונמנע במתכוון מלהורות להם לחדול מביצוע העבירות (כב' השופט מצא בעמ' 30, 32). כן נקבע כי היה נוכח בזירת ביצוע העבירות בסמוך לפני תחילתן, ובאותה עת הניע את תוכנית העבירה, והוא אף היה מי שתכנן את המבצע (כב' הנשיא א. ברק בעמ' 50-51); ותכנן וביצע את ה"מרד" קודם למעצרו (כב' השופט חשין בעמ' 61).

גם כב' השופט קדמי, התייחס בדבריו בעניין **משולם** למי שמעורבותו בביצוע באה לידי ביטוי בתכנון, בהנחיה ובחלוקת תפקידים, וציין כי משולם נמנע מלהורות לאנשיו לחדול מביצוע העבירות (עמ' 63, 66-67).

מאפיינים אלה של שליטה מלאה במבצעי העבירה, נוכחות לצד המבצעים בזירת האירועים עד לתחילתם, מעורבות בתכנון העבירות, מתן הנחיות לביצוען ופיקוח על מעשי המבצעים - אינם מתקיימים בענייננו, כאשר לא הוכח שהנאשם ידע מראש על הכוונה לבצע את מרבית הפיגועים נשוא כתב האישום.

הנאשם לא היה מעורב אישית ביזום, תכנון או ביצוע של הפיגועים נשוא כתב האישום (פרט לפיגועים בודדים שיפורטו בהמשך). הנאשם גם לא נתן הנחיות או אישור לביצוע פיגועים אלה, והוא גם לא סייע או שידל באופן ספציפי לביצועם, כאמור לעיל. כך גם נושא השליטה של הנאשם במבצעי הפיגועים ומתכנניהם איננו נקי מספקות, כפי שפורט לעיל. על אף היותו של הנאשם נושא בתואר הלא-רשמי של מפקד התנזים וגדודי חללי אלאקצא, אין כל ראיה שהנאשם היה חלק מן ההחלטה המשותפת לביצוע הפיגועים נשוא כתב האישום, או כי פעל יחד עם האחרים למען הגשמת פיגועים אלה, או כי נטל חלק בביצועם או בתכנונם. בהעדר כל אלה, ועל פי הכללים שנקבעו בפסיקה לאור הוראות חוק העונשין, לא ניתן לראות בנאשם מבצע בצוותא של הפיגועים נשוא כתב האישום, שלגביהם לא היתה לו כל מעורבות וידיעה אישית, רק מכוח היותו המנהיג הלא מוכתר של התנזים וגדודי חללי אלאקצא, או בשל קרבתו למתכנני הפיגועים והסיוע הכללי שהגיש להם.

**174.** לסיכום כל האמור לעיל, המצב החוקי השורר במדינת ישראל איננו מאפשר להרשיע מנהיג של חבורה עבריינית או ארגון טרור כמבצע בצוותא של עבירות שנעשו על ידי חברי אותה חבורה או אותו ארגון, ואף לא בסיוע או בשידול לביצוען, כאשר הוא עצמו איננו מעורב אישית ובצורה פרטנית בשום אופן בעבירות עצמן, לא לפני ולא בעת ביצוען. כזה הוא המצב, הגם שברור כי אותו

מנהיג נותן את ברכתו לביצוע העבירות, ומעניק לאנשיו סיוע כללי שלא לצורך ביצוע עבירה זו או אחרת.

הנאשם, במקרה דנא, עודד והמריץ את מפקדי החוליות ואנשי השטח לבצע פיגועים, ודאג שיהיו בידיהם כספים ואמצעי לחימה לצורך ביצוע הפיגועים. הוא היה מנהיגם של המפקדים ואנשי השטח, והייתה לו מידה לא מבוטלת של השפעה עליהם.

