E4bgsokc

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK

2  ------------------------------x

3  MARK I. SOKOLOW, et al.,

4                Plaintiffs,

5          v.                              04 CV 00397(GBD)

6  PALESTINIAN LIBERATION
   ORGANIZATION, et al.,

7
               Defendants.

8  ------------------------------x

9                                   New York, N.Y.
                                    April 11, 2014

10                                  2:00 p.m.

11  Before:

12              HON. GEORGE B. DANIELS,

13                                  District Judge

14                  APPEARANCES

15  ARNOLD & PORTER, LLP
        Attorneys for Plaintiffs

16  KENT YALOWITZ
    KEN HASHIMOTO

17  PHILIP HORTON
    TAL MACHNES

18
    MILLER & CHEVALIER CHARTERED

19      Attorneys for Defendants
    LAURA FERGUSON

20  BRIAN HILL
    MARK ROCHON

21

22

23

24

25

E4bgsokc

1              (In open court)

2              MR. YALOWTIZ:  Kent Yalowitz from Arnold Porter on

3     behalf of all plaintiffs.  With me are my colleagues Ken

4     Hashimoto, Philip Horton, and Tal Machnes.

5              MS. FERGUSON:  Good afternoon, your Honor.  Laura

6     Ferguson from Miller & Chevalier on behalf of defendants, the

7     Palestinian Authority and the PLO.  I'm here with my colleagues

8     Brian Hill and Michael Rochon.

9              THE COURT:  Good afternoon.

10             Let me hear from the defense with regard to the motion

11    to reconsider.  We'll probably have some interruptions.  You

12    probably see I have a jury deliberating.

13             MS. FERGUSON:  Would it be all right if I used the

14    podium?

15             THE COURT:  Yes.

16             MS. FERGUSON:  Your Honor, after the Supreme Court's

17    decision earlier this year in *Daimler* and *Walden*, there is no

18    longer any basis for this Court to exercise either general or

19    specific personal jurisdiction.  I'd like to briefly review the

20    two bases for the assertion of personal jurisdiction.

21             As this Court noted in its 2011 decision on personal

22    jurisdiction in this case, where a specific jurisdiction

23    applies where a defendant's contacts are related to the

24    litigation, general jurisdiction applies where they are

25    unrelated and involves a more stringent minimum contacts test.

E4bgsokc

1    Because there were no related contacts, this Court exercised

2    general personal jurisdiction back in 2011.  When defendants

3    filed their renewed Rule 12(b)(2) motion following the personal

4    jurisdiction discovery, the Court reviewed the discovery,

5    reviewed the arguments and concluded that based on the United

6    States' presence of the PLO mission to the United States, that

7    this Court could assert general personal jurisdiction because

8    the PLO had this continuous, systematic presence in the United

9    States.

10        While we have disagreed with that ruling, it could be

11   argued it was consistent with the state of the law at that

12   time.

13        THE COURT:  Wasn't *Goodyear* already decided by that

14   time?

15        MS. FERGUSON:  *Goodyear* was decided after this Court's

16   decision in March 2011.  *Goodyear* came out a few months later,

17   but importantly*,* *Goodyear* did not deal with the issue presented

18   in this case.

19        *Goodyear* was a stream of commerce case where the only

20   alleged defendants' contacts with the forum were the fact that

21   some of their tires or some of their products eventually

22   reached the forum, and the Court said that's not sufficient.

23        THE COURT:  They articulated legal positions they

24   relied on in *Daimler* as quoted right out of *Goodyear*.

25        MS. FERGUSON:  *Goodyear* did refer to at home.  It used

E4bgsokc

1    that language, at home.  The defendant needs to be at home.

2    But there was a significant question as to what the Supreme

3    Court meant by that.

4           In fact, the solicitor general's office, when we filed

5    a brief on behalf of the United States in *Daimler*, specifically

6    noted that *Goodyear* left unresolved whether a Court could

7    exercise personal jurisdiction over a defendant that

8    continuously and systematically is present in a forum, in

9    essence, operates an office there.  That's also why Justice

10   Sotomayor said in *Daimler* that we have adopted a new rule in

11   *Daimler*; this wasn't a rule that we adopted in *Goodyear*.

12          THE COURT:  What's the difference other than whether

13   or not the contacts are sufficient for the PLO and the

14   Palestinian Organization to be at home in the jurisdiction?

15   Why isn't that the only issue?

16          MS. FERGUSON:  We would say under *Daimler*, that is the

17   only issue, whether the PA and PLO are at home in the United

18   States.  *Daimler* makes clear something that *Goodyear* did not

19   make clear; that a defendant is generally only at home in one

20   place; that when deciding where a defendant is at home, it's

21   not enough that they have an office in the forum.  It needs to

22   be their principal place of operation.

23          THE COURT:  I don't see that language in *Daimler*.  Let

24   me make sure I have the right language.

25          It says that that is the paradigm basis for general

E4bgsokc

1    jurisdiction, but it does not say it is the only basis for

2    general jurisdiction.

3            If that was the case, then the standard wouldn't be

4    continuous and significant contacts within the jurisdiction

5    such that they're at home in the jurisdiction; it would be a

6    domicile test.

7            They said it was short of a domicile test, right?

8            MS. FERGUSON:  *Daimler* expressly requires the Court to

9    undertake a proportionality test.

10           THE COURT:  Right.

11           MS. FERGUSON:  It looks to the defendants' presence

12   worldwide and must determine that its presence in the forum

13   predominates over its activities worldwide, which could not be

14   said of the PA and PLO here.

15           THE COURT:  Where does it say it has to predominate

16   over its presence worldwide?

17           MS. FERGUSON:  We cite the language in our brief, but

18   basically it says that the defendant is generally only going to

19   be at home in one forum.

20           THE COURT:  I'm asking you about the language you just

21   used.  I don't remember reading in that language.

22           Is there such language in *Daimler*?

23           MS. FERGUSON:  *Daimler* arose because of the

24   subsidiary.

25           THE COURT:  I know.  My question is very specific

E4bgsokc

before you go on.  The language you have just used, are you

saying that's the language used in *Daimler*, that that is the

test?  If it is, I would need to see it right away.

MS. FERGUSON:  It's footnote number 20, page 43 of

*Daimler*, footnote 20, "The general jurisdiction inquiry does

not 'focus solely on the magnitude of the defendant's in-state

contacts.'  General jurisdiction instead calls for an appraisal

of the corporation's activities in their entirety, nationwide

and worldwide.  A corporation that operates in many places can

scarcely be deemed to be at home in all of them.  Otherwise,

'at home' would be synonymous with 'doing business' tests

framed before specific jurisdiction evolved in the United

States.  Nothing in *International Shoe* and its progeny suggest

that 'a particular quantum of local activity' should give state

authority over a 'far larger quantum of activity' having no

connection to any in-state activity."

THE COURT:  I know, but the principle you articulated

for me was that if they have a large presence worldwide, that

somehow that can preclude their having sufficient contact,

continuous and systematic contacts with the United States such

that they're at home in the United States.  It doesn't preclude

that.

MS. FERGUSON:  If you look at the facts of *Daimler*, it

does, because in *Daimler*, the subsidiary, whose contacts were

attributed to the foreign parent, it was at home in California,

E4bgsokc

1    but the Court said that's not enough.  You have to look at

2    *Daimler's* worldwide activity.

3            THE COURT:  The Court didn't say that with regard to

4    the subsidiary.  That wasn't the issue before the Court.

5            As a matter of fact, for the purpose of *Daimler*, the

6    Court said they were going to assume that the California

7    subsidiary of the U.S. subsidiary had sufficient contacts that

8    they were at home in California.

9            MS. FERGUSON:  Right.  They attributed those contacts

10   to the parent.

11           THE COURT:  Right.  That's a different issue, though.

12           MS. FERGUSON:  Because the defendants didn't make

13   these arguments, they waived those arguments.  The Court said

14   even if the subsidiary is based in California and even if we

15   treat those subsidiaries' jurisdictional contacts as the

16   parent's jurisdictional contacts, the parent is not at home in

17   California.

18           THE COURT:  Well, that makes sense.  I can understand

19   that, but I'm trying to understand the extent of your argument.

20           Is your argument that only where the company is

21   incorporated or has its principal place of business, that's the

22   only place that they can be continuously and systematically at

23   home in a forum?

24           MS. FERGUSON:  Yes, your Honor.  *Daimler* makes clear

25   that general jurisdiction is rarely to be exercised.  It's an

E4bgsokc

1  unusual situation where there will be general jurisdiction over

2  a foreign defendant.  And it gives the example of the *Perkins*

3  case, which it cites as one of those rare situations where a

4  U.S. court could exercise jurisdiction over a foreign

5  defendant.

6       Because of the wartime situation, the Philippines

7  company had essentially moved its operations out of the

8  Philippines and was operating in the United States.  For that

9  reason, it was at home, but the Court discusses *Perkins* at

10  length.

11       THE COURT:  Again, the factual situation in *Perkins* is

12  different than what is being applied here and the factual

13  situation in *Daimler* is different.  You're talking about a

14  company that was forced out of its location because of war.

15       In *Daimler*, first of all, you're suing an Argentinian

16  company based upon the contacts of the California subsidiary of

17  the *Daimler* parent; and, therefore, you're asserting

18  jurisdiction over *Daimler*.

19       Are you saying this is something that I must evaluate

20  or are you saying that the test is such that if it's not the

21  corporate headquarters or the worldwide headquarters, it can't

22  meet the test at all, no matter how significant its contacts

23  are otherwise?

24       MS. FERGUSON:  I'm saying the latter, your Honor,

25  because, otherwise, the lawsuit has to arise out of the

E4bgsokc

1    defendant's contact.

2             THE COURT:  Why doesn't the Court say that?  The Court

3    doesn't go that far.  The Court never says that you can only

4    sue a corporation where it is domiciled.

5             MS. FERGUSON:  It says that's the paradigm basis.

6             THE COURT:  The paradigm.  That's the easy one.

7    That's what they mean to say.  That's the easy analysis.  Of

8    course they're systematically and continuously in the place

9    where they have their corporate headquarters and that's where

10   they exist.  Of course that's the paradigm.

11            I'm trying to figure out whether or not you're saying

12   paradigm is supposed to mean there's no other situation, no

13   other analysis that's supposed to be done once you say that

14   that's not the corporate headquarters, so therefore, you can't

15   can have jurisdiction.

16            MS. FERGUSON:  The Supreme Court also said in *Daimler*

17   that it cannot be the case that corporations are at home

18   everywhere they have offices.

19            THE COURT:  That's true.

20            MS. FERGUSON:  Here, the PLO had missions in almost

21   every country.

22            THE COURT:  But it doesn't say it can't be at home in

23   more than one place.  It doesn't say that, does it?  Not

24   everywhere does it do business, you're right.  It doesn't stand

25   for the proposition that it can't be at home in more than one

E4bgsokc

1    place, does it?

2            MS. FERGUSON:  It's not it cannot be at home in a

3    jurisdiction just because it continuously and systematically --

4            THE COURT:  It depends on how continuous and how

5    systematic those contacts are, because the Court says if their

6    continuous and systematic contacts are such that it makes them

7    at home in the jurisdiction, then you can assert jurisdiction,

8    right?

9            MS. FERGUSON:  The Court assumed that *Daimler* was at

10   home in that jurisdiction in the way you're talking about and

11   said that's not enough.

12           THE COURT:  In *Daimler* they said that's not enough to

13   assert jurisdiction over the parent company.  That's what it

14   said in *Daimler*.

15           MS. FERGUSON:  But the Court had to assume that the

16   subsidiary's contacts were really the parent's contacts because

17   of the failure of the defendants to reject the agency arguments

18   and failure to argue that the subsidiary wasn't at home in

19   California.

20           So the Court basically assumes that even if we find

21   that *Daimler* has an office that it continuously and

22   systematically operates in California, that's not enough

23   because we have to look at where is *Daimler* predominately?

24   Where is its home worldwide?

25           The notion is that the United States is not to take

E4bgsokc

1    jurisdiction over cases that it doesn't have a substantial

2    connection to; and here, it's the happenstance that among the

3    many countries in the world, the PLO has an office here, just

4    like it has in every country in the world, that that's a basis

5    for the United States to sue the PLO for something that happens

6    anywhere in the world --

7           THE COURT:  It's not a basis to sue the PLO.  What's a

8    basis to sue the PLO is an analysis of whether or not their

9    continuous and systematic presence and contacts in the

10    jurisdiction are significant enough that one can say that it's

11    the equivalent of being at home in the jurisdiction.  Isn't

12    that the analysis?  Isn't that the analysis first, right?

13           MS. FERGUSON:  Yes, but depending on what you mean by

14    "at home."

15           THE COURT:  Well, you tell me what you mean by "at

16    home."

17           MS. FERGUSON:  The Court took *Daimler* to resolve the

18    question left open by *Goodyear*, which was, if you continuously

19    and systematically operate in one forum, is that enough?

20    *Daimler* says no, it's not enough; you have to look at the

21    presence in the forum compared to the totality of its

22    operations.

23           THE COURT:  I know, but think about the analysis that

24    you've just given.

25           When you have a foreign corporation, by your analysis,

E4bgsokc

1   the foreign corporation would never be able to be sued because

2   they're a foreign corporation.  I don't understand.

3           MS. FERGUSON:  That's the whole message of *Daimler*.

4           THE COURT:  You're saying that *Daimler* stands for the

5   proposition that you could never assert general jurisdiction

6   over a foreign corporation because no foreign corporation, by

7   your definition, is at home anywhere else except a foreign

8   country.

9           MS. FERGUSON:  Yes, I think that's exactly what the

10  Supreme Court is saying; and it gave the narrow exception of

11  the *Perkins* v. *Benguet Mining* case where the foreign

12  corporation had basically moved from the Philippines to the

13  United States because of the war and was running as a business.

14  That was the exception.

15          THE COURT:  Then why would it quote *Goodyear* and say

16  "As we have since explained, a court may assert general

17  jurisdiction over foreign (sister-state or foreign-country)

18  corporations to hear any and all claims against them when their

19  affiliations with the state are so continuous and systematic as

20  to render them essentially at home in the foreign state"?

21          That's the exact opposite of what you've just argued,

22  right?  By definition, what you just argued, that makes that

23  impossible, but they say that it is possible.

24          MS. FERGUSON:  But the question is, do you have more

25  than one home and Supreme Court says almost always no.

E4bgsokc

1          THE COURT:  Not by that language they don't say

2    "almost always no."  They say it depends.  It depends on the

3    significance of your continuous and systematic contact,

4    because, as I said, by your definition, as long as you're a

5    foreign company, regardless of how strong your continuous and

6    systematic contacts are with the United States, no analysis is

7    necessary because you could never be sued by your definition if

8    I accept your test.

9          That's not the test that *Daimler* says I'm supposed to

10   apply.  *Daimler* says, yes, you can assert jurisdiction over a

11   foreign company, entity, even though it is a foreign entity if

12   the analysis is that their continuous and systematic contacts

13   with the jurisdiction are such that they are at home in the

14   state.

15         So, it cannot be the proposition that simply because

16   you're incorporated and your principal place of business is in

17   a foreign country, that that precludes asserting, for all

18   purposes, any general jurisdiction because that's exactly what

19   they said.  You can do such a thing.

20         MS. FERGUSON:  The Court is rejecting the notion that

21   the United States should take jurisdiction over lawsuits

22   arising outside of the United States simply because a foreign

23   corporation or foreign organization happens to have an office

24   here.

25         THE COURT:  I agree.  I agree.

E4bgsokc

1          MS. FERGUSON:  That's what the Court was doing here.

2          THE COURT:  No, but the Court says if their activity

3     here is so systematic and continuous, that it would qualify as

4     being at home in the state, even though it may be a foreign

5     company, even though their business may be worldwide, then it

6     is possible to assert jurisdiction over them.

7          Isn't that what the Court said?

8          MS. FERGUSON:  The Court would have asserted

9     jurisdiction over *Daimler* then.

10         THE COURT:  No.  They found in *Daimler* it wasn't

11    sufficient to assert it over *Daimler* by asserting jurisdiction

12    over the subsidiary, attributing that to the parent, and then

13    saying that the parent has continuous and systematic contacts

14    such that *Daimler* is at home in the jurisdiction.  That's what

15    I read the case to say.

16         That's not what you read the case to say?

17         MS. FERGUSON:  I think you also need to read the case

18    in connection with the Court's other jurisprudence, for

19    example, *Kiobel*, where the Court has made clear that it wants

20    to limit federal courts taking cases that arise out of conduct

21    and foreign defendants having no connection to the forum.

22         For example, towards the end of the decision, the

23    Court says "The Ninth Circuit, moreover, paid little heed to

24    the risk to international comity its expansive view of general

25    jurisdiction posed.  Other nations do not share the uninhibited

E4bgsokc

1    approach to personal jurisdiction advanced by the Court of

2    Appeals in this case.  In the European Union, for example, a

3    corporation generally may be sued in the nation in which it is

4    'domiciled,' a term defined to refer only to the location of

5    the corporation's 'statutory seat,' 'central administration,'

6    or 'principal place of business.'"

