REDACTED - PUBLICLY FILED VERSION

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARK I. SOKOLOW, *et al.*, | MEMORANDUM OF LAW |
| Plaintiffs, | No. 04 Civ. 00397 (GBD) (RLE) |
| vs. | |
| THE PALESTINE LIBERATION ORGANIZATION, *et al.*, | |
| Defendants. | |

# MEMORANDUM OF LAW
## IN SUPPORT OF PLAINTIFFS' MOTION IN LIMINE

Arnold & Porter LLP
399 Park Avenue
New York, New York 10022
(212) 715-1000

*Attorneys for Plaintiffs*

May 2, 2014

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................ ii

ARGUMENT ................................................................................................................... 1

I.    EVIDENCE ALLEGING MISTREATMENT OF PALESTINIANS BY THE
STATE OF ISRAEL SHOULD BE EXCLUDED ............................................... 1

    A.    Defendants' Anti-Israel Evidence ......................................................... 2

    B.    Defendants' Anti-Israel Evidence Should Be Excluded ........................ 7

II.    GENERALIZED EVIDENCE ATTACKING THE ISRAELI MILITARY
COURTS SHOULD BE EXCLUDED ................................................................. 9

III.    DEFENDANTS' ARGUMENTS THAT A VERDICT IN PLAINTIFFS'
FAVOR WOULD INTERFERE WITH UNITED STATES FOREIGN POLICY
SHOULD BE EXCLUDED ............................................................................... 12

IV.    PERSONAL ATTACKS ON PLAINTIFFS' CO-COUNSEL SHOULD
BE PROHIBITED ............................................................................................ 13

V.    TESTIMONY BY FACT WITNESSES WHOM DEFENDANTS NEVER
IDENTIFIED AS REQUIRED BY FED. R. CIV. P. 26(A)(1)(A)(I)
SHOULD BE EXCLUDED ............................................................................... 14

VI.    EXPERT TESTIMONY OFFERING OPINIONS ON NON-ECONOMIC
DAMAGES BASED ON REPORTED JUDGMENTS IN OTHER CASES
SHOULD BE EXCLUDED ............................................................................... 17

    A.    Mr. Gaskins' Testimony Would Invade the Province of the Jury ........ 18

    B.    Testimony On Non-economic Damages Is Beyond Mr. Gaskins' Expertise ....... 19

    C.    Mr. Gaskins' Testimony Regarding Compensation Paid In Other
Proceedings Is Irrelevant, Unduly Prejudicial, And Fails To Comply
With The Requirements Of *Daubert* .................................................. 20

VII.    EXPERT TESTIMONY ON "EXPERTISE" SHOULD BE EXCLUDED .................. 22

VIII.    EXPERT TESTIMONY ON MATTERS OF LAW SHOULD BE EXCLUDED ......... 23

CONCLUSION ............................................................................................................. 25

## TABLE OF AUTHORITIES

**Page(s)**

**CASES:**

*Alfano v. Nat'l Geographic Channel,*
    2007 WL 2982757 (E.D.N.Y. Oct. 5, 2007) .......................................................................17

*Allen v. Bank of Am., N.A.,*
    933 F. Supp. 2d 716 (D. Md. 2013) ................................................................................18

*Am. Stock Exch., LLC v. Mopex, Inc.,*
    215 F.R.D. 87 (S.D.N.Y. 2002) ................................................................................15, 16

*Daubert v. Merrell Dow Pharms., Inc.,*
    509 U.S. 579 (1993) ..............................................................................18, 19, 20, 22

*Davis v. City of New York,*
    959 F. Supp. 2d 427 (S.D.N.Y. 2013) ................................................................................23

*Degelman Indus. v. Pro-Tech Welding & Fabrication,*
    2011 WL 675405 (W.D.N.Y. June 8, 2011) ................................................................................16, 17

*Ebewo v. Martinez,*
    309 F. Supp. 2d 600 (S.D.N.Y. 2004) ................................................................................14

*Hall v. N. Am. Indus. Servs.,*
    2008 WL 789895 (E.D. Cal. Mar. 21, 2008) ................................................................................18

*Hartford Fire Ins. Co. v. Socialist People's Libyan Arab Jamahiriya,*
    2007 WL 1876392 (D.D.C. June 28, 2007) ................................................................................9

*Hurst v. Socialist People's Libyan Arab Jamahiriya,*
    474 F. Supp. 2d 19 (D.D.C. 2007) ................................................................................9

*Hygh v. Jacobs,*
    961 F.2d 359 (2d Cir. 1992) ................................................................................23

*In re September 11 Litig.,*
    621 F. Supp. 2d 131 (S.D.N.Y. 2009) ................................................................................8

*Labadie v. Dennis,*
    2008 WL 5411901 (W.D. Mich. Dec. 23, 2008) ................................................................................14

*Lappe v. Am. Honda Motor Co.,*
    857 F. Supp. 222 (N.D.N.Y. 1994),
    *aff'd,* 101 F.3d 682 (2d Cir. 1996) ................................................................................19

*Linde v. Arab Bank PLC*,
    920 F. Supp. 2d 282 (S.D.N.Y. 2011)........................................................7, 8, 24

*Linde v. Arab Bank, PLC*,
    944 F. Supp. 2d 217 (E.D.N.Y. 2013) .........................................................23, 24

*Marx & Co. v. Diners Club, Inc.*,
    550 F.2d 505 (2d Cir. 1977)................................................................................23

*Music Sales Corp. v. Morris*,
    73 F. Supp. 2d 364 (S.D.N.Y. 1999).................................................................23

*Pal v. New York Univ.*,
    2008 WL 2627614 (S.D.N.Y. June 30, 2008) ..........................................14, 16, 17

*Patterson v. Balsamico*,
    440 F.3d 104 (2d Cir. 2006)..............................................................................15

*Slantis v. Capozzi & Assocs., P.C.*,
    2010 WL 3122868 (M.D. Pa. Aug. 9, 2010) ..................................................13

*Smith v. Pfizer Inc.*,
    265 F.R.D. 278 (M.D. Tenn. 2010) ...................................................................14

*Sokolow v. Palestine Liberation Org.*,
    583 F. Supp. 2d 451 (S.D.N.Y. 2008)...............................................................24

*Strauss v. Credit Lyonnais, S.A.*,
    925 F. Supp. 2d 414 (E.D.N.Y. 2013) ................................................................9

*Sullivan v. U.S. Gypsum Co.*,
    862 F. Supp. 317 (D. Kan. 1994)................................................................18, 19

*United States v. Bilzerian*,
    926 F.2d 1285 (2d Cir. 1991)............................................................................23

*United States v. Darui*,
    545 F. Supp. 2d 108 (D.D.C. 2008) ...................................................................8

*United States v. Lumpkin*,
    192 F.3d 280 (2d Cir. 1999).............................................................................23

*United States v. Scop*,
    846 F.2d 135 (2d Cir. 1988),
    *modified*, 856 F.2d 5 (2d Cir. 1988)................................................................23

*United States v. Toner*,
    728 F.2d 115 (2d Cir. 1984)............................................................................2, 7

