# EXHIBIT A.5

# EXPERT REPORT OF JOHN QUIGLEY

I. Background and Qualifications

I.1   I am John Quigley (see curriculum vitae attached). I have been asked to give an opinion in *Sokolow v. Palestine Liberation Organization*, No. 1:04-cv-397 (S.D.N.Y.) on the status of Palestine, the Palestinian Authority, and the Palestine Liberation Organization.

I.2   I have taught international law since 1972 at the Moritz College of Law of the Ohio State University. I have extensive practical experience in international law as reflected in Exhibit A. I have written extensively on international law, and in particular on issues relating to the Middle East, as reflected in Exhibit B.

I.3   In September 2010, I filed a written affidavit as an expert in Hernandez v. U.S., U.S. District Court, Southern District of Florida, Case No. 10-21957-CivLENARD.

I.4   I am being compensated at the rate of $250.00 per hour for my services as an expert in this case. My compensation is not conditioned on the content of the opinions expressed in this report, nor is my compensation contingent on the results of these proceedings.

I.5   The materials I have considered are referenced in the text of this document.

II. Summary of Opinions

II.1   Palestine is a state, despite the fact that it has not been accorded diplomatic recognition by the United States. The Palestinian Authority, also known as the Palestinian National Authority, is a governing authority of Palestine.

III. Discussion and Grounds for Opinions

III.1   Palestine is accepted as a state in the international community. This status was reflected most recently in the decision of the General Assembly of the United Nations to regard the Palestine mission at the United Nations as the mission of a state. Resolution 67/19, November 29, 2012. In Resolution 67/19, the General Assembly recited that it

> *Decides* to accord to Palestine non-member observer State status in the United Nations, without prejudice to the acquired rights, privileges and role of the Palestine Liberation Organization in the United Nations as the representative of the Palestinian people, in accordance with the relevant resolutions and practice.

Resolution 67/19 was adopted on a vote of 138 in the affirmative, 9 in the negative, and 41 abstaining. UN General Assembly, 67th session, 44th plenary meeting, UN Doc. A/67/PV.44, November 29, 2012.

1

III.2  The factors specified for statehood in the Convention on Rights and Duties of States, Montevideo, December 26, 1933, League of Nations Treaty Series, vol. 165, at 19, popularly known as the Montevideo Convention, are taken by the American Law Institute, *Restatement (Third) of the Foreign Relations Law of the United States*, §201(1987), as the factors that are to guide states as they determine their attitude towards entities that purport to be states. These factors are: a territory, a permanent population, the exercise of governmental functions, and a capacity to engage in relations with other states. As states determine their attitude towards an entity that purports to be a state, they do not necessarily apply these factors. The issue of whether an entity is a state depends on the opinion of the states of the world, as expressed individually or collectively. There is no accepted standard for how general the opinion of states must be. No international authority governs their judgment on the matter or requires the utilization of particular factors. The *Restatement* at §201 explains that "issues of statehood have been resolved by the practice of states reflecting political expediency as much as logical consistency." *Restatement*, §201. The issue of whether an entity is a state is not determined by courts assessing the entity under the Montevideo criteria. For a court faced with the issue of whether a particular entity is a state, the issue is whether the entity is accepted as a state by the community of states. An example is a case decided by the Permanent Court of International Justice, when it was called upon to determine Palestine's status. The case involved the rights of a foreign concessionaire who had an agreement with the previous sovereign of the territory, namely, Turkey. If Palestine were a state, it would succeed to the obligations of Turkey under the concession agreement. The Court determined that Palestine was a state. It did so not by assessing factors like the Montevideo criteria. Rather, it looked to the attitude of the major powers of the era, as reflected in the peace treaty (Treaty of Lausanne, 1923) that followed World War I and which dealt with the status of a number of states, including Palestine, whose territory had formerly been under Turkish sovereignty. Permanent Court of International Justice, *Mavrommatis Jerusalem Concessions*, at 46, Series A, no. 5, March 26, 1925. The states that voted in the affirmative in the UN General Assembly on November 29, 2012 on Resolution 67/19 did not publicly explain the basis for their conclusion that Palestine is a state. Statehood is an issue of fact, albeit one with legal implications. The states that voted in the affirmative on Resolution 67/19 reflected in their vote a factual determination that Palestine is a state.

III.3.  That said, Palestine does meet the Montevideo criteria for statehood. Palestine has a territory. International acceptance of the extent of Palestine's territory appears in Resolution 67/19, which refers to the "State of Palestine on the Palestinian territory occupied since 1967." That territory is the West Bank of the Jordan River and the Gaza Strip. The General Assembly regards that territory as the territory of Palestine.

