# EXHIBIT B.1

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

```
- - - - - - - - - - - - - - -+
                              |
MARK I. SOKOLOW, et al,       |
                              |
        Plaintiffs,           |
                              |
  vs.                         | No. 04 Civ 00397
                              |
THE PALESTINE LIBERATION      |    (GBD)(RLE)
ORGANIZATION, et al,          |
                              |
        Defendants.           |
                              |
- - - - - - - - - - - - - - -+
```

Deposition of Rick Gaskins, MBA, CPA

Washington, D.C.

Thursday, November 7, 2013

1:00 p.m.

Reported by:

Laurie Bangart-Smith

Ref. No.: 10555

1              Let's go on to the second bullet point,
2     which is the well-known Pan Am Flight 103, the
3     Lockerbie Bombing.
4              Could you explain what your role was in
5     that.
6         A    I was engaged to work up economic damages
7     for the flight crew.
8         Q    Just for the flight crew?
9         A    Yes.
10        Q    Okay.
11             Who were the defendants in that case?  Was
12    it Pan Am?
13        A    Good question.  I don't recall.
14        Q    Did that case go to trial?
15        A    No.
16        Q    And the next references your work for the --
17    in connection with the September 11 Victim
18    Compensation Fund, or VCF.
19        A    Right.
20        Q    Can you explain what work you did in
21    connection with -- if it's okay with you, I'll call it
22    the VCF.
23        A    I worked up two or three, I think it was,
24    back then.
25        Q    Two or three of the victims?

 1    A    Yes.

 2    Q    Were they all people who had died?

 3    A    I don't recall.

 4    Q    Okay.

 5    Let's go further down on page 2 of

 6 Exhibit 3, your report on Ms. Elliott.

 7    Under the heading "Scope of Report," the

 8 second sentence says, "Judicial economy on major

 9 issues are addressed in this report," and I want to

10 ask if there are any other issues that you didn't

11 consider major and did not address in the report but

12 reflected any, what you regarded as problems or

13 mistakes of any kind in Mr. Soudry's report.

14    A    Those would be things like choice of a

15 growth rate or a discount rate forensic economists can

16 differ on, but I considered those overshadowed by the

17 other deficiencies.

18    Q    Is it fair to say that on those issues --

19 and we'll look at Mr. Soudry's report later, see if it

20 refreshes your memory -- did you believe that any

21 choices he had made for something such as a discount

22 rate were inappropriate or that you just thought you

23 had a better number?

24    A    I don't recall.

25    Q    When you did your report in response to

1      Q      This is all assuming a plaintiff's verdict,
2   which may or may not happen?
3      A      Correct.
4      Q      The 1,399,000, the very top number on the
5   page, is that in essence an average number for all the
6   breast disfigurement verdicts they have added up and
7   divided by the number of verdicts?
8      A      That's probably a good way to look at it.
9      Q      So next there is a multiple injury
10  reduction, which here is indicated as a subtraction of
11  35 percent; correct?
12     A      Correct.
13     Q      Could you explain to me what the multiple
14  injury reduction is about?
15     A      When there are multiple injuries -- let's
16  say you just had the chest injury with breast
17  disfigurement.  Okay.  A bad thing happened to you,
18  and there were expenses associated with it, and we get
19  a verdict amount.  You wouldn't have the reduction for
20  multiple injury if that was all you had.
21     Q      Okay.
22     A      But you've got a knee injury, you've got
23  mouth injury, fractures and chips of your mouth,
24  whatnot.  Overall I think it gets to the point where
25  they're going to give you your lost earnings and

1  they're going to give you something for the
2  noneconomic damages, well, for your expenses, and
3  noneconomic damages, but juries don't stack up the
4  noneconomic.  It's not additive, you know.  You had a
5  bad thing happen to you.
6      Q    Certainly the economic wouldn't be added up.
7  You wouldn't get your lost earnings -- if you're not
8  able to work anymore, you wouldn't get lost earnings
9  once for breast disfigurement, a second time for
10 gunshot wounds, another time for knee, and that seems
11 pretty obvious to me.  I'm trying to make sure I
12 understand you're saying the same thing is true with
13 respect to noneconomic damages.
14     A    Correct.
15     Q    That was a little less clear it me.  Could
16 you explain to me why that's true?
17     A    I guess it's the psychology of juries.
18     Q    Let me just tell you my thought process.
19     A    Okay.
20     Q    My thought would be a jury would say, well,
21 what are the noneconomic damages for the breast
22 disfigurement, whether it's medical expenses, pain and
23 suffering, and then would look separately at other
24 injuries and say what would the noneconomic damages be
25 for the knee injury, for the gunshot wound to the

