# EXHIBIT C.28

## PART 1 OF 2

Home | Permalink |
English printer-friendly (pdf) | Arabic | Chinese | Français | ······ | Español |
Take the UNISPAL user survey

UNITED
NATIONS

A

General Assembly

Distr.
GENERAL

A/56/491
22 October 2001

Original: English

Fifty-sixth session
Agenda item 88
I ort of the Special Committee to Investigate Israeli Practices Affecting the Human Rights of the Palestinian People and Other Arabs of the Occupied Territories

**Report of the Special Committee to Investigate Israeli Practices Affecting the Human Rights of the Palestinian People and Other Arabs of the Occupied Territories**

**Note by the Secretary-General***

1. The Secretary-General has the honour to transmit to the General Assembly the thirty-third report of the Special Committee to Investigate Israeli Practices Affecting the Human Rights of the Palestinian People and Other Arabs of the Occupied Territories, submitted pursuant to General Assembly resolution 55/130 of 8 December 2000.

2 ~his report should be considered together with the Special Committee's periodic reports (A/56/428 anu Add.1).

03:TP000290

accordance with General Assembly resolution 55/222, part III, paragraph 10, this report is being suomitted on 17 October 2001 so as to include as much updated information as possible.

Contents

| | | | Para. | Page |
|---|---|---|---|---|
| I. | Introduction | | 1–3 | 3 |
| II. | Mandate | | 4–12 | 3 |
| | A. | General background | 4–9 | 3 |
| | B. | General Assembly resolution 55/130 of 8 December 2000 | 10 | x |
| | C. | Reports of the Special Committee | 11–12 | x |
| III. | Organization of work | | 13–27 | x |
| | A. | Meetings | 13–21 | x |
| | B. | Exchanges with other United Nations bodies | 22–24 | x |
| | C. | Other matters | 25–27 | x |
| IV. | Gaza, the West Bank and East Jerusalem | | 28–93 | x |
| | A. | Closures, curfews and other restrictions on the movement of persons, vehicles and goods | 38–39 | x |
| | B. | Destruction of property, land and housing | 40–45 | x |
| | C. | Settlements and settlers | 46–52 | x |
| | D. | Use of disproportionate force | 53–55 | x |
| | E. | Method of arrest, administrative detention, methods of interrogation, visits from family and relatives, and conditions of imprisonment | 56–70 | x |
| | F. | Overall consequences of such a manner of occupation | 71–72 | x |
| | G. | The continuing difficulty of Palestinians in East Jerusalem | 73–90 | x |
| | H. | The special difficulties of the Palestinians in refugee camps | 91–93 | x |
| V. | Occupied Syrian Golan | | 94 | x |
| VI. | Conclusions | | 95–104 | x |

03:TP000291

02:008352

## I. Introduction

1. ‗ne Special Committee to Investigate Israeli Practices Affecting the Human Rights of the Palestinian People and Other Arabs of the Occupied Territories was established by the General Assembly by its resolution 2443 (XXIII) of 19 December 1968.

2. The Special Committee is composed of three Member States: Malaysia (represented by the Permanent Representative of Malaysia to the United Nations, Hasmy Agam), Senegal (represented by the Permanent Representative of Senegal to the United Nations Office at Geneva, Absa Claude Diallo) and Sri Lanka (represented by the Permanent Representative of Sri Lanka to the United Nations, John de Saram, serving as Chairperson).

3. The Special Committee reports to the Secretary-General. The reports of the Special Committee are considered in the Special Political and Decolonization Committee (Fourth Committee) of the General Assembly.

## II. Mandate

### A. General background

4. ‗he General Assembly, in its resolution 2443 (XXIII) of 19 December 1968, entitled "Respect for and implementation of human rights in occupied territories", decided to establish a Special Committee, composed of three Member States, to Investigate Israeli Practices Affecting the Human Rights of the Population of the Occupied Territories.

5. The General Assembly, in its resolution 44/48 A of 8 December 1989, decided to change the name of the Special Committee to Special Committee to Investigate Israeli Practices Affecting the Human Rights of the Palestinian People and Other Arabs of the Occupied Territories.

6. The mandate of the Special Committee, as set out in resolution 2443 (XXIII) and subsequent resolutions, was to investigate Israeli practices affecting the human rights of the population of the occupied territories.

03:TP000292

7. The Special Committee has proceeded on the basis that:

(a) For the purposes of the present report, the territories considered occupied territories are those remaining under Israeli occupation, namely, the occupied Syrian Arab Golan, the West Bank, including East Jerusalem, and the Gaza Strip;

(b) The persons covered by resolution 2443 (XXIII) and therefore the subject of the investigation of the Special Committee, were the civilian population residing in the areas occupied as a result of the

hostilities of June 1967 and those persons normally resident in the areas that were under occupation but who had left those areas because of the hostilities;

(c) The "human rights" of the population of the occupied territories consist of two elements, namely, those rights which the Security Council referred to as "essential and inalienable human rights" in its resolution 237 (1967) of 14 June 1967 and, secondly, those rights which found their basis in the protection afforded by international law in particular circumstances such as military occupation and, in the case of prisoners of war, capture. In accordance with General Assembly resolution 3005 (XXVII) of 15 December 1972, the Special Committee was required to investigate allegations concerning the exploitation and the looting of the resources of the occupied territories, the pillaging of the archaeological and cultural heritage of the occupied territories and interference in the freedom of worship in the Holy Places of the occupied territories;

(d) The "policies" and "practices" affecting human rights that come within the scope of investigation by the Special Committee refer, in the case of "policies", to any course of action consciously adopted and pursued by the Government of Israel as part of its declared or undeclared intent; while "practices" refers to those actions which, irrespective of whether or not they were in implementation of a policy, reflect a pattern of behaviour on the part of the Israeli authorities towards the civilian population in the occupied areas;

( ` The geographical names and the terminology employed in the present report reflect the usage in the o..ginal source and do not imply the expression of any opinion whatsoever on the part of the Special Committee or the Secretariat of the United Nations.

8. The Special Committee has, in determining human rights standards and obligations, relied principally on the following:

(a) The Charter of the United Nations;

(b) The Universal Declaration of Human Rights, of 10 December 1948;[1]

(c) The International Covenant on Civil and Political Rights, of 16 December 1966; [2]

(d) The International Covenant on Economic, Social and Cultural Rights, of 16 December 1966;[2]

(e) The (Fourth) Geneva Convention relative to the Protection of Civilian Persons in Time of War, of 12 August 1949;[3]

(f) The Geneva Convention relative to the Treatment of Prisoners of War, of 12 August 1949;[4]

03:TP000293

(g) The Hague Convention for the Protection of Cultural Property in the Event of Armed Conflict, of 14 May 1954;[5]

(h) The Hague Conventions of 1899 and 1907 respecting the Laws and Customs of War on Land.[6]

9. The Special Committee has also relied on those resolutions relevant to the situation of civilians in the occupied territories adopted by United Nations organs — the General Assembly, the Security Council, the Economic and Social Council and the Commission on Human Rights.

**B. General Assembly resolution 55/130 of 8 December 2000**

10. The General Assembly, in its resolution 55/130 of 8 December 2000:

> "5. *Requests* the Special Committee, pending complete termination of the Israeli occupation, to continue to investigate Israeli policies and practices in the Occupied Palestinian Territory, including Jerusalem, and other Arab territories occupied by Israel since 1967, especially Israeli lack of compliance with the provisions of the Geneva Convention relative to the Protection of Civilian Persons in Time of War, of 12 August 1949, to consult, as appropriate, with the International Committee of the Red Cross according to its regulations in order to ensure that the welfare and human rights of the peoples of the occupied territories are safeguarded, and to report to the Secretary-General as soon as possible and whenever the need arises thereafter;
>
> "6. *Also requests* the Special Committee to submit regularly to the Secretary-General periodic reports on the current situation in the Occupied Palestinian Territory, including Jerusalem;
>
> "7. *Further requests* the Special Committee to continue to investigate the treatment of prisoners in the Occupied Palestinian Territory, including Jerusalem, and other Arab territories occupied by Israel since 1967".

**C. Reports of the Special Committee**

11. Pursuant to General Assembly resolution 55/130, in 2001 the Special Committee submitted a first periodic report, relating to the period from 1 August 2000 to 30 April 2001 (A/56/428), and a second periodic report, relating to the period from 1 May to 31 July 2001 (A/56/428/Add.1).

12. The present report for the year 2001 is also submitted pursuant to General Assembly resolution [illegible]130.

**III. Organization of work**

03:TP000294

## A. Meetings

1. The Special Committee met in Geneva on 17 and 18 May 2001 to consider its programme and organization of work for 2001. The Special Committee met with and was addressed by a representative of the International Labour Organization knowledgeable as to conditions in the occupied territories. The Permanent Representative of the Syrian Arab Republic to the United Nations Office at Geneva and the Permanent Observer of the Palestinian Authority to the United Nations Office at Geneva also met with and addressed the Special Committee. On 17 and 18 May 2001, the Special Committee considered and adopted its first periodic report to the Secretary-General (A/56/428).

14. The Special Committee has not, since its establishment in 1968, had access to the occupied territories. As in previous years, in a letter addressed to the Permanent Representative of Israel to the United Nations Office at Geneva, copied to the Secretary-General, the Special Committee requested that it be given access to the occupied territories. There was no response to the letter.

15. As in previous years, in order that the Special Committee might meet with and hear statements from persons with personal knowledge of the occupied territories, the Special Committee convened in Cairo from 26 to 29 July, in Amman from 30 July to 1 August, and in Damascus from 2 to 4 August. The Special Committee wishes to express its deep appreciation for the cooperation it received from the Governments of Egypt, Jordan and the Syrian Arab Republic.

