# EXHIBIT C.36

Federal Register / Vol. 67, No. 49 / Wednesday, March 13, 2002 / Rules and Regulations 11233

**DEPARTMENT OF JUSTICE**

**Office of the Attorney General**

**28 CFR Part 104**

**[CIV 104F; AG Order No. 2564–2002]**

**RIN 1105–AA79**

## September 11th Victim Compensation Fund of 2001

**ACTION:** Final rule.

**SUMMARY:** Shortly after the September 11, 2001 terrorist attacks, the President signed the "September 11th Victim Compensation Fund of 2001" (the "Fund") into law as Title IV of Public Law 107–42 ("Air Transportation Safety and System Stabilization Act") (the "Act"). The Act authorizes compensation to any individual (or the personal representative of a deceased individual) who was physically injured or killed as a result of the terrorist-related aircraft crashes on that day. This final rule is the third and final step in the Department of Justice's promulgation of regulations pursuant to § 407 of the Act, following the November 5, 2001 Notice of Inquiry and Advance Notice of Rulemaking ("Notice of Inquiry") and the December 21, 2001 interim final rule.

After reviewing the extensive public comments and meeting with numerous victims, victims' families, and other groups, the Department of Justice, in consultation with the Special Master, is issuing this final rule and associated commentary, which make certain clarifications and changes that are designed to address issues raised by victims, their families, and thousands of other Americans. Specifically, the final rule clarifies, supplements, and amends the interim final rule by, among other things: Clarifying how the Special Master will treat certain "collateral sources," including pensions, to lessen their impact in reducing victims' awards; expressing the Special Master's intention to assist claimants in understanding how certain types of collateral offsets will be treated under the Fund before they decide whether to participate; adjusting the "presumed" economic loss methodology in a manner that should increase potential awards for most claimants; increasing the "presumed" non-economic award in certain cases; clarifying the Special Master's intention that most families of victims who died should receive a minimum of $250,000 from the Fund; and providing certain exceptions to the requirement that injured victims received medical treatment within 24 hours of injury.

**DATES:** This final rule takes effect on March 13, 2002.

**FOR FURTHER INFORMATION CONTACT:** Kenneth L. Zwick, Director, Office of Management Programs, Civil Division, U.S. Department of Justice, Main Building, Room 3140, 950 Pennsylvania Avenue NW., Washington, DC 20530, telephone 888–714–3385 (TDD 888–560–0844).

**SUPPLEMENTARY INFORMATION:**

### Statement by the Special Master

Since December 21, 2001, the date of the promulgation of the interim final rule, I have been engaged in meetings and conversations with September 11 victims, their families, public officials, representatives of private charities and interested concerned citizens of our nation and foreign nations as well. I have listened carefully to both supporters and critics of the interim final rule. I have benefitted tremendously from their input. I believe that, as a direct result of that varying input, this final rule constitutes a product worthy of support by all those interested in a just, fair and efficient compensation program.

No amount of money can right the horrific wrongs done on September 11, 2001. Nor can any of us who has not shared such immediate and irrevocable loss fully understand the depths of suffering that families and victims are enduring.

The September 11th Victim Compensation Fund is a unique federal program created by Congress in recognition of the special tragic circumstances these victims and their families confront. The Fund provides an alternative to the significant risk, expense, and delay inherent in civil litigation by offering victims and their families an opportunity to receive swift, inexpensive, and predictable resolution of claims. The Fund provides an *unprecedented* level of federal financial assistance for surviving victims and the families of deceased victims.

There has been significant public commentary regarding the Fund's proposed structure. The plan has been described as "about as fair as it could possibly be" (*Newsweek*, December 31, 2001), "a good start on the road to recovery" (*The New York Times*, December 23, 2001), "an eminently fair plan" (*The New York Daily News*, December 28, 2001), and a program that "offers speedy and rational compensation" (*The Washington Post*, January 18, 2002). I believe that—when compared to the alternative of a protracted, uncertain lawsuit—the Fund provides a vastly preferable method of assuring fair compensation to all eligible claimants.

The comments submitted to the Department of Justice have been starkly divided regarding the methodologies for calculating awards and, in particular, the "presumed award" charts I released at the same time as the interim final rule. Many have argued that the presumed awards are too high, particularly for victims who had high incomes. Others, in contrast, have argued, for differing reasons, that the high end "presumed awards" should be even higher.

Under the "presumed award" methodology, presumed awards ranged from several hundred thousand dollars to more than $3 million for certain eligible applicants. We have spent considerable time carefully evaluating the comments on the "presumed award" methodology and have made certain adjustments that have the effect of increasing the expected presumed awards. In addition, we have clarified the definition of "collateral source compensation" in a manner that should have an additional, upward impact on awards.

As I have repeatedly stated to the victims and their families, there are many aspects of the Fund that are mandated by Congress and cannot be changed by me or by the Department. Indeed, many of the most controversial aspects of the Fund—such as the requirement that awards be offset by life insurance and other collateral source compensation—are specifically required by Congress. I have no power to usurp or disregard congressional mandates. Rather, my goal has always been to provide the most fair and appropriate compensation within the parameters established by Congress.

Accordingly, within the discretion available, we have made the following clarifications and improvements in the final rule:

• *Definition of Collateral Sources.* As already indicated, the final rule clarifies the definition of "collateral source" compensation by expressly stating that certain government benefits, such as tax relief, contingent Social Security benefits, and contingent workers' compensation benefits (or comparable contingent benefits for government employees), need *not* be treated as collateral source compensation. Also, because we do not believe that Congress intended to treat a victim's savings accounts or similar investments as collateral source compensation, the collateral-source offsets will not include

DEFENDANT'S EXHIBIT NO. 36

PENGAD-Bayonne, N.J.

02:008484

moneys or other investments in victims' 401(k) accounts.

• *Valuation of Collateral-source offsets.* While Congress left us little choice on whether to make certain collateral source deductions, we have slightly more discretion in how to calculate the appropriate deduction. For example, we will adjust the collateral source offset for pensions and life insurance policies to ensure that we are not counting "self-contributions" or premium payments as part of the offset. In addition, for collateral source compensation that claimants will receive through future payments, we will employ present value methodologies to apply a proper discount to the amount actually deducted from a victim's award. This obviously has the effect of reducing offsets and, in turn, increasing awards. Finally, to ensure that the impact of collateral-source offsets is clear to potential claimants *before* they decide whether to participate in the Fund, we will also make available an advisory service to provide additional information for potential applicants as to how the Fund will treat different types of collateral source compensation.

• *Discretion Where the Recipients of Collateral Source Compensation Are Not Beneficiaries of Awards.* In cases where the recipients of collateral source compensation are not beneficiaries of the awards from the Fund, the Special Master will have discretion to exclude such compensation from the collateral source offset where necessary to prevent beneficiaries from having their awards reduced by collateral source compensation they will not receive.

• *Clarification of Definition of Charitable Donations.* The final rule clarifies that benefits from charities disbursing private donations will not be treated as collateral source compensation, even if such charities were created or managed by governmental entities.

• *Increase in Compensation for Non-economic Losses.* The amount of additional presumed non-economic loss compensation for the spouse and each dependent of a deceased victim is doubled from $50,000 to $100,000. This increase is in addition to the $250,000 presumed non-economic loss that is awarded on behalf of all decedents. This means that a family of a victim who was survived by a spouse and two minor children would be entitled to a presumed non-economic award of over half a million dollars *before collateral-source offsets.*

• *Adjustments to the Presumed Economic Loss Methodology.* The Special Master has adjusted his methodology for determining presumed economic losses in several respects that are described herein. As a result, no presumed awards are lower than under the original methodology, and most are higher.

• *Policy Toward Final Awards.* The Act *requires* that collateral source compensation be deducted from all final awards. The Act, therefore, does not permit us to create a mandatory legal rule requiring minimum payouts for all eligible claimants *after* collateral source deductions. Nevertheless, the Special Master is permitted to consider the individual circumstances of each claimant, including the needs of the victim's family. Having personally met with thousands of individual family members, discussing with them their various needs, I anticipate that, when the total needs of deceased victims' families are considered, it will be very rare that a claimant will receive less than $250,000, except in unusual situations where a claimant has already received very substantial compensation from collateral sources.

• *Physical Harm Requirements.* The time period for obtaining medical treatment under the definition of "physical harm" is increased from 24 hours to 72 hours for those victims who were unable to realize immediately the extent of their injuries or for whom appropriate health care was not available on September 11. The Special Master has discretion to extend the time period even further on a case-by-case basis for rescue personnel who otherwise meet this requirement but did not seek or were not able to seek medical treatment within 72 hours.

• *Time for Hearings.* Under the interim final rule, claimants had the option of requesting a formal hearing. This option remains part of the final rule, but we have eliminated the suggested two-hour hearing limitation.

Congress offered little guidance regarding the procedural framework for resolving claims. Nevertheless, we have provided varied procedural options for applicants because we know that one size and one system will not fit all. Victims who so choose may take a simple and direct route, filing forms and accepting payment within a matter of weeks. Other victims may opt for a more detailed and lengthy process, electing for a hearing and exercising their opportunity to present their cases personally in greater detail.

Some have argued that it is essential that each claimant know how much he or she will recover from the Fund before a formal application is submitted, particularly in light of the congressional requirement that each participating claimant waive the right to file a civil lawsuit in connection with the September 11 attacks. Others, however, have argued precisely the opposite—namely, that no formula can account for all of a claimant's individual circumstances, and that recovery should therefore be determined solely on the basis of an individualized hearing.

The Act requires that the award be determined only *after* the application is submitted and *after* a review of the requested economic and other information. It would therefore be inappropriate for me to provide any binding estimates of individual awards before we go through that process. However, to ensure that potential applicants have the ability to estimate roughly the possible ranges of their own recoveries, we have produced tables of presumed awards, and our consultants are available to provide additional guidance on the methodology for valuing different types of pension benefits and other collateral-source offsets. Accordingly, no claimant will be required to waive litigation options before receiving some indication from the Special Master as to how collateral-source offsets will be treated generally.

