# EXHIBIT C.50

## PART 1 OF 5



# FINAL REPORT

## OF
## THE SPECIAL MASTER FOR THE
## SEPTEMBER 11TH
## VICTIM COMPENSATION FUND OF 2001

### VOLUME I



Kenneth R. Feinberg, Esq.
Special Master

Camille S. Biros
Jordana Harris Feldman, Esq.
Deborah E. Greenspan, Esq.
Jacqueline E. Zins, Esq.



DEFENDANT'S EXHIBIT NO. 50

PENGAD-Bayonne, N.J.

02:008501

# TABLE OF CONTENTS

PREFACE ........................................................................................................... iv

INTRODUCTION .............................................................................................. 1

I.     STATUTE AND REGULATIONS ............................................................ 3

       A. Statutory Framework ...................................................................... 3

       B. The Regulations .............................................................................. 4

              1. Overview .................................................................................. 4

              2. Development of the Regulations .............................................. 5
                     a) The Presumed Methodology ............................................ 7
                     b) The Assessment and Deduction of Collateral Source Compensation ...... 9
                     c) Procedures for the Submission and Presentation of Claims ............ 10

              3. Implementation of the Regulations/Policy Guidance ............... 11

              4. Challenges to the Regulations ................................................. 12

II.    IMPLEMENTING THE FUND ................................................................ 14

       A. Outreach ........................................................................................ 14

       B. Process for Submission and Evaluation of Claims ........................ 15

       C. Evaluation of Claims ..................................................................... 18

              1. Eligibility ............................................................................... 18
                     a) Eligibility for Physical Injury Claims ............................. 19
                     b) Eligibility for Claims for Deceased Victims .................... 22
                     c) Appointment of the Personal Representative .................. 24
                     d) Proof of Eligibility of Undocumented Aliens ................ 29

              2. Determination of Awards ....................................................... 30
                     a) Economic Loss – Deceased Victims ................................ 30
                     b) Economic Loss – Physical Injury Victims ....................... 39
                     c) Non-Economic Loss ........................................................ 40

              3. Collateral Offsets ................................................................... 43
                     a) Definition of Collateral Offsets ...................................... 45
                     b) Entitlement ...................................................................... 47
                     c) Contingent or Uncertain Payments .................................. 49
                     d) Appropriate Amount of Deduction .................................. 50
                     e) Effects of Collateral Offset Deductions on Awards for Deceased
                        Victims ............................................................................ 51
                     f) Valuing Foreign Collateral Payments .............................. 52
                     g) Collateral Offsets for Physical Injury Claims ................. 52

       D. Demographics of Deceased and Physical Injury Victims ............. 52

02:008502

1.  Deceased Victims ........................................................................ 52

2.  Injury Victims ............................................................................ 55

E.  Distribution ................................................................................... 56

1.  Distribution Plan Guidelines ..................................................... 57

2.  Protection of the Interests of Minors ........................................ 60

3.  Distribution to Non-U.S. Claimants and Beneficiaries ............. 62

4.  Application of Offsets to Award Distribution ........................... 63

5.  Distribution Hearings ............................................................... 63

F.  Confidentiality and Transparency ................................................. 64

1.  Confidentiality .......................................................................... 64

2.  Transparency ............................................................................ 65

G.  Coordination with Government and Private Entities ..................... 65

1.  Verification of Information from Government and Private Employers ......... 66
    a)  Department of Defense ....................................................... 66
    b)  Department of Labor ........................................................... 66
    c)  New York City Fire Department .......................................... 67
    d)  Port Authority of New York and New Jersey ...................... 67
    e)  Private Employers ............................................................... 67

2.  Verification of Benefits by Government Entities ........................ 68
    a)  Social Security Administration ........................................... 68
    b)  New York State Workers' Compensation Board .................. 68

3.  Investigation of Potential Fraud: Coordination with the FBI and the
    Department of Justice - Office of Inspector General ................... 69

4.  Assistance to Claimants ............................................................ 69
    a)  Establishment of Periodic Payments Program: Coordination with the
        IRS ..................................................................................... 69
    b)  Coordination with the INS .................................................. 70
    c)  Coordination with the State Department and Foreign Consulates ........ 70
    d)  Coordination with The National Center for Victims of Crime ........... 70
    e)  The Role of Attorneys ........................................................ 70

5.  Participation of Hearing Officers from Federal Agencies ........... 72

H.  Administration of Program/Staffing/Costs .................................... 74

1.  Attorney Staff ........................................................................... 74

2.  PricewaterhouseCoopers ........................................................... 75

III.  OBSERVATIONS AND LESSONS LEARNED .................................... 78

A.  The September 11th Victim Compensation Fund of 2001: Sound Public Policy? 79

B.  The September 11th Victim Compensation Fund of 2001: Different Amounts or
    the Same for All? ............................................................................ 80

02:008503

C. The September 11th Victim Compensation Fund of 2001: A Precedent for the Future?................................................................................................................ 83

NOTES ................................................................................................................................ 85

## IV.    STATISTICS

| | | |
|---|---|---|
| Table 1 | Claims for Deceased/Physical Injury Victims by Incident Location | 96 |
| Table 2 | Claims for Deceased Victims by Income Level | 97 |
| Table 3 | Claims for Deceased Victims by Gender and Age | 98 |
| Table 3a | Claims for Physical Injury Victims by Gender and Age | 99 |
| Table 4 | Breakdown of Physical Injury Types | 100 |
| Table 5 | Number of Claims for Deceased Victims by State of Residence | 101 |
| Table 5a | Number of Claims for Physical Injury Victims by State of Residence | 102 |
| Table 6 | Claims for Deceased Victims by Foreign Citizenship or Foreign Residency | 103 |
| Table 6a | Claims for Physical Injury Victims by Foreign Citizenship or Foreign Residency | 104 |
| Table 7 | Claims Awarded by Employment Categories for All Claims | 105 |
| Table 8 | Claims Awarded by Employment Categories for Death/Injury Claims | 106 |
| Table 9 | Awards for Uniformed Workers | 107 |
| Table 10 | Awards for Deceased Victims with Minor Children | 108 |
| Table 11 | General Award Statistics for All Claims | 109 |
| Table 12 | General Award Statistics for Death/Physical Injury | 110 |
| Table 13 | Summary of Hearings for All Claims Received and Processed | 111 |
| Table 14 | Receipt of Claims Timeline | 112 |
| Table 15 | Claims Processing Statistics | 113 |
| Table 16 | Costs Associated with the Administration of the September 11th Victim Compensation Fund | 114 |

