# EXHIBIT C.50

## PART 2 OF 5

available on September 11.[68] In many instances, the Fund granted eligibility to injured victims who were unable to seek medical treatment within 24 hours. In addition, the Final Regulations give the Special Master discretion to extend the time period even further for rescue personnel who did not seek or were not able to obtain medical treatment within 72 hours.[69] The Fund defined "rescue worker" to mean an individual who had directly and materially assisted in the effort to rescue or recover victims. In general, rescue workers included workers directly engaged in rescue and recovery at the World Trade Center site, including those removing debris to aid in the search for victims and those shuttling other rescue workers in and out of the zone. Throughout the operation of the Fund, each request for waiver of the 72-hour rule was reviewed by a staff attorney and decided on a case-by-case basis. The Fund granted waivers to hundreds of rescue workers who were diagnosed with demonstrable and documented respiratory injuries directly related to their rescue service.

### b) Eligibility for Claims for Deceased Victims

#### (1) Proof of Death/Presence at the Site

Issues relating to proof of death and presence at the site for deceased victims were significantly less complex than those issues presented by injury claims. The Fund allowed various forms of proof of death, including a death certificate or other evidence, such as an employer affidavit and presence of a victim on an airline manifest. Where the death certificate was based on an actual autopsy or medical examiner confirmation of identity, the Fund did not require another form of proof. Where death certificates could not be obtained by the claimant, other official documentation was accepted. For example, in Virginia a death certificate could not be obtained if a body had not been identified. The Fund instead accepted a report of casualty from the Department of Defense and a court order establishing the death.

To determine presence at the site, the Fund examined death certificates, records of employment, affidavits from employers and other knowledgeable persons, airline records, DNA test results and other documentation.[70] The Fund denied 45 claims asserted on behalf of deceased victims for: (1) lack of proof of death, (2) lack of proof of presence at the site; or (3) lack of proof that the death was related to the September 11th attacks.[71]

02:008528

The following chart provides a breakdown of claims for deceased victims by location:

| | | |
|---|---|---|
| World Trade Center – Building | 2,388 | $5,083,751,440.29 |
| World Trade Center – Street | 209 | $439,185,736.33 |
| Pentagon | 114 | $172,571,215.31 |
| Flight No. AA11 | 65 | $119,638,023.32 |
| Flight No. UA 175 | 46 | $69,556,753.04 |
| Flight No. AA 77 | 33 | $57,908,226.32 |
| Flight No. UA 93 | 25 | $53,649,607.47 |
| TOTAL | 2,880 | $5,996,261,002.08 |



(2)    The Personal Representative

The statute provides that the claimant in the case of a decedent shall be "the Personal Representative of the decedent."[272] In addition, no more than one claim may be submitted on behalf of a deceased individual.[273] There is no further guidance regarding the identity of the Personal Representative or the procedures that should be utilized to appoint the Personal Representative, to provide other potential beneficiaries with notice that the Personal Representative has filed a claim or to allow other potential beneficiaries to object to the authority of an individual to file as the Personal Representative. The Regulations address each of these issues, primarily by looking to the pertinent state law of the victim's domicile. By relying upon reference to state law, the Fund was able to avoid the difficulties associated with attempting to gather facts relevant to the designation of Personal Representatives and Fund beneficiaries on a case-by-case basis.

02:008529

### c) Appointment of the Personal Representative

In recognition that the state probate courts have mechanisms for the appointment of Personal Representatives and, in many cases, would have already appointed the appropriate Personal Representative for the administration of a victim's estate, the Regulations state that the Personal Representative shall be the person appointed by a court of competent jurisdiction either as the Personal Representative of the decedent or as the executor or administrator of the decedent's will or estate.[74] The Regulations also anticipate, however, that there may be situations where the court has not appointed the Personal Representative. Rather than allow the lack of such appointment to create an obstacle to resolution of a claim, the Regulations provide that, in the event the Personal Representative has not been appointed by a court and there is no pending litigation regarding the issue, the Special Master has the discretion to appoint a Personal Representative for the purposes of compensation by the Fund. If there is a will, the Special Master may appoint the executor or the administrator as the Personal Representative or, if no will exists, the Special Master may, in his discretion, determine that the Personal Representative is the first person in the line of succession established by the applicable intestacy laws.[75] In practice, there were few instances where it was necessary for the Special Master to appoint the Personal Representative. These instances included claims where the state courts did not require appointment of the Personal Representative under the particular circumstances and the claimant preferred not to seek such an appointment due to unrelated circumstances, as well as those rare cases where the identity of the appropriate Personal Representative was disputed and the parties were unable to agree upon a particular individual to fill the role.

The reliance of the Regulations upon the state courts to appoint the Personal Representative was the most reasonable and efficient approach in light of the expertise of state probate courts. In most states, the mechanism was trouble-free. However, the requirement created significant problems in the State of New York where many of the Surrogate's Courts construed the Surrogate's Court Procedure Act and the New York Estates, Powers and Trusts Law to mandate the continued involvement by the courts in many aspects of the Program. For example, certain Surrogate's Courts viewed state law to require bonding, court approval of the compromise of the claim, supervision of distribution and payment to minors, approval of any award, and approval of the distribution of the award. As a result, many of the Surrogate's Courts began issuing "limited" Letters of Administration[76] that functionally prohibited claimants from completing an application to participate in the Fund. These letters contained different types of limitations. Some limitations restrained the Personal Representative from compromising any right of action, thereby precluding participation in the Fund. Other restrictions limited the amount of money the claimant could collect. Often, limited Letters of Administration contained both types of restrictions. At the inception of the Program, the limitations were particularly problematic because many claimants filing early were seeking the immediate payment of Advance Benefits due to financial hardship.[77] Requiring state court approval of these payments was contrary to

02:008530

the purpose of the Advance Benefit Program, *i.e.*, to allow especially needy claimants filing death claims to receive $50,000 immediately upon proof of eligibility.[78]

An additional problem was created by the lack of uniformity of the New York Surrogate's Courts' interpretation of their responsibilities under state law to supervise Personal Representatives filing with the Fund. As a result, New York residents seeking Letters of Administration to apply to the Fund received different types of letters depending on the Surrogate's Court issuing their letters. For example, if a decedent was domiciled in certain counties, the Personal Representative was able to obtain unlimited Letters of Administration that allowed the submission of an application to the Fund and the collection of both Advance Benefits and a final award. In other counties, however, the Personal Representative might receive letters with various restrictions, preventing submission of a claim or collection of an award.

The Special Master analyzed various avenues for resolution of these problems and concluded, ultimately, that the most expedient approach was to seek legislation setting forth uniform rules regarding appointment of Personal Representatives in New York for purposes of the Fund that would allow the Personal Representative appointed by a Surrogate's Court to submit a claim, compromise a claim, and accept an award without prior court approval. The Special Master's Office was able to work effectively with Governor Pataki's office to ensure that these issues would be resolved expeditiously by legislation. On May 21, 2002, the September 11th Victims and Families Relief Act (the "New York Act") was enacted due to the efforts of the Governor and the New York Senate and Assembly.[79] The New York Act included, *inter alia*, provisions addressing the issues relating to the appointment of Personal Representatives.

