# EXHIBIT C.50

## PART 3 OF 5

awards to the greatest extent possible, New York amended its workers' compensation law to prohibit insurance carriers from asserting liens against awards from the Fund.[158] However, not all states followed suit. As a result, where survivors were eligible to receive workers' compensation benefits in states where a lien could be asserted, the Fund decided that it would be inappropriate to offset even those payments already received in light of the possibility that such payments might ultimately have to be relinquished.

### (2)   Pension Benefits

Some company pension benefits are contingent upon future events, such as the remarriage of the surviving spouse. Due to this contingency, the Fund generally did not offset future survivor pension benefits payable to surviving spouses under such pension plans.

### (3)   Other Benefits

Many employers promised to continue to provide medical coverage to the victims' families for a specified period of time based on the coverage maintained by the victim on September 11. However, since these employers were not contractually obligated to continue coverage and could terminate medical benefits at any time, past or future benefits were not offset from the award.

### d)  Appropriate Amount of Deduction

The Regulations allow the Special Master to reduce the amount of collateral offsets to reflect self-contributions or premiums paid by the victim during his or her lifetime and to take into account the time value of money.[159]

### (1)   Self-Contributions and Premiums

The Fund generally reduced the amount of offsets by any premiums or assets that the victim paid into a life insurance program to build up a tax-deferred cash value.

### (2)   Present Value

The Fund reduced future periodic payments or benefits from collateral sources to present value based on higher before-tax discount rates and current yields on mid- to long-term U.S. Treasury securities. This had the effect of decreasing offsets and thereby increasing the award. For example, in the case of Social Security benefits paid to children, the Fund determined the monthly benefit to the child, multiplied that benefit by the number of months remaining until the child reached age 18 (taking into account possible limits such as maximum family benefits available), included a factor for inflation (as consistent with Social Security guidelines), and then discounted the total to present value to determine the amount of the offset.

02:008556

(3)  Burial Costs

The Fund also had discretion to adjust the amount of offsets by considering burial costs incurred by the claimant and not otherwise reimbursed by state workers' compensation programs, employers or other sources.  Out-of-pocket burial costs were characterized as an economic loss in the Regulations.[160]  They were treated as a counter-offset in calculating awards (achieving the same bottom-line result).

e)  Effects of Collateral Offset Deductions on Awards for Deceased Victims

The deduction of collateral offsets had a significant impact on the amounts paid to claimants.  The average collateral offset for claims for deceased victims was approximately $855,000, but offsets for death claims ranged to as high as nearly $10 million.  Overall, offsets accounted for a 29% reduction in the awards for deceased victims.  Life insurance constituted the single largest offset for families of victims working in the private sector.  Survivor pensions generally constituted the largest offset for families of uniformed victims.  Collateral offsets affected awards at all income levels, but offsets in general were somewhat higher for claims for deceased victims at the highest income levels, as illustrated in the chart below:

| INCOME LEVEL OF DECEASED VICTIM | RATIO OF OFFSETS TO TOTAL ECONOMIC & AND NON ECONOMIC LOSS |
|---|---|
| $24,999 or Less | 14.76% |
| $25,000   to   $ 99,999 | 29.64% |
| $100,000   to   $199,999 | 30.30% |
| $200,000   to   $499,999 | 29.04% |
| $500,000   to   $999,999 | 26.74% |
| $1,000,000 to   $1,999,999 | 28.40% |
| $2,000,000 to   $3,999,999 | 31.36% |
| $4,000,000 and Greater | 35.90% |

In some cases, collateral source deductions exceeded non-economic and economic loss and would have eliminated the award.[161]  In the Statement by the Special Master accompanying the Final Rule, the Special Master stated his expectation that when the total needs and circumstances of the victims' families were considered, it would be rare that a claimant would receive less than $250,000.[162]  In fact, no claim on behalf of a deceased victim received less than $250,000 from the Fund.

02:008557

### f) Valuing Foreign Collateral Payments

When valuing collateral source offsets paid in foreign currency, the Fund used March 11, 2002 – the date the compensation forms were first available for completion – as the conversion date. In addition, if the collateral source payment was taxed by the beneficiary's country, the Fund counted as an offset only the portion that the claimant actually received.

### g) Collateral Offsets for Physical Injury Claims

The Fund was also obligated to deduct collateral offsets from physical injury awards. Most commonly, physical injury claimants received payments from the Social Security Administration ("SSA"), workers' compensation, disability insurance, state and federal governments (such as in the case of disabled firefighters) and pensions. All of these payments were considered collateral offsets and were deducted from the total economic and non-economic loss. Forty-seven percent of physical injury victims with temporary or permanent disabilities reported some form of collateral source compensation.

The Fund endeavored to ensure that the offsets applied matched the Fund's determination of the duration of injury. Thus, if the Fund found that the claimant was only temporarily disabled, the Fund would offset only those collateral source payments received by the claimant during the defined period of disability for the qualified injury. Collateral offsets reduced physical injury awards by nearly 30% on average. The average collateral offset for a physical injury claim was approximately $168,000. The highest offset was nearly $3 million.

### D. Demographics of Deceased and Physical Injury Victims

#### 1. Deceased Victims

The Fund disbursed $5.99 billion to 2,880 families of deceased victims of the September 11th attacks. Although the deceased victims as a whole spanned a wide socio-economic range, most of the victims (55.24%) had annual incomes ranging from $25,000 to $99,999. A relatively small percentage of deceased victims (6.25%) had income levels below $25,000 and less than 3% of victims had annual incomes over $1 million. Eighty-three percent of victims had incomes below $200,000. Fourteen percent had incomes between $200,000 and $1 million.

Of the funds disbursed, 68% was paid to families of deceased victims with incomes below $200,000; nearly 18% was disbursed to families of victims who had incomes in the $200,000 to $500,000 range.

02:008558

The following chart shows the breakdown of claims and amounts awarded by income level. Note that income is defined for purposes of this chart as the average of the victim's historical compensation for the four-year period from 1998-2001:

| Breakdown of Death Claims by Income Levels | | | |
|---|---|---|---|
| Income Level | # of Claims | % of Claims | % of Total Awarded |
| $   24,999 or Less | 180 | 6.25% | 3.22% |
| $   25,000 to $99,999 | 1,591 | 55.24% | 40.34% |
| $   100,000 to $199,999 | 633 | 21.98% | 24.30% |
| $   200,000 to $499,999 | 310 | 10.76% | 17.55% |
| $   500,000 to $999,999 | 89 | 3.09% | 7.05% |
| $1,000,000 to $1,999,999 | 52 | 1.81% | 4.92% |
| $2,000,000 & Over | 25 | .87% | 2.62% |
| Total | 2,880 | 100.00% | 100.00% |

The deceased victims ranged in age from 2 to 85. Over 65% were between 31 and 50. Seventy-six percent of the deceased victims were males and 24% were females. Claims on behalf of male decedents represented 83% of the total amount awarded on behalf of deceased victims and claims on behalf of females represented 17% of the total.

