# EXHIBIT C.50

## PART 4 OF 5

### III. OBSERVATIONS AND LESSONS LEARNED

Did the September 11th Victim Compensation Fund of 2001 constitute sound public policy? This question, repeatedly asked by the public, media representatives, public officials and, especially, the September 11th families themselves, is posed in different ways. Did Congress do the right thing in enacting the Victim Compensation Fund? How does one justify the creation of such a Fund limited to September 11th victims and their families, while ignoring the claims of other victims of terrorist attacks at Oklahoma City, the African Embassy bombings, the USS Cole, and the first World Trade Center attack in 1993? Why should Congress provide very generous compensation to a limited number of individuals while excluding other victims of life's misfortunes?

A second question also arises. Even if the Fund can be justified in benefiting only a very small segment of the population, was it a good idea for the Act to require individualized and different amounts of compensation for each eligible claimant? Would it have been wiser to provide a flat payment - the same amount - to each individual claimant? What problems arise when the statutory mandate requires a separate tailored calculation for each individual? What are the strengths and weaknesses, the pros and cons, of the flat payment, one-size-fits-all approach to public compensation?

Finally, the most frequently asked question: In the event of another terrorist attack, should Congress establish a similar victim compensation fund? Is the September 11th Victim Compensation Fund a viable precedent for a similar future program, or should it be viewed as *sui generis*, a unique response to a unique historical event?

These are the questions considered in a preliminary summary review of the issues posed. The words "preliminary" and "summary" must be emphasized. The September 11th terrorist attacks occurred just three years ago. They constitute a contemporary event that currently drives public policy. We still lack the benefit of historical perspective. Compounding this difficulty is the fact that the Fund itself has just been completed and the implementation and administration of the Fund is only beginning to undergo scrutiny by public officials, academics, the September 11th families and the public at large. It will, therefore, be a few years before a comprehensive evaluation of the September 11th Victim Compensation Fund in all of its aspects and complexity can be completed. Nevertheless, it is appropriate and timely to offer the Special Master's personal perspective on these issues as at least a preliminary blueprint to guide policymakers – an initial road map to be modified as we learn more about the impact of this unique Program.

02:008584

A. The September 11th Victim Compensation Fund of 2001:  Sound Public Policy?

The September 11th Victim Compensation Fund of 2001 was enacted by Congress and signed into law by the President only 11 days after the terrorist attacks. It provided generous compensation to eligible victims and their families. But the law was limited to September 11; it did not provide compensation to other families and victims of terrorist attacks in Oklahoma City or Kenya, nor did it declare eligible the families and victims of the terrorist attacks on the USS Cole or at the first World Trade Center attack in 1993.

Various arguments have been made attempting to justify this limitation in the Act, none of them particularly convincing to me. First, it is often argued that the Fund can only be understood in the context of the overall Act that protected the airlines from tort lawsuits which would threaten their financial viability. According to this argument, the Fund constituted a surrogate for litigation. Since the collection of tort damages against the airlines was limited by the Act to the airlines' existing insurance coverage, the Fund served as an attractive alternative, encouraging would-be plaintiffs to opt for a prompt and predictable administrative compensation program over the risks, delays, expense, and challenges of the courtroom. But this argument assumes too much. A statutory restriction on tort claims against the airlines could have been enacted without the Fund, leaving the courts to determine its constitutional validity when challenged.

Nor can the status of the victims — killed or injured by a foreign terrorist attack on domestic shores — be used to justify the enactment of a unique compensation act. Under this justification, the victims and families of the first World Trade Center attacks would be equally deserving of compensation. Also, it appears difficult to justify generous compensation to some victims of terrorism, but not others. Does the fact that the terrorists were foreign justify providing $2 million to the family of a victim at the World Trade Center, Pentagon or the airplanes, while denying similar relief to those who lost a loved one in Oklahoma City solely because the terrorist was an American citizen? And what is the definition of "an act of terrorism"? Should the recent anthrax attacks or the bombing of abortion clinics be deemed "acts of terrorism"? To justify a very generous public compensation scheme based upon the status of the perpetrator or the victim is problematic and cannot help but promote divisiveness between eligible claimants and ineligible victims and their families who do not understand the basis for the distinction.

How, then, can one justify the September 11th Victim Compensation Fund of 2001? It must be viewed from the perspective not of the *victim* but, rather, that of the *nation*, a unified community response to a unique and unprecedented historical tragedy. The September 11th terrorist attacks, and their impact on the collective psyche of the United States, evoked a national response to the tragedy. One aspect of that response was the creation of a public compensation scheme that not only

02:008585

provided financial relief to the victims, but also expressed a shared national grief, horror, and revulsion in response to the terrorist atrocities. The September 11th Victim Compensation Fund is different because the response to the attacks was so universal and profound nationwide. While in no way diminishing the tragedy of Oklahoma City or other terrorist acts, the September 11th attacks constitute a unique historical event, similar in kind to the American Civil War, Pearl Harbor and the assassination of President Kennedy. Viewed in this context, the Fund constitutes a legitimate response by the nation. Critics of the Fund are, therefore, off-base when they focus on the restrictive definition of the victims in arguing unfairness. It is not the victims that justify the Fund, but rather the response of the entire nation to the tragedy. In the genesis and magnitude of the attacks, we find justification for the Congressional response that became the September 11th Victim Compensation Fund. This is why the Fund constitutes sound public policy and why it could legitimately and appropriately be limited to the families and victims of September 11.

### B. The September 11th Victim Compensation Fund of 2001:   Different Amounts or the Same for All?

Questions are also posed as to whether Congress acted wisely in providing a statutory compensation scheme that mandated different amounts of compensation for each eligible claimant. Was this a mistake? Why did Congress take this approach and what alternatives might be preferable?

It is easy to understand why Congress did what it did. Since the Act placed limitations on the potential recovery of families and victims in court, the alternative compensation scheme was designed to track the civil justice system in critical respects. Similarly, the definitions of economic and non-economic loss built into the statutory framework tracked traditional tort concepts. The Fund became a familiar conceptual alternative to the tort system and was designed to attract victims and families who otherwise might file thousands of lawsuits against the airlines and others. Individual, tailored awards were designed, at least in large part, to mirror the civil justice system. (Of course, the notion of collateral offsets, also part of the statutory framework, was decidedly not a familiar tort concept, and proved controversial with September 11th families and their lawyers who argued that the offsets severely undercut the very idea of mirroring the tort system.)

But the very idea of individual awards, tailored to the particular circumstances of each eligible claimant, necessitated a more complex analytical approach to the administration of the Fund. That these challenges were overcome, that, ultimately, 97% of eligible families who lost a loved one on September 11 voluntarily participated in the Program, and that the objectives of the Act were accomplished in such a relatively brief period of time and in a cost-effective manner, can be traced in large part to the Regulations which addressed and solved the most serious problems created by the enabling statute. These Regulations, and the day-to-day administration of the Fund, proved to be of critical importance in convincing eligible claimants and the

02:008586

public that this unique Program was a credible and effective alternative to conventional litigation.

What were the most serious challenges posed by the statute concerning the calculation of individual awards? First, the statutory mandate vested substantial authority and discretion in "one person" - the Special Master and his "designees" - to determine an appropriate award without a right of appeal. In essence, the Special Master and his staff were both judge and jury. To vest such authority in one group, however credible and qualified, without opportunity for appeal, raised perceptions of unfairness and guaranteed second-guessing by claimants determined to compare their awards with others. The Regulations and the Fund confronted this problem by providing: 1) a substantial degree of transparency concerning the calculation of awards (what factors and variables would be important and what constituted "extraordinary circumstances"); 2) an intensive outreach program designed to familiarize claimants with the Fund, its Regulations, and procedures; and 3) a rigorous adherence to standards assuring consistency and predictability. In addition, although the Act prohibited appeal of award determinations to the courts, the Regulations established an administrative hearings process which actually encouraged families to meet face-to-face with the Special Master or his designees to discuss family views of an appropriate award and created the opportunity of a review, albeit in front of the Special Master. The objective in all of this was not to limit the Special Master's discretion conferred by statute, but, rather, to give families an opportunity to avail themselves of the Program's procedural protections and to assure that the Fund took into account all relevant information. As potential claimants became more familiar with the Program, and learned over time that the Special Master and his staff would exercise discretion in a consistent manner while taking into account individual circumstances, the Fund proved to be increasingly attractive as a viable alternative to litigation.

