# EXHIBIT A.6

## PART 2 OF 2

Nathan Brown captured the sentiment of the Palestinian textbook incitement myth best when suggesting that Palestinian textbooks that contain the national Palestinian narrative will always be rejected in some quarters: "as long as the textbooks do not repudiate the Palestinian point of view, they will always remain suspect in some eyes."[96]

c) *Prisoners and "martyrs."*

The sense of Palestinian persecution runs very deep, and the place of Palestinians prisoners in the long battle for independence is held very high indeed.[97] No Palestinian government can be seen as abandoning prisoners. From 1967 to 1994, nearly 800,000 Palestinians had been arrested by Israel for periods ranging from one week to life.[98] To put that figure in perspective, the equivalent number of Americans arrested would be about 75 million. Many Palestinians have spent months, even years, in jail without any charges being brought, under the old British colonial system of "administrative detention."[99] Many others have been unjustly or unduly imprisoned by military courts in the West Bank based on scant evidence or "confessions" signed to charge sheets in Hebrew, a language few Palestinians read.[100] The PA has tried to keep faith with those imprisoned by Israel for domestic political purposes, even at the risk of alienating Israel with the accusation that it is encouraging violence as a result. The PA's support of prisoners has taken a number of forms, including monthly payments for the support of the prisoners' families, the continuance of scheduled promotions of police and security personnel while they remain incarcerated, and the "canteen" payments to prisoners.

The PA support for Palestinian prisoners is a political necessity, and does not indicate an endorsement of violence or terrorism. It is also a form of social welfare, given the sheer numbers of prisoners Israel has held at any one time, and the fact that it often incarcerates the primary bread winner in a family. Prisoners are viewed as political detainees, and

---

[96] Brown, The International Controversy Regarding Palestinian Textbooks (2002).

[97] *Reaching the 'No-Peace' Agreement: The Role of Palestinian Prisoner Releases in Permanent Status Negotiations*, Addameer Prisoner Support and Human Rights Association, December 2009, available at http://www.addameer.org/files/Reports/addameer-report-reaching-the-no-peace-agreement.pdf.

[98] Palestinian Centre for Human Rights, "Statistics: Arrests, Imprisonment and Torture," last updated October 4, 2002, available at http://www.pchrgaza.org/arrests_torture_stat.html.

[99] David Kretzmer, *The Occupation of Justice: The Supreme Court of Israel and the Occupied Territories*, at 129-135 (SUNY Press, 2002).

[100] For an excellent description of Israel's system of military justice, see Lisa Hajjar, *Courting Conflict: the Israeli Military Court System in the West Bank and Gaza* (Berkeley and Los Angeles: University of California Press, 2005). For an earlier depiction of similar issues, see Raja Shehadeh, *Occupier's Law: Israel and the West Bank* (Washington, D.C.: Institute of Palestine Studies, 1988).

their support is a political calling that if denied would have dire consequences for PA leaders.

This same logic applies to families of "martyrs," that is, those people who died in the fight for national liberation. As with prisoners, in distributing support payments to the families, the Institute for the Care of Martyrs' Families and the Injured (Martyrs' Institute) does not make determinations of guilt or innocence, nor does it attempt to distinguish between legitimate acts of resistance and acts that could be considered terrorism. In fact some "martyrs" were simply innocent bystanders or were themselves victims of Israeli attacks. Again, this policy is not a reward for terror, but rather a legacy of the struggle for national liberation and the intense popular affinity for anyone who lost their lives in the struggle, however misguided their actions may have been.

Compare, for example, the Martyrs' Institute's historical policy of paying any Palestinian (or his family) killed during 'the struggle' a modest stipend with the promise of Saddam Hussein to pay $25,000 to any suicide bomber's family. In Saddam's case, the activity must be a suicide bombing, which clearly was a call to terror. In the case of the Martyrs' Institute, someone caught in the crossfire and killed would be deemed a martyr and his family provided for (at a fraction of the amount Saddam paid). The Martyrs' Institute payments should be understood in the context of generations of those sacrificing for the Palestinian cause; it has long since become a legacy program that no politician would dare reverse without risking being seen as a traitor to the Palestinian cause by his own people.

## B. The PA Did Not Have the Ability to Stop the Violence During the Second Intifada

### 1. *Sources of Palestinian Rage During the Second Intifada*

The Oslo peace process from 1993 to the Second Intifada did not substantially change the situation on the ground in the West Bank. Settlements were not dismantled and, indeed, the settler population increased quite rapidly in the West Bank. The IDF maintained overall control over the borders and inside the West Bank, although regular IDF patrols deep inside the most populated Palestinian areas of West Bank did stop, at least until the start of the Second Intifada. Periodic IDF operations inside Area A (PA) lands did occur throughout the Oslo period. International development aid in the 1990s improved certain aspects of everyday life in the West Bank (e.g., better sewage

treatment, more paved roads). However, beginning in 1992, Israel initiated a closure policy that prevented Palestinians from working in Israel on a regular basis. Employment income in the West Bank and Gaza was stagnant throughout most of the 1990s as a result. In short, Oslo did not bring the kind of economic and political transformation that most Palestinians had expected.

### a) Settlements

The dominant political purpose of Israel's settlement drive in lands occupied during the 1967 war was to undercut the ability of a withdrawal by a future Israeli government from most or all of these lands. This political agenda became explicit after the Likud Party came to power in Israel in 1977 and greatly accelerated the settlement drive; the Likud Party has consistently rejected the establishment of a sovereign Palestinian state west of the Jordan River, even today. The linkage between settlements and preventing or minimizing potential withdrawal was neatly captured by Ariel Sharon, the "father" of the settlements, in 1998 during negotiations with the Palestinians. Sharon, then Foreign Minister, went on Israeli radio to urge Israelis to settle more Palestinian lands right away: "Grab the hilltops, and stake your claim. Everything we don't grab will go to them."[101]

In defense of its settlement drive, Israel has argued that settlements serve Israeli security needs. In particular, Israel has argued that settlements constitute a first line of defense against outside aggression. Historically, settlers have been provided military grade weapons by the IDF, generally M-16 automatic rifles.[102] Thus, both in word and deed, Israel itself has linked settlements and settlers with a state security function. Indeed, on a visit to the Gush Katif settlement bloc in Gaza in 2001, Prime Minister Sharon told the gathered settlers "You are the first line of defense of this country."[103]

Former US Ambassador to Israel Daniel Kurtzer likewise confirms the official Israeli security rationale for settlements:

> Ariel Sharon was considered the godfather of the Israeli settlements movement. His ardent support of settlements

---

[101] David Sharrock, "Land Grab Gathers Pace in West Bank War of the Hilltops", *The Guardian*, January 8, 1999, available at http://www.guardian.co.uk/world/1999/jan/08/davidsharrock.
[102] Foundation for Middle East Peace, "Israel's Policy of Arming Israeli Settlers Endangers Palestinians in the Territories," 4 *Settlement Report* 3, May-June 1994, available at
http://www.fmep.org/reports/archive/vol.-4/no.-3/israels-policy-of-arming-israeli-settlers-endangers-palestinians-in-the-territories.
[103] Rachel Saperstein, *Eviction* (Pavillion Press 2005).

construction and the legitimacy he lent to the strategic
argument for settlements as a means of enhancing Israeli
security were vital to the success of the enterprise,
particularly in the years after he left the Israeli military
for politics. Sharon's basic argument revolved around
security. During my time as U.S. Ambassador to Israel,
Sharon would often hold forth on the rationale for and
his own role in the planning of new settlements.[104]

Palestinians are understandably hostile to settlers and the settlement
enterprise, viewing settlers as usurpers of land and destroyers of Palestinian
livelihoods. Settlers regularly destroy Palestinian property and injure, and
sometimes kill, Palestinian civilians through excessive and often unjustified
use of force. Israel's highly regarded human rights organization, B'tselem,
has documented settler violence against Palestinian civilians. In one report
from 2001, B'tselem opens its report with these words: "Violence by settlers
and other Israeli civilians against Palestinians have occurred in the Occupied
Territories practically since the occupation began." B'tselem's website
currently lists at least 20 separate reports in English that document settler
violence against Palestinians.[105]

A 2005 official Israeli government report written by former state
prosecutor Talia Sasson confirmed the often-lawless behavior of settlers.
"When people see there is no enforcement of law," Sasson said, "they can take
land that is not theirs and establish new settlements without government
approval and build houses on them, and no one does anything afterward.
They can come and hit and shoot Palestinians, and they see no one does
anything about it."[106] Indeed, even President Obama in his recent speech in
Israel in front of a large Israeli audience publicly chided Israel over
settlements and the behavior of some settlers:

*Put yourself in their shoes, look at the world through their
eyes. It is not fair that a Palestinian child cannot grow up in a
state of her own, and lives with the presence of a foreign army
that controls the movements of her parents every single day. It*

---

[104] Daniel Kurtzer, "Behind the Settlements", *The American Interest Online*, March-April 2010 available at
http://www.the-american-interest.com/article.cfm?piece=781.
[105] B'Tselem, *Violence by Settlers*, (2011) available at http://www.btselem.org/publications?tid=32.
[106] Dina Kraft, "Israel Wrestles with Settler Challenge," *JTA*, June 24, 2009, available at
http://jta.org/news/article/2009/06/24/1005831/israel-wrestles-with-settler-conundrum.

