UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARK I. SOKOLOW, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | Docket No. |
| ) | 04-cv-397 (GBD) (RLE) |
| v. ) | |
| ) | |
| THE PALESTINE LIBERATION ORGANIZATION, ) | |
| *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT


Mark J. Rochon
Laura G. Ferguson
Brian A. Hill
MILLER & CHEVALIER CHARTERED
655 15th Street, NW, Suite 900
Washington D.C. 20005-6701
(202) 626-5800 (tel)
(202) 626-5801(fax)

*Counsel for Defendants the Palestinian Authority
and the Palestine Liberation Organization*

May 2, 2014

1425373.1

# TABLE OF CONTENTS

Page

Introduction and Brief Procedural Background ........................................................... 1

Standard of Review ..................................................................................................... 2

Argument ..................................................................................................................... 3

I.    PLAINTIFFS LACK ADMISSIBLE EVIDENCE THAT THE PA OR PLO
ENGAGED IN AN ACT OF INTERNATIONAL TERRORISM ................................... 3

    A.    Overview of Plaintiffs' Evidence ........................................................ 3

    B.    Overview of Failure of Proof as to Key Elements of Plaintiffs' ATA Claim ....... 6

        1.    Plaintiffs Lack Admissible Evidence of Proximate Cause ...................... 6

        2.    Plaintiffs Lack Admissible Evidence of Scienter ...................................... 7

    C.    The PA Is Not Vicariously Liable for the Alleged Acts of Its Employees .......... 9

        1.    There Is No Respondeat Superior Liability under the ATA ...................... 9

        2.    Even If There Is Respondeat Superior Liability Under the ATA,
the PA, as a Governmental Entity, Cannot Be Held Vicariously
Liable .......................................................................................................... 11

            a.    The *Monell* Standard Applies Here ............................................... 12

            b.    Plaintiffs Cannot Establish an Official Policy or Custom ............. 13

        3.    In Any Event, Plaintiffs Have No Admissible Evidence That PA
Employees Acted Within the Scope of Their Employment .................... 15

        4.    There Is No Vicarious Liability for Punitive Damages ........................... 18

        5.    The PLO Is Not Liable Under a Respondeat Superior Theory of
Liability ...................................................................................................... 18

    D.    The PA and PLO Are Not Directly Liable for Acts of International
Terrorism .................................................................................................... 18

        1.    There Is No Admissible Evidence Defendants Violated § 2339B .......... 19

        2.    There Is No Admissible Evidence Defendants Violated § 2339A .......... 22

            a.    Payment of Salaries ........................................................................ 22

            b.    Prisoner and "Martyr" Payments ................................................... 22

            c.    Training .......................................................................................... 23

            d.    "Revolving Door Policy" ............................................................... 24

1425373.1

II.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT AS TO SPECIFIC INCIDENTS ALLEGED IN THE COMPLAINT ........................................ 25

    A.    The January 8, 2001 Shooting: the Guetta Plaintiffs ............................................ 26

    B.    January 27, 2002 Bombing:  the Sokolow Plaintiffs ............................................. 29

    C.    The June 19, 2002 Bombing:  the Mandelkorn Plaintiffs ..................................... 31

    D.    With Respect to the Remaining Four Attacks, Plaintiffs Lack Admissible Evidence to Establish Who Carried Out the Attacks ............................................ 32

        1.    The Israeli Convictions Are Not Admissible ........................................ 32

            a.    Foreign Convictions Are Not Admissible Under FRE 803(22) ..................................................................................... 32

            b.    Israeli Military Court Convictions Do Not Meet the Criteria for Recognition of Foreign Judgments ......................... 34

            c.    There Is No Admissible Evidence Due Process Was Provided as to the Particular Convictions at Issue ....................... 36

        2.    Other Israeli Military Court Documents Are Not Admissible ............... 36

        3.    Custodial Statements Are Not Admissible ............................................. 38

        4.    Statements in Defendants' Files Are Not Admissible to Establish Who Carried Out the Attacks at Issue ..................................................... 39

III.    MANY OF THE PLAINTIFFS LACK STANDING TO BRING ATA CLAIMS ........ 40

    A.    "Injured in His or Her Person" Requires Physical Injury ................................... 40

    B.    At the Very Least, the ATA Requires Presence at the Attack to Recover for Emotional Distress Injuries .............................................................................. 41

IV.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' NON-FEDERAL LAW CLAIMS ........................................................ 43

    A.    Wrongful Death ................................................................................................... 45

    B.    Plaintiffs' Battery and Assault Claims Are Barred by the Statute of Limitations .......................................................................................................... 46

    C.    Loss of Consortium and Solatium ...................................................................... 46

    D.    Negligence .......................................................................................................... 47

    E.    Intentional and Negligent Infliction of Emotional Distress ................................ 48

    F.    Civil Conspiracy ................................................................................................. 49

V.    THE COURT LACKS PERSONAL JURISDICTION OVER DEFENDANTS ............ 49

1425373.1

## Introduction and Brief Procedural Background

Plaintiffs commenced this action against the Palestinian Authority ("PA") and Palestine Liberation Organization ("PLO") (collectively, "Defendants") ten years ago. Plaintiffs sought damages under the civil liability provision of the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, for injuries related to seven separate alleged terrorist attacks – two shootings and five bombings – in or near Jerusalem during the 2001-2004 period. *See* DE 4 (Amended Complaint, First Count). Plaintiffs also pled numerous non-federal law claims. *Id.* (Second-Thirteenth Counts).[1] Represented by the Israel Law Center, whose self-described mission is to engage in "Lawfare" to "bankrupt" organizations they deem terrorists "one lawsuit at a time," Plaintiffs seek $1 billion in compensatory damages from the PA and PLO, or $3 billion after the ATA's automatic trebling.[2] Plaintiffs also seek punitive damages. DE 4 at 44.

The attacks at issue occurred during the popular uprising known as the Second Intifada, in which Palestinians protested the ongoing Israeli Occupation of the West Bank and Gaza Strip. A small, radicalized segment of the population engaged in attacks on Israeli civilians, many in response to the disproportionate, deadly use of force by the Israel Defense Forces ("IDF") on Palestinian civilians. A variety of disparate Palestinian individuals and groups are alleged to have carried out the shootings and bombings at issue here, with no apparent connection to one another. Plaintiffs' complaint did not clearly identify the legal basis for imposing ATA liability on Defendants PA and PLO (as distinct from Defendants John Does 1-99), other than respondeat

---

[1] Plaintiffs have yet to identify the substantive law that governs their non-federal law claims. *See* Joint Proposed Pretrial Order at 12-14 (referring only to "applicable State law and/or the CWO of Israel"). Plaintiffs also have not filed a FRCP 44.1 notice of intent to rely on foreign law.

[2] *See* Ex. B (www.israellawcenter.org). The Israel Law Center has brought numerous lawsuits in furtherance of its political agenda, including a suit against former President Jimmy Carter for his publication of *Palestine: Peace Not Apartheid* and against the U.S. State Department for providing foreign aid to the Palestinian Authority. *See id.* (Lawfare: Fighting Back, Some of Our Cases).

superior, aiding and abetting, and conspiracy. *See* DE 4. Plaintiffs subsequently acknowledged that controlling precedent prohibits the imposition of ATA liability on an aiding and abetting theory. *See* Joint Proposed Pretrial Order ("JPTO") at 12 n.1. Plaintiffs also are no longer pursing an independent claim for civil conspiracy. *Id.* at 13. Indeed, there is no civil conspiracy liability under the ATA. *Linde v. Arab Bank*, 944 F. Supp. 2d 215, 217 (E.D.N.Y. 2013).

Fact discovery closed in December 2012, and expert discovery closed in November 2013. The parties submitted their JPTO on January 22, 2014. Defendants' motion to certify the *Daimler* personal jurisdiction issue for interlocutory appeal is pending. DE 472. As set forth in Part V, Plaintiffs lack an evidentiary basis for the Court's assertion of personal jurisdiction. An 8-10 week trial is currently scheduled to commence in January 2015. DE 435 at 2.

## Standard of Review

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists only "where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. Cnty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008). Where, as here, the burden of proof at trial would fall on the nonmoving party, "it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). In that event, the nonmoving party "must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Id.* (citing *Celotex* , 477 U.S. at 322-23).

1425373.1

Because the purpose of summary judgment is to "weed out cases in which 'there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law,' it is appropriate for district courts to decide questions regarding the admissibility of evidence on summary judgment." *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997); *accord Menlo v. Friends of Tzeirei Chabad in Isr., Inc.*, 2012 U.S. Dist. LEXIS 167979, at *21-22 (S.D.N.Y. Nov. 21, 2012). Here, as set forth below, Plaintiffs lack admissible evidence that would allow a reasonable juror to find in their favor.

### Argument

## I.    PLAINTIFFS LACK ADMISSIBLE EVIDENCE THAT THE PA OR PLO ENGAGED IN AN ACT OF INTERNATIONAL TERRORISM.

### A.    Overview of Plaintiffs' Evidence

In rejecting Defendants' reliance on the political question doctrine, this Court previously noted that this is a tort case, not a case about the relations between Israel and Palestine. DE 58 at 6. Plaintiffs, however, have no admissible evidence that Defendants authorized, directed, or supported the attacks at issue. As is evident from Plaintiffs' expert reports and proposed trial exhibits, Plaintiffs want to litigate the Israeli-Palestinian conflict in a U.S. court. Plaintiffs seek to broadly indict PA governmental policies and speech that have no conceivable causal connection to their injuries. When the focus is where it belongs, on the attacks at issue, it is evident that Plaintiffs lack sufficient admissible evidence to take their case to a jury.

With the possible exception of Varda Guetta, Plaintiffs have no percipient witnesses who can testify regarding the identity of those who allegedly carried out the shootings or bombings at issue.[3]  During discovery, no plaintiff testified regarding any personal knowledge of PA or PLO

---

[3] Varda Guetta's inadmissible photo identification of the individual who allegedly shot her son is discussed in Part II.A. below. The remaining plaintiffs either were not present at the shooting or

1425373.1

responsibility for the attacks. *See* Ex. A (Statement of Material Facts as to Which There Is No Genuine Issue) at ¶ 564. Plaintiffs' Witness List identifies four Palestinian fact witnesses they may call "to testify in person about Defendants' acts of international terrorism," including former PA Prime Minister Salam Fayyad. *See* Ex. C at 3. All four individuals are beyond the subpoena power of the Court. Additional fact witnesses are identified as relevant to Plaintiffs' damages, not PA or PLO liability. *See id.* In sum, Plaintiffs have no fact witnesses who can testify that the Defendants directed or authorized the attacks at issue or that they were carried out by PA or PLO employees acting within the scope of their employment.

Plaintiffs have burdened the record with approximately 930 proposed trial exhibits, the vast majority of which cannot be authenticated and/or consist of rank hearsay, and many of which were not produced or disclosed during discovery. Plaintiffs seek to lay the foundation for admissibility of documents produced by Defendants through "a representative designated by Defendants." Ex. C at 4. The various records custodians Plaintiffs identify, however, are beyond the subpoena power of the Court. And this Court previously overruled and denied Plaintiffs' objections to Magistrate Judge Ellis's order denying Plaintiffs' efforts to re-open discovery on the admissibility of Defendants' documents. DE 447. Plaintiffs' motion in limine on the admissibility of documents produced by Defendants is pending. With respect to numerous exhibits that were not produced by the PA or PLO, including large volumes of material collected from the internet, Plaintiffs list 10 fact witnesses whom they may call to serve as "foundational witnesses," many of whom are beyond the subpoena power of the Court (such as former PA Prime Minister Ahmed Qurei), and/or were not disclosed during discovery. *See*

---

bombing or were present but did not see or cannot identify the perpetrator. *See* Ex. A ¶¶ 70, 142-49, 226-29, 268-73, 326-28, 359-61, 365-66, 371-73, 378-79, 463-70, 564.

Exh. C at 4.[4]  Many of Plaintiffs' proffered trial exhibits contain multiple levels of hearsay as to which there is no applicable hearsay exception.  In sum, the vast majority of Plaintiffs' trial exhibits will never get to a jury.

