# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------- X

MARK SOKOLOW, *et al.*,

       Plaintiffs,

     - against -

THE PALESTINE LIBERATION ORGANIZATION,
*et al.*,

       Defendants.

--------------------------------------------------------------------- X

Docket No:
04-CV-397 (GBD) (RLE)

## DEFENDANTS' STATEMENT OF MATERIAL FACTS
## <u>AS TO WHICH THERE IS NO GENUINE ISSUE</u>

   Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1, Defendants

The Palestinian Authority ("PA") and The Palestine Liberation Organization ("PLO")

(collectively, "Defendants"), respectfully submit the following Statement of Material Facts as to

Which There Is No Genuine Issue in support of their Motion for Summary Judgment.

## <u>The Defendants</u>

   1.  The PLO was founded in 1964 by the Arab League and was recognized as the

representative of the Palestinian People by Israel as part of the Oslo Accords in 1993. *See* Ex. 1,

Abu-Libdeh Dep. 25:20-24; *see also* Ex. 2, Safieh Dep. 20:12-21; Ex. 3, Fayyad Dep. 48:17-

49:12.

   2.  The PA was established by the PLO after the Oslo Accords to serve as the

governing authority for the Occupied Palestinian Territories in the West Bank and Gaza Strip.

Ex. 1, Abu-Libdeh Dep. 118:2-11, 200:12-16; Ex. 2, Safieh Dep. 86:1-12, 87:10-23, 132:10-15;

Ex. 3, Fayyad Dep. 47:2-11.

3.      A state is an entity that is accepted in the international community by other states as having the status of a state.  *See* Ex. 4, Quigley Dep. 16:6-11, 89:1-4, 118:7-8, 124:24-125:3, 140:15-140:25, 170:17-20.

4.      Palestine is a state.  *Id.* at 104:3-5, 112:11-13, 116:14-17.

5.      The overwhelming majority of member states in the United Nations have accepted Palestine as a state by, *inter alia*, voting for the November 2012 resolution admitting Palestine to the UN as a nonmember observer state, and by voting to admit Palestine to the UN Economic, Social and Cultural Organization ("UNESCO").  *Id.* at 142:15-24, 145:1-146:13, 148:2-5, 148:25-149:4, 150:11-153:2, 154:7-157:2; *see also* Ex. 5, DTE 58.

6.      The Holy See also has nonmember observer state status at the UN, and is accepted by the international community as a state.  Ex. 4, Quigley Dep. 169:15-170:6.

7.      The state of Palestine also holds full membership in the Economic and Social Commission for Western Asia and the Group of Asia-Pacific States, the League of Arab States, the Movement of Non-Aligned Countries, the Organization of Islamic Cooperation and the Group of 77 and China.  Ex. 5, DTE 58 at 3.

8.      Israel and the United States have also accepted Palestine as a state by, *inter alia*, entering into negotiations and accords with the PLO and encouraging negotiations between Israel and the PLO through the "Road map to peace."  Ex. 4, Quigley Dep. 142:15-143:16, 158:6-169:11, 173:13-174:8, 194:25-195:1.

9.      Between 130 and 160 out of 190 countries have granted diplomatic recognition to the state of Palestine.  *Id.* at 196:14-197:23; Ex. 5, DTE 58 at 3 ("to date, 132 States Members of the United Nations have accorded recognition to the State of Palestine").

10. The fact that Palestine has not been granted diplomatic recognition as a state by the United States or Israel does not negate its statehood. Ex. 4, Quigley Dep. 140:19-141:9, 174:9-176:20, 185:9-12, 188:25-190:22, 200:20-201:7.

11. The United States also initially refused to recognize the Soviet Union as a state, but that refusal of recognition did not negate the Soviet Union's statehood during that time. *Id.* at 201:8-21.

12. The fact that Palestine is under a belligerent occupation by Israel does not negate its statehood. *Id.* at 43:3-17, 137:20-138:10, 198:17-23.

13. The PLO is a governing authority of the state of Palestine. *Id.* at 105:3-6, 106:6-17.

14. The PLO's governmental functions involve representing the state of Palestine at the international level. *Id.* at 108:3-8, 110:16-20, 135:9-13.

15. The PA is also a governing authority of the state of Palestine. *Id.* at 104:24-105:2, 106:6-17.

16. The PA carries out the kinds of functions that governments normally do in administering certain of the territories of the state of Palestine. *Id.* at 106:23-107:2, 110:16-20, 131:4-135:8.

17. The PLO is not an individual. *See* Ex. 6, Guetta Response to RFA at No. 46; *see also* Ex. 7, Gould & Waldman Response to RFA at No. 458; Ex. 8, Sokolow Response to RFA at No. 158; Ex. 9, Bauer Response to RFA at No. 197; Ex. 10, Mandelkorn Response to RFA at No. 60; Ex. 11, Carter, Coulter and Gritz Response to RFA at No. 307; Ex. 12, Goldberg Response to RFA at No. 263.

18.     The PA is not an individual.  Ex. 6, Guetta Response to RFA, No. 45; Ex. 7,

Gould & Waldman Response to RFA, No. 457; Ex. 8, Sokolow Response to RFA, No.157; Ex.

9, Bauer Response to RFA, No. 196; Ex. 10, Mandelkorn Response to RFA, No. 59; Ex. 11,

Carter, Coulter and Gritz Response to RFA, No. 306; Ex.12, Goldberg Response to RFA, No.

262.

19.     The PLO is not a partnership.  Ex. 2, Safieh Dep. 20:23-27:4; Ex. 1, Abu Libdeh

Dep. 32:20-33:8.

20.     The PA is not a partnership.  Ex. 2, Safieh Dep. 86:25-87:23; Ex. 1, Abu Libdeh

Dep. 31:1-32:17.

21.     The PLO is not a corporation.  Ex. 2, Safieh Dep. 20:23-27:4; Ex. 1, Abu Libdeh

Dep. 32:20-33:8.

22.     The PA is not a corporation.  Ex. 2, Safieh Dep. 86:25-87:23; Ex. 1, Abu Libdeh

Dep. 31:1-32:17.

23.     Plaintiffs served the Complaint on Hassan Abdel Rahman, whom the Court has

concluded was the Chief Representative of the PLO and the PA in the United States at the time

of service.  DE 87 at 5.

24.     Plaintiffs effectuated service in this matter pursuant to Rule 4(h)(1)(B), which

governs service on a domestic or foreign corporation, a partnership, or other unincorporated

association.  DE 87 at 5; Fed. R. Civ. P. 4(h)(1)(B).  *See also* DE 83 at 4 (Plaintiffs arguing that

"Mr. Abdel Rahman… has repeatedly been found to be a valid agent for service of process on

the PA and PLO under Fed. R. Civ. P. 4(k)(1)([C]) and 4(h).").

4

25.    Because Defendants are neither corporations nor partnerships, Plaintiffs necessarily served Mr. Rahman as a representative of Defendants *qua* unincorporated associations.  SOMF ¶¶ 19-24.

26.    Plaintiffs have admitted that the PLO is a foreign unincorporated association.  DE 202 ¶ 6 (Declaration from Robert. J. Tolchin stating "in respect to a foreign unincorporated association such as the PLO").

27.    Other courts have found that the PLO is an unincorporated association.  *Estate of Parsons v. Palestinian Auth.*, No. 07-cv-1847, DE 14 at 13-14 (D.D.C. Sept. 30, 2008); *Estate of Klieman v. Palestinian Auth.*, 467 F. Supp. 2d 107, 113 (D.D.C. 2006); *Klinghoffer v. S.N.C. Achille Lauro*, 739 F. Supp. 854, 858 (S.D.N.Y. 1990).

28.    Other courts have found that the PA is an unincorporated association.  *Estate of Parsons v. Palestinian Auth.*, No. 07-cv-1847, DE 14 at 13-14 (D.D.C. Sept. 30, 2008); *Estate of Klieman v. Palestinian Auth.*, 467 F. Supp. 2d 107, 113 (D.D.C. 2006); *Estates of Ungar v. Palestinian Auth.*, 153 F. Supp. 2d 76, 89 (D.R.I. 2001).

29.    Under the terms of the Oslo Accords, the PA does not have jurisdiction over Jerusalem, Israelis or settlements.  *See* Ex. 13, Shehadeh Dep. 34:9-22.

30.    During the Second Intifada, the PA's security agencies headquarters were demolished by Israeli Forces, PA security personnel were arrested or detained by Israeli Forces at checkpoints and otherwise, and many PA security personnel stopped reporting for duty.  *See* Ex. 14, Faraj Dep. 31:24-33:17.

31.    During the relevant time period, the PLO had its headquarters in Gaza, the West Bank, and Amman, Jordan.  Ex. 1, Abu-Libdeh Dep. 105:9-17; Ex. 2, Safieh Dep. at 32:22-33:10.

5

32.     During the relevant time period, the PA had its headquarters in Gaza and the West Bank.  Ex. 2, Safieh Dep. at 167:21-168:23.

33.     The Treasury of the PLO is known as the Palestine National Fund ("PNF").  *See* Ex. 15, Shaqbu'a Dep.  21:9-22:2, 92:18-24.

34.     Between 1998 and 2004, the PNF's only source of revenue was the PA.  *Id.* at30:22-31:9.

35.     In 2000, the PNF received $18 million from the PA.  *Id.* at 73:24-74:5.

36.     In 2001, the PNF received $13 million from the PA.  *Id.* at 74:4-5.

37.     In 2002, the PNF received $13 million from the PA.  *Id.* at 74:8-9.

38.     In 2002, the PA had an overall budget of 6 billion, 392 million Shekels.  *See* Ex. 16, Jadallah Dep. 175:5-21.

39.     Between 2000 and 2004, the budget for the PA's presidential office alone was normally about $2 million a month.  *Id.* at 48:1-6.

40.      In 2002, the PA had over 100,000 employees.  *Id.* at 175:22-176:10.

41.     During the January 1998 to January 2004 period, the PLO had only two offices in the United States:  the PLO Mission to the United States in Washington, D.C. and the Permanent Observer Mission of Palestine to the United Nations.   DE 50 at 10-11; DE 83 at 6-19; DE 84 ¶ 2 (citing *Estate of Ungar v. Palestinian Authority*, 325 F. Supp. 2d 15 (D.R.I. 2004)).

42.     The parties dispute whether the PLO Mission to the United States can be treated as an office of the PA.  Other than that office, which Defendants maintain was not a PA office, the PA did not operate any other offices in the United States during the January 1998 to January 2004 period.   DE 50 at 10-11; DE 83 at 6-19; DE 84 ¶ 2 (citing *Estate of Ungar v. Palestinian Authority*, 325 F. Supp. 2d 15 (D.R.I. 2004)).

6

43.     Following personal jurisdiction discovery, Plaintiffs lack any admissible evidence that either the PA or the PLO own any real property in the United States other than the office of the Permanent Observer Mission of Palestine to the United Nations. DE 83; Ex. 68, Defs.' Objs. & Answers to Pls.' Personal Jurisdiction Interrogs, at INT Nos. 7 & 8.

44.     During the January 1998 to January 2004 period, the PLO Mission to the United States had a total of 14 employees, not all of whom were employed at any one time. *See* Ex. 68 at INT No. 1; *see also* Ex. 71 ¶ 19.

45.     Throughout the January 1998 to January 2004 period, the New York office of the Permanent Observer Mission of Palestine to the United Nations employed 21 individuals, though not all were employed at any one time. *Id.* at INT No. 2.

46.     Following personal jurisdiction discovery, in opposing Defendants' Renewed Motion to Dismiss, Plaintiffs did not cite any jurisdictionally relevant contracts to which either the PA or PLO was a party other than the contract with lobbying firm Bannerman & Associates. DE 83 at 6-19.

