# EXHIBIT 20

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARK I. SOKOLOW, et al., ) | |
| Plaintiffs, ) | |
| v. ) | Civil Action No. 04cv397 (GBD) (RLE) |
| THE PALESTINE LIBERATION ) ORGANIZATION, et al., ) | |
| Defendants. ) | |

## DECLARATION OF GARY L. WELLS

Pursuant to 28 U.S.C. § 1746, I, Gary L. Wells, declare under penalty of perjury under the laws of the United States of America, as follows:

1. I am over eighteen years old, and I am competent to make this declaration.

2. I am a Distinguished Professor of Psychology at Iowa State University and the Stavish Chair in the Social Sciences at Iowa State University.

3. On July 15, 2013, I submitted an expert report in the above-referenced case, which is attached to this declaration.

4. I wrote the attached report. It accurately reflects my opinions in this case and the reasons and bases for my opinions.

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT THE FOREGOING IS TRUE AND CORRECT.

Executed on this 28th day of April, 2014, in Ames, Iowa.

_____
Gary L. Wells, Ph.D.

1297551.2

Wells Report

**Expert Report**
**Gary L. Wells**
**July 15, 2013**

RE: Mark I. Sokolow et al. v. The Palestinian Liberation Organization et al.

I am Gary L. Wells, Ph.D., Distinguished Professor of Psychology at Iowa State University, Director of Social Science Research for the American Judicature Society Center of Forensic Science and Public Policy, and the Stavish Chair in the Social Sciences at Iowa State University. I am an expert in human memory and judgment in general and eyewitness identification evidence in particular. I have published over 150 peer-reviewed publications reporting my studies of eyewitness identification since 1978 and have received several national awards for this work. The National Science Foundation (Washington, DC) funds my research studies on eyewitness identification. I chaired the national committee of the American Psychology-Law Society that reviewed the scientific literature on eyewitness evidence and published the conclusions in 1998. I was a planning panel member, working group member, and author on the U.S. Department of Justice publication *Eyewitness Evidence: A Guide for Law Enforcement*, which was published in 1999. I have given workshops and lectures on eyewitness identification evidence to attorneys, prosecutors, police, and judges across the United States. I have worked with prosecutors, law enforcement, or other public officials and policy makers to help reform eyewitness identification procedures in Arizona, Connecticut, North Carolina, Massachusetts, New York, New Jersey, Virginia, the District of Columbia, Colorado, Georgia, Illinois, Iowa, Florida, Louisiana, Minnesota, Wisconsin, Ohio, Maryland, California, Washington, Texas, and Canada. I co-chaired and co-authored the National Institute of Justice's Training Guide on Eyewitness Evidence for law enforcement, which was published in 2003. I am on the editorial boards or serve as a reviewer for every major scientific journal that publishes research on eyewitness identification. I am a past President of the American Psychology-Law Society. My curriculum vita is included with this report.

I have given depositions, or testified in the following cases since 2008:

In 2008: Hernandez v. City of El Paso, No.: 3:08-CV-00222-KC
In 2008: deposition: 3:07-CV-1413-R, Billy James Smith v. City of Dallas, et al.
In 2008: deposition Wallis v. City of Irving, Texas, et al 3:07-CV-1483
In 2008: deposition; Thomas Doswell; Raymond Thomas Lowry, plaintiffs, v. City of Pittsburgh, et al., 07-0761
In 2009: deposition; Thomas Lee Goldstein v. City of Long Beach, CV 04-9692-AHM(Ex)
In 2009: deposition Jerry Miller v. City of Chicago, No. 08-cv-773
In 2009: deposition Briscoe v. County of Saint Louis et al, Cause No. 052-08057
In 2009: DeAndre Washington and William Yancy v. City of Chicago et al., No. 01 L 007111 and 04 L 007212

Wells Report

- In 2010: deposition; Jimmerson v. Village of Skokie & Detective Zahn, No. 08 L 004824- deposition
- In 2010: Galindo v. O'Donnell, et al No. 08 C 5233
- In 2010: deposition; Wilson v. O'Brien, et al. No. 07 C 3994 - deposition
- In 2011: deposition; Alberto Sifuentes and Jesus Ramirez v. Salvador Abreo, et al. No. AO9CA 325LY
- In 2011: deposition; Raymond Towler v. Richard Dechant, Frank Ferrini, Kenneth Herron, Frank Taylor, and Cleveland Metroparks
- In 2013: deposition; Larry Davis and Alan Northrop v. Clark County, Washington and Donald Slagle, No. 3:12-cv-5765

I was contacted by Timothy O'Toole of Miller & Chevalier Chartered, 655 Fifteenth Street, N.W. Suite 900, Washington, DC concerning this case. I was asked to review materials related to an alleged eyewitness identification in 2013 relating to a shooting incident that occurred in January of 2001. I agreed to review any relevant materials and, if appropriate, prepare a report, participate in a deposition relating to my report, and, if necessary, give trial testimony. My work in connection with this case is billed at $350/hour. Travel for purposes of depositions or trial testimony is billed at $3,000/day for any full day away or $1600 for half days away. These are my standard consulting rates.

The opinions that I reach in this report are based on (1) my Ph.D. education and training in social and cognitive psychology, (2) my approximately 35 years of studies on eyewitness identification that I have conducted and published in peer-reviewed scientific psychology journals, (3) my knowledge of the published empirical work of other eyewitness scientists, (4) my study of actual cases of mistaken identification that been proven through post-conviction DNA testing, (5) my work with the U.S. Department of Justice (National Institute of Justice) on eyewitness identification procedures that included a cross-section of crime investigators from across the country, (6) my consultations and discussions with crime investigators across the U.S. on eyewitness identification procedures, (7) my studies of photo lineup filler-identifications in police departments in San Diego, CA, Tucson, AZ, Charlotte, NC, and Austin, TX, (8) my knowledge of policies and practices of crime investigators related to eyewitness identification procedures, and (9) my knowledge of investigation strategies in eyewitness cases across the United States over the last 30 years.

I reserve the right to modify this opinion based on any new information regarding the eyewitness identification matters in this case.

