# EXHIBIT V

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

MARK I. SOKOLOW, *et al.*,

               Plaintiffs,

        v.

THE PALESTINE LIBERATION
ORGANIZATION, *et al.*,

               Defendants.

Civil Action No. 04cv397 (GBD) (RLE)

## DECLARATION OF MICHAEL SFARD

Pursuant to 28 U.S.C. § 1746, I, Michael Sfard, declare under penalty of perjury under the laws of the United States of America, as follows:

1.     I am over eighteen years old, and I am competent to make this declaration.

2.     I am the founder of a law office in Tel-Aviv, Israel that specializes in international human rights law, international humanitarian law, and Israeli constitutional and criminal law.

3.     On July 15, 2013, I submitted an expert report in the above-referenced case, which is attached to this declaration.

4.     I wrote the attached report. It accurately reflects my opinions in this case and the reasons and bases for my opinions.

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT THE FOREGOING IS TRUE AND CORRECT.

Executed on this ___ day of April, 2014, in Tel-Aviv, Israel.

Michael Sfard

**MICHAEL SFARD | LAW OFFICE**

45 Yehuda Halevi Street • Tel Aviv, 65157 • Israel
Tel: 03.620.6947/8/9
Fax: 03.620.6950
contact@sfard.co.il

---

Michael Sfard, Adv.
Shlomy Zachary, Adv.
Emily Schaeffer, Adv.
Adar Grayevsky, Adv.
Anu Deuelle Luski, Adv.
Noa Amrami, Adv.

מיכאל ספרד | משרד עריכת דין

רחוב יהודה הלוי 45 • תל אביב • 65157
טלפון: 03.620.6947/8/9
פקס: 03.620.6950
contact@sfard.co.il

---

מיכאל ספרד, עו"ד
שלומי זכריה, עו"ד
אמילי שפר, עו"ד
אדר גרייבסקי, עו"ד
אנו דיאואל לוסקי, עו"ד
נועה עמרמי , עו"ד

## *Expert report by Adv. Michael Sfard*

### BACKGROUND & QUALIFICATIONS:

#### A. Introduction

My name is Michael Sfard. I was born in Jerusalem and am a member of the Israel Bar Association. I am the founder of a law office in Tel-Aviv which specializes in International Human Rights Law, International Humanitarian Law and Israeli constitutional and criminal law. I have an LL.B. from the law faculty of the Hebrew University of Jerusalem and an LL.M. from the University College of London ("UCL"), specializing in International Human Rights Law. Counsel for the Palestinian Authority (PA) and the Palestine Liberation Organization (PLO) have requested that I serve as an expert witness in the case of *Sokolow v. PLO* and provide my opinions on issues that are within my field of expertise including (1) the nature of custodial interrogations of Palestinian suspects in security-related investigations, the voluntariness of the statements made by the suspects during the interrogations, and the reliability and credibility of the statements made in such interrogations; (2) the structure of the Israeli Military Court system and the adequacy of the due process protections afforded to Palestinian suspects in the system; and (3) the legal status of Israeli settlements in the Occupied Palestinian Territories[1] (hereinafter: "OPT") and their impact on Palestinian communities.

---

[1] For the purposes of this opinion, which focuses on the settlements and military courts located today only in the West Bank, my reference throughout to the Occupied Palestinian Territories (or "OPT") connotes the West Bank only, and the term the "West Bank" is often used interchangeably with the OPT.

B. **Qualifications to render my opinion**

My academic studies and legal training, as well as my decade-long practice as an attorney involved in some of the most important cases challenging Israeli policies and practices in the OPT, have provided me with the knowledge base and experience in the subject matter of my opinion.

Of these experiences, I highlight the following:

- I served as the legal counsel to the Israeli human rights organization "Yesh Din" (Hebrew for "There is a law") since its establishment in 2005. Yesh Din campaigns to enhance the respect and protection afforded to basic human rights of Palestinians in the OPT through, among others things, monitoring the operation of Israeli civil and military law enforcement agencies, litigating in the Israeli courts and military tribunals, publishing reports, and representing victims of human rights abuses before Israeli military and governmental authorities.

- For the last eight years I served as legal counsel for the Settlement Watch program, which was established by and operates within the biggest and oldest Israeli peace group – Peace Now. The program monitors the establishment and expansion processes of Israeli settlements and outposts in the OPT, publishes reports and initiates litigation to halt illegal construction and land theft.

- I was the editor and legal advisor of the Yesh Din Report: "Backyard Proceedings: The Implementation of Due Process Rights in the Military Courts in the Occupied Territories" (December 2007) (hereinafter: "Yesh Din Military Courts Report").

- I was the editor, legal advisor and one of the authors of the Yesh Din Report to the UN Fact Finding Mission on Israeli Settlements (November 2012) (hereinafter: "Yesh Din Settlements Report"). The Yesh Din Settlements Report examined the impact of the settlements and the settlement policy on basic rights and freedoms of the Palestinian community in the West Bank.

2

- I was and am the lead counsel for petitioners in at least three dozen Israeli High Court of Justice (hereinafter "HCJ") petitions filed in the last eight years arising from settlement or outpost expansion activity and/or denial of access to Palestinian farm lands. In those petitions I represent Israeli organizations as well as Palestinian individuals and communities.

- I have acted as defense counsel in numerous criminal cases in both Israeli civilian and military courts.

- I interned for a year and then served as an associate attorney for five years at the Avigdor Feldman Law Office, where I was involved in defending Palestinians accused of security-related offenses.

My Curriculum Vitae is attached as Exhibit A.

## C. Biography

I was born in Jerusalem in 1972. After high school graduation I served for three years in the Israeli army as a combat medic in the infantry. After my release from mandatory service I studied law at the Hebrew University of Jerusalem, after which I completed a year-long legal internship with one of Israel's most renowned human rights and criminal defense attorneys, Attorney Avigdor Feldman (1998-99).

In 1998 I refused on conscientious grounds to serve in the West Bank city of Hebron as part of my annual army reserve duty because I was not willing to participate in and facilitate what I saw as a system of occupation that was fundamentally discriminatory and unjust. I was sentenced in a disciplinary procedure by my commanders to 21 days in a military prison, which I served in July of 1998.

I was admitted to the Israel Bar Association in 1999. I worked as an associate in Attorney Feldman's law office for another five years, though I took leave for one year to study International Human Rights Law at University College London. I received an LL.M. degree in 2001, and in March of 2004 I opened my own practice in Tel-Aviv.

3

My law office consists of six attorneys, including me, and an intern. Our clients include Israeli human rights organizations, peace groups, Palestinian individuals and communities as well as Israeli, Palestinian and international peace activists and human rights defenders, among others. We were and are involved in most areas of litigation challenging Israeli policies and practices in the OPT including, the Israeli assassinations policy, settlement construction and expansion activity, violations of property rights, freedom of movement issues, criminal proceedings in the military courts, the construction of the separation barrier, accountability for human rights abuses, violations of prisoners' rights and more. I have filed dozens of petitions to the Israeli High Court of Justice and was the lead attorney in each of them.

In June 2013 I received the Emille Grintzweig Human Rights Award, which is awarded by the Association for Civil Rights in Israel to "an individual or NGO that has made a unique contribution to the advancement of human rights in Israel."

D. **Prior testimony as expert witness** - In the previous four years I have not testified as an expert witness in any trial. I provided an expert report for the defendants and was deposed by the plaintiffs in *Saperstein v. The Palestinian Authority*. I have also provided an expert report in the case of *Shatsky v. Syrian Arab Republic*.

E. **List of publications in the last ten years**

A list of all my publications is attached as Exhibit B.

F. **Terms of engagement and compensation** – I am being compensated at the rate of $300 per hour for my services as an expert in this case. The compensation is not conditioned on the content of the opinions expressed in this report, nor is my compensation contingent on the results of these proceedings.

G. **Material considered** – In addition to the materials cited in the report, I have also reviewed the materials listed in Exhibit C.

I have also reviewed expert reports submitted by the plaintiffs. I will refer to a number of them in this report and, in large part, to Adv. Nick Kaufman's report ("The Kaufman Report").

4

5

### SUMMARY OF OPINIONS:

I render the following opinions, all of which relate to the time period relevant to this litigation:

A. On the nature of custodial interrogations of Palestinian suspects in security-related investigations, the voluntariness of the statements made by the suspects during the interrogations, and the reliability and credibility of those statements:

    1. Statements made by a Palestinian suspect during a custodial interrogation of a security-related investigation (hereinafter: "custodial statements") are usually the end product of many hours or even days of interrogation by the Israeli General Security Service (hereinafter: "GSS"; also referred to as the "Israel Security Agency (ISA)" or the "Shin Bet").

    2. Given the GSS's coercive interrogation techniques and the opaqueness of the process, there is no way to make any general or blanket assertions as to the reliability or credibility of statements made by specific suspects during the interrogations.

    3. The case files supplied by the Plaintiffs do not include the GSS investigation files so it is not possible to assess whether and to what extent coercive methods were used to obtain custodial statements. Thus any serious analysis or informed findings as to the reliability and credibility of the custodial statements supplied by Plaintiffs is not possible. In my opinion, in the absence of the complete GSS investigation files, a determination cannot be made as to whether the custodial statements supplied by the Plaintiffs are reliable or credible.

B. On the structure of the Israeli Military Court system and the adequacy of the due process protections afforded to Palestinian suspects in the system:

    1. The military courts are a unit of an occupying army, who in practice preside over alleged offenses committed only by Palestinians; Israelis accused of similar offenses are not charged in this court.

    Proceedings in the military courts in the Occupied Palestinian Territories, at the times relevant to the rulings relied upon by the Plaintiffs, do not meet

6

international law standards of due process, which is the applicable and binding legal framework for Israeli activity in the OPT.

2. Regardless of the due process issues, the procedures and practices of the military courts cannot guarantee the reliability of facts that are determined based only on a guilty plea or on an agreement between the parties as to the facts.

C. On the legal status of Israeli settlements in the OPT and their impact on Palestinian communities:

The settlement enterprise[2] constitutes a violation of customary international humanitarian law and has had, and still has, a devastating impact on the rights and freedoms of Palestinian individuals and communities.

I reserve the right to author additional opinions or rebuttal opinions as new facts are disclosed to me.

---

[2] I define the "settlement enterprise" to be the establishment of Israeli settlements, outposts, and industrial zones in the OPT, the expansion thereof, and any activity that is aimed at facilitating their development and growth.

7

DISCUSSION AND GROUNDS FOR OPINIONS

The bases for the opinions stated in the section above include the following:

## Part One:

## The Investigation and Interrogation of Palestinian Suspects

### A.  The Detention and Interrogation of Palestinians Suspected of Security-related Offenses:

1.  I am familiar with the legal framework and the actual practice of security investigations into alleged security-related offenses in Israel during the relevant timeframe for this case. Such investigations share a number of traits, including the following:

2.  **(i) GSS involvement in security-related investigations:** According to the Israeli *General Security Service Act, 5772-2002* (hereinafter: "the GSS Act"), the GSS is the Israeli authority entrusted with the protection of the security of the state from threats of terror, espionage and subversion (Article 7(a) of the GSS Act). To that end, the GSS is authorized to conduct investigations of "suspects and suspicions" of offenses aimed at damaging state security or disrupting the democratic process or institutions, and to hold investigations intending to preempt such offenses (Article 8(3) of the GSS Act).

3.  In practice, the GSS is responsible, among other things, for investigating militant Palestinians in the West Bank and Gaza, and it is also responsible for gathering information about the activity of such persons through various means.

4.  **(ii) Detention of the suspect:** The GSS investigation process is usually conducted while the suspect is in detention. If the suspect is a Palestinian resident of the West Bank, the authority for pre-indictment detention in the relevant timeframe was established by a military order, *Order Concerning Security Provisions (Judea and Samaria) (No.378), 1970*, Article 78. Pursuant to this order, investigators have the power to arrest and detain suspects for up to 8 days without a judicial arrest warrant, and a Military Court judge may prolong such detention by up to 30 days at a time, and altogether up to 90 days. There are procedures for further extension of detention in extreme cases, and the authority for such extensions lies with the Military Court of Appeals. By comparison, Israeli citizens suspected of crimes, including

8

security-related offenses, may only be detained for a maximum of 24 hours by the investigating body before they must be brought before a judge, and magistrate judges have the authority to extend such detention by up to 15 days at a time and up to a total of 30 days. There are special procedures for longer detentions, but such motions must be accompanied by the personal approval of the Israeli Attorney General or even a Supreme Court justice.

5. **(iii) Order preventing the suspect from meeting his/her lawyer:** In investigations relating to serious security offenses, the GSS has the power to prevent a suspect from meeting his/her attorney for a period of up to 30 days. All attempts to obtain official figures on the frequency of use of this measure have failed. A freedom of information petition, filed by the Israeli human rights organization Yesh Din to the Israeli HCJ in this matter, was dismissed (HCJ 2662/09 The Freedom of Information Movement, Yesh-Din et. al., v. The Prime Minister's Office et. al.). From my experience, an order preventing attorney-client meetings was usually issued when the suspect was believed to be directly involved in a terror attack.

6. **(iv) Gag orders:** The GSS may request a judicial gag order from the court prohibiting any publication regarding a security-related investigation. Most gag orders prevent publication of the fact that a suspect (or suspects) has/have been detained as well as the suspect's identity. There are no official figures regarding the frequency of such gag orders, but from my experience, many investigations into terror attacks against Israel and Israelis are obscured by gag orders preventing the media from reporting about them, until they are concluded, or at least until a very advanced stage of investigation.

7. **(v) Use of physical means of interrogation, including torture and inhumane or degrading treatment:** In 1999 the Israeli HCJ concluded that any *advance*-authorization permitting GSS investigators to use one of five physical means in interrogation of suspects is illegal (HCJ 5100/1994 The Public Committee Against Torture in Israel v. The State of Israel, PD 53(4) 817) – "the PCATI case") (emphasis added). But the Court also held that the "necessity defense," found in the Israeli Penal Code, could serve to allow GSS investigators to employ such interrogation practices and then defend them after the fact pursuant to the "necessity defense." In practice, Israeli human rights organizations have regularly documented complaints of use of physical means in GSS interrogations since the PCATI case was decided. According to the Public Committee against Torture in Israel, between 2001 and 2011 more than 700 Palestinians detained by the GSS have filed complaints alleging physical abuse. All complaints

(filed to a special ombudsman who is a GSS employee working in the Israeli Ministry of Justice) were dismissed.

8.  **(vi) GSS interrogatees are not "Mirandized" before being interrogated:** Unlike the policy and practice regarding police investigations in the United States, from my understanding, and in Israeli civilian courts, in GSS-led investigations the suspects are <u>not</u> warned that they have the right to remain silent, that anything they say may be used against them and that they have a right to consult an attorney ("the warning"). In fact, a suspect's silence can be, and frequently is, used as evidence against him or her. In 1999, the Israeli Supreme Court held that the absence of a 'Miranda'-style warning in GSS investigations does not make an admission/confession inadmissible in court proceedings, and that in security-related investigations conducted by the GSS there are ample reasons that justify refraining from warning the suspect prior to interrogation. Criminal Appeal 6613/1999 <u>Steven Smirek v. The State of Israel</u>.

9.  **(vii) The involvement of a police interrogator in GSS investigations:** In practice, GSS investigation teams are escorted by a (civilian) police officer whose tasks are, *inter alia*, to file investigation-related motions to the court (requests for gag orders, orders enabling wire-taps, orders to produce documents, etc.) and to conduct "police-style" interviews/interrogations of the suspect at the end of every GSS investigation stage. In this later role, prior to the interview/interrogation, the policeman will receive memoranda from the GSS team summarizing the investigation activities so far, and the policeman will direct the suspect to repeat things he has "already told the GSS team", this time in a written statement that begins with a proper warning of the suspect's right to remain silent and to consult an attorney.

10. **(viii) Use of informants:** In many GSS investigations the suspect is sent for a few days to a prison cell with inmates who are supposedly Palestinian members of militant groups. The suspects are then accused by their cellmates of collaborating with Israel and are threatened. This leads, in many cases, to the suspect's attempt to "legitimize" himself by describing his important role and activity in combating Israel. Many suspects who went through such investigation tricks report that they have lied or exaggerated about their activities in order to convince their cellmates that they are not collaborators. In practice, these "militant cellmates" often turn out to be informants acting on behalf of Israel who then testify against the suspect

10

reporting the cellblock statements, which if given under the said circumstances are clearly unreliable.

**B. The Reliability and Credibility of Statements Made During Custodial Interrogations:**

11. GSS investigations, as described above, seek to minimize the suspect's freedom of choice and ability to resist the demand to provide information and admit guilt. The failure to warn suspects of a right to remain silent and to consult an attorney, the lengthy period of pre-indictment detention, the isolation from the outer world (by way of gag orders and prevention of attorney-client consultation), the use of physical means of interrogation and the use of informants significantly increase the likelihood of false admissions and the disclosure of false information in general.

**C. The Reliability and Credibility of the Custodial Statements of the Detainees Involved in the Underlying Incidents in this Case**

    **i.   GSS involvement – absence of relevant material**

12. The Plaintiffs in *Sokolow v. PLO* have provided 21 military court files, which purport to contain the case files of the Palestinians allegedly involved in some of the attacks that are the subject of this lawsuit.

13. I have reviewed all 21 files. Many of them include alleged custodial statements made by suspects during their interrogations by the Israel Police. Most statements are admissions of guilt. Those statements are the primary, and in some cases only, evidence brought by the military prosecution to the Israeli Military Courts against the suspects. In some cases, the custodial statements of the suspect serve as evidence against their alleged co-conspirators as well.

14. **The files supplied by the Plaintiffs are <u>not</u> the full investigation files. In fact, they form <u>a very small part</u> of the investigation files.**

15. As explained above, security investigations are conducted by the Israeli GSS, and police interrogators interview the suspects only at the end of the GSS investigation stage. In order to fully assess the reliability and credibility of the custodial statements to the police included in the files supplied by the Plaintiffs, the full GSS investigation file must be provided. Such a file

should include memoranda from interviews with the suspects, documentation of investigation techniques, including sleep deprivation, lengthy interrogations, exposure to psychological or physical threats, solitary confinement, prevention of client-attorney meetings, gag orders, and more.

16. GSS investigations, as explained above, are conducted in an environment designed to minimize the suspect's freedom of choice and ability to resist the demand to provide information and admit guilt. There is an inherent risk that GSS investigations as described may coerce admissions of guilt. Such coercive admissions of guilt may include false admissions extracted from a suspect who has reached the condition under which he would do anything to end the interrogation.

17. In the 2012 documentary "The Gatekeepers," the former head of the GSS, Carmi Gilon, acknowledged that a suspect who was detained in the Jerusalem main GSS detention facility "would admit to killing Jesus." A suspect who is willing to confess to having "killed Jesus" to his GSS interrogators will repeat any similar false confession when a police officer enters the room and the suspect is instructed by the GSS interrogators to repeat what he already said for purposes of a police statement.

18. Hence, the GSS investigation material is central and essential to any assessment of the reliability and credibility of statements made by suspects in security investigations, even if such statements were repeated in a subsequent police interview.

19. **Assessing the credibility of the suspect's statements made in the police interview alone, without regard to, and knowledge of, the contents of the GSS investigation file, is like forming a view on the healthiness of a foodstuff according to its appearance without knowledge of its ingredients and manner of preparation.**

20. During the relevant timeframe, it was the practice of the military prosecution not to provide the defense with the GSS investigation file, unless the defense attorney specifically requested it. Experienced defense attorneys who operated in the military courts knew that they had to ask for the GSS material in order to provide their clients with an effective and professional defense.

21. I did not find in 20 of the 21 military court files provided by the Plaintiffs any sign that the defense attorneys representing the suspects in the underlying cases requested to review the GSS

12

investigation material, which suggests there was a significant failure to provide adequate representation to the suspects in these cases.

22. I understand that in August 2011 the United States District Court for the Southern District of New York, which presides over the *Sokolow* case, issued a letter of request for international judicial assistance, to the relevant Israeli governmental authority, requesting the GSS documentation of the investigations conducted into the attacks that are at issue.

23. I also understand that the Israeli authorities have not replied, and that none of the documents requested have been supplied.

24. **Under these circumstances, an analysis of the reliability and credibility of the custodial statements in the underlying cases is not possible. In my opinion, until full disclosure of the GSS investigation files allows a more specific review, the custodial statements supplied by the Plaintiffs suffer from the inherent reliability and credibility flaws described in this report. Kaufman's reliance on these statements and the derivative statements in the files produced by the Plaintiffs are therefore not a reliable methodology for determining either the credibility and reliability of the statements or due process afforded in the subsequent proceedings on which those statements were based.**

**ii. Statements recorded in Hebrew**

25. Even without reviewing the GSS files the language of the statements presents significant reliability and credibility issues.

26. All but one of the custodial statements provided by the claimants were written in Hebrew. At the end of each statement, the policeman declares in writing that the suspect has signed the statement "after it was read to him and translated [orally] to Arabic".

27. International law requires that any criminal investigation be held in a language mastered by the suspect (see, e.g. Article 14 of the International Convention on Civil and Political Rights (ICCPR) of 1966; Article 72 of the Fourth Geneva Convention of 1949). Breach of this fundamental principle would amount to a breach of the suspect's right to be notified of the charges against him/her.

13

28. Israeli law, too, is very clear that the interrogation must take place in the suspect's native language: The Criminal Procedure (Suspect Interrogation) Act, 2002 stipulates in Article 2 that "the interrogation of a suspect will be conducted in his language or in a language that the suspect understands and speaks, including sign language." Article 8 of the same Act states that "with regard to the documentation language of a suspect's interrogation in a [police] station, the following instructions shall apply: (1) if the suspect's interrogation has been documented in writing only, the documentation shall be conducted in the language of the interrogation; (2) if documenting the interrogation in the language in which it is conducted is not possible, the investigation shall be documented visually or by audio recording."

29. The above provisions led the Israeli Supreme Court to hold that breach of the duty to document interrogations in the suspect's language significantly reduces the credibility attributed to the statements, and in some cases, renders them inadmissible (see Crim. App. 1746/00 Brilev v. The State of Israel, PD 55 (5) 145; Crim. App. 788/77 Bader v. The State of Israel, PD 34(2) 818; Crim. App. 3695/99 Abu-Kaf v. The State of Israel, PD 54 (5) 547).

30. In one seminal case, the Israeli Supreme Court held the following: "In recording Musa's statements ... there was a grave defect, because although the two were interrogated in Arabic, their statements were recorded in Hebrew. As such, the interrogators did not proceed according to the requirement of Article 8(1) of the Criminal Procedure Act... The interrogators did not make use of the proposed alternatives either... We would not have attributed to the statements ... great evidentiary weight, and we even could have ignored them entirely" (Criminal Appeal 2285/05 State of Israel v. Ashak Hamed, para. 4).

31. As noted above, all but one of the custodial statements made by the suspects in the underlying cases were written in Hebrew. All of the suspects are Palestinians who are Arabic speakers, and their oral interrogations were conducted in Arabic (GSS interrogators are usually fluent in Arabic). No court file suggests that the police recorded the interview by either visual or audio means. In those circumstances, if such statements had been brought before an Israeli civilian (criminal) court, under Israeli laws of evidence, the court would have given the statements very little weight, if any.

32. The Israeli Criminal Procedure Act, however, does not apply to the military criminal justice system in the OPT.

14

33. In any event, one cannot assign any significance to the signatures of the suspects on the documents, as there is no reliable record to indicate that the Hebrew language statements contained therein accurately reflect what was said to, or by, the suspects.

# Part Two:

## The Structure of the Israeli Miltiary Court System and the Adequacy of the Due Process Protections Afforded to Palestinian Suspects

34. In this part I will analyze the institutional due process failures in the Israeli Military Court system. Where appropriate, I will address Adv. Nick Kaufman's analysis as presented in his expert report. I will also cite files supplied by Plaintiffs according to the number given to them by Kaufman (see Kaufman Report, pp. 7-8).

35. At the outset, it should be noted that according to his own description of his expertise, for nearly 20 years Adv. Kaufman has worked in the Israeli civilian and military legal systems. He began in the Legal Department of the Military Advocate General Corps (hereinafter: "MAG Corps"), where he performed his IDF service for over a year. The MAG Corps, among other things, oversaw and regulated the Military Courts, their proceedings and procedures, and the prosecution of Palestinians in the occupied territories suspected of crimes against the security of Israel (as well as other non-security related crimes). Later, for some 16 years, his work as Assistant Jerusalem District Attorney entailed, though not exclusively, the prosecution of suspects in Israel under GSS investigation for suspicion of crimes against the security of the State of Israel (hereinafter: "security suspects"), who are predominantly Palestinian citizens of Israel, or "Arab Israelis." Although today Adv. Kaufman is no longer an advocate for the State or the military in cases involving GSS investigated suspects, he continues, as he has for the last decade (since 2002) to serve in his reserve duty as a judge in the Judea Military Court (presiding over investigations and prosecutions from the southern half of the West Bank).

36. In other words, for nearly 20 years, Adv. Kaufman has represented, defended and/or adopted the practices and conclusions of GSS interrogations and interrogators. Even when he may have

15

cast doubt on the credibility of individual statements due to their particular circumstances, he has upheld the overall credibility, reliability and efficacy of the rules and procedures of the GSS and of the Military Court systems regarding security suspects, and to this day remains loyal to those systems, at least implicitly, by serving as a reserve judge in the Military Courts.

37. It is my opinion that since Adv. Kaufman has served as a military court judge in the relevant timeframe (and still does), he cannot be considered sufficiently impartial and unbiased to adequately assess the extent to which the Military Courts' investigations and prosecutions comport with due process standards. His service as a judge in that system, by its very nature, renders him bound, if not professionally then logically, to defend its fairness, decency and credibility, at least on the whole. In fact, in his expert opinion he is essentially evaluating his own work, something that cannot be claimed to be objective. Thus, Adv. Kaufman's objectivity as an expert must be called into question, and in turn the contents of his report as well.

## A.   Legal framework for establishment and operation of the military courts:

38. I am familiar with the legal framework – international as well as Israeli military – under which the military courts in the OPT operate and according to which their scope of jurisdiction is set. These include at the relevant timeframe:

   i.   The Fourth Geneva Convention Relative to the Protection of Civilian Persons in Times of War (1949) IV, mainly articles 64-68.

   ii.  Proclamation Concerning the Takeover of the Administration by the Israel Defense Forces, Proclamation (No. 1) (West Bank); Proclamation Concerning the Takeover of the Administration by the Israel Defense Forces, Proclamation (No. 1) (Gaza Strip Area); Proclamation Concerning Administrative and Judiciary Procedures (West Bank Area) (No. 2), 5727-1967; Proclamation Concerning Administrative and Judiciary Procedures (Gaza Strip Area) (No. 2), 5727-1967; Order Concerning the Establishment of Military Courts (West Bank Area) (No. 3), 5727-1967; Proclamation Concerning Entry Into Force of the Order Concerning Security Provisions (West Bank Area) (No. 3), 5727-1967; Proclamation Concerning Entry Into Force of the Order Concerning Security Provisions (Gaza Strip Area) (No. 3), 5727-1967;

16

iii.   The Order Concerning Security Provisions (West Bank) (No. 378) 5730-1970; The Order Concerning Security Provisions (Gaza Strip Area) (No. 19) 5730 – 1970;

iv.   The Defense (Emergency) Regulations, 1945; and

v.   Other relevant military orders.

