Everyone charged with a criminal offence shall have the right to be presumed innocent until proved guilty according to law.

Article 16(2) of the *European Convention for the Protection of Human Rights and Fundamental Freedoms*[130] [hereinafter: ECHR], Article 8(2) of the *American Convention on Human Rights*[31] [hereinafter: ACHR], and Article 7(1)(b) of the *African Charter on Human and Peoples' Rights*[32] [hereinafter: ACHPR] feature similar language.

## (b)    Security Legislation

The Order Concerning Security Provisions (OCSP) and other orders included in the Security Legislation do not stipulate any explicit provision as to the presumption of innocence, except for stating that in rules of evidence the Military Courts shall follow the practices accepted in Israeli courts.[133]

## (c)    The presumption of innocence in the Military Courts

### Rate of acquittals

Two main indices are employed to evaluate the degree to which presumption of innocence is observed in court. One such index tests the judicial rulings themselves in order to determine to what extent the court accepts the evidence submitted by the Prosecution, and whether it indeed places the onus of proof on the Prosecution to pass the threshold of "beyond a reasonable doubt."

A systematic evaluation of judicial rulings in legal proceedings would entail checking each and every interim decision that was handed down by the Courts' judges, and addressing the strength and validity of the evidence put before them. As noted in the introduction to the present report, this is not the kind of inquiry that Yesh Din undertook when it set out to evaluate the implementation of due process rights in the Military Courts. This study does not address the question of whether the Military Court judges' rulings are "right" or "wrong."

---

130.    Signed on November 4, 1950.
131.    Signed on November 22, 1969 and came into effect on July 18, 1978.
132.    Adopted on June 27, 1981 and came into effect on October 21, 1986.
133.    Order Concerning Security Provisions, Section 9.

69



Yet even if the substance of the judicial rulings in the course of legal proceedings is beyond the scope of this study, the rate of acquittals in Military Courts constitutes a clear indication as to how scrupulously the presumption of innocence is observed in the military judicial system of the West Bank.

It appears that the answer is practically self-evident from the figures (the data supplied by the Military Courts Unit itself) and requires no further explanation. Out of 8,854 cases that were adjudicated[134] in the Military Courts during 2006, only 26 cases – which make up 0.29% of the cases – ended in the defendant's full acquittal of the offenses imputed to him. In all the rest of the cases – 8,828 cases, which represent 99.71% of the cases adjudicated – the defendants were convicted of at least some of the offenses for which they were indicted.

The following table presents the figures for acquittals and convictions among the cases that were adjudicated in 2006 by the Military Courts, broken down by the categories of offenses in the indictments.

Table 3: Acquittals and convictions in the Military Courts, 2006[135]

| Category | Cases adjudicated | Full acquittals | | Full/partial convictions | |
|---|---|---|---|---|---|
| | | number | pct. | number | pct. |
| HTA | 2,943 | 8 | 0.61% | 2,925 | 99.39% |
| Disturbances | 882 | 2 | 0.23% | 880 | 99.77% |
| Criminal | 248 | 2 | 0.81% | 246 | 99.19% |
| IPI | 1,297 | 2 | 0.15% | 1,295 | 99.85% |
| Traffic | 3,484 | 2 | 0.05% | 3,482 | 99.94% |
| Total | 8,854 | 26 | 0.29% | 8,828 | 99.71% |

It should be noted that in numerous cases, defendants are acquitted of some counts in their indictments but convicted of others, and in a major part of the cases this results from a plea bargain reached between the Prosecution and the Defense. The low rate of acquittal

---

134.  In 2006, the military courts concluded their proceedings in 9,123 cases. In 269 of these (2.95% of the concluded cases), legal proceedings were waived for various reasons. The other 8,854 cases were adjudicated; MCU 2006, p. 10; IDF Spokesperson's response to questions from Yesh Din, July 30, 2007 and October 14, 2007.

135.  Source of the figures: MCU 2006, p. 10; IDF Spokesperson's response to questions from Yesh Din, July 30, 2007 and October 14, 2007.

is both a foundation and a product of the mechanism that makes the Military Courts tick – the plea bargain mechanism. This subject will be expanded upon later in this chapter.

## Release of suspects from detention

A second index for measuring how meticulously the presumption of innocence is respected pertains to the court's readiness to release from detention both suspects (before an indictment is filed) and defendants (before conviction). The release of suspects and defendants is ostensibly a corollary of their presumed innocence and of the principle whereby detention is not an advance payment on account of their sentence (as at these stages the defendant is presumed to be innocent).

Out of 118 hearings on extension of detention for the purpose of interrogation (not including, of course, hearings on extension of detention "until the end of proceedings," which take place only after an indictment is filed) that were observed by Yesh Din volunteers, only one detainee was released. Only in 92 of these 118 hearings were the Yesh Din observers able to hear, over the commotion of the extension hearings courtroom, for how long the judge ruled to extend the detention. In these instances, the Military Court judges extended the suspects' detention for an average of 10.2 days.[136]

Yesh Din volunteers timed the duration of every extension hearing, including the judge's reading of the documents submitted to him by the Prosecution, the statements of the prosecutor and defense counsel, the interpretation of everything verbalized in court into Arabic, and so on. It was found that a hearing on extension of detention in the Military Courts lasts an average of three minutes and four seconds, from start to finish. Taken together, the aforementioned findings indicate that three minutes and four seconds is the average time that a military judge takes to extend a person's detention for an average of over 10 days.

Yesh Din volunteers observed 38 hearings on extension of detention until the end of proceedings. The observation findings for these hearings show that the average time devoted to them is even shorter than for hearings on extension of detention for the purpose of interrogation. As already mentioned, these hearings may result in a person's detention for a period of over a year, or even two, before his case is adjudicated (see below). Yesh Din volunteers established that these hearings last for an average of one minute and 54

---

136.    It should be noted that Yesh Din observers were usually unable to determine whether the hearing was on a first, second, or subsequent extension of detention, and this figure refers to the total of such hearings that were observed (excluding hearings on extension of detention until the end of proceedings).



seconds. In every one of these hearings, the Court granted the Prosecution's motion to extend the defendant's detention for the duration of proceedings.

Table 4: Timing of hearings on extension of detention until the end of proceedings that were attended by Yesh Din observers

| Number of hearings that lasted for less than one minute | 2 |
|---|---|
| Number of hearings that lasted for one to two minutes | 9 |
| Number of hearings that lasted for two to four minutes | 7 |
| Total hearings | 38 |

As a rule, conducting a trial while the defendant is in detention is the regular practice rather than the exception. Out of 590 reports by Yesh Din observers from hearings that did not relate to extension of detention, but rather other proceedings in the course of a trial, in 541 cases the defendant was in custody, and only in 35 hearings was the defendant released pending a judgment.

In response to a question from Yesh Din, the IDF Spokesperson stated there was no figure on file for the number of cases in progress in the Military Courts in which the defendant is in detention or released. However, as of December 31, 2006 there were 3,183 cases pending in the Military Courts of first instance, of which in 2,116 cases – two-thirds of the cases – the defendant was held in custody, while in the rest he was free.[137] It can be assumed that most of the cases in which the defendant was free pertained to traffic violations or other slight offenses.

## Judges' views

As part of Yesh Din's research methodology, and in order to ensure impartial documentation of court hearings, the observers were instructed by the organization not to engage in conversation with prosecutors and judges in the courtroom. However, courtroom observers of the MachsomWatch organization conducted several conversations with judges – mainly reservists – in the Military Courts, and these judges' remarks revealed some of the worldview that they brought with them to the courtroom.

---

137.   IDF Spokesperson's response to questions from Yesh Din, July 30, 2007.

Thus, for example, MachsomWatch observers recorded the remarks of a judge at the Judea Military Court in April 2006:

> When the session ended, we stayed on for a few minutes and the judge told us at length how hard the GSS was working and how reliable he considered its investigations, and he explained that the detention and prison facilities were bursting with detainees who clearly were not detained without reason, but were dangerous people.[138]

In another hearing, a military judge in a courtroom of the Kishon Military Courtroom (which is dedicated to extension of detention hearings) praised the quality and quantity of rights that are granted to detainees by the military judicial system, and made remarks to the effect that "these are all suicide terrorists, and we look after their rights and translate for them." When asked by a MachsomWatch member whether this applied to them "all," he replied: "Most of them. They are suicide bombers, terrorists who blow themselves up. They were caught en route to committing suicide attacks, and confessed it."[139]

In yet another hearing, at the Judea Military Court, a judge interrupted defense counsel when the latter stated that the defendant was a policeman of the Palestinian Authority and that his weapon was legal. The judge said: "Rabin did indeed give them weapons; after Oslo they received weapons from Israel and this was his mistake, Rabin's. What a shame to us that he did so."[140]

## Presumption of innocence from a defense attorney's viewpoint

The seasoned attorney Jawad Bulus responded at length to Yesh Din's question as to his opinion about presumption of innocence in the Military Courts. This was his reply:

> The answer to this question has to be given from one's experience, as at the theoretical level everyone will come and say "of course." The Prosecution, the prosecuting attorneys, and certainly the judges, as well as any lawyer who appears

---

138.  MachsomWatch, In the Eyes of Justice: Observations at Military Courts in the State of Israel (Hebrew, October 2006), p. 39.
139.  Ibid., p. 40.
140.  Ibid., p. 39.



once a year, will tell you: "No, no, it exists." So unlike this theory, I would like to rely on experience, and experience simply negates this claim absolutely. In my opinion, the presumption that prevails in the Military Courts, as they have consisted over the years, and at least recently – and I have monitored this system for more than two decades – in recent years, the erosion resulting from a lack of commitment to this presumption is almost total. This is so much the case that I would not be mistaken in saying that the opposite is presumed: that everyone who is brought before a military court is presumed guilty so long as he has not managed to prove his innocence.

In order not to let this appear as a political or pugnacious claim, let me make two remarks. First, the basic practices that guide any court – any ordinary court – which is supposed to operate in the realm of ordinary, criminal, law… There is a stage that precedes a trial, the stage when detention is extended for the duration of proceedings. Afterwards, the indictment is filed, and recently… there are all kinds of practices in the State of Israel, especially after the Basic Law: Human Dignity and Liberty was enacted, there are quite a number of practices, or at least schools of thought, that are increasingly beginning to tip the balance toward liberty up to the stage of conviction. At any rate, there are practices developing on the basic presumption that a person is innocent so long as he has not been convicted; of course, the law itself imposes some limitations… but the legislator made a determination, practice develops the legislator's intent, and this could have been most welcome. However, no such thing actually exists in the Military Courts – for slight as well as serious offenses – and I am referring to really slight offenses, the very slightest, from routine disorderly conduct, or even taking part in an assembly; even acting as a member [of an unauthorized association], even performing any kind of service… offenses that cannot be held to constitute commission of any prohibited act, except perhaps thoughts or the like.

In all such cases, regrettably, there is almost no practice – at least in principle – that holds a person to be entitled to stand trial as a free person, subject of course to such bond as the court should see fit to impose. So I say that at this stage, there is almost no possibility to obtain the release of a Palestinian who is brought before the Military Court, no matter what arguments are submitted – [for instance] that in the State of Israel, courts might in similar cases opt to release him.

My other remark is that the standard of evidence that is required to prove an indictment, and the mode of contending with it in court, are completely different from the standard

74

that prevails in the State of Israel, and the difference is to the disadvantage of defendants in the military system. The levity with which the Military Courts and judges treat deficiencies and omissions in the examination of witnesses or in the completion of investigations as the case sometimes demands, at the level of assistance, the level of "something extra" that is required – all kinds of things like these... In my opinion, anyone who delves deeper and conducts a comparative study between the courts in the State of Israel and the Military Courts – and I am not saying that the courts in the State of Israel are paragons – well, I say that even in [comparison with] their present, unfortunate state of affairs the situation [in the Military Courts] is very disturbing.

Therefore, based on my experience I say – and sometimes experience does not have to be proved – I speak, of course, about the general rule. There are of course other judges; there are, of course, other prosecutors, but I speak about the prevalent rule, the prevailing atmosphere, and if here and there some exceptions occur, they only prove the rule. Therefore I say – with respect to this issue, the presumption of a defendant's innocence – that I would confidently state, based on experience, from long years of impressions and quite a number of cases in which the prognosis was different from the judgment that was finally handed down, that a Palestinian who is brought before a Military Court is presumed guilty, and must prove his innocence, rather than the opposite as conventionally accepted.'[141]

(d)     Conclusion

At the outset, adjudication of civilians by Military Courts, some of whom are suspected of involvement in activity against the IDF and/or the State of Israel, is problematic with respect to the presumption of innocence. The military officers serving as judges on the bench cannot divest themselves of their identities, both as Israelis and as military men, when judging those perceived as their enemies: persons to whom involvement in the activity of Palestinian organizations is imputed.

Special concern in this regard arises in the case of judges who are military reservists. These reservists, as already mentioned, are selected for duty without having any judicial experience, and the professional qualifications required of them consist of some (minimal)

---

141.   The interview was conducted by Edna Kaldor and Lior Yavne in Jerusalem, August 13, 2007.



seniority as attorneys. Those among them who gave free rein to their opinions in open conversations well exemplified the inadequacy of this nomination method. As described in the previous chapter, the Military Courts-Martial Unit was granted an amendment to the Military Jurisdiction Law, which allows it to utilize the services of reservists who are retired military judges or judges in the "ordinary" judicial system. This arrangement ought to be implemented by the Military Courts in the OT.

The detention of suspects who are brought before the Military Courts is almost always extended, in very brief hearings. Thus, a few minutes usually suffice to send a man into detention until the end of proceedings in his case.

A minute percentage of the indictments filed in the Military Courts end with the defendant's full acquittal. Of the indictments that reach a final judgment, 99.71% lead to conviction on all or some of the counts. Analysis of the data for acquittals by the various categories of offenses indicates that the vast majority of acquittals were handed down in prosecutions for HTA offenses – that is, the security offenses which are the gravest in the range of violations for which Palestinians are tried in the Military Courts. This appears to stem from the fact that such full acquittals are handed down only after a full trial, including presentation of evidence – certainly not as a result of plea bargains, in which the defendant pleads guilty on some of the counts in exchange for other counts being dropped, or for a lighter punishment. As will be shown below, plea bargains are the mainstay of the Military Courts, while full-evidence trials are a tiny minority. All of the above indicates that application of the presumption of innocence in the Military Courts is quite deficient.

## (e)    Recommendations

1. The appointment of reservists without judicial background to the position of judges of the Military Courts must cease, and instead the IDF should appoint former judges, now in reserve service, as legislated for the IDF Courts-Martial.

2. The number of military judges presiding over detention proceedings, as well as the facilities where these hearings are held, should be modified such that defendants have sufficient opportunity to defend themselves against motions to extend their detention.



**IN RESPONSE TO THE DRAFT OF THIS REPORT, THE IDF SPOKESPERSON STATED ON BEHALF OF THE MILITARY COURTS UNIT:**

→ The rate of full acquittals from all the cases in the Military Courts is much higher than the rate of acquittals in courts in Israel, where the rate of full acquittal from all cases (for 2005) is 0.1% (according to data from the Central Bureau of Statistics, Statistical Yearbook for Israel 2007, p. 482).

→ Assumption of innocence [42] is meticulously upheld in the Military Courts. The feelings of one defense attorney cannot replace facts: the percentage of full acquittals is significant, partial acquittals are even more common, the accused is given full opportunity to voice his arguments and present his witnesses, professional, serious and in depth consideration by the judges of the parties' arguments. Therefore, the Military Courts meet all professional standards prevalent in developed countries, and there is especially a maximum closeness to the legal system in Israel in all aspects and regards. In administrative proceedings as well, the courts tend to intervene significantly in the decision of the military commander, and shorten or annul warrants, in cases where the judge has not been convinced that the sanction is necessary. This activity on behalf of the court, is a source of pride to a system, that despite its being a military system, knows how to maintain and uphold its independence, its great professionalism, and its continuous aspiration for just trial.

→ It is incorrect to present an average hearing time. There is no room for including in these statistics hearings in which both parties agree, both the defense attorney for the accused as well as the prosecutor, to remand custody. Such hearings are naturally shorter, and this is also true in the courts in Israel. It is necessary to check the length of the hearing when the defense attorney objects to the remand request, and argues his request. In these cases, hearings can take a significantly longer amount of time, in such a manner as to allow both parties to present their arguments to the court, as well as to allow the judge to formulate a reasoned decision.

---

142.   In translating the original Hebrew version of this report, Yesh Din translated the same term as "presumption of innocence."

77



True, the number of judges is small compared to the number of cases (a total of 14 judges in all instances). The system acknowledges that work load on the judges is very great. Too great, even. The IDF acknowledges the lack of judges and it was recently decided to increase the number of judges in the first instance by two additional persons. Of course, one should remember that besides the judges in career service, there are also judges on reserve duty, and they are all legal practitioners from the private and public sectors, both from the prosecution and from the defense. Either way, an in-depth review of the courts' decisions shows that the load borne by the judges does not detract from their professionalism.

78

## 02    THE RIGHT TO A PUBLIC TRIAL

### (a)    International legal standards

The principle of a public trial is one of the most important elements of due process rights, and some say that it is the precondition for the implementation of the other rights. Without a public trial, there can be no public oversight, and in the absence of such oversight there is a heightened risk of a miscarriage of justice. However, the right to a public hearing is not an absolute principle. All legal codes, including international law, recognize that in certain cases – which are naturally circumscribed – the public nature of a trial may be limited in favor of other interests, particularly the protection of minors or the protection of state security, or whenever the court deems that restrictions on publicity will serve the interest of justice.

The principle of a public trial is manifested in a considerably limited manner by the Fourth Geneva Convention. The latter's provisions do not stipulate general public access to judicial proceedings conducted against defendants in military courts. Instead, the Convention's provisions hold the occupying power responsible for informing the "protecting power"[143] of details concerning a defendant's identity, the offenses imputed to him, the place of his detention, and the time of the first hearing in his trial – all at least three weeks before the commencement of the defendant's trial.[144] Article 74 of the Fourth Geneva Convention asserts the right of the protecting power's representatives to witness the hearings in trials of defendants charged with offenses punishable by more than two years' imprisonment.[145]

---

143.    A "protecting power," under Articles 9 and 11 of the Fourth Geneva Convention, is a neutral state or international organization that undertakes to protect the interests of the parties to a conflict. With respect to the OT, no state has undertaken this function. The International Committee of the Red Cross did undertake several of the tasks reserved for a protecting power, but not in the context of any judicial proceedings.

144.    Article 71 of the Fourth Geneva Convention. This article further provides that no trial shall take place unless proof is presented at its commencement that such obligatory notification to the protecting power has been made.

145.    The language of Article 74 of the Fourth Geneva Convention is: "Representatives of the Protecting Power shall have the right to attend the trial of any protected person, unless the hearing has, as an exceptional measure, to be held *in camera* in the interests of the security of the Occupying Power, which shall then notify the Protecting Power. A notification in respect of the date and place of trial shall be sent to the Protecting Power. Any judgment involving a sentence of death, or imprisonment for two years or more, shall be communicated, with the relevant grounds, as rapidly as possible to the Protecting Power. The notification shall contain a reference to the notification made under para. 71 and, in the case of sentences of imprisonment, the name of the place where the sentence is to be served. A record of judgments other than those referred to above shall be kept by the court and shall be open to inspection by representatives of the Protecting Power. Any period allowed for appeal in the case of sentences involving the death penalty, or imprisonment of two years or more, shall not run until notification of judgment has been received by the Protecting Power."



Nevertheless, international human rights law, as manifested in the ICCPR as well as the regional conventions, ascribes great importance to the principle of a public trial. Article 14(a) of the ICCPR lists the obligations incumbent on the state with respect to public trials:

> [...] In the determination of any criminal charge against him, or of his rights and obligations in a suit at law, everyone shall be entitled to a fair and public hearing by a competent, independent and impartial tribunal established by law. The press and the public may be excluded from all or part of a trial for reasons of morals, public order or national security in a democratic society, or when the interest of the private lives of the parties so requires, or to the extent strictly necessary in the opinion of the Court in special circumstances where publicity would prejudice the interests of justice; but any judgment rendered in a criminal case or in a suit at law shall be made public except where the interest of juvenile persons otherwise requires, or the proceedings concern matrimonial disputes or the guardianship of children.

The United Nations Human Rights Committee, which is the body empowered to interpret the ICCPR, has noted that the publicity of court proceedings constitutes an important tool for an individual on trial in court, and benefits society in general. The Committee further stated that even though Article 14(a) of the ICCPR permits, in certain cases, to hold court hearings *in camera*, such cases are exceptional by nature and, as a rule, proceedings should be open to the public, including the press. The Committee also noted that access to court proceedings should not be limited to a certain category of persons. Finally, the Committee asserted that in those cases in which public access to a hearing is denied, the judgment should be made public, subject to specific and clear limitations.[146]

The ECHR states that every person is entitled to a "fair and public" trial, although public access to all or part of the trial may be limited for reasons stemming from morals, public order, or national security in a democratic society, when the interests of minors or the protection of litigants requires this, or alternatively in whatever measure the court deems necessary under the special circumstances in which publicity might endanger the

---

146.    UN Human Rights Committee, *General Comment no. 13: Equality before the courts and the right to a fair and public hearing by an independent court established by law (Article 14)* [Hereinafter: "General Comment 13"], para. 6. The UN Human Rights Committee is currently preparing General Comment no. 32, which will serve to update and replace General Comment 13. Overall, the draft of General Comment no. 32 enhances the rights of due process beyond the provisions in the present language.

administration of justice." [147] The ACHR reduces even further the scope of limitations on the principle of the public trial and states that "criminal proceedings shall be public, except insofar as may be necessary to protect the interests of justice." [148]

## (b)    Security Legislation

Provisions concerning the right to a public trial are specified in Section 11 of the OCSP. Sub-section (a) states:

> A military court shall conduct its hearings in public, but the Court may order that its hearings be conducted *in camera*, in full or in part, if it deems that this should be done for considerations of the IDF troops' security, public safety, or protection of morals, or of a minor's welfare, or if the Court deems that a public hearing is liable to deter a witness from testifying freely, or from testifying at all.

Sub-section (b) empowers the Court to permit a person or "a category of persons" to attend all or part of a hearing, even when the hearing is held *in camera*. Additionally, when a hearing is conducted in public, the Court is authorized to prohibit the publication of any detail relating to the Court's proceedings, in order to protect the security of a litigant, a witness, or any other person whose name was mentioned in a hearing, or in order to protect "security in the Area." [149] Other sub-sections specify additional prohibitions concerning photography in the courtroom, [150] disclosure of particulars from hearings held *in camera*, [151] and disclosure of suspects' names, for reasons of undermining investigation or security of the Area. Under such circumstances, it is also prohibited to publicize the submission of motions for gag orders. [152]

In addition to the powers vested in the Court to order that hearings be held *in camera*, as well as the aforementioned provisions of Section 11(a) above, the Military Commander saw fit to empower himself, under Section 11(a) of the OCSP, to submit his written opinion as to whether a trial or other legal proceeding should be held wholly or partially *in camera* in order to prevent harm to the security in the Area. However, the Military Court is empowered, after hearing the other parties, to determine the extent to which the Military Commander's motion

---

147.    ECHR, Para. 6 (a), emphasis added.
148.    ACHR, Article 8 (5).
149.    OCSP, Section 11(f).
150.    Ibid., Section 11(d).
151.    Ibid., Section 11(c).
152.    Ibid., Section 11(g).



should be entertained, and whether to close the hearing entirely or to permit a person or "category of persons" to attend all or part of the hearing.[53]

#### (c)    Military Court procedures

In response to Yesh Din's request to receive copies of procedures, rules, or orders regulating the Military Courts or other military units regarding access by the general public and defendants' families to hearings at the Military Courts, the IDF Spokesperson referred Yesh Din to Section 11 of the OCSP, as cited above.[54]

In a letter, the IDF Spokesperson noted that according to the provisions of Section 11, "admittance to the courts is permitted for the general public, and of course for families of the defendants. However, naturally, access to the courts is affected by security considerations and by courtroom capacity."

