# EXHIBIT X

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK


MARK I. SOKOLOW, et al.,                    )
                                            )
            Plaintiffs,                     )
                                            )
v.                                          ) Civil Action No.
                                            ) 04cv397(GBD)(RLE)
THE PALESTINE LIBERATION                    )
ORGANIZATION, et al.,                       )
                                            )
            Defendants.                     )
_____      )




                DEPOSITION OF MICHAEL SFARD

                    JERUSALEM, ISRAEL

                    OCTOBER 24, 2013










REPORTED BY:  BRENDA MATZOV, CA CSR NO. 9243

Page 74

1  should digest the notion of public hearing.  And I
2  think they -- they -- they didn't at least at the
3  time frame that is relevant to our discussion here.
4      Q.  Do you -- do you think there's a difference
5  between the -- well, let me ask you this.
6          As I understand it, the military courts that
7  we've been discussing have jurisdiction over a wide
8  variety of kinds of offenses; is that true?
9      A.  That's true.
10     Q.  Things ranging from traffic violations on
11 the one hand, perhaps one end of the spectrum, speeding
12 tickets, to -- to acts of terrorism at the other end?
13         Is that fair to say?
14     A.  That's true.
15     Q.  Okay.  So -- and -- and the 21 cases we're
16 dealing with were all terrorism cases; right?
17     A.  Right.
18     Q.  So do you have a view on -- are you able
19 to compare security precautions taken for public
20 access in terrorism cases in the military courts
21 versus terrorism cases in the civilian courts, of
22 which the Marwan Barghouti --
23     A.  Is one.
24     Q.  -- seems to be the archetypical example?
25     A.  I don't have a knowledge and expertise in

Page 75

1  this.
2      Q.  Fair enough.  Okay.
3          Now, in the military courts that we've been
4  discussing, the accused is entitled to a translator;
5  is that right?
6      A.  The accused is entitled to an interpretator --
7  interpreter.
8      Q.  Interpreter.
9          And -- and the accused has a right to object
10 to a particular interpreter; isn't that right?
11     A.  That's right.
12     Q.  Now, in the military courts that we've been
13 discussing, a summary record of the trial is made rather
14 than a verbatim transcript; correct?
15     A.  That's correct.
16     Q.  And the summary record must be signed by the
17 president of the court; is that right?
18     A.  By the -- yeah.
19     Q.  And, commonly, the summary record is actually
20 signed by all three judges?
21         Have you seen that?
22     A.  No, I haven't.  But there is usually, at
23 the end of each hearing, a decision made by the --
24 by the judges, and the decision is signed by all three.
25 But that's not a confirmation of -- of the summary

Page 76

1  minutes.
2      Q.  Now, does -- as counsel for the defense,
3  were you provided with those summary records during
4  the course of the cases that you've handled?
5      A.  Yes, I have.
6      Q.  And do defense counsel have the opportunity
7  to object if they feel that the record is inaccurate
8  or incomplete?
9      A.  They do.
10     Q.  Now -- and is that -- is the fact of the
11 objection recorded in the record of the case?
12     A.  It should.
13     Q.  Now, the defendant may request the court
14 to summon witnesses for the defense; right?
15     A.  Right.
16     Q.  And the -- the court can hold witnesses
17 in contempt if they fail to obey the summons; right?
18     A.  That's true.
19     Q.  And the defense has the right to examine,
20 cross-examine, and re-examine witnesses; right?
21     A.  It has the right.  It doesn't -- it doesn't
22 mean that they have the opportunity always to do that.
23     Q.  The -- the right is subject to the control
24 of the court?
25     A.  That is -- that is correct.

Page 77

1      Q.  And that's true in our courts in New York
2  as well.
3      A.  Well, the question is:  What are the
4  evidentiary ramifications of not being able to use
5  your right to cross-examine?
6          I mean, it's true that no judge in the
7  world can compel a person to testify if he decided
8  that he will not say a word, if we're taking torture
9  out of the equation.  But the question --
10     Q.  I think you would agree with me it would
11 be inconsistent with the judicial mission for a --
12 for a judge to torture a witness?
13     A.  I -- I agree.  Of course.
14         But the question is:  What happens if the
15 defense did not have the opportunity to cross-examine
16 the witness?  Will his out-of-court statement be
17 admitted to the truth or not?  And that -- that is
18 a serious question which I deal with in my report.
19     Q.  Have the -- have the courts, either the
20 Military Court of Appeals or the Israel Supreme Court
21 dealt with that issue?
22     A.  It has.
23     Q.  And what have they said about that?
24     A.  The rules that govern are -- that govern now,
25 after a long evolution, is -- jurisprudential evolution,

