# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| MARK I. SOKOLOW, *et al.*, | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. 04cv397 (GBD) (RLE) |
| THE PALESTINE LIBERATION ORGANIZATION, *et al.*, | ) | |
| Defendants. | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION IN LIMINE TO EXCLUDE THE TESTIMONY OF PLAINTIFFS' CASE IN CHIEF LIABILITY EXPERTS

Mark J. Rochon
Laura G. Ferguson
Brian A. Hill
MILLER & CHEVALIER CHARTERED
655 15th Street, NW, Suite 900
Washington D.C. 20005-6701
(202) 626-5800 (tel)
(202) 626-5801(fax)

*Counsel for Defendants the Palestinian Authority and the Palestine Liberation Organization*

May 2, 2014

1425274.1

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

LEGAL STANDARDS .......................................................................................................3

     I.      THE WITNESS MUST BE QUALIFIED TO RENDER THE OPINIONS ..........4

     II.    THE WITNESS'S OPINIONS MUST BE BASED ON A RELIABLE
           METHODOLOGY .................................................................................................6

     III.   THE WITNESS'S TESTIMONY MUST ASSIST THE TRIER OF FACT
           AND NOT BE UNDULY PREJUDICIAL .........................................................10

ARGUMENT .....................................................................................................................11

     I.      ITAMAR MARCUS'S TESTIMONY SHOULD BE EXCLUDED ...................11

          A.     MARCUS IS NOT QUALIFIED TO RENDER HIS OPINIONS ...........12

          B.     MARCUS'S OPINIONS ARE NOT BASED ON A RELIABLE
                METHODOLOGY ....................................................................................14

                1.     Marcus Is Transmitting Hearsay....................................................14

                2.     Marcus's Opinions Are Not Based on Sufficient Facts or
                       Data ................................................................................................15

                 3.     Marcus Did Not Employ a Reliable Methodology ........................17

          C.     MARCUS'S TESTIMONY WILL NOT ASSIST THE JURY
                AND IS HIGHLY PREJUDICIAL............................................................21

     II.    MATTHEW LEVITT'S TESTIMONY SHOULD BE EXCLUDED.................22

          A.     LEVITT IS NOT QUALIFIED TO RENDER HIS OPINIONS ..............22

          B.     LEVITT'S OPINIONS ARE NOT BASED ON A RELIABLE
                 METHODOLOGY ....................................................................................25

                  1.     Levitt Did Not Follow a Reliable Methodology ............................25

                 2.     Levitt Did Not Apply a Reliable Methodology to the Facts..........27

                 3.     Levitt Aggregates and Transmits Hearsay .....................................30

           C.     LEVITT'S TESTIMONY WILL NOT ASSIST THE JURY AND
                  IS HIGHLY PREJUDICIAL .................................................................31

1425274.1

III.  JEFFREY ADDICOTT'S TESTIMONY SHOULD BE EXCLUDED ...............32

    A.  ADDICOTT IS NOT QUALIFIED TO RENDER HIS OPINIONS ........32

    B.  ADDICOTT'S OPINIONS ARE NOT BASED ON A RELIABLE METHODOLOGY ...................................................................................35

        1.  Addicott Did Not Generate the Opinions in his Report................35

        2.  Addicott's Opinions Are Based on the *Ipse Dixit* of the Witness.............................................................................................36

    C.  ADDICOTT'S TESTIMONY WILL NOT ASSIST THE JURY AND IS HIGHLY PREJUDICIAL............................................................39

IV.  EFRAIM KARSH'S TESTIMONY SHOULD BE EXCLUDED .......................41

    A.  KARSH IS NOT QUALIFIED TO RENDER HIS OPINIONS ..............41

    B.  KARSH'S OPINIONS ARE NOT BASED ON A RELIABLE METHODOLOGY ...................................................................................43

        1.  Karsh's Opinions Are Not Based on Sufficient or Reliable Data.................................................................................................43

        2.  Karsh Did Not Employ a Reliable Methodology...........................45

    C.  KARSH'S TESTIMONY WILL NOT ASSIST THE JURY ...................47

V.  ALON EVIATAR'S TESTIMONY SHOULD BE EXCLUDED .......................49

    A.  EVIATAR IS NOT QUALIFIED TO RENDER HIS OPINIONS ...........49

    B.  EVIATAR'S OPINIONS ARE NOT BASED ON A RELIABLE METHODOLOGY ...................................................................................52

        1.  Eviatar Did Not Generate the Opinions in his Report ..................52

        2.  Eviatar's Opinions Are Based on the *Ipse Dixit* of the Witness.............................................................................................54

    C.  EVIATAR'S TESTIMONY WILL NOT ASSIST THE JURY ...............57

VI.  ISRAEL SHRENZEL'S TESTIMONY SHOULD BE EXCLUDED..................57

    A.  SHRENZEL IS NOT QUALIFIED TO RENDER HIS OPINIONS ........58

    B.  SHRENZEL'S OPINIONS ARE NOT BASED ON A RELIABLE METHODOLOGY ...................................................................................61

1425274.1

1.      Shrenzel Did Not Generate the Opinions in his Report.................61

2.      Shrenzel Transmits Hearsay without Applying any Expertise ...................................................................62

3.      Shrenzel's Opinions Are Based on the *Ipse Dixit* of the Witness.............................................................64

C.      SHRENZEL'S TESTIMONY WILL NOT ASSIST THE JURY ............67

VII.    NICK KAUFMAN'S TESTIMONY SHOULD BE EXCLUDED ......................68

A.      KAUFMAN IS NOT QUALIFIED TO RENDER HIS OPINIONS.........69

B.      KAUFMAN'S OPINIONS ARE NOT BASED ON A RELIABLE METHODOLOGY ...................................................71

1.      Kaufman's Assessment of Due Process in the IMC Is Not Reliable ................................................71

2.      Kaufman's Assessment of Due Process in the 21 Cases Is Not Reliable ..............................................72

C.      KAUFMAN'S TESTIMONY WILL NOT ASSIST THE JURY ............79

VIII.   SHRENZEL'S AND KAUFMAN'S TESTIMONY SHOULD ALSO BE EXCLUDED BECAUSE PLAINTIFFS' COUNSEL OBTAINED AN EXTENSION FOR THEIR EXPERT REPORTS BASED ON FALSE REPRESENTATIONS TO THE COURT............................................80

IX.     PLAINTIFFS' EXPERTS' TESTIMONY SHOULD BE EXCLUDED TO THE EXTENT THAT THEY RELIED ON MATERIALS PRODUCED AFTER THE CLOSE OF FACT DISCOVERY ...................................82

CONCLUSION.........................................................................84

## <u>INTRODUCTION</u>

This is a case involving seven separate incidents spread over a thirty-six month period. With the possible exception of Varda Guetta, none of the plaintiffs has any personal knowledge of who carried out, planned, or supported any of the attacks.[1]  In fact, Plaintiffs took only two depositions of fact witnesses in this case, and one of them, the Israeli detainee Abdullah Barghouti, would not answer any questions.   As a result, Plaintiffs are seeking to prove their case largely through the testimony of expert witnesses.  In all, Plaintiffs have proffered seven expert witnesses to testify on liability issues in their case-in-chief.[2]  As discussed in detail below, none of these seven witnesses should be permitted to provide expert testimony at trial.

Six of the seven witnesses (Itamar Marcus, Matthew Levitt, Jeffrey Addicott, Efraim Karsh, Alon Eviatar, and Israel Shrenzel) opine that the Palestinian Authority (PA) was responsible for acts of terrorism during the Second Intifada.  In doing so, each purports to be an expert on the PA, Palestinian politics, and Palestinian culture during the Second Intifada.  But none of them has expertise in these areas.[3]  Three of them (Marcus, Eviatar, and Shrenzel) are not academics, and their work experience is not a sufficient basis for their opinions.  The other three (Levitt, Addicott, and Karsh) are academics but their scholarly work does not focus on the PA, Palestinian politics, or the Second Intifada.  Meanwhile, Plaintiffs' remaining expert, Nick

---

[1] As discussed in Defendants' Motion for Summary Judgment, filed concurrently with this Motion, Defendants contend that Ms. Guetta does not have personal knowledge of the perpetrator of her attack and that her alleged identification of the perpetrator is not admissible evidence at trial.

[2] Another seven experts proffered by Plaintiffs cover damages issues or are rebuttal experts.  The admissibility of those experts' testimony is not addressed in this motion.

[3] Two of Defendants' experts, Dr. David Miller, a sociologist who conducts research on "terrorism expertise," and Dr. Glenn Robinson, a political scientist who has studied Palestinian politics for 25 years, separately concluded that Plaintiffs' six experts lack expertise in the proffered areas.  *See* Ex. 1 (Miller Report) at 3 (concluding that they "are not experts in the areas about which they claim to have expertise"); Ex. 2 (Robinson Report) at 60 (concluding that "none [of the six experts] is viewed in the academic community as a scholarly expert on Palestinian politics").

1425274.1

Kaufman, who opines about the quality of due process in the Israeli military court system (IMC) and on the quality of due process afforded to 21 individuals convicted in the IMC, is also unqualified because he has no training or experience assessing due process in the IMC or any legal system, and he is not even that familiar with the IMC.

Furthermore, none of the expert opinions is the product of a reliable methodology. The experts did not consider sufficient and reliable data and they did not apply that data reliably to the facts of this case. Instead, each cherry-picked the source material that supported his conclusions, while ignoring contrary evidence and failing to examine whether the source material was reliable and trustworthy. At the same time, they transmit the conclusions found in Israeli government reports and other documents without applying any expertise. Not surprisingly, none of the experts describes a methodology in his report. Worse yet, three of them (Addicott, Eviatar, and Shrenzel) did not even generate their own opinions; they merely made minor edits to reports produced by someone else.

In addition, the proposed testimony would not be helpful to the jury. Four of the experts (Marcus, Levitt, Addicott, and Karsh) do not address any of the seven incidents in this case. All of them invade the province of the jury by opining on the state of mind of the PA, the alleged perpetrators of the seven incidents, and Palestinians in general.

Accordingly, this Court should exclude their testimony under Federal Rule of Evidence 702. The Court should also exclude their testimony under Federal Rule 403 because the testimonies' probative value is substantially outweighed by the danger of unfair prejudice, confusing the jury, undue delay, wasting time, and needlessly presenting cumulative evidence. Indeed, the six "terrorism experts" would testify about many of the same opinions at trial. The Court should also preclude the testimony of Shrenzel and Kaufman because Plaintiffs' counsel

obtained an extension of the deadline to submit their reports based on false representations to the

Court.  Finally, the Court should exclude experts' testimony to the extent they relied on materials

produced after the close of fact discovery.

## LEGAL STANDARDS

The admissibility of expert testimony is governed by Federal Rule of Evidence 702,

which states:

> A witness who is qualified as an expert by knowledge, skill,
> experience, training, or education may testify in the form of an
> opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized
> knowledge will help the trier of fact to understand the evidence or
> to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods;
> and
> (d) the expert has reliably applied the principles and methods to the
> facts of the case.

Fed. R. Evid. 702.  The rule was amended in response to *Daubert v. Merrell Dow Pharm., Inc.*,

509 U.S. 579 (1993), in which the Supreme Court tasked trial courts with the responsibility of

acting as "gatekeepers" to exclude unreliable expert testimony.  *Id.* at 597; *see* Fed. R. Evid. 702

Advisory Committee's Note (2000); *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 464,

469 (9th Cir. 2014) (en banc) (determining that the trial court "abused its discretion by admitting

the expert testimony without first finding it to be relevant and reliable under *Daubert*," and

reversing and remanding for a new trial).

This "gatekeeper function" applies not only to testimony based on scientific knowledge

but also to testimony based on "technical" and "other specialized" knowledge.  *Kumho Tire Co.

v. Carmichael*, 526 U.S. 137, 141 (1999).  Under Rule 702, the trial court's inquiry focuses on

three issues: (1) whether the witness is qualified to be an expert; (2) whether the proffered

opinion is based upon reliable data and methodology; and (3) whether the expert's testimony on

a particular issue will assist the trier of fact. *Nimely v. City of New York*, 414 F.3d 381, 396-97

(2d Cir. 2005). The party seeking to admit the expert testimony bears the burden of establishing,

by a preponderance of the evidence, that the requirements of Rule 702 have been met. *See*

*Daubert*, 509 U.S. at 593 n.10.

These standards apply to the range of expert testimony proffered in Anti-Terrorism Act

("ATA") cases. *See*, *e.g.*, *United States v. Farhane*, 634 F.3d 127, 158-60 (2d Cir. 2011)

(reviewing district court's analysis of proffered expert testimony about the organization and

structure of al Qaeda and the publisher of a jihadist videotape); *Linde v. Arab Bank ("Linde II")*,

922 F. Supp. 2d 316, 321-32 (E.D.N.Y. 2013) (evaluating proffered expert testimony about the

organization and structure of Hamas and charitable organizations, the attribution of attacks to

Hamas, and terrorism designations by the United States); *Gill v. Arab Bank*, 893 F. Supp. 2d 523,

531-42 (E.D.N.Y. 2012) (scrutinizing proffered expert testimony concerning, *inter alia*, the

claims of responsibility for attacks by Hamas, the distribution of funds to families of "martyrs,"

Hamas's relationship with terrorist organizations, and the effect of security measures imposed by

Israel on Palestinians during the Second Intifada).

## I.    THE WITNESS MUST BE QUALIFIED TO RENDER THE OPINIONS

Whether a party seeking to admit the expert testimony has established that a witness is

qualified to render an expert opinion by his "knowledge, skill, experience, training or education"

(Fed. R. Evid. 702) is a "threshold question" to be resolved prior to inquiry into the other factors

set forth in the Rule. *Nimely*, 414 F.3d at 396 n.11. A court "must first ascertain whether the

proffered expert has the educational background or training in a relevant field by looking at the

totality of [the] witness's background." *Arista Records LLC v. Lime Grp. LLC*, No. 06-cv-5936,

2011 U.S. Dist. LEXIS 47416, at *7 (S.D.N.Y. May 2, 2011) (internal quotation marks and

citations omitted).  The court must then "compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony," *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004), to ensure that the expert will be testifying "'on issues [or] subject matters within his or her area of expertise,'" *Arista*, 2011 U.S. Dist. LEXIS 47416, at *7.

It is not enough to be an "expert" in some area — the proffered witness must possess superior qualifications specific to the subject on which he is offered to testify.  "[A] district court may properly conclude that witnesses are insufficiently qualified despite the relevance of their testimony because their expertise is too general or too deficient."  *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 81 (2d Cir. 1997); *see also Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 322 (3d Cir. 2003) ("While the background, education, and training may provide an expert with general knowledge to testify about general matters, more specific knowledge is required to support more specific opinions.").  Indeed, "an expert who is qualified in one field cannot offer an opinion about aspects of the case in another field for which she is not qualified."  *In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*, No. 1:00-1898, 2008 U.S. Dist. LEXIS 37331, at *19 n.48 (S.D.N.Y. May 7, 2008) (citing *Nimely*, 414 F.3d at 399, n.13); *see also Linde II*, 922 F. Supp. 2d at 328-29 (finding an author and historian who had written two books on Saudi Arabia unqualified to testify about specific topic of Saudi Committee funds).

An expert who relies solely or primarily on experience (as opposed to knowledge, skill, training or education) "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  Fed. R. Evid. 702 Advisory Committee's Note (2000).  While "an expert might draw a conclusion from a set of observations based on extensive and specialized experience," *Kumho*

5

*Tire Co.*, 526 U.S. at 156, "the trial court's gatekeeping function requires more than simply

'taking the expert's word for it,'" Fed. R. Evid. 702 Advisory Committee's Note (2000) (citing

*Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995)). A "witness whose

expertise is based purely on experience" is properly asked "whether his preparation is of a kind

that others in the field would recognize as acceptable." *Kumho Tire Co.*, 526 U.S. at 151. And

"the more subjective and controversial the expert's inquiry, the more likely the testimony should

be excluded as unreliable." Fed. R. Evid. 702 Advisory Committee's Note (2000) (citing

*O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090 (7th Cir. 1994)).

## II.    THE WITNESS'S OPINIONS MUST BE BASED ON A RELIABLE METHODOLOGY

Assuming the proffered expert is sufficiently qualified to render an opinion, the district

court must determine that the expert's opinion is based upon sufficient facts and data and results

from the reliable application of principles and methods to those facts and data. Fed. R. Evid.

702(b)-(d). The focus is "solely on principles and methodology, not on the conclusions that they

generate." *Daubert*, 509 U.S. at 595. The Supreme Court provided a non-exhaustive list of

factors that trial courts should consider in evaluating the reliability of a theory, including (1)

whether it can be or has been tested; (2) whether it has been published or subjected to peer

review; (3) its known or potential error rate; (4) the existence and maintenance of standards and

controls; and (5) whether the theory has been generally accepted in the scientific community. *Id.*

at 593-94. However, "the test of reliability is 'flexible,' and *Daubert*'s list of specific factors

neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire Co.*, 526

U.S. at 141.

*Daubert* applies to "soft" experts as well as "hard" experts: although "a social scientist's

approach might have inherent methodological limitations and does not produce a testable

hypothesis or a known or potential rate of error,… [t]his is not to suggest, however, that a non-scientific expert's testimony is subjected to less rigorous standards of reliability but merely emphasizes that the reliability analysis under Rule 702 must be flexible to account for different types of expertise." *EEOC v. Bloomberg*, 2010 U.S. Dist. LEXIS 92511, at *44-45 (S.D.N.Y. Aug. 31, 2010) (internal quotation marks and citations omitted). Thus, even in the case of a proffered social science expert, the court must make certain that he "'employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *United States v. Paracha*, 2006 U.S. Dist. LEXIS 1, at *60 (S.D.N.Y. Jan. 3, 2006) (quoting *Kumho Tire Co.*, 526 U.S. at 152).

And regardless of the expert's specialty, the court should exclude expert testimony that lacks a "sufficiently rigorous analytical connection between that methodology and the expert's conclusions." *Nimely*, 414 F.3d at 396. "Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Every qualified expert must articulate a methodology which can be evaluated as to its reliability. "Merely touting [one's] expertise rather than relying on analytic strategies widely used by specialists in the field does not make [one] an expert as Rule 702 defines that term." *Bloomberg*, 2010 U.S. Dist. LEXIS 92511, at *48 (internal quotation marks and citations omitted). Thus, "[s]ubjective or intuitive guesswork, as well as testimony that is insufficiently connected to the facts of the case, are grounds for rejection of a proffered expert's testimony." *In re Zyprexa Prods. Liab. Litig.*, 2009 U.S. Dist. LEXIS 40125, at *25 (E.D.N.Y. May 12, 2009). Similarly, opinions based on unfounded extrapolation, insufficient facts or data, or

unsupported suppositions should be rejected. *Tin Yat Chin*, 371 F.3d at 40-41. Moreover, an expert who simply "cherry-picks" data that supports his conclusion fails to employ a reliable and valid methodology. *See Paracha*, 2006 U.S. Dist. LEXIS 1, at *63; *Bloomberg*, 2010 U.S. Dist. LEXIS 92511, at *45-50.

Two essential features characterize the methodologies employed by terrorism experts that have been approved by courts in the Second Circuit: transparency and a system of cross-referencing and review. In *Linde II*, the district court approved the methodology of a proposed expert who articulated "eighteen criteria, derived from his professional experience, academic studies, and other documents" to determine whether certain charities were under the control of Hamas, and then applied those criteria to a "'collection of information from many sources, which included primary and secondary sources.'" 922 F. Supp. 2d at 322-23. The expert "cross-referenc[ed] [the primary and secondary sources]"and "examin[ed]... new information that supports or contradicts previous assumptions that have been made in the course of the research." *Id.* (internal quotation marks omitted). The eighteen-factor test "ma[de] plain and transparent the considerations [the expert] evaluated in reaching his conclusions," *id.*, rather than simply connecting the opinion evidence to existing data "only by the *ipse dixit* of the expert." *Nimely*, 414 F.3d at 396.

A similar methodology was approved by the district court in *Paracha*. There, the expert "gather[ed] multiple sources of information, including original and secondary sources, cross-check[ed] and juxtapose[ed] new information against existing information and evaluat[ed] new information to determine whether his conclusions remain consonant with the most reliable sources." 2006 U.S. Dist. LEXIS 1, at *62. While the expert's methodology was "not readily subject to testing and permits of no ready calculation of a concrete error rate," the court

8

concluded that was "more reliable than a simple cherry-picking of information from websites and other sources." *Id.* at *63. Moreover, in admitting the expert's testimony, the court noted that his opinions were "subjected to various forms of peer review and…are generally accepted within the relevant community." *Id.*

An expert who simply reviews materials provided by the party that retains him and ignores contradictory information lacks the reliability required under Rule 702 and must be excluded. *Bloomberg*, 2010 U.S. Dist. LEXIS 92511, at *46 ("[A]ny expert should be aware that a party and counsel in a litigation have an interest in the outcome and that an expert study should not be dependent on the information they supply.") (quoting *Rowe Entm't, Inc. v. William Morris Agency, Inc.*, No. 98-cv-8272, 2003 U.S. Dist. LEXIS 15976, at *3 (Sept. 16, 2003)).

