# Exhibit 1

I.    **Introduction**

I have been engaged by counsel for the Palestinian Authority (PA) and the Palestine Liberation Organization (PLO) in this matter to serve as a testifying expert witness. This report is for use in the *Sokolow v. PLO* case (No. 1:04-cv-397) currently pending in the United States District Court for the Southern District of New York.

I have been requested by Counsel for the PA and PLO to prepare a report based upon my experience and training concerning the qualifications, methodology, and ultimate conclusions of the following potential expert witnesses offered by the plaintiffs in the case: Efraim Karsh, Nicholas Kaufman, Matthew Levitt, Jeffrey Addicott, Itamar Marcus, and Alon Eviatar.

    A.    Expertise

As indicated in my CV, I am a Professor of Sociology and earned my PhD in Sociology in 1994.  Sociology, generally, is the study of the organization, functioning, and classification of human societies.  Relevant to this case, I have spent a portion of my career studying the sociology of expertise. My research in this area involves examining how expertise is created and how it is used in society in relation to a variety of issues including scientific expertise and specifically in relation to expertise in terrorism. I have studied the way in which terrorism and political violence have been portrayed, going back to my doctoral thesis (in 1994) which examined the conflict in Northern Ireland.[1] I have also, since that time, been interested in the way in which government and related institutions engage in public relations and propaganda activities. More recently, I undertook a study on the way in which academia and the press evaluated expertise in terrorism.[2] This study used citation data to examine which 'experts' were most highly cited in scholarly journals and compared this with those most highly cited in the global English language press, and found that the most highly cited academic experts featured rarely in the press and conversely that those described as 'experts' in the press were not among the most highly cited in the scholarly literature. In some cases this appeared to be because some of those cited in the press did not possess any real degree of expertise in the topics on which they were quoted, but simply were members of intelligence, military or policing agencies or were closely connected to them such as being involved in think tanks with close links of that type. The approach taken to expertise in this work and in other similar research is that of comparing and evaluating datasets against each other. This is important because it allows the comparison of the way in which differing domains (the press, academia for example) treat 'expertise', while avoiding subjective judgements about individual levels of expertise. In 2012 I was awarded a 'Global Uncertainties Leadership Fellowship' to run from January 2013 to mid 2015.[3]  This is a competitive, peer reviewed award from the Economic and Social Research Council, the main public social science funding agency in the UK. It was awarded to further develop my research on terrorism expertise.[4]

    B.    Methodology

This report examines each expert in turn and addresses several questions. Firstly, did their biography demonstrate a record of relevant replicable expertise? Secondly, where appropriate, what patterns of citation did the work of each potential expert garner? Thirdly, how is their work evaluated by other academics?  Fourthly, did their expert reports demonstrate the application of a replicable expert methodology? This involved examining sources of data and how they were used, via the following methods:

- **Expertise analysis** – this involves examining the stated expertise of an expert witness, testing the accuracy of the CV and evaluating the expertise in relation to the topic under discussion.  To do this I examined the biographies provided by the plaintiffs and also looked at relevant material such as newspaper articles available on the internet or on databases such as Nexis. The question of whether their experience came from institutions that are a valid source of replicable expertise was examined. This suggested a particular problem in the case of a number of the experts considered, who base their claim to expertise on experience with clandestine intelligence, rather than open, peer-reviewed evidence.

- **Citation analysis** – this determines patterns and trends of citations of the work of the relevant experts.  This shows how often and how extensively the work of particular authors has been cited by others.  It is a crude indication of the extent to which the work of a scholar has been referred to by others since it is obviously the case that a work can be cited for positive or negative reasons.  Citation patterns are, however, significant metrics in the measurement of academic performance.

- **Scholarly evaluation** – this documents the way in which scholarly work is received and evaluated by other scholars. This allows a more fine-grained analysis of scholarly reception than citation analysis. Also considered was whether a review of the available evidence disclosed potential issues of bias, and whether their methodology had been subject to relevant criticism in the past.

- **Source analysis** – this examines the sources used and assesses their reliability, including any known weaknesses or biases in the sources. To answer this I undertook a critical reading of the expert reports provided. I examined whether evidence was provided for the conclusions reached, whether the evidence cited was accurately described, whether the evidence used was itself reliable, and whether it was used in a replicable expert manner. Problems encountered included the reliance of a number of experts on a small range of sources, which are themselves biased or methodologically and even ethically suspect, as for example, in the case of uncorroborated confession evidence obtained by institutions with a record of using physical abuse and/or torture against detainees.

The methodological techniques used here can be used by any other researcher and can be replicated – the key indicator of scientific testability.  While this report and the opinions in it do depend on my previous research experience in a general way, in this report every attempt has been made to indicate and reference the empirical evidence and data that underpin the opinions here.

My CV and publications list is attached.

In the past four years I have testified as an expert witness in the following case:

- Upper Tribunal (Immigration and Asylum Chamber) Appeal Number: IA/21631/2011 Between Raed Salah Mahajna and THE SECRETARY OF STATE FOR THE HOME DEPARTMENT

I am being compensated at the rate of $125 per hour in connection with my work on this matter.

2

Based upon my review, my opinions are as follows:

- Each of the potential expert witnesses has ties to Israeli government organizations and/or strongly pro-Israel, anti-Palestinian organizations, which creates concerns about bias. Moreover, because each of the witnesses relies heavily on a limited pool of sources, including Israeli intelligence offices, Israeli government reports, and pro-Israel private organizations, the opinions of each of the potential expert witnesses are not independent from one another and suffer from the same fundamental flaws.

- The potential witnesses are not experts in the areas about which they claim to have expertise. Many are not scholars engaged in analysis of facts by application of specialized knowledge, but are rather partisans with a vested interest in the areas about which they opine. In the limited instances where the potential witnesses' work has been subjected to peer review, the work has been criticized or discredited and proven to be unreliable.

- The potential experts did not employ any recognizable or valid methodology in reaching their conclusions. Instead, each appeared to selectively pick only the source material that supported his conclusions, while ignoring contrary evidence and failing to examine whether the source material was reliable and trustworthy. In many instances, the potential experts relied upon non-public intelligence documents and/or the expert's own experience as an intelligence officer. These fundamental flaws in the methodology of review make the resulting opinions untrustworthy and largely unhelpful.

- In some instances, the opinions of the potential witnesses do not appear to be their own, but instead appear to have authored by someone else.

For purposes of efficient organization, this report will take each potential expert witness in turn, which means that some themes will be repeated as they re-appear with multiple individuals.

II.    **Efraim Karsh**

A.    Background and Institutional Affiliations

Efraim Karsh is Professor of Middle East and Mediterranean Studies at King's College London. He was awarded a BA by the Hebrew University, Jerusalem in 1974. He then served as an Intelligence Officer in the Israel Defence Forces (IDF) for seven years, where he 'dealt with superpower involvement in the Middle East rather than with Arab affairs'.[5] During this time he studied toward an MA at Tel Aviv University (which he completed in 1980).

Professor Karsh left the IDF in 1981 at the rank of Major and in 1982 became Director of Studies in International Relations at Israel's Open University and an Assistant and Instructor in International Relations at Tel-Aviv University. He was awarded a PhD in political science and international relations[6] by the latter institution in either 1984 or 1985.[7] Until 1989, Professor Karsh was a senior research associate at the Jaffee Center for Strategic Studies at Tel Aviv University ('Jaffee Center'), during which time he was seconded to the International Institute for Strategic Studies in London (1985-86).[8]

The Jaffee Center for Strategic Studies was founded in 1977 by Aharon Yariv, a retired major general and a former head of military intelligence at the IDF. As Professor Nicholas J. Cull notes, prior to establishing the Center for Strategic Studies, Aharon Yariv was the Israeli government's head of propaganda:

> In response to a sense of increasing diplomatic distress over international
> criticism of Israel's control of territories conquered in the Six Day War, the
> government decided to concentrate propaganda efforts in a special official
> body, the Information Ministry, entrusted to Brig. (res.) Aharon Yariv…[9]

By its own account, the Jaffee Center, was not a scholarly institute but rather sought to 'address the strategic community in Israel and abroad' and to contribute to 'Israel's national security agenda.'[10]  In so doing, the Jaffee Center maintained very close links with the Israeli military and intelligence services.  In addition to Karsh and Yariv, the Center employed a number of other former intelligence officers over the years, including Yossi Alpher,[11] Shlomo Brom, Ephraim Kam and Aryeh Shalev.[12]  Indeed, so close was the relationship between the Center and Israeli intelligence that the Historical Dictionary of Israeli Intelligence states that it can 'be considered the academic equivalent to the Military Intelligence (MI) unit of the Israel Defense Forces'.[13]

In 2011, Professor Karsh was appointed director of the Middle East Forum (MEF),[14] a right-wing think-tank that launched the controversial 'Campus Watch' and 'Islamist Watch' programmes.  Karsh has served as the editor of its flagship publication the *Middle East Quarterly* since 2010,[15] having first written for the journal in 1996.[16]

The MEF was founded by Daniel Pipes, a former scholar of the Middle East who since the mid-1980s has worked largely as a right-wing essayist and activist.  Pipes and the MEF have been widely criticized for campaigns against mainstream Middle Eastern scholarship in Canada and the United States.  The Center for American Progress has argued that the MEF, and Pipes, are part of 'a small, tightly networked group of misinformation experts' that 'peddle hate and fear of Muslims and Islam'.[17]

According to former MEF board member Jerry Sorkin, the MEF began to adopt a particularly extreme and pro-Israel position after the September 11th attacks.[18]  In 2002 it launched Campus Watch, an organization described by political scientists John Mearsheimer and Stephen Walt as a 'transparent attempt to blacklist and intimidate scholars'.[19]  Daniel Pipes has labelled more than a hundred American scholars as 'apologists for suicide bombings and militant Islam.'[20]  The US scholar Juan Cole has accused him of 'smearing and bullying people with whom he disagrees' and of having spied on, threatened and lied about scholars on the Middle East.[21]  Professor Cole describes Pipes as a propagandist[22] and an extremist who has supported 'aggressive annexationist policies' and 'brutal murders and repression' 'to the hilt'.[23]  He also claims that Pipes misrepresents Palestinian politics and specifically Palestinian attitudes towards Israel.[24]  According to Eyal Press, a journalist with *The Nation*, Pipes has a habit of 'lifting quotes out of context'.[25]

Karsh's immediate predecessor as editor of *Middle East Quarterly*, was Denis MacEoin, who remains a Senior Editor of the journal.[26]  MacEoin emerged as a right-wing activist in 2007 after authoring a controversial report for the British think-tank, Policy Exchange. The report, titled *The Hijacking of British Islam*, claimed to 'demonstrate unequivocally that separatist and hate literature, written and disseminated in the name of Islam, is widely available in the UK.'[27]  The BBC subsequently uncovered evidence that the evidence in the report had been fabricated.[28]  In addition to his role at MEF, MacEoin now runs a blog entitled 'A Liberal Defence of Israel' and is involved with pro-Israel advocacy in the UK.[29]

The MEF is connected to other organizations involved in pro-Israel advocacy, and in spreading misinformation on Islam and Muslims, via its donor networks. An investigation by RightWeb found that the funding for the MEF comes primarily from pro-Israel organizations and other right-wing outfits.[30] A number of its key donors support other alarmist outfits also identified by the Center for American Progress as part of 'the Islamophobia Network in America'.[31] It found that between 2001 and 2009 the Middle East Forum received grants from six of the seven largest donors to anti-Muslim groups,[32] meaning that it shared donors with all eight of the key anti-Muslim organizations identified by the authors of the report.[33] In addition, the Middle East Forum has itself provided research grants to other allegedly Islamophobic organizations detailed in this report, including the David Horowitz Freedom Center, the Center for Security Policy, the Investigative Project on Terrorism, MEMRI and NGO Monitor.[34]

According to his CV, in 2007-10, Karsh received a $260,000 grant (by far the largest he has ever received) from the Hertog Foundation for a book on the origins of the Arab-Israeli conflict. The Hertog Foundation is the philanthropic foundation of the neoconservative businessman, Roger Hertog. It supports a number of right-wing, alarmist groups and extremist pro-Israel organizations. In recent years the Hertog Foundation has supported the Middle East Forum; the Middle East Media Research Institute (MEMRI), which is used as a source by a number of the plaintiffs' proposed experts in this case; *Commentary* magazine, where Professor Karsh is a regular contributor; the Anti-Defamation League, an organization alleged to smear critics of Israel as anti-Semites; the Washington Institute for Near East Policy, a think-tank spun off from the leading US pro-Israel lobby group AIPAC that currently employs another of the plaintiffs' proposed experts, Matthew Levitt; the Institute for Zionist Strategies, an Israeli organization known for attacking Israeli academics; and the Centre for Security Policy.[35] Two other notable grant recipients are the Central Fund of Israel and the Israel Independence Fund,[36] both of which support far-right Israeli settlement organizations.

B.      Lack of Relevant, Peer-Reviewed Scholarly Work

In his CV, Professor Karsh references his 'vast scholarly output –15 authored books, 15 edited volumes, 5 monographs, over 100 academic articles, and some 60 op-ed pieces.' A bibliographical analysis of his output however indicates a notable decline in citation by other scholars over the last decade, whilst an examination of the themes of his writing suggests a shift away from conservative scholarship, towards far-right, pro-Israel, political activism. In short, the writing he has done is outdated and not focused on the issues upon which he now seeks to offer an opinion. Much of it has appeared in publications that are not peer reviewed, and when his work has been peer reviewed, it has come under significant criticism for selective and misleading use of evidence.

The academic indexing service, ISI Web of Knowledge, currently contains a total of 99 articles authored or co-authored by Professor Karsh dating back to 1985 (roughly half of which were published in magazines and other non-peer reviewed publications.)[37] Together, these 99 articles have been cited a total of 43 times in other articles indexed by ISI Web of Knowledge (38 times excluding citation by Professor Karsh to his own articles.)

The articles indexed by ISI Web of Knowledge for Professor Karsh's first five years of academic publishing (1985-1990) overwhelmingly appeared in publications affiliated with foreign policy think-tanks rather than scholarly journals. Of the thirteen articles indexed by ISI Web of Knowledge from this period, three were published in *World Today* and

four in *International Affairs*, both of which are associated with the UK think-tank Chatham House (and only the latter of which is a peer reviewed publication). Two indexed articles were published in the German foreign policy magazine *Europa-Archiv*, one in the *Middle East Journal*, which is published by the Middle East Institute, and one in the peer reviewed scholarly *Journal of Peace Research*. Another two indexed articles were published in *Orbis*, the journal of the US Foreign Policy Research Institute. At that time, Daniel Pipes was the director of the US Foreign Policy Research Institute (out of which his Middle East Forum later emerged) as well as the editor of *Orbis*.[38] These early articles were largely strategic analyses of superpower rivalry in the Middle East.

According to Google Scholar, Professor Karsh's two most cited books are *The Gulf conflict, 1990-1991: Diplomacy and war in the new world order*, a 1993 book co-authored with his King's College colleague Lawrence Freedman, and *Saddam Hussein: A political biography*, a 1991 book co-authored with his partner Inari Rautsi.[39]

Since the 1990s, Professor Karsh's academic impact (as gauged by the citation of his articles in ISI Web of Knowledge's databases) has declined significantly. For a decade now his work has appeared largely in non-scholarly publications and has been very rarely cited by other scholars. Figure 1 displays the total citations of articles authored or co-authored by Professor Karsh (indexed by ISI Web of Knowledge) by their year of publication.



**Figure 1 Graph showing citation of articles by Professor Karsh by year of publication**

As shown in *Figure 1*, though Professor Karsh's articles authored between the mid-80s and mid-90s have been fairly widely cited, indexed articles authored in the last decade have been cited only three times in total. These three citations are of two articles; one co-authored article published in the scholarly *Journal of Contemporary History* in 2004,[40] and another published in *Israel Affairs*[41] – a scholarly journal founded and edited by Professor Karsh (where Daniel Pipes is also a member of the editorial board).[42]

In addition to those two cited articles, Professor Karsh has authored a further 23 indexed articles since 2003 which have not been cited by any other indexed articles in ISI Web of Knowledge's databases.  These include fifteen articles in the political magazine *Commentary* – which has described itself as 'the intellectual home of the neoconservative movement' – and another four in Karsh's *Israel Affairs* journal.

This overall decline in academic impact has been contemporaneous with Professor Karsh's increased engagement in right-wing activism, culminating in his appointment as director of the Middle East Forum in 2011.

Professor Karsh's affiliation with controversial right-wing pressure groups appears to have stemmed from his outspoken criticisms of Israel's 'new historians' –  a term used to describe a number of Israeli scholars who from the mid-1980s began to question key aspects of official Israeli history.  In 1996 – by which time he had by his own account '[given] up political history'[43] – Professor Karsh wrote several highly critical reviews of work produced by 'new historians' Benny Morris, Avi Shlaim and Ilan Pappé.  Karsh's reviews were roundly criticized by those historians.  Responding to an article by Professor Karsh published in Daniel Pipes' *Middle East Quarterly*, Avi Shlaim accused him of distortion and misrepresentation and of making claims 'without any basis in fact'.[44] Similarly, Benny Morris referred to Professor Karsh's article as 'a mélange of distortions, half-truths, and plain lies'.[45]  More recently, Morris has described Professor Karsh as 'completely politically motivated, often unscholarly, and, in large part, propagandistic'.[46]

Karsh's criticisms of the 'new historians', and his defence of official Israeli history, led to the publication in 1997 of his third most cited work (according to Google Scholar), *Fabricating Israeli History*, which was republished in 2000.  Reviewing the book on its original publication, Ian Lustick, founder and former President of the Association for Israel Studies, wrote:

> [H]owever likely readers are to be impressed by the intensity of Karsh's pristine faith in Zionism, they are sure to be stunned by the malevolence of his writing and confused by the erratic, sloppy nature of his analysis.  Errors, inconsistencies and over-interpretation there may be in some of the new Israeli histories, but nothing in them can match the howlers, contradictions and distortions contained in this volume.[47]

Reviewing the second edition of the book, Professor Karsh's King's College colleague, the British-Israeli political scientist Ahron Bregman, wrote:

> *Fabricating Israeli History*, even in this new edition, is part of a disappearing school of thought, while a new generation of Israeli historians – open minded enough to look at *all* the evidence – is emerging.

