# Exhibit 2

# Expert Report by Glenn E. Robinson

I have been engaged by counsel for the Palestinian Authority (PA) and the Palestine Liberation Organization (PLO) in this matter to serve as a testifying expert witness. This report is for use in the *Sokolow v. PLO* case (No. 1:04-cv-397) currently pending in the United States District Court for the Southern District of New York. I have not testified as an expert witness during the previous four years, however expert reports I prepared were submitted in the cases of *Saperstein v. the Palestinian Authority*, *Ungar v. the Palestinian Authority*, and *Shatsky v. the Syrian Arab Republic*. I am being compensated at the rate of $400 per hour for testimony and $125 per hour for additional time, plus expenses, in connection with my work on this matter.

## Summary of Opinions

I have been requested by Counsel for the PA and PLO to prepare a report based upon my experience and training concerning certain events and circumstances surrounding several acts of violence that occurred during the second Palestinian uprising, also known as the al-Aqsa Intifada, or Second Intifada, which took place during the years 2000-2004. I am currently an associate professor in the Department of Defense Analysis at the Naval Postgraduate School in California, where I also served for 10 years as Co-Director of the Center on Terrorism and Irregular Warfare. My opinions are based on over 30 years of regular travel to and residence in the West Bank and Gaza Strip, original and regular scholarly fieldwork in the West Bank and Gaza Strip since 1989, numerous professional consulting projects undertaken in the West Bank and Gaza Strip between 1995 and 2006, and significant scholarly research and publications on Palestinian politics since 1989. Included in this work has been detailed and regular interaction with Palestinian and Israeli officials, public figures, and ordinary citizens. A copy of my curriculum vitae is attached as Exhibit A.

In furtherance of my analysis, I have reviewed and considered the material cited in this report and additional materials specified in Exhibit B (attached), as well as other publicly available sources. I believe the materials I have reviewed and considered and the analysis I have conducted to date are sufficient and appropriate to support my opinions in this report.

Based upon and subject to the analysis that follows, my principal opinions are:
- It is inaccurate to view the PA, PLO, Fatah, and the Al Aqsa Martyrs Brigades as the same or controlling entities.
- During the Second Intifada, the Palestinian Authority did not support terrorism and did not have the ability to prevent acts of violence by Palestinian militants against Israeli civilians.

*Robinson, p. 1*

- During the Second Intifada, the Palestine Liberation Organization (PLO) did not support terrorism and did not have the ability to prevent acts of violence by Palestinian militants against Israeli civilians.
- The plaintiff's experts are not qualified to offer the opinions offered in their reports, their opinions are not based on reliable methodologies, and in some instances their opinions do not represent the application of any expertise at all but rather are mere summaries of documents and media reports.

Additional subsidiary opinions underlying the foregoing principal opinions, and the grounds and bases for all opinions in this report, are discussed in section 3, below. In addition, I reserve the right to form additional, supplemental or rebuttal opinions as additional facts or analysis may become available to me.

### Background

The conflict between Israelis and Palestinians is primarily about land and the willingness (or unwillingness) of various parties to share the land in a meaningful way. Not only is the struggle over land between the two adversaries, but also inside each. That is, each side has strong voices who advocate for a peaceful resolution of the conflict that entails the creation of two states, Israel and Palestine, living in peace, based largely on the 1967 borders; and each side has strong voices who advocate for the exclusive or near-exclusive use of the land between the Mediterranean Sea and the Jordan River for their side only. It is not clear today, nor was it clear in 2002, nor was it clear in 1993 when the original Oslo Accord was signed, which side inside both Israeli and Palestinian societies will prevail.

This nationalist struggle over land has been complicated in the post-1967 period by an overlay of growing religious nationalism on both sides. Today there are large numbers of both Israelis and Palestinians who advocate for the whole of the land for their side only based on a belief that God promised the land to their side. For Palestinians, the leading advocate of this position today is Hamas. In its founding 1988 Charter (*mithaq*), Hamas argues that the whole of Palestine (today's Israel, West Bank and Gaza) constitutes a religious endowment (*waqf*) given by God for exclusive use by Muslims until the end of times. There has been no room at all for Israel in this vision. Inside Israel, religious Zionism has grown enormously since 1967. The settler community is the most significant manifestation of this belief. For religious Zionists, God gave all of the Land of Israel (*Eretz Yisrael*) to Jews for their exclusive use, including the whole of the West Bank, or "Judea and Samaria."

While religious nationalists are today the single biggest impediment to a two-state solution to the conflict (the preferred solution by the United States and virtually every country in the world), there are also secular hardliners on both sides who also reject a meaningful two-state solution. On the Israeli side, secular

*Robinson, p. 2*

rejectionism is embodied by "revisionist Zionism", most notably in the Likud Party. The Likud Party specifically rejects a two-state solution west of the Jordan River, and Likud-led governments have consistently taken actions that reinforce a vision of permanent Israeli control over all or much of the West Bank. Secular Palestinians today overwhelmingly support a two-state solution, but elements inside the secular camp continue to support a single democratic state for both Arabs and Jews in all of historic Palestine.

The following graph depicts the major trends in both Palestinian and Israeli societies, with the x-axis representing more secular or more religious ideology, and the y-axis representing support for a two-state solution or support for a one-state ideology. Only political parties and organizations with defined, adopted positions are included; unorganized groups of militants without a platform on both sides are not included. This would include groups of militants who self-define as the Al-Aqsa Martyrs Brigades (AAMB) and Popular Resistance Committees (PRC) on the Palestinian side, and groups of militant settlers on the Israeli side. The US Government and most of the international community support the goals of those organizations found in the upper-right quadrant.



The PA is viewed by the US Government, the European Union, the United Nations, Russia, and the Arab League as an essential element to the peaceful resolution of the Israeli-Palestinian conflict. While various Palestinian groups such as Hamas, Palestinian Islamic Jihad (PIJ), the Popular Front for the Liberation of Palestine (PFLP) and the AAMB have all been designated as terror organizations by the State Department, the same is not true of the PA. Indeed, the US Government is so committed to the success of the PA that it has provided it hundreds of millions of dollars in aid.[1] For anyone to conclude that the PA supports terrorism, one must then further conclude that the US Government is likewise supporting terrorism, given its strong support of the PA. The PA is firmly committed to a two-state

---

[1] Office of Inspector General, U.S. Dept. of State and the Broadcasting Board of Governors, "Performance Evaluation of Palestinian Authority Security Forces Infrastructure Construction Projects in the West Bank", March 2011, available at http://oig.state.gov/documents/organization/162557.pdf ; GAO Report, "Palestinian Authority: U.S. Assistance is Training and Equipping Security Forces, but the Program Needs to Measure Progress and Faces Logistical Constraints," May 2010, available at http://www.gao.gov/assets/310/304331.pdf

peaceful solution to this long running conflict, consistent with US policy and national interests. Political attacks aimed at destabilizing (or destroying) the financial well-being of the PA hinder its ability to achieve what the US and the international community have clearly stated are the desired end goals of peace and stability in Israel and Palestine.

## Discussion of and Grounds for Opinions

I.  **It is Inaccurate to View the PA, PLO, Fatah, and the Al Aqsa Martyrs Brigades (AAMB) as the Same Entity.**

The PA, PLO, Fatah, and AAMB should not be viewed as interchangeable labels for the same entity. Each entity is unique, with its own history, political objectives, organizational structure, constituency, and legal status. The PA was created by the Oslo Accords to serve as a limited form of governing entity for those Palestinians living in certain areas of the West Bank and Gaza. The PLO is recognized as the entity representing the interests of all Palestinians both inside the West Bank and Gaza as well as the Diaspora. It is an umbrella organization encompassing most Palestinian political factions, although it does not (to date) include Islamist organizations, such as Hamas. The influence of the PLO was largely overtaken upon creation of the PA, although it retained the exclusive right to negotiate international agreements for the Palestinians. Fatah is the dominant secular political movement within the PLO. The AAMB emerged during the Second Intifada as a brand name utilized by independent cells of rogue militants who still viewed themselves as generally aligned with Fatah, but unlike Fatah were no longer willing to accept the Oslo process as a legitimate path to achieving Palestinian rights. The term "Tanzim," the Arabic term for "organization," is also sometimes used to describe Fatah-associated individuals, but that term lacks any consistent definition and could not be used to describe an identifiable group of people.

A. **The Palestinian Authority Was Created by the Oslo Accords as a Limited Form of Government.**

Under the terms of the Oslo Accords (a series of agreements signed in 1993, 1994, and 1995 by Israel and the PLO), the Palestinian Authority is recognized as a partially autonomous, transitional government with specified civil and security responsibilities in specified areas. The PA was supposed to last only during an interim period while final status negotiations were finalized. In theory, the PA was supposed to have dissolved by May 1999, five years after it was first established. The formal title of the 1993 accord connotes the limited nature of the PA's formal authority: *Declaration of*

*Principles on Interim Self-Government Arrangements.*  The terms of Oslo designated the formal title of the PA as: *The Palestinian Interim Self-Governing Authority.*  The PA was to have "jurisdiction" over some areas of the West Bank and Gaza Strip, but not sovereignty.  Israel maintained full authority over borders and the PA was precluded from exercising any jurisdiction over "Jerusalem, settlements, military locations, and Israelis." (Article 4).  Article 7 makes clear that duties not specifically transferred to the PA remained in the hands of Israel.

The 1995 accord, titled *The Israeli-Palestinian Interim Agreement on the West Bank and Gaza Strip*, codified the fact that the PA had only those authorities enumerated and that Israel retained all other authority in the West Bank and Gaza Strip (Article 1.1).

Limitations to PA authority included territorial limits as well as limits on the jurisdiction of its legal institutions.  All settlements, settlers, bypass roads and military lands in the West Bank and Gaza were under full Israeli authority (see attached maps, Exhibits C and D).  In addition, all lands in the West Bank and Gaza were subject to Israeli control depending on the location of Israel Defense Forces (IDF) patrols at any time.  Even before September 2000, the IDF could undertake operations anywhere in the West Bank and Gaza, and did not need PA permission to enter areas to arrest wanted individuals or undertake other operations.  After September 2000, such incursions were regular events.  IDF incursions into PA territory without PA consent or even advance notice indicate that Israel did not, in fact, recognize PA sovereignty anywhere in the West Bank.  Further evidence of the lack of authority exercised by the PA comes from the limited extent of the jurisdiction of its legal institutions.  The PA has a legal system of courts and law, but it applies to Palestinians only, and only those in territory where the PA has been designated to have civil authority.  Palestinians are subject to Israeli military law.  Israelis anywhere in the West Bank and Gaza are subject to Israeli civilian law and can not be prosecuted by the PA.

During the period following the 1993 signing of the first Oslo accord (the Declaration of Principles), the West Bank and Gaza remained under over-arching Israeli control, but were divided by areas of security and civil control.  In the West Bank, these were called Area A, Area B and Area C.  In Area A, which constituted about 20% of the West Bank, the PA was designated to have civil and security control.[2]  In Area B, also about 20% of the West Bank, the PA was designated to have civil control but Israel exercised security

---

[2] The exact percentages varied over time, depending on political agreements, but never differed very much from this 60-20-20 split.  The percentages do not include East Jerusalem, which remained under full Israeli control.

control.  In Area C, about 60% of the West Bank, Israel maintained complete security and civil control.  Settlements, designated roads, military areas and border areas were for use by Israelis only.

The PA had no authority over settlements or settlers (wherever they may be) in the West Bank or Gaza.  As of 2000, Israel maintained 123 "official" settlements (virtually all in the West Bank)[3] and dozens of "outposts" – newer West Bank settlements that were not officially recognized by the State of Israel but over which the PA had no authority.  Settlements and settlers (indeed, all Israelis) were subject to Israel's authority.  A map of the West Bank settlements and their official areas of control is attached as Exhibit C, where the blue shaded areas represent the settlements and their municipal boundaries in 2002.

Israel also built a series of "by-pass roads" in the West Bank and Gaza that were prohibited for use by Palestinians.  A map of Israel's "forbidden road system" in the West Bank in 2004 is attached as Exhibit D.

## B.  The PLO is an Umbrella Organization Representing the Nationalist Aspirations of the Palestinian People, Including the Refugee Population

The Palestine Liberation Organization (PLO) was formed in 1964 to advance the cause of Palestinian rights in historic Palestine.  During the 1948 war that created Israel, about 85% of the Palestinian population of what became Israel, or about 700,000 people, were expelled.  While Palestinians were displaced in various ways during 1948, an Israeli cabinet decision in June 1948 turned Palestinians into permanent refugees when it voted to prohibit any Palestinians displaced by war from returning to their homes.  They and their descendants today number over 4 million registered refugees, constituting about 50% of the world's total Palestinian population.  The Oslo accords did not deal with the refugee issue other than to assign it to final status negotiations that have yet to come to anything.  The discernible product of this situation is that there is a vocal, active, and often militant segment of the Palestinian refugee population that has rejected the Oslo process and sees the process as without hope for them.

