# EXHIBIT 14

# *REDACTIONS APPLIED TO CONFIDENTIAL INFORMATION

**JEFFREY ADDICOTT DEPOSITION**     October 2, 2013                    **Sokolow v. the PLO**

Page 1

```
MARK I. SOKOLOW, et al,     *   IN THE UNITED STATES

            Plaintiffs,     *   DISTRICT COURT

vs.                         *   FOR THE SOUTHERN

THE PALESTINE LIBERATION    *   DISTRICT OF NEW

ORGANIZATION, et al,        *   CIVIL ACTION NO.:

            Defendants,     *   04cv397 (GBD) (RLE)

            *       *       *       *       *

DEPOSITION OF:

                JEFFREY ADDICOTT,

was held on Wednesday, October 2, 2013,

commencing at 8:01 a.m., at Miller & Chevalier,

655 15th Street, N.W., Suite 900, Washington,

D.C., before Cheryl Jefferies, Certified

Shorthand Reporter.

                *       *       *       *       *
```

**JEFFREY ADDICOTT DEPOSITION**      **October 2, 2013**                **Sokolow v. the PLO**

Page 2

1 APPEARANCES:
2
3 On behalf of the PLAINTIFFS:
4   KENT A. YALOWITZ, ESQ.
    TAL R. MACHNES, ESQ.
5   ARNOLD & PORTER, LLP
    399 Park Avenue
6   New York, NY  10022
    (212) 715-1195
7   E-mail: Kent.yalowitz@aporter.com
        Tal.machnes@aporter.com
8
9
10 On behalf of the DEFENDANTS:
11
    ANDREW WISE, ESQ.
11  BRIAN HILL, ESQ.
    MATTHEW T. REINHARD, ESQ.
12  MILLER & CHEVALIER CHARTERED
    655 15th Street, N.W.
13  Suite 900
    Washing, D.C.  20005
14  (202) 626-5800
    E-mail: Awise@milchev.com
15      Bhill@milchev.com
        Mreinhard@milchev.com
16
17
18
19
20
21

Page 3

1            I-N-D-E-X
2      Deposition of Jeffrey Addicott
3            October 2, 2013
4 EXAMINATION BY:              PAGE:
5 Mr. Wise                5
6 EXHIBITS MARKED:             PAGE:
7 238    Expert Report of Dr. Jeffrey      6
         F. Addicott
8
  239    E-mail dated 21 March, 2013       8
9
  240    Expert Report - Americans Killed  12
10
  241    Expert Report PA Sponsorship of   12
11  Terrorism
12 242    Invoice              20
13 243    Photocopies from Terrorism Law,   36
    The Rule of Law and the War on
14  Terror, Second Edition
15 243A   Terrorism Law, The Rule of Law    47
    and the War on Terror, Second
16  Edition
17 244    E-mail from Rachel Weiser to      39
    Brian Hill dated 5/22/13
18
  245    TIME Article-The Work of Assassins 52
19
  246    Professor Addicott Public Speeches 67
20
  247    Addicott Media Appearances        67
21

Page 4

1            I-N-D-E-X (cont'd.)
  EXHIBITS:              PAGE:
2
  248    Chapter 6 - Terrorist Groups     120
3
  249    U.S. Department of State report   129
4
  250    Suicide bombing in the Beit      137
5  Yisrael neighborhood in Jerusalem
   March 2, 2002
6
  251    Page from Targeting Terror       168
7  by Matthew Levitt
8 252    July 9, 2001, Special Dispatch   180
   No. 237, MEMRI
9
  253    Suha Arafat admits husband       185
10  premeditated Intifada
11 254    Email debate: Yigal Carmon and   191
   Brian Whitaker
12
  255    No Longer Obscure, Memri         194
13  Translates the Arab World: But
   Detractors Say a Right-Wing Agenda
14  Distorts Think-Tank's Service to
   Journalism
15
  256    Analysis of Attacks in the Last  197
16  Decade 2000-2010
17 257    H.R. 5500              210
18 258    H. Con. Res. 426       212
19 259    H.R. 5522             215
20 260    Congress criticizes Palestinian  217
   ties, JTA
21

Page 5

1            I-N-D-E-X (cont'd.)
2 EXHIBITS:                 PAGE:
3 261    S. 1377              219
4 262    Rebuttal report           223
5 263    Yasser Arafat, TIME       225
6 264    Fatah and Hamas: The New  238
   Palestinian Factional Reality,
7  CRS Report for Congress
8 265    The PLO and Its Factions,  245
   CRS Report for Congress
9
  266    Terrorism Havens: Palestinian  253
10  Authority, Council on Foreign
   Relations
11
  267    Terrorism: Near Eastern Groups  257
12  and State Sponsors, 2002,
   CRS Report for Congress
13
  268    The Palestinians: Background   261
14  and U.S. Relations, Congressional
   Research Service
15
16   (Original exhibits retained by counsel.)
17
18
19
20
21

Page 6

1          P-R-O-C-E-E-D-I-N-G-S
2          (Defendants' Deposition Exhibit Number
3    238 was premarked for identification.)
4    WHEREUPON --
5          JEFFREY ADDICOTT,
6    a Witness called for examination, having first
7    been duly sworn, was examined and testified as
8    follows:
9          EXAMINATION
10    BY MR. WISE:
11    Q.    Good morning.
12    A.    **Good morning.**
13    Q.    Can you state your name for the
14    record, please?
15    A.    **Jeffrey Frank Addicott.**
16    Q.    And, Professor Addicott, what is your
17    home address?
18    A.    **Currently I'm at 105 Wood Glen in**
19    **Boerne, Texas.**
20    Q.    And your Social Security Number?
21    A.    ██████████.    REDACTED

Page 7

1    Q.    I'm going to show you what has been
2    marked as Defendants' Deposition 238.  Do you
3    recognize that document?
4    A.    **I do.**
5    Q.    And what is it?
6    A.    **This is a copy of my expert opinion**
7    **report that's dated 22 March, 2013.**
8    Q.    On Page 27 of the document, is that
9    your signature?
10    A.    **It is.  It is my signature.**
11    Q.    And you signed this on March 22nd,
12    2013?
13    A.    **Yes, I did.**
14    Q.    And it appears that you had the
15    original notarized; is that right?
16    A.    **Yes.**
17    Q.    Declaring under penalty of perjury
18    that the foregoing is true and correct?
19    A.    **Absolutely.**
20    Q.    Let me start by asking you what
21    portions of this report did you personally write?

Page 8

1    A.    **What portions of it?  Well, the report**
2    **was given to me as a draft, and I made**
3    **corrections on the draft.  Of course, looking at**
4    **it right now, I can't really recall exactly where**
5    **the corrections were.  So that's my answer.**
6    Q.    The draft that was provided to you,
7    who provided it to you?
8    A.    **It was provided by Rachel Weiser, I**
9    **think is her last name.**
10    Q.    And what office does she work with?
11    A.    **I'm not really sure.**
12    Q.    Are you familiar with a person named
13    Nitsana Darshan-Leitner?
14    A.    **I have not met her, but I've seen some**
15    **e-mails with her name on it, yeah.**
16          MR. WISE:  Can we mark this as 239.
17          (Defendants' Deposition Exhibit Number
18    239 was marked for identification.)
19          BY MR. WISE:
20    Q.    Professor, that's Exhibit 239.
21    A.    **Okay.  I see it.**

Page 9

1    Q.    239 is an e-mail from Ms.
2    Darshan-Leitner to you, correct?
3    A.    **Yes.**
4    Q.    And the e-mail address,
5    Jaddicott@stmarytx.edu, that is your St. Mary's
6    University Law School e-mail address, correct?
7    A.    **Yes, it is.**
8    Q.    Looking at Exhibit 239, was that your
9    first contact with Ms. Darshan-Leitner?
10    A.    **I can't really recall.**
11    Q.    What do you recall about your first
12    contact with her?
13    A.    **Well, I was contacted by several**
14    **individuals, and they asked me to look at a draft**
15    **and sent me that draft to see what I thought**
16    **about the draft, and that was my first contact.**
17    **But I don't, you know, exactly remember.  I look**
18    **at the dates here, March, it appears to be**
19    **approximately the time that they contacted me.**
20    Q.    You said a few people contacted you?
21    A.    **I think Rachel contacted me and this**

Page 10

1 other individual contacted me.  I've never met
2 either of them in person, so I can't put a face
3 to a name.
4     Q.   And when they contacted me initially,
5 was it by telephone or was it by e-mail?
6     A.   Telephone.
7     Q.   Do you know how they came to know
8 about you?
9     A.   I do not know.  I would assume, and
10 this is just an assumption, that they'd heard
11 about the Center For Terrorism Law, where I'm the
12 director and the founder.  We're an
13 internationally recognized institute at the law
14 school, so I assume that they probably came
15 across my name in media reports or something of
16 that nature.
17     Q.   The substance of the first phone call,
18 what do you remember about what they asked you to
19 do?
20     A.   Well, I mean, the main point was to:
21 Would I be willing to look over a draft or to

Page 11

1 write an expert opinion piece on the subject.
2 And as I recall, they had a rather short time
3 line, and I said that I would be willing to do
4 so.
5     Q.   How long after that phone call did you
6 receive the draft that they had referenced?
7     A.   Again, if you looked at my CV, you can
8 see that I do about a hundred -- well, between 50
9 and a hundred media interviews each month.  I do
10 like five to ten speeches each month.  I'm a
11 full-time law professor, so a lot of activity
12 going on.  So I really don't recall, but it was a
13 short period.  Perhaps days, but I can't recall.
14     Q.   When they said that they wanted to
15 know whether you would be willing to read a draft
16 or write a draft about "the subject," what was
17 "the subject" as they identified it to you?
18     A.   Well, it was concerning the issue of
19 the Second Intifada and the role that the PLO and
20 Yasser Arafat and the PA had played in the
21 violence associated with that event in history.

Page 12

1     Q.   Looking at 239, the e-mail, you'll see
2 on the bottom of that two attachments.
3     A.   Right.
4     MR. WISE:  So let me ask the court
5 reporter to mark this document as Exhibit 240.
6     (Defendants' Deposition Exhibit Number
7 240 was marked for identification.)
8     MR. WISE:  And this as 241, and I will
9 show them to you together.
10     (Defendants' Deposition Exhibit Number
11 241 was marked for identification.)
12     BY MR. WISE:
13     Q.   Professor, looking at Exhibit 240, do
14 you recognize that as the Word document attached
15 to Ms. Darshan-Leitner's March 21 e-mail titled
16 Expert Report - Americans Killed.doc?
17     A.   I believe that's correct.
18     Q.   And do you recognize 241 as the Word
19 document titled Expert Report PA Sponsorship of
20 Terrorism.doc?
21     A.   Yes, I believe that's correct as well.

Page 13

1     Q.   The two Word documents, Exhibit 240
2 and 241, you did not write these drafts, correct?
3     A.   No, I didn't pen these drafts; that's
4 correct.
5     Q.   Those were written by someone
6 presumably associated with Ms. Darshan-Leitner,
7 correct?
8     A.   I do not know, but I know that she
9 sent me those drafts and asked me to look at
10 them, to research them, and I did so.
11     Q.   Do you know who did pen them?
12     A.   I have no idea.
13     Q.   Did you ask her who wrote them?
14     A.   No.
15     Q.   Do you have any reason to believe that
16 you received 240 and 241 prior to the e-mail that
17 is marked as 239?
18     A.   Well, again, I don't think so, but I
19 don't know.  I see the name on the e-mail.  It
20 looks vaguely familiar, and I'm assuming that
21 that e-mail -- that these two documents as

Page 14

1  attachments are the two documents that reflect
2  that they are attached in the e-mail.
3      Q.  When you say that you looked at the
4  drafts and researched them, what did you do to
5  research them?
6      A.  Well, the first thing I did, of
7  course, is looked at the footnotes, and I've got
8  that here.  I went through each footnote,
9  reproduced a hard copy to look at the footnotes,
10  read the paper.  I did make some changes to the
11  draft, and -- so that's what I did, yeah.
12      Q.  When you made changes to the draft,
13  did you do it in pen and ink, or did you do it on
14  the computer?
15      A.  That's a good question.  I do not
16  recall whether I did it on the paper and scanned
17  it and sent it back, or whether I typed it and
18  sent it back.  I don't recall.
19      Q.  And then tell me how the process
20  worked after you sent your edits back to them,
21  what was the next step?

Page 15

1      A.  Well, I don't have the e-mails in
2  front of me, obviously, but I would assume that
3  my changes were incorporated into the draft, and
4  it was sent back to me to look at again, and
5  that's what occurred.
6      Q.  Your report -- well, before you signed
7  it on the 22nd of March, what did you do to
8  review the document to make sure that the changes
9  that you had made had been incorporated?
10      A.  I read the document.
11      Q.  And do you recall whether you read it
12  and compared side-to-side the edits that you had
13  sent?
14      A.  I believe I did because I'm not going
15  to sign something unless I adopt it as my
16  professional opinion, so I'm pretty meticulous
17  about what I sign, so yes.
18          It would be my habit to do so.  Again,
19  I've written over 60 periodicals.  I do a lot of
20  writing all the time.  But I do not sign anything
21  unless I can affirm that it reflects my

Page 16

1  professional opinion.
2      Q.  The materials in the footnotes, you
3  said you compiled those?
4      A.  Yeah.  Well, I -- yeah, I researched
5  them.  I mean, I printed them out, looked at
6  them, checked to make sure that they're accurate.
7  Yeah.
8      Q.  Did Ms. Darshan-Leitner send you any
9  of the source materials that were cited in the
10  footnotes?
11      A.  Not that I recall.
12      Q.  Do you recall whether there were any
13  materials that you were unable to locate?
14      A.  Well, I think there was one footnote
15  that I was unable to recall, yeah, one that I was
16  not able to locate.  I think that would be
17  Footnote Number 1, which was a YouTube video.
18      Q.  And so what did you do when you
19  couldn't locate Footnote 1?
20      A.  What do you mean what did I do?
21      Q.  Did you strike that citation from the

Page 17

1  report?
2      A.  No, because it was consistent with
3  other, you know, videos that I'd seen, so I
4  couldn't locate that precise one, but I did not
5  strike that one footnote.
6      Q.  What were the other videos that you
7  had seen that were consistent with that YouTube
8  video?
9      A.  Well, they're listed in the footnotes.
10  I mean I can read them through with you if you
11  want.
12      Q.  Other footnotes in the report, you're
13  saying, are consistent with Footnote Number 1?
14      A.  Well, not just -- yeah, I mean there's
15  a mosaic that fits together.  So that one
16  footnote, though, I couldn't locate the YouTube
17  video.  I did not view that YouTube video.
18      Q.  And that's the only source that you
19  did not view before you signed your report?
20      A.  That's the only source that I did not,
21  could not obtain, that I recall.  Let me just

Page 18

1  check real quick and see if I've got any others
2  here.  I've got them all labeled.
3       (Witness Reviews Documents.)
4       A.   I've got a star here on this one.  Let
5  me see what that says.  No, that's good.  I've
6  got a star on this one, on 42.  That's good.
7       Q.   What was the significance of the
8  stars, when you put a star next to something?
9       A.   These are congressional resolutions
10 which I found very enlightening.
11      Q.   So the star just meant that it was
12 particularly relevant to your analysis?
13      A.   Yes, as when you would highlight
14 something to recall your attention to it.
15      Q.   Can you tell me which documents you
16 noted you had starred?
17      A.   Yeah.  Looks like I had put a star on
18 Footnote 30, 37 and 42.  Let me see if there's
19 anything else.  Yeah.
20      Q.   So the report that you signed, Exhibit
21 238, on Page 11 states that your fees for

Page 19

1  preparation and testimony in the instant matter
2  are $300 per hour plus expenses, correct?
3       A.   That's correct.
4       Q.   How does that fee compare -- well, let
5  me ask you this:  You've spoken about other
6  speaking engagements?
7       A.   Uh-huh.
8       Q.   Do you have an hourly fee for those
9  engagements?
10      A.   It depends on the audience.
11      Q.   How does your rate in this matter
12 compare to rates that you charge for other
13 speaking engagements?
14      A.   It depends on the audience.  I've been
15 paid up to $13,000 for a speech, and I've been
16 paid zero for a speech, so it just depends on the
17 audience.
18      Q.   The $13,000 speech, which one was
19 that?
20      A.   That was a speech in Laredo, Texas
21 about two years ago on border security.

Page 20

1       Q.   And who was the audience?
2       A.   The audience was a -- it is
3  videotaped, so it was given to a larger, wider
4  audience, but it was mainly for a law enforcement
5  officials and a university in Laredo.  I think it
6  was the -- it's one of the Texas universities.
7       Q.   Okay.
8       A.   But I'd have to check my -- as I said,
9  I've almost done 700 speeches in the last 10
10 years, and I'd have to check my notes to see
11 exactly what that audience was.  I do remember
12 the fee.
13      MR. WISE:  Can I have that marked?
14      MR. YALOWITZ:  Mr. Wise, they're
15 looking for speakers if you're interested.
16      (Laughter.)
17      (Defendants' Deposition Exhibit Number
18 242 was marked for identification.)
19      BY MR. WISE:
20      Q.   That is Exhibit 242.
21      A.   Yes.

Page 21

1       Q.   Do you recognize that document?
2       A.   I sure do.
3       Q.   Tell me what it is.
4       A.   This is an invoice for payment for
5  services rendered from 25 July to 13 September,
6  2013.
7       Q.   And who did you send that invoice to?
8       A.   I hand delivered this invoice to --
9  did I give it to you, Tal?  It was at our
10 meeting.  I gave it to --
11      Q.   You gave it to one of the Plaintiffs'
12 counsel?
13      A.   One of the Plaintiffs' counsel, yeah.
14      Q.   And has this invoice been paid?
15      A.   I do not know.  It's a direct deposit.
16 I've had one payment already made.  I don't
17 believe this one has been made, but I haven't
18 checked my direct deposit in several days.
19      MR. YALOWITZ:  And I'll just state for
20 the record that payment is not contingent on Mr.
21 Addicott's testimony.  If it hasn't been paid,

Page 22

1  it's a processing issue, not a substance issue.
2      Q.   Other than 242, have you sent other
3  invoices --
4      A.   Yes.
5      Q.   -- in this matter?
6      A.   There was a previous invoice that I
7  believe I sent by e-mail to -- who did I send it
8  to?  Again, I'm pretty bad with the money.
9  Probably Nitsana.  I probably sent it to Nitsana.
10  And that was for $500, and that was my fee
11  associated with my first white paper.
12      Q.   And by your first white paper, you're
13  referring to the document we've marked as 238?
14      A.   Yes.
15      Q.   Do you have a copy of that invoice?
16      A.   I do not have it with me.
17      Q.   But you believe you sent it to Nitsana
18  Darshan-Leitner?
19      A.   I believe so.
20      Q.   By e-mail or mail, do you recall?
21      A.   It would have to be e-mail.

Page 23

1      Q.   And that invoice covered all of your
2  work on Defendants' 238, right?
3      A.   It did, but I didn't charge by the
4  hour for the white paper.
5      Q.   Why not?
6      A.   Our Center for Terrorism Law is a
7  nonprofit center, and when I was asked to look at
8  the paper, I had my research students pull all
9  the footnotes, so I didn't charge for that time
10  because I didn't personally pull them myself.  I
11  did review them all, read them all, but I didn't
12  do the actual labor, and so I didn't charge for
13  that.
14          I simply charged for my time -- I
15  didn't really charge for my full time because I
16  spent many more hours reviewing the draft.  I
17  don't run the Center as a profit organization, so
18  I'm not there to make money.  So the first
19  instance, I just told her I'd charge a flat fee
20  to produce this paper.
21      Q.   Did you record anywhere the amount of

Page 24

1  time that you spent reviewing 238?
2      A.   No, I didn't, but it was hours.  It
3  was a lot of time.
4      Q.   Who were the research assistants that
5  pulled the source materials for you?
6      A.   I've got ten research assistants, and
7  I did 20 years in the military so I run it as a
8  military organization.  I give the task to my
9  senior research fellow, and they send that task
10  down to other law -- these are all law students,
11  so I don't know exactly who pulled these.  My
12  senior research fellow is Evan Anders.
13      Q.   Do you recall any conversations with
14  Mr. Anders about difficulty in locating any of
15  the source materials?
16      A.   Just the first one.
17      Q.   And did you have any conversations
18  with any of the law students that Mr. Anders
19  delegated this work to about the source
20  materials?
21      A.   We have a $700,000 facility at the

Page 25

1  school, and the research fellows come and go
2  quite often so there could have been some
3  conversations with some of them about it, but I
4  don't recall.
5      Q.   As you sit here today, you don't
6  recall having any such conversations?
7      A.   I may have; I just don't recall.
8      Q.   The $500 fee for this, for Defendants'
9  238, was that something you agreed upon with Ms.
10  Darshan-Leitner?
11      A.   Yeah.  When she first called, probably
12  about the same time she sent the e-mail with the
13  draft, and she asked if I could review this
14  draft, and I said yeah, I would be happy to
15  review it.  That's what our Center does.  We do a
16  lot of pro bono activity, you can imagine.  So my
17  initial thought was that I would review the
18  draft, and that's what I did.
19      Q.   Do you know someone named Avi Leitner?
20      A.   Not personally, no.
21      Q.   Do you know of him?

Page 26

1      A.    I've heard the name.  I'm trying to
2  associate it.
3      Q.    Where do you think you heard it?
4      A.    Probably in the context of this issue
5  somewhere.
6      Q.    By "this issue," what do you mean?
7      A.    The draft.
8      Q.    Were you ever told that Avi Leitner
9  was the person who wrote the draft that you
10  received?
11      A.    No.  I was never told who drafted it.
12  I have no idea who drafted it.
13      Q.    Looking at 242, which is your invoice,
14  I take it that is your signature at the bottom?
15      A.    Yes.
16      Q.    And is there a stamp that's been
17  affixed to it next to your signature?
18      A.    Yes.
19      Q.    And who affixed that stamp?
20      A.    I did.
21      Q.    That is a stamp, I take it, you had

Page 27

1  created for the Center?
2      A.    Yes, one of our stamps.
3      Q.    I think you said before that as you
4  sit here today, you can't tell us exactly which
5  portions of this document, and by "this", I mean
6  Exhibit 238, you edited and what was sent to you,
7  correct?
8      A.    I know one portion I did edit.
9      Q.    Okay.  Which portion is that?
10      A.    That would be -- I've got my copy; now
11  I'm trying to identify the page on your copy so
12  we can be on the same copy.  Give me a second
13  here.
14          On Page 13, four lines down from the
15  top, I inserted that sentence where it says,
16  "Nevertheless, even if one accepts the view that
17  the 'spark' was not orchestrated, it is clear
18  that Arafat utilized the incident as an excuse to
19  orchestrate his planned al-Aqsa Intifada."
20      Q.    So that sentence was not in the draft
21  that was sent to you on March 21st?

Page 28

1      A.    I'd have to look at the draft again,
2  but I think I'm recalling that I either reworded
3  it or added that sentence.  Easy to solve if we
4  look at the draft.
5      Q.    So let's take a look at 241.
6      A.    Yeah, it looks like I -- again,
7  obviously it would fit somewhere before the
8  Arafat launch, but, I mean, I recall that
9  sentence because, you know, I'm looking at both
10  sides of the issue from a scholarly perspective.
11  There's arguments on both sides about what
12  sparked, you know, the uprising, so that is one
13  sentence that sticks out in my mind.
14      Q.    Any other sentences that you recall
15  adding?
16      A.    That would be a substantive issue
17  because I didn't agree with the draft, you know,
18  putting the issue on one side.  I felt, from my
19  scholarship, that there's two sides to it.  There
20  were other changes.  I just don't recall what
21  they were.

Page 29

1      Q.    So your view was that the initial
2  draft was too one-sided?
3      A.    Well, that particular paragraph.
4      Q.    And so you added that sentence to even
5  it out?
6      A.    I recall adding that sentence.  I
7  obviously made other changes to the structure of
8  various sentences and grammar and things like
9  that.  That's just the one that sticks out in my
10  mind.
11      Q.    Well, let's turn to the substance of
12  the report, and maybe we can identify other
13  areas.
14          On Page 11 there is a paragraph with
15  the header "Opinion," correct?
16      A.    Yes.
17      Q.    The document that you are looking at,
18  is that a document you brought with you?
19      A.    Yes, this is a copy of the one that I
20  submitted.  It appears to be the same one that
21  you have shown me.  I've got this one obviously

Page 30

1  marked up.

2  Q.  And what are the markings?

3  A.  Highlighters.

4  Q.  And what do the highlighters signify?

5  A.  I don't understand your question,

6  "What do they signify?"

7  Q.  Why did you mark it?

8  A.  Because we're doing a deposition

9  today.

10  Q.  Did you mark it in preparation for the

11  deposition?

12  A.  Oh, yeah.

13  Q.  The Opinions section that we're

14  looking at starting on Page 11, the last

15  paragraph, starting with "I will demonstrate

16  herein" --

17  A.  Uh-huh.

18  Q.  -- this is the paragraph that

19  essentially summarizes the opinions offered in

20  this report, correct?

21  A.  That is correct.

Page 31

1  Q.  So just so we're on the same page, I

2  want to make sure we agree on the opinions that

3  you are adopting by signing this report.

4      The first is that, "The Fatah faction

5  and the Palestinian Authority were effectively

6  indistinguishable from one another," during the

7  Second Intifada.

8      MR. YALOWITZ:  Object to the form.

9  A.  Well, that's -- yeah, that's not --

10  that's part of the context of that sentence, but

11  it's not the full sentence.

12  Q.  Well, why don't you tell me the

13  opinions that you are setting forth in this

14  report?

15  A.  You want me to read them to you?

16  Q.  Sure.

17  A.  I can read the document if you want.

18  Well, the first paragraph, of course, sets out my

19  qualifications, and then the second short

20  paragraph indicates that I've examined the

21  complaint, which I did thoroughly.

Page 32

1      The third paragraph talks about the

2  fact that this white paper will demonstrate, in

3  the main, that the Fatah faction and the

4  Palestinian Authority were essentially --

5  effectively, rather, indistinguishable from one

6  another.  They're both led by Yasser Arafat.  In

7  fact, Arafat founded the Fatah party, as we know,

8  and he's the president of the PLO.  And there in

9  the relevant time period that we're looking at,

10  he's responsible.  He's culpable, "For the terror

11  campaign known as the al-Aqsa Intifada, or Second

12  Intifada, that claimed both Israeli and American

13  lives, among others, during the period relevant

14  to the case."  And, "In addition to the hundreds

15  of Israelis killed during this campaign, scores

16  of innocent Americans lost their lives in this

17  conflict.  The PA," which stands, of course, for

18  the Palestinian Authority, "was fully aware of

19  the fact that, in its campaign of violence

20  against Israelis, Americans were at risk of

21  falling victim to these attacks.  I will identify

Page 33

1  specific requests by the United States to the PA

2  to stop the violence because American citizens

3  were being killed.  I further note that the

4  American casualties continued to mount during the

5  2000-2004 time frame, even after the PA became

6  aware of the danger to American citizens.  The

7  intifada continued unabated, and fueled by the

8  Palestinian leadership."

9  Q.  So your opinion is focused on the

10  actions of the Palestinian Authority and Fatah

11  during the Second Intifada, correct?

12  A.  Yes, we're looking at that specific

13  time frame, correct.

14  Q.  And that time frame is 2000 to 2004,

15  right?

16  A.  Right, September 2000.

17  Q.  Turn, if you will, to Page 11 of 238.

18  A.  Going back?

19  Q.  Yes.  The first sentence under,

20  "Opinion," reads, "My opinion as set forth below

21  is based upon my academic studies, research,

Page 34

1  lecturing and publishing over the course of over
2  thirteen years as a professor of law and Director
3  of the Center for Terrorism Law, St. Mary's
4  University School of Law; and lecturer at
5  numerous academic and professional institutions
6  around the word, to include the FBI Academy and
7  other international law enforcement agencies."
8       What academic studies have you
9  conducted concerning the role of Fatah and the
10 Palestinian Authority during the Second Intifada?
11     **A.  I'm not sure I understand the**
12 **question.  When you say "academic studies," I**
13 **mean obviously I have been involved with**
14 **terrorist incidents and organizations for many,**
15 **many years, so I've done lectures, I've done**
16 **seminars, I've produced papers, included the**
17 **terrorism and the incidents of terrorism as part**
18 **of the framework for studying terrorism.  So I**
19 **guess that's --**
20     Q.   And of what you just mentioned, which
21 specifically dealt with the Palestinian Authority

Page 35

1  and Fatah during the Second Intifada?
2      **A.   Well, many of them do because they're**
3  **a classic framework when you look at terrorism**
4  **and what causes terrorism and how it's motivated**
5  **and whether or not certain acts of terrorism fall**
6  **under different categories, for example,**
7  **state-sponsored or state-supported or substate**
8  **terrorist groups.  What's occurred for a long**
9  **time with the PLO over the years has been**
10 **associated with terrorism, so it's wide-ranging**
11 **discussion that touches almost every field of**
12 **terrorism.**
13     Q.   Which academic studies that you've
14 just referenced related to the PA and Fatah is my
15 question.  Can you identify a single one?
16     **A.   Oh, sure.  I'd have to look at my bio.**
17 **I mean, if you look at my textbook, I've got**
18 **language in the textbook that identify that**
19 **category and brand of terrorism.  I can't cite**
20 **the page without having the book in front of me.**
21     Q.   Are you referring to your Terrorism

Page 36

1  Law textbook?
2      **A.   The Seventh Edition, yes.**
3      Q.   I'm going to show you excerpts from
4  the Second Edition, and then I'll ask you about
5  the Seventh.
6      **A.   Second Edition, wow.**
7      Q.   Yes.
8      **A.   That's a long time ago.**
9          MR. WISE:  Can we mark that as 243.
10         (Defendants' Deposition Exhibit Number
11 243 was marked for identification.)
12         BY MR. WISE:
13     Q.   So do you recognize that, first of
14 all, as the cover of your book?
15     **A.   Yes.  As the Second Edition cover,**
16 **yes.**
17     Q.   And when was the Second Edition
18 published?
19     **A.   I don't recall.  I'm in the Seventh**
20 **Edition now, so if you work backwards in time, I**
21 **do a new edition about every two to three years.**

Page 37

1  **For 2013 -- I'm just trying to imagine.  I don't**
2  **know.  I can't recall the date.  But, again, I do**
3  **a new edition about once every two to three**
4  **years.  I'm in the Seventh Edition now, which is**
5  **almost 600 pages.  I think this edition was -- I**
6  **don't know.  It wasn't very big.  So I would say**
7  **maybe 2005, 2004.**
8      Q.   We'll turn back to this.  I'm going to
9  get the book so that I don't have to have you
10 guess.
11         Let me ask you this, though:  You
12 mentioned the PLO before.  The PLO is not
13 mentioned in your opinion as you've just read it,
14 correct?
15     **A.   In my opinion?**
16     Q.   Right.
17     **A.   The PLO itself?  No, I did not put**
18 **that in the opinion.**
19     Q.   You mentioned --
20     **A.   I did put it in my second opinion, my**
21 **rebuttal to the Robinson report, though.**

JEFFREY ADDICOTT DEPOSITION    October 2, 2013    Sokolow v. the PLO

Page 38

1    Q.    We'll turn to that a little bit later.
2    You mentioned before Rachel Weiser, W-E-I-S-E-R,
3    correct?
4    A.    Yes.
5    Q.    And who is she?
6    A.    She's an attorney.  My impression is
7    she lives in Israel.  I've never met her.
8    Q.    Does she represent the plaintiffs in
9    this case as far as you understand?
10    A.    As far as I understand.
11    Q.    And in the course of preparing for
12    your deposition in this case, you've had
13    conversations with Rachel about these academic
14    studies that you've referred to in this report,
15    correct?
16    A.    Not in great detail.
17    Q.    Has she asked you specifically which
18    of these writings relates to the subject of your
19    report?
20        MR. YALOWITZ:  Objection.  Instruction
21    not to answer.

