# Exhibit 35

1

```
 1          IN THE UNITED STATES DISTRICT COURT

 2         FOR THE SOUTHERN DISTRICT OF NEW YORK

 3

 4   MARK I. SOKOLOW, et al.,        )

 5          Plaintiffs,             )

 6   v.                             ) Civil Action No.
                                     ) 04cv397(GBD)(RLE)
 7   THE PALESTINE LIBERATION       )
     ORGANIZATION, et al.,          )
 8                                   )
            Defendants.             )
 9   _____)

10

11

12

13

14          DEPOSITION OF NICK KAUFMAN

15             JERUSALEM, ISRAEL

16              OCTOBER 20, 2013

17

18

19

20

21

22

23

24

25   REPORTED BY:  BRENDA MATZOV, CA CSR NO. 9243

              OCTOBER 20, 2013 - NICK KAUFMAN
```

2

```
 1          Deposition of NICK KAUFMAN, taken in the

 2   above-entitled cause pending in the United States

 3   District Court, for the Southern District of New York,

 4   pursuant to notice, before BRENDA MATZOV, CA CSR 9243,

 5   at the American Colony Hotel, Executive Room, First

 6   Floor, Jerusalem, Israel, on Sunday, the 20th day of

 7   October, 2013, at 9:05 a.m.

 8

 9   APPEARANCES:

10   FOR PLAINTIFFS:

11          ARNOLD & PORTER, LLP
            By:  KENT A. YALOWITZ, ESQ.
12          399 Park Avenue
            New York, New York 10022-4690
13          (212) 715-1000 / Fax (212) 715-1399
            kent.yalowitz@aporter.com
14

15   FOR DEFENDANTS:

16          MILLER & CHEVALIER CHARTERED
            By:  MICHAEL J. SATIN, ESQ.
17               BRIAN A. HILL, ESQ.
                 MARK ROCHON, ESQ. (partial)
18          655 Fifteenth Street, NW
            Suite 900
19          Washington, DC 20005-5701
            (202) 626-5800 / Fax (202) 626-5801
20          msatin@milchev.com
            bhill@milchev.com
21          mrochon@milchev.com

22

23   ALSO PRESENT:

24          RACHEL WEISER, Esq.

25          MICHAEL SFARD, Advocate

              OCTOBER 20, 2013 - NICK KAUFMAN
```

3

```
 1                    I N D E X

 2   WITNESS

 3   Nick Kaufman

 4

 5   EXAMINATION                              PAGE

 6   By Mr. Satin                            6, 288

 7   By Mr. Yalowitz                         285

 8

 9

10

11      D E F E N D A N T S '  E X H I B I T S

12   NUMBER        DESCRIPTION              MARKED

13   Exhibit 404   Document Entitled "Expert
                   Opinion," by Nick Kaufman,
14                 Advocate, Dated April 10,
                   2013
15                 (No Bates Number)              7

16   Exhibit 405   Document Entitled "Independent
                   and Impartial Tribunals"
17                 (No Bates Number)              7

18   Exhibit 406   Document Entitled "Expert
                   Opinion, Rebuttal," by
19                 Nick Kaufman, Advocate,
                   Dated September 16, 2013
20                 (No Bates Number)             11

21   Exhibit 407   Document Entitled "Curriculum
                   Vitae," by Nicholas Kaufman
22                 (No Bates Number)             12

23   Exhibit 408   Hebrew Document, Case 4646/06
                   (Bates P 11-7:296 to P 11-7:300
24                 and P 11-7:302 to P 11-7:303)  75

25

              OCTOBER 20, 2013 - NICK KAUFMAN
```

4

```
 1      D E F E N D A N T S '  E X H I B I T S

 2   NUMBER        DESCRIPTION              MARKED

 3   Exhibit 409   Hebrew Document, Case 3459/02
                   (Bates P 11-8:121)            105
 4
     Exhibit 410   Hebrew Document, Case 3250/02
 5                 (Bates P 11-9:50 to P 11-9:51) 108

 6   Exhibit 411   Hebrew Document, Case 3465/02
                   (Bates P 11-1:130 to P 11-1:132) 155
 7
     Exhibit 412   Hebrew Document, Case 3465/02
 8                 (Bates P 11-1:17 to P 11-1:18) 158

 9   Exhibit 413   Hebrew Document, Case 3262/02
                   (Bates P 11-11:44 to P 11-11:54) 174
10
     Exhibit 414   Hebrew Document, Case 3529/02
11                 (Bates P 11-4:166 to P 11-4:169) 196

12   Exhibit 415   Hebrew Document, Case 3739/02
                   (Bates P 11-3:301, P 11-3:303,
13                 P 11-3:305, and P 11-3:307)    203

14   Exhibit 416   Hebrew Document, Case 4646/06
                   (Bates P 11-7:117 to P 11-7:171) 221
15
     Exhibit 417   Hebrew Document, Case 4646/06
16                 (Bates P 11-7:172 to P 11-7:178) 227

17   Exhibit 418   Hebrew Document, Case 5398/03
                   (Bates P 11-12:83, P 11-12:85,
18                 P 11-12:87, P 11-12:89,
                   P 11-12:91, P 11-12:93,
19                 P 11-12:95, P 11-12:97,
                   P 11-12:99, P 11-12:101,
20                 P 11-12:103, P 11-12:105,
                   P 11-12:107, P 11-12:109,
21                 and P 11-12:111)              250

22

23

24

25

              OCTOBER 20, 2013 - NICK KAUFMAN
```

**Page 5**

```
 1        D E F E N D A N T S '   E X H I B I T S
 2  NUMBER          DESCRIPTION              MARKED
 3  Exhibit 419   Hebrew Document, Case 5398/03
 4                (Bates P 11-12:279, P 11-12:281,
                  P 11-12:283, P 11-12:285,
 5                P 11-12:287, P 11-12:289,        250
                  and P 11-12:291)
 6
 7
 8
 9        Q U E S T I O N S   I N S T R U C T E D
10             N O T   T O   A N S W E R
11             PAGE      LINE
12             283        3
13
14
15
16
17
18
19
20
21
22
23
24
25
         OCTOBER 20, 2013 - NICK KAUFMAN
```

**Page 7**

```
 1    Q.   Which side of the 1948 boundaries is it on,
 2  the Palestinian side or the Israeli side?
 3    A.   I suppose, according to international law,
 4  it would be on the Palestinian side.  Yes.
 5    Q.   When you say "according to international law,"
 6  do you not think that is correct?
 7    A.   I agree with the international law.  Yes.
 8    Q.   Okay.
 9         (Defendants' Exhibit 404 marked.)
10    Q.   BY MR. SATIN:  I'm showing you what will be
11  marked as Defense 404.
12         Do you recognize this document?
13    A.   (Examining.)  Yes.  That's an expert opinion.
14    Q.   By whom?
15    A.   By myself.
16    Q.   And did you submit that report?
17    A.   I did indeed.
18    Q.   In connection with this case?
19    A.   I did.
20         MR. SATIN:  And mark Exhibit 405.
21         (Defendants' Exhibit 405 marked.)
22    Q.   BY MR. SATIN:  Do you recognize this document?
23         MR. YALOWITZ:  Excuse me, Michael.  Would you
24  happen to have extra copies of the exhibits you're
25  marking?
         OCTOBER 20, 2013 - NICK KAUFMAN
```

**Page 6**

```
 1             P R O C E E D I N G S
 2
 3             NICK KAUFMAN,
 4        called as a witness, being first duly
 5        sworn, was examined and testified as
 6        hereinafter set forth.
 7
 8             EXAMINATION
 9  BY MR. SATIN:
10    Q.   Please introduce yourself and spell your full
11  name.
12    A.   My name is Nicholas Kaufman.  N-i-c-h-o-l-a-s.
13  That's my first name.  Kaufman, K-a-u-f-m-a-n.
14    Q.   Where do you live?
15    A.   I live in Jerusalem.
16    Q.   What part?
17    A.   Pisgat Ze'ev.
18    Q.   Is that in East Jerusalem?
19    A.   Well, it's northeast Jerusalem.
20    Q.   Is that a settlement?
21    A.   It's -- under international law, I suppose
22  yes, you would call it a settlement.
23    Q.   On which side of the 1948 boundaries is it on?
24    A.   It's on the -- what -- sorry.  What was it
25  again, the question?
         OCTOBER 20, 2013 - NICK KAUFMAN
```

**Page 8**

```
 1         MR. SATIN:  I do.
 2         THE WITNESS:  (Examining.)  I believe this is
 3  a page out of the article -- out of the expert opinion.
 4    Q.   BY MR. SATIN:  Was that a page that was
 5  submitted after the original document was submitted?
 6    A.   I can't tell you, I must say, I'm afraid.
 7    Q.   Was there a time after you had completed your
 8  report --
 9    A.   I made some revisions to my report.  Yes.
10    Q.   And is that the revisions that's on document
11  No. 405?
12    A.   Well, I would have to take my time to compare
13  the two documents.
14         MR. YALOWITZ:  Please go ahead and do that.
15  And while you're doing it, perhaps I can see a copy of
16  405.  Thank you.
17         THE WITNESS:  (Examining.)  Yes.  Well, it
18  would appear that the -- the one with the marked changes
19  is an earlier version than the one which you finally
20  received.
21    Q.   BY MR. SATIN:  Sorry.  Did you say that's an
22  earlier version or a later version?
23    A.   It would appear that this one here on the
24  right-hand side would be an earlier version.
25    Q.   So document -- and you -- when you say "on
         OCTOBER 20, 2013 - NICK KAUFMAN
```

1    the right-hand side," you're referring to document
2    number --
3        A.    Sorry.  Yes, number -- Exhibit 405.
4        Q.    So what was submitted as the additional page
5    that I just handed you marked as 405 --
6        A.    Yes.
7        Q.    -- you completed before the original report?
8        A.    Well, I'm looking at it now, and I can tell
9    you what's the truth and what I believe to be the case
10   and what -- so, I mean, I -- I made some revisions.
11        I remember specifically making revisions to
12   this.  Because, at the time, I wasn't too sure of the
13   history of the development of the -- when judges had
14   to become lawyers, it was a requirement that all judges
15   sitting in the tribunal were lawyers.  And I remember
16   thinking about that whilst I working under considerable
17   pressure to get this expert opinion completed on time.
18        And I remember that I also stated, at the
19   beginning of my opinion, that I would reserve the
20   right to make amendments, if necessary, upon further
21   clarification.  This is one of the aspects that I found
22   necessary to clarify, when exactly a candidate for the
23   judiciary would have to become -- would have to be a
24   lawyer to sit in the tribunal in the -- in the military
25   courts.

OCTOBER 20, 2013 - NICK KAUFMAN

1    is perhaps the right version?
2        A.    Yes, perhaps.  Once again, I don't know how
3    this got here.  I certainly wouldn't have passed it
4    to you.
5        Q.    Well, you notice that on 405 there are a
6    number of lines that go through that document?
7        A.    Yeah.  Those are track changes.
8        Q.    Did you make those track changes, or did --
9        A.    Yes, I did.
10        (Court reporter clarification.)
11        BY MR. SATIN:  Did you make those track
12   changes, or did --
13        A.    I made these track changes.
14        (Court reporter clarification.)
15        THE WITNESS:  I apologize.
16        (Partial pending question read.)
17        MR. HILL:  "Or did someone else?"
18        THE WITNESS:  I made those track changes.
19        Q.    BY MR. SATIN:  I'll do my best to not talk
20   when you're speaking.  And I'd ask you not to speak
21   while I'm speaking.  It will be a lot easier for both
22   of us.  Okay?
23        A.    Understood.
24        (Defendants' Exhibit 406 marked.)
25        Q.    BY MR. SATIN:  I'm showing you what we've

OCTOBER 20, 2013 - NICK KAUFMAN

1        Q.    You said a moment ago that the document 405,
2    the single page, was an earlier version.
3        Are you now saying that document 405 is, in
4    fact, a later version of page 6 of that report?
5        A.    The honest truth, I really can't remember.
6    What I -- I'm -- I'm speaking from experience.  I know
7    that actually -- I mean, the reason why I'm confused
8    now is because I have sat on tribunals where the
9    presiding officer has been a major, not a lieutenant
10   colonel.
11        (Court reporter clarification.)
12        THE WITNESS:  Yeah.  As I said, from the --
13   speaking from personal experience, I have sat in --
14   on a tribunal in a military court where the presiding
15   officer has actually been a major, not a -- not a
16   lieutenant colonel.  So document 405 would perhaps
17   represent the -- the more correct version.
18        What I do know is that, by 2004, all of the
19   people who -- members of a tribunal sitting in the
20   military courts were, in fact, lawyers.
21        Q.    BY MR. SATIN:  Okay.  But at least -- we'll
22   get to that later.  But at least for now you would
23   agree --
24        A.    Well, yes.
25        Q.    Your testimony is that 405, the single page,

OCTOBER 20, 2013 - NICK KAUFMAN

1    marked as 406.
2        Do you recognize Defense 406?
3        A.    (Examining.)  Yes.  That is a report that
4    I prepared.  It's entitled "Expert Opinion."  And it
5    is my so-called rebuttal.
6        Q.    Did you write that report?
7        A.    Yes, I did.
8        Q.    All three of the documents in front of you,
9    did you write them?
10        A.    I did.
11        Q.    All of them?
12        A.    Yes.  I would like to clarify something, if
13   that's possible.
14        Q.    Does it pertain to the question that I just
15   asked?
16        A.    Yes, it does.
17        Q.    Sure.
18        A.    You asked me:  Did I write them -- write
19   these documents?  Yes, I did write all -- all of the
20   documents.  I did not submit them, however.
21        (Defendants' Exhibit 407 marked.)
22        Q.    BY MR. SATIN:  Well, if you would turn --
23   we'll get to that in a minute.  First, let me show
24   you what's been marked as Defense --
25        A.    (Examining.)  This is my curriculum vitae.

OCTOBER 20, 2013 - NICK KAUFMAN

13

```
 1     Q.  -- 407.
 2         What is that document?
 3     A.  It's entitled "Curriculum Vitae" and is the
 4  document that I gave to counsel for the plaintiffs
 5  because it reflects my -- my career and experience --
 6     Q.  Did you write that document?
 7     A.  -- in a succinct form.
 8         Yes, I did.
 9     Q.  Now, you said you did not submit the document
10  a month ago; correct?
11     A.  Yes.
12     Q.  Which document were you referring to?
13     A.  All of these documents.  I worked with
14  counsel for the plaintiffs.  When I'd finish my reports,
15  I would pass them to counsel for the plaintiffs.  How
16  they ended up in your hands I have no idea.
17     Q.  Is what you submitted to counsel for the
18  plaintiffs what is in front of you now?
19     A.  Yes.
20     Q.  In other words, did they make changes,
21  as far as you know, to the documents that you see
22  before you?
23     A.  They didn't make any changes that I saw.
24  Everything that went out was something that I read.
25  I can't know what happened to the documents after
```

OCTOBER 20, 2013 - NICK KAUFMAN

14

```
 1  I gave them to counsel for the plaintiffs.
 2     Q.  Did you ever see a signed and completed
 3  document?
 4     A.  I saw a signed and completed document.  Yes.
 5     Q.  And if you would actually turn now to your
 6  original report --
 7     A.  Uh-huh.
 8     Q.  -- to the last page.
 9     A.  That's --
10     Q.  Do you have that in front of you?  I believe
11  it's 404.  There's a paragraph in bold above the
12  signature line; correct?
13     A.  Yes.
14     Q.  Would you read that?
15     A.  (Reading.)
16         "I hereby declare, under penalty of perjury
17  under the laws of the United States, that the foregoing
18  opinion consisting of" blank "pages, each initialed
19  by me, is true and correct to the best of my knowledge
20  and belief."  (As read.)
21     Q.  Did you write that paragraph?
22     A.  That was a standard format that was given
23  to me.
24     Q.  So you did not write it?
25     A.  Well, it's not my composition at all.  No.
```

OCTOBER 20, 2013 - NICK KAUFMAN

15

```
 1     Q.  Who gave it to you?
 2     A.  Counsel for the plaintiffs.
 3     Q.  And you see that there's a missing bracket
 4  there --
 5     A.  Correct.
 6     Q.  -- missing language?
 7     A.  Yes.
 8     Q.  Were you supposed to fill that in?
 9     A.  I assume so, yes.  I neglected to do so.
10     Q.  And it says each page would be initialed
11  by you; correct?
12     A.  Once again, I neglected to do that.
13     Q.  Why is that?
14     A.  Pressure of time.
15     Q.  How long do you think it would have taken
16  you to initial the pages?
17     A.  A very short space of time, I suppose.  But
18  then I can't exactly remember when I completed this
19  report and how much time remained before its submission.
20         Somehow I seem to remember -- and this is
21  something true in the practice of counsel for the
22  plaintiffs throughout, that I was asked to perform
23  these tasks at very short notice.  And the deadline
24  was ticking as it were.  And these things were completed
25  at the very last minute.
```

OCTOBER 20, 2013 - NICK KAUFMAN

16

```
 1     Q.  Is that your signature above the signature
 2  line?
 3     A.  That's an electronic signature.  Yes, it's
 4  my electronic signature.
 5     Q.  You'll notice that it's a couple centimeters
 6  above the line?
 7     A.  Correct.
 8     Q.  Did you actually sign the document?
 9     A.  I did not sign it with my own hand.  I gave
10  my permission for my electronic signature to be used.
11     Q.  And if you would turn to your rebuttal report.
12     Q.  Exhibit 406.
13     Q.  Turn to page 5, the last page.
14     A.  I have page 5 in front of me.
15     Q.  And is that your signature there?
16     A.  Once again, yes, it is my signature.  It's
17  an electronic signature.
18     Q.  Were you supposed to put the place in?
19     A.  Apparently so, yes.  I can tell you where
20  it was written, if it's empty.
21     Q.  Where was it written?
22     A.  It was written in my office, King George
23  No. 33, Jerusalem.
24     Q.  Okay.  Now, when were you first contacted to
25  work on this case?
```

OCTOBER 20, 2013 - NICK KAUFMAN

17

```
1        A.  I really can't remember.  I would ask you --
2    I would refer you to counsel for the plaintiffs.  But
3    what I can remember is that there was a considerable
4    amount of time before my first being contacted by
5    counsel for the plaintiffs and my actually being
6    requested to -- asked to write the report.
7        I also remember being pretty furious about
8    it in the sense that I was first consulted about it
9    a long time ago and then requested to write the report
10   within ten days or something like that, maybe a bit
11   more.
12       Q.  When was it that you were first contacted?
13       A.  Once again, I really can't tell you when
14   it was exactly.  I remember that it was a considerable
15   amount of time before --
16       Q.  Within two thousand -- sorry.
17       A.  I remember it was a considerable amount of
18   time before I wrote the report, up to a year maybe,
19   maybe nine months.  Once again, I'm just guessing.
20   I can't tell you exactly.
21       MR. YALOWITZ:  Don't guess.
22       Q.  BY MR. SATIN:  Do you believe it was in
23   the year 2012?
24       A.  I can't tell you.  I'm sorry.
25       Q.  And was there a time when you were asked to
              OCTOBER 20, 2013 - NICK KAUFMAN
```

18

```
1    review the case files?
2        A.  There was a time when I was asked to review
3    the case files.  Yes.
4        Q.  And at what point were you asked to review
5    the case files?
6        A.  I can't tell you.  I don't remember.
7        Q.  At some point you came into possession of
8    the case files; correct?
9        A.  Correct.
10       Q.  When was that?
11       A.  I can't tell you.  I don't remember.
12       Q.  Did you receive all the case files at once
13   or in piecemeal?
14       A.  Piecemeal.
15       Q.  When did you begin to receive the case files?
16       A.  I can't tell you.  I don't remember.
17       Q.  Was it around the time you were first
18   contacted in this case?
19       A.  No.
20       Q.  How long after you had been contacted did
21   you receive the case files?
22       A.  Several months.
23       Q.  And your report was completed in April 2010
24   [sic]; correct?
25       A.  My report was completed very shortly before
              OCTOBER 20, 2013 - NICK KAUFMAN
```

19

```
1    it was submitted.
2        Q.  And it was submitted in April of two
3    thousand --
4        A.  Almost on the same day maybe.
5        Q.  If you would just let me finish my question
6    before --
7        A.  Apologies.
8        Q.  -- you answer.
9        But your -- your report is dated in April
10   of 2013?  Excuse me.
11       A.  We're talking about the -- the exhibit
12   No. 404?
13       Q.  Correct.
14       A.  Yes.  It's dated April 10, 2013.
15       Q.  And when were you asked to write the report?
16       A.  Shortly beforehand.  I would say somewhere
17   in the middle of March.  But, once again, I'm not
18   allowed to guess, so I can't tell you.  I would refer
19   you to counsel for plaintiffs.
20       Q.  And did you receive the case files -- did
21   you begin to receive the case files in 2012 or 2013?
22       A.  I would say in 2013.  That definitely I can
23   say.
24       Q.  And you received them in piecemeal in 2013?
25       A.  Yes.
              OCTOBER 20, 2013 - NICK KAUFMAN
```

20

```
1        Q.  Who gave you the case files?
2        A.  They arrived via an organization named
3    Shurat HaDin.
4        Q.  Are you familiar with this organization?
5        A.  To tell you the truth, before I started
6    writing this, not really.  I was familiar with
7    senior counsel, I believe she's called, Nitsana
8    Darshan-Leitner.  I know of her from my being an
9    Israeli lawyer.
10       Q.  What's your relationship with Nitsana
11   Darshan-Leitner?
12       A.  My relationship?
13       Q.  Yes.
14       A.  I have no relationship with her apart from
15   on this case.
16       Q.  Had you worked with her before this case?
17       A.  Never worked with her before.
18       Q.  Are you familiar with Shurat HaDin?
19       A.  As I said, I wasn't too familiar with Shurat
20   HaDin before I accepted the request to write an expert
21   opinion in this case.
22       Q.  How is it that Shurat HaDin got in touch with
23   you?
24       A.  I really don't know.  You'd have to ask them.
25       Q.  Are you familiar with the term "lawfare"?
              OCTOBER 20, 2013 - NICK KAUFMAN
```

21

```
 1       A.   Of course I'm familiar with the term
 2  "lawfare."
 3       Q.   What does it mean to you?
 4       A.   The use of courts of law, tribunals, law,
 5  in order to pursue a political agenda.
 6       Q.   Have you been involved with any other cases
 7  involving Shurat HaDin?
 8       A.   No.  Oh, sorry.  Apologies.  Yes.
 9            Prior to that, no.  Thereafter, yes.  I have
10  been asked to prepare two more expert reports in two
11  separate cases.
12       Q.   Are you aware that, on the website of Shurat
13  HaDin, there's an op-ed by Nitsana Darshan-Leitner
14  entitled "Israel Needs to Invade The Hague"?
15       A.   I've heard of Nitsana Darshan-Leitner's
16  views regarding The Hague.  I've never entered the
17  Shurat HaDin website.  It doesn't interest me to tell
18  you the truth.
19       Q.   Where have you heard about her views?
20       A.   From reading the -- I think I might have
21  read the same op-ed article in the Jerusalem Post.
22  I'll tell you why.
23            I, being someone who practices in the field
24  of international criminal law, I have an application
25  on my cell phone which feeds me, now and again, all
```
OCTOBER 20, 2013 - NICK KAUFMAN

22

```
 1  sorts of various information according to keyword
 2  searches which I've programmed.  One of the keyword
 3  searches that I've programmed is "The Hague."  And
 4  so when anything comes up with respect to the Hague,
 5  I get to see it.  And if it interests me, then I read
 6  it.  One of these items, I believe, was an op-ed by
 7  Nitsana -- Nitsana Darshan-Leitner, which refers to --
 8  which refers to The Hague.  And I believe that was
 9  the piece you're referring to.
10       Q.   Did you agree with her position?
11       A.   I really can't remember what I read there.
12       Q.   Which other case have you worked on for Shurat
13  HaDin?
14       A.   Gilmore.  And a case called Shatsky.
15       Q.   And how many days before April 10th, 2013,
16  when you submitted your -- your report, did you get
17  the case files in connection with this case?
18       A.   I think I've already answered that question.
19  I really don't remember.
20       Q.   Are you aware that Ms. Leitner has said that,
21  in its early years, her organization, Shurat HaDin, took
22  direction from the government of Israel on which cases
23  to pursue?
24       A.   No, I'm not aware of that.
25       Q.   Do you know if the instances in this case
```
OCTOBER 20, 2013 - NICK KAUFMAN

23

```
 1  are ones that the government of Israel directed Shurat
 2  HaDin to bring?
 3       A.   I'm not aware of any such instruction or
 4  any -- any such proposal.
 5       Q.   Would it give you pause to work on cases that
 6  were brought at the behest of the Israeli government?
 7       A.   I don't think it's really relevant.
 8       Q.   That wasn't my question.
 9            Would it give you pause?
10       A.   What do you mean "pause"?
11       Q.   Would you feel comfortable or uncomfortable
12  working on behalf of a case that was brought at the
13  direction of the Israeli government?
14       A.   Aah.  In general?  I would have no problem
15  with it, as I would have no problem working for any
16  client who comes to us for my services, as long as
17  I didn't -- as long as I'm sure that there wasn't a
18  conflict of interest.  I don't choose my clients.
19       Q.   When you received the case files in this case,
20  did you believe them to be complete?
21       A.   Well, it depends how you define "complete."
22  I believed that I had a complete record of the -- of
23  the -- what was in the registry court files.  And I
24  specifically asked counsel for the plaintiffs to make
25  sure that, when they brought me the photocopies of the
```
OCTOBER 20, 2013 - NICK KAUFMAN

24

```
 1  case files, that they did photocopy every document.
 2            I, thereafter, went to the courthouse in the
 3  Judea military court and went over the case files to
 4  make sure that what I had received, in fact, reflected
 5  what was in those files.
 6       Q.   So you did a page-by-page comparison of what
 7  you were given --
 8       A.   Yes, I did.
 9       Q.   -- to what was in the military registry?
10       A.   Yes, I did.
11       Q.   And were there any discrepancies?
12       A.   To the best of my knowledge, no.  And if there
13  was something missing, I would have made a note of it.
14  I don't remember making a note of it.
15            I remember making -- sorry.  I do want to --
16  I do want to correct.  There was one appeal hearing
17  on a very, shall we say, peripheral matter.  I don't
18  remember what it was offhand.  I remember that not
19  being included in the file and making a note of that.
20  But apart from that, that was the only thing I found
21  out of place.
22       Q.   Do you believe that the case files that you
23  had reflected everything that had happened in connection
24  with the case that should have been in those case files?
25       A.   I believe that those case files reflected
```
OCTOBER 20, 2013 - NICK KAUFMAN

---

**Page 25**

everything that was in the case files.

Q. But you're familiar with the military court system; correct?

A. Correct.

Q. And so you know what is supposed to be in those court records; correct?

A. I know what's supposed to be in those court records, transcripts and documents which are submitted by the parties, either by agreement or as a result of making submissions to the judge and that submission being accepted, even if the other side has objected.

So yes, I believe that everything was in those files that ought to be in those files.

Q. Did you request additional materials after you received the files you received from plaintiffs' counsel?

A. Could you be more specific?

Q. Did you make any requests for anything else?

A. Not that I recall. No.

Q. Did you conduct any independent investigation into those cases?

A. No, I did not.

Q. Did you seek out any additional information about those cases?

A. About the specific cases? No.

OCTOBER 20, 2013 - NICK KAUFMAN

**Page 26**

Q. Did you believe you had all the materials you needed to do the work that was requested of you?

A. I believe that I had all the materials that I needed to perform my mandate. And my mandate was to examine the court files and to express an opinion as to whether or not this is what happened in the court in those specific cases and whether or not, on the basis of those court files, I felt that the defendants concerned received due process.

Q. How many days before April 10, 2013, did you review those case files in the court registry?

A. I believe you've asked that question already. I don't remember.

Q. Are those case files publicly accessible?

A. Publicly accessible in the sense that any individual can walk into the military courts and ask for them? I don't believe there's any confidentiality which applies to those case files. So, theoretically, anybody could walk in and ask to see those files. Whether the court would let anybody walk in is a different matter entirely.

Q. So in response to the question, if I wanted to go and see them, could I do that?

A. Yes, I assume you could. You could make an application, request access, and they would let you,

OCTOBER 20, 2013 - NICK KAUFMAN

**Page 27**

if you had a legitimate purpose, just as counsel for the plaintiffs have access to these case files.

Q. Did you have to go through that process, or were you able to just walk in and see them because of your familiarity with the system?

A. No, I not -- I did not do that. When I went there, my attendance was coordinated in advance through counsel for the plaintiffs. I didn't -- if -- if this is what you're hinting at -- take advantage of any special status by virtue of being a reserve officer in that particular unit.

Q. What caused you to go to the military court to review the case files if you had already received them from plaintiffs' counsel?

A. I wanted to be sure that everything that I received was what was in those case files, anticipating that you might ask me questions about it.

Q. So when you conducted your work in this case, it was with an eye towards questions from the opposing counsel?

A. It was with an eye to ensuring that the court gets the best version of the truth.

Q. Do you believe that you're being an advocate with what you're doing here?

A. Can you clarify your question? I'm an

OCTOBER 20, 2013 - NICK KAUFMAN

**Page 28**

advocate by training.

If you mean do I believe that I'm being an advocate, am I jumping on the counsel's bandwagon and trying to promote their cases best as possible, I'm trying to be objective. That's my answer to you.

Q. We'll get to that in a little bit. But let's first talk about what you were asked to do in this case.

You were asked to provide an opinion on the quality of justice dispensed by the Israeli military courts in general; is that correct?

(Court reporter clarification.)

MR. SATIN: I apologize.

MR. YALOWITZ: Yeah, everybody needs to slow down here. We've got all day. Ask your question slowly so Brenda can hear it. Don't step on Mike's lines. Let him ask his questions. You don't step on his lines. We have all day.

Q. BY MR. SATIN: You were asked to provide an opinion on the quality of justice dispensed by the Israeli military courts in general; correct?

A. I would say that that forms 10 percent of my opinion. 90 percent of it was the continuation of my instructions as set out in page 1 of Exhibit 404, paying particular attention to the cases of the

OCTOBER 20, 2013 - NICK KAUFMAN

29

1  defendants.
2      Q.  Well, you'd agree that, in your report, the
3  very first sentence is about the request for an opinion
4  on the quality of justice dispensed by the Israeli
5  military courts; correct?
6      A.  That's correct.
7      Q.  In fact, it does not say that you were
8  requested to render an opinion on the case files
9  related to this incident; correct?
10      A.  Not in the first sentence.  But it does in
11  the second.
12      Q.  On the second sentence, it says you were
13  asked to request -- you were requested to pay particular
14  attention to those cases; correct?
15      A.  Correct.
16      Q.  What did you take it to mean to pay particular
17  attention to those cases?
18      A.  I understood -- and with the benefit of
19  hindsight, I see that this has been rather loosely
20  phrased in my instructions.
21          But what I understood in my instructions
22  were -- were that I was to basically provide summary
23  evidence, i.e., present what happened in these cases
24  to a court in the United States and give my opinion
25  as to whether or not these defendants had received

30

1  due process in the course of their cases on the basis
2  of the information made available to me.
3          In the course of doing that, of course,
4  I had to touch on issues relating to the quality of
5  justice dispensed by the Israeli military courts in
6  the West Bank.
7      Q.  But you would agree that you were asked to
8  do two things; correct?
9      A.  Correct.  Summary evidence, i.e., present
10  cases.  That's number one.  And, number two, to give
11  my opinions as to whether or not, on the basis of the
12  information made available to me, these defendants
13  received due process.
14      Q.  Well, those two things only refer to your
15  evaluation and assessment of the 21 case files; correct?
16      A.  To a large extent, yes.
17      Q.  And you were also asked to render an opinion
18  on the quality of justice in general in the Israeli
19  military courts; correct?
20      A.  That's what would appear to be in the first
21  sentence of my instructions.  I seem to remember that
22  I was more focused on the cases rather than on giving
23  a general opinion on the quality of justice in the
24  Israeli military courts in the West Bank.
25      Q.  And so would you say that your report does

31

1  not reflect, then, what you believe to be what you were
2  supposed to be doing in this case?
3      A.  No.  My report reflects exactly what I believe
4  I was meant to be doing.
5      Q.  But you were --
6      A.  Just I said that the first paragraph is
7  perhaps a bit -- could -- could be more tightly phrased,
8  with the benefit of hindsight.
9      Q.  You'd agree that you did discuss the Israeli
10  military courts in general before you --
11      A.  Yes, I did.
12      Q.  Can you just let me finish?
13      A.  Apologies.
14      Q.  You would agree that you did do an assessment
15  of the Israeli military courts in general before you
16  went on to discuss the 21 cases; correct?
17      A.  There was a, shall we say -- let me have
18  a look.  I would say the first six or so pages are
19  devoted to discussing basic principles of due process
20  as are to be found in the Israeli military courts.
21      Q.  Now, this is the first time you've ever done
22  an assessment of the Israeli military courts; correct?
23      A.  Correct.
24      Q.  You've never written an academic article on
25  the Israeli military courts?

32

1      A.  Never.
2      Q.  You've never written a non-academic article
3  on the Israeli military courts?
4      A.  No.
5      Q.  And this is the first time you've ever done
6  an assessment of any legal system; correct?
7      A.  Correct.
8      Q.  You've never published an academic or
9  non-academic article on any legal system?
10      A.  No.
11      Q.  And you're not an academic?
12      A.  No.
13      Q.  You're not a Ph.D.?
14      A.  No.
15      Q.  You're not a social scientist?
16      A.  No.
17      (Court reporter clarification.)
18      THE WITNESS:  Let's start again.
19      Q.  BY MR. SATIN:  You've never published an
20  academic or non-academic article on any legal system?
21      A.  No.
22      Q.  You are not an academic?
23      A.  No.
24      Q.  You're not a social scientist?
25      A.  No.

33

1    Q.   You have not received training on social
2  science methodological techniques?
3    A.   No, and nor would I want to.
4    Q.   You do not have a Ph.D.?
5    A.   No.
6    Q.   You're not currently in a program to obtain
7  a Ph.D.?
8    A.   No.
9    Q.   Your undergraduate degree was in humanities?
10   A.   Let me clarify.  At Cambridge, I started off
11 learning classics, Latin, Greek, and ancient history
12 and ancient philosophy.  After my first year, I changed
13 to law.  And then I studied the six basic core subjects.
14 I exited Cambridge with a degree in law.
15   Q.   You have a J.D.?
16   A.   No.  There's no such concept in England where
17 I grew up and trained.
18   Q.   You have a legal degree?
19   A.   I have a BA in law from Cambridge University.
20 Thereafter, I went to what's call Bar school.  I was a
21 member of the Inner Temple.  I had my dinners.  I did
22 my legal training for the period of one year.  And then
23 I was a qualified barrister, require -- having been --
24 thereafter being required to do my pupilage, as it's
25 called, something which, in Israel, would be called an

OCTOBER 20, 2013 - NICK KAUFMAN

34

1  internship.  So I suppose, if you want to compare it
2  to the U.S. system, my J.D. would probably be my Bar
3  school training.
4    Q.   You're a practicing lawyer now?
5    A.   I'm a practicing lawyer here in Israel.
6    Q.   You're strictly a legal practitioner?
7    A.   Strictly a legal practitioner.
8    Q.   You were a prosecutor for 16 years?
9    A.   Correct.
10   Q.   And now you're in private practice?
11   A.   Correct.
12   Q.   Primarily as a defense attorney now?
13   A.   Correct.
14   Q.   You were never a prosecutor in the Israeli
15 military courts?
16   A.   No.
17   Q.   No, as in that is correct?
18   A.   Correct.  I was never a prosecutor in the
19 Israeli military courts.
20   Q.   You were never a defense attorney in the
21 Israeli military courts?
22   A.   I was never a defense attorney in the Israeli
23 military courts.  I was, however, a defense attorney in
24 the Israeli military courts within Israel, as it were,
25 representing soldiers of the IDF.

OCTOBER 20, 2013 - NICK KAUFMAN

35

1    Q.   You've never represented a defendant in the
2  Israeli military courts?
3    A.   In the occupied territories, no.
4    Q.   Your experience in the Israeli military courts
5  is only as a judge; correct?
6    A.   Once again to clarify, in the Israeli military
7  courts of the occupied territories, only as a judge.
8  Correct.
9    Q.   And your opinion is only about the Israeli
10 military courts in the occupied territories?
11   A.   Correct.
12   Q.   And your experience in the Israeli military
13 courts in the occupied territories is as a part-time
14 judge; correct?
15   A.   As a reserve duty judge.
16   Q.   This is not your full-time job?
17   A.   No.
18   Q.   You only sit, according to you, from time
19 to time?
20   A.   Whenever requested.
21   Q.   How often is that?
22   A.   For the last couple of years, it's been very
23 infrequent.  I would say, in the last two years, I --
24 I have been called maybe two or three times, maybe --
25 maybe a bit more than that.

OCTOBER 20, 2013 - NICK KAUFMAN

36

1    Q.   For how long each time were you called?
2    A.   I'm sorry.  Once again, I want to complete
3  that question [sic].
4         I really can't -- I don't want to commit to
5  something that I can't remember.  I think it might be
6  more than two or three.
7    Q.   Okay.
8    A.   Once again, if that's something which is
9  essential, I can clarify it for you.  It's very easy
10 to clarify.
11   Q.   Feel free to clarify.
12   A.   I can't at the present moment in time.  But
13 if it's important for you, I will return to you with
14 a figure.
15   Q.   You'd agree it was just a handful of times,
16 then, without locking yourself into a specific --
17   A.   Without locking in, I would say it was
18 a two-handful amount of times.  Yes.  You can count
19 the number of occasions on which I've been in military
20 service over the last -- in the last two -- two years
21 on the fingers of two hands.
22   Q.   And each time that you were called, how long
23 was that period?
24   A.   It's only for a day.
25   Q.   And in the -- during the preceding seven or

OCTOBER 20, 2013 - NICK KAUFMAN

37

1    eight years -- you started in 2002?
2        A.    I started when that call went out for judges
3    who had legal training.
4        Q.    When was that?
5        A.    As I said, it was sometime between 2002 to
6    2004.  I really can't remember.  But there was, at
7    first, a request which was circulated amongst serving
8    officers in the Israeli military Advocate General's
9    call, which is where I was serving at the time as
10   a reserve officer in the -- as I said, the Israeli
11   military courts in Israel representing soldiers.  They
12   needed people who had legal degrees, legal training,
13   legal expertise in criminal law, to sit as judges in
14   the occupied territories.  I agreed.
15       Q.    So you, essentially, volunteered to do that?
16       A.    Yes, I did.
17       Q.    And that was back in 2002?
18       A.    Once again, don't catch me on the time period.
19   It was between 2002 and 2004.  Once again, it's an
20   issue which can easily be clarified because I have
21   a certificate from the general of the area, appointing
22   me as a judge.
23       Q.    And from the time you started in the Israeli
24   military courts in the occupied territories --
25       A.    Yes.

