# Exhibit 36



# BACKYARD PROCEEDINGS

THE IMPLEMENTATION OF DUE PROCESS RIGHTS IN THE
MILITARY COURTS IN THE OCCUPIED TERRITORIES

יש דין
Yesh Din يش دين
Volunteers for Human Rights

December 2007

# BACKYARD PROCEEDINGS

## THE IMPLEMENTATION OF DUE PROCESS RIGHTS IN THE MILITARY COURTS IN THE OCCUPIED TERRITORIES



**December 2007**



Public Council: Shulamit Aloni, Michael Ben Yair, Shlomo Gazit, Rut Dayan, Michal Smoira-Cohn, Shlomo Lahat, Paul Kedar, Yair Rotlevy.

Yesh Din Volunteers: Hanna Aviram, Yehudit Elkana, Rachel Afek, Maya Bailey, Ruth Ben Shaul, Hanna Barag, Dina Goor, Tami Gross, Mooky Dagan, Avner Harari, Tair Zvulun, Rohaleh Hayut, Judy Lotz, Varda Laserson, Monique Lieberman, Roi Maor, Menucha Moravitz, Prof. Joseph Morin, Racheli Merhav, Anat Sela, Niva Inbar, Yvonne Fatyal, Michal Pundak, Rina Plesser, Ruth Kedar, Edna Kaldor, Maya Rothschild, Dr. Nura Resh, Ilana Meki Shapiro, Dr. Tzvia Shapira.

Volunteer coordinator: Yudit Avi Dor
Palestinian field contact and coordinator: Azmi Bdeir

Yesh Din's activity in 2007 was made possible thanks to the support of the Foreign and Commonwealth Office – United Kingdom, Foundation Open Society Institute, the Government of the Netherlands, the Moriah Fund, the Mark Rich Foundation, the Naomi and Nehemiah Cohen Foundation, the New Israel Fund and private donors.

Legal council: Michael Sfard Law Office
Professional and strategic consulting, information systems, research, press and government relations: Ben Or Consulting Ltd.

Yesh Din – Volunteers for Human Rights | 11 Rothschild Blvd | Tel Aviv, 66881 | Telefax: 03-516-8563 | info@yesh-din.org | www.yesh-din.org

Research and writing: Lior Yavne
Editor: Michael Sfard, Attorney
Project manager and coordinator of observation data: Emily Schaeffer

Courtroom Observation: Yudit Avi Dor, Hanna Aviram, Yehudit Elkana, Maya Bailey, Keren Ben Dov, Ruth Ben Shaul, Hanna Barag, Nirit Bregman, Judy Lotz, Monique Lieberman, Roi Maor, Anat Sela, Niva Inbar, Yvonne Fattal, Rina Plesser, Edna Kaldor, Maya Rothschild, Dr. Nura Resh, Ilana Meki Shapiro, Dr. Tzvia Shapira.

Advisory legal committee: Michael Ben Yair, Prof. Orna Ben Naftali, Dr. Amir Paz-Fuchs, Atty. Talia Sasson.

English translation: Shoshana London Sappir with Mike Rogoff, Sharon Neeman, Gideon Remez, Michael Sappir, Shaul Vardi and Marsha Brown
English translation of IDF response: IDF
English editor: Emily Schaeffer

Photography: Nir Keidar
Design: Berkowitz and Weinheber Studio

Cover photo: Hearing in Gaza Military Court, August 1967 (photography: Moshe Milner, Government Press Office).

Yesh Din wishes to thank:
· The organization's volunteers for their tireless efforts conducting observations in the Military Courts.
· The defense Attorneys who appear in the Military Courts, who willingly answered our questions.
· Lila Margalit and Sigal Shahab from the Association for Civil Rights in Israel.
· Lt. Col. Eyal Samueloff, Major Zohar Levy, Captain Rinat Hameiri, PAO Ron Roman from the Israel Defense Forces (IDF) Spokesperson's division, who provided data and answers to our questions.

© All rights reserved to Yesh Din – Volunteers for Human Rights, Tel Aviv, 2007.

# Table of Contents

| ACRONYMS | 10 |
| --- | --- |

| SUMMARY OF FINDINGS AND RECOMMENDATIONS | 11 |
| --- | --- |

| INTRODUCTION | 25 |
| --- | --- |

| CHAPTER A: THE MILITARY COURT SYSTEM IN THE OCCUPIED TERRITORIES: BACKGROUND | 31 |
| --- | --- |
| 01 THE LEGAL POWER TO ESTABLISH MILITARY COURTS IN OCCUPIED TERRITORY | 31 |
| 02 THE HISTORY OF THE MILITARY COURTS IN THE OCCUPIED TERRITORIES | 35 |
| (a) Establishment | 35 |
| (b) Principal developments | 37 |
| (c) Distribution | 39 |
| 03 THE SCOPE OF ACTIVITY OF THE MILITARY COURTS | 41 |

| CHAPTER B: THE STRUCTURE OF THE LEGAL SYSTEM IN THE OCCUPIED TERRITORIES | 45 |
| --- | --- |
| 01 JURISDICTION | 45 |
| 02 JUDGES | 47 |
| 03 PROSECUTORS | 51 |





| 04 | DEFENSE ATTORNEYS | 55 |
|----|-------------------|----|

| 05 | DEFENDANTS | 56 |

| 06 | CONDITIONS IN THE MILITARY COURTS | 59 |

**CHAPTER C: DUE PROCESS RIGHTS IN THE MILITARY COURTS   67**

| 01 | PRESUMPTION OF INNOCENCE | | 68 |
|----|--|---|----|
| | (a) | International legal standards | 68 |
| | (b) | Security Legislation | 69 |
| | (c) | The presumption of innocence in the Military Courts | 69 |
| | (d) | Conclusion | 75 |
| | (e) | Recommendations | 76 |

| 02 | THE RIGHT TO A PUBLIC TRIAL | | 79 |
|----|--|---|----|
| | (a) | International legal standards | 79 |
| | (b) | Security Legislation | 81 |
| | (c) | Military Court procedures | 82 |
| | (d) | Access to the courts | 82 |
| | (e) | Publication of judgments | 85 |
| | (f) | Conclusion | 87 |
| | (g) | Recommendations | 89 |

| 03 | THE RIGHT TO BE NOTIFIED OF THE CHARGES | | 92 |
|----|--|---|----|
| | (a) | International legal standards | 92 |
| | (b) | Security Legislation | 93 |
| | (c) | Practical application of the rules concerning informing the accused of the charges against him | 93 |
| | (d) | Results of regulations concerning indictments | 95 |
| | (e) | Conclusion | 97 |
| | (f) | Recommendations | 98 |

| 04 | THE RIGHT TO THE ASSISTANCE OF COUNSEL AND THE RIGHT TO PREPARE AN EFFECTIVE DEFENSE | | 100 |
|----|--|---|----|
| | (a) | International legal standards | 100 |
| | (b) | Security Legislation | 102 |

