The decision to establish the Military Court system – and its judges – as part of the Military Advocate General's Corps would later be described by its founder, Meir Shamgar, as the inevitable result of the circumstances: the need for rapid deployment of prosecutors and for adjudication in territories that had just been occupied, with no intention for that system to remain operational in the long term.[41] What was intended to be temporary, however, remained permanent. For 37 years, the judges of the Military Courts belonged to the Military Advocate General's Corps, the same military unit as the military prosecutors appearing before them, and that which decisively influences the content of military legislation in the Occupied Territories.[42] This arrangement also had a negative impact on the principle of equality between the Defense and the Prosecution in the courtroom, as well as on the appearance of objectivity required by any judicial institution. Nonetheless, 37 years passed before the military order establishing the Military Courts Unit (in the OT, hereinafter: "MCU") was signed, in April 2004, separating the Unit from the Military Advocate General's Corps and subordinating the newly established MCU to the Courts-Martial Unit, which operates the Courts-Martial before which IDF troops are tried.[43]

## (c) Distribution

The Military Courts, which, as set forth above, were established pursuant to Order No. 3, operated in the West Bank during the 1967 War in Nablus, Tubas, Ramallah, Jericho, Hebron and East Jerusalem. The latter court, however, was dissolved upon the annexation of East Jerusalem by the State of Israel on June 28, 1967. After some time, only two military courts remained in the West Bank: the Military Court of Samaria, which operated in Nablus or in Ramallah, as required, and the Military Court of Judea, which operated in Hebron or in Bethlehem.[44]

The outbreak of the first Intifada, in December 1987, gave rise to a significant increase in the volume of activity of the Military Courts in the Occupied Territories. Whereas, in the

41. A Panel-Discussion with Meir Shamgar, Former Chief Justice of the Supreme Court, **Law and Military** 16 (5762-2002) [Hebrew], p. 461; statement by Maj. Gen. Prof. Yishai Bar, Presiding Judge of the Military Courts Unit, from the minutes of a meeting of the Army and Security Committee, Israel Bar Association, July 2, 2003.

42. See structure of the Military Advocate General's Corps in the Occupied Territories, below.

43. Eyal Rozin, The Silent Revolution in the Courts in the Occupied Territories, **Attorney** 48 (September 2004) [Hebrew], p. 58. Former Military Advocate General Amnon Strashnov notes in his book that, during the first Intifada, a proposal to transfer the military courts to the responsibility of the Courts-Martial Unit was discussed. According to Strashnov, the proposal was rejected, in light of the vast experience accumulated by the Military Advocate General's Corps in operating the military courts and due to the events of the Intifada. Strashnov, p. 59.

44. Shamgar, p. 26.




years prior to the first Intifada, approximately 5,000 indictments per year had been filed before the Military Courts (of which approximately 1,000-1,200 were related to offenses classified as "disturbance of the peace"), by December 1991, four years after the outbreak of the first Intifada, 45,000 indictments had been filed before the Military Courts, of which more than 30,000 were for offenses involving disturbance of the peace.[45] The increase in the volume of activity led to the opening of additional military courts in the West Bank – in Hebron and in Jenin.[46] These courts were closed following the Oslo agreements, the withdrawal of the IDF from the centers of those cities, and the end of the first Intifada.

Upon the withdrawal of IDF troops from the Gaza Strip in August 2005 (in accordance with the Disengagement Plan), the Military Court of the Gaza Strip, which had been located in the Erez facility, was closed.[47] Today, military courts operate in two locations in the West Bank. The Military Court of Samaria, where defendants who reside in the northern part of the West Bank are tried, operates in a military base near the village of Salem. The Military Court of Judea, where defendants who are residents of the southern part of the West Bank are tried, operates in the Ofer Military Base, near Ramallah. Ofer Base is also the site of the Military Court of Appeals and the Administrative Detention Court.

**Chart 1: Structure of the Military Court system, 2007**




45. Strashnov, p. 50.

46. B'Tselem, **The Military Judiciary System in the West Bank** (Jerusalem, 1989) [Hebrew], p. 6.

47. Hanan Greenberg, History: The Military Court at Erez is Closed, Ynet, August 31, 2005 [Hebrew], http://www.ynet.co.il/articles/0,7340,L-3135884,00.html (viewed on August 1, 2007).

## Military Courts in the territory of the State of Israel

Aside from the Samaria and Judea Military Courts, which are located in the West Bank, "branches" of the Military Court system also operate within the territory of the State of Israel. These courts, which mostly deal with judgments on extensions of detention, are located near General Security Services (GSS) interrogation facilities in the Russian Compound police station in Jerusalem, the police station in Petah Tikva, the Kishon detention facility in northern Israel and the Shikma Prison in Ashkelon. These courtrooms are extensions of the Military Courts of Samaria (Kishon and Petah Tikva) and Judea (Russian Compound and Ashkelon), and the judges who hear petitions for extension of detention are military judges, generally reservists. The prosecutors in these courtrooms, generally speaking, are members of the police force who are subordinate to the GSS interrogators and not members of the Military Prosecution.

The location of these extensions within the State of Israel runs counter to the provisions of Article 66 of the Fourth Geneva Convention, which, as set forth above, states that military courts must always be located within the occupied territory. This state of affairs makes it impossible for the detainees' families, who wish to observe the proceedings on the extension of their relatives' detention, to have access to the deliberations. The same is true for Palestinian attorneys representing these suspects, most of whom have been forbidden to enter the State of Israel in recent years (see below). Furthermore, the basic principle of a public trial is damaged by the entry restrictions imposed on civilians wishing to observe proceedings, not unlike the situation prevailing in the Military Courts in the West Bank.

## 03 THE SCOPE OF ACTIVITY OF THE MILITARY COURTS

Each year, tens of thousands of hearings are held in the Military Courts. In 2006 alone, for example, more than 37,000 separate hearings were held by military courts of first instance:




25,907 in the Military Court of Judea and 11,622 in the Military Court of Samaria.[48] Of these, 16,451 were deliberations on the extension of detention of suspects[49] and the rest took place following the filing of indictments against accused persons.

The indictments filed against Palestinians in the Military Courts concern a broad spectrum of offenses, which the IDF divides into five separate categories. The category of "Hostile Terrorist Activity" (HTA) includes involvement in the performance of terrorist attacks and military training, as well as offenses concerning weapons and arms trading, but also offenses concerning membership in "unauthorized associations" – associations that have been declared forbidden by the Military Commander. The second category, "disturbances of the peace" (DOP), includes offenses such as stone-throwing and incitement to violence. "Classic" criminal offenses – theft, robbery, trading in stolen property and the like – make up the third category. In recent years, a new category has been added: "illegal presence in Israel" (IPI), which includes the offense of "leaving the Area without a permit," with which Palestinians entering Israel without a permit, generally in order to find work, are charged. The last category is that of traffic violations in the Occupied Territories.

**Table 1: Indictments filed in the West Bank and the Gaza Strip, divided into categories, 2002-2006[50]**

| Year | HTA | DOP | Criminal | IPI | Traffic | Total |
|---|---|---|---|---|---|---|
| 2002 | 2,·35 | 94· | 473 | ·,546 | 2,502 | 7,597 |
| 2003 | 2,650 | ·,·43 | 436 | ·,564 | 2,0·· | 7,804 |
| 2004 | 3,·89 | ·,·39 | 732 | ·,27· | 3,790 | ·0,·2· |
| 2005[51] | 2,642 | ·,60· | 29· | 6·0 | 2,924 | 8,068 |
| 2006 | 3,523 | ·,·20 | 378 | ·,387 | 3,392 | 9,800 |
| Total | ·4,·39 | 5,944 | 2,3·0 | 6,378 | ·4,6·9 | 43,390 |

48. Letter from the IDF Spokesperson to Yesh Din, July 30, 2007. These data include cases involving traffic violations (in which the prosecutors are generally members of the police force) and do not include hearings before the Military Court of Appeals or judicial review of administrative detention.

49. Military Courts Unit, Annual Report on Activity for 2006 [hereinafter: "MCU 2006"], p. 16.

50. Sources of the data: Military Advocate General's Corps Headquarters, Annual Report on Activity for 2003 [hereinafter: "MAG 2003"], pp. 216, 249; Annual Report on Activity for 2004 [hereinafter: "MAG 2004"], p. 126; Annual Report on Activity for 2006 [hereinafter: "MAG 2006"], p. 138; MCU 2006, pp. 10, 15.

51. Data for this year include the activity of the Military Court of the Gaza Strip, which was closed in August 2005. The data for 2006 refer to the Military Courts in the West Bank.

The data in the table indicate that the indictments which were filed for offenses included in the "HTA" category constitute about one-third (32.6%) of all indictments filed before the Military Courts. If we do not include the traffic indictments, the HTA indictments constitute about half (49.1%) of the number of indictments filed before the Military Courts. Chart 2 provides a relative representation of the table data.

Chart 2: Indictments filed in the West Bank and the Gaza Strip, divided into categories, 2002-2006




## Indictments for offenses of murder and attempted murder

The offense parallel to murder in the Security Legislation is the offense of "Intentionally causing death," which was set forth in Section 51 of the Order Concerning Security Provisions. As in all of the other offenses set forth in the Security Legislation, it is possible to try, under this offense, not only the one who actually committed the offense, but his accomplices as well, as if they had actually committed the offense themselves.[52]

Data collected by Yesh Din with regard to indictments filed between 2004 and 2006 show that, by contrast to the conventional perception of the nature of the cases heard before the Military Courts, indictments for intentionally causing death

52. *Order Concerning the Rules of Liability for an Offense (Judea and Samaria) (NO. 225), 5728-1968*, Section 14.




and intentionally attempting to cause death constitute jointly only about five percent of the indictments filed before the Military Courts.

**Chart 3: Percentage of charges of murder and attempted murder in the indictments filed before the Military Courts, 2004-2006**[53]




53. Sources of the data: MAG 2006, p. 138; Military Advocate General's Corps HQ, **Annual Report on Activity for 2005** [hereinafter: "MAG 2005"], p. 52; MAG 2004, p. 41.

# CHAPTER B

## THE STRUCTURE OF THE LEGAL SYSTEM IN THE OCCUPIED TERRITORIES

### 01 JURISDICTION

The establishment of Military Courts in the Occupied Territories – both the courts of first instance and the Court of Appeals – the manner of appointment of their judges, the composition of the benches, and the jurisdiction of the Courts are set forth in Section A of Chapter II of the Order Concerning Security Provisions.

The order sets forth two types of benches for the Military Courts of first instance: a panel of three judges and a single judge. A court sitting as a single judge is entitled to sentence an accused person to a maximum of ten years' imprisonment[54] and to impose a suspended sentence of imprisonment.[55] In addition, a single judge is entitled to sentence a defendant who has been convicted to the payment of fines as set forth in Section 1(a)(5) of the *Order Concerning the Raising of Fines Set Forth in the Security Legislation (Judea and Samaria) (No. 845) 5740-1980* (as of this writing – up to NIS 3 million) and in Section 5A of the *Order Concerning Penal Sanctions (Judea and Samaria) (No. 322), 5729-1969.*[56]

The Order Concerning Security Provisions states that indictments for more serious crimes shall be brought before a panel of three judges headed by a chief judge, who is typically the

---

54. The original version of the Order Concerning Security Provisions, published in 1970, stated that a single judge was entitled to sentence a person to a maximum of two years' imprisonment. The maximum period was subsequently increased to five years; upon the outbreak of the first Intifada, it was again increased, to ten years' imprisonment. Statement by former Deputy Military Advocate General, Col. Ilan Katz, at a meeting of the Military and Security Committee of the Israel Bar Association; minutes dated June 19, 2002.

55. Order Concerning Security Provisions, Section 4A(d)(2).

56. Ibid., Sections 4A(d) (1) and 4A(d)(4). The wording of Section 5A of the Order Concerning Penal Sanctions: "For an offense by which the accused intended to cause monetary damage to another or to obtain a benefit for himself or for another, the Court is entitled to impose upon the accused a fine four times the amount of the damage caused or the benefit obtained by the offense, or the fine set forth in legislation, whichever is larger."




Presiding Judge of the Court or another judge appointed by him.[57] A panel of three judges has the authority to try all offenses for which the penalty exceeds ten years' imprisonment, including the death penalty.[58] The Deputy Presiding Judge of the Military Court of Judea, Lt. Col. Netanel Benichou, writes that the decision as to whether an accused will be judged by a single judge or a panel of three judges, in fact, rests with the Military Prosecution, which notes on the indictment whether it is being filed "before a panel" or "before a single judge," according to the Prosecution's expectations of the sentence.[59]

Section 7 of the Order Concerning Security Provisions sets forth the range of material jurisdiction of the Military Courts in the Occupied Territories: to try any offense defined in the Security Legislation or under any law, subject to the Security Legislation, including the jurisdiction given to local courts (that is, civilian courts operating under Jordanian, and subsequently Palestinian, law); to try anyone accused of committing an act outside the OT which would have been considered an offense had it been committed within the OT, provided that the action "harmed, or was intended to harm, security in the Area or public order," and anyone who committed an offense in Area A of the Palestinian Authority which harmed, or was intended to harm, security in the Area.[60] In other words, the jurisdiction of the Military Courts is not restricted to offenses that were *prima facie* committed within the occupied territory itself, but also includes offenses committed anywhere else. It should be noted that the definition of the offenses that are within the jurisdiction of the Military Courts, as set forth in the Order Concerning Security Provisions, is broader than the powers given to military courts in the Fourth Geneva Convention. Article 66 of the Convention states that military courts are to try cases involving violations of criminal security legislation only, but Section 7(b) of the Order Concerning Security Provisions also grants powers within the jurisdiction of local courts. It thus appears, *prima facie*, that although the Geneva Convention restricts the jurisdiction of the Military Courts to offenses that concern matters of security and public order, the Order Concerning Security Provisions also gives the Military Courts jurisdiction to hear offenses totally unrelated to those matters.

---

57. Order Concerning Security Provisions, Section 4(a)-(b). Concerning the judges in the panel of three judges, see box in Section 2 of this chapter.

58. At the same time, Section 47(a)(8) states that only a panel of three judges, each of whom holds the rank of Lieutenant Colonel or higher, is entitled to sentence an accused person to death, and only unanimously.

59. Benichou, p. 305.

60. Order Concerning Security Provisions, Section 7.

## 02 JUDGES

The system of the Military Courts is headed by the Presiding Judge of the Military Court of Appeals, an officer with the rank of Colonel. Since the transfer of responsibility for the Military Courts Unit to the Courts-Martial Unit, the Presiding Judge of the Military Court of Appeals has been subordinate to the Presiding Judge of the Court-Martial of Appeals (which primarily hears cases of soldiers accused of criminal and military offenses).

Section 3B of the Order Concerning Security Provisions states that the persons appointed as judges in the Military Courts shall be Israel Defense Forces officers holding at least the rank of Captain, in the Regular Army or the reserves, who have at least five years of "legal experience" (note: not "judicial experience"). An officer holding at least the rank of Lieutenant Colonel may be appointed as Presiding Judge of a court of first instance.

A judge of the Military Court of Appeals must hold the rank of Lieutenant Colonel and must have at least seven years of "legal experience," including a term (of undefined length) as a military judge. An exception may be made to this rule if the Committee for the Appointment of Military Judges is convinced that the candidate, "in his service in the IDF, was engaged in a legal profession that makes him suitable for this position."[61]

The independence of the Military Court judges is set forth in Section 7A of the Order Concerning Security Provisions: "In matters of judging, there is no authority over anyone who holds the power to judge, except the authority of the law and the Security Legislation." The judges are appointed to positions by virtue of an order issued by the Military Commander, according to the recommendation of the Committee for the Appointment of Military Judges. Until 2004, military judges were appointed by the Military Commander, according to the recommendation of the Military Advocate General, and the Order Concerning Security Provisions specified nothing about the removal of a military judge from office. At least theoretically, a situation could arise whereby the Military Commander could cancel the appointment of a judge at any time and for any reason. Only in that year was the Order amended so as to limit the authority of the Military Commander to intervene in the appointment – and dismissal – of judges.

In the year 2004, the authority to recommend the appointment of military judges to the Military Commander was transferred from the Military Advocate General to the Committee for the

61. Ibid., Section 3B(4).



Appointment of Military Judges, which was established that year in order to recommend such appointments. The Committee is composed of seven members, including four IDF officers – the Presiding Judge of the Court-Martial of Appeals (who serves as chair of the committee), his deputy, the Presiding Judge of the Military Court of Appeals, and the IDF Chief Human Resources Officer. An additional member of the Committee, the Coordinator of Government Operations in the OT, is an employee of the Ministry of Defense. The other members of the Committee are a retired judge appointed to the position by the Presiding Judge of the Court-Martial of Appeals, and a sole civilian: a representative of the Israel Bar Association, selected by the National Council of the Bar Association. Candidates for service as military judges are proposed by the Presiding Judge of the Court-Martial of Appeals, the Presiding Judge of the Military Court of Appeals, the IDF Chief Human Resources Officer, or two members of the Committee. The resolutions of the Committee are adopted by majority vote. Following selection by the Committee, the Presiding Judge of the Military Court of Appeals gives the Military Commander his recommendation concerning the candidates for the positions of judges in the Military Courts, and the judges are appointed by the Military Commander.[62]

As set forth above, the prerequisite conditions for the appointment of a person as a judge in the Military Courts are that one must be an IDF officer with at least five years' "legal experience" for a court of first instance, and seven years' "legal experience" for the Military Court of Appeals.[63] In practice, most such appointees are attorneys, many of whom were formerly posted to the Military Advocate General's Corps or serve their reserve duty therein, and there can be no certainty as to their expertise in the area of criminal law, in general, and in matters concerning security offenses, in particular court.

According to data provided to Yesh Din by the IDF Spokesperson, at the end of 2006 there were 14 Regular Army judges and about 140 reservist judges in the Military Court system in the OT, including the courts of first instance and the appeals.[64]

The problematic nature of the fact that attorneys, with no judicial experience whatsoever, are appointed as reservist judges and serve on panels who try persons accused of offenses, has not escaped the eyes of the judges themselves. At a meeting of the Military and Security Committee of the Israel Bar Association, Atty. Daniel Friedmann, a member of the Committee who himself conducts reserve service as a judge with the rank of Colonel in the Military Court of Appeals, commented as follows:

---

62. Ibid., Sections 3(d)-(g).

63. Letter from the IDF Spokesperson to Yesh Din, May 27, 2007.

64. Ibid.

> *The main problem is that judges in the Military Courts are not professionals – they have not taken any judicial courses. Generally speaking, they are attorneys, most of whom are reservists. It makes a difference whether your chosen profession is that of judge or attorney. [...] The fact that non-professional judges are serving has an impact. As I see it, the system should be made subordinate to the Courts-Martial Unit, and should involve those reservists, but "real" judges should also be added.*[65]

Since that discussion took place, the Military Court system has indeed been made subordinate to the Courts-Martial Unit. However, the prerequisite conditions for the appointment of its judges, and their professional profiles, have remained unchanged.

In 2006, an amendment to the Military Jurisdiction Law was passed, empowering the Chief of Staff of the Israel Defense Forces to appoint "associate judges" to the Courts-Martial, which hold criminal trials of IDF soldiers who have been accused of offenses.[66] According to the amendment, military judges who have left the Regular Army and judges who have retired from the "ordinary" court system will be appointed to serve as judges – in reserve service – in the Courts-Martial.

The reason for this amendment was explained by Lt. Col. Roni Pinhas of the Department of Consultancy and Legislation in the Military Advocate General's Corps as follows: "It was important to the Courts-Martial for it to be possible, at least in the higher instances, to take advantage of the experience of veteran judges, whose good services would otherwise not be available to the Courts-Martial simply because they have retired from the civilian courts."[67] With regard to the Military Courts, no such amendment has been enacted, and reservists with no background as judges continue to try persons accused of offenses much more serious than those of which the soldiers brought before the Courts-Martial stand accused.

65. Statement by Daniel Friedmann at a meeting of the Military and Security Committee of the Israel Bar Association; minutes dated July 2, 2003.

66. *Military Jurisdiction Law (Amendment No. 54), 5766-2006.*

67. Statement by Lt. Col. Roni Pinhas, at a meeting of the Military and Security Committee of the Israel Bar Association; minutes dated February 15, 2005.



## The Lay Judges

For about 35 years, until 2002, panels of three military judges included, besides the Presiding Judge, who was a judge with a legal education (a "jurist judge"), two lay judges who were IDF officers from various units, devoid of any legal training. The reasons for this were set forth in the provisions of Article 66 of the Fourth Geneva Convention, which states that military courts in an occupied territory shall be identical in composition to the military courts that try soldiers of the occupying army;[68] additional reasons were related to tradition and budgetary resources.[69]

In May 2001, the Military Advocate General's Corps began an internal administrative process toward examining the use of the lay judges who were not jurists.[70] Only a few months thereafter, the media featured the heavily critical reports of two IDF officers on their positions as lay judges in the Military Courts in the Occupied Territories. One of them, Lieutenant Omer Barak, made the following comments to a correspondent from the daily Haaretz about his role as a lay judge:

*"A rubber stamp. You come in and get a brief explanation sheet, a single page. Something like 'Welcome. Go and do justice. We wish you every success.' On the witness stand, no Palestinian witness agrees to say a word. They refuse to confirm testimony that was taken from them against their friends. Every few minutes, Lt. Col. Haniel [the Presiding Judge] declares that this or the other witness is a hostile witness or is standing mute. The judgments are handed down in the name of the Court – that is, in the name of the lay judges as well – without asking us at all. Haniel decided what the status of the witnesses would be, without my even knowing what a mute witness or a hostile witness is. [...] This happens every day. Lay judges with no legal education determine the fate of the accused."*[71]

---

68. Statement by former Deputy Military Advocate General, Col. Ilan Katz, at a meeting of the Military and Security Committee of the Israel Bar Association; minutes dated June 19, 2002.

69. Amos Harel, The Military Courts in the Occupied Territories: Judges with No Legal Education Pass Sentences of Imprisonment, Haaretz, December 16, 2001 [Hebrew].

70. Statement by former Deputy Military Advocate General, Col. Ilan Katz, at a meeting of the Military and Security Committee of the Israel Bar Association; minutes dated June 19, 2002.

71. Amos Harel, The Military Courts in the Occupied Territories: Judges with No Legal Education Pass Sentences of Imprisonment, Haaretz, December 16, 2001.

Following the publication of the article, in January 2002, a meeting of the Foreign Affairs and Security Committee of the Knesset was held, with the participation of representatives of the Military Advocate General's Corps, for the purpose of making changes in the array of lay judges.[72] Several weeks later, the press reported that all of the lay judges would be replaced by jurist judges.[73] In March 2002, the then Presiding Judge of the Military Court of Appeals, Col. Shaul Gordon, sent a letter to the jurists who served as reservists in the Military Advocate General's Corps, in which he admitted the long-term deficiency with regard to the lay judges and called upon them to volunteer for one day's reserve service each month for two years as lay judges in the Military Courts in the OT.[74] This move led to the recruitment of approximately 150 reservist jurists and the replacement of all lay judges by judges with a legal education.[75]

## 03 PROSECUTORS

The prosecuting entities in the Occupied Territories belong to the Military Advocate General's Corps, which functions as prosecution and law enforcement among IDF troops, legal defense for IDF troops, consultation and representation for IDF entities in various legal matters, consultation for IDF entities in matters of international law and the laws of

72. Knesset, **This Week in the Knesset Committees**, February 3, 2002, http://www.knesset.gov.il/takzir/tak270102.htm (observed on June 15, 2007).

73. Lior Greenbaum, Lay Judges Will Have to Have a Legal Education, **Globes**, February 24, 2002 [Hebrew]; Amos Harel, IDF: Within a Year All Judges in the Occupied Territories Will Be Jurists, **Haaretz**, March 20, 2002 [Hebrew].

74. In his letter, Col. Gordon wrote (*inter alia*) as follows: "As we know, in serious cases, the trial is conducted before a panel of three ("panel cases"). According to law and custom in the military courts, cases have been conducted to date before a jurist judge who was the Presiding Judge of the panel, with IDF officers devoid of any legal education serving as lay judges alongside him. Precisely at this time, after almost 35 years of activity, we have come to the conclusion that it will no longer be correct to make use of lay judges who are not jurists, as is customary in Courts-Martial and other tribunals, and that a changeover must be made to professional judging, to be carried out exclusively by judges with a legal education. This being the case, I hereby appeal to all the reserve officers of the Military Advocate General's Corps, those who understand the fateful nature of this decision and the importance of the existence of a sound juridical system, to come to the forefront and – even for a limited period of time – to join the judiciary system in Judea and Samaria and in the Gaza Strip. The judges joining us will sit on panel cases alongside a professional and experienced Presiding Judge; however, as regular judges, they will be able to affect the results of the proceeding." Quoted from Yoav Yitzhak, Without Lay Judges, **First Class News**, http://www.nfc.co.il/Archive/003-D-921-00.html?tag=08-14-26 [Hebrew] (viewed on January 5, 2007).

75. Eyal Rozin, The Silent Revolution in the Courts in the Occupied Territories, **Attorney** 48 (September 2004) [Hebrew], p. 60.



armed conflict, and more.[76] In its role in the field of law enforcement, the Military Advocate General's Corps is divided into districts and arms (Central Command, Air Force, etc.). One such district is the Military Advocate General's Corps in Judea and Samaria Area [hereinafter: "MAG JSA"].[77]

The prosecutors in the Military Courts are IDF officers or "legal officers,"[78] in Regular Army service or reserve duty in the Military Advocate General's Corps, who were appointed to their positions by the Military Commander.[79] The Regular Army officers among them are generally graduates of the Academic Reserves program, who obtained a Bachelor's degree in law[80] before beginning their military service and, in exchange for this postponement of service, undertook to serve in the Regular Army for several years after their compulsory military service. Most of the jurists in the MAG JSA serve as prosecutors in the various prosecution units of the MAG JSA.

The MAG JSA, in which approximately 36 jurists serve,[81] is headed by the Military Advocate for Judea and Samaria Area, an officer with the rank of Lt. Colonel. His powers, in addition to conducting the prosecution in the Military Courts and providing professional guidance to the prosecutors, also include legal support of interrogations by the police and the GSS, decisions to close investigation files for lack of evidence or lack of public interest, and representing the Military Commander in administrative procedures, among others.[82]

The MAG JSA is composed of five units. Two of these units, the criminal units of first instance in the Military Court of Samaria (in the Salem Base) and of Judea (in the Ofer Base), handle the filing of indictments and the conducting of criminal proceedings. As of the end of 2006, 13 jurists served in the Prosecution Unit in the Military Court of Judea, and 11 jurists served in the Prosecution Unit in the Military Court of Samaria.[83] Some

76. MAG 2005, p. 1.

77. The Military Advocate General's Corps in Judea and Samaria was established in 2004. Until that time, the prosecution entities in the occupied territories were subject to the Legal Advisor to the Judea and Samaria and the Legal Advisor to the Gaza Strip.

78. In other words, attorneys at law or law-school graduates who have not qualified as officers in the IDF Officer Candidate School.

79. Order Concerning Security Provisions, Section 8.

80. A Bachelor's degree in law, or LL.B., is the level of education required in Israel (and many other countries) for certification as an attorney, which is granted upon completion of articles and passage of the bar exam.

81. The data regarding the number of personnel in the Military Prosecution are correct as of the end of 2006. MAG 2006, p. 51.

82. Ibid., pp. 52-53.

83. Ibid., pp. 56-57.

military prosecutors who appear in court are articling interns who are not yet certified as attorneys. For example, of the nine prosecutors serving in July 2007 in the Military Court of Judea, five were interns.

The Military Prosecution Unit dealing with appeals is physically located in Ofer Base, adjacent to the building that houses the Military Court of Appeals. Those prosecutors both file and defend against appeals of Court judgments, decisions regarding detention, as well as additional proceedings before the Military Court of Appeals.[84]

A "desk" in the MAG JSA is charged with representing the Military Commander with regard to administrative detention, and it also heads two units physically located in the incarceration facilities in Ofer Base and Ketziot Base in the Negev.[85]

## Administrative detention

Along with the ordinary criminal proceedings that take place in the OT, many Palestinians are incarcerated under administrative detention. This is detention for fixed periods of time that are set by the Military Commander and may be extended. Administrative detainees are not detained as suspects of a particular offense; rather, they are detained on the grounds that they present a future risk. Accordingly, they do not undergo ordinary legal proceedings, in which an indictment is filed and the accused has an opportunity to defend himself against the charges. The power of administrative detention, as confirmed by case law in the High Court of Justice, enables a person to be detained for preventive reasons only and not as punishment for actions he committed or is suspected of having committed.[86] The Military Courts and the Military Prosecution play a role in these proceedings as well.

Chapter E1 of the Order Concerning Security Provisions states that the Military Commander is given the power to issue an order for the detention of a person for a period of up to six months, if he has "reasonable grounds to assume that reasons involving the security of the Area or public security" require that the person remain in

84. Ibid., p. 54.

85. MAG 2005, p. 55.

86. See e.g. Appeals 28/1, Hazem Mahmoud Kawassmeh v. Minister of Defense, PD 36 (1) 666.




detention.[87] The Order Concerning Security Provisions enables the Military Commander to extend the administrative detention order against the detainee again and again, for periods of up to six months at a time, if he has "reasonable grounds to assume" that this is still necessary. Table 2 shows that the Military Commander, in fact, makes extensive use of this power.[88]

**Table 2: Administrative detention orders and administrative detention extension orders, 2004-2006[89]**

| Year | "Initial" administrative detention orders | Administrative detention extension orders | Total |
|---|---|---|---|
| 2004 | ·,283 | ·,360 | 2,643 |
| 2005 | ·,·38 | ·,435 | 2,573 |
| 2006 | ·,299 | ·,635 | 2,934 |
| Total | 3,720 | 4,430 | 8,·50 |

A person detained by way of administrative detention is brought before the Military Court of Administrative Detention, in a proceeding known as "judicial review," within 96 hours of the start of his first detention (the proceeding is held *in camera*). In the proceeding, the military judge may confirm, set aside or shorten the administrative detention order. An additional hearing takes place before a military judge three months after the confirmation of the administrative detention. Section 87D of the Order Concerning Security Provisions permits the military judge to deviate from the laws of evidence, for "security reasons," and receive evidence in the absence of the detainee or his attorney, and without disclosing that he has received any evidence whatsoever. In practice, in most hearings on administrative detention the detainee is not aware of the content of the evidence against him, if any, and cannot defend himself against that evidence. The threshold of evidence required for confirmation of the administrative detention order issued against the detainee is extremely low, particularly in contrast

87. Order Concerning Security Provisions, Section 87(a).

88. For more details on the use of administrative detentions by Israel during the first Intifada and for several years thereafter, see B'Tselem, **Prisoners of Peace: Administrative Detention During the Oslo Process** (May 1997); B'Tselem, **Detainees Without a Trial: Administrative Detention in the Occupied Territories Since the Beginning of the Intifada** (October 1992).

89. Military Courts Unit, **Annual Report on Activity for 2004** [hereinafter: "MCU 2004"], p. 17; Military Courts Unit, **Annual Report on Activity for 2005** [hereinafter: "MCU 2005"], p. 17; MCU 2006, p. 18.

to the threshold required in criminal trials ("beyond a reasonable doubt"). An appeal against the judgment in the judicial review proceeding may be filed before the Presiding Judge or the Deputy Presiding Judge of a military court of first instance.[90]

The legal position of the State of Israel is that the use of administrative detentions is permitted, pursuant to Article 78 of the Fourth Geneva Convention, which holds that, for "necessary reasons of security," the occupying power is entitled to take measures involving the "restriction of place of residence" or detention against civilians in the occupied territory. The ICRC interpretation of this article states that the occupying power is entitled to use these measures for "real and essential" reasons of security only, and that it must ensure "the exceptional nature" of the use thereof.[91] Examination of the data regarding the use of administrative detention in the Military Court system in the West Bank, even before considering other important aspects of the policy regarding the use of administrative detention against Palestinians, demonstrates that the Military Commander makes frequent and routine use of administrative detentions in the OT, in contrast with the provisions of international law.[92]

## 04 DEFENSE ATTORNEYS

Section 8 of the Order Concerning Security Provisions laconically states that an accused standing trial in the Military Courts is entitled to avail himself of a defense attorney for his defense. A separate order, issued in 1970, the *Order Concerning Defense Attorneys in a Military Court (Judea and Samaria) (No. 400), 5730-1970* [hereinafter: the "Order Concerning Defense Attorneys"], sets forth provisions w ith regard to the representation of accused persons in the Military Courts. The Order states, *inter alia*, that an accused person is entitled to retain an attorney for himself or to represent himself,[93] and that "for an accused person tried before the court sitting as a panel of three, who has been accused of an offense for which the penalty is 10 years' imprisonment or more, who has not chosen a defense attorney or for whom the Attorney General has not appointed an attorney, the

90. Order Concerning Security Provisions, Section 87E (a).

91. Pictet, p. 368.

92. For additional data with regard to administrative detention, see Appendix 8.

93. Order Concerning Defense Attorneys, Section 2.



Military Court shall appoint a defense attorney, with the consent of the accused person."[94] At the same time, the cases in which the Military Court appoints a defense attorney on behalf of the accused are "very few,"[95] because attorneys employed by Palestinian organizations such as Nadi al-Asir ("The Prisoner's Club"), Ad-Damir, and the Palestinian section of Defense for Children International [hereinafter: "DCI Palestine"] are generally present in the courts and take upon themselves the representation of suspects and defendants not otherwise represented by private attorneys.

Regarding the identity of the attorneys authorized to represent accused persons, the Order Concerning Defense Attorneys states that they must be attorneys registered in the Israel Bar Association, or Palestinian attorneys registered as such according to law and the Security Legislation, and imposes no further limitations on their identity.[96]

Attorneys interviewed by Yesh Din for this report estimate that the number of defense attorneys – Israeli and Palestinian – who regularly appear before the Military Courts does not exceed a few dozen.

## 05 DEFENDANTS

The Military Courts, as outlined above, have jurisdiction in principle to try any person – Palestinian, Israeli or foreign – who allegedly commits an offense defined in the Security Legislation, whether within or outside the Occupied Territories, provided that such a person is either endangering the security of the Occupied Territories, or falls under the jurisdiction conferred upon the local courts of the OT.

In fact, the overwhelming majority (if not all) of the accused persons tried by the Military Courts are Palestinian civilians who stand accused of a wide range of offenses.[97] As set forth previously, these offenses may be directly related to "security" (what are referred to as "HTA offenses"), offenses involving disturbance of the peace (such as stone-throwing), offenses related to presence in Israel without a permit (IPI) or other criminal offenses, traffic

94. Ibid., Section 4 (a).

95. IDF Spokesperson's response to questions from Yesh Din, May 27, 2007.

96. Order Concerning Defense Attorneys, Section 1.

97. In response to Yesh Din's request to receive data on Israeli and other (non-Palestinian) civilians tried before the Military Courts in recent years, the IDF Spokesperson answered that he was not in possession of such data. IDF Spokesperson's response to questions from Yesh Din, October 14, 2007.

offenses, and other offenses for which the Military Commander, for his own reasons, sees fit to order that a defendant be tried by a Military Court.

## Trials of Israeli civilians who commit offenses in the OT: a double legal system

In all matters regarding law enforcement vis-à-vis Israeli citizens who commit offenses in the OT, and defense of residents of the Occupied Territories against violence by third parties (including Israeli civilians in the OT), the Military Commander has delegated his duties and powers to the civilian entities of the State of Israel: the Israel Police, the Office of the Attorney General, and the Israeli courts within the borders of the State of Israel.[98]

Section 7 of the OCSP gives the Military Courts in the OT territorial and extra-territorial jurisdiction to try any person who has committed an offense, within or outside the OT, regardless of that person's citizenship – Israeli, Palestinian or other. Nonetheless, Israeli civilians are not tried by the Military Courts, even when they commit offenses that are undoubtedly related to security, within the OT, and when there is no legal dispute over the jurisdiction of the Military Courts to hear the cases concerned. Instead, they are adjudicated by the "ordinary" courts within the borders of the State of Israel, based on the jurisdiction given to the Israeli courts by Section 2 (a) of the *Emergency Regulations (Judea and Samaria, Gaza Strip, Sinai and Southern Sinai – Judging of Offenses and Legal Aid), 5727-1967*, as amended and updated from time to time.[99]

The IDF has not always refrained from trying Israeli citizens before the Military Courts. During the 1970s, Israeli demonstrators from leftist organizations were tried in the Military Courts; in 1982, demonstrators at the time of the Sinai Peninsula evacuation

98. See Yesh Din, A Semblance of Law: Law Enforcement upon Israeli Civilians in the West Bank (June 2006).

99. The most recent update was enacted in July 2007, within the framework of the *Amendment and Extension of Emergency Regulations Law (Judea and Samaria and the Gaza Strip – Judging of Offenses and Legal Assistance), 5767-2007*, and will remain in force until the end of June 2012. Section 2(a) reads as follows: "In addition to that set forth under any law, the court in Israel shall have jurisdiction to try, under applicable law in Israel, a person who is located in Israel, for the action or omission of that person, which took place in the Area, and an Israeli, for the action or omission of that person, which took place within the territory of the Palestinian Council, provided that the action or omission would have constituted offenses, had they taken place within the jurisdiction of the courts in Israel." The words "Palestinian Council" refer to the Palestinian National Authority.



were also tried before the Military Courts. However, the IDF has not done so since. When initiatives to resume trials of Israelis before the Military Courts have arisen, the IDF has stood vigorously opposed. Thus, for example, in April 1995, when the Attorney General at the time, Michael Ben Yair, proposed that Israeli citizens who commit security-related offenses in the OT be tried by the Military Courts, the Military Advocate General at the time, Brig. Gen. Ilan Schiff, objected, claiming that "any decision regarding a change in the prosecution policy in the OT might be interpreted by the settlers as a political act."[100]

Furthermore, when Minister Haim Ramon raised a similar proposal in 2005, Attorney General Menahem Mazuz rejected it with no legal grounds whatsoever, saying that "even though, from a legal standpoint, this possibility exists, in practice, it has not been implemented for a long time, and it appears preferable to stick to the *status quo*, according to which law-breaking citizens who are residents of Judea and Samaria and the Gaza Strip are tried before civilian courts."[101]

The result is the establishment of a double legal system in the OT, according to which a person is arrested, charged and tried by a system determined by his or her national identity. An Israeli citizen residing in the settlement of Itamar and a Palestinian civilian residing in the adjacent village of Beit Furiq, both of whom commit, for example, the offense of manslaughter, will be tried before different legal systems – the latter according to the military Order Concerning Security Provisions, which allows him to be arrested for up to eight days before being brought before a judge, followed by extensions of detention by 30 days each up to three months, and the former according to the Israeli Penal Code, which requires the arrested person to be brought, within 24 hours, before a judge authorized to extend his arrest by up to 15 days at a time, and not more than 30 days in total. They will be tried before different courts: the Israeli will be tried by the Magistrate Court of Kfar Saba, and the Palestinian before the Military Court in Salem. The Israeli will be tried according to the Israeli Penal Code and – if convicted – will be sentenced to up to 20 years' imprisonment; the Palestinian will be tried according to the Order Concerning Security Provisions, and may be sentenced up to and including life imprisonment.

100. Gideon Alon, Libai, Shahal and Brig. Gen. Schiff Reject Ben-Yair's Proposal to Transfer the Handling of Settlers to Military Courts, **Haaretz**, May 3, 1995 [Hebrew].

101. Tal Rozner, Settler, Go to the Guardhouse, **YNET**, January 14, 2005 [Hebrew]. The statement by the Attorney General is quoted from the response by the Ministry of Justice which appears in the article.

In addition to the above, the law enforcement system applicable to Israelis who commit what is labeled as "ideological" offenses in the OT – including violent offenses – has been subjected, over the years, to scathing criticism over its powerlessness and failure to bring justice to offenders.[102] The separation between the legal systems for Palestinians and for Israeli residents of the Occupied Territories is not a technical separation, but a significant one.

**IN RESPONSE TO THE DRAFT OF THIS REPORT, THE IDF SPOKESPERSON STATED ON BEHALF OF THE MILITARY ADVOCATE GENERAL:**

"Courts-Martial[103] are indeed competent to try any person who has committed an offense within their jurisdiction. However, since the early 1980's, it has been the Attorney General's policy not to commit Israeli citizens to trial by Courts-Martial."

## 06 CONDITIONS IN THE MILITARY COURTS

Detainees and defendants in custody are brought from detention facilities to court on the morning of their hearings, and they are held there before and after these proceedings in detention cells on the courts' premises. Yesh Din observers were denied access to the areas of these detention cells at the Military Courts, but a complaint lodged before the Military Court presidents by the human rights organizations, the Public Committee Against Torture in Israel and Physicians for Human Rights-Israel, describes the conditions in the cells.[104]

As detailed in the human rights organizations' petition, the eight detention cells serving the Judea Military Court and the Military Court of Appeals at the Ofer military base measure

---

102. See e.g. Yesh Din, **A Semblance of Law: Law Enforcement upon Israeli Civilians in the West Bank** (June 2006) [Hebrew]; Talia Sassoon, **Opinion Concerning Unauthorized Outposts** (March 2005) [Hebrew]; Meir Shamgar (Chair), **Committee of Inquiry Concerning the Massacre in the Cave of Machpelah in Hebron, 5754 – 1994: Report** (State Committee of Inquiry, 1994) [Hebrew].

103. In translating the original Hebrew version of this report, Yesh Din translated the same term as "Military Courts", as the term "Courts-Martial" is reserved for the military judicial system which handles IDF soldiers.

104. Letter from The Public Committee Against Torture in Israel and Physicians for Human Rights-Israel to the Military Court presidents, Lt.-Col. Aharon Mishnayot, Lt-.Col. Tzvi Lekach, and Capt. Amit Preiss, July 11, 2007. On October 23, 2007, Attorney Eliyahu Avram of The Public Committee Against Torture in Israel stated to Yesh Din that no response had yet been received to this letter.



about 2.5 sq. m. (27 sq. ft.) each. The Samaria Military Court, at the Salem military base, has seven detention cells, measuring about 2.5 by 2 m (8 by 6 ½ ft.). At least 11 detainees are held in a single cell, under extremely crowded conditions (even when some of the adjacent cells are completely vacant), and their number can at times even reach 20. There is no heating or air conditioning in the cells, such that they are very hot in summer and cold in winter. The cells are unventilated, and fresh air can only enter them through a small aperture in the door. As a result, they are stifling and malodorous.[105] There are no toilets in the cells, and the detainees, at least at the Judea Military Court, are allowed to exit to use outside toilets only once a day. Tap water for drinking is occasionally provided in a single bottle that is passed among the detainees.

Detainees who are brought to the Samaria Military Court from the Hawara detention facility – which is still under IDF responsibility – are not taken to the same cells in which those brought from IPS detention facilities are held. Instead, the detainees from Hawara are held in two metal freight containers, in which planks have been installed for seating.[106] There are, of course, no water taps or toilets in these containers.

In a discussion held by Yesh Din with officials of the Samaria Military Court,[107] the latter asserted that the containers are hardly in use for holding detainees, that they are used very seldom and only as a last resort, and that "everything" is done to have the Hawara detainees brought first before the court in order to return them to the detention facility without holding them in these containers. In a random check that Yesh Din carried out at midday on the same day, immediately after this statement was made, three Palestinian detainees were found inside one of the containers.

From the detention cells, groups of detainees and defendants are taken into the courtrooms and seated in the defendant dock. The number seated on the dock benches varies according to the case load and is usually greatest at hearings on extension of detention. Only two family members of every detainee or defendant are permitted to enter the courts to observe the proceedings.[108] The courtrooms used for detention proceedings are usually

105. Although there are large fans in the detention cells area of the Samaria Military Court, the letter from The Public Committee Against Torture in Israel and Physicians for Human Rights-Israel notes that on the day of their inspection, only one of these fans was turned on – and it was pointed toward the room used by personnel of the IPS Nahshon escort unit.

106. These particulars were stated to Yesh Din by an IPS officer on November 11, 2007. This officer's name is on file with Yesh Din.

107. The officials' names are on file with Yesh Din.

108. See p. 82.

very crowded, both by detainees and the audience, but the other courtrooms are relatively empty, and at times most of the public seating is vacant. For family members, this is usually a rare opportunity to meet their relatives who are in detention,[109] but the security guards in the courtroom absolutely forbid the detainees to converse with their family members there. This situation sometimes leads to violence between the guards and the detainees inside the courtrooms. The following quotations from Yesh Din observation forms illustrate the atmosphere that sometimes prevails in these courtrooms:

→ *At the conclusion of the hearing, the mothers attempted to touch their children [juvenile detainees who were brought to the courtroom]. IPS personnel literally pounced on the mothers and pushed them away from their children. One of the policemen seized a child forcibly and physically threw him out of the courtroom. Miraculously, the child was unhurt. The judge ignored this incident.*[110]

→ *In the course of a hearing, a policeman pounces on one of the other defendants in the dock, seizes him by the collar, brings his face up close, and tells him "if you don't go back to your seat I'll crush you." The assaulted defendant's attorney appeals to the judge to intervene and to reprimand the policeman. The next hearing begins with defense counsel demanding the identity of the assaulting guard. The attorney moves for the incident to be recorded and for a complaint to be lodged with the Police Investigation Department. The judge says that he is recording everything in the transcript, but that it is defense counsel who must handle the complaint.*[111]

→ *A recess is called, and the judges leave the courtroom. Attorney [...] continues conversing with the defendant, apparently in an attempt to conclude a plea bargain with him, but IPS and Border Police personnel seek to remove the defendant from the courtroom and are not willing to permit another few minutes of conversation. The defendant runs amok and begins to rampage, and seven guards pounce upon him violently in order to subdue him. One of them chokes him. Meanwhile his mother looks on, crying out and weeping. Once the defendant is brought under control, he is forcibly removed from the courtroom. The prosecutor explained to us that conversation between*

109. For the limitations on family visits, see the B'Tselem report **"Barred from Contact: Violation of the Right to Visit Palestinians Held in Israeli Prisons"** (September 2006).

110. Yesh Din observation report form no. 1217 (Judy Lotz and Ruth Ben-Shaul). Hearing in the Judea Military Court on May 29, 2007 (case number unknown to Yesh Din).

111. Yesh Din observation report forms nos. 607 and 608 (Judy Lotz and Ruth Ben-Shaul). Hearing in the Judea Military Court on December 26, 2006.



*defendant and counsel is prohibited in the absence of the judge. He thereby justifies the violent incident.*[112]

→ *The wife, mother, and sick child of the defendant were present in court, weeping. The soldiers did not permit the defendant to speak with his wife, even though defense counsel told them that the child had undergone surgery and that the defendant was seeking to find out how he was. The soldiers completely disregarded this request and literally expelled the family from the courtroom. The defendant appeared very despondent. He constantly attempted to wave to his wife and child, but was forbidden to make any move. The judge appeared to disregard the defendant's problem and did not instruct the guards to let the defendant converse with the child. The judge was listless and periodically looked at his wristwatch.*[113]

→ *The defendant and his family members are not permitted to leave the courtroom during a recess. They sit there for hours with no food or water.*[114]

Family members of detainees and defendants await their relatives' hearings in fenced enclosures on the courts' premises, where the Palestinian visitors are let in and out at the discretion of staff personnel on site. The families' enclosure at the Judea Military Court was refurbished during the past year, and a refreshment kiosk was even opened inside. On the grounds of the families' enclosure at the Samaria Military Court, an air conditioned mobile structure was added in recent months to serve as a waiting room. At each of these courts, two toilet stalls are designated for visitors. Repeated inspection conducted by Yesh Din in the four visitors' toilet stalls at these courts found that they are invariably filthy. Family members are allowed to leave the enclosures only when they are summoned to the courtrooms for their relatives' hearings.

The courtrooms themselves are situated in temporary (prefabricated) structures. Family members are seated in the public seating area, which is separated by a railing from the dock and the defense desk. Noise inside and outside the courtrooms, coupled with the fact that in many cases the interpreters and judges do not speak loudly, often make it difficult to follow the hearings. Yesh Din observers have frequently characterized the hearings they witnessed as "noisy" and "unruly." Here is a small sampling of their impressions:

---

112. Yesh Din observation report form no. 1120 (Nura Resh and Ilana Meki Shapiro). Samaria Military Court, case no. 4815/06, hearing on April 26, 2007.

113. Yesh Din observation report form no. 682 (Tzvia Shapira). Judea Military Court, case no. 3113/06, hearing on March 30, 2007.

114. Yesh Din observation report form no. 934 (Keren Ben Dov). Judea Military Court, case no. 3940/06, hearing on March 13, 2007.



Public seating in one of the courtrooms at Samaria Military Court.

→ *Throughout today's hearings, there was noise in the courtroom, mainly due to the unhindered entry and exit of soldiers, Border Policemen and the like. As the doors opened and closed, they emitted a terribly load creak. Truly unpleasant to the ears.*[115]

→ *The courtroom is very small, and four defendants are crammed into the dock. A lot of noise, entries and exits, and talking. Very hard to follow the goings-on in this uproar. The judge does not insist on clear interpretation, and does not see to it that statements can be heard.*[116]

→ *A lot of uproar in the courtroom. No interpreter present in the room. Halfway through the hearing, another attorney comes in and talks with the judge about some other matter.*[117]

115. Yesh Din observation report form no. 958 (Nura Resh). Samaria Military Court, case no. 4884/06, hearing on March 21, 2007.

116. Yesh Din observation report form no. 1099 (Judy Lotz and Ruth Ben-Shaul). Judea Military Court, case no. 4959/06, hearing on December 26, 2006.

117. Yesh Din observation report form no. 1183 (Keren Ben Dov). Judea Military Court, case no. 4490/06, hearing on May 1, 2007.



→ *The courtroom was extremely noisy, and the judge did nothing to quiet it down, except for a slight gesture. It was almost impossible to hear what was being said in the courtroom.*[118]

Yesh Din observers were requested to specify in their report forms whether the conditions that prevailed in the courtrooms were appropriate. In 330 forms out of 810, various problems were listed,[119] including noise (266 hearings), cold (82), overload and crowding (28), and so on:[120]

→ *Heavy rain beating on the courtroom roof makes it hard to hear. People entering and leaving the courtroom drag in a lot of mud on their feet. There is nowhere to scrape off muddy shoes.*[121]

→ *The air conditioning is feeble. It is hot and people are sweating. The sun comes in through the windows onto the family members' seats and our own. It is hard to hear the judge, who speaks softly. The interpreter is hard to hear.*[122]

In response to Yesh Din's request to receive copies of procedures, rules, or orders regulating the Military Courts or other pertinent military units with respect to required physical conditions in the courtrooms of the Military Courts, the IDF spokesperson noted that "in the matter of physical conditions in courtrooms, there exists no written procedure or order. Nonetheless, appropriate standards are maintained in this regard."[123]

---

118. Yesh Din observation report form no. 1418 (Keren Ben Dov). Hearing on July 25, 2007 in Judea Military Court, case number unknown to Yesh Din.

119. In numerous cases, the observers noted problems about the conditions at hearings only on forms relating to a single hearing, even if these problems extended over several hearings that were held on the same day in the same courtroom. The figure of 330 report forms thus represents a minimal estimate, and the proportion of hearings in which problematic conditions were noted is higher.

120. The total comes to more than 330 since the observers sometimes noted more than one problem at the same hearing.

121. Yesh Din observation report form no. 806 (Tzvia Shapira). Judea Military Court, case no. 3063/06, hearing on February 6, 2007.

122. Yesh Din observation report form no. 1466 (Rohaleh Hayut and Nura Resh). Samaria Military Court, case no. 2186/07, hearing on August 23, 2007.

123. IDF Spokesperson's response to questions from Yesh Din, July 30, 2007.

## Weapons in the courtroom

While hearings are in progress, numerous security personnel are present in the courtrooms. At the Judea Military Court, the security guards are usually IPS personnel posted at the adjacent prison facility, whereas at the Samaria Military Court they are servicemen of the IPS, Military Police, and Border police. At both courts, unarmed members of the IPS Nahshon escort unit are also present as they bring in the detainees and defendants.

At least one of the security guards in every courtroom carries a loaded M-16 weapon. In many cases, the barrel of this gun – intentionally or unintentionally – was pointed at the relatives of the defendants, as they sat in the public seating area of the courtroom.

This occurred, for example, at hearings that took place in courtroom no. 1 of the Samaria Military Court on the morning of November 11, 2007. In the courtroom on that morning were five defendants and eight members of their families, as well as two Military Policemen and five to seven members of the IPS Nahshon escort unit, three of them armed with M-16s. Two of the weapons in the courtroom were loaded.[124]

In interviews held by Yesh Din with IPS personnel who served as security guards in courtrooms of the Samaria and Judea Military Courts, they noted that the loaded firearms are brought into the courtrooms for deterrence only, and that the security guards are instructed not to use them in the event that a violent incident develops. In such a case, they are instructed to use only the tear gas devices that they are supposed to carry. However, one of the IPS servicemen noted that the security guards in the courtrooms are not usually equipped with tear gas.[125]

In an interview with the public relations officer of the Military Courts Unit, Lt. Wafi Hanifas, a Yesh Din volunteer expressed her discomfort with the fact that many prosecutors appear in court for hearings wearing a pistol in a holster belt. Lt. Hanifas promised to look into the matter.[126]

---

124. Observation conducted by Ran Goldstein and Lior Yavne.

125. These interviews were conducted in August 2007. The names of the IPS servicemen interviewed by Yesh Din are on file with Yesh Din.

126. Yesh Din interview with Lt. Wafi Hanifas, public relations officer of the Military Courts Unit, Ofer military base, August 8, 2007. Yesh Din was represented in this interview by Judy Lotz, Emily Schaeffer, and Lior Yavne.







**IN RESPONSE TO THE DRAFT OF THIS REPORT, THE IDF SPOKESPERSON STATED ON BEHALF OF THE MILITARY COURTS UNIT:**

→ The claims [in respect of the detention cells on the premises of the Military Courts] are not true. From inquiring with the persons responsible in the Israeli Prison Service, there is no limitation for the number of times that a prisoner can go to the restrooms. The size of a prison cell in the Judea court is 9 sqm and not 2.5 sqm as claimed in the report.

→ The Military Courts have waiting halls that would not shame any other court of law. These are tidy, air conditioned buildings that offer many seats. The Judea court has even opened a cafeteria for visitors to the courthouse.

# CHAPTER C

## DUE PROCESS RIGHTS IN THE MILITARY COURTS

Two codes of international law constitute the legal framework that applies to the State of Israel's control over the Occupied Territories (OT): international humanitarian law (also known as the law of armed conflict) and international human rights law. These two codes, which are separate but complementary, include an enumeration of the rights of detainees, suspects, and defendants, which the state is required to respect in the course of legal proceedings that it conducts against civilians. Regarding most of the rights enumerated in these codes, no distinction is made between proceedings in an ordinary (civilian) court and those conducted in a military court. This bundle of rights, which includes the rights known as "due process" rights, is the minimum prescribed by international law, and any denial of them is perceived as creating a real and significant danger of a miscarriage of justice.

Besides the law of armed conflict, including the law of belligerent occupation, the main instruments that prescribe the standards incumbent on the Israeli Military Commander when putting Palestinian civilians on trial in the OT are the provisions of international human rights law, as enumerated in a series of international conventions to which Israel is a party. The provisions of these conventions complement those of the law of armed conflict where the latter are deficient by filling in lacunae or facilitating interpretation. The Government of Israel has for years officially declared that the provisions of international human rights law do not apply to its operations in the OT, as according to its perception this area of international law applies only to relations between states and their citizens, and not to relations between a state and the inhabitants of territory that is held by its army under belligerent occupation. The HCJ justices have avoided endorsing this position of the Government of Israel. Although the HCJ has referred to this issue many times in petitions filed over the years, the justices chose not to decide the question of applicability of international human rights law to the OT, leaving it pending while assuming for the sake

of argument that this body of law does apply to the OT.[127] In contrast to the HCJ, the competent international legal authorities have utterly rejected the Government of Israel's position on this issue. Thus, for instance, the advisory opinion of the International Court of Justice at The Hague in *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory* discussed Israel's arguments regarding the applicability of international human rights law provisions (and particularly the ICCPR, the *International Covenant on Social and Economic Rights* and the *Convention on the Rights of the Child*), rejected the arguments, and ruled that these provisions do apply to the OT.[128]

In the introductory passages of this chapter's various sections, the reader will also be referred to the regional legal instruments that have reinforced, *inter alia*, the right to due process in Europe, Africa, and the American continent. The references to these instruments, which of course are not binding on the Israeli military occupation authorities in the OT, are intended to exemplify the universality of international standards that Yesh Din employs in this report to evaluate the Military Court system in the OT.

## 01 PRESUMPTION OF INNOCENCE

### (a) International legal standards

The presumption of innocence is one of the basic preconditions for conducting due process, and has been recognized as such in all the conventions of international human rights law. Article 14(b) of the *International Covenant on Civil and Political Rights*[129] [hereinafter: ICCPR] states:

---

127. E.g., the President of the Supreme Court, Justice Aharon Barak, noted in his judgment on one of the petitions filed against the route of the separation barrier: "Is it possible to base the rights of the inhabitants, who are protected by international conventions on human rights, which are centered around the 1966 ICCPR, and to which Israel is a party [...] when this question arose previously in the Supreme Court, it was left open and the Court was prepared – without deciding the issue – to rely on the international conventions [...] We will adopt a similar approach. Indeed, we are not obliged, in respect of the petition now before us, to take a position on the question of applicability of international conventions on human rights in the Area [...] Nonetheless, let us assume – without deciding the issue – that the international conventions on human rights do apply to the Area." Para. 27, judgment on HCJ 7957/04, **Zahran Yunis Muhammad Mara'bah v. Prime Minister of Israel**, SC case 3335 (3) 2005. See also para. 18, judgment on HCJ 769/02, **Public Committee Against Torture in Israel v. Government of Israel** (yet unpublished). For more on this issue, see also Orna Ben Naftali and Yuval Shani, Living in Denial: The Application of Human Rights in the Occupied Territories, **Israel Law Review** 37(1)(2003-2004), pp. 17-118.

128. *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory*, Advisory Opinion (International Court of Justice, July 9, 2004), 43 IL M 1009 (2004), paras. 102-113.

129. The convention was signed by the State of Israel on December 19, 1966, ratified on August 18, 1991, and came into effect for the State of Israel on January 3, 1992.