Everyone charged with a criminal offence shall have the right to be presumed innocent until proved guilty according to law.

Article 16(2) of the *European Convention for the Protection of Human Rights and Fundamental Freedoms*[30] [hereinafter: ECHR], Article 8(2) of the *American Convention on Human Rights*[31] [hereinafter: ACHR], and Article 7(1)(b) of the *African Charter on Human and Peoples' Rights*[32] [hereinafter: ACHPR] feature similar language.

## (b)   Security Legislation

The Order Concerning Security Provisions (OCSP) and other orders included in the Security Legislation do not stipulate any explicit provision as to the presumption of innocence, except for stating that in rules of evidence the Military Courts shall follow the practices accepted in Israeli courts.[133]

## (c)   The presumption of innocence in the Military Courts

### Rate of acquittals

Two main indices are employed to evaluate the degree to which presumption of innocence is observed in court. One such index tests the judicial rulings themselves in order to determine to what extent the court accepts the evidence submitted by the Prosecution, and whether it indeed places the onus of proof on the Prosecution to pass the threshold of "beyond a reasonable doubt."

A systematic evaluation of judicial rulings in legal proceedings would entail checking each and every interim decision that was handed down by the Courts' judges, and addressing the strength and validity of the evidence put before them. As noted in the introduction to the present report, this is not the kind of inquiry that Yesh Din undertook when it set out to evaluate the implementation of due process rights in the Military Courts. This study does not address the question of whether the Military Court judges' rulings are "right" or "wrong."

---

130.   Signed on November 4, 1950.

131.   Signed on November 22, 1969 and came into effect on July 18, 1978.

132.   Adopted on June 27, 1981 and came into effect on October 21, 1986.

133.   Order Concerning Security Provisions, Section 9.



Yet even if the substance of the judicial rulings in the course of legal proceedings is beyond the scope of this study, the rate of acquittals in Military Courts constitutes a clear indication as to how scrupulously the presumption of innocence is observed in the military judicial system of the West Bank.

It appears that the answer is practically self-evident from the figures (the data supplied by the Military Courts Unit itself) and requires no further explanation. Out of 8,854 cases that were adjudicated[34] in the Military Courts during 2006, only 26 cases – which make up 0.29% of the cases – ended in the defendant's full acquittal of the offenses imputed to him. In all the rest of the cases – 8,828 cases, which represent 99.71% of the cases adjudicated – the defendants were convicted of at least some of the offenses for which they were indicted.

The following table presents the figures for acquittals and convictions among the cases that were adjudicated in 2006 by the Military Courts, broken down by the categories of offenses in the indictments.

Table 3: Acquittals and convictions in the Military Courts, 2006[35]

| Category | Cases adjudicated | Full acquittals | | Full/partial convictions | |
|---|---|---|---|---|---|
| | | number | pct. | number | pct. |
| HTA | 2,943 | 8 | 0.6% | 2,925 | 99.39% |
| Disturbances | 882 | 2 | 0.23% | 880 | 99.77% |
| Criminal | 248 | 2 | 0.8% | 246 | 99.9% |
| IPI | ,297 | 2 | 0.5% | ,295 | 99.85% |
| Traffic | 3,484 | 2 | 0.05% | 3,482 | 99.94% |
| Total | 8,854 | 26 | 0.29% | 8,828 | 99.7% |

It should be noted that in numerous cases, defendants are acquitted of some counts in their indictments but convicted of others, and in a major part of the cases this results from a plea bargain reached between the Prosecution and the Defense. The low rate of acquittal

---

134.   In 2006, the military courts concluded their proceedings in 9,123 cases. In 269 of these (2.95% of the concluded cases), legal proceedings were waived for various reasons. The other 8,854 cases were adjudicated; MCU 2006, p. 10; IDF Spokesperson's response to questions from Yesh Din, July 30, 2007 and October 14, 2007.

135.   Source of the figures: MCU 2006, p. 10; IDF Spokesperson's response to questions from Yesh Din, July 30, 2007 and October 14, 2007.

is both a foundation and a product of the mechanism that makes the Military Courts tick – the plea bargain mechanism. This subject will be expanded upon later in this chapter.

## Release of suspects from detention

A second index for measuring how meticulously the presumption of innocence is respected pertains to the court's readiness to release from detention both suspects (before an indictment is filed) and defendants (before conviction). The release of suspects and defendants is ostensibly a corollary of their presumed innocence and of the principle whereby detention is not an advance payment on account of their sentence (as at these stages the defendant is presumed to be innocent).

Out of 118 hearings on extension of detention for the purpose of interrogation (not including, of course, hearings on extension of detention "until the end of proceedings," which take place only after an indictment is filed) that were observed by Yesh Din volunteers, only one detainee was released. Only in 92 of these 118 hearings were the Yesh Din observers able to hear, over the commotion of the extension hearings courtroom, for how long the judge ruled to extend the detention. In these instances, the Military Court judges extended the suspects' detention for an average of 10.2 days. [136]

Yesh Din volunteers timed the duration of every extension hearing, including the judge's reading of the documents submitted to him by the Prosecution, the statements of the prosecutor and defense counsel, the interpretation of everything verbalized in court into Arabic, and so on. It was found that a hearing on extension of detention in the Military Courts lasts an average of three minutes and four seconds, from start to finish. Taken together, the aforementioned findings indicate that three minutes and four seconds is the average time that a military judge takes to extend a person's detention for an average of over 10 days.

Yesh Din volunteers observed 38 hearings on extension of detention until the end of proceedings. The observation findings for these hearings show that the average time devoted to them is even shorter than for hearings on extension of detention for the purpose of interrogation. As already mentioned, these hearings may result in a person's detention for a period of over a year, or even two, before his case is adjudicated (see below). Yesh Din volunteers established that these hearings last for an average of one minute and 54

---

136.    It should be noted that Yesh Din observers were usually unable to determine whether the hearing was on a first, second, or subsequent extension of detention, and this figure refers to the total of such hearings that were observed (excluding hearings on extension of detention until the end of proceedings).



seconds. In every one of these hearings, the Court granted the Prosecution's motion to extend the defendant's detention for the duration of proceedings.

**Table 4: Timing of hearings on extension of detention until the end of proceedings that were attended by Yesh Din observers**

| Number of hearings that lasted for less than one minute | ·2 |
|---|---|
| Number of hearings that lasted for one to two minutes | ·9 |
| Number of hearings that lasted for two to four minutes | 7 |
| Total hearings | 38 |

As a rule, conducting a trial while the defendant is in detention is the regular practice rather than the exception. Out of 590 reports by Yesh Din observers from hearings that did not relate to extension of detention, but rather other proceedings in the course of a trial, in 541 cases the defendant was in custody, and only in 35 hearings was the defendant released pending a judgment.

In response to a question from Yesh Din, the IDF Spokesperson stated there was no figure on file for the number of cases in progress in the Military Courts in which the defendant is in detention or released. However, as of December 31, 2006 there were 3,183 cases pending in the Military Courts of first instance, of which in 2,116 cases – two-thirds of the cases – the defendant was held in custody, while in the rest he was free.[37] It can be assumed that most of the cases in which the defendant was free pertained to traffic violations or other slight offenses.

### Judges' views

As part of Yesh Din's research methodology, and in order to ensure impartial documentation of court hearings, the observers were instructed by the organization not to engage in conversation with prosecutors and judges in the courtroom. However, courtroom observers of the MachsomWatch organization conducted several conversations with judges – mainly reservists – in the Military Courts, and these judges' remarks revealed some of the worldview that they brought with them to the courtroom.

---

137.   IDF Spokesperson's response to questions from Yesh Din, July 30, 2007.

Thus, for example, MachsomWatch observers recorded the remarks of a judge at the Judea Military Court in April 2006:

*When the session ended, we stayed on for a few minutes and the judge told us at length how hard the GSS was working and how reliable he considered its investigations, and he explained that the detention and prison facilities were bursting with detainees who clearly were not detained without reason, but were dangerous people.[138]*

In another hearing, a military judge in a courtroom of the Kishon Military Courtroom (which is dedicated to extension of detention hearings) praised the quality and quantity of rights that are granted to detainees by the military judicial system, and made remarks to the effect that "these are all suicide terrorists, and we look after their rights and translate for them." When asked by a MachsomWatch member whether this applied to them "all," he replied: "Most of them. They are suicide bombers, terrorists who blow themselves up. They were caught en route to committing suicide attacks, and confessed it."[139]

In yet another hearing, at the Judea Military Court, a judge interrupted defense counsel when the latter stated that the defendant was a policeman of the Palestinian Authority and that his weapon was legal. The judge said: "Rabin did indeed give them weapons; after Oslo they received weapons from Israel and this was his mistake, Rabin's. What a shame to us that he did so."[140]

## Presumption of innocence from a defense attorney's viewpoint

The seasoned attorney Jawad Bulus responded at length to Yesh Din's question as to his opinion about presumption of innocence in the Military Courts. This was his reply:

The answer to this question has to be given from one's experience, as at the theoretical level everyone will come and say "of course." The Prosecution, the prosecuting attorneys, and certainly the judges, as well as any lawyer who appears

---

138.  MachsomWatch, In the Eyes of Justice: Observations at Military Courts in the State of Israel (Hebrew, October 2006), p. 39.
139.  Ibid., p. 40.
140.  Ibid., p. 39.



once a year, will tell you: "No, no, it exists." So unlike this theory, I would like to rely on experience, and experience simply negates this claim absolutely. In my opinion, the presumption that prevails in the Military Courts, as they have consisted over the years, and at least recently – and I have monitored this system for more than two decades – in recent years, the erosion resulting from a lack of commitment to this presumption is almost total. This is so much the case that I would not be mistaken in saying that the opposite is presumed: that everyone who is brought before a military court is presumed guilty so long as he has not managed to prove his innocence.

In order not to let this appear as a political or pugnacious claim, let me make two remarks. First, the basic practices that guide any court – any ordinary court – which is supposed to operate in the realm of ordinary, criminal, law... There is a stage that precedes a trial, the stage when detention is extended for the duration of proceedings. Afterwards, the indictment is filed, and recently... there are all kinds of practices in the State of Israel, especially after the Basic Law: Human Dignity and Liberty was enacted, there are quite a number of practices, or at least schools of thought, that are increasingly beginning to tip the balance toward liberty up to the stage of conviction. At any rate, there are practices developing on the basic presumption that a person is innocent so long as he has not been convicted; of course, the law itself imposes some limitations... but the legislator made a determination, practice develops the legislator's intent, and this could have been most welcome. However, no such thing actually exists in the Military Courts – for slight as well as serious offenses – and I am referring to really slight offenses, the very slightest, from routine disorderly conduct, or even taking part in an assembly; even acting as a member [of an unauthorized association], even performing any kind of service... offenses that cannot be held to constitute commission of any prohibited act, except perhaps thoughts or the like.

In all such cases, regrettably, there is almost no practice – at least in principle – that holds a person to be entitled to stand trial as a free person, subject of course to such bond as the court should see fit to impose. So I say that at this stage, there is almost no possibility to obtain the release of a Palestinian who is brought before the Military Court, no matter what arguments are submitted – [for instance] that in the State of Israel, courts might in similar cases opt to release him.

My other remark is that the standard of evidence that is required to prove an indictment, and the mode of contending with it in court, are completely different from the standard

that prevails in the State of Israel, and the difference is to the disadvantage of defendants in the military system. The levity with which the Military Courts and judges treat deficiencies and omissions in the examination of witnesses or in the completion of investigations as the case sometimes demands, at the level of assistance, the level of "something extra" that is required – all kinds of things like these… In my opinion, anyone who delves deeper and conducts a comparative study between the courts in the State of Israel and the Military Courts – and I am not saying that the courts in the State of Israel are paragons – well, I say that even in [comparison with] their present, unfortunate state of affairs the situation [in the Military Courts] is very disturbing.

Therefore, based on my experience I say – and sometimes experience does not have to be proved – I speak, of course, about the general rule. There are of course other judges; there are, of course, other prosecutors, but I speak about the prevalent rule, the prevailing atmosphere, and if here and there some exceptions occur, they only prove the rule. Therefore I say – with respect to this issue, the presumption of a defendant's innocence – that I would confidently state, based on experience, from long years of impressions and quite a number of cases in which the prognosis was different from the judgment that was finally handed down, that a Palestinian who is brought before a Military Court is presumed guilty, and must prove his innocence, rather than the opposite as conventionally accepted.'[41]

## (d)    Conclusion

At the outset, adjudication of civilians by Military Courts, some of whom are suspected of involvement in activity against the IDF and/or the State of Israel, is problematic with respect to the presumption of innocence. The military officers serving as judges on the bench cannot divest themselves of their identities, both as Israelis and as military men, when judging those perceived as their enemies: persons to whom involvement in the activity of Palestinian organizations is imputed.

Special concern in this regard arises in the case of judges who are military reservists. These reservists, as already mentioned, are selected for duty without having any judicial experience, and the professional qualifications required of them consist of some (minimal)

---

141.    The interview was conducted by Edna Kaldor and Lior Yavne in Jerusalem, August 13, 2007.



seniority as attorneys. Those among them who gave free rein to their opinions in open conversations well exemplified the inadequacy of this nomination method. As described in the previous chapter, the Military Courts-Martial Unit was granted an amendment to the Military Jurisdiction Law, which allows it to utilize the services of reservists who are retired military judges or judges in the "ordinary" judicial system. This arrangement ought to be implemented by the Military Courts in the OT.

The detention of suspects who are brought before the Military Courts is almost always extended, in very brief hearings. Thus, a few minutes usually suffice to send a man into detention until the end of proceedings in his case.

A minute percentage of the indictments filed in the Military Courts end with the defendant's full acquittal. Of the indictments that reach a final judgment, 99./1% lead to conviction on all or some of the counts. Analysis of the data for acquittals by the various categories of offenses indicates that the vast majority of acquittals were handed down in prosecutions for HTA offenses – that is, the security offenses which are the gravest in the range of violations for which Palestinians are tried in the Military Courts. This appears to stem from the fact that such full acquittals are handed down only after a full trial, including presentation of evidence – certainly not as a result of plea bargains, in which the defendant pleads guilty on some of the counts in exchange for other counts being dropped, or for a lighter punishment. As will be shown below, plea bargains are the mainstay of the Military Courts, while full-evidence trials are a tiny minority. All of the above indicates that application of the presumption of innocence in the Military Courts is quite deficient.

## (e)    Recommendations

**1.** The appointment of reservists without judicial background to the position of judges of the Military Courts must cease, and instead the IDF should appoint former judges, now in reserve service, as legislated for the IDF Courts-Martial.

**2.** The number of military judges presiding over detention proceedings, as well as the facilities where these hearings are held, should be modified such that defendants have sufficient opportunity to defend themselves against motions to extend their detention.



**IN RESPONSE TO THE DRAFT OF THIS REPORT, THE IDF SPOKESPERSON STATED ON BEHALF OF THE MILITARY COURTS UNIT:**

→ The rate of full acquittals from all the cases in the Military Courts is much higher than the rate of acquittals in courts in Israel, where the rate of full acquittal from all cases (for 2005) is 0.1% (according to data from the Central Bureau of Statistics, Statistical Yearbook for Israel 2007, p. 482).

→ Assumption of innocence[142] is meticulously upheld in the Military Courts. The feelings of one defense attorney cannot replace facts: the percentage of full acquittals is significant, partial acquittals are even more common, the accused is given full opportunity to voice his arguments and present his witnesses, professional, serious and in depth consideration by the judges of the parties' arguments. Therefore, the Military Courts meet all professional standards prevalent in developed countries, and there is especially a maximum closeness to the legal system in Israel in all aspects and regards. In administrative proceedings as well, the courts tend to intervene significantly in the decision of the military commander, and shorten or annul warrants, in cases where the judge has not been convinced that the sanction is necessary. This activity on behalf of the court, is a source of pride to a system, that despite its being a military system, knows how to maintain and uphold its independence, its great professionalism, and its continuous aspiration for just trial.

→ It is incorrect to present an average hearing time. There is no room for including in these statistics hearings in which both parties agree, both the defense attorney for the accused as well as the prosecutor, to remand custody. Such hearings are naturally shorter, and this is also true in the courts in Israel. It is necessary to check the length of the hearing when the defense attorney objects to the remand request, and argues his request. In these cases, hearings can take a significantly longer amount of time, in such a manner as to allow both parties to present their arguments to the court, as well as to allow the judge to formulate a reasoned decision.

---

142.   In translating the original Hebrew version of this report, Yesh Din translated the same term as "presumption of innocence."



True, the number of judges is small compared to the number of cases (a total of 14 judges in all instances). The system acknowledges that work load on the judges is very great. Too great, even. The IDF acknowledges the lack of judges and it was recently decided to increase the number of judges in the first instance by two additional persons. Of course, one should remember that besides the judges in career service, there are also judges on reserve duty, and they are all legal practitioners from the private and public sectors, both from the prosecution and from the defense. Either way, an in-depth review of the courts' decisions shows that the load borne by the judges does not detract from their professionalism.

## 02    THE RIGHT TO A PUBLIC TRIAL

### (a)    International legal standards

The principle of a public trial is one of the most important elements of due process rights, and some say that it is the precondition for the implementation of the other rights. Without a public trial, there can be no public oversight, and in the absence of such oversight there is a heightened risk of a miscarriage of justice. However, the right to a public hearing is not an absolute principle. All legal codes, including international law, recognize that in certain cases – which are naturally circumscribed – the public nature of a trial may be limited in favor of other interests, particularly the protection of minors or the protection of state security, or whenever the court deems that restrictions on publicity will serve the interest of justice.

The principle of a public trial is manifested in a considerably limited manner by the Fourth Geneva Convention. The latter's provisions do not stipulate general public access to judicial proceedings conducted against defendants in military courts. Instead, the Convention's provisions hold the occupying power responsible for informing the "protecting power"[143] of details concerning a defendant's identity, the offenses imputed to him, the place of his detention, and the time of the first hearing in his trial – all at least three weeks before the commencement of the defendant's trial.[144] Article 74 of the Fourth Geneva Convention asserts the right of the protecting power's representatives to witness the hearings in trials of defendants charged with offenses punishable by more than two years' imprisonment.[145]

143.    A "protecting power," under Articles 9 and 11 of the Fourth Geneva Convention, is a neutral state or international organization that undertakes to protect the interests of the parties to a conflict. With respect to the OT, no state has undertaken this function. The International Committee of the Red Cross did undertake several of the tasks reserved for a protecting power, but not in the context of any judicial proceedings.

144.    Article 71 of the Fourth Geneva Convention. This article further provides that no trial shall take place unless proof is presented at its commencement that such obligatory notification to the protecting power has been made.

145.    The language of Article 74 of the Fourth Geneva Convention is: "Representatives of the Protecting Power shall have the right to attend the trial of any protected person, unless the hearing has, as an exceptional measure, to be held *in camera* in the interests of the security of the Occupying Power, which shall then notify the Protecting Power. A notification in respect of the date and place of trial shall be sent to the Protecting Power. Any judgment involving a sentence of death, or imprisonment for two years or more, shall be communicated, with the relevant grounds, as rapidly as possible to the Protecting Power. The notification shall contain a reference to the notification made under para. 71 and, in the case of sentences of imprisonment, the name of the place where the sentence is to be served. A record of judgments other than those referred to above shall be kept by the court and shall be open to inspection by representatives of the Protecting Power. Any period allowed for appeal in the case of sentences involving the death penalty, or imprisonment of two years or more, shall not run until notification of judgment has been received by the Protecting Power."



Nevertheless, international human rights law, as manifested in the ICCPR as well as the regional conventions, ascribes great importance to the principle of a public trial. Article 14(a) of the ICCPR lists the obligations incumbent on the state with respect to public trials:

[...] In the determination of any criminal charge against him, or of his rights and obligations in a suit at law, everyone shall be entitled to a fair and public hearing by a competent, independent and impartial tribunal established by law. The press and the public may be excluded from all or part of a trial for reasons of morals, public order or national security in a democratic society, or when the interest of the private lives of the parties so requires, or to the extent strictly necessary in the opinion of the Court in special circumstances where publicity would prejudice the interests of justice; but any judgment rendered in a criminal case or in a suit at law shall be made public except where the interest of juvenile persons otherwise requires, or the proceedings concern matrimonial disputes or the guardianship of children.

The United Nations Human Rights Committee, which is the body empowered to interpret the ICCPR, has noted that the publicity of court proceedings constitutes an important tool for an individual on trial in court, and benefits society in general. The Committee further stated that even though Article 14(a) of the ICCPR permits, in certain cases, to hold court hearings *in camera*, such cases are exceptional by nature and, as a rule, proceedings should be open to the public, including the press. The Committee also noted that access to court proceedings should not be limited to a certain category of persons. Finally, the Committee asserted that in those cases in which public access to a hearing is denied, the judgment should be made public, subject to specific and clear limitations.[146]

The ECHR states that every person is entitled to a "fair and public" trial, although public access to all or part of the trial may be limited for reasons stemming from morals, public order, or national security in a democratic society, when the interests of minors or the protection of litigants requires this, or alternatively in whatever measure the court deems necessary under the special circumstances in which publicity might endanger the

---

146.   UN Human Rights Committee, *General Comment no. 13: Equality before the courts and the right to a fair and public hearing by an independent court established by law (Article 14)* [Hereinafter: "General Comment 13"], para. 6. The UN Human Rights Committee is currently preparing General Comment no. 32, which will serve to update and replace General Comment 13. Overall, the draft of General Comment no. 32 enhances the rights of due process beyond the provisions in the present language.

administration of justice.'[47] The ACHR reduces even further the scope of limitations on the principle of the public trial and states that "criminal proceedings shall be public, except insofar as may be necessary to protect the interests of justice."[48]

## (b)   Security Legislation

Provisions concerning the right to a public trial are specified in Section 11 of the OCSP. Sub-section (a) states:

> A military court shall conduct its hearings in public, but the Court may order that its hearings be conducted *in camera*, in full or in part, if it deems that this should be done for considerations of the IDF troops' security, public safety, or protection of morals, or of a minor's welfare, or if the Court deems that a public hearing is liable to deter a witness from testifying freely, or from testifying at all.

Sub-section (b) empowers the Court to permit a person or "a category of persons" to attend all or part of a hearing, even when the hearing is held *in camera*. Additionally, when a hearing is conducted in public, the Court is authorized to prohibit the publication of any detail relating to the Court's proceedings, in order to protect the security of a litigant, a witness, or any other person whose name was mentioned in a hearing, or in order to protect "security in the Area."[149] Other sub-sections specify additional prohibitions concerning photography in the courtroom,[150] disclosure of particulars from hearings held *in camera*,'[51] and disclosure of suspects' names, for reasons of undermining investigation or security of the Area. Under such circumstances, it is also prohibited to publicize the submission of motions for gag orders.'[52]

In addition to the powers vested in the Court to order that hearings be held *in camera*, as well as the aforementioned provisions of Section 11(a) above, the Military Commander saw fit to empower himself, under Section 11(a) of the OCSP, to submit his written opinion as to whether a trial or other legal proceeding should be held wholly or partially *in camera* in order to prevent harm to the security in the Area. However, the Military Court is empowered, after hearing the other parties, to determine the extent to which the Military Commander's motion

---

147.   ECHR, Para. 6 (a), emphasis added.

148.   ACHR, Article 8 (5).

149.   OCSP, Section 11(f).

150.   Ibid., Section 11(d).

151.   Ibid., Section 11(c).

152.   Ibid., Section 11(g).



should be entertained, and whether to close the hearing entirely or to permit a person or "category of persons" to attend all or part of the hearing.[53]

### (c)    Military Court procedures

In response to Yesh Din's request to receive copies of procedures, rules, or orders regulating the Military Courts or other military units regarding access by the general public and defendants' families to hearings at the Military Courts, the IDF Spokesperson referred Yesh Din to Section 11 of the OCSP, as cited above.[54]

In a letter, the IDF Spokesperson noted that according to the provisions of Section 11, "admittance to the courts is permitted for the general public, and of course for families of the defendants. However, naturally, access to the courts is affected by security considerations and by courtroom capacity."

The IDF Spokesperson further stated that the Military Courts Unit "does not have written procedures regarding access to hearings for the public and for defendants' families."

### (d)    Access to the courts

**Family members:** As clearly indicated by the reports of Yesh Din observers at the Military Courts, the Military Courts Unit does not permit more than two family members of each detainee to enter the court compound and to attend the hearing of their relative's case. It is unknown whether this prohibition is based on any written procedure.

The Court authorities occasionally permit a young child to attend a hearing as a third family member. However, it is unclear who is authorized to permit the entry of an additional family member. In a conversation conducted by Yesh Din with security guards at the Military Court at Salem, they claimed that only the sitting judge is authorized to admit a third family member into the hearing.[55] However, Yesh Din observers frequently heard judges rule, in response to requests by counsel in the courtroom, that only personnel of the Court's security forces have discretion on this matter.[156]

---

153.    Ibid,, Section 11(a).

154.    IDF Spokesperson's response to questions from Yesh Din, July 30, 2007.

155.    This conversation took place at the Samaria Military Court in August, 2007.

156.    Memorandum by Yesh Din observer Roi Maor, August 10, 2007.

**Other audience:** Other than family members who are admitted into the courtroom (and sometimes witness hearings in the cases of other defendants, before or after the hearing of their own relative's case), and observers on behalf of the human rights organizations Yesh Din and MachsomWatch, there are usually no other persons in the audience during court hearings.

An IPS serviceman posted at the entrance to the court compound at the Ofer military base had no response when asked by Yesh Din what action he is to take if a person who is not a family member of a defendant or detainee should request admittance to the courts. He ultimately replied that he believed such a person would have to obtain a permit from the headquarters of the adjacent detention facility.[157]

When Yesh Din questioned the public relations officer of the Military Courts Unit on this matter, Lt. Wafi Hanifas replied that an ordinary person would have no problem entering the courts, but entry would be conditioned on an application having been submitted to the public relations officer a day or two before the date of the intended visit. The decision whether to issue or to deny such a permit would, according to Lt. Hanifas, be at his discretion. According to Lt. Hanifas, before the IPS assumed responsibility for security in the Military Courts, this matter was subject to the procedures of the Military Courts Unit. But since responsibility for the adjacent detention facility was transferred to the IPS in October 2006, new procedures have not yet been formulated, and he would act in this matter as prescribed by previous procedures.

Lt. Hanifas noted that a key restriction on admitting audience into the courtrooms, whether they are relatives of the detainees and the accused or others, is the capacity of the security detail in the courtrooms to allocate sufficient personnel to secure the courtrooms.

According to Lt. Hanifas, besides security considerations, two additional considerations guided the MCU. One was the limited number of seats for the audience in the courtrooms. It should be noted here that while in some courtrooms, such as those reserved for detention hearings in the Judea Military Court, Yesh Din observers did report crowding, in other courtrooms in the same court facility there was usually plenty of empty space for the audience.

A second consideration concerns the presence of an audience in evidentiary hearings. On this matter Lt. Hanifas noted that he personally prefers not to allow the entrance of

---

157.   This conversation took place at the Samaria Military Court on August 8, 2007.



an audience into evidentiary hearings where witnesses testified about harm they inflicted on others or suffered themselves. This, he said, stems from consideration both of the accused and of the victims of the offense: "I personally, as Wafi, do not like the presence of people from outside of the.. in such hearings. In this kind of hearing I personally prefer not to give permission to anyone."[158]

However, Lt. Hanifas stressed that so far, he has not been required to decide whether to admit audience to hearings of this kind, due to the paucity of applications.

Lt. Hanifas's remarks reveal the unreasonably arbitrary conduct of a matter pertaining to one of the most important rights of due process – the public trial. In the absence of written procedures, the authority to grant or deny admission to the court is vested in a junior officer of the Military Courts Unit, who also determines the considerations for making this decision.

## "Let us not pretend that attendance by family members is the same as attendance by others"

The Military Prosecution's sensitivity to public presence in the Military Courts was revealed clearly at an evidentiary hearing in the Judea Military Court, in which a GSS serviceman was due to testify about the interrogation of the defendant, Fuad Shubaki, a former senior official of the Palestinian Authority who was indicted in connection with the arms ship Karin A. The audience included two MachsomWatch observers.

At the outset of the hearing, the military prosecutor, Capt. H.Y., moved to hold the hearing *in camera* and under a gag order. She later consented to attendance at the hearing by the defendant's family members alone. When Atty. Avigdor Feldman, the defendant's defense counsel, noted that this motion would in effect mean the ejection of the MachsomWatch observers, the prosecutor confirmed that this was indeed the case. "It is common knowledge that this is an organization that publishes certain texts relating to proceedings in this Court. The testimony that is to be given is of a sensitive nature. We cannot allow her to observe what the witness is about to be asked. By agreeing that the defendant's family members

---

158.    Conversation by Yesh Din with Lt. Wafi Hanifas, public relations officer of the MCU at the Ofer Base, August 8, 2007. The conversation on behalf of Yesh Din was conducted by Judy Lotz, Emily Schaeffer and Lior Yavne.

attend, we are attempting somehow to minimize the damage that can be expected to be caused. But let us not pretend that attendance by family members is the same as attendance by others."[159]

Even after the Court denied the prosecutor's motion, for considerations of the right to a public trial, the prosecutor's superior, the Military Advocate of the Judea and Samaria Area, Lt. Col. Erez Hason (who up until a few days before this incident had served as President of the Samaria Military Court), was called into the courtroom. Lt. Col. Hason sought to appeal the decision before the Military Court of Appeals. After the Court, despite its reservations, entertained the Prosecution's motion to appeal (which was made with the consent of the Defense), the witness's testimony was postponed.[160]

## (e)   Publication of judgments

International standards require the publication of judgments as part of fulfilling the right to a public hearing (aside from a few narrowly defined exceptions). Temporary solutions have occasionally been improvised by office holders in the military court system, by means of which copies of the judgments were given to lawyers who regularly appeared in the Military Courts. However, with the exception of the aforesaid, no mechanism exists whatsoever by which the public-at-large may locate the Military Court judgments. The findings of Yesh Din on the subject shall be discussed later in this chapter.

### Refusal of the courts to provide observers with the records from court deliberations

As early as the pilot stage of Yesh Din's project to monitor the Military Court hearings, the observers noted that the audience present in the courtroom frequently had difficulty following what was articulated during the hearings. This problem stems from

---

159. Lines 8-12, p. 2, record of hearing on July 23, 2007 at the Judea Miltary Court, case no. 3052/06, Military Prosecutor v. Fuad Shubaki.

160. The full record of this hearing is accessible (in Hebrew) on the Yesh Din website, www.yesh-din.org.



the size of the courtrooms and the placement of the audience benches, as well as the nature of the exchanges between the court, the prosecutor and the defense attorney. In order for the observers in the audience to carry out their task, Yesh Din requested that the Military Courts Unit allow the observers to copy (for a fee) the daily schedules of hearings, which contain, among other things, details about the type of hearing, the name of the defendant, and the type of offense. Yesh Din also requested copies of the records of hearings in which the organization's observers were present, so as to make documentation easier and to receive additional details that appear in the records but are not mentioned aloud in the courtroom, or are recited too fast to be followed and documented.[161]

On November 5, 2006, Yesh Din received an answer from the Military Courts Unit, asserting that the daily schedules of hearings are an "internal administrative document of the Court," and therefore rejected the request to copy them. Nevertheless, it was noted in the response that as a result of Yesh Din's request, it had been decided that the schedule of hearings would be posted at the entrance to the courtroom daily.

Concerning the request to receive the records of the hearings in which observers from Yesh Din were present, the organization was informed that "pursuant to adjudication procedures in the Area [i.e. the West Bank] and in Israel, records of the hearings are given only to the parties involved in the hearings, and not to the audience present during them."[162]

As a result of this response, Yesh Din's legal advisor, Atty. Michael Sfard, contacted the HCJ Department in the State Attorney's office and requested that it address the issue. In his letter Adv. Sfard noted, among other things, that the organization did not request access to records of closed door hearings or those in which a gag order had been issued, but only those to which the principle of a public trial applies. Atty. Sfard further emphasized that Yesh Din commits to cover all the costs involved in copying and receiving the records of the deliberations.[163] When it did not receive a substantive reply to its letter, Yesh Din filed an appeal with the HCJ. In their appeal,

---

161.   Letter from Yesh Din to the MCU, October 15, 2006.

162.   Letter from Second Lieutenant Wafi Hanifas, the MCU public relations officer, to Atty. Michael Sfard, Yesh Din's legal advisor, November 5, 2006. The emphasis is in the original.

163.   Letter from Yesh Din to the State Attorney's Office HCJ Department, Atty. Osnat Mandel, from December 20, 2006.

Yesh Din's lawyers, Attys. Michael Sfard and Shlomy Zachary, wrote *inter alia*, that "the meaningful realization of the principle of a public trial depends not only on the procedural question of the ability to be present in the courtroom, but also on the public's opportunity (or its representatives, whether reporters, academics or human rights organizations) to effectively follow the proceedings and deliberations therein."[164]

After a date was set for hearing the HCJ petition, the State Attorney's office, HCJ Department, sent a letter to Atty. Sfard, in which the State accepted the demands made by Yesh Din in its appeal. The letter stated that it was decided, as a result of the appeal, "that the Military Courts would adopt the law customary in Israel concerning reviewing and copying the records of hearings and the daily schedule of hearings, while adjusting them to the special conditions in the Area."[165] Also noted was that from that date, observers from Yesh Din (and by implication representatives of other human rights organizations) were entitled to copy the daily schedules of hearings, and, upon requesting a "permit for general perusal" of Military Court files, could copy Military Court case files, including hearing records. As of today, Yesh Din holds a permit for general perusal, which it was granted as a result of the appeal.

## (f)    Conclusion

Application of the right to a public trial, in all its various aspects, is rather deficient in the Military Courts. This refers both to the public's ability to observe courtroom deliberations and regular publication of decisions and judgments of the Military Courts.

Damage to the principle of public deliberations in the Military Courts derives in part from factors beyond the control of the Military Courts and Military Prosecution, but falls under the responsibility of the IDF nonetheless. Palestinian residents of the West Bank have been subject to restrictions on their freedom of movement imposed by the IDF – in varying degrees – since the beginning of the second Intifada in September 2000.[166] In fact, in

---

164.    HCJ 4333/07 Yesh Din–Volunteers for Human Rights v. the IDF – Military Courts Unit in the Judea and Samaria Area. To read the appeal, see Yesh Din's website: http://www.yesh-din.org

165.    Letter from Atty. Dana Briskman, chief of HCJ Department in the State Attorney's office, to Atty. Sfard, July 4, 2007. To see the letter, see Yesh Din's website.

166.    In this matter, see for example the B'Tselem report: Ground to a Halt: Denial of Palestinians' Freedom of Movement in the West Bank (August, 2007); periodic reports on the website of the U.N.'s Office for the Coordination of Humanitarian Affairs: www.ochaopt.org.



many cases, family members have difficulty in getting through the IDF checkpoints and to the courts in time for their relatives' hearings, if they reach the courts at all. Among /68 observation forms containing details about the presence of family members in the courtroom, it was noted that in of the hearings (21%), family members were not present at all. [67] It can be assumed that in most of these cases, family members were unable to attend the hearings because of travel restrictions in the West Bank.

Furthermore, two of the courts in the West Bank are located within army bases. The Samaria Court is located in the Salem army camp, very close to the "green line" (Israel within its internationally recognized borders), and those that go there must pass through a gate on the route of the separation barrier, enter the military base and then enter the court area. The Judea Court is located in the Ofer army base, which includes the prison facility over which the IPS was recently assigned responsibility. Those coming to both courts must be checked by security guards, and are subject to the restrictions imposed on observers of the hearings: a quantitative restriction imposed on family members of defendants and detainees who come to watch their relatives' hearings; and, for those visitors who are not relatives, the restrictions deriving from the prior approval of a low-level officer in the Military Courts Unit.

The limitation on the number of relatives who are permitted to enter the courtroom due to constraints on the number of security guards there is unjustified. The security arrangements should be adapted to the number of visitors in the courtroom, and not vice versa.

Moreover, the location of many of the detention hearing courtrooms, which constitute branches of the Military Courts, within the State of Israel absolutely prevents the relatives of Palestinian detainees from observing those hearings. As noted, this contradicts the directives of Article 66 of the Fourth Geneva Convention. Furthermore, the establishment of these Military Court extensions within police stations and prison facilities prevents any unauthorized person – Israeli, Palestinian or foreigner – from entering the hearings.

In addition to these *de facto* restrictions on the presence of an audience in the courtrooms, as set forth above, there is the failure to publish the judgments of the Military Courts. Together, these two elements create a judicial system and a judicial process that takes place far from the public eye, and thus is not substantially exposed to public criticism.

---

167.   Amongst those, 85 hearings concerned detention and the rest were hearings held after an indictment was filed (arraignment, reminders, evidentiary, etc.).

## (g)    Recommendations

**1.** Immediately close the branches of the Military Courts that are located within the State of Israel, and hold all Military Court deliberations within the OT.

**2.** Lift all restrictions on the presence of family members of defendants and detainees whose cases are brought before the Courts.

**3.** Regulate by procedure the entrance of an audience (not restricted to family members of the accused) to the Military Court hearings, without any need for prior approval whatsoever.

**4.** Adapt the Military Courtrooms' conditions and security arrangements to a larger audience.

**5.** Publish the judgments of the Military Courts, and translate them into Arabic and English.





**IN RESPONSE TO THE DRAFT OF THIS REPORT, THE IDF SPOKESPERSON STATED ON BEHALF OF THE MILITARY COURTS UNIT:**

→ The Military Courts are very strict in upholding the publicity of the hearing,[168] and are not deterred from instructing that a hearing be opened to the public even against the opinion of other senior persons in the defense forces.

→ The matter of accessibility of the courts can be divided into two parts. First, it is necessary to recall that the provisions of the Order for Security Directives, 5730 – 1970, and the many amendments made to it, have greatly improved the accused' access to the courts. If in the past there was no system of appeals, this was established in 1990. Following its creation, the door was opened for suspects and accused persons to appeal first instance decisions, during all stages of trial, as is common in the criminal system in Israel. Accessibility was further strengthened by the court's determining mandatory attendance in all trial proceedings, and by the possibility to conduct disclosure of evidence and disclosure of classified evidence, that were initially provided by court rulings, and were later anchored by law.

→ The second aspect of this right pertains to the accessibility of the court to the public. In this matter, too, it must be said that the Military Courts meet the appropriate standards. In this regard, there is emphasis on providing family members with the opportunity to be present in the courtroom during the trial, as part of the realization of the publicity principle of the trial. Representatives of human rights organizations and from the Israeli and international media are also present during hearings. However, alongside the principle of public trial and accessibility to the court, there are also additional considerations that cannot be ignored, including the limited space available in the courtrooms, as well as security considerations that necessitate a level of security derived, among other things, from the number of attendants in the courtroom, and from security risks involved in the location of the courthouse. Therefore, a certain

---

168.    In translating the original Hebrew version of this report, Yesh Din translated the same term as "the right to a public trial," or "publicity of trial."

BACKYARD PROCEEDINGS

limitation has been determined by the security elements guarding the courthouses (the IDF in past and the IPS today) on the number of family members allowed to enter the courtroom, so as to allow the relatives of all detainees to be present during the hearing, while maintaining the required level of security. We believe that the procedure set forth properly balances the publicity and accessibility principles to which we are obligated, and the security needs detailed above. Furthermore, when a defense attorney requests that additional persons be allowed to enter the courtroom, this request is usually granted, subject to the aforementioned security considerations.

→ The courts system has no objection to increasing the number of security guards in such a manner that would allow additional family members and audiences to be admitted to hearings.

91



## 03    THE RIGHT TO BE NOTIFIED OF THE CHARGES

### (a)    International legal standards

The requirement that any accused person be notified of the particulars of the charges against him, as early as possible, and in a language that he understands, appears in Article 71 of the Fourth Geneva Convention:

> Accused persons who are prosecuted by the Occupying Power shall be promptly informed, in writing, in a language which they understand, of the particulars of the charges preferred against them [….]

The ICRC commentary clarifies that the accused shall receive information about the reasons for his arrest in a timely fashion, such that he can prepare his defense; and that the notification, which, according to the wording of the article in the Fourth Geneva Convention, must be written in a language understood by the accused, shall include all the of particulars about the charges against him.

Similar wording appears in Section 14(3)(a) of the ICCPR, which states that every person accused of a crime shall be entitled:

> To be informed promptly and in detail in a language which he understands of the nature and cause of the charge against him.

In Paragraph 8 of General Comment 13, the United Nations Human Rights Committee states that the aforesaid applies to "all cases of criminal charges, including those of persons not in detention," and that the "right to be informed of the charge 'promptly' requires that information is given in the manner described as soon as the charge is first made by a competent authority."

The wording of the ECHR is almost identical to that of the ICCPR. [169] The wording of the ACHR omits the requirement of immediacy, and is satisfied with "prior notification in detail to the accused of the charges against him." [170]

---

169.    ECHR, Article 6(3)(a) .

170.    ACHR, Article 8(2)(b).

## (b)    Security Legislation

Section 21(a) of the Order Concerning Security Provisions, which addresses the indictment and the defendant's response to the charge, states among other things that:

> Before an accused person is brought before a military court, the substance of the charge and its particulars shall be written in the indictment, which will be presented to the Military Court by the military prosecutor; at the heading of the indictment sheet, the military prosecutor shall indicate whether the indictment is being presented to a panel of three judges or one. A copy of the indictment shall be given to the defendant before his trial.

The wording of this section is not in accordance with the accepted standards of international law; the requirement that the charges be "immediately" given to the defendant, and the requirement that the charges be written in a language spoken by the defendant – in this case, in Arabic – have both been omitted.

## (c)    Practical application of the rules concerning informing the accused of the charges against him

**Immediacy:** Indictments against defendants who are in custody are presented to their defense attorneys, as a rule, on the day of the hearings regarding the prosecutor's request to detain the accused until the end of proceedings.

Atty. Fadi Qawasmi is of the opinion that there is no reason that the indictments should not be given to the defendants before the hearing on the request for detention until the end of proceedings.

> *It is possible. Why not? But you know what happens. They have a problem here. Why? They have many cases, perhaps more than the Magistrate Court in Jerusalem. But they have fewer judges, fewer prosecutors, fewer courtrooms – and so they don't have time. And all of that is to the detriment of whom? Of the defendants and their attorneys.*[171]

---

171.    Interview conducted by Judy Lotz, Ruth Ben Shaul and Lior Yavne, in the military court facility in the Ofer army camp on August 14, 2007.



Even if the lack of sufficient personnel makes it difficult to provide the indictment to the defendant and his attorney in a timely fashion, it is difficult to accept the present situation, particularly given its ramifications on the results of hearings concerning detention of the accused until the end of proceedings, as described below.

**Language:** Despite the clear directives in international law, and despite the fact that Arabic is an official language in the West Bank (and in the State of Israel), the indictments, as is the case in the rest of the written material in the Military Courts, are written and presented to the courts only in Hebrew.

The majority of the accused does not read Hebrew, and certainly are not conversant with the legal language in which the particulars of the indictment are written; they require the mediation of their attorneys in order to understand with which crimes they have been charged. However, the majority of the defense attorneys are also Palestinian residents of the West Bank, who are not completely fluent in Hebrew. Some of them do not read Hebrew at all, or do so only to a limited extent.

One of them, Atty. S.B., a resident of Jenin, explained to Yesh Din that when she receives an indictment, she is forced to request from other attorneys present in the courtroom to translate the indictment for her.[172]

In those cases in which defense attorneys insist on their rights to receive a translation of the indictment, the courts turn to the military interpreters. Nevertheless, this frequently drags out the proceedings and causes delays, which is perceived by some of the defense attorneys as "punishment" for their insistence. So, for example, Atty. Fares Abu Hassan notes:

> *If all of the attorneys were to request [translation of the indictments], the courts would do something. It would put pressure on them [the courts]. But when not everyone does that, whoever does ask for it gets it thrown back at him. If he says to the judge ... 'If you want me to respond to the prosecutor's request today, give me a translated indictment,' the judge answers, 'All right, they're translating the indictment for you. Go to one of the interpreters, he'll translate what you want.' That is, he keeps the attorney there until they prepare the translation.[173]*

---

172.    Interview conducted by Roi Maor and Lior Yavne, in the Samaria Military Court on August 15, 2007.

173.    Interview conducted by Nura Resh and Lior Yavne, in the Samaria Military Court on August 7, 2007.

Atty. Riad Anees criticizes the conduct of the courts in regards to the language used, and especially translation of the indictments:

> *Attorneys in the Occupied Territories do not speak Hebrew. Attorneys also do not read Hebrew. I remember that when they presented an indictment in the 1980s, a Druze soldier would sit here and translate the indictment into Arabic. The fact that attorneys pretend they understand Hebrew, and feign as if they understand the indictments, is because the system wants them to be that way, as if ... here's an indictment, go make a plea bargain. [Attorneys] know the headings [on the indictments] but to discern all of the evidentiary material, which is usually written in Hebrew, and to translate it and all ... It would be one thing if you told me that the defendant can take an interpreter and have him translate it. But that's not right. That should not be the method. The method is that, if you put the accused [on trial] ... you being the Military Court meeting in the Occupied Territories, in the West Bank – the language is Arabic. The accused speak Arabic. The attorneys speak Arabic. They need to do this. And therefore, all of the material has to be translated into Arabic.[174]*

## (d)   Results of regulations concerning indictments

While the Judea Military Court allows the possibility of delaying the hearing on detention until the end of proceedings for a few days, when a defense attorney so requests, to enable him to study the indictment and the investigation material (and of course, during that time, the accused remains in detention), the Samaria Court in recent years has required the defendant to respond immediately to the prosecutor's request to detain him until the proceedings are completed. Requests to delay the deliberations in order to study the material are answered in the negative, and the defense attorney must respond to the prosecutor's request without having any idea what is included in the investigation material against his client. Defense attorneys who do not read Hebrew are forced to rely on perfunctory translations of the main points of the indictment provided by one of the people in the courtroom.

So, for example, one of Yesh Din's observers described the dynamics in the Samaria courtroom:

---

174.   Interview conducted by Nura Resh and Lior Yavne, in the Samaria Military Court on August 7, 2007.



→ *The defense attorney requested 48 hours to study the material. The judge explained that that was not the way things were done, and suggested that he peruse the material that moment. The defense attorney agreed to detention until the end of proceedings.*[175]

Atty. Fareed Hawash notes that the fact that the indictment is presented only in Hebrew makes it even more difficult for the attorneys in the Samaria Court, who are forced to respond on the spot to the request to detain the accused until the end of proceedings.

> *Many attorneys come here, take the indictment in Hebrew, and immediately agree to [detention until] the end of proceedings – why? Because of the language, and unfortunately, the court also has a hand in it: it does not provide the defense attorney with the opportunity to read the indictment and copy the evidentiary material before he agrees to or opposes detention until the end of proceedings. Here, you have to respond at once to the prosecutor's request for detention until the end of proceedings. They don't give you time [to study the material] as a defense attorney. [....] The problem is that a Palestinian attorney cannot read the indictment in Hebrew. He has to give an answer and maintain the right to request a review after the hearing.*[176]

In exchange for the defense attorney's agreement to the detention of the accused until the end of proceedings, without giving him enough time to study the indictment and the investigation material against the accused, the court gives a defense attorney who is interested the opportunity to request a "review" of the extension of detention, without having to provide a reason, as required by law. Nonetheless, in the words of Atty. Iyad Mahameed, it seems that fulfillment of this right after the accused has already been detained until the end of proceedings is limited:

> *Then they say, 'Listen, you want to oppose [detention until the end of proceedings]? Plead now. We'll give you an hour or two, until after the recess, no problem. Study the material, read it. A delay of a few days to study the material – there's no such thing here. At the most ...,' and that's what usually happens, 'agree to detention until the end of proceedings, subject to maintaining the right to request a review without any change of conditions.' That is, unlike a regular court – and that's the escape they provide – changes in conditions or new information are unnecessary to request a review. A review can be requested automatically without*

---

175.   Yesh Din observation form No. 905 (Roi Maor). Case 1778/07 in the Samaria Military Court, hearing on March 13, 2007.

176.   Interview conducted by Roi Maor and Lior Yavne in the Samaria Military Court on August 15, 2007.

*any problem. But it's rare that a review is requested. Sometimes it's requested, sometimes not. It depends on the case.[177]*

### (e)    Conclusion

On the issue of the rights of the accused to know the nature of the charges against him, international standards raise two principal requirements: the requirement that the prosecutor inform the accused "immediately" (or at the very least "promptly") and in writing of the charges against him; and the requirement to give the accused the indictment in his own language.

The requirement to inform the accused of the particulars of the charges against him "immediately" are meant to decrease the delay of justice to a person who has the threat of an indictment hanging over his head. This aim becomes even more important when it refers to a person whose liberty has been deprived and who is detained. The requirement of immediacy is intended to decrease, as much as possible, the length of time that a person is detained after completion of the investigation and before trial, which could otherwise be prolonged arbitrarily.

The requirement that notification of the indictment be given to the accused in his language is designed to enable him to understand the exact charges the prosecutor is filing against him and to prepare his defense in the best way possible. As described above, the Military Prosecution in the Military Courts does not meet either of these two requirements.

This deficiency is not surprising, given that there is nothing in the Security Legislation that orders the Military Prosecution to behave differently. Section 21(a) of the Order Concerning Security Provisions (quoted above) stipulates only that a written copy of the charges be given to the defendant "before his trial." The order does not refer, in any way whatsoever, to the language in which the indictment is to be presented.

In the Samaria Court, these failures are combined with the policy of the court itself, which does not allow the delay of hearings on requests to detain the accused until the end of proceedings. This policy is apparently designed solely to reduce the case load on the court's desk. As a result of the combination of these failures, the ability of the accused to defend himself against the unjust deprivation of his liberty is severely impaired. The

---

177.    Telephone interview by Lior Yavne on August 12, 2007.



changes in the legal proceedings that have been enacted by the Samaria Court hinder defense attorneys from reading and understanding the indictment given to them. This hindrance is exacerbated by the fact that attorneys are not allowed the time required to copy and study the investigation material on which the indictment and the request to detain their clients until the end of proceedings are based.

These are not theoretical questions. The significance of the conclusions drawn in the study conducted by Yesh Din is that many accused are not fully aware of the nature of the charges against them, nor of the particulars. This applies especially to those whose defense attorneys are not proficient in the Hebrew language. Furthermore, the study found that hundreds of defendants are detained until the end of proceedings against them (sometimes for many months and even years), without a conclusive hearing to address the question of whether conditions have been met for their detention. These are two serious violations of the defendants' due process rights in the Military Courts.

## (f)    Recommendations

1. The Samaria Court must cease from demanding a response to the request to detain the accused until the end of proceedings on the same day on which an indictment is received. Instead, the court should postpone the deliberations to a date that will enable the defense attorney to study the indictment and investigation file and argue against detention until the end of proceedings, in accordance with his considered opinion and his client's desires.

2. All indictments served in the Military Courts must be translated into Arabic.

3. The indictment, translated into Arabic, must be sent immediately upon its completion, and at least 72 hours before the hearing on detention until the end of proceedings, both to the defendant (in the place in which he is detained or to his home) and to his attorney.