רבים מן הפיגועים נשוא כתב האישום הוצאו לפועל ותוכננו בידי מפקדי השטח שהיו מקורבים אל הנאשם, ונתמכו על ידו. חרף כל אלה, לא ניתן לייחס לנאשם על פי הדין הישראלי אחריות פלילית של מבצע בצוותא, מסייע או משדל - ככל שהדבר נוגע לפיגועים שאין כל ראיה הקושרת את הנאשם אליהם, וכאשר לא הוכח כי ידע על הכוונה לבצעם.

אכן, קיים פער בין אחריותו הכללית והקולקטיבית של הנאשם לביצוע הפיגועים נשוא כתב האישום, שלא לדבר על האחריות המוסרית לביצועם, לבין האפשרות המשפטית לייחס לו אחריות פלילית לביצועם של פיגועים ספציפיים שלא הוכח כי ידע על התוכנית לבצעם. לא מוכר לנו תקדים להרשעת אדם בעבירת רצח, או בשידול או סיוע לרצח, כאשר אין כל ראיה הקושרת אותו למעשה זה באופן ספציפי. הנאשם נושא אמנם באחריות הכבדה והנוראית לפיגועים נשוא כתב האישום, בהם קפדו את חייהם אנשים רבים, בהיותו מנהיג ומפקד חוליות הטרור שביצעו את הפיגועים. אך זוהי אחריות פיקודית "מעין מיניסטריאלית", ולא אחריות שניתן לבססה מבחינת דיני העונשין. אל לנו למתוח את הוראות חוק העונשין אל מעבר לגבולותיו הטבעיים, הגם שבמקרה זה ניצבת בפנינו בעיה שקשה לפתרה באמצעות הוראות החוק הקיימות.

תוצאה משפטית זו רחוקה מלהשביע רצון, ואף מקוממת. לכך כוונו דבריו של פרופ' מ. קרמניצר שצוטטו לעיל, כי המושגים המקובלים של סיוע ושידול אינם הולמים תופעות עברייניות של ארגוני פשע וטרור, ולכן גם הועלתה הצעתה של פרופ' מ. גור-אריה לתקן את החוק באופן שניתן יהיה לראות במנהיג שכזה "מבצע באמצעות אחר" (ראה סעיף 164 לעיל). בדנ"פ 1294/96 הנ"ל בעניין **משולם**, דחה בית המשפט את האפשרות לראות במנהיג חבורת עבריינים "מבצע באמצעות אחר" לפי סעיף 29(ג) לחוק העונשין, אף שהשופט מ. חשין גזר מהוראת חוק זו אנלוגיה לעניין אחריותו של מבצע בצוותא לעומת אחריותו של משדל (עמ' 59-60).

175. לאחרונה נעשה ניסיון של המחוקק להתמודד, ולו בצורה חלקית, עם בעיה משפטית זו. הכנסת חוקקה חוק מאבק בארגוני פשיעה, התשס"ג-2003, המאפשר להטיל על העומד בראש ארגון פשיעה עונש של עד 20 שנות מאסר, כאשר הארגון מבצע עבירות מסוג פשע שעונשו עולה על 20 שנות מאסר. חוק זה איננו חל על העבירות נשוא כתב האישום, שבוצעו קודם לחקיקתו. אך הוא משתרע גם על ארגוני טרור ומנהיגיהם (ראה התוספת הראשונה המחילה את החוק על עבירות לפי סעיף 4 לפקודת מניעת טרור, ודברי ההסבר להצעת החוק: ה"ח תשס"ב 3155, בעמ' 762). מדברי ההסבר להצעת החוק ניתן להבין כי המחוקק היה ער לבעיה המשפטית הנובעת מהעדר היכולת להרשיע את העומדים בראש ארגוני פשע בביצוע עבירות הנעשות על ידי הכפופים להם, בשל ריחוקם מן העבירות. וכך נאמר בדברי ההסבר (עמ' 762):

"הצעת חוק מאבק בארגוני פשיעה, התשס"ב-2002, באה להתמודד במישור החקיקתי עם התופעות של פשיעה מאורגנת ועם המבנה של ארגוני פשיעה, הגורם לעתים קרובות קושי בהוכחת הקשר בין ראשיהם ומובילהם של ארגונים מסוג זה לבין ביצוען של עבירות שנעברו על ידי אחרים; זאת לאור המבנה ההיררכי של אחדים מארגונים אלו,

היוצר מרחק בין מקבלי ההחלטות ומתווי המדיניות לבין מבצעי העבירות".

כך גם נאמר בדברי ההסבר להצעת החוק (עמ' 763), כי סעיף 2 לחוק המאפשר להטיל עונש עד 20 שנות מאסר על העומד בראש ארגון פשיעה "בא להתמודד עם הקושי להוכיח את הקשר בין נושאי תפקידים בארגוני פשיעה לבין עבירות שנעברו בפועל, והוא קובע, כי די בעצם העמידה בראש הארגון, ניהולו, מימונו וכד' כדי שהדבר יהווה עבירה...".
עוד נאמר בהמשך לדברים אלה כי לגבי חברי ארגון פשיעה בדרג נמוך יותר, "יוותר הצורך להוכיח קשר לעבירה מסוימת".

מכאן ברור שהחוק בא להתמודד עם הבעיה העומדת להכרעה גם בתיק זה, דהיינו, העדר היכולת, על פי המצב החוקי הקיים, להרשיע מנהיג של ארגון פשיעה או ארגון טרור בביצוע, בשידול או בסיוע לעבירות ספציפיות המבוצעות על ידי אנשי הארגון.

ואולם, אין בחוק זה מענה לשאלה שהציב כב' השופט מ. חשין בדנ"פ 1294/96 הנ"ל בעניין **משולם** (בעמ' 59), לאמור: "הנקבל כי הרב-מוח יהא זוטר ל'חייליו' עושי דברו?". גם לפי חוק זה יהא עונשו של העומד בראש ארגון פשיעה קל מעונשם של הסרים למרותו, כאשר אלו ביצעו עבירה של רצח שדינה מאסר עולם. זאת ועוד, ככל שמדובר בארגון טרור אין צורך בחוק זה, שכן על פי סעיף 2 לפקודת מניעת טרור צפוי מנהיג בארגון טרור, ממילא, לעונש מאסר עד 20 שנה בשל עצם היותו ממלא תפקיד ניהולי בארגון (ראה תת-פרק (1) לעיל).

176. הדברים האמורים לעיל נוגעים למרבית הפיגועים המיוחסים לנאשם בכתב האישום, כפי שפורטו בפרק ה' לחלקו השני של הכרעת הדין. בפיגועים אלה, כפי שבואר לעיל, לא ניתן להרשיע את הנאשם בעבירות של סיוע או שידול למעשי רצח, ואף לא כמבצע בצוותא. יחד עם זאת, הובאו ראיות ברורות ומשכנעות למעורבותו של הנאשם  בשלושה פיגועי רצח שבוצעו על ידי אנשיו, ובניסיון לבצע פיגוע רצח נוסף, ואלה הם:

א.   **פיגוע הרצח בתחנת הדלק בגבעת זאב**

בפיגוע זה, שבוצע ביום 15.1.02, נרצחה יואלה חן ז"ל, ונפצעה נוסעת שהיתה עמה. מן הראיות שהובאו עולה בבירור כי בעת היותם בסוכת האבלים שהוקמה לאחר חיסולו של ראיד כרמי ביום 14.1.02, הורה הנאשם למקורבו אחמד ברגותי לבצע פיגוע נקם. אחמד ברגותי מסר נשק לאבו סטחה, אף הוא מקורב של הנאשם הסר למרותו, ואנשי החוליה של אבו סטחה ביצעו את הרצח, ומיד לאחר מכן דיווחו לנאשם על תוצאותיו.

הנאשם הודה כי פיגוע זה בוצע בהוראתו, ונטל אחריות לביצועו, כשהוא מדגיש כי זה הפיגוע הראשון של הפת"ח שבוצע בתוך ישראל. במקרה זה אחראי הנאשם באופן ישיר לביצוע הרצח, משום שהוא עצמו הורה על ביצועו.

בוודאי שהוראה שכזו של הנאשם לאנשים הסרים למרותו מהווה שידול לרצח, גם אם הנאשם לא התעניין באופן ספציפי באיזה מקום ובאיזה אופן יבוצע הפיגוע. כאשר הנאשם הורה לבצע פיגוע נקם, היה ברור לו ולאנשיו שהכוונה היא לרצוח ישראלים. אולם אחריותו של הנאשם אינה רק כשל משדל, אלא כמבצע בצוותא יחד עם המבצעים האחרים, שהם אחמד ברגותי, אבו סטחה ואנשיו. הנאשם היה חלק מן התוכנית המשותפת

לביצוע הפיגוע, כמי שיזם את ביצועו. היתה לו מעורבות נפשית גבוהה וידיעה על כך שהעבירה עומדת להתבצע על פי הוראתי. הנאשם לא רק הביא אחרים לידי ביצוע העבירה במקרה זה, ולא רק נתן את אישורו לביצוע העבירה, אלא הוא **הורה** לבצע את העבירה, ובשל מעמדו כמנהיג ומפקד, ומערכת יחסיו עם אחמד ברגותי ואבו סטחה, היתה הוראה זו משולה ללחיצה על ההדק שהביאה לרציחתה של יואלה חן ז"ל.

למצב דברים כגון זה כוונו דבריה של כב' השופטת ד. ביניש בע"פ 8469/99 הנ"ל בעניין **אסקין**, כי: **"בנסיבות מיוחדות אפשר ש'הסכמה' לביצוע תהווה השתתפות 'בביצוע עבירה תוך עשיית מעשים לביצועה' כאמור בסעיף 29 לחוק העונשין".** כך גם פסק כב' השופט י. קדמי בע"פ 5589/98 הנ"ל בעניין **סולטאן**, כי מתן **"אור ירוק לרצח"** משול ל**"ירית ההזנקה המשלחת ספורטאי למרוץ",** והוא עולה כדי **"מעשה של השתתפות בביצוע העבירה"** (ראה סעיף 163 לעיל).

בדנ"פ 1294/96 הנ"ל בעניין **משולם** אמר כב' השופט מ. חשין (בעמ' 59): "רוחו הרעה של המנהיג שורה על כל המבצע העבריני, מוחו מילא את הקפיץ מפעיל-העבירה קודם תחילתה, ולעת עשייתה של העבירה הוא 'נמצא' עם העבריינים כמבצע – **בצוותא עימהם".** כך יש לומר על הנאשם שבפנינו, ולפיכך יש להרשיעו לגבי פיגוע רצח זה כמבצע בצוותא של רצח בכוונת תחילה, ולא רק כמשדל.

ב.   **רצח הנזיר היווני ציפוקטקיס גרמנוס ז"ל במעלה אדומים**

גם פיגוע זה בוצע בהוראת הנאשם וביוזמתו ביום 12.6.01. המפגע רדאידה פנה אל הנאשם על מנת לקבל נשק ולבצע פיגוע התאבדות.

הנאשם הניח אותו שלא לבצע פיגוע התאבדות, אלא פיגוע ירי "כמקובל בתנזים", והפנה אותו אל מוהנד לצורך קבלת נשק והדרכה בירי, בידיעה ברורה שרדאידה עומד לבצע פיגוע ירי ולרצוח ישראלים על פי הנחייתו. כך אכן עשה רדאידה יחד עם מפגע נוסף, כאשר קיבלו שני רובי קלצ'ניקוב ממוהנד, ואף קיבלו ממנו הדרכה כיצד להשתמש בהם - כל זאת על פי הוראת הנאשם. בפיגוע נרצח הנזיר היווני ציפוקטקיס גרמנוס ז"ל במעלה אדומים, כאשר המפגעים חשבו אותו בטעות ליהודי.

גם במקרה זה אחריותו של הנאשם לרצח הנזיר היווני היא כשל מבצע בצוותא, ולא רק כמשדל. הנאשם לא רק שכנע את רדאידה לבצע פיגוע ירי רצחני אלא הוא הנחה אותו כיצד לבצע את הפיגוע, סייע לו בהשגת נשק והדרכה לצורך הפיגוע, והורה לו למי עליו לפנות על מנת להוציא לפועל את הפיגוע. במקביל הורה הנאשם לאנשיו לסייע לרדאידה לבצע את הפיגוע, ואלה אכן פעלו על פי הוראת הנאשם.
על פי ההלכה, שידול שמתלווה אליו מעשה לביצוע, כגון: תכנון או מתן הוראות וביצוע - מהווה השתתפות בביצוע, ולא רק שידול. כפי שאמר כב' הנשיא א. ברק בע"פ 2796/95 הנ"ל בעניין **פלונים**: "ככל שהשידול של המשדל אינטנסיבי יותר, וככל שמתלווה אליו לא רק פעולות במישור הנפשי אלא גם פעולות במישור העובדתי, כך מתקרב המשדל למבצע בצוותא" (ראה סעיף 161 לעיל). לכן הורשע באותו מקרה הקטין ט' כמבצע בצוותא, ולא רק כמשדל, משום שהשתתף בתכנון העבירה, והיה "ראש וראשון לכולם".

גם במקרה דנא, אחריותו של הנאשם כמבצע בצוותא נגזרת ממעמדו כמנהיג ומפקד, ומן ההנחיות שנתן לרדאידה ולאנשיו לגבי דרך ביצוע הפיגוע. הנאשם לא רק סייע לביצוע הפיגוע, ולא רק שידל לביצועו על ידי עידודו של רדאידה לפעול כפי שפעל, אלא הנאשם היה

חלק מן התוכנית המשותפת לביצוע פיגוע זה, ולמעשה הורה על ביצועו. על משמעותה של הוראה שכזו עמדנו בס"ק א' לעיל, ולפיכך יש להרשיע את הנאשם גם לגבי פיגוע זה בעבירה של רצח בכוונה תחילה.

ג. **פיגוע הרצח במסעדת "סי פוד מרקט" בתל אביב**

פיגוע זה בוצע ביום 5.3.02 במסעדת "סי פוד מרקט" בתל אביב על ידי המפגע אברהים חסונה, שרצח במהלכו את יוסף הבי ז"ל, אליהו דהן ז"ל והשוטר רס"ר סלים בריכאת ז"ל. מן הראיות שהובאו עולה כי הפיגוע תוכנן והוצא לפועל על ידי מקורביו של הנאשם אחמד ברגותי, אבו חמיד ועויס, וכי אחמד ברגותי דיווח לנאשם לפני שהפיגוע יצא לדרך על כך שהוא עומד להתבצע. הנאשם אישר את ביצוע הפיגוע, ורק הורה לבצעו שלא בתוך ישראל, אלא בהתנחלות או במחסום צבאי בגדה המערבית. מיד לאחר ביצוע הפיגוע התקשר ברגותי לנאשם על מנת לדווח לו על כך, והנאשם הורה לעויס שלא ליטול אחריות על הפיגוע, כיוון שבוצע בתוך ישראל.

מן הראיות שפורטו לעיל, ברורה אחריותו של הנאשם לפיגוע זה כמבצע בצוותא. הנאשם היה שותף לתוכנית הפיגוע, נתן הנחיות לגבי מקום ביצועו ואישר לבצעו. העובדה שהמבצעים סטו מההנחיות שנתן להם הנאשם, אינה מעלה ואינה מורידה דבר לעניין אחריותו הפלילית. כפי שבואר לעיל, אחריותו של הנאשם לפיגוע זה איננה רק כשל מחדל, שכן הוא נתן את אישורו לביצוע פיגוע רצח, דבר שמהווה מעשה של השתתפות בביצוע העבירה. הנאשם היה חלק מתוכנית הפיגוע, ונתן למתכנן הפיגוע הנחיות לגבי מקום הביצוע, ולכן גם קיבל ממנו דיווח מייד לאחר על הביצוע. מנהיג חבורה עברייניית המאשר ביצוע רצח, ונותן הנחיות לביצועו, נושא באחריות לרצח כמבצע בצוותא, ולא רק כמחדל, על פי ההלכות שבוארו לעיל. לפיכך יש להרשיע את הנאשם גם בגין פיגוע זה באחריות של מבצע בצוותא לעבירה של רצח בכוונה תחילה של שלושה אנשים.

ד. **ניסיון פיגוע ליד קניון מלחה בירושלים**

מתכנן הפיגוע, ג'יהאד ג'וערה, הודיע לנאשם יום לפני הפיגוע על הכוונה לפוצץ מכונית תופת, והנאשם אישר את הפיגוע, אך הורה לבצעו שלא בתוך ישראל, אלא בגדה המערבית. בפועל התפוצצו שני המחבלים עם מכונית התופת ליד קניון מלחה בירושלים, בדרכם לבצע את הפיגוע. גם בפיגוע זה נעזר הנאשם במקורבו אחמד ברגותי.

גם כאן אחריותו של הנאשם אינה רק כמחדל, אלא כמבצע בצוותא אשר נתן "אור ירוק לרצח", בצירוף הנחיות ביצוע. הואיל והפיגוע נכשל, יש להרשיע את הנאשם במקרה זה בעבירה של ניסיון לרצח.

**חלק חמישי:**     **סיכום**

177.   הנאשם הצהיר בשלב הסיכומים: "אני נגד הרג חפים מפשע, נגד רצח ילדים ונשים. צריך

להתנגד לכיבוש בשטחים, אני נגד פעולה צבאית או התאבדות. לא נכון שהייתי אחראי לכך שהיו **התאבדויות**" (עמ' 24 לישיבה מיום 29.9.03). אולם בפועל הוכח מעבר לכל ספק שהנאשם נטל חלק, ועמד בראש, פעילות רצחנית שמטרתה פגיעה בחפים מפשע - הן בשטחי יהודה ושומרון והן בתחומי "הקו הירוק" - כולל פיגועי התאבדות.

178. הנאשם בחר שלא להתגונן כנגד האשמות החמורות העולות מחומר הראיות שנצבר כנגדו, כפי שפורט לעיל. טענותיו שהועלו במהלך הדיון ובדברי הסיכום שנשא התמקדו בשאלת סמכותו של בית משפט זה לדון בענייננו, ובהצדקת מה שהוא רואה כהתנגדות לכיבוש הישראלי. לטענות אלו של הנאשם התייחסנו בהחלטתנו המקדמית שניתנה ביום 19.01.03 – ככל שמדובר בטענות שאינן במישור הפוליטי בלבד. דחינו טענות אלו, ופסקנו כדלקמן:

א. בית משפט בישראל מוסמך לדון ב"עבירות חוץ" כנגד בטחון המדינה, או כנגד אזרח או תושב ישראלי, יהא מקום ביצוע העבירה אשר יהא, על פי סעיף 13(א)-(ב) לחוק העונשין, התשל"ז-1977, אם כי רוב העבירות נשוא כתב האישום הן "עבירות פנים" הנוגעות לפיגועים שבוצעו בישראל.

ב. חוק יישום הסכם הביניים בדבר הגדה המערבית ורצועת עזה (סמכויות שיפוט והוראות אחרות), התשנ"ו-1996, הנותן תוקף להסכם הביניים ישראלי-פלסטיני בדבר הגדה המערבית ורצועת עזה, כמו גם תקנה 2 לתוספת לחוק להארכת תוקפן של תקנות שעת חירום (יהודה והשומרון וחבל עזה – שיפוט בעבירות ועזרה משפטית), התשל"ח-1977 – אינם שוללים את סמכותו של בית משפט בישראל לדון בעבירות חוץ או בעבירות פנים המיוחסות לנאשם. חיקוקים אלו העבירו לרשות הפלסטינאית את סמכות השיפוט לגבי פלסטינאים שביצעו עבירות בשטחה, אך לא בגין עבירות שבוצעו כנגד אזרחי או תושבי ישראל בשטח מדינת ישראל או בשטחי יהודה ושומרון ורצועת עזה.

ג. לנאשם לא עומדת חסינות כלשהי בגין העבירות שיוחסו לו בכתב האישום, גם אם כיהן כחבר הפרלמנט הפלסטינאי, שכן המשפט הבינלאומי אינו מכיר בחסינות שכזו.

ד. הנאשם איננו זכאי למעמד של "שבוי מלחמה" על פי אמנת ז'נבה השלישית, ועל כן אין מניעה להעמידו לדין על מעשים שביצע כלוחם בלתי חוקי. אדם הפועל מחוץ למסגרת הלחימה החוקית, ובניגוד לדיני המלחמה, ואשר מעורב בביצוע פעולות טרור שמטרתן לפגוע ללא אבחנה באוכלוסיה אזרחית, חושף עצמו לסנקציות הפליליות הרגילות של המשפט הפלילי הבינלאומי, ואיננו זכאי להגנה הניתנת במשפט הבינלאומי.

ה. התנגדות לכיבוש, כפי שטוען הנאשם, איננה מהווה צידוק על פי דין כלשהו לביצוע מעשי הרג של אזרחים חפים מפשע. פעילות טרור שמפרה את דיני המלחמה, ואיננה מבחינה בין מטרות צבאיות לבין מטרות אזרחיות, איננה נחשבת כפעילות לוחמתית המוכרת על פי כללי המשפט הבינלאומי, גם אם מטרתה היא הסרת הכיבוש – כפי שטוען הנאשם.

179. **לסיכום**: לאור כל הטעמים שפורטו בהכרעת הדין לא מצאנו בסיס משפטי להרשעת הנאשם בביצוע מכלול הפיגועים נשוא כתב האישום, ומן הדין להרשיעו בעבירות הכלליות שיוחסו לו בכתב האישום, ובעבירות הרצח וניסיון הרצח הנוגעות לארבעה פיגועים שבכתב האישום (מס' 3

, 7, 12 ו- 36 בנספח לכתב האישום).

על סמך התשתית הראייתית, ולאור הניתוח המשפטי דלעיל, אנו מרשיעים את הנאשם בביצוע העבירות הבאות:

א. רצח בכוונה תחילה לפי סעיף 300(א)(2) לחוק העונשין, התשל"ז-1977 (בשלושה מקרים בהם נרצחו חמישה בני אדם);

ב. ניסיון לרצח לפי סעיף 305(1) לחוק העונשין, התשל"ז-1977;

ג. פעילות בארגון טרור לפי סעיף 2 לפקודת מניעת טרור, התש"ח-1948;

ד. חברות בארגון טרור לפי סעיף 3 לפקודת מניעת טרור, התש"ח-1948.

ה. העבירה של קשירת קשר לביצוע פשע לפי סעיף 499 לחוק העונשין, תשל"ז-1977 הוכחה אף היא, ככל שהדבר נוגע לארבעת הפיגועים בהם הורשע הנאשם, והיא נבלעת בעבירה העיקרית של רצח בכוונה תחילה וניסיון רצח.

ניתן והודע היום כ"ט באייר תשס"ד (20 במאי, 2004) בנוכחות ב"כ התביעה, הסניגוריה הציבורית והנאשם.

_____     _____     _____
ד"ר עמירם בנימיני, שופט       אברהם טל, שופט              שרה סירוטה, ס"נ
                                                         אב"ד