7              THE COURT:  Right.  Wait a minute.  Didn't *Daimler*

8    also clearly say that *Goodyear*, in relying on *Goodyear*, to

9    expand on *Goodyear*, it says *Goodyear* did not hold that a

10   corporation may be subject to general jurisdiction, only in a

11   forum where it is incorporated or has its principal place of

12   business?

13             That's what you want to argue.  It says just the

14   opposite.  You can't argue that.  It clearly says that; that

15   you can't argue that it's only subject to general jurisdiction

16   in the forum where it's incorporated or has its principal place

17   of business.  If that's your argument, I have to reject that

18   argument.  I may still have to consider whether or not the

19   appropriate analysis has been done and whether or not the

20   systematic and continuous contact make it at home in the state.

21             But clearly you know, based on that language, you

22   cannot argue that *Daimler* is standing for the proposition that

23   general jurisdiction could only be asserted in a forum where an

24   entity is incorporated or has its principal place of business.

25             Is that what you're trying to argue?

E4bgsokc

1          MS. FERGUSON:  It requires this proportionality test

2     which the plaintiffs could not meet here because the

3     predominant focus of the PA and PLO's activities are in the

4     West Bank.  They're not in the United States.  A small fraction

5     of the PLO's activities and presence is in the United States.

6     When you look at its worldwide presence and activity, a very

7     tiny portion occurs in the United States and under *Daimler*

8     that's clearly not enough.  So, I agree there's no blanket rule

9     in a proportionality test.

10          THE COURT:  Let's go to the proportionality test

11     because that's not test you were trying to argue to me five

12     minutes ago.  You were arguing to me that because it's not

13     incorporated here and doesn't have its principal place of

14     business and is not domiciled here, that there's no way you

15     could assert general jurisdiction over it.  That is not the

16     rule.  That is not the rule in *Daimler*.  That's never been the

17     rule.  That's not the rule articulated in *Goodyear* as *Daimler*

18     has indicated.

19          The test is an analysis of the significance and the

20     extent of the contact and whether that creates a definition of

21     at home in the jurisdiction.  The real question is, how much

22     contact do you have to have to be at home in the jurisdiction?

23          Isn't that the real analysis?  That's a factual

24     analysis.

25          MS. FERGUSON:  I'll say in the general situation when

E4bgsokc

1    you're dealing with a foreign corporation, the paradigm case

2    would be is there general jurisdiction where it's based?  But I

3    agree the Supreme Court holds open the possibility that there

4    could be more than one place where a defendant is at home.

5              THE COURT:  Okay.

6              MS. FERGUSON:  But then you have to look at the

7    proportionality test.  And plainly, the plaintiffs could not

8    meet a proportionality test.  For one thing, the U.S. contacts

9    are those of one mission – and again, the PLO has missions in

10   almost every country in the world – one mission of the PLO in

11   the United States.  We have always argued that's not a PA

12   contact.

13             THE COURT:  That's not a new argument.  You had this

14   in your motion for reconsideration.  That's not a new argument.

15             MS. FERGUSON:  It's one office, and there are offices

16   all over the world.  The PA, in fact, is not allowed to have a

17   presence in the United States.  The PA operates out of the West

18   Bank.  All of its activities are in the West Bank.

19             THE COURT:  When you say they're not allowed to have a

20   presence in the United States, that sounds like semantics to me

21   because they do have a presence in the United States.

22             MS. FERGUSON:  As a matter of the Oslo Accord, they're

23   not --

24             THE COURT:  They do have a presence in the United

25   States.  For jurisdictional purposes, they have a presence in

E4bgsokc

1    the United States, right?

2            MS. FERGUSON:  It is a PLO office, your Honor.

3            THE COURT:  No.  They have a presence in the United

4    States, right?  Just like you say for specific jurisdiction,

5    they have a sufficient presence in the United States to be sued

6    with regard to specific jurisdiction, right?

7            MS. FERGUSON:  It is the PLO office that speaks on

8    behalf of Palestinian --

9            THE COURT:  I know, but you just said they don't have

10   a presence in the United States.  And I say that's semantics

11   because I can walk into their office in the United States.

12   They do have a presence in the United States.

13           MS. FERGUSON:  It will say it's a PLO office, and

14   under the Oslo Accord, it has to be a PLO office.

15           THE COURT:  No.  "Under the Oslo Accord" has nothing

16   to do with the assessment of asserting personal jurisdiction

17   over them under U.S. law.  That doesn't define jurisdiction.

18           MS. FERGUSON:  I think your Honor treated the PLO

19   office as an agent of the PA, and I think under *Daimler*, that

20   agency analysis is questionable.

21           THE COURT:  No.  I'm treating it the same way it was

22   described to me originally in terms of the activity, who they

23   represent, what they're doing here in the United States.  I

24   went through that whole analysis.  They represent the interests

25   and to be the presence of the PLO and the Palestinian Authority

E4bgsokc

1    in the United States representing their interests.  We all know

2    that.  We can't stick our heads in the sand and say, well, the

3    PLO under the Oslo Convention is nowhere in the United States.

4    That's not an accurate analysis for jurisdiction, right?

5            MS. FERGUSON:  Just because you advocate for someone's

6    position doesn't mean that their jurisdictional contacts are

7    your jurisdictional contacts.

8            THE COURT:  That's not the question.

9            MS. FERGUSON:  They're not alter egos.  There has been

10   no finding that they're alter egos.

11           THE COURT:  The only question, again, is, you wanted

12   to push another argument on me.  You wanted to say they have no

13   presence in the United States for jurisdictional purposes.

14   That's not true.  They do have a presence in the United States

15   for a jurisdictional analysis under U.S. law.

16           Now, whether or not you want to argue that that

17   jurisdictional analysis is not sufficient contact and violates

18   due process to assert general jurisdiction over them, that's a

19   different question, but you can't argue that the reason there's

20   no jurisdiction over them is because they don't have a presence

21   in the United States as that is defined for jurisdictional

22   purposes.

23           MS. FERGUSON:  What is clear is that -- we'll assume

24   your Honor has ruled that that's a PA and PLO presence in the

25   United States.  It fails the *Daimler* proportionality test

E4bgsokc

1    because it is a small percentage of the PA and PLO's worldwide

2    activity.  The focus of their activity, their presence is in

3    the West Bank.

4            THE COURT:  Of all the numerous cases that have been

5    brought and continue to be brought against the PLO and

6    Palestinian Authority, has the PLO or the Palestinian Authority

7    successfully made the argument anywhere that there isn't

8    general jurisdiction over them in the United States?

9            I know maybe a dozen cases where they have been sued.

10    Is there any case that they successfully made that argument?

11            MS. FERGUSON:  No, because all of the Courts were

12    holding that it's enough to have a continuous and systematic

13    presence in the forum, and they found the office created a

14    continuous and systematic presence in the forum.  The Supreme

15    Court has now said, very explicitly, having a continuous and

16    systematic presence in the forum is not enough unless it is

17    your home; and the PA and PLO cannot be considered to be at

18    home in the United States applying the *Daimler* proportionality

19    test.

20            THE COURT:  I should ask you this way:  Why is this a

21    timely motion?

22            MS. FERGUSON:  Your Honor, the plaintiffs have argued

23    we have somehow waived the personal jurisdiction defense.  And

24    we have filed a timely Rule 12(b)(2) motion.  They argued

25    waiver then.  Your Honor said no, there's been no waiver.  We

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E4bgsokc

1    preserved the defense.  We had jurisdictional discovery.  We

2    have renewed our Rule 12(b)(2) motion.

3            If this case were to go up on appeal, we would

4    certainly be allowed to argue personal jurisdiction and rely on

5    *Daimler*.  So, we haven't done anything to waive our personal

6    jurisdiction defense.

7            THE COURT:  I'm not asking about waiver.  I'm asking

8    why is this a timely motion in response to new law?

9            MS. FERGUSON:  It was *Daimler* that made this

10   proportionality test clear.

11           THE COURT:  But *Goodyear* made it clear.  They cite

12   *Goodyear* for that.

13           MS. FERGUSON:  They don't cite *Goodyear* for the

14   proportionality test.  The reason the Court took *Daimler* was to

15   make this point.  And the solicitor general's office, in

16   arguing the U.S.'s position in *Daimler*, and we quoted this

17   language in our brief, explicitly said this issue was left

18   unclear in *Goodyear*.  And Justice Sotomayor in *Daimler* said

19   *Goodyear* did not deal with the situation where there was a

20   local office.

21           In fact, numerous district court decisions from across

22   the country, including cases from this jurisdiction that came

23   out after *Goodyear*, continue to assert general personal

24   jurisdiction without applying a proportionality test involving

25   defendants who didn't have as their principal place of business

E4bgsokc

1    or predominate place of business the forum.

2          The Courts were viewing *Goodyear* as a stream of

3    commerce case, and it wasn't until *Daimler* that the law has

4    shifted.  We're not required to be clairvoyant and anticipate

5    exactly how the Supreme Court is going to evolve on this, but I

6    think if you look at all of the cases we cited in our brief

7    that came out between *Goodyear* and *Daimler*, no one was

8    interpreting *Goodyear* as broadly as *Daimler*.  They weren't

9    interpreting it to adopt this proportionality test.

10          We're timely in saying that it's *Daimler* that poses a

11    question of can a court assert general personal jurisdiction

12    over a defendant that has a local office but it's not its

13    principal place of business under the proportionality test.

14          THE COURT:  The answer to that is yes, you can, if

15    those contacts are continuous and systematic to the extent that

16    it makes them at home in the jurisdiction.

17          MS. FERGUSON:  Compared to --

18          THE COURT:  Not compared to anything.  It's always

19    going to be compared to, as they say, their place of

20    incorporation or the principal place of business.

21          MS. FERGUSON:  *Daimler* is saying you're not at home

22    everywhere you have an office.

23          THE COURT:  Yes, but you can be at home someplace else

24    other than your principal place of business.  You can't just

25    simply say I am an Australian company and my principal place of

E4bgsokc

1    business is Australia, so therefore, you cannot have general

2    jurisdiction over me any place else because that's my principal

3    place of business.  I'm not supposed to compare it to the

4    principal place of business.

5            MS. FERGUSON:  I think the last section of the Court's

6    decision in *Daimler* that talks about international comity and

7    how other courts view general jurisdiction --

8            THE COURT:  It stands for what proposition?

9            MS. FERGUSON:  It stands for the proposition that U.S.

10   courts should not be hailing foreign defendants into the United

11   States for lawsuits that arise out of foreign conduct that have

12   no nexus to the United States just because they happen to have

13   an office here.

14           It need to be where they're --

15           THE COURT:  Unless their continuous and systematic

16   contact in the United States make them at home in that

17   jurisdiction.

18           That's the rule, right?

19           MS. FERGUSON:  But *Daimler* says the local office

20   doesn't create the necessary continuous and systematic contact

21   because that was the case in *Daimler*; there was the local

22   office.

23           THE COURT:  No.  There was a subsidiary office; There

24   wasn't a local office.

25           MS. FERGUSON:  But the Court said because of this

E4bgsokc

```
 1    agency attribution, we're going to assume those contacts are as

 2    if those were Daimler's, we're going to assume as if Daimler

 3    was there because the Court accepted for the purposes of its

 4    decision as though all of those contacts could be treated as

 5    Daimler's.

 6              THE COURT:  I understand that, but you can't change

 7    the facts.  This is not on all-fours with Daimler.  Daimler is

 8    dealing with a situation where they tried to assert

 9    jurisdiction over Daimler because they had a subsidiary in the

10    United States and they wanted to use that as the systematic and

11    continuous contact with Daimler when it did not seem that was

12    consistent with due process to hold Daimler, the parent

13    company, responsible under that set of circumstance.

14              MS. FERGUSON:  I don't understand why it's any less

15    problematic to hold the Palestinian Authority subject to

16    jurisdiction.

17              THE COURT:  Because this isn't a subsidiary of the

18    Palestinian Authority.  Clearly, there's a difference.  This is

19    the Palestinian Authority's presence representing their

20    interests in the United States.

21              So, you can try to convince me that their contacts are

22    not systematic or continuous to make them at home in the

23    jurisdiction, but it is their contacts.  It's their direct

24    contacts.

25              MS. FERGUSON:  But they have missions all over the
```

E4bgsokc

1   world.

2           THE COURT:  That's not determinative.

3           MS. FERGUSON:  Then any country anywhere in the world

4   can sue them for anything that happens anywhere, and the

5   Supreme Court is rejecting that notion.

6           THE COURT:  No.  It depends on the nature of their

7   activities in those countries.  It has nothing to do with

8   whether they have a mission there.

9           If they have a mission there, a sleepy mission in

10  Tongo or something, that isn't necessarily the same continuous

11  and systematic contact as an aggressive PR and lobbying

12  campaign in the United States.  The analysis depends on the

13  individual facts, doesn't it?

14          No one is saying that everywhere the PLO has a

15  mission, those contacts are all the same so that they would

16  warrant asserting jurisdiction over them simply because they

17  have a mission.

18          MS. FERGUSON:  Respectfully, I think you're reading

19  the proportionality test out of *Daimler*.  Respectfully, I think

20  you're reading the proportionality test out of *Daimler* because

21  if you consider the PA's activities worldwide, their home is

22  the West Bank.  There's no other place that even is a close

23  second.

24          THE COURT:  The question isn't is where is their home.

25  The question is where they're at home.

E4bgsokc

1             You haven't yet given me a definition of "at home,"

2    what the limits and extent of that definition is supposed to be

3    in terms of the significance of the contact.

4             MS. FERGUSON:  I think the Court's discussion of

5    *Perkins* is really significant.  The Court specifically says

6    there are very few instances in which the Court has upheld

7    general jurisdiction over foreign defendants.

8             The example they give where that was warranted, there

9    was this case where technically the home is the Philippines,

10   but basically they had to relocate and now were operating

11   exclusively out of the United States so then they could be

12   treated as at home there.  But the Court rejects the idea that

13   multinational corporations are at home in all of the places in

14   which they have substantial operations.  You have to look at

15   the proportionality test.

16            THE COURT:  Tell me what the test is.  Tell where you

17   cross the line into at home.  That's what I'm trying to

18   understand from your argument.

19            What makes you at home?  How much contact?

20            MS. FERGUSON:  You cannot be at home --

21            THE COURT:  No.  Don't tell me what you can't be.

22   Tell me what you can be.  I understand what you mean when you

23   say you can't do it on this.

24            I'm trying to understand where you say you can do it

25   on; otherwise, you're not giving me a test that's useful.

E4bgsokc

1              MS. FERGUSON:  Where it is reasonable to sue a

2    defendant for conduct that occurs anywhere in the world is

3    where they have chosen to predominately operate, and maybe that

4    could be a couple of places, but it's not everywhere they have

5    an office.

6              THE COURT:  I understand.

7              Let's take a recess.

8              (Recess)

9              THE COURT:  Please continue.

10             MS. FERGUSON:  Your Honor, in terms of the

11   proportionality test, I just wanted to clarify.  For example,

12   the PLO has a lot of activity in Oman, so potentially Oman

13   might be another place.  But it is the plaintiffs' burden of

14   proof to meet the test for personal jurisdiction and the

15   plaintiffs have not made any showing that the PLO's U.S.

16   activities in any way predominate.

17             THE COURT:  When you say "predominate," I'm not quite

18   sure.  Are you using a standard that it's got to be more here

19   than someplace else?

20             MS. FERGUSON:  Yes.

21             THE COURT:  Is that the standard you're using?

22             MS. FERGUSON:  Yes.

23             THE COURT:  As opposed to it just has to meet a

24   threshold of continuous and systematic contact?

25             MS. FERGUSON:  Yes, right.

E4bgsokc

1          THE COURT:  That's what I'm trying to understand.

2          If I have the PLO and I have another entity, and that

3    other entity has a presence in a foreign country, principal

4    place of business, and they do the exact same level of activity

5    in the United States as the PLO, your argument is that even if

6    that would be enough for them, that if the PLO does a greater

7    level of activity in some other country than that, then, by

8    definition, they can't be at home in the United States.

9          MS. FERGUSON:  Absolutely, because that's what the

10   proportionality test requires.

11         THE COURT:  Where are you getting it?

12         MS. FERGUSON:  It's asking where does the defendant

13   make its home.

14         THE COURT:  Show me.  I don't see that.  You get that

15   out of *Daimler* or *Goodyear* or someplace else?

16         MS. FERGUSON:  I want to emphasize the discussion of

17   *Perkins* because I think it's really key to understanding what

18   the Court is saying.

19         THE COURT:  You get that proportionality test out of

20   *Perkins*?

21         MS. FERGUSON:  It says "*Perkins* remains the textbook

22   case of general jurisdiction appropriately exercised over a

23   foreign corporation that has not consented to suit in the

24   forum."

25         THE COURT:  Right.

E4bgsokc

1          MS. FERGUSON:  It says that Ohio was the corporation's

2     principal, if temporary, place of business, so that's why it

3     could be exercised.

4          Technically, it had its home in the Philippines, but

5     its principal place of business was Ohio.  Well, you can

6     imagine a company that has significant operations, but it

7     decides to register itself offshore somewhere but it makes

8     itself at home in a particular forum.

9          THE COURT:  I know, but that's a different test.

10    You're giving me a different test.

11         If I give the number 20 to at home, you're not saying

12    to me that the number ten below that is not at home; you're

13    saying if there's a number 15, number ten is not at home

14    because it's not proportionally greater than number 15 in the

15    other jurisdiction, regardless of how significant an

16    independent analysis is of its continuous and systematic

17    contacts.

18         Where are you getting that from?

19         MS. FERGUSON:  *Daimler* requires a consideration of the

20    defendants' contacts in the forum versus its contacts

21    elsewhere.

22         THE COURT:  Right.

23         MS. FERGUSON:  The plaintiffs have made no showing,

24    and they have the burden of proof, that the U.S. contacts are

25    in any way predominate such that the PA and PLO can be said to

E4bgsokc

have made their home here.  It is a small fraction of their

contacts.  They're based in the Middle East.

        The Court has said, as a matter of international

comity, we don't hail foreign organizations into the U.S.

courts to litigate conduct that occurs elsewhere that is

unrelated to our forum just because they happen to have a local

office here unless they have made a decision to make this their

home.

        THE COURT:  You want me, based on *Daimler*, to be the

first court in the United States to ever say that?  I guess

that's accurate, right?  As I said, the PLO hasn't successfully

made this argument anywhere.

        MS. FERGUSON:  Because the Courts that had decided

personal jurisdiction before relied on the continuous and

systematic test, and *Daimler* specifically says that's not

enough.

        THE COURT:  Nobody has made such a determination

since?

        MS. FERGUSON:  *Daimler* says that's the test for

specific jurisdiction.  You may use continuos and systematic

for specific jurisdiction, but for general jurisdiction, you

need significantly more.  It's a rare situation where the

United States should hail a foreign organization into the

United States to be sued here for conduct that has nothing to

do with the United States over conduct that it occurred outside

E4bgsokc

1    of the United States.

2            The Court, in the alien tort statute cases and in

3    *Daimler*, is saying there needs to be a really close connection

4    between the lawsuit, the defendant and the forum for you to be

5    taking this case, unless it's someone who truly has made the

6    United States their home; and that cannot be said of the PA and

7    the PLO.

8            Unless your Honor has any questions.

9            THE COURT:  Let me hear from the other side and then

10    I'll let you respond.

11            MS. FERGUSON:  There's also the issue of specific

12    jurisdiction.  I don't know if your Honor wants me to address

13    that, but I can come back to that later.

14            THE COURT:  With regard to service?  Focus me on the

15    specific jurisdiction.

16            MS. FERGUSON:  Your Honor, the plaintiffs have a

17    fallback position that even if there's no general jurisdiction,

18    the Court could assert specific jurisdiction, but specific

19    jurisdiction has to be case-related.

20            THE COURT:  Right.

21            MS. FERGUSON:  There is no evidence of that here.

22            THE COURT:  I didn't understand that they were making

23    a case-related argument, but they can articulate that for me.

24            MS. FERGUSON:  I can respond to Mr. Yalowitz on that.

25            THE COURT:  Thank you.

E4bgsokc

1          Mr. Yalowitz.

2          MR. YALOWTIZ:  Thank you, your Honor.

3          THE COURT:  What makes the PLO at home in the United

4    States?

5          MR. YALOWTIZ:  First of all, your Honor, I read

6    *Daimler* the same way your Honor does, which is that it requires

7    a qualitative analysis of the contacts of the PLO and the PA.

8          I should say this*:*  *Daimler* requires a qualitative

9    analysis of the contacts of a foreign corporation with the

10   United States or with a state when sued under state law.

11         I don't think that the defendants have made any record

12   that anything has changed since this Court made its general

13   jurisdiction decision, which was that in light of the

14   activities, the very significant continuous, systematic

15   activities in the United States by the PA and by the PLO acting

16   through their authorized agents, it was fair for them to

17   foresee that they would be called into court here in light of

18   those activities.

19         There's no record now of what the proportion of

20   worldwide activities is, what their mission does in this, that,

21   or the other place.  The one thing we know is that they care

22   very, very deeply what the United States citizens and what the

23   United States government think of them, and they have spent

24   millions of dollars and sent dozens of employees to live in the

25   United States so that they can try to effect U.S. public

E4bgsokc

1    opinion.

2            I think your Honor has *Daimler* right with regard to

3    corporations, but I think there are three things about the

4    defendant's position with regard to *Daimler* that are just

5    sloppy and need to be corrected.

6            The first thing is that *Daimler* was about a

7    multinational corporation. *Daimler* was not about a government

8    or a person or a partnership or a limited company or anything

9    else. With regard to jurisdiction, forum matters. We know,

10   for example, that when an individual goes to California or

11   Alaska, if they get served, they're subject to general

12   jurisdiction. That's the *Burnham* case, gotcha jurisdiction.

13   That rule is special for individuals. It doesn't apply to

14   corporations. Every entity has its own rules. *Daimler* wasn't

15   about a foreign government sponsor of terrorism. *Daimler* was

16   about a corporation selling automobiles; that's the first

17   thing.

18           We're here, as your Honor said, on a motion for

19   reconsideration which requires a change in controlling law.

20   And when you have a case that's not controlling, that's not the

21   stuff for a motion for reconsideration; it's a different

22   factual scenario. That's problem number one with the motion.

23           Problem number two, this is a Fifth Amendment case,

24   not a Fourteenth Amendment case. And when the defendants cited

25   in their reply brief that solicitor general brief from *Daimler*,

E4bgsokc

1    I thought it was very interesting so I went and read it because

2    I always like to know what the solicitor general thinks about

3    things that I'm working on.  If your Honor doesn't have a copy

4    of the brief, I'm happy to supply it, but I just pulled it off

5    the internet.

6            In the section about the interests of the United

7    States, the solicitor general says this is a 14th amendment

8    case.  It's not a Fifth Amendment case.  The Fifth Amendment

9    implicates important interests of the United States as a whole

10   – matters of foreign policy, foreign commerce, power of

11   Congress – and we think the Court needs to treat the Fifth

12   Amendment differently than the Fourteenth Amendment.

13           The solicitor general is not the only person to say

14   that.  That's also what "Wright & Miller" says in their

15   treatise, which plaintiffs cited for the benefit of the Court

16   in our brief, and that's what the Sixth Circuit and the Third

17   Circuit held in cases that we cited in our brief.  The Fifth

18   Amendment is just different because here you're constraining

19   the United States.

20           THE COURT:  There's still a due process analysis.

21           MR. YALOWITZ:  Agreed.  But if you think about it,

22   what we're talking about with the Fifth Amendment is something

23   that has to be less constraining than what we're talking about

24   with the Fourteenth Amendment for two reasons:  A practical

25   reason and a theoretical reason.

E4bgsokc

1          The practical reason is the political actors in the

2    United States, Congress and the president, have determined that

3    it is in the interest of the United States in many, many

4    circumstances to assert extraterritorial jurisdiction.  For

5    example, there are a lot of crimes where if you kill a United

6    States citizen abroad, the United States has said that is a

7    federal crime, we can bring you to the United States and put

8    you in jail.

9          In the Second Circuit in the Yousef case said that's

10   consistent with due process.  Yousef was in Manila.  He did the

11   Philippine bombing plot.  They caught him because his apartment

12   caught on fire.  They renditioned him to New York and they

13   indicted him, prosecuted him, and put him in jail for planning

14   to blow up U.S. airplanes.

15         His plot didn't succeed, but if it had, the position

16   of the defendants in this case, is that -- and the Second

17   Circuit then looked at that case and said what the U.S.

18   government did to Yousef, bringing him to the United States and

19   putting him in jail for plotting abroad to blow up U.S. planes,

20   that's consistent with the due process clause in the Fifth

21   Amendment.

22         The defendant's position is, if Yousef had succeeded,

23   if he had actually killed U.S. citizens abroad, the way these

24   defendants did, if he had succeeded, it would be okay under the

25   Fifth Amendment for the United States government to rendition

E4bgsokc

1   him, to bring him to New York, to try him, prosecute him, and

2   put him in jail, but then if the families of the people he

3   killed brought a case under the Antiterrorism Act to recover

4   civil damages, that would violate the Constitution.  That is

5   the position that these defendants are asking this Court to

6   take.  It makes no sense.

7           The reason it makes no sense, in addition to the

8   practicalities, is that the Fourteenth Amendment does two items

9   of work.  It's a fairness imposition, which is what the Fifth

10  Amendment does.  There has to be some basic fairness.  But the

11  Fourteenth Amendment also constrains the states.  The states

12  are coequal sovereigns.  They don't have the power to conduct

13  foreign policy.  They don't have the power to go beyond our

14  shores.  They don't have the vast powers the Constitution

15  assigns to the federal government.

16          The Fourteenth Amendment, which is what *Daimler* was

17  about, is, in a sense, constraining the state; it does two

18  levels of work.  The Supreme Court said that in *World-wide*

19  *Volkswagen*, and it's quoted in that Sixth Circuit case, which I

20  can never remember the name of that we put in our brief, but

21  *World-wide Volkswagen* is the Supreme Court case.  That's the

22  second problem with the defendant's underpinnings of their

23  position.  Problem number one is that they're talking about

24  corporations instead of governments; problem number two is this

25  Fifth Amendment problem.  Problem number three is the

E4bgsokc

1    attribution problem.

2            THE COURT:  As they say, now it's in your interest to

3    argue that they're a government, but I have a recollection that

4    I heard just the opposite argument from you that they weren't a

5    government during the course of this.

6            MR. YALOWITZ:  As your Honor knows, I came into the

7    case about a year ago.  One of the things I did, I went back

8    and looked at some of the transcripts and the pleadings.  I

9    think they're a government.  They say they're a government.  I

10   looked at the practical test of what they are.  I think they're

11   a government.  I think they're a government for all purposes.

12           I don't think they're a sovereign government.  They

13   don't meet the test of sovereignty, but when I look at the

14   practicalities of what they do and who they are, my view is

15   they're a government.

16           THE COURT:  Why is the analysis stronger with regard

17   to their being a nonsovereign government as opposed to being

18   comparable to a corporation?

19           MR. YALOWITZ:  I think that the forum matters, and I

20   think there may be good reasons to hold a foreign government

21   accountable here, for example, when they come here to influence

22   the United States, that are different than corporations

23   where we're trying to improve the flow of commerce.

24           The United States' position, as expressed by the

25   solicitor general in that brief, was that the traditional

E4bgsokc

1    assertion of general jurisdiction had caused problems for

2    international commerce, so it was in the interest of the United

3    States to scale back what the states were doing in that realm.

4         THE COURT:  I don't know why it seems more compelling

5    to allow the states to assert jurisdiction over governments as

6    opposed to corporations.

7         If you stretch out that analysis, there's an even

8    stronger reason not to allow the state without a significant

9    jurisdictional basis to assert jurisdiction over foreign

10   governments.

11        MR. YALOWTIZ:  I think that's true of the states.  I

12   don't think it's true of the United States.  I think that

13   context matters.

14        THE COURT:  Why is the due process analysis any

15   different?

16        MR. YALOWTIZ:  Because the states can't conduct

17   foreign policy.

18        THE COURT:  Right.

19        MR. YALOWTIZ:  That's assigned entirely to the federal

20   government.  If the Congress and the president decide it's in

21   the interest of the United States to assert general

22   jurisdiction over a foreign government, the Courts are likely

23   to respect that policy decision.

24        THE COURT:  But I'm not aware of any test that says

25   that it is easier or there's a particular different analysis to

E4bgsokc

1   assert jurisdiction over a foreign government than over a

2   corporation, the distinction that you're trying to draw here.

3           MR. YALOWTIZ:  Yes.  It's pretty rare because most

4   foreign governments are protected by sovereign immunity or by

5   international --

6           THE COURT:  Right.  Why doesn't that make this more

7   akin to a corporate situation than akin to a sovereign

8   government situation?

9           MR. YALOWTIZ:  I think it's not akin to a sovereign

10   government situation.  I think it's most akin to a state

11   sponsor of terrorism.  There's an exception in the Foreign

12   Sovereign Immunities Act for state-sponsored terrorism.  If you

13   are a foreign sovereign government that sponsors terrorism, you

14   are, in fact, subject to jurisdiction.

15           THE COURT:  That's a statutory exception.

16           MR. YALOWTIZ:  Correct.

17           THE COURT:  That's not a standard jurisdictional

18   analysis.

19           MR. YALOWTIZ:  Correct.

20           What the defendants are saying is that, as a

21   Constitutional matter, that statute is unconstitutional because

22   the Constitution requires this extra overlay of essentially "at

23   home."

24           Everybody agrees that under the regular general

25   jurisdiction, doing business C.P.L.R. 301 test that's been in

E4bgsokc

1   existence for 100 years that the defendants are in the United

2   States and subject to jurisdiction.

3          What they're saying is there's a constitutional

4   overlay over that now because of *Daimler* and because of

5   *Goodyear*.  And *Goodyear* and *Daimler* do say that under the

6   Fourteenth Amendment, there is a restriction on the states, but

7   they don't say there is a restriction on the United States

8   under the Fifth Amendment.  I think it's an extremely important

9   distinction, and it's one that the solicitor general agrees

10  with me on.  I didn't know that when we started, but it is what

11  they say as well.

12         The third problem that the defendants have is that in

13  our statute, we have a statute that gives us jurisdiction over

14  the defendants.  It's 18 U.S.C. 2334.  We served the defendants

15  in accordance with 18 U.S.C. 2334, and that says that you can

16  serve a defendant, under the Antiterrorism Act, in any district

17  in which, and I don't remember the exact wording, but it's like

18  the Antitrust Act, in any jurisdiction where they reside, where

19  they can be found or where they have an agent.

20         The service here was made on a duly authorized agent

21  who is present in the United States.  So Congress has said in

22  order to obtain jurisdiction over a foreign entity that engages

23  in international terrorism, if you serve an agent, that's

24  enough; and what the defendants are saying is that that statute

25  is unconstitutional as applied to them.

E4bgsokc

1    They're saying even though you served us properly,

2    they have no truck about the way they were served, even though

3    service under Rule 4(k) grants jurisdiction, they're saying

4    that that statute, as applied to them, is unconstitutional.

5    That's their position in this case.  That's the problem with

6    *Daimler* in my mind.

7    The second thing I want to talk about is something

8    that your Honor raised, which is the timing of this motion.

9    This is a motion for reconsideration, and it is supposed to be

10   made in a timely way.  Everything that the defendants argued in

11   their motion for reconsideration was something that they could

12   have, should have, would have argued under *Goodyear* had they

13   thought of it or had they been diligent instead of dilatory.

14   They can make whatever arguments they want at the end

15   of the case if they get a verdict against them and if they

16   appeal and they want to make those jurisdictional arguments.

17   Of course they can make arguments they have preserved, but they

18   can't burden the Court with motion after motion for

19   reconsideration of old rulings unless they do it promptly.  The

20   courts enforce those kinds of rules all the time, and I would

21   commend that to the Court.  I agree with the Court that I think

22   they're late.

23   The problem that they have is compounded because they

24   submitted to the jurisdiction of the Court in January of 2012

25   when they made a Rule 12(c) motion for judgment on the

E4bgsokc

pleadings in order to throw out the pendent claims.  When they
did that, they asked the Court for affirmative relief.  Federal
Rules of Civil Procedure 12(g) and 12(h) say that if you submit
a Rule 12(c) motion and you don't make a jurisdictional motion
that's available to you – that's the wording of the rule,
"available to you" – then you have waived it.

           The Second Circuit has taught us in the *Holsinger* case
that a jurisdictional defense is available if it might be
successful; in other words, if you have a good faith basis to
make it.  It doesn't have to be an 100 percent winner.  It has
to be something that you think you might win.  We know that
these defendants thought that they might win jurisdictional
motions under *Goodyear* because they made them in other cases.

           So, when *Goodyear* came out, if they wanted to preserve
their jurisdictional defenses, they had a duty at that time to
come forward and say there's been a change in law and we would
like you to consider *Goodyear*.  Maybe they would have won.
Maybe they would have lost at that time.  I think they would
have lost for the reasons we have already discussed, but that
was the time to do it, not two and-a-half years later after we
have been through millions and millions of pages of documents
at dozens of depositions and dozens of conferences with Judge
Ellis and hundreds of pages of briefs.  At some point, you have
submitted yourself to the jurisdiction of the Court on the
merits.

E4bgsokc

1          Remember, basically what they're asking for here is a

2    ruling that would say you can't litigate the case here, so it

3    would just go to Israel.  It's not like it's going to end the

4    case on the merits.  They're essentially looking for a change

5    in forum.

6          We did mention and your Honor did, too, and I didn't,

7    but the last time there was a do-si-do about change in forum,

8    the defendants made a deal.  They said we don't want to go to

9    Brooklyn, we'll stay here and waive our objections to venue.

10   It seems to me a reasonable person reading that waiver, reading

11   that contract, if you will, would say they said expressly the

12   case can proceed in the Southern District of New York and they

13   ought to be held to that bargain.

14         There are a couple of other alternatives, your Honor,

15   that we did brief.  If it would be helpful to the Court, I

16   would be happy to walk through them with regard to specific

17   jurisdiction and with regard to the rights of governments like

18   the Palestinian Authority and the PLO to have due process

19   rights.

20         THE COURT:  Remind me of what your specific

21   jurisdiction argument was because I didn't understand as

22   articulated.

23         MR. YALOWTIZ:  Sure.

24         With regard to specific jurisdiction, the Court looks

25   at the relationship between the defendants, the forum, and the

E4bgsokc

1    claim.  The claim here, which has been the claim from the very

2    beginning of the case, is that the defendants used a campaign

3    of violence in order to threaten and intimidate and coerce both

4    the government of Israel and the government of the United

5    States.  That's always been the claim.

6          That's how terrorism works; that's the fundamental

7    nature of terrorism.

8          THE COURT:  Whose claim is that?

9          MR. YALOWTIZ:  That's the plaintiffs' claim.

10          THE COURT:  Articulated as what legal claim?  It's not

11    a separate, legal claim.

12          MR. YALOWTIZ:  Right.  It's just an element.  An

13    element of the claim is it's a crime of international violence

14    that appears intended to threaten or intimidate a civilian

15    population or to coerce a government.  In other words, it's not

16    enough to prove that it was street crime.  Street crime isn't

17    terrorism.  Terrorism requires that you're communicating to a

18    government or a civilian population.

19          So when they come here to the United States and they

20    say, oh, it's terrible, there's horrible violence in Israel, if

21    only you would end the occupation, the violence would end, what

22    they're doing is they're completing the tort of international

23    terrorism.

24          THE COURT:  I don't understand that argument.  I

25    didn't understand it.  I'm remembering now.  I didn't

E4bgsokc

1    understand it then.

2            If you were arguing that they came and what they were

3    saying was that they came here and advocated violence on this

4    shore, I would understand that argument, but you're saying just

5    the opposite.  You want to say that is part of the plan of

6    intimidation to say what?

7            Who does that activity intimidate?

8            MR. YALOWTIZ:  It intimidates the civilian population.

9            THE COURT:  How?  What intimidates the civilian

10   population?

11           MR. YALOWTIZ:  The Israeli civilian population.

12           THE COURT:  What are you saying that they did here

13   that's intimidating the civilian population?

14           MR. YALOWTIZ:  I don't think that the conduct in the

15   United States intimidated the United States' population.

16           THE COURT:  What conduct in the United States

17   intimidated citizens of Israel?  A plea to stop the violence?

18           MR. YALOWTIZ:  Right.

19           THE COURT:  Why is a plea to stop the violence an

20   intimidation?

21           MR. YALOWTIZ:  It's like a protection racket.  The

22   defendants here created the violence, then they come around and

23   they say oh, you know, it's a very dangerous neighborhood over

24   there.  If you want to make it a safe neighborhood, just do

25   what we say and then it will be a nice, safe neighborhood.

E4bgsokc

1          THE COURT:  No.  They don't say do what we say; they

2     say stop the violence.

3          You're saying they're coming over here and saying stop

4     the violence is an intimidation of the Israeli population

5     because they're asking them to stop the violence?

6          MR. YALOWTIZ:  Let me try to break it down a little

7     bit.  The cycle goes like this:  The defendants incite

8     violence, the defendants perpetuate violence --

9          THE COURT:  Outside of the United States.

10         MR. YALOWTIZ:  -- outside of the United States.  The

11    defendants communicate that the reason the violence is going on

12    is because their territory is occupied by Israel and they would

13    like sovereignty over it.

14         THE COURT:  They do that in the United States in a

15    peaceful, nonviolent way.

16         MR. YALOWTIZ:  That is correct.

17         THE COURT:  You say that constitutes what actionable

18    action in the United States under specific jurisdiction?

19         MR. YALOWTIZ:  It does two things:  Number one, it is

20    influencing the policy of the United States.

21         THE COURT:  To try to create peace.

22         MR. YALOWTIZ:  To try to end the occupation.  Their

23    goal is to end the occupation.

24         THE COURT:  You're saying they don't have a right to

25    advocate that in the United States?

E4bgsokc

1          MR. YALOWTIZ:  They do have the right to advocate

2     that, but what they did here was they created violent situation

3     and then they said the only way to end the violence is to end

4     the occupation.

5          THE COURT:  Why is that intimidating?  Who is that

6     intimidating?

7          MR. YALOWTIZ:  That's intimidating and coercing an

8     entire civilian population.

9          THE COURT:  How?  If I'm a citizen of Israel walking

10    down the streets of Jerusalem, how does that statement in

11    Washington, D.C., that if you end the occupation, it will end

12    the violence?  How does that intimidate?

13         MR. YALOWTIZ:  Because they're living every day with

14    people blowing themselves up.

15         THE COURT:  That intimidates me; I understand that

16    part of it.  But I don't understand how the nonviolent rhetoric

17    in the United States is what you want to latch on to sufficient

18    for specific jurisdiction.  Under what theory?

19         MR. YALOWTIZ:  Under the relatedness test.

20         THE COURT:  No; what legal theory of specific

21    jurisdiction, a tort theory that a tort is taking place in the

22    United States or a tort outside of the United States, its

23    effect?

24         What is your legal theory of specific jurisdiction?  I

25    don't understand.

E4bgsokc

1          MR. YALOWTIZ:  It's not same as C.P.L.R. like 302.

2          THE COURT:  That is what specific jurisdiction is.  Is

3     there another specific jurisdiction that you can apply in this

4     case?

5          MR. YALOWTIZ:  I think there is.

6          THE COURT:  I don't know of any other test other than

7     that.

8          MR. YALOWTIZ:  In other states, they say we have

9     specific jurisdiction to the limits of the Constitution.  We

10    don't do that in New York, but some states do that.

11         THE COURT:  Right.

12         MR. YALOWTIZ:  They don't have a test like we have.

13         THE COURT:  Most states do have a test similar to what

14    we have.  Not exactly.

15         MR. YALOWTIZ:  Not all of them, but most of them, I

16    agree with you.

17         THE COURT:  All of them have an articulable test.  I'm

18    trying to ask you what is your articulable test that you are

19    applying to assert specific jurisdiction?  It's not a statutory

20    test.

21         MR. YALOWTIZ:  You have to have a statute.

22         THE COURT:  I know, but this is not a statutory

23    jurisdictional test of specific jurisdiction.

24         MR. YALOWTIZ:  Correct.

25         THE COURT:  Where are you getting this test of

E4bgsokc

1    specific jurisdiction?  What jurisdiction are you getting this

2    from?

3          MR. YALOWTIZ:  The way I would analyze it is, you

4    start with 4(k), which says if you serve somebody in accordance

5    with the federal statute, you have personal jurisdiction for

6    them.

7          THE COURT:  I understand that theory.

8          MR. YALOWTIZ:  Then we served an agent under 2334(a),

9    so we got it.

10          THE COURT:  I understand that theory.

11          MR. YALOWTIZ:  Now the defendants come in and say,

12    yes, but that doesn't meet the Constitutional limitations on

13    specific jurisdiction.

14          THE COURT:  You alternatively want to say we have

15    specific jurisdiction.

16          MR. YALOWTIZ:  Correct.

17          THE COURT:  I'm saying what specific jurisdiction or

18    test are you using and where are you getting it from?

19          MR. YALOWTIZ:  We would get it from the cases that

20    say, okay, once you have a statutory basis for jurisdiction,

21    now we're going to look at is that claim related to or arising

22    out of the conduct that gives rise to the claim?

23          THE COURT:  The conduct that you're trying to rely

24    upon for specific jurisdiction in the United States, my

25    recollection is, that's not even asserted as a part of the

E4bgsokc

1    claim in your complaint.  I may be wrong.

2              MR. YALOWTIZ:  I may stand corrected, but I thought

3    that we said that --

4              THE COURT:  That lobbying in the United States by

5    saying that the violence will stop if the occupation stops,

6    that you said that was part of the intimidation.

7              MR. YALOWTIZ:  I don't think we went that far.

8              THE COURT:  I'm sure you didn't go that far.

9              MR. YALOWTIZ:  I don't think we went that far.

10             THE COURT:  I don't think you went far at all.  I

11   don't think you mentioned this in the complaint; that this

12   conduct in the United States related to lobbying the U.S.

13   government or a campaign in the United States to stop the

14   occupation.  I don't think you say that's part of any of your

15   claim.

16             MR. YALOWTIZ:  I don't think we say that; I agree with

17   that.  I don't think we say that in the complaint.

18             THE COURT:  How does that become a specific

19   jurisdictional basis for your claim when that's not even an

20   element of your claim?

21             MR. YALOWTIZ:  Where you have U.S. conduct that is

22   related to the cause of action, then that meets the

23   Constitutional test.

24             THE COURT:  Where do you get that test from?  I don't

25   know of such a test where you have related conduct.

E4bgsokc

1          MR. YALOWTIZ:  I'll give you an example.

2          THE COURT:  Where do you get that test from?

3          MR. YALOWTIZ:  I'll give you an example.

4          There's a case called *Bank Brussels Lambert*.  It's a

5   Second Circuit case decide by then Judge Sotomayor.  That was a

6   case where there was a Puerto Rican defendant law firm and they

7   caused injury in New York, so it was like a C.P.L.R. 302(a)(3)

8   claim.

9          They had an apartment in New York.  So, they were like

10  here, but they didn't quite have enough for general

11  jurisdiction, but they came to New York and they solicited

12  business sometimes.  The claim was malpractice and fraud by the

13  Puerto Rican law firm.

14         Judge Sotomayor says, look, they come to New York,

15  they have some New York contacts.  The claim didn't arise out

16  of anything they did in New York.  They sat back there in

17  Puerto Rico and did all the bad stuff, but their New York

18  activity is related to the practice of law because they solicit

19  business and they do some stuff.  So, that meets the

20  Constitutional test.

21         THE COURT:  It meets the Constitutional test.

22         MR. YALOWTIZ:  Right.

23         THE COURT:  But what test of specific jurisdiction

24  does it meet?

25         MR. YALOWTIZ:  She was applying 302(a)(3).

E4bgsokc

1              THE COURT:  You're not relying on that.

2              MR. YALOWTIZ:  Because we're going under the federal

3      statute.

4              THE COURT:  I know, but she had a legal theory of

5      specific jurisdiction.  Other than you wanting it to be this

6      way, I'm not sure where you get this legal theory of specific

7      jurisdiction as you characterize it if you're not getting it

8      out of either the federal statute or getting it out of the

9      state law.

10             MR. YALOWTIZ:  I don't think I'm getting it out of the

11     C.P.L.R.

12             THE COURT:  Right.

13             MR. YALOWTIZ:  But that's what *Licci* was about.  I

14     don't have to tell you that.  In *Licci* they did get it out of

15     the C.P.L.R., but I think I can get the statutory basis out of

16     2334.

17             THE COURT:  The statutory specific jurisdiction test,

18     and that test is what.  That if something is related to

19     something that happened in the Middle East, then it's good

20     enough for specific jurisdiction?

21             I just don't know what the test is.

22             MR. YALOWTIZ:  I think the test is if we serve an

23     agent in a district, we have got personal jurisdiction; and

24     then the only question left is, does that violate the Fifth

25     Amendment?

E4bgsokc

1          THE COURT:  You're arguing it doesn't violate Fifth

2     Amendment due process because they were engaged in other

3     related activities to advance the interests that were related

4     to the claim.

5          MR. YALOWTIZ:  Exactly.  You have articulated it

6     better than I did.

7          THE COURT:  I understand what you're saying.  I wasn't

8     quite sure, but it's not really a specific jurisdiction test.

9          MR. YALOWTIZ:  It's not.

10          THE COURT:  It's a due process analysis test.

11          MR. YALOWTIZ:  I agree with that.  I agree with that.

12     Nobody disputes the statutory basis for jurisdiction.  The only

13     thing that the defendants have come up with is that they think

14     it violates due process because of *Goodyear* and *Daimler*.  So I

15     say, well, I don't think *Goodyear* and *Daimler* reach us because

16     of the things we've talked about.  And if they did reach us,

17     then we have an alternate basis to meet due process, which is

18     this relatedness test from *Bank Brussels Lambert*.

19          THE COURT:  The thing that makes me hesitate is

20     because it also implicates the other Constitutional free speech

21     rights.

22          To say that I have to keep my mouth shut about what my

23     personal interests are in the United States because it's going

24     to be a basis on which somebody is going to assert jurisdiction

25     over me, I mean, that's like saying someone came to Washington

E4bgsokc

1    after shooting somebody in Argentina; and somebody asked them,

2    well, why did you shoot them and they said, well, I shot them

3    because they were no good and I didn't like them.  So, you say,

4    well, you said they were no good, you didn't like them, that's

5    related to your shooting him, it doesn't violate the due

6    process clause of the Fifth Amendment to sue you here because

7    you made some comment about the act in Argentina.

8            MR. YALOWTIZ:  It's a qualitative test.  If somebody

9    gives one interview when somebody sticks a microphone in front

10   of them, that's one thing.  An orchestrated lobbying campaign

11   that goes on for years and follows the script of trying to

12   achieve their political goals is a different thing.

13           THE COURT:  It's a different thing, a novel thing.

14   But unless you want to show me someplace in case law where this

15   was the analysis, this is an unusual argument to make, not a

16   usual argument to make.

17           MR. YALOWTIZ:  I think my best case scenario in that

18   regard is Justice Sotomayor in *Bank Brussels Lambert* where they

19   were coming to New York to solicit business.  It's commercial

20   speech, it's not political speech, but it is speech.

21           The other thing I should say in that regard, there is

22   a case from the Southern District 1988, Judge Palmieri, called

23   *Mendelsohn v. Meese*.  *Mendelsohn v. Meese* was a companion case

24   to the *U.S. v. PLO*.

25           What happened in that case was that Congress passed a

E4bgsokc

1    statute saying the PLO is a terrorist organization and they

2    cannot operate in the United States.  The U.S. Attorney's

3    Office sued the PLO to shut down the New York mission.  Then a

4    bunch of individuals filed a companion case saying if you shut

5    down the PLO mission and don't allow the PLO to spend money and

6    communicate here, it will violate freedom of speech.

7            In that case, the Court did keep open the PLO mission

8    because it was applying the UN headquarters' agreement, but it

9    said in *Mendelsohn v. Meese* that the PLO itself, because it

10   falls outside of the Constitutional structure, it's not

11   something that is governed by the United States, it can't

12   invoke the First Amendment in the way that an individual or a

13   corporation could.

14           That case, I dare say, is very well reasoned and I

15   commend it to the Court.  It's getting a little old, but Judge

16   Palmieri writes a really well-reasoned decision.  And I think

17   that does talk very profoundly about where somebody like the

18   PLO fits in our Constitutional structure, which is not to say

19   that if Congress -- Congress has given us a cause of action so

20   we have to follow the Federal Rules of Civil Procedure.  We

21   have to follow the rules of evidence.  We have to follow 28

22   U.S.C, But what Judge Palmieri was saying there was, they don't

23   get that plus factor of the Bill of Rights just because of who

24   they are and where they fit in the Constitutional system.

25           THE COURT:  Thank you.

E4bgsokc

1              MR. YALOWTIZ:  Thank you so much.

2              Would it be helpful to the Court to have a copy of the

3    solicitor general's brief?

4              THE COURT:  It won't be determinative but it will be

5    helpful.

6              MR. YALOWTIZ:  May I.

7              THE COURT:  It will make me smarter.

8              MR. YALOWTIZ:  May I approach.

9              THE COURT:  Sure.

10             MR. YALOWTIZ:  It's my only copy, but we can get it

11   off the internet.

12             MS. FERGUSON:  Your Honor, I'd like to revisit

13   *Daimler*.  I found the language I was looking for.  In fact, I

14   think it's very telling that even plaintiffs did not argue that

15   they can meet the *Daimler* test.

16             The focus of their brief was that you shouldn't apply

17   *Daimler* because the PA is like a foreign state or it's

18   Fourteenth Amendment, not Fifth Amendment.  They didn't argue

19   they could meet the *Daimler* test.

20             I found the language I was looking for in footnote 19.

21   "We do not foreclose the possibility that in an exceptional

22   case such as *Perkins*," – the case of the Philippine mining

23   company that had to move to the U.S. because of the war – "a

24   corporation's operations in a forum other than its formal place

25   of incorporation or principal place of business may be so

E4bgsokc

1   substantial and of such a nature as to render the corporation

2   as at home in that state, but this case presents no occasion to

3   explore that question."

4          The Court is saying it's an exceptional case where a

5   forum can exercise general jurisdiction where a defendant

6   doesn't have that forum of principal place of business.  It's

7   an exceptional case.

8          THE COURT:  On the record before me, outside of the

9   Palestinian territory, where else do I have a basis to conclude

10  that there's somehow a greater level of activity than in the

11  United States?

12         MS. FERGUSON:  First, it's the plaintiffs' burden, and

13  they didn't argue in their briefs that they could meet the

14  *Daimler* proportionality test.

15         THE COURT:  But you're arguing to me that everywhere

16  you have a mission is not the test, and I agree with that.  But

17  when you say there's a proportionality test, and so I say,

18  well, if there's a proportionality test, even on this record, I

19  don't have any basis to conclude that the Palestinian Authority

20  or the PLO's activity is any greater, more continuous or

21  systematic in any other country than in the United States.

22         Do I have a basis to conclude that?

23         MS. FERGUSON:  The West Bank.

24         THE COURT:  I said other than the Palestinian

25  territory, other than the West Bank, is there any country in

E4bgsokc

1    the world that you're arguing that there's a greater level of

2    activity than in the United States?

3            MS. FERGUSON:  Sure, like, maybe Oman, Jordan, for the

4    PLO.

5            THE COURT:  Like I said, I don't have that record in

6    front of me.

7            MS. FERGUSON:  Respectfully, your Honor, it's the

8    plaintiffs' burden to establish personal jurisdiction.

9            THE COURT:  No.  It's the plaintiffs' burden to

10   demonstrate that there is continuous and systematic contact

11   with the United States such that the PLO is at home in the

12   United States.  They identify the level of activity.  You came

13   back and you urge me under *Daimler* to compare that to the level

14   of activity elsewhere.  And I say to you, one, I don't have any

15   basis to compare it to any level of activity elsewhere outside

16   of the West Bank; and two, I'm not sure that you're even

17   legitimately arguing -- as you said, maybe Yemen, but I'm not

18   sure that you're legitimately arguing that I'm going to find a

19   number of countries in which the activity is greater, more

20   systematic and more continuous than it is in the United States.

21           MS. FERGUSON:  Your Honor, I respectfully suggest that

22   you're misreading *Daimler*.  *Daimler* says it's going to be the

23   exceptional case where a forum will assert general

24   jurisdiction.

25           THE COURT:  That's not test.

E4bgsokc

1          MS. FERGUSON:  The textbook case is the *Perkins* case

2     where the Philippine company moved here.  You're continuing to

3     apply the continuous and systematic test, but the Court said

4     that's not enough.

5          THE COURT:  No.  I'm applying whether or not it's so

6     continuous and systematic that they're at home in this

7     jurisdiction, and you say I should do that in comparison to

8     being at home in other jurisdictions.

9          I say to you, I have no basis to conclude that their

10    level of activity in any country in the world with regard to

11    the kind of activity the PLO is continuously and systematically

12    involved in in the United States is greater in any country.

13         Quite frankly, I don't even have a basis to conclude

14    that the type of activity in the United States is greater, more

15    significant, continuous and systematic even in the West Bank.

16         What's happening in the West Bank is a governance in

17    the West Bank.  That's one thing that makes this unique among

18    corporations:  It's not like they're making Volkswagens in the

19    West Bank and they're also making Volkswagens in New York.  The

20    activity that is going on in Washington in the United States is

21    even significantly different from the activity that's going on

22    in the West Bank, right?

23         MS. FERGUSON:  The fact that the PLO has mission

24    offices – and we had discovery; it's a relatively small office.

25    I think that's in the record before you.  It's a relatively

E4bgsokc

1    small office.  It has an office in the United States just like

2    it has an office in almost every country in the in the world.

3            THE COURT:  I'm not talking about how small the office

4    is.  I'm talking about the nature of the activity.

5            MS. FERGUSON:  The nature of the activities were

6    significantly less than the nature of the California

7    activities.

8            THE COURT:  How am I supposed to compare making

9    Mercedes-Benzes in California to the activity of the PLO in

10   Washington, D.C.?  That's comparing apples and oranges.  That's

11   not significantly less.  It's not the same kind of activity.

12   That's like saying McDonald's is more activity than IBM.

13           That doesn't tell me anything.

14           MS. FERGUSON:  Then you're not taking *Daimler* at its

15   word when they're saying the continuous and systematic test

16   that's enough for specific jurisdiction isn't enough for

17   general jurisdiction; that as a matter of international comity,

18   we do not hail foreign defendants into U.S. courts.

19           THE COURT:  I accept that principal, but you do hail

20   foreign defendants into the United States when their activity

21   is so continuous and systematic that they are, even under the

22   way you characterized the test, when that activity demonstrates

23   that they're more at home in the United States than they are

24   any place outside of the West Bank.

25           I don't have any evidence that they have a greater

E4bgsokc

1    level of activity any place else outside of the West Bank, and

2    I have a record that shows me that the level of activity is

3    significant.

4            MS. FERGUSON:  Your Honor, I think.

5            THE COURT:  What am I supposed to be comparing other

6    than that?

7            MS. FERGUSON:  Because the level of activity is so

8    much more significant in the West Bank, that's where they're at

9    home.

10           THE COURT:  The level of activity is always more

11   significant in the place where you have your principal place of

12   business.  That's the basic premise of *Daimler*.  You can't

13   argue from that.  If that was the case, and we started with

14   this, if that was the case, then you could never assert

15   jurisdiction over a company other than their principal place of

16   business.

17           MS. FERGUSON:  The Supreme Court says it's the

18   exceptional case, it's the exceptional case.

19           THE COURT:  The question is, is this that exception?

20           MS. FERGUSON:  There's nothing about this that makes

21   this exceptional.

22           THE COURT:  Why?

23           MS. FERGUSON:  Because it had a local office here like

24   it has a local office in every country in the nation.

25           THE COURT:  That's not what the record shows me.  The

E4bgsokc

1    record shows me they had a significant level of activity, a

2    significant amount of money being spent, a significant amount

3    of PR activity.  We have gone through all of that.

4          I have no indication, nor has anybody ever argued,

5    that there's a greater level of such activity any place else

6    outside of the West Bank.  Nobody's ever made that argument to

7    me.

8          This is a motion to reconsider.  Nobody has made that

9    argument to me.  Even on the old test nobody has made that

10   argument to me.

11         MS. FERGUSON:  Your Honor, can we make a factual

12   submission to demonstrate this?

13         THE COURT:  Not on a motion to reconsider, no, because

14   that's not the basis for a motion to reconsider, that you

15   didn't make the argument and now you want to make it.

16         MS. FERGUSON:  There was a Supreme Court case that is

17   a significant case on general jurisdiction, and this is a

18   Constitutional question that goes towards our due process

19   rights.  And the Court is saying it's only in an exceptional

20   case that the United States should take jurisdiction over a

21   defendant who doesn't have his principal place of business

22   here.

23         THE COURT:  You want to characterize it as an

24   exceptional case.

25         MS. FERGUSON:  That's the Supreme Court.

E4bgsokc

1          THE COURT:  But, quite frankly, as I say, I have no

2     case where it hasn't been applied to the PLO.  I don't have any

3     case.

4          You want me to be the first judge to apply the rule to

5     the PLO in this circumstance, even though, now you may say it

6     recently happened, but the PLO has other litigation going on.

7     And I'm sure you're making the argument in other places.

8          MS. FERGUSON:  We're actually in the process of

9     concluding the briefing, and I expect there are going to be a

10    number of dismissals under *Daimler* in a variety of lawsuits.

11         THE COURT:  That would be a significant change in the

12    law.  Then you might have a real opportunity at that point to

13    renew your application.

14         MS. FERGUSON:  There will be courts that begin

15    interpreting *Daimler* to say a local office is not sufficient

16    that applies the proportionality test.

17         THE COURT:  I haven't ruled that a local office is

18    sufficient.  I've never ruled that way.  That's not what I

19    said.  That's not what the decision says.  I wouldn't

20    characterize it that way.  It depends on the level of activity.

21         MS. FERGUSON:  The local office and the activities.

22    You found it had phones, it had computers, it had employees.

23    And then the only other activity you found in that office was

24    it had a lobbying contract, a contract with someone to lobby

25    the federal government, which we argued should be covered by

E4bgsokc

1    the government contact exception and speech, which the

2    plaintiffs are now arguing is speech intended to influence U.S.

3    foreign policy, and that's protected political speech.  So,

4    there was protected political speech, a lobbying contract, and

5    just the fact that it had phones and bought paper.

6             THE COURT:  You can characterize it that way, but I

7    know that's not all that the case says.  I know it's not.

8             I don't want to debate with you the level of activity

9    because at the level of activity that I found at the time, I

10   think it's fairly and clearly laid out in the case, and it is

11   more than just they, quote, "got a mission" in D.C.

12            You're going to want to characterize it that way.  I

13   never characterized it that way.

14            MS. FERGUSON:  It was the speeches, it was the public

15   appearances, the media appearances, and the Bannerman contract.

16   I'm very certain about that.

17            THE COURT:  You can be certain about it, but I know

18   that's not all that's in that case.  I know that's not all

19   that's in that case.  It talks about the level of activity.  It

20   talks about the amount of money spent.  It talks about the

21   amount of independent private contracts that it has.  It talks

22   about the PR activity.

23            I don't need to debate that with you because the

24   ruling is there and the facts that I used are there, but it's

25   clearly more than just what you have just articulated.

E4bgsokc

1          I understand your argument.  I clearly understand your

2     argument.  And I don't have any problem with allowing you to

3     try to convince me that *Daimler* now has articulated a test that

4     is a more strenuous test in evaluation that I should make.  I

5     understand that argument.

6          MS. FERGUSON:  Even the plaintiffs, all the bright

7     minds at Arnold Porter, they are not arguing that they can meet

8     the *Daimler* test.  They did not make that argument to your

9     Honor.

10         They read *Daimler* like I did, which is why they don't

11    make this argument.  They don't believe they can reach the

12    proportionality test or they would have argued it in their

13    brief, and Mr. Yalowitz would have gotten up here and told you

14    how they can meet it.  They haven't tried to make that argument

15    because they don't think they can meet it.

16         Your Honor, I truly think the proportionality test and

17    the language in *Daimler* saying that it's only the exceptional

18    case and the *Perkins* case is the textbook case and the concerns

19    about international comity are very strong evidence that the

20    Supreme Court would absolutely reject the assertion of general

21    jurisdiction in this case.

22         THE COURT:  Why wasn't the service proper here and why

23    isn't your agreement and your activity to litigate this case

24    here, why shouldn't that be controlling?

25         MS. FERGUSON:  We were served under Federal Rules of

E4bgsokc

1    Civil Procedure 4(k)(1)(C), which is a federal long-arm

2    statute.  Under federal 4(k)(1)(C), yes, we have to be served

3    pursuant to statute.  We were served pursuant to the statute,

4    as Mr. Yalowitz mentioned, where our agent resided; yet, that's

5    not sufficient for personal jurisdiction.  Every court that has

6    interpreted 4(k)(1)(C) has said that you need service, plus you

7    may need to meet the due process standard.  That's what this

8    Court held.  That's what other courts in this jurisdiction have

9    held.  Every Court who has looked at the personal jurisdiction

10   over the PA and PLO has said service under 4(k)(1)(C) plus due

11   process, so you don't get to avoid the due process test.

12       The notion that there are special due process rules

13   for corporations versus individuals is not borne out in the

14   Supreme Court's case law.

15       The Supreme Court recently decided a case involving an

16   individual.  They applied the test interchangeably, whether

17   it's a corporation, whether it's an individual.  There's no

18   special test for commercial cases.

19       *Daimler* was actually a human rights case involving

20   allegations that *Daimler* was engaged in gross human rights

21   violations in Argentina.  It wasn't a commercial case.  There's

22   no different rule, Fifth Amendment versus the Fourteenth

23   Amendment.  Case after case, this is the same test with the

24   exception that the Fifth Amendment looks to contacts throughout

25   the United States.  There's no special rule for terrorism

E4bgsokc

cases, and terrorism cases include the 9/11 cases here.  The

Courts vigorously applied the same due process test, and, in

fact, dismissed 60-something defendants for lack of personal

jurisdiction, even though it was a terrorism case.

        The parade of horribles about how criminal terrorists

can't be prosecuted here is completely irrelevant.  Criminal

jurisdiction is different from civil jurisdiction.  So, there's

no basis for distinguishing *Daimler*.

        Plaintiffs knew they could not meet the *Daimler* test.

That's why they have spent all of their energy trying to argue

about their wacky specific jurisdiction theory that speech in

the U.S. condemning terrorism somehow caused the violence here.

        Respectfully, your Honor, *Daimler* redefines the scope

of general personal jurisdiction.  It says only in an

exceptional case should the Court exercise jurisdiction over a

foreign organization that doesn't make its home here.  There is

no such exceptional case here.

        The PLO has offices in every country and is

predominately based in the West Bank.  This is not the sort of

case that the United States should be taking jurisdiction over.

It has no U.S. connection, other than the nationality of the

U.S. plaintiffs, and that's simply not enough for the exercise

of jurisdiction.

        Thank you.

        THE COURT:  At this point, I'm going to deny the

E4bgsokc

1    motion to reconsider.

2         At this point I don't think there has been such a

3    significant change in the law that now makes this case not an

4    appropriate case for litigation here on this record.

5         I think the activities are continuous and systematic.

6    I think that the arguments with regard to jurisdiction, the

7    defendants want to argue that the law has significantly

8    changed, but a motion based on jurisdiction was an argument to

9    be made much earlier in this case and that argument was not

10   made with regard to the lack of due process, even though there

11   was case law from which one could have made such an argument.

12        I think at this point on the record that I have before

13   me, whether or not I'm applying the proportionality test or a

14   qualitative test, I don't see that I have a basis to conclude

15   that somehow that the PLO's activity outside of the West Bank,

16   and the nature of their activities here in the United States,

17   would not qualify as a continuous and systematic activity and

18   contact to make it at home in the United States.

19        Quite frankly, I don't have, on this record, any basis

20   to believe that they're engaged in any significant activity of

21   the kind that they're continuously and systematically involved

22   in in the United States than any other country.  I don't have

23   such a record that wasn't the issue, but because that wasn't

24   the issue, it's not a basis for a motion to reconsider.  I

25   don't have those facts now.  The motion to reconsider was made

E4bgsokc

1    without those facts.  So, I don't think that that is a basis.

2         I think there is no reason at this point, given the

3    litigation that the PLO has continuously been involved in in

4    the United States, they're involved without assertions of lack

5    of jurisdiction and involved in even beyond any assertion of a

6    lack of jurisdiction, that somehow I have a record before me to

7    be the first Court to say that there's no basis to sue the PLO

8    in the United States on the basis of their continuous and

9    systematic contact that its at home in this jurisdiction.

10        If some factual analysis is done in a case or cases

11   that have such a record to produce such a result, then I'm

12   willing to consider that if that is compelling or binding case

13   law, but I don't have such a record.  Quite frankly, the

14   activity that is at issue here seems to be significant, and

15   significantly different, even than the activity in the West

16   Bank.

17        Given its continuous and ongoing activity here and no

18   indication that worldwide it has greater activity than its home

19   base, someplace else other than the West Bank, I have no basis

20   on this record to reconsider this and make a factual

21   determination that the contacts are so not continuous and

22   significant and systematic enough to make it at home in this

23   this country to be expected to be sued based on its continuous

24   and significant contact and activity in this country.

25        I don't think there's anything nor has it ever been

E4bgsokc

demonstrated, and if it's to be argued someplace else and

convincingly, then I'd like to see it, but I have no basis to

conclude that a successful argument lies that it's somehow

violative of their due process rights for them to be expected

to be sued in the United States based on what is, obviously,

its greatest level of PR and political activity as the record

is before me at this point in the United States other than

anyplace else, so I'm going to deny the motion.

          We're going to move forward.  If the law significantly

changes, then we will address that.  But I don't think *Daimler*

stands for the proposition that I should do anything other than

make an independent factual evaluation of the significance of

the contact in its continuous and systematic nature to make a

determination of whether or not it makes the PLO at home in the

United States.

          To the extent that it can be sued in the United States

rather than simply only be sued in the West Bank, where really

the only argument that's being made is that it's an alternative

forum that would have jurisdiction over the PLO or the

Palestinian Authority, I think it raises other issues which I

think are not ripe for determination now.  It may not be ripe

for determination during this litigation.  It's a little

awkward to argue that the only place that they can be sued is

the place where they govern, even though they have what's

expected to be ongoing, continuous, significant activity in the

E4bgsokc

1    United States, that activity is insufficient contact to make

2    them at home in any place other than the West Bank.

3         I'm not aware of any greater level of activity over a

4    longer time period and the type of activity that's continuously

5    engaged in in the United States, on this record or on any

6    record.  I'm not aware of any jurisdiction in which that level

7    of activity is more continuous, more systematic, and is more

8    significant on an ongoing basis than in the United States.

9         I think unless the test is that they can only be sued

10   in their home base, and I won't even use the term "their

11   principal place of business" because I don't think that's an

12   appropriate term to use – this is not the corporation doing

13   business.

14        I don't think that the result of it, somehow that

15   that's the only place, given what one of the defendant would

16   characterize as an insignificant rather than a significant

17   level of activity than the United States, insignificant to the

18   extent that it does not make them at home in the United States,

19   I don't think that argument compels saying they cannot be sued

20   here, that they should not expect to be sued here, and that

21   their activity is insufficient for them to be sued here.

22        I'm not particularly compelled by some of the

23   plaintiffs' other arguments, but I think some of them might

24   still apply, even if that were the case.

25        But at this point, given the limited evaluation that

E4bgsokc

1    I'm supposed to give to a motion to reconsider, I don't believe

2    that *Daimler* or *Goodyear* themselves make such a pronouncement

3    that it compels a different decision based on a significant

4    change in the law in order to make a different determination

5    that somehow the contacts and activity of the PLO do not meet

6    the test as it has been articulated.

7           I'm going to deny the motion, and we're going to move

8    forward on the schedule that we have already agreed to.

9           Let me give the court reporter a break and then I want

10   to address some basic issues.  We're not going to address all

11   of the issues that the parties have raised, but there are a

12   couple of issues that should be addressed today so we can move

13   forward efficiently in this case.

14          Thank you.

15          (Recess)

16          THE COURT:  I want to stay about 20 minutes to talk

17   about some issues.  You have a whole list of issues you're

18   liable to address.  I want to address a couple of issues in

19   general to give you some guidance.

20          Let me first use the document that's at issue, the

21   original document at issue, with regard to confidentiality.  My

22   position is this, and you can explain to me why it should be a

23   different position.

24          My position is that there's a confidentiality

25   agreement and protective order in this case.  The

E4bgsokc

1    confidentiality agreement and protective order via Section 2A

2    designates the kinds of documents that qualify as confidential.

3    If it doesn't fall under that category, it is not confidential.

4    If it does fall under that category, it is confidential.

5    That's the ruling.

6            If you have some exception to that ruling, then you

7    can articulate it to me, but that should be the rule.  I don't

8    understand why there's any debate about that.

9            MR. YALOWTIZ:  May I be heard on that?

10           THE COURT:  Yes.

11           MR. YALOWTIZ:  Thank you.

12           The confidentiality order, which I don't have in front

13   of me, your Honor, but I know there is a provision that says

14   the Court will establish a different procedure for hearings and

15   trial.

16           THE COURT:  That's procedure.  I'm talking about what

17   qualifies under the definition of confidential.

18           MR. YALOWTIZ:  The rule is, under the First Amendment,

19   as we move from the discovery phase into the decision-making

20   phase, things that might have been reasonable to maintain as

21   confidential during the discovery phase are no longer

22   reasonable to maintain as confidential during the judicial

23   documents and trial phase.

24           For example, employment records where they show that

25   such and such officer in their police department who got

E4bgsokc

convicted of murdering civilians is still getting such and such
an amount per month on the payroll even today, that might be
something that during the discovery phase people say, well, we
don't know if it's going to be useful.  We don't know if it's
ever going to come up.  Under the common law and under the
First Amendment, there's no reason to allow that to be spread
on the public record.

        Once it becomes important for the Court's decision, or
something that goes to the jury, there is a very heightened
standard for when something qualifies as confidential.  Now it
has to be something of a highly private nature, like mental
illness or something, and not relevant or germane to the issues
at hand.

        For example, there is one document that we observed
where they were talking about the parents of one of the
terrorists and it said some private thing and it just observed
some things that really aren't relevant to the case.  I have no
problem redacting those out of the public filings.

        But when it comes to how much money these defendants
are paying to convicted terrorists on a month-by-month basis
today, that's a really central fact that goes to ratification,
it goes to authorization, it goes to the appearance of intent
to intimidate and coerce.

        All of those things, those kinds of documents which
fit under the confidentiality designation for discovery, are

E4bgsokc

1    now no longer appropriate for confidential treatment.

2              THE COURT:  What about this agreement that says that?

3              MR. YALOWITZ:  The agreement is appropriate for the

4    discovery phase.

5              THE COURT:  Where does the agreement say that?  This

6    is not either a First Amendment or due process analysis.  My

7    analysis was very simple with regard to confidentiality

8    agreements.

9              It is an agreement.  The parties enter into an

10   agreement thereby waiving whatever other rights that they would

11   have.  That's what an agreement is for.  I will enforce the

12   agreement.

13             If you tell me that the agreement provides for

14   something other than what it says, then you can convince me why

15   it does.  But with regard to both sides, for example, the only

16   thing I'm looking at right now is 2A says only those portions

17   of any discovery material that:  One, contain or derive from

18   trade secrets or other proprietary, commercial or previously

19   nondisclosed financial information or; two, contain or derive

20   from personal, private medical including, mental health

21   information or; three, contains or relate to the addresses of

22   the plaintiffs or; four, contain or relate to personal,

23   private, financial or other employment information that may be

24   designated by the disclosing, producing party or nonparty as

25   confidential.

E4bgsokc

1          If it doesn't fall under that definition, as far as

2     I'm concerned, it is not going to have a confidential

3     protection unless you have some other argument to make.

4          I have the first document that you are both arguing

5     about.  The defense makes an argument that there's some

6     compelling reason not to disclose this document.  Quite

7     frankly, that document does not fall under any of these

8     categories.  As far as I'm concerned, there's no compelling

9     reason and there's no further articulated compelling reason

10    that would overcome the agreement that the parties reached that

11    these are the categories of documents that are going to be

12    confidential.

13         Similarly, if you want to disclose documents that are

14    designated confidential by this agreement, then you give me

15    some compelling reason that's not inconsistent with this order

16    why those particular documents should now become public,

17    because if you anticipated that they were going to become

18    public, then you should have said so, that they were going to

19    be handled that way.

20         I'm not going to go through every single document, the

21    thousands and thousands of documents that you want to fight

22    about, to determine whether or not you've got an extra argument

23    to make that somehow it is or isn't confidential.

24         If it's on this list, it's confidential and it will

25    remain so unless and until I say it's not.  If it's not on this

E4bgsokc

```
 1   list, it's not confidential, and I don't have any compelling

 2   reason to hear another argument that there's some interest to

 3   keep it confidential that the parties didn't agree to.

 4              MR. YALOWTIZ:  I understand the Court's ruling.  We

 5   respect the Court's ruling, we accept it.

 6              Do I have it right, your Honor, we're talking about

 7   portions of documents?

 8              THE COURT:  I don't know.  We're talking about

 9   whatever falls under that definition and whatever you agreed

10   to.  You're the parties.  You know what you agreed to.

11              MR. YALOWTIZ:  As I heard your Honor read the

12   agreement, it was portions of documents.

13              THE COURT:  No.  It was portions of any discovery

14   material.

15              MR. YALOWTIZ:  Portions of discovery materials.

16              THE COURT:  You tell me what it means.

17              MR. YALOWTIZ:  I think that means if it says, the

18   Nasser release was paid X dollars in this month, what needs to

19   happen is, under the Court's ruling, the dollars need to be

20   redacted, but the document itself can be put up on the court's

21   website.

22              THE COURT:  As I say, the documents that have been

23   designated as confidential and had this information, to the

24   extent you have identified the information, if it qualifies as

25   being confidential, that's the extent that it stays
```

E4bgsokc

1    confidential.  At this point, I don't intend to lift the

2    confidentiality determination at any time prior to trial.

3            MR. YALOWITZ:  We understand the Court's ruling.

4            THE COURT:  I'm not going to spend time fighting about

5    every document.  If it falls in this category, it's in there

6    and it's in there at least up until trial.  If another argument

7    needs to be made at trial, maybe I will hear it.  If it's not

8    on this list, if it wasn't otherwise designated as privilege in

9    some way or objected to because it was privilege, if it was

10   produced and it was produced and it didn't qualify as

11   confidential when it was produced, then I'm not going to keep

12   it secret.  There's no compelling reason to do that in this

13   litigation.

14           MR. YALOWITZ:  We understand the Court's ruling.

15           THE COURT:  Does defense understand what I'm saying?

16           MR. HILL:  I understand your Honor to have ruled that

17   we're going to apply the existing order going forward based on

18   the designation that exists.

19           MR. YALOWITZ:  I'm sorry.  Mr. Hill has misstated the

20   Court's ruling.  It's not based on the designations that they

21   have made; it's based on the actual terms of the order.

22           Like this document that your Honor is talking about,

23   they designated it, but they shouldn't have designated, so that

24   doesn't qualify.

25           THE COURT:  Fine. I am not going to spend time going

E4bgsokc

1    through these documents not until some time before trial after

2    summary judgment.  I'm not going to make any documents that are

3    designated confidential public at this point in time.  There's

4    no compelling reason to do it.  If there wasn't at this point

5    an objection to that designation, you can make an objection to

6    that designation at some time after summary judgment motions

7    are filed.

8         But the papers that are to be filed with regard to

9    summary judgment, those things that are currently designated as

10   confidential, unless you come to some agreement that that

11   designation is overly broad, through summary judgment motion,

12   those are the designations that are going to apply unless you

13   give me some compelling reason why I should change that

14   determination.

15        MR. YALOWTIZ:  I thought I understood the Court's

16   ruling, and now it's been thrown into confusion.

17        The document that started this brouhaha, your Honor

18   has it.  It's a report about the arrest of three guys.

19        THE COURT:  I don't see how it falls into any of these

20   categories.

21        MR. YALOWTIZ:  I agree.

22        THE COURT:  That's not rocket science.  It doesn't

23   fall into any of those categories, as far as I'm concerned.  If

24   they wanted that designation confidential in that category,

25   then that's the category it should have been in in the

E4bgsokc

1    agreement.

2            MR. YALOWTIZ:  Right.  So, they've improperly

3    designated that document.  Do we go to Judge Ellis when they

4    refuse to downgrade it?  What's our process?

5            I don't want to burden the Court with this, but we

6    have had such trouble working with the defendants on what

7    seemed like should be very simple things.

8            THE COURT:  You need to first talk to the other side.

9            MR. YALOWTIZ:  Of course.

10            THE COURT:  You need to determine whether or not there

11    is any legitimate argument to make that it falls under one of

12    these categories.  If there's no legitimate argument to make

13    that it falls under one of these categories, then it's not

14    going to stay confidential.

15            MR. YALOWTIZ:  All right.

16            THE COURT:  Anything that doesn't fall under this

17    category.

18            The only dispute that I want to hear about any

19    designation is someone saying to me that they designated this

20    inappropriately because it doesn't fall under one of these

21    categories and we want to make it public, or the other side is

22    saying no, they cannot make this document public because it

23    does fall under this category.

24            If it doesn't fall under this category, it is not

25    confidential.  If it does fall under this category, it is

E4bgsokc

1    confidential.  That's it.

2                MR. YALOWTIZ:  Thank you.

3                THE COURT:  That's going to be my approach to it.  I'm

4    probably going to be even more restrictive than that if I start

5    getting letters that are inconsistent with that reasonable,

6    straightforward determination.

7                It's not a time to debate about the categories.  These

8    are the categories.  It's not time for you to now want to

9    disclose things that fall into this category legitimately.  If

10   you say you have employment information, it's in that category.

11   If they have arrest information, it's outside of that category.

12   That's going to be my approach, at least through summary

13   judgment.

14               If you think that there's a genuine disagreement about

15   that, let me know.  I would think that for most of this, given

16   that approach, somebody will be taking an unreasonable position

17   if you can't decide whether or not a document falls into one of

18   these categories that doesn't fall into one of these categories

19   for a proper handling, unless or until some other decision is

20   made.

21               MR. YALOWTIZ:  Thank you very much, your Honor.

22               THE COURT:  You wanted to agree to pretrial

23   submissions.  I don't have any problem on the schedule or

24   similar schedule to the extent that you have agreed.

25               Have you agreed on all of those dates that you wanted?

E4bgsokc

1          MR. YALOWTIZ:  This is item eight of my letter

2      yesterday, your Honor.

3          THE COURT:  No.  I assume it's item five.

4          MR. YALOWTIZ:  Right, item five. A, B and C are agreed

5      of item five.  D is agreed, but subject to a condition that the

6      defendants would like to impose, but D is fine with me.

7          THE COURT:  I don't know the nature of the motion to

8      sever, but I don't have any reason to believe that there is a

9      basis to sever these cases.

10         If you want to make the argument and you have some

11     compelling argument to make, but I've not heard, in any way, in

12     what way the defenses are divergent or somehow the defenses are

13     inconsistent.

14         MR. HILL:  There are seven different incidents at

15     issue in the case.  We would like to move to sever if more than

16     one of them survives summary judgment, which is why we asked

17     for the timing of either that date -- if you have ruled at that

18     point.  If you haven't ruled at that point, it doesn't make

19     sense for us to file it in the vacuum not knowing which of the

20     incidents may or may not go to trial.

21         THE COURT:  I intend to rule by that point.  I intend

22     to keep us on the schedule.  I want to be clear:  You're

23     talking about severing plaintiffs' cases, not severing the

24     defendants' cases.

25         MR. HILL:  Severing the incidents.  We're not asking

E4bgsokc

1    for a separate trial against PA or the PLO.

2            We're saying we can't try seven incidents together

3    because there is going to be prejudice to the defendants from

4    the evidence in incident two versus the evidence in incident

5    six where one may be relatively stronger or different groups

6    may be involved.

7            We'll make those arguments postsummary judgment,

8    assuming any of the cases are going to go to trial.

9            THE COURT:  You say you have a motion outstanding to

10   substitute plaintiff.  I don't have any problem with that

11   motion.  I don't know if we addressed these yet, the motion for

12   prior counsel to withdraw.

13           MR. YALOWTIZ:  I apologize.  On the motion to

14   substitute, the defendants just haven't advised if they're

15   going to consent to or oppose.

16           THE COURT:  Do you have objection?

17           MR. HILL:  I've been on vacation.  I'd like to look at

18   it and let you know by next week whether we consent.

19           THE COURT:  Yes.

20           The sanctions motion for Judge Ellis, is that still in

21   front of Judge Ellis?  He tried to call me this morning, but I

22   was on trial.  I didn't get a chance to speak to him.

23           MR. YALOWTIZ:  We had a premotion conference with

24   Judge Ellis about it.  He's, I'm sure, working on something,

25   but that's not ripe for your Honor.

E4bgsokc

1              THE COURT:  That's still before him?

2              MR. YALOWTIZ:  Correct; that's not ripe for your

3    Honor.

4              THE COURT:  I'm not inclined to go to 250 pages in in

5    limine motions.  All of you are going to have to figure out a

6    better way to streamline this.

7              Quite frankly, even on the motion to reconsider, I get

8    a box of documents from the plaintiffs, 90 percent of which are

9    totally irrelevant to this issue.  Even the documents that

10   you're arguing about, I still don't have any reason to

11   understand why it had anything to do with the motion to

12   reconsider.

13             I suggest all of you start to streamline your

14   submissions to what's really relevant to the issues rather than

15   delivering boxes of stuff, which obviously, I neither have the

16   time nor the inclination to go through.  Particularly, as I

17   say, just using that one document you're fighting about with

18   regard to the motion for reconsideration, I have no idea why an

19   arrest record of one of the defendants was relevant to the

20   motion for reconsideration.  I have no idea why that's

21   relevant.

22             MR. YALOWTIZ:  That document actually goes to the

23   motion for sanctions that's before Judge Ellis.

24             THE COURT:  I flipped through the box of documents.

25   As I say, your argument was it was a motion to reconsider, so

E4bgsokc

1      it's a limited issue, and you give me a whole box of documents.

2              MR. YALOWTIZ:  I apologize for that.  We wanted to

3      better safe than sorry.  I apologize.  I don't want to bury the

4      Court with documents.

5              THE COURT:  I think I got a box of documents

6      yesterday, the day before yesterday.

7              MR. YALOWTIZ:  On this admissibility issue.

8              THE COURT:  Right.  You have to find a better way to

9      streamline this.

10             Do you want to address that before I move on, the

11     admissibility issue?

12             MR. YALOWTIZ:  I want to talk about the in limine.

13             THE COURT:  Let me hear from them first.

14             MR. YALOWTIZ:  I just think it's so excessive, this

15     250-page limit.

16             MS. FERGUSON:  On the in limine issue, we're faced

17     with the approach you're describing in the exhibit list.  It's

18     a complete kitchen sink approach where there's 930 exhibits as

19     compared to we have around 100.  We don't want it to be in a

20     situation where we're somehow deemed to have waived objections

21     to this evidence and yet it's simply not feasible to brief the

22     host of admissibility issues raised by these exhibits.

23             THE COURT:  I can't imagine that you'd need to brief

24     900-and-something exhibits.

25             MS. FERGUSON:  There's multiple categories of issues

E4bgsokc

1    that the exhibits raise.  We have tried to streamline the

2    process by focusing on what we believe to be the core

3    categories of documents.

4              THE COURT:  When you say "brief," I'm not sure what

5    you want to talk about.

6              Do you want to tell me the facts or do you want to

7    make legal arguments in 200 pages?

8              MS. FERGUSON:  The bulk of those pages are for the

9    experts, the *Daubert* motions.

10             THE COURT:  I know, but what do you want to fill up

11   the 200 pages with?  Telling me what they're going to say?  I

12   don't need you to cite me *Daubert* for six pages.

13             MS. FERGUSON:  There is significant methodology issues

14   and as to each expert, there are different issues that come

15   into play.

16             THE COURT:  I can't imagine each expert has a separate

17   issue.  I assume it's the same general legal issue for most of

18   them.

19             MR. HILL:  It's not.  I don't want to double-team, but

20   Brian Hill for the record.

21             There are substantially different issues among the

22   different plaintiffs' experts and the problem is, the

23   plaintiffs have proceeded with designating seven different

24   experts.

25             THE COURT:  But not legal issues.  There are limited

E4bgsokc

1  legal issues with regard to the admissibility of the experts'

2  testimony.

3         MR. HILL:  Correct.

4         THE COURT:  You're going to tell me either that

5  they're not qualified or you're going to tell me their

6  methodology is flawed.

7         MR. HILL:  Both.

8         THE COURT:  I don't need 100 pages on the legal

9  argument.

10        MR. HILL:  I understand you understand what Rule 703

11  says, but with respect to each of their seven experts, there

12  are issues with the qualifications, there are issues with their

13  methodology, and there are issues with the sufficiency of their

14  facts and data.  We need a sufficient ability to brief all of

15  those.

16        Across the river in another one of these cases before

17  Weinstein, he allowed a 20-page brief for each of the experts.

18  Frankly, based on Judge Ellis' prior direction, that's what we

19  were preparing when the *Daubert* motion keyed off each of their

20  experts.

21        We only want to move at this point on the seven

22  liability experts.  They have a total of 14 experts they have

23  designated in this case.  But we only want to move on the seven

24  case-in-chief liability experts, which we anticipate, and

25  Mr. Yalowitz can tell me if he's not going to use any of these

E4bgsokc

1    seven people to oppose our summary judgment motions, but we

2    anticipate you're going to get, in response to our summary

3    judgment motions, statements from or references to the reports

4    of these seven individuals as a basis to create triable issues

5    of material fact.

6              So, we need an opportunity to brief for you, in the

7    context of a summary judgment motion, why these seven

8    individuals should not be allowed to testify to the opinions

9    that have been set forth in their various reports.

10             THE COURT:  That's different than the in limine

11   motion.

12             MR. HILL:  We view them as *Daubert* motions.  You can

13   call them in limine motions.  Whatever they are, they are

14   pretrial challenges to the admissibility of expert testimony

15   that are going to be pertinent, unless the plaintiff tells me

16   otherwise, to your resolution of whether they can create

17   triable issues of material fact to overcome our motion for

18   summary judgment.

19             THE COURT:  That's what I still don't get.

20             With regard to a particular expert, how many pages do

21   you want to address a particular expert?

22             MR. HILL:  Your standard rule allowed 25 pages.

23             THE COURT:  How many pages do you want to address for

24   each expert?

25             MR. HILL:  20 pages.

E4bgsokc

1        THE COURT:  For each expert?

2        MR. HILL:  Yes.

3        THE COURT:  What do you want to fill up most of the 20

4   pages with?

5        MR. HILL:  To give you the picture here, each of the

6   expert reports is itself more than 20 pages long.  We're going

7   to have address the content of their opinions.  One of these is

8   90 pages long and has over 100 footnotes.

9        THE COURT:  That doesn't mean you have to respond to

10  it in 90 pages and another 100 footnotes.

11       MR. HILL:  I'm not asking to.  I'm asking for 20.  I'm

12  asking for a fraction of the material.

13       THE COURT:  Tell me what you want to fill the 20 pages

14  up with.

15       MR. HILL:  I'll pick an example.  One of their experts

16  is a professor of law at the University in Texas who has never

17  acted as an expert on Palestine in the history of his life.

18  He's being offered as an expert.

19       THE COURT:  Why do you need 20 pages to tell me that?

20       MR. HILL:  I need it to explain why he's not

21  qualified, why somebody ghost-wrote this report, why he got it

22  the day before, why he signed it and it shouldn't be allowed,

23  why it's improper methodology, because all he does is cite

24  sources that are favorable the plaintiffs' point of view and

25  all he does is summarize hearsay, which is an inadmissible and

E4bgsokc

 1    inappropriate use of the expert testimony.  All of the experts

 2    have that sort of an issue.

 3         In order for me to contextualize it for your Honor and

 4    your Honor's clerk is so you don't have to read the 75 pages of

 5    reports from this individual and all the footnotes.

 6         I'm trying to create a record that will be helpful for

 7    the Court so you can make an informed ruling about whether or

 8    not this individual should be allowed to testify at trial.

 9         THE COURT:  I don't have a feel for what you want in

10    terms of motions in limine.

11         MR. HILL:  What we prefer is either the page limit we

12    proposed in the letter or individual motions of up to 25 pages

13    on each of these seven case-in-chief liability experts, plus an

14    additional briefing on what we think are going to be the key

15    documents which fall into two categories.  They are the

16    materials we produced during discovery.  That is, to a certain

17    degree, been overcome by their motion that they filed last week

18    or earlier this week, I guess, on the admissibility of our

19    experts, so we can respond to that.  There are additional

20    materials that plaintiffs have indicated that they think are

21    party admissions of our clients.  We need an opportunity to

22    address those with you and show why they are not admissible to

23    prove the truth of the matters asserted or otherwise admissible

24    to oppose summary judgment.  That's going to take some space

25    because of the way the plaintiffs have proceeded.

E4bgsokc

1          Your Honor is upset about one box.  They have

2     designated 35,000 pages of trial exhibits for this matter.  We

3     have to sift through that, identify what we think is actually

4     going to be pertinent to summary judgment and move on that so

5     you can make evidentiary rulings about whether those are

6     admissible.

7          THE COURT:  The first thing I want you to do is I want

8     the plaintiffs to give you a list of the exhibits that they

9     intend to offer and on what basis they intend to lay the

10    foundation for their admissibility.

11         In response to that, I want you to respond, document

12    by document, as to whether you have an objection or you have an

13    objection to the foundation that they intend to lay.  I want

14    you to exchange that between each other first and then let's

15    see what's what.  Now, everything may be left, but I want you

16    to go through that process first.

17         With regard to the experts, I don't know what other

18    motions in limine you want to make other than the foundation

19    admissibility of their documents and the seven experts.

20         MR. HILL:  The categories I was thinking of were the

21    documents we have produced, the documents they allegedly

22    obtained from a military tribunal in the West Bank, which is

23    called the Israeli Military Court for Judea and Samaria.

24         THE COURT:  That should be on that list.

25         MR. HILL:  That's only a very small part of their

E4bgsokc

1    list.  Those are the categories we're proposing to move on at

2    this point in time.

3         If the plaintiffs want the tell me we're only going to

4    offer these and it's less than the 930 they currently propose

5    to offer and here's what we think the foundation is and here is

6    why we think these are admissible, notwithstanding the hearsay

7    rule, and I'd be glad to receive that.  If that narrows things

8    down and they're going to take things off the table, we'd be

9    glad to do that.  But unless we get down to a substantially

10   smaller number of materials than they previously designated, I

11   don't see how we can do that.

12        THE COURT:  I think you should do that first, because

13   the next thing I'm going to ask the plaintiffs to do is to tell

14   me on what basis they believe that it's admissible and what

15   they think needs to be done or should be done to admit it into

16   evidence.

17        Obviously, in the first instance, depending on the

18   nature of the document, it's usually the party's obligation to

19   establish that the document is admissible.  How they want to

20   establish that and whether they got those documents from you or

21   whether or not you're either going to concede the document is

22   what it purports to be or what it is offered as or you will

23   have to produce someone for them to authenticate the document

24   if you gave them that document as a representation of that's

25   what it was because that's what they asked for, then we can

E4bgsokc

1    consider that.

2          But I'm not going to go through a technical fight over

3    the admissibility of documents if there's no genuine dispute

4    with regard to their authenticity, particularly if those

5    documents were produced and represented as being such documents

6    by the other side.

7          It seems to me that may get some documents in that

8    they can independently authenticate.  It may get some documents

9    in that you may have an obligation to produce somebody to

10   authenticate it if we need to subpoena somebody from your side

11   to do so, or it will go in over your objection if the only

12   objection you have is that we don't want to agree to this

13   document because even though we don't have any genuine

14   disagreement that it is what it purports to be, we just want to

15   make it more difficult strategically for the plaintiff to

16   produce the document at trial.

17         You both should first start a process by which we can

18   determine what's generally in dispute.  That's the only thing I

19   want to hear.  I want to know what's generally in dispute.  If

20   there are documents that are generally in dispute, fine, we'll

21   deal with it.

22         If your position is we just don't want to make it easy

23   for them, I'll consider that, too, but I'm going to give that

24   significantly less weight than I would that there is generally

25   a question about whether or not the purpose for which they're

E4bgsokc

1    using this document, that the document is admissible for that

2    purpose.  You should go through that process first.

3            Is the plaintiff in a position to do that?

4            MR. YALOWTIZ:  To give a document-by-document

5    explanation of our foundation?

6            THE COURT:  Or what you want from them.

7            All you have to do is give them the list because

8    sooner or later, I may want to look at that list.  I just want

9    a list of what documents you want to use at trial and on what

10   basis you want that document to be admitted.  If there's some

11   concession or stipulation from them, then you put that on the

12   list.  Then they can go through it and they can agree and

13   disagree.

14           If you have some other documents that you

15   independently are going to authenticate, business records or

16   records of individuals, then you can dispense with their

17   cooperation and you can say that on your list; then I can know

18   what you're fighting about.

19           But I'm not going to give either one of you carte

20   blanche to basically say, well, Judge, force them to agree to

21   every document I want to put in or for them to just simply say

22   we're not going to agree that a genuine document that we

23   produced to them or represented to them, that that was the

24   document that they requested and we know that that's the

25   authentic document, that they're just simply going to say,

E4bgsokc

1  well, we're going to put an obstacle in their way because they

2  can't get somebody from the Middle East to authenticate it on

3  their own.

4              MR. YALOWTIZ:  Right.

5              With regard to our documents, of course, for the most

6  part, our documents are things that we can authenticate without

7  significant difficulty; for example, to give one category,

8  there are a lot of videotape broadcasts by the Palestinian

9  Authority-owned television station.

10             We have a witness whose job it is to watch their

11 television station and record it.  And he can come to trial and

12 say, yes, this is our process and we recorded these videos and

13 that's how we got them.  We can go through that exercise.  It's

14 very easy.

15             The same with convictions:  We can bring witnesses who

16 say, look, I'm a lawyer practicing in Israel.  I'm a part-time

17 judge in these military courts.  I'm very familiar with the

18 court files.  I have reviewed these documents and they are true

19 and correct copies of court documents from the court that

20 convicted these individuals.  No problem.

21             We can go through the exercise of listing those and

22 giving that sort of explanation.  I don't think it's going to

23 be productive.  I'm glad to do it.  It's not a problem.

24             THE COURT:  It would be easy for me because, quite

25 frankly, on those issues, I don't need briefing.  I need you to

E4bgsokc

1    tell me what the document is, what's the basis on which you can

2    or can't authenticate it, and what objection they have to the

3    admissibility of the document.

4              I need a list; I don't need a brief.

5              MR. YALOWITZ:  Where we run into a problem is on

6    documents that the defendants themselves produced.

7              THE COURT:  I understand.

8              MR. YALOWITZ:  There, we did write to them and said

9    here are the documents, you produced them, will you please

10   stipulate that they are authentic and that they're not

11   excludable hearsay.  We gave them a letter explaining it.

12             THE COURT:  I understand.

13             MR. YALOWITZ:  They wrote us back a one-page letter

14   saying, politely, pound of sand.  Then we need to take the next

15   step and we have done that.

16             THE COURT:  What I want is your complete list.

17             MR. YALOWITZ:  Glad to do it.

18             THE COURT:  I want to know on what basis did you want

19   to or can admit the document.

20             Whether you can or can't do it without their

21   cooperation, I want a response to them which says I have an

22   objection to this one, we won't have an objection to this one,

23   so I can just narrow the field.

24             If they want to object to everything, they have the

25   right to do so, and I'll deal with that if that's the way it's

E4bgsokc

1   presented to me.  But I suspect that someone will stand up to

2   me and you will give me a rational, reasonable basis why you

3   need some assistance in admitting your own documents.

4           They'll give me a rational, reasonable basis why they

5   object to the admissibility of the document because there's

6   some general dispute with regard to the admissibility of the

7   document.

8           You make that list and whether or not your list says I

9   need your stipulation or if I don't need your stipulation, this

10  is the way I intend to do it, I want them to respond as to

11  whether they'll have an objection to its admissibility or not

12  so I can at least figure out how to streamline this trial, too.

13  I don't need those kinds of witnesses.

14          I don't need somebody who watches hours of Al Jazeera

15  TV.  I need somebody where, if there's a general dispute about

16  what this is, that we can fight about it if it is what it is.

17  No one needs to sit here through those kinds of foundational

18  witnesses.

19          To the extent they will say to you that they are not

20  going to object to it and they will stipulate to its

21  admissibility, then you put that aside and that's what you

22  have.  To the extent they say they won't, then you can put that

23  aside.  They should tell you whether they're going to stipulate

24  to its admissibility.  They should tell you if they're not

25  going to stipulate to its admissibility.  They should tell you

E4bgsokc

1    if they're going to object to its admissibility.

2            That's the response I want, that to you from them.

3            MR. YALOWTIZ:  They have done that, because in the

4    JPTO process, we gave them our exhibit list.  In accordance

5    with your Honor's individual practices, they identified those

6    documents that they don't have an authenticity objection to,

7    and they identified the documents they don't have any objection

8    to.  We did the one star/two star thing.  And there's basically

9    no documents that they don't object to.

10            In addition to that, they filed on the document a

11    little coded objection list so that they show for every

12    document what all of their objections are.  They have been very

13    thorough in saying all of their objections:  Incomplete, Rule

14    403, this, that, and the other thing.

15            THE COURT:  I'm not particularly interested in having

16    that discussion with either one of you.  I want you to put

17    together the list and give it to them, again not for their

18    benefit, but for my benefit, because when we're going to have

19    to go through those issues, I'm just going to go down that

20    list.  If you tell me that you have a video and your list says

21    that you have this person, if necessary, to bring in to

22    authenticate it, then I can very quickly make a determination

23    whether that's worth it or they're entitled to it.

24            If they want to fight about everything, they can, but

25    in light of this discussion, I would hope that they would be a

E4bgsokc

little bit more discriminating in terms of what it is, is it
really worth fighting about, and what's not worth fighting
about in regards to the authenticity and admissibility of
exhibits.

        MR. YALOWTIZ:  I would hope so, too, your Honor.

        Truthfully, the only thing I feel we need the Court's
assistance with is these documents, the defendants' own
documents, because, for example, with the videos, I'm going to
have my expert or my summary witness either one, say, okay, let
me give you some examples of the kind of incitement we see, and
he'll play them.  If there's an objection to the video coming
in, they can make their objection on the basis of foundation
and the guy can give a minute of testimony.

        To me, this is something that doesn't need 250 pages
of briefing or even one page of briefing.  It's kind of
ordinary trial practice.  Of course, if it's to the benefit of
the Court, I'll be glad to give a list of what our foundation
is for each document and what our basis is that it's not
hearsay or that it's admissible as an exclusion.

        THE COURT:  I'd like to see the exchange of that list
between the parties.  To the extent that I have to address it,
I'd like to address it after that by utilizing that list in
that response.

        MR. YALOWTIZ:  My fundamental problem with the
defendants' approach is what they want to do is instead of

E4bgsokc

1    doing the normal things that you do at trial, where you offer

2    an exhibit or have voir dire on an expert, what they want to do

3    is pretry the case in these massive briefs, and it's not

4    useful.

5            THE COURT:  That's not going to happen.  We don't have

6    to get into that.

7            Yes.

8            MR. ROCHON:  Good afternoon, your Honor.  Mark Rochon

9    for the PA and the PLO.

10           Where we part company here is the conversation always

11   seems to deviate towards authenticity.  The plaintiffs, like I

12   say, we decided this video was really on Palestinian TV and

13   that's easy; and if they don't agree to it, we get some expert

14   to say that's what it was.

15           Where the rubber hits the road, and the reason why we

16   need briefing, is because the question isn't going to be

17   whether that thing was on TV some time for the most part.  The

18   question is going to be whether that person who said those

19   things has statements that would be attributable to us,

20   whether, in fact, they would be admissible or relevant on the

21   issues here, and the plaintiffs are going to rely on those

22   videos extensively in their oppositions to the motions for

23   summary judgment.

24           So, the reason why we're trying to have briefing here

25   is not as Mr. Yalowitz talks; he states it would be so nice if

E4bgsokc

1    the defendants admitted that their documents were their

2    documents and then we just go to trial.  The fact is, there is

3    an intermediary step for the motion for summary judgment where

4    they're going to try to rely on levels of hearsay that will not

5    be admissible for trial and shouldn't be considered for the

6    motion for summary judgment in our view.  That's really why we

7    think we need the briefing.

8         They have videos galore of various people saying

9    things, newspaper reports and people supposedly saying things

10   in the newspaper, and there it's harder to prove what they

11   said; they want those statements to come in as if they were

12   said by the PA or the PLO.

13        THE COURT:  I will reserve your right to make that

14   separate argument, okay?  I don't want to be fighting about, as

15   they say, the foundation for the documents or the general

16   admissibility.

17        If you think that they're prejudicial, if you think

18   they are not admissible for the purpose that they're trying to

19   offer because they're trying to offer it as an admission or a

20   statement, that's a different question.

21        MR. ROCHON:  The plaintiffs have described a process.

22   And it sounds like the defendants are being unreasonable

23   because we objected to things a lot, but the process involves

24   them explaining to us why hearsay was otherwise admissible.  So

25   much of the plaintiff's case is out-of-court statements by

E4bgsokc

1    people that aren't PA or PLO people.

2              For instance, some guy, some religious figure in some

3    temple, or I forget the politically correct name, I'm not very

4    good with this stuff, on a Friday afternoon says things that

5    they think are incitement, and they want to attribute it to us.

6              They have some expert, this guy who looks at all the

7    video, that's one of the experts, this guy who watches video

8    all day; that's one of the experts that we want to talk to you

9    about, because they think an expert is somebody who watches

10   videos all day and then comes to court and tells people what

11   they say.

12             We want to address those issues because when we get to

13   a motion for a summary judgment, they don't have much in the

14   way of the direct evidence of the PA or PLO liability here

15   except through their experts.  So, we really think for this

16   case that we would ask the Court to give us, as to the seven

17   liability experts, 25 pages apiece because that's, in our view,

18   upon which the case turns.  For the motion for summary

19   judgment, they're relying on this hearsay.

20             For example, they have a couple of experts that like

21   to talk about these proceedings they have over there where the

22   Israeli government tries Palestinians in these military courts.

23   They want to admit in evidence here what was said at those

24   trials by witnesses, the findings of hearsay courts, all this

25   hearsay from those things, which are not duly constituted

E4bgsokc

1    courts for admission of foreign convictions.  That's an

2    extremely significant issue.

3         THE COURT:  It's significant, but it's not extensive.

4    It's a limited issue.

5         MR. ROCHON:  On those military convictions, because

6    they do two different things there, they try to get in the

7    convictions or what they call convictions, they're not

8    convictions in our system, and they try to get in the

9    underlying hearsay.

10         Though they would be interesting issues, I agree,

11    you'll figure them out, but we'd like to take 25 pages for each

12    of those specious of things to talk about them because you need

13    to know the facts to make the decision.  The pages are going to

14    talk more about what the facts are as to what these people say

15    than the law.  You know *Daubert*, but you don't know what these

16    experts are trying to get into evidence.

17         THE COURT:  I know, but I don't know why I need 25

18    pages of your regurgitating everything they're going to say,

19    because everything that they're going to say is not relevant to

20    the issue that you're trying to raise.  I don't need that.

21         MR. ROCHON:  They go on for much more than 25 pages.

22    We're not trying to tell you everything they're trying to say.

23    We're trying to distill what they say and present it to you so

24    you can rule.

25         Of all the other cases that we face, it's one incident

E4bgsokc

1   at a time.  If they hadn't filed seven incidents together, we'd

2   be getting appropriate page limits here.  By putting seven

3   together, what they're really doing is jamming us in the amount

4   of pages we get to present our argument to the Court.  They

5   chose to put seven cases together and then cite severance.

6          The fact is, in every one of these cases, you hear

7   about Gilmore and Shetsky, and all of these cases.  We got one

8   incident, one set of experts, one set of facts.  Here, they

9   have cases where they say Hamas did it.  They got cases where

10  they say Fatah did it.  They got cases where they say Al-Aqsa

11  Martyrs Brigade did it.  Each one of those has a separate,

12  complicated theory as to potential liability.

13         THE COURT:  But your attack on them is still pretty

14  much legally the same attack.

15         MR. ROCHON:  It is not factually the same.

16         THE COURT:  Of course it's not factually the same as

17  to each, but legally it's pretty much the same as to each.

18         MR. ROCHON:  There are similarities, but there are

19  significant differences, because even the plaintiffs would say

20  we have Fatah cases where they say it was done by an entity of

21  the PLO and they have a whole series of notions there.  Then

22  they have cases that they served on Michael Mass, which is

23  oppositional to the Palestinian Authority, and as you recall,

24  over through it in the Western region of Gaza, but they still

25  seek to have liability to us for their actions.

E4bgsokc

1          We need to break that down for you.  What we really

2    ask for is since they put seven incidents together, we should

3    essentially not be prejudiced in our ability to make legal

4    arguments because they chose to conjoin them.  That's why we

5    asked for more pages.

6          THE COURT:  That's 175 pages.  Is that right?  Yes.

7          MR. HILL:  Seven times 25 is 175.  That's one thing we

8    can all agree on.

9          THE COURT:  You want 175 pages to tell me that their

10   experts shouldn't testify?

11         MR. ROCHON:  All I'm asking for on the experts, I want

12   25 pages to tell you why an expert is inadmissible.

13         THE COURT:  You want 175 pages to tell me why seven

14   experts are inadmissible.

15         MR. ROCHON:  Tell them to identify fewer experts.  I

16   can't help that they chose seven and they potentially overlap.

17   I don't know which ones they're going to try to call at trial.

18         THE COURT:  I'm not going to give you that many pages.

19   I see no reason why you can't explain to me the deficiency in

20   an expert's testimony in less than 25 pages.

21         I'm willing to give you this:  I will give you ten

22   pages per seven experts each, plus an additional 20 pages of

23   legal argument if you want it.  You can use those pages any way

24   you want to use them.  But I expect a succinct, cogent argument

25   and not an in-depth recitation of everything the witness

E4bgsokc

1    intends to say.

2              I need you to focus on the particular deficiency in

3    the expert's testimony that makes the expert's testimony

4    inadmissible.

5              MR. ROCHON:  Given the length of the reports, can we

6    have 15 pages for each expert and 15 on the legal argument?  If

7    they had one expert, I'd get 25 pages on the guy under the

8    normal rules.  I'm getting less pages because they have chosen

9    to have more experts.

10             Why should that be the result when everyone here knows

11   they'll never call seven at trial?

12             THE COURT:  Why should that be the result?  Because I

13   think I can probably resolve the issue in those number of pages

14   and understand what your argument is and rule in your favor if

15   you have merits to that argument.  That's why.

16             MR. ROCHON:  I like that last part.

17             THE COURT:  That's only reason why I'm saying that.

18   Lawyers think that somehow they need more pages.  As I always

19   say, I usually find the shorter brief wins.

20             You've articulated no compelling reason other than a

21   lawyer's reason that you think more pages is more compelling.

22   It is not.  You have not convinced me of that.  What I said to

23   you is not significantly different in terms of the number of

24   pages than what you just asked for.

25             You can take ten pages per expert, that's 70 pages,

E4bgsokc

1    and an additional 20 pages of argument.  That's 90 day pages.

2    If you want to use them in a different manner, use them in a

3    different manner.

4            Quite frankly, if you can't tell me why these experts

5    should not be able to testify in that amount of pages, you're

6    not going to convince me, okay.  Giving you another 15, 20

7    pages is not going to convince me.

8            I suggest that you concentrate on why you think that

9    these experts are deficient and go straight to that and use

10   that amount of pages so that we can move forward with this.

11           Nothing that you say will give me the impression that

12   anything more than that is going to be useful.

13           MR. ROCHON:  I understand the Court's ruling.  The net

14   effect of what's happening is because the plaintiffs' have

15   overdesignated and overidentified experts that we're taking a

16   fire hose when we all know, and this happens with every one

17   these cases with these big firms, they identify way more

18   experts that they're going to use, then we have to go through

19   this.  In fact, they know who they're going to use.  We

20   shouldn't be prejudiced in that regard.

21           THE COURT:  As I say, the only prejudice is if I rule

22   against you.

23           MR. ROCHON:  Yes.

24           THE COURT:  I don't think he should be prejudiced

25   either, but if you have a legitimate argument to make, I'm

E4bgsokc

1   willing to hear it.

2            MR. ROCHON:  I think I'm prejudiced if I'm not able to

3   make a sufficient record in order to obtain the ruling.  If you

4   rule against me, my concern is that I need to make a record in

5   order to have a sustainable argument if ever necessary on

6   appeal.

7            THE COURT:  As I say, if you tell me that you can't

8   lay a sufficient record without 25 pages on ten pages, then I

9   think that's a deficiency on your part, not a problem with the

10  amount of pages.

11           I see no reason why you can't make a cogent, succinct

12  and compelling argument in 90 pages for seven experts that you

13  don't think should be able to testify for pretty much the same

14  reasons.

15           MR. ROCHON:  That's where I think we probably

16  disagree, on the same reasons, because even if you're critical

17  of the methodology, they don't all use the same methodology.

18  Even if you're critical of their qualifications, each of them

19  have separate lacking qualifications.  If they had all had the

20  same lack of expertise, it would be easy, but their experts

21  fail in their lack of expertise in unique ways.

22           That's ultimately why normally I would get 25 pages,

23  and now I end up getting seven, whatever, 14.

24           THE COURT:  As I say, you have still not given me any

25  reason why you can't make a compelling argument in those number

E4bgsokc

1    of pages.  You tell me the real thing is you want to, quote,

2    make a record.

3                MR. ROCHON:  I want to give you a chance.  You said

4    you're only prejudiced if you don't rule for me.  What I'm

5    suggesting to the Court is if you got to deal with -- these

6    guys, their qualifications alone, they go on for pages in

7    theory but then we have to stop them.

8                THE COURT:  Most of it is irrelevant.  I know how

9    experts go.  Most of it is totally irrelevant.

10               MR. ROCHON:  Yes.

11               THE COURT:  Do I need you to tell me where they went

12   to college?  I don't need that kind of stuff.

13               MR. ROCHON:  I'm not going to tell you that.

14               THE COURT:  I need you to get right to what is the

15   deficiency in their qualifications and what is the deficiency

16   in their methodologies.  That's all I need to hear from you.  I

17   don't need you to give me quote, chapter, and verse of their

18   life story.

19               Do it in ten pages and I guaranty you, it will be much

20   more compelling to me to be able to focus on that and decide

21   whether or not these experts have any qualifications or any

22   relevant testimony to give.

23               Let's start with that.

24               MR. ROCHON:  I understand the Court's ruling and I'll

25   stop arguing about it.

E4bgsokc

1          Then we have a procedure where the plaintiffs want to

2     identify the theory not for just for authenticity but

3     admissibility of their 900 exhibits; that's what you asked them

4     to do and then we respond to it.

5          MR. YALOWTIZ:  I have to say there's a constant

6     nibbling around the Court's rulings that I find.

7          THE COURT:  From both sides.

8          MR. YALOWTIZ:  Can we not revisit what the Court

9     already ruled?

10          MR. ROCHON:  How did I nibble?  I thought we had one

11     procedure on exhibits; you said they tell us the authenticity

12     and the basis for admissibility, and then we respond.  You laid

13     out the procedure.

14          MR. YALOWTIZ:  There they go again, your Honor.

15          MR. ROCHON:  I really don't get it.  What did I miss?

16          THE COURT:  Is there something you two disagree about?

17          MR. YALOWTIZ:  I think that the Court made a ruling

18     which I understood to be give them the foundation of our

19     exhibits.  Now they're asking for me to anticipate their

20     objections, respond to them on every item.  I don't think

21     that's useful.

22          THE COURT:  What you should do in your list, if you

23     want them to do something so you don't have the entire burden

24     to get the exhibit into evidence, if you want them to do

25     something for you to get it into evidence, you'd better tell

E4bgsokc

1  them on that list.

2        MR. YALOWTIZ:  I understand.  I agree with that.

3        THE COURT:  That's what I expect you to do.

4        MR. ROCHON:  He accused me of nibbling.  If I'm wrong,

5  I'm wrong.

6        I thought you said they should tell us about the

7  theory of admissibility, which is more than authenticity, as we

8  all know.

9        THE COURT:  What do you mean by that is the question.

10        MR. ROCHON:  They have all of these videos of various

11  people saying stuff.  I'd like to know how in the world they

12  think that should come in when it's just some guy saying

13  something.

14        THE COURT:  I'm not talking about relevance.

15        MR. ROCHON:  I'm talking about hearsay.

16        THE COURT:  I'm not talking about relevance.

17        They don't have to tell you whether something is

18  hearsay.  You know when something is hearsay, all right?  They

19  will tell you how they intend to put it into evidence without

20  your assistance.  If they can't do that without your

21  assistance, they will say so and they will ask you to

22  stipulate.  That's what we mean on that piece of paper.  And

23  you will respond appropriately.  You will say, you know what, I

24  don't care about this.  Fine.  We can stipulate to that.  This

25  one, I'm not going to stipulate to, but I'm not sure if you've

E4bgsokc

1    laid the proper foundation that I would have any objection to

2    it; or you'll say, well, look, whether you can lay a foundation

3    or not, I'm going to object to this because it is being

4    admitted for an improper purpose.  So, you can respond to them

5    in that way.

6              MR. ROCHON:  I now understand.

7              THE COURT:  I think to the extent that the two sides

8    should talk to each other, it would be a little more helpful.

9    But to the extent that you can work out some of these issues, I

10   would hope that you would do that and can do that.  That's

11   where we're going to start with this.

12             I'm trying to accommodate you, move you along, keep

13   you on an appropriate, reasonable schedule.  I have given you a

14   schedule and a firm trial date for the next three months in

15   January.  Hopefully, you can come to terms on some of this and

16   it may be two months instead of three months if I don't have to

17   have a bunch of foundational witnesses that are paraded in here

18   for no reason, but try to work these things out and we'll move

19   forward.

20             I think that we have just about exhausted this.  What

21   else do we need urgently to address today?

22             MR. YALOWTIZ:  I think we're done, your Honor.  The

23   only other item on my list, it's just a housekeeping item.

24   There are two applications from prior counsel for the Court's

25   leave to withdraw that they filed.

E4bgsokc

1           THE COURT:  Right.

2           MR. YALOWTIZ:  I have no objection to that.  You can

3    memo-endorse them or how ever the Court wants to handle it.  I

4    was trying to put it in one place.

5           THE COURT:  I'll move forward and act on that.  I'll

6    find it.

7           MR. YALOWTIZ:  Thank you so much.

8           THE COURT:  Let's minimize the paper to me.  I have

9    read a lot of stuff.  Unfortunately, for your argument, most of

10   what I have read was unnecessary, okay?  I'm not particularly

11   compelled by either side to argue that you can't do this with

12   less paper.  It's clear to me that you can do this with less

13   paper.  Most of the correspondence that I have got, other than

14   the first paragraph of the first letter I got, was totally

15   unnecessary and didn't advance your arguments much at all.

16          Let's try to get to the point.  Join the issue for me

17   and I can very quickly resolve it.  I'll give you a full

18   opportunity to not only to express yourself to me in writing,

19   but to talk out these issues so that I fully understand the

20   record as full as it can be with regard to the issues that you

21   need resolved.

22          MR. YALOWTIZ:  I don't want to reargue the ruling, but

23   I have to say, I was admitted to practice in this district in

24   1988.  I have never seen a 90-page brief in this district.  I

25   think the Court is being overly generous.

E4bgsokc

1            THE COURT:  Then I'll be impressed when your response

2     is significantly less.

3            MR. YALOWTIZ:  I can assure you it will be.  Thank

4     you.

5            THE COURT:  Thank you.  That starts you out with the

6     advantages.  As I say, I usually find the shorter brief wins.

7            Have a good evening.

8            MR. HILL:  Thank you, your Honor.

9            MR. YALOWTIZ:  Thank you.

10           (Adjourned)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25