STATUTES, RULES AND OTHER AUTHORITIES:

Fed. R. Civ. P. 26(a) ........................................................................................1, 14, 15, 16

Fed. R. Civ. P. 26(e) ...............................................................................................14, 15

Fed. R. Civ. P. 37(c) ....................................................................................................15

Fed. R. Civ. P. 44.1 ......................................................................................................23

Fed. R. Evid. 401 ......................................................................................................7, 12

Fed. R. Evid. 403 ....................................................................................................*passim*

Fed. R. Evid. 702 ..........................................................................................................23

Fed. R. Evid. 702, Adv. Comm. Note...........................................................................23

Fed. R. Evid. 702(a) .......................................................................................................7

Fed. R. Evid. 803(22)......................................................................................................9

6 Patrick E. Higginbontham,
   Moore's Federal Practice, § 26.22[4][a] [i] (3d ed. 2014).......................................14

Wikipedia, Lawfare, *available at*
   http://en.wikipedia.org/wiki/Lawfare (last visited May 1, 2014) ...........................13

## PLAINTIFFS' MOTION IN LIMINE

Plaintiffs request this Court to exclude the following categories of evidence and arguments that defendants have indicated they intend to offer:

1. Evidence alleging mistreatment of Palestinians by the State of Israel;

2. Generalized evidence attacking the Israeli Military Courts;

3. Arguments that a verdict in plaintiffs' favor would interfere with United States foreign policy;

4. Personal attacks on plaintiffs' co-counsel and their motives;

5. Testimony by fact witnesses whom defendants never identified as required by Fed. R. Civ. P. 26(a)(1)(i);

6. Expert testimony on damages based on judgments in other cases;

7. Expert testimony on the "expertise" of other expert witnesses; and

8. Expert testimony on law.

## ARGUMENT

### I. EVIDENCE ALLEGING MISTREATMENT OF PALESTINIANS BY THE STATE OF ISRAEL SHOULD BE EXCLUDED

Defendants' expert reports and proposed trial exhibits reveal that their principal strategy is to put the State of Israel on trial by alleging mistreatment of Palestinians and arguing that the Palestinian side is "right" in the decades-old political conflict over control of the land of Israel. Defendants' evidence is chock full of anti-Israel propaganda. Defendants' experts and documents argue that "settlements" are illegal; that the State of Israel mistreats Palestinian civilians by engaging in generalized "torture"; that the history of Israel reflects victimization of the Palestinian people, and so forth. This Court should not permit defendants to turn this case into a "show trial" to convey anti-Israel messages to the jury and the press, whether for their own

sake or as purportedly legitimizing defendants' terrorist conduct. Such evidence is irrelevant and would improperly expand the trial and confuse and distract the jury.

The Second Circuit upheld a decision excluding such evidence in a case involving the sale of machine guns to terrorists in Northern Ireland. *United States v. Toner*, 728 F.2d 115 (2d Cir. 1984). The defendant proffered evidence of "various abuses, beatings bombings, threats and torture inflicted on members of his own family by British soldiers in Northern Ireland," but the court found that this evidence was both irrelevant and excludable under Fed. R. Evid. 403:

> In any event, evidence regarding the Irish conflict would have been very apt to confuse and mislead the jury. It was excludable for this reason alone. Fed. R. Evid. 403…. This was not a trial as to who was, or is, right or wrong in the dispute in Northern Ireland, but rather as to whether the appellants knowingly possessed unregistered guns. *Id.* at 123.

### A.    Defendants' Anti-Israel Evidence

Four of defendants' expert reports and many of their proposed trial exhibits are riddled with anti-Israel propaganda, some of it quite venomous.[1] It consists of allegations of torture; mistreatment of civilians by the Government of Israel; criticism of political decisions by the Government of Israel; arguments about the "legality" or desirability, *vel non*, under international law of Israeli communities in the West Bank; and historical evidence dating back to the World War I era sounding a theme of Palestinian victimhood.

**Generalized Allegations of Torture.** Mr. Allen and Ms. Robinson claim to have generalized evidence "of the torture and forced confessions" by agents of the State of Israel of "Palestinian political prisoners" (Ex. A.1 at 22), and they contend that "Israel … has a long

---

[1] The experts are: (1) Lori Allen, a "social anthropologist" who claims expertise in "Palestinian politics and society"; (2) Raja Shehadeh, a Palestinian lawyer; (3) Glenn Robinson, a political science professor who conducted fieldwork and consulting projects in the West Bank and Gaza Strip; and (4) Michael Sfard, an Israeli human rights lawyer.

REDACTED - PUBLICLY FILED VERSION

history of torturing Palestinian prisoners." Ex. A.6 at 68.  Neither of these experts has any

experience with the Israeli criminal justice system or any other justice system.  Nor do they

claim that any of the perpetrators in this case were tortured.

     **Alleged Governmental Mistreatment of Civilians.**  Defendants' experts claim that the

State of Israel treats Palestinian civilians in the West Bank poorly.  Mr. Robinson claims that

Palestinians were subject to a "belligerent military occupation" that lasted for many years (Ex.

A.6 at 44–45), that Israel has built a "forbidden road system" in the West Bank that Palestinians

cannot use (*id.* at 7), and that Israel has demolished 24,000 Palestinian homes since the 1967 war

(*id.* at 34).  He contends that Israel imposed road closures and curfews in the West Bank that

"severely limited movement of more than a million people for months on end."  *Id.* at 53.  Dr.

Allen asserts that women were "forced to give birth at checkpoints because Israeli soldiers would

not let them through to a hospital" (Ex. A.1 at 15) and that Israel has unjustly "detained"

thousands of Palestinians (*id.* at 8–9).  She even likens the State of Israel to Nazi Germany:

> Palestinians—like activists opposing the system of apartheid in
> South Africa and resistance fighters opposing the Nazi regime in
> France—have an internationally recognized right to fight against
> oppression through the use of peaceful protests, passive resistance,
> *and armed uprising.*"  *Id.* at 9 (quotations omitted; emphasis
> added).[2]

     Mr. Robinson states that "the overwhelming majority of Palestinians were killed at the

hands of the IDF."  Ex. A.6 at 43.  Defendants' proposed Exhibits 1 and 6 are decades-old

international conventions, apparently designated to help defendants complain about alleged

violations of Palestinian rights by the State of Israel.  Exs. C.1, C.6.  Further to this strategy,

defendants plan to show the jury a 1982 U.N. report on colonialism that "condemns the

---

[2] Ms. Allen's abhorrent comparison of Israel to the Third Reich and use of rhetoric about what
she calls "Zionist forces" (*i-d.* at 19) raise serious questions about her bias.

expansionist activities of Israel in the Middle East and the continual bombing of Palestinian civilians," (Ex. C.15 at 02:008137) and a 1994 U.N. Security Council resolution that condemned the shooting of Palestinians by an apparently deranged civilian and demanding that the Government of Israel take steps to "prevent[] illegal acts of violence by Israeli settlers." Ex. C.19 at 02:008196. Another of defendants' trial exhibits (this one from the 1990s) ascribes "the deaths of innocent children" to the "policies and practices of the Israeli occupation" (Ex. C.23 at 02:008314) and condemns Israeli governmental actions regarding settlements, the treatment of prisoners, the Palestinian economy, and even water rights. *Id.* Exhibit 38 is a May 2002 map of Israeli communities in the West Bank, and Exhibit 49 is a map of the West Bank purporting to show "The Forbidden Roads Regime." Exs. C.38 and C.49.

**Political Criticism of Government Decisions.** Defendants offer extensive critiques of Israel's political decisions. Mr. Shehadeh discusses the status of Jerusalem (Ex. A.8 at 5–7); Israel's administration of the West Bank (*id.* at 7–13); and the alleged failure of the State of Israel to fulfill agreements to release Palestinian prisoners. (*Id.* at 20–33, 35–40). Mr. Robinson claims that the Likud political party rejected a two-state solution in favor of "permanent Israeli control over all or much of the West Bank" (Ex. A.6 at 3) and that Israel's extrajudicial killing of a Hamas terrorist leader thwarted peace efforts. *Id.* at 21. Mr. Shehadeh asserts that, in 1984, the State of Israel decided to build more "east-west" than "north-south" roads in the West Bank because the "east-west" roads connect the settlements to Israel. Ex. A.8 at 19.

**Alleged Illegality of West Bank "Settlements."** Defendants complain that civilian homes in the West Bank are illegal "settlements." Mr. Sfard argues that the Government's permission for the construction of homes in neighborhoods outside the 1949 armistice line (sometimes called the "Green Line") constitutes "a multi-dimensional, devastating trauma" for

4

REDACTED - PUBLICLY FILED VERSION

Palestinians (Ex. A.7 at 37–40); violates international law (*id*. at 34–35); has led to vigilante violence against Palestinians (*id*. at 39, 41) and "plundering" of West Bank gravel and water resources (*id*. at 42); has hurt the profits of Palestinian farmers (*id*. at 42–43); and has limited the ability of Palestinian communities near settlements to engage in urban planning. *Id*. at 43.

Mr. Shehadeh also argues that all "settlements" are unlawful. Ex. A.8 at 4–5, 7–16. He asserts that the State of Israel has acquired land for settlements through "distortion of the local laws affecting land" such as "illegal and discriminatory changes to the Land Use Planning Laws." *Id*. at 16–19. He criticizes the alleged appropriation (in 1982) of Palestinian water resources (*id*. at 19–20, 31) and complains of the "immediate, day-to-day brutalization that inevitably results from the expropriation of a large percentage of the land settled by about half a million Israeli Jews." *Id*. at 29.

Mr. Shehadeh also attacks the credibility of plaintiffs' expert Alon Eviatar on the theory that he allegedly "lives in an illegal settlement in the occupied West Bank." *Id*. at 35. In fact, defendants asked many of plaintiffs' experts who live in Israel if they are "settlers," making it clear that they intend to inject disputes about the "settlements" into this case.

Mr. Robinson criticizes settlements as an attempt by the Government of Israel to prevent any Israeli withdrawal from the West Bank. Ex. A.6 at 40. He also lambasts the "settlers" for their "often-lawless behavior," contending that they "regularly destroy Palestinian property and injure, and sometimes kill, Palestinian civilians through excessive and often unjustified use of force." *Id*. at 41. He even contends that most Israelis view settlers as "a sectarian project of the religious right in Israel." *Id*. at 42.

**Defendants' Historical Narrative of Victimhood.** Much of defendants' "evidence" is historical polemic about alleged Palestinian victimhood at the hands of "occupiers" and

"colonialists" dating back to the Great War. They begin with the 1917 Balfour Declaration, in which the United Kingdom, which controlled Transjordan and Palestine, announced its support for a Jewish homeland. Ex. C.2. Defendants offer a map of the area under British rule (Ex. C.3) and documents concerning the creation of the State of Israel in 1948 (Exs. C.4–C.8),[3] and then move to the 1967 Six Day War, with various maps purporting to illustrate "territories seized by Israel [in 1948] beyond the area for the proposed Jewish State" (Ex. C.8) and "Palestinian Villages Depopulated in 1948 and 1967, and Razed by Israel." Ex. C.9. Defendants really get going in the 1970s, with U.N. General Assembly resolutions condemning the Government of Israel and praising the PLO. Exs. C.12–C.14.[4] There can be no doubt as to how defendants intend to use a 1973 U.N. document (Ex. C.13 at 02:008130) on the "struggl[e] against colonial and alien domination and racist regimes" or a 1982 communiqué of the Palestinian National Council (Ex. C.16 at 02:00814243) condemning Israel's "racist Fascist assault" and the "repression and terror practiced by Israel against the Palestinian people."

When they finally get to the current millennium, defendants continue their theme of blaming the Government of Israel: for example, Exhibit 28 is a 2001 U.N. agency critique of the Government of Israel's policies and political decisions. Ex. C.28. Exhibit 29 is a companion

---

[3] Ex. C.4 consists of the 1945 rules of the British military courts in Palestine. Ex. C.5 is a 1947 U.N. document involving the partitioning of Palestine and the creation of Israel. Ex. C.6 is the U.N.'s 1948 Universal Declaration of Human Rights. Ex. C.7 is a 1948 U.N. document regarding the creation of the State of Israel. Ex. C.8 consists of two maps showing how control of land in the area changed between 1947 and 1949 (*i.e.*, before and after the 1948 war sparked by the creation of the State of Israel).

[4] Ex. C.12 is U.N. General Assembly Resolution 338, calling for the State of Israel to withdraw to the 1949 Armistice Borders. Ex. C.13 is a 1973 resolution (not specific to Israel) regarding the rights of combatants "struggling against colonial and alien domination and racist regimes." Ex. C.14 is a 1974 U.N. resolution, issued in connection with the U.N.'s recognition of the PLO as the representative of the Palestinian people.

U.N. report on the "Inalienable Rights of the Palestinian People" that blames the breakdown of peace negotiations since the start of the Second Intifada on the Government of Israel. Ex. C.29.

### B.      Defendants' Anti-Israel Evidence Should Be Excluded

This evidence is irrelevant under Fed. R. Evid. 401.[5] The issue is whether the defendants injured the plaintiffs, not who is right in a decades-old conflict. Indeed, even if defendants were 100% correct in their political positions and claims against the Israeli government, that would not justify these terrorist attacks, as defendants' experts acknowledged. *E.g.*, Ex. B.4 at 178–79. This evidence should also be excluded under Rule 403 because any arguable value it may have is far outweighed by its prejudicial effect, by the danger of misleading and confusing the jury, and by the sheer waste of the time involved in putting the State of Israel on trial, as well as the inevitable counter-argument in this intractable political debate.

As noted above, the Second Circuit has affirmed the exclusion of such evidence. *Toner,* 728 F.2d at 123. Other terrorism decisions have reached the same result. In *Linde v. Arab Bank PLC*, 920 F. Supp. 2d 282 (S.D.N.Y. 2011), an ATA suit against a bank for providing financial services to terrorists, Judge Gershon rejected the bank's expert testimony on U.S.-Jordanian relations, whether either Jordan or Israel would have allowed the bank to support terrorism, the history of "economic and humanitarian assistance in the Palestinian territories," or the state of "economic development in the region," on the grounds that such evidence "is not relevant to whether or not certain bank transactions took place in violation of the ATA." *Id.* at 284–85:

> [E]ven if it could be said that some statements in some of the reports reference matters of marginal relevance to the discrete issues for trial in this case, the reports are so far afield from the

---

[5] Defendants' attacks on the State of Israel are also not an appropriate subject for expert testimony under Fed. R. Evid. 702(a), which allows such testimony only if it "will help the trier of fact ... to determine a fact in issue." Since the State of Israel's actions are not "in issue," expert testimony on them is impermissible.

> specific allegations and statutory elements at issue that there is an
> appreciable risk of prejudice, jury confusion, and misleading the
> jury. The trial, anticipated to be lengthy, cannot be burdened with
> extraneous issues such as . . . the lengthy history of social,
> political, economic, and diplomatic factors relating to a conflict
> that goes well beyond the issues in this case. *Id.* at 286–87.[6]

Similarly, *In re September 11 Litigation*, 621 F. Supp. 2d 131 (S.D.N.Y. 2009), victims

of the September 11 attacks sued the airlines, alleging that they negligently allowed the terrorists

to hijack their jets. The airlines argued that the government failed to uncover the plot or to warn

them of an attack, but the court refused to allow the airlines to put the government on trial:

> The trial against the Aviation Defendants will focus on what they
> knew and should have known about terrorist threats to civil
> aviation, and on what they did and should have done to protect
> against such threats . . . . What the government knew and failed to
> pass on is irrelevant. What the government failed even to learn or
> fully apprehend also is irrelevant. *Id.* at 146.

In particular, the court cited Fed. R. Evid. 403 in support of this ruling:

> [T]he evidence sought by the Aviation Defendants is inadmissible
> because of Federal Rule of Evidence 403 . . . . Permitting an
> inquiry into what fragments of information the various government
> agents knew, or should have known, and at what time, but did not
> tell the defendants, threatens thoroughly to confuse and prejudice
> the jury, distract it from the major issues of the case, and add to the
> trial substantial expense and delay. *Id.* at 149.

These principles govern here. The focus of this case must be on defendants' actions—not

on the supposed wrongdoing of the State of Israel. Accordingly, this Court should exclude all

evidence regarding the history of the Arab-Israeli conflict, the settlements, Israel's admin-

istration of the West Bank, or any other alleged misdeeds by Israel or Israelis described above.

---

[6] *See also United States v. Darui*, 545 F. Supp. 2d 108, 110–11 (D.D.C. 2008) (excluding
evidence, in a fraud case against the operator of an Islamic center, of various political and
historical events, such as civil disturbances and protests, because evidence of such "politically
charged historical events" was both irrelevant and prejudicial).

## II.    GENERALIZED EVIDENCE ATTACKING THE ISRAELI MILITARY COURTS SHOULD BE EXCLUDED

Twenty-one of the perpetrators of the attacks in this case—as well as many additional terrorists who were employees and officials of the defendants—were convicted by the Israeli military courts ("IMCs").  The records of those convictions are admissible under Fed. R. Evid. 803(22) and on the basis of comity.  Indeed, IMC convictions were recently admitted in an ATA case.  In *Strauss v. Credit Lyonnais, S.A.*, the court found that the IMCs easily satisfied the modest requirement to accord the defendant "more than a modicum of due process."  925 F. Supp. 2d 414, 448 (E.D.N.Y. 2013); *see Hartford Fire Ins. Co. v. Socialist People's Libyan Arab Jamahiriya*, 2007 WL 1876392, at *9–12 (D.D.C. June 28, 2007) (relying on conviction obtained in Scottish criminal court, on the basis of comity, to conclude that Libya was civilly liable for the bombing of Pan Am Flight 103); *Hurst v. Socialist People's Libyan Arab Jamahiriya*, 474 F. Supp. 2d 19, 34–36 (D.D.C. 2007) (same).  As plaintiffs will show through the testimony of their expert, Nick Kaufman—an Israeli criminal defense attorney who has also served as a part-time judge in the IMCs—and through the admissions of defendants' own expert, that requirement is met here.

The conviction records are central evidence in this case.  One example suffices here.  Abdel Karim Aweis, a First Lieutenant in the PA's General Intelligence Service, was convicted for his role in the March 21, 2002 suicide bombing that injured the Bauer plaintiffs.  The court records in his case include the transcript of the hearing at which Aweis pleaded guilty, stating "My counsel has explained the amended indictment to me, I understand and plead guilty to it," (Ex. C.375 at P5: 40) as well as a transcript of Aweis' sentencing hearing, at which he stated: "I am proud of the acts that I have committed and there is a just reason for my having done them

.... If I could have murdered more Jews, I would not hesitate." Ex. C.376 at P5: 43. Since his

conviction, Aweis████████████████████████████████████ Ex. C.58.

Defendants offer two expert reports about the Israeli military justice system, but neither

has much to say about the actual convictions in this case. Instead, they principally attack the

entire IMC "system" for alleged deficiencies that defendants' reports do not even attempt to tie

to the convictions. This blunderbuss, generalized attack is indistinguishable from defendants'

attempt to put the State of Israel on trial for the "occupation" of the West Bank and Gaza, and

this Court should reject it under Fed. R. Evid. 403 for the reasons described above.

Israeli attorney Michael Sfard presents a laundry list of complaints about the Israeli

military justice system that fall into two categories: (1) generalized allegations that

interrogations of suspected terrorists are conducted improperly so that their confessions are

unreliable; and (2) generalized allegations that the IMCs do not provide sufficient due process

for defendants accused of terrorism. Almost none of his report purports to show that any

particular rights of any perpetrators involved in *these* cases were violated.

For example, Mr. Sfard complains that the IMCs can theoretically authorize terrorism

suspects to be detained for up to 90 days before being brought to court, that Israeli investigators

use jailhouse informants, and that terrorism suspects are not "Mirandized" by Israel's General

Security Service ("GSS"). Ex. A.7 at 10. From these generalities, he concludes that GSS

interrogations "significantly increase the likelihood of false admissions." Ex. A.7 at pp. 8–11.

Mr. Sfard's report highlights the dangers of allowing testimony about generalities. His

report provides no evidence of interference with any particular defendant's free will in any of the

convictions at issue in this case. Indeed, Mr. Sfard does not point to a single conviction at issue

in this case in which the evidence included statements to GSS officers—as opposed to post-

REDACTED - PUBLICLY FILED VERSION

Miranda warning statements to civil police.  He even acknowledged on deposition that any Israeli military court "has to suppress the evidence" if it concludes that the accused's freedom of will was interfered with.  Ex. B.4 at 17.  Indeed, on deposition, Mr. Sfard *declined* to offer any opinion that any of the convicted perpetrators were "actually innocent."  Ex. B.4 at 146.

Many of Mr. Sfard's due process arguments are even farther afield.  He attacks the IMCs because most criminal cases are resolved through plea bargaining.  Ex. A.7 at 21–22.  Yet he points to no evidence suggesting that any of the plea bargains in these cases were improper.  If plea bargaining were inherently suspect, most convictions in American courts would be inadmissible.  He complains that court papers and investigative files are in Hebrew and that the courtroom interpreters are soldiers, rather than "professional legal interpreters."  *Id.* at 24, 30.  But he does not allege any translation difficulties in these actual cases, or that defendants or their counsel complained of such difficulties.  He contends that Palestinian defense lawyers sometimes have trouble entering Israel to visit their clients, but he presents no evidence that that occurred or that the defendants lacked, or claimed to lack, adequate access to counsel.  *Id.* at 24–25.  He even finds fault with the perfectly reasonable security requirement that members of the public obtain a permit to enter the military bases where terrorist trials are conducted.  *Id.*  There is no evidence that these rules tainted the convictions in these cases, and he makes no such claim.

Finally, Mr. Sfard complains that some Israeli procedures differ from American rules.  For example, the prosecutor can comment on the silence of defendants who do not testify, and the hearsay rules are more relaxed.  *Id.* at 26–27.  These rules probably stem from the fact that the IMCs do not use juries, which is another of Mr. Sfard's complaints.  Again, however, he points to no evidence that these differences resulted in any wrongful convictions.

Ms. Weill's report is even more generalized. Half of her report simply replicates Mr. Sfard's general complaints about the IMCs. Ex. A.9 at 17–35. The other half argues that, under international law, the IMCs lacked jurisdiction over the perpetrators because the IMCs are "not properly constituted" as a matter of law. *Id.* at 3–17. Ms. Weill admitted that she did not read a single document from any of the convictions at issue, and she offers no opinions on either the convictions or the guilt or innocence of the perpetrators.

The Court should not allow defendants to turn this trial into a forum for considering every arguable theoretical shortcoming of the IMCs. None of these generalized complaints is relevant under Rule 401. Moreover, this is a textbook case for applying Fed. R. Evid. 403. Allowing the defendants to present a generalized critique of the IMCs, untethered to the evidence in this case, will cause delay and risk confusing the jury into thinking—incorrectly—that there may be evidence that Mr. Sfard's complaints reflect on the validity of any of these convictions.

## III.    DEFENDANTS' ARGUMENTS THAT A VERDICT IN PLAINTIFFS' FAVOR WOULD INTERFERE WITH UNITED STATES FOREIGN POLICY SHOULD BE EXCLUDED

This Court should prohibit defendants from arguing that a judgment against them would harm the prospects for "peace and stability" in the Middle East or interfere with United States foreign policy. Such a ruling is necessary because defendants' expert, Glenn Robinson, asserts in his report that the US government regards the PA "as an essential element to the peaceful resolution of the Israeli-Palestinian conflict" and that any action "aimed at destabilizing (or destroying) *the financial well-being of the PA*" could "hinder its ability to achieve what the US and the international community have clearly stated are the desired end goals of peace and stability in Israel and Palestine." Ex. A.6 at 4–5 (emphasis added).

It is highly improper for defendants to suggest that the jury should base its verdict on anything other than the evidence before it, much less on the dubious assertion that a verdict

12

based on the evidence could harm "peace and stability" in the Middle East. In any event, Mr.

Robinson's personal plea for mercy for the PA is not appropriate expert testimony.

## IV.    PERSONAL ATTACKS ON PLAINTIFFS' CO-COUNSEL SHOULD BE PROHIBITED

Plaintiffs' co-counsel in Israel, Nitsana Darshan-Leitner, represents victims of terrorism,

and she has successfully represented plaintiffs in cases against these defendants. Although Ms.

Darshan-Leitner will not participate in the trial, defendants' questioning of plaintiffs' experts

about her has been improper and should not be permitted before the jury. For example,

defendants asked terrorism expert Matthew Levitt if Ms. Darshan-Leitner's organization engages

in "lawfare"—a term sometimes used to describe bringing legal claims to pursue a political

agenda. Ex. B.2 at 242.[7] Similarly, defendants have suggested that Ms. Darshan-Leitner "took

direction from the Government of Israel about which cases to pursue," (*id.* at 253), and they

even suggested to this Court that plaintiffs' counsel has a "personal vendetta." Ex. D.1 at 4.

This Court should not allow such tactics. Any complaints defendants may have about

plaintiffs' co-counsel are utterly irrelevant here, and attacks on and innuendo about opposing

counsel have no place before a jury. *See Slantis v. Capozzi & Assocs., P.C.*, 2010 WL 3122868,

at * 2 (M.D. Pa. Aug. 9, 2010) (granting motion in limine precluding evidence that "plaintiff's

legal claims … were frivolous [or] for purpose of harassment").

---

[7]**"Lawfare** is a recently coined word . . . said to describe a form of asymmetric warfare. Lawfare is asserted by some to be the illegitimate use of domestic or international law with the intention of damaging an opponent, winning a public relations victory, financially crippling an opponent, or tying up the opponent's time so that they cannot pursue other ventures such as running for public office, similar to a SLAPP lawsuit. Other scholars see it more neutrally as a reference to both positive and negative uses of law as an instrument of warfare or even to the legal debates surrounding national security and counterterrorism." Wikipedia, Lawfare, *available at* http://en.wikipedia.org/wiki/Lawfare (last visited May 1, 2014).

REDACTED - PUBLICLY FILED VERSION

**V.    TESTIMONY BY FACT WITNESSES WHOM DEFENDANTS NEVER IDENTIFIED AS REQUIRED BY FED. R. CIV. P. 26(a)(1)(A)(i) SHOULD BE EXCLUDED**

Fed. R. Civ. P. 26(a)(1)(A)(i) provides that every "party must, without awaiting a discovery request, provide to the other parties ... the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment." Rule 26(e)(1) also requires a party to supplement its initial disclosures whenever it learns that the information originally provided is incomplete or incorrect. The purpose of this requirement "is to alert an opposing party of the need to take discovery of the named witness," *Pal v. New York Univ.*, 2008 WL 2627614, at *4 (S.D.N.Y. June 30, 2008), and "to prevent the practice of 'sandbagging' an opposing party with new evidence." *Ebewo v. Martinez*, 309 F. Supp. 2d 600, 606–07 (S.D.N.Y. 2004).

Defendants have never disclosed *any* fact witnesses. Their initial disclosures, served on July 25, 2011, list only generic categories of witnesses and do not name even one specific witness. Ex. F at 34. Listing such "generic categories" of witnesses is "patently insufficient and amounts to a non-disclosure." *Labadie v. Dennis*, 2008 WL 5411901, at *2 (W.D. Mich. Dec. 23, 2008); *see Smith v. Pfizer Inc.*, 265 F.R.D. 278, 283 (M.D. Tenn. 2010) (Rule 26(a)(1)(A)(i) "requires parties to disclose 'the *name* ... of each individual likely to have discoverable information.' 'It is not sufficient to identify [witnesses] through the use of a collective description, such as "employees or representatives of the defendant."'") (quoting 6 Patrick E. Higginbontham, Moore's Federal Practice, § 26.22[4][a] [i] (3d ed. 2014) (citation omitted)).

Defendants never served any supplemental disclosures pursuant to Rule 26(e)(1) identifying any fact witnesses or the "subjects" on which they have information. Nevertheless,

their witness list submitted with the parties' Joint Pretrial Order on January 22, 2014, lists 21

undisclosed fact witnesses, whom defendants describe as putative "trial witnesses who they may

call in their case in chief in this matter." Ex. E, at Witnesses Nos. 17–37.[8]

Defendants should be barred from presenting testimony from these 21 fact witnesses (or

from any other undisclosed witnesses) on summary judgment or at trial. Fed. R. Civ. P. 37(c)(1)

provides that a party who fails to identify a witness under Rule 26(a) or 26(e)(1) "is not allowed

to use that ... witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure

was substantially justified or is harmless." Rule 37(c)(1)'s preclusionary sanction is "automatic"

and "self-executing" absent a finding of either "substantial justification" or "harmlessness[,]"

and the "burden to prove substantial justification or harmlessness rests with the dilatory party."

*Am. Stock Exch., LLC v. Mopex, Inc.*, 215 F.R.D. 87, 93 (S.D.N.Y. 2002).

Defendants cannot meet this burden. The Second Circuit has identified four factors to be

considered in deciding whether to impose sanctions: "'(1) the party's explanation for the failure

to comply with the [disclosure requirement]; (2) the importance of the testimony of the precluded

witness[es]; (3) the prejudice suffered by the opposing party as a result of having to prepare to

meet the new testimony; and (4) the possibility of a continuance.'" *Patterson v. Balsamico*, 440

F.3d 104, 117 (2d Cir. 2006) (citation omitted). All four factors support preclusion:

*First*, defendants have not provided any explanation for their failure to timely disclose

these 21 witnesses, even in the face of plaintiffs' specific request that they explain or cure their

deficient disclosure. Ex. D.2. Nor could defendants do so, since 17 of the witnesses are their

---

[8] Witnesses Nos. 1–16 on defendants' list are their expert witnesses; Witnesses Nos. 17–37 on
defendants' list are their undisclosed fact witnesses.

current officers and employees, and the other four are senior former officers and employees of defendants.[9]

*Second*, to this day defendants have never identified the "subjects" on which they intend to have these witnesses testify, as required by Rule 26(a)(1)(i).  Defendants' Witness List contains only the witnesses' names and contact information, but does not so much as hint at the subjects of their intended testimony.  Having failed even to identify the topics on which they seek to have these 21 witnesses testify, defendants have forfeited any claim that that testimony is "important" to their case.  Moreover, the lateness of defendants' identification of these fact witnesses and the large number of witnesses would make a claim of "importance" incredible.

*Third*, plaintiffs would suffer severe and unfair prejudice if these witnesses were allowed to testify, because discovery is long over, trial is fast approaching, and plaintiffs are therefore unable to depose or seek paper discovery regarding them.  "If the Court were to permit these untimely disclosures, it would have to reopen discovery to afford [plaintiffs] an opportunity to depose some or all of the additional witnesses.  The Court might also have to permit [them] to seek discovery regarding ... records" relating to the witnesses. *Pal*, 2008 WL 2627614, at *4; *cf. Am. Stock Exch.*, 215 F.R.D. at 94 (finding prejudice to plaintiff where defendant made disclosure "five weeks after the completion of fact discovery," because it thereby "deprived the [plaintiff] of the opportunity to conduct needed fact discovery."); *Degelman Indus. v. Pro-Tech*

---

[9] The positions of the current officers and employees listed by defendants as witnesses are set forth in the Witness List.  Ex. E.  The four former officers listed as witnesses by defendants are Salam Fayyad (former PA Prime Minister and Finance Minister and head of the PLO Economic Affairs department); Hasan Abu-Libdeh (former PA Minister of National Economy, PA Minister of Labour and Social Affairs and Chief of the PA Prime Minister's Bureau); Afif Safieh (former Chief PA and PLO Representative in the U.S.); and Mazen Jadallah (former Director-General for International Relations and Project in the PA Ministry of Finance).

*Welding & Fabrication*, 2011 WL 6754059, at *3–4 (W.D.N.Y. June 8, 2011) (same); *Alfano v.*
*Nat'l Geographic Channel*, 2007 WL 2982757, at *2 (E.D.N.Y. Oct. 5, 2007).

Plaintiffs' inability to obtain discovery regarding these witnesses is especially prejudicial
because several of them have serious criminal records, including terrorism convictions. For
example, plaintiffs are informed that: Mohammad Jibrini was convicted and sentenced to 18
years imprisonment for terrorist crimes, including homicide; that Ghaleb Abdul Rahman al al-
Nobani was convicted for unlawful weapons possession and trafficking; that Jibreen Elias Abed
Al-Bakri spent years in prison for terrorism-related offenses; and that Hasan Abu-Libdeh faced
criminal charges in a PA court for breach of trust, fraud, insider trading and embezzlement of
public funds. Plaintiffs have no way of determining at this stage—due to the very limited ability
of private investigators to locate such information in the West Bank—whether any *other* of
defendants' undisclosed witnesses have similar terrorist or criminal pasts.

*Fourth*, the possibility of a continuance is impractical. The case is ten years old; parties
and witnesses are planning to attend from all over the world; the Court has cleared its docket.
"[A]lthough a continuance is always a possibility, [defendant] has made no showing that its
efforts to [disclose the witnesses] began at an appropriately early date. In the absence of such a
showing, [defendant] should not be permitted to upset a discovery schedule which was extremely
liberal and to which its adversary adhered." *Pal*, 2008 WL 2627614, at *6. Accordingly, the
Court should preclude defendants from calling these or any other undisclosed witnesses.

## VI.  EXPERT TESTIMONY OFFERING OPINIONS ON NON-ECONOMIC DAMAGES BASED ON REPORTED JUDGMENTS IN OTHER CASES SHOULD BE EXCLUDED

Defendants' damages expert, Rick Gaskins, is a CPA. He submitted two kinds of expert
reports: ten reports (on ten plaintiffs) covering economic damages such as lost earnings; and
seventeen reports (on seventeen plaintiffs) covering non-economic damages, such as pain,

suffering, grief, disfigurement, and emotional injuries. The Court should not let Mr. Gaskins testify about non-economic damages. Testimony by a CPA attempting to quantify non-economic damages would improperly invade the function of the jury. In addition, Mr. Gaskins is not qualified to give such testimony, he has not offered a valid methodology, and his testimony lacks an adequate factual footing. *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579 (1993).

The seventeen offending reports are largely identical. Mr. Gaskins collected and averaged data about damage awards or other compensation given to persons, who, he asserts, were similarly situated to those plaintiffs. Specifically, he studied awards in three types of proceedings: (1) jury verdicts in personal injury cases; (2) awards by the federal "Victims Compensation Fund" ("VCF") for victims of the September 11 attacks; and (3) compensation to disabled veterans. Mr. Gaskins asserts that his calculations would give the jury a "frame of reference" for determining the appropriate damages. Ex. B.1 at 149:4–18.

### A.     Mr. Gaskins' Testimony Would Invade the Province of the Jury

It is well settled that "a jury is perfectly capable of determining [non-economic] damages without any expert testimony." *Allen v. Bank of Am., N.A.*, 933 F. Supp. 2d 716, 734 (D. Md. 2013). Indeed, "nothing is better settled than the principle that in actions for torts, where no precise rule of law fixes the recoverable damages, the jury's peculiar function is to determine the amount." *Hall v. N. Am. Indus. Servs.*, 2008 WL 789895, at *13 (E.D. Cal. Mar. 21, 2008). For this reason, the courts are "'loath to usurp this core function of the jury by relying on quasi-mathematical formulas to assess the amount of damages that may be awarded, simply because non-economic damages are not readily quantifiable.'" *Id.* (citation omitted). Because "a jury is capable of determining these losses from its own experiences and knowledge," the "great weight of authority" precludes "expert testimony on precise damage calculations" for non-economic damages such as "loss of enjoyment of life." *Sullivan v. U.S. Gypsum Co.*, 862 F. Supp. 317,

321 n.5 (D. Kan. 1994) (collecting cases).  Mr. Gaskins' testimony about what *other* courts or

juries or panels have done in *other* cases would invade the jury's province.

**B.    Testimony On Non-economic Damages Is Beyond Mr. Gaskins' Expertise**

Mr. Gaskins specializes in expert witness work in economic damages, including lost

earnings in personal injury cases.  Mr. Gaskins is not a doctor or mental health professional, and

nothing in his credentials suggests that he has any expertise in measuring non-economic damages

for physical or emotional injuries.  Yet the data he provides for damage awards in other court

cases and by the VCF all include awards for physical and/or emotional injuries for persons who

he contends suffered injuries similar to plaintiffs' injuries.[10]  This testimony is outside his area of

expertise and thus runs afoul of *Daubert*'s requirement  that "the expert's opinion will have a

reliable basis in the knowledge and experience of *his discipline*."  509 U.S. at 592 (emphasis

added); *see also Lappe v. Am. Honda Motor Co.*, 857 F. Supp. 222, 227 (N.D.N.Y. 1994) (an

expert must "stay within the reasonable confines of his subject area, and cannot render expert

opinion on an entirely different field or discipline."), *aff'd*, 101 F.3d 682 (2d Cir. 1996).

Mr. Gaskins also lacks any expertise regarding the three sources he relies on for data

regarding non-economic damages.  For example, he obtained data on damages awarded in other

personal injury cases from a database called Jury Verdict Research ("JVR"), which compiles

data, and adjusts them in various ways.  Mr. Gaskins could not explain how or why JVR makes

these adjustments.  When asked why the average awards were adjusted downward for plaintiffs

with multiple injuries, he replied: "It's Thomson Reuters Lexus.  If they didn't do it well, I don't

think they would still be in business."  Ex. B.1 at 141–43.  Similarly, when asked if he

---

[10] Report of Rick Gaskins dated July 15, 2014 re "Personal Injury to Ms. Shayna Elliott," p. 2.
(Ex. A.2 at 2).  Plaintiffs submit the report on Ms. Elliott as an example of the seventeen reports
at issue in this motion.

REDACTED - PUBLICLY FILED VERSION

understood how that adjustment is calculated, he replied "I do not" and agreed that "[t]hat's just the way JVR does it." *Id.* at 144.  When asked about the adjustments, he could only say "I can speculate, but I don't want to." *Id.* at 147.

Mr. Gaskins also has no relevant expertise in the 9/11 VCF awards or the rules for compensating disabled veterans.  His experience with the VCF consists of representing "two or three" claimants of the fund, and his "expertise" consists of reading the VCF report and calculating the average awards to persons he regarded as similar to the plaintiffs.  *Id.* at 22–23, 149–51.  For disabled veterans, he just guessed about the relevant inputs.  *Id.* at 152–53.[11]

Mr. Gaskins admitted that he is unaware of any other forensic economist using these materials, so there is no basis for finding that experts in his field reasonably rely on them.  *Id.* at 143–44.  Thus, his "expertise" consists of doing the kind of math that a schoolchild could perform with a calculator.  This is not expert testimony.  Indeed, Mr. Gaskins admitted that he has never given any such testimony during his 34 years as an expert witness on accounting.  *Id.* at 160.  This Court should keep that record intact.

### C.    Mr. Gaskins' Testimony Regarding Compensation Paid In Other Proceedings Is Irrelevant, Unduly Prejudicial, And Fails To Comply With The Requirements Of *Daubert*

This testimony also fails *Daubert*'s requirement that "the reasoning or methodology underlying the testimony [be] scientifically valid and [that] that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93.

Mr. Gaskins did not identify awards that are for injuries sufficiently similar to the plaintiffs' injuries.  One example suffices.  Shayna Elliott was shot in the chest with an M-16

---

[11] For example, he assumed that Ms. Elliott is 80% disabled and that she would live for 60 more years.  He then just calculated the value of payments over that time for a veteran who is 80% disabled.

REDACTED - PUBLICLY FILED VERSION

assault rifle, appeared to be DOA at the hospital, and lost a lung. Mr. Gaskins chose the category "gunshot wound to the trunk," which he admitted could constitute anything from the kind of devastating injury Ms. Elliott suffered down to a minor "flesh wound." Ex. B.1 at 144. A source that draws from such a wide spectrum of injuries is of no value to the jury, and it appears to have been chosen to suggest an improperly low recovery for Ms. Elliot, whose injuries were severe.

This problem gets worse with Mr. Gaskins' other two data sources, which do not allow any kind of injury-to-injury comparison. For example, the two categories Mr. Gaskins used for Ms. Elliot from the VCF were "All females age 25 and under" and persons with "Multiple Injuries." Ex. A.3, Schedule 1. Data on awards to other young women—without regard to the types or severity of their injuries—or on awards to persons with more than one unspecified injury are utterly irrelevant to Ms. Elliot's damages. Similarly, as discussed above, the benefits paid to disabled veterans are not keyed to specific injuries at all, but only to the claimant's percentage degree of disability. These benefits also say nothing about injuries such as pain and suffering, or emotional distress that is not literally disabling.

Finally, the wide disparity between the amounts of the awards from Mr. Gaskins' sources shows that his data would mislead the jury. For example, Mr. Gaskins cited the following awards for Ms. Elliot:

| | |
|---|---|
| Jury awards: | $1,303,000 |
| 9/11 VCF awards: | $142,882 (for women under 25) |
| | $343,669 (for claimants with multiple injuries) |
| Benefits to disabled veterans: | $531,993 |
| Average of all four: | $580,000 |

This broad span of awards—in which the smallest award is only 11% of the largest—cannot provide any useful guidance to a jury. To the contrary, it appears that Mr. Gaskins added

the VCF and military benefits awards not to provide a neutral "frame of reference" for the jury, but to water down the already depressed "average" jury award he found in the Jury Verdict Reporter. Ex. B.1 at 157 (conceding that the jury awards database tends to yield much higher awards than the VCF and military benefits data).

The misleading nature of Mr. Gaskins' analysis is exacerbated by his inclusion of *two* lowball categories of awards from the VCF—both of which are significantly lower than the "average" jury and disability awards—as inputs into his "average of averages." Such an obviously slanted analysis cannot pass muster under the methodology requirements of *Daubert*. Accordingly, this Court should bar any testimony by Mr. Gaskins based on non-economic damages and exclude defendants' three proposed trial exhibits offered to support his testimony.[12]

## VII.    EXPERT TESTIMONY ON "EXPERTISE" SHOULD BE EXCLUDED

David Miller, a sociology professor who claims to be an expert on "the sociology of expertise," wrote a report (Ex. A.4) opining that plaintiffs' liability experts are not qualified to testify because they lack expertise, because they do not cite certain sources, because their reports are not based on an appropriate methodology, and because they are biased against Palestinians. *Id.* at 3. Glenn Robinson also opines that these experts are not qualified. Ex. A.6 at 59–62.

This testimony must be excluded for several reasons. *First*, there is no such thing as an "expert on expertise." Only an expert in the subject matter fields actually covered by plaintiffs' liability experts could assess their sources or methodology. Mr. Miller, however, does not even profess to be an expert in any of those substantive areas. Ex. B.3 at 20, 68–70. Mr. Miller thus has no basis to testify. At most, his complaints might be fodder for cross-examination.

_____

[12] Ex. C.36 (description of the VCF published in the Federal Register), Ex. C.50 (final report of the Special Master for the VCF), and Ex. C.51 (description of the VCF from the website of the Department of Justice).

*Second*, this Court, not the jury, must determine whether an expert is qualified under Fed.

R. Evid. 702; *see* 2000 Adv. Comm. Note ("expert testimony present[s] questions of

admissibility for the trial court"). Thus, Messrs. Miller and Robinson cannot testify on this issue.

*Finally*, it is well established that experts may not testify as to witness credibility. *See*

*United States v. Lumpkin*, 192 F.3d 280, 289 (2d. Cir. 1999) (precluding expert testimony on

witness credibility because that would usurp "'the role of the jury in applying that law to the

facts before it'") (citation omitted). Thus, Mr. Miller cannot testify as to any alleged pro-Israel

bias, and neither he nor Mr. Robinson can testify as to the qualifications of other experts.

## VIII.   EXPERT TESTIMONY ON MATTERS OF LAW SHOULD BE EXCLUDED

It is black letter law that it is the province of the Court to instruct the jury as to the law

and that experts cannot usurp that role by testifying as to legal issues. For example, in *Hygh v.*

*Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992), the Second Circuit stated: "This circuit is in accord

with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion."

As the court explained: "Whereas an expert may be uniquely qualified by experience to assist the

trier of fact, he is not qualified to compete with the judge in the function of instructing the jury."

*Id.* Numerous other decisions affirm this principle.[13]

This prohibition applies to foreign law. Fed. R. Civ. P. 44.1 provides that "the court"

shall decide issues of foreign law and that the court's "determination must be treated as a ruling

on a question of law." Judge Gershon cited this language in two recent ATA decisions excluding

expert testimony on matters of foreign law. *Linde v. Arab Bank, PLC*, 944 F. Supp. 2d 217,

---

[13] *E.g., United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991); *United States v. Scop*,
846 F.2d 135, 139–40 (2d Cir. 1988), *modified*, 856 F.2d 5 (2d Cir. 1988); *Marx & Co. v. Diners
Club, Inc.*, 550 F.2d 505, 509–11 (2d Cir. 1977); *Davis v. City of New York*, 959 F. Supp. 2d 427,
435–36 (S.D.N.Y. 2013); *Music Sales Corp. v. Morris*, 73 F. Supp. 2d 364, 381 (S.D.N.Y.
1999).

218–20 (E.D.N.Y. 2013) (barring such testimony because it would "mislead and confuse the jurors, and improperly invite them to decide legal issues"); *Linde*, 920 F. Supp. 2d at 286 (testimony was "not relevant because questions of foreign law are not to be determined through a proffer of expert testimony given to the jury").

Accordingly, the following testimony should be excluded:

**A.    Muhammed Dahleh**  Mr. Dahleh is a Jerusalem attorney who purports to be an expert in Israeli and Palestinian tort law. His report (Ex. A.2), which opines on a number of legal issues regarding plaintiffs' non-ATA claims, such as the standards for negligence and causation, falls squarely within the rule against legal expert testimony. (Mr. Dahleh also speculates that if this case had been filed in an Israeli court "there is a good chance" that plaintiffs would not prevail "because it would be very hard to prove the allegations mentioned in the claim." *Id.* at ¶ 2. Such speculation would confuse and mislead the jury.)

**B.    John Quigley**  Mr. Quigley is a professor emeritus of international law at Ohio State University. The sole purpose of his report (Ex. A.5) is to argue that, as a matter of international law, "Palestine is a state, despite the fact that it has not been accorded diplomatic recognition by the United States." *Id.* at ¶ II.1. Such legal testimony is clearly prohibited. The Court should also exclude his testimony because it has already ruled that Palestine is not a state: "Palestine, whose statehood is not recognized by the United States, does not meet the definition of a 'state' under United States and international law." *Sokolow v. Palestine Liberation Org.*, 583 F. Supp. 2d 451, 457–58 (S.D.N.Y. 2008) (footnote omitted). In any event, whether Palestine is a state is irrelevant to the jury.

**C.    Michael Sfard, Raja Shehadeh and Sharon Weill**  As noted above, Mr. Sfard argues that Israeli settlements in the West Bank are illegal under international law and that the

REDACTED - PUBLICLY FILED VERSION

IMCs also violate that law.  Mr. Shehadeh offers legal conclusions on several issues, including the legality of the settlements (Ex. A.8 at 13–20, 27–32), the legal status of Jerusalem, the West Bank and the Gaza Strip (*id.* at 5–7), and the law of occupation (*id.* at 7–13).  Similarly, Ms. Weill's report is devoted to arguing that the IMCs violate international law.  Ex. A.9 at 3–35.

Three experts must be excluded from the trial in their entirety because they offer only legal opinions that would usurp the role of the Court:  Mr. Dahleh; Mr. Quigley; and Ms. Weill.  In addition, Mr. Sfard's and Mr. Shehadeh's testimony about issues of law must be excluded.

## CONCLUSION

For the reasons set forth above, plaintiffs' motion in limine should be granted.

Dated: New York, New York
May 2, 2014

ARNOLD & PORTER LLP

By: _____
Kent A. Yalowitz
*kent.yalowitz@aporter.com*
Philip W. Horton
*philip.horton@aporter.com*
Sara K. Pildis
*sara.pildis@aporter.com*
Ken L. Hashimoto
*ken.hashimoto@aporter.com*
Carmela T. Romeo
*carmela.romeo@aporter.com*
Tal R. Machnes
*tal.machnes@aporter.com*

399 Park Avenue
New York, New York 10022
(212) 715-1000