The territorial factor is not negated by the fact that the Gaza Strip is not contiguous with the West Bank of the Jordan River. Non-contiguous territory is not unknown for a state. It was the situation of Pakistan early in its history, when Pakistan was made up of an eastern and a western sector. It is the situation of the United States, with Alaska being separate from the continental United States.

The territorial factor is not negated by the fact that Palestine's border with Israel may be subject to negotiation. A state need not have definitively fixed borders in order to be a state. Israel was admitted to United Nations membership in 1949 at a time when its borders were not fixed. Even

today, to the extent that Palestine's western border is considered not to be fixed, logically Israel's eastern border must be considered not to be fixed. That fact does not negate Israel's status as a state. The Montevideo territorial criterion does not demand definitively fixed borders.

III.4. Palestine has a permanent population, another Montevideo factor. This factor is not seriously questioned in regard to Palestine. The *Restatement* gives Antarctica as an example of an entity that would fail on the factor of a permanent population even if it qualified on the other factors.

III.5. Governmental functions are exercised by the authorities of Palestine. To be sure, Israel as belligerent occupant exercises control in significant ways. The exercise of control by a belligerent occupant, however, does not negate statehood. *Restatement*, §201, Reporters' Note 3. A belligerent occupant does not hold sovereignty. During Iraq's belligerent occupation of Kuwait (1990-91), the Government of Kuwait was unable to exercise control in the territory of Kuwait. Yet Kuwait was regarded as a state by the international community. During Germany's belligerent occupation of Denmark in World War II, the Government of Denmark was unable to exercise control. Yet Denmark was regarded as a state by the international community. Israel's status as belligerent occupant is reflected in the case law of the Supreme Court of Israel. See, e.g., *Tamimi v. Minister of Defence*, H.C. 507/85, Judgment (Opinion of Goldberg, J., excerpted in *Israel Yearbook on Human Rights*, vol. 18, at 248 (1988). *Beit Sourik Village Council v. Government of Israel*, H.C. 2056/04, Judgment, May 2, 2004 (Opinion of President A. Barak, para. 23). Israel does not claim sovereignty in the territory of Palestine, as reflected in its submissions to the Human Rights Committee. Israel there takes the position that its territory is that which it controlled prior to 1967. Israel has in this regard taken the position before the Human Rights Committee, which monitors Israel's compliance with the International Covenant on Civil and Political Rights, that the Covenant, which, in Israel's view, applies only in its territory, does not apply to its activities in the Gaza Strip or in the West Bank of the Jordan River. Human Rights Committee, 2718th meeting, July 14, 2010, UN Doc. CCPR/C/SR.2718, para. 15 (statement of representative of Israel). Israel's position thus is that neither the Gaza Strip nor the West Bank of the Jordan River is part of Israel's territory.

The governmental function factor is not negated by the fact that administration is currently split between the West Bank of the Jordan River on the one hand, and the Gaza Strip on the other. Each sector is administered by a political force that participated in, and gained substantial votes in, an election held in Palestine in 2005. In international practice, split administrations within a state are not unknown and do not negate statehood. In Vietnam for a time in the 1960s and 1970s, administration was split between a northern administration and a southern, each claiming to be the government of Vietnam. Despite this split in administration, Vietnam was accepted as a state.

Despite Israel's belligerent occupation, the Palestinian Authority exercises governmental functions in many ways. An occupant may or may not exercise total authority in territory under its occupation. A belligerent occupant may exercise certain elements of control, while the government of the state exercises others. Beginning with the political process initiated in 1993, Israel transferred control of certain sectors to the Palestinian Authority. *Beit Sourik Village*

*Council v. Government of Israel*, H.C. 2056/04, Judgment, May 2, 2004 (Opinion of President A. Barak, para. 1).

III.6.   Palestine has the capacity to engage in international relations and in fact does so. The recognition of Palestine by, presently, 132 states, bespeaks an engagement in international relations. Palestine maintains a network of embassies and other diplomatic establishments in states around the world. These diplomatic establishments are maintained by the Palestine Liberation Organization. The Palestinian Authority does not maintain the diplomatic establishments of Palestine. The Palestine mission at the United Nations, for example, is maintained by the Palestine Liberation Organization.

III.7.   The European Union deals with the Palestine Liberation Organization and the Palestinian Authority as two components of the governing authority of the State of Palestine. Such is reflected in the European Union-Palestine treaty entitled *Euro-Mediterranean Interim Association Agreement on Trade and Cooperation between the European Community, of the One Part, and the Palestine Liberation Organization (PLO) for the Benefit of the Palestinian Authority of the West Bank and the Gaza Strip, of the Other Part*, Official Journal L 187, July 16, 1997, at 0003. The European Union by its own founding document enters into such agreements only with states. *Consolidated Version of the Treaty Establishing the European Community*, Art. 133(3), Official Journal C325/33, December 24, 2002. Thus, the conclusion of this agreement reflects the view of the European Union that Palestine is a state. The title of this Agreement reflects the further view of the European Union that the Palestine Liberation Organization handles Palestine's affairs at the international level, whereas the Palestinian Authority exercises authority in Palestine's territory.

III.8.   Even the United States, which has yet to accord Palestine diplomatic recognition, tacitly accepts its status as a state. This view of the United States is reflected in the US sponsorship of and adherence to the 2003 Performance-based Road Map to a Permanent Two-State Solution to the Israeli-Palestinian Conflict, UN Document S/2003/529, May 7, 2003. That document was issued in late April 2003 by the United States in conjunction with the United Nations, the European Union, and the Russian Federation, these four entities colloquially being referred to as the "Quartet." The Road Map contemplated a series of "phases" in resolving the conflict. In a second "phase," specified as beginning in June 2003, the Road Map specified, "Quartet members promote international recognition of Palestinian state, including possible UN membership." Thus the Quartet was prepared in April 2003 to anticipate calling for diplomatic recognition of Palestine within a matter of weeks. In the event, the "performance" did not come about, but the specification in April 2003 of an intent to promote recognition by June 2003 bespoke a view that Palestine was a state as of April 2003. Nothing in the status of Palestine was anticipated to change between April 2003 and June 2003.

III.9.   The acceptance of Palestine as a state is sufficiently general, based on diplomatic recognition and on the General Assembly vote of November 29, 2012 on Resolution 67/19. States determining their attitude towards a putative state may take the Montevideo factors into account, but ultimately it is the acceptance by states that is decisive, whatever the basis for the acceptance. An attitude of acceptance of an entity as a state is often reflected in the extension of diplomatic recognition. One hundred thirty-two states have recognized Palestine as a state and

maintain with it some form of diplomatic relations. Acceptance may be expressed in other ways as well. The adoption of General Assembly Resolution 67/19 provides an example. States voting in the affirmative indicated their view that Palestine is a state. Moreover, 28 states that had not recognized Palestine diplomatically were among those voting in the affirmative. When this number is added to the 132 that have recognized Palestine diplomatically, a total of 160 states can be counted as having formally indicated acceptance of Palestine's statehood. The fact that 28 states that had not recognized Palestine diplomatically voted in the affirmative reflects the fact that diplomatic recognition is a matter of policy. It is a political question for a state as to whether it chooses to recognize a particular entity as a state. A decision on diplomatic recognition may turn on issues beyond whether the entity is regarded as state. The fact that the United States has not accorded diplomatic recognition is driven not by a consideration of whether Palestine is a state but rather by factors related to the United States' relationship with Israel and to the United States' view that a formal recognition of Palestine as a state might impede the bilateral negotiations that the United States views as the appropriate route to a peaceful relationship between Israel and Palestine.

III.10. In September 1993, the Palestine Liberation Organization concluded with the Government of Israel the *Declaration of Principles on Interim Self-Government Arrangements*. By this document, Israel ceded in part the control it exercised in Palestine's territory as belligerent occupant. On October 10-11, 1993, at a meeting held in Tunis, the PLO established the Palestinian Authority as a governing authority to implement the *Declaration of Principles*. Thus, the Palestinian Authority was constituted as an arm of the provisional government of Palestine. A 19-member cabinet was formed for the Palestinian Authority comprised of the usual portfolios of government, including finance, education, trade, health, justice, and transportation.

III.11. In a May 1994 agreement concluded between the Palestine Liberation Organization and the Government of Israel, the Palestinian Authority was specified as the governing authority to which Israel would transfer certain governmental functions. *Agreement on the Gaza Strip and the Jericho Area*, Cairo, May 4, 1994, UN Doc. A/94/180, S/1994/127. By a subsequent agreement, Israel and the PLO confirmed that the powers being ceded by the Government of Israel would be exercised by the Palestinian Authority. *Interim Agreement on the West Bank and the Gaza Strip*, September 28, 1995, U.N. Doc. A/49/180, S/1994/727. The 1995 Interim Agreement provided for the modalities of the Palestinian Authority's relationship with the Israeli occupation forces. In so doing, it preserved and accepted Palestine's position on its statehood. Article 31(6) provided: "Neither Party shall be deemed, by virtue of having entered into this Agreement, to have renounced or waived any of its existing rights, claims or positions." Palestine statehood had been declared by the PLO in 1988 (see Sec. III.12), hence Palestine statehood was an existing "claim" or a "position." The Palestine Liberation Organization continued to exercise the diplomatic functions of Palestine, whereas the Palestinian Authority exercised governmental functions in the territory of Palestine.

III.12. The General Assembly of the United Nations, in Resolution 67/19, did not purport to be creating a state that did not previously exist. Rather, it was indicating a view that Palestine already was a state. In 1988, the PLO's legislative body, the Palestine National Council, affirmed the statehood of Palestine. *Declaration of Independence*, November 15, 1988, UN Doc. A/43/827, S/20278, Annex III, November 18, 1988. This *Declaration* was acknowledged by the

UN General Assembly, UN Doc. A/RES/43/177, and led shortly to the recognition of Palestine's statehood by over one hundred states. In an accompanying document of the same date, the Palestine National Council constituted the PLO as the provisional government of Palestine. *Declaration of the formation of the provisional Government of the State of Palestine*, November 15, 1988, UN Doc. A/43/928, December 9, 1988.

III.13. The *Declaration of Independence* did not purport to create a new state but rather re-affirmed an existing Palestine state. It referred in fact to the *Treaty of Lausanne* (1923), the treaty of peace between the Allied and Associated Powers on the one hand and Turkey on the other. It was in that treaty that Palestine was specified as a state being formed out of territory being ceded by Turkey in the wake of World War I. That status was confirmed by the League of Nations, which established a system of governance for Palestine and the other territories that had constituted the Arab territories of the Turkish Empire. Great Britain, implementing that system, administered Palestine under the auspices of the League of Nations, and was accountable to the League for its implementation of administration. Great Britain did not regard Palestine as sovereign territory of Great Britain but rather treated it, consistent with the League system, as a state of its own. Palestine under the administration of Great Britain was considered to be a state by the Permanent Court of International Justice, when Palestine's status became an issue in litigation. In a case involving a concession agreement that had been concluded by Turkey, the Permanent Court of International Justice, citing the Treaty of Lausanne, referred to Palestine as a successor state to Turkey. Permanent Court of International Justice, *Mavrommatis Jerusalem Concessions*, at 31, Series A, no. 5, March 26, 1925.

III.14. The United States regarded Palestine as a state in the interwar period. It so indicated in a diplomatic exchange with Great Britain in 1932. Britain was adopting new customs tariffs and wanted to provide an exception for Palestine, so that goods from Palestine would enter Britain duty free. But Britain had a most-favored-nation treaty arrangement with the United States that required Britain and the United States to accord to goods entering from each other the lowest tariff it demanded from any other state. Britain was concerned that if it allowed Palestinian goods to enter Britain duty free, the United States would say that Palestine was a state and therefore demand duty free entry into Britain of US goods. Before acting, Britain decided to ask the United States how it would react if Palestine goods were allowed to enter Britain duty free. U.S. Secretary of State Henry Stimson replied that Palestine was a state, hence if Palestine goods entered Britain duty free the United States would demand the same. *Foreign Relations of the United States 1932*, vol. 2, at 32. *Kletter v. Dulles*, 111 F.Supp. 593 (1953).

III.15. Israel established itself in 1948 by seceding from Palestine in a portion of Palestine's territory. After 1948, the two sectors of Palestine that were not controlled by Israel were administered by neighboring states: the Gaza Strip by Egypt, and the West Bank of the Jordan River by Jordan. These two sectors were regarded as territory of the state of Palestine that had existed prior to 1948, even in the absence of a Palestine government. The acceptance of Palestine as a state in the international community – an initial acceptance in the 1920s and a continuation of statehood after the events of 1948 -- is explained more fully in my book, *The Statehood of Palestine: International Law in the Middle East Conflict*, which provides citation to relevant authorities.

III.16. Palestine is a state, accepted in the international community as such. Palestine's status as a state, like that of any state, is regarded in law as a fact. Neither the PA nor the PLO has been incorporated by any state.

*[signature]*

John Quigley
July 15, 2013

# (EXHIBITS OMITTED)