1   trunk, and logically it seems to me you would just add
2   them up.  It would be additive.
3           Is it your understanding that juries tend
4   not to operate that way?  Is that the reason for the
5   reduction with respect to noneconomic damages?
6       A   That's my assumption.
7       Q   Okay.
8           You do know this is what the JVR does?
9       A   They specialize.  They have done it for 40
10  some years.
11      Q   Okay.
12      A   It's Thomson Reuters Lexus.  If they didn't
13  do it well, I don't think they would still be in
14  business.
15      Q   Is the JVR something that forensic
16  economists like yourself tend to rely on, in your
17  understanding?
18      A   I have used it over the years, and that's
19  why I brought it to this assignment.
20      Q   Have you seen other forensic economists use
21  it?
22      A   I don't know.  I don't think so.
23      Q   Do you know if there's any independent
24  literature -- and by "independent" I mean not
25  published by the same JVR company -- that encourages

1  the use of this JVR data to assist juries?
2     A   I'm not aware of any.
3     Q   The next item is "gunshot wound to trunk,
4  age 18 plus."
5        As you understand it, does that encompass
6  verdicts for almost any kind of gunshot injury that
7  hits the trunk of one's body?
8     A   Yes.
9     Q   So that could be a devastating injury down
10 to a what in the movies might be described as a "flesh
11 wound"?
12    A   Okay.
13    Q   And here there is a multiple injury
14 reduction of 50 percent rather than 30 percent.
15       Do you understand why the multiple injury
16 reduction factor is 50 percent for the gunshot wound
17 to the chest rather than 35 percent for the chest
18 injury/breast disfigurement?
19    A   I do not.
20    Q   That's just the way the JVR does it?
21    A   Correct.
22    Q   Okay.
23    A   It's based on a large complex statistical
24 analysis.
25    Q   And so if I asked you about the next three,

1  the lung injury, the mouth injury and the emotional
2  distress injury, same answer, you can't explain why
3  they're using 60 percent once and 80 percent twice?
4  That's just the way the JVR does it?
5       A    Correct.
6       Q    Okay, and each of these injuries -- each of
7  these categories for each of the various kind of
8  injuries, just to make sure I'm clear, each of them is
9  supposed to include both economic and noneconomic
10 damages?
11      A    Yes.
12      Q    Is there any way to tell from the JVR what
13 the components are, what the breakdown is between
14 economic damages and noneconomic damages?
15      A    No.
16      Q    Is that reflective of the fact that juries
17 just return verdicts which don't -- which may not
18 break them down?
19      A    Or the way the data collection was set up.
20      Q    But from the JVR you can't tell what the
21 breakdown is between economic and noneconomic?
22      A    No.
23      Q    Okay.
24           So then there is a category "Total Base
25 Injury Value" close to the bottom of the page.

1    is an adjustment upwards for multiple defendants of
2    five percent.
3              Correct?
4        A    Correct.
5        Q    And do you understand why there is an upward
6    adjustment for multiple defendants?
7        A    I can speculate, but I don't want to.
8        Q    I don't want to ask you to speculate.  This
9    is the way the JVR does it; correct?
10       A    Right.
11       Q    And you're not sure what the basis is for
12   doing that?
13       A    The basis is the data.  I know what the
14   basis is.  Can I link that to what is in a jury's
15   mind?  You could speculate as to why they would do
16   that.
17       Q    Yeah, I'm not asking you what's in a jury's
18   mind.  The question is:  Do you understand why the JVR
19   is making this adjustment?
20       A    Because their statistical analysis shows
21   that it's --
22       Q    If there are multiple defendants, the jury
23   verdicts tend to be higher?
24       A    Yes.
25       Q    Okay, and next is "Plaintiff Disabled," and

Page 149

```
 1   you think it should be higher or lower based on things
 2   I didn't know or your judgment, that's the purview of
 3   the jury.
 4        Q    So, and then I think that's what I was about
 5   to ask you.  A reasonable jury, depending on what
 6   evidence they hear at trial, might reasonably come in
 7   with a verdict assuming a plaintiff's verdict, of
 8   economic and noneconomic damages, either more than
 9   this 1.3 million or less than the 1.3 million?
10        A    Sure.  Absolutely.  This just gives them a
11   frame of reference.  I mean for most of them it will
12   be the first time.  Even if you've been on jury duty
13   more than one time, what are the odds that you'll get
14   say a significant injury, or you'll get a case which
15   is nothing but noneconomic damages?
16        Q    I thought that's what you were doing, and I
17   just wanted to be absolutely sure.
18        A    That's what it's for.
19        Q    Okay.
20             Let's turn to Schedule 3.  This involves VCF
21   data; correct?
22        A    Correct.
23        Q    And for Ms. Elliott you have several
24   categories of data from the VCF; correct?
25        A    Correct.
```

```
 1       Q    And the first is for females in various age
 2  ranges; right?
 3       A    Correct.
 4       Q    And that would be the age at the time of the
 5  injury; is that correct?
 6       A    Yes.
 7       Q    So for Ms. Elliott, "25 and under" would be
 8  the correct category?
 9       A    I believe so, yes.  Yes.
10       Q    And I think I understand the chart.  I just
11  want to be sure.
12            Claim count.  There's a column labeled
13  "Claim Count."  Does that reflect the number of claims
14  of females 25 and under submitted to the Special
15  Master in the VCF process?
16       A    Right.  I give that to you.  Obviously I
17  could have hidden those two columns, but I give that
18  to you so that you can directly find this data in the
19  final report.
20       Q    I appreciate it.  I've looked at the final
21  report some.  I just want to make sure I'm
22  understanding what I'm seeing here.
23       A    So I show you exactly the data and where I
24  got it from, and then I calculate the average for that
25  item.
```

1  Q  So the total amount awarded is simply adding
2  up the awards for those 14 claimants, and the final
3  average total is simply dividing that $2 million total
4  by 14?
5  A  Right.
6  Q  Okay.
7     The next column is for males rather than
8  females.  I assume that you did not take this into
9  account with respect to Ms. Elliott?
10  A  No.  As you can see in the summary --
11  Q  We'll be going back through the summary in a
12  moment.
13     The next is "Uniform Workers, Male and
14  Female."  Why did you include that?
15  A  That's just general reference related to the
16  VCF.
17  Q  And I think you did not include that on
18  Schedule 1; is that correct?
19  A  Correct.
20  Q  And next --
21  A  And again, I mean the report -- I'm hoping
22  that I won't just say it but that I'll be able to -- I
23  plan to use these schedules, so the jury will have all
24  that data to work with, you know, not just me speaking
25  a few numbers from Schedule 1.

1   Q   Understood. Understood.
2       And then the final category on Schedule 3
3  is -- the heading is "By Nature of Injury, Male and
4  Female," and then you have two categories, one for
5  multiple injuries and one for burns.
6   A   Right.
7   Q   Why did you include burns here?
8   A   Because some people of these plaintiffs had
9  burns.
10  Q   But not Ms. Elliott?
11  A   No.
12  Q   Let's go back to Schedule 1.
13  A   Okay.
14  Q   Actually, let's just do disabled veterans
15 while we're here. Then we'll go back to Schedule 1.
16      Let me refer you to Schedule 4. These are
17 the data with respect to disabled veterans; correct?
18  A   Correct.
19  Q   So these are payments made by the Veterans
20 Administration to disabled veterans; correct?
21  A   Correct.
22  Q   Are these intended to encompass recovery of
23 both economic and noneconomic damages?
24  A   This is what they get, and it's based on
25 level of disability.

1    Q    The way it's actually calculated is based on
2    a percentage disability; correct?
3    A    Correct.
4    Q    And then the amount is based on their life
5    expectancy; correct?
6    A    The amount of their monthly payment is based
7    on the severity of the disability, and I've calculated
8    for various remaining life expectancies what the
9    present value of the lifetime benefit is.
10   Q    So that was my next question.  For
11   Ms. Elliott you assumed an 80 percent disability;
12   correct?
13   A    I did.
14   Q    And that's based on your review of
15   Ms. Elliott's deposition and other materials; correct?
16   A    Correct.
17   Q    And Schedule 1 indicates for the disabled
18   veterans category a total award of about $530,000?
19   A    Yes.
20   Q    So if we flip back to Schedule 4, under the
21   80 percent disability line, we'll see that figure next
22   to the, the column on the left-hand side, a life
23   expectancy of 60 years after 2002; correct?
24   A    Correct.
25   Q    And so the $531,000 is your calculation of

1  does that tend to weight this somewhat more towards
2  the VCF data than the other two?
3       A    I don't think so, because I mean overall I
4  think you're going to find the JVR is going to be
5  higher than those other two consistently.
6            The other thing is, again these are
7  indicators.  I've given all four indicators and indeed
8  even more data in the detail schedules, so they aren't
9  the answer.  They're just a frame of reference.
10      Q    This is one way which you believe is a fair
11 way of presenting these various data points to the
12 jury?
13      A    Yes.
14      Q    One could present them in a different way
15 reasonably?
16      A    Could, sure.
17      Q    For example, you could take the two data
18 points from the VCF, I'll use round numbers of
19 142,000, 343,000, add them together, divide by two, to
20 come up with one figure for the VCF?
21      A    Could.
22      Q    Okay.
23           Do you think that's a better or a worse way
24 than the way that you did it in terms of how useful it
25 is to the jury?

1  of the plaintiffs there are no economic damages.  It's
2  all noneconomic.  I was asked, I mean how can you get
3  guidance on what to do, so this is the methodology I
4  think that addresses that need.
5       Q    Can you recall if you've testified before in
6  a case in which you've used these three data points of
7  the JVR, the VCF and the disability payments?
8       A    In these ATA cases, this is the first
9  deposition.
10      Q    In any case in which you've testified
11 involving personal injury.
12      A    No, I can't recall.
13      Q    Okay.
14           Mr. Gaskins, the court reporter has handed
15 you a document marked as Exhibit 28.  This is your
16 report with respect to Janis Coulter, not the report
17 that responds to Mr. Soudry, but the one that does a
18 somewhat similar analysis to the one that we just
19 discussed with respect to Ms. Elliott; correct?
20      A    Correct.
21      Q    Turn to page 4 of your report.  Under the
22 section that discusses Schedule 3, the last sentence
23 says, "The VCF award guidelines" -- let me back up.
24 Ms. Coulter died rather than being injured; correct?
25      A    Correct.