16. In Cairo (26-29 July), the Special Committee met with the Assistant Minister for Multilateral Affairs of the Ministry of Foreign Affairs and also received statements under oath of persons with personal knowledge of East Jerusalem, the West Bank and Gaza.

17. Because of time constraints and problems of scheduling, the Special Committee was unable to meet with the Secretary-General of the League of Arab States or his representatives as it had done in previous years.

18. In Amman (30 July-1 August), the Special Committee met with the Minister for Foreign Affairs of Jordan and also received the testimony of persons from Jerusalem, the West Bank and Gaza.

19. In Damascus (1-4 August), the Special Committee met with the Minister of State for Foreign Affairs and received a report from the Director for International Organizations of the Ministry of Foreign Affairs, who also addressed the Special Committee. Statements under oath of eight Palestinians residing in a refugee camp in the vicinity of Damascus, who had been in Israeli imprisonment and expressed a wish to make statements to the Special Committee, were also received by the Special Committee in Damascus. The Special Committee visited Quneitra Province, bordering the occupied Syrian Arab Golan, and met with the Governor of Quneitra and also heard statements under oath in Quneitra of persons with personal knowledge of the occupied Syrian Arab Golan.

03:TP000295

20. A total of 20 witnesses, including a number of Israeli Arab and Jewish witnesses, out of an aggregate

of 33 scheduled witnesses whose attendance had previously been confirmed, were heard by the Special Committee. While the Special Committee was in the region, from 26 July to 4 August, there were a r ber of incidents of great violence in the occupied territories. It is the understanding of the Special Committee that difficulties created by the high tensions within the occupied territories and severe restrictions on movement within and out of the occupied territories prevented the attendance of other witnesses, as had been previously arranged.

21. The materials and testimony considered by the Special Committee included the following:

• Testimony and documentary materials provided by persons knowledgeable as to the occupied territories;

• Testimony provided under oath and recorded by United Nations verbatim reporters. These materials are available for consultation;

• Various documentary materials;

• Written materials received from the Government of the Syrian Arab Republic;

• Articles appearing in *The Jerusalem Post*, *Ha'aretz* and *The Jerusalem Times* in 2000 and 2001;

• Report of the Office of the United Nations Special Coordinator entitled " The impact on the Palestinian economy of confrontations, mobility restrictions and border closures", covering the period from 1 October to 31 January 2001;

• Report dated 29 November 2001 of the United Nations High Commissioner for Human Rights on her visit, at the request of the Commission on Human Rights at its special session (17-19 October 2000), to the occupied Palestinian territories, Israel, Egypt and Jordan;

• Report dated 16 March 2001 of the Human Rights Inquiry Commission, established by the Commission on Human Rights at its special session (17-19 October 2000), to investigate violations of human rights and humanitarian law in the occupied Palestinian territories after 28 September 2000.

**B. Exchanges with other United Nations bodies**

22. The Special Committee considers it necessary to note, as it also did in its report last year and the year before, that when a United Nations body, such as the Special Committee, undertakes a mission to the field, it is mutually beneficial and necessary that there should be exchanges of views with United ` 'ions bodies with knowledge of relevant matters, the work of the Special Committee being part of the ιυιality of a United Nations endeavour.

03:TP000296

23. The Special Committee wishes to record with appreciation the helpful cooperation extended, as in the past, to the Special Committee by the Office of the United Nations Resident Coordinator for the S an Arab Republic.

24. The Special Committee also wishes to record its appreciation of the readiness expressed by the United Nations Department of Public Information to be of assistance to the Special Committee whenever requested.

**C. Other matters**

25. The Special Committee recognizes that because of lack of access to the occupied territories its report to the General Assembly is limited by its inability to observe directly the conditions of the lives of the Palestinians and other Arabs of the occupied territories and to receive the views of representatives of the occupying authority.

26. Nonetheless, notwithstanding such limitations, the Special Committee has sought to convey to the General Assembly in its report what the Special Committee understands to be the conditions affecting human rights in the occupied territories.

27. The information provided to the Special Committee from documentary material and oral testimony v considerable. Where oral testimony was provided, a record of the oral testimony was maintained by U..ted Nations verbatim reporters and is available for consultation.

**IV. Gaza, the West Bank and East Jerusalem**

03:TP000297

28. The Oslo Accords (Declaration of Principles on Interim Self-Government Arrangements, signed on 13 September 1993 (A/48/486-S/26560, annex) and the related instruments) divided the West Bank into three areas (A, B and C) with civil and security responsibilities allocated, in ways specified in the Oslo Accords, to Israel and the Palestinian Authority, generally as follows: in Area A, the Palestinian Authority was to have full control; in Area B, Israel was to retain security control; and in Area C, Israel was to have exclusive control.

29. The Fourth Geneva Convention relative to the Protection of Civilian Persons in Time of War, of 12 August 1949, applies to Israel as the "occupying Power", in terms of the Convention. The High Contracting Parties, at a Conference convened in Geneva on 15 July 1999, reaffirmed the applicability of the Fourth Geneva Convention to the occupied territories. A number of persons appearing before the Special Committee expressed the view that it is important that the international community pursue with the Government of Switzerland, as depositary of the Convention, the convening of a substantial conference on measures to enforce the Convention in occupied Gaza, the West Bank and East Jerusalem.

30. The Special Committee, in its earlier reports to the General Assembly, including its report at the previous session (A/55/453, paras. 38-107), has sought to convey to the General Assembly the elaborate

and extensive nature of the systems of control the Israeli authorities have established in the occupied territories through, for example, such measures as restrictions on the movement of persons, vehicles and ɛ ls; confiscation of lands; the establishment of new settlements and the expansion of existing ones; restrictions on the construction or expansion of houses and other buildings; demolition of housing; severe restrictions on access to water; administrative detentions; conditions of imprisonment; use of unjustifiable force; and curtailment of access to Israel by Palestinian workers dependent on employment in Israel.

31. The Special Committee had, in the paragraphs set out below of its report to the General Assembly at the previous session (A/55/453), expressed some of its understandings as to conditions relevant to human rights in Gaza, the West Bank and East Jerusalem:

> "127. The Special Committee takes cognizance of the position enunciated in the sixth preambular paragraph of General Assembly resolution 54/76, and in earlier resolutions of the Assembly, that occupation itself represents a gross human rights violation.
>
> "128. The Special Committee believes that the observations made in September 1999 in paragraphs 251 to 265 of its report (A/54/325) continue to be valid, and reaffirms those observations once again, in paragraphs 129 to 144 below, based on and reinforced by additional information obtained by the Special Committee during its visit to the region.
>
> "129. The Israeli authorities have put in place a comprehensive and elaborate system of laws and regulations and administrative measures that affect all aspects of the lives of the Palestinian and Syrian peoples in the occupied territories. The laws and regulations are so framed that they vest in officials a considerable degree of authority and latitude over the lives of the people of the occupied territories.
>
> "130. These laws and regulations are designed to enhance the exercise of its control over the occupied territories and their population.

03:TP000298

> "131. There exists an all-encompassing sense of great tension in the occupied territories, in particular during periods of crisis, and the rigorous implementation of laws and regulations and administrative measures creates a sense of fear and despondency among the inhabitants of the territories.
>
> "132. Moreover, during periods of violence, such exercise of control makes the lives of the Palestinian and Syrian peoples in the occupied territories even more unbearable.
>
> "133. Bitterness at their treatment by the authorities and the sense of dispossession, hopelessness and despair of the people of the occupied territories caused to a large extent, it seems to the Special Committee, by lack of progress in the peace process and a lack of tangible benefits for

the people of the occupied territories, make the situation in those territories one of the greatest urgency."

The Special Committee considers such observations to be still valid.

32. The Special Committee, had also, in its report to the General Assembly at the previous session (A/55/453), described the general conditions prevailing in Gaza, the West Bank and East Jerusalem, immediately prior to 29 September 2000, in the following terms:

"32. A principal and recurring theme in the presentations made to the Special Committee was that the finalization of the peace process in a manner satisfactory to all concerned is, now more than ever before, of overwhelming importance.

"33. The frustrations, tensions and often great anger of the people of the occupied territories, under the oppressiveness of an occupation that has continued for so long, was referred to by nearly all those who appeared as witnesses before the Special Committee. They spoke of the fact that there has been little or no relief from the pressures of continuous occupation, revealing a very unsatisfactory condition with respect to human rights.

"34. On Friday, 29 September 2000, shortly before the final meeting of the Special Committee in New York for the adoption of the present report, violent disturbances, resulting in great loss of life and injuries, erupted at the Holy Places in East Jerusalem, spreading to the occupied territories of the West Bank, Gaza and also to several Arab townships in Israel."

33. Since 29 September 2000, tensions in Gaza, the West Bank and East Jerusalem have been greatly heightened. The Israeli authorities have enforced their systems of control with extraordinary intensity and severity. There have been hostile confrontations, almost daily, between Israeli forces and the Palestinians. The Special Committee was informed that conditions have been exacerbated to the extreme because of the use by Israeli authorities of greatly disproportionate force. The toll of dead and injured is rising, with the Palestinians suffering by far the greater casualties. Closures of entry into and out of the West Bank and Gaza; internal closures of the borders of areas A, B, and C; numerous checkpoints; and restrictions on movement out of towns and villages have resulted in a situation that has been described repeatedly to the Special Committee as a "state of siege". This "state of siege" made even more desperate in areas where curfews are imposed.

03:TP000299

34. The Special Committee has sought in sections A to H below, on the basis of information it has received, to convey to the General Assembly an overall sense of the conditions relating to human rights in the occupied territories.

35. It seemed important to the Special Committee that the General Assembly should be apprised, at least

to some degree, in the words of the witnesses themselves of the very difficult circumstances in which the Palestinians currently find themselves, particularly after 29 September 2000. It is for that reason that the S ial Committee has in sections A to H below included, from the very substantial materials provided to the Special Committee, a few extracts from, or summaries of, passages of statements made by witnesses to the Special Committee. The extracts of summaries are, of course, neither exhaustive nor adequately representative of the various statements made to the Special Committee. The extracts and summaries refer to such matters as: (a) controls imposed over the movement of persons, vehicles and goods; (b) the extensive destruction of houses and property; (c) the difficulties caused by settlements and settlers; (d) the use of disproportionate force; (e) methods of arrest, administrative detention, methods of interrogation, visits from lawyers and relatives, and conditions of imprisonment; (f) the overall consequences of such a manner of occupation; (g) the continuing difficulties of the Palestinians in East Jerusalem; and (h) the special difficulties of the Palestinians in refugee camps.

36. The extracts of summaries set out below are in no way exhaustive. They were taken from statements made to the Special Committee in the course of its field mission by witnesses whose reliability the Special Committee has no reason to question. (As noted above, statements made to the Special Committee were recorded verbatim by United Nations Verbatim Reporters and are available for consultation.)

37. The consequences of such systems of control on Palestinian life as a whole within Gaza, the West B-nk and East Jerusalem have been catastrophic, with grave consequences for the economic and social, c..ural and political, and other aspects of Palestinian life in the occupied territories.

**A. Closures, curfews and other restrictions on the movement of persons, vehicles and goods**

38. Severe restrictions have applied, since 29 September 2000, on the movement of persons, vehicles and goods into and out of as well as within the occupied territories. The only Palestinian airport in the occupied territories, in Gaza, has been closed. International and border crossings to Jordan and Egypt have been closed for extended periods of time. There is no "safe passage" between Gaza and the West Bank. Travel into and out of nearly every town and village has been shut down or heavily obstructed by Israeli authorities. Numerous checkpoints have been established. Curfews have been imposed that confine those Palestinians within the scope of the curfew to their houses for substantial periods of time. The expression "state of siege" was used by a number of witnesses before the Special Committee to describe the traumatic conditions currently prevailing.

39. The following are extracts from, or summaries of, passages in statements made to the Special Committee. They concern some of the matters brought to the attention of the Special Committee in the course of its field mission, by witnesses whose reliability the Special Committee has no reason to question.

03:TP000300

(a) "I do not think any members of the Committee can imagine what it means to wait for three hours in the sweltering sun. People who live in Geneva or other cities may have rush-hour problems ..."

(b) "Generally, crossing begins at 9 a.m. I arrived at the crossing point at 6.30 a.m. I waited in the car u-'·l 9.30 a.m. to be able to enter the crossing point. That was after coming from Gaza City by way of a ta... and then waiting for another car with authorization to cross issued by the occupying forces. They allow only a limited number to enter. I had to pay the drivers in advance for my seat. I succeeded in being among the first five cars that had been allowed in. I had left my house at 5.30 a.m. and I came out of the Israeli side of the crossing around 11.30 a.m., a total of six hours. I am not speaking about any person in particular. I am a young man and can withstand the hardships of travel, but what about mothers, children? I have seen mothers carrying infants waiting under the heat of the sun, from 5.30 a.m. until as late as noon. I am talking about the area outside the crossing, where there is no roof. People wait in the sun; it is horrible, we are talking about hundreds of cars ... Within the border crossing there are no toilet facilities. There is a private cafeteria outside that is run by a Palestinian. It is usually full of people, but there a re no public facilities. The crossing centre was not meant for people to wait. Usually people would just go inside to wait. But under the present situation, people are not allowed inside and before the second intifada the crossing point was open 24 hours daily; now it operates only six hours per day."

(c) "There are more than 20 stages that one passes through, not to be checked, but, it would seem, to humiliate travellers. Sometimes you find yourself going in circles for no reason. You leave the bus to take another bus, or you walk a few steps to take another car to take you a few metres. These measures are meant to terrify and humiliate people. No one could believe that these measures are related to inspection or security. At the main checkpoints we go through within Gaza and the bypass roads and at t' ›orders there are a number of things that must be done to travel by car or bus: you leave the bus; you enter a car. All of this happens under duress; every few minutes, a weapon is pointed at you. As I said, these measures appear to be to humiliate people, not to check them. There are electronic devices and checks at all these stages. A person is asked to go through these electronic gates; even if he has already been inspected, he is inspected again."

(d) "... during this long trip, the problem is felt by people with children. Children need things more than adults do. There are restrooms but the problem is that there is no access to them. When you take the bus, you sometimes have to wait in the bus for an hour or two. But there are no toilets in the buses. The same is true with regard to food. There is food outside, but when we are waiting in a car or a bus, it is impossible to get food. That is the problem: things exist, but they are of no use to us."

03:TP000301

(e) "My house is a few metres away from where shells are dropped from Israeli jets. The children are used to this ... It took 15 to 16 hours to come here (Cairo). There were more than 20 crossing points. We had to experience more than 25 stops before we got here. Sometimes it takes more time to get through the Gaza Strip than to go to Europe or other places. I left home at about 5.30 or 6 a.m. I left the border checkpoint at about 3.30 p.m. The measures were very stringent. Had I known this, I would not have come. On the Israeli side, you stand side by side facing the guns with your child, to prove that you are not carrying anything. This is behind cement blocks ... all you see is guns. You have to be fully aware of e dangers; you should not close your eyes; you should not look around; you should not move your hands; any movement could cost you your life. Many incidents have occurred on the pretext that somebody had approached a soldier or was thinking of stabbing a soldier. If you are travelling by car,

you have to be aware of the language of signals and the way those signals are used."

( Israel has imposed curfews on many Palestinian towns. I shall take up the curfew imposed in Hebron, as that town has experienced the largest number of curfews ... Since 8 October 2000, curfews have been imposed on Hebron for a total of over three months. This is particularly the case in the old town section of the city. Curfews are lifted for a few hours only on any given day. Sometimes, a curfew is not lifted at all. The curfew has had a very severe impact on education as schools were entirely closed and education had to take place inside homes. In 2001, curfews were imposed on Hebron from 1 to 27 February, 3 to 10 March and from 2 to 17 July. From 14 to 18 February and from 5 to 8 March, the curfew also applied to the camp located in the city itself. Curfews were also imposed on other towns, including Hawara and Surda in the area of Ramallah."

(g) "And the siege sort of ebbs and flows. When the Israelis are really mad, they tighten the siege. They even — at one point, at the beginning of June, after one of those bombs went off, they were angry, so they tore up all the roads in and out of Bethlehem. They came with bulldozers and chopped the roads up and then they ploughed all the debris up to block the highway. This was, I think, a road funded by the World Bank that had just been resurfaced. They just chopped the whole thing up, gouged it, piled all the debris in the middle and then they dropped these big concrete barriers. Then they just sit there with their jeeps and say, 'Sorry, you can't go through, closed, siege' ... So you can imagine what this does for commerce. People with their trucks of produce or their raw materials can't go anywhere. How do you get fresh food in? And what about those villages that are completely dependent on outside water s plies? This is where the Red Cross has to mobilize, and they do. They are trying to bring in trucks, tankers of water, because these people are thirsty."

(h) "... Israel issued a military order ... declaring that the Gaza Strip was a closed military region, entry into and exit from which was banned until further notice. That order, along with further modifications, remained in effect during the period of relative calm when movement was allowed on an exceptional basis ... The closure that has been imposed is very strict. Israel directly controls the crossings as concerns not only Palestinians but also goods. Israel has completely closed the crossings during certain days and periods during the current intifada. It has banned the importation of necessities such as gasoline ... I own a car, and I faced this problem personally, since there wasn't a drop of gasoline at the Gaza gas station for 10 days. After this, the Israelis again allowed necessities to be imported."

**B. Destruction of property, land and housing** 03:TP000302

40. In its earlier reports to the General Assembly, including its report at the previous session (A/55/453, paras. 46-58), the Special Committee has sought to convey to the Assembly the difficulties experienced by Palestinians of the occupied territories because of such matters as: the very restrictive policies and practices of the Israeli authorities regarding the construction of new Palestinian buildings and homes — ie expansion of existing structures — in the occupied territories; and Israeli authorizations necessary in that connection; the destruction of Palestinian buildings and homes where such authorizations have not been obtained; and the acquisition of land by Israeli authorities for the construction of access roads

to settlements and bypass roads for settlement and other Israeli use. Such policies and practices continue.

4 Since 29 September 2000, and during the periods of heightened tension thereafter, the acquisition of Palestinian property (lands and housing) and the destruction of Palestinian property (lands and housing) for what was described as Israeli security considerations has intensified.

42. There has been substantial bulldozing, clearance and destruction of lands, properties, fruit trees and olive groves of considerable age in the vicinity of settlements and bypass roads and borders. Olive groves appear to have a special significance for the Palestinians. As explained to the Special Committee:

"These have included olive trees, some more than a century old. For parents and children alike, these are sacred trees because they are a major source of income for Palestinian families. We visited one family in Abboud which had lost more than 200 olive trees that had been planted over the last 100 years. I feel that I have lost my grandfather, my father and my son."

43. There have been shellings and military-style incursions (with tanks, troops and bulldozers) into Palestinian residential areas or refugee camps and substantial destruction of Palestinian housing.

44. The extent of destruction of houses, farms and agricultural lands in areas close to settlements along borders has, the Special Committee was informed, been extensive. One witness informed the Special Committee that in Gaza, 245 houses, inhabited by 1,725 persons, including 810 children, had been destroyed since the beginning of the intifada. Another witness informed the Special Committee that land close to bypass roads had been cleared to a distance of between 50 and 250 metres.

45. The following are extracts from, or summaries of, passages in statements made to the Special Committee. They concern some of the matters brought to the attention of the Special Committee in the course of its field mission, by witnesses whose reliability the Committee has no reason to question.

(a) "The Israelis are creating a buffer zone between the Gaza Strip and the borders. Mostly, the buffer zone involves agricultural land. In the area of Rafah, in the southern part of the Gaza Strip, the area between the Palestinian Rafah and the Egyptian side is a residential and agricultural area. The Israelis first began by razing all the trees in the agricultural areas in the south-eastern part of the Gaza Strip. Then they moved to the other area, the residential area, where they demolished houses. Until today, people have been living in tents. There are also other areas which are treated in similar fashion."

(b) "Acts of destruction take place during the night and in some cases in the daytime. The areas to be destroyed are sealed off and journalists are prevented from approaching them. In some cases the areas are densely populated and some of the houses are owned by farmers. Shelling takes place prior to razing, in order to terrorize habitants and drive them off. Families are not given any opportunity to gather their belongings. They leave in a stampede as shelling is continuous and they run away leaving everything behind. Once the shelling is over, the bulldozers take over. Again this may take place during the night as well as in the daytime."

03:TP000303

(c) "Bulldozing in the Gaza Strip has focused mainly on agricultural lands. Areas that have been s[illegible]ected to bulldozing include those adjacent to the border between the Gaza Strip and Israel. It has been clear from the very beginning that Israel is seeking to create a buffer zone. This is being done at the expense of the territory of the Gaza Strip. It is not a question of a buffer zone on Israeli territories or of an equally divided buffer zone. Bulldozing also takes place in areas around the settlements of the Gaza Strip. In addition, buffer zones have also been created in the land adjacent to the bypass roads linking settlements. Agricultural land has been bulldozed. Scores, if not hundreds, of greenhouses have been destroyed. Wells and irrigation networks have also been destroyed, as have warehouses, agricultural equipment and farms."

(d) "Beginning in late September 2000, palm trees, olive trees, almond trees, vegetables, all kinds of trees have been totally uprooted. Bulldozing also includes farmhouses and chicken coops. I am talking about houses in agricultural areas that have been bulldozed. I am talking about the demolition of 147 houses in the areas that have been subjected to bulldozing ... From late September 2000 to the end of May 2001, 13,764 dunums of agricultural and wooded lands have been bulldozed. Agricultural land represents 88.3 per cent of all the land bulldozed, or about 12,155 dunums. Those lands had been planted with vegetables, greenhouses, fruit and palm trees. They uprooted everything except the palm trees, which were not entirely destroyed. We have reports from witnesses from the Rafah area who tell of seeing Israeli forces very gently uprooting palm trees and then carrying them off in trucks to Israel to be planted. All other trees were destroyed, but very old palm trees were carefully uprooted. To be honest, I [illegible] not see that, but we did receive reports from farmers in the Rafah area who saw soldiers with bulldozers in the Rafah area doing so."

(e) "There is a total of almost 167,000 dunums of agricultural land in the Gaza Strip ... The Israeli authorities have already destroyed almost 7.3 per cent of all agricultural land."

(f) "In Gaza alone, 9,216 dunums were bulldozed. A dunum is about 1,000 square metres. This land was utilized by 785 families. The number of people benefiting from this land was 7,830. There is an organized process to destroy property, uproot trees and destroy wells. All of these lands include a number of wells. The destruction of wells does not concern only the 9,216 dunums that were bulldozed. These wells irrigate larger areas, which have also been subject to drought because of the destruction of wells ... regarding the bulldozing of land ... instead of having borderlines; they are now trying to have clear lines. Instead of lines, we are now talking of zones, so the Israelis have destroyed most of the property there, whether it contains houses or just land. They have uprooted all the trees."

## C. Settlements and settlers

46. As the Special Committee in its earlier reports, including its report of the previous session ([illegible]55/453, paras. 62-65), has informed the General Assembly, relations between settlers in the West Bank and Gaza and the Palestinians are of great sensitivity and tension reaching, at times of crises, very high levels of intensity and violence.

47. It is the understanding of the Special Committee that there are approximately 190 settlements in the West Bank and Gaza, inhabited by approximately 360,000 settlers. The settlements are scattered t ighout the occupied territories, but as in the case of the city of Hebron, they are often located close to Palestinian areas of residence.

48. The system of bypass roads, enabling settlers and Israeli authorities to move quickly and safely through the West Bank, now extends to almost 400 kilometres of roads. The bypass roads prevent the expansion of Palestinian villages and the movement of commerce and workers from one Palestinian area to another. The construction of such roads required the taking of Palestinian land, often land under cultivation, and the demolition of homes.

49. Settlements and settlers are seen as being in a privileged position, to the disadvantage of Palestinians with respect to the location of settlements; the effects of settlements on surrounding lands; access to water; travel on bypass roads; and protection by Israeli security forces.

50. Difficulties are compounded considerably because of the violence between settlers and Palestinians, initiated on occasion by the settlers themselves. The principal function of Israeli forces in the West Bank and Gaza, the Special Committee was informed, is the protection of settlements and settlers.

51. Relations between settlers and the Palestinians continue to be a major source of discord.

52. The following are extracts from, or summaries of, passages in statements made to the Special Committee. They concern some of the matters brought to the attention of the Special Committee in the course of its field mission, by witnesses whose reliability the Special Committee has no reason to question.

(a) "The settlers, as is well known, constitute a major problem for all Palestinians. They have committed acts of violence against students ... in addition, Israeli settlers open fire every day against Palestinian civilians. This is particularly the case in the Psagot settlement in Mount Tawil near the city of Al-Bireh. Citizens in that region are exposed to shooting from settlers on a daily basis. On one occasion, such shooters were responsible for taking the life of a Palestinian mother of three children. One of the most frequent violations of settlers against Palestinians involves the occupying army's closure of principal roads linking Palestinian villages that are near Israeli settlements. Those roads are closed to Palestinians and can be used by settlers only. In addition to Israeli checkpoints, settlers have their own checkpoints to prevent Palestinians from moving between towns. That is in addition to the physical assaults faced by Palestinians on those roads. I would like to speak specifically about the city of Hebron, where there are daily clashes between settlers and Palestinians. An incident caused by settlers in the village of Idma near Hebron led to the death of three Palestinian citizens ... Using machine guns, settlers in another car opened fire on the Palestinians."

03:TP000305

(b) "There are settlers who are living on Palestinian land at the expense of the development of the Palestinian economic sectors. What is happening in Hebron, for example, is that the crimes that are

committed by settlers are not dealt with in the same way as if the perpetrators were Palestinians. The shootings, killings and other incidents by settlers, if carried out by Palestinians, would cost them their l' . The major issue is the land, and the Israelis want to confiscate more land at the expense of the Palestinians. So they put Palestinians into enclaves."

(c) "I will compare the case of an Israeli settler who killed an 11-year-old Palestinian boy last year. He was found guilty of the crime of killing the boy, and he received six months' community service for the killing of this Palestinian boy ... by comparison, consider the girl I mentioned earlier ... she was found guilty of planning to stab an Israeli settler. She was found with a knife in her possession but the knife was found in her bag and she had not done anything to the settler. She received one year in prison and a four-and-a-half year suspended sentence for any act she might commit within five years. You can compare these two cases."

(d) "First of all, as a Palestinian with an Israeli passport, I am not allowed to enter Ramallah. Of course, they claim that this is for security reasons and that they are worried about my security. However ... I am allowed to enter the occupied territories, though only those parts that are still under Israeli control, using bypass roads, despite the fact that the risk of my being attacked by settlers is greater than any risk I run by entering Ramallah."

(e) "Since the beginning of the intifada, the settlers in the occupied territories have moved in tandem with the armed forces to carry out systematic attacks against Palestinian civilians; as happened on Thursday, 19 July 2001. At 9.15 that day, a Palestinian family in a village in Galilee was returning to their home. Before reaching a crossroad, an Israeli vehicle containing several settlers fired at the family and killed three persons, a 3-month-old baby and two adults. There was an Israeli checkpoint about 500 metres from where the incident took place. The Israeli vehicle went through it without being checked. An Israeli patrol arrived at the scene within two or three minutes. One of the witnesses told them what had happened and asked them to get in touch with the military checkpoint to stop or pursue the vehicle. The patrol called for an ambulance but received no response. This story illustrates the relationship between Palestinian civilians, the settlers and the Israeli forces who routinely provide security for the settlers."

**D. Use of disproportionate force**

03:TP000306

53. The heightened tensions and great violence that have enveloped Gaza, the West Bank and East Jerusalem since 29 September 2000 have caused death and injury to Palestinians and Israelis alike, with Palestinians suffering by far the greater number of casualties.

54. Statements made to the Special Committee spoke often of the considerable and disproportionate force used by the Israelis: heavy weaponry, e.g. tanks, missile-firing helicopters, on occasion F-16 aircraft, heavy machine guns with long-distance (over a kilometre) range; artillery; bulldozers for destruction of houses and other property; extrajudicial killings of specifically targeted persons that often kill or injure others; absence of adequate recourse to " ;incremental measures of crowd control" and

premature resort to lethal measures; and the seizure by Israeli forces of symbols of national importance to the Palestinians such as Orient House in East Jerusalem.

55. The following are extracts from, or summaries of, passages in statements made to the Special Committee. They concern some of the matters brought to the attention of the Special Committee in the course of its field mission, by witnesses whose reliability the Special Committee has no reason to question.

(a) "I have spoken about the excessive use of force against civilians including the firing of often lethal rubber bullets, artillery shelling and missiles and the use of gunships and gunboats. In a number of well-documented cases, the occupying forces have used what are referred to as fragmentation bombs. I do not know the military name for those weapons, but they are essentially bombs which upon exploding spread fragments 3 centimetres in length. They have been used against civilians on more than one occasion. Most recently, on 9 June, three women from Gaza were killed after such a bomb was dropped on a residential neighbourhood located north of the Netzaren settlement."

(b) "I have seen press reports of how Israel deals with protests by Jewish extremists. I am not talking about Palestinians and Israelis, just Israeli demonstrators whose treatment differs from Palestinians. Even the Palestinian minority in Israel is treated differently. Troops are ordered to use force in an incremental manner. They should first begin without any weapons, by using water cannons, rubber c ted clubs or shields. For example, security troops do not use violence against Jews. However, with regard to cases when the situation concerns Palestinian civilians ... there is an immediate resort to lethal weapons. In addition to rubber coated bullets and live ammunition, tear gas is sometimes used in densely populated areas, and scores of women and children are taken to hospitals."

(c) "They use very heavy weaponry in addition to very heavy and medium-size machine guns. They also use cannons. They bombarded the Gaza Strip and many other cities in the West Bank using Apache helicopters and F-16 jets. They bombed Gaza City with F-16 jets. They bombed Nablus with F-16 jets. This is excessive force ... They also bombarded the Gaza Strip using rockets. I believe they have rocket bases along the northern and eastern borders of the Gaza Strip. They have often used those borders to shell the Gaza Strip. They are very destructive."

03:TP000307

(d) "At times, thousands of Palestinians attended demonstrations at which they were fired upon. In addition, from the very early days of the Al-Aqsa Intifada, it was clear that there was indiscriminate firing on the marchers that targeted the upper part of the body. In fact, most injuries were to the chest, abdomen, shoulders, neck and head. This led to an increase in civilian Palestinian fatalities. By the end of 2000, the total number of Palestinians killed by the fire of the Israeli occupation forces was 309."

(e) "As for the destruction and poverty, it is not only a matter of families being forced to leave because r houses have been destroyed; many families were forced to leave their houses because it was too dangerous to live there. In Rafah, for example, not only were houses demolished in the border area, but families were living in the crossfire. That had an effect on the lives of the members of those families."

(f) "The camp that is targeted directly by the Israeli occupation forces is the Rafah camp. It is located on th Palestinian side on the border with Egypt ... regarding the bombardment, up until two or three months ago, the Israelis targeted the police and Fatah buildings. Fatah is the mainstream of the PLO and it has been targeted by the Israelis. Usually the Israelis used F-16s and Apaches; they also undertook bombardments from the sea. They also used tanks. For example, the borders at Rafah were targeted by tanks, but in a very selective way. The police stations were targeted by Apaches or F-16s and also by ground-to-ground missiles. Some areas were targeted inside the Gaza Strip from Israeli territory near Beit Hanun to the north of Gaza. In many instances civilian houses were also affected, whether directly or indirectly, by Israeli bombardment."

(g) "I think that the pattern of resistance can change and it has changed over the months. It started as civilians, crowds, a popular movement, but now it is more without the emphasis on these civilians — big crowds marching to Israeli checkpoints with the large numbers of casualties that we used to witness. Now it is more about shooting encounters between Israelis and Palestinians. Of course, the Israelis are more powerful and better equipped. Palestinians have light weapons. But that is not the point really. The point is that the Palestinians, whether in this way or in other ways, want the struggle to continue until the occupation ends. The Israelis with these kinds of responses — what we say is that Israeli's responses should be governed by international law. That is one thing: the Fourth Geneva Convention governs the conduct of occupiers versus the occupied, who are mainly civilians. Scores of Palestinians resort to armed struggle, to the use of firearms: that does not change the fact that Palestinians are civilians and should be protected. You cannot use F-16 planes to bomb facilities inside cities. You cannot have this policy of extrajudicial killings."

(h) "As I said, the ambulance driven by Bassan Al Baisie was coming to the assistance of the child and his father. As soon as Mr. Al Baisie arrived on the spot, intense gunfire was aimed at him, at the child and at the child's father, and he was hit in the chest. Another ambulance which was in the vicinity then arrived to evacuate Bassan Al Baisie, the child, and the child's father. It too encountered intense gunfire and it was only with difficulty that the martyr Bassan Al Baisie and the martyr and the martyr child Mohamad Al-Durra were removed. As the child's father was carried off by those who had come to help him, he was struck by further gunfire. This is based on testimony from those who witnessed the evacuation."

(i) "Sometimes I am afraid of such actions as stone-throwing. Stones are thrown when there are demonstrations, and the soldiers shoot. Do not distinguish between those who are throwing stones and the people who are walking nearby."

**E. Method of arrest, administrative detention, methods of interrogation, visits from family and relatives, and conditions of imprisonment**

03:TP000308

... In its earlier reports to the General Assembly, including its report at the previous session (A/55/453, paras. 73-95), the Special Committee has sought to convey to the Assembly the concern that the practices of Israeli authorities with respect to the Palestinians of the occupied territories on such matters

as method of arrest, administrative detention, methods of interrogation, access to family and lawyers, and conditions of imprisonment were not in accord with human rights requirements.

57. Since 29 September 2000 and in the periods of heightened tensions thereafter, the practices of the Israeli authorities with respect to the Palestinians of the occupied territories have continued to be very severe and, in the opinion of the Special Committee, not in accord with human rights requirements.

58. The following are extracts from, or summaries of, passages in statements made to the Special Committee. They concern some of the matters brought to the attention of the Special Committee in the course of its field mission, by witnesses whose reliability the Special Committee has no reason to question.

**Method of arrest**

59. A number of witnesses spoke of the manner in which children are arrested on suspicion of involvement in the throwing of stones.

(a) "The purpose of the Israeli process of interrogation is to extract confessions from children ... in 1981 a military order was passed that allowed people to be sentenced on the basis of a confession by someone else; there did not need to be direct evidence from the Court. If someone else said this person did such a [illegible]e, he could be sentenced. The purpose of the interrogation is to extract a confession so that other children can be arrested and interrogated. So if someone is arrested at his home at night, it may be because someone else, usually under duress, mentioned his name in a signed confession, a confession that is often written in Hebrew, a language that the person signing does not understand. He may have said this person, this person, this person also threw stones with me, then the Police go to the houses of those people whose names appear in the confession and arrest them. It should also be pointed out that there are no warrants for these arrests and they just go and arrest them."

(b) "Most of the children were arrested at night, not at the site of the incident itself. I would say that 90 per cent of them were arrested in their houses, between 3 a.m. and 5 a.m., by soldiers. When they are taken into custody, the procedure goes like this for 100 per cent of them: a jeep full of soldiers comes to the house; they knock on the door as though a bomb had hit; they get inside the house ... they damage everything in the house; they beat everyone they see: the whole family; they take the kid from his bed — a 14-year-old; I have seen such small kids that you would never believe that they could ever get arrested in any country in the world; they are taken to the jeep with their hands cuffed behind their backs; they are put on the edge of the jeep so that they get scared and are frightened all the way to the prison. They put a black bag on their heads until they get to the police station."

03:TP000309

(c) "I have heard stories from kids, which have been confirmed by social workers in court statements, [illegible] these kids are taken to different places outside the cities and mistreated ... I have a case of a 14-year-old kid ... he was taken to a garage outside the city with a black bag on his head. He was asked to move his hands and put them on the table. And they asked a friend he was arrested with to beat his hands with

stones. The other guy refused, of course, and they were both asked to put their hands on the table and they were beaten by soldiers on their hands. They were scarred all over. The second day I met them in c ;, we tried to convince the judges that these guys had been beaten; that is one reason under Israeli law, why they should be acquitted. That reason is enough under Israeli law. The police said, 'We do not know where this comes from. They probably got scars from stones which their friends threw at them at the time of the incident', even though these kids were arrested a few days later. So they were put in prison because of an absolutely wrongful decision of a high court of appea l judge in October that anyone older than 12 years old who is arrested for throwing stones ... until his hearing is complete. So these kids who are accused of throwing stones have already stayed in prison for 4 to 6 months, so if they are found innocent, they have already spent four months in jail."

(d) "One witness spoke of the process of the storming of houses and the arresting of people in their homes ... There is a lot of intimidation. Citizens have informed us that houses are stormed by large groups of occupation soldiers in military uniforms. Most of these raids take place at dawn. The house, and sometimes the entire neighbourhood in which the person to be arrested lives, is surrounded. Sometimes more than one person is targeted in the same area. So all the houses of those targeted are surrounded by hundreds of soldiers and members of the Israeli Special Forces (under the authority of the Israeli Security Service). In some cases members of the Special Forces wear black masks. The citizens have also informed us that during the storming of houses, there is a deliberate attempt at destruction. Sometimes the contents of houses, including furniture, are destroyed. They also mess up the bedrooms. Sometimes inhabitants, including women and children, are forced to leave at dawn or at 2 a.m. or 3 a.m. l .ybody is woken up and forced out during the inspection. They inspect the house using trained police dogs. Sometimes the detainees are taken out and they use high-intensity lights and the detainee is asked to undress so that they can search him without getting close to him." ;

**Administrative detention**

60. The Special Committee was informed that the practice of administrative detention continues.

(a) "As to administrative detainees, persons are held without trial. They are interrogated ... the interrogation may last for 70 or 80 days without any charge being brought, if the Israelis suspect the detainee. Having been subjected to ... prolonged interrogation ... the detainee is sentenced to administrative detention. He may be held for six months, which can be extended indefinitely. There is no limit to administrative detention. Possibly, after the last four or five three- or six-month extensions, the prisoner may be told that there is a case against him or he may be released after six or seven sixth-month extensions. Some people ... are held for seven years on administrative detention. Others are held for four or five years, their sentence having been extended every six months."

03:TP000310

(b) "As to the question of administrative detainees, we must admit that the number of administrative .inees has diminished. There are only a few administrative detainees. The measures exist, the mechanism is there, but those who are detained today are only from the West Bank or East Jerusalem. There is a review of the detention eight days after the detention takes place. And three months later,

there is a further review ... one of the problems, among others, of administrative detention is that the days of the interrogation are not taken into consideration. If people are interrogated for very long p ds, in most, though not all the cases, the administrative detention will be six months in addition to the interrogation period. And the detention period can be renewed again without the need to give any explanation to the detainee himself or to the lawyer."

**Methods of interrogation**

61. In its report to the General Assembly at the previous session (A/55/453, paras. 86-95), the Special Committee made reference to forms of interrogation that were severe and oppressive and that sought to circumvent the limitations imposed on interrogation methods by the Israeli Supreme Court's decision of 6 September 1999. Paragraph 95 of the previous report of the Special Committee read as follows:

"All witnesses stated that the Court decision is a positive step and that, at first, it appeared to be an attempt to put an end to torture, which was routinely used at the time in Israeli prisons during investigations. But, through the constant follow-up of many cases since the adoption of the Supreme Court decision, they have come to believe that the intelligence agents and investigators are trying somehow to circumvent it and are also concerned that the decision might lead to the enactment of legislation that would allow ... coercive measures during interrogations."

6 A number of witnesses informed the Special Committee that current methods of interrogation, though not carried out in the manner of those prohibited by the Israeli Supreme Court decision of September 1999, are nevertheless oppressive and clearly not in conformity with human rights requirements.

(a) "We had a big success in September 1999 with the Supreme Court decision against torture and regarding the illegality of the habits of the security services up until that time ... As concerns torture, a Member of Parliament by the name of Rivlin is proposing new legislation that would allow for the torture of political prisoners of terrorist cases as they are called. This bill has not yet passed. Meanwhile, if we consider the general practices of the security services, we can say that the old forms of torture are no longer being used. They have been replaced by lighter measures, such as preventing people from sleeping for long and unreasonable lengths of time. People are forced to sit on a chair, not the small chair as before, but a regular chair. Again, these people are tied in painful positions, not as they used to be, but in less painful positions. People are still blindfolded for many hours while awaiting interrogation. And two major things are being used today more than before. One is the prevention of any contact with the outside world. In particular, lawyers are not able to see a prisoner in most cases until the interrogation has been concluded ... Besides the prevention of a lawyer from meeting a person under interrogation, there is another very successful method that is being used, which is collaborators ... The collaborators are considered a legal measure. It is legal insofar as it involves posing as normal prisoners osing as high-ranking prisoners who are involved in the security of the prison and so on. Such behaviour is, as I said, totally legal and allowed. It becomes illegal when the collaborators threaten the people under interrogation that if they do not collaborate, if they do not confess to what they have done,

they will be punished by the prisoners themselves and not by the interrogators. By doing so, the collaborators are very effective in extracting information from people."

(b) "One of the forms of interrogation and imprisonment is putting children in rooms with collaborators. The Israeli interrogators often tell the children: 'Look, if you work with us and give a bit of information, we will go easy on you. We will let you go early, and you can eat.' Often things such as access to food or the toilet or being able to go to sleep will be used as a form of bargaining with the child, to persuade the child to work with them and collaborate. Many collaborators were imprisoned when they were children and were recruited by the Israeli security forces while they were imprisoned as children."

**Access to family and lawyers**

63. In its report to the General Assembly at the previous session (A/55/453, para. 76), the Special Committee referred to the substantial restrictions placed on family visits to Palestinians in prison or detention. Such a practice, the Special Committee was informed, continues.

64. One witness spoke at length of such difficulties as follows:

03:TP000312

"I will speak about the banning of family visits. Since 1996, the Israeli authorities have issued instructions that the prisoner or detainee can receive visits only from first-degree relatives: parents, spouse, children and siblings. With regard to children and siblings, there is a designated age for the visit. Those under the age of 16 and above the age of 40 are allowed to visit. Those between 16 and 40 are not allowed to visit. There are further restrictions. There is a special permit that the family is required to obtain in order to visit their children. These permits can be refused. They are given only to first-degree relatives but may be refused on the pretext of security reasons without any convincing explanation being provided except saying that the relative has a security ban ... the family cannot visit their sons in Israeli prisons unless the visit is coordinated with the International Committee of the Red Cross (ICRC). Under the conditions of closure since 29 September 2000, visits have been completely banned, even those coordinated by ICRC, and none of the families have been granted visiting permits. There are difficulties experienced by those relatives who wish to undertake such visits, if such visits are allowed, even with Red Cross approval ... transport in buses to distant areas. Certain prisoners are usually transferred to the south, whereas their family or relatives are from the north. There may be no waiting rooms or waiting spaces in summer or winter. In certain prisons there are no toilets that can be used by family member s. Furthermore, prisoners are not allowed to use the telephone or make calls even in emergency cases such as the death of a relative, of a father or mother ... No prisoner is allowed to make a telephone call himself, but the policemen in the detention centre may contact the relative to inform him that such a person is in the detention centre, but a day or more may go by without the relatives finding out where the father or son is being held at that time ... Furthermore, as a result of the ban on family visits, there is a lack of provisions for the prisoners because 45 per cent of their needs are usually met by family members. They rely on such provisions, which have been reduced because of the lack of family visits. They suffer in other ways too. A prisoner

may be transferred without the family's knowledge ... Those conditions have existed since last year and there have been further restrictions, in particular, a complete ban on family visits. But telephone communication has always been subjected to restrictions ... If they are arrested by the police, there is no problem in visiting them from the first hour they are imprisoned, unless they are in investigation. But if they are arrested by the security or the secret services, those services have a right to refuse lawyers meeting with them for 21 days, then another 21 days, which is normally what happens. But in Jerusalem, most of those arrested are arrested for throwing stones, not like those who are arrested in the West Bank, who are arrested for being connected to a terrorist group; that is a different case."

65. In its report to the General Assembly at the previous session (A/55/453, para. 92), the Special Committee referred to steps taken to prevent or delay lawyers visiting Palestinians in prison or in detention:

"... there has been an escalation in the practice of preventing lawyers from visiting their clients. According to the military orders ... the intelligence services can prevent lawyers' visits for interrupted periods that can range anywhere from 30 to 60 days. ... Hence, the detainee will largely be isolated from the outside world and open to all forms of psychological pressure, because the Supreme Court did not consider psychological pressure to be a form of torture."

66. The restrictions that continue with respect to visits of lawyers was spoken of by one witness as follows:

"Normally a lawyer is allowed to come and visit his clients, but now they say 'oh no, since you are residents of the occupied territories, you cannot freely enter Israel. We can take your clients to be interrogated in Israel but their lawyers cannot come and meet them there'; although at the beginning we tried to fight the fact that people are taken to Israel to be interrogated — this is also in contravention of the Geneva Convention — we lost this battle on a legal basis. Lawyers cannot visit and represent their clients in a free way. Nowadays lawyers have to get a permit. Not every lawyer can get such permission because some of the lawyers have already been declared to be suspected of contacts with illegal organizations. So only a few lawyers would get such permits and the civilian administration would have a list of lawyers who can get these permits. At the beginning of this new intifada, they used to give permits for a whole month. Now they limit the permits to sometimes one day a week and they decide on which day the lawyer can visit his clients. Some time ago they still used to allow lawyers to come with their own cars; now, forget it. You cannot. Your lawyer should walk in between the different border posts and then take a taxi to get to the prison. If you are not allowed to see the client, if he is under this limitation, you will be able to represent the client, without him, before the court that is near the interrogation centre and you would have to go back."

03:TP000313

### *C⌃⌝ditions of imprisonment*

67. In its report to the General Assembly at the previous session (A/55/453, paras. 78-85), the Special Committee made reference to the conditions of imprisonment of Palestinians from the occupied territories. The statements made to the Special Committee in the course of its field mission during the current reporting period appeared to confirm that the imprisonment of Palestinians by Israeli authorities continued to be very harsh, involving or resulting in hunger strikes in protestation by prisoners, inadequate medical treatment provided for prisoners and the difficulties experienced by women prisoners.

68. Speaking about health conditions inside prisons, a witness informed the Special Committee that a state of medical negligence prevails: negligence on the part of the prison administration and management with regard to the Palestinian detainees. A medical care facility is installed in every prison, but doctors are available for consultation once or twice a week. Detainees have also to wait for several months before being transferred to a proper hospital for the necessary medical tests and examinations. Food quality has been described as very poor, to the extent that most of the Palestinian detainees buy their own food.

69. There are currently 10 Palestinian female detainees at Ramla Prison-Female Section. The treatment ( omen detainees is reportedly no different from that of male inmates. Reference was made to the case of Ms. Sana Amer, who was beaten and her hands and legs shackled to a bed from 6 p.m. to 8 a.m. for two days. Another witness informed the Special Committee that some female detainees are kept in the same section as the Israeli Jewish common-law prisoners. They are subjected to attacks and harassment on a daily basis.

70. The following are extracts from, or summaries of, passages in statements made to the Special Committee. They concern some of the matters brought to the attention of the Special Committee in the course of its field mission, by witnesses whose reliability the Special Committee has no reason to question.

(a) "Obtaining permission from Israeli authorities for Palestinian doctors to examine patients requires considerable effort, because there is a list of 45 Arab doctors approved for possible prison visits. However, most of the Arab doctors allowed into the prisons happen to be residents of the West Bank or have West Bank identification and these days such doctors need special permits from the competent authorities to enter Israel. Obtaining such permits may require a wait of several months because, in addition to the permit to enter Israel, a permit is also required from the prisoner patient to allow the doctor to enter prison. Thus, months may go by before obtaining permits."

03:TP000314

(-) "They have repeatedly demanded that some of the outstanding demands be solved, but the prison administration has not responded to those demands. On 23 July, the women prisoners took steps to protest against the prevailing conditions. They refused to participate in recreation and to eat and they

threatened further action if they were not given due representation, access to books, the media, letters and family visits; if they were not allowed to open the doors between cells, to install fans in the rooms, t joy one hour's exercise every day or to have shade in the area of recreation or medical assistance."

(c) "The other prison where minors are detained is at Telmond. At that prison, a section has been prepared for Palestinian children whom we call political or security prisoners because they were convicted in security cases; however, since the beginning of the events of September 2000, Israel has decided that children who throw stones should not be considered as political or security cases but rather as ordinary criminal cases; that is why those minors were grouped with other minors — Arabs and Jews who are criminal prisoners."

(d) "There are several major issues with regard to children in Telmond prison. The first is the imprisonment of children with Israeli juvenile criminal prisoners. There are about 12 Palestinian children who are now being held in the same section as Israeli juvenile criminal prisoners ... what has happened to the children in this section is that they have been harassed both physically and verbally in a severe manner by the Israeli juvenile criminal prisoners. There have been cases of personal belongings being stolen and of children being beaten or cut with razors ... despite all our attempts ... to move the Palestinian children to a special section of the prison, the Israeli Prison Authority has refused to do so ... there have also been many cases of beatings of Palestinian children by Israeli prison guards. In fact, from the beginning of 2001 to July 2001, we have recorded four occurrences of severe beatings of P-'estinian children by Israeli prison guards. The most recent of these occurred on 26 June this year ... L prison guards entered the cells with batons and heavy sticks using tear gas and beat the children ... four children were placed in solitary confinement after being beaten by the prison guards ... Our lawyer attempted to visit Telmond Prison and was denied access. He was told that as a result of a new policy by the Israeli Government it was now impossibl e for Palestinian and Israeli lawyers to visit children who have been sentenced ... There is no way they can receive a lawyer's visit. This is very problematic. Since 26 June, when those beatings occurred in Telmond, we have had no information of the situation inside the prison ... No family visits for children detained in Israeli jails have been permitted since the beginning of the intifada in October 2000."

(e) "... boy children over 16 at the time of their arrest are detained in Megiddo prison, which is run by the Israeli Ministry of Defence. Because they are treated as adults, none of the special requirements of children are met ... there is no way they can continue their education. All prisoners in Megiddo are housed within tents. They are not housed in normal cells. They obviously have a roof, but they are open to the elements: the wind, the rain and the heat in summer and winter ... There is no possibility for family visits. Our lawyer has been prevented from visiting for several weeks now. Because they receive no family visits, they are not able to get items of clothing. So they are forced to swap their items of clothing with criminal prisoners. I should also mention that female political prisoners are together with Israeli criminal prisoners in the same area."

03:TP000315

(f) "It might seem to be better to be a criminal prisoner in Israeli jails because conditions are so comfortable. They can use the phone and go outside. But the Palestinians from the occupied territories cannot get those privileges because they are afraid that Palestinian prisoners will not return to finish

their sentences. So they never get home visits or phone calls because security reasons are cited ... In my opinion, if they are treated inside the jails as criminals, they will lose from the point of view of ideology. T ' will lose the humanity of being people who are resisting. We were so afraid when we heard that kids have been placed with criminals. We are talking of 15- or 16-year-olds who are in prison for the first time. There is heroin inside the jails with criminals and many other things can happen."

(g) "Another problem related to the situation of minors is the severe sentences handed down by the military tribunals. Since the beginning of these events, the severity of these sentences has increased greatly. In the past, we were able to obtain the release, under bond, and with a pledge from the family, of a minor under 14 years of age who had thrown a stone, but under current conditions such a person is sentenced to four to five months in prison."

**F. Overall consequences of such a manner of occupation**

71. The overall consequences — in Gaza, the West Bank and East Jerusalem as a whole — of such a manner of occupation have been catastrophic across the whole spectrum of Palestinian life in the occupied territories.

72. The following are extracts from, or summaries of, passages in statements made to the Special Committee. They concern some of the matters brought to the attention of the Special Committee in the ' se of its field mission, by witnesses whose reliability the Special Committee has no reason to question: a general sense of frustration and desperation that seems to be all-pervasive; disruptions of trade, crippling unemployment, the resulting general poverty; overwhelming difficulties in the provision of health services; generations of children traumatized; and the severe strains on public authorities.

**Pervasive frustration and desperation**

(a) "You have to stand in line with your car, with thousands of cars waiting to be checked and you feel that you are going to explode. I am a philosopher, not a violent person. I am peace-loving. But with these Israeli practices it is very difficult to imagine. Every Palestinian family has been affected. Not only economically. Maybe one member of your family has been killed, imprisoned, wounded or disabled. We are talking about 3 million Palestinians and we are talking about so many dead, so many wounded and so many houses demolished. Every Palestinian family has been affected."

**Disruption of trade, unemployment and poverty**

03:TP000316

(b) "There are also restrictions on the movement of goods. There is currently a limited closure with regard to trade. Such trade takes place, naturally, under the control of Israelis and there are great d' "iculties. For example, workers cannot now enter Israel. Before the events that started last September, ...re were thousands of workers from the Gaza Strip working within Israel. None of them are working now. Palestinian statistics indicate that there were 130,000 Palestinian workers before September 2000. While that figure may be correct, there were also thousands of undocumented Palestinians working in

Israel. About half were from the Gaza Strip and half from the West Bank."

( It should also be taken into account that there has been an effect on all sectors: in agriculture, tourism, industry and trade. Workers from those sectors cannot even find work in the Gaza Strip. This is a result of the closure. I am not an economic expert and I do not have exact unemployment statistics, but there is a very high level of unemployment in the Gaza Strip as a result of the closure."

(d) "A study prepared by the Palestinian Central Bureau of Statistics noted that 14.4 per cent of Palestinian families have lost their source of income since 29 September 2000 and another 47.4 per cent have lost more than half of their income since 29 September 2000 and a total of 64.9 per cent are below the poverty line and the percentage is higher in Gaza than in the West Bank."

(e) "Thus, we are talking of about two thirds of the Palestinians being below the poverty line. Poverty is defined as 1,642 Israeli shekels for a family of six: husband, wife and four children. So we are really talking of $400 divided by 6. Almost two thirds of Palestinians living in the occupied territories fall into that category. There is more poverty in Gaza because Gaza relies more on work in Israel and the number of workers in Israel has been reduced radically. Furthermore, Israel is not transferring the money it owes to the Palestinian National Authority: taxes, deductions, customs, value-added tax, deductions from employees for benefits. These transfers of money used to account for more than 50 per cent of the budget of the Palestinian authority."

(ı) 'The rate of poverty among the Palestinian people has now gone beyond 82 per cent, according to official statistics, and this has sounded an alarm for the Palestinian people.

(g) "The United Nations Relief and Works Agency for Palestine Refugees in the Near East (UNRWA) is the major provider of services to refugees in the Gaza Strip; 75 per cent of the population of Gaza is made up of refugees who benefit from the services of UNRWA ... now, as in the past, UNRWA's work is a relief effort, not a development effort. Given the magnitude of what is happening, neither UNRWA nor the Palestinian Authority is capable of paying the bill. What is happening is very serious and it is having negative repercussions. Over the past 30 years, Gaza has been transformed into a servant of the Israeli economy. The Palestinian workforce in the Gaza Strip has been transformed into a source of cheap labour which can sell itself only in the Israeli labour market ... now that the crossings have been closed, the overwhelming majority of Palestinians have been denied the opportunity to return to their places of work in Israel, even though they work there on a daily basis. UNRWA must now provide for the needs of the Palestinian people. Earlier I mentioned Jabaliya, which is the largest refugee camp. Work in Israel provides the major source of income for those who live there, followed by UNRWA, which is both a relief and a works agency for refugees, although employment has been curtailed to the minimum."

03:TP000317

"Some non-governmental organizations and charities provide relief or aid for refugees. Apart from that, the Palestinian Authority tries to maintain minimum services for the community even though it is facing very severe problems politically and financially. These are affecting not only refugees but the

whole community. There has been a change in the socio-economic situation, and this is reflected in political and social attitudes, which will have consequences at a later stage for Palestinian society."

**Disruption of the provision of health services**

(i) "The closure policy also affects health. Many people have died at military checkpoints in the West Bank ... There are military checkpoints on the principal highways. Palestinians must get around those checkpoints over very rough terrain. They usually encounter checkpoints even on that terrain. Getting to hospital by way of detours might sometimes take 3 to 4 hours, while on the main road it would take only 20 minutes. We have documented cases of births at military checkpoints."

(j) "There are really major difficulties with regard to health, especially in the Gaza Strip. At one point during the intifada the forces of occupation divided the Gaza Strip into three isolated zones: the northern, central and southern. The major hospitals in the Gaza Strip are located in the City of Gaza itself. The hospitals at Khan Younis and Rafah have limited facilities. The central zone, which is a large zone, lacks the sort of medical services available in Gaza City. Beyond the services of clinics and those provided by UNRWA, patients from the central zone must seek treatment in hospitals. Central zone patients must go to the Al-Shifa hospital in Gaza City or to Nasser in Khan Younis. During the closure that possibility does not exist."

(" "There have been many complicated cases in which we have proved, through numerous medical reports, the need for a person to go to Jordan for treatment because the treatment he needs is not available in the West Bank or Gaza or is exorbitantly expensive. Many times the person would be allowed to leave only a day or two before his surgery is to take place ... With regard to Jerusalem and the West Bank, there is no way for anyone to inquire whether he is allowed or not allowed to leave. The only way is to go to the King Hussein Bridge and attempt to cross; there he is either arrested, sent back or allowed to cross. This is a huge problem in making preparations to travel: one wonders whether one would be arrested. There is no way to inquire in advance whether one would be allowed to leave."

(l) "The United Nations High Commissioner for Human Rights spoke in her report about 44 ambulances that were prevented from proceeding by the Israelis. Now the number is about 120. The essence of the practice is about the same. The United Nations High Commissioner saw for herself, she herself says in her report, how ambulances were prevented from reaching the wounded. This is repeated on a daily basis. That is why I say that the Palestinian people cry out, we raise our voices, in Arabic we say 'my heart has been extinguished', because there has been so much suffering, which we have talked about, which the world knows about and has seen our suffering. I warn that we must recognize the reality: our people are desperate and also angry, and not only at the Israelis but also at the United Nations ... My granddaughter, who is three and a half years old, asked, 'Where are you going?' I said, 'To Amman'. I tried to explain to her that I was going to Amman to tell the world about the Israeli shelling of houses children. She immediately said to me, 'Does that mean that all this will come to an end when you come back?'"

03:TP000318

02:008379

(m) "The siege is preventing medical crews and teams from reaching clinics and hospitals, particularly in the outlying, remote, poorer areas. Seventy per cent of the citizens in Palestinian areas now cannot r ve medical treatment in hospitals ... citizens cannot get to the hospitals to receive treatment. ... I can cite examples of patients who died at checkpoints while in ambulances and others who delivered babies at these checkpoints ... many cancer patients or those suffering from chronic diseases such as heart attacks or kidney failure and those who require dialysis have died because they were unable to reach a hospital or to receive the necessary medication. In the northern area, for instance, there is only one hospital which performs dialysis, in Nablus. Thus all the patients in this area, those who live in the surrounding villages — in all approximately 500,000 people — cannot go to Nablus to have dialysis ... Another point is that pregnant women cannot go for regular check-ups. Therefore, since the intifada began, the ratio of home deliveries has increased fivefold. Many heart and diabetes patients die either because of shortages of medicine or because of their inability to get to the hospitals: they take smaller doses instead of taking two tablets a day, they take one ... the purchasing ability is very low. People can barely buy medicines. Fifty per cent of our people have no health insurance. Therefore, since they depend on services provided by NGOs and given our inability to move around, those patients are either not treated or they continue to suffer from diseases or they die, joining the majority."

**Children and education**

(n) "As regards the schools and preventing children from going to school, four schools in the West Bank h[illegible] been converted into military barracks; 41 schools have been closed; 42 students were killed in the [illegible] two months of the intifada. UNRWA in the Gaza Strip stated that, as of 15 November 2000, students had lost 1,100 school days."

(o) "The impact of the seizures and closures touches all aspects of Palestinian life, including education. The adverse effects on education were most pronounced at the outset of the intifada, when education at most schools and universities stopped for almost two months. Violations pertaining to education include the Israeli transformation of four schools in Al-Khader area into military camps."

(p) "Most of the patients suffer from deep depression. Some of these cases suffer from deep aggression. It is naturally the case for children and the effect on the psychological state of children. Among the first words my granddaughter learned was the word '*takh*' (shooting). When she hears any sound, even the sound of television or radio or any high-pitched sound, she immediately says innocently '*takh-takh-takh-takh*'. Sometimes she can sleep only when next to her mother. She cannot sleep by herself. When her mother travelled to Amman for one day some time ago, the child did not sleep for 24 hours until her mother returned, because she hears about murders, disappearances and deaths. Children suffer immensely in Palestine."

03:TP000319

(q) "Unemployment highly affects people's ability to receive medical help and services. This leads to nutrition. It also gives rise to the spread of many diseases, especially among children. This affects the psychological well-being of people. Many children experience so-called psychological disturbances and melancholy; they wet their beds, have horrible dreams, are unable to focus on their studies, have a

terrible fear of any sound, cry for no reason, are afraid of going to school, and so forth. There are many psychological manifestations."

**Disruption of public services**

(r) "There are no hospitals in the villages or in the countryside, and because of the travel restrictions there are problems in the areas of education, worship, health, as well as social problems, involving family visits and relations. But I think work also gets disrupted in most Palestinian institutions. The Palestinian legislative council is not able to meet daily, to hold sessions to legislate. It was elected to legislate and monitor the work of the executive branch, but it is not able to do so because of the travel restrictions. Members from Gaza cannot get to the West Bank, and vice versa. They cannot come from the different cities of the West Bank to the centre in Ramallah ... the Palestinian police and other security services are not functioning as they should. Prison facilities have been attacked by the Israelis. If you go to Ramallah, it is clear that the Palestinian police are more worried about their own safety than about providing services ... they are not able to provide adequate facilities to the Palestinian people ... The overall result of the travel restrictions are as follows: fewer services to Palestinian citizens, less work, less security, less justice."

**G. The continuing difficulty of Palestinians in East Jerusalem**

7^ Israel has pursued a policy of "passive transfer" of Palestinian residents of East Jerusalem since its a...exation of East Jerusalem in 1967. It has sought to establish a demographic balance between Jews and Arabs so that Arabs do not exceed 26 per cent of the population of Jerusalem.

74. It has used various means against Arab East Jerusalem's residents to prevent an increase in the population and has tried to encourage them to leave the city by making their lives in it intolerable.

75. In the pursuit of these policies there has been cooperation between various ministries, notably the Ministry of the Interior, the Jerusalem Municipality and the National Insurance Institute.

**"Centre of life" policy**

76. Under Israeli law the Arab inhabitants of East Jerusalem are treated as permanent residents of the State of Israel. They do not have Israeli citizenship. They have the right to live and work in the State of Israel without needing special permits. They have the right to participate in local elections, but they do not have the right to vote in Israeli elections.

77. East Jerusalem residents also have the right to obtain social benefits in accordance with Israeli law. They must pay taxes, both income taxes and the municipal tax (*arnona* ), plus payments to the National I. .rance Institute.

03:TP000321

78. Since 1995, the Ministry of the Interior has pursued a "centre of life" policy with regard to the Arab

inhabitants of East Jerusalem. In order to retain their status as permanent residents of the State of Israel, they are required to prove that their centre of life is in Jerusalem by submitting documentary evidence, e. g ectricity bills, water bills, rental contracts, certification of payment of *arnona* taxes for the past seven years. The burden of proof is on the individual to prove that his centre of life is in Jerusalem, rather than the burden of proof being on the Ministry of the Interior to prove that the person's centre of life is elsewhere.

79. This policy has resulted in the following actions by the Israeli authorities:

• Confiscation of Jerusalem identity cards of those unable to prove that their centre of life is in Jerusalem;

• Refusal of the Ministry of Interior to register children born to parents, one of whom does not possess a Jerusalem identity card;

• Refusal to register persons for family reunification, in particular, a spouse who does not have a Jerusalem identity card, or obstruction of attempts to register.

80. The "centre of life" policy is not clearly stated. Lawyers do not know exactly what they have to prove in order to convince the Ministry of the Interior that a person's centre of life is in Jerusalem.

81. When the Ministry of the Interior decides to withdraw an identity card, withdrawal can take place without prior notification and without the provision of reasons. In many cases a person's identity card is confiscated on the spot when he goes to the offices of the Ministry of the Interior for some reason or other. Border officials have also confiscated identity cards when a person was away on travel.

82. The offices of the Ministry of the Interior treat Palestinian residents in a degrading way. Residents have no choice but to wait outside the office without shelter for hours, exposed to the elements. Jerusalemites are forced to sleep at the Ministry of the Interior in order to gain access to the building. Many do not succeed in gaining access.

**Family reunification**

83. Individuals who would like to benefit from family reunification cannot live in Jerusalem until the request is granted, unless they obtain a special permit. Decisions by the Ministry of the Interior regarding family reunification can take up to four years. During the interim period, families are forced to remain apart. When a Jerusalem resident applies for family reunification for a family member, he or she has to prove that their centre of life is in Jerusalem.

03:TP000322

8-.. Currently, all requests to the Israelis for family reunification are on hold. This makes people's lives unstable and the situation tense. According to one witness, Palestinians are afraid to attempt to visit their relatives for fear they may not be allowed to return home. In addition, registrations of newborn children