The efforts that I have taken to inform potential claimants of the likely range of their awards should not be mistaken for some sort of "cap" on awards. Although we still anticipate that awards in excess of $3 or $4 million will be rare, we emphasize again that there are no "caps" under this program. To the contrary, each claimant has the option to ask for a hearing at which he or she may assert additional individualized circumstances and argue that the presumed award methodology is inadequate to resolve his or her particular claim in a fair manner. We will consider all such individual circumstances, including, but not limited to, the financial needs of victims and victims' families.

One final concern should be addressed. I have received during the comment period, and have read in the newspapers, comments from a few American citizens expressing the opinion that the victims and their families are "greedy" in seeking additional compensation. As I have repeatedly stated, both publicly and privately, I believe that such a characterization is unfair. This Fund, and the comments of distressed family members, are not about "greed" but, rather, reflect both the horror of September 11 and the determination of family members to value the life of loved ones suddenly lost on that tragic day. I believe the American people understand this and in no way associate

the efforts of family members to secure compensation with any characterization of "greed." This Fund represents the best spirit and compassion of the American people. I believe that America is unique in creating such a Fund that expresses the compassion, concern and determination of its people in coming to the aid of the victims of September 11.

In sum, we believe the changes adopted in this final rule best ensure that claimants will receive fair and appropriate awards. I remain personally committed to ensuring that every claimant is compensated fairly.

**Background**

This preamble discusses the public comments regarding the interim final rule and the additions and amendments to that rule that have been adopted through this final rulemaking. It does not purport to provide a complete overview of the program or an explanation of all of the many aspects of the interim final rule that remain unchanged. For an explanation of those aspects that remain unchanged, the reader is directed to the Department's interim final rule, published at 66 FR 66274 (Dec. 21, 2001). In addition, more detailed information regarding the program, including a flow chart of applicable procedures, a revised table of the Special Master's estimated or "presumed" awards, claim forms, and answers to frequently asked questions are available on the Victim Compensation Fund website at *www.usdoj.gov/victimcompensation.*

*I. The Statute*

The President signed the "September 11th Victim Compensation Fund of 2001" (the "Fund") into law on September 22, 2001, as Title IV of Public Law 107–42 ("Air Transportation Safety and System Stabilization Act") (the "Act"). The purpose of this Fund is to provide compensation to eligible individuals who were physically injured as a result of the terrorist-related aircraft crashes of September 11, 2001, and compensation through a "personal representative" for those who died as a result of the crashes. Generally, eligibility is limited to: (1) Individuals on the planes at the time of the crashes (other than the terrorists); and (2) individuals present at the World Trade Center, the Pentagon, or the site of the crash in Pennsylvania at the time of the crashes or in the immediate aftermath of the crashes.

The Fund is designed to provide a no-fault alternative to tort litigation for eligible claimants. Congress has determined that others who may have suffered losses as a result of those events (*e.g.*, those without identifiable physical injuries but who lost employment) are not included in this special program. Accordingly, compensation will be provided only for losses caused on account of personal physical injuries or death, even though the victims may have suffered other losses, such as property loss. For this reason, the Department and the Special Master anticipate that all awards from the Fund will be free of federal taxation. *See* I.R.C. section 104(a)(2) (stating that damages received "on account of personal physical injuries or physical sickness" are excludable from gross income for purposes of federal income taxation).

A claimant who files for compensation waives any right to file a civil action (or to be a party to an action) in any federal or state court for damages sustained as a result of the terrorist-related aircraft crashes of September 11, 2001, except for actions to recover collateral source obligations or civil actions against any person who is a knowing participant in any conspiracy to hijack any aircraft or to commit any terrorist act.

Determinations of eligibility and the amount of compensation are to be made by the Special Master. After determining whether an individual is an eligible claimant under the Act, the Special Master is to determine the amount of compensation to be awarded based upon the harm to the claimant, the facts of the claim, and the individual circumstances of the claimant.

The law also provides that the Special Master make a final determination on any claim within 120 days after filing of the claim and, if an award is made, to authorize payment within 20 days thereafter. The determinations of the Special Master are final and not reviewable by any court. Claims with the Fund must be filed on or before December 21, 2003, two years after the effective date of the interim final rule. Payments from the Fund are made by the United States Government, which in turn obtains the right of subrogation to each award.

The Department is promulgating this final rule pursuant to section 407 of the Act, which provides that the Department, in consultation with the Special Master, must promulgate regulations on the following matters:

(1) Forms to be used in submitting claims;

(2) The information to be included in such forms;

(3) Procedures for hearing and the presentation of evidence; and

(4) Procedures to assist an individual in filing and pursuing claims under this title.

In addition, section 407 authorizes, but does not require, the Department to issue additional rules to implement the program. This final rule addresses issues beyond the four specifically required by the Act in order to create a program that will be efficient, will treat similarly situated claimants alike, and will allow potential claimants to make informed decisions regarding whether to file claims with the Fund. Nonetheless, the Department recognizes that it cannot anticipate all of the issues that will arise over the course of the program and that there will inevitably be many difficult issues the Special Master will have to resolve in the course of making determinations on individual claims.

*II. Rulemaking History to Date*

On November 5, 2001, the Department requested public input on a number of issues. *See* 66 FR 55901. The Department noted that, at that time, the Special Master had not yet been appointed, but that it wanted as much public comment as feasible before issuing the regulations by December 21, 2001. On November 26, 2001, the Attorney General appointed Kenneth R. Feinberg as Special Master.

The Department reviewed the more than 800 comments submitted in response to the Department's Notice of Inquiry. On December 21, 2001, the Department promulgated an interim final rule governing the Fund. 66 FR 66274. The interim final rule had immediate force of law and allowed the Special Master to begin accepting applications and providing "Advance Benefits" to certain classes of eligible claimants. In addition, the Rule provided for a 30-day public comment period on the interim final rule.

The Department has received thousands of comments since the December 21 publication of the interim final rule. The Department and the Special Master's Office have reviewed each of these comments, and the Special Master has met personally with more than 1,000 victims, victims' advocates, public officials, and others. As was the case with the interim final rule, the Department and the Special Master have considered all comments in promulgating the final rule.

*III. Comments on the Interim Final Rule*

A. The Creation of the Fund

Congress created the Victim Compensation Fund to compensate those injured or killed in the September 11 terrorist attacks. A number of people

commented on whether or not Congress should have created this program in the first place.

Scores of commenters—recognizing Congress' belief that the airlines were facing imminent bankruptcy and could be effectively judgment proof—described the Fund as a testament to Congressional and taxpayer generosity. Many described the Fund as compassionate and critical to meet the needs of victims of September 11. A few noted that they wish Congress had enacted similar legislation prior to September 11 to care for the needs of those in previous tragedies, and voiced their support for similar programs in the future.

Many others, however, expressed their disapproval of Congress for creating the Fund. For example, several argued that Osama bin Laden and his al Qaeda network are the sole responsible parties and that the government should not expend taxpayer dollars to compensate those who are not in immediate financial need. Several commenters indicated that taxpayer revenue should instead be spent on the homeless and other social programs "that currently lack adequate funding."

Others expressed their regret that victims of other tragedies were not given the same benefit of compensation. These commenters raised several questions, including: Why were not the victims of the Oklahoma City bombing given the same opportunities? What about victims on the U.S.S. Cole? Victims of anthrax? Those who died in the embassy bombings in East Africa? Why are the soldiers in the United States military not included? What about those who volunteered or were drafted to fight in World War II, Vietnam, and other arenas of combat who died defending the United States? What about those who perished in floods, hurricanes, snowstorms, fires, tornados, earthquakes, and other domestic tragedies? What about those persons who were murdered on September 10 and 12?

On the other hand, a number of commenters who indicated that they are eligible to file a claim with the Fund voiced concerns that Congress had inappropriately limited their right to sue potentially liable third parties for their loss. Some of these commenters argued that several companies and agencies "contributed" to the September 11 attacks and "should be held responsible" for their alleged "negligence."

While the Department and the Special Master have reviewed the many comments both in favor and in opposition to the Fund, such comments principally address Congress' legislation. The Department's regulations are designed to implement the Act as written; we cannot rewrite the Act or nullify Congressional intent. The goal in this final rule was simply to create the best and fairest program possible within the requirements set by Congress.

B. Amount of Compensation in the Special Master's Presumed Award Charts

The Act does not specify the amount of the awards for individual claimants. Instead, the Act gives the Special Master discretion to determine the amount of the award "based on the harm to the claimant, the facts of the claim, and the individual circumstances of the claimant." Section 405(b)(1)(B)(ii). The Act further provides that the Special Master's determination "shall be final and not subject to judicial review." Section 405(b)(3).

The Act thus permits the Special Master to determine the amount of awards on a case-by-case basis without giving any guidance to potential claimants regarding the awards that they would likely receive if they waived their rights to litigation and opted into the Fund. Further, such case-by-case determinations would not be subject to judicial review. As a practical matter, of course, the Special Master would need some methodology to ensure a measure of consistency among awards to similarly situated claimants, to give potential claimants some idea of their likely range of awards, and to make the Fund administratively feasible. The Department and the Special Master decided that the interests of potential claimants would be best served by providing, where reasonably possible, information concerning the Special Master's methodology for calculating awards. The Special Master has not imposed any "cap" on awards nor limited claimants from presenting evidence of their individual circumstances.

On December 20, 2001, Kenneth R. Feinberg, the Special Master of the Fund, publicly announced the completion of the interim final rule and, along with the rule, unveiled several charts illustrating in a general way presumptive, non-binding estimated awards available for those eligible claimants filing on behalf of certain deceased victims. Furthermore, in heeding the Attorney General's instruction to help the neediest victims as quickly as possible, Mr. Feinberg also introduced a means by which most eligible claimants could receive immediate, advance benefits in the amount of $50,000 for decedents and $25,000 for most of those with serious physical injuries. The interim final rule permitted claimants either to accept the presumed award or to argue for a greater award either at an individual hearing or, at the claimant's option, on submitted documentation.

While the Special Master's presumed award charts are not part of the Department's rulemaking, the amount of compensation reflected on those charts received more public comments than any other subject. Both the Department and the Special Master's office have considered those comments, just as they have considered the comments regarding the interim final rule.

The comments regarding the presumptive awards varied greatly. While many described the presumptive awards as just and fair, others criticized them as either too high or too low. These disagreements were based in large part upon differing views regarding the purposes of the Fund. Some commenters began with the presumption that the Act's provision of recovery for both economic and non-economic losses, accompanied by the requirement that claimants waive their right to civil litigation, indicated that the amount of compensation under the Fund should mirror past jury awards in airline litigation. Those commenters, for the most part, concluded that the presumed awards were insufficient, particularly for victims with the highest incomes.

Many other commenters took a very different view of the program. These commenters viewed the program not as a replication of the tort system, but instead as a government program designed to assist the victims and their families. Those commenters therefore concluded that there should not be a disparity among the awards based upon the income of the victim. Some vigorously criticized the proposition that the wealthiest victims should receive more from the taxpayers than many of the public safety officers and Pentagon employees would receive. Indeed, some commenters expressed frustration that people are demanding more than the presumed awards, contending that the awards are "more than generous" and that it is inappropriate for the federal government to "make victims' families millionaires with taxpayer money."

Other commenters noted the competing goals of the Act and the complexities of placing dollar figures on a life and determining awards within the prescriptions of the Act. For example, one commenter stated that "[t]here is no way for distribution of

these funds to be totally fair in the eyes of everyone. That's just the way it is." Those commenters, by and large, praised the efforts of the Special Master.

The Department and the Special Master have thoroughly reviewed and considered the differing views regarding the amounts of compensation reflected in the Special Master's presumed award charts and have concluded that no single analogy should dictate the compensation under the Fund. Civil litigation often takes years, with awards varying greatly from one claimant to another, particularly where the incomes of the victims vary. Indeed, under the tort system, while many claimants receive extremely large awards, many others walk away empty-handed due to the requirement that plaintiffs prove fault. In contrast, the Fund is a no-fault alternative to civil litigation designed to provide fair compensation in a matter of months.

At the same time, the Department and the Special Master do not believe that any other federal government program provides a perfect analogy for determining the amount of awards. The Fund is a unique program that provides compensation for both economic and non-economic losses and requires that claimants waive their rights to civil litigation.

The final rule makes some important changes that will increase the amount of compensation in the Special Master's presumed award charts. While the Department and the Special Master believe that the original presumed award charts are entirely sound and are based upon neutral, current data and generally accepted methodologies, the public comments did suggest certain adjustments that we determined were appropriate to implement. Specifically, as described in more detail below, the final rule increases the amount of non-economic loss compensation by providing that the presumed awards will include $100,000, rather than $50,000, for the spouse and each dependent of a deceased victim (in addition to the $250,000 presumed non-economic award for each deceased victim). In connection with publication of this final rule, the Special Master will also announce revised presumed award charts that modify presumed economic loss in a manner that will further increase presumed awards. In addition, as explained below, the definition of collateral source compensation is clarified in a manner that will lead to higher final awards than many in the public had assumed.

Of course, it bears repeating that the Special Master's "presumed award charts" are estimates and do not determine the final award for claimants who request individualized hearings. Rather, the Special Master stands prepared to depart from the presumed awards for individual claims based upon the extraordinary circumstances of the claimants.

*1. Economic Loss*

Although prescribed by the Act, many commenters expressed frustration that a victim's income is considered in calculating economic loss. One commenter stated that "rich people do not deserve more because they are rich." Others believed that the distribution of taxpayer dollars should be equal to all victims regardless of income levels. At least one commenter noted that persons with substantial incomes should not receive higher awards because they are the ones, he argued, with the "financial savvy" to protect their loved ones with life insurance.

Several commenters raised issues with respect to deriving a victim's average annual income from the years 1998–2000 in determining the foundation for calculating economic loss. One commenter noted that only the last year of annual income should be included. Many comments on this subject, however, contended that the three-year period used to obtain the average encompasses the wrong period of years. These commenters suggested the Special Master use the average income from 1999–2001 (rather than 1998–2000), arguing that 2001 is more indicative of a victim's actual earning potential. In addition, several families of victims of the Pentagon attack expressed concern that the description of income in the interim final rule did not account fully for income of employees of the military, which often uses terms of art to describe various forms of compensation.

In response to these suggestions, the interim final rule is amended to allow the Special Master discretion to consider on a prorated basis a victim's income from 2001 as well as published salary scales for government or military employees. In addition, the interim final rule is amended to clarify that military service members' and uniformed service members' compensation includes all of the various components of compensation, including, but not limited to, basic pay (BPY), basic allowance for housing (BAH), basic allowance for subsistence (BAS), federal income tax advantage (TAD), overtime bonuses, differential pay, and longevity pay.

Several comments also raised issues regarding the fact that the Special Master's schedules, tables, and charts only identify presumed economic determinations of economic loss up to a salary level commensurate with the 98th percentile of individual income in the United States. Commenters had mixed reactions to this component of the calculations. Some complained that the program is inappropriately "making millionaires" of victims' families and that the high end presumed awards for earners at the 98th percentile were inordinately high when compared to the average or lower end awards. One commenter stated that the percentile should be lowered because, as currently implemented, it "unfairly discriminates against lower-income families." Other commenters, however, indicated that those same presumed awards that many regarded as too high were actually too low—that the amounts at the 98th percentile failed to fully redress losses for the most successful of all victims (in the top 2% of annual income). These commenters often inaccurately described the 98th percentile as a "cap" on awards.

The final rule does not change the interim final rule's provision that the presumed award charts will address incomes only up to the 98th percentile of income in the United States. Many of the criticisms of that provision were based upon the incorrect assumption that the provision constitutes a "cap" on economic loss recovery. To be absolutely clear: The fact that the "presumed awards" address incomes only up to the 98th percentile does *not* indicate that awards from the Fund are "capped" at that level. In extending the presumed awards only up to the 98th percentile, we merely recognized that calculation of awards for many victims with extraordinary incomes beyond the 98th percentile could be a highly speculative exercise and that, moreover, providing compensation above that level would rarely be necessary to ensure that the financial needs of a claimant are met. Calculation of an award beyond that point using the presumed award methodology without a detailed record could very well produce inappropriate results. Accordingly, we permitted applicants with extraordinary prior earnings to accept awards at the 98th percentile or seek calculation of an award based upon a more detailed record. We also note that the Special Master has express authority under the Act to consider the "individual circumstances of the claimant" in fashioning awards, including the *financial needs* of victims and surviving families in rebuilding their lives. As indicated, the Special Master will strive

to deliver a fair and equitable sum to each eligible claimant.

Many commenters argued for changes in other components of the economic calculations, the effect of which would increase awards. Some commenters stated that the wage growth rates used in the economic calculations are too low. A few commenters noted their opposition to consumption factors being used. Another stated that a person engaged to be married should not be straddled with an unmarried person's consumption rate. Some suggested that the work life estimates are outdated and gender biased. One commenter stated that the promotion and merit assumptions are inconsistent and unfair to particular age groups. Another indicated that taxes should not be deducted from future lost earnings. One commenter stated that economic loss for foreign nationals should be calculated by percentages. She suggested that the Special Master determine the percentile of the foreign national's income in his or her own country (in light of national averages), and calculate the economic loss in light of the income of the corresponding percentage in the United States. Finally, some commenters were worried that victims just out of school (but with degrees or professional licenses in industries offering top-level salaries), and without any income history, would be treated unfairly.

On the other hand, several commenters argued that the calculations were too generous and suggested changes, the effect of which would decrease awards. Some indicated that the wage growth rates are too high. One commenter suggested that personal representatives of single claimants should not be entitled to economic losses because they would not have benefitted from the decedent's economic gain absent death. Another commenter generally agreed with that proposition, but stated that economic loss should be limited to any amount a single deceased victim was obligated or ordered to pay in child support. Other commenters argued that economic awards should not assume that surviving spouses or other family members will never work again. Lastly, one commenter stated that divorce rates should be factored in to the economic loss calculations.

The new presumed award charts released by the Special Master make several changes that are designed to improve the economic loss methodology in light of the comments. While this methodology is not part of the Department's rulemaking, we believe it is helpful to offer this explanation here. These changes will have the overall effect of increasing presumed awards for all claimants. Specifically:

(1) The Special Master's original presumed economic loss methodology relied upon expected work life data from the publication "A Markov Process Model of Work-Life Expectancies Based on Labor Market Activity in 1997–1998," by James Ciecka, Thomas Donley, and Jerry Goldman in the Journal of Legal Economics, Winter 1999–2000. Contrary to the assertions of some commenters, the Special Master did not use data from the 1970s; rather, the study was conducted in 1997 and 1998. Also, the Special Master's original presumed award methodology did not, as some suggested, discriminate against women. Rather, the original methodology relied upon the same assumptions for men and women—the combined average of All Active Males and All Active Females. However, in order to increase awards for all claimants by maximizing the duration of expected foregone earnings and accommodating potential increases by women in the labor force, the Special Master's revised presumed economic loss methodology uses the most generous data available. Specifically, the new methodology uses the All Active Males table for all claimants.

(2) To address concerns about wage growth assumptions and the application of wage growth assumptions to different age groups, the Special Master has adjusted the wage growth assumptions to growth rates that incorporate annual adjustments for inflation, productivity in excess of inflation and life cycle increases using data from the March 2001 Current Population Survey conducted by the Bureau of the Census for the Bureau of Labor Statistics. For life cycle increases, the Special Master is applying the higher age-specific life cycle increases (those for males) for all claimants. For inflation and productivity increases, the Special Master has applied rates of 2 percent and 1 percent, respectively. These rates are consistent with the long-term relationship between wage growth and risk-free interest rates. The net effect of this adjustment is to better represent the expected earnings pattern of the victims over their expected careers as compared to the original methodology, which based anticipated wage growth on the victim's age at death. The original assumptions reflected and indeed emphasized the fact that real increases are typically higher in the earlier stages of a career but was subject to some criticism because it did not adjust the growth continually throughout the work life and thus created differentials at specific ages (particularly, age 31 and age 51). By adopting the revised assumptions, the Special Master adjusts wage growth throughout the duration of the work life, thus reducing the differences between age groups. In addition, although the data indicate that wages actually fall at a certain stage in the career, the Special Master has chosen to assume that peak earnings remain constant and do not decline at any stage in the career.

(3) As with the original presumed award calculations, the Special Master subtracts from the annual projected compensable income the victim's "consumption" as a percentage of after-tax income instead of before-tax income. While the consumption adjustment is standard, the application of the adjustment to after-tax income lowers the amount of the consumption offset below the amount that would typically apply in an economic loss calculation. In addition, as with the initial model, the Special Master's assumptions eliminate some of the components typically used in estimating consumption, thereby further limiting the consumption deduction.

(4) To better reflect typical life cycle earnings expectation, the Special Master has incorporated into the calculation a factor to account for risk of unemployment—again, a common factor in the calculation of future lost earnings.

(5) Finally, the Special Master has elected to use three blended after-tax discount rates to compute the present value of the award and has adjusted the discount rate to reflect current yields on mid-to long-term U.S. Treasury securities. Although this adjustment creates a more complex computational process, the Special Master believes that the effect will be to better reflect the different ages of the victims and the fact that the survivors will receive awards reflecting different assumed future years of work life.

Overall, it is important to understand that the basic factor that affects the economic loss analysis is the victim's own data: each presumed award will be calculated using the victim's data regarding actual compensation, including fringe benefits and forms of compensation and effective tax rate. It is also important to emphasize that the presumed award methodology is intended to facilitate the computation of a large number of awards without the detailed review that might typically be employed in a lengthy economic loss analysis in an individual case. To achieve this objective, the Special Master specifically adopted assumptions that are intended to be favorable to claimants and to enable prompt analysis and payment. Needless

to say, a case specific analysis that took into account the actual consumption and savings rates of a particular individual could require a substantial amount of time and could very well produce *lower* awards in some cases.

It is also relevant to note comments suggesting that the economic loss calculations fail to incorporate sufficiently replacement services loss. The Special Master recognizes that such losses are variable, and thus claimants may present at a hearing individualized data to support a departure from the presumed award.

*2. Non-Economic Losses*

After extensive fact finding, public outreach, and review of public comments, the Special Master and the Department concluded that the most rational and just way to approach the imponderable task of placing a dollar amount on the pain, emotional suffering, loss of enjoyment of life, and mental anguish suffered by the thousands of victims is to assess the non-economic losses for categories of claimants. The regulations, therefore, set forth presumed awards for non-economic losses sustained. The presumed non-economic loss awards for decedents in the interim final rule were $250,000, plus an additional $50,000 for the spouse and each dependent of the deceased victim. Notably, the regulations further provide the option of a hearing for those claimants who feel the presumed awards do not take into account their extraordinary circumstances.

While many lauded the decision not to distinguish (at least presumptively) between the pain and suffering of victims or loved ones, many others voiced their disapproval and urged that all presumptions be removed. Many of the comments addressing this topic focused on the pain and suffering of those left behind, while others referred to the pain and suffering experienced by the victims who lost their lives.

Those in favor of presumed equality pointed out the alleged difficulty in drawing distinctions. For instance, one commenter (speaking of the pain and suffering she has experienced) focused on another commenter's assertions that he deserved more money for pain and suffering because he spoke to his wife (who was in the World Trade Center) after one of the planes hit her building but before she lost her life. She stated that—although she did not talk to her husband prior to his death—she experienced just as much (if not more) pain and suffering because she never had the opportunity to say goodbye to him.

Other commenters, however, expressed their views on how distinctions should be made. For example, one family member (speaking of his son's pain and suffering) proposed the creation of a separate category of pain and suffering that differentiates between those victims who were trapped above the impact area of each World Trade Center building from those who were physically located below it. He believes his son's pain and suffering was greater than those who died below the respective impact zones. Moreover, proposed distinctions were made depending on whether someone was an emergency worker or not. Some argued that emergency workers should receive more by way of non-economic losses because they sacrificed their lives to save victims. In contrast, others argued that emergency workers should receive less because "they knew [the] risks when they pursued their careers in public service."

Further, some argued the presumed awards as a whole were inadequate, while others stated they were too high. Many commenters stated that a victim's life is priceless and suggested that the non-economic presumptions be raised to acknowledge the grief suffered by family members. At least one commenter stated that non-economic losses usually are not available for wrongful death actions and, therefore, should be minimal under the Fund, if recognized at all.

One commenter urged that consequential and incidental damages be included in the non-economic calculations. Another indicated that non-economic losses should not be comparable to military benefits. Finally, at least one commenter argued that those who died without children are being "forgotten" or "penalized."

It is important once again to emphasize that the final rule specifies only the presumed non-economic losses award, and any claimant may request a hearing to present individualized evidence. However, the Special Master believes that it is important to have some measure of consistency among awards, so that he does not have to "play Solomon" by attempting to place a value on human lives on an ad hoc basis.

The selection of a dollar value for non-economic losses is inherently subjective. The Department and the Special Master concluded that an appropriate starting point is the compensation that Congress has made available under existing federal programs for public safety officers who are killed while on duty and members of our military who are killed in the line of duty while serving our nation. *See* 38 U.S.C. 1967 (military personnel); 42 U.S.C. 3796 (Public Safety Officers Benefit Program). That amount ($250,000) is not a cap.

The Department and the Special Master also decided to include an additional component for the spouse and each dependent of deceased victims. The interim final rule set that amount at $50,000 for the spouse and each dependent. After reviewing the public comments and meeting with numerous families of victims, we have decided to double that amount to $100,000 for the spouse and each dependent. Obviously, this will have an upward impact on the amount of the awards for many families of victims. In addition, the definition of "dependents" is modified to include those who meet the IRS' definition of "dependent" even where the victim did not include the individual as a dependent on his or her most recent federal tax return.

C. Collateral Source

In enacting the Fund, Congress required that awards be offset by "collateral source compensation" such as life insurance benefits, employer death benefits, and benefits from other government programs. Under the law, the Special Master must make these offsets. Nevertheless, the law does give the Special Master some measure of discretion regarding charitable donations, and the interim final rule states that such donations will not be deducted from victims' awards.

Many commenters focused on issues that are beyond the Department's authority to regulate. For example, many commenters addressed the appropriateness of reducing final awards by collateral compensation at all. Many commenters suggested that it was inappropriate to reduce awards for the families of victims who planned ahead by purchasing life insurance or other means of ensuring financial compensation to their families. On the other hand, those comments in favor of maintaining collateral-source offsets shared a similar theme; namely, in their opinion, the intent of the Fund was to "make sure that nobody's loss is compounded by sudden destitution," not to enrich those who already have the financial means to make ends meet.

Despite the unequivocal language in the Act that mandates the Special Master deduct life insurance proceeds from awards, a substantial percentage of comments focused on this issue. While the majority of those comments urged that such proceeds not be deducted—a course that only Congress can prescribe—several commenters had

more limited suggestions. For instance, a few commenters suggested that premiums that were contributed by the policyholder should be subtracted from the proceeds in calculating offsets. Other commenters similarly insisted that "cash values" not be included in the deductions.

Additionally, a few commenters were worried that life insurance proceeds that are not paid to a victim's personal representative (or any member of the decedent's current family) would be deducted from the award paid to the personal representative. One commenter proposed that "[l]ife insurance proceeds should only be offset to the extent they were payed to those persons who are the beneficiaries or distributees of the estate of a deceased victim."

There also was a high volume of comments regarding workers' compensation. Several commenters stated they are uncertain whether or not workers' compensation benefits constitute a collateral source under the rule. Many argued that such benefits should not be deducted. Others argued they should. Some suggested that offsetting workers' compensation benefits would be impracticable because several "unknowns" exist. For example, survival benefits, under certain state laws, are forfeited if and when the recipient remarries, and such benefits, they contend, "cannot accurately be reduced to present value." One organization specializing in New York workers' compensation law raised important technical issues and proposed preemptive solutions.

Although the topic of private charitable awards (as a potential component of collateral source) provoked a large percentage of the comments submitted in response to the Department's Notice of Inquiry, scant mention was made of it in response to the interim final rule. At least one commenter insisted that charities be deducted. Others sought further clarification on the scope of the definition of "charity" under the rule.

An important point needs to be made here regarding the differences between the private and federal compensation efforts arising out of the attacks of September 11. Many commenters confused this Victim Compensation Fund, which was created by Congress and is financed by taxpayer revenue, with the private charities (*e.g.*, American Red Cross). For example, some were upset with the Special Master because their private charitable donations were not being divided equally. Others were angry at the Special Master for not disseminating private charitable donations in a more timely fashion. It should be reiterated that the Special Master administering this Fund is not in charge of, nor does he maintain any control over, the private charitable organizations or the money they have collected.

Many comments raised additional collateral source issues. These comments consisted of proposals that, if adopted, would either increase or decrease the amount of offsets. Those wanting decreased offsets argued that pension funds, 401(k) plans, and IRAs essentially are "savings plans" and, therefore, should not be offset. Others contended that collateral offsets should affect only the amount of economic loss, rather than economic and non-economic losses combined. At least one commenter urged that money paid into Social Security on behalf of a victim (over his or her lifetime) be subtracted from any offset. One commenter asked that collateral offsets not be considered over $500,000.

Similarly, some commenters argued that pensions and other forms of retirement are, in fact, compensation (or incentives) for either accepting higher risk (in the case of emergency workers) or lower salaries (in the case of government employees). Others proposed that the regulations include a floor whereby every claimant, notwithstanding the amount of collateral-source offsets, is entitled to receive a considerable amount of compensation. These commenters expressed concern that—after collateral-source offsets—they could end up receiving nothing under the Fund.

The public's questions and comments make it clear that the determination of the appropriate collateral source offset will in many situations involve an individualized case-by-case review. It also appears from questions and from reports in the media that some individuals may be over-valuing the collateral source compensation and therefore assuming a much greater offset than would likely be applicable and that there is a great deal of uncertainty regarding the types of compensation that would be subject to the offset. Indeed, many commenters over-valued their particular collateral source compensation by failing to reduce future periodic payments or benefits to present value, a calculation that in many circumstances has a substantial effect on offset amounts. It is both necessary and appropriate therefore to provide more detailed guidance to the victims and their families so that they can make educated choices regarding participation in the program. The following clarifications regarding the interpretation and application of the collateral source compensation provisions of the Act should allow potential claimants to make more informed choices.

The Act defines collateral sources to mean all such sources, including life insurance, pension funds, death benefit programs, and payments by federal, state, or local governments related to the terrorist-related aircraft crashes of September 11, 2001. The Act and the rule require the Special Master to reduce the total amount of compensation by the amount of the collateral source compensation the claimant (or, in the case of a Personal Representative, the victim's beneficiaries) has received or is entitled to receive as a result of the terrorist-related aircraft crashes. In administering the Fund, consistent with the purpose and terms of the Act, the Special Master will exercise discretion in valuing the appropriate deductions for collateral offsets, including by determining: (1) Whether the particular offsets fall within the definition of collateral sources; (2) whether beneficiaries of the Fund are "entitled" to receive compensation from those collateral sources; (3) whether the collateral source compensation is certain or can be computed with sufficient certainty to enable its deduction while ensuring that the beneficiaries receive the total compensation that is appropriate; and (4) the appropriate amount of the compensation that should be deducted, taking into account the time value of money and contributions made before death by the victim in the nature of investment or savings.

*1. Definition of Collateral Source Compensation Offset*

While it is not possible to define in advance every possible collateral source deduction, a few general illustrations should provide guidance: First, the Special Master has discretion to exclude from consideration life insurance proceeds that are distributed to persons other than the beneficiaries of this Fund; second, the Special Master has discretion to adjust the amount of offsets to exclude premiums or assets that were accumulated by the victim through self-contributions paid into a life insurance program to build up a tax-deferred cash value; third, the Special Master may reduce the amount of the offset for a pension to take account of self-contributions to that plan over the decedent's lifetime.

In addition, the final rule provides that tax benefits received from the federal government as a result of the enactment of the Victims of Terrorism Tax Relief Act of 2001 ( Pub. L. 107–

134) will *not* be treated as collateral source compensation. The Victims of Terrorism Tax Relief Act of 2001 provides income and estate tax relief to the families of victims of terrorism. The law waives the income tax liability of a victim who died in one of the attacks for both the year of the attack and the previous year, and ensures that a minimum benefit of $10,000 is provided to the family of each victim. In addition, the law shields the first $8.5 million of a victim's estate from the federal estate tax. For example, prior to the new law, citizens or residents of the United States who died in the September 11, 2001 terrorist attacks, were able to utilize the maximum state death tax credit allowed for federal estate tax purposes, and had made no prior taxable gifts would have had federal estate tax liabilities as follows: a decedent with a federal taxable estate valued at $2,000,000 would have had a federal estate tax liability of approximately $460,650; a decedent with a federal taxable estate valued at $4,000,000 would have had a federal estate tax liability of approximately $1,339,850; and a decedent with a federal taxable estate valued at $8,000,000 would have had a federal estate tax liability of approximately $3,047,050. As a result of the new law, no estate tax would be due in each case. The Victims of Terrorism Tax Relief Act of 2001 therefore provides very substantial tax relief to many victims, and that relief will *not* be treated as collateral source compensation for purposes of determining awards from the Fund. Nevertheless, substantial income tax rebates could bear on financial need, and therefore could conceivably be considered by the Special Master in the context of a hearing.

*2. Guidelines for Determining Offset Where Benefit Is Uncertain*

Some survivors may be eligible for benefits or payments from certain programs that provide periodic payments subject to adjustment or termination depending on potential future events that cannot be predicted. Examples include Social Security survivor benefits paid to the spouse of a victim. Such benefits are paid only under certain conditions and only for certain periods of time. Further, the benefits are paid periodically over a period of years.

Where the benefits to be paid due to death of the victim are uncertain, unpredictable, or contingent on unknown future events, the amount of the compensation to which the survivor is entitled can be impossible to compute with reasonable certainty. In those instances, the Special Master has discretion not to require a *full* deduction where the amount of the collateral source compensation cannot be determined with reasonable certainty. Thus, for example, the Special Master has determined that workers' compensation benefits that are payable only if the spouse does not re-marry will only be offset to the extent they have already been paid. Likewise, Social Security and similar benefits payable to a surviving spouse only if the spouse does not re-marry or does not earn income above a certain threshold will be offset only to the extent they have already been paid. By contrast, survivor benefits from the Social Security Administration and from the military to children of victims—who generally are entitled by law to periodic payments until they reach the age of 17 or 18—can be reasonably computed and will be offset.

*3. Computation of Collateral Source Offset*

In light of numerous questions regarding the valuation of collateral source compensation, it is important to clarify that in computing the offset for any collateral source that is to be paid over a period of time, the Special Master will only offset the present value of that collateral source compensation. This has the effect of decreasing offsets and, thus, increasing the amount of awards. As an example, in the case of Social Security children's benefits, the Special Master would determine the monthly benefit to the child, multiply that benefit by the number of months remaining until the child reaches age 17 (taking into account possible limits such as maximum family benefits available), include—if consistent with Social Security guidelines—a factor for inflation, and then discount the total to present value to determine the amount of the offset.

*4. Clarification Regarding Charitable Contributions*

The interim final rule provides that charitable donations distributed to beneficiaries of the decedent, to the injured claimant, or to the beneficiaries of the injured claimant by "private charitable entities" are *not* collateral source compensation. § 104.47(b)(2). The interim final rule further provides that the Special Master may determine that funds provided through a private charitable entity constitute, in substance, a payment described in the definition of collateral sources, and therefore *should* be used to offset the award.

Some commenters have expressed concern that the interim final rule's definition could require that privately funded charities would be treated as collateral sources if a governmental entity created or manages the charity. In order to avoid this confusion, the provision is amended to provide that money received from "privately funded charitable entities" do *not* constitute collateral source compensation, subject to the same exception described above.

*5. Availability of Information Regarding Collateral-Source Offsets*

Through this preamble, the Special Master announces his intention to permit applicants to meet with the Special Master or his representative consultants in order to advise such applicants whether particular types of collateral source compensation will fall within the definition of "collateral source compensation," and how such types of collateral sources will be valued. This service is an attempt to deal with an issue raised during the comment period; namely, that potential claimants should not be required to waive their right to sue without having some indication of how particular types of collateral offsets will be treated. The final rule attempts to deal with this problem by striking a careful balance.

The Act does not permit the Special Master to provide claimants any precise estimate of their award prior the claimant opting into the Fund. Indeed, the Special Master and his staff will carefully review the information submitted in any claim before reaching any conclusions regarding an award. Nevertheless, by permitting applicants to inquire as to how the offsets will be calculated for differing types of collateral sources, this provision of the final rule should assist applicants to make a considered election concerning whether to participate in the Fund or not. To be clear, this consultation will focus on broad categories of benefits and will *not* provide applicants with a precise estimate of their eventual award. The determination of an appropriate award requires a deliberative review of a victim's file, including the types of detailed financial records that the application requires. The Special Master cannot, and will not, give a precise computation of an award before a claim is filed. This provision helps to assure claimants a better understanding of their award without requiring the Special Master to engage in individual computation not permitted by the Act.

Finally, some commenters expressed concern that their collateral-source deductions could eliminate their awards altogether. The Act *requires* that

collateral source compensation be deducted from all final awards. The Act, therefore, does not permit us to create a mandatory legal rule requiring minimum payouts for all eligible claimants *after* collateral source deductions. Nevertheless, the Special Master is permitted to consider the individual circumstances of each claimant, including the needs of the victim's family. The Special Master has announced his expectation that, when the total needs of deceased victims' families are considered, it will be very rare that a claimant will receive less than $250,000, except in unusual situations where a claimant has already received very substantial compensation from collateral sources.

D. Eligibility.

The Act requires the Special Master to determine whether a claimant is an "eligible individual." "Eligibility," in turn, is defined by the Act to include: (1) Individuals (other than the terrorists) aboard American Airlines flights 11 and 77 and United Airlines flights 93 and 175; (2) individuals who were "present at" the World Trade Center, the Pentagon, or the site of the aircraft crash at Shanksville, Pennsylvania at the time or in the immediate aftermath of the crashes; or (3) personal representatives of deceased individuals who would otherwise be eligible. Moreover, to be eligible for an award, an individual must have suffered physical harm or death as a result of one of the terrorist-related air crashes. The rule addresses eligibility by defining the terms "present at," "immediate aftermath," "physical harm," and "personal representative."

Many commenters submitted comments regarding eligibility issues. However, although the rule defined several terms important to eligibility requirements, the majority of comments concerning this topic discussed the scope of the terms "physical harm" and "personal representative."

*1. Physical Harm*

To be eligible for compensation under the Fund, victims who did not lose their lives in the terrorist attacks of September 11 must demonstrate that they suffered physical harm. "Physical harm" is defined in the interim final rule as "a physical injury to the body that was treated by a medical professional within 24 hours of the injury having been sustained or within 24 hours of rescue." Additionally, such injury must have: (i) Required hospitalization as an in-patient for at least 24 hours; *or* (ii) caused, either temporarily or permanently, partial or total physical disability, incapacity or disfigurement.

The Act does not extend eligibility to those who suffered emotional distress without physical injury. A few commenters therefore urged that the Act be rewritten to include such harm, or that regulations be drafted to interpret emotional distress as a physical injury. At least one commenter stated that those suffering from post-traumatic stress disorder should be eligible under the Fund. Another lauded the program for its restrictions on eligibility based on physical injury.

Several commenters stated that the rule's definition of "physical harm" strikes an appropriate balance between compensating victims and preventing fraud or abuse. A few, however, indicated they were severely injured in the immediate aftermath of the terrorist attacks, yet would not be eligible for the Fund because they were not "treated by a medical professional within 24 hours of the injury having been sustained." These commenters urged that the rule be adjusted to allow a longer period of time for treatment by a medical professional. At least one commenter indicated that—despite being seriously injured—he spent more than 24 hours trying to locate his family members and friends who worked in the World Trade Center. Another commenter described how many individuals with serious physical injuries either were reluctant to seek immediate treatment or were persuaded not to seek treatment in the 24 hours following the attacks in order to allow physicians to care for those suffering potentially life-threatening injuries.

The final rule expands the time period in which victims must have obtained medical treatment from 24 hours to 72 hours for those victims who were unable to realize immediately the extent of their injuries or for whom appropriate medical care was not available on September 11. The Special Master has discretion to extend the time period even further for rescue personnel or possibly others who otherwise meet this requirement but did not seek or were not able to seek medical treatment within 72 hours. Of course, the Special Master will continue to require evidence that victims suffered physical injury at the time of, or in the immediate aftermath of, the aircraft crashes, as defined in § 104.2 of this rule.

*2. Personal Representative*

The Act provides that in the case of an individual who is deceased but who otherwise meets the other criteria for eligibility, a claim may be filed by the personal representative of the decedent. In many or most cases the identity of the personal representative will not be in dispute. Where disputes exist, however, at least two issues arise: (1) What are the rules for determining who is the personal representative; and (2) who should apply the rules and resolve the dispute?

As to the first issue, the regulations rely upon state law. With respect to the second issue, the regulations provide that the Special Master is not obligated to arbitrate, litigate, or otherwise resolve disputes as to the identity of the personal representative. The regulations do provide, however, that the disputing parties may agree in writing on a personal representative to act on their behalf—who may seek and accept payment from the Fund—while those disputing parties work to settle their dispute. Further, in appropriate cases, the Special Master may determine an award, but place the payment in escrow until the dispute regarding the personal representative is ultimately resolved.

While several commenters agreed that state law should govern personal representative issues, others did not. Most commenters who were dissatisfied with the rule's reliance upon state law in this area expressed concern that state law determinations would preclude recovery by particular individuals who lost loved ones in the terrorist attacks. Others, however, expressed concerns regarding possible uncertainty and the lack of uniformity among different states' laws. Consequently, several commenters contended that the rule should provide eligibility requirements that displace state law.

One of the topics receiving the most comments was the eligibility of domestic partners. Many comments submitted on behalf of members of Amnesty International urged that there be "equal access to benefits under the Fund for all victims, regardless of sexual orientation or marital status." Members of this organization, and several other individuals, stated that eligibility should be extended to surviving partners of gays and lesbians. Others urged that partners in common law marriages be eligible. Another group of commenters suggested that eligibility should be construed more broadly to include all partners "in long standing stable relationships * * *." In contrast, scores of comments were submitted by those who feel "funds should be limited to spouses and other family members * * * and should not extend to domestic partners, including surviving partners of gays and lesbians."

In addition to fiancees who may be part of a domestic partnership, many other fiancees (and those commenting

on their behalf) similarly expressed frustration they are not (or may not be) eligible under the Fund. Some noted that their state of domicile does not place fiancees in the line of intestate succession. One asked, rhetorically, "Why am I eligible to recover money from certain private charities, but yet am ineligible under the Fund?" On a related note, more than one commenter indicated that ex-spouses should be eligible.

The final rule continues to rely upon state law for the determination of the personal representative. Reliance on state law is necessary in part because those who file for recovery under the Fund waive their rights to recover through litigation, in which state law would determine the identity of the appropriate representatives of the decedent, or the decedent's estate, to bring suit. Thus, if the identity of personal representatives for purposes of this Fund were determined by federal regulation, there could be many situations in which the representative as defined by state law would choose litigation while the personal representative as defined by federal regulation would seek to recover from the Fund. While many have voiced criticisms of some of the potentially applicable state laws, those criticisms are more properly directed toward state officials. It is important to note, however, that state intestacy laws are relevant only in the absence of a valid will. Thus, to the extent that some or all of the award would pass by will, the will may determine the identity of some or all of the beneficiaries.

*3. Other Eligibility Issues*

Many commenters stated they are angry that men and women in the United States armed forces who have died (or may die) fighting terrorism in Afghanistan are not eligible under the Fund. One commenter noted that "military victims bleed and die like everyone else." One commenter argued that more than one claim per family should be allowed under the Act. At least one commenter suggested that the term "dependent" be construed more broadly to include all children, including sons and daughters who have reached the age of majority. Another commenter stated that siblings who lived in the same household of the decedent should be compensated. A few commenters urged that all parents and siblings be compensated, even when state law does not provide for it. Last, one commenter noted that those who are found ineligible to recover from the Fund should not have to waive their rights to sue in a court of law.

Congress explicitly provided that only those who suffered physical harm as a result of the air crashes and the personal representatives of those who were killed as a result of the air crashes are eligible claimants. Congress did not, however, address who could ultimately receive compensation. Indeed, the 120-day statutory deadline for adjudicating claims on the Fund could in many instances preclude the Special Master from fairly determining how best to disburse awards among family members. Because state laws routinely serve that type of function, it makes the most sense that they generally provide the bases for distribution. Thus, issues regarding whether siblings and adult offspring of victims can receive part of the award will generally be determined by reference to state (or relevant foreign) law.

E. Distribution of Awards

The interim final rule allows the Special Master to issue awards in a lump sum to eligible claimants. One commenter implied that the rule was not clear on how funds will be distributed once a lump payment is made to a personal representative. She stated her concern that certain distributees under state law may be left out. One organization stated its concern that absent a regulation creating the option of structured awards, the tax-free status of awards may be compromised. Finally, at least one commenter indicated that the option to create a trust is necessary to prevent beneficiaries from squandering lump sums.

The interim final rule provided that the Special Master has discretion to provide claimants with information regarding annuities or other financial planning devices or to offer structured awards with periodic payments. The Special Master is encouraged to provide information to claimants regarding the availability of annuities and other financial planning devices and services. The Special Master strongly recommends that personal representatives or beneficiaries consider annuities and structured settlements.

It has come to the Department's attention that the classification of awards as "pain and suffering" awards or as "wrongful death" awards will affect the distribution of the awards under the laws of some states. Some, including the judges of New York's Surrogate's Courts, have explained that it would be difficult to determine the appropriate distribution without some guidance from the Special Master regarding the nature of the awards. Therefore, the Special Master has discretion, where appropriate, to specify the amount of the final award that is attributable to economic loss and the amount that is attributable to non-economic loss and other relevant information necessary in order to provide guidance to personal representatives and state courts in determining the proper distribution of awards or in reviewing the distribution plan.

F. Procedural Rules

Certain commenters proposed substantive changes to the interim final rule. A few commenters, however, raised concerns with the procedural framework it envisioned. Most of these commenters criticized the use of presumed awards. Specifically, they contended that presumptive awards should be eliminated altogether, and that all awards made under Fund should be decided primarily on evidence presented at a mandatory hearing. These commenters contended there should exist no rebuttable presumption whatsoever or, in the alternative, surmised that the "extraordinary circumstances" burden was too high to have any practical effect on increasing awards. In order to effectuate these proposed changes, a few commenters proposed that hearings not be limited to two hours. Rather, in their opinion, there should exist an unlimited time period at the hearings to discuss each case and present oral testimony or other evidence. One commenter stated that the rule needs to be clear as to whether or not there is risk of receiving less than the presumed award when someone opts for a hearing under Track B.

The final rule leaves intact the "presumed award" approach, under which claimants may choose to receive the presumed award and seek review if appropriate, or instead proceed directly to an individualized hearing. With regard to the suggestion that the Special Master jettison the presumed awards altogether in favor of a purely individualized, case-by-case adjudication, we do not believe that such a "black box" approach would serve the best interests of the claimants. While the regulations are designed to provide claimants an opportunity to present their individual circumstances, claimants should not waive their rights to litigation without some indication of what they might recover under the Fund.

At the same time, it is important that the Special Master have an opportunity to consider circumstances that are not accounted for in the presumed award charts. The term "extraordinary

02:008494

circumstances" is not intended to signal that there is an unsustainable burden to justify departure from the presumed award. Instead, it reflects the Special Master's sense that the presumed award methodology should be fair and appropriate for a substantial majority of claims. A number of factors could support a determination to depart from the presumed award methodology. For victims who had extremely high incomes (beyond the 98th percentile of individuals in the United States), the Special Master may consider any relevant individual circumstances, including whether the financial needs of those victims' families are being met.

In addition, the final rule explains that there will be no firm time limit for hearings.

**Application of Various Laws and Executive Orders to This Rulemaking**

*Administrative Procedure Act, 5 U.S.C. 553*

This rule provides for compensation to eligible individuals who were physically injured and to the personal representatives of those who were killed as a result of the terrorist-related aircraft crashes of September 11, 2001. On December 21, 2001, the Department published its interim final rule and provided a thirty-day period for public comments.

The Department finds "good cause" for exempting this rule from the provision of the Administrative Procedure Act providing for a delayed effective date. 5 U.S.C. 553(d). Delaying the opportunity for eligible claimants to avail themselves of the final rule's changes to the regulations would be contrary to the public interest. The interim final rule is already in effect, and it is in the public interest to minimize the amount of time during which nonfinal rules are in effect. In addition, potential claimants may prefer to have their claims resolved under the final rule, and it is in the public interest to allow them to file and, if eligible, receive awards as soon as possible.

*Congressional Review Act*

The Administrator of the Office of Information and Regulatory Affairs of the Office of Management and Budget has designated this final rule as a "major rule" as that term is defined by the Congressional Review Act ("CRA"), 5 U.S.C. 801 *et. seq.* Pursuant to section 808(2) of the CRA, the Department finds that "good cause" exists for making this rule effective upon publication because delay would be contrary to the public interest favoring prompt disbursement of benefits.

*Paperwork Reduction Act of 1995*

The Department of Justice (DOJ), Civil Division has submitted the following information collection request to the Office of Management and Budget (OMB) for review and clearance in accordance with the emergency review procedures of the Paperwork Reduction Act of 1995. OMB approval has been requested by March 6. The proposed information collection is published to obtain comments from the public and affected agencies. Two associated information collections, the Registration/Eligibility Form and Application for Emergency Benefits from the Victim Compensation Fund (OMB 1105–0073, SM–001) and the Victim Compensation Fund Objection Form (OMB 1105–0077, SM–002) have already received OMB approval. The Death Compensation Form for the September 11 Victim Compensation Fund (SM–003) and the Personal Injury Compensation Form for the September 11 Victim Compensation Fund (SM–004) are currently under OMB review. If granted, the emergency approval is only valid for 180 days. Comments should be directed to OMB, Office of Information and Regulatory Affairs, Attention: Department of Justice Desk Officer, Washington, D.C. 20530.

During the first 60 days of this same review period, a regular review of this information collection will be undertaken. All comments and suggestions, or questions regarding additional information, including obtaining a copy of the proposed information collection instrument with instructions, should be directed to Office of the Special Master, U.S. Department of Justice, 950 Pennsylvania Avenue, NW., Washington, DC 20530. We request written comments and suggestions from the public and affected agencies concerning the proposed emergency collection of information.

Your comments should address one or more of the following four points:

(1) Evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, e.g., permitting electronic submission of responses.

Overview of This Information Collection

(1) Type of Information Collection: New Collection

(2) Title of the Form/Collection: Death Compensation Form for the September 11 Victim Compensation Fund and Personal Injury Compensation Form for the September 11 Victim Compensation Fund.

(3) Agency form number, if any, and the applicable component of the Department of Justice sponsoring the collection: Form Number: SM–003 (Death Compensation Form) and SM–004 (Injury Compensation Form), Office of the Special Master, Department of Justice.

(4) Affected public who will be asked or required to respond, as well as a brief abstract: Primary: The primary affected public will be individuals who were physically injured and the Personal Representatives of those killed as a result of the terrorist-related aircraft crashes of September 11, 2001. Abstract: Physically injured victims as a result of the terrorist-related attacks of September 11, 2001 will use the Injury Compensation Form and Personal Representatives of those killed as a result of September 11 will use the Death Compensation Form. Both forms will be used to provide information needed to determine eligibility for the program and to calculate compensation awards.

(5) An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond: 5,000 claimants with an average of 15 hours per response.

(6) An estimate of the total public burden (in hours) associated with the collection: 75,000 hours.

If additional information is required contact: Robert B. Briggs, Department Clearance Officer, Information Management and Security Staff, Justice Management Division, United States Department of Justice, 601 D Street NW., Suite 1600, Washington, DC 20004.

*Privacy Act of 1974*

The Department of Justice, Civil Division (CIV) has established a new Privacy Act system of records entitled "September 11th Victim Compensation Fund of 2001 File System," JUSTICE/CIV–008. By law, regulations addressing certain administrative matters for the September 11th Victim Compensation Fund of 2001 were to be issued within

the 90-day period established by Congress. In compliance with that time period, the Privacy Act notice was published on December 21, 2001 at 66 FR 65991, with no routine uses, and was effective on the date published. It is likely that amendments to this notice, including routine uses, will be published at a later date, with the opportunity to comment. In the interim, disclosures necessary to process claims are being made, and will be made, only with the prior written consent of claimants or as otherwise authorized under 5 U.S.C. 552a(b).

*Regulatory Flexibility Act*

These regulations set forth procedures by which the Federal government will award compensation benefits to eligible victims of the September 11, 2001 terrorist attacks. Under 5 U.S.C. 601(6), the term "small entity" does not include the Federal government, the party charged with incurring the costs attendant to the implementation and administration of the Victims Compensation Fund. To the extent that small entities, including small government entities, will be economically affected by the promulgation of these regulations, such effects will likely be minimal. Further, the number of entities that will be affected will, in all probability, fall short of a "substantial number" of small entities. In fact, the Department believes that the promulgation of these rules will play a considerable role in reducing the amount of complex, private litigation, wherein a substantial number of small (and large) entities would undoubtedly be significantly impacted.

Accordingly, the Department has reviewed this rule in accordance with the Regulatory Flexibility Act (5 U.S.C. 605(b)) and by approving it certifies that this rule will not have a significant economic impact on a substantial number of small entities because it provides compensation to eligible individuals who were physically injured as a result of the terrorist-related aircraft crashes of September 11, 2001, and compensation through a "personal representative" for those who were killed as a result of those crashes. This rule provides compensation to individuals, not to entities.

*Unfunded Mandates Reform Act of 1995*

This rule will not result in the expenditure by State, local and tribal governments, in the aggregate, or by the private sector, of $100,000,000 or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

*Executive Order 12866—Regulatory Planning and Review*

This regulation has been drafted and reviewed in accordance with Executive Order 12866, "Regulatory Planning and Review," section 1(b), Principles of Regulation. The Department of Justice has determined that this rule is a "significant regulatory action" under Executive Order 12866, section 3(f), Regulatory Planning and Review, and accordingly this rule has been reviewed by the Office of Management and Budget.

*Executive Order 13132—Federalism*

This regulation will not have substantial direct effects on the States, on the relationship between the national government and the States, or on distribution of power and responsibilities among the various levels of government. Therefore, in accordance with Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a Federalism Assessment. However, the Department of Justice has worked cooperatively with state and local officials in the affected communities in the preparation of this rule. Also, the Department individually notified national associations representing elected officials of the initial Notice of Inquiry and the subsequent interim final rule, and the Department will be taking similar action in connection with the final rule.

**List of Subjects in 28 CFR Part 104**

Disaster assistance, Disability benefits, Terrorism.

Accordingly, for the reasons set forth in the preamble, the interim rule amending Part 104 of chapter I of Title 28 of the Code of Federal Regulations that was published on December 21, 2001 at 66 FR 66274 is adopted as a final rule with the following changes:

## PART 104—SEPTEMBER 11TH VICTIM COMPENSATION FUND OF 2001

1. The authority citation for part 104 continues to read as follows:

**Authority:** Title IV of Pub. L. 107–42, 115 Stat. 230, 49 U.S.C. 40101 note.

2. Section 104.2 is amended by revising paragraph (c)(1) to read as follows:

**§ 104.2 Eligibility definitions and requirements.**

* * * * *

(c) * * *

(1) The term *physical harm* shall mean a physical injury to the body that was treated by a medical professional within 24 hours of the injury having been sustained, or within 24 hours of rescue, or within 72 hours of injury or rescue for those victims who were unable to realize immediately the extent of their injuries or for whom treatment by a medical professional was not available on September 11, or within such time period as the Special Master may determine for rescue personnel who did not or could not obtain treatment by a medical professional within 72 hours; and

* * * * *

3. Section 104.3 is amended by revising paragraphs (a) and (b) to read as follows:

**§ 104.3 Other definitions.**

(a) *Beneficiary.* The term *beneficiary* shall mean a person to whom the Personal Representative shall distribute all or part of the award under § 104.52 of this Part.

(b) *Dependents.* The Special Master shall identify as dependents those persons so identified by the victim on his or her federal tax return for the year 2000 (or those persons who legally could have been identified by the victim on his or her federal tax return for the year 2000) unless:

(1) The claimant demonstrates that a minor child of the victim was born or adopted on or after January 1, 2001;

(2) Another person became a dependent in accordance with then-applicable law on or after January 1, 2001; or

(3) The victim was not required by law to file a federal income tax return for the year 2000.

* * * * *

4. Section 104.6 is revised to read as follows:

**§ 104.6 Amendments to this part.**

Claimants are entitled to have their claims processed in accordance with the provisions of this Part that were in effect at the time that their claims were submitted under § 104.21(d). All claims will be processed in accordance with the current provisions of this Part, unless the claimant has notified the Special Master that he or she has elected to have the claim resolved under the regulations that were in effect at the time that the claim was submitted under § 104.21(d).

5. Section 104.21(d) is revised to read as follows:

**§ 104.21 Filing for compensation.**

* * * * *

(d) *Submission of a claim.* Section 405(c)(3)(B) of the Act provides that upon the submission of a claim under the Fund, the claimant waives the right to file a civil action (or to be a party to an action) in any Federal or State court for damages sustained as a result of the terrorist-related aircraft crashes of September 11, 2001, except for civil actions to recover collateral source obligations and civil actions against any person who is a knowing participant in any conspiracy to hijack any aircraft or commit any terrorist act. A claim shall be deemed submitted for purposes of section 405(c)(3)(B) of the Act when the claim is deemed filed pursuant to § 104.21, regardless of whether any time limits are stayed or tolled.

* * * * *

6. Section 104.33 is amended by revising paragraphs (c) and (g), to read as follows:

**§ 104.33 Hearing.**

* * * * *

(c) *Location and duration of hearings.* The hearings shall, to the extent practicable, be scheduled at times and in locations convenient to the claimant or his or her representative. The hearings shall be limited in length to a time period determined by the Special Master or his designee.

* * * * *

(g) *Determination.* The Special Master shall notify the claimant in writing of the final amount of the award, but need not create or provide any written record of the deliberations that resulted in that determination. There shall be no further review or appeal of the Special Master's determination. In notifying the claimant of the final amount of the award, the Special Master may designate the portions or percentages of the final award that are attributable to economic loss and non-economic loss, respectively, and may provide such other information as appropriate to provide adequate guidance for a court of competent jurisdiction and a personal representative.

7. In Section 104.43, paragraph (a) is amended by:

a. revising the second and third sentences; and

b. adding at the end thereof two new sentences, to read as follows:

**§ 104.43 Determination of presumed economic loss for decedents.**

* * * * *

(a) * * * The Decedent's salary/income in 1998–2000 (or for other years the Special Master deems relevant) shall be evaluated in a manner that the Special Master deems appropriate. The Special Master may, if he deems appropriate, take an average of income figures for 1998–2000, and may also consider income for other periods that he deems appropriate, including published pay scales for victims who were government or military employees. * * * For victims who were members of the armed services or government employees such as firefighters or police officers, the Special Master may consider all forms of compensation (or pay) to which the victim was entitled. For example, military service members' and uniformed service members' compensation includes all of the various components of compensation, including, but not limited to, basic pay (BPY), basic allowance for housing (BAH), basic allowance for subsistence (BAS), federal income tax advantage (TAD), overtime bonuses, differential pay, and longevity pay.

8. Section 104.44, is amended by revising the first sentence to read as follows:

**§ 104.44 Determination of presumed noneconomic losses for decedents.**

The presumed non-economic losses for decedents shall be $250,000 plus an additional $100,000 for the spouse and each dependent of the deceased victim. * * *

9. Section 104.47 is amended by:

a. revising paragraphs (a) and (b)(2); and

b. adding paragraph (b)(3), to read as follows:

**§ 104.47 Collateral sources.**

(a) *Payments that constitute collateral source compensation.* The amount of compensation shall be reduced by all collateral source compensation, including life insurance, pension funds, death benefits programs, and payments by Federal, State, or local governments related to the terrorist-related aircraft crashes of September 11, 2001. In determining the appropriate collateral source offset for future benefit payments, the Special Master may employ an appropriate methodology for determining the present value of such future benefits. In determining the appropriate value of offsets for pension funds, life insurance and similar collateral sources, the Special Master may, as appropriate, reduce the amount of offsets to take account of self-contributions made or premiums paid by the victim during his or her lifetime. In determining the appropriate collateral source offset for future benefit payments that are contingent upon one or more future event(s), the Special Master may reduce such offsets to account for the possibility that the future contingencies may or may not occur. In cases where the recipients of collateral source compensation are not beneficiaries of the awards from the Fund, the Special Master shall have discretion to exclude such compensation from the collateral source offset where necessary to prevent beneficiaries from having their awards reduced by collateral source compensation that they will not receive.

(b) * * *

(2) Charitable donations distributed to the beneficiaries of the decedent, to the injured claimant, or to the beneficiaries of the injured claimant by privately funded charitable entities; provided however, that the Special Master may determine that funds provided to victims or their families through a privately funded charitable entity constitute, in substance, a payment described in paragraph (a) of this section.

(3) Tax benefits received from the Federal government as a result of the enactment of the Victims of Terrorism Tax Relief Act.

10. Section 104.52 is amended by revising the third sentence to read as follows:

**§ 104.52 Distribution of award to decedent's beneficiaries.**

(a) * * * Notwithstanding any other provision of these regulations or any other provision of state law, in the event that the Special Master concludes that the Personal Representative's plan for distribution does not appropriately compensate the victim's spouse, children, or other relatives, the Special Master may direct the Personal Representative to distribute all or part of the award to such spouse, children, or other relatives.

11. Section 104.61(a) is amended by revising the first sentence to read as follows:

**§ 104.61 Limitation on civil actions.**

(a) *General.* Section 405(c)(3)(B) of the Act provides that upon the submission of a claim under the Fund, the claimant waives the right to file a civil action (or be a party to an action) in any Federal or State court for damages sustained as a result of the terrorist-related aircraft crashes of September 11, 2001, except that this limitation does not apply to recover collateral source obligations, or to a civil action against any person who is a knowing participant in any conspiracy to hijack any aircraft or commit any terrorist act. * * *

* * * * *

Dated: March 7, 2002.
John Ashcroft,
*Attorney General.*
[FR Doc. 02–5923 Filed 3–12–02; 8:45 am]
BILLING CODE 4410–12–P

ENVIRONMENTAL PROTECTION AGENCY

40 CFR Part 131

[FRL–7157–1]

**Withdrawal of the Federal Designated Use for Shields Gulch in Idaho**

AGENCY: Environmental Protection Agency.

ACTION: Final rule.

SUMMARY: In July 1997, EPA promulgated new use designations for five water bodies in the State of Idaho, including the designation of cold water biota for Shields Gulch. On March 14, 2000 the U.S. District Court for the District of Idaho vacated and remanded that portion of the EPA rule designating Shields Gulch for cold water biota uses to the EPA for further consideration. To conform with the U.S. District Court order, EPA is withdrawing the cold water biota designated use for Shields Gulch.

DATES: This rule is effective March 13, 2002.

ADDRESSES: The administrative record for the Federal use designations for surface waters of Idaho is available for public inspection at EPA Region 10, Office of Water, 1200 Sixth Avenue, Seattle, Washington 98101 during normal business hours of 8 a.m. to 4:30 p.m.

FOR FURTHER INFORMATION CONTACT: Robert Van Brunt at EPA Headquarters, Office of Water (4305), 1200 Pennsylvania Ave NW., Washington, DC 20460 (tel: 202–260–2630, fax 202–260–9830) or e-mail *vanbrunt.robert@epa.gov* or Lisa Macchio at EPA Region 10, Office of Water, 1200 Sixth Avenue, Seattle, Washington 98101 (tel: 206–553–1834, fax 206–553–0165) or e-mail *macchio.lisa@epa.gov.*

SUPPLEMENTARY INFORMATION:

**Potentially Affected Entities**

Citizens concerned with water quality in Idaho may be interested in this rulemaking. Entities discharging pollutants to Shields Gulch, its tributaries, and waters they flow into could be affected by this rulemaking since water quality standards are used in determining NPDES permit limits. Currently, we are not aware of any entities discharging pollutants to Shields Gulch, however, potentially affected categories and entities could include:

| Category | Examples of potentially affected entities |
|---|---|
| Industry | Industries discharging pollutants to Shields Gulch, its tributaries, and waters they flow into. |
| Federal, State, Tribal or local governments | Publicly-owned treatment works discharging pollutants to Shields Gulch, its tributaries, and waters they flow into. |

This table is not intended to be exhaustive, but rather provides a guide for readers regarding entities likely to be potentially affected by this action. This table lists the types of entities that EPA is now aware could potentially be affected by this action. Other types of entities not listed in the table could also be affected. If you have any questions regarding the applicability of this action to a particular entity, consult Lisa Macchio, listed in the preceding FOR FURTHER INFORMATION CONTACT section.

**Background**

On July 31, 1997, pursuant to section 303(c) of the Clean Water Act (CWA), EPA promulgated cold water biota as a designated beneficial use for several water body segments, including Shields Gulch (PB 148S)—below mining impact. In designating beneficial uses, EPA relied on the rebuttable presumption implicit in the CWA and EPA's regulations at 40 CFR part 131, that in the absence of data to the contrary, "fishable" uses are attainable. EPA concluded that the presumption that fishable uses were attainable had not been rebutted for the water body segments in question.

On March 19, 1999, the Idaho Mining Association challenged EPA's promulgation in the U.S. District Court of Idaho. On March 14, 2000, the Court, while upholding the legality of the rebuttable presumption approach under the CWA, found that EPA was arbitrary and capricious in determining that the presumption of a fishable use had not been rebutted for Shields Gulch. Therefore, the Court ordered that portion of the EPA rule designating Shields Gulch for cold water biota uses vacated and remanded to the EPA for further consideration. To conform with the Court's order, EPA is withdrawing the cold water biota designated use for Shields Gulch. The State has revised its water quality standards since EPA's July 31, 1997, promulgation and now applies the cold water biota use to Shields Gulch as a matter of State law. Therefore, withdrawing the Federal use designation will not result in a change in the level of environmental protection for Shields Gulch.

Section 553 of the Administrative Procedure Act, 5 U.S.C. 553(b)(B), provides that, when an agency for good cause finds that notice and public procedure are impracticable, unnecessary or contrary to the public interest, the agency may issue a rule without providing notice and an opportunity for public comment. EPA has determined that there is good cause for making today's rule final without prior proposal and opportunity for comment because this is a strictly legal issue of the impact of the District Court decision on the July 31, 1997, Federal designated use for Shields Gulch. Thus, notice and public procedure are impracticable. EPA finds that this constitutes good cause under 5 U.S.C. 553(b)(B).

EPA has also determined that good cause exists under section 553(d) of the Administrative Procedure Act to waive the requirement for a 30-day period before the rule becomes effective because this rule relieves a restriction. Therefore, the rule will be effective March 13, 2002.

**Administrative Requirements**

Under Executive Order 12866 (58 FR 51735, October 4, 1993), this action is not a "significant regulatory action" and is therefore not subject to review by the Office of Management and Budget. Because the agency has made a "good cause" finding that this action is not subject to notice-and-comment requirements under the Administrative Procedure Act or any other statute, it is not subject to the regulatory flexibility provisions of the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*), or to sections 202 and 205 of the Unfunded Mandates Reform Act of 1995 (UMRA) (Public Law 104–4). In addition, this action does not significantly or uniquely affect small governments or impose a