## EXHIBITS – VOLUME II

| | |
|---|---|
| Exhibit A | Air Transportation Safety and System Stabilization Act |
| Exhibit B | Final Regulations, September 11th Victim Compensation Fund of 2001 |
| Exhibit C | Compensation Form for Deceased Victims |
| Exhibit D | Compensation Form for Physical Injury Victims |
| Exhibit E | Victim Compensation Fund Frequently Asked Questions |
| Exhibit F | Objection/Statement of Interest Form |
| Exhibit G | Distribution Plan Information |
| Exhibit H | Sample Letter Notifying All Interested Parties of Final Distribution Plan Determination (Approved) |
| Exhibit I | Sample Letter Notifying All Interested Parties of Final Distribution Plan Determination (Not Approved) |
| Exhibit J | Application for Representative Payee |
| Exhibit K | Sample Periodic Payment Agreement |

02:008504

Exhibit L     Award Payment Statistics for Deceased Victims – Substantially
              Complete/Presumed Award Amounts
Exhibit M     Award Payment Statistics for Deceased Victims – General Award
              Statistics and Range of Award Values
Exhibit N     Award Payment Statistics for Physical Injury Victims

02:008505

# PREFACE

In preparing this Report, I personally want to acknowledge the valuable contributions made by hundreds of individuals to the success of the Program. Although it is simply impossible to list the individual names of every person who worked to assure the success of the September 11th Victim Compensation Fund of 2001, I offer a special word of thanks to four skilled individuals who prepared this Report and helped assure the success of the September 11th Victim Compensation Fund. Deborah E. Greenspan, Jacqueline E. Zins, and Jordana Harris Feldman are three brilliant attorneys who exemplify the very best of our legal profession. Camille Biros was instrumental in assisting me in administering and coordinating the entire Program. I thank each of them for a job well done. To each and every individual who exhibited the dedication, commitment and determination to help those in need as a result of the September 11th terrorist attacks, you have my deep thanks and appreciation.

A special word of thanks to the Attorney General of the United States who designated me as Special Master to administer the Fund. His total support and cooperation during the past 33 months, as well as that of the Department of Justice, helped assure the success of the Fund. I extend my personal thanks to the dedicated lawyers and individuals at the Department of Justice who worked with me and my staff in implementing and administering this unique and unprecedented experiment in American democracy.

Kenneth R. Feinberg
Special Master
The September 11th Victim Compensation Fund of 2001

02:008506

## INTRODUCTION

As the Special Master for the September 11th Victim Compensation Fund of 2001 (the "Fund"), I respectfully submit this Report detailing the activities of the Fund. The Report provides an extensive accounting of the operation and administration of the Fund and of the final resolution of all claims. The Fund is a unique Program created in the aftermath of the tragic events of September 11, 2001. It was conceived, implemented and concluded within a 33-month period. I am pleased to report that, in my view, the Fund was an unqualified success: 97% of the families of deceased victims who might otherwise have pursued lawsuits for years have received compensation through the Fund. The Fund provided generously for those directly affected by the attack. In total, the Fund distributed over $7.049 billion to survivors of 2,880 persons killed in the September 11th attacks[1] and to 2,680 individuals who were injured in the attacks or in the rescue efforts conducted thereafter. The average award for families of victims killed in the attacks exceeded $2 million. The average award for injured victims was nearly $400,000. The success of the Fund was directly attributable to the unprecedented cooperation from the legal and financial communities, the judiciary, federal and state agencies, state governments, public and private sector employers, individual citizens, and of course, the victims and their families. I am grateful to all those who contributed tirelessly to the successful operation, administration and conclusion of the Fund.

Nearly every family of an individual killed in the September 11th attacks chose to participate in the Fund. To the extent that participation is a measure of success, the Fund was extraordinarily successful. What factors contributed to this success? In our view, there are five major factors that resulted in this overwhelming acceptance of the Fund as a means of compensation. First, the alternative of litigation presented both uncertainty and delay. Second, the Fund took extraordinary steps to assure that families could obtain detailed information about their likely recovery from the Fund. Third, the Fund took a proactive approach – personally contacting each claimant, ensuring that claimants were able to obtain and present the best information in support of the claim; assisting claimants to obtain helpful information; explaining to claimants information that would assist the Fund in maximizing the computation of economic loss and resolving uncertainties in favor of the claimant. Fourth, the Fund offered in-person informal meetings along with hearings so that claimants could "have their day in court" and explain the magnitude of their loss and their views about the way in which the Fund should treat their particular situation. Fifth, the Fund offered certainty without significant delay, allowing families the option of a type of "closure." Although the Fund's decision to create an accessible, proactive program undoubtedly added to the administrative costs of the program, it proved to be the appropriate choice for the claimants. By giving the claimants the meaningful opportunity to

02:008507

present the strongest claim and by giving claimants access to the Fund's decisionmakers, the Fund empowered claimants. Claimants had a personal stake and involvement in the process. Had the Fund opted to curtail access or failed to offer explanations of the manner in which the Fund would treat each individual's situation, some portion of claimants would likely have been sufficiently uncomfortable or uncertain to commit to the Fund.

This Report is comprised of five parts. Part One of the Report describes the legislation creating the Fund, the development and implementation of the Regulations and basic policy decisions that guided the operation and administration of the Fund. Part Two outlines the substantive guidelines adopted by the Fund to evaluate and pay claims, as well as the administrative process established to accomplish these tasks. Part Three sets forth various issues that I believe should be considered in the event there are any future efforts to establish a similar "compensation program." Part Four sets forth, in chart format, the demographics of the claimant and victim population, the processing statistics and the breakdown of the distribution of awards. Part Five is an appendix containing relevant Fund documents and information that were posted on the Fund's website.

02:008508

# I. STATUTE AND REGULATIONS

## A. Statutory Framework

In the immediate aftermath of the terrorist attacks of September 11, 2001, Congress enacted the Air Transportation Safety and System Stabilization Act (the "Act").[2] That legislation, signed by the President on September 22, 2001, sought "[t]o preserve the continued viability" of the air transportation industry.[3] To that end, the Act's express purpose was to provide financial assistance to an airline industry potentially threatened with collapse as a result of the terrorist attacks and thereby to protect the American economy against the consequences of that collapse.[4]

As part of that legislation, Congress also created the "September 11th Victim Compensation Fund of 2001."[5] The stated purpose of the Fund was "to provide compensation to any individual (or relatives of a deceased individual) who was physically injured or killed as a result of [the September 11th attacks]."[6] In creating this Program, Congress intended, in part, to establish a mechanism that would provide financial security and assistance to the victims of the attacks without the uncertainties, delays and costs of traditional litigation. The principal provisions of the statute are the following:

- The Act establishes the Fund as an administrative alternative to litigation for victims of the terrorist attacks.[7] For persons choosing litigation, the exclusive remedy for damages arising out of the crashes on September 11 is a federal cause of action[8] in the United States District Court for the Southern District of New York.[9] Air carrier liability for compensatory and punitive damages is capped at the limits of liability insurance coverage maintained by the air carrier.[10]

- A Special Master appointed by the Attorney General is to administer the Fund and promulgate any necessary "procedural and substantive rules."[11]

- The Special Master is to determine eligibility to receive compensation from the Fund.[12] Eligible individuals are defined by the Act to include those individuals aboard the flights and individuals present at the World Trade Center, the Pentagon, or the site of the aircraft crash at Shanksville, Pennsylvania at the time, or in the immediate aftermath, of the terrorist-related aircraft crashes who have suffered physical harm or death as a result of the air crashes. In the case of a decedent, the "claimant" is defined as the Personal Representative of the decedent.[13]

- The Special Master is to determine the amount of compensation to which a claimant is entitled based on the harm to the claimant, both

Page 3

02:008509

economic[14] and non-economic,[15] the facts of the claim and the individual circumstances of the claimant.[16] The Special Master is prohibited from considering issues of liability or punitive damages.[17] The Special Master is obligated to deduct from any award, payments the claimant received from certain collateral sources – such as insurance.[18]

- The Act authorizes the appropriation of sums necessary to pay the costs for the administration of the Fund.[19] The Act does not limit either the aggregate amount to be paid for all claims or the amount to be paid to any individual claimant.

- Any claim for compensation must be submitted on a claim form developed by the Special Master.[20] Only one claim may be submitted by an individual or on behalf of a deceased individual.[21] The Special Master is required to complete a review, make a determination, and provide written notice to the claimant, with respect to the matters that were the subject of the claim under review, no more than 120 days after the claim is filed.[22] The Special Master's determination of "the matters that were the subject of the claim" is "final and not subject to judicial review."[23] The Act further requires the Special Master to authorize payment "regarding the amount of compensation due" within 20 days of the date of determination.[24] Claims must be filed no later than "2 years after the date on which Regulations are promulgated."[25]

- The Attorney General appointed Kenneth R. Feinberg as the Special Master on November 26, 2001.

## B. The Regulations

### 1. Overview

The Act required the Department of Justice (the "Department") to issue administrative Regulations within 90 days of the date of enactment. During that 90-day period, the Department and the Special Master solicited public comments and undertook extensive efforts to obtain the views of all interested parties. The Special Master and attorneys working with the Special Master met personally with victims' advocacy groups, individual members of the victims' families, lawyers, employers, government agencies, members of Congress, members of the judiciary, associations, charities, representatives of the military, fire and police departments, and individuals in state governments to solicit views, concerns and comments about the nature of the Program and its administration. In addition, the Special Master and senior attorneys reviewed the thousands of comments submitted to the Department, researched theories of compensation and methodologies for the calculation of economic loss, as

02:008510

well as the various state laws governing wrongful death actions, appointment of Personal Representatives and determination of state law beneficiaries. The supervising attorney in the Special Master's Office (as well as officials at the Department assisting the Fund) met with numerous economists, experts and actuaries, both in the private sector and in the federal government. These individuals provided extensive valuable information on issues related to the determination of future economic loss, evaluation of employer benefits and valuation of insurance and other potential collateral source payments. These meetings, as well as the submissions from various interested parties, were invaluable to the process of developing the regulatory scheme. Each submission was reviewed carefully, and considered in the course of developing the Regulations. The Special Master is grateful to all the individuals who took the time to outline issues, concerns and proposals.

The Department and the Special Master issued Interim Final Regulations on December 21, 2001. The Interim Final Regulations set forth detailed information about the determination of economic and non-economic losses, and the procedures for submitting claims. The Fund also opened its doors on December 21, 2001 - just 14 weeks after the tragedy - by establishing temporary "walk-in" offices in New York and in the Washington, D.C. area, setting up toll-free information telephone lines and providing an "Eligibility Form and Application for Advance Benefits" that permitted claimants to seek immediate emergency compensation.[26] After evaluating 2,687 timely comments to the Interim Final Regulations, the Department and the Special Master issued the Final Regulations on March 13, 2002.[27] At the same time, the Fund published the final compensation forms necessary to enable claimants to submit their claims for full compensation.

## 2. Development of the Regulations

The comments submitted demonstrated divergent views about the purpose and proper implementation of the Act. Various individuals and groups expressed opinions about virtually every component of the Act. Some raised questions about the nature of the compensatory program. Did Congress intend to provide "tort type" compensation or to establish a reparation program? Should the program provide equal compensation to every family or should the compensation vary based on income or other factors? Should the program differentiate between the pain and suffering of different individual victims? Some questioned the scope of the Act. Did Congress intend to cover anyone affected emotionally or psychologically by the attacks? Others expressed concern about the process by which awards would be determined and distributed. Should the Fund conduct evidentiary hearings to determine the harm and loss in each case? How could the Fund determine the appropriate recipients of the award? Still others viewed the Act as a means to "reform" perceived inequities in state legal systems, arguing for example that the Act should provide financial security to individuals – such as domestic partners – who were not entitled under most state laws to obtain compensation based on "wrongful death." Still others viewed the Act as some type of blueprint for "tort reform."

02:008511

In developing the Regulations, the Department and the Special Master were guided by the plain language, structure, and evident purpose of the Act. First, Congress had created a hybrid compensation system that encompassed some but not all elements of tort compensation: the Act required the Special Master to consider such traditional elements of tort compensation as economic and non-economic loss but *precluded* the Special Master from considering issues of liability or punitive damages and *obligated* the Special Master to reduce any awards by payments that the claimant received from certain collateral sources. Second, Congress wanted a system that would *quickly* provide fair compensation to the families of the victims of the September 11th attacks. Congress placed strict time limits on the evaluation of claims, thereby evidencing the intent to avoid a complex, adversarial process that would inevitably delay awards. Third, Congress did not intend to extend compensation to all persons affected by the events of September 11. The statute focused on a narrow group of individuals *physically* harmed or killed at the sites and in the immediate aftermath of the attacks. Finally, the structure and language of the Act and the public nature of the Program demonstrated that, while compensation should vary based on the circumstances of the individual claim, Congress did not intend that claimants should receive widely disparate awards from the Program. The Act charged the Special Master with the obligation to determine an *"appropriate"* award, taking into account the individual circumstances of the claimant, the facts of the claim and the harm to the claimant.

To achieve these purposes, the Department and the Special Master felt it essential to craft a system that would assure fairness and consistency among claimants, both with respect to the process for submitting and evaluating claims and the methodology for determining the appropriate award. The Act mandated not only that each award be determined based on the individual circumstances of the claimant, but also that each award be determined promptly within extraordinarily short time deadlines. Given these two potentially conflicting mandates, the Department and the Special Master determined to establish policies and guidelines that would apply uniformly to the evaluation of all claims, taking into account certain individual factors. The Department and the Special Master further concluded that the award methodology should be designed to assure that families and injured victims were given adequate financial support to provide a "safety net" from which to rebuild their lives, while avoiding widely divergent awards that would be unfair, speculative, or based on questionable theoretical projections. Finally, claimants would need to be kept informed fully about the methodology for computation and other factors that would be evaluated so that they could make an informed decision about whether to submit a claim to the Fund or to pursue litigation.

To achieve these objectives, the Regulations established: (1) guidelines defining eligible claimants; (2) a "presumed award" methodology, providing a uniform set of guidelines for the valuation of economic loss which would be favorable to most victims and yet based on information that claimants should be able to obtain easily; (3)

02:008512

policies for the assessment and deduction of collateral source compensation; and (4) flexible procedures for the submission and presentation of claims.

### a) The Presumed Methodology

The Regulations set forth guidelines for the determination of economic and non-economic loss and directed the Special Master to develop a methodology for computing "presumed" economic and non-economic loss for claims on behalf of deceased victims based on objectively verifiable factors. The Special Master published detailed guidelines explaining the computation methodology and assumptions that would be incorporated into the calculations as well as charts showing computation examples. In order to minimize, as much as possible, the speculative nature of computing future economic loss, the presumed methodology relies on a combination of the victim's own objectively verifiable historical experience with assumptions about likely future events based on publicly available national data. [28] In this manner, the methodology incorporates the individual circumstances of the victim and generally accepted non-speculative assumptions about the future. By recognizing the financial history of the victim through incorporation of individual income data and utilizing favorable assumptions about continuous wage growth and work life, the presumed award loss computations for most deceased victims provide the necessary financial support to the families in an individual tailored manner.

The presumed economic loss methodology computes the victim's future earnings by starting with the victim's earnings history. The Special Master has discretion under the Regulations to select the most appropriate measure of the victim's historical earnings based on the victim's own circumstances. [29] The selected compensation level is then reduced by applicable state and federal taxes. The formula accounts for the fact that some portion of the victim's income is self-consumed and therefore not a measure of the economic loss to the survivors by incorporating a consumption deduction (derived from available national data).

The methodology assumes that the victim's income would grow over time at an average growth rate and would continue through an average work life. Finally, the methodology takes into account the potential for periods of future unemployment by incorporating an unemployment risk factor (based on national average data). The resulting figures are reduced to present value using age adjusted after-tax rates.

The presumed methodology was designed to provide generous awards to the families and to be simple to administer. Claimants did not need to present detailed computations or analyses. Instead, they needed only to supply the Fund with easily obtained data: the victim's historical earnings, the victim's age, the age and status of members of the victim's household, the victim's employment benefits and collateral offset data. The presumed methodology assured that the economic loss calculation for similarly situated victims (*i.e.*, same age, number of dependents and income level) would be consistent.

02:008513

The Regulations provide that the presumed award methodology will be applied only to income levels up to the 98th percentile of individual income in the United States.[30] This limitation was dictated by policy as well as fact. First, the Act was intended to provide fair and appropriate awards based upon families' individual circumstances, needs and resources. (The Special Master is directed to determine an appropriate award, not to calculate the maximum, theoretically possible, future earnings of each victim.) Second, the assumptions applied in the presumed methodology are inappropriate and become extremely speculative and conjectural when applied to incomes above the 98th percentile which are often comprised of a variety of forms of compensation, some of which are variable and volatile and tied to factors other than standard inflation and promotion increases. For victims whose income exceeded the 98th percentile, the Fund calculated a *"presumed"* economic loss using $231,000 as the income level (*i.e.*, the 98th percentile income level in the year 2000).

The Special Master and the Department understood that the presumed award methodology might be inadequate for claimants with extraordinary needs or circumstances. Accordingly, the Regulations provide that claimants who believe that the presumed methodology will not address their individual circumstances can request that the Special Master depart from that methodology. If a claimant established extraordinary circumstances, the Fund had the obligation under the Regulations to evaluate all the individual circumstances of the claim, including the claimant's particular needs and resources and to determine the appropriate award based on factors that might not be reflected in the presumed methodology.[31] Extraordinary, sustainable income above the 98th percentile was one such factor that could, in the Special Master's discretion, be considered.

The treatment of claims involving victims with incomes that exceeded the 98th percentile generated significant discussion and controversy among victims' families. Families and representatives of various employers argued that the Fund was required to assume that such victims would inevitably have continued to earn a high income throughout the standard (or even extended) work life. While those families were willing to have the Special Master consider their needs in continuing a lifestyle supported by a high income, they objected to the Special Master also considering their resources. In addition, families of decedents with incomes at or below the 98th percentile objected to significantly larger awards for families of higher income victims as insulting and demeaning to the memory of their lost family members.

In numerous instances, the Fund departed from the presumed methodology when the victim's earnings history revealed consistent earnings in excess of the 98th percentile, the earnings history being one element in the specific facts demonstrating extraordinary circumstances. For such high-income claims, the Fund computed economic loss applying claim-specific facts. Specifically, the Fund considered the position of the victim, the victim's demonstrated "career path," and the nature of the income (*i.e.*, variable and subject to fluctuation or guaranteed). The Fund did not

02:008514

apply the presumed award assumptions about consumption, taxation and growth in calculating economic loss for such claims. Rather, the Fund determined claim-specific discount and growth rates and further adjusted consumption and other factors to the projected future income levels.

The Regulations establish uniform figures for "presumed" non-economic loss for decedents and dependents because the Department and Special Master could not justifiably conclude that one deceased victim or one victim's family suffered more than another. (Non-economic loss for the decedents was intended to address such intangible factors as pain and suffering and loss of enjoyment of life.) This system was administratively simple: each claim received a uniform non-economic award of $250,000 for the death of the victim and an additional non-economic award of $100,000 for the spouse and each dependent of the victim.

The Regulations allow the Special Master to depart from the "presumed" non-economic loss in extraordinary circumstances. The Fund did, in fact, award extraordinary non-economic loss in some instances: for example, the Fund increased the presumed $250,000 non-economic loss award in situations where a victim ultimately died after surviving for days, weeks or even months after the tragedy. The non-economic loss issues are discussed in more detail at II(C)(2)(c).

The Regulations do not include a specific methodology for the calculation of awards for surviving victims who suffered physical injury. Economic loss for physical injury victims was computed using the same methodology that was applied for deceased victims adjusting for the duration of economic loss on a case-by-case basis.[32] However, the Department and the Special Master did not believe that it was either possible or appropriate to determine in advance, through schedules or formulae, non-economic loss for physical injury victims. Because the physical injuries were so vastly different[33] and had significantly different long-term effects, the Regulations direct the Fund to evaluate each individual physical injury claim to determine the extent, nature and permanence of the injury and establish non-economic loss accordingly. Thus, the Regulations do not mandate any uniform amount or formula for non-economic loss for physical injury claimants. Instead, the Regulations provide that the Special Master may rely upon the non-economic loss methodology for deceased victims and adjust the losses based upon the extent of the victim's physical harm.[34]

### b) The Assessment and Deduction of Collateral Source Compensation

One of the most controversial aspects of the Act is the requirement that the Special Master deduct "collateral offsets" from the award. The Act defines collateral sources to include a variety of types of payments but does not give detailed definitions or guidance. While the Regulations provide some additional guidelines for claimants, the Special Master recognized that it would be difficult for an individual claimant to understand precisely how the collateral source provisions might affect his or her claim. Accordingly, the Fund provided the opportunity for claimants to meet with the staff

02:008515

of the Fund or the Special Master for specific guidance.[35]  In general, the Fund adopted the policy that collateral source payments would not be deducted if the payment was contingent, was payable to someone who was neither a beneficiary nor a close family member of a beneficiary, or had been funded by defined contributions made by the victim (to the extent of such funding).  These guidelines were intended to avoid reducing an award for funds that the claimant either would not or might not receive and to avoid deducting benefits that the victim had effectively "earned" prior to death.

The deduction of collateral offsets had a significant effect on the amount paid from the U.S. Treasury to victims and their families:  collateral source compensation reduced overall payments from the U.S. Treasury by approximately 29%, saving over $2.9 billion.

The following chart shows the aggregate economic and non-economic loss computed for all eligible claimants before offsets, the total offsets attributed to those claims and the ratio of total offsets to total economic and non-economic loss before offsets:

| Type of Claim | Total Economic & Non-Economic Loss | Total Offsets | Offsets as % of Total Computed Loss |
|---|---|---|---|
| Death | $8,461,041,779 | $2,464,780,777 | 29.13% |
| Injury | $1,503,401,608 | $450,247,073 | 29.95% |
| Totals | $9,964,443,387 | $2,915,027,850 | 29.25% |

### c) Procedures for the Submission and Presentation of Claims

The Regulations address the mechanics of submitting a claim as well as the deadlines for the determination of awards. Extensive comments received from families and advocates for victims indicated a need to provide a flexible process to address the individual circumstances of claimants.  Some families felt they could not submit an adequate claim to the Fund without a personal hearing where they presented information about the victim and facts relevant to the award computation.  Others could not face the pain of an in-person hearing and wanted an award based solely on written submissions.  The Regulations address these varied desires by allowing a claimant to elect one of two "tracks" for the review and evaluation of claims as described in detail at II(B) below.

Importantly, the claim submission, evaluation, and hearing process were designed to be non-adversarial.  Claimants could submit any data, information or arguments they felt were relevant.  The hearings were conducted informally, and claimants were entitled to bring experts, advocates and family members.  All testimony was under oath, but there was no "cross-examination."  The process was designed to secure the required information so that it could be evaluated by the Fund.  This non-adversarial approach was necessary to assure prompt determination of awards as

02:008516

required by the Act and to minimize the burden on claimants. Had the Regulations established an adversarial process, claimants would likely have been less willing to seek guidance from the Fund staff, the costs of administration would have risen significantly, and the time and staff required for the resolution of claims would have increased.

The Regulations establish policies addressing the election of remedies required by the Act and due process concerns of victims and their families. Because the filing of a claim with the Fund bars a claimant from pursuing a lawsuit for damages, the Department and the Special Master concluded that it was essential to establish a clear-cut definition of "filing" for the benefit of both potential claimants and potential defendants in litigation.[36] Without such a rule, potential claimants would have been fearful that minimal contact with the Fund, such as requesting information or supplying background materials necessary for the Fund to provide informed guidance, could constitute "filing" a claim. To solve this problem, the Regulations provide that a claim is deemed filed when it is "substantially complete" and that the Fund itself will determine whether and when a claim is substantially complete.[37]

### 3. Implementation of the Regulations/Policy Guidance

During the initial stages of the Fund's operation, the Special Master's Office focused on establishing detailed guidelines for evaluating claims and providing sufficient information to permit claimants to evaluate their options. The Special Master's Office concluded that it was important for claimants and representatives of claimants to have open access to Fund personnel and the opportunity to have all their questions and concerns addressed. Claimants were invited to meet with representatives of the Fund at any time for any purpose. The Special Master and the senior attorneys conducted hundreds of meetings with claimants to discuss issues relating to the operation of the Fund, address specific questions about the Fund's treatment of the individual claimant's situation, and provide realistic estimates of the potential award from the Fund. Some of these meetings were conducted as "town hall" meetings in various locations around the United States and in England. Others were conducted as individual meetings with a single claimant or family. Throughout its operation, the Fund maintained its open-door policy inviting claimants or their representatives to call or meet with Fund representatives. The Fund made it a firm policy to ensure that each claimant understood the basis of the award determination. Thus, the Fund responded to all questions in writing, telephonically, or in person, even after the award was issued.

One of the key functions of the Fund was to assist claimants. The Fund rejected the concept that it need only respond to the submission made by the claimant. Instead, the Fund took a proactive role advising each claimant of information that would assist in the evaluation of the claim, even undertaking – to the extent possible – to obtain information from third parties. The Fund took measures to ensure that claimants were not treated differently merely because one claimant was represented by

02:008517

an effective advocate and another was not. The Fund scrutinized every claim to ensure that information that could affect the outcome of the claim was considered and in certain circumstances gathered information that the claimant might not have presented. To foster the claimant assistance and information process, the Fund collected all questions from claimants and continuously published guidance in the form of Frequently Asked Questions ("FAQs") to update claimants on new issues, policy decisions and the Fund's treatment of various issues.[38]

The Fund staff also met extensively with key employers of victims of the attacks. These meetings were exceedingly useful; the Fund advised employers of the type of information that they could provide the families in order to facilitate the claims process and at the same time, the Fund developed extensive data about the compensation and benefits policies of specific companies. Through this process, the Fund was able to tailor its evaluation guidelines to account for employer-specific issues. The Fund staff created employer-specific models to ensure that all calculations were appropriate and consistent for victims employed by the same entity. This streamlined the claims processing operation and relieved the individual claimants of some of the burden of producing information for the Fund.

In sum, the Regulations, methodologies and policies adopted by the Fund were designed to accomplish several objectives: (1) provide full and complete information to the claimants, allowing informed choices about participation in the Fund, (2) ensure consistent and understandable awards through the adoption of clear-cut guidelines, (3) ensure generous awards consistent with the Regulations by resolving ambiguity and uncertainty in favor of the claimant, (4) allow claimants the opportunity to participate in an in-person hearing, (5) ensure that claimants who did not secure a lawyer or other expert would not be penalized in their opportunity to participate in the process and obtain a fair and consistent award, and (6) make certain that the staff of the Fund was accessible to claimants to answer questions and respond to concerns.

### 4. Challenges to the Regulations

Some families disagreed with the Fund's guidelines for determining economic loss and sought to challenge the Regulations. On January 24, 2003, the families of a few deceased victims of the September 11th attacks filed suit in the Southern District of New York against the Special Master, the Attorney General, and the Department of Justice alleging that the Regulations and the interpretive policies of the Special Master were arbitrary and capricious and in violation of the Act. On May 8, 2003, Judge Hellerstein granted the United States' Motion for Judgment on the Pleadings and dismissed the complaints.[39] The plaintiffs had contended that the Regulations and the methodologies and policies employed by the Special Master: (1) imposed an arbitrary and unreasonable cap on awards; (2) improperly took into account the financial needs or resources of the claimant or the victim's dependents and beneficiaries; (3) utilized a restrictive analysis of state law for determining economic loss; (4) failed to publish a methodology for determining presumed economic loss beyond the 98th percentile of

02:008518

individual income and improperly focused on earnings for 1998-2000; (5) improperly required claimants to present "extraordinary circumstances" in order to obtain an adjustment in the presumed award; (6) improperly used post-tax income as the basis for calculating economic loss; (7) improperly used a consumption rate for single decedents that was higher than that utilized for married decedents or decedents with children; and (8) violated equal protection and due process rights in making award determinations.[40]

The District Court, in rejecting these contentions, concluded as a preliminary matter that the Regulations and the Special Master's methodologies did not exceed the bounds of the Congressional delegation, which expressly granted the Special Master the power to promulgate procedural and substantive rules to administer the Fund.[41] As to the challenged Regulations and the Special Master's methodologies and policies, the District Court found that the procedures required by the Regulations and by the Special Master fairly implemented the Act, were entitled to judicial deference, and did not infringe on plaintiffs' constitutional and statutory rights.[42]

The plaintiffs appealed Judge Hellerstein's decision to the United States Court of Appeals for the Second Circuit. That Court affirmed the District Court's decision on September 26, 2003.[43] The Court found that, while a *de facto* cap on awards would be impermissible under the statute, the Special Master had not imposed such a cap.[44] The Court rejected the plaintiffs' challenge to the Regulation defining "individual circumstances" to include the financial needs of the victim's dependents and beneficiaries,[45] and also rejected the challenge to the Regulation construing the statutory phrase "to the extent recovery for such loss is allowed under applicable state law" to mean that only the categories of loss compensable under governing state law may be used to calculate economic loss.[46] Finally, the Court concluded that it lacked jurisdiction to decide whether the higher consumption rates used by the Special Master to calculate the losses for single decedents without children were arbitrary and capricious since the use of this methodology was committed to the discretion of the Special Master under the Administrative Procedure Act.[47]

02:008519

## II. IMPLEMENTING THE FUND

### A. Outreach

One of the Special Master's principal objectives was to disseminate information regarding the Fund to the public at large and in particular to all victims, families of victims, and other interested parties. Outreach was essential for a number of reasons. The Program created by Congress was unique, and it quickly became apparent that an education process would be necessary to explain the Fund and its procedures to eligible claimants. In addition, the Program was established by Congress within weeks after the September 11th tragedy, when grieving families and victims understandably were often unable to comprehend the purpose of the statute and the details of the application process. If the Program were to be successful, it was essential that the Special Master and his staff become proactive in helping familiarize eligible claimants with the benefits of the Program. Outreach, therefore, was critical to the Program's success.

The Fund used several different outreach vehicles to publicize the Program to victims and families, including:

- Helpline – A toll-free helpline to assist potential claimants was established and put into operation on October 22, 2001. The helpline received over 54,000 calls during the course of the Program.

- Claims Assistance Sites – The Fund established claims assistance sites[48] in 13 locations at various points during its operation. The sites were staffed with individuals who could provide information and assistance to claimants and their families in the claims submission process. The claims assistance sites were visited by 2,250 individuals.

- Internet – The Fund established a website on which the Fund posted documents, FAQs, claim forms, and other relevant information to support claim submission and processing, and an email link that individuals could use to easily email questions or comments to the Fund. The website was updated over 830 times during the Fund's operation.

- Mass Mailings – The Fund sent out 33 separate mass mailings to potential claimants. These mailings included information, guidance and instructions for the preparation of a claim, copies of Claim Forms and FAQs and logistical information regarding the Claims Assistance Site locations. Follow up mailings were sent periodically as reminders.

02:008520

- <u>Town Hall Meetings</u> – Beginning in January of 2002, over 25 meetings were organized and in most cases conducted by the Special Master to provide an update on Fund progress, answer questions, and provide case-specific assistance after the meetings. The meetings were promoted via special mailings, the Fund website, and the Helpline's recorded self-service system.

- <u>*Pro Bono* Legal Training Sessions</u> – Training sessions were held for *pro bono* legal counsel to educate them on claim submission guidelines, supporting documentation requirements, common submission errors, and ways to expedite claim processing.

- <u>Individual Meetings</u> – The Special Master and senior attorneys working on the Fund also conducted hundreds of individual meetings at the request of claimants to answer claim-specific questions.

- <u>Special Interest Group Meetings</u> – The Special Master conducted meetings for special interest groups representing groups of claimants with similar circumstances allowing issues specific to their situation to be addressed.

- <u>Advertisements and Media</u> – Notification to potential claimants about the existence of the Fund and information on where and how to apply was placed in a number of publications.[49] In addition, numerous interviews by the Special Master were conducted by the television[50] and the print media.[51]

## B. <u>Process for Submission and Evaluation of Claims</u>

The Fund established two "tracks" for the review and evaluation of claims. Claimants were asked to elect either Track A or Track B. Under Track A, the Fund evaluated the claim submission first to determine whether the claim was "substantially complete."[52] The Fund then issued a determination on eligibility and a presumed award within 45 days of the substantially complete determination. Upon receipt of this determination, the claimant could request a review (*i.e.*, an appeal). On appeal, the claimant had the right to an in-person hearing and to request that the Fund make a determination of "extraordinary circumstances" that might justify a departure from the presumed award calculation. After review of the presumed award, a final award was issued; there was no further right of appeal.

Under Track B, the Fund initially reviewed the claim submission to determine whether it could be deemed substantially complete. Once a claim was found to be substantially complete, the claimant was notified and a hearing was scheduled. Under Track B, the Fund would not issue a decision until after a hearing was conducted. The decision issued after the Track B hearing was final; there was no right of appeal.[53]

02:008521

Claims for deceased victims were nearly equally divided between Track A and Track B: 47% of claims for deceased victims elected Track A and 53% elected Track B. Election of the Track B process often correlated with the victim's income level: over 69% of claims for victims with income levels in the top 2% (*i.e.*, over $231,000) elected Track B. In comparison, 48% of claims of victims with the lowest income levels (under $25,000) elected Track B. In general, Personal Representatives asserting claims for victims with higher incomes expressed the view, in meetings and in hearings, that the presumed methodology, calculated at an income level of $231,000 with favorable growth and stability assumptions, was inadequate to address these families' needs and individual circumstances.

Physical injury victims, on the other hand, overwhelmingly elected Track A: over 89% of injury victims elected Track A. As with claims for deceased victims, physical injury victims with higher incomes elected Track B more frequently: over 67% of physical injury claimants with income levels above $200,000 elected Track B while 89% of physical injury victims with income below $150,000 elected Track A.

The Fund established an extensive, proactive process to respond to claim filings. In the intake process, submissions were assigned tracking numbers, sent to data entry and all documents were imaged. Submissions then went through a review process to determine the appropriate next action. Upon receipt of an initial claim submission, the Fund contacted the claimant both to acknowledge receipt and to advise of documentation that appeared to be missing. Claims were then assigned to individual case managers who were responsible for following up with the claimant to obtain any information necessary for evaluating the claim. This process was designed intentionally to be proactive. Case managers contacted claimants or their representatives personally to discuss what documents were necessary and provided assistance to claimants in obtaining their documents. While this practice added to the administrative costs, it effectively helped to reassure claimants while also ensuring that the Fund received the information necessary to properly evaluate the claims.

After sufficient documentation was obtained for evaluation, the claim was sent to an adjudicator who would prepare the initial presumed award calculations using the standard model (as adjusted for specific employers). After a quality control process, the claim was sent to an attorney in the Special Master's Office for review. If the claim was designated as a Track A claim, the attorney reviewed the claim, determined whether the claimant was eligible, decided whether the claim was substantially complete and if it was, determined the appropriate inputs for the presumed award calculation so that an award letter could be issued. If the award or eligibility denial was appealed, the claim was reviewed again, along with the transcript of the hearing by a managing attorney in the Special Master's Office and a final award was determined and issued. If the claim was designated as Track B, the attorney reviewed the claim to determine eligibility, whether the claim was substantially complete, and the appropriate presumed award calculation. If the claim was found to be substantially complete, the claimant was sent a letter advising of the substantially complete

02:008522

determination and the timing of a hearing. After the Track B hearing, each claim was reviewed again, along with the transcript of the hearing, by the supervising attorney in the Special Master's Office who then determined and issued the final award.

The Fund conducted a total of 3,962 eligibility and award hearings involving 3,629 claims.[54] The hearings were conducted informally and claimants were entitled to submit any testimony, including expert testimony, that they felt was relevant to the claim. In general, claimants used the hearing process to inform the Fund of the effect of September 11 on their daily lives and to clarify issues relating to need, individual circumstances, the victim's employment history and future prospects and other information submitted with the claim. The Fund used the hearing process to elicit information from claimants regarding the details of their claims and to ascertain individual factors or circumstances that the Fund should take into account in determining the award.

The hearing process was integral to the success of the Fund. Claimants in general felt a strong need to advise the Fund personally of their circumstances. Indeed, many claimants felt that without a hearing, they would have been deprived of "due process." Many attorneys and claimants expressed the view that the hearing process provided a degree of closure and, in some cases, a cathartic experience. Clearly the hearings were emotionally difficult for claimants. (Informal settings were designed to minimize claimants' fears and concerns as much as possible.) The Fund placed no restrictions on time or content of hearings, although Hearing Officers received instructions from the Special Master's Office designating specific questions to ask the claimant. (It was rare for a hearing to exceed two hours.)

02:008523

The following table shows the number of hearings held by claim type and track. Hearings on objections and statements of interest are counted as separate hearings, even if they relate to the same claim.

| HEARINGS – ALL CLAIMS (7,403 CLAIMS FILED) | | | | |
|---|---|---|---|---|
| | TRACK A | TRACK B | TOTAL | % OF TOTAL CLAIMS FILED WITH HEARING(S) |
| AWARD HEARINGS | 1,302 | 1,742 | 3,044 | |
| ELIGIBILITY HEARINGS | 653 | 109 | 762 | |
| OTHER OFFICIAL HEARINGS | 91 | 65 | 156 | |
| TOTAL (3,962 Hearings on 3,629 Claims) | 2,046 | 1,916 | 3,962 | 49.00% |
| **HEARINGS – DEATH CLAIMS (2,880 DEATH CLAIMS WITH FINAL AWARDS)** | | | | |
| | TRACK A | TRACK B | TOTAL | % OF TOTAL DEATH CLAIMS WITH HEARING(S) |
| AWARD HEARINGS | 518 | 1,455 | 1,973 | |
| ELIGIBILITY HEARINGS | 6 | 2 | 8 | |
| OTHER OFFICIAL HEARINGS | 32 | 61 | 93 | |
| TOTAL (2,074 hearings on 1,977 Claims) | 556 | 1,518 | 2,074 | 68.60% |
| **HEARINGS – PHYSICAL INJURY CLAIMS (2,880 PHYSICAL INJURY CLAIMS WITH FINAL AWARDS)** | | | | |
| | TRACK A | TRACK B | TOTAL | HEARING(S) |
| AWARD HEARINGS | 783 | 283 | 1,066 | |
| ELIGIBILITY HEARINGS | 331 | 62 | 393 | |
| OTHER OFFICIAL HEARINGS | 30 | 2 | 32 | |
| TOTAL (1,490 hearings on 1,265 Claims) | 1,144 | 347 | 1,491 | 47.20% |
| **CLAIMS WITH MULTIPLE HEARINGS – (CLAIMS WITH FINAL AWARDS)** | | | | |
| | # of Claims | % Claims with Multiple Hearings | | |
| CLAIMS WITH MULTIPLE HEARINGS – ALL CLAIMS WITH FINAL AWARDS | 285 | 5.13% | | |
| CLAIMS WITH MULTIPLE HEARINGS – DEATH CLAIMS WITH FINAL AWARDS | 62 | 2.15% | | |
| CLAIMS WITH MULTIPLE HEARINGS – PHYSICAL INJURY CLAIMS WITH FINAL AWARDS | 223 | 8.32% | | |

## C. Evaluation of Claims

### 1. Eligibility

The first step in the claim evaluation process was to determine whether a claimant was an "eligible individual."[55]   Eligibility is defined by the Act to include individuals aboard the flights and individuals present at the World Trade Center, the Pentagon, or the site of the aircraft crash at Shanksville at the time or in the immediate aftermath of the crashes or Personal Representatives of deceased individuals who would otherwise be eligible. In addition, an individual must have suffered physical harm or death as a result of one of the air crashes. The Act also states that only one claim may be submitted by an individual or on behalf of a deceased individual.[56]  The statute provides no definitions of "present at the site," "immediate aftermath," "physical harm," or "Personal Representative."  While the Regulations fill some of

02:008524

these gaps as described below, the senior attorneys in the Special Master's Office, consistent with the Act and the Regulations, further developed criteria and procedures to administer the claims as the Program proceeded.

### a) Eligibility for Physical Injury Claims

#### (1) Presence at the Site

Obviously, the definition of "present at the site" (*i.e.*, the World Trade Center, the Pentagon, or the Shanksville site) would have dramatic implications for the number and type of claims that would be eligible, particularly in regard to physical injury. For example, some argued that "the site" should encompass the island of Manhattan, thereby creating the possibility of a vast universe of claimants that could include individuals a substantial distance from the World Trade Center who might have suffered relatively minor injuries while leaving the City. The Regulations reject this approach and define "the site" to include "the buildings or portions of buildings that were destroyed as a result of the airplane crashes," and "any area contiguous to the crash sites that the Special Master determines was sufficiently close to the site that there was a demonstrable risk of physical harm resulting from the impact of the aircraft or any subsequent fire, explosions or building collapses (generally, the immediate area in which the impact occurred, fire occurred, portions of building fell or debris fell upon and injured persons)."[57] To implement this Regulation with respect to the World Trade Center site, the attorneys in the Special Master's Office examined aerial photographs and maps of the debris field for all debris larger than particulate matter. These sources indicated that the overwhelming majority of the debris fell within an area well inside the boundaries of the New York Police Department ("NYPD") Pedestrian No Access Zone. To add a margin of safety, the Special Master's Office extended borders of this zone by one block in each direction; the resulting area became the zone utilized to determine presence at site for victims in New York.[58] Individuals who were outside the zone but who received blunt trauma injuries after having been struck by debris (*i.e.*, something substantially larger than particulate matter) were also found eligible. Other individuals who were injured outside of the zone were denied eligibility. Implementation of the Regulation defining the Pentagon and Shanksville sites was less complex and did not require the definition of a specific zone.

02:008525

The following chart shows the breakdown of injury claims by incident location:

### PHYSICAL INJURY CLAIMS BY INCIDENT LOCATION

| Location | # of Claims | Amount Awarded |
|---|---|---|
| World Trade Center – Building | 2,212 | $892,824,923.59 |
| World Trade Center – Street/Other | 382 | $108,687,824.01 |
| Pentagon | 86 | $51,641,786.96 |
| TOTAL | 2,680 | $1,053,154,534.56 |



### (2)  Immediate Aftermath

The second eligibility requirement is that the victim must have been present at the sites at the time or "in the immediate aftermath" of the crashes.[59] The statute provides no definition of "in the immediate aftermath." Consistency in administration of the Act's eligibility requirement required a bright-line definition for this term; "immediate aftermath" is defined in the Regulations to mean "until 12 hours after the crashes."[60] The rationale for this definition was that this period of time would cover all of those who suffered actual physical injury or death as a direct result of the attacks, other than rescue workers.[61] In recognition of "their heroic efforts and their selfless reasons for being at the sites as well as the high level of danger and difficulty during the first four days of rescue operations,"[62] the Regulations define the "immediate aftermath" for rescue workers to include the period from the crashes until 96 hours after the crashes.[63] The Special Master does not have discretion to vary the 12- and 96-hour deadlines set by the Regulations.

### (3)  Physical Harm

To be eligible, an individual must have suffered physical harm or death as a result of the air crashes. The Regulations adopt a plain reading of the term "physical harm."[64] Although many individuals may have experienced significant psychological injuries, the Department and the Special Master concluded that the Act's use of the

02:008526

term "physical harm" meant "a physical injury to the body," thus excluding psychological injuries.[65] Individuals who suffered from only a psychological injury were ineligible, and individuals who suffered psychological injuries as a result of physical injury were not eligible for additional compensation resulting from their psychological injury.

The Regulations address Congress' intention *not* to cover those who face only a risk of future injury by setting standards for time of treatment. The Special Master's Statement regarding the Interim Final Rule explains the conclusion that those with only latent injuries are ineligible:

> The statutory term 'physical harm' also indicates that Congress did not intend for this Fund to cover those who face only a risk of future injury (*i.e.*, latent harm that does not fully manifest itself within the statutory time period for this Fund). Indeed, because participation in this Fund precludes claimants from recovering through tort litigation, those with latent injuries that later became manifest would likely be *undercompensated* if they sought compensation now from the Fund before the injuries became manifest. Conversely, those who recovered for latent injuries that did *not* later become manifest could be *overcompensated* if they recovered from the Fund.[66]

The Regulations require that a physical injury be verified by "contemporaneous medical records created by or at the direction of the medical professional who provided the medical care."[67] Each file was reviewed to determine whether sufficient medical documentation existed. The Fund recognized that many of the overburdened medical facilities dealing with the massive influx of September 11th victims, including most triage sites, could not and did not create clear or thorough records on September 11. When these facilities were involved, the Fund accepted testimonial evidence or a combination of later credible medical records that demonstrated that the victim's injuries were treated within a 72-hour time frame after the attacks.

The Interim Final Regulations define physical harm to mean a physical injury to the body that was treated by a medical professional within 24 hours of the injury having been sustained or within 24 hours of rescue. In addition, the injury must have required hospitalization as an in-patient for at least 24 hours or caused (whether temporarily or permanently) partial or total physical disability, incapacity, or disfigurement. Comments to the Interim Final Regulations argued that the 24-hour requirement was unfair because many individuals with serious physical injuries were reluctant to seek immediate treatment or were persuaded not to seek treatment in the 24 hours following the attacks in order to allow physicians to care for those suffering potentially life-threatening injuries. In response, the Final Regulations expand the time period from 24 to 72 hours for those victims who failed to appreciate immediately the extent of their injuries or for whom appropriate medical care was not

02:008527