The New York Act amended the New York Estates, Powers, and Trusts law by providing that the Personal Representative appointed by the Surrogate's Courts could file and compromise a claim even if there were restrictions in the Letters of Administration.[80] The New York Act further provided that families of the victims could commence probate and related Surrogate's Court proceedings in any county in the state of New York.[81] Finally, in response to concerns expressed by both attorneys and claimants regarding the potential liability of a Personal Representative, the New York Act also provided that a Personal Representative who submitted a claim on behalf of a victim of the terrorist attacks would have no liability for actions taken reasonably and in good faith with respect to the Fund.[82]

### (1)    Notice of Appointment of the Personal Representative

Notice to all parties who might have a financial interest in a Fund award was of paramount importance to the fair administration of the Fund. Some comments to the Interim Final Regulations suggested that a regulation requiring notice was not necessary and would be duplicative of the notice requirements required by state courts issuing Letters of Administration to the Personal Representative. Contrary to this

02:008531

view, the Final Regulations adopt a notice provision *broader* than that of most state courts. The Regulations require that written notice of the claim must be provided by the purported Personal Representative not only to the immediate family of the decedent (including the decedent's spouse, former spouses, children, other dependents, and parents) and to the executor, administrator and beneficiaries of the decedent's will, but also to any persons who "may reasonably be expected to assert an interest in an award or to have a cause of action to recover damages relating to the wrongful death of the decedent."[83]  In order to cast as wide a net as possible, the Special Master also required notice to siblings of the decedent.[84]  The Personal Representative was required to submit with the claim a list of individuals notified, along with a certification that the required notice was provided to all of those individuals either by personal delivery or certified mail and that the Personal Representative was not aware of anyone else to whom such notice should be provided.[85]  The certified list of those provided with notice was reviewed and checked by the Fund against other sources of information including obituaries, news articles, the Internet, and other information contained in the file.

The breadth of the required notice resulted in notification of some individuals who were not beneficiaries of the award under state law.  In requiring overly broad notice in some cases, the Special Master intended to make certain that there was as little risk as possible that either a *bona fide* beneficiary or a person with relevant information regarding the appropriate Personal Representative or beneficiaries would be deprived of notice and thereby unable to participate in the process.  In some instances, the purported Personal Representative objected to the broad scope of the notice requirement on the ground either that notification of extended family members with no financial interest in the award would aggravate acrimony in the family or that it was impossible to locate certain estranged family members. The Fund evaluated these objections on a case-by-case basis and, if satisfied that a specific individual could not under state law assert a valid interest in the award and that the reasons underlying the objection were compelling, granted the requested waiver.  In response to an assertion that a specific family member could not be located, the Fund required the Personal Representative to take a number of steps to prove that location was not possible.  If the Fund concluded that all reasonable efforts had been exhausted, a waiver of the notification requirement was granted.

The Fund took various additional steps to ensure that the Personal Representative had notified all interested parties.  Although the Personal Representative was required to certify on the claim form that all persons required to be notified by the Regulations (as described above) had in fact been notified in writing, the Fund took the further step of publishing the names of the deceased victims for whom claims had been filed on the Fund's official website for 90 days.  This additional safeguard was designed to alert any person not notified by the purported Personal Representative that a claim had been filed.  In some cases, individuals who had not been notified by the purported Personal Representative for a variety of reasons

02:008532

(including that their existence or relationship to the victim might not have been apparent) did in fact learn of the filing of the claim through the website.

### (2)    Objections and Statements of Interest

The Regulations provide that an objection or statement of interest ("SOI") may be filed up to 30 days following the filing of a claim by the Personal Representative and that a timely objection will be considered evidence of a "dispute."[86]  In practice, the Fund considered objections and SOIs even if they were received after 30 days. Indeed there were some cases where the Fund acted upon evidence of a dispute regarding the identity of a Personal Representative that was particularly compelling even after issuance of an award.

An individual could file an objection to a claim on one of two grounds: first, to the identity or authority of the purported Personal Representative to file the claim, and second, to the filing of *any* claim on behalf of a decedent.  Additionally, a person asserting an interest in the award could file an SOI setting forth any information relevant to his or her relationship to the victim or the proposed distribution plan.

Where an objection to the identity of the Personal Representative was filed, the Fund presumed that the court-appointed Personal Representative was the appropriate claimant unless the objector submitted evidence that the state court ruling was incorrect.  Determinations by the Fund that the appointment by a court was not appropriate were extraordinarily rare and were limited to cases where the objector could demonstrate facts that had not been considered by the court (*e.g.* evidence of a voided marriage) and cases where more than one Personal Representative had been appointed by different courts.[87]

Many objections to the identity of the Personal Representative were, in fact, requests to include the objector in the distribution of the award, resulting in little distinction in the content of these objections and SOIs.  The bases of these objections were typically that the Personal Representative would not fairly represent the objector's interest and, accordingly, they were considered by the Fund as SOI's. The majority of objections or SOIs were filed on behalf of potential beneficiaries from families distinct from that of the Personal Representative, such as children of the decedent who were not children of the Personal Representative, parents of the decedent when the spouse was the Personal Representative, or fiancées and domestic partners when a parent or other family member was the Personal Representative.  In these circumstances, the Special Master abided by the court appointment of the Personal Representative, but reviewed all documentation provided by the family member or interested party to make certain his or her interests were adequately addressed by the Fund.  To ensure full participation by those filing an objection or SOI, the Special Master or his designee held a hearing for those filing an objection or SOI when requested.[88]

02:008533

Another common reason for the filing of an objection was the concern by a potential beneficiary that the Personal Representative would choose *not* to file a claim and thereby deprive the beneficiary of the opportunity to receive a portion of an award from the Fund. In some of these cases, the Personal Representative had little or no incentive to file a claim, whereas a particular potential beneficiary had a strong interest in filing.[89] Given the Act's clear designation that only one claim could be filed by the Personal Representative, the Special Master had no discretion to accept these objections or attempts to file a claim in the face of a decision by a duly appointed Personal Representative not to file with the Fund.[90]

The Special Master and the Fund's staff worked with families to attempt to resolve differences when possible.[91] If a hearing was requested by both the Personal Representative and those individuals submitting an objection or SOI, the Fund conducted separate hearings with various family members. This procedure preserved confidentiality and ensured that all parties had the opportunity to be heard in an informative but non-acrimonious atmosphere. In some circumstances, family members or other interested parties felt this procedure unfairly deprived them of information necessary to advance their claim. It was the Special Master's experience, however, that evaluating and processing competing interests in this manner did not limit the Special Master's capacity to fairly evaluate the claims and, in fact, contributed to containing familial discord.

### (3) Processing of Disputes as to the Appropriate Personal Representative

The Regulations provide that the Special Master shall not be required to arbitrate, litigate, or otherwise resolve any dispute as to the identity of the Personal Representative and that in the event of a dispute over the appropriate Personal Representative, the Special Master may suspend adjudication of the claim or, if sufficient information is provided, calculate the appropriate award and authorize payment, but place in escrow any payment until the dispute is resolved either by agreement of the disputing parties or by a court. As an alternative, the Regulations allow the disputing parties to agree to the identity of a Personal Representative to act on their behalf while they work to settle their dispute.[92]

In most cases involving a dispute as to the identity or authority of the Personal Representative, the Fund was able to calculate an appropriate award pending resolution of the dispute. After receiving notification of a dispute, the Fund continued to receive and gather information necessary to calculate a claim and, when necessary, conducted more than one hearing to make certain that all relevant information was taken into account in calculating a fair and appropriate award. The Fund kept the claim open until the end of the Program with the hope and expectation that the parties would resolve the dispute and thereby obviate the necessity to place any payment in escrow. By its end, the Fund had only 6 claims that could not be paid directly to the Personal Representative, to the decedent's estate or to beneficiaries under state law.

02:008534

The awards for these claims were paid to state courts in New York and New Jersey where the disputes will be resolved.[93]   Only 3 of these claims actually involved the identity of the Personal Representative. The other 3 awards were paid to the courts due to concerns regarding distributions to minors.

### (4)   Foreign Personal Representatives

Appointment of a foreign Personal Representative raised special challenges. While review of domestic Letters of Administration from various states resulted in certain complexities due to variation from state to state, such a review could be conducted by the Fund's attorneys with some confidence. Review and verification of the authenticity and meaning of foreign documents was a different matter. For these claims, the Fund reached out to the consular offices of the foreign country in question, had direct communications with the appropriate legal authorities, and conducted a document verification process. If the Fund received appropriate assurances that the type of document received was sufficient for the appointment of the Personal Representative and that the person appointed was the correct individual under foreign law, the appointment was accepted. In the rare instance where a foreign appointment and a domestic appointment conflicted and the parties were unable to agree upon the appropriate Personal Representative for purposes of compensation by the Fund, the dispute was referred to a state court for resolution.

### d)   Proof of Eligibility of Undocumented Aliens

Under the Act, in addition to foreign claimants, undocumented aliens and their families were eligible for compensation. Undocumented workers and their families posed special problems for the Fund, due to difficulties in locating the claimants and reluctance by some to enter the Fund for fear of legal sanctions. The Special Master and the Department made clear that these fears were unjustified. Nevertheless, it took patience and intensive outreach efforts to convince these eligible claimants that they were welcome in the Program.

Undocumented aliens and their attorneys as well as various legal organizations communicated significant concerns to the Special Master regarding the Fund's proof of eligibility requirements. The eligibility portion of the claim form required the claimant to state the victim's country of citizenship and Social Security Number or national identification number. In addition, the claimant was required to sign an authorization allowing the Department to disclose any records or information relating to the form to other parties to the extent necessary for the claim's review (including other government agencies), and to release information relating to the claim where such information indicated a violation of law to any civil or criminal law enforcement authority.[94]

Undocumented aliens and their families and advocates voiced concerns that information provided to the Special Master could be used against the claimant by the

02:008535

Immigration and Naturalization Service ("INS")[95] for deportation or other proceedings arising out of their immigration status and that the specter of INS proceedings or penalties would prevent former employers from providing information supporting the claims of undocumented aliens. The Special Master communicated with the INS to assure that undocumented aliens and their families could file with the Fund without fear of reprisal. The Fund received eligible claims from families of 11 deceased victims confirmed to be undocumented aliens.

### 2. Determination of Awards

The Special Master is obligated by the Act to determine the extent of harm to the claimant, including economic and non-economic loss and the amount of compensation to which the claimant is entitled based on the harm to the claimant, the facts of the claim and the individual circumstances of the claimant. To satisfy this obligation, the Fund first undertook to evaluate economic loss.

### a) Economic Loss – Deceased Victims

The Act expressly requires the Special Master to determine "the extent of the harm to the claimant, including any economic...losses."[96] The Regulations establish that economic loss should be computed with reference to the future earnings potential of the victim.[97] The components of the economic loss calculation included compensation history, fringe benefits, work life, growth rates, consumption, adjustments for taxes and risk of unemployment and present value factors. Presumed economic loss was calculated using standardized assumptions for these components. Computer models were constructed that incorporated the presumed award assumptions allowing each claim to be evaluated through a uniform process. [98]

### (1) Income

The starting point in valuing economic loss was to ascertain the most appropriate measure of the victim's historical income. The Fund counted as income combined compensation from all sources including salaries and bonuses (including variable performance-based bonuses and commissions), stock options, partnership or equity distributions, self-employment earnings, capital gains, deferred compensation, overtime pay, and part-time income.[99] In general, the Fund relied on pay stubs and employer statements as the most accurate depiction of actual compensation. Where such information was not available, the Fund considered the data in W-2 forms.[100]

The Regulations give the Special Master discretion to apply average income for the three years prior to 2001, to apply annualized 2001 compensation, to select other years, or to rely on published pay scales.[101] The Special Master's Office evaluated the compensation history of each victim and any information provided by the employer regarding the victim's status (including planned promotions) as well as the family circumstances in selecting the appropriate compensation base for the calculation.

02:008536

In general, the Fund considered an average of 1998-2001 income[102] to determine base compensation. Use of these years was appropriate because it "averaged out" fluctuations in income and it benefited claimants by counting years of high earnings particularly for those working in the financial industry. However, in many instances, the Fund determined that compensation data from other years, or a specific year, was a more appropriate basis for the calculation of lost future income. For instance, the Fund typically used the victim's most recent income (2001 annualized) where a victim's income had increased significantly due to a substantial promotion (such as a change in job responsibility or title), re-negotiated contract, or change in employer or educational degree. Likewise, the Fund deviated from the 1998-2001 average where use of the historical earnings data would unfairly disadvantage the claimant. For example, where a victim stopped working or had worked on a reduced schedule for some period of time due to personal issues (*e.g.*, maternity leave, temporary disability, caring for ill family members) or professional issues (*e.g.*, layoff), those years were viewed as unrepresentative of future lost earnings and were excluded from the earnings basis. Additionally, if the employer established that a victim had been promoted shortly before the attacks or was guaranteed a promotion shortly after the attacks, the Fund might apply the post-promotion income.

For victims in the uniformed services (military, fire, and police departments), the Fund's economic loss model incorporated all forms of compensation to which the victim was entitled. For military personnel, such compensation included basic pay, basic allowance for housing, basic allowance for subsistence, federal income tax advantages, overtime, bonuses, differential pay, and longevity pay.[103] For New York Fire Department ("FDNY") personnel, the Special Master also included the retroactive pay increases authorized after September 11 as part of the victim's earnings basis.

In some cases a victim had little or no earnings history on which to base future economic loss. In light of the highly speculative nature of future income in these cases, the Fund either applied the minimum loss computation specified in the Regulations, assessed economic loss based on generalized data derived from national statistics or based economic loss on a replacement services loss analysis.[104] For example, the Fund generally calculated economic loss for minor children, students and many victims who had just started working by using the average income of all wage earners in the U.S. (which was $32,864 in 2000).[105] Economic Loss for homemakers and retired persons was determined under a replacement services loss analysis.

### (2)  Employer-Provided Benefits

The Fund incorporated all employer-provided benefits in the computation of historical compensation. For those claimants who did not have or could not document any fringe benefits, the Fund incorporated a "presumed" default value for health insurance and pension contributions. The default values were averages derived from studies of the employee benefits programs in the U.S. and were incorporated on the theory that at some point in his or her work life, the average worker would receive

02:008537

such fringe benefits. Since the Fund was calculating future lost income, the Fund included these "assumed" benefits. The following sections describe the treatment of specific components of the "fringe benefits" included in the calculations.

### (a)   Pensions

The value of the pension that a victim would have received but for his or her death in the September 11th attacks was considered a component of the victim's lost income. Under the Fund's methodology, in the absence of case-specific data, the economic loss calculation included an assumed employer contribution of 4% of pension-eligible compensable income. Where, however, the claimant provided data about a specific pension plan, the Fund valued the pension (through average life expectancy) in accordance with the terms of the actual pension plan under which the victim was covered. As an example, every economic loss calculation for FDNY, NYPD, and military victims included as part of the economic loss the value of the future pension that the victim would have received had he or she lived to retirement age.[106] For victims in the private sector who were entitled under the terms of their employment to a specific pension, the Fund calculated the present value of the lost future pension starting at the later of the age the victim would have been eligible for benefits under the plan or the end of the victim's work life (as determined by the Fund's methodology), and continuing through the victim's life expectancy.[107]

### (b)   Health Insurance and Other Fringe Benefits

Health insurance benefits were also included in lost earnings as an element of the victim's employer-provided benefits. The presumed award computation used the actual employer cost of health insurance in computing the loss. If there was no information about the cost or if the victim did not have health insurance coverage, the Fund assumed health insurance costs of $2,400 per year in current dollars.[108] The Fund also counted as lost "fringe benefits" the value of life and disability insurance, employer 401(k) or savings plan contributions, profit sharing and other employer provided benefits (such as car allowance).

### (c)   Stock Options

In certain circumstances, stock option grants were valued as a component of lost earnings. In cases where the victim's earning history showed a consistent pattern of stock option grants, the calculations assumed that the options were reflective of annual grants and were thus treated as future recurring income. The stock options were valued as of September 11, 2001 using the Black-Scholes model (which is the generally accepted method for measuring stock option value). However, where awarded as a one-time, nonrecurring event – for instance, upon hire – stock option grants were typically viewed as unrepresentative of continuing compensation and therefore excluded from the economic loss calculation.

02:008538

### (3)  Work Life

The presumed economic loss calculation adopted a standard of expected remaining years of workforce participation was based on the victim's age at the time of death.  The presumed work life was based on the expected remaining years of workforce participation for active males in the United States.[109]  Average work life for males is longer than the average work life for females.  The Fund adopted the more generous standard for males to avoid any gender bias in assumed future work life patterns and to ensure consistency .

### (4)  Growth Rates

The presumed methodology also accounts for earnings growth, in excess of inflation and overall productivity adjustments, through the victim's expected work-life.  The percentage change at each age incorporates an annual inflation or cost of living expense of 2% plus productivity adjustment of 1% plus real life-cycle growth consistent with age.[110]  Since the life-cycle increases for males are higher than those for men and women combined, the Special Master applied the growth patterns for all males into earnings growth for all victims, both for the sake of consistency and to ensure adequate awards.[111]  The Fund determined that the incorporation of age-specific growth rates reflects an expected pattern of earnings over one's career, *i.e.*, real life-cycle increases are typically higher in the earlier stages of one's career due to unrealized opportunities for advancement and promotion that individuals in later stages of their careers have already experienced.  The age-specific growth rates thus generated more equitable and consistent projections for victims.

### (5)  Consumption

Under the presumed methodology, the victim's projected earnings (including income and benefits) were reduced by his or her share of household expenditures or consumption as a percentage of income.[112]  This consumption reduction is a standard adjustment in evaluating loss of earnings in wrongful death claims because some portion of the victim's income would have been consumed personally by the decedent and not by other household members.[113]  The victim's "self consumption" is thus not a "loss" from the perspective of the surviving family.  The victim's consumption was calculated as a share (based on household size) of certain expenditure categories including food, apparel, services, transportation and entertainment.

The consumption rates used in the presumed methodology were more favorable in several respects than the rates that would be used to calculate damages under standard tort law.  For instance, although the actual consumption rate of low-income earners is often greater than 100% (because some of their needs are met by sources other than personal income), expenditures were scaled to income so that claimants for all decedents would receive an award.  Furthermore, although the consumption rate was computed based as a percentage of *before-tax* income, the

02:008539

presumed consumption rates were applied to after-tax income to reduce the actual amount of the deduction. Additionally, the victim's consumption was determined as a share of the victim's own earnings only rather than the standard share of total household earnings, thus further reducing the deduction. The consumption rate, computed based on the victim's income level as of the date of death, was applied to all future years, except that it was adjusted for household size as minor children reached the age of 19.

Although the consumption rates were based on national data, the Fund determined which consumption rate to apply based on the individual facts and circumstances of the claim. For example, the Fund occasionally adjusted consumption for single victims based on credible evidence demonstrating that the victim's consumption patterns were atypical of a single individual. For instance, where a single victim was living with his or her family in a transitional period (*e.g.*, after graduation from college or after relocation) and contributing to household expenses, consumption was often adjusted for the time period the family reasonably expected the victim to remain at home (typically only a few years). Where a victim was older, had been living with and sharing household costs with his or her parents for a number of years and had no immediate plans to move out, consumption was often adjusted for a longer period, depending on the needs of the family. Likewise, where the victim was contributing to the care or support of his parents or other family members – whether or not they physically shared the same household - consumption was often lowered to reflect the victim's decreased self-consumption.

Consumption was also sometimes adjusted, on a case-by-case basis, where a single victim was engaged to be married or was living with a fiancé or other individual in a long-term arrangement. In these cases, the presumed consumption rates for single victims did not reflect the reality of the victim's household arrangements and consumption patterns. Generally, the Special Master required evidence of an impending marriage, long-term commitment or shared household, along with need or demonstrated extraordinary circumstances to support a departure from the presumed consumption rates. For example, consumption was sometimes adjusted where a victim and his fiancée had already set a wedding date or where a victim lived with and shared household expenses with a domestic partner for many years. Consumption was not adjusted where there was a factual dispute over whether a long-term commitment existed or where the claimant merely proffered general statistics regarding the victim's likelihood of marriage based on his or her demographics.

The practical effect of applying the standard consumption rates (for the relevant income level) for a single person and adjusting it to account for other circumstances was significant since the consumption rates (and therefore deduction) for single victims with no dependents was considerably higher than the rate for victims who were married or had dependents.[114] As a result, awards often increased dramatically where consumption adjustments were made.

02:008540

Children were assumed to remain in the household for consumption purposes through age 18. However, where the evidence demonstrated that the victim was supporting his or her children beyond age 18, consumption was adjusted accordingly. For example, where the victim was contributing toward a child's college or graduate school education or caring for a disabled child, the Special Master adjusted the consumption rate for the period of time the family reasonably expected such support to continue.

### (6)  Adjustments

The presumed methodology adjusts future income to account for taxes and risk of unemployment.

### (a)  Taxes

The presumed methodology determines the net income after deducting the average effective combined federal, state and local income tax rate for the victim's income bracket applicable in the state of the victim's domicile.[115] The computation of tax rate was based on the lesser of two rates – one calculated using Internal Revenue Service ("IRS") data or one calculated based on the victim's actual tax returns. When calculating economic losses using the presumed methodology, the tax rate that corresponded to the victim's compensable income bracket as of the date of death was assumed to apply for the remainder of the victim's career, without increase. This assumption generally favored the claimants since the lost earnings calculations assumed that younger victims would cross into higher income brackets, and be subject to corresponding higher income tax rates, over the course of their projected careers.

### (b)  Risk of Unemployment

The presumed methodology incorporates a low reduction factor of 3% to account for the risk of unemployment since lifetime jobs are not representative of the modern economy. The unemployment adjustment was not applied in cases where the nature of the victim's job or other factors demonstrated that the risk of unemployment was negligible or non-existent. For example, the adjustment generally was not applied to uniformed service workers[116] or to older victims who had maintained the same job for several years. Likewise, the risk factor was eliminated where a victim was a long-time government employee nearing retirement age since the likelihood of unemployment was insignificant.

### (7)  Present Value

The projected compensable income and benefits were adjusted to present value, using blended after-tax discount rates based on the victim's age on the date of death. The after-tax rates are computed by tax-adjusting average yields on mid to long-term U.S. Treasury securities.

02:008541

### (8)  Replacement Services Loss

Replacement services loss represents the value of household services the victim provided to the household.  Such services include cleaning, cooking, child care, home maintenance and repairs, and financial services, among many others.  The Regulations provide that a replacement services loss analysis should be used to compute presumed economic loss where a victim had no prior earned income or did not work outside the home.[117]  Thus, the Fund determined presumed economic loss for homemakers and retired persons based on such an analysis.[118]

The Fund recognized that services losses were very real and could be substantial, not only for families of homemakers and retirees, but also for part-time or full-time workers.  However, due to the variability of replacement services losses among claimants, the presumed methodology generally did not account for such losses.  Rather, as explained at Part IIC2.a)(11) claimants were permitted to present, in a hearing or through sworn testimony, individualized data to support an award for replacement services losses for all victims, regardless of whether they were employed.

### (9)  Medical Expenses

The Regulations also provide for losses related to out-of-pocket medical expenses incurred as a result of the victim's death.  To the extent that such expenses were documented and not reimbursed by health insurance, charities or other organizations, they were considered on a case-by-case basis as a potential element of economic loss.

### (10)  Loss of Business Opportunities

The Regulations further require the Special Master to consider the loss of business or employment opportunities.[119]  Since the value of such losses depended on individual circumstances, they were not accounted for by the presumed methodology.  Rather, the Special Master invited claimants to present the facts and circumstances surrounding any lost opportunities at a hearing for consideration.

In calculating these losses, the Special Master examined the victim's role and responsibilities in the business and how, if at all, that role had been performed since the victim's death.  In the case of an owner or active partner in a privately-held business, the Special Master considered not only current compensation but also the loss in future value of the enterprise due to the death of the principal or partner.

### (11)  Adjustments to Presumed Economic Loss Based on Extraordinary Circumstances

The Fund departed from the presumed methodology in situations where claimants demonstrated "extraordinary circumstances."[120]

02:008542

### (a)  Special Issues Surrounding High-Income Earners

As specified by the Regulations, the Fund calculated a presumed economic loss figure for victims with incomes that exceeded the 98th percentile by applying the presumed methodology to the 98th percentile income (*i.e.*, $231,000).  The families of high-income earners had the option of accepting the award computed in this manner or seeking a hearing and requesting a departure from that computation.

In many instances, families of high-income earners argued that the fact that the victim had received compensation at one point in time in excess of $231,000 was in itself an "extraordinary circumstance."  The Fund did not accept such a generalized argument but rather considered the issue on a case-by-case basis.  If the Fund found extraordinary circumstances, economic loss of high-income earners was not computed pursuant to the presumed methodology.[121]

As required by the Regulations, economic loss under these circumstances was based on individual factors.  In general, to compute economic loss for a high-income earner in a claim that presented extraordinary circumstances, the Fund applied the presumed methodology assumptions pertaining to work life, actual fringe benefits and unemployment risk.  Other factors were varied as follows:  (1) the tax rate was projected to change as the income projections moved into higher brackets during work life instead of freezing the tax rate at the initial base salary level; (2) the consumption deduction was applied to before-tax earnings, thereby increasing the deduction; (3) variable discount rates were applied to variable income to account properly for risk; and (4) different growth rates (as opposed to the standard presumed growth rate) were applied based on the compensation structure.

### (b)  Adjustments to Calculations Based on Extraordinary Employment and Family Circumstances

The Fund adjusted growth rates and work life assumptions in the presumed methodology to account for employment situations that varied from the norm.  For example, where the victim had recently joined the workforce and therefore had limited earnings history, the Special Master applied industry or company-specific growth information for a period of time.[122]  Adjustments were also made to age-specific growth rates where the individual's age did not correspond to his or her work experience.  For example, where a middle-aged victim changed careers shortly before September 11, and had not yet settled into a new career (*i.e.*, by building up a client base or establishing a reputation in the industry), the age-specific growth rates undervalued the victim's potential.  Accordingly, the Fund applied higher growth rates to reflect the victim's greater potential for future advancement.

Evidence of the victim's impending advancement within a company also supported a departure from the presumed methodology.  For example, where an employer provided proof that the victim had been selected for a management position

02:008543

within a specified period of time, growth rates were adjusted accordingly. Furthermore, where the victim's future earnings growth was set forth in a contractual wage guaranty (*e.g.*, pursuant to a union agreement), the scheduled increases were applied if they exceeded the presumed rates.

The Fund adjusted work life if the family showed extraordinary financial need, *i.e.*, that the victim would not have been able to meet financial obligations had he or she ceased work on the date determined using the average workforce participation data.

### (i)    Replacement Services Loss in Cases of Extraordinary Circumstances

The Fund awarded as part of economic loss the present value of the victim's services where extraordinary circumstances were demonstrated. Replacement services were awarded when the Fund determined that the victim (in the case of physical injury claims) or victim's family would suffer significant out-of-pocket expenses in order to maintain daily care and household services. Replacement services were determined on a case-by-case basis based on the type of services the victim had provided, the amount of time spent performing such services and the cost of replacing those services. The Fund typically determined the value of the services based on testimony and the documented actual costs of the replacement services. If the Fund was unable to obtain useful data through testimony or similar means, the Fund relied on survey data specifying the average time and cost expended for care and household services in the New York Metropolitan area.[123]

### (ii)    Special Needs

Over 300 victims' families demonstrated extraordinary special needs, such as children suffering from serious medical conditions or developmentally disabled family members who had depended on the victim's assistance for daily care. To determine a replacement services loss award under these circumstances, the Fund computed the cost of replacing the care and services the victim had provided to the family members with special needs or, in rare cases involving a family member with an extremely severe or life-threatening condition, the projected reasonable cost for the care of the special needs family member. In addition, in some cases, the Fund computed the reasonable cost of providing the care and support the family member with special needs would require throughout his or her expected lifespan. The Fund endeavored to obtain data through testimony or other documentation as to the actual time spent by the victim in providing the care and other services. If the Fund was unable to obtain useful data through testimony or similar means, the Fund relied on survey data.

02:008544

### (iii)  Unborn Children

The Fund received 13 claims documenting the loss of unborn children as a result of the attacks.  Eleven decedents were pregnant and 2 spouses of deceased victims had miscarriages or still-born children due to the trauma from the attacks.  The Fund considered these losses to be "extraordinary circumstances" and increased the award of the claims filed on behalf of the deceased victim accordingly.

### b)  Economic Loss – Physical Injury Victims

Economic loss for physical injury victims was comprised of two components: actual lost income or expenses incurred as a direct result of the injury and future lost income and costs caused by the future effects of the injury.

### (1)  Actual Lost Income or Expenses

The computation of economic loss for claimants who suffered relatively minor injuries, resulting in either short-term loss of work or out-of-pocket expenses, was straightforward.  The award in such cases was comprised of the documented losses, plus an award for non-economic loss, less any collateral offsets received.

### (2)  Future Lost Income and Costs

Many victims suffered more extensive, long-lasting injuries.  In each case, the Fund evaluated the qualifying injury to determine the following:  1) whether the injury was permanent or temporary; 2) if temporary, how long the effects of the injury would remain; 3) whether the claimant had a total disability; and 4) whether the claimant had a partial disability.

The answer to each of these questions affected the computation of economic loss. If a claimant suffered from a temporary disability, the Fund computed economic loss for the period of disability.  If a claimant suffered from a permanent total disability, the Fund computed the economic loss through the conclusion of the ordinary work life of the individual. If the claimant suffered from a permanent partial disability, the Fund computed economic loss based on the diminution of earning capacity resulting from the qualifying injury.  In each case, economic loss was computed using the same standards applied to the computation for deceased victims, except that the consumption reduction was eliminated from the calculation.

### (3)  Replacement Services Loss for Physical Injury Victims

On a case-by-case basis, the Fund provided an award for the value of replacement services for physical injury victims.  In general, the replacement services computations addressed the value of services lost to the victim's family as a result of the injury as well as the cost of obtaining services that the victim could no longer perform for him or herself.  For example, if a physical injury victim required nursing

02:008545

assistance in order to perform activities of daily living (and that assistance was not provided through health care coverage or other programs for which the victim was eligible), the Fund computed the present value of the reasonable cost of obtaining such services for the duration of the disability or incapacity. As with claims for deceased victims, the value of the services was based either on average costs for the New York metropolitan area or actual out-of-pocket costs if sufficient documentation was provided.

### c) Non-Economic Loss

The Fund provided an award for non-economic loss for every claim.[124] Each person who was killed or injured in the September 11th attacks suffered horrific and grievous harm, and experienced the unspeakable events of that day in a unique way. Some victims experienced terror for many minutes, as they were held hostage by terrorists on an airplane or trapped in a burning building. Some victims had no warning and died within seconds of a plane hitting the building in which they worked. While these circumstances may be known in some cases, for the vast majority of victims the precise circumstances are unknown.

Faced with the unfathomable task of placing a dollar amount upon the pain, emotional suffering, loss of enjoyment of life, and mental anguish suffered by the thousands of victims of the September 11th attacks, the Special Master and the Department determined that the fairest and most rational approach was to establish a uniform figure for the pain and suffering of deceased victims and their dependents.

#### (1) Presumed $250,000 Non-Economic Award for Deceased Victims

To determine an appropriate presumed non-economic loss figure for deceased victims, the Special Master and the Department looked to the amount of compensation available under existing federal programs for public safety officers who are killed while on duty, or members of the United States military who are killed in the line of duty while serving our nation.[125] The presumed non-economic loss award of $250,000 for victims who died as a result of the aircraft on September 11 is roughly equivalent to the amounts received by survivors under these other federal programs.[126] The Regulations allow claimants to attempt to demonstrate in a hearing any extraordinary circumstances that justify departure from the presumed non-economic loss award.[127]

#### (2) Additional $100,000 Non-Economic Award for Spouse and Dependents of Deceased Victims/Definition of Dependent

The Regulations also provide for an additional $100,000 for the spouse and each dependent of the deceased victim.[128] The $100,000 figure for the spouse and each dependent includes a non-economic component of "replacement services loss."[129] Under the Regulations, the Special Master "shall identify as the spouse of a victim the person reported as the spouse on the victim's federal tax returns for the year 2000

02:008546

unless: (1) [t]he victim was married or divorced in accordance with applicable state law on or after January 1, 2001; or (2) [t]he victim was not required by law to file a federal income tax return for the year 2000."[130]

While seemingly straightforward, the identification of a victim's spouse, for purposes of allocating an additional $100,000, presented some complicated problems, including challenges to the validity of a victim's marriage or the enforceability of a victim's divorce, the legal effect of separations, and alleged bigamy. In response to these issues, the Fund established guidelines for assessing marital status for valuation purposes only. Marriage certificates, recent joint tax returns and other similar evidence, were accepted as presumptive proof of marriage.

The Regulations define "dependents" as "those persons so identified by the victim on his or her federal tax return for the year 2000 (or those persons who legally could have been identified by the victim on his or her federal tax return for the year 2000) unless: (1) [t]he claimant demonstrates that a minor child of the victim was born or adopted on or after January 1, 2001; (2) [a]nother person became a dependent in accordance with then-applicable law on or after January 1, 2001; or (3) [t]he victim was not required by law to file a federal income tax return for the year 2000."[131]

To evaluate assertions of dependency, the Special Master used the definition of dependency set forth in the IRS guidelines.[132] The IRS applies five dependency criteria: (1) member of the household or relationship test; (2) joint return test; (3) gross income test; (4) support test; and (5) citizen or resident test.[133]

To be eligible as a dependent, the person must either have been living with the victim for the entire year (except for qualifying temporary absences)[134] as a member of the victim's household or must be related to the victim in one of the ways specified by the IRS guidelines,[135] and the person asserting dependency must not have filed a joint return.[136]

The gross taxable income of the person claiming dependency must not have exceeded the exemption amount of $2,900 in the year 2000. Taxable income includes money, property and services, and unemployment compensation. Welfare benefits and nontaxable Social Security benefits are excluded from taxable income. The gross income test does not apply if the dependent is a child of the victim and was either under age 19 at the end of the year, or a full-time student under age 24 at the end of the year. Accordingly, a child attending college, vocational, technical or trade school could qualify as a dependent even if his or her gross income exceeded the allowable amount.

The gross income test was the most prohibitive of the dependency requirements. Typically, the persons asserting dependency were the victim's parents or adult children. The low exemption amount effectively disqualified parents and adult children who were not full-time students and who maintained any type of

02:008547

employment, since even part-time income generally exceeded this amount. However, parents who were retired or disabled and relied on Social Security as their sole source of income may have qualified so long as the other tests were met.

The victim must also have provided more than half of the purported dependent's total support for the entire year. Support includes food, clothing, shelter, education, medical and dental care, recreation, and transportation, as well as welfare, food stamps, and housing provided by the state. In determining whether the support test is met, the dollar value of the support provided by the victim is compared with the total support the dependent received from all sources. The support test considers all income, not just taxable income. Accordingly, retired or disabled parents who received tax-exempt income such as Social Security benefits (which is excluded from "gross income") must nevertheless have shown that the victim contributed more than half of their support in order to satisfy this test.

The Fund applied special rules to children of divorced or separated parents. Under the IRS Regulations, only one parent (generally the custodial parent) can claim the child as a dependent. However, the Special Master recognized that, under certain circumstances, children of divorced or legally separated parents who were claimed as dependents on their surviving parent's 2000 tax returns could have been claimed on the victim's tax returns but for the exemption rule described above. So, for example, where the victim provided over half of his or her child's support, the Special Master determined that this prong was satisfied, despite the exemption rule. This determination acknowledged both the realities of current family circumstances as well as the unfair effect that a strict application of the IRS rule would have on children who were financially dependent on the victim notwithstanding an agreement between their divorced or separated parents assigning the exemption to the surviving parent.

Finally, to qualify as a dependent under the IRS Regulations, a person must be, for some part of the year, a U.S. citizen or resident, or a resident of Canada or Mexico. In order to avoid penalizing foreign citizens or nationals, the Special Master did *not* apply the "citizen or resident" test. Accordingly, foreign citizens or nationals were considered dependents under the Fund provided that they satisfied the four other dependency tests.

### (3)   Adjustments to Presumed Non-Economic Loss for Decedents' Claims due to Extraordinary Circumstances

In rare cases, based on extraordinary circumstances demonstrated at a hearing, the Special Master deviated from the presumed non-economic loss values. These circumstances included cases where multiple family members were killed on September 11, where other members of the nuclear family unit died shortly before or after September 11, where children were left with no parents, where victims survived the attacks but subsequently died as a result of injuries sustained (for example, burn victims who later died from complications), where victims were pregnant at the time

02:008548

of death, and where spouses of deceased victims lost an unborn child due to the trauma of September 11. The Fund adjusted the $250,000 presumed award for the decedents' pain and suffering where the victim died days or even months after the attacks for injuries sustained on September 11. The Fund adjusted the $100,000 presumed non-economic award for dependents for other circumstances, such as loss of multiple family members. The Fund increased presumed non-economic loss in a total of 75 claims for deceased victims.

(4)    Non-Economic Loss for Physical Injury Victims

The nature and severity of pain and suffering due to injuries sustained by victims who survived the attacks varied greatly, from cuts and bruises to catastrophic burns. Accordingly, the Special Master rejected the uniform approach used in evaluating the presumed non-economic loss for deceased victims. Instead, the Regulations allow the Special Master to determine the non-economic losses for physical injury victims by referring to the non-economic losses set forth in the Regulations for decedents, *i.e.*, $250,000, and adjusting the losses based upon the extent of the victim's physical harm.[137]

The Fund established the non-economic awards for physical injury victims based on the nature, severity and duration of the injury and the individual circumstances of the claimant. The Fund assured consistency by categorizing injuries so that claimants with like injuries (in terms of severity and duration) would receive a similar non-economic award. Thus, for example, claimants with respiratory injuries with the same degree of disability received a uniform non-economic award. Similarly, claimants with joint injuries (knee or shoulder injuries) received awards in the same range. (Of course, there were variations in the awards based on individual factors such as the necessity for surgery, or multiple injuries.) The non-economic awards for physical injury victims ranged from $500 to $6 million. In general, the non-economic awards for physical injury victims were lower than the presumed non-economic award for deceased victims, reflecting the fact that most injuries were relatively moderate and did not result in long-term physical pain and suffering. Approximately 53% of the non-economic awards for physical injury claims were under $100,000. Only 4% of the non-economic awards for physical injury victims exceeded the $250,000 awarded for deceased victims. The Fund did not provide non-economic awards for the dependents of physical injury victims.

3.    Collateral Offsets

The Act expressly directs the Special Master to reduce the amount of compensation awarded to the claimant "by the amount of the collateral source compensation the claimant has received or is entitled to receive as a result of the terrorist-related aircraft crashes of September 11, 2001."[138] Collateral offsets are defined by the Act to include "all collateral sources, including life insurance, pension

02:008549

funds, death benefit programs, and payments by Federal, State, or local governments related to" the September 11th attacks.[139]

The deduction of collateral source payments from awards proved to be one of the Fund's most contentious issues. Although most claimants recognized that the Fund was legally mandated to follow the Act's directive, some nevertheless vociferously argued against the appropriateness of reducing awards by collateral source payments. They asserted both that the rule unfairly penalized families of victims who planned ahead by purchasing life insurance or other means of ensuring financial security for their families and that collateral sources are typically not offset in wrongful death suits.

In administering the Program, the Special Master sought to reconcile the unequivocal language of the Act on collateral offsets with the Fund's purpose of providing financial support to victims' families based upon their individual needs and circumstances. This required balancing, within the legislative framework, the interests of the victims' families with the legal obligation to expend tax dollars only in accordance with the Congressional mandate. The Fund was an expression of compassion by the U.S. taxpayers who generously subsidized the Program, and the Special Master attempted to recognize both factors in administering the Program.

To that end, the Fund exercised discretion in valuing the appropriate deductions for collateral offsets by determining: (1) whether the particular offsets fell within the definition of collateral source compensation; (2) whether beneficiaries of the Fund were "entitled" to receive payments from those collateral sources; (3) whether the amount of the collateral source payment was certain or could be computed with sufficient certainty to enable its deduction; and (4) whether the amount deducted took into account the time value of money and contributions made before death by the victim in the nature of investment or premiums.

The Special Master invited claimants to meet with him or other Fund representatives to get a clear reading as to whether particular types of collateral source payments would fall within the statutory definition and how such payments would be valued. However, he cautioned that such consultations would focus on broad categories of payments and would not necessarily provide claimants with a precise determination of their award. Instead, a deliberate review of the facts and circumstances of each individual claimant would be necessary before deciding how certain offsets in a particular claim would be treated.

02:008550

### a) Definition of Collateral Offsets

#### (1)  Expressly Included Benefits

The Act specifically includes life insurance, pension funds, death benefit programs and payments by federal, state and local governments as collateral source compensation.  On a general level, these benefits share a common thread:  they create an entitlement arising by contract or operation of law.  However, the Fund recognized that variations existing within and among these categories created distinctions that affected their treatment as collateral offsets.

#### (a)  Life Insurance

The Act expressly includes life insurance as collateral source compensation.[140] In most cases (with the primary exception of uniformed workers whose families were entitled to receive generous survivor pension benefits), life insurance proceeds proved to be the largest offset and, thus, the greatest factor in reducing awards.[141]  Life insurance policies fell into two categories:  those that were provided by the victims' employers[142] and those that were privately funded.  The Fund offset the net proceeds (after deduction of premiums) of all life insurance and accidental death policies paid to a beneficiary entitled to receive a portion of the Fund award.

Employers were exceedingly cooperative in providing relevant income and benefit information about their employees, including information about life insurance or other benefits granted as a result of employer-provided benefits.  However, there was no independent verification mechanism available to ensure that all private insurance policies were disclosed to the Fund.[143]  Instead, the Fund relied on the legal obligation of claimants to provide full disclosure:  a claimant was required to sign an affirmation in the claim form attesting to the accuracy of the information provided and confirming his or her understanding that false statements may result in fines or imprisonment.

#### (b)  Pensions/401K

The Act specifically defines pension funds as collateral offsets[144] but provides no guidance as to how pensions should be valued.  The Fund determined that it would be inappropriate to consider, as a collateral offset, pensions or similar programs to the extent they were "self-funded" by the victim.  Accordingly, the Fund did not offset monies or other investments in victims' 401(k) accounts, IRA accounts or similar plans on the grounds that such accounts are akin to savings plans.

Unlike defined contribution plans, defined benefit plans provide for a specific monthly benefit at retirement or to a survivor upon the participant's death based on a formula that takes into consideration the participant's salary and years of service.

02:008551

Whether and to what extent such defined benefits were offset from Fund awards depended on the language of the plan and the entitlement of the beneficiaries. The Fund determined that it would be inappropriate to offset pension benefits that were contingent on specific future events.

Families of deceased uniformed officers, such as FDNY, NYPD and Port Authority fire and police victims, received survivor pensions that were considered collateral offsets under the terms of the Act. In determining the amount of the offset, the Fund computed the annual value of the death benefit for the expected life span of the spouse (or relevant period of time the benefit is payable to children or parents) in accordance with the rules governing the payment of death benefits and discounted the payments to present value. To maximize the awards and to properly reflect the uncertainties in computing the value of a future collateral payment, the Fund assumed that the survivor pension benefit would not be increased over time, as any increases would have to be legislatively mandated. For FDNY and NYPD survivors, that meant that the offset was based on the victim's salary as of September 11 without increases. [145] On the other hand, in computing the lost pension as part of economic loss, the Fund did account for income growth since income was assumed to grow under the Fund's methodology.

### (c)    Death Benefit Programs

Death benefits are also expressly listed in the Act as collateral source compensation. [146] Many employers provided the victims' families with generous benefits as a result of a victim's death. [147] As a general rule, any benefits paid by an employer as a result of a victim's death, even if voluntary, were offset from the awards. However, a case-by-case analysis of the nature of these payments was often necessary in order to determine whether or not they fell within the scope of the offset provisions.

The Fund was careful to avoid "penalizing" victims' families for the generosity of employers. In investigating these benefits, the Fund determined that certain payments, while referred to as death benefits by the employer, in fact represented compensation earned by the victim before his or her death. [148] To the extent that the payments reflected the past performance of the victim (such as any bonus the victim would have received at the end of the year but for his or her death), or an acceleration of future compensation owed (such as bonuses or commissions that ordinarily would have been paid in a later year or severance payments that were owed due to corporate restructuring), they were not offset. Similarly, certain company profit-sharing plans set up as an additional source of employee compensation were also deemed to fall within the scope of this exception. [149] To the extent that payments were made solely as a result of a victim's death, they were offset.

Some payments were treated as death benefits, and thus offset, because including them would have resulted in a double recovery. An example was payments

02:008552

representing salary continuation. Since the Fund's economic loss models calculated lost income beginning on September 11, and thus covered lost earnings for the final quarter of 2001, any income continuation paid by the employer to the victims' families had to be offset to avoid what would be, in effect, a double payment.

### (d)  Payments by Governments

Payments by federal, state and local governments made to families in the aftermath of September 11 are also included in the statutory definition of collateral offsets.[150] In determining whether payments created, managed or funded by a government agency should be treated as collateral offsets, the Fund considered whether such payments were mandated by law or contract. To the extent that specific government payments were legally, contractually or otherwise prescribed, thus vesting a right in the beneficiary to receive the payment, they were offset.

### (2)  Other Payments

Many victims or victim's families received support from charities or other privately-funded entities. This financial assistance, like that provided by the Fund, was intended to provide resources to victims or their families in times of desperate need. The Special Master concluded that charitable donations were different in kind from the collateral offsets specifically enumerated in the Act. Charities are under no contractual or legal obligation to provide assistance to any particular individual and deducting such benefits from the awards could encourage potential donors to withhold their contributions until after the claimants had received their awards from the Fund, frustrating the intent of the Act. Accordingly, the Regulations exclude from collateral source compensation "[t]he value of services or in-kind charitable gifts such as provision of emergency housing, food or clothing" and charitable donations from privately funded charities, but provide that "the Special Master may determine that funds provided to victims or their families through a privately funded charitable entity constitute, in substance, a payment described in [the definition of collateral sources]" and thus should be offset.[151] By changing the phrase "private charitable entities" used in the Interim Final Regulations to "privately funded charitable entities" in the Final Regulations, the Special Master sought to make clear that charitable gifts would not be treated as collateral offsets, even if the charities were created or managed by government entities, subject to the exception noted above.

The Regulations also exclude from collateral offsets any tax benefits received from the federal government as a result of the enactment of the Act.[152]

### b)  Entitlement

The Regulations grant the Special Master discretion to exclude collateral source compensation where the recipients of the collateral offsets are not beneficiaries of the award and "where necessary to prevent beneficiaries from having their awards reduced by collateral source compensation that they will not receive."[153] In general, where

02:008553

collateral source payments were paid to non-beneficiaries of a Fund award, Fund beneficiaries had no reasonable expectation of receiving any benefit from them and offsetting them would unfairly reduce the award. However, under certain circumstances, payments made to persons who were *not* Fund beneficiaries nevertheless benefited persons who *were* Fund beneficiaries. In such cases, the payments could be offset. These determinations required a detailed review of the facts and circumstances of each individual claim.

### (1) Non-Beneficiaries

The Fund offset collateral source payments received by any state law beneficiary or other person listed on a distribution plan. In addition, the Fund generally offset collateral source payments received by siblings of a deceased victim where the state law beneficiaries were the parents of the victim. However, if the sibling demonstrated that no portion of the collateral source payment would be used to benefit the parents, then the Fund eliminated that offset.

### (2) Disclaimers

Some claimants argued that collateral source payments made to state law beneficiaries who disclaimed the Fund award should not be offset. Under many state laws, in order to disclaim or renounce any or all interest in a victim's estate, a formal disclaimer must be filed with a court of competent jurisdiction within nine months of the victim's death.[154] Once a disclaimer is properly filed with the court, the person disclaiming his or her interest is treated as if he or she predeceased the victim, and the distribution never vests in the disclaiming party. As such, the next of kin inherits the renouncer's share, and the renouncer cannot recover any interest in the victim's estate or wrongful death proceeds.[155]

When a surviving spouse formally disclaims any interest in the victim's estate, the victim's children normally receive the award. In those cases, the spouse arguably continues indirectly to enjoy the benefit of the disclaimed funds, since such funds can reduce the costs of the maintenance, health and education of the children. The Fund concluded that fairness required payments to a spouse who disclaimed the Fund award to be treated as collateral offsets. This decision stemmed in part from the Fund's concern that the intent of the Act and Regulations could be circumvented by filing a disclaimer and thereby increasing the award from the Fund.

### (3) Unidentifiable Beneficiaries/Disputed Beneficiaries

Where the Fund could not identify the proper distributee of a collateral source payment as a Fund beneficiary, the collateral source was not offset. This situation generally arose in cases of pending disputes regarding who was entitled to a particular collateral source benefit. For example, under the New York Workers' Compensation Act existing on September 11, 2001, when a victim was survived by parents, but no spouse or children, the parents were the sole beneficiaries of any benefits payable as a

02:008554

result of the victim's death. However, on August 20, 2002, the New York Workers' Compensation Act was amended retroactively to allow qualified domestic partners to receive benefits arising from the death of victims of the September 11th attacks.[156] As a result, situations arose in which a victim's domestic partner asserted a claim for workers' compensation benefits that the victim's parents had been receiving under the previously existing law. Litigation over the identity of the proper beneficiary of such benefits ensued and, in many cases, was pending at the time of a final determination from the Fund. Insurance carriers, in an effort to avoid making double payments, indicated they would seek recovery of any benefits paid to parents in the event that a domestic partner was declared eligible by the Workers' Compensation Board. In light of these uncertainties, the Fund determined that such benefits would not be offset.

### c)  Contingent or Uncertain Payments

The Regulations allow the Special Master to reduce collateral offsets for future benefit payments that are contingent on future events to account for the possibility that the future contingencies may not occur.[157] Thus, in determining the appropriate deduction for collateral sources, the Fund considered whether the benefits could be computed with reasonable certainty. Where the benefits were uncertain, unpredictable or contingent on unknown future events, such benefits were only offset to the extent that they had already been paid.

#### (1)  Workers' Compensation/Social Security Benefits

Many survivors were eligible for benefits from programs, including workers' compensation or Social Security, that provide periodic payments subject to adjustment or termination depending on future events that cannot be predicted. Such benefits are paid only under certain conditions and for specified periods of time. Additionally, they are paid periodically over a period of years.

For example, under some state workers' compensation programs, including New York, Massachusetts, and Virginia, as well as the Federal Employees' Compensation Act ("FECA"), benefits payable to a surviving spouse terminate upon remarriage. Likewise, benefits from the SSA and other similar programs are payable only if the spouse does not re-marry or does not earn income above a certain threshold. In light of these contingencies, the Fund determined that such benefits would only be offset to the extent they had already been paid by the time the claim was filed. By contrast, survivor benefits from SSA and from the military to children of victims who are entitled by law to periodic payments until they reach a certain age are more definite and subject to computation. These benefits were therefore offset.

Some workers' compensation laws, both domestic and foreign, contain provisions which would allow the insurance carrier to assert a lien against an award issued from the Fund. In an effort to ensure that victims and their families received the full amount of compensation to which they were entitled and to protect such

02:008555