The following chart shows a breakdown of deceased victims by gender and age:

| | Age Range | Claim Count | Award Amount |
|---|---|---|---|
| **Female** | | | |
| | 25 & Under | 55 | $84,483,690.68 |
| | 26-30 | 93 | $172,998,972.03 |
| | 31-40 | 212 | $356,996,222.65 |
| | 41-50 | 193 | $268,166,342.79 |
| | 51-60 | 104 | $89,769,339.59 |
| | 61-70 | 27 | $21,178,460.11 |
| | Over-70 | 8 | $5,459,153.75 |
| | Sub Totals: | 692 | $999,052,181.60 |
| **Male** | | | |
| | 25 & Under | 96 | $167,352,503.98 |
| | 26-30 | 253 | $572,081,177.11 |
| | 31-40 | 842 | $2,347,011,727.86 |
| | 41-50 | 630 | $1,418,855,991.40 |
| | 51-60 | 299 | $427,192,091.63 |
| | 61-70 | 57 | $58,159,862.69 |
| | Over 70 | 11 | $6,555,465.81 |
| | Sub Totals: | 2,188 | $4,997,208,820.48 |
| **TOTALS** | | 2,880 | $5,996,261,002.08 |

02:008559

Sixty-four percent of the deceased victims were married and 36 percent were single. Most of the victims (72%) left at least one dependent (as defined by the Regulations). Forty-eight percent of claims were filed on behalf of deceased victims who had minor children under the age of 18 on September 11, 2001 who were included in the household for consumption purposes in computing economic loss.[163] Eighty percent of the total amount disbursed for deceased victims was paid to claims where the beneficiaries included at least one minor child or dependent within the meaning of the Regulations.

The following chart shows by state of residence the breakdown of death claims of victims with minor children in the household. This includes children under the age of 18 on September 11, 2001 who were included in the household for consumption purposes in computing economic loss. Ten percent of the victims who left minor children in the household were single.

| Victim Residence | # of Minor Children | # of Claims |
|---|---|---|
| STATE | | |
| ARIZONA | 3 | 2 |
| ARKANSAS | 2 | 1 |
| CALIFORNIA | 11 | 9 |
| COLORADO | 1 | 1 |
| CONNECTICUT | 93 | 44 |
| DISTRICT OF COLUMBIA | 10 | 5 |
| FLORIDA | 10 | 4 |
| GEORGIA | 7 | 3 |
| ILLINOIS | 4 | 2 |
| LOUISIANA | 1 | 1 |
| MAINE | 2 | 1 |
| MARYLAND | 45 | 27 |
| MASSACHUSETTS | 39 | 23 |
| NEW HAMPSHIRE | 4 | 2 |
| NEW JERSEY | 827 | 391 |
| NEW MEXICO | 2 | 1 |
| NEW YORK | 1,628 | 805 |
| NORTH CAROLINA | 4 | 1 |
| OHIO | 2 | 2 |
| PENNSYLVANIA | 27 | 15 |
| RHODE ISLAND | 1 | 1 |
| TENNESSEE | 1 | 1 |
| TEXAS | 2 | 1 |
| VIRGINIA | 62 | 36 |
| COUNTRY | | |
| CANADA | 2 | 2 |
| GERMANY | 7 | 4 |
| UNITED KINGDOM | 9 | 5 |
| TOTALS | 2,806 | 1,390 |

02:008560

Deceased victims resided in 29 states. Over half (62%) of the victims resided in New York State; 24% resided in New Jersey. Claimants for victims from the state of New York received $3,417,832,930.47 (57% of the total disbursed for death victims); claimants for victims from the state of New Jersey received $1,752,276,148.72 (29% of the total disbursed for death victims).

The victims resided in 10 different countries (including the United States). Although nine percent of victims (249) were citizens of countries other than the United States, only 30 victims resided outside of the United States. Most were living and working in the United States.

The following chart shows the breakdown of death claims by victims' employment category:

| EMPLOYMENT CATEGORIES | # OF CLAIMS | TOTAL AWARD | % of Total Fund Awarded |
|---|---|---|---|
| Attorneys/Legal Profession/Law Firm Staff | 23 | $47,370,341.37 | 0.79% |
| Civil Service | 105 | $136,925,005.82 | 2.28% |
| Communications Industry/Telecommunications/Broadcast | 26 | $43,478,760.85 | 0.73% |
| Construction (including carpenters, electricians, etc.) | 55 | $84,055,990.64 | 1.40% |
| Emergency Medical Technicians & Assistants/Paramedics | 5 | $7,567,620.84 | 0.13% |
| Finance/Banking/Insurance/Accounting | 1,669 | $4,099,933,810.82 | 68.37% |
| Fire Department | 342 | $559,197,606.41 | 9.33% |
| Homemakers | 4 | $3,568,113.68 | 0.06% |
| Maintenance/Janitorial | 28 | $37,808,186.01 | 0.63% |
| Medical/Doctors/Nurses | 9 | $14,031,181.86 | 0.23% |
| Military | 54 | $102,000,055.64 | 1.70% |
| Pilots/Flight Attendants/Other Airline Employees | 30 | $37,994,215.96 | 0.63% |
| Police Department | 23 | $34,771,624.63 | 0.58% |
| Port Authority | 75 | $127,395,765.33 | 2.12% |
| Restaurant/Food Workers/Wait Staff/Dishwashers | 97 | $131,140,863.73 | 2.19% |
| Retired | 13 | $12,890,255.07 | 0.21% |
| Security Personnel/Private | 32 | $32,329,579.41 | 0.54% |
| Students | 3 | $2,767,526.47 | 0.05% |
| Technology/Computer Related | 130 | $235,857,731.69 | 3.93% |
| Unemployed | 4 | $7,038,280.77 | 0.12% |
| Other | 153 | $238,138,485.08 | 3.97% |
| Total | 2,880 | $5,996,261,002.08 | 100.00% |

## 2.  Injury Victims

The Fund disbursed $1.053 billion to injured victims. Eighty-four percent of the physical injury victims who received awards from the Fund were male. Victims range in age from 18 to 86 years old.

02:008561

Again, the victims spanned a wide socio-economic range. However, the injured victims generally appeared to fall into lower income groups than the deceased victims. Forty-five percent of the injured victims reported an income under $25,000. Only 2% reported an income over $125,000.

Physical injury victims suffered a variety of types of injuries. The most common injury, representing 51% of claims, was respiratory ailments.

The following chart shows the breakdown of claims and payments by injury type:

| INJURY TYPE | # OF CLAIMS | % OF CLAIMS |
|---|---|---|
| ASTHMA/OTHER RESPIRATORY | 1,377 | 51.38% |
| BACK INJURY (Disc Problem, Back Pain, etc.) | 94 | 3.51% |
| BROKEN BONES/FRACTURES | 87 | 3.25% |
| BRUISES/CUTS | 44 | 1.64% |
| BURNS | 40 | 1.49% |
| HEART ATTACK/OTHER CARDIAC PROBLEMS | 6 | 0.22% |
| NEUROLOGICAL PROBLEMS (Stroke, Seizure, Brain Damage, etc.) | 8 | 0.30% |
| OTHER INJURY | 67 | 2.50% |
| SENSORY PROBLEMS (Vision, Hearing, etc.) | 31 | 1.15% |
| SOFT TISSUE (Ligaments and Cartilage) | 91 | 3.40% |
| MULTIPLE INJURIES | 835 | 31.16% |
| TOTAL | 2,680 | 100.00% |

Injured victims resided in 31 states. The majority (85%) of the victims resided in New York State and received 84% of the funds distributed to injury victims; less than 7% resided in New Jersey.

Physical injury victims resided in 6 countries (including the United States). Of the 85 citizens of foreign countries, only 14 resided outside of the United States.

### E. Distribution

The Act's silence regarding the distribution of awards for decedents' claims created a huge vacuum in the administration of the Fund. While the Act was intended to benefit the families of deceased victims, questions regarding which family members should be included in a plan of distribution and how the award should be allocated were left to the Department and the Special Master to resolve. The Regulations and the procedures developed by the Fund attempted to create a mechanism for the allocation of awards that would be consistent among similarly situated families, efficient, and easy to administer, but would also allow for the consideration of the individual needs of the families. The Department and the Special Master determined that these goals would be best served by distributing the award in a manner consistent

02:008562

with the law of the decedent's domicile. Consistency would be assured by authorizing the Special Master to approve or disapprove the plan depending on whether it complied with state law. Efficiency would be served by requiring the Personal Representative to submit a plan of distribution to the Fund for the Special Master's approval, thereby eliminating the involvement of the state courts where the Special Master determined that the plan followed state law. Fairness and the evaluation of individual factors would be accomplished by allowing the Special Master to direct distribution to specific family members if the Personal Representative's proposed plan did not appropriately compensate these relatives.

The Regulations require the Personal Representative to distribute the award in a manner consistent with the law of the decedent's domicile[164] or any applicable rulings made by a court of competent jurisdiction. In order to monitor the actions of Personal Representatives in meeting this obligation, the Personal Representative was required to submit a proposed distribution plan to the Special Master. If the distribution plan submitted appeared to be consistent with state law, the Fund approved the plan; if it did not comply with state law, the plan was not approved. In the latter case, the Personal Representative would need to seek a determination from the relevant state court as to the proper distribution of funds.

### 1. Distribution Plan Guidelines

At the outset, claimants required substantially more guidance than that provided by the Regulations in order to submit a plan that the Fund would consider consistent with state law and would ultimately approve. Attorneys also were in need of guidance since even those expert in the applicable state trusts and estates law were often uncertain as to which particular state law rules applied to various portions of the award. In order to clarify the components of an appropriate plan, the Fund provided guidelines on its website,[165] at town meetings, in mailings,[166] and by telephone. Claimants were told that the Personal Representative must provide a proposed distribution plan to the Fund for review prior to payment and that the distribution plan would need to address three components of the award: (1) a non-economic award on behalf of the victim, (2) a non-economic award for a spouse and each dependent, (3) and an economic award. As to these three components, the following guidelines were provided. First, the $250,000 non-economic presumed award on behalf of the victim was to be distributed in accordance with the victim's will or, in the absence of a will, according to the intestacy law of the state where the victim had been domiciled. The Fund's website provided claimants and their attorneys a chart summarizing the intestacy law for most states where decedents had been domiciled.[167] Second, the $100,000 additional non-economic award for a spouse and each dependent was to be distributed to each qualifying person. Third, the economic loss portion of the award (in most cases the bulk of the award) would be governed by the wrongful death law of the state of the victim's domicile. A chart summarizing the wrongful death law for most applicable states was also posted on the Fund's website.[168]

02:008563

The review of distribution plans and the process required for approval of a plan proved to be extremely time-consuming for the Fund attorneys. Many claimants found the requirement that the plan account for three different components of the award complex and confusing.   Likewise, trusts and estates attorneys accustomed to distributions of estate property and physical injury lawyers familiar with wrongful death awards initially found the hybrid nature of the Fund's award perplexing. However, as the Program proceeded, the management of the distribution plan process by claimants and attorneys significantly improved.   Nevertheless, the process of education of claimants and attorneys in conjunction with evaluating plans and working to achieve approvable plans was ultimately one of the more labor-intensive tasks in administering the Fund.   From the claimant's perspective, however, the process was significantly more efficient than that of seeking approval for the distribution of an award from a court of competent jurisdiction.

While claimants and attorneys found the appropriate allocation of the non-economic award to be comparatively simple, the allocation of the economic portion of the award posed greater challenges. Unlike wills and state intestacy laws, which delineate the identity of the distributee as well as the portion of the estate the distributee should receive, the wrongful death law of most states provides that damages should be distributed to those eligible to recover under a state's intestacy law, "in proportion to their pecuniary loss."[169]   A finding of proportionate "pecuniary loss" often requires a court to engage in time-consuming fact-finding.  However, the goal of efficient and speedy resolution of claims obviously would not have been served had the Fund regularly engaged in distribution plan hearings to determine the "pecuniary harm" of significant numbers of beneficiaries.  In order to avoid this result and provide Personal Representatives and their attorneys with guidance regarding "pecuniary loss," the Fund adopted criteria considered by state courts.  Generally, the Fund determined that the economic portion of a plan of distribution would be approved if the allocation either followed the intestate law of the state of domicile or, in the case of distribution between a spouse and children, a formula developed by the New York Surrogate's Courts in *In re Kaiser Estate* that based pecuniary loss on remaining years of dependency.[170]   These criteria provided the Personal Representative with some flexibility while still protecting the interests of beneficiaries.  For example, the option of relying upon the *Kaiser* formula was particularly helpful to a spouse with older minor children, since under those circumstances the *Kaiser* formula would provide a larger portion of the economic award to a spouse with many years of remaining dependency than an allocation based on the intestate laws, which usually split the estate equally between a spouse and children.

In some situations, the Fund concluded that certain state laws created potential hardships for claimants by limiting a spouse's share to less than half of the economic recovery.  To address these circumstances, the Special Master determined that, in the interest of both uniformity and fairness, it would be appropriate to allow every Personal Representative the option of utilizing the *Kaiser* formula for allocation of the

02:008564

economic portion of the award regardless of whether "pecuniary loss" was the measure for wrongful death allocation in the state of the victim's domicile.

The Fund carefully scrutinized distribution plans involving minor children. For claims where minor children would be the recipients of awards, the Fund generally required strict compliance with either the *Kaiser* formula[171] or the intestate law. However, in the case of consenting adults, the Fund accepted consensual distribution plans that deviated from a strict application of state law so long as all potential beneficiaries agreed and the plan was not contrary to the purpose of the Act or state law.[172] This option was utilized most often by parents of a single victim without children who chose to distribute a portion of the award to the decedent's siblings.[173]

Some of the most difficult distribution problems involved allocation of the economic portion of the award between a victim's spouse and parents, where there were no children.[174] Many state wrongful death laws, including those in New York and New Jersey, the domicile of most decedents, provide that when there is a surviving spouse and parents, but no children, the parents may recover in proportion to their pecuniary loss. Under these circumstances, the Special Master did not develop criteria for apportionment of pecuniary harm since the application of a general formula to every case could overstate or understate a parent's pecuniary harm depending on whether and to what extent a parent had relied or reasonably expected to rely upon the decedent. Instead, the Special Master encouraged the parents and spouse to enter into a consensual distribution plan. When the Special Master was not able to approve a plan under these circumstances, the award was issued to the Personal Representative in his or her capacity as Personal Representative, and the Fund sent a letter to the Personal Representative advising that he or she was legally obligated to distribute the award in accordance with the law of the victim's domicile and that the distribution must be based on either an agreement of all potential beneficiaries or the direction of a court of competent jurisdiction.[175] A copy of this letter was also sent to the potential beneficiaries of the award. The Personal Representative thereafter had the fiduciary responsibility to enter into an agreement with the other beneficiaries or to seek resolution of the dispute in the appropriate court.[176]

An additional area of frequent dispute regarding distribution included claims where a fiancée or domestic partner had filed an SOI or an objection. Since few states recognize the claim of a fiancée or a domestic partner to either an intestate share of an estate or a portion of a wrongful death award, a domestic partner or fiancée could ordinarily only receive an award from the Fund if he or she was provided for in the decedent's will (and thus entitled to all or a portion of the $250,000 non-economic award) or was financially dependent upon the decedent (and thus entitled to the $100,000 non-economic award).[177]

02:008565

## 2. Protection of the Interests of Minors

Both the Act and the Regulations are silent regarding the payment of awards to or on behalf of minors. Accordingly, the Fund set about developing a mechanism that would provide flexibility to custodians in overseeing an award for a child's benefit, while affording protection to the child. In order to accomplish this goal, the Fund evaluated a variety of options including guardianship, trusts, custodial accounts, representative payees and periodic payments through structured settlements.

The Fund initially considered requiring the appointment of a guardian of the property[178] for every minor beneficiary. Becoming a guardian of the property is a comparatively simple process in undisputed cases, particularly where a natural parent is seeking guardianship. In addition, the surrogate and probate courts nationwide were extremely responsive to the Fund's requests that this process be expedited for purposes of facilitating payment of Fund awards. However, many states impose significant limitations on the ability of the guardian to access the minor's funds.[179] The fundamental premise in these states is that it is the guardian's duty to protect the funds during the child's minority, and, therefore, the award is to be used only after a parent's obligation of support has been satisfied. In New York, for example, in order to utilize funds a parent must disclose his or her financial means and indicate why access to the funds is necessary. The court then decides whether to allow the expenditure.[180]

Many parents of minor beneficiaries, particularly those residing in New York, argued that requiring a parent to be appointed guardian of the property would be cumbersome and unnecessarily restrictive. These parents complained that they would be unable to provide adequately for their children's needs if they were required to submit to the probate and surrogate's courts requirements in their jurisdiction. They asked the Fund to provide an alternative mechanism for payment to minors that would be less onerous.

In response to these concerns, the Fund evaluated a number of other options for the payment of minors. Many parents and attorneys argued that the Fund should allow parents the option of payment into a custodial account pursuant to the Uniform Transfer to Minors Act. However, this option appeared to be unworkable. In most states, payments of over a certain sum into a custodial account require either court supervision or utilization of a bank as co-trustee.[181] Various banks contacted by the Fund indicated that in order to serve as co-trustee, they would require an order specifying the purpose of the funds, the amount that could be withdrawn by the custodian per annum, and other directives including orders from the Special Master before withdrawals could be made by a custodian.

The Fund also considered the option of depositing awards into a trust. Depending on the provisions, trust accounts can be substantially less restrictive than guardianship. This option was advocated by many parents as the most protective, yet flexible mechanism available. However, the Fund concluded that the utilization of trusts was problematic. First, there were significant legal questions regarding whether

02:008566

an award could be deposited into a trust without court approval. Second, the trust option would create administrative difficulties since a review of the trust documents -- by the Fund or a court -- to determine whether the instrument was sufficiently protective of the minor and whether it comported with state law would likely be appropriate.

The Fund also considered the option of appointing a parent as a representative payee. This approach has been used in other federal programs.[182] Under this option, a parent would apply to the Fund to serve as a representative payee. Upon appointment by the Fund, the representative payee would hold the funds on behalf of the minor and would have the fiduciary responsibility to ensure that the award to the child was utilized for the child's current needs, and, if not currently needed, saved for the child's future needs. The advantage of this option was its flexibility and ease of administration. The disadvantage was the lack of oversight and supervision of the representative payee by a third party.

Finally, the option of establishing periodic payments through structured settlements for minors was evaluated. The advantage of this option was that payments to minors would be disbursed over time (instead of upon reaching the age of majority) and the earnings on the portion of the award that was structured are not taxed. Such an option necessarily involved insurance or annuity contracts and implicated issues concerning the taxability of future periodic payments when received. The benefit of this option was contingent upon the IRS' consideration of the tax implications of structuring a Fund award.

The Fund weighed the advantages and disadvantages of the above alternatives. While requiring every parent or custodian to become a guardian and receive funds for the minor in his or her capacity as a guardian was the most protective option, the Fund concluded it did not promote the Program's goal of providing funds to parents and custodians of minor children for purposes of the child's current as well as future needs. Accordingly, those parents and custodians who chose to become appointed guardians and receive funds for a minor in this capacity were able to do so, but those who desired greater flexibility were not required to accept this option. The Fund rejected the alternative of depositing an award into a custodial account as an administratively unworkable solution. The Fund simply would not be able to provide advice and guidance to banks regarding payments after the completion of the Program, and supervision of the accounts by a court would result in the same administrative issues as guardianship. As to the trust option, the Fund concluded that payment of a minor's award into a trust would be made by the Fund if the trust had been approved for this purpose by a court of competent jurisdiction.[183] The Fund also decided to implement a representative payee program as an option to allow custodial parents to receive awards on behalf of their minor children, if they applied for such status. Applicants for the representative payee program were required to sign an acknowledgment that he or she could be held liable if he or she did not prudently invest the funds, maintain separate accounts, and maintain records, or if he or she

Page 61

02:008567

misused or misappropriated the funds. In addition, the applicant was required to acknowledge that the minor was entitled to receive the award upon reaching 18 years of age and that, at such time, the award would be distributed to the minor unless the minor otherwise consented.[184]

Parents and custodians of minor children were informed of their various options by letter. In addition, an explanation of the options was published on the Fund's website and was reviewed at town hall meetings and in response to inquiries by telephone. The Fund found that most custodial parents chose to utilize the representative payee program, presumably due to its flexibility and ease of administration.[185] Non-custodial parents and custodians who were not parents were obligated by the Fund to receive a minor's award either as a court-appointed guardian or in a court-approved trust. Despite the availability of the representative payee program, some custodial parents chose to receive their children's awards in their capacity as court-appointed guardians either on advice of counsel or in order to obtain the additional protections afforded by the court's supervision.[186]

A final option of utilizing a structured settlement for minors became available after the Fund was notified of the IRS' decision on October 28, 2003 regarding the election of a periodic payment option through a structured settlement.[187] Senior attorneys at the Fund and at the Department worked with the IRS and Department of Treasury for well over a year in an effort to obtain a detailed determination on the availability of the structured settlement option. In order to assure that the structure was entered into by an individual with authority to bind the minor, the Fund required that a parent or custodian signing the structure documents be appointed guardian of the property for the minor by a court of competent jurisdiction.[188] For many parents or custodians, such an appointment had to be made on an expedited basis to allow timely approval of the structure. The various surrogate's and probate courts were able to respond quickly to the Fund's request to expedite these applications for guardianship by granting such appointments for the limited purpose of entering into a structured settlement agreement for the Fund award. The cooperation of these various courts was instrumental in making the structured settlement option viable for minors.

While most parents and guardians were able to utilize a mechanism for payment that met their needs, some parents and guardians were dissatisfied and complained that none of the options allowed both the flexibility to bypass state court requirements that limited the use of the funds for support of the child and protected the funds from dissipation after the minor had reached the age of majority.

### 3. Distribution to Non-U.S. Claimants and Beneficiaries

As discussed above, in evaluating the appointment of an appropriate Personal Representative for foreign claims, the Fund enlisted the help of the consular offices of the foreign country in question. This procedure was effective because the issues relating to proper appointment were relatively discrete. However, in regard to

02:008568

distribution plans submitted by foreign claimants, the Fund concluded that, due to the diversity and complexity of various applicable foreign laws, it was not feasible for the Fund to adequately evaluate distribution plans, even with the help of the consular offices. Accordingly, for foreign claims, the final award was paid to the Personal Representative in his or her capacity as Personal Representative. The Personal Representative thereafter had the responsibility to distribute the award consistent with applicable foreign law.

### 4. Application of Offsets to Award Distribution

When determining the amount of the award for each Fund beneficiary, the Fund applied collateral offsets against the share of the individual who received the collateral source payment. Any excess offsets were applied against the remaining shares of the award. The Fund, however, agreed to depart from this general rule in certain circumstances. If the Personal Representative believed that a hardship was created by applying collateral offsets against individual shares, he or she had the option of sending a written request to the Fund for a reallocation of collateral offsets. The most common reallocation was where a spouse had received most of the collateral source payments (e.g., life insurance) and was using these payments to support the victim's minor children, who were all part of one nuclear family unit. In such a situation, the collateral source payments could be so large that deduction of the collateral offset individually from the spouse's portion would leave little, if any, of the award for the spouse's support. If the Fund found reallocation appropriate, the total collateral offsets were deducted from the entire award and the remaining award was apportioned according to state law.

### 5. Distribution Hearings

The Regulations provide that, in the event the Special Master concludes that the plan for distribution does not appropriately compensate the victim's spouse, children, or relatives, the Special Master can direct the distribution of the award to such spouse, children or other relatives.[189] The Special Master exercised this discretion rarely. In most cases, when the distribution plan submitted by the Personal Representative appeared to be inconsistent with state law, one of the Fund's attorneys worked with the Personal Representative or his or her attorney to approve an appropriate plan. If this could not be accomplished due to an intractable dispute among the potential beneficiaries or a case where strict adherence to state law would have been inequitable due to special circumstances, a managing attorney held a distribution hearing. Throughout the Program, only 3 distribution hearings were held. These hearings were conducted separately with each of the opposing parties in order to mitigate familial acrimony. The Fund thereafter approved a distribution plan based on the information presented at the hearings that appropriately compensated the victim's spouse, children, or other relatives. In a limited number of cases, the Special Master determined that the issues presented by a dispute regarding distribution required extensive fact finding and were more appropriately resolved by a state court

02:008569

of competent jurisdiction. In these cases, the Fund authorized payment of the award to the applicable court, and the parties were referred to the court for resolution of the claim.

## F.  Confidentiality and Transparency

The Special Master recognized from the beginning of the Program the deep concern that claimants would have in preservation of their privacy. Most claimants submitted substantial private and intimate information regarding their loved ones and the victim's family's needs that they intended to be utilized solely by the Fund to issue a fair and individualized award. Balanced against this need for confidentiality was the legitimate interest of both claimants and potential beneficiaries in obtaining information enabling them to make an informed judgment whether to file a claim or to file a lawsuit. In addition, the Fund was a *public program*, funded by the taxpayers. Accordingly, the Special Master concluded that, notwithstanding the need for confidentiality, a certain degree of information about the Program must be made available to all American citizens.

The Fund responded to these concerns by protecting the confidentiality of the claimants through dissemination of information regarding the Program that would be informative but would not be linked to treatment of a particular claim. In regard to specific inquiries by claimants, the Special Master, the senior attorneys and other Fund staff were available to every claimant and his or her attorney to discuss the methodology utilized in evaluating the particular claim as well as the specific issues relating to the claim.

### 1.  Confidentiality

The information submitted by a claimant was confidential and not disclosed to other parties except pursuant to the Authorization for Release of Information (the "Authorization") that was signed by each claimant. This Authorization fulfilled a variety of needs. First, the Authorization allowed the Fund to gather and verify information necessary to process the claim. The potential sources of this information included employers, hospitals, medical service providers, and federal, state and local agencies, such as state workers' compensation boards and the SSA. By contacting these entities directly, the Fund obtained information that the claimant might have been unable to obtain in such a limited time period (due to administrative issues or paralyzing grief) and also corroborated information submitted by the claimant relating to the victim (*e.g.*, compensation) or the beneficiaries (*e.g.*, death benefits).

Second, the Authorization allowed publication of the name of the claimant and the victim for whom compensation was sought. Pursuant to the Authorization, the Fund published a list of names on its website.[190] The purpose of this publication was twofold:  to notify all potential beneficiaries that a claim had been filed on behalf of the victim so that any potential beneficiary could file an objection or SOI with the

02:008570

Fund and to ensure that any person who might be impacted by the waiver of rights signed by the claimant was on notice of the filing. In the interest of balancing confidentiality with publication of information, the names of the victim and claimant were removed from the website after 90 days, a period of time that the Special Master concluded would effectively provide notice to any interested parties. In addition, the Authorization allowed the Fund to provide notice of the proposed distribution of the award to potential beneficiaries, thereby providing these interested parties the opportunity to participate in the process.

Finally, in order to allow the investigation of potentially fraudulent claims, the Authorization allowed the release of information relating to the claim where such information indicated a violation or potential violation of law to any authority investigating or prosecuting such a violation.

## 2. Transparency

In order to keep claimants, potential beneficiaries, and other interested parties, including the public, informed regarding the process and the decisions made throughout the Program, the Special Master published on the Fund website information and statistics relating to awards. The information and statistics published were presented in a manner designed to safeguard the confidentiality of claimants.

Other information provided to keep claimants and other parties informed regarding the awards issued by the Fund included, for death claims, a listing of all award amounts sorted by income level but with no other identifying information,[191] as well as statistics including the number of claims resolved, the number of award letters issued, the average awards for deceased victims after offsets, the median deceased victims' awards after offsets, and the range of award values for claims relating to deceased victims sorted by income level and age.[192] The Fund also published the number and range of amount of physical injury awards.[193]

A principal goal of the Fund was to engage claimants in the process through consistent communication with victims and families of victims regarding their claims. The Special Master held countless hearings and meetings with families to discuss how the Fund would evaluate their claim and to give estimates of the award. In addition, a member of the Fund staff was available to respond to any and all questions regarding the award and its calculation. Indeed, the Fund staff continued to respond to inquiries well after the Fund had completed the issuance of all awards.

## G. Coordination with Government and Private Entities

From the inception of the Program, the Fund established channels of communication with various government and private organizations. Procedures were established to obtain and verify information from these organizations in order to foster efficiency of claims processing, ease the burden of information gathering for

02:008571

claimants, verify the accuracy and completeness of information included in the claim, and facilitate the payment and distribution of awards.

### 1. Verification of Information from Government and Private Employers

In order to ensure that the Fund had access to and a full understanding of particularized information for each claim, the Fund developed valuable relationships with employers who had lost multiple employees. These employers included the Department of Defense, the New York City Police Department, The New York City Fire Department, the Port Authority of New York and New Jersey, and various private employers.

#### a) Department of Defense

Through contacts established with the Department of Defense ("DOD"), the Fund was able to obtain detailed information about the compensation of every victim employed by the military, thereby obviating the need for families of the military to compile documents on their own, and ensuring that the Fund treated members of the military consistently. The military provided the Fund information through the Defense Finance and Accounting Service, Army Casualty Assistance, Navy Casualty Assistance/Family Liaison, and Marine Corps Casualty Assistance. Information was obtained from these sources regarding compensation for 2001 from the most recent military Leave and Earnings Statement, the military pension calculation methodology, the Survivor Benefit Plan, Dependency Indemnity Compensation, and basic pay schedules, basic allowance, and basic allowance for subsistence by year, rank, and geographic location.

The Special Master's Office held meetings with representatives of the DOD Civilian Personnel Management Service to gain a thorough understanding of the unique aspects of the compensation and benefits for civilian employees of the DOD who were killed in the Pentagon. These meetings, along with explanatory documentation received from the DOD facilitated the processing of claims for DOD civilian employees.

#### b) Department of Labor

The Special Master's Office met with representatives of the Department of Labor ("DOL") concerning benefits under the Federal Employees' Compensation Act ("FECA")[194] to gain an understanding of how such benefits should be treated in the calculation of awards, and also to gain an understanding of the DOL's claims process as relevant to establishing the Fund's own processes and procedures.

02:008572

c) New York City Fire Department[195]

The assistance provided by the FDNY was invaluable for the evaluation of both death and physical injury claims. The FDNY and the New York City Office of the Actuary provided information critical to the computation of death claims, including explanations of retirement and survivor pension benefits, union pay agreements, post-September 11th overtime, and other compensation and benefit information. The FDNY also provided valuable information for the evaluation of physical injury claims, including retirement dates, monthly pension amounts, the monthly annuity provided by excess optional contributions, 2003 retroactive pay adjustments resulting from FDNY contract changes, the results of a claimant's 1B medical board hearing and FDNY medical board minutes memoranda.

d) Port Authority of New York and New Jersey

The Fund developed lines of communication with the Port Authority Fire and Police Pension Group and the New York City Employee Benefits Division. These groups provided compensation and pension information for uniformed Port Authority firefighters and police officers as well as other Port Authority victims.

e) Private Employers

In order to expedite claim processing, verify compensation and other benefits data, and assist claimants in providing complete and thorough information, the Fund established relationships with several of the private employers who lost multiple employees.[196]  Initially, the Fund contacted the human resources department of identified organizations and requested a list of all employees who were killed on September 11, along with an affidavit supporting presence at site requirements. These affidavits were used to establish eligibility and obviate the need for claimants to submit separate proof of presence at site. In response to the Fund's goal of streamlining the claims process for as many claimants as possible, several of the larger employers compiled packages of information specific to each victim. The Fund reviewed these materials and accepted the packages in lieu of claimants completing certain sections of the compensation form.

Throughout the administration of the Fund, employers who had lost multiple employees (as well as employers with few losses) were invaluable in providing necessary information. For employers who had lost multiple employees, specific procedures were established to efficiently gather information, including the identification of a specific point of contact for communications. For other employers, information was requested on a case-by-case basis. These communications not only streamlined the process, but also facilitated processing of claims in cases where a claimant had only submitted minimal information, allowing preparation by the Fund of a "baseline" model for each claim, which could be then finalized when and if additional information was received from the claimant.

02:008573

## 2. Verification of Benefits by Government Entities

The claim form requested the claimant to list various offsets received. In the case of offsets received from government entities, the Fund established procedures to obtain information and verify benefits received from the New York State Workers' Compensation Board and the SSA. These procedures facilitated the efficient processing of claims.

### a) Social Security Administration

Initially, the Fund met with SSA representatives, including the New York Regional Commissioner, to gain an understanding of SSA benefits payable to claimants, and to discuss how the Fund could coordinate with the SSA on obtaining data related to claimants to assist in the valuation and verification of claims and offsets.

At the beginning of the Program, the Fund communicated with the SSA on a weekly basis to confirm and calculate total SSA benefits paid to eligible beneficiaries. As claim volume increased and processing time decreased, requests were sent to the SSA on a daily basis. The SSA provided the Fund with the following information: Social Security payments related to each victim, including the Social Security number and date of birth of each beneficiary, the month each beneficiary began receiving benefits, the total amount paid to each beneficiary, and the current monthly payment amount. This information was used to verify the collateral offset amounts associated with Social Security benefits received by family members of a victim. Under certain circumstances, dates of birth received from the SSA were utilized to determine appropriate award calculations and distributions. Occasionally, when documentation for an individual's income was missing for a given year, the Fund used the SSA information to determine an earnings history for that individual.

### b) New York State Workers' Compensation Board

The Fund established a relationship with the New York State Workers' Compensation Board that allowed the Fund to access the New York State Workers' Compensation system data. This data was used both for physical injury and death claims. For death claims, administrative decisions regarding survivor benefits were obtained directly from the New York State Workers' Compensation system, if not provided by the claimant. For physical injury claims, the New York State Workers' Compensation system was used to obtain critical pieces of information for valuation. This information included average weekly wages, the amount of Workers' Compensation benefits paid to claimants, the period of time the benefits were paid, and injuries for which Workers' Compensation was paying benefits. The Board provided the Fund with electronic access to claimants' medical records, Independent Medical Exam Reports, Workers' Compensation claim forms, billing information for medical services performed, and Workers' Compensation Board decisions on benefit payments and compensable injuries.

02:008574

### 3. Investigation of Potential Fraud: Coordination with the FBI and the Department of Justice - Office of Inspector General

The Special Master's Office coordinated with the FBI and The Department of Justice - Office of the Inspector General (OIG) to determine whether any claims should be investigated as potentially fraudulent or as relating to a person potentially involved in any terrorist activities. All victim, claimant, payee, and distributee names were submitted to the Department of Justice with associated Social Security Numbers and dates of birth. This information was forwarded to the FBI, where it was checked against FBI records. Payments of awards were made after the FBI indicated that it had located no pertinent information regarding the victim, claimant, and payee(s). If the FBI determined that an individual name required a review of records, this information was reported to the Special Master's Office. The Special Master's Office reviewed the information and made a determination regarding whether the records indicated potential fraud or any other basis for further investigation of the claim before authorization of payment. If the Special Master's Office concluded that the FBI records required further investigation, the claim was sent to OIG for review. Additionally, the Special Master referred all other claims to OIG which it concluded warranted a more thorough review for potential fraud. After its investigation, OIG sent a report of its findings to the Special Master's Office.

During the course of the Program, 28 claims and one SOI were sent to OIG for investigation. As of the date of this Report, 6 had been prosecuted with 5 having resulted in criminal convictions. By any measure, the Fund proved remarkably free from fraud and other criminal activity.

### 4. Assistance to Claimants

#### a) Establishment of Periodic Payments Program: Coordination with the IRS

From the inception of the Program, significant numbers of claimants expressed interest in receiving awards as periodic payments through structured settlements. Claimants and beneficiaries, however, were understandably concerned as to how such periodic payments would be treated by the IRS (*i.e.*, whether they would be granted tax-exempt status). The Special Master's Office initially contacted the IRS Office of the General Counsel in the spring of 2002 to determine the best mechanism to allow victims the opportunity to receive their award in the form of periodic payments. The Special Master's Office continued to work with the IRS and the Treasury's Office of Tax Policy throughout 2003. On November 17, 2003, the Commissioner of the IRS issued Revenue Ruling 2003-115 that provided the IRS' final guidance on the issue. Thereafter, the Fund offered a periodic payment option to beneficiaries of a Fund award. A total of 181 claims were paid, in some part, via this option.

### b) Coordination with the INS

Undocumented aliens and their families voiced concern from the outset of the Program that filing a claim could adversely affect their status with the INS. After discussing the issue with senior INS representatives, the Special Master received assurances from the INS that information submitted by claimants to the Fund in support of their claims would not be used to initiate immigration proceedings against claimants who lacked legal immigration status.

### c) Coordination with the State Department and Foreign Consulates

The Fund communicated with foreign consulates in order to ensure effective notice of the Fund was provided to foreign victims and their families. Consular offices were extremely helpful in assisting the Fund regarding the laws and procedures of their countries relating to notice, trusts and estates laws, and the foreign appointment of Personal Representatives.

The Special Master met with officials at the State Department in May 2003 to enlist the State Department's help in the Fund's outreach effort to victims of foreign countries. As a result of that meeting, cables were sent to numerous diplomatic and consular posts in countries believed to have lost citizens on September 11, which included a Fund Fact Sheet with information regarding the Fund. This same information was also cabled to United States' embassies in over 20 countries. In order to maximize the notice provided by these cables, the Fund Fact Sheet was translated into five languages: French, Spanish, German, Russian, and Japanese.

### d) Coordination with The National Center for Victims of Crime

Members of the Fund's staff interacted with the families and victims of September 11 throughout their work day. In order to equip the Fund's staff to handle these often emotionally charged interactions in a responsive, professional, and caring manner, the Fund sought the services of the National Center for Victims of Crime ("the Center"), a resource and advocacy group for crime victims. The Center conducted training sessions with Fund staff members on several occasions. As a result of these educational interchanges, Fund staff members reported that they were better able to communicate with claimants and their families and to deal with the stress of their positions in a healthy manner.

### e) The Role of Attorneys

The legal profession proved to be a valuable ally in assuring the success of the Fund. Attorneys throughout the nation stepped forward in unprecedented numbers to provide free legal assistance to those September 11th families and victims in need. The legal community also offered extensive support to the Fund from the inception of the Program. Significant numbers of attorneys in private practice, as well as various legal organizations, provided thoughtful and helpful comments to the Regulations

02:008576

which were considered and, in some cases, adopted in the Interim and Final Regulations.

Due to the proactive role of the legal community, most claimants were represented by counsel. Of the 2,968 death claims submitted, 2,666 or 90% of claimants were represented by an attorney. Of the 4,435 physical injury claims submitted, 2,763 or 62% were represented by an attorney. When claimants and potential beneficiaries were unrepresented by counsel, the Fund went to great lengths to assure that the results obtained by those unrepresented, both in terms of final awards and the opportunity to be heard, were consistent with the results achieved by represented individuals. The Fund's staff spent a significant amount of time assisting unrepresented claimants by explaining the procedures of the Fund, describing the type of information necessary to process a claim, and contacting third parties to obtain relevant and helpful information, where appropriate. In addition, the Fund uniformly applied determinations made in one claim with regard to treatment of components of income and promotions to all other similarly situated claims. Hearing Officers were trained to conduct hearings where claimants were unrepresented in a manner that would assist in ensuring that the Fund obtained the information necessary for a complete evaluation of the issues posed.

The legal community was extraordinarily helpful to the Fund not only in the dissemination of information to claimants and the representation of claimants and potential beneficiaries before the Fund, but also in bringing to the fore countless problems and issues that related not only to an attorney's single client but to significant numbers of other claimants. Just a few examples of the myriad problems addressed by attorneys representing individuals, but impacting larger numbers of claimants included the treatment of pensions, the treatment of collateral offsets, the interplay of the probate court system and the Fund's processes, the availability of periodic payments, specific issues relating to undocumented aliens and foreign claimants, and mechanisms to ensure protection of the interests of minors.

The unprecedented *pro bono* effort undertaken by the legal community included law firms, consortiums of firms, individual practitioners, bar associations, and Trial Lawyers Care ("TLC"), a national non-profit organization founded by senior trial attorneys and significantly funded by the Association of Trial Lawyers of America, specifically for the provision of free legal services to victims who chose to seek compensation from the Fund. As reported by TLC, 1,092 TLC attorneys represented 1,745 families with claims before the Fund.[197] A primary reason for the Fund's ultimate success can be attributed to TLC and other lawyer organizations which met the challenge of providing legal assistance and counseling to claimants. The Special Master is in their debt.

TLC staff interacted with the Fund on an ongoing basis throughout the operation of the Program. Initially, this interaction was focused on coordination of referrals of potential claimants seeking *pro bono* assistance. As the Program proceeded,

02:008577

the Fund arranged training for TLC attorneys conducting several training sessions to ensure that TLC attorneys were educated on the claims process, including factual and legal issues. The Fund maintained daily communication with TLC to answer questions regarding specific claims as well as global issues. Refresher training programs as well as meetings relating to specific areas of concern were conducted with TLC attorneys throughout the operation of the Fund.

TLC's original mandate was to provide legal assistance by lawyers familiar with physical injury and wrongful death cases to individuals who sought compensation from the Fund. This assistance, in most cases, did not include representation on issues relating to trusts and estates. While the Fund's Regulations necessarily required some TLC lawyers to interact with the probate courts, in many claims involving complex trusts and estates issues relating to distribution, the assistance of attorneys specializing in that field was necessary. Once again, the legal profession rose to the challenge and provided *pro bono* assistance to many families in need. The New York City Bar Fund's September 11th Legal Initiative (the "City Bar Fund") played a significant role in providing this type of *pro bono* assistance. The City Bar Fund reported that the Initiative provided assistance to over 200 individuals with issues relating to their claims before the Fund.[198]

The following chart shows the breakdown of claims by type and attorney representation. Note that this chart includes all filed claims, whether or not they ultimately were determined to be eligible.

| All Filed Claims With Attorney Representation | | | |
|---|---|---|---|
| Claim Type | Total Claims Filed | # of Claims with Attorney Representation | % of Claims with Attorney Representation |
| Death | 2,968 | 2,666 | 89.82% |
| Physical Injury | 4,435 | 2,763 | 62.30% |
| Total | 7,403 | 5,429 | 73.34% |

### 5. Participation of Hearing Officers from Federal Agencies

Under the Regulations, every claimant was entitled to a hearing, whether he or she chose Track B and proceeded directly to a hearing, or chose Track A and elected to appeal a presumed award. In addition, a claimant deemed ineligible was also entitled to a hearing reviewing the finding of ineligibility. Under this regulatory framework, it was clear early in the Program that the Special Master and his relatively small staff would be unable to conduct every hearing without additional personnel. As a result, the Fund worked with the Department of Justice to designate qualified individuals to preside over hearings. Eleven Assistant United States Attorneys from offices throughout the country were designated as Hearing Officers. In addition, 9 federal agencies volunteered the time of 47 Administrative Law Judges.[199] Finally, 4 attorneys from the private sector served as Hearing Officers on a *pro bono* basis. Through the

02:008578

efforts of these individuals, the Special Master's Office was able to fulfill its mandate to provide a hearing to every claimant who requested one. During the course of the Fund, 3,962 hearings were held. Of these hearings, the Special Master conducted 931, and the attorneys working in the Special Master's Office conducted 1,822. The remaining 1,209 hearings were conducted by the Administrative Law Judges and *pro bono* Hearing Officers.

Hearing Officers were trained by attorneys from the Special Master's Office. The training consisted of a review of the Act, Regulations, claims process, methodology for valuation of claims, and substantive issues raised in the hearings. All Hearing Officers were required to observe hearings conducted by the Special Master or an attorney from the Special Master's Office before conducting their own hearings. A report regarding each claim set for hearing was prepared by an attorney from the Special Master's Office and was submitted to the Hearing Officer prior to the hearing along with the entire claim file. These reports summarized the documentation submitted by the claimant, as well as issues presented by the claim. The attorney who had reviewed the claim and prepared the pre-hearing report was available to the Hearing Officer both before and after the hearing to answer any questions. After the hearing, the Hearing Officer reviewed the hearing transcript and any exhibits submitted at the hearing, prepared a report which focused on explaining the testimony presented, and submitted the report to the Special Master's Office. One of the senior attorneys in the Special Master's Office then reviewed the hearing transcript, exhibits, the Hearing Officer's report and the claim file, including documentation submitted after the hearing, before issuing a final determination. The Hearing Officer's observations regarding the credibility of witnesses informed the senior attorneys' award decision. *Every* claim and hearing transcript was reviewed *de novo* by the Special Master's Office before a final award was issued.

Attorneys from the Special Master's Office supervised the Hearing Officers and provided refresher training sessions. In addition, supervising attorneys fielded questions regarding the Program and the hearing process on an ongoing basis during conference calls and via email. A managing attorney periodically reviewed transcripts to evaluate the performance of the Hearing Officers and to provide feedback to Hearing Officers, when appropriate. In addition, comments from claimants and attorneys regarding the performance of various Hearing Officers were elicited and utilized for purposes of maintaining quality control and providing additional feedback to the Hearing Officers.

02:008579

## H. Administration of Program/Staffing/Costs

To achieve the Fund's goals of fairness, transparency, consistency, and one-on-one communications with claimants, their attorneys, and interested parties with the maximum efficiency and cost-effectiveness, the Special Master concluded that decisions regarding evaluation of claims, policy, process, and implementation of policies and rules should be made by a limited number of attorneys working directly with the Special Master. In order to provide the back-up necessary to allow a limited number of attorneys to evaluate and recommend decisions regarding awards, the Special Master decided that one over-arching consultant should be retained to manage the operation of claims processing. After a formal solicitation and bid process, PricewaterhouseCoopers LLP ("PWC") was retained by Department of Justice to operate the Fund's Claims Processing Center and provide management services for the Fund.

### 1. Attorney Staff

For the sake of consistency, efficiency, and quality control, the Special Master limited the staff of attorneys to a few individuals at the outset of the Program when policies and procedures were being developed and the number of claims were limited. As the Program ramped up and greater numbers of claims were filed, the staff of attorneys was increased slowly, on an as-needed basis, with the largest addition of attorneys in the last six months of the Program when the number of claims ready for evaluation was at its peak. The structure consisted of one overall supervising attorney responsible for all policy development and determinations, management of the claims processing contractors, establishment of rules for economic loss calculation and specific loss valuation models, and determination of final Track B awards as well as all supervision of awards involving high-income claims, and two managing attorneys, one responsible for the supervision of the attorneys analyzing death claims and for adjudicating appeals, and one responsible for oversight of attorneys processing injury claims. The supervising attorney was Deborah E. Greenspan. The two managing attorneys were Jacqueline E. Zins, and Matthew Connelly.

During the first year of the Program, the Special Master was assisted by attorneys, administrative and support staff from The Feinberg Group, LLP ("The Feinberg Group") as well as one junior attorney from the Civil Division of the Department. During this period of time, the policies and procedures that would govern the administration of the Fund throughout its operation were, in large part, developed and implemented. In September of 2002, one senior attorney and one junior attorney from the Department of Justice joined the Fund at which point the legal staff was divided into attorneys specializing in either death or physical injury claims. By the spring of 2003, the legal staff had been increased by four more staff attorneys from the Department of Justice, two specializing in physical injury claims

02:008580

and two in death claims.[200]  In anticipation of the filing of massive numbers of claims in and around the deadline for filing, the legal staff for the last six months of the Program, from January through June of 2004 was increased to a total of 29.[201]  This number included 2 attorneys from The Feinberg Group, 11 attorneys from the Civil Division of the Department, 15 Assistant United States Attorneys, and one attorney from the Department of Agriculture.  Of the 29 attorneys working in the Special Master's Office by the end of the Program, 8 were specialists in death claims and 21 in physical injury claims.  The cost for The Feinberg Group attorneys was zero since the Special Master and his firm's attorneys were working on a *pro bono* basis.  The cost for the government attorneys working in the Special Master's Office was $3,667,000.[202]

In addition to The Feinberg Group attorneys working in the Special Master's Office, the Special Master was also assisted by various other administrative and support staff from The Feinberg Group.  The Feinberg Group donated a total of 15 individuals (full or part-time) to assist in administering the Fund.  The actual costs associated with the time expended by the Special Master and The Feinberg Group attorneys and administrative and support staff as well as the additional government lawyers working in the Office of the Special Master represented a small percentage (less than 5%) of the costs of administering the Program due to three factors:  the *pro bono* nature of the work performed by the Special Master and the legal, administrative, and support staff of The Feinberg Group,[203] the decision to operate the Fund with a limited core group of attorneys at the outset of the Program and to increase that number only on an as-needed basis, and the administrative support provided by PWC.

As noted, the Special Master and his staff of attorneys were also assisted in the conducting of hearings by Administrative Law Judges from various agencies and *pro bono* lawyers.  The hearings conducted by the Special Master and attorneys from The Feinberg Group were done on a *pro bono* basis, while the costs of the hearings conducted by the remainder of the staff attorneys is captured in the total attorney costs of $3,667,000.  The costs associated with the hearings conducted by the Administrative Law Judges represent an additional $679,000.

## 2.  PricewaterhouseCoopers

PWC was retained by the Department of Justice to implement the Special Master's claims processing procedures.  PWC's management of the Claims Processing Center encompassed administration of all aspects of the process, including:

- Operation of 13 claims assistance sites open at various points in time during the operation of the Fund, throughout the United States and in London, England.  The sites provided in-person assistance to claimants in completing compensation forms, answering questions relating to the Program, and forwarding substantive inquiries to the Special Master's Office.  The claims assistance sites were visited by 2,250 individuals.

02:008581

- Staffing and coordination of 25 Special Master town hall meetings.

- Operation of a toll-free helpline which responded to general inquiries by claimants or interested parties, forwarded specific questions to the claims assistance sites and referred complex questions to the Special Master's Office. Over the course of the Program, the helpline handled over 54,000 calls and processed over 10,000 requests for claims forms.

- Management of 329,504 documents and 1,313,150 pages received, as well as generation and mailing of over 81,000 letters relating to claims.

- Management of contacts with claimants after submission of an application to ensure that claims were complete when evaluated, and that all questions after submission of a claim were answered by an appropriate and knowledgeable Fund representative.

- Construction of the Victim Claims Management System, a web-based system used to manage claim applications through the entire evaluation process, up to and including the determination of a final award.

- Development of various economic loss models, including models incorporating employer-specific data and assumptions, as determined by attorneys in the Special Master's Office.

- Design and update of the Fund's website. The site was updated over 830 times.

- Initial review of claim submissions to assist attorneys in the Special Master's Office by compiling all eligibility and economic data and providing initial loss calculations using the standard presumed models.

- Coordination of scheduling and logistics for 3,962 hearings and meetings.

- Coordination of the payment process, including gathering information necessary for the Special Master's Office to review and render distribution plan decisions as well as gathering information from claimants and coordination with the Special Master's Office and the Department to authorize and complete the payment of final awards.

PWC began the project with a staff of 129 (including staff of paid subcontractors). Additional personnel were added as the number of claim filings increased. At the peak of the Fund's activity the PWC team (including subcontractors) had a staff of 474. The total number of hours worked by the PWC team was 781,625 at a total cost of $76,511,000.[204]

02:008582

Insight into the efficiency and success of the Fund can be found by examining the overall costs of administering a program which provided over $7 billion in benefits to over 5,560 eligible claimants. The total costs of administration were approximately $86 million; this amount is broken down as follows:

| | |
|---|---|
| PricewaterhouseCoopers | $76,511,000 |
|     including costs of subcontractors | |
| Government Attorneys & Support | |
|     Assigned to the Program | $ 3,667,000 |
| Administrative Law Judges | $ 679,000 |
| Aspen Systems | $ 4,674,000 |
| CACI | $ 862,000 |
| Consultants | $ 76,312 |
| The Feinberg Group Professional Services | $ 0 |
|     Out-of-pocket-expenses | $ 404,000 |
| Total | $86,873,312 |

The overall cost of $86,873,312 constitutes 1.2% of the total dollars awarded to eligible claimants. By any measure, the overall costs of administration demonstrate the efficiency, streamlining and lack of bureaucracy of the Special Master's Office and associated staff. When one compares this efficiency with the costs associated with protracted, complex and uncertain litigation, or other administrative compensation schemes, it is clear that the Act was implemented in a cost-effective manner with due consideration given to minimizing administrative overhead.

02:008583