A second challenge posed by the requirement of individual calculations concerned the issue of efficiency in light of the necessity of individual computations for each and every eligible claimant. How could such awards be calculated quickly so that families would receive immediate financial assistance? Fairness and consistency were assured by establishing standard presumptions and assumptions embodied in the computer models used for every claim. Here, the decision was made to concentrate the actual calculation of individual awards in a very few hands. Although a large staff was required to process claims, to make sure that appropriate documentation was submitted, and to promote outreach efforts designed to familiarize claimants with the Program, the actual determination of presumed awards was delegated to 26 lawyers and the determination of individual final awards after hearing was accomplished by 3 lawyers. This streamlined operation not only assured a high degree of consistency in the treatment of individual applications, but also permitted a quicker, more efficient response to claimants' needs. It is axiomatic that a statutory compensation scheme providing the same fixed amount for all eligible claimants would have been swifter and easier to administer, but given the nature of the unique statutory mandate, the effectiveness of the results speak for themselves - over 7,400 individual applications

02:008587

processed and completed in less than three years! Compared to the delays, costs and uncertainties of the civil justice system, the Fund proved to be an efficient and effective alternative.

Nevertheless, despite this efficiency and effectiveness, there are serious problems posed by a statutory approach mandating individualized awards for each eligible claimant. The statutory mandate of tailored awards fueled divisiveness among claimants and undercut the very cohesion and united national response reflected in the Act. The fireman's widow would complain: "Why am I receiving less money than the stockbroker's widow? My husband died a hero. Why are you demeaning the value of his life?" The statutory requirement of collateral offsets added to the controversy: "Let me make sure I understand this. Because my wife and I planned our financial future by buying life insurance, you are deducting these life insurance payments from my award. So I am receiving less than my neighbor who never bought life insurance but spent the money on vacations and new automobiles." The statutory requirement that each individual claimant's award reflect unique financial and family circumstances inevitably resulted in finger-pointing and a sense among many claimants that the life of their loved one had been demeaned and undervalued relative to others also receiving compensation from the Fund.

A better approach might be to provide the same amount for all eligible claimants. Such an approach would eliminate the problem of discerning fact from speculation in calculating individual awards. It would also be easier and quicker to process claims since eligibility for compensation would be the sole issue for a Special Master. Most importantly, such an approach might reduce divisiveness among eligible claimants since, by statute, one size would fit all.

But such an approach is not without controversy. Hundreds or thousands of individual claimants could argue that their financial wherewithal and "exceptional circumstances" justify greater compensation than the uniform amount established by Congress. The same amount, whatever it might be, would have a much different impact on the family of the stockbroker or banker than the family of the waiter, policeman or member of the military. Thus, the impact of any flat award would depend upon the financial and family circumstances of the surviving claimant. Providing the same amount for all eligible claimants can easily be criticized as providing no more than "rough justice." But, on balance, I believe that this approach has much to recommend it, especially when one considers the available alternatives.

However, the flat amount approach begs two critically important questions - what exactly *is* the appropriate amount for an eligible claimant, and should the award come free of any restrictions on the ability of the claimant to access the civil justice system by commencing a lawsuit? These two questions are interrelated. If Congress mandates a flat amount for all, it will likely be relatively modest, tracking, for example, the $250,000 award currently afforded the families of a fireman or police officer killed in the line of duty. This award is mandated by federal law without any

02:008588

restriction on the right of the eligible family to commence a lawsuit against alleged tortfeasors. If the flat amount approach is to be used in the future as the basis for compensating victims of terrorist attacks, it should not be part and parcel of restrictions imposed on the right to litigate in court. Alternatively, the flat amount mandated by statute might arguably be high enough to constitute fair consideration for limiting access to the courtroom. But what is "fair consideration?" Would Congress establish it in the statute or delegate the responsibility to a Special Master? All of these questions and approaches are important food-for-thought in determining the design and contours of any future terrorist compensation program which provides the same amount for all eligible claimants.

### C. The September 11th Victim Compensation Fund of 2001: A Precedent for the Future?

Commentators and the public have repeatedly asked whether the September 11th Victim Compensation Fund should be replicated if the nation is the unfortunate victim of another terrorist attack. Some have suggested that a statute establishing a future compensation fund should be enacted now, to be triggered by a certification from the Secretary of State that an attack by foreign terrorists has occurred in the United States. The supporters of such legislation suggest, with some justification, that careful consideration of a future public compensation scheme should be undertaken now, prior to the unfortunate future event, so that all options can be carefully considered, free from the emotion and trauma associated with a future terrorist attack.

This approach has a certain appeal and should not be automatically rejected. But, although the Congress and the Administration might consider the structure of some type of future compensation program and debate the alternatives, it is unlikely that such a statute would be established at the present time. Nor would it be wise to do so.

If it is true that the triggering event justifying the creation of a program like the September 11th Victim Compensation Fund is the traumatic impact of the September 11th attacks on our nation, it is probably true that, absent such an attack, no such program can or should be established. The September 11th Victim Compensation Fund was a unique response to an unprecedented historical event. It is unlikely — and probably unwise — to establish a similar program for future implementation absent the profound conditions which existed immediately after the September 11th attacks. It was precisely these conditions, and the national sense of grief and compassion associated with September 11, that led to enactment of the Fund. To expect that this would or should be done outside of such a context is probably incorrect. Only if Congress, the Administration, and the public at large conclude that a similar horrific attack justifies the establishment of such a fund should one be enacted. This is not to say that Congress and the Administration should not consider the strengths and weaknesses of the existing Act and begin to consider modifications and alternatives. It is not too early to begin the debate. But I do not recommend the enactment of similar

02:008589

compensation legislation at the present time.  Hopefully, the September 11th attacks will remain a unique historical event, never to be repeated. And there will be no need to cite the September 11th Victim Compensation Fund of 2001 as precedent for establishing a similar program.

02:008590

## NOTES

[1] The total number of deceased victims was compiled from lists of victims provided to the Fund by the Department of Defense, American and United Airlines, the States of New Jersey, Massachusetts, Connecticut and New York, the NYPD and the FDNY.

[2] Pub. L. No. 107-42, 115 Stat. 230 (codified at 49 U.S.C. § 40101) [hereinafter the "Act"], attached hereto as Exhibit A.

[3] See note following 49 U.S.C. § 40101.

[4] See id. See, e.g., 147 Cong. Rec. S9599 (statement of Sen. Leahy) ("the airline industry of this country is in grave danger of collapse"; "[i]f Congress does not pass this legislation today, it is likely that all of our Nation's air carriers would cease service next Wednesday"); see also 147 Cong. Rec. S9594 (statement of Senator McCain) ("The effect on the airlines of the September 11 terrorist attack put Congress in the unenviable position of having to take immediate action to prevent the collapse of the aviation industry as a result of the federally ordered grounding of all aircraft and the anticipated reduction of air travel."); 147 Cong. Rec. S9600 (Sept. 21, 2001) (statement of Sen. Byrd) ("[t]he Federal Government cannot allow this industry to fold without seriously disrupting the United States economy").

[5] See Act § 401.

[6] Id. § 403.

[7] The Act provides that "[u]pon submission of a claim" to the Fund, a claimant "waives the right to file a civil action (or to be a party to an action) in any Federal or State court for damages sustained as a result of the terrorist-related aircraft crashes of September 11, 2001." Id. § 405(c)(3)(B)(i). There are two exceptions to the limitation on a civil action. First, the statute does not preclude any civil action "to recover collateral source obligations." Id. § 405(c)(3)(B)(i). Second, the statute does not limit the liability of any person who is "a knowing participant in any conspiracy to hijack any aircraft or commit any terrorist act." Id. § 408(c). The statute does not define "a knowing participant."

[8] See Act § 408(b)(1). In such an action, the Act provides that the "substantive law for decision . . . shall be derived from the law, including choice of law principles, of the State in which the crash occurred unless such law is inconsistent with or preempted by Federal law." Id. § 408(b)(2).

[9] See id. § 408(b)(3).

[10] See id. § 408(a).

[11] See id. §§ 404(a)(1), (2).

[12] See id. § 405(b)(1)(A).

[13] See id. § 405(c).

[14] The Act defines economic loss as "any pecuniary loss resulting from harm (including the loss of earnings or other benefits related to employment, medical expense loss, replacement services loss, loss due to death, burial costs, and loss of business or employment opportunities) to the extent recovery for such loss is allowed under applicable State law." Id. § 402(5). The statute does not define the phrase "to the extent recovery for such loss is allowed under applicable state law."

[15] The Act defines non-economic losses as "losses for physical and emotional pain, suffering, inconvenience, physical impairment, mental anguish, disfigurement, loss of enjoyment of life, loss of society and companionship, loss of consortium (other than loss of domestic service), hedonic damages, injury to reputation, and all other nonpecuniary losses of any kind or nature." Id. § 402(7).

[16] See id. § 405(b)(1)(B).

[17] See id. § 405(b)(5).

[18] See id. § 405(b)(6).

[19] See id. § 404(b). It also establishes claimants' entitlement to compensation by setting forth "the obligation of the Federal Government to provide for the payment of amounts for compensation." Id. § 4.06(b).

[20] See id. §§ 405(a)(1), (2)(A).

[21] See id. § 405(c)(3)(A).

02:008591

[22] *See id.* § 405(b)(3).

[23] *Id.*

[24] *Id.* § 406(a).

[25] *Id.* § 405(a)(3).

[26] In total, the Fund provided this emergency assistance to 236 families, issuing "Advance Benefit" payments in the amount of $11,300,000.

[27] *See* Final Regulations, September 11th Victim Compensation Fund of 2001, 28 C.F.R. Part 104 (2002), attached hereto as Exhibit B.

[28] The Department and the Special Master rejected the suggestion that all economic loss calculations should be based strictly on an analysis of compensation and workforce participation specific to either New York City or to workers in the financial industry in New York. Although a fair number of the victims worked in the New York financial industry, the victims were actually a diverse group: the victims resided in 36 states and were citizens or permanent residents of 66 foreign countries; they ranged in age from 2 years to 85 years and had varying levels of education and job experiences; the group included retired persons, young people still in school, and people established in the workforce; the income levels ranged from zero to well over $4 million annually.

[29] The Special Master could select either one particular year or an average of several years based on the information submitted by the claimant. For example, if a decedent had in the year 2001 begun a new career, the Special Master could conclude that the income level for 2001 was the appropriate predictor of future wage loss.

[30] *See* 28 C.F.R. § 104.43(a).

[31] *See* 28 C.F.R. §§ 104.31(b)(2) (for Track B claims), 104.33(f)(2) (for Track A claims).

[32] *See id.* § 104.45.

[33] The injuries ranged from minor abrasions to catastrophic burn and crush injuries. Catastrophic burn and crush injuries accounted for only about 1% of the injury claims that received awards.

[34] *See id.* § 104.46.

[35] *See* September 11th Victim Compensation Fund, Statement of the Special Master, Final Rule, 67 Fed. Reg. 11,234 (Mar. 13, 2002).

[36] The Regulations require that to be considered a claim, a compensation form must be filed. *See* 28 C.F.R. § 104.21(a). *See* Compensation Form for Deceased Victims attached hereto as Exhibit C; *see also* Compensation Form for Physical Injury Victims, attached hereto as Exhibit D.

[37] The Regulation defining the "filing" of claims was also motivated by the specific deadlines established by the Act for issuing awards. It would be impossible to meet those deadlines if the "filing" were triggered by the submission of various components of a claim without the documentation necessary to compute an award.

[38] *See* FAQs, attached hereto as Exhibit E.

[39] *Colaio v. Feinberg,* 262 F. Supp. 2d 273 (S.D.N.Y. 2001).

[40] *See id.* at 282-283.

[41] *See id.* at 286.

[42] *See id.* at 286-301.

[43] *Schneider v. Feinberg,* 345 F.3d 135 (2d Cir. 2003).

[44] *See id.* at 143-44.

[45] *See id.* at 147 (citing 28 C.F.R. § 104.41)

[46] *See id.* at 148 (citing 28 C.F.R. § 104.42).

[47] *See id.* at 148-49.

[48] Permanent sites were located in Arlington, VA; Boston, MA; Edison, NJ; Jersey City, NJ; Manhattan, NY; Melville, NY; Piscataway, NJ; Stamford, CT; and Staten Island, NY. Some examples include: U.N. Consulate Representatives (outreach for foreign victims), British Consulate for families of British Citizens, Australian Consulate for families of Australian Citizens, FDNY Family Assistance, Windows of Hope for undocumented workers and other foreign language speaking victims or families, Catholic

Charities, Red Cross, Trial Lawyers Care, NY Financial Planning Association, Boston, MA Financial Planning Association, Manalapan, NJ Outreach for Injured, NY Bar Association, and Twin Towers Fund.

[49] The New York Times, The New York Daily News, The Washington Post, Staten Island Advance, Newark Star Ledger, Bergen County Record, The Boston Herald, The Boston Globe, El Diario, USA Today (National Edition), Newsday, New York Times, San Francisco Chronicle and The Wall Street Journal.

[50] Examples include the News Hour with Jim Lehrer, Meet the Press, The Today Show, NBC News – Tom Brokaw, 60 Minutes, CNN – Wolf Blitzer, CNBC, MSNBC, ABC Nightly News – Peter Jennings, CBS – The Early Show, Fox News, BBC, Telemundo, Bloomberg News, The Blade Magazine, New York One, Voice of America, NPR, NBC – Boston affiliate, Israeli News, and New Zealand News Radio.

[51] Some examples include: The New York Times, The Washington Post, The Boston Globe, The New York Daily News, Newsweek Magazine, and Fortune Magazine.

[52] Pursuant to the Act, the Special Master must complete a review, make a determination and provide notice to the claimant no later than 120 days after a claim is filed. See Act § 405(b)(3). Under the Regulations, a claim is "filed" when it is "substantially complete." 28 C.F.R. § 104.21(a). Only attorneys in the Special Master's Office had the authority to determine whether a claim was substantially complete. Such a determination required the attorney to find that: (1) the individual intended to submit a claim (as opposed, for example, to a request for an informational evaluation), (2) all necessary documentation establishing the claimant's eligibility (including, for example, proof of death, presence at site, and the claimant's authority as the Personal Representative) existed, (3) information necessary for a basic determination of economic loss and collateral offsets was available, and (4) the Fund had obtained the claimant's signature authorizing the release of information, acknowledging a waiver of rights and certifying the accuracy of the information provided.

[53] Although there was no right of appeal from a final Track A decision or a Track B award, the Special Master's Office reviewed and responded to post-award inquiries and, in some cases, issued a revised award where the Fund found either a computation error or where clarification of data resulted in a revised calculation.

[54] For this purpose, the term "claims" is defined as a group of submissions (claims, objections and statements of interest) involving the same victim.

[55] See Act § 405(b)(1)(A).

[56] See id. § 405(c)(3)(A).

[57] 28 C.F.R. § 104.2(e).

[58] The zone was defined as follows: the northern boundary runs, starting from the intersection of Reade and Center Streets, west along Reade Street to the Hudson River; the western boundary is the Hudson River; the southern boundary runs, starting from the Hudson River, east along the line of W. Thames Street, Edgar Street and Exchange Place to Nassau Street; the eastern boundary runs, starting from the intersection of Exchange Place and Nassau Street, north along Nassau Street to the intersection of Center and Reade Streets.

[59] Act § 405(c)(2)(A)(i).

[60] 28 C.F.R. § 104.2(b).

[61] See September 11th Victim Compensation Fund of 2001, Statement of the Special Master, Interim Final Rule, 66 Fed. Reg. 66,276 (Dec. 21, 2002).

[62] See id.

[63] See 28 C.F.R. § 104.2(b); 66 Fed. Reg. 66,276 (Dec. 21, 2001).

[64] 66 Fed Reg. at 66,276.

[65] See 28 C.F.R. § 104.2(c)(1).

[66] 66 Fed Reg. at 66,276.

[67] 28 C.F.R. § 104.2(c)(2).

02:008593

[48] *See id.* § 104.2(c)(1).

[49] *See id.*

[70] *Id.* § 104.21(b)(3)(ii).

[71] Some of these 45 claims were denied for more than one of these reasons.

[72] *See* § 405(c)(2)(C).

[73] *See id.* § 405(c)(3)(A).

[74] *See id.* § 104.4(a)(1).

[75] *See* 28 C.F.R. § 104.4(a)(2).

[76] In New York, Letters of Administration are issued when a decedent dies intestate (without a will); Letters Testamentary are issued when a decedent dies with a will. For purposes of this discussion, the term Letters of Administration will hereinafter be used to refer to both types of letters.

[77] The Regulations allow the Personal Representative to apply for immediate "Advance Benefits" of $50,000 to alleviate financial hardship faced by the beneficiaries of the decedent. *See* 28 C.F.R. § 104.22.

[78] In response to the Special Master's request to remove limitations in the Letters of Administration, certain Surrogate's Courts issued amended limited Letters of Administration that allowed claimants to at least submit an application to the Fund and collect a $50,000 Advance Benefit. However, some of these letters continued to contain a requirement that the applicant file an application with the Court to receive approval for collection of a final award from the Fund.

[79] *See* 2002 N.Y. Laws Ch. 73(S.7356).

[80] The New York Act provided that, •Notwithstanding any other provision of law to the contrary, or any restrictions set forth in letters relating to any decedent who dies as a result of wounds or injury incurred as a result of the terrorist attacks on September eleventh, two thousand one, a duly appointed Personal Representative is authorized to file and prosecute a claim with the [F]und, and the filing of such a claim for an award from the [F]und, and the resulting compromise of any cause of action pursuant to the Act, shall not violate any restriction on the powers granted to the Personal Representative relating to the prosecution or compromise of any action, the collection of any settlement, or the enforcement of any judgment." *Id.* § 4(e)(3), *amending,* N.Y. EST. POWERS & TRUSTS § 11-4.7(e)(3).

[81] *See* New York Act § 5(3), *amending* N.Y. SURR. CT. PROC. ACT § 205(3).

[82] *See* New York Act § 4(e)(2), *amending* N.Y. EST. POWERS & TRUSTS § 11-4.7(e)(2).

[83] 28 C.F.R. § 104.4(b).

[84] *See* Compensation Form for Deceased Victims - Instructions to Part IV - Supporting Documentation Checklist, Notice of Filing a Claim, attached hereto as Exhibit C.

[85] *See* Compensation Form for Deceased Victims - Instructions to Part IV - Supporting Documentation Checklist, List of Individuals Notified of Claim Filing, attached hereto as Exhibit C.

[86] *See* 28 C.F.R. § 104.4(c).

[87] In some cases, courts appointed more than one Personal Representative out of concern that an individual that the court considered a *bona fide* beneficiary would not be fairly compensated due to a conflict between the potential beneficiary and the Personal Representative.

[88] Hearing were not held on objections or SOI's unless requested. This practice resulted in complaints after the issuance of a final award by some family members who had not requested and therefore had not received a hearing.

[89] For example, if a spouse was the Personal Representative and had received significant collateral offsets (e.g., life insurance), he or she might decide not to submit a claim even though a child of the victim from a different marriage might have no offsets and could have received some portion of an award.

[90] In some instances courts appointed "co-Personal Representatives." Under these circumstances, the Special Master required both Personal Representatives to agree to the submission of a claim.

[91] Those filing an objection or SOI signed an authorization allowing disclosure of any records or information relating to the objection or SOI to the Personal Representative. *See* Objection/Statement of Interest Form, Authorization for Release of Information, attached hereto as Exhibit F. As a rule, the

02:008594

Personal Representative was informed of the submission of an objection or SOI and was provided with the form, but generally not provided with any submitted supporting documentation. The Fund adopted this procedure in an attempt to limit formal discovery. However, if the Personal Representative requested additional documentation, it was provided pursuant to the authorization for release. Conversely, the authorization for release of information signed by the Personal Representative did *not* contain authorization for release to those who filed an objection or SOI. *See* Compensation Form for Deceased Victims, Part III Attestations and Certifications, attached hereto as Exhibit C. Accordingly, individuals filing an objection or SOI were not provided with the claim or supporting documentation submitted by the Personal Representative.

[92] *See* 28 C.F.R. § 104.4(d).

[93] Surprisingly, most state courts where payments were sent by the Fund did not have a process in place to accept the Fund s award pending resolution of a dispute. The courts involved in accepting these awards were accommodating and creative in developing mechanisms for accepting and holding payments pending resolution.

[94] The Fund construed this authorization to allow release of information only when the information indicated a potential violation of law in regard to the submission of the claim.

[95] INS functions were transferred to the Department of Homeland Security in November of 2002.

[96] Act § 405(b)(1)(B)(i). Economic loss is defined by the Act as "any pecuniary loss resulting from harm (including the loss of earnings or other benefits related to employment, medical expense loss, replacement services loss, loss due to death, burial costs, and loss of business or employment opportunities) to the extent recovery for such losses is allowed under applicable State law." *Id.* § 402(5). The Regulations make plain that the phrase "to the extent recovery for such losses is allowed" is a limiting provision, meant to prohibit the Special Master from awarding "those categories or types of economic loss that would not be compensable under the law of the state that would be applicable to any tort claims brought by or on behalf of the victim." 28 C.F.R. § 104.42.

[97] Thus, for example, economic loss for single victims was determined using the same general methodology as for married victims, even though the persons who were likely to file a claim for a single victim might not have relied on the income of the victim.

[98] In all, the Fund developed 12 different computer models to calculate presumed awards for death claims and 16 models to calculate presumed awards for physical injury claims. The models varied based on employer-specific issues (such as pensions or other employer benefits) or other issues related to the data supporting the economic loss calculation or, in the case of physical injury claims, the duration of any disability resulting in loss.

[99] Part-time jobs were common among firefighters who had flexible schedules. Any documented part-time income that was reasonably expected to continue in the future was included in the economic loss calculations. The Fund also considered unreported income on a limited, case-by-case basis, where a claimant provided clear documentary evidence (e.g., bank statements, invoices, payments) substantiating a secondary income stream. While the Fund in no way condoned the practice of keeping income "off the books," it was appropriate, in some instances, to take such income into account in an effort to more accurately project the victim's expected future earnings.

[100] W-2 forms are a less reliable indicator of compensation than pay stubs and employer statements because they can include one-time payments such as unused vacation time.

[101] *See* 28 C.F.R. § 104.43(a).

[102] 2001 income was annualized, based on the victim's pay stubs or other employer-provided information.

[103] *See id.*

[104] *See id.* § 104.43(c).

[105] *See* 28 C.F.R. § 104.43(a). The methodology assumes that the economic loss calculation begins immediately as if the minor victim was 20 years old on September 11.

02:008595

[106] The Fund established specific models for these victims, and applied a uniform assumed retirement in order to calculate pension loss. The "retirement" date was based on data received from the FDNY, NYPD and military about the average duration of service.

[107] Life expectancy was determined based on life expectancy for the total population United States, 1999, Vital Statistics, vol. 50, no. 6, United States Department of Health and Human Services, Centers for Disease Control and Prevention, March 21, 2002.

[108] In some cases, employers continued to provide medical coverage to the victims' families based on the coverage maintained by the victim on September 11 and promised to continue such coverage in the future. Since those employers were not contractually obligated to continue such coverage and could terminate medical benefits at any time, the Fund did not eliminate the medical replacement cost component in calculating the award.

[109] James Ciecka, Thomas Donley, and Jerry Goldman, *A Markov Process Model of Work-Life Expectancies Based on Labor Market Actuality 1997-98*, JOURNAL OF LEGAL ECONOMICS, Winter 1999-2000.

[110] Life-cycle percentage change was calculated using a regression analysis of total earnings on experience and experience squared, using 2000 earnings for full-time year-round male workers from the 2001 Current Population Survey Table PINC-04.

[111] *See* U.S. Department of Labor, Bureau of the Census for the Bureau of Labor Statistics, *Current Population Survey*, March 2001.

[112] Consumption rates were derived from data on average annual expenditures from the U.S. Department of Labor, Bureau of Labor Statistics, *Consumer Expenditures in 1999*, May 2001.

[113] Consumption and dependency, while related, differ in terms of the nature of the losses they address and the standards applied. Dependency, a component of non-economic loss, was evaluated by reference to the Internal Revenue Service ("IRS") guidelines which set forth a strict, bright-line test. *See* IRS Publication 501, Exemptions, Standard Deductions, and Filing Information. By contrast, consumption, a component of economic loss, may have been adjusted where there was evidence that a family member relied on the victim for financial support even if the family member did not meet the IRS dependency test.

[114] The presumed consumption reduction for single individuals ranged from 48% to 76.4%, compared to 6.7% to 21.6% for individuals who were married or had dependents, depending on income bracket. These higher rates reflect the presumption that single individuals have fewer financial support obligations to other family members and thus, in general, consume a greater percentage of their earnings.

[115] *See* 67 Fed. Reg. at 11,237-39 (Mar. 13, 2002).

[116] Note, however, the adjustment was applied to any earnings from sources other than the uniformed service.

[117] *See* 28 C.F.R. § 104.43(c).

[118] For retirees, any retirement pension loss was also included in the economic loss calculations.

[119] *See id.* at § 104.43(e).

[120] *See* 28 C.F.R. §§ 104.31(b)(2), 104.33(f)(2).

[121] For example, the Fund found extraordinary circumstances in some cases where the victim had a long standing history of high earnings (in excess of $231,000), and a demonstrated commitment to a long-term career path that was unlikely to change or result in lower earnings, and the family demonstrated that it relied on the income to meet its expenses. The Fund also departed from the presumed methodology in instances where the victim had a guaranteed income in excess of $231,000 and there was evidence of family need.

[122] Aspiring stockbrokers, for instance, typically worked as trainees for two to three years, after which time their income and responsibilities increased significantly.

[123] *See* The Dollar Value of a Day, Expectancy Data, Economic Demographers, 1999 (average hours); 2000 Metropolitan Area Wage Estimates, Bureau of Labor Statistics (hourly wage).

02:008596

[124] The Act defines "non-economic losses" as "losses for physical and emotional pain, suffering, inconvenience, physical impairment, mental anguish, disfigurement, loss of enjoyment of life, loss of society and companionship, loss of consortium (other than loss of domestic service), hedonic damages, injury to reputation, and all other nonpecuniary losses of any kind or nature." Act § 402(7).

[125] See 38 U.S.C. § 1967 (military personnel); 42 U.S.C. § 3796 (Public Safety Officers Benefit Program).

[126] 38 U.S.C. § 1967 (military personnel) (providing insurance coverage of $250,000 for any qualified member of the uniformed forces); 42 U.S.C. § 3796 (Public Safety Officers Benefit Program) (establishing a benefit of $250,000 for any public safety officer who died as the direct and proximate result of a physical injury sustained in the line of duty).

[127] See 28 C.F.R. §§ 104.31(b)(2), 104.33(f)(2).

[128] See id. § 104.44.

[129] Id.

[130] Id. § 104.3(c).

[131] Id. § 104.3(b).  The Final Regulations expand the definition of dependency set forth under the Interim Final Regulations, which limited dependents to those persons who were claimed as dependents on the victims 2000 tax returns.  This expansion reflected the Special Master's recognition that many deceased victims provided crucial financial assistance to extended family members who, due to residence or citizenship or applicable tax law, were not claimed on the victim's tax returns, and that some of the limitations imposed by the tax laws were inconsistent with the purposes of the Fund.

[132] See IRS Publication 501, Exemptions, Standard Deductions, and Filing Information.

[133] See id.

[134] See id.  Temporary absences include attending school, taking vacations, business trips, military service, and hospital stays.  (If the person is placed in a nursing home for an indefinite period of time to receive constant medical care, the absence is considered temporary.)

[135] See id. The relationship between the taxpayer and the dependent must not violate local laws (e.g., zoning restrictions on the number of unrelated persons living together).    Allowable relationships include: child, parent, brother/sister, stepparent, stepchild, stepbrother/stepsister, half brother/half sister, grandparent, grandchild, son-in-law/daughter-in-law, mother-in-law/father-in-law, brother-in-law/sister-in-law.  Also, if related by blood, relatives can include uncle/aunt and niece/nephew.

[136] See id.  The joint return test does not apply if a joint return is filed by a dependent with his or her spouse merely to claim a refund of withheld tax and no tax liability would exist for either spouse on separate returns.

[137] 28 C.F.R. § 104.46.

[138] Act § 405(b)(6); 28 C.F.R. § 104.47(a).

[139] Act § 402(4).

[140] See id.

[141] The Fund did not specifically track the sources of offsets in its electronic database.  However, a random sampling of 200 claims demonstrated that an average of $525,947 per claim (or 63% of total average offsets) was attributable to life insurance.  The amount of insurance benefits received by the victims' families varied widely based on the income level of the victim, with a strong correlation between higher income and higher insurance benefits.  For example, the families of victims earning $24,999 or less received an average of $126,971 of insurance, which comprised about 49% of total offsets per claim.  By contrast, families of victims earning $200,000 to $499,999 received an average of $993,666 of insurance, which comprised nearly 73% of total offsets per claim.  To be sure, there was some variation even among similarly situated victims.  For example, there were victims who earned over the 98th percentile who maintained no private insurance policies and there were administrative personnel who took out significant policies.  However, such cases were unusual.

[142] Many employers covered their employees under company-subsidized insurance policies, the proceeds of which were payable to the victims' families as a result of death.  Some of these policies provided a

02:008597

uniform amount among eligible employees; others conferred a benefit commensurate with the employee's position or income.

[143] Although the Fund investigated the possibility of obtaining information from databases maintained by private insurers, it found that the logistical problems in such an endeavor were overwhelming.

[144] *See* Act § 402(4).

[145] All pensions were "counted" on both sides of the ledger. Thus, the Fund computed the value of the pension benefits lost as a result of the premature death of the victim in determining economic loss and separately computed as an offset the present value of any pension received by the survivors as a result of the victim's death. In many cases the value of the lost future pension exceeded the collateral offset attributable to the survivor benefit.

[146] *See* Act § 402(4).

[147] Examples of payments that were considered "death benefits" by the Special Master included: United Airlines and American Airlines benefits for families of passengers aboard the flights; FDNY and NYPD benefits, granted to uniformed personnel killed in the line of duty, including a contractual benefit of $25,000 and a Mayor's Office Benefit generally equal to the victim's final year salary; and Defense Finance and Accounting Service ("DFAS") payments provided to families of military personnel and some civilian Pentagon victims.

[148] For example, the "Voluntary 9/11 Death Benefit" issued by Fred Alger and the "Gratuitous Benefit – Hardship Payment" issued by Carr Futures were determined to represent pro-rata bonuses earned in 2001 that would have been paid in 2002 but for the victim's death. Neither payment was offset.

[149] An example of such a plan was that of Keefe, Bruyette & Woods.

[150] *See* Act § 402(4).

[151] 28 C.F.R. §§ 104.47(b)(1), (2).

[152] *See* 28 C.F.R. § 104.47(b)(3).

[153] *Id.* § 104.47(a).

[154] *See e.g.*, N.Y. EST. POWERS & TRUSTS § 2-1.11; N.J. STAT. ANN. § 3B:9-5.

[155] Wrongful death law typically refers to applicable intestate law to determine the class of beneficiaries eligible to recover.

[156] *See* N.Y. WORK. COMP. § 4.

[157] *See* 28 C.F.R. § 104.47(a).

[158] *See* N.Y. WORK. COMP. § 29(1-b).

[159] *See* 28 C.F.R. § 104.47(a).

[160] *See id.* § 104.43(d).

[161] The Regulations provide for a minimum award *before* collateral offsets have been deducted ($500,000 for claims on behalf of deceased victims with a spouse or dependent or $300,000 for claims on behalf of deceased victims who were single with no dependents), but do not set forth a minimum award *after* offsets. *See id.* § 104.41.

[162] *See* 67 Fed. Reg. at 11,242 (Mar. 13, 2002).

[163] This statistic includes minor children who did not qualify as dependents.

[164] *See* 28 C.F.R. § 104.52. Issues relating to the decedent's proper domicile were raised in a number of claims, particularly where decedents were in the military or working for foreign companies located in New York. Rather than looking to the specific law and the potential places of domicile and negotiating the complexities and distinctions between various states' choice of law rules, the Special Master adopted criteria for the determination of domicile. These criteria were published on the Fund website. Most claimants were able to resolve questions regarding domicile by reference to these criteria. *See* Frequently Asked Questions, Section 1.16, "What is domicile?" attached hereto as Exhibit E.

[165] *See* Distribution Plan Information for Deceased Victims-Summary of State Wrongful Death and Intestacy Statutes, attached hereto as Exhibit G.

02:008598

[166] *See* Sample Letters Notifying All Interested Parties of Final Award Determination, where a distribution plan had been approved, attached hereto as Exhibit H, and where a distribution plan had not been approved, attached hereto as Exhibit I.

[167] *See* Distribution Plan Information for Deceased Victims – Summary of State Wrongful Death and Intestacy Statutes, attached hereto as Exhibit G.

[168] The Summary of State Wrongful Death and Intestacy Statutes was intended to be a general summary only. The summary specifically stated that it was only meant to provide information regarding relevant state law as a guide to devising plans for distributions that were consistent with state law and that, to the extent state law varied with the chart, state law controlled. In addition, the summary advised claimants that if more information was needed, an attorney familiar with state statutes and case law should be consulted.

[169] *See* Distribution Plan Information for Deceased Victims - Summary of State Wrongful Death and Intestacy Statutes, attached hereto as Exhibit G.

[170] *See In re Kaiser's Estate*, 100 N.Y.S.2d 218 (1950). Under *Kaiser*, each distributee receives a percentage of the award in proportion to the number of years of dependency for which that distributee would have looked to the deceased for support. The formula is achieved by adding up all of the years of "dependency." The figure for each child is the number of years it would take to reach the age of 21. For the spouse, the length of anticipated dependency is measured by mortality tables. (The presumption utilized by the Fund for these purposes was that the life expectancy for males is 78 and females is 80.) The total number of years for the spouse and children constitute the denominator, and the respective number of years of ··dependency··is the numerator for each of the distributes. Note that under a strict application of the rule, a child over 21 would not be entitled to any portion of the wrongful death award. However, because dependency is defined so broadly and because many states determine wrongful death allocations based on what is "fair and equitable," the Fund required the consent of an adult child to an economic award distribution that excluded him or her.

[171] Where the Personal Representative elected allocation pursuant to a *Kaiser* formula, the Special Master allowed the allocation among children to be equalized if the family did not want children to receive differing percentages of the award as long as the spouse s portion of the award was not increased at the children s expense. For example, if under *Kaiser* a spouse was entitled to 60% of the economic award and the two children were entitled to 22% and 18% respectively due to their different ages, the Special Master would approve a submitted plan allocating each child 20% of the economic award.

[172] For example, the Special Master would not have approved a distribution plan that included a charitable institution as a beneficiary of the award.

[173] In claims where the decedent was single and a parent was the Personal Representative, 45% of the approved plans included not only the parent, but also a sibling or other person.

[174] Allocation to the parents was not an issue when there were surviving children since most states do not allow recovery for parents under either intestate law or wrongful death when there are surviving children.

[175] *See* Sample Letter Notifying All Interested Parties of Final Award Determination where a distribution plan had been approved, attached hereto as Exhibit I.

[176] In rare cases, the Fund was informed by potential beneficiaries that, although the Personal Representative had received an award, the Personal Representative had not entered into a consensual agreement with the potential beneficiaries and had not filed an action in court. In these cases, the Special Master sent written notice to the Personal Representative of the complaint and advised the Personal Representative once again that federal law required him or her to distribute the award in accordance with state law. In addition, the Fund notified the court that had issued the Letters of Administration of the complaint.

[177] Some domestic partners argued that the New York "September 11th Victims and Families Relief Act" (the "New York Act") meant that domestic partners should receive awards from the Fund, even if not provided for in a will or found to be dependent upon the decedent. The New York Act states in

02:008599

precatory language that it is the legislature's intent that domestic partners of victims of September 11 should be eligible for distribution from the Fund and that the requirements for awards under the New York State World Trade Center Relief Fund and other New York laws should guide the Special Master. *See* N.Y. SURR. CT. PROC. ACT §§ 205, 2307 (2002). The New York Act, however, itself does not provide for any change in the New York intestate or wrongful death law, and therefore, the Fund did not treat this precatory language as a revision to New York's intestacy and wrongful death laws.

In some claims, the consumption factor utilized to determine economic damages was adjusted to reflect the fact that the decedent was living with or was engaged to a domestic partner or fiancée, thereby increasing the award. In these circumstances, the domestic partner or fiancée often argued that he or she should receive the increase in the award that was the result of his or her relationship with the victim. The Regulations, however, require the Fund to follow state law and, if the state wrongful death law did not recognize domestic partners or fiancées as distributees, the Fund could not mandate that a portion of the economic award be allocated to them. In some instances, families chose to share a portion of the award with a domestic partner or fiancée. Provided all beneficiaries were consenting adults, the Fund did not disapprove but did not affirmatively approve such plans. However, when a minor child was the recipient of a portion of the award under state law, a sharing agreement with a domestic partner or fiancée that impacted the minor child's award was not permissible. The Fund determined that a minor child (or a person acting on his or her behalf) could not consent to a redistribution of an award in such circumstances and that he or she should receive the full allocation to which he or she was entitled under state law.

[178] In most states, the guardian of the property is responsible for the child's assets while the guardian of the person has custody of the child. The guardian of the property is hereinafter referred to as the "guardian."

[179] In New York, the guardian must file an annual accounting, *see* N.Y. SURR. CT. PROC. ACT § 1719, investment authority is limited, *see id.* at § § 1708, 1713, and the Surrogate's Court's approval is required for the expenditure of a minor's funds, *see id.* at § 1713. Not all states are this restrictive. In New Jersey, for example, guardians have the option of depositing funds into an unsupervised account so long as bond is provided. *See* N.J. STAT. ANN. § 3B:13-43 (authorizing expenditures for the support, maintenance, education and general use and benefit of minor without court order); 3B:15-1 (generally requiring the posting of a bond by guardian); *but see* N.J. STAT. ANN. § 3B:17-3 (requiring guardian to file accounting at intervals determined by the court).

[180] *See* N.Y. SURR. CT. PROC. ACT at § 1713(2) (court considers a parent's "financial ability to pay" in determining whether to authorize expenditures of guardianship funds and in what amount.)

[181] *See, e.g.,* N.J. STAT. ANN. § 46:38A-14(c) (requiring court approval of transfer exceeding $10,000); N.Y. EST. POWERS & TRUST § 7-6.6 (c)(iii) (prohibiting transfers over $50,000 without court approval); VA. CODE ANN. § 31-42C (restricting transfers over $10,000 without court order).

[182] *See, e.g.,* Social Security Administration, 42 U.S.C. § 405(j); Workers Compensation 20 C.F.R. § 10.424; Railroad Retirement Board, 20 C.F.R. § 266.1.

[183] State law differs on whether and what type of trust could be approved by a court for Fund awards to minors. In New Jersey, specific legislation was enacted in response to parents concerns that large awards would be paid from the Fund to children who would have access to their funds at 18 and might not use these funds responsibly. The New Jersey legislation provided that the Superior Court, Chancery Division, Probate Part, could allow any award from the Fund to be the subject of a trust that could hold the funds for a number of years past the age of majority. *See* N.J. STAT. ANN. § 3B:12-54.1(c)(1).

[184] *See* Application for Representative Payee, attached hereto as Exhibit J.

[185] Of the 1,025 approved distribution plans that included minors, 68% had some portion of the minor's award paid to a representative payee while 15% had some portion of the minor's award paid as a structure and 4% had some portion of the minor's award paid to a guardian of the property.

02:008600

[186] One criticism of the representative payee program was that it could result in potential liability of parents and attorneys in a later action by the child for misuse of the funds.

[187] A Sample Award Determination Periodic Payment Agreement is attached hereto as Exhibit K.

[188] Before the Fund would issue a periodic payment agreement, documentation demonstrating the appointment of a guardian of the property was required. *See* FAQs, Section 11.7, attached hereto as Exhibit E.

[189] *See* 28 C.F.R. § 104.52.

[190] The Regulations authorized the Special Master to publish a list of individuals who had filed claims and the names of the victims, but not the content of any such claim. *See* § 28 C.F.R. 104.21(b)(6).

[191] *See* Award Payment Statistics for Deceased Victims – Substantially Complete Claims/Final Award Amounts, attached hereto as Exhibit L.

[192] *See* Award Payment Statistics for Deceased Victims – General Award Statistics and Range of Award Values, attached hereto as Exhibit M.

[193] *See* Award Payment Statistics for Physical Injury Victims, attached hereto as Exhibit N.

[194] FECA provides workers' compensation benefits for civilian employees of the federal government.

[195] Information relating to FDNY benefits was also applicable to the NYPD.

[196] The Fund established specific channels of communication and procedures for the gathering of information from the following employers: AIG, American Building Maintenance, AON, Banker's Trust n/k/a Deutsche Bank, Cantor Fitzgerald, Carr Futures, Euro Brokers, Fiduciary Trust, Forte Food Services, Inc., Fred Alger, Intellisource Consulting; Keefe, Bruyette & Woods, Inc., Marsh & McLennan, Moneyline Telerate, Oracle, Raytheon, Royal & Sun Alliance, Sandler O'Neill, Sidley Austin Brown Wood, LLP, and TJX.

[197] Final Report, Trial Lawyers Care (July 26, 2004).

[198] Assistance was also provided by Safe Horizon, the largest not-for-profit mediation service in New York City. The Special Master's Office met with members of Safe Horizon in an effort to locate services that victims' families could use as a resource in resolving intra-family issues regarding the filing of claims and distribution of awards. Safe Horizon reported that it handled approximately 90 inquiries and conducted 5 full-scale mediations for families of victims.

[199] The agencies that provided Hearing Officers included: the Department of Labor, the Environmental Protection Agency, the Federal Energy Regulatory Commission, the Federal Mine, Safety and Health Review Commission, Housing and Urban Development, the National Labor Relations Board and the United States Coast Guard.

[200] In addition, in the spring of 2003, one of The Feinberg Group attorneys working on the Fund joined the Department of Justice.

[201] In addition to these 29 attorneys, 3 additional attorneys from The Feinberg Group worked on the Fund periodically throughout the Program.

[202] This cost will increase minimally after the receipt of pending additional invoices.

[203] Kenneth R. Feinberg and the legal, administrative and support staff of The Feinberg Group worked in excess of 19,000 hours during the period beginning November of 2001 through September 2004. The value of this time is estimated to be in excess of $7.2 million.

[204] This figure includes actual costs plus obligated funds through Fiscal year 2004.

02:008601

TABLE NO. 1

## CLAIMS FOR DECEASED VICTIMS BY INCIDENT LOCATION

| Location | # of Claims | Amount Awarded |
|---|---|---|
| World Trade Center – Building | 2,388 | $5,083,751,440.29 |
| World Trade Center -- Street | 209 | $439,185,736.33 |
| Pentagon | 114 | $172,571,215.31 |
| Flight No. AA11 | 65 | $119,638,023.32 |
| Flight No. UA 175 | 46 | $69,556,753.04 |
| Flight No. AA 77 | 33 | $57,908,226.32 |
| Flight No. UA 93 | 25 | $53,649,607.47 |
| **TOTAL** | **2,880** | **$5,996,261,002.08** |



## CLAIMS FOR PHYSICAL INJURY VICTIMS BY INCIDENT LOCATION

| Location | # of Claims | Amount Awarded |
|---|---|---|
| World Trade Center -- Building | 2,212 | $892,824,923.59 |
| World Trade Center – Street/Other | 382 | $108,687,824.01 |
| Pentagon | 86 | $51,641,786.96 |
| **TOTAL** | **2,680** | **$1,053,154,534.56** |



96

02:008602

TABLE NO. 2

## CLAIMS FOR DECEASED VICTIMS BY INCOME LEVEL

| Income Levels | # of Claims | % of Claims Filed | Total Awards | % of Total Awarded for Death Claims |
|---|---|---|---|---|
| $0 | 17 | 0.59% | $13,396,374.59 | 0.22% |
| $24,999 or less | 163 | 5.66% | $179,648,077.33 | 3.00% |
| $25,000 to $99,999 | 1591 | 55.24% | $2,418,567,253.96 | 40.34% |
| $100,000 to $199,999 | 633 | 21.98% | $1,457,314,626.24 | 24.30% |
| $200,000 to $499,999 | 310 | 10.76% | $1,052,333,721.38 | 17.55% |
| $500,000 to $999,999 | 89 | 3.09% | $422,719,241.32 | 7.05% |
| $1,000,000 to $1,999,999 | 52 | 1.81% | $294,933,413.48 | 4.92% |
| $2,000,000 to $3,999,999 | 17 | 0.59% | $106,312,992.16 | 1.77% |
| $4,000,000 & over | 8 | 0.28% | $51,034,301.62 | 0.85% |
| **Total Claims** | **2,880** | **100.00%** | **$5,996,261,002.08** | **100.00%** |




# of Claims

02:008603

CLAIMS FOR DECEASED VICTIMS                    TABLE NO. 3
BY
GENDER and AGE

**Female**

| Age Range | Claim Count | Award Amount |
|-----------|-------------|--------------|
| 25 & Under | 55 | $84,483,690.68 |
| 26-30 | 93 | $172,998,972.03 |
| 31-40 | 212 | $356,996,222.65 |
| 41-50 | 193 | $268,166,342.79 |
| 51-60 | 104 | $89,769,339.59 |
| 61-70 | 27 | $21,178,460.11 |
| Over 70 | 8 | $5,459,153.75 |
| Sub Totals: | 692 | $999,052,181.60 |

**Male**

| Age Range | Claim Count | Award Amount |
|-----------|-------------|--------------|
| 25 & Under | 96 | $167,352,503.98 |
| 26-30 | 253 | $572,081,177.11 |
| 31-40 | 842 | $2,347,011,727.86 |
| 41-50 | 630 | $1,418,855,991.40 |
| 51-60 | 299 | $427,192,091.63 |
| 61-70 | 57 | $58,159,862.69 |
| Over 70 | 11 | $6,555,465.81 |
| Sub Totals: | 2,188 | $4,997,208,820.48 |

| TOTAL | 2,880 | $5,996,261,002.08 |
|-------|-------|--------------------|

98

**02:008604**

CLAIMS FOR PHYSICAL INJURY VICTIMS
BY
GENDER and AGE

TABLE NO. 3a

| Female | | |
|---|---|---|
| Age Range | Claim Count | Award Amount |
| 25 & Under | 14 | $2,000,345.22 |
| 26-30 | 28 | $14,043,126.00 |
| 31-40 | 137 | $45,417,705.00 |
| 41-50 | 135 | $55,679,111.21 |
| 51-60 | 87 | $16,082,384.00 |
| 61-70 | 13 | $1,423,781.00 |
| Over 70 | 4 | $346,933.00 |
| Subtotals: | 418 | $134,993,385.43 |

| Male | | |
|---|---|---|
| Age Range | Claim Count | Award Amount |
| 25 & Under | 26 | $3,682,647.00 |
| 26-30 | 117 | $58,076,207.00 |
| 31-40 | 776 | $387,302,284.72 |
| 41-50 | 988 | $374,401,312.97 |
| 51-60 | 307 | $87,951,300.44 |
| 61-70 | 43 | $6,579,744.00 |
| Over 70 | 5 | $167,653.00 |
| Subtotals: | 2,262 | $918,161,149.13 |

| TOTAL | | |
|---|---|---|
| | 2,680 | $1,053,154,534.56 |

99

02:008605

BREAKDOWN OF PHYSICAL INJURY TYPES                    TABLE NO. 4

| INJURY TYPE | # OF CLAIMS | % OF CLAIMS | FINAL AWARD AMOUNT | % OF TOTAL AWARDED |
|---|---|---|---|---|
| ASTHMA/OTHER RESPIRATORY | 1,377 | 51.38% | $573,210,012.71 | 54.43% |
| BACK INJURY  (Disc Problem, Back Pain, etc.) | 94 | 3.51% | $26,467,639.07 | 2.51% |
| BROKEN BONES/FRACTURES | 87 | 3.25% | $23,847,413.22 | 2.26% |
| BRUISES/CUTS | 44 | 1.64% | $3,670,167.00 | 0.35% |
| BURNS | 40 | 1.49% | $82,843,807.52 | 7.87% |
| HEART ATTACK/OTHER CARDIAC PROBLEMS | 6 | 0.22% | $2,472,146.00 | 0.23% |
| NEUROLOGICAL PROBLEMS (Stroke, Seizure, Brain Damage | 8 | 0.30% | $9,088,576.00 | 0.86% |
| OTHER INJURY | 67 | 2.50% | $18,464,246.00 | 1.75% |
| SENSORY PROBLEMS (Vision, Hearing, etc.) | 31 | 1.15% | $3,319,694.00 | 0.32% |
| SOFT TISSUE (Ligaments and Cartilage) | 91 | 3.40% | $22,807,193.98 | 2.17% |
| MULTIPLE INJURIES | 835 | 31.16% | $286,963,639.06 | 27.25% |
| TOTAL | 2,680 | 100.00% | $1,053,154,534.56 | 100.00% |

02:008606

CLAIMS FOR DECEASED VICTIMS BY          TABLE NO. 5
STATE OF RESIDENCE

| STATE | NO. OF CLAIMS |
|---|---|
| Arizona | 2 |
| Arkansas | 2 |
| California | 26 |
| Colorado | 2 |
| Connecticut | 61 |
| Delaware | 2 |
| District of Columbia | 10 |
| Florida | 4 |
| Georgia | 2 |
| Illinois | 8 |
| Iowa | 1 |
| Louisiana | 2 |
| Maine | 4 |
| Maryland | 47 |
| Massachusetts | 64 |
| Michigan | 2 |
| Mississippi | 1 |
| Missouri | 2 |
| New Hampshire | 9 |
| New Jersey | 621 |
| New Mexico | 1 |
| New York | 1,622 |
| North Carolina | 2 |
| Ohio | 2 |
| Pennsylvania | 29 |
| Rhode Island | 5 |
| Tennessee | 1 |
| Texas | 3 |
| Virginia | 94 |
| Subtotal | 2,631 |
| | |
| Foreign Citizenship/Foreign Residence | 249 |
| TOTAL | 2,880 |

101

**02:008607**

CLAIMS FOR PHYSICAL INJURY VICTIMS BY
STATE OF RESIDENCE

TABLE NO. 5a

| STATE | NO. OF CLAIMS |
|---|---|
| Alabama | 1 |
| Arizona | 2 |
| California | 5 |
| Colorado | 1 |
| Connecticut | 12 |
| Delaware | 2 |
| District of Columbia | 8 |
| Florida | 22 |
| Georgia | 2 |
| Kentucky | 2 |
| Louisiana | 1 |
| Maine | 2 |
| Maryland | 22 |
| Massachusetts | 7 |
| Minnesota | 1 |
| Missouri | 2 |
| Nevada | 1 |
| New Hampshire | 1 |
| New Jersey | 182 |
| New Mexico | 2 |
| New York | 2,218 |
| North Carolina | 3 |
| Ohio | 3 |
| Oklahoma | 2 |
| Pennsylvania | 24 |
| Rhode Island | 3 |
| South Carolina | 3 |
| Tennessee | 2 |
| Texas | 4 |
| Virginia | 53 |
| Washington | 2 |
| Subtotal | 2,595 |
| Foreign Citizenship/Foreign Residence | 85 |
| TOTAL | 2,680 |

102

02:008608

CLAIMS FOR DECEASED VICTIMS BY FOREIGN CITIZENSHIP OR
FOREIGN RESIDENCY*

TABLE NO. 6

| Country | No. of Claims | Country | No. of Claims |
|---------|---------------|---------|---------------|
| Argentina | 1 | Israel | 4 |
| Australia | 6 | Italy | 2 |
| Bangladesh | 3 | Ivory Coast | 2 |
| Barbados | 1 | Jamaica | 7 |
| Belarus | 1 | Japan | 23 |
| Belgium | 1 | Jordan | 1 |
| Brazil | 3 | Kazakstan | 1 |
| Canada | 18 | Lithuania | 1 |
| Chile | 1 | Malaysia | 3 |
| China | 3 | Mexico | 5 |
| Colombia | 6 | Pakistan | 1 |
| Dominican Republic | 13 | Paraguay | 1 |
| Ecuador | 10 | Peru | 2 |
| Egypt | 1 | Philippines | 1 |
| El Salvador | 2 | Poland | 2 |
| Ethiopia | 2 | Romania | 1 |
| France | 2 | Russia | 3 |
| Gambia | 2 | South Africa | 1 |
| Germany | 8 | Sri Lanka | 1 |
| Ghana | 4 | St Vincent | 1 |
| Guatemala | 1 | Sweden | 1 |
| Guyana | 4 | Switzerland | 2 |
| Haiti | 1 | Taiwan | 1 |
| Honduras | 3 | Thailand | 1 |
| Hong Kong | 1 | Togo Africa | 1 |
| India | 18 | Trinidad | 3 |
| Indonesia | 1 | United Kingdom | 52 |
| Ireland | 2 | Ukraine | 1 |
|  |  | Uzbekistan | 2 |
|  |  | Venezuela | 2 |
|  |  | Yugoslavia | 1 |
|  |  | **Subtotal** | **249** |

Citizens of the U.S. with
U.S. Residency          2,631

**Total**          **2,880**

*This chart sets forth all death claims where the claimant stated on the claim form that the victim
was a foreign citizen or resident of a foreign country. Over 85% of these victims were living in the
U.S. on 9/11/01.

103

02:008609

CLAIMS FOR PHYSICAL INJURY VICTIMS BY FOREIGN CITIZENSHIP OR
FOREIGN RESIDENCY*                                    TABLE NO. 6a

| Country | No. of Claims | Country | No. of Claims |
|---|---|---|---|
| Antigua | 1 | India | 6 |
| Argentina | 1 | Italy | 3 |
| Bangladesh | 2 | Ivory Coast | 1 |
| Belize | 1 | Jamaica | 3 |
| Brazil | 1 | Liberia | 2 |
| Canada | 13 | Kenya | 1 |
| China | 2 | Mexico | 1 |
| Colombia | 1 | Nigeria | 5 |
| Cuba | 1 | Panama | 2 |
| Dominican Republic | 9 | Peru | 1 |
| El Salvador | 1 | Poland | 4 |
| France | 2 | Russia | 1 |
| Germany | 1 | Thailand | 2 |
| Ghana | 2 | Trinidad | 2 |
| Guatemala | 1 | United Kingdom | 3 |
| Haiti | 3 | Ukraine | 1 |
| Honduras | 3 | Venezuela | 1 |
| Hong Kong | 1 | | |
| | | Subtotal | 85 |
| | | Citizens of the U.S. with | |
| | | U.S. Residency | 2,595 |
| | | Total | 2,680 |

*This chart sets forth physical injury claims where the claim form states that the victim was a
foreign citizen or resident of a foreign country.  Over 80% of these victims were living in the U.S.
when the claim was filed.

02:008610

TABLE NO. 7

| ALL CLAIMS | | | |
|---|---|---|---|
| *EMPLOYMENT CATEGORIES* | *# OF CLAIMS* | *TOTAL AWARD* | *% of Total Awarded* |
| Attorneys/Legal Profession/Law Firm Staff | 46 | $49,145,779.37 | 0.70% |
| Civil Service | 304 | $193,295,040.82 | 2.74% |
| Communications Industry/Telecommunications/Broadcast | 50 | $46,867,078.07 | 0.66% |
| Construction (including carpenters, electricians, etc.) | 158 | $116,148,604.39 | 1.65% |
| Emergency Medical Technicians & Assistants/Paramedics | 30 | $21,092,146.84 | 0.30% |
| Finance/Banking/Insurance/Accounting | 1,864 | $4,186,236,350.36 | 59.38% |
| Fire Department | 1,730 | $1,185,982,427.37 | 16.82% |
| Homemakers | 4 | $3,568,113.68 | 0.05% |
| Maintenance/Janitorial | 96 | $55,231,119.66 | 0.78% |
| Medical/Doctors/Nurses | 32 | $20,243,525.86 | 0.29% |
| Military | 100 | $133,639,541.60 | 1.90% |
| Pilots/Flight Attendants/Other Airline Employees | 30 | $37,994,215.96 | 0.54% |
| Police Department | 228 | $119,143,962.63 | 1.69% |
| Port Authority | 138 | $155,838,175.33 | 2.21% |
| Restaurant/Food Workers/Wait Staff/Dishwashers | 132 | $140,090,160.73 | 1.99% |
| Retired | 22 | $13,791,860.07 | 0.20% |
| Security Personnel/Private | 64 | $36,804,938.39 | 0.52% |
| Students | 6 | $2,895,393.47 | 0.04% |
| Technology/Computer Related | 173 | $243,680,812.69 | 3.46% |
| Unemployed | 6 | $7,627,674.77 | 0.11% |
| Other | 347 | $280,098,614.58 | 3.97% |
| Total | 5,560 | $7,049,415,536.64 | 100.00% |

02:008611