*is not just when settler violence against Palestinians goes unpunished.*[107]

Mainstream Israelis view settlements as a problem. A June 2009 poll by Tel Aviv University found that two-thirds of Israelis view settlements as a liability, not an asset. The poll found that Israelis no longer accept the original security argument for settlements and now view them as a sectarian project of the religious right in Israel.[108] While proponents of settlements in Israel and the United States passionately argue in their defense, often on religious grounds, most Israelis themselves view settlers as an increasingly troubling problem both because they undermine any movement toward a two-state solution (supported by a majority of Israelis) and because they often act outside Israeli law. Radical settlers fight Israeli police and military personnel sent to evacuate illegal outposts, and threats to ignore and even violently resist IDF withdrawal orders as part of a peace deal are commonplace. Thus, while settlers have always been a problem for Palestinians, they are increasingly seen as a problem for mainstream Israelis as well.[109]

Even Israeli policy on what are universally recognized as "illegal outposts" can be contradictory. In 2004, Israel's State Comptroller's Office found that "while the Defense Ministry was officially supposed to be dismantling illegal outposts, the Housing Ministry had been financing them through budgets sent to established settlements that would sponsor the unauthorized outposts, often as 'suburbs' outside the official jurisdiction of the established settlement."[110] While the state funding for these illegal outposts reportedly dried up as a result of this investigation, the construction continues.[111]

---

[107] "Obama: 'Peace is Possible,' But See the World as Palestinians Do," *CNN*, March 21, 2013, available at http://www.cnn.com/2013/03/21/politics/obama-mideast-visit.

[108] Nathan Jeffay, "Pollsters Find Israeli Public Less Supportive of Settlements," *Jewish Daily Forward*, June 12, 2009, available at http://www.forward.com/articles/107114/.

[109] The internal Israeli arguments over settlements are studied in detail by Israeli authors Idith Zertal and Akiva Eldar, *Lords of the Land; the War over Israeli Settlements in the Occupied Territories, 1967-2007* (Philadelphia: Nation Books, 2009).

[110] Gideon Alon, "State Mulls Probe Over Funding for Outposts," *Ha'aretz*, June 23, 2004, available at http://www.haaretz.com/misc/article-print-page/state-mulls-probe-over-funding-for-outposts-1.125983?trailingPath=2.169%2C2.216%2C.

[111] Chaim Levinson, "The Organization Behind Illegal West Bank Outpost Construction," *Ha'aretz*, May 13, 2013, available at http://www.haaretz.com/news/features/the-organization-behind-illegal-west-bank-outpost-construction.premium-1.523823).

There is a broad consensus among international legal scholars that Israeli settlements in the West Bank and Gaza Strip[112] are in violation of international law, specifically the Fourth Geneva Convention (1949, ratified by Israel 1951). Article 49 states that an occupying power "shall not deport or transfer parts of its own civilian population into the territory it occupies." At a formal level, the US Government views the settlements as illegal under international law. Specifically, in 1979, the US State Department found that the establishment of Israeli settlements in occupied Palestinian territories is "inconsistent with international law," specifically citing Article 49 of the Fourth Geneva Convention. The US Government has never revoked or revised its finding.[113]

b) *Palestinian Civilian Deaths*

Virtually all Palestinians in the West Bank and Gaza felt rage toward Israel during the Second Intifada. The ratio of those killed during the Second Intifada was disproportionate between Israelis and Palestinians. According to Israel's respected human rights organization B'tselem, a total of 1,063 Israelis were killed during the Second Intifada, compared to 4,905 Palestinians killed, for a kill ratio of 1:5 (one Israeli killed for every five Palestinians killed).[114] The vast majority of these killings occurred during the first three years of the intifada.

While the large majority of Israelis were killed by Hamas and PIJ militants, the overwhelming majority of Palestinians were killed at the hands of the IDF, prompting worldwide condemnation. In one such instance, the Spokesman for the Secretary General of the United Nations, Kofi Annan, said:

> *The Secretary-General strongly deplores the acts of violence in the occupied Palestinian territory. He is especially concerned at the recent killing of a number of Palestinian civilians, including several children, as a result of Israeli military attacks. It is particularly distressing that these incidents have occurred during a period of relative calm and while efforts are made to implement a security agreement and to strengthen international assistance to a peaceful settlement. The Secretary-General wishes to remind the Government of Israel*

---

[112] Settlements in Gaza were dismantled in 2005.
[113] Glenn Kessler, "1979 State Dept. Legal Opinion Raises New Questions About Israeli Settlements," *Washington Post*, June 17, 2009, available at http://www.washingtonpost.com/wp-dyn/content/article/2009/06/16/AR2009061603285.html.
[114] B'Tselem, *Statistics*, available at http://www.btselem.org/english/Statistics/Casualties.asp.

*of its obligations under international humanitarian law to*
*protect civilians.*[115]

While the Israeli government justifiably arrests, and unjustifiably
assassinates, those it believes responsible for terrorist attacks, Palestinian
victims rarely see justice. In a 2001 news report discussing Jewish terror cells
operating in the Palestinian territories, Gideon Levy noted:

*Most of the Israeli media play down the reports of the drive-by*
*shootings Jews perpetrate. There are no headlines and*
*photographs to stir the blood. The victims remain anonymous*
*and the bereavement of their families is not addressed. From*
*the Palestinians' point of view, the list of the victims of Jewish*
*terrorism needs to be added to a much longer, and no less*
*painful list consisting of the innocent victims whom Israeli*
*soldiers shot during the past year. A woman who worked in a*
*hospital who was shot to death when she returned home, or a*
*child shot in his grandfather's car at a roadblock are also*
*victims in the Palestinians' eyes – even if they were killed by*
*soldiers in uniform.*[116]

*c) Life Under a Belligerent Military Occupation*

A belligerent military occupation always generates vast rage in the
occupied people. Harvard's Stephen Walt, former Dean at the Kennedy
School of Government and the Robert and Renee Belfer Professor of
International Affairs and Faculty Chair of the International Security Program,
well captured this sentiment in a recent discussion:

*Military occupation generates resistance because it is*
*humiliating, disruptive, arbitrary and sometimes terrifying to*
*its objects, even when the occupying power is acting from*
*more-or-less benevolent motives. If you've ever been caught in*
*a speed trap by a rude or abusive policeman (I have), or selected*
*out for special attention crossing a border (ditto), you have a*
*mild sense of what this is like. You are at the mercy of the*
*person in charge, who is inevitably well-armed and can do*
*pretty much whatever he (or she) wants. Any sign of protest*
*will only make things go badly -- and in some situations will*

---

[115] UN Press Release SG/SM/8364 of 4 September 2002, UN Chronology, September 2002.
[116] Gideon Levy, "When the Terrorists Are Jews," *Ha'aretz, October* 14, 2001, available at
http://www.haaretz.com/misc/article-print-page/when-the-terrorists-are-jews-
1.71832?trailingPath=2.169%2C2.225%2C2.227%2C.

> *get you arrested, beaten, or worse -- so you choke down your*
> *anger and just put up with it. Now imagine that this is*
> *occurring after you've waited for hours at some internal*
> *checkpoint, that none of the occupiers speak your language, and*
> *that it is like this every single day. And occasionally the*
> *occupying power kills innocent people by mistake, engages in*
> *other forms of indiscriminate force, and does so with scant*
> *regard for local customs and sensibilities. Maintain this*
> *situation long enough, and some members of the local*
> *population will start looking for ways to strike back.*[117]

Israel's military occupation of the West Bank and Gaza Strip had lasted over 33 years when the Second Intifada began.

### 2. Lack of PA Control

Several conclusions can be drawn about the decline in PA organizational capability by the end of 2000: (1) PA police and security capabilities, already limited, were significantly weakened through the bombing by the IDF of most police and security installations, the targeting of police and security personnel, and severe restrictions on the movement and arms of PA security forces; (2) Israeli incursions undermined PA security control in the West Bank and Gaza; (3) non-PA militias, including the Popular Resistance Committees (PRC), the AAMB, Hamas, Palestinian Islamic Jihad (PIJ), and others were responsible for virtually all of the violence against Israeli targets; and (4) the PA's efforts to neutralize militants to prevent further violence had limited effect.

Writing in December 2000, well-known Palestinian scholars Salim Tamari and Rema Hammami commented on the broad ineffectiveness of the PA in general:

> *Underneath this support lies a growing critique of the PA's*
> *inability to provide basic logistical support to the civilian*
> *population during the intifada. No civil defense directives have*
> *been given to the public, nor any indication that they are prepared*
> *for critical eventualities such as water and electricity supply cuts*
> *or gas shortages. Palestinians see these omissions as signs of PA*
> *incompetence, or even worse, neglect. They are also loath to trust a*
> *government well-known for economic corruption with*
> *responsibility for dealing with the population's mounting*
> *economic losses.... In the current crisis, an unavoidable conclusion*

---

[117] Stephen Walt, "Why They Hate Us: On Military Occupation," *Foreign Policy*, November 23, 2009, available at http://walt.foreignpolicy.com/posts/2009/11/23/on_military_occupation .

*is that the historic leadership is incapable of basic governance and,
at the same time, is unable to operate as a national liberation
movement.*[118]

a) *Limits on PA Police and Security Capabilities*

i. *Limited Command and Control Capability in PA Forces Prior to the Second
Intifada (1994-2000).*

From its inception in 1994, the Palestinian Authority was never able to
achieve significant command and control capabilities within its police and
security forces. Instead of a formalized, systematic, hierarchical structure,
PA forces were commanded largely in an *ad hoc* and personalized manner.
Besides the civil police, the PA's main security force was the Preventive
Security Service (PSS). In addition to the sheer newness of these forces,
four reasons contributed to the limited command and control capability.

First, the police and security forces had little professional training.
Their members tended to come either from underground militia forces
formed in the West Bank and Gaza during the first Palestinian uprising, or
intifada, of 1987-1993, or from units within Fatah militia operating in the
Diaspora who returned to Palestine in 1994-1995. The former had little
professional training, and the latter had minimal and often conflicting
exposure to professional training.

Second, the "inside-outside" split in these forces undermined overall
organizational effectiveness. Members of the PA police and security
forces consisted both of "insiders" who were born and raised in the West
Bank and Gaza, and "outsiders" who migrated to Palestine in 1994 or after
from Tunisia and elsewhere in the Arab world as a result of the Oslo
accords. The outsiders were Palestinians who had spent many years,
often their entire lives, living in exile, typically in Jordan, Syria, Lebanon
and Tunisia. The top PA political establishment, from Yasir Arafat down,
was dominated by outsiders, much to the consternation of "inside"
Palestinians. This tension was likewise reflected in the PA police and
security forces. The PSS attempted to overcome this tension by manning
discrete units with all insiders or all outsiders. While easing intra-unit
tensions, overall institutional efficiency suffered as a consequence.

---

[118] "Middle East Research and Information Project," available at
http://www.merip.org/mer/mer217/217_hammami-tamari.html.

Third, the forces were structured in a manner that did not encourage good organizational command and control operations. This was done by a) multiplying the number of security forces, b) encouraging them to report on each other, and c) having them report directly to Arafat, rather than through a well-organized chain of command. At least 14 different police and security forces were established by Arafat prior to the Second Intifada with no clear chain of command or division of labor between or among them. Various commanders would compete with each other for the good graces of Arafat, with no top commander allowed to build up a powerful and autonomous security presence within the PA. This structure, though common in the Arab world where military coups are responsible for most significant governmental transitions, prevented Arafat from having any effective ability to reach down into the police and security hierarchies and gain compliance in a systematic and orderly manner.

Fourth, the police and security forces were subject to the same spirit of de-institutionalization that was experienced by the PA and politics in general in the West Bank and Gaza after 1994. Outsiders returning to Palestine, reflecting broader Arab world politics, relied more on the politics of personality than on institutions. These outsiders tended to advocate a cult of personality and a de-emphasis on institutions and modern institutional norms and processes. Like all PA institutions, police and security forces were not immune from this anti-professional, anti-institutional dynamic.

In contrast, the insiders among the general public demanded a much more accountable and responsive government, especially in the police and security services, and used such forums as the Legislative Council, media, and human rights NGOs to push these demands. Many of these insiders believed the primary purpose of the Palestinian police and security forces should be to protect Palestinians from the brutality of Israel's occupation and not to act as its enforcers against their own people. Large protests from all factions, including Fatah, became commonplace from 1997 through the Second Intifada, in response to PA attempts to crackdown on political activity, as was demanded by Israel. The police and security forces were not immune to these conflicting demands.

Friedrich and Luethold came to a similar conclusion in their study of the Palestinian security sector:

*Between 1994 and 2000, the performance of the PNA [PA] security organizations was mixed. Some branches worked in*

*an effective and law-abiding mode – certainly by regional
standards – and managed to maintain a modicum of law and
order in the Areas A, despite the geographical and
organizational constraints under which they had to operate.
On a more general level, however, the work of the PNA
security organizations was marred by confusion over remits
and responsibilities, inefficiency, and sometimes even open
confrontation between different branches.  Also, organisations
with intelligence functions engaged in political repression and
became distrusted.  The absence of a legal framework and weak
legislative and judicial oversight over the security sector meant
that security personnel were rarely held accountable for
violations of the law.*[119]

In short, the result was a very ineffective command and control
hierarchy.  Command and control weakened further with the outbreak of
the Second Intifada, affording Arafat even less ability to control and
channel public anger.

### ii. Destruction of PA Infrastructure During the Second Intifada

With the outbreak of the Second Intifada in late September 2000,
Palestinian police and security infrastructure became the primary military
target of the Israel Defense Forces (IDF).  Virtually all PA police and
security installations were systematically destroyed in the first 18 months
of the Second Intifada.[120]  In short, the relatively minimal command and
control capability within PA police and security forces was quickly
diminished by Israel during the second uprising.  Chain of command,
weak to begin with, was effectively destroyed.

The United Nations kept monthly chronologies documenting
significant events as reported in the media, such as these attacks during
the Second Intifada, and one can easily see a pattern of IDF targeting of
PA and related infrastructure throughout the intifada, starting with its
earliest days.  In October 2000 the IDF targeted Arafat's Gaza
headquarters and the Voice of Palestine building.  On November 20, 2000,
the IDF bombed 15 PA security service buildings.  On December 13, 2000,

---

[119] Roland Friedrich and Arnold Luethold, eds., *Entry-Points to Palestinian Security Sector Reform* (Geneva: DCAF, 2007), p. 20.
[120] *Ibid.* p. 102 (rise of non-statutory armed groups "was a direct result of the almost complete destruction of Palestinian security infrastructure by the Israeli army in 2001 and 2002"); Gideon Levy, "Burning the Oslo Candle at Both Ends," *Ha'aretz*, June 16, 2002, available at http://www.haaretz.com/misc/article-print-page/burning-the-oslo-candle-at-both-ends-1.42269?trailingPath=2.169%2C2.225%2C2.227%2C

the IDF fired anti-tank missiles into the Khan Yunis police station. These types of attacks only intensified after Ariel Sharon was elected prime minister in March 2001, and they culminated in Operation Defensive Shield in March/April 2002 which sought to destroy the PA as the institutional basis of Palestinian governance. The last of the police and security services that had not been subject to significant attack up to that point – the Preventive Security Service ("PSS") in the West Bank – was then targeted by the IDF as well.[121]

Destruction of PA and police facilities included jails and prisons, greatly limiting the ability of the PA to hold detainees. Indeed, up until Operation Defensive Shield (begun in March 2002), PA security installations, the port and airport in Gaza, and Palestinian media outlets were the only systematic PA targets of IDF combat actions during the Second Intifada.

Already the subject of deep suspicion among the Palestinian population for acting on behalf of the Occupation, PA security forces were accused by the local populace of holding militants in jails to enable their capture or assassination by IDF forces, who frequently attacked these jails. One such example where the IDF bombed a jail for the purpose of assassinating one of the prisoners involves Hamas militant Mahmoud Abu Hanoud. Hanoud was sentenced by a Palestinian court in September 2000 to 12 years in prison for forming illegal military cells.[122] When Israel began bombing Palestinian jails in October 2000, Hanoud was taken to a secret location and continued to be held in custody.[123] Hanoud staged a 12 day hunger strike demanding that he be moved from the jail for fear that Israel would try to kill him.[124] On May 18, 2001, Israeli war planes bombed the jail in Nablus where he was being held.[125] Palestinian police were used to the sound of IDF helicopters, normally prompting them to run for cover.[126] For the first time during the Second Intifada, the Israelis used F-16 warplanes, which gave no audible warnings before two missiles struck the building, killing 11 Palestinian police officers, injuring about 30 others, and allowing Hanoud to escape with relatively minor injuries.[127]

---

[121] UN Chronology (April 2002).

[122] "Palestinian authorities recapture some prisoners sprung last week," *Associated Press*, October 16, 2000; "Suicide Bomber Kills 5; Israel Retaliates in Jet Strikes," *New York Times*, May 19, 2001.

[123] "Mofaz denies PA rearresting terrorists," *Jerusalem Post*, October 16, 2000.

[124] "Islamic militant who tops Israel's wanted list escapes shelling," *Associated Press Worldstream*, May 18, 2001.

[125] "Six killed in suicide blast; four Palestinians killed in Israeli bombing," *Associated Press*, May 18, 2001.

[126] D. Sontag, "As Emotions Boil Over, Arab-Israeli Violence Rages On," *New York Times*, May 20, 2001.

[127] "Suicide Bomber Kills 5; Israel Retaliates in Jet Strikes," *New York Times*, May 19, 2001; "Israel shells home of top Palestinian; Cheney urges sides to prevent violence from escalating; 'Down this road lies

Hanoud remained free until he was assassinated by Israeli gunships on November 25, 2001, while driving near Nablus.[128]  30,000 Palestinians marched in his funeral.

A spokesman for the French Foreign Ministry called it a "particularly inappropriate and irresponsible act at a time when parties have been asked to resume dialogue to bring about a ceasefire."[129]  Predictably, Hamas reprisal attacks followed, breaking the informal ceasefire agreement that had prevented any Hamas suicide bombings inside Israel since September 11th, 2001.[130]

The irony of the situation was described by reporter Hussein Ibish:

*The Israeli rhetoric about Arafat has become increasingly incoherent in recent weeks.  One day, he is solely responsible for the conflict, the very incarnation of evil.  The next day, he is declared 'irrelevant.'  The day after that, everything depends on his security forces suppressing Hamas and Islamic Jihad, a task Israel could never accomplish even with far more military power.*

*These are the same Palestinian security forces that Israel's military has under restricted movement and constant attack. They are routinely bombed by jets or simply captured, disarmed and executed on the spot, as happened to two Palestinian police officers in Salfit on Dec. 14.*

*In one of the most telling recent ironies, the suicide bomb attacks that killed almost 30 Israelis in Haifa and Jerusalem this month were a direct response to Israel's assassination of Mahmoud Abu Hanoud, a leading member of Hamas.  He had been serving a 12-year sentence in a Palestinian jail, only to escape when Israel bombed the jail in May in one of its attacks on Palestinian police positions.*[131]

---

disaster'; Sharon tries to ward off criticism within government, media," *Baltimore Sun*, May 21, 2001; "The 'Pimpernel' of Hamas Delays His Martyrdom Again; Alan Philips in Asira Shamalia on the Fate of an Elusive Militant," *Daily Telegraph* (London), May 29, 2001.

[128] "Violence Dents Peace Mission," *Courier Mail* (Queensland, Australia). November 26, 2001.

[129] *Ibid.*

[130] "Twelve Horrific Hours of Death, Mutilation and Terror Take Middle East to Edge of War; Israel Under Attack," *The Independent (London)*, December 3, 2001.

[131] "No More Violence from Israel; No More Violence from Israel, or Silence from U.S.," *Milwaukee Journal Sentinel* (Wisconsin), December 29, 2001.

Notably, one of the suicide bombers reportedly responsible for the
March 21, 2002, incident in the *Sokolow* case, Mahmoud Hashaika, was
reportedly motivated by Israel's assassination of Mahmoud Abu Hanoud,
an attack which also killed two of Hashaika's cousins.[132]

Friedrich and Luethold well capture the impact on the Palestinian
security sector given Israeli targeting policy during the second uprising:

> *With the eruption of the second Intifada, Palestinian security
> sector governance became much more complicated. Between
> 2000 and 2002, Israel almost completely destroyed the security
> infrastructure of the PNA [PA], including police stations
> barracks, detention centres, vehicles and communications
> systems, thereby crippling all PNA capacity to uphold law and
> order in the areas under its control. Non-statutory security
> actors entered the scene at the same pace at which the PNA's
> administrative infrastructure disintegrated.[133]*

Beginning in October 2000, there was a systematic attempt by Israel
to degrade PA institutional capacities, and by early 2002, the PA had no
systematic command and control capabilities remaining, as their physical
infrastructures had been destroyed by Israel. Ariel Sharon's government,
elected in early 2001, sought to use the uprising as a pretext to destroy the
PLO, the PA and the Palestinian national movement as a whole. Israeli
scholar Baruch Kimmerling referred to Sharon's intent to destroy the
Palestinian national movement during the intifada as "politicide."[134]

Israel effectively destroyed much of the limited ability of the PA to
exercise command and control over its police and security forces early in
the intifada. *The Economist* described this demolition of command and
control succinctly: "Israel's counter-attack against the intifada (uprising)
that broke out in 2000 pulverised the PA's security apparatus and

---

[132] "Zinni mission in tatters," *The Weekend Australian,* March 23, 2002 ("The Brigades said the bombing
avenged Israeli attacks and killings, and named the bomber as Mohammed Hashaika, at 22. Two of his
cousins died last year in an Israeli missile strike that killed a militant leader."); "Israel defends
assassination: Palestinians vow revenge," *Calgary Herald (Alberta, Canada),* November 25, 2001 ("Abu
Hanoud, 34, was killed late Friday when an Israeli helicopter fired missiles into a car near the West Bank
village of Kfar Farah. Also killed were an aide identified as Mahmoun Rashid Hashaika, and his brother
Ahmed.")
[133] *Roland Friedrich and Arnold Luethold, eds., Entry-Points to Palestinian Security Sector Reform (Geneva:
DCAF, 2007), p. 18.*
[134] Baruch Kimmerling, *Politicide: Ariel Sharon's War Against the Palestinians* (London and New York:
Verso, 2003).

punctured central authority."[135]  Friedrich and Luethold specifically point to the expansion of the militant capabilities of Hamas, Islamic Jihad, and the new AAMB, as examples of groups able to take advantage of the destruction of the Palestinian security infrastructure.[136]

### iii. *Targeting of PA Police and Security Personnel*

Palestinian policemen legitimately feared for their lives since October 2000 when police and security infrastructure became targets. Despite a large number of police and security force casualties from December 2000 through the intifada, one report quoting IDF soldiers indicates they were told to treat Palestinian police as noncombatants until February 2002, when six IDF soldiers were killed at a checkpoint.[137]  In February 2002, IDF soldiers say the rules were changed and Palestinian police were targeted.

"Brig. Gen. Gershon Yitzhak, commander of the West Bank, said the targeting of the policemen was a justifiable act of war. 'This shall not be a one-sided war,' he told reporters at a briefing.' We will react toward anyone in any place necessary. The purpose of the operation was to strike at anyone who is in any way 'involved in the dispatch of terrorists.'"[138] But the IDF soldiers involved don't agree. "The soldiers say that the Palestinians they killed had no role in the attack on the soldiers, but were chosen because they were readily available targets, and that the Palestinian officers were mowed down without being given a chance to surrender."[139]  "'Some of them could have been terrorists and some of them could not – we didn't care, actually,' Levi said. 'I felt that I wanted to kill. It smelled like revenge.'"[140]

### iv. *Restrictions on the Movement and Armament of PA Police and Security Forces*

---

[135] "Hamas Hangs On," *The Economist*, March 31, 2010, available at
http://www.economist.com/node/15824034 .

[136] *Roland Friedrich and Arnold Luethold, eds., Entry-Points to Palestinian Security Sector Reform (Geneva: DCAF, 2007), p. 18.*

[137] Police and security forces were killed by IDF forces in December 2000, February 2001, March 2001, April 2001, May 2001, July 2001, August 2001, September 2001, October 2001, December 2001, and January 2002. See UN Monthly Chronologies.

[138] Glenn Frankel, "Israelis Recall a Night of Death and Revenge; Ex-Soldiers Decry 2002 Reprisal Killings," *Washington Post*, June 11, 2005, available at http://www.washingtonpost.com/wp-dyn/content/article/2005/06/10/AR2005061001900.html.

[139] *Ibid.*

[140] *Ibid.*

Palestinian police and security personnel faced severe restrictions on
their movements and armaments through most of the Second Intifada. As
described in 2010 by a retired U.S. Army Colonel with thirty years'
experience in the Middle East, "Starting from the second intifada (2000-
2004) and up to the not so distant past, there was little, if any, uniformed
Palestinian security presence, even in the PA-controlled (Oslo derived)
area A. This was due to Israeli-mandated restrictions on Palestinian
security personnel (including on their movement) throughout the West
Bank."[141]

The Israeli policies of closures and curfews during the Second Intifada
precluded any effective police functions. "Severe internal closures"
prevented pedestrian and vehicle mobility on main roads in the West
Bank 73% of the time between September 2000 and March 2002.[142] Partial
internal closures rendered the main north-south road in the West Bank
inaccessible for the remaining 27% as well.[143]

Curfews, an extreme form of closure in which people were not allowed
to leave their homes for extended periods, reached their peak during
Operation Defensive Shield in Spring 2002.[144] Curfews severely limited
movement of more than a million people for months on end, were often
enforced by the IDF using live fire, and effectively halted most police and
civilian activity.[145]

Various negotiations between the PA and Israel to allow PA police and
security personnel to return to duty in specific cities occurred from
August 2002 through at least October 2004.[146] The few that reached the

---

[141] Ret. Col. Philip J. Dermer, "Trip Notes on a Return to Israel and the West Bank: Reflections on U.S.
Peacemaking, the Security Mission, and What Should Be Done," 39 *Journal of Palestine Studies,* at 66, 70
(Spring 2010), available at http://www.palestine-studies.org/files/pdf/jps/10706.pdf.

[142] World Bank, "Fifteen Months – Intifada, Closures and Palestinian Economic Crisis, An Assessment,"
March 18, 2002, available at www.ochaopt.org/documents/intifada_assess.pdf (at 3).

[143] *Ibid.*

[144] World Bank, "Four Years – Intifada, Closures and Palestinian Economic Crisis, p. xv, October  2004),
available at http://siteresources.worldbank.org/INTWESTBANKGAZA/Resources/wbgaza-
4yrassessment.pdf .

[145] B'Tselem, *Lethal Curfew: The Use of Live Ammunition to Enforce Curfew,* at p. 8, October 2002, available
at www.btselem.org/download/200210_lethal_curfew_eng.pdf.

[146] UN Chronologies for September 2002, October 2002, November 2002, June 2003, July 2003, and January
2004; "Analysis/Sticking With the Gradual Cease-fire Plan – For Now," *Ha'aretz*, August 26, 2002,
available at http://www.haaretz.com/misc/article-print-page/analysis-sticking-with-the-gradual-cease-
fire-plan-for-now-1.35863?trailingPath=2.169%2C2.225%2C2.226%2C ; "As Armed Gangs Terrorize PA,
Army Considers Letting Palestinian Police Force Resume Armed Patrols," *Ha'aretz*, January 2, 2004,
available at http://www.haaretz.com/misc/article-print-page/as-armed-gangs-terrorize-pa-army-

stage of being implemented were very short-lived and ended within a few months.[147] By Fall of 2004, PA security personnel began carrying weapons again despite the Israeli ban because they feared AAMB militants more than the Israeli reprisals.[148]

Even apart from the Israeli closures, curfews, and arms restrictions, the division of the Palestinian territories into Areas A, B, and C made police work a significant challenge. This situation is described by B'Tselem in its 2007 report, "Ground to a Halt: Denial of Palestinians' Freedom of Movement in the West Bank":

> The restrictions on movement make it hard for Palestinian
> Authority law-enforcement authorities to operate. . . .
> Under the Oslo Agreements, . . . [Areas A and B], which
> amount to some forty percent of the West Bank, are
> comprised of dozens of "islands." Therefore, movement
> between them requires, almost always, movement through
> Area C, where Israel continued to have complete control
> over law enforcement. To the extent that Palestinian police
> are involved, especially armed police officers, prior
> coordination is needed with Israeli security forces.
> Uncoordinated movement brings with it protracted delays
> at checkpoints and the possible arrest of Palestinian police
> officers.[149]

Colonel 'Adnan Dainiri, of the Palestinian police in Ramallah, described one example of how this worked in practice:

> In cases of violent, armed clashes, as happened, for example,
> in the area of Bir Zeit, which is only eight kilometers from
> Ramallah, we submit a request to send a police patrol with
> armed officers. This happened last summer, when there
> was an armed clash between families from Abu Shakhidam
> and Bir Zeit, during which the police station in Bir Zeit

considers-letting-palestinian-police-force-resume-armed-patrols-
1.60754?trailingPath=2.169%2C2.225%2C2.226%2C

[147] "PA Cancels Agreement Allowing Its Police to Patrol Jenin," Ha'aretz, January 13, 2003, available at http://www.haaretz.com/misc/article-print-page/pa-cancels-agreement-allowing-its-police-to-patrol-jenin-1.22381?trailingPath=2.169%2C2.216%2C ; UN Chronology (Oct. 2003).

[148] "Palestinian Police Carrying Weapons Despite Israel's Ban," Ha'aretz, September 20, 2004, available at http://www.haaretz.com/misc/article-print-page/palestinian-police-carrying-weapons-despite-israel-s-ban-1.135151?trailingPath=2.169%2C2.225%2C2.226%2C.

[149] B'Tselem, Ground to a Halt: Denial of Palestinians' Freedom of Movement in the West Bank," at 85-86 (2007), available at http://www.btselem.org/download/200708_ground_to_a_halt_eng.pdf

> *was attacked. When we submitted a request for*
> *coordination [with the Israeli authorities] so that we could*
> *send a force to the scene to settle the dispute, we received*
> *approval the following day. The incident ended in the*
> *killing of one young man, the wounding of others, and the*
> *torching of a building.*[150]

### b)  Israeli Incursions

With the outbreak of the second intifada in September 2000, Israeli forces redeployed into Area A, which was supposed to be under the control of the PA.  In addition to their new deployment lines, the IDF undertook near-daily operations into the heart of Area A, Palestinian urban areas in the West Bank as well as similar areas in Gaza.  Israel's COIN, or counter insurgency strategy, during the Second Intifada left the PA without continuous effective control in any part of the West Bank and Gaza Strip.

### c)  *Violence Undertaken by Individuals and Groups Outside of PA Control and/or Influence*

There was widespread Palestinian raw anger in the aftermath of the failed peace process, which sometimes expressed itself through violence. The violence could be organized by groups or random acts of violence by individual Palestinians. Hamas was a leading source of Palestinian violence throughout the Intifada. For example, according to Israel's Ministry of Foreign Affairs, Hamas committed four major acts of terrorism between June and December 2001 that killed 62 people and injured nearly 500 others.[151] During the same period, and especially from the spring of 2001, Arafat unsuccessfully sought a viable means to end the Intifada and decrease violence.

Virtually all attacks against Israeli civilian targets undertaken during the Second Intifada were conducted by factional militia and disorganized local cells and individuals, not by PA forces acting *qua* PA forces. PA security forces, for example, did not carry out suicide attacks on civilians.[152] In a few cases, individuals on the PA security force payroll were alleged to have

---

[130] *Ibid* at pp. 86-87.
[151] "Hamas terrorist attacks," Israel Ministry of Foreign Affairs, March 22, 2004, available at
http://www.mfa.gov.il/MFA/Terrorism-
+Obstacle+to+Peace/Terror+Groups/Hamas+terror+attacks+22-Mar-2004.htm
[152] Efraim Benmelech and Claude Berribi, "Human Capital and the Productivity of Suicide Bombers,"
*Journal of Economic Perspectives at* 21:3 (Summer 2007).

undertaken attacks against Israelis. A large number of security force employees, though technically still on the payroll, stopped reporting for duty during the Second Intifada and some took up resistance activities on their own behalf.

At the beginning of the Oslo process and following the end of the first intifada, "the intifada's semi-independent nationalist fighters, including Fatah's Black Panthers and the Fatah Hawks, were neutralized, at least in the short term, through co-option into the new security apparatus."[153] It stands to reason that some former militants who had been incorporated into the police and security forces would revert to their old militant ways in the context of the Second Intifada uprising, particularly once Israel began targeting police and security service infrastructure and personnel

Oslo was meant to create a 'post-conflict' structure in which, as is the standard practice, militants are coopted to accept peace through their inclusion in police and security forces.[154] The US did much the same thing in ending the Sunni insurrection in Iraq in 2007 by promising to integrate those militants into the Iraqi military. However, neither Oslo nor the US involvement in Iraq really ended the basic conflict, and thus there has been a reversion in both cases back to militancy by some people who had been previously integrated into uniformed forces. In the case of the Palestinians, the reversion back to militancy started with the Second Intifada, and in the case of Iraq, the reversion to militancy accelerated after the US departure from the country.

One must conclude that the alleged participation by some PA personnel in attacks on Israeli targets during the Second Intifada was linked to the degradation of the PA security sector infrastructure and reflects a lack of control by the PA rather than actions taken under PA control.

---

[153] Nigel Parsons, *The Politics of the Palestinian Authority*, p. 93 (2005).

[154] United Nations Security Council, "The Role of United Nations Peacekeeping in Disarmament, Demobilization and Reintegration; Report of the Secretary General," S/2000/101, February 11, 2000 (demobilization "may be followed by recruitment into a new, unified military force". "Reintegration refers to the process which allows ex-combatants and their families to adapt, economically and socially, to productive civilian life. It generally entails the provision of a package of cash or in-kind compensation, training, and job- and income-generating projects."); Mark Knight, "Security Sector Reform: Post-conflict Integration," Commissioned by the Global Facilitation Network for Security Sector Reform, August 2009, available at http://www.ssrnetwork.net/documents/Publications/MarkKnight%20-%20SSR%20-%20Post-conflict%20integration/SSR%20-%20Post%20Conflict%20Integration.pdf; Alison Laporte-Oshiro, "From Militants to Policemen: Three Lessons from U.S. Experience with DDR and SSR," U.S. Institute of Peace, November 17, 2011, available at http://www.usip.org/sites/default/files/resources/PB115.pdf.

Fighters from Hamas and the Palestinian Islamic Jihad (PIJ) acted independent of any PA or PLO control.  Moreover, Israeli assassinations of field commanders of these and other various groups tended to free up local cells to undertake violent acts autonomously, leading to higher levels of disorganized violence.[155]

The lack of command and control over militant cells by the PA was demonstrated in the April 2001 attempt by Arafat to ban the Popular Resistance Committees (PRC), which were an amalgamation of Palestinian fighters from different groups who banded together to defend Gaza against Israeli incursions.  The Palestinian Security Council's decision was openly rejected by PRC members in Gaza.  One PRC member phrased it this way: "No one has the right to stop me from defending myself.  We are defending our people."[156]  In October 2001, Arafat and the Palestinian Security Council once again banned the PRC and several other militant groups, including the military wing of the PFLP.[157]  These bans were generally rejected or ignored by the militant groups, further demonstrating the PA's lack of control in the West Bank and Gaza Strip.  Militants with superior firepower were often able to resist arrest by PA forces, particularly in militant strongholds.

   *d)  Clans*

Palestinian clans often formed their own armed militias during the intifada in order to protect clan members and their interests.  Sometimes the clan militias would take on grandiose names but would always be, at core, a clan militia.  Clan militias undertook significant acts of violence, although often it was of an intra-Palestinian nature.  Clans were outside of the control of the PLO, PA, Fatah or any other political grouping.

In addition to this security function, clans and other extended familial units provide many other valuable 'services' to individuals, particularly those in more traditional societies such as with the Palestinians.  Most Palestinian marriages occur within the familial structure (typically to first cousins), employment patterns closely follow clan and family ties, and social life in general is typically enjoyed within the extended family.  A man's honor is closely linked to the manner in which he treats his fellow clan members.

---

[155] Anne Marie Baylouny, "Fragmented Space and Violence in Palestine," *International Journal of World Peace*, Vol. 26, No. 3 (September 2009).

[156] "Security Tightens in Gaza, Unrest Divides Communities," *CNN*, April 29, 2001.

[157] "Arafat Bans Armed Groups," *United Press International*, October 21, 2001.

Rudeness to a member of one's extended family unit through the denial of hospitality, for example, would be seen as a mark of dishonor.[158]

e) *Limited Effect of Efforts by the PA and Others to Co-Opt AAMB Militants During the Second Intifada.*

Palestinian leaders tried a number of methods to neutralize and gain control over the actions of the Al Aqsa Martyrs Brigades to prevent them from engaging in destabilizing attacks on civilians. Israel's preferred method of mass arrests and imprisonment of anyone associated with AAMB, Hamas, or any number of other organizations, was completely infeasible for the weak PA. In any event, Israel's longstanding use of this method had proven to be misguided, as it only led to greater rage and violence among the Palestinian population. Instead, Palestinian leaders tended to take an approach similar to those used in post-conflict state-building exercises.

In post-conflict state-building, the United Nations advocates the disarmament, demobilization, and reintegration (DDR) of former militants. The UN Secretary General defined the demobilization and reintegration steps as follows:

> *Demobilization refers to the process by which parties to a conflict begin to disband their military structures and combatants begin the transformation into civilian life. It generally entails registration of former combatants; some kind of assistance to enable them to meet their immediate basic needs . . . .. It may be followed by recruitment into a new, unified military force.*

> *Reintegration refers to the process which allows ex-combatants and their families to adapt, economically and socially, to productive civilian life. It generally entails the provision of a package of cash or in-kind compensation, training, and job- and income-generating projects.[159]*

The PA was at a disadvantage compared to most post-conflict state-building situations as the Oslo process never created the post-conflict situation that had been envisioned by the Palestinians. Instead of ending the

---

[158] See Glenn E. Robinson, "Palestinian Tribes, Clans and Notable Families" in *Strategic Insights*, at 7:4, September 2008.

[159] United Nations Security Council, "The Role of United Nations Peacekeeping in Disarmament, Demobilization and Reintegration; Report of the Secretary General." S/2000/101 (Feb. 11, 2000).

Occupation, settlements and the number of settlers grew at a fast pace, more
highways (off-limits to Palestinians) were built, farm lands were bulldozed,
and freedom of movement became further restricted. Jeff Halper calls this
Israel's "Matrix of Control."[160]  As an interim governmental entity with little
hope for statehood by the Fall of 2000, the PA also lacked the necessary
legitimacy to be able to negotiate a ceasefire with the armed factions.  The
PA's legitimacy was entirely dependent on its ability to negotiate concessions
with Israel, such as Israel's agreement to stop assassinating Palestinian
political leaders, withdraw troops, release prisoners, and ease travel
restrictions.  Despite moments of hope during political negotiations, these
concessions never came.  Nevertheless, the PA made many efforts.

III.   **The PLO Did Not Support Terrorism and Had No Ability to Stop the Violence
During the Second Intifada**

As explained in Part I of my report, the PLO is an umbrella organization,
encompassing most of the Palestinian factions, with the primary exceptions of
Hamas and Palestinian Islamic Jihad (PIJ).  Although Fatah is the dominant faction
within the PLO, Fatah alone cannot speak for the PLO, nor can any other individual
faction.  The PLO can only make decisions through its representative bodies, the
Executive Committee, Central Committee, and Palestine National Council (PNC).[161]

After creation of the PA through the Oslo Accords in 1993, the role of the PLO
became significantly diminished and the vast majority of its funding was redirected
to the PA.  The PLO did continue to represent the Palestinian people living in the
diaspora and in peace negotiations with Israel, and those continuing efforts are
referenced in Section IIA, above.  The PLO Executive Committee also issued some
ceasefire calls, as referenced in Section IIB, above.  Thus, as with the PA, the PLO
supported a peaceful solution to the conflict and did not support terrorism.

Due to its severely diminished role and capacity after the creation of the PA, the
PLO had no ability to stop the violence during the Second Intifada.

IV.   **Evaluation of Expert Witnesses**

I have been asked to provide an evaluation of the professional qualifications
(pertaining to this case) and opinions offered by certain of the expert witnesses engaged

---

[160] Jeff Halper, "The 94 Percent Solution, A Matrix of Control," *Middle East Report*, Vol. 216, Fall 2000,
available at http://www.merip.org/mer/mer216/94-percent-solution; Jeff Halper, "Dismantling the
Matrix of Control," *Middle East Research and Information Project*, September 11, 2009, available at
http://www.merip.org/mero/mero091109.
[161] See Section IB, above.

by the Plaintiffs. Let me begin with offering my judgment about the kinds of criteria necessary to be considered an expert on Palestinian politics from a scholarly vantage point. Since this case hinges on readings of internal Palestinian dynamics, this is the appropriate expertise to evaluate the material involved in the *Sokolow* case. None of what follows should be viewed as detracting from the expertise that Plaintiffs' expert witnesses have in their own fields, but none is viewed in the academic community as a scholarly expert on Palestinian politics.

In my judgment, an academic expert on Palestinian politics must meet five criteria. First, he or she must have the requisite professional education, meaning have earned a PhD in a relevant field of study. A PhD is the *sin qua non* of the Academy as it signals that the holder has mastered proper methodology in his or her field of study. Methodological sophistication is what most distinguishes a holder of a PhD (and especially from top universities) from others who hold an interest in a region.

Second, an expert on Palestinian politics must have carried out regular and sustained fieldwork over time in Palestinian society, in this case, in the West Bank and Gaza Strip. Reading secondary sources from afar is no substitute for serious political ethnography done in and among Palestinians. Only such fieldwork allows a scholar to really learn the nuances and dynamics at work in Palestinian politics. First-rate historians of Palestine can carry out their work in archives in Britain, Jordan, Israel and elsewhere, but those that claim expertise in contemporary Palestinian politics must spend significant research time in Palestine.

Third, an expert on Palestinian politics must have competency in written Arabic in order to be able to judge primary source material directly, and not through someone else's translation. This is particularly true in the *Sokolow* case in order to gauge the accuracy of the translation of the captured ODS documents.

Fourth, an expert on Palestinian politics needs to have published in peer-reviewed journals and in university presses (which also go through a peer review process). Peer review is at the heart of the scientific method, and a scholar who cannot get published in such prestigious journals and presses would not be given much esteem in the field. If one's scholarship cannot pass muster through critical examination of fellow experts, then it likely is of poor quality or simple partisanship, or both.

Fifth, an academic expert on Palestinian politics would likely be a regular participant in professional associations, conferences and workshops, and would be invited to participate on panels at professional gatherings on Palestinian politics. In North America, the primary professional association is the Middle East Studies Association (MESA), which publishes the flagship journal in the field, the *International Journal of Middle East Studies (IJMES)*. Participation in MESA conferences and publications in *IJMES* are a quick way to gauge the level of professional engagement in

the Middle East scholars enjoy. For scholars in the United Kingdom, the equivalent is the British Society for Middle Eastern Studies (BRISMES), and the *British Journal of Middle East Studies*. There are a number of smaller professional, academic forums for the study of Palestinian politics, often associated with universities in the US, Europe and Israel.

With these five criteria in mind, it is my opinion that none of Plaintiffs' expert witnesses is viewed as a scholarly expert on Palestinian politics in the Academy. I was asked to comment on the professional qualifications of Messrs. Addicott, Karsh, Levitt, Marcus, Shrenzel and Eviatar. As to the first criteria – a PhD in a relevant field – only two (Karsh and Levitt) of the six experts hold such a degree. The others hold no PhD in any field, so would not be considered scholarly experts at all.

As to the second criteria of conducting scholarly fieldwork in the West Bank and Gaza, not a single one of the six witnesses I was asked to evaluate qualifies. While it appears most have at least visited the West Bank (not Gaza), it appears none has ever conducted any sort of sustained fieldwork on a research project in the West Bank and Gaza Strip. Such a lack of on-the-ground research in and familiarly with Palestinian society should discount any witness' ability to claim expertise in contemporary Palestinian politics.

As to the third criteria of competency in written Arabic, at least two of the Plaintiff's witnesses (Addicott and Levitt) do not qualify. They (and perhaps others) must rely on translations of Arabic documents, so are in no position to independently assess the accuracy of such translations. Given these experts' reliance on the ODS documents in forming their opinions, the lack of Arabic proficiency is a serious shortcoming.

When it comes to scholarly, peer-reviewed articles and books, Plaintiffs' witnesses also come up short. As far as I can tell, four of these six individuals have never published a scholarly article at all, much less on internal Palestinian politics. A fifth, Dr. Levitt, published a university press book on Hamas, but that book was less about internal Palestinian political dynamics and more about Hamas' various financial dealings. And, as noted, it was not based on fieldwork in the West Bank and Gaza, including interviews with Hamas officials. Dr. Karsh's most noted foray into internal Palestinian politics was a widely panned book on Yasir Arafat (full disclosure: I was one of the academic reviewers who panned Dr. Karsh's book. See Glenn E. Robinson, "Being Yasir Arafat: a Portrait of Palestine's President" in *Foreign Affairs*, November/December 2003).

None of Plaintiffs' expert witnesses appears to spend any time immersed in professional, scholarly organizations pertaining to the Middle East. Not one of these six gentlemen is a current member of the Middle East Studies Association, the premier

scholarly organization of the Middle East in North America (which has members from around the world, as it is the premier global scholarly organization of the Middle East). As Dr. Karsh is a British academic, I expected to find him on the roster of BRISMES experts, but he is not listed. A search of the archives of the flagship *International Journal of Middle East Studies* reveals that five of the six Plaintiffs' expert witnesses have never published an article or even a book review there, with only Dr. Karsh as the exception (but his publications have never been on Palestinian politics). Several of the Plaintiffs' witness are well known on the partisan circuit of some 'think tanks' and related non-academic institutions, but that is simply not the same thing as having scholarly credentials.

In conclusion, of the six criteria I outlined as being essential to claim expertise on Palestinian politics, not one of the six Plaintiffs' witnesses could claim to meet more than three of those criteria. Most scored a 0 or 1 on the six criteria. This is consistent with my experience of studying Palestinian politics over the past 24 years of never seeing any of these gentlemen in scholarly venues pertaining to Palestinian political and social studies.

With respect to the substantive opinions offered by each individual, my reactions are as follows:

    i.   **Jeffrey F. Addicott:** Mr. Addicott's opinion contains at least five fundamental errors:

- He repeatedly makes the foundational mistake of over-simplifying Palestinian internal politics. His portrayal of Yasir Arafat as an all-powerful dictator who could set the Palestinian street buzzing at one moment, and then just as suddenly turn it off, utterly misunderstands the context in which Arafat operated and his profound political weaknesses. Arafat was not a Stalin-like figure who could dictate outcomes. Rather, he was a relatively weak leader who tried to cajole and persuade people to do as he wanted, but with decidedly mixed results. Mr. Addicott's portrayal of Arafat as a dictator fully in control of Palestinian politics and making all the key decisions is a caricature of a much more complex and fluid reality.

- He portrays the conflict which began in September 2000 as having been unchanged in its dynamics until Arafat died in November 2004. Again, this is a gross distortion of the reality. For example, some Fatah personalities actively called for resistance to IDF occupation forces in the fall of 2000 after the fateful visit to the Haram al-Sharif of Ariel Sharon. But it is clear that by late fall of 2000 and early 2001 Arafat and some other leaders were trying to rein in Palestinian violence, while others opposed

de-escalation. This conflict, like all conflicts, evolved over time, something that Mr. Addicott ignores. A similar evolution can be seen in the relationship between Fatah and the al-Aqsa Martyrs Brigades (AAMB). In the first months of the uprising certain Fatah militants in the West Bank started using the label of AAMB. However, as the conflict evolved, influence of Fatah leaders over AAMB cells seriously weakened, and AAMB cells throughout the West Bank began to act autonomously. Arafat himself declared the AAMB illegal in 2001 but had little capacity to enforce that decision, given the destruction by Israel of the PA's command and control capabilities.

- He fails to appreciate legal, ideological and pragmatic distinctions between various Palestinian groups. In Mr. Addicott's analysis, the PA is synonymous with Fatah, which is synonymous with the AAMB that may also be synonymous with Hamas and the Popular Resistance Committees. It is a case of, essentially, 'they are all the same.' This one-size-fits-all understanding of Palestinian political groupings is misleading and factually erroneous.

- He ignores clear evidence that Arafat and other leaders (e.g., Mahmud Abbas) attempted to rein in the violence. It was not something that Arafat could just snap his fingers and stop, but his efforts to tamp down the violence, particularly behind the scenes, were clear, especially beginning in early 2001. Israel's destruction early in the al-Aqsa intifada of the PA's command and control systems (both police and security personnel and institutions were targeted), as well as Israel's targeted assassinations left very little central control over peripheral cells and militants.

ii.  **Efraim Karsh:** Mr. Karsh's opinion suffers similar flaws to those described for Mr. Addicott.

- He takes a very ahistorical approach to understanding the past two decades (and more) of Palestinian history. For Karsh, the whole Oslo peace process was a giant conspiracy, planned and executed by Yasir Arafat, to destroy Israel. This discussion ignores professionally accepted history and omits mention of important events. There is no discussion, for example, of the extreme weakness the PLO found itself in following the 1991 Gulf war, the post-war maneuvering by the first Bush administration to generate a peace process (leading to the Madrid Conference of October 1991 and the subsequent Washington talks), or the very real concessions Arafat offered Israel to kick-start the Oslo peace process in 1993. Those concessions included the acceptance of an interim period (previously rejected by the PLO), no change in the status of Jerusalem during an

interim period, no mandatory cessation of settlement activity, no early resolution of the refugee issue, and no promise of ultimate Palestinian statehood. For Karsh, this was all part of a grand conspiracy by a master terrorist. In other words, this is not history but rather an ahistorical and rather partisan and Manichean portrayal of a complex and important period of history. Dr. Karsh has no explanation for how such a Master Conspirator could be so ineffective at the end of the day. For example, if Arafat were such a cunning genius, why did the number of settlers in the West Bank double from 1991 to 2000? Or why did Arafat only ever win control over 20% of the West Bank (Area A) and no control at all over Jerusalem? For someone who manipulated history and Israel so easily in Karsh's rendering, Arafat obviously failed to deliver the goods when it counted. Dr. Karsh's report regrettably reminded me of other great (and false) historical conspiracies, such as FDR supposedly luring the Japanese to bomb Pearl Harbor, or 9-11 "truthers" who argue that the 2001 terror attacks were an inside job organized by the US Government.

- He resorts to partisan language that is not scholarly and predetermines a conclusion. For Karsh, all PLO fighters are simple "terrorists", the second uprising was a "terrorist war", the West Bank is "Judea and Samaria," which in context is making a partisan statement. This phrase is used almost exclusively by supporters of the Israeli settlement enterprise in the West Bank.

- He bases his opinion on unsupported theories. Dr. Karsh argues that the second uprising was "pre-meditated" by Arafat. There is no serious evidence that this is true. There is some evidence that others, in particular Marwan Barghouti, believed a confrontation with Israel was politically necessary after Camp David failed, but there is no serious evidence that Arafat thought this to be true or actively planned for it.

- Like Mr. Addicott, he makes no distinction between various Palestinian groups and entities. He appears to believe they were all the same and were all under the total control of Arafat. Such an argument is not consistent with the realities of internal Palestinian politics.

- Like Mr. Addicott, he has no appreciation that the al-Aqsa Intifada evolved over time and took on different dynamics at different stages, including, importantly, the destruction of (already weak) PA command and control capabilities. Like all conflicts, this one evolved in important ways, but one would not know that by reading Dr. Karsh's portrayal of it.

iii.    **Matthew Levitt**: Mr. Levitt's opinion suffers from serious substantive
shortcomings, many related to the source material upon which he relies.

- Virtually the whole of Dr. Levitt's report relies on documents provided by
the Israel Defense Forces, some of which may have been seized from PA
offices in 2002. These documents are not considered reliable by
professionals in my field because they were held by the IDF for internal
use before any independent scholars could review them. We frankly
cannot know which documents are authentic, whether any documents
have been forged, or whether exculpatory documents were never
released. A number of independent scholars who have reviewed some
documents have raised serious doubts about their credibility.[162] I am
unaware of any serious scholars writing about the Second Intifada who
rely on or even use the ODS documents because of the credibility
problem.[163] Dr. Levitt is well aware of these criticisms and tries to (very
briefly) address them, but only does so through further assertion and a
couple of anecdotes; this is hardly convincing. Because there is an absence
of corroborating evidence in Dr. Levitt's report not linked to these tainted
documents, the opinions in his report are not the result of a reliable
academic methodology. Moreover, even the documents Dr. Levitt's cites
are no longer available on the cited website, so the documents he
discusses cannot be reviewed by scholars.[164]

- Relying in large part on a few tainted documents, Dr. Levitt maintains
that the AAMB and Fatah were one and the same organization from the
whole period 2000-2005. In maintaining this position, Dr. Levitt ignores
the fact that most analysts, and in most cases US Government reports,
disagree. Beginning in late 2000, a number of Fatah militants and others
caught up in the Second Intifada began using the AAMB name. However,
whatever influence Fatah had over AAMB cells quickly dissipated as
disorganized cells emerged and multiplied, and undertook autonomous
violent actions without any form of command and control from either
Fatah or the PA.

---

[162] See, for example, Jean-Francoise Legrain, *Les textes: quelle authenticité?* Found at:
http://www.mom.fr/guides/aqsa/aqsa025.htm. Legrain, a French academic, is widely considered one
of the most outstanding scholars of Palestinian politics.

[163] As an example, a recent study by Strazzari and Tholens on the Palestinian military component of the
second intifada – an obvious place to use the ODS documents – does not use the documents at all. See
their "Another Nakba: Weapons Availability and the Transformation of the Palestinian National Struggle,
1987–2007" *International Studies Perspectives* 11 (2010).

[164] I personally confirmed with the institution in Israel that runs the website Dr. Levitt's cites from
extensively (www.terrorism-info.org) that the ODS documents are no longer available as the IDF took
back full possession of them.

- Levitt asserts that the PA itself was involved in terrorist activity and that Arafat maintained "significant control" over PA forces throughout the conflict. But he quotes the May 2002 State Department report that found no convincing evidence that either the PLO or the PA had been involved in violence. Furthermore, as my report has shown, PA command and control over its police and security forces was never very strong, and it essentially collapsed in the early months of the uprising as police stopped reporting for duty and security forces were targeted by Israeli forces. Some police or security forces who had abandoned their official posts instead joined local cells (AAMB, Popular Resistance Committees, Hamas, etc.) to fight what was perceived as Israeli aggression against Palestinians in the West Bank and Gaza Strip. These cells were typically outside the direct control of any central body, and most often undertook actions autonomously, based on local decisions by local actors.

iv. **Itamar Marcus:** It is not clear what opinions Mr. Marcus is offering, aside from simply reproducing incendiary statements without any context. Given Mr. Marcus' history, his opinions should be viewed with great caution.

- Mr. Marcus has no professional qualifications to be considered an expert witness on any of the issues under review in this case. He is not a scholar or neutral analyst. Quite the opposite: through his "Palestinian Media Watch" he has played the role of a high profile propagandist trying to attack Arafat and the Palestinian Authority almost since the moment the PA was established. Marcus nearly single-handedly manufactured the false crisis that Palestinian school textbooks were teaching anti-Semitism and incitement. Several studies – including one commissioned by the US Government – showed this claim to be false and Dr. Nathan Brown (author of one of these studies) said, virtually all of the persistent and false reports of hatred in Palestinian textbooks could be traced back to one person: Itamar Marcus.[165] According to Dr. Brown, Marcus relied on "misleading and tendentious reports" to support his claims of incitement.[166]

- Mr. Marcus makes the same set of mistakes and problematic claims as found in the other reports under review, but usually does so more enthusiastically and with less context. As with the others, there is little to no appreciation of the evolution of the conflict, of the differences between various Palestinian groups, and of the constraints on Arafat's

---

[165] Traubman, "Reports on Palestinian Kids' Hatred Grossly Exaggerated," *JWeekly.com*, February 6, 2004, available at: http://www.jweekly.com/article/full/21668/
[166] *Ibid.*

power. Mr. Marcus simply selects inflammatory rhetoric by some Palestinians during the second Intifada and presents those statement without any surrounding context, and without any acknowledgement that similar statements could be pulled out of context from the Israelis during the uprising as well.

v.   **Israel Shrenzel:** Mr. Shrenzel appears to rely heavily on classified data to reach his conclusions, which makes evaluation of parts of his report impossible. Those parts that are reviewable exhibit many of the same flaws as detailed with the other individuals.

- Mr. Shrenzel was working for the GSS during the period of all the events he describes (through 2004), so such an apparent reliance on classified data to draw his conclusions would be expected. Data that remains classified cannot be reproduced, so we have no basis on which to confirm or infirm Mr. Shrenzel's conclusions. By definition, that is not scholarship.

- Data that was collected in a classified manner but has since been made public is similarly problematic as we do not know the sources and methods of its collection. Moreover, we are left without sufficient knowledge of what percentage of the previously-classified information has been declassified and what remains hidden from public view. Thus, we have no way of gauging the reliability of the data upon which Mr. Shrenzel drew his conclusions.

- Those parts of Mr. Shrenzel's report that do not rely on classified data consist primarily of reading and summarizing documents without any independent professional judgment being exercised. This is consistent with how intelligence agents often operate. However, without independent judgment and expertise being brought to bear on the documents being examined, there is little to which I can professionally respond.

vi.   **Alon Eviatar:** I was originally asked to review the report of Ronni Shaked and later learned Mr. Shaked had been withdrawn as a potential expert. I then reviewed a report that bore Mr. Eviatar's name, but which was virtually identical to Mr. Shaked's report. These circumstances raise obvious questions about who authored Mr. Eviatar's report and whether the views expressed in that report are indeed his own and the result of his review of the facts or simply views dictated to him by others. With that observation, there are significant flaws in the analysis, regardless of its true author.

- Mr. Eviatar's report is a dramatic read, but is woefully short on scholarly rigor. As with Mr. Schrenzel's report, much of the material in Mr. Eviatar's report comes from classified Israeli data, leaving us no way to gauge the reliability of this data or subject it to the usual forms of critical academic scrutiny. As we know from the recent debate in this country, data obtained from torture is not reliable.[167]  Israel also has a long history of torturing Palestinian prisoners. The Landau Commission in Israel (1987) allowed for "moderate physical pressure" to be used on Palestinian prisoners, a phrase that provided the legal justification for torture. The Israeli High Court ruled in 1999 that the forms of torture allowed by Landau were, in fact, impermissible, and the use of torture declined substantially. However, there is evidence that torture by Israel did continue, albeit at lower levels. The recent death of Arafat Jaradat while in Israeli custody focused new attention on this issue.[168]  The bottom line is that classified data should not be relied upon as authoritative. For data that has been declassified or otherwise released, we cannot rely on its credibility for reasons noted above, and for classified data that has not been released but only seen and represented as true, we should have even less confidence as that material cannot be seen and critically judged by anyone.

- When this report was submitted under Mr. Shaked's name, it contained conclusions allegedly based on Mr. Shaked's interviews with various people. Mr. Eviatar has adopted Mr. Shaked's conclusions, but without having participated in the interviews, and to my knowledge, without having reviewed the unabridged contents of these interviews. That Mr. Eviatar would do so makes one suspicious of the rigor of his review and the legitimacy of his process. As to the underlying accurate of Mr. Shaked's accounts, we simply do not have sufficient information to make a meaningful evaluation.

- Mr. Eviatar makes a great deal of the allegation that Marwan Barghouti (a top leader of Fatah) and Abdullah Barghouti (of Hamas) shared hospitality, a car ride, and other familial favors. He portrays these things as representing close Fatah-Hamas cooperation on acts of violence, which ignores cultural norms and necessities in the Arab world. Extending favors to members of one's extended family is an important custom in the Arab world and a man's worth is traditionally judged by how he honors these sorts of familial obligations. Mr. Eviatar's willingness to ignore those customs and instead assign a political motive for such acts (and thereby blame the PA for Abdullah

---

[167] See The Report of The Constitution Project's Task Force on Detainee Treatment (Washington, D.C., 2013) at http://detaineetaskforce.org/newsroom/multimedia/
[168] For example, see
http://www.aljazeera.com/indepth/opinion/2013/02/201322511744515745.html

Barghouti's violent acts) indicates a willingness to ignore contrary facts and evidence in order to reach a preordained conclusion.

- Mr. Eviatar makes the rather preposterous claim that Hamas could not have undertaken acts of terror without PA/PLO support. In so doing, he necessarily ignores the many acts of violence Hamas undertook prior to 1994 when Israel was in direct control of the West Bank and Gaza. Would Mr. Eviatar suggest that those acts show Israel was supporting Hamas, especially given Israel's advanced military and security technologies at the time? That would be an absurd claim, and yet Mr. Eviatar concludes the weak and new PA could simply shut down Hamas and its failure to do so proves the PA's support for Hamas. This type of conclusory analysis demonstrates the weakness of Mr. Eviatar's scholarship.


_____          July 15, 2013_____

Glenn E. Robinson                        Date