Lacking percipient witnesses and admissible documentary evidence establishing any PA or PLO involvement in the seven attacks at issue, Plaintiffs seek to rely on a collection of expert witnesses, some of whom have made a career out of vilifying the PA and PLO.  The primary function of these witnesses is to summarize rank hearsay and make unsubstantiated conclusions about PA and PLO liability, without any relevant expertise and based on unreliable and ideologically-based methodologies.  Plaintiffs cannot defeat summary judgment by reliance on their experts' conclusory opinions.  *See Garcia v. Hartford Police Dep't*, 706 F.3d 120, 127-128 (2d Cir. 2013) (expert's report, which included "speculative and conclusory" opinions "does not add any facts to the record that create a genuine dispute as to any material fact"); *In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 187, 193 (2d Cir. 1987) (finding that an issue of fact at the summary judgment stage "cannot be established by mere speculation or idiosyncratic opinion, even if that opinion is held by one who qualifies as an expert"); *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) ("[A]n expert's report is not a talisman against summary judgment."); *Knight v. City of New York*, 303 F. Supp. 2d 485, 498 (S.D.N.Y. 2004) (holding that because a "report is based largely on the expert's interpretation of the factual record . . . even if admitted into evidence, [it] would not alter the factual record sufficiently to enable a reasonable juror to find [retaliation]").

---

[4] With the exception of former PA Prime Minister Ahmed Qurei, none of Plaintiffs' "foundational witnesses" was disclosed during discovery.  Defendants, therefore, have no idea what possible connection they have, if any, to the trial exhibits Plaintiffs seek to introduce. Among those on the list is Roni Shaked, who Plaintiffs previously disclosed as an expert witness and then withdrew.

As set forth below, Plaintiffs lack any admissible evidence of who carried out the attacks at issue. But even if Plaintiffs could establish a triable issue of fact that some PA or PLO employees were involved in some of the incidents, the Plaintiffs lack any admissible evidence that the employees acted within the scope of their employment, and therefore lack any basis for imposing vicarious liability on the Defendants. With respect to attacks allegedly carried out by non-employees, Plaintiffs lack any admissible evidence that the PA or PLO engaged in any "acts of international terrorism" that caused the attacks at issue. *See* Ex. A.

**B.      Overview of Failure of Proof as to Key Elements of Plaintiffs' ATA Claim.**

Plaintiffs' sole federal law claim against the Defendants is under the civil liability provision of the Anti-Terrorism Act, 18 U.S.C. § 2333(a), which provides in its entirety:

> Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

"International terrorism" is a defined term in the statute and requires, among other things, that the acts giving rise to liability "involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States . . . , or that would be a criminal violation if committed within the jurisdiction of the United States." 18 U.S.C. § 2331(1)(A). As a result, "to prevail, a plaintiff must prove that the defendant would have violated any one of a series of predicate criminal laws had the defendant acted within the jurisdiction of the United States." *Estate of Parsons v. Palestinian Authority*, 651 F.3d 118, 122 (D.C. Cir. 2011).

1.      Plaintiffs Lack Admissible Evidence of Proximate Cause.

The statute's "by reason of" language requires a plaintiff to show that his injury was proximately caused by the defendant. *Rothstein v. UBS AG*, 708 F.3d 82, 95 (2d Cir. 2013). To establish proximate cause, Plaintiffs must establish that the Defendants' alleged tortious conduct

6

was an actual cause, or cause in fact, of their injuries. *Paroline v. United States*, 2014 U.S. LEXIS 2936, at *18 (Apr. 23, 2014). "The concept of actual cause is not a metaphysical one but an ordinary, matter-of-fact inquiry into the existence . . . of a causal relation as laypeople would view it." *Id.* (internal quotations omitted). Actual cause traditionally requires a showing that "but for" Defendants' conduct, the Plaintiffs would not have been injured. *Id.* at *27. In addition, Plaintiffs must establish that Defendants' conduct "was not just any cause, but one with a sufficient connection to the result" to make Defendants' legally responsible. *Id.* at *18. Thus, "a requirement of proximate cause is more restrictive than a requirement of factual cause alone." *Id.* at *21. Here, there is an absence of evidence demonstrating any causal relationship between *Defendants'* alleged wrongful conduct and Plaintiffs' injuries.

In a recent decision in the September 11 multi-district litigation, the Second Circuit affirmed the Rule 12(b)(6) dismissal of ATA claims against five defendants on the basis that plaintiffs failed to adequately allege that money donated by defendants to charities associated with al Qaeda "actually was transferred to al Qaeda *and aided in the September 11, 2001 attacks*." *In re Terrorist Attacks on September 11, 2001 (Al Rajhi Bank)*, 714 F.3d 118, 124 (2d Cir. 2013) (emphasis added). Here, with the possible exception of routine salary payments, as to which there is no evidence of the requisite scienter, there is no admissible evidence that the PA or PLO made any pre-attack payments to the individuals or organizations alleged to be associated with the shootings or bombings at issue. There also is no evidence that routine salary payments caused the attacks at issue.

2.    Plaintiffs Lack Admissible Evidence of Scienter.

Although § 2333(a) does not explicitly contain a state of mind requirement, courts consistently have interpreted the statute "to include a requirement that there be some deliberate wrongdoing by the defendant, in light of the fact that the statute contains a punitive element (i.e.

7

treble damages)." *Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 428 (E.D.N.Y. 2009); *accord Kaplan v. Al Jazeera*, No. 10 Civ. 5298, 2011 U.S. Dist. LEXIS 61373, at *13-15 (S.D.N.Y. June 7, 2011); *accord Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 503 (E.D.N.Y. 2012) ("deliberate or reckless misconduct is required").

In addition, in order to establish liability "a connection must be made between the defendant's mental state and the potential for harm to American nationals." *Gill*, 893 F. Supp. 2d at 506. As to the individuals or organizations alleged to have carried out the attacks at issue, Plaintiffs must prove (1) that the Defendants "knew, and it was the case, that a terrorist organization [or individual] it supported intended to injure Americans," (2) that the Defendants intended that their support help a terrorist organization or individual in injuring Americans, or (3) that the Defendants "knew that there was a substantial probability that Americans would be injured as a result of [their] support of the terrorist organization" or individual. *Id.*

The scienter requirement under § 2333(a) is in addition to the scienter requirement Plaintiffs must meet to establish the requisite predicate criminal act violation. *Id.* at 504 (describing mental state requirements for federal material support statutes). *See also Goldberg*, 660 F. Supp. 2d at 427-28 ("irrespective of which statute . . . provides the basis for a finding that defendant engaged in international terrorism, plaintiffs must still meet the scienter requirements of § 2333(a) itself in order to hold defendant liable under that statute"); *accord Boim v. Holy Land Found. for Relief and Dev.*, 549 F.3d 685, 692 (7th Cir. 2008).

Here, there is an absence of admissible evidence that Defendants engaged in any conduct knowing or intending it would result in the death or injury of U.S. citizens. There also is an absence of admissible evidence that the Defendants provided any material support to a terrorist organization, that it did so with the requisite scienter, and that such support caused the attacks at

8

issue. With respect to alleged support provided to individuals claimed to be associated with the attacks, such as salary payments, there is no admissible evidence the Defendants provided those payments with intent to support terrorist attacks on U.S. nationals or with knowledge that the payments would be so used.

### C.  The PA Is Not Vicariously Liable for the Alleged Acts of Its Employees.

Plaintiffs seek to introduce into evidence various categories of evidence to establish PA employee involvement in the attacks at issue (e.g., Israeli Military Court convictions and custodial statements). The non-admissibility of those materials is addressed in Part II.D. But even assuming arguendo there is admissible evidence of PA employee involvement, there is no triable issue of fact regarding PA liability for the following reasons.

### 1.    There Is No Respondeat Superior Liability under the ATA.

The ATA does not provide for respondeat superior liability. As a statute that applies extraterritorially, the ATA must be construed narrowly. The Supreme Court has long recognized a presumption against extraterritorial application of federal law. *See, e.g., EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991). For the same reasons, the Supreme Court has held that even expressly extraterritorial statutes should not be extended beyond their precise terms. In *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010), for example, the Court held that, "when a statute provides for some extraterritorial application, the presumption against extraterritoriality operates to limit that provision to its terms." *Id.* at 2883. And in *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437 (2007), the Court confirmed that, where a statute "specifically . . . extend[s] the reach of United States . . . law to cover certain activity abroad," courts must "resist giving the language . . . an expansive interpretation." *Id.* at 442, 455-56. The Court affirmed this principle last year in *Kiobel v. Royal Dutch Petro. Co.*, 133 S. Ct. 1659, 1665 (2013), where it held that

the principles underlying the presumption against extraterritoriality constrain courts exercising their jurisdiction under the Alien Tort Statute.

Recently, in *Mohamad v. Rajoub*, 132 S. Ct. 1702 (2012), the Supreme Court unanimously held that the Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350 note, does not impose organizational liability on the PA or PLO for acts of individual employees. A similar result should obtain here where, like the TVPA, the ATA does not expressly provide for vicarious liability under a respondeat superior theory. When Congress wishes to impose respondeat superior liability in statutes having extraterritorial reach, it does so expressly. *See* Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A (allowing suits against certain foreign states in terrorism cases for acts of "an official, **employee, or agent of such foreign state** while acting within the scope of his or her office, employment, or agency"). Where an extraterritorial statute is silent on secondary liability, "there is none." *Boim v. Holy Land Found. for Relief and Dev.*, 549 F.3d 685, 689 (7th Cir. 2008) (en banc) (ATA case rejecting aiding and abetting liability because "statutory silence on the subject of secondary liability means there is none").

Not a single court has imposed liability under the ATA under a respondeat superior theory. Only a few cases have even discussed the issue. In *Abecassis v. Wyatt*, 785 F. Supp. 2d 614 (S.D. Tex. 2011), on a motion to dismiss, the district court found an ATA claim sufficiently pled against a corporation by virtue of the conduct of its employee but did so without any analysis. In *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 542, 558 (E.D.N.Y. 2012), the court stated in dicta that the plaintiffs should be able to rely on "general principles of tort law" in seeking liability under a respondeat superior theory. The court, however, failed to cite any authorities for the proposition that general principles of tort law allow imposition of respondeat superior

10

liability where the statute at issue, as here, has a treble damages provision. The court gave the issue cursory treatment because there was no evidence of employee wrongdoing in any event. *Id.* In contrast to *Abecassis* and the dicta in *Gill*, a district court in Washington, D.C. rejected the imposition of ATA liability on the Palestinian Authority under a respondeat superior theory. *Estate of Parsons v. Palestinian Authority*, 715 F. Supp. 2d 27, 34 (D.D.C. 2010) ("we have no basis on which to assign vicarious liability to the PA for the alleged criminal acts of a few employees"), *aff'd in part, rev'd in part on other grounds*, 651 F.3d 118 (D.C. Cir. 2011).[5]

In sum, the ATA does not impose vicarious liability under a respondeat superior theory. The Defendants therefore are not vicariously liable for the alleged acts of PA employees.

> ### 2.    Even If There Is Respondeat Superior Liability Under the ATA, the PA, as a Governmental Entity, Cannot Be Held Vicariously Liable.

The PA, as a foreign government, cannot be held vicariously liable for the acts of low-level employees; rather Plaintiffs must establish wrongful conduct by the PA itself. In *Monell v. Dep't of Social Services*, 436 U.S. 658, 691 (1978), the Supreme Court established that "a municipality cannot be held liable solely because it employs a tortfeasor." Rather, plaintiffs must establish that their injury resulted from an official policy or custom. *Id.* at 694 ("[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible"); *see also Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 403-04 (1997) ("[A] plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal

---

[5] On appeal, the panel majority did not reach the question of whether the PA could be held liable for the actions of its employees. *See Parsons*, 651 F.3d at 148 (Brown, J., concurring in part).

1425373.1

action and the deprivation of federal rights"); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 470

(1986) ("The 'official policy' requirement [of *Monell*] was intended to distinguish acts of the

*municipality* from acts of the municipality's *employees* of the municipality, and thereby make

clear that municipal liability is limited to actions for which the municipality is actually

responsible."). Therefore, "a plaintiff must demonstrate that, through its deliberate conduct, the

municipality was the 'moving force' behind the alleged injury." *Roe v. City of Waterbury*, 542

F.3d 31, 37 (2d Cir. 2008).[6]

a.      The *Monell* Standard Applies Here.

The *Monell* standard governs PA liability under the ATA. Plaintiffs have argued that the

PA is a foreign governmental organization which should be treated like a U.S. municipality. *See*

DE 474 at 11. *See also* DE 200 at 15 ("Defendant PA is a municipal government"); *id.* at 16

("the PA has the status of a governmental entity"). Plaintiffs and this Court also have

characterized Defendants as "'performing core governmental functions.'" *Id.* (quoting *Sokolow*

*v. PLO*, 583 F. Supp. 2d 451, 457 (S.D.N.Y. 2008)). *See also* Ex. A ¶¶ 15-6.

Moreover, the *Monell* rule is not limited to Section 1983 cases involving U.S.

municipalities. It applies to foreign governments in terrorism cases. In *Tracy v. Islamic*

*Republic of Iran*, , 2003 U.S. Dist. LEXIS 15844, at *23-24 (D.D.C. Aug. 21, 2003), a case

brought under the state-sponsor of terrorism provision of the FSIA, 28 U.S.C. § 1605(a)(7) (now

§ 1605A), the court held: "In order for an agent, official, or employee's unlawful conduct to be

imputed to a government, however, the government must share a degree of responsibility for the

---

[6] Even under *Monell*, municipalities are not liable for the intentional acts of police officers acting outside the scope of employment – "whether the theory is respondeat superior or the City's own negligence in hiring, retention or training." *See Claudio v. Sawyer*, 2013 N.Y. Misc. Lexis 5064, at *19 (Nov. 1, 2013) (summarizing New York law).

1425373.1

wrongful conduct.  The government must have engaged in the wrongful conduct . . . as a matter of policy or custom." *Id.* (citing *Monell*, 436 U.S. at 694-95).

Further, the rationale behind the *Monell* standard supports applying it to the PA here. Respondeat superior liability "stems not from any fault of the employer, but from a public policy determination that liability for acts committed within the scope of employment should be allocated to the employer as a cost of engaging in that business." *Rau v. Roberts*, 640 F.3d 324, 328 (8th Cir. 2011) (internal quotes omitted).  Unlike private employers, municipalities are not profit-making enterprises that can simply purchase liability insurance and pass on costs to their customers.  The reason for special treatment for municipalities and similar governmental entitles is "to protect these public bodies from the enormous liabilities that might result from the mistakes of police officers or other employees." *See Brown v. Starrett City Assocs.*, 2011 U.S. Dist. LEXIS 75410, at *5 (E.D.N.Y. July 13, 2011).  Here, the public fisc and the provision of governmental services essential to the security and welfare of the Palestinian public should not be put at risk absent a showing that the PA, as an institution, engaged in wrongdoing which was the "moving force" behind Plaintiffs' injuries.

    b.    <u>Plaintiffs Cannot Establish an Official Policy or Custom.</u>

Plaintiffs cannot establish a triable issue of fact that (1) the PA had an official policy or custom supporting the use of deadly force on Israeli civilians, or (2) that the employees who allegedly carried out the shootings and bombings at issue acted pursuant to such a policy or custom.  Policy, in the *Monell* sense, may be made by the municipality's legislative body or by a municipal official "possess[ing] final authority to establish municipal policy with respect to the action ordered." *Pembaur*, 475 U.S. at 481; *accord Vives v. City of New York*, 524 F.3d 346, 350 (2d Cir. 2008).  Under the *Monell* standard, an "official policy," means "an officially promulgated policy as that term is generally understood (*i.e.*, a formal act by the municipality's

13

governing body).” *Triano v. Town of Harrison*, 895 F. Supp. 2d 526, 531-32 (S.D.N.Y. 2012) (internal quotes and citation omitted). Here, Plaintiffs have no evidence of an expressly adopted official policy authorizing PA personnel to use deadly force against Israeli civilians. To the contrary, the PA’s official policy was, and remains, to condemn attacks on civilians. *See* Ex. A ¶¶ 138, 225, 267, 322, 324-25, 358, 457-61.

Nor do Plaintiffs have admissible evidence that their injuries were caused by a government official with policy-setting authority. In identifying the official having authority with respect to a particular issue, federal courts must analyze the operative local law. *McMillian v. Monroe County*, 520 U.S. 781, 786 (1997); *St. Louis v. Praprotnik*, 485 U.S. 112, 124 (1988) (“the identification of policymaking officials is a question of state law”). To create municipal liability, the government official must be the final policymaker for the local government on the particular issue involved in the action. *Hurdle v. Bd. of Educ.*, 113 Fed. Appx. 423, 425 (2d Cir. 2004). Plaintiffs lack any admissible evidence that PA officials with policy making authority carried out, planned, authorized, directed, or provided pre-attack material support to, any of the shootings or bombings at issue.

Nor can Plaintiffs establish “the existence of a widespread practice that, although not authorized by written law or express municipal policy, is ‘so permanent and well settled as to constitute a “custom or usage” with the force of law.’” *Praprotnik*, 485 U.S. at 127 (quoting *Adickes v. S. H. Kress & Co.*, 398 U. S. 144, 167-68 (1970)). A substantial number of Plaintiffs’ exhibits are print or broadcast media statements of Palestinians, which they apparently intend to offer to show PA support for, or incitement of, the attacks. These media statements do not create a triable issue of fact for a variety of reasons: (1) Plaintiffs have no means of authenticating most of the media-related exhibits; (2) the exhibits contain multiple levels of hearsay, for which

14

there is no basis for admissibility; (3) the statements almost never refer to attacks on civilians, as opposed to a right to resistance; (4) the statements are not made by individuals with authority to make policy for the PA, and in many cases the declarant is not even employed by the PA; and (5) the statements almost never refer to the attacks at issue, and many even substantially post-date the attacks. Moreover, there is no evidence of the requisite "causal link" between the statements and the Plaintiffs' injury. *See Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983) ("Absent a showing of a causal link between an official policy or custom and the plaintiffs' injury, *Monell* prohibits a finding of liability against the City."); *accord Johnson v. City of New York*, 2011 U.S. Dist. LEXIS 15867, at *6-8 (S.D.N.Y. Feb. 15, 2011) (internal quotations omitted) (noting Second Circuit rule requiring a "causal connection – an affirmative link").

### 3. In Any Event, Plaintiffs Have No Admissible Evidence That PA Employees Acted Within the Scope of Their Employment.

Even if there is respondeat superior liability under the ATA and *Monell* does not apply, Plaintiffs still lack a basis for imposing liability on the PA for the alleged acts of PA employees. "For an employer to be liable for the conduct of its employees, a plaintiff must demonstrate that the alleged wrongful conduct was performed in the course of employment." *Capitol Records, Inc. v. MP3tunes, LLC*, 821 F. Supp. 2d 627, 649 (S.D.N.Y. 2011); *see also* Restatement (Third) of Agency § 2.04 ("An employer is subject to liability for torts committed by employees while acting within the scope of their employment."). An important factor in determining whether the conduct was within the scope of employment is whether it was within the "work-related limits of time and place." *Rau*, 640 F.3d at 328 (affirming district court's grant of municipality's motion for summary judgment where the plaintiff produced no evidence showing that the police officer assaulted him within the officer's "work-related limits of time and space"). In *Rau*, the Court of Appeals specifically noted that the employee was "outside his jurisdiction as an officer for the

15

Minneapolis Police Department" when the assault occurred. *Id.* Similarly, the seven attacks at issue occurred outside the jurisdiction of PA security forces. Ex. A ¶ 29.

*Hamm v. United States*, 483 F.3d 135 (2d Cir. 2007), is also instructive. There, the Second Circuit held that a U.S. army reservist was not acting within the scope of his employment, or in the "line of duty," when involved in a car accident on his way to a training exercise. The Court of Appeals rejected the plaintiff's argument that the reservist acted within the scope of employment because he was subject to military discipline for wrongful conduct outside of work hours. "[T]his approach would hold the military potentially liable under respondeat superior for any wrongful conduct by a military employee outside of work hours that may subject the employee to military discipline, at least where the conduct is, in some way, 'in furtherance of the duties he owes to his employer.'" *Id.* at 138-39. Rejecting this approach as a "drastic expansion of federal liability," the Second Circuit required "case-specific evidence of control." *Id.* at 139. The Second Circuit also cited *Bissell v. McElligott*, 369 F.2d 115, 119 (8th Cir. 1966), for the principle that the "unique control which the Government maintains over a soldier has little if any bearing upon determining whether his activity is within the scope of his employment." *See Hamm*, 483 F.3d at 139. Moreover, the Second Circuit expressly rejected a theory offered by Plaintiffs in these cases, namely, that the subsequent payment of salary to the officer, including for the day the wrongful conduct occurred, constituted ratification. *Id.* at 140.

In addition, as part of the scope of employment inquiry, Plaintiffs must establish that the tortious conduct was "in furtherance of the employer's interests." *Doe v. Abdulaziz Bin Fahd Alsaud*, 2014 U.S. Dist. LEXIS 47103, at *5 (S.D.N.Y. Apr. 3, 2014). Here, the PA is not liable for the alleged tortious behavior of its employees because there is no evidence their conduct was in furtherance of the PA's interests as opposed to for their own personal motives. An employer

16

cannot be held liable for 'torts committed by the employee for personal motives unrelated to the furtherance of the employer's business.'" *Woods v. CVS*, 2013 U.S. Dist. LEXIS 58764, at *6 (S.D.N.Y. Apr. 19, 2013) (dismissing sexual assault claim against employer even though employee acted while on duty as a security guard for employer); *Ross v. Mitsui Fudosan*, Inc., 2 F. Supp. 2d 522, 531 (S.D.N.Y. 1998) ("New York courts consistently have held that sexual misconduct and related tortious behavior arise from personal motives and do not further an employer's business, even when committed within the employment context"). In addition, "[t]he fact that the act done is a serious crime is a factor indicating that it is not in the scope of employment." Restatement (Second) of Agency § 229(2)(j), Comment f. [7]

Even Plaintiffs' own proffered (and inadmissible) trial exhibits indicate that the persons who allegedly committed the attacks at issue did so for their own personal reasons, such as revenge for Israeli assassinations of relatives or friends, rather than to benefit the Defendants. For example, the translation proffered by Plaintiffs of an Arabic video recording broadcast the day after the January 22, 2002 shooting states: "The Al-Aqsa Brigades announced today that one of their operatives, named Sa'id Ibrahim Ramdan, carried out the terrorist attack in response to the assassination of Ra'ad Karmi, one of their leaders, and as revenge for the killings of members of the Izz A-Din al-Qasam brigades who fell in the Israeli action in Nablus yesterday morning." Ex. D (PTE 196) Tr. at 4. *See also* Ex. E (PTE 376) Tr. at P 5:43 (indicating Abdel Karim

---

[7] In a variety of contexts, federal courts have interpreted federal statutes to impose respondeat superior liability only on a showing that the employee acted for the benefit of the employer. *See, e.g.*, *Faulkner v. Nat'l Geographic Soc'y*, 211 F. Supp. 2d 450, 472 (S.D.N.Y. 2002) ('Benefit and control are the signposts of vicarious liability.''); *Gallose v. Long Island R.R. Co.*, 878 F.2d 80, 83 (2d Cir. 1989) (no liability attaches under the Federal Employees Liability Act "when an employee acts entirely upon his own impulse, for his own amusement, and for no purpose or benefit to the defendant employer") (internal quotes omitted); *FMC Corp. v. Boesky (In re Boesky Sec. Litig.)*, 36 F.3d 255, 265 (2d Cir. N.Y. 1994) ("While an employer may be liable for even intentional and criminal acts committed by its employee, those acts must in some way further the interests of the employer, and not solely benefit the employee.").

1425373.1

Aweis acted in revenge for "the killing of my brother Samer"); Ex. F (PTE 380) Tr. at P 5: 60-62

(indicating that two of Nasser Shawish's brothers had been shot by Israeli forces).

    4.    There Is No Vicarious Liability for Punitive Damages.

Plaintiffs seek punitive damages in connection with their non-federal law claims.

Punitive damages cannot be imposed under a vicarious liability theory unless (i) the principal

authorized, ratified, or approved the act, or (ii) managerial level agents carried out the act within

the scope of their employment. *Kolstad v. ADA*, 527 U.S. 526, 542-44 (1999). Plaintiffs lack

admissible evidence to meet that test.

    5.    The PLO Is Not Liable Under a Respondeat Superior Theory of Liability.

Plaintiffs lack admissible evidence that any PLO employees carried out the shooting or

bombing attacks at issue. To the extent the Plaintiffs attempt to make such an argument, the

PLO is not liable for the acts of its employees for the same reasons the PA is not liable. The

PLO is a foreign unincorporated association carrying out certain governmental functions. Ex. A

¶¶ 13-14, 26-27. To the extent it acts as a government, it is not vicariously liable for the acts of

employees under *Monell*. To the extent it (or the PA) acts as an association, it is not vicariously

liable for the acts of its members under *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 920

(1982) ("For liability to be imposed by reason of association alone, it is necessary to establish

that the group itself possessed unlawful goals and that the individual held a specific intent to

further those aims.").

    **D.**    **The PA and PLO Are Not Directly Liable for Acts of International**
           **Terrorism.**

Throughout this litigation, Plaintiffs have blurred the distinction between their allegations

of direct (or primary) versus indirect (or secondary) liability. Their Amended Complaint made

allegations as to "Defendants," which included "John Does 1-99." *See* DE 4. As recently, as the

18

JPTO, Plaintiffs failed to identify any conduct of the PA or PLO, separate from that of "their agents, employees, and/or co-conspirators" that would give rise to ATA liability. *See* JPTO at 9. In order to establish *direct* liability under the ATA, Plaintiffs must prove that the PA and PLO engaged in an act of international terrorism, which in turn requires them to demonstrate violation of one of the enumerated predicate criminal acts. In the JPTO, Plaintiffs provide a three-page list of criminal laws they claim the Defendants (or their employees, agents, or co-conspirators) violated. *Id.* at 9-11. Plaintiffs, however, failed to identify these predicate criminal acts in their Amended Complaint and so may not litigate them at trial. Moreover, Plaintiffs' laundry list of theories, which includes dozens of statutes they claim Defendants have violated, is untethered from the facts of this case. Plaintiffs, for example, claim Defendants have violated 18 U.S.C. § 832, which bears the title "[P]articipating in a weapons of mass destruction program." JPTO at 9. Plaintiffs also claim Defendants have violated 31 C.F.R. § 594.204, which applies only to "U.S. persons." *Id.* at 11. As a matter of basic rules of civil procedure and fairness, Defendants should not have to defend against myriad unpled theories of liability. The page limit constraints of this motion do not permit Defendants to address each of the now-alleged predicate criminal act violations. Defendants, however, highlight a few of Plaintiffs' theories that are likely to be a focus of their summary judgment opposition.

> 1.    There Is No Admissible Evidence Defendants Violated § 2339B

Plaintiffs now claim that Defendants are liable for providing material support to designated foreign terrorist organizations in violation of 18 U.S.C. § 2339B. Plaintiffs never pled a violation of § 2339B, let alone pled facts sufficient to show a violation of § 2339B. Section 2339B makes it a crime to "knowingly provide[] material support or resources to a foreign terrorist organization." To violate this provision, the defendant "must have knowledge that the organization is a designated terrorist organization . . . that the organization has engaged

1425373.1

or engages in terrorist activity . . . or that the organization has engaged or engages in terrorism."

18 U.S.C. § 2339B(a)(1). Plaintiffs now contend that Defendants violated this statute by

allegedly providing material support to Hamas or the Al Aqsa Martyrs Brigades ("AAMB").

Plaintiffs, however, have no admissible evidence that any such support was provided.

      Plaintiffs' expert Matthew Levitt opines that the PA funded and armed the AAMB. Ex.

G at 24. Levitt also claims that "500,000 documents Israel seized from PA offices during

Defensive Shield provide extensive evidence of PA support for, and involvement in terrorism."

*Id.* at 18. Yet, the only example Levitt is able to provide of supposed PA funding or arming of

AAMB is an unauthenticated, undated letter supposedly reproduced in an Israeli Ministry of

Foreign Affairs publication in which the "Al Aqsa Martyrs Brigades – Southern Area" allegedly

asked President Arafat for financial aid for six individuals or families. *See id.* at 24 n.92; *see*

*also* Ex. H (PTE 629) at 17. There is no evidence any such funds were provided, or that they

were provided with the requisite scienter, or that they have any causal connection whatsoever to

the attacks at issue.[8] This is typical of Levitt's report which does not offer expertise but instead

simply relays rank hearsay. For example, Levitt attributes to Jibril Rajoub, then head of the PA's

Preventive Security Service in the West Bank, a statement allegedly made in 2002 that the PA

would not dismantle the AAMB. Ex. G at 11. Levitt's source is Ex. I (PTE 624), a March 18,

2002 article in Israeli newspaper *Haaretz* reporting on an Israeli Radio broadcast citing an

interview Rajoub allegedly gave with *Al-Hayam* newspaper.

      Plaintiffs rely on Alon Eviatar to support their claim that Defendants provided material

support to Hamas. Eviatar states: "In my expert opinion, Hamas would have been unable to

---

[8] AAMB was not designated as a foreign terrorist organization until March 27, 2002, *see* Ex. G at 9, so
any alleged support provided before March 27, 2002 could not constitute a violation of 18 U.S.C.
§ 2339B.

1425373.1

carry out terrorist attacks, such as the Hebrew University bombing, if the PA and the PO had not sheltered Hamas, and allowed it to operate in PA territory." Ex. J at 14. Eviatar cites two statements of Muhammad Dahlan, which post-date the attacks at issue. *Id.* at 13. The first, Ex. K (PTE 217), is Plaintiffs' translation of a statements made on a video posted on YouTube, in which Dahlan supposedly describes efforts taken by the Preventive Security Service *in the Gaza Strip* to protect Hamas members from "assassination operations that Israel has planned for." The second statement appears on a Palestinian Media Watch video and is to a similar effect and describes Dahlan as a "senior Fatah leader," not a PA spokesperson. Plaintiffs in *Estate of Mark Parsons v. Palestinian Authority*, 651 F. 3d 118 (D.C. Cir. 2011), also relied on the same video clip. As Judge Tatel explained, the Dahlan statement "is cast at such a high level of generality that it makes the family's theory about what happened in this particular instance only infinitesimally more likely." *Id.* at 134. Even assuming *arguendo* Plaintiffs could authenticate these statements and lay an evidentiary foundation for treating them as admissions of the PA, these statements have no probative value.

In any event, § 2339B cannot provide a basis for imposing liability on the PA because the statute imposes a U.S. nexus requirement, which is not met here. *See* § 18 U.S.C. § 2339B(d)(1) (requiring that the offense or offender have a U.S. nexus). Here, any alleged material support would have been provided in the West Bank or Gaza Strip, not the United States, and would not have affected interstate or foreign commerce. *See id.* § 2339B(d)(1)(D), (E). Moreover, neither Defendant is a "national of the United States," neither has its "habitual residence . . . in the United States," and neither was "brought into or found in the United States." *See id.* § 2339B(d)(1)(A), (B), (C).

1425373.1

2.    There Is No Admissible Evidence Defendants Violated § 2339A.

18 U.S.C. § 2339A criminalizes "provid[ing] material support or resources or conceal[ing] or disguise[ing] the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation" of other enumerated federal criminal statutes. "Material support" is defined in § 2339A(b). Plaintiffs have pointed to three types of payments the PA makes: salary payments to government employees, payments to Palestinians detained by the Israelis, and payments to families of individuals who have died as a result of the Israeli-Palestinian conflict. None of these government programs of general application gives rise to material support liability. Plaintiffs also claim that the PA provided material support by offering training to terrorists and by releasing known terrorists from prison, claims for which Plaintiffs have no admissible evidence.

a.    Payment of Salaries. The Palestinian Authority had over 100,000 employees during the 2000-2004 time period. Ex. A at ¶ 40. When it pays the salaries of public sector employees, it does so in its capacity as employer, in compensation for work performed as a PA employee. There is a complete absence of evidence that the PA paid its employees knowing or intending they would use their government income to carry out terrorist attacks on U.S. citizens or that the payment of any such salaries caused the attacks at issue. *See* discussion of Causation and Scienter requirements in Part I.B above. There also is no admissible evidence that the PA or PLO provided any of the weapons used in the attacks.

b.    Prisoner and "Martyr" Payments. Plaintiffs cite to government policies of providing financial assistance to families of individuals detained, injured, or killed in connection with the Israeli-Palestinian conflict. There is no admissible evidence that these policies were the proximate cause of the shootings or bombings at issue. There is no evidence that the alleged perpetrators were motivated by the policies to carry out the shooting or bombing

22

attacks at issue. And there is no admissible evidence that the PA or PLO intended these policies to facilitate acts of terrorism against U.S. nationals.

           c.      <u>Training.</u>  **Plaintiffs'** expert Israel Shrenzel claims that the "Palestinian Authority undertook practical preparations to train young operatives for military terrorist activity." Ex. L at 15. According to Shrenzel, in 2000, "dozens of summer camps were held for young people throughout the territory of the Palestinian Authority, within the framework of which thousands of young people were trained in the use of weapons and the attack of Israeli soldiers and settlers, by throwing stones and improvised firebombs." *Id.* at 16. There are a number of reasons Plaintiffs cannot rely on this claim to establish liability: First, Shrenzel provides no source or substantiation for his claim. Second, Shrenzel describes training in the territory of the Palestinian Authority, which could have been provided by any group. Third, the training described is not related to the attacks at issue, none of which involved stone throwing or "improvised firebombs." Fourth, there is no evidence anyone associated with the attacks at issue attended these supposed camps, so there is no evidence the camps caused the attacks at issue.

      Shrenzel also claims that "military courses were reported as being held for 'Shabiba' activists of the Fatah Organization, in cooperation with the National Security and Military Intelligence Apparatuses of the Palestinian Authority." Ex. L at 16. Shrenzel's sole support for that claim is a September 17, 2000 issue of a newspaper, "Filastinuna." Both claims appear to trace back to Ex. M (PTE 186), a Hebrew language document which includes the claim about the summer camps and a reference to the same Filastinuna story. It is not evident what PTE 186 even purports to be. It is captioned: Confidential / Intelligence Update for Commanders / Central Retinal Command Intelligence / Autonomy Branch / April 14, 2001." Ex. M at 1.

1425373.1

Plaintiffs have not identified any witness who could authenticate this document and, in any event, it contains multiple levels of hearsay.

Shrenzel also cites a decision in the Tel Aviv District Court in *Estate of Mentin v. Bezeq* for his claim that "[s]uch military courses continued during the years of the intifada. Ex. L at 16 n.19. The decision describes a custodial statement taken by the Israeli police of a hospitalized 15 year-old who initially claimed he received training "in the Palestinian Authority in Jericho" and later clarified that he was not trained *by* the PA, explaining, "[t]hey interrogated me, and I was wounded, tired." Ex. N (PTE 948) at 43-45.  In sum, the Plaintiffs lack any admissible evidence that PA or PLO trained individuals to carry out shooting or bombing attacks on civilians or that the individuals implicated in the attacks at issue received training from either Defendant knowing or intending it would be used to carry out terrorist attacks on Americans.

> d.    "Revolving Door Policy"

Plaintiffs make claims that the PA released known terrorists, who later carried out some of the attacks at issue. Plaintiffs, however, have no admissible evidence for their claims. *See* Ex. A at ¶¶ 279, 281, 283, 389, 392.  Plaintiffs' expert Matthew Levitt states in his report: "The PA released key Hamas bomb makers and military commanders from PA prisons in 2000." Ex. G at 14. Levitt provides no citation or substantiation for that claim.  Plaintiffs' expert Alon Eviatar claims that the PA released Abdullah Barghouti from prison in August 2001 and that the PA supposedly is responsible for his alleged involvement in the Hebrew University bombing in July 2002. Whether the PA did or did not release Abdullah Barhouti is a question of fact, of which Eviatar has no personal knowledge. Indeed, Eviatar bases his claim solely on a book Barghouti supposedly published. Ex. J at 11 n.21. In a recent filing, Plaintiffs have cited deposition testimony of Mosaab Hassan Yousef as evidence of Abdullah Barghouti's alleged release by the PA. *See* Mem. of Law in Support of Plaintiffs' Motion for Discovery Sanctions at 21 (citing

1425373.1

Yalowitz Decl. Ex F.1 at 106-07).  In fact, Yousef did not testify to any personal knowledge of the release and instead relays hearsay regarding the alleged terms of Barghouti's arrest.  *See id.*

Along the same lines, Plaintiffs claim that the PA released Mohammed Hashaika prior to his alleged involvement in the March 21, 2002 bombing.  Plaintiffs' evidence purports to be press release from Israel's Prime Minister's Office the day of the bombing, which simply infers "[f]rom today's events . . . that Haskaikeh was in fact released after being transferred to Ramallah."  Ex. O at 2 (PTE 353).  Plaintiffs' expert Alon Eviatar asserts:  "Pursuant to a request by Abd al-Karim Awis to the General Intelligence Service, Hashaika was released from detention, though the intervention of Marwan Barghouti."  Ex. J at 71.  Again, this is not an expert opinion.  This is a statement of fact for which Eviatar has no personal knowledge and for which he provides no substantiation or citation.  In sum, there is no admissible evidence that the PA released Hashaika, and no admissible evidence that any such release was done with the requisite scienter to facilitate an act of terrorism against Americans.

## II.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT AS TO SPECIFIC INCIDENTS ALLEGED IN THE COMPLAINT.

This lawsuit involves seven separate incidents.  Plaintiffs have failed to particularize their basis for imposing liability on Defendants and have failed to narrow the record to admissible evidence, instead relying on their experts to make factual assertions based on inadmissible hearsay.  The page constraints of this motion do not permit Defendants to address on an incident-by-incident basis the non-admissibility of all the hearsay Plaintiffs have injected into the case or to detail the many ways in which Plaintiffs and their experts have mischaracterized the evidence.  The Statement of Material Facts as to Which There Is No Genuine Issue addresses each incident separately.  *See* Ex. A.  Below, Defendants highlight three of the incidents to illustrate the lack of triable facts.  As to the remaining incidents, Defendants address the non-admissibility of the

evidence on which Plaintiffs will rely to establish employee involvement in the attacks. Again, even if Plaintiffs could establish employee involvement, there is no basis for imposing respondeat superior liability on Defendants for the reasons set forth in Part I.C above.

A.    **The January 8, 2001 Shooting: the Guetta Plaintiffs**

Plaintiff Oz Joseph Guetta was injured in a shooting attack near Jerusalem on January 8, 2001. His mother, plaintiff Varda Guetta (not a U.S. national), was with him at the time of the shooting but was not injured. Ex A. ¶¶ 67, 69, 71. The Guettas' claims must be dismissed because they rest on Ms. Guetta's inadmissible identification of the shooter.

The Guettas initially pled that Muhanad Abu Halawa shot Mr. Guetta. DE 4 at ¶¶ 54-60. The Guettas later abandoned that claim, and now claim that PA employee Fawzi Murar was the shooter based on Ms. Guetta's identification of a photo from a photo array provided by her attorney in 2013, 12 years after the attack. There is no admissible evidence that the person in the photo chosen by Ms. Guetta is, in fact, Fawzi Murar, Ex. A ¶¶ 100, 119, but even if there was, her photo identification would not be admissible to establish Murar's involvement in the shooting.

The circumstances of the shooting, which took place at night in a car and lasted a few seconds, make reliable witness identification extremely unlikely. *See id.* ¶¶ 73-89. Ms. Guetta did not provide any contemporaneous description to the Israeli police, and later testified that she could not do so. *Id.* ¶¶ 90-98. Her 2013 photo identification was not the result of a reliable process, and violated at least four of the five critical elements required to avoid mistaken identification. *Id.* ¶¶ 100-18. Dr. Gary Wells, who is "widely recognized as one of the leading experts in the United States on eyewitness identification and misidentification," *Newsome v. McCabe*, 2002 U.S. Dist. LEXIS 6345, at *17 (N.D. Ill. Apr. 4, 2002), has described her 2013 identification as "one of the most unreliable identifications I have seen." Ex. A-20 at 17.

26

As an initial matter, Ms. Guetta's alleged identification is not admissible because there is no evidence that Ms. Guetta has or ever had "personal knowledge" of the shooter's identity. Fed. R. Evid. 602. Numerous factors known to adversely affect identifications, including a high level of stress and fear, a short duration, the presence of weapons, diverted attention, and poor viewing conditions, were present at the time of the shooting. *See* Ex. A-20 at 12-13; *New Jersey v. Henderson*, 27 A.3d 872, 904-08 (N.J. 2011). That she did not provide a description to police or review photos in 2001, Ex. A ¶¶ 90-93, confirms that she did not have an adequate "opportunity to observe" and remember the shooter's face. *See* Fed. R. Evid. 602 advisory committee's note. "The chances that an individual under these circumstances could acquire the type of detailed memory for the face of a stranger that would permit a reliable identification of the gunman among a set of other dark skinned individuals with mustaches is nearly zero." Ex. A-20 at 12-13. Moreover, even if Ms. Guetta had an opportunity to observe the shooter's face at the time of the incident in 2001, she lacked such personal knowledge by 2007 when she testified that she could not identify the shooter. Ex. A ¶¶ 94-98. Although she claimed in 2012 and 2013 that she could identify the shooter, "memory never gets better with time." Ex. A-20 at 14; *see Henderson*, 27 A.3d at 907 ("Memories fade with time. [M]emory decay 'is irreversible'; memories never improve."). Moreover, 12 years between the incident and the identification procedure "is an extreme amount of time." Ex. A-20 at 14; *see Neil v. Biggers,* 409 U.S. 188, 201 (1972) (passage of seven months between the crime and the identification "would be a seriously negative factor in most cases"). Based on the "poor conditions of memory acquisition and the extraordinarily long retention interval," Dr. Wells "conclude[s] that the reliability of any identification at this point is so close to zero as to be negligible." Ex. A-20 at 14. Dr. Wells' opinion and testimony went unrebutted by Plaintiffs' experts.

27

Ms. Guetta's identification is also not admissible under Rule 701 because her opinion that the photo she picked depicts the shooter is not "rationally based on [her] perceptions." Fed. R. Evid. 701; *State v. Lawson*, 352 Ore. 724, 755 (2012) ("When there are facts demonstrating that a witness could have relied on something other than his or her own perceptions to identify the defendant, the state – as the proponent of the evidence – must establish by a preponderance of the evidence that the identification was based on a permissible basis rather than an impermissible one."). In this case, Ms. Guetta's identification of a photo more than 12 years after the incident was either a random guess or the product of a suggestive procedure. The procedure used in this case "violated at least four and possibly all five safeguards against mistaken identification." Ex. A-20 at 17. Specifically, the evidence suggests that the array did not include known innocent fillers among an *a-priori* suspect; the suspects did not all fit Ms. Guetta's (sparse) physical description of the shooter; Ms. Guetta was not warned that the shooter might not be in the line-up; the person conducting the procedure – her attorney – was not a neutral party; and finally, she was not asked her level of certainty at the time of the identification. *Id.* at 14-16.

Ms. Guetta's identification is also not admissible under Rule 403 because "its probative value is substantially outweighed by its prejudicial impact or potential for misleading the jury." *Perry v. New Hampshire*, 132 S. Ct. 716, 729 (2012). The probative value of identification evidence is directly linked to its reliability. *Lawson*, 352 Ore. at 757. Unfair prejudice means "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Old Chief v. United States*, 519 U.S. 172, 180 (1997). On the one hand, this case presents "one of the most unreliable identifications" Dr. Wells has seen in his "30 plus years of experience in the field." Ex. A-20 at 17. On the other hand, the danger of unfair prejudice cannot be overstated: "[s]tudy after study demonstrates…that jurors routinely overestimate the

28

accuracy of eyewitness identifications [and] that jurors place the greatest weight on eyewitness

confidence in addressing identifications even though confidence is a poor gauge of accuracy."

*Perry*, 132 S. Ct. at 739.  The DNA exoneration cases bear out this point: 75% of defendants

exonerated by DNA evidence were convicted based on eyewitness identification evidence.  Ex.

A-20 at 3.  Meanwhile, neither cross-examination nor expert testimony is an effective tool

against jurors' faith in eyewitness identifications.  *See id.* at 12.  Accordingly, testimony

regarding Ms. Guetta's identification, the photograph used, and any documents related to Murar

are not admissible evidence, and Defendants are entitled to summary judgment as a matter of law

on the Guettas' claims.

   **B.**     **January 27, 2002 Bombing:  the Sokolow Plaintiffs**

   The Sokolow Plaintiffs allege that Wafa Idris detonated a bomb at Jaffa Street in

Jerusalem on January 27, 2002, and that the attack was planned by Munzer Noor.  Neither Idris

nor Noor was a PA or PLO employee, Ex. A ¶¶ 254, 257, so the Defendants cannot be liable for

their alleged actions under a respondeat superior theory.  There also is no admissible evidence

that Idris or Noor acted as an agent of the PA or PLO.  *Id.* ¶¶ 255, 258.  Nor is there any

admissible evidence that Idris or Noor acted with the support or authorization of the PA or PLO.

*Id.* ¶¶ 232, 256, 259.

   One of Plaintiffs' experts claims that "Idris served as a confidential informant and agent

of the Palestinian Authority's Military Intelligence force before the terrorist attack."  Ex. L at 40.

The sole basis for this claim is an alleged April 25, 2002 custodial statement of Noor in which

Noor implicates an alleged PA employee referred to variously as Mohamad Muhsatib, Abu

Ibrahim,  Abu Talal, or Kamal Al Abed ("Al Abed").  *See id.* at 40 n.162.  Noor's alleged

custodial statement is not admissible.  The statement is a statement in Hebrew purportedly

written by Noor's Israeli police interrogator Yaakov Barazani, and there is no evidence it bears

1425373.1

Noor's signature. *See* Ex. P. Shrenzel also cites an alleged Noor custodial statement dated May 13, 2002 for his claim that Noor "served as an agent of the Military Intelligence service in the Palestinian Authority, from August 2001, until to [sic] the terrorist attack." Ex. L at 43. This statement also purports to be the Hebrew language statement of Noor's police interrogator, not Noor's statement. *See* Ex. Q. Even if Plaintiffs could get past the first level of hearsay, Noor's supposed statements are not admissible under Rule 804(b)(3), as discussed in Part II.D.3 below. Here, Noor's alleged statement is not admissible to show Idris's or Al Abed's supposed role in the bombing. In any event, there is no admissible evidence that Al Abed was acting within the scope of his employment. Ex. A ¶ 247.

Plaintiffs also rely on the Judgment of the Israeli Military Appeals Court in Noor's prosecution as evidence of Al Abed's involvement in the bombing. The judgment is not admissible under Rule 803(22) to show Al Abed's involvement and, in any event, Israeli Military Court documents are not admissible under FRE 803(22) for the reasons stated in Part II.D.1. In addition, the Judgment merely summarizes the Noor custodial statements. Ex. R at 4. Notably, there is no evidence that the Israelis prosecuted Al Abed.

Citing Ex. S, Plaintiffs' expert Shrenzel also claims that "the head of the PA's General Intelligence Service, Tawfik Tirawi, was aware that Wafa Idris was the bomber even before her name was published and attempted to cover-up her involvement with the attack." Ex L. at 41. Defendants did not produce this document, and Plaintiffs have no means of authenticating it. The document also contains multiple levels of hearsay and provides no evidence of pre-attack knowledge of the PA.

1425373.1

In sum, neither Idris nor Noor was a PA or PLO employee. Plaintiffs lack any admissible evidence that Idris acted as an agent of the PA or PLO in carrying out the attack, or that Idris received any material support from the PA or PLO used in carrying out the attack.

### C.     The June 19, 2002 Bombing:  the Mandelkorn Plaintiffs

The Plaintiffs claim that the June 19, 2002 bombing was carried out by Said Awada and that Mazen Freitah was involved in perpetrating the attack. Neither Awada nor Freitah was a PA or PLO employee. Ex. A ¶¶ 349, 352. Nor is there admissible evidence that Awada or Freitah acted as agents of the PA or PLO. *Id.* ¶¶ 350, 353. There also is no admissible evidence that the PA or PLO provided authorization or material support for the bombing. *Id.* ¶¶ 331, 354-55.

Plaintiffs claim that Naef Abu Sharah, a low-level PA employee, was responsible for the attack, but have disclosed no admissible evidence to support that claim. The sole evidence on which Plaintiffs appear to rely is Ex. T, which purports to be a printout from Israel's Ministry of Foreign Affairs website dated February 26, 2004, which relays hearsay information "Communicated by the GPO." Plaintiffs rely on one sentence from the document which conclusorily alleges that "Naef Abu Sharh, a senior fugitive of the Tanzim infrastructure in Nablus . . . was behind" the June 19, 2002 bombing. Ex. T at 3. Even assuming arguendo Plaintiffs could authenticate the document, Plaintiffs' exhibit is hearsay within hearsay and does not meet the requirements for admissibility under the public records exception, Rule 803(8). Among other reasons, the document does not set out the activities of the Israeli Ministry of Foreign Affairs, but rather relays information communicated by the "GPO," and it is not the job of the Ministry of Foreign Affairs to determine responsibility for bombing attacks. Courts have treated similar Israeli government documents relaying hearsay as inadmissible under Rule 803(8). *Gill*, 893 F. Supp. 2d at 571 (E.D.N.Y. 2012). In any event, Plaintiffs lack any admissible evidence that Naef Abu Sharah acted within the scope of any employment with the

31

PA. Plaintiffs' own document describes him as part of the "Tanzim infrastructure in Nablus." Ex. T at 3.

> **D.** **With Respect to the Remaining Four Attacks, Plaintiffs Lack Admissible Evidence to Establish Who Carried Out the Attacks.**

As to the remaining four incidents, Plaintiffs seek to rely on various categories of documents to establish that PA or PLO employees were involved in the attacks. These documents are not admissible, as set forth below. In any event, the PA and PLO are not liable for the alleged acts of employees for the reasons set forth in Part I.C, and there is no admissible evidence that the PA or PLO provided any material support to the alleged perpetrator, with the requisite scienter, or that the alleged support proximately caused the attacks at issue.

> 1.    The Israeli Convictions Are Not Admissible.

> a.    *Foreign Convictions Are Not Admissible Under FRE 803(22).*

The judgments of convictions in Israeli military or civilian courts are not admissible under Rule 803(22), "Judgment of a Previous Conviction." The rule refers to "[e]vidence of a final judgment of conviction," which should not be construed to include foreign court convictions. In *Small v. United States*, 544 U.S. 385 (2005), the Supreme held that the phrase "convicted in any court" in a federal felon-in-possession statute applies only to domestic convictions because of "the legal presumption that Congress ordinarily intends its statutes to have domestic, not extraterritorial, application." *Id.* at 388-89. The Court also considered the statutory language, legislative history, and purpose of the felon-in-possession statute and "found no convincing indication to the contrary." *Id.* at 391. Thus, the Court held "that the phrase 'convicted in any court' refers only to domestic courts, not to foreign courts." *Id.* at 394. *See also In re Jinhee Kim Wilde*, 68 A.3d 749, 757 (D.C. 2013) (relying on *Small* to hold that the

phrase "conviction of a crime" in a D.C. statute does not include a criminal conviction entered in a foreign country). [9]

Here, the language of Rule 803(22) does not overcome the presumption that it applies only to domestic convictions. In fact, the overall framework of the provision makes clear that it is a narrow hearsay exception; Rule 803(22) explicitly excludes domestic misdemeanor convictions and domestic felony convictions following a nolo contendere plea. Second, the legislative history does not overcome the presumption that Rule 803(22) applies only to domestic court convictions. Neither the House Judiciary Report Committee Report, H.R. 93-605 (1973), nor the Senate Judiciary Committee Report, Sen. Rep. No. 93-1277 (1974), discusses Rule 803(22) at all, and the Advisory Committee Notes to Rule 803(22) make no mention of foreign court convictions. Finally, the purpose behind Rule 803(22) – that "criminal convictions are reliable and trustworthy" (see *Am. Int'l Specialty Lines Ins. Co. v. Towers Fin. Corp.*, No. 94-CV-2727, 1997 U.S. Dist. LEXIS 22610, at *14, n.7 (S.D.N.Y. Sept. 12, 1997)) – is inapposite to foreign court convictions. As the Supreme Court noted in *Small*, "foreign convictions differ from domestic convictions in important ways" and may "include a conviction from a legal system that is inconsistent with an American understanding of fairness." 544 U.S. at 389. This is particularly true for foreign *military* court convictions. Indeed, the Supreme Court has expressed deep skepticism towards the fairness of U.S. military courts. *Reid v. Covert*, 354 U.S. 1, 38-39 (1957) (noting that military law "emphasizes the iron hand of discipline more than it does the even scales of justice" and concluding "that military tribunals have not been and

---

[9] Foreign court convictions are also exempt from a defendant's criminal history score under the U.S. Sentencing Guidelines. 18 U.S.C.S. Appx. § 4A1.2(h) ("Sentences resulting from foreign convictions are not counted, but may be considered under § 4A1.3 (Adequacy of Criminal History Category)").

1425373.1

probably never can be constituted in such  way that they can have the same kind of qualifications
that the Constitution has deemed essential to fair trials of civilians in federal courts").[10]

> b.    *Israeli Military Court Convictions Do Not Meet the Criteria for
> Recognition of Foreign Judgments.*

Assuming *arguendo* that Rule 803(22) encompasses foreign court convictions, this Court
should still not admit the Israeli military court (IMC) judgments of convictions because they
were rendered "under a judicial system that does not provide impartial tribunals or procedures
compatible with due process of law." Restatement (Third) of Foreign Relations (1987) §
482(1)(a) (requiring the nonrecognition of foreign judgments on these grounds); *see also id.* at
cmt. b (stating that "[a] significant distinction in treatment between alien and citizen litigants
may be an indication of unfairness…").

First, the IMC subjects Palestinians to an unequal judicial system because of their
nationality. *See* Ex. U, Weill Report at 13-16; Ex. V, Sfard Report at 17-21. Since the 1980s,
only Palestinians have been prosecuted in the IMC; Jewish Israelis charged with identical crimes
– in the same location – are charged in Israeli civilian court (ICC). *See* Ex. U, Rpt. at 13-16; Ex.
V, Rpt. at 17-21. According to the former President of the Military Court of Appeals, Col. Shaul
Gordon, Israel's policy of prosecuting Palestinians in the IMC and Israelis in the ICC was
introduced, in part, because "it ensures that the Israeli Jewish defendant will enjoy the extensive
procedural rights guaranteed by Israeli law which…do not apply in the Israeli Military Courts."
Ex. U, Rpt. at 14. For example, as Plaintiffs' expert Nick Kaufman acknowledged, a defendant
in the IMC can be detained and interrogated without a warrant and without access to a lawyer for

---

[10] A few federal courts have admitted foreign court convictions under Rule 803(22). *See e.g., Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 447-48 (E.D.N.Y. 2013). But no panel of the Second Circuit or district court in the Southern District of New York has ever done so. And none of the courts that has admitted foreign court convictions under Rule 803(22) has ever considered whether a foreign court conviction is a conviction within the meaning of Rule 803(22).

1425373.1

up to eight days whereas an ICC defendant can only be so detained for 24 hours. *See* Ex W at 81:10-82:6.

Second, the judiciary in the IMC was not independent and impartial during the relevant time period. *See* Ex. U, Rpt. at 9-12; Ex. V, Rpt. at 21-22, 25-26. Until 2004, IMC judges and prosecutors were both part of the same branch of the Israeli military. *See* Ex. U, Rpt. at 9. Furthermore, until 2009, the Israeli military commander had legislative, judicial, and executive power in the IMC. *See id.* at 111. The commander regularly issued new orders, which were not required to be published. *See id.* at 11-12; 16-17; *see also* Ex. X at 111:8-9 ("judgments of the military court are not disseminated"). Thus, like the military commission struck down by the Supreme Court in *Hamdan v. Rumsfeld*, 548 U.S. 557 (2006), the IMC's "rules and procedures [were] subject to change midtrial, at the whim of the Executive." *Id.* at 633, n.65.

Finally, defendants in the IMC do not, in practice, receive adequate due process. *See* Ex. V, Rpt. at 23-27; Ex. U, Rpt. at 17-35. In 2007, the Israeli human rights organization Yesh Din (Hebrew for "there is a law") conducted a comprehensive examination of due process in the IMC. Its report, attached to Ex. V, found "severe shortcomings and failures" related to the presumption of innocence (Yesh Din Rpt. at 68-78), the right to a public trial (*id.* at 79-91), the right to be notified of the charges (*id.* at 92-99), the right to the assistance of counsel and the right to prepare an effective defense (*id.* at 100-125), the right to trial without undue delay (*id.* at 126-134), the right to plea and present evidence (*id.* at 135-143), interpretation (*id.* at 144-153), and the treatment of minors (*id.* at 154-163). Thus, any argument that the IMC's design is roughly comparable to that of the ICC is irrelevant. *See Bridgeway Corp. v. Citibank*, 201 F.3d 134, 142 n.2 (2d Cir. 2000) (stating "where a party presents evidence concerning the actual practice of a judicial system, evidence about design is not likely to create a genuine issue of

1425373.1

material fact"). This Court should therefore not admit evidence of the judgments of convictions from the IMC.

          c.     *There Is No Admissible Evidence Due Process Was Provided as to the Particular Convictions at Issue.*

Assuming *arguendo* that IMC judgments may, in theory, be admitted under Rule 803(22), the Court should still not admit the proffered judgments because Plaintiffs have not shown that each of the defendants received due process in their individual cases. *See Lloyd v. American Export Lines*, Inc., 580 F.2d 1179, 1189-90 (3d Cir. 1978) (admitting a judgment from a Japanese court only after examining the record in the case and determining that it "accord[ed] with civilized jurisprudence, and [was] stated in a clear manner"). Here, the limited information in the case files does not permit a finding that the defendants received due process.[11] *See* Ex. V, Rpt. at 11-13, 29-33. Plaintiffs rely on the opinion of Nick Kauffman to establish the admissibility of the convictions. His opinion is inadmissible for the reasons set forth in the motion in limine filed concurrently with this filing. If the Court decides to allow expert opinion on the admissibility of the convictions, then it would need to also consider the contrary expert opinion of Defendants' experts Michael Sfard and Sharon Weill. See Exs. U, V.

          2.     <u>Other Israeli Military Court Documents Are Not Admissible.</u>

Whereas the IMC and ICC judgments of convictions are not admissible under Rule 803(22), the documents in the Israeli case files contain inadmissible hearsay. The verdicts, sentencing judgments, and appellate opinions contain inadmissible hearsay of the judges. *See Blue Cross and Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.*, 141 F. Supp. 2d 320, 323

---

[11] Of course, the Court need not find that the defendants were denied due process to exclude the evidence. The burden is on Plaintiffs, as the proponents of the evidence, to show that the alleged perpetrators received due process. In the end, as the Third Circuit recognized in *Lloyd*, "the inquiry into the foreign criminal procedures might prove unduly complex and cumbersome. In such a case, the district court would have discretion to exclude the proffered evidence under Rule 403 . . . ." 580 F.2d at 1189, n.20.

(E.D.N.Y. 2001) ("Judicial findings in other cases proffered as evidence are generally characterized as inadmissible hearsay."). The indictments contain inadmissible hearsay of the prosecutors and witnesses. *See In re Worldcom*, 2005 U.S. Dist. LEXIS 2214, *25-28 (S.D.N.Y. Feb. 28, 2005). The records of the IMC proceedings contain inadmissible hearsay of the alleged perpetrators. In fact, because the individual's alleged statements were interpreted from Arabic into Hebrew before they were memorialized in Hebrew, the records contain three levels of hearsay: (1) the court reporter's memorialization of what the interpreter said in Hebrew; (2) the interpreter's statement in Hebrew of what the individual said in Arabic; and (3) the individual's statement in Arabic. *See Al Binahi v. Obama*, 662 F. Supp. 2d 9 (D.D.C. 2009). None of these levels of hearsay conforms to an exception to the hearsay rule.

First, although "[a] well-recognized exception to the hearsay rule...permits the introduction of certified court transcripts to prove the testimony given at a prior proceeding," *Anderson v. United States,* 417 U.S. 211, 221 n.11 (1974), Plaintiffs cannot show that the IMC records accurately reflect what was said at the hearing. *See In re Evelyn Litwok*, 2001 U.S. App. LEXIS 3036, *3 (2d Cir. Feb. 15, 2001). That is because in the IMC, a summary record of the proceeding is made rather than a verbatim transcript. Ex. X at 75:12-15; *see also* Ex W at 73:10-74:13. Second, Plaintiffs cannot establish that the interpretations were sufficiently reliable to be admitted into evidence. *See Al Binahi,* 662 F. Supp. 2d at 22-25 (holding that the proponent of the evidence must establish that the interpreter had the necessary qualifications for their interpretation to be considered reliable). In the IMC, the individuals tasked with interpreting are not certified court interpreters (Ex. X at 75:6-11 or 86:9-22); rather they are Bedouin or Druze soldiers in the Israeli military (*id.* at 86:23-87:4) who "are not trained in the law and receive minimal training before they are put to work as interpreters" (Ex. V, Rpt. at 24).

37

3.   <u>Custodial Statements Are Not Admissible.</u>

Custodial statements of Palestinians detained by Israeli police are inadmissible hearsay. They are not admissible under Rule 801(d)(2) as statements by a party opponent. The supposed declarant is not a party to this lawsuit, and while some of them may have been PA employees, their statements in custody did not "'relate[] to a matter within the scope of the agency [relationship].'" *Marcic v. Reinauer Trans. Cos.*, 397 F.3d 120, 128-29 (2d Cir. 2005).

The statements are also not admissible under Rule 804(b)(3) as statements against interest. Many of the statements offered by Plaintiffs are not truly self-inculpatory; rather they are inculpate third parties or are polemics against the Israeli occupation as opposed to admissions to specific crimes. In *Williamson v. United States*, 512 U.S. 594, 607 (1994), the Court held that Rule 804(b)(3) "does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory." The Court specifically cautioned against admitting confessions that implicate others. "The district court may not just assume for purposes of Rule 804(b)(3) that a statement is self-inculpatory because it is part of a fuller confession, and this is especially true when the statement implicates someone else." *Id.* at 601. "'Due to his strong motivation to implicate the defendant and to exonerate himself, a codefendant's statements about what the defendant said or did are less credible than ordinary hearsay evidence.'" *Id.* (quoting *Lee v. Illinois*, 476 U.S. 530, 541 (1986)). The Court's reluctance to admit statements that implicate others stems from its belief that "[o]ne of the most effective ways to lie is to mix falsehood with truth, especially truth that seems particularly persuasive because of its self-inculpatory nature." *Id.* at 600.

To be sure, some of the statements *appear* to be truly self-inculpatory. *See e.g.,* Ex. Y at 24 (quoting a detainee who purportedly said, "I admit killings [sic] all those people from Israel, but I am not guilty because it is my right. It is a response to dozens of thousands that you have

1425373.1

killed of our people without any reason…'"). Such statements are not admissible under Rule 804(b)(3), however, because the "assumption" underlying the rule – "that persons do not make statements which are damaging to themselves unless satisfied for good reason that they are true" (Fed. R. Evid. 804(b)(3) Advisory Committee's Note) – does not apply to the statements of Palestinian militants. As Judge Weinstein explained in *Gill*, 893 F. Supp. 2d at 569, "[t]his assumption is negated when the declarant has ulterior motives for admitting conduct. . . . Under the perverse assumptions of terrorists, an armed attack on civilians reflects glory." Indeed, as Mr. Sfard explained, "their guilty pleas, their admissions out of court and especially their [expressions of] pride… may be motivated by many things that are not necessarily the truth." Ex. X at 195:21-24. Palestinian detainees are not "typical" defendants. "They are seen by their communities as heroes and leaders. Because defendants do not believe that they will receive a fair judgment or sentence, *they often perceive it as being in their interest to enhance their conduct* in order to increase the respect they and their families receive from large sections of Palestinian society." Ex. V, Rpt. at 29 (emphasis added). Accordingly, the custodial statements are not admissible under Rule 804(b)(3).

4.    Statements in Defendants' Files Are Not Admissible to Establish Who Carried Out the Attacks at Issue.

Plaintiffs have included a number of documents from the General Intelligence Service, the Institute for the Care of Martyrs' Families and the Injured, and the Ministry of Detainees and Ex-Detainees Affairs on their exhibit list. Plaintiffs have not disclosed the portion of those documents on which they intend to rely, including which particular statements they claim are admissible under an exception to the rule against hearsay. Plaintiffs have filed a Motion to Overrule Defendants' Authenticity and Hearsay Objections as to these documents. That motion

39

will be fully briefed on June 13. *See* DE 480. Defendants will not repeat their arguments for

non-admissibility here, but incorporate those arguments by reference.

## III.    MANY OF THE PLAINTIFFS LACK STANDING TO BRING ATA CLAIMS.

The civil liability provision of the ATA provides that "[a]ny national of the United States

*injured in his or her person*, property, or business by reason of an act of international terrorism,

*or* his or her estate, survivors, or heirs, may sue therefor . . . ." 18 U.S.C. § 2333(a) (emphasis

added). Thus, in order to recover under the ATA, Plaintiffs must fall under one of these two

categories: (1) U.S. nationals injured in at act of international terrorism; or (2) heirs or survivors

of a U.S. national killed in an act of international terrorism. Varda Guetta, Revital Bauer, Shaul

Mandelkorn and Nurit Mandelkorn are not U.S. nationals and are not the heirs or survivors of a

U.S. national. Ex. A ¶¶ 67, 69, 71, 264, 266, 318-19. Their ATA claims must be dismissed.

### A.    "Injured in His or Her Person" Requires Physical Injury.

The Goldberg plaintiffs, Leonard Mandelkorn, Ronald Gould, Elise Gould, Jessica Rine,

Henna Waldman, Morris Waldman, Eva Waldman, Elana Sokolow, and minors BB, DB, and YB

were not present at the alleged terrorist attack and they are not the heirs or survivors of a U.S.

national killed in a terrorist attack. *Id.* ¶¶ 139, 142-147, 224, 226, 266, 269-71, 318, 323, 326,

463-72. They nonetheless claim they are entitled to bring ATA claims as the principal victims,

based on their own emotional distress at the loss of or injury to their family members. Such

claims were allowed in *Biton v. Palestinian Interim Self-Gov't Auth.*, 310 F. Supp. 2d 172, 181-

82 (D.D.C. 2004), and a handful of other district courts have followed suit. *See, e.g., Goldberg*

*v. UBS*, 660 F. Supp. 2d 410, 426 (E.D.N.Y. 2009); *Morris v. Khadr*, 415 F. Supp. 2d 1323,

1338 (D. Utah 2006).

In these cases, the courts erroneously conflated the language used by Congress in the

ATA ("injured in his or her person") with a term that has a distinct meaning in the law ("personal

1425373.1

injury"). Had Congress intended to provide a cause of action to U.S. nationals who had suffered a "personal injury," it would have done so – as it has repeatedly done in the past. *See, e.g.,* 28 U.S.C. § 1346(b); 6 U.S.C. § 442(a)(2). Accordingly, since none of these Plaintiffs was "injured in his or her person" or is the heir or survivor of a U.S. national, they lack standing to bring claims under the ATA.

### B.    At the Very Least, the ATA Requires Presence at the Attack to Recover for Emotional Distress Injuries.

The civil liability provision of the ATA operates as a tort statute. *See Gill*, 893 F. Supp. 2d at 483-84 (explaining that, in enacting § 2333, Congress "constructed a new federal substantive tort," which is "essentially a subspecies of the common-law tort of battery"). As a result, courts must analyze claims arising under the ATA according to traditional tort law principles. *See Boim v. Quranic Literacy Inst.*, 291 F.3d 1000, 1010 (7th Cir. 2002) (ATA's legislative history "evidences an intent by Congress to codify general common law tort principles and to extend civil liability for acts of international terrorism to the full reaches of *traditional tort law*") (emphasis added); *Estates of Yaron Ungar v. Palestinian Auth.*, 304 F. Supp. 2d 232, 238 (D.R.I. 2004) ("S.2465 gave victims of terrorism the remedies of *traditional American tort law*, including treble damages and attorney's fees") (emphasis added).

Under the Restatement (Second) of Torts, to recover for intentional infliction of emotional distress where conduct was directed at a third person, the plaintiff must be "a member of such person's immediate family *who is present at the time*." Restatement (Second) of Torts § 46(2)(a) (emphasis added). This presence requirement limits the scope of recovery, particularly where an incident may result in the distress of many individuals: "The limitation may be justified by the practical necessity of drawing the line somewhere, since the number of persons who may suffer emotional distress at the news of an assassination of the President is virtually

41

unlimited, and the distress of a woman who is informed of her husband's murder ten years

afterward may lack the guarantee of genuineness which her presence on the spot would afford."

*Id.*, cmt l.  A similar principle applies to claims for negligent infliction of emotional distress,

limiting recovery to those who are within the zone of danger.  *Id.* § 313(2); *see also Buckley v.*

*Metro-North Commuter R.R.*, 79 F.3d 1337, 1343 (2d Cir. 1996); *Bovsun v. Sanperi*, 461 N.E.2d

843, 849 (N.Y. 1984) ("the compensable emotional distress must be tied, as a matter of

proximate causation, to the *observation* of the serious injury or death of the family member and

such injury or death must have been caused by the conduct of the defendant") (emphasis added).

   To be sure, some courts have treated hostage cases as justifying waiver of the presence

requirement.  The courts' rationale has been that hostage circumstances are inherently intended

to inflict emotional distress on the hostage victim's family.  Thus, the rationale suggests, intent

can be proved with substantial certainty without a showing of presence.  *See Sutherland v.*

*Islamic Republic of Iran*, 151 F. Supp. 2d 27 (D.D.C. 2001); *Jenco v. Islamic Republic of Iran*,

154 F. Supp. 2d 27, 36 (D.D.C. 2001); *Acree v. Republic of Iraq*, 271 F. Supp. 2d 179 (D.D.C.

2003).  In *Sutherland*, for example, the court explained:

> The Court finds that, when an organization takes someone hostage, it is implicitly
> intending to cause emotional distress among the members of that hostage's
> immediate family.  Further, the Court finds that an organization taking someone
> hostage implicitly believes that such emotional distress is substantially certain to
> result.  *These conclusions are based on the logical inference that a hostage*
> *without loved ones -- that is, a hostage without those who will be emotionally*
> *distressed by his absence -- is of no value at all to a hostage-taker.*

151 F. Supp. 2d at 50 (emphasis added).  *See also Jenco*, 154 F. Supp. 2d at 36 ("[H]ostage cases

are unique in that they implicitly involve a physical separation of the plaintiff from the victim of

the outrageous conduct.  As a matter of fact, a plaintiff's lack of presence is the *exact source* of

his emotional distress").  Thus, it is precisely the separation between the hostage and his or her

1425373.1

family that provides the hostage taker with leverage to secure his or her demands. Because of the nature of the hostage/demand dynamic, presence is not necessary to evidence with substantial certainty the tortfeasor's intent to inflict emotional distress on the hostage's family. No such considerations are present here.

A broad construction would also run counter to the law of the forum state. New York follows the narrow "zone of danger" test for emotional distress claims, which requires not only that a plaintiff was present at the event, but also that he was a member of the victim's immediate family and suffered a physical impact (or the possibility of physical impact) while there. *See Trombetta v. Conkling*, 626 N.E.2d 653 (N.Y. 1993); *Bovsun*, 461 N.E.2d at 849. A federal statute that Congress intended to codify American tort law should not be construed to permit a tort that is not recognized by the forum state. Indeed, Congress' decision to create a remedy only for persons "injured in his or her person" suggests that Congress had in mind the very sort of physical impact limitation on the reach of the tort it was codifying that has long been the rule in New York.

## IV. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' NON-FEDERAL LAW CLAIMS.

As with the Plaintiffs' ATA claims, the Plaintiffs' non-federal law claims must be dismissed because of a failure to establish a basis for imposing respondeat superior liability on the PA or PLO and because of an absence of admissible evidence establishing the Defendants' direct involvement in the shootings or bombings at issue. There are additional grounds for dismissing Plaintiffs' non-federal law claims. The page constraints of this brief do not permit Defendants to deal with each of Plaintiffs' eight non-federal law claims in detail. Defendants highlight the key grounds for dismissal below, after first addressing two issues that apply to all the non-federal law claims (choice of law and lack of capacity).

Choice of Law. A federal court adjudicating non-federal law claims that are pendent to a federal claim must apply the choice of law rules of the forum state. *Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155, 157 (2d Cir. 2012). Under New York choice-of-law rules, "the first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved." *Id.*; *see also Wall v. CSX Transp., Inc.*, 471 F.3d 410, 415 (2d Cir. 2006) (internal quotes and citation omitted). "If no actual conflict exists, and if New York is among the relevant jurisdictions, the court may simply apply New York law." *Id.* Moreover, New York law governs the statute of limitations for Plaintiffs' non-federal law claims. *See* N.Y. C.P.L.R. § 202.

In opposing Defendants' motion for the Court to decline to exercise supplemental jurisdiction over the non-federal law claims, Plaintiffs previously argued that there is no conflict between New York and Israeli law as it relates to their claims. DE 200 at 19-20. To the extent Plaintiffs are seeking recovery under Israeli law, they failed to comply with FRCP 44.1.

Lack of Capacity. For a party that is not an individual, corporation, partnership, or unincorporated association, its capacity to be sued is determined by the law of the forum state. Fed. R. C. P. 17(b). The PA and PLO are governing authorities of Palestine, which is a State, albeit one not recognized as such by the United States. *See* Ex. A ¶¶ 1-22. As agencies of an unrecognized foreign state, the PA and PLO lack capacity to be sued under New York law. *Russian Socialist Federated Republic v. Cibrario*, 139 N.E. 259 (N.Y. 1923) (unrecognized foreign states lack capacity). Accordingly, all of the Plaintiffs' claims must be dismissed.

Alternatively, the PA and PLO are unincorporated associations, *see* Ex. A ¶¶ 23-28, and, accordingly, lack capacity to be sued for non-federal law claims. *See* Fed. R. Civ. P. 17(b)(3). Under New York law, an unincorporated association has no distinct legal identity or status

separate from that of its members. *Martin v. Curran*, 101 N.E. 2d 683, 685 (N.Y. 1951). It can only be sued in the name of its President or Treasurer — and only then if the complaint alleges that each member of the association knowingly approved or ratified the conduct at issue.[12] Moreover, each and every member of the unincorporated association must have <u>known of and consented to each specific act complained of</u>; a bald assertion of authorization or ratification is insufficient. *A. Terzi Productions v. Theatrical Protective Union*, 2 F. Supp. 2d 485, 492 (S.D.N.Y. 1998) (Sotomayor, J.). Plaintiffs lack any evidence that their injuries were caused by acts of the PLO or PA that were unanimously ratified by their members. Courts previously have dismissed non-federal law claims against the PA, PLO, and Palestinian political organizations for lack of capacity. *See Estate of Parsons v. Palestinian Auth.*, No. 07-cv-1847, DE 14 at 13-14 (D.D.C. Sept. 30, 2008); *Sisso v. Islamic Rep. of Iran*, 448 F. Supp. 2d 76, 91 (D.D.C. 2006) (dismissing non-federal claims against Hamas for lack of capacity).

A.    **Wrongful Death**

Under New York law, a wrongful death action must be brought by the duly appointed personal representative of the decedent's estate. NY CLS EPTL § 5-4.1 (2013). Here the alleged personal representatives have not disclosed any evidence that they are the duly appointed personal representatives of the estates. Moreover, Richard Blutstein, Katherine Baker, Rebekah Blutstein, Larry Carter, Shaun Coffel, the Gritz plaintiffs, the Coulter plaintiffs, and the

---

[12] The pleading standards under *Martin* are rigorous. The alleged authorization or ratification by all of the association's members must be unanimous. *Duane Reed, Inc. v. Local 338 Retail, Wholesale, Dep't Store Union*, 791 N.Y.S.2d 288, 290 (N.Y. Sup. Ct. 2004), *aff'd*, 794 N.Y.S.2d 25 (N.Y. App. Div. 2005), *appeal denied*, 835 N.E.2d 328 (N.Y. 2005). Unanimity is required whether the association has 2,000 members, *see Girolamo v. Teamsters Local 72, N.Y. State Thruway Employees*, No. 97-cv-9412, 1998 U.S. Dist. LEXIS 19819, at *2, *26 (S.D.N.Y. Dec. 21, 2998), or 30,000 members, *see Martin*, 101 N.E. 2d at 686. There are no substitutes for the unanimity requirement. *See, e.g., Duane Reed, Inc. v. Local 338 Retail, Wholesale, Dep't Store Union*, 794 N.Y.S.2d 25, 26 (N.Y. App. Div. 2005) (holding that reliance on the "general language" of an unincorporated association's constitution is no substitute for unanimous authorization or ratification by its membership).

45

Goldberg plaintiffs have no admissible evidence of pecuniary injury, and therefore are not entitled to recovery under New York law. *Id.* § 5.4.1, § 5-4.3. *See also Gabriel v. County of Herkimer*, 889 F. Supp. 2d 374, 405 (N.D.N.Y 2012) (summarizing New York law on wrongful death actions). Under New York law, recovery for wrongful death does not include the sorrow or mental anguish of the survivors. *In re Air Crash near Clarence Ctr.*, 2013 U.S. Dist. LEXIS 157886, at *11-12 (W.D.N.Y. Nov. 3, 2013) (citing New York authorities). Thus, the wrongful death claims must be dismissed.

### B.    Plaintiffs' Battery and Assault Claims Are Barred by the Statute of Limitations.

Under New York law, there is a one-year statute of limitations for battery. NY CLS CPLR § 215 (2013). Plaintiffs filed their Complaint on January 15, 2004. The battery claims of Shayna Gould; Shmuel Waldman; Mark, Rena, Jamie, and Lauren Sokolow; Alan and Yehonathon Bauer; Shaul Mandelkorn; and Joseph Oz Guetta are therefore barred by the statute of limitations because their alleged batteries all occurred more than one year before the filing of the Complaint. Ex. A ¶¶ 69, 139, 224, 266, 323.

The New York statute of limitations for assault also is one year. NY CLS CPLR § 215 (2013). The assault claims of Shayna Gould; Shmuel Waldman; Alan and Yehonathon Bauer; Shaul Mandelkorn; Varda and Joseph Guetta; and Mark, Rena, Jamie, and Lauren Sokolow arose more than one year before the filing of the Complaint and therefore are barred by the statute of limitations. Ex. A ¶¶ 69, 139, 224, 266, 323.

### C.    Loss of Consortium and Solatium

Robert Coulter, Sr., Diane Coulter Miller, Robert Coulter, Jr., Larry Carter, Shaun Coffel, Richard Blutstein, Katherine Baker, Rebekah Blutstein, Norman Gritz, and Nevenka Gritz are not entitled to recovery for loss of consortium or solatium. "Under New York law, the parents

of a deceased child may not recover for loss of consortium, familial relationship, companionship, or comfort that the child would have provided." *Negron v. City of New York*, 2013 U.S. Dist. LEXIS 144064, at *37-38 (E.D.N.Y. Oct. 4, 2013) (citing authority). Under the same rationale, siblings of a decedent may not recover. Under the same rationale, if there is no recovery for loss of consortium or solatium for parents or siblings where the family member has died, there is no recovery for loss of consortium or solatium where the family member survived. Accordingly, Varda Guetta, Ronald Gould, Elise Gould, Jessica Rine, Morris Waldman, Eva Waldman, the Sokolows, and the Bauers are not entitled to damages for loss of consortium or solatium related to the injury of a child or sibling. Moreover, Plaintiffs' claims for loss of consortium and solatium are treated as derivative actions under New York law and fail because the primary cause of actions (for wrongful death and battery) fail. *See Gelber v. Stryker Corp.*, 788 F. Supp. 2d 145, 167 (S.D.N.Y. 2011).

### D.    Negligence

With the exception of the Goldberg plaintiffs, the Plaintiffs' negligence claims are barred by the one-year, 90 day statute of limitations for commencing tort actions against municipal defendants. *Gonzalez v. City of New York*, 20 Misc. 3d 1130(A), 1130A (N.Y. Sup. Ct. 2008). The Goldberg plaintiffs have no admissible evidence of any duty of care owed them by the PA or PLO and no admissible evidence of a breach of that duty. Scott Goldberg was a non-U.S. national allegedly killed in Jerusalem, who lived with his family in an Israeli settlement in the West Bank. Ex. A ¶¶ 461-62, 472. Because he was not a U.S. national, his estate, heirs and survivors have no federal ATA claim and the Court should decline to exercise supplemental jurisdiction under 28 U.S.C. § 1367(c)(3).

47

E.    **Intentional and Negligent Infliction of Emotional Distress**

With the exception of the Goldberg plaintiffs, the Plaintiffs' intentional infliction of emotional distress claims ("IIED") are barred by the one-year statute of limitations, N.Y. C.P.L.R. § 215(3), and their negligent infliction of emotional distress ("NIED") claims are barred by the 1-year, 90 day statute of limitations for commencing tort actions against municipal defendants. *Gonzalez v. City of New York*, 20 Misc. 3d 1130(A), 1130A (N.Y. Sup. Ct. 2008). As set forth above, in addition to a failure of proof as to PA or PLO liability, the Goldbergs' claims should be dismissed under 28 U.S.C. § 1367(c)(3).

In addition, only Mark Sokolow, Rena Sokolow, Jamie Sokolow, Shana Gould, Shmuel Waldman, Alan Bauer, Yehonathon Bauer, Shaul Mandelkorn, Oz Guetta and Varda Guetta have standing to seek recovery for IIED or NIED. The remaining plaintiffs were not in the zone of danger. *See* New York Pattern Jury Instructions 3:6 (stating that "transferred intent" doctrine has not been applied in this State to outrageous conduct); *Buckley v. Metro-North Commuter R.R.*, 79 F.3d 1337, 1343 (2d Cir. 1996) (NEID claims may be brought only by plaintiffs who sustain a physical impact as a result of defendant's negligent conduct, or who are placed in immediate risk of physical harm by that conduct). *See also* Ex. A ¶¶ 139, 142-147, 224, 226, 266, 269-71, 318, 323, 326, 463-72.

In addition, Defendants cannot be sued for IIED. *See* New York Pattern Jury Instruction 3:6 ("public policy bars a claim for intentional infliction of emotional distress against a governmental entity"). And, to the extent Plaintiffs seek to impose liability for conduct that constitutes verbal expression, the claim is barred by the First Amendment. *See Snyder v. Phelps*, 131 S. Ct. 1207 (2011) (First Amendment complete defense to state law IIED claim).

### F.    Civil Conspiracy

In the JPTO, Plaintiffs state that they "do not assert an independent claim for civil conspiracy, but all plaintiffs intend to use evidence of defendants' participation in a conspiracy to establish liability under . . . applicable State law and/or the CWO of Israel." JPTO at 13. Under New York Law, "to establish a claim of civil conspiracy, the plaintiff 'must demonstrate the primary tort, plus the following four elements: (1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury' (*World Wrestling Fedn. Entertainment v Bozell*,142 F Supp 2d 514, 532 [SDNY 2001])." *Abacus Fed. Sav. Bank v Lim*, 75 A.D.3d 472, 474 (N.Y. App. Div. 1st Dep't 2010). Plaintiffs have no admissible evidence that the PA or PLO engaged in a conspiracy that resulted in their alleged injuries.

## V.    THE COURT LACKS PERSONAL JURISDICTION.

At the hearing on April 11, 2014, the Court denied Defendants' motion for reconsideration of the Court's March 2011 ruling that it has general personal jurisdiction over them. Defendants' motion for reconsideration was based on a change in the controlling law. In *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014), the Supreme Court held that in all but "exceptional case[s]" a foreign organizational defendant can be deemed "essentially at home," and thus subject to general personal jurisdiction, only where it is incorporated or where it has its principal place of business. *Id.* at 760-62 and n.19. In determining whether Defendants' contacts with this forum present the "exceptional case," the Court must compare Defendants' activities in the forum with their activities worldwide. *Id.* at 762 n.20.

At the April 11 hearing, the Court found that it lacked a sufficient record, on a motion for reconsideration, "to conclude that the Palestinian Authority or the PLO's activity is any greater, more continuous or systematic in any other country than in the United States." Tr. 4/11/14 at

1425373.1

57:19-21.  Defendants maintain that the factual record developed through personal jurisdiction discovery precluded a finding that they are "at home" in the U.S. under *Daimler*. *See Daimler*, 134 S. Ct. at 762 n.20 (rejecting Justice Sotomayor's concern that the new rule would expand the scope of jurisdictional discovery because "it is hard to see why much in the way of discovery would be needed to determine where a corporation is at home").   It is Plaintiffs' burden of proof to meet the test for personal jurisdiction under the controlling law, which is now *Daimler*.  In opposing the motion for reconsideration, Plaintiffs did not even argue that Defendants could be considered at home in the United States. *See* DE 474.  Defendants have moved to certify the *Daimler* issue for interlocutory appeal.  DE 472.

In any event, the Court should grant summary judgment for Defendants based on the undisputed material facts, Ex. A at ¶¶ 31-66, which demonstrate that the U.S. activities of the Defendants were a tiny fraction of their worldwide activities during the relevant period. *See also* Ex. A-71 at ¶¶ 17-19 (Declaration of Ambassador Maen Areikat).  For example, in contrast to the approximately 12 employees at the PLO Mission to the United States, *Sokolow v. PLO*, 2011 U.S. Dist. LEXIS 36022, at *16-18 (S.D.N.Y. Mar. 30, 2011), the PA had approximately 100,000 employees during the same period, Ex. A ¶ 40, and the PLO employed approximately 1,300 persons just to work at its embassies, missions and delegations in countries or organizations outside the United States.  Ex. A-71 at ¶ 18.  "During that same period, there were several embassies, missions and delegations maintained by the PLO around the world that were larger than the [U.S. Mission office] measured by the number of personnel serving at those locations, including the embassies, missions and delegation in the following countries: Jordan, Egypt, Lebanon, France, Chile, the People's Republic of China, Japan, South Africa, Germany, Russia and Brazil." *Id.* ¶ 19.

1425373.1

May 2, 2014                          Respectfully Submitted,

                                     /s/ *Laura G. Ferguson*
                                     Laura G. Ferguson
                                     Mark J. Rochon
                                     Brian A. Hill
                                     MILLER & CHEVALIER CHARTERED
                                     655 15th Street, NW, Suite 900
                                     Washington D.C. 20005-6701
                                     (202) 626-5800 [tel]
                                     (202) 626-5801 [fax]
                                     mrochon@milchev.com [email]


                                     *Counsel for Defendants the Palestinian Authority and the*
                                     *Palestine Liberation Organization*