47.     Following personal jurisdiction discovery, Plaintiffs lack admissible evidence of any commercial activity the PA or PLO conducted in the United States during the January 1998-January 2004 period. *Id.; see also* Ex. 68.

48.     Following personal jurisdiction discovery, Plaintiffs lack admissible evidence of any fundraising activity the PA or PLO conducted in the United States during the January 1998-January 2004 period. DE 83 at 6-19; Ex. 68.

49.     Following personal jurisdiction discovery, Plaintiffs lack any admissible evidence that the PA or PLO leadership (other than the Head of the PLO Mission to the United States and

7

the Head of the Permanent Observer Mission of Palestine to the United Nations) conducted any activity in the United States in their official capacity.  DE 83 at 6-19; Ex. 68.

50.    *Sokolow v. PLO*, 2011 U.S. Dist. LEXIS 36022 (S.D.N.Y. Mar. 30, 2011) (DE 87).  The Court found that Defendants "expended substantial amounts of money - often exceeding $200K every six months - on these activities."  *Id.* at *21.

51.    The Court also found that the Defendants "operated a fully and continuously functional office in Washington, D.C., during the relevant period," with approximately 12 employees.  *Id.* at *16-18.

52.    During the six-month period ending in September 1998, the PLO Mission to the United States received $226,936.64 from the PA's Ministry of Finance and spent $232,728.78. DE 84, Ex. 2.

53.    During the six-month period ending in March 1999, the PLO Mission to the United States received $142,319.66 from the PA's Ministry of Finance and spent $199,247.66. DE 84, Ex. 3.

54.    During the six-month period ending in September 1999, the PLO Mission to the United States received $352,894.79 from the PA's Ministry of Finance and spent $263,824.53. DE 84, Ex. 4.

55.    During the six-month period ending in March 2000, the PLO Mission to the United States received $125,838.84 from the PA's Ministry of Finance and spent $215,846.53. DE 84, Ex. 5.

56.    During the six-month period ending in September 2000, the PLO Mission to the United States received $384,238.47 from the PA's Ministry of Finance and spent $300,698.66. DE 84, Ex. 6.

57.     During the six-month period ending in March 2001, the PLO Mission to the United States received $169,026.93 from the PA's Ministry of Finance and spent $250,816.95. DE 84, Ex. 7.

58.     For the six-month period ending in September 2001, the PLO Mission to the United States received $211,381.60 from the PA's Ministry of Finance and spent $214,502.83. DE 84, Ex. 8.

59.     For the six-month period ending in March 2002, the PLO Mission to the United States failed to report its income, expenditures or activities because its papers were in storage. DE 84, Ex. 9.

60.     During the six-month period ending in September 2002, the PLO Mission to the United States received $201,655.91 from the PA's Ministry of Finance and spent $92,237.66. DE 84, Ex. 10.

61.     During the six-month period ending in March 2003, the PLO Mission to the United States received $431,828.50 from the PA's Ministry of Finance and spent $296,128.60. DE 84, Ex. 11.

62.     During the six-month period ending in September 2003, the PLO Mission to the United States received $417,994.52 from the PA's Ministry of Finance and spent $418,666.34. DE 84, Ex. 12.

63.     During the period 1998 to 2004, the PLO also maintained and staffed over seventy-five (75) embassies, missions and delegations in countries or organizations outside the United States.  The PLO currently maintains over ninety (90) embassies, missions or delegations in countries or organizations outside the United States.  Ex. 71 ¶ 17.

9

64.    During the period 1998 to 2004, the PLO employed at various times approximately 1,300 persons to work at its embassies, missions and delegations in countries or organizations outside the United States.  During the same period, the PLO employed thousands of persons worldwide.  *Id.* ¶ 18.

65.    The PLO Mission to the United States was one of the smaller PLO embassies, missions or delegations during the 1998-2004 period, measured by number of personnel working at the locations of the various embassies, delegations or missions. *Id.* ¶ 19.

66.    During the 1998-2004 period, there were several embassies, missions and delegations maintained by the PLO around the world that were larger than the PLO Mission to the United States measured by the number of personnel serving at those locations, including the embassies, missions and delegation in the following countries: Jordan, Egypt, Lebanon, France, Chile, the People's Republic of China, Japan, South Africa, Germany, Russia and Brazil.  *Id.*

**The Guetta Plaintiffs' Claims**

67.    Varda Guetta is not a U.S. National.  *See* Ex. 17, V. Guetta Dep. 10:17-11:5.

68.    In January 2001, Varda and Oz Guetta resided in Givat Zeev, which is near Jerusalem.  *Id.* at 8:7-15; *see also* Ex. 18, O. Guetta Dep. 13:9-21.

69.    Oz Guetta was injured on January 8, 2001.  *Id.* at 55:21-56:3; *see also* Ex. 19, V. Guetta (AB) Dep. 23:20-22.

70.    Oz Guetta is not aware of the identity of the person or persons who injured him. Ex. 18, O. Guetta Dep. 81:5-12.

71.     Varda Guetta was not injured on January 8, 2001.  Ex. 19, V. Guetta (AB) Dep. 23:23-24.

72.     Oz Guetta was injured around 8:00 or 8:30 in evening.  Ex. 17, V. Guetta Dep. 27:17-20.

73.     It was nighttime and dark.  *Id.* at 27:24-25, 278:7-9.

74.     Varda Guetta was driving a Hyundai Lancer.  *Id.* at 274:22-24.

75.     Oz Guetta was in the passenger seat.  *Id.* at 277:19-21.

76.     Varda Guetta drove to an intersection.  *Id.* at 278:4-6.

77.     Another car came into the intersection and blocked Varda Guetta's car.  *Id.* at 278:13-18.

78.     Varda Guetta saw flashes coming from the other car.  *Id.* at 278:13-18.

79.     Varda Guetta focused on the flashes of light.  *Id.* at 324:2-4.

80.     At first, Varda Guetta did not comprehend they were being shot at.  *Id.* at 278:23-279:5, 369:6-11.

81.     Oz Guetta told her that they were being shot at.  *Id.* at 279:6-8, 324:5-7.

82.     The shooters never got out of the car.  *Id.* at 279:14-24.

83.     Varda Guetta looked at the guns and saw four guns.  *Id.* at 297:18-23.

84.     Varda Guetta became nervous and very confused.  *Id.* at 324:8-11, 327:2-14.

85.     Varda Guetta wanted to save her son.  *Id.* at 324:12-14.

86.     Varda Guetta turned to Oz Guetta and pushed him down with her hands.  *Id.* at 325:6-7.

87.     Varda Guetta put herself on top of Oz Guetta.  *Id.* at 325:8-9.

88.     The shooting episode lasted a matter of seconds.  *Id.* at 327:14-15.

11

89.     It is very difficult for Varda Guetta to remember some things about the shooting. *Id.* at 344:2-5.

90.     Varda Guetta spoke to the police about the shooting later that night. *Id.* at344:6-345:6.

91.     Varda Guetta did not provide a description of the shooters to the police. *Id.* at 345:25-346:6.

92.     Varda Guetta did not tell the police that one of the shooters had a moustache. *Id.* at 346:7-12.

93.     The police never showed Varda Guetta pictures or had her try and identify anyone. *Id.* at 349:6-11.

94.     Six years later, in March 2007, Varda Guetta was deposed in another matter and testified that she had seen the shooters' faces, but could not identify them. Ex. 19, V. Guetta (AB) Dep. 25:18-20.

95.     In March 2007, Varda Guetta was asked if there was anything about the faces that allowed her to tell who they were, and she shook her head and answered "no." *Id.* at 25:21-26:3, Ex. 17, V. Guetta Dep. 363:2-6.

96.     Varda Guetta did not provide any description of the shooters at her March 2007 deposition. *Id.* at 365:19-24.

97.     Varda Guetta did not claim that any of the shooters had a moustache at her March 2007 deposition. *Id.* at 365:25-366:3.

98.     In March 2007, Varda Guetta testified that she could not tell by looking at them whether the shooters' were Palestinians or Israelis. Ex. 19, V. Guetta (AB) Dep. 26:7-10.

99.     Three years later, at her first deposition in this case in June 2010, Varda Guetta testified that she could see the face of one shooter with a mustache and dark skin when she closed her eyes, but that she did not know the person or his name.  Ex. 17, V. Guetta Dep. 30:4-16, 31:23-32:7.

100.    The first time Varda Guetta reviewed photographs to try and identify the shooters was in February 2013.  *Id.* at 390:8-12, 403:3-10.

101.    Plaintiffs' counsel Robert Tolchin brought Ms. Guetta an envelope of pictures.  V. Guetta Dep. 394:24-395:8.  The envelope contained 15 head shots of men.  Only two of the men, including the individual subsequently picked by Ms. Guetta, had a significant mustache. Whereas most of the photographs have a red background, the photograph picked by Ms. Guetta was one of two with a blue background.  *See* Ex. 69, PTE 334.

102.    Varda Guetta assumed that the pictures Mr. Tolchin gave her were of potential terrorists, and assumed and hoped that the right picture was in the group.  Ex. 17, V. Guetta Dep. 397:14-398:2.

103.    Mr. Tolchin did not tell Ms. Guetta that the shooter might not be in the group of pictures.  *Id.* at 398:14-19.

104.    Varda Guetta reviewed the photographs in Mr. Tolchin's presence at 5:30 pm on February 17, 2013, but she did not make any identification.  *Id.* at 407:3-408:10; 478:16-19.

105.    Mr. Tolchin then left and left the photographs with Ms. Guetta who set them aside.  *Id.* at 413:10-12.

106.    Varda Guetta reviewed the photographs a second time for a long time starting at 9:00 pm that same day.  *Id.* at 415:9-15, 419:25-420:4.

107.    She eventually selected a photo marked with the letter "J," put it aside, and went to sleep. *Id.* at 420:8-421:20.

108.    The next morning, she again looked at photo "l," because she wanted to be certain. *Id.* at 421:12-16.

109.    On February 19, 2013, Varda Guetta told Mr. Tolchin that had selected a photo. *Id.* at 477:13-478:5.

110.    Varda Guetta does not know the name of the person whose image appears in the photograph which she ultimately selected in February 2013. V. Guetta Dep. *Id.* at 478:12-15.

111.    The chances that an individual in Varda Guetta's circumstances could acquire the type of detailed memory for the face of a stranger that would permit a reliable identification of the gunman among a set of other dark skinned individuals with mustaches is nearly zero. *See* Ex. 20, G. Wells Report, at 12-13.

112.    This is an extreme case of a long retention interval, and the reliability of any identification at this point is so close to zero as to be negligible. *Id.* at 13-14.

113.    A proper eyewitness identification procedure involves five critical elements that help safeguard against mistaken identification.  First, the only proper lineup identification procedure (whether photographic or live) is one in which an a-priori suspect is embedded among known-innocent fillers.  Second, the fillers must all fit the verbal description that the witness gave of the culprit.  Third, witnesses must be explicitly told that the culprit might not be in the lineup, that they should not guess, and that they do not need to make an identification. Fourth, the person who interacts with the witness regarding the lineup (e.g., delivers instructions, gives the photos to the witness, observes the witness attempting the identification, takes the witness's statement) should not have direct involvement in the case (e.g., should not know which photo

14

might be that of the suspect) but instead should be a neutral party. Finally, immediately following the identification of any individual the eyewitness must be asked by the neutral party to state how certain she or he is that the identified person is the culprit and a clear record must be made of the answer. *Id.* at 14-15.

114.    With respect to there being only one a-priori suspect and the remaining photos being known-innocent fillers, the evidence suggests that this was not the case. At a hearing on November 20, 2012, before Magistrate Judge Ellis, counsel for the plaintiffs stated that they intend to show Varda Guetta photos and that they "picked out the names of 17 people who are people who operate in this kind of MO in that area during that time period." Tr. 25:20-23. Counsel for the plaintiffs have not confirmed that the individuals in the other photos were not also potential suspects. If the others were also potential suspects, then this is not an identification test at all; there was no way to fail the test because the witness could have chosen anyone, even at random, and that person would then be named as the gunman. Ex. 20, G. Wells Report at 15.

115.    On the matter of the suitability of the fillers (if they were in fact fillers rather than also being potential suspects), they fall far short of meeting the criteria for a proper identification procedure. Based on Varda Guetta's profoundly sparse description in her 2012 deposition, the gunman had a mustache. More than half of the photos can be eliminated on that basis alone. And, with the exception of one other individual, only the photo she picked has a mustache of any significance. *Id.* at 15.

116.    Varda Guetta was not given any cautionary instruction (often called a pre-lineup admonishment) warning her that the culprit might not be in the lineup, that she should not guess, and that she need not make an identification. In fact, Varda Guetta testified that when she

received the photos from her lawyer, she believed that they were photos of "terrorists" and that she "assumed" that the shooter was among the photos. *Id.* at 15.

117.    The photos were delivered by the plaintiff's attorney, an initial examination of the photos occurred in the presence of the plaintiff's attorney, and the witness reported her pick to that same attorney.    No recordings were made of any of this identification procedure. *Id.* at 15.

118.    There was no protocol for taking a clear statement from the witness at the time of identification with regard to her certainty and making a record of that.  The identification decision was not taken at the time the photos were delivered. Instead, Varda Guetta was allowed to take possession of the photos and examine them for more than 24 hours. *Id.* at 16.

119.    There is no admissible evidence that the photograph picked by Varda Guetta in February 2013 is an image of Fawzi Murar.

120.    There is no admissible evidence that Fawzi Murar caused the shooting that injured Oz Guetta.

121.    There is no admissible evidence that the PA or PLO caused the shooting that injured Oz Guetta.

122.    There is no admissible evidence that "terrorist units" of the PA or PLO caused the shooting that injured Oz Guetta.

123.    There is no admissible evidence that the PA or PLO authorized, ordered, instructed, solicited or directed the shooting that injured Oz Guetta.

124.    There is no admissible evidence that Fatah caused the shooting that injured Oz Guetta.

125.    There is no admissible evidence that Fawzi Murar acted as an agent of Fatah at the time of the shooting that injured Oz Guetta.

126.     There is no admissible evidence that Fawzi Murar acted within the scope of any agency he may have had with Fatah in connection with the shooting that injured Oz Guetta.

127.     There is no admissible evidence that Fatah was an agent of the PLO in connection with the shooting that injured Oz Guetta.

128.     There is no admissible evidence that the PA was an agent of the PLO in connection with the shooting that injured Oz Guetta.

129.     There is no admissible evidence that Fatah was an agent of the PA in connection with the shooting that injured Oz Guetta.

130.     There is no admissible evidence that Fawzi Murar was an employee of the PLO.

131.     There is no admissible evidence that Fawzi Murar acted within the scope of any employment by the PA in connection with the shooting that injured Oz Guetta.

132.     There is no admissible evidence that the PA or PLO provided material support to Fawzi Murar which was used for the shooting that injured Oz Guetta.

133.     There is no admissible evidence that any funds provided to Fawzi Murar by the PA were used for the shooting that injured Oz Guetta.

134.     There is no admissible evidence that the PA or PLO provided material support to Fatah which was used for the shooting that injured Oz Guetta.

135.     There is no admissible evidence that any funds provided to Fatah by the PA were used for the shooting that injured Oz Guetta.

136.     The Israelis did not prosecute anyone, including any PA or PLO officials, for involvement in the shooting that injured Oz Guetta.  Ex. 18, O. Guetta Dep. 81:17-20.

## The Gould and Waldman Plaintiffs' Claims

137.    On December 16, 2001, President Arafat delivered a speech to the Palestinian people in which he said, *inter alia*, "Dear brothers, we have declared a state of emergency, and have undertaken a series of steps and measures that we intend to pursue, including as declaring outside the law all illegal organizations and bodies that carry out terrorist activities. We have undertaken a cease fire initiative, and it is imperative that all respect and abide by this initiative without exception." Ex. 21, DTE 33 at 2.

138.    During that same December 16, 2001 speech President Arafat also said "Once again, l reaffirm today the full and immediate cessation of all armed operations. Again, I call for the total halt of all operations, particularly suicide attacks, that we have always denounced, and we shall hold accountable all those who facilitate and plan them. . . . Any violation of this decision will be deemed as causing grave damage to the supreme national interests of our people and of the Arab nation, and all violators will be relentlessly prosecuted." *Id.* at 3.

139.    Shayna Gould and Shmuel Waldman were injured on January 22, 2002. *See* Ex. 22, S. Waldman Dep. 80:18-20; *see also* Ex. 23, S. Gould (AB) Dep. 21:9-11.

140.    On January 22, 2001, Shmuel and Henna Waldman resided in lsrael. *See* Ex. 24, H. Waldman Dep. 11:18-20.

141.    On January 22, 2001, Shayna Gould resided in lsrael. Ex. 23, S. Gould (AB) Dep. 11:22-12:8; *see also* Ex. 25 E. Gould Dep. 27:9-20.

142.    Ronald Gould was not present when Shayna Gould and Shmuel Waldman were injured. Ex. 7, Gould and Waldman Response to RFA, No. 1.

143.    Elise Gould was not present when Shayna Gould and Shmuel Waldman were injured. Ex. 7, Gould and Waldman Response to RFA, No. 2.

144.    Jessica Rine was not present when Shayna Gould and Shmuel Waldman were injured.  Ex. 7, Gould and Waldman Response to RFA, No. 3.

145.    Henna Waldman was not present when Shayna Gould and Shmuel Waldman were injured.  Ex. 7, Gould and Waldman Response to RFA, No. 4.

146.    Morris Waldman was not present when Shayna Gould and Shmuel Waldman were injured.  Ex. 7, Gould and Waldman Response to RFA, No. 5.

147.    Eva Waldman was not present when Shayna Gould and Shmuel Waldman were injured.  Ex. 7, Gould and Waldman Response to RFA, No. 6.

148.    Shmuel Waldman did not see the person or persons who injured him.  Ex. 22, S. Waldman Dep. 63:5-20.

149.    Shayna Gould cannot identify the person that injured her.  *See* Ex. 26, S. Gould Dep. 33:4-10.

150.    There is no admissible evidence that the PA or PLO caused the shooting that injured Shayna Gould and Shmuel Waldman.

151.    There is no admissible evidence that "terrorist units" of the PA or PLO caused the shooting that injured Shayna Gould and Shmuel Waldman.

152.    There is no admissible evidence that the PA or PLO authorized, ordered, instructed, solicited or directed the shooting that injured Shayna Gould and Shmuel Waldman.

153.    There is no admissible evidence that Fatah caused the shooting that injured Shayna Gould and Shmuel Waldman.

154.    There is no admissible evidence that Said Ramadan caused the shooting that injured Shayna Gould and Shmuel Waldman.

155.    There is no admissible evidence that Nasser Aweis caused the shooting that injured Shayna Gould and Shmuel Waldman.

156.    There is no admissible evidence that Ahmed Barghouti caused the shooting that injured Shayna Gould and Shmuel Waldman.

157.    There is no admissible evidence that Ibrahim Abdel Hai caused the shooting that injured Shayna Gould and Shmuel Waldman.

158.    There is no admissible evidence that Majed al-Masri caused the shooting that injured Shayna Gould and Shmuel Waldman.

159.    There is no admissible evidence that Mohamed Mousleh caused the shooting that injured Shayna Gould and Shmuel Waldman.

160.    There is no admissible evidence that Firas Ghanem caused the shooting that injured Shayna Gould and Shmuel Waldman.

161.    There is no admissible evidence that Mohammed Abdullah caused the shooting that injured Shayna Gould and Shmuel Waldman.

162.    There is no admissible evidence that Mahmoud al-Titi caused the shooting that injured Shayna Gould and Shmuel Waldman.

163.    There is no admissible evidence that Bashar Barghouti caused the shooting that injured Shayna Gould and Shmuel Waldman.

164.    There is no admissible evidence that Said Ramadan acted as an agent of Fatah at the time of the shooting that injured Shayna Gould and Shmuel Waldman.

165.    There is no admissible evidence that Said Ramadan acted within the scope of any agency he may have had with Fatah in connection with the shooting that injured Shayna Gould and Shmuel Waldman.

20

166.    There is no admissible evidence that Nasser Aweis acted as an agent of Fatah at the time of the shooting that injured Shayna Gould and Shmuel Waldman.

167.    There is no admissible evidence that Nasser Aweis acted within the scope of any agency he may have had with Fatah in connection with the shooting that injured Shayna Gould and Shmuel Waldman.

168.    There is no admissible evidence that Ahmed Barghouti acted as an agent of Fatah at the time of the shooting that injured Shayna Gould and Shmuel Waldman.

169.    There is no admissible evidence that Ahmed Barghouti acted within the scope of any agency he may have had with Fatah in connection with the shooting that injured Shayna Gould and Shmuel Waldman.

170.    There is no admissible evidence that Ibrahim Abdel Hai acted as an agent of Fatah at the time of the shooting that injured Shayna Gould and Shmuel Waldman.

171.    There is no admissible evidence that Ibrahim Abdel Hai acted within the scope of any agency he may have had with Fatah in connection with the shooting that injured Shayna Gould and Shmuel Waldman.

172.    There is no admissible evidence that Majed al-Masri acted as an agent of Fatah at the time of the shooting that injured Shayna Gould and Shmuel Waldman.

173.    There is no admissible evidence that Majed al-Masri acted within the scope of any agency he may have had with Fatah in connection with the shooting that injured Shayna Gould and Shmuel Waldman.

174.    There is no admissible evidence that Mohamed Mousleh acted as an agent of Fatah at the time of the shooting that injured Shayna Gould and Shmuel Waldman.

175.    There is no admissible evidence that Mohamed Mousleh acted within the scope of any agency he may have had with Fatah in connection with the shooting that injured Shayna Gould and Shmuel Waldman.

176.    There is no admissible evidence that Firas Ghanem acted as an agent of Fatah at the time of the shooting that injured Shayna Gould and Shmuel Waldman.

177.    There is no admissible evidence that Firas Ghanem acted within the scope of any agency he may have had with Fatah in connection with the shooting that injured Shayna Gould and Shmuel Waldman.

178.    There is no admissible evidence that Mohammed Abdullah acted as an agent of Fatah at the time of the shooting that injured Shayna Gould and Shmuel Waldman.

179.    There is no admissible evidence that Mohammed Abdullah acted within the scope of any agency he may have had with Fatah in connection with the shooting that injured Shayna Gould and Shmuel Waldman.

180.    There is no admissible evidence that Mahmoud al-Titi acted as an agent of Fatah at the time of the shooting that injured Shayna Gould and Shmuel Waldman.

181.    There is no admissible evidence that Mahmoud al-Titi acted within the scope of any agency he may have had with Fatah in connection with the shooting that injured Shayna Gould and Shmuel Waldman.

182.    There is no admissible evidence that Bashar Barghouti acted as an agent of Fatah at the time of the shooting that injured Shayna Gould and Shmuel Waldman.

183.    There is no admissible evidence that Bashar Barghouti acted within the scope of any agency he may have had with Fatah in connection with the shooting that injured Shayna Gould and Shmuel Waldman.

184.     There is no admissible evidence that Fatah was an agent of the PLO in connection with the shooting that injured Shayna Gould and Shmuel Waldman.

185.     There is no admissible evidence that the PA was an agent of the PLO in connection with the shooting that injured Shayna Gould and Shmuel Waldman.

186.     There is no admissible evidence that Fatah was an agent of the PA in connection with the shooting that injured Shayna Gould and Shmuel Waldman.

187.     There is no admissible evidence that Said Ramadan was an employee of the PLO.

188.     There is no admissible evidence that Said Ramadan acted within the scope of any employment by the PA in connection with the shooting that injured Shayna Gould and Shmuel Waldman.

189.     There is no admissible evidence that the PA or PLO provided material support to Said Ramadan which was used for the shooting that injured Shayna Gould and Shmuel Waldman.

190.     There is no admissible evidence that any funds provided to Said Ramadan by the PA were used for the shooting that injured Shayna Gould and Shmuel Waldman.

191.     There is no admissible evidence that Nasser Aweis was an employee of the PLO.

192.     There is no admissible evidence that Nasser Aweis acted within the scope of any employment by the PA in connection with the shooting that injured Shayna Gould and Shmuel Waldman.

193.     There is no admissible evidence that the PA or PLO provided material support to Nasser Aweis which was used for the shooting that injured Shayna Gould and Shmuel Waldman.

194.     There is no admissible evidence that any funds provided to Nasser Aweis by the PA were used for the shooting that injured Shayna Gould and Shmuel Waldman.

195.     There is no admissible evidence that Ahmed Barghouti was an employee of the PLO.

196.     There is no admissible evidence that Ahmed Barghouti acted within the scope of any employment by the PA in connection with the shooting that injured Shayna Gould and Shmuel Waldman.

197.     There is no admissible evidence that the PA or PLO provided material support to Ahmed Barghouti which was used for the shooting that injured Shayna Gould and Shmuel Waldman.

198.     There is no admissible evidence that any funds provided to Ahmed Barghouti by the PA were used for the shooting that injured Shayna Gould and Shmuel Waldman.

199.     There is no admissible evidence that Ibrahim Abdel Hai was an employee of the PLO.

200.     There is no admissible evidence that Ibrahim Abdel Hai acted within the scope of any employment by the PA in connection with the shooting that injured Shayna Gould and Shmuel Waldman.

201.     There is no admissible evidence that the PA or PLO provided material support to Ibrahim Abdel Hai which was used for the shooting that injured Shayna Gould and Shmuel Waldman.

202.     There is no admissible evidence that any funds provided to Ibrahim Abdel Hai by the PA were used for the shooting that injured Shayna Gould and Shmuel Waldman.

203.     There is no admissible evidence that Majed al-Masri was an employee of the PLO.

204.    There is no admissible evidence that Majed al-Masri acted within the scope of any employment by the PA in connection with the shooting that injured Shayna Gould and Shmuel Waldman.

205.    There is no admissible evidence that the PA or PLO provided material support to Majed al-Masri which was used for the shooting that injured Shayna Gould and Shmuel Waldman.

206.    There is no admissible evidence that any funds provided to Majed al-Masri by the PA were used for the shooting that injured Shayna Gould and Shmuel Waldman.

207.    There is no admissible evidence that Mohamed Mousleh was an employee of the PLO.

208.    There is no admissible evidence that Mohamed Mousleh acted within the scope of any employment by the PA in connection with the shooting that injured Shayna Gould and Shmuel Waldman.

209.    There is no admissible evidence that the PA or PLO provided material support to Mohamed Mousleh which was used for the shooting that injured Shayna Gould and Shmuel Waldman.

210.    There is no admissible evidence that any funds provided to Mohamed Mousleh by the PA were used for the shooting that injured Shayna Gould and Shmuel Waldman.

211.    There is no admissible evidence that Firas Ghanem was an employee of the PA or PLO at the time of the shooting that injured Shayna Gould and Shmuel Waldman.

212.    There is no admissible evidence that Firas Ghanem acted as an agent of the PA or PLO at the time of the shooting that injured Shayna Gould and Shmuel Waldman.

213.    There is no admissible evidence that the PA or PLO provided material support to Firas Ghanem which was used for the shooting that injured Shayna Gould and Shmuel Waldman.

214.    There is no admissible evidence that Mohammed Abdullah was an employee of the PA or PLO at the time of the shooting that injured Shayna Gould and Shmuel Waldman.

215.    There is no admissible evidence that Mohammed Abdullah acted as an agent of the PA or PLO at the time of the shooting that injured Shayna Gould and Shmuel Waldman.

216.    There is no admissible evidence that the PA or PLO provided material support to Mohammed Abdullah which was used for the shooting that injured Shayna Gould and Shmuel Waldman.

217.    There is no admissible evidence that Mahmoud al-Titi was an employee of the PA or PLO at the time of the shooting that injured Shayna Gould and Shmuel Waldman.

218.    There is no admissible evidence that Mahmoud al-Titi acted as an agent of the PA or PLO at the time of the shooting that injured Shayna Gould and Shmuel Waldman.

219.    There is no admissible evidence that the PA or PLO provided material support to Mahmoud al-Titi which was used for the shooting that injured Shayna Gould and Shmuel Waldman.

220.    There is no admissible evidence that Bashar Barghouti was an employee of the PA or PLO at the time of the shooting that injured Shayna Gould and Shmuel Waldman.

221.    There is no admissible evidence that Bashar Barghouti acted as an agent of the PA or PLO at the time of the shooting that injured Shayna Gould and Shmuel Waldman.

222.    There is no admissible evidence that the PA or PLO provided material support to Bashar Barghouti which was used for the shooting that injured Shayna Gould and Shmuel Waldman.

223.    There is no admissible evidence that any funds provided to Fatah by the PA were used for the shooting that injured Shayna Gould and Shmuel Waldman.

**The Sokolow Plaintiffs' Claims**

224.    Mark, Rena, Jamie and Lauren Sokolow were injured on January 27, 2002.  *See* Ex. 27, M. Sokolow Dep. 17:3-5.

225.    On February 3, 2002, the New York Times published an "Op-Ed" by Yasir Arafat that stated, *inter alia*, "let me be very clear.  I condemn the terrorist attacks carried out by terrorist groups against Israeli civilians.  These groups do not represent the Palestinian people or their legitimate aspirations for freedom.  They are terrorist organizations, and I am determined to put an end to their activities."  *See* Ex. 28, DTE 35.

226.    Elana Sokolow was not present when Mark, Rena, Jamie and Lauren Sokolow were injured.  *See* Ex.29, E. Sokolow Dep. 9:8-11; *see also* Ex. 8, Sokolow Response to RFA No. 1.

227.    Mark, Jamie and Lauren Sokolow did not see the person or persons who caused the explosion that injured them.  Ex. 27, M. Sokolow Dep. 38:17-39:8; *see also* Ex. 30, J. Sokolow Dep. 16:20-17:9; Ex. 31, L. Sokolow 10:3-11:2.

228.    Rena Sokolow did not see the person or persons who caused the explosion that injured her prior to, or at the time of, the explosion.  *See* Ex. 32, R. Sokolow Dep. 41:19-24, 42:9-12.

229.    Rena Sokolow saw the head of a person after the explosion, but is not able to identify that person.  *Id.* 43:25-44:5, 45:18-46:14.

230.    There is no admissible evidence that the PA or PLO caused the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

231.    There is no admissible evidence that "terrorist units" of the PA or PLO caused the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

232.    There is no admissible evidence that the PA or PLO authorized, ordered, instructed, solicited or directed the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

233.    There is no admissible evidence that Fatah caused the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

234.    There is no admissible evidence that Wafa Idris caused the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

235.    There is no admissible evidence that Munzer Noor caused the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

236.    There is no admissible evidence that Kamal El Abed caused the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

237.    There is no admissible evidence that Tewfiq Tirawi caused the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

238.    There is no admissible evidence that Wafa Idris acted as an agent of Fatah at the time of the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

239.    There is no admissible evidence that Wafa Idris acted within the scope of any agency she may have had with Fatah in connection with the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

240.    There is no admissible evidence that Munzer Noor acted as an agent of Fatah at the time of the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

241.    There is no admissible evidence that Munzer Noor acted within the scope of any agency he may have had with Fatah in connection with the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

242.    There is no admissible evidence that Kamal El Abed acted as an agent of Fatah at the time of the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

243.    There is no admissible evidence that Kamal El Abed acted within the scope of any agency he may have had with Fatah in connection with the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

244.    There is no admissible evidence that Tewfiq Tirawi acted as an agent of Fatah at the time of the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

245.    There is no admissible evidence that Tewfiq Tirawi acted within the scope of any agency he may have had with Fatah in connection with the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

246.    There is no admissible evidence that Kamal El Abed was an employee of the PLO.

247.    There is no admissible evidence that Kamal El Abed acted within the scope of any employment by the PA in connection with the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

248.    There is no admissible evidence that the PA or PLO provided material support to Kamal El Abed which was used for the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

249.    There is no admissible evidence that any funds provided to Kamal El Abed by the PA were used for the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

250.    There is no admissible evidence that Tewfiq Tirawi was an employee of the PLO.

251.    There is no admissible evidence that Tewfiq Tirawi acted within the scope of any employment by the PA in connection with causing the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

252.    There is no admissible evidence that the PA or PLO provided material support to Tewfiq Tirawi which was used for the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

253.    There is no admissible evidence that any funds provided to Tewfiq Tirawi by the PA were used for the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

254.    There is no admissible evidence that Wafa Idris was an employee of the PA or PLO.

255.    There is no admissible evidence that Wafa Idris acted as an agent of the PA or PLO in connection with the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

256.    There is no admissible evidence that the PA or PLO provided material support to Wafa Idris which was used for the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

257.    There is no admissible evidence that Munzer Noor was an employee of the PA or PLO.

258.    There is no admissible evidence that Munzer Noor acted as an agent of the PA or PLO in connection with the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

259.    There is no admissible evidence that the PA or PLO provided material support to Munzer Noor which was used for the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

260.    There is no admissible evidence that Tawfiq Tirawi knew in advance of the explosion that injured Mark, Rena, Jamie and Lauren Sokolow that the explosion was going to occur.

261.    There is no admissible evidence that Tawfiq Tirawi was involved in planning the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

262.    There is no admissible evidence that the PA or PLO provided material support to Fatah which was used for the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

263.    There is no admissible evidence that any funds provided to Fatah by the PA were used for the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

**The Bauer Plaintiffs' Claims**

264.    Revital Bauer is not a U. S. National.  *See* Ex. 33, R. Bauer Dep. 11:21-12:2.

265.    On March 21, 2002, the Bauer Plaintiffs resided in Jerusalem.  *See* Ex. 34, A. Bauer (AB) Dep. 8:5-12.

266.    Alan and Yehonathon Bauer were injured on March 21, 2002.  *See* Ex. 35, A. Bauer Dep. 8:10-15.

267.    On April 13, 2002, a statement was released on behalf of the President and the Palestinian Leadership which stated, *inter alia*, "President Yasser Arafat and the Palestinian Leadership express their condemnation of all terrorist activities that target civilians, whether Israeli or Palestinian, and regardless of whether this terrorism is sponsored by a state, group or individual.  This is based on a well-established principle that rejects resorting to violence and terrorism as a means to achieving political goals.  We have declared this position in 1988, when the Oslo Agreement was signed at the White House, and have repeated it numerous times,

31

including on December 16, 2001 and thereafter. . . . We strongly condemn the violent attacks targeting Israeli civilians, especially the last attack in Jerusalem . . . ." *See* Ex. 36, DTE 37, at 2.

268.    Revital Bauer was not present when Alan and Yehonathon Bauer were injured. Ex. 9, Bauer Response to RFA, No. 1.

269.    Binyamin Bauer was not present when Alan and Yehonathon Bauer were injured. Ex. 9, Bauer Response to RFA, No. 2.

270.    Daniel Bauer was not present when Alan and Yehonathon Bauer were injured. Ex. 9, Bauer Response to RFA, No. 3.

271.    Yehuda Bauer was not present when Alan and Yehonathon Bauer were injured. Ex. 9, Bauer Response to RFA, No. 4.

272.    Alan Bauer did not see the person or persons who caused the explosion that injured him. Ex. 25, A. Bauer Dep. 110:7-13.

273.    Yehonathon Bauer does not remember anything about the explosion that injured him. *See* Ex. 37, Y. Bauer Dep. 9:22-10:17.

274.    There is no admissible evidence that the PA or PLO caused the explosion that injured Alan and Yehonathon Bauer.

275.    There is no admissible evidence that "terrorist units" of the PA or PLO caused the explosion that injured Alan and Yehonathon Bauer.

276.    There is no admissible evidence that the PA or PLO authorized, ordered, instructed, solicited or directed the explosion that injured Alan and Yehonathon Bauer.

277.    There is no admissible evidence that Fatah caused the explosion that injured Alan and Yehonathon Bauer.

278.    There is no admissible evidence that Mohammed Hashaika caused the explosion that injured Alan and Yehonathon Bauer.

279.    There is no admissible evidence that the PA released Mohammed Hashaika in early 2002.

280.    There is no admissible evidence that Abdel Karim Aweis caused the explosion that injured Alan and Yehonathon Bauer.

281.    There is no admissible evidence that the PA released Abdel Karim Aweis in late 2001 or early 2002.

282.    There is no admissible evidence that Nasser Shawish caused the explosion that injured Alan and Yehonathon Bauer.

283.    There is no admissible evidence that the PA released Nasser Shawish in early 2002.

284.    There is no admissible evidence that Kahira Saadi caused the explosion that injured Alan and Yehonathon Bauer.

285.    There is no admissible evidence that Sanaa Shehadeh caused the explosion that injured Alan and Yehonathon Bauer.

286.    There is no admissible evidence that Mohammed Hashaika acted as an agent of Fatah at the time of the explosion that injured Alan and Yehonathon Bauer.

287.    There is no admissible evidence that Mohammed Hashaika acted within the scope of any agency he may have had with Fatah in connection with the explosion that injured Alan and Yehonathon Bauer.

288.    There is no admissible evidence that Abdel Karim Aweis acted as an agent of Fatah at the time of the explosion that injured Alan and Yehonathon Bauer.

289.    There is no admissible evidence that Abdel Karim Aweis acted within the scope of any agency he may have had with Fatah in connection with the explosion that injured Alan and Yehonathon Bauer.

290.    There is no admissible evidence that Nasser Shawish acted as an agent of Fatah at the time of the explosion that injured Alan and Yehonathon Bauer.

291.    There is no admissible evidence that Nasser Shawish acted within the scope of any agency he may have had with Fatah in connection with the explosion that injured Alan and Yehonathon Bauer.

292.    There is no admissible evidence that Kahira Saadi acted as an agent of Fatah at the time of the explosion that injured Alan and Yehonathon Bauer.

293.    There is no admissible evidence that Kahira Saadi acted within the scope of any agency she may have had with Fatah in connection with the explosion that injured Alan and Yehonathon Bauer.

294.    There is no admissible evidence that Sanaa Shehadeh acted as an agent of Fatah at the time of the explosion that injured Alan and Yehonathon Bauer.

295.    There is no admissible evidence that Sanaa Shehadeh acted within the scope of any agency she may have had with Fatah in connection with the explosion that injured Alan and Yehonathon Bauer.

296.    There is no admissible evidence that Fatah was an agent of the PLO in connection with the explosion that injured Alan and Yehonathon Bauer.

297.    There is no admissible evidence that the PA was an agent of the PLO in connection with the explosion that injured Alan and Yehonathon Bauer.

298.     There is no admissible evidence that Fatah was an agent of the PA in connection with the explosion that injured Alan and Yehonathon Bauer.

299.     There is no admissible evidence that Mohammed Hashaika was an employee of the PLO.

300.     Mohammed Hashaika's employment with the PA was terminated on February 1, 2002. *See* Ex. 70, DTE 34.

301.     There is no admissible evidence that Mohammed Hashaika acted within the scope of any employment by the PA in connection with the explosion that injured Alan and Yehonathon Bauer.

302.     There is no admissible evidence that the PA or PLO provided material support to Mohammed Hashaika which was used for the explosion that injured Alan and Yehonathon Bauer.

303.     There is no admissible evidence that any funds provided to Mohammed Hashaika by the PA were used for the explosion that injured Alan and Yehonathon Bauer.

304.     There is no admissible evidence that Abdel Karim Aweis was an employee of the PLO.

305.     There is no admissible evidence that Abdel Karim Aweis acted within the scope of any employment by the PA in connection with the explosion that injured Alan and Yehonathon Bauer.

306.     There is no admissible evidence that the PA or PLO provided material support to Abdel Karim Aweis which was used for the explosion that injured Alan and Yehonathon Bauer.

307.     There is no admissible evidence that any funds provided to Abdel Karim Aweis by the PA were used for the explosion that injured Alan and Yehonathon Bauer.

308.    There is no admissible evidence that Nasser Shawish was an employee of the PA or PLO at the time of the explosion that injured Alan and Yehonathon Bauer.

309.    There is no admissible evidence that Nasser Shawish acted as an agent of the PA or PLO at the time of the explosion that injured Alan and Yehonathon Bauer.

310.    There is no admissible evidence that the PA or PLO provided material support to Nasser Shawish which was used for the explosion that injured Alan and Yehonathon Bauer.

311.    There is no admissible evidence that Kahira Saadi was an employee of the PA or PLO at the time of the explosion that injured Alan and Yehonathon Bauer.

312.    There is no admissible evidence that Kahira Saadi acted as an agent of the PA or PLO at the time of the explosion that injured Alan and Yehonathon Bauer.

313.    There is no admissible evidence that the PA or PLO provided material support to Kahira Saadi which was used for the explosion that injured Alan and Yehonathon Bauer.

314.    There is no admissible evidence that Sanaa Shehadeh was an employee of the PA or PLO at the time of the explosion that injured Alan and Yehonathon Bauer.

315.    There is no admissible evidence that Sanaa Shehadeh acted as an agent of the PA or PLO at the time of the explosion that injured Alan and Yehonathon Bauer.

316.    There is no admissible evidence that the PA or PLO provided material support to Sanaa Shehadeh which was used for the explosion that injured Alan and Yehonathon Bauer.

317.    There is no admissible evidence that any funds provided to Fatah by the PA were used for the explosion that injured Alan and Yehonathon Bauer.

318.

**The Mandelkorn Plaintiffs' Claims**

319.    Shaul Mandelkorn is not a U.S. National.  *See* Ex. 38, S. Mandelkorn Dep. 6:18-20.

320.    Nurit Mandelkorn is not a U.S. National.  *See* Ex. 39, N. Mandelkorn Dep. 5:16-18.

321.    In 2002, Leonard and Nurit Mandelkorn resided in Shiloh, which is a settlement in the West Bank.  *See* Ex. 40, L. Mandelkorn Dep. 5:8-7:15, 9:22-24; Ex. 39, N. Mandelkorn 8:23-10:21.

322.    In 2002, Shaul Mandelkorn resided at his parents' home in Shiloh, and in a high school dormitory in Israel.  Ex. 40, L. Mandelkorn Dep. 27:24-29:2.

323.    On May 8, 2002, a statement was released on behalf of President Arafat that stated, *inter alia*, "In my capacity as President of the Palestine Liberation Organ and the Palestinian National Authority, I reaffirm my commitment and participation with the United States and the international community in their war on terrorism.  I have given my orders to the Palestinian Security Forces to confront and prevent any terrorist attacks by any Palestinian entities against Israeli civilians . . . ."  *See* Ex. 41, DTE 39, at 2.

324.    Shaul Mandelkorn was injured on June 19, 2002.  Ex. 38, S. Mandelkorn Dep. 16:7-9.

325.    On June 19, 2002, a statement was released on behalf of the Palestinian Leadership that stated, *inter alia*, "Yesterday and today, two tragic attacks befell the citizens of Israel.  The leaders and people of Palestine wholly condemn these despicable acts, which further deteriorated security and resulted in the deaths of both Israeli and Palestinian civilians. . . .  We have issued this statement in order to clearly denounce and condemn all acts of violence against

Israeli civilians, and to announce our intention to pursue the perpetrators of these heinous acts, and bring them to justice . . . . We repeat our denunciation and condemnation of these operations targeting civilians . . . ." *See* Ex. 42, DTE 40, at 2.

326.    On June 19, 2002, a statement was also made by President Arafat to the Palestinian people that stated, *inter alia*, "By virtue of my national and nationalist position and responsibility, l find it necessary to stand before our Palestinian people . . . and declare . . . my unqualified condemnation of all attacks that target Israeli civilians . . . . Targeting civilians, whether Israeli or Palestinian, is an act condemned and rejected by the Leadership, myself and the international community . . . . l have to be honest with you about the necessity for a complete cessation of these attacks that have been condemned in many Palestinian Leadership statements, and against which we have taken many decisive steps for the benefit of our people's supreme national interest." *See* Ex. 43, DTE 42, at 2.

327.    Leonard Mandelkorn was not present when Shaul Mandelkorn was injured.  Ex. 40, L. Mandelkorn Dep. at 69:16-19; Ex. 10, Mandelkorn Response to RFA, No. 1.

328.    Nurit Mandelkorn was not present when Shaul Mandelkorn was injured.  Ex. 39, N. Mandelkorn Dep. 64:24-65:3; Ex. 10, Mandelkorn Response to RFA, No. 2.

329.    Shaul Mandelkorn did not see the person or persons who caused the explosion that injured him.  Ex. 38, S. Mandelkorn Dep. at 22:25-23:5.

330.    There is no admissible evidence that the PA or PLO caused the explosion that injured Shaul Mandelkorn.

331.    There is no admissible evidence that "terrorist units" of the PA or PLO caused the explosion that injured Shaul Mandelkorn.

38

332. There is no admissible evidence that the PA or PLO authorized, ordered, instructed, solicited or directed the explosion that injured Shaul Mandelkorn.

333. There is no admissible evidence that Fatah caused the explosion that injured Shaul Mandelkorn.

334. There is no admissible evidence that Naef Abu Sharah caused the explosion that injured Shaul Mandelkorn.

335. There is no admissible evidence that Mazen Freitah caused the explosion that injured Shaul Mandelkorn.

336. There is no admissible evidence that Said Awada caused the explosion that injured Shaul Mandelkorn.

337. There is no admissible evidence that Naef Abu Sharah acted as an agent of Fatah at the time of the explosion that injured Shaul Mandelkorn.

338. There is no admissible evidence that Naef Abu Sharah acted within the scope of any agency he may have had with Fatah in connection with the explosion that injured Shaul Mandelkorn.

339. There is no admissible evidence that Mazen Freitah acted as an agent of Fatah at the time of the explosion that injured Shaul Mandelkorn.

340. There is no admissible evidence that Mazen Freitah acted within the scope of any agency he may have had with Fatah in connection with the explosion that injured Shaul Mandelkorn.

341. There is no admissible evidence that Said Awada acted as an agent of Fatah at the time of the explosion that injured Shaul Mandelkorn.

342.     There is no admissible evidence that Said Awada acted within the scope of any agency he may have had with Fatah in connection with the explosion that injured Shaul Mandelkorn.

343.     There is no admissible evidence that Fatah was an agent of the PLO in connection with the explosion that injured Shaul Mandelkorn.

344.     There is no admissible evidence that the PA was an agent of the PLO in connection with the explosion that injured Shaul Mandelkorn.

345.     There is no admissible evidence that Fatah was an agent of the PA in connection with the explosion that injured Shaul Mandelkorn.

346.     There is no admissible evidence that Naef Abu Sharah was an employee of the PLO.

347.     There is no admissible evidence that Naef Abu Sharah acted within the scope of any employment by the PA in connection with the explosion that injured Shaul Mandelkorn.

348.     There is no admissible evidence that the PA or PLO provided material support to Naef Abu Sharah which was used for the explosion that injured Shaul Mandelkorn.

349.     There is no admissible evidence that any funds provided to Naef Abu Sharah by the PA were used for the explosion that injured Shaul Mandelkorn.

350.     There is no admissible evidence that Mazen Freitah was an employee of the PA or PLO.

351.     There is no admissible evidence that Mazen Freitah acted as an agent of the PA or PLO in connection with the explosion that injured Shaul Mandelkorn.

352.     There is no admissible evidence that the PA or PLO provided material support to Mazen Freitah which was used for the explosion that injured Shaul Mandelkorn.

40

353.    There is no admissible evidence that Said Awada was an employee of the PA or PLO.

354.    There is no admissible evidence that Said Awada acted as an agent of the PA or PLO in connection with the explosion that injured Shaul Mandelkorn.

355.    There is no admissible evidence that the PA or PLO provided material support to Said Awada which was used for the explosion that injured Shaul Mandelkorn.

356.    There is no admissible evidence that the PA or PLO provided material support to Fatah which was used for the explosion that injured Shaul Mandelkorn.

357.    There is no admissible evidence that any funds provided to Fatah by the PA were used for the explosion that injured Shaul Mandelkorn.

358.    There is no admissible evidence that Israelis prosecuted anyone, including any PA or PLO officials, for involvement in the explosion that injured Shaul Mandelkorn.

**The Coulter, Carter, Blutstein and Gritz Plaintiffs' Claims**

359.    On July 31, 2002, a statement was released on behalf of Palestinian Leaders that stated, *inter alia*, "The Leaders of Palestine were shocked and disgusted when, just this morning, a terrorist attack took the lives of six people and injured 40 others. We decry this act of terrorism against civilians at the Hebrew University. We consider this attack a subhuman act that demolishes totally the image of the Palestinian people in the eyes of the international community . . . . We reiterate our stance against these attacks, as they are fundamentally contradictory to the interest of our people . . . ." *See* Ex. 44, DTE 43, at 2.

360.    Robert Coulter Sr. was not present when Janis Coulter was allegedly killed. Ex. 11, Carter, Coulter, and Gritz Response to RFA, No. 1.

41

361.    Diane Coulter Miller was not present when Janis Coulter was allegedly killed.
Ex. 11, Carter, Coulter, and Gritz Response to RFA, No. 2.

362.    Robert Coulter Jr. was not present when Janis Coulter was allegedly killed.  Ex.
11, Carter, Coulter, and Gritz Response to RFA, No. 3.

363.    There is no admissible evidence that Robert Coulter Sr. is the duly appointed
personal representative of the Estate of Janis Coulter.

364.    In 1990, Diane Carter moved to Israel.  *See* Ex. 45, S. Coffel Dep. 73:19-21.

365.    Larry Carter and Shaun Coffel did not have any communications with Diane
Carter between May of 1990 and 2002.  Ex. 45, S. Coffel Dep. 46:21-25.

366.    Larry Carter was not present when Diane Carter was allegedly killed.  Ex. 11,
Carter, Coulter, and Gritz Response to RFA, No. 4.

367.    Shaun Coffel was not present when Diane Carter was allegedly killed.  Ex. 11,
Carter, Coulter, and Gritz Response to RFA, No. 5.

368.    Larry Carter and Shaun Coffel have not seen the remains of Diane Carter.  *See*
Ex. 46, L. Carter Dep. 91:21-22; Ex. 45, S. Coffel Dep. 50:6-9.

369.    There is no admissible evidence that Diane Carter was killed in an explosion at
the Hebrew University in Jerusalem on July 31, 2002.

370.    There is no admissible evidence that Larry Carter is the duly appointed personal
representative of the Estate of Diane Carter.

371.    In July 2002 Benjamin Blutstein was living in Israel.  *See* Ex. 47, K. Baker Dep.
15:14-15.

372.    Richard Blutstein was not present when Benjamin Blutstein was allegedly killed.

Ex. 11, Carter, Coulter, and Gritz RFA, No. 6.[1]

373.    Katherine Baker was not present when Benjamin Blutstein was allegedly killed.

Ex. 11, Carter, Coulter, and Gritz RFA, No. 7.

374.    Rebekah Blutstein was not present when Benjamin Blutstein was allegedly killed.

Ex. 11, Carter, Coulter, and Gritz RFA, No. 8.

375.    Richard Blutstein, Katherine Baker and Rebekah Blutstein have not seen the
remains of Benjamin Blutstein.  *See* Ex. 48, Richard Blutstein Dep. 50:5-11; Ex. 47, K. Baker
Dep. 154:3-7; *see also* Ex. 49, Rebekah Blutstein Dep. 10:7-12.

376.    There is no admissible evidence that Benjamin Blutstein was killed in an
explosion at the Hebrew University in Jerusalem on July 31, 2002.

377.    There is no admissible evidence that Richard Blutstein or Katherine Baker is the
duly appointed personal representative of the Estate of Benjamin Blutstein.

378.    In July 2002 David Gritz was living in Jerusalem.  *See* Ex. 50, N. Gritz Dep. 16:7-
14.

379.    Norman Gritz was not present when David Gritz was allegedly killed.  Ex. 11,
Carter, Coulter, and Gritz Response to RFA, No. 9.

380.    Nevenka Gritz was not present when David Gritz was allegedly killed.  Ex. 11,
Carter, Coulter, and Gritz Response to RFA, No. 10.

381.    Norman Gritz and Nevenka Gritz have not seen the remains of David Gritz.  Ex.
50, N. Gritz Dep. 17:8-18:18.

---

[1] The Blutstein Plaintiffs did not respond to Defendants' Requests for Admission within 30 days.
Therefore, Defendants' Requests for Admission are admitted as to the Blutstein Plaintiffs.  *See* Fed. R.
Civ. P. 36(a)(3).

382.    There is no admissible evidence that David Gritz was killed in an explosion at the Hebrew University in Jerusalem on July 31, 2002.

383.    There is no admissible evidence that Norman Gritz or Nevenka Gritz is the duly appointed personal representative of the Estate of David Gritz.

384.    There is no admissible evidence that the PA or PLO caused the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

385.    There is no admissible evidence that "terrorist units" of the PA or PLO caused the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

386.    There is no admissible evidence that the PA or PLO authorized, ordered, instructed, solicited or directed the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

387.    There is no admissible evidence that Fatah caused the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

388.    There is no admissible evidence that Marwan Barghouti caused the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

389.    There is no admissible evidence that Abdullah Barghouti caused the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

390.    There is no admissible evidence that the PA released Abdullah Barghouti in August 2001.

391.    There is no admissible evidence that Ahmed Barghouti caused the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

392.    There is no admissible evidence that Mohammed Arman caused the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

393.   There is no admissible evidence that the PA released Mohammed Arman in 2001.

394.   There is no admissible evidence that Ibrahim Hamed caused the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

395.   There is no admissible evidence that Wael Qasam caused the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

396.   There is no admissible evidence that Walid Anjas caused the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

397.   There is no admissible evidence that Mohammed Odeh caused the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

398.   There is no admissible evidence that Marwan Barghouti acted within the scope of any agency he may have had with Fatah in connection with the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

399.   There is no admissible evidence that Marwan Barghouti acted as an agent of Hamas at the time of the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

400.   There is no admissible evidence that Marwan Barghouti acted within the scope of any agency he may have had with Hamas in connection with the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

401.   There is no admissible evidence that Abdullah Barghouti acted as an agent of Fatah at the time of the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

402.     There is no admissible evidence that Abdullah Barghouti acted within the scope of any agency he may have had with Fatah in connection with the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

403.     There is no admissible evidence that Abdullah Barghouti acted as an agent of Hamas at the time of the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

404.     There is no admissible evidence that Abdullah Barghouti acted within the scope of any agency he may have had with Hamas in connection with the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

405.     There is no admissible evidence that Ahmed Barghouti acted as an agent of Fatah at the time of the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

406.     There is no admissible evidence that Ahmed Barghouti acted within the scope of any agency he may have had with Fatah in connection with the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

407.     There is no admissible evidence that Ahmed Barghouti acted as an agent of Hamas at the time of the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

408.     There is no admissible evidence that Ahmed Barghouti acted within the scope of any agency he may have had with Hamas in connection with the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

409.    There is no admissible evidence that Mohammad Arman acted as an agent of Fatah at the time of the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

410.    There is no admissible evidence that Mohammad Arman acted within the scope of any agency he may have had with Fatah in connection with the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

411.    There is no admissible evidence that Mohammad Arman acted as an agent of Hamas at the time of the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

412.    There is no admissible evidence that Mohammad Arman acted within the scope of any agency he may have had with Hamas in connection with the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

413.    There is no admissible evidence that Ibrahim Hamed acted as an agent of Fatah at the time of the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

414.    There is no admissible evidence that Ibrahim Hamed acted within the scope of any agency he may have had with Fatah in connection with the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

415.    There is no admissible evidence that Ibrahim Hamed acted as an agent of Hamas at the time of the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

416.    There is no admissible evidence that Ibrahim Hamed acted within the scope of any agency he may have had with Hamas in connection with the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

417.    There is no admissible evidence that Wael Qasam acted as an agent of Fatah at the time of the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

418.    There is no admissible evidence that Wael Qasam acted within the scope of any agency he may have had with Fatah in connection with the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

419.    There is no admissible evidence that Wael Qasam acted as an agent of Hamas at the time of the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

420.    There is no admissible evidence that Wael Qasam acted within the scope of any agency he may have had with Hamas in connection with the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

421.    There is no admissible evidence that Walid Anjas acted as an agent of Fatah at the time of the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

422.    There is no admissible evidence that Walid Anjas acted within the scope of any agency he may have had with Fatah in connection with the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

423.    There is no admissible evidence that Walid Anjas acted as an agent of Hamas at the time of the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

424.    There is no admissible evidence that Walid Anjas acted within the scope of any agency he may have had with Hamas in connection with the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

425.    There is no admissible evidence that Mohammed Odeh acted as an agent of Fatah at the time of the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

426.    There is no admissible evidence that Mohammed Odeh acted within the scope of any agency he may have had with Fatah in connection with the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

427.    There is no admissible evidence that Mohammed Odeh acted as an agent of Hamas at the time of the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

428.    There is no admissible evidence that Mohammed Odeh acted within the scope of any agency he may have had with Hamas in connection with the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

429.    There is no admissible evidence that Marwan Barghouti was an employee of the PA or PLO.

430.    There is no admissible evidence that Marwan Barghouti acted within the scope of any employment by the PA or PLO in connection with the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

431.     There is no admissible evidence that the PA or PLO provided material support to Marwan Barghouti which was used for the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

432.     There is no admissible evidence that any funds provided to Marwan Barghouti by the PA were used for the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

433.     There is no admissible evidence that Abdullah Barghouti was an employee of the PA or PLO.

434.     There is no admissible evidence that Abdullah Barghouti acted as an agent of the PA or PLO in connection with the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

435.     There is no admissible evidence that the PA or PLO provided material support to Abdullah Barghouti which was used for the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

436.     There is no admissible evidence that Ahmed Barghouti was an employee of the PLO.

437.     There is no admissible evidence that Ahmed Barghouti acted within the scope of any employment by the PA in connection with the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

438.     There is no admissible evidence that the PA or PLO provided material support to Ahmed Barghouti which was used for the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

439.    There is no admissible evidence that any funds provided to Ahmed Barghouti by the PA were used for the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

440.    There is no admissible evidence that Mohammad Arman was an employee of the PA or PLO.

441.    There is no admissible evidence that Mohammad Arman acted as an agent of the PA or PLO in connection with the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

442.    There is no admissible evidence that the PA or PLO provided material support to Mohammad Arman which was used for the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

443.    There is no admissible evidence that Ibrahim Hamed was an employee of the PA or PLO.

444.    There is no admissible evidence that Ibrahim Hamed acted as an agent of the PA or PLO in connection with the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

445.    There is no admissible evidence that the PA or PLO provided material support to Ibrahim Hamed which was used for the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

446.    There is no admissible evidence that Wael Qasam was an employee of the PA or PLO.

447.     There is no admissible evidence that Wael Qasam acted as an agent of the PA or PLO in connection with the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

448.     There is no admissible evidence that the PA or PLO provided material support to Wael Qasam which was used for the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

449.     There is no admissible evidence that Walid Anjas was an employee of the PA or PLO.

450.     There is no admissible evidence that Walid Anjas acted as an agent of the PA or PLO in connection with the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

451.     There is no admissible evidence that the PA or PLO provided material support to Walid Anjas which was used for the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

452.     There is no admissible evidence that Mohammed Odeh was an employee of the PA or PLO.

453.     There is no admissible evidence that Mohammed Odeh acted as an agent of the PA or PLO in connection with the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

454.     There is no admissible evidence that the PA or PLO provided material support to Mohammed Odeh which was used for the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

455.    There is no admissible evidence that the PA or PLO provided material support to Fatah which was used for the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

456.    There is no admissible evidence that the PA or PLO provided material support to Hamas which was used for the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

457.    There is no admissible evidence that any funds provided to Fatah by the PA were used for the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**The Goldberg Plaintiffs' Claims**

458.    On March 5, 2003, a statement was released on behalf of Palestinian Leadership that stated, *inter alia*, "This afternoon . . . in the city of Haifa, an Israeli bus transporting Israeli and Palestinian civilians was bombed.  The Leadership declares that it strenuously condemns and deplores this bombing attack whose victims were innocent Israeli and Palestinian civilians . . . . The Leadership considers this bombing attack against civilians to be a departure from the responsible Palestinian national position which rejects these acts, particularly those targeting civilians. . . .  The Palestinian Leadership rejects this logic of revenge.  It also rejects the targeting of civilians on moral and political grounds."  *See* Ex. 51, DTE 44, at 2.

459.    On May 18, 2003, an official statement was issued by the PA and PLO that stated, *inter alia*, "The Palestinian Leadership deplores all violent acts against Israeli and Palestinian civilians, and calls for the immediate cessation to all aggressions against civilians in all areas without exception. . . .  We again express our denunciation of all acts of violence against Palestinian and Israeli civilians."  *See* Ex. 52, DTE 45, at 2.

460.    On June 11, 2003, a statement was released on behalf of President Arafat that stated, *inter alia*, "I urge an immediate cessation of all types of operations and shootings.  The hellish hollow circle of terrorist operations by all parties must stop now and immediately.  I strongly condemn the terrorist operations that targeted Israeli civilians in Jerusalem today." *See* Ex. 53, DTE 46, at 2.

461.    On September 10, 2003, a statement was released on behalf of the Chairman of the Palestinian Legislative Council and Acting Prime Minister that stated, *inter alia*, "We reaffirm the established Palestinian position of rejecting all acts of murder and assassination, and the targeting of innocent civilians, both Palestinian and Israeli.  In this context, we condemn the latest Jerusalem operation, which harms our cause and the interest of our people." *See* Ex. 54, DTE 47, at 2.

462.    On January 29, 2004, a statement was released on behalf of the PA Prime Minister that stated, *inter alia*, "Prime Minister Ahmed Qurei Abu Alaa denounced today the bus bombing that struck downtown Jerusalem this morning leaving many dead and injured." *See* Ex. 55, DTE 48 at 2.

463.    On January 29, 2004, the Goldberg Plaintiffs resided in Beitar Illit, which is a settlement in the West Bank. *See* Ex. 56, Shifra Goldberg Dep. 29:24-32:20.

464.    Karen Goldberg was not present when Stuart Scott Goldberg was allegedly killed. Ex. 12, Goldberg Response to RFA, No. 1.

465.    Chana Goldberg was not present when Stuart Scott Goldberg was allegedly killed. Ex. 12, Goldberg Response to RFA, No. 2.

466.    Esther Goldberg was not present when Stuart Scott Goldberg was allegedly killed. Ex. 12, Goldberg Response to RFA, No. 3.

467.    Yitzhak Goldberg was not present when Stuart Scott Goldberg was allegedly killed. Ex. 12, Goldberg Response to RFA, No. 4.

468.    Shoshana Goldberg was not present when Stuart Scott Goldberg was allegedly killed. Ex. 12, Goldberg Response to RFA, No. 5.

469.    Eliezer Goldberg was not present when Stuart Scott Goldberg was allegedly killed. Ex. 12, Goldberg Response to RFA, No. 6.

470.    Yaakov Goldberg was not present when Stuart Scott Goldberg was allegedly killed. Ex. 12, Goldberg Response to RFA, No. 7.

471.    Tzvi Goldberg was not present when Stuart Scott Goldberg was allegedly killed. Ex. 12, Goldberg Response to RFA, No. 8.

472.    None of the Goldberg Plaintiffs have seen the remains of Stuart Scott Goldberg. Ex. 56 Shifra Goldberg Dep. 48:6-21; *see also* Ex. 57, Chana Goldberg Dep. 19:3-11; Ex. 58, Esther Goldberg Dep. 15:24-16:9; Ex. 59, Yitzhak Goldberg Dep. 56:13-15; Ex. 60, Shoshana Goldberg Dep. 35:21-23; Ex. 61, Eliezer Goldberg Dep. 44:21-45:4.

473.    Stuart Scott Goldberg is not a U.S. National.  Shifra Goldberg Dep. 9:12-14.

474.    There is no admissible evidence that Stuart Scott Goldberg was killed in an explosion in Jerusalem on January 29, 2004.

475.    There is no admissible evidence that Karen Goldberg is the duly appointed personal representative of the Estate of Stuart Scott Goldberg.

476.    There is no admissible evidence that the PA or PLO caused the explosion that allegedly killed Stuart Scott Goldberg.

477.    There is no admissible evidence that "terrorist units" of the PA or PLO caused the explosion that allegedly killed Stuart Scott Goldberg.

478.    There is no admissible evidence that the PA or PLO authorized, ordered, instructed, solicited or directed the explosion that allegedly killed Stuart Scott Goldberg.

479.    There is no admissible evidence that Fatah caused the explosion that allegedly killed Stuart Scott Goldberg.

480.    There is no admissible evidence that Ali Ja'ara caused the explosion that allegedly killed Stuart Scott Goldberg.

481.    There is no admissible evidence that Abdel Maqdad caused the explosion that allegedly killed Stuart Scott Goldberg.

482.    There is no admissible evidence that Ahmed Salah caused the explosion that allegedly killed Stuart Scott Goldberg.

483.    There is no admissible evidence that Hilmi Hamash caused the explosion that allegedly killed Stuart Scott Goldberg.

484.    There is no admissible evidence that Izzadin al-Hamamra caused the explosion that allegedly killed Stuart Scott Goldberg.

485.    There is no admissible evidence that Ali Abu Haliel caused the explosion that allegedly killed Stuart Scott Goldberg.

486.    There is no admissible evidence that Mohamed Maali caused the explosion that allegedly killed Stuart Scott Goldberg.

487.    There is no admissible evidence that Ahmed Saad caused the explosion that allegedly killed Stuart Scott Goldberg.

488.    There is no admissible evidence that Ali Ja'ara acted as an agent of Fatah at the time of the explosion that allegedly killed Stuart Scott Goldberg.

56

489.    There is no admissible evidence that Ali Ja'ara acted within the scope of any agency he may have had with Fatah in connection with the explosion that allegedly killed Stuart Scott Goldberg.

490.    There is no admissible evidence that Ali Ja'ara acted as an agent of Hamas at the time of the explosion that allegedly killed Stuart Scott Goldberg.

491.    There is no admissible evidence that Ali Ja'ara acted within the scope of any agency he may have had with Hamas in connection with the explosion that allegedly killed Stuart Scott Goldberg.

492.    There is no admissible evidence that Abdel Maqdad acted as an agent of Fatah at the time of the explosion that allegedly killed Stuart Scott Goldberg.

493.    There is no admissible evidence that Abdel Maqdad acted within the scope of any agency he may have had with Fatah in connection with the explosion that allegedly killed Stuart Scott Goldberg.

494.    There is no admissible evidence that Abdel Maqdad acted as an agent of Hamas at the time of the explosion that allegedly killed Stuart Scott Goldberg.

495.    There is no admissible evidence that Abdel Maqdad acted within the scope of any agency he may have had with Hamas in connection with the explosion that allegedly killed Stuart Scott Goldberg.

496.    There is no admissible evidence that Ahmed Salah acted as an agent of Fatah at the time of the explosion that allegedly killed Stuart Scott Goldberg.

497.    There is no admissible evidence that Ahmed Salah acted within the scope of any agency he may have had with Fatah in connection with the explosion that allegedly killed Stuart Scott Goldberg.

498.    There is no admissible evidence that Ahmed Salah acted as an agent of Hamas at the time of the explosion that allegedly killed Stuart Scott Goldberg.

499.    There is no admissible evidence that Ahmed Salah acted within the scope of any agency he may have had with Hamas in connection with the explosion that allegedly killed Stuart Scott Goldberg.

500.    There is no admissible evidence that Hilmi Hamash acted as an agent of Fatah at the time of the explosion that allegedly killed Stuart Scott Goldberg.

501.    There is no admissible evidence that Hilmi Hamash acted within the scope of any agency he may have had with Fatah in connection with the explosion that allegedly killed Stuart Scott Goldberg.

502.    There is no admissible evidence that Hilmi Hamash acted as an agent of Hamas at the time of the explosion that allegedly killed Stuart Scott Goldberg.

503.    There is no admissible evidence that Hilmi Hamash acted within the scope of any agency he may have had with Hamas in connection with the explosion that allegedly killed Stuart Scott Goldberg.

504.    There is no admissible evidence that Izzadin al-Hamamra acted as an agent of Fatah at the time of the explosion that allegedly killed Stuart Scott Goldberg.

505.    There is no admissible evidence that Izzadin al-Hamamra acted within the scope of any agency he may have had with Fatah in connection with the explosion that allegedly killed Stuart Scott Goldberg.

506.    There is no admissible evidence that Izzadin al-Hamamra acted as an agent of Hamas at the time of the explosion that allegedly killed Stuart Scott Goldberg.

507.    There is no admissible evidence that Izzadin al-Hamamra acted within the scope of any agency he may have had with Hamas in connection with the explosion that allegedly killed Stuart Scott Goldberg.

508.    There is no admissible evidence that Ali Abu Haliel acted as an agent of Fatah at the time of the explosion that allegedly killed Stuart Scott Goldberg.

509.    There is no admissible evidence that Ali Abu Haliel acted within the scope of any agency he may have had with Fatah in connection with the explosion that allegedly killed Stuart Scott Goldberg.

510.    There is no admissible evidence that Ali Abu Haliel acted as an agent of Hamas at the time of the explosion that allegedly killed Stuart Scott Goldberg.

511.    There is no admissible evidence that Ali Abu Haliel acted within the scope of any agency he may have had with Hamas in connection with the explosion that allegedly killed Stuart Scott Goldberg.

512.    There is no admissible evidence that Mohamed Maali acted as an agent of Fatah at the time of the explosion that allegedly killed Stuart Scott Goldberg.

513.    There is no admissible evidence that Mohamed Maali acted within the scope of any agency he may have had with Fatah in connection with the explosion that allegedly killed Stuart Scott Goldberg.

514.    There is no admissible evidence that Mohamed Maali acted as an agent of Hamas at the time of the explosion that allegedly killed Stuart Scott Goldberg.

515.    There is no admissible evidence that Mohamed Maali acted within the scope of any agency he may have had with Hamas in connection with the explosion that allegedly killed Stuart Scott Goldberg.

516.    There is no admissible evidence that Ahmed Saad acted as an agent of Fatah at the time of the explosion that allegedly killed Stuart Scott Goldberg.

517.    There is no admissible evidence that Ahmed Saad acted within the scope of any agency he may have had with Fatah in connection with the explosion that allegedly killed Stuart Scott Goldberg.

518.    There is no admissible evidence that Ahmed Saad acted as an agent of Hamas at the time of the explosion that allegedly killed Stuart Scott Goldberg.

519.    There is no admissible evidence that Ahmed Saad acted within the scope of any agency he may have had with Hamas in connection with the explosion that allegedly killed Stuart Scott Goldberg.

520.    There is no admissible evidence that Ali Ja'ara was an employee of the PLO.

521.    Ali Ja'ara's employment with the PA was terminated on January 5, 2004.  *See* Ex. 62, PTE 88; PTE 94 at 02:009450, 02:009452.

522.    There is no admissible evidence that Ali Ja'ara acted within the scope of any employment by the PA in connection with the explosion that allegedly killed Stuart Scott Goldberg.

523.    There is no admissible evidence that the PA or PLO provided material support to Ali Ja'ara which was used for the explosion that allegedly killed Stuart Scott Goldberg.

524.    There is no admissible evidence that any funds provided to Ali Ja'ara by the PA were used for the explosion that allegedly killed Stuart Scott Goldberg.

525.    There is no admissible evidence that Abdel Maqdad was an employee of the PLO.

526.     There is no admissible evidence that Abdel Maqdad acted within the scope of any employment by the PA in connection with the explosion that allegedly killed Stuart Scott Goldberg.

527.     There is no admissible evidence that the PA or PLO provided material support to Abdel Maqdad which was used for the explosion that allegedly killed Stuart Scott Goldberg.

528.     There is no admissible evidence that any funds provided to Abdel Maqdad by the PA were used for the explosion that allegedly killed Stuart Scott Goldberg.

529.     There is no admissible evidence that Ahmed Salah was an employee of the PLO.

530.     There is no admissible evidence that Ahmed Salah acted within the scope of any employment by the PA in connection with the explosion that allegedly killed Stuart Scott Goldberg.

531.     There is no admissible evidence that the PA or PLO provided material support to Ahmed Salah which was used for the explosion that allegedly killed Stuart Scott Goldberg.

532.     There is no admissible evidence that any funds provided to Ahmed Salah by the PA were used for the explosion that allegedly killed Stuart Scott Goldberg.

533.     There is no admissible evidence that Hilmi Hamash was an employee of the PLO.

534.     There is no admissible evidence that Hilmi Hamash acted within the scope of any employment by the PA in connection with the explosion that allegedly killed Stuart Scott Goldberg.

535.     There is no admissible evidence that the PA or PLO provided material support to Hilmi Hamash which was used for the explosion that allegedly killed Stuart Scott Goldberg.

536.     There is no admissible evidence that any funds provided to Hilmi Hamash by the PA were used for the explosion that allegedly killed Stuart Scott Goldberg.

537.    There is no admissible evidence that Izzadin al-Hamamra was an employee of the PLO.

538.    There is no admissible evidence that Izzadin al-Hamamra acted within the scope of any employment by the PA in connection with the explosion that allegedly killed Stuart Scott Goldberg.

539.    There is no admissible evidence that the PA or PLO provided material support to Izzadin al-Hamamra which was used for the explosion that allegedly killed Stuart Scott Goldberg.

540.    There is no admissible evidence that any funds provided to Izzadin al-Hamamra by the PA were used for the explosion that allegedly killed Stuart Scott Goldberg.

541.    There is no admissible evidence that Ali Abu Haliel was an employee of the PA or PLO.

542.    There is no admissible evidence that Ali Abu Haliel acted as an agent of the PA or PLO in connection with the explosion that allegedly killed Stuart Scott Goldberg.

543.    There is no admissible evidence that the PA or PLO provided material support to Ali Abu Haliel which was used for the explosion that allegedly killed Stuart Scott Goldberg.

544.    There is no admissible evidence that Mohamed Maali was an employee of the PA or PLO.

545.    There is no admissible evidence that Mohamed Maali acted as an agent of the PA or PLO in connection with the explosion that allegedly killed Stuart Scott Goldberg.

546.    There is no admissible evidence that the PA or PLO provided material support to Mohamed Maali which was used for the explosion that allegedly killed Stuart Scott Goldberg.

547.    There is no admissible evidence that Ahmed Saad was an employee of the PA or PLO.

548.    There is no admissible evidence that Ahmed Saad acted as an agent of the PA or PLO in connection with the explosion that allegedly killed Stuart Scott Goldberg.

549.    There is no admissible evidence that the PA or PLO provided material support to Ahmed Saad which was used for the explosion that allegedly killed Stuart Scott Goldberg.

550.    There is no admissible evidence that the PA or PLO provided material support to Fatah which was used for the explosion that allegedly killed Stuart Scott Goldberg.

551.    There is no admissible evidence that the PA or PLO provided material support to Hamas which was used for the explosion that allegedly killed Stuart Scott Goldberg.

552.    There is no admissible evidence that any funds provided to Fatah by the PA were used for the explosion that allegedly killed Stuart Scott Goldberg.

**Plaintiffs ATA Claims**

553.    In the First Court of their Complaint, which is a claim brought under the Anti-Terrorism Act (18 U.S.C. § 2333), Plaintiffs allege that "Defendants acts' constitute a violation of the criminal laws of the United States and of the several States" prohibiting "homicide, battery, assault and the construction and use of explosive devices; as well as the criminal prohibitions against aiding and abetting, serving as an accessory to, solicitation of and conspiracy to commit these and other such felonies." Compl. ¶ 127.

554.    No admissible evidence exists in this case to support Plaintiffs' allegations set forth in Paragraph 127 of their Complaint.

555.    Plaintiffs allege that defendants acted "pursuant to and as implementation of an established policy of utilizing terrorist attacks in order to achieve their goals." Compl. ¶ 128.

556.     No admissible evidence exists in this case to support Plaintiffs' allegations set forth in Paragraph 128 of their Complaint.

557.     Plaintiffs allege that the "Defendants' acts were dangerous to human life, by their nature and as evidenced by their consequences." Compl. ¶ 129.

558.     No admissible evidence exists in this case to support Plaintiffs' allegations set forth in Paragraph 129 of their Complaint.

559.     Plaintiffs allege that the "acts of defendants are . . . 'acts of international terrorism'" and their behavior "constitutes aiding and abetting acts of international terrorism, and conspiracy to commit acts of international terrorism." Compl. ¶ 131.

560.     No admissible evidence exists in this case to support Plaintiffs' allegations set forth in Paragraph 131 of their Complaint.

561.     Plaintiffs allege that "plaintiffs were caused severe injury" as "a direct and proximate result of the acts of international terrorism committed by defendants." Compl. ¶ 132.

562.     No admissible evidence exists in this case to support Plaintiffs' allegations set forth in Paragraph 132 of their Complaint.

563.     Plaintiffs allege that "Defendants' conduct was outrageous in the extreme, wanton, willful and malicious, and constitutes a threat to the public at large . . . ." Compl. ¶ 134.

564.     No admissible evidence exists in this case to support Plaintiffs' allegations set forth in Paragraph 134 of their Complaint.

565.     None of the Plaintiffs who were deposed in this matter possesses any admissible evidence to support the allegations against the PA or PLO set forth in their Complaint. *See* Ex. 17, V. Guetta Dep. 173:14-175:11; Ex. 18, O. Guetta Dep. 75:13-78:16, 79:21-80:5; Ex. 26, S. Gould Dep. 81:15-82:17; Ex. 63, R. Gould Dep. 42:18-44:3; Ex. 25, E. Gould Dep. 116:2-24,

120:4-20; Ex. 64, J. Rine Dep. 58:2-21; Ex. 27, M. Sokolow Dep. 69:24-75:20; Ex. 32, R.

Sokolow Dep. 69:11-22; Ex. 30, J. Sokolow Dep. 50:25-51:5, 53:19-24; Ex. 31, L. Sokolow

Dep. 35:4-38:23; Ex. 29, E. Sokolow Dep. 24:15-28:25; Ex. 38, S. Mandelkorn Dep. 105:2-

107:18; Ex. 35, A. Bauer Dep. 159:20-160:6; Ex. 33, R. Bauer Dep. 72:22-25; Ex. 37, Y. Bauer

Dep. 68:4-15; Ex. 40, L. Mandelkorn Dep. 74:14-82:25, 109:12-110:3; Ex. 39, N. Mandelkorn

Dep. 73:21-78:6; Ex. 65, R. Coulter Sr. Dep. 15:12-16:4, 53:5-23; Ex. 66, D. Miller Dep. 60:14-

22; Ex. 67, R. Coulter Jr. Dep. 59:17-24; Ex. 46, L. Carter Dep. 99:14-21; Ex. 45, S. Coffel Dep.

60:21-61:8; Ex. 48, Richard Blutstein Dep. 180:3-183:17; Ex. 47, K. Baker Dep. 166:8-18; Ex.

49, Rebekah Blutstein Dep. 32:7-34:2; Ex. 50, N. Gritz Dep. 23:16-24:18; Ex. 56, Shifra

Goldberg Dep. 53:22-25, 54:16-55:18; Ex. 57, Chana Goldberg Dep. 24:8-25:6; Ex. 58, Esther

Goldberg Dep. 64:7-11; Ex. 59, Yitzhak Goldberg Dep. 54:7-56:9; Ex. 60, Shoshana Goldberg

Dep. 39:5-20; Ex. 61, Eliezer Goldberg Dep. 49:3-51:8.

May 2, 2014                          Respectfully Submitted,

                                     _/s/ Laura G. Ferguson_____
                                     Laura G. Ferguson
                                     Mark J. Rochon
                                     Brian A. Hill
                                     MILLER & CHEVALIER CHARTERED
                                     655 15th Street, NW, Suite 900
                                     Washington D.C. 20005-6701
                                     (202) 626-5800 [tel]
                                     (202) 626-5801 [fax]
                                     lferguson@milchev.com


                                     *Counsel for Defendants the Palestinian Authority and the
                                     Palestine Liberation Organization*