### General Background Information on the Social Science of Eyewitness Memory

Eyewitness identification of criminal suspects from lineups (both photo and live) can be an important form of evidence against a defendant, especially if it is corroborated by other evidence. Controlled studies in psychological science, however, indicate that people commonly make mistakes in attempting to identify a person they encountered previously. There is no single rate of mistaken identification, but instead mistaken identification rates

vary as a function of a large number of variables relating to acquisition, retention, and retrieval. Hence, the reliability of an identification depends critically on factors such as view and attention (acquisition variables), events that occur between witnessing and attempting to identify (retention variables), and the manner in which the identification test is administered (retrieval variables).

All three factors (acquisition, retention, and retrieval) are necessary for successful retrieval of an accurate memory. In other words, a problem at the level of any one of these factors is sufficient to make a memory fail. At acquisition, for instance, stress and fear reduce the amount of information that is processed, thereby severely restraining what can be retained and what can be retrieved. As a result, encountering a person under stressful or fearful conditions increases the chances that the witness will later make a mistaken identification[1].

When acquisition conditions are good, the gist of an event might be well retained (e.g., recalling that one was robbed by a dark haired man with a gun) but details are forgotten, such as what the face actually looked like, thereby making mistaken identification more likely as time passes since the event[2]. There are several published reviews of this voluminous empirical literature on eyewitness identification[3].

The scientific literature on eyewitness reliability has reached a high level of sophistication over the last 30 years. Complementing the controlled scientific studies has been the advent of forensic DNA testing of people who have been convicted and proven innocent. The use of forensic DNA testing in recent years has resulted in the exoneration of 310 individuals who were convicted by juries and, importantly, 75% of these are cases of mistaken eyewitness identification[4].

In each of these cases, the eyewitnesses were positive in their identifications and in some of these cases there were up to five eyewitnesses who all mistakenly identified the same

---

[1] E.g., Morgan, C. A., Hazlett, G., Doran, A, Garrett, S., Hoyt, G., Thomas, P., Baranoski, M., & Southwick, S. M. (2004) Accuracy of eyewitness memory for persons encountered during exposure to highly intense stress. *International Journal of Psychiatry and the Law, 27*, 265-279.

[2] Shepherd, J. (1983). Identification after long delays. In S. Lloyd-Bostock & B.R. Clifford (Eds.). *Evaluating witness evidence: Recent psychological research and new perspectives* (pp. 173-178). Chidester, New York: John Wiley & Sons.

[3] E.g., see Cutler, B. L., & Penrod, S. D. (1995). *Mistaken identification: The eyewitness, psychology, and the law*. New York: Cambridge University Press; Wells, G. L. & Loftus, E. F. (2003;2013). Eyewitness memory for people and events. In A. Goldstein, Ed. *Comprehensive handbook of psychology, Volume 11, Forensic psychology*. New York: John Wiley and Sons; Wells, G. L., Memon, A, & Penrod, S. (2006). Eyewitness evidence: Improving its probative value. *Psychological Science in the Public Interest, 7*, 45-75.

[4] http://www.innocenceproject.org/

innocent person[5]. These DNA exoneration cases corroborate the main points that have been made from the scientifically-controlled eyewitness identification studies. For example, the scientific studies show that the mistaken identifications tend to occur most often when someone other than the actual perpetrator is shown to the witness as the suspect in a lineup[6] and, in fact, every DNA exoneration case involving mistaken identification is of that type. Also, the scientifically-controlled eyewitness identification studies show that eyewitnesses can be positive and yet mistaken and that eyewitnesses often remain certain about their identification even in the face of later definitive proof that they were mistaken. The controlled scientific studies show that witnesses can be mistaken even if they claim that they paid close attention and that they had an excellent view of the perpetrator[7], which is a common pattern noted in DNA exoneration cases as well. Controlled scientific studies also show that mistaken identification eyewitnesses sometimes do not identify the innocent person in an initial identification procedure but come to identify the person in a later procedure due to exposure to that person's face in the previous identification procedure[8]. Moreover, eyewitnesses who make mistaken identifications will often be uncertain initially but their certainty grows with repeated identifications[9] and with new "information" provided later by other people that reinforces the witness's sense that they were "correct' even when they were mistaken[10].

There is general agreement in the scientific literature that a huge problem with eyewitness identification from lineups is that witnesses have a propensity to identify the person from the lineup who looks most like their memory of the perpetrator <u>relative</u> to the other lineup members[11]. This is known as the relative-judgment process. Such a

---

[5] The Kirk Bloodsworth case.

[6] Wells, G. L. (1984). The psychology of lineup identifications. *Journal of Applied Social Psychology, 14,* 89-103.

[7] Wells, G. L., & Bradfield, A.L. (1998). "Good, you identified the suspect:" Feedback to eyewitnesses distorts their reports of the witnessing experience. *Journal of Applied Psychology, 83,* 360-376.

[8] E.g., see Pezdek, K., & Blandon-Gitlin, I. (2005). When is an intervening line-up most likely to affect eyewitness identification accuracy? *Legal and Criminological Psychology, 10,* 247-263; Deffenbacher, K. A., Bornstein, B. H., & Penrod, S. D. (2006). Mugshot exposure effects: Retroactive interference, mugshot commitment, source confusion, and unconscious transference. *Law and Human Behavior, 30,* 287-307.

[9] E.g., see Hastie, R., Landsman, R., & Loftus, E. F. (1978). Eyewitness testimony: The dangers of guessing. *Jurimetrics Journal, 19,* 1-8.

[10] Wells, G. L., Olson, E., & Charman, S. (2003). Distorted retrospective eyewitness reports as functions of feedback and delay. *Journal of Experimental Psychology: Applied, 9,* 42-52.

[11] Wells, G. L. (1984). The psychology of lineup identifications. *Journal of Applied Social Psychology, 14,* 89-103; Wells, G. L., Memon, A, & Penrod, S. (2006). Eyewitness evidence: Improving its probative value. *Psychological Science in the*

strategy can work reasonably well when the actual perpetrator is in the lineup[12], but someone will always look more like the perpetrator than the other members of the lineup even when the actual perpetrator is not in the lineup. In fact, all of the DNA exoneration cases involving mistaken identification are cases in which the actual perpetrator was not in the lineup viewed by the witness. This is one reason why it is absolutely critical that a lineup (whether photographic or live) include only one a-priori suspect and the remainder are known-innocent fillers[13]. The relative-judgment process is lessened to some extent by a clear warning to the eyewitness prior to conducting the lineup that the actual perpetrator might not be in the lineup and that the eyewitness need not make an identification[14].

Under pristine conditions of testing, there is a statistically significant relation between eyewitness identification accuracy and the confidence (or certainty) of the eyewitness at the time of the identification test[15]. However, eyewitness identification confidence is readily contaminated by external information given to the eyewitness. In effect, the degree of confidence or certainty that an eyewitness holds in his or her identification is a degree of belief strength that the eyewitness has that the particular individual in question is the perpetrator. Such confidence or certainty can come from an internal source (the strength of the witness's memory) or it can come from external sources (e.g., suggestions from a lineup administrator, being told of other evidence against the accused). Studies conducted in the United States, Australia, Canada, Great Britain, and South Africa converge on the conclusion that the confidence that an eyewitness expresses in his or her identification is readily inflated if an external source suggests to the eyewitness that the person identified is he "right" person[16]. This effect is stronger for witnesses who are

---

*Public Interest, 7,* 45-75; Wells, G. L. (1993). What do we know about eyewitness identification? *American Psychologist, 48,* 553-571.

[12] The term lineup refers to either a live lineup or a photo-lineup. All of the principles and processes operating with live lineups and photo lineups are the same.

[13] Technical Working Group for Eyewitness Evidence (1999). *Eyewitness evidence: A guide for law enforcement.* Washington, DC: United States Department of Justice, Office of Justice Programs; Wells, G. L., Small, M., Penrod, S., Malpass, R. S., Fulero, S. M., & Brimacombe, C. A. E. (1998). Eyewitness identification procedures: Recommendations for lineups and photospreads, *Law and Human Behavior, 22,* 603-647; Wells, G. L., & Turtle, J. W. (1986). Eyewitness identification: The importance of lineup models. *Psychological Bulletin, 99,* 320-329.

[14] Malpass, R. S., & Devine, P. G. (1981). Eyewitness identification: Lineup instructions and the absence of the offender. *Journal of Applied Psychology, 66,* 482-489.

[15] Sporer, S., Penrod, S., Read, D., & Cutler, B. L. (1995). Choosing, confidence, and accuracy: A meta-analysis of the confidence-accuracy relation in eyewitness identification studies. *Psychological Bulletin, 118,* 315-327; Wells, G. L., Small, M., Penrod, S., Malpass, R. S., Fulero, S. M., & Brimacombe, C. A. E. (1998). Eyewitness identification procedures: Recommendations for lineups and photospreads, *Law and Human Behavior, 22,* 603-647.

[16] Bradfield, A. L., Wells, G.L, & Olson, E.A. (2002). The damaging effect of confirming feedback on the relation between eyewitness certainty and identification accuracy.

mistaken than for witnesses who are accurate. Importantly, these same studies show that such information also leads witnesses to recall that their view was better than it really was, that they paid more attention than they really did, and that they could make out

*Journal of Applied Psychology, 87*, 112-120; Charman, S. D., & Wells, G. L. (2008). Can eyewitnesses correct for external influences on their lineup identifications? The actual/counterfactual assessment paradigm. *Journal of Experimental Psychology: Applied, 14*, No. 1, 5–20; Douglass, A. B., & McQuiston-Surrett, D. M. (2006). Post-identification feedback: Exploring the effects of sequential photospreads and eyewitnesses" awareness of the identification task. *Applied Cognitive Psychology, 20*, 991-1007; Douglass, A. B., & Steblay, N. (2006). Memory distortion in eyewitnesses: A meta-analysis of the post-identification feedback effect. *Applied Cognitive Psychology, 20*, 859-869; Dixon, S., & Memon, A. (2005). The effect of post-identification feedback on the recall of crime and perpetrator details. *Applied Cognitive Psychology, 19*, 935-951; Hafstad, G. S., Memon, A., & Logie, R. (2004). Post-identification feedback, confidence and recollections of witnessing conditions in child witnesses. *Applied Cognitive Psychology, 18*, 901-912; Lampinen, J.M., Scott, J., Pratt, D., Ledding, J.K., & Arnal, J.D. (2007). 'Good, you identified the suspect…but please ignore this feedback': Can warnings eliminate the effects of post-identification feedback? *Applied Cognitive Psychology, 21*, 1037-1056; Neuscahtz, J. S., Lawson, D. S., Fairless, A. H., Powers, R. A., Neuscahtz, J. S., Goodsell, C. A., & Toglia, M. P. (2007). The mitigating effects of suspicion on post-identification feedback and on retrospective eyewitness memory. *Law and Human Behavior, 31*, 231-247; Neuschatz, J. S., Preston, E. L., Burkett, A. D., Toglia, M. R., Lampinen, J. M., Neuschatz, J. S., Fairless, A. H., Lawson, D. S., Powers, R. A., & Goodsell, C. A. (2005). The effects of post-identification feedback and age on retrospective eyewitness memory. *Applied Cognitive Psychology, 19*, 435-453; Quinlivan, D. S., Neuschatz, J. S., Jimenez, A., Cling, A. D., Douglass, A. B., & Goodsell, C. A. (2009). Do prophylactics prevent inflation? Post-identification feedback and the effectiveness of procedures to protect against confidence-inflation in earwitnesses. *Law & Human Behavior, 33*, 111-121; Semmler, C., & Brewer, N. (2006). Post-identification feedback effects on face recognition confidence: Evidence for metacognitive influences. *Applied Cognitive Psychology, 20*, 895-916; Semmler, C., Brewer, N., & Wells, G. L. (2004). Effects of postidentification feedback on eyewitness identification and nonidentification. *Journal of Applied Psychology, 89*, 334-346; Skagerberg, E. M. (2007). Co-witness feedback in lineups. *Applied Cognitive Psychology, 21*, 489-497; Skagerberg, E. M. & Wright, D. B. (2009). Susceptibility to postidentification feedback is affected by source credibility. *Applied Cognitive Psychology, 23*, 506-523; Smith, S.M., Lindsay, R.C.L., & Pryke, S. (2000). Postdictors of eyewitness errors: Can false identification be diagnosed? *Journal of Applied Psychology, 85*, 542-550; Wells, G.L., & Bradfield, A.L. (1998). "Good, you identified the suspect:" Feedback to eyewitnesses distorts their reports of the witnessing experience. Journal of Applied Psychology, 83, 360-376.

details of the perpetrator's face better than they actually could. Such information also increases the witness' willingness to testify against the person.

The critical need to assess (and make a record of) the certainty of the witness at the time of an identification is not just because of later reinforcing feedback from **external** sources that inflate witness certainty. Witnesses' own thoughts and reflections over time about their identification tend to result in certainty inflation among mistaken eyewitnesses[17]. Almost ironically, the more mental effort that a witness makes in retrieving a memory, the more certainty inflates[18]. And the mere anticipation of having to give testimony about an identification inflates witnesses' certainty in their mistaken identifications[19]. In an analysis of 161 DNA exoneration cases in which eyewitnesses' identification testimony was proffered against these innocent defendants, there is clear evidence in 91 of them (57%) that the witness was initially uncertain[20]. The actual rate of initial uncertainty in these misidentification cases is likely much higher because of failures to make any record of certainty/ uncertainty at the time of the identification. And yet, in only four of these cases did the witnesses express uncertainty when they gave identification testimony at trial. Once again, this underscores the critical need to have a clear assessment and record of the certainty of the witness at the time of the identification.

An important source of witness contamination is any procedure or confluence of events that suggests to the witness that a particular lineup member is the likely perpetrator. Contamination means that the witness's memory has been altered or that the witness can rely on something other than his or her own memory of the event. Consider some examples of suggestive contamination: If a witness to an intrusion overhears someone else mention a mustache on the intruder when he did not have one, the witness will likely describe the intruder as having had a mustache and identify someone with a mustache.[21] If a second witness learns that a first witness has identified a particular person, this makes the second witness likely to identify that same person, even when that is the wrong person.[22] Exposing witnesses to a mugshot of a person (e.g., that might have appeared in

---

[17] Wells, G. L. & Bradfield, A. L. (1999). Distortions in eyewitnesses' recollections: Can the postidentification feedback effect be moderated? *Psychological Science, 10*, 138-144;

[18] Shaw, J. S., III., Zerr, T. K. (2003). Extra effort during memory retrieval may be associated with increases in eyewitness confidence. *Law and Human Behavior, 27*, 315-329.

[19] Wells, G. L., Ferguson, T. J., & Lindsay, R. C. L. (1981). The tractability of eyewitness confidence and its implication for triers of fact. Journal of Applied Psychology, 66, 688-696.

[20] Garrett, B. L. (2011). *Convicting the innocent: Where criminal prosecutions go wrong.* Cambridge, Mass.: Harvard University Press.

[21] Loftus, E. F., & Greene, E. (1980). Warning: Even memory for faces may be contagious. *Law and Human Behavior, 4*, 323-334.

[22] Shaw, J. S., III, Garven, S., & Wood, J. M. (1997). Co-witness information can have immediate effects on eyewitness memory reports. *Law and Human Behavior, 21*,

Wells Report

the press) and then placing that person in a lineup increases the risk of that person being identified even if the person is innocent.[23] Showing the same innocent person twice (e.g., successive photo lineups or a photo lineup followed by a live lineup) can lead the witness to identify that person, especially if that is the only person in common to both identification procedures[24]. Importantly, even in the absence of reinforcement, the certainty of witnesses who make mistaken identifications inflates just from the passage of time, reflection on the choice they made, and anticipation of cross examination[25].

The reliability of an eyewitness identification depends on a large number of factors. These include the view that the witness had and whether there was a reason to attend to the person. But, view and reason to attend to the person are not sufficient for accurate identification. The DNA exoneration cases, for example, are almost all rape cases for which the witnesses had good views of the perpetrator and were motivated to attend to the perpetrator's appearance for later identification. However, as noted earlier, factors such as fear and stress interfere with memory acquisition. And, having a good "opportunity" to view (e.g., sufficient lighting, reasonable distance) does not mean that sufficient *attention* was paid to the details that are later important for purposes of recognition. A prominent example of this is the weapon-focus effect, which shows that eyewitnesses tend to focus on a weapon because it is salient and threatening and this undermines attention paid to the perpetrator [26].

Importantly, the reliability of an identification also depends critically on the way in which the identification procedure was conducted. Critical elements include (but are not restricted to) how the witness was instructed prior to viewing a lineup (the need for the

---

503–523; Hasel, L. (2009). Follow the leader: Social influences in eyewitness identification decisions. *Dissertaton Abstracts*.

[23] Deffenbacher, K. A., Bornstein, B. H., & Penrod, S. D. (2006). Mugshot exposure effects: Retroactive interference, mugshot commitment, source confusion, and unconscious transference. *Law and Human Behavior, 30,* 287-307.

[24] E.g., see Pezdek, K., & Blandon-Gitlin, I. (2005). When is an intervening line-up most likely to affect eyewitness identification accuracy? *Legal and Criminological Psychology, 10,* 247-263; Deffenbacher, K. A., Bornstein, B. H., & Penrod, S. D. (2006). Mugshot exposure effects: Retroactive interference, mugshot commitment, source confusion, and unconscious transference. *Law and Human Behavior, 30,* 287-307.

[25] Wells, G. L., & Bradfield, A.L. (1999). Distortions in eyewitnesses' recollections: Can the post-identification feedback effect be moderated? *Psychological Science, 10,* 138-144; Wells, G. L., Ferguson, T.J., & Lindsay, R. C. L. (1981). The tractability of eyewitness confidence and its implication for triers of fact. *Journal of Applied Psychology, 66,* 688-696.

[26] Tooley, V., Brigham, J. C., Maass, A., & Bothwell, R. K. (1987). Facial recognition: Weapon effect and attentional focus. *Journal of Applied Social Psychology, 17,* 845-859; Pickel, K. L. (1998). Unusualness and threat as possible causes of "weapon focus." *Memory, 6,* 277-295; Steblay, N. M. (1992). A meta-analytic review of the weapon focus effect. *Law and Human Behavior, 16,* 413-424.

Wells Report

pre-lineup admonition), how many fillers (non-suspects) were in the lineup, whether the lineup draws the witness's attention to the person the police suspect, how the fillers in the lineup were selected (so as to match the description of the perpetrator as well as the suspect does), whether there are cues from others present at the lineup, and whether there is a clear, contemporaneous record of what the witness actually said, including how certain the witness was in any pick that was made[27]. More specifically, witnesses must be explicitly warned that the person they saw might or might not be in the lineup[28], a lineup should have only one suspect and the remainder should be fillers[29], there should be nothing about the suspect's photos that makes it stand out, the fillers need to fit the eyewitnesses' description of the suspect in significant features[30], the officers who administer the lineup should be neutral parties (preferably not someone who knows which person is the suspect and which are fillers)[31], and the exact words of the witness should be taken down, including a statement of their confidence (certainty) in their own exact words that the person identified is the person whom they witnessed at the scene[32]. Furthermore, complete and accurate records need to be made of any and all photos that were viewed and any responses that were made to those photos.

True recognition memory involves what can be characterized as an "automatic" process rather than a "deliberative" process. Automatic processes are fast whereas deliberative processes are slow. Other types of memory (such as recall) can be deliberative and slow, but recognition memory occurs quickly. Consistent with this is clear evidence from scientific studies showing that eyewitness identifications from lineups that take more than 10-12 seconds are much less reliable than those that occur under 10 seconds[33]. More

---

[27] See treatments of these matters in Wells, G. L., Small, M., Penrod, S. J., Malpass, R. S., Fulero, S. M., & Brimacombe, C. A. E. (1998). Eyewitness identification procedures: Recommendations for lineups and photospreads. *Law and Human Behavior, 22*, 603-647; also U.S. Department of Justice (1999). *Eyewitness Evidence: A Guide for Law Enforcement*, Office of Justice Programs.

[28] E.g., Malpass, R. S., & Devine, P. G. (1981). Eyewitness identification: Lineup instructions and the absence of the offender. *Journal of Applied Psychology, 66*, 482-489.

[29] E.g., Wells, G. L., & Turtle, J. W. (1986). Eyewitness identification: The importance of lineup models. *Psychological Bulletin, 99*, 320-329.

[30] E.g., Lindsay, R. C. L., & Wells, G. L. (1980). What price justice? Exploring the relationship between lineup fairness and identification accuracy. *Law and Human Behavior, 4*, 303-314.

[31] E.g., see Wells, G. L., Small, M., Penrod, S. J., Malpass, R. S., Fulero, S. M., & Brimacombe, C. A. E. (1998). Eyewitness identification procedures: Recommendations for lineups and photospreads. *Law and Human Behavior, 22*, 603-647.

[32] E.g., see Wells, G. L., Memon, A, & Penrod, S. (2006). Eyewitness evidence: Improving its probative value. *Psychological Science in the Public Interest, 7*, 45-75.

[33] Dunning, D., & Perretta, S. (2002). Automaticity and eyewitness accuracy: A 10 - to - 12 second rule for distinguishing accurate from inaccurate positive identifications.

recent research shows that 10-12 seconds is not a hard-and-fast rule and that 20 or even 25 seconds might separate accurate from mistaken identifications better in some circumstances, but there is no doubt that the separation of accurate from mistaken identifications based on decision latency is a matter of seconds, not minutes[34]. For this and other reasons, it is essential that witnesses be observed in making their identification attempts and that a clear and contemporaneous written record be prepared as to their identification behaviors.

Importantly, as mistaken eyewitnesses become more certain about their identification later, they "forget" that they were uncertain at the time of the identification. Controlled scientific studies show that witnesses who are reinforced **after** they made a mistaken identification forget that they were uncertain at the time of the identification and instead report that they were certain all along[35].

It has long been known in the eyewitness science literature that once a mistaken identification is made and the behaviors of trusted others suggest to the witness that the identification was accurate, it increasingly resembles an accurate identification in the mind of the witness and in the eyes of the observer of that witness's demeanor and testimony.[36] Just knowing that they will have to testify and thinking about the upcoming questions about their identification serves to inflate eyewitness's inward feelings of certainty and their outward expressions of sureness even when they are mistaken.[37]

---

*Journal of Applied Psychology, 87*, 951-962; Sporer, S. L. (1992). Post-dicting eyewitness accuracy: Confidence, decision times and person descriptions of choosers and non-choosers. *European Journal of Social Psychology, 22*, 157-180; Sporer, S. L. (1993). Eyewitness identification accuracy, confidence, and decision times in simultaneous and sequential lineups. *Journal of Applied Psychology, 78*, 22-33; Sporer, S. L. (1994). Decision times and eyewitness identification accuracy in simultaneous and sequential lineups. In D.F. Ross, J.D Read, and M.P. Toglia (Eds.) pp. 300-327. *Adult eyewitness testimony: Current trends and developments*. New York: Cambridge University Press.

[34] Weber, N., Brewer, N., Wells, G. L., Semmler, C, & Keast, A. (2004). Eyewitness identification accuracy and response latency: The unruly 10-12 second rule. *Journal of Experimental Psychology: Applied, 10*, 139-147.

[35] See meta-analysis of the scientific literature on this by Douglass, A. B., & Steblay, N. (2006). Memory distortion in eyewitnesses: A meta-analysis of the post-identification feedback effect. *Applied Cognitive Psychology, 20*, 859-869.

[36] Wells, G. L., Lindsay, R. C. L., & Ferguson, T.J. (1979). Accuracy, confidence, and juror perceptions in eyewitness identification. *Journal of Applied Psychology 64*, 440-448.

[37] Wells, G. L., Ferguson, T.J., & Lindsay, R. C. L. (1981). The tractability of eyewitness confidence and its implication for triers of fact. *Journal of Applied Psychology, 66*, 688-696.

Retelling the story or repeatedly recalling the event leads to inflated confidence in witnesses' memories even when the memories are inaccurate.[38]

### Eyewitness Misidentification Becomes a Mix of Genuine Error, Reinforcement, and Dissonance

Considering all of these factors operating on eyewitnesses, it should not be surprising that inaccurate witnesses and accurate witnesses tend to be indistinguishable by the time they give a deposition or take the witness stand. Consider what is going on with the mistaken witness. Their errors are genuine errors (by definition of the term "mistaken," they don't know they are mistaken). The mistake is reinforced in the witness's mind by many other things, such as being greeted with approval by others involved in the case, the decision of other actors to move the case forward based on the identification evidence, and retellings of the story of identification.

Creating that kind of reality makes it difficult for individuals to ever go back and re-evaluate their identification decisions objectively. In fact, a witness cannot fully do so because the memory has evolved into a belief. The witness believes that the identified person is the perpetrator and so the identified person "becomes" the memory. A good example of this is Jennifer Thompson Canino, a woman who identified Ronald Cotton as her attacker. Eleven years later it was proven with DNA that Bobby Poole was her attacker, leading to Cotton's release. Having mistakenly identified Cotton, she could no longer identify Poole ("I have never seen that man before"). Even after knowing and accepting that DNA had proven that Cotton was not her attacker, Jennifer continued to "see" Cotton in her mind when thinking back to the assault.[39] Many other of the eyewitnesses in the DNA exoneration cases reject the DNA evidence because their false memories after all this time are too vivid and ingrained to accept as false.

Cognitive Dissonance Theory, one of the most widely accepted and best known of all psychological theories, states that people experience psychological discomfort when their beliefs conflict with their actions, especially when they perceive themselves as being responsible for those actions. It is, therefore, sometimes necessary (psychologically) for people to avoid this dissonance discomfort by maintaining beliefs that are consistent with their actions. An eyewitness is, of course, well aware of his or her actions in identifying someone from a lineup and making incriminating statements, which are used as evidence against the person. The actions, therefore, will naturally shape the belief that the identification was of the right person; after all, the belief that the person was innocent would arouse unbearable amounts of dissonance anxiety. Dissonance is not pathological process; it is a naturally occurring process in normal, healthy people. But, in this

---

[38] Shaw, J. S., III (1996). Increases in eyewitness confidence resulting from postevent questioning. *Journal of Experimental Psychology: Applied, 2,* 126–146; Shaw, J. S., III, & McClure, K. A. (1996). Repeated postevent questioning can lead to elevated levels of eyewitness confidence. *Law and Human Behavior, 20,* 629–653.

[39] Thompson-Canino, J., & Cotton, R. (2010). *Picking Cotton: Our memoir of injustice and redemption.* St. Martin's Press.

Wells Report

eyewitness context it can lead to denial ("I cannot be wrong about this"). Dissonance avoidance and reduction is not a conscious process in the usual sense of the term.

Jurors' Propensities to Trust Eyewitness Identification Testimony
Whereas cross examination might have some value in helping to sort between witnesses who are lying and those who are telling the truth, it has long been established that cross examination does not help sort between witnesses who are genuinely mistaken in their identifications and those who are accurate[40]. The tendency to over-believe eyewitnesses is especially pronounced when the witnessing conditions were particularly poor[41]. Moreover, expert testimony does not appreciably correct this problem[42]. In fact, in some of the DNA exoneration cases an eyewitness expert was permitted to testify at the original trial and yet the juries still accepted the eyewitness identification testimony and wrongfully convicted those people.

## Varda Guetta's (VG) Alleged Pick of Fawzi Murar (FM)

There are numerous factors that raise serious concerns about the reliability of Varda Guetta's alleged pick of Fawzi Murar from the photos that she was given 12 years after the shooting. In fact, the conditions for memory acquisition and memory retention are extremely problematic.

With regard to acquisition, we know from VG's deposition that the scene was at night but there were streetlights. We know that she was suddenly and unexpectedly fired upon multiple times by individuals with machine guns. She says that her primary concern was her son, who had been hit by bullets, and that she was trying to tend to her son. Hence, she was experiencing great fear, stress, and panic, each of which would impair her ability to encode details about the face of the gunman.[43] The chances that an individual under

---

[40] E.g., Wells, G. L., Lindsay, R. C. L., & Ferguson, T.J. (1979). Accuracy, confidence, and juror perceptions in eyewitness identification. Journal of Applied Psychology 64, 440-448; Boyce, M., Beaudry, J. L., & Lindsay, R. C. L. (2007). Belief of eyewitness identification evidence. In R. C. L. Lindsay, D. F. Ross, J. D. Read, & M. P. Toglia (Eds.) *Handbook of eyewitness psychology: Memory for people.* Mahwah, NJ: Lawrence Erlbaum Associates.

[41] Lindsay, R. C. L., Wells, G. L., & Rumpel, C. (1981). Can people detect eyewitness identification accuracy within and between situations? Journal of Applied Psychology, 66, 79-89.

[42] Wells, G. L., Lindsay, R. C. L., & Tousignant, J.P. (1980). Effects of expert psychological advice on juror judgments in eyewitness testimony. Law and Human Behavior, 4, 275-286.

[43] At a deposition about this incident in 2007 in *Linde v. Arab Bank*, VG testified that she couldn't identify the shooters' faces and that she couldn't tell whether the shooters were Palestinian or Israeli. (Tr. 3/18/07 25:12-26:10) At her deposition in this case in 2012, however, she testified that she was able to recognize one shooter's face and that "he had a mustache, he was dark skinn[ed], and smiled." (Tr. 6/27/12 31:23-32:7)

these circumstances could acquire the type of detailed memory for the face of a stranger that would permit a reliable identification of the gunman among a set of other dark skinned individuals with mustaches is nearly zero. The DNA exoneration cases, almost all of which are sexual assault cases, represent an interesting comparison and contrast to this case. In most of those cases, the victims had long and close views of their perpetrator, no one was firing a gun at them, and they saw the perpetrator at various angles. And yet, they all made mistaken identifications.

Reinforcing a conclusion that VG could not make out significant details of the face is the fact that she could never give a description of the person whom she saw beyond saying that he had a mustache and dark skin. Consistent with VG's first deposition in which she denied being able to identify any of the shooter's faces, VG was not asked by the police to describe the shooters following the incident and she could never describe other features such as his age, his height, his body build, his hair length, his hair style, his eyes, his nose, his general face shape, his clothing, or any distinguishing features. Although VG says in her 2012 deposition that she could still remember his face – which is inconsistent with what she testified to in her deposition in 2007– her inability to describe the person belies her claim in 2012. Instead, her purported clarity regarding a face in 2012 is likely a natural phenomenon of repeatedly thinking back to the scene and each time filling in the face with more detail out of a need to put a face on the gunman. That would not be true memory but instead a post-event construction that promotes a sense of clarity but not verity.

With regard to retention, this is an extreme case of a long retention interval. No controlled scientific studies of eyewitness identification from lineups have examined forgetting over such a long period; instead they have examined it over periods of hours, days, or weeks[44]. But science has known the general function relating the passage of time

---

[44] E.g., Shepherd, J. (1983). Identification after long delays. In S. Lloyd-Bostock & B. R. Clifford (Eds.). *Evaluating witness evidence: Recent psychological research and new perspectives* (pp. 173-178). Chidester, New York: John Wiley & Sons; Ellis, H. D., Shepherd, J. W., & Davies, G. M. (1980). The deterioration of face memory over different delay intervals. *Journal of Police Science and Administration, 8*, 101-106; Flin, R., Boone, J., Knox, A., & Bull, R. (1992). The effect of a five-month delay on children's and adult's eyewitness memory. *British Journal of Psychology, 83*, 323-336; Krouse, F. L. (1981). Effects of pose, pose change, and delay on face recognition performance. *Journal of Applied Psychology, 66*, 651-654; Laughery, K., Fessler, P., Lenorovitz, D., & Yoblick, D. (1974). Time delay and similarity effects in facial recognition. *Journal of Applied Psychology, 59*, 490-496; Walker-Smith, G. J. (1978). The effects of delay and exposure duration in a face recognition task. *Perception and Psychophysics, 24*, 63-70; see meta-analysis in Cutler, B. L., & Penrod, S. D. (1995). *Mistaken identification: The eyewitness, psychology, and the law.* New York: Cambridge University Press.

to forgetting (a negatively accelerating curve) for over 125 years[45]. Generally, eyewitness researchers have not taken eyewitness identification retention intervals beyond 12 months because by that point the rate of performance decline is well established from its baseline and memory never gets better with time. In Shepherd's (1983) work, for example, he found that an eyewitness identification accuracy at 65% at a one-week delay decayed to a mere 10% at 11 months. There was no need to test longer retention intervals in that study because the trend at that point was clear. This is not to say that the eyewitness identification accuracy rate will always be down to 10% at 11 months. The amount and rate of decay depends on numerous factors, such as the starting point (or baseline). But 12 years is an extreme amount of time passage, especially when the acquisition conditions were poor in the first place. As a scientist, I can never say that something is impossible, but considering both the poor conditions of memory acquisition and the extraordinarily long retention interval I can conclude that the reliability of any identification at this point is so close to zero as to be negligible.

The procedure used to secure VG's alleged pick of FM makes the identification in this case even more problematic. It is important first to review what constitutes a proper eyewitness identification procedure. A proper eyewitness identification procedure involves five critical elements that help safeguard against mistaken identification[46]. First, the only proper lineup identification procedure (whether photographic or live) is one in which an a-priori suspect is embedded among known-innocent fillers. In contrast, it is totally unacceptable to put together a lineup in which multiple persons in the lineup could have been the culprit. This is because the only proper lineup test is one that a witness can clearly "fail" by selecting a filler. This helps guard against witnessing merely guessing or choosing someone based on implied or explicit pressures that witnesses place on themselves or others place on the witness. By making sure that the lineup contains only one possible suspect and the remaining are known-innocent fillers, unreliable witnesses can potentially be "weeded out" by their selection of one of the fillers. Second, the fillers must all fit the verbal description that the witness gave of the culprit. Otherwise, the suspect will stand out as the one who best fits the witness's description and witnesses can narrow it down to the suspect based on mere elimination processes. Third, witnesses must be explicitly told that the culprit might not be in the lineup, that they should not guess, and that they do not need to make an identification. Fourth, the person who interacts with

---

[45] Ebbinghaus, H. (1885). *Memory: A contribution to experimental psychology*. New York Teacher's College, Columbia University.

[46] For more detailed treatments of these various points about proper identification procedures, see Technical Working Group for Eyewitness Evidence (1999). *Eyewitness evidence: A guide for law enforcement*. Washington, DC: United States Department of Justice, Office of Justice Programs; Wells, G. L., Small, M., Penrod, S., Malpass, R. S., Fulero, S. M., & Brimacombe, C. A. E. (1998). Eyewitness identification procedures: Recommendations for lineups and photospreads, *Law and Human Behavior, 22*, 603-647; Wells, G. L., & Turtle, J. W. (1986). Eyewitness identification: The importance of lineup models. *Psychological Bulletin, 99*, 320-329.

the witness regarding the lineup (e.g., delivers instructions, give the photos to the witness, observes the witness attempting the identification, takes the witness's statement) should not have direct involvement in the case (e.g., should not know which photo might be that of the suspect) but instead should be a neutral party. [This is commonly referred to as a double-blind procedure or double-blind administration.] When this is not possible or practical, the entire procedure should be videotaped. The lineup-administering party must also be made available to testify about the procedure and the witness's behaviors. Finally, immediately following the identification of any individual the eyewitness must be asked by the neutral party to state how certain she or he is that the identified person is the culprit and a clear record must be made of the answer. Collection of a certainty statement at the time of identification is necessary to prevent the certainty-inflation effects that inevitably result from later reinforcement (see earlier discussion of the post-identification feedback effect).

How does the procedure used with VG compare to a proper procedure? With respect to there being only one a-priori suspect and the remaining photos being known-innocent fillers, the evidence suggests that this was not the case. At a hearing on November 20, 2012, before Magistrate Judge Ellis, counsel for the plaintiffs stated that they intend to show VG photos and that they "picked out the names of 17 people who are people who operate in this kind of MO in that area during that time period." (Tr. 11/20/12 25:20-23) Counsel for the plaintiffs have not confirmed that the individuals in the other photos were not also potential suspects. If the others were also potential suspects, then this is not an identification test at all; there was no way to fail the test because the witness could have chosen anyone, even at random, and that person would then be named as the gunman. Even someone with no memory at all could have passed such a "test".

On the matter of the suitability of the fillers (if they were in fact fillers rather than also being potential suspects), they fall far short of meeting the criteria for a proper identification procedure. Based on VG's profoundly sparse description in her 2012 deposition, the gunman had a mustache. More than half of the photos can be eliminated on that basis alone. And, with the exception of one other individual, only the photo she picked has a mustache of any significance.

Third, VG was not given any cautionary instruction (often called a pre-lineup admonishment) warning her that the culprit might not be in the lineup, that she should not guess, and that she need not make an identification. In fact, VG testified that when she received the photos from her lawyer, she believed that they were photos of "terrorists" and that she "assumed" that the shooter was among the photos. (Tr. 5/7/13 397:14-25)

Fourth, the photos were delivered by the plaintiff's attorney, an initial examination of the photos occurred in the presence of the plaintiff's attorney, and the witness reported her pick to that same attorney. No recordings were made of any of this identification procedure and the status of the attorney makes it unclear whether he can even be deposed. As discussed previously, a proper identification procedure is administered by a neutral police officer who does not know which person is the suspect and which is the filler. A

double-blind procedure is important because it prevents an officer who is invested in closing out the case from influencing the witness's identification, even unconsciously.

Finally, there was no protocol for taking a clear statement from the witness at the time of identification with regard to her certainty and making a record of that. The identification decision was not taken at the time the photos were delivered. Instead, VG was allowed to take possession of the photos and examine them for more than 24 hours. Not only that, VG didn't speak to anyone, including her attorney, immediately after picking FM's alleged photo but instead first tried to contact her attorney "perhaps" the following night and first spoke to him the day after that, which was two days after she first allegedly picked the photo at issue. (Tr. 5/7/13 476:5-14) Recall from earlier discussion in this report that reliable eyewitness identification is a rapid process, taking mere seconds rather than minutes and definitely not taking hours. Accordingly, there has been considerable opportunity for her certainty to grow and for her to be reinforced repeatedly. Meanwhile, the defense has little chance to reveal the certainty (or lack of certainty) that she had at the time of her pick of FM's photo.

Although we do not know precisely what happened over this long period of time, VG's testimony about what happened during that 24 hour period, even if believed, casts further doubt about the reliability of the identification procedure. According to VG, she looked at the photos when she first received them from her lawyer but did not pick any photo. (Tr. 5/7/13 407:9-14 408:7-10) When VG examined the photos again later that night, she eliminated certain photos "from the outset" (Tr. 5/7/13 415:13-21) but did not pick FM's photo immediately upon viewing it. She first claimed to be certain the next day after she had viewed the photos countless times. (Tr. 5/7/13 420:12-17) VG's significant delay in picking FM's photo supports the conclusion that the identification is simply not reliable.

It is also worth pointing out that VG's potential bias may adversely affect the reliability of her identification. The vagaries of eyewitness identification discussed in this report exist despite the absence of any bias. In other words, it is generally assumed that a witness has no reason or incentive to make an identification and that any false identification was an "honest" or "innocent" mistake. The circumstances giving rise to this identification – that VG's lawsuit depends on a positive identification – coupled with VG's change of story – that she testified at the 2007 deposition that she could not recognize any of the shooter's faces but later testified that she could – suggest that VG may not be an unbiased witness, which would render her identification even less reliable.

Finally, admission of VG's identification would likely mislead the jury into concluding that there is reliable evidence that the person identified as FM shot at VG. Jurors tend to trust eyewitness identifications even when, as here, all three factors (acquisition, retention, and retrieval) show that the identification was not reliable. The risk of unfair prejudice is particularly great in this case because no police officer (or anyone for that matter) was present when VG picked what is alleged to be FM's photo. Accordingly, the defense cannot present evidence from another source about the identification procedure, but must instead rely on VG's memory.

## Summary

As this report makes clear, eyewitness identification evidence is often unreliable even under quite favorable circumstances of memory acquisition, retention, and retrieval. Both scientific studies and the DNA exoneration cases make that very clear. In this particular case, however, the conditions of memory acquisition are so poor as to render it unlikely that VG could reliably distinguish between the actual gunman and other dark skin, Palestinian-looking men with mustaches. Compounding the problem even further is the 12-year retention interval between the shooting event and the identification attempt. Having never seen the shooter again between the time of the brief chaotic shooting and the photos 12 years later, reliability at that time would be nearly zero. And the procedures used for securing a pick of a photo by VG violated at least four and possibly all five safeguards against mistaken identification. Considered in totality, I conclude that VG's pick of FM's alleged photo is not reliable evidence that the person depicted in that photo was the shooter. In my 30 plus years of experience in this field, this is one of the most unreliable identifications I have seen.

Respectfully submitted,

*[signature]*

Gary L. Wells, Ph.D.

July 15, 2013
*DATE*

Wells report

## Documents Provided to Dr. Gary Wells

1. Array of Photographs
2. Photograph of Fawzi Murar
3. Email from Robert Tolchin dated February 19, 2013, about alleged identification of Fawzi Murar by Varda Guetta
4. Transcript of Varda Guetta Deposition in *Linde v. Arab Bank* on March 18, 2007
5. Transcript of Varda Guetta Deposition in *Sokolow v. PLO* on June 27, 2012
6. Transcript of Varda Guetta Deposition in *Sokolow v. PLO* on May 7, 2013
7. Videotape of Varda Guetta Deposition in *Sokolow v. PLO* on May 7, 2013
8. Transcript of hearing in *Sokolow v. PLO* on November 20, 2012