## B.   The Structure and Jurisdiction of the Israeli Military Court System – A Separate System for Palestinians

39. The laws enforced on Palestinian residents of the West Bank who are suspected of committing crimes in the West Bank or in Israel against Israel or Israelis are different from those enforced over Israeli citizens suspected of committing similar or analogous crimes.

40. During the first days of Israel's occupation of the West Bank and Gaza in June 1967, Israeli military commanders established military courts in both territories with jurisdiction to try any person in those territories accused of breaching, among other things, Israeli Security (military) Legislation. Today the military courts are in operation in the West Bank only.

41. Under international humanitarian law (specifically, Article 66, et. al. of the Fourth Geneva Convention), an occupying power has the authority to establish "properly constituted, non-political military courts" to try residents of the occupied territory for offenses harming security and public order. However, Israel has deviated from its authority under international law, by both expanding and restricting the jurisdiction of its military courts.

42. According to Israeli military order in force at the relevant time (Sec. 7 of the Order Concerning Security Provisions (Judea and Samaria) (No. 378), 5272-1967), Israeli military courts have extra-territorial jurisdiction over any person, resident or non-resident, in the occupied territories, and for any offense committed within or outside the occupied territories.

43. Indeed, tens of thousands of Palestinians have been prosecuted in these courts each year for a full spectrum of crimes. Non-security related crimes (from theft and robbery to traffic violations) have made up a significant proportion of the indictments filed against Palestinians and prosecuted in the military courts over the years. As of 2006, non-security related crimes constituted over two-thirds of the indictments in the Israeli Military Courts (Yesh Din Military Courts Report, p. 42-43).

17

44. Security-related crimes prosecuted in the Military Courts range from violent crimes against Israeli civilians, military personnel or property, to non-violent crimes such as membership in banned associations or organizations that Israel has determined to advocate violence against Israel or present a threat to Israel's security, to unauthorized protest or political assembly.

45. On the other hand, as will be discussed below, according to regularly renewed Israeli emergency regulations, law enforcement over Israeli civilians in the occupied territories is delegated to the Israeli police, the Attorney General, and the Israeli civilian courts within the borders of the State of Israel.

46. As such, Israeli citizens and residents (and foreign citizens with Israeli tourist visas) arrested for crimes committed in the West Bank are arrested, processed and tried by Israel's civilian legal system, which has significantly different facilities, procedures, laws, and penalties. The Israeli civilian legal system is far more modern, and adheres much better to the set of internationally recognized due process rights. I will return to and expand upon this point below.

47. In fact, through hundreds of military orders and Knesset (Israeli parliament) legislation, Israel has created a reality of legal segregation in the West Bank. Accordingly, **different law applies to Israelis than to Palestinians living in the same territory,** the West Bank. These dual legal systems play out in the following ways and were created through the following three methods:

48. **(i) Military orders with personal application** - Over the years, the Military Commander of the West Bank has issued hundreds of orders that function as legislation by fiat. Some of them apply to the entire territory – and population – of the West Bank; others are directed at Palestinians and apply to them alone; and some apply deliberately and explicitly to Israelis. A primary example of such personal legislation is the "Seam Zone Permit Regime". This is a Closed Military Zone Order encompassing approximately 2.5% of the West Bank and establishing a vast legal and bureaucratic arrangement, under which entry to and exit from the "Seam Zone" *by Palestinians only* requires the proper permits. This arrangement creates grave hardships on Palestinian daily life, from accessing land for agricultural purposes, to travelling to and from work, school, and hospitals, to maintaining contact with friends and family located outside the "seam zone." On the other hand, the order and its legal structure exempt Israelis (and tourists holding Israeli visas) entirely from any permit requirements.

18

49. (ii) **The importation of Israeli law (mainly administrative) into the settlements** – This legal technique is called "channelling": via two broad military orders regarding the regional and local settlement councils, from 1979 and 1981 respectively, the Military Commander serves as a channel for applying Israeli Knesset legislation enacted within the State of Israel to Israeli settlement areas.

50. The majority of the legal provisions channelled into the law applying to settlement areas in the West Bank regulate the status and authority of the Israeli authorities and governmental institutions within the boundaries of the settlements, including in the following areas: welfare, family law, statistics, education, health, labour, agriculture, housing, environment, consumer protection, industry, trade and communications. It is this channelling that grants the Israeli Ministry of Education, for instance, authority over schools within the boundaries of the settlements, grants the Israeli Ministry of Health authority over medical facilities, and so forth. The overall impact of this channelling, or importing of Israeli administrative law into the settlements, is that it creates *de facto* Israeli enclaves or "islands" of Israeli law within the West Bank.

51. (iii) **Israeli legislation granted extraterritorial application** – Certain primary legislation enacted by the Knesset provides personal-extraterritorial application over Israelis residing or located in the West Bank (rather than territorial application, as is customary). Similarly, Israel's secondary legislator (the executive branch) is authorized to institute regulations and issue various decrees, the application of which is also personal-extraterritorial, over Israelis in the West Bank.

52. The most outstanding, and perhaps the most important, example of this sort of legislation is the law extending the power of the Emergency Regulations (Judea and Samaria and the Gaza Strip – Adjudication of Offences and Legal Aid), 1977, authorizing the courts and tribunals in Israel to adjudicate matters involving Israelis and events occurring in the West Bank *according to Israeli Law*. Among other such matters, these Regulations authorize Israeli criminal courts to try Israeli civilians suspected of committing criminal offences in the West Bank, according to the penal code and criminal procedure laws of the State of Israel.

53. The result is the creation of two **parallel criminal legal systems.** As such, two neighbours, a Palestinian and an Israeli, residing in the same territory (the West Bank), suspected of the same

19

crime, can be arrested, interrogated, prosecuted and sentenced in vastly different systems that operate according to vastly different procedural and substantive laws.

54. For instance, if an Israeli West Bank resident (a settler) is suspected of manslaughter, he will be arrested by the Israeli Police and questioned by them. He will have the right to consult with his lawyer immediately. He can only be held in custody for up to 24 hours and then an extension of his detention and interrogation must be sought, which requires that he be brought before a judge. Should he be indicted, he will be entitled to publicly funded counsel if he cannot afford a lawyer, and he will be tried in Hebrew (with few exceptions his native tongue, and when needed translation will be provided) and afforded the high level of due process protections present in the Israeli criminal justice system. If convicted, he will be subject to a penalty of up to 20 years in prison, which is the maximum penalty for manslaughter in the Israeli criminal law.

55. If his Palestinian neighbour is suspected of manslaughter, he will be arrested by any number of authorities (the Israeli Police, the IDF or the Border Police). He can be held and interrogated for up to 8 days before he must be brought before a judge, and the power to extend his detention rests with a military judge. Procedures to prevent him from meeting and consulting an attorney are available and allow longer prevention. If indicted, he will have to secure his own lawyer (there is no public defender system in the Military Courts). He will be tried in Hebrew (with few exceptions a language which he has not mastered and usually does not even speak) in the Military Court system, which as will be expanded later in this report, falls short in almost every area of the fundamental due process rights required under international law, and certainly cannot be compared to the level of rights guaranteed in the system that would try him, were he an Israeli civilian. If convicted, he will be subject to life sentence, which is the maximum penalty for manslaughter in the military court.

56. It should be noted that almost without exception ideologically-motivated crimes committed by Israeli civilians in the West Bank, the equivalent of which, if committed by a Palestinian, would be treated as security offenses, are tried as regular crimes in the Israeli civilian criminal justice system. That said, were an Israeli settler to be suspected of a security offense, such as membership in a terror organization, he would still be tried in the Israeli civilian court system, be subject to the Israeli criminal procedure and enjoy the due process rights enshrined in Israeli law described above. The only difference would be that his attorney-client meeting could be

20

postponed with the approval of the Supervising Police Officer for up to 48 hours under certain exigent circumstances (as opposed to 24 were he a non-security prisoner), and under additional extreme circumstances, for up to 10 additional days and, upon approval of the Chief District Court Justice and the Attorney General, up to 21 additional days. The remainder of the procedures and proceedings would be identical to those of the Israeli civilian criminal justice system.

57. In sum, the outcome of all the aforementioned legal procedures is the same: one set of harsher laws is applied to a *Palestinian* in the West Bank and another set of more lenient laws to an *Israeli* in the West Bank.

58. The military court system, the subject of my analysis in this part, exclusively tries Palestinians who have allegedly committed crimes in the West Bank or Israel. Israelis who are charged with committing crimes in the West Bank or Israel (and usually foreign nationals as well), will be tried in the Israeli magistrate's and district courts. This legal segregation alone is an affront to justice and human dignity.

## C. The Structure and Goals of the Israeli Military Court System

59. The military prosecution in the West Bank, as well as the military courts, form a justice system in which soldiers and army officers are appointed to prosecute and try civilians; in which the judges, prosecutors and administrative staff are Israelis and the defendants are Palestinians; in which the courts are an army unit and thus are committed to the goals of that army.

60. It is important to further understand that the military courts are a body of a government which, almost five decades ago, established in the OPT (then both the West Bank and Gaza) a non-democratic regime. The military courts are a central mechanism used by that regime to secure domination over the occupied territory and to suppress resistance by its inhabitants, the Palestinians.

61. As such, and taking into account the institutional due process failures detailed herein, it is my experience that many defense attorneys who act on behalf of defendants in the military court system do not trust it as a serious, impartial, professional and just judicial system, and thus, instead of investing their energy in litigation, are focused on securing plea bargains for their clients.

21

62. In fact, the military court system directs all parties to plea, and everyone involved is under pressure to do so – the defendants and their families who do not trust the court, the defense attorneys who do not believe they can reach a satisfactory result through full litigation of the matter, and the judges and military prosecution who understand that the military courts could not deal with the workload if more than a tiny fraction of cases would undergo a full evidentiary trial.

63. The ultimate result is a system that generates a judicial product that is infected with, and susceptible to, extreme injustice.

64. Given all the above, it is no wonder that when Israeli authorities apprehended Marwan Barghouti, a decision was made to hold his trial in the Tel-Aviv district court rather than -- as was and is the practice – in the military court system. Israel could not take the risk that such a high profile case, with worldwide interest, would be held in a system that suffers from so many due process flaws. Israel could not, and would not, take the chance that journalists from all over the world would be exposed to the military court system, an exposure that undoubtedly would undermine the reputation of the Israeli justice system. Barghouti's trial began in 2002 and ended in 2004, exactly in the timeframe in which most of the trials of the suspects charged with the attacks that are the basis of the claim at hand took place in the military court system.

**D. Legal framework for due process rights:**

65. The main sources of international law standards of due process include the following treaties and conventions (which have been applied and interpreted by international and domestic tribunals).

    i.    The Universal Declaration of Human Rights, 1948;

    ii.    The International Covenant on Civil and Political Rights, 1966 (including General Comments issued by the UN Human Rights Committee);

    iii.    The European Convention for the Protection of Human Rights and Fundamental Freedoms; The Inter-American Convention on Human Rights; The African Charter on Human and People's Rights; The UN Convention on the Rights of the Child (including General Comments issued by the UN Committee on the Rights of the Child);

22

    iv.    The Fourth Geneva Convention of 1949;

    v.    ICRC study of the rules of customary international humanitarian law (mainly rules 100-103);

All of the above are recognized and relied upon sources of international law according to Art. 38 of the Statute of the International Court of Justice.

66. Based on the sources listed above, the fundamental due process rights of a criminal suspect or defendant include the following:

    i.    The right to presumption of innocence;

    ii.    The right to a public trial;

    iii.    The right to be notified of the charges;

    iv.    The right to legal counsel and the right to prepare an effective defense (including the right to interpretation of the proceedings and to translation of relevant material into a language understood by the defendant or suspect);

    v.    The right to trial without undue delay; and

    vi.    The right to make arguments, present evidence and cross-examine witnesses.

**E. Failures of due process in the Israeli military courts – in general:**

67. Based on my review of the sources described above and my own experience, review of previous studies, conversations with Israeli and Palestinian attorneys who participate in military court proceedings, and my work as editor and legal advisor on the Yesh Din Report "Backyard Proceedings" (December 2007) (hereinafter: "Yesh Din Military Courts Report"), I **conclude that the Israeli Military Courts failed, in the relevant timeframe, to safeguard each of the due process rights mentioned above.**

68. The support for the foregoing conclusion is reflected in the Yesh Din Military Courts Report which I have attached to this report.

23

69. The Yesh Din Military Courts Report was a result of a collaborative enterprise of Yesh Din professional staff and volunteers which included an unprecedented extensive study of the work of the military courts through the examination of three types of information: (a) more than 800 observations of military court hearings conducted by Yesh Din volunteers; (b) interviews with military court personnel and defense attorneys; (c) publicly available information and information gathered through freedom of information proceedings. The data contained in the Yesh Din Military Courts Report, and as such my opinion herein, refers exclusively to the years leading up to the report's publication at the end of 2007, which are the years relevant for the legal proceeding at hand.

70. The Israeli Military Courts failed to protect each of a suspect's fundamental due process rights. Below are some examples of the repeated failures:

71. **(i) Right to be notified of the charges:** The Israeli Military Courts failed to supply the defense with an Arabic translation of the indictment and the investigation material. The Kaufman Report notes that "most counsel practicing before the military courts, save a few exceptions, understand and speak both Arabic and Hebrew" (p. 5). This is a misunderstanding of the right to understand the charges and evidence against the suspect. If the defendant does not understand the investigation material he will not be fully aware of the evidence presented against him, and he will not be able to assist his lawyer. These are the exact failures that the right is meant to preempt.

72. **(i) Right to interpretation**: The Israeli Military Courts failed to supply professional legal interpreters in court, and, as a result, failed to ensure that the defendant understood the proceedings and could mount an effective defense. The Kaufman Report states that native Arabic speakers (Druze or Bedouin soldiers serving in the military court unit) interpret the proceedings for the accused (p.5). The Druze and Bedouin soldiers are not trained in the law and receive minimal training before they are put to work as interpreters. The Yesh Din Military Courts Report study concluded that in practice those "interpreters" interpret the proceedings in full in only a small minority of cases. Of 648 observations conducted by Yesh-Din, only 23% of the hearings were translated fully (Yesh Din Military Courts Report , p. 149).

73. **(iii) Right to legal counsel (1):** In contravention of Article 76 of the Fourth Geneva Convention, which requires the occupying power to detain protected persons inside the

24

occupied territory, Israel detains Palestinian prisoners in facilities inside Israel. The majority of Palestinian attorneys are not allowed to enter Israel and therefore have no physical access to their clients. Attorney-client meetings are essential to preparing a defense and thus the right to the adequate assistance of counsel is severely limited in the majority of cases, as Palestinian West Bank resident attorneys comprise the majority of attorneys representing Palestinian suspects and defendants in the military courts (see Yesh Din Military Courts Report, p. 108).

74. **(iv) Right to legal counsel (2):** Even where physical access by the attorney is not a barrier, such as in cases in which the defense attorney is an Israeli citizen or resident, or the Palestinian attorney has a permit to enter Israel, attorney-client meetings may be barred or delayed for up to 30 days, as noted above. Such delays effectively bar a suspect's right to consult with an attorney during the course of investigation and present a significant obstacle to the preparation of an effective defense (see Yesh Din Military Courts Report, p. 111).

75. **(v) Right to effective defense:** Military orders and military court rulings during the relevant timeframe, on which defense attorneys in the military courts must rely in presenting legal arguments on behalf of their clients, were not always published in full or were available only in places where most Palestinian attorneys do not have physical access, such as in the IDF Civil Administration offices (see Yesh Din Military Courts Report, p.79-89). This created a significant barrier to the ability of the majority of defense attorneys in the military court system to provide adequate legal representation.

76. **(vi) Presumption of innocence, right to trial without undue delay:** Given all of these failures and others, it is not surprising that only 0.29% of defendants whose trials were concluded in 2006 were acquitted (23 out of 9,123 cases). Additionally, pre-trial and trial proceedings in the military courts are prolonged for long periods, reaching up to several years (See Yesh Din Military Court Report, p. 69-70, 130).

77. **(vii) Right to be tried by a competent professional and impartial tribunal:** Military courts are made up of a three-judge panel. Until 2002, one of the three judges was a jurist (a military judge with a legal education) while the other two were lay judges who were IDF officers with no legal training. As of 2004, the permanent military courts' judges must have at least five years' "legal experience" and appeals court judges must have seven. In practice, most of them are trained lawyers, many of whom have served in the MAG Corps, but not all of whom

25

necessarily have a background in criminal law. Alongside these judges, two reservists who are also lawyers typically sit, but they do not necessarily practice criminal law during the remainder of the year when they are not serving their reserve duty. According to data provided to Yesh Din by the IDF Spokesperson, at the end of 2006, there were 14 permanent military judges and approximately 140 reservist judges serving in the military courts (see Yesh Din Military Courts Report, p. 47-51). Thus, everyone involved in the Military Court process, except for the defendant and his or her lawyer, is part of the same military system including the judges, prosecutors, translators, clerks, guards, etc.

78. **(viii) Right to a public trial:** The Israeli Military Courts failed to hold trials and court hearings open to the public. The Kaufman Report discusses at length the right to a public hearing and uses NGO entrance and family member entrance as examples of how the hearings are public (p. 5). The Israeli Military Courts limited access to the hearings to just two family members per detainee, however. Additionally, any member of the public who wishes to observe the proceedings is required to apply for a permit to enter the compound (see Yesh Din Military Courts Report, p. 82-84).

79. Several procedural and evidentiary features of the Israeli Military Court system are also relevant. They include the following:

    a.    The trials in the military courts are always trials by a judge or a panel of judges, which, as mentioned above, are usually composed of a permanent military judge and reservist lawyers not necessarily trained in criminal law. The military courts do not hold jury trials.

    b.    The right against self-incrimination, as practiced in the Israeli Military Courts and in the Israeli criminal courts, does not entail a prohibition on using the defendant's silence against him or her. As a matter of fact, the law applicable in the military courts provides that a defendant's choice to remain silent is considered as having corroborative weight to the incriminating evidence produced against him or her.

    c.    According to the rules of admissibility which apply in the Israeli Military Courts and are based on Israeli law and jurisprudence, an out-of-court statement of a witness is admissible if the witness's testimony in court is materially different from his or her out-of-court statement, and he is available for cross examination. There

26

are however exceptions which allow the admissibility of out-of-court statements even when cross examination or **effective** cross examination is not possible: Taking the stand satisfies the requirement of availability for cross examination, even if the witness refuses to testify, does not answer questions or "babbles" (replies illogically to questions). An out-of-court statement is also admissible when the court is satisfied that the unavailability of a witness for the trial is a consequence of an unlawful act which deterred or prevented the witness from testifying, even if the act is not attributed to the defendant. Kaufman fails to mention these exceptions to the requirement that effective cross examination is enabled as a precondition to admissibility of witness out-of-court statements (see page 4 of his report).

Therefore, if the evidence brought against an accused includes the out-of-court statement of an accomplice witness who decides not to answer questions in cross examination or is not available at all because he was assaulted or intimidated even if through no fault of the accused, and the accused chooses to refrain from testifying in the trial, the court, in this theoretical example, will be allowed by law to admit the out-of-court statement and convict the defendant solely on that statement with the corroborative weight of the defendant's silence.

### F. The reliability of in-court admissions of facts by defendants

80. Of the 21 case files that the Plaintiffs provided, only 5 of them involved a detailed judgment by the military court analyzing evidence and determining facts (defendants: Munther Mahmood Khalil Nur [case no.1],Nasser Jamal Mussa Shawish [case no.3], Ibrahim Hamed [case no.7], Fares Ghanem [case no.11], Majid al-Masri [case no.12 ). The remaining 16 cases were resolved by a guilty plea or an agreement between the parties as to the facts leaving the court only to assess the legal implications. In 8 of these cases a guilty plea was entered as part of a plea bargain which included admission of an amended indictment (defendants: Abd el Karim Aweis [case no.2], Kahira Sai'd Ali Sa'adi [case no.4], Sana'a Mohammed Shehada [case no.5], Mohammed Musleh [case no.9], Mohammed Sami Abdallah [case no.10], Ibrahim Abd al Hai [case no.19], Bashar Barghouti [case no.20], Ezz-a-din Hamamra [case no.21]); in 3 cases the accused entered a guilty plea without any agreement with the prosecution (defendants: Abdallah Barghouti [case no.6], Ahmed Barghouti [case no.8], Mohammed Issa Mohammed Ma'ali [case no.17]); and, in 5 other cases the parties agreed on the submission of evidence, and

thus on the facts, and argued only about the legal conclusions from those facts (defendants: Ali Mohammed Hamed Abu Hliel [case no.13], Abd al Rahman Muqdad [case no.14], Hilmi Abd al Karim Hamash [case no.15], Ahmed Salah Ahmed Salah [case no.16], and Ahmed Mohammed Ahmed Sa'ad [case no.18]).

81. In other words, in eleven cases the military court rendered judgments convicting the defendants based on a guilty plea, and in another five cases the military court was relieved of the task of ascertaining facts, as they were agreed upon by the parties.

82. It is my opinion that regardless of the due process issues addressed above, the procedures and practices of the military courts cannot guarantee the reliability of a fact determined in a ruling that is based on a guilty plea or an agreement between the parties as to the facts.

83. The reasons for my opinion are the following:

84. **(i) No verification of facts or allocution:** The military courts do not ask a defendant who is entering a guilty plea (as part of a plea agreement or without), to agree to a proffer of facts in open court. Instead, after the defense attorney has announced the decision of a defendant to enter a guilty plea, the judge will simply ask the defendant if he/she admits the content of the indictment (or the amended indictment). If the defendant says yes or "I confess" the judge will not inquire further. As discussed above, the defendant will not have received a translated copy of the indictment and no one will confirm that the defendant knows what is in the indictment.

85. Following a guilty plea, the military court will render a very short judgment convicting the defendant of the offences. The court usually will not detail the facts which constitute the offences. During the sentencing phase, the court will simply "copy and paste" the facts as described in the indictment. This means that no real procedure has been conducted to verify the accuracy of the facts that the defendant has affirmed in his guilty plea.

86. **(ii) Many of the facts are immaterial to defendant's guilt and severity of the crime:** It is clear that many of the facts contained in the indictments do not reflect the defendant's guilt or severity of conduct. Thus, even if one accepts the notion that admission of guilt has inherent reliability (a notion I reject as explained herein), one cannot attribute inherent reliability to facts that were confirmed by a defendant as part of an admission of guilt, but do not reflect on his/her moral and legal responsibility.

28

87. **(iii) Some defendants exaggerate their guilt:** While in the "normal" criminal case it may be expected that a defendant will minimize his involvement in the alleged crime in anticipation of acquittal or in hopes of reducing his sentence, this 'normal' behavior is often not true of Palestinian defendants who are charged with crimes against Israel/is. Many see themselves as "freedom fighters" and "soldiers of their people." They are seen by their communities as heroes and leaders. Because defendants do not believe that they will receive a fair judgment or sentence, they often perceive it as being in their interest to enhance their conduct in order to increase the respect they and their families receive from large sections of Palestinian society.

88. Hence, the "normal" logic that leads "normal" defendants to minimize their role in the crime does not always operate when dealing with ideologically driven Palestinian militants. There is always the risk that a defendant of this type will gladly admit to facts which portray him as a central figure responsible for much more than he actually was.

## G.  Due process issues arising from the military court files supplied by claimants:

89. **Missing documents:** As noted above, the Plaintiffs provided 21 military court files, documenting 21 cases brought against 21 Palestinian defendants who were charged with involvement in attacks against Israeli civilians, which are the subject of this lawsuit.

90. All 21 defendants in the military court trials were convicted. Some of them pleaded guilty, while others were convicted at trial based almost exclusively on their custodial statements. The custodial statements were the primary, and, in some cases, only, evidence against the defendants.

91. As previously discussed, the military court files do not include the investigative documents which detail the process leading up the defendants' alleged confession or that of their co-conspirators.

92. In addition to the absence of investigative documents, the files provided by the Plaintiffs do not include the following important judicial records:

   a.  Transcripts or even minutes of pre-trial detention hearings; and

29

b. Immunity certificates issued to withhold disclosure of evidence. According to the evidence law applicable in the military courts, the prosecution may file a certificate signed by the military commander of the Israeli forces in the West Bank to the court which lists evidence relevant to the trial which must remain classified and cannot be used by any of the parties. The defendant may ask a Military Appellate Court judge to review ex parte the classified evidence and if the judge concludes that it may assist the defense, s/he must instruct the prosecution to either disclose the evidence or to withdraw the indictment against the accused. In practice, it is extremely rare that such evidence is disclosed. **In none of the case files which were provided by the Plaintiffs did I find a trace of the defense invoking a Military Appellate Court review of the classified evidence.**

93. In addition to the broader institutional due process failures enumerated above, there are more specific failures apparent on a case-by-case basis, including:

94. **(i) Lack of Translation:** The indictment, investigation file and trial minutes are all in Hebrew. This means that the defendants, all of whom are Palestinian and most very likely did not read, speak, or understand Hebrew, would have had great difficulty understanding the charges they were facing and the proceedings taking place. This also means that they would be significantly limited in participating in their defense.

95. **(ii) Inadequate Representation:** There were significant limitations on the ability of the lawyers to provide adequate representation, including:

a. Orders prohibiting client-attorney meetings: Without the ability to review the investigation files we cannot know which of the 21 defendants was barred from meeting an attorney in the pre-trial investigation phase, and for how long. My experience is that **in most security investigations conducted by the GSS against suspects of terror activity a defendant is denied access to his attorney.** I therefore believe that most, if not all, of the 21 defendants were barred from meeting their attorneys and receiving legal advice, at least in the initial stages of their interrogation. Usually the ban on such meetings is only lifted once the suspect has confessed and incriminated himself and/or others.

30

b. <u>Failure to request GSS files</u>: As mentioned above, only one of the trial files showed that defense counsel had received the GSS investigation files. If only one of the defense attorneys received the GSS investigation material, it means that there was a significant failure to provide adequate representation to the defendants.

c. <u>Waiver of defense of the right to cross-examine adverse witnesses</u>: In many of the cases the defense simply agreed that the incriminating out-of-court statements of others would be admitted at trial. The defense even waived the right to cross examine the prosecution's witness(es). An example of this is case number 3262/02 (defendant – Fares Ghanem), in which the defense agreed in four consecutive hearings to the admission of out-of-court statements of adverse witnesses, and waived the right to cross-examine any of the witnesses. In fact, only in 5 of the 21 trials did cross examination take place at all. There is no evidence that any such failures of counsel were understood, let alone approved, by the defendants who were thereby convicted.

d. As explained above, in none of the case files which were provided by the Plaintiffs did I find a trace of the defense requesting a Supreme Court review of the classified evidence.

96. **(iii) Denial of right of cross-examination.** As explained above, the law in the Israeli Military Courts allows admission of out-of-court statements without cross-examination.

a. In the trial of Majd al-Masri (number 12), for example, the court admitted into evidence eight incriminating out-of-court statements allegedly made by witnesses who in court either denied those statements or refused to testify or answer questions posed by the parties. The right to cross examine witnesses was denied in this case.

b. It is no wonder that in Kaufman's analysis of the Al-Masri case, he wrote that: "the evidential hearings were conducted in a textbook fashion with no out of the ordinary occurrences." In the case of the Military Courts, it is "the textbook" itself that results in the regular denial of due process to the accused.

97. **(iv) Failure to investigate allegations of torture in custody:** In four cases allegations of physical and mental abuse in interrogation were raised.

31

a. Admission of witness testimony given under the use of physical abuse or torture:

98. In the Nasser Shawish case (3739/02, case number 3) four witnesses testified that they were abused, intimidated and coerced to sign statements. As they were prosecution witnesses and not the accused, no "trial within a trial" to verify admissibility of their out-of-court statements was conducted, and all of their out-of court statements were admitted.

99. In the Ibrahim Hamed case (4646/06, case number 7), two of the witnesses on whose incriminating statements the defendant's conviction was based raised allegations at trial of physical abuse during their GSS interrogations. One claimed that he identified the defendant in a photograph presented to him only when he was beaten, badly bleeding and nearly unconscious, and denied the veracity of his statements given under interrogation. A GSS investigator confirmed at trial only that he had "slapped" the witness and invoked the "necessity defense." The witness was declared a hostile witness and all of his out-of-court statements, including his identification of the defendant, were admitted.

100. A second witness claimed that his incriminating statements about the defendant were taken while under physical abuse, including beatings. One GSS interrogator confirmed that he had slapped the witness and forced him to sit in uncomfortable and painful positions, invoking the "necessity defense." Another GSS interrogator confirmed having witnessed the above. The witness was declared a hostile witness and all of his out-of-court statements were admitted.

101. It should be noted that during trial, both of the above witnesses insisted that their custodial statements had been made only because of the physical coercion to which they were subjected.

b. Admission of defendant confessions given under the use of physical abuse or torture:

102. Two of the witnesses in case number 3 mentioned above were themselves defendants in other cases (Kahira Sa'adi 3529/02, case number 4, and Sanaa Shehade, 3544/02, case number 5). They alleged, *inter alia*, physical abuse, threats of rape, threats to arrest family members, long solitary confinement and intimidation. From the files I have received it seems that both pled guilty before the question of their out-of-court statements' admissibility was examined.

103. **(v) Long detention periods:** Cases in the Israeli Military Courts drag on for years. Most of the accused in the cases at issue in this lawsuit were held several years in detention before their

32

trials were concluded. Shorter trials were secured by those defendants who confessed in court to the charges (in the framework of a plea bargain or without).

# Part Three:

# The Settlement Enterprise and Its Impact on Palestinian Communities

**A. Legal authorities for the opinion on the legality of settlements:**

104. The following are the legal authorities upon which I am basing my opinion in this section:

i. Article 49 of the Fourth Geneva Convention (1949);

ii. The Rome Statute of the International Criminal Court (1998);

iii. The International Court of Justice ruling in the case concerning *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory* (2004);

iv. Additional decisions, resolutions and declarations of UN bodies, including Security Council and General Assembly, UN treaty bodies and UN specialized agencies;

v. Academic writings of international law experts;

vi. Declarations of heads of States.

vii. The recent report of the UN independent international fact finding mission set to investigate the implications of the Israeli settlements on the civil, political, economic, social and cultural rights of the Palestinian people throughout the Occupied Palestinian Territory, including East Jerusalem (February 7, 2013);

viii. Dozens of Israeli High Court of Justice rulings affirming the Occupied status of the West Bank.

33

105. Based on the above I conclude, as have all international bodies and most nations and scholars, that Israeli settlements in the OPT are illegal.

106. Based on my experience and familiarity with the Israeli settlement enterprise, I also conclude that the prohibition set in international law seeks to prevent the exact danger that the policy of settlements in the OPT has created and continues to create.

## B.  The International Community's Consensus on the Illegality of Settlements in the West Bank

107. Following the end of the British Mandate, the State of Israel was created in part of what had been Mandatory Palestine by a United Nations (UN) partition with the aim of establishing two democratic states – one with a Jewish majority and the other with a Palestinian Arab majority (see UN General Assembly Resolution 181 (II), 1947). Following the 1948-49 civil war in Mandatory Palestine and simultaneous war between Israel and the Arab countries, an inviolable Armistice Line (Green Line) was established by agreements between Israel and the Arab states of Egypt, Lebanon, Syria and Jordan in 1949, which replaced the borders from those of the "UN Partition Plan" (see UN Security Council (UNSC) Resolution 72, February 23, 1949. [S/1264]; UNSC Res. 72, March 23, 1949. [S/1296]; UNSC Res. 72, April 3. [S/1302]; UNSC Res. 72, July 20, 1949. [S/1353]). The Armistice Agreements must be read in conjunction with UN Security Council Resolution 62 of 16 November 1948, which obliged the parties to establish "permanent armistice demarcation lines" in order to ensure "the transition to permanent peace in Palestine" ([S/1080]).

108. Following the 1967 war between Israel and its Arab neighbors, Egypt, Jordan and Syria, which resulted in Israel taking belligerent military control of the West Bank and East Jerusalem, among other territories, the UN Security Council began expressing its consistent and continuous position that these territories are occupied and must be returned (see United Nations Security Council Resolutions 242 and 338). East Jerusalem was annexed by Israel in 1980, but this annexation has not been recognized by any state (see UN SC Council Resolution 478).

34

109. Since 1967, numerous UN General Assembly and Security Council resolutions, as well as the reports and General Comments of the human rights bodies, have reinforced the position that Israel is occupying the West Bank and have reiterated the prohibition under international law on the establishment of Israeli civilian settlements there (namely according to the Fourth Geneva Convention, Article 49(6)). Included among them are: UN General Assembly Resolutions: 446, 465; UN Human Rights Committee General Comments on the civil and political rights violations caused by the settlement enterprise in the OPT: U.N. Doc. CCPR/C/79/Add.93 (1998); U.N. Doc. CCPR/CO/78/ISR (2003); U.N. Doc. CCPR/C/ISR/CO/3 (2010); Opinions published by the Committee on the Elimination of all Forms of Racial Discrimination on the impact of settlements: U.N. Doc. A/49/18, paras. 73-91 (1994); U.N. Doc. CERD/C/304/Add.45 (1998); U.N. Doc. CERD/C/ISR/CO/13 (2007); U.N. Doc. CERD/C/ISR/CO/14-16 (2012); Reports of the Committee on Economic, Social and Cultural Rights on the settlements: U.N. Doc. E/C.12/1/Add.27 (1998); U.N. Doc. E/C.12/1/Add.90 (2003); U.N. Doc. E/C.12/ISR/CO/3 (2011); Reports of the Committee Against Torture on the settlements: U.N. Doc. A/49/44, paras. 159-171 (1994); U.N. Doc. A/53/44, paras. 232-242 (1998); U.N. Doc. CAT/C/XXVII/Concl.5 (2001); U.N. Doc. CAT/C/ISR/CO/4 (2009); Reports of the Committee on the Elimination of Discrimination Against Women on the settlements in the OPT: U.N. Doc. A/60/38, paras. 221–268 (2005); U.N. Doc. CEDAW/C/ISR/CO/5 (2011).

110. Additionally, the International Court of Justice (ICJ), in its *Advisory Opinion on the Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory*, ICJ Reports 2004 136 (ICJ Opinion) held that: "the Israeli settlements in the OPT (including East Jerusalem) have been established in breach of international law" (para. 120). Similar conclusions have been reached, as previously mentioned, by the UN Security Council and General Assembly, the High Contracting Parties to the Geneva Conventions, the authoritative ICRC study on customary international humanitarian law (ICRC study on illegality of settlements under customary international law), as well as the majority of legal scholars, including many Israelis. It is the official foreign policy of most of Israel's allies, including the United States, United Kingdom and the majority of the European Union members, that Israeli settlement of the West Bank is illegal and must not be continued.

35

A Note on the 2012 Levy Commission Report on Settlements in the West Bank

111. On June 21, 2012, the Israeli Prime Minister was provided with a report of the commission that he and the Minister of Justice had appointed in order to examine questions related to land and building regulations and land disputes in the West Bank, but which also addressed the legal status of the West Bank and Israel's settlement enterprise. The Commission was chaired by former Israeli Supreme Court Justice Levy and is thus referred to as the "Levy Commission."

112. Despite my assessment that the Commission's establishment was fundamentally flawed and that it deviated dramatically from its narrow mandate, thereby detracting from the legitimacy of the Commission and its resulting report, I respond briefly to the main conclusions contained therein, as they manifest a new trend of denying that Israel is occupying the West Bank and that settlements are thus illegal.

113. I stress that as of this writing, more than a year after the Levy Commission Report was published, the Government of Israel has not adopted it, despite the fact that pro-settlement parties and politicians have applied extreme pressure on the government to do so.

114. In my capacity as legal advisor to Yesh Din, I participated in preparing a letter to the members of the Levy Commission explaining Yesh Din's position regarding the legitimacy of the Commission and, thus, its reason for declining the Commission's invitation to submit a report to it.

115. The Levy Commission took the liberty of expanding its mandate from land and building in the West Bank to a discussion of whether Israel, via the IDF, has occupied the West Bank. In concluding that the situation in the West Bank is one of continued and expanding Israeli presence, but not of occupation, and that that presence and the construction of settlements and outposts were done with the backing of successive Israeli governments, the Levy Report asserts that the majority of outposts are not illegal, and therefore could be retroactively authorized. As a result, it also concluded that there is no legal prohibition against the continued settlement of the West Bank.

116. First, this conclusion is flawed because it flagrantly disregards the relevant agreements,, UN resolutions, rulings, opinions and academic writings mentioned above (paras. 107-110).

36

Moreover, the Levy Report patently ignores the international consensus regarding the fact of Israel's continued occupation of the West Bank and the illegality of civilian settlement within the occupied territory, as outlined above.

117. It should also be noted that while the Israeli Supreme Court has opted not to rule on the question of the legality of Israeli settlements in the occupied territories, leaving the question to the political branches of government, a long line of Israeli Supreme Court rulings recognize Israel, via the IDF, as the Belligerent Occupying Power over the West Bank (and Gaza, in judgments rendered prior to the 2005 "Disengagement").

118. The seminal case in which the Israeli Supreme Court confirmed that Israel is maintaining an occupation over the West Bank (and Gaza at the time), and that those territories *are not a part of the State of Israel* is the case of the Gaza Coast Regional (settlement) Council, filed months before the scheduled "disengagement" in 2005 (see HCJ 1661/0 Gaza Coast Regional Council v. Israeli Knesset (2005). It should be noted that Former Supreme Court Justice Edmond Levy wrote the sole dissenting opinion out of a panel of 11 justices in the Gaza Coast case.

119. Not surprisingly, the Israeli Supreme Court's position on the status of the West Bank has not changed since or in light of the Levy Report. Such a change in position would not only contradict decades of previous Supreme Court rulings, but it would also contradict the prevailing opinion of the international community, both on diplomatic and legal levels.

120. It should also be noted that as recently as in 2005, former Deputy State Attorney (for Special Affairs), Talia Sasson, was commissioned to conduct a comprehensive study of the West Bank outposts, from both a legal and factual standpoint. The "Sasson Report," which concluded that the outposts were in fact illegal, was approved by the Attorney General and adopted by the Israeli government in an official decision.

**C. Impact of settlements on Palestinian communities:**

121. Based on my experience as legal counsel to numerous Palestinian communities, my academic and professional study of the settlements, my visits to the West Bank, my familiarity with governmental and non-governmental reports on the subject, I conclude that **the establishment and continued existence of illegal settlements, and the official and unofficial practices they attract, results in a multi-dimensional, devastating trauma for**

37

the neighboring Palestinian communities, as well as for the many Palestinians displaced by the settlements.

122. In support of my opinion, I am hereby attaching and incorporating by reference the Yesh Din Report to the United Nations Fact Finding Mission on Israeli Settlements (submitted in November 2012). The Fact Finding Mission was established by a resolution of the Human Rights Council on March 22, 2012 (A/HRC/RES/19/17), with a mandate "to investigate the implications of the Israeli settlements on the civil, political, economic, social and cultural rights of the Palestinian people throughout the Occupied Palestinian Territory, including East Jerusalem."

123. I edited and co-authored Yesh Din's submission to the Fact Finding Mission, which details the impact of settlements on the Palestinian neighboring communities' and individuals' right to life and security, right to property, freedom of movement, right to equality, and the collective sovereignty over natural resources. In further support of my opinion I attach, and incorporate by reference, the February 7, 2013 Report of the UN Fact-Finding Mission (A/HRC/22/63: Independent international fact-finding mission to investigate the implications of the Israeli settlements on the civil, political, economic, social and cultural rights of the Palestinian people throughout the Occupied Palestinian Territory, including East Jerusalem, hereinafter: UN Settlements Report) on the implications of the settlements on Palestinians in the OPT, specifically relating to the basic rights I mentioned above. The settlements within the OPT impact the basic rights of Palestinians living in the West Bank in numerous ways, including:

124. **(i) Loss of property rights or ability to use property.** This is probably the main affront to the rights of Palestinians and the main source of other violations. The Israeli-Palestinian conflict is a territorial conflict, and the friction between settlers and Palestinians results primarily from a dispute over the legitimacy of each side's claims to the land. The policies and practices implemented in the OPT by Israel and the settlers impact property rights of Palestinians in numerous ways, including:

a. The government of the State of Israel, the Civil Administration, the Israeli army and the settler community have all employed a variety of land, planning and security policies and practices which enlarge the inventory of lands allocated for the settlement project at the expense of Palestinian towns and villages. All of these policies and practices are

discriminatory, and none of them is recognized as legal by the international community, *see* ¶ 111(i)(c), *infra*.

b.  In addition, a failure on the part of Israeli law enforcement agencies to enforce criminal law on violent settlers serves to deny many Palestinian farmers access to their agricultural lands. Often those lands are taken at some stage by settlers and used for either housing or cultivation. This failure to apply the law equally to all residents of the OPT also results in a daily violation of the right to life and security of many Palestinians who are physically attacked and abused by violent settlers.

The conclusion of the UN Settlements Report highlights the direct link between the violation of Palestinian property rights and the lack of adequate law enforcement by the Israeli authorities against settlers whose criminal acts of harassment, intimidation and trespass often lead to the takeover of Palestinian land by settlers for housing or cultivation, in para. 107 of the report:

> *The mission noted that the identities of settlers who are responsible for violence and intimidation are known to the Israeli authorities, yet these acts continue with impunity. It is led to the clear conclusion that institutionalized discrimination is practiced against the Palestinian people when the issue of violence is addressed. The mission believes that the motivation behind this violence and the intimidation against the Palestinians and their properties is to drive the local populations away from their lands and allow the settlements to expand.*

c.  Based on claims of the security needs of the settlers and settlements, the Israeli government and army have imposed a set of practices that result in the loss of Palestinian land, including, expropriation of land for public use, military seizure of land for security needs, establishment of Special Security Zones around settlements and outposts, erection of the separation barrier, and declaration of land as a closed military zone.

d.  The UN Settlements Report notes the negative impact of restrictive permit and prior coordination regimes on Palestinian access to lands and livelihood, as well as the discriminatory aspect, in para. 73:

39

*The outer expanses of many settlements incorporate Palestinian private property, and access to this land is regulated through the prior coordination regime whereby the Palestinian landowners are granted a permit for access to their land for a limited number of days each year, normally coinciding with harvest time and based on prior coordination with the Israeli authorities. This regime is in place for Palestinian landowners in some 90 communities with land in the environs of some 55 settlements. In some cases, the prior coordination regime is applied to private Palestinian land that has been unilaterally fenced off by settlers without authorization by the Israeli authorities. The widespread access restrictions in and around the wall in the form of gate and permit regimes particularly affect access to agricultural land in the seam zone and, as previously noted, these restrictions only apply to the Palestinian population.*

e.  A legal mechanism based on an interpretation of a 19th century Ottoman law was developed by the Civil Administration of the OPT to allow the declaration of over a million dunams of lands (a dunam is approximately a quarter of an acre) as "state lands" (or public lands). The aim of these declarations was to enlarge the inventory of public lands after the Israeli High Court of Justice ruled in 1979 that establishment of settlements on private land seized by the army was illegal (see HCJ 390/79 *Dweikat v. Government of Israel* (1979) 34 (1) PD 1). According to figures obtained in FOIA proceedings, 37% of those declared state lands have been allocated to Israeli settlements and only 0.7% to Palestinian development (FOIA initiated by the Israeli Human Rights NGO's The Association for Civil Rights in Israel and BIMKOM).

f.  In addition to the above, denial of access to Palestinian farm lands is achieved through acts of violence and property destruction by extreme elements in the settler community (see, e.g. Yesh Din, A Semblance of Law: Law Enforcement upon Israeli Civilians in the West Bank (June 2006); Yesh Din, The Road to Dispossession: A Case Study – The Outpost of Adei Ad (February 2013), especially Chapter 5).

125. (ii) **Severe denial of the freedom of movement due to practices which are meant to facilitate and secure settlements.**

40

The following policies and practices contribute to the denial of the freedom of movement:

a.  Palestinians are denied entrance to settlements and cannot obtain permits to enter the settlements.

b.  The Declaration of Special Security Zones has made certain security zones around settlements off-limits to Palestinians.

c.  The Declaration of the seam zone (discussed above) has made the area between the separation fence and wall and 1949 ceasefire lines, known as "the green line," off-limits to Palestinians.

d.  Palestinians are regularly denied access to certain roads.

e.  The system of checkpoints located in the West Bank controls Palestinians' movement around settlements and within the West Bank.

f.  Palestinians are denied access to farming land through violence and property destruction by extreme elements in the settler community, and Israeli law enforcement agencies have failed to secure accountability for such offenses.

The UN Settlements Report addresses these practices and concludes that they violate Palestinian rights, both by restricting their freedom of movement and by discriminating against them. For instance, in para. 40, the UN Settlements Report states:

> *Israelis and Palestinians are also treated differently by the same laws; for instance, some military orders designate areas in the Occupied Palestinian Territory as closed military zones/areas. With the exception of military training or firing zones, only Palestinians are prohibited from entering such areas unless they have a permit, even if the area encompasses Palestinian land, thereby denying Palestinians access to or ownership of land. The so-called seam zone is closed to Palestinians, while Israelis and foreign visitors have unrestricted access. Certain other Israeli laws expressly discriminate against Palestinians.*

41

Additionally, the UN settlements report states in para. 72:

> The mission received information according to which **the vast majority of restrictions on the freedom of movement of Palestinians seem to be directly linked to the settlements**, and include restrictions aimed at protecting the settlements, securing areas for their expansion, and improving the connectivity between settlements and with Israel itself. The restrictions themselves come in many forms, including settler-only roads, a regime of checkpoints and crossings (closure obstacles), impediments created by the wall and its gate and permit regime, as well as administrative restrictions. The Office for the Coordination of Humanitarian Affairs reports more than 540 closure obstacles in 2012. Although there have been significant easing measures in recent years (which have improved connectivity between the main Palestinian cities and towns), movement restrictions reportedly remain in place in areas around settlements (emphasis added).

126. **(iii) The plundering of natural resources:** Settlement activity is responsible for the plundering of natural resources, mainly gravel, located in the West Bank, by Israeli companies and almost exclusively for use by Israeli civilians in the West Bank and Israel. The UN Settlements Report states in para. 36: "The settlements, including the associated restrictions, impede Palestinian access to and control over their natural resources." In addition, the UN Settlements Report refers, under the general category of denial of access to natural resources, to the specific issue of access to water resources (as well as all of Section IV.B(7)), and in the same paragraph states:

> In his report, the Secretary-General noted that Palestinians had virtually no control over the water resources in the West Bank. Eighty six per cent of the Jordan Valley and the Dead Sea is under the de facto jurisdiction of the settlement regional councils. Settlements exploit mineral extraction and fertile agricultural lands, denying Palestinians access to their natural resources.

127. **(iv) The right to earn a livelihood:** As a direct outcome of the practices and policies described above, Palestinian communities' livelihood (largely dependent on agriculture) suffers grave damage. The UN Settlements Report, too, addresses the issue, such as in para.

73: "The mission notes that restrictions on freedom of movement have a detrimental impact on the access of Palestinians to their land, and have direct consequences for their ability to work and earn a livelihood." In fact, the UN Settlements Report dedicated an entire section (Section IV.B(8)) to the issue, labeling it "impact on economic rights," and notes, for instance, in para. 89:

> *The agricultural sector, considered the cornerstone of Palestinian economic development, has not been able to play its strategic role because of dispossession of land and the denial of access for farmers to agricultural areas, water resources and domestic and external markets. This has led to a continuous decline in the share of agricultural production in GDP and employment since 1967.*

128. **(v) Limitation on planning and the right to development/self-determination:** The proximity to an Israeli settlement brings about serious *de facto* limitations on urban planning in Palestinian communities. This is achieved, among other ways, through the declaration of Special Security Zones, closed military areas, nature reserves and more. The UN Settlement Report stresses the violation of the Palestinian people's right to self-determination and devotes the entire first section of its discussion of the impact of settlements (Section IV.A) to the concept. It concludes, in para. 38:

> *The mission considers that the right to self-determination of the Palestinian people, including the right to determine how to implement self-determination, the right to have a demographic and territorial presence in the Occupied Palestinian Territory and the right to permanent sovereignty over natural resources, is clearly being violated by Israel through the existence and ongoing expansion of the settlements. The transfer of Israeli citizens into the Occupied Palestinian Territory, prohibited under international humanitarian law and international criminal law, is a central feature of the practices and policies of Israel.*

129. **(vi) Institutional discrimination and the right to equality:** The differences in the living conditions and the attitude of the authorities toward the settlers and Palestinians in the West

43

Bank make it virtually impossible to speak of equality in this context. One population belongs to the ruling group and enjoys civil rights enabling it to influence decisions and policy; the other lacks rights and is often perceived by the regime as an enemy.

130. Nevertheless, based on my personal expertise, my opinion focuses especially on the creation and development **of a double and segregated legal system** in the OPT over five decades of occupation.

131. As was previously discussed, over this period, two legal systems have been created in the OPT: one which applies to Palestinians and the other to Israelis. The former is military in character; the latter is civilian.

132. The UN Independent Fact-Finding Mission devoted much attention to this issue and referred to it extensively in its ensuing report (*see* Section IV.B of the UN report). Among its findings, the UN report states:

> *Palestinians in the Occupied Palestinian Territory endure a discriminatory application of a military court system that does not comply with international standards of fair trial and administration of justice. In testimony to the mission, a witness explained that two individuals in the West Bank may commit the same offence. One is investigated by the police in the West Bank and brought before a military court, and can be detained up to eight days without seeing a judge. The Israeli who has done the same is investigated and brought before a civilian judge, and enjoys all the safeguards of a modern criminal process. Both face different penalties. The prevailing legal systems in Occupied Palestinian Territory translate into stark inequality before the law* (para. 46).

> ...

> *The legal regime of segregation operating in the Occupied Palestinian Territory has enabled the establishment and the consolidation of the settlements through the creation of a privileged legal space for settlements and settlers.* **It results in daily violations of a multitude of the human rights of the Palestinians in the Occupied Palestinian Territory, including,**

44

*incontrovertibly, violating their rights to non-discrimination, equality before the law and equal protection of the law* (para. 49, emphasis added).

133. In sum, the detrimental harm caused by the settlement enterprise is confirmed and detailed in the February 7, 2013 UN Settlements Report. I will conclude by quoting the UN Settlements Report's conclusions:

> *The existence of the settlements has had a heavy toll on the rights of the Palestinians. Their rights to freedom of self-determination, non-discrimination, freedom of movement, equality, due process, fair trial, not to be arbitrarily detained, liberty and security of person, freedom of expression, freedom of access to places of worship, education, water, housing, adequate standard of living, property, access to natural resources and effective remedy are being violated consistently and on a daily basis.*

July 15th 2013

Michael Sfard, Adv.

z:\documents\cases\sokolow\sfard report-final.doc

45

# EXHIBIT A-B

# MICHAEL SFARD

## PERSONAL INFORMATION

Birth date and place: 21.4.1972, Jerusalem

Nationality: Israeli

## EDUCATION

| | |
|---|---|
| September 2000 – September 2001 | **LL.M. (Master of Laws) in International Human Rights Law, University College of London (UCL), Faculty of Law.** |
| October 1993 – February 1998 | **LL.B. (Bachelor of Law), The Hebrew University of Jerusalem, Faculty of Law** |
| November 1993 – March 1994 | **Course for instructors of Arab-Jewish groups meetings, Neve-Shalom School of Peace** |
| July 1990 | **Graduation, Rene-Kassin High School, Jerusalem** |

## PROFESSIONAL EXPERTISE:

**Field of expertise:** International human rights law, international humanitarian law, Israeli criminal law, Israeli administrative and constitutional Law.

**Credentials and Professional training:** LL.M. in International protection of Human Rights (as described above); Legal internship as required by the Israeli Bar Association; Member of the Israeli Bar Association

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| February 2004 – Present | **LAWYER, MICHAEL SFARD LAW OFFICE**<br>My office specializes in litigation of Human right cases on behalf individuals and Human Rights NGO's. My main field of expertise: International Humanitarian Law and Laws of Occupation. Among my cases: Legal challenges to the construction of the Separation Wall (On behalf of ACRI, |

HaMoked. The village of Bil'in): Legal action against construction of Israeli settlements in the West Bank (on behalf of "Peace Now's settlement Watch" group and "Yesh Din" organization); Challenging impunity in the IDF (On behalf of International and Palestinian victims and NGOs such as "Yesh Din" and "Yesh-Gvul"); representation of conscientious objectors to military service (legal council for "Courage to refuse" group, defense lawyer for Jonathan Ben-Artzi and others); Litigation of High Court of Justice petition against the legality of the Israeli policy of assassinations.

| | |
|---|---|
| December 2001 – February 2004; June 1999 - July 2000; | **LAWYER, AVIGDOR FELDMAN LAW OFFICE**<br>Litigation in criminal and human rights cases mainly in the Tel-Aviv district court and the Israeli Supreme Court. The office is a leading law firm in the field of criminal law, human rights law and humanitarian law in Israel. |
| October 2001 – December 2001 | **MONITORING HUMAN RIGHTS, THE PUBLIC COMMITTEE AGAINST TORTURE IN ISRAEL (PCATI)**<br>At the request of the Israeli NGO PCATI I have written an extensive legal section of a report (together with a staff of field researchers from LAW – the Palestinian society for Human Rights) on the Israeli policy of assassinations, later to be the base for the high court petition on the subject. |
| March 1998 – March 1999 | **INTERNSHIP, AVIGDOR FELDMAN LAW OFFICE**<br>A year of training, as demanded by the Israeli bar association. Advocate |
| February 1995 – March 1998 | **LEGAL CORRESPONDENT, KOL HA'IR WEEKLY**<br>'Kol Ha'ir' weekly newspaper was based in Jerusalem and has formed a part of the 'Haaretz' chain of newspapers. As its legal correspondent I reported pending cases and decisions given in the Jerusalem area courts (including the Supreme Court), and also wrote legal commentary. In the last year of my work in Kol Ha'ir I concentrated in writing critical commentaries on High Court of Justice decisions. |
| August 1994 – 1996 | **LECTURER, THE ASSOCIATION FOR CIVIL RIGHTS IN ISRAEL (ACRI)**<br>Gave lectures to teachers, university students and policemen on different human rights issues. During the 1995-1996 academic year I gave a course to first year education students of the David Yalin college in Jerusalem on behalf of the ACRI. The Course title was: "Human Rights in the Israeli Reality". |
| April 1994 – February 1995 | **RESEARCHER, THE ISRAELI EDUCATIONAL TELEVISION**<br>Member of the production team of the weekend (Friday) edition of "Erev Chadash" daily program. |

PRIZES AND AWARDS

June 2013          Emille Grintzweig Human Rights Award for 2012, which is awarded by the Association for Civil Rights in Israel to "an individual or NGO that has made a unique contribution to the advancement of human rights in Israel"

MEMBERSHIPS

2012 – Present      Board member, MOLAD – The Center for the Renewal of Israeloi Democracy

2009 - Present      Legal Advisory Board of the Norwegian Refugee Council Program Information, Counseling on the West Bank and East Jerusalem

2005-2006      International Steering Committee of the Sir Joseph Hotung Research Program on Law, Human Rights and Peace Building in the Middle East

May 1999 – Present    Israel Bar Association

PUBLICATIONS

**Books:**

**The Wall of Folly** (Yedioth Achronot books and Sifrey Aliyat Hagag, 2008) *(Co-authored with Shaul Arieli)(Hebrew)*

**Marcus Klingberg: The Last Spy** (Maariv books. 2007) *(Co-authored with Marcus Klingberg)(Hebrew)*

**The Refusenik Trials** (Babel, 2004) *(Co- edited with Dov Hanin and, Sharon Rotbrad) (Hebrew)*

**Legal Periodicals:**

**The Price of Internal Legal Opposition to Human Rights Abuses,** 1 Journal of Human Rights Practice 37 (vol. 1) *(University of York, March 2009) (English)*

**The Human Rights Lawyer's Existential Dilemma,** 38 Israel Law Review 154 (Vol. 3) *(The Hebrew University of Jerusalem, Fall 2005) (English)*

**The Fallacies of Objections to Selective Conscientious Objection,** 36 Israel Law Review 111 (Vol. 3) *(The Hebrew University of Jerusalem, Fall 2002). (Written together with Amir Fuchs, English)*

**Litigating International Law in the Local Courts: Between Legal Dilution and Judicial Separatism,** 9 Hamishpat 161 (Israeli College of Management, 2004). *(Hebrew)*

**The Israeli Policy of Assassinations,** A report published by the Israeli Committee Against Torture In Israel and Law – The Palestinian Society for Human Rights, June 2002 *(English and Hebrew)*

**"Focused Prevention" Undermines the Judicial Process,** 29 "Orech-Ha'Din" 50 (The Israeli Bar Association, May 2002). *(Hebrew)*

**Op-Eds and Reviews[*]:**

**The 47th Year,** *Haaretz,* June 5th 2013 *(Hebrew)*

**The Hebrew Language Renovators,** *Haaretz,* June 11th 2012 *(Hebrew)*

**Democracy-challenged,** *Haaretz,* December 14th 2011 *(Hebrew)*

**Jerusalem Beach,** *Haaretz Weekly Supplement,* August 4th, 2011 *(Hebrew)*

**In the Name of his Father,** *Haaretz,* August 8th 2011 *(Hebrew)*

**Civilian, the Base is Your Home,** *Haaretz Literary supplement,* June 7th 2011 *(Hebrew)*

---

[*] *Not including essays, reviews and reports written as a journalist of Kol-Ha'Ir weekly (1995-2000)

**The Legal Tsunami**, *Haaretz*, April 29th 2011 *(Hebrew)*

**The Way to The Hague Goes through Brazil**, *Ynet internet site*, December 29th, 2010 *(Hebrew)*

**The Lesser Known Settlement Freeze Deal**, *Foreign Policy - fp.com*, May 10th 2010 *(English)*

**Israel Hates Foreigners and Immigrants**, *Walla* internet site, February 1st, 2010 *(Hebrew)*

**How does the IDF Create Palestinian Heroes?** *Ynet* internet site, January 31st, 2010 *(Hebrew), coauthored with Gabby Laski*

**In Your Back Yard**, *Maariv*, January 4th, 2010 *(Hebrew), coauthored with Neta Patrick*

**Cast Truth**, *Ynet* internet site, December 27th, 2009 *(Hebrew)*

**Attorney General's Office for Rent**, *Haaretz*, September 16th, 2009 *(Hebrew)*, coauthored with Dror Etkes

**The High Court of Justice – an Axe to Dig With?** *Ynet* internet site, September 15th. 2009 *(Hebrew)*

**Back to Warsaw 1968**, *Haaretz Weekly Supplement*, September 4th. 2009 *(Hebrew)*

**The Truth Walks Into a Court in Jaffa**, *Forward*, June 19th, 2009 *(Translated from Hebrew to English)*

**A Verdict That Was Not Given but Might Have**, *Ha'Oketz* internet site, June 8th, 2009 *(Hebrew)*

**An Unwelcome Visitor in the Military Court-Martial**, *Ynet* internet site, May 24th, 2009 *(Hebrew)*

**The Prisoners' Conditions you Wanted to Worsen**, *Ynet* internet site, March 19th, 2009 *(Hebrew)*

**A Just Investigation**, *Haaretz*, February 5th, 2009 *(Hebrew)*

**Dropping a Bomb Without Blinking an Eye**, *Ha'Ir*, January 16th, 2009 *(Hebrew)*

**The Commander's Criminal Intent**, *Haaretz* English Edition, October 11th, 2008 *(English)*

**Welcome to the 41st Year**, *Haaretz*, June 2008 *(Hebrew)*

**Apartheid Koshered by the Supreme Court**, *Maariv*, March/April 2008 *(Hebrew)*

**The High Court of Justice and the Gordian Knot**, *Maariv*, February 13th, 2008 *(Hebrew)*

**The Problem with the Settlers**, *Haaretz*, December 13th, 2007 *(Hebrew)*

**Thanks to the Attorney General**, *Maariv*, October 31st, 2007 *(Hebrew)*

**Lawyering Is Not a Profession, It's a State of Mind**, *Haaretz literary Supplement*, October 11th, 2006 *(Hebrew)*

**High Court, or House of Lords**, *Haaretz* English Internet Edition, September 14th, 2005 *(Translated from Hebrew to English)*

**Back to the Routine of Torture**, *Haaretz*, December 12th, 2003 *(Hebrew)*

**Israeli Supreme Court Finds Assassinations a Justiciable issue**, Il Manifesto, June 2002 *(Translated from English to Italian)*

**Why Israeli Conscripts say: enough is enough**, the *Observer internet edition*, 19.5.2002 *(English)*

# EXHIBIT C

## DOCUMENTS CONSIDERED BY MICHAEL SFARD

| | DOCUMENT | DATE OF DOC |
|---|---|---|
| 1. | Nasser Shawish Statement (English Version) | 6/3/2002 |
| 2. | Sokolow Amended Complaint | 5/17/2005 |
| 3. | Abdullah Barghouti Statement (Arabic) | 5/22/2003 |
| 4. | Abdullah Barghouti Statement (Hebrew) | 5/13/2003 |
| 5. | Abdullah Barghouti Statement (Hebrew) | 5/15/2003 |
| 6. | Abdullah Barghouti Statement (Hebrew) | 5/12/2003 |
| 7. | Abdullah Barghouti Statement (Hebrew) | 3/30/2003 |
| 8. | Abdullah Barghouti Statement (Hebrew) | 3/12/2003 |
| 9. | Munzar Nur Statement (Hebrew) | 4/23/2002 |
| 10. | Munzar Nur Statement (Hebrew) | 5/13/2002 |
| 11. | Munzar Nur Staement (Hebrew) | 4/25/2002 |
| 12. | Text of Nur Statement (Hebrew) | 4/25/2002 |
| 13. | Nasser Shawish Statement (Hebrew/Arabic) | 6/3/2002 |
| 14. | Ahmad Taleb Mustafa Barghouti (Al-Fransy) Documents:<br>  1.  Police Statement - 4/16/2002<br>  2.  Amended Indictment - 9/29/2002<br>  3.  Ruling – 2/24/2003<br>  4.  Hearing Proceeding – 7/30/2003<br>  5.  Ruling – 7/30/2003 | Various |
| 15. | Majed al-Masri Documents:<br>  1.  Indictment – 2/27/2003<br>  2.  Conviction & Sentencing – 2/6/2005<br>  3.  Conviction Opinion – 6/28/2005 | Various |
| 16. | Firas Sadak Mohammed Ghanem Documents:<br>  1.  Police Statement – 4/7/2002<br>  2.  Indictment – 2/18/2002<br>  3.  Conviction (2004)<br>  4.  Sentencing (2004) | Various |

| | | |
|---|---|---|
| 17. | Mohammed Sami Ibrahim Abdullah Documents:<br>  1.  Police Statement – 3/11/2002<br>  2.  Police Statement – 4/1/2002<br>  3.  Handwritten statement – 4/1/2002<br>  4.  Indictment & Amended Indictment<br>  5.  Conviction & Sentencing - January 12, 2003<br>  6.  Sentencing – 4/1/2002 | Various |
| 18. | Mohammed Abdel Rahman Salam Musleh Documents:<br>  1.  Police Statement – 2/25/2002<br>  2.  Police Statement – 3/19/2002<br>  3.  Amended Indictment<br>  4.  Conviction – January 12, 2003<br>  5.  Guilty Plea – January 12, 2003 | Various |
| 19. | Ibrahim Adnan Najib Abdel Hai Indictment & Conviction | 6/3/2002 |
| 20. | Abdel Karim Ratab Yunis Aweis Documents:<br>  1.  Sentence Decision – 3/12/2001<br>  2.  Amended Indictment – 1/14/2003<br>  3.  Plea & Conviction – 1/22/2003<br>  4.  Sentencing Arguments – 3/12/2003<br>  5.  Testimony at Kahira Saadi Trial – 3/26/2003<br>  6.  Testimony at Prosecutor v. Shawish – 11/14/2002 | Various |
| 21. | Nasser Jamal Mousa Shawish Documents:<br>  1.  Indictment<br>  2.  Police Statement – 6/3/2002<br>  3.  Pre-Sentencing Statement – 3/10/2003<br>  4.  Sentence – 3/10/2003<br>  5.  Explanation of Sentence – 4/2/2003<br>  6.  Trial Transcripts & Conviction | Various |

| | | |
|---|---|---|
| 22. | Sana'a Muhammed Shehadeh Documents:<br>1. Indictment – 7/10/2002<br>2. Amended Indictment & Conviction – 4/29/2004<br>3. Sentencing Argument – 5/13/2004<br>4. Sentencing Decision – 7/7/2004<br>5. Appeal – 8/5/2004<br>6. Appeal Judgment – 7/11/2005 | Various |
| 23. | Qahira Said Ali Saadi Documents:<br>1. Indictment 7/7/2002<br>2. Trial – AKA Testimony – 3/26/2003<br>3. Amended Indictment<br>4. Decision – 3/31/2004<br>5. Plea & Conviction<br>6. Sentencing Decision – 10/17/2004<br>7. Sentencing Order – 10/29/2004<br>8. Appeal Judgment – 7/11/2005 | Various |
| 24. | Munzar Mahmoud Khalil Noor Documents:<br>1. Conviction<br>2. Sentencing Decision – 1/12/2004<br>3. Senteing Order – 1/12/2004<br>4. Appellate Decision – 9/28/2005 | Various |
| 25. | Abdel Rahman Zaher Yousef Abdel Rahman Muqdad (Makdad) Documents:<br>1. Indictment – May 20, 2004<br>2. Joint Stipulation on Evidence 3/06/2004<br>3. Conviction and Sentencing – 7/27/2006<br>4. Sentencing Opinion - 9/28/2006 | Various |
| 26. | Ahmad Salah Ahmad Salah Documents:<br>1. Indictment<br>2. Conviction & Sentencing – 7/27/2006<br>3. Joint Stipulation on Evidence – 2/14/2006<br>4. Grounds for the Sentence – 9/28/2006 | Various |

| 27. | Halmi Abdel Karim Hamash Documents:<br>1. First Conviction for anti-Jewish Violence<br>2. Second Conviction for anti-Jewish Violence<br>3. Third Conviction for anti-Jewish Violence<br>4. Pre-bombing Rap Sheet<br>5. Indictment and Conviction – 5/23/2004<br>6. Conviction/Verdict 08/24/2006<br>7. Sentencing Order 09/25/2006<br>8. Sentencing Opinion 06/28/2007<br>9. Appeals Ruling – 1/16/2008 | Various |
| 28. | Ahmad Mohammad Ahmad Sa'ad Documents:<br>1. Amended Indictment<br>2. Conviction – 9/18/2006<br>3. Sentencing Argument – 9/19/2006<br>4. Grounds for Sentence/Sentencing Opinion – 1/15/2008<br>5. Appeal Decision – 1/18/2010 | Various |
| 29. | Ali Mohammed Hamed Abu-Halil Indictment | - |
| 30. | Abdallah Ghaleb Abdallah Al-Jamal Documents:<br>1. Indictment –5/29/2003<br>2. Verdict – 6/1/2003<br>3. Decision – 11/9/2003<br>4. Sentence – 11/9/2003<br>5. Verdict – 11/30/2004<br>6. Sentence Executed – 11/30/2004<br>7. Notice on Hague Depos – 2/27/2012<br>8. Motion on the Part of Plaintiffs – 3/27/2012<br>9. Hearing on Testimony (Transcript)– 6/22/2012 | Various |
| 31. | Walid Abdul Aziz Abdel Hadi Anjas Sentence | 11/30/2003 |
| 32. | Mohammed Hassan Ahmed Erman ("Abu Mouaz") Sentence | 11/30/2003 |
| 33. | Expert Reports of Shaked, Shrenzel, Kaufman & Eviatar | Various |
| 34. | Appendices to Expert Report of Kaufman | Various |
| 35. | Court order and Letter of Request for International Judicial Assistance Pursuant to the Hague Convention | 6/14/2013 |



# BACKYARD PROCEEDINGS

THE IMPLEMENTATION OF DUE PROCESS RIGHTS IN THE
MILITARY COURTS IN THE OCCUPIED TERRITORIES

יש דין
Yesh Din
يش دين
Volunteers for Human Rights

December 2007

# BACKYARD PROCEEDINGS

## THE IMPLEMENTATION OF DUE PROCESS RIGHTS IN THE MILITARY COURTS IN THE OCCUPIED TERRITORIES



**December 2007**



Public Council: Shulamit Aloni, Michael Ben Yair, Shlomo Gazit, Rut Dayan, Michal Smoira-Cohn, Shlomo Lahat, Paul Kedar, Yair Rotlevy.

Yesh Din Volunteers: Hanna Aviram, Yehudit Elkana, Rachel Afek, Maya Bailey, Ruth Ben Shaul, Hanna Barag, Dina Goor, Tami Gross, Mooky Dagan, Avner Harari, Tair Zvulun, Rohaleh Hayut, Judy Lotz, Varda Laserson, Monique Lieberman, Roi Maor, Menucha Moravitz, Prof. Joseph Morin, Racheli Merhav, Anat Sela, Niva Inbar, Yvonne Fatyal, Michal Pundak, Rina Plesser, Ruth Kedar, Edna Kaldor, Maya Rothschild, Dr. Nura Resh, Ilana Meki Shapiro, Dr. Tzvia Shapira.

Volunteer coordinator: Yudit Avi Dor
Palestinian field contact and coordinator: Azmi Bdeir

Yesh Din's activity in 2007 was made possible thanks to the support of the Foreign and Commonwealth Office – United Kingdom, Foundation Open Society Institute, the Government of the Netherlands, the Moriah Fund, the Mark Rich Foundation, the Naomi and Nehemiah Cohen Foundation, the New Israel Fund and private donors.

Legal council: Michael Sfard Law Office
Professional and strategic consulting, information systems, research, press and government relations: Ben Or Consulting Ltd.

Yesh Din – Volunteers for Human Rights | 11 Rothschild Blvd | Tel Aviv, 66881 | Telefax: 03-516-8563 | info@yesh-din.org | www.yesh-din.org

Research and writing: Lior Yavne
Editor: Michael Sfard, Attorney
Project manager and coordinator of observation data: Emily Schaeffer

Courtroom Observation: Yudit Avi Dor, Hanna Aviram, Yehudit Elkana, Maya Bailey, Keren Ben Dov, Ruth Ben Shaul, Hanna Barag, Nirit Bregman, Judy Lotz, Monique Lieberman, Roi Maor, Anat Sela, Niva Inbar, Yvonne Fattal, Rina Plesser, Edna Kaldor, Maya Rothschild, Dr. Nura Resh, Ilana Meki Shapiro, Dr. Tzvia Shapira.

Advisory legal committee: Michael Ben Yair, Prof. Orna Ben Naftali, Dr. Amir Paz-Fuchs, Atty. Talia Sasson.

English translation: Shoshana London Sappir with Mike Rogoff, Sharon Neeman, Gideon Remez, Michael Sappir, Shaul Vardi and Marsha Brown
English translation of IDF response: IDF
English editor: Emily Schaeffer

Photography: Nir Keidar
Design: Berkowitz and Weinheber Studio

Cover photo: Hearing in Gaza Military Court, August 1967 (photography: Moshe Milner, Government Press Office).

Yesh Din wishes to thank:
· The organization's volunteers for their tireless efforts conducting observations in the Military Courts.
· The defense Attorneys who appear in the Military Courts, who willingly answered our questions.
· Lila Margalit and Sigal Shahab from the Association for Civil Rights in Israel.
· Lt. Col. Eyal Samueloff, Major Zohar Levy, Captain Rinat Hameiri, PAO Ron Roman from the Israel Defense Forces (IDF) Spokesperson's division, who provided data and answers to our questions.

© All rights reserved to Yesh Din – Volunteers for Human Rights, Tel Aviv, 2007.

# Table of Contents

ACRONYMS                                                             10

SUMMARY OF FINDINGS AND RECOMMENDATIONS                             11

INTRODUCTION                                                        25

CHAPTER A: THE MILITARY COURT SYSTEM IN THE OCCUPIED
TERRITORIES: BACKGROUND                                            31

01   THE LEGAL POWER TO ESTABLISH MILITARY COURTS
     IN OCCUPIED TERRITORY                                          31

02   THE HISTORY OF THE MILITARY COURTS IN THE
     OCCUPIED TERRITORIES                                           35
     (a)    Establishment                                           35
     (b)    Principal developments                                  37
     (c)    Distribution                                            39

03   THE SCOPE OF ACTIVITY OF THE MILITARY COURTS                   41

CHAPTER B: THE STRUCTURE OF THE LEGAL SYSTEM IN THE
OCCUPIED TERRITORIES                                               45

01   JURISDICTION                                                   45

02   JUDGES                                                         47

03   PROSECUTORS                                                    51



| 04 | DEFENSE ATTORNEYS | 55 |
| 05 | DEFENDANTS | 56 |
| 06 | CONDITIONS IN THE MILITARY COURTS | 59 |

**CHAPTER C: DUE PROCESS RIGHTS IN THE MILITARY COURTS** — 67

| 01 | PRESUMPTION OF INNOCENCE | 68 |
| | (a) International legal standards | 68 |
| | (b) Security Legislation | 69 |
| | (c) The presumption of innocence in the Military Courts | 69 |
| | (d) Conclusion | 75 |
| | (e) Recommendations | 76 |

| 02 | THE RIGHT TO A PUBLIC TRIAL | 79 |
| | (a) International legal standards | 79 |
| | (b) Security Legislation | 81 |
| | (c) Military Court procedures | 82 |
| | (d) Access to the courts | 82 |
| | (e) Publication of judgments | 85 |
| | (f) Conclusion | 87 |
| | (g) Recommendations | 89 |

| 03 | THE RIGHT TO BE NOTIFIED OF THE CHARGES | 92 |
| | (a) International legal standards | 92 |
| | (b) Security Legislation | 93 |
| | (c) Practical application of the rules concerning informing the accused of the charges against him | 93 |
| | (d) Results of regulations concerning indictments | 95 |
| | (e) Conclusion | 97 |
| | (f) Recommendations | 98 |

| 04 | THE RIGHT TO THE ASSISTANCE OF COUNSEL AND THE RIGHT TO PREPARE AN EFFECTIVE DEFENSE | 100 |
| | (a) International legal standards | 100 |
| | (b) Security Legislation | 102 |

BACKYARD PROCEEDINGS

| | | |
|---|---|---|
| (c) | Unrepresented defendants | 104 |
| (d) | The appointment of an attorney: Palestinian NGOs as public defenders | 104 |
| (e) | Meeting with an attorney | 107 |
| (f) | Palestinian attorneys | 108 |
| (g) | Conditions of the meetings | 109 |
| (h) | Preventing attorney-client meetings | 111 |
| (i) | Detention hearings | 113 |
| (j) | Copying investigation material | 115 |
| (k) | Language of investigation material | 116 |
| (l) | The defendant's presence at the hearing | 116 |
| (m) | Access to judgments and legislation | 118 |
| (n) | Conclusion | 121 |
| (o) | Recommendations | 122 |

| | | |
|---|---|---|
| 05 | THE RIGHT TO TRIAL WITHOUT UNDUE DELAY | 126 |
| (a) | International legal standards | 126 |
| (b) | Security Legislation | 127 |
| (c) | The prolonging of proceedings in Military Courts | 128 |
| (d) | The duration of detention until the end of proceedings | 130 |
| (e) | Conclusion | 131 |
| (f) | Recommendations | 133 |

| | | |
|---|---|---|
| 06 | THE RIGHT TO PLEA AND PRESENT EVIDENCE | 135 |
| (a) | International legal standards | 135 |
| (b) | Security Legislation | 135 |
| (c) | Plea bargains as a substitute for the right to plea | 136 |
| (d) | Conclusion | 141 |

| | | |
|---|---|---|
| 07 | INTERPRETATION | 144 |
| (a) | International legal standards | 144 |
| (b) | Security Legislation | 144 |
| (c) | Military Court procedures | 145 |
| (d) | Interpreters in the Military Courts | 145 |
| (e) | Interpreter training | 146 |
| (f) | The role of the interpreters: maintaining order | 147 |
| (g) | The volume and quality of interpretation | 148 |
| (h) | Conclusion | 151 |
| (i) | Recommendations | 152 |



| 08 | **MINORS** | | 154 |
| | (a) | International legal standards | 154 |
| | (b) | Security Legislation | 155 |
| | (c) | Military Court procedures | 156 |
| | (d) | Proportion of minors' trials at the Military Courts | 156 |
| | (e) | Training of prosecutors and judges to adjudicate minors | 158 |
| | (f) | Separation from adult defendants | 158 |
| | (g) | Release from detention | 159 |
| | (h) | Consideration of minority | 160 |
| | (i) | Punishment | 160 |
| | (j) | Closing doors | 161 |
| | (k) | Conclusion | 162 |
| | (l) | Recommendations | 162 |

CONCLUSIONS                                                     164

APPENDICES                                                     167

Appendix 1: Israel Prison Service response                                  168
Appendix 2: Order concerning the establishment of military courts             172
Appendix 3: Procedural rules in the Military Courts                           173
Appendix 4: Standing orders for interpreters – not a word about interpreting    176
Appendix 5: Extension of detention hearings in the Military Courts, 2000-2006   178
Appendix 6: Indictments filed for offenses of Hostile Terrorist Activity category, 1998-2006                                                           179
Appendix 7: Fines imposed in the Military Courts, 2002-2006                    180
Appendix 8: The number of detainees held under administrative detention in the month of December, 2001-2006                                               181

TABLES

Table 1: Indictments filed in the West Bank and the Gaza Strip, divided into categories, 2002-2006                                                     42
Table 2: Administrative detention orders and administrative detention extension orders, 2004-2006                                                     54

Table 3: Acquittals and convictions in the Military Courts, 2006                              70

Table 4: Timing of hearings on extension of detention until the end of proceedings
          that were attended by Yesh Din observers                                           72

Table 5: Comparison between maximum periods of detention of suspects and
          defendants in Israeli law and Security Legislation in the West Bank               128

Table 6: Minors above and below the age of 16 held under detention or i
          ncarcerated by IDF and IPS, 2005-2007                                             157

Table 7: The proportion of minors under the age of 18 among confined persons
          detained and imprisoned by the IDF and IPS, 2001-2007                             157

## CHARTS

Chart 1: Structure of the Military Court system, 2007                                         40

Chart 2: Indictments filed in the West Bank and the Gaza Strip,
          divided into categories, 2002-2006                                                 43

Chart 3: Percentage of charges of murder and attempted murder in
          the indictments filed before the Military Courts, 2004-2006                       44

Chart 4: Prolonging of proceedings: Defendants in the Military Courts
          under detention until the end of proceedings                                      130

Chart 5: Extent of interpretation at hearings monitored by Yesh Din                         149



# ACRONYMS

| | |
|---|---|
| ACHPR | African Charter on Human and Peoples' Rights |
| ACHR | American Convention on Human Rights |
| ECHR | European Convention for the Protection of Human Rights and Fundamental Freedoms |
| GSS | General Security Service (also known as Shin-Bet or Israel Security Agency) |
| HCJ | High Court of Justice |
| ICRC | International Committee of the Red Cross |
| ICCPR | International Covenant on Civil and Political Rights |
| IDF | Israel Defense Forces |
| IPS | Israel Prison Service |
| OCSP | Order Concerning Security Provisions |
| OT | Occupied Territories |
| MAG | Military Advocate General |
| MAGHQ | Military Advocate General's Corps Headquarters |
| MAG JSA | Military Advocate General corps in the West Bank (Judea and Samaria Area) |
| MCU | IDF Military Courts Unit (in the Occupied Territories) |

# SUMMARY OF FINDINGS
# & RECOMMENDATIONS

Since the occupation of the Palestinian Territories in 1967, and to this day, Palestinian civilians charged with security-related and other criminal offenses are tried by the Israeli Defense Forces (IDF) in the military court system in the Occupied Territories. More than 150,000 Palestinians have been prosecuted in these courts since 1990, and about half the prisoners currently being held in Israel were sent to prison by the Military Courts.

Nonetheless, the military judicial system in the Occupied Territories (OT) has acted under a veil of almost complete darkness until now. Few studies and publications have examined its activities, and it is subject to very lax internal supervision. Yesh Din's report, Backyard Proceedings, aims to fill this void.

The report examines one particular aspect of what takes place in the Military Courts: the extent to which due process rights are observed in the Military Courts of first instance. Due process rights in criminal law constitute an essential part of an assortment, or "bundle of rights", granted to all defendants, suspects and detainees, and generally known as the right to a fair trial. Due process rights ensure that every defendant standing trial – in any court – is granted the means to defend against the charges brought against him. These means include, *inter alia*, the rights to understand the charges brought against him, to present a full defense, to have the effective assistance of counsel, to interrogate witnesses, and several other rights regarded as 'procedural' rights, relevant to the establishment of conditions for a fair trial. In their absence, there can be no just trial, and, likewise, their violation increases the risk of miscarriage of justice.

Based on over 800 courtroom observations conducted by Yesh Din volunteers in the Samaria and Judea Military Courts serving the West Bank, data received from the IDF, interviews of Military Courts personnel and defense attorneys, and additional research, the report uncovers a series of severe shortcomings and failures in the implementation of due process rights in the military judicial system operating in the OT.

11



# THE MILITARY JUDICIAL SYSTEM IN THE OCCUPIED TERRITORIES: BACKGROUND AND STRUCTURE

The authority of an Occupying Power to establish military courts in the occupied territory in which it may prosecute local residents is based on the provisions of Article 66 of the Fourth Geneva Convention and encompasses offenses in matters of security and public order. Other articles of the Fourth Geneva Convention, as well as those of other treaties constituting the law of armed conflict, the law of belligerent occupation and international human rights law, set forth the minimum standards that will ensure the existence of due process in these courts.

The military regulations enacted by the IDF in the Occupied Territories grant the courts extra-territorial jurisdiction that enables them to try any person – resident or non-resident of the OT – for any offense, whether committed in the OT or not. The judges there are military officers in regular or reserve service; the prosecutors are officers of the Military Advocate General, some of them not yet certified lawyers by the Israeli Bar Association; the defense attorneys consist of a few dozen lawyers, Israeli and Palestinian; and, the defendants are Palestinian civilians – both minors and adults. Israeli citizens are not tried in these courts, though the Military Courts are granted full jurisdiction over them.

Tens of thousands of proceedings take place in the Military Courts every year, in which thousands of indictments, covering a vast range of issues, are filed: ranging from distinct security-related offenses, to regular criminal offenses, and even traffic violations. In the years 2002-2006 the Military Prosecution filed more than 43,000 indictments to the courts, about a third of which were for security-related offenses (HTA – Hostile Terrorist Activity). Even so, only five percent of the indictments filed during that time charged the defendant with murder (one percent) or attempted murder (four percent).

The military judicial system currently operates in two first instance courts, together with a military court of appeals, as well as an administrative detention court operating in the Ofer military base near Ramallah and in Ketzi'ot prison in Southern Israel. The bulk of the military court system's activities take place in the two Military Courts of first instance – the Samaria Military Court, located in the Salem military base in the northern West Bank, and the Judea Military Court, located in the Ofer military base near Ramallah. These courts also operate four courtrooms dedicated to detention hearings, constituting 'branches' of the courts within the boundaries of Israel in: Jalame junction, Petach-Tikva, Jerusalem and Ashkelon.

12

# DUE PROCESS RIGHTS IN THE MILITARY COURTS

## PRESUMPTION OF INNOCENCE

The presumption of innocence is the principle stating that a person is presumed innocent until proven guilty beyond any reasonable doubt. From the outset, the adjudication of civilians suspected of involvement in actions against the IDF and/or the State of Israel by an Israeli military court is problematic in this regard. Military officers sitting in judgment cannot dissociate themselves from their identity, both as Israelis and as Military personnel, when adjudicating those perceived to be their enemies – persons allegedly involved in activities of militant Palestinian organizations.

Security Legislation remains silent regarding the presumption of innocence in military courts. Nevertheless, data provided by the Military Courts Unit itself provides a clear indication of the extent to which the presumption of innocence is followed: of 9,123 cases concluded in the Military Courts in the year 2006, only in 23 cases – which constitute 0.29% of the rulings – was the defendant found to be entirely not guilty.

Further indications of the presumption of innocence in the military courts can be found in data relating to the release of detainees from custody (prior to the filing of an indictment): in 118 detention hearings in which Yesh Din observers were present, only one person was released. Each of these detention hearings, in which a suspect's detention was extended by 10.2 days on average, lasted an average of only three minutes and four seconds. Thus, the detention of suspects brought before the Military Courts is almost always extended, in hearings that are concluded in a matter of minutes. Hearings to authorize "detetntion until the end of proceedings" (which may extend for more than a year or even two) took even less time: one minute and 54 seconds, on average. In each of the latter hearings, where Yesh Din observers were present, the Court granted the Prosecution's motion to extend the suspect's detetntion until the end of proceedings. Less than two minutes are required to send a person to detention until the conclusion of criminal proceedings. According to the IDF's data, by the end of 2006, two thirds of the defendants whose cases were still under deliberation in the Military Courts were held in detention.

13



## Recommendations:

**1.** The appointment of reservists without judicial background to the position of judges of the Military Courts must cease, and instead the IDF should appoint former judges, now in reserve service, as legislated for the IDF Courts-Martial.

**2.** The number of military judges presiding over detention proceedings, as well as the facilities where these hearings are held, should be modified such that defendants have sufficient opportunity to defend themselves against motions to extend their detention.

## THE RIGHT TO A PUBLIC TRIAL

The principle of holding a public trial is one of the fundamental principles on which the bundle of due process rights stands. In the absence of a public trial there can be no public scrutiny, and without public scrutiny concerns about miscarriage of justice grow. However, the right to a public trial is not absolute and all legal systems, including international law, acknowledge that in certain cases – limited in their nature – it may be restricted in favor of other interests, chiefly the protection of minors, national security, or cases in which the court deems a restriction of publicity will serve the interests of justice.

Although Security Legislation stipulates that sessions in Military Courts are public, severe restrictions are imposed on those wishing to enter the courts: the families of the defendants and detainees are allowed to send only two representatives to the proceedings concerning their relatives. Other members of the public who wish to watch the proceedings taking place in the Military Courts in the OT are required to submit an application in advance in order to secure the permission of a junior officer in the Military Courts Unit, who holds discretion to decide on the application. In fact, some of the detention hearings are held in the Military Courts' branches located within the borders of Israel. Due to the closure policy imposed on Palestinian residents of the OT, these hearings are completely inaccessible to Palestinians – even when they are family members of detainees and Palestinian defense attorneys. What is more, verdicts of the Military Courts are not published.

The *de facto* restrictions on the presence of the public in the Military Courts, combined with the lack of publicity of their verdicts, creates a legal system operating outside the public view and, therefore, substantially lacking public scrutiny.

14

Recommendations:

1. Immediately close the branches of the Military Courts that are located within the State of Israel, and hold all Military Court deliberations within the OT.

2. Lift all restrictions on the presence of family members of defendants and detainees whose cases are brought before the Courts.

3. Regulate by procedure the entrance of an audience (not restricted to family members of the accused) to the Military Court hearings, without any need for prior approval whatsoever.

4. Adapt the Military Courtrooms' conditions and security arrangements to a larger audience.

5. Publish the judgments of the Military Courts, and translate them into Arabic and English.

## THE RIGHT TO BE NOTIFIED OF THE CHARGES

International law presents two main requirements regarding a defendant's right to be notified of the charges brought against him: the defendant must be informed of the details of the charges against him immediately and in a language he understands. Israeli Security Legislation on this matter ignores both these requirements.

Indictments are provided to defendants held in detention and to their attorneys only on the occasion of "detention until the end of proceedings" hearings – after the indictment has already been filed to the court – and are always provided in Hebrew only – a language typically neither spoken nor understood by the defendants and some of their attorneys. As a result, some attorneys are forced to seek someone in the courtroom to translate, for their clients and themselves, the charges against which they are to present a defense.

Special concern arises from the policy customary in the Samaria Court in recent years: demanding that the defendant respond at once to the prosecution's motion to detain until the end of proceedings, while denying motions for continuance to study the evidence. Thus the defense attorney is required to respond to the prosecution's motion without any knowledge as to the contents of the case against his client, and defense attorneys who do not read Hebrew are forced to rely on a rushed translation, by a chance person in the courtroom, of the principal issues in the detailed charge sheet.

15

The implication of the findings on this issue is that many defendants are not fully aware of the nature of the charges brought against them nor are they familiar with the details. This is especially true regarding defendants whose defense attorneys are not proficient in the Hebrew language. Hundreds of defendants are thus held under detention until the end of proceedings, although a serious and comprehensive hearing regarding the fulfillment of conditions warranting such detention has not taken place.

## Recommendations:

1. The Samaria Court must cease from demanding a response to the request to detain the accused until the end of proceedings on the same day on which an indictment is received. Instead, the Court should postpone the deliberations to a date that will enable the defense attorney to study the indictment and investigation file and argue against detention until the end of proceedings, in accordance with his considered opinion and his client's desires.

2. All indictments served in the Military Courts must be translated into Arabic.

3. The indictment, translated into Arabic, must be sent immediately upon its completion, and at least 72 hours before the hearing on detention until the end of proceedings, both to the defendant (in the place in which he is detained or to his home) and to his attorney.

## THE RIGHT TO COUNSEL AND THE EFFECTIVE ASSISTANCE OF COUNSEL

Although the right to counsel and the right to effective assistance thereof are usually regarded as different rights, they are nonetheless interconnected: there is no point in hiring a defense attorney if the conditions that would enable him to adequately and effectively prepare his client's defense do not exist.

Yesh Din's observations in the military courtrooms show that the majority of defendants and detainees are represented by counsel. As a rule, the Military Commander – who is bound, in certain cases, to provide funding to destitute defendants for defense counsel – relies to a great extent on Palestinian associations providing a similar "public defender" type service to detainees and defendants in the Military Courts, but without financial contributions by the IDF.

Severe restrictions are imposed on a lawyer's ability to provide his clients with an effective defense: Palestinian lawyers are unable, in most cases, to visit clients incarcerated in Israel;

16

Israeli lawyers and those who are residents of East Jerusalem, who do have access to detention facilities in Israel, are frequently harassed when arriving at detention facilities and regularly experience conditions that discourage them from visiting their clients in preparing their defense and raise cause for concern regarding the violation of attorney-client privilege.

According to an estimate of a former military prosecutor, GSS (General Security Service or 'Shin Bet') investigators issue orders denying attorney-client meetings to about sixty percent of GSS-interrogated suspects, which may remain in effect for up to a month from the time of arrest; detention extensions are granted in many cases based on confidential material disclosed to the judge alone; and, after the filing of indictments, case material photocopied by the defense attorneys is almost entirely in Hebrew, a language not spoken by a large portion of them. In cases where GSS investigation material exists, a formal request occasionally yields the material's disclosure, and only after delay. All lawyers – both Israeli and Palestinian – are denied open access to current regulations and rulings, upon which they are to base their defense arguments and make practical considerations regarding the choices available to their clients and advise them accordingly.

Thus, even though the requirement that defendants are represented by counsel is formally satisfied, it is not substantially satisfied: the defendants and detainees brought to detention hearings in the Military Courts are unable to provide themselves, by proxy of their lawyers, the optimal legal defense to which they are entitled.

## Recommendations:

1. The IDF is to move Palestinian detainees and defendants to detention and incarceration facilities located within the boundaries of the West Bank, as required by international law.

2. Alternatively, and as long as the policy denying Palestinian civilians entry to Israel is in effect, the IDF must provide Palestinian lawyers with entry permits that will allow them to reach the locations in Israel where their clients, Palestinian detainees and defendants, are held. Denying such permits must be the exception rather than the rule, and must be done only in rare instances in which such denial cannot be avoided.

3. The IPS must amend its regulations so as to reduce the waiting time of attorneys at detention facilities to the minimum required.

4. Concerns regarding the use of listening devices in privileged attorney-client communications must be removed by disposing of the telephone receivers through

17



which these conversations are currently conducted, and an alternative means of enabling communication must be found, e.g. a mesh-screen.

5. Palestinian lawyers must be allowed to appoint agents to photocopy case material at the prosecution offices in the military courts.

6. The number of photocopy machines available to lawyers for the purpose of photocopying case material is to be increased, and the elimination of payment for photocopying should be considered.

7. Indictments and case material must be routinely translated into Arabic.

8. The military prosecution is to be instructed to permanently make GSS interrogation documents, together with the rest of the case material, available to defense counsel upon the filing of an indictment.

9. All judgments of the Military Courts, both at the first instance and appellate levels, must be published on a regular basis and made available. Such publication must appear, at the very least, in Arabic and Hebrew, and responsibility for its execution must be assigned to the MCU and not the Military Advocate General, which supervises the prosecutors.

10. The Security Legislation must be published on a regular basis with any amendments and updates, in Arabic and Hebrew, and in a way that is accessible to defense attorneys as well as the general public.

## THE RIGHT TO BE TRIED WITHOUT UNDUE DELAY

International law standards require that a defendant stand trial "promptly", "without undue delay" and within a reasonable time. The Military Courts are far from satisfying these requirements.

Security Legislation allows the detention of a suspect for eight days before bringing him before a judge and allows the judge to repeatedly extend a suspect's detention to an accumulative period of ninety days, and twice as long with the authorization of a military appellate judge. Security Legislation imposes no limitation as to the period a person may be held in detention from the time the investigation is completed to the time of filing an indictment, nor does it limit the period a person may be held in detention from the time an

18

indictment is filed until proceedings in the matter commence. The only stipulation regarding detention after the filing of an indictment is that the trial must be concluded within two years from the time the indictment is filed (in contrast to a period of nine months in Israeli domestic courts); here, the right is also granted to a military appellate judge to extend the defendant's detention for as long as the trial is pending.

The result is prolonged legal proceedings. Yesh Din observers documented the period of time between the hearings in which they were present and the next scheduled hearing in the case: the average time between the "detention until the end of proceedings" hearing and the arraignment (the first session of trial) was 61 days; the average time between the arraignment and the next session of trial was 51 days in average for defendants held in detention and 71 days for defendants not held in detention; and, the average time between each session in the 'post-arraignment' stages of the trial (reminder conferences, evidentiary hearings, handing down the verdict, etc.) for defendants held in detention was 52 days.

At the end of 2006, approximately 1,800 detainees were held in detention until the end of proceedings for periods of up to one year, and 189 detainees for periods longer than one year. The figures for the previous five years are even bleaker: at the end of 2001, 231 detainees were held in detention until the end of proceedings for periods of over one year (of these, 85 were held for more than two years); and at the end of 2004, 671 detainees were held in such detention for more than one year (of those, 78 were held for more than two years).

## Recommendations:

1. The Order Concerning Security Provisions is to be amended so as to significantly reduce periods of time allowed for detention during investigation and after the filing of indictments.

2. The Order Concerning Security Provisions must be amended such that it determines the maximum amount of time a person may remain in detention until the conclusion of the interrogation, the maximum time until the indictment is filed, the maximum time from the indictment until his arraignment, and the maximum time between court hearings.

3. Additional personnel must be immediately allocated to the Military Prosecution and the Military Courts in order to avoid prolonging the legal process, on the one hand, and pressure on defendants to accept a plea bargain with the Prosecution on the other. .



## THE RIGHT TO PRESENT EVIDENCE AND WITNESSES

The proceedings of a trial from beginning to end – including the presentation of arguments, interrogation of witnesses, examination of evidence and presentation of closing argument – scarcely exist in the Military Courts. In 2006, for example, of the 9,123 cases concluded that year, only 130 cases – 1.42% of the cases concluded that year – were concluded after a full evidentiary stage consisting of the presentation of evidence and interrogation of witnesses. Instead, the Military Courts operate on a plea-bargain basis: according to the Chief Military Prosecutor, about 95% of the cases in the Military Courts conclude in plea-bargains.

The parties in the Military Courts are driven toward plea-bargains for a variety of reasons: Interrogation methods customary in the GSS, which, according to reports published by human rights organizations, include threats and physical measures, combined with the prohibition imposed on many detainees to consult their lawyer and receive legal advice during their interrogation, bring many of the defendants to court after confessing to actions attributed to them or after being incriminated by others; the considerable case load in the courts brings all parties involved – defense attorneys, prosecutors and judges – to view plea-bargains as the fast and efficient way to finish their work on a case; defense attorneys feel that conducting a full trial, including the summoning of witnesses and submission of evidence, usually brings along a penalty far more severe, a sort of 'punishment' inflicted by the court on a defendant who did not have the good sense to reach a plea-bargain; additionally, Palestinian defendants and their families tend to lack trust in the military judiciary system and thus prefer to reach a plea-bargain rather than leave the verdict in the hands of the judge.

As a consequence, plea-bargains have in effect replaced full legal proceedings in the Military Courts.

## INTERPRETATION

Despite the fact that the Military Courts in the Occupied Territories are designed to try Arabic-speaking civilians, proceedings in the courts are all conducted in Hebrew. In order to interpret the deliberations in the courtrooms to Arabic and to interpret the defendants' words to Hebrew, the Military Courts Unit maintains a staff of interpreters, most of which are soldiers in compulsory service.

According to Yesh Din's observers, many of the interpreters – if not the majority – seem to make an effort to perform their job properly. The IDF's choice to use cheap labor, composed mainly of soldiers in compulsory service and lacking any professional background, either as interpreters in general or specifically as legal interpreters, and thus learning their profession as they go, results in the interpretation being extremely unsatisfactory in both quality and scope. Yesh Din observers classified the scope of interpretation as provided by the interpreters in the courtrooms during hundreds of sessions. In 35% of the sessions the observer's impression was that the translation was "partial or sloppy" and in another five percent there was no interpretation at all.

Copies of a document, entitled "Standing Orders for Interpreters," signed by the Court's NCO, are posted on the Samaria courtroom walls. The document specifies the interpreters' duties before, during and after a day of court sessions. The 12 articles of the document describe at length the interpreters' functions regarding order in the courtroom – entry of detainees into court procedures, change of personnel between interpreters, courtroom cleanliness, etc. – yet there isn't a single reference to their duties relating to the interpretation work itself. The fact that the Military Courts Unit does not even have any written procedures and instructions relating to the interpretation of proceedings and translation of various documents (as admitted by the IDF Spokesperson) illustrates the contempt with which the military authorities view their obligation to ensure that a defendant brought to trial or a detainee brought to a detention hearing fully understand what transpires during the proceedings concerning his matter.

## Recommendations:

1. The Military Courts Unit must set clear professional procedures for interpretation in the courtrooms.

2. The use of regular soldiers as interpreters must cease, and professional interpreters must be employed, as is customary in courtrooms in the State of Israel.

3. Until regular soldiers functioning as interpreters are replaced by professional interpreters, the functions of attendant and interpreter are to be clearly separated, and no further soldiers enlisted for the purpose of serving as interpreters shall serve in this capacity until they have undergone a comprehensive professional course, as soon as possible after their enlistment.



## MINORS

Security Legislation regards Palestinians as minors only until the age of 16. Palestinians aged 16-18 are deemed adults and are tried accordingly. Moreover, according to these regulations, the sentence of a person who was a minor at the time of the offense shall be determined according to his age at the time of sentencing – and not according to his age the time of committing the offense.

The Military Courts Unit has no data regarding the number of minors tried in the system. However, in the years 2001-2006 minors (under 18 years of age) constituted four to six percent of all internees detained and imprisoned by the IDF and IPS, and one may assume that the volume of court activity in matters concerning them was similar.

International human rights law grants special protections to minors standing trial and emphasizes the need for special treatment, rehabilitative penalties, showing respect regarding their privacy, and thorough and continued training of officials coming in contact with them – judges, prosecutors, police officers and the like. The IDF has refrained from establishing a special juvenile court – as exists in Israel, for example – in the OT, and minors stand trial in the ordinary Military Courts, under the same framework of legal proceedings as adults; those prosecuting and judging them have no training in dealing with minors. The Military Courts have no "closed door" policy while deliberating matters concerning minors, although Security Legislation allows such a policy.

Yesh Din observers were present in 48 sessions concerning the matters of minors. Of these, the fact of a detainee or defendant being a minor was mentioned in only 13 sessions. This occurred, in nearly all cases, when the court included the defendant's age in explaining its considerations regarding a proposed plea-bargain.

## Recommendations:

1. Security Legislation is to be amended to the effect that a person is defined a minor until he is 18 years of age.

2. Sections 4 and 5 of the Order Concerning Adjudication of Juvenile Offenders are to be amended so that the determining date relating to the penalizing of minors shall be the time of committing the offense and not the time of sentencing.

22

3. The closing of courtroom doors during sessions in the matter of minors must be strictly observed.

4. Special juvenile courts are to be established, in which prosecutors and judges specially trained in juvenile matters and proceedings will serve.

5. Until the establishment of a juvenile court, absolute separation must exist between adults and minors in the military courtrooms.

23



BACKYARD PROCEEDINGS

# INTRODUCTION

Tens of thousands of Palestinians have stood trial in the Military Courts since they were established in 1967. A total figure of the number of people who stood trial since the beginning of the occupation is unavailable, but we know that from 1990 to the end of 2006 more than 150,000 Palestinians have stood trial in the Military Courts.[2] About half the prisoners currently being held in Israel Prison Service (IPS) facilities were tried by the Military Court system and not the "regular" Israeli court system.[3]

Despite the extensive volume of Military Court activity in the Occupied Territories (OT), for 40 years the military judicial system was subject to very lax public supervision. In 1989 Israeli human rights organization B'Tselem published the first report in Hebrew about the Military Courts,[4] and a few months later the organization issued a follow-up report.[5] In the annual State Comptroller's report for 1993 an entire chapter was devoted to the activity of the Military Prosecution and the Military Courts, with an emphasis on administrative shortcomings in their activity.[6] A full 13 years later, in October 2006, MachsomWatch published a report containing its volunteers' impressions from observations they held in the military courtrooms in the State of Israel on extension of detention hearings.[7] The number of reports issued to the public so far on the Military Courts in the OT is therefore very small.

---

1.  A distinction needs to be made between the Courts-Martial, where IDF soldiers are tried for criminal offenses, and the Military Courts, where civilians are tried. The latter are the subject of this report.

2.  The figure of "more than 124,000" defendants tried in the Military Courts in the years 1990-2003 appears in Netanel Benichou, On criminal law in the areas of Judea, Samaria and Gaza: a window and trends, (Hebrew), Law and Military 18 (5765-2004), p. 294, FN4. Figures collected by Yesh Din on the number of indictments filed in the Military Courts in the years 2004-2006 (see below) bring the number up to over 150,000.

3.  According to IPS figures, on August 19, 2007 there were 20,356 prisoners in IPS detention, of which 10,881 were classified as "criminal" prisoners and the other 9,475 (46% of all the prisoners) as "security" prisoners. The figures were provided in a phone conversation between Yesh Din and Yarona Linhart of the IPS Spokesperson's office on August 20, 2007. The vast majority of the prisoners classified as "security" prisoners were tried in the Military Courts. As will be presented below in this report a large portion of those tried in the Military Courts are prosecuted for offenses that are not classified as "security" offenses, and they too are sent to serve their sentences in IPS facilities.

4.  B'Tselem, The Military Judicial System In The West Bank (November 1989).

5.  B'Tselem, The Military Judicial System In The West Bank, Follow-Up Report (May 1990).

6.  State Comptroller, Annual Report 43 (April 1993) (Hebrew), pp. 870-878.

7.  MachsomWatch, In the Eyes of Justice: Observations at Military Courts in the State of Israel (October 2006) (Hebrew).

25



Even within the military system the extent of supervision of the Military Courts is limited. In a conversation with staff officers in the Military Courts Unit who have a direct bearing on the subject, they told Yesh Din that the courts are not subject to any organized review by IDF bodies and that the headquarters of the Military Courts Unit does not inspect the courts themselves. According to the officers there is no need for systematic inspections of the operation of the Military Courts because "any mishap that occurs – in summoning witnesses, defendants, etc. – is immediately discovered thanks to comments from the Prosecution or the Defense."[8] This means that even if specific defects are detected quickly and corrected, the IDF does not conduct any examination that could identify systemic failures in the operation of the Military Courts in the West Bank.

Petitions are occasionally filed to the High Court of Justice (HCJ) regarding decisions of the Military Court system in the OT. The HCJ's review in those petitions is limited to administrative causes (i.e., mainly questions of jurisdiction and reasonableness). In petitions of this sort the HCJ always stresses that the scope of its intervention is narrow and depends on evidence of an administrative defect in the Military Courts' operation. In the absence of research and regular, comprehensive review (by academics, civil society or others) of the ongoing activity of the Military Courts in the OT, chances are slim that petitioners will succeed in proving the existence of systemic defects in the general operations of the Military Courts (as opposed to specific defects in one hearing or another).

The Military Court system, the operations of which affect the lives of tens of thousands of Palestinian suspects and defendants, has therefore acted for many years under a veil of darkness, without anyone examining its activities comprehensively. This report aims to fill, at least to some extent, the dangerous void that has resulted from the lack of public supervision of this system.

The Military Courts Unit in the OT defines its mission as such: "To enforce law and order, by adjudicating defendants accused of committing security offenses or other criminal offenses, that were committed in the Area[9] or were meant to harm it, while ensuring due process and the delivery of justice."[10]

---

8.   The conversation took place in August 2007. The names of the officers are on file with Yesh Din.

9.   "Area" is the term the IDF uses in reference to the OT. For example, the West Bank is called "The Judea and Samaria Area," and the Gaza Strip, until IDF forces left the area in August 2005, was called "The Gaza Strip Area." The use of the terms "Area" and "Areas" (such as "the security of the area") is common in orders and other military documents referring to the OT.

10.  The military Courts Unit, Annual Report of Activities for the Year of 5767-2006, (Hebrew), p. 5. Emphasis in the original.

26

BACKYARD PROCEEDINGS



Courtroom no. 1 in Samaria Military Court.[11]

This report does not intend to examine to what extent the Military Courts deliver justice. Yesh Din did not study the content of the Military Court judgments, nor does the organization express an opinion as to their merits. Yesh Din does not purport to assess the degree of justice in the judgments or sentences imposed by the Military Courts under the authority of the Security Legislation. The subject of this report is the first principle that the Military Courts Unit undertook to guarantee: the principle of due process.

Due process rights in criminal law[12] are part of a "bundle of rights" vested in defendants, suspects and detainees in the criminal process and are included in what is known as the right to a fair trial. These rights are anchored both in the provisions of international humanitarian law (also called "the law of armed conflict") as well as the international treaties that constitute international human rights law and many other legal tools. Due process

---

11.    The pictures in this report were taken with the accompaniment of the IDF Spokesperson representatives and under restrictions imposed on Yesh Din by the IDF Spokesperson.
12.    The proceedings in the military courts are criminal proceedings, whether the defendants are on trial for "regular" criminal offenses or for "security," traffic or other offenses.

27



rights guarantee to every defendant standing trial – in any court, whether a "regular," military or "special" court – the conditions to allow him to contest the charges against him. These conditions refer, *inter alia*, to his rights to understand the charges against him, to prepare an effective defense against them, to be assisted by counsel, to question witnesses and various other rights, considered "procedural" rights, concerned with creating the conditions for a fair trial. Due process rights derive from the understanding that in their absence there can be no fair trial and that compromising them increases the risk of the distortion of justice.

The fact that in certain places in this report Yesh Din chose to provide comparative figures related to legislation in the State of Israel does not mean that the prevailing standards in Israel's justice system – whether or not they are praiseworthy – should dictate those prevailing in the military justice system in the OT. The Military Court system, established by a military government in an area subjected to belligerent occupation for the adjudication of civilians, is based on the provisions of international law, and the laws of armed conflict in particular; therefore, the standards by which it should be measured are the international standards that were agreed upon in a long series of treaties and international legal tools that constitute armed conflict law and international human rights law.

Since September 2006 Yesh Din-Volunteers for Human Rights has been conducting a project to monitor the implementation of due process rights in the Military Courts. The organization's volunteers completed extensive training, including a three-month "pilot" phase, in order to conduct observations in the Military Courts. An observation questionnaire composed especially for this project aided the Military Court observers in monitoring various aspects of due process rights. The factual information and the observers' impressions were recorded in a special database prepared by the organization. From the official launch of the observation phase of the project in December 2006 until its completion in August 2007, Yesh Din volunteers were present in the Military Courts in the Ofer military base and the Salem military base every week. At the time of this writing the project database includes observation forms of more than 800 separate hearings held in the Military Courts during that period. The findings of these observations do not constitute the results of a representative statistic sample of all proceedings in the Military Courts because tens of thousands of hearings take place in the Military Courts each year, but conclusions can be drawn from them as to trends in the issues under examination in this report.

Yesh Din complemented the extensive information collected by the observations through a study of aspects of due process rights that are harder to examine in the courtrooms, including interviews with 14 lawyers who appear regularly in the Military Courts and informal

28

conversations held by members of Yesh Din with some 10 Military Court personnel. Additional information was obtained from the IDF Spokesperson Unit in response to questions posed by Yesh Din and was incorporated in the chapters of this report.

The first chapter of the report provides background on the Military Court system in the OT: the legal authority to establish it, its development and the extent of its activity. The second chapter presents the structure of the Court system and its components – judges, prosecutors, defense lawyers, suspects and defendants, and describes the conditions of the hearings in the courtrooms. The third chapter is the heart of the report: due process rights are described in detail and the extent of their implementation in the courts is examined. In addition, military legislation regarding these rights is analyzed against the relevant recognized and binding international standards.

Before publication of the report Yesh Din sent the draft to the IDF Spokesperson Unit and the Israel Prison Service for their reactions. Comments by the Military Courts Unit and the Military Advocate General on the contents of the report, as provided (and translated) by the IDF Spokesperson to Yesh Din, are included in Chapter C. The full IDF response is featured on Yesh Din's website, alongside which the organization has posted its reply to the IDF response. The full IPS response appears at the end of this report.

29



# CHAPTER A

## THE MILITARY COURT SYSTEM IN THE OCCUPIED TERRITORIES: BACKGROUND

**01     THE LEGAL POWER TO ESTABLISH MILITARY COURTS IN OCCUPIED TERRITORY**

The protracted Israeli occupation in the Occupied Territories does not exist in a legal vacuum. International law recognizes the existence of a situation whereby a foreign army establishes a military occupation of a territory and imposes a series of rules and provisions, most of which are incorporated in international treaties – and which are collectively referred to as the "laws of belligerent occupation."[13]

These laws govern the legal aspects of the duties, powers and limitations on the force of an occupying army in a territory that it seized in the course of belligerent activity and give it the power to take various actions. The laws of occupation are based on the inherent tension between the security needs of the state on behalf of which the army is fighting (the "Occupying Power," in the wording of the Fourth Geneva Convention) and its duty to ensure the security and well-being of the population in the occupied territory. The laws of occupation attempt to regulate the tension between these two duties of the occupying army by requiring the occupying army to respect the rights of the occupied population and the social and legal arrangements existing within the occupied territory, while, at the same time, making arrangements for certain exceptions to that duty when necessary for reasons involving the security of the occupying power. The normative development process of the laws of occupation, from the Hague Convention (1907) through the Fourth Geneva Convention (1949) and up to the protocols annexed to the Geneva Conventions (1977), reflects the attribution of increasing importance to the duty of the occupying power to

---

13.   The laws of belligerent occupation are part of the laws of armed conflict (otherwise known as the "laws of war" or "international humanitarian law"). Most of the codification of this legal branch (the laws of belligerent occupation) is to be found in the *Fourth Hague Convention Respecting the Laws and Customs of War on Land (1907)* and the regulations annexed thereto [hereinafter: the "Hague Regulations"] and in the *Fourth Geneva Convention Relative to the Protection of Civilian Persons in Time of War (1949)* [hereinafter: the "Fourth Geneva Convention"] and the two additional protocols annexed to the Geneva Conventions.



protect the occupied population. By its very nature, belligerent occupation is intended to be temporary. The longer it lasts, the greater the occupying power's duty becomes vis-à-vis the occupied population.[14]

One of the exceptions to the duty of the occupying army to respect the law and order that prevailed in the occupied area prior to the occupation consists of its power to establish Military Courts on its behalf and to try civilians under its occupation in those courts. Generally speaking, those civilians have the right to be tried before the courts operating in their own country and by judges from among their own people. Nonetheless, placing those civilians on trial before a bench of officers in the enemy army does not, in and of itself, constitute a violation of international law. Quite the opposite is true: this power is anchored in the provisions of international law which deal with belligerent occupation.

The Hague Convention does not set forth specific provisions with regard to the power of an occupying army to try civilians under its occupation. At the same time, the closing passage of Regulation 43 of the Regulations annexed to the Convention – a regulation known as the "mini-Constitution of the occupying administration," which sets forth the principle instructing the occupying power to preserve and secure law and order in the occupied territory – includes a general exception enabling deviation from that principle:

The authority of the legitimate power having in fact passed into the hands of the occupant, the latter shall take all measures in his power to restore, and ensure, as far as possible, public order and safety, while respecting, unless absolutely prevented, the laws in force in the country.

Other extensive portions of the laws of belligerent occupation (in the Hague Regulations, the Geneva Conventions and the appendices thereto) deal with the measures the occupant is entitled to take in order "to restore... public order and safety," and the operations included under the exception to the duty of respecting the existing legal arrangements ("unless absolutely prevented"). The translation of the authorization to deviate from the existing arrangements in order to restore order and safety in the occupied territory into concrete authority is found, *inter alia*, in the provisions of Article 64 of the Fourth Geneva Convention. That article, which contains clear guidelines with regard to the continuity of the Penal Code in the occupied territory, empowers the occupying power to change the local law and to amend provisions of the local law that detract from the security of the occupying power, or to

---

14.   Orna Ben Naftali, Aeyal M. Gross, Keren Michaeli, <u>Illegal Occupation: Framing the Occupied Palestinian Territory</u>, Berkeley Journal of International Law (2005), pp. 551-614.

amend those laws of the occupied territory which conflict with the provisions of international humanitarian law – provided that the amendment of the legislation is implemented in such a way as to protect the interests of the population in the occupied territory.[15]

Following Article 64, and as a supplement thereto, Article 66 of the Fourth Geneva Convention gives the military commander the authority to hand accused persons over to military courts for trial, provided that the courts in question comply with defined basic conditions. This, too, constitutes an exception to the general principle calling for preservation of the legal arrangements that existed prior to the occupation. In light of the importance of this article, we shall quote it in full below:

> In case of a breach of the penal provisions promulgated by it by virtue of the second paragraph of Article 64, the Occupying Power may hand over the accused to its properly constituted, non-political military courts, on condition that said courts sit in the occupied country. Courts of appeal shall preferably sit in the occupied country.

The official interpretation of the Geneva Convention by the International Committee of the Red Cross (ICRC) clarifies that, whereas the military courts were *a priori* intended to judge the members of the occupying army who are accused of committing offenses, the same military courts, which are located in the occupied territory, may also judge "other persons," including residents of the occupied territory, who have committed offenses.[16]

The text of Article 66 sets forth a number of explicit conditions governing the legality of the military courts in question. The statement that the military courts must be "non-political" was intended to prevent the use thereof as a tool for political or racist persecution; the provision that the military courts must be "properly constituted" utterly excludes the possibility of setting up "special tribunals" and indicates that "ordinary" military courts, which operate according to the rules of due process, are to be used for judging the residents of the occupied territory (additional articles of the Geneva Convention cover the basic rules of legal proceedings in the military courts). In addition, the principle of territorialism in criminal law guided the drafters of the Convention to establish that the military courts would be located within the occupied territory only. This condition, according to the ICRC

---

15.   Jean S. Pictet (ed.), Commentary: The Fourth Geneva Convention Relative to the Protection of Civilian Persons in Time of War (Geneva: ICRC, 1958), p. 335-336 [hereinafter: "Pictet"].

16.   Ibid., p. 340. As we shall see, the Israel Defense Forces have made a distinction between courts in which IDF troops are tried and courts in which Palestinians are tried.

33



interpretation, constitutes an essential means of protecting the rights of the accused in the military courts.[17] A series of additional articles in the Fourth Geneva Convention set basic rules for the operation of the military courts, so as to ensure due process for detainees and accused persons brought before them (see Chapter C).

On the basis of the principles set forth above, and based on the powers given to the military commander of an occupied territory under the laws of belligerent occupation, the commanders of the West Bank and the Gaza Strip, immediately after the occupation thereof in 1967 – and while the war was still underway – published orders that transferred sovereign jurisdiction into their hands, established the continuity of the existing legal system (Jordanian in the West Bank, and military Egyptian in Gaza Strip), and declared that the legal system would remain binding, subject to changes that would be made to it by the military commanders. In addition, and most importantly for our purposes, the military commanders of Gaza and the West Bank established military courts with jurisdiction over any person in the occupied territory who committed offenses against the Security Legislation (the military legislation).

At the time, the Israel Defense Forces recognized the fact that the Fourth Geneva Convention was the source of the legal jurisdiction for the operation of military courts in the territories under belligerent occupation. Section 35 of the original version of the Order Concerning Security Provisions (OCSP),[18] one of the first pieces of legislation established by the Military Commander of the West Bank, expressly recognized that the procedures established in that Order were subordinate to the provisions of the Fourth Geneva Convention:

> A military court and the administration of a military court shall fulfill the provisions of the Geneva Convention dated August 12, 1949 Relative to the Protection of Civilian Persons in Time of War, in all matters related to legal proceedings, and in any case of contradiction between this Order and the aforesaid Convention, the provisions of the Convention shall prevail.

Sometime later, the Military Commander recanted his earlier statement regarding the supremacy of the provisions of the Fourth Geneva Convention, and the original version of

---

17.   Ibid.

18.   The Order was attached as an appendix to the *Proclamation Concerning the Entry Into Force of the Order Concerning Security Provisions (West Bank Area) (No. 3) 5727-1967.*

34

Section 35 disappeared from the order.[19] Nevertheless, years later, when the Military Court itself addressed the issue, it also recognized the fact that its jurisdiction was primarily drawn from Article 66 of the Fourth Geneva Convention, and that the founders of the Military Courts in the Occupied Territories had been well aware of the Convention's implications:

> Article 66 [of the Fourth Geneva Convention] is presented in the form of a declaration of binding international custom. In other words, it is a declaratory provision, and as such, constitutes a law of custom. In any event, we shall again assume that the Military Commander was aware of the provisions of Article 66 of the Geneva Convention when he established the system of Military Courts. This appears to be the actual state of affairs, and it appears that the Military Commander does indeed take care to comply with the provisions of the Convention in this context – for example, the provision that states that trials of the protected population will be held within the borders of the area.[20]

The degree to which the Military Commander takes care to comply with the provisions of the Geneva Convention – and with other provisions of international law dealing with legal proceedings – is the subject we address in this report. In any event, since their establishment four decades ago, the Military Courts of the Israel Defense Forces – as a matter of routine – have been trying Palestinian civilians.

## 02    THE HISTORY OF THE MILITARY COURTS IN THE OCCUPIED TERRITORIES

### (a)    Establishment

The adjudication of civilians by Israel in Military Courts was instituted by the Israel Defense Forces following the establishment of the State of Israel in 1948. The Defense (Emergency) Regulations (1945), which were enacted in Mandatory Palestine, constituted the legal basis

---

19.    Section 1 of the *Order Concerning Security Provisions (West Bank Area) (Amendment No. 9) (Order No. 144) 5727-1967*. This amendment entered into force on October 22, 1967, a few months after the publication of the original version. The manner of deletion of the section, whereby the original wording was replaced by another provision (instead of writing the word "canceled," as is customary), was referred to as "unconventional," "unusual" and "shameful." See Moshe Drori, Legislation in the Judea and Samaria Area (Jerusalem, 1975: Harry Sacher Institute of Studies on Legislation and Comparative Law, Faculty of Law, Hebrew University of Jerusalem) [Hebrew], pp. 66-67; Haim Holtzman, The Security Legislation in the Occupied Territories (Givat Haviva, 1968: Center for Arab and African-Asian Studies) [Hebrew], pp. 56-57.

20.    Samaria Court Case 5732/01, 5708/01, **Military Prosecutor v. Odeh**, decision dated September 11, 2002.

35



for the establishment of military courts and military courts for summary proceedings, in which Israeli citizens who had committed offenses against the Defense (Emergency) Regulations were tried. Many of them were Palestinian citizens of Israel, who lived under military rule until 1966 and were tried for related offenses.[21]

Accordingly, in 1967, Israel already had significant experience in using military courts to try civilians. Since 1948, it had operated courts of this type in order to try Palestinian citizens of Israel; in 1957, it used similar military courts during the short-term military occupation of the Gaza Strip. In addition, as early as 1963, the Military Advocate General's Corps began to prepare for the imposition of a military government on occupied territories. As part of those preparations, proclamations and orders were drafted, governmental units were established for areas to be occupied in the future, and training courses were held for reservists in the Military Advocate General's Corps, qualifying them to hold positions in the anticipated military government.[22]

Such advance preparations, immediately after the outbreak of the 1967 War, enabled units of the Military Advocate General's Corps to enter the Occupied Territories along with the occupying forces (each of the units of which included a legal advisor to the commander of the sector, two military judges, two military prosecutors and administrative staff). As early as June 7, 1967, the first day of operation of the military government in the West Bank, three proclamations and several orders were published throughout the West Bank and the Gaza Strip:[23] Proclamation No. 1 announced the takeover of the administration and the powers of preserving security and public order by the commander of the Israel Defense Forces in the area.[24] Proclamation No. 2[25] assured the continuity of the judiciary system that had prevailed in the area until its occupation by IDF troops, declared the takeover of all of the powers related to "government, legislation, appointment and administration" by the commander of the IDF or his agents, and announced the transfer of the property that had

---

21.   Menahem Hoffnung, Israel – the Security of the State versus the Rule of Law (Jerusalem, 1991: Nevo) [Hebrew], p. 278. Hoffnung notes three additional types of military courts with the jurisdiction to try civilians: a court-martial pursuant to the Prevention of Terror Ordinance, 5708-1948; a court-martial pursuant to the Prevention of Infiltration Law, which judged foreign civilians who entered the territory of the State of Israel unlawfully; and the Military Jurisdiction Law, 5715-1955, which placed civilians belonging to various categories under the jurisdiction of the Courts-Martial.

22.   Zvi Inbar, The Military Advocate General's Corps and the Occupied Territories, Law and Military 16 (5762-2002) [Hebrew], pp. 149-153.

23.   Meir Shamgar, "Legal Concepts and Problems of the Israeli Military Government-the Initial Stage" in Meir Shamgar (Ed.) Military Government in the Territories Administered by Israel 1967-1980: the Legal Aspects (Vol. I) (Jerusalem, 1982: Hebrew University of Jerusalem Faculty of Law), pp. 14, 24-25.

24.   Proclamation Concerning the Takeover of the Administration by the Israel Defense Forces, Proclamation No. 1.

25.   Proclamation Concerning Administrative and Judiciary Procedures (West Bank Area) (No. 2), 5727-1967.

belonged to the previous administration to the possession and management of the Military Commander. Furthermore, the Military Commander, in Proclamation No. 2, declared the takeover of powers regarding the collection of taxes, determined that the publication of items of legislation – proclamations, orders or notices – would be implemented "in any manner as I see fit,"[26] and stated that anyone committing a breach of public order, security or any provision or order issued by the Military Commander would be punished to the full extent of the law.[27] Proclamation No. 3[28] announced the entry into force of the Order Concerning Security Provisions which was annexed thereto. That order set forth legal procedures in the Military Courts and defined offenses and penalties to be imposed upon offenders.

In addition to the aforementioned proclamations, a number of orders were published on the same day. One of them, Order No. 3[29], established military courts in the districts of Jerusalem, Hebron, Jenin and "West Nablus," "East Nablus," and Ramallah and Jericho, respectively.

The Order Concerning Security Provisions, which was annexed to Proclamation No. 3, and additional orders[30] were replaced, in 1970, by a new order, which included the 18 amendments adopted since the Order has been annexed to Proclamation No. 3, as well as new provisions.[31] The new version was entitled **Order Concerning Security Provisions (Judea and Samaria) (No. 378) 5727-1967** [hereinafter: the "Order Concerning Security Provisions", or OCSP]. Since that time, the Order has been amended repeatedly and constitutes the basis for the existence of the Military Courts, the laws governing the arrest and detention of Palestinian civilians in Israeli custody, the definition of offenses and the determination of penalties for offenders, and the establishment of legal procedures in the Military Courts of the West Bank (see below).

## (b)    Principal developments

Until the late 1980s, the Israel Defense Forces chose not to establish courts of the second instance, in which appeals would be heard against the judgments of the Military Courts,

---

26.    Ibid., Section 6.

27.    Ibid., Section 7.

28.    *Proclamation Concerning the Entry Into Force of the Order Concerning Security Provisions (West Bank Area) (No. 3) 5727-1967.*

29.    *Order Concerning the Establishment of Military Courts (West Bank Area) (No. 3), 5727-1967.*

30.    *Order Concerning the Application of Provisions (Judea and Samaria) (No. 12), 5727-1967* and *Order Concerning the Extension of a Detention Order (Temporary Provision) (Judea and Samaria) (No. 157), 5728-1967.*

31.    Drori, p. 129.

37

notwithstanding the fact that calls for such courts had been brought before the system a number of times during the 1970s.[32] A petition to the HCJ filed in February 1985 by brothers Jamal and Ismail Arjub, containing a demand to establish a Military Court of Appeals,[33] was denied by the justices, who did not find an international law provision obligating the establishment of an instance of appeal in a territory under belligerent occupation. At the same time, the justices of the High Court of Justice stated that the Military Commander would nevertheless do well to establish such an instance in the Occupied Territories. Following the High Court of Justice's recommendation, an order was signed establishing a Military Court of Appeals, which began operation in April 1989.[34]

In recent years, the Military Court of Appeals has established case law slightly expanding the rights granted to defendants and detainees brought before the Military Courts. Thus, for example, the Court ruled that the Military Courts should be guided by the spirit of the Basic Law: Human Dignity and Freedom;[35] the causes for arrest set forth in the Israeli Criminal Code were adopted;[36] judiciary reservations concerning the period for extension of detention were established, notwithstanding the possibility of longer periods of detention set forth in the Security Legislation (see below);[37] as was introduced the ability to petition for removal of the classification of evidence as privileged before the Military Court of Appeals, rather than just the Supreme Court.[38] This expansion of the rights of the accused through case law was not adopted by the Military Commander into the Security Legislation.

Until 1990, the Military Courts were completely subordinate to the Military Commander, who was authorized to confirm or set aside their judgments and rulings, including factual findings and penalties imposed, and even to order the holding of a retrial.[39] In a move intended to reinforce the independence of the Military Court judges, the IDF Military Commander in the area was deprived that year of those powers.[40]

---

32.  Amnon Strashnov, Justice Under Fire (Tel Aviv, 1994: Yedioth Ahronoth Books) [Hebrew], p. 54.

33.  HCJ 87/85, Arjub et al. v. IDF Commander in Judea and Samaria et al., PD 42 (1) 353.

34.  Strashnov, p. 59.

35.  Appeals – Gaza Strip 5/05, al-Jamal v. Military Prosecutor, PSM 12 138.

36.  Appeals 157/00, Military Prosecutor v. Abu Salim.

37.  Appeals – Judea and Samaria 20/03, Ahmad Sharab v. Military Prosecutor; Appeals – Judea and Samaria 119/03, Fadi Jibrin v. Military Prosecutor; Appeals – Judea and Samaria 1380/05, Salah Hamuri v. Military Prosecutor.

38.  Misc. Petitions – Judea and Samaria 71/03, John Doe v. Military Prosecutor.

39.  Order Concerning Security Provisions, Section 42.

40.  Netanel Benichou, On Criminal Law in Judea, Samaria and the Gaza Strip: Spotlight and Trends, Law and Military 18 (5765-2005) [Hebrew], p. 299 [hereinafter: "Benichou"].

The decision to establish the Military Court system – and its judges – as part of the Military Advocate General's Corps would later be described by its founder, Meir Shamgar, as the inevitable result of the circumstances: the need for rapid deployment of prosecutors and for adjudication in territories that had just been occupied, with no intention for that system to remain operational in the long term.[41] What was intended to be temporary, however, remained permanent. For 37 years, the judges of the Military Courts belonged to the Military Advocate General's Corps, the same military unit as the military prosecutors appearing before them, and that which decisively influences the content of military legislation in the Occupied Territories.[42] This arrangement also had a negative impact on the principle of equality between the Defense and the Prosecution in the courtroom, as well as on the appearance of objectivity required by any judicial institution. Nonetheless, 37 years passed before the military order establishing the Military Courts Unit (in the OT, hereinafter: "MCU") was signed, in April 2004, separating the Unit from the Military Advocate General's Corps and subordinating the newly established MCU to the Courts-Martial Unit, which operates the Courts-Martial before which IDF troops are tried.[43]

(c)    Distribution

The Military Courts, which, as set forth above, were established pursuant to Order No. 3, operated in the West Bank during the 1967 War in Nablus, Tubas, Ramallah, Jericho, Hebron and East Jerusalem. The latter court, however, was dissolved upon the annexation of East Jerusalem by the State of Israel on June 28, 1967. After some time, only two military courts remained in the West Bank: the Military Court of Samaria, which operated in Nablus or in Ramallah, as required, and the Military Court of Judea, which operated in Hebron or in Bethlehem.[44]

The outbreak of the first Intifada, in December 1987, gave rise to a significant increase in the volume of activity of the Military Courts in the Occupied Territories. Whereas, in the

---

41.  A Panel Discussion with Meir Shamgar, Former Chief Justice of the Supreme Court, Law and Military 16 (5762-2002) [Hebrew], p. 461; statement by Maj. Gen. Prof. Yishai Bar, Presiding Judge of the Military Courts Unit, from the minutes of a meeting of the Army and Security Committee, Israel Bar Association, July 2, 2003.

42.  See structure of the Military Advocate General's Corps in the Occupied Territories, below.

43.  Eyal Rozin, The Silent Revolution in the Courts in the Occupied Territories, Attorney 48 (September 2004) [Hebrew], p. 58. Former Military Advocate General Amnon Strashnov notes in his book that, during the first Intifada, a proposal to transfer the military courts to the responsibility of the Courts-Martial Unit was discussed. According to Strashnov, the proposal was rejected, in light of the vast experience accumulated by the Military Advocate General's Corps in operating the military courts and due to the events of the Intifada. Strashnov, p. 59.

44.  Shamgar, p. 26.



years prior to the first Intifada, approximately 5,000 indictments per year had been filed before the Military Courts (of which approximately 1,000-1,200 were related to offenses classified as "disturbance of the peace"), by December 1991, four years after the outbreak of the first Intifada, 45,000 indictments had been filed before the Military Courts, of which more than 30,000 were for offenses involving disturbance of the peace.[45] The increase in the volume of activity led to the opening of additional military courts in the West Bank – in Hebron and in Jenin.[46] These courts were closed following the Oslo agreements, the withdrawal of the IDF from the centers of those cities, and the end of the first Intifada.

Upon the withdrawal of IDF troops from the Gaza Strip in August 2005 (in accordance with the Disengagement Plan), the Military Court of the Gaza Strip, which had been located in the Erez facility, was closed.[47] Today, military courts operate in two locations in the West Bank. The Military Court of Samaria, where defendants who reside in the northern part of the West Bank are tried, operates in a military base near the village of Salem. The Military Court of Judea, where defendants who are residents of the southern part of the West Bank are tried, operates in the Ofer Military Base, near Ramallah. Ofer Base is also the site of the Military Court of Appeals and the Administrative Detention Court.

Chart 1: Structure of the Military Court system, 2007



---

45.  Strashnov, p. 50.

46.  B'Tselem, The Military Judiciary System in the West Bank (Jerusalem, 1989) [Hebrew], p. 6.

47.  Hanan Greenberg, History: The Military Court at Erez is Closed, Ynet, August 31, 2005 [Hebrew], http://www.ynet.co.il/articles/0,7340,L-3135884,00.html (viewed on August 1, 2007).

40

## Military Courts in the territory of the State of Israel

Aside from the Samaria and Judea Military Courts, which are located in the West Bank, "branches" of the Military Court system also operate within the territory of the State of Israel. These courts, which mostly deal with judgments on extensions of detention, are located near General Security Services (GSS) interrogation facilities in the Russian Compound police station in Jerusalem, the police station in Petah Tikva, the Kishon detention facility in northern Israel and the Shikma Prison in Ashkelon. These courtrooms are extensions of the Military Courts of Samaria (Kishon and Petah Tikva) and Judea (Russian Compound and Ashkelon), and the judges who hear petitions for extension of detention are military judges, generally reservists. The prosecutors in these courtrooms, generally speaking, are members of the police force who are subordinate to the GSS interrogators and not members of the Military Prosecution.

The location of these extensions within the State of Israel runs counter to the provisions of Article 66 of the Fourth Geneva Convention, which, as set forth above, states that military courts must always be located within the occupied territory. This state of affairs makes it impossible for the detainees' families, who wish to observe the proceedings on the extension of their relatives' detention, to have access to the deliberations. The same is true for Palestinian attorneys representing these suspects, most of whom have been forbidden to enter the State of Israel in recent years (see below). Furthermore, the basic principle of a public trial is damaged by the entry restrictions imposed on civilians wishing to observe proceedings, not unlike the situation prevailing in the Military Courts in the West Bank.

## 03    THE SCOPE OF ACTIVITY OF THE MILITARY COURTS

Each year, tens of thousands of hearings are held in the Military Courts. In 2006 alone, for example, more than 37,000 separate hearings were held by military courts of first instance:



25,907 in the Military Court of Judea and 11,622 in the Military Court of Samaria.[48] Of these, 16,451 were deliberations on the extension of detention of suspects[49] and the rest took place following the filing of indictments against accused persons.

The indictments filed against Palestinians in the Military Courts concern a broad spectrum of offenses, which the IDF divides into five separate categories. The category of "Hostile Terrorist Activity" (HTA) includes involvement in the performance of terrorist attacks and military training, as well as offenses concerning weapons and arms trading, but also offenses concerning membership in "unauthorized associations" – associations that have been declared forbidden by the Military Commander. The second category, "disturbances of the peace" (DOP), includes offenses such as stone-throwing and incitement to violence. "Classic" criminal offenses – theft, robbery, trading in stolen property and the like – make up the third category. In recent years, a new category has been added: "illegal presence in Israel" (IPI), which includes the offense of "leaving the Area without a permit," with which Palestinians entering Israel without a permit, generally in order to find work, are charged. The last category is that of traffic violations in the Occupied Territories.

Table 1: Indictments filed in the West Bank and the Gaza Strip, divided into categories, 2002-2006[50]

| Year | HTA | DOP | Criminal | IPI | Traffic | Total |
|-------|--------|-------|----------|-------|--------|--------|
| 2002 | 2,135 | 941 | 473 | 1,546 | 2,502 | 7,597 |
| 2003 | 2,650 | 1,143 | 436 | 1,564 | 2,011 | 7,804 |
| 2004 | 3,189 | 1,139 | 732 | 1,271 | 3,790 | 10,121 |
| 2005[51] | 2,642 | 1,601 | 291 | 610 | 2,924 | 8,068 |
| 2006 | 3,523 | 1,120 | 378 | 1,387 | 3,392 | 9,800 |
| Total | 14,139 | 5,944 | 2,310 | 6,378 | 14,619 | 43,390 |

48.  Letter from the IDF Spokesperson to Yesh Din, July 30, 2007. These data include cases involving traffic violations (in which the prosecutors are generally members of the police force) and do not include hearings before the Military Court of Appeals or judicial review of administrative detention.

49.  Military Courts Unit, Annual Report on Activity for 2006 [hereinafter: "MCU 2006"], p. 16.

50.  Sources of the data: Military Advocate General's Corps Headquarters, Annual Report on Activity for 2003 [hereinafter: "MAG 2003"], pp. 216, 249; Annual Report on Activity for 2004 [hereinafter: "MAG 2004"], p. 126; Annual Report on Activity for 2006 [hereinafter: "MAG 2006"], p. 138; MCU 2006, pp. 10, 15.

51.  Data for this year include the activity of the Military Court of the Gaza Strip, which was closed in August 2005. The data for 2006 refer to the Military Courts in the West Bank.

42

The data in the table indicate that the indictments which were filed for offenses included in the "HTA" category constitute about one-third (32.6%) of all indictments filed before the Military Courts. If we do not include the traffic indictments, the HTA indictments constitute about half (49.1%) of the number of indictments filed before the Military Courts. Chart 2 provides a relative representation of the table data.

Chart 2: Indictments filed in the West Bank and the Gaza Strip, divided into categories, 2002-2006



## Indictments for offenses of murder and attempted murder

The offense parallel to murder in the Security Legislation is the offense of "Intentionally causing death," which was set forth in Section 51 of the Order Concerning Security Provisions. As in all of the other offenses set forth in the Security Legislation, it is possible to try, under this offense, not only the one who actually committed the offense, but his accomplices as well, as if they had actually committed the offense themselves.[52]

Data collected by Yesh Din with regard to indictments filed between 2004 and 2006 show that, by contrast to the conventional perception of the nature of the cases heard before the Military Courts, indictments for intentionally causing death

---

52.  *Order Concerning the Rules of Liability for an Offense (Judea and Samaria) (NO. 225), 5728-1968, Section 14.*



and intentionally attempting to cause death constitute jointly only about five percent of the indictments filed before the Military Courts.

Chart 3: Percentage of charges of murder and attempted murder in the indictments filed before the Military Courts, 2004-2006[53]



- DOP, Criminal, IPI, Traffic
- HTA (except intentionally causing / intentionally atttempting to cause death)
- Intentionally attempting to cause death
- Intentionally causing death

53.    Sources of the data: MAG 2006, p. 138; Military Advocate General's Corps HQ, Annual Report on Activity for 2005 [hereinafter: "MAG 2005"], p. 52; MAG 2004, p. 41.

# CHAPTER B

## THE STRUCTURE OF THE LEGAL SYSTEM IN THE OCCUPIED TERRITORIES

### 01    JURISDICTION

The establishment of Military Courts in the Occupied Territories – both the courts of first instance and the Court of Appeals – the manner of appointment of their judges, the composition of the benches, and the jurisdiction of the Courts are set forth in Section A of Chapter II of the Order Concerning Security Provisions.

The order sets forth two types of benches for the Military Courts of first instance: a panel of three judges and a single judge. A court sitting as a single judge is entitled to sentence an accused person to a maximum of ten years' imprisonment[54] and to impose a suspended sentence of imprisonment.[55] In addition, a single judge is entitled to sentence a defendant who has been convicted to the payment of fines as set forth in Section 1(a)(5) of the *Order Concerning the Raising of Fines Set Forth in the Security Legislation (Judea and Samaria) (No. 845) 5740-1980* (as of this writing – up to NIS 3 million) and in Section 5A of the *Order Concerning Penal Sanctions (Judea and Samaria) (No. 322), 5729-1969.*[56]

The Order Concerning Security Provisions states that indictments for more serious crimes shall be brought before a panel of three judges headed by a chief judge, who is typically the

---

54.    The original version of the Order Concerning Security Provisions, published in 1970, stated that a single judge was entitled to sentence a person to a maximum of two years' imprisonment. The maximum period was subsequently increased to five years; upon the outbreak of the first Intifada, it was again increased, to ten years' imprisonment. Statement by former Deputy Military Advocate General, Col. Ilan Katz, at a meeting of the Military and Security Committee of the Israel Bar Association; minutes dated June 19, 2002.

55.    Order Concerning Security Provisions, Section 4A(d)(2).

56.    Ibid., Sections 4A(d) (1) and 4A(d)(4). The wording of Section 5A of the Order Concerning Penal Sanctions: "For an offense by which the accused intended to cause monetary damage to another or to obtain a benefit for himself or for another, the Court is entitled to impose upon the accused a fine four times the amount of the damage caused or the benefit obtained by the offense, or the fine set forth in legislation, whichever is larger."

45



Presiding Judge of the Court or another judge appointed by him.[57] A panel of three judges has the authority to try all offenses for which the penalty exceeds ten years' imprisonment, including the death penalty.[58] The Deputy Presiding Judge of the Military Court of Judea, Lt. Col. Netanel Benichou, writes that the decision as to whether an accused will be judged by a single judge or a panel of three judges, in fact, rests with the Military Prosecution, which notes on the indictment whether it is being filed "before a panel" or "before a single judge," according to the Prosecution's expectations of the sentence.[59]

Section 7 of the Order Concerning Security Provisions sets forth the range of material jurisdiction of the Military Courts in the Occupied Territories: to try any offense defined in the Security Legislation or under any law, subject to the Security Legislation, including the jurisdiction given to local courts (that is, civilian courts operating under Jordanian, and subsequently Palestinian, law); to try anyone accused of committing an act outside the OT which would have been considered an offense had it been committed within the OT, provided that the action "harmed, or was intended to harm, security in the Area or public order," and anyone who committed an offense in Area A of the Palestinian Authority which harmed, or was intended to harm, security in the Area.[60] In other words, the jurisdiction of the Military Courts is not restricted to offenses that were *prima facie* committed within the occupied territory itself, but also includes offenses committed anywhere else. It should be noted that the definition of the offenses that are within the jurisdiction of the Military Courts, as set forth in the Order Concerning Security Provisions, is broader than the powers given to military courts in the Fourth Geneva Convention. Article 66 of the Convention states that military courts are to try cases involving violations of criminal security legislation only, but Section 7(b) of the Order Concerning Security Provisions also grants powers within the jurisdiction of local courts. It thus appears, *prima facie*, that although the Geneva Convention restricts the jurisdiction of the Military Courts to offenses that concern matters of security and public order, the Order Concerning Security Provisions also gives the Military Courts jurisdiction to hear offenses totally unrelated to those matters.

---

57.    Order Concerning Security Provisions, Section 4(a)-(b). Concerning the judges in the panel of three judges, see box in Section 2 of this chapter.

58.    At the same time, Section 47(a)(8) states that only a panel of three judges, each of whom holds the rank of Lieutenant Colonel or higher, is entitled to sentence an accused person to death, and only unanimously.

59.    Benichou, p. 305.

60.    Order Concerning Security Provisions, Section 7.

46

## 02    JUDGES

The system of the Military Courts is headed by the Presiding Judge of the Military Court of Appeals, an officer with the rank of Colonel. Since the transfer of responsibility for the Military Courts Unit to the Courts-Martial Unit, the Presiding Judge of the Military Court of Appeals has been subordinate to the Presiding Judge of the Court-Martial of Appeals (which primarily hears cases of soldiers accused of criminal and military offenses).

Section 3B of the Order Concerning Security Provisions states that the persons appointed as judges in the Military Courts shall be Israel Defense Forces officers holding at least the rank of Captain, in the Regular Army or the reserves, who have at least five years of "legal experience" (note: not "judicial experience"). An officer holding at least the rank of Lieutenant Colonel may be appointed as Presiding Judge of a court of first instance.

A judge of the Military Court of Appeals must hold the rank of Lieutenant Colonel and must have at least seven years of "legal experience," including a term (of undefined length) as a military judge. An exception may be made to this rule if the Committee for the Appointment of Military Judges is convinced that the candidate, "in his service in the IDF, was engaged in a legal profession that makes him suitable for this position."[61]

The independence of the Military Court judges is set forth in Section 7A of the Order Concerning Security Provisions: "In matters of judging, there is no authority over anyone who holds the power to judge, except the authority of the law and the Security Legislation." The judges are appointed to positions by virtue of an order issued by the Military Commander, according to the recommendation of the Committee for the Appointment of Military Judges. Until 2004, military judges were appointed by the Military Commander, according to the recommendation of the Military Advocate General, and the Order Concerning Security Provisions specified nothing about the removal of a military judge from office. At least theoretically, a situation could arise whereby the Military Commander could cancel the appointment of a judge at any time and for any reason. Only in that year was the Order amended so as to limit the authority of the Military Commander to intervene in the appointment – and dismissal – of judges.

In the year 2004, the authority to recommend the appointment of military judges to the Military Commander was transferred from the Military Advocate General to the Committee for the

---

61.    Ibid., Section 3B(4).



Appointment of Military Judges, which was established that year in order to recommend such appointments. The Committee is composed of seven members, including four IDF officers – the Presiding Judge of the Court-Martial of Appeals (who serves as chair of the committee), his deputy, the Presiding Judge of the Military Court of Appeals, and the IDF Chief Human Resources Officer. An additional member of the Committee, the Coordinator of Government Operations in the OT, is an employee of the Ministry of Defense. The other members of the Committee are a retired judge appointed to the position by the Presiding Judge of the Court-Martial of Appeals, and a sole civilian: a representative of the Israel Bar Association, selected by the National Council of the Bar Association. Candidates for service as military judges are proposed by the Presiding Judge of the Court-Martial of Appeals, the Presiding Judge of the Military Court of Appeals, the IDF Chief Human Resources Officer, or two members of the Committee. The resolutions of the Committee are adopted by majority vote. Following selection by the Committee, the Presiding Judge of the Military Court of Appeals gives the Military Commander his recommendation concerning the candidates for the positions of judges in the Military Courts, and the judges are appointed by the Military Commander.[62]

As set forth above, the prerequisite conditions for the appointment of a person as a judge in the Military Courts are that one must be an IDF officer with at least five years' "legal experience" for a court of first instance, and seven years' "legal experience" for the Military Court of Appeals.[63] In practice, most such appointees are attorneys, many of whom were formerly posted to the Military Advocate General's Corps or serve their reserve duty therein, and there can be no certainty as to their expertise in the area of criminal law, in general, and in matters concerning security offenses, in particular court.

According to data provided to Yesh Din by the IDF Spokesperson, at the end of 2006 there were 14 Regular Army judges and about 140 reservist judges in the Military Court system in the OT, including the courts of first instance and the appeals.[64]

The problematic nature of the fact that attorneys, with no judicial experience whatsoever, are appointed as reservist judges and serve on panels who try persons accused of offenses, has not escaped the eyes of the judges themselves. At a meeting of the Military and Security Committee of the Israel Bar Association, Atty. Daniel Friedmann, a member of the Committee who himself conducts reserve service as a judge with the rank of Colonel in the Military Court of Appeals, commented as follows:

---

62.   Ibid., Sections 3(d)-(g).

63.   Letter from the IDF Spokesperson to Yesh Din, May 27, 2007.

64.   Ibid.

48

> *The main problem is that judges in the Military Courts are not professionals – they have not taken any judicial courses. Generally speaking, they are attorneys, most of whom are reservists. It makes a difference whether your chosen profession is that of judge or attorney. [...] The fact that non-professional judges are serving has an impact. As I see it, the system should be made subordinate to the Courts-Martial Unit, and should involve those reservists, but "real" judges should also be added.[65]*

Since that discussion took place, the Military Court system has indeed been made subordinate to the Courts-Martial Unit. However, the prerequisite conditions for the appointment of its judges, and their professional profiles, have remained unchanged.

In 2006, an amendment to the Military Jurisdiction Law was passed, empowering the Chief of Staff of the Israel Defense Forces to appoint "associate judges" to the Courts-Martial, which hold criminal trials of IDF soldiers who have been accused of offenses.[66] According to the amendment, military judges who have left the Regular Army and judges who have retired from the "ordinary" court system will be appointed to serve as judges – in reserve service – in the Courts-Martial.

The reason for this amendment was explained by Lt. Col. Roni Pinhas of the Department of Consultancy and Legislation in the Military Advocate General's Corps as follows: "It was important to the Courts-Martial for it to be possible, at least in the higher instances, to take advantage of the experience of veteran judges, whose good services would otherwise not be available to the Courts-Martial simply because they have retired from the civilian courts."[67] With regard to the Military Courts, no such amendment has been enacted, and reservists with no background as judges continue to try persons accused of offenses much more serious than those of which the soldiers brought before the Courts-Martial stand accused.

---

65.    Statement by Daniel Friedmann at a meeting of the Military and Security Committee of the Israel Bar Association; minutes dated July 2, 2003.

66.    *Military Jurisdiction Law (Amendment No. 54), 5766-2006.*

67.    Statement by Lt. Col. Roni Pinhas, at a meeting of the Military and Security Committee of the Israel Bar Association; minutes dated February 15, 2005.



## The Lay Judges

For about 35 years, until 2002, panels of three military judges included, besides the Presiding Judge, who was a judge with a legal education (a "jurist judge"), two lay judges who were IDF officers from various units, devoid of any legal training. The reasons for this were set forth in the provisions of Article 66 of the Fourth Geneva Convention, which states that military courts in an occupied territory shall be identical in composition to the military courts that try soldiers of the occupying army;[68] additional reasons were related to tradition and budgetary resources.[69]

In May 2001, the Military Advocate General's Corps began an internal administrative process toward examining the use of the lay judges who were not jurists.[70] Only a few months thereafter, the media featured the heavily critical reports of two IDF officers on their positions as lay judges in the Military Courts in the Occupied Territories. One of them, Lieutenant Omer Barak, made the following comments to a correspondent from the daily Haaretz about his role as a lay judge:

*"A rubber stamp. You come in and get a brief explanation sheet, a single page. Something like 'Welcome. Go and do justice. We wish you every success.' On the witness stand, no Palestinian witness agrees to say a word. They refuse to confirm testimony that was taken from them against their friends. Every few minutes, Lt. Col. Haniel [the Presiding Judge] declares that this or the other witness is a hostile witness or is standing mute. The judgments are handed down in the name of the Court – that is, in the name of the lay judges as well – without asking us at all. Haniel decided what the status of the witnesses would be, without my even knowing what a mute witness or a hostile witness is. [...] This happens every day. Lay judges with no legal education determine the fate of the accused."[71]*

---

68.   Statement by former Deputy Military Advocate General, Col. Ilan Katz, at a meeting of the Military and Security Committee of the Israel Bar Association; minutes dated June 19, 2002.

69.   Amos Harel, The Military Courts in the Occupied Territories: Judges with No Legal Education Pass Sentences of Imprisonment, Haaretz, December 16, 2001 [Hebrew].

70.   Statement by former Deputy Military Advocate General, Col. Ilan Katz, at a meeting of the Military and Security Committee of the Israel Bar Association; minutes dated June 19, 2002.

71.   Amos Harel, The Military Courts in the Occupied Territories: Judges with No Legal Education Pass Sentences of Imprisonment, Haaretz, December 16, 2001.

50

Following the publication of the article, in January 2002, a meeting of the Foreign Affairs and Security Committee of the Knesset was held, with the participation of representatives of the Military Advocate General's Corps, for the purpose of making changes in the array of lay judges.[72] Several weeks later, the press reported that all of the lay judges would be replaced by jurist judges.[73] In March 2002, the then Presiding Judge of the Military Court of Appeals, Col. Shaul Gordon, sent a letter to the jurists who served as reservists in the Military Advocate General's Corps, in which he admitted the long-term deficiency with regard to the lay judges and called upon them to volunteer for one day's reserve service each month for two years as lay judges in the Military Courts in the OT.[74] This move led to the recruitment of approximately 150 reservist jurists and the replacement of all lay judges by judges with a legal education.[75]

## 03    PROSECUTORS

The prosecuting entities in the Occupied Territories belong to the Military Advocate General's Corps, which functions as prosecution and law enforcement among IDF troops, legal defense for IDF troops, consultation and representation for IDF entities in various legal matters, consultation for IDF entities in matters of international law and the laws of

---

72.    Knesset, This Week In the Knesset Committees, February 3, 2002, http://www.knesset.gov.il/takzir/tak270102.htm (observed on June 15, 2007).

73.    Lior Greenbaum, Lay Judges Will Have to Have a Legal Education, Globes, February 24, 2002 [Hebrew]; Amos Harel, IDF: Within a Year All Judges in the Occupied Territories Will Be Jurists, Haaretz, March 20, 2002 [Hebrew].

74.    In his letter, Col. Gordon wrote (inter alia) as follows: "As we know, in serious cases, the trial is conducted before a panel of three ("panel cases"). According to law and custom in the military courts, cases have been conducted to date before a jurist judge who was the Presiding Judge of the panel, with IDF officers devoid of any legal education serving as lay judges alongside him. Precisely at this time, after almost 35 years of activity, we have come to the conclusion that it will no longer be correct to make use of lay judges who are not jurists, as is customary in Courts-Martial and other tribunals, and that a changeover must be made to professional judging, to be carried out exclusively by judges with a legal education. This being the case, I hereby appeal to all the reserve officers of the Military Advocate General's Corps, those who understand the fateful nature of this decision and the importance of the existence of a sound juridical system, to come to the forefront and – even for a limited period of time – to join the judiciary system in Judea and Samaria and in the Gaza Strip. The judges joining us will sit on panel cases alongside a professional and experienced Presiding Judge; however, as regular judges, they will be able to affect the results of the proceeding." Quoted from Yoav Yitzhak, Without Lay Judges, First Class News, http://www.nfc.co.il/Archive/003-0-921-00.html?tag=08-14-26 [Hebrew] (viewed on January 5, 2007).

75.    Eyal Rozin, The Silent Revolution in the Courts in the Occupied Territories, Attorney 48 (September 2004) [Hebrew], p. 60.



armed conflict, and more.[76] In its role in the field of law enforcement, the Military Advocate General's Corps is divided into districts and arms (Central Command, Air Force, etc.). One such district is the Military Advocate General's Corps in Judea and Samaria Area [hereinafter: "MAG JSA"].[77]

The prosecutors in the Military Courts are IDF officers or "legal officers,"[78] in Regular Army service or reserve duty in the Military Advocate General's Corps, who were appointed to their positions by the Military Commander.[79] The Regular Army officers among them are generally graduates of the Academic Reserves program, who obtained a Bachelor's degree in law[80] before beginning their military service and, in exchange for this postponement of service, undertook to serve in the Regular Army for several years after their compulsory military service. Most of the jurists in the MAG JSA serve as prosecutors in the various prosecution units of the MAG JSA.

The MAG JSA, in which approximately 36 jurists serve,[81] is headed by the Military Advocate for Judea and Samaria Area, an officer with the rank of Lt. Colonel. His powers, in addition to conducting the prosecution in the Military Courts and providing professional guidance to the prosecutors, also include legal support of interrogations by the police and the GSS, decisions to close investigation files for lack of evidence or lack of public interest, and representing the Military Commander in administrative procedures, among others.[82]

The MAG JSA is composed of five units. Two of these units, the criminal units of first instance in the Military Court of Samaria (in the Salem Base) and of Judea (in the Ofer Base), handle the filing of indictments and the conducting of criminal proceedings. As of the end of 2006, 13 jurists served in the Prosecution Unit in the Military Court of Judea, and 11 jurists served in the Prosecution Unit in the Military Court of Samaria.[83] Some

---

76.   MAG 2005, p. 1.

77.   The Military Advocate General's Corps in Judea and Samaria was established in 2004. Until that time, the prosecution entities in the occupied territories were subject to the Legal Advisor to the Judea and Samaria and the Legal Advisor to the Gaza Strip.

78.   In other words, attorneys at law or law-school graduates who have not qualified as officers in the IDF Officer Candidate School.

79.   Order Concerning Security Provisions, Section 8.

80.   A Bachelor's degree in law, or LL.B., is the level of education required in Israel (and many other countries) for certification as an attorney, which is granted upon completion of articles and passage of the bar exam.

81.   The data regarding the number of personnel in the Military Prosecution are correct as of the end of 2006. MAG 2006, p. 51.

82.   Ibid., pp. 52-53.

83.   Ibid., pp. 56-57.

52

military prosecutors who appear in court are articling interns who are not yet certified as attorneys. For example, of the nine prosecutors serving in July 2007 in the Military Court of Judea, five were interns.

The Military Prosecution Unit dealing with appeals is physically located in Ofer Base, adjacent to the building that houses the Military Court of Appeals. Those prosecutors both file and defend against appeals of Court judgments, decisions regarding detention, as well as additional proceedings before the Military Court of Appeals.[84]

A "desk" in the MAG JSA is charged with representing the Military Commander with regard to administrative detention, and it also heads two units physically located in the incarceration facilities in Ofer Base and Ketziot Base in the Negev.[85]

## Administrative detention

Along with the ordinary criminal proceedings that take place in the OT, many Palestinians are incarcerated under administrative detention. This is detention for fixed periods of time that are set by the Military Commander and may be extended. Administrative detainees are not detained as suspects of a particular offense; rather, they are detained on the grounds that they present a future risk. Accordingly, they do not undergo ordinary legal proceedings, in which an indictment is filed and the accused has an opportunity to defend himself against the charges. The power of administrative detention, as confirmed by case law in the High Court of Justice, enables a person to be detained for preventive reasons only and not as punishment for actions he committed or is suspected of having committed.[86] The Military Courts and the Military Prosecution play a role in these proceedings as well.

Chapter E1 of the Order Concerning Security Provisions states that the Military Commander is given the power to issue an order for the detention of a person for a period of up to six months, if he has "reasonable grounds to assume that reasons involving the security of the Area or public security" require that the person remain in

---

84.    Ibid., p. 54.
85.    MAG 2005, p. 55.
86.    See e.g. Appeals 28/1, Hazem Mahmoud Kawassmeh v. Minister of Defense, PD 36 (1) 666.



detention.[87] The Order Concerning Security Provisions enables the Military Commander to extend the administrative detention order against the detainee again and again, for periods of up to six months at a time, if he has "reasonable grounds to assume" that this is still necessary. Table 2 shows that the Military Commander, in fact, makes extensive use of this power.[88]

Table 2: Administrative detention orders and administrative detention extension orders, 2004-2006[89]

| Year | "Initial" administrative detention orders | Administrative detention extension orders | Total |
|------|-------------------------------------------|-------------------------------------------|-------|
| 2004 | ˙,283 | ˙,360 | 2,643 |
| 2005 | ˙,˙38 | ˙,435 | 2,573 |
| 2006 | ˙,299 | ˙,635 | 2,934 |
| Total | 3,720 | 4,430 | 8,˙50 |

A person detained by way of administrative detention is brought before the Military Court of Administrative Detention, in a proceeding known as "judicial review," within 96 hours of the start of his first detention (the proceeding is held *in camera*). In the proceeding, the military judge may confirm, set aside or shorten the administrative detention order. An additional hearing takes place before a military judge three months after the confirmation of the administrative detention. Section 87D of the Order Concerning Security Provisions permits the military judge to deviate from the laws of evidence, for "security reasons," and receive evidence in the absence of the detainee or his attorney, and without disclosing that he has received any evidence whatsoever. In practice, in most hearings on administrative detention the detainee is not aware of the content of the evidence against him, if any, and cannot defend himself against that evidence. The threshold of evidence required for confirmation of the administrative detention order issued against the detainee is extremely low, particularly in contrast

---

87.   Order Concerning Security Provisions, Section 87(a).

88.   For more details on the use of administrative detentions by Israel during the first Intifada and for several years thereafter, see B'Tselem, Prisoners of Peace: Administrative Detention During the Oslo Process (May 1997); B'Tselem, Detainees Without a Trial: Administrative Detention in the Occupied Territories Since the Beginning of the Intifada (October 1992).

89.   Military Courts Unit, Annual Report on Activity for 2004 [hereinafter: "MCU 2004"], p. 17; Military Courts Unit, Annual Report on Activity for 2005 [hereinafter: "MCU 2005"], p. 17; MCU 2006, p. 18.

54

to the threshold required in criminal trials ("beyond a reasonable doubt"). An appeal against the judgment in the judicial review proceeding may be filed before the Presiding Judge or the Deputy Presiding Judge of a military court of first instance.[90]

The legal position of the State of Israel is that the use of administrative detentions is permitted, pursuant to Article 78 of the Fourth Geneva Convention, which holds that, for "necessary reasons of security," the occupying power is entitled to take measures involving the "restriction of place of residence" or detention against civilians in the occupied territory. The ICRC interpretation of this article states that the occupying power is entitled to use these measures for "real and essential" reasons of security only, and that it must ensure "the exceptional nature" of the use thereof.[91] Examination of the data regarding the use of administrative detention in the Military Court system in the West Bank, even before considering other important aspects of the policy regarding the use of administrative detention against Palestinians, demonstrates that the Military Commander makes frequent and routine use of administrative detentions in the OT, in contrast with the provisions of international law.[92]

## 04    DEFENSE ATTORNEYS

Section 8 of the Order Concerning Security Provisions laconically states that an accused standing trial in the Military Courts is entitled to avail himself of a defense attorney for his defense. A separate order, issued in 1970, the *Order Concerning Defense Attorneys in a Military Court (Judea and Samaria) (No. 400), 5730-1970* [hereinafter: the "Order Concerning Defense Attorneys"], sets forth provisions with regard to the representation of accused persons in the Military Courts. The Order states, *inter alia*, that an accused person is entitled to retain an attorney for himself or to represent himself,[93] and that "for an accused person tried before the court sitting as a panel of three, who has been accused of an offense for which the penalty is 10 years' imprisonment or more, who has not chosen a defense attorney or for whom the Attorney General has not appointed an attorney, the

---

90.   Order Concerning Security Provisions, Section 87E (a).
91.   Pictet, p. 388.
92.   For additional data with regard to administrative detention, see Appendix 8.
93.   Order Concerning Defense Attorneys, Section 2.



Military Court shall appoint a defense attorney, with the consent of the accused person."[94] At the same time, the cases in which the Military Court appoints a defense attorney on behalf of the accused are "very few,"[95] because attorneys employed by Palestinian organizations such as Nadi al-Asir ("The Prisoner's Club"), Ad-Damir, and the Palestinian section of Defense for Children International [hereinafter: "DCI Palestine"] are generally present in the courts and take upon themselves the representation of suspects and defendants not otherwise represented by private attorneys.

Regarding the identity of the attorneys authorized to represent accused persons, the Order Concerning Defense Attorneys states that they must be attorneys registered in the Israel Bar Association, or Palestinian attorneys registered as such according to law and the Security Legislation, and imposes no further limitations on their identity.[96]

Attorneys interviewed by Yesh Din for this report estimate that the number of defense attorneys – Israeli and Palestinian – who regularly appear before the Military Courts does not exceed a few dozen.

## 05    DEFENDANTS

The Military Courts, as outlined above, have jurisdiction in principle to try any person – Palestinian, Israeli or foreign – who allegedly commits an offense defined in the Security Legislation, whether within or outside the Occupied Territories, provided that such a person is either endangering the security of the Occupied Territories, or falls under the jurisdiction conferred upon the local courts of the OT.

In fact, the overwhelming majority (if not all) of the accused persons tried by the Military Courts are Palestinian civilians who stand accused of a wide range of offenses.[97] As set forth previously, these offenses may be directly related to "security" (what are referred to as "HTA offenses"), offenses involving disturbance of the peace (such as stone-throwing), offenses related to presence in Israel without a permit (IPI) or other criminal offenses, traffic

---

94.   Ibid., Section 4 (a).

95.   IDF Spokesperson's response to questions from Yesh Din, May 27, 2007.

96.   Order Concerning Defense Attorneys, Section 1.

97.   In response to Yesh Din's request to receive data on Israeli and other (non-Palestinian) civilians tried before the Military Courts in recent years, the IDF Spokesperson answered that he was not in possession of such data. IDF Spokesperson's response to questions from Yesh Din, October 14, 2007.

offenses, and other offenses for which the Military Commander, for his own reasons, sees fit to order that a defendant be tried by a Military Court.

### Trials of Israeli civilians who commit offenses in the OT: a double legal system

In all matters regarding law enforcement vis-à-vis Israeli citizens who commit offenses in the OT, and defense of residents of the Occupied Territories against violence by third parties (including Israeli civilians in the OT), the Military Commander has delegated his duties and powers to the civilian entities of the State of Israel: the Israel Police, the Office of the Attorney General, and the Israeli courts within the borders of the State of Israel.[98]

Section 7 of the OCSP gives the Military Courts in the OT territorial and extra-territorial jurisdiction to try any person who has committed an offense, within or outside the OT, regardless of that person's citizenship – Israeli, Palestinian or other. Nonetheless, Israeli civilians are not tried by the Military Courts, even when they commit offenses that are undoubtedly related to security, within the OT, and when there is no legal dispute over the jurisdiction of the Military Courts to hear the cases concerned. Instead, they are adjudicated by the "ordinary" courts within the borders of the State of Israel, based on the jurisdiction given to the Israeli courts by Section 2 (a) of the *Emergency Regulations (Judea and Samaria, Gaza Strip, Sinai and Southern Sinai – Judging of Offenses and Legal Aid), 5727-1967*, as amended and updated from time to time.[99]

The IDF has not always refrained from trying Israeli citizens before the Military Courts. During the 1970s, Israeli demonstrators from leftist organizations were tried in the Military Courts; in 1982, demonstrators at the time of the Sinai Peninsula evacuation

---

98.   See Yesh Din, A Semblance of Law: Law Enforcement upon Israeli Civilians in the West Bank (June 2006).

99.   The most recent update was enacted in July 2007, within the framework of the *Amendment and Extension of Emergency Regulations Law (Judea and Samaria and the Gaza Strip – Judging of Offenses and Legal Assistance), 5767-2007*, and will remain in force until the end of June 2012. Section 2(a) reads as follows: "In addition to that set forth under any law, the court in Israel shall have jurisdiction to try, under applicable law in Israel, a person who is located in Israel, for the action or omission of that person, which took place in the Area, and an Israeli, for the action or omission of that person, which took place within the territory of the Palestinian Council, provided that the action or omission would have constituted offenses, had they taken place within the jurisdiction of the courts in Israel." The words "Palestinian Council" refer to the Palestinian National Authority.

57



were also tried before the Military Courts. However, the IDF has not done so since. When initiatives to resume trials of Israelis before the Military Courts have arisen, the IDF has stood vigorously opposed. Thus, for example, in April 1995, when the Attorney General at the time, Michael Ben Yair, proposed that Israeli citizens who commit security-related offenses in the OT be tried by the Military Courts, the Military Advocate General at the time, Brig. Gen. Ilan Schiff, objected, claiming that "any decision regarding a change in the prosecution policy in the OT might be interpreted by the settlers as a political act."[100]

Furthermore, when Minister Haim Ramon raised a similar proposal in 2005, Attorney General Menahem Mazuz rejected it with no legal grounds whatsoever, saying that "even though, from a legal standpoint, this possibility exists, in practice, it has not been implemented for a long time, and it appears preferable to stick to the *status quo*, according to which law-breaking citizens who are residents of Judea and Samaria and the Gaza Strip are tried before civilian courts."[101]

The result is the establishment of a double legal system in the OT, according to which a person is arrested, charged and tried by a system determined by his or her national identity. An Israeli citizen residing in the settlement of Itamar and a Palestinian civilian residing in the adjacent village of Beit Furiq, both of whom commit, for example, the offense of manslaughter, will be tried before different legal systems – the latter according to the military Order Concerning Security Provisions, which allows him to be arrested for up to eight days before being brought before a judge, followed by extensions of detention by 30 days each up to three months, and the former according to the Israeli Penal Code, which requires the arrested person to be brought, within 24 hours, before a judge authorized to extend his arrest by up to 15 days at a time, and not more than 30 days in total. They will be tried before different courts: the Israeli will be tried by the Magistrate Court of Kfar Saba, and the Palestinian before the Military Court in Salem. The Israeli will be tried according to the Israeli Penal Code and – if convicted – will be sentenced to up to 20 years' imprisonment; the Palestinian will be tried according to the Order Concerning Security Provisions, and may be sentenced up to and including life imprisonment.

100.    Gideon Alon, Libai, Shahal and Brig. Gen. Schiff Reject Ben-Yair's Proposal to Transfer the Handling of Settlers to Military Courts, Haaretz, May 3, 1995 [Hebrew].

101.    Tal Rozner, Settler, Go to the Guardhouse, YNET, January 14, 2005 [Hebrew]. The statement by the Attorney General is quoted from the response by the Ministry of Justice which appears in the article.

In addition to the above, the law enforcement system applicable to Israelis who commit what is labeled as "ideological" offenses in the OT – including violent offenses – has been subjected, over the years, to scathing criticism over its powerlessness and failure to bring justice to offenders.[102] The separation between the legal systems for Palestinians and for Israeli residents of the Occupied Territories is not a technical separation, but a significant one.

**IN RESPONSE TO THE DRAFT OF THIS REPORT, THE IDF SPOKESPERSON STATED ON BEHALF OF THE MILITARY ADVOCATE GENERAL:**

"Courts-Martial[103] are indeed competent to try any person who has committed an offense within their jurisdiction. However, since the early 1980's, it has been the Attorney General's policy not to commit Israeli citizens to trial by Courts-Martial."

## 06    CONDITIONS IN THE MILITARY COURTS

Detainees and defendants in custody are brought from detention facilities to court on the morning of their hearings, and they are held there before and after these proceedings in detention cells on the courts' premises. Yesh Din observers were denied access to the areas of these detention cells at the Military Courts, but a complaint lodged before the Military Court presidents by the human rights organizations, the Public Committee Against Torture in Israel and Physicians for Human Rights-Israel, describes the conditions in the cells.[104]

As detailed in the human rights organizations' petition, the eight detention cells serving the Judea Military Court and the Military Court of Appeals at the Ofer military base measure

---

102.   See e.g. Yesh Din, A Semblance of Law: Law Enforcement upon Israeli Civilians in the West Bank (June 2006) [Hebrew]; Talia Sassoon, Opinion Concerning Unauthorized Outposts (March 2005) [Hebrew]; Meir Shamgar (Chair), Committee of Inquiry Concerning the Massacre in the Cave of Machpelah in Hebron, 5754 – 1994: Report (State Committee of Inquiry, 1994) [Hebrew].

103.    In translating the original Hebrew version of this report, Yesh Din translated the same term as "Military Courts", as the term "Courts-Martial" is reserved for the military judicial system which handles IDF soldiers.

104.    Letter from The Public Committee Against Torture in Israel and Physicians for Human Rights-Israel to the Military Court presidents, Lt.-Col. Aharon Mishnayot, Lt.-Col. Tzvi Lekach, and Capt. Amit Preiss, July 11, 2007. On October 23, 2007, Attorney Eliyahu Avram of The Public Committee Against Torture in Israel stated to Yesh Din that no response had yet been received to this letter.



about 2.5 sq. m. (27 sq. ft.) each. The Samaria Military Court, at the Salem military base, has seven detention cells, measuring about 2.5 by 2 m (8 by 6 ½ ft.). At least 11 detainees are held in a single cell, under extremely crowded conditions (even when some of the adjacent cells are completely vacant), and their number can at times even reach 20. There is no heating or air conditioning in the cells, such that they are very hot in summer and cold in winter. The cells are unventilated, and fresh air can only enter them through a small aperture in the door. As a result, they are stifling and malodorous. [105] There are no toilets in the cells, and the detainees, at least at the Judea Military Court, are allowed to exit to use outside toilets only once a day. Tap water for drinking is occasionally provided in a single bottle that is passed among the detainees.

Detainees who are brought to the Samaria Military Court from the Hawara detention facility – which is still under IDF responsibility – are not taken to the same cells in which those brought from IPS detention facilities are held. Instead, the detainees from Hawara are held in two metal freight containers, in which planks have been installed for seating. [106] There are, of course, no water taps or toilets in these containers.

In a discussion held by Yesh Din with officials of the Samaria Military Court, [107] the latter asserted that the containers are hardly in use for holding detainees, that they are used very seldom and only as a last resort, and that "everything" is done to have the Hawara detainees brought first before the court in order to return them to the detention facility without holding them in these containers. In a random check that Yesh Din carried out at midday on the same day, immediately after this statement was made, three Palestinian detainees were found inside one of the containers.

From the detention cells, groups of detainees and defendants are taken into the courtrooms and seated in the defendant dock. The number seated on the dock benches varies according to the case load and is usually greatest at hearings on extension of detention. Only two family members of every detainee or defendant are permitted to enter the courts to observe the proceedings. [108] The courtrooms used for detention proceedings are usually

---

105.    Although there are large fans in the detention cells area of the Samaria Military Court, the letter from The Public Committee Against Torture in Israel and Physicians for Human Rights-Israel notes that on the day of their inspection, only one of these fans was turned on – and it was pointed toward the room used by personnel of the IPS Nahshon escort unit.

106.    These particulars were stated to Yesh Din by an IPS officer on November 11, 2007. This officer's name is on file with Yesh Din.

107.    The officials' names are on file with Yesh Din.

108.    See p. 82.

very crowded, both by detainees and the audience, but the other courtrooms are relatively empty, and at times most of the public seating is vacant. For family members, this is usually a rare opportunity to meet their relatives who are in detention,[109] but the security guards in the courtroom absolutely forbid the detainees to converse with their family members there. This situation sometimes leads to violence between the guards and the detainees inside the courtrooms. The following quotations from Yesh Din observation forms illustrate the atmosphere that sometimes prevails in these courtrooms:

→  *At the conclusion of the hearing, the mothers attempted to touch their children [juvenile detainees who were brought to the courtroom]. IPS personnel literally pounced on the mothers and pushed them away from their children. One of the policemen seized a child forcibly and physically threw him out of the courtroom. Miraculously, the child was unhurt. The judge ignored this incident.*[110]

→  *In the course of a hearing, a policeman pounces on one of the other defendants in the dock, seizes him by the collar, brings his face up close, and tells him "if you don't go back to your seat I'll crush you." The assaulted defendant's attorney appeals to the judge to intervene and to reprimand the policeman. The next hearing begins with defense counsel demanding the identity of the assaulting guard. The attorney moves for the incident to be recorded and for a complaint to be lodged with the Police Investigation Department. The judge says that he is recording everything in the transcript, but that it is defense counsel who must handle the complaint.*[111]

→  *A recess is called, and the judges leave the courtroom. Attorney [...] continues conversing with the defendant, apparently in an attempt to conclude a plea bargain with him, but IPS and Border Police personnel seek to remove the defendant from the courtroom and are not willing to permit another few minutes of conversation. The defendant runs amok and begins to rampage, and seven guards pounce upon him violently in order to subdue him. One of them chokes him. Meanwhile his mother looks on, crying out and weeping. Once the defendant is brought under control, he is forcibly removed from the courtroom. The prosecutor explained to us that conversation between*

---

109.  For the limitations on family visits, see the B'Tselem report "Barred from Contact: Violation of the Right to Visit Palestinians Held in Israeli Prisons" (September 2006).

110.  Yesh Din observation report form no. 1217 (Judy Lotz and Ruth Ben-Shaul). Hearing in the Judea Military Court on May 29, 2007 (case number unknown to Yesh Din).

111.  Yesh Din observation report forms nos. 607 and 608 (Judy Lotz and Ruth Ben-Shaul). Hearing in the Judea Military Court on December 26, 2006.



*defendant and counsel is prohibited in the absence of the judge. He thereby justifies the violent incident.*[112]

→ *The wife, mother, and sick child of the defendant were present in court, weeping. The soldiers did not permit the defendant to speak with his wife, even though defense counsel told them that the child had undergone surgery and that the defendant was seeking to find out how he was. The soldiers completely disregarded this request and literally expelled the family from the courtroom. The defendant appeared very despondent. He constantly attempted to wave to his wife and child, but was forbidden to make any move. The judge appeared to disregard the defendant's problem and did not instruct the guards to let the defendant converse with the child. The judge was listless and periodically looked at his wristwatch.*[113]

→ *The defendant and his family members are not permitted to leave the courtroom during a recess. They sit there for hours with no food or water.*[114]

Family members of detainees and defendants await their relatives' hearings in fenced enclosures on the courts' premises, where the Palestinian visitors are let in and out at the discretion of staff personnel on site. The families' enclosure at the Judea Military Court was refurbished during the past year, and a refreshment kiosk was even opened inside. On the grounds of the families' enclosure at the Samaria Military Court, an air conditioned mobile structure was added in recent months to serve as a waiting room. At each of these courts, two toilet stalls are designated for visitors. Repeated inspection conducted by Yesh Din in the four visitors' toilet stalls at these courts found that they are invariably filthy. Family members are allowed to leave the enclosures only when they are summoned to the courtrooms for their relatives' hearings.

The courtrooms themselves are situated in temporary (prefabricated) structures. Family members are seated in the public seating area, which is separated by a railing from the dock and the defense desk. Noise inside and outside the courtrooms, coupled with the fact that in many cases the interpreters and judges do not speak loudly, often make it difficult to follow the hearings. Yesh Din observers have frequently characterized the hearings they witnessed as "noisy" and "unruly." Here is a small sampling of their impressions:

---

112.   Yesh Din observation report form no. 1120 (Nura Resh and Ilana Meki Shapiro). Samaria Military Court, case no. 4815/06, hearing on April 26, 2007.

113.   Yesh Din observation report form no. 682 (Tzvia Shapira). Judea Military Court, case no. 3113/06, hearing on March 30, 2007.

114.   Yesh Din observation report form no. 934 (Keren Ben Dov). Judea Military Court, case no. 3940/06, hearing on March 13, 2007.



Public seating in one of the courtrooms at Samaria Military Court.

→ *Throughout today's hearings, there was noise in the courtroom, mainly due to the unhindered entry and exit of soldiers, Border Policemen and the like. As the doors opened and closed, they emitted a terribly load creak. Truly unpleasant to the ears.*[115]

→ *The courtroom is very small, and four defendants are crammed into the dock. A lot of noise, entries and exits, and talking. Very hard to follow the goings-on in this uproar. The judge does not insist on clear interpretation, and does not see to it that statements can be heard.*[116]

→ *A lot of uproar in the courtroom. No interpreter present in the room. Halfway through the hearing, another attorney comes in and talks with the judge about some other matter.*[117]

---

115.   Yesh Din observation report form no. 958 (Nura Resh). Samaria Military Court, case no. 4884/06, hearing on March 21, 2007.

116.   Yesh Din observation report form no. 1099 (Judy Lotz and Ruth Ben-Shaul). Judea Military Court, case no. 4959/06, hearing on December 26, 2006.

117.   Yesh Din observation report form no. 1183 (Keren Ben Dov). Judea Military Court, case no. 4490/06, hearing on May 1, 2007.

63



→ *The courtroom was extremely noisy, and the judge did nothing to quiet it down, except for a slight gesture. It was almost impossible to hear what was being said in the courtroom.*[118]

Yesh Din observers were requested to specify in their report forms whether the conditions that prevailed in the courtrooms were appropriate. In 330 forms out of 810, various problems were listed,[119] including noise (266 hearings), cold (82), overload and crowding (28), and so on:[120]

→ *Heavy rain beating on the courtroom roof makes it hard to hear. People entering and leaving the courtroom drag in a lot of mud on their feet. There is nowhere to scrape off muddy shoes.*[121]

→ *The air conditioning is feeble. It is hot and people are sweating. The sun comes in through the windows onto the family members' seats and our own. It is hard to hear the judge, who speaks softly. The interpreter is hard to hear.*[122]

In response to Yesh Din's request to receive copies of procedures, rules, or orders regulating the Military Courts or other pertinent military units with respect to required physical conditions in the courtrooms of the Military Courts, the IDF spokesperson noted that "in the matter of physical conditions in courtrooms, there exists no written procedure or order. Nonetheless, appropriate standards are maintained in this regard."[123]

---

118.    Yesh Din observation report form no. 1418 (Keren Ben Dov). Hearing on July 25, 2007 in Judea Military Court, case number unknown to Yesh Din.

119.    In numerous cases, the observers noted problems about the conditions at hearings only on forms relating to a single hearing, even if these problems extended over several hearings that were held on the same day in the same courtroom. The figure of 330 report forms thus represents a minimal estimate, and the proportion of hearings in which problematic conditions were noted is higher.

120.    The total comes to more than 330 since the observers sometimes noted more than one problem at the same hearing.

121.    Yesh Din observation report form no. 806 (Tzvia Shapira). Judea Military Court, case no. 3063/06, hearing on February 6, 2007.

122.    Yesh Din observation report form no. 1466 (Rohaleh Hayut and Nura Resh). Samaria Military Court, case no. 2186/07, hearing on August 23, 2007.

123.    IDF Spokesperson's response to questions from Yesh Din, July 30, 2007.

64

## Weapons in the courtroom

While hearings are in progress, numerous security personnel are present in the courtrooms. At the Judea Military Court, the security guards are usually IPS personnel posted at the adjacent prison facility, whereas at the Samaria Military Court they are servicemen of the IPS, Military Police, and Border police. At both courts, unarmed members of the IPS Nahshon escort unit are also present as they bring in the detainees and defendants.

At least one of the security guards in every courtroom carries a loaded M-16 weapon. In many cases, the barrel of this gun – intentionally or unintentionally – was pointed at the relatives of the defendants, as they sat in the public seating area of the courtroom.

This occurred, for example, at hearings that took place in courtroom no. 1 of the Samaria Military Court on the morning of November 11, 2007. In the courtroom on that morning were five defendants and eight members of their families, as well as two Military Policemen and five to seven members of the IPS Nahshon escort unit, three of them armed with M-16s. Two of the weapons in the courtroom were loaded.[124]

In interviews held by Yesh Din with IPS personnel who served as security guards in courtrooms of the Samaria and Judea Military Courts, they noted that the loaded firearms are brought into the courtrooms for deterrence only, and that the security guards are instructed not to use them in the event that a violent incident develops. In such a case, they are instructed to use only the tear gas devices that they are supposed to carry. However, one of the IPS servicemen noted that the security guards in the courtrooms are not usually equipped with tear gas.[125]

In an interview with the public relations officer of the Military Courts Unit, Lt. Wafi Hanifas, a Yesh Din volunteer expressed her discomfort with the fact that many prosecutors appear in court for hearings wearing a pistol in a holster belt. Lt. Hanifas promised to look into the matter.[126]

---

124.   Observation conducted by Ran Goldstein and Lior Yavne.

125.   These interviews were conducted in August 2007. The names of the IPS servicemen interviewed by Yesh Din are on file with Yesh Din.

126.   Yesh Din interview with Lt. Wafi Hanifas, public relations officer of the Military Courts Unit, Ofer military base, August 8, 2007. Yesh Din was represented in this interview by Judy Lotz, Emily Schaeffer, and Lior Yavne.

65





**IN RESPONSE TO THE DRAFT OF THIS REPORT, THE IDF SPOKESPERSON STATED ON BEHALF OF THE MILITARY COURTS UNIT:**

→ The claims [in respect of the detention cells on the premises of the Military Courts] are not true. From inquiring with the persons responsible in the Israeli Prison Service, there is no limitation for the number of times that a prisoner can go to the restrooms. The size of a prison cell in the Judea court is 9 sqm and not 2.5 sqm as claimed in the report.

→ The Military Courts have waiting halls that would not shame any other court of law. These are tidy, air conditioned buildings that offer many seats. The Judea court has even opened a cafeteria for visitors to the courthouse.

66

# CHAPTER C

## DUE PROCESS RIGHTS IN THE MILITARY COURTS

Two codes of international law constitute the legal framework that applies to the State of Israel's control over the Occupied Territories (OT): international humanitarian law (also known as the law of armed conflict) and international human rights law. These two codes, which are separate but complementary, include an enumeration of the rights of detainees, suspects, and defendants, which the state is required to respect in the course of legal proceedings that it conducts against civilians. Regarding most of the rights enumerated in these codes, no distinction is made between proceedings in an ordinary (civilian) court and those conducted in a military court. This bundle of rights, which includes the rights known as "due process" rights, is the minimum prescribed by international law, and any denial of them is perceived as creating a real and significant danger of a miscarriage of justice.

Besides the law of armed conflict, including the law of belligerent occupation, the main instruments that prescribe the standards incumbent on the Israeli Military Commander when putting Palestinian civilians on trial in the OT are the provisions of international human rights law, as enumerated in a series of international conventions to which Israel is a party. The provisions of these conventions complement those of the law of armed conflict where the latter are deficient by filling in lacunae or facilitating interpretation. The Government of Israel has for years officially declared that the provisions of international human rights law do not apply to its operations in the OT, as according to its perception this area of international law applies only to relations between states and their citizens, and not to relations between a state and the inhabitants of territory that is held by its army under belligerent occupation. The HCJ justices have avoided endorsing this position of the Government of Israel. Although the HCJ has referred to this issue many times in petitions filed over the years, the justices chose not to decide the question of applicability of international human rights law to the OT, leaving it pending while assuming for the sake

67



of argument that this body of law does apply to the OT.[127] In contrast to the HCJ, the competent international legal authorities have utterly rejected the Government of Israel's position on this issue. Thus, for instance, the advisory opinion of the International Court of Justice at The Hague in *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory* discussed Israel's arguments regarding the applicability of international human rights law provisions (and particularly the ICCPR, the *International Covenant on Social and Economic Rights* and the *Convention on the Rights of the Child*), rejected the arguments, and ruled that these provisions do apply to the OT.[128]

In the introductory passages of this chapter's various sections, the reader will also be referred to the regional legal instruments that have reinforced, *inter alia*, the right to due process in Europe, Africa, and the American continent. The references to these instruments, which of course are not binding on the Israeli military occupation authorities in the OT, are intended to exemplify the universality of international standards that Yesh Din employs in this report to evaluate the Military Court system in the OT.

## 01    PRESUMPTION OF INNOCENCE

### (a)    International legal standards

The presumption of innocence is one of the basic preconditions for conducting due process, and has been recognized as such in all the conventions of international human rights law. Article 14(b) of the *International Covenant on Civil and Political Rights*[129] [hereinafter: ICCPR] states:

---

127.    E.g., the President of the Supreme Court, Justice Aharon Barak, noted in his judgment on one of the petitions filed against the route of the separation barrier: "Is it possible to base the rights of the inhabitants, who are protected by international conventions on human rights, which are centered around the 1966 ICCPR, and to which Israel is a party [...] when this question arose previously in the Supreme Court, it was left open and the Court was prepared – without deciding the issue – to rely on the international conventions [...] We will adopt a similar approach. Indeed, we are not obliged, in respect of the petition now before us, to take a position on the question of applicability of international conventions on human rights in the Area [...] Nonetheless, let us assume – without deciding the issue – that the international conventions on human rights do apply to the Area." Para. 27, judgment on HCJ 7957/04, Zahran Yunis Muhammad Mara'bah v. Prime Minister of Israel, SC case 3335 (3) 2005. See also para. 18, judgment on HCJ 769/02, Public Committee Against Torture in Israel v. Government of Israel (yet unpublished). For more on this issue, see also Orna Ben Naftali and Yuval Shani, Living in Denial: The Application of Human Rights in the Occupied Territories, Israel Law Review 37(1)(2003-2004), pp. 17-118.

128.    *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory*, Advisory Opinion (International Court of Justice, July 9, 2004), 43 IL M 1009 (2004), paras. 102-113.

129.    The convention was signed by the State of Israel on December 19, 1966, ratified on August 18, 1991, and came into effect for the State of Israel on January 3, 1992.