The IDF Spokesperson further stated that the Military Courts Unit "does not have written procedures regarding access to hearings for the public and for defendants' families."

#### (d)    Access to the courts

Family members: As clearly indicated by the reports of Yesh Din observers at the Military Courts, the Military Courts Unit does not permit more than two family members of each detainee to enter the court compound and to attend the hearing of their relative's case. It is unknown whether this prohibition is based on any written procedure.

The Court authorities occasionally permit a young child to attend a hearing as a third family member. However, it is unclear who is authorized to permit the entry of an additional family member. In a conversation conducted by Yesh Din with security guards at the Military Court at Salem, they claimed that only the sitting judge is authorized to admit a third family member into the hearing.[55] However, Yesh Din observers frequently heard judges rule, in response to requests by counsel in the courtroom, that only personnel of the Court's security forces have discretion on this matter.[156]

---

153.    Ibid,, Section 11(a).

154.    IDF Spokesperson's response to questions from Yesh Din, July 30, 2007.

155.    This conversation took place at the Samaria Military Court in August, 2007.

156.    Memorandum by Yesh Din observer Roi Maor, August 10, 2007.

82

Other audience: Other than family members who are admitted into the courtroom (and sometimes witness hearings in the cases of other defendants, before or after the hearing of their own relative's case), and observers on behalf of the human rights organizations Yesh Din and MachsomWatch, there are usually no other persons in the audience during court hearings.

An IPS serviceman posted at the entrance to the court compound at the Ofer military base had no response when asked by Yesh Din what action he is to take if a person who is not a family member of a defendant or detainee should request admittance to the courts. He ultimately replied that he believed such a person would have to obtain a permit from the headquarters of the adjacent detention facility.[157]

When Yesh Din questioned the public relations officer of the Military Courts Unit on this matter, Lt. Wafi Hanifas replied that an ordinary person would have no problem entering the courts, but entry would be conditioned on an application having been submitted to the public relations officer a day or two before the date of the intended visit. The decision whether to issue or to deny such a permit would, according to Lt. Hanifas, be at his discretion. According to Lt. Hanifas, before the IPS assumed responsibility for security in the Military Courts, this matter was subject to the procedures of the Military Courts Unit. But since responsibility for the adjacent detention facility was transferred to the IPS in October 2006, new procedures have not yet been formulated, and he would act in this matter as prescribed by previous procedures.

Lt. Hanifas noted that a key restriction on admitting audience into the courtrooms, whether they are relatives of the detainees and the accused or others, is the capacity of the security detail in the courtrooms to allocate sufficient personnel to secure the courtrooms.

According to Lt. Hanifas, besides security considerations, two additional considerations guided the MCU. One was the limited number of seats for the audience in the courtrooms. It should be noted here that while in some courtrooms, such as those reserved for detention hearings in the Judea Military Court, Yesh Din observers did report crowding, in other courtrooms in the same court facility there was usually plenty of empty space for the audience.

A second consideration concerns the presence of an audience in evidentiary hearings. On this matter Lt. Hanifas noted that he personally prefers not to allow the entrance of

---

157.    This conversation took place at the Samaria Military Court on August 8, 2007.



an audience into evidentiary hearings where witnesses testified about harm they inflicted on others or suffered themselves. This, he said, stems from consideration both of the accused and of the victims of the offense: "I personally, as Wafi, do not like the presence of people from outside of the.. in such hearings. In this kind of hearing I personally prefer not to give permission to anyone."[158]

However, Lt. Hanifas stressed that so far, he has not been required to decide whether to admit audience to hearings of this kind, due to the paucity of applications.

Lt. Hanifas's remarks reveal the unreasonably arbitrary conduct of a matter pertaining to one of the most important rights of due process – the public trial. In the absence of written procedures, the authority to grant or deny admission to the court is vested in a junior officer of the Military Courts Unit, who also determines the considerations for making this decision.

### "Let us not pretend that attendance by family members is the same as attendance by others"

The Military Prosecution's sensitivity to public presence in the Military Courts was revealed clearly at an evidentiary hearing in the Judea Military Court, in which a GSS serviceman was due to testify about the interrogation of the defendant, Fuad Shubaki, a former senior official of the Palestinian Authority who was indicted in connection with the arms ship Karin A. The audience included two MachsomWatch observers.

At the outset of the hearing, the military prosecutor, Capt. H.Y., moved to hold the hearing *in camera* and under a gag order. She later consented to attendance at the hearing by the defendant's family members alone. When Atty. Avigdor Feldman, the defendant's defense counsel, noted that this motion would in effect mean the ejection of the MachsomWatch observers, the prosecutor confirmed that this was indeed the case. "It is common knowledge that this is an organization that publishes certain texts relating to proceedings in this Court. The testimony that is to be given is of a sensitive nature. We cannot allow her to observe what the witness is about to be asked. By agreeing that the defendant's family members

---

158.    Conversation by Yesh Din with Lt. Wafi Hanifas, public relations officer of the MCU at the Ofer Base, August 8, 2007. The conversation on behalf of Yesh Din was conducted by Judy Lotz, Emily Schaeffer and Lior Yavne.

attend, we are attempting somehow to minimize the damage that can be expected to be caused. But let us not pretend that attendance by family members is the same as attendance by others."[159]

Even after the Court denied the prosecutor's motion, for considerations of the right to a public trial, the prosecutor's superior, the Military Advocate of the Judea and Samaria Area, Lt. Col. Erez Hason (who up until a few days before this incident had served as President of the Samaria Military Court), was called into the courtroom. Lt. Col. Hason sought to appeal the decision before the Military Court of Appeals. After the Court, despite its reservations, entertained the Prosecution's motion to appeal (which was made with the consent of the Defense), the witness's testimony was postponed.[160]

## (e)    Publication of judgments

International standards require the publication of judgments as part of fulfilling the right to a public hearing (aside from a few narrowly defined exceptions). Temporary solutions have occasionally been improvised by office holders in the military court system, by means of which copies of the judgments were given to lawyers who regularly appeared in the Military Courts. However, with the exception of the aforesaid, no mechanism exists whatsoever by which the public-at-large may locate the Military Court judgments. The findings of Yesh Din on the subject shall be discussed later in this chapter.

## Refusal of the courts to provide observers with the records from court deliberations

As early as the pilot stage of Yesh Din's project to monitor the Military Court hearings, the observers noted that the audience present in the courtroom frequently had difficulty following what was articulated during the hearings. This problem stems from

---

159.    Lines 8-12, p. 2, record of hearing on July 23, 2007 at the Judea Military Court, case no. 3052/06, Military Prosecutor v. Fuad Shubaki.

160.    The full record of this hearing is accessible (in Hebrew) on the Yesh Din website, www.yesh-din.org.



the size of the courtrooms and the placement of the audience benches, as well as the nature of the exchanges between the court, the prosecutor and the defense attorney. In order for the observers in the audience to carry out their task, Yesh Din requested that the Military Courts Unit allow the observers to copy (for a fee) the daily schedules of hearings, which contain, among other things, details about the type of hearing, the name of the defendant, and the type of offense. Yesh Din also requested copies of the records of hearings in which the organization's observers were present, so as to make documentation easier and to receive additional details that appear in the records but are not mentioned aloud in the courtroom, or are recited too fast to be followed and documented.[161]

On November 5, 2006, Yesh Din received an answer from the Military Courts Unit, asserting that the daily schedules of hearings are an "internal administrative document of the Court," and therefore rejected the request to copy them. Nevertheless, it was noted in the response that as a result of Yesh Din's request, it had been decided that the schedule of hearings would be posted at the entrance to the courtroom daily.

Concerning the request to receive the records of the hearings in which observers from Yesh Din were present, the organization was informed that "pursuant to adjudication procedures in the Area [i.e. the West Bank] and in Israel, records of the hearings are given only to the parties involved in the hearings, and not to the audience present during them."[162]

As a result of this response, Yesh Din's legal advisor, Atty. Michael Sfard, contacted the HCJ Department in the State Attorney's office and requested that it address the issue. In his letter Adv. Sfard noted, among other things, that the organization did not request access to records of closed door hearings or those in which a gag order had been issued, but only those to which the principle of a public trial applies. Atty. Sfard further emphasized that Yesh Din commits to cover all the costs involved in copying and receiving the records of the deliberations.[163] When it did not receive a substantive reply to its letter, Yesh Din filed an appeal with the HCJ. In their appeal,

---

161.   Letter from Yesh Din to the MCU, October 15, 2006.

162.   Letter from Second Lieutenant Wafi Hanifas, the MCU public relations officer, to Atty. Michael Sfard, Yesh Din's legal advisor, November 5, 2006. The emphasis is in the original.

163.   Letter from Yesh Din to the State Attorney's Office HCJ Department, Atty. Osnat Mandel, from December 20, 2006.

Yesh Din's lawyers, Attys. Michael Sfard and Shlomy Zachary, wrote *inter alia*, that "the meaningful realization of the principle of a public trial depends not only on the procedural question of the ability to be present in the courtroom, but also on the public's opportunity (or its representatives, whether reporters, academics or human rights organizations) to effectively follow the proceedings and deliberations therein."[164]

After a date was set for hearing the HCJ petition, the State Attorney's office, HCJ Department, sent a letter to Atty. Sfard, in which the State accepted the demands made by Yesh Din in its appeal. The letter stated that it was decided, as a result of the appeal, "that the Military Courts would adopt the law customary in Israel concerning reviewing and copying the records of hearings and the daily schedule of hearings, while adjusting them to the special conditions in the Area."[165] Also noted was that from that date, observers from Yesh Din (and by implication representatives of other human rights organizations) were entitled to copy the daily schedules of hearings, and, upon requesting a "permit for general perusal" of Military Court files, could copy Military Court case files, including hearing records. As of today, Yesh Din holds a permit for general perusal, which it was granted as a result of the appeal.

## (f)    Conclusion

Application of the right to a public trial, in all its various aspects, is rather deficient in the Military Courts. This refers both to the public's ability to observe courtroom deliberations and regular publication of decisions and judgments of the Military Courts.

Damage to the principle of public deliberations in the Military Courts derives in part from factors beyond the control of the Military Courts and Military Prosecution, but falls under the responsibility of the IDF nonetheless. Palestinian residents of the West Bank have been subject to restrictions on their freedom of movement imposed by the IDF – in varying degrees – since the beginning of the second Intifada in September 2000.[166] In fact, in

---

164.    HCJ 4333/07 Yesh Din–Volunteers for Human Rights v. the IDF – Military Courts Unit in the Judea and Samaria Area. To read the appeal, see Yesh Din's website: http://www.yesh-din.org

165.    Letter from Atty. Dana Briskman, chief of HCJ Department in the State Attorney's office, to Atty. Sfard, July 4, 2007. To see the letter, see Yesh Din's website.

166.    In this matter, see for example the B'Tselem report: Ground to a Halt: Denial of Palestinians' Freedom of Movement in the West Bank (August, 2007); periodic reports on the website of the U.N.'s Office for the Coordination of Humanitarian Affairs: www.ochaopt.org.

87



many cases, family members have difficulty in getting through the IDF checkpoints and to the courts in time for their relatives' hearings, if they reach the courts at all. Among 768 observation forms containing details about the presence of family members in the courtroom, it was noted that in of the hearings (21%), family members were not present at all.[167] It can be assumed that in most of these cases, family members were unable to attend the hearings because of travel restrictions in the West Bank.

Furthermore, two of the courts in the West Bank are located within army bases. The Samaria Court is located in the Salem army camp, very close to the "green line" (Israel within its internationally recognized borders), and those that go there must pass through a gate on the route of the separation barrier, enter the military base and then enter the court area. The Judea Court is located in the Ofer army base, which includes the prison facility over which the IPS was recently assigned responsibility. Those coming to both courts must be checked by security guards, and are subject to the restrictions imposed on observers of the hearings: a quantitative restriction imposed on family members of defendants and detainees who come to watch their relatives' hearings; and, for those visitors who are not relatives, the restrictions deriving from the prior approval of a low-level officer in the Military Courts Unit.

The limitation on the number of relatives who are permitted to enter the courtroom due to constraints on the number of security guards there is unjustified. The security arrangements should be adapted to the number of visitors in the courtroom, and not vice versa.

Moreover, the location of many of the detention hearing courtrooms, which constitute branches of the Military Courts, within the State of Israel absolutely prevents the relatives of Palestinian detainees from observing those hearings. As noted, this contradicts the directives of Article 66 of the Fourth Geneva Convention. Furthermore, the establishment of these Military Court extensions within police stations and prison facilities prevents any unauthorized person – Israeli, Palestinian or foreigner – from entering the hearings.

In addition to these *de facto* restrictions on the presence of an audience in the courtrooms, as set forth above, there is the failure to publish the judgments of the Military Courts. Together, these two elements create a judicial system and a judicial process that takes place far from the public eye, and thus is not substantially exposed to public criticism.

---

167.    Amongst those, 85 hearings concerned detention and the rest were hearings held after an indictment was filed (arraignment, reminders, evidentiary, etc.).

### (g)    Recommendations

1. Immediately close the branches of the Military Courts that are located within the State of Israel, and hold all Military Court deliberations within the OT.

2. Lift all restrictions on the presence of family members of defendants and detainees whose cases are brought before the Courts.

3. Regulate by procedure the entrance of an audience (not restricted to family members of the accused) to the Military Court hearings, without any need for prior approval whatsoever.

4. Adapt the Military Courtrooms' conditions and security arrangements to a larger audience.

5. Publish the judgments of the Military Courts, and translate them into Arabic and English.





**IN RESPONSE TO THE DRAFT OF THIS REPORT, THE IDF SPOKESPERSON STATED ON BEHALF OF THE MILITARY COURTS UNIT:**

→ The Military Courts are very strict in upholding the publicity of the hearing,[168] and are not deterred from instructing that a hearing be opened to the public even against the opinion of other senior persons in the defense forces.

→ The matter of accessibility of the courts can be divided into two parts. First, it is necessary to recall that the provisions of the Order for Security Directives, 5730 – 1970, and the many amendments made to it, have greatly improved the accused' access to the courts. If in the past there was no system of appeals, this was established in 1990. Following its creation, the door was opened for suspects and accused persons to appeal first instance decisions, during all stages of trial, as is common in the criminal system in Israel. Accessibility was further strengthened by the court's determining mandatory attendance in all trial proceedings, and by the possibility to conduct disclosure of evidence and disclosure of classified evidence, that were initially provided by court rulings, and were later anchored by law.

→ The second aspect of this right pertains to the accessibility of the court to the public. In this matter, too, it must be said that the Military Courts meet the appropriate standards. In this regard, there is emphasis on providing family members with the opportunity to be present in the courtroom during the trial, as part of the realization of the publicity principle of the trial. Representatives of human rights organizations and from the Israeli and international media are also present during hearings. However, alongside the principle of public trial and accessibility to the court, there are also additional considerations that cannot be ignored, including the limited space available in the courtrooms, as well as security considerations that necessitate a level of security derived, among other things, from the number of attendants in the courtroom, and from security risks involved in the location of the courthouse. Therefore, a certain

---

168.   In translating the original Hebrew version of this report, Yesh Din translated the same term as "the right to a public trial," or "publicity of trial."

limitation has been determined by the security elements guarding the courthouses (the IDF in past and the IPS today) on the number of family members allowed to enter the courtroom, so as to allow the relatives of all detainees to be present during the hearing, while maintaining the required level of security. We believe that the procedure set forth properly balances the publicity and accessibility principles to which we are obligated, and the security needs detailed above. Furthermore, when a defense attorney requests that additional persons be allowed to enter the courtroom, this request is usually granted, subject to the aforementioned security considerations.

→ The courts system has no objection to increasing the number of security guards in such a manner that would allow additional family members and audiences to be admitted to hearings.

91

## 03    THE RIGHT TO BE NOTIFIED OF THE CHARGES

### (a)    International legal standards

The requirement that any accused person be notified of the particulars of the charges against him, as early as possible, and in a language that he understands, appears in Article 71 of the Fourth Geneva Convention:

> Accused persons who are prosecuted by the Occupying Power shall be promptly informed, in writing, in a language which they understand, of the particulars of the charges preferred against them [....]

The ICRC commentary clarifies that the accused shall receive information about the reasons for his arrest in a timely fashion, such that he can prepare his defense; and that the notification, which, according to the wording of the article in the Fourth Geneva Convention, must be written in a language understood by the accused, shall include all the of particulars about the charges against him.

Similar wording appears in Section 14(3)(a) of the ICCPR, which states that every person accused of a crime shall be entitled:

> To be informed promptly and in detail in a language which he understands of the nature and cause of the charge against him.

In Paragraph 8 of General Comment 13, the United Nations Human Rights Committee states that the aforesaid applies to "all cases of criminal charges, including those of persons not in detention," and that the "right to be informed of the charge 'promptly' requires that information is given in the manner described as soon as the charge is first made by a competent authority."

The wording of the ECHR is almost identical to that of the ICCPR.[169] The wording of the ACHR omits the requirement of immediacy, and is satisfied with "prior notification in detail to the accused of the charges against him."[170]

---

169.    ECHR, Article 6(3)(a).
170.    ACHR, Article 8(2)(b).

92

(b)    Security Legislation

Section 21(a) of the Order Concerning Security Provisions, which addresses the indictment and the defendant's response to the charge, states among other things that:

> Before an accused person is brought before a military court, the substance of the charge and its particulars shall be written in the indictment, which will be presented to the Military Court by the military prosecutor; at the heading of the indictment sheet, the military prosecutor shall indicate whether the indictment is being presented to a panel of three judges or one. A copy of the indictment shall be given to the defendant before his trial.

The wording of this section is not in accordance with the accepted standards of international law; the requirement that the charges be "immediately" given to the defendant, and the requirement that the charges be written in a language spoken by the defendant – in this case, in Arabic – have both been omitted.

(c)    Practical application of the rules concerning informing the accused of the charges against him

Immediacy: Indictments against defendants who are in custody are presented to their defense attorneys, as a rule, on the day of the hearings regarding the prosecutor's request to detain the accused until the end of proceedings.

Atty. Fadi Qawasmi is of the opinion that there is no reason that the indictments should not be given to the defendants before the hearing on the request for detention until the end of proceedings.

> *It is possible. Why not? But you know what happens. They have a problem here. Why? They have many cases, perhaps more than the Magistrate Court in Jerusalem. But they have fewer judges, fewer prosecutors, fewer courtrooms – and so they don't have time. And all of that is to the detriment of whom? Of the defendants and their attorneys.*[171]

---

171.    Interview conducted by Judy Lotz, Ruth Ben Shaul and Lior Yavne, in the military court facility in the Ofer army camp on August 14, 2007.

Even if the lack of sufficient personnel makes it difficult to provide the indictment to the defendant and his attorney in a timely fashion, it is difficult to accept the present situation, particularly given its ramifications on the results of hearings concerning detention of the accused until the end of proceedings, as described below.

Language: Despite the clear directives in international law, and despite the fact that Arabic is an official language in the West Bank (and in the State of Israel), the indictments, as is the case in the rest of the written material in the Military Courts, are written and presented to the courts only in Hebrew.

The majority of the accused does not read Hebrew, and certainly are not conversant with the legal language in which the particulars of the indictment are written; they require the mediation of their attorneys in order to understand with which crimes they have been charged. However, the majority of the defense attorneys are also Palestinian residents of the West Bank, who are not completely fluent in Hebrew. Some of them do not read Hebrew at all, or do so only to a limited extent.

One of them, Atty. S.B., a resident of Jenin, explained to Yesh Din that when she receives an indictment, she is forced to request from other attorneys present in the courtroom to translate the indictment for her.'[172]

In those cases in which defense attorneys insist on their rights to receive a translation of the indictment, the courts turn to the military interpreters. Nevertheless, this frequently drags out the proceedings and causes delays, which is perceived by some of the defense attorneys as "punishment" for their insistence. So, for example, Atty. Fares Abu Hassan notes:

> If all of the attorneys were to request [translation of the indictments], the courts would do something. It would put pressure on them [the courts]. But when not everyone does that, whoever does ask for it gets it thrown back at him. If he says to the judge ... 'If you want me to respond to the prosecutor's request today, give me a translated indictment,' the judge answers, 'All right, they're translating the indictment for you. Go to one of the interpreters, he'll translate what you want.' That is, he keeps the attorney there until they prepare the translation.'[173]

---

172.   Interview conducted by Roi Maor and Lior Yavne, in the Samaria Military Court on August 15, 2007.
173.   Interview conducted by Nura Resh and Lior Yavne, in the Samaria Military Court on August 7, 2007.

Atty. Riad Anees criticizes the conduct of the courts in regards to the language used, and especially translation of the indictments:

> *Attorneys in the Occupied Territories do not speak Hebrew. Attorneys also do not read Hebrew. I remember that when they presented an indictment in the 1980s, a Druze soldier would sit here and translate the indictment into Arabic. The fact that attorneys pretend they understand Hebrew, and feign as if they understand the indictments, is because the system wants them to be that way, as if ... here's an indictment, go make a plea bargain. [Attorneys] know the headings [on the indictments] but to discern all of the evidentiary material, which is usually written in Hebrew, and to translate it and all ... It would be one thing if you told me that the defendant can take an interpreter and have him translate it. But that's not right. That should not be the method. The method is that, if you put the accused [on trial] ... you being the Military Court meeting in the Occupied Territories, in the West Bank – the language is Arabic. The accused speak Arabic. The attorneys speak Arabic. They need to do this. And therefore, all of the material has to be translated into Arabic.[174]*

(d)     Results of regulations concerning indictments

While the Judea Military Court allows the possibility of delaying the hearing on detention until the end of proceedings for a few days, when a defense attorney so requests, to enable him to study the indictment and the investigation material (and of course, during that time, the accused remains in detention), the Samaria Court in recent years has required the defendant to respond immediately to the prosecutor's request to detain him until the proceedings are completed. Requests to delay the deliberations in order to study the material are answered in the negative, and the defense attorney must respond to the prosecutor's request without having any idea what is included in the investigation material against his client. Defense attorneys who do not read Hebrew are forced to rely on perfunctory translations of the main points of the indictment provided by one of the people in the courtroom.

So, for example, one of Yesh Din's observers described the dynamics in the Samaria courtroom:

---

174.    Interview conducted by Nura Resh and Lior Yavne, in the Samaria Military Court on August 7, 2007.



→ *The defense attorney requested 48 hours to study the material. The judge explained that that was not the way things were done, and suggested that he peruse the material that moment. The defense attorney agreed to detention until the end of proceedings.*[175]

Atty. Fareed Hawash notes that the fact that the indictment is presented only in Hebrew makes it even more difficult for the attorneys in the Samaria Court, who are forced to respond on the spot to the request to detain the accused until the end of proceedings.

> *Many attorneys come here, take the indictment in Hebrew, and immediately agree to [detention until] the end of proceedings – why? Because of the language, and unfortunately, the court also has a hand in it: it does not provide the defense attorney with the opportunity to read the indictment and copy the evidentiary material before he agrees to or opposes detention until the end of proceedings. Here, you have to respond at once to the prosecutor's request for detention until the end of proceedings. They don't give you time [to study the material] as a defense attorney. [….] The problem is that a Palestinian attorney cannot read the indictment in Hebrew. He has to give an answer and maintain the right to request a review after the hearing.*[176]

In exchange for the defense attorney's agreement to the detention of the accused until the end of proceedings, without giving him enough time to study the indictment and the investigation material against the accused, the court gives a defense attorney who is interested the opportunity to request a "review" of the extension of detention, without having to provide a reason, as required by law. Nonetheless, in the words of Atty. Iyad Mahameed, it seems that fulfillment of this right after the accused has already been detained until the end of proceedings is limited:

> *Then they say, 'Listen, you want to oppose [detention until the end of proceedings]? Plead now. We'll give you an hour or two, until after the recess, no problem. Study the material, read it. A delay of a few days to study the material – there's no such thing here. At the most …,' and that's what usually happens, 'agree to detention until the end of proceedings, subject to maintaining the right to request a review without any change of conditions.' That is, unlike a regular court – and that's the escape they provide – changes in conditions or new information are unnecessary to request a review. A review can be requested automatically without*

---

175.    Yesh Din observation form No. 905 (Roi Maor), Case 1778/07 in the Samaria Military Court, hearing on March 13, 2007.

176.    Interview conducted by Roi Maor and Lior Yavne in the Samaria Military Court on August 15, 2007.

*any problem. But it's rare that a review is requested. Sometimes it's requested, sometimes not. It depends on the case.[177]*

(e)    Conclusion

On the issue of the rights of the accused to know the nature of the charges against him, international standards raise two principal requirements: the requirement that the prosecutor inform the accused "immediately" (or at the very least "promptly") and in writing of the charges against him; and the requirement to give the accused the indictment in his own language.

The requirement to inform the accused of the particulars of the charges against him "immediately" are meant to decrease the delay of justice to a person who has the threat of an indictment hanging over his head. This aim becomes even more important when it refers to a person whose liberty has been deprived and who is detained. The requirement of immediacy is intended to decrease, as much as possible, the length of time that a person is detained after completion of the investigation and before trial, which could otherwise be prolonged arbitrarily.

The requirement that notification of the indictment be given to the accused in his language is designed to enable him to understand the exact charges the prosecutor is filing against him and to prepare his defense in the best way possible. As described above, the Military Prosecution in the Military Courts does not meet either of these two requirements.

This deficiency is not surprising, given that there is nothing in the Security Legislation that orders the Military Prosecution to behave differently. Section 21(a) of the Order Concerning Security Provisions (quoted above) stipulates only that a written copy of the charges be given to the defendant "before his trial." The order does not refer, in any way whatsoever, to the language in which the indictment is to be presented.

In the Samaria Court, these failures are combined with the policy of the court itself, which does not allow the delay of hearings on requests to detain the accused until the end of proceedings. This policy is apparently designed solely to reduce the case load on the court's desk. As a result of the combination of these failures, the ability of the accused to defend himself against the unjust deprivation of his liberty is severely impaired. The

---

177.    Telephone interview by Lior Yavne on August 12, 2007.



changes in the legal proceedings that have been enacted by the Samaria Court hinder defense attorneys from reading and understanding the indictment given to them. This hindrance is exacerbated by the fact that attorneys are not allowed the time required to copy and study the investigation material on which the indictment and the request to detain their clients until the end of proceedings are based.

These are not theoretical questions. The significance of the conclusions drawn in the study conducted by Yesh Din is that many accused are not fully aware of the nature of the charges against them, nor of the particulars. This applies especially to those whose defense attorneys are not proficient in the Hebrew language. Furthermore, the study found that hundreds of defendants are detained until the end of proceedings against them (sometimes for many months and even years), without a conclusive hearing to address the question of whether conditions have been met for their detention. These are two serious violations of the defendants' due process rights in the Military Courts.

## (f)    Recommendations

1. The Samaria Court must cease from demanding a response to the request to detain the accused until the end of proceedings on the same day on which an indictment is received. Instead, the court should postpone the deliberations to a date that will enable the defense attorney to study the indictment and investigation file and argue against detention until the end of proceedings, in accordance with his considered opinion and his client's desires.

2. All indictments served in the Military Courts must be translated into Arabic.

3. The indictment, translated into Arabic, must be sent immediately upon its completion, and at least 72 hours before the hearing on detention until the end of proceedings, both to the defendant (in the place in which he is detained or to his home) and to his attorney.

98



**IN RESPONSE TO THE DRAFT OF THIS REPORT, THE IDF SPOKESPERSON STATED ON BEHALF OF THE MILITARY COURTS UNIT:**

→ [Reference is made to] the alleged "practice" in the Samaria court not to allow time for reviewing the material during detention hearings. This practice, if it had existed in the past, and these claims have not been proven, was rejected due to the Military Court of Appeals' rulings, so that it no longer occurs today.

→ It should be noted that the practice of remanding custody[178] in order that the defense attorney may study the material is also common in courts in Israel, and this option is always given at the defense attorney's request in the Military Courts as well.

→ As regards the translation of bills of indictment, in the past a large portion of the indictments were translated into Arabic, but as no request was made to receive these translations, the practice was changed, and today indictments are translated as per the accused' request, or that of his representative.

**THE IDF SPOKESPERSON STATED ON BEHALF OF THE MILITARY ADVOCATE GENERAL:**

→ Defense lawyers are served bills of indictment on the last day of detention, simply because they are usually drafted and submitted to court on that last day. Due to the load and magnitude of cases and detainees processed and handled by the Military Court, the prosecution is forced to exhaust the duration of detentions in order to prepare the bills of indictment.

---

178.    In its translation of the original Hebrew report, Yesh Din translated the term, remand of custody, to "extension of detention."



## 04    THE RIGHT TO THE ASSISTANCE OF COUNSEL AND THE RIGHT TO PREPARE AN EFFECTIVE DEFENSE

### (a)    International legal standards

Although the right to counsel and the right to prepare an effective defense are usually regarded as separate rights, they are nonetheless inherently intertwined: there is no point in hiring a defense attorney if he will be unable, adequately and effectively, to prepare his client's defense. Accordingly, the provisions of international law are phrased in a manner that connects these two rights. Article 72 of the Fourth Geneva Convention establishes the right of a defendant to representation by counsel of his choice and to conditions ensuring that the defendant enjoys an effective defense:

> [The defendants] shall have the right to be assisted by a qualified advocate or counsel of their own choice, who shall be able to visit them freely and shall enjoy the necessary facilities for preparing the defense.

The authoritative interpretation of this article, as presented by the ICRC, states that the legal authorities must provide counsel of the defendant's choice full freedom of action and facilities[179] enabling him to prepare his client's defense. "Above all," the Red Cross states, counsel must be allowed "to study the written evidence in the case, visit the defendant and interview him without witness, and to contact persons summonsed as witnesses."[180]

Similar to the phrasing of the aforementioned article in the Fourth Geneva Convention, Article 14(3)(b) of the ICCPR establishes that any person accused of a criminal offense is entitled to be granted "adequate time and facilities for the preparation of his defense and to communicate with counsel of his own choosing." The UN Human Rights Committee, as the body empowered to interpret the latter convention, noted in General Comment 13 that while the adequate time for preparation of defense depends on the circumstances of each case, the "facilities" mentioned in this article should include access to documents and other evidence required for the client's defense, as well as secure the possibility for the defendant to consult with his attorney under conditions ensuring "absolute respect" for the privileged and confidential nature of their communications.[181]

---

179.   The term "facilities" may be understood as referring to "means;" the latter is the word employed in the analogous article of the ACHR (quoted in Note 182 below).

180.   Pictet, p. 356.

181.   General Comment 13, para. 9.

100

It must be emphasized in this context that the right to counsel is meaningless unless the defense attorney is given access to the documents, witnesses, legislation, case law, and other aspects of the case that will determine his client's fate. The primary obligation, of course, is to grant counsel access to his client in person, and to do so in a manner that will enable counsel and client to prepare a defense. In other words, the meeting between attorney and client must take place in decent physical conditions, for the length of time required, and while protecting the confidentiality of the exchanges between the two. In the absence of these conditions, the right to counsel will be implemented in a technical but ineffective manner, without substantive implementation, and, accordingly, the right cannot be realized.

A parallel provision to the above-mentioned provision in the ICCPR was also established in the three regional human rights conventions;[182] two of these conventions (the ECHR and the ACHR), define this provision, as does the ICCPR, as one of the "minimum guarantees" owed to any person accused of a criminal offense.

## Appointed Counsel

In addition to the provisions of Article 72 of the Fourth Geneva Convention, as quoted above, the Convention establishes:

> Failing a choice by the accused, the Protecting Power may provide him with an advocate or counsel. When an accused person has to meet a serious charge and the Protecting Power is not functioning, the Occupying Power, subject to the consent of the accused, shall provide an advocate or counsel.

According to the ICRC interpretation of this provision, the obligation to provide counsel applies in cases in which the defendant is suspected of offenses for which the penalty ranges from two years' imprisonment to the death penalty (this is the ICRC interpretation of the vague term "serious charge"). In those cases in which neither the defendant nor the "Protecting Power" provides counsel, this obligation is transferred to the Occupying Power, subject to the defendant's consent.

---

182.    Article 6(c)(2) of the ECHR establishes a defendant's right to "adequate time and the facilities for the preparation of his defence;" Article 8(b)(3) of the ACHR stipulates that the defendant is entitled to "adequate time and means for the preparation of his defense;" and Article 7(a)(3) of the ACHPR establishes that a defendant has "the right to defence, including the right to be defended by counsel of his choice."



The minimum guarantees in the ICCPR also include a provision regarding the appointment of counsel for the defendant by the state, although the provision is restricted to cases in which the defendant refrains from appointing counsel for financial reasons:

> ... to be informed, if he does not have legal assistance, of this right; and to have legal assistance assigned to him, in any case where the interests of justice so require, and without payment by him in any such case if he does not have sufficient means to pay for it.[183]

An analogous provision appears in the ECHR[184] and in the ACHR, establishing that domestic law shall determine whether or not the state is to finance the counsel it appoints.[185]

International humanitarian law and international human rights law both establish that the right to be represented by counsel in criminal law is one of the basic rights included in the bundle of due process rights. This right includes, first and foremost, the freedom to receive assistance from counsel chosen by the defendant, suspect, or detainee, but this guarantee does not exhaust the right. The international conventions establish that the defendant must be permitted to choose his counsel, and the defendant and his counsel must be granted conditions and means to prepare the defense; in other words, they must be allowed to meet alone and for the period of time required in order to prepare for the trial; they must have free access to documents and to the relevant evidence in the trial; and, when necessary, the fee of counsel must be covered.

**(b)      Security Legislation**

The concluding part of Section 8 of the OCSP, relating to "prosecutor and defender," states laconically that "a defendant is entitled to receive assistance from counsel in his defense." However, the order makes no reference whatsoever to the rights relating to counsel's access to the evidence, witnesses, and other legal material that may aid him in preparing his client's defense.

A specific order was devoted to the subject of the defense. The *Order Concerning Defense in a Military Court (Judea and Samaria) (No. 400), 5730-1970* (which replaced an earlier version, Order No. 143 from 1967), essentially addresses procedural matters. Section 1 of

---

183.   ICCPR, Article 14(c)(4).
184.   ECHR, Article 6(c)(3).
185.   ACHR, Article 8(b)(5).

the order defines "counsel" as a "local" or Israeli attorney;[186] Section 2, entitled "Defense before a Military Court," extends somewhat the provision in Section 8 of the OCSP, stating that "a defendant before a court is entitled to defend himself through counsel or to manage his defense by himself."

The Order Concerning Defense in a Military Court enables the appointment of counsel by the "Legal Advisor"[187] to manage the defendant's defense in such "cases as he shall see fit" and with the consent of the defendant.[188] This provision grants discretion to the Legal Advisor, but the Order requires the Court to appoint counsel to a defendant, in an offense for which the penalty is ten years' imprisonment or more, who did not appoint his own counsel or for whom counsel was not appointed by the Legal Advisor, provided that the defendant consents thereto.[189] In addition, the Court is also entitled to appoint counsel "on special grounds" to a defendant for whom there is no obligation to do so, at the request of the defendant, the military prosecutor, or on its own initiative.[190] The Order establishes further provisions regarding financing the fee for counsel appointed by the Court or the Legal Advisor and related defense costs from the funds of the Command of the Area.[191]

In addition, the Order instructs counsel chosen by the defendant or appointed to his function by the Court or the Legal Advisor to represent the defendant "in any proceeding relating to the trial for which he was chosen or appointed."[192] However, the authors of the Order Concerning Defense in a Military Court did not see fit to establish any provisions regarding the ability of counsel to pursue an effective defense, including access to the evidentiary material and witnesses; the determination of conditions for an undisturbed conversation between the detainee or defendant and his counsel in the place of detention or elsewhere; or any other condition recognized under international law as the "minimum" for the maintenance of an effective defense.

---

186.   Previous orders (*Order Concerning the Appearance of Israeli Advocates in the Courts (Temporary Order) (West Bank Area) (No. 145), 5728-1967*, and an order (No. 248) with a similar name from 1968 extending the temporary order "until such date as it is nullified by the Commander of the Area,") authorized attorneys who are members of the Israel Bar Association to appear in all the courts in the Occupied Territories. As far as Yesh Din is aware, said temporary order has not been nullified to date.

187.   The Order does not specify to which "legal advisor" it refers; it may be assumed that this currently refers to the Legal Advisor to the Judea and Samaria Area.

188.   Order Concerning Defense, Section 3.

189.   Ibid., Section 4(a).

190.   Ibid., Section 4(b).

191.   Ibid., Section 10.

192.   Ibid., Section 6.



### (c)     Unrepresented defendants

Based on observations conducted by Yesh Din observers in the military courtrooms and from interviews held with attorneys appearing in these courts on a regular basis, it appears that the vast majority of defendants brought before the Military Courts are represented by counsel in the hearing.

Of the 810 hearings in the Samaria and Judea courtrooms observed by Yesh Din volunteers, the observers noted in just 13 hearings that counsel was not present in the courtroom at the time of the hearing. [93] The absence of counsel in these cases was due to diverse reasons, including the non-appointment of counsel prior to the hearing, absence due to illness, the fact that counsel was busy in another courtroom, and so forth.

Notwithstanding the above, the procedure for the appointment of counsel for defendants in the Military Courts is not implemented in an appropriate and proper manner. In many cases, when the defendant arrives in the courtroom without counsel, one of the attorneys present agrees on the spot to undertake his defense, without the ability to study the details of the suspicions or charges and to consult with his new client, as shall be described below.

### (d)     The appointment of an attorney: Palestinian NGOs as public defenders

On March 15, 2007, Yesh Din asked the IDF Spokesperson to provide a copy of any procedure, rule, or order regarding legal aid for unrepresented defendants. In response, the IDF Spokesperson referred Yesh Din to the Order Concerning Defense in a Military Court, noting that the Military Courts act in accordance with this order. The IDF Spokesperson further noted that cases in which the Military Courts are required to appoint counsel for defendants in accordance with the provisions of the Order are "very few," since organizations supported by the Palestinian Authority (the IDF Spokesperson mentioned the "Prisoner's Club" in this context) provide legal defense for defendants "in accordance with criteria that are unknown" to the IDF. [94]

---

193.    In 28 additional hearings, the observers noted that it was unknown whether the defendant was represented, and in 20 additional observation forms the observers did not complete the relevant item.

194.    IDF Spokesperson's response to questions from Yesh Din, July 30, 2007.

Defendants who can afford to do so hire the services of private attorneys whose fees may be very substantial. Many defendants, however, are forced to make do with the legal defense provided free of charge by one of the numerous Palestinian NGOs that provides legal representation for detainees and defendants.

Except in isolated cases, the Court does not typically appoint counsel for a defendant at the expense of the State. In those cases in which this occurs, counsel's fee is paid from the funds of the Treasury Headquarter Officer in the Civil Administration. In most cases, however, when an unrepresented defendant arrives in court, the court refers him or his relatives to a Palestinian NGO that provides legal representation for detainees and defendants, or instructs him to hire the services of a private attorney.

Thus, for example, in one of the hearings to which an unrepresented defendant arrived, the Yesh Din observers noted that:

> The judge attempts to clarify to the defendant (through an interpreter) that they will not be able to pursue the trial without an attorney. He calls the father, who is in court, and explains to him that they must try to obtain an attorney. He refers him to the prisoners' organization and clarifies that it is also possible to hire a private attorney.[195]

The detailed documentation of this hearing on the observation form of the Yesh Din observers also reveals that when the Court postponed the hearing to a later date, by which time the defendant was to be represented by an attorney, it again refrained from offering to appoint counsel on its own behalf:

> The judge initially proposes [postponing the hearing until] July 8, but the father requests more time [to find counsel]. Although the judge again explains where he may turn, he agrees and postpones the hearing until July 30.

In this case, the conditions listed in the provisions of the Order Concerning Defense in a Military Court instructing the Court to order the appointment of counsel funded by the Civil Administration, subject to the consent of the defendant, were present: The indictment served by the Prosecution before a panel of judges (which tries offenses for which the penalty is greater than ten years' imprisonment) included a charge of shooting at a person,

---

195.   Yesh Din Observation Form No. 1136 (Nura Resh and Ilana Shapiro). Hearing in Samaria Court case no. 3500/07, May 13, 2007.



an offense for which the maximum penalty under the Defense (Emergency) Regulations is the death penalty. Despite this fact, the chief judge of the panel did not see fit to appoint counsel on the Court's behalf and certainly made no effort to examine whether the defendant was interested in such appointment.

Instead, judges routinely instruct unrepresented detainees – generally during detention hearings prior to the filing of an indictment – to contact attorneys employed by the various Palestinian NGOs and request that they undertake their representation. For example, in two consecutive hearings, the judge recommended that a detainee avail himself of the services of counsel from one of the NGOs who was present in the courtroom at the time:

> The suspect is not represented. The judge expresses his surprise that the Prisoner's Club did not visit this detainee or the previous one in their place of detention. Atty. Khariz, as in the previous case, volunteers to speak with the detainee; the judge again suggests to the detainee that Atty. Khariz represent him, and the suspect agrees.[196]

In another example:

> The defendant does not have counsel. The judge turns to the attorneys from the Prisoner's Club and asks them to what area [the village of] Jayyus belongs and who deals with this area. They reply that Jayyus is in the Qalqiliya district, under the responsibility of Atty. Adnan Abu Laila. The judge turns to the defendant and tells him that the attorney who represents his area is not present, and asks him whether he agrees to be represented by Atty. Mohammed Sharif.[197]

The above exchanges, in which the judge in one case expressed his surprise that the representatives from the Prisoner's Club had not visited detainees in their place of detention and, in another case, sought to clarify under which Prisoner's Club attorney's "area of jurisdiction" the detainee's village belonged, illustrate the extent to which the Palestinian NGOs have been transformed into a type of public defender. These NGOs effectively constitute a means of satisfying the court that the detainees and defendants appearing before it receive representation without the Civil Administration having to fund it. Thus the court saves the Civil Administration the fees to retain counsel and other expenses incurred in funding a defense – receipt of expert opinions, laboratory tests, and so forth.

---

196.   Yesh Din Observation Form No. 843 (Roi Maor). Detention hearing of A.Z. at Samaria Military Court, February 27, 2007.

197.   Yesh Din Observation Form No. 761 (Roi Maor). Hearing in Samaria Military Court case no. 1471/07, February 13, 2007.

Given the substantial sums received each year by the Civil Administration from fines imposed on those convicted in the Military Courts,[198] and bearing in mind the obligation incumbent on the court, in certain cases, to offer to appoint counsel on its behalf for defendants, the custom of essentially evading this responsibility while imposing it on various Palestinian bodies is simply improper practice.

### (e)     Meeting with an attorney

On October 3, 2006, responsibility for the Ofer military incarceration facility was reassigned by the Military Police to the Israel Prison Service (IPS), completing the transfer of authority over all the major incarceration facilities that hold detainees and prisoners from the OT from the IDF to the IPS.[199] The vast majority of Palestinian detainees held by Israel and sentenced in the Military Courts[200] have since been held by the IPS, and their meetings with attorneys are subject to IPS procedures.

The IPS procedures establish that an attorney seeking to meet with a "security prisoner" (including security detainees)[201] must send a request application in advance via facsimile to the prisoners' officer at the facility;[202] that the meeting will take place behind a partition; and that the attorney will be permitted to take into the place of meeting "only documents

---

198.     See figures in Appendix 7.

199.     The two other major facilities, Megiddo Prison and Ketziot Prison, were transferred from the IDF to the IPS in February 2005 and March 2006, respectively.

200.     Thus, for example, according to figures forwarded to B'Tselem, in June 2007 the IDF held 64 Palestinian detainees, including two under arrest until the end of proceedings, compared to 2,539 Palestinian "security detainees" in the incarceration facilities of the IPS (including 2,272 persons under arrest until the end of proceedings). The figure for the number of detainees in the IPS is correct as of July 6, 2007, while that for the number of detainees in IDF custody is correct as of June 18, 2007.

201.     Section 3(a) of the Israel Prison Service Commission Ordinance 04.05.00 – "Definition of a Security Prisoner" – defines a security prisoner as "a prisoner who has been convicted and sentenced to imprisonment on account of committing, or who is detained on suspicion of committing, an offense that by its type or circumstances is defined as a clear security offense, or the motive for which offense was nationalistic, as well as a person convicted or accused of an action that was tantamount, or there was a tangible possibility that it was tantamount, to the granting of service to a terror organization or to a person seeking to injure state security, when said act was committed out of awareness, or while turning a blind eye, or out of apathy for the danger that was or might have been created to state security." Section 3(c) of the Commission Ordinance states that the nationalistic motive is to be determined in accordance with the motive or circumstances of the offense as presented in the arrest decision, the judgment, or in an intelligence information opinion from the police or the GSS regarding a detainee or defendant. A list of "security" offenses is provided in the appendices to the Ordinance, including any "offense against Security Legislation [in the OT] which, had it been committed in Israel, would have been included in the definition of a "security prisoner."

202.     Israel Prison Service Commission Ordinance 04.34.00 – "Prisoners' Contacts with Attorneys," Section 6. Section 8 of the same Ordinance establishes that meetings between an attorney and a detainee do not require prior coordination.



and writing implements."[203] The procedures also establish that the meeting between detainee and attorney shall be held "in private and in conditions ensuring the confidentiality of the conversation, but in a manner enabling supervision of the detainee's movements and behavior."[204]

## (f)    Palestinian attorneys

Most of the Palestinian detainees are held in incarceration facilities within Israeli territory, under the terms of Section 6(b) of the *Law Concerning the Extension of Validity of the Emergency Regulations (Judea and Samaria and Gaza Strip – Judgment in Offenses and Legal Aid), 5727-1967*.[205] With the exception of the Ofer incarceration facility in the West Bank (in the army base to which the Judea Military Court was transferred in 2002), all the remaining incarceration facilities of the IPS, in which the vast majority of Palestinian detainees are held, are situated within the territory of the State of Israel.[206]

This arrangement severely restricts the ability of Palestinian attorneys to visit their detained clients and provide them with counsel. Israel has imposed a sweeping prohibition against entry into Israel by Palestinian residents of the OT; the provision applies equally to attorneys and includes the places of detention in which most Palestinian detainees and prisoners are held.

As a result, Palestinian attorneys are almost completely prevented from meeting with detainees, the vast majority of whom, as noted, are held within the territory of the State of Israel.[207] Accordingly, attorneys who are residents of the OT are forced to hire the services of Israeli colleagues to visit their clients at detention facilities on their behalf, and report to them on the content of the meeting. Thus, for example, Atty. Fares Abu Hassan, a resident of Nablus, states:

---

203.    Israel Prison Service Commission Ordinance 03.02.00 – "Rules Relating to Security Prisoners," Section V(3).

204.    Ibid., Section 22(1). This provision also applies to non-security detainees.

205.    The section states: "The arrest and detention of a person against whom an arrest warrant or a detention order was issued in the Area under the terms of the authority granted by a Commander's proclamation or order may be executed in Israel in the manner in which an arrest warrant or a detention order are executed, and such person may be transferred to detention in the area in which the offense was committed."

206.    Detainees from the OT are held at Shata Prison, Damon Prison, and Kishon Detention Center (in the north of the State of Israel); at Sharon Prison and Hadarim Prison, and at detention centers in the "Russian Compound" in Jerusalem and at the Petah Tikva Police station (in the center of the country); and at Shikma, Eshel, Nafha, and Ketziot Prisons (in the south). With the exception of the detention centers in the "Russian Compound" and in Petah Tikva, all the prisons, as well as the Kishon Detention Center, are under the responsibility of the IPS.

207.    Attorney Abu Hassan noted in an interview with Yesh Din that in only one case in recent years did he receive an entry permit for a few hours into the State of Israel in order to visit his clients held at the Kishon Detention Facility.

*The problem of all the Palestinian attorneys representing detainees in the Military Courts is that they do not have an opportunity to enter Israel and visit the person whose detention case they are handling – not during interrogation, not during the extension of detention, and not thereafter. This greatly impedes our work. We always have to send another, Israeli attorney, but he does not convey all that you want to convey to the detainee. During the hearings in court – and we work under pressure here – we [only] talk [to the clients] in the courtroom during the hearing. We stand before the judge and speak quickly and briefly – this isn't how the work of an attorney should look. You need to sit and talk to your client, consult with him about the evidence in his case, and discuss each point. That doesn't happen at all. This is the problem we have faced for years, since 1999 or 2000.*[208]

### (g)    Conditions of the meetings

Attorneys who are Israeli citizens (or residents of East Jerusalem holding permanent residency in Israel) also encounter numerous difficulties imposed by the IPS with regard to meeting with their clients. All the attorneys with whom Yesh Din spoke noted that the conditions imposed by the IPS concerning visits with detainees in their places of incarceration – some of which are defined in proper procedures and others derived from additional decisions by the IPS – waste much of their time and, in practice, lead some of them to refrain entirely from visiting their clients during detention.

Thus, for example, in at least some of the incarceration facilities in which detainees are held, the IPS only permits one attorney to meet his clients at a time. As a result, other attorneys who arrive at the facility are forced to wait in line until their colleague completes his meetings with all his clients. Moreover, the IPS does not permit an attorney to meet several clients simultaneously, thus causing additional delays. For example, Atty. Riad Anees comments:

*If you're looking for the logic behind this, there isn't any. Sometimes I go to visit three detainees being held in the same cell who spend all their time together, sleeping and eating together, but when they need to meet with me they cannot come together... So I stay in one place and they come to me one at a time. Even if I have three defendants in the same case who are being held together they cannot be brought to me together. The problem is if I arrive in the morning with an*

---

208.    The interview was conducted by Nura Resh and Lior Yavne at the Samaria Military Court on August 7, 2007.



*advance appointment, and I want to see three detainees, and another attorney arrives two minutes later, then he can't enter the prison until I leave.*[209]

Israeli attorneys hired by the NGOs that provide assistance to prisoners arrive at the incarceration facilities with a long list of detainees with whom they are scheduled to meet. As a result, other attorneys are unable to meet with their clients for several hours. This policy, which forces attorneys to wait in turn for hours outside the incarceration facility, wastes time and creates the sense that, for the IPS, meetings between detainees and their attorneys are merely a chore to which no particular importance is attached:

> *The IPS has strict procedures regarding security so that an attorney doesn't take anything in. They conduct strict inspections – I don't have any problem with that. Our problem is with respect for the attorneys. The guy is coming to do his job, and for the IPS this is the lowest priority. They leave an attorney outside – "let him wait, we will do our work first, this isn't part of our work. The last thing we do is to let an attorney in." That's their approach as I understand it.*[210]

During the meeting, a glass partition separates the attorney from his client, and they are required to speak using a telephone receiver. A guard is always stationed nearby; his function, as described in the procedures (see above), is to supervise "the detainee's movements and behavior."

Most of the attorneys questioned by Yesh Din on this matter stated that they do not suspect that the warden is attempting to listen to their conversation with the client. However, the combination of the requirement to coordinate in advance any attorney visit with a security detainee (a demand that is not raised concerning a criminal detainee), and the fact that their conversation takes place through a telephone receiver, raises concern that security services may listen to some of the consultations between attorneys and their clients. Such a situation does not encourage open conversation between the detainee and his counsel as required in order to prepare an effective defense.

As a result of the situation described above, many attorneys forego visits to their clients. As one attorney who represents security prisoners commented: "Unless I absolutely have to, I don't go to visit the client."

---

209.   The interview was conducted by Nura Resh and Lior Yavne at the Samaria Military Court on August 7, 2007.

210.   Interview with Attorney Wisam Fallah. The interview was conducted by Judy Lotz and Lior Yavne in Jerusalem on August 12, 2007.

Atty. Fares Abu Hassan, a resident of Nablus, commented on a visit to detainees held at the small number of holding facilities remaining in the OT and under the responsibility of the IDF:

> Some detainees are held at the detention center [holding facility] at Hawara near Nablus. There is no interrogation there, they just hold the detainee and bring him here for extension of detention until they decide to what track he is to be transferred [administrative detention or prosecution]. [...] There isn't much to talk about in Hawara, they are only held there [for] extension of detention. There's no interrogation, nothing. It's just, "How are you doing, how are things?" and whether he would like to tell his family anything or wants anything from his family.[211]

Against the backdrop of the numerous restrictions Israel imposes on meetings between attorney and client during the interrogation period, the first meeting between the two is held, in many cases, only on the day of the hearing. Sometimes an attorney and client speak in the courtroom itself, immediately before or after the hearing, and in other cases attorneys proceed to the doors of the detention cells where detainees and defendants are held within the court complexes. In this case the attorney talks to his client through a small opening in the detention cell door, and the former is required to stand approximately one meter from the door of the cell. Naturally, the content of the conversation is completely open to all those held in the cell and to the guards stationed nearby.[212]

## (h)    Preventing attorney-client meetings

The Security Legislation prevailing in the OT authorizes a detainee's interrogators to prevent him from meeting his attorney for a period of up to 30 days: according to Section 78(c) of the OCSP, the chief of the investigation[213] is allowed to forbid a detainee from meeting his lawyer for a period of up to 15 days, and higher officials in the defense establishment[214] are allowed to bar meetings with an attorney for another 15 days, for reasons of "security of the area" or the "benefit of the investigation." In comparison, the Criminal Procedure

---

211.   Interview conducted by Nura Resh and Lior Yavne at Samaria Military Court on August 7, 2007.

212.   Letter from the Public Committee against Torture in Israel and Physicians for Human Rights – Israel to Brig. Gen. Aharon Mishnayot, Lt. Col. Zvi Lekach, and Lt. Amit Preiss, July 11, 2007.

213.   A "chief of investigation" is defined by the order of a police officer with the rank of chief superintendent or higher, chief of a GSS investigation team, or an IDF officer so authorized by the commander of IDF forces in the area.

214.   Such higher officials are defined as a police officer with the rank of deputy commander or higher, chief of the GSS investigation division, or an IDF officer with the rank of lieutenant colonel or higher, so authorized by the commander of IDF forces in the area.



Law prevailing in the State of Israel allows investigative bodies – the GSS, the Israel Police or the IDF – to prevent security suspects from meeting their attorneys for up to six days only, or up to ten days with the permission of a higher authority.[215]

Barring attorney-client meetings in the Military Court system is not an exceptional or rare procedure. Atty. Wisam Fallah, a former prosecutor in the Military Prosecution in the OT, estimates that at least sixty percent of Palestinians arrested by the Israeli security forces in the OT received orders immediately upon their detention preventing them from meeting an attorney.[216]

Frequently, the detainees themselves are unaware that an order has been issued forbidding them to meet with an attorney. Their attorneys are allowed to petition the HCJ and request that the order be lifted. However, human rights organization, the Public Committee Against Torture in Israel, reported that in the year 2005 lawyers functioning on its behalf filed 49 petitions of this nature and all were rejected or canceled as a result of HCJ comments.[217]

A number of lawyers reported that officials in the detention facilities attempted to prevent them from meeting their clients for various excuses, even though orders barring such meetings had not been issued. So, for instance, reported Atty. Iyad Mahameed:

> *On one particular occasion I came to Kishon [Detention Center] and was told the detainee was being interrogated. I asked how long the interrogation would continue and I said 'no problem. I will wait.' After waiting for two or three hours I was told 'visiting hours are almost over, you have to leave.' So I said – "Abu Rish, "who is in charge of the security prisoners at Kishon was there – I told him 'okay, give me a letter, tell me the detainee was being interrogated from this time to that time. Give it to me in writing.' Then he started to shout and things, so they brought the detainee. And then I understood that he was not*

---

215.  Secondary Regulations 2(a) and 2(b) of the Criminal Procedure Regulations (Enforcement Powers – Arrests) (Postponing Meeting of Detainee on Security Offenses with a Lawyer), 5757-1997.

216.  This figure was provided during an interview by Yesh Din with Attorney Wisam Fallah on August 12, 2007. On the results of preventing attorney-client meetings, see below. On October 29, 2007 Yesh Din approached the GSS with a request based on the Freedom of Information Act and through the Prime Minister's Office to receive figures on the number of Palestinian detainees to whom orders preventing their meeting attorneys had been issued in recent years. On November 27, 2007 Yesh Din was informed by telephone that the GSS had decided to refuse to provide figures on the requested matter, based on Section 14(a)(2) of the Freedom of Information Law, indicating that the provisions of this law do not apply to the GSS.

217.  The figure is quoted in a joint report by B'Tselem and Hamoked – Center for the Defense of the Individual: Absolute Prohibition: The Torture and Ill-Treatment of Palestinian Detainees (May 2007), p. 80. More on HCJ treatment of petitions on prohibition of attorney-client meetings, see Absolute Prohibition, pp. 80-83.

*even being interrogated. They just didn't want him to meet his attorney, even though there was not – apparently there was not – anyone to issue a barring order.[218]*

Atty. Fallah provides another example:

*Sometimes interrogators do not tell you whether they have the detainee. He does not have a "bar on meeting," but they do not want you to meet him – they tell you he is not at that facility. I have had cases when I was told a detainee was at a certain facility, I went there and somebody else told me he was not there. I persisted and in the end it turned out he was there. They messed with me like that for three hours and after three hours gave me a barring order on meeting an attorney. Do you understand what went on there? Before that he was not barred. When I got there they decided to issue a prohibition on him.[219]*

## (i)    Detention hearings

When an order is issued barring the detainee from meeting his attorney, the prohibition is enforced during the detention hearings as well. These are held according to a special procedure, by which the detainee is brought into the courtroom in the absence of his attorney, and afterwards is taken out of the courtroom at which point his attorney is called in. In such cases the attorney is required to defend his client without meeting him, and often without knowing the charges against the detainee.

In many cases, and regardless of whether there is a prohibition on meeting, the judge's decision about extending a person's detention is based on confidential information provided to him by the prosecutor, without providing the Defense an opportunity to review the material and refute it. Yesh Din monitors documented such a case in one of the extension of detention hearings they observed:

→ *The defense attorney asked the interrogator a series of questions. To all of the questions about the interrogation, the interrogator replied that everything is detailed in the confidential report. He noted that the activity of which the suspect was suspected was current. The defense attorney asked to release the suspect, who had arrived in the area three months earlier, and had previously lived outside of the area, in Jordan, for seven years. According*

---

218.    The interview was conducted by Lior Yavne by phone on August 12, 2007.

219.    The interview was conducted by Judy Lotz and Lior Yavne on August 12, 2007 in Jerusalem.

*to the defense attorney the suspect was married and supporting his family, had no record [of security offenses], could have been investigated during the time that had passed, and would be willing to appear at any time determined. The Prosecution asked to extend his detention by 21 days on the suspicion of conspiring to commit a grave offense. The judge: 'I reviewed the confidential report that indicates suspicion of current activity. I examined the sources of the suspicion and found them sufficient to require an interrogation. The detention is extended by 15 days to allow completion of the interrogation.'*[220]

In another case of a hearing on extending the detention of a suspect under an order barring him from meeting his attorney, the judge warned the detainee's defense attorney that if he posed "too many" questions it would count against him:

→ *The defense attorney demanded to know of what the detainee was suspected. At first the prosecutor tried to evade the demand, but the defense attorney persisted and asked how it could be that the detainee knows what he is suspected of (the prosecutor admitted that indeed the suspicions were raised to the detainee), yet he, the defense attorney, does not know what they are? The defense attorney suggested that if the suspicions were confidential the judge instruct other people present to leave the courtroom, but the judge did not do so. The defense attorney asked, for instance, whether the suspect's alibi had been checked, if they had checked whether the firearm in the suspect's possession was a firearm in use by the Palestinian security agencies, etc. The prosecutor avoided answering the questions and said that providing details could undermine the investigation. At a certain point the judge addressed the defense attorney and said that there was no use in persisting because the prosecutor was not going to answer the questions and he, the judge, was not going to instruct him to do so. He asked the defense attorney to 'focus... simply to save us time.' The defense attorney continued to demand answers and the judge addressed him again saying: 'You are at the detention stage. You would be better off focusing your questions on the needs of the investigation rather than asking for the sake of discussion... if you want to win by 'fishing,' to gain points later on, that is not how it's done...' The judge added that 'questions of this nature can work against you and that is another reason – it could poke holes in your case.'*[221]

---

220.    Yesh Din observation form no. 864 (Roi Maor). Extension of detention hearing in Samaria Military Court on February 27, 2007.

221.    Yesh Din observation form no. 450 (Hanna Aviram and Dina Goor). Extension of detention hearing in Samaria Military Court on August 9, 2007.

114

(j)     Copying investigation material

Upon completion of the interrogation of a detainee, the Prosecution decides whether to release him, to issue an administrative detention order against him, or to file an indictment. When an indictment is filed against a person held in detention, the indictment, in Hebrew, is handed to his attorney during the hearing on the extension of detention until the end of proceedings (see below). At this stage the defendant's attorney is allowed to photocopy the investigation material collected by the investigation authorities. That material includes the evidence the Prosecution plans to present to the Court during the defendant's trial.

In a petition from March 15, 2007, Yesh Din requested a copy of the regulations concerning the method of copying investigation files by a defense attorney. On July 30, 2007 the IDF Spokesperson replied that "once the defendant has the right to photocopy investigation material, the defendant's attorney may approach the Military Prosecution's office and arrange a time to copy it. Photocopy machines were installed in the Office of the Prosecution in Judea and Samaria solely for that purpose." The IDF Spokesperson refrained from providing Yesh Din a copy of the regulations regarding copying an investigation file by the defense, as had been requested. The following description is based on interviews conducted by Yesh Din with the lawyers who appear regularly in the Military Courts.

The Offices of the Prosecution in each of the Military Courts have a single photocopy machine for use by the defense attorneys. The latter must make appointments in advance in order to copy the contents of the investigation files and pay NIS 0.25 per page copied. From the time a request for an appointment is made, one or two days go by, and sometimes even more, until the attorney is allowed to copy the investigation material. When the photocopy machine breaks down the attorneys must wait a few days until it is repaired. The situation is particularly grave regarding the defendants held in detention, because as long as their attorneys do not have the investigation material, they cannot argue against the Military Prosecution's requests to detain the defendant until the end of proceedings. Thus, because of technical deficiencies related to the photocopy machine, such defendants (and there are many) remain under detention for many additional days.

In Israel it is customary for attorneys to send their clerks to perform the "drudgery" of photocopying investigation files. But the Military Courts in the OT do not allow anyone but the defendant's attorney or an articling intern from his office to photocopy the material. This directive requires the attorneys (or the interns in their offices, if there are any) to appear in the courts in order to photocopy the investigation material, sometimes solely for that purpose.

115



In the case of a defendant under interrogation by the GSS, the investigation material in many cases will not include the notes of the GSS interrogation. In cases where record documents are missing from the investigation material provided to the attorney, he must ask for that material expressly, and only then are the missing documents provided. As a result of such an inapt system, defense attorneys sometimes handle severe cases without knowing that the investigation material provided to them is incomplete. Equally serious is the length of time between the attorney's request for the GSS interrogation material and its delivery. During that period of time the defendant continues to sit in custody while his trial does not progress.

## (k)     Language of investigation material

The vast majority of the material contained in the investigation files received by the attorney for review is written in Hebrew. A single exception to that rule is a confession or statement by the defendant, who sometimes writes it in his own hand and his own language upon the suggestion of his interrogators.

Attorneys who are not proficient in the Hebrew language need to have the investigation material translated. This causes a further delay in preparing the defense and entails costs that not every defendant can bear.

The fact that the investigation material is delivered in Hebrew may harm preparation of the defense even when the attorney is proficient in the language. In many cases the defendants cannot read Hebrew and therefore their ability to aid in administering their defense is impaired. A defendant who does not read the investigation material against him and is not proficient in the witness accounts and testimony material cannot provide his attorney with the information he needs to prepare an effective defense.

## (l)     The defendant's presence at the hearing

Usually the defendant or suspect is present at hearings held in his matter in the Military Court. Defendants released on bail are required to appear in court on their own recognizance, while defendants and suspects held in custody are brought to the premises by IPS officials, soldiers or police – depending on the place of their detention. Yesh Din monitors attended thirteen hearings conducted in the defendant's absence or postponed for that reason. In four cases the defendant was not brought to court even though he was in custody at the time.

116

In one of the aforementioned cases the defendant was not brought to court because he was hospitalized in an IPS medical facility, and as a result the hearing was postponed.[222] In another case the hearing was postponed because the defendant was absent due to illness.[223] In a third case Yesh Din is not aware of the reason for the defendant's absence; the hearing was delayed at the request of his attorney in order to study the investigation material.[224] In an additional case both the defendant and his attorney were absent, and the Court ruled there was no indication the latter had received notice of the hearing.[225]

In other cases defendants who were not in custody were absent from hearings. In four additional cases Yesh Din does not know the reason for the defendant's absence. In three cases, according to the attorneys, the absence was a result of the checkpoints and transportation restrictions imposed by the IDF in the West Bank.[226] In one of those three cases the Court accepted the defense attorney's request to decide on a plea bargain in his absence.[227] In another hearing the Court postponed the decision over accepting a plea bargain (suspended sentence and a monetary fine) because the judge refused to sentence the defendant to a suspended sentence in his absence.[228] In another case the Court accepted a plea bargain in the absence of the defendant (according to his attorney, as a result of severe heart disease), and the judge noted that he had "given up" and for now on would be willing to accept plea bargains including suspended sentences even in the absence of the defendant.[229] At an arraignment hearing in another case the Court allowed the attorney to plea "not guilty" on behalf of his absent client.[230]

In two other cases Yesh Din is not aware of whether the defendant who was absent was held in custody or not. In one of those cases, an evidentiary hearing, witness testimony was

---

222.   Yesh Din observation form no. 1333 (Judy Lotz and Ruth Ben Shaul). Judea Military Court case 6057/06, hearing from April 18, 2007.

223.   Yesh Din observation form no. 1043 (Yehudit Elkana). Judea Military Court case 5552/06, hearing from April 11, 2007.

224.   Yesh Din observation form no. 1260 (Maya Bailey and Yehudit Elkana). Judea Military Court case 3031/07 hearing from June 19, 2007.

225.   Yesh Din observation form no. 1235 (Yehudit Elkana). Judea Military Court case 5277/05, hearing from June 6, 2007.

226.   Yesh Din observation forms no. 850, 1054 and 1055.

227.   Yesh Din observation form no. 850 (Roi Maor). Samaria Military Court case 4792/06, hearing from February 27, 2007.

228.   Yesh Din observation form no. 926 (Roi Maor). Samaria Military Court case 1779/07, hearing from March 13, 2007.

229.   Yesh Din observation form no. 855 (Roi Maor). Samaria Military Court case 1396/07, hearing from February 27, 2007.

230.   Yesh Din observation form no. 856 (Roi Maor). Samaria Military Court case whose number is unknown to Yesh Din, hearing from February 27, 2007.



delivered despite the absence of the defendant.[231] In the other case the Court announced that the absence of the defendant, and the fact that his attorney was not informed of the hearing, were the result of a failure by the Court.[232]

(m)     Access to judgments and legislation

One of the tenets of a public trial is, as discussed above, that the decisions and judgments of courts, with the exception of a handful of defined cases, should be made public. However, this principle in the Military Courts – at the appeals level and all the more so in the first instance – is insufficiently upheld.

First instance judgments handed down in the Judea Military Court and the Samaria Military Court are not published regularly with the exception of the publication, begun only in 2000, of the "Volume of Selected Judgments of Military Courts at the Trial and Appellate levels."[233] These volumes are distributed, according to the IDF Spokesperson, to "legal libraries in academic institutions, to courts, and also to the Israel Bar's libraries."[234]

The fact that the lawyers who represent defendants in the Military Courts do not have access to the complete set of prior judgments by the Court places them in a position of inferiority vis-à-vis the Prosecution. This is reflected, for instance, when a negotiation takes place between the Prosecution and the Defense about a plea bargain, or when pleading at the sentencing stage at the conclusion of a trial in which a defendant has been convicted. Atty. Abu Hassan related the following to Yesh Din on the subject:

> There is a problem of access to the sentencing judgments of this court. I always go to the prosecutor, we talk about a plea bargain, sometimes he gets angry, I get angry, the atmosphere is not... Why? Because I cannot see [the prior sentences]. Maybe the prosecutor likes a certain attorney better and helps him more? Maybe he dislikes another attorney and hands down worse sentences on his client? Why does that happen? Because I cannot compare sentences. [...] I want to know specifically a certain charge – membership [in an unauthorized association], stone throwing, whatever – how much all the defendants accused of that offense got.

231.    Yesh Din observation form no. 1407 (Judy Lotz). Judea Military Court case whose number is unknown to Yesh Din, hearing on August 1, 2007.

232.    Yesh Din observation form no. 1454 (Yehudit Elkana). Judea Military Court case 1375/06, hearing from August 14, 2007.

233.    IDF Spokesperson in response to the report draft, November 12, 2007.

234.    Ibid.

*What the level of punishment is. If there is a reason for aggravation or leniency – okay... I want to go in and speak to the Prosecution, negotiate, reach a bargain and finish the case. How can I convince him to give me less? I will bring him other cases he concluded with this punishment or that. That way, by negotiating, I will have something [that will help me] to convince him. [...] The prosecutor can, with the court computer network, go into all of the cases, the indictments, the records, all of the sentences. The Prosecution has that option, but I as a defense attorney do not have the same option.*[235]

Nor are the decisions of the Military Appellate Courts published regularly. So far the Military Advocate General has published a limited number of volumes or highlights of judgments by the Military Appellate Court. Some of the judgments by the Military Appellate Court find their way to a commercial company and can be found on its website for a charge, but for lawyers who operate in the Military Courts there is no systematic means of updating themselves regularly on the Court's judgments.

Occasionally, on a private initiative by chief justices in the Courts, CDs containing select judgments have been created and provided to attorneys on request. Atty. Anees said on this topic: "There are no judgments of the Appellate Court to be found. There are no such publications. There is no publication that I can obtain right now. All kinds of attempts have been made. For instance, [Col. Shaul] Gordon [who was president of the Military Appellate Court] used to collect a number of judgments every year, put them on a disk, and if you went and asked for it you would get it. But still, it is not [enough]."[236]

When they were asked how they keep themselves abreast of new judgments, and the ramifications thereof on their cases, several attorneys said that typically they hear about new judgments from colleagues who are counsel on the cases, and when they have a special interest in a particular judgment they ask the Prosecution or the Court for a copy. Atty. Adnan Rabi said a former chief justice of the Samaria Military Court provided a file folder in the defense attorneys' waiting room on the court premises with judgments by the Military Appellate Court, and the folder was occasionally updated. However, the folder is no longer current. When Yesh Din examined the folder in August 2007 it found judgments from the period between September 2005 and March 2006 alone. In the Judea Military Court there is no such file folder.

---

235.    The interview was conducted by Nura Resh and Lior Yavne at the Samaria Military Court on August 7, 2007.

236.    The interview was conducted by Nura Resh and Lior Yavne on August 7, 2007 at the Samaria Military Court.

## Legislation for "internal use" only

The OCSP (along with the Mandatory Defense (Emergency) Regulations), the Order Concerning Responsibility for an Offense, the Order Concerning Adjudication of Juvenile Offenders, along with a number of additional orders, constitute "primary legislation," on the bases of which persons suspected of security offenses are detained and defendants accused of committing them are tried. These orders were issued in the first years of the Israeli occupation of the OT and most of them have been amended and updated many times since.

The defense attorneys in the Military Courts testify that nobody informs them of the publication of amendments to the military orders, rather they learn about them only by rumor or during a hearing in the courtroom. Atty. Khaled al-Arraj says that "if there is an amendment, I don't know about it until [the Prosecution or the Court] tells me."[237] Atty. Wisam Fallah shared that when he was a military prosecutor he was unable to obtain updated copies of the relevant military orders:

*"Once I tried to obtain it, the entire legislation, even when I was a prosecutor, and I couldn't. I tried the IDF Military Justice School. I said 'come on, at least give it to the Prosecution…' How is a Palestinian defense attorney going to get it? How should he even know there is a Military Justice School? The Legal Advisor to the Judea and Samaria Area? As a defense attorney you have no possibility at all… Who is going to answer you at the Military Justice School or at the [office of the] Legal Advisor to the Judea and Samaria Area and tell you 'I'll send you the order?'"[238]*

When Yesh Din petitioned the office of the Legal Advisor to the Judea and Samaria Area to receive the current version of a number of orders, it turned out that even in the latter's office – which is responsible, among other things, for amending and updating the Security Legislation – there were no official versions containing all of the amendments made to the military orders over the years. The following was the response of Capt. Harel Weinberg, Consulting Officer in the Security and Criminal Department of the Office of the Legal Advisor to the Judea and Samaria Area:

---

237.  The interview was conducted by Judy Lotz and Lior Yavne on August 12, 2007 in Jerusalem.
238.  The interview was conducted by Judy Lotz and Lior Yavne on August 12, 2007 in Jerusalem.

"I hereby inform you that the orders listed in your referenced letter, and the amendments made to them over the years, were published over the years in the booklets of the Proclamations, Orders and Appointments, but we do not have an official combined versions of the orders listed in your referenced letter with their amendments."[239] Capt. Weinberg provided Yesh Din with copies of several orders the organization had requested, but stressed: "These copies are unofficial versions, which were made for our internal use."

Based on interviews conducted by Yesh Din with defense attorneys, and from the answer given by the Office of the Legal Advisor to the Judea and Samaria Area, it is therefore apparent that there is no official, combined and available version of the current Security Legislation provisions: neither the Defense, nor the Prosecution, nor anyone else has a copy.[240]

(n)    Conclusion

The Military Commander heavily relies on Palestinian organizations to serve as a sort of "public defense" for the detainees and defendants in the Military Courts. The Palestinian attorneys employed by those organizations are not permitted to visit their clients in prison in Israel, as part of the travel restrictions imposed by the Military Commander himself. Israeli lawyers and residents of East Jerusalem who visit the prison facilities inside Israel are often exposed to harassment. The conditions under which they are forced to meet their clients are prohibitive, impair the preparation of a legal defense, and raise concerns as to violation of the privilege and confidentiality applying to communications between them. Palestinian lawyers are forced to appear in court themselves, or send their articling interns in their place, in order to photocopy the investigation material. They are not permitted to send for this purpose another employee the cost of whose employment is lower. The investigation material they photocopy is almost all written in Hebrew, a language in which many of the defendants, and the Palestinian lawyers that represent them, are not proficient. GSS interrogation material is often delivered only in response to a request, and belatedly.

---

239.    Letter from Capt. Harel Weinberg to Atty. Michael Sfard, July 30, 2007.

240.    On September 3, 2007 the Military Prosecution's website published a number of military orders. However, the orders that were published did not include the Security Legislation upon which Palestinians are adjudicated in the military courts. The only order that was published that deals with courts is the one about the jurisdiction of the Rabbinical Courts in the OT. See http://www.aka.idf.il/patzar/klali/default.asp?catid=58262&docid (Hebrew).

121



The current judgments and legislation are not available freely to the attorneys, whether Palestinian or Israeli. This impairs their ability to prepare a defense, to consider practically the options facing their clients and to counsel them accordingly. Even when they do manage to obtain copies of judgments or legislation, these documents are available only in Hebrew.

In the last few months the Israeli judicial authority's website (www.court.gov.il) has featured a page enabling users to search the archive of the judgments of the first instance and appellate Military Courts. However, an attempt to conduct such a search produces an announcement that "the page does not exist." In a letter sent by the State Attorney's HCJ Department to Yesh Din in response to a petition submitted by the organization (see box on p. 85) it was stated, among other things, that "an administrative endeavor to examine the possibility of establishing a website for the Military Courts Unit is currently underway. The [MCU] intends to publish on the website the records of the hearings and decisions of the Military Courts. As soon as the website is launched there will be increased access to the records and decisions of the Military Courts."[241]

As a footnote it should be mentioned that if indeed the judgments of the Military Courts are published on a website or in any other way, while it would constitute a welcome development in itself, it would not suffice as long as the decisions and judgments are not published in the Arabic language.[242]

Based on the circumstances described above, it appears that the Military Court system in the OT, the IDF in general, and even the IPS have shirked their responsibility to provide detainees and defendants with the conditions that would allow them to prepare an effective defense, as required by international law. The consequences of that situation go well beyond a theoretical discussion: hundreds of defendants do not manage to obtain, for themselves and through their attorneys, the optimal legal defense to which they are entitled.

## (o)      Recommendations

1. The IDF is to move Palestinian detainees and defendants to detention and incarceration facilities located within the boundaries of the West Bank, as required by international law.

---

241.    Letter from Attorney Dana Briskman, Chief of HCJ Affairs at the State Attorney's Office, to Atty. Michael Sfard, July 4, 2007. To view the letter see Yesh Din's website http://www.yesh-din.org.

242.    On this matter, see p. 94.

2. Alternatively, and as long as the policy denying Palestinian civilians entry to Israel is in effect, the IDF must provide Palestinian lawyers with entry permits that will allow them to reach the locations in Israel where their clients, Palestinian detainees and defendants, are held. Denying such permits must be the exception rather than the rule, and must be done only in rare instances in which such denial cannot be avoided.

3. The IPS must amend its regulations so as to reduce the waiting time of attorneys at detention facilities to the minimum required.

4. Concerns regarding the use of listening devices in privileged attorney-client communications must be removed by disposing of the telephone receivers through which these conversations are currently conducted, and an alternative means of enabling communication must be found, e.g. a mesh-screen.

5. Palestinian lawyers must be allowed to appoint agents to photocopy case material at the prosecution offices in the military courts.

6. The number of photocopy machines available to lawyers for the purpose of photocopying case material is to be increased, and the elimination of payment for photocopying should be considered.

7. Indictments and case material must be routinely translated into Arabic.

8. The military prosecution is to be instructed to permanently make GSS interrogation documents, together with the rest of the case material, available to defense counsel upon the filing of an indictment.

9. All judgments of the Military Courts, both at the first instance and appellate levels, must be published on a regular basis and made available. Such publication must appear, at the very least, in Arabic and Hebrew, and responsibility for its execution must be assigned to the MCU and not the Military Advocate General, which supervises the prosecutors.

10. The Security Legislation must be published on a regular basis with any amendments and updates, in Arabic and Hebrew, and in a way that is accessible to defense attorneys as well as the general public.





**IN RESPONSE TO THE DRAFT OF THIS REPORT, THE IDF SPOKESPERSON STATED ON BEHALF OF THE MILITARY COURTS UNIT:**

➔ The Military Courts do not avoid appointing a defense attorney funded by the Civil Administration. They do this not only in severe cases, but also in minor cases where there is no obligation to appoint a defense attorney. The key data that should be noted, is that in 99.9% of the cases, the accused is represented by a defense attorney.

➔ Throughout the years, select Military Court rulings.[243] are published from the first instance and from the appeals instance. As of 2000, these files are published regularly, once a year. The formulation of these files is carried out by functionaries in the Military Court system alone. The files are sent to all the legal libraries in academic institutions, to courts, and also to the Bar's libraries. If this does not suffice, all Military Court of appeals rulings are distributed, by known procedure, according to the order worked out together with representatives from the Military Courts Attorneys' Committee, to four different attorneys from all districts, who have volunteered to distribute the rulings to their friends. Moreover, the select rulings were also given to the attorneys who asked for them, as were select legislation files prepared by the court system, which were also given to anyone who asked for them. Indeed, attorneys who appear in the Military Courts come equipped with the relevant legislation, and there have been no charges of lack of access to the rulings.

➔ It has recently been decided that amendments to legislation be published, in Hebrew and in Arabic – in the defense attorneys' room in the courthouse.

➔ Besides that, as mentioned, the courts system has no objection that rulings be published on the internet, the staff work for which is already underway.

---

243.   In translating the original Hebrew version of this report, Yesh Din translated the same term as "judgment."

124

→ During the investigation stage, the Military Courts act as is common in Israel, meaning: the police is given the right to file a confidential report to the judge, and it is

not disclosed to the defense. There is no difference between the Military Courts and the courts in Israel in this matter.

**ON BEHALF OF THE MILITARY ADVOCATE GENERAL, THE IDF SPOKESPERSON WROTE:**

→ The order to deprive a person of legal consultation exists in the detention laws of the state of Israel as well (albeit valid for different periods of time and rendered under different authorities). There are certain situations where meeting with an attorney might impede investigation or immediately compromise security in the region. This is why the relevant legal provisions have been instituted. This is all the more necessary since the most of the lawyers who are active in the region are not subordinate to the Israel Bar or constrained by effective enforcement of ethical principles. Regretfully, too often lawyers have even been involved in outright obstruction of justice, including conveyance of messages or even mobile phones to detainees.

→ The rule set forth in section 74 of the criminal procedure law concerning the right to peruse investigation documents is constantly and continuously observed by Courts-Martial. It does sometimes happen that parties disagree as to the nature or scope of this material, but this is not different, by all means, than what transpires in Israel, and the court renders decisions in these matters.

→ The Xerox machines at the prosecution offices are available to all lawyers and are operated by a civilian franchiser. Military Court Prosecution is unaware of any complaints of lawyers pertaining to difficulties in obtaining photocopies. Although the report states otherwise, memorandums of ISA interrogations are included in the prosecution file and the defending attorney may photocopy it whenever he or she please.

125



## 05    THE RIGHT TO TRIAL WITHOUT UNDUE DELAY

### (a)    International legal standards

The ICRC commentary attaches paramount importance to the provision in Article 71 of the Fourth Geneva Convention, that "accused persons who are prosecuted by the Occupying Power [...] shall be brought to trial as rapidly as possible," especially during times of occupation, when delays in the course of the investigation may result in the extension of the detention of the defendant while awaiting trial.[244] Article 9(3) of the ICCPR provides that:

> Anyone arrested or imprisoned on a criminal charge shall be brought promptly before a judge or other officer authorized by law to exercise judicial power, and shall be entitled to trial within a reasonable time or to release.[245]

Article 14 reiterates that the defendant should "be tried without undue delay,"[246] as part of the minimum guarantees provided by the Covenant. The United Nations Human Rights Committee (General Comment 13) determined that the aforementioned "relates not only to the time by which a trial should commence, but also the time by which it should end and judgment be rendered; all proceedings – both in first instance and on appeal – must take place "without undue delay." To make this right effective, wrote the authors of the General Comment, the authorities must create a procedure "in order to ensure that the trial will proceed 'without undue delay.'"[247] The demand for commencing a trial "within a reasonable time" of the defendant's arrest is common to the three regional conventions,[248] as well as to additional international conventions.[249]

---

244.    Pictet, p. 354.

245.    With the ratification of the Covenant by the State of Israel in October 1991, the State submitted a derogation regarding Article 9. The derogation stated that in the light of the state of emergency in Israel declared in May 1948, the Government of Israel "found it necessary to take measures to the extent strictly required by the exigencies of the situation for the defense of the State and for the protection of life and property, including the exercise of powers of arrest and detention. Insofar as any of these measures are inconsistent with article 9 of the Covenant, Israel derogates from its obligations under that provision." It should be noted that the period of time the State of Israel has maintained the "state of emergency" – almost 60 years – does not stand the test of reasonableness with respect to the derogation submitted by the State. On this issue, see Article 10 of General Comment 24 of the UN Human Rights Committee.

246.    ICCPR, Article 14(c)(3).

247.    General Comment 13, Article 10.

248.    ECHR, Article 6(1); ACHR Article 7(5); and ACHPR, Article 7(1)(d).

249.    For example, Article 40(2)(b)(3) of the Convention on the Rights of the Child, and Article 67(1)(c) of the Rome Statute of the International Criminal Court.

(b)     Security Legislation

The Order Concerning Security Provisions (OCSP) states that an army officer of the rank of captain, or a police officer of the rank of superintendent, is authorized to order the detention of a suspect for eight days before the person is brought before a judge for an extension of his detention.[250] Military judges are authorized to extend a person's detention for thirty days, and to extend that period repeatedly as long as the judge's detention does not exceed ninety days. The eight days before the detainee is brought before a judge are not included in those 90 days.[251] Even after the 90 days have elapsed, a military appellate judge may extend the detention for an additional three months if requested to do so by the Legal Advisor to the Judea and Samaria Area.[252]

After an indictment has been filed, a judge may order the detention of the defendant until the end of proceedings – a detention that could extend up to two years, according to the provisions of the court order. In the event that the trial has not been concluded at the end of two years, the defendant's case is reviewed by a military appellate judge, who may release him or extend his detention because of the seriousness of the offenses of which he is accused, the danger he constitutes, the fear that he may flee, or in consideration of the reasons for prolonging the proceedings.[253] At this stage, the military appellate judge may extend the defendant's detention by six months at a time, again and again, with no limitation.[254]

In Israel, by comparison, the law with respect to a defendant who has been placed under detention until the end of proceedings limits his detention to nine months, after which a Supreme Court judge may extend the detention from time to time by no more than three months. In other words, the initial period of arrest, customary in the military judicial system in the West Bank, is equivalent to detention until the end of proceedings after five extensions approved by a Supreme Court judge in Israel.

---

250.     OCSP, Section 78(e1)(2).
251.     Ibid., Section 78(f)(1).
252.     Ibid., Section 78(f)(2).
253.     Ibid., Section 78(k)(2)(a).
254.     Ibid., Section 78(k)(2)(b).



## (c)      The prolonging of proceedings in Military Courts

The maximum periods of detention determined by the Order Concerning Security Provisions, whether before or after filing the indictment, are significantly longer than those allowed by Israeli law.

The State of Israel's Criminal Procedure (Powers of Enforcement – Arrest) Law of 1996 [hereinafter: "Detention Law"] determines far shorter periods of arrest and arraignment of a suspect than those determined by the OCSP. Thus, for example, under the Detention Law, a person can be held for no more than 24 hours before being brought before a judge;[255] and each extension of detention for the purpose of interrogation is limited to fifteen days, for a maximum period of thirty days.[256]

The following table demonstrates the main differences between the Security Legislation in force in the Occupied Territories and Israeli Detention Law:

Table 5: Comparison between maximum periods of detention of suspects and defendants in Israeli law and Security Legislation in the West Bank

|  | Israeli "Detention Law" | OCSP |
|---|---|---|
| Detention until brought before a judge | 24 hours | 8 days |
| Total period of detention authorized by a judge | 30 days (up to 75 days on the authority of the Attorney General) | 90 days (up to 180 days on the authority of a judge of the Military Appeal Court) |
| Detention from the end of investigation until indictment | 5 days | |
| Detention from filing indictment until arraignment | 30 days | two years |
| Detention from arraignment until end of proceedings | 9 months | |
| Judge's approval of extension of detention if proceedings have not concluded | 90 days (Supreme Court judge) | 6 months (judge of the Military Appeal Court) |

---

255.  *Criminal Procedure (Powers of Enforcement-Detention) Law, 5756-1996,* Section 29.

256.  Ibid., Section 17. A further extension can only be authorized by the Attorney General.

Unlike the Detention Law, Security Legislation in the West Bank does not determine the maximum duration of detention from the moment the interrogation has been completed until the indictment is filed, nor the maximum duration permitted between the indictment and the commencement of hearings in the trial (the "arraignment" hearing). The data gathered in observations by Yesh Din volunteers indicates that this fact allows for the scheduling of hearings a considerable time apart.

When information was given in court about the prolonging of proceedings between one hearing and the next, the Yesh Din observers noted it on their observation forms. A calculation of the average time elapsed between hearings attended by Yesh Din observers and the next hearing announced in the courtroom produced the following findings:

The average time elapsed between the hearing on detention until the end of proceedings and the reading of the indictment (the arraignment): 61 days.[257]

The time elapsed between the arraignment and the next court session: 51 days on average in the case of defendants who were in custody, and 71 days on average in the case of defendants who were not in custody.[258]

The average time that elapsed between hearings at stages after the arraignment (memoranda, evidence, judgment, etc.), in the case of defendants held in detention: 52 days.[259]

A comparative examination of the data with respect to the Samaria and Judea Military Courts indicates that the issue of delays between hearings is especially marked in the Samaria Military Court, with an average of 63 days in cases of defendants held in custody. In the Judea Military Court, the delay between hearings is 43.5 days.

In 83 of the 195 cases in which Yesh Din was able to assess the time between hearings (52 in the Samaria Military Court and 31 in Judea), the period between the hearing attended

---

257.  The figure is based on 31 observation forms relating to hearings regarding "detention until the end of proceedings" in which the date of the next hearing was announced (out of 38 observation forms on hearings on detention until the end of proceedings).

258.  The figures are based on 125 observation forms that relate to arraignment sessions, in which the date of the next hearing was announced (out of 164 arraignment hearings observed by Yesh Din observers).

259.  The figure is based on 195 observation forms relating to hearings that did not deal with "detention until the end of proceedings" or "arraignment," in which the date of the next hearing was announced. In a limited number of instances, Yesh Din observers noted the date of the next hearing in cases where the defendant was not under arrest: in six cases for which Yesh Din has data, the figure is 65 days.

129



by observers and the date set for the next hearing exceeded 60 days. Of those, the delay exceeded 90 days in 15 cases (11 in Samaria Military Court, four in Judea).

## (d)     The duration of detention until the end of proceedings

The 1993 State Comptroller Report examined, *inter alia*, the workings of the Military Prosecution and the Military Courts and delivered harsh criticism over the number of detainees held until the end of proceedings for a year or even two years and more between the years 1990 and 1992. The Comptroller noted "this situation is improper and constitutes a delay of justice."[260] Data of the Military Courts Unit collected by Yesh Din indicate that in recent years the number of defendants detained until the end of proceedings is several times greater than during the period reviewed in the State Comptroller Report.

Thus, at the end of 2006, some 1,800 prisoners under detention until the end of proceedings had been in detention for up to one year, and 189 for over one year. The statistics for the five previous years are even more alarming: from 231 prisoners under detention until the end of proceedings who had been in detention for over a year (among them 85 for over two years) at the end of 2001, to 671 in detention for over a year (among them 78 for over two years) at the end of 2004.

Chart 4: Prolonging of proceedings: Defendants in the Military Courts under detention until the end of proceedings[261]



260.    State Comptroller, Annual Report 43 (April 1993) (Hebrew), p. 871. The figures to which the State Comptroller referred were in general low by comparison to later years: in January 1992 there were 35 prisoners who had been in custody for over two years; and in April 1992 the number of those in detention for between one and two years was 174.

261.    The data relates to the number of detainees held at the end of each year mentioned, and not to the total number of prisoners during those years. Source: MCU 2004, p. 16; MCU 2006, p. 17.

(e)     Conclusion

The duration of periods of detention before and after the filing of an indictment determined by the Order Concerning Security Provisions deviates considerably from the provisions of the Israeli Detention Law. This discrepancy exists despite the fact that the Israeli law, too, is intended to deal with those suspected of security-related offenses and serious crimes within the State of Israel itself.

As a consequence of the combination of lengthy detention before a suspect is brought before a judge, the long period of time available for interrogation thereafter (up to 90 days, and in certain cases even more), and the authority of the interrogators to prevent the suspect from seeing a lawyer for up to 30 days, the suspect is essentially at the interrogators' mercy. This state of affairs is quite far from the standards of both Israeli and international law, which demand that a suspect be tried "promptly," "without undue delay" and within a reasonable time.

With the filing of the indictment, and after the detained suspect becomes a defendant, there is another delay in the legal proceedings. The findings of Yesh Din observers indicate that the average time elapsed between the filing of an indictment and the decision to keep the suspect under detention until the end of proceedings, on the one hand, and the first hearing in the defendant's trial, on the other, is 61 days – twice the maximum time permitted in these matters by the Israeli Detention Law. During this period, the accused is not given any opportunity to address the indictment against him in court.

Furthermore, in the course of the trial, there is an average of almost two months between hearings, and sometimes more than 90 days. It must be emphasized that this does not relate to hearings that were postponed for various reasons, but to the original dates on the court calendar, announced at the time of the hearings. This practice explains why many defendants are kept under detention for over a year, and in many cases for over two years, between indictment and sentencing.

In a judgment by the HCJ in February 2007, the Supreme Court Chief Justice Dorit Beinish wrote, *inter alia*, as follows:

> The time has come to implement in the Military Courts statutory procedures similar to those legislated by the Detention Law in Israel, in order to protect defendants' rights – all subject to the special circumstances of the Area. This applies with respect to the duration of detention between the filing of the indictment and

131



the beginning of the trial [...]; limitation of the duration of detention between the conclusion of the interrogation and the filing of the indictment [...]; and, similarly, reduction of the periods of detention determined by the Security Legislation in effect in the Area, which are significantly longer than those determined by the Detention Law in Israel.[262]

In May 2007, Atty. Sigal Shahab of the Association for Civil Rights in Israel approached the Military Advocate General, demanding that the periods of detention determined by Security Legislation be brought in line with those determined by the Israeli Detention Law, among other reasons, in the wake of the above-mentioned judgment by the Chief Justice Beinish.[263] In response, the Deputy Legal Advisor to the Judea and Samaria Area wrote that the Military Advocate General had begun a study to examine changing the Security Legislation "in an effort to reduce the harm to detainees' rights, as much as possible."[264] At the time of writing this report no changes had been made in the legislation related to detention in the OT.

The Military Courts suffer from an enormous case load that falls on the shoulders of a limited number of prosecutors and judges. Seeking a solution to this problem, the Military Courts encourage plea bargaining as a substitute for evidentiary trials. Plea bargains are agreements at which the prosecutor and defense attorney arrive and, according to which, in most cases, the defendant agrees to plead guilty to some or all of the charges against him in exchange for a sentence agreed upon in advance. The Courts are not obliged to accept the agreements reached between the two parties, which are subject to court approval, but only rarely do they reject them.

Simpler cases, in which the charges are not of a serious nature, are generally resolved quickly by the Prosecution and the Defense, agreeing to a plea bargain at an early stage of the legal proceedings, soon after the indictment has been filed. Complex cases involving more serious charges take a longer time, because of the difficulty of reaching agreement on the level of sentencing.

In the next section we will expand on the problematic nature of the policy of encouraging plea bargaining. In any event, it is clear that plea bargaining cannot be a substitute for a full legal process that fulfills all the requirements of due process, as defined in international

---

262.   HCJ 10720/06 Fried v. Military Appellate Court (unpublished).
263.   Letter from Atty. Sigal Shahab of the Association for Civil Rights in Israel to the Military Advocate General, May 6, 2007.
264.   Letter from Lt.-Col. Eli Bar-On, Deputy Legal Advisor to the Judea and Samaria Area, to Atty. Sigal Shahab, May 29, 2007.

law. As will be seen below, a system based on plea bargaining creates a serious and dangerous situation in which a defendant who refuses a plea bargain risks the hostility of the Court, merely because of his insistence on his right to a hearing.

Yesh Din hopes that the legislation will indeed be amended so as to bring it into compliance with both the Israeli Detention Law and the provisions of international law. This is not enough, however. In order for the Courts to cope with the large number of cases brought before them every year, the number of personnel assigned to the Prosecution and to the Courts themselves must be increased.

## (f)    Recommendations

1. The Order Concerning Security Provisions is to be amended so as to significantly reduce periods of time allowed for detention during investigation and after the filing of indictments.

2. The Order Concerning Security Provisions must be amended such that it determines the maximum amount of time a person may remain in detention until the conclusion of the interrogation, the maximum time until the indictment is filed, the maximum time from the indictment until his arraignment, and the maximum time between court hearings.

3. Additional personnel must be immediately allocated to the Military Prosecution and the Military Courts in order to avoid prolonging the legal process, on the one hand, and pressure on defendants to accept a plea bargain with the Prosecution on the other.





**IN RESPONSE TO THE DRAFT OF THIS REPORT, THE IDF SPOKESPERSON STATED ON BEHALF OF THE MILITARY COURTS UNIT:**

→ The workload in the courts is very great, the number of judiciary hours and the number of courtrooms are limited, and this necessarily affects the interval between hearings. However, it should be emphasized that the statistical data regarding the closing of cases in 2006 indicates that a "hostile act of terrorism" case closed on average after 7.5 months, a "violation of civil order" case after 3.9 months, and a "criminal" case after 5.4 months. This proves, with proven and validated facts, that the right to trial without delay is meticulously upheld by the Military Courts.

→ It should be stressed that in the past there was no limit to prolonging detention. The limitation was enacted due to clear and unequivocal call by the Military Courts for the legislator to change the situation (case 1313/00 Miscellaneous Appeals 108/02 Military Court Prosecution v. Amro). Only following the Military Courts' ruling, was the law amended.

**ON BEHALF OF THE MILITARY ADVOCATE GENERAL, THE IDF SPOKESPERSON WROTE:**

→ Even though the legal arrangement for limiting the period of detention after prosecution declaration has yet to be explicitly incorporated in region law, the appeal court ruling has established the principles thereof and in practice, Courts-Martial conform to that ruling despite the great number of investigation files processed by Military Court prosecution.

→ It is true that nominal detention periods in the region are different, longer, than those permissible in Israel. This is an inevitable consequence of the extent and severity of offenses perpetrated in the region.[…]We should also assert that the legal ordinance regarding periods of detention in the region have been repeatedly put the scrutiny of the Supreme Court which dismissed all these petitions.

134

## 06     THE RIGHT TO PLEA AND PRESENT EVIDENCE

### (a)     International legal standards

The right of defendants standing trial in military courts to present evidence and call witnesses is entrenched in the preamble to Article 72 of the Fourth Geneva Convention: "Accused persons shall have the right to present evidence necessary to their defense and may, in particular, call witnesses." Within the context of the minimum defenses available to a defendant, Article 14(3)(e) of the ICCPR provides that any defendant in a criminal case is entitled to exercise the following rights:

> To examine, or have examined, the witnesses against him and to obtain the attendance and examination of witnesses on his behalf under the same conditions as witnesses against him;

On this subject, the UN Human Rights Committee notes that this provision is intended to ensure that the defendant is able to summon witnesses to appear in court for examination by the Defense, just as the Prosecution does.[265] Similar provisions appear in the ECHR (Article 6(3)(d)) and the ACHR (Article 8(2)(f)).

### (b)     Security Legislation

According to the OCSP, summoning witnesses is the prerogative of the Court, which is "permitted" to do so at the request of the Prosecution or the Defense, or on its own initiative " if it deems that such a summons is useful in clarifying a question that has bearing on the trial."[266] The Court, as mentioned, may compel witnesses to attend a hearing, and order the presentation of documents by them, or by another who was not summoned to give testimony.[267]

Section 18 stipulates that witnesses who give testimony before the Court will be subject to direct examination, cross-examination and redirect examination. Section 29(b) requires that a defendant who is not represented by legal counsel, and who denies the charges brought against him, will be given the opportunity to cross-examine the Prosecution witnesses.

---

265.  General Comment 13, paragraph 12.
266.  Order Concerning Security Provisions, Section 16(a). Emphases added.
267.  Ibid., Section 16(b)-(e).

135

The provisions in Section 31, which deal with laying the Defense's case, include a provision stating that the Court will hear the testimony of the defendant, if he wishes to testify, and the testimony of "all the witnesses that were summoned to testify."[268] If the defendant declares that he has witnesses who are not present in court, "the Court, at its discretion, may postpone the remainder of the hearing, as well as order, if it deems appropriate, measures to ensure the appearance of such witnesses at a date that it determines."[269]

## (c)    Plea bargains as a substitute for the right to plea

The monitoring conducted by Yesh Din observers, combined with interviews with defense attorneys for the purpose of this report, indicate that in general there are no particular problems with respect to the technical side of summoning Defense witnesses – when they are called – and their examination in court. The matter is almost irrelevant in the Military Courts, however, considering the small number of evidentiary hearings that take place therein.

Data provided to Yesh Din by the IDF Spokesperson, and gathered from the annual reports of the activity of the Military Courts Unit, indicate that only a few legal proceedings are conducted to the very end – from the indictment, through the case for the Prosecution and the case for the Defense, to judgment based on evidence presented to the Court and testimony given by witnesses in the framework of a full evidentiary trial.

Thus, of the 9,123 cases concluded in Military Courts in 2006, full evidentiary trials were conducted in only 130 – 1.42% – of them.[270] Evidentiary hearings in cases that were concluded in 2005 and 2006 that concerned Hostile Terrorist Activity, public disturbances and other criminal offenses (excluding IPI and traffic cases) were held in 3.62% of such cases in 2005, and 2.53% in 2006.[271]

Cases that conclude with a plea bargain are not unique to the Military Courts. Many court cases in Israel itself are concluded with plea bargains, but there appears to be a lack of consensus on the extent of the phenomenon.[272]

---

268.   Ibid., 31(a).

269.   Ibid., 31(c). Emphases added.

270.   Response of IDF Spokesperson to questions by Yesh Din, July 30, 2007.

271.   MCU, 2006, p. 12.

272.   On the difficulty of gathering data regarding plea bargains in Israeli courts, see Sarah Leibowitz-Dar, The Arrangements Law, Maariv, July 6, 2007 [Hebrew].

136

According to data furnished by the IDF Spokesperson to Yesh Din, only 51.5% of the cases concluded in the Judea Military Court in 2006 ended with a plea bargain, while in the Samaria Military Court the figure was 75%.[273] In response to a query by Yesh Din regarding the discrepancy between the number of cases ending with plea bargains and those concluded after full evidentiary trials, the IDF Spokesperson replied that in the remaining cases the defendant confessed without a plea bargain, or the legal proceedings were suspended after the indictment was filed.[274]

However, all the defense attorneys interviewed for this report refuted those figures, contending that a far higher number of cases concluded with a plea bargain. This assessment was substantiated by the Chief Military Prosecutor, Col. Liron Liebman, who stated at a meeting with the Israel Bar Association that the rate of plea bargains in Military Courts was 95%.[275] Yesh Din requested further clarification from the IDF Spokesperson and was informed that "there are different statistical categories relating to the manner in which a case is concluded with a plea bargain […] It is quite possible that the figures [given to Yesh Din by the IDF Spokesperson on this subject] relate to a particular category."[276]

Yesh Din observers also monitored the number of plea bargains accepted by the Court, and particularly those referred to as "settled" (that is, the Prosecution and the Defense had agreed on the sentence). These data reveal that the Court accepts these agreements with almost no exception. Of the 99 "settled" plea bargains documented by Yesh Din, the Court accepted 95 of them in their entirety. In two cases the defendant was handed a harsher sentence than agreed upon in the plea bargain; in two others the Court was more lenient.[277]

As such, it may be established with certainty that, in the words of one of the attorneys interviewed for this report, in the Military Courts "the system is based on plea bargains."[278]

In order to reach an agreement on a plea bargain, the defense attorney approaches one of the military prosecutors. In the Judea Military Court, there are three members of the Military

---

273.   IDF Spokesperson's response to questions by Yesh Din, May 27, 2007.

274.   IDF Spokesperson's response to questions by Yesh Din, July 30, 2007.

275.   Col. Liebman, at a joint meeting of the Military and Security Committee and the Rule of Law Committee of the Israel Bar Association, minutes from September 18, 2006.

276.   Letter from Yesh Din to IDF Spokesperson, August 29, 2007; reply of IDF Spokesperson, October 14, 2007.

277.   In two additional cases the court accepted the plea bargain, but the Yesh Din observers were unable to determine whether the sentence was identical to or different from what was agreed upon.

278.   Interview with Atty. Riad Anees, conducted by Nura Resh and Lior Yavne at the Samaria Military Court on August 7, 2007.



Prosecution who have been authorized to negotiate plea bargains with defense attorneys. In the Samaria Court, the Chief of the Military Prosecution has reserved that prerogative for himself.

During the negotiations, the two sides review the charges and the evidentiary material in each case. The prosecutor strikes charges for which the evidence is relatively weak, or to which the defense attorney objects and insists on striking. In return, the defendant pleads guilty to the other charges as they stand, or after amendment, all according to the understanding reached between the prosecutor and the defense attorney. Atty. Fallah, on the basis of his experience as a military prosecutor, confirmed that in many cases details are introduced into the indictment at the very beginning for the express purpose of deleting them later as part of the plea bargain.[279] If this is in fact the case, this tactic constitutes a serious ethical violation on the part of the prosecutors, who are expected to sign an indictment only if they are truly convinced that the suspects indeed perpetrated the offenses of which they are accused, and only if they believe they have sufficient evidence to put them on trial for said offenses. Introducing charges for other reasons is improper and amounts to an abuse of the authority with which the prosecutors are invested.

Atty. Fares Abu Hassan briefly described the process of settling a plea bargain:

> First we check the evidence. If there are problems with the evidence, with certain items, we strike [the indictment items], without hearing witnesses and so on. If the evidence "seals" the details, if there is nothing to talk about, nothing to plead, then instead of wasting court time and hearing witnesses, we plead guilty, in order to shorten the proceedings and [eliminate] some of the charges. The Prosecution always deletes those kinds of small items that don't add much [to the sentencing], and leaves the main charges. Then we talk about the sentence.[280]

There are several reasons for the widespread use of plea bargaining.

Admissions of guilt: Palestinians suspected of security offenses are sometimes interrogated by the GSS rather than the Israel Police. The combination of two factors – the methods of interrogation employed by the GSS, which include physical measures and threats not

---

279.   The interview was conducted by Judy Lotz and Lior Yavne in Jerusalem on August 12, 2007.

280.   The interview was conducted by Nura Resh and Lior Yavne at the Samaria Military Court, August 7, 2007.

138

used by the Police,[281] and the fact that many suspects are prevented from consulting an attorney during their detention and interrogation – results in most indictments being filed with the Military Courts after the suspect has confessed during his interrogation to the charges against him, or has been incriminated by others.

Work load: The work load of cases in the Military Courts is enormous for everyone involved. An inadequate number of judges, prosecutors and attorneys deal with thousands of cases every year. Consequently, the military judges encourage plea bargaining, and prosecutors and defense attorneys prefer to reach an agreement as a quick means of bringing the case to a conclusion.

In one of the hearings attended by Yesh Din observers, they witnessed pressure to accept a plea bargain exerted on the defendant by all parties, even though he refused at first:

→ *The defense attorney asks the judge for permission to bring the defendant's father and cousin into court and let them talk to the defendant, since the defendant refuses to accept the plea bargain, and his father wants to persuade him to do so. Deviating from normal procedure, the judge allows the father to sit close to the defendants' dock so as to speak with his son, and what ensues is a long and loud conversation between them. Under the pressure of the father, the attorney and the judge, the defendant finally agrees to accept the plea bargain and begin the hearing.[282]*

The prolonging of proceedings in the Military Courts (see below) also leads defense attorneys to prefer a plea bargain over a full evidentiary trial. Atty. Adnan Rabi offered an illustration from a case in which he appeared on the day of the interview:

*I had a case of a minor today [August 7, 2007], attempted assault. They found a knife on him, and he said "I attempted..." First, I saw that he had no chance of being released on bail – according to the evidence and my experience. But, as the saying goes: step on the gas – but not in gear. I requested that the trial should at least begin as soon as possible, and that the witnesses should be brought in. No. They scheduled it for October. In my opinion, he would only be*

---

281.   On the matter of methods of interrogation, see (for example) the joint report of B'Tselem and Hamoked – Center for the Defense of the Individual, Absolute Prohibition: The Torture and Ill-Treatment of Palestinian Detainees (May 2007); report by the Public Committee Against Torture in Israel, "Ticking Bombs": Testimonies of Torture Victims in Israel (May 2007); report by B'Tselem, Torture of Palestinian Minors at the Gush Etzion Police Station (July 2001).

282.   Yesh Din Observation Form No. 657 (Judy Lotz and Ruth Ben Shaul), case 3491/06 in the Judea Military Court, hearing on January 17, 2007.



*jailed for a few months. If I go to trial, the proceedings will take over four months – something like six months. But if I go for a plea bargain, it'll come out to three or four months.[283]*

**Fear of a heavy sentence:** Attorneys representing suspects and defendants in the Military Courts believe that conducting a full evidentiary trial, including summoning witnesses and presenting testimony, generally results in a far harsher sentence, as a 'punishment' the Court imposes on the defense attorney for not securing a plea bargain. That opinion is shared by Atty. Abu Hassan:

*You have to make deals here. Why? If you don't make a deal, and you go all the way with the evidence, you'll get double the sentence you could have gotten with a deal. If you were convicted on the evidence [in a trial], and you brought out a precedent, with identical charges, that got four years [imprisonment] in a plea bargain – so, because you introduced testimony, you'll get eight years. In other words, even if you show precedents and everything, they [the Court] will tell you: 'That ended in a plea bargain. Because you wasted the Court's time, etc., you'll get more.'[284]*

This impression is not merely an unsubstantiated feeling. This approach by the Court emerged in a number of the hearings at which Yesh Din observers were present. At a hearing in the Judea Military Court, for example, Yesh Din observers documented the advice the judge gave the defense attorney:

→ *After the defense attorney announced that the defendant pleads not guilty, the judge asked the names of those who recorded the testimony on which the indictment was based. Their names are M.L. and Y.Y. The judge orders them brought to the next hearing. Then the judge tells the attorney that he should persuade the defendant that he is making a mistake [by] taking a path that may result in a more severe sentence.[285]*

Lack of trust in the Military Courts leads many defendants and their families to put pressure on the defense attorneys to secure a plea bargain, in order to avoid a convicting judgment by the Military Court and a sentence that could be stiffer than one on which the

---

283. The interview was conducted by Nura Resh and Lior Yavne in the Samaria Military Court, August 7, 2007.

284. The interview was conducted by Nura Resh and Lior Yavne in the Samaria Military Court, August 7, 2007.

285. Yesh Din observation form no. 1098 (Judy Lotz and Ruth Ben Shaul). Judea Military Court case 4108/06, hearing on December 26, 2006. The full names are on file with Yesh Din.

two sides agree. An attorney that fails to deliver a plea bargain could find himself out of work, as Atty. Jamal Mahameed explains:

> We are part of the whole thing, because if you don't do it, you are thrown out of the system. That means that your reputation among the defendants' families is damaged. They'll say that you're not good, that your clients get heavy sentences, that [the Court] doesn't accept your deals [...] That's when the attorney starts making plea bargains. Plea bargains are a part of the system, such a crappy system – forgive the expression – that you have to be a part of it. If not, you're out. You're rejected.[286]

## (d)    Conclusion

The right of the defendant to call and examine witnesses of his choosing and question them is not unequivocally entrenched in the Order Concerning Security Provisions, as it is in international law. Nevertheless, it seems that there are no particular problems in this regard in the Military Courts. According to Atty. Anees, in an interview with Yesh Din, the defense witnesses he calls are generally in detention themselves anyway, and thus there is no difficulty in summoning them.

The problem with the Military Courts, therefore, is not the technical issue of calling witnesses and pleading the case, but rather the threat hanging over the defendant that calling witnesses will result in a stiffer sentence, whether in a plea bargain agreed upon after the witnesses have testified, or at the conclusion of a full evidentiary trial with no plea bargain.

The chances of a Palestinian defendant indicted by a Military Court to be acquitted at the end of his trial are low, to say the least. As mentioned previously, in 2006 only 0.29% of the defendants in the Military Courts were acquitted. All of the defendants who were found not guilty had conducted evidentiary trials and not agreed on a plea bargain with the Prosecution. In that year, in fact, a relatively high proportion of those who conducted full evidentiary trials were acquitted: about twenty percent. Nevertheless, the lack of trust in the courts, the fear of harsher sentences imposed on defendants who insist on their right to an evidentiary trial, and additional reasons enumerated above, all guide most defendants and their attorneys to the Offices of the Prosecution to work out a plea bargain.

---

286.    The interview was conducted by Nura Resh and Lior Yavne in the Samaria Military Court, August 7, 2007.



Plea bargaining has in effect replaced full legal proceedings in the Military Courts, but the practice is perceived as serving the interests of all sides: the defendants are generally given some reduction of sentence in comparison with what might have been expected after a conviction in an evidentiary trial; the Prosecutor and the Defense are able to conclude the case without the need for summoning and examining witnesses; and the work load of the Court is reduced. The question of whether justice is served in this manner, or whether it increases the danger of distortion of justice, is outside the framework of this report, but it is a subject worthy of examination. It should only be noted that it is not by accident that lawmakers in every country, Israel included, have legislated procedures for a full evidentiary trial in which witnesses can be heard and examined, and each side can present its arguments in a comprehensive manner – all this as a guarantee of a fair trial in which the danger of a miscarriage of justice is minimized to the fullest extent possible.

142



**IN RESPONSE TO THE DRAFT OF THIS REPORT, THE IDF SPOKESPERSON STATED ON BEHALF OF THE MILITARY COURTS UNIT:**

→ The settlements[287] mechanism is common in Israeli courts, just as it is common in courts in the region [...] In Israel too it is common for an accused person who confesses in court to be entitled to an easement of his sentence, while persons denying guilt, prolonging their trial and who are found guilty are not entitled to such easement.

→ According to the method of law common in Judea and Samaria and in Israel, the court orders that settlements be upheld if they do not deviate radically from the common and reasonable level of punishment. Therefore, once the accused has decided to reach a settlement through his attorney, the court will usually honor the settlement. Settlements are usually a definite public interest, that in the reality of the region can greatly benefit accused persons whose attorneys believe have a high chance of being convicted. Assuming that the defense attorney has carried out his work properly, in such a case the interest to reach settlement is first and foremost the interest of the accused person who can minimize the severity of the indictment filed against him, and that of his sentence. Therefore, there is no flaw in reaching settlements.

---

287.    In translating the original Hebrew version of this report, Yesh Din translated the same term as "plea bargain."



## 07    INTERPRETATION

### (a)    International legal standards

In order to guarantee that a defendant is able to defend himself in court (as well as properly provide his account during questioning), explicit instructions have been established in international law regarding the occupying power's obligation to provide an interpreter for suspects and accused persons. Article 72 of the Fourth Geneva Convention states, among other things, that

> Accused persons shall, unless they freely waive such assistance, be aided by an interpreter, both during preliminary investigation and during the hearing in court. They shall have the right at any time to object to the interpreter and to ask for his replacement.

The minimum protections determined by the ICCPR, the ECHR[288] and the ACHR (the latter also requires the services of a translator – for the translation of documents – in addition to an interpreter of the hearing)[289] use similar language, guaranteeing the accused "the free assistance of an interpreter if he cannot understand or speak the language used in court."[290]

General Comment 13 indicates that the right to interpretation services is a basic right, especially in cases when unfamiliarity with the court's customary language or difficulties understanding it may be a substantial barrier to the realization of the accused's right to defend himself in court.[291]

### (b)    Security Legislation

The rule requiring the services of an interpreter during sessions in the Military Courts was adopted in Section 12 of the OCSP, which, following the instructions in the Fourth Geneva Convention, stipulates:

> If the accused does not know Hebrew, the Military Court will appoint an interpreter in order to interpret the proceedings and the Court's decisions, unless the accused

---

288.    ECHR, Article 6(3)(e).

289.    ACHR, Article 8(2)(a).

290.    ICCPR, Article 14(3)(f).

291.    General Comment 13, Para. 13.

freely waives the entire interpretation or part of it. The accused has the right to oppose an interpreter and request a replacement.

## (c)    Military Court procedures

Yesh Din petitioned the IDF Spokesperson for copies of the regulations on interpretation in the Military Courts and, among other things, the translation of court proceedings.[292] In response, the IDF Spokesperson said that "there are no written regulations in the Military Courts Unit related to translation of evidential material, proceedings and judgments, or for the training of interpreters."[293]

As for interpretation during hearings, the IDF Spokesperson noted in his answer that

> At Military Court hearings, a translator is regularly present, simultaneously translating what is said by the parties to the court proceedings and by the Court. The judgments given by the Court are read aloud in the court, and therefore are interpreted accordingly as well. Additionally, a copy of the judgment is given to the parties.[294]

## (d)    Interpreters in the Military Courts

In each of the Military Courts – Samaria and Judea – nine to ten interpreters serve under the supervision of an interpretation officer of the MCU. One interpreter in each court is a career serviceperson, termed "senior interpreter."

The interpreters are regular soldiers, mostly of Druze origin, whose native language is Arabic and who learned Hebrew in elementary and high school. These soldiers are not singled out for this position by the IDF before they enlist, but rather are assigned service in the Military Courts immediately upon enlistment, with no prior professional background in interpretation. At a certain point after beginning their work, the interpreters complete training in an army course.

---

292.    Questionnaire handed to IDF Spokesperson's Unit representatives at a meeting on March 15, 2007.
293.    IDF Spokesperson's answer to Yesh Din's questions, July 30, 2007.
294.    Ibid.



(e)     Interpreter training

As to the training of the interpreters in the Military Courts, the IDF Spokesperson shared with Yesh Din:

For the position of interpreter in the Military Courts Unit, regular soldiers are recruited who speak the Arabic and Hebrew languages fluently. Additionally, the interpreter training includes an interpreters' course. The unit also includes career-service interpreters, selected from amongst the regular soldiers who stood out as exceptionally professional.[295]

The training of interpreters takes place in the Military Advocate General's Military Justice School, at irregular intervals determined by the availability of budget and human resources.[296] The three-week course includes content related to translation of documents, simultaneous oral interpretation, translation of judgments and sentences, legal terminology, and lectures about various subjects, such as GSS interrogations and security offenses.[297]

In 2005, in the course of a study, Shira Lipkin, a Masters Degree candidate in the Translation Department of Bar-Ilan University, interviewed every one of the interpreters serving at the Judea Military Court at the time. The interpreters interviewed for Lipkin's study testified they were sent to an interpretation course after a period of active duty several months to a year and a half long.[298] One of them noted that in his opinion, the level of the interpreters would increase if the new interpreters were sent to the course immediately upon enlistment.[299]

Despite the formal training given to interpreters at some point (sometimes many months after they have started their work), lawyers appearing in the Military Courts are not satisfied with the quality of the interpretation. Among other things, some of the lawyers place blame on the decision to make use of regular soldiers, assigned this position only because of their mastery of both languages. Atty. Riyadh Anees, for instance, says:

> *I have been an attorney since 1976. Sit me down here to translate [interpret],*
> *me, a native speaker of Arabic who has learned Hebrew since the fourth grade,*

---

295.    Ibid.

296.    Shira Lipkin, Norms and Ethics Among Military Court Interpreters: The Unique Case of the Yehuda Court. (December 2006: Bar-Ilan University, Department of Translation and Interpreting Studies), pp. 88.

297.    Appendices 13-15 of Lipkin's study present the training plans of three interpreters' courses.

298.    Lipkin, pp. 66-69.

299.    Ibid., pp. 69-70.

146

*in a Hebrew-speaking school, and at Tel Aviv University, if you sat me down and asked me to translate – I could not translate. Translation is a profession. With all due respect to all of these people... Who are we talking about? We are talking about soldiers, who just finished the twelfth grade, and come and translate. I see what happens in the district court in Haifa. I appear in Haifa and in Tel-Aviv. There, if your defendant, or a witness, does not understand Hebrew, the court brings in people from a special company, people for whom this is a profession, translation. And even they have a hard time. Because you have to understand, this is legal translation. That not every one... it's not just anybody's profession.*[300]

Atty. Jamal Mahameed is also not impressed with the interpreters' skill, even after they have passed military training:

*These youngsters do not know Hebrew, they've hardly finished their twelfth-grade schooling, they come here on compulsory duty. At most they get some course but it's not enough. Many things go un-translated. After all, these youngsters don't know the legal jargon. They make mistakes to no end. You see it every day.*[301]

(f)    The role of the interpreters: maintaining order

An integral part of the interpreters' function in the courts is to ensure the order and proper conduct of the proceedings. This function is manifested, among other ways, by bringing in detainees and defendants whose cases are to be heard, removing them from the courtroom afterwards and bringing others in their place. The function of the interpreters is detailed in regulations. Copies of a document entitled "Standing Orders for Interpreters" are posted on the Samaria courtroom walls. The document details the interpreters' obligations before, during and after the day's proceedings. The document's 12 articles describe at length the procedural functions for which the interpreters are responsible – the procedures for the entry of detainees into the courtroom, change of personnel between interpreters, courtroom cleanliness, and more – yet there is not a single reference to their duties relating to the interpretation work itself.[302]

One of the prominent findings of Lipkin's study is the fact that the interpreters consider the main part of their function to be maintaining order in the courtroom. Lipkin notes in

---

300.    The interview was conducted by Nura Resh and Lior Yavne in the Samaria Military Court on August 7, 2007.
301.    The interview was conducted by Nura Resh and Lior Yavne in the Samaria Military Court on August 7, 2007.
302.    See full text of the document "Standing Orders for Interpreters" in the Samaria Military Court, Appendix 4.

147



her study that when asked about their position and job description in the courtroom, most interpreters referred mainly to the administrative aspects of the position. Furthermore, Lipkin writes that most of the interpreters she interviewed believed the importance of their work derived from the fact that they determined the court's schedule and were responsible for bringing detainees and defendants in and out of the courtroom.[303]

One interpreter Lipkin interviewed was asked for his opinion on the topic of the neutrality required by his position. However, he did not understand the question, and in his response he spoke of the importance he attributes to the role he plays:

> *The interpreter's job is in my opinion like such an important position, for instance calling the prosecutor to come into the courtroom, to call the defense lawyer, to bring in the detainees from the cell... To bring in the detainees' families, to coordinate between the prosecutor, when he comes in, for instance I have four cases, I bring in four detainees, two prosecutors show up – you've got to coordinate with the other prosecutor, you've got to, a case is scheduled for nine-thirty, the lawyer still hasn't got there, you can't sit down... you have to update the judge, tell him what's going on, I need to call the clerk so she'll be ready in the court, it's a job... [...] I'm under pressure all the time.[304]*

Both the interpretation officer and one of the veteran interpreters interviewed by Lipkin for her study agreed that the interpretation work in the Military Courts would improve if the interpreters were to deal only with interpretation.[305] The observation data Yesh Din Collected in the courts, and the words of attorneys who regularly appear there, indicate there is indeed much room for improvement.

## (g)    The volume and quality of interpretation

One of the indicators measured by Yesh Din observers is the scope of the translation provided for the accused, their attorneys and their families during proceedings. The observers, most of whom do not speak Arabic, were not asked for their opinion of the translation's quality, but rather asked to note their impression of the degree to which the interpreter conveyed the pleadings within the proceedings in full, such that the defendant and family members in attendance could, as much as possible, understand them.

---

303.   Lipkin, pp. 82-85.
304.   Quoted in Lipkin, p. 83
305.   Ibid, p. 102.

148

Of 648 observation forms on which the observers noted their impression of the scope of the translation, only 23% of the forms indicated that the translation was "full," and 37% of the forms assessed the translation as "reasonable." On the other hand, in 35% of the hearings observed by Yesh Din observers the translation was "partial or sloppy," and in another five percent there was no translation whatsoever.

Chart 5: Extent of interpretation at hearings monitored by Yesh Din



In some cases Yesh Din observers recorded their impressions of the interpreters' work and behavior. For example, the observers commented about the proceedings in one of the courtrooms of the Judea Military Court on the morning of June 12, 2007:

→ *Throughout the entire morning's hearings, the interpretation was sloppy. The interpreter did not always follow what was going on, he was sprawled on his seat with his legs wide open and his hands behind his head and intermittently and sloppily interpreted the proceedings. The judge commented on it again and again to no avail.*[306]

In other cases interpretation only resumed due to remarks by a defense attorney or judge. One Yesh Din observer reported as much on the hearings in the Samaria Military Court courtroom on February 6, 2007, noting that "the hearing is not being interpreted. Probably because this is the ninth case, almost in succession, that is not being interpreted, the judge turns to the interpreter and sarcastically says 'don't interpret, feel free.' From that point on, the interpreter starts working again."[307] On another observation form, it was noted about the proceedings in a minor's trial that "from time to time there is no interpretation at all.

---

306.    Yesh Din observation report no. 1246 (Judy Lotz and Ruth Ben Shaul).

307.    Yesh Din observation report no. 728 (Roi Maor). The comment refers to the hearings that took place in the Samaria Military Court on February 6, 2007.



The defense attorney gets angry and says he will interpret himself and the interpretation resumes. As the charges are read out the defendant protests constantly but his words are not interpreted."[308]

Attorneys who appear frequently in the Military Courts note that there are clear gaps in some interpreters' professional skills. Atty. Abu Hassan, when asked for an evaluation of the level of the Court interpreters, responded: "There are interpreters who interpret very nicely and accurately, but there are others... it depends on each and every one. They are not all the same."[309]

In some cases the interpreters' ignorance of legal terminology may harm a witness's ability to defend himself effectively. Atty. Sahar Frances says, on this topic:

> Some interpreters try, but it's not accurate, to such a degree that the cross-examination is impaired... . For example, in the hearing I just attended, when the judge explained to the [Palestinian] witness about his right to avoid self-incrimination, the term 'self-incrimination' was translated incorrectly – if I hadn't known Hebrew I would not have understood the term myself, the way it was translated.[310]

The translation in courtrooms is intended to allow the defendant – and his attorney, if the latter is not fluent – to understand the proceedings. Often interpreters do not bother to interpret exchanges between the Prosecution, the Defense and the judges in the courtroom, although they are significant to the proceedings. Atty. Abu Hassan believes the defendants and family members attending (who do not speak Hebrew) hardly understand the proceedings:

> The detainees and their families understand less than fifty percent of what goes on in the courtroom. Less... maybe they understand thirty percent. And it depends on the interpreter, whether he interprets and you can hear him, or whether he interprets...[311]

---

308.     Yesh Din observation report no. 1177 (Judy Lotz and Ruth Ben Shaul). Judea Military Court case 3665/06, hearing from May 9, 2007.

309.     The interview was conducted by Nura Resh and Lior Yavne in the Samaria Military Court on August 7, 2007.

310.     The interview was conducted by Lior Yavne at the Judea Military Court on August 1, 2007.

311.     The interview was conducted by Nura Resh and Lior Yavne at the Samaria Military Court on August 7, 2007.

Indeed, Lipkin's study indicates that most interpreters testify that they interpret only what goes on the record. As one interpreter stated, "the procedural arguments between the judges and the Defense or the Prosecution are not relevant, and we are instructed that they need not be interpreted, unless something of importance to the defendant is said."[312] Yesh Din courtroom observations indicate that in many cases even when things are said that are of importance to the defendant, they are not interpreted.

(h)      Conclusion

One of the Court interpreters with whom Yesh Din met spoke of his work:

> It is boring. Every day the same work. The same people, the same words, the same thing. Listen, a year and a half is okay, but three years? You just go nuts. [...] As far as physical fatigue, you can rest for an hour, or two or three. But if you are tired in here [points at his heart] like, you can't.... hear three or four witnesses in one day, you go home and you can't even talk. But what can you do, you have to do three years [of military service].[313]

Although the Military Courts in the OT are intended to try Arabic-speaking civilians, all proceedings in the Courts are conducted entirely in Hebrew. The indictment is submitted in Hebrew, the hearings are conducted in Hebrew, the records are written in Hebrew, and Hebrew is also the language in which the judgments are written.[314] Even defense attorneys whose Hebrew is poor usually prefer Hebrew when addressing the courtroom.

Some of the interpreters – if not most of them – try, so it seems, to perform their duties as best they can. However, the IDF's choice to rely on cheap human resources composed primarily of regular soldiers with absolutely no professional background – either as translators, in general, or more specifically as legal interpreters – who learn the profession as they work, severely harms the scope and quality of the interpretation provided. The IDF Spokesperson admitted that the Military Courts Unit has no regulations or written instructions whatsoever regarding the interpretation of hearings and translation of various documents. This fact illustrates the contempt with which the military authorities view their obligation to ensure that a defendant standing trial, or a detainee brought to a detention hearing, fully comprehends what transpires during the hearings over his matter.

---

312.   Lipkin, p. 86.

313.   The interpreter's name is on file with Yesh Din. The conversation took place in August 2007.

314.   For the matter of the translation of indictments and judgments, see above.



The fact that, in addition to their interpretation work, interpreters are required to act as escorts in the courts, hampers their ability to boost their professional skills and to devote their full attention to their interpretation duties. As a result, the quality of the interpretation is less than adequate, and the defendants' right to a full interpretation of the proceedings in their trials is not realized.

## (i)    Recommendations

1. The Military Courts Unit must set clear professional procedures for interpretation in the courtrooms.

2. The use of regular soldiers as interpreters must cease, and professional interpreters must be employed, as is customary in courtrooms in the State of Israel.

3. Until regular soldiers functioning as interpreters are replaced by professional interpreters, the functions of attendant and interpreter are to be clearly separated, and no further soldiers enlisted for the purpose of serving as interpreters shall serve in this capacity until they have undergone a comprehensive professional course, as soon as possible after their enlistment.



**IN RESPONSE TO THE DRAFT OF THIS REPORT, THE IDF SPOKESPERSON STATED ON BEHALF OF THE MILITARY COURTS UNIT:**

→ The Military Courts system gives utmost importance to the translation[315] of its hearings. To this end, soldiers with high personal abilities are recruited, who undergo admissions tests, a professional course, and constant on-the-job training, as well as advanced professional training. The unit translations officer, who serves as a professional guide, conducts a periodic review of the quality of the translations, and translators who are not up to standard are reassigned to other duties. Furthermore, several judges in the unit speak Arabic at mother tongue level, and they too supervise the level of translation and serve as professional guides for the translators.

→ In order to raise the quality of the translation, career-service translators were recruited. There is no need to mention that in cases where a defense attorney is not satisfied with the level of translation, this is brought to the court's knowledge, and later to the attention of the translations officer for review and in order to find suitable solutions.

→ Nevertheless, we acknowledge that the quality of translation varies, as by translator, and measures are being taken in the system to rectify this. One of the measures is augmenting the number of commissioned translators. The Judea court, for example, currently employs 3 translators in career service instead of just one as before. Clearly, the more permanent service commissions instituted, the better the translations obtained.

---

315.    In translating the original Hebrew version of this report, Yesh Din translated the same term as "interpretation."

153



## 08     MINORS

### (a)     International legal standards

The Fourth Geneva Convention does not include special instructions on the subject of the rights of minors put on trial by an occupying power. International human rights law, on the other hand, sets clear guidelines regarding the treatment of minors in criminal proceedings, and the requirement to take the fact of their minority into account at all times.

Article 14(d) of the ICCPR requires the adjustment of legal procedures in the courtroom to the minor's age:

> In the case of juvenile persons, the procedure shall be such as will take account of their age and the desirability of promoting their rehabilitation.

Article 40 of the *Convention on the Rights of the Child*,[316] relating to children "alleged as, accused of, or recognized as having infringed the penal law," sets forth a detailed list of the rights of such children. The rights listed in Article 40 are principally identical to the basic protections required by international human rights law vis-à-vis adult defendants, while paying special attention to the fact that the accused is a minor, considering the accused's age and condition, involving the minor's parents (if possible) in the proceedings, and respecting the child's privacy entirely, at all stages.

In paragraphs 36-38 of the United Nations Committee on the Rights of the Child's *General Comment 10: Children's Rights in Juvenile Justice*, the Committee calls signatory states parties to the Convention on the Rights of the Child to define the threshold for legal majority as 18 and no lower. The Committee also asserts that a "key requirement" for securing the rights of minors suspected of criminal offenses is that professionals coming in contact with such minors – including police officers, prosecutors, judges and others – undergo comprehensive and continuous training. Specifically, the Committee refers to training about "the child's, and particularly about the adolescent's physical, psychological, mental and social development."[317]

A central tenet of the requirements of international law regarding criminal procedures for minors is separating them from adults, mainly during detention (Article 37(b) of the

---

316.   The Convention was signed by the State of Israel on July 3, 1990 and ratified on August 4, 1991.

317.   Paragraph 40 of the UN Committee on the Rights of the Child's General Comment no. 10.

154

Convention on the Rights of the Child). All practices in criminal law emphasize rehabilitation as the goal of criminal proceedings and criminal punishment when relating to minors.[318]

(b)    Security Legislation

The adjudication of minors charged with criminal offenses is mainly regulated by the *Order Concerning Adjudication of Juvenile Offenders (West Bank Area) (no. 132), 1967*. The Decree lists three categories of minors: a "child" is defined as "a person not yet twelve years of age"; a "youth" is one who has already reached twelve years of age but not yet fourteen years of age; a "young adult" is one already fourteen years of age but not yet sixteen years of age.[319] Above the age of sixteen, excluding one caveat to be discussed below, a person is considered an adult.

Section 2 of the Order absolves "children" (under the age of 12) from arrest and criminal trial.[320] Section 3 asserts that a "youth" or "young adult" (that is, ages 12-16) must be held in custody separately from adults.

Sections 4 and 5 stipulate a maximum period of confinement for "youths" (up to six months of confinement) and for "young adults" (up to a year of confinement, unless the "young adult" has been convicted of an offense entailing five or more years of confinement), but the date used to classify the minor is his age at the time of sentencing -- and not his age at the time of the offense of which he has been convicted. However, Section 5a provides that "when determining the punishment of a youth or young adult, the Court will take into consideration, among other things, his age at the time of the offense." Combining the fact that the age involved in the question of minority is the day of sentencing, and not the day of the crime, with the above details about prolonged proceedings in the Military Courts, it is inevitable that in many cases minors who committed offenses become adults by the date of their sentencing. Moreover, these problematic circumstances exert pressure on defense lawyers to bring minors' trials to an end before they turn sixteen years old.

---

318.    Rehabilitation is also a goal in adult cases, but with them a more central role is attributed to other goals, such as deterrence and retaliation.

319.    *Order Concerning Adjudication of Juvenile Offenders (West Bank Area) (no. 132), 1967* [hereinafter: "Order Concerning Adjudication of Juvenile Offenders"], Section 1.

320.    Section 4 of the *Order Concerning Rules of Liability (Judea and Samaria) (no. 225), 1967* asserts that "one not yet twelve years of age will not be held criminally liable for any action or omission."



Section 6 stipulates that if a monetary fine has been imposed on a minor, the Court may require his parents or legal guardians to pay the fine, including ordering the minor's father, mother or legal guardian to serve a prison sentence in place of the fine. Sections 7(a)-(c) of the order detail various provisions regarding the obligation of parents or legal guardians to deposit a financial guarantee (bond) for the release of a 12-16 year old suspected or convicted of a crime. For these matters alone, a person is considered a minor until the age of 18.[321]

An isolated reference in the OCSP to the protection of minors on trial in the Military Court system can be found in Section 11(a), under which the Military Commander instructs that the Court "may" order an *in camera* hearing for a variety of reasons, including the protection of "a minor's well-being."

(c)     Military Court procedures

In response to Yesh Din's petition to receive copies of regulations, guidelines or orders instated in the Military Courts or in other military units regarding minors on trial in the Military Courts, the IDF Spokesperson referred Yesh Din to the Order Concerning Adjudication of Juvenile Offenders, the provisions of which are outlined above.

(d)     Proportion of minors' trials at the Military Courts

International law awards special protection to minors standing trial. However, the IDF has refrained from erecting a special juvenile court in the OT, for instance like the one in Israel. Therefore, minors stand trial in the regular Military Courts, in proceedings identical to those of adults. This is the case both for minors ages 16-18 years, as well as minors not yet 16 years of age.

The IDF has refrained from collecting data as to the number of minors put on trial in the Military Courts.[322] However, one may gain insight on the matter from the data regarding Palestinian minors held under detention or incarcerated by the IDF and the Israeli Prison Service (IPS).

---

321.   Order Concerning Adjudication of Juvenile Offenders, Sections 6(b) and 7(e).
322.   IDF Spokesperson's response to Yesh Din's questions, May 27, 2007.

156

Table 6: Minors above and below the age of 16 held under detention or incarcerated by IDF and IPS, 2005-2007[323]

|  | Under 16 | Age 16-17 | Total |
|---|---|---|---|
| December 2005 | 6˙ | 2˙˙ | 272 |
| December 2006 | 34 | 327 | 36˙ |
| April 2007 | 29 | 355 | 384 |

Extension of detention hearings and trial hearings for minors comprise a significant portion of the hearings in the Military Courts. Table 7 shows that in the years 2001-2006, minors constituted four to six percent of all Palestinians detained and incarcerated by IDF and IPS, and it may be estimated that the relative volume of their cases in the Courts was similar.

Table 7: The proportion of minors under the age of 18 among confined persons detained and imprisoned by the IDF and IPS, 2001-2007[324]

|  | Total confined | Of them minors | Minors' percentage of total |
|---|---|---|---|
| 200˙ | ˙,854 | ˙˙6 | 6.26% |
| 2002 | 4,5˙˙ | 279 | 6.˙8% |
| 2003 | 5,944 | 235 | 3.95% |
| 2004 | 7,787 | 355 | 4.56% |
| 2005 | 8,˙76 | 272 | 3.33% |
| 2006 | 9,˙78 | 36˙ | 3.93% |
| 2007 (April) | 9,337 | 369 | 3.95% |

---

323.    Source: IDF and IPS data given to B'Tselem. The data do not include detainees in administrative detention, detainees and persons convicted of "criminal" category offenses, and do not include minors detained and held by the Israel Police. The data relate to a specific point of time in each year and do not constitute the total number detained that year.

324.    Source: IDF and IPS data given to B'Tselem. The data do not include detainees in administrative detention, detainees and persons convicted of "criminal" category offenses, and do not include minors detained and held by the Israel Police. The data relate to a specific point of time in each year and do not constitute the total number detained that year.



Forty-eight of the defendants and detainees in the 810 observations made by Yesh Din observers in the Military Courts were minors under the age of 18. In 52 additional cases the observers found it difficult to ascertain whether the detainee or defendant was a minor or an adult. The fact that the MCU denied Yesh Din access to the records of the proceedings until near the end of the observations made it difficult to determine precisely whether the person was a minor or a legal adult.

### (e)   Training of prosecutors and judges to adjudicate minors

As previously mentioned, the UN Committee on the Rights of the Child established that there is a series of "key conditions" that investigators, prosecutors and judges who deal with criminal proceedings against minors must fulfil, and central to them is comprehensive and continuous training.

Atty. Fallah served as military prosecutor in the Judea Military Court for two years. When asked about the training of prosecutors and judges for dealing with the prosecution and trial of minors he replied: "No. Nothing. Nothing. Much to my regret, they are tried like any other person. Like an adult – the same."[325]

### (f)   Separation from adult defendants

As a rule, minors detained or imprisoned are held separately from adults, as required by international law. However, when they are brought to court and during their trial proceedings the separation from adults is not always strictly maintained. Atty. Adnan Rabi, who represents many minors within the framework of the Defence for Children International organization, notes on this topic:

> *Sometimes they bring them [to court] with the adults and when we ask them to do so they separate them. Other times they bring them in an orderly fashion. "Nahshon" [the IPS escort unit] takes care to separate minors from adults. But not always, there are problems there too: sometimes they are placed with adults.*[326]

Yesh Din observers reported that minors brought into the courtrooms are seated, except for some isolated cases, in the dock alongside adults, and that their hearings are not held separately from those of adults.

---

325.   The interview was conducted by Judy Lotz and Lior Yavne in Jerusalem on August 12, 2007.

326.   The interview was conducted by Nura Resh and Lior Yavne in the Samaria Military Court on August 7, 2007.



A minor waiting for his hearing to start in the Samaria Military Court. Yesh Din's observation findings show that minors are usually seated together with adult defendants.

## (g)    Release from detention

Atty. Adnan Rabi notes that in his experience the Military Courts do not tend to show more flexibility on the matter of releasing minors from detention:

> *They don't release them [on bail]. You know, in Israel they hardly even send them into detention. Here they don't release them. Only in rare cases, when there's reason to release even an adult defendant – only then do they release them. For instance when there's no danger [in the alleged crime]. There's no differentiation.*[327]

---

327.    The interview was conducted by Nura Resh and Lior Yavne in the Samaria Military Court on August 7, 2007.



Nine hearings of the 48 minors' hearings observed by Yesh Din observers were detention hearings. In all nine sessions – which lasted three minutes and twenty seconds on average – the detentions were extended by periods of six to 28 days. Not one of the minors in these proceedings was released from detention.[328]

## (h)    Consideration of minority

In the vast majority of hearings documented, there was apparently no special consideration on the part of prosecutors or judges of the fact that the defendants were minors. The fact that the defendant or detainee was a minor was usually expressed by the defense lawyer alone. Generally the prosecutors only bothered to note that the defendant was a minor when explaining to the court the reasons the parties could agree to a plea bargain. In other cases the Prosecution demanded that the court ignore the defendant's minority. So, for example, the prosecutor told the court in one case that the fact the defendant was a minor (who, according to her, "chose as a way of life to commit security offenses") did not need to have a bearing on his punishment.[329]

The judges presiding over the hearings observed by Yesh Din observers also seldom addressed the fact that the defendant or detainee was a minor. The issue was mentioned by judges in only 13 of the 48 minors' hearings observed by Yesh Din. Then, too, the fact was raised almost exclusively in the context of the court's discussion of its considerations in whether to accept a proposed plea bargain.

## (i)    Punishment

A defendant's minority is not formally incorporated into procedures or any other proceedings in court . The only stage in which the fact receives any attention is at sentencing. Moreover, the leniency in punishment based on the minor's age is usually insignificant and depends on the kind of offense of which he is convicted. So, for instance, Atty. Khaled al-Arraj says:

> Still – I say this cautiously – it depends what the alleged offense is. When the offense is throwing rocks – there is no difference. Almost the same punishment for an adult and a minor, maybe with a difference of one month. If it is an offense

---

328.    Also in the eight further detention hearings where the Yesh Din observers could not determine if the detainee was a minor or an adult, no detainee was released from detention.

329.    Yesh Din observation form no. 1484 (Keren Ben Dov), Judea Military Court case 4233/06, hearing from August 21, 2007.

*of throwing a bomb, a Molotov cocktail, or I don't know what – there's a difference of four-five months between an adult and a minor. Other offenses – there is a difference, not a significant one but there is a difference.*[330]

Atty. Rabi too notes that the slight difference between punishment of minors and adults is the only expression of their minority in their trial procedures:

*Exactly the same. Totally. The same exact proceedings, the same procedure, everything is the same. There is no special interrogator for juveniles. There is no special judge as juvenile judge. It's the same judge for everybody – it is the same. The only thing is sometimes in the punishment – a little – there is a difference and only the... separation. And the separation is not always made, by the way. Sometimes they just put them together and that's it. As for treatment – the same treatment. In interrogation too. Even their interrogation – worse than adults. A minor needs a special interrogator who knows how to relate to him and that – they don't have that. It is the same interrogator for everybody. And a minor, even in the crime itself he just follows the others. He does not always understand the offense he is committing. And they do not always take that into account. His thinking is totally different thinking, not like an adult.*[331]

## (j)    Closing doors

The juvenile courts in Israel regularly operate *in camera* to protect the minors on trial. Although security regulation allows the Military Courts to hear minors' cases *in camera*, the practice is not customary there. Atty. Rabi noted that in several cases in which he requested that the court hold a session *in camera* his request was denied.

Yesh Din petitioned the IDF Spokesperson for the latter's data regarding hearings *in camera* in the Military Courts.[332] In reply the Spokesperson answered that because closing the doors in the Military Courts is a "rare exception," the Military Court's computerized system holds no data on this matter.[333]

---

330.    The interview was conducted by Judy Lotz and Lior Yavne in Jerusalem on August 12, 2007.

331.    The interview was conducted by Nura Resh in the Samaria Military Court on August 7, 2007.

332.    Yesh Din petition to the IDF Spokesperson, August 29, 2007. The request referred to all hearings and not only those in minors' cases.

333.    IDF Spokesperson's reply to Yesh Din petition, October 14, 2007.

161



## (k)    Conclusion

In recent years minors comprise four to six and a half percent of all detainees and defendants in the Military Courts. Considering these numbers the Military Court system's lack of regard for these minors and youths is conspicuous.

The IDF, as previously mentioned, refrained from erecting military courts in the OT for the adjudication of minors, and the prosecutors and judges handling their cases undergo no training in the treatment of minors. As such, these minors are prosecuted and tried under conditions identical to those of adult defendants, and by prosecutors and judges whose regular activity is the adjudication of adults. Minors are usually seated in the dock alongside adults, and their cases are heard before and after adults' cases, usually in public sessions.

In accordance with Security Legislation, minors are tried as adults from the moment they turn 16 years old, even if the crime of which they are accused was committed before they had reached that age.

With the Israeli-Palestinian conflict in the background, the punishment of youths is determined without taking into consideration the possibility of rehabilitation – neither with regard to "security" offenses nor with regard to regular criminal offenses.

## (l)    Recommendations

1. Security Legislation is to be amended to the effect that a person is defined a minor until he is 18 years of age.

2. Sections 4 and 5 of the Order Concerning Adjudication of Juvenile Offenders are to be amended so that the determining date relating to the penalizing of minors shall be the time of committing the offense and not the time of sentencing.

3. The closing of courtroom doors during sessions in the matter of minors must be strictly observed.

4. Special juvenile courts are to be established, in which prosecutors and judges specially trained in juvenile matters and proceedings will serve.

5. Until the establishment of a juvenile court, absolute separation must exist between adults and minors in the military courtrooms.

162

BACKYARD PROCEEDINGS



**IN RESPONSE TO THE DRAFT OF THIS REPORT, THE IDF SPOKESPERSON STATED ON BEHALF OF THE MILITARY COURTS UNIT:**

→ Military court rulings consistently take into account the necessity for leniency in castigating minors and paying heed to their minority upon sentencing, both on account of very serious and lesser offenses. Rulings emphasize time and again the need to attribute considerable significance to an accused person's youth.

**ON BEHALF OF THE MILITARY ADVOCATE GENERAL, THE IDF SPOKESPERSON WROTE:**

→ The rulings index (of the military appeals court) list dozens of appeal court verdicts[334] grouped together under the category of "minors". And therein, the minority of persons is explicitly addressed, with respect to punishment as well as to a host of other aspects pertaining to rehabilitation and commitment to trial, and all this in addition to clear military law provisions regarding this issue.

→ The plaintiff in case 4233/06 refers to a minor who was party to a long series of grave felonies, including the manufacturing and use of Molotov cocktails, trafficking a detonative vest, and conspiring to carry out a stabbing attack on an IDF road block.

---

334.   In translating the original Hebrew version of this report, Yesh Din translated the same term as "judgment."



# CONCLUSIONS

International law allows the creation of military courts in occupied territories, though it foresees the difficulties entailed in maintaining due process when military officers try civilians. However, the drafters of the international conventions did not address a situation in which the occupation persists over the course of four decades. The findings of this study raise the question of whether a fair legal system can be maintained, in a non-democratic regime, for such an extended period.

The courtrooms of the Military Courts, surrounded by the protective perimeter walls of the military bases within which they are located, have been operating since the beginning of the occupation under virtually an absolute veil of darkness. Journalists do not frequent the courtrooms and do not report on what transpires therein as is customary in the courtrooms of Israel; retirees do not frequent them out of interest, as they do in the courtrooms in Tel-Aviv and Haifa; sentences levied by them do not raise public discourse in the Israeli public at large or even in the legal and academic community.

The accused brought to the Military Courts are judged according to military orders, the current versions of which are not readily available, for committing crimes ranging from casual conversation to premeditated murder, based on indictments not written in their language. The working conditions forced upon their defense attorneys make consultation with them impossible, and defense of their clients is expressed primarily in business meetings with a prosecutor present.

In the Military Courts, as in any system operating without external review, arbitrariness plays a central role. Family members, who cannot meet their detained relatives except in court, are permitted to send only two representatives into the courtroom because that is what somebody decided, once; a junior officer has independent discretion as to the limits of the right to a public trial – who shall be permitted (after providing advanced notice) the privilege of a courtroom visit and what shall be the criteria for such permission; it is left to the interpreters to decide what they translate and what they do not; a young prosecutor decides a defendant's fate for the many years to come in a short hallway exchange with a defense lawyer; judges are appointed to their positions without the measurement of their qualifications by any type of standard, other than the period of time lapsed since their certification as attorneys.

164

The Military Courts operate in the State of Israel's backyard – the Occupied Territories. This judicial system constitutes a central pillar of the continuing Israeli control and occupation mechanisms in the West Bank. These control mechanisms direct the flow of accused persons to this judicial system – suspects, detainees, murderers (one percent of the accused) and those who tried to make a living in Israel without a permit. In light of the volume of activity in the military judicial system, one may learn that few homes in the West Bank have fates not somehow interlinked with it, but the Israeli public, which seldom peeks into its backyard, and refrains from investing in it, does not show any kind of interest in the system.

Under this limited public scrutiny, the courts have continued working throughout the years on their own. A detention is extended ("I examined the classified report"); an indictment is submitted ("membership in an unauthorized association, a crime according to the Defense (Emergency) Regulations 1945"); a plea bargain is agreed upon ("I ask that the plea bargain be adopted"); a defendant is convicted ("the plea bargain is not outside reasonable bounds"). Not all are convicted, of course, for what is a court without acquittals? And indeed, there are defendants who leave the court with a judgment that says they have committed no crime. There are some. Zero point twenty-nine percent in 2006.

Over the course of forty years of activity several reforms have taken place within the Military Court arrangement. An appeals court erected here, field officers replaced with lawyers as lay judges there. These reforms, though discussed within the system internally for many years, occurred in the end because of external constraints. Here some critique from HCJ judges; there a disgruntled judge-officer "spills the beans" to a journalist.

The military judicial system adopted Israeli laws of evidence. However, in 2006 this fact was only reflected in one hundred and thirty trials that were concluded during that year. Only in those one hundred and thirty did a full evidentiary trial take place in which witnesses gave testimony, evidence was examined and closing arguments were made. One hundred and thirty full evidentiary trials of 9,123 cases closed.

This report examined one aspect of the conduct in the Military Courts. Due process rights are a foundation for the existence of a fair trial, but are, of course, not the only ingredient. The report is full of recommendations for changes and amendments. Implementation of the recommendations will not make the Military Courts and their activity exemplary, but it will at least assist in doing the very minimum required of the IDF in its trial of the residents of the Occupied Territories.

165



# APPENDICES

167



**APPENDIX 1: ISRAEL PRISON SERVICE RESPONSE**

Israel Prison Service
Unclassified

---

## Office of IPS Spokesperson

Date:                           3 Kislev, 5768
                        November 13, 2007
File: Spokesperson's Office, outgoing mail
Public affairs: reactions to public queries and
petitions
Reference: 85719807

---

To: Mr. Lior Yavne
Research Director
Yesh Din-Volunteers for Human Rights
11 Rothschild Blvd.
Tel Aviv 66881
By fax 03516-6119

Re: <u>Backyard Proceedings: The Implementation of Due Process Rights
in the Military Courts in the Occupied Territories</u>
Reference: your letter of October 30, 2007

1. I hereby confirm receipt of the referenced report on the topic of: "The implementation of
due process rights in the Military Courts." The IPS was asked to respond to the subjects related
to it:
    a. Attorney-client meetings.
    b. Security procedures in the Military Courts and visits by family members of defendants in
    the Military Courts.

168

Our response is as follows:

Introduction

The Israel Prison Service has 28 prison facilities all over the country. When the IPS became a national incarceration authority, three large prison facilities were transferred from the IDF to the IPS (Ofer, Meggido and Ketziot), in which are held security convicts and detainees who were convicted or detained for various lengths of time.

At the three prisons – Ketziot, Meggido (Salem) and Ofer, there are Military Courts.

2.     Attorney-client meetings

The issue of meetings between attorneys and security prisoners is regulated by Commission Order 04.34.00 (posted on the IPS website). Coordination of the meeting, its conditions and its location are regulated the aforementioned order in accordance with the law. The IPS operates according to what is required and set forth in the order. The IPS operates according to the order and the timetable set forth therein (according to the law).

Following an inquiry within the main prison facilities in which most of the security detainees are held (after indictments are filed), and where security prisoners are held, we were told that in general meetings take place between attorneys and detainees/ prisoners within 24 hours of a request to arrange a meeting, while in some prison facilities the length of time is between 24 and 48 hours. The meetings are made possible at the earliest time possible, considering the number of requests at those times.

It should be added that many times attorneys request that the meeting take place at specific times later on, as is convenient for them, and this is arranged.

The IPS's experience has been that security prisoners and detainees possess particular features with regard to meetings with attorneys. Thus, one common phenomenon is that many security detainees and prisoners meet with a number of different attorneys who come to the prison separately, and on the basis of a separate power of attorney given to each one.

And so it is common for a given security prisoner or detainee to meet within a short period of time with a number of different attorneys on different occasions. This becomes increasingly common the more the detainee or prisoner is considered a leader of the organization to which he belongs, even when, to the best of the IPS's

169



knowledge, there is no pending legal procedure regarding the prisoner. This creates an unusual volume of visits to security prisoners and detainees.

Likewise, many attorneys who represent security prisoners and detainees come to the prison for meetings with a number of different prisoners or detainees on the same day. It is common for an attorney who represents security prisoners and detainees to conduct a series of meetings at the prison with different clients one after another (this is not the case when attorneys meet criminal prisoners). This situation requires advance coordination in order to hold the meetings, because without such coordination we cannot guarantee in advance that all the meetings will be able to take place and that there will not be significant delays that could disrupt the orderly management of the prison in addition to burdening the lawyers themselves. All of the above considerations are the reason for the need to coordinate the aforementioned meetings in advance with the security prisoners and detainees.

3.   <u>Security procedures and family visits to the Military Courts</u>

a.   Possessing firearms in the courtroom – from September 2000 all of the wardens of the Ofer prison who worked in the court were instructed not to possess firearms in the courtrooms. If a violent incident develops with prisoners or family members, the incident is handled by the use of other means.

b.   Visit by a family member of one of the defendants who wants to enter the courtroom – visits by immediate [first-degree] family members of prisoners take place in the courtrooms on a regular basis. If there is a visit by someone who is not an immediate relative this requires permission from the Court Secretary prior to entry into the courtroom. Visits by a non-immediate relative must be coordinated and approved in advance with the MCU's public affairs officer, as has been practiced throughout the IDF period to this day.

c.   New procedures have been prepared by the Ofer prison and approved as to maintaining public order there.
The only cases in which a person may not enter the prisons, regardless of the place of their residence, is harm to state security or harm to public order in the court.
Responsibility for the order, organization and security in the court is

170

maintained by the Ofer prison. In general we do not decide who can enter the court compound given the powers of legal jurisdiction. The management of the Ofer prison is not prohibited from letting any person in as long as they have the relevant and appropriate permit.

4.    Regarding section 15 – recommendations – p. 67 in the draft report

• According to law, there is no eavesdropping on conversations between attorneys and clients in accordance with the legal principle of attorney-client privilege.

• The IPS operates as required and as much as possible to allow prisoners to consult their attorneys in the optimal conditions required by the law according to security considerations.

• Security prisoners and detainees are subject to different restrictions than criminal prisoners and detainees. Prison Commission Order number 03.02.00 sets forth the special rules that apply to security prisoners – Article 1 of the aforementioned order explains the rationale for those conditions as follows:

"Prisoners convicted of offenses against state security usually constitute a real potential to endanger state security in general, and to endanger the order and discipline in the prisons in particular, in light of the kind of offense they committed, their past, their motives and their involvement in activities against state security. Therefore every security prisoner is defined as a prisoner under warning."

"The security risk inherent in the security prisoners requires them to be imprisoned separately from the criminal prisoners and subjected to special restrictions as far as contact with the outside, including matters of leaves, visits, phone calls..."


Sincerely,

Yaron Zamir, Deputy Warder
IPS Spokesperson


171



**APPENDIX 2: ORDER CONCERNING THE ESTABLISHMENT OF MILITARY COURTS**

The text of the Order Concerning the Establishment of Military Courts in the West Bank, as published in the booklet of "Proclamations, Orders and Appointments No. 1" of the IDF Command in the West Bank Area, August 11, 1967.

Israel Defense Forces

Order No. 3

## Order Concerning the Establishment of Military Courts

By my authority as IDF Commander in the West Bank, and in accordance with Section 5 of the Order Concerning Security Provisions (Area of the West Bank), I hereby establish Military Courts, as follows:

1.      Military Court for the Jerusalem District
2.      Military Court for the Hebron District
3.      Military Court for the Jenin and Western Nablus District
4.      Military Court for the Eastern Nablus District
5.      Military Court for the Ramallah and Jericho District.

This Order shall be known as "Order Regarding the Establishment of Military Courts (West Bank Area) (No. 3) 5727–1967."

25 Iyar 5727
June 7 1967

Maj.-Gen. Chaim Herzog
Commander, Israel Defense Forces
West Bank Area

172

## APPENDIX 3: PROCEDURAL RULES IN THE MILITARY COURTS

The Procedural Rules in the Military Courts were defined in Point No. 2 of the Order Concerning Security Provisions (OCSP), under the heading "Trial Proceedings." Laws pertaining to arrest and detention are laid out in Chapter 4 of the same Order. There follows a description of the general plan of legal process in the Military Courts, as per the provisions of the Order.[335]

### Arrest and detention

The Military Court tries Palestinians accused of offenses under the Security Legislation, divided into the following categories: Public Disturbance, Hostile Terrorist Activity, Illegal Presence in Israel and other criminal offenses, as well as persons accused of traffic violations.

Police or soldiers are authorized to arrest a suspect and detain him for up to four days.[336] A ranking police officer is authorized to extend this initial detention by four additional days.[337] Any further detention requires an order signed by a Military Court judge.

A military judge is authorized to extend the detention of a suspect for 30 days at a time for the purpose of interrogation, up to a maximum detention of 90 days.[338] A military appellate judge may extend detention for more than 30 days if requested to do so by the Legal Advisor to the Judea and Samaria Area, but in any event, the entire duration of a suspect's detention must not exceed three months.[339]

Hearings regarding extension of detention for the purpose of interrogation may take place in the Military Courts adjoining GSS interrogation facilities (the police station in the Russian Compound, Jerusalem; Petah Tikva police station; Kishon jail at the Jalameh junction; Ashkelon), at the Judea Military Court (Ofer Base near Ramallah) or at the Samaria Military Court (near Kafr Salem).[340]

---

335.   The detail in this chapter is intended to give the reader an idea of the legal procedures in the military courts. A more detailed description may be found in the OCSP, Sections 8-46.

336.   OCSP, Section 78(c)(1).

337.   Ibid., Section 78(d)(1).

338.   Ibid., Section 78(f)(1).

339.   Ibid., Section 78(f)(2).

340.   For a survey based on observations of detention extension hearings in the Military Courts, see MachsomWatch: In the Eyes of Justice: Observations at Military Courts in the State of Israel (October 2006).



## Preliminary proceedings

The Military Prosecution is required to file an indictment within 90 days of the initial extension of detention by a judge. If the suspect is not under arrest, there is no deadline for filing the indictment. The indictment is filed according to the geographical division between the Judea Military Court (for defendants from the southern West Bank) and the Samaria Military Court (northern West Bank). The prosecutor is the one who decides, in theory and in practice, whether the case will come before one judge or a panel of three,[341] according to the seriousness of the offenses with which the suspect is charged, and he notes this decision in the heading of the indictment.

If the Military Prosecution requests it, there is a hearing soon after the filing of the indictment on extending the detention of the suspect – who has now become a defendant – until the end of legal proceedings regarding his case. The proceedings could take up to two years,[342] after which a judge of the Military Court of Appeals has the authority to extend the detention repeatedly for periods of six months at a time.[343]

In the next stage, called "the arraignment," the judge is supposed to read the indictment to the suspect, and ensure, "if he finds it necessary,"[344] that the suspect has understood the charges brought against him. Nevertheless, the Court usually dispenses with this stage, as is permitted by the Order Concerning Security Provisions,[345] if the defense attorney assures the court that he has read and explained the content of the indictment to the defendant. Upon the reading of the indictment follows the defendant's response: he can either plead guilty, not guilty, or not guilty while admitting all or some of the facts.[346]

At this stage, the hearing turns to various requests: postponement of the hearing in order to arrange for defense counsel, or to allow the Defense to receive and study material from the investigation, as well as various memoranda – all this to ensure that both sides are prepared for the trial before the evidentiary stage begins.

---

341.  OCSP, Section 21(a).
342.  Ibid., Section 78(k)(2)(a).
343.  Ibid., Section 78(k)(2)(b).
344.  Ibid., Section 21(b).
345.  Ibid.
346.  Ibid., Sections 21(d)-(e).

174

## Evidentiary stage

If the defendant pleads not guilty to the charges brought against him, the evidentiary stage begins. The Prosecution presents its evidence, and its witnesses testify in court. Every witness undergoes direct examination by the prosecutor, cross-examination by the Defense, and redirect examination by the prosecutor.

After the Prosecution's case has been presented, the Defense may claim "no case to answer," if it believes that the evidence presented is insufficient to support part or all of the charges against the defendant. If the Court accepts this claim, the defendant is acquitted of those charges.[347] If the Court rejects the claim, the trial continues to the case for the Defense.

If the defendant chooses to testify, he will be the first of the defense witnesses to take the stand. He too, like the other defense witnesses, is subject to direct examination by his defense attorney, cross-examination by the prosecutor, and redirect examination by his attorney.

## Closing stage

Upon close of the Defense's case, the Prosecution and the Defense present their closing arguments. This stage may be conducted in writing, orally, or a combination of the two. The Prosecution presents its summary first, followed by the Defense.[348]

## The judgment

In handing down its judgment, the court announces whether it finds the defendant guilty or not guilty of the various charges against him. If the defendant is convicted on all or some of the charges, the Prosecution presents arguments for sentencing and evidence that may influence the nature or severity of the sentence. Following this stage, the Defense presents its own arguments, at which point the defendant has the right to make a statement on his behalf and to call witnesses and introduce evidence that may help reduce his sentence. This stage too concludes with a closing statement by the Prosecution and the Defense.[349] The Court passes its sentence and informs the defendant of his right to appeal the judgment, the sentence or both. The defendant is allowed a period of 30 days to file an appeal.[350]

---

347.    Ibid., Section 30.
348.    Ibid., Section 32.
349.    Ibid., Section 34(b).
350.    Ibid., Section 40(d).



**APPENDIX 4: STANDING ORDERS FOR INTERPRETERS – NOT A WORD
ABOUT INTERPRETING**

Military  Courts  Unit  132
Samaria   Military   Court
Tel.     –     04-651-2702
Fax     –     04-651-2757
Date:          July/9/2007
Monday, 23 Tammuz, 5767


File: <u>Standing Orders</u>


Re: <u>Standing Orders for Interpreters</u>

1. Standing Orders for Interpreters – the following regulations must be strictly observed:
  (a) It is the interpreters' responsibility to begin the hearing at 9:30 a.m., after all preparations
  have been made.
  (b) The interpreters answer to the judges, from whom they will receive guidelines for the
  order of the hearings and for the number of defendants allowed in the courtroom.
  (c) The interpreters will ensure that the court escorts do not bring detainees into the
  courtroom without their permission.
  (d) The interpreters are responsible for verifying that there are always security personnel in
  the courtroom, in accordance with the number of detainees.
  (e) At the end of the recess, it is the responsibility of the interpreters to return to the hearing
  on time, at 1 p.m., or according to the instructions of the presiding judge.
  (f) Interpreters are not allowed to relieve each other without permission from the judges.
  (g) If the interpreters are relieved with the judge's permission, it is obligatory that they have
  an overlap period.
  (h) The interpreters are responsible for keeping order and silence in the courtroom during all
  the hearings, for preventing [people] entering and leaving the courtroom [during sessions],
  and for assisting the judge in controlling the courtroom.
  (i) The interpreters are responsible for keeping the courtrooms clean.
  (j) [The interpreters] must check that the daily schedule of hearings is posted at the entrance
  to the courtrooms.
  (k) At the end of the [day's] hearings, [the interpreters] must prepare the courtrooms for the
  following day.

176

(l) In an emergency situation, all the interpreters will assist the security personnel in escorting the detainees to the security rooms [adjacent to the courtroom], and the families and attorneys to the family rest area.

Sincerely,
Yvette --------------, Sgt.-Maj.
NCO, Samaria Military Court

The text above is an exact [translated] transcription of the Order that is posted on the walls of the Samaria Military Courtrooms.

177



**APPENDIX 5: EXTENSION OF DETENTION HEARINGS IN THE MILITARY COURTS, 2000-2006**



Note: The data relates to all the Military Courts, including military courtrooms within the borders of the State of Israel, and the Military Court in the Gaza Strip until its closure in August 2005.

Data source: MAG 2004, p. 126; MCU 2006, p. 16.

178

**APPENDIX 6: INDICTMENTS FILED FOR OFFENSES OF HOSTILE TERRORIST
ACTIVITY CATEGORY, 1998-2006**



Data source: MCU 2006, p. 13

179



**APPENDIX 7: FINES IMPOSED IN THE MILITARY COURTS, 2002-2006**

| Year | Total fines imposed (NIS) | Defendants whose trials were concluded | Average fine per defendant (NIS) |
|------|---------------------------|----------------------------------------|----------------------------------|
| 2002 | 7,05˙,305 | 5,849 | ˙,206 |
| 2003 | 9,˙96,385 | 6,635 | ˙,386 |
| 2004 | ˙7,073,686 | 9,485 | ˙,800 |
| 2005 | ˙4,373,700 | 9,986 | ˙,439 |
| 2006 | ˙˙,906,670 | 9,˙23 | ˙,305 |

Data source: MAG 2002, p. 262; MAG 2003, p. 248; MCU 2004, p. 10; MCU 2005, p. 10; MCU 2006, p. 10.

180

**APPENDIX 8: THE NUMBER OF DETAINEES HELD UNDER ADMINISTRATIVE DETENTION IN THE MONTH OF DECEMBER, 2001-2006**



Data source: Statistics from the Israel Defense Forces (IDF) and the Israel Prison Service (IPS), as given to B'Tselem. The figures do not reflect the total number of detainees held in administrative detention each year. The figures relate to different dates in the month of December in different years, as supplied by the IDF and the IPS. For comments and further reservations, see the B'Tselem website: www.btselem.org/english/administrative_detention/statistics.asp

The military justice system in the Occupied Territories adjudicates thousands of Palestinian civilians prosecuted by the Israel Defense Forces every year. The Military Courts, which have existed for four decades, operate virtually under complete darkness. The report, Backyard Proceedings, provides the Israeli and international public, for the first time in more than 15 years, with information about a system that serves as a cornerstone of Israeli rule in the West Bank. The report examines the degree to which this system upholds and implements the due process rights of Palestinian detainees and defendants brought before the Military Courts. The report evaluates, among other things, the realization of a defendant's right to know the charges against him, to prepare an effective defense, and to enjoy the presumption of innocence. The report further assesses how the principle of a public trial is applied in the Military Courts, how minors are adjudicated in the system and other related subjects. Additionally, the report examines whether the Security Legislation applying to the Occupied Territories meets the requirements of international law regarding due process of law. Through hundreds of observations, the report provides findings about the proceedings in the courtrooms.

The findings of the research described in the report reveal a series of grave defects and lapses in the implementation of due process rights in the Military Courts. On the basis of those findings Yesh Din offers recommendations for reforming legislation and policies.

Yesh Din-Volunteers for Human Rights was founded in March 2005, and since then its volunteers have been working for structural and long-term improvement of the human rights situation in the Occupied Territories. The organization collects and disseminates credible and current information on systematic human rights abuses in the Occupied Territories; applies public and legal pressure on the state authorities to stop them; and raises public awareness of human rights abuses in the Occupied Territories. In order to realize its goals effectively, Yesh Din operates according to a unique model among human rights organizations in Israel. The organization is run and staffed by volunteers and is assisted on a daily basis by a professional staff of lawyers, human rights experts and strategic and communications consultants.

www.yesh-din.org