1    Q.  -- I'm being imprecise, and you're --
2  you're being more precise by talking about somebody
3  who translates written documents?
4    A.  That's what I mean by "translation."
5    Q.  That's the distinction that you're making?
6    A.  Yeah.
7    Q.  Okay.  So I'll try to go with your lingo.
8    A.  Okay.
9    Q.  And -- and so if -- if there -- whatever
10  proceedings there are in the -- in the military court,
11  the interpreter is required to interpret them.
12      And is the -- is the interpreter sworn to
13  interpret to the best or his or her ability?
14    A.  I don't remember if they're sworn.  I don't
15  think -- there is no swearing in general.  They're --
16  they're --
17    Q.  Affirming?
18    A.  -- affirming.
19    Q.  Yeah.
20    A.  Yeah.  I don't -- I don't recall seeing
21  a interpreter sworn in a case.  They might be sworn
22  in general -- I don't know -- or affirmed.
23      But in any event, they are supposed to
24  interpret to Hebrew Arabic and to Arabic Hebrew.
25  And as -- as mentioned in the -- in my report, in

1  the Yesh Din report, those interpreters are not
2  professional interpreters.  They are young Druze
3  or Bedouins whose only quality for interpretation
4  is that they are native Arabic speakers.
5    Q.  Do you -- do you have any statistics on
6  how frequently the -- the interpreters are objected
7  to in the military courts?
8    A.  No, I do not.
9    Q.  Do you know whether, in any of our 21 cases,
10  the interpreter --
11    A.  I haven't --
12    Q.  -- was objected to?
13    A.  I haven't seen any objection in those 21
14  cases.
15    Q.  So coming back to the charge sheet, do we
16  agree that the Military Order 378 provides the accused
17  with a right to have the charge sheet read out?
18    A.  Can you point me to the article?
19    Q.  I was afraid you were going to say that.
20    A.  No, because I want to be very accurate --
21    Q.  Yeah, yeah.
22    A.  -- if it's the right to be read out or to
23  be handed.
24    Q.  Yeah.  Let's -- let's see if I can find it.
25  It appears -- it appears in my version of 21(b) like

1  "bravo."
2    A.  21(b).  Yeah, you are right.
3    Q.  Okay.
4    A.  It says that the court will read out the
5  charge sheet.
6    Q.  And -- and when you say it's the practice
7  not to do that, you understand that that's a strategic
8  decision or a -- a trial judgment that the counsel
9  are making or that the witness -- that the accused
10  is making; right?
11    A.  Okay.  My answer to you on this is the
12  following.  Being a defense attorney in the military
13  courts, you get accustomed -- you're -- you're joining
14  a culture in which there are many practices that deviate
15  from the letter of the law, like this one.  And it
16  is exactly the kind of failures that -- to uphold due
17  process rights to their letter that it was me -- I was
18  very much afraid to get accustomed to.
19      Yes, you're right, a defense attorney should
20  object to the idea that a judge would not read out the
21  charge sheet and instead let him, definitely if he is
22  not a master in Hebrew, interpret the charge sheet to
23  the defendant.  Yes, in most cases, the defense
24  attorneys cooperate with that practice.
25    Q.  So when you were with Avigdor Feldman, did

1  he object to the -- or did he insist on the reading
2  out of the charge sheet?
3    A.  I don't recall that he did.
4    Q.  And you would agree with me that -- I can't
5  remember the exact -- you -- you made some critical
6  comment about being corrupted by the system or something
7  like that.
8      You would agree with me he's not such a
9  person; right?
10    A.  I agree that he's not.
11    Q.  Thank you.
12      Now, the court is required, before accepting
13  a guilty plea, to be satisfied that the accused fully
14  understands the nature of the charge brought against
15  him and the implications of his admission of guilt;
16  correct?
17    A.  Again, which -- yeah, I -- it sounds like
18  what is said in the order.
19    Q.  Every person tried in the military courts
20  is entitled to be present during the whole trial,
21  so long as he conducts himself properly; correct?
22    A.  Correct.
23    Q.  I think we spoke about this earlier.  And I --
24  I didn't see it in 378.  But as I understand -- well,
25  let me ask you this.

Page 110

1    Q.  That's not uncommon among lawyers that they
2  see things differently but still respect each other.
3        Is that your situation with Reisner?
4    A.  Yeah.
5    Q.  He mentioned in his report -- did I ask you
6  if you read his report?
7    A.  Yes.
8    Q.  And you did?
9    A.  I did.
10    Q.  And he -- he mentioned that -- that the
11  de minimis doctrine applies in the military courts.
12        Do you agree with that?
13    A.  I don't.  Mr. Reisner has made a report that
14  is based on the law and case law.  That is a -- that
15  is a work that can be done by students and has nothing
16  to do with practice.
17    Q.  Let me ask the question again.  Well, let me
18  ask it a little differently, then, because I -- I don't
19  want to -- I really don't want to debate with you about
20  Mr. Reisner's report.
21    A.  Okay.
22    Q.  There's a -- there's a doctrine called the
23  de minimis doctrine.
24        Do you know what that is?
25    A.  I do.

Page 111

1    Q.  What is it?
2    A.  It's a doctrine which states that if -- that,
3  for certain very minor issues, the court would not deal
4  with, and so it will cancel or acquit defendants.
5    Q.  That applies in the military courts?
6    A.  I read for the first time, in Reisner's
7  report, that there was such a judgment.
8        Since judgments of the military courts are
9  not disseminated, I couldn't check it.  And since we
10  didn't get -- I didn't get -- I asked for the -- for
11  the judgments to be supplied, because there is no way
12  for me to get these judgments.  They were not cited
13  with any publication that I can go to a library and --
14  and look for it.  So I did not have the opportunity
15  to go through, so I cannot -- I cannot say.
16    Q.  Did you try?
17    A.  How?
18    Q.  Did you go to a library?  Did you go to the --
19    A.  No.  The military courts' cases -- military
20  courts' cases of first instance are not published.
21  Military court cases of the Court of Appeals, only
22  a selection of them is being published.  And since
23  Mr. Reisner, in his report, did not cite publication --
24  the publication, I didn't try to -- to look for them.
25  I asked for them to be handed over.  And until

Page 112

1  yesterday, I didn't get it.  So it might --
2    Q.  You mean until today, even sitting here today,
3  you haven't seen it?
4    A.  No, I haven't seen it.
5    Q.  I just wanted to make that clear, because
6  you said "until yesterday."
7    A.  No, no, no.
8    Q.  But you haven't actually seen it?
9    A.  No, no, I haven't seen it.
10    Q.  Okay.  It must be an idiom.
11    A.  Yeah.
12    Q.  All right.  Abusive process, that's a defense
13  that applies in the military courts as well; is that
14  right?
15    A.  I understand -- I know that it is.
16    Q.  And there's a -- rule that mentally unfit
17  defendants may not be held criminally liable in the
18  military courts; is that right?
19    A.  I believe that this is -- this applies in
20  the military courts.
21    Q.  I -- I think we've established this, but
22  just so I'm 100 percent sure, there is a right to
23  appeal every final judgment in the military courts?
24    A.  Yes.
25    Q.  And if -- if a defendant pleads guilty and

Page 113

1  is unhappy with the sentence that's handed down, the
2  defendant can appeal just the sentence; is that right?
3    A.  That's right.
4    Q.  And the defendant can agree on certain
5  facts and -- and argue that, even though the facts
6  are stipulated, for -- for various legal reasons,
7  he should be acquitted; right?
8    A.  Right.
9    Q.  And -- and can the defendant plead guilty
10  and then appeal on the basis of some agreed issue
11  that has been resolved adverse to him?
12    A.  Sorry.  Can you repeat that?
13    Q.  Sure.  I mean, sometimes situations arise
14  where -- where there's a -- oh, I don't know -- a
15  very important piece of evidence that -- that the
16  witness asks to be suppressed, for example, a post-arrest
17  statement --
18    A.  Uh-huh.
19    Q.  -- right?
20    A.  Right.
21    Q.  So in -- I don't -- I'm not sure we touched
22  on this.  But if -- if -- I think we did -- that the
23  defendant has a right to a supression hearing to have
24  the court evaluate whether his post-arrest statements
25  were coerced; right?

Page 194

1    A.  I didn't really examine the accuracy of his
2  reports, definitely not in a resolution of translation
3  or dates or things of that sort.
4    Q.  Do you believe, to a reasonable degree of
5  certainty, that Nasser Jamal Mussa Shwaysh is actually
6  innocent?
7    A.  I cannot answer that question.
8    Q.  And let me just ask you the same question
9  of Abd-el Karim Ratheb Younis Aweis.
10    Do you believe, to a reasonable degree of
11  certainty, that Abd-el Karim Ratheb Younis Aweis is
12  actually innocent?
13    A.  I cannot answer that question.  And, also,
14  it was not my mandate.
15    Q.  When you say you can't answer that question,
16  what do you mean by that?
17    A.  I mean that, as a lawyer, as a -- someone
18  that wants to be a serious lawyer, I cannot make
19  judgment calls based on partial -- a very small part
20  of the information in -- in those cases.
21    Q.  So do you think it's a tip-off as to guilt
22  or innocence that Abd-el Karim Ratheb Younis Aweis
23  said "the acts I did I am proud of them and there
24  is justification for what I did"?
25    MR. HILL:  Objection.  Lack of foundation.

Page 195

1    Q.  BY MR. YALOWITZ:  Do you think that that's
2  a tip-off that he's actually guilty?
3    A.  Well, as a defense lawyer, it actually
4  raises my suspicion whether -- if he's so proud, maybe
5  he enlarges his role in those -- in those charges.  But
6  it's not a tip-off not to this, nor -- nor to the other.
7    Q.  In your view, when a man says, immediately
8  before his sentence, that he's proud of the acts, that
9  that doesn't give you any evidence as to whether he's
10  innocent or guilty?
11    A.  No.
12    Q.  Do you think that that's one of those things
13  where you're in sort of the small minority?
14    A.  No.  I think that serious defense attorneys --
15  I'm in a large majority.  I think that especially in --
16  in cases where there is institutional due process
17  issues, there are many things that drive people to
18  admit to things they didn't do.  And I didn't -- and
19  I'm not suggesting that any of those didn't do what
20  they were convicted of.  I'm just saying that their --
21  their guilty pleas, their admissions out of court and
22  especially their pride, when they express such pride,
23  may be motivated by many things that are not necessarily
24  the truth.
25    Q.  Have you ever had a client who maintained

Page 196

1  his innocence?
2    A.  Did I have a client that maintained his
3  innocence?  I had.
4    Q.  And do clients -- in your experience, do
5  clients who maintain their innocence, immediately
6  before they're being sentenced, tell the court that
7  they're proud of what they did and they'd kill more
8  people if they could?
9    A.  It happens only in -- in security related
10  cases.
11    Q.  You've had such a client?
12    A.  I don't recall that I had a client that
13  said that.  But I recall many cases of that sort.  Yes.
14    Q.  Where clients maintained their innocence
15  and said that they're proud that they killed Jews?
16    A.  Maintained their innocence in the sense
17  that -- instructed their attorneys to -- to present
18  a defense and to try to acquit them.  And when they
19  are convicted, then they say things that might be
20  because these are -- this is the truth and it might
21  be because they want to be -- get some respect among
22  whatever community that thinks these kind of things
23  are -- are a matter to be proud of.
24    Q.  In the parole system in Israel, does the
25  acceptance of responsibility and the acknowledgment

Page 197

1  of remorse play a role in whether parole will be
2  granted?
3    A.  A very significant role.
4    Q.  And so a defendant who is actually innocent
5  and wishes parole is in a tough spot?
6    A.  Very, very tough spot.  I had -- I had such
7  cases.
8    Q.  And in the cases that you've had in that
9  situation, did your clients say "I'm proud of what
10  I did"?
11    A.  In the parole board?
12    Q.  Yes.
13    A.  Look, someone that goes to the parole board
14  wants to get something.  So he wouldn't say that he's
15  proud.
16    Q.  Why don't we -- why don't we move to the
17  case of Kahira Sa'id Ali Sa'adi.
18    A.  Yeah.
19    Q.  Ali Sa'adi.  Do you have her file?
20    A.  No. 4.  Yeah.
21    Q.  She's the fourth one on the list.
22    A.  Yeah.
23    Q.  And before we go to her specifically, I've --
24  I've asked you a number of times about actual innocence.
25  And I think I've asked it before, but let me just make