Federal Rule of Evidence 703 permits experts to base their opinions on inadmissible evidence, including hearsay, only if "experts in the field reasonably rely on such evidence in forming their opinions." *United States v. Locascio*, 6 F.3d 924, 938 (2d Cir. 1993). "[A]n expert cannot simply serve as a conduit through which a party can transmit inadmissible evidence to the jury." *Master-Halco, Inc. v. Scillia, Dowling & Natarelli, LLC*, No. 09-cv-1546, 2010 U.S. Dist. LEXIS 38113, at *9-10 (D. Conn. Apr. 19, 2010). As the Second Circuit explained:

> [T]he expert must form his own opinions by 'applying his extensive experience and a reliably methodology' to the inadmissible materials. Otherwise, the expert is simply 'repeating hearsay evidence without applying any expertise whatsoever,' a practice that allows the [proponent] to circumvent the rules prohibiting hearsay.

*United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008) (quoting *United States v. Dukagjini*, 326 F.3d 45, 58-59 (2d Cir. 2003) (internal citations omitted); *see also Estate of Mark Parsons v. Palestinian Authority,* 715 F. Supp. 2d 27, 33 (D.D.C. 2010) ("Expert opinions may be based on hearsay, but they may not be a conduit for the introduction of factual assertions that are not based

on personal knowledge."). Mere repetition of hearsay through an expert is of particular concern where the party offering the expert "will offer no fact witness[es] on [the] issues that the defendant could test through cross-examination." *Paracha*, 2006 U.S. Dist. LEXIS 1, at *70. Indeed, the Supreme Court recognized the vital importance of "vigorous cross-examination [and] presentation of contrary evidence" as a means of attacking "shaky but admissible evidence." *Daubert*, 509 U.S. at 596. Where such cross-examination and rebuttal are precluded by an expert's simple repetition of hearsay, exclusion of the expert is required.

## III.   THE WITNESS'S TESTIMONY MUST ASSIST THE TRIER OF FACT AND NOT BE UNDULY PREJUDICIAL

If an expert is qualified to testify as to a particular matter and the expert's opinion is based upon reliable data and methodology, the court must make a "third inquiry: whether the expert's testimony (as to a particular matter) will 'assist the trier of fact.'" *Nimely*, 414 F.3d at 397. If the testimony is "directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help, [it] is properly excludable." *United States v. Castillo*, 924 F.2d 1227, 1232 (2d Cir. 1991) (internal quotation marks and citation omitted). The Second Circuit has held that expert testimony that

> usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it…by definition does not aid the jury in making a decision; rather it undertakes to tell the jury what result to reach and thus attempts to substitute the expert's judgment for the jury's.

*Nimely*, 414 F.3d at 397 (internal quotation marks and citations omitted).

One subject matter that impermissibly invades the province of the jury and is therefore not amenable to expert testimony is the state of mind of individuals or parties. *Marvel Worldwide, Inc., v. Kirby*, 777 F. Supp. 2d 720, 729-30 (S.D.N.Y. 2011); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004); *Linde v. Arab Bank ("Linde I")*, 920 F.

Supp. 2d 282, 285 (E.D.N.Y. 2011) ("*Linde I*").  "Inferences about the intent or motive of parties

or others lie outside the bounds of expert testimony."  *In re Rezulin Prods. Liab. Litig.*, 309 F.

Supp. 2d at 547.  That is because "the question of intent is a classic jury question and not one for

the experts."  *Id.* (internal quotation marks omitted).  In *Linde I*, the district court excluded expert

testimony in an ATA case about the state of mind, intentions, or motives of "a government, a

charitable entity, or a person" as irrelevant and not proper expert evidence.  920 F. Supp. 2d at

285.  The court included in this category "[e]xpert opinions regarding the motivations of suicide

bombers and the charitable intentions of the Saudi Committee In Support of the Intifada Al

Quds," and "[n]arrative histories of economic and humanitarian assistance in the Palestinian

Territories aimed at proving intent."  *Id.*  As the court explained, "[s]uch expert opinions amount

to an attempt to 'tell the jury the defendant's intentions through the mouths of witnesses other

than [itself].'"  *Id.* (quoting *United States v. Rahman*, 189 F.3d 88, 136 (2d Cir. 1999)).

　　　Expert testimony is subject to Rule 403 and therefore may be excluded if its probative

value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or

misleading the jury.  *Id.* at 283.  Because "[e]xpert evidence can be both powerful and quite

misleading because of the difficulty in evaluating it…the judge in weighing possible prejudice

against probative force under Rule 403…exercises more control over experts than over lay

witnesses."  *Daubert*, 509 U.S. at 595; *see also Nimely*, 414 F.3d at 397 (Rule 403 plays a

"uniquely important role" in the district court's scrutiny of expert testimony, given the unique

weight such evidence may have in a jury's deliberations).

## ARGUMENT

## I.    ITAMAR MARCUS'S TESTIMONY SHOULD BE EXCLUDED

　　　Plaintiffs offer Itamar Marcus to opine that the PA controlled the Palestinian media

during the Second Intifada (Ex. 3 (Marcus Report) at 15-23), that the PA used the media to incite

1425274.1

violence against Israeli civilians, to glorify the perpetrators of the violence, and to make disingenuous condemnations of violence to appease the international community (*id.* at 23-54), that PA leaders acknowledged responsibility for the violence (*id.* at 55-62), and that the perpetrators of the violence believed they were following the orders of PA leadership (*id.* at 62-64). Based on these claims, Marcus ultimately concludes that "[t]he Palestinian Authority bears overall responsibility for the violence and killings of the intifada in general and every particular act of killing in particular." *Id.* at 64.

A.    MARCUS IS NOT QUALIFIED TO RENDER HIS OPINIONS

Marcus has no specialized education, knowledge, or training that permits him to render opinions about the PA, its alleged control and use of the media during the Second Intifada, its motivations and goals in making statements in the media, or the motivations of those Palestinians who committed acts of violence during the Second Intifada. He does not have a Ph.D., and his master's degree is in *Jewish* Culture. *Id.* at 2 (emphasis added). Nothing he has ever written has been subject to peer-review by experts in a relevant field. *See id.* at 3-10. Most of his publications have appeared in newspapers. *Id.* at 4-7. As Dr. Robinson notes, "Mr. Marcus has no professional qualifications to be considered an expert witness on any of the issues under review in this case." Ex. 2 at 66.

To be sure, Marcus has experience *reviewing* Palestinian media. As director of Palestinian Media Watch (PMW), he reviews translations of certain Palestinian print and broadcast media presented to him by others. Ex. 3 at 1; Ex. 4 (Marcus Tr.) at 104:18-105:19. But this experience does not permit him to opine on the structure of the PA,[4] PA policy,[5] and

---

[4] Ex. 3 at 15 (asserting that there was "absolute PA control of all the media within the PA territories"),
[5] *Id.* at 28 (stating that certain material could not have been broadcast in the media "had it not been PA policy.").

1425274.1

media censorship in Palestine.[6]  It certainly does not permit him to opine on the PA's

responsibility for violent acts during the Second Intifada or to draw conclusions about the

religious nature of Palestinian society,[7] Islamic ideology,[8] and the psychology and worldview of

certain Palestinians.[9]

      Even if media review could, in theory, permit expert testimony about the topics in

Marcus's report, Marcus could not be considered an expert in this field.  That is because PMW

does not monitor those popular media outlets that Palestinians watched throughout the Intifada,

including for example, Al Jazeera Television, satellite television from Abu Dhabi or Egypt, and

MBC satellite television.  Ex. 5 (Marcus Rebuttal Report) at 21; Ex. 4 at 154:16-156-2, 160:8-19.

PMW reviews only Palestinian newspapers and "television channels produced and broadcasted

in the West Bank and Gaza Strip."  Ex. 3 at 1.  Thus, Marcus is not even aware of what other

media outlets were saying or what other media Palestinians were consuming at the time.

      Marcus's experiences outside of PMW also do not qualify him to render the proffered

opinions.  Prior to his tenure as director of PMW, Marcus gained no specialized education in the

Palestinian Media (Ex. 4 at 12:5-19, 13:9-11), and he has never worked as a journalist (*id*. at

13:12-20).  His experience at the Institute for Monitoring Peace and Cultural Tolerance in School

Education involved the study of curricula in "Middle Eastern countries," and at any rate,

concluded shortly after the Second Intifada began.  Ex. 3 at 3.  His brief stint as an Israeli

representative in negotiations with Palestinians also preceded the Second Intifada.  *Id.*

---

[6] *Id*. at 16 (opining on the manner in which media "self-censorship was achieved in the PA").
[7] *Id*. at 25 ("This promotion of killing Jews as Allah's will is very significant in a religious society.").
[8] *Id*. at 32 (opining on what is "a supreme positive Islamic act").
[9] *Id*. at 63 ("Most significantly, the Palestinian terrorists saw themselves as fulfilling the instructions of the leadership.").

1425274.1

Finally, Marcus is unqualified to render opinions on the meaning of Arabic words and phrases that allegedly appear in the media.  Marcus repeatedly opines about the meaning of the term "martyrdom" in Islam, *see, e.g.*, Ex. 3 at 33 ("In Islam, a martyr is broadly understood . . . ."); Ex. 5 at 22 ("Martyrdom . . . is part of a long tradition in religious Islam that puts [m]artyrdom for Allah on a highest level – even higher sometimes than succeeding for Allah."), even though he has no higher education in the Islamic religion, is not an Islamic scholar, and cannot read or speak Arabic.  Ex. 4 at 7:2-9, 10:1-5, 209:4-9.   He similarly opines, without any background in the field, on the meaning of Islamic religion to Palestinians and their view of religion in the conflict with Israel.  *See* Ex. 3 at 25 ("This promotion of killing Jews as Allah's will is very significant in a religious society."); Ex. 5 at 14 ("Another confirmation of the religious nature of the PA terror campaign and that in Palestinian eyes it was not solely about the West Bank, Gaza Strip and Jerusalem . . .").  In his rebuttal report, Marcus even concludes that the religious identity of the Palestinian population is "paramount" (*id.* at 8), and that "[t]he message that Martyrdom death for Allah was [] to be desired . . . was transmitted so successfully to Palestinians that violent death became an act of aspiration, not of desperation."  *Id.* at 24.

B.    MARCUS'S OPINIONS ARE NOT BASED ON A RELIABLE METHODOLOGY

1.    Marcus Is Transmitting Hearsay

"Expert opinions may be based on hearsay, but they may not be a conduit for the introduction of factual assertions that are not based on personal knowledge."  *Estate of Parsons*, 715 F. Supp. 2d at 33; *Master-Halco, Inc.,* 2010 U.S. Dist. LEXIS 38113, at *9-10 ("[A]n expert cannot simply serve as a conduit through which a party can transmit inadmissible evidence to the jury.").  In this case, Marcus is not merely basing his opinions on hearsay; he is seeking to present certain hearsay as fact despite the absence of personal knowledge.  Specifically, he

14

makes the factual assertion that the PA controlled the media in the Palestinian territories during the Second Intifada even though he has no personal knowledge of that alleged fact.  *See* Ex. 3 at 15-23.  He cites a report by the Palestinian Human Rights Monitor and a few news articles and statements by a university lecturer as support for his factual assertion.  *See id.*  But these statements are rank hearsay.  Therefore, his opinion that the PA controlled the Palestinian media should be excluded.  And because that opinion is a predicate for the rest of his opinions, his entire testimony should be excluded.

> 2.     Marcus's Opinions Are Not Based on Sufficient Facts or Data

Marcus bases his opinions almost exclusively on what was disseminated in the media. He did not consult relevant scholarship.  *See generally* Ex. 3.  He did not interview any Palestinian leaders (Ex. 4 at 7:21-8:4), nor did he interview the sources in the media clips that he quotes (*id.* at 115:14-116:10).

Marcus's opinions are not even based upon a study of *all* media outlets in the Palestinian territories during the relevant time.  It is limited to only the media monitored by PMW – three newspapers and one television station, Palestine TV (which Marcus refers to as PA TV).[10] PMW's review does not include other media watched by Palestinians, including Al Jazeera, which, according to Marcus, was watched by 52.3% of either Palestinians or Palestinian viewers during the Intifada.  Marcus Rebuttal Report at 20-21.  Marcus thus made no effort to conduct a systematic review of all media transmitted to Palestinians during the relevant time period.

___

[10] Though Marcus claimed that Al-Aqsa television was also monitored during the Intifada, he does not cite to it in either of his reports.  *See generally* Ex. 3.  Marcus does reference two different media reports from two Arab satellite channels.  *See id.* at 60.

Furthermore, Marcus's opinions on the effects of the media on the Palestinian population are based on the least read media. For example, Marcus draws inferences about the effects of newspaper articles on the Palestinian population even though few Palestinians read newspapers:

> Q. All right. So…only 13 percent of Palestinians would rely on Palestinian newspapers, correct?
>
> A. Yes. Before the Intifada.
>
> Q. And you have no data or information that says that that reliance jumped after the beginning of the Intifada, do you?
>
> A. No

Ex. 4 at 203:8-16. Marcus also admitted at his deposition that the newspaper he most frequently cited, Al-Hayat Al-Jadida, had a circulation of approximately 5,000 out of a population of approximately three million.[11]  *Id.* at 108:12-109:11; *id.* at 113:1-12. With respect to television, Marcus similarly relies almost exclusively on the station he refers to as PA TV. *Id.* at 163:1-3. Again, at his deposition, Marcus admitted that Palestine TV (which he refers to as PA TV), has "legendary low ratings." *Id.* at 205:12-17.[12]

Marcus defended his reliance on barely consumed media by suggesting it did not matter who was consuming the media because PMW's "goal was to find out what the Palestinian Authority was saying to its people by the structures it controlled [such as] Al-Hayat Al-Jadida." *Id.* at 207:9-208:6. Yet, Marcus relies on this very material to support his conclusion that the Palestinian population was made to "believe" that it should kill "as many Israelis . . . as

---

[11] *See* Ex. 6, World Bank Development Indicators for West Bank and Gaza Strip - 2000 through 2005, accessed at http://databank.worldbank.org/data/views/reports/tableview.aspx (estimating that between 2000 and 2005 the population of the West Bank and Gaza Strip ranged from 2.9 million to 3.3 million).

[12] Marcus claimed that 76.6% watched Palestinian Television *and* Palestinian satellite television during the Intifada. Ex. 4 at 154:15-155:6. He did not remember which stations this referred to or whether this figure referred to 76.6% of Palestinians or Palestinians television viewers. *Id.* at 155:1-14; 156:10-15. He offered no other testimony and relied on no other data on the viewership of Palestinian television during the Intifada. *Id.* at 165:15-166:1.

1425274.1

possible." Ex. 3 at 15.  Marcus therefore draws unfounded and broad conclusions from his admittedly limited data.

Marcus also does not rely on sufficient data to support his opinion that the PA controlled the media.  He does not examine the PA's interaction with the media or consider the structure of Palestinian media outlets.  Instead, he cites to a report from the Palestinian Human Rights Monitoring Group ("PHRMG") (*id.* at 15-20), which, Marcus asserts, "shows the absolute PA control of all the media within the PA territories" that was accomplished, in part, through "human rights abuses."  *Id*. at 15-16.  But at his deposition he admitted that this report did not reveal instances where reporters were punished for not reporting incitement.  Ex. 4 at 226:17-227:1.

### 3.    Marcus Did Not Employ a Reliable Methodology

Marcus did not follow any specific methodology to generate his opinions.  Indeed, his report does not discuss a methodology at all.  *See generally* Ex. 3.  At his deposition, he claimed that PMW's "methods" and "conclusions" about the Intifada were "accurate and very precise" "because it was corroborated . . . by what happened."  Ex. 4 at 296:11-19 (citing a statement attributed to PA Minister of Communications Imad Faluji as "corroboration" for PMW's methodology).

A review of Marcus's opinions and source material makes clear that his methodology consisted of cherry-picking those quotes from limited media sources that supported his conclusions and ignoring those quotes from the same media that contradicted his conclusions.  Or, as Dr. Glenn Robinson observed:

> Mr. Marcus simply selects inflammatory rhetoric by some Palestinians during the second Intifada and presents those statement[s] without any surrounding context, and without acknowledgement that similar statements could be pulled out of context from the Israelis during the uprising as well.

17

Ex. 2 at 67.

Marcus discounted any condemnation of terror by the PA or its leaders found in the media because he believed that these condemnations were not authentic expressions of PA policy. Ex. 4 at 178:10-19. He also ignored material that could show an alternative explanation for Palestinian violence against Israelis, namely, that it was a reaction to the building of settlements. *See id.* at 309:4-310:7 (testifying that settlements were "a legitimate complaint" of Palestinians but that PMW did not report on them).

Marcus even removed language from a quotation printed in the media because it undermined his conclusions. For example, to support his claim that Yasser Arafat used Ariel Sharon's visit to the Temple Mount as an excuse to "spark" a conflict with the Israelis, he presents the following statement attributed to the PA Minister of Communications under Arafat:

> Yasser Arafat summoned the Palestinian leadership to an emergency meeting in Ramallah just prior to the day of the visit [to the Temple Mount, by Sharon], on Sept. 28, 2000. He said there: '… The battle for Jerusalem began with the Camp David summit, and Sharon's [planned] visit has brought it to here. Jerusalem is in danger, and the Al-Aqsa Mosque is in danger, and as Allah is my witness, I make this known.

Ex. 3 at 24 (quoting Al-Ayyam, Sept. 30, 2001) (Exhibit 8 to Marcus's Report) (internal quotation marks omitted). The original quotation includes, in the place of the ellipsis, the language, "[Israeli Prime Minister Ehud] Barak has started to execute Fields of Thorns that I told you all about." *See* Ex. 7 (Translation of Exhibit 8 to Marcus's Report) at 6. The "Fields of Thorns" refers to an "operation [that] allowed for the use of live ammunition against those upsetting public order." *Id*. at 5. Thus, the complete statement shows that Barak, not Arafat, initiated the conflict. By presenting an edited version of the statement, Marcus distorts the meaning of the statement to support his conclusion.

1425274.1

Similarly, Marcus quotes a news article that states that Ahmed Abdel Rahman "emphasized that the Intifada will continue" but omits the phrase "as long as the conquest continues," which was included in the statement. *Compare* Ex. 3 at 31 (quoting Al-Quds, Jan. 19, 2001) (Exhibit 21 to Marcus's Report) *with* Ex. 8 (Translation of Exhibit 21 to Marcus's Report). Marcus also inserts "Palestinian security forces" in place of "Fatah forces" in a quote attributed to Ashraf Al-Ajrami about whom the Intifada belongs to. *Compare* Ex. 3 at 56-57 (quoting PA TV (Fatah), June 29, 2009 Exhibit 1 – DVD) *with* Ex. 9 (Screenshot of Exhibit 1 – DVD). In addition, Marcus inserts into the quote the language "(i.e., terror attacks)" in the discussion of "operations" even though that language does not appear in the original text. *See id.* This added text shows that Marcus is infusing his interpretation of the quote into the quote itself.

In the end, Marcus's opinions are based on nothing more than his own word. He claims that the Second Intifada was a "Palestinian terror campaign from October 2000 – 2005." Ex. 3 at 14. Yet he offers no support for this opinion. He does not explain why the Intifada should be considered a "terror campaign." He offers no basis for determining what acts were part of this "terror campaign," aside from his claim that it encompassed "the full range of violence" from stone-throwing to drive-by shootings. *Id.* at 23. Marcus does not describe who the participants in the Intifada were. And he does not offer any context regarding why and how the Intifada began or ended, aside from asserting that Palestinians "started it in response to then Israel member of . . . Parliament Ariel Sharon's visit . . . to the Temple Mount in Jerusalem." *Id.*

Marcus also gives opinions about the meaning of words without providing support. For example, he states that when Marwan Barghouti used the word resistance he meant "violent resistance." *Id.* at 29 (quoting a newspaper that stated Marwan Barghouti said "Negotiation

19

without resistance (*i.e.* violence) is humiliation and begging" (citing Al-Hayat Al-Jadida, Jan. 13,

2001)).  Marcus testified:

> A.  The word 'resistance' -- the word 'resistance' in this usage here
>      meant the use of, you know, the use of violence and arms
>      against Israel. That's what he went. And everybody understood
>      that.
>
> Q.  When you say 'everybody understood that'?
>
> A.  Palestinians would be reading this. I would be confident in
>      saying, would understand that's what is being said.

Ex. 4 at 122:16-123:2.  Similarly, when questioned at his deposition about his claim that PA

President Mahmoud Abbas used "resistance" as a "euphemism for terror," he simply asserted

that Abbas was "not talking here about anything less than that."  *Id.* at 267:15-21.  Likewise,

Marcus asserts that any media quote linking former PA President Yasser Arafat to the Intifada

meant that "Yasser Arafat . . . was responsible for" a "terror campaign."  Ex. 3 at 56.  Marcus

offers no support for these interpretations beyond his own assertions that they are true.

Finally, Marcus provides no support for his ultimate conclusion that "[t]he Palestinian

Authority bears overall responsibility for the violence and killings of the intifada in general and

every particular act of killing in particular."  *Id.* at 64.  Nowhere in his report does he

demonstrate a causal connection between the media messages and a particular act of violence.

Instead, he simply concludes, for example, that if a Palestinian soccer tournament was

subsequently named after an alleged terrorist, the PA must have directed the terrorist attacks.  *Id.*

at 43 (citing Al-Hayat Al-Jadida, March 6, 2011); *id.* at 47 (citing PA TV, Oct. 26, 2012).  There

is "simply too great an analytical gap between the data and the opinion[s] proffered" by Marcus

to find that he employed a reliable methodology.  *Linde II*, F. Supp. 2d at 321 (quoting *General

Electric*, 522 U.S. at 146 (1997) (internal quotation marks omitted))

C.     MARCUS'S TESTIMONY WILL NOT ASSIST THE JURY AND IS HIGHLY
       PREJUDICIAL

Marcus's opinions are not beyond the ken of the average juror.  Marcus's "opinions"

consist primarily of newspaper and television clips that, according to Marcus, demonstrate

incitement and glorification of violence as well as acknowledgement of responsibility for

violence by the PA.  *See generally* Ex. 3.  A jury does not need an expert to help it understand

whether the media clips say what Marcus claims they say.  The jury can reach its own

conclusions from this evidence, assuming that such evidence is admissible.

In addition, Marcus impermissibly opines on the state of mind of the PA and Palestinian

individuals.  *See In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d at 547 ("Inferences about the

intent or motive of parties or others lie outside the bounds of expert testimony.").   Marcus

devotes an entire section of his report to "Understanding PA 'condemnations' of terror."  Ex. 3 at

51-54.  According to Marcus, public condemnations of violence were not genuine.  *Id.*  That he

poses and then answers the question, "why did the PA issue 'condemnations' if they were not

sincere and if it was not the message they wanted to deliver to their people?" (*id.* at 53) shows

that he is explicitly opining on the intentions and motivations of the PA.  He states that calls for

the "killing of Jews" could not have been disseminated in the media "were this not the official

policy that the PA leaders wished to promote."  *Id.* at 26.  He opines that "the Palestinian

terrorists saw themselves as fulfilling the instructions of the [PA] leadership" and that they "*felt*

they were participating in a national fight under orders of the PA leaders."  *Id*. at 63 (emphasis

added).  Such improper opinion testimony should not reach the jury.

Finally, Marcus's proposed testimony is highly prejudicial because it would expose the

jury to highly inflammatory statements.  *See e.g., id.* at 24-25 (quoting from a sermon where the

speaker allegedly said "The Jews are the Jews . . . . They are all liars . . .They must be butchered

and they must be killed . . . .").   These statements are passed off as official PA statements despite the absence of evidence attributing them to the PA.   These statements are alleged to be the cause of all of the violence during the Intifada despite the absence of evidence that any statements caused any of the seven attacks at issue in this case.   *See e.g.,* Ex. 4 at 7:10-16 (testifying that he does not know what, if any, media was read or seen by the alleged perpetrators); *id.* at 167:15-168:9 (testifying that he does not know whether any particular person saw the media clips cited in his report).   His testimony should therefore be excluded under Rule 403.

## II.    MATTHEW LEVITT'S TESTIMONY SHOULD BE EXCLUDED

Plaintiffs offer Matthew Levitt as an expert to testify that (1) the Al Aqsa Martyrs Brigades ("AAMB") was the military wing of Fatah; (2) Fatah controlled the AAMB's terrorist activities; and (3) during the Second Intifada, the PA funded the AAMB and its individual activists, thereby enabling the AAMB's terrorist activities.   Ex. 10 (Levitt Report) at 1.

### A.    LEVITT IS NOT QUALIFIED TO RENDER HIS OPINIONS

Levitt has spent his career studying Hamas, Hezbollah, and Al-Qaeda and the funding of *those* organizations.   He has written on and testified about *those* organizations.   *See* Ex. 11 (Levitt C.V.) at 3-32 (emphasis added).   But his expertise does not include the structure of Fatah, the command and control of the AAMB, or the PA's internal finances.   None of his coursework, academic research, or academic field work focused on the relationship between Fatah and the AAMB, or the PA's alleged support for terrorism.   Ex. 12 (Levitt Tr.) at 24:21-27:11, 28:3-6, 28:21-29:8; *see also id.* at 21:1-10, 23:3-11.   His non-academic experience is similarly irrelevant:

- His work at the FBI, the Treasury Department, and the State Department related generally to terrorism but did not concern the topics in his report.   *Id.* at 47:5-8, 49:5-14, 50:10-51:2, 53:7-13, 55:7-11, 270:17-20.

1425274.1

- The courses he has taught at Johns Hopkins University's School of Advanced International Studies, including "Combating the Funding of Transnational Threats" and "Terrorism: Concepts and Problems," did not cover the topics in his report.  *Id.* at 61:16-20, 62:19-63:2, 64:4-8, 65:13-16, 67:5-8.

- Although he states that "[he is] frequently sought after as an analyst and commentator on terrorism issues," Ex. 10 at 2, he could not recall a single time when he was interviewed about the relationship between Fatah and the AAMB, or about the PA's alleged support for terrorism.  Ex. 12 at 55:18-56:18, 68:12-16.

- He could not name any peer-reviewed publication that he has written that pertains to the relationship between Fatah and the AAMB, or to the PA's alleged support for terrorism, other than an "aside" in his book about Hamas.  *Id.* at 77:4-78:13.  None of his monographs is related to the opinions in his report, and he could not name any book chapters or journal articles that pertain to the opinions in his report.  *Id.* at 106:11-21, 107:1-16, 108:18-116:8.

- He "interview[s] experts, officials, academics and others" in the United States, Europe, and the Middle East (Ex. 10 at 3), but he could not name a single person he had interviewed about the relationship between Fatah and the AAMB, or about the PA's alleged support for terrorism.  Ex. 12 at 31:16-20, 33:3-35:17.  He ultimately testified that he was not relying on this "field work" to support his opinions.  *Id.* at 42:10-13.

- When asked what "field work" he had done regarding the opinions in his report, he replied, "Nothing that I can recall specifically."  *Id.* at 35:18-35:21, 36:14-15.

- He "engage[s] in private, personal meetings, public conferences, group discussions, and talks that are both on and off the record" (Ex. 10 at 3), but he could not identify any that pertained to the relationship between Fatah and the AAMB, or to the PA's alleged support for terrorism.  Ex. 12 at 68:17-71:4, 75:15-76:6.

- He does not read Arabic.  *Id.* at 262:12-18, 406:17-19.  He must therefore rely on translations of Arabic documents and cannot independently assess the accuracy of such translations.

- He states that he has "lectured…on terrorism for a variety of government and other organizations," is "frequently called upon to testify before the United States Senate and House of Representatives as an expert on international terrorism, militant Islam, and terrorist financing," and has "been qualified as an expert witness and provided expert testimony in many U.S. federal court proceedings . . . ."  Ex. 10 at 3-5.  But he could not name a time when he had ever spoken publicly in any forum about the relationship between Fatah and the AAMB or the PA's alleged support for terrorism during the Second Intifada.  Ex. 12 at 71:14-72:3.

- While he has "been qualified as an expert witness and provided expert testimony in many U.S. federal court proceedings" (Ex. 10 at 4-5), none of his prior experience as an expert witness pertained to the topics in his report, nor has he ever been qualified to testify as an

expert on the relationship between Fatah and the AAMB, or the PA's alleged support for terrorism.  Ex. 12 at 93:7-12, 93:19-94:1, 94:5-17, 95:11-18.[13]

Thus, Levitt's "knowledge, experience, training and education," do not relate to the subject of his testimony.  His academic training, his work with the government, and his experiences as a commentator, lecturer, and teacher are on separate topics.  Even his prior expert testimony did not cover the topics in his report.[14]  His purportedly "extensive" research also does not qualify him as an expert in this case; he reviewed the materials cited in his report, but he could not describe anything else he had done before reaching his conclusions, and expressly disclaimed reliance on any "field work" that he might — or might not — have done.[15]  Accordingly, he is "wholly unqualified to proffer" the opinions at issue, and he should not be permitted to testify in this case.  *Linde II*, 922 F. Supp. 2d at 329.

Levitt's characterization of himself as "a noted expert in international terrorism" (Ex. 10 at 1) does not change this result.  *See Linde II*, 922 F. Supp. 2d at 328-29; *In re MTBE Prods. Liab. Litig.*, 2008 U.S. Dist. LEXIS 37331, at *19 n.48.  While Levitt claims to be an expert on "Middle East terrorist groups," he never identifies which ones.  *See* Ex. 10 at 1-3.  For good

---

[13] *See*, *e.g.*, *United States v. Ibrahim*, 529 Fed. App'x 59, 62-63 (2d Cir. 2013) (holding that Levitt's testimony on "the structures and methods of [Jamaat Al-Muslimeen], Hezbollah, and Al Qaeda" was properly admitted); *United States v. Kadir*, 718 F.3d 115, 122 (2d Cir. 2013) (holding that it was not an abuse of discretion to admit Levitt's testimony "describ[ing] al Qaeda and Hezbollah and their activities in South America"); *United States v. El-Mezain*, 664 F.3d 467, 489 (5th Cir. 2011) (describing Levitt as "an expert on the subject of Hamas"); *United States v. Hammoud*, 381 F.3d 316, 337 (4th Cir. 2004) (holding that it was not an abuse of discretion to permit Levitt to testify about "the structure of Hizballah and…its leaders").  Notably, one court expressly declined to consider Levitt's proposed testimony in a case against the PA because it was not particularly probative.  *Estate of Parsons,* 715 F. Supp. 2d at 32-33 & n.3.

[14] Ex. 12. at 21:1-10, 23:3-11, 24:21-27:11, 28:3-6, 28:21-29:8, 47:5-8, 49:5-14, 50:10-51:2, 53:7-13, 55:7-11, 55:18-56:18, 61:16-20, 62:19-63:2, 64:5-8, 65:13-16, 67:5-8, 68:12-16, 71:14-72:3, 77:4-78:13, 92:11-93:3, 93:7-12, 93:19-94:1, 94:5-17, 95:11-18, 106:11-21, 107:1-16, 108:18-116:8, 262:12-18, 406:17-19.

[15] *Id.* at 31:16-20, 33:3-35:21, 36:14-15, 42:10-13, 68:17-71:4, 72:16-76:6.

reason: his expertise appears to be specific to Hezbollah, Hamas, and Al-Qaeda — certainly not Fatah, the AAMB, or the PA.  *See generally* Ex. 11.  Indeed, in *Linde II*, the court found that Levitt was qualified to testify as an expert on "Hamas, its history and organization, and the structure of the social wing of Hamas (including zakat committees)" because those were "precisely the subjects at issue" in that case.  922 F. Supp. 2d at 324-25.

Just as an expert on Saudi Arabia is not qualified to give expert testimony on the specific subject of the purpose and operations and of the Saudi Committee in Support of the Intifada Al Quds (*id.* at 328-29), Levitt cannot parlay his knowledge of "Middle East terrorist groups" writ large into an expertise specifically on the structure and organization of Fatah; who, if anyone, controls the AAMB; and the PA's internal finances.  *Nimely*, 414 F.3d at 399 n.13; *Tin Yat Chin*, 371 F.3d at 40.  This is "far more than a mere quibble with academic training."  *Linde II*, 922 F. Supp. 2d at 329 (internal quotation marks and alterations omitted).  Levitt is not an expert on the issues on which he seeks to opine, and he should not be permitted to testify as such.

### B.  LEVITT'S OPINIONS ARE NOT BASED ON A RELIABLE METHODOLOGY

#### 1.  Levitt Did Not Follow a Reliable Methodology

Levitt applied no methodology at all, much less a reliable one.  In his report, Levitt describes his *normal* methodology as follows:

> In my efforts to study and understand terrorism and militant Islamist ideology I interview experts, officials, academics and others with insight into these issues, both in the United States and Europe and in the Middle East.  I engage in private, personal meetings, public conferences, group discussions, and talks that are both on and off the record….I also attend conferences and academic and professional lectures, and read books, newspapers, academic and policy journals, and research these materials on the internet (including the websites, video and audio clips and images on sites geared towards counterterrorism and those of terrorist groups and their sympathizers as well).  These are the standard sources and methods in the academic and policy communities for

developing the kind of specialized knowledge and expertise I have accumulated…

Ex. 10 at 3.  But in this case, in reaching his opinions regarding the PA, Fatah, AAMB, and the Second Intifada, Levitt is not relying on any interviews or other fieldwork that he could recall. Ex. 12 at 31:16-20, 33:3-35:21, 36:14-15, 42:10-42:13.  He attended no meetings, public conferences, group discussions, or talks that were on point.  *Id.* at 68:17-71:4, 75:15-76:6. Unlike areas in which he has years of experience reviewing, evaluating, and interpreting primary source information, in this instance, Levitt simply compiled and represented what appeared to be facts that supported his starting thesis.  Indeed, at his deposition he could not cite to a single additional document that supported his conclusions, instead claiming that all such documents were referenced in his report.  *Id.* at 72:16-74:7.

Not only does Levitt's methodology fall short of his own articulated standards, it stands in stark contrast to the methodology utilized by other terrorism experts, particularly those who employ enumerated criteria "derived from…professional experience, academic studies, and other documents" that are used specifically to evaluate, for example, the level of control that an organization has over an alleged terrorist group.  *Linde II,* 922 F. Supp. 2d at 322*; see also Weiss v. Nat'l Westminster Bank PLC*, 453 F. Supp. 2d 609, 623 (E.D.N.Y. 2006) (explaining that to demonstrate an alter-ego relationship, "[f]actors to be considered include whether the organizations share leadership, whether they commingle finances, publications, offices, and personnel, and whether one operates as a division of the other") (internal citations omitted).  In reaching his conclusions, Levitt did not establish relevant criteria and then undertake a systematic analysis of properly collected facts.  He offered no criteria that could be used to evaluate whether an organization is "the military arm" of a political party.  He did not articulate how to determine where funds from government coffers flow.  He did not say how to decide

26

whether those funds ultimately financed terrorist activities.  And he never described what factors should be considered in deciding whether one entity controls another, much less did he apply any such factors.  The very purpose of such factors is to "make plain and transparent the considerations [the expert] evaluated in reaching his conclusions."  922 F. Supp. 2d at 322-23.

Levitt did not make "plain" or "transparent" the steps he took to reach his conclusions.  During his deposition, Levitt often claimed that he could not remember what steps he took to prepare sections of his report.  *See*, *e.g.*, Ex. 12 at 124:4-5 ("I don't know offhand.  As I said, I do this work all the time."); *id.* at 152:4-8 ("Q: And can you tell me any of the evidence that you considered but then rejected in reaching your conclusions?  A: No, because we're sitting here today, and I didn't write this yesterday.").  And beyond the claim that his opinions are "based on [his] research and the evidence [he has collected]" (*id.* at 150:14-16), Levitt often could not say with whom he spoke or what else he might have read other than what is cited in his report.  *Id.* at 31:16-20, 33:3-15, 33:20-34:5, 34:17-35:1, 35:4-8, 35:13-17, 72:16-73:9, 73:13-74:7, 75:15-76:6, 137:2-3, 152:4-8.

2.    Levitt Did Not Apply a Reliable Methodology to the Facts

Levitt ignored contrary evidence in order to arrive at his desired conclusion.  *Id.* at 151:17-152:3, 425:5-426:11, 426:12-427:12, 429:2-18.  For example, Levitt concludes that the AAMB was the "armed wing" of Fatah based on a quote in USA Today attributed to an individual named Maslama Thabet.  Ex. 10 at 8.  The article identifies Thabet as an AAMB member and quotes him as saying, "[T]he truth is, we are Fatah itself, but we don't operate under the name Fatah.  We are the armed wing of the organization.  We receive our instructions from Fatah.  Our commander is Yasser Arafat himself."  *Id.* at 11.  At his deposition, Levitt conceded that he ignored a report issued by Human Rights Watch ("HRW") that contradicts Thabet's characterization of the relationship between Fatah and the AAMB because he disagreed with it.

27

Ex. 12 at 126:8-19; *see id.* at 436:7-437:5 (Levitt conceding that his report likewise does not

discuss a Canadian report finding that the AAMB consists of loose cells of militants loyal to, but

*not* under the control of, Fatah); *see also id.* at 414:21-417:15 (Levitt admitting during his

deposition that he similarly ignored a report issued by the European Union that contradicted his

conclusion that the PA "diverted funds to Fatah members engaged in terrorism," Ex. 10 at 18).

　　　Levitt did not ignore the HRW report because he knew the USA Today article to be

credible.  He had never spoken to Thabet himself (Ex. 12 at 119:1-3) and he had no recollection

of speaking with the article's author about the article or the people quoted in the article (*id.* at

119:20-120:3).  He simply "assume[d]" that the quote in the USA Today article was accurate

because the quote "made it into the print" and was never retracted, and because USA Today is "a

reputable outlet."  *Id.* at 120:4-17.  Levitt even admitted that he did not know, aside from the

USA Today article, whether Thabet was, in fact, associated with the AAMB.  *Id.* at 120:21-

121:14.  Thus, Levitt relied on the USA Today article over the contrary HRW and Canadian

reports simply because it supported his conclusion.

　　　During his deposition, Levitt characterized other evidence that contradicted his findings

as "logical denia[ls]" or just plain incorrect — but either way, he did not discuss them in his

report.  *Id.* at 128:2-133:13; 145:13-149:9.  He also admitted that there is no way for Defendants

to discover the material that he might have considered but rejected.  *Id.* at 152:4-153:18.

　　　Levitt also relied extensively on documents allegedly seized by the Israeli Defense Forces

(IDF) during raids on PA offices that were selectively released by the Israeli government (which,

Levitt admitted, is "party to a conflict").  Ex. 10 at 12-13, 15-19; Ex. 12 at 284:20-285:3, 380:19-

381:5.  He did so without examining a comprehensive cross-section of the documents seized or

even obtaining independent translations of the documents that the Israeli government released

28

(instead relying on the IDF's translations).  He nonetheless draws broad conclusions from isolated statements contained in those documents.  *Id.* at 263:2-267:2, 277:18-280:8, 285:4-286:13.[16]  Notably, Levitt could not identify a single scholar who relies on these "seized" documents in their research.  *Id.* at 384:5-11.  Dr. Robinson has confirmed that "[t]hese documents are not considered reliable by professionals in my field."  Ex. 2 at 65.

The result of Levitt's selective reliance on portions of cherry-picked documents is that there is no "analytical connection" between his so-called methodology and the conclusions he reached.  *Nimely*, 414 F.3d at 396.  Indeed, Levitt's analysis appears to be no more than his "instinctive reaction" to the materials he reviewed.  *Bethea v. Bristol Lodge Corp.*, No. 01-cv-612, 2003 U.S. Dist. LEXIS 9011, at *20 (E.D. Pa. May 19, 2003).  This is improper, and amounts to "only…the *ipse dixit* of the expert."  *General Electric*, 522 U.S. at 146.

There are numerous other examples where Levitt repeatedly reaches conclusions with no independent support and without exercising due diligence:

- Levitt relies on what he characterizes as the "confession" of Tamer Rimawi as evidence that AAMB served as the armed wing of Fatah. Ex. 10 at 10.  Levitt believes that this "confession," which is not signed by Rimawi, is part of an official Israeli government report because he received it from "lawyers in another case," even though he did nothing to authenticate it.  Ex. 12 at 154:2-159:18; *see also id.* at 164:15-165:3 (Levitt testifying that he was "comfortable with the document" because the lawyers gave it to him).  In fact, those lawyers, who were representing a group of plaintiffs against the PA and the PLO, had not only created the document, but also presented the document to Rimawi, who refused to sign it.  *Id.* at 159:19-165:16.

- Levitt concludes that the PA directly funded terrorism, in part, because a document allegedly seized by the IDF during "Operation Defensive Shield" was purportedly signed by Arafat and authorized payment of $300 to each of 24 Fatah members.  Ex. 10 at 16.  But Levitt admitted during his deposition that (1) there was a journalistic/scholarly debate about whether Arafat's signature was authentic, and he could not name anyone who had actually authenticated it; (2) he had no idea where the document had actually come from; and (3)

---

[16] Levitt similarly took at face value the partial translations contained in another Israeli report.  Ex. 12 at 358:15-360:12.

while the document allegedly authorized payment to 24 Fatah members, it does not say what the money was for. Ex. 12 at 299:9-300:21, 306:19-307:18, 311:18-21.

- Levitt cites several other communications in support of his conclusion that the PA directly funded terrorism (Ex. 10 at 16), but he admitted for each one that there is no indication that the money requested in these communications had ever actually been paid, or if it had been, what it was used for. Ex. 12 at 319:4-14, 391:8-394:17, 395:4-7.

- Levitt's report states that "[i]n December 2001, Arafat would order the closure of Hamas and PIJ offices yet he rescinded the order days later," and cites two news articles for this conclusion. Ex. 10 at 17. Levitt admitted during his deposition that neither article says the order was rescinded. Ex. 12 at 446:9-447:12.

- While Levitt's report concludes that "[l]etters from AAMB leaders on letterhead with both the AAMB and Fatah logos, and posters of AAMB terrorists with both logos…point to the intimate relationship between the two groups" (Ex. 10 at 12), he admitted that he did not know who made the documents or whether Fatah authorized them. Ex. 12 at 325:12-327:17, 328:6-330:21, 337:12-338:2.

Thus, "the opinions in [Levitt's] report are supported by what appears to be a 'because I said so' explanation." *Bloomberg*, 2010 U.S. Dist. LEXIS 92511, at *48. In lieu of "relying on analytic strategies widely used by specialists in the field," Levitt is "[m]erely touting [his] expertise." *Id*. This "does not make [him] an expert as Rule 702 defines that term." *Id*. (internal quotation marks omitted). The Court should therefore exclude his testimony.

3.    Levitt Aggregates and Transmits Hearsay

Levitt's opinions are based largely on a compilation of multiple levels of hearsay. His report repeatedly cites to portions of news reports or Israeli government reports that simply repeat unsourced hearsay. *See generally* Ex. 10; *see also* Ex. 1 at 21 (noting that Levitt "relies overwhelmingly on official Israeli sources and on news reports"). For example, Levitt's report states that there is "evidence" that Arafat approved funding for terrorists, including a $20,000 payment to the AAMB, but he cites only to an article in the New York Times as support. Ex. 10 at 14. The New York Times article, in turn, relies on a U.S. official's description of an Israeli intelligence report. Levitt has never seen the intelligence report; he has never spoken to anyway

30

who has seen the report; he does not know what the report says, other than how the U.S. official characterized it to the New York Times; and he did nothing to verify the supposed payment other than read the news. Ex. 12 at 444:1-446:8.

Levitt also relies on the Israeli government's interpretation of translated hearsay materials, even though the underlying source materials do not support the Israeli government's conclusions. Specifically, he assumes that a letter is addressed to a man named Shubaki, even though the English translation provided by the Israeli government does not contain the word Shubaki, simply because the Israelis said that it was addressed to Shubaki. *See id.* at 353:8-356:1; *see also id.* at 358:15-362:8, 364:1-21 (Levitt acknowledging that, while his report states that a particular document shows that "PA General Intelligence passed to its Ramallah office a list of 232 terrorists wanted by Israel," he similarly relied on the Israeli government's characterization of the document – when the translation of the document itself does not actually say that the individuals are terrorists).

Levitt made no effort to assess the reliability or authenticity of his sources. He failed to distinguish between matters of fact on the one hand, and claims made by government agencies on the other. Thus, Levitt did not so much analyze the sources "so much as repeat their contents." *Mejia*, 545 F.3d at 198. Thus, his testimony should be excluded.

C.     LEVITT'S TESTIMONY WILL NOT ASSIST THE JURY AND IS HIGHLY PREJUDICIAL

Levitt's proposed testimony does not address any of the seven incidents at issue in this civil action. Instead, it includes extraneous (and frequently unsourced) "evidence," including the PA's purported release of "key Hamas bomb makers and military commanders from PA prisons in 2000" and the allegation that "senior Palestinian security officers…supplied PIJ and Hamas in the Jenin area with most of the weapons in their possession" (Ex. 10 at 14-15) (internal quotation

31

marks omitted) that is "so far afield from the specific allegations and statutory elements at issue that there is an appreciable risk of prejudice, jury confusion, and misleading the jury." *Linde I*, 902 F. Supp. 2d at 286. The jury should not be burdened with such extraneous issues, which would only complicate an already-complex case and unduly prejudice Defendants in the process. *See Bloomberg*, 2010 U.S. Dist. LEXIS 92511, at *55 (finding the "minimal probative value" of a proffered expert's testimony to be "substantially outweighed by its prejudicial effect" when his opinion "focuse[d] on factors that…would serve merely to distract the jury's attention from considering the evidence as it applies to…[the] causes of action alleged in the Second Amended Complaint"). Accordingly, his testimony should be excluded.

## III.   JEFFREY ADDICOTT'S TESTIMONY SHOULD BE EXCLUDED

Plaintiffs offer Jeffrey Addicott as an expert to testify that (1) "the Fatah faction and the [PA], which were effectively indistinguishable from one another and both led by Yasser Arafat during the relevant time period, were responsible for the terror campaign known as the al-Aqsa *Intifada*, or second Intifada . . . ."; (2) "scores of innocent Americans lost their lives in this conflict," and (3) "[t]he PA was fully aware of the fact that, in its campaign of violence against Israelis, Americans were at risk of falling victim to these attacks." Ex. 13 (Addicott Report) at 11-12.

### A.    ADDICOTT IS NOT QUALIFIED TO RENDER HIS OPINIONS

A cursory examination of Addicott's background reveals the enormous mismatch between his actual experience and his opinions in this case (*see Tin Yat Chin*, 371 F.3d at 40):

- Addicott is a "full Professor of Law" (Ex. 13 at 1), but he has no professional expertise concerning the PA, Fatah, the AAMB, Arafat, the Second Intifada, Palestine, or even the Israel-Palestine conflict in general. He does not teach about these topics. Ex. 14 (Addicott Tr.) at 154:9-18. And he has never written about these topics. *Id.* at 42:3-13, 42:14-15, 45:20-46:17, 49:7-20, 57:17-18, 60:13-61:6, 60:13-61:6; Ex. 13 at 1-3.

32

- The only two texts in which he has ever purportedly analyzed the PA and Fatah during the Second Intifada are *his reports in this case* — one of which he admittedly did not write. Ex. 14 at 46:14-17.

- His S.J.D. is based on his "experiences with terrorism organizations in *Peru*." *Id.* at 151:20-152:2 (emphasis added).

- He has no scholarly expertise on the history of the PA or the PLO. *Id.* at 41:12-21.

- He claims to have lectured "on topics of terrorism, national security law, terrorism law and constitutional law" (Ex. 13 at 2; Ex. 14 at 20:9-10), but he has given no lectures relevant to the opinions expressed in his reports other than within the context of "mention[ing]" the PA or Fatah. *Id.* at 68:12-69:19.

- He has "done over 4,000 media appearances" (*id.* at 63:14-15), but, at most, only one of those appearances relates to the opinions in his reports — a "debate" on Fox News concerning the PA's purported "use" or "sponsorship" of "violence against Israeli and American civilians" between himself and another "talking head[]" that lasted, at most, five minutes. *Id.* at 63:17-64:21; 67:14-68:1.

- He claims to have traveled to the "Middle East," but he has visited only Egypt, Israel, and Kuwait. Ex. 13 at 11. He has never traveled to the Gaza Strip (Ex. 14 at 92:7-9), and he has only been to the West Bank once or twice. The West Bank trip(s) were cursory and made in the presence of Israeli defense officials for the purpose of observing the border. *Id.* at 92:7-13, 93:7-11. He has never conducted scholarly fieldwork in the West Bank.

- He does not speak Arabic. *Id.* at 173:3-5, 230:1. Thus, he must rely on translations of Arabic documents and cannot independently assess the accuracy of such translations.

- He has never served as an expert in a case involving Arafat, the PA, Fatah, or the Second Intifada. *Id.* at 80:4-15.

- He has testified before Congress, but never on topics related to the opinions proffered in this case. *Id.* at 80:16-81:2.

- The two amicus briefs he filed with the Supreme Court "were directed at Saddam Hussein," not Arafat, the PA, Fatah, or the Second Intifada. *Id.* at 81:3-13.

Two examples demonstrate Addicott's lack of a basic understanding of the PA and of Palestine's political structure. First, during his deposition, Addicott tried to equate the PA with "radical Islam." *Id.* at 72:16-74:6. Yet he could not name a single scholarly source that supports this theory. *Id.* Second, in his rebuttal report (which, unlike his case-in-chief report, he actually wrote), Addicott states that by signing the 1993 Oslo Accords, "Israel recognized the *Palestinian*

33

*National Authority (PNA)* as the sole legitimate representative of the Palestinian people." Ex. 15 (Addicott Rebuttal Report) at 4 (emphasis added). This is demonstrably false. The PNA (another name for the PA) did not exist at the time of the Oslo Accords and therefore could not have been recognized by anyone as anything. It was the *PLO* that Israel recognized. *See* Letter from Prime Minister Rabin to Yasser Arafat (Sept. 9, 1993), *available at* http://tinyurl.com/p6xb6gk. When confronted with this inaccuracy during his deposition, Addicott still insisted that it was the PNA that was "recognized, yes, as the legitimate representative." Ex. 14 at 251:4-252:14.

But it's not just that Addicott lacked the relevant expertise *prior* to his assignment in this matter — he also engaged in no scholarly work to develop the necessary expertise *after* he took on the assignment. He admits that he was given a selected group of sources (*id.* at 76:7-11), and that he did no independent research to verify their validity. *Id.* at 127:4-128:4. This provides further support for his disqualification. *See Linde II*, 922 F. Supp. 2d at 329 (disqualifying a purported expert who, having no prior expertise on the subject at issue, also failed to "identif[y] [any] scholarly work or experience that he engaged in to develop expertise on the subject of his report after his assignment; he reviewed only a limited number of documents before reaching his conclusions, and he performed at best a minimal amount of additional work to reach his current level of knowledge.").

Addicott's self-proclaimed expertise in the field of "terrorism law" does not qualify him as an expert in this case. *See Linde II*, 922 F. Supp. 2d at 328-29; *In re MTBE Prods. Liab. Litig.*, 2008 U.S. Dist. LEXIS 37331, at *19 n.48. He does not have the necessary knowledge or credentials in any of the relevant fields, including internal Palestinian politics, the particular groups he attempts to lump together, and the sources and causes of Palestinian violence during

34

the Second Intifada.  Moreover, he cannot explain how he reliably applied his experience in national security law and terrorism law to the facts of this case (Fed. R. Evid. 702 Advisory Committee's Note (2000)), nor how his experience is recognized as acceptable by actual experts in Palestinian affairs.  *Kumho Tire Co.*, 526 U.S. at 151.  Accordingly, he is "wholly unqualified to proffer" the opinions espoused in his report and he should not be permitted to testify in this case.  *Linde II*, 922 F. Supp. 2d at 329.

B.    ADDICOTT'S OPINIONS ARE NOT BASED ON A RELIABLE METHODOLOGY

1.    Addicott Did Not Generate the Opinions in his Report

Addicott did not write his case-in-chief report, and he admits that he does not know who did.  Addicott likewise has no idea what methodology the actual author applied or what analysis the author undertook.  Ex. 14 at 118:15-119:16; 124:13-19.  Addicott was provided with a draft report containing citations to a selected group of sources (*id.* at 76:7-11), and he did no independent research to verify the validity of those sources (*id.* at 127:4-128:4), much less to cross-reference them or evaluate them against other information.  He arranged for no independent translations.  *Id.* at 102:19-103:6.  And even when he could not locate one of the sources cited in the report (a video), he left the citation in the report (*id.* at 16:12-17:5), despite the fact that he had never personally watched the video and had no idea whether the report's actual author could be relied upon to cite it appropriately.[17]

As one district court explained:

---

[17] The source in question is the YouTube video cited in footnote 1 of his case-in-chief report ("PA Minister of Communications: Intifada Already Planned When Arafat Returned from Camp David").  Ex. 14 at 16:12-17.  During his deposition, Addicott justified leaving the citation in the report by claiming that the missing YouTube video was "consistent with other…videos [he had] seen."  *Id.* at 16:18-17:5.  But not having seen the YouTube video, Addicott obviously could not assess whether it was consistent with anything.

35

> The wholesale adoption of the opinion of another expert verbatim cannot be within the intent of Fed. R. Evid. 702.  The purpose of expert testimony is to aid[] the fact-finder, through explanation of complicated or technical areas which require specialized knowledge and understanding.  *See* Fed R. Evid. 702.  While this function undoubtedly can lead to the adoption or incorporation of the ideas, information, and analysis of others with expertise in the same field, it does not lead to the conclusion that an expert…should be permitted to merely adopt and incorporate verbatim another's "expert" opinion.

*Bouygues Telecom, S.A. v. Tekelec*, 472 F. Supp. 2d 722, 729 (E.D.N.C. 2007).[18]

Addicott applied no intellectual rigor to his case-in-chief report and does not know what the actual author did to prepare it.  All Addicott did was adopt and incorporate, almost verbatim, someone else's work.  As a result, his case-in-chief report cannot be characterized as the product of a reliable methodology or reliable data, and the Court should preclude his expert testimony.

### 2.    Addicott's Opinions Are Based on the *Ipse Dixit* of the Witness

Neither Addicott's case-in-chief report nor his rebuttal report describes a methodology.  *See generally* Ex. 13; Ex. 15.  During his deposition, Addicott testified that he generally "look[s] at terrorism and what causes terrorism and how it's motivated and whether or not certain acts of terrorism fall under different categories, for example, state-sponsored or state-supported or substate terrorist groups."  Ex. 14 at 35:2-8.  He said that this is "a legal framework" into which he "plug[s]" the behavior of "a particular organization, government or state" to "come up with an analysis and a conclusion."  *Id.* at 70:12-20.[19]

---

[18] *Bouygues Telecom* allows that in certain circumstances an "expert opinion which relies upon the information or opinion of others" can be acceptable — but it must be "the sort of opinion reasonably relied on by experts in the relevant area of expertise."  *Id.* at 728.  No bona fide expert would blindly adopt a report that was not only written by an unknown individual but that was also provided to him with only 24 hours in which to sign it as his own, as Addicott did here. Ex. 14 at 111:7-112:10.

[19] *See also id.* at 71:19-72:3 ("[W]hen you plug in the analysis, you'll see that states will use, or misuse, religion as a justification for terrorist acts, and we've seen that in the Second Intifada, where they wrapped themselves in religious themes, martyrdom, Jihad, and so that fits into that process."); *id.* at 84:16-19 ("My expertise is looking at the groups in terms of their behavior and plugging that into a

1425274.1

Yet, he offered no criteria that should be used to evaluate "what causes terrorism" or "how it's motivated." He never described what "behaviors" he looks at, how he decides which ones to evaluate, or how he decides whether those behaviors contribute to terrorism. He did not articulate how he determines whether any particular act of violence is an act of terror. Nor did he explain how he goes about determining whether an act of terrorism falls within one of the categories he listed during his deposition. He did not analyze contradictory sources and explain why he rejected them.[20]

In lieu of applying a reliable methodology, Addicott suggests the Court and the jury simply take his word for it. He opines on matters for which he has no first-hand knowledge. Then when asked during his deposition to provide specific support for his opinions, he would distort the facts. And when challenged, he would invariably point to his experience, "common knowledge," or "common sense." *See*, *e.g.*, *id.* at 34:13-18, 72:16-73:11, 75:7-18, 135:12-19, 140:2-16, 144:8-145:2, 176:17-177:2, 205:7-206:21, 207:17-208:1; 268:12-272:9. Consider the following example about President Arafat's alleged use of the term "martyr." In his report, Addicott writes:

> In his attempt to reclaim his lost status as the liberator of the
> Palestinian people, Arafat began to wield Islamist rhetoric similar
> to that of Hamas. He made Jerusalem, perhaps the lowest common
> denominator among Palestinians, a focal point of the violence.
> 'We are marching, millions of martyrs to Jerusalem,' chanted one
> frenzied crowd at an Arafat rally in December 2001.

---

framework that's well recognized as a national security discipline."); *id.* at 153:4-7 ("[I]t's an interdisciplinary discipline that looks at the framework, the creation, the behavior of governments and organizations that use terrorism as a tool.").

[20] The closest Addicott came to this was when he described in his deposition why he credits the words of the Israeli government, but not those of the PA. *See id.* at 102:6-108:15 (Addicott testifying that he believes what the Israeli government says because it is "a democracy," and presumes that anything the PA says is "false" because it is a "totalitarian system.").

37

Ex. 13 at 13-14 (internal footnote omitted).  At his deposition, Addicott claimed he was referring to Arafat's "rhetoric of Jihad," especially his use of the word "martyr," during a speech at this rally.  Ex. 14 at 169:16-170:4.  According to Addicott, a "martyr" is someone that dies while engaging in "unlawful violence."  *Id.* at 170:7-19; *see also id.* at 172:3-6) (testifying that "[t]here's no question in [his] mind" that Arafat was using the word "martyr" to describe someone "*involved* in unlawful violence")  (emphasis added).  But Arafat's actual language at this rally shows that he was not glorifying someone who died while committing acts of violence.  According to the secondary source that Addicott cites, Arafat actually said at the rally, "'The martyr Muhammad al-Dura [a twelve-year-old boy killed in cross-fire between Israeli and Palestinian forces] says to [the Jews] from paradise, and all of our martyrs tell them: We are a nation of heroes.'"  *Id.* at 173:17-174:1.  In other words, the "martyr" was a 12-year-old boy that had been killed in cross-fire; he was not someone involved in violence.  *Id.* at 174:8-175:10.  When confronted with the language from Arafat's speech, Addicott changed his tune.  "[Arafat] used the boy to incite others to commit acts of violence," Addicott claimed.  *Id.* at 175:14-19.  When asked the basis for this opinion on Arafat's intentions, Addicott had none but persisted in his opinion:

> Q. And that's why Arafat was calling him a martyr, in your opinion?
>
> A. Oh, yeah.
>
> Q. Because he knew he was going to use the boy to incite acts of violence by others?
>
> A. Absolutely.
>
> Q. What's your basis for that opinion?
>
> A. The statement itself.
>
> Q. Tell me what part of the statement supports that conclusion.
>
> A. Common sense.
>
> Q. What part of common sense?

1425274.1

> A. *The common sense part of common sense.*

*Id.* at 175:20-176:11 (emphasis added). Even more illustrative of Addicott's unreliable

methodology is his willingness to simply make things up:

> Q. Your report describes the crowd as "frenzied" at the top of Page
>   14, right?
>
> A. Yep.
>
> Q. What's the basis for that opinion?
>
> …
>
> A. Well, I've attended many and I've viewed many rallies of this
>   sort, and these crowds get very emotional. They get very
>   frenzied.
>
> Q. Have you viewed any video of *this* rally?
>
> A. This particular crowd, no.
>
> Q. So you have no basis to adopt the word "frenzied"?
>
> A. I do have a basis.
>
> Q. What's your basis?
>
> A. My experience.
>
> Q. But not related to this individual event?
>
> A. I wasn't at this event.
>
> Q. And have never seen any video of it?
>
> A. Not this particular event.

*Id.* at 178:16-179:19 (emphasis added).

When opinion evidence hangs onto a case "only by the *ipse dixit* of the expert" (*see*

*General Electric,* 522 U.S. at 146), it should be rejected. The Court should therefore exclude

Addicott's testimony.

C.    ADDICOTT'S TESTIMONY WILL NOT ASSIST THE JURY AND IS
      HIGHLY PREJUDICIAL

While "an expert may opine on an issue of fact within the jury's province, he may not

give testimony stating ultimate legal conclusions based on those facts." *United States v.*

*Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991). "That sort of usurpation of the jury's role is

unacceptable." *Mejia*, 545 F.3d at 191.  Addicott opines, based solely on hearsay, that the PA is ultimately responsible for every act of violence committed during the Second Intifada.  His opinion necessarily encompasses the seven attacks at issue in this case.  This is improper.  The PA's alleged role in the seven attacks is "a *fact* that must be proved by competent evidence," and not by the "shortcut" of an "expert pronounce[ment]" of guilt."  *Id.* at 195 (emphasis in original).

Furthermore, expert testimony concerning an entity's knowledge constitutes an "impermissible legal conclusion."  *In re MTBE Prods. Liab. Litig.*, 643 F. Supp. 2d at 482, 498 n.125 (S.D.N.Y. 2009).  Thus, Addicott's opinion that the PA knew that Americans could be victims of attacks committed during the Second Intifada is likewise improper (*see* Ex. 12 at 18-26) because any expert testimony about what the PA knew is inherently speculative.  *In re MTBE Prods. Liab. Litig.*, 643 F. Supp. 2d at 502-503, 505.  Similarly, Addicott's opinions concerning the intent of the PA or of Arafat simply "lie outside the bounds of expert testimony."  *Linde I*, 920 F. Supp. 2d at 285 (internal quotation marks omitted).

The admission of Addicott's testimony would greatly prejudice Defendants.  Because Addicott did not write his own report, Defendants cannot cross-examine the actual author about the sources selected and methodology, if any, applied.  Moreover, his opinions consist of nothing more than cherry-picked hearsay statements, strung together for a prejudicial "wow" factor.  For example, seven pages of his rebuttal report list Congressional pronouncements and selected fragments of speeches made by Arafat — the sole purpose of which is *not* to provide a factual basis for an opinion that the PA or the PLO caused or were otherwise responsible for the seven attacks at issue in this case, but to inflame the jury.  Ex. 15 at 8-15.  Thus, his testimony should be excluded.

## IV.    EFRAIM KARSH'S TESTIMONY SHOULD BE EXCLUDED

Plaintiffs offer Efraim Karsh to testify that the PA and the PLO are liable for "the planning, initiation, execution and management of the terrorist offensive known as the 'al-Aqsa Intifada,' and for the terrorist attacks against Israeli and Jewish targets within this framework." Ex. 16 (Karsh Report) at 1.

### A.    KARSH IS NOT QUALIFIED TO RENDER HIS OPINIONS

Karsh is a professor of Middle East and Mediterranean Studies (Ex. 17 (Karsh C.V.) at 1), but he does not have specific expertise on Palestinian politics or the causes of the Second Intifada.  The Middle East and Mediterranean Studies Program at King's College that Karsh founded does not focus on Palestinian politics or even the Israeli-Palestinian conflict; it focuses more broadly on the "fields of Middle East & Mediterranean history, politics, and international relations, culture and society."  *Id.*  None of the 28 Ph.D. dissertations he has supervised focused on the PA, the PLO, or the Israeli-Palestinian conflict.  *Id.* at 7-8.  Although he has authored numerous books and articles in "the field of Middle Eastern studies" (*id.* at 3), "the writing he has done is outdated and not focused on the issues upon which he now seeks to offer an opinion." Ex. 1 at 5.  Most of his publications that, according to him, are "directly related" to his expert opinions in this case, were published in newspapers, magazines, and non-peer reviewed journals.  *See* Ex. 18 (List of Karsh Publications) at 1-2.  A few of them even pre-date the events for which he offers an expert opinion.  *See id.*  Others do not directly address the topics in his report; they focus on Zionism,[21] Israeli Arabs,[22] and the 1948 partition of Palestine.[23]  His early

---

[21] *See id.* at 1 (listing "Zionism and the Palestinians," Israel Affairs, Vol. 14, No. 3 (July 2008), pp. 355-373.)

[22] *Id.* at 1 (listing "Israel's Arabs: Deprived or Radicalized?" Israel Affairs, Vol. 19, No. 1 (Jan. 2013), pp. 1-19).

1425274.1

work also rules out expertise in Palestinian politics.  As an intelligence officer in the IDF, he

focused on "Soviet foreign policy, military policy in the Middle East, [and] Syrian policy."  Ex.

19 (Karsh Tr.) at 50:25-51:12; 53:6-9.  Arafat and the PLO "[were] not [his] main field[s] of

occupation."  *Id.* at 53:6-9.  He received both his master's degree and his Ph.D. in international

relations.  *Id.* at 50:12-16.

To be sure, Karsh wrote a book, <u>Arafat's War: The Man and his Battle for Israeli</u>

<u>Conquest</u>, that addresses the topics in his report.  But it was published by a trade publisher and

was not peer-reviewed.  Ex. 19 at 21:13-22:6, 24:5-14, 41:3-19.  "'That the research is accepted

for publication in a reputable scientific journal after being subjected to the usual rigors of peer

review is a significant indication that it is taken seriously by other scientists, *i.e.*, that it meets at

least the minimal criteria of good science.'"  *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d

164, 183 (S.D.N.Y. 2009) (quoting *Daubert,* 43 F.3d at 1318).  Moreover, as discussed in detail

below, this book was not based on primary source material, was published in 2003 (before one of

the attacks at issue in this case had even occurred), and was roundly criticized by others in the

field.  In sum, Karsh should not be deemed qualified to render an expert opinion when the only

potential basis for his qualification, a book he wrote in 2003, was not itself the result of a reliable

methodology.

Finally, Karsh has virtually no expertise on Palestinian society, culture, and religious

practice, yet he opines (impermissibly) on such topics as the significance of historical religious

references (*see* Ex. 16 at 7-11), the Palestinian population's attitude towards the peace process

(*see id.* at 40), and their response to so-called incitement to terrorism (*see id.* at 32).

---

[23] *Id.* at 1 (listing Palestine Betrayed, New Haven & London, Yale University Press, 2010).

B.     KARSH'S OPINIONS ARE NOT BASED ON A RELIABLE
       METHODOLOGY

    1.     Karsh's Opinions Are Not Based on Sufficient or Reliable Data

Karsh's opinions in this case are based on outdated and unreliable research.  He admitted

at his deposition that in writing his report he "drew heavily on" his work in writing his book,

Arafat's War.  Ex. 19 at 21:22-22:6.  He even said that it "could well be" that every citation in

his report except one comes from his book.  *Id.* at 21:25-22:2.  But his book was published in

2003.  *Id.* at 22:21-22.  Karsh's report in this case was "written based on a work that [he] did ten

years ago," even though the Intifada was not even over at that point.  *Id.* at 274:22-23.  And

Karsh does not appear to have conducted research on the topics in his report since he published

his book.  Indeed, he did not read a 2004 Israeli Military Intelligence Report that opined on the

causes of the Intifada.  *Id.* at 255:9-256:17.  He was not aware of media reports reflecting the

2009 statements by leaders of the Israeli Security Agency (ISA), Avi Dichter and Yuvai Diskin,

that the Intifada was not conceived by the Palestinian leadership.  *Id.* at 273:6-275:1.[24]

    Furthermore, Karsh's opinions are based largely on unattributed hearsay from media

sources.  Of the 229 citations in his report, 209 cite to print, radio, and television sources.  *See*

*generally* Ex.15.  None of these 229 citations is to scholarly material or information obtained

from Karsh's fieldwork or interviews.  *See id.*  Indeed, a review of the book in the *Washington*

*Post's National Weekly Edition* by Jonathan Tepperman, the managing editor of *Foreign Affairs*

magazine, described it as "rushed polemic essentially assembled from secondary sources."  Ex. 1

at 9 (internal quotation marks omitted).  For example, Karsh opines that Arafat "apparently gave

[Hamas] a 'green light' to resume the terrorist attacks against Israel" in March 1997.  Ex. 16 at

---

[24] The Israel Security Agency is variously referred to by its Hebrew or English names or acronyms as the
ISA, Shin Bet, Shabak, General Security Service, or GSS.

1425274.1

29 ¶ 81.  He cites no confirmed, first-hand source for this supposed "green light."  *See id.* at 30, n.78.  Instead, he cites to an Israeli television report that the Israeli Committee on National Ministerial Affairs "received a report" that the PA had led various terrorist organizations to understand that they had been given such a "green light," allegations by a television reporter regarding this "green light," and a Jerusalem Post article reporting that Moshe Yaalon, the Israeli military intelligence chief, stated that such a "green light" existed.  *Id*. at 30 n.78 (Ex. 20 (Israel Television, Channel 1 March 23, 1997)); *Id*. (Ex. 21 (Peter Hirshberg, Can Arafat Switch Off Terror? Jerusalem Report, April 17, 1997)).

Moreover, Karsh has no evidence that the cited material is reliable.  When questioned about the reliability of the Israeli newspaper sources, Karsh simply claimed that such newspapers are "of course, reliable."  Ex. 19 at 34:11-25.  To make matters worse, Karsh often does not know the source of the information in the media reports that he is relying on.  For example, he cites to a report from Voice of Palestine radio that Haaretz, an Israeli newspaper, reported that Israeli security sources stated that there was an agreement between two Palestinian groups, Hamas and the Fatah youth movement, to carry out attacks against Israeli settlers in order to support his contention that such an agreement existed.  *Id.* at 227:5-228:24.  But Karsh does not know who these security sources were.  *Id*. at 228:25-229:10.  Similarly, Karsh cites to a Jerusalem Report news article for the claim that after Ariel Sharon's visit to Temple Mount, "Arafat gave direct orders to senior Fatah leaders, Marwan Barghouti and Hussein al-Sheikh, to arm their men with stones, and subsequently with rifles, in order to fire on positions held by Israel Defense Forces troops, settlements, and vehicles on main roads."  Ex. 16 at 33 ¶ 92 (citing Ehud Ya'ari, "Super-Intifada", Jerusalem Report, October 23, 2000, p. 19).  But the allegation in

the article is unsourced and Karsh testified that he did not know its source.  Ex. 19 at 252:20-254:20.

Finally, Karsh made no effort to obtain primary source information about the topics informing his opinions.  He claims, for example, that certain media is controlled by the PA (Ex. 16 at 33 ¶ 91; *id.* at 35 ¶ 95), but he could not name a single person that he had spoken with regarding the Palestinian leadership's control of Palestinian media.  Instead, he testified that there are "stories that you hear," about the way the PA "pressures, sometimes by violent means, Palestinian journalists who stray out of line."  Ex. 19 at 192:4-193:4.

Merely reading and repeating media reports is not a sufficient basis for the type of far-reaching opinions that Karsh offers about the Second Intifada and terrorism.  *See Jinro Am., Inc. v. Secure Invs., Inc.*, 266 F.3d 993, 1006 (9th Cir. 2001) (rejecting as unreliable testimony about illicit practices in the Korean business community where the expert provided no support for his testimony "other than to cite newspaper articles and a few anecdotal examples, some of them clearly hearsay").   Thus, the Court should exclude his testimony.

> 2.      Karsh Did Not Employ a Reliable Methodology

First, Karsh does not appear to have employed any methodology.  Instead of explaining how he reached his conclusions, he states:

> This expert opinion is based on my personal and professional knowledge, originating in many years of study and work experience in Middle Eastern affairs; in independent research in my areas of specialization; and in information and documents available to experts in the field . . .

Ex. 16 at 2.  He does not explain how he conducted his research or how he determined what constituted "information and documents available to experts in the field."

Second, Karsh does not provide adequate support for his opinions.  He states that the PA, PLO, and its leaders incited violence through television.  Ex. 16 at 35 ¶ 96.  But he cites no

support for his assertion that certain media is controlled by the PA and PLO.  *See id.* at 33 ¶ 91; *id.* at 35 ¶ 95.  Similarly, Karsh's conclusion that an "[a]n incessant stream of policy declarations, press articles and electronic media broadcasts, . . . incited – the Palestinians to sacrifice their lives for the sake of the 'general good'" (*id.* at 35 ¶ 96 ) is based only on two electronic media broadcasts and a media report regarding the Palestinian draft constitution.  *Id.* at 35 n.97, 35 n.98, 36 n.99.  Karsh also concludes that Arafat "exploited" sermons at Friday prayers "as the springboard for his new war," but his source material does not state that Arafat had any connection to such sermons.  *Compare id.* at 33 ¶ 91 n.88 *with* Ex. 22 (Lee Hockstader, "Street Army Spearheads Arab Riots," Washington Post (October 4, 2000)).  Karsh's ultimate conclusion that the PA and PLO are liable for the seven attacks at issue in this case because they took place in the context of the Second Intifada and, in particular, "served the political purposes and aims of the PA and PLO at the time" (Ex. 16 at 1) is also based on Karsh's unsupported assertions.  Karsh does not even claim that he reviewed any information about the seven attacks.  Worse yet, Karsh draws conclusions from evidence that contradicts his conclusion.  For example, he claims that Arafat said "we are all suicide bombers" based on Arafat's spokesman's denial that he said that.  Ex. 19 at 134:11-135:9.

Third, Karsh's opinions are based on unreliable assumptions.  For example, Karsh assumes that after Arafat arrived in the Gaza Strip in 1994, he "began to construct an extensive terrorist infrastructure;" that he "rehabilitated and expanded the PLO's old terrorist infrastructure," and that he "carried out intensive purchasing of prohibited armaments."  Ex. 16 at 5 ¶ 5.  But he provides no support for these claims.  *See id.*  Likewise, Karsh claims without any citation to source material that the official PA media made "great efforts" to minimize the Holocaust if "not to deny it altogether."  *Id.* at 16 ¶ 41; Ex. 19 at 180:10-181:2.  Karsh also states

without providing any support that Palestinians described the cause of the Second Intifada to Arabs as a "premeditated Israeli attack." Ex. 16 at 31 ¶ 86.

Fourth, Karsh cherry-picked assertions that support his opinions and ignored facts that contradict them. For example, he states in his report that following a terrorist attack Arafat "praised" the attack (*Id.* at 23 ¶ 58), but he fails to mention that Arafat issued a public statement condemning the attack, because, according to Karsh, "Arafat was speaking from both sides of his mouth all of the time" (Ex. 19 at 132:10-20). Similarly, Karsh quotes Arafat's statement that "[t]he jihad will continue and Jerusalem is not for the Palestinian people alone. It is for the entire Muslim umma . . . ," but he fails to acknowledge that Arafat specifically stated that by jihad, he meant a peaceful one. *See* Ex. 16 at 23 ¶ 59 (citing Time, May 30, 1994, p. 32); Ex. 19 at 139:12-140:4. Instead, Karsh testified, without providing any support, that "[t]here is no doubt when Arafat uses 'jihad' . . . he means 'jihad' in a traditional sense," *i.e.* "tak[ing] arms and fight[ing]." *Id.* at 140:5-15. Karsh also cites a media source for the proposition that there was an agreement between Fatah's youth wing and Hamas to carry out attacks against Israeli settlers in 1996 but fails to mention that the media source reported that Fatah's youth wing denied that such an agreement existed. Ex. 16 at 25 ¶ 66 (citing Voice of Palestine (PLO Radio), June 11, 13, 1996). At his deposition, Karsh testified that this denial was not relevant to his report. Ex.18 at 227:5-230:19. In sum, Karsh simply cites the data that supported his conclusions and ignores the data that contradict his conclusions.

C.    KARSH'S TESTIMONY WILL NOT ASSIST THE JURY

Karsh's opinions will not assist the jury because they do not speak to the cause of any specific violent attack that took place during the time period of the Intifada, let alone the cause of any of the events at issue in this case. Even if it could be said that Karsh's proposed testimony has some marginal relevance to the questions in this case, it is "so far afield from the specific

47

allegations and statutory elements at issue that there is an appreciable risk of prejudice, jury confusion, and misleading the jury." *Linde I,* 920 F. Supp. 2d at 286; *see* Fed. R. Evid. 403.

Karsh also impermissibly opines on the state of mind of Palestinians. For example, Karsh states that in Arab and Palestinian parlance "justice" always means the establishment of a Palestinian state on Israel's ruins. Ex. 16 at 6 ¶ 8. He testified that his basis for this opinion is 30 to 40 years of studying Palestinian parlance, even though he lacks special training or knowledge in this regard. Ex. 19 at 74:6-10. Karsh also states in his report that "[i]n Arab and Palestinian discourse . . . the demand for the return of the 1948 [Palestinian] refugees and their descendants to territory that is now part of the state of Israel, and their financial compensation for their losses and suffering," is calling for the "destruction of Israel through demographic subversion." Ex. 16 at 8-9 ¶ 16. Karsh further testified during his deposition that every Arab leader who references the "right of return" is actually calling for the destruction of Israel. Ex. 19 at 99:21-24. Karsh interprets Arafat's description of his vision of "peace," which included the establishment of "a democratic state in which Muslims, Christians and Jews can coexist" as Arafat actually calling for the "destruction of Israel." Ex. 16 at 13 ¶ 31. Karsh also opines on Arafat's wants. Without citing a single source, he characterizes the 1996 Tunnel War as a situation in which Arafat "wished" for "'tens of shahid martyrs.'" *Id*. at 27 ¶ 74.

Karsh even opines about the *feelings* of an entire group of people. He states that between 1994 and 1996, Hamas "*felt* free to continue its terrorist attacks," because of PA and PLO action. *Id*. at 22 ¶¶ 55-58 (emphasis added). He opines that Arafat's "obvious failure to fight and implicit encouragement of terrorism had appeared to the Palestinian public as permission to act." *Id*. at 30 ¶ 82. Karsh similarly and impermissibly opines that during the Second Intifada

1425274.1

Palestinians were "incited" to "sacrifice their lives for the sake of the 'general good.'" *Id.* at 35 ¶ 96. Accordingly, his testimony should be excluded.

## V. ALON EVIATAR'S TESTIMONY SHOULD BE EXCLUDED

Plaintiffs have proffered Alon Eviatar, a former IDF intelligence officer, to provide an expert opinion on ten different topics: (1) "[t]he responsibility of the [PA] and the [PLO] for the July 31, 2002 Hebrew University Bombing;" (2) "[t]he connection and relationship between the PA, PLO, and Fatah;" (3) "PA/PLO payments to terrorists and their families;" (4) "[t]he Palestinian Ministry of Prisoners and Released Prisoners Affairs;" (5) "[t]he release of terrorist prisoners, the 'Revolving Door Policy' of the PA;" (6) "Fatah's terrorist operations between 2000-2004 under the auspices of the PA and PLO;" (7) "[t]he [PA's] direct assistance of terrorism;" (8) "[c]ooperation among Palestinian terrorist organizations and the PA;" (9) "[t]he Tanzim;" and (10) "Yasser Arafat's personal involvement in terrorist operations."[25] Ex. 24 (Eviatar Report) at 3-4.

### A. EVIATAR IS NOT QUALIFIED TO RENDER HIS OPINIONS

Eviatar does not have any specialized "knowledge, skill, experience, training, or education" that would allow him to opine on any of the ten topics in his report. He does not have a Ph.D., and his master's degree in public policy does not "pertain to the role of the PA or PLO in the Second Intifada." Ex. 23 at 48:14-23. He has not written any books or published any papers in the last ten years on any subjects. Ex. 24 at 2. He has never testified as an expert before. *Id.*

To be sure, Eviatar's work in the IDF *may* have touched on some of the topics in his report. But he has not explained how that experience "leads to the conclusion[s] reached, why

___

[25] Eviatar's report listed an additional topic – "witness interrogations" – but Plaintiffs' counsel withdrew his opinions on that topic just prior to Eviatar's deposition. Ex. 23 (Eviatar Tr.) at 7:7-11.

that experience is a sufficient basis for the opinion[s], and how that experience is reliably applied to the facts." Fed. R. Evid. 702 Advisory Committee's Notes (2000). In his report, he provides a description of his work as a Department Head in the Department of Palestinian Affairs that is virtually identical to the job description provided in the report of Israel Shrenzel, another former Israeli intelligence official proffered by Plaintiffs, even though Eviatar and Shrenzel worked at different agencies and had different titles. *Compare* Ex. 24 at 1 (stating "In that position, I was responsible (among other things) for supervising the work of the IDF research and assessment personnel in various fields relating to Palestinian affairs, drafting and presenting research and policy papers concerning Palestinian affairs, and appearing before and providing briefings to senior governmental and military forums regarding Palestinian affairs") *with* Ex. 25 (Shrenzel Report) at 1 (providing same job description except substituting "GSS" for "IDF"). Similarly, Eviatar's claim that "[i]n the course of [his] services in the IDF, [he] received and read many thousands of intelligence items…relating to the activities of the Palestinian Authority (the 'PA'), the Palestine Liberation Organization (the 'PLO') and the full range of Palestinian groups, organizations, institutions and personalities" (Ex. 24 at 2) is virtually identical to the claim made by Shrenzel in his report. *See* Ex. 25 at 1 (making same claim except substituting "GSS" for "IDF"). Worse yet, Eviatar maintained at his deposition that he wrote these passages in his report, even though Shrenzel's report was submitted a month *before* Eviatar was even contacted about working on this case. Ex. 23 at 37:17-42:3. The record compels the conclusion not only that Eviatar did not author that part of his report, but also that he was untruthful about his writing it.

   At his deposition, Eviatar testified that he had written papers on topics related to his report, including, for example, the ideological and political concepts of the PA, PLO, and Fatah

50

and the release of prisoners by the PA, but that they are classified.  *Id.* at 121:1-123:14; 125:24-

126:22.  Meanwhile, he testified that he "[d]efinitely" had "in [his] mind" information learned

from confidential sources when he was working on his report but that he could not reveal that

information.  *Id.* at 52:5-22.  He also refused to disclose allegedly classified information he had

received about the connection between the PA, PLO, and Fatah.  *Id.* at 94:11-21.  Thus, Eviatar's

qualifications cannot be evaluated and the basis for his opinions cannot be tested.  *See Gill*, 893

F. Supp. 2d at 541 (excluding two former Israeli intelligence officers because their reliance on

confidential information means that that they cannot be effectively cross-examined).

What *is* known about Eviatar's work at the IDF suggest that he is not qualified to testify

about the ten topics in his report.  The Hebrew University bombing receives the most attention in

his report.  Indeed, it is the only topic that he mentions by name in the section entitled "Nature

and Purpose of Report."  *See* Ex. 24 at 2.  Yet none of Eviatar's work in the IDF involved the

Hebrew University bombing.  Ex. 23 at 59:15-17.  He had "no job responsibilities related to that

bombing."  *Id.* at 60:6-9.  At the time of the Hebrew University bombing, Eviatar was "serv[ing]

as commander of the Coordination and Liaison Administration in Jericho and the Jordan Valley."

Ex. 24 at 1.  His responsibilities were in Jericho, not in Jerusalem.  Ex. 23 at 60:13-15.  Like

members of the public, he heard about the bombing from the media, not intelligence sources.  *Id.*

at 59:22-24.  Indeed, Eviatar does not have first-knowledge of any of the information in his

report about the Hebrew University bombing except for a single paragraph on page 13.  *Id.* at

61:4-62:10.

B.    EVIATAR'S OPINIONS ARE NOT BASED ON A RELIABLE
      METHODOLOGY

      1.    Eviatar Did Not Generate the Opinions in his Report

Plaintiffs' counsel initially identified Ronni Shaked as their expert and tendered a report

for him.  When Shaked withdrew for personal reasons, Plaintiffs' counsel sought leave to

substitute Eviatar for Shaked.  *See* Ex. 26 (May 16, 2013 Letter from Kent Yalowitz to the Hon.

Ronald L. Ellis).  At his deposition Eviatar testified that he was not asked to write a report;

rather, he was asked "to read [Shaked's] report and to make amendments to it."  Ex. 23 at 13:6-

12.  While Eviatar claimed that he "wrote part of [his report]" (*id.* at 12:12-20), a comparison of

the reports demonstrates that he made only minor changes to Shaked's report.  *Compare* Ex. 24

*with* Ex. 27 (Shaked Report).  Shaked's 90-page report contains 11 sections and 176 footnotes.

Eviatar's 88-page report contains the same 11 sections and 178 footnotes,[26] and the two-page

difference in the reports results largely from the simple fact that Shaked's credentials are more

extensive than Eviatar's.  Eviatar's report occasionally adds or omits a sentence not in Shaked's

report, but the edits are minor and infrequent.  Moreover, Eviatar admitted that he made his

amendments in the "red line" or "track changes" mode (Ex. 23 at 27:10-16), which suggests that

someone else was reviewing his edits.

      Remarkably, when Eviatar submitted his report on June 14, 2013, he retained those

portions of Shaked's report for which even Plaintiffs now admit he lacked any expertise.  For

example, Eviatar's report retained the section on "Terrorist Interrogations" by the Israeli Security

Agency (*see* Ex. 24 at 17-19), even though Eviatar, unlike Shaked, was not in the Israeli Security

Agency (*compare id.* at 1-2 *with* Ex. 27 at 1; *see also* Ex. 23 at 11:4-6).  Eviatar's report even

---

[26] At his deposition, Eviatar was able to identify only seven footnotes out of 178 that he wrote.  Ex. 23 at
22:10-23:14.

states, "While I have not personally been involved in the interrogation of terrorists, I am familiar

with such information from, inter alia, *my work at the Israel Security Agency*," (Ex. 24 at 17)

(emphasis added), a statement which is completely false.  Apparently realizing that Eviatar's

report contained an easily proven falsity, Plaintiffs submitted a corrected version of his report

that simply struck the phrase "from, inter alia, my work at the Israel Security Agency."  Ex. 28

(Eviatar Corrected Report) at 17.  Then, on the eve of Eviatar's deposition, Plaintiffs withdrew

the entire section of his report on terrorist interrogations.  Ex. 23 at 7:7-11.  These events

illustrate, not only that Eviatar barely contributed to the production of his opinions, but that he

was willing to sign a report that contained false information.

That Eviatar merely made minor edits to Shaked's report is especially problematic

because Eviatar has never published a book or article on the topics in his report.  Thus, one

cannot argue that Defendants can examine his methodology elsewhere.  Typically, in evaluating

the reliability of an expert's methodology, courts ask "whether [the expert] is 'proposing to

testify about matters growing naturally and directly out of research [he has] conducted

independent of the litigation, or whether [he has] developed [his] opinions expressly for purposes

of testifying.'"  Fed. R. Evid. 702 Advisory Committee Notes (2000) (quoting *Daubert,* 43 F.3d

at 1317).  But in this case Eviatar has *never* generated the opinions that appear in his report, for

litigation purposes or otherwise.

Meanwhile, Defendants cannot determine the methodology employed by Shaked to

generate his opinions because his report does not include a description of the methodology.  *See*

Ex. 27.  To make matters worse, Eviatar did not make "plain and transparent" the (limited) work

he did prior to submitting his report.  He did not memorialize the "hundreds" of uncited

documents on the internet that he claimed he reviewed but are not cited in his report.  Ex. 23 at

24:10-25:4.  He did not keep electronic copies of those documents, and he discarded those documents for which he had hard copies.  *Id.* at 25:5-17.  Eviatar agreed that "there's no way we can reconstruct [the] group of materials" that he examined.  *Id.* at 25:23-26:3.  Eviatar also testified that he "shredded" the drafts and notes he made.  *Id.* at 20:14-21:2.

2.    Eviatar's Opinions Are Based on the *Ipse Dixit* of the Witness

A review of Eviatar's report reveals two fundamental methodological deficiencies: (1) Eviatar does not provide support for many of his claims, and (2) Eviatar draws unfounded conclusions from his data.

In his discussion of the Hebrew University bombing, for example, Eviatar does not cite to a single source when providing background information about the attack, including its date and location, the number of casualties, other attacks that preceded it, and the party responsible for the attack.  *See* Ex. 24 at 4.  Even when he discusses his main argument, "The Role of the PA in Supporting and Encouraging Hamas in Carrying Out the Hebrew University Attack," he does not provide support for his claims that "[t]he conditions in the West Bank…enabled and encouraged the freedom of activity of the various terrorist groups on multiple levels," that "[t]he Palestinian Authority provided Hamas with assistance, including from the PA's leader, Yasser Arafat, in assisting Hamas terrorists in their terrorist activities," and that "the Palestinian Authority, with the approval of Arafat, financially supported the families of suicide bombers and terrorists."  *See id.* at 5-6.  Further, he fails to cite a source for his claim that "[i]n July 2002, nearly two years after the outbreak of the al-Aqsa Intifada, the coordination and cooperation between Hamas and Fatah had become well-established and *Arafat already had given a green light to Hamas to carry out bombing attacks within Israel*."  *Id.* at 7 (emphasis added).  He also states, without citing to a source, that Muhammad Dahlan said in a television interview in 2007, "'The Palestinian security forces were those who protected and hid half of the Hamas leadership and of the Hamas military

forced during the Intifada.'" *Id.* at 13.  In short, Eviatar's failure to provide support for his claims

pervades the entire discussion of the Hebrew University bombing.  *See id.* at 4-16.

To be sure, his discussion of the Hebrew University bombing includes some reference to

sources.  He cites to Abdullah Barghouti's alleged 2003 custodial statements to the Israeli police,

for example, to support his claim that Barghouti received "favorable treatment in [Palestinian]

prison" in 2001.  *See id.* at 8-11.  According to Eviatar, Barghouti's "favorable treatment"

included the fact that (1) "'[there] was not an interrogation, but just questions'" following

Barghouti's arrest by the Palestinian security forces in 2001, (*see id.* at 10-11); (2) Barghouti was

given a phone in jail and called a Hamas leader to set up a meeting (*see id.* at 10);  and

(3) Barghouti was released from jail despite his admission that he was involved in terrorism (*see*

*id.* at 11).  Based on this alleged favorable treatment, Eviatar concludes that the PA "intended to

send Abdullah Barghouti a clear message: he could continue to carry out terrorist attacks with

impunity." *Id.* at 10.

But Eviatar draws unfounded conclusions from his data and fails to consider obvious

alternative explanations.  *See* Fed. R. Evid. 702 Advisory Committee Notes (2000) (noting that

courts consider these factors relevant in determining whether expert testimony is sufficiently

reliable).  First, he fails to consider that Barghouti may not have made the statements attributed

to him; he spoke Arabic and the statements are written in Hebrew.  In fact, "Abdullah Barghouti

denied many details and ignored many other details which he had given in his confession" when

he was later interviewed by Shaked.  Ex. 27 at 22.  Remarkably, Eviatar omits this crucial fact

from his report, even though it appears in Shaked's report.  *Compare id*. at 22 *with* Ex. 24 at 17-

19.  Second, even if Barghouti did, in fact, make the statements attributed to him and those

statements are true, they do not implicate the PA.  There is nothing untoward about letting a

prisoner use a telephone in jail, and Eviatar does not allege that Palestinian security forces

typically denied phone calls to prisoners.  Nor is it suspicious that the Palestinian security forces

subjected him to "questions" instead of "interrogation."  As for Barghouti's alleged release from

jail, Eviatar has no information about the quantity and quality of evidence in the PA's possession

at the time or the reason for their alleged decision to release him.  Just because Eviatar believes –

now – that there was sufficient evidence to detain Barghouti at the time does not mean that there

was.  In fact, Barghouti reportedly "claimed that public pressure had led to his release," not the

PA's desire for him to commit attacks.  *See* Ex. 24 at 11.

These two fundamental deficiencies – failing to provide support for his claims and

drawing unfounded conclusions from his data – are not limited to his discussion of the Hebrew

University bombing.  In another section, "Part Eight – The Palestinian Authority's Direct

Assistance of Terrorism," Eviatar states,  "In the course of the intifada, Israel declared Tawfiq

Tirawi, the head of the Palestinian General Intelligence Service in the West Bank – the man who

should have prevented and thwarted terrorist activity – to be a wanted person."  *Id.* at 61.  Eviatar

provides no support for this claim.  Instead, he draws the following conclusion from this single

piece of unsupported data:

> In my expert opinion, the fact that the man in the PA's General
> Intelligence Service whose job it was to prevent terrorism was
> wanted by Israel for doing precisely the opposite, is a clear proof
> that the leadership of the PA is not only tainted with terrorism, but
> actually takes measures towards the promotion of terrorism.

*Id.* at 61.  Eviatar's conclusion does not follow from this data.  The PA might not have known

that Tirawi was wanted by Israel.  And if the PA did know that he was wanted, they might not

have agreed with Israel that he was a terrorist; Eviatar does not provide evidence that Tirawi was

a terrorist, nor does he show that such evidence, if it existed, was given to and credited by the

PA.  Tellingly, Eviatar ignores the fact that Tirawi remains at liberty in the West Bank today, *see*

56

Declaration of Tawfiq Tirawi, attached as Exhibit 1 to the March 27, 2014 Letter from Brian A. Hill to the Honorable Ronald L. Ellis (cc'd to the Honorable George B. Daniels), a fact that is obviously inconsistent with his assertion that Tirawi was wanted by the Israelis for terrorist activity.  In the end, Eviatar's conclusion only reinforces that he is not applying a reliable methodology.

### C.    EVIATAR'S TESTIMONY WILL NOT ASSIST THE JURY

Testimony about the state of mind of individuals and entities is impermissible expert testimony.  *See Linde I*, 920 F. Supp. 2d at 285.  Yet, Eviatar's proposed testimony includes the following opinions:

- "In my expert opinion, the decision by Palestinian security forces not to interrogate Barghouti, not to confiscate his preparation materials (including chemicals used to make explosives), and not to inquire about his motives for owning those materials and explosive devises was *intended* to send Abdullah Barghouti a clear message: he could continue to carry out terrorist attacks with impunity."  Ex. 24 at 10 (emphasis added).

- "In my expert opinion, it is clear . . . that the prisoner's salary, which is transferred to his family, is not simply a social welfare benefit to relieve economic stress, but is *intended* as compensation for carrying out the terrorist operation."  *Id.* at 32 (emphasis added).

- "A terrorist who perpetrates terrorist attacks is aware that his family will receive money after his imprisonment, death or injury.  This knowledge naturally increases young people's *motivation* and *willingness* to join the ranks of terrorism."  *Id.* at 37 (emphasis added).

Each of the aforementioned examples is an impermissible opinion about the motives, intentions, or state of mind of organizations or individuals.  These statements and others like it should therefore be excluded.

## VI.    ISRAEL SHRENZEL'S TESTIMONY SHOULD BE EXCLUDED

Plaintiffs have proffered Israel Shrenzel, a former Israeli intelligence analyst, as an expert witness even though his report does not contain an opinion, much less an expert one.  He states that Plaintiffs requested him to provide an expert opinion on "the degree of involvement of the

Palestinian Authority in six terrorist attacks that are at the center of this action, and in the encouragement, support and assistance in the execution of these attacks." Ex. 25 at 3. But a review of his report does not reveal any opinions. Instead, after discussing briefly "the general characteristics of the conduct of the Palestinian Authority during the relevant period of time" (Ex. 30 (Shrenzel Tr.) at 25:9-14; Ex. 25 at 4-16), he provides information *about* the six attacks. *See id.* at 18-77. For each attack, he provides a summary of the incident and a "profile" of the alleged perpetrators. *See id.* The profile typically includes information about the alleged perpetrator's personal, criminal, employment, and financial history. *See id.* Because Shrenzel is not providing an expert opinion and does not have personal knowledge of the attacks at issue in this case, his testimony should be excluded.

Assuming *arguendo* that Shrenzel's proposed testimony contains an expert opinion, his testimony should be excluded for the reasons discussed below.

A.    SHRENZEL IS NOT QUALIFIED TO RENDER HIS OPINIONS

Shrenzel does not have any specialized "knowledge, skill, experience, training, or education" that would allow him to opine on the degree of involvement of the PA in the six attacks. He does not have a Ph.D. *See id.* at 1. He has never written any books about the six attacks (Ex.28 at 26:2-5), the Second Intifada (*id.* at 26:23-27:6), or any of the issues discussed in his report (*id.* at 27:7-9). He has published three articles in the past ten years (*see* Ex. 25 at 2), but they "are not related to the subject of the expert opinion." Ex. 30 at 27:17-20. Shrenzel claims that he has "edited a number of books, some of which are relevant to the *Palestinian issue*, including Hamas Lexicon and Ticking Bomb" (Ex. 25 at 1) (emphasis added), but his expert report is not about Hamas and he was merely "a linguistic editor" for Ticking Bomb. Ex. 30 at 30:25-31:9. His name did not even appear on the cover of the book. *Id.* at 31:6-13.

58

To be sure, Shrenzel claims to have "decades of professional experience analyzing the Palestinian arena." Ex. 25 at 3. But he has not explained "how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 Advisory Committee's Notes (2000). He does not define "the Palestinian arena" in his report or explain what it means to "analyze" it. *See* Ex. 25 at 3. Worse yet, he provides a description of his work as a Department Head in the General Security Service (GSS)[27] Research Division that is virtually identical to the job description provided in the report of Alon Eviatar, even though Eviatar and Shrenzel worked at different agencies and had different titles. *Compare* Ex. 25 at 1 (stating "In that position I was responsible (among other things) for supervising the work of the GSS research and assessment personnel in various fields relating to Palestinian affairs, drafting and presenting research and policy papers concerning Palestinian affairs, and appearing before and providing briefings to senior governmental and military forums regarding Palestinian affairs") *with* Ex. 24 at 1 (providing same job description except substituting "IDF" for "GSS"). Shrenzel's claim that "[i]n the course of [his] services in the GSS, [he] received and read many thousands of intelligence items…relating to the activities of the Palestinian Authority (the 'PA'), the Palestine Liberation Organization (the 'PLO') and the full range of Palestinian groups, organizations, institutions and personalities" (Ex. 25 at 1) is also virtually identical to the claim made by Eviatar in his report. *See* Ex. 24 at 2 (making same claim except substituting "IDF" for "GSS").

Furthermore, at his deposition, Shrenzel would not explain the nature of his work at GSS. When asked whether he had ever conducted interrogations, he stated, "I prefer not to respond to that question." Ex. 30 at 78:1-2. When asked why he prefers not to answer that question, he

---

[27] The GSS is now called the ISA. Ex. 30 at 36:8-24.

stated, "The reason is that I'm not interested in responding on anything in a detailed or individual way to the characteristics of my overall employment with the General Security Services, or the security services." *Id.* at 79:1-8. Instead, he referenced back to the (vague) description in his report: "At the outset of the report, it was stated – and I stand by that – that the primary focus of my work was analysis, assessment, and supervision of people who engage in that. And beyond that, I do not wish to provide any more detailed information." *Id.* at 79:9-13. Similarly, when asked whether the classified material he reviewed at the GSS pertained to the general characteristics of the PA he discusses in his report, he stated, "Generally speaking…I would be very happy not to make any references to the types and the nature of the classified materials that I have been exposed to." *Id.* at 48:4-11. When questioned further, he stated, "[B]oth the unclassified material and the classified material deals with the Palestinian arena, in the broad sense of the terms as we have already discussed. Any deviation to the area of specific classified material is extremely problematic from many points of view." *Id.* at 48:24-49:5.

Meanwhile, what *is* known about Shrenzel's experience as an intelligence analyst in the GSS suggests that he is not qualified to testify about the six attacks. He did not investigate any of the six attacks. *Id.* at 39:18-40:1. He did not review documents pertaining to the six attacks at the time he worked at the GSS. *Id.* at 80:14-17. He did not interrogate any of the alleged perpetrators (*id.* at 77:23-25) or speak to the family and friends of the alleged perpetrators (*id.* at 153:19-154:2). Accordingly, his GSS experience does not permit him to testify about his opinions.

1425274.1

B.    SHRENZEL'S OPINIONS ARE NOT BASED ON A RELIABLE METHODOLOGY

1.    Shrenzel Did Not Generate the Opinions in his Report

Shrenzel's report is 77 pages long (Ex. 25 at 77), contains 329 footnotes (*id.* at 76), and is supposedly based on the review of over four thousand pages of documents (*id.* at 2-3).  Shrenzel did not prepare the original draft of his report, however.  *See* Ex. 30 at 14:9-21.  Instead, he received a draft of the report from "the team of colleagues who were involved in the preparation of the first draft *before* [he] became involved in it."  *Id.* at 14:9-24 (emphasis added).  The draft he received from the team was "several dozen pages. . . . It could have been 60, 70, [or] 50 [pages]."  *Id.* at 15:3-11.  Shrenzel started working on this case only about two weeks prior to the submission of his report.  *Id.* at 9:2-5; *id.* at 18:1-3.  During that two-week period, Shrenzel had "at least two meetings of approximately five hours each" with the team that prepared the original draft of the report.  *Id.* at 21:13-15.  Altogether, according to an invoice he submitted for his work, he spent just 31 hours working on this case prior to the filing of his report.[28]  *Id.* at 23:24-24:14.

At his deposition, Shrenzel admitted that he reviewed each document "with varying degrees of attention" and that he "relied, to a very great extent, on the team which had examined the documents over a very long period of time."  *Id.* at 20:2-7.  He also admitted that he "spent less time" on "things that [he] thought were obvious or clear, *or with respect to which [he] fully relied on the conclusions of the team*."  *Id.* at 20:12-21 (emphasis added).  When asked whether he read a document cited twice in his report, the April 23, 2002 statement of Munzir Noor cited at footnotes 176 and 185, he stated, "Not in a full format.  I definitely relied on the conclusions

---

[28] By contrast, Shrenzel spent "approximately 80 hours" working on this case – with and without the team – *after* the submission of his report.  *Id.* at 33:15-24.  And much, if not all, of that time was focused on preparing for his deposition.  *See id.* at 34:5-35:1.

that were drawn by Arieh Spitzen and Noam Meridor, whom I have already praised previously." *Id.* at 125:21-126:3.  He also testified that he did not receive a copy of every document referenced in his report; rather, he claimed he saw some of them during his meetings with the team.  *Id.* at 19:19-20:1.  He also did not review any documents other than those given to him by the team that prepared the original draft of his report.  *Id.* at 41:25-42:22.

In sum, Defendants cannot know, much less test, the methodology that led to the production of the opinions about which he will testify because Shrenzel did not generate the opinions.

### 2.    Shrenzel Transmits Hearsay without Applying any Expertise

A review of Shrenzel's report reveals that he is simply transmitting the hearsay statements and conclusions found in other documents without applying any expertise.  *See generally* Ex. 25 at 18-77.  Shrenzel even admitted that to provide his summary of each attack and profile of the alleged perpetrators, he simply read documents given to him and passed along the information contained in those documents.  Ex. 30 at 80:21-81:14.

Frequently, he transmits the conclusions found in secondary sources without applying any expertise or evaluating the underlying data.  For example, he concludes that Naef Abu Sharah was responsible for the June 19, 2002 attack in the French Hill neighborhood of Jerusalem based on an Israeli Ministry of Foreign Affairs (IMFA) report.  Ex. 25 at 56-58; Ex. 30 at 138:11-21, 140:4-7.  The IMFA report, which focused on the confiscation of money by the Israeli government (*id.* at 139:5-7), not the June 19, 2002 attack, contains a single "bullet point" alleging Sharah's involvement in the June 19, 2002 attack.  *See* Ex. 31 (Deposition Exhibit 435) at 4 (stating that Sharah was behind "[t]he 19 June 2002 suicide bombing of a crowded bus stop and hitchhiking post at the French Hill intersection in northern Jerusalem, in which seven people were murdered and over 35 were wounded"); Ex. 30 at 139:14-140:19.  At his deposition,

62

Shrenzel admitted that he had not seen the intelligence data that informed the IMFA report (*id.* at 140:20-25) or any intelligence material related to Sharah and this incident (*id.* at 141:1-5). Nonetheless, Shrenzel, who testified that he appeared for the deposition "on behalf of [his] former employer" (*id.* at 80:2-4), transmits this conclusion because "such a statement in an official document of the State . . . of Israel is perceived by me to be credible." *Id.* at 140:10-19. He also testified, "I am convinced that [the IMFA] would not have published this information if they had any substantive doubt with respect to its credibility." *Id.* at 141:5-9.

Similarly, Shrenzel opines that Yasser Arafat personally provided financial assistance to the perpetrators of the June 19, 2002 attack based on a line in a book written by Elliott Abrams, a member of the George W. Bush Administration. *See* Ex. 25 at 57; Ex. 28 at 144:16-145:1, 149:11-14. Quoting the line from the book, *Tested by Zion, the Bush Administration and Israeli-Palestinian Conflict*, Shrenzel states, "'There is new intelligence showing that Arafat had approved the payment of 20,000 dollars to the group.'"[29] Ex. 25 at 57. Shrenzel testified that he could not recall whether he had seen the intelligence, however. Ex. 30 at 146:1-147:4. He was not even certain whether the intelligence was Israeli intelligence or United States intelligence. *Id.* at 145:16-25. Shrenzel had not even read Abrams' book in its entirety. *Id.* at 147:13-14. Furthermore, Shrenzel admitted that the book does not state that the $20,000 was connected to the June 19, 2002 attack. *Id.* at 148:23-25.

Shrenzel also opines that "Nasser Aweis' name appeared in the list of wanted senior terrorists which the United States envoy, General Zinni, gave to the PA in December 2001" based on a report from the IMFA. *See* Ex. 25 at 21. Shrenzel claims that the "PA continued to

---

[29] Shrenzel misquotes the line from the book slightly. The actual line in the book reads, "new intelligence was received showing that Arafat had authorized a $20,000 payment to the group." Ex. 32 (Deposition. Exhibit 436).

employ and pay Aweis his salary without interruption after receiving the Zinni list." *Id.* at 26; *see also* Ex. 30 at 106:10-19 (explaining that the Zinni list refers to a list of 33 terrorists for whom Israel requested extradition from the PA). But Shrenzel "did not see the list within the framework of the preparations for the writing of this expert opinion" and he did not recall having ever seen the list. *Id.* at 106:20-107:18. He nevertheless relies on the IMFA report because it is "an official Israeli document. . . . And I certainly, as an Israeli citizen, attribute absolute credibility to that." *Id.* at 109:2-11.

3.      Shrenzel's Opinions Are Based on the *Ipse Dixit* of the Witness

<u>First</u>, Shrenzel fails to provide support for many of his claims. In his profile of Nasser Aweis, Shrenzel does not provide support for his claim that "[t]he PA has also portrayed and praised Nasser Aweis as a hero in broadcasts on Palestinian television." Ex. 25 at 26; Ex. 30 at 115:11-22 (admitting that his failure to provide evidence for his claim is "problematic"). In his profile of Ahmed Barghouti, Shrenzel does not provide support for his claim that "Ahmed Barghouti was the head of Fatah's al-Aqsa Martyrs' Brigade in the Ramallah district." Ex. 25  at 28; Ex. 30 at 117:18-118:8 (acknowledging that the document referenced in the footnote does not state that Barghouti was head of the al-Aqsa's Martyrs' Brigade). In his profile of Kahira Sa'adi and Sana'a Shehadeh, Shrenzel does not cite a single document or provide any support for his claim that the two women "admitted to and were convicted for assisting in this terrorist attack" or that they "have been receiving benefits from the PA during their imprisonment, and subsequently (as ex-convicts)." Ex. 25 at 56. In his discussion of Arafat's speeches, Shrenzel does not cite a document to support his claim that "on May 10, 1994 . . . , Arafat compared the Oslo Accords to the Treaty of Hudaybiyyah, i.e. a temporary agreement that need not be honored for a long time." *Id.* at 11.

64

Shrenzel also does not does not provide support for many of his claims about Naef Abu Sharah, the alleged perpetrator of the June 19, 2002 attack.  *See id.* at 56-58.  Shrenzel states that Naef Sharah "was employed by the Palestinian Authority, first in the General Intelligence Service in Nablus, at the rank of Molazim Awal (=lieutenant) and later in the Palestinian Civil Service."  *Id.* at 56.  The footnote that follows this statement, footnote 251, merely directs the reader to "see the profile of Abu Sharah below."  *Id.* at 56 n.251.  A "profile" of Abu Sharah does not appear below, however.  *See id.* at 56-58.  Later in the report, Shrenzel states that Abu Sharah "served as an official in the Palestinian Authority Civil Service, and before that served in a sensitive function as an officer of the Palestinian General Intelligence" (*id.* at 57), but he does not cite any documents in support of these claims.  Shrenzel ends his discussion of the June 19, 2002 attack with two paragraphs of factual assertions about Abu Sharah's political affiliation, criminal activity, and legacy, but he does not cite to any sources.  *See id.* at 58.

Similarly, in his profile of Ali Munir Yousef Ja'ara, Shrenzel includes six bullet points of alleged facts in support of his claim that the PA had a positive attitude toward Ja'ara.  *See id.* at 63-64.  Shrenzel does not cite a single document in support of any of the factual claims made in the bullet points.  *Id.*  In his profile of Hilmi Abdel Karim Mohammed Hamash, Shrenzel does not provide support for the statements he makes about his criminal history, namely, that "Hilmi Hamash was convicted and jailed repeatedly for throwing stones at Israelis on scores of occasions…[that] [h]e was sentenced to two months' imprisonment on June 29, 1993…[that] [h]e was arrested on April 3, 1995 . . . again convicted of stone throwing . . . [and] [that] [o]n November 17, 2002, he was sentenced to eight days' imprisonment and license cancellation, for driving an unlicensed, uninsured vehicle."  *Id.* at 70.

65

Second, "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co.*, 522 U.S. at 146. For example, Shrenzel's opinion that it is "very likely" that the January 8, 2001, shooting on the Guettas was "carried out by PA security forces" is based primarily on his claim that "the characteristics of the attack on the Guettas are *identical* to the characteristics of many attacks that were carried out in that area at that time by PA security officers . . . " Ex. 25 at 75 (emphasis added). But Shrenzel's premise – that the characteristics of the Guetta shooting are "identical" to those of other shootings carried out by PA security forces – is unfounded. The Guetta shooting and the other shootings did not happen on the same date but over a period of 15 months. Ex. 30 at 85:20-86:4. The shootings did not happen in the same location but within a 15-mile radius of Jerusalem, a major city in "a small country." *Id.* at 86:13-87:5. The shootings did not happen at the same time of day. *Id.* at 87:6-91:3. The number of shooters was not the same in all of the shootings. *Id.* at 91:18-92:4. The victims were not the same sex (*id.* at 92:5-12) or the same age (*id.* at 92:13-17). There was no evidence that the victims were wearing the same religious garb. *Id.* at 92:20-93:5. The shooters were not always shooting from a vehicle. *Id.* at 93:6-8. And there was no evidence that the same weapon was used in the Guetta shooting as in the other shootings. *Id.* at 93:9-12. In short, the Guetta shooting was not remotely "identical" to the other shootings, and thus, there is too great an analytical gap between the data and his opinion.

Shrenzel also draws the unfounded conclusion that "the evidence indicates that [the alleged perpetrators of the January 22, 2002 attack] were *recruited* into the PA security forces *because of* their prior records." Ex. 25 at 20 (emphasis added). When asked for his evidence that the men were recruited into PA security forces because of their prior records, Shrenzel admitted that he had no such evidence:

66

> Perhaps there is no specific reference for that fact.  But those
> perhaps fall within the purview of things that are general
> knowledge, that most of the recruits for the Palestinian security
> forces had a record of terrorist activity prior to the emergence of
> the Palestinian Authority.

Ex. 30 at 104:25-105:9.  Evidence that the men had a prior record, or even, as he later stated, that

the PA "clearly knew about their pasts in Israeli prisons, Israeli courts" (*id.* at 105:19-24), does

not establish that the men were recruited *because of* their records.

Third, Shrenzel cherry-picked data that supports his opinions and ignored data that

contradicted them.  For example, in a section of his report entitled "Speeches in praise of acts of

terrorism" (Ex. 25 at 11), Shrenzel quotes the portion of a speech by Yasser Arafat at a rally in

Nablus on June 25, 2002, that Shrenzel claims called for armed resistance to the occupation to

the occupation but fails to mention the portion of the same speech that explicitly called for peace:

"'We are with peace; however, with just and comprehensive peace.'"[30]  Ex. 30 at 75:6-76:10.

### C.    SHRENZEL'S TESTIMONY WILL NOT ASSIST THE JURY

Testimony about the state of mind of the PA is impermissible expert testimony.  *See*

*Linde I*, 920 F. Supp. 2d at 285.  Yet, Shrenzel admitted at his deposition that he is opining on

the state of mind of the PA. In fact, when asked directly whether "the report is an attempt to

understand what the Palestinian Authority was thinking at the time of these incidents," he said,

"Definitely."  Ex. 30 at 81:15-19.  He also admitted that he sought to "show what the goals and

motivations of the Palestinian were at the time [of the attacks]."  *Id.* at 81:20-22.  To that end,

Shrenzel devotes entire sections of his report to the "attitude" of the PA towards the alleged

perpetrator, his or her family, and the attack itself.  *See* Ex. 25 at 22 (section heading entitled

"Positive attitude of the Palestinian Authority towards the terrorists"); *see also id.* at 26, 33, 42,

---

[30] Mr. Shrenzel does not quote from the speech itself but from a Reuters newspaper article about the speech.  Ex. 30 at 74:20-75:5.

44, 60, 63, 66, and 72.  He states, for example, that "Wafa Idris is considered by the PA to be an icon of the Palestinian struggle against Israel" (*id.* at 42) and that "[t]he attitude of the PA toward Hamash – since his arrest – has been extremely positive" (*id.* at 72).   He also states, that "[t]he attitude of the Palestinian Authority toward Ahmed Barghouti, given his conviction for murder and terrorism, was and continues to be most positive" (*id.* at 30) and "[a]n analysis of Naef Abu Sharah's profile reveals that the Palestinian Authority had a positive, sympathetic and warm attitude towards Abu Sharah and the attacks that he carried out" (*id.* at 58).

In addition, Shrenzel's opinions are not beyond the ken of the average juror.  An average juror can read the same documents that Shrenzel read and can reach her own conclusions from the documents, assuming such evidence is admissible.  Accordingly, his testimony should be excluded.

## VII.    NICK KAUFMAN'S TESTIMONY SHOULD BE EXCLUDED

In contrast to the preceding six experts, Nick Kaufman, an Israeli lawyer and reserve-duty judge in the IMC, does not opine on the PA or its alleged responsibility for violent acts during the Second Intifada.  Rather, because Plaintiffs intend to rely on the convictions of 21 individuals in the IMC to establish the involvement of PA employees in the attacks at issue in this case, he proposes to "deliver an expert opinion on the quality of justice dispensed by the Israeli military courts…[and] [i]n the course of giving [his] opinion…to pay particular attention to the cases of those [21] defendants convicted of participation in offences of relevance to [this] case."  Ex. 33 (Kaufman Report) at 1.  Though not stated explicitly in his case-in-chief report, Kaufman concludes that "the Military Court System is reliable and provides due process to the accused it tries."  Ex. 34 (Kaufman Rebuttal Report) at 2.  He also concludes that each of the 21 individuals received due process.  *See* Ex. 33 at 9-32.

A.    KAUFMAN IS NOT QUALIFIED TO RENDER HIS OPINIONS

Kaufman is, by his own admission, "strictly a legal practitioner." *Id.* at 2.  Prior to his work in this case, he had never assessed the IMC (Ex. 35 (Kaufman Tr.) at 31:21-23) or any legal system (*id.* at 32:5-7).  He has never published an academic or non-academic article on the IMC (*id.* at 31:24-32:4) or on any legal system (*id.* at 32:8-10).  Indeed, he is not a social scientist (*id.* at 32:15-16), he does not have a Ph.D. (*id.* at 33:4-5), and he has not received training on social science methodological techniques (*id.* at 33:1-3).  In addition, Kaufman is not familiar with those studies that have examined the IMC.  He was not even aware of the Yesh Din report prior to reading the expert report of Defendants' expert, Michael Sfard.[31] Ex. 35 at 63:6-14.  Thus, Kaufman lacks the "knowledge, skill, experience, training, or education" to render his opinions.

Assuming *arguendo* that a legal practitioner could provide the proffered expert opinions, Kaufman does not have sufficient familiarity with the IMC to do so.  He is a practicing lawyer *in Israeli civilian court.  Id.* at 34:4-5 (emphasis added).  He has never served as a prosecutor or a defense attorney in the IMC.  *Id.* at 34:14-35:3.  His only experience with the IMC is as a "reserve duty judge" (*id.* at 35:12-15) in just one of the three courts in the IMC (*id.* at 38:17-39:4).  As a "reserve duty judge," he is required to sit in the IMC only "from time-to-time."  Ex. 33 at 2.  When he first began to sit as a "reserve duty judge" in the IMC, he sat only about once or twice a month.[32] *Id.* at 37:23-38:4.  "For the last couple of years, it's been very infrequent. . .

---

[31] The Yesh Din report refers to a 2007 publication by the Israeli human rights organization Yesh Din (Hebrew for "There is a law") entitled, "Backyard Proceedings: The Implementation of Due Process Rights in the Military Courts in the Occupied Territories." (Attached hereto as Ex. 36)  *See* Ex. 37 (Sfard Report) at 2.  It is a comprehensive examination of due process in the IMC.  *See* Ex. 36.

[32] Kaufman could not recall the exact year he began to serve as a reserve duty judge.  He testified "[i]t was between 2002 and 2004."  Ex. 35 at 37:2-19.

. [He has] been called maybe two or three times, maybe – maybe a bit more than that. . . . [i]t might be more than two or three." *Id.* at 35:18-36:6.  During the six months between the writing of his report in April 2013 and his deposition on October 20, 2013, he could not recall sitting even one time. *Id.* 46:8-12.  Each time he is called to sit, "[i]t's only for a day." *Id.* at 36: 22-24.

When he sits as "reserve duty judge" in one of the three courts in the IMC, his job is to "apply the law first and foremost" in the cases before him. *Id.* at 41:22-42:14.  He does not provide opinions about the "system as a whole." *Id.* at 42:15-17.  Nor does he provide opinions about whether defendants in cases not before him received due process. *See id.* at 42:18-21. Prior to his engagement in this case, he had never been asked to give an opinion about whether a defendant in a case not before him had received due process. *Id.* at 42:18-25.

As a result of his limited experience with the IMC, Kaufman could not answer basic questions about the lawyering in the IMC and instead relied on his experience as a prosecutor in *Israeli civilian court*.  For example, in response to a question about how defense attorneys in the IMC can obtain the GSS files related to their clients' interrogations, Kaufman stated, "I can't comment on that.  I can only comment on what my practice was, as a prosecutor in the office of the district attorney of Jerusalem." *Id.* at 88:5-9.  Kaufman then testified that "[he] can't comment" on whether "the practice in the civilian court in Jerusalem is different than [it is in] the military court system" because "[he's] never practiced as a prosecutor in the Israeli military courts." *Id.* at 88:10-14, 19-22.  Similarly, when asked whether prosecutors in the IMC will refuse to engage in plea negotiations unless the defense attorney consents to the admission of witness statements at trial, Kaufman testified, "I have no comment on that.  It's not within my knowledge.  I don't know what the prosecution policy is with respect to that." *Id.* at 180:6-12. In another discussion about plea bargaining in the IMC, Kaufman admitted that he "can't speak

to" whether defendants and defense attorneys in the IMC believe they will get a fair trial in the IMC (*id.* at 119:4-9) and that he does not know what happens between defense attorneys and prosecutors during plea negotiations because the judge is not involved (*id.* at 119:10-15). In sum, Kaufman does not know enough about the IMC to render opinions about it.

B.    KAUFMAN'S OPINIONS ARE NOT BASED ON A RELIABLE METHODOLOGY

1.    Kaufman's Assessment of Due Process in the IMC Is Not Reliable

At his deposition, Kaufman admitted – twice – that he did not have a methodology in providing his assessment of due process in the IMC. *Id.* at 55:1-2 ("Q: Did you have a specific methodology? A. Academic methodology? No."); *id.* at 56:10-11 ("As I said, there was no particular methodology, strict academic methodology."). In his report, he states that he took "for [his] starting point, those notions of due process enshrined in the Universal Declaration of Human Rights, which are of relevance to [his] mandate." Ex. 33 at 3. But at his deposition he admitted that it was "[a]n arbitrary choice" to start with the Universal Declaration of Human Rights (UDHR). Ex. 35 at 56:14-16. And he did not even consider those due process rights not mentioned in the UDHR, including the right to be brought before a judge without undue delay (*id.* at 59:12-14), the right to a speedy trial (*id.* at 59:15-16), the right to present a defense (*id.* at 59:17-19), and the right to compel witnesses to testify on the defendant's behalf (*id.* at 59:20-22).

Of the (few) due process rights he actually considers, Kaufman purports to "giv[e] a general overview of how these basic principles are applied by the IMC." Ex. 33 at 3. But he merely summarizes the black-letter law in the IMC. *See id.* at 4-7. He does not consider any facts or data that speak to whether defendants, in practice, received due process in the IMC during the relevant time period (*see id.* at 4-7; *see also* Ex. 35 at 61:9-22), even though he admitted that "just because the law says there is a right does not mean that that right is provided"

(*id.* at 60:23-61:1).  He did not interview individuals who work in the IMC.  *Id.* at 62:16-19.  He did not collect quantitative data.  *Id.* at 62:20-22.  He did not review studies about due process in the IMC that were conducted by NGOs such as Yesh Din and Amnesty International.  *Id.* at 63:2-17.  He did not submit his assessment to stakeholders in the IMC for their review.  *Id.* at 62:23-63:1.  To the extent that Kaufman considered evidence of the quality of due process in the IMC at all, he considered only anecdotal evidence.  *See e.g.,* Ex. 33 at 5 ("Speaking from experience, I have noted, on occasion, the desire of an accused to request a hearing *in camera* so that he may communicate information of a sensitive nature.") (emphasis in original).  But anecdotal evidence is not an adequate basis for an expert opinion.  *See Tin Yat Chin*, 371 F.3d at 40-41.

> 2.    Kaufman's Assessment of Due Process in the 21 Cases Is Not Reliable

<u>First</u>, Kaufman did not consider sufficient data.  An assessment of due process in a criminal case requires consideration of information found *outside* the court record.  *See e.g., Martinez v. Ryan*, 132 S. Ct. 1309, 1317-18 (2012) (stating "the right to counsel is the foundation for our adversary system" and "[i]neffective-assistance claims often depend on evidence outside the trial record").  But Kaufman considered only the information in the court record.[33]  *See* Ex. 35 at 44:1-5 (testifying that his opinion is each case is based "[e]xclusively on the review of the case files").  The court records in the 21 cases do not include the GSS files.[34]  *Id.* at 79:5-7.  The

---

[33] The court record does not include verbatim transcripts of the court hearings.  Ex. 35 at 72:18-74:13.  Although Kaufman testified that "[i]n [his] experience there is normally…a young female soldier, who…types away everything that is happening during the hearing" (*id.* at 73:13-16), he admitted that "now and again" the records will merely include a summary of what happened such as "'the court had the indictment read to the defendant'" rather than the actual words spoken in court (*id.* at 74:1-13).

[34] The court record also does not include the files of the prosecutor or the defense attorney (*id.* at 69:19-25), police reports (*id.* at 69:16-18), or crime scene photographs (*id.* at 71:17-72:4).

GSS files are the records from the defendants' interrogations.[35]  *Id.* at 85:4-7.  These records memorialize the interrogation techniques that were used (*id.* at 85:8-10), whether the defendant was exposed to force (*id.* at 85:11-20), whether the defendant was given food (*id.* at 85:21-25), and whether the defendant had asked for and was denied a lawyer (*id.* at 86:8-10).  They document what the defendant supposedly said during the interrogation.  *Id.* at 86:11-25.  These records were vital to the cases because, as Kaufman acknowledged, "a large proportion of [the 21 defendants] did confess and were convicted on the basis of their own confession." *Id.* at 81:1-6.  Kaufman even admitted that he would like to have seen what happened during those interrogations.  *Id.* at 87:19-25.

In addition to the GSS files, the court records of the 21 cases are missing records of pre-trial detention hearings, immunity certificates issued to withhold the disclosure of evidence, gag orders, client-attorney prevention orders, and records of trial testimony.  *See* Ex. 37 at 29-30; Ex. 38 (Sfard Tr.) at 164:25-165:13; 222:25-223:1; 247:12-19.  Michael Sfard even referred to the case file of Mohammed Messalah as a "very, very slim file" ( *id.* at 234:2) and to the case file of Uzz-a-din Hamamra as a "very partial file" (*id.* at 285:14).

Despite the absence of information in the case records, Kaufman made no effort to gather additional information outside of the record.  He did not try to speak to the lawyers or anyone else connected to the 21 cases (Ex. 35  at 92:10-13), even though he does not know whether the defense counsel in each of the 21 cases received the GSS files (*id.* at 88:1-4).  He did not try to obtain the prosecutors' files or the defense attorneys' files.  *Id.* at 92:17-93:5.

---

[35] In the IMC, a GSS interrogation can go on "for days" without access to a lawyer.  *Id.* at 81:7-15.  That period of detention, which is longer in the IMC than in Israeli civilian court (*id.* at 81:20-82:14), can be extended up to 90 days.  *Id.* at 82:7-11.

1425274.1

Instead of gathering additional information, Kaufman simply assumed that defense counsel were competent and acted in good faith. *Id.* at 116:25-117:25 (testifying that "[o]ne presumes good faith on the part of counsel representing these individuals" and "one has to presume competence"). Presuming the competence and good faith of counsel in the IMC is problematic, however. First, the IMC does not take measures to ensure that defendants receive competent representation. A lawyer need not apply for admission to the IMC; anyone who is a member of the Palestinian, Jordanian, or Israeli bar may represent defendants in the IMC. *Id.* at 144:20-145:2. There is not even a test to ensure that the lawyers speak Hebrew well enough to practice in the IMC. *Id.* at 145:8-11. When a defendant pleads guilty in the IMC, as some of the 21 defendants did, the court does not ensure that the defendant received competent representation or that he understood what he was pleading guilty to or the consequences of his decision to plead guilty. The court does not ask the defendant if he understands the rights he is giving up by pleading guilty or the maximum penalty fixed by law. *Id.* at 115:10-116:18. The court does not ask the defendant if he is satisfied with the services of his lawyer or if anyone pressured him to plead guilty. *Id.* at 116:19-117:4. The defendant does not receive a translated copy of the indictment (*id.* at 104:19-23), and the indictment is "rarely read out" to the defendant (*id.* at 110:14-111:8). The defendant does not sign a document stating that the facts in the indictment are true. *Id.* at 113:7-23. At his deposition, when confronted with the record of the guilty plea of Mohammed Messalah (case #9), which does not say that the defense attorney had explained the contents of the indictment to his client (*id.* at 113:3-6), Kaufman testified that "one would be fully entitled to *assume* that defense counsel had actually put to his client the contents of the amended indictment." *Id.* at 112:23-113:2 (emphasis added).

Second, the court records in many of the 21 cases suggest that defense counsel were not competent, or alternatively, that the IMC prevents defense counsel from being effective. In "many" of the 21 cases, the defense counsel consented to the admission of incriminating, out-of-court statements of prosecution witnesses and waived the live testimony and cross-examination of those prosecution witnesses. *Id.* at 163:15-164:13. As a result, the prosecution's witnesses were not required to testify. *Id.* at 164:5-9. In many of the trials, there was no testimony heard at all. *Id.* at 164:10-13. In the case of Moonzer Nur (#1), the defendant was convicted because his attorney consented to the admissibility *and truth* of his client's own incriminating statements. *Id.* at 148:8-149:1 (emphasis added). Kaufman testified that he "assumed" that the defendant told his attorney to consent to the admission and truth of his incriminating statements (*id.* at 149:24-150:3, 150:17-21), even though nothing in the court record indicated that the defendant told his attorney to consent to the admission and truth of the statements (*id.* at 150:8-11) and Kaufman never spoke to the defendant or his lawyer (*id.* at 150:22-151:1).

In the end, even Kaufman had doubts that he had enough information to assess whether each defendant was afforded due process:

> Q. Did you believe you had all the information you needed to render a decision in each case about whether or not there was due process?
>
> A. Once again, my mandate was to give an opinion on the basis of the information which is in front of me. Obviously, with the benefit of more information, maybe I would have decided something else. I doubt it. On the basis of what was put in front of me, I believe that these people were afforded due process.

*Id.* at 165:8-16. If Kaufman believed that he had sufficient information to render his opinions, he would have simply answered "yes" to this question.

Second, Kaufman did not employ a methodology, much less a reliable methodology, in determining whether each of the 21 defendants received due process. When asked at his deposition how he went about deciding whether the defendants received due process, Kaufman did not articulate a methodology. Instead, he testified:

> I would review the files. I would then give a general overview of what happened in the case, because I believe that to be at least 50 percent of my mandate. And then, if I noticed anything untoward or out of the ordinary, I would comment on that and deal with it in the other 50 percent, if I felt it touched on an issue of due process.

*Id.* at 63:24-64:12. Kaufman did not create a "scientific method" to guide him in determining whether a defendant was afforded due process. *Id.* at 64:22-25, 67:8-9. Nor did he have a specific set of factors that he considered in each case. *Id.* at 65:1-12; 67:8-9 ("I didn't have a scientific methodology with a checklist of factors to look out for."). When asked whether he followed a specific set of steps in reading the files and reaching his conclusions that could be repeated by someone else, he stated, "I read the files. I gave my opinion. I don't know what anyone else could have done." *Id.* at 66:14-67:2. At his deposition, Kaufman could not even recall whether he started writing his report before he had reached his opinion on whether each defendant was afforded due process. *Id.* at 64:13-16.

Furthermore, Kaufman did not apply a particular standard in determining whether a defendant was afforded due process. *Id.* at 101:8-22. In fact, Kaufman may not have applied the same standard in each case. In four of the cases, Kaufman made an affirmative finding that the defendant *was* afforded due process. *See*, e.g., Ex. 33 at 9 (case #1) ("In my opinion, the defendant was afforded due process."); *see also id.* at 18 (case #7); *id.* at 22 (case #12); *id.* at 25 (case #15). In most of the other cases, however, Kaufman merely concluded that "[n]othing in the materials which I have been provided leads me to believe that this defendant was denied due

process." Ex. 33 at 11 (case #2); *see also id.* at 19; (case #8); *id.* at 19 (case #9); *id.* at 21 (case #11); *id.* at 23 (case 13); *id.* at 27(case #17); *id.* at 30 (case #19); *id.* at 31 (case #20); *id.* at 20 (case #10); *id.* at 24 (case #14); *id.* at 26 (case #16).  At his deposition, Kaufman – a *lawyer* and a reserve duty *judge* – claimed that the difference between affirmatively finding that a defendant received due process and concluding that nothing in the record leads him to believe that the defendant was denied due process is one of "semantics" (Ex. 35 at 95:3-24) and that "[he] varied [his] language…because [he] didn't want to sound too robotic" (*id.* at 97:18-22).  Ultimately, his explanation for using certain language – "I mean, I used what I used. . . . there was no specific reason for my using [certain language].  *Maybe it's because I'm just not a scientific sociologist giving an opinion according to scientific methods.  I was just giving my view*." (*id.* 99:12-20) (emphasis added) – only reinforces the notion that he was not following a reliable methodology.

Third, Kaufman's opinions are based on the *ipse dixit* of the witness.  In the case of Bashar Barghouti (case #20), for example, he does not explain why he concludes that Barghouti's lawyer "offered him extremely fine representation."  Ex. 33 at 31; *see* Ex. 35 at 282:8-21, 283:16-21.  In the case of Majid al-Masri (case #12), he does not explain why he concludes that "[t]he evidential hearings were conducted in textbook fashion with no out of the ordinary occurrences."  Ex. 33 at 21.  What is more, Kaufman does not explain the basis for his ultimate conclusion in each case that the defendant was afforded due process.  *See Id.* at 9-32. Instead, he merely states that the defendant received (or was not denied) due process.  *See id.* at 9-32.

To be sure, Kaufman occasionally "comments" on an event in a case that "touches" on an issue of due process.  *See* Ex. 35 at 64:3-12 ("[I]f I noticed anything untoward or out of the ordinary, I would *comment* on that and *deal* with it… if I felt it *touched* on an issue of due

1425274.1

process.") (emphasis added).  But his comments are not an explanation for his opinion that the defendant was afforded due process.  Rather, his comments are an attempt to explain away an apparent due process violation.  For example, in the case of Kahira Sa'id Ali Sa'adi (case #4), Kaufman first points out "the fact that the Court…informed the parties that one of the members of the judicial tribunal had business relations with [the defendant's attorney] from time to time." Ex. 33 at 13.  But then he concludes that "[s]uch a declaration suggests that the Court was fully aware of the need to disclose any conflicting interests so that the impartiality of the tribunal be preserved."  *Id.*  In fact, the court's actions show, at most, that the court was concerned with the *appearance* of impartiality.  The court did not ask the defendant at her sentencing if *she* objected to the conflict of interest (Ex. 35. at 198:9-13), which Kaufman admitted he would have done if he were the judge in the case (*id.* at 196:4-11).

Whereas Kaufman cites relatively minor due process violations as evidence of due process, he simply ignores major due process violations.  For example, he ignores the fact that one attorney, Awdeh, who "effectively admitted malpractice" by "allowing his client [Ahmed Sa'ad (case #18)] to plead guilty to facts for which…there was no evidence" (Ex. 33 at 28), represented four defendants who were charged in connection with the same incident.  Ex. 35  at 186:8-11.  Worse yet, he ignores the fact that one of Awdeh's clients, Hilmi Abd-al-Karim Mohammed Hamash (case #15), was convicted based on evidence from one of *Awdeh's other clients*, Ahmed Salah Ahmed Salah (case #16).  *Id.* at 189:2-14 (emphasis added).  During his deposition, Kaufman tried to claim that this conflict was merely a "*potential* for a conflict of interest" (*id.* at 189:15-17) (emphasis added), but upon further examination he admitted that it was a "*real* conflict of interest," not a potential one (*id.* at 190:7-9) (emphasis added).  He also admitted that he did not recollect whether he was aware of this real conflict of interest at the time of his

review of the cases. *Id.* at 190:10-12. Kaufman also ignores the fact that a different attorney, attorney Ahraj, represented three defendants charged in connection with the same incident and yet another attorney, attorney Samara, represented two defendants charged in connection with the same incident. *Id.* at 190:22-193:14.

Kaufman also ignores the fact that Kahira Sa'id Ali Sa'adi (case #4), the defendant whose lawyer had business relations with the judge, and another defendant, Sana'a Mohammed Shchada (case #5), both claimed that they were tortured during their interrogations. *Id.* at 239:24-240:3. At his deposition, Kaufman could not even recollect these and other allegations of torture (*id.* at 236:3-13), even though the prohibition of torture was the first legal principle he discussed in his report (Ex. 33 at 4) and was supposedly "foremost in [his] mind" when he was reviewing the cases. Ex. 35 at 236:14-237:2.

In sum, Kaufman fails to explain the basis for his conclusions and he ignores information that undermines them. Accordingly, his testimony should be excluded.

C.    KAUFMAN'S TESTIMONY WILL NOT ASSIST THE JURY

Kaufman's opinions about the IMC and the 21 cases would be helpful to the jury only *if* the Court admits evidence of the 21 IMC convictions at trial. Otherwise, expert testimony about the IMC is not relevant at all. For the reasons discussed in Defendants' Motion for Summary Judgment, evidence of the 21 IMC convictions are not admissible under Federal Rule of Evidence 803(22) because, *inter alia*, they are not convictions of a United States court. *See Small v. United States*, 544 U.S. 385 (2005).

In addition, Kaufman impermissibly opines about the motivations and intentions of the defendants in the underlying cases. In some cases, Kaufman opines on the defendant's reason for confessing or pleading guilty:

79

- "At the end of the day, the defendant was motivated by an ideological desire to admit his crimes." Ex. 33 at 30 (case #19);

- "[The defendant's] confession was voluntary and ideologically motivated." *Id.* at 24 (case #14);

- "There is no doubt in my mind that this defendant was eager to plead guilty for ideological reasons and was not minded, in any way at all, to benefit himself of any [of] the procedural safeguards which could have been afforded him." *Id.* at 16 (case #6); and

- "The defendant's speech in mitigation makes clear his remorse and reinforces my opinion that he voluntarily confessed to the physical elements of the crimes of which he was found guilty." *Id.* at 28 (case #18).

In other cases, Kaufman opines on the defendant's reason for committing the offense:

- "From the reasoned sentencing judgment, it is apparent that the defendant justified the deeds to which he had pleaded guilty as a reaction to 'the Occupation.'" *Id.* at 19 (case #9); and

- "The defendant's utterances during the sentencing hearing confirmed the ideological basis for his offence and the voluntary nature of his confession." *Id.* at 20 (case #10).

Because Kaufman's opinions contain "inferences about the intent or motive" of the defendants,

his testimony lies "outside the bounds of expert testimony." *In re Rezulin Prods. Liab. Litig.*,

309 F. Supp. 2d at 547. His testimony should therefore be excluded.

## VIII.  SHRENZEL'S AND KAUFMAN'S TESTIMONY SHOULD ALSO BE EXCLUDED BECAUSE PLAINTIFFS' COUNSEL OBTAINED AN EXTENSION FOR THEIR EXPERT REPORTS BASED ON FALSE REPRESENTATIONS TO THE COURT

Plaintiffs' expert reports were originally due on January 21, 2013. *See* DE 131 (June 27,

2011). Plaintiffs' counsel did not submit any expert reports by that date, nor did they seek leave

of the Court for an extension prior to that deadline. In seeking an extension of the then-expired

deadline at a hearing on February 13, 2013, Plaintiffs' counsel told Magistrate Judge Ellis that

the work on the expert reports had "started." Feb. 13, 2013 Hearing Tr. at 44:18-20. Magistrate

Judge Ellis subsequently ordered Plaintiffs to submit expert reports by March 25, 2013. *See* DE

310 (Feb. 26, 2013). On March 20, 2013, Plaintiffs' counsel filed "an extremely urgent time-

critical application" for an extension deadline for three of their expert reports.[36] Ex. 39 (March 20, 2013 Letter from Robert J. Tolchin to the Hon. Ronald L. Ellis) at 1. In that letter, Plaintiffs' counsel claimed that the three experts "have been working diligently to complete the reports *for quite some time now*" but that three of the experts "have notified [Plaintiffs] that it will be extremely difficult or impossible for them to complete their reports by [the March 25, 2013 deadline]." *Id.* at 1-2 (emphasis added). The Court granted the Plaintiffs' request for an extension until April 10, 2013. *See* DE 312 (Mar. 22, 2013).

In fact, when Plaintiffs sought the extension on March 20, 2013, Shrenzel and Kaufman had not "been working diligently to complete the reports for quite some time." Ex. 39 at 1. At his deposition, Shrenzel, who produced his report on April 10, 2013 (*see* Ex. 25 at 77), testified that he was first contacted about working on this case "approximately two weeks prior to the date of the filing of the expert opinion." Ex. 30 at 9:2-5; *see also id.* at 9:8-12 (testifying that "[i]t might have been two and a half weeks" between the time he was first contacted to work on this case and the time he produced his report). Likewise, at his deposition, Kaufman testified that he was first asked to write his report "shortly before[]" the April 10, 2013 deadline. Ex. 35 at 19:15-16. Although Kaufman did not recall the exact date he was asked to write the report, he testified that it was "somewhere in the middle of *March*." *Id.* at 19:15-17 (emphasis added). He even recalled "being pretty furious" with Plaintiffs for having "requested to write the report within ten days or something like that, maybe a bit more." *Id.* at 16:24-17:11.

Thus, when Plaintiffs' counsel sought another extension of the deadline on March 20, 2013, Shrenzel and Kaufman had not "been working diligently to complete [their] report[s] for

---

[36] Although the letter did not specify that Shrenzel and Kaufman were two of the three experts for whom the Plaintiffs were seeking an extension, Shrenzel's and Kaufman's reports were two of the three reports submitted after the March 25, 2013 deadline.

quite some time." Plaintiffs' counsel therefore sought an extension of the January 21, 2013

deadline and the March 25, 2013 deadline based on false representations to the Court.

Accordingly, their testimony should be excluded for that reason alone.

## IX. PLAINTIFFS' EXPERTS' TESTIMONY SHOULD BE EXCLUDED TO THE EXTENT THAT THEY RELIED ON MATERIALS PRODUCED AFTER THE CLOSE OF FACT DISCOVERY

During fact discovery, Magistrate Judge Ellis repeatedly warned Plaintiffs that

documents not produced during fact discovery would not be admissible at trial, and that if their

experts relied on any documents that were not produced during discovery, the testimony of those

experts would not be allowed. Specifically, he stated, "I don't want an expert coming in here

and saying, okay, I looked at document 747 and the defendant says, I've never seen 747. Okay.

*If you have an expert who relies on a document you didn't produce to the defendants, that*

*expert's testimony is not going to be allowed.*" Mar. 20, 2012 Hearing Tr. at 62 (emphasis

added); *see also* Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information…as required by

Rule 26(a) or (e), the party is not allowed to use that information…to supply evidence on a

motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless.");

Fed. R. Civ. P. 37(c)(1)(C) (authorizing the imposition of other appropriate sanctions). While

Judge Ellis's statements were made in the context of a discussion about damages experts, there is

no reason to treat documents relied on by liability experts differently. In fact, during a broader

discussion about discovery, Judge Ellis stated, "[I]f I have to do an order at the end of this to

make it clear, any responsive documents not produced *during* discovery will be inadmissible at

trial." July 10, 2012 Hearing Tr. at 29-30 (emphasis added). He further stated at the close of

fact discovery, "I don't expect anybody to hit me with something that's new and if somebody

hits you with something that's totally new or unexpected it's going to be problematic." Dec. 20,

2012 Hearing Tr. at 20.

Fact discovery closed on December 21, 2012.  *See* DE 131.  Yet, in reaching their opinions, Plaintiffs' experts relied on materials provided to them by Plaintiffs' counsel *after* the close of fact discovery, which were not provided to Defendants prior to the close of fact discovery.  Consider Nick Kaufman, for example.  In reaching his opinion that each of the 21 defendants in the IMC received due process, Kaufman relied "[e]xclusively on [his] review of the case files."  Ex. 35 at 44:1-5.  He received the case files from Shurat HaDin (*id.* at 20:1-3), the Israeli organization that represents Plaintiffs.  *Id.* at 20:4-24.  Although he could not recall the exact date that he received the case files from Shurat HaDin (*id.* at 18:7-11), he was certain that he received them in 2013:

> Q.   And did you receive the case files – did you begin to receive the case files in 2012 or 2013?
>
> A.   I would say in 2013.  That definitely I can say.
>
> Q.   And you received them in piecemeal in 2013?
>
> A.   Yes.

*Id.* at 19:20-25.  Thus, Kaufman relied on materials produced to him after the close of fact discovery to reach his opinions.  Worse yet, Defendants had sought those very case files from Plaintiffs in their August 2011 Requests for the Production of Documents and Things but they did not receive the vast majority of them until Plaintiffs submitted Kaufman's report on April 10, 2013.[37]

Because Plaintiffs' experts relied on materials that were only produced to Defendants for the first time after the close of fact discovery, this Court should exclude their testimony, at least to the extent that they relied upon such materials.

---

[37] As discussed in Defendants' letter to Magistrate Judge Ellis on May 6, 2013, only 15% of the pages relied up on by Kaufman were disclosed to Defendants prior to the close of fact discovery.  *See* Ex. 40 (May 6, 2013 Letter from Brian A. Hill to the Hon. Ronald L. Ellis) at 2.

83

## CONCLUSION

For the reasons stated above, the Court should exclude Plaintiffs' seven case-in-chief liability experts from testifying at trial in this matter.


May 2, 2014                              Respectfully Submitted,

                                         /s/ Brian A. Hill
                                         Mark J. Rochon
                                         Richard A. Hibey
                                         Laura G. Ferguson
                                         Brian A. Hill
                                         MILLER & CHEVALIER CHARTERED
                                         655 15th Street, NW, Suite 900
                                         Washington, DC  20005-6701
                                         (202) 626-5800 [tel]
                                         (202) 626-5801 [fax]
                                         mrochon@milchev.com [email]

                                         *Counsel for Defendants the Palestinian Authority and the Palestine Liberation Organization*

84