Professor Bregman's reference to '*all* the evidence' (his emphasis) is significant since Professor Karsh has been repeatedly criticized for focusing on sources which support his argument, whilst failing to engage with the full range of evidence – a tendency which – if true - raises serious questions about this reliability as an expert witness.

In a sympathetic review of his most recent book, *Palestine Betrayed*, Colin Shindler, Professor of Israeli Studies at SOAS, noted that Professor Karsh uses 'selective quotation' to argue that Palestinians are dedicated to an 'eternal struggle' against Israel.[48]

Reviewing Professor Karsh's 1999 book, *Empires of the Sand* (co-authored with his wife Inari Karsh), Charles D. Smith, noted the authors' 'extreme selectivity in citing their sources', their '[failure] to consult key sources' and their tendency to '[distort] the meaning and context of evidence they use.'  Professor Smith noted that

> They extract sentences out of context, or juxtapose documents that conflict with each other, to buttress their case, with no indication that their material as a whole often points in a different direction.

He continued:

> It is difficult to know how much of the misrepresentation in this book is deliberate or due to incompetence, but it is clear that material has been arranged to create impressions at odds with the full documentary evidence.[49]

At least one example however, according to Professor Smith, pointed to a 'deliberate selectivity of sources to obscure what occurred.'[50]  He concluded that the book was 'essentially a work of propaganda, but still of use to students who wished to see how scholars could misrepresent sources.'[51]

Reviewing Professor Karsh's 2006 book *Islamic Imperialism*, Henry Chambers noted Professor Karsh's 'historical selectiveness', writing that: 'Incidents that support his thesis are included; others... are absent.'[52]  Richard W. Bulliet noted 'many instances' of 'factual errors and gaps between rhetoric and reality' and wrote that the book was 'selling ideology, not historical acumen'.[53]

Professor Karsh has been accused of misrepresentation by the media watchdog group, Fairness and Accuracy in Reporting (FAIR).  In 2010 Professor Karsh authored a *New York Times* opinion piece in which he sought to refute the 'conventional wisdom that the resolution of the Palestinian-Israeli conflict is a prerequisite to peace and stability in the Middle East…since Arabs and Muslims are so passionate about the Palestine problem'.[54] The 'poll' around which the piece was based was in fact not a scientific poll at all, but a website readers survey, whilst its wording referred not to Palestine or Palestinians but to respondents' 'level of interest in the 'Middle East peace process".  FAIR commented that:

> Karsh's claim that the Arab public is presently 'apathetic' about the plight of Palestinians rests on an unreliable Internet poll, and on excluding other polling that would suggest precisely the opposite. According to the Zogby/University of Maryland poll of Arab public opinion (5/09), 76 percent of respondents put 'the Palestinian issue' as either the 'most important' issue or as one of their 'top 3 priorities.'[55]

It concluded that Karsh had 'erroneously treated an unscientific website poll as if it were a meaningful survey of public opinion, and misrepresented even its findings'.[56]

C.    Lack of a Valid Methodology in his Expert Report

Many of the methodological shortcomings that appear to mar Professor Karsh's earlier writing reappear in his expert report.  This is perhaps unsurprising as his report appears to be in large part cut and pasted from his 2003 book, *Arafat's War: The Man and His Battle for Israeli Conquest*.  Reviewing that book in the *Washington Post National Weekly Edition*, the Managing Editor of *Foreign Affairs* magazine, Jonathan Tepperman, described it as a 'rushed' 'polemic' 'essentially assembled from secondary sources'.[57]  It was also reviewed in the Israeli daily *Haaretz* by Yossi Alpher, a former advisor to former Israeli Prime Minister Ehud Barak and like Professor Karsh a former military intelligence officer who went on to work at (and later head) the Jaffee Center for Strategic Studies. Alpher wrote that *Arafat's War* had a 'disturbing' 'lack of nuance, depth and balance...' compounded by lack of attention to fact, detail and the correct spelling of names.'  He noted that no Palestinians were interviewed at all for the book and that it failed to cite 'recent scholarly works by highly qualified Palestinians such as Khalil Shikaki and Yezid Sayigh, both of whom have attempted to explain Arafat's strategic thinking (or lack thereof) and the socioeconomic and political underpinnings of the current conflict.'  He continued:

> Karsh's reputation was built in part on his critique of the Israeli new historians, arguing that Prof. Benny Morris and others allegedly abused source material to implicate Israel in the expulsion of some of the 1948 refugees. Accordingly, one would expect Karsh to exercise great care in selecting and handling his own sources. Instead, he indiscriminately cites Israeli media sources – not all reliable or unbiased politically. He quotes at length and with evident glee from the shocking descriptions of Arafat contributed by a Romanian intelligence chief who defected to the West in 1978, Ion Pacepa, some of whose allegations never checked out.[58]

Professor Karsh's expert report suffers from many of the same flaws. Some of Professor Karsh's conclusions do not demonstrate any analysis or the application of any discernible methodology to complicated facts.  For example, Karsh claims that the Palestinian leadership was never committed to the principles of the peace process and that the Oslo Accords were seen merely as one step towards the PLO's long-term objective of establishing a Palestinian state in the whole of historic Palestine.  He draws this absolute conclusion from reported statements of senior members of the PLO either implying political ambitions beyond the 1967 borders or suggesting an ambiguous or contingent commitment to the peace process.  In announcing his conclusion, Karsh does not acknowledge that Palestinians have overwhelmingly viewed the establishment of a Palestinian state within the 1967 borders as a political *compromise* rather than an ideal outcome, or recognize that any peace process involves compromise between rival political actors.  Karsh does not consider that statements suggesting that the Palestinian leadership viewed the peace process as ambiguous or contingent could have resulted from a distrust of Israel's willingness to enter into a final settlement but rather concludes they simply show an unwillingness by the Palestinian side to meet their obligations.

Professor Karsh's report shows no evidence of a methodology capable of dealing with this kind of complexity.   There is little by way of social, economic, or even political, context and there is no analysis at all of the actions and motives of Israeli actors. As Yossi Alpher noted in reviewing *Arafat's War*, Karsh has nothing 'critical to say about Israel's contribution' to the collapse of the peace process and 'mentions neither the larger problem of settlement expansion nor examples of Jewish extremism'.[59]  There is virtually

no mention of social, economic, or even political context. The report instead is comprised of little more than a series of quotations from Palestinian officials that Professor Karsh takes to be evidence of malign intent. This partiality and lack of analytical rigour is evident in Professor Karsh's tendency to ascribe violent intentions to Palestinian actors without sufficient supporting evidence; and even to equate certain forms of political or civil settlements with violence and destruction. On page 7 for example, Professor Karsh cites Yasser Arafat's statement that, 'I may not live to see it, but I promise you that in the future, Israel and Palestine will be one united state' as a 'PLO euphemism for the destruction of the State of Israel'; hardly a sustainable position given that the statement plainly alludes to the *incorporation* rather than the *destruction* of Israel. Another example can be found on page 9 where Karsh describes the right of return of Palestinian refugees as a strategy for 'the destruction of Israel through demographic subversion'. Later, on page 13, he describes Yasser Arafat's allusion to 'a democratic state in which Muslims, Christians and Jews can coexist' as an 'old euphemism for the destruction of Israel.'

Perhaps the most incriminating statement by Arafat in Professor Karsh's report appears on page 6 where Arafat is quoted as saying, 'I have no use for Jews. They are and remain Jews,' and is said to have declared a plan to 'make life unbearable for Jews by psychological warfare and population explosion'. The origin of this quotation, however, remains highly obscure. Professor Karsh's source is a report in the *Jerusalem Post* and a very brief column in the *Jerusalem Report*, which reproduced a small section of the alleged quote a month later. What Professor Karsh does not note, however, is that according to the *Jerusalem Post*'s report, Arafat's office denied the reports, describing them as 'false and inaccurate'. According to that article, the alleged comments were first reported in Israel by an offshore radio station and were subsequently reported by the Hebrew daily *Maariv*. The original source was a small conservative Christian newspaper in Norway called *Dagen* which was reported to have confirmed the report with 'Swedish sources, which traced the information to one of the diplomats attending the meeting'.[60] *Dagen* was 'known for its strong pro-Israeli stance and for a critical approach to Islam.' In 2008 it merged with the Christian magazine *Magazinet*, a publication best known for having been one of the first publications to reprint the highly controversial Muhammad cartoons published by the Danish daily *Jyllands-Posten*. According to Oddbjørn Leirvik, a Professor of Theology at Oslo University, both publications are part of the far-right, pro-Israel neoconservative movement in Norway, comparable to the Christian right in the United States.[61]

Turning to the specific question of terrorism during the peace process and after its breakdown in 2000, here again, Professor Karsh makes no effort to scrutinise the actions and motives of Israeli actors, and little effort to analyse the role of rival Palestinian political factions. He also fails to distinguish between acts of terrorism and other forms of violent, and even non-violent, activities. On page 19, for example, he suggests that all references made by Palestinian actors to 'the armed struggle' should be treated as a euphemism for acts of terrorism (he places the phrase 'armed struggle' in parentheses after 'terrorism' indicating that he considers the two synonymous). Earlier, on page 5, he refers to the al-Aqsa intifada as a euphemism for a 'terrorist war'. In Professor Karsh's analysis, however, all forms of political violence, even stone throwing, are subsumed within the category of a 'terrorist war'. On page 24 Professor Karsh even claims that compensation granted by the PA to Palestinians whose homes had been demolished by the Israel Defence Forces amounted to 'a clear message' of 'unwavering support for terrorism'.

There is clear evidence here of the misrepresentation of sources. On pages 18 and 19 Professor Karsh quotes the following statement by the Grand Mufti of Jerusalem:

> We tell them: inasmuch as you love life – the Muslim loves death and martyrdom. There is a great difference between he who loves the hereafter and he who loves this world. The Muslim loves death and [strives for] martyrdom. He does not fear the oppression of the arrogant or the weapons of the blood-letters. The blessed and sacred soil of Palestine has vomited all the invaders and all the colonialists throughout history and it will soon vomit, with Allah's help, the present occupiers.

Professor Karsh's source for this statement is a televised sermon translated and published by MEMRI. He describes it as a 'clear and overt call for the indiscriminate murder of Jews and the destruction of the State of Israel'. However, the section of the sermon immediately preceding this passage states:

> Oh Muslims, when the Prophet sent the army to Mu'tah, he gave them the following instruction: 'conquer in the name of Allah, fight the enemies of Allah and your enemies in Al-Sham [Syria]. You will find innocent people there. Do not harm them. Do not kill a woman. Do not kill a child. Do not uproot a tree, and do not destroy a house'. This is our great Islamic religion. It encourages good ethics and high morale in days of peace, as well as in days of war.

> On the other hand, our enemies destroy houses, kill children, destroy wells, disconnect water, and uproot trees. They prevent pregnant women from reaching hospitals and they are forced to give birth by the side of the road. They use warplanes against defenceless citizens. Yes, they are occupiers and not owners of any sovereignty...

Perhaps even more crucially, a key claim on which Professor Karsh bases his argument in this section is simply false. On page 22 Professor Karsh states:

> Not only did Arafat do nothing to halt Palestinian terrorism in the territories under his control; terrorism spiralled to new, unprecedented heights following the establishment of the PA in mid-May 1994.

To support this claim Professor Karsh provides the following reference: 'The PLO's and the Palestinian Authority's Compliance with their Obligations to Prevent Terrorism during the Authority's First Two Years,' Jerusalem, Peace Watch, 1996, pp.17-20. This source, he claims, demonstrates that 'the number of people killed by terrorism in each of the years between 1994 and 1996 was the highest since the territories were first occupied during the 1967 Six-Day War'. As a point of fact, according to the Global Terrorism Database (GTD) the number of terrorist incidents and fatalities in Israel and the occupied territories declined dramatically during this period, and further declined until the outbreak of the Second Intifada. The graph below displays the number of incidents and fatalities from 1987 (the first year of the first intifada) to 2002.

11



**Figure 2. Graph showing terrorist incidents in Israel and the Occupied Territories and the number of fatalities by year.  Source: Global Terrorism Database.**[62]

In the final section of his report, Professor Karsh argues, in summary, that the Second Intifada 'was not a spontaneous eruption but a premeditated war of terror waged by the PA and the PLO.'  Here, Karsh's argument echoes the claim of the Israeli Government, which argued to the Mitchell Committee that, 'The Palestinian leadership have instigated, orchestrated and directed the violence'.[63]  In adopting the official Israeli narrative, Professor Karsh ignores a substantial body of expert opinion that has concluded otherwise, and fails to acknowledge that the Mitchell Committee itself concluded it had been 'provided with [no] persuasive evidence that the PA planned the uprising'.[64]  As Jeremy Pressman, Associate Professor of Political Science at the University of Connecticut, notes:

> The view that Arafat and the Palestinian Authority orchestrated the outbreak of the intifada was rejected by the Mitchell committee, the investigative body set up by the United States and others in late 2000. In an especially insightful analysis of Palestinian decision-making, the academic Yezid Sayigh suggested Arafat's approach was the exact opposite: 'Contrary to the Israeli account, [Arafat's] behaviour since the start of the intifada has reflected not the existence of a prior strategy based on the use of force, but the absence of any strategy.' Ami Ayalon, former head of Israel's Shin Bet (General Security Service), was clear: 'Yasser Arafat neither prepared nor triggered the Intifada.'  Menachem Klein, an Israeli academic, agreed: '[t]here is no evidence whatsoever that there was any such pre-planned decision by the Palestinian Authority.'[65]

Professor Karsh simply ignores these analyses, and presents a discredited allegation as a proven fact.  In the course of his argument, Professor Karsh quotes Imad Faluji, the PA

Minister of Post and Communications, to suggest that the Second intifada was planned by the PLO.[66]   Professor Karsh fails to acknowledge that the same Faluji quotes were used in the Government of Israel's submissions to the Mitchell Committee, and that in response Faluji told the committee that he had been misquoted and taken out of context.[67]

Though Professor Karsh presents himself as an accredited scholar, he has no particular expertise in Palestinian politics or society.  His scholarly reputation and impact has declined significantly as he has become closely affiliated with individuals and organizations criticized for spreading propaganda and misinformation.   His writings, which have been funded by right-wing foundations, have been widely criticized as propagandistic and unscholarly, and he has been accused of misinterpreting information and quoting out of context.  Each of these criticisms applies equally to the expert report that he has submitted in this case.  It does not represent a scholarly analysis of complicated facts, but rather is an untrustworthy compilation of selectively chosen quotes and information.

## III.   **Nicholas Kaufman**

Nicholas Kaufman is a British born Israeli lawyer.  He lives in the Israeli settlement of Pisgat Ze'ev in East Jerusalem[68] which like other settlements in the occupied territories is considered illegal under international law and in contravention of official US government policy.[69]

### A.    Background and Institutional Affiliations

After studying law and training as a barrister in the UK, Mr. Kaufman immigrated to Israel in 1993 following a meeting with the then Deputy Military Advocate General.[70]  He told the Israeli daily *Haaretz*: 'I immigrated to Israel in order to serve the country'.[71]

After enlisting in the IDF Mr. Kaufman spent approximately 15 months working for the Military Advocate General's office (MAG), the Israeli state body which provides legal advice and supervision to the IDF.  The MAG has been criticized by independent human rights organizations for failing to adequately investigate allegations of wrongdoing made against the IDF.  Amnon Strashnov, who served as MAG from 1986-1991, later wrote that during the first *intifada*, the MAG sought 'to provide the IDF and the security forces the widest range and quality of legal tools in order to allow them to fulfil their difficult task of suppressing the uprising'.  He admitted that the MAG applied lenient standards in charging, trying and sentencing Israeli soldiers.[72]  These 'lenient standards' remained in place during Mr. Kaufman's period at the MAG.  In a 1997 report entitled *Escaping Responsibility*, the Israeli human rights group HaMoked found that the policy of leniency had 'permeated down from the MAG himself to the military prosecutors of each regional command, from there to the [Military Police] investigators, and then on to every last solider, passing through each of the chains of command.'[73]  Failures in the judicial process were attributed by HaMoked not to 'a series of errors, but rather a policy fully backed by the MAG'.[74]  HaMoked noted that: 'The same patterns in the investigations and decisions to not prosecute are apparent throughout the period under discussion, and remain so [in 1997].'[75]

After a brief period working at a corporate law firm, Mr. Kaufman was then appointed a prosecutor at the Jerusalem District Attorney's Office by the current Israel State Prosecutor, Moshe Lador.  According to his CV, he served as a Senior District Attorney

at the Office of the District Attorney of Jerusalem from January 1996 to April 2003. In his expert report he states that during this time he 'acquired particular experience handling cases involving offences against the security of the State of Israel which were investigated by the Israel General Security Services'.

Mr. Kaufman has worked on so called 'lawfare' cases pursued by the Israeli state and pro-Israel private advocacy groups. In 2007, he was reported to be preparing a case against Hamas leader Khaled Mashaal, the al-Aqsa Martyrs' Brigades and Islamic Jihad for application to the International Criminal Court.[76] In 2011, he was reported to be pursuing a case against Mashaal in France on behalf of the parents of the kidnapped Israeli soldier son Gilad Schalit.[77] Mr. Kaufman was also involved in attempts to block Palestinian applications to the International Criminal Court. Following a declaration to the registrar of the International Criminal Court by a representative of the Palestinian Authority recognising the Court's jurisdiction in the occupied territories, Mr. Kaufman represented the Israeli organization Regavim in a petition calling for the registrar's decision to receive the declaration to be revoked.[78]

Regavim is a far-right campaigning group with a stated mission 'to protect national lands and properties and prevent foreign elements from taking over the countries [sic.] territorial resources'.[79] It monitors Palestinian construction in the West Bank and petitions the Israeli courts for the demolition of Palestinians buildings.[80] Its website gives a P.O. Box in Jerusalem as its mailing address, but is registered to an address in Modi'in Illit, an ultra-Orthodox settlement in the West Bank.[81]

As part of his reserve duty, Mr. Kaufman served as a judge at military courts in Ramallah and Hebron in the West Bank, where he claims to have 'presided over countless trials and detention remand applications.'[82] On the basis of this experience, Mr. Kaufman claims an expertise on 'the quality of justice dispensed by the Israeli military courts on the West Bank'.

Two immediate issues appear. First, as Mr. Kaufman concedes in his report, he is 'strictly a legal practitioner' with no academic training or professional experience as an assessor of due process or the rule of law. He has '[n]ever published any articles' or produced similar scholarly work, and therefore his opinions have never been independently assessed or subjected to peer review.

More critically, however, Mr. Kaufman seeks to opine upon the fairness and of a process over which he presided. So aside from the obvious risk of bias evidenced by Mr. Kaufman's ties to the Israeli military and security services and his connection to the settler movement, his personal interest in vindicating the fairness of the system in which he served calls the reliability of his opinion into question.

      B.      Lack of a Valid Methodology in his Expert Report

Mr. Kaufman's expert report amounts to little more than a number of references to Military Ordinances purporting to confer certain rights on defendants at the military courts. But Mr. Kaufman does not apply any specialized knowledge to evidence drawn from those proceedings or demonstrate that *in fact* such rights are upheld at the military courts. He merely asserts that proceedings in those courts, which he personally conducted, are fair and comport with due process.

Even in announcing his summary conclusion, Mr. Kaufman selectively ignores evidence that undermines it. For example, Mr. Kaufman asserts 'that human rights NGOs – both Israeli and international – visit the JMC on a frequent basis in order to monitor the conduct of proceedings' as evidence of the adherence to human rights standards and due process. Mr. Kaufman fails to mention that these organizations have repeatedly criticized the Israeli military court system for its failures to meet such standards.

The most extensive examination of due process in the military court system to date was conducted by the Israeli human rights groups, Yesh Din in 2006. It noted a lack of opportunity for public scrutiny of the courts, failures to notify defendants of the charges against them, 'severe restrictions' on 'a lawyer's ability to provide his clients with an effective defense,'[83] and unreasonable delays in proceedings. It also found that the military authorities viewed with 'contempt' their obligation that defendants must 'fully understand what transpires during the proceedings,'[84] and noted that trial proceedings entailing the right to present and examine evidence 'scarcely exist in the Military Courts'.[85]

Relevant to Mr. Kaufman's conclusions, but also perhaps equally to his personal bias in rendering an opinion on a procedure in which he participated, Yesh Din noted that:

> Military officers sitting in judgment cannot dissociate themselves from their identity, both as Israelis and as Military personnel, when adjudicating those perceived to be their enemies – persons allegedly involved in activities of militant Palestinian organizations.[86]

Yesh Din expressed 'special concern' about military reservist attorneys like Mr. Kaufman who are 'selected for duty without having any judicial experience' and noted the opinion of military court judge Daniel Friedmann that

> judges in the Military Courts are not professionals – they have not taken any judicial courses. Generally speaking, they are attorneys, most of whom are reservists. It makes a difference whether your chosen profession is that of judge or attorney.[87]

Finally, on the question of respect for the presumption of innocence, Yesh Din noted that:

> data provided by the Military Courts Unit itself provides a clear indication of the extent to which the presumption of innocence is followed: of 9,123 cases concluded in the Military Courts in the year 2006, only in 23 cases – which constitute 0.29% of the rulings – was the defendant found to be entirely not guilty.[88]

Other independent observers have noted that the military court system is not an independent system of justice, but is rather a central element of Israeli military control over the occupied territories. It is estimated that since the military court system was established in 1967, 20% of the total Palestinian population in the occupied territories and as much as 40% of the total male Palestinian population have been detained under Israeli military orders.[89] In *Courting Conflict: The Israeli Military Court System in the West Bank and Gaza*, Professor Lisa Hajjar noted that:

> The military and emergency laws enforced through the military courts criminalize Palestinian violence, as well as a wide array of other types of activities, including certain forms of political and cultural expression, association, movement and nonviolent protest – anything deemed to threaten Israeli security or to adversely affect the maintenance of order and control of the territories.[90]

Dr. Sharon Weill, a researcher at the Geneva Academy of International Humanitarian and Human Rights Law and lecturer at Tel Aviv University, has described the military court system in the Occupied Territories as the 'judicial arm of the occupation' and argued that as a form of military domination it is 'even more dangerous because it appears to be under the guise of the rule of law.'  She notes:

> Due to this expansion of jurisdiction, matters which should be under the jurisdiction of a civil court (Palestinian or Israeli) are in many cases dealt with under the Israeli military system – a system that enjoys less independence and impartiality and does not effectively safeguard the individual rights of accused persons and suspects.[91]

In its seminal study of the Israeli military system, published in 1989, the Israeli human rights group B'Tselem, noted:

> significant injustice that is caused on a routine basis by inexplicable inefficiency, unjustifiable indifference, and lack of initiative.  Neglect, commotion, and a sense of utter chaos characterize the judicial process... The basic rights granted residents of the territories by orders of the military commander are not protected.  These violations are not occasional, but are rather ingrained in military procedures.[92]

Two years later Amnesty International noted that

> Improper pressures are exacted on defendants to plead guilty and enter into a plea bargain with the prosecutors. Many defendants do so because confessions cannot be effectively challenged in court, or because those who ask for a full trial risk spending more time in detention than they would if they plead guilty. They also risk much heavier sentences. Their fundamental right to a fair trial is prejudiced in these circumstances.[93]

These longstanding failings persist to this day.  The US NGO Freedom House notes that:

> Most convictions in Israeli military courts are based on confessions, sometimes obtained through coercion. Israel outlawed the use of torture to extract security information in 2000, but milder forms of coercion are permissible when the prisoner is believed to have vital information about impending terrorist attacks. Human rights groups criticize Israel for continuing to engage in what they consider torture. Interrogation methods include binding detainees to a chair in painful positions, slapping, kicking, and threatening violence against detainees and their relatives.[94]

In its 2012 Annual Report, Amnesty International noted that peaceful Palestinian activists 'continued to face arrest and trial before Israeli military courts' which 'routinely denied access to lawyers during pre-trial interrogation' and accepted 'confessions allegedly obtained under duress'.[95]  In its 2013 World Report, Human Rights Watch noted that, 'Israeli military authorities detained Palestinians who advocated non-violent protest against Israeli settlements and the route of the separation barrier,' and 'continued to arrest children suspected of criminal offenses, usually stone-throwing, in their homes at night, at gunpoint, question them without a family member or a lawyer present, and coerce them to sign confessions in Hebrew, which they did not understand.'[96]

In sum, Mr. Kaufman cannot be considered a legitimate expert on the quality of justice administered by the Israeli military courts.  His bias is evident, his lack of qualifications as an analyst of a legal system rather than as a participant is disqualifying, and his conclusions are not based on any application of a valid methodology to relevant facts.

## IV.  **Matthew Levitt**

Matthew Levitt is Director of the Stein Program on Counterterrorism and Intelligence at the Washington Institute for Near East Policy.  He is also a lecturer at John Hopkins University's Paul H. Nitze School of Advanced International Studies and has worked as an advisor and analyst at the FBI and US Department of Treasury.

### A.  Background and Institutional Affiliations

Mr. Levitt has close connections with organizations that have been described as forming part of the 'Israel Lobby', and is also connected to individuals and organizations which have been described as constituting the 'Islamophobic Network in America'.[97]  He was 'founding director' of the Washington Institute for Near East Policy's terrorism programme from 2001 to 2005.[98]  The Washington Institute for Near East Policy (WINEP) is a privately funded think-tank that is one of a number of policy institutes and pressure groups in the United States that are sometimes referred to as the 'Israel Lobby'. It was founded in 1985 by Martin Indyk, a former research director of the American Israel Public Affairs Committee (AIPAC),[99] an organization which describes itself as 'America's leading pro-Israel lobby'.[100]  The US political scientists John Mearsheimer and Stephen Walt note the following on the origins and agenda of WINEP:

> Recognizing the need for a prominent but seemingly 'objective' voice in the policy arena surrounding Israel, former AIPAC president Larry Weinberg; his wife, Barbi Weinberg; AIPAC's vice president; and AIPAC deputy director for research Martin Indyk founded the Washington Institute for Near East Policy in 1985.  Although WINEP plays down its links to Israel and claims that it provides a 'balanced and realistic' perspective on Middle East issues, this is not the case.  In fact, WINEP is funded and run by individuals who are deeply committed to advancing Israel's agenda.[101]

Mr. Levitt is a former contributor to the now defunct website 'Counterterrorism Blog'. The Counterterrorism Blog ceased its operations in March 2011, but described itself as 'a unique, multi-expert blog dedicated to providing a one-stop gateway to the counterterrorism community'.[102]  It was founded by Andrew Cochran, a US lobbyist who had represented the former journalist Steve Emerson and his think-tank the Investigative Project on Terrorism (IPT).[103]  Steve Emerson was a Contributing Expert at the Counterterrorism Blog, as were former IPT researchers Evan Kohlmann and Daveed

Gartenstein-Ross. Emerson and his colleagues not only have a poor record as analysts, but Emerson himself has been accused of deliberately spreading misinformation. On one occasion he presented Associated Press with a purported FBI dossier showing ties between Muslim American organisations and radical Islamist groups. [104] The Associated Press reporters 'concluded [that] the dossier was created by Emerson and that [Emerson] had edited out all phrases, taken out anything that made it look like his.'[105] The Center for American Progress has identified the IPT as being part of America's 'Islamophobia network' and claimed that its research 'frames Islam as an inherently violent and antagonistic religion'.[106]

Levitt was awarded his MA and PhD by the Fletcher School of Law and Diplomacy at Tufts University. His PhD research was supported by grants from two conservative foundations: the Sarah Scaife Foundation and the William H. Donner Foundation (as well as grants from Tufts University). Both foundations have provided funding to organizations criticized for spreading propaganda and misinformation.

The Sarah Scaife Foundation is the largest of four conservative foundations associated with the billionaire conservative philanthropist Richard Mellon Scaife. It has supported two controversial right-wing organizations that have been criticized for spreading Islamophobic ideas; the Center for Security Policy and the David Horowitz Freedom Center. Both were described by the Center for American Progress as part of 'a small, tightly networked group of misinformation experts' who have been instrumental in the 'rise of Islamophobia'[107]

The second foundation which supported Levitt's PhD research, The William H. Donner Foundation, has also funded the Center for Security Policy and the David Horowitz Freedom Center, as well as Daniel Pipe's Middle East Forum, with which plaintiffs' proposed expert Efraim Karsh is associated.[108]

Mr. Levitt's scholarship has been specifically criticized for conflating military or terroristic actions with political and civil activities and has been supported by private foundations connected to pro-Israel organizations and other propagandistic groups (with which Mr. Levitt himself has been connected). His thesis formed the basis of his book *Negotiating Under Fire*, published in 2008.[109] According to Google Scholar, the book has been cited only once in the five years since its publication; in a monograph written by a student at the US Army's School of Advanced Military Studies.[110] Mr. Levitt's first book, *Targeting Terror*, was published by the Washington Institute for Near East Policy in 2002 and according to Google Scholar it has been cited 12 times in eleven years[111] (including three times in student theses or monographs[112] and once in a university bibliography[113]).

Mr. Levitt's most widely cited publication, according to Google Scholar, is his book *Hamas: Politics, Charity and Terrorism in the Service of Jihad*, first published in 2006. The book is particularly notable for its failure to distinguish between political, social and military activity, and even its willingness to conflate such activities. Under the subtitle, 'Muddying the Waters', Levitt writes: 'Inside the Palestinian territories, the battery of mosques, schools, orphanages, summer camps, and sports leagues sponsored by Hamas are integral part of an overarching apparatus of terror.'[114]

The book has been has been strongly criticized by academic reviewers. For example, Dr. Laleh Khalili, Senior Lecturer in Middle East Politics at the School of Oriental and

African Studies, University of London, writes that, 'Levitt's aim is to prove that Hamas is all about terror, terror, terror, and nothing else':

> To accomplish this aim, Levitt uses declassified documents primarily drafted by Israeli and US security agencies (whose colossal recent failures should give anyone pause about using their analyses uncritically), as well as English-language news reports and court documents. Levitt consults no Arabic sources, conducts no interviews with Hamas members or leaders, and relies on documents produced by Hamas's avowed political adversaries to illuminate the organization. In so doing, he reduces Hamas's complex social relations, the divisions within its political organization and its broad methods of contention, to its use of violence against Israel, a militant tactic that Levitt does not come close to explaining why it has chosen, under what specific political conditions, and to achieve which particular political aims.

Dr. Khalili concludes that Levitt's 'book seems like a post hoc justification of US and Israeli policies towards Hamas rather than a scholarly examination of its internal political and organizational dynamics and their complex influence on its decision-making.'[115]

Khaled Hroub, of Cambridge University's Centre of Islamic Studies, writes: 'If misperception and misinterpretation is sought as a prerequisite for American or Western policy making with regard to Hamas, then Levitt's book should be their bible.' He describes the book as 'abound throughout' with 'Fallacies, misinformation, bizarre anecdotes, and sweeping accusations'. He continues:

> Levitt's aim is to prove that Hamas is a terrorist organization that should be met with force. There is no distinction between Hamas's social, political, religious, and cultural aspects and its military activities. Hamas, Levitt insists, is part of a 'global Jihad network' and very close to al-Qa'ida. …
>
> Levitt's analysis strongly subscribes to the unfounded approach to Hamas and other militant movements where the 'cause' or the 'end' is brushed aside as irrelevant, in the interest of focusing only on the 'means' – violence and armed struggle. The result of this approach is thus a collection of scattered bits of information about Hamas drawn from American, Israeli, Jordanian, and Palestinian Authority intelligence that lack any convincing analytical framework.[116]

Sara Roy, an Associate of the Center for Middle Eastern Studies at Harvard, writes that the book 'is not a work of analysis or scholarship, to say the least' and has 'many serious flaws' beyond the scope of a book review:

> It is the principle aim of his book to show how Hamas uses its extensive social-service network-mosques, schools, kindergartens, orphanages, hospitals, clinics, sports clubs, youth clubs-to further its primary political agenda, which he claims is the destruction of Israel… [The] evidence, at times interesting, particularly with regard to Hamas's external sources of financing, is more often than not based on assumption, extrapolation and generalization.

She continues:

19

> Levitt's presentation reduces this increasingly complex and sophisticated organization to an insular, one-dimensional and seemingly mindless entity dedicated solely to violence, terrorism and Israel's destruction. … His analysis aims simply to demonize Hamas, and he discounts the critical connections between changing patterns of protest and structures of society, competing visions of a Palestinian social and political order, and contesting Islamic and secular definitions of meaning and legitimacy. The synergy among these forces has characterized the history and growth of Palestinian Islamism.[117]

As is clear from a review of this articles and monographs on terrorism, Mr. Levitt's focus has been on Hamas and issues other than Palestinian politics and society. His articles have overwhelmingly appeared in publications affiliated with think-tanks and research institutes which are not peer reviewed by scholarly experts. The academic search service and citation indexing service, ISI Web of Knowledge, currently contains only one article authored by Levitt.[118] It was published in November 2007 and has never been cited in any publications listed in the database. This suggests that he does not have a major profile either in publishing academic work in peer-reviewed journals, or in terms of his work being cited by other scholars.

B.    Lack of a Valid Methodology in his Expert Report

The arguments in Mr. Levitt's expert report are confused and occasionally misleading, and his analysis lacks any methodological rigour or solid evidential base. There is no attempt to assess the reliability of different sources, or to distinguish between matters of *fact* on the one hand, and *claims* made by government agencies on the other.

For example, Mr. Levitt cites a May 2002 State Department report to Congress which found 'no conclusive evidence that [Fatah] elements [involved in violence] acted with the prior approval and encouragement of the PLO and PA leaderships'. (Page 20) Mr. Levitt rejects this finding based only on a contrary assertion made by the IDF, but without reference to any substantial evidence.

In other instances, Mr. Levitt distorts the meaning of statements to further his argument. For example, at page 17 of his report, Mr. Levitt claims that, 'PA support for terrorism was both active and passive' based upon a speech in which Yassir Arafat called for 'a complete cessation of any operation or actions, especially suicide attacks' but 'failed to condemn terrorist attacks on humanitarian grounds' and 'stopped short of calling for an end to the Intifada'. Mr. Levitt's conclusion in this regard is not based on the application of specialized knowledge or training to Mr. Arafat's statement, but is simply personal conjecture.

The tendency to conflate terrorism with non-terroristic forms of political or military conflict is a recurring theme throughout Mr. Levitt's report. For example, Mr. Levitt cites a payment which the Israeli authorities alleged the PA made for ammunition and explosives as evidence which 'underscore[s] the close cooperation between PA security services and terrorist groups.' But this simple conclusion ignores the possibility that there were non-terroristic uses for the materials and even if the Israeli allegation were true (which Mr. Levitt does not question), a meaningful analysis would have to consider the possible alternatives before drawing a valid conclusion.

Similarly, a legitimate expert with experience in the area of Palestinian politics would recognize the relevance of properly interpreting terms such as 'intifada' and 'jihad' but Mr. Levitt simply categorizes these terms as incitements to violence.  For example, on page 20, Mr. Levitt suggests that 'incendiary public statements' by 'the senior leaderships of the PA or PLO' are evidence of 'planning or approving specific acts of violence'.  The one example he cites here is a statement by the then Grand Mufti of Jerusalem, Ekrima Sa'id Sabri, in support of 'Intifada and jihad' (neither of which necessarily even denote physical violence, let alone acts of terrorism). In sum, Mr. Levitt's analysis lacks the type of critical analysis and application of specialized knowledge that would meaningfully advance resolution of the issues he purports to resolve.

This poor conceptualisation and inadequate scrutiny of sources is underlined by a flawed methodology and weak evidential base.  Mr. Levitt's report contains a total of 95 footnotes and 103 citations (several footnotes refer to more than one source).  Amongst these there are no references to any scholarship of any kind, or to any reputable studies of Palestinian politics and society, the Israel/Palestine conflict in general, or the Second Intifada in particular.  There are only four references to publications by think-tank (footnotes 40, 64, 89 and 94), of which three are reports produced by Mr. Levitt for the Washington Institute for Near East Policy (two of which were co-authored).  These three reports are essentially comment pieces, containing no references to primary or secondary sources.

The various sources of information cited in Mr. Levitt's expert report are displayed in Figure 2 below.  It shows that Mr. Levitt relies overwhelmingly on official Israeli sources and on news reports, which together make up 67% of the reports' citations.  This is suggestive of a lack of independent, empirical research, a failure to engage with existing scholarship and dependence on news reports and on Israeli state agencies for information.  These failures are characteristic of Mr. Levitt's work in general and all seriously call into question his status as an expert, as well as the reliability of his opinions.



**Figure 3 Pie Chart displaying the sources of information in Matthew Levitt's expert report**

On page 3 of his expert report, Mr. Levitt outlines his methodology as follows:

> In my efforts to study and understand terrorism and militant Islamist ideology I interview experts, officials, academics and others with insight into these issues, both in the United States and Europe and in the Middle East. I engage in private, personal meetings, public conferences, group discussions, and talks that are both on and off the record. I travel to the Middle East regularly, including trips to the Palestinian territories, Israel, Jordan, Egypt, Bahrain, Qatar, the UAE and Turkey. I also attend conferences and academic and professional lectures, and read books, newspapers, academic and policy journals, and research these materials on the internet (including the websites, video and audio clips and images on sites geared towards counterterrorism and those of terrorist groups and their sympathizers as well). These are the standard sources and methods in the academic and policy communities for developing the kind of specialized knowledge and expertise I have accumulated...

Whilst it is true that these sorts of methods are common amongst those purporting to be experts on terrorism, they remain highly problematic as a basis for expertise for two major reasons.

First, news reports and other 'open source' evidence are highly unreliable.  Two of the world's leading terrorism experts, Scott Atran and Marc Sageman, have noted that 'journalistic accounts of terrorism' 'rely heavily on anecdotal evidence' and that 'initial reports of attacks are full of speculations, which remain uncorrected and echo over time to give error-prone sources a misleading credibility and importance.'[119]  According to

Atran, 'newspaper and magazine articles written within six months of a suicide bombing have about a 30% error rate in reporting basic content'.[120]  Mr. Levitt is highly dependent on such sources.

Second, the dependence on state agencies that this approach to research necessarily entails reduces an expert's capacity to make independent judgements about the nature of evidence, and can in some cases fatally undermine an expert's independence.

Both these problems are in practice interrelated.  This was acknowledged by Mr. Levitt in his 2002 book *Targeting Terror*, in which he thanked his

> many friends and colleagues in various U.S. government departments and agencies who allowed me to bounce ideas off of them and helped me differentiate between fact and fiction in the open-source reporting on terrorism in the Middle East.'[121]

This statement is an implicit acknowledgement of (1) the difficulties faced in differentiating 'between fact and fiction' inherent in Mr. Levitt's approach to research and (2) his significant reliance on the perspectives and authority of state institutions in interpreting data.

In this particular case, Mr. Levitt is highly dependent on Israeli military and intelligence services, an obviously partisan and opaque source of evidence.  Mr. Levitt's failure to interrogate official sources has been commented on in the *New York Times*, where a reviewer went as far as to suggest that Mr. Levitt's could be seen 'as fronting for the Israeli intelligence establishment':

> ...to judge from his acknowledgements and his notes, Levitt depends heavily on analyses from the Intelligence and Terrorism Information Center of the Center for Special Studies — an Israeli nongovernmental organization created 'in memory of the fallen of the Israeli intelligence community' and staffed by its former employees. (When I asked, a spokesman for the center told me that it receives some Israeli government financing.)
>
> None of this would matter if Levitt used the center's analyses critically, but he doesn't appear to. As a result, there will be readers of this book who will see it as fronting for the Israeli intelligence establishment and its views.[122]

Central to Mr. Levitt's expert report are documents seized by the IDF which purport to be PA documents.  Mr. Levitt refers to these documents on page 18 of his expert stating: 'The 500,000 documents Israel seized from PA offices during *Defensive Shield* provide extensive evidence of PA support for, and involvement in, terrorism.'  This statement is, at best, misleading.  Only a tiny portion of these thousands of documents have been made public, and even these do not support the claims made by Mr. Levitt.

Reporting on what it described as a 'campaign' by Israeli officials to 'discredit Yasir Arafat', the *New York Times* noted the Israeli contention that the seized documents were 'indisputable proof that the Palestinian leader personally approved terror attacks'.  It concluded, however, that it was 'unclear' from the documents 'whether senior Palestinian officials approved the attacks, tried to stop them or tacitly backed them by not intervening.'[123]

23

In the course of researching a report on suicide bombing attacks against Israeli civilians, Human Rights Watch examined all the documents made public by the Israeli authorities. Having considered 'five cases in which Israeli analysts allege that an individual requesting financial assistance had direct involvement in suicide attacks against civilians,' Human Rights Watch noted that the 'documents do not indicate whether any of these requests were granted,' and also noted that 'each was made several months before the first al-Aqsa Brigades suicide attacks against civilians.'[124]   In the case of two documents which the IDF claimed provided proof of PA financial support for the al-Aqsa Brigades, Human Rights Watch noted that: 'Neither document was signed.  There is no indication in the scanned originals of the office(s) or individual(s) to whom the documents were addressed or whether they were ever approved.'[125]   It concluded that 'the publicly available evidence is not conclusive as to whether President Arafat or the PA provided financial support to the perpetrators of attacks against civilians with the intent of supporting such attacks.'[126]

In a report for the United States Institute of Peace, Professor Nathan J. Brown noted that despite the claims made by the Israeli prime minister's office (in a report cited three times by Mr. Levitt), 'an examination of the documents published by Israel showed no support for the far-reaching charges of terrorism.'[127]   Indeed, Professor Brown notes that despite the claim in that report that the PA 'allocated vast sums of money from its budget to pay salaries to Fatah terrorists,' in its formal complaint to the European Union, 'Israel adduced no public evidence to support the charge'.[128]

The reliability of the seized PA documents was a matter of contention in the Holy Land Foundation case (*United States v. El-Mezain, et al.*), in which Mr. Levitt appeared as an expert witness.  The documents were excluded from the original trial but were admitted at the second after the Government argued that they had 'circumstantial guarantees of trustworthiness'.  In 2011, the Fifth Circuit Court of Appeal noted that 'there is nothing known about the circumstances under which the documents were created, the duty of the authors to prepare such documents, [or] the procedures and methods used to reach the stated conclusions'.  It concluded that 'the Government's justification for admitting the documents was insufficient to prove their trustworthiness, and they should have been excluded from the second trial.'[129]

Matthew Levitt works with and for a variety of organizations that have a specific analysis of the Israel Palestine conflict, some of which are themselves part of the 'Pro-Israel lobby'.  Through his institutional affiliations and funding he is also connected to organizations that have been criticized for spreading misinformation.  His work is not widely cited by scholars and has been strongly criticized by academic reviewers.  Like his expert report, it is marred by poor conceptualisation and inadequate scrutiny of sources. He cannot therefore be considered a reliable expert.

V.    **Itamar Marcus**

Itamar Marcus is an American born Israeli settler, a right-wing political activist and a former advisor to the Israeli Government.  He was featured in the 2005 documentary *Obsession: Radical Islam's War Against the West*, along with a number of others referred to here, including Steven Emerson and Daniel Pipes.  Mr. Marcus is a member of the 'Speakers Bureau' of Hasbara Fellowships,[130] an organization which promotes Israel on campuses in North America.  'Hasbara' is a Hebrew word which literally means

explanation, but which like the English phrase 'public diplomacy' is used as a euphemism for propaganda. This raises serious questions about his reliability as an expert witness.

    A.    Background and Institutional Affiliations

Mr. Marcus's claim to expertise is based upon his role as the founder of Palestinian Media Watch (PMW). He is described on the PMW website as 'one of the foremost authorities on Palestinian ideology and policy'.[131] But aside from his own claim, there is no evidence that Mr. Marcus has such expertise. On his CV, Mr. Marcus states that he has a BA in Political Science and an MA in Jewish Culture and he makes no reference to any qualifications relevant to Palestinian society or politics. He also states that PMW uses translators, suggesting that he cannot himself adequately read or understand Arabic.

From 1997 to 2001, Mr. Marcus was Research Director of the Center for Monitoring the Impact of Peace, an Israeli NGO which monitors the content of school text books in the Middle East. In 2001, the work of the Center was analysed by Professor Nathan J. Brown of George Washington University as part of a study for an Israeli NGO, the Adam Institute for Peace and Democracy. Professor Brown wrote:

> The Center claims that its purpose is 'to encourage the development and fostering of peaceful relations between peoples and nations, by establishing a climate of tolerance and mutual respect founded on the rejection of violence as a means to resolving conflicts.' Critics charge that the Center's real purpose is to launch attacks on the Palestinian National Authority, and it would be difficult to contest such a conclusion. They point to the identity of the Center's first director, Itamar Marcus, to support their suspicions.[132]

Examining the work of the Center, Professor Brown found that its reports were 'often highly misleading and always unreliable'.[133] He noted that: 'the Center generally ignores any historical context in a way that renders some of its claims sharply misleading,' whilst 'evidence that contradicts the Center's harsh message is ignored, obscured, or dismissed. … Other evidence is interpreted inaccurately.[134]

PMW is described in Mr. Marcus's expert report as a 'research institute that studies Palestinian society, political activities and ideology'. In reality PMW is a right-wing monitoring group that translates and publicises inflammatory statements by Palestinian political figures, as well as Arabic language media and educational materials in the occupied territories. In its research and publications it repeats the same serious methodological flaws as the Center for Monitoring the Impact of Peace. Indeed, in his report Professor Brown notes that PMW 'searches Palestinian media for anti-Israeli and anti-Jewish statements, following a similar method to that followed for textbooks'.

Mr. Marcus gives no account of his activities between studying his MA at New York University in 1977-79 and founding PMW in 1996. However, press reports reveal that some time before 1982 he moved to the Israeli settlement of Maale Adumim.[135] In 1989 he was reported to be the Israel director of the Central Fund of Israel, a New York based tax-exempt charity registered in 1979[136] which distributes funds to settlers in the Occupied Territories.[137]

The Central Fund of Israel continues to operate as a 'clearing house' for funding for settlement activities today.[138] Mr. Marcus was reported to be the Fund's Vice President in 2010,[139] though he has since stepped down. The Fund is now run by relatives of Mr.

Marcus.  Two of its registered officers (including its Vice President) give addresses in the Israeli settlement of Efrat,[140] where Mr. Marcus is also reported to now live.[141]

The Central Fund of Israel channels donations to PMW[142] and to other right-wing Israeli groups including Im Tirtzu,[143] a far right extra-parliamentary youth movement that has attacked universities, non-governmental organizations and peace groups in Israel.[144]  Im Tirtzu has described the displacement of Palestinians during the establishment of the State of Israel as 'a lie' and in 2011 produced a pamphlet entitled Nakba Harta ('Nakba Bullshit').  It reportedly stated: 'The myth of the nakba is an unprecedented and brazen fraud whose sole purpose is to rewrite history. Under this myth, the attacker becomes the victim, and those defending themselves from massacre become war criminals.'[145]  Mr. Marcus himself has promoted the idea that Palestine was a 'land without people' before the creation of the State of Israel (a notion long discredited by historians).  In a television discussion in July 2012, he stated: 'When the Zionist movement started, Jews started moving there, returning to our land, returning to the land of Israel.  No one was displaced… The land was empty.  Just look at the numbers.  The land was empty.'[146]

In addition to receiving support from the Central Fund of Israel, PMW is known to receive funding from the Michael Cherney Foundation,[147] a fund established by the Russian-Israeli billionaire Michael Cherney.  The Michael Cherney Foundation also funds the Jerusalem Summit, another far right Israeli organization where Mr. Marcus is listed as a Media Committee member.[148]  The Jerusalem Summit has called for the 'establishment of a Palestinian State' to be 'removed from the international agenda' and for 'a generous relocation and resettlement package' to be established so as to encourage Palestinians 'to build a new life for themselves and their families in countries preferably, but not necessarily exclusively, with similar religious and socio-cultural conditions.'[149]

### B.    Lack of Valid Methodology in his Expert Report
Mr. Marcus's expert report is a piece of propaganda masquerading as expertise.  It displays the same flaws identified by Professor Brown in the work of the Center for Monitoring the Impact of Peace and displays no evidence of a replicable methodology.

Mr. Marcus suggests that his conclusions are based on the 'totality of the evidence' (p.14).  He alludes to '*representative examples*' of official Palestinian media during the period' (p.25) and '*systematic* religious messages' (p.26) (emphases added).  However, no account is given of any methodology that could support the claim that the sample provided by Mr. Marcus is either representative or systematic.  Even without this fundamental flaw, however, it is clear even from the content of the report itself that the evidence and argumentation therein is misleading.

Having presented a sample of media content in his report, Mr. Marcus concludes that 'The Palestinian Authority bears overall responsibility for the violence and killings of the intifada in general and every particular act of killing in particular' (p.64).  This is an extreme conclusion to reach given that Shlomo Ben-Ami, Israel's Minister of Public Security during the Second Intifada, has written that it was 'Israel's disproportionate response to what had started as a popular uprising with young unarmed men confronting Israeli soldiers armed with lethal weapons [that] fuelled the intifada beyond control and turned it into an all-out war.'[150]

Mr. Marcus acknowledges the *intifada* included 'the full range of violence from youths throwing stones at Israeli cars, to drive-by shootings and to suicide bombings on busses,

restaurants, pizza shops and in malls' (p.23), but then conflates each and declares that 'the *intifada* was synonymous with acts of killing civilians.' (Page 23). He selectively ignores statements referencing political motivations of Palestinians, see, *e.g.* interview with Marwan Barghouti in which Barghouti's statement 'we will try to break [Sharon] on the very issue of security, because Sharon was elected on the strength of security' is cited as evidence that the 'purpose of the intifada was to kill Israelis.'

Mr. Marcus intentionally redefines words like 'resistance' into 'terror' to advance his arguments. For example, he argues 'the PA ordered the terrorists to kill,' page 55, based upon PA Chairman Mahmoud Abbas saying:

> I demand [the release of] prisoners because they are human beings, who did what we, we, ordered them to do. We – the [Palestinian] Authority… This is war. One (i.e., Israel) ordered a soldier to kill, I ordered my son, brother, or others, to carry out the duty of resistance (i.e., euphemism for terror). This person killed and the other person killed.

Mr. Marcus's claim that Abbas' phrase 'the duty of resistance' is a 'euphemism for terror' is not an expert opinion, but rather baseless speculation. Such rudimentary errors demonstrate a lack of rigour in Mr. Marcus' analysis and his willingness to misrepresent evidence to advance his argument.

Mr. Marcus has no relevant academic expertise. He is personally and professionally committed to the extreme settlement movement in Israel and is openly involved in pro-Israeli propaganda ('hasbara'). He has founded two organizations that have been criticized for misrepresenting and misinterpreting evidence, whilst his expert report gives no account of any expert methodology and contains misleading evidence and argumentation. He cannot be considered a reliable expert.

## VI.    **Professor Jeffrey F. Addicott**

Terrorism is a field in which claims to expertise are often highly controversial. In January 2008, the *Nation* magazine, noted the emergence of 'self-styled experts' in terrorism who are often 'unabashedly ideological,' a phenomenon which it said 'juries may be growing weary of.' One expert interviewed by the *Nation*, Bruce Hoffman said he would be reluctant to testify in a terrorism case in the United States: '"I have to bring added value," he said. "I don't want to be a mouthpiece or have anyone put added words into my mouth or base anything on hearsay."'[151] Like Professor Addicott, Hoffman is a member of the advisory board of the International Institute for Counter-Terrorism.[152] His comments are particularly apt in the present case.

Professor Addicott's academic qualifications do not provide any indication of expertise relevant to this case. His CV provides no evidence of any knowledge of Arabic, despite the fact that his export report cites numerous translations of Arabic documents. Nor does it provide any evidence of any expertise in Palestinian politics or society relevant to the factual claims in his report.

A.    Background and Institutional Affiliations.

Professor Addicott is a member of the advisory board of the International Institute of Counter-Terrorism.[153] The ICT has close links with the Israeli security establishment, and

was co-founded by Shabtai Shavit, the former head of Israel's foreign intelligence agency, Mossad.[154]

Professor Addicott relies on a narrow range of sources linked to the Israeli security establishment that he is not in a position to independently evaluate. In essence, therefore, his 'expert opinion' is little more than the passing on of unexamined reports of anti-Palestinian biased sources.  The pool of those sources is quite small.  This fact is partially concealed by Professor Addicott's practice of citing secondary sources, which turn out, on inspection, to refer to back to the same small group of primary sources.

For example, in the first section of Professor Addicott's opinion, entitled 'PA/Fatah's Sponsorship and Incitement of Terror Attacks', there are nineteen citations, seven of which are to reports by the Middle East Media Research Institute (MEMRI). But other cited materials are drawn directly from the same MEMRI materials.  Note 2 cites a *Jerusalem Post* article, which itself cites back to a MEMRI translation.[155]  Note 3 cites to a book by Matthew Levitt, which itself cites back to a MEMRI report.[156]  Remarkably, in this instance, the MEMRI report cited by Levitt does not contain the phrase Levitt cites, and both Levitt and Professor Addicott failed to acknowledge that error.[157]

MEMRI's translations are highly controversial, and Professor Addicott fails to acknowledge, much less address, that controversy. In August 2002, the Middle East correspondent of the *Guardian*, Brian Whitaker, wrote that 'the stories selected by Memri for translation follow a familiar pattern: either they reflect badly on the character of Arabs or they in some way further the political agenda of Israel.'[158]  In an email debate with MEMRI president Yigal Carmon, Whitaker charged that MEMRI 'poses as a research institute when it's basically a propaganda operation. As with all propaganda, that involves a certain amount of dishonesty and deception. The items you translate are chosen largely to suit your political agenda. They are unrepresentative and give an unfair picture of the Arab media as a whole.'  Whitaker cited several instances of poor referencing and textual manipulation in MEMRI dispatches, warning that 'journalists who make use of your translations without checking the original Arabic also put their own reputations at risk.'[159]

MEMRI President Carmon is a former colonel in Israeli military intelligence, and a former acting head of the 'Civil Administration in Judea and Samaria', the Israeli military government in the West Bank.[160] Carmon's work on allegations of Palestinian incitement first came to prominence in the mid-1990s when he emerged alongside another of plaintiffs' proposed experts, Itamar Marcus, the founder of Palestinian Media Watch (PMW), as one of a number of activists who sought to use the issue as a vehicle for mobilisation against the US-backed Oslo peace process.[161]

Palestinian Media Watch is cited once in the first section of Professor Addicott's report. PMW presents many of the same methodological concerns as MEMRI. A report on the debate on Palestinian textbooks by Professor Nathan Brown of George Washington University found that research by IMPACT-SE, another organization run by Marcus, elided context in way that was 'sharply misleading', and 'ignored, obscured, or dismissed' evidence that contradicted its message. Such nuances as did appear were frequently lost when the research was cited by others.[162]

Both MEMRI and PMW are seen as partisan in Israel itself. In January 2012, *Haaretz* reported that the Israeli government was outsourcing media monitoring to the two organizations, which were described as 'associated with right-wing politics.'[163]

The other major source for the first section of Professor Addicott's opinion is a report prepared under the leadership of Israeli Minister for Parliamentary Affairs Danny Naveh in May 2002 (the 'Nevah Report').[164] This was an explicitly political document. The *Washington Post* reported at the time that its publication appeared to be an effort to 'advance two of the prime minister [Ariel Sharon]'s main goals', convincing the US that Israel could not negotiate with Yasser Arafat, and that he should be deported from the West Bank. The Post's report also stated: 'The report features original and translated documents, some of them seized from Palestinian computer disks, along with a great many assertions and allegations for which no documentary proof is offered. Throughout the report, Israel identifies individuals as 'terrorists' without providing evidence to substantiate the characterization.' When the European Union (EU) was accused of providing funding that was used for terrorism on the basis of the Naveh Report, the European Commission rejected the claim as lacking evidence.[165]

The first section of Professor Addicott's opinion which seeks to assert the Palestinian Authority's responsibility for terrorism is completely dependent on material from MEMRI, PMW, and the Naveh Report; all of which are of deeply questionable reliability and linked to opponents of political negotiation with the Palestinians.

In the latter sections of his report, concerned with the deaths of US citizens in the Israel-Palestinian conflict and US efforts to stop the violence, Professor Addicott makes extensive use of US Government and particularly State Department sources.

Even here, however, his citations are sometimes more dependent on pro-Israel NGOs than is at first apparent. For example, he cites an April 2001 letter from US Senators and Representatives calling on President George W. Bush not to meet Yasser Arafat.[166] However, he does not mention that this letter was based on a draft by the American-Israel Public Affairs Committee (AIPAC), or that it was significantly modified by US legislators to remove references to the Palestinian's 'war' against Israel, undermining the very thrust which he is seeking to establish.[167]

Finally, it is worth noting that it is unclear whether Professor Addicott actually wrote the report that bears his name. I have been provided with correspondence from plaintiffs' counsel to defense counsel that included a copy of report provided to Professor Addicott by unidentified 'consultants' to the plaintiffs which is virtually identical to the report now presented as Professor Addicott's work. If, indeed, Professor Addicott has simply passed along someone else's analysis as his own, that would raise additional concerns about his methodological approach.

In summary, Professor Addicott does not bring any relevant expertise to bear in rendering his opinion – he simply acts as a conduit to pass along information from biased, partisan sources which he is not in a position to critically evaluate.

VII.    **Israel Shrenzel**
    A.    Background and Institutional Affiliations
Professor Shrenzel's claim to expertise is based on what he describes as his 'decades of professional experience analyzing the Palestinian arena'. This experience consists

predominantly of his intelligence career with Israeli Military Intelligence (Aman) from 1980 to 1985, and with the Israel Security Agency ('GSS' or 'Shin Bet') from 1988 to 2004.[168]  He states:

> In the course of my services in the GSS, I received and read many thousands of intelligence items – including raw intelligence data obtained from electronic and human sources, as well as analyses and summaries compiled from such raw data, many of which my team prepared under my supervision – relating to the activities of the Palestinian Authority (the 'PA'), the Palestine Liberation Organization (the 'PLO') and the full range of Palestinian groups, organizations, institutions and personalities.[169]

A valid expert discipline must be capable of peer-review and provide conclusions replicable by other experts in the same field using a generally accepted methodology.  Mr. Shrenzel has precluded any such review by relying upon unidentified secret intelligence and confidential sources.

The historical record of the Israel Security Agency makes this practice even more suspect. An investigation by the Israeli NGO B'Tselem in 2010 found that a longstanding pattern of cruel and abusive interrogations by the agency was still continuing.[170]  Their report found that 'the ill-treatment of detainees is not only a method to collect information' stating that 'It is hard to avoid the impression that the cruel means described in this report is made possible by a certain racism and dehumanization of anyone who is categorically tagged as an enemy.'[171]

      B.      Lack of Valid Methodology in his Expert Report

Concerns about the reliability of Shin Bet investigations must also extend to some of the sources used in Professor Shrenzel's report, not least because he relies extensively on Shin Bet material.  Shrenzel relies heavily on transcripts of Shin Bet interrogations that were produced in Israeli courts and on the results of Israeli judicial proceedings where Shin Bet evidence went largely unchallenged.  But some of the specific examples he cites demonstrate significant flaws in his methodology.

For example, Shrenzel cites an alleged statement made under interrogation by Palestinian security official Nasser Awais to the effect that: 'following the outbreak of the al-Aqsa Intifada, in September 2000, he began carrying out terrorist attacks against Israeli targets, and at the same time worked for the Palestinian National Security Forces in Nablus, with the rank of Major (*Naqib*).'(Page 24, n. 62.) Shrenzel states that Awais later retracted this statement, but that it was nevertheless used at the trial of Palestinian political leader Marwan Barghouti.

Shrenzel omits the fact that Awais not only retracted the statement, but maintained that it was written by the Shin Bet and was the product of torture.  An Associated Press report of the Barghouti trial in May 2003 stated:

> [Awais] told the judges that the Shin Bet security service extracted by force a confession presented to the court regarding his ties with Barghouti. 'Everything in this confession was written by the Shin Bet,' Awais said. 'I remember the torture during my interrogation and this is not my handwriting.'

Two other Palestinian witnesses in the Barghouti trial also denied they had made written statements presented to the court, and challenged the court's authority to try them.[172]

Shrenzel also cites the Barghouti trial itself as support of his claim that Fatah leaders supported terrorism. But he fails to acknowledge significant evidence that the trial was fundamentally unfair.

A report by Mr. Simon Foreman, the lawyer appointed to observe the trial by the Inter Parliamentary Union, stated that 'the manner in which the phase leading up to the trial was conducted precluded any possibility of a fair trial.'[173]

He further warned that 'Owing to the fact that Mr. Barghouti was captured in Palestinian territory during a military operation, before being held incommunicado for several weeks, during which time accusations against President Yasser Arafat 'leaked out', the Israeli authorities not only ran the risk of holding a trial in which the political controversy almost inevitably overshadowed the legal debate, but also the risk of a trial based on an investigation using questionable methods and hence on flimsy evidence.'[174]

Foreman found that Barghouti's arrest in Palestinian territory by the Israeli Army appeared to directly contravene both the Oslo Accords and the Fourth Geneva Convention. He stated: 'In Mr. Barghouti's case, if indeed the Israeli authorities had been in possession of evidence to warrant his arrest, it would appear that they did not communicate any such information to the Palestinian institutions, which were therefore denied the opportunity of examining these charges and deciding whether there was reason to take the matter further.'[175]

According to Foreman, Barghouti 'remained in solitary confinement for a month, except for two visits by his lawyer, one on 18 April where they were able to communicate freely, and the following on 7 May under the supervision of the security services and without that freedom.'[176]

During that month of isolation, Mr. Barghouti was interrogated by the security services. Right at the beginning of May 2002, at a time when he was denied any contact with the outside world, the Israeli press published information from Shin Bet that Mr. Barghouti had admitted responsibility in planning the attacks and the personal involvement of the President of the Palestinian Authority, Mr. Arafat, in financing them.[177]

Foreman draws implications from these facts are highly apposite to Mr. Shrenzel's use of the Barghouti case:

The authorities have a price to pay for resorting to such practices: it greatly discredits the evidence they claim to have gathered during those weeks of interrogation, which nevertheless constitutes one of the bases of the charge, particularly since Mr. Barghouti has claimed that he was subjected to cruel, inhuman and degrading treatment during the interrogations. Those claims were not investigated.[178]

Barghouti claimed that he had been subjected to: 'physical pressures in the form of sleep deprivation and uninterrupted interrogations, and recourse to what is known as

31

the *shabeh* method, consisting in attaching the person interrogated to a chair and forcing them to sit for several hours in a painful position in this case protruding nails in the back of the chair aggravated the discomfort by preventing him from leaning back. Mr. Barghouti also said that the interrogators proffered death threats against him and his son.'[179]

According to Foreman, the Israeli authorities denied any ill-treatment of Barghouti when he appealed his detention to the Supreme Court, but 'nevertheless submitted that there were good reasons for refusing the prisoner the right to a visit by his lawyer, as we have seen, and implicitly admitted that they had deprived the prisoner of sleep, set out in a statement in which reference was made to the case law of the Supreme Court.'[180]

Foreman also highlights a number of incidents casting doubt on whether Barghouti was afforded a proper presumption of innocence by the Israeli authorities, notably a statement by the senior presiding judge, Sara Zerota, during Barghouti's first appearance before the court on 5 September 2002:

> After Mr. Barghouti had described himself as a *'fighter for peace for both peoples'*, she interrupted him and said *'one who fights for peace doesn't turn people into bombs and kill children'*.
>
> Such a statement was most surprising coming from a judge who has the responsibility of ruling on the guilt of the defendant, and who, from the very outset of the trial, expressed a categorical opinion on the case. Mr.. Barghouti probably should have been entitled to ask his judge to withdraw from the case because of this failure of her duty to show impartiality.[181]

Foreman goes on to state that 'The numerous breaches of international law recalled in this report make it impossible to conclude that Mr. Barghouti was given a fair trial.'[182] It is clear from the foregoing that to accept evidence based on the trial of Marwan Barghouti, and related cases such as that of Nasser Awais, would be to rely on uncorroborated confession evidence, procured by the Israeli security forces under dubious circumstances, and largely untested by any adversarial process. The Inter Parliamentary Union's report is itself powerful testimony that evidence adduced from such proceedings cannot constitute a replicable expert methodology.

Foreman concludes that: 'The Barghouti case has very clearly demonstrated that, far from bringing security, the breaches of international law have, above all, undermined the authority of Israeli justice by casting discredit on its conduct of investigations and the procedures used.' [183]

Many of the same issues plagued other, less publicized trials from the period of the Second Intifada, a period which covered other cases cited by Professor Shrenzel.  This period, according to Foreman, included 'a breakdown of Israeli law placing it in breach of international law, by authorising prisoner transfers (which is clearly prohibited by the Fourth Geneva Convention) or tolerating interrogation methods which should be prohibited, in addition to the laws making it possible to keep a prisoner incommunicado for excessively long periods.'[184]

Professor Shrenzel cites the Barghouti conviction and other contemporaneous cases as evidence in support of his conclusions but does so without acknowledging the contrary facts that an expert would reasonably consider in reaching a valid opinion.

The non-government sources cited by Professor Shrenzel also are dubious. For example in note 14 of page 11 in his statement, Shrenzel cites the Intelligence and Terrorism Information Center (ITIC) in support of his claim that President Arafat had supported terrorists, (a claim which appears in any case to depend on identifying the word 'martyrs' as meaning 'terrorists' without further argument).

However, the ITIC is highly controversial, both in Israel itself, and internationally. It's English language website is opaque about its personnel and funding.[185] The *New York Times* reported in June 2006, that this non-governmental organization was staffed mainly by former Israeli intelligence officers, and part-funded by the Israeli government.[186] The *Washington Post* reported in December 2006 that the ITIC worked closely with government officials and maintained an office in the Israeli Defense Ministry.[187]

In February 2007, Yossi Melman of the Israeli newspaper *Haaretz* reported that the center was a subsidiary of Malam, an association of former intelligence officers headed by ex-Mossad chiefs Ephraim Halevy and Meir Amit, and that the center's work was co-ordinated by 'Dr.. Reuven Ehrlich, a former Military Intelligence officer and coordinator of the Defense Ministry government activities unit in Lebanon.'[188]

Melman stated:

> the information center has become a 'pipeline' for information and assessments that the Military Intelligence research division does not want directly associated with it. Thus, for example, Military Intelligence transferred documents on terror organization activities captured by the Israel Defense Forces in Jenin during Operation Defensive Shield to Ehrlich's center, where researchers can study them.[189]

According to Melman, the Center's research was subject to criticism from within the Israeli intelligence community itself:

> The symbiotic connection between Ehrlich's center and Military Intelligence aroused criticism from several members of Malam and Military Intelligence. Some also opposed the center's establishment. The opponents argue that Military Intelligence should not be connected to a propaganda body, at the expense of objective and ideologically unbiased professional analysis.[190]

Deniable propaganda of this kind is the opposite of a replicable expert methodology, which depends on transparent sourcing.

Professor Shrenzel relies on information from MEMRI, which has been addressed earlier in this report.  For example, MEMRI is cited as a source for a 'a recent statement by a Fatah operative from Gaza who glorified the actions of Fatah terrorists, among them Wafa Idris.' This appears in a short section entitled 'Attitude of the Palestinian Authority to the terrorist attack and to the terrorist's family.'

The MEMRI report states that the statement appeared 'In a January 17, 2013 article on a PLO-affiliated website', and gives the address Amad.ps.[191] Amad was in fact one of a number of opposition websites that had been censored by the Palestinian Authority in April 2012, in a decision that was reversed the following month due to international criticism.[192]  In this way, material on a website which the Palestinian Authority attempted to ban, is adduced by Professor Shrenzel as evidence of the Palestinian Authority's own views.

This misleading use of the material builds on the distortion in the original MEMRI report, which is in keeping with a methodology for which MEMRI has been widely criticized internationally.

In 2002, the *Guardian* Middle East correspondent Brian Whitaker accused MEMRI of a selective approach in its translations of Arabic material, stating 'either they reflect badly on the character of Arabs or they in some way further the political agenda of Israel.'[193]

Whitaker noted that at the time of his article, three of MEMRI's six staff had previously worked for Israeli intelligence.[194] The President of MEMRI, Yigal Carmon, was a senior military officer in the Israeli administration in the West Bank in the 1980s. He later emerged, according to the *Jerusalem Post* as 'a leading critic on the right' of Benjamin Netanyahu's government and an opponent of the Oslo accords. When he accused Netanyahu of endangering Israeli security in 1996, the Prime Minister's spokesman stated: 'These are wild accusations and they do not merit a response.'

MEMRI's track record of distortion is consistent with this political bias. Professor Shrenzel's uncritical use of its translations is further evidence of his lack of a replicable expert methodology. Indeed, it is precisely the attempt to replicate his work that discloses the flawed methodology of his sources.

Shrenzel also cites source material from PMW, Itamar Marcus' organization discussed earlier in this report.  Like Mr. Marcus, Professor Shrenzel cites Palestinian textbooks as proof that the PA was involved in incitement:

> The books ignore the existence of Israel, and the existence of Judaism in the region is not mentioned by name alongside Christianity and Islam. The cities that are within the State of Israel, as well as mountains and geographic areas, are considered in the textbooks as part of Palestine.

However an analysis of the *National Education* series by Professor Nathan J, Brown of George Washington University in 2001 concluded that 'far from inciting schoolchildren, the books generally treat sensitive political questions as tangential.'[195]

> If there is any issue that has attracted more international attention, it is the presence of maps in Palestinian textbooks that do not indicate the existence of Israel.  But the 1994 National Education series worked to avoid maps altogether, instructing the students at one point to draw their own.  The newer books break some of the silence of the 1994 series.  But those books omit much more than Israel; they also omit the borders of the Palestinian state.  The books include many maps; all present the ambiguity of the borders of Palestine without addressing the subject directly in the text.  Absent any authoritative borders, the books dodge the issue: maps of the entire area of mandatory Palestine (including

34

Israel) are sometimes historical or topographical in order to avoid drawing political boundaries. Israel is thus not indicated (nor are Jordan, Syria, Lebanon and Egypt). Other maps clearly delineate the West Bank and Gaza with different colors or dotted lines but do not explain what these indications signify. Sometimes Palestine's provinces are drawn (including only the West Bank and Gaza). On one occasion, Palestinian telephone area codes are indicated on a map that covers only the West Bank and Gaza—no mention is made that these area codes straddle the 1967 borders and are thus shared with Israel. Maps of cities indicate the existence of those within the 1967 borders of Israel with a significant Palestinian population before and after 1948 (Jaffa, Nazareth, Beersheva, Akka, and Haifa), but the significance of these cities is not explained: are they included because they are the birthplace of many schoolchildren's grandparents or because they still contain Palestinians? No explanation is ever given.[196]

In criticizing similar allegations made by Mr. Marcus, Akiva Eldar of the Israeli paper *Haaretz* reported in 2001:

> In recent years Marcus has been making a living translating and disseminating defamatory communications against Israel, extracted by his staff from Palestinian publications. Marcus, a settler, used to work for David Bar Illan, Benjamin Netanyahu's PR chief, and served on the Joint Israeli Palestinian Anti-Incitement Committee. Marcus's center routinely feeds the media with excerpts from 'Palestinian' textbooks that call for Israel's annihilation. He doesn't bother to point out that the texts quoted in fact come from Egypt and Jordan.
>
> In an executive summary he published for Thursday's seminar, Marcus makes a report of the 14 new textbooks published by the PA's 'Center for Developing the Palestinian Curricula,' replacing the old books. Marcus concedes there were 'a few changes,' like the fact that 'The open calls for Israel's destruction found in the previous books are no longer present' and that 'references defining Jews and Israelis as 'treacherous' or 'the evil enemy,' common in the previous books, are likewise not present.' But this, to Marcus, is not enough. He complains that the new books 'continue to teach non-recognition of Israel,' and that the maps portray greater Palestine, with no boundaries separating the territories and Israel (just like the official textbooks and maps used by most Israeli institutions).[197]

The failure to consider such alternative interpretations is a further indication that rather than following a replicable expert methodology, Professor Shrenzel is simply reproducing uncritically the sources most hostile to the Palestinian Authority.

A number of key sources cited by Professor Shrenzel turn out either to come either from the Israeli security establishment or from NGOs closely linked to it. In the case of material produced by the Israeli judicial process, key evidence is adduced from uncorroborated confessions produced in trials that did not meet international standards. Professor Shrenzel does not apply any specialized knowledge to analyse complicated facts – he simply repeats the contentions of other, like-minded commentators and wraps his opinions in his background as an intelligence officer.

VIII.  **Alon Eviatar**

A.    Background and Institutional Affiliations.

Lt. Col Eviatar's claim to relevant expertise is based primarily on his career with the Israel Defence Forces (IDF).  This falls broadly into two parts: Firstly his service with the IDF Intelligence Branch from 1986 to 1997, and secondly his service in various organs of the civil administration run by the IDF in the Occupied Territories between 1998 and 2013.[198]  In relation to his intelligence experience, Eviatar states:

> In the course of my services in the IDF, I received and read many thousands of intelligence items – including raw intelligence data obtained from electronic and human sources as well as analyses and summaries compiled from such raw data, many of which my team prepared under my supervision – relating to the activities of the Palestinian Authority (the 'PA'), the Palestine Liberation Organization (the 'PLO') and the full range of Palestinian groups, organizations, institutions and personalities.[199]

Intelligence experience of this kind cannot provide a sound basis for a claim to expertise. A valid expert discipline must be capable of peer-review and provide conclusions replicable by other experts in the same field using a generally accepted methodology. Secret intelligence, based on appeals to confidential sources, cannot meet this standard. Eviatar's work with the civil administration is also problematic for his claim to expertise given its record of extreme bias against the Palestinian people.

The Israeli civil administration in the West Bank is part of the IDF's Coordinator of Government Activities in the Territories Unit. Its main activities are run through a series of district coordination and liaison administrations.[200] A 2004 report by two Israeli NGOs, Physicians for Human Rights and Machsom Watch, described how these administrations work in practice:

> At every Israeli DCL [District Civil Liaison] in the West Bank, without any consideration for the size of the population it serves, there are five reception counters, two of which deal with applications for travel permits. Simple arithmetic reveals that a population of two million people is dependent on the functioning and good will of sixteen clerks.  For anything connected with health there is in addition one Health Coordinator, who has a secretary and an assistant. Even if we have made some small mistakes here, and there are further clerks in the buildings who are not visible to the Palestinians or to us, it is clear that this system suffers from a huge shortage of manpower. Furthermore, their working methods have hardly changed since the Oslo Agreements, and they have scarcely responded to the dramatic increase in the needs of the Palestinian population following the imposition of internal closures, blockades and the collapse of Palestinian civil organizations. These facts confirm that the system of DCLs is not intended to provide a real answer to the daily needs of the Palestinian population. It is there in order to preserve appearances, to look as if civil life could carry on in a situation where paralysis of ordinary life is the rule, and travel can be undertaken only with a permit.[201]

In his introduction to the report, Dr. Danny Filc of Physicians for Human Rights-Israel, said of this system: 'the restrictions on movement within the occupied territories are not there to provide security for the state of Israel and her citizens, but to enable the

continuation of the occupation and in particular its major expression, the settlement project.'[202]

Eviatar was personally involved in the imposition of oppressive restrictions on the Palestinian population. In 2003, during his tenure as head of the Coordination Administration in Jericho and the Jordan Valley, the *Christian Science Monitor* reported on the implementation of a 'Jericho model', based on what Eviatar called a 'clear and direct connection between the degree of security stability and the degree of activity by the Palestinian forces in Jericho and Israel taking steps [to ease strictures].'[203]

The paper reported:

> Unlike other cities, where armed factions have carried out local attacks on troops and suicide bombings against Israeli cities, Jericho has been completely quiet for over a year, according to the Israeli army, and since the start of the intifada, according to Palestinians.
>
> The main step in the current easing has been allowing the East Jerusalem residents and some busloads of Palestinians from other cities into the town, for two years completely off-limits to Palestinians from outside. Jericho residents stress, however, that despite what Israel acknowledges to be complete quiet for over a year, they are still hemmed in by checkpoints, earthen barriers and a huge ditch dug by the army on all sides of the town.[204]

Eviatar told the *Christian Science Monitor* that further steps were possible if the Palestinian security forces arrest fugitives wanted by Israel. Despite the prolonged period of quiet, he added that 'We have made it very clear to them that one security incident can overturn everything,' a clear example of the arbitrary approach ascribed to the Coordination and Liaison Administration by Physicians for Human Rights.[205]

The Jericho model over which Eviatar presided was strongly criticized by human rights groups:

> B'tselem, the Israeli human rights group, says the army's practices violate the Geneva Conventions, which proscribes collective punishment, and that the reasoning behind the model is 'cynical.' The easing of strictures as a type of reward proves they do not derive from specific security concerns to begin with, says the organization. 'Freedom of movement is not a favor to be granted, it is an obligation on the occupying power,' says spokesman Lior Yavne.[206]

Eviatar's direct personal role in implementing an arbitrary and oppressive regime in Jericho must vitiate his claim to be an objective expert on the Palestinians. In particular, the fact that Israel's pursuit of Palestinian fugitives provided the pretext for his own arbitrary policies in Jericho creates a profound issue of bias, since any acknowledgement that such fugitives may have been innocent would cast an even more negative light on his own actions.

In sum, Lt Col. Eviatar's biography does not demonstrate relevant expertise, and raises profound issues of bias. His report itself provides further evidence for these conclusions as will be demonstrated below.

B.     Lack of Valid Methodology in his Expert Report

As an initial matter, it is not clear who wrote Lt. Col. Eviatar's report.  The report bears a close similarity to the report previously submitted for the plaintiffs by Ronni Shaked.  An automated comparison of the reports carried out for the respondents shows that large parts of the substance of both documents are identical, and the Eviatar report appears to be simply a lightly edited version of the Shaked report.[207]  This being the case, Lt. Col. Eviatar's report cannot be said to be the result of the independent exercise of a replicable expert methodology by its author.

This conclusion is strengthened by the fact that the Eviatar report retains claims of expertise in areas within Ronni Shaked's personal experience, but not within Lt. Col. Eviatar's.  For example, the report by Shaked, who is a former officer of the Israel Security Agency, states:

> Terrorist interrogation is one of the more difficult operations in the work of the Israel Security Service Agency. An interrogator must be skilled and professional in his work: he must have an excellent knowledge of Arabic, including the nuances of the language; he must be familiar with the ideology of the organization to which the suspect belongs; he must be thoroughly familiar with Palestinian society from the socioeconomic and cultural standpoints. An interrogator must be tolerant, patient and quick to catch on; he must know how to exploit the weaknesses of a clever and credible suspect. These are only some of the character traits which an Israel Security Service Agency / Israel Police interrogator needs in order to contend with a subject who is suspected of having perpetrated a terrorist operation.[208]

The statement of credentials in Lt. Col. Eviatar's report does not mention any experience of the Israel Security Agency.[209] However, in the corresponding passage in his report, he states:

> While I have not personally been involved in the interrogation of terrorists, I am familiar with such interrogations from, inter alia, my work at the Israel Security Agency. Terrorist interrogation is one of the more difficult operations in the work of the Israel Security Service Agency. An interrogator must be skilled and professional in his work: he must have an excellent knowledge of Arabic, including the nuances of the language; he must be familiar with the ideology of the organization to which the suspect belongs; he must be thoroughly familiar with Palestinian society from the socioeconomic and cultural standpoints. An interrogator must be tolerant, patient and quick to catch on; he must know how to exploit the weaknesses of a clever and credible suspect. These are only some of the character traits which an Israel Security Service Agency / Israel Police interrogator needs in order to contend with a subject who is suspected of having perpetrated a terrorist operation.[210]

Eviatar here adopts Shaked's claims as his own, despite his lesser experience, and without attribution.  In an academic environment, this would be considered plagiarism, precisely because it is the opposite of a replicable expert methodology.

Whoever is the true author of the Eviatar report, there are other fundamental problems with its methodology and sourcing.

For example, on page 7 of his report, the report cites a wanted list delivered to the Palestinian Authority by the Israel Security Agency in August 2001. He states of this document, 'Given the way in which the document is organized, i.e. by geographical area and then by organizational affiliation, and given the timing, the missing page of the request should contain Abdullah Barghouti's name.'[211]

The only legitimate inference that can be drawn from Eviatar's argument is that Barghouti's name would have been on the missing page of the list, *if it was on the list at all*. To go beyond this and suggest that the missing page 'should contain' Barghouti's name is a speculative exercise, and not the application of a replicable expert methodology, which would require evidence such as the missing page itself. Indeed, one might equally infer, from the plaintiffs inability to produce the page, that Barghouti's name was not on the list.

Eviatar makes similar arguments from authority in his account of the Palestinian Authority's detention of Abdullah Barghouti. He states, for example, that: 'In my expert opinion, the decision by Palestinian security forces not to interrogate Barghouti, not to confiscate his preparation materials (including chemicals used to make explosives), and not to inquire about his motives for owning those materials and explosive devises was intended to send Abdullah Barghouti a clear message: he could continue to carry out terrorist attacks with impunity.'[212] He also states: 'It is my expert opinion that Abdullah Barghouti's favorable treatment in prison constituted a signal from the PA that he was free to carry out attacks against Israel.'[213]

It is not clear that there is any replicable methodology, rather than personal intuition, underlying Lt. Col. Aviatar's preference for these inferences over alternative hypotheses. These inferences also do not appear to be based on any law enforcement experience, which is absent from Lt. Col. Aviatar's statement of credentials.[214]

A key passage from the Shaked report, omitted in the Aviatar report, bears consideration on this point. Shaked states that: 'in a long conversation which I held with him, Abdullah Barghouti denied many details and ignored many other details which he had given in his confession, which I read before I spoke with him.'[215]

The omission of this passage in the Eviatar report raises two possibilities. Either Lt Col Eviatar chose to omit information which is central to the assessment of Barghouti's testimony, or he was unaware of it. Neither possibility is consistent with the application of a replicable expert methodology.

The Eviatar report does retain an extensive discussion of Israeli interrogations. Lt. Col. Eviatar makes one brief mention of the issue of physical pressure, as one of a number of reasons detainees give for frequently repudiating statements made under interrogation

> The most common argument is that the suspect/interrogatee was tortured during the interrogation and submission of the confession. In many cases, this argument becomes a 'trial within a trial', in which the argument is that the confession was extracted under the physical and emotional pressure of torture, and the suspect signed the confession as a result of the pressure and even without knowing what was written in the confession.[216]

Lt. Col. Eviatar gives a number of alternative reasons why detainees may repudiate their confessions but does not explicitly attempt to deny that such events occur. In 2009, a joint report by the Israeli NGOs B'Tselem and HaMoked found that interrogations of Palestinian security prisoners by Israel 'are still based on harmful and cruel means', in spite of a 1999 Israeli Supreme Court ruling which nullified a number of interrogation methods used at the time by the ISA.[217]

By acknowledging the reasons some detainees give for repudiating confessions, and failing to show why such repudiations should be disregarded, Lt. Col. Eviatar underlines the weakness of this key source for his report.

The professional practices upon which Lt. Col. Eviatar relies raise profound moral questions in themselves, and his willingness to rely upon the resulting statements without further inquiry reflect a significant flaw in his expert methodology. As with others of the plaintiffs' proposed experts, Lt. Col. Eviatar does not analyse and process facts and information. Rather, he simply passes along information from biased sources without making any critical evaluation of the accuracy or context of that information.


_____                    _____15 July 2013_____
David Miller                                       Date


40

1 Miller, David, *Don't Mention the War: Northern Ireland, Propaganda and the Media* London: Pluto, 1994.
2 Miller D. and Mills, T., '[The Terror Experts and the Mainstream Media: The Expert Nexus and its Dominance in the News Media](#)', *Critical Studies on Terrorism*, Volume 2, issue 3. December 2009, p. 414 – 437.
3 Global Uncertainties 'RCUK Global Uncertainties Leadership Fellows'
http://www.globaluncertainties.org.uk/about/Leadership-Fellows.aspx
4 Global Uncertainties, 'Understanding and explaining terrorism: expertise in practise'
http://www.globaluncertainties.org.uk/about/GU-fellows/Miller.aspx
**Notes and references**
5 Efraim Karsh, 'The Unbearable Lightness of My Critics', *Middle East Quarterly*, Vol IX, No.3, Summer 2002, pp. 63-73. http://www.meforum.org/207/the-unbearable-lightness-of-my-critics
6 Efraim Karsh, 'The Unbearable Lightness of My Critics', *Middle East Quarterly*, Vol IX, No.3, Summer 2002, pp. 63-73. http://www.meforum.org/207/the-unbearable-lightness-of-my-critics
7 Professor Karsh's submitted CV gives the latter date, whilst his entry in *Who's Who in the World*, gives the former date.  See *Who's Who in the World*, 23rd Edition, accessed via Nexus UK.
8 Who's Who in the World, 23rd Edition, accessed via Nexus UK. See biographical note in 'Finland: Adaptation and Conflict', *International Affairs*, Vol. 62, No. 2, Spring 1986, pp. 265-278.
9 Nicholas John Cull, *Propaganda and mass persuasion: a historical encyclopedia,* Abc-clio, 2003, p.195.
10 Zeev Maoz and Azar Gat, *War in a changing world*, University of Michigan Press, 2001.
11 Bitter Lemons, About, http://www.bitterlemons.org/about/about.html.
12 Tel Aviv University, Jaffee Center for Strategic Studies, JCSS Staff, 8 November 2001. Retrieved from the Internet Archive.
http://web.archive.org/web/20011108014040/http://www.tau.ac.il/jcss/staff.html
13 Ephraim Kahana, Historical Dictionary of Israeli Intelligence, Scarecrow Press, 2006, p.135
14 'Efraim Karsh, 'Abbas's fable', *Jerusalem Post*, 20 May 2011, p.24.
15 Middle East Forum, The Middle East Quarterly, http://www.meforum.org/meq/.
16 Efraim Karsh, 'Rewriting Israel's History', *Middle East Quarterly*, June 1996, pp. 19-29.
http://www.meforum.org/302/rewriting-israels-history
17 Wajahat Ali et al (2001), *Fear Inc: The Roots of the Islamophobia Network in America*, Center for American Progress, August 2011. http://www.americanprogress.org/issues/2011/08/pdf/islamophobia.pdf
18 Eyal Press, 'Neocon Man', *The Nation*, 10 May 2004. http://www.thenation.com/article/neocon-man
19 John Mearsheimer and Stephen Walt, *The Israel Lobby and U.S. Foreign Policy* (New York: Farrar, Straus and Giroux, 2007) p.179.
20 Eyal Press, 'Neocon Man', *The Nation*, 10 May 2004. http://www.thenation.com/article/neocon-man
21 Juan Cole, 'Character Assassination', Informed Comment, 8 December, 2004.
http://www.juancole.com/2004/12/character-assassination-yes-im-aware.html
22 Eyal Press, 'Neocon Man', *The Nation*, 10 May 2004. http://www.thenation.com/article/neocon-man
23 Eyal Press, 'Neocon Man', *The Nation*, 10 May 2004. http://www.thenation.com/article/neocon-man
24 Eyal Press, 'Neocon Man', *The Nation*, 10 May 2004. http://www.thenation.com/article/neocon-man
25 Eyal Press, 'Neocon Man', *The Nation*, 10 May 2004. http://www.thenation.com/article/neocon-man
26 Middle East Forum, The Middle East Quaterly, http://www.meforum.org/meq/.
27 Denis MacEoin, *The Hijacking of British Islam: How Extremist Literature is Subverting Mosques in the UK* (Policy Exchange, October 2007) p.5.
28 Peter Barron, 'Disastrous misjudgement?', BBC Blogs, 13 December 2007. Available at:
http://www.bbc.co.uk/blogs/theeditors/2007/12/disastrous__misjudgement.html
29 Middle East Forum, Biography of Denis MacEoin, http://www.meforum.org/staff/Denis+MacEoin
30 RightWeb, Profiles > Organizations > Middle East Forum, http://www.rightweb.irc-online.org/profile/Middle_East_Forum
31 Wajahat Ali et al (2001), *Fear Inc: The Roots of the Islamophobia Network in America*, Center for American Progress, August 2011. http://www.americanprogress.org/issues/2011/08/pdf/islamophobia.pdf
32 The donors, followed by the total amounts received in parentheses were: Donors Capital Fund ($2,300,000), the Lynde and Harry Bradley Foundation ($305,000), the Newton D. & Rochelle F. Becker foundations and charitable trust ($355,000), Russell Berrie Fondation ($273,016), the Anchorage Charitable Foundation and William Rosenwald Family Fund ($2,320,229) and the Fairbrook Foundation ($410,000).
33 Wajahat Ali et al (2001), *Fear Inc: The Roots of the Islamophobia Network in America*, Center for American Progress, August 2011. http://www.americanprogress.org/issues/2011/08/pdf/islamophobia.pdf
34 See Middle East Forum, Form 990s for the Years Ending 2009, 2010 and 2011.
35 See Hertog Foundation Inc., Form 990s for the Years Ending 2009, 2011 and 2012.
36 See Hertog Foundation Inc., Form 990s for the Years Ending 2009, 2011 and 2012.

41

[37] 48 of the 99 articles were published in magazines and other non-peer reviewed publications; namely *Commentary* (27), *Europa-Archiv* (2), *New Republic* (2), *Orbis* (2), *The Times Literary Supplement* (10), *The Washington Quarterly* (2) and the *World Today* (3).

[38] Eyal Press, 'Neocon Man', *The Nation*, 10 May 2004. http://www.thenation.com/article/neocon-man

[39] A search of Google Scholar (which unlike ISI Web of Knowledge includes books) conducted on 9 May 2012 found that his five most cited works were: Lawrence Freedman and Efraim Karsh, *The Gulf conflict, 1990-1991: Diplomacy and war in the new world order*. Princeton: Princeton University Press, 1993 (Cited by 439); Efraim Karsh and Inari Rautsi, *Saddam Hussein: A political biography*. Grove Pr, 1991 (Cited by 209); Efraim Karsh, *Fabricating Israeli History: The 'New Historians'*. Vol. 10. Routledge, 2000. (Cited by 126); Efraim Karsh, *Islamic imperialism: A history*. Yale University Press, 2007. (Cited by 108); Efraim Karsh, *Neutrality and small states*. Routledge, [1988] 2012. (Cited by 86)

[40] Efraim Karsh and Rory Miller, 'Freya Stark in America: Orientalism, antisemitism and political Propaganda', *Journal of Contemporary History*, 39(3), 315-332.

[41] Efraim Karsh, 'How many Palestinian Arab refugees were there?', *Israel Affairs*, 17(2), 224-246,

[42] Taylor & Francis Online, Israel Affairs > About This Journal > Editorial Board, http://www.tandfonline.com/action/aboutThisJournal?show=editorialBoard&journalCode=fisa20

[43] Efraim Karsh, 'Rewriting Israel's History', *Middle East Quarterly*, June 1996, pp. 19-29. http://www.meforum.org/302/rewriting-israels-history

[44] Avi Shlaim, 'A Totalitarian Concept of History', *Middle East Quarterly*, September 1996, pp. 52-55. http://www.meforum.org/92/a-totalitarian-concept-of-history

[45] Benny Morris, 'Undeserving of a Reply', *Middle East Quarterly*, September 1996, p. 51. http://www.meforum.org/90/undeserving-of-a-reply

[46] Benny Morris, 'My Response to Efraim Karsh', *The American Thinker*, 17 July 2011. http://www.americanthinker.com/2011/07/my_response_to_efraim_karsh.html

[47] Ian S. Lustick, 'Israeli history: Who is fabricating what?', *Survival*, 39.3 (1997): 156-166.

[48] Colin Shindler, 'Right, wrong, or neither', *Jewish Chronicle*, 14 May 2010, p.41.

[49] Charles D. Smith, 'Book Review of Empires of the Sand: The Struggle for Mastery in the Middle East, 1789-1923', *International Journal of Middle East Studies*, Vol. 32, No. 4 (Nov., 2000), 559-565.

[50] Charles D. Smith, 'Book Review of Empires of the Sand: The Struggle for Mastery in the Middle East, 1789-1923', *International Journal of Middle East Studies*, Vol. 32, No. 4 (Nov., 2000), 559-565.

[51] Charles D. Smith, 'Palestine Betrayed (review)', *The Middle East Journal*, Volume 65, Number 1, Winter 2011.

[52] Henry E. Chambers, *International Review of Modern Sociology*, 34(2) (Autumn 2008), pp. 315-317.

[53] Richard W. Bulliet, *International Journal of Middle East Studies*, 40(3), 2008, pp.485-486.

[54] Efraim Karsh, 'The Palestinians, Alone', *New York Times*, 1 August 2010. http://www.nytimes.com/2010/08/02/opinion/02karsh.html?_r=0

[55] 'Does the NY Times Factcheck Op-Eds?', Fairness and Accuracy in Reporting (FAIR), 4 August 2010. http://fair.org/take-action/action-alerts/does-the-ny-times-factcheck-op-eds/

[56] 'Does the NY Times Factcheck Op-Eds?', Fairness and Accuracy in Reporting (FAIR), 4 August 2010. http://fair.org/take-action/action-alerts/does-the-ny-times-factcheck-op-eds/

[57] Jonathan D. Tepperman, *Washington Post National Weekly Edition*, 19-25 January 2004, p.32.

[58] Yossi Alpher, '"I am de Gaulle, I am Mandela, I am Washington": Two Biographies Explore the Life of Yasser Arafat, But Neither Pierces the Darkness', *The Forward*, 5 March 2004. http://forward.com/articles/6455/i-am-de-gaulle-i-am-mandela-i-am-washington/#ixzz2Xy8yaHlR

[59] Yossi Alpher, '"I am de Gaulle, I am Mandela, I am Washington": Two Biographies Explore the Life of Yasser Arafat, But Neither Pierces the Darkness', *The Forward*, 5 March 2004. http://forward.com/articles/6455/i-am-de-gaulle-i-am-mandela-i-am-washington/#ixzz2Xy8yaHlR

[60] 'Arafat sees Israel's demise', *Jerusalem Post,* 23 February 1996.

[61] Oddbjørn Leirvik, 'The Cartoon Controversy in Norway: The New Christian Right and Liberal Fundamentalism Confronting Islam?', In *Fundamentalism in the Modern World Vol 2: Fundamentalism and Communication: Culture, Media and the Public Sphere*, edited by Ulrika Martensson, Jennifer Bailey, Priscilla Ringrose, Asbjorn Dyrendal, Tauris, 2011, pp.129-130.

[62] Details of the search are : Years: (between 1988 and 1996). All incidents regardless of doubt. Country: (Israel; West Bank and Gaza Strip). The GTD does not contain specific data for 1993 and the aggregate figures for that year are therefore based on those that appear in the appendix of the GTD Codebook, logged as Israel. There is no entry in that document detailing incidents that occurred in the West Bank and Gaza that year.

[63] Israeli Ministry of Foreign Affairs, Sharm el-Sheikh Fact-Finding Committee, Second Statement of the Government of Israel, 20 March 2001. http://www.mfa.gov.il/MFA/MFA-Archive/2001/Pages/Sharm%20el-Sheikh%20Fact-Finding%20Committee%20-%20Second%20St.aspx

[64] *Report of the Sharm el-Sheikh Fact-Finding Committee.* http://2001-2009.state.gov/p/nea/rls/rpt/3060.htm

[65] Jeremy Pressman, 'The second intifada: Background and causes of the Israeli-Palestinian conflict,' *Journal of Conflict Studies* 23.2 (2006). http://journals.hil.unb.ca/index.php/jcs/article/view/220/378#a19

[66] See Israeli Ministry of Foreign Affairs, Sharm el-Sheikh Fact-Finding Committee, First Statement of the Government of Israel, 28 December 2000, para.3. and Second Statement of the Government of Israel, 20 March 2001, para.2.

[67] *Report of the Sharm el-Sheikh Fact-Finding Committee.* http://2001-2009.state.gov/p/nea/rls/rpt/3060.htm

[68] CoBen-Simhon. 'My job is to represent people', *Haaretz*, 28 January 2011. http://www.haaretz.com/weekend/week-s-end/my-job-is-to-represent-people-1.339711

[69] US Department of State, Israel/Palestinians: U.S. Position on Settlements, Question Taken at the October 12, 2011. http://www.state.gov/r/pa/prs/ps/2011/10/175339.htm

[70] CoBen-Simhon. 'My job is to represent people', *Haaretz*, 28 January 2011. http://www.haaretz.com/weekend/week-s-end/my-job-is-to-represent-people-1.339711

[71] CoBen-Simhon. 'My job is to represent people', *Haaretz*, 28 January 2011. http://www.haaretz.com/weekend/week-s-end/my-job-is-to-represent-people-1.339711

[72] Cited in HaMoked (Center for the Defence of the Individual), *Escaping Responsibility: The Response of the Israeli Military Justice System to Complaints Against Soldiers by Palestinians* (Jerusalem, December 1997) p.9.

[73] HaMoked (Center for the Defence of the Individual), *Escaping Responsibility: The Response of the Israeli Military Justice System to Complaints Against Soldiers by Palestinians* (Jerusalem, December 1997) p.10.

[74] HaMoked (Center for the Defence of the Individual), *Escaping Responsibility: The Response of the Israeli Military Justice System to Complaints Against Soldiers by Palestinians* (Jerusalem, December 1997) p.8.

[75] HaMoked (Center for the Defence of the Individual), *Escaping Responsibility: The Response of the Israeli Military Justice System to Complaints Against Soldiers by Palestinians* (Jerusalem, December 1997) p.10.

[76] Judy Siegel, 'ZAKA wants Mashaal tried for crimes against humanity', *Jerusalem Post*, 22 November 2007, p.5.

[77] Tovah Lazaroff and Ron Friedman, 'Schalit's parents ask French court to probe Hamas', *Jerusalem Post*, 7 June 2011, p.3.

[78] Joanna Paraszczuk, 'Israeli NGO asks ICC to revoke PA's acceptance of court's jurisdiction', *Jerusalem Post*, 9 September 2011, p.2; Joanna Paraszczuk, 'ICC prosecutor: No Cast Lead probe since Palestinian Authority not a state', *Jerusalem Post*, 4 April 2012, p.1.

[79] Regavim, Our Vision, http://regavim.org.il/en/our-vision/

[80] Dan Izenberg, 'For first time, High Court orders demolition of illegal Palestinian houses', *Jerusalem Post*, 10 September 2009, p.1

[81] regavim.org.il Whois record, accessed via Domain Tools on 2 May 2013.

[82] Ina Friedman, 'Our Man in the Capital of Justice', *Jerusalem Report*, 12 January 2004, p.26.

[83] Yesh Din, Backyard Proceedings: The Implementation of Due Process Rights in the Military Courts in the Occupied Territories, January 2007, p.16. http://www.yesh-din.org/userfiles/file/Reports-English/BackyardProceedingsfullreportEng.pdf

[84] Yesh Din, Backyard Proceedings: The Implementation of Due Process Rights in the Military Courts in the Occupied Territories, January 2007, p.21. http://www.yesh-din.org/userfiles/file/Reports-English/BackyardProceedingsfullreportEng.pdf

[85] Yesh Din, Backyard Proceedings: The Implementation of Due Process Rights in the Military Courts in the Occupied Territories, January 2007, p.20. http://www.yesh-din.org/userfiles/file/Reports-English/BackyardProceedingsfullreportEng.pdf

[86] Yesh Din, Backyard Proceedings: The Implementation of Due Process Rights in the Military Courts in the Occupied Territories, January 2007, p.13. http://www.yesh-din.org/userfiles/file/Reports-English/BackyardProceedingsfullreportEng.pdf

[87] Yesh Din, Backyard Proceedings: The Implementation of Due Process Rights in the Military Courts in the Occupied Territories, January 2007, p.49. http://www.yesh-din.org/userfiles/file/Reports-English/BackyardProceedingsfullreportEng.pdf

[88] Yesh Din, Backyard Proceedings: The Implementation of Due Process Rights in the Military Courts in the Occupied Territories, January 2007, p.13. http://www.yesh-din.org/userfiles/file/Reports-English/BackyardProceedingsfullreportEng.pdf

[89] Addameer Prisoner Support and Human Rights Association, *Presumed Guilty: Failures of the Israeli Military Court System*, November 2009, p.5.. http://www.addameer.org/files/Reports/addameer-report-presumed-guiltynove2009.pdf

[90] Lisa Hajjar, *Courting conflict: The Israeli military court system in the West Bank and Gaza*, University of California Press, 2005, p.3.

[91] Sharon Weill, 'The judicial arm of the occupation: the Israeli military courts in the occupied territories', *International Review of the Red Cross – New Series*, 89.866 (2007): 395.

92 Daphna Golan, *The Military Judicial System in the West Bank*. Ed. Elliot Appel. B'Tselem, 1989, p.35.

93 Amnesty International, *The Military Justice System in the Occupied Territories: Detention, Interrogation and Trial Procedures*, New York: Amnesty International, 1991.

94 Freedom House, Freedom in the World 2012 > West Bank,
http://www.freedomhouse.org/report/freedom-world/2012/west-bank

95 Amnesty International, Annual Report 2012 – The state of the world's human rights.
http://www.amnesty.org/en/region/israel-occupied-palestinian-territories/report-2012

96 Human Rights Watch, World Report 2013, Israel/Palestine, http://www.hrw.org/world-report/2013/country-chapters/israel-palestine?page=3

97 Wajahat Ali et al. Fear Inc: The Roots of the Islamophobia Network in America, Center for American Progress, (August 2011). http://www.americanprogress.org/issues/2011/08/pdf/islamophobia.pdf

98 Washington Institute for Near East Policy, Expert Biography > Matthew Levitt.
http://www.washingtoninstitute.org/experts/view/levitt-matthew

99 Rightweb, Washington Institute for Near East Policy, 10 September 2009. http://www.rightweb.irc-online.org/profile/Washington_Institute_for_Near_East_Policy

100 AIPAC 'Our Mission' http://www.aipac.org/en/about-aipac/our-mission

101 John J Mearsheimer and Stephen M Walt, *The Israel Lobby and US Foreign Policy*, New York: Farrar, Straus, and Giroux, 2007, pp.175-6.

102 Counterterrorism Blog, 'About'. http://counterterrorismblog.org/about/

103 See for example Public Policy Partnership Lobbying Report for Steven Emerson 2004,
http://www.powerbase.info/images/a/ad/Steven_Emerson_Public_Policy_Partnership_Year_End_Report_2004.pdf

104 Wajahat Ali et al, *Fear Inc.: The Roots of the Islamophobia Network in America*, Center for American Progress (August 2011), http://www.americanprogress.org/issues/2011/08/pdf/islamophobia.pdf

105 Wajahat Ali et al, *Fear Inc.: The Roots of the Islamophobia Network in America*, Center for American Progress (August 2011), http://www.americanprogress.org/issues/2011/08/pdf/islamophobia.pdf

106 Wajahat Ali et al, *Fear Inc.: The Roots of the Islamophobia Network in America*, Center for American Progress (August 2011), http://www.americanprogress.org/issues/2011/08/pdf/islamophobia.pdf

107 Wajahat Ali et al, *Fear Inc.: The Roots of the Islamophobia Network in America*, Center for American Progress (August 2011), http://www.americanprogress.org/issues/2011/08/pdf/islamophobia.pdf

108 Media Transparency, Recipients of Funder > William H. Donner Foundation, 10 June 2007. Retrieved from the Internet Archive.
http://web.archive.org/web/20070610005547/http://www.mediatransparency.org/recipientsoffunder.php?funderID=19

109 Matthew Levitt, *Negotiating Under Fire: Preserving Peace Talks in the Face of Terror Attacks*, Rowman & Littlefield Publishers, 2008.

110 Billmyer, John R. *The IDF: Tactical Success - Strategic Failure, SOD, the Second Intifada and Beyond*. ARMY COMMAND AND GENERAL STAFF COLL FORT LEAVENWORTH KS SCHOOL OF ADVANCED MILITARY STUDIES, 2011.

111 Google Scholar at the time of the search included 13 references but these results included a duplicate entry for Adam Lowther's book, *Americans and asymmetric conflict*.

112 Namely John A. Robinson, *Shaping the Middle East in an Era of Revolution: Synchronizing US Central Command Theater Engagement*. ARMY COMMAND AND GENERAL STAFF COLL FORT LEAVENWORTH KS SCHOOL OF ADVANCED MILITARY STUDIES, 2011; Aaron Novy, 'CIA and KGB Covert Operations in Iran and Afghanistan and how it affects the US in the war on Terror with an emphasis on Saudi Arabia.' *URJ-UCCS: Undergraduate Research Journal at UCCS* 3.1 (2010): 30-38; and Daniel Evan Nowicki, 'Assessing the effectiveness of the US counterterrorism assistance program to the Republic of Yemen.' (2011).

113 Kira Homo, Christina Jones, John Russell, and Robert Goehlert, 'Terrorism: A Guide to Selected Resources', Indiana University, Bloomington, 2004.

114 Matthew Levitt, *Hamas: Politics, Charity, and Terrorism in the Service of Jihad*, Yale University Press, 2006, p.5.

115 Laleh Khalili, 'A Review of Matthew Levitt's Hamas: Politics, Charity, and Terrorism in the Service of Jihad', *International Affairs*, Volume 83, Issue: 3, pp.604-605

116 Khaled Hroub 'Hamas: Politics, Charity, and Terrorism in the Service of Jihad', *Journal of Palestinian Studies*, Volume: 35, Issue: 4, pp. 73-75.

117 Sara Roy, 'Hamas: Politics, Charity and Terrorism in the Service of Jihad', *Middle East Policy*, Volume: 14, Issue: 2, pp.162-166.

118 Matthew Levitt, 'Could Hamas Target the West?', *Studies in Conflict and Terrorism*,
Vol 30, Issue: 11, pp.925-945.

[119] Scott Atran and Marc Sageman, 'Connecting the Dots in Global Network Terrorism', Final Report of the Fourth Meeting of the World Federation of Scientists Permanent Monitoring Panel on Terrorism (PMPT), 18-22 May 2005.
http://www.federationofscientists.org/pmpanels/terrorism/erice_pmpt_2006_final_report.pdf

[120] An Edge Discussion of Beyond Belief: Science, Religion, Reason and Survival, Salk Institue, La Jolla November 5-7, 2006. http://www.edge.org/discourse/bb.html

[121] Matthew Levitt, *Targeting Terror: U.S. Policy toward Middle Eastern State Sponsors and Terrorist Organizations, Post-September 11*, Washington Institute for Near East Policy, 2002, p.vii.
http://www.washingtoninstitute.org/uploads/Documents/pubs/TargetingTerror.pdf.pdf

[122] Steven Erlanger, 'Militant Zeal: "Hamas," by Matthew Levitt', *New York Times*, 25 June 2006.
http://www.nytimes.com/2006/06/25/books/review/25erlanger.html?_r=1&

[123] David Rohde, 'Release More Documents Accusing Arafat of Terror', *New York Times*, 6 May 2002.
http://www.nytimes.com/2002/05/06/international/middleeast/06DOCU.html

[124] *Erased In A Moment: Suicide Bombing Attacks Against Israeli Civilians*, Human Rights Watch, 2002, p.128-9.
http://www.hrw.org/reports/2002/isrl-pa/ISRAELPA1002.pdf

[125] *Erased In A Moment: Suicide Bombing Attacks Against Israeli Civilians*, Human Rights Watch, 2002, p.131.
http://www.hrw.org/reports/2002/isrl-pa/ISRAELPA1002.pdf

[126] *Erased In A Moment: Suicide Bombing Attacks Against Israeli Civilians*, Human Rights Watch, 2002, p.132.
http://www.hrw.org/reports/2002/isrl-pa/ISRAELPA1002.pdf

[127] Nathan J. Brown, *The Palestinian Reform Agenda*, United States Institute of Peace, 2002, p.25.

[128] Nathan J. Brown, *The Palestinian Reform Agenda*, United States Institute of Peace, 2002, p.49, ft.19.

[129] *United States v. El-Mezain, et al.*, No. 09-10560, (5th Cir. Dec. 7, 2011).

[130] Hasbara Fellowships, Recommended Speakers, Itamar Marcus,
http://www.hasbarafellowships.org/index.php?page=recommended-speakers#Itamar Marcus

[131] Palestinian Media Watch, About Us, http://www.palwatch.org/pages/aboutus.aspx

[132] Nathan J. Brown, 'Democracy, history and the contest over the Palestinian curriculum', *Adam Institute*, Jerusalem, 2001, pp.2-3. http://www.jnul.huji.ac.il/ia/archivedsites/gushshalom010204/www.gush-shalom.org/archives/nathan_textbook.pdf

[133] Nathan J. Brown, 'Democracy, history and the contest over the Palestinian curriculum', *Adam Institute*, Jerusalem, 2001, p.3. http://www.jnul.huji.ac.il/ia/archivedsites/gushshalom010204/www.gush-shalom.org/archives/nathan_textbook.pdf

[134] Nathan J. Brown, 'Democracy, history and the contest over the Palestinian curriculum', *Adam Institute*, Jerusalem, 2001, p.4. http://www.jnul.huji.ac.il/ia/archivedsites/gushshalom010204/www.gush-shalom.org/archives/nathan_textbook.pdf

[135] Thomas L. Friedman, 'Israeli Children's Book: When Daddy is in Uniform', *New York Times*, 28 January 1985; 'Gulf of Distrust Divides 2 Jerusalem Suburbs', *New York Times*, 17 April 1986.

[136] Central Fund of Israel Form 990 for the year ending 31 January 2012.[137] Moshe Kohn, 'Caring', *Jerusalem Post*, 27 September 1989.

[138] Jim Rutenberg, Mike McIntire, and Ethan Bronner, 'Tax-Exempt Funds Aid Settlements in West Bank', *New York Times*, 5 July 2010.
http://www.nytimes.com/2010/07/06/world/middleeast/06settle.html?pagewanted=all&_r=0

[139] Barak Ravid, 'Foreign Ministry working with rightists against Palestinian incitement', Haaretz, 7 May 2010. http://www.haaretz.com/print-edition/news/foreign-ministry-working-with-rightists-against-palestinian-incitement-1.288828

[140] Central Fund of Israel Form 990 for the year ending 31 January 2012.[141] 'U. S. To Fund Unique Study Of Incitement In Textbooks', *The Forward*, 8 July 2011.

[142] Palestinian Media Watch, Support PMW, http://palwatch.org/pages/donate1.aspx

[143] Barak Ravid, 'Foreign Ministry working with rightists against Palestinian incitement', Haaretz, 7 May 2010. http://www.haaretz.com/print-edition/news/foreign-ministry-working-with-rightists-against-palestinian-incitement-1.288828

[144] Michael Felsen, 'Im Tirtzu's Zionism without democracy', *Haaretz,* 7 January 2013.
http://www.haaretz.com/opinion/im-tirtzu-s-zionism-without-democracy.premium-1.492403

[145] Ben Hartman and Lahav Harkov, 'Im Tirtzu launches campaign against 'myths' of the Nakba', *JPost.com*, 13 May 2011. http://www.jpost.com/National-News/Im-Tirtzu-launches-campaign-against-myths-of-the-Nakba

[146] Crosstalk, Israel: What Occupation? *Russia Today* 23 July 2012.  http://rt.com/shows/crosstalk/israel-occupation-report-bank/

[147] The Michael Cherney Foundation, Michael Cherney Foundation in Support of Palestinian Media Watch, http://www.cherfund.org/english/antifascism/antifascism11.htm

[148] Jerusalem Summit, International Advisory Board, http://www.jerusalemsummit.org/eng/board.php

[149] Jerusalem Summit, A New Paradigm for the Israeli-Palestinian Conflict: From the Political to the Humanitarian, http://www.jerusalemsummit.org/eng/hs_short_eng.htm

[150] Shlomo Ben-Ami, *Scars of War, Wounds of Peace: The Israeli-Arab Tragedy*, Oxford University Press, 2006, 267.

[151] Petra Bartosiewicz, 'Experts in Terror', *The Nation*, 4 February 2008. http://www.thenation.com/article/experts-terror?page=0,0, accessed 29 April 2013.

[152] Advisory Board, International Institute for Counter-Terrorism. http://www.ict.org.il/AboutICT/AdvisoryBoard/tabid/59/Default.aspx, accessed 29 April 2013.

[153] Advisory Board, International Institute for Counter-Terrorism. http://www.ict.org.il/AboutICT/AdvisoryBoard/tabid/59/Default.aspx, accessed 29 April 2013.

[154] 'Mr. Shabtai Shavit', International Institute for Counter-Terrorism. http://www.ict.org.il/Biographies/Mr.ShabtaiShavit/tabid/222/Default.aspx, accessed 29 April 2013.

[155] 'Suha Arafat admits husband premeditated Intifada', *Jerusalem Post*, 29 December 2012. http://www.jpost.com/Middle-East/Suha-Arafat-admits-husband-premeditated-Intifada, accessed 26 April 2013.

[156] Matthew Levitt, Targetting Terror: U.S. Policy toward Middle Eastern State Sponsors and Terrorist Organizations, Post-September 11, The Washington Institute for Near East Policy, 2002, p.89. http://www.washingtoninstitute.org/uploads/Documents/pubs/TargetingTerror.pdf., accessed 26 April 2013.

[157] 'Special Dispatch no.317: Recent Statements by Yasser Arafat', Middle East Media Research Institute, 21 December 2001. http://www.memri.org/report/en/0/0/0/0/0/0/572.htm, accessed 26 April 2013.

[158] Brian Whitaker, 'Selective Memri: Brian Whitaker investigates whether the 'independent' media institute that translates the Arabic newspapers is quite what it seems', guardian.co.uk, 12 August 2002. http://www.guardian.co.uk/world/2002/aug/12/worlddispatch.brianwhitaker, accessed 26 April 2013.

[159] 'Email debate: Yigal Carmon and Brian Whitaker', guardian.co.uk, 28 January 2003. http://www.guardian.co.uk/world/2003/jan/28/israel2, accessed 26 April 2013.

[160] Ruthie Blum Leibowitz, One on One with Yigal Carmon: If MEMR.I serves..., *Jerusalem Post*, 15 November 2006. http://www.jpost.com/Features/One-on-One-with-Yigal-Carmon-If-MEMRI-serves, accessed 26 April 2013.

[161] Ofira Seliktar, Doomed to Failure? The Politics and Intelligence of the Oslo Peace Process, ABC-CLIO, 2009, p.97.

[162] Nathan J. Brown, Democracy, History and the Contest Over the Palestinian Curriculum, Adam Institute, November 2001, p.3-7. http://www.jnul.huji.ac.il/ia/archivedsites/gushshalom010204/www.gush-shalom.org/archives/nathan_textbook.pdf, accessed 27 April 2013.

[163] Barak Ravid, 'Officials: Israel outsources monitoring of Palestinian media after IDF lapse', *Haaretz*, 31 January 2012. http://www.haaretz.com/print-edition/news/officials-israel-outsources-monitoring-of-palestinian-media-after-idf-lapse-1.410082, accessed 27 April 2013.

[164] The Involvement of Arafat, PA Senior Officials and Apparatuses in Terrorism against Israel: Corruption and Crime, Israel Ministry of Foreign Affairs, 6 May 2002. http://www.mfa.gov.il/MFA/MFAArchive/2000_2009/2002/5/The+Involvement+of+Arafat-+PA+Senior+Officials+and.htm, accessed 27 April 2013.

[165] Constant Brand, 'EU head office denies aid to Palestinians used to fund suicide bombers', Associated Press, 6 May 2002.

[166] Congress Criticizes Palestinian Ties,' *JTA, 5* April 5 2001. http://www.jta.org/2001/04/05/life-religion/features/congress-criticizes-palestinian-ties-2, accessed 28 April 2013.

**[167]** Shirl McArthur, 'Sharon Visit, AIPAC Meeting Generate Negative Congressional Letters, Unhelpful Bill,' *Washington Report On Middle East Affairs*, May-June 2001, p.12. <, accessed 19 April 2013.

[168] EXPERT REPORT OF ISRAEL SHRENZEL IN SOKOLOW V. PALESTINIAN AUTHORITY, CASE NO. 04-397 (S.D.N.Y.), (hereafter, Shrenzel report), p.1.

[169] Shrenzel report, p.1.

[170] Shrenzel report, pp.6-7.

[171] Shrenzel report, p.49.

[172] Gavin Rabinowitz, 'Palestinian Militia Founder Convicted to Multiple Life Terms by Israel', Associated Press Worldstream, 5 May 2003.

[173] 'THE TRIAL OF MR.. MARWAN BARGHOUTI – PALESTINE' in Results of the 110th IPU Assembly and related meetings, 2004, p.114.

[174] Ibid.

[175] Ibid, p.115.

[176] Ibid, p.111.

[177] Ibid.

[178] Ibid, p.119.

[179] Ibid, p.111.

[180] Ibid, p.119.

[181] Ibid, p.122

[182] Ibid, p.123.

[183] Ibid.

[184] Ibid, p.123.

[185] http://www.terrorism-info.org.il/en/index.aspx, accessed 12 June 2013.

[186] Steven Erlanger, 'Miltant Zeal: Hamas by Matthew Levitt, New York Times, 25 June 2006. http://www.nytimes.com/2006/06/25/books/review/25erlanger.html?_r=2&,

[187] Amy Tiebel, The Associated Press, 'Hezbollah accused of using human shields', *Washington Post*, 5 December 2006.

[188] Yossi Melman, 'The terrorist kills, and the bank pays", *Haaretz*, 14 February 2007.http://www.haaretz.com/print-edition/features/the-terrorist-kills-and-the-bank-pays-1.212923,

[189] Ibid.

[190] Ibid.

[191] 'Fatah Member In Gaza: We Must Sanctify The Blood Of Suicide Bombers', MEMR.I, 25 February 2013, http://www.meri.org/report/en/print7024.htm.

[192] Hillary Zaken, 'Abbas reverses censorship of anti-regime websites', *The Times of Israel*, 6 May 2012, http://www.timesofisrael.com/abbas-reverses-censorship-of-anti-regime-web-sites/.

[193] Brian Whitaker, 'Selective MEMRI', guardian.co.uk, 12 August 2002, http://www.guardian.co.uk/world/2002/aug/12/worlddispatch.brianwhitaker.

[194] Ibid.

[195] Professor Nathan J. Brown, 'Democracy, History and the Contest over the Palestinian Curriculum', Adam Institute, November 2001. Archived at the Internet Archive, http://web.archive.org/web/20090829005554/http://geocities.com/nathanbrown1/Adam_Institute_Palestinian_textbooks.htm#_ftnref37

[196] Ibid.

[197] Akiva Eldar, 'What did you study in school today, Palestinian child?,' *Haaretz*, 2 January 2001.

[198] Expert report of Alon Eviatar, p.1.

[199] Expert report of Alon Eviatar, p.2.

[200] Civil Administration in Judea and Samaria, Coordination of Government Activities in the Territories, http://www.cogat.idf.il/1279-en/Cogat.aspx, accessed 30 June 2013.

[201] Hadas Ziv, *The Bureaucracy of Occupation: the District Civil Liaison Offices*, Physicians for Human Rights-Israel & MachsomWatch, < http://www.phr.org.il/uploaded/15.5.04Report_1.pdf, 15 May 2004, p.8.

[202] Ibid, pp.6-7.

[203] Ben Lynfield, Tourists Trickle back to Jericho, *Christian Science Monitor*, 9 May 2003, http://www.csmonitor.com/2003/0509/p06s01-wome.html.

[204] Ibid.

[205] Ibid.

[206] Ibid.

[207] Shaked Expert Report 041013 - Alon Eviatar Expert Report 061413, 14 June 2013.

[208] Expert report of Ronni Shaked, p.19.

[209] Expert report of Alon Eviatar, pp.1-2.

[210] Expert report of Alon Eviatar, p.17.

[211] Expert report of Alon Eviatar, p.7, note 6.

[212] Expert report of Alon Eviatar, p.10.

[213] Expert report of Alon Eviatar, p.11.

[214] Expert report of Alon Eviatar, pp.1-2.

[215] Expert report of Ronni Shaked, p.22.

[216] Expert report of Alon Eviatar, p.18.

[217] 'Kept in the Dark, Oct. 2010', B'Tselem. http://www.btselem.org/publications/summaries/201010_kept_in_the_dark, accessed 1 May 2013.