The PLO is the main vehicle of Palestinian national aspirations for statehood.  To understand the PLO's history, it is important to provide some historical background on the Israeli-Palestinian conflict.  The dominant Palestinian national narrative holds that Palestine was stolen from its rightful

---

[3] B'Tselem, *Land Grab: Israel's Settlement Policy in the West Bank*, May 2002, p. 18, available at http://www.btselem.org/download/200205_land_grab_eng.pdf .

owners by European Jewish migrants under the banner of Zionism. Zionism, essentially a doctrine of Jewish nationalism, emerged during the second half of the 19th century in Europe. Zionism encouraged all Jews, most of whom lived in Europe at the time, to emigrate to Palestine in order to form an independent Jewish state and to "normalize" Jewish life. At the time, very few Zionist Jews lived in Palestine, although traditional Jewish communities in the cities of Hebron, Jerusalem, Tiberias and Safad dated back centuries. Beginning in 1897, an organized, institutionalized process of Jewish migration to Palestine was undertaken. By the time of WW I, Jews made up about 10% of the population of Palestine and owned about 2% of its land. European Jewish migration to Palestine received a significant boost in 1917 when Britain issued the Balfour Declaration, which expressed official British support for a "Jewish national home in Palestine."[4] The Balfour Declaration was contained within the structures of the British Mandate of Palestine. British policy under its League of Nations Mandate in Palestine encouraged further Jewish migration and, indeed, Britain formed the Jewish Agency to allow the expanding Zionist population to self govern in most respects. Rising violence and opposition to this migration prompted Britain to limit Jewish immigration in 1939, with mixed success. By the time of the United Nations Partition of Palestine in 1947, Jews made up about 30% of the population and owned about 7% of the land of Palestine. The UN partition of Palestine immediately resulted in war, first a communal war between Jews and Palestinians and, beginning in May 1948, between Israel and surrounding Arab states.[5]

The Jewish fighters in 1948 were comprised of several military groups, all designated as terrorist organizations by the British Mandate.[6] The primary Jewish groups were the Haganah (whose fighters included Yitzhak Rabin and Ariel Sharon, who would become Israel's Prime Ministers in 1992 and 2001, respectively), Irgun (whose leader Menachem Begin later became Prime Minister in 1977), and The Lehi, also known as The Stern Gang (whose leader Yitzhak Shamir became Prime Minister in 1983). These Jewish fighters won the war decisively, declaring the new State of Israel on May 14, 1948, and, by war's end, expanding its territory from about 53% of Palestine under the UN

---

[4] United Nations, *The Question of Palestine and the United Nations* (New York, 2008), available at http://unispal.un.org/pdfs/DPI2499.pdf
[5] *Ibid.*
[6] Encyclopaedia Britannica, available at http://www.britannica.com/EBchecked/topic/251461/Haganah; Jacob A. Stoil, "The Haganah and SOE: Allies and Enemies, Irregular Warfare & Politics in Mandatory Palestine, (paper presented at the Society of Military History, 2012), available at http://www.academia.edu/1504354/The_Haganah_and_SOE_Allies_and_Enemies_-_Irregular_Warfare_and_Politics_in_Mandatory_Palestine_-_Given_at_SMH_2012.

Partition plan to 77%. The fighting stopped, at least temporarily, with a UN-brokered armistice in 1949.

The 1948 war shattered Palestinian society. Indeed, Palestinians refer to the 1948 war as the *nakba*, or the catastrophe. Not only were many Palestinians made refugees, but Palestine itself was fragmented into three territories: Israel, the West Bank annexed by Jordan, and the Gaza Strip administered by Egypt. Palestinians not only lived under those three governments, but in Syria and Lebanon as well. Reversing the outcome of the 1948 war has long been the goal of Palestinian society, including by the PLO when it was formed.

Since 1948 there have been a number of wars or other forms of conflict between Israel and its neighbors. Of greatest importance to this case is the war of 1967 in which Israel captured the West Bank from Jordanian forces. The West Bank remains under Israeli control.

The UN General Assembly recognized the PLO as the legitimate representative of the Palestinian people in 1974 when it affirmed the right of the Palestinian people "to self-determination in accordance with the Charter of the United Nations," and requested the Secretary-General to "establish contacts with the Palestine Liberation Organization on all matters concerning the question of Palestine."[7]

In November 1988, following Jordan's July dissolution of all legal and administrative ties to the West Bank, the Palestine National Council issued two ground-breaking pronouncements: a political communique affirming its determination to reach a comprehensive political settlement within the framework of UN resolutions, and a Proclamation of the Independence of the State of Palestine under the provisions of international law. Armed with these documents, PLO leader Yasir Arafat appeared before the UN in December 1988 and explicitly recognized the State of Israel and the right of both Israel and Palestine to exist in peace and security.[8]

The PLO acceptance of Israel in 1988 and then its formal exchange of recognition letters with Israel in 1993 ushered in a new political chapter, but Palestinian historiography has little changed. Even the most peacenik Palestinian will argue today that the creation of Israel came at the expense of the Palestinians and constituted an historic injustice against the Palestinian

---

[7] G.A. Res. 3236, A/RES/3236 (XXIX) (Nov. 22, 1974), available at
http://unispal.un.org/UNISPAL.NSF/0/025974039ACFB171852560DE00548BBE.
[8] United Nations, *The Question of Palestine and the United Nations*, at 29, available at
http://unispal.un.org/pdfs/DPI2499.pdf.

*Robinson, p. 9*

people.  The PLO embodies that national narrative of injustice and trying to right an historic wrong through statehood.  The meaning of statehood has involved over time from an exclusivist vision of all Palestine only for Palestinians (and Jews present before the Balfour Declaration of 1917) to a vision of a two state solution, Palestine and Israel.

The PLO narrative of Zionist and Israeli theft of Palestinian land over the past century can be summarized graphically by the following map, published by *The Atlantic Online* (March 11, 2010):



For the purpose of clarifying this political history, I have attached five additional maps to complement the maps of the West Bank in 2002 (Exhibits C and D).  The first, Exhibit E, shows the boundaries of British Mandatory Palestine and Transjordan; Exhibit F notes the 1947 United Nations Partition Plan and the 1949 Armistice Lines (also known as the 1967 boundaries); Exhibit G shows land ownership patterns in 1947 and the "nakba" of destroyed Palestinian villages primarily from the 1948 war; Exhibit H shows the results of the 1967 war when Israel conquered the West Bank and Gaza Strip, as well as surrounding lands; and Exhibit I is a map of the West Bank

under the terms of Oslo II (1995). Exhibit J is a timeline of major events from 1993 to 2004.

The PLO as an organization can be depicted schematically in the following graph. The Executive Committee, long led by Arafat and now led by Mahmud Abbas, is the top executive body in the PLO, tasked with implementing the decisions of the Palestine National Council. The PLO's Central Committee was established to give counsel to the Executive Committee in the absence of a full meeting of the PNC. Its membership is generally under 100 members. The Palestine National Council is considered the main decision-making body for the national movement, and includes representatives from all major secular Palestinian factions (and a number of minor ones as well). The membership of the PNC has fluctuated over the years, but typically includes about 500 members. Hamas and the Palestinian Islamic Jihad are not members of the PLO so do not serve on the PNC, although there has been some discussion periodically about inclusion. The Palestine Liberation Army was the armed wing of the PLO, and had units stationed in Jordan, Syria, Lebanon and elsewhere over the years. The PLA was largely integrated into the police and security forces of the PA following the signing of the Oslo Accord in 1993.



C. **Overlap Between the PA and PLO Does Not Indicate Control by Either Entity Over the Other.**

The PA (then denominated the Palestinian Interim Self-Government Authority) was created by the Declaration of Principles signed in 1993 by the

State of Israel and the PLO, as formally witnessed by the United States and Russia. Israel and the PLO shared in the de jure formation of the PA. However, the PA government was to be elected by a vote of Palestinians in the West Bank, East Jerusalem and the Gaza Strip and was thus accountable to the electorate rather than to the PLO. The first election for the PA Legislative Council and the Presidency occurred in January 1996. The only formal role the PLO has under Oslo is to be the negotiator for the Palestinians with Israel, particularly on a Final Status Agreement. The only significant formal organizational tie between the PA and PLO is the representation of members of the Legislative Council in the Palestine National Council, a body of the PLO. In 2003, the PA representatives constituted 13% of the membership of the PNC. The PNC has no formal authority over the PA's Legislative Council, nor does the Legislative Council report to the PLO's Executive Committee. In short, at the formal, de jure level, the PLO and the PA are independent organizations with no legal control of one over the other.

A number of top officials in the PLO also had PA positions. For example, Yasir Arafat was both the head of the PLO and the elected president of the PA. Mahmud Abbas has played the same dual role since 2005. These overlapping positions do not indicate PLO control over the PA. **The PLO has never appointed PA leadership;** all PA officials during the 2000-2004 period were either elected in the 1996 elections or appointed by those who won the elections. The Hamas victory in the 2006 PA elections demonstrates this separation between the PA and PLO as Hamas is not part of the PLO. It would not be accurate to say the PLO had no influence on the PA; at the same time, one would be mistaken to overstate this influence. In the final analysis, the PA's authority derived primarily from the legitimacy of its elected officials, both presidential and parliamentary.

## D. Fatah is the Dominant Secular Movement within the PLO.

The name Fatah is an inverted acronym of Harakat al-Tahrir al-Filastini, or the Palestine Liberation Movement. Fatah was founded in the late 1950s by Yasir Arafat and several others. Originally an underground guerilla movement, it reorganized with a central committee in 1963 and joined the PLO in 1967. In 1969, Yasir Arafat became Chairman of the PLO. While Fatah was historically the largest and strongest faction within the PLO, it did not dictate PLO policy. Rather, the PLO was run generally through a form of **consensus-building** and pluralism, although Fatah's voice was the strongest. Fatah's support was critical for PLO efforts to negotiate the Oslo Accords.

Fatah is a diffuse, broad movement. Most Palestinians seeking a democratic, secular state on some portion of historic Palestine view themselves as affiliated with (or at least sympathetic to) Fatah. Its legitimacy since 1993, however, has been based in large part on the success of the Oslo process. As that process has proven itself a failure, Fatah has lost much popular support to its primary rival, Hamas. This was demonstrated in Hamas' victory in the 2006 elections and the ensuing civil war between Hamas and Fatah.

### E. Al-Aqsa Martyrs Brigades Emerged During the Second Intifada as Independent Cells of Rogue Militants

Al-Aqsa Martyrs Brigades cells emerged out of Fatah militant circles with the outbreak in 2000 of the Second Intifada. The AAMB militants adopted the AAMB brand name and violent tactics in opposition to the veteran Fatah leadership, who they viewed as having failed to deliver independence and the end of occupation through the Oslo peace project.[9] Militants active in the AAMB would often identify themselves as loyal to Fatah, but that loyalty was to Fatah as a revolutionary movement, not the Fatah of the old leadership responsible for the Oslo failure. Certainly, the occasional Palestinian politician would equate AAMB with Fatah, without making that distinction. There was wide agreement by Palestinian political factions over the necessity to fight Israel's occupation of the West Bank and Gaza with force of arms during the first few years of the Second Intifada. It is wrong to conclude, however, that the AAMB was the 'armed wing' of Fatah, representing a united organization. It is equally wrong to conclude that in supporting armed resistance against the Israeli occupying army (the IDF) Fatah also supported attacks on civilians, which various members of AAMB cells occasionally undertook.

It is important to understand the often ambiguous and always evolving relationship between Fatah and the AAMB. Analysts have tried to accurately capture the nature of this relationship. For example, the Council on Foreign Relations ("CFR") in New York referred to the AAMB as a "Fatah linked coalition of militias" before the AAMB evolved "into a more radical group," citing early 2002 as a turning point.[10] The CFR notes that the AAMB consisted of "localized, autonomous units that mostly act independently of each other" and had a "decentralized power structure."[11]

---

[9] Ephraim Lavie, "Israel's Coping with the al-Aqsa Intifada: A Critical Review", INSS: *Strategic Assessment*, Vol. 13, No. 3, October 2010, p. 105 and *passim*.
[10] Holly Fletcher, "Al-Aqsa Martyrs Brigades", Council on Foreign Relations, April 2, 2008, available at http://www.cfr.org/israel/al-aqsa-martyrs-brigade/p9127.
[11] *Ibid*.

The US Department of State succinctly captured the nature of the relationship between Fatah and the AAMB in its Country Reports on Terrorism (2007):

> *The al-Aqsa Martyrs Brigade consists of loose cells of Palestinian militants loyal to, but not under the direct control of the secular-nationalist Fatah movement. Al-Aqsa emerged at the outset of the 2000 Palestinian al-Aqsa intifada as a militant offshoot of the Fatah party to attack Israeli military targets and settlers with the aim of driving Israel from the West Bank and Gaza and establishing a Palestinian state. Al-Aqsa has no central leadership; the cells operate with autonomy...*

The AAMB cells did not operate under the command and control of either the PA or Fatah. As one high level Western diplomat involved in security liaison told Human Rights Watch in June 2002, "There is no [AAMB] infrastructure, just small groups making their own small decisions."[12] More prosaically, a PFLP militant in Jenin commented at the same time that "around here an Aqsa Brigade is any five or six guys who call themselves that."[13] A captured AAMB leader from Jenin, Abdel Karim Aweis, likewise confirmed the localized and decentralized nature of the Brigades by noting their attacks were "organized at the local level, often in revenge for Israeli killings of suspected Palestinian militants, by volunteers who had let it be known that they were prepared to carry out suicide bombings or shootings."[14]

As the intifada progressed, relations between Fatah and AAMB became even more strained. This was due to several reasons, including the poor command and control throughout all Palestinian institutions and organizations, Israel's assassination of key commanders who had some ability to link AAMB cells with higher political calculations,[15] and the obliteration of the PA security establishment more generally in the early months of the intifada. By early 2001, neither the PA nor Fatah had any systematic command and control capabilities remaining, as their physical infrastructures had been destroyed by Israel. Such lack of control also applied to AAMB.

---

[12] Human Rights Watch, *Erased in a Moment: Suicide Bombing Attacks Against Israeli Civilians,* October 2002, p. 82.
[13] *Ibid.*
[14] *Ibid.*
[15] Anne Marie Baylouny, "Fragmented Space and Violence in Palestine," *International Journal of World Peace,* Vol. 26, No. 3 (September 2009).

Human Rights Watch succinctly summarized the loose relationship between Fatah and AAMB during 2001-2002 period: "Human Rights Watch did not find that Fatah officials possessed a supervisor-subordinate relationship over the al-Aqsa Martyrs' Brigades or the effective control required to hold the Fatah leadership criminally liable for the actions of the Brigades."[16]

Friedrich and Luethold likewise see the AAMB as a "local response by grassroots Fatah activists" originally based in the Nablus area of the West Bank "who feared that their movement would lose legitimacy and popular support to Hamas and Islamic Jihad in the course of the Intifada."  They emphasize the cell-based nature of AAMB militias that were typically gathered around a local strongman in a particular village or refugee camp.  This "loose network of cells" made command and control impossible, as Friedrich and Luethold make clear:

> The localised character of the [AAMB] Brigades is reinforced by a loose, personality-driven command structure.  In fact, the Brigades never had any central or unified command and control.  Operational decisions are taken by the cells themselves.[17]

It follows, of course, that if the AAMB itself could not practice command and control within its own ranks, then certainly other bodies such as the centralized Fatah leadership, the PLO or the PA did not practice effective (or any) command and control over the AAMB cells.

## F.  "Tanzim" is a Term with No Clear Definition

Plaintiffs and their experts claim "Tanzim" is a terrorist organization within Fatah.  The term "Tanzim," however, does not refer to any clearly identifiable group of people and its meaning is amorphous and undefined.  In Arabic, Tanzim translates to "Organization."  Tanzim al-Fatah means the Fatah Organization, but the word Tanzim is used in connection with many other organizations as well.

Tanzim is sometimes used to distinguish the "insider" **Fatah cadres as** opposed to the historic Fatah structure based outside the Territories prior to Oslo.  This appears to be the view adopted by the Government of Israel,

---

[16] Human Rights Watch, *Erased in a Moment: Suicide Bombing Attacks Against Israeli Civilians*, p. 87.

[17] Roland Friedrich and Arnold Luethold, eds., *Entry-Points to Palestinian Security Sector Reform* (Geneva: DCAF, 2007), pp. 115-117.

which has designated Tanzim as a terrorist organization and defined it as "an organizational framework through which the activity of the Fatah members was implemented in the Judea and Samaria region and in Gaza."[18] Fatah, however, is separately designated by Israel (as are virtually all Palestinian political organizations).  Neither Fatah nor Tanzim is designated as a foreign terrorist organization by the US Government.

The term Tanzim has also been used in a more militant sense as roughly equivalent to "the mob."  In this sense, it is an amorphous term that generally seems to refer to the underground Fatah fighters from the first Intifada.

Dr. Sari Nusayba, President of al-Quds University and Fatah member explained Tanzim in this manner:

> During the al-Aqsa intifada Israel presented it as something new and weird . . . tanzim is just the Fatah operatives in the occupied territories from the beginning [who were] militarised in the seventies and later provided the support base for Oslo in the nineties.  The tanzim is no more than the organisation of Fatah in the occupied territories as it existed historically.[19]

PLC member Qaddura Faris "claimed the word tanzim originally applied to the prisoners' committees established in Israeli jails.  Over the years it became 'part of our culture, our relations in the movement.  When we got released we continued to use the word.'"[20]

II.    **During the Second Intifada, the PA Did Not Support Terrorism and Did Not Have the Ability to Prevent Acts of Violence by Palestinian Militants Against Israeli Civilians.**

   A.  **The PA Did Not Support Terrorism**

The numerous efforts by the Palestinian leadership to engage in political negotiations with the Government of Israel, to engage in ceasefire negotiations with militant groups and with Israel, and to consistently demand an international force be placed on the ground to monitor the actions of both sides, are all inconsistent with the idea that the PA supported terrorism (specifically

---

[18] Charge Sheet, *Israel v. Barghouti*, August 14, 2002, available at http://www.imra.org.il/story.php3?id=13212.
[19] Nigel Parsons, *The Politics of the Palestinian Authority:  From Oslo to al-Aqsa* (New York: Routledge, 2005), 137.
[20] *Ibid.* at 137-138.

including attacks on Israeli civilians and U.S. nationals).  **Palestinian leaders** called for non-violence on both sides and repeatedly condemned suicide bombings.  What it could not legitimately do was to call for an end to all armed resistance at any time, as the Palestinian right to armed resistance against a foreign occupying force was well recognized by the international community and a strongly held principle by Palestinians themselves.  The PA was better able to limit acts of armed resistance during times of official ceasefires as detrimental to the negotiated agreements, and it did so on multiple occasions.

Additionally, claims that Arafat planned the Second Intifada, that documents seized by Israel in 2002 prove PA support for terrorism, that the PA cooperated with Hamas in terrorism, or that the PA incited violent attacks on civilians are all false.

### 1.    *Continuing Efforts at Political Negotiations*

Despite widespread belief that political negotiations between Israel and the PA ended once the Second Intifada began, political negotiations continued in earnest during this time and both parties came closer to agreement than ever before.

Following the outbreak of the Second Intifada on September 29, 2000, peace talks continued, including when the Israeli and Palestinian negotiating teams met in Washington, DC, in December 2000.  Meetings continued in Cairo, then in Taba, Egypt, in January 2001.  The European Union Special Representative to the Middle East Peace Process, Ambassador Moratinos, drafted a "non-paper" describing the outcome of the negotiations at Taba, noting that "both sides have traveled a long way to accommodate the views of the other side and that solutions are possible."[21] At the closing press conference, the parties issued a joint statement: "The sides declare that they have never been closer to reaching an agreement and it is thus our shared belief that the remaining gaps could be bridged with the resumption of negotiations following the Israeli election."[22] In that election on February 6, 2001, Likud candidate Ariel Sharon was elected in a landslide and quickly rejected the progress that had been made at Taba.

---

[21] Miguel Angel Moratinos, UNISPAL, January 27, 2001, available at http://unispal.un.org/UNISPAL.NSF/0/CEA3EFD8C0AB482F85256E3700670AF8.

[22] United Nations Secretariat, Special Unit on Palestinian Rights, Monthly Media Monitoring Review, Chronological Review of Events Relating to the Question of Palestine, January 2001.  These chronologies are available online for each month of the intifada at http://unispal.un.org/unispal.nsf/Chronological?OpenView [Hereinafter "UN Chronology (Date)"] ; Mideast Negotiators Want to Continue Talks After Israeli Elections, *CNN*, January 27, 2001, available at http://archives.cnn.com/2001/WORLD/meast/01/27/mideast.02/.

2.    *Continuing Efforts at Ceasefire Negotiations*

In October, 2000, both parties met in Sharm el-Sheikh, Egypt, and agreed to issue public statements calling for an end to the violence and to take immediate measures to end the confrontation and eliminate points of friction.[23]  The PA issued a statement the next day confirming its commitment to this agreement.  Arafat met with former Israeli Prime Minister Shimon Peres on October 31, 2000, in Gaza to discuss the renewal of security cooperation.  The PA Information Minister called on Palestinians to exercise restraint and demonstrate only in peaceful ways.[24]  The PA National Security Council issued orders "to prevent any element from firing from Area A" on November 14, 2000.[25]  These orders, however, did little to stop the violence in the face of vast rage by the Palestinian population, fueled by Israel's excessive use of force to quash the uprising.

Senior IDF officers reported that Arafat gave a "clear and direct cease-fire order" less than two weeks into the Second Intifada.[26]  Even US Secretary of State Madeleine Albright acknowledged that Arafat was not in control of the Palestinian street during October 2000.[27]  Arafat was not Joseph Stalin: he never ruled Palestinians with a dictator's iron fist, and could not simply order it to be done.  Arafat's style of rule was one of cajoling, convincing and co-opting, not beating over the head.

On October 7, 2000, the UN Security Council adopted resolution 1322, condemning the excessive use of force against the Palestinians and urging Israel to abide by the Fourth Geneva Convention.[28]  By October 16, 2000, "at least 108 people were reported killed and some 3,000 injured, the vast majority of them Palestinians."[29]  In the face of this violence, newspapers reported such quotes from the Palestinian public as "The intifada will go on against Israel and even against the Palestinian Authority.  Neither the Authority, nor anybody, can stop the intifada."[30]  Other quotes more specifically rejected the PA pleas for calm:  "The masses started the intifada.

---

[23] Sharm El-Sheikh Summit Concluding Statement by President Clinton, October 17, 2000, available at http://unispal.un.org/UNISPAL.NSF/0/46B79961630ECA3F85256E3700653CBF.

[24] UN Chronology (Oct. 2000)

[25] UN Chronology (Nov. 2000).

[26] "Arafat Orders Cease-Fire; Marked Drop in Violence," *Ha'aretz*, October 11, 2000.

[27] "Middle East Conflict:  US Reaction:  How a Virtuous Circle Turned Vicious:  Clinton Administration Stunned and Angry as Its Investment in Arafat Fails to Pay Off," *Guardian (London)*, October 13, 2000.

[28] UN Chronology (Oct. 2000).

[29] *Ibid.*

[30] "The West Bank; On the Streets, Palestinians Vow to Keep Fight Going," *New York Times*, November 3, 2000, available at http://www.nytimes.com/2000/11/03/world/03ARAB.html .

It was not started with a political statement, and it can't be stopped with a political statement."[31]

By the spring of 2001, Arafat was again actively trying to find a politically viable means to end the Second Intifada – the uprising was widely seen in Palestinian political circles by that point to have been detrimental to Palestinian interests – numerous attempts were made to rein in militant groups.

In April 2001, Arafat held separate meetings with UN Special Coordinator Terje Rod-Larson and UN Special Envoy Miguel Moratinos. Other PA leaders met with the Israeli Foreign Minister.[32] While no details of these meetings were released, Arafat declared the Popular Resistance Committees dissolved[33], and then reportedly reached an understanding on a ceasefire during meetings in Egypt that same month.[34]

On June 2, 2001, Arafat sent a written order to the PA security services to implement a total and immediate ceasefire.[35] This order received the support of the PA Cabinet on June 7, 2001. On June 8, the PA and Israel began negotiating a ceasefire based on a plan by CIA Director George Tenet, with the negotiated ceasefire taking effect on June 13th. On June 15, Palestinians engaged in protests against the ceasefire were shot at by IDF forces. On June 17, IDF soldiers shot and killed a 12 year old boy. Violence on both sides escalated and on June 21st, Israeli Ministers Rechavem Ze'evy and Avigdor Lieberman joined 15 Knesset members in calling for an "all-out war" until the PA was "defeated and dismantled." On July 3rd, Israeli Foreign Minister Shimon Peres said he would not be able to continue in his role if Israeli authorities kept trying to "delegitimize" Arafat.[36] Nevertheless, the PA Cabinet put forth a political initiative on July 5th, calling upon the US, UN, EU, and Russia to help both sides implement their commitments.

In July 2001, Arafat and PA security officials met and negotiated with political factions in an effort to calm the violence.[37] In August, Israeli Prime

---

[31] *Ibid.*; "Crisis in the Middle East: No More Room for Manoeuvre in a Land Where Hatred Rules," *The Independent (London)*, October 15, 2000) (quoting one activist as saying Arafat had told them to stop the violence three days earlier, "but they had politely decided to ignore him.").

[32] UN Chronology (Apr. 2001).

[33] "Security Tightens in Gaza, Unrest Divides Communities, *CNN*, April 29, 2001 ("the authority again ordered that such attacks stop, and called for the dissolution of the popular resistance committees, that have lead the uprising.").

[34] UN Chronology (Apr. 2001).

[35] UN Chronology (June 2001).

[36] UN Chronology (July 2001).

[37] UN Chronology (July 2001).

Minister Ariel Sharon rejected a proposal by Foreign Minister Peres to begin ceasefire talks with the PA as Peres expressed concern that Arafat was becoming weaker and Hamas was becoming stronger. Sharon insisted on seven days of total calm from the Palestinian side before he would begin any negotiations,[38] a condition that was impossible for Arafat to satisfy.

The PA went through similar, significant ceasefire attempts in September 2001, with similar results.[39]

In October, 2001, measures were taken by the PLO Executive Committee, the Fatah Central Committee, as well as the PA. The PLO Executive Committee met in Ramallah on October 4, 2001, and called upon "all forces and factions to strictly respect the ceasefire to preserve the Palestinian national interests."[40] The Fatah Central Committee met and issued a similar appeal, stating "Draconian measures will be taken to prevent any violation of the law and damage to the national interest."[41] The PA released a statement saying that "measures [would] be taken against those groups which [did] not put an end to the violence."[42] The PA arrested militants, foiled suicide bombings, and reportedly reached an understanding with the Islamist factions to cease terror attacks.[43] The French Foreign Ministry spokesman said the PA had displayed "a courageous commitment" to the ceasefire agreement with Israel and "significant actions [had] been taken [by it] in the realm of security."[44]

The ceasefire was broken on October 17, 2001, when PFLP militants assassinated Israeli Minister Rechavem Ze'evy in retaliation for the Israeli assassination of PFLP leader Ali Abu Mustafa in August. Prime Minister Sharon suspended all contacts with the PA as a result.[45] The PA issued orders for the arrest of those responsible for the assassination, cracked down on militants violating the ceasefire, and outlawed many militant groups, including AAMB and the military wing of the PFLP.[46] The IDF reoccupied

---

[38] UN Chronology (Aug. 2001).
[39] UN Chronology (Sept. 2001).
[40] UN Chronology (Oct. 2001).
[41] *Ibid.*
[42] *Ibid.*
[43] *Ibid*; Danny Rubinstein, "Focus / A Tacit Understanding," *Ha'aretz*, October 14, 2001, available at http://www.haaretz.com/misc/article-print-page/focus-a-tacit-understanding-1.71830?trailingPath=2.169%2C2.225%2C2.226%2C.
[44] UN Chronology (Oct. 2001).
[45] UN Chronology (Oct. 2001).
[46] *Ibid*; "Arafat Bans Armed Groups," *United Press International*, October 21, 2001; Danny Rubinstein, "An Unfeasible Ultimatum," *Ha'aretz*, October 22, 2001, available at http://www.haaretz.com/misc/article-print-page/an-unfeasible-ultimatum-1.72506?trailingPath=2.169%2C2.225%2C2.227%2C.

many cities throughout the Palestinian territories, killing 21 civilians within a week and prompting worldwide condemnation.[47]

Significant efforts to return to the ceasefire continued throughout November, 2001, until thwarted by Israel's assassination of Hamas militant leader Mahmud Abu Hanoud on November 25, 2001. This was followed by several terror attacks.[48] On November 29, 2001, a month after AAMB had been banned by Arafat, AAMB carried out a joint attack with the Palestinian Islamic Jihad, killing three people inside Israel. This was AAMB's first operation inside Israel, and showed how far AAMB was moving away from any influence by the political leadership.

On November 29, 2001, the same day as the joint AAMB-PIJ attack inside Israel, the Central Committee of Fatah issued a statement calling on all Palestinians to abide by the cease-fire negotiated in June with Israel.[49] Militants identifying themselves as AAMB members rejected the appeal.[50] Part of the difficulty for the Palestinian leadership in ending violence was that much of the violence was undertaken in retaliation for Israeli actions, as part of the ongoing cycle of violence.

Matters came to a head on December 2, 2001, when the PA Cabinet of Ministers declared a national State of Emergency. The immediate cause of this action was two Hamas suicide bombings in Israel that killed 26 Israelis. The Secretary of the Palestinian Higher Council for National Security immediately went on national television to announce the State of Emergency and its restrictions. Within days, Palestinian security forces arrested about 200 militants, in spite of significant popular support against the arrests.[51] The Israeli response on December 3 was to destroy the airport in Gaza and bomb Arafat's headquarters in Gaza. On December 4, the Israeli cabinet formally declared the PA was an "entity supporting terrorism." On December 13, Israel's cabinet declared it was breaking all ties with Arafat.[52]

The cycle of violence had entered into a newer, more deadly phase, with the PA and Arafat in little control of events. Still, the Palestinian leadership

---

[47] UN Chronology (Oct. 2001).

[48] UN Chronology (Nov. 2001) and (Dec. 2001).

[49] UN Chronology (Nov. 2001); "Fatah Central Committee welcomes 'new US positions'," *BBC Worldwide Monitoring*, November 30, 2001.

[50] "Fatah forces reportedly reject Arafat's cease-fire orders," *BBC Worldwide Monitoring*, November 29, 2001.

[51] "Arafat: End All Attacks on Israel," *UPI*, December 16, 2001.

[52] "Hamas attacks busload of Jewish settlers which leads to strong Israeli response; Jewish Defense League chairman charged in plot to blow up mosque in office of Arab-American congressman," *ABC News*, December 13, 2001.

worked hard to rein in Hamas and other militants to dampen the violence, in spite of the political toll such a crackdown was taking on Arafat's standing in Palestinian society.[53] Even senior Israeli security officials noted to visiting American official General Anthony Zinni that the Palestinians were cracking down hard on Hamas and other militants.[54] The kind of chaotic and bloody violence then being seen did not serve Palestinian interests. Arafat himself went on national television on December 16 to personally call for the cessation of all armed attacks.[55]

In this new and more volatile context, and after months of effort, Arafat and Fatah successfully pressured Hamas and the PIJ to agree to a cease fire on December 21, 2001, even while these groups were simultaneously engaged in an armed clash with PA forces in Gaza on the same day. Arafat and the Palestinian leadership had tried to get these non-PLO groups to agree to a cease-fire for months, as outlined by CIA Director George Tenet in June 2001 (and accepted by the PA at that time). Showing how diffuse the AAMB had become, one statement put out at the time said it also agreed to a cease-fire, while another one said it had not.[56] Still, AAMB cells abided by the cease-fire terms.

There were three weeks of calm until January 14, 2002, when Israel assassinated AAMB leader Ra'id al-Karmi. Retaliatory suicide attacks followed and the region descended into violence once again.[57]

This also marked AAMB's biggest symbolic break with the Fatah leadership: Arafat pressured Palestinian militants into stopping attacks on Israel, but was shown to be unable to stop Israeli attacks on Palestinians. Karmi's assassination accelerated the radicalization of AAMB cells and their further distancing from Fatah leadership.

Fatah leaders held a secret meeting on February 7, 2002, in which they called for the disbanding of the AAMB.[58] A statement issued in the name of the Brigades in Gaza accepted the decision, while another message faxed

---

[53] According to Palestinian pollsters, Arafat's approval rating dropped to 20% during the crackdown. "Reprisals Risk Collapse of Arafat's Rule," *Manchester Guardian Weekly*, December 12, 2001. Another poll revealed that 72% of Palestinians opposed arresting militants and a majority of Palestinians opposed the cease fire. "All Eyes on Arafat After Public Appeal Brings Sudden Lull," *AFP*, December 18, 2001.
[54] "Israel sees real progress in Palestinian terror crackdown," *AFP*, December 11, 2001.
[55] Bates 02:007743.
[56] UN Chronology (Dec. 2001) and (Jan. 2002).
[57] UN Chronology (Jan. 2002).
[58] Human Rights Watch, *Erased in a Moment: Suicide Bombing Attacks Against Israeli Civilians*, October 2002, pp. 84-85, available at http://www.hrw.org/reports/2002/isrl-pa/ISRAELPA1002.pdf .

from the West Bank denounced it.[59]  A month later Nasser Aweis, an alleged leader of the AAMB in the Nablus region, issued a leaflet that specifically rejected Arafat's call for a cease-fire, likening the call to sending sheep to slaughter in the face of Israeli attacks.[60]

The confluence of growing opposition to Fatah political leaders, the loss of AAMB leader Ra'id Karmi (further weakening any kind of central influence over disparate cells), and more military pressure from Israel in the form of Operation Defensive Shield (Israel's reconquest of Palestinian urban areas in the West Bank, in March 2002,) pushed AAMB to higher levels of violence, very much outside the control of Fatah or the PA.  The turn toward suicide bombings of civilian targets in Israel by AAMB led the US State Department to declare AAMB a Foreign Terrorist Organization in March 2002.   From a single attack in 2001 that killed three civilians inside Israel, AAMB proceeded to carry out 8 suicide bombings inside Israel in 2002, leaving 35 civilians dead.  The inability of Palestinian leaders to control AAMB militants was clear.

It is important to note in this context that, unlike the AAMB, neither Fatah nor the PA was ever declared a Foreign Terrorist Organization by the US State Department, further indicating that the entities were recognized to be separate.

### 3.    *Continuing Efforts to Demand an International Force*

Arafat and other Palestinian leaders made repeated pleas for the help of an international force to protect Palestinians from Occupation forces and to ensure ceasefire compliance by all parties.  These numerous efforts are entirely inconsistent with the idea that the PA supported violence.  Consistently throughout the Second Intifada, the only entity preventing the establishment of an international force was Israel.

Arafat first demanded an international force on October 4, 2000, just days after the violence of the Second Intifada began.[61]  Later in October, the Palestinian Chief Negotiator was urging European countries to step in to end the violence and provide international protection to the Palestinian people.  A similar call for a UN protection force was made two days later.  On November 5th, Arafat made the same plea on CBS television.  The UN Secretary-General said the UN could not deploy an international force without the consent of both parties and Israel opposed the idea.[62]

---

[59] *Ibid.*
[60] *Ibid.*
[61] UN Chronology (Oct. 2000).
[62] UN Chronology (Nov. 2000).

*Robinson, p. 23*

Many similar pleas were repeated throughout the remainder of 2000, 2001, 2002, and beyond.[63]

### 4.     Condemnation of Terror Attacks

The Palestinian leadership consistently and repeatedly, in English and in Arabic, made its opposition to terror attacks known.  As a few examples, in early June 2001, Arafat condemned a suicide attack in Tel Aviv, saying he was against any killing of civilians.[64]  In October 2001, both the Fatah Central Committee and the PLO Executive Committee renewed their condemnation of the September 11 attacks in the United States and pledged to fight terrorism in all its forms.[65]  On December 16, 2001, in a televised address in Arabic to the Palestinian public, Arafat called "once again for a halt to all operations, particularly suicide attacks which we have always condemned."[66]

Official condemnations have been released for many specific attacks.  For example:

On June 19, 2002, the Palestinian leadership issued a statement regarding "two dangerous operations."  "These two operations are strongly condemned by the Palestinian Leadership and people.  . . .  The Leadership reiterates its condemnation of these operations that target civilians.  . . .  The Leadership also calls for sending international observers as fast as possible to consolidate the cease-fire and to stop the blood shedding amongst Israeli and Palestinian civilians."[67]

On July 31, 2002, the Palestinian leadership issued an official statement to condemn the bombing at the Hebrew University.  "With shock and condemnation, the Palestinian leadership received the news about the terrorist operation that was implemented at Hebrew University in Jerusalem this morning.  . . .  The Leadership condemns this terrorist operation that targeted the civilians at Hebrew University.  This operation is out of humanitarian and moral standards and it causes heavy damage to the image of the Palestinian people in the eyes of the international community and public opinion . . . ."[68]

---

[63] UN Chronologies.

[64] Bates 02:008338; UN Chronology (June 2001).

[65] UN Chronology (Oct. 2001).

[66] Bates 02:007743; UN Chronology (Dec. 2001).

[67] Bates 02:006410.

[68] Bates 02:006413.

On January 29, 2004, "Mr. Ahmed Qurei 'Abu Ala,' the Prime Minister, denounced [], along with the Palestinian government, the attack against the passenger bus that took place this morning in Jerusalem, killing and injuring a number of people."[69]

### 5.    *Resistance versus Terrorism versus Jihad*

The concepts of "resistance", "terrorism" and "jihad" all have distinct meanings, although they are often conflated and confused in popular discourse, both in this country and in the Middle East.  For example, whether one chooses to describe a violent act as resistance or terrorism is often an indication of which side of the conflict one supports.  This is as true in English as it is in Arabic, where resistance (*muqawama*) is what "we" do and terror (*irhab*) is what "they" do.  Scholars understand these three words are distinct.  "Resistance," including through acts of violence, is allowed under international law under certain circumstances.  Palestinian resistance – again, including violence – against Israel's military occupation of lands seized in the 1967 war has been routinely recognized as legitimate and legal by the United Nations as long as it is directed against combatants (i.e., military and security forces) inside the occupied lands.  Whether or not such resistance always constitutes sound strategy is another question entirely.

By contrast, "terrorism" is recognized as violence that is always illegal and illegitimate.  Terrorism, however, is not just any violence that someone or some government does not like.  It refers specifically to the threat or act of violence against randomly selected non-combatants for political purposes.  The whole point of terrorism, a staple of asymmetric warfare, is to instill a sense of panic and fear in a broad civilian population that there is no rhyme or reason as to who may be targeted next – anyone, anytime is fair game.  The theory is that, out of such fear, the population will then pressure their government to accede to the demands of the group that is perpetrating the terror.  This description of terrorism is widely accepted by analysts and by governments.  The only point of contention is that governments (including the US) tend to insist that only non-state actors can undertake terrorism (by definition), while most scholars do not accept this distinction, arguing that states have also engaged in acts of terror.

Palestinian violence in the Second Intifada fell under both categories.  For example, suicide bombings that targeted a restaurant (Haifa), a disco (Tel Aviv), or a pizzeria (West Jerusalem) clearly meet the definition of terrorism.  Violent attacks that targeted IDF positions in the West Bank or Gaza, by

---

[69] Bates 02:006414.

*Robinson, p. 25*

contrast, should be considered legitimate acts of resistance, not terrorism.

In the post-9/11 world, the Arabic word "jihad" has entered the American lexicon. It is widely misinterpreted and misunderstood. The word comes from the common Arabic verb "jahada", to struggle or make an effort. When used in the form "jihad" it has two meanings, both of which have a positive connotation to Arab and Muslim ears. The "greater jihad" means to strive to accomplish something good – to be a better person, overcome temptation, raise a good family, improve one's community, etc. The "jihad of the sword" (*jihad al-sayf*), or "lesser jihad" constitutes a call to arms to defend Islam and the Muslim community from attack. This is why orthodox Islamic jurisprudence defines the "jihad of the sword" as always defensive in nature. The point that is relevant to this present case is that the use of the term "jihad" by Palestinian leaders is not by itself a call to arms. For example, the oft-quoted remark by Arafat calling for a jihad for Jerusalem does not necessarily (or even probably) mean a call to violence. It is something akin to the present day use of the word "crusade" in English that rarely means a call to violence anymore.

### 6.    *Arafat Did Not Plan or Orchestrate the Second Intifada*

The notion that Arafat had planned or orchestrated the Second Intifada is false. As Ephraim Lavie, Director of the Steinmetz Center at Tel Aviv University, has noted, "Officials from all the intelligence organizations acknowledged in retrospect that the intifada was a grassroots uprising and not a move planned by Arafat." Lavie points to 2006 comments made by Avi Dichter, head of the GSS during the intifada, his deputy Yuval Diskin, and special GSS advisor Matti Steinburg, and reports by the head of Military Intelligence Gen. Amos Malka and Mossad researcher Gen. Yossi Ben-Ari that "determined explicitly that the intifada broke out as a popular protest" and not as an event planned by Arafat or anyone else.[70]

The position of Yasir Arafat over the outbreak of violence in the fall of 2000 and winter of 2001 is widely debated. There are two main schools of thought. First are people who argue that Arafat accepted the Marwan Barghouti-type argument that fighting and negotiating should go hand in hand. That is, the Camp David negotiations showed just how insincere the Israeli government was about creating a truly sovereign and independent Palestinian state. Thus, limited armed resistance for a short period of time might create better conditions for negotiations. Certainly the mood on the

---

[70] Ephraim Lavie, "Israel's Coping with the al-Aqsa Intifada: A Critical Review," INSS: *Strategic Assessment*, Vol. 13, No. 3, October 2010, fn 1.

Palestinian street was calling for greater action, especially in the face of stepped-up violence by settlers in the West Bank and Gaza. Under this view, Arafat let the violence take its course for a while, as long as it did not "get out of hand" or last too long. We do know that Arafat continued to press for negotiations even after Camp David broke down, all the way through the Taba negotiations in January 2001 (and beyond). Proponents of this school of thought assume a tacit approval of violence by Arafat, but cannot point to hard evidence of Arafat actually openly endorsing violence.

A second school of thought holds that Arafat actively tried to stop the Second Intifada but realized he could not do so without jeopardizing his position as Palestinian leader. One can point to numerous meetings Arafat held behind closed doors trying to tamp down the violence, to the many statements made by activists that they were disobeying Arafat's orders to cease and desist, and even the periodic arrest of Palestinian militants.

What both interpretations have in common is that they acknowledge that Arafat never abandoned the ultimate necessity of negotiations, and recognized that, at the end of the day, only a negotiated solution would bring about a Palestinian state. The tide clearly turned with the election of Ariel Sharon in March 2001 when Arafat pushed hard and publicly to end the intifada.

While the evidence is mixed about which school of thought is correct – Arafat died in November 2004 – certainly the weight of hard evidence leans toward the second interpretation.

### 7.    *ODS Documents Fail to Prove PA Support for Terror*

The Government of Israel claims that some Palestinian documents seized during Operation Defensive Shield (ODS) in March and April 2002 show that Arafat made payments to AAMB and show PA support for militant operations. There is no independent evidence that corroborates this claim, and Israel's mishandling of the seized documents has permanently tainted them in scholars' eyes. The closest scholarly analysis of those ODS documents released by Israel was conducted by Jean Francois Legrain who raises series questions about the authenticity of those few documents that relate to the AAMB.[71]

---

[71] Jean-Francois Legrain, "Internet and History: al-Aqsa Martyrs Brigades; the Web Pages as Sources of Contemporary History" (in French), (Lyon, France) June 17, 2004, available at http://www.mom.fr/guides/aqsa/aqsa025.htm (noting several inconsistencies, including the use in one document of a header common to the Jenin area being used for a list of martyrs from the Nablus area, where a different header was in use).

*Robinson, p. 27*

Human Rights Watch concluded that the documents did not provide evidence for PA command and control over AAMB, indeed just the opposite:

> The localized nature of the al-Aqsa Brigades' structure appears to be reinforced by a loose, personality-driven command structure. None of the more than twenty compilations of Palestinian documents publicly released by the IDF provide substantive evidence of any chain of military command between al-Aqsa groups and Arafat or other high-ranking PA and Fatah officials."[72]

Interestingly, the ODS documents show that the reported payments to AAMB militants came not before attacks to induce them or immediately after attacks as a reward. Rather, the payments came at the onset of ceasefire negotiations. Thus, even if these documents are authentic, they would seem to suggest that the payments were intended to bribe AAMB militants to abide by the ceasefire, not to undertake new violence. Bribery (or "patronage" in its academic form) is consistent with Arafat's style of leadership. For example, the July 2001 letter requesting funds for 24 individuals in the Bethlehem area, contains a signature allegedly by Arafat and dated August 12, 2001, the same day in which Ariel Sharon publicly authorized Foreign Minister Shimon Peres to negotiate a ceasefire, according to Israel Radio.[73] Similarly, a request for funds for three individuals contains a signature allegedly by Arafat and dated September 19, 2001. On September 18, 2001, Arafat "reissued orders for a ceasefire and told the PA not to fire on Israeli troops even in self-defence."[74] In response, "Secretary Powell welcomed the Palestinian ceasefire announcement and Israel's decision to withdraw troops from Palestinian-controlled areas."[75] Instead of showing support for terrorist actions, these payments, if true, show how desperate Arafat was to ensure these ceasefires took hold and allowed him to pursue a negotiated solution to the conflict.

The idea of bribes to powerful actors being central to statecraft is not new or foreign to the United States. In early 2013, the New York Times reported regular CIA cash payments to Hamid Karzai, president of Afghanistan.[76] Not

---

[72] Human Rights Watch, *Erased in a Moment: Suicide Bombing Attacks Against Israeli Civilians, op. cit,* p. 82.
[73] UN Chronology (August 2001).
[74] UN Chronology (Sept. 2001).
[75] *Ibid.*
[76] Matthew Rosenberg, "With Bags of Cash, C.I.A. Seeks Influence in Afghanistan," *New York Times,* April 28, 2013, available at http://www.nytimes.com/2013/04/29/world/asia/cia-delivers-cash-to-afghan-leaders-office.html?pagewanted=all&_r=0 ; Matthew Rosenberg, "Afghan Leader Confirms Cash Deliveries by C.I.A.," *New York Times,* April 29, 2013, available at http://www.nytimes.com/2013/04/30/world/asia/karzai-acknowledges-cash-deliveries-by-cia.html ;

embarrassed by these revelations, Karzai reiterated how important this cash was to taming social actors in Afghanistan who might otherwise cause problems for Kabul.[77] Karzai used the cash to buy peace, just as Arafat may have used cash to entice AAMB personnel to abide by cease fires. It certainly fits with Arafat's traditional style of leadership.

Plaintiffs' experts also cite to a document dated May 21, 2001, in which the PA General Intelligence Service allegedly passes a list of 232 individuals wanted by Israel to its Ramallah office, telling the office to "please inform the brothers whose names are mentioned above to take cautionary measures." Contrary to showing support for terrorist activities, this document more likely reflects the unfortunate reality that May 2001 was one of the deadliest months for Palestinian policemen and the prisoners in their charge. On May 14, 2001, five Palestinian policemen were shot dead by IDF forces at a roadblock with no warning or reason. All but one had been sleeping. On May 18, 2001, IDF forces used warplanes to bomb a security building in Nablus, killing eleven, and a Presidential Security Services building in Ramallah, killing one. On May 20, 2001, three Israeli tank shells hit the Ramallah house of Preventive Security head Jibril Rajoub, while he was home.[78]

Plaintiffs' experts also point to a BBC investigation in November 2003, claiming the PA cabinet took a decision to make payments to AAMB personnel. The same report quotes a former PA government official familiar with the policy as saying this was an attempt to "wean the gunmen away from suicide bombings."[79] While some critics pounced on this news as

---

Qadir Sediqi and Chelsea J. Carter, "Karzai: CIA Promises to Continue Cash Payments," *CNN*, May 6, 2013, available at  http://www.cnn.com/2013/05/04/world/asia/afghanistan-cia-money.
[77] David Lerman and John Walcott, "CIA Cash to Karzai Said to Fit Afghan Patronage System," *Bloomberg*, April 29, 2013 ("Using secret cash payments to buy influence and access, recruit agents or undermine opponents has long been standard procedure for all intelligence agencies, said three U.S. intelligence officials who asked not to be identified discussing clandestine practices."), available at http://www.bloomberg.com/news/2013-04-30/cia-cash-to-karzai-said-to-fit-afghan-patronage-system.html; Amy Davidson, "Karzai and His Cash," *New Yorker*, May 6, 2013, available at http://www.newyorker.com/online/blogs/closeread/2013/05/karzai-and-his-cash.html ; "Karzai Confirms Accepting CIA Cash Monthly for 10 Years," *Wall Street Journal*, April 29, 2013, available at http://online.wsj.com/article/SB10001424127887323798104578452532322242100.html.
[78] UN Chronology (May 2001).
[79] "Palestinian Funds Go to Militants," *BBC*, November 7, 2003, available at http://news.bbc.co.uk/2/hi/middle_east/3243071.stm. That same former government official again addressed the absurdity of the Israeli claims of PA support for AAMB activities in March of 2004, saying "the whole story boils down to that the PNA, at the time of the Abu-Mazin Mahmud Abbas government, with the knowledge of the US administration and the Israeli government and with the aim of calming down the situation, sought to embrace Al-Aqsa Martyrs Brigades activists and help them. Many of them are unemployed and thus exposed to parties that do not accept the PNA policy, which seeks calm. He

evidence that top Palestinian leaders were rewarding AAMB for its violence, the more prosaic explanation offered by the former official is likely correct. A rule of thumb in counterinsurgency strategy is: "if you can't beat them, buy them." It was the strategy the US military used in Iraq to dramatically reduce violence in 2007. Rather than fighting Sunni tribal militants, the US instead put them on its payroll and promised them jobs in the new Iraqi military, police and security services, and had them turn on al-Qa'ida in Iraq militants instead. This was the basis of the "Awakening" program, better known to most Americans as part of the "Surge" strategy. Palestinian leaders proved ineffectual in banning the AAMB or in cajoling them to put down their weapons; buying off those who agreed to cooperate was not a bad strategy. The policy also seems to have worked: there were no more sole AAMB suicide bombings inside Israel. The suicide attacks that did occur thereafter always had a Hamas, PIJ, PRC or PFLP hand.

### 8. "Revolving Door" Policy

Israel has long complained of an undefined "revolving door" policy by the PA. Such claims do not take into account legitimate reasons why individuals accused of crimes might be released, including lack of evidence against them.

B'Tselem has complained about the conduct of both Israel and the PA (or, "PNA") in putting ostensible Israeli security needs ahead of the rights of the accused to a fair trial. Decrying Israel's claims of a "revolving door" policy as unfair, B'Tselem said:

> *Were the PNA to convict individuals of grave crimes in fair trials, only to release them immediately, such a practice would be contrary to the rule of law, and Israel and the United States would be justified in protesting. However, the rhetoric surrounding the "revolving door" suggests that this term would be applied to any Palestinian released by the PNA, including those against whom there is no evidence to try them, or those acquitted by a court of law. Such use of the "revolving door" allegations demonstrates additional blatant disregard for basic rights of due*

---

added that the PNA policy has been to embrace the 'brothers in Al-Aqsa Martyrs Brigades so that they will fall in line with the PNA political line and thus avoid security lawlessness.'" "Palestinian MP Denies Financing Al-Aqsa Brigades Operatives," *BBC Monitoring Middle East*, April 1, 2004.

process.[80]

The PLO complained about these Israeli allegations to the Mitchell Fact-Finding Committee in 2001.  Noting that:

> Israel has demanded the re-arrest of a list of allegedly
> released detainees without describing in what capacity and
> to what extent any of them was involved in "acts of
> violence and terror against Israelis."  Prior to the current
> uprising, Palestinian law enforcement institutions released
> suspects only when the evidence against them was too
> insubstantial to proceed with the charges against them.
> The PA cannot legitimately or legally jail Palestinian
> dissidents indefinitely simply because the Government of
> Israel demands it.  If Israel seeks to call the Palestinian
> Authority into account for releasing criminals or criminal
> suspects, it should provide clear information to the PA and
> to the Committee regarding these persons' alleged criminal
> conduct.
>
> To cite one example, the first person on Israel's list of
> detainees released after the start of the uprising, Abbas
> Uthman Ahmad 'Awiwi, was released due to insufficient
> evidence against him, although he was kept under close
> security surveillance.  Based on regular contact with Mr.
> 'Awiwi, Palestinian police officials were satisfied that he
> was engaged in no criminal conduct whatsoever.  They had
> no cause to rearrest him.  Even so, Israel has now made Mr.
> 'Awiwi's rearrest impossible:  he was assassinated by an
> Israeli sniper on December 13, 2000, while standing on the
> street in the Palestinian-controlled area of Hebron.[81]

### 9.    The PA and PLO Opposed the Activities of Hamas

a)   Tensions between the PA, PLO, and Hamas 1994-2000.

Tensions between the PLO and Hamas, already entrenched during the

---

[80] B'Tselem, *Cooperating Against Justice*, p. 16 (1999), available at
http://www.btselem.org/sites/default/files2/publication/199907_cooperating_against_justice_eng.pdf
[81] *Third Submission of the Palestine Liberation Organization to the Sharm El-Sheikh Fact-Finding Committee*, p.
16, Apr. 3, 2001, available at http://www.nad-plo.org/userfiles/file/Reports/response_to_israelis.pdf.

first Intifada,[82] deepened with the establishment of the Palestinian Authority in 1994. Hamas rejected the legitimacy of the newly minted Palestinian Authority, and did not participate in its activities. Hamas boycotted the 1996 PA elections. Hamas frequently tried to sabotage the peace process during this period, including the launching of its first wave of suicide bombings against Israel in 1996.

The PA, in response, took a carrot and stick approach toward Hamas. On the one hand, the PA tried to crack down on Hamas' activities, often through the use of State Security Courts against Hamas militants. At times, the PA acted in a heavy-handed manner, although not always very effectively. For example, in breaking up a Hamas rally to protest the peace process in November 1994, ill-trained police and security officials ended up shooting dead 16 protestors. On the other hand, the PA and PLO leadership knew that Hamas was simply too big and powerful to simply crush. Not even Israel with all of its resources and superiority succeeded in getting rid of Hamas; the PA had no chance of doing it. Rather, Hamas needed to be induced to accept the peace process. The PA and PLO leadership reasoned that if the peace process yielded substantial political dividends – especially an independent Palestinian state – Hamas would have no choice but to yield to popular support. Thus, they kept the political door open to Hamas and tried to induce it to accept the peace process.

The PA had some success by 1995 in forcing Hamas to cease armed attacks against Israel, in large measure because of the broad support the Oslo process initially enjoyed among Palestinians. For example, an October 1995 poll from the Center for Palestine Research and Studies (CPRS) found that 72% of Palestinians supported the peace process. [83] Hamas's informal agreement to cease attacks ended with the Israeli assassination of top Hamas militant Yahya 'Ayyash, leading to four deadly suicide bombings against Israel in early 1996.

Because the peace process failed to yield political dividends for the average Palestinian throughout the 1990s – for example, the number of settlers doubled during the decade – Hamas never really had to yield to popular support to get on board. Indeed, Hamas' rhetoric that the Oslo

---

[82] For a fuller discussion of this, see my discussions in Glenn E. Robinson, "Hamas as Social Movement," in Quentin Wiktorowicz, ed., *Islamic Activism* (Bloomington: Indiana University Press, 2003), and Glenn E. Robinson, *Building a Palestinian State*, Ch. 6 (Bloomington: Indiana University Press, 1997).

[83] For a good discussion of the PA-Hamas dynamics that led to Hamas' cessation of attacks in 1995, see Muhammad Muslih, *The Foreign Policy of Hamas* (New York: Council on Foreign Relations, 1999), especially p. 35.

process would never lead to an independent Palestinian state seemed to be borne out by events, and their ideology of a return to armed resistance increasingly caught on, to the detriment of the PA.

b) *Hamas during the Second Intifada.*

It has been suggested that Hamas and the PLO and/or the PA worked hand in glove against Israel during the Second Intifada (2000-2004). This suggestion ignores the reality of a history of hostile relations between the two. The PLO and then later the PA had only hostile relations with Hamas from its founding in 1987. Then, shortly after the Second Intifada ended, Hamas and Fatah fought a low intensity civil war against each other, leading to Hamas' violent capture of the Gaza Strip in 2007. All attempts since then to reconcile the two forces have ended in failure. Yet, the Plaintiffs' experts in the *Sokolow* case would like the court to believe that all of this history of hostility and violence between the two groups before and after the Second Intifada is to be disregarded and the forces worked in close collaboration during those critical years.

In fact, relations remained strained throughout the Second Intifada, although both sides were far more interested in fighting Israel than fighting each other at the time. Hamas took the lead in launching violent attacks against Israel. Militants in Fatah, over the objections of their traditional leaders, formed AAMB cells to compete with Hamas in fighting Israel. Occasionally, these groups would even issue competing claims for the same attack.[84] Although joint attacks were claimed at times, this occurred on a grassroots level based on individual friendships and not on a factional level. While Hamas, PIJ, and AAMB militants were competing with each other in fighting Israel – itself, a highly popular cause at this point given the level of rage felt by Palestinians at Israel's denial of Palestinian independence – the PA was powerless to effectively end the violence. And the PA risked political suicide if it was seen by Palestinians as little more than Israel's police force in the West Bank and

---

[84] Jean-Francois Legrain, *Al-Aqsa Brigades, The Communiques*, June 17, 2004, translation of original French available at http://www.mom.fr/guides/aqsa/aqsa025.htm ("The Al-Aqsa Martyrs Brigades and the 'Izz Al-Din Al-Qassam Brigades of Hamas both claimed credit for the February 19 2002 'Ayn 'Arik operation in which six Israeli soldiers were killed by a sniper at a checkpoint near Ramallah.") ; "Islamic Jihad claims attack on Jewish pilgrims, vows revenge for Rafah raid," *Agence France Presse*, December 12, 2003 (three groups each claiming credit for an attack in Nablus); Ken Ellingwood, "The World: Israel Mounts a Limited Response to Bus Attack; Troops Raze Bomber's Home in Bethlehem but Leave Soon After. Hamas Issues a Competing Claim of Responsibility for the Jerusalem Suicide Blast," *Los Angeles Times*, January 31, 2004; "Palestinian Al-Qassam Denies Al-Aqsa Brigades Participated in Gaza Strip Attack," *BBC Summary of World Broadcasts*, July 1, 2004 (Hamas military wing "denying and castigating claim by Al-Aqsa Martyrs Brigades, to have participated with them in attack").

Gaza Strip. The PA was caught between a rock (its own lack of capacity) and a hard place (political suicide if it tried too hard to stop all resistance, which it couldn't anyway). But the PA's Catch-22 predicament never translated into support or cooperation for Hamas during the intifada.

### 10.     The PA did not systematically or institutionally "incite violence" against Israel through its policies.

a) *No financial incentives for Palestinian terrorists.*

The claim is periodically made that Palestinians engage in terrorism in order to reap financial rewards for their families. This claim was made famous by Saddam Hussein's promise to pay Palestinian families up to $25,000 for such acts of violence against Israel. However, even under the "best" of circumstances when a check from the Iraqi tyrant might have actually arrived, there was never a financial incentive for Palestinians to engage in violence. The reason was simple: Israel would demolish the family home of any suspected terrorist, including anyone suspected of involvement in any kind of attack on Israelis, successful or not. The loss of the family home was always a devastating financial blow to a family, which is why stories are legion of Palestinian parents trying to prevent their sons from engaging in terrorist acts.

In some cases, Palestinian families would evacuate their home even before Israel destroyed it simply in anticipation. The human consequences of punitive demolitions can be significant.

Since the occupation of Palestinian lands began in 1967, Israel has demolished over 24,000 Palestinian homes in Gaza, the West Bank and East Jerusalem for various reasons. "Punitive" demolitions, which include family homes of suspected terrorists, have numbered over 1,500. The year 2002 had the greatest number of punitive demolitions ever by Israel, with 251 Palestinian homes demolished on punitive grounds.[85]

The IDF suspended the practice of punitive house demolitions in February 2005 because it determined that punitive demolitions more likely enraged people to commit more violence, instead of deterring violence. The Israeli organization B'tselem summarizes the state of Israeli understanding of house demolitions and deterrence like this:

---

[85] Data comes from the Israeli Committee Against House Demolitions, www.icahd.org/; B'Tselem, *Through No Fault of Their Own: Punitive House Demolitions During the Al-Aqsa Intifada* (2004), available at http://www.btselem.org/download/200411_punitive_house_demolitions_eng.pdf.

*Robinson, p. 34*

*It should be mentioned that the deterrent effect of house demolitions has never been proven. In his book on the first intifada, Brigadier General Ariyeh Shalev examined the effect of house demolitions on the scope of violence. He found that the number of violent events did not diminish following house demolitions, and at times even rose. Similar findings were reached in an internal IDF report on house demolitions during the al-Aqsa intifada. In their book The Seventh War, journalists Amos Harel and Avi Isacharoff reported that the IDF report stated there was no proof of the deterrent effect of house demolitions, and that the number of attacks even rose a few months after implementation of the policy began.*[86]

The practice of punitive house demolitions was resumed by Israel in January 2009.[87]

b) *Debunking the "Palestinian textbooks incitement" myth.*

It has been alleged that Palestinian Authority school textbooks incite violence against Jews and Israel. There are two serious problems with this allegation. First, all serious studies have shown this allegation to be, at the least, grossly exaggerated, and, more generally, false. Second, the PA only began issuing its own textbooks in 2000 (and then only for first and sixth grade), meaning all of the alleged assailants in the *Sokolow* attacks were too old to have ever been exposed to PA textbooks.

When the PA was established in 1994, its Ministry of Education continued to use the existing Jordanian textbooks for West Bank schools and Egyptian textbooks for Gaza schools. While these textbooks had many shortcomings, they were the same textbooks Israel had allowed to be used in Palestinian schools since 1967. The PA established a Curriculum Development Center (CDC) to design a new curriculum for all K-12 grades; the CDC issued is comprehensive report in 1996. The Ministry of Education used the report as the basis for its own proposal, submitted to the Palestinian Legislative Council for approval in 1997. After PLC approval of the blueprint, the Ministry of Education tasked a

---

[86] B'Tselem, *Background on the Demolition of Houses as Punishment,* January 1, 2001, available at http://www.btselem.org/English/Punitive_Demolitions/Index.asp.
[87] Valentina Azarov, "Israel Reinstates Punitive House Demolitions Adding to Its Reprehensible Human Rights Record," *International Law Observer,* April 12, 2009, available at http://www.internationallawobserver.eu/2009/04/12/israel-reinstates-punitive-house-demolitions-adding-to-its-reprehensible-human-rights-record/.

new center to draft the actual textbooks. As noted, the first textbooks were issued in 2000, to first and sixth grades. Second and seventh grade textbooks came out for the first time in 2001, third and eighth grade textbooks in 2002, and so on.[88]

No one paid much attention to these benign events in the Ministry of Education until an American NGO issued a report in 1998 attacking the content of Palestinian school textbooks, accusing the textbooks of anti-Semitism and incitement to violence. There were numerous problems later identified with this report, not least of which was the fact that it was criticizing (unbeknownst to any reader of the report) Jordanian and Egyptian textbooks, not Palestinian ones.[89] Dr. Nathan Brown, a leading expert on the issue of Palestinian textbooks who himself studied the textbooks, later referred to the Israeli report as "tendentious, misleading, and unreliable."[90] No matter, the report generated considerable international attention and began the myth of textbook incitement that is still with us today.

Every serious academic study has found the accusations of incitement and anti-Semitism to be unfounded.[91] Nathan Brown conducted his own study, which was published in several forums.[92] Brown found that the

---

[88] Nathan J. Brown, perhaps the leading expert on the study of Palestinian textbooks, has nicely summarized this history in his December 2002 essay on "The International Controversy Regarding Palestinian Textbooks," available at http://home.gwu.edu/~nbrown/Georg_Eckert.htm.

[89] General Secretariat of the Council of the European Union Press Office, *Palestinian Schoolbooks* (Brussels, May 15, 2002) ("Quotations attributed by earlier CMiP reports to the Palestinian textbooks are not found in the new [PA] schoolbooks . . . some were traced to the old Egyptian and Jordanian textbooks . . .. While many of the quotations attributed to the new textbooks . . . could be confirmed, these have been found to be often badly translated or quoted out of context, thus suggesting an anti-Jewish incitement that the books do not contain."), available at
http://www.consilium.europa.eu/uedocs/cms_data/docs/pressdata/en/misc/70923.pdf.

[90] Brown, The International Controversy Regarding Palestinian Textbooks (2002).

[91] UNESCO, *Studies on the Palestinian Curriculum and Textbooks, Consolidated Report* (2006) ("The starting point for the controversy was a report issued in 2001 by an American [NGO], the Center for Monitoring the Impact of Peace (CMIP). The study claimed that the textbooks did not teach peace and coexistence with Israel, but rather instilled a culture of hatred. The report has been the springboard for an effective advertising campaign which has drawn in support from other American groups and from some influential American politicians. On the other hand, a research initiative involving institutional, academic, and independent researchers has resulted in a consensus which hold that the Palestinian curriculum is not anti-Semitic and does not incite violence. This view has not only the support of many eminent researchers and academics, but also that of the European Union."), available at
http://web.archive.org/liveweb/http://unesdoc.unesco.org/images/0015/001515/151551e.pdf.

[92] See chapter 6 "Democracy, Nationalism, and Contesting the Palestinian Curriculum" in Nathan Brown, *Palestinian Politics After the Oslo Accords: Resuming Arab Palestine* (Berkeley and Los Angeles: University of California Press, 2003). See also his report for the Adam Institute (2001), *Democracy, History, and the Contest over the Palestinian Curriculum*, available at

textbooks were nationalistic in tone, as to be expected, and had numerous shortcomings, but did not exhibit either anti-Semitism or incitement to violence.  In fact, he found, the PA textbooks were probably the most kind to Israel of any textbooks found in the Arab world:

> *Here I should point out something odd about the criticisms that began to be voiced beginning in 1998: the Palestinians came under the most severe attack just as they were creating a curriculum that – from an Israeli perspective – was far superior to any that an Arab state had used in the past.  By late 2000, the attack clearly had nothing to do with the content of the books and everything to do with the bitterness of the second intifada.*[93]

The US Government also wanted to investigate whether Palestinian textbooks incited violence against Israel.  Congress requested that the State Department investigate the matter, and the State Department in 2002 hired a well-respected NGO – the Israel/Palestine Center for Research and Information (IPCRI) – to research the issue.  IPCRI issued its report to the USG in March 2003 and concluded that the

> *overall orientation of the curriculum is peaceful despite the harsh and violent realities on the ground. It does not openly incite against Israel and the Jews. It does not openly incite hatred and violence. Religious and political tolerance is emphasized in a good number of textbooks and in multiple contexts.*[94]

Still, the issue will not die.  The US State Department recently funded a new group of Israeli, Palestinian and international scholars to compare bias in both Israeli and Palestinian textbooks.  As with earlier scholarly analyses, these academics found plenty of shortcomings in Palestinian textbooks (as well as some shortcomings in Israeli textbook portrayals of Palestinians), and much nationalistic tone.  But they did not find anti-Semitism and incitement to violence in PA textbooks.[95]

---

http://www.jnul.huji.ac.il/ia/archivedsites/gushshalom010204/www.gush-shalom.org/archives/nathan_textbook.pdf.
[93] Brown, The International Controversy Regarding Palestinian Textbooks (2002).
[94] A short summary of the 2003 IPCRI report and the related controversy is available here: http://www.nytimes.com/2004/12/18/opinion/18iht-edavenstrup_ed3_.html
[95] Council of Religious Institutions of the Holy Land, *"Victims of Our Own Narratives?"  Portrayal of the "Other" in Israeli and Palestinian School Books,* February 4, 2013, available at http://d7hj1xx5r7f3h.cloudfront.net/Israeli-Palestinian_School_Book_Study_Report-English.pdf.

Nathan Brown captured the sentiment of the Palestinian textbook incitement myth best when suggesting that Palestinian textbooks that contain the national Palestinian narrative will always be rejected in some quarters: "as long as the textbooks do not repudiate the Palestinian point of view, they will always remain suspect in some eyes."[96]

c) *Prisoners and "martyrs."*

The sense of Palestinian persecution runs very deep, and the place of Palestinians prisoners in the long battle for independence is held very high indeed.[97] No Palestinian government can be seen as abandoning prisoners. From 1967 to 1994, nearly 800,000 Palestinians had been arrested by Israel for periods ranging from one week to life.[98] To put that figure in perspective, the equivalent number of Americans arrested would be about 75 million. Many Palestinians have spent months, even years, in jail without any charges being brought, under the old British colonial system of "administrative detention."[99] Many others have been unjustly or unduly imprisoned by military courts in the West Bank based on scant evidence or "confessions" signed to charge sheets in Hebrew, a language few Palestinians read.[100] The PA has tried to keep faith with those imprisoned by Israel for domestic political purposes, even at the risk of alienating Israel with the accusation that it is encouraging violence as a result. The PA's support of prisoners has taken a number of forms, including monthly payments for the support of the prisoners' families, the continuance of scheduled promotions of police and security personnel while they remain incarcerated, and the "canteen" payments to prisoners.

The PA support for Palestinian prisoners is a political necessity, and does not indicate an endorsement of violence or terrorism. It is also a form of social welfare, given the sheer numbers of prisoners Israel has held at any one time, and the fact that it often incarcerates the primary bread winner in a family. Prisoners are viewed as political detainees, and

---

[96] Brown, The International Controversy Regarding Palestinian Textbooks (2002).

[97] *Reaching the 'No-Peace' Agreement: The Role of Palestinian Prisoner Releases in Permanent Status Negotiations*, Addameer Prisoner Support and Human Rights Association, December 2009, available at http://www.addameer.org/files/Reports/addameer-report-reaching-the-no-peace-agreement.pdf.

[98] Palestinian Centre for Human Rights, "Statistics: Arrests, Imprisonment and Torture," last updated October 4, 2002, available at http://www.pchrgaza.org/arrests_torture_stat.html.

[99] David Kretzmer, *The Occupation of Justice: The Supreme Court of Israel and the Occupied Territories*, at 129-135 (SUNY Press, 2002).

[100] For an excellent description of Israel's system of military justice, see Lisa Hajjar, *Courting Conflict: the Israeli Military Court System in the West Bank and Gaza* (Berkeley and Los Angeles: University of California Press, 2005). For an earlier depiction of similar issues, see Raja Shehadeh, *Occupier's Law: Israel and the West Bank* (Washington, D.C.: Institute of Palestine Studies, 1988).

their support is a political calling that if denied would have dire consequences for PA leaders.

This same logic applies to families of "martyrs," that is, those people who died in the fight for national liberation. As with prisoners, in distributing support payments to the families, the Institute for the Care of Martyrs' Families and the Injured (Martyrs' Institute) does not make determinations of guilt or innocence, nor does it attempt to distinguish between legitimate acts of resistance and acts that could be considered terrorism. In fact some "martyrs" were simply innocent bystanders or were themselves victims of Israeli attacks. Again, this policy is not a reward for terror, but rather a legacy of the struggle for national liberation and the intense popular affinity for anyone who lost their lives in the struggle, however misguided their actions may have been.

Compare, for example, the Martyrs' Institute's historical policy of paying any Palestinian (or his family) killed during 'the struggle' a modest stipend with the promise of Saddam Hussein to pay $25,000 to any suicide bomber's family. In Saddam's case, the activity must be a suicide bombing, which clearly was a call to terror. In the case of the Martyrs' Institute, someone caught in the crossfire and killed would be deemed a martyr and his family provided for (at a fraction of the amount Saddam paid). The Martyrs' Institute payments should be understood in the context of generations of those sacrificing for the Palestinian cause; it has long since become a legacy program that no politician would dare reverse without risking being seen as a traitor to the Palestinian cause by his own people.

## B. The PA Did Not Have the Ability to Stop the Violence During the Second Intifada

### 1. *Sources of Palestinian Rage During the Second Intifada*

The Oslo peace process from 1993 to the Second Intifada did not substantially change the situation on the ground in the West Bank. Settlements were not dismantled and, indeed, the settler population increased quite rapidly in the West Bank. The IDF maintained overall control over the borders and inside the West Bank, although regular IDF patrols deep inside the most populated Palestinian areas of West Bank did stop, at least until the start of the Second Intifada. Periodic IDF operations inside Area A (PA) lands did occur throughout the Oslo period. International development aid in the 1990s improved certain aspects of everyday life in the West Bank (e.g., better sewage

treatment, more paved roads). However, beginning in 1992, Israel initiated a closure policy that prevented Palestinians from working in Israel on a regular basis. Employment income in the West Bank and Gaza was stagnant throughout most of the 1990s as a result. In short, Oslo did not bring the kind of economic and political transformation that most Palestinians had expected.

a)  *Settlements*

The dominant political purpose of Israel's settlement drive in lands occupied during the 1967 war was to undercut the ability of a withdrawal by a future Israeli government from most or all of these lands. This political agenda became explicit after the Likud Party came to power in Israel in 1977 and greatly accelerated the settlement drive; the Likud Party has consistently rejected the establishment of a sovereign Palestinian state west of the Jordan River, even today. The linkage between settlements and preventing or minimizing potential withdrawal was neatly captured by Ariel Sharon, the "father" of the settlements, in 1998 during negotiations with the Palestinians. Sharon, then Foreign Minister, went on Israeli radio to urge Israelis to settle more Palestinian lands right away: "Grab the hilltops, and stake your claim. Everything we don't grab will go to them."[101]

In defense of its settlement drive, Israel has argued that settlements serve Israeli security needs. In particular, Israel has argued that settlements constitute a first line of defense against outside aggression. Historically, settlers have been provided military grade weapons by the IDF, generally M-16 automatic rifles.[102] Thus, both in word and deed, Israel itself has linked settlements and settlers with a state security function. Indeed, on a visit to the Gush Katif settlement bloc in Gaza in 2001, Prime Minister Sharon told the gathered settlers "You are the first line of defense of this country."[103]

Former US Ambassador to Israel Daniel Kurtzer likewise confirms the official Israeli security rationale for settlements:

Ariel Sharon was considered the godfather of the Israeli settlements movement. His ardent support of settlements

---

[101] David Sharrock, "Land Grab Gathers Pace in West Bank War of the Hilltops", *The Guardian*, January 8, 1999, available at http://www.guardian.co.uk/world/1999/jan/08/davidsharrock.
[102] Foundation for Middle East Peace, "Israel's Policy of Arming Israeli Settlers Endangers Palestinians in the Territories," 4 *Settlement Report* 3, May-June 1994, available at http://www.fmep.org/reports/archive/vol.-4/no.-3/israels-policy-of-arming-israeli-settlers-endangers-palestinians-in-the-territories.
[103] Rachel Saperstein, *Eviction* (Pavillion Press 2005).

construction and the legitimacy he lent to the strategic argument for settlements as a means of enhancing Israeli security were vital to the success of the enterprise, particularly in the years after he left the Israeli military for politics. Sharon's basic argument revolved around security. During my time as U.S. Ambassador to Israel, Sharon would often hold forth on the rationale for and his own role in the planning of new settlements.[104]

Palestinians are understandably hostile to settlers and the settlement enterprise, viewing settlers as usurpers of land and destroyers of Palestinian livelihoods. Settlers regularly destroy Palestinian property and injure, and sometimes kill, Palestinian civilians through excessive and often unjustified use of force. Israel's highly regarded human rights organization, B'tselem, has documented settler violence against Palestinian civilians. In one report from 2001, B'tselem opens its report with these words: "Violence by settlers and other Israeli civilians against Palestinians have occurred in the Occupied Territories practically since the occupation began." B'tselem's website currently lists at least 20 separate reports in English that document settler violence against Palestinians.[105]

A 2005 official Israeli government report written by former state prosecutor Talia Sasson confirmed the often-lawless behavior of settlers. "When people see there is no enforcement of law," Sasson said, "they can take land that is not theirs and establish new settlements without government approval and build houses on them, and no one does anything afterward. They can come and hit and shoot Palestinians, and they see no one does anything about it."[106] Indeed, even President Obama in his recent speech in Israel in front of a large Israeli audience publicly chided Israel over settlements and the behavior of some settlers:

> Put yourself in their shoes, look at the world through their eyes. It is not fair that a Palestinian child cannot grow up in a state of her own, and lives with the presence of a foreign army that controls the movements of her parents every single day. It

---

[104] Daniel Kurtzer, "Behind the Settlements", *The American Interest Online*, March-April 2010 available at http://www.the-american-interest.com/article.cfm?piece=781.

[105] B'Tselem, *Violence by Settlers*, (2011) available at http://www.btselem.org/publications?tid=32.

[106] Dina Kraft, "Israel Wrestles with Settler Challenge," *JTA*, June 24, 2009, available at http://jta.org/news/article/2009/06/24/1005831/israel-wrestles-with-settler-conundrum.

*is not just when settler violence against Palestinians goes*
*unpunished.[107]*

Mainstream Israelis view settlements as a problem.  A June 2009 poll by
Tel Aviv University found that two-thirds of Israelis view settlements as a
liability, not an asset.  The poll found that Israelis no longer accept the
original security argument for settlements and now view them as a sectarian
project of the religious right in Israel.[108]  While proponents of settlements in
Israel and the United States passionately argue in their defense, often on
religious grounds, most Israelis themselves view settlers as an increasingly
troubling problem both because they undermine any movement toward a
two-state solution (supported by a majority of Israelis) and because they often
act outside Israeli law.  Radical settlers fight Israeli police and military
personnel sent to evacuate illegal outposts, and threats to ignore and even
violently resist IDF withdrawal orders as part of a peace deal are
commonplace.  Thus, while settlers have always been a problem for
Palestinians, they are increasingly seen as a problem for mainstream Israelis
as well.[109]

Even Israeli policy on what are universally recognized as "illegal
outposts" can be contradictory.  In 2004, Israel's State Comptroller's Office
found that "while the Defense Ministry was officially supposed to be
dismantling illegal outposts, the Housing Ministry had been financing them
through budgets sent to established settlements that would sponsor the
unauthorized outposts, often as 'suburbs' outside the official jurisdiction of
the established settlement."[110]  While the state funding for these illegal
outposts reportedly dried up as a result of this investigation, the construction
continues.[111]

---

[107] "Obama: 'Peace is Possible,' But See the World as Palestinians Do," *CNN*, March 21, 2013, available at
http://www.cnn.com/2013/03/21/politics/obama-mideast-visit.
[108] Nathan Jeffay, "Pollsters Find Israeli Public Less Supportive of Settlements," *Jewish Daily Forward*, June
12, 2009, available at http://www.forward.com/articles/107114/.
[109] The internal Israeli arguments over settlements are studied in detail by Israeli authors Idith Zertal and
Akiva Eldar, *Lords of the Land; the War over Israeli Settlements in the Occupied Territories, 1967-2007*
(Philadelphia: Nation Books, 2009).
[110] Gideon Alon, "State Mulls Probe Over Funding for Outposts," *Ha'aretz*, June 23, 2004, available at
http://www.haaretz.com/misc/article-print-page/state-mulls-probe-over-funding-for-outposts-
1.125983?trailingPath=2.169%2C2.216%2C.
[111] Chaim Levinson, "The Organization Behind Illegal West Bank Outpost Construction," *Ha'aretz*, May
13, 2013, available at http://www.haaretz.com/news/features/the-organization-behind-illegal-west-
bank-outpost-construction.premium-1.523823).

There is a broad consensus among international legal scholars that Israeli settlements in the West Bank and Gaza Strip[112] are in violation of international law, specifically the Fourth Geneva Convention (1949, ratified by Israel 1951). Article 49 states that an occupying power "shall not deport or transfer parts of its own civilian population into the territory it occupies." At a formal level, the US Government views the settlements as illegal under international law. Specifically, in 1979, the US State Department found that the establishment of Israeli settlements in occupied Palestinian territories is "inconsistent with international law," specifically citing Article 49 of the Fourth Geneva Convention. The US Government has never revoked or revised its finding.[113]

b)  *Palestinian Civilian Deaths*

Virtually all Palestinians in the West Bank and Gaza felt rage toward Israel during the Second Intifada. The ratio of those killed during the Second Intifada was disproportionate between Israelis and Palestinians. According to Israel's respected human rights organization B'tselem, a total of 1,063 Israelis were killed during the Second Intifada, compared to 4,905 Palestinians killed, for a kill ratio of 1:5 (one Israeli killed for every five Palestinians killed).[114] The vast majority of these killings occurred during the first three years of the intifada.

While the large majority of Israelis were killed by Hamas and PIJ militants, the overwhelming majority of Palestinians were killed at the hands of the IDF, prompting worldwide condemnation. In one such instance, the Spokesman for the Secretary General of the United Nations, Kofi Annan, said:

> *The Secretary-General strongly deplores the acts of violence in the occupied Palestinian territory. He is especially concerned at the recent killing of a number of Palestinian civilians, including several children, as a result of Israeli military attacks. It is particularly distressing that these incidents have occurred during a period of relative calm and while efforts are made to implement a security agreement and to strengthen international assistance to a peaceful settlement. The Secretary-General wishes to remind the Government of Israel*

---

[112] Settlements in Gaza were dismantled in 2005.

[113] Glenn Kessler, "1979 State Dept. Legal Opinion Raises New Questions About Israeli Settlements," *Washington Post*, June 17, 2009, available at http://www.washingtonpost.com/wp-dyn/content/article/2009/06/16/AR2009061603285.html.

[114] B'Tselem, *Statistics*, available at http://www.btselem.org/english/Statistics/Casualties.asp.

> of its obligations under international humanitarian law to
> protect civilians.[115]

While the Israeli government justifiably arrests, and unjustifiably assassinates, those it believes responsible for terrorist attacks, Palestinian victims rarely see justice. In a 2001 news report discussing Jewish terror cells operating in the Palestinian territories, Gideon Levy noted:

> Most of the Israeli media play down the reports of the drive-by
> shootings Jews perpetrate. There are no headlines and
> photographs to stir the blood. The victims remain anonymous
> and the bereavement of their families is not addressed. From
> the Palestinians' point of view, the list of the victims of Jewish
> terrorism needs to be added to a much longer, and no less
> painful list consisting of the innocent victims whom Israeli
> soldiers shot during the past year. A woman who worked in a
> hospital who was shot to death when she returned home, or a
> child shot in his grandfather's car at a roadblock are also
> victims in the Palestinians' eyes – even if they were killed by
> soldiers in uniform.[116]

c)  *Life Under a Belligerent Military Occupation*

A belligerent military occupation always generates vast rage in the occupied people. Harvard's Stephen Walt, former Dean at the Kennedy School of Government and the Robert and Renee Belfer Professor of International Affairs and Faculty Chair of the International Security Program, well captured this sentiment in a recent discussion:

> Military occupation generates resistance because it is
> humiliating, disruptive, arbitrary and sometimes terrifying to
> its objects, even when the occupying power is acting from
> more-or-less benevolent motives. If you've ever been caught in
> a speed trap by a rude or abusive policeman (I have), or selected
> out for special attention crossing a border (ditto), you have a
> mild sense of what this is like. You are at the mercy of the
> person in charge, who is inevitably well-armed and can do
> pretty much whatever he (or she) wants. Any sign of protest
> will only make things go badly -- and in some situations will

---

[115] UN Press Release SG/SM/8364 of 4 September 2002, UN Chronology, September 2002.
[116] Gideon Levy, "When the Terrorists Are Jews," *Ha'aretz*, October 14, 2001, available at http://www.haaretz.com/misc/article-print-page/when-the-terrorists-are-jews-1.71832?trailingPath=2.169%2C2.225%2C2.227%2C.

> *get you arrested, beaten, or worse -- so you choke down your*
> *anger and just put up with it. Now imagine that this is*
> *occurring after you've waited for hours at some internal*
> *checkpoint, that none of the occupiers speak your language, and*
> *that it is like this every single day. And occasionally the*
> *occupying power kills innocent people by mistake, engages in*
> *other forms of indiscriminate force, and does so with scant*
> *regard for local customs and sensibilities. Maintain this*
> *situation long enough, and some members of the local*
> *population will start looking for ways to strike back.*[117]

Israel's military occupation of the West Bank and Gaza Strip had lasted over 33 years when the Second Intifada began.

### 2. *Lack of PA Control*

Several conclusions can be drawn about the decline in PA organizational capability by the end of 2000: (1) PA police and security capabilities, already limited, were significantly weakened through the bombing by the IDF of most police and security installations, the targeting of police and security personnel, and severe restrictions on the movement and arms of PA security forces; (2) Israeli incursions undermined PA security control in the West Bank and Gaza; (3) non-PA militias, including the Popular Resistance Committees (PRC), the AAMB, Hamas, Palestinian Islamic Jihad (PIJ), and others were responsible for virtually all of the violence against Israeli targets; and (4) the PA's efforts to neutralize militants to prevent further violence had limited effect.

Writing in December 2000, well-known Palestinian scholars Salim Tamari and Rema Hammami commented on the broad ineffectiveness of the PA in general:

> *Underneath this support lies a growing critique of the PA's*
> *inability to provide basic logistical support to the civilian*
> *population during the intifada. No civil defense directives have*
> *been given to the public, nor any indication that they are prepared*
> *for critical eventualities such as water and electricity supply cuts*
> *or gas shortages. Palestinians see these omissions as signs of PA*
> *incompetence, or even worse, neglect. They are also loath to trust a*
> *government well-known for economic corruption with*
> *responsibility for dealing with the population's mounting*
> *economic losses…. In the current crisis, an unavoidable conclusion*

---

[117] Stephen Walt, "Why They Hate Us: On Military Occupation," *Foreign Policy*, November 23, 2009, available at http://walt.foreignpolicy.com/posts/2009/11/23/on_military_occupation .

*is that the historic leadership is incapable of basic governance and,
at the same time, is unable to operate as a national liberation
movement.*[118]


a)  *Limits on PA Police and Security Capabilities*

i.  <u>Limited Command and Control Capability in PA Forces Prior to the Second
Intifada (1994-2000).</u>

From its inception in 1994, the Palestinian Authority was never able to
achieve significant command and control capabilities within its police and
security forces.  Instead of a formalized, systematic, hierarchical structure,
PA forces were commanded largely in an *ad hoc* and personalized manner.
Besides the civil police, the PA's main security force was the Preventive
Security Service (PSS).  In addition to the sheer newness of these forces,
four reasons contributed to the limited command and control capability.

First, the police and security forces had little professional training.
Their members tended to come either from underground militia forces
formed in the West Bank and Gaza during the first Palestinian uprising, or
intifada, of 1987-1993, or from units within Fatah militia operating in the
Diaspora who returned to Palestine in 1994-1995.  The former had little
professional training, and the latter had minimal and often conflicting
exposure to professional training.

Second, the "inside-outside" split in these forces undermined overall
organizational effectiveness.  Members of the PA police and security
forces consisted both of "insiders" who were born and raised in the West
Bank and Gaza, and "outsiders" who migrated to Palestine in 1994 or after
from Tunisia and elsewhere in the Arab world as a result of the Oslo
accords.  The outsiders were Palestinians who had spent many years,
often their entire lives, living in exile, typically in Jordan, Syria, Lebanon
and Tunisia.  The top PA political establishment, from Yasir Arafat down,
was dominated by outsiders, much to the consternation of "inside"
Palestinians.  This tension was likewise reflected in the PA police and
security forces.  The PSS attempted to overcome this tension by manning
discrete units with all insiders or all outsiders.  While easing intra-unit
tensions, overall institutional efficiency suffered as a consequence.

---

[118] "Middle East Research and Information Project," available at
http://www.merip.org/mer/mer217/217_hammami-tamari.html.

Third, the forces were structured in a manner that did not encourage good organizational command and control operations. This was done by a) multiplying the number of security forces, b) encouraging them to report on each other, and c) having them report directly to Arafat, rather than through a well-organized chain of command. At least 14 different police and security forces were established by Arafat prior to the Second Intifada with no clear chain of command or division of labor between or among them. Various commanders would compete with each other for the good graces of Arafat, with no top commander allowed to build up a powerful and autonomous security presence within the PA. This structure, though common in the Arab world where military coups are responsible for most significant governmental transitions, prevented Arafat from having any effective ability to reach down into the police and security hierarchies and gain compliance in a systematic and orderly manner.

Fourth, the police and security forces were subject to the same spirit of de-institutionalization that was experienced by the PA and politics in general in the West Bank and Gaza after 1994. Outsiders returning to Palestine, reflecting broader Arab world politics, relied more on the politics of personality than on institutions. These outsiders tended to advocate a cult of personality and a de-emphasis on institutions and modern institutional norms and processes. Like all PA institutions, police and security forces were not immune from this anti-professional, anti-institutional dynamic.

In contrast, the insiders among the general public demanded a much more accountable and responsive government, especially in the police and security services, and used such forums as the Legislative Council, media, and human rights NGOs to push these demands. Many of these insiders believed the primary purpose of the Palestinian police and security forces should be to protect Palestinians from the brutality of Israel's occupation and not to act as its enforcers against their own people. Large protests from all factions, including Fatah, became commonplace from 1997 through the Second Intifada, in response to PA attempts to crackdown on political activity, as was demanded by Israel. The police and security forces were not immune to these conflicting demands.

Friedrich and Luethold came to a similar conclusion in their study of the Palestinian security sector:

*Between 1994 and 2000, the performance of the PNA [PA] security organizations was mixed. Some branches worked in*

*Robinson, p. 47*

> *an effective and law-abiding mode – certainly by regional*
> *standards – and managed to maintain a modicum of law and*
> *order in the Areas A, despite the geographical and*
> *organizational constraints under which they had to operate.*
> *On a more general level, however, the work of the PNA*
> *security organizations was marred by confusion over remits*
> *and responsibilities, inefficiency, and sometimes even open*
> *confrontation between different branches. Also, organisations*
> *with intelligence functions engaged in political repression and*
> *became distrusted. The absence of a legal framework and weak*
> *legislative and judicial oversight over the security sector meant*
> *that security personnel were rarely held accountable for*
> *violations of the law.[119]*

In short, the result was a very ineffective command and control hierarchy. Command and control weakened further with the outbreak of the Second Intifada, affording Arafat even less ability to control and channel public anger.

### ii. *Destruction of PA Infrastructure During the Second Intifada*

With the outbreak of the Second Intifada in late September 2000, Palestinian police and security infrastructure became the primary military target of the Israel Defense Forces (IDF). Virtually all PA police and security installations were systematically destroyed in the first 18 months of the Second Intifada.[120] In short, the relatively minimal command and control capability within PA police and security forces was quickly diminished by Israel during the second uprising. Chain of command, weak to begin with, was effectively destroyed.

The United Nations kept monthly chronologies documenting significant events as reported in the media, such as these attacks during the Second Intifada, and one can easily see a pattern of IDF targeting of PA and related infrastructure throughout the intifada, starting with its earliest days. In October 2000 the IDF targeted Arafat's Gaza headquarters and the Voice of Palestine building. On November 20, 2000, the IDF bombed 15 PA security service buildings. On December 13, 2000,

---

[119] Roland Friedrich and Arnold Luethold, eds., *Entry-Points to Palestinian Security Sector Reform* (Geneva: DCAF, 2007), p. 20.

[120] *Ibid.* p. 102 (rise of non-statutory armed groups "was a direct result of the almost complete destruction of Palestinian security infrastructure by the Israeli army in 2001 and 2002"); Gideon Levy, "Burning the Oslo Candle at Both Ends," *Ha'aretz*, June 16, 2002, available at http://www.haaretz.com/misc/article-print-page/burning-the-oslo-candle-at-both-ends-1.42269?trailingPath=2.169%2C2.225%2C2.227%2C

the IDF fired anti-tank missiles into the Khan Yunis police station. These types of attacks only intensified after Ariel Sharon was elected prime minister in March 2001, and they culminated in Operation Defensive Shield in March/April 2002 which sought to destroy the PA as the institutional basis of Palestinian governance. The last of the police and security services that had not been subject to significant attack up to that point – the Preventive Security Service ("PSS") in the West Bank – was then targeted by the IDF as well.[121]

Destruction of PA and police facilities included jails and prisons, greatly limiting the ability of the PA to hold detainees. Indeed, up until Operation Defensive Shield (begun in March 2002), PA security installations, the port and airport in Gaza, and Palestinian media outlets were the only systematic PA targets of IDF combat actions during the Second Intifada.

Already the subject of deep suspicion among the Palestinian population for acting on behalf of the Occupation, PA security forces were accused by the local populace of holding militants in jails to enable their capture or assassination by IDF forces, who frequently attacked these jails. One such example where the IDF bombed a jail for the purpose of assassinating one of the prisoners involves Hamas militant Mahmoud Abu Hanoud. Hanoud was sentenced by a Palestinian court in September 2000 to 12 years in prison for forming illegal military cells.[122] When Israel began bombing Palestinian jails in October 2000, Hanoud was taken to a secret location and continued to be held in custody.[123] Hanoud staged a 12 day hunger strike demanding that he be moved from the jail for fear that Israel would try to kill him.[124] On May 18, 2001, Israeli war planes bombed the jail in Nablus where he was being held.[125] Palestinian police were used to the sound of IDF helicopters, normally prompting them to run for cover.[126] For the first time during the Second Intifada, the Israelis used F-16 warplanes, which gave no audible warnings before two missiles struck the building, killing 11 Palestinian police officers, injuring about 30 others, and allowing Hanoud to escape with relatively minor injuries.[127]

---

[121] UN Chronology (April 2002).

[122] "Palestinian authorities recapture some prisoners sprung last week," *Associated Press*, October 16, 2000; "Suicide Bomber Kills 5; Israel Retaliates in Jet Strikes," *New York Times*, May 19, 2001.

[123] "Mofaz denies PA rearresting terrorists," *Jerusalem Post*, October 16, 2000.

[124] "Islamic militant who tops Israel's wanted list escapes shelling," *Associated Press Worldstream*, May 18, 2001.

[125] "Six killed in suicide blast; four Palestinians killed in Israeli bombing," *Associated Press*, May 18, 2001.

[126] D. Sontag, "As Emotions Boil Over, Arab-Israeli Violence Rages On," *New York Times*, May 20, 2001.

[127] "Suicide Bomber Kills 5; Israel Retaliates in Jet Strikes," *New York Times*, May 19, 2001; "Israel shells home of top Palestinian; Cheney urges sides to prevent violence from escalating; 'Down this road lies