Page 39

1        MR. WISE:  Let me mark this as 244.
2        (Defendants' Deposition Exhibit Number
3    244 was marked for identification.)
4        BY MR. WISE:
5    Q.    Professor, I'm going to refer you
6    specifically to Sub Number 2 on paragraph -- on
7    Page 1, beginning with "Obviously, the majority."
8    A.    Okay.
9    Q.    Do you see that paragraph?
10    A.    I see it.
11    Q.    This document is an e-mail from Ms.
12    Weiser to Brian Hill.  Do you see that?
13    A.    I see it.
14    Q.    And in that e-mail, Ms. Weiser writes,
15    "Obviously, the majority of the over 600 talks
16    and 3,000 media events would not be on point, but
17    he provided them all in the interest of full
18    disclosure.  Having worked with various law
19    enforcement and military organizations across the
20    globe (to include the IDF and Egyptian military)
21    Professor Addicott has gleaned much information

Page 40

1    from first hand observations which were then
2    coupled with his knowledge of history and law.
3    Indeed, much of the international terrorism" --
4    strike that -- "much of international terrorism
5    emanates from radical Islamic extremism.
6    Professor Addicott has not specifically written
7    on the historical development of the PLO or any
8    particular terror organization but he has often
9    mentioned these groups in associated talks, etc.
10    (hence the 'appear throughout' language) and
11    themes relating to his opinions may," in italics,
12    "be contained in those media events, speeches and
13    publishings.  However, he cannot recall anything
14    in particular with the exception of the following
15    Law Review article that he believes may be of
16    some interest:  American Punitive Damages vs.
17    Compensatory Damages in Promoting Enforcement in
18    Democratic Nations of Civil Judgments to Deter
19    State-Sponsors of Terrorism, 5 University of
20    Massachusetts Roundtable Symposium Law Journal
21    192 (Winter 1010)."  Having looked at Ms.

Page 41

1    Weiser's representation, is that accurate as to
2    your recollection of these previous writings?
3    A.    Well, not entirely, no.
4    Q.    What is inaccurate about it?
5    A.    Well, the sentence about in the middle
6    of the paragraph, where she says, "Professor
7    Addicott has not specifically written on the
8    historical development of the PLO or any
9    particular terror organization," I would say that
10    that's a generalized statement.
11    Q.    That is a generalized statement?
12    A.    Yeah.  I mean, I have written on other
13    terrorist organizations.  It's true I'm not a
14    historian of the development of the PLO, haven't
15    written on that, but I have written on other
16    terrorist organizations, how they developed.
17    Q.    Have you written on the history of the
18    Palestinian Authority?
19    A.    I'm not a historian in that degree,
20    no, I haven't written on the history of the
21    Palestinian -- PLO.

JEFFREY ADDICOTT DEPOSITION    October 2, 2013    Sokolow v. the PLO

Page 42

1    Q.   Have you written on the historical
2    development -- strike that.
3         Have you written on the Palestinian
4    Authority at all?
5    **A.   Well, I'd have to look at the over**
6    **600, you know, books, articles, book reviews I've**
7    **written, but I know I have mentioned the**
8    **Palestinian Authority and Yasser Arafat and --**
9    **you know, as an example that I use when I speak**
10   **on terrorism issues, so I -- I haven't written**
11   **any in-depth -- so the part where she talks that**
12   **I haven't done any historical development of the**
13   **PLO, that's true.**
14   Q.   Have you written on Fatah?
15   **A.   Not specifically, no.  In other words,**
16   **when I've written articles on targeted killing,**
17   **obviously you're talking about the Palestinian,**
18   **you know, terrorists, and whether they come from**
19   **Hamas, Fatah, or, you know, what brand of**
20   **terrorism that they represent.  I've certainly**
21   **written about terrorism in that area on many**

Page 43

1    occasions.
2    Q.   And when you're writing about targeted
3    killings, you're writing about the legality of
4    Israel conducting targeted killings against
5    Palestinians, correct?
6    **A.   Not against Palestinians.  Against**
7    **Palestinian terrorists, yes, terrorists that**
8    **happen to be Palestinians.  I mean, I'm not -- to**
9    **me, it's irrelevant if they're Palestinians or**
10   **not Palestinians.  I'm looking at whether their**
11   **acts are legal or illegal, yeah.**
12   Q.   And is it your testimony that your
13   writing in that regard focuses on anything other
14   than the legality of the Israeli action?
15   **A.   Well, I mean I'm looking at the**
16   **legality of Israeli action vis-a-vis the action**
17   **of the other side.  You know, you've got to**
18   **consider what the other side is doing.  That fits**
19   **into the equation.  So it's not a one sided**
20   **discussion, no.  I look at both sides of the**
21   **issue.**

Page 44

1    Q.   Can you identify for me, as you sit
2    here today, a single piece where you have
3    analyzed the actions of either Fatah or the
4    Palestinian Authority?
5    **A.   You mean the historical development of**
6    **those groups?**
7    Q.   No.  I mean the actions --
8    **A.   Well, yeah, of course.  When I'm**
9    **writing about the issue of targeted killing, for**
10   **example, you know, those individuals are coming**
11   **from an environment that is associated with the**
12   **PLO, with the Fatah, with various organizations.**
13   Q.   So let's turn earlier in your report,
14   238.
15   **A.   Which page?**
16   Q.   Well, let's start with your list of
17   books that appears on Page 3.
18   **A.   Page 3?**
19   Q.   Yes.
20   **A.   Okay.**
21   Q.   And on Pages 3 and 4, you list nine

Page 45

1    books, correct?
2    **A.   At the time, yes, that's correct.**
3    Q.   Have there been more since March of
4    2013?
5    **A.   Yes.**
6    Q.   And what else?  What are the new ones
7    that are not on this list?
8    **A.   The new one would be the Seventh**
9    **Edition, which is 2014, of the Terrorism Law:**
10   **Materials, Cases and Comments.**
11   Q.   Okay.  So between the nine books
12   listed on Pages 3 and 4 and the new edition of
13   the Terrorism Law book, please identify for me
14   which of those books includes your writing on
15   Fatah and the Palestinian Authority.
16   **A.   Well, again, I'm looking at the acts**
17   **of the -- I haven't done a historical development**
18   **of either organization.  I don't have that in**
19   **there.  That's not my function.**
20   Q.   I'm not asking for historical
21   development right now.  Let's tie this to your

Page 46

1  report. Tell me which of these books includes
2  your writing about the role of Fatah or the
3  Palestinian Authority during the Second Intifada.
4  **A.    Well, again, the Seventh Edition would**
5  **mention those types of activities, but they're**
6  **not a detailed analysis of, you know, exactly**
7  **when this action occurred or how it occurred.**
8  **That would be in my white paper, where I went**
9  **into it. I've not analyzed it before this white**
10  **paper, to that degree.**
11  Q.    And by "this white paper," you're
12  referring to 238?
13  **A.    And the rebuttal report.**
14  Q.    So those two writings are the only
15  places where you have done an analysis of PA and
16  Fatah during the Second Intifada, correct?
17  **A.    In writing, yes.**
18  Q.    I'm going to hand you, now that we
19  have it, the book from which the photocopies that
20  are Exhibit 243 comes.
21     MR. WISE:  Would you like to mark that

Page 47

1  also?
2     THE REPORTER:  It's up to you.
3     MR. WISE:  Let's mark that as 243A.
4     (Defendants' Deposition Exhibit Number
5  243A was marked for identification.)
6     BY MR. WISE:
7  Q.    And that's the Second Edition of your
8  book, correct?
9  **A.    That's correct.**
10  Q.    What year was it?
11  **A.    2004.**
12  Q.    So you said this was published in what
13  year? I'm sorry.
14  **A.    The book indicates 2004.**
15  Q.    Is it fair to say that that edition of
16  the book was the edition printed closest in time
17  to the time period analyzed in your report?
18  **A.    Well, no, because the First Edition**
19  **would be 2003.**
20  Q.    I thought you said they came out every
21  three years.

Page 48

1  **A.    Well, approximately. If you notice in**
2  **the cover here, it says First Edition, 2003.**
3  **This is Second Edition, 2004.**
4  Q.    Let's work off of this edition, and
5  then we'll go back to whether there have been
6  subsequent changes.
7     This is the textbook that you
8  referenced before when you pointed to one of the
9  books in your report, correct?
10     MR. YALOWITZ:  Objection.
11  **A.    I don't think so, no. That's an**
12  **edition that's been superseded. I think I**
13  **referred to the Sixth Edition.**
14  Q.    The Sixth Edition, does it have
15  additional materials about the PA and Fatah that
16  are not in the Second Edition?
17  **A.    I'd have to read the Second Edition**
18  **again and compare it with the -- that's been**
19  **years. I haven't looked at that since 2004.**
20  Q.    As you think back to writing the
21  subsequent editions, do you recall researching

Page 49

1  and writing on the PA and Fatah for sections of
2  your book that are different from what's in the
3  Second Edition?
4  **A.    I'd have to look at the Second Edition**
5  **and compare it. I don't know. It's been a long**
6  **time ago.**
7  Q.    Taking a look at the index of your
8  book, do you see any mentions or citations to
9  Fatah?
10  **A.    I'm looking at that right now. That**
11  **was my first thing before you asked the question.**
12  **This book is a shadow of the one I have now.**
13  **It's almost embarrassing to look at it.**
14     **(Witness Reviews Book.)**
15  **A.    No, I don't see that. But, again,**
16  **this is a -- nope.**
17  Q.    Do you see any references in the index
18  to Arafat?
19     **(Witness Reviews Book.)**
20  **A.    No, I do not.**
21  Q.    Do you see any references to the PLO?

Page 50

1        (Witness Reviews Book.)
2    **A.    No.**
3    Q.    And do you see references to the
4    Palestinian Authority?
5        (Witness Reviews Book.)
6    **A.    Yes, I do.**
7    Q.    There are two, correct?
8    **A.    Yes, I see two pages that are listed**
9    **there, listed in the index, on Page 455.**
10    Q.    And what pages cite to the Palestinian
11    Authority?
12    **A.    It says Pages 10 and 169.**
13    Q.    Okay.  Will you turn to Page 10?
14    **A.    Okay.**
15    Q.    The citation to the Palestinian
16    Authority on Page 10 reads, first full paragraph,
17    "In early 2000, United States and Israeli
18    intelligence sources reported that Hamas, a
19    militant Palestinian terrorist group that the
20    Palestinian Authority denies responsibility for,
21    was experimenting with chemical weapons in their

Page 51

1    rocket attacks against Israeli targets," correct?
2    **A.    That's what it says.**
3    Q.    Is there any other reference on that
4    page to the Palestinian Authority?
5    **A.    I'll have to read the page.**
6        (Witness Reviews Book.)
7    **A.    I don't see anything else on that**
8    **page.**
9    Q.    The second reference to the
10    Palestinian Authority in your index refers to
11    Page 168, correct?
12    **A.    169.**
13    Q.    169, thank you.  So will you turn to
14    Page 169, please?
15    **A.    Okay, I have 169.**
16    Q.    And I'll call your attention to the
17    first full paragraph, nine lines down, that
18    reads, "The next step is to give the Palestinian
19    Authority the list of suspects for arrest, which
20    proves futile due to the fact that the
21    Palestinian Authority refuses to act on the

Page 52

1    information, Footnote 69," correct?
2    **A.    Yes, that's correct.**
3    Q.    Okay.  And if you look at Footnote 69
4    for this chapter, which is on Page 176, the
5    footnote refers to a TIME Magazine article from
6    January 15th, 2001, right?
7    **A.    Yes.**
8        MR. WISE:  We'll mark this, please.
9        (Defendants' Deposition Exhibit Number
10    245 was marked for identification.)
11        BY MR. WISE:
12    Q.    Professor, looking at Exhibit 245, do
13    you recognize that as the TIME article that you
14    cited in your book?
15    **A.    I'd have to read it.  It's been years,**
16    **years ago.**
17    Q.    Let me call your attention first to
18    the date and title of the article.
19    **A.    Okay, I'm looking at it.**
20    Q.    And go ahead and take your time to
21    read it.

Page 53

1    **A.    Oh, okay.**
2        **(Witness Reviews Document.)**
3    **A.    Okay.  I've read that article.**
4    Q.    Based on the author, title, date and
5    publication, you would agree with me that this is
6    the article cited in your book, correct?
7    **A.    Let's see.  That would be the article**
8    **on Page -- let's see, Footnote -- what footnote**
9    **was that again?**
10    Q.    69.
11    **A.    69.  Okay.  That is the article,**
12    **that's correct.**
13    Q.    And having read it now, would you
14    agree with me that nothing in that article states
15    that the Palestinian Authority refuses to act on
16    information provided by Israel?
17    **A.    I believe the footnote should have**
18    **been 71.  I know Michael Schmitt.  And again,**
19    **that's why we have other editions to correct**
20    **errors when they occur.  But it's not directly on**
21    **point, but it -- the fact that it's there should**

Page 54

1 have been -- it should have been Footnote 71.
2    Q.   So you believe that Mr. Schmitt's
3 article supports the contention you've made in
4 that sentence on Page 169.
5    A.   Well, I believe so.  Again, this was
6 written a long time ago and I'd have to look at
7 it.  It appears to be a typo.
8    Q.   Do you have any present recollection
9 of editing that footnote in subsequent editions?
10    A.   Well, not this footnote.  I've added a
11 lot of footnotes in subsequent editions.
12    Q.   But this footnote is the one I'm
13 concerned about.
14    A.   I can't recall.
15    Q.   Are you familiar with the concept of
16 peer review?
17    A.   Yeah.
18    Q.   What is peer review?
19    A.   Peer review usually is associated with
20 tenure.  If someone is seeking tenure, you get
21 scholars in the field to review your work to

Page 55

1 render an opinion whether or not you are
2 advancing scholastically to the degree that you
3 should be granted tenure or put on a tenure
4 track.  Generally that's what the term indicates.
5        It also is used when you write Law
6 Review articles or other periodicals.  A Law
7 Review will take your draft article, they'll send
8 it to other scholars to look at it, to make sure
9 that it is in the main that's appropriate.
10    Q.   Have any of the books that you've
11 listed in your report been peer reviewed?
12    A.   Well, all the Law Review articles
13 have.  What I do with my books is generally I
14 will take the Law Review articles, and if you
15 notice my Law Review articles, a lot of them
16 track what's in the book.  So while the book may
17 have not been peer reviewed -- and I don't know.
18 I mean, the publisher, I'm sure, sends it out to
19 other scholars.  That's not my responsibility to
20 peer review my own work.  It's usually the
21 publisher will send it out to other scholars.

Page 56

1        I've been asked to peer review lots of
2 stuff, so I assume my publisher did that, but
3 I -- good question.
4    Q.   When you've been asked to peer review
5 the work of others, I take it that you've then
6 had discussions with the authors of those pieces
7 about your findings, correct?
8    A.   Well, sometimes.
9    Q.   Have you ever been contacted by
10 another scholar who said that they were doing
11 peer review of any of your books?
12    A.   Well, my Law Review articles, yeah.
13    Q.   Okay.  But let's start with the books,
14 and then we'll move to the Law Review articles.
15        As it relates to the books, have you
16 ever been contacted by another scholar saying
17 that they were conducting peer review of your
18 books?
19    A.   I'm sure I have.  I just can't recall.
20    Q.   So let's turn to your Law Review
21 articles.  You said that you know those have been

Page 57

1 peer reviewed, correct?
2    A.   If you've ever written a Law Review
3 article for a journal, that's what journals do.
4 They get a lot of Law Review articles that are
5 submitted to the journal, and -- like the
6 Kentucky Journal on National Security, I believe,
7 I wrote an article about interrogation.  So
8 they'll send those -- before they publish them,
9 they obviously do a peer review and cite check
10 and they'll notify you whether or not they accept
11 your article or not, but I've not been involved
12 in that process.  I was not on the Law Review
13 when I was in law school.
14    Q.   Have any of your Law Review articles
15 that you've written that have been subject to
16 peer review been about the PA or Fatah?
17    A.   I haven't written any articles
18 directly on the PA or the Fatah.  I've written
19 articles on targeted killing, which obviously are
20 associated with the killings in the Palestinian
21 territories.

1    Q.  Let me turn your attention back to the
2  index to the Second Edition of your book and to
3  the Michael Schmitt article, Law Review article,
4  excuse me, that you reference in Footnote 71,
5  which is on Page 176.
6    **A.  You want me to go to Footnote 71?**
7  Q.  Yeah.
8    **A.  Okay.  I'm there.**
9  Q.  And if I understood correctly, what
10  you said was that Footnote 71, you believe, was
11  the source for the statement on Page 169?
12    **A.  I think a better source would be to**
13  **look at the actual Law Review article that I**
14  **wrote, because obviously when you write a book,**
15  **you're not -- you don't put the hundreds and**
16  **hundreds of footnotes in the book.  So if we**
17  **could get the Law Review that I wrote on targeted**
18  **killing, we'd probably be able to figure out**
19  **where the source came from.**
20      **Again, I can't recall at this time**
21  **what Michael Schmitt's article indicated.  That's**

1  **my assumption because it looks like it's close in**
2  **time, but it could be another cite.  I don't**
3  **know.**
4  Q.  You'd agree with me, at least, that
5  according to your book, the Schmitt article was
6  written in 1992?
7    **A.  That's what it says, yes.**
8  Q.  Which would make it impossible for
9  that to be the source of information on the
10  Palestinian Authority, correct?
11    **A.  Well, I think that's correct.**
12  Q.  Why?
13    **A.  Well, the PA, of course, the Oslo**
14  **Accord's in 1993, so we've got a year -- the**
15  **dates wouldn't match.  The dates wouldn't match.**
16  Q.  Because the PA didn't exist in 1992?
17    **A.  Right.  They existed the next -- 1993,**
18  **I believe, is when they stood up.**
19  Q.  Your report at Page 2 says that you,
20  "Lecture four times a year at the United States
21  Federal Bureau of Investigation (FBI) Academy in

1  Quantico, Virginia," correct?
2    **A.  Approximately, yes.**
3  Q.  What do you lecture on there?
4    **A.  Terrorism.**
5  Q.  Broadly?
6    **A.  Well, broadly and specifically.**
7  Q.  Have you ever lectured to the FBI
8  Investigation Academy about the Palestinian
9  Authority or Fatah during the Second Intifada?
10    **A.  When you say "about," what do you**
11  **mean?  I mean, I don't go into historical**
12  **development of the organizations, no.**
13  Q.  Have you ever discussed the actions of
14  the PA or Fatah during the Second Intifada in any
15  of your lectures to the FBI Academy?
16    **A.  Well, I concentrate on the act of**
17  **terrorism and the links, I don't go into great**
18  **detail about the linkage because I'm looking at**
19  **the actual events.  So I don't do detailed**
20  **analysis of the links between the Palestinian**
21  **terrorists and exactly what organization they**

1  **come from, whether it's Hamas, Fatah, the Martyrs**
2  **Brigade, no, I don't instruct them on the party**
3  **membership or the membership of that particular**
4  **terrorist.**
5  Q.  So the answer is no?
6    **A.  No.**
7  Q.  How long have you been lecturing at
8  the FBI Academy?
9    **A.  I'd have to look at my list of**
10  **lectures.  If you go through the over 600**
11  **speeches, you can probably go back in time and**
12  **see the first one.  I would say maybe 2004, '5.**
13  Q.  Did there come a time that you were
14  asked not to return for some period?
15    **A.  I got a -- about a year and a half**
16  **ago -- well, the answer is yes.**
17  Q.  Tell me the circumstances of that,
18  please.
19    **A.  About a year and a half ago, I got a**
20  **call from the agent that organizes, had organized**
21  **a course that I was an integral part of on**

Page 62

1    terrorism, and he told me his course had been
2    suspended by higher headquarters. It had nothing
3    to do with me, but the course itself had been
4    suspended.
5        Q.   In the speeches that you listed in
6    your report, you've cited to a number of things
7    that are on YouTube, correct?
8        A.   My speeches?
9        Q.   Yes.
10       A.   Yeah, I've had speeches on YouTube.
11       Q.   And in at least some of those prior
12   speeches, you've talked about how you were asked
13   not to come back for some period, right?
14       A.   Because I was asked not to come --
15   well, I wouldn't say not to come back. I was
16   told that the program had been suspended.
17       Q.   Because you had been critical of Janet
18   Napolitano?
19       A.   No, that's never mentioned.
20       Q.   Do you deny that you said that during
21   one of your speeches?

Page 63

1        A.   I've been very critical of Janet
2    Napolitano over the years.
3        Q.   But are you denying that during one of
4    your speeches you said the reason that you were
5    not invited back was because you guess you had
6    been critical of Janet Napolitano?
7        A.   I can't recall. I know I've been
8    critical of her. I've been critical of President
9    Bush. I've been critical of President Obama.
10   I've been critical of a lot of people.
11       Q.   But as you sit here today, you don't
12   believe that that criticism had anything to do
13   with not being invited back to the FBI?
14       A.   I can't recall. I've done over 4,000
15   media appearances. I cannot recall. You'd have
16   to show it to me and I'd have to look at it.
17       Q.   In the 4,000 media appearances, how
18   many times have you opined about the role of the
19   PA or Fatah in the Second Intifada?
20       A.   I don't know. I have, but I can't
21   give you a number.

Page 64

1        Q.   Tell me now, as you sit here today,
2    what you recollect about any instance where in
3    the media you have opined about the PA or Fatah's
4    actions during the Second Intifada.
5        A.   I recall one interesting one because
6    those are the ones that stand out. When you've
7    done almost 4,000, it's hard to recall, but I do
8    recall one on Fox News, I think it was 2004, I
9    was debating a PA official high up the chain of
10   command -- I can't remember his name, but you can
11   probably pull it from Fox News -- about their use
12   of violence, their sponsorship of violence
13   against Israeli and American civilians. We were
14   in a debate. I recall that one.
15       Q.   How long was that?
16       A.   How long was the debate?
17       Q.   Yes.
18       A.   Well, there's two talking heads. I
19   don't know, five minutes. Usually when you do,
20   you know, a Fox News or MSNBC, it's between three
21   to five minutes.

Page 65

1        Q.   Do you remember who the Fox News
2    moderator was?
3        A.   Oh, I can't remember.
4        Q.   Do you remember whether there was a
5    particular incident that had led to Fox News
6    doing this story?
7        A.   It was associated with the Israeli
8    push against Ramallah.
9        Q.   Any particular Israeli push against
10   Ramallah?
11       A.   Well, I guess the tanks were rolling
12   into Ramallah. They were engaged in combat with
13   elements of the PA and the PLO, I suppose.
14       Q.   Are you referring to what you've
15   spoken about in your report as Operation
16   Defensive Shield?
17       A.   It might have been. Again, it's
18   been -- I've done many talks about it. You asked
19   me which one stands out. That one stands out.
20       Q.   And that appearance, I take it, would
21   be on your list of prior media appearances?

Page 66

1     A.   Should be.  Although, quite frankly,
2  **not all the media appearances I've done are on**
3  **the list, just the volume of it and getting the**
4  **secretary to record them, some of them.  I would**
5  **say that probably there's about 3 to 500 that**
6  **probably aren't even on that list.**
7     Q.   Do you have any reason to believe that
8  appearance would not be on that list?
9     **A.   No.  I haven't looked at it, though,**
10 **for a long time.**
11    Q.   When you provided that list to counsel
12 in relation to this litigation, did you check the
13 list to see whether it included relevant
14 appearances?
15    **A.   No.  No, I just provided the entire**
16 **list that I had.**
17         MR. YALOWITZ:  Just let him finish his
18 questions.
19         MR. WISE:  Professor, let me know if
20 you want to take a break.  We've been going for
21 an hour and 20 minutes.

Page 67

1          MR. YALOWITZ:  I wouldn't mind a
2  break.
3          MR. WISE:  Can we take five minutes?
4          MR. YALOWITZ:  I don't need it right
5  this second, but.
6          MR. WISE:  That's fine.  Let's take
7  five.
8          (Brief Recess.)
9          MR. WISE:  Can I have these two marked
10 as 246 and 247.
11         (Defendants' Deposition Exhibit
12 Numbers 246 and 247 were marked for
13 identification.)
14         THE WITNESS:  I did a hundred month
15 before -- a hundred and six, so this is supposed
16 to be a lot thicker.
17         BY MR. WISE:
18    Q.   A hundred and six media appearances?
19    **A.   Media appearances, yeah.**
20    Q.   Did any of those relate to the role of
21 the PA or Fatah in the Second Intifada?

Page 68

1     **A.   No, they were about Hassan primarily.**
2     Q.   So looking at 246, that is your list
3  of public speeches up through March 2nd of 2013,
4  correct?
5     **A.   That's correct.**
6     Q.   And looking at 247, that is your list
7  of media appearances up through March 23rd of
8  2013?
9     **A.   Yes, that's correct.**
10    Q.   Other than what you've already told me
11 about, are there any public -- let's start with
12 the public speeches.  Are there any public
13 speeches that you can recall where you spoke
14 about specifically the Palestinian authority or
15 Fatah and the Second Intifada?
16    **A.   Well, many times.  You know, I've**
17 **spoken about those organizations and their**
18 **participation in terrorist attacks in the context**
19 **of a lot of speeches, but I haven't had a speech**
20 **that was entitled, as you suggest, the role of**
21 **the PLO in the Second Intifada, no.**

Page 69

1     Q.   Aside from the title of the speech,
2  I'm asking whether any of your public speeches,
3  you've spoke about the issue of the PA or Fatah
4  in the Second Intifada?
5     **A.   I have talked about that in a variety**
6  **of speeches over the years.**
7     Q.   And looking at your list of public
8  speeches, can you identify for me the speeches
9  where you spoke about the PA or Fatah and their
10 role during the Second Intifada?
11    **A.   Well, every speech you see at the FBI**
12 **Academy, I would mention -- that would be part of**
13 **the discussion, and so we'd have to look through**
14 **the list to see how many speeches are associated**
15 **with that.**
16         **When you see speeches, for example, on**
17 **the 21st of August, where it says Radical Islam**
18 **and the War on Terror, I would include that as**
19 **part of that broader discussion.**
20    Q.   What page are you talking about?  I'm
21 sorry.

Page 70

1      A.    That would be Page 3, Number 36.
2      Q.    Radical Islam and the War on Terror?
3      A.    Yeah.  I just pulled that out at
4  random.
5      Q.    Okay.  Do you consider the Palestinian
6  Authority to be part of Radical Islam, as you
7  define it?
8      A.    Yes.
9      Q.    Why is that?
10     A.    Because of their track record and how
11  they fit into the framework.
12          My legal expertise is really
13  associated with the discipline of the legal
14  aspects of terrorism, so what I do is I look at
15  the concept -- I have a framework, I guess is a
16  better way to put it, a legal framework, so if I
17  can look at a particular organization, government
18  or state, look at their behavior, what they do, I
19  plug that into a legal framework and then I come
20  up with an analysis and a conclusion.
21     Q.    So tell me how, in your analysis, the

Page 71

1  Palestinian Authority is part of radical Islam.
2      A.    Well, it depends on how you define
3  radical Islam.  I define it from the perspective
4  that they use terrorism and have used terrorism
5  as a tactic to achieve political or other goals.
6  Terrorism is a tactic.
7      Q.    Islam is a religion, correct?
8      A.    Islam is a religion.
9      Q.    And it's your view, though, that the
10  Palestinian Authority is part of radical Islam?
11     A.    Could you ask that question again?
12     Q.    Tell me how, in your analysis, was the
13  initial question, tell me how, in your analysis,
14  the Palestinian Authority is part of radical
15  Islam.
16     A.    It's part of the motivation that you
17  will see or the ideology that motivates
18  terrorism, acts of terrorism.  So we've seen --
19  when you plug in the analysis, you'll see that
20  states will use, or misuse, religion as a
21  justification for terrorist acts, and we've seen

Page 72

1  that in the Second Intifada, where they wrapped
2  themselves in religious themes, martyrdom, Jihad,
3  and so that fits into that process.
4      Q.    Would you similarly consider Fatah to
5  be part of radical Islam?
6      A.    Yes, they have used radical Islamic
7  extremism as a mechanism to motivate, to insight
8  and to conduct terror attacks.
9      Q.    Do you draw any differentiation
10  between the PA and Hamas?
11     A.    Well, they're two different entities.
12     Q.    And what are the differences as you
13  see them?
14     A.    Hamas is more likely to use the
15  symbols of "radical Islam" to motivate violence.
16     Q.    Have you read any scholarly work that
17  supports your definition of the Palestinian
18  Authority as part of radical Islam?  Or is that
19  simply your conclusion?
20     A.    I've read lots of scholarly works on
21  that topic.

Page 73

1      Q.    That cite to the Palestinian Authority
2  as part of radical Islam?
3      A.    Well, yeah.
4      Q.    Can you name for me what those are?
5      A.    Well, not off the top of my head.  I
6  can write a research paper on it.  I mean, it
7  would take me some time to research the issue,
8  but it's pretty much common knowledge in the
9  field that they have used co-op'd religious
10  symbols, signs, motivations to inspire, direct,
11  solicit people to engage in terrorism.  As I said
12  in my white paper, I've got statements in their
13  own words by these people.
14     Q.    What's your basis for saying it's
15  common knowledge in the field that the
16  Palestinian Authority is part of radical Islam?
17     A.    Well, my basis comes really from a
18  wide range of sources.  I think one, their own
19  words, as I indicated in my white paper.  You can
20  read it, and you don't have to read the original
21  languages to know exactly what they are doing.

Page 74

1    Q.    But you can't cite to me a single
2  scholarly source where another academic has said
3  the Palestinian Authority is part of radical
4  Islam, right?
5    **A.  I could, but I can't do it right at**
6  **this second.**
7    Q.    What would you need to do to be able
8  to do it right at this second?
9    **A.    Well, it wouldn't be at this second.**
10  **I'd have to go back and research the issue and**
11  **compile them.  You've got a lot of literature**
12  **that talks about the connection of the PA.**
13  **You've got -- as I've got in my white paper,**
14  **we've got seized documents, a lot that the**
15  **Israelis seized that show a connection between**
16  **those two links.  You've got congressional**
17  **resolutions that would make certain findings of**
18  **fact that I've put out in my white paper.  You've**
19  **got media reports that cover the topic by a**
20  **variety of sources.**
21    Q.    So you're referring to the sources

Page 75

1  that are cited either in this initial report or
2  in your rebuttal report, correct?
3    **A.    Well, some of the sources.  There's**
4  **many, many more.  If you're going to research**
5  **that particular issue, then I imagine you could**
6  **write hundreds of pages on the topic.**
7    Q.    Are their other sources of scholarship
8  or evidence that you are aware of that you
9  omitted from either this report or your rebuttal
10  report?
11    **A.    Am I aware of other sources that I**
12  **omitted?**
13    Q.    That you omitted?
14    **A.    There are hundreds of other sources**
15  **that I've not put in the report.**
16    Q.    You've personally reviewed these
17  sources?
18    **A.    It's pretty much common knowledge.**
19    Q.    You personally reviewed these sources?
20    **A.    Well, I haven't read every word in**
21  **every source that's out there, no.  No one has.**

Page 76

1    Q.    Professor Addicott, are you saying
2  that there are bases for your opinion that you
3  have omitted from your report or your rebuttal
4  report that support your conclusion?
5    MR. YALOWITZ:  Object to the form.
6  Objection.
7    **A.    Well, I would say that, you know, as a**
8  **scholar, I look at a lot of different sources**
9  **and, again, I plug that information, whether it**
10  **comes from -- I've just got a selected, you know,**
11  **group of sources in these reports.  If I had the**
12  **time, I could produce a greater volume of**
13  **material with obviously many, many more sources,**
14  **but I was not asked to put every source that is**
15  **out there in this report.  That would encompass a**
16  **lot of time.**
17    **So I'm satisfied that the sources that**
18  **I have developed are enough to convince the**
19  **reasonable person that these facts are correct**
20  **and my conclusions are correct.**
21    Q.    Let's turn to your initial report.

Page 77

1  First of all, you did not compile the sources for
2  this initial report, right?
3    **A.    For the initial report, I didn't pen**
4  **the initial report, but everything in the initial**
5  **report I have adopted, and it reflects my**
6  **professional opinion exactly.**
7    Q.    But you didn't add a single footnote
8  to the text that was sent to you that makes up
9  your initial report, correct?
10    **A.    I can't say that.  I don't recall.  I**
11  **would say if I did, it wasn't very many.**
12    Q.    You said you reviewed all of the
13  sources that are cited in this report?
14    **A.    To my knowledge, except for that one.**
15  **But, again, it's been awhile, since March.  But I**
16  **did produce all the ones that I could find.  The**
17  **one stands out in my mind, the YouTube video,**
18  **but -- so I'll just say yes.**
19    Q.    And did you review them all before you
20  signed it?
21    **A.    Yes.**

Page 78

1    Q.    Just to wrap up our last line of
2    questions:  Are there any sources that you can
3    think of, as you sit here today, that support
4    your conclusion that the PA and Fatah were
5    involved in the Second Intifada, but which you
6    excluded from either your report or your rebuttal
7    report?
8        **A.    That I excluded from the report?  No,**
9    **I can't think of any sources that I -- well, I**
10   **can't think of it this time, but if I had more**
11   **time to write a more detailed report, I'm**
12   **confident that I could increase those sources**
13   **10-fold.**
14       Q.    Professor, was there a time limit put
15   on your drafting of your rebuttal report?
16       **A.    I think there was.  I think I was told**
17   **that the report had to be in by a fixed date.  I**
18   **can't remember what the date was.**
19       Q.    And who told you that?
20       **A.    I don't recall.**
21       Q.    Was it in writing, or was it oral?

Page 79

1        **A.    I don't recall.  If I had to say, I**
2    **would probably say it was Rachel Weiser that told**
3    **me that.**
4        Q.    Did you ever communicate to Rachel
5    that there were many more sources but that you
6    just couldn't include them in the rebuttal
7    because you had run out of time?
8        MR. YALOWITZ:  Objection.  Instruct
9    you not to answer.
10       **A.    I can tell you my professional --**
11       MR. WISE:  You're instructing him not
12   to answer what he told counsel?
13       MR. YALOWITZ:  Right.  I'm instructing
14   him not to answer that question.
15       MR. WISE:  Let me try it another way.
16       Q.    You've just told us that there are
17   many more bases for your opinion than what's
18   contained in your report, correct?
19       **A.    In my opinion, yes.**
20       Q.    Did you communicate that to Rachel or
21   any other of the lawyers for the plaintiffs?

Page 80

1        MR. YALOWITZ:  Objection.  Instruction
2    not to answer.  Don't answer it.
3        MR. WISE:  I'll come back to it.
4        Q.    You said in your report that you have
5    provided expert testimony -- and I'm on Page
6    10 -- in the case of United States versus David
7    Staffel, correct?
8        **A.    That's correct.**
9        Q.    That was a --
10       **A.    Article 32 investigation.**
11       Q.    Regarding a shooting in Afghanistan?
12       **A.    Yes, he was charged with murder.**
13       Q.    Did not involve any issues related to
14   the PA or Fatah or the Second Intifada?
15       **A.    No.  It was a Taliban extremist.**
16       Q.    You've also written that you've
17   testified before the United States Congress and
18   the Senate, correct?
19       **A.    Correct.**
20       Q.    Does any of that testimony involve the
21   Palestinian Authority, Fatah, or the Second

Page 81

1    Intifada?
2        **A.    No.**
3        Q.    You wrote in your report that you
4    filed two Amicus briefs with the United States
5    Supreme Court, correct?
6        **A.    Correct.**
7        Q.    What were the names of those cases?
8        **A.    I can't recall.**
9        Q.    Did either of them involve the
10   Palestinian Authority, Fatah or the Second
11   Intifada?
12       **A.    No, they were directed at Saddam**
13   **Hussein.**
14       Q.    If you recall the e-mail that I showed
15   you from Rachel Weiser to Brian Hill?
16       **A.    Yes.**
17       Q.    What's the number?
18       **A.    244.**
19       Q.    Thank you.  You'll see in the
20   paragraph that we read before there was a
21   reference to you having worked with military

JEFFREY ADDICOTT DEPOSITION    October 2, 2013    Sokolow v. the PLO

Page 82

1  organizations across the globe, to include the
2  IDF and Egyptian military, correct?
3     **A.  Yes.**
4     Q.   Can you tell me about your work with
5  the IDF, starting with what the IDF is?
6     **A.  Israeli Defense Force.  My first**
7  **contact -- do you want the entire background?**
8     Q.   Yes.
9     **A.  Probably in the 1990s, maybe 1995, I**
10 **taught at the Judge Advocate General School in**
11 **Charlottesville, Virginia.  I was the deputy**
12 **chief for the operational law division.  We**
13 **taught, amongst other things, terrorism.**
14    **We had four military officers, legal**
15 **officers, that would attend the courses in**
16 **residence.  We'd have Israelis, Egyptians,**
17 **Kuwaitis, Saudis.  Most of the officers would be**
18 **from the Middle East, as a matter of fact.**
19    **And in our curriculum, we would**
20 **encourage discussion about causes, effects of**
21 **terrorism, and get the perspectives of these**

Page 83

1  **officers, how they viewed the issues.  One of the**
2  **officers that I met at that time is now a**
3  **professor at the University of Denver Law School.**
4     Q.   What's that person's name?
5     **A.  His name is -- it will come to me.  It**
6  **starts with a G. It's an Israeli name.  Right on**
7  **the tip of my tongue.  I can't remember his name**
8  **right now, but I subsequently met him on my first**
9  **trip to Israel after I had retired from the**
10 **military in 2000.**
11    Q.   So the meeting started in 1995, you
12 said, correct?
13    **A.  A lot of meetings with different**
14 **Israeli officers and Egyptian officers and, as I**
15 **said, officers from the Middle East, and we would**
16 **teach terrorism.  I had taught there for three**
17 **years. So there was quite a few officers from**
18 **different countries around the world, and we were**
19 **very anxious to get their perspectives.**
20    Q.   And that went from '95 to '98, you
21 said, right?

Page 84

1     **A.  Probably '93 to '95, as I look back on**
2  **it now.**
3     Q.   Those sessions, you'd agree with me,
4  did not deal with the Second Intifada obviously?
5     **A.  No, no, but they did deal with**
6  **terrorism.**
7     Q.   Terrorism involving the Palestinian
8  Authority?
9     **A.  Yes.  Well, terrorism involving the**
10 **Palestinians in the territories.**
11    Q.   Which Palestinians?
12    **A.  Well, we basically looked at the**
13 **issue.  Again, I'm not -- my expertise is not in**
14 **the origin of these groups and the historical**
15 **development and the personnel that come and go**
16 **amongst the groups.  My expertise is in looking**
17 **at the groups in terms of their behavior and**
18 **plugging that into a framework that's well**
19 **recognized as a national security discipline.**
20    Q.   But you are not seeking at this time,
21 1993 to '95, to differentiate between the various

Page 85

1  Palestinian actors?
2     **A.  No.  We were looking at the acts.**
3     Q.   And even to this day, your expertise
4  is not to differentiate between the various
5  Palestinian actors, correct?
6     **A.  Well, no, that's not correct.  That's**
7  **part of the framework of the analysis.  You have**
8  **to make a distinction.**
9     Q.   So let's back up then to the '93 to
10 '95 time period.  What distinctions were you
11 drawing between the various Palestinian actors
12 that you were speaking to the Israeli IDF folks
13 about?
14    **A.  Well, we were looking at the**
15 **culpability and the hierarchy of where the**
16 **terrorist acts emanate from, what motivates them,**
17 **you know, who funds them, how they controlled, so**
18 **those types of issues were discussed.**
19    Q.   About the Palestinian Authority?
20    **A.  Well, no, it would be just the**
21 **Palestinian -- at that time the Palestinian, you**

Page 86

1  know, PLO, the Palestinian Liberation
2  Organization, and their role in these types of
3  activities, so I didn't -- again, I wasn't
4  concentrating on the historical development of
5  the groups at that time.  In fact, the discipline
6  of terrorism law hadn't been created at that
7  time.
8        We were, again, concentrating at that
9  early stage on the acts and the motivation for
10  the acts, so we didn't discuss particular groups
11  and draw the linkage at that time.  We were more
12  concerned with the legality of it, and training
13  our military lawyers.
14     Q.   Training your military lawyers on what
15  discipline?
16     A.   Well, at that time we called it
17  operational law.
18     Q.   What does that mean?
19     A.   It was a term that was coined in 1992,
20  and it deals with all the legal aspects
21  associated with deployment outside the

Page 87

1  continental United States in the context of
2  hostilities.
3     Q.   So essentially it was focused on the
4  rules of engagement that governed actions?
5     A.   Part of it.
6     Q.   Was any of it focused on identifying
7  the role of either the Palestinian Authority or
8  Fatah in acts of terror?
9     A.   No, that was beyond our scope at that
10  time.
11     Q.   So you said '93 to '95.  When was the
12  next time you visited Israel?  Sorry, no.  Did
13  you visit Israel during the '93 to '95 time
14  frame?
15     A.   I never visited Israel when I was in
16  the military.  I retired in 2000.
17     Q.   When was the first time you visited
18  Israel?
19     A.   I'd have to check my passport.  I've
20  visited a lot of countries over the last ten
21  years.  I would say probably 2004, 2005.  I'd say

Page 88

1  2005.
2     Q.   And what was the circumstance of your
3  first visit?
4     A.   You have to forgive me.  I literally
5  have done a lot of countries.  I believe, to the
6  best of my memory without checking my notes, that
7  it was a trip to Herzliya, at the Institute for
8  Counter-Terrorism, ICT.  It's run by Boaz Ganor.
9     Q.   And who is that?
10     A.   Amos Guiora, that's the law professor,
11  and that's the person I couldn't remember.
12  A-M-O-S, Guiora, G-U-I-E-O-R-A (sic), but I'm not
13  sure.
14     Q.   Who is Boaz Ganor?
15     A.   He is the director of the Institute
16  for Counter-Terrorism, located in Herzliya,
17  Israel.
18     Q.   And what is the Institute?
19     A.   It's a think tank, basically, attached
20  to one of their universities there.
21     Q.   What was the cause of your trip over?

Page 89

1     A.   He has an annual conference on
2  terrorism, and they had invited me to come
3  participate in a panel discussion and also to
4  deliver a lecture, if I recall.
5     Q.   And did you do both?
6     A.   Yes.
7     Q.   What was the topic of the panel
8  discussion?
9     A.   I cannot recall.
10     Q.   Was it about the Palestinian Authority
11  or Fatah in relation to the Second Intifada?
12     A.   Yeah.  The topic was about terrorism
13  and the activities that had been -- well, the
14  fact that Israel had been targeted by terrorists,
15  so that was the topic.
16     Q.   But when you spoke in your lecture,
17  were you speaking about the Palestinian Authority
18  and Fatah and the Second Intifada?
19     A.   I probably was.
20     Q.   Why do you say "probably"?
21     A.   I've done hundreds and hundreds and

**JEFFREY ADDICOTT DEPOSITION**     October 2, 2013     Sokolow v. the PLO

Page 90

1  hundreds and hundreds and hundreds of speeches.
2  I would assume that if I was in Israel at that
3  time, that that would have been the topic,
4  without checking my notes. I just honestly
5  cannot recall. But to the best of my knowledge,
6  that's probably what the topic was about.
7      I do remember in all the panel
8  discussions that Boaz would put on, he would put
9  on perspectives from -- well, he put on different
10 perspectives. It wasn't a preaching-to-the-choir
11 conference.
12     Q.  Were there Palestinians that spoke at
13 the conference?
14     A.  There were Palestinians there.
15     Q.  Who were they?
16     A.  I don't recall.
17     Q.  What roles did they serve?
18     A.  I'm sorry?
19     Q.  What roles did the Palestinian
20 speakers serve?
21     A.  I don't know what positions they

Page 91

1  served.
2      Q.  Do you know what positions they held?
3      A.  I can't recall. I would assume they'd
4  be an elevated position of some sort because --
5      Q.  Why would you assume that?
6      A.  I would assume they would be fellow
7  scholars that he had invited to participate
8  because of the scholarly nature of the
9  organization. I would assume they had some
10 background, some credentials to offer an opinion.
11     Q.  On the panel discussion that you were
12 involved in at that conference, what was the
13 topic?
14     A.  I don't recall. I would assume, if I
15 had to take a guess, it would be about --
16     MR. YALOWITZ:  Don't guess.
17     A.  I mean, I don't recall.
18     Q.  So that was your first trip, you said,
19 in 2005, correct?
20     A.  To the best of my knowledge. It might
21 have been 2006, but it could have been 2005.

Page 92

1      Q.  How long were you in Israel for that
2  trip?
3      A.  Probably two days, three days.
4      Q.  Did you visit either the West Bank or
5  Gaza during that trip?
6      A.  I don't recall.
7      Q.  Have you ever been to the West Bank or
8  Gaza?
9      A.  Not to Gaza. I crossed over into the
10 West Bank.
11     Q.  How long were you in the West Bank?
12     A.  Oh, no more than just a day, part of a
13 day.
14     Q.  What was the occasion for your trip to
15 the West Bank?
16     A.  I was with some Israelis that I'd gone
17 into the West Bank to look at some of the
18 security apparatus that had been built by the
19 Israelis to protect themselves from terrorist
20 attacks.
21     Q.  Do you remember who the Israelis were?

Page 93

1      A.  Military officers. I don't remember
2  their names.
3      Q.  Do you remember what positions they
4  held?
5      A.  They were officers.
6      Q.  You may have answered this already:
7  How long were you there in the West Bank for?
8      A.  I didn't spend the night.
9      Q.  Was that the only time you've been to
10 the West Bank?
11     A.  I think I went one other time.
12     Q.  Did you have meetings with any
13 Palestinian Government officials during the first
14 visit that you've described?
15     A.  Not on the West Bank, but I did at the
16 conference. And I've been to other conferences
17 in Israel where I've had discussions with
18 Palestinian scholars.
19     Q.  Can you recall the names of any of
20 them as you sit here today?
21     A.  Not at this time.

Page 94

1    Q.    Have you written about your
2  conversations with those scholars in any of the
3  writings that you've cited?
4    A.    No.  Not directly.
5    Q.    Have you done it indirectly?
6    A.    Well, obviously they influence your
7  thinking.  You want to gather information from
8  different sources, and so yes, I mean, there
9  would be an indirect influence.
10    Q.    Is there a place in your previous
11  writings where you've written something like,
12  "According to Palestinian sources," and then
13  written a conclusion?
14    A.    I'd have to check my article on
15  targeted killing that I wrote -- I think I wrote
16  that for the Kentucky Law Journal, or I'm not
17  sure which law journal it came in.  I don't
18  recall.
19    Q.    But that's the one article that you
20  think might include such a reference?
21    A.    Yes.

Page 95

1    Q.    You noted that you had lived in Egypt,
2  correct?
3    A.    I visited Egypt.
4    Q.    When did you visit?
5    A.    At least two occasions.
6    Q.    Can you tell me about the first?
7    A.    The first was a conference on
8  terrorism at the Marriott Hotel, 2006, 2007.
9    Q.    Who sponsored the conference?
10    A.    I think it was the Egyptian
11  Government.
12    Q.    And what did you speak about?
13    A.    I spoke on terrorism, and the lack of
14  a international definition for the term was the
15  theme of my talk.
16    Q.    Did that talk reference the
17  Palestinian Authority or Fatah during the Second
18  Intifada?
19    A.    Not directly.
20    Q.    You said that was the first visit to
21  Egypt.  When was the second?

Page 96

1    A.    Probably a couple years later.
2    Q.    And what was the occasion for that
3  visit?
4    A.    That was a cyber terrorism conference.
5    Q.    Cyber terrorism meaning the use of
6  computers?
7    A.    Uh-huh, engaged in terrorism.
8    Q.    And who sponsored that conference?
9    A.    That was sponsored in part by a French
10  company.  It was organized by Dr. Mohammed -- it
11  will come to me.
12    Q.    Was he a government official?
13    A.    He's a judge in Egypt.  I've had him
14  come to my Center to speak in the United States,
15  so I'm ashamed I can't remember his last name.
16    Q.    What year was this second visit?
17    A.    A couple of years after the first
18  visit.
19    Q.    And in your discussion of cyber
20  terrorism, did you address the involvement of the
21  PA or Fatah in the Second Intifada?

Page 97

1    A.    Not directly.
2    Q.    How did you do it indirectly?
3    A.    In the second event or the first one?
4    Q.    Well, let's start with the second.
5  How did you indirectly speak about the PA and
6  Fatah in the Second Intifada in a speech about
7  cyber terrorism?
8    A.    I recall that the speech had a part in
9  it when there was tensions or conflict between
10  the Palestinian Authority or the PLO or the PN
11  and Israel, you would see a spike in cyber
12  activity, and drew some parallels between that.
13  And cyber activity, I mean by harmful cyber
14  activity.
15    Q.    During the Second Intifada?
16    A.    Again, that was years ago, but I'm
17  sure when I delivered the speech, I had done some
18  research on that.  As I recall, I did have some
19  stats about the spike in cyber warfare, cyber
20  terrorist activity against the Israelis, the
21  servers, and the correlation was when you have,

Page 98

1  you know, spikes in actual physical violence,
2  you'll see a correlation between the cyber
3  attacks increasing.
4      Q.   Have you retained your research on
5  that subject?
6      A.   Most of the notes, I do.  And, again,
7  many of the speeches I do, I prepare notes, but I
8  don't have a good habit of keeping them.
9      Q.   Have you written on the subject of the
10  PA and Fatah's use of cyber terrorism?
11      A.   I've written on cyber terrorism, but I
12  think when I wrote my latest chapter on cyber
13  terrorism, that I revised it and I kept it -- I
14  didn't go into specific instances or, you know --
15  I think I used as an example, when I edited the
16  thing, China.
17      Q.   Have you ever lived in Kuwait?
18      A.   I haven't lived in Kuwait, but I
19  visited Kuwait.
20      Q.   What was the circumstance of your
21  visit to Kuwait?

Page 99

1      A.   I was asked to develop the curriculum
2  at the Kuwaiti University, for terrorism.
3      Q.   And what year was that?
4      A.   About four years ago, approximately.
5      Q.   And did you create a written --
6      A.   Yes, I did.  I --
7      Q.   -- document for that?
8          MR. YALOWITZ:  You just got to let him
9  finish.
10         THE WITNESS:  I'm sorry.
11      Q.   Did you create a written document in
12  relation to your work in Kuwait?
13      A.   Yes.
14      Q.   And is that cited in your list of
15  prior writings?
16      A.   It wasn't published, so I didn't cite
17  it.
18      Q.   Did any of that involve discussions of
19  the Palestinian Authority or Fatah during the
20  Second Intifada?
21      A.   I'd have to look at the written

Page 100

1  curriculum that, you know, they -- so I don't
2  know.  We obviously -- I don't know.
3      Q.   It states in your initial report that
4  you served as a senior legal advisor for the
5  United States Army Special Forces?
6      A.   I did.
7      Q.   When was that?
8      A.   I was the senior legal advisor from
9  1995 to 1997, right when I left the JAG School.
10      Q.   So I take it, obviously, then, that
11  none of that teaching involved a PA or Fatah
12  during the Second Intifada, correct?
13      A.   I wasn't doing any teaching on that
14  job.
15      Q.   I'm sorry, none of your advising
16  involved advising on the PA or Fatah in relation
17  to the Second Intifada?
18      A.   No, the Second Intifada hadn't
19  occurred.
20      Q.   You wrote that you were the Deputy
21  Chief of the International and Operational Law

Page 101

1  Division of the Pentagon?
2      A.   Yes.
3      Q.   What years was that?
4      A.   That would have been '97 to '99.
5      Q.   So that, again, was predating the time
6  period covered in your report?
7      A.   Yes.
8      Q.   Let's turn to your report, sir, and I
9  want to start with the section on Page 13.  The
10  very top line, the report states, "Faluji was
11  quoted as saying that the violence was 'planned
12  since [Arafat] the President returned from the
13  recent talks at Camp David' when peace talks
14  collapsed in July 2000, Footnote 1."
15      A.   Uh-huh.
16      Q.   That is the footnote that you have
17  spoken about before as being unable to locate,
18  correct?
19      A.   I did not view it.  I did not view
20  that YouTube footnote.
21      Q.   The report, if you'll turn with me to

Page 102

1  Page 15, at the first full paragraph, your report
2  discusses document seized from PA offices by the
3  Israeli military during Operation Defensive
4  Shield, right?
5      A.  Correct.
6      Q.  And through the rest of that page and
7  the first two lines of the next page, you cite
8  four times to a report produced by the Israeli
9  Ministry of Foreign Affairs, correct?
10     A.  Yes, that's correct.
11     Q.  How many documents were seized during
12  Operation Defensive Shield?
13     A.  The number of documents?  I don't
14  know.
15     Q.  Have you viewed any of the documents
16  that were seized?
17     A.  I viewed translations of the
18  documents.
19     Q.  Who did the translations?
20     A.  I do not know.
21     Q.  Where did you obtain the translations?

Page 103

1      A.  Well, I obtained them from the source
2  that cite it.
3      Q.  Other than the source that cite it,
4  have you done any other independent translation
5  of the documents that were allegedly seized?
6      A.  No, I haven't.
7      Q.  Have you viewed any other reports
8  about those documents other than the report that
9  you cited in your report?
10     A.  I cite the congressional resolutions
11  that reference these documents, so they came to
12  the same conclusion I did.
13     Q.  And what was your conclusion?
14     A.  They're authentic.
15     Q.  And tell me all of the bases for your
16  conclusion that the documents were authentic.
17     A.  Well, I think the primary source would
18  be the fact that our Congress, in a bipartisan
19  demonstration in the resolutions that I've cited,
20  have found as a finding of fact that they are
21  what they purport to be.

Page 104

1          Second, I think it's reasonable to
2  conclude that if they'd been adopted by the
3  Israelis, then I would presume that what they're
4  purporting to be true, is true.
5      Q.  When you read a statement from the
6  Israeli Government, do you uniformly accept that
7  statement to be true because of its source?
8      A.  When I read a statement by any
9  government, my first question is what is the
10  government?  If it's a democracy, I presume it to
11  be true.  If it's a totalitarian regime, my
12  initial thought is that it's false.
13     Q.  I take it then that you presume that
14  statements from the Israeli Government are true?
15     A.  Israel is a democracy.  They are bound
16  up with our same traditions, rule of law.  They
17  have a system of checks and balances.  So, yes.
18     Q.  How would you define the Palestinian
19  Authority?
20     A.  A totalitarian system.
21     Q.  And I take it from your previous

Page 105

1  analysis, you then presume that statements from
2  the Palestinian Authority are false?
3      A.  My initial presumption is to look at
4  those statements with skepticism, yes, as I would
5  any totalitarian regime.
6      Q.  And have you applied those
7  presumptions to all of the statements you
8  reviewed in connection with the drafting or
9  review of your reports?
10     A.  I'm not sure I understand the
11  question.
12     Q.  The assumptions that you just told us
13  about Israel and the PA, did you apply those
14  assumptions --
15     A.  Yes.
16         MR. YALOWITZ:  Let him -- you got to
17  let him ask the question.
18     Q.  Did you apply those assumptions in the
19  drafting of your rebuttal report?
20         MR. YALOWITZ:  Object to the form.
21  Because it was interrupted, it's disjointed.

Page 106

1   Just ask your question again.
2       Q.   The presumptions you've just described
3   about Israeli Government and the PA, did you
4   apply those assumptions in the drafting of your
5   rebuttal report?
6       A.   Yes.
7       Q.   And in your review of the initial
8   report?
9       A.   Yes.
10      Q.   Are you aware that questions have been
11  raised about the authenticity of the documents
12  seized in Operation Defensive Shield?
13      A.   Yes.
14      Q.   Have you ever heard of someone named
15  Jean-Francois Legrain?
16      A.   I've heard the name.
17      Q.   Have you read the analysis of the
18  documents?
19      A.   His analysis?
20      Q.   Yes.
21      A.   I'd have to look at it again.

Page 107

1       Q.   As you sit here today, do you recall
2   having read it?
3       A.   I can't associate his name with that
4   topic. I'd have to look at the name and the
5   topic together.
6       Q.   When you say you've heard of the
7   debate regarding the documents' authenticity,
8   what can you tell me about what you've considered
9   suggesting that there may be a problem with the
10  authenticity of the documents?
11          MR. YALOWITZ:  Object to the form.
12      A.   I'm aware that some people have made
13  the claim that they're not authentic.
14      Q.   And do you know the basis for those
15  claims?
16      A.   I suppose -- well, I don't know, no.
17  I suppose there's a whole litany of bases for
18  those complaints.
19      Q.   Do you know what that litany is?
20      A.   That they were forged.
21      Q.   Have you considered those claims in

Page 108

1   deciding whether to rely on these documents in
2   forming your opinions?
3       A.   I've considered them.
4       Q.   And I take it that you've rejected the
5   suggestions?
6       A.   I rejected, yes.
7       Q.   And on what basis?
8       A.   As I said, our Congress has adopted
9   them as true in making certain findings of facts
10  in a bipartisan effort, vote, and we have a lot
11  of fact finders that are associated with
12  supplying information to our members of Congress.
13          Also, I give the presumption of
14  authenticity and validity to the statements of
15  governments that come from democratic traditions.
16      Q.   I'm going to show you what's been
17  previously marked as Defendants' Exhibit 203.
18  You recognize that as the document that is cited
19  in your initial report at Footnotes 8, 9, 10 and
20  11?
21      A.   If I could have a moment to look

Page 109

1   through it.
2       Q.   Sure.
3           (Witness Reviews Document.)
4       A.   This appears to be the document, yes.
5       Q.   Who is Dani Naveh, D-A-N-I, capital
6   N-A-V-E-H?
7       A.   I've never met him.
8       Q.   Do you know who he is?
9       A.   He's the Minister of Parliamentary
10  Affairs.
11      Q.   You say that based on your reading --
12      A.   Based on the document itself, yes.
13      Q.   In the report that you adopted, this
14  document is cited four times, correct?
15          (Witness Reviews Document.)
16      A.   That appears to be correct.
17      Q.   And have you gone through the document
18  marked as 203 to check the source for the
19  citations in the report you signed?
20      A.   Did I go through the document?  Yes.
21      Q.   So the first citation --

Page 110

1    A.    Okay.  Citation Number 8?
2    Q.    Number 8.
3    A.    Okay.
4    Q.    Whereas the report states, "Documents
5    seized from PA offices by the Israeli military
6    during Operation Defensive Shield (2002) further
7    demonstrated that Fatah, the dominant faction of
8    the Palestinian Authority, bankrolled nearly
9    every aspect of the AAMB's terrorist
10   operations-from explosives to guns and gas money.
11   Footnote 8."
12        What is the source -- what portion of
13   the document that you have as 203 supports that
14   contention in your report?
15   A.    It's cumulative.  As you see, there's
16   no page number cited.  If you look at the
17   document and read it, that's the conclusion that
18   I came to.
19   Q.    When you say that's the conclusion you
20   came to, you didn't write that sentence, right?
21   A.    Everything in this report I adopt as

Page 111

1    my own.  It reflects my professional opinion.  I
2    didn't pen it, but I adopt it as 100 percent
3    reflecting my professional opinion based on these
4    documents and my knowledge of the organization,
5    operation and behavior of terrorist
6    organizations.
7    Q.    And you don't know who penned that
8    sentence?
9    A.    No, I don't know who did the draft.
10   Q.    It was provided to you by plaintiffs'
11   counsel, correct?
12   A.    This draft was provided to me.  I
13   carefully reviewed it, I made changes and I've
14   adopted it exactly as my own.
15   Q.    And you signed off on it the next day?
16   A.    Well, I don't know -- no, it wasn't
17   the next day, no.  I spent some time looking
18   through this document.
19   Q.    Let's go back to Exhibit 239.  Do you
20   still have that in front of you?
21   A.    239.  I don't see it -- oh, yes, I do

Page 112

1    see it.  Okay.  Yes.
2    Q.    This is the e-mail we discussed before
3    from Nitsana Darshan-Leitner to you attaching the
4    two Word documents, correct?
5    A.    Yes.
6    Q.    Dated March 21st, 2013, right?
7    A.    Correct.
8    Q.    And you signed the report on March
9    22nd, correct?
10   A.    That is correct.
11   Q.    The next sentence on Page 15?
12   A.    The next sentence on Page 15, okay.
13   Q.    That ends with Footnote 9 is a
14   quotation from the report that is Exhibit 203,
15   correct?
16   A.    Yes.
17   Q.    What is the unequivocal proof cited in
18   that sentence?
19   A.    "The captured documents proved
20   unequivocally that the Fatah organization and the
21   Al-Aqsa Martyrs Brigade are one and the same and

Page 113

1    they cannot be separated."
2    Q.    My question is what is the unequivocal
3    proof cited in that report?
4    A.    I'm not sure I follow the question.
5    Q.    The sentence that's in quotations
6    states that, "The captured documents proved
7    unequivocally that the Fatah organization and the
8    Al-Aqsa Martyrs Brigade are one and the same and
9    they cannot be separated," correct?
10   A.    That's what the document states, yes.
11   Q.    Based on your review of the document,
12   what is the unequivocal proof?
13   A.    You're asking me to find the cite
14   where that came from in the quotation?
15   Q.    No, I'm asking you to tell me in your
16   words what the unequivocal proof is that Fatah
17   and Al-Aqsa are one and the same.
18   A.    That's a quotation from the Israeli
19   report.
20   Q.    So the quotation is lifted verbatim
21   from the Israeli report and dropped into the

Page 114

1  report you signed, correct?
2      A.   I think so. I'd have to find the
3  quote, unless you can help me out and find it for
4  me. Starts on Page 4. Okay.
5      Q.   Look at Number 5.
6      A.   Okay.
7      Q.   So the first sentence is accurately
8  reproduced from Exhibit 203 into Page 15 of the
9  report you signed, correct?
10     A.   Yes.
11     Q.   But you can't tell me what the basis
12  is for the conclusion that those documents proved
13  unequivocally that Fatah and Al-Aqsa are one and
14  the same, right?
15     A.   That's the conclusion of this report.
16  That's one of their conclusions.
17     Q.   But you can't tell me the basis for
18  that conclusion?
19     A.   Well, the documents obviously.
20     Q.   Which documents?
21     A.   When you take the wide view and look

Page 115

1  at all the documents, I think a reasonable person
2  would come to that conclusion.
3      Q.   Which specific documents cited in this
4  report are the basis for your adoption of the
5  conclusion that Fatah and Al-Aqsa are one and the
6  same?
7      A.   You want me to read the report to you?
8      Q.   No, I'm asking you for the basis for
9  your opinion, Professor.
10     A.   This report. These documents indicate
11  this is a -- this is beyond a smoking gun.
12     Q.   But you can't cite to a single
13  individual document?
14     A.   No, but I --
15         MR. YALOWITZ: Objection.
16     A.   I would join with the congressional
17  resolutions that have cited the same document,
18  come to the same factual conclusion.
19     Q.   For this sentence, you would agree
20  with me that it is just lifted from one report
21  and placed into the report you signed, correct?

Page 116

1      A.   That's why there's a quotation mark
2  around it, yes.
3      Q.   Same thing with the next sentence that
4  ends with Footnote 10, right?
5      A.   I'd have to find that quote again.
6  Again, my document's marked up, and obviously I
7  moved -- when I went through this in March, I
8  didn't use this clean copy, so if you can point
9  me to the sentence, I can tell you whether
10  that --
11     Q.   Well, let me ask you about what you
12  did in March. What do you mean you didn't use
13  this clean copy? What did you use in March?
14     A.   Well, obviously I got a hold of a copy
15  and I checked, you know, the citations to ensure
16  that they, you know, were accurate.
17     Q.   And so your review consisted of making
18  sure that what was in the text that you had been
19  sent actually appeared in the report that you
20  found, right?
21     A.   Yes.

Page 117

1      Q.   Look at Page 14.
2      A.   14 of the?
3      Q.   I'm sorry, of Exhibit 238.
4      A.   238?
5      Q.   The report you adopted.
6      A.   Oh, the report. Page 14?
7      Q.   Page 14.
8      A.   Okay.
9      Q.   First paragraph, first sentence, you
10  write, "During the intifada, Arafat's Fatah
11  faction through its Al-Aqsa Martyrs Brigade
12  (AAMB) co-opted Islamic symbols and slogans,"
13  correct?
14     A.   Yes.
15     Q.   What Islamic symbols and slogans are
16  you referring to?
17     A.   Well, from the rhetoric that was
18  allowed on Palestinian Authority television, they
19  would adopt the theme of martyrdom and embrace
20  that concept as a motivation to incite people to
21  commit murder, and that is a theme that you see

Page 118

1  in radical Islamic extremism, that they adopt
2  that theme.  And it's not a secular issue,
3  obviously.  It's a religious issue.
4      Q.   Other than martyrdom, are you
5  referring to anything else?
6      A.   Well, the word Jihad, of course, is
7  also a word that is used by radical Islamic
8  extremists, and it motivates people to engage in
9  suicide attacks and targeting civilians.
10     Q.   Which symbols are you referring to?
11     A.   Well, I guess the symbols are the
12  symbolic use of these terms and the gestures and
13  mannerisms that people engage in when they incite
14  people in the name of radical Islam.
15     Q.   You didn't write this sentence,
16  correct?  You didn't pen this sentence?
17     A.   No, I did not pen that sentence, but I
18  adopt it.
19     Q.   Did you speak to the author who penned
20  it?
21     A.   I don't know who the author was.

Page 119

1      Q.   Do you know what "Islamic symbols" the
2  author of that passage was referring to?
3      A.   I know what I refer to it as.  I refer
4  to it as a synonym for the slogans.  I mean it's
5  another way to say a slogan.  A symbol is not
6  necessarily something that's on a flag or on an
7  emblem, but it involves, you know, all the
8  trappings of radical Islam.
9      Q.   So in your view, symbols and slogans
10  are one and the same?
11     A.   They can be.
12     Q.   But you didn't speak to the author to
13  figure what the distinction was that the author
14  was drawing?
15         MR. YALOWITZ:  Objection.
16     A.   I didn't know the author.
17     Q.   The next paragraph, you cite to a 2002
18  U.S. State Department report -- or the report
19  cites to a 2002 U.S. State Department report as
20  support for the proposition that the Al-Aqsa
21  Martyrs Brigade was "Fatah's," correct?

Page 120

1      A.   Trying to read the -- so he's got,
2  "According to U.S. State Department"?
3      Q.   Yes.  Then the report states, "Fatah's
4  AAMB," correct?
5      A.   Uh-huh.  Yes.
6         MR. WISE:  Can you mark this for me.
7         (Defendants' Deposition Exhibit Number
8  248 was marked for identification.)
9         BY MR. WISE:
10     Q.   Professor, you're holding Exhibit 248,
11  correct?
12     A.   I am.
13     Q.   You recognize that as the document
14  cited in Footnote 4 on Page 14?
15     A.   I'm looking at my documents here.
16         (Witness Reviews Documents.)
17     A.   Yes, I see that.  Yes, uh-huh.
18     Q.   That is the document cited?
19     A.   Yes.
20     Q.   And if you turn to Page 3, that is
21  where the description of the Al-Aqsa Martyrs

Page 121

1  Brigade appears in that document?
2      A.   That is correct.
3      Q.   The actual language of the State
4  Department report was that Al-Aqsa, "Consists of
5  an unknown number of small cells of terrorists
6  associated with the Palestinian Fatah
7  organization," correct?
8      A.   Yes.
9      Q.   The State Department report cited in
10  the report that you signed did not state that the
11  Al-Aqsa Martyrs Brigade was part of Fatah,
12  correct?
13     A.   It just says -- it uses the word
14  "associated with."
15     Q.   Didn't use the word "part of,"
16  correct?
17     A.   No, it did not.
18     Q.   Did not say that Fatah controlled the
19  Al-Aqsa Martyrs Brigade, correct?
20     A.   It didn't use the word "controlled."
21     Q.   Or that the Al-Aqsa Martyrs Brigade

Page 122

1  was Fatah's, right?
2      A.  I don't see that there.
3      Q.  Would you acknowledge that that is a
4  distinction with a difference relevant to your
5  analysis?
6      A.  No.
7      Q.  To you, "association with" is the same
8  as "controlled by?"
9      A.  Can be.
10     Q.  You are associated with St. Mary's
11  University School of Law, correct?
12     A.  Yes.
13     Q.  Would you describe yourself as
14  controlled by the school?
15     A.  Can be.
16     Q.  In what way?
17     A.  If the dean tells me I've got a class
18  at 8, I've got a class at 8.
19     Q.  Okay.  When you go out in the public
20  speaking circuit and speak, are you being
21  controlled by St. Mary's?

Page 123

1      A.  Can be.
2      Q.  You, in fact, almost always start your
3  speeches with a disclaimer that you are not
4  speaking on behalf of St. Mary's, correct?
5      A.  That's control.  Yeah.  They want me
6  to say that, and that is control.  They want me
7  to make that very clear, so that is an element of
8  control over my freedom of speech.
9      Q.  Okay.  So is it your position now that
10  your employment with St. Mary's means that they
11  control you?
12     A.  To a degree, they do.
13     Q.  And did you engage in that type of
14  analysis as you agreed to what was written in
15  this report?
16     A.  I think this is an accurate
17  description.  I think there is a direct
18  association, link that at times is controlling,
19  certainly under the legal parameters, between
20  Fatah and the Martyrs Brigade.
21     Q.  And that conclusion is based on this

Page 124

1  State Department report that's cited, correct?
2      A.  That's one of the sources.
3      Q.  There are no other sources cited for
4  this sentence, are there?
5      A.  Again, if I had the time -- and again,
6  this, as you indicated, was researched over a
7  very quick period of time, as I recall now, when
8  I got that phone call in the morning.  It was a
9  lot of man hours to send back my comments.  So,
10  yeah -- I mean, it's --
11     Q.  When you say -- I'm sorry.
12     A.  So, yes.
13     Q.  When you say this report was
14  researched, do you have any knowledge of how the
15  person who penned that sentence went about
16  reaching the conclusion contained in it?
17     A.  I don't know the person.
18     Q.  So the answer is no?
19     A.  No.
20     Q.  The report that you signed also cites
21  to the designation of the Al-Aqsa Martyrs Brigade

Page 125

1  as a foreign terrorist in 2002 by the U.S.
2  Department of State, correct?
3      A.  Yes, the U.S. State Department made
4  that determination in 2002.
5      Q.  Has Fatah ever been designated as a
6  foreign terrorist organization by the State
7  Department?
8      A.  No.
9      Q.  What about the Palestinian Authority?
10     A.  Not to my knowledge.
11     Q.  Has the PLO ever been designated as a
12  foreign terrorist organization by the State
13  Department?
14     A.  Not in recent memory, not to my
15  knowledge.  There was some discussion several
16  decades ago, but not now.
17     Q.  And you know that the U.S. Government
18  allows the PLO to maintain offices in Washington,
19  D.C. and New York, correct?
20     A.  Correct.
21     Q.  Turning back to 248, the State

Page 126

1  Department report, later on in the description of
2  the Al-Aqsa Martyrs Brigade, the report states,
3  under the heading External Aid, "In the last
4  year, numerous public accusations suggest Iran
5  and Hizballah are providing support to al-Aqsa
6  elements, but the extent of external influence on
7  al-Aqsa as a whole is not clear."  Do you see
8  that?
9      A.   Yes, I do.
10     Q.   Do you know what the numerous public
11  accusations are?
12     A.   Do I know where they got this
13  information to write this sentence?  No.
14     Q.   Did you do any independent research to
15  verify the validity of any of the sources that
16  were cited in the initial report?
17     A.   Well, I have a basis of knowledge.
18  For example, Iran, a lot of basis of knowledge
19  about Iran's support to Hizballah, Hamas, other
20  terrorist organizations, so I have a -- you know,
21  just based on my general scholarship on the

Page 127

1  issue, I've got a wide basis.  It's not like the
2  issue of terrorism law is something that is
3  foreign to me.
4      Q.   Did you do any independent research to
5  verify the validity of any of the sources cited
6  in the initial report you signed?
7      A.   You mean additional independent --
8      Q.   Yeah.
9      A.   Well, yeah.
10     Q.   And what was that?
11     A.   Well, you'll see some of it reflected
12  in my rebuttal to the Robinson report.  I'd have
13  to get the other report out and go through it
14  with you, I guess.
15     Q.   Let's talk about just the initial
16  report.  Between when you received the drafts and
17  when you signed it, did you do any independent
18  research regarding the validity of the sources
19  cited in that report?
20     A.   Well, I found that the sources were
21  all mainstream sources, so, you know, you can

Page 128

1  pull TIME Magazine, you can look at the
2  resolutions.  I don't really have to double-check
3  whether the resolution is the correct resolution.
4  So, no.
5      Q.   Do you know whether the Al-Aqsa
6  Martyrs Brigade was mentioned in the State
7  Department's 2001 report?
8      A.   I can't recall.
9      Q.   This is an annual report that the
10  State Department puts out, correct?
11     A.   The State Department puts out an
12  annual report.
13     Q.   And have you researched the State
14  Department's subsequent statements about Al-Aqsa
15  Martyrs Brigade?
16     A.   Well, I have, and I can't recall right
17  now precisely which year I looked at and what the
18  language said because I've looked at CSR reports,
19  I've looked at resolutions, bills.
20         MR. WISE:  Can you mark that for me,
21  please.

Page 129

1         (Defendants' Deposition Exhibit Number
2  249 was marked for identification.)
3         BY MR. WISE:
4      Q.   Professor, that's 249.  I'll ask you
5  if you recognize that as the 2006 version of the
6  State Department report?
7      A.   It says 2007 at the top.
8      Q.   The date that it is produced, do you
9  know what that means in relation to what year the
10  report is covering?
11     A.   My only comment is I don't see where
12  it says 2006 on here.
13     Q.   Do you know, based on how the State
14  Department produces its reports, how the date of
15  publication relates to the time period the State
16  Department is covering?
17     A.   No.
18     Q.   Will you turn to Chapter 6.
19     A.   Do you know what page that would be
20  on?
21     Q.   Well, I'm trying to figure out how the

JEFFREY ADDICOTT DEPOSITION      October 2, 2013                    Sokolow v. the PLO

Page 130

1  page convention works.  The bottom says 2/35.
2      **A.   It's going to be near the back, right?**
3      Q.   It's about two-thirds of the way
4  through.  And I apologize that I don't have this
5  better marked.
6      **A.   I've got Chapter 6.**
7      Q.   Okay.  If you're at Chapter 6, then
8  turn to the second page of Chapter 6, and at the
9  bottom of the page you'll see a reference to
10  Al-Aqsa Martyrs Brigade.
11      **A.   I see it.**
12      Q.   In this report, the State Department
13  wrote under Description, "The al-Aqsa Martyrs
14  Brigade" -- strike that.
15          Look at the last sentence of the first
16  paragraph.  It states, "Al Aqsa has no central
17  leadership; the cells operate with autonomy,
18  although they remained ideologically loyal to
19  Palestinian Authority (PA) President and Fatah
20  party head Yasser Arafat until his death in
21  2004," correct?

Page 131

1      **A.   I'm sorry, I could not follow where**
2  **you were reading.**
3      Q.   I'm sorry.
4      **A.   I was on the first sentence you**
5  **started to read, and I was --**
6      Q.   Okay.  The third sentence of that
7  paragraph.
8      **A.   What's the title heading of it?**
9      Q.   "Description."
10      **A.   Okay.  Where it says, "Al Aqsa Martyrs**
11  **Brigade consists?"**
12      Q.   Right, that paragraph.
13      **A.   Okay.**
14      Q.   Look at the third sentence, which
15  starts, "Al-Aqsa has no central leadership."
16      **A.   It looks like the first sentence under**
17  **description is one long sentence.  You're under**
18  **Activities then.**
19      Q.   Let's read the whole description.
20  "The al-Aqsa Martyrs Brigades consists of
21  localized cells of Palestinian militias loyal to

Page 132

1  the secular-nationalist Fatah movement.  Al-Aqsa
2  emerged at the outset of the 2000 Palestinian
3  al-Aqsa Intifada, splitting from the Fatah party
4  to attack Israeli military targets and settlers
5  with the aim of driving Israel from the West Bank
6  and Gaza Strip and establishing a Palestinian
7  state.  Al-Aqsa has no central leadership; the
8  sells operate with autonomy, although they
9  remained ideologically loyal to Palestinian
10  Authority (PA) President and Fatah party head
11  Yasser Arafat until his death in 2004," correct?
12      **A.   Yes.**
13      Q.   Were you familiar with this State
14  Department report when you adopted your initial
15  report?
16      **A.   I'm familiar --**
17          MR. YALOWITZ:  Object to the form.
18      **A.   I'm familiar the State Department puts**
19  **out an annual report every year.  I'm familiar**
20  **with the Martyrs Brigade since their creation has**
21  **been in that report.  As to this specific report,**

Page 133

1  I can't recall.
2      Q.   Do you read the State Department
3  report when it comes out?
4      **A.   I generally do, yeah.**
5      Q.   But you can't recall whether you were
6  aware of that specific finding in March of this
7  year?
8      **A.   I know I've read it, but how deeply it**
9  **registered, I can't tell you.**
10      Q.   A little bit later in this same
11  report, I believe under the description of
12  External Aid on the next page, the report states,
13  "Iran has exploited al-Aqsa's lack of leadership
14  and funds by providing aid and exerting influence
15  over the organization," correct?
16      **A.   That's what it says.**
17      Q.   Do you know what that is a reference
18  to?
19      **A.   Well, it's common knowledge that Iran**
20  **provides support to terrorist organizations**
21  **around the world.  They do it every year.  And**

JEFFREY ADDICOTT DEPOSITION    October 2, 2013    Sokolow v. the PLO

Page 134

1  obviously if they see an opportunity to increase
2  their influence, they will take that opportunity,
3  as we're seeing today in Syria.
4      Q.   And in Syria, they're exerting
5  influence because of a lack of leadership,
6  correct, in Syria?
7      A.   Well, they're actually supporting the
8  regime, so I think there is leadership.  I
9  wouldn't say there's a lack of leadership, no.
10  Assad is still firmly in power.
11      Q.   In the State Department report about
12  Al-Aqsa Martyrs Brigade, when it refers to
13  exploiting Al-Aqsa's lack of leadership, do you
14  know what that's a reference to?
15      A.   Well, I would assume, as you can see
16  from this State Department, they don't use the
17  word "associated" anymore, so they're recognizing
18  that the Brigade doesn't have the influence it
19  once had.  And so Iran obviously -- whoever wrote
20  this report is coming to the conclusion that Iran
21  sees it as an opportunity to increase its

Page 135

1  influence over this terrorist organization.
2      Q.   You said that was your assumption,
3  correct?
4      A.   You asked me for my assumption, yeah.
5      Q.   I think I asked you for the basis of
6  your opinion.
7      A.   Well, you asked me for the basis of
8  this guy's opinion.  I don't know.
9      Q.   You haven't spoken to the author of
10  the report?
11      A.   No.  I would agree with it.
12      Q.   What would your basis for agreeing
13  with it be?
14      A.   I've been doing this stuff for 13
15  years --
16      Q.   So what is your --
17      A.   -- looking at terrorist organizations,
18  how they operate, how they function, how they
19  behave, and this is what I would expect to see.
20      Q.   And what can you tell us about Iran's
21  exploitation of the lack of Al-Aqsa leadership in

Page 136

1  2006, 2007?
2      A.   Well, it's a general principle.
3  Iran's a state sponsor of terrorism.  They look
4  for opportunities to exploit the use of
5  terrorism.  And if they perceive that that's an
6  opportunity for them to have more influence in
7  the region, then they will take advantage of it.
8  That's what they've been doing for years, with
9  not just this Brigade, but with other terrorist
10  organizations.
11      Q.   Later on, on Page 14, the report cites
12  to a March 21st, 2002 Al-Aqsa Martyrs Brigade, or
13  AAMB, suicide bomber who "detonated himself in
14  the middle of a crowded street in Jerusalem,
15  killing three and injuring 86," correct?
16      A.   Yes.
17      Q.   Do you know what the basis for that
18  sentence in the report was?
19      A.   Well, the basis for that particular
20  sentence, I believe the footnote used was from
21  the Israeli Minister of Foreign Affairs, which I

Page 137

1  have a copy here.
2      Q.   Let me hand you what I'll have marked.
3      A.   This was also reported in the
4  mainstream media, of course.
5      (Defendants' Deposition Exhibit Number
6  250 was marked for identification.)
7      BY MR. WISE:
8      Q.   That is the document cited in Footnote
9  6, correct?
10      A.   Yes, that's the document cited in
11  Footnote 6.
12      Q.   Do you see a reference in that
13  document to the March 21st bombing that's
14  described in the report?
15      A.   Well, I see the report.  I see the
16  document.
17      Q.   Would you agree there's no reference
18  in that document to the March 21st?
19      A.   That appears to be a mistake in the
20  footnote.
21      Q.   In the highlighted document you have

**JEFFREY ADDICOTT DEPOSITION**     **October 2, 2013**     **Sokolow v. the PLO**

Page 138

1  in front of you, did you catch that mistake in
2  the footnote when you reviewed these materials
3  before you signed your report?
4      **A.   No, I didn't catch that mistake.**
5      Q.   I'm handing you Defendants' Exhibit
6  210, which was previously marked.  You recognize
7  this as the 2002 State Department Patterns of
8  Global Terrorism report?
9      **A.   Yes, I do.**
10     Q.   I'd ask you to turn to Page 85 of this
11  document.
12     **A.   Okay.**
13     Q.   Middle of the page, if you'd look at
14  the date of 21 March?
15     **A.   Yes.**
16     Q.   The State Department report states,
17  "In Jerusalem, a suicide bomber detonated the
18  explosive device he was wearing, killing three
19  persons and wounding 86 others, including two
20  U.S. Citizens, according to U.S. Consulate and
21  media reporting.  The Palestinian Islamic Jihad

Page 139

1  claimed responsibility."  Do you see that?
2      **A.   I do see that, yes.**
3      Q.   Were you aware of the Palestinian
4  Islamic Jihad's claim of responsibility when you
5  signed the report on March 23rd?
6      **A.   I see this report indicates that that**
7  **is their conclusion.**
8      Q.   Does seeing that section of the report
9  cause you to question the accuracy of what is in
10  the report that you signed?
11     **A.   There appears to be a contradiction**
12  **between the name of the organization.  But, of**
13  **course, the Palestinian Islamic Jihad are closely**
14  **related as a terrorist group to the Martyrs**
15  **Brigade.  I mean, that's not an error that's, in**
16  **my opinion, that is -- I mean, you've got two**
17  **different groups that conducted the attack, if**
18  **it's to be taken.**
19         **But in the main, it doesn't alter my**
20  **opinion about the responsibility of Fatah, PLO**
21  **and Yasser Arafat for whichever group engaged in**

Page 140

1  the suicide attack.
2      Q.   What is, in your view, the
3  relationship between Palestinian Islamic Jihad
4  and the Al-Aqsa Martyrs Brigade?
5      **A.   I would look at the relationship**
6  **between the PA, Palestinian Authority, and Yasser**
7  **Arafat in these various organizations.**
8  **Organizations are merely groups that have**
9  **splintered out that have an association with the**
10  **PLO, Yasser Arafat and Fatah.**
11     Q.   Palestinian Islamic Jihad is a group,
12  in your view, that splintered out from the
13  Palestinian Authority, Fatah and the PLO?
14     **A.   They're a group that's associated with**
15  **them.**
16     Q.   What is the association?
17     **A.   Well, again, that question is really**
18  **part of a larger question.  What is the**
19  **association of these terrorist units vis-a-vis**
20  **Yasser Arafat, PLO.**
21     Q.   Aside from being Palestinian, what

Page 141

1  else ties the Palestinian Islamic Jihad to the
2  PLO, PA or Fatah?
3      **A.   Well, I would say they are tied**
4  **together by the common thread of their goals.**
5      Q.   What is the common thread of their
6  goals?
7      **A.   The common thread of their goals**
8  **basically is to -- if you look at the charter of**
9  **the PLO, it's to regain territories that they**
10  **believe belong to them.**
11     Q.   And what is the charter of the
12  Palestinian Islamic Jihad.
13     **A.   It's similar.**
14     Q.   What is your basis for saying it?
15     **A.   I haven't looked at it in quite some**
16  **time, but I would imagine this is similar.**
17     Q.   But you have looked at it.
18        (Witness pauses.)
19     **A.   I cannot recall specifically, to tell**
20  **you the truth.  I'm sure that I would have looked**
21  **at it.**

Page 142

1    Q.   Why do you say you're sure you would
2  have looked at it?
3    **A.   I looked at a lot of paper.**
4    Q.   Let's go back, and if I repeat, I
5  apologize.  I was inquiring about your basis for
6  the contention that the Palestinian Islamic Jihad
7  is associated with the PA, the PLO and Fatah.
8    **A.   Yeah, I was just looking at the big**
9  **picture, and you have a variety of splinter**
10  **groups, some more closely associated with Fatah,**
11  **PLO, PA and others.**
12    Q.   And is it your view that the
13  Palestinian Islamic Jihad is closely associated
14  with the PA, the PLO or Fatah?
15    **A.   It's a matter of degree.**
16    Q.   Okay.  Well, tell me how you would
17  define the degree to which Palestinian Islamic
18  Jihad is associated with the PA, PLO and Fatah.
19    **A.   I would define it based on the legal**
20  **culpability.**
21    Q.   And what facts establish that legal

Page 143

1  culpability, in your mind?
2    **A.   Whether the PLO, Fatah, aka the**
3  **Palestinian Authority, have solicited these**
4  **organizations, inspired them, directed them,**
5  **supported them to engage in acts of terrorism.**
6    Q.   So what evidence do you have that the
7  PA has solicited Palestinian Islamic Jihad to
8  commit terrorist attacks?
9    **A.   Well, as you've seen in the reports,**
10  **both of them, we've got numerous statements for**
11  **calls to Jihad to the Palestinian people, which**
12  **includes these terrorist organizations.  That's**
13  **just one source.**
14    Q.   What else?
15    **A.   Well, you would have the Palestinian**
16  **Authority control of the media, where they allow**
17  **people to get on the media, such as the Grand**
18  **Motif of Jerusalem, calling for Jihad, glorifying**
19  **martyrdom, and that incites these groups.  So you**
20  **can't escape responsibility as the leader of the**
21  **Palestinian people by saying, "Well, I don't know**

Page 144

1  **what impact those statements are going to have."**
2    Q.   So in your view, that's the
3  solicitation that the PA has made of Palestinian
4  Islamic Jihad to commit terrorist attacks?
5    **A.   At the minimum level.  And then, of**
6  **course, you have direct links, where I would draw**
7  **a closer tie with the Martyr Brigade.**
8    Q.   Tell me about the direct links between
9  the Palestinian Authority and Palestinian Islamic
10  Jihad.
11    **A.   Well, direct links are hard to**
12  **ascertain because that's the very nature.  That's**
13  **where my expertise falls into, is the framework.**
14  **You would expect that the government, the ruling**
15  **authority, the PLO, would not claim direct**
16  **responsibility.  You would not expect to see**
17  **that.  You would expect them to incite, to use**
18  **these groups to do their bidding on the one hand,**
19  **while on the other hand holding out the olive**
20  **branch of peace, and we're trying to do**
21  **everything we can.  So you would expect that**

Page 145

1  **duplicity to be evident, particularly in times of**
2  **violence.**
3    Q.   Can you point to a single specific
4  event that, according to you, shows that the
5  Palestinian authority was soliciting Palestinian
6  Islamic Jihad to commit a terrorist attack?
7    **A.   Yes.**
8    Q.   Please do.
9    **A.   It's in my report.**
10    Q.   Identify it for me.
11    **A.   I can read it for you.  These would be**
12  **the statements that are made, they're allowed to**
13  **be made on the Palestinian media networks --**
14    Q.   Do any of those statements reference
15  Palestinian Islamic Jihad specifically?
16    **A.   They do not reference any terrorist**
17  **organization specifically, and that's the beauty**
18  **of it.  That's what they do.  Therefore, they can**
19  **have it both ways.  This is what you would expect**
20  **to see.**
21    Q.   The other incident on Page 14 is an

Page 146

1  incident that -- I'll wrap up this question --
2  cites to Footnote 6. The sentence says, "Less
3  than" --
4      A.   I'm sorry. Let me go back to it.
5  Page 14?
6      Q.   Page 14.
7      A.   Yes.
8      Q.   "Less than three weeks earlier,
9  another Al-Aqsa Martyrs Brigade suicide bomber
10  had killed 10 and injured 50 at a bar mitzvah
11  celebration, Footnote 6."
12      A.   That's correct.
13      Q.   That's the article that we looked at
14  earlier that is Number 250, correct?
15      A.   Right.
16      Q.   Other than that news report, is there
17  any other source for the tie of Al-Aqsa Martyrs
18  Brigade to that incident?
19      A.   Well, this is a Reuters report, I
20  believe, but I'm sure that if you Googled this
21  incident, you would have numerous mainstream

Page 147

1  media newspapers that reported that same
2  incident.
3      Q.   You believe 250 is a Reuters report?
4      A.   Well, I'm reading down here at the
5  bottom. It says, "2002 Reuters/Cohen Magen.
6  Members of funeral service search a baby carriage
7  for body parts at scene of suicide bombing."
8          So as you know -- you may not know,
9  but many of these news reports get feeders from,
10  you know, from different news services, and then
11  they provide that to different newspapers who
12  pick up the story, but the origin --
13      Q.   Look at 250 with me, the one I handed
14  you, that's marked in front of you.
15      A.   250, okay.
16      Q.   Is that the same document that you
17  have in your notebook?
18      A.   It appears that your document is
19  missing some information.
20      Q.   What information is my document
21  missing?

Page 148

1      A.   The caption is cut off, the one I just
2  read, where it says, "Members of funeral service
3  search a baby carriage for body parts at scene of
4  suicide bombing," it appears to be in the same
5  type and font as, "2002 Reuters/Gil Cohen Magen."
6          MR. YALOWITZ: If you won't object, we
7  can point the witness to the second page. I
8  think we just have a pagination issue.
9          MR. WISE: That's fine.
10      Q.   Yeah, look at the second page.
11      A.   Oh, okay. So there it is. That's
12  comforting.
13      Q.   Turn back to the front page.
14      A.   Yes.
15      Q.   The header on the front page of the
16  document says, "Israel Ministry of Foreign
17  Affairs," correct?
18      A.   Yes.
19      Q.   What is the Israel Ministry of Foreign
20  Affairs?
21      A.   It's the Israel Minister of Foreign

Page 149

1  Affairs.
2      Q.   What does it do?
3      A.   I assume that the Ministry does what
4  it says it does. It conducts foreign affairs for
5  the State of Israel.
6      Q.   Other than assuming based on its name,
7  do you know what the Ministry of Foreign Affairs
8  does?
9      A.   I've never worked there. I don't.
10  No. I don't know.
11          (Brief Recess.)
12          BY MR. WISE:
13      Q.   So before we go back into your report,
14  let me just ask you a couple of things. First of
15  all, during the breaks, have you been speaking
16  with anybody about the substance of your
17  testimony?
18      A.   No.
19      Q.   Earlier you described something that
20  you called the discipline of terrorism law?
21      A.   Yes.

Page 150

1    Q.    First of all, that's a discipline that
2  you, yourself, have created, right?
3    A.    I helped create it.
4    Q.    Can you describe to me the process of
5  creating it?
6    A.    Well, I'll go back to the beginning.
7  Congress passed a law in the 1980s that said that
8  every special forces group had to have an
9  attorney assigned to it, and I was a new JAG
10 officer captain, and I volunteered for that
11 position, so I was assigned to the first special
12 forces group.  We had never had JAG lawyers that
13 accompanied soldiers in the field before.  In
14 Vietnam, we had a couple of extraordinary cases
15 where that occurred, but the new discipline
16 required that the JAG officers would accompany
17 combat forces into the field, and so I went
18 through the training and did that for a special
19 forces group out of Ft. Lewis, directed towards
20 Asia.
21     Based on that experience, because it

Page 151

1  was so new, they recruited me to go back to the
2  JAG School to teach, and that's where I started
3  teaching operational law, which was recognized as
4  a new discipline, and part of that was dealing
5  with, not just conventional warfare, but
6  asymmetrical warfare and terrorism and those
7  types of issues because of the experiences we had
8  had in the '80s, of course, with Libya and other
9  terrorist organizations and the bombing of the
10 Twin Towers in 1993, which, of course, was later,
11 but that kind of drove the discipline.
12     I picked up an extra degree from the
13 grandfather of national security laws, John
14 Norton Moore, the University of Virginia Law
15 School.  You're familiar with him.  He's really
16 credited for starting this discipline, national
17 security law, at the American Bar Association.  I
18 was on the ground for all of that.  I got my
19 master's of law from UVA at that time.
20     When I went to the Pentagon, I got my
21 doctorate of political science, which I knocked

Page 152

1  out in about a year and a half, based on my
2  experiences with terrorism organizations in Peru,
3  which I have a lot of experience with that.
4      So from there, I think we've already
5  covered that part of my career, in 2000 I go to
6  the law faculty of St. Mary's.  After 9/11, I
7  went to the dean and proposed that we create a
8  Center to look at all the legal issues associated
9  with terrorism, and "The War on Terror."  The
10 dean agreed, and we had Senator John Cornyn come
11 and cut the ribbon to our Center in 2003.
12     I coined the phrase "terrorism law," I
13 guess probably right after 9/11, and today, if
14 you Google the term "terrorism law," thousands of
15 things will pop up, all the way from the ABA
16 recognizing that as a legal discipline, to, you
17 know, institutes, organizations all over the
18 place.  But it's a subset of national security
19 law.  It deals with state-sponsored terrorism,
20 state-supported terrorism, substate terrorism,
21 lone wolf terrorism, looks at how these things

Page 153

1  develop, how they're used as a tool, a policy
2  tool, political tool, an ideological tool, and so
3  that's what our Center does.
4      But it's an interdisciplinary
5  discipline that looks at the framework, the
6  creation, the behavior of governments and
7  organizations that use terrorism as a tool.
8    Q.    The discipline of terrorism law itself
9  started with your institute at St. Mary's; is
10 that fair to say?
11   A.    We're the only law school in the
12 country that has an institute that's devoted to
13 the study of terrorism law.  That's correct.
14   Q.    How many other law schools in the U.S.
15 Teach a course on terrorism law?
16   A.    Well, I know -- I have, obviously,
17 relations with other law professors and law
18 schools across the country.  I know that
19 University of Virginia has a national security
20 course that they teach, and part of that course
21 deals with the issue of terrorism.

**JEFFREY ADDICOTT DEPOSITION    October 2, 2013**    **Sokolow v. the PLO**

Page 154

1    I know that Duke in North Carolina,
2  under a fellow by the name of Silliman has an
3  institute that teaches terrorism.
4    Most law schools do not teach courses
5  in national security or terrorism. I teach a
6  course on terrorism law and national security
7  law. So there are other law schools that do
8  that, but the majority of them do not.
9    Q.   Do you have a printed syllabus for
10  your course on terrorism law?
11    A.   Yes, I do.
12    Q.   And does that course include a section
13  on the Palestinian Authority?
14    A.   No.
15    Q.   Or Fatah?
16    A.   No.
17    Q.   Or the Second Intifada?
18    A.   No.
19    Q.   Let's go back to Page 14 of Exhibit
20  238, specifically the sentence that begins on the
21  end of 14 and then continues onto 15.

Page 155

1    A.   I'll look at your original document
2  here.
3    Q.   238 is your report.
4    A.   Page 14?
5    Q.   Yes. Starts on the bottom of 14 and
6  then continues to Page 15.
7    A.   Okay.
8    Q.   It says, "Indeed, one commander in
9  Tulkarem acknowledged, 'We receive our
10  instructions from Fatah. Our commander is Yasser
11  Arafat himself.' Footnote 7." Do you see that?
12    A.   Uh-huh, yes.
13    Q.   I'm going to show you what's been
14  previously marked as Defendants' Exhibit 184 and
15  ask you if you recognize that as the document
16  cited in Footnote 7?
17    A.   Yes.
18    Q.   You see the quote that's in the report
19  in this article?
20    A.   Yes.
21    Q.   And who is the speaker, according to

Page 156

1  the article?
2    A.   It would be -- well, according to the
3  article? I'll have to read the article here.
4    Q.   Let me ask you this: Did you ever
5  speak with the author of this article?
6    A.   Matthew Kalman?
7    Q.   Yes.
8    A.   I don't recall.
9    Q.   Do you know who he is?
10    A.   The name sounds familiar.
11    Q.   Any recollection of speaking with him
12  about this particular article?
13    A.   No, not this article.
14    Q.   Okay. If you'll look at the first
15  paragraph leading down to the quote that's cited
16  in the report, do you see that the speaker is
17  identified, by the article, at least, as Maslama,
18  M-A-S-L-A-M-A, Thabet, T-H-A-B-E-T?
19    A.   I see that name on the USA Today
20  article.
21    Q.   Other than seeing the name in the USA

Page 157

1  Today article, do you know who Maslama Thabet is?
2    A.   I've never met him.
3    Q.   Have you ever spoken with anyone about
4  him?
5    A.   Have I spoken with anyone about him?
6    Q.   Yes.
7    A.   No.
8    Q.   Do you know whether he is, in fact, a
9  "Commander with the Al-Aqsa Martyrs Brigade"?
10    A.   I know what's in the article in
11  regards to this gentleman.
12    Q.   Other than what's in the article about
13  Maslama Thabet?
14    A.   No.
15    Q.   Do you see the paragraph, second full
16  paragraph from the end?
17    A.   From the end of the article?
18    Q.   No, from the end of the first page.
19    A.   Okay. Second full paragraph. Oh,
20  yes.
21    Q.   Paragraph starts with, "Spokesmen for

Page 158

1  Arafat." See that?
2     A.  Yes.
3     Q.  The second sentence, do you know who
4  Nabil Abu Rudeineh is?
5     A.  Well, the article says he's Arafat's
6  chief spokesman.
7     Q.  Do you have any reason to believe that
8  is not the case?
9     A.  No.
10    Q.  Other than what is reported in the
11 article, do you have any other knowledge of Mr.
12 Rudeineh?
13    A.  No.
14    Q.  Do you see where the article quotes
15 Mr. Rudeineh, saying he's never heard of Thabet?
16    A.  Yes.
17    Q.  That is not included in the report you
18 signed, correct?
19    A.  No.
20    Q.  Are you familiar with a group called
21 Human Rights Watch?

Page 159

1     A.  Oh, yes.
2     Q.  What is that?
3     A.  It's NGO.
4     Q.  Just for the record, what does NGO
5  stand for?
6     A.  Non-Governmental Organization.
7     Q.  And what does Human Rights Watch do?
8     A.  Well, they produce opinions about the
9  compliance of various nations in regards to human
10 rights.
11    Q.  Do you view Human Rights Watch as a
12 reputable organization?
13    A.  I view them as an NGO.  I've had some
14 experiences with them that would cause me to
15 question their methodology.
16    Q.  Can you describe those experiences for
17 me?
18    A.  Well, as I indicated, I had a great
19 deal of experience in Peru in the 1990s
20 associated with Sendero Luminoso, S-E-N-D-E-R-O,
21 Luminoso, L-U-M-I-N-O-S-O, which in English is

Page 160

1  The Shining Path.  This was a Marxist terrorist
2  organization founded by a university professor in
3  Ayacucho that was trying to overthrow the
4  Peruvian Government.  And Human Rights Watch, in
5  my opinion, was very disingenuous in how they
6  covered the human rights issues in Peru in the
7  1990s.
8     Q.  Any experiences with Human Rights
9  Watch in relation to Israel or Palestine or --
10    A.  Personally, no.
11    Q.  -- events in the Second Intifada?
12    A.  No, sir.
13    Q.  I'm going to show you what has
14 previously been marked as Defendants' Exhibit
15 185.  Do you recognize what that is?
16    A.  That appears to be the Human Rights
17 Watch report.
18    Q.  Have you ever seen this document
19 before?
20    A.  I've seen references to the document
21 before, yes.

Page 161

1     Q.  Where?
2     A.  I believe it's in the Robinson report.
3  I'm going to have to check my notes.
4     Q.  As a result of those references, have
5  you reviewed this report?
6     A.  I haven't read the report, no.
7     Q.  Have you read the sections that
8  Robinson cites in his report?
9     A.  No, I didn't read all of his
10 footnotes.
11    Q.  Turn, if you would, to -- actually,
12 let's start with the back side of the third page,
13 and you will see something called, "About This
14 Report."
15    A.  The back side of the third page.  I'm
16 not finding it.  Is it after the Table of
17 Contents?
18    Q.  No, right before the Table of
19 Contents.
20    A.  Oh, yes, I see it.
21    Q.  The first paragraph of the About This

Page 162

1  Report section states, "This report is based on
2  field research, expert and witness interviews,
3  and examination of public documents.  Field
4  research was carried out during two Human Rights
5  Watch investigative missions to Israel, the West
6  Bank, and the Gaza Strip in May-June 2002.
7  During these visits, Human Rights Watch
8  interviewed members of armed groups, victims,
9  families of perpetrators, PA officials, current
10  and former PA security officers, Israeli and
11  Palestinian analysts and security experts,
12  diplomats and other foreign officials, and
13  Palestinian activists and militants."
14      Assuming that statement of methodology
15  is correct, is this the type of report that you
16  would rely on in forming your opinions about the
17  subject matters you have opined on in this case?
18      **A.  I would consider them a secondary**
19  **source at best.**
20      Q.  Why at best?
21      **A.  As I said, I've had personal**

Page 163

1  **experiences with Human Rights Watch that I know**
2  **to be false.**
3      Q.  Would you consider a source like Human
4  Rights Watch to be more, less than, or similarly
5  credible as Israeli Government reports?
6      **A.  No.  I'd consider the Israeli**
7  **Government reports to be far superior.**
8      Q.  What about accounts in newspaper
9  articles?
10      **A.  Superior.**
11      Q.  Why?
12      **A.  I view them as more fair and balanced**
13  **than Human Rights Watch.  My opinion, Human**
14  **Rights Watch has an agenda.**
15      Q.  And that's based on your experience
16  with them in Peru, correct?
17      **A.  Based on my experience with them over**
18  **several years associated with the terrorist**
19  **activities in Peru.**
20      Q.  Go with me, if you would, to Page 81
21  of this report.  I'll call your attention

Page 164

1  specifically to the Footnote 217, which reads,
2  "Israel has made public a February 2002 memo
3  ("memo to Tirawi") from the head of the PA's
4  General Intelligence Services (GIS) in Tulkarem,
5  which refers to Maslama Thabet as 'an outcast'
6  among the al-Aqsa Brigades fighters there.  (The
7  "memo to Tirawi" is analyzed in detail in Section
8  7, below.)"
9      Do you know who Tirawi is?
10      **A.  No, I don't.**
11      Q.  Do you know what the circumstances of
12  Israel making public this memo?
13      **A.  I am not familiar with that memo.**
14      Q.  Does the citation to the memo and its
15  reference to Maslama Thabet affect your reliance
16  or your evaluation of the quote in the USA Today
17  article?
18      **A.  As I said, I would give more weight to**
19  **the USA Today article than the Human Rights Watch**
20  **report, just based on my personal experiences**
21  **with Human Rights Watch.**

Page 165

1      Q.  Okay.  So you don't know the
2  circumstances of the writing of the memo
3  referenced, correct?
4      **A.  I have not seen the memo.**
5      Q.  You don't know the circumstances of
6  Israel's release of the memo, correct?
7      **A.  Correct.**
8      Q.  You previously said that when the
9  Israeli Government makes statements, you credit
10  them because they come from the Israeli
11  Government, right?
12      **A.  That's correct.**
13      Q.  Do you distinguish between statements
14  made and documents released?
15      **A.  No, I would give them weight, as I**
16  **indicated, but I don't know in this -- I haven't**
17  **seen the memo.  I don't -- obviously Human Rights**
18  **Watch is interpreting this memo in a way that**
19  **they want to interpret the memo.  I'd have to**
20  **read the memo so I can make up my own assessment.**
21      Q.  Do you know whether this memo was

**JEFFREY ADDICOTT DEPOSITION      October 2, 2013      Sokolow v. the PLO**

Page 166

1  cited in the Robinson report?
2      A.  I'd have to look at his report.  I
3  seem to think it might have been.  I'd have to
4  look at it again.
5      Q.  But you didn't make any effort to
6  locate this memo itself to review it
7  independently?
8      A.  No.
9      Q.  Page 13 of your initial report, in the
10  paragraph that starts at the bottom and finishes
11  on Page 14, your report cites to a piece by
12  Matthew Levitt, correct?
13      A.  The paragraph where it says, "In his
14  attempt"?
15      Q.  Yes.
16      A.  And you're talking of Footnote 3?
17      Q.  Yes.
18      A.  Yes.
19      Q.  So in this paragraph, your report
20  alleges that, "Arafat began to wield Islamic
21  rhetoric similar to that of Hamas."  Correct?

Page 167

1      A.  Yes, that's what it says.
2      Q.  "He made Jerusalem, perhaps the lowest
3  common denominator among Palestinians, a focal
4  point of the violence."  Correct?
5      A.  That's what I believe.
6      Q.  What do you mean by "lowest common
7  denominator"?
8      A.  Well, it's the one issue that he felt
9  would unite individuals.  It's a religious issue.
10  As I indicated before, that's what -- when they
11  incorporate these slogans and symbols, Jerusalem
12  is a symbol, if you will, not a slogan.  There
13  are several holy places there related to Islam,
14  so that's the symbol.
15      Q.  Any other basis for the opinion that
16  it's the lowest common denominator among
17  Palestinians?
18      A.  Well, the basis would be the rhetoric
19  that's put out by a variety of individuals about
20  their attachment to Jerusalem as being something
21  that would be associated with martyrdom.  This is

Page 168

1  not a new theme.
2      MR. WISE:  I'm going to show you --
3  I'm going to hand you what's 251.
4      (Defendants' Deposition Exhibit Number
5  251 was marked for identification.)
6      BY MR. WISE:
7      Q.  Do you recognize Exhibit 251 as the
8  document cited in Footnote 3?
9      MR. YALOWITZ:  I'm sorry, my copy only
10  has what looks like one page out of --
11      MR. WISE:  Yeah, that will be my next
12  question.
13      A.  Okay.  So let me -- we're looking at
14  Footnote 3?
15      Q.  Looking at Footnote 3.
16      A.  Okay.
17      Q.  So my first question is this:  What
18  I've handed you as 251 is what we've received
19  from the plaintiffs' counsel related to this
20  exhibit.  Have you reviewed Mr. Levitt's entire
21  piece?

Page 169

1      A.  I don't have it in front of me here.
2  I reviewed this back in my office.
3      Q.  You think you reviewed the entire
4  piece?
5      A.  Well, I can't recall right now, no.
6  When I can't recall, I'm not saying no.  I just
7  can't recall.
8      Q.  If you look at the end of the first
9  full paragraph on the second page of the exhibit
10  I've handed you, you see the quotation, "We are
11  marching, million of martyrs to Jerusalem"?
12      A.  Yes.
13      Q.  And that is the quote that is included
14  in the report you signed, right?
15      A.  That's the one in my report, yes.
16      Q.  A conclusion in your report, based on
17  that quotation, is that Arafat was wielding
18  Islamic rhetoric similar to that of Hamas,
19  correct?
20      A.  Well, yes, that's my conclusion.  It's
21  the same they're -- he's using the symbols and

Page 170

1  the rhetoric of Jihad.
2      Q.   And are you referring to the use of
3  the word "martyr" their?
4      A.   Yes.
5      Q.   Okay.  What is your definition of the
6  word "martyr"?
7      A.   Well, a martyr is someone that dies in
8  Jihad.
9      Q.   And what is Jihad?
10     A.   In this context, it would be to engage
11 in violence, unlawful violence, of course, that's
12 what terrorism is, against other individuals.
13 They're apostate or they categorize them, of
14 course, as infidels.
15     Q.   So a martyr is one who engages in
16 unlawful violence against others, correct?
17     A.   Well, you kill yourself.  I mean,
18 that's part of the ingredient.  You martyr
19 yourself.  You kill yourself for the cause.
20     Q.   Is there any other definition of
21 martyr that you know of that would not involve

Page 171

1  acts of violence?
2      A.   From the context of the rhetoric that
3  was employed by Arafat, I would say no, that's
4  exactly what he was intending to be the response.
5      Q.   In all of your other work, has there
6  ever been the term "martyr" used that didn't have
7  a connotation of unlawful violence?
8      A.   I suppose it can.
9      Q.   Can you give me an example?
10     A.   Well, in the English language you
11 would say that, you know, you've martyred
12 yourself by doing the dishes.  It just shows that
13 you're doing something as a sacrifice or as
14 something that you want people to recognize what
15 you're doing.
16     Q.   Did Arafat ever use the term "martyr,"
17 in your view, in a way that did not connote an
18 act of violence by the person called a martyr?
19     A.   I've never met Yasser Arafat.  I can't
20 say never, no.  I don't know.
21     Q.   Let's turn back to this instance that

Page 172

1  you've included in your report.
2      A.   Right.
3      Q.   There's no question in your mind that
4  here, Arafat is using "martyr" to describe
5  someone involved in unlawful violence, correct?
6      A.   Yes.
7      Q.   The quotes attributed to Arafat on
8  this page of Mr. Levitt's piece are translated by
9  the Middle East Media Research Institute,
10 correct?
11     A.   Yes.
12     Q.   Have you ever heard of the acronym
13 MEMRI?
14     A.   I believe that was standing for the
15 Institute.
16     Q.   Have you heard that acronym used?
17     A.   I'm sure I have.  I don't recall.
18     Q.   Do you know what MEMRI is?
19     A.   I would assume it stands for the
20 institute you just described, Middle East Media
21 Research Institute.

Page 173

1      Q.   Do you know what that institute does?
2      A.   I've never visited the institute.
3      Q.   I take it you do not, yourself, speak
4  Arabic?
5      A.   No, I don't.
6      Q.   And other than what you see on this
7  page, do you have any other knowledge regarding
8  this speech by Mr. Arafat?
9      A.   I know that the speech has been quoted
10 in other articles, but no.  Other than that, no.
11     Q.   The middle of this page includes the
12 sentence in the middle.
13     A.   In the middle, okay.
14     Q.   "Arafat continued:" -- you see where I
15 am?
16     A.   Yes, I sure do.
17     Q.   "Arafat continued: 'The martyr
18 Muhammad al-Dura [a twelve-year-old boy killed in
19 cross-fire between Israeli and Palestinian
20 forces] says to [the Jews] from paradise, and all
21 of our martyrs tell them:  We are the nation of

**JEFFREY ADDICOTT DEPOSITION**    October 2, 2013    Sokolow v. the PLO

Page 174

1  heroes.'"  Do you see that?
2    **A.  Uh-huh.**
3    Q.  First of all, the brackets were added
4  by MEMRI, correct?
5    **A.  They're added by someone.**
6    Q.  You don't know who, though?
7    **A.  No.**
8    Q.  Based on the quotation that you see
9  there, you'd agree with me that Arafat was
10 referring to Muhammad al-Dura as a martyr,
11 correct?
12   **A.  Yes.**
13   Q.  Who is Muhammad al-Dura?
14   **A.  According to the bracket, he is a**
15 **12-year-old boy killed in cross-fire and, of**
16 **course, this story was reported, as I recall,**
17 **years ago.  He was a symbol that was used to**
18 **incite other individuals, as this indicates here.**
19   Q.  He was used to incite other
20 individuals?
21   **A.  My opinion, yes.**

Page 175

1    Q.  He was a 12-year-old boy, right?
2    **A.  Right.**
3    Q.  Killed in cross-fire?
4    **A.  Yes.**
5    Q.  No indication that Muhammad al-Dura
6  blew himself up, right?
7    **A.  No.**
8    Q.  Or committed an act of violence,
9  correct?
10   **A.  No.**
11   Q.  And Yasser Arafat refers to him in
12 this quote as a martyr, right?
13   **A.  Correct.  As I said, he was used.**
14   Q.  So this is an instance, you'd agree
15 with me, where Arafat used the term "martyr" to
16 describe someone who was not himself committing
17 acts of violence, right?
18   **A.  He used the boy to incite others to**
19 **commit acts of violence.**
20   Q.  And that's why Arafat was calling him
21 a martyr, in your opinion?

Page 176

1    **A.  Oh, yeah.**
2    Q.  Because he knew he was going to use
3  the boy to incite acts of violence by others?
4    **A.  Absolutely.**
5    Q.  What's your basis for that opinion?
6    **A.  The statement itself.**
7    Q.  Tell me what part of the statement
8  supports that conclusion.
9    **A.  Common sense.**
10   Q.  What part of common sense?
11   **A.  The common sense part of common sense.**
12   Q.  Describe for me what common sense part
13 of common sense leads you to draw that opinion.
14   **A.  Well, it's not just this one**
15 **statement.  You're looking at other statements**
16 **that people associated with Arafat have made, as**
17 **I've covered in my report.  You're looking at**
18 **other statements that Arafat has made about his**
19 **desire to be a martyr, you know, to die for the**
20 **cause, so this is not just one statement.  You**
21 **look at the entire picture, and then common sense**

Page 177

1  **will tell you this is exactly what he's trying to**
2  **do.**
3    Q.  Which is what in relation to this
4  12-year-old boy?
5    **A.  Incite the crowd and individuals**
6  **within the crowd or others to engage in**
7  **martyrdom, terrorist activities.**
8    Q.  That's the conclusion you draw from
9  that sentence?
10   **A.  That sentence, plus the context, plus**
11 **all the other evidence that you put together.**
12 **That's what Arafat would do.  He would use**
13 **people, use situations to his own advantage.**
14   Q.  Are you suggesting that he sent this
15 12-year-old boy out to be killed so he could then
16 incite violence?
17   **A.  This particular case?  I do not know.**
18 **I do know that the PA, the PLO had training camps**
19 **for children, which our Congress also found as a**
20 **finding of fact, teaching them to engage in**
21 **violence.**

Page 178

1    Q.   What's your basis for saying that the
2  PA had these camps?
3    **A.   Well, we can pull up the congressional**
4  **resolution.**
5    Q.   Is there anything more than the
6  congressional resolution?
7    **A.   That's enough for me, but I'm sure**
8  **there's -- you know, obviously there's other**
9  **media reports.  We can do the research and dig**
10  **that up pretty easily if we wanted to.**
11    Q.   Have you seen the other media reports?
12    **A.   Have I seen other media reports?  I've**
13  **seen other media reports on that issue, yes.**
14    Q.   Did you cite them in your report?
15    **A.   No.  I cited the best source.**
16    Q.   Your report describes the crowd as
17  "frenzied" at the top of Page 14, right?
18    **A.   Yep.**
19    Q.   What's the basis for that opinion?
20    **A.   Oh, my opinion?**
21    Q.   Yes.

Page 179

1    **A.   I thought you were talking about the**
2  **paper, so let me look at the top of Page 14.**
3    **Yeah.  Well, I've attended many and**
4  **I've viewed many rallies of this sort, and these**
5  **crowds get very emotional.  They get very**
6  **frenzied.**
7    Q.   Have you viewed any video of this
8  rally?
9    **A.   This particular crowd, no.**
10    Q.   So you have no basis to adopt the word
11  "frenzied"?
12    **A.   I do have a basis.**
13    Q.   What's your basis?
14    **A.   My experience.**
15    Q.   But not related to this individual
16  event?
17    **A.   I wasn't at this event.**
18    Q.   And have never seen any video of it?
19    **A.   Not this particular event.**
20    Q.   On Page 16 of the report, you state
21  that Arafat, first full paragraph -- I'm sorry,

Page 180

1  I'm on Page 16 of your report.
2    **A.   Okay.  Page 16.  I'm with you.**
3    Q.   Page 16, you write, "Arafat personally
4  praised numerous attacks, including the 2001
5  Dolphinarium discotheque bombing in Tel Aviv,
6  which killed a large number of Israeli youths.
7  According to Arafat, the attack was a 'heroic
8  martyrdom operation'."  See that quote in the
9  report?
10    **A.   I sure do.**
11    Q.   Okay.  And you cite to another MEMRI
12  dispatch?
13    **A.   Yes.**
14    Q.   Have you reviewed that dispatch?
15    **A.   Yes.**
16    MR. WISE:  Mark this as 252.
17    (Defendants' Deposition Exhibit Number
18  252 was marked for identification.)
19    BY MR. WISE:
20    Q.   You recognize 252 as the document
21  cited?

Page 181

1    **A.   That is the one.**
2    Q.   And this is the MEMRI report?
3    **A.   It is.**
4    Q.   And you said that you read this,
5  correct?
6    **A.   I did.**
7    Q.   MEMRI is reporting on a German
8  television program, correct?
9    **A.   Yes.**
10    Q.   Did you view the original source, the
11  television program?
12    **A.   No.**
13    Q.   Any idea whether MEMRI reported it
14  correctly?
15    **A.   I assume they did.**
16    Q.   What's the basis for that assumption?
17    **A.   It fits the pattern of what Arafat**
18  **does.**
19    Q.   Did you see the letter yourself that's
20  referenced?
21    **A.   I see the MEMRI report.  My German is**

Page 182

1 **not too good. I haven't seen the German TV, as I**
2 **said, or the letter.**
3    Q.    So this is not a document that you've
4 viewed an independent translation of, correct?
5    **A.    No.**
6    Q.    The MEMRI report, you see a footnote
7 on the second page that says, "The PA daily
8 Al-Ayyam, reported on June 24, '01 that on June
9 23rd, 2001 Yasser Arafat's bureau in Ramallah
10 denied the claims of the German TV station
11 according to which they have a letter by Arafat
12 praising the martyrdom operation that caused the
13 death of 21 Israel youth.  Arafat's bureau said
14 that the letter is a forgery."  You see that in a
15 footnote?
16    **A.    I see that.**
17    Q.    Do you consider the footnote in
18 deciding whether or not to sign on to your
19 report?
20    **A.    Yes.**
21    Q.    It's not mentioned in the report, the

Page 183

1 denial, correct?
2    **A.    No.  I would expect him to deny it.**
3    Q.    Why is that?
4    **A.    Again, based on the discipline that**
5 **I've been involved in, terrorism law, that's what**
6 **groups, governments, organizations that engage in**
7 **terrorism do.  They don't take responsibility**
8 **directly.  They use people.  They use**
9 **organizations to carry out their bidding.  And**
10 **when they are confronted with it, they deny all**
11 **responsibility.**
12    Q.    I thought you had told us before that
13 Arafat would often incite the public through
14 public statements calling for acts of violence?
15    **A.    He would, but he would craft it in a**
16 **way that -- as we indicated in the last**
17 **discussion about his speech in Jerusalem, he**
18 **would craft it in a way to incite but not**
19 **directly tell people, "Put your suicide vest on,**
20 **go out and blow up things."  He's not that**
21 **stupid.**

Page 184

1    Q.    So when he says things that are
2 ambiguous, you infer that he is inciting
3 violence, right?
4    **A.    It depends on the context.  I'd have**
5 **to look at the context.  Give me a specific**
6 **example.  I mean, he says a lot of things.**
7    Q.    Well, let's use the last example, the
8 12-year-old boy who he called a martyr.  In your
9 view, that was an incitement to violence?
10    **A.    Yes.**
11    Q.    And when he denies the truth of
12 things, you discredit that as untrue?
13    **A.    Yes.  I give it less weight.  I mean,**
14 **I give it less weight, far less weight, because**
15 **that's the modus operandi of a totalitarian ruler**
16 **that engages in terrorism.  That's what they do.**
17    Q.    It's not mentioned anywhere in your
18 report that this was denied, correct?
19    **A.    No, I have not -- well, no.**
20    Q.    Take a look at Page 13 of your report.
21    **A.    Sure.**

Page 185

1    Q.    You claim on Page 13 -- on Page 13,
2 you cite to a media report quoting Suha Arafat,
3 correct?
4    **A.    Yes, yes.**
5    Q.    Okay.  And that is Yasser Arafat's
6 widow?
7    **A.    Yes.**
8    Q.    And the report states that Yasser
9 Arafat's widow, "Admitted that Arafat had planned
10 the intifada," correct?
11    **A.    Correct.**
12    Q.    Citing to a Jerusalem Post article
13 from 2012, right?
14    **A.    Yes.**
15       **(Defendants' Deposition Exhibit Number**
16 **253 was marked for identification.)**
17       **BY MR. WISE:**
18    Q.    You recognize that as the article
19 cited in Footnote 2?
20    **A.    Yes, it is.**
21    Q.    The article was written in 2012,

Page 186

1    correct?
2        A.    Yes.
3        Q.    And quoted an interview with Dubai
4    Television, correct?
5        A.    Correct.
6        Q.    Again, translated by MEMRI, according
7    to the first paragraph of the article?
8        A.    Yes.
9        Q.    Have you viewed the interview or the
10   television broadcast?
11       A.    I have not.
12       Q.    According to the article, Suha Arafat
13   claimed that her husband said he did not want to
14   be seen as "abandoning the Palestinian cause and
15   principles," correct?
16       A.    Yes.
17       Q.    Did you consider whether Suha Arafat
18   had any motive to falsely recount what her
19   husband said to her?
20       A.    No.
21       Q.    The article states that Ms. Arafat was

Page 187

1    explaining why she stayed in Paris during the
2    Second Intifada, correct?
3        A.    She says that her husband told her,
4    "You should remain in Paris."
5        Q.    What was the issue regarding Suha
6    Arafat's presence in Paris during the Second
7    Intifada?
8        A.    The article doesn't describe that.
9        Q.    Aside from the article, do you know
10   anything about the circumstances of Suha Arafat
11   being in Paris during the Second Intifada?
12       A.    I heard reports she went there for
13   safety.
14       Q.    What reports?
15       A.    I can't recall.
16       Q.    What was the medium of the reports?
17       A.    Newspaper media, mainstream media
18   sources.  It's a long time ago.
19       Q.    Was she subjected to criticism because
20   of that?
21       A.    I don't recall.

Page 188

1        Q.    Did you consider whether she
2    personally had any motive in giving an untrue
3    explanation for why she stayed in Paris during
4    the Second Intifada?
5        A.    No.
6        Q.    The article also says that Ms. Arafat
7    claimed that Yasser Arafat was killed by Israel,
8    correct?
9        A.    Let me take one second here.
10           (Witness pauses.)
11           MR. YALOWITZ:  I'm sorry.  Can I have
12   the question back?
13           MR. WISE:  Yes.  The article reports
14   that Ms. Arafat has accused Israel of killing
15   Yasser Arafat.
16       A.    I don't see that, unless you can point
17   it to me.
18       Q.    Do you see the section at the bottom?
19       A.    Uh-huh.
20       Q.    Describing Ms. Arafat's request?
21       A.    Yes, she requested an autopsy.

Page 189

1        Q.    Okay.  And the sentence that says,
2    "Palestinians have accused Israel of causing
3    Arafat's death"?
4        A.    Yes, but that's not her.  That just
5    says Palestinians.
6        Q.    Have you heard any reports that she
7    has made that claim?
8        A.    I can't recall.  It doesn't say it in
9    the article here.
10       Q.    Do you credit the claim in the article
11   made by Palestinians that Israel has caused
12   Arafat's death?
13       A.    I've heard the claim by some
14   Palestinians that perhaps he was murdered.
15       Q.    Do you find that to be a credible
16   claim?
17       A.    I do not know.
18       Q.    Let's talk about this organization
19   MEMRI.  You said that you've never been to the
20   institute, correct?
21       A.    No.

Page 190

1    Q.   Are you familiar with a person named
2  Yigal, Y-I-G-A-L, Carmon, C-A-R-M-O-N?
3    A.   Well, let me take that back.  I don't
4  think I've ever been to the institute.  I visited
5  a lot of ministries when I was in Israel on one
6  of my trips, introduced to a lot of people.  To
7  the best of my knowledge, I haven't.
8    Q.   Do you know who Carmon is?
9    A.   What was the name?
10    Q.   Yigal, Y-I-G-A-L, Carmon, C-A-R-M-O-N.
11    A.   Again, that name sounds familiar, but
12  you'll have to forgive me.  I just, I can't place
13  it.  If you'll give me a clue.
14    Q.   Are you aware that MEMRI has been
15  accused of anti-Arab bias?
16    A.   It would surprise me if they hadn't.
17    Q.   Why is that?
18    A.   It's common knowledge.  I mean, the
19  Israelis and the Israeli Government is the most
20  maligned Government on the face of the planet
21  next to our Government by a variety of

Page 191

1  organizations and nations around the world.
2    Q.   Do you believe that MEMRI is an
3  institution of the Israeli Government?
4    A.   No.
5    Q.   Do you know Brian Whitaker?  Have you
6  ever heard that name?
7    A.   I don't recall.
8    Q.   Are you familiar with a Guardian
9  newspaper?
10    A.   Oh, yes.
11    Q.   Guardian is a UK newspaper?
12    A.   Yes.
13    Q.   Do you believe that to be a reliable
14  source?
15    A.   It's considered to be a mainstream
16  media source.
17       MR. WISE:  Mark this.
18       (Defendants' Deposition Exhibit Number
19  254 was marked for identification.)
20       BY MR. WISE:
21    Q.   This is Defendants' Exhibit 254.

Page 192

1  Looking at this document, do you recall ever
2  having seen this debate between Carmon and
3  Whitaker?
4    A.   I have not seen this document before.
5    Q.   Let me ask you to turn to the second
6  page.
7    A.   Okay.
8    Q.   Which is a statement under the heading
9  Brian Whitaker, and ask you to turn to the third
10  paragraph, where Whitaker says, "My problem with
11  Memri is that it poses as a research institute
12  when it's basically a propaganda operation.  As
13  with all propaganda, that involves a certain
14  amount of dishonesty and deception.  The items
15  you translate are chosen largely to suit your
16  political agenda.  They are unrepresentative and
17  give an unfair picture of the Arab media as a
18  whole."
19       MR. YALOWITZ:  I'm sorry, bear with me
20  for a minute.  I just want to look at the
21  document.

Page 193

1       MR. WISE:  Uh-huh.
2    Q.   Do you see that?
3       (Witness Reviews Document.)
4    Q.   Have you had a chance to read it,
5  Professor?
6    A.   Yes, it's pretty long.
7    Q.   You weren't familiar with this
8  discussion between Whitaker and Carmon?
9    A.   Not this particular discussion, no.
10    Q.   Did the concerns about MEMRI's
11  credibility raised by Whitaker cause you any
12  concern about relying on MEMRI as a source for
13  your report?
14    A.   Does this report cause me any
15  concerns?
16    Q.   Yes.
17    A.   Oh, I would have to look at the report
18  and really get more information about who these
19  individuals are, but it appears that the debate,
20  some of the points that were brought out on the
21  translation issue, on that one instance there's

JEFFREY ADDICOTT DEPOSITION      October 2, 2013      Sokolow v. the PLO

Page 194

1  no organization that's going to be perfect in
2  everything they do, but, I don't know, I still
3  trust -- you know, I trust that this organization
4  could not exist if they had more than a five
5  percent error in what they were translating
6  because it would become extremely common
7  knowledge that they were not reputable, more than
8  just a debate between two people that they had
9  some issues. I think the issue would have come
10 out in a larger avenue than this if it was true.
11     Q.   Okay. Take a look at 253, which is
12 there.
13         (Defendants' Deposition Exhibit Number
14 255 was marked for identification.)
15         THE REPORTER:  255 counsel.
16         MR. WISE:  I'm sorry, 255. Thank you.
17     Q.   And I'm going to point your attention
18 specifically to the last paragraph on the first
19 page, which quotes a gentleman named Vincent
20 Cannistraro, C-A-N-N-I-S-T-R-A-R-O. Do you know
21 who that is?

Page 195

1      A.   I'm sorry, which page are you on? I'm
2  sorry.
3      Q.   End of Page 1, beginning of Page 2.
4      A.   Okay. I certainly know who Thomas
5  Friedman and Richard Cohen are, but let's see.
6         (Witness Reviews Document.) Okay.
7  I've read it.
8      Q.   Do you know who Vincent Cannistraro
9  is?
10     A.   I've heard the name.
11     Q.   This article reports that he is the
12 former head of CIA's counterintelligence unit.
13 Do you have any reason to believe that is not
14 accurate?
15     A.   I think that's correct.
16     Q.   And his quote, according to this
17 article, is they -- about MEMRI is, "They are
18 selective and act as propagandists for their
19 political point of view, which is the
20 extreme-right of Likud. They simply don't
21 present the whole picture." Correct?

Page 196

1      A.   That's his opinion, yes.
2      Q.   Does that opinion cause you to
3  reevaluate your reliance on MEMRI as support for
4  the positions you've taken in your report?
5      A.   In and of itself, no.
6      Q.   You, on Page 18 of your report, start
7  a section titled Americans Killed During Second
8  Intifada. Do you see that section?
9      A.   Yes.
10     Q.   And at the start, it states,
11 "According to the Israeli Security Agency (Shin
12 Bet or Shabak) between September 29, 2000 and
13 2004, at least 1,028 innocent people died as a
14 result of Palestinian terror attacks." Do you
15 see that?
16     A.   Yes.
17     Q.   What is Shabak?
18     A.   Well, it's an agency within the
19 Israeli Government that is charged with, among
20 other things, special operations.
21     Q.   And what is Shin Bet?

Page 197

1      A.   That's a synonym for Shabak.
2      Q.   Okay. Your citation is to a Shabak
3  report, correct?
4      A.   My citation is Footnote 20, which is
5  the Israeli Security Agency.
6         (Defendants' Deposition Exhibit Number
7  256 was marked for identification.)
8         BY MR. WISE:
9      Q.   Do you recognize 256 as the document
10 cited in Footnote 20?
11     A.   That's the one.
12     Q.   Can you tell me, based on the document
13 in Footnote 20, how you verified the number 1,028
14 innocent people?
15     A.   There have been several calculations,
16 as you know, from different sources about the
17 number of individuals that have been murdered.
18 This is just one source.
19     Q.   This is the document that's cited,
20 though, correct?
21     A.   This is the one that I cited, yes.

Page 198

1    Q.    So can you tell me how you got to the
2  number that's in your report based on the
3  document you're holding in front of you?
4    A.    This is not a quotation, it's a cite,
5  so I don't have any parentheses around the
6  figures.
7    Q.    Do you have any idea where the number
8  1,028 came from?
9    A.    The document lists 1,178, but that's
10  end of 2009.  Well, let's see.  Let me look
11  at the charts.
12    Q.    Professor, as you sit here today, do
13  you have any idea how that number was derived?
14    A.    Oh, I'd have to look at the chart
15  again.  Again, there's a lot of charts, facts and
16  figures.  I know that Congress has reached a
17  slightly different number in their findings.  So
18  if we're trying to determine the exact number,
19  this is one of many reports.  It's an
20  approximate.  You know, the exact body count
21  here, let me see if I can find it from the

Page 199

1  charts.
2        (Witness Reviews Document.)
3    A.    If you add the figures in the chart on
4  the first page between the period of 2000 and
5  2004, unless my math is off, I get 1,018, and not
6  1,028, so apparently I'm off by 10.
7    Q.    When you say you're off by 10, you
8  didn't calculate that number, did you?
9    A.    I just did calculate it, yes.
10    Q.    When the report was written that you
11  signed, you did not pen that number, right?
12    A.    No, I didn't do the math.  I didn't
13  add them all up.  I looked at the chart and I
14  assumed that the math was correct.
15        Let me add it one more time.  Maybe
16  I've got it wrong right now.  I'm adding the
17  figures on the chart, but no, I didn't
18  double-check the math.
19    Q.    Let me ask you this:  You say in your
20  report that this is 1,028 innocent people,
21  correct?

Page 200

1    A.    Yes.
2    Q.    The word "innocent," do you see that
3  in the report that's cited at Footnote 20?
4    A.    That's an amplifier that I added.  You
5  know, when you use violence and you have no
6  lawful right to use violence, then the victims
7  obviously are innocent people there.  You have no
8  right to kill them.
9    Q.    You then list in bullet form a number
10  of individual people that were killed, correct?
11    A.    Yes.  Do you want me to add this up
12  again, or are we gone from that?
13    Q.    No, we're gone from that.
14    A.    Okay.  I might have got it right, but
15  that's how I got it.
16        MR. YALOWITZ:  Before we leave the
17  topic of a thousand and 28, I'll just represent
18  that I did the math and I got a thousand and 28,
19  so I'm comfortable that the numbers on the chart
20  add up.  We can stipulate to that.
21    Q.    You didn't do the addition when you

Page 201

1  signed your report?
2    A.    I looked at the chart.  I didn't add
3  up every figure, no.
4    Q.    So you just gave me a description of
5  why you added the word "innocent," right?
6    A.    Yes.
7    Q.    And then you list a number of
8  individuals by bullet point, correct?
9    A.    In the report, yes.
10    Q.    The second person is Rabbi Benjamin
11  Kahane, correct?  K-A-H-A-N-E.
12    A.    And his wife, yes.
13    Q.    Who is Benjamin Kahane?
14    A.    I don't understand the question.
15    Q.    Do you know who Benjamin Kahane is?
16    A.    I've never met him, no.
17    Q.    Okay.  Do you know that he was the
18  leader of a group called Kahane Chai, C-H-A-I?
19    A.    If it's the same one, that's a very
20  common name.  That may be the same person.  I
21  don't know.  I've heard of the group.

JEFFREY ADDICOTT DEPOSITION    October 2, 2013    Sokolow v. the PLO

Page 202

1    Q.    You know that Kahane Chai is a
2  designated foreign terrorist organization,
3  correct?
4    A.    I do not know that without looking at
5  the State Department list.
6    Q.    Take a look at Exhibit 248.
7    A.    I see it listed on the front page of
8  Chapter 6.
9    Q.    This is the report that you used and
10 cited as a designation of the Al-Aqsa Martyrs
11 Brigade, correct?
12   A.    I believe I used this report.  I know
13 I used several reports.  I have to check the
14 dates again, but I'll assume that's correct.
15   Q.    You'd agree with me that Kahane Chai
16 is listed on this report --
17   A.    Yes.
18   Q.    -- of designated foreign terrorist
19 organizations, correct?
20   A.    Yes.
21   Q.    Based on your definition of

Page 203

1  "innocent," would you still include that name in
2  your list of innocents killed during the Second
3  Intifada?
4    A.    Yes.  It's not the -- it's not the
5  guilt of the victim.  It's the justification of
6  the one that uses force.
7    Q.    If Israel killed a Hamas terrorist,
8  how would you describe that?
9    A.    Well, I would describe it as a
10 justified use of self-defense.
11   Q.    Because the Hamas terrorist was
12 designated as a terrorist?
13   A.    Well, not just because they're
14 designated as a terrorist, but, you know, you
15 have to -- in the targeted consideration, you've
16 got to evaluate who the person is because the
17 label "terrorist" can be used quite widely.  Is
18 that person engaging in unlawful violence,
19 conspiring to engage in it, soliciting to engage
20 in it, and, therefore, nations have the right to
21 respond in self-defense?  It's called

Page 204

1  anticipatory self-defense.
2    Q.    What is it called when an Israeli
3  who's on the designated foreign terrorist
4  organization list is killed?
5    A.    Well, it depends on who kills him.
6    Q.    Let's assume it was a Palestinian that
7  killed him.
8    A.    The Palestinians do not have the right
9  to engage in violence.  They are not acting in
10 accordance with Article 51 of the UN Charter.
11 They can use other means.
12        In other words, they're not -- they
13 would use the process of notifying the
14 appropriate country where that person's located,
15 ask them to arrest that person, but they have no
16 right to violate the sovereignty of another
17 nature and to engage in violence against an
18 individual.
19   Q.    Page 20 of your report, you state, "It
20 was (and remains) common knowledge that tens of
21 thousands of Israeli citizens are dual nationals

Page 205

1  who hold US citizenship (there are approximately
2  300,000 today)."
3    A.    I see that sentence, yes.
4    Q.    And you cite to a 2012 USA Today
5  article, correct?
6    A.    Yes.
7    Q.    Why did you choose to use a 2012
8  article regarding population when you're writing
9  a report about 2000 to 2004?
10   A.    Well, it's -- again, it's common
11 knowledge that there are individuals that do
12 that.  I suppose that that report was directly on
13 point for the issue, and, therefore, I chose
14 that, although obviously you could choose many,
15 many reports that have talked about that issue.
16 I assume a quick Lexis search or a Google search
17 would pop up lots of reports.  Why I used this
18 report, I don't know.
19   Q.    You didn't choose it, right?
20   A.    I chose this report.  This is my work.
21   Q.    The document that was sent to you in

Page 206

1   draft, did it have that footnote in it?
2       A.   I believe it did.  I believe it did.
3       Q.   And explain to me how a 2012 USA Today
4   article establishes what was common knowledge to
5   the PA during the Second Intifada.
6       A.   I wouldn't even need a footnote for it
7   to be common knowledge.  It's common knowledge
8   that Jerusalem is a center of tourism, that
9   thousands of Americans visit that site year
10  round.
11      Q.   Common knowledge to who, Professor?
12      A.   Anybody.
13      Q.   Anybody?
14      A.   Any knowledgeable person that reads
15  any type of language, that knows anything about
16  Jerusalem, that knows anything about Israel,
17  knows that one of their major sources of income
18  is tourism, and many Jews in Israel have direct
19  connections with the United States.  If it's not
20  common knowledge to someone, I would question
21  what would be common knowledge to them.

Page 207

1       Q.   And you believe it's common knowledge
2   to those who perpetrated the various attacks at
3   issue in this case?
4       A.   Has to be.
5       Q.   Why does it have to be?
6       A.   They live there.  I mean if I know
7   that and I don't live there, certainly a fortiori
8   they're going to know that since they live there.
9       Q.   Okay.  You also cite to a number of
10  State Department travel warnings that you say
11  were, "Obviously issued to Americans but they
12  were conveyed via State Department channels each
13  time to the Palestinian Authority," correct?
14      A.   Yes.  The PA certainly had knowledge
15  that Americans were in danger.  Americans were in
16  Israel.
17      Q.   What's your basis for stating that the
18  travel warnings were conveyed via State
19  Department channels each time to the Palestinian
20  Authority?
21      A.   Habit.  I mean that's pretty much

Page 208

1   common knowledge.  That's what the State
2   Department does, based on my knowledge of working
3   with the State Department over the years.  I
4   mean, they send out cables.  They communicate
5   with their Embassies and with their counterparts,
6   and they put these warnings out on a regular
7   basis.
8       Q.   Do you have any specific knowledge
9   that these travel warnings you cite in your
10  report were, in fact, communicated to the
11  Palestinian Authority?
12      A.   I couldn't tell you exactly who it
13  went to, no.
14          MR. WISE:  Want to break for lunch?
15          MR. YALOWITZ:  Whenever you're ready.
16          MR. WISE:  Why don't we break until
17  1:00.
18          (Luncheon recess taken at 12:20 p.m.)
19
20
21

Page 209

1          A-F-T-E-R-N-O-O-N  S-E-S-S-I-O-N
2              (1:08 p.m.)
3          BY MR. WISE:
4       Q.   So, Professor, let me just start with
5   the same question I asked you before:  Did you
6   speak about the substance of your testimony with
7   anyone during the break?
8       A.   Absolutely not.
9       Q.   Let me turn your attention to Page 22
10  of the March 2013 report.
11      A.   Okay.  I've got to find your copy now
12  because I was working off my copy.  Page 13?
13      Q.   No, Page --
14      A.   I'm sorry.  22, you said.
15      Q.   -- 22, right.
16      A.   Okay.
17      Q.   This is the beginning of the section
18  that describes a number of actions by the U.S.
19  Congress, right?
20      A.   Yes.
21      Q.   You start with the statement that

Page 210

1   Congress, "Made it clear that it was concerned
2   about the role the PA played in the violence, and
3   consistently called upon the PA to halt the
4   intifada immediately.  Their concern was
5   primarily focused on ending the violence, without
6   specific regard for potential American
7   casualties."  Correct?
8       A.   Yes.
9       Q.   Okay.  And the first example is House
10  Resolution 5500, right?
11      A.   Yes.
12          (Defendants' Deposition Exhibit Number
13  257 was marked for identification.)
14          BY MR. WISE:
15      Q.   For starters, this is a bill -- you
16  see 257, correct?
17      A.   Correct.
18      Q.   And this is H.R. 5500?
19      A.   Yes.
20      Q.   This is a bill that was introduced in
21  the House of Representatives by three members,

Page 211

1   right?
2       A.   Yes.
3       Q.   And it was referred to the Committee
4   on the Judiciary?
5       A.   Yes.
6       Q.   And the bill was never voted on,
7   correct?
8       A.   As far as I know, no.
9       Q.   This Bill 5500, you'd agree with me,
10  only refers to the Palestinian Authority in two
11  places?
12      A.   I do not have my copy where I've
13  marked it up, so I'm going to have to --
14          MR. YALOWITZ:  Just take your time.
15          (Witness reviews document.)
16      A.   That is correct.
17      Q.   One was a call for the stationing of
18  U.S. personnel within Palestinian Authority
19  territory to administer the Act, correct?
20      A.   Yes.  That would be on Page 4, Bow
21  Legs 7.

Page 212

1       Q.   And the other mention was at Page 3,
2   Subparagraph 4?
3       A.   Yes.
4       Q.   There was no finding in this bill that
5   the PA had committed acts on U.S. nationals,
6   correct?
7       A.   No, there's no findings specifically
8   identifying the PA.
9       Q.   Okay.  The last paragraph of Page 22
10  of your report references House Concurrent
11  Resolution 426, right?
12      A.   Yes.
13      Q.   You understand that a concurrent
14  resolution is not legislation, right?
15      A.   That's correct.
16      Q.   It is just a statement of Congress?
17      A.   Yes.  It's a resolution.
18          MR. WISE:  Mark this.
19          (Defendants' Deposition Exhibit Number
20  258 was marked for identification.)
21          BY MR. WISE:

Page 213

1       Q.   So Exhibit 258 is House Concurrent
2   Resolution 426, correct?
3       A.   Yes.
4       Q.   And this concurrent resolution
5   includes language cited in your report
6   condemning, "The Palestinian leadership for
7   encouraging the violence and doing so little for
8   so long to stop it, resulting in the senseless
9   loss of life."
10      A.   Yes.
11      Q.   What fact finding did Congress do
12  before passing this concurrent resolution?
13      A.   I have no personal knowledge of what
14  the mechanics were that produced the resolution,
15  but I do know that the resolution was passed, I
16  have it in my other report, by an overwhelming
17  majority, bipartisan, I mean overwhelming.  So
18  the findings were not something that was done by
19  few members of Congress.
20      Q.   But you don't know what the process
21  was that led to the things set forth in the

Page 214

1  whereas clauses, correct?
2      A.  I know what the general process is in
3  Congress.  When they gather facts, they turn to
4  several organizations such as the Congressional
5  Research Service to provide information, facts to
6  them.  They have staffs that provide information
7  to them.
8          So just on the basis of what I do now,
9  how the process works in general, I would assume
10 that that process was utilized in this case
11 because these are very serious matters, and
12 Congress would take them very seriously and, I
13 would assume, do their homework.
14     Q.  That's simply an assumption, right?
15     A.  It's an assumption based on my
16 knowledge of how Congress operates, yes.
17     Q.  And you have no knowledge that that
18 occurred with regard to this resolution?
19     A.  I do not.
20     Q.  Have you talked with any members of
21 Congress who wrote for this concurrent resolution

Page 215

1  about 426?
2      A.  No.  No.
3      Q.  The next cite to House Resolution
4  5522, on Page 23, correct?
5      A.  Yes.
6      Q.  This was a bill to prohibit U.S.
7  Assistance for the Palestinian Authority and for
8  programs, projects and activities in the West
9  Bank and Gaza?
10     A.  It's a resolution, yes.
11     Q.  The bill included no factual findings
12 whatsoever, right?
13     A.  I would have to look at the
14 resolution.  I have it in the document you took
15 to get Xeroxed.
16         MR. WISE:  May I have this marked,
17 please.
18         (Defendants' Deposition Exhibit Number
19 259 was marked for identification.)
20         BY MR. WISE:
21     Q.  You recognize that as Bill --

Page 216

1      A.  Yes, I do.
2      Q.  -- excuse me, House Resolution 5522?
3      A.  Yes.
4      Q.  This included no factual findings?
5      A.  There are no factual findings here.
6  There's conclusions, so we must assume they had
7  facts to make the conclusions.
8      Q.  But you have no knowledge of what
9  facts they considered?
10     A.  No, sir.
11     Q.  This resolution was never passed,
12 correct?
13     A.  As far as I know, that's correct.
14     Q.  And you know that financial assistance
15 to the Palestinian Authority was not cut as a
16 result of this bill, correct?
17     A.  As far as I know, that's correct.
18     Q.  You then cite to House Resolution
19 1087, correct?
20     A.  Yes, I did.
21     Q.  Which is simply a reintroduction of

Page 217

1  5522 in the next Congress, right?
2      A.  I believe so.
3      Q.  That also never passed?
4      A.  Not to my knowledge.
5      Q.  Footnote 33 refers to, "A group of 87
6  senators and 209 representatives called on
7  President Bush to not invite Yasser Arafat to the
8  White House until the intifada ceased," correct?
9      A.  Correct.
10     Q.  Your citation for that is to an
11 article in JTA, correct?
12     A.  Yes.
13         MR. WISE:  Mark this.
14         (Defendants' Deposition Exhibit Number
15 260 was marked for identification.)
16         BY MR. WISE:
17     Q.  260 is the article you cited in the
18 report?
19     A.  Yes.
20     Q.  JTA, under its symbol, is called the
21 Global News Service of the Jewish People,

Page 218

1    correct?
2        A.    That's correct.
3        Q.    Do you know who publishes JTA?
4        A.    No, I do not.
5        Q.    You said the article is an example of
6    congressional concern regarding American
7    casualties in the Intifada, correct?
8        A.    Yes.
9        Q.    Do you see any indication in this news
10   report of congressional concerns regarding
11   American casualties in the Intifada?
12       A.    I think it's implicit in the report.
13       Q.    That was a conclusion you've inferred?
14       A.    Yes.
15       Q.    The last sentence in the article
16   states that, "Secretary of State Colin Powell met
17   with Arafat during his tour of the Middle East in
18   February, and both Bush and Powell have spoken to
19   him on the telephone."  Correct?
20       A.    That's what it says.
21       Q.    Do you take that to mean that the

Page 219

1    White House did not agree with the strategy of
2    isolating Arafat as proposed by the Congress men
3    and women?
4        A.    No, I took that to mean that, in a
5    common sense reading, that obviously the United
6    States has been working for a long time to
7    achieve peace in the Middle East, and I took that
8    to mean that they were attempting to continue
9    with that policy.
10       Q.    You then cite Senate Bill 1377 in
11   Footnote 34, correct?
12       A.    Yes, I believe I have that in my other
13   report as well, more fully cited.
14       Q.    Okay.
15             MR. WISE:  Can you mark that as 261.
16             (Defendants' Deposition Exhibit Number
17   261 was marked for identification.)
18       BY MR. WISE:
19       Q.    261 in front of you is Senate Bill
20   1377, correct?
21       A.    Yes.

Page 220

1        Q.    Which is, again, identical to House
2    Resolution 5500, which you had previously cited,
3    correct?
4        A.    I have to check and see if it's
5    identical or not.  5522?
6        Q.    5500.
7        A.    5500.  The short title is different.
8    The findings are the same.  The rest of the
9    document seems to be the same except for Section
10   4, where the fiscal years are different.
11   Everything else appears to be the same.
12       Q.    It's fair to say that this is the same
13   bill introduced in the Senate, correct?
14       A.    Same bill, different year.
15       Q.    This bill was referred to committee
16   and never voted out of committee, correct?
17       A.    Yes, that's correct.
18       Q.    Look with me, if you will, at 24.
19       A.    Page 24?
20       Q.    Page 24, the first full paragraph.
21       A.    Okay.

Page 221

1        Q.    You say, "In the months that followed,
2    Congress continued to pass legislation that
3    condemned the Palestinian Authority," cite
4    Footnote 37?
5        A.    Yes.
6        Q.    And again, 37 cites to House
7    Concurrent Resolution 202, correct?
8        A.    That's correct.
9        Q.    And we've agreed that a House
10   concurrent resolution is not legislation?
11       A.    No.  But it does reflect the opinion
12   of Congress.
13       Q.    But the representation in the first
14   sentence that this was "legislation" is
15   inaccurate, correct?
16       A.    Well, I'm using the term "legislation"
17   in the sense that it's a congressional
18   resolution, but I probably could have used a
19   better word.  But it falls under the main rubric.
20       Q.    And for all of these congressional
21   actions that you've cited, your answer about --

Page 222

1   strike that.  Sorry.
2        For all of the pieces of congressional
3   action that you cite, you don't have any specific
4   knowledge of what process Congress undertook in
5   terms of fact finding, right?
6   **A.   I do have knowledge about how Congress**
7   **tasks individuals to gather information for them,**
8   **to gather facts and make decisions.**
9   Q.   But that knowledge is in a general
10  sense?
11  **A.   In a general sense.  I, myself, have**
12  **been asked to produce information for Congress so**
13  **they could use that information.  About these**
14  **particular ones, I don't have any personal**
15  **knowledge on the specifics of how the information**
16  **was gathered.**
17  Q.   And none of the times that Congress
18  has requested information from you, were those
19  requests related to any of the bills, resolutions
20  or concurrent resolutions you cite in either the
21  first report or in your rebuttal report?

Page 223

1   **A.   That's correct.**
2   Q.   Let's turn to the rebuttal report.
3        (Defendants' Deposition Exhibit Number
4   262 was marked for identification.)
5        BY MR. WISE:
6   Q.   262 is your rebuttal report, correct?
7   **A.   That is correct.**
8   Q.   And what portions of this report did
9   you personally write?
10  **A.   I'm the author for the entire report.**
11  Q.   And by author, does that mean that you
12  wrote every word that's in here?
13  **A.   Yes.**
14  Q.   You state in the third line that it is
15  a, "Rebuttal to Robinson Report," correct?
16  **A.   Yes, that's correct.**
17  Q.   What specific evidence from the
18  Robinson report was your rebuttal intended to
19  contradict or rebut?
20  **A.   Robinson had a lot of themes in his**
21  **report, a lot of historical background, but his**

Page 224

1   **basic contention was -- if I could get the**
2   **Robinson report, I can read it -- but there was**
3   **no culpability on the part of the PLO, Yasser**
4   **Arafat or the PA associated with the terrorist**
5   **attacks.**
6   Q.   Throughout your rebuttal report, you
7   don't cite to specific parts of the Robinson
8   report at all, correct?
9   **A.   No.**
10  Q.   In fact, the name Robinson doesn't
11  appear again after your title, right?
12  **A.   No.**
13  Q.   Is the spelling of your name correct
14  in the name line?
15  **A.   I hope it is. A-D-D-I-C-O-T-T.  Yes.**
16  Q.   First name?
17  **A.   Oops, that should be R-E-Y.  I typed**
18  **it myself also.**
19  Q.   Let's start on Page 1.
20  **A.   Okay.**
21  Q.   You write on Page 1, in the last

Page 225

1   sentence, and this is about Yasser Arafat, "While
2   portraying himself to the civilized world as a
3   beacon of 'peace' and denouncing 'terrorism', the
4   objective reality is that Yasser Arafat worked
5   tirelessly to promote and encourage brutal acts
6   of murder by means of terrorism in order to
7   achieve personal and political goals," and you
8   cite to a TIME Magazine article from 2011,
9   correct?
10  **A.   Yes.  That's meant to be a general**
11  **cite.  There's no quotations there, and obviously**
12  **I could -- you know, what I've written in this**
13  **report, I'm not giving a full citation of all the**
14  **cites that I could produce, but that's my**
15  **conclusion.**
16       **(Defendants' Deposition Exhibit Number**
17  **263 was marked for identification.)**
18       BY MR. WISE:
19  Q.   This is the TIME article that you were
20  referencing?
21  **A.   Well, this doesn't appear to be the**

Page 226

1  full TIME article.
2      Q.   How long was the full article?
3      A.   I'd have to refer to my notes.  Again,
4  the footnote there, this introduction is a
5  summary of my opinion.  I simply threw that
6  footnote in to buttress that point, but it's
7  maybe in -- no, let's see here.
8          (Witness Reviews Document.)
9      A.   Well, I mean, that just kind of stands
10  for the proposition where we've got the quote
11  here, "An unrepentant terrorist with a long
12  legacy of promoting violence," I'm really saying
13  it in a different way.
14     Q.   The TIME article that you were citing
15  didn't use the words "Objective reality is that
16  Arafat worked tirelessly to promote and encourage
17  brutal acts of murder," right?
18     A.   No, they didn't use that language.  If
19  they would have, I would have quoted it as my
20  language.
21     Q.   But by dropping a footnote to this

Page 227

1  article, all you were suggesting was that there
2  was an article that related to the sentence?
3      A.   Well, the article talks about the
4  duplicity of the fact that you're a Nobel Peace
5  Prize winner and yet, on the other hand, you also
6  have -- you're an unrepentant terrorist with a
7  long legacy of promoting violence, so that's my
8  point.
9      Q.   Does the TIME article say that Arafat
10  was an unrepentant terrorist with a long legacy
11  of promoting violence?
12     A.   Well, it says his critics condemn him
13  as being that, so they're giving both sides of
14  the story.  And I'm choosing to amplify that
15  particular side of the story.
16     Q.   So as a general rule, when you cite to
17  a document in your rebuttal report, what should
18  we take that citation to mean?
19     A.   Depends on the citation.  We'd have to
20  go through each one of them.  Some of them are
21  meant as a, "See generally," as Footnote Number

Page 228

1  2.  Some of them are, "But see," which stands for
2  a contradictory point.  I don't think I have any
3  "but sees" in this one.  Some have, "See also."
4  Some have, "Supra, infra."  It depends on the
5  context.
6      Q.   Okay.  But when you don't write
7  something like, "See generally," or, "But see,"
8  when you just cite to a document, as the reader,
9  what is the reader to take from a citation to
10  that source document?
11     A.   Well, the footnote should amplify
12  something in the sentence, and this footnote does
13  amplify something in this particular sentence.
14     Q.   And just point to me exactly what you
15  believe it amplifies.
16     A.   Well, it amplifies both sides of this
17  coin, while portraying himself to the civilized
18  world as a beacon of peace, and those are the
19  people that, you know, buy into that propaganda
20  that Arafat puts out, and then the other hand is
21  my belief, based on my professional opinion, that

Page 229

1  the objective reality is quite the opposite.
2      Q.   When you say that you think there's
3  more to that article, are you saying you think
4  there's more about Yasser Arafat in the article?
5      A.   I don't have my original documents in
6  front of me, so the document you produced, there
7  are many, many documents that I go through on
8  writing topics over the course of a week, so I
9  would have to refer to my own notes.
10     Q.   Let's talk about the second page.
11     A.   Okay.
12     Q.   And specifically I'm interested in the
13  quote at the very top, where you cite Mr. Arafat
14  as saying, "Struggle, struggle, struggle,
15  struggle.  Combat, combat, combat, combat.
16  Jihad, jihad, jihad, jihad."
17         First of all, have you reviewed the
18  video clip that is cited in the footnote?
19     A.   No.
20     Q.   Do you know what Arabic word Arafat
21  used in this quote?

Page 230

1    A.    No, I don't speak Arabic.
2    Q.    This morning we had a discussion about
3  the word "martyr" in connection with the Levitt,
4  Matthew Levitt, piece; do you recall?
5    A.    The word "murder?"
6    Q.    The word "martyr."
7    A.    Oh, martyr.  Yes, I do recall that
8  discussion.
9    Q.    Do you know what Arabic word was used
10 in that speech?
11   A.    No.
12   Q.    Let's turn back to the word "Jihad."
13 In your opinion, is there any definition of the
14 word "Jihad" that does not involve violent
15 struggle?
16   A.    Yes, there are.
17   Q.    Tell me what that definition is?
18   A.    I'd have to go into a discussion of
19 Islam, but Islam has a variety of writings.  They
20 put great emphasis on different Imams.  Many of
21 them do not even come out of schools.  They

Page 231

1  simply take the title and have a following of
2  individuals, and they make pronouncements.
3        So in the mainstream literature, Jihad
4  can mean a spiritual quest to better yourself,
5  associated with the pillars of Islam, and the
6  pillars of Islam deal with obligations that
7  you're expected to do if you're a Muslim in order
8  to work your way into paradise before the
9  judgmency of Allah.
10       So it can mean a spiritual cleansing,
11 a striving to do better in your life, to live by
12 the moral code, i.e., the pillars of Islam.  It
13 also is used in a "defensive" term -- and again,
14 defense, offense -- where they believe that some
15 Imams teach -- and this is particularly the
16 strain of Wahhabism, W-H-A-B-B-I-S-M (sic).  But
17 they believe that it's your duty to literally
18 kill people that do not agree with your orthodox
19 theology, and if you kill in the name of Jihad
20 someone that is outside of your belief, you
21 bypass the judgmency of Allah and you go directly

Page 232

1  to paradise and you have certain rewards.
2        So to answer your question, there are
3  different meanings, but there's two main
4  meanings.  One is this moral, spiritual, try to
5  live a better life, and the other one is kill.
6  But then they use the term -- then there's a
7  variation on the kill part, where some believe
8  that it's an offensive obligation to go out and
9  target individuals to kill them.  The other
10 school of thought says, "Yeah, you're going out
11 to kill these individuals.  Even though you're on
12 the offense, you're actually defending the
13 faith."
14   Q.    So is it fair to say that there is a
15 wide spectrum of definition of the word "Jihad?"
16   A.    There are two main schools, as I
17 indicated, and they are pretty far apart.  One
18 deals with moral obligations and following the
19 rituals, and the other one deals with violence.
20 In between, there's I guess what I can
21 characterize as two main branches.  It's not a

Page 233

1  spectrum, it's two main branches of the ideology,
2  in my understanding.
3    Q.    The quote that you cite to in your
4  rebuttal report is from 1996, correct?
5    A.    Yes.
6    Q.    Do you know the context of the speech
7  that Arafat was giving?
8    A.    Well, again, I don't have the full
9  text of the speech in front of me.  I think a
10 plain reading -- and again, when you compare it
11 to the list of Arafat quotes I've got, you'll
12 notice that many of them are from the mid '90s,
13 late '90s, where he's advocating, in my opinion,
14 violence, so I don't know the full context of
15 that particular quote.
16   Q.    Do you know where he was speaking?
17   A.    I'd have to refer back to my notes.  I
18 don't have it in here.
19       What I generally do when I write a
20 paper sometimes, in the articles I'll put a quote
21 to kind of amplify the theme, and that's what I

Page 234

1  did in this case.
2      Q.    And other than what you cited in your
3  report, are there other bases for this particular
4  opinion?
5          MR. YALOWITZ: Objection. I don't
6  understand the question.
7      A.    What opinion?
8      Q.    You've cited this quotation, correct,
9  and dropped a footnote?
10     A.    Right.
11     Q.    As part of your section called,
12 "History of Yasser Arafat and the PLO?"
13     A.    Uh-huh.
14     Q.    And you've just said that based on the
15 context -- well, strike that. Maybe you haven't
16 said that.
17         What is the relevance of this quote to
18 you?
19     A.    Well, it underscores the theme in Part
20 2 that he was willing to use violence when
21 necessary to achieve his ends. Whether that

Page 235

1  violence -- and that violence is indicated by the
2  words, "Struggle, combat and Jihad," and, in my
3  opinion, just looking at this sentence alone,
4  this is not Jihad associated with being a better
5  moral person individually. This is the Jihad for
6  war because in the context you're talking about,
7  combat and struggle.
8      Q.    And you can tell that without knowing
9  who he was speaking to, right?
10     A.    Yeah, I can tell it by reading it.
11     Q.    Or what the circumstances of the
12 speech were?
13     A.    I don't know the circumstances of this
14 particular one without referring back to my
15 notes.
16     Q.    On Page 3 of your rebuttal, you have a
17 discussion of Force 17, right?
18     A.    Yes.
19     Q.    Which you allege was involved in
20 terror attacks, mostly in the 1980s?
21     A.    Yes.

Page 236

1      Q.    What opinion of Glen Robinson does
2  this part of your rebuttal report rebut?
3      A.    Well, in his report, he was -- if I
4  recall correctly, he indicated that Force 17 was
5  not as powerful as individuals made it out to be.
6  It had no connection with Yasser Arafat, as he
7  did with all these organizations. So I'd have to
8  look at his report and point you to the parts
9  where he talked about Force 17. It's quite a
10 lengthy report he had.
11     Q.    But you believe that he did write
12 about Force 17 in his report?
13     A.    I think he did mention it.
14     Q.    In your discussion of Force 17, you
15 state that Imad, I-M-A-D, Fa'iz,
16 F-A-apostrophe-I-Z, Mughniyah, M-U-G-H-N-I-Y-A-H,
17 achieved a high rank in Hezbollah.
18     A.    Yes.
19     Q.    Okay. And for that you cite to a
20 Washington Post article, correct?
21     A.    February the 14th, 2008, yes.

Page 237

1      Q.    By writing that Mughniyah's shining
2  achievement was his high rank in Hezbollah, are
3  you suggesting that Hezbollah was somehow
4  controlled by the PA or PLO?
5      A.    No.
6      Q.    So what is the relevance of his
7  ascendancy in Hezbollah?
8      A.    Hezbollah is a terrorist organization
9  that is so recognized by the U.S. Government, and
10 it just indicates the mindset of this individual,
11 that this is part and parcel of his modus
12 operandi.
13     Q.    In your view, what is the
14 relationship, if any, between Hezbollah and
15 Fatah?
16     A.    I do not know the relationship between
17 those two organizations.
18     Q.    What about between Hezbollah and the
19 PA?
20     A.    Do not know. And Hezbollah is located
21 out of Lebanon and they have other interests.

Page 238

1    Q.   In your opinion, is Hezbollah
2    associated with Force 17?
3    **A.   I don't have any specific information**
4    **on that.**
5    Q.   Tell me why you've included in your
6    report a reference to this individual's high rank
7    in Hezbollah.
8    **A.   Again, they're both terrorist**
9    **organizations.**
10    Q.   At the top of that page, you state
11    that, "Fatah, now under the umbrella of the PLO,
12    continued to use violent attacks against innocent
13    civilians, even though Fatah purported formally
14    to renounce 'armed struggle' in accordance with
15    the 1993 Oslo Accords," and you cite to a
16    Congressional Research Service report, correct?
17    **A.   Correct.**
18    **(Defendants' Deposition Exhibit Number**
19    **264 was marked for identification.)**
20    **BY MR. WISE:**
21    Q.   Exhibit 264, is that the document

Page 239

1    cited in your Footnote Number 11?
2    **A.   It appears to be.**
3    Q.   Now, is this an instance where --
4    well, let me first ask this question:  Can you
5    point me to a place in this report where the CRS
6    indicates that Fatah used violent attacks against
7    innocent civilians?
8    **A.   Well, let me look at the report again.**
9    **Again, I don't have my copy that's marked.**
10    **(Witness Reviews Document.)**
11    **A.   Okay.  I believe my footnote was meant**
12    **to amplify the second part of that sentence,**
13    **where it says, "Even though Fatah purported**
14    **formally to renounce 'armed struggle' in**
15    **accordance with the 1993 Oslo Accords."**
16    Q.   So the statement that Fatah continued
17    to use violent attacks against innocent civilians
18    is just your opinion, not drawn directly from
19    this report?
20    **A.   That is my opinion, but I believe the**
21    **footnote was meant to amplify the second part of**

Page 240

1    the sentence.
2    Q.   The paragraph about the Al-Aqsa
3    Martyrs Brigade includes the sentence that, "The
4    Al-Aqsa Martyr Brigade, which emerged in 2000 at
5    the time of the Second Intifada, operated with
6    horrific violence against civilians during the
7    Second Intifada, Footnote 14.  Their goal was to
8    use violence against civilians to force Israel to
9    bend to Palestinian demands in 'peace' talks,
10    Footnote 15."
11    Both of those citations are also to
12    this CRS report which is Exhibit 264, correct?
13    **A.   Let's see here.**
14    **(Witness Reviews Document.)**
15    **A.   No, that's not.  That's to the U.S.**
16    **State Department website list of foreign**
17    **terrorist organizations.**
18    Q.   Okay.  When you have Footnote 14 that
19    says, "Id."?
20    **A.   Oh, I see.  Yes, you're right.  That**
21    **does go back to the U.S. Congressional Research**

Page 241

1    **Service, which -- yes.**
2    Q.   And having looked at this document,
3    can you point me to where the CRS report states
4    that the Al-Aqsa Martyrs Brigade operated with
5    horrific violence against civilians?
6    **A.   Well, the report talks about the**
7    **origins of the Brigades and the fact that they**
8    **are a designated foreign terrorist organization,**
9    **so there is -- that would be on Page -- under**
10    **Fatah and the Palestinian Liberation Organization**
11    **leadership instruction about the middle of that**
12    **paragraph.**
13    Q.   So it was the fact of the designation
14    by the State Department that led you to say that
15    they operated with horrific violence against
16    civilians?
17    **A.   Of course.**
18    Q.   But that language, you would agree
19    with me, is not in the CRS report?
20    **A.   If it was, I would have quoted it.**
21    Q.   Your next sentence where you drop a

Page 242

1    footnote after the sentence there, "Goal was to
2    use violence against civilians to force Israel to
3    bend to Palestinian demands in 'peace' talks,"
4    and then you site to the CRS report, where in the
5    CRS report do you see support for that
6    contention?
7        A.    That's the general theme of the
8    organization.  And I'm not citing to that as the
9    sole authority for that sentence; I just simply
10   do an Id. to indicate that that report also
11   amplifies that point, but that's an obvious
12   statement in my mind.
13       Q.    Okay.  It amplifies the point, but
14   you'd agree the report doesn't actually make that
15   point, correct?
16       A.    It doesn't use that same language, no,
17   but that's obviously what they do.  That's what
18   it's all about.
19       Q.    But that's based on something other
20   than what's in this report, correct?
21       A.    I wouldn't say that's correct, no.

Page 243

1    The general theme of the report supports that
2    sentence.
3        Q.    Professor, point to me the part of
4    this report that supports the sentence that
5    Al-Aqsa Martyrs Brigades', "Goal was to use
6    violence against civilians to force Israel to
7    bend to Palestinian demands in 'peace' talks."
8        A.    Okay.  "Additionally, three
9    militia-type organizations have developed from
10   Fatah:  The Al-Aqsa Martyrs Brigade, a designated
11   foreign terrorist organization that emerged
12   during the intifada that began in September 2000,
13   and takes a violent approach to force Israel to
14   end its occupation," and that's basically what
15   that sentence is saying in my paper, and that's
16   another way to say it.
17       Q.    You think that's the same thing?
18       A.    Very similar.
19       Q.    Was the Al-Aqsa Martyrs Brigade
20   involved in peace talks?
21       A.    Well, were they directly involved in

Page 244

1    the peace talks?
2        Q.    Yes.
3        A.    No, they're not involved in the talks,
4    but by their actions, they're influencing the
5    outcome of the talks.  That's the whole goal of
6    terrorism.
7        Q.    On Page 3, you have a section about
8    the Tanzim militia in the last paragraph?
9        A.    Yes.
10       Q.    In your initial report, you wrote that
11   you had read the complaint in Sokolow versus PLO,
12   correct?
13       A.    That's correct.
14       Q.    Which of the attacks in Sokolow are
15   alleged to be the work of Tanzim?
16       A.    Well, as you look at the complaint,
17   the complaint indicates a listing of various
18   terrorists organizations, to include unknown
19   organizations in that list, and so I think the
20   complaint also uses the term "terrorism units" to
21   indicate that these are groups that operate.  So

Page 245

1    while you don't list them all in the complaint,
2    the complaint does list some of them.
3        Q.    Is it your belief that the Sokolow
4    complaint makes allegations against the Tanzim
5    militia?
6        A.    They're included in it, I would say,
7    yes.
8        Q.    You cite three times to a 2002 CRS
9    report titled, "The PLO and its Factions,"
10   correct?
11       A.    Let me check.  I see three cites, yes.
12           MR. WISE:  I only have one copy of
13   this for some reason, so I'm going to mark it.
14           MR. YALOWITZ:  Why don't we pause for
15   a moment.
16           MR. WISE:  You want me to go copy it?
17           MR. YALOWITZ:  Yeah.  Actually, I
18   think Jeffrey has a copy of it.  It's June 10th,
19   2012?
20           MR. WISE:  Yeah.  So let's mark this.
21           (Defendants' Deposition Exhibit Number

Page 246

1  265 was marked for identification.)
2      BY MR. WISE:
3      Q.    So this is 265.  Take a look at this
4  and make sure that it matches what you're looking
5  at in your notebook.
6      A.    Okay.
7      (Witness Reviews Document.)
8      A.    Looks like I Xeroxed every other page.
9  Didn't push two-sided, pushed one-sided, so we
10  have every other page of this document.
11      MR. YALOWITZ:  Maybe we should just
12  get a couple copies made.
13      MR. WISE:  Sure.  I apologize.
14      (Brief Recess.)
15      BY MR. WISE:
16      Q.    Professor, you have 265 in front of
17  you?
18      A.    Yes.
19      Q.    Which is the document cited Footnote
20  21 of your rebuttal report?
21      A.    Yes, it is.

Page 247

1      MR. YALOWITZ:  I'm sorry, I have the
2  wrong one.
3      MR. WISE:  265 is there.
4      BY MR. WISE:
5      Q.    The copy that you came with today was
6  missing every other page, correct?
7      A.    Yes, it was.
8      Q.    Did you have another copy of that
9  document that you worked off of when you wrote
10  this report?
11      A.    Oh, yeah.  Yes, I did.
12      Q.    What did you do with that copy?
13      A.    It's in my office.
14      Q.    So look at 265, if you would.
15      A.    Okay.
16      Q.    And we were talking about your
17  paragraph about Tanzim, correct?
18      A.    Correct.
19      Q.    You cite 265 three times in your
20  review of Tanzim?
21      A.    Correct.

Page 248

1      Q.    And you believe it to be accurate in
2  its description of the Tanzim, correct?
3      A.    I'd have to look at the context again.
4  Again, the footnotes don't stand for every
5  proposition in the sentence.  It depends on what
6  part of the sentence.  We'd have to look at the
7  sentence and dissect it.
8      Q.    Is it fair to say that you found this
9  document to be a credible document?
10      A.    Yes.  The CRS report, yes.
11      Q.    This report also covers the Al-Aqsa
12  Martyrs Brigade, correct?
13      A.    Yes, it does.
14      Q.    And on page CRS 5, the last paragraph
15  starts, "The Al Aqsa Martyrs Brigade does not
16  have a well defined structure and, of the
17  factions discussed in this section, is the one
18  over which Arafat would appear to have the least
19  political control."  Correct?
20      A.    That's what it says.
21      Q.    The next sentence says, "There is no

Page 249

1  firm evidence that Arafat selected any leaders or
2  commanders of the Brigades or specifically
3  authorized its formation."  Right?
4      A.    Yes.
5      Q.    You didn't include either of those
6  portions of the CRS report in your rebuttal,
7  correct?
8      A.    No, I didn't take any quotes from
9  those sections.
10      Q.    On the next page, the report
11  concludes, in the first sentence of the first
12  paragraph, "It is not possible from publicly
13  available information to determine the exact
14  extent to which Arafat is able to or has sought
15  to control Palestinian factions that use
16  violence."  Correct?
17      A.    That's what it says.
18      Q.    You didn't cite that conclusion in
19  your report, correct?
20      A.    Well, I think I did to a degree
21  because if you read the sentence, it says, "It's

Page 250

1  not possible to determine the exact extent," and
2  I think that's a correct statement, but I think
3  that goes without saying. You can't determine
4  the exact extent because, again, that's a pattern
5  that totalitarian leaders utilize when they
6  conduct acts of terror. They don't want to leave
7  a paper trail.
8      Q. Do you believe there's any portion of
9  your rebuttal report that suggests that, "It is
10  not possible from publicly available information
11  to determine the exact extent to which Arafat is
12  able to or has sought to control Palestinian
13  factions that use violence"?
14     A. I think I cover that point on Page 2
15  of my report, where I compliment Arafat as being
16  a master at duplicity. He was the perfect choice
17  for the PLO because he was very good at doing
18  that. Shrewd leader who embraced terrorism on
19  the one hand and portrayed himself as a man of
20  peace on the other.
21     Q. That is where you believe you

Page 251

1  acknowledge the sentiment in that sentence of the
2  CRS report?
3      A. Yes.
4      Q. On Page 4 of your report, you state
5  that pursuant to the, excuse me, 1993 Oslo
6  Accords, Israel, quote, "Recognized the
7  Palestinian National Authority (PNA) as the sole
8  legitimate representative of the Palestinian
9  people, with Arafat as its head period." Right?
10     A. Yes.
11     Q. You know that's factually incorrect,
12  right?
13     A. No, I don't.
14     Q. You believe that the PA or the PNA was
15  at some point the sole legitimate representative
16  of the Palestinian people?
17     A. Well, they were recognized, yes, as
18  the legitimate representative. But, again,
19  that's a function that Arafat was the head, so
20  they recognized -- basically, what I'm trying to
21  say is Arafat is the head of the Palestinian

Page 252

1  people in terms of his leadership in the PA, the
2  PNA, PLO and Fatah.
3      Q. Aside from the text of the report, let
4  me just ask you this as a yes or no question: Is
5  it your opinion as you sit here today that the PA
6  has been recognized as the, "Sole legitimate
7  representative of the Palestinian people"?
8      A. The PA or the PNA.
9      Q. Let's start with the PA. Has the PA
10  ever been recognized as the sole legitimate
11  representative of the Palestinian people?
12     A. I believe it has.
13     Q. And what about the PNA?
14     A. I believe that's true, too.
15     Q. Later on Page 4 you cite to a Council
16  on Foreign Relations report from 2006 at Footnote
17  29, correct?
18     A. Correct.
19     Q. And that same piece is cited for your
20  last statement on that page, correct?
21     A. Well, when you say it's stated for

Page 253

1  that, again, it's a footnote, so it's associated
2  with that last sentence; that is correct.
3      Q. When you say, "It's associated with
4  that last sentence"?
5      A. Yes, I did say that.
6      Q. When you put the footnote there, what
7  is -- strike that. Let's go to the document.
8          (Defendants' Deposition Exhibit Number
9  266 was marked for identification.)
10         BY MR. WISE:
11     Q. Do you recognize 266 as the document
12  cited in your Footnotes 29 and 30?
13     A. This appears to be that document.
14     Q. You first cite it for the proposition
15  that, "Accordingly, when it came to fending off
16  accusations that he failed to combat terrorism,
17  Arafat would maintain with a straight face that
18  he was doing everything in his power to fight
19  it."
20         Did I read that correctly?
21     A. That is a correct reading of that

Page 254

1  sentence.
2      Q.   And you are now saying that when you
3  dropped the footnote, it was to amplify your
4  statement, not to suggest that this document
5  supported that conclusion; am I understanding you
6  correctly?
7      A.   I need to read the document again.  I
8  don't have my original copy in front of me.  I
9  notice this one is dated December of 2005.
10          (Witness Reviews Document.)
11      A.   I'm not sure this is the one I cited
12  to.  I'll just read it real quick.
13          (Witness Reviews Document.)
14      A.   It substantially looks like the same
15  document.  So your question is:  Does this
16  document amplify some part of that sentence?
17  Yes.
18      Q.   But when you drop a footnote to it,
19  you're not suggesting that this report directly
20  supports the contention you make in the sentence;
21  is that your testimony?

Page 255

1      A.   What does "drop a footnote" mean?
2      Q.   Write a footnote at the end of the
3  sentence and then cite to this article.
4      A.   It depends.  It depends on the
5  sentence and on the footnote.  So this particular
6  sentence, you can amplify some of, you know, the
7  content from this report, yes.
8      Q.   Okay.  So point to me in the exhibit,
9  266, what portion of 266 you were referring to
10  when you cited this article in Footnote 29.
11      A.   I call your attention to the top
12  portion, third line, fourth line down on the
13  second page, where it has, "PA leaders insisted
14  Arafat was doing all he could to fight
15  terrorism."  And then a little further down,
16  "Israeli attacks have destroyed the very forces
17  Arafat could have used to crack down on
18  terrorism," and that would answer Footnote 30 on
19  Page 4 of my white paper.
20      Q.   So you're citing to the portion of the
21  article that states that PA officials claimed

Page 256

1  Israeli attacks destroyed forces the PA could
2  have used to crack down, correct?
3      A.   In my report, yes.
4      Q.   And that's support for the sentence
5  that reads, "His efforts to portray his sense of
6  helplessness included circular arguments claiming
7  that Israeli attacks on those responsible for
8  terrorism destroyed the very forces he could have
9  used to crack down on terrorism!"?
10      A.   Uh-huh.  Yes.
11      Q.   On Page 5, you cite to a 2002
12  Congressional Research Service report titled
13  "Terrorism:  Near Eastern Groups and State
14  Sponsors."
15      A.   Yes.
16      Q.   For the proposition that
17  administrative reports, "Consistently found that
18  factions associated with the PLO encouraged or
19  participated in illegal violence against
20  civilians in Israel," correct?
21      A.   That's correct.

Page 257

1          (Defendants' Deposition Exhibit Number
2  267 was marked for identification.)
3          BY MR. WISE:
4      Q.   Is 267 the document you cited in the
5  Footnote 31?
6      A.   I believe it is.  Yes, I recognize the
7  front of it and the Table of Contents.  Yes, yes
8  it is.
9      Q.   Now, in your footnote you don't cite
10  to a -- oh, you do cite to a specific page,
11  excuse me.  So let's turn to Page 23.
12      A.   Okay, I'm on Page 23.
13      Q.   And tell me, as you look at this,
14  where the support is on this page for the
15  assertion that administration reports, plural,
16  "Consistently found that factions associated with
17  the PLO encouraged or participated in illegal
18  violence against civilians in Israel."
19      A.   Well, I believe I'm referring to the
20  first full paragraph and four lines down.
21      Q.   Which reads, "An Administration report

Page 258

1  to Congress on PLO compliance with the
2  commitments (covering December 15, 2000 through
3  June 15, 2001) alleges that factions of the PLO
4  have encouraged or participated in violence
5  against Israel," correct?
6      **A.  Yes. And then you could include the**
7  **rest of that as well, so this is an example of an**
8  **administrative report that amplifies my general**
9  **sentence that -- in the plural, and in that, I**
10 **would include, of course, the broader reports**
11 **that Congress has issued that I list in the white**
12 **paper.**
13     Q.   The document you cite refers to a
14 single report, right?
15     **A.   The footnote refers to a single**
16 **report, yeah. The footnote is quoting a single**
17 **report, and I use that as an example of one, but**
18 **my opinion is that there are numerous**
19 **administrative reports, and I would include in**
20 **that the resolutions, the bills as administration**
21 **in the broader sense, our legislative branch.**

Page 259

1      Q.   Okay. You say in that same sentence,
2  "The PLO encouraged or participated in illegal
3  violence against civilians in Israel."
4          Looking at the Congressional Research
5  Service document you cited, would you agree with
6  me that the report does not include the words
7  "illegal" or "against civilians?"
8      **A.   Well, terrorism is illegal by**
9  **definition, and the targets of terrorism are**
10 **generally civilians, so it's included in there,**
11 **in my opinion. Doesn't specifically use those**
12 **two words.**
13     Q.   So this is another example of where
14 you amplified what was in the document that you
15 cited?
16         MR. YALOWITZ: Object to the form.
17     **A.   Violence against Israel, it's obvious**
18 **that the violence in question is towards**
19 **civilians in Israel, and the violence is illegal.**
20     Q.   So it's another example of where you
21 amplified --

Page 260

1      **A.   Clarified.**
2      Q.   -- something that was not --
3          MR. YALOWITZ: Object to the form.
4      **A.   I'd use the word "clarified".**
5      Q.   But you amplified something that was
6  not in the original document?
7          MR. YALOWITZ: Objection.
8      Q.   You can answer.
9      **A.   I wouldn't say "amplified." I'd say**
10 **"clarified." So no. The answer is no.**
11     Q.   You clarified something that was not
12 in the original report?
13     **A.   I made it clearer.**
14     Q.   Turn to Page 6 of your rebuttal
15 report. You state that, in the second paragraph,
16 third line, "A 2012 United States Congressional
17 Research Service report claims that 'since Oslo
18 in 1993, these groups [Palestinian terror
19 organizations] have engaged in a variety of
20 methods of violence, killing approximately 1,350
21 Israelis (over 600 civilians" --

Page 261

1          MR. YALOWITZ: Objection.
2      **A.   Nine hundred.**
3      Q.   Excuse me?
4      **A.   You said 600. It says 900.**
5      Q.   Nine hundred. Thank you.
6          --"- including Jewish settlers in the
7  Palestinian territories - and 450 security force
8  personnel),'" correct?
9      **A.   That's what it says.**
10     Q.   And you cited to this Congressional
11 Research Service report from 2012?
12     **A.   Yes.**
13         MR. WISE: Mark that.
14         (Defendants' Deposition Exhibit Number
15 268 was marked for identification.)
16         BY MR. WISE:
17     Q.   First question: You added the
18 [Palestinian terror organizations] language,
19 correct?
20     **A.   That's correct.**
21     Q.   The report itself names specific

Page 262

1  organizations, and I'll direct your attention to
2  Page 11.
3      A.  I'm with you.
4      Q.   And then the specific groups that the
5  report identifies are Hamas, the Abu Nidal
6  Organization, N-I-D-A-L, the Al-Aqsa Martyrs
7  Brigade, Palestine Liberation Front, Palestine
8  Islamic Jihad, Popular Front for the Liberation
9  of Palestine, and Popular Front for the
10  Liberation of Palestine-General Command, correct?
11      A.  That is correct, but my sentence where
12  I quoted from does not include that.  That's in
13  the previous sentences.
14          In other words, I didn't leave
15  anything out in my quote.  There's no ellipses.
16      Q.   Okay.  The quote says, "Since Oslo in
17  1993, these groups have engaged in a variety of
18  methods of violence."
19      A.  Yes.
20      Q.   Correct?
21      A.  And that's starting -- the sentence

Page 263

1  you read is several sentences before that
2  sentence that I quoted.
3      Q.   In the language that you quoted, the
4  words "these groups" refers to the list of
5  organizations that I just read to you, right?
6      A.  Yes.
7      Q.   This report does not allege that any
8  of those groups were, "Under Arafat," right?
9      A.  Incorrect.  It's got the group Al-Aqsa
10  Martyrs Brigade, such as the Fatah-affiliated,
11  Fatah -- Oh, the Brigade came out of Fatah.
12  Arafat's the founder of Fatah.
13      Q.   I'm sorry.  Where are you reading?
14      A.  I'm reading from the sentence where it
15  starts, "Most Palestinian militant groups," and
16  you'll see a dash, "such as Fatah-affiliated
17  Al-Aqsa Martyrs Brigade."  Fatah is the party
18  that Arafat heads and founded.  The Brigade came
19  out of Fatah.  Therefore, there is a connection.
20      Q.   What is the connection between Hamas
21  and the Palestinian Authority?

Page 264

1      A.  Well, there are a lot of connections.
2      Q.   Tell me what they are.
3      A.  They're Palestinians.  They're
4  composed of people that are Palestinians.  It is
5  an organization that is vying for power with the
6  Fatah party.  Arafat at one time attempted to
7  co-op them, but they refused, so there's, you
8  know, there's -- there's not a direct link, but
9  there is a link.
10      Q.   Any other links that you can name
11  other than what you've just told me?
12      A.  Well, we know that Arafat, again, made
13  several attempts and overtures towards Hamas to
14  have them join a unity government.  We know that
15  Arafat knew that Hamas engaged in violence
16  against civilians, and we know that Arafat had
17  responsibility for that violence because he
18  incited and used Hamas for his own purposes, in
19  my opinion, to engage in violence.
20      Q.   Anything else?
21      A.  Not in the general sense.

Page 265

1      Q.   What are the links between the
2  Palestinian Authority and the Abu Nidal
3  Organization?
4      A.  Well, these organizations that are
5  listed here, they are organizations that exist in
6  the Palestinian territories, and you would expect
7  to see, again under my discipline of terrorism
8  law, that you wouldn't -- you would not expect to
9  see a direct command and control linkage where
10  Arafat is sending out direct orders to these
11  organizations.  That's not how they operate.
12          So in some cases, the links are clear,
13  much clearer, for example, where responsibility is
14  claimed for certain terror attacks.  In other
15  cases, you develop culpability by the actions of
16  Yasser Arafat and the PLO, how they deal with
17  these organizations, how they perceive them.
18      Q.   So what is the link between the
19  Palestinian Authority and the Abu Nidal
20  Organization?
21      A.  Well, I think that they are -- Arafat

Page 266

1  uses them or has used them, solicited them to,
2  incited them to engage in violence.
3      Q.   Give me one example of what you're
4  talking about.
5      A.   Well, we can look at the speeches that
6  Arafat has made, public statements about jihad on
7  numerous occasions, and we can look at the
8  resolutions that Congress has passed, 426 by a
9  vote of 365 to 30, where they make certain
10 findings about the responsibility of the
11 Palestinian Authority to control the violence and
12 not to incite violence.
13     Q.   Do you think in any of those
14 materials, you're going to find any reference to
15 the Abu Nidal Organization?
16     A.   Well, again, you would not expect
17 direct links because that's the modus operandi.
18 They don't put out.  And if they do have direct
19 communiques, they shred them, destroy them.  They
20 want to engage in terror without suffering any of
21 the responsibility.

Page 267

1      Q.   Who are the leaders of the Abu Nidal
2  Organization?
3      A.   Again, I am not proficient in Arabic.
4  I can't tell you the names of the leaders, but I
5  know how these organizations operate, and this is
6  a classic case of how a Government, in this case
7  led by Yasser Arafat and the PLO, conducts
8  terror.
9      Q.   When did the Abu Nidal Organization
10 form?
11     A.   I'd have to look at my notes.
12     Q.   Was it ever designated as a foreign
13 terrorist organization?
14     A.   I believe it is.
15     Q.   What year?
16     A.   I'd have to look at my notes.
17     Q.   You think it's in your notes?
18     A.   I'm sure it is, yes.
19     Q.   What notes are you referring to?
20     A.   The notes that I do not have with me.
21 I have a volume of notes back at my office.

Page 268

1      Q.   That you've made in preparation for
2  this report?
3      A.   No.  Not necessarily, no, I have -- I
4  have notes on books, notes, articles on a variety
5  of terrorist organizations.
6      Q.   Did you consult those notes in writing
7  this report?
8      A.   Yes.
9      Q.   They formed the basis for your report?
10     A.   In part.  My reports also are based on
11 my experience talking to people.
12     Q.   Tell me what link there is between the
13 Palestine Liberation Front and the Palestinian
14 Authority.
15     A.   Again, I can tell you that the groups
16 that are associated, that operate within the
17 territory of the Palestinian areas, the links
18 are -- it depends on the situation, on the
19 circumstances, so.
20     Q.   Can you point to a single link between
21 the Palestinian Authority and the Palestine

Page 269

1  Liberation Front?
2      A.   Give me one second.  Let me review my
3  notes here because -- we do know that the PFLP
4  was given 50 of the PLO's 100-seat National
5  Council.
6      Q.   Do you think the PFLP is the same
7  thing as the Palestine Liberation Front?
8      A.   The Popular Front for the Liberation
9  of Palestine?
10     Q.   I'm talking about the Palestine
11 Liberation Front.  Do you think that's the same
12 thing as the PFLP?
13     A.   No, that's a different organization.
14     Q.   I'm looking for links between the
15 Palestine Liberation Front and the Palestinian
16 Authority.
17     A.   Well, again, the links would be the
18 same for a vast majority of these groups.  They
19 have different names, and the links in terms of
20 culpability is, I guess, what you're asking.  If
21 you're asking, "What is the paperwork, what's the

Page 270

1  charter," I don't know.
2      Q.   Are you saying that the Palestine
3  Liberation Front is just a different name for the
4  Palestinian Authority?
5      A.   No. I'm saying that the Palestinian
6  Authority uses various groups that have evolved,
7  either on their own or that came out of the Fatah
8  party. Like we know, for example, the Martyrs
9  Brigade came out of the Fatah party. Other
10 terrorist organizations have a more shadowy
11 history. It's hard to pin down.
12      But in terms of culpability -- and
13 that's my expertise -- it's not giving you the
14 history of how these organizations developed and
15 who founded them, and where did they come from,
16 and those types of issues. My concern is with
17 the culpability of the PLO, Yasser Arafat, his
18 Fatah party vis-a-vis these organizations, and I
19 believe that he has culpability.
20      Q.   You don't know the first thing about
21 the Palestine Liberation Front, do you?

Page 271

1      A.   I know that it's a terrorist
2  organization.
3      Q.   Based on what?
4      A.   Based on my readings. Based on my
5  research.
6      Q.   What readings and what research are
7  you referring to?
8      A.   I don't understand the question. What
9  readings? I mean --
10      Q.   What readings and what research are
11 you referring to as support for your statement
12 that you just made?
13      A.   My readings of numerous articles over
14 the years. My discussions with other terrorism
15 experts. Again, I can't tell you the history of
16 many of these organizations -- who headed them,
17 who founded them, where they developed -- that's
18 not my expertise.
19      Q.   You can't cite me to a single article
20 you've read about the Palestine --
21      A.   Not off the top of my head.

Page 272

1      Q.   -- Liberation Front?
2          MR. YALOWITZ: Let him finish his
3  question.
4      A.   Oh, sorry. Not off the top of my
5  head, no.
6      Q.   Or a single conversation you've had
7  with a colleague about the Palestine Liberation
8  Front?
9      A.   Not that particular organization, no.
10      Q.   Next line of this CRS report that
11 we've just been looking at states, "The
12 Palestinians who insist they are engaging in
13 asymmetric warfare with a stronger enemy point to
14 the approximately 7,000 deaths inflicted on
15 Palestinians by Israelis since 1993, some through
16 acts of terrorism aimed at civilians." Do you
17 see that sentence?
18      A.   I see it.
19      Q.   Do you believe that to be a true
20 statement about the number of deaths inflicted on
21 Palestinians since 1993?

Page 273

1      A.   It wouldn't surprise me if it was
2  true. You're talking about the casualty figures?
3      Q.   Yes. Turn to Page 8 of your rebuttal
4  report.
5      A.   I have it.
6      Q.   Second sentence, you write, "Gathering
7  all the pertinent facts, the United States
8  Congress specifically found that Yasser Arafat
9  and the forces directly under his control were
10 responsible for the murder of hundreds of
11 innocent Israelis and the wounding of thousands
12 more," correct?
13      A.   Yes.
14      Q.   Describe what you meant by gathering
15 all the pertinent facts as it related to House
16 Resolution 4693, which is the resolution cited at
17 the end of your sentence.
18      A.   Well, again, I'm assessing that our
19 Congress, before they pass these resolutions by a
20 vote of 365 to 30 in the case of Resolution 426,
21 did due diligence in gathering all the pertinent

Page 274

1  facts before they would sign their names on this
2  resolution, as any rational person would do.
3      Q.   You say, "Assessing." How did you
4  make that assessment?
5      A.   How do I make the assessment?
6      Q.   Let me ask it a different way. You
7  assumed that they did fact finding.
8          You did not assess it, correct?
9      A.   Did I write the report? No, I didn't
10  write it. I'm making the assumption, yes, that
11  Congress did due diligence before they put their
12  name on a House Concurrent Resolution by a vote
13  of 365 to 30, and I'm giving them that
14  assessment, yeah.
15         MR. WISE: Can we take a five-minute
16  break?
17         MR. YALOWITZ: Sure.
18         (Brief Recess.)
19         BY MR. WISE:
20      Q.   Professor, can you turn to Page 12 of
21  your rebuttal report.

Page 275

1          Starting on Page 12, you cite to 16
2  quotations that you list between Pages 12 and 15,
3  correct?
4      A.   Yes.
5      Q.   And these quotations were allegedly
6  made between the years 1996 and 2010, correct?
7      A.   You know what, I didn't put the dates
8  on some of the ones from '09, '10, '11, and '12,
9  which I should have for consistency, but I
10  believe that to be true.
11      Q.   Were there any quotations of Mr.
12  Arafat that you considered and did not include in
13  this list?
14      A.   I believe -- well, yes, there was one.
15  There was one quote from 2001, but I didn't put
16  it in here.
17      Q.   And why not?
18      A.   I forgot. I think that's in the first
19  report, in his incitement of the crowd to --
20  regarding the 12-year-old boy that was killed, I
21  don't have that in this one. It's in the other

Page 276

1  one.
2      Q.   So we're talking about the quote that
3  was cited in the Levitt piece?
4      A.   Yes. I wanted to put that in here,
5  but I didn't.
6      Q.   You just forgot to put it in?
7      A.   I forgot to put it in.
8      Q.   Other than that one quote that you
9  forgot, were there others that you considered but
10  decided not to put in?
11      A.   Well, there were a lot of quotes that
12  I was aware of associated with his desire for
13  quote, "peace and harmony and brotherhood" and
14  things of that nature. I did not include those
15  in there.
16      Q.   So the quotations that contradicted
17  your opinion, you left out of the report?
18      A.   Well, I'm not sure that they really
19  contradicted my opinion. I left them out because
20  that's what a totalitarian leader does. They
21  have quotes about peace. And I probably should

Page 277

1  have put some in there to amplify his duplicity.
2      Q.   To you, any quotation that Arafat made
3  calling for peace, calling for cease-fires,
4  calling for ends to violence were duplicitous?
5      A.   At the least, they were highly
6  suspicious because that's the nature of a
7  totalitarian dictator, and that's -- in my
8  opinion, that's what he was. You would have to
9  take them with a grain of salt, as the idiom
10  goes.
11      Q.   The first two quotes are alleged to be
12  from speeches Mr. Arafat made in 1996, correct?
13      A.   Yes.
14      Q.   Four years before the beginning of the
15  Second Intifada, correct?
16      A.   That would be correct.
17      Q.   Both from public rallies?
18      A.   Yes.
19      Q.   How do you reconcile the public nature
20  of those speeches with the contention that Arafat
21  was extremely careful to conceal his involvement

JEFFREY ADDICOTT DEPOSITION     October 2, 2013     Sokolow v. the PLO

Page 278

1  in promoting and advocating terror?
2      A.    It depends on the audience.  It
3  depends on the audience and depends on the
4  context.
5      Q.    Okay.  So looking at Quotes 1 and 2 in
6  your list, tell me how you reconcile those
7  quotations with your contention that Arafat was
8  extremely careful to conceal his involvement in
9  promoting and advocating terror, assuming that
10  those quotes stand for the proposition that you
11  allege.
12     A.    One of the problems with democracies
13  is that they desperately want to believe that the
14  opponents of democracies will negotiate with
15  them, and, therefore, they're willing to overlook
16  statements that would otherwise be offensive.
17  Because in their desire for peace, they will try
18  to overlook these types of statements, and
19  they'll rationalize them by saying that, "Well,
20  he simply had to say that to the audience."
21         So I think that Yasser Arafat, knowing

Page 279

1  that, that the international community was so
2  desperate for peace that they would allow him
3  great latitude, and he played on that.
4      Q.    So it's your view that Arafat, in
5  speaking these words, was calling for acts of
6  terror, but believed that democracies would look
7  the other way because they wanted so badly to
8  believe in peace?
9      A.    In many instances, that's correct.
10  And if you look at the words, themselves, they
11  are not direct calls in terms of, "Pick up your
12  guns and follow me."  They are shrouded in code
13  words.  As we discussed before, Jihad, Jihad,
14  Jihad has two meanings.  So if he's confronted,
15  he can simply say, "Well, I was referring to the
16  'peaceful' meaning."  But any reasonable person,
17  based on the context and the number of statements
18  that he's made, and his duplicity in peace
19  negotiations all the way from Camp David back,
20  would think otherwise.
21     Q.    The third quote is from 1997, correct?

Page 280

1      A.    Yes.
2      Q.    And in this quotation, Arafat is
3  alleged to have used the word "Intifada,"
4  correct?
5      A.    Yes.
6      Q.    What is your definition of the term
7  "Intifada?"
8      A.    It's an uprising.  It's an armed
9  uprising using violence.
10     Q.    Armed uprising using violence.  Does
11  it necessarily constitute armed uprising?
12     A.    Well, violence can be used with a rock
13  or a hand, but generally it refers to violence.
14  How that violence is portrayed fluctuates from
15  mortar to a rock.  Both can kill you.
16     Q.    Is it your opinion that every time the
17  word "Intifada" is used, it is a reference to a
18  violent uprising?
19     A.    Not every time.  You'd have to look at
20  the context.  In this context, I'd say it's a
21  call for violence, yes.

Page 281

1      Q.    And tell me the context that leads you
2  to that conclusion?
3      A.    Just a plain reading of the language.
4  "Intensify the revolution and the blessed
5  intifada ... We must burn the ground under the
6  feet of our invaders."
7      Q.    What was the circumstance of the rally
8  at which Arafat made that statement?
9      A.    I believe it was a political really of
10  some sort.  But, again, I don't speak the
11  language.  I do not know.
12     Q.    Why do you believe that it was a
13  political rally?
14     A.    Most of his rallies were associated
15  with him staying in power, and everything he did
16  was calculated to maintain his power, expand his
17  power in his own interest.
18     Q.    Do you have any idea what the
19  circumstances of this speech were?
20     A.    I do not know, no.
21     Q.    The fourth quote reads, "The

Page 282

1  settlements [Israeli] are a declaration of total
2  war against the Palestinian people, an open and
3  destructive war against our people, our land, and
4  our holy places. The Israeli settlements on our
5  land, in our Jerusalem and in the rest of the
6  West Bank are a war against the peace process."
7  Correct?
8      A.  That's what it says.
9      Q.  What is the Conference of Businessmen
10 for Jerusalem?
11     A.  I've never attended it. I assume it's
12 some type of an organization associated with
13 people that do business in the City of Jerusalem.
14     Q.  Do you know whether its membership is
15 predominantly Jewish? Predominantly Palestinian?
16     A.  I would assume that the organization
17 does not have any Jewish members based on the
18 content of this language.
19     Q.  Why would you assume that?
20     A.  He's advocating basically violence, in
21 my opinion, against those that are not

Page 283

1  Palestinian that live in Jerusalem and that
2  occupy what he thinks is his land.
3      Q.  Tell me the specific language in that
4  quote that you claim is an advocation of violence
5  by Mr. Arafat.
6      A.  Well, obviously he believes in this
7  sentence here that the Israelis, by occupying the
8  land, are in a state of total war against the
9  Palestinian people, and, therefore, it's
10 contradictory, obviously, from the 1993 Oslo
11 Accords and the reality on the ground.
12         But that is -- you know, it's language
13 that incites. It's language meant to incite, in
14 my opinion.
15     Q.  You don't know who the listeners were,
16 right?
17     A.  Well, they're at the Conference of
18 Businessmen for Jerusalem, which I would assume
19 were non-Jews. When he says, "Our people, our
20 land, and our holy places," he's not talking to
21 Jews.

Page 284

1      Q.  How do you know that?
2      A.  Common sense.
3      Q.  Let's take it clause by clause. "The
4  settlements are a declaration of total war
5  against the Palestinian people."
6          Do you claim that part of the sentence
7  is advocating violence?
8      A.  Well, the Palestinian people, back to
9  the original premise, would not be Jews. These
10 would be Arabs. And it is not a total
11 declaration of war. That's inconsistent with the
12 1993 Oslo Accords. He knows that's not true.
13     Q.  What part of saying, "The settlements
14 are a declaration of total war against the
15 Palestinian people," is advocating violence?
16     A.  Well, he's indicating, by using this
17 inflammatory language, which is false, that
18 settlements are not a declaration of total war,
19 because that obviously in the mind of any normal
20 person means that if I am the object of total
21 war, I must do something about it, and that would

Page 285

1  be the mind of any person that's reading this,
2  that he's advocating for me to respond to it.
3  And like kind at a minimum, which would be meet
4  violence with violence.
5      Q.  "An open and destructive war against
6  our people, our land, and our holy places," how
7  is that a call to violence?
8      A.  Again, he's asking people to respond
9  to the false claim that the Israeli settlements
10 constitute illegal violence. It's normal to
11 assume that if I was a Palestinian reading this
12 letter, and I think any reasonable person would
13 read this, that we need to do something about
14 this. Total war means that -- the term "total
15 war" indicates disregard for civilians to attack
16 anything that -- you know, any structure, any
17 person, any thing. That's total war, which is
18 illegal. Total war is illegal. You cannot
19 engage in total war. It's a war crime. You
20 cannot target civilians. You can't target
21 civilian facilities.

Page 286

1    And so the implication is that they
2  are engaging in a total genocide on the
3  Palestinian people and their holy places, their
4  land, so I think it's logical to assume that he's
5  inciting Palestinians to do something in response
6  to the false claim to justify their use of
7  violence.
8    Q.   And is that the analysis that you made
9  in including in this sentence in your report?
10    A.   Yes.
11    Q.   You would agree that the settlements
12  in the West Bank have been cited as violating
13  international law, correct?
14    A.   No.
15    Q.   You don't believe that they have been,
16  or you don't agree with that conclusion?
17    A.   I do not agree with that conclusion.
18  Resolution 242, I believe, talked about the
19  Israeli right to peaceful borders, the return of
20  settlements, not -- the return of territory, not
21  all the territory if you read the language, and

Page 287

1  the definite article was left out for a very
2  specific purpose.  So, no, I don't, no.
3    Q.   You don't what?  You don't believe --
4    A.   I don't believe the statement that the
5  occupation is illegal.
6    Q.   Okay.  That wasn't my statement.  My
7  statement was:  You're aware that they have been
8  cited as being illegal, correct?
9    A.   By some people, yes.  Not by me.
10    Q.   Seven of the sixteen quotes by my
11  reading of your footnotes come from Palestinian
12  Media Watch.  Am I counting that correctly?
13    A.   Correct.
14    Q.   And have you personally viewed those
15  sources?
16    A.   Are you talking about the transcripts
17  or the actual video itself?
18    Q.   Let's start with the transcripts.
19  Have you viewed the transcripts?
20    A.   I have looked at the transcripts.
21    Q.   Have you viewed the original videos?

Page 288

1    A.   No.
2    Q.   Do you know whether any of the
3  original videos were clips spliced together?
4    A.   I have not reviewed the videos.  I do
5  not know if they're spliced.
6    Q.   Section 5 of your report on Page 15 is
7  titled, "Finances of the PLO and Arafat,"
8  correct?
9    A.   Yes.
10    Q.   What section of the Robinson report
11  does this section of your rebuttal report rebut?
12    A.   Well, again, his claim that there's no
13  connection between -- no culpability.  When I say
14  connection, I think that's the issue we're really
15  looking here, is not, again, the nature of the
16  terrorist organization, how it developed, where
17  it came from.  I'm looking at the culpability of
18  the PLO, the PA, Yasser Arafat, and so this --
19  you know, this is a conclusion because it is --
20  you can't have a terrorist connection unless
21  there's funding.  So when you say there is no

Page 289

1  terrorist connection, you're also saying there is
2  no funding.
3    Q.   So Robinson didn't talk about the
4  funding or the finances --
5    A.   Well, actually, he did.  He did.
6    Q.   Okay.  So tell me what part he did.
7    A.   Well, he is -- most of his critique
8  was associated with the captured documents,
9  Israeli captured documents, and in his report, he
10  went to some length to try to describe these
11  payments in a way that was, in my opinion,
12  circular reasoning.
13    Q.   And so Section 5 of your report is
14  intended to rebut Robinson's discussion of the
15  ODS documents?
16    A.   In part.
17    Q.   What's the other part?
18    A.   Well, I mean in part, yeah.  I don't
19  specifically address the documents in this report
20  because he admits that -- in my opinion, he
21  spends great length not attacking the

Page 290

1  **authenticity but trying to draw parallels**
2  **justifying the payments. Some of the parallels**
3  **he drew was, you know, payments that some**
4  **governments give to some organizations to buy**
5  **their silence, you know, in that context.**
6      Q.   You don't refer to the ODS documents
7  at all in your rebuttal report, correct?
8      **A.   Not in the rebuttal report, no. I**
9  **took a broader picture about the finances.**
10     Q.   Do you know who Glen Robinson is?
11     **A.   I've never met him.**
12     Q.   Have you heard of him?
13     **A.   I've never heard of him.**
14     Q.   You were not familiar with him at all
15  before you were asked to write a rebuttal report
16  about him?
17          MR. YALOWITZ: Object to the form.
18     **A.   I can't say never. I may have met him**
19  **at a conference. Who knows? I go to a lot of**
20  **conferences, you know, associated with these type**
21  **of topics. I can't place him.**

Page 291

1          MR. WISE: Professor, I think that's
2  all I have.
3          THE WITNESS: Thank you very much.
4          THE REPORTER: Reading and signing?
5          MR. YALOWITZ: Yes, reading and
6  signing is a good idea.
7          THE REPORTER: Copy of the deposition?
8          MR. YALOWITZ: You know, what I'd like
9  is a regular way copy on -- nothing expedited and
10  just by e-mail.
11          THE REPORTER: No hard copy at all?
12          MR. YALOWITZ: I'll have a hard copy
13  from the witness so all I need is e-mail so that
14  I have an electronic copy. I don't need
15  expedited. I don't need rough. Just your
16  standard budget style, economy style copy.
17          (Reading and signing requested.)
18          (Deposition concluded at 3:15 p.m.)
19
20
21

Page 292

1          CERTIFICATE OF CERTIFIED COURT REPORTER
2          I, CHERYL JEFFERIES, a Certified Court
3  Reporter, do hereby certify that the within-named
4  witness personally appeared before me at the time
5  and place herein set out, and after having been
6  duly sworn by me, according to law, was examined
7  by counsel.
8          I further certify that the examination
9  was recorded stenographically by me and this
10  transcript is a true record of the proceedings.
11          I further certify that I am not of
12  counsel to any of the parties, nor in any way
13  interested in the outcome of this action.
14          As witness my hand this 11th day of
15  October, 2013.
16
17          - - - - - - - - - - -
                Cheryl Jefferies
18              Certified Court Reporter
19
20
21

Page 293

1  DATE SENT: October 11, 2013
2          ERRATA SHEET
3  DEPOSITION OF: Jeffrey Addicott
4      DATE: October 2, 2013
5      CASE: Mark Sokolow, et al vs. The
           Palestine Liberation Org, et al
6
   INSTRUCTIONS:
7
   1. Please read the transcript of your deposition
8     and make note of any corrections or changes
      on this Errata Sheet.
9
   2. Indicate below general reason for change,
10    such as:
         A. To correct stenographic error.
11       B. To clarify record.
         C. To conform to the facts.
12
   3. Sign the Certificate of Deponent page.
13
   4. Within 30 days of the Date Sent, return this
14    Errata Sheet, and signed Certificate of
      Deponent, to the Attorneys listed on the
15    Appearance page.
16  PAGE #  LINE #  CORRECTION          REASON
17  _____
18  _____
19  _____
20  _____
21

**JEFFREY ADDICOTT DEPOSITION**    October 2, 2013    **Sokolow v. the PLO**

Page 294

1        ERRATA SHEET
2  DEPOSITION OF JEFFREY ADDICOTT:
3  PAGE #  LINE #  CORRECTION          REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____

Page 295

1      CERTIFICATE OF DEPONENT
2     I hereby certify that I have read and
3  examined the foregoing transcript and:
4  (Check one of the following)
5     ( ) The same is a true and accurate
6  record of the testimony given by me, and I have
7  made no corrections to this transcript.
8       -OR-
9     ( ) Any additions or corrections
10  that I feel are necessary, I have listed on the
11  attached Errata Sheet.
12     As witness my hand and signature this
13  _____ day of _____.
14
15     - - - - - - - - - - - -
        JEFFREY ADDICOTT
16
17
18
19
20
21