OCTOBER 20, 2013 - NICK KAUFMAN

38

1        Q.    -- for the next five years or so, how often
2    would you sit?
3        A.    I would say it would be at least once a month,
4    maybe perhaps even more than that, twice.
5        Q.    And each time you're sitting it's for a day?
6        A.    For a day.  Or if I was tied to a particular
7    case that I was sitting as a judge at trial, then
8    I would fix my calendar according to the -- to the
9    progress of the case.
10            For the large part, I preferred handling
11   custody hearings, bail applications, as you would
12   probably call them.  And I used to do a lot of them.
13   I would say, on an average day, I would get something
14   like 40 cases given to me to -- to deal with.
15       Q.    And that would -- that would last for one day?
16       A.    And that would last for one day.  Yes.
17       Q.    And there are three courts in the Israeli
18   military courts in the occupied territories?
19       A.    Three courts?  There are -- there are --
20   there's -- there's a court in -- in Judea, and there's
21   a court in Samaria.  Those are the two courts that I'm
22   aware of.  And there was a -- an appeals court, which
23   sat in Judea, in the military court compound, if I
24   were.  There was formerly a court in Gaza, which sat
25   at the Erez checkpoint.  I believe that that was closed

OCTOBER 20, 2013 - NICK KAUFMAN

39

1    down at some stage.
2        Q.    And how many of those courts have you sat --
3    have you sat in?
4        A.    Only in the Judea military court.
5            Oh, once again, let me qualify.  If you're
6    referring to the -- the court in the -- in the Israeli
7    police station in the Russian Compound, I've sat there
8    as well.  Yes.
9        Q.    How many times?
10       A.    Less frequently.  Much less frequently.
11   I would say you could count the number of times I've
12   sat there on the fingers of one hand.
13       Q.    And over the course of your career as a
14   part-time judge in the Israeli military courts in
15   the occupied territories, how many trials have you
16   presided over?
17       A.    I really can't tell you.  I don't remember.
18   I remember the trials that I have sat over that --
19   that stick in my mind.  And one of them I believe I
20   referred to in my expert report, if I'm not mistaken.
21   Maybe not.  No, I don't believe I did.
22            I remember one particular case that I sat on.
23   But I can't tell you how many times.  A lot of cases
24   I've sat on over the course of the years.
25       Q.    And it's your serve -- it's your choice to

OCTOBER 20, 2013 - NICK KAUFMAN

40

1    do your reserve duty as a judge in the Israeli military
2    courts in the occupied territories; correct?
3        A.    Correct.
4            MR. YALOWITZ:  Objection to the form.
5            THE WITNESS:  Well --
6        Q.    BY MR. SATIN:  You can answer.
7            MR. YALOWITZ:  You can answer.
8            THE WITNESS:  I can answer?
9            Yes, it is.  And I can give you a reason
10   why I chose to -- to move from being defense counsel
11   to being -- to being a judge.
12       Q.    BY MR. SATIN:  Sure.
13       A.    To be a defense counsel, I had to travel
14   from Jerusalem to Jaffa.  That's where the courts sit,
15   in the military courts in Jaffa.  I live in Pisgat
16   Ze'ev, as you know -- as you know.  The Ofer military
17   court is about ten minutes away from my house.  It's
18   purely a matter of convenience.
19       Q.    There's nowhere -- you don't have to serve
20   as a judge as part of your reserve duty in the military;
21   correct?
22       A.    I have to do military reserve duty.  Whether
23   I do it in Jaffa or whether I do it in Ofer, it doesn't
24   really matter.
25       Q.    But it need not be --

OCTOBER 20, 2013 - NICK KAUFMAN

41

```
1       A.   But I prefer to have it in -- in Ofer because
2   it's closer to my house.  That's the only reason.
3       Q.   But you need not serve your reserve duty in
4   the form of being a judge; correct?
5       A.   That is correct.  No one obliged me to do it.
6       Q.   And as a part-time judge in the Israeli
7   military courts, your job is not to evaluate the quality
8   of due process in the Israeli military court system;
9   correct?
10      A.   Sitting as a judge?
11      Q.   Correct.
12      A.   If I believe that there has been an infraction
13  of -- of due process, then I wouldn't hide it in my
14  opinion -- in my judgment, if I felt that it had --
15  it impacted on the case.
16      Q.   My question is:  As a judge -- as a part-time
17  judge, your job is not to evaluate the quality of due
18  process in the system as a whole; correct?
19      A.   Well, in what context?  In academic articles?
20  In court?  Or in giving evidence in court?  Tell me,
21  please.  I mean, clarify the question.
22      Q.   When you go to sit once a month or whenever
23  you go to sit in the Israeli military courts, you are
24  not going there to generate opinions or do assessments
25  of that Israeli military court system; correct?
```

42

```
1       A.   I'm going there to apply the law first and
2   foremost.  However, one has to clarify here.
3            The law in the occupied territories recognizes
4   the concept of "hagana min hatzedek" it's called in
5   Hebrew.  It's a special defense where, if you believe
6   that the prosecution has behaved, for example, in an
7   outrageous fashion, then the defense attorney can raise
8   that as a -- as a -- as a plea, as a defense.  And the
9   judge will be required to sit and adjudicate on that.
10  And in doing so, of course he will refer to the nature
11  of due process which has been applied in the case.
12      Q.   But even in your example, you are making
13  decisions based on the cases before you; correct?
14      A.   Correct.
15      Q.   You're not making decisions based on the
16  system as a whole; correct?
17      A.   No.
18      Q.   And this is the first time you've been asked
19  to give an opinion on whether there was due process in
20  a case that is not before you; correct?
21      A.   Correct.
22      Q.   These 21 cases that you reviewed were not
23  before you; correct?
24      A.   No, I did not take a part in any of these
25  21 cases.
```

43

```
1       Q.   And you'd agree that you have not been asked
2   to make legal decisions in any of those 21 cases?
3       A.   None of these 21 cases have I been asked
4   to give a legal opinion or sit as a judge.  I have,
5   however -- to clarify matters -- familiarity with some
6   of these cases.  And I can't remember whether it is as
7   a prosecutor or as a defense counsel -- sorry -- as a --
8   as a judge.
9       Q.   I'm sorry.  Did you just say that the 21 cases
10  you reviewed are cases that you are familiar with from
11  your prior service as an attorney?
12      A.   Sorry?
13      Q.   Are you saying that the 21 cases you reviewed
14  are cases that you have familiarity with based on your
15  experience as an attorney?
16      A.   Well, the case of, I think, Barghouti is --
17  is a case that most of the Israeli public is familiar
18  with.  Okay.  So I might have known a bit more about
19  it by virtue of having been a prosecutor at the relevant
20  period of time in Jerusalem.
21           I wouldn't have had access to the information
22  contained in that case, if that's what you're asking.
23      Q.   But you weren't participating in any of these
24  cases as a lawyer?
25      A.   No.
```

44

```
1       Q.   And is your report based exclusively on your
2   review of the case files or on other information that
3   you've received?
4       A.   Exclusively on the review of the case files
5   where I refer to those case files.
6       Q.   You had mentioned a minute ago the special
7   case where a defense can raise a defense if -- if he
8   or she believes that the prosecutor had been acting
9   outrageously; correct?
10      A.   Yes.  I believe it's called abusive process.
11  Now I've remembered the word in English.
12      Q.   And how many times has that happened?
13      A.   In front of me?
14      Q.   Yes.
15      A.   I can't remember.
16      Q.   What's your estimate?
17      A.   I can't remember.
18      Q.   In front of other judges in general, how
19  often has it happened?
20      A.   It happens.
21      Q.   How regularly?
22      A.   It's not an infrequent plea or defense.
23      Q.   How often is the defense granted?
24      A.   It has been granted in my knowledge.
25      Q.   How often?
```

45

```
1       A.   Are we talking about Israeli military courts
2  or Israeli courts in general, civilian courts?
3       Q.   Let's do both.  For in the military courts,
4  how often is it successful?
5       A.   I can't tell you.
6       Q.   How about in civilian courts?
7       A.   It's now and again accepted.
8       Q.   Is it more successful in the civilian courts
9  than in the military courts?
10      A.   I can't give you an opinion on that because
11 I don't know how many times it's been accepted in the
12 military courts.
13      Q.   Now, as a part-time judge, you appreciate
14 the importance of being impartial?
15      A.   Correct.
16      Q.   As a judge, you must be impartial?
17      A.   Correct.
18      Q.   You can't have an interest in the outcome
19 of a case; correct?
20      A.   Correct.
21      Q.   Now, in being asked to give an opinion on
22 the quality of justice in the Israeli military court,
23 you were being asked to render an opinion about the
24 very system in which you work; correct?
25      A.   You are correct.
```

OCTOBER 20, 2013 - NICK KAUFMAN

46

```
1       Q.   During the time in which you worked there?
2       A.   During the time in which I was a registered
3  soldier.  Correct.
4       Q.   And as a registered soldier, serving as a
5  judge in the Israeli military courts?
6       A.   As a reserve duty judge, serving in the
7  military courts.
8            But as I've told you, in the last two or
9  three years, I have been not so frequently called to
10 military service.  And I cannot remember whether I
11 have actually been called to military service since
12 writing this opinion, Exhibit 404.
13      Q.   But you agree that the time period during
14 which these 21 cases took place was a time period
15 in which you were serving as a part-time judge in
16 the Israeli military courts?
17      A.   On paper, yes.  And you are very welcome
18 to verify that.  It's very easy to access.
19      Q.   When you say "on paper, yes," what do you
20 mean by that?
21      A.   By the fact that I am still a serving
22 reserve officer in the unit which is responsible
23 for administering justice in the Judea military court.
24      Q.   Now, is it your opinion that the system of
25 justice in which you participate as a part-time judge
```

OCTOBER 20, 2013 - NICK KAUFMAN

47

```
1  is fair?
2       A.   Yes.
3       Q.   If you were to have concluded, during your
4  assessment in this case, that the Israeli military
5  court system is not fair, you would be questioning the
6  integrity of the convictions that you presided over;
7  correct?
8       A.   Could you repeat your question, once again?
9       Q.   If you were to have concluded, during your
10 work in this case, that the Israeli military court
11 system in the occupied territories is not fair, you
12 would be questioning the integrity of the convictions
13 you preceded over?
14      A.   I have an opinion in this case with respect
15 to the quality of justice in the occupied territories
16 and the cases which I particularly examined.  That's
17 all I can say.
18           I didn't come to any conclusion that the
19 system of justice in the occupied territories was
20 unjust or unfair.  But I can appreciate where you're
21 coming from.  And if, yes, I had come to some conclusion
22 that the quality of justice in the occupied territories
23 is unfair, then that would have a knock-on effect.
24           But I don't think that the quality of justice
25 in the occupied territories is unfair.  And I have seen
```

OCTOBER 20, 2013 - NICK KAUFMAN

48

```
1  nothing to suggest that the quality of justice in the
2  occupied territories is unfair.
3       Q.   Had you determined that the system of justice
4  in the occupied territories was not fair, what would
5  you do about those convictions that you preceded over?
6       A.   Well, I didn't conclude that.  So it's not
7  a question which really concerned me.
8       Q.   My question was:  Had you concluded that the
9  system was not fair, what would you have done about
10 those convictions?
11           MR. YALOWITZ:  Objection.  Asked and answered.
12 Hypothetical.
13           MR. SATIN:  It was asked but not answered.
14           THE WITNESS:  Well, but there --
15           MR. YALOWITZ:  It was -- it was answered.
16 Wait a minute.  It was answered.
17           You can answer it again.
18           THE WITNESS:  My review of the situation in
19 the occupied territories is that the system of justice
20 is fair.  And, therefore, I don't see -- I can't answer
21 your question any further than I've already answered.
22 Theoretically, anything's possible.
23      Q.   BY MR. SATIN:  You'd agree it'd be
24 problematic if the judges in the Israeli military
25 court system thought the system was not fair;
```

OCTOBER 20, 2013 - NICK KAUFMAN

49

```
1    correct?
2        A.   What other people think is of no relevance
3    to me in writing this opinion.  It's what I believe.
4        Q.   Do you agree that a more neutral assessment
5    of the Israeli military court system would come from
6    someone who does not serve as a part-time judge in
7    that system?
8        A.   I was asked to give my opinion, I believe,
9    because I have actual experience in sitting in these
10   courts.  And I think that I'm able to give my particular
11   view from the vantage point of someone who has practical
12   experience.
13            Yes, you might get someone who answers the
14   criteria you're looking for, who may be able to give
15   his opinion.  But then he wouldn't actually be sitting
16   as a judge.  He wouldn't have the necessary day-to-day
17   familiarity of the goings-on in these courts.
18       Q.   So do you agree that a more neutral assessment
19   would come from someone who was not serving within that
20   system?
21            MR. YALOWITZ:  Objection.  Asked and answered.
22            If you have anything to add to your prior
23   answer, please go ahead.
24            THE WITNESS:  I don't have anything to
25   answer -- to add.  Sorry.
```

OCTOBER 20, 2013 - NICK KAUFMAN

50

```
1        Q.   BY MR. SATIN:  Well, suppose someone
2    wanted to determine whether FIFA, the international
3    governing body of football, was corrupt.
4            Do you agree it would be more reliable to
5    have someone who did not work for FIFA do an assessment
6    than to have someone who did work for FIFA?
7        A.   Who?  Luis Moreo Ocampo?  That's where he
8    went, I believe, afterwards.
9            Once again, there are advantages to having
10   someone who is completely neutral, and there are
11   advantages to having somebody who knows the workings
12   of that particular organization.  I believe we've
13   already discussed this issue, and I've answered the
14   question.
15       Q.   Well, what is your answer with respect to
16   the question I just asked you about FIFA?
17       A.   As I said -- I repeat the same answer -- yes,
18   there are advantages to have a neutral observer.  But
19   there are also advantages to having somebody who is
20   familiar with the day-to-day workings of the institution
21   in question.
22       Q.   So you'd agree that you are not completely
23   neutral?
24            MR. YALOWITZ:  Objection.
25            THE WITNESS:  I didn't say that.
```

OCTOBER 20, 2013 - NICK KAUFMAN

51

```
1        Q.   BY MR. SATIN:  What's your answer?
2        A.   I believe the question has been objected to.
3        Q.   You still have to answer.
4            MR. YALOWITZ:  He answered it.
5            Did you get the answer?  He answered.
6        Q.   BY MR. SATIN:  I didn't hear the answer.
7        A.   What was the question once again?  I'm sorry.
8        Q.   Do you agree that you are not completely
9    neutral?
10           MR. YALOWITZ:  Objection.
11           THE WITNESS:  I believe that I'm neutral.
12           Can I ask for a clarification?  I mean, when
13   Mr. Yalowitz states "objection," I still have to give
14   the answer, and then the judge at trial will rule on
15   the objections?
16           MR. YALOWITZ:  Correct.
17           THE WITNESS:  Okay.
18           MR. YALOWITZ:  Correct.  Unless I tell you
19   not to answer, you go ahead and answer.
20           THE WITNESS:  Fantastic.
21       Q.   BY MR. SATIN:  You're getting paid for
22   your work in this case?
23       A.   Of course.
24       Q.   How much?
25       A.   I believe it's set out in the thing.  I --
```

OCTOBER 20, 2013 - NICK KAUFMAN

52

```
1    I can't remember.  I believe I state it somewhere,
2    how much I got paid on this one.  Give me one moment,
3    please.
4            "Terms of Engagement," page 2, last paragraph.
5    I agreed to 10,000 USD.
6        Q.   That was for the report; correct?
7        A.   That was for the report.  Yes.
8        Q.   Are you getting paid additionally for your
9    testimony and for any preparation for the testimony?
10       A.   Yes, I am.
11       Q.   How much is that?
12       A.   I believe an invoice has been submitted
13   or prepared.  I asked for 6,500.  I based it on the
14   Laffey matrix.  I believe you're familiar with that.
15       Q.   No.  Why don't you explain?
16       A.   As I understood it, the Laffey matrix is a --
17   is the mode used by U.S. courts for assessing reasonable
18   fees for a lawyer of my call and experience.
19       Q.   So what was your fee?
20       A.   I asked for $433 an hour.  And that was
21   then computed with the number of hours I'd worked in
22   preparation, preparing a rebuttal, being prepared for
23   deposition.  It didn't include today's deposition.
24       Q.   Are you going to submit an invoice for that?
25       A.   It would be based on the same hourly rate,
```

OCTOBER 20, 2013 - NICK KAUFMAN

1   judging on how many hours you keep me here.  Obviously,
2   if you want to save costs, you'll finish your
3   cross-examination quicker.
4       Q.   You've engaged in legal work against the
5   PA before, the Palestinian Authority; correct?
6       A.   That is correct.  Yes.
7       Q.   You -- you've served as a general counsel
8   for Regavim?
9       A.   Not as a general counsel of Regavim.  This
10  was a one-off occasion.  And I'll explain why.
11          I sit in an office in King George No. 33.
12  The person sitting next door to me in my office, who
13  shared the office with me at the time, was a chap
14  called Amir Fisher.  Amir Fisher is the general counsel
15  for Regavim.  I believe Mr. Sfard will know that.  And
16  so this was a one-off, as it were, request.
17      Q.   And your work for Regavim was in fighting to
18  block the PA's application to the ICC; correct?
19      A.   Correct.  Because I thought it was illegal.
20  It didn't obey the law.
21          Let me clarify that.  It didn't conform to
22  the Rome Statutes or the regulations or any form of
23  application.
24      Q.   Did you know that when you took the case?
25      A.   Yes.  It's something I firmly believe.

1       Q.   Did you have a specific methodology?
2       A.   Academic methodology?  No.  I took, as my
3   starting point, the Universal Declaration of Human
4   Rights, something which I believe that Mr. Sfard
5   referred to in his report.
6       Q.   And the Universal Declaration of Human Rights
7   is not exclusively about due process rights; correct?
8       A.   Not exclusively, no.
9       Q.   It's about human rights?
10      A.   Human rights.
11      Q.   It covers a wide range of topics?
12      A.   Correct.
13      Q.   You'd agree that there are other sources of
14  due process rights?
15      A.   Yes.
16      Q.   The U.S. Constitution, for example?
17      A.   I'm not a U.S. lawyer, but I assume so.
18      Q.   The International Covenant on Civil and
19  Political Rights?
20      A.   A lot of the rights which you're referring to,
21  due process rights, have their source in the Universal
22  Declaration of Human Rights.  And they are thereafter
23  transported into these various instruments that you're
24  now going to refer me to.  The basic source is normally
25  the Universal Declaration of Human Rights.

1       Q.   What is it that you firmly believe?
2       A.   That the Palestinian Authority at the time,
3   before the United Nations vote, had no standing to
4   request membership of the ICC.
5       Q.   Has your opinion changed --
6       A.   Purely a legal view.
7       Q.   -- on that?
8       A.   Yes, I think it has.  Since the U.N. voted,
9   the General Assembly voted, I believe that nowadays
10  there is a viable case for the Palestinian Authority
11  to become members of the International Criminal Court.
12      Q.   Do you currently represent any Palestinian
13  defendants charged with security offense cases against
14  Israel?
15      A.   No, I don't.
16      Q.   Have you ever represented a Palestinian
17  defendant charged with a security offense against
18  the State of Israel?
19      A.   No, I have not.  I'm not so sure that the
20  Palestinian security indictee would come my way in
21  any event.  They have their own very competent lawyers.
22      Q.   Well, let's talk now about your opinion on
23  the quality of justice dispensed by the Israeli military
24  courts in general.  And let's talk about how you went
25  about doing that.

1       Q.   Well, you said that was your starting point;
2   correct?
3       A.   Yes.  Because I found it to be a good common
4   denominator.
5       Q.   You didn't discuss those other sources --
6       A.   No.
7       Q.   -- of due process rights in your report;
8   correct?
9       A.   No.  I felt that -- I discussed the sources
10  which I felt were appropriate.  As I said, there was
11  no particular methodology, strict academic methodology.
12  And I make no secret of the fact that I'm not an
13  academic.
14      Q.   And it was your choice, then, to start with
15  the universal -- Universal Declaration of Human Rights?
16      A.   Yes.  An arbitrary choice.
17      Q.   And after choosing a start there, you
18  chose which due process rights within the Universal
19  Declaration of Human Rights to focus on; correct?
20      A.   Correct.
21      Q.   You chose to consider the prohibition of
22  torture; correct?
23      A.   Yes.
24      Q.   The right to equal protection of law and
25  equality before the law?

57

```
1        A.   I chose to refer to those human rights or
2   due process rights which appear on pages 4 to 6 of my
3   report, which is Exhibit 404.
4        Q.   But you only focused on certain due process
5   rights within the Universal Declaration of Human Rights;
6   correct?
7        A.   I focused on those which I felt were most
8   appropriate to the cases at hand, the cases which I
9   was given.
10       Q.   You recognized, before you got to the cases,
11  you were doing this overall assessment; correct?
12       A.   Correct.
13       Q.   And you didn't consider, for example,
14  Article 9 that no one shall be subjected to arbitrary
15  arrest, detention, or exile?
16       A.   No, because it wasn't relevant to my mandate.
17       Q.   Was your mandate to look at specific due
18  process rights as opposed to other ones?
19       A.   As I said, the emphasis was on the cases.
20  None of the cases in front of me of those 21 cases
21  I had been asked to examine for the purposes of
22  assessing whether or not they were appropriately
23  or inappropriately arrested.
24       Q.   Well, detention was an issue in almost all
25  of the cases; correct?
```

OCTOBER 20, 2013 - NICK KAUFMAN

58

```
1        A.   Could you clarify?
2        Q.   The defendants in those 21 cases were detained
3   both investigatorially [sic] and after indictment?
4        A.   Almost all defendants in the Israeli military
5   courts are detained when they come for trial.
6        Q.   Okay.
7        A.   Yes, almost all of them.  And especially if
8   we're talking about security offenses.
9        Q.   And not only did you not consider Article 9,
10  the one about arrest and detention, you didn't consider
11  the second half of Article 5; correct?
12       A.   Clarify, please.
13       Q.   Article 5 is the one that says:
14            "No one shall be subjected to torture or to
15  cruel, inhuman, or degrading treatment or punishment."
16       A.   Well, I did discuss briefly in paragraph --
17  in the -- in the first two paragraphs of page 4 the
18  prohibition of torture.
19       Q.   But you don't go into the issue of cruel,
20  inhuman, or degrading treatment; correct?
21       A.   No.  Only when it arose in specific cases.
22       Q.   And you stated on page 3 that you would
23  discuss the right to equal protection of the law and
24  equality before the law; correct?
25       A.   I did.  And I didn't refer to it thereafter.
```

OCTOBER 20, 2013 - NICK KAUFMAN

59

```
1        Q.   Why don't we take a five-minute break.
2        A.   Sure.
3            (Recess from 10:03 a.m. to 10:19 a.m.)
4        Q.   BY MR. SATIN:  In your overall assessment
5   of the Israeli military courts, you don't consider
6   a number of basic due process rights; correct?
7        A.   I did not consider one of the due process
8   rights that you've mentioned.  Correct.
9        Q.   You didn't discuss one of the ones from the
10  Universal Declaration of Human Rights, the right to --
11       A.   As you presented it to me, correct.
12       Q.   You also don't discuss the right to be brought
13  before a judge without undue delay; correct?
14       A.   Correct.
15       Q.   You don't discuss the right to a speedy trial?
16       A.   I don't discuss that.  Correct.
17       Q.   You don't consider the right to present
18  a defense?
19       A.   I don't discuss that in particular.  No.
20       Q.   You don't discuss or consider the right to
21  compel witnesses to testify on the defendant's behalf?
22       A.   I don't discuss that in any detail.  No.
23  What is in the report is in the report.
24       Q.   After starting with the Universal Declaration
25  of Human Rights, you then looked to Israeli law in
```

OCTOBER 20, 2013 - NICK KAUFMAN

60

```
1   the Israeli military court system in the occupied
2   territories; correct?
3        A.   I looked at the law as applied in the Israeli
4   military courts.
5        Q.   When you say "as applied," what you mean is
6   what the law says with respect to those rights; correct?
7        A.   Well, I looked at Military Ordinance No. 378.
8        Q.   And that's the governing law?
9        A.   That's the most basic law.  Yes.  There are
10  other laws.  Mr. Sfard refers to them in his report.
11       Q.   But the ones you focused on --
12       A.   The procedural aspects in the due process ones
13  find their expression based in the Military Ordinance
14  No. 378.
15       Q.   And I would just ask you to let me finish my
16  question before you answer.
17       A.   Apologies.
18       Q.   But you'd agree that was your methodology, to
19  the extent you had one, was to start with the Universal
20  Declaration of Human Rights and then look to Military
21  Ordinance No. 378?
22       A.   That would be a reasonable assessment.
23       Q.   Okay.  You'd agree that just because the law
24  says there is a right does not mean that that right is
25  provided?
```

OCTOBER 20, 2013 - NICK KAUFMAN

61

```
 1      A.   Correct.
 2      Q.   So, for example, suppose there was a law in
 3 the United States that said everyone gets $100 on New
 4 Year's Day.
 5           To see whether that right is actually
 6 provided, you would want to know if people actually
 7 got $100 on New Year's Day?
 8      A.   In your theoretical scenario, yes.
 9      Q.   And with what you did, your methodology
10 did not involve looking to see whether the due process
11 rights you decided to focus on were, in fact, provided
12 in the Israeli military court system; correct?
13           MR. YALOWITZ:  Objection.
14           THE WITNESS:  In general.  I did not review
15 all of the caseload in the military courts for the
16 period of 2002 until 2013.
17           What I did do was look at the specific cases
18 which were given to me and examine whether or not the
19 due process rights, which I identified, which I know
20 to exist, being a -- a practicing lawyer for the best
21 part of 21 years, I looked at those cases to see whether
22 those due process rights had been applied.
23      Q.   BY MR. SATIN:  So you agree that the main
24 thrust of what you did in this case was related to
25 the 21 case files; right?
```

62

```
 1      A.   Correct.  Yes.
 2      Q.   Not to the overall system?
 3      A.   Not to the overall system.  Mr. Sfard, in
 4 his report, goes into far more detail about that.
 5      Q.   And your description of the overall system
 6 was just some general background information?
 7      A.   Well, yes, you could say that as a reasonable
 8 assessment.
 9      Q.   I did say that.
10           Would you say that?
11      A.   I would say as a starting point.  But it
12 wasn't the main thrust of my opinion.
13      Q.   You didn't do a formal study on the Israeli
14 military court system; correct?
15      A.   No.
16      Q.   And your report does not reference that you
17 interviewed individuals who work in the Israeli military
18 court system; correct?
19      A.   Correct.
20      Q.   And you didn't collect any statistical data?
21      A.   Correct.  I did not collect any statistical
22 data.
23      Q.   You didn't submit an assessment or a study of
24 the Israeli military court system to other stakeholders
25 in that system for review?
```

63

```
 1      A.   I submitted no such report.
 2      Q.   And as part of your work in this case, you
 3 didn't review studies of other organizations and groups?
 4      A.   In preparing my opinion, which is marked
 5 Exhibit 404, I did not.
 6      Q.   And you're aware that entities have conducted
 7 studies on the Israeli military court system?
 8      A.   Correct.  I am aware of such.
 9      Q.   For example, the Yesh Din report?
10      A.   I am aware of that because of Mr. Sfard's
11 expert opinion.
12      Q.   Were you not aware of it before you read his
13 opinion?
14      A.   No.
15      Q.   Are you aware of reports from Amnesty
16 International?
17      A.   No.
18      Q.   Do you think a report or a study from the
19 U.N. would be helpful in assessing the quality of due
20 process in the Israeli military court system?
21      A.   In general, yes.  But that was not my mandate.
22      Q.   Your mandate was more on the 21 case files?
23      A.   As I have already said, yes.
24      Q.   Okay.  Let's talk about the 21 case files.
25 Before we talk about the substance of the opinions,
```

64

```
 1 let's talk about how you went about deciding whether
 2 the defendants in those cases received due process.
 3           Your methodology consisted of two things.
 4 You'd read the files, and you'd decide if there was
 5 due process; correct?
 6      A.   I would review the files.  I would then give
 7 a general overview of what happened in the case, because
 8 I believe that to be at least 50 percent of my mandate.
 9 And then, if I noticed anything untoward or out of the
10 ordinary, I would comment on that and deal with it in
11 the other 50 percent, if I felt it touched on an issue
12 of due process.
13      Q.   Did you start writing your report before you
14 had rendered an opinion on whether or not there was due
15 process for each individual case?
16      A.   I can't remember.
17      Q.   And you didn't have a formula that you used
18 that would tell you whether a defendant was afforded
19 due process or not; correct?
20      A.   Could you clarify what you mean by a
21 "formula"?
22      Q.   Did you create a model or some system, some
23 scientific method that would guide you in reaching a
24 decision?
25      A.   I created no such scientific method.
```

65

```
1        Q.   Did you have a checklist of factors that
2   you identified before you started reviewing each case?
3        A.   As I mentioned, I took the Universal
4   Declaration of Human Rights as my starting point.
5   I'm familiar with that declaration.  If I felt that
6   something was untoward with reference to that particular
7   declaration, then I would have commented on it.  If I
8   felt that there was anything else untoward that impacted
9   on due process, I would have made a comment on that.
10       Q.   But you didn't lay out a specific set of
11  factors that you would look for in each particular case?
12       A.   I did not have a checklist of factors.  No.
13       Q.   And how much time did you actually spend on
14  each particular -- reviewing each particular case?
15       A.   I read everything that was made available
16  to me.  I can't remember how much time it took me.
17  I remember doing it under extreme pressure and working
18  into the early hours of the morning in order to get
19  the job completed by the deadline provided.
20       Q.   So did you spend a couple days, then, focused
21  on reading the case files and writing your report?
22       A.   I remember I had to spend the best part of
23  a week from 9:00 until the early hours of the evening
24  in my office reviewing these files.  I remember that
25  they came in piecemeal fashion.  I remember being
```

OCTOBER 20, 2013 - NICK KAUFMAN

66

```
1   annoyed about it.
2        Q.   Can you say how much time was spent on each
3   individual case?
4        A.   No.
5        Q.   Did you do anything to help Shurat HaDin
6   obtain the files?
7        A.   No.  I just shouted at them for not getting
8   them to me in time.
9        Q.   And there are no steps that you followed that
10  someone else could do as well in trying to repeat the
11  process?
12       A.   I'm not sure I understand your question.
13       Q.   That's because it was a terrible question.
14            There was not a specific step or steps that
15  you took in reading the files and coming to your
16  conclusion that could be repeated by someone else;
17  correct?
18       A.   Well, once again, I'm -- the thrust of the
19  question is not too clear to me.
20            All I can say is what I did.  I mean, I read
21  the files, and I felt that my reading of the files was
22  sufficient to give my opinion.  I don't believe anyone
23  else could have given the same opinion on reading the
24  files because -- let me clarify that.
25            I mean, once again, I'm not sure about the
```

OCTOBER 20, 2013 - NICK KAUFMAN

67

```
1   question.  I mean, I read the files.  I gave my opinion.
2   I don't know what anyone else could have done.
3        Q.   There wasn't a specific series of concrete
4   steps you took in each case in reviewing the files and
5   rendering your opinion; correct?
6        A.   Once again, I don't know what you're referring
7   to by "concrete steps."  I -- I think I've clarified my
8   methodology.  I didn't have a scientific methodology
9   with a checklist of factors to look out for.
10            What I did was read every document that
11  was provided to me.  I believe that those documents
12  reflected what truly happened in the military court.
13  I thereafter checked to make sure that those documents
14  actually reflected what was in the files in the military
15  court, because I had received photocopies.  I read all
16  of those documents.  And if I felt that anything was
17  untoward, then I would have discussed the matter and
18  dealt with it.
19       Q.   And after you reached your decision on each
20  particular case and wrote your report, did you submit
21  it for any type of peer review?
22       A.   No.
23       Q.   And this is the first time you've ever been
24  asked to review cases that you were not the judge
25  presiding over; correct?
```

OCTOBER 20, 2013 - NICK KAUFMAN

68

```
1        A.   That's correct.
2        Q.   It's not what you do as a lawyer; correct?
3        A.   No.
4        Q.   It's not even what you do as a part-time
5   judge?
6        A.   No.
7        Q.   And your opinion on each case is based only
8   on the information that you received; correct?
9        A.   On the information that I received and
10  my personal experience of handling cases in Israeli
11  military courts.
12       Q.   But the information with respect to each
13  individual case was based uniquely on the case files
14  you received?
15       A.   You mean the evidence?  Yes.
16       Q.   When you say "evidence," "evidence" is a term
17  of art.
18       A.   Okay.
19       Q.   I mean the court records --
20       A.   The information --
21       Q.   -- the documents in the files.
22       A.   Correct.
23            MR. YALOWITZ:  Let him answer.
24            (Court reporter clarification.)
25            THE WITNESS:  Sorry.  Can you ask the question
```

OCTOBER 20, 2013 - NICK KAUFMAN

69

1    once again?
2        Q.    BY MR. SATIN:  Sure.  Your opinion is based
3    on just those court records in terms of the information
4    about the cases that informed your opinion?
5        A.    Correct.  I had no external sources of
6    information with respect to these cases.
7        Q.    And the files that you reviewed only included
8    certain documents related to each individual case;
9    correct?
10       A.    I believe that the files contained everything
11   that was submitted to the court and transcripts.
12       Q.    You'd agree that what is in the court record
13   is not every document that was ever generated in
14   connection with the case?
15       A.    Correct.
16       Q.    In other words, there's going to be police
17   reports that are not in the court records; correct?
18       A.    Correct.
19       Q.    They're going to be the files and records
20   of the prosecutor that are not in the court records?
21       A.    Correct.
22       Q.    They're going to be court -- they're going
23   to be records and materials from the defense attorney
24   that are not in the court records?
25       A.    Correct.

OCTOBER 20, 2013 - NICK KAUFMAN

70

1        Q.    And even the evidence that was submitted
2    in the case was not always within those court records;
3    correct?
4        A.    What do you mean --
5              MR. YALOWITZ:  Object to the form.  I don't
6    understand the question.
7              You can answer it if you understand it.
8              THE WITNESS:  Are you talking about the --
9              MR. YALOWITZ:  Don't ask him a question.  If
10   you understand the question, answer it.  If you don't
11   understand the question, tell him you don't understand
12   the question.
13             MR. SATIN:  Please don't advise the witness
14   how to answer a question.
15             THE WITNESS:  Well, I think I started my
16   answer by asking for clarification.  So I would ask
17   you to clarify your question once again.
18       Q.    BY MR. SATIN:  Sure.  There are in the
19   case files -- there are not going to be in the case
20   files certain records in connection with that case;
21   correct?
22       A.    I've already answered that question.  Correct.
23       Q.    And even evidence that was submitted in
24   the case, for example, photographs or statements of
25   witnesses, those did not make it into the court records

OCTOBER 20, 2013 - NICK KAUFMAN

71

1    that you reviewed; correct?
2        A.    I can't give an opinion about what is not in
3    those court files.  I can only give you an opinion on
4    what is in those court files, what I saw.  Thereafter,
5    I went to the courtroom -- the courthouse -- sorry --
6    to the registry of the courthouse.  I had the cases
7    brought to me.  I reviewed the cases to make sure that
8    what I'd reviewed in the photocopied versions reflected
9    what was in the case files in the courthouse.
10       Q.    You have, on occasion, as a part-time judge,
11   received evidence during the course of a trial; correct?
12       A.    Correct.  Yes.
13       Q.    And sometimes that evidence would include
14   things like photographs of the scene of the incident;
15   correct?
16       A.    Correct.
17       Q.    And in these 21 case files, there were no
18   photographs?
19       A.    To the best of my knowledge, no.
20       Q.    And you would agree that in the -- given
21   the nature of these cases, that there were photographs
22   taken in connection with those cases?
23       A.    I can't give you an opinion on what could
24   have been done or could not have been done.  I don't
25   know.  I only know what I saw.  Okay.  And what I

OCTOBER 20, 2013 - NICK KAUFMAN

72

1    saw I don't remember seeing photographs apart from
2    ID photographs, ID parades, but not scene of crime
3    photographs, as you put it.  No, I did not see one
4    scene of crime photograph.
5        Q.    So you can't say, based on the -- the
6    records you reviewed, whether there was other evidence
7    in connection with the -- with each individual case
8    that was actually submitted into the record but was
9    not actually stored in the court registry?
10       A.    I find the question rather long-winded.
11   And I'm having difficulty understanding it.
12             Once again, I've told you:  All I reviewed
13   was what was given to me in the photocopy version.
14   I thereafter went to the courthouse to make sure that
15   the photocopies I was given reflected what were in
16   those court files.  And I found that indeed to be
17   the case.
18       Q.    And the records in the court hearings are
19   not a verbatim transcript of everything that is said
20   in the courtroom; correct?
21       A.    Well, it doesn't include the umm's and the
22   aah's and -- and everything else.  So yes, it's not
23   a verbatim transcript.  No.
24       Q.    But not only is it not the umm's and the
25   aah's, there's actually not a court reporter who is

OCTOBER 20, 2013 - NICK KAUFMAN

73

```
 1   transcribing simultaneously while the litigants and
 2   the judges are speaking; correct?
 3       A.   The obligation of a judge is to ensure that
 4   an accurate court record is -- is produced.  There is
 5   a mechanism for parties, if they feel that the court
 6   record does not reflect what was said in court, to
 7   request amendments.  I did not see -- or sorry.  I
 8   cannot remember if I saw any particular request for
 9   amendment.
10       Q.   But those court records, then, are not based
11   on a court reporter who is in the courtroom at the time
12   and transcribes verbatim everything that is said?
13       A.   In my experience, there is normally a young
14   soldier, normally a young female soldier, who sits next
15   to the judge on his left-hand side.  And she types away
16   everything that is happening during the hearing.
17            Does it include a verbatim account?  To the
18   best of my knowledge, normally the -- the attempt is
19   made for it to be verbatim.  Of course, reality dictates
20   that it is not always verbatim.
21       Q.   You'd agree that, in your review of these case
22   files, there would often be summaries of what the court
23   said to the parties or what a discussion was that took
24   place?
25       A.   I can't remember if I saw a summary.
```

OCTOBER 20, 2013 - NICK KAUFMAN

74

```
 1       Q.   You'd agree that sometimes it would say things
 2   like "the court discussed the rights with the defendant"
 3   or "discussed the issue of representation with the
 4   defendant"?
 5       A.   Yes, that is the case.  Or "the court had the
 6   indictment read to this defendant."  Yes, that occurs
 7   now and again.
 8       Q.   It doesn't actually have the words of the
 9   judge. It just has a description of what supposedly
10   took place?
11       A.   That does occur from time to time.  I can't
12   remember whether it occurred in this case -- in the
13   21 cases that I reviewed.
14       Q.   And there's no certification that's affixed
15   to the court records from a court transcriber, saying
16   this is a complete and accurate description of
17   everything that was said in this particular court
18   hearing?
19       A.   There is no such certification.  No.  It's
20   assumed, as part of his responsibilities, to correctly
21   reflect what happens.
22       Q.   And the young woman that you were referring
23   to earlier is not a certified stenographer?
24       A.   No.  She's a soldier.
25       Q.   And the records are in Hebrew; correct?
```

OCTOBER 20, 2013 - NICK KAUFMAN

75

```
 1       A.   Correct.
 2       Q.   And the defendants in these cases spoke in
 3   Arabic; correct?
 4       A.   Correct.
 5       Q.   So what is written in the record purports
 6   to be a translation of what the defendants said when
 7   the defendants were speaking; correct?
 8       A.   It's your word "purport."  Those are
 9   translations of what the defendant said.
10       Q.   Well, there's not a certified court
11   interpreter in the Israeli military court system;
12   correct?
13       A.   Correct.
14       Q.   In Israeli civilian courts, the interpreters
15   are certified?
16       A.   I don't know.
17       Q.   And some of the records you received were
18   clearly missing pages; correct?
19       A.   Some of the documents I received?
20       Q.   Yes.
21       A.   I can't remember.  Would you like to produce
22   something for me?
23            (Defendants' Exhibit 408 marked.)
24       Q.   BY MR. SATIN:  I'm handing you what's been
25   marked as Defense Exhibit 408.
```

OCTOBER 20, 2013 - NICK KAUFMAN

76

```
 1            Defense 408 is a record of a court hearing;
 2   correct?
 3       A.   One moment.  (Examining.)  This is the
 4   beginning of a hearing.  Correct.
 5       Q.   And this is in the case of --
 6       A.   Ibrahim Hamed.
 7       Q.   That's Case No. 7; correct?
 8       A.   Let me check Exhibit No. 404.  (Examining.)
 9            It would indeed appear that that is the case,
10   although I do remember that -- that there was a problem
11   with the numbering here.  Because the way it appears in
12   my report is 4696/06.  And the transcript that you just
13   handed as Exhibit 408 carries the number 4646/06.
14       Q.   Sorry.  Say that again.
15            You believe this is a different case number?
16   You're talking about the court case number?
17       A.   I remember that there was a problem -- my
18   answer was that I remember there was a problem with
19   the numbering in this case.
20            The transcript that you've just handed me carries
21   the number 4646/06, if I refer you to the top left-hand
22   corner.  Some of the transcripts, I remember, carried
23   a different number, 4696/06, but they actually refer
24   to the same case.
25       Q.   This court record, though, is the only one
```

OCTOBER 20, 2013 - NICK KAUFMAN

77

1    that you have of what happened on that date in this
2    case, the date of August 18, 2010?
3        A.   I can't know whether it's the only record.
4    I assume that it is.
5            Yes.  It would be highly improbable for it
6    not to be.  But then I -- this is what it is.  Okay.
7    The transcript refers to a hearing which took place
8    on the 18th of August, 2010.  And it carries the number
9    4646/06.  That's the number of the case.  And it's the
10   case of Ibrahim Jamil Abd Al-Gani Hamed.
11       Q.   And you only have odd-numbered pages of that
12   court hearing; correct?
13       A.   In a document that you presented me, yes.
14   In a document in court, I can't remember.
15       Q.   Well, the one I gave you, the original page
16   numbers are only odd numbered; correct --
17       A.   Correct.  The document you gave me are --
18   is only --
19       Q.   In the bottom corner of that page --
20       A.   -- odd numbered.
21       Q.   -- is also a Bates number, another number --
22   set of numbers; correct?
23       A.   "P 11-7."
24       Q.   And on the first page is "296"?
25       A.   Correct.  Yes.

78

1        Q.   And on the second page it's "297"?
2        A.   Correct.
3        Q.   Which is actually page 3 of that document?
4        A.   Correct.
5        Q.   So the Bates number -- the ones that start
6    with the letter "P" are numbered correctly in order;
7    correct?
8        A.   Correct.
9        Q.   But the original court hearing page numbers
10   are only the odd-numbered pages?
11       A.   Correct.
12       Q.   Were you aware when you -- when you read this
13   document -- first of all, did you read this document
14   when you reviewed the files?
15       A.   I can't remember.  I read a lot of documents.
16       Q.   Were you aware that a document or that this
17   document had missing page numbers?
18       A.   I refer you to my last answer.  I can't
19   remember.  I read a large amount of documents.
20       Q.   Did you notice that pages from other cases,
21   unrelated cases, were mixed in with the court records
22   you reviewed?
23       A.   I can't remember.
24       Q.   So, for example, in the case of Moonzer Nur,
25   No. 1, did you notice that there were records from some

79

1    other person's case records mixed in with Moonzer Nur's
2    court records?
3        A.   I assume you have a reason for asking me this
4    question.  But, seriously, I cannot remember.
5        Q.   The GSS files were not included in the files
6    that you received; correct?
7        A.   Correct.
8        Q.   The GSS is the entity that investigates State
9    security offenses; correct?
10       A.   Yes.
11       Q.   And the defendants in these cases were charged
12   with State security offenses?
13       A.   To a large part, yes.
14       Q.   In each of those cases, the GSS interrogated
15   the defendant?
16       A.   That is not something that I can know but
17   I would assume to be the case.
18       Q.   But you do know that, in many of these cases,
19   the defendant allegedly confessed?
20       A.   Correct.
21       Q.   And in many of these cases, defendants or
22   other arrestees incriminated other defendants?
23       A.   Correct.
24       Q.   While those arrestees were under arrest or
25   in detention?

80

1        A.   Correct.
2        Q.   So you'd agree that the custodial statements
3    of the defendants were very important in these cases?
4        A.   Clarify what you mean by "custodial
5    statements."
6        Q.   Statements made while defendants were in the
7    custody of the GSS or the police.
8        A.   Correct.
9        Q.   Statements that were made while an individual
10   was not free to go?
11       A.   Correct.
12       Q.   Okay.  You'd agree that those statements --
13   those custodial statements were an important part of
14   these cases?
15       A.   Correct.
16       Q.   In fact, it was the primary evidence against
17   many of these defendants?
18       A.   I don't remember.  Refer me to a specific
19   case, and then I will give you my opinion.
20       Q.   Well, you would agree that your main job --
21   the main thrust of what you did, according to you, was
22   to review these case files?
23       A.   Correct.
24       Q.   And to provide a summary of what happened?
25       A.   Correct.

81

1    Q.    And what you're saying is you don't remember
2    if the main evidence against most of them was the
3    statements that they, the defendants, themselves made?
4    A.    I remember that a large proportion of them
5    did confess and were convicted on the basis of their
6    own confession.
7    Q.    And the interrogations by the GSS can go on
8    for days; correct?
9    A.    Correct.
10   Q.    In the Israeli military court system, a
11   suspect can be detained and interrogated without a
12   warrant for up to eight days; correct?
13   A.    That is correct.
14   Q.    Without access to a lawyer?
15   A.    That is correct.  However, there are
16   safeguards -- statutory safeguards -- yes, statutory
17   safeguards, whereby a person who's denied access to
18   his lawyer can petition.  The same applies in the
19   Israeli civilian courts.
20   Q.    Well, the period of detention is different
21   in a civilian court than it is in the military court
22   system; correct?
23   A.    You are correct.
24   Q.    Because you said it's up to eight days in the
25   Israeli military court system --

82

1    A.    Correct.
2    Q.    -- without access to a lawyer?
3    A.    Correct.
4    Q.    Only up to 24 hours in the Israeli civilian
5    court system?
6    A.    Correct.
7    Q.    And in the military court system, it can be
8    extended for up to 30 days at a time?
9    A.    Detention, correct.
10   Q.    Up to 90 days altogether?
11   A.    Correct.
12   Q.    And it's not like that in the civilian court
13   system?
14   A.    There is a distinction.  Correct.
15   Q.    And you said that there is a -- a safeguard
16   being that the person can petition; correct?
17   A.    I said that a moment -- a few moments ago.
18   Yes.  And I think it's subject to -- judicial review.
19   Q.    That person would have to be the defendant,
20   then, because they don't have access to a lawyer;
21   correct?
22   A.    In my experience, what happens sometimes --
23   and I have dealt with these cases as a prosecutor.  I'm
24   talking about denial of access to attorney cases.  It's
25   normally the family who generates the petition, because

83

1    they apply to a lawyer.  A lawyer tries to get access.
2    The lawyer is refused access.  And then he petitions
3    the court.
4    Q.    You just said in your experience as a
5    prosecutor.
6          That was not in the Israeli military court
7    system --
8    A.    No.
9    Q.    -- correct?
10   A.    This was a prosecutor in the offices of the
11   district attorney of Jerusalem.  But it's the same
12   principle.
13   Q.    In a different court system?
14   A.    In the Israeli civilian court system, yes.
15   But as I said, it's exactly the same principle.
16   Q.    And a person --
17   A.    It's a matter of common sense as well.
18   Q.    And in the Israeli military court system,
19   a person can be detained up to 180 days without seeing
20   a lawyer if the appellate court approves?
21   A.    Sorry.  180?
22   Q.    Yes.
23   A.    I can't remember.  I have to check the law.
24        180 days?
25   Q.    That was the question.

84

1    A.    Without seeing a lawyer in the Israeli
2    civilian court system?  Is that what you --
3    Q.    Military court system.
4    A.    Once again, I have to check the statute.
5    I can't remember the numbers offhand.  But I know that
6    the -- that the -- the time periods are different.  But
7    I also know that there is the possibility to petition
8    and request for that to be returned.  And the -- the
9    whole thing is subject to judicial review.
10   Q.    Although the person at the time that is
11   seeking judicial review does not actually have access
12   to their lawyer?
13   A.    Correct.  But I've explained to you how it
14   happens, how it works normally.  Normally, the family --
15   Q.    Based on your experience in the civilian court
16   system?
17   A.    Based on my experience in the civilian court
18   system, the family suddenly noticed that their loved
19   one goes missing.  They assume it's something to do with
20   the security services.  They apply to a lawyer.  Their
21   lawyer applies to the GSS, the police station, whatever,
22   demands access, is refused access, and then he goes to
23   court.
24   Q.    And a defendant who's in custody who doesn't
25   have a family, much less a family that takes those

85

1  steps wouldn't be able to do that, then; correct?
2      A.   Correct.
3      Q.   Let's get back to the GSS records.
4           The GSS keeps records of what happens during
5  those interrogations; correct?
6      A.   The GSS keeps records of what happens during
7  those interrogations.  Correct.
8      Q.   Records about the interrogation techniques
9  that were used?
10     A.   Correct.
11     Q.   Whether the defendant was exposed to force?
12     A.   In none of the 21 cases that I reviewed did
13 I have any grounds to believe that there was deliberate
14 use of force applied by the GSS.
15     Q.   You just said -- you'd agree that you actually
16 didn't have the GSS records?
17     A.   Correct.
18     Q.   And the GSS records would have a record of
19 whether or not there was force used?
20     A.   I would assume so.  Yes.
21     Q.   And so those GSS records, they have records
22 of whether a defendant was given food, for example;
23 correct?
24     A.   I have seen that now and again in GSS records.
25 Yes.

86

1      Q.   Whether the defendant was threatened?
2      A.   Threatened?
3      Q.   Threatened.
4      A.   I have not seen that in GSS records.
5      Q.   Whether there had been gag orders that had
6  been issued?
7      A.   Gag orders, yes.
8      Q.   Whether the defendant had asked for and was
9  denied a lawyer?
10     A.   Correct.
11     Q.   And those GSS records would also include
12 a record of what the defendant supposedly said during
13 the period of his interrogations?
14     A.   Your word "supposedly."  That imputes bad
15 faith to the GSS.  But yes -- the answer is "yes."
16     Q.   Well, you'd agree that you've never actually
17 been there for one of these interrogations; correct?
18     A.   Correct.
19     Q.   So when you see a record, that's just based
20 on what somebody else said happened; correct?
21     A.   It's based on what the GSS officer reports
22 to have happened.  Yes.
23     Q.   Right.  So I use the word "supposedly" because
24 you don't have firsthand knowledge of it; correct?
25     A.   Correct.

87

1      Q.   And in this case, you never got to see any
2  of those records; right?
3      A.   No.  Not in any of the 21 cases that I
4  reviewed.
5      Q.   You would have liked to have seen those
6  records?
7      A.   I would have liked to have seen lots of
8  things.  I'm sure, with the benefit of access to
9  all of the -- to the records, I could give a view
10 on whether or not these people -- you know, a better
11 view on whether or not these people were rightly or
12 wrongly convicted.
13          That wasn't my mandate.  I wasn't asked to
14 pass an opinion on whether or not these people were
15 rightly or wrongly convicted.  I was asked to pass an
16 opinion on whether or not, on the basis of the reports
17 that were put to me, they were afforded due process.
18 And my answer was "yes."
19     Q.   Well, in cases built almost exclusively on
20 the word of defendants --
21     A.   Uh-huh.
22     Q.   -- you'd agree that you'd like to see what
23 happened during the course of those interrogations;
24 correct?
25     A.   Correct.

88

1      Q.   You don't know whether the defense lawyers in
2  those cases received the GSS files for those incidents
3  for their clients?
4      A.   I do not.
5      Q.   To get the files, the defense attorneys had
6  to ask for them; correct?
7      A.   I can't comment on that.  I can only comment
8  on what my practice was, as a prosecutor in the office
9  of the district attorney of Jerusalem.
10     Q.   You'd agree that the practice in the civilian
11 court in Jerusalem is different than the military court
12 system?
13     A.   Once again, I can't comment.  I've never
14 worked as a prosecutor in the Israeli military courts.
15 I've only worked as a prosecutor in the office of the
16 district attorney of Jerusalem.  And my practice I know
17 full well.  If you want to ask me, I'll tell you what
18 my practice was.
19     Q.   You can't say whether or not your practice
20 was the practice followed by the attorneys in the
21 Israeli military court system; correct?
22     A.   Correct.
23     Q.   You'd agree that the defense attorneys
24 should have sought to obtain the GSS files in these
25 cases?

**89**

```
 1        MR. YALOWITZ:  Object -- objection.  Object
 2  to the form.
 3        THE WITNESS:  As a prosecuting attorney
 4  in the office of district Jerusalem, I -- district
 5  attorney of Jerusalem, I always insisted that the
 6  GSS records which pertain to a statement or confession
 7  or admission made by a defendant were always handed
 8  over to the defense.  I cannot comment on what the
 9  prosecution in the military courts did.
10     Q.   BY MR. SATIN:  I didn't ask you about the
11  prosecution.  I asked you if the defense attorneys
12  should have sought the GSS files of their clients.
13     A.   The GSS files in general?
14        MR. YALOWITZ:  Wait a second.  Do you have
15  a question, or are you just going to argue with the
16  witness?  Are you going to ask --
17     Q.   BY MR. SATIN:  You can answer.
18        MR. YALOWITZ:  -- him a question?  It wasn't
19  a question.
20     Q.   BY MR. SATIN:  My question is:  Do you
21  agree that the defense attorneys should have sought
22  the records of the GSS files of their clients?
23        THE WITNESS:  Do I answer this?
24        MR. YALOWITZ:  Now you can answer.  He's asked
25  a question.
```

OCTOBER 20, 2013 - NICK KAUFMAN

**90**

```
 1        THE WITNESS:  Okay.  Thank you.
 2        Yes, I think they should have asked for the --
 3  for the GSS files.  But let me clarify what they should
 4  have asked for.  Not for complete access to the GSS
 5  files.  I'm talking about the statements which were
 6  taken from these individuals, which reflected their
 7  admissions.
 8        Should they have asked for access to the
 9  files which document, shall we say, as you would have
10  it, the application of pressure, if that was the case?
11  No.
12     Q.   BY MR. SATIN:  You don't believe the
13  defense attorneys should have sought the records
14  of the investigative techniques that led to their
15  client's statements?
16     A.   They can ask for it.  Yes.  But then that
17  is subject to what's called immunity.  They have a
18  right to challenge that immunity.
19     Q.   But the question is whether or not the
20  defense attorneys should have sought the records
21  relating to the investigative techniques?
22     A.   Well, again --
23        MR. YALOWITZ:  Objection.  Objection.  This --
24  this -- objection.  Objection.
25     Q.   BY MR. SATIN:  Please answer the question.
```

OCTOBER 20, 2013 - NICK KAUFMAN

**91**

```
 1     A.   Insofar as it impacts on their client's free
 2  will in giving their -- their confession, yes, they
 3  should have sought it.
 4     Q.   And in the Israeli military court system,
 5  a defense lawyer can't speak to prosecution witnesses;
 6  correct?
 7     A.   Correct.  Not until they've given their
 8  evidence.
 9     Q.   Not until they're on the witness stand?
10     A.   Not until after they have given their
11  evidence.  They cannot talk to them about the evidence
12  in the case.
13     Q.   Until they're on the witness stand?
14     A.   Until they're on the witness stand.  Correct.
15     Q.   If, in fact, they are called to testify in
16  the case?
17     A.   Well, they would only know that they're
18  witnesses if they're called to testify in the case.
19     Q.   Well, many of the witnesses in the case were
20  not actually called to testify in these cases; correct?
21     A.   Many of the witnesses in these 21 cases were
22  not called to testify.
23     Q.   Correct?
24     A.   Correct.
25     Q.   In other words, just their written statements
```

OCTOBER 20, 2013 - NICK KAUFMAN

**92**

```
 1  were submitted?
 2     A.   Correct.
 3     Q.   There was no live testimony?
 4     A.   Correct.
 5     Q.   There was no cross-examination?
 6     A.   Correct.
 7     Q.   The prosecution witnesses are listed in the
 8  indictment; correct?
 9     A.   Correct.
10     Q.   Now, in generating your opinions about the
11  due process in these 21 cases, did you speak to anyone
12  personally who worked on these cases?
13     A.   No.
14     Q.   Did you try to speak to any of the individuals
15  who worked on those cases?
16     A.   No.
17     Q.   Did you obtain and review the records of the
18  defense attorneys who represented these defendants?
19     A.   No.  And I wouldn't expect them to give them
20  to me.
21     Q.   Did you ask?
22     A.   I felt I would -- I did not ask.  I felt that
23  would have been a breach of client-attorney privilege.
24     Q.   Well, you agree that a client-attorney
25  privilege can be waived; correct?
```

OCTOBER 20, 2013 - NICK KAUFMAN

1      A.   It can be.  Yes.
2      Q.   Did you seek those records?
3      A.   No.
4      Q.   Did you seek the records of the prosecutors?
5      A.   No.
6      Q.   Now, when you're working as a part-time judge,
7  you hear from both sides before you ever render a
8  decision; correct?
9      A.   Correct.
10     Q.   You give each -- each side the opportunity
11 to provide you with whatever information they want
12 to provide you before you make a decision?
13     A.   Correct.
14     Q.   And in this case, you relied only on the
15 information you received from the plaintiffs' counsel;
16 correct?
17     A.   Correct.
18     Q.   The side that is paying you?
19     A.   Sorry?
20     Q.   The side that is paying you?
21     A.   Well, the side that instructed me.  Of course
22 they pay me.  I don't do it for free.
23     Q.   The side that hired you?
24     A.   Correct.
25     Q.   Okay.  And you'd agree that you don't have

1  all the information related to these cases?
2      A.   Well, I -- once again, you have to clarify.
3      I had all the information, which I -- which
4  I later reviewed to be in the court files in the
5  registry of the courthouse.
6      Q.   And you'd agree that there are many records,
7  as well as other oral information that exist outside
8  of those case records?
9      A.   Correct.  We discussed that already.
10     Q.   And you'd be in a better position to render
11 an opinion about whether those defendants received due
12 process if you had more information?
13     A.   I think you say "asked and answered" in your
14 jurisdiction.
15          MR. YALOWITZ:  Indeed we do.  If you have
16 anything to add, please go ahead.
17          MR. SATIN:  Please don't instruct the witness.
18          THE WITNESS:  I've given you my answer on that
19 point.
20     Q.   BY MR. SATIN:  What is it?
21     A.   As I said, obviously in a perfect world,
22 if I had more -- access to more information, I would
23 have been able to give a better opinion.  But then
24 I gave my opinion on what I had in front of me and
25 whether I thought that the defendants were afforded

1  due process on the basis of the information which was
2  supplied to me.
3      Q.   And given the information that was supplied
4  to you, you did not have enough information to say the
5  defendant was afforded due process; correct?
6      A.   I had enough information to say, on the basis
7  of the information that was supplied to me, that the
8  defendant was afforded due process.
9      Q.   The most you can say is that you don't see
10 a due process violation based on the information that
11 you had received?
12     A.   On the basis of information that was provided
13 to me, I believe that the defendants were afforded due
14 process.
15     Q.   Well, you only affirmatively found that a
16 defendant received due process in four of the cases;
17 correct?
18     A.   In none of the cases did I find that the
19 defendant was denied due process.
20     Q.   Okay.  That's not what I asked you.
21          My question was:  You only affirmatively
22 found that a defendant received due process in four
23 of the cases?
24     A.   Mr. Satin, we can play semantics all day.
25     Q.   What's your answer to my question?

1      A.   My answer is that in none of the cases did
2  I find that defendants were denied due process.
3      Q.   Well, I'll refer you to your original report.
4  I believe it's Exhibit 404.
5      A.   Yes.
6      Q.   And if you turn to page 10.  And in the case
7  of Moonzer Nur, you wrote at the top of page 10:
8           "In my opinion, the defendant was afforded
9  due process."
10     A.   Correct.
11     Q.   That's what you wrote?
12     A.   Correct.
13     Q.   Okay.  In the case of Ibrahim Hamed, No. 7,
14 on page 18 --
15     A.   Correct.
16     Q.   -- you write in the last paragraph:
17          "To conclude, it is my opinion that the
18 defendant's rights were protected at all times."
19     A.   Correct.
20     Q.   That's part of the statement that you wrote?
21 You did say that?
22          Is that correct?
23     A.   Correct.
24     Q.   Okay.  In the case of Majid Al-Masri, No. 12,
25 page 22 --

97

```
1      A.   Uh-huh.
2      Q.   -- you wrote in the last paragraph for that
3  defendant:
4           "From perusal of the transcripts of the trial
5  proceedings, I am of the opinion that due process was
6  observed."
7      A.   Correct.
8      Q.   What do you mean by "observed"?
9      A.   That he was afforded due process.  "Observed,"
10 it's -- it's a British term.  Observed.  Afforded.
11     Q.   Okay.  In the case of Hilmi Hamash, No. 15 --
12     A.   Yep.
13     Q.   -- you wrote in the very end:
14          "It is my opinion that the defendant's
15 case was handled appropriately and in accordance
16 with recognized principles of due process."
17     A.   Correct.
18     Q.   You use very different language to describe
19 your findings in other cases; correct?
20     A.   Yes.  I -- well, I varied my language, I think
21 would be more accurate, because I didn't want to sound
22 too robotic.  Okay.  But then, apparently, if I would
23 have adopted some form of scientific method, then I
24 would have repeated exactly the same formula.  Because
25 but I do believe that the same formula applies to all
```

OCTOBER 20, 2013 - NICK KAUFMAN

98

```
1  21 of the cases.  All 21 defendants were afforded due
2  process.
3      Q.   Well, let's at least review the language that
4  you used, and then we'll talk about what that language
5  means.
6      A.   Okay.
7      Q.   In the case of No. 2, Abd-El Karim Aweis,
8  you wrote:
9           "Nothing in the materials with which I
10 have been provided leads me to believe that this
11 defendant was denied due process."
12     A.   Correct.
13     Q.   For No. 8, Ahmed Barghouti, page 19, it
14 also says:
15          "Nothing in the materials made available to
16 me suggest that the defendant was denied due process."
17 (As read.)
18          Correct?
19     A.   Correct.
20     Q.   And you wrote the same language, Case No. 9
21 [sic], Pharess Ghanem, page 21?
22     A.   Correct.
23     Q.   (Reading.)
24          "Nothing in the material with which I have
25 been provided suggests that the defendant was denied
```

OCTOBER 20, 2013 - NICK KAUFMAN

99

```
1  due process."
2      A.   Twenty-one?
3      Q.   Page 21.
4      A.   Correct.
5      Q.   The same language in Case No. 13, on page 23?
6  The same language?
7      A.   (Reading.)
8           "Having reviewed the materials placed at my
9  disposal, there is nothing to suggest that the defendant
10 was denied due process."
11          Correct.
12     Q.   So you'd agree, in the vast majority of these
13 cases, you use that negative language; correct?
14     A.   I --
15          MR. YALOWITZ:  Object to the form.
16          THE WITNESS:  I mean, I used what I used.
17 As I said already, there was no specific reason for my
18 using it.  Maybe it's because I'm just not a scientific
19 sociologist giving an opinion according to scientific
20 methods.  I was just giving my view.
21     Q.   BY MR. SATIN:  Well, you're a lawyer,
22 though; right?
23     A.   That's correct.
24     Q.   And you'd agree that there's a difference
25 between saying a defendant was afforded due process
```

OCTOBER 20, 2013 - NICK KAUFMAN

100

```
1  and saying nothing in the materials provided leads you
2  to believe that the defendant was denied due process?
3      A.   When I wrote this opinion, I was not of the
4  belief that there was a difference between the two.
5      Q.   Would you agree that the absence of something
6  does not prove that it affirmatively exists?
7      A.   Correct.
8      Q.   There's a difference; right?
9      A.   Correct.  But, once again, when I wrote this
10 opinion, I was not aware of making any distinction
11 between the two.
12     Q.   Well, on the question of whether a defendant
13 was afforded due process, what was your starting point?
14     A.   I've told you already.
15     Q.   No, I don't mean your starting point in
16 terms of the law.
17          Did you start from the premise that the
18 defendant was afforded due process, or did you start
19 from the premises that the defendant was not provided
20 due process?
21     A.   I started from no particular premises.  I
22 just looked at the transcripts.  If something caught
23 my attention as being inappropriate, then I would deal
24 with it.  If not, I would just summarize and say that
25 nothing in the court records gives me reason to believe
```

OCTOBER 20, 2013 - NICK KAUFMAN

101

```
 1  that he was denied due process --
 2      Q.  What standard --
 3      A.  -- or --
 4      Q.  -- did you apply?
 5      A.  -- was afforded due process.  I used the two
 6  terms interchangeably.  I made no distinction between
 7  the two when I wrote my opinion.
 8      Q.  In making the determination that there was
 9  due process, what was the standard that you applied?
10      A.  Clarify what you mean by "standard,"
11  Mr. Satin, please.
12      Q.  Well, by what standard of proof, probable
13  cause, preponderance of the evidence?  Did you have
14  clear and convincing evidence?  Did you have a standard
15  that you applied?
16          MR. YALOWITZ:  Object -- object to the form.
17  You've just asked him, like, six questions.  Would you
18  like to rephrase?
19          MR. SATIN:  No.
20          THE WITNESS:  There was no particular standard
21  of proof that I applied.  I believe that -- no, there
22  was no particular standard of proof that I applied.
23      Q.  BY MR. SATIN:  Can you --
24      A.  I reached my conclusions on the basis of what
25  I saw.
```

OCTOBER 20, 2013 - NICK KAUFMAN

102

```
 1      Q.  Can you state, to a degree of scientific
 2  certainty, that each defendant was afforded due process?
 3          MR. YALOWITZ:  Object -- object to the form.
 4          THE WITNESS:  Any degree of scientific
 5  certainty?  I'm not so sure what you mean by that.
 6  Percentages -- do I believe that 99 percent?
 7  99.5 percent?  60 percent?
 8          I don't -- I don't understand the question.
 9  I'm sorry.
10      Q.  BY MR. SATIN:  The question is:  Can
11  you say to a degree of scientific certainty the
12  defendant was -- that the defendants were afforded
13  due process?
14      A.  Well, I -- I must confess I don't understand
15  the question.  But I believe that these defendants were
16  afforded due process.  And I'm certain about that.
17      Q.  Now, all of the defendants in these cases
18  were convicted of their crimes; correct?
19      A.  Correct.
20      Q.  Just because a person is found guilty by
21  a court does not mean that the person received due
22  process; correct?
23      A.  Correct.
24      Q.  Because, if that were the case, there would
25  be no reason for anyone to review the files; right?
```

OCTOBER 20, 2013 - NICK KAUFMAN

103

```
 1      A.  You're right in your assumption.
 2      Q.  You could just look to see what the verdict
 3  was?
 4      A.  Correct.
 5      Q.  Some of the defendants pled guilty; correct?
 6      A.  Correct.
 7      Q.  Now, a person who has been denied due process
 8  can also plead guilty?
 9      A.  You are correct in your assumption.
10      Q.  Sorry?
11      A.  I believe you are correct in your assumption.
12      Q.  An innocent person can be found guilty?
13      A.  It happens.
14      Q.  And an innocent person can even plead guilty?
15      A.  It does indeed happen.
16      Q.  Let's talk about how a guilty plea happens
17  in the Israeli military court system.
18          When the parties reach an agreement -- a plea
19  agreement, the prosecutor submits an amended indictment;
20  correct?
21      A.  Correct.
22      Q.  The lawyers tell the judge the defendant is
23  pleading guilty?
24      A.  Correct.
25      Q.  The defendant does not receive a translated
```

OCTOBER 20, 2013 - NICK KAUFMAN

104

```
 1  copy of the amended indictment?
 2      A.  That's the duty of his counsel.
 3      Q.  The defendant does not receive from the court
 4  a translated copy of the amended indictment?
 5      A.  The court will clarify whether or not he has
 6  understood the contents of the amended indictment.  It
 7  is counsel's duty to clarify to his client the exact
 8  contents of that indictment as amended.
 9      Q.  And any discussions that happen between
10  the client and the attorney, you certainly have no
11  information about that?
12      A.  No.
13      Q.  Because you weren't there during those
14  communications?
15      A.  Of course not.
16      Q.  And you don't have records of what was said
17  during those communications?
18      A.  No.
19      Q.  But what you can say is that, in court,
20  a translated copy of the indictment is not provided
21  to the defendant?
22      A.  A translated copy of the indictment is not
23  provided to the defendants.
24          I repeat my previous answer, that is the
25  duty of counsel to translate the contents of that
```

OCTOBER 20, 2013 - NICK KAUFMAN

1  indictment, as amended, to his client.  And the court
2  will question counsel for the client as to whether
3  or not he has explained to the client the contents
4  of that amended indictment and whether or not the
5  client understands them.
6        (Defendants' Exhibit 409 marked.)
7  Q.  BY MR. SATIN:  I'm showing you what's been
8  marked as Defense Exhibit 409.
9        409 is a court record in the case of --
10 A.  (Examining.)  Ahmed Barghouti.
11 Q.  Case No. 8; correct?
12 A.  Let me check Exhibit 404.  Yes, you are
13 correct.
14 Q.  And this is a record of a hearing in that
15 case; correct?
16 A.  I don't know whether it's a complete record
17 of the whole hearing, because you've only given me one
18 page.  But yes, it is a record -- it comes from a record
19 of a -- it comes -- it is a record of part of a hearing
20 in the case of Ahmed Barghouti.
21 Q.  And on that one page, it says "hearing
22 proceedings," and then underneath it "decision";
23 correct?
24 A.  "Mahalach hadiun."  That's the -- the
25 conduct of the proceedings.  "Hachraat hadin" is

OCTOBER 20, 2013 - NICK KAUFMAN

---

106

1  not "decision."  It's "judgment," "verdict."
2  Q.  And this is a record of the guilty plea in
3  this case?
4  A.  Correct.  But it's not a full transcript
5  because there is no date fixed for the next hearing
6  present in the transcript you've given to me.  And
7  there is no record of what happened thereafter, for
8  example, a sentencing hearing.  I would assume that
9  there were more pages attached to this document.
10 Q.  Well, they're going to be more pages in the
11 case records because there were other dates of hearings;
12 correct?
13 A.  Correct.
14 Q.  This is just a hearing record from May 15th,
15 2003?
16 A.  Correct.
17 Q.  And in this page is reflected the guilty plea
18 of the defendant?
19 A.  What is referred to here is an announcement
20 by the defense lawyer who states:
21       (Reading/translating.)
22       "We would like to withdraw our 'kfira'" --
23       "Kfira" is a "denial," "ulehodot,"
24       -- "and to plead to the amended indictment,
25 which was filed on the 1st of October, 2002."

OCTOBER 20, 2013 - NICK KAUFMAN

---

1  Then the defendant himself states:
2        (Reading/translating.)
3        "I confirm what has been said by my lawyer."
4        Then the prosecutor states as follows:
5        (Reading/translating.)
6        "I would request that the court convicts
7  the defendant according to his confession."
8        Then you have "hachraat hadin," "verdict."
9        Do you want me to continue translating?
10 Q.  Yes.
11 A.  (Reading/translating.)
12       "On the basis of the confession, or plea of
13 guilty, we convict the defendant of the offenses which
14 are attributed to him in the amended indictment."
15       And then it's signed by all three judges.
16 Q.  There's no inquiry from the judge of the
17 defendant?
18 A.  There is no allocution as you would put it.
19 No.
20 Q.  There's -- the only thing that the defendant
21 says is "I confirm the words of my defense counsel"?
22 A.  You are absolutely correct.
23       But let me say something.  This is Attorney
24 Ahmed Tsafiah.  I know him personally.  He has much
25 experience.  He is the lawyer who formerly worked for

OCTOBER 20, 2013 - NICK KAUFMAN

---

108

1  Attorney Jawad Boulous, who I am sure you are familiar
2  with.  He trained with Jawad Boulous.  He has much
3  experience in court.  And I'm not so sure that he
4  would say those things unless it indeed was the case.
5  Q.  But you don't know what he said?
6  A.  No.
7  Q.  You weren't there for any conversations
8  between him and his lawyer?
9  A.  Of course not.
10 Q.  But what is certainly clear from this record
11 is there was no question and answer between the judge
12 and the defendant?
13 A.  I believe I've already answered that question.
14 There was no allocution.  Nor is there any requirement
15 for allocution under law.
16 Q.  Sorry?
17 A.  Nor is there a requirement for allocution.
18 Q.  It doesn't happen in the Israeli military
19 court system?
20 A.  Nor in the Israeli civilian court system.
21       (Defendants' Exhibit 410 marked.)
22 Q.  BY MR. SATIN:  I'm showing you --
23 A.  It doesn't mean that there is a lack of due
24 process.
25 Q.  I'm showing you Defense 410.

OCTOBER 20, 2013 - NICK KAUFMAN

1    A.   (Examining.)
2         I would like to add one thing, with your
3    permission, to the previous Exhibit 409.
4         If you look at the -- the judges -- the list
5    of judges, you will see that the three judges there
6    are -- the persons in the tribunal, the chief judge,
7    presiding judge is Nathaniel Ben-Ishu.  He is now the
8    most senior judge, I believe, in the Judea military
9    court.
10    Q.   You didn't put that in your report?
11    A.   No.  And the same goes for Exhibit 410.  He
12   is presiding over this hearing as well.
13    Q.   So the one I've just given you, 410, is the
14   hearing record in the case of --
15    A.   Mohammad Messalah.
16    Q.   No. 9; correct?
17    A.   Let me check Exhibit 404, please.
18         (Examining.)  Correct.
19    Q.   And according to this record, the amended
20   indictment also was not read out loud at this hearing?
21    A.   Give me a moment, please, sir, to review the
22   transcript which you've presented to me.  (Examining.)
23         You're correct.  There's no allocution here.
24   However, there is something which is slightly odd, and
25   it's at line 24.  And this is actually what I believe

1    to be a gesture on behalf of the military prosecutor
2    to the defendants.  And it is probably prompted by
3    defense counsel's request.  And this is based, let
4    me add, on experience being a prosecutor.
5         Many times defendants want to plead guilty,
6    but they're concerned about the effects that it may
7    have on their colleagues, as it were, co-perpetrators.
8    So what the -- what the prosecuting lawyer is actually
9    saying here in -- in -- in line 24 is an assurance to
10   the defendant that his confession here in court will
11   not be used against any of -- in any of the other
12   trials which are taking place.
13         But you're right, there's no allocution.
14    Q.   There's also no reading of the amended
15   indictment in court?
16    A.   It's not reflected in the transcript.
17   You're correct.
18    Q.   And even in the previous case that I just
19   gave you for Case No. 8, there was also no reading
20   of the amended indictment out loud?
21    A.   It's assumed.  But you're correct.  There
22   is -- it's not actually written in the transcript.
23    Q.   So is it your position that it may have
24   happened, but it's not written down because the
25   court reporting just doesn't happen that way?  Or

1    are you saying it didn't happen?
2    A.   That the amended indictment was read out?
3    Q.   Right.
4    A.   It's rarely read out when there's an amended
5    indictment.  All of the -- that would happen is that
6    the defense lawyer would say:  I have read to my client
7    the amended indictment, and he's understood the contents
8    thereof.  And he pleads them.
9         Very rarely -- let me say -- and this is based
10   on personal experience -- does a judge actually sit down
11   and read out all of the indictments -- all of the counts
12   in the indictments, especially in cases -- for example,
13   the case of Ibrahim Hamed where you've got umpteen
14   counts.  It would take all day to read out an indictment
15   of that nature.  It's not required under the practice
16   and procedure.
17         There are, however, institutions where it
18   does, and I can speak from experience here.  In the
19   International Criminal Court, for example, long charge
20   sheets are actually read out word for word by the clerk
21   of the court.  It happens in the U.K. as well.  From
22   what I remember, the charges are read out.
23    Q.   So it rarely happens that the amended
24   indictment is read out loud; correct?
25    A.   Correct.

1    Q.   And the amended indictment is not provided
2    to the defendant in a form of a translation?
3    A.   We've already discussed that.
4    Q.   And for Case No. 9, it doesn't even say here
5    that the defense lawyer had advised his client what
6    the amended indictment contained; correct?
7    A.   Well, that's not quite correct.  The defense
8    lawyers says, okay:
9         (Reading/translating.)
10         "I affirm or agree to what the prosecutor
11   has stated.  And I would ask for the court to allow
12   my client to retract his denial."
13         What the -- the prosecuting lawyer read out
14   is that:
15         (Reading/translating.)
16         "We've reached a plea bargain in the course
17   of which -- in the context of which" --
18         I apologize.
19         (Reading/translating.)
20         -- "I would like to submit an amended
21   indictment.  The defendant will retract his denial
22   and will plead to the amended indictment."
23         So on behalf of his client, the defense
24   attorney is, in fact, agreeing to what the prosecuting
25   counsel has said.  So one would be fully entitled to

113

```
1    assume that defense counsel had actually put to his
2    client the contents of the amended indictment.
3         Q.   Nowhere in this document does it say that
4    the defense lawyer had explained the contents of the
5    amended indictment to his client?
6         A.   No.
7         Q.   The defendant never signed the documents
8    stating that the facts in the indictment are true;
9    correct?
10        A.   The defendant himself?
11        Q.   Correct.
12        A.   No, he did not.
13        Q.   In general, that does not happen that the
14   defendant signs a document stating that what he is
15   pleading guilty to --
16        A.   In the courts?  No.  As a practitioner,
17   defense counsel, sometimes I insist that my client
18   signs.
19        Q.   Even if he --
20        A.   That's for my own personal benefit.  But I
21   have not seen in this case.  No.
22        Q.   You didn't see that in any of these cases?
23        A.   No.
24        Q.   Okay.  And the judge does not ask the
25   defendant if he is pleading guilty because, in fact,
```

OCTOBER 20, 2013 - NICK KAUFMAN

114

```
1    he is guilty?
2         A.   It's not written in any of these -- to
3    the best of my knowledge, in any of these transcripts.
4    However, sitting as a judge myself, I always ensure
5    that that is the case.
6         Q.   So perhaps you do things differently than
7    the other judges do?
8         A.   I think it would be more correct to say that
9    I can't know what other judges do apart from those with
10   whom I sit.
11        Q.   As a part-time judge?
12        A.   As a part-time judge.
13        Q.   In one of the courts?
14        A.   In the Judea military court.  Correct.
15        Q.   And at the --
16        A.   I would not sleep at night if I felt someone
17   had pled guilty for something that he didn't do.
18        Q.   So you take extra measures to protect the
19   due process rights of the defendants?
20        A.   I'm speaking about myself.
21        Q.   And I'm asking you about yourself.
22        A.   Uh-huh.  Yeah.
23        Q.   You have to say "yes" or "no" for the record.
24        A.   Do I take more measures than other judges?
25   I can't answer that, I'm afraid.
```

OCTOBER 20, 2013 - NICK KAUFMAN

115

```
1         Q.   But the measure of --
2         A.   I don't know what other judges do.  I take
3    what I believe to be extra precaution, yes.  But then
4    that's just me.
5         Q.   It's not required?
6         A.   It's not required by the law --
7         Q.   It's just the way you do it?
8         A.   -- no.
9              I'm a peasant.  What can I say?
10        Q.   At the time of the guilty plea, the judge
11   doesn't ask the defendant if he understands that, by
12   pleading guilty, he is giving up his rights?
13        A.   No.
14        Q.   He doesn't tell him, by pleading guilty,
15   Mr. Defendant, you're giving up your right to trial;
16   correct?
17        A.   No.
18        Q.   Or your right to cross-examine witnesses?
19        A.   When he pleads guilty?
20        Q.   Correct.
21        A.   No, he does not explain that.
22        Q.   The right to present a defense?
23        A.   He does not explain that.
24        Q.   The right to testify?
25        A.   Clarify, please.
```

OCTOBER 20, 2013 - NICK KAUFMAN

116

```
1         Q.   The defendant's right to testify at a trial?
2         A.   Testify as to his innocence?
3         Q.   Correct.
4         A.   Correct.
5         Q.   And the judge does not ask the defendant
6    if he understands the maximum penalty he is facing
7    by pleading guilty?
8         A.   I'd wish to qualify that.  He doesn't explain
9    what the maximum penalty fixed by law is.  One would
10   assume that his counsel would do that.
11             However, if the plea bargain relates to a
12   specific punishment, which may or may not be imposed
13   on the defendant, then the judge is obliged to explain
14   to the defendant that he is not obliged to honor the
15   plea bargain.
16        Q.   But the judge doesn't tell him how much or
17   how high of a sentence he can give him; correct?
18        A.   No.
19        Q.   And the judge doesn't ask the defendant if
20   he is satisfied with his lawyer?
21        A.   No.
22        Q.   The defend -- the judge doesn't ask the
23   defendant if he was pressured to plead guilty?
24        A.   It's not required because one assumes good --
25   sorry.  One presumes good faith on the part of counsel
```

OCTOBER 20, 2013 - NICK KAUFMAN

1  representing these individuals.  It would be a pretty
2  sad indictment of defense counsel if you questioned the
3  capability and capacity of each and every one of them.
4  So no, it doesn't happen.
5       Q.   Would you agree that your opinions in this
6  case are based on the assumptions of defense counsel?
7       A.   I believe that, if there were claims of
8  ineffective or inappropriate representation, then
9  they would have been raised.  I didn't see any such
10  claims.  I saw, shall we say, muted reference to such
11  in Mr. Sfard's report.  But even he doesn't go so
12  far as to allege negligence on behalf of any of these
13  lawyers appearing in the 21 cases that I've reviewed.
14       Q.   So you believe that, absent some kind
15  of record or motion by the defendant regarding
16  ineffectiveness, that the lawyers were necessarily
17  effective?
18       A.   I believe that one has to presume competence.
19       Q.   That's what you have done when you evaluated
20  these cases?
21       A.   Absolutely.  Unless there's anything to prove
22  contrary.
23            (Court reporter clarification.)
24            THE WITNESS:  Unless there's anything to prove
25  to the contrary or suggest to the contrary.

OCTOBER 20, 2013 - NICK KAUFMAN

1       Q.   BY MR. SATIN:  In the Israeli military court
2  system, there's tremendous pressure on the defendants
3  to plead guilty?
4       A.   You say that, not me.
5       Q.   Do you agree with it?
6       A.   I don't agree with it, no, not in my
7  experience.  I've never pressurized anyone to plead
8  guilty.
9       Q.   You -- but you -- you would recognize that
10  pressure could come from sources than other than from
11  the judge; right?
12       A.   In any system, there can be all sorts of
13  sources for applying pressure to get a caseload done
14  as quickly as possible.
15       Q.   The pressure could come from the defense
16  lawyer himself?
17       A.   It could come from the defense lawyer.  It
18  could come from the prosecution.  It could come from
19  the -- the judge.
20       Q.   And it could come from the defendants own
21  perception of the fairness of the system?
22       A.   In a theoretical world, yes, what you're
23  saying is true to any system, any jurisdiction, not
24  just in Israeli military courts.
25       Q.   But you recognize the defendants and defense

OCTOBER 20, 2013 - NICK KAUFMAN

1  attorneys in the Israeli court -- Israeli military
2  court system --
3            (Court reporter clarification.)
4       Q.   BY MR. SATIN:  Do you agree that defendants
5  and defense attorneys in the Israeli military court
6  system in the occupied territories do not believe that
7  they will get a fair trial?
8       A.   I can't speak to what other people believe,
9  I'm afraid.
10       Q.   And you don't know what happens during plea
11  negotiations between the defense attorneys and the
12  prosecutors?
13       A.   No.
14       Q.   It doesn't involve the judge?
15       A.   No.
16       Q.   There's no record of it?
17       A.   No.
18       Q.   And having never served as a prosecutor or
19  defense attorney in the Israeli military court system,
20  you don't have any firsthand knowledge or experience
21  to rely on?
22       A.   To rely on what?
23       Q.   What happens during plea negotiations between
24  the defense attorneys and the prosecutors?
25       A.   I don't think that there is any difference

OCTOBER 20, 2013 - NICK KAUFMAN

1  between plea negotiations in Israeli military courts
2  and plea negotiations in the Israeli civilian courts.
3  And I have a large amount of experience in handling
4  plea negotiations as a prosecutor, even in security
5  offenses.
6       Q.   Only in the civilian court system?
7       A.   Only in the civilian court system.
8       Q.   Okay.  And the Israeli military courts are
9  in occupied territory?
10       A.   Correct.
11       Q.   The Israeli military court system did not
12  exist until the land was occupied by the military in
13  1967?
14       A.   Correct.
15       Q.   A conflict between Israelis and Palestinians
16  has continued at different levels of intensity since
17  1967?
18       A.   Correct.
19       Q.   The conflict has gone on for decades?
20       A.   Correct.
21       Q.   The Israeli military court system has been
22  in existence for decades?
23       A.   Well, you yourself just said since '67.
24       Q.   And judges have been serving for decades?
25       A.   Correct.

OCTOBER 20, 2013 - NICK KAUFMAN

121

1      Q.   And you've been doing it now, you think,
2  since 2004?
3      A.   Somewhere in there.  2003, I believe.  Once
4  again, I'm not sure of the date.  We can clarify that
5  very easily.
6      Q.   And when you were providing your overview
7  early on in your report, that was based on your general
8  experience during the -- during the entire period in
9  which you've served as a military court judge; correct?
10     A.   Correct.
11     Q.   It wasn't specific to any specific time period
12 within that period?
13     A.   No.
14     Q.   And in the Israeli military court system, the
15 judges are members of the military?
16     A.   Correct.
17     Q.   And in each case, there's a panel of three
18 judges?
19     A.   It depends.
20     Q.   The trial court?
21     A.   It depends.  It depends on the sentence.
22 Once again, up to a certain sentence, it can be tried
23 by one judge.  I believe it's ten years or -- or seven
24 years.  I forget which.  I have sat as a single judge,
25 trying cases --

                OCTOBER 20, 2013 - NICK KAUFMAN

122

1      Q.   Whether it's one judge --
2      A.   -- of a security nature, as a single judge,
3  not as a member of a tribunal of three.  Most of
4  these cases involve murder or, shall we said, homicide.
5  Because the offense of murder doesn't exist in the
6  military courts.  And those cases are all tried by
7  tribunals of three.  Membership in outlawed association
8  cases, which I sat in on a frequent basis, are tried
9  by single judges.
10     Q.   And whether it's one judge or three judges
11 that's serving in a particular case, they're all members
12 of the Israeli military?
13     A.   Correct.
14     Q.   And they wear military uniforms on the bench;
15 correct?
16     A.   Correct.
17     Q.   Not robes?
18     A.   Correct.
19     Q.   The prosecutors are members of the military
20 as well?
21     A.   Correct.
22     Q.   And they wear military uniforms in court?
23     A.   Correct.
24     Q.   The defense attorneys are not members of the
25 Israeli military?

                OCTOBER 20, 2013 - NICK KAUFMAN

123

1      A.   Correct.
2      Q.   They're not necessarily Israeli?
3      A.   Correct.
4      Q.   They can be Israeli, Palestinian, or
5  Jordanian?
6      A.   Correct.
7      Q.   Most are Palestinian?
8      A.   Correct.
9      Q.   And during the times of these cases, the
10 21 cases you reviewed, the defendants in the Israeli
11 military court system were Palestinians; correct?
12     A.   The defendants?
13     Q.   Yes.
14     A.   Were Palestinians?
15     Q.   Yes.
16     A.   Correct.
17     Q.   Now, under the law, Palestinians and Israeli
18 Jews can be charged in the Israeli military court
19 system?
20     A.   Correct.
21     Q.   Theoretically?
22     A.   Theoretically.  Mr. Sfard talks about that.
23 And I agree with his views on that.
24     Q.   In practice, only Palestinians are tried in
25 the Israeli military court system?

                OCTOBER 20, 2013 - NICK KAUFMAN

124

1      A.   Correct.
2      Q.   That's how it was during the period of these
3  cases?
4      A.   Correct.
5      Q.   Israeli Jews who are charged with the
6  identical crimes, even occurring in the West Bank
7  in the occupied territories, they'd be charged in
8  the Israeli military courts -- they would not be
9  charged --
10     A.   Not be charged.
11     Q.   -- in the Israeli military court system?
12     A.   They would be charged in Israeli civilian
13 courts.  Correct.
14     Q.   An Israeli Jew has not been brought before
15 the Israeli military court system in decades?
16     A.   I can't comment on that.  And I'm not so
17 sure the assertion is correct.  But then I would --
18 I would concede to my peers on that matter.
19     Q.   In addition to the lawyers and the judges
20 we talked about, the -- the clerks in the courtroom,
21 they're all members of the Israeli military?
22     A.   Clarify what you mean by "clerk."
23     Q.   Well, is there a courtroom clerk who is --
24 has some administrative duties in the courtroom?
25     A.   There is an interpreter, who is also the

                OCTOBER 20, 2013 - NICK KAUFMAN

125

1    person who handles the court, the -- the goings-on
2    in the courtroom, calls the judges into court, allows
3    the families to come into court, basically the person
4    who organizes what goes on in the court from an
5    administrative point of view.
6        Q.  He's the court reporter, did you say?
7        A.  Not the court reporter.  He's the court
8    translator.
9        Q.  The court translator?
10       A.  Yes.  He also doubles as the person who calls
11   the judges into court, calls the silence in court, calls
12   for the defendants' families to come into court so they
13   can be present during the hearing.  Yes, he will be the
14   interpreter.  He is either Bedouin or Druze.
15       Q.  The person who is responsible for interpreting
16   for the defendant has other responsibilities?
17       A.  Yes.
18       Q.  And that's a person who's a member of the
19   military?
20       A.  Correct.  And he wears a green uniform.
21       Q.  Okay.  So do you agree -- are there guards
22   in the courtroom or people --
23       A.  Yes, there are.
24       Q.  -- for -- who keep order in the courtroom?
25       A.  Correct.

                OCTOBER 20, 2013 - NICK KAUFMAN

126

1        Q.  Also members of the military?
2        A.  Yes.  Normally of the military police.
3        Q.  So would you agree that the only non-military
4    people in a courtroom is going to be the defendant,
5    the defendant's family, and the defense attorney?
6        A.  You're forgetting one very important body
7    of people who like to come to these hearings and follow
8    what's going on.  Machsom Watch, Yesh Din, and all the
9    human rights organizations.  I have frequently observed
10   the presence of human rights organizations' observers,
11   diplomats, various people who come to see what's going
12   on in those courts.  They're public.  They're open to
13   the public.
14       Q.  You said earlier you became familiar with
15   the Yesh Din report after Mr. Sfard's --
16       A.  Yes.
17       Q.  -- report was generated?
18       A.  That's correct.
19       Q.  Okay.  But now you're saying that you actually
20   were familiar with their observers in your courtroom?
21       A.  I used them as an example of human rights
22   organizations that come.  I'm more familiar with Machsom
23   Watch.  It's a bunch of ladies who hang out at security
24   checkpoints to see what's going on.  They also come to
25   court.  I think they perform a very important role to

                OCTOBER 20, 2013 - NICK KAUFMAN

1    tell you the truth.  But I've frequently observed them
2    in court.  I've frequently chatted to them.
3        Q.  So would you say that, in most cases, if
4    not all the cases that you're familiar with, you have --
5    most serious cases, you have three judges of the Israeli
6    military preceding over a trial in occupied territory
7    where the prosecutor is also a member of the Israeli
8    military and the defendant and his lawyer are
9    Palestinian?
10       A.  Correct.
11           MR. SATIN:  Why don't we take a break.
12           (Recess from 11:35 a.m. to 11:48 a.m., after
13   which Mr. Rochon was not present.)
14       Q.  BY MR. SATIN:  Good morning.
15           You know other judges who have worked in the
16   Israeli military court system?
17       A.  I know of the judges.  Yes.
18       Q.  Do you know a judge named Jonathan Livni?
19       A.  Jonathan Livni?
20       Q.  Yes.
21       A.  I know of him.  Yes.  He's a lawyer.  He
22   practices in Jerusalem.  Jonathan Livni.
23       Q.  Sorry?
24       A.  Jonathan Livni.  I am familiar with him.
25   I know him personally.

                OCTOBER 20, 2013 - NICK KAUFMAN

128

1        Q.  He was a judge in the Israeli military court
2    system?
3        A.  I believe so.
4        Q.  You know him personally, you said?
5        A.  I know him, yes, as a private defense counsel.
6        Q.  Do you respect him as a person?
7        A.  I respect him as a person.  Yes.
8        Q.  Do you respect him as a lawyer, as a judge?
9        A.  I respect him as a lawyer.  As a judge, I
10   have not an opinion on him.
11       Q.  Okay.  This is what he had to say about being
12   a judge in the Israeli military court system.
13           (Playing video clip.)
14           MR. HILL:  Maybe you should say for the record
15   what you're playing.
16           MR. YALOWITZ:  Hold on.  Just -- just wait.
17   While we're -- while he's fooling with the video,
18   what -- what time did we start?
19           THE COURT REPORTER:  11:48.
20           MR. YALOWITZ:  Okay.  Michael, if you're going
21   to play a video, could you please just explain --
22           MR. SATIN:  Sure.
23           MR. YALOWITZ:  -- what it is and where it's
24   from?  And then show the witness so he can see the
25   video and listen to it.

                OCTOBER 20, 2013 - NICK KAUFMAN

129

1       MR. SATIN:  Yeah, I was trying to do that,
2   but I had mechanical difficulty.
3       MR. YALOWITZ:  You were rushing too.  That's
4   okay.  These things happen.
5       Q.  BY MR. SATIN:  I'm going to show you a
6   clip from the movie "The Law in These Parts."
7       A.  "The Law in These Parts"?
8       Q.  Are you familiar with that film?
9       A.  No.
10      Q.  I'm going to show you --
11      A.  What's the name in Hebrew.
12      MR. SFARD:  "Shilton HaHok" in Hebrew.
13      THE WITNESS:  I've heard of that film.  Yes.
14      Q.  BY MR. SATIN:  I'm going to show you a clip --
15      A.  I believe my name appears in the credits at
16  the end.  Is this Ronen Alexander's [sic] film?
17      MR. SFARD:  Ra'anan.
18      THE WITNESS:  Ra'anan Alexander [sic].  Yes.
19  In fact -- oh, I'm not going to volunteer information.
20      MR. YALOWITZ:  Please don't volunteer
21  information.
22      THE WITNESS:  Yes.
23      Q.  BY MR. SATIN:  I'm going to show you a clip
24  from that movie.  Okay?
25      A.  I can't see the screen.

OCTOBER 20, 2013 - NICK KAUFMAN

130

1       (Playing video clip.)
2       THE WITNESS:  And your question?
3       Q.  BY MR. SATIN:  That's the Jonathan Livni that
4   you know?
5       A.  That is the Jonathan Livni that I know.
6       Q.  And one of the things he says in that clip
7   was:
8           "As a military judge, you represent the
9   authorities of the occupation vis-a-vis the population
10  that sees you as an enemy.  You're conducting a trial
11  against your enemy."
12      A.  Those are his words.
13      Q.  What is your reaction to what he said?
14      A.  As I said, those are his words.
15      Q.  What is your opinion about what he said?
16      A.  That's his opinion.
17      Q.  Do you agree with him?
18      A.  I don't regard the people that I sit and try
19  as a judge as being my enemy.  I regard them as people
20  who have come -- been brought before a court, who have
21  been charged with criminal offenses.  And it is my job
22  to determine whether or not they did those criminal
23  offenses.  Whether or not they're my enemy or my friends
24  is of no relevance whatsoever.
25      Q.  Do you know whether other judges in the

OCTOBER 20, 2013 - NICK KAUFMAN

131

1   Israeli military court system view the defendants
2   the same way as Mr. Livni?
3       A.  I can't comment on what other judges view.
4   I've never sat down and discussed the matter with them,
5   whether or not they sit in the military courts and try
6   these people and enjoy trying these people because this
7   is for them an opportunity to take vengeance on what
8   they view as the enemy.  All I can talk about is what
9   I do in the military court.
10      Q.  But in rendering an opinion about the 21 case
11  files, you're assuming that those judges did not think
12  the way that Jonathan Livni thinks; correct?
13      A.  All the --
14      MR. YALOWITZ:  You know what?  I'm just going
15  to object.  Because I -- I watched the clip, and I think
16  the question or perhaps the editing of the movie might
17  be misleading.  Because I read -- I read that to mean
18  that he was looking at the perspective of the defendant
19  to the judge, not the judge to the defendant.  So I
20  think the -- I think that the question misreads the
21  film clip.
22      MR. HILL:  Kent, as you know, the proper
23  way to object is to object and say you think there
24  is a mistake, but not to explain your view of that
25  in front of the witness.  So please don't do that in

OCTOBER 20, 2013 - NICK KAUFMAN

132

1   the future.
2       MR. YALOWITZ:  Well, the witness is -- I'm --
3   I'm not going to argue with you.  Go ahead and ask your
4   question.
5       THE WITNESS:  Please ask your question again
6   for me.
7       Q.  BY MR. SATIN:  In rendering an opinion
8   about the 21 cases, you're assuming that the judges
9   who presided over those cases don't think the way
10  that Jonathan Livni just expressed himself?
11      MR. YALOWITZ:  Objection.  Object to the form
12  of the question.  Misstates the record.
13      THE WITNESS:  Yes, I have to answer?
14      MR. YALOWITZ:  Please answer.
15      THE WITNESS:  I am familiar with a large
16  majority of the judges who sat in the cases which I
17  reviewed.  And I don't believe that they hold those
18  views.
19          Let me say something more about "Shilton
20  HaHok," that film.  I believe that film was produced
21  with a certain, shall we say, view that the people
22  who are participating in it should speak their minds
23  freely and openly.  And I cannot rule out that the
24  film was not produced with a certain agenda in mind
25  either.  I don't know what the bias of the producer

OCTOBER 20, 2013 - NICK KAUFMAN

133

1  of that film is.
2        All I can say is that I know.  And what I
3  know is that practically all of the judges with whom
4  I am familiar in these 21 cases do not espouse those
5  particular views.
6      Q.  BY MR. SATIN:  You do know that he served
7  as a judge in the Israeli military court system for
8  over 25 years?
9      A.  I'm not aware of the time period that he
10 served in the military courts.  I know that he was
11 a military judge.  Yes.
12     Q.  What does it say about a system that allowed
13 a judge to sit for so long who thinks the way he thinks?
14        MR. YALOWITZ:  Objection.
15        THE WITNESS:  Now --
16        MR. YALOWITZ:  Objection.  Completely -- well,
17 objection.
18        THE WITNESS:  I think that it probably would
19 be better to make your submissions in -- in closing
20 arguments in your case in the United States.
21     Q.  BY MR. SATIN:  So what is your answer?
22     A.  I don't have an answer.
23     Q.  You're refusing to answer the question?
24     A.  I'm not refusing to answer the question.
25 That's his own personal view.  It's not my view.  And

OCTOBER 20, 2013 - NICK KAUFMAN

134

1  I cannot say whether it's the view of any other of the
2  judges I sat with.  It's just one particular person's
3  view that you've showed me.
4      Q.  I understand that.
5          But you're testifying about a system; correct?
6      A.  I'm testifying, to a certain extent, about
7  a system.  You are correct, Mr. Satin.
8      Q.  And I'm asking you:  What does it say about
9  that system if it permitted a judge like Mr. Livni
10 to sit --
11        MR. YALOWITZ:  Objection.
12        THE WITNESS:  Once again --
13        MR. YALOWITZ:  Objection.  It's a totally
14 improper foundation.  There's no foundation for the
15 question whatsoever.  I object.
16        THE WITNESS:  All right.  Once again, I don't
17 know whether Mr. Livni was sitting as a judge at the
18 time he made that interview or not.  I don't know.  I
19 think it's fairly clear that that's his own personally
20 held opinion.  And what does it say about the system?
21 Well, it says nothing about the system apart from one
22 man's particular views of the system.
23     Q.  BY MR. SATIN:  And you can't say what goes
24 on inside the minds of other judges; correct?
25     A.  Of course not.  Neither nor can you.

OCTOBER 20, 2013 - NICK KAUFMAN

135

1      Q.  And fair to say it would not be a politically
2  correct thing to do for judges to openly admit that they
3  view the defendants as the enemy?
4        MR. YALOWITZ:  Objection.  Lacks foundation.
5  I don't understand the term --
6        THE WITNESS:  Well --
7        MR. YALOWITZ:  -- "politically correct."
8        THE WITNESS:  -- it depends on who you are.
9  Here's an example of one of them who actually did
10 open his mouth and say what he thought of the --
11 of the system.
12     Q.  BY MR. SATIN:  You'd agree that what he
13 just said, though, reflects that he is not an
14 impartial judge; correct?
15        MR. YALOWITZ:  Objection.  Lacks foundation.
16        THE WITNESS:  It reflects his own personal
17 views.
18     Q.  BY MR. SATIN:  But you'd agree that if a
19 judge were to say "you're the judge, but he stands
20 before you, and he's the enemy, you're conducting a
21 trial against your enemy," that statement reflects a
22 lack of impartiality?
23        MR. YALOWITZ:  Objection.  Lacks foundation.
24        THE WITNESS:  As I said, it's his own personal
25 view.  And don't you think it's a great system where

OCTOBER 20, 2013 - NICK KAUFMAN

136

1  judges are allowed to say those sort of things?  At
2  least we don't live in a dictatorship where freedom of
3  speech is suppressed.  He is speaking his own personal
4  view.  It's not my view.  I've told you what I believe.
5      Q.  BY MR. SATIN:  You would agree, though,
6  that if someone had that view, it would make them
7  unqualified to sit as a judge in the Israeli
8  military court system?
9      A.  I can't comment on what makes him -- whether
10 or not he's qualified or not qualified to sit as a judge
11 in the Israeli military court system.
12     Q.  I asked about him.  If anyone were to share
13 the views that he just expressed, that would make that
14 person unfit to serve as a judge in the Israeli military
15 court system?
16        MR. YALOWITZ:  Objection.  Lacks foundation.
17        THE WITNESS:  I don't think that that's
18 judicial temperament.  No.
19     Q.  BY MR. SATIN:  And it's a lack of
20 impartiality; correct?
21     A.  I don't know how --
22        MR. YALOWITZ:  Objection.  Lacks foundation.
23        THE WITNESS:  Yes, I don't know how Jonathan
24 Livni, when he sits in a military court, handles his
25 cases.  All I know is what you've shown me on that

OCTOBER 20, 2013 - NICK KAUFMAN

1  video.  It might be that he's a fantastic judge when
2  he's sitting in the military courts.
3        This is some -- a statement that was made
4  for the benefit of the cameras.  Maybe he got excited
5  by the -- you know, the footlights.  Some people do
6  get excited by the footlights sometimes.
7        Q.  BY MR. SATIN:  So you think that he's not
8  being genuine with what he says?
9        MR. YALOWITZ:  Objection.  Lacks foundation.
10       THE WITNESS:  That does lack foundation.
11  I know Jonathan Livni personally.  I know he's a man
12  who likes to speak his mind.  He's vociferous.
13       Q.  BY MR. SATIN:  We spoke earlier about
14  some of the differences between the Israeli military
15  court system and the Israeli civilian court
16  system --
17       A.  Correct.
18       Q.  -- in -- in terms of the period of detention,
19  pretrial detention; correct?
20       A.  Correct.
21       Q.  And there are other differences as well?
22       A.  There are.
23       Q.  The penalties for crimes are often different
24  as well; right?
25       A.  According to the statute book, perhaps yes.

OCTOBER 20, 2013 - NICK KAUFMAN

1  okay, in the military courts, these cases would often
2  be settled for sentences much lower than one would
3  impose in a military court -- in a civilian court.
4        Q.  BY MR. SATIN:  But what you're talking
5  about now is the sentences that people actually
6  receive; correct?
7        A.  Correct.
8        Q.  I was asking you about the period of
9  incarceration that a person could receive.
10       A.  Fixed by statute?  Correct.  You are
11  absolutely right.  Yes.
12       Q.  It's true that the period --
13       A.  There is -- there can be a certain difference
14  sometimes.  Yes.  What exactly the differences are and
15  with respect to which offenses I cannot tell you without
16  looking at the statute books.
17       Q.  For example, a defendant in the civilian court
18  charged with manslaughter faces a maximum of 20 years
19  in prison.  Whereas, in the military court system, it's
20  up to life in prison?
21       A.  Well, yes, you are correct.  But then you
22  have to qualify this, Mr. Satin.  Because the Israeli
23  military ordinance does not provide for a distinction
24  between the various categories of homicide, whereas,
25  Israeli penal code does.

OCTOBER 20, 2013 - NICK KAUFMAN

1  Offhand, I cannot tell you.  I would have to look and
2  compare the two statutes.
3        Q.  You acknowledge there are differences?
4        A.  I acknowledge.
5        Q.  And you acknowledge that the differences
6  create more exposure time for defendants in the military
7  court system than in the civilian court system?
8        A.  What do you mean by "exposure time"?
9        Q.  The defendants are facing more time in prison
10  in the military court system than in the civilian court
11  system?
12       MR. YALOWITZ:  Objection.  Vague.
13       THE WITNESS:  It's a -- it's a vague question.
14  And it's not actually true in some circumstances.
15       Sentencing policy, as a matter of general
16  observation -- and I'm not going to commit myself to
17  any scientific answer on this -- does differ from time
18  to time in between the civilian courts and the military
19  courts.  Sometimes the sentences imposed in a military
20  court are more severe than those imposed in the civilian
21  court for the same type of offense.  Sometimes they are
22  less.
23       I'll give you an example of where they have
24  been less in my own personal experience, and nothing
25  more than that.  In the cases -- stone throwing cases,

OCTOBER 20, 2013 - NICK KAUFMAN

1        Q.  Now, before we move on to another -- to
2  a new topic, would you agree that, without regard to
3  your agreement about the ultimate conclusion, that the
4  Yesh Din report and its methodology was more scientific
5  and lends itself to peer review more so than your
6  methodology?
7        A.  I didn't study the Yesh Din report in too
8  much detail because I didn't feel it was relevant to
9  the mandate that I was given.
10       Q.  So you don't know what their methodology is?
11            Is that what you're saying?
12       A.  I wouldn't profess to know in too much detail
13  what their methodology was.  No.
14       I know that there was some reference to
15  having attended something like 800 hearings and
16  observed what went on in those hearings.  I would
17  also add that I believe 800 to be a minute fraction
18  of the amount of hearings that takes place in a court
19  throughout the course of one year.  And bearing in
20  mind that the cases discussed or the questions that
21  you're asking me refer to a time period of 2002 up
22  to 2013, then it's a tiny drop in the ocean.
23       Q.  Are you aware that they also spoke to
24  individuals involved in the system?
25       A.  I believe so.  Yes.

OCTOBER 20, 2013 - NICK KAUFMAN

141

```
1        Q.   Prosecutors, defense attorneys, judges?
2        A.   So I believe.  I don't know whether -- who
3   exactly they spoke to.  But then I am aware that that
4   is what is claimed in the report.  Yes.
5        Q.   And that they collected data -- quantitative
6   data?
7        A.   I'm not familiar with what quantitative data
8   you're referring to.  But I know that they attended
9   800 hearings.  That's what I believe.  I know they've
10  spoken to a number of people from all, shall we say,
11  sectors of the military justice system.  And -- and
12  I know that they produced a report on the basis of
13  those conversations and those observations.
14       Q.   Would you agree that, based on the limited
15  information that you have about them, that theirs
16  was more scientifically reliable than yours, their
17  methodology?
18       A.   Well, it depends what you're looking at.
19  If you're saying as a general overview of military
20  justice, then they're coming from a different vantage
21  point.
22            Nowhere did the Yesh Din report touch on the
23  cases that I examined in the same way that I examined
24  them.  And nowhere, in any of the reports that I've
25  seen that were produced by counsel for the defendants,
```

OCTOBER 20, 2013 - NICK KAUFMAN

142

```
1   was there any reference to the specific cases.  There
2   were a few sentences in Mr. Sfard's report.  But he
3   didn't do any overview of the cases that I did.
4        Q.   At least with respect to the overall system,
5   the assessment of the overall military court system,
6   his was a more scientific -- the Yesh Din was a more
7   scientifically reliable method than your methodology?
8            MR. YALOWITZ:  Objection.  Asked and answered.
9            THE WITNESS:  Well, I don't know what a
10  scientific --
11           MR. YALOWITZ:  Let -- let me object, and
12  then you can -- objection.  Asked and answered several
13  times.
14           THE WITNESS:  If you mean --
15           MR. YALOWITZ:  If you have anything to add,
16  please go ahead.
17           THE WITNESS:  If you mean by "scientific,"
18  well, he sat down and spoke to people and his
19  representatives sat down and spoke to people,
20  collected evidence, sat in hearings, well, yes,
21  you're right, it's more scientific.
22       Q.   BY MR. SATIN:  Now, in the Israeli
23  military court system, a defendant is not entitled
24  to counsel at detention proceedings; correct?
25       A.   In the Israeli military court system he's
```

OCTOBER 20, 2013 - NICK KAUFMAN

143

```
1   not entitled to counsel to what?
2        Q.   In other words, he's not entitled to be
3   provided by the --
4        A.   By law?
5        Q.   By law.
6        A.   No.  There is no statutory obligation for
7   him to be.  The -- the simple fact of the matter is
8   that he is represented by counsel.
9            We're talking about detention hearings?
10       Q.   Detention hearings.  The State is not required
11  to provide an attorney to the defendant?
12       A.   No.
13       Q.   And the State is not required to provide
14  counsel to the defendant --
15       A.   There's no --
16       Q.   -- at trial unless he's facing at least ten
17  years in prison?
18       A.   Correct.  There's no statutory obligation as
19  such.  But the simple fact of the matter is that I've
20  never presided over a case that hasn't -- there hasn't
21  been counsel involved.
22       Q.   In the civilian court system, there is a
23  public defender system; correct?
24       A.   Correct.
25       Q.   There's a requirement of providing a lawyer
```

OCTOBER 20, 2013 - NICK KAUFMAN

144

```
1   to defendants?
2        A.   You should clarify that.  Because -- and
3   you should be -- it's not necessarily the case.  If
4   it's of a certain amount of time and -- and if -- and
5   if the defendant -- sorry -- what I mean is a certain
6   sentence and if the defendant is facing a custodial
7   sentence, then there is an obligation to appoint
8   him defense counsel.  It's not always the case that
9   defense -- that defendants in the civilian court
10  system are appointed defense counsel by the court.
11       Q.   And as you said, in practice in the military
12  court system, most defendants get a lawyer?
13       A.   I have never sat in a trial in a military
14  court, apart from traffic offenses -- because I've
15  sat once or twice as a judge doing traffic offenses.
16  I have always presided over trials where defendants
17  have been represented.  I've seen more trials where
18  defendants have not been represented take place in
19  civilian courts in Israel.
20       Q.   Now, anyone who's a member of the Palestinian,
21  Jordanian, or Israeli Bar may represent defendants in
22  the military court system; correct?
23       A.   Correct.
24       Q.   There's no -- there's no other test to be
25  qualified to represent defendants in the Israeli
```

OCTOBER 20, 2013 - NICK KAUFMAN

1  military court system?

2      A.   I'm not aware of any other test.

3      Q.   There's no test to see if the -- if the lawyer
4  speaks Hebrew well enough to practice in the military
5  court system?

6      A.   Simple fact of the matter is that all of the
7  lawyers in these cases do speak Hebrew.

8      Q.   My question is:  There's no test to see if
9  lawyers in general in the military court system speak
10  Hebrew well enough to practice in that court system?

11      A.   There is no such test.  No.

12      Q.   And in your report, you state that you're
13  familiar with a few of the lawyers in these cases;
14  right?

15      A.   Correct.

16          MR. SATIN:  Should we stop for lunch?  Okay.
17  I think we're making good progress.  Why don't we take
18  a lunch now.

19          MR. YALOWITZ:  All right.

20          (Recess from 12:08 p.m. to 1:22 p.m.)

21          THE WITNESS:  Good afternoon.  Yes.

22      Q.   BY MR. SATIN:  During the lunch break, did
23  you discuss the substance of your testimony with the
24  lawyers?

25      A.   The substance of our test -- no, the

1  testimony, no.

2      Q.   Were you given advice or information about
3  the style of your answering questions?

4      A.   No.  Not that I can remember, not offhand.

5      Q.   How about during the other breaks we had this
6  morning?

7      A.   We discussed you and the way you were asking
8  questions.

9      Q.   And what was that?

10      A.   That you were eager and that you were firing
11  away and that it was a bit like a bronco ride.

12      Q.   Were you provided any advice about how to
13  answer those questions, my questions?

14      A.   No.  I received that advice in the meeting
15  that I had with Mr. Yalowitz at the -- on the last
16  occasion we met.

17      Q.   Let's talk about Mr. Nur's attorney.

18          You know him?

19      A.   Mr. Who's attorney?

20      Q.   Nur.  Moonzer Nur.

21          Which number is that?

22      Q.   Defendant No. 1.

23      A.   Ali Gozlan.

24      Q.   You know this attorney?

25      A.   Yes.  He's in -- I do know him.

1      Q.   You said --

2      A.   Not personally.  I know him from him having
3  appeared in front of me in court.

4      Q.   You said in your report, bottom of page 9:

5          "Of note is the fact that the defendant
6  was represented, at trial and on appeal, by counsel,
7  Attorney Ali Gozlan, with who I am familiar and know
8  to represent many accused at the JMC."

9      A.   Yes.  I stand behind that comment.

10      Q.   Altogether for your description and opinion
11  of the Nur case, you wrote two paragraphs; correct?

12      A.   Correct.

13      Q.   And you decided of the just two paragraphs
14  to have a sentence in there about your familiarity with
15  Attorney Gozlan?

16      A.   Would you let me refresh my memory as to what
17  I actually wrote here?

18      Q.   Sure.

19      A.   (Examining.)  Yes.  Your question, sir?

20      Q.   What was noteworthy of the fact that you
21  knew this individual that you decided to put it in
22  your report?

23      A.   Just that I knew him.  There was no specific
24  reason.  I think there probably was -- well, I know him
25  from having represented many people.  He's familiar with

1  the court.  He's familiar with the procedures that are
2  adopted in the court.

3          This is an individual, Mr. Moonzer Nur, who
4  was convicted on the basis of his -- of his confession
5  to a large extent, where a distinction was sought to
6  be made by his defense counsel between what we would
7  call the completed defense and aiding and abetting.

8      Q.   You'd agree, then, that Mr. Nur was convicted
9  primarily because of statements he made during his
10  interrogation; correct?

11      A.   I think I stated that in my review of the
12  case.

13      Q.   Yes?

14      A.   Yes.

15      Q.   Okay.  And the defense attorney, Gozlan,
16  had consented to the admission of the defendant's
17  statements; correct?

18      A.   Correct.

19      Q.   And you did put that in your report?

20      A.   Correct.

21      Q.   Now, the attorney didn't just consent to the
22  admissibility of the defendant's statements; correct?

23      A.   Do you mean that he consented also to the
24  truth of the contents thereof?

25      Q.   That's correct.

1    A.   Correct.

2    Q.   He did do that?

3    A.   Well, that goes hand in hand.  One -- one
4    admits them, unless you stipulate otherwise.  And they
5    are accepted as the truth of the contents.

6    Q.   And in this case, there was no stipulation
7    or reservation that the contents would not be consented
8    to?

9    A.   Well, for extra 100 percent certainty, I
10   would like to have a -- review the -- the judgment,
11   once again, if it can be produced to me.  But then
12   I would assume that that is indeed the case.  Yes.

13        He admitted to the truth of the contents.
14   He placed the emphasis on drawing a distinction between
15   actually participating in the plan to place the bomb,
16   as opposed to knowing of the plan to place the bomb,
17   which would make him an accessory.

18   Q.   And so this attorney had -- in a case where
19   the -- the client's -- the defendant's statements were
20   the evidence against him -- you'd agree with that?  It
21   was the primarily the statements that was the evidence
22   against him?

23   A.   Correct.

24   Q.   In such a case, the defense attorney had
25   elected to consent to both the admissibility and truth

---

1    of those incriminating parts of his statements; correct?

2    A.   Correct.  With the consent of his client, one
3    would presume.

4    Q.   And that's a presumption that you are making?

5    A.   Well, it's a presumption that any normal
6    person would make reviewing the -- the -- the court
7    records.

8    Q.   Well, there's nothing in the court records
9    to indicate that the client -- the defendant had
10   consented to that; correct?

11   A.   Correct.

12   Q.   You didn't put in your report that the defense
13   attorney had consented to both the admissibility and
14   the truth of the defendant's incriminating statements;
15   correct?

16   A.   Correct.

17   Q.   Now, you don't know why the defense attorney
18   did that; correct?

19   A.   I don't know 100 percent why.  But I would
20   assume that it was because that's what his client told
21   him to do.

22   Q.   But you haven't spoken to the defendant, have
23   you?

24   A.   No.

25   Q.   And you haven't spoken to the attorney?

---

1    A.   No.

2    Q.   And, in fact, you haven't even seen the
3    statements that the defendant made; correct?

4    A.   If they were in a court file, then I would
5    assume that.  I can't remember if they were in a court
6    file or not.

7    Q.   Well, in your report, you don't mention that
8    the statements were in the court record; correct?

9    A.   Well, then, if they were in the court record
10   and I didn't mention it in my report, that was a lapse
11   on my part.

12   Q.   In fact, the statements were not in the court
13   record.

14   A.   Okay.

15        MR. YALOWITZ:  I'm sorry.  Was -- were you
16   making a representation, or were you asking a question?

17        MR. SATIN:  It was a question.

18        THE WITNESS:  Well, I took you to be making a
19   representation.  You're telling me that the statements
20   are not in the court record.

21        My answer is that I can't know unless I look
22   at the court -- look at the complete court file.

23   Q.   BY MR. SATIN:  Well --

24   A.   If you want to produce me the file, then
25   I will give you my --

---

1    Q.   So you don't have a --

2    A.   -- answer as to whether or not the statements
3    of the defendant are in the court record.

4    Q.   So as you sit here today, you don't have a
5    recollection of whether, in Case No. 1 that was based
6    primarily on the defendant's statements, whether or not
7    those statements were in the court records you reviewed?

8    A.   I can't remember.  Produce me the file, and
9    I will let you know.

10   Q.   You'd agree that, if those records were not
11   in the file, that's a significant fact to inform your
12   opinion; correct?

13   A.   It depends how you define "significant."

14        Here I was of the opinion that the defendant
15   was represented by competent counsel, who was arguing
16   a point of law which is frequently argued in cases like
17   this, namely, that he made an admission on behalf of his
18   client with the full instructions of his client that he
19   about the plan to place a bomb.  But on the other hand,
20   his client took no part in encouraging the planting of
21   the said bomb.

22        As to whether or not the actual statements
23   of the defendant, which support defense counsel's
24   contention, are in the court file or not in the court
25   file, I cannot remember.  Produce me the court file,

153

```
 1    and I will let you know.
 2         Q.   Do you claim that there is a difference in
 3    the amount of time -- prison time that a defendant is
 4    facing based on a conviction for the completed crime,
 5    as opposed to the aiding and abetting crime?
 6         A.   It's a very contentious question you're
 7    asking.  Technically speaking, the practice is, in
 8    most courts of law in Israel, whether it be the civilian
 9    courts of law, in the military courts, that there is a
10    difference, that aiding and abetting receives a lesser
11    sentence.  You normally receive half the sentence that
12    one is normally given to a completed offense.
13         If you go to the international criminal
14    courts, however, there has been a recent judgment in
15    the appeal of Charles Taylor I can refer you to, which
16    was given a few days ago, that there is no hierarchy
17    in sentencing when it comes to distinguishing between
18    the completed offense and aiding and abetting.  And
19    there's been a lot of criticism given as a result of
20    that.
21         Q.   In making your assumption that the counsel
22    Gozlan was competent, are you relying just on your own
23    familiarity with Gozlan or based on other things that
24    you saw that he did in the record?
25         A.   It's based on my general view of the lawyer,
```
OCTOBER 20, 2013 - NICK KAUFMAN

154

```
 1    having experienced him appear in cases in front of me
 2    in these Judea military courts.
 3         Q.   Are you aware that this Attorney Gozlan did
 4    not submit a written summation prior to the verdict?
 5         A.   I am not aware of that.  No.  But if --
 6         Q.   If that were the -- sorry?
 7         A.   Yes.  Unless it's evident from the record.
 8         Q.   If that were true, that the attorney did
 9    not submit a written summation, would that affect your
10    opinion about whether or not he was a competent attorney
11    in this case?
12         A.   Well, it depends what his reasons were for not
13    submitting.  What were his reasons for not submitting,
14    if he did not submit in this case?  Can you tell me?
15    And then I'll give you my view.
16         Q.   If all you knew was that a written summation
17    was not submitted, would that alone affect your judgment
18    or your opinion as to whether or not he was competent?
19         A.   It would depend, once again, on the context
20    for him not submitting.
21         Frequently, one -- I'm sorry.  Not frequently.
22    But then it could conceivably arise the situation where
23    the -- both the prosecution and the defense don't make
24    closing submissions and the judge takes his own
25    decision.
```
OCTOBER 20, 2013 - NICK KAUFMAN

155

```
 1         I don't know what the reasons are.  I'm --
 2    conceptually speaking, it could arise that situation.
 3    Does it in practice?  I don't know what the reasons
 4    were in this present case for Gozlan not submitting
 5    a closing argument.
 6         Q.   Are you aware that the prosecutor did submit
 7    a written summation?
 8         A.   Once again, you're testing my memory.  Let
 9    me see the file and I will tell you.  I want to see
10    the whole court transcript, if it's possible, the whole
11    court file.
12         (Defendants' Exhibit 411 marked.)
13         Q.   BY MR. SATIN:  I'm showing you what's been
14    marked as Exhibit 411.
15         MR. YALOWITZ:  The witness -- the witness
16    has asked for the entire file.
17         MR. SATIN:  Well, the witness doesn't need
18    to ask questions of the lawyer.
19         MR. YALOWITZ:  I'm sorry?
20         THE WITNESS:  Okay.  What you're showing me --
21         MR. YALOWITZ:  Wait.  Wait.  Wait a minute.
22         THE WITNESS:  Okay.
23         MR. YALOWITZ:  Wait -- wait a minute.  The
24    witness has made a request for the entire file.  Are you
25    denying him the opportunity to see the whole file before
```
OCTOBER 20, 2013 - NICK KAUFMAN

156

```
 1    he gives his answers to your questions?
 2         MR. SATIN:  This isn't the time for us to
 3    have this discussion.
 4         MR. YALOWITZ:  I'm just asking.
 5         MR. SATIN:  Okay.  Well, off the record we
 6    can have this conversation.  I want to engage my witness
 7    with questions.
 8         MR. YALOWITZ:  Well, I'm asking you if
 9    you'll extend the witness the courtesy of showing
10    him the documents he's asked for.  If the answer is
11    "no," you're entitled to do that.  I just want the
12    record to be clear that that's the choice you've made.
13         MR. SATIN:  Thank you.
14         THE WITNESS:  Okay.  Now, so --
15         MR. YALOWITZ:  So the -- the record can
16    reflect that the witness has asked for the entire
17    file and counsel has decided not to provide a copy
18    of the entire file.
19         THE WITNESS:  (Examining.)  Okay.  What I
20    have here in front of me --
21         MR. YALOWITZ:  I'm not sure there's a pending
22    question.
23         THE WITNESS:  Okay.
24         MR. YALOWITZ:  Let him ask the questions.
25         Q.   BY MR. SATIN:  This is the written
```
OCTOBER 20, 2013 - NICK KAUFMAN

157

```
1    summation by the prosecutor in this case?
2        A.  You're correct.  Yes.
3        Q.  So suppose a prosecutor had written a
4    summation and a defense attorney had not.
5            Would that affect your judgment of whether
6    or not the defense attorney had been effective in their
7    representation?
8        A.  If defense counsel had been ordered to file
9    closing submissions and failed to do so, then that
10   would reflect on his competence.  Yes.
11       Q.  Well, suppose the defense attorney had not
12   been ordered to do it, but just elected on his own not
13   to do it.
14           Would you agree that would not be effective
15   representation?
16       A.  In an ideal world, a defense attorney should
17   submit closing arguments.  Yes.
18       Q.  Are you aware that Attorney Gozlan didn't show
19   up to court on a number of occasions?
20       A.  Once again, you're testing my memory.  Let me
21   see the court file, and I will let you know.
22       Q.  Do you have any recollection of that from your
23   review of the court files?
24       A.  I do not recollect.  I reviewed a large amount
25   of information in a short space of time back in April.
```

158

```
1    And we're now in October.
2        Q.  Do you -- do you believe that the absence
3    of a defense attorney to -- fail to show up to
4    court -- strike that.
5            Are you of the opinion that a lawyer's
6    failure to attend court on a number of occasions would
7    demonstrate that that lawyer's not an effective lawyer?
8        A.  If he'd been ordered to attend court
9    and failed to turn up, then that would be, yes,
10   a disciplinary offense, without justifiable reason.
11   I don't think you need me to tell you that.
12       Q.  Now, you say in your report he filed an
13   appeal; correct?
14       A.  Can you refer me to where I said that?
15       Q.  Second -- excuse me -- third full sentence
16   in the first paragraph.
17       A.  Correct.
18           (Defendants' Exhibit 412 marked.)
19       Q.  BY MR. SATIN:  I'm showing you what's been
20   marked as Exhibit 412.
21       A.  Just let me read that paragraph, please.
22       Q.  Sorry?
23       A.  Can I just re-read the first paragraph?
24       Q.  Sure.
25       A.  (Examining.)  Okay.  Your question, sir?
```

159

```
1        Q.  Do you understand -- what is -- document
2    No. 412 is the appeal filed by Nur's attorney, Gozlan;
3    correct?
4        A.  Uh-huh.  It's a Notice of Appeal.  It's not --
5    oh, yes, it is.  It is a Notice of Appeal.  And it has
6    the motives of appeal as well, apparently.
7            Give me a moment to read it if you wish to
8    ask me questions on it.  (Examining.)
9        Q.  My question's are very simple.
10       A.  Okay.  Go ahead, sir.
11       Q.  This is actually the actual appellate --
12       A.  Notice of Appeal.  Yes.
13       Q.  It's not just the Notice of Appeal.  It's
14   the actual appeal?
15       A.  Okay.
16       Q.  Do you agree?
17       A.  Well, I can't -- I would assume so because
18   he's dealing with the "neemukay bengor."  "Neemukay"
19   are grounds for appeal.
20           What can happen on occasion is that "hodaa,"
21   which is a Notice of Appeal, then -- which basically is
22   filed in order to avoid the expiration of the time limit
23   for filing an appeal.  And then the motives or reasons
24   of the appeal are filed on a separate date.  But from
25   looking at this document, it would appear that the --
```

160

```
1    the actual full grounds for appeal are contained in the
2    Notice of Appeal.
3        Q.  And this document is two pages long; correct?
4        A.  Correct.
5        Q.  And two pages, it's -- it's only a portion
6    of the second page; correct?
7        A.  Correct.
8        Q.  And the lawyer --
9        A.  One and a quarter pages, if you want to put
10   it that way.
11       Q.  And the lawyer doesn't cite a case in his
12   appeal?
13       A.  No, he doesn't.
14       Q.  Do you agree that it is not effective
15   lawyering to file a one and a quarter page appeal
16   and not cite a single case?
17       A.  It depends on the circumstances.  It's not
18   the way that I would personally file an appeal.
19       Q.  Are you aware that other lawyers in these
20   cases also did not submit a written summation?
21       A.  Please produce the cases, and I'll give you
22   my opinion.
23       Q.  Do you recall whether or not Ali Abu-Halil,
24   No. 13, filed a written summation or not?
25       A.  I refer to my previous answer.  I really can't
```

161

1  remember what happened in all of these cases unless you
2  produce them to me.  And then I'll be able to give you
3  a proper informed answer.
4      Q.  When you were reading the case files, is
5  one of the things you were looking for whether or not
6  a written summation was filed by the defense attorney?
7      A.  The failure to submit a written summation I
8  don't think is indicative of the fact that he was denied
9  due process.  It might be indicative of the amount of
10 time that the lawyer himself spent in summarizing the
11 case.  But then, at the end of the day, the judge
12 doesn't base his judgment on the -- the submissions
13 of the parties but on the evidence that he's heard.
14     Q.  You're saying that, in the Israeli military
15 court system, judges don't base their decisions on the
16 advocacy --
17     A.  I guess it --
18     Q.  -- by the lawyers in summation?
19     A.  It's a show to see how well someone can argue.
20 Yes, it is an adversarial system.  But the judges place
21 the emphasis on the evidence that's been received and
22 the questions that have been asked.  They are taking
23 notes at the same time, at least I do it when I sit
24 in the court.  I take notes of the evidence I've heard.
25 And then I base my decision on the -- on the -- on

OCTOBER 20, 2013 - NICK KAUFMAN

162

1  my notes.  I will ask questions in closing submissions
2  of the parties if I believe that something that --
3  needs clarifying from a legal point of view, legal
4  submissions.
5       But the -- but the evidence is not dictated
6  by the lawyers.  It's dictated -- the decisions as to
7  the evidence are dictated by me as a judge.
8      Q.  So the written summations that are submitted
9  by the parties are not so important in your view?
10     A.  They are less important than the actual
11 evidence itself.  I didn't say that they were not
12 important.
13     Q.  Now, at least going back to Moonzer Nur,
14 there was no testimony in this case.  It was just the
15 documents that were submitted; right?
16     A.  That would appear to be the case.  But, once
17 again -- and I'm afraid I have to repeat this answer
18 to most of your questions, because I don't know if I'm
19 going to -- actually going to see any of the case files
20 here.  But then, yes, that would appear to be the case.
21     Q.  And you have no recollection of whether or not
22 you even saw those written -- those written documents
23 that were submitted in the Nur case?
24     A.  I've already answered this question.  I can't
25 remember, given the passage of six months, what I saw

OCTOBER 20, 2013 - NICK KAUFMAN

163

1  and what I didn't see.  I would be much obliged to you
2  and in a better position to give you an accurate answer
3  if I actually had the case file in front of me.
4      Q.  Would you -- would it surprise you to learn
5  that, in a number of these cases that did not end in
6  a guilty plea, written submissions were not submitted
7  by the lawyer -- the defense lawyer?
8      A.  Would it surprise me?  Once again, it would
9  depend on the reasons for not submitting the closing
10 submissions.  If it was the case that the judge ordered
11 the submission of closing submissions and didn't leave
12 it to the discretion of the parties, then I think I've
13 already given you my answer on that.  I think it would
14 have been inappropriate not to file closing submissions.
15     Q.  Now, in many of the cases you reviewed, the
16 defense attorneys consented to the admission of the
17 prosecution's evidence; correct?
18     A.  Correct.
19     Q.  Including the out-of-court statements of
20 witnesses?
21     A.  Correct.
22     Q.  So the prosecution witnesses -- prosecution's
23 witnesses didn't have to testify and be subject to
24 cross-examination?
25     A.  Correct.

OCTOBER 20, 2013 - NICK KAUFMAN

164

1      Q.  And this happened even in cases where the
2  witnesses' out-of-court statements incriminated the
3  defendants?
4      A.  Correct.
5      Q.  In other words, the defense attorneys had
6  waived the right to require the witness to testify
7  and to cross-examine them and to allow their written
8  statements to just go into evidence?
9      A.  Correct.  It's permissible.
10     Q.  In many of the cases, there was actually
11 no testimony heard at all?
12     A.  You're absolutely right.  It happens
13 frequently.  There is nothing wrong with that.
14     Q.  In your view, there's nothing wrong with
15 trials where there's no testimony?
16     A.  If there is the instructions which are taken
17 from a client to agree to the admission of a statement,
18 an out-of-court statement, then I find nothing wrong
19 with that.
20     Q.  And for all these cases, you can't say
21 whether or not the defendants consented to their
22 lawyers foregoing the cross-examination and allowing
23 the written statements of witnesses to be introduced
24 into evidence?
25     A.  I've given my answer to that.

OCTOBER 20, 2013 - NICK KAUFMAN

165

1    MR. YALOWITZ:  Object -- let me just object
2  to the form of the question.  I think it was a little
3  garbled.  But, anyway, just -- just for my --
4    THE WITNESS:  I can't know, because I did
5  not speak to the defendants, nor did I speak to the
6  attorneys involved.  I viewed it as piercing the veil
7  of attorney-client privilege.
8    Q.  BY MR. SATIN:  Did you believe you had all
9  the information you needed to render a decision in each
10  case about whether or not there was due process?
11    A.  Once again, my mandate was to give an opinion
12  on the basis of the information which is in front of me.
13  Obviously, with the benefit of more information, maybe
14  I would have decided something else.  I doubt it.  On
15  the basis of what was put in front of me, I believe
16  that these people were afforded due process.
17    Q.  Did you believe you had the option of saying
18  "I don't know," "I can't tell"?
19    A.  Of course.  But that wasn't the case here.
20  I believe that everyone was afforded due process.
21  And I don't think that anybody in these 21 cases
22  was convicted of something that they didn't do.
23    Q.  You -- you understand there -- there's
24  a difference between what you were asked to do in
25  rendering an opinion about due process and making a --

OCTOBER 20, 2013 - NICK KAUFMAN

166

1  and rendering an opinion about whether they were
2  rightfully convicted of their --
3    A.  Correct.  You are right.
4    Q.  When a witness' out-of-court statements are
5  admitted, those statements are admitted for the truth
6  of the matter; correct?
7    A.  Correct.  That is normally the case.
8    Q.  Sorry?
9    A.  That is normally the case.  Correct.
10    Q.  And those out-of-court statements are not
11  made under oath; correct?
12    A.  They are normally made not under oath as
13  in court.  No, not the court oath.  They are made
14  with a warning being given to them, if they are
15  suspects.  And they are made with a general warning
16  given at the end, if they are witnesses.
17    Q.  Well, all of the so-called witness statements
18  in these cases came from other co-conspirators,
19  co-perpetrators; correct?
20    A.  Well, if they were co-conspirators and they
21  were suspected of having committed a criminal offense,
22  then they would have been warned of their rights, okay,
23  the Miranda rights or whatever you call them in the
24  United States.
25    If they were normal witnesses, which --

OCTOBER 20, 2013 - NICK KAUFMAN

167

1  who were not suspected of having committed a criminal
2  offense, then they would have been given a general
3  warning at the end of their statement that they know
4  that they're telling the truth and that they've re-read
5  their statement and everything containing the truth
6  is -- is there.
7    Q.  And your opinion about the process, that
8  that is what happened, is based on hearsay; correct?
9    MR. YALOWITZ:  Object to the form.  I --
10  I don't --
11    MR. SATIN:  I'll rephrase.
12    THE WITNESS:  Yes.  Ask the question more
13  specifically, please.
14    Q.  BY MR. SATIN:  Your basis for knowledge
15  about what happened during interviews between police
16  or GSS when they interrogate arrestees is based on
17  what you've been told about what happens; correct?
18    A.  Well, I've never actually sat in on a police
19  investigation and viewed how a police -- or a police
20  investigator takes a statement from an individual,
21  whether it be a witness or a suspect.  I'm not allowed
22  to.  I'm a lawyer.
23    And -- and our principles of a code of
24  practice, as a prosecuting lawyer, when I was a
25  prosecuting lawyer, it's not considered appropriate

OCTOBER 20, 2013 - NICK KAUFMAN

168

1  for a prosecuting attorney to be present during an
2  interview with a suspect or a client -- I'm sorry --
3  or a witness, for the very simple reason that the
4  prosecuting attorney doesn't want to be in a situation
5  where he could suddenly be called as a witness at the
6  trial that he's supposed to be handling.
7    Q.  So you agree you have no firsthand knowledge
8  about whether arrestees are, in fact, told or warned
9  to tell the truth when they make statements?
10    A.  I have not witnessed it with my own eyes.
11  I have no reason to doubt that that is, in fact, the
12  case.
13    Q.  And in addition to Nur, some of the other
14  lawyers in these cases consented to the introduction
15  and admission of their client's statements; correct?
16    A.  Yes.  Many did.  In fact, some of the most
17  famous and professional lawyers, as you would have it,
18  since you are impugning the competence of Attorney
19  Gozlan.
20    Q.  The -- and it is the case that, when the
21  defense attorney consents to the admission of their
22  client's statements, they are consenting only to the
23  truth of the incriminating portions of that statement?
24    A.  Ask the question once again, please.
25    Q.  You're aware that, when an attorney consents

OCTOBER 20, 2013 - NICK KAUFMAN

169

```
1    to the admission of his client's statements, that
2    attorney and the defense is consenting only to the
3    truth of the incriminating portions of the statements?
4        A.   That is the case.  He's consenting to the
5    truth of the incriminating portions.
6             I've never actually looked at it from the
7    point of -- whether or not he's consenting to the
8    truth of the exculpatory aspects of it.  I would
9    assume that's the case as well.
10            Once an attorney agrees to the admission
11   of a statement, he agrees to the admission of the
12   statement at face value, to the truth of the contents.
13       Q.   But only the truth of the incriminating
14   portions, not the exculpatory portions; right?
15       A.   Well, perhaps you could be a bit more
16   specific with your question.
17       Q.   Suppose a witness gave two statements to
18   the police.
19       A.   Uh-huh.
20       Q.   One statement was exculpatory and one
21   statement was inculpatory.
22       A.   Yes.
23       Q.   And the defense attorney consents to the
24   admission of his client's two statements.
25       A.   Yes.
```

OCTOBER 20, 2013 - NICK KAUFMAN

170

```
1        Q.   The only one for which the truth has been
2    consented to is the one that's the incriminating one,
3    not the exculpatory one?
4        A.   Well, I've -- I've never been faced with
5    a problem of that nature.  But if I were to be faced
6    with a problem of that nature, I would just regard the
7    incriminating one as being problematic, given that he
8    consented to the introduction of the exculpatory one
9    as well, if it dealt with the same issue.
10       Q.   So suppose a witness had done that --
11            MR. YALOWITZ:  I'm sorry.  I don't think the
12   witness was finished with his answer.
13            THE WITNESS:  No, no.  I mean, I -- I think
14   it's a matter of judicial discretion at the end of the
15   day, whether or not to accept an incriminating statement
16   when you know full well that there is an exculpatory
17   statement on the same issue before you.  I think it
18   would be a bad judge that did accept the incriminating
19   aspect of it.
20            But then mistakes do happen from time to time.
21   It doesn't mean that someone was denied due process.
22   That's what an appeals chamber is there for, to rectify
23   mistakes of that nature.
24       Q.   BY MR. SATIN:  Now, one of the attorneys
25   who consented to the admission of witness statements
```

OCTOBER 20, 2013 - NICK KAUFMAN

171

```
1    was Attorney Osama Saadi; right?
2        A.   Yes.  A very good lawyer, represents the PA,
3    your client.
4        Q.   And you state in your report -- you give him
5    lots of praise; correct?
6        A.   Yes.  And I think it's justifiable.
7        Q.   More praise than you do for other lawyers?
8        A.   I know him personally.  I have a high regard
9    for him.
10       Q.   And you don't say such things about Attorney
11   Gozlan and the other attorneys?
12       A.   Because I don't know him personally.  Osama
13   Saadi I know personally.  I've worked with him --
14   opposite him for many years.
15            Same goes for Jawad Boulous.  I wouldn't call
16   Jawad Boulous my friend.  I wouldn't necessarily call
17   Osama Saadi my friend.  But I have more conversations
18   with Osama Saadi than I do with Jawad Boulous.  They
19   are both extremely competent lawyers who appear in
20   these cases.
21       Q.   Now, in your report, you write -- I'll direct
22   you to page 21.  At the very end of your discussion of
23   that defendant -- of that case, you say:
24            "Attorney Saadi well protected his client's
25   rights and provided him with a solid defense."
```

OCTOBER 20, 2013 - NICK KAUFMAN

172

```
1        A.   Yeah.
2        Q.   You don't -- you don't explain the basis
3    for that opinion; correct?
4        A.   Just my general review of the case file.
5            But, once again, please do give me the case
6    file.  I will review it here, and I will tell you why
7    I believe that to be the case.
8        Q.   I didn't ask you why you believe that to
9    be the case.
10            My question is:  In your report, you don't
11   explain the basis of your opinion?
12       A.   You are correct.
13       Q.   Now, Mr. Saadi's client, Pharess Ghanem,
14   he maintained his innocence; right?
15       A.   Please let me refresh my memory as to
16   Pharess Ghanem.  (Examining.)  Okay.
17            Actually, I can perhaps justify why I argued
18   that he well protected his client's rights, if you'll
19   permit me to answer that question now, having reviewed
20   my --
21       Q.   Sure.
22       A.   -- report.
23            On the 29th of April, 2004, defense counsel
24   stated that his client would waive the right to testify
25   in his own defense.  That is not considered appropriate
```

OCTOBER 20, 2013 - NICK KAUFMAN

173

```
1   normally.  However, Attorney Saadi -- Saadi, according
2   to what I've written here:
3              "Added that, with the agreement of the
4   prosecution, such a decision would not corroborate
5   the prosecution evidence where such corroboration
6   was required."
7        Because the normal effect of not testifying
8   in one's own defense is that that failure to testify
9   will corroborate other evidence.
10       Now, Attorney Saadi was obviously fully aware
11  of this point of evidential law and acted to protect
12  his client in these circumstances.  It was a very crafty
13  move on his part.  And he got the prosecution to agree
14  to such as well.
15       Q.   Now --
16       A.   I, as a prosecutor, wouldn't have created
17  such a thing.  But then, you know, it just shows you
18  that Osama Saadi managed to achieve something which
19  actually benefited his client --
20       Q.   Well, Osama Saadi --
21       A.   -- procedurally speaking.  Yes.
22       Q.   -- consented to the admission of the
23  statements of the witnesses against him; correct?
24       A.   Are you referring to Mohammad Abdallah and
25  Mohammad Messalah?
              OCTOBER 20, 2013 - NICK KAUFMAN
```

174

```
1   Q.   Correct.
2   A.   Correct.
3   Q.   But Osama Saadi consented to the admission
4   of the witness statements without reservation?
5        A.   Once again, I can't know what was discussed
6   between him and his client and why they were admitted
7   with that reservation.
8        Q.   But do you agree that he did consent to the
9   admission of the witness statements without reservation?
10       A.   Once again, the admission of the witness
11  statements I cannot tell you whether or not it was
12  with or without reservation unless you show me the
13  court file.  I can't remember.
14       (Defendants' Exhibit 413 marked.)
15       Q.   BY MR. SATIN:  I'm showing you what's been
16  marked as Defense 413.  Defense 14 [sic] is a record
17  from the case of the defendant Ghanem --
18       A.   Correct.
19       Q.   -- is that correct?
20       A.   (Examining.)  It's the judgment, the verdict,
21  the reason judgment.
22       Q.   And I'll direct your attention to Bates number
23  11:50.  There's a section about submitting the evidence
24  and material in agreement between the two sides?
25       A.   You are correct, from line 31 onwards.
              OCTOBER 20, 2013 - NICK KAUFMAN
```

175

```
1        Q.   And in that third paragraph --
2        A.   Which paragraph?  Line 47 onwards?
3             The Hebrew is failing you.
4        Q.   You'd agree that, in that paragraph, it
5   discusses the concession that the attorney made to
6   admit the statements without reservation?
7        A.   It discusses the normal legal principles
8   which apply to submission of evidence by agreement
9   of the parties.
10       Q.   And on the next page, around line 12 or 13,
11  it notes that the defense attorney -- the defense never
12  asked, during the trial, to reserve with reservation
13  the submission of evidence?
14            MR. YALOWITZ:  Objection.  Could you point
15  to the specific language that you're referring to,
16  please, Counsel?
17            MR. SATIN:  Well, I'm looking at the second
18  paragraph -- the second -- the first full paragraph on
19  that page.
20            THE WITNESS:  Could you repeat your question?
21  I've just taken the opportunity to read the whole --
22  the section.  Yes.  What's your question?
23       Q.   BY MR. SATIN:  Do you agree that this
24  judgment establishes that the defense attorney
25  consented to the admission of witness statements
              OCTOBER 20, 2013 - NICK KAUFMAN
```

176

```
1   without reservation?
2        A.   Yes.  It would seem to support that.
3        Q.   Okay.  And as a result of that, the evidence
4   was admitted with the defense consenting to the truth
5   of those statements?
6        A.   Yes.  And the judge said that the -- the
7   defendant did not put up any alternative explanation.
8   He maintained his right to silence.
9        Q.   Now, in your report, you noted that it was --
10  that the lawyer had obtained this particular -- I think
11  you said clever move or crafty --
12       A.   No.  I said that in my evidence just now, not
13  in my report.
14       Q.   No, I thought in describing --
15       A.   I described --
16       Q.   -- your report --
17       A.   -- that --
18            MR. YALOWITZ:  Let him ask the questions.
19  Then you answer.
20            Go ahead, Counsel.
21       Q.   BY MR. SATIN:  In describing your basis
22  for belief that he had provided a solid defense, you
23  noted that he had made this reservation with respect
24  to his client's failure or decision not to testify;
25  correct?
              OCTOBER 20, 2013 - NICK KAUFMAN
```

177

1      A.   Correct.
2      Q.   You did not write that in your report
3  with respect to the fact that he did not make such
4  a reservation with respect to his -- the witness
5  statements?
6      A.   You are correct.
7      Q.   And just for purposes of the record, since
8  it was a bit of a convoluted question, let me just
9  re-ask it.
10          In your report, you did not say that Osama --
11 Osama Saadi consented to the admission of witness
12 statements without reservation?
13     A.   You are correct.
14     Q.   So a lawyer that you point out is -- is one
15 of the best consented to the admission of evidence
16 against his client; correct?
17     A.   Correct.  But then, apparently, he tried to
18 change that tactic in -- once again, I'm hampered by
19 the fact that you refuse to present me the whole case
20 file.
21          Because it could have been the case that, in
22 closing submissions, if he filed closing submissions --
23 because you've hinted at the fact that many of the
24 lawyers didn't file closing submissions -- he could
25 have hinted at the fact or tried to retract the

                OCTOBER 20, 2013 - NICK KAUFMAN

178

1  substance of some of these statements that he
2  admitted -- he'd submitted by agreement.
3      Q.   Well, in the very next paragraph of the
4  verdict form --
5      A.   Uh-huh.
6      Q.   -- the court says:
7          "Furthermore, we return to the question of
8  why do we have to give a verdict when the defendant
9  did not contest any of the clear evidences presented
10 by the prosecution and did not present any counter
11 line of defense."
12     A.   Correct.
13     Q.   So the best attorney didn't mount a defense;
14 correct?
15     A.   Once again, I don't know what the instructions
16 were that were given to him.
17     Q.   Do you believe that, if there's no
18 instructions that were given to him one way or the
19 other, that would show that this defendant was not
20 able to receive due process?
21     A.   I'm not sure I understand the question.
22          Can you repeat it, please?
23     Q.   Sure.  Absent any information indicating that
24 there was a particular reason why the defense attorney
25 did this, would you agree that demonstrates ineffective

                OCTOBER 20, 2013 - NICK KAUFMAN

179

1  representation or at least a lack of due process for
2  the defense?
3      A.   No, I don't think I would agree.  The judges
4  were at pains, from this judgment, to ensure that he
5  did have due process.  And it's quite -- it's quite
6  clear --
7      Q.   Well --
8      A.   -- even to the extent of making criticism
9  of the defense lawyer's tactics.
10     Q.   Well, let's talk about why a lawyer,
11 including a very good lawyer, would do such a thing --
12     A.   Uh-huh.
13     Q.   -- of consenting to the admission of
14 out-of-court statements without reservation.
15          Okay.
16     A.   A defense attorney, in the Israeli military
17 courts, they're often seeking to get plea offers for
18 their clients; correct?
19     A.   Seeking a plea offer is a legitimate tactic
20 in a military court, as it is in any other court.
21     Q.   My question was simply:  Do you agree that
22 defense attorneys in the Israeli military courts seek
23 plea offers?
24     A.   That wasn't your question.  But the answer
25 to that question is "yes."

                OCTOBER 20, 2013 - NICK KAUFMAN

180

1      Q.   And in the Israeli military court, the reason
2  defense attorneys seek plea offers, as far as you know,
3  is because of the fear of conviction at trial; correct?
4      A.   A plea offer is not only sought for those
5  particular reasons.  By and large, yes.
6      Q.   And in the Israeli military court system,
7  prosecutors will often not agree to even negotiate with
8  defense attorneys unless the defense attorney consents
9  to the admission of witness statements?
10     A.   I have no comment on that.  It's not within
11 my knowledge.  I don't know what the prosecution policy
12 is with respect to that.
13     Q.   You'd agree that plea bargaining is a big
14 part of the Israeli military court system?
15     A.   Yes, as it is of the Israeli civilian court
16 system.
17     Q.   But in the Israeli civilian system, you have
18 worked as a lawyer; correct?
19     A.   As a prosecuting counsel.  Correct.
20     Q.   And also as defense attorney now; right?
21     A.   Correct.
22     Q.   But in the military court system, not as
23 a prosecutor or a defense attorney?
24     A.   Correct.
25     Q.   So you don't know about the kinds of

                OCTOBER 20, 2013 - NICK KAUFMAN

181

1  pressures, including plea bargaining issues, that
2  would cause a great attorney like Osama Saadi to
3  consent to the admission of out-of-court witness
4  statements without reservation?
5      A.   That's your assumption.  But no, I'm not
6  aware of prosecutorial policy with respect to whether
7  or not to accept a plea bargain in the Israeli military
8  courts.
9      Q.   Let's talk about a different lawyer, Attorney
10 Awdeh.
11     A.   Yes.
12     Q.   Attorney Awdeh --
13     A.   The name rings a bell.
14     Q.   Attorney Awdeh is the attorney that
15 represented No. 18, Ahmed Sa'ad?
16     A.   No. 18?
17     Q.   Eighteen.
18     A.   Yes.
19     Q.   And Attorney Awdeh allowed his client to
20 plead guilty even though there was no evidence to
21 support the guilty plea?
22     A.   Well, you are correct.  Yes.
23     Q.   You'd agree that's --
24     A.   I mention --
25     Q.   -- terrible representation?

OCTOBER 20, 2013 - NICK KAUFMAN

182

1      A.   I mentioned it in my report because I felt
2  that this was something which was -- bizarre is an
3  understatement.  But then, when we're talking about
4  principles of due process, I felt it important to
5  note that the -- the:
6           "Court acceded to an exceptional request
7  to vacate its earlier judgment."
8      Q.   Okay.
9      A.   This was an instance where I felt that there
10 was bad representation.  But the court didn't allow
11 the matter to go undone with.
12     Q.   So we can at least agree that Attorney Awdeh's
13 representation was bad?
14     A.   In this particular instance, yes.  As a
15 general rule, whether or not Attorney Awdeh is a good
16 or bad lawyer, I cannot comment.
17     Q.   Well, the fact that he allowed someone to
18 plead guilty for which there was no evidence did not
19 prevent him from representing other defendants in the
20 Israeli military court system; correct?
21     MR. YALOWITZ:  Objection.  Even Homer nods.
22     THE WITNESS:  You've explained to me what
23 that means, but I've forgotten already.  Homer nodding,
24 yes.
25     The question again, please, sir?

OCTOBER 20, 2013 - NICK KAUFMAN

183

1      Q.   BY MR. SATIN:  The fact that Attorney
2  Awdeh had advised a client to plead guilty, even
3  though there was no evidence, did not prevent him
4  from representing other defendants in the
5  criminal -- in the Israeli military court system?
6      A.   He has represented other defendants in the
7  Israeli military court system.  You are right.
8      Q.   And Attorney Awdeh represented a number of
9  other defendants in these cases?
10     A.   Once again, I can't remember.  If you let
11 me refresh my memory, I will be able to tell you.
12     Q.   Well, he represented No. 14, Abd-Al-Rahman
13 Mekadad?
14     MR. YALOWITZ:  Is that a question or a
15 representation?
16     MR. SATIN:  It's a question.  I'm only
17 asking questions.
18     THE WITNESS:  Correct.
19     Q.   BY MR. SATIN:  He represented No. 15, Hilmi
20 Hamash?
21     A.   Correct.
22     Q.   No. 16, Ahmed Salah?
23     A.   Correct.
24     Q.   So the lawyer who committed essentially
25 malpractice, according to your words, represented

OCTOBER 20, 2013 - NICK KAUFMAN

184

1  four of the 21 defendants?
2      MR. YALOWITZ:  Objection.
3      THE WITNESS:  Your word "malpractice," not
4  mine.  He made a mistake.  It doesn't necessarily mean
5  that he's totally incompetent.
6      Q.   BY MR. SATIN:  You did write in your
7  report despite -- regarding Mr. Ahmed Sa'ad, Case
8  No. 18:
9           "Despite being represented, at first instance,
10 by counsel who effectively admitted malpractice" --
11     Those were your words; correct?
12     A.   Correct.
13     Q.   And so the -- the attorney --
14     MR. YALOWITZ:  I'm -- I'm sorry.  Where --
15 where are we?
16     MR. SATIN:  On page 28.
17     THE WITNESS:  The words were:
18           "Prior to the aforementioned ... defense
19 counsel remarkably admitted to allowing his client
20 to plead guilty to facts for which he ... did not
21 appreciate that there was no evidence."  (As read.)
22     Q.   BY MR. SATIN:  And the last paragraph --
23     A.   Yes.
24     Q.   -- on the bottom --
25     A.   Correct.

OCTOBER 20, 2013 - NICK KAUFMAN

185

1      Q.   -- it says:
2           "Despite being represented, at first instance,
3  by counsel who effectively admitted malpractice" --
4      A.   Correct.
5      Q.   Those -- those were your words?
6      A.   Correct.
7      Q.   So the attorney who, according to you,
8  effectively admitted malpractice represented three
9  other defendants in these cases?
10     A.   The facts speak for themselves.
11     Q.   Is that a "yes"?
12     A.   It is a "yes."
13     Q.   Did you realize, as you were writing up your
14 reports on the other defendants, that Attorney Awdeh
15 was representing him and that he, Awdeh, was the one
16 who effectively admitted malpractice?
17     A.   Yes.
18     Q.   Were you concerned about those other cases
19 and the -- and the due process that those defendants
20 received?
21          MR. YALOWITZ:  Objection.  Compound question.
22     Q.   BY MR. SATIN:  Were you concerned about
23 whether or not those other defendants received due
24 process by virtue of the fact that they'd been
25 represented by Awdeh?

                OCTOBER 20, 2013 - NICK KAUFMAN

186

1      A.   I did not see any evidence of malpractice
2  in any of the other cases.
3      Q.   Do you agree that evidence of malpractice
4  in one case suggests a lawyer that is not effective
5  in other cases?
6      A.   It would be more suggested than someone who
7  didn't make any malpractice.
8      Q.   Now, did you realize that all four of those
9  defendants that Attorney Awdeh represented were charged
10 in connection with the same incident?
11     A.   Yes.
12     Q.   Do you think it's a problem that one attorney
13 is representing four defendants who are charged in
14 connection with the same defendant -- same incident?
15     A.   Obviously, a competent attorney would ask
16 himself whether or not there's a conflict of interest.
17 One would assume that those questions of conflict of
18 interest did not arise.
19          If you let me study the files, I'll be
20 able to tell you whether or not, on the face of it,
21 a conflict of interest arose.  Obviously, conflicts
22 of interest depend on what was said by the defendant.
23 If they all pleaded guilty, then there would be no
24 conflict of interest.
25     Q.   You don't discuss the conflict of -- conflict

                OCTOBER 20, 2013 - NICK KAUFMAN

187

1  of interest issue in your report when you discuss these
2  defendants?
3      A.   You are correct.  I'm discussing it now.
4      Q.   Were you aware, as you reviewed these cases,
5  that two of those defendants, No. 14 and No. 16, were
6  tried in the same case?
7      A.   Please let me review Nos. 14 and 16.
8           (Examining.)  Yes.  If you look at page 26,
9  I actually state that.
10     Q.   Are there rules prohibiting a lawyer from
11 representing multiple defendants in the same incident
12 in the Israeli military court system?
13     A.   Not that I'm aware of.
14     Q.   Are there rules prohibiting a lawyer from
15 representing multiple defendants in the same case?
16     A.   Not that I'm aware of, unless, of course,
17 there is a conflict of interest, in which case he would
18 be committing an offense against his ethics, Bar ethics.
19     Q.   Are there Bar ethical rules in the Israeli
20 military court system?
21     A.   The lawyers who are admitted to practice in
22 Israel are bound by their -- the ethics of their Bar
23 Association.
24     Q.   Suppose a lawyer represents two defendants --
25     A.   Uh-huh.

                OCTOBER 20, 2013 - NICK KAUFMAN

188

1      Q.   -- who are charged in connection with the
2  same incident.  Okay?
3      A.   Yes.
4      Q.   And let's say one of those defendants, "A,"
5  was a witness against "B."
6           Would you agree that that would be a conflict
7  of interest?
8      A.   Ask me the question once more.
9      Q.   If two -- one lawyer has two clients -- we'll
10 call them "A" and "B."  Okay?
11     A.   Uh-huh.
12     Q.   They're charged in connection with the same
13 incident.
14     A.   Yes.
15     Q.   If "A" were a witness against "B" in "B's"
16 case, would that be a conflict of interest?
17     A.   Strictly speaking, yes.
18     Q.   Because, if "A" were called to testify, how
19 would that cross-examination work?
20     A.   You're correct.
21     Q.   There would be a major problem --
22     A.   Correct.
23     Q.   -- if a lawyer was representing both the
24 defendant and a prosecution witness in the exact same
25 case?

                OCTOBER 20, 2013 - NICK KAUFMAN

189

1      A.   Correct.

2      Q.   Now, as we've discussed, Hilmi Hamash, No. 15,

3  was represented by Attorney Awdeh; right?

4      A.   Correct.

5      Q.   And in his trial, the prosecution admitted

6  the evidence of a co-conspirator, Salah, No. 16?

7      A.   Correct.

8      Q.   And Salah, No. 16, was also represented by

9  Attorney Awdeh?

10     A.   Correct.

11     Q.   And Attorney Awdeh's client, No. 15, was

12  convicted in part because of evidence from Attorney

13  Awdeh's other client?

14     A.   Correct.

15     Q.   You'd agree there was a conflict of interest

16  there?

17     A.   A potential for a conflict of interest.  Yes.

18     Q.   You think it's only a potential conflict of

19  interest if one attorney represents both a defendant

20  and a prosecution witness in the same case?

21     A.   Were they jointly tried?  No.

22     Q.   So in your mind, if they're not tried

23  together --

24          MR. YALOWITZ:  I'm sorry.  I'm not sure the

25  witness was finished.

OCTOBER 20, 2013 - NICK KAUFMAN

190

1          THE WITNESS:  Yeah.  Go ahead.

2      Q.   BY MR. SATIN:  In your mind, if the two

3  defendants are not tried together, it's not a real

4  conflict of interest, only a potential conflict?

5      A.   There is a conflict of interest I told you.

6  Yes.

7      Q.   But you'd agree that there is a real conflict

8  of interest in this case, not a potential one?

9      A.   A real conflict of interest.

10     Q.   Were you aware of that at the time you

11  reviewed these cases?

12     A.   I do not recollect -- recollect.

13     Q.   You didn't put it in your report?

14     A.   No, I did not.

15     Q.   Now that you're aware of it, does it change

16  your opinion about whether those defendants received

17  due process?

18     A.   No.

19     Q.   And Attorney Awdeh wasn't the only attorney

20  to be representing multiple defendants; correct?

21     A.   Correct.

22     Q.   Attorney Ahraj represented three defendants

23  in connection with the same incident?

24     A.   I cannot recall offhand.  If you let me look

25  at the files, I'll be able to tell you.

OCTOBER 20, 2013 - NICK KAUFMAN

191

1      Q.   Well, from your report, you know that Attorney

2  Ahraj represented No. 13?

3      A.   Let me verify that.  (Examining.)  Correct.

4      Q.   No. 17?

5      A.   Correct.

6      Q.   And No. 21?

7      A.   Correct.

8      Q.   Three defendants that Attorney Ahraj

9  represented whose cases all involved the same incident?

10     A.   Once again, let me refresh my memory.

11          Are you representing that, or are you asking

12  for my opinion?

13     Q.   I'm only asking questions.

14     A.   Well, in that case, you're going to have to

15  tell me the case numbers again.  And I'm going to have

16  to take some time to --

17     Q.   Sure.  Case No. 13 on page 22 of your report.

18     A.   No. 13.  Okay.  Yes.

19     Q.   So Attorney Ahraj represented No. 13 in the

20  January 29, 2004, incident; correct?

21     A.   Yes.  And the next one?

22     Q.   No. 17.  Defendant No. 17.

23     A.   Correct.

24     Q.   And No. 21.  No. 21 wasn't actually charged

25  with the January 29 incident?

OCTOBER 20, 2013 - NICK KAUFMAN

192

1      A.   Was he charged or was he not charged, 21?

2      Q.   My question:  He was not charged in connection

3  with that specific incident, but he was tried with

4  defendant No. 13?

5      A.   Correct.

6      Q.   Attorney Samara represented two defendants

7  in connection with another incident; correct?

8      A.   Refer me to the instance, and I will tell

9  you whether you're correct or not.

10     Q.   Sure.  Incident -- Case No. 9, Mohammad

11  Messalah, was charged in connection with the January 22,

12  2002, shooting?

13     A.   On Jaffa Street.  Correct.

14     Q.   And Attorney Samara initially represented

15  No. 11, Pharess Ghanem, in connection with that same

16  incident?

17     A.   Correct.

18     Q.   And, eventually, Samara was fired and replaced

19  by --

20     A.   Saadi.

21     Q.   -- Saadi?

22     A.   Correct.

23     Q.   And that decision had nothing to do with

24  conflict of interest, why the -- why he had been

25  replaced by one lawyer and given another one?

OCTOBER 20, 2013 - NICK KAUFMAN

193

1    A.   Well, if you present me the court file and
2  if there's anything in there that would suggest the
3  reasons for changing the attorney, then I will let
4  you know.
5    Q.   You don't have any recollection of it having
6  to do with a conflict of interest?
7    A.   Six months later down the line, no.
8    Q.   Now, in your report, you don't discuss
9  anywhere the potential and real conflicts of interest
10  arising from the multiple representation of defendants
11  by the same attorney?
12    A.   Correct.  Neither do any of your experts.
13    Q.   You don't talk about that at all?
14    A.   No.
15    Q.   And you also don't talk about the fact that
16  it's the Israeli military judges who are presiding over
17  the Palestinian defendants in occupied territories?
18    A.   Sorry.  Can you repeat the last question?
19    Q.   In your report, you also don't talk about
20  the fact that it is military judges who are presiding
21  over Palestinian defendants in occupied territory?
22    A.   In general, everyone knew that as an
23  assumption.
24    Q.   Now, you do occasionally talk about potential
25  conflict of interest type issues, though; correct?

OCTOBER 20, 2013 - NICK KAUFMAN

194

1    A.   Refer me to the specific --
2    Q.   Sure.  In Case No. 4, the bottom of page 13 --
3    A.   Yes.
4    Q.   -- you write:
5       "Procedural issues of note include the fact
6  that the court, on 29 August, 2004, before submissions
7  were heard as to the appropriate sentence, informed the
8  parties that one of the members of the judicial tribunal
9  had business relations with Attorney Abu-Ganem from time
10  to time."
11    A.   Correct.
12    Q.   (Reading.)
13       "Such a declaration suggests that the court
14  was fully aware of the need to disclose any conflicting
15  interests so that the impartiality of the tribunal be
16  preserved."
17    A.   Correct.  That's one of the basic principles
18  of due process, impartiality.
19    Q.   Okay.  So, first, your statement at the end
20  actually does not suggest that the court was concerned
21  about the impartiality of the tribunal.  All your
22  statement suggests is that the court was concerned
23  with the appearance of impartiality; right?
24    A.   I'm not sure I follow the distinction that
25  you're making.

OCTOBER 20, 2013 - NICK KAUFMAN

195

1    Q.   Well, you'd agree that there is a distinction
2  between being impartial versus appearing to be
3  impartial?
4    A.   I believe that the court was being impartial
5  here.
6    Q.   Well, do you think, then, that the court,
7  upon raising this issue, should have asked the defendant
8  whether or not it was a problem?
9    A.   Did they or did they not?  I don't remember.
10  Show me the court record.
11    Q.   My question is:  Do you think the court should
12  have asked whether it was a problem?
13       MR. YALOWITZ:  Objection.  The -- the question
14  assumes -- the question appears to assume facts.
15    Q.   BY MR. SATIN:  You said, sir, that the
16  court raised this issue of a business relationship;
17  correct?
18    A.   Correct.  And I would assume that it was
19  of its own initiative.  Because a member of the panel
20  obviously knew that he had relations with this lawyer.
21    Q.   So upon making that statement, do you believe
22  the court should have inquired of the defendant whether
23  it's a problem or not?
24       MR. YALOWITZ:  Objection.
25       THE WITNESS:  I don't know whether there was

OCTOBER 20, 2013 - NICK KAUFMAN

196

1  such an inquiry made.
2    Q.   BY MR. SATIN:  And I'm not asking you that
3  question right now.
4       My question is:  Given that the court
5  had raised the issue of business relations with the
6  attorney, do you believe the court should have then
7  asked the defendant if there is a problem or whether
8  or not there should be a recusal in the case?
9    A.   If I was sitting as a judge in that case,
10  I would ask the defense counsel if there's a problem.
11  And he would ask his client.
12    Q.   Do you recall whether or not the court did,
13  in fact, ask the defendant?
14    A.   I do not recall.  Please produce the file
15  for me, and I will let you know.
16       MR. SATIN:  Why don't we take a break.
17       (Recess from 2:26 p.m. to 2:41 p.m.)
18       (Defendants' Exhibit 414 marked.)
19    Q.   BY MR. SATIN:  I'm showing you,
20  Mr. Kaufman, what's been marked as Defense Exhibit
21  414.
22       414 is a document from the case of Kahira
23  Sa'adi; correct?
24    A.   (Examining.)  What's actually written here
25  is Kahira Sa'id Ali Sa'adi.  Okay.

OCTOBER 20, 2013 - NICK KAUFMAN

197

```
1      Q.   You'd agree it relates to defendant No. 4?
2      A.   Indeed.
3      Q.   And this is a record from the sentencing
4  hearing of the defendant?
5      A.   Correct.
6      Q.   And during this hearing, it states:
7          "The court updates the parties that one of
8  the panel of judges has occasional business relations
9  with the office of the defense attorney."
10         That's what it states?
11     A.   Correct.
12     Q.   And that would have been stated in Hebrew;
13 correct?
14     A.   I don't know whether it was stated in
15 Hebrew or stated in Arabic or stated -- the judge --
16 the judges -- none of these judges speak -- well,
17 actually, I can't say that.  I know that Shlomi Kohav
18 does not speak Arabic.  I'm not sure about Eli Tosia
19 Cohen.  And I can't comment on Avraham Einhorn.
20     Q.   The language in the court is Hebrew; correct?
21     A.   Yes.
22     Q.   There's nothing on this record to indicate
23 that it was in anything but in Hebrew?
24     A.   The language is Hebrew.  But I cannot tell
25 you whether or not it was translated into Arabic.
```

OCTOBER 20, 2013 - NICK KAUFMAN

198

```
1  One would assume it was translated into Arabic for
2  the benefit of the defendant.
3      Q.   Well, I haven't you asked about translation.
4      I've just asked you the question that the
5  court, in stating what it stated, was speaking in
6  Hebrew?
7      A.   The transcript reflects that the court said
8  what it said in Hebrew.
9      Q.   And that nowhere on this court record does
10 it show that the court ever asked the defendant at her
11 sentencing if the court's business relations with the
12 defense attorney was a problem?
13     A.   You are correct.  Nowhere does the transcript,
14 in the same breath, state that the defense attorney who
15 was present at the time, Abu-Ganem, made any objection
16 on her behalf.
17     Q.   But you'd agree that the conflict of interest
18 is not just related to the courts, but also to the
19 defense attorneys?
20         MR. YALOWITZ:  Objection.  I don't understand
21 the question.
22         THE WITNESS:  Nor do I.
23     Q.  BY MR. SATIN:  Well, you'd agree that
24 it's a conflict of interest for a defense attorney
25 to represent a defendant in front of a judge that
```

OCTOBER 20, 2013 - NICK KAUFMAN

199

```
1  the defense attorney has business relationships
2  with?
3      A.   It can be, but not necessarily.
4          MR. YALOWITZ:  I would think it would be a
5  selling point for the defense.
6          MR. SATIN:  I haven't asked you your opinion,
7  Mr. Yalowitz.
8          MR. HILL:  Yeah.  Kent, it really isn't proper
9  for you to comment.  I know it's sort of informal, but
10 please refrain.
11     Q.  BY MR. SATIN:  You would agree that there
12 was, in the very least, the appearance of a conflict
13 of interest both for the court and the defense
14 attorney?
15     A.   That could indeed appear to be the case.
16 Whether or not that substantially was the case, it
17 would appear not.
18     Q.   And there's --
19     A.   Because there is no -- no objection made by
20 Abu-Ganem.
21     Q.   And there's --
22     A.   In fact, it would work to his advantage if
23 there were business relations.  Because one would assume
24 that, if there were business relations, then he might
25 be expecting some type of favor.  That definitely I
```

OCTOBER 20, 2013 - NICK KAUFMAN

200

```
1  don't think was the case here.
2          I know all -- I know two of the judges.  I'm
3  not familiar with Avraham Einhorn.  I know Shlomi Kohav.
4  I know Eli Tosia Cohen.
5          If you really asked me who I think this
6  related to and who was raising the concern, I think
7  it would probably be Eli Tosia Cohen because Eli Tosia
8  Cohen and Abu-Ganem are both Jerusalem lawyers and they
9  both deal in the same area of law.
10     Q.   Do you agree that what you just said was not
11 remotely in response to any question that I asked?
12     A.   Repeat your question and I can -- I will
13 tell you.
14     Q.   Nothing in this court record indicates that
15 the defendant was ever asked if the defendant had a
16 problem with the court's business relations with the
17 office of the defense attorney?
18     A.   Correct.
19     Q.   And any benefit that you might say was there
20 is pure speculation on your part?
21     A.   Speculation, but informed speculation.
22     Q.   Do you think a court system ought to permit
23 defendants to be represented by defense attorneys who
24 are in business with the court?
25     A.   Israel is a small place, Mr. Satin.  And most
```

OCTOBER 20, 2013 - NICK KAUFMAN

201

1  of the judges know the lawyers.  That's why the question
2  arises frequently in cases which I've appeared in.
3          Lawyers have an ethical obligation to the
4  court.  And I would assume that, if there was a blatant
5  conflict of interest and that lawyer felt that that
6  was a conflict of interest that could harm the interest
7  of his client, then he would recuse himself.  This
8  obviously was not the case.
9      Q.  But you realize I didn't ask you about whether
10  it's a problem if the lawyers know the judges.  My
11  question was about the judges being in business with
12  the defense attorneys.
13          Do you recognize that distinction?
14      A.  It says here -- let's be -- let's be, shall
15  we say, exact.  It says here:
16          (Reading/translating.)
17          "The court updates the parties that, when one
18  of the members of the tribunal has business relations
19  with the office of the defense counsel."
20          It doesn't say he has business relations with
21  defense counsel himself.  Okay.  That could mean any
22  number of things.
23      Q.  So now you're suggesting that this actually
24  isn't a big deal at all; correct?
25      A.  What I'm saying is that Abu-Ganem did not

OCTOBER 20, 2013 - NICK KAUFMAN

202

1  think that it was a -- that there was a conflict of
2  interest which harmed the interests of his client.
3      Q.  Of course, you're assuming that Abu-Ganem
4  was seeking the best interest of his client, as opposed
5  to looking out for Abu-Ganem's own interest; correct?
6      A.  I have nothing to suggest that Abu-Ganem is
7  an unethical lawyer.
8      Q.  There's nothing to indicate that Abu-Ganem
9  explained the significance and consequences to his
10  client of the fact that the attorney had -- he had --
11  attorney's office had relations -- business relations
12  with the court?
13      A.  We've already discussed that.  The transcript
14  reflects what it reflects.
15      Q.  Okay.  Now, in your report, you mention that
16  Nasser Shwaysh was not represented by counsel.  This
17  is defendant No. 3.
18      A.  I state that in the first line of paragraph 2
19  of the consideration of this case.
20      Q.  You, in fact, quote a line from the defense --
21  from the defendant about not wanting to be represented
22  by a lawyer --
23      A.  Correct.
24      Q.  -- correct?
25      A.  Because I assumed that, at a later stage,

OCTOBER 20, 2013 - NICK KAUFMAN

203

1  you would ask me questions about whether or not he
2  was harmed by the fact that he was not represented
3  by a lawyer.
4      Q.  But later Attorney Shwaysh [sic] said he
5  wanted a lawyer; correct?
6      A.  Attorney Shwaysh?
7      Q.  I'm sorry.  The defendant Shwaysh --
8      A.  Where?
9      Q.  -- later said he wanted a lawyer?
10      A.  Please refer me to where I state that.
11      Q.  I'm not referring to anything.  I'm asking
12  you as a matter of fact that --
13      A.  Well --
14      Q.  -- that he wanted a lawyer.
15      A.  Show me the case file, and I'll let you know.
16          (Defendants' Exhibit 415 marked.)
17      Q.  BY MR. SATIN:  I'm showing you what's been
18  marked as Defense Exhibit 15 [sic].
19          MR. YALOWITZ:  415?
20          MR. SATIN:  415.
21          THE WITNESS:  (Examining.)  Where are you
22  referring to me -- to on this?
23      Q.  BY MR. SATIN:  I haven't asked you a question
24  yet.
25      A.  Okay.

OCTOBER 20, 2013 - NICK KAUFMAN

204

1      Q.  First, you'd -- you'd agree that document 415
2  is a record from the case of the defendant Shwaysh?
3      A.  It is indeed one of -- a record -- a
4  transcript from one of the hearings in the case
5  of Nasser Jamal Mussa Shwaysh.
6      Q.  And at the top of that document, it says:
7          "Defendant:  To the question of the court,
8  I still do not have a defense lawyer.  As for the file,
9  I still do not know what to do."
10          That's what the defendant said?
11      A.  Correct.
12      Q.  And then the record shows that a witness was
13  called to the witness stand to testify?
14      A.  Yes.  Abu Karim Aweis.
15      Q.  Were you aware, when you wrote your report
16  and rendered your opinion, that the defendant had said,
17  in response to the court, that he did not have a lawyer
18  and he did not know what to do?
19          MR. YALOWITZ:  Objection.  Misstates the
20  testimony.
21      Q.  BY MR. SATIN:  Were you aware, when
22  you wrote your report, that the defendant said
23  in court what it says on document No. 415, namely,
24  "to the question of the court, I still do not have
25  a lawyer -- a defense lawyer; as for the file, I

OCTOBER 20, 2013 - NICK KAUFMAN

205

1  still do not know what to do"?
2      A.  I don't recollect.
3      Q.  Now that you know that that was said, does
4  it change your opinion as to Mr. Shwaysh's due process?
5      A.  Line 22 he says:
6          (Reading/translating.)
7      "I still don't have a lawyer."
8          Does that mean that he wanted a lawyer?
9          You are putting it to me that he stated that
10  he wanted a lawyer.  And he was denied a lawyer, or
11  wasn't given a lawyer, or had no way to get a lawyer?
12  I don't understand that from line 22 of this transcript.
13      Q.  And you'd agree that there's no inquiry there
14  from the court about whether or not the defendant wanted
15  a lawyer or how he wanted to proceed; correct?
16      A.  There is no follow-up question of the court
17  to that statement --
18      Q.  All we --
19      A.  -- made by the defendant at line 22 of the
20  transcript.
21      Q.  And you'd agree that the defendant also
22  said -- in addition to "I still do not have a defense
23  lawyer" -- "as for the file, I still do not know what
24  to do"?
25      A.  Correct.

OCTOBER 20, 2013 - NICK KAUFMAN

206

1      Q.  And that, immediately after that, the record
2  reflects that a witness -- a prosecution witness was
3  called to the witness stand.
4      A.  The transcript speaks for itself.
5      Q.  You'd agree that that's what the transcript
6  reflects?
7      A.  Uh-huh.
8      Q.  You have to say "yes."
9      A.  Yes.  I do note that, if you turn over the
10  page, it states at P 11-3:303, line 25 -- the defendant
11  states:
12          (Reading/translating.)
13      "I would like to know what the -- what the
14  witness said about me in the police station."
15          That was participation on his part.  I cannot
16  see --
17      Q.  And you'd agree that, in your report, you
18  don't write anywhere the fact that --
19      MR. YALOWITZ:  I'm sorry.  I'm sorry.  The
20  witness just -- just needs a moment to look at the
21  document.
22      THE WITNESS:  Just give me a minute.  Yes.
23  I'm referring to the last page.
24      Line 13, Bates number P 11-3:307, the
25  defendant says:

OCTOBER 20, 2013 - NICK KAUFMAN

207

1          (Reading/translating.)
2      "I don't have any cross-examination for
3  the witness, despite the fact -- despite the fact" --
4      And I stress "despite."
5      -- "that the court has explained to me that
6  it's my right to cross-examine the witness."
7          And then he makes a general comment:
8      "The witness' comments conflict with what
9  he's said and confessed to."
10      Q.  BY MR. SATIN:  You'd agree nowhere in this
11  document does it make any mention -- mention of the
12  court inquiring of the defendant of whether or not
13  he wants a lawyer?
14      A.  I've already answered that question.  There
15  was no follow-up question by the court to the initial
16  comment of the accused at line 22, the first page of
17  the transcript, which is reflected in Exhibit 415.
18      Q.  And you'd agree that, in your report, where
19  you isolated a statement made by the defendant about
20  not wanting to be represented by a lawyer, nowhere
21  else in that report does it indicate that he later
22  said he still does not have a defense lawyer and he
23  does not know what to do and the court did not follow
24  up?
25      MR. YALOWITZ:  Objection.  Misstates the --

OCTOBER 20, 2013 - NICK KAUFMAN

208

1  misstates the transcript, as the witness has testified
2  to it.
3      THE WITNESS:  I only refer to this issue
4  once in my report.
5      Q.  BY MR. SATIN:  You never referenced what
6  was said and not said on the November 14th, 2002,
7  hearing which is reflected in Defense 415?
8      A.  I did not reference that.  No.
9      Q.  In your report, you state that Shwaysh said
10  to another witness -- this is on page 12:
11      "Don't testify about the weapons - whether
12  or not I gave you and you gave me ... it is a criminal
13  offense for you, and you can receive years in prison -
14  so keep your mouth shut."
15      A.  Uh-huh.  Yes.
16      Q.  And according to you, this demonstrates,
17  quote:
18      "The defendant's apparent understanding
19  of the concept of self-incrimination and an accused's
20  right to avoid such."
21      A.  Yes.
22      Q.  Now, you're not saying that this statement
23  shows the defendant knows the laws and procedures that
24  governs the admissibility of defendant's statements;
25  correct?

OCTOBER 20, 2013 - NICK KAUFMAN

```
1        A.    Correct.
2        Q.    And there is law in the Israeli military
3   court regarding admissibility of statements?
4        A.    Correct.
5        Q.    And the use of statements at trial?
6        A.    Correct.
7        Q.    And what can happen if a defendant speaks
8   versus doesn't speak and is silent at trial?
9        A.    Correct.
10       Q.    And you'd agree that nothing about what
11  Mr. Shwaysh said shows his awareness or understanding
12  of these laws?
13       A.    I don't know what Mr. Shwaysh's understanding
14  of those laws are.  Maybe he did know.  I don't know.
15  All I can comment on is what he said in court.
16             And I quoted it because I found it bizarre.
17  I found it odd.  I found it exceptional.  That's
18  the first time that I've come across a defendant
19  saying that sort of thing in court.  I thought it
20  was noteworthy.  And I specifically remember writing
21  these things because of the fact that he wasn't
22  represented by counsel.
23       Q.    Now, you've mentioned the presumption of
24  innocence.  You've discussed that in your report;
25  correct?
```

```
1        A.    Correct.
2        Q.    You cite a passage from Military Ordinance
3   378?
4        A.    I cite the passage of the law.  Yes.
5        Q.    The phrase "presumption of innocence" doesn't
6   appear in that passage?
7        A.    You're referring me to page 6 of my report,
8   Article 29 of the Military Ordinance 378?
9        Q.    Yes.
10       A.    Nowhere is it mentioned the presumption of
11  innocence.
12       Q.    And in your report, you don't mention any
13  claims about whether defendants, in practice, receive
14  the presumption of innocence; correct?
15       A.    I don't specifically refer to the presumption
16  of innocence as a concept in practice in my report.  No.
17       Q.    Mr. --
18       A.    That is the case, however.  All defendants
19  appearing before the military courts enjoy the
20  presumption of innocence.
21       Q.    When you say they enjoy the presumption
22  of innocence, you mean that, according to your
23  interpretation of the statute, the defendants are
24  entitled to the presumption of innocence; correct?
25       A.    Not according to my interpretation of the
```

```
1   statute.  That is what is practiced.  That is the law.
2        Q.    Well, Mr. Sfard points out, in his report
3   or in the Yesh Din report, that the acquittal rate
4   in the Israeli military court system in 2006 was only
5   .29 percent.
6              Correct?
7        A.    In 2006?
8        Q.    Yes.
9        A.    Well, we're talking here about 2002, 2003,
10  or maybe 2001.  I don't remember.
11       Q.    Do you remember when he --
12       A.    Are you arguing that the -- that the
13  statistics from 2006 are applicable to the statistics
14  of 2001?  I don't know.
15       Q.    The only question I've asked you so far
16  about this issue is that Mr. Sfard points out that
17  the acquittal rate is .29 percent in 2006?
18       A.    That's his finding.
19       Q.    Do you believe that it is actually
20  representative, in your experience, of the conviction
21  rates and acquittal rates in the Israeli military court
22  system?
23       A.    I have no comment on that.  I can't know.
24       Q.    Because you've never taken an assessment?
25       A.    Because I didn't analyze the statistics for
```

```
1   2006.
2        Q.    Would you agree, from your own experience,
3   that the overwhelming majority of defendants are
4   convicted?
5        A.    No.
6        Q.    How about in State security offenses?
7        A.    In cases -- are you asking me in general,
8   or are you asking with respect to these cases?
9        Q.    General.
10       A.    As I said, in general, the percentage of
11  convictions is high, yes, in my experience.
12       Q.    And would you agree that the acquittal rate
13  is a relevant factor in evaluating whether judges honor
14  the presumption of innocence?
15       A.    No.
16       Q.    And I'm not asking you whether you think it's
17  dispositive.
18             Do you think it's at least relevant to that
19  inquiry?
20             MR. YALOWITZ:  Objection.  Asked and answered.
21             THE WITNESS:  No.
22       Q.    BY MR. SATIN:  Well, according to you, how
23  do you determine whether defendants actually receive
24  the presumption of innocence?
25       A.    It's my personal experience.  I've never
```

213

```
1   tried anybody on the presumption of guilt.
2        Q.   And, of course, you --
3        A.   I've never presided over a tribunal or been
4   part of a tribunal that has ever tried anybody with
5   the presumption of guilt.
6        Q.   Okay.  And, of course, you weren't involved
7   in any of these cases that you've reviewed; right?
8        A.   Of course not.  No.
9        Q.   You know a judge named Oded Pesensson?
10       A.   I know of him if he's the person in a
11  wheelchair.
12       Q.   He was a judge in the Israeli military court
13  system for a long time?
14       A.   Yes.
15       Q.   Do you respect him?
16       A.   I have no view about him.
17       Q.   Okay.  I'm going to show you a clip from
18  the movie "The Law in These Parts," featuring --
19       A.   "Shilton HaHok."
20       Q.   Wait.
21       A.   Are you showing me an edited part or --
22            MR. YALOWITZ:  Just let him do what he's
23  doing.
24       Q.  BY MR. SATIN:  I'm going to show you the
25  clip.  I'm not showing you the entire movie.
```

OCTOBER 20, 2013 - NICK KAUFMAN

214

```
1        A.   Okay.
2            (Court reporter clarification.)
3            MR. SATIN:  "The Law in These Parts."
4            THE COURT REPORTER:  Thank you.
5            (Playing video clip.)
6            MR. YALOWITZ:  Could you just start it over
7   and turn it so that I can --
8            MR. SATIN:  Sure.
9            MR. YALOWITZ:  Thank you.
10           THE WITNESS:  That was the question I was
11  going to ask.
12           (Playing video clip.)
13           THE WITNESS:  Okay.  It's come back to
14  the beginning now.  Okay.
15           MR. YALOWITZ:  I just -- I just want to make
16  a statement, that I've watched the clip that counsel
17  just played.  And I noticed that there were edits
18  and slicing between questions and answers and within
19  answers.  So I don't have any confidence that the
20  clip accurately portrays a conversation that actually
21  occurred.  And -- and I assume that counsel received
22  this movie from the public domain and that counsel
23  doesn't have the ability to make any representations
24  in that regard.
25       Q.  BY MR. SATIN:  So, Mr. Kaufman, Oded
```

OCTOBER 20, 2013 - NICK KAUFMAN

215

```
1   Pesensson says at the end of that clip:
2            "When a detainee tells me what they did to
3   him, I'm pretty suspicious because he has his interest.
4   To begin with, I believe the agent of the authorities
5   because his job is to protect me."
6            That's what he said?
7        A.   That's what --
8            MR. YALOWITZ:  Objection.
9            THE WITNESS:  That's what he purportedly said.
10  Yes.
11       Q.  BY MR. SATIN:  You'd agree that that's
12  what it says on the movie?
13       A.   That's what it says on the portion of the
14  movie that you have played me.  Yes.
15       Q.   Okay.  Assume for a minute --
16       A.   Uh-huh.
17       Q.   -- that he said that --
18       A.   Yes.
19       Q.   -- and, specifically, that Oded Pesensson
20  said:
21            "When a detainee tells me what they did to
22  him, I'm pretty suspicious because he has his interest.
23  To begin with, I believe the agent of the authorities
24  because his job is to protect me."
25            Assume that he said that, Oded Pesensson.
```

OCTOBER 20, 2013 - NICK KAUFMAN

216

```
1            Would you agree that that demonstrates that
2   he does not apply the presumption of innocence?
3        A.   I do not agree with what he said, if that's
4   what he said.
5        Q.   That's not what I asked you.
6            Do you agree that, if that is what's -- is --
7   was said by him, that demonstrates that, for this judge,
8   the judge does not apply the presumption of innocence?
9            MR. YALOWITZ:  Objection.  Lacks foundation.
10           THE WITNESS:  I can't tell you what the judge
11  applies or does not apply when he sits in a court of
12  law.
13       Q.  BY MR. SATIN:  My question is:  Do you
14  agree that that statement by Oded Pesensson reflects
15  that he does not apply the presumption of innocence?
16           MR. YALOWITZ:  Objection.
17           THE WITNESS:  As I said, I can't tell you
18  what he does and does not apply in law.  I find it an
19  inappropriate statement.  That's all I can say.
20       Q.  BY MR. SATIN:  If a judge said that, do
21  you believe that makes the judge unqualified to sit
22  as a judge in the Israeli military court system?
23       A.   I'm not going to past judgment on his
24  qualifications to sit or not to sit.  That's not my job.
25  There's a -- there's a council of people who do that.
```

OCTOBER 20, 2013 - NICK KAUFMAN

217

```
1      Q.   If any judge were to say that, do you agree
2   that that makes that judge unqualified to sit in the
3   Israeli military court system?
4      A.   Once again, I'm not qualified to give you
5   an answer on that.  What I can say is that I find that
6   statement to be inappropriate.
7      Q.   Inappropriate in the sense that a judge
8   should not start out by presuming that he -- that the
9   authorities are being truthful and that the defendant
10  is not being truthful; correct?
11     A.   Correct.  But then you have to look at the
12  circumstances and the whole context of this.  I don't
13  know what was put to this interviewee, Pesensson, when
14  he gave his little speech which you've presented to me.
15  I don't know in what context he was making it.  I don't
16  know whether that is the whole of what he said or
17  whether it was tempered by other remarks at a later
18  stage in that interview.
19     Q.   You'd agree it's difficult to make judgments
20  or render opinions based on incomplete information?
21     A.   Correct.  And just as I can't make a judgment
22  on his competence or willful ignoring of the presumption
23  of innocence based on that clip alone.
24     Q.   In the Israeli military court system, a
25  defendant's silence can be admitted as evidence against
```

OCTOBER 20, 2013 - NICK KAUFMAN

219

```
1      A.   His decision not to testify was a major factor
2   leading to his conviction; correct?
3      A.   We're talking about Ibrahim Hamed?
4      Q.   Yes.
5      Q.   Okay.  Please let me refresh my memory.
6      Q.   I'll refer you to the bottom of page 17.
7      A.   Yes.  And the court referenced this in its
8   judgment.
9      Q.   Okay.  Now, he was convicted not only because
10  he refused to testify but because there were statements
11  of co-perpetrators; correct?
12     A.   Correct.  Mohammad Amran [sic] and the other
13  guy -- I forget his name.  Arman -- "slicha, lo Amran."
14  And there was another witness, if I'm not mistaken.
15          But please, once again, do present me with
16  the court file, and I will give you my more informed
17  opinion.
18     Q.   Well, on page 18 of your report, you note
19  that the other evidence admitted against him was, quote:
20          "A note taken from the investigative interview
21  of a co-perpetrator called Arman."
22     A.   Correct.
23     Q.   And you wrote what that note was; correct?
24     A.   I translated the relevant portion from the
25  judgment, I believe.
```

OCTOBER 20, 2013 - NICK KAUFMAN

218

```
1   him?
2      A.   We discussed that earlier.  Yes.
3      Q.   Both his silence and not answering questions
4   during interrogations can be used against him?
5      A.   It can be where corroboration is required.
6      Q.   And his silence in not testifying at the trial
7   can be used against the defendant?
8      A.   Once again, it can be where corroboration
9   is require -- is required.  And we discussed that with
10  respect to Osama Saadi.
11     Q.   And in the Israeli military court system,
12  a defendant can end up getting convicted because he
13  chooses not to testify?
14     A.   Where it is served as corroboration, yes.
15     Q.   In one of the cases that you examined, No. 7,
16  a defendant was convicted as a result of his decision
17  not to testify; correct?
18     A.   Yes.  This must be one of the few cases where
19  a defendant was -- was convicted not on the basis of his
20  own confession.  Because I would say a large majority,
21  maybe 75 to 80 percent of the cases here, the defendants
22  actually confessed to the crimes which were put to them.
23          Which page do you wish to refer me to?
24     Q.   Page 16, 17, to 18.
25     A.   Yeah.  The question, please, sir?
```

OCTOBER 20, 2013 - NICK KAUFMAN

220

```
1      Q.   Then you put in that note, in that relevant
2   translation, a bracket with your initials; correct?
3      A.   Yes.
4      Q.   Because, even in that note, the defendant's
5   name is not mentioned.  It's -- it's a nickname or
6   some other person's name; correct?
7      A.   "Sheikh."  Yes.  That's correct.
8      Q.   And you would agree that what Arman said
9   to whomever wrote that note was not made under oath?
10     A.   I can't remember.
11     Q.   Well, the note did not take -- was not --
12  did not take place in court?
13     A.   That's correct.
14     Q.   It was an out-of-court statement?
15     A.   Out of --
16          (Court reporter clarification.)
17          MR. YALOWITZ:  You talked over each other.
18     Q.   BY MR. SATIN:  The note did not take place
19  at trial in court?
20     A.   Correct.
21     Q.   The note reflects an out-of-court statement
22  of the witness Arman?
23     A.   Correct.
24     Q.   In fact, Arman's interrogation was hardly
25  about Hamed, the defendant?
```

OCTOBER 20, 2013 - NICK KAUFMAN

221

1    A.   I don't recollect.

2         (Defendants' Exhibit 416 marked.)

3    Q.   BY MR. SATIN:  I'm showing you what's been

4    marked as Defense Exhibit 416.

5         Defense 416 is a record of the verdict in

6    Hamed's case?

7    A.   (Examining.)  You are correct.

8    Q.   And, first, I would just direct you to the --

9    the pages on the bottom.  It starts out pages 1 to 10,

10   and then it skips to page 17?

11   A.   Yes, it does.

12   Q.   And then it skips to page 21?

13   A.   Indeed it does.  And I note that the Bates

14   numbers run as normal.

15   Q.   And then from page 21, it goes to page 23?

16   A.   Yes.

17   Q.   Eventually, it goes up to page 36 and then

18   back to page 11?

19   A.   Yes.

20   Q.   It ends on page 59?

21   A.   I remember there being a problem with this

22   particular judgment.

23   Q.   Because certain pages are missing --

24   A.   Yes.

25   Q.   -- from this record?

222

1    A.   Yeah, I remember.

2    Q.   Did that bother you?

3    A.   I did actually -- somehow -- I think I --

4    once again, I don't want my memory to fail me.  I

5    remember there being a problem with one of them and

6    requesting that they actually be sent to me again.

7    Q.   Did you get a second one?

8    A.   I think I might have done.  I can't -- I

9    don't want to state positively because I'm not sure.

10   Q.   Was the second --

11   A.   I remember there being a problem with one

12   of these documents.

13   Q.   To the extent you got a second one, was it

14   a complete and full record?

15   A.   I think it might have been.  Once again,

16   I don't want to commit myself to that because I don't

17   remember whether it does refer to this case or another

18   case.  I'd have to check that.

19   Q.   You didn't mention in your report that the

20   verdict came in with pages missing, though; correct?

21   A.   No, I didn't.

22   Q.   And just for the record, I may have misspoken

23   earlier.  I said there was a total of 59 pages.  But

24   it ends on page 60.  [sic]

25        Correct?

223

1    A.   Yes, it does.

2    Q.   Now, if I could direct you to pages 167 to

3    168 of the Bates numbers.

4         MR. YALOWITZ:  Can you bear with me one

5    second, Counsel?  I'm just -- I just want to figure

6    out the document.

7         THE WITNESS:  I have that in front of me.

8         MR. YALOWITZ:  Where is he?

9         THE WITNESS:  Page 56.

10   Q.   BY MR. SATIN:  At the very bottom of

11   page 56, which is Bates number 167, it says:

12        "The defendant's role appears in one spot

13   and only in a small portion of Arman's statements."

14        And this is what he said in his interrogation;

15   correct?

16   A.   Which line are you reading from?

17   Q.   The bottom of page 56 and to the top of

18   page 57.

19   A.   Correct.

20   Q.   The -- the court states:

21        "The defendant's role appears just in one

22   spot and only in a small portion of Arman's statements."

23        Correct?

24   A.   Once again, repeat the question.  I -- I do

25   apologize.  I'm trying to read the document and digest

224

1    your question at the same time.

2    Q.   Let me --

3    A.   Typically --

4         MR. YALOWITZ:  Let me just caution you.  Don't

5    do that.  Listen to the question carefully, look at the

6    document carefully.  Counsel wants you to give the best

7    answers you can.

8         THE WITNESS:  Okay.  Please.

9         MR. YALOWITZ:  As do I.

10        THE WITNESS:  Ask your question, and then I

11   shall consult the document.

12   Q.   BY MR. SATIN:  The court verdict shows and

13   states that:

14        "The defendant's role appears in one spot

15   and only in a small portion of Arman's statements."

16   A.   Let me translate exactly what it says, and

17   that will avoid any misunderstanding.  At line 33:

18        (Reading/translating.)

19        "The court turns to the events surrounding

20   the attack at the campus in Har-Hatsofim on the 31st

21   of July, 2002."

22        And the court states as follows at line 36:

23        (Reading/translating.)

24        "In order to understand the facts relating

25   to this count, it's necessary to examine again the

225

```
1   notes from the interviews of Arman.  The role of the
2   defendant appears in one place and in a small part
3   only of the statement of Arman."
4           And this is what he had to say.
5       Q.   Okay.  So that was the part that I was
6   focusing on.
7       A.   Yes.
8       Q.   And it does say that about it only being --
9       A.   Yes.
10      Q.   -- a small part?
11      A.   Correct.
12      Q.   Okay.  Now -- now, you don't mention, in
13  your report, that Arman was actually called to testify
14  at the trial?
15      A.   No.
16      Q.   Do you remember that, in fact, Arman did
17  testify at the trial?
18      A.   I remember there was some discussion of
19  this matter in my rebuttal or in Mr. Sfard's report.
20  And then I considered it thereafter.
21      Q.   Do you remember that, in fact, Arman did
22  testify?
23      A.   Vaguely.
24      Q.   And during the testimony, Arman did not
25  incriminate Hamed at trial?
```

OCTOBER 20, 2013 - NICK KAUFMAN

226

```
1       A.   Vaguely, I remember that.  Yes.
2       Q.   And he said that Arman stated that what he
3   said during the -- during his interrogation was not
4   correct?
5       A.   You're telling me?
6       Q.   Do you agree?
7       A.   Show me the file, and I will confirm that.
8       Q.   Do you have a recollection of that?
9       A.   Vaguely.  But I can't commit to it.
10      Q.   If Arman had testified and said that the
11  defendant was not guilty, that his interrogation was
12  not correct, do you think that would be an important
13  fact?
14      A.   It would be a fact which was worthwhile for
15  judicial attention.
16      Q.   And a fact that you should have noted in your
17  report?
18      A.   With the benefit of hindsight, maybe yes.
19  But then, once again, I don't think that, having
20  reviewed the file, I would change my opinion in the
21  slightest.
22      Q.   Because, according to your report, the
23  defendant was convicted based on two things:  One,
24  his decision not to testify, and, two, a note of the
25  out-of-court statement of Arman, implicating the
```

OCTOBER 20, 2013 - NICK KAUFMAN

227

```
1   defendant?
2       A.   Primarily.  But let me refer to the judgment,
3   please.
4       Q.   But I asked you about what was in your report.
5           You'd at least agree -- and then you can go
6   to your -- the judgment.  But in your report --
7       A.   My report --
8       Q.   -- those are the facts that you focused on?
9       A.   Those are the facts I focused on, if I
10  remember correctly, because those are the facts that
11  were stated in the judgment of the court.  That's why
12  I wish to refer to the judgment of the court.
13          Will you permit me?
14      Q.   Sure.
15      A.   (Examining.)  I don't remember that the court,
16  having reviewed the relevant parts of the judgment,
17  discussed the fact that Arman gave evidence.
18          (Defendants' Exhibit 417 marked.)
19      Q.   BY MR. SATING:  Okay.  Well, let me show you
20  what's marked as Defense Exhibit 417.
21      A.   Yes.  417.
22      Q.   Defense 417 is a court record from the case
23  of Hamed; correct?
24      A.   (Examining.)  Correct.
25      Q.   And this is the statement of the prosecutor;
```

OCTOBER 20, 2013 - NICK KAUFMAN

228

```
1   correct?
2       A.   This is apparently the closing submission
3   of the prosecutor.
4       Q.   And on the third page, you see the name
5   Mohammad Arman underlined?
6       A.   Correct.
7       Q.   And then it says the witness testified
8   in court on August 18, 2010?
9       A.   Correct.
10      Q.   Down below, the prosecution's summation says:
11  "Arman claimed in court that he did
12  not recognize the photo of the defendant in the
13  interrogation and that they met for the first time
14  in the courtroom."
15      A.   Can you refer me to the line?  Which line
16  on page 3 of this transcript are you referring to?
17      Q.   About ten lines down from where -- the
18  paragraph beginning with "Mohammad Arman."
19      A.   So you mean from line 24 onwards?
20      Q.   Beginning on line 21, midway through the
21  sentence.
22      A.   Yes.  It is true that, at the outset, Arman,
23  in direct examination, claimed that he didn't recognize
24  the photo of the defendant being Ibrahim Hamed.  But
25  then the prosecutor goes on to clarify that.
```

OCTOBER 20, 2013 - NICK KAUFMAN

229

```
 1        Q.   You'd agree --
 2            MR. YALOWITZ:  I'm sorry.  I think the
 3   witness was --
 4            THE WITNESS:  Yes.  I'm -- I mean --
 5            MR. YALOWITZ:  He's reading.
 6            THE WITNESS:  -- you've given me a very
 7   contorted, convoluted submission by the prosecutor.
 8   And I'm trying to refresh my memory and to remember
 9   exactly what he said.
10            MR. YALOWITZ:  Bear with the witness just
11   a moment.
12            THE WITNESS:  See, the -- from what the
13   prosecutor is saying, the witness was not -- Arman --
14   consistent in what he said.  First of all, he denies
15   being able to identify the defendant.  Then, afterwards,
16   he said -- and I quote:
17            (Reading/translating.)
18            "If he did identify him and he didn't mean
19   to identify him and he, in fact, didn't know what he
20   was doing" --
21            I'm referring to line 26 for the benefit
22   of Mr. Sfard, who can follow this.
23            (Reading/translating.)
24            -- "and he didn't do it from his own will.
25   Despite that, he returned to his version that he said
```

230

```
 1   he was not able to identify Ibrahim Hamed.  But at no
 2   stage did he say to the investigators that he didn't
 3   know who the 'sheikh' was."
 4            And then the prosecutor goes on to summarize
 5   the cross-examination, which was performed by the
 6   defense counsel.  This is at line 28.
 7        Q.   BY MR. SATIN:  Okay.  So my question to
 8   you --
 9        A.   Uh-huh.
10        Q.   -- is that:  In your report, you don't make
11   any mention of Arman's testimony at trial; correct?
12        A.   That is -- that is correct.  But I believe --
13   and let me -- I'd have to check this -- that Mr. Sfard
14   refers to this.
15            Because he -- what -- what comes later,
16   in the following line, is the allegation that he
17   said what he said because he was tortured, if I'm
18   not mistaken.  And I believe that Mr. Sfard made some
19   reference to that in his report.  And I refer to that
20   as well.
21            I mean, Arman himself I haven't reviewed
22   his file because that wasn't part of my mandate.  But
23   I don't know whether Arman was tried and convicted at
24   any stage and what he was convicted of and if he made
25   allegations that he was being tortured in the context
```

231

```
 1   of his own trial.
 2        Q.   Fair to say, in a case where a defendant had
 3   not confessed and was convicted based on his refusal
 4   to testify and a note of a witness -- an out-of-court
 5   note of a witness, you don't mention the fact that the
 6   witness actually did testify at the trial and did not
 7   accuse the defendant of his crimes?
 8        A.   You are correct that I did not mention that.
 9        Q.   Okay.  And as you brought up, during his
10   interrogation, Arman testified that he was beaten --
11   strike that.  Let me start over.
12            Arman testified that, during his
13   interrogation, he was beaten until he started
14   bleeding and was not in full consciousness?
15        A.   Could you refer me to where he says that?
16        Q.   Do you agree that that's what -- I'm not
17   referencing you to the document in front of you right
18   now.
19        A.   Well, I'd need to know, I mean, in order to
20   be able to pronounce to you whether or not he said he
21   was beaten.
22        Q.   Well, here's my question to you.
23        A.   Yes.
24        Q.   Would you agree that a -- witness' claim
25   of having been beaten is a significant event?
```

232

```
 1        A.   Yes.
 2        Q.   And what you're saying --
 3        A.   A significant event which deserves attention.
 4        Q.   And what you're saying is you don't have
 5   a recollection one way or the other about whether
 6   or not Arman testified that he was beaten until he
 7   started bleeding?
 8        A.   I don't recollect that.  But if there is
 9   such documentation, please present it to me now so
10   I can give you my opinion, if that's what he said.
11        Q.   I'm not asking you about your opinion.  I'm
12   asking you about your recollection.
13            And your recollection is you don't remember
14   one way or the other?
15        A.   Six months down the line, I don't remember.
16   No.
17        Q.   And this is not something that you noted
18   in your report?
19        A.   I've already answered that question.
20        Q.   Well, I hadn't -- I had asked you about
21   whether you put in your report the fact that --
22        A.   Can I --
23        Q.   -- you talk about Arman testifying and what
24   he said during his testimony.
25            My question now is:  You didn't put in your
```

233

1   report anything about Arman's claim of being beaten?
2          MR. YALOWITZ:  Object -- objection to the
3   form of the question.  There's -- it's argumentative
4   and it's compound.
5          THE WITNESS:  Would you let me refer to my
6   rebuttal report, please?
7      Q.  BY MR. SATIN:  Sure.
8      A.  Because I don't remember whether or not
9   I dealt with the matter there.  Because I distinctly
10  remember the issue being raised by Mr. Sfard.
11     Q.  But while you're doing that, let me just
12  pose this to you because I think it will make it
13  a little bit easier.  My --
14     A.  Can I just --
15         MR. YALOWITZ:  Counsel, let -- let him read
16  the document that he's reading, please.
17         MR. SATIN:  Sure.
18         MR. YALOWITZ:  Thank you.
19         THE WITNESS:  (Examining.)  Yes.  I refer
20  you to page 5.  In the case of Ibrahim Hamed at pages
21  43, 44, and 45 of his judgment, the military court did
22  not, in fact, fail to investigate allegations of torture
23  or perversion of two incriminating witnesses, Abdullah
24  Barghouti and Mohammad Arman, concluding that, even if
25  such allegations were true, they did not impact on the

OCTOBER 20, 2013 - NICK KAUFMAN

234

1   accused's guilt.
2          The court's reasoning was founded principally
3   on the fact that both incriminating witnesses were
4   interviewed independently of each other on separate
5   dates, yet gave mutually corroborating versions of
6   events.
7          So yes, you are correct that I didn't mention
8   it in my first report.  But I did deal with the issue
9   in my rebuttal opinion.  And that was in response to
10  the criticisms raised by Attorney Sfard.
11     Q.  BY MR. SATIN:  And in that case, do you have a
12  recollection of whether or not another witness testified
13  that he was interrogated for 70 days?
14     A.  I don't recollect that.  No.  Please do show
15  me the relevant document.
16     Q.  My question's about your memory.
17         Do you have a recollection of the fact?
18     A.  Sorry.  I can't recollect that so far down
19  the line.  No.
20     Q.  Do you remember that a witness in the Hamed
21  case testified that he had been beaten and deprived
22  of sleep?
23     A.  I remember vaguely such an allegation being
24  made.
25     Q.  And that he was put in cold temperatures?

OCTOBER 20, 2013 - NICK KAUFMAN

235

1      A.  I remember such an allegation being made.
2   Yes.
3      Q.  And he was tortured until he finally framed
4   Hamed?
5      A.  That I don't particularly remember.
6      Q.  And in the files -- the court files are the
7   minutes of the interrogations of Hamed; correct?
8      A.  Repeat your question, please, sir.
9      Q.  In the files that you reviewed are the minutes
10  of the interrogation of Hamed -- records or notes?
11     A.  Do you mean the GSS records or the -- or
12  the -- the witness statements or -- or investigator's
13  notes, "sahadim," as they're called in Hebrew?
14     Q.  Well, whatever they're called, there are
15  minutes or records of the interrogations of Hamed?
16         MR. YALOWITZ:  Object to the form.
17         THE WITNESS:  That I -- I don't recollect.
18  If you let me look at the court file, as I've been
19  asking for most of this cross-examination, then I
20  would be able to tell you "yes" or "no."
21     Q.  BY MR. SATIN:  But nowhere in your report,
22  your original report about Hamed, do you mention any
23  allegations of torture by any of the individuals or
24  the length and period of the interrogations of
25  Hamed?

OCTOBER 20, 2013 - NICK KAUFMAN

236

1      A.  In the original report, no.  In the response
2   to Attorney Sfard's report, yes.
3      Q.  And there were other allegations of torture
4   that had been made in other cases as well; correct?
5      A.  I believe so, in -- once again, I don't want
6   to guess.  But in at least one of the cases, yes.
7      Q.  Well, in the case of Nasser Shwaysh, four
8   witnesses claimed that they were the victims of
9   coercion; correct?
10     A.  You're telling me.  I don't --
11     Q.  Do you agree?
12     A.  I don't recollect.  I'd have to look at the
13  files.
14     Q.  Now, when you started this -- your expert
15  report, you started by giving a -- sort of an overview
16  of the Israeli military court system; correct?
17     A.  Correct.
18     Q.  And the very first principle you talked
19  about was the prohibition of torture?
20     A.  Correct.
21     Q.  And according to you, these due process
22  rights, including the first one, the prohibition
23  of torture, were going to guide your analysis of
24  the case file -- case files; correct?
25     A.  These principles were -- principles were

OCTOBER 20, 2013 - NICK KAUFMAN

237

1  the foremost in my mind when I was considering the
2  cases.  Yes.
3      Q.    And yet what you're saying now is that you
4  don't have a recollection of allegations of torture
5  that had been made in these cases?
6      A.    I'm saying that six months have gone by.  I
7  deal with an incredible amount of information in the
8  course of my day-to-day practice.  And I don't remember
9  the specifics of these cases.
10     If you show me the case files -- and I've
11 asked you on more than one occasion to do so -- then
12 I'll be able to give you a better answer.
13     Q.    And two of the witnesses in the Shwaysh
14 case were defendants in -- of the cases you reviewed --
15 correct? -- Sana'a Shchada and Kahira Sa'adi?
16     A.    Two women.  Yes, I remember that.
17     Q.    And in the case of Shwaysh, they testified;
18 correct?
19     A.    I remember that.  Yes.
20     Q.    And in those -- during their testimony, they
21 claimed that they had been tortured?
22     A.    They claimed, but not during their own trials.
23     Q.    And yet nowhere --
24     A.    And one would assume that, in the course of
25 their own trials, if they had been tortured, they would

OCTOBER 20, 2013 - NICK KAUFMAN

238

1  have raised those comments instead of pleading guilty,
2  which is what they did.
3      Q.    So you're assuming that no one who was --
4  no one who was tortured would plead guilty?
5      A.    I'm assuming that, if there was any substance
6  to their claims of torture, it would be more reasonable
7  to assume that they would raise them in the context
8  of their own trials, as opposed to raising them in
9  the context of a trial where they have an interest
10 in assisting their colleagues, compatriots, whatever
11 it may be.
12     Q.    Well, certainly whatever interest they may
13 have had in testifying in other cases, they have an
14 even greater interest in their own case; right?
15     A.    I agree.  As I said, if they had been
16 tortured, one would assume that they would have raised
17 it in their own trial and say:  Hey, Mr. Judge, I was
18 tortured.  You can't convict me of what I'm pleading
19 guilty to.
20     Q.    And, of course, by that you're assuming that
21 the witness -- that the defendant has faith that the
22 justice system will render the right result; correct?
23     A.    Well, that's a speculative argument.
24     Q.    But you realize that your opinion is based
25 on your own assumptions that anyone who had been

OCTOBER 20, 2013 - NICK KAUFMAN

239

1  tortured would have raised it in their case; correct?
2      A.    One would assume so, yes, when you're
3  comparing it to when they make the same argument
4  at a later date in someone else's case.
5      Q.    And -- and your assumption is not based
6  on any personal experience in representing defendants
7  in the Israeli military court system?
8      A.    It's based on a comparison of the two
9  instances.  In one instance, you have a witness who
10 is saying:  I was tortured and that's why I said the
11 things that I said.
12     In the other instance, you have a defendant
13 who's saying -- a witness, in the other case, who's
14 saying that:  I wasn't tortured.  I'm pleading guilty
15 to some things that I did.
16     Q.    When you reviewed each case file, did you
17 treat each case separately, or did you allow your
18 reading of another case to inform your decision in
19 a different case?
20     A.    To a large extent, I took each case file
21 separately.  Of course, I was aware that case files
22 are interrelated and that they refer to the same
23 incidents.  So I would check the consistency.
24     Q.    But you didn't think it was important to
25 put in your report that Sana'a Shchada and Kahira

OCTOBER 20, 2013 - NICK KAUFMAN

240

1  Sa'adi had claimed torture during their testimony
2  in the Shwaysh case?
3      A.    I didn't write it.
4      Q.    Were you aware that Kahira Sa'adi, one of
5  the ones -- one of the defendants who claims to have
6  been tortured, was the attorney -- was the defendant
7  whose lawyer had business relations with the court?
8      A.    I don't recollect.
9      Q.    But you recall earlier we had that discussion
10 about a defendant's lawyer, that lawyer's office having
11 business relations with the court?
12     A.    I do.
13     Q.    And that was Kahira Sa'adi?
14     A.    Please refer me to the page.  Is this
15 Abu-Ganem, the lawyer Abu-Ganem?
16     Q.    This is, I believe, the only document you
17 have related to Kahira Sa'adi.
18     A.    Yes, it's Kahira Sa'adi.  I refer you to
19 Exhibit 414.  Correct.
20     Q.    Now -- now you'd agree that, generally
21 speaking, family members come to court to support,
22 if they can, the -- the individual who's on trial?
23     A.    I can't answer that question.  I know,
24 in these specific cases, where the family members
25 came or didn't come.  As a general rule, yes, family

OCTOBER 20, 2013 - NICK KAUFMAN

241

1  members do have an interest in coming and seeing their
2  family -- their -- their relations and beloved ones.
3       Q.   In one of the --
4       A.   And the courtroom is an opportunity to do so.
5       Q.   And one of the allegations that Kahira Sa'adi
6  made about coercion was of a sexual nature; correct?
7       A.   I vaguely remember something like that.  Yes.
8       Q.   And so what you're saying is that you would
9  have expected Kahira Sa'adi to have raised with the
10 judge, in a courtroom full of other people, this
11 allegation --
12      A.   I know where --
13      Q.   -- of a sexual nature?
14      A.   Yes.  I know where you're going with this
15 line of questioning.  And, once again, you're presuming
16 that the family -- her family was actually there and,
17 if that was the case, that her pride, as a Muslim woman,
18 would be more important than her need to profess her
19 innocence.
20      Q.   If we can agree on anything, Mr. Kaufman,
21 it's that assumptions have been made about why
22 attorneys and defendants did or did not do certain
23 things in these cases; correct?
24           MR. YALOWITZ:  Objection.
25           THE WITNESS:  Could you repeat the question,

                OCTOBER 20, 2013 - NICK KAUFMAN

242

1  please, sir?
2       Q.   BY MR. SATIN:  Assumptions have been made
3  about why the defendants and the defense attorneys
4  did or did not do certain things in these cases?
5       A.   I can only repeat my previous answer.
6  I can't know what discussions were held between
7  attorney -- attorneys and their clients.
8       Q.   And you're making assumptions about why
9  a defendant or whether a defendant would have informed
10 the court about torture?
11      A.   No.  I think I gave you a fairly coherent
12 answer on that matter.  I believe that where you
13 have the same individual testifying as a witness as
14 to torture, personal torture, one would expect that
15 that same witness would raise the argument when the
16 matter concerns their own case.
17           I would like to add, furthermore, that
18 I find a certain internal contradiction in your
19 argument.  Because one of the factors that you're
20 posing to me is that defendant would not want to
21 say these matters -- would seem a defendant would
22 not want to raise allegations of sexual harassment
23 in front of her own family.  But then that would
24 equally apply to the members of the public who were
25 present in the trial when she was giving evidence

                OCTOBER 20, 2013 - NICK KAUFMAN

243

1  as a witness.
2       Q.   But when she's giving evidence as a witness,
3  she is told to tell the truth; correct?
4       A.   That is true.
5       Q.   So it's not her decision whether she wants
6  to answer truthfully or not.  She just has to do it?
7       A.   She's obliged to by law.  Yes.
8       Q.   Whereas, when she's a defendant, it's her
9  decision whether or not to testify; correct?
10      A.   Well, still, if she testifies, she has to
11 tell the truth as well --
12      Q.   But it's her --
13      A.   -- even if it's in her own defense.
14      Q.   But it's her decision whether or not to
15 testify?
16      A.   Correct.
17      Q.   And according to you, it's her decision
18 whether or not her lawyer speaks up and raises the
19 issue of torture with the judge?
20      A.   Correct.  But I think we've already exhausted
21 this subject.
22      Q.   Now, let's get back to Mr. Hamed.
23           Mr. Hamed was held in jail for more than
24 three years before his trial even started; correct?
25      A.   Yes.  I think I noted the length of his trial.

                OCTOBER 20, 2013 - NICK KAUFMAN

244

1       Q.   And, in fact, you even --
2       A.   It took a long time.
3       Q.   In fact, you stated:
4            "It is worth noting that the court itself
5  expressed its displeasure."
6            On page 16.
7       A.   Yeah.  I remember that.
8       Q.   Now, the court's expression of displeasure
9  didn't benefit the defendant any, though, did it?
10      A.   Well, expression of displeasure as to length
11 of proceedings has a -- has -- has a remedy.  And the
12 remedy is that defense counsel, if he can show that
13 the proceedings have been unduly protracted because
14 of prosecution negligence or mishandling or whatever,
15 he can make an application to the court for interim
16 relief.  That remedy does exist.
17      Q.   Mr. Hamed wasn't released; correct?
18      A.   He was not released.  No.
19      Q.   And Hamed was denied access to evidence in
20 his case?
21      A.   Could you refer me specifically to the --
22 the portion of the transcript or to what exactly
23 you're referring to?
24      Q.   Well, you, in your report, raised the issue
25 of immunity certificates that had been issued by the

                OCTOBER 20, 2013 - NICK KAUFMAN

245

1    Israeli authorities?
2        A.   Refer me to the page, please.
3        Q.   Sixteen, into 17.
4        A.   Yes.  He was denied, but by law.  And he
5    had the opportunity to challenge it.
6        Q.   Okay.  He was denied access to evidence in
7    his case?
8        A.   He was denied access to investigative
9    material.  Immunity certificates are certificates
10   which are signed in the presence -- I believe by
11   the general in charge of the area; in civilian courts,
12   by the relevant minister of State.  They are taken
13   out to protect matters of public interest or State
14   security.  They are subject to challenge, and they
15   frequently are challenged.
16       Q.   So Hamed was in a worse position than
17   a typical defendant in the Israeli military court
18   system; correct?
19       A.   Not necessarily the case.  Because you don't
20   know what materials that these immunity certificates
21   were designed to protect.
22            One of the considerations that a defense
23   lawyer often takes into account, when considering
24   whether or not to challenge an immunity certificate,
25   is where the hearing will take place on the petition

246

1    to challenge the immunity certificate.
2            If it's a certificate which is taken out
3    for State security, then he has no problem because
4    it's not in front of the same tribunal which is
5    trying the case.  If it's a State certificate, which
6    is taken -- immediate certificate, which is taken out
7    to protect the public interest, then it could be in
8    front of the same judge who's hearing the trial.
9        Q.   But you'd agree --
10       A.   Let me complete my question, please -- answer,
11   please.
12            Sometimes the information which is protected
13   by these immunity certificates is highly incriminating,
14   in fact, more incriminating than the evidence which
15   actually is contained in the case file, which is
16   supplied to the defense counsel.
17       Q.   Now, you write in your report:
18            "The fact that the defense is entitled
19   by law to challenge these certificates is an extra
20   guarantee of due process."
21       A.   Yes.  I believe that to be the case.
22       Q.   But by "extra," you don't mean that a
23   defendant has more due process when the prosecution
24   is withholding materials than in cases where -- in
25   cases where the prosecution is not?

247

1        A.   I don't believe that the prosecution
2    is withholding materials unlawfully.  An immunity
3    certificate is taken out in order to regulate the
4    fact that the prosecution is not disclosing material
5    which it would otherwise be obliged to disclose.
6        Q.   Correct.
7            So in this scenario, when that happens, the
8    defend -- the defendant does not automatically receive
9    materials that he would otherwise receive; correct?
10       A.   That is correct.
11            And there is a -- as I said, a judicial --
12   I'm sorry -- there is a mechanism for challenging that
13   certificate.
14       Q.   And -- there's a mechanism to challenge that,
15   you say.  But the defendant's lawyer doesn't have access
16   to the information in representing him before that
17   tribunal; correct?
18       A.   Not unless a court rules that he's entitled
19   to see that information.  What happens is that the
20   lawyer will, first of all, ask for a redacted version
21   of the information.
22       Q.   Did that happen in this case?
23       A.   To the best of my knowledge, no.
24            If he's not given a redacted version which
25   satisfies him, then he's entitled to challenge the

248

1    certificate.  The matter will go before an independent
2    judge who is not connected with hearing the case itself.
3    That judge will see the material and then make a
4    decision accordingly.
5        Q.   And in Hamed's case, the material was not
6    disclosed; correct?
7        A.   To the best of my recollection, no.
8        Q.   In fact, it's quite rare, in State security
9    offenses, for the court to require the prosecution
10   to disclose the material to the defense?
11       A.   In nearly every case in which the General
12   Security Services, the Shabak, the GSS is involved,
13   there is nearly always a -- an immunity certificate
14   protecting State security interests.  For the large
15   part, it is to protect the working methodology of the
16   GSS.
17       Q.   And my question is:  It is quite rare, in
18   State security offenses, for the court to require the
19   prosecution to disclose the material to the defense?
20       A.   You are correct.
21       Q.   And earlier you mentioned how the process
22   of -- of seeking disclosure of those materials goes
23   to a tribunal; correct?
24       A.   Correct.
25       Q.   That's an Israeli military tribunal; correct?

249

1   A.   Which is independent of the trial tribunal
2   hearing the case.
3   Q.   Not independent of the Israeli military,
4   though; right?
5   A.   No, of course not.  No.  It's the system
6   in which we're all working.
7   Q.   And the judges are all in the same military
8   unit; correct?
9   A.   Yes.
10  Q.   Now, in the Hamed case, the prosecution was
11  entitled to introduce Arman's alleged statement during
12  his interrogation because it was different than what
13  he said on the witness stand; correct?
14  A.   Correct.
15  Q.   Now, in the Israeli military court system,
16  a witness' out-of-court statement can be admitted
17  even if the witness refuses to answer questions on
18  the witness stand?
19  A.   That is correct, as it is in the civilian
20  court system, as Attorney Sfard knows and mentioned
21  in his report.
22  Q.   And in Case No. 12, Majid Al-Masri, one of
23  the witnesses against the defendant refused to answer
24  questions on cross-examination?
25  A.   Correct.

OCTOBER 20, 2013 - NICK KAUFMAN

250

1   Q.   And this witness, Mohammad Nifa, testified
2   at length for the prosecution on direct examination?
3   A.   Where are you referring me to -- Nifa? --
4   in my report?
5   (Defendants' Exhibit 418 marked.)
6   Q.   BY MR. SATIN:  I'm showing you what's been
7   marked as Defense Exhibit 418.
8   Defense 418 is a document --
9   MR. YALOWITZ:  May I have a copy?
10  Q.   BY MR. SATIN:  -- from the case of Majid
11  Al-Masri.  Sorry.
12  A.   (Examining.)  It's the verdict.  Yes.  The
13  judgment.
14  Counsel is showing me, at Exhibit 418,
15  the judgment in the case of Majid Ismail Mohammad
16  Al-Masri, from the 28th of June, 2005.
17  Q.   And what I just realized that I've done is
18  I meant to give you a different document that is nearly
19  the same number.
20  A.   So what do you want me to do with Exhibit 418?
21  Q.   Ignore it for now.  I apologize.
22  (Defendants' Exhibit 419 marked.)
23  Q.   BY MR. SATIN:  I'd like to give you an
24  exhibit, which will now be marked 419.
25  A.   (Examining.)  What's this?

OCTOBER 20, 2013 - NICK KAUFMAN

251

1   Q.   This is a different document from the same
2   case; correct?
3   A.   It's in English.
4   Q.   Aah, then I gave you the wrong one.
5   A.   This -- are you asking me what this is?
6   MR. YALOWITZ:  This is different.
7   MR. HILL:  Let's go off the record for
8   a second.
9   MR. YALOWITZ:  Okay.
10  (Brief discussion held off the record.)
11  Q.   BY MR. SATIN:  Now, document -- excuse
12  me -- Defense 419 is a document from the case of
13  Majid Mohammad Al-Masri.
14  A.   (Examining.)  Exhibit 419 is a document from
15  the case of Majid Al-Masri.  You're correct.  And it's
16  dated the 2nd of September, 2003.
17  Q.   And if you turn the page --
18  A.   It's in the Samaria court, by the way.
19  Q.   -- on page 3, which is Bates number 283,
20  begins the testimony of prosecution witness "MN";
21  correct?
22  A.   Mohammad Nifa.  Yes.
23  Q.   And that direct examination continues on
24  to the next page?
25  A.   Correct.

OCTOBER 20, 2013 - NICK KAUFMAN

252

1   Q.   And the following page?
2   A.   Yes.  It continues until page 6.
3   Q.   And on page 6 begins the cross-examination
4   of this witness.
5   And after about five questions, the
6   witness refused to answer any more questions on
7   cross-examination?
8   A.   The witness stated as follows -- and
9   I quote from line 19 onwards, on page 6, Bates
10  P 11-12:289:
11  "The" --
12  Q.   There isn't a question pending other than
13  that there were a series of questions?
14  A.   There were a series of questions.
15  MR. YALOWITZ:  Wait.  Wait a minute.  Wait
16  a minute.  You -- you asked him a question, and now
17  he's answering the question.  If you want to withdraw
18  the question, that's fine.  It's your deposition.
19  But --
20  MR. SATIN:  Well --
21  MR. YALOWITZ:  But you did ask him a question.
22  MR. SATIN:  The witness didn't answer the
23  question.
24  Q.   BY MR. SATIN:  So my question is simply this:
25  There were a series of questions --

OCTOBER 20, 2013 - NICK KAUFMAN

253

```
1            MR. YALOWITZ:  Can we -- can we take a break?
2    We've been going about 45 minutes -- I mean, an hour
3    and 15 minutes.  It would be --
4            MR. HILL:  Let --
5            MR. YALOWITZ:  -- good to take a break.
6            MR. HILL:  Let him finish this line, and
7    then we'll take a break.
8        Q.   BY MR. SATIN:  There were a series
9    of questions asked by the defense attorney on
10   cross-examination; correct?
11       A.   Correct.
12       Q.   And then the witness decided that the witness
13   did not want to testify?
14       A.   Yes.  He gave a reason.
15            Do you want to hear that reason?
16       Q.   No.
17            And then, at some point, the witness refused
18   to continue testifying; correct?
19       A.   He did.  He gave a reason.
20            Do you want me to translate that reason for
21   you?
22       Q.   See, the way this works is I ask the questions
23   and you answer them.
24       A.   Okay.
25       Q.   So after the witness had refused to testify,
```

OCTOBER 20, 2013 - NICK KAUFMAN

254

```
1    there was a discussion with the judge about what would
2    happen to the witness' testimony?
3        A.   It would appear that that is the case, yes,
4    from the words which are highlighted in bold.
5        Q.   So the witness' direct examination testimony
6    and the limited cross-examination was permitted to
7    remain in evidence in the case?
8            MR. YALOWITZ:  Objection.  Lacks foundation.
9            THE WITNESS:  Repeat your question, please,
10   sir.
11       Q.   BY MR. SATIN:  The court decided that the
12   witness' direct examination testimony and the portions
13   of the cross-examination testimony before the witness
14   refused to testify was permitted to remain as evidence
15   in the case?
16       A.   I believe that's the case.  Yes.
17       Q.   Even though the defense attorney was not
18   permitted to continue with the cross-examination;
19   correct?
20       A.   There was no further cross-examination
21   after the witness stated that he'd been annoyed by
22   the police -- by the prison officers, that he didn't
23   feel well, and that he didn't want to give evidence.
24       Q.   You'd agree that the court ruled that the
25   limited and incomplete testimony of this witness was
```

OCTOBER 20, 2013 - NICK KAUFMAN

255

```
1    allowed to remain as evidence in the case?
2        A.   Yes, it did.
3        Q.   Even though the defense was not permitted
4    a full cross-examination of this witness?
5            MR. YALOWITZ:  Objection.  Lacks foundation.
6            THE WITNESS:  The witness stated that he
7    didn't want to give testimony.  He said he didn't feel
8    well.  He said he was annoyed by the prison officers.
9        Q.   BY MR. SATIN:  And you'd agree, then, that
10   that cross-examination ended before the attorney had
11   decided he had no more questions?
12       A.   Sorry?
13       Q.   The cross-examination ended before --
14   because the witness decided it [sic] didn't want --
15   did not want to answer questions; correct?
16       A.   Let me continue reading the cross-examination
17   or what is purported to be the cross-examination.
18            (Examining.)  Okay.  With the benefit of
19   having read the transcript, I note certain things
20   which should perhaps be reflected in the -- in this
21   transcript.
22            First of all, he -- he -- he refused to
23   testify.  The court negotiated with him and said
24   that he has an obligation to testify in order to help
25   the court reach the truth, "lishpach or," which means
```

OCTOBER 20, 2013 - NICK KAUFMAN

256

```
1    "to shed light" on the incidents which are the subject
2    matter of the case, including the question of the
3    innocence of the defendant.
4            And then the -- the witness stated:
5            (Reading/translating.)
6            "I do not want to give evidence.  I want
7    that my lawyer should come here and make a complaint
8    against the prison officers."
9            And at the request of the court, his lawyer
10   was, in fact, called into the courtroom.  And -- and
11   at the request of the court, the lawyer explained
12   to his client, namely, the witness, the importance
13   of giving evidence and the meaning of his refusal
14   not to give -- and his refusal not to give evidence.
15   And the answer of the witness, thereafter, was:
16            (Reading/translating.)
17            "I do not want to give evidence."
18            Okay.  That's what happened in the courtroom.
19       Q.   Okay.  And my question is that after the
20   witness refused to continue answering questions on
21   cross-examination -- and you agree that the witness
22   refused answering questions on cross-examination;
23   correct?
24       A.   He was a non-cooperative witness.  Yes.
25       Q.   And he had only been asked six questions
```

OCTOBER 20, 2013 - NICK KAUFMAN

257

1    on cross-examination?
2       A.    He'd only been asked six questions on
3    cross-examination.  But he'd made his intent not
4    to give evidence abundantly clear.
5       Q.    And then, on the next page, on the final
6    page, the court issued its decision on this matter
7    of the witness refusing to testify --
8       A.    Uh-huh.
9       Q.    -- correct?
10       A.    "Sarvan."  That's what he was referred to as.
11    Yes.
12       Q.    And the court decided that the witness'
13    testimony would stand in the case?
14       A.    Let me read the decision, and then I'll give
15    you my answer.  (Examining.)
16              What the court, in fact, ruled is what I was
17    hinting at earlier, that the -- the witness' profession
18    or protestations or assertion that he didn't feel well
19    was just an excuse.  After persuasion -- and this is
20    what they were required to do by judicial direction,
21    asking him for his reasons not to give evidence and
22    explaining to him the importance of giving evidence --
23    the judges ruled that the evidential conclusions to
24    be drawn from his refusal to give evidence would be
25    subject to the submissions of the parties at a later

                OCTOBER 20, 2013 - NICK KAUFMAN

258

1    date in closing submissions.  And I refer you to line
2    12.
3       Q.    So you'd agree that the court did not strike
4    the testimony of the witness?
5       A.    At that moment in time, no.
6       Q.    In fact, the defense had specifically
7    requested a continuance; correct?
8       A.    Can you refer me to where the --
9       Q.    Sure.  The previous page, Bates number 12:289.
10       A.    Yes.  Which line?
11       Q.    Very bottom, 38.
12       A.    The defense lawyer says:
13              (Reading/translating.)
14              "I don't ask to -- for a continuance."
15              (Comment in Hebrew by the witness.)
16              "I need to cross-examine the witness.
17    Everything depends on this witness.  I suggest
18    that we reconvene -- that I sit, once again, with
19    the prosecution and that -- that we try to reach a
20    plea bargain.  I need to cross-examine this witness.
21    I have questions for this witness.  I request that
22    the court, on account of this, will look at this
23    evidence as irrelevant evidence.  We're talking about
24    a witness who's a principal witness, who incriminates
25    the defendant as set out in the indictment.  The refusal

                OCTOBER 20, 2013 - NICK KAUFMAN

259

1    of the witness today and on another date is causing
2    the defendant severe prejudice.  I would ask the court
3    to use its power -- its inherent power to put off the
4    witness evidence for another hearing.  Concerning
5    the investigator who interviewed Mohammad Nifa, his
6    name does not appear in the list of witnesses.  And,
7    therefore, it's not possible to submit the witness'
8    statements."
9              Well, that's not true.  But then that's his
10    submission.
11       Q.    Despite the request of the defense attorney,
12    the judge did not honor his request; correct?
13       A.    He did not put the case off to another date
14    to re-summon the witness.  No.
15       Q.    And so this direct examination and the very
16    brief cross-examination was allowed to stand in the
17    case; correct?
18       A.    Apparently so.
19       Q.    And then the court admitted the witness'
20    out-of-court written statements; correct?
21       A.    Can you show me where that indeed happened,
22    and then I will confirm it?
23              MR. YALOWITZ:  Are we -- are we ready to
24    go off?
25              MR. SATIN:  Let me just finish this.

                OCTOBER 20, 2013 - NICK KAUFMAN

260

1              MR. YALOWITZ:  No.  You know, I -- I want
2    a break.  Can we take a break, please?
3              MR. SATIN:  Fine.
4              MR. YALOWITZ:  Thank you.
5              (Recess from 4:05 p.m. to 4:15 p.m.)
6       Q.    BY MR. SATIN:  In your report about
7    Mr. Al-Masri, No. 12, you state, quote:
8              "The prosecution evidence incriminating
9    the defendant was largely based on the testimony of"
10    co-conspirators.  (As read.)
11       A.    That's correct.  It's the second sentence
12    on page 22.
13       Q.    And by "testimony," you mean out-of-court
14    statements of co-conspirators; correct?
15       A.    It could mean that.  Yes.
16       Q.    You're not using the word "testimony" just
17    to refer to what a witness says on the stand; correct?
18       A.    In this particular case, once again, I would
19    be able to give you a better answer if you show me the
20    actual court file.  But then I would assume it is also
21    based on out-of-court testimony.
22       Q.    Well, I'll -- I'll refer you to one of the
23    documents you have in front of you with Bates number
24    12:83.
25       A.    Which exhibit number?

                OCTOBER 20, 2013 - NICK KAUFMAN

261

```
 1       Q.   I can't recall if that's 418 or 419.  But
 2   the Bates number --
 3       A.   83 is 418.  I have it in front of me.
 4       Q.   If you turn to --
 5       A.   This is the judgment.
 6       Q.   If you turn to page 5 --
 7       A.   I'm looking at page 5.
 8       Q.   And it deals with the prosecution witness,
 9   Nasser Aweis; correct?
10       A.   Correct.
11       Q.   And in the third paragraph, the court notes,
12   about five lines down from the top of the third
13   paragraph:
14            "We have decided to give preference to
15   the statements over the testimony."
16       A.   That's correct.
17            I must state, though, that the photocopy
18   that you're working from here is incredibly poor and
19   I'm having difficulty reading it.  But I do know that
20   the court is referring, in line 36, to Section 10.A
21   of the evidence ordinance, which is the appropriate
22   section for preferring out-of-court statements over
23   in-court testimony.
24       Q.   And so would you agree that, when you
25   write that he was incriminated based on testimony
```

OCTOBER 20, 2013 - NICK KAUFMAN

262

```
 1   of co-conspirators, you were including statements
 2   made out of court?
 3       A.   Yes.  Because I use the word "testimony"
 4   very loosely.  It doesn't have the same distinction
 5   maybe that you're used to.  In quoting "testimony,"
 6   in my books, can mean statements, evidence.
 7       Q.   Now, in your report, you don't make mention
 8   of the fact that one of the witnesses refused to answer
 9   questions on cross-examination; correct?
10       A.   Are we going back to the witness Mohammad
11   Nifa?
12       Q.   Yes.
13       A.   You are correct.  I don't mention Mohammad
14   Nifa in my report.
15       Q.   Instead, what you say is:
16            "The evidential hearings were conducted
17   in textbook fashion with no out of the ordinary
18   occurrences."
19       A.   I don't think that a witness who refuses
20   to give evidence is an out of the ordinary occurrence.
21   It happens all the time, frequently, in the military
22   courts, and especially when we're talking about security
23   offenses perpetrated by ideo -- ideology.
24       Q.   Now, in your report, you discuss what you
25   refer to as the suppression hearing concept; correct?
```

OCTOBER 20, 2013 - NICK KAUFMAN

263

```
 1       A.   Correct.
 2       Q.   The idea that a defendant can seek suppression
 3   of statements he made as a result of coercion?
 4       A.   A defendant, yes.
 5       Q.   Did I not say "defendant"?
 6       A.   Yes, you did.  Because I'm just recollecting
 7   it, in the same point in time, one of the comments
 8   that Attorney Sfard made.
 9       Q.   And you'd agree that a defendant cannot
10   seek suppression of the out-of-court statements of
11   a witness that has claimed to have been tortured?
12       A.   This is a comment which was raised by
13   Attorney Sfard.
14            There are rules governing the submission
15   of out-of-court testimony.  And those rules have
16   to be followed.  And if a statement is admitted
17   into evidence, then submissions can be made in the
18   concluding submissions of both -- of the defense
19   that that statement should not be preferred over the
20   testimony given in court.  He can also object to it
21   being admitted.
22       Q.   But with respect to witnesses who have
23   testified --
24       A.   With respect to witnesses as well, yes.
25       Q.   But you -- you talked about how there can
```

OCTOBER 20, 2013 - NICK KAUFMAN

264

```
 1   be what -- quote, "a trial within a trial"?
 2       A.   That refers to defendants.
 3       Q.   That only refers to the defendant?
 4       A.   Correct.
 5       Q.   It does not refer to witness statements,
 6   witnesses who have been --
 7       A.   Witnesses who allege to have been tortured
 8   and, therefore, don't give the evidence that they
 9   gave out of court on the witness stand.  They can
10   be questioned.  If the prosecution should seek to
11   admit their out-of-court statement, then the defense
12   has a right to object to that.  And if the judge takes
13   that statement into account or into the case file as
14   evidence, then it has to be done according to certain
15   rules and regulations, which are set out in law.  And
16   the defense attorney, in his closing submissions, will
17   argue that that out-of-court statement should not be
18   preferred over and above the statement which is given
19   in court.
20       Q.   And when you say the "written summations,"
21   you're referring to the --
22       A.   Closing submissions.
23       Q.   -- documents that aren't very important?
24            MR. YALOWITZ:  Objection.
25            THE WITNESS:  That's argumentative.
```

OCTOBER 20, 2013 - NICK KAUFMAN

**265**

1    Q.  BY MR. SATIN:  The written summations that
2  you said earlier were not as important as the testimony?
3    A.   Well, as I said, this is -- this is one
4  particular instance where one would expect defense
5  counsel, if he's arguing that an out-of-court testimony
6  should not be preferred to the in-court evidence, he
7  should make those submissions.  Yes.
8    Q.   So in some respects, the written submissions
9  are important in the cases?
10   A.   In some respects, yes.
11   Q.   Now, in many cases, it's the GSS that
12 conducts the initial interrogation of the defendant;
13 correct?
14   A.   Yes.
15   Q.   In fact, that's the usual practice in State
16 security offenses?
17   A.   Yes.
18   Q.   The GSS's role is about getting information
19 to protect Israel's security?  That's their goal?
20        That's their role; correct?
21   A.   The GSS's job primarily is to gather
22 intelligence.  They are aware, however, that the
23 information which they document, especially when
24 it is a defendant's statement, will be disclosed
25 at a later date to the defense.  So they are aware,

**266**

1  in the course of their work, of the principles of
2  criminal justice.
3    Q.   The police are not present for the
4  interrogations done by the GSS; correct?
5    A.   Correct.
6    Q.   The police come in at the end; correct?
7    A.   Correct.
8    Q.   And the police then obtain a statement from
9  the defendant for purposes of admission at trial?
10   A.   There is a police officer who sits in the
11 Shabak unit, the GSS unit.  His sole function is
12 basically to receive the defendant after he's been
13 interrogated by the Shabak.  He will normally get
14 the document which sets out the statement given by
15 that defendant to the GSS -- sorry -- accused suspect
16 to the GSS officer.  And then he will review that
17 document with the suspect and take a proper full
18 written statement from him.
19   Q.   And it's the statement taken by the police
20 after the GSS interrogation that will be sought to be
21 introduced at the trial?
22   A.   Correct.  But sometimes also the GSS
23 statement.
24   Q.   But, usually, it's the police statement
25 and not the GSS statement; correct?

**267**

1    A.   I can't make a generalization of that nature.
2  But I'm speaking from my own personal experience as
3  a prosecutor.  I always insisted that the defense
4  counsel would receive the GSS statements or the
5  GSS documents recording the statements, admissions,
6  interviews with -- with the suspect.
7    Q.   And what we -- what is clear from the
8  record --
9    A.   And defense counsel would frequently
10 exploit the differences between those two documents --
11   Q.   But in these cases --
12   A.   -- in cross-examination.
13   Q.   -- we didn't have those two documents;
14 correct?
15   A.   Correct.
16   Q.   Because there's only the statements that
17 were taken by the police later on; correct?
18   A.   Once again, I believe that to be the case.
19 But to give you an exact answer, I would have to
20 refresh my memory with reference to the case -- the
21 cases.
22   Q.   Now, if the defendant is interrogated by
23 the GSS and makes an incriminating statement and then
24 the defendant repeats that -- repeats a statement --
25 the statement he ultimately makes to a police at

**268**

1  the trial, the defendant will only have the right to
2  cross-examine the police officer who took the statement,
3  not the GSS who interrogated him initially; correct?
4    A.   I'm not sure that that's a general --
5  that's correct.  If I felt that, as a defense counsel
6  representing one of these individuals, that my client
7  had said something different to a GSS officer than
8  that which appears in the police officer's statement,
9  then I would insist that he be called as a witness.
10   Q.   And the only way a defense attorney would
11 know that, in the Israeli military court system, is
12 based on what his client may have told him; correct?
13   A.   Or if he's asked for the documents or has
14 received the documents from the GSS.
15   Q.   And at least with respect to these cases,
16 we can agree that did not happen?
17   A.   Once again, I believe that that is the case.
18 But to give you a definite answer, I would have to
19 review the case files.
20        MR. YALOWITZ:  I'm sorry.  The -- I have to
21 object to the form.
22        The -- the question was "we agree that did
23 not happen."  And if you could just clarify what you
24 understood the word "that" to refer to, so the record
25 is clear, I would appreciate it.

1    THE WITNESS:  That defense counsel did not
2  have access to the GSS document.
3    Q.  BY MR. SATIN:  Are you familiar with the
4  fruit of the poisonous tree doctrine?
5    A.  Fruit of the poisoned tree?  Yes.
6    Q.  What do you take that doctrine to mean?
7    A.  Inadmissibly obtained evidence through illegal
8  methods is not admissible at trial.
9    Q.  And that doesn't apply in the Israeli military
10  court system; correct?
11    A.  The whole issue of the -- whether or not
12  a court is entitled to admit the fruit of a poison tree
13  is something which has been the subject of contention
14  in Israeli civilian jurisprudence over many years.
15    Only recently has there been a ruling of
16  the Supreme Court on whether or not the fruits of an
17  illegally conducted search or an improperly consented
18  search that had been given is not admissible.  Prior
19  to that, it was admissible.
20    So it's not true to say that Israeli law,
21  over the years, has recognized the doctrine of the
22  fruit of the poisoned tree --
23    Q.  Now, the right --
24    A.  -- or the exclusion of the fruit of the
25  poisoned tree.

                OCTOBER 20, 2013 - NICK KAUFMAN

1    Q.  Defendants.
2    A.  A defendant's confession?  Correct.
3    Q.  The right to public trials, there's an
4  exception to that rule; correct?
5    A.  Yes.
6    Q.  It can be secretive if it's in the interest
7  of the security of the Israeli Defense Forces' justice
8  or for public safety?
9    A.  Yes.
10    Q.  Do you know how often that happens?
11    A.  I haven't witnessed it personally.
12    Q.  Have you presided over any State security
13  offense cases?
14    A.  Most of the State cases conducted in the
15  military courts are State security cases.
16    Q.  And it's the Israeli military that defines
17  what is a State security offense; correct?
18    A.  Security offenses are actually defined in
19  the Israeli Civil Procedure Ordinance of 1982.
20    Q.  Defined by Israel?
21    A.  Well, of course.  It's Israeli law that's
22  being applied there.  It's either Israeli security --
23  Israeli military or Israeli procedural law.
24    Q.  The detention facilities are in Israel, not
25  in the occupied territories; correct?

                OCTOBER 20, 2013 - NICK KAUFMAN

270

1    Q.  The right to seek exclusion of a defendant's
2  statement only applies if, in fact, the prosecution
3  is seeking to introduce those statements; correct?
4    A.  Can you repeat the question, please?
5    Q.  The right to seek suppression of statements
6  only applies if the prosecution is seeking to introduce
7  the defendant's statements?
8    A.  Are we talking about witness statements or
9  defendants --
10    Q.  Defendant's statements.
11    A.  Defendant's statements.  That's correct.
12    Q.  So if a defendant is tortured but doesn't
13  make any statement, there's nothing for the lawyer to
14  do to seek suppression of; correct?
15    A.  That's obvious.  If he doesn't incriminate
16  himself, why would he want to seek any supression of
17  the -- of the document which contains no incrimination?
18    Q.  So you'd agree, then, that the right to seek
19  suppression of statements would protect against torture;
20  correct?
21    A.  The right to seek admission -- can you repeat
22  your question?
23    Q.  The right to seek supression or exclusion
24  of statements does not protect against torture?
25    A.  Witness confessions?  You mean --

                OCTOBER 20, 2013 - NICK KAUFMAN

272

1    A.  Some are.  A large proportion are.  What
2  particular -- which particular detention facility
3  are you referring to?
4    Q.  Well, there are a number of detention
5  facilities; correct?
6    A.  Yes.
7    Q.  And at least some of them are in Israel,
8  not in the occupied territories?
9    A.  That's correct.
10    Q.  Under international law, the detention
11  facilities are supposed to be in the occupied territory;
12  correct?
13    A.  Correct.
14    Q.  Because the detention facilities are in
15  Israel, family members may not be able to visit their
16  loved ones who are in detention; correct?
17    A.  Correct.
18    Q.  Palestinians need a permit to enter into
19  Israel; correct?
20    A.  Correct.  But they are visited by the
21  International Committee of the Red Cross on a
22  frequent basis.
23    Q.  The family members?
24    A.  No.  The defendants.  And the family members
25  can communicate with the ICRC.  I do it frequently.  And

                OCTOBER 20, 2013 - NICK KAUFMAN

273

```
 1   I have defendants who --
 2        Q.   So what you're saying --
 3        A.   -- are in oppressive regimes around the world.
 4   Yes.
 5        Q.   So what you're saying is that, even though --
 6        A.   Including Libya.
 7        Q.   -- even though family members may not be
 8   able to visit their loved ones in detention inside
 9   of Israel, they can communicate with their loved ones
10   through an international organization?
11        A.   They can ask for the ICRC to petition the
12   military, the GSS, to visit these individuals.
13        Q.   For whom to visit?
14        A.   The ICRC. I'm giving you a good example.
15        Q.   So it's not that the -- that body, the ICRC --
16        A.   The International Committee of the Red
17   Cross has a special mandate under the Fourth Geneva
18   Convention. The Israeli Army applies the Fourth
19   Geneva Convention de facto, if not de jure, and
20   permits the International Committee of the Red Cross
21   to visit detainees wherever they may be, whether it's
22   in Israel, in detention facilities there, or in the
23   occupied territory.
24        Q.   But you're not saying that the ICRC can
25   arrange for family members to go into Israel to visit --
```

274

```
 1        A.   No.
 2        Q.   -- their loved ones --
 3        A.   I'm not saying that. I'm saying that --
 4        MR. YALOWITZ:  Let him finish his question.
 5        Q.   BY MR. SATIN:  You're not saying that the
 6   ICRC arranges for family members to visit their loved
 7   ones in Israel?
 8        A.   No, I'm not saying that.
 9        Q.   Okay.
10        A.   What I'm saying is that the ICRC will perform
11   those visits by proxy.
12        Q.   And some of the lawyers -- strike that.
13             Do you have any empirical evidence about
14   how often that actually happens, that the ICRC will
15   be contacted by loved ones and will, therefore, visit
16   their loved ones in Israeli detention facilities?
17        A.   I don't have any empirical evidence. But
18   I can speak from personal experience. Because, prior
19   to my role as a military judge and prior to my role
20   as a defense counsel in the Israeli military tribunals
21   for soldiers, I served my compulsory military service
22   in the unit which is known as the international law unit
23   of the military Advocate General's office, otherwise
24   known as "dabla" in Hebrew.
25             And I was responsible for responding to
```

275

```
 1   the various concerns which were raised by the ICRC
 2   as to visits which had been carried out and allegations
 3   of mistreatment being made. I would then take those
 4   allegations, refer them to the various units, and ask
 5   for their comments in order to be able to formulate
 6   a proper response to the ICRC.
 7        Q.   You can't say, per 100 defendants, how
 8   many of them go through this process of contacting
 9   the ICRC so that the ICRC can visit their family
10   member on their behalf?
11        A.   I cannot give you an empirical -- any
12   empirical evidence as to that. I just know that
13   I dealt with a lot of these requests on behalf of
14   the ICRC.
15        Q.   And in the Israeli military court system,
16   a defendant is denied access to counsel during the
17   early stages of a case; correct?
18        A.   Not in Israeli military courts. We're
19   talking about in a -- an investigation. In a Israeli
20   military court, they're never denied access to counsel.
21        Q.   Well, at the time that someone's been
22   arrested, based on suspicion --
23        A.   Yes, they are -- they can be denied.
24        Q.   -- of -- of committing an offense --
25        A.   We discussed that.
```

276

```
 1        MR. YALOWITZ:  Let him ask his question.
 2        THE WITNESS:  Sorry. Apologies.
 3        Q.   BY MR. SATIN:  From the time of arrest --
 4        MR. YALOWITZ:  And let me just -- I apologize
 5   for interrupting. But I'm -- I'm trying to help the
 6   reporter and you, Counsel, to get a clean record.
 7        (Partial pending question read.)
 8        MR. YALOWITZ:  Why don't you start over.
 9        Q.   BY MR. SATIN:  Okay. During the period of
10   detention post arrest, prior to being brought to
11   court, a defendant does not have access to counsel?
12        A.   That's a generalization. There is power
13   to deny access of a defendant to his counsel. And
14   we discussed that earlier.
15        Q.   Mr. Sfard writes in his report that, because
16   the defendants are kept in prisons inside Israel, many
17   Palestinian attorneys may not be able to visit their
18   clients.
19             Do you remember that?
20        A.   I remember that.
21        Q.   And in response, you write:
22             "Most of the counsel involved in the cases
23   which I examined are resident in Israel."
24        A.   I have seen --
25        Q.   My question is just: Did you say that --
```

1    A.    Yes.

2    Q.    -- in your report?

3          Do you know what percentage of defense

4    attorneys practicing in the Israeli military court

5    system are residents of Israel?

6    A.    I do not know what percentage of attorneys

7    practicing in the military courts in general are

8    resident in Israel.  I do know that -- I believe that

9    most, if not all, of the attorneys involved in the cases

10   which I examined, the 21 cases, are residents of Israel

11   in the sense that they have their offices in Israel.

12   That was --

13   Q.    Do you know how often -- sorry.

14   A.    And that's on the basis of searching the

15   Israel Bar Association records.

16   Q.    You said, if I understand correctly, before

17   in your report that it was most of them.

18         Now you're saying that it's all of them?

19   A.    Most of them.  Okay.

20   Q.    Which are the ones that are not?

21   A.    I can't remember.  I think most, if not all.

22   Q.    Well, you can't say whether the non-resident

23   ones had regular access to their clients, can you?

24   A.    I don't believe that there was a problem of

25   not having access to the clients in the 21 cases that

1    presumptions to support your conclusions; correct?

2    A.    I relied on the facts to support my

3    conclusions of what I'd seen in the transcripts.

4    Q.    Well, what is the fact that you're relying

5    on here?

6    A.    Let me refresh my memory to the summary of

7    the case you're referring to.  (Examining.)

8          Well, it's based on the fact that defense

9    counsel agreed to submit all the evidence and to

10   the fact that -- based on the fact that the defendant

11   chose not to give evidence, yet admitted most of the

12   facts of the indictment, bar the two reservations

13   which I set out.

14   Q.    So you're making assumptions about the

15   tactical decisions of the lawyer; correct?

16   A.    I'm making conclusions based on what I

17   presume fairly to be the defense counsel's legitimate

18   strategy.

19   Q.    Not having ever spoken to the lawyer; correct?

20   A.    I did not speak to the lawyer.  And I told

21   you that earlier.

22   Q.    And from this record, it's clear that that

23   lawyer --

24   A.    I didn't think it appropriate to speak to

25   the lawyer.

1    I examined.

2    Q.    Do you have any information about how

3    often the lawyers visited their clients in detention

4    facilities?

5    A.    No, I don't.

6    Q.    Would you agree it's just pure speculation

7    on your part to make the claim that there were no

8    problems of access to defendants?

9          MR. YALOWITZ:  Objection.  Lacks foundation.

10         THE WITNESS:  I have no reason to believe that

11   they didn't visit their clients in detention facilities.

12   Q.  BY MR. SATIN:  You write in Case No. 21,

13   on page --

14   A.    Thirty-one.

15   Q.    -- 31 -- for Case 21 --

16   A.    Yes.

17   Q.    -- you say:

18         "It is reasonable to presume that defense

19   counsel's arguments, although ultimately unsuccessful,

20   were necessitated by the exigencies of the evidence."

21         You don't explain, though, why the arguments

22   were necessitated by the exigencies of the evidence;

23   correct?

24   A.    No, I did not.

25   Q.    And this statement shows that you rely on

1    Q.    And --

2    A.    Because then you would have fairly and quite

3    rightly asked me:  Did I speak to the prosecution?  And

4    then I could have spoken to the judges.  There would

5    have been no end to the matter.

6    Q.    Well, when you set out to do this work, did

7    you have an eye on getting it right or about how you

8    were going to respond to defense counsel's questions?

9    A.    I had an eye on fulfilling my mandate --

10   fulfilling my mandate to the best of my ability.

11   And my mandate was to examine the court transcripts

12   which were given to me and to give my opinion, based

13   on those transcripts, whether or not due process was

14   observed.

15         I was satisfied that due process was observed

16   after reviewing those transcripts.  And I was satisfied,

17   although this wasn't part of my technical mandate, that

18   no one was convicted of something that he did not do.

19   Q.    Fair to say, on Case No. 21, you have no idea

20   of what the exigencies of the evidence were?

21   A.    The exigencies of the evidence was the

22   evidence that was submitted to the court by agreement

23   of defense counsel and the fact that the defendant

24   pleaded guilty to most of the facts contained in the

25   indictment.

281

1    Q.   What's the exigency?

2    A.   That's what I meant by the exigencies of

3    the evidence.  The -- the situation presented by the

4    evidence which was admitted to the court.

5    Q.   You also said just below this:

6         "Although I am not aware of the exact

7    duties that the defendant may have performed in such

8    a capacity, I assume that were he to have believed

9    that his rights and interests were being infringed

10   at ... he would have notified such to the court

11   through his counsel.  (As read.)

12   A.   That is a presumption, and that is an

13   assumption.  Because I don't know what he was doing

14   in his role as a legal advisor to the Palestinian

15   Authority.  But then he's a legal advisor.  And one

16   would assume that he has more knowledge concerning

17   legal rights and interests than a reasonable individual

18   from the street.

19        MR. YALOWITZ:  I'm -- I'm sure that counsel

20   will stipulate that legal advisors to the Palestinian

21   Authority are competent.

22        MR. HILL:  You know, Kent, please don't do

23   that.  It's not appropriate.

24        MR. YALOWITZ:  Please don't -- please don't --

25        MR. HILL:  I don't want to take up time

OCTOBER 20, 2013 - NICK KAUFMAN

282

1    on the record.  But your --

2         MR. YALOWITZ:  Please don't --

3         MR. HILL:  Your comments during the

4    examination are not appropriate.  You need to curtail

5    them, please.

6         MR. YALOWITZ:  You're -- please don't bicker.

7    It's not appropriate.

8    Q.   BY MR. SATIN:  In Case 20, just above

9    that, Mr. Kaufman --

10   A.   Yeah.

11   Q.   -- you say:

12        "Indeed, after consulting his lawyer -

13   who had offered him extremely fine representation -

14   the defendant voluntarily pled guilty to an amended

15   indictment."

16        That's what it says; correct?

17   A.   Yes.  That's what it does indeed.

18   Q.   Your statement that the lawyer had offered

19   him extremely fine representation, you don't state in

20   your report the basis for that opinion?

21   A.   No.  But if you give me the case file, I'm

22   prepared to review it here and now.  It might take

23   me a bit of time, I'm afraid.  But I can give you my

24   reasons for reaching that conclusion.  I'm sure that

25   if I have to give testimony in the United States in

OCTOBER 20, 2013 - NICK KAUFMAN

283

1    due course, I will be prepared to give an answer to

2    that.

3    Q.   Were you informed, when you started your

4    work in this case, that when you produced your report,

5    you should explain the basis for your opinions, not

6    simply give your opinions?

7         MR. YALOWITZ:  Objection.

8         You know what?  Don't answer that question.

9    Q.   BY MR. SATIN:  Did you believe, in your

10   mind, that you should provide the basis for your

11   opinions in writing your report?

12   A.   I have already confirmed to you what my

13   mandate was.

14   Q.   My question --

15   A.   I did my best to conform to that mandate.

16   Q.   My question is:  Did you believe that it

17   was your responsibility to explain the basis for your

18   opinions in your report?

19   A.   Yes, I do.  And if you're referring to Case

20   No. 20 as being a lapse, well, then yes, even Homer

21   nods.

22        MR. SATIN:  Why don't we take a five-minute

23   break.  We might be just about done.  And then we

24   will --

25        MR. YALOWITZ:  Before we go off the record,

OCTOBER 20, 2013 - NICK KAUFMAN

284

1    I just -- I just want to say one thing with regard to

2    Exhibit 408, which is the document that has every other

3    page.  During the course of the day, we asked somebody

4    at the -- back at the office to check on that document.

5    And it appears that we made -- we, the lawyers for

6    the plaintiffs, made a scanning error.  And we will

7    reproduce the complete document.  So we apologize for

8    that.

9         MR. HILL:  Okay.  Off the record.

10        (Recess from 4:46 p.m. to 4:52 p.m.)

11   Q.   BY MR. SATIN:  I have no more questions.

12   A.   Thank you.

13   Q.   But before we -- before we finish, you had

14   requested previously to see the complete files and

15   records.  We have all of them, at least the ones that

16   were produced by plaintiffs, on an iPad.  We're willing

17   to give them to you now to review them off the record,

18   so you can take as much time as you'd like.  And then

19   we can come back tonight or tomorrow and -- so you can

20   modify your answers if you'd like.

21   A.   Well, my comment on that is I think it's

22   a very unfair thing to suggest at this late stage,

23   knowing full well, as you do, that I have to leave

24   early tomorrow morning for a flight.  And I have

25   told you on a number of occasions throughout today

OCTOBER 20, 2013 - NICK KAUFMAN

285

1    that I have to pack my bags and be ready to leave.
2            I asked you throughout the hearing today
3    to present me with the files.  And you deliberately
4    refused to do so.
5            MR. HILL:  We'd be willing to hold the
6    witness' open -- deposition open and reconvene on
7    another date when he's had an opportunity to review
8    the material.  If Mr. Yalowitz would like to enter
9    into such a stipulation, I'm prepared to do so.
10           MR. YALOWITZ:  We'll take your suggestion
11   under advisement.  I have a couple of follow-up
12   questions, if you're ready to pass the witness.
13           MR. SATIN:  Sure.
14
15                   EXAMINATION
16   BY MR. YALOWITZ:
17      Q.   Mr. Satin asked you a great number of
18   questions about ISS files -- GSS files.
19           Do you recall that topic being touched
20   upon from time to time?
21      A.   Yes, I do.
22      Q.   Now, do you think there is a lawyer who
23   appears in the Israeli military court system who is
24   unaware of the existence of GSS files?
25           MR. SATIN:  Objection.  Calls for speculation.

                OCTOBER 20, 2013 - NICK KAUFMAN

286

1            THE WITNESS:  I'm not familiar with any such
2    lawyer.
3       Q.   BY MR. YALOWITZ:  Is it fair to say that,
4    among counsel, the existence of GSS files is common
5    knowledge in your experience?
6       A.   Yes, absolutely, sir.
7       Q.   Now, you were asked some questions about
8    immunity certificates.  And I just wanted to ask you
9    one follow-up about that.
10           If -- if the -- in the review process
11   for taking on an immunity certificate, is the court
12   required to examine the file to determine whether
13   there is exculpatory evidence that's being withheld?
14      A.   Yes, it is.
15      Q.   And if a court determines that exculpatory
16   evidence is being withheld, what happens?
17      A.   What happens and has happened, in my
18   experience, especially when the prosecution or
19   investigatory authorities make a cardinal mistake
20   involving their sources or leaving them at the
21   scene of the crime, is that the judge will order
22   that exculpatory information to be disclosed to the
23   defense.
24           Then the prosecution's faced with either
25   disclosing that information and burning their sources,

                OCTOBER 20, 2013 - NICK KAUFMAN

287

1    or damaging the interests which are protected by
2    that immunity certificate, or basically withdrawing
3    the indictment.
4            And I have been witness to a number of
5    cases where an indictment has been withdrawn because,
6    on a challenge to an immunity certificate, the judge
7    has given the order for that exculpatory information
8    to be disclosed.  I'm sure that Mr. Sfard has been in
9    a similar situation as well and probably uses it, like
10   I did, as a defense tactic.
11      Q.   Speaking of Mr. Sfard, there was a comment
12   that you made early on today about Israelis being
13   tried in -- in the civil court system or something
14   like that.  And you said you agreed with Mr. Sfard's
15   views.  And I thought that the transcript was a little
16   vague on that point.
17           Would you be -- do -- first of all, do you
18   recall that conversation?
19      A.   Yes, I do.
20           MR. SATIN:  Objection to the form of the
21   question.
22           THE WITNESS:  I remember.  I mean, Mr. Sfard
23   was making a distinction between the Israeli civilian
24   courts and the Israeli military courts as to various
25   time periods in which defendants or accuses could be

                OCTOBER 20, 2013 - NICK KAUFMAN

288

1    held in custody prior to being put before a judge and
2    the time periods where they may be denied access to
3    counsel.
4            There is disproportion between the two
5    jurisdictions.  And when I said I agree with Attorney
6    Sfard, it was to that I was referring.
7       Q.   BY MR. YALOWITZ:  The last thing I want to
8    ask you about is the question of conflicts.
9            Do you recall Mr. Satin asked you a number
10   of questions about representing multiple defendants
11   in a single case?
12      A.   Yes.
13      Q.   Now, is it permitted for clients to elect
14   to pursue a joint defense strategy where they of their
15   own free will decide, not withstanding the conflicts or
16   even the risk of conflicts, that they'll stick together
17   and try to mount a defense together?
18      A.   There's nothing that prevents that.
19      Q.   All right.  Thank you.
20           MR. SATIN:  I have one follow-up.
21
22                   FURTHER EXAMINATION
23   BY MR. SATIN:
24      Q.   You don't have any information that the
25   defendants in these case -- cases specifically decided

                OCTOBER 20, 2013 - NICK KAUFMAN

289

```
1   to engage in a joint representation, do you?
2       A.   There's nothing on the court transcripts
3   that suggests that to me.  No.
4            MR. SATIN:  I'm done.
5            MR. YALOWITZ:  Okay.  We'll read and sign.
6            (The deposition concluded at 4:58 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

OCTOBER 20, 2013 - NICK KAUFMAN

291

```
1                CERTIFICATE OF WITNESS/DEPONENT
2
3            I, NICK KAUFMAN, witness herein, do
4   hereby certify and declare the within and foregoing
5   transcription to be my examination under oath in said
6   action taken on October 20, 2013, with the exception
7   of the changes listed on the errata sheet, if any;
8            That I have read, corrected, and do hereby
9   affix my signature under penalty of perjury to said
10  examination under oath.
11
12
13
14
15  _____   _____
16       NICK KAUFMAN, Witness        Date
17
18
19
20
21
22
23
24
25
```

OCTOBER 20, 2013 - NICK KAUFMAN

290

```
1                CERTIFICATE OF REPORTER
2
3            I, BRENDA MATZOV, CA CSR No. 9243, do hereby
4   certify:
5            That, prior to being examined, the witness
6   named in the foregoing deposition was duly sworn by me
7   to testify the truth, the whole truth, and nothing but
8   the truth;
9            That the foregoing deposition was taken before
10  me at the time and place herein set forth, at which time
11  the aforesaid proceedings were stenographically recorded
12  by me and thereafter transcribed by me;
13           That the foregoing transcript, as typed, is a
14  true record of the said proceedings;
15           And I further certify that I am not interested
16  in the action.
17
18           Dated this 8th day of December, 2013.
19
20  _____
21       BRENDA MATZOV, CA CSR No. 9243
22
23
24
25
```

OCTOBER 20, 2013 - NICK KAUFMAN

292

```
1                     ERRATA SHEET
2   Case:     MARK I. SOKOLOW, et al. vs. THE PALESTINE
3             LIBERATION ORGANIZATION, et al.
4   Date:     OCTOBER 20, 2013
5   Witness:  NICK KAUFMAN
6
7   Page _____ Line _____ Change _____
8   Reason _____
9   Page _____ Line _____ Change _____
10  Reason _____
11  Page _____ Line _____ Change _____
12  Reason _____
13  Page _____ Line _____ Change _____
14  Reason _____
15  Page _____ Line _____ Change _____
16  Reason _____
17  Page _____ Line _____ Change _____
18  Reason _____
19  Page _____ Line _____ Change _____
20  Reason _____
21  Page _____ Line _____ Change _____
22  Reason _____
23
24  _____   _____
         NICK KAUFMAN, Witness        Date
25
```

OCTOBER 20, 2013 - NICK KAUFMAN