|     | (c) | Unrepresented defendants | 104 |
|     | (d) | The appointment of an attorney: Palestinian NGOs as public defenders | 104 |
|     | (e) | Meeting with an attorney | 107 |
|     | (f) | Palestinian attorneys | 108 |
|     | (g) | Conditions of the meetings | 109 |
|     | (h) | Preventing attorney-client meetings | 111 |
|     | (i) | Detention hearings | 113 |
|     | (j) | Copying investigation material | 115 |
|     | (k) | Language of investigation material | 116 |
|     | (l) | The defendant's presence at the hearing | 116 |
|     | (m) | Access to judgments and legislation | 118 |
|     | (n) | Conclusion | 121 |
|     | (o) | Recommendations | 122 |
| 05  |     | **THE RIGHT TO TRIAL WITHOUT UNDUE DELAY** | **126** |
|     | (a) | International legal standards | 126 |
|     | (b) | Security Legislation | 127 |
|     | (c) | The prolonging of proceedings in Military Courts | 128 |
|     | (d) | The duration of detention until the end of proceedings | 130 |
|     | (e) | Conclusion | 131 |
|     | (f) | Recommendations | 133 |
| 06  |     | **THE RIGHT TO PLEA AND PRESENT EVIDENCE** | **135** |
|     | (a) | International legal standards | 135 |
|     | (b) | Security Legislation | 135 |
|     | (c) | Plea bargains as a substitute for the right to plea | 136 |
|     | (d) | Conclusion | 141 |
| 07  |     | **INTERPRETATION** | **144** |
|     | (a) | International legal standards | 144 |
|     | (b) | Security Legislation | 144 |
|     | (c) | Military Court procedures | 145 |
|     | (d) | Interpreters in the Military Courts | 145 |
|     | (e) | Interpreter training | 146 |
|     | (f) | The role of the interpreters: maintaining order | 147 |
|     | (g) | The volume and quality of interpretation | 148 |
|     | (h) | Conclusion | 151 |
|     | (i) | Recommendations | 152 |



| 08 | **MINORS** | | 154 |
|---|---|---|---|
| | (a) | International legal standards | 154 |
| | (b) | Security Legislation | 155 |
| | (c) | Military Court procedures | 156 |
| | (d) | Proportion of minors' trials at the Military Courts | 156 |
| | (e) | Training of prosecutors and judges to adjudicate minors | 158 |
| | (f) | Separation from adult defendants | 158 |
| | (g) | Release from detention | 159 |
| | (h) | Consideration of minority | 160 |
| | (i) | Punishment | 160 |
| | (j) | Closing doors | 161 |
| | (k) | Conclusion | 162 |
| | (l) | Recommendations | 162 |

## CONCLUSIONS 164

## APPENDICES 167

Appendix 1: Israel Prison Service response — 168
Appendix 2: Order concerning the establishment of military courts — 172
Appendix 3: Procedural rules in the Military Courts — 173
Appendix 4: Standing orders for interpreters – not a word about interpreting — 176
Appendix 5: Extension of detention hearings in the Military Courts, 2000-2006 — 178
Appendix 6: Indictments filed for offenses of Hostile Terrorist Activity category, 1998-2006 — 179
Appendix 7: Fines imposed in the Military Courts, 2002-2006 — 180
Appendix 8: The number of detainees held under administrative detention in the month of December, 2001-2006 — 181

## TABLES

Table 1: Indictments filed in the West Bank and the Gaza Strip, divided into categories, 2002-2006 — 42
Table 2: Administrative detention orders and administrative detention extension orders, 2004-2006 — 54

Table 3: Acquittals and convictions in the Military Courts, 2006                    70
Table 4: Timing of hearings on extension of detention until the end of proceedings
        that were attended by Yesh Din observers                                   72
Table 5: Comparison between maximum periods of detention of suspects and
        defendants in Israeli law and Security Legislation in the West Bank       128
Table 6: Minors above and below the age of 16 held under detention or i
        ncarcerated by IDF and IPS, 2005-2007                                     157
Table 7: The proportion of minors under the age of 18 among confined persons
        detained and imprisoned by the IDF and IPS, 2001-2007                     157

## CHARTS

Chart 1: Structure of the Military Court system, 2007                              40
Chart 2: Indictments filed in the West Bank and the Gaza Strip,
        divided into categories, 2002-2006                                        43
Chart 3: Percentage of charges of murder and attempted murder in
        the indictments filed before the Military Courts, 2004-2006               44
Chart 4: Prolonging of proceedings: Defendants in the Military Courts
        under detention until the end of proceedings                             130
Chart 5: Extent of interpretation at hearings monitored by Yesh Din              149



# ACRONYMS

| | |
|---|---|
| ACHPR | African Charter on Human and Peoples' Rights |
| ACHR | American Convention on Human Rights |
| ECHR | European Convention for the Protection of Human Rights and Fundamental Freedoms |
| GSS | General Security Service (also known as Shin-Bet or Israel Security Agency) |
| HCJ | High Court of Justice |
| ICRC | International Committee of the Red Cross |
| ICCPR | International Covenant on Civil and Political Rights |
| IDF | Israel Defense Forces |
| IPS | Israel Prison Service |
| OCSP | Order Concerning Security Provisions |
| OT | Occupied Territories |
| MAG | Military Advocate General |
| MAGHQ | Military Advocate General's Corps Headquarters |
| MAG JSA | Military Advocate General corps in the West Bank (Judea and Samaria Area) |
| MCU | IDF Military Courts Unit (in the Occupied Territories) |

# SUMMARY OF FINDINGS
# & RECOMMENDATIONS

Since the occupation of the Palestinian Territories in 1967, and to this day, Palestinian civilians charged with security-related and other criminal offenses are tried by the Israeli Defense Forces (IDF) in the military court system in the Occupied Territories. More than 150,000 Palestinians have been prosecuted in these courts since 1990, and about half the prisoners currently being held in Israel were sent to prison by the Military Courts.

Nonetheless, the military judicial system in the Occupied Territories (OT) has acted under a veil of almost complete darkness until now. Few studies and publications have examined its activities, and it is subject to very lax internal supervision. Yesh Din's report, Backyard Proceedings, aims to fill this void.

The report examines one particular aspect of what takes place in the Military Courts: the extent to which due process rights are observed in the Military Courts of first instance. Due process rights in criminal law constitute an essential part of an assortment, or "bundle of rights", granted to all defendants, suspects and detainees, and generally known as the right to a fair trial. Due process rights ensure that every defendant standing trial – in any court – is granted the means to defend against the charges brought against him. These means include, *inter alia*, the rights to understand the charges brought against him, to present a full defense, to have the effective assistance of counsel, to interrogate witnesses, and several other rights regarded as 'procedural' rights, relevant to the establishment of conditions for a fair trial. In their absence, there can be no just trial, and, likewise, their violation increases the risk of miscarriage of justice.

Based on over 800 courtroom observations conducted by Yesh Din volunteers in the Samaria and Judea Military Courts serving the West Bank, data received from the IDF, interviews of Military Courts personnel and defense attorneys, and additional research, the report uncovers a series of severe shortcomings and failures in the implementation of due process rights in the military judicial system operating in the OT.

11



# THE MILITARY JUDICIAL SYSTEM IN THE OCCUPIED TERRITORIES: BACKGROUND AND STRUCTURE

The authority of an Occupying Power to establish military courts in the occupied territory in which it may prosecute local residents is based on the provisions of Article 66 of the Fourth Geneva Convention and encompasses offenses in matters of security and public order. Other articles of the Fourth Geneva Convention, as well as those of other treaties constituting the law of armed conflict, the law of belligerent occupation and international human rights law, set forth the minimum standards that will ensure the existence of due process in these courts.

The military regulations enacted by the IDF in the Occupied Territories grant the courts extra-territorial jurisdiction that enables them to try any person – resident or non-resident of the OT – for any offense, whether committed in the OT or not. The judges there are military officers in regular or reserve service; the prosecutors are officers of the Military Advocate General, some of them not yet certified lawyers by the Israeli Bar Association; the defense attorneys consist of a few dozen lawyers, Israeli and Palestinian; and, the defendants are Palestinian civilians – both minors and adults. Israeli citizens are not tried in these courts, though the Military Courts are granted full jurisdiction over them.

Tens of thousands of proceedings take place in the Military Courts every year, in which thousands of indictments, covering a vast range of issues, are filed: ranging from distinct security-related offenses, to regular criminal offenses, and even traffic violations. In the years 2002-2006 the Military Prosecution filed more than 43,000 indictments to the courts, about a third of which were for security-related offenses (HTA – Hostile Terrorist Activity). Even so, only five percent of the indictments filed during that time charged the defendant with murder (one percent) or attempted murder (four percent).

The military judicial system currently operates in two first instance courts, together with a military court of appeals, as well as an administrative detention court operating in the Ofer military base near Ramallah and in Ketzi'ot prison in Southern Israel. The bulk of the military court system's activities take place in the two Military Courts of first instance – the Samaria Military Court, located in the Salem military base in the northern West Bank, and the Judea Military Court, located in the Ofer military base near Ramallah. These courts also operate four courtrooms dedicated to detention hearings, constituting 'branches' of the courts within the boundaries of Israel in: Jalame junction, Petach-Tikva, Jerusalem and Ashkelon.

# DUE PROCESS RIGHTS IN THE MILITARY COURTS

## PRESUMPTION OF INNOCENCE

The presumption of innocence is the principle stating that a person is presumed innocent until proven guilty beyond any reasonable doubt. From the outset, the adjudication of civilians suspected of involvement in actions against the IDF and/or the State of Israel by an Israeli military court is problematic in this regard. Military officers sitting in judgment cannot dissociate themselves from their identity, both as Israelis and as Military personnel, when adjudicating those perceived to be their enemies – persons allegedly involved in activities of militant Palestinian organizations.

Security Legislation remains silent regarding the presumption of innocence in military courts. Nevertheless, data provided by the Military Courts Unit itself provides a clear indication of the extent to which the presumption of innocence is followed: of 9,123 cases concluded in the Military Courts in the year 2006, only in 23 cases – which constitute 0.29% of the rulings – was the defendant found to be entirely not guilty.

Further indications of the presumption of innocence in the military courts can be found in data relating to the release of detainees from custody (prior to the filing of an indictment): in 118 detention hearings in which Yesh Din observers were present, only one person was released. Each of these detention hearings, in which a suspect's detention was extended by 10.2 days on average, lasted an average of only three minutes and four seconds. Thus, the detention of suspects brought before the Military Courts is almost always extended, in hearings that are concluded in a matter of minutes. Hearings to authorize "detetntion until the end of proceedings" (which may extend for more than a year or even two) took even less time: one minute and 54 seconds, on average. In each of the latter hearings, where Yesh Din observers were present, the Court granted the Prosecution's motion to extend the suspect's detetntion until the end of proceedings. Less than two minutes are required to send a person to detention until the conclusion of criminal proceedings. According to the IDF's data, by the end of 2006, two thirds of the defendants whose cases were still under deliberation in the Military Courts were held in detention.

13



## Recommendations:

**1.** The appointment of reservists without judicial background to the position of judges of the Military Courts must cease, and instead the IDF should appoint former judges, now in reserve service, as legislated for the IDF Courts-Martial.

**2.** The number of military judges presiding over detention proceedings, as well as the facilities where these hearings are held, should be modified such that defendants have sufficient opportunity to defend themselves against motions to extend their detention.

## THE RIGHT TO A PUBLIC TRIAL

The principle of holding a public trial is one of the fundamental principles on which the bundle of due process rights stands. In the absence of a public trial there can be no public scrutiny, and without public scrutiny concerns about miscarriage of justice grow. However, the right to a public trial is not absolute and all legal systems, including international law, acknowledge that in certain cases – limited in their nature – it may be restricted in favor of other interests, chiefly the protection of minors, national security, or cases in which the court deems a restriction of publicity will serve the interests of justice.

Although Security Legislation stipulates that sessions in Military Courts are public, severe restrictions are imposed on those wishing to enter the courts: the families of the defendants and detainees are allowed to send only two representatives to the proceedings concerning their relatives. Other members of the public who wish to watch the proceedings taking place in the Military Courts in the OT are required to submit an application in advance in order to secure the permission of a junior officer in the Military Courts Unit, who holds discretion to decide on the application. In fact, some of the detention hearings are held in the Military Courts' branches located within the borders of Israel. Due to the closure policy imposed on Palestinian residents of the OT, these hearings are completely inaccessible to Palestinians – even when they are family members of detainees and Palestinian defense attorneys. What is more, verdicts of the Military Courts are not published.

The *de facto* restrictions on the presence of the public in the Military Courts, combined with the lack of publicity of their verdicts, creates a legal system operating outside the public view and, therefore, substantially lacking public scrutiny.

14

BACKYARD PROCEEDINGS

## Recommendations:

**1.** Immediately close the branches of the Military Courts that are located within the State of Israel, and hold all Military Court deliberations within the OT.

**2.** Lift all restrictions on the presence of family members of defendants and detainees whose cases are brought before the Courts.

**3.** Regulate by procedure the entrance of an audience (not restricted to family members of the accused) to the Military Court hearings, without any need for prior approval whatsoever.

**4.** Adapt the Military Courtrooms' conditions and security arrangements to a larger audience.

**5.** Publish the judgments of the Military Courts, and translate them into Arabic and English.

## THE RIGHT TO BE NOTIFIED OF THE CHARGES

International law presents two main requirements regarding a defendant's right to be notified of the charges brought against him: the defendant must be informed of the details of the charges against him immediately and in a language he understands. Israeli Security Legislation on this matter ignores both these requirements.

Indictments are provided to defendants held in detention and to their attorneys only on the occasion of "detention until the end of proceedings" hearings – after the indictment has already been filed to the court – and are always provided in Hebrew only – a language typically neither spoken nor understood by the defendants and some of their attorneys. As a result, some attorneys are forced to seek someone in the courtroom to translate, for their clients and themselves, the charges against which they are to present a defense.

Special concern arises from the policy customary in the Samaria Court in recent years: demanding that the defendant respond at once to the prosecution's motion to detain until the end of proceedings, while denying motions for continuance to study the evidence. Thus the defense attorney is required to respond to the prosecution's motion without any knowledge as to the contents of the case against his client, and defense attorneys who do not read Hebrew are forced to rely on a rushed translation, by a chance person in the courtroom, of the principal issues in the detailed charge sheet.

15



The implication of the findings on this issue is that many defendants are not fully aware of the nature of the charges brought against them nor are they familiar with the details. This is especially true regarding defendants whose defense attorneys are not proficient in the Hebrew language. Hundreds of defendants are thus held under detention until the end of proceedings, although a serious and comprehensive hearing regarding the fulfillment of conditions warranting such detention has not taken place.

## Recommendations:

**1.** The Samaria Court must cease from demanding a response to the request to detain the accused until the end of proceedings on the same day on which an indictment is received. Instead, the Court should postpone the deliberations to a date that will enable the defense attorney to study the indictment and investigation file and argue against detention until the end of proceedings, in accordance with his considered opinion and his client's desires.

**2.** All indictments served in the Military Courts must be translated into Arabic.

**3.** The indictment, translated into Arabic, must be sent immediately upon its completion, and at least 72 hours before the hearing on detention until the end of proceedings, both to the defendant (in the place in which he is detained or to his home) and to his attorney.

## **THE RIGHT TO COUNSEL AND THE EFFECTIVE ASSISTANCE OF COUNSEL**

Although the right to counsel and the right to effective assistance thereof are usually regarded as different rights, they are nonetheless interconnected: there is no point in hiring a defense attorney if the conditions that would enable him to adequately and effectively prepare his client's defense do not exist.

Yesh Din's observations in the military courtrooms show that the majority of defendants and detainees are represented by counsel. As a rule, the Military Commander – who is bound, in certain cases, to provide funding to destitute defendants for defense counsel – relies to a great extent on Palestinian associations providing a similar "public defender" type service to detainees and defendants in the Military Courts, but without financial contributions by the IDF.

Severe restrictions are imposed on a lawyer's ability to provide his clients with an effective defense: Palestinian lawyers are unable, in most cases, to visit clients incarcerated in Israel;

Israeli lawyers and those who are residents of East Jerusalem, who do have access to detention facilities in Israel, are frequently harassed when arriving at detention facilities and regularly experience conditions that discourage them from visiting their clients in preparing their defense and raise cause for concern regarding the violation of attorney-client privilege.

According to an estimate of a former military prosecutor, GSS (General Security Service or 'Shin Bet') investigators issue orders denying attorney-client meetings to about sixty percent of GSS-interrogated suspects, which may remain in effect for up to a month from the time of arrest; detention extensions are granted in many cases based on confidential material disclosed to the judge alone; and, after the filing of indictments, case material photocopied by the defense attorneys is almost entirely in Hebrew, a language not spoken by a large portion of them. In cases where GSS investigation material exists, a formal request occasionally yields the material's disclosure, and only after delay. All lawyers – both Israeli and Palestinian – are denied open access to current regulations and rulings, upon which they are to base their defense arguments and make practical considerations regarding the choices available to their clients and advise them accordingly.

Thus, even though the requirement that defendants are represented by counsel is formally satisfied, it is not substantially satisfied: the defendants and detainees brought to detention hearings in the Military Courts are unable to provide themselves, by proxy of their lawyers, the optimal legal defense to which they are entitled.

## Recommendations:

**1.** The IDF is to move Palestinian detainees and defendants to detention and incarceration facilities located within the boundaries of the West Bank, as required by international law.

**2.** Alternatively, and as long as the policy denying Palestinian civilians entry to Israel is in effect, the IDF must provide Palestinian lawyers with entry permits that will allow them to reach the locations in Israel where their clients, Palestinian detainees and defendants, are held. Denying such permits must be the exception rather than the rule, and must be done only in rare instances in which such denial cannot be avoided.

**3.** The IPS must amend its regulations so as to reduce the waiting time of attorneys at detention facilities to the minimum required.

**4.** Concerns regarding the use of listening devices in privileged attorney-client communications must be removed by disposing of the telephone receivers through

17



which these conversations are currently conducted, and an alternative means of enabling communication must be found, e.g. a mesh-screen.

5. Palestinian lawyers must be allowed to appoint agents to photocopy case material at the prosecution offices in the military courts.

6. The number of photocopy machines available to lawyers for the purpose of photocopying case material is to be increased, and the elimination of payment for photocopying should be considered.

7. Indictments and case material must be routinely translated into Arabic.

8. The military prosecution is to be instructed to permanently make GSS interrogation documents, together with the rest of the case material, available to defense counsel upon the filing of an indictment.

9. All judgments of the Military Courts, both at the first instance and appellate levels, must be published on a regular basis and made available. Such publication must appear, at the very least, in Arabic and Hebrew, and responsibility for its execution must be assigned to the MCU and not the Military Advocate General, which supervises the prosecutors.

10. The Security Legislation must be published on a regular basis with any amendments and updates, in Arabic and Hebrew, and in a way that is accessible to defense attorneys as well as the general public.

## THE RIGHT TO BE TRIED WITHOUT UNDUE DELAY

International law standards require that a defendant stand trial "promptly", "without undue delay" and within a reasonable time. The Military Courts are far from satisfying these requirements.

Security Legislation allows the detention of a suspect for eight days before bringing him before a judge and allows the judge to repeatedly extend a suspect's detention to an accumulative period of ninety days, and twice as long with the authorization of a military appellate judge. Security Legislation imposes no limitation as to the period a person may be held in detention from the time the investigation is completed to the time of filing an indictment, nor does it limit the period a person may be held in detention from the time an

18

indictment is filed until proceedings in the matter commence. The only stipulation regarding detention after the filing of an indictment is that the trial must be concluded within two years from the time the indictment is filed (in contrast to a period of nine months in Israeli domestic courts); here, the right is also granted to a military appellate judge to extend the defendant's detention for as long as the trial is pending.

The result is prolonged legal proceedings. Yesh Din observers documented the period of time between the hearings in which they were present and the next scheduled hearing in the case: the average time between the "detention until the end of proceedings" hearing and the arraignment (the first session of trial) was 61 days; the average time between the arraignment and the next session of trial was 51 days in average for defendants held in detention and 71 days for defendants not held in detention; and, the average time between each session in the 'post-arraignment' stages of the trial (reminder conferences, evidentiary hearings, handing down the verdict, etc.) for defendants held in detention was 52 days.

At the end of 2006, approximately 1,800 detainees were held in detention until the end of proceedings for periods of up to one year, and 189 detainees for periods longer than one year. The figures for the previous five years are even bleaker: at the end of 2001, 231 detainees were held in detention until the end of proceedings for periods of over one year (of these, 85 were held for more than two years); and at the end of 2004, 671 detainees were held in such detention for more than one year (of those, 78 were held for more than two years).

## Recommendations:

**1.** The Order Concerning Security Provisions is to be amended so as to significantly reduce periods of time allowed for detention during investigation and after the filing of indictments.

**2.** The Order Concerning Security Provisions must be amended such that it determines the maximum amount of time a person may remain in detention until the conclusion of the interrogation, the maximum time until the indictment is filed, the maximum time from the indictment until his arraignment, and the maximum time between court hearings.

**3.** Additional personnel must be immediately allocated to the Military Prosecution and the Military Courts in order to avoid prolonging the legal process, on the one hand, and pressure on defendants to accept a plea bargain with the Prosecution on the other.

19



## THE RIGHT TO PRESENT EVIDENCE AND WITNESSES

The proceedings of a trial from beginning to end – including the presentation of arguments, interrogation of witnesses, examination of evidence and presentation of closing argument – scarcely exist in the Military Courts. In 2006, for example, of the 9,123 cases concluded that year, only 130 cases – 1.42% of the cases concluded that year – were concluded after a full evidentiary stage consisting of the presentation of evidence and interrogation of witnesses. Instead, the Military Courts operate on a plea-bargain basis: according to the Chief Military Prosecutor, about 95% of the cases in the Military Courts conclude in plea-bargains.

The parties in the Military Courts are driven toward plea-bargains for a variety of reasons: Interrogation methods customary in the GSS, which, according to reports published by human rights organizations, include threats and physical measures, combined with the prohibition imposed on many detainees to consult their lawyer and receive legal advice during their interrogation, bring many of the defendants to court after confessing to actions attributed to them or after being incriminated by others; the considerable case load in the courts brings all parties involved – defense attorneys, prosecutors and judges – to view plea-bargains as the fast and efficient way to finish their work on a case; defense attorneys feel that conducting a full trial, including the summoning of witnesses and submission of evidence, usually brings along a penalty far more severe, a sort of 'punishment' inflicted by the court on a defendant who did not have the good sense to reach a plea-bargain; additionally, Palestinian defendants and their families tend to lack trust in the military judiciary system and thus prefer to reach a plea-bargain rather than leave the verdict in the hands of the judge.

As a consequence, plea-bargains have in effect replaced full legal proceedings in the Military Courts.

## INTERPRETATION

Despite the fact that the Military Courts in the Occupied Territories are designed to try Arabic-speaking civilians, proceedings in the courts are all conducted in Hebrew. In order to interpret the deliberations in the courtrooms to Arabic and to interpret the defendants' words to Hebrew, the Military Courts Unit maintains a staff of interpreters, most of which are soldiers in compulsory service.

20

According to Yesh Din's observers, many of the interpreters – if not the majority – seem to make an effort to perform their job properly. The IDF's choice to use cheap labor, composed mainly of soldiers in compulsory service and lacking any professional background, either as interpreters in general or specifically as legal interpreters, and thus learning their profession as they go, results in the interpretation being extremely unsatisfactory in both quality and scope. Yesh Din observers classified the scope of interpretation as provided by the interpreters in the courtrooms during hundreds of sessions. In 35% of the sessions the observer's impression was that the translation was "partial or sloppy" and in another five percent there was no interpretation at all.

Copies of a document, entitled "Standing Orders for Interpreters," signed by the Court's NCO, are posted on the Samaria courtroom walls. The document specifies the interpreters' duties before, during and after a day of court sessions. The 12 articles of the document describe at length the interpreters' functions regarding order in the courtroom – entry of detainees into court procedures, change of personnel between interpreters, courtroom cleanliness, etc. – yet there isn't a single reference to their duties relating to the interpretation work itself. The fact that the Military Courts Unit does not even have any written procedures and instructions relating to the interpretation of proceedings and translation of various documents (as admitted by the IDF Spokesperson) illustrates the contempt with which the military authorities view their obligation to ensure that a defendant brought to trial or a detainee brought to a detention hearing fully understand what transpires during the proceedings concerning his matter.

## Recommendations:

**1.** The Military Courts Unit must set clear professional procedures for interpretation in the courtrooms.

**2.** The use of regular soldiers as interpreters must cease, and professional interpreters must be employed, as is customary in courtrooms in the State of Israel.

**3.** Until regular soldiers functioning as interpreters are replaced by professional interpreters, the functions of attendant and interpreter are to be clearly separated, and no further soldiers enlisted for the purpose of serving as interpreters shall serve in this capacity until they have undergone a comprehensive professional course, as soon as possible after their enlistment.



## MINORS

Security Legislation regards Palestinians as minors only until the age of 16. Palestinians aged 16-18 are deemed adults and are tried accordingly. Moreover, according to these regulations, the sentence of a person who was a minor at the time of the offense shall be determined according to his age at the time of sentencing – and not according to his age the time of committing the offense.

The Military Courts Unit has no data regarding the number of minors tried in the system. However, in the years 2001-2006 minors (under 18 years of age) constituted four to six percent of all internees detained and imprisoned by the IDF and IPS, and one may assume that the volume of court activity in matters concerning them was similar.

International human rights law grants special protections to minors standing trial and emphasizes the need for special treatment, rehabilitative penalties, showing respect regarding their privacy, and thorough and continued training of officials coming in contact with them – judges, prosecutors, police officers and the like. The IDF has refrained from establishing a special juvenile court – as exists in Israel, for example – in the OT, and minors stand trial in the ordinary Military Courts, under the same framework of legal proceedings as adults; those prosecuting and judging them have no training in dealing with minors. The Military Courts have no "closed door" policy while deliberating matters concerning minors, although Security Legislation allows such a policy.

Yesh Din observers were present in 48 sessions concerning the matters of minors. Of these, the fact of a detainee or defendant being a minor was mentioned in only 13 sessions. This occurred, in nearly all cases, when the court included the defendant's age in explaining its considerations regarding a proposed plea-bargain.

## Recommendations:

1. Security Legislation is to be amended to the effect that a person is defined a minor until he is 18 years of age.

2. Sections 4 and 5 of the Order Concerning Adjudication of Juvenile Offenders are to be amended so that the determining date relating to the penalizing of minors shall be the time of committing the offense and not the time of sentencing.

**3.** The closing of courtroom doors during sessions in the matter of minors must be strictly observed.

**4.** Special juvenile courts are to be established, in which prosecutors and judges specially trained in juvenile matters and proceedings will serve.

**5.** Until the establishment of a juvenile court, absolute separation must exist between adults and minors in the military courtrooms.



# INTRODUCTION

Tens of thousands of Palestinians have stood trial in the Military Courts since they were established in 1967. A total figure of the number of people who stood trial since the beginning of the occupation is unavailable, but we know that from 1990 to the end of 2006 more than 150,000 Palestinians have stood trial in the Military Courts.[2] About half the prisoners currently being held in Israel Prison Service (IPS) facilities were tried by the Military Court system and not the "regular" Israeli court system.[3]

Despite the extensive volume of Military Court activity in the Occupied Territories (OT), for 40 years the military judicial system was subject to very lax public supervision. In 1989 Israeli human rights organization B'Tselem published the first report in Hebrew about the Military Courts,[4] and a few months later the organization issued a follow-up report.[5] In the annual State Comptroller's report for 1993 an entire chapter was devoted to the activity of the Military Prosecution and the Military Courts, with an emphasis on administrative shortcomings in their activity.[6] A full 13 years later, in October 2006, MachsomWatch published a report containing its volunteers' impressions from observations they held in the military courtrooms in the State of Israel on extension of detention hearings.[7] The number of reports issued to the public so far on the Military Courts in the OT is therefore very small.

---

1.  A distinction needs to be made between the Courts-Martial, where IDF soldiers are tried for criminal offenses, and the Military Courts, where civilians are tried. The latter are the subject of this report.

2.  The figure of "more than 124,000" defendants tried in the Military Courts in the years 1990-2003 appears in Netanel Benichou, On criminal law in the areas of Judea, Samaria and Gaza: a window and trends, (Hebrew), Law and Military 18 (5765-2004), p. 294, FN4. Figures collected by Yesh Din on the number of indictments filed in the Military Courts in the years 2004-2006 (see below) bring the number up to over 150,000.

3.  According to IPS figures, on August 19, 2007 there were 20,356 prisoners in IPS detention, of which 10,881 were classified as "criminal" prisoners and the other 9,475 (46% of all the prisoners) as "security" prisoners. The figures were provided in a phone conversation between Yesh Din and Yarona Linhart of the IPS Spokesperson's office on August 20, 2007. The vast majority of the prisoners classified as "security" prisoners were tried in the Military Courts. As will be presented below in this report a large portion of those tried in the Military Courts are prosecuted for offenses that are not classified as "security" offenses, and they too are sent to serve their sentences in IPS facilities.

4.  B'Tselem, The Military Judicial System In The West Bank (November 1989).

5.  B'Tselem, The Military Judicial System In The West Bank, Follow-Up Report (May 1990).

6.  State Comptroller, Annual Report 43 (April 1993) (Hebrew), pp. 870-878.

7.  MachsomWatch, In the Eyes of Justice: Observations at Military Courts in the State of Israel (October 2006) (Hebrew).



Even within the military system the extent of supervision of the Military Courts is limited. In a conversation with staff officers in the Military Courts Unit who have a direct bearing on the subject, they told Yesh Din that the courts are not subject to any organized review by IDF bodies and that the headquarters of the Military Courts Unit does not inspect the courts themselves. According to the officers there is no need for systematic inspections of the operation of the Military Courts because "any mishap that occurs – in summoning witnesses, defendants, etc. – is immediately discovered thanks to comments from the Prosecution or the Defense."[8] This means that even if specific defects are detected quickly and corrected, the IDF does not conduct any examination that could identify systemic failures in the operation of the Military Courts in the West Bank.

Petitions are occasionally filed to the High Court of Justice (HCJ) regarding decisions of the Military Court system in the OT. The HCJ's review in those petitions is limited to administrative causes (i.e., mainly questions of jurisdiction and reasonableness). In petitions of this sort the HCJ always stresses that the scope of its intervention is narrow and depends on evidence of an administrative defect in the Military Courts' operation. In the absence of research and regular, comprehensive review (by academics, civil society or others) of the ongoing activity of the Military Courts in the OT, chances are slim that petitioners will succeed in proving the existence of systemic defects in the general operations of the Military Courts (as opposed to specific defects in one hearing or another).

The Military Court system, the operations of which affect the lives of tens of thousands of Palestinian suspects and defendants, has therefore acted for many years under a veil of darkness, without anyone examining its activities comprehensively. This report aims to fill, at least to some extent, the dangerous void that has resulted from the lack of public supervision of this system.

The Military Courts Unit in the OT defines its mission as such: "To enforce law and order, by adjudicating defendants accused of committing security offenses or other criminal offenses, that were committed in the Area[9] or were meant to harm it, while ensuring due process and the delivery of justice."[10]

---

8.    The conversation took place in August 2007. The names of the officers are on file with Yesh Din.

9.    "Area" is the term the IDF uses in reference to the OT. For example, the West Bank is called "The Judea and Samaria Area," and the Gaza Strip, until IDF forces left the area in August 2005, was called "The Gaza Strip Area." The use of the terms "Area" and "Areas" (such as "the security of the area") is common in orders and other military documents referring to the OT.

10.   The military Courts Unit, Annual Report of Activities for the Year of 5767-2006, (Hebrew), p. 5. Emphasis in the original.



Courtroom no. 1 in Samaria Military Court. [11]

This report does not intend to examine to what extent the Military Courts deliver justice. Yesh Din did not study the content of the Military Court judgments, nor does the organization express an opinion as to their merits. Yesh Din does not purport to assess the degree of justice in the judgments or sentences imposed by the Military Courts under the authority of the Security Legislation. The subject of this report is the first principle that the Military Courts Unit undertook to guarantee: the principle of due process.

Due process rights in criminal law [12] are part of a "bundle of rights" vested in defendants, suspects and detainees in the criminal process and are included in what is known as the right to a fair trial. These rights are anchored both in the provisions of international humanitarian law (also called "the law of armed conflict") as well as the international treaties that constitute international human rights law and many other legal tools. Due process

11.    The pictures in this report were taken with the accompaniment of the IDF Spokesperson representatives and under restrictions imposed on Yesh Din by the IDF Spokesperson.

12.    The proceedings in the military courts are criminal proceedings, whether the defendants are on trial for "regular" criminal offenses or for "security," traffic or other offenses.



rights guarantee to every defendant standing trial – in any court, whether a "regular," military or "special" court – the conditions to allow him to contest the charges against him. These conditions refer, *inter alia*, to his rights to understand the charges against him, to prepare an effective defense against them, to be assisted by counsel, to question witnesses and various other rights, considered "procedural" rights, concerned with creating the conditions for a fair trial. Due process rights derive from the understanding that in their absence there can be no fair trial and that compromising them increases the risk of the distortion of justice.

The fact that in certain places in this report Yesh Din chose to provide comparative figures related to legislation in the State of Israel does not mean that the prevailing standards in Israel's justice system – whether or not they are praiseworthy – should dictate those prevailing in the military justice system in the OT. The Military Court system, established by a military government in an area subjected to belligerent occupation for the adjudication of civilians, is based on the provisions of international law, and the laws of armed conflict in particular; therefore, the standards by which it should be measured are the international standards that were agreed upon in a long series of treaties and international legal tools that constitute armed conflict law and international human rights law.

Since September 2006 **Yesh Din-Volunteers for Human Rights** has been conducting a project to monitor the implementation of due process rights in the Military Courts. The organization's volunteers completed extensive training, including a three-month "pilot" phase, in order to conduct observations in the Military Courts. An observation questionnaire composed especially for this project aided the Military Court observers in monitoring various aspects of due process rights. The factual information and the observers' impressions were recorded in a special database prepared by the organization. From the official launch of the observation phase of the project in December 2006 until its completion in August 2007, Yesh Din volunteers were present in the Military Courts in the Ofer military base and the Salem military base every week. At the time of this writing the project database includes observation forms of more than 800 separate hearings held in the Military Courts during that period. The findings of these observations do not constitute the results of a representative statistic sample of all proceedings in the Military Courts because tens of thousands of hearings take place in the Military Courts each year, but conclusions can be drawn from them as to trends in the issues under examination in this report.

Yesh Din complemented the extensive information collected by the observations through a study of aspects of due process rights that are harder to examine in the courtrooms, including interviews with 14 lawyers who appear regularly in the Military Courts and informal

BACKYARD PROCEEDINGS

conversations held by members of Yesh Din with some 10 Military Court personnel. Additional information was obtained from the IDF Spokesperson Unit in response to questions posed by Yesh Din and was incorporated in the chapters of this report.

The first chapter of the report provides background on the Military Court system in the OT: the legal authority to establish it, its development and the extent of its activity. The second chapter presents the structure of the Court system and its components – judges, prosecutors, defense lawyers, suspects and defendants, and describes the conditions of the hearings in the courtrooms. The third chapter is the heart of the report: due process rights are described in detail and the extent of their implementation in the courts is examined. In addition, military legislation regarding these rights is analyzed against the relevant recognized and binding international standards.

Before publication of the report Yesh Din sent the draft to the IDF Spokesperson Unit and the Israel Prison Service for their reactions. Comments by the Military Courts Unit and the Military Advocate General on the contents of the report, as provided (and translated) by the IDF Spokesperson to Yesh Din, are included in Chapter C. The full IDF response is featured on Yesh Din's website, alongside which the organization has posted its reply to the IDF response. The full IPS response appears at the end of this report.



# CHAPTER A

## THE MILITARY COURT SYSTEM IN THE OCCUPIED TERRITORIES: BACKGROUND

### 01    THE LEGAL POWER TO ESTABLISH MILITARY COURTS IN OCCUPIED TERRITORY

The protracted Israeli occupation in the Occupied Territories does not exist in a legal vacuum. International law recognizes the existence of a situation whereby a foreign army establishes a military occupation of a territory and imposes a series of rules and provisions, most of which are incorporated in international treaties – and which are collectively referred to as the "laws of belligerent occupation."[13]

These laws govern the legal aspects of the duties, powers and limitations on the force of an occupying army in a territory that it seized in the course of belligerent activity and give it the power to take various actions. The laws of occupation are based on the inherent tension between the security needs of the state on behalf of which the army is fighting (the "Occupying Power," in the wording of the Fourth Geneva Convention) and its duty to ensure the security and well-being of the population in the occupied territory. The laws of occupation attempt to regulate the tension between these two duties of the occupying army by requiring the occupying army to respect the rights of the occupied population and the social and legal arrangements existing within the occupied territory, while, at the same time, making arrangements for certain exceptions to that duty when necessary for reasons involving the security of the occupying power. The normative development process of the laws of occupation, from the Hague Convention (1907) through the Fourth Geneva Convention (1949) and up to the protocols annexed to the Geneva Conventions (1977), reflects the attribution of increasing importance to the duty of the occupying power to

---

13.    The laws of belligerent occupation are part of the laws of armed conflict (otherwise known as the "laws of war" or "international humanitarian law"). Most of the codification of this legal branch (the laws of belligerent occupation) is to be found in the *Fourth Hague Convention Respecting the Laws and Customs of War on Land (1907)* and the regulations annexed thereto [hereinafter: the "Hague Regulations"] and in the *Fourth Geneva Convention Relative to the Protection of Civilian Persons in Time of War (1949)* [hereinafter: the "Fourth Geneva Convention"] and the two additional protocols annexed to the Geneva Conventions.



protect the occupied population. By its very nature, belligerent occupation is intended to be temporary. The longer it lasts, the greater the occupying power's duty becomes vis-à-vis the occupied population.´ [4]

One of the exceptions to the duty of the occupying army to respect the law and order that prevailed in the occupied area prior to the occupation consists of its power to establish Military Courts on its behalf and to try civilians under its occupation in those courts. Generally speaking, those civilians have the right to be tried before the courts operating in their own country and by judges from among their own people. Nonetheless, placing those civilians on trial before a bench of officers in the enemy army does not, in and of itself, constitute a violation of international law. Quite the opposite is true: this power is anchored in the provisions of international law which deal with belligerent occupation.

The Hague Convention does not set forth specific provisions with regard to the power of an occupying army to try civilians under its occupation. At the same time, the closing passage of Regulation 43 of the Regulations annexed to the Convention – a regulation known as the "mini-Constitution of the occupying administration," which sets forth the principle instructing the occupying power to preserve and secure law and order in the occupied territory – includes a general exception enabling deviation from that principle:

The authority of the legitimate power having in fact passed into the hands of the occupant, the latter shall take all measures in his power to restore, and ensure, as far as possible, public order and safety, while respecting, unless absolutely prevented, the laws in force in the country.

Other extensive portions of the laws of belligerent occupation (in the Hague Regulations, the Geneva Conventions and the appendices thereto) deal with the measures the occupant is entitled to take in order "to restore... public order and safety," and the operations included under the exception to the duty of respecting the existing legal arrangements ("unless absolutely prevented"). The translation of the authorization to deviate from the existing arrangements in order to restore order and safety in the occupied territory into concrete authority is found, *inter alia*, in the provisions of Article 64 of the Fourth Geneva Convention. That article, which contains clear guidelines with regard to the continuity of the Penal Code in the occupied territory, empowers the occupying power to change the local law and to amend provisions of the local law that detract from the security of the occupying power, or to

---

14.   Orna Ben Naftali, Aeyal M. Gross, Keren Michaeli, Illegal Occupation: Framing the Occupied Palestinian Territory, **Berkeley Journal of International Law** (2005), pp. 551-614.

amend those laws of the occupied territory which conflict with the provisions of international humanitarian law – provided that the amendment of the legislation is implemented in such a way as to protect the interests of the population in the occupied territory.[15]

Following Article 64, and as a supplement thereto, Article 66 of the Fourth Geneva Convention gives the military commander the authority to hand accused persons over to military courts for trial, provided that the courts in question comply with defined basic conditions. This, too, constitutes an exception to the general principle calling for preservation of the legal arrangements that existed prior to the occupation. In light of the importance of this article, we shall quote it in full below:

> In case of a breach of the penal provisions promulgated by it by virtue of the second paragraph of Article 64, the Occupying Power may hand over the accused to its properly constituted, non-political military courts, on condition that said courts sit in the occupied country. Courts of appeal shall preferably sit in the occupied country.

The official interpretation of the Geneva Convention by the International Committee of the Red Cross (ICRC) clarifies that, whereas the military courts were *a priori* intended to judge the members of the occupying army who are accused of committing offenses, the same military courts, which are located in the occupied territory, may also judge "other persons," including residents of the occupied territory, who have committed offenses.[16]

The text of Article 66 sets forth a number of explicit conditions governing the legality of the military courts in question. The statement that the military courts must be "non-political" was intended to prevent the use thereof as a tool for political or racist persecution; the provision that the military courts must be "properly constituted" utterly excludes the possibility of setting up "special tribunals" and indicates that "ordinary" military courts, which operate according to the rules of due process, are to be used for judging the residents of the occupied territory (additional articles of the Geneva Convention cover the basic rules of legal proceedings in the military courts). In addition, the principle of territorialism in criminal law guided the drafters of the Convention to establish that the military courts would be located within the occupied territory only. This condition, according to the ICRC

---

15.    Jean S. Pictet (ed.), **Commentary: The Fourth Geneva Convention Relative to the Protection of Civilian Persons in Time of War** (Geneva: ICRC, 1958), p. 335-336 [hereinafter: "Pictet"].

16.    Ibid., p. 340. As we shall see, the Israel Defense Forces have made a distinction between courts in which IDF troops are tried and courts in which Palestinians are tried.

33



interpretation, constitutes an essential means of protecting the rights of the accused in the military courts.[17] A series of additional articles in the Fourth Geneva Convention set basic rules for the operation of the military courts, so as to ensure due process for detainees and accused persons brought before them (see Chapter C).

On the basis of the principles set forth above, and based on the powers given to the military commander of an occupied territory under the laws of belligerent occupation, the commanders of the West Bank and the Gaza Strip, immediately after the occupation thereof in 1967 – and while the war was still underway – published orders that transferred sovereign jurisdiction into their hands, established the continuity of the existing legal system (Jordanian in the West Bank, and military Egyptian in Gaza Strip), and declared that the legal system would remain binding, subject to changes that would be made to it by the military commanders. In addition, and most importantly for our purposes, the military commanders of Gaza and the West Bank established military courts with jurisdiction over any person in the occupied territory who committed offenses against the Security Legislation (the military legislation).

At the time, the Israel Defense Forces recognized the fact that the Fourth Geneva Convention was the source of the legal jurisdiction for the operation of military courts in the territories under belligerent occupation. Section 35 of the original version of the Order Concerning Security Provisions (OCSP),[18] one of the first pieces of legislation established by the Military Commander of the West Bank, expressly recognized that the procedures established in that Order were subordinate to the provisions of the Fourth Geneva Convention:

A military court and the administration of a military court shall fulfill the provisions of the Geneva Convention dated August 12, 1949 Relative to the Protection of Civilian Persons in Time of War, in all matters related to legal proceedings, and in any case of contradiction between this Order and the aforesaid Convention, the provisions of the Convention shall prevail.

Sometime later, the Military Commander recanted his earlier statement regarding the supremacy of the provisions of the Fourth Geneva Convention, and the original version of

---

17.  Ibid.

18.  The Order was attached as an appendix to the *Proclamation Concerning the Entry Into Force of the Order Concerning Security Provisions (West Bank Area) (No. 3) 5727-1967.*

34

Section 35 disappeared from the order.[19] Nevertheless, years later, when the Military Court itself addressed the issue, it also recognized the fact that its jurisdiction was primarily drawn from Article 66 of the Fourth Geneva Convention, and that the founders of the Military Courts in the Occupied Territories had been well aware of the Convention's implications:

> Article 66 [of the Fourth Geneva Convention] is presented in the form of a declaration of binding international custom. In other words, it is a declaratory provision, and as such, constitutes a law of custom. In any event, we shall again assume that the Military Commander was aware of the provisions of Article 66 of the Geneva Convention when he established the system of Military Courts. This appears to be the actual state of affairs, and it appears that the Military Commander does indeed take care to comply with the provisions of the Convention in this context – for example, the provision that states that trials of the protected population will be held within the borders of the area.[20]

The degree to which the Military Commander takes care to comply with the provisions of the Geneva Convention – and with other provisions of international law dealing with legal proceedings – is the subject we address in this report. In any event, since their establishment four decades ago, the Military Courts of the Israel Defense Forces – as a matter of routine – have been trying Palestinian civilians.

## 02    THE HISTORY OF THE MILITARY COURTS IN THE OCCUPIED TERRITORIES

### (a)    Establishment

The adjudication of civilians by Israel in Military Courts was instituted by the Israel Defense Forces following the establishment of the State of Israel in 1948. The Defense (Emergency) Regulations (1945), which were enacted in Mandatory Palestine, constituted the legal basis

---

19.    Section 1 of the *Order Concerning Security Provisions (West Bank Area) (Amendment No. 9) (Order No. 144) 5727-1967.* This amendment entered into force on October 22, 1967, a few months after the publication of the original version. The manner of deletion of the section, whereby the original wording was replaced by another provision (instead of writing the word "canceled," as is customary), was referred to as "unconventional," "unusual" and "shameful." See Moshe Drori, **Legislation in the Judea and Samaria Area** (Jerusalem, 1975: Harry Sacher Institute of Studies on Legislation and Comparative Law, Faculty of Law, Hebrew University of Jerusalem) [Hebrew], pp. 66-67; Haim Holtzman, **The Security Legislation in the Occupied Territories** (Givat Haviva, 1968: Center for Arab and African-Asian Studies) [Hebrew], pp. 56-57.

20.    Samaria Court Case 5732/01, 5708/01, **Military Prosecutor v. Odeh**, decision dated September 11, 2002.

35

for the establishment of military courts and military courts for summary proceedings, in which Israeli citizens who had committed offenses against the Defense (Emergency) Regulations were tried. Many of them were Palestinian citizens of Israel, who lived under military rule until 1966 and were tried for related offenses.[21]

Accordingly, in 1967, Israel already had significant experience in using military courts to try civilians. Since 1948, it had operated courts of this type in order to try Palestinian citizens of Israel; in 1957, it used similar military courts during the short-term military occupation of the Gaza Strip. In addition, as early as 1963, the Military Advocate General's Corps began to prepare for the imposition of a military government on occupied territories. As part of those preparations, proclamations and orders were drafted, governmental units were established for areas to be occupied in the future, and training courses were held for reservists in the Military Advocate General's Corps, qualifying them to hold positions in the anticipated military government.[22]

Such advance preparations, immediately after the outbreak of the 1967 War, enabled units of the Military Advocate General's Corps to enter the Occupied Territories along with the occupying forces (each of the units of which included a legal advisor to the commander of the sector, two military judges, two military prosecutors and administrative staff). As early as June 7, 1967, the first day of operation of the military government in the West Bank, three proclamations and several orders were published throughout the West Bank and the Gaza Strip:[23] Proclamation No. 1 announced the takeover of the administration and the powers of preserving security and public order by the commander of the Israel Defense Forces in the area.[24] Proclamation No. 2[25] assured the continuity of the judiciary system that had prevailed in the area until its occupation by IDF troops, declared the takeover of all of the powers related to "government, legislation, appointment and administration" by the commander of the IDF or his agents, and announced the transfer of the property that had

---

21. Menahem Hoffnung, **Israel – the Security of the State versus the Rule of Law** (Jerusalem, 1991: Nevo) [Hebrew], p. 278. Hoffnung notes three additional types of military courts with the jurisdiction to try civilians: a court-martial pursuant to the Prevention of Terror Ordinance, 5708-1948; a court-martial pursuant to the Prevention of Infiltration Law, which judged foreign civilians who entered the territory of the State of Israel unlawfully; and the Military Jurisdiction Law, 5715-1955, which placed civilians belonging to various categories under the jurisdiction of the Courts-Martial.

22. Zvi Inbar, The Military Advocate General's Corps and the Occupied Territories, **Law and Military** 16 (5762-2002) [Hebrew], pp. 149-153.

23. Meir Shamgar, "Legal Concepts and Problems of the Israeli Military Government-the Initial Stage" in Meir Shamgar (Ed.) **Military Government in the Territories Administered by Israel 1967-1980: the Legal Aspects (Vol. I)** (Jerusalem, 1982: Hebrew University of Jerusalem Faculty of Law), pp. 14, 24-25.

24. *Proclamation Concerning the Takeover of the Administration by the Israel Defense Forces, Proclamation No. 1.*

25. *Proclamation Concerning Administrative and Judiciary Procedures (West Bank Area) (No. 2), 5727-1967.*

belonged to the previous administration to the possession and management of the Military Commander. Furthermore, the Military Commander, in Proclamation No. 2, declared the takeover of powers regarding the collection of taxes, determined that the publication of items of legislation – proclamations, orders or notices – would be implemented "in any manner as I see fit,"[26] and stated that anyone committing a breach of public order, security or any provision or order issued by the Military Commander would be punished to the full extent of the law.[27] Proclamation No. 3[28] announced the entry into force of the Order Concerning Security Provisions which was annexed thereto. That order set forth legal procedures in the Military Courts and defined offenses and penalties to be imposed upon offenders.

In addition to the aforementioned proclamations, a number of orders were published on the same day. One of them, Order No. 3[29], established military courts in the districts of Jerusalem, Hebron, Jenin and "West Nablus," "East Nablus," and Ramallah and Jericho, respectively.

The Order Concerning Security Provisions, which was annexed to Proclamation No. 3, and additional orders[30] were replaced, in 1970, by a new order, which included the 18 amendments adopted since the Order has been annexed to Proclamation No. 3, as well as new provisions.[31] The new version was entitled **Order Concerning Security Provisions (Judea and Samaria) (No. 378) 5727-1967** [hereinafter: the "Order Concerning Security Provisions", or OCSP]. Since that time, the Order has been amended repeatedly and constitutes the basis for the existence of the Military Courts, the laws governing the arrest and detention of Palestinian civilians in Israeli custody, the definition of offenses and the determination of penalties for offenders, and the establishment of legal procedures in the Military Courts of the West Bank (see below).

## (b)    Principal developments

Until the late 1980s, the Israel Defense Forces chose not to establish courts of the second instance, in which appeals would be heard against the judgments of the Military Courts,

---

26.    Ibid., Section 6.

27.    Ibid., Section 7.

28.    *Proclamation Concerning the Entry Into Force of the Order Concerning Security Provisions (West Bank Area) (No. 3) 5727-1967.*

29.    *Order Concerning the Establishment of Military Courts (West Bank Area) (No. 3), 5727-1967.*

30.    *Order Concerning the Application of Provisions (Judea and Samaria) (No. 12), 5727-1967* and *Order Concerning the Extension of a Detention Order (Temporary Provision) (Judea and Samaria) (No. 157), 5728-1967.*

31.    Drori, p. 129.



notwithstanding the fact that calls for such courts had been brought before the system a number of times during the 1970s.[32] A petition to the HCJ filed in February 1985 by brothers Jamal and Ismail Arjub, containing a demand to establish a Military Court of Appeals,[33] was denied by the justices, who did not find an international law provision obligating the establishment of an instance of appeal in a territory under belligerent occupation. At the same time, the justices of the High Court of Justice stated that the Military Commander would nevertheless do well to establish such an instance in the Occupied Territories. Following the High Court of Justice's recommendation, an order was signed establishing a Military Court of Appeals, which began operation in April 1989.[34]

In recent years, the Military Court of Appeals has established case law slightly expanding the rights granted to defendants and detainees brought before the Military Courts. Thus, for example, the Court ruled that the Military Courts should be guided by the spirit of the Basic Law: Human Dignity and Freedom;[35] the causes for arrest set forth in the Israeli Criminal Code were adopted;[36] judiciary reservations concerning the period for extension of detention were established, notwithstanding the possibility of longer periods of detention set forth in the Security Legislation (see below);[37] as was introduced the ability to petition for removal of the classification of evidence as privileged before the Military Court of Appeals, rather than just the Supreme Court.[38] This expansion of the rights of the accused through case law was not adopted by the Military Commander into the Security Legislation.

Until 1990, the Military Courts were completely subordinate to the Military Commander, who was authorized to confirm or set aside their judgments and rulings, including factual findings and penalties imposed, and even to order the holding of a retrial.[39] In a move intended to reinforce the independence of the Military Court judges, the IDF Military Commander in the area was deprived that year of those powers.[40]

---

32.    Amnon Strashnov, Justice Under Fire (Tel Aviv, 1994: Yedioth Ahronoth Books) [Hebrew], p. 54.

33.    HCJ 87/85, Arjub et al. v. IDF Commander in Judea and Samaria et al., PD 42 (1) 353.

34.    Strashnov, p. 59.

35.    Appeals – Gaza Strip 5/05, al-Jamal v. Military Prosecutor, PSM 12 138.

36.    Appeals 157/00, Military Prosecutor v. Abu Salim.

37.    Appeals – Judea and Samaria 20/03, Ahmad Sharab v. Military Prosecutor; Appeals – Judea and Samaria 119/03, Fadi Jibrin v. Military Prosecutor; Appeals – Judea and Samaria 1380/05, Salah Hamuri v. Military Prosecutor.

38.    Misc. Petitions – Judea and Samaria 71/03, John Doe v. Military Prosecutor.

39.    Order Concerning Security Provisions, Section 42.

40.    Netanel Benichou, On Criminal Law in Judea, Samaria and the Gaza Strip: Spotlight and Trends, Law and Military 18 (5765-2005) [Hebrew], p. 299 [hereinafter: "Benichou"].