

**IN RESPONSE TO THE DRAFT OF THIS REPORT, THE IDF SPOKESPERSON STATED ON BEHALF OF THE MILITARY COURTS UNIT:**

→ [Reference is made to] the alleged "practice" in the Samaria court not to allow time for reviewing the material during detention hearings. This practice, if it had existed in the past, and these claims have not been proven, was rejected due to the Military Court of Appeals' rulings, so that it no longer occurs today.

→ It should be noted that the practice of remanding custody[178] in order that the defense attorney may study the material is also common in courts in Israel, and this option is always given at the defense attorney's request in the Military Courts as well.

→ As regards the translation of bills of indictment, in the past a large portion of the indictments were translated into Arabic, but as no request was made to receive these translations, the practice was changed, and today indictments are translated as per the accused' request, or that of his representative.

**THE IDF SPOKESPERSON STATED ON BEHALF OF THE MILITARY ADVOCATE GENERAL:**

→ Defense lawyers are served bills of indictment on the last day of detention, simply because they are usually drafted and submitted to court on that last day. Due to the load and magnitude of cases and detainees processed and handled by the Military Court, the prosecution is forced to exhaust the duration of detentions in order to prepare the bills of indictment.

---

178.    In its translation of the original Hebrew report, Yesh Din translated the term, remand of custody, to "extension of detention."



## 04    THE RIGHT TO THE ASSISTANCE OF COUNSEL AND THE RIGHT TO PREPARE AN EFFECTIVE DEFENSE

### (a)    International legal standards

Although the right to counsel and the right to prepare an effective defense are usually regarded as separate rights, they are nonetheless inherently intertwined: there is no point in hiring a defense attorney if he will be unable, adequately and effectively, to prepare his client's defense. Accordingly, the provisions of international law are phrased in a manner that connects these two rights. Article 72 of the Fourth Geneva Convention establishes the right of a defendant to representation by counsel of his choice and to conditions ensuring that the defendant enjoys an effective defense:

> [The defendants] shall have the right to be assisted by a qualified advocate or counsel of their own choice, who shall be able to visit them freely and shall enjoy the necessary facilities for preparing the defense.

The authoritative interpretation of this article, as presented by the ICRC, states that the legal authorities must provide counsel of the defendant's choice full freedom of action and facilities[179] enabling him to prepare his client's defense. "Above all," the Red Cross states, counsel must be allowed "to study the written evidence in the case, visit the defendant and interview him without witness, and to contact persons summonsed as witnesses."[180]

Similar to the phrasing of the aforementioned article in the Fourth Geneva Convention, Article 14(3)(b) of the ICCPR establishes that any person accused of a criminal offense is entitled to be granted "adequate time and facilities for the preparation of his defense and to communicate with counsel of his own choosing." The UN Human Rights Committee, as the body empowered to interpret the latter convention, noted in General Comment 13 that while the adequate time for preparation of defense depends on the circumstances of each case, the "facilities" mentioned in this article should include access to documents and other evidence required for the client's defense, as well as secure the possibility for the defendant to consult with his attorney under conditions ensuring "absolute respect" for the privileged and confidential nature of their communications.[181]

---

179.    The term "facilities" may be understood as referring to "means;" the latter is the word employed in the analogous article of the ACHR (quoted in Note 182 below).

180.    Pictet, p. 356.

181.    General Comment 13, para. 9.

It must be emphasized in this context that the right to counsel is meaningless unless the defense attorney is given access to the documents, witnesses, legislation, case law, and other aspects of the case that will determine his client's fate. The primary obligation, of course, is to grant counsel access to his client in person, and to do so in a manner that will enable counsel and client to prepare a defense. In other words, the meeting between attorney and client must take place in decent physical conditions, for the length of time required, and while protecting the confidentiality of the exchanges between the two. In the absence of these conditions, the right to counsel will be implemented in a technical but ineffective manner, without substantive implementation, and, accordingly, the right cannot be realized.

A parallel provision to the above-mentioned provision in the ICCPR was also established in the three regional human rights conventions;[182] two of these conventions (the ECHR and the ACHR), define this provision, as does the ICCPR, as one of the "minimum guarantees" owed to any person accused of a criminal offense.

## Appointed Counsel

In addition to the provisions of Article 72 of the Fourth Geneva Convention, as quoted above, the Convention establishes:

> Failing a choice by the accused, the Protecting Power may provide him with an advocate or counsel. When an accused person has to meet a serious charge and the Protecting Power is not functioning, the Occupying Power, subject to the consent of the accused, shall provide an advocate or counsel.

According to the ICRC interpretation of this provision, the obligation to provide counsel applies in cases in which the defendant is suspected of offenses for which the penalty ranges from two years' imprisonment to the death penalty (this is the ICRC interpretation of the vague term "serious charge"). In those cases in which neither the defendant nor the "Protecting Power" provides counsel, this obligation is transferred to the Occupying Power, subject to the defendant's consent.

---

182.    Article 6(c)(2) of the ECHR establishes a defendant's right to "adequate time and the facilities for the preparation of his defence;" Article 8(b)(3) of the ACHR stipulates that the defendant is entitled to "adequate time and means for the preparation of his defense;" and Article 7(a)(3) of the ACHPR establishes that a defendant has "the right to defence, including the right to be defended by counsel of his choice."



The minimum guarantees in the ICCPR also include a provision regarding the appointment of counsel for the defendant by the state, although the provision is restricted to cases in which the defendant refrains from appointing counsel for financial reasons:

> ... to be informed, if he does not have legal assistance, of this right; and to have legal assistance assigned to him, in any case where the interests of justice so require, and without payment by him in any such case if he does not have sufficient means to pay for it.[83]

An analogous provision appears in the ECHR[84] and in the ACHR, establishing that domestic law shall determine whether or not the state is to finance the counsel it appoints.[85]

International humanitarian law and international human rights law both establish that the right to be represented by counsel in criminal law is one of the basic rights included in the bundle of due process rights. This right includes, first and foremost, the freedom to receive assistance from counsel chosen by the defendant, suspect, or detainee, but this guarantee does not exhaust the right. The international conventions establish that the defendant must be permitted to choose his counsel, and the defendant and his counsel must be granted conditions and means to prepare the defense; in other words, they must be allowed to meet alone and for the period of time required in order to prepare for the trial; they must have free access to documents and to the relevant evidence in the trial; and, when necessary, the fee of counsel must be covered.

## (b)    Security Legislation

The concluding part of Section 8 of the OCSP, relating to "prosecutor and defender," states laconically that "a defendant is entitled to receive assistance from counsel in his defense." However, the order makes no reference whatsoever to the rights relating to counsel's access to the evidence, witnesses, and other legal material that may aid him in preparing his client's defense.

A specific order was devoted to the subject of the defense. The *Order Concerning Defense in a Military Court (Judea and Samaria) (No. 400), 5/30-19/0* (which replaced an earlier version, Order No. 143 from 1967), essentially addresses procedural matters. Section 1 of

---

183.    ICCPR, Article 14(c)(4).

184.    ECHR, Article 6(c)(3).

185.    ACHR, Article 8(b)(5).

the order defines "counsel" as a "local" or Israeli attorney;[86] Section 2, entitled "Defense before a Military Court," extends somewhat the provision in Section 8 of the OCSP, stating that "a defendant before a court is entitled to defend himself through counsel or to manage his defense by himself."

The Order Concerning Defense in a Military Court enables the appointment of counsel by the "Legal Advisor"[87] to manage the defendant's defense in such "cases as he shall see fit" and with the consent of the defendant.[88] This provision grants discretion to the Legal Advisor, but the Order requires the Court to appoint counsel to a defendant, in an offense for which the penalty is ten years' imprisonment or more, who did not appoint his own counsel or for whom counsel was not appointed by the Legal Advisor, provided that the defendant consents thereto.[89] In addition, the Court is also entitled to appoint counsel "on special grounds" to a defendant for whom there is no obligation to do so, at the request of the defendant, the military prosecutor, or on its own initiative.[90] The Order establishes further provisions regarding financing the fee for counsel appointed by the Court or the Legal Advisor and related defense costs from the funds of the Command of the Area.[91]

In addition, the Order instructs counsel chosen by the defendant or appointed to his function by the Court or the Legal Advisor to represent the defendant "in any proceeding relating to the trial for which he was chosen or appointed."[92] However, the authors of the Order Concerning Defense in a Military Court did not see fit to establish any provisions regarding the ability of counsel to pursue an effective defense, including access to the evidentiary material and witnesses; the determination of conditions for an undisturbed conversation between the detainee or defendant and his counsel in the place of detention or elsewhere; or any other condition recognized under international law as the "minimum" for the maintenance of an effective defense.

---

186.   Previous orders (*Order Concerning the Appearance of Israeli Advocates in the Courts (Temporary Order) (West Bank Area) (No. 145), 5728-1967*, and an order (No. 248) with a similar name from 1968 extending the temporary order "until such date as it is nullified by the Commander of the Area,") authorized attorneys who are members of the Israel Bar Association to appear in all the courts in the Occupied Territories. As far as Yesh Din is aware, said temporary order has not been nullified to date.

187.   The Order does not specify to which "legal advisor" it refers; it may be assumed that this currently refers to the Legal Advisor to the Judea and Samaria Area.

188.   Order Concerning Defense, Section 3.

189.   Ibid., Section 4(a).

190.   Ibid., Section 4(b).

191.   Ibid., Section 10.

192.   Ibid., Section 6.



## (c)    Unrepresented defendants

Based on observations conducted by Yesh Din observers in the military courtrooms and from interviews held with attorneys appearing in these courts on a regular basis, it appears that the vast majority of defendants brought before the Military Courts are represented by counsel in the hearing.

Of the 810 hearings in the Samaria and Judea courtrooms observed by Yesh Din volunteers, the observers noted in just 13 hearings that counsel was not present in the courtroom at the time of the hearing. [93] The absence of counsel in these cases was due to diverse reasons, including the non-appointment of counsel prior to the hearing, absence due to illness, the fact that counsel was busy in another courtroom, and so forth.

Notwithstanding the above, the procedure for the appointment of counsel for defendants in the Military Courts is not implemented in an appropriate and proper manner. In many cases, when the defendant arrives in the courtroom without counsel, one of the attorneys present agrees on the spot to undertake his defense, without the ability to study the details of the suspicions or charges and to consult with his new client, as shall be described below.

## (d)    The appointment of an attorney: Palestinian NGOs as public defenders

On March 15, 2007, Yesh Din asked the IDF Spokesperson to provide a copy of any procedure, rule, or order regarding legal aid for unrepresented defendants. In response, the IDF Spokesperson referred Yesh Din to the Order Concerning Defense in a Military Court, noting that the Military Courts act in accordance with this order. The IDF Spokesperson further noted that cases in which the Military Courts are required to appoint counsel for defendants in accordance with the provisions of the Order are "very few," since organizations supported by the Palestinian Authority (the IDF Spokesperson mentioned the "Prisoner's Club" in this context) provide legal defense for defendants "in accordance with criteria that are unknown" to the IDF. [94]

---

193.   In 28 additional hearings, the observers noted that it was unknown whether the defendant was represented, and in 20 additional observation forms the observers did not complete the relevant item.

194.   IDF Spokesperson's response to questions from Yesh Din, July 30, 2007.

104

Defendants who can afford to do so hire the services of private attorneys whose fees
may be very substantial. Many defendants, however, are forced to make do with the legal
defense provided free of charge by one of the numerous Palestinian NGOs that provides
legal representation for detainees and defendants.

Except in isolated cases, the Court does not typically appoint counsel for a defendant
at the expense of the State. In those cases in which this occurs, counsel's fee is paid
from the funds of the Treasury Headquarter Officer in the Civil Administration. In most
cases, however, when an unrepresented defendant arrives in court, the court refers him
or his relatives to a Palestinian NGO that provides legal representation for detainees and
defendants, or instructs him to hire the services of a private attorney.

Thus, for example, in one of the hearings to which an unrepresented defendant arrived, the
Yesh Din observers noted that:

> *The judge attempts to clarify to the defendant (through an interpreter) that they
> will not be able to pursue the trial without an attorney. He calls the father, who is
> in court, and explains to him that they must try to obtain an attorney. He refers
> him to the prisoners' organization and clarifies that it is also possible to hire a
> private attorney.*[195]

The detailed documentation of this hearing on the observation form of the Yesh Din
observers also reveals that when the Court postponed the hearing to a later date, by which
time the defendant was to be represented by an attorney, it again refrained from offering
to appoint counsel on its own behalf:

> *The judge initially proposes [postponing the hearing until] July 8, but the father
> requests more time [to find counsel]. Although the judge again explains where he
> may turn, he agrees and postpones the hearing until July 30.*

In this case, the conditions listed in the provisions of the Order Concerning Defense in
a Military Court instructing the Court to order the appointment of counsel funded by the
Civil Administration, subject to the consent of the defendant, were present: The indictment
served by the Prosecution before a panel of judges (which tries offenses for which the
penalty is greater than ten years' imprisonment) included a charge of shooting at a person,

---

195.    Yesh Din Observation Form No. 1136 (Nura Resh and Ilana Shapiro). Hearing in Samaria Court case no. 3500/07,
May 13, 2007.



an offense for which the maximum penalty under the Defense (Emergency) Regulations is the death penalty. Despite this fact, the chief judge of the panel did not see fit to appoint counsel on the Court's behalf and certainly made no effort to examine whether the defendant was interested in such appointment.

Instead, judges routinely instruct unrepresented detainees – generally during detention hearings prior to the filing of an indictment – to contact attorneys employed by the various Palestinian NGOs and request that they undertake their representation. For example, in two consecutive hearings, the judge recommended that a detainee avail himself of the services of counsel from one of the NGOs who was present in the courtroom at the time:

*The suspect is not represented. The judge expresses his surprise that the Prisoner's Club did not visit this detainee or the previous one in their place of detention. Atty. Khariz, as in the previous case, volunteers to speak with the detainee; the judge again suggests to the detainee that Atty. Khariz represent him, and the suspect agrees.[196]*

In another example:

*The defendant does not have counsel. The judge turns to the attorneys from the Prisoner's Club and asks them to what area [the village of] Jayyus belongs and who deals with this area. They reply that Jayyus is in the Qalqiliya district, under the responsibility of Atty. Adnan Abu Laila. The judge turns to the defendant and tells him that the attorney who represents his area is not present, and asks him whether he agrees to be represented by Atty. Mohammed Sharif.[197]*

The above exchanges, in which the judge in one case expressed his surprise that the representatives from the Prisoner's Club had not visited detainees in their place of detention and, in another case, sought to clarify under which Prisoner's Club attorney's "area of jurisdiction" the detainee's village belonged, illustrate the extent to which the Palestinian NGOs have been transformed into a type of public defender. These NGOs effectively constitute a means of satisfying the court that the detainees and defendants appearing before it receive representation without the Civil Administration having to fund it. Thus the court saves the Civil Administration the fees to retain counsel and other expenses incurred in funding a defense – receipt of expert opinions, laboratory tests, and so forth.

196.   Yesh Din Observation Form No. 843 (Roi Maor). Detention hearing of A.Z. at Samaria Military Court, February 27, 2007.

197.   Yesh Din Observation Form No. 761 (Roi Maor). Hearing in Samaria Military Court case no. 1471/07, February 13, 2007.

Given the substantial sums received each year by the Civil Administration from fines imposed on those convicted in the Military Courts,[198] and bearing in mind the obligation incumbent on the court, in certain cases, to offer to appoint counsel on its behalf for defendants, the custom of essentially evading this responsibility while imposing it on various Palestinian bodies is simply improper practice.

## (e)    Meeting with an attorney

On October 3, 2006, responsibility for the Ofer military incarceration facility was reassigned by the Military Police to the Israel Prison Service (IPS), completing the transfer of authority over all the major incarceration facilities that hold detainees and prisoners from the OT from the IDF to the IPS.[199] The vast majority of Palestinian detainees held by Israel and sentenced in the Military Courts[200] have since been held by the IPS, and their meetings with attorneys are subject to IPS procedures.

The IPS procedures establish that an attorney seeking to meet with a "security prisoner" (including security detainees)[201] must send a request application in advance via facsimile to the prisoners' officer at the facility;[202] that the meeting will take place behind a partition; and that the attorney will be permitted to take into the place of meeting "only documents

---

198.    See figures in Appendix 7.

199.    The two other major facilities, Megiddo Prison and Ketziot Prison, were transferred from the IDF to the IPS in February 2005 and March 2006, respectively.

200.    Thus, for example, according to figures forwarded to B'Tselem, in June 2007 the IDF held 64 Palestinian detainees, including two under arrest until the end of proceedings, compared to 2,539 Palestinian "security detainees" in the incarceration facilities of the IPS (including 2,272 persons under arrest until the end of proceedings). The figure for the number of detainees in the IPS is correct as of July 6, 2007, while that for the number of detainees in IDF custody is correct as of June 18, 2007.

201.    Section 3(a) of the Israel Prison Service Commission Ordinance 04.05.00 – "Definition of a Security Prisoner" – defines a security prisoner as "a prisoner who has been convicted and sentenced to imprisonment on account of committing, or who is detained on suspicion of committing, an offense that by its type or circumstances is defined as a clear security offense, or the motive for which offense was nationalistic, as well as a person convicted or accused of an action that was tantamount, or there was a tangible possibility that it was tantamount, to the granting of service to a terror organization or to a person seeking to injure state security, when said act was committed out of awareness, or while turning a blind eye, or out of apathy for the danger that was or might have been created to state security." Section 3(c) of the Commission Ordinance states that the nationalistic motive is to be determined in accordance with the motive or circumstances of the offense as presented in the arrest decision, the judgment, or in an intelligence information opinion from the police or the GSS regarding a detainee or defendant. A list of "security" offenses is provided in the appendices to the Ordinance, including any "offense against Security Legislation [in the OT] which, had it been committed in Israel, would have been included in the definition of a "security prisoner."

202.    Israel Prison Service Commission Ordinance 04.34.00 – "Prisoners' Contacts with Attorneys," Section 6. Section 8 of the same Ordinance establishes that meetings between an attorney and a detainee do not require prior coordination.

107



and writing implements."[203] The procedures also establish that the meeting between detainee and attorney shall be held "in private and in conditions ensuring the confidentiality of the conversation, but in a manner enabling supervision of the detainee's movements and behavior."[204]

## (f)    Palestinian attorneys

Most of the Palestinian detainees are held in incarceration facilities within Israeli territory, under the terms of Section 6(b) of the *Law Concerning the Extension of Validity of the Emergency Regulations (Judea and Samaria and Gaza Strip – Judgment in Offenses and Legal Aid), 5727-1967.*[205] With the exception of the Ofer incarceration facility in the West Bank (in the army base to which the Judea Military Court was transferred in 2002), all the remaining incarceration facilities of the IPS, in which the vast majority of Palestinian detainees are held, are situated within the territory of the State of Israel.[206]

This arrangement severely restricts the ability of Palestinian attorneys to visit their detained clients and provide them with counsel. Israel has imposed a sweeping prohibition against entry into Israel by Palestinian residents of the OT; the provision applies equally to attorneys and includes the places of detention in which most Palestinian detainees and prisoners are held.

As a result, Palestinian attorneys are almost completely prevented from meeting with detainees, the vast majority of whom, as noted, are held within the territory of the State of Israel.[207] Accordingly, attorneys who are residents of the OT are forced to hire the services of Israeli colleagues to visit their clients at detention facilities on their behalf, and report to them on the content of the meeting. Thus, for example, Atty. Fares Abu Hassan, a resident of Nablus, states:

203.   Israel Prison Service Commission Ordinance 03.02.00 – "Rules Relating to Security Prisoners," Section V(3).

204.   Ibid., Section 22(1). This provision also applies to non-security detainees.

205.   The section states: "The arrest and detention of a person against whom an arrest warrant or a detention order was issued in the Area under the terms of the authority granted by a Commander's proclamation or order may be executed in Israel in the manner in which an arrest warrant or a detention order are executed, and such person may be transferred to detention in the area in which the offense was committed."

206.   Detainees from the OT are held at Shata Prison, Damon Prison, and Kishon Detention Center (in the north of the State of Israel); at Sharon Prison and Hadarim Prison, and at detention centers in the "Russian Compound" in Jerusalem and at the Petah Tikva Police station (in the center of the country); and at Shikma, Eshel, Nafha, and Ketziot Prisons (in the south). With the exception of the detention centers in the "Russian Compound" and in Petah Tikva, all the prisons, as well as the Kishon Detention Center, are under the responsibility of the IPS.

207.   Attorney Abu Hassan noted in an interview with Yesh Din that in only one case in recent years did he receive an entry permit for a few hours into the State of Israel in order to visit his clients held at the Kishon Detention Facility.

108

*The problem of all the Palestinian attorneys representing detainees in the Military Courts is that they do not have an opportunity to enter Israel and visit the person whose detention case they are handling – not during interrogation, not during the extension of detention, and not thereafter. This greatly impedes our work. We always have to send another, Israeli attorney, but he does not convey all that you want to convey to the detainee. During the hearings in court – and we work under pressure here – we [only] talk [to the clients] in the courtroom during the hearing. We stand before the judge and speak quickly and briefly – this isn't how the work of an attorney should look. You need to sit and talk to your client, consult with him about the evidence in his case, and discuss each point. That doesn't happen at all. This is the problem we have faced for years, since 1999 or 2000.*[208]

## (g)    Conditions of the meetings

Attorneys who are Israeli citizens (or residents of East Jerusalem holding permanent residency in Israel) also encounter numerous difficulties imposed by the IPS with regard to meeting with their clients. All the attorneys with whom Yesh Din spoke noted that the conditions imposed by the IPS concerning visits with detainees in their places of incarceration – some of which are defined in proper procedures and others derived from additional decisions by the IPS – waste much of their time and, in practice, lead some of them to refrain entirely from visiting their clients during detention.

Thus, for example, in at least some of the incarceration facilities in which detainees are held, the IPS only permits one attorney to meet his clients at a time. As a result, other attorneys who arrive at the facility are forced to wait in line until their colleague completes his meetings with all his clients. Moreover, the IPS does not permit an attorney to meet several clients simultaneously, thus causing additional delays. For example, Atty. Riad Anees comments:

*If you're looking for the logic behind this, there isn't any. Sometimes I go to visit three detainees being held in the same cell who spend all their time together, sleeping and eating together, but when they need to meet with me they cannot come together.. So I stay in one place and they come to me one at a time. Even if I have three defendants in the same case who are being held together they cannot be brought to me together. The problem is if I arrive in the morning with an*

---

208.    The interview was conducted by Nura Resh and Lior Yavne at the Samaria Military Court on August 7, 2007.



*advance appointment, and I want to see three detainees, and another attorney*
*arrives two minutes later, then he can't enter the prison until I leave.[209]*

Israeli attorneys hired by the NGOs that provide assistance to prisoners arrive at the incarceration facilities with a long list of detainees with whom they are scheduled to meet. As a result, other attorneys are unable to meet with their clients for several hours. This policy, which forces attorneys to wait in turn for hours outside the incarceration facility, wastes time and creates the sense that, for the IPS, meetings between detainees and their attorneys are merely a chore to which no particular importance is attached:

*The IPS has strict procedures regarding security so that an attorney doesn't take*
*anything in. They conduct strict inspections – I don't have any problem with that.*
*Our problem is with respect for the attorneys. The guy is coming to do his job,*
*and for the IPS this is the lowest priority. They leave an attorney outside – "let him*
*wait, we will do our work first, this isn't part of our work. The last thing we do is*
*to let an attorney in." That's their approach as I understand it.[210]*

During the meeting, a glass partition separates the attorney from his client, and they are required to speak using a telephone receiver. A guard is always stationed nearby; his function, as described in the procedures (see above), is to supervise "the detainee's movements and behavior."

Most of the attorneys questioned by Yesh Din on this matter stated that they do not suspect that the warden is attempting to listen to their conversation with the client. However, the combination of the requirement to coordinate in advance any attorney visit with a security detainee (a demand that is not raised concerning a criminal detainee), and the fact that their conversation takes place through a telephone receiver, raises concern that security services may listen to some of the consultations between attorneys and their clients. Such a situation does not encourage open conversation between the detainee and his counsel as required in order to prepare an effective defense.

As a result of the situation described above, many attorneys forego visits to their clients. As one attorney who represents security prisoners commented: "Unless I absolutely have to, I don't go to visit the client."

---

209.  The interview was conducted by Nura Resh and Lior Yavne at the Samaria Military Court on August 7, 2007.

210.  Interview with Attorney Wisam Fallah. The interview was conducted by Judy Lotz and Lior Yavne in Jerusalem on August 12, 2007.

Atty. Fares Abu Hassan, a resident of Nablus, commented on a visit to detainees held at the small number of holding facilities remaining in the OT and under the responsibility of the IDF:

> Some detainees are held at the detention center [holding facility] at Hawara near Nablus. There is no interrogation there, they just hold the detainee and bring him here for extension of detention until they decide to what track he is to be transferred [administrative detention or prosecution]. [...] There isn't much to talk about in Hawara, they are only held there [for] extension of detention. There's no interrogation, nothing. It's just, "How are you doing, how are things?" and whether he would like to tell his family anything or wants anything from his family.[211]

Against the backdrop of the numerous restrictions Israel imposes on meetings between attorney and client during the interrogation period, the first meeting between the two is held, in many cases, only on the day of the hearing. Sometimes an attorney and client speak in the courtroom itself, immediately before or after the hearing, and in other cases attorneys proceed to the doors of the detention cells where detainees and defendants are held within the court complexes. In this case the attorney talks to his client through a small opening in the detention cell door, and the former is required to stand approximately one meter from the door of the cell. Naturally, the content of the conversation is completely open to all those held in the cell and to the guards stationed nearby.[212]

## (h)    Preventing attorney-client meetings

The Security Legislation prevailing in the OT authorizes a detainee's interrogators to prevent him from meeting his attorney for a period of up to 30 days: according to Section 78(c) of the OCSP, the chief of the investigation[213] is allowed to forbid a detainee from meeting his lawyer for a period of up to 15 days, and higher officials in the defense establishment[214] are allowed to bar meetings with an attorney for another 15 days, for reasons of "security of the area" or the "benefit of the investigation." In comparison, the Criminal Procedure

---

211.   Interview conducted by Nura Resh and Lior Yavne at Samaria Military Court on August 7, 2007.

212.   Letter from the Public Committee against Torture in Israel and Physicians for Human Rights – Israel to Brig. Gen. Aharon Mishnayot, Lt. Col. Zvi Lekach, and Lt. Amit Preiss, July 11, 2007.

213.   A "chief of investigation" is defined by the order of a police officer with the rank of chief superintendent or higher, chief of a GSS investigation team, or an IDF officer so authorized by the commander of IDF forces in the area.

214.   Such higher officials are defined as a police officer with the rank of deputy commander or higher, chief of the GSS investigation division, or an IDF officer with the rank of lieutenant colonel or higher, so authorized by the commander of IDF forces in the area.



Law prevailing in the State of Israel allows investigative bodies – the GSS, the Israel Police or the IDF – to prevent security suspects from meeting their attorneys for up to six days only, or up to ten days with the permission of a higher authority.[215]

Barring attorney-client meetings in the Military Court system is not an exceptional or rare procedure. Atty. Wisam Fallah, a former prosecutor in the Military Prosecution in the OT, estimates that at least sixty percent of Palestinians arrested by the Israeli security forces in the OT received orders immediately upon their detention preventing them from meeting an attorney.[216]

Frequently, the detainees themselves are unaware that an order has been issued forbidding them to meet with an attorney. Their attorneys are allowed to petition the HCJ and request that the order be lifted. However, human rights organization, the Public Committee Against Torture in Israel, reported that in the year 2005 lawyers functioning on its behalf filed 49 petitions of this nature and all were rejected or canceled as a result of HCJ comments.[217]

A number of lawyers reported that officials in the detention facilities attempted to prevent them from meeting their clients for various excuses, even though orders barring such meetings had not been issued. So, for instance, reported Atty. Iyad Mahameed:

*On one particular occasion I came to Kishon [Detention Center] and was told the detainee was being interrogated. I asked how long the interrogation would continue and I said 'no problem. I will wait.' After waiting for two or three hours I was told 'visiting hours are almost over, you have to leave.' So I said – "Abu Rish, "who is in charge of the security prisoners at Kishon was there  –  I told him 'okay, give me a letter, tell me the detainee was being interrogated from this time to that time. Give it to me in writing.' Then he started to shout and things, so they brought the detainee. And then I understood that he was not*

---

215.    Secondary Regulations 2(a) and 2(b) of the Criminal Procedure Regulations (Enforcement Powers – Arrests) (Postponing Meeting of Detainee on Security Offenses with a Lawyer), 5757-1997.

216.    This figure was provided during an interview by Yesh Din with Attorney Wisam Fallah on August 12, 2007. On the results of preventing attorney-client meetings, see below. On October 29, 2007 Yesh Din approached the GSS with a request based on the Freedom of Information Act and through the Prime Minister's Office to receive figures on the number of Palestinian detainees to whom orders preventing their meeting attorneys had been issued in recent years. On November 27, 2007 Yesh Din was informed by telephone that the GSS had decided to refuse to provide figures on the requested matter, based on Section 14(a)(2) of the Freedom of Information Law, indicating that the provisions of this law do not apply to the GSS.

217.    The figure is quoted in a joint report by B'Tselem and Hamoked – Center for the Defense of the Individual: **Absolute Prohibition: The Torture and Ill-Treatment of Palestinian Detainees** (May 2007), p. 80. More on HCJ treatment of petitions on prohibition of attorney-client meetings, see **Absolute Prohibition**, pp. 80-83.

*even being interrogated. They just didn't want him to meet his attorney, even though there was not – apparently there was not – anyone to issue a barring order.[218]*

Atty. Fallah provides another example:

*Sometimes interrogators do not tell you whether they have the detainee. He does not have a "bar on meeting," but they do not want you to meet him – they tell you he is not at that facility. I have had cases when I was told a detainee was at a certain facility, I went there and somebody else told me he was not there. I persisted and in the end it turned out he was there. They messed with me like that for three hours and after three hours gave me a barring order on meeting an attorney. Do you understand what went on there? Before that he was not barred. When I got there they decided to issue a prohibition on him.[219]*

## (i)    Detention hearings

When an order is issued barring the detainee from meeting his attorney, the prohibition is enforced during the detention hearings as well. These are held according to a special procedure, by which the detainee is brought into the courtroom in the absence of his attorney, and afterwards is taken out of the courtroom at which point his attorney is called in. In such cases the attorney is required to defend his client without meeting him, and often without knowing the charges against the detainee.

In many cases, and regardless of whether there is a prohibition on meeting, the judge's decision about extending a person's detention is based on confidential information provided to him by the prosecutor, without providing the Defense an opportunity to review the material and refute it. Yesh Din monitors documented such a case in one of the extension of detention hearings they observed:

→ *The defense attorney asked the interrogator a series of questions. To all of the questions about the interrogation, the interrogator replied that everything is detailed in the confidential report. He noted that the activity of which the suspect was suspected was current. The defense attorney asked to release the suspect, who had arrived in the area three months earlier, and had previously lived outside of the area, in Jordan, for seven years. According*

---

218.   The interview was conducted by Lior Yavne by phone on August 12, 2007.

219.   The interview was conducted by Judy Lotz and Lior Yavne on August 12, 2007 in Jerusalem.



*to the defense attorney the suspect was married and supporting his family, had no record
[of security offenses], could have been investigated during the time that had passed, and
would be willing to appear at any time determined. The Prosecution asked to extend his
detention by 21 days on the suspicion of conspiring to commit a grave offense. The judge:
'I reviewed the confidential report that indicates suspicion of current activity. I examined
the sources of the suspicion and found them sufficient to require an interrogation. The
detention is extended by 15 days to allow completion of the interrogation.'[220]*

In another case of a hearing on extending the detention of a suspect under an order
barring him from meeting his attorney, the judge warned the detainee's defense attorney
that if he posed "too many" questions it would count against him:

→ *The defense attorney demanded to know of what the detainee was suspected. At first
the prosecutor tried to evade the demand, but the defense attorney persisted and asked
how it could be that the detainee knows what he is suspected of (the prosecutor admitted
that indeed the suspicions were raised to the detainee), yet he, the defense attorney,
does not know what they are? The defense attorney suggested that if the suspicions
were confidential the judge instruct other people present to leave the courtroom, but the
judge did not do so. The defense attorney asked, for instance, whether the suspect's alibi
had been checked, if they had checked whether the firearm in the suspect's possession
was a firearm in use by the Palestinian security agencies, etc. The prosecutor avoided
answering the questions and said that providing details could undermine the investigation.
At a certain point the judge addressed the defense attorney and said that there was no use
in persisting because the prosecutor was not going to answer the questions and he, the
judge, was not going to instruct him to do so. He asked the defense attorney to 'focus…
simply to save us time.' The defense attorney continued to demand answers and the
judge addressed him again saying: 'You are at the detention stage. You would be better off
focusing your questions on the needs of the investigation rather than asking for the sake
of discussion… if you want to win by 'fishing,' to gain points later on, that is not how it's
done…' The judge added that 'questions of this nature can work against you and that is
another reason – it could poke holes in your case.'[221]*

---

220.   Yesh Din observation form no. 864 (Roi Maor). Extension of detention hearing in Samaria Military Court on February
27, 2007.

221.   Yesh Din observation form no. 450 (Hanna Aviram and Dina Goor). Extension of detention hearing in Samaria Military
Court on August 9, 2007.

## (j)    Copying investigation material

Upon completion of the interrogation of a detainee, the Prosecution decides whether to release him, to issue an administrative detention order against him, or to file an indictment. When an indictment is filed against a person held in detention, the indictment, in Hebrew, is handed to his attorney during the hearing on the extension of detention until the end of proceedings (see below). At this stage the defendant's attorney is allowed to photocopy the investigation material collected by the investigation authorities. That material includes the evidence the Prosecution plans to present to the Court during the defendant's trial.

In a petition from March 15, 2007, Yesh Din requested a copy of the regulations concerning the method of copying investigation files by a defense attorney. On July 30, 2007 the IDF Spokesperson replied that "once the defendant has the right to photocopy investigation material, the defendant's attorney may approach the Military Prosecution's office and arrange a time to copy it. Photocopy machines were installed in the Office of the Prosecution in Judea and Samaria solely for that purpose." The IDF Spokesperson refrained from providing Yesh Din a copy of the regulations regarding copying an investigation file by the defense, as had been requested. The following description is based on interviews conducted by Yesh Din with the lawyers who appear regularly in the Military Courts.

The Offices of the Prosecution in each of the Military Courts have a single photocopy machine for use by the defense attorneys. The latter must make appointments in advance in order to copy the contents of the investigation files and pay NIS 0.25 per page copied. From the time a request for an appointment is made, one or two days go by, and sometimes even more, until the attorney is allowed to copy the investigation material. When the photocopy machine breaks down the attorneys must wait a few days until it is repaired. The situation is particularly grave regarding the defendants held in detention, because as long as their attorneys do not have the investigation material, they cannot argue against the Military Prosecution's requests to detain the defendant until the end of proceedings. Thus, because of technical deficiencies related to the photocopy machine, such defendants (and there are many) remain under detention for many additional days.

In Israel it is customary for attorneys to send their clerks to perform the "drudgery" of photocopying investigation files. But the Military Courts in the OT do not allow anyone but the defendant's attorney or an articling intern from his office to photocopy the material. This directive requires the attorneys (or the interns in their offices, if there are any) to appear in the courts in order to photocopy the investigation material, sometimes solely for that purpose.



In the case of a defendant under interrogation by the GSS, the investigation material in many cases will not include the notes of the GSS interrogation. In cases where record documents are missing from the investigation material provided to the attorney, he must ask for that material expressly, and only then are the missing documents provided. As a result of such an inapt system, defense attorneys sometimes handle severe cases without knowing that the investigation material provided to them is incomplete. Equally serious is the length of time between the attorney's request for the GSS interrogation material and its delivery. During that period of time the defendant continues to sit in custody while his trial does not progress.

## (k)   Language of investigation material

The vast majority of the material contained in the investigation files received by the attorney for review is written in Hebrew. A single exception to that rule is a confession or statement by the defendant, who sometimes writes it in his own hand and his own language upon the suggestion of his interrogators.

Attorneys who are not proficient in the Hebrew language need to have the investigation material translated. This causes a further delay in preparing the defense and entails costs that not every defendant can bear.

The fact that the investigation material is delivered in Hebrew may harm preparation of the defense even when the attorney is proficient in the language. In many cases the defendants cannot read Hebrew and therefore their ability to aid in administering their defense is impaired. A defendant who does not read the investigation material against him and is not proficient in the witness accounts and testimony material cannot provide his attorney with the information he needs to prepare an effective defense.

## (l)   The defendant's presence at the hearing

Usually the defendant or suspect is present at hearings held in his matter in the Military Court. Defendants released on bail are required to appear in court on their own recognizance, while defendants and suspects held in custody are brought to the premises by IPS officials, soldiers or police – depending on the place of their detention. Yesh Din monitors attended thirteen hearings conducted in the defendant's absence or postponed for that reason. In four cases the defendant was not brought to court even though he was in custody at the time.

116

In one of the aforementioned cases the defendant was not brought to court because he was hospitalized in an IPS medical facility, and as a result the hearing was postponed.[222] In another case the hearing was postponed because the defendant was absent due to illness.[223] In a third case Yesh Din is not aware of the reason for the defendant's absence; the hearing was delayed at the request of his attorney in order to study the investigation material.[224] In an additional case both the defendant and his attorney were absent, and the Court ruled there was no indication the latter had received notice of the hearing.[225]

In other cases defendants who were not in custody were absent from hearings. In four additional cases Yesh Din does not know the reason for the defendant's absence. In three cases, according to the attorneys, the absence was a result of the checkpoints and transportation restrictions imposed by the IDF in the West Bank.[226] In one of those three cases the Court accepted the defense attorney's request to decide on a plea bargain in his absence.[227] In another hearing the Court postponed the decision over accepting a plea bargain (suspended sentence and a monetary fine) because the judge refused to sentence the defendant to a suspended sentence in his absence.[228] In another case the Court accepted a plea bargain in the absence of the defendant (according to his attorney, as a result of severe heart disease), and the judge noted that he had "given up" and for now on would be willing to accept plea bargains including suspended sentences even in the absence of the defendant.[229] At an arraignment hearing in another case the Court allowed the attorney to plea "not guilty" on behalf of his absent client.[230]

In two other cases Yesh Din is not aware of whether the defendant who was absent was held in custody or not. In one of those cases, an evidentiary hearing, witness testimony was

222.    Yesh Din observation form no. 1333 (Judy Lotz and Ruth Ben Shaul). Judea Military Court case 6057/06, hearing from April 18, 2007.

223.    Yesh Din observation form no. 1043 (Yehudit Elkana). Judea Military Court case 5552/06, hearing from April 11, 2007.

224.    Yesh Din observation form no. 1260 (Maya Bailey and Yehudit Elkana). Judea Military Court case 3031/07 hearing from June 19, 2007.

225.    Yesh Din observation form no. 1235 (Yehudit Elkana). Judea Military Court case 5277/05, hearing from June 6, 2007.

226.    Yesh Din observation forms no. 850, 1054 and 1055.

227.    Yesh Din observation form no. 850 (Roi Maor). Samaria Military Court case 4792/06, hearing from February 27, 2007.

228.    Yesh Din observation form no. 926 (Roi Maor). Samaria Military Court case 1779/07, hearing from March 13, 2007.

229.    Yesh Din observation form no. 855 (Roi Maor). Samaria Military Court case 1396/07, hearing from February 27, 2007.

230.    Yesh Din observation form no. 856 (Roi Maor). Samaria Military Court case whose number is unknown to Yesh Din, hearing from February 27, 2007.



delivered despite the absence of the defendant.[231] In the other case the Court announced that the absence of the defendant, and the fact that his attorney was not informed of the hearing, were the result of a failure by the Court.[232]

## (m)   Access to judgments and legislation

One of the tenets of a public trial is, as discussed above, that the decisions and judgments of courts, with the exception of a handful of defined cases, should be made public. However, this principle in the Military Courts – at the appeals level and all the more so in the first instance – is insufficiently upheld.

First instance judgments handed down in the Judea Military Court and the Samaria Military Court are not published regularly with the exception of the publication, begun only in 2000, of the "Volume of Selected Judgments of Military Courts at the Trial and Appellate levels."[233] These volumes are distributed, according to the IDF Spokesperson, to "legal libraries in academic institutions, to courts, and also to the Israel Bar's libraries."[234]

The fact that the lawyers who represent defendants in the Military Courts do not have access to the complete set of prior judgments by the Court places them in a position of inferiority vis-à-vis the Prosecution. This is reflected, for instance, when a negotiation takes place between the Prosecution and the Defense about a plea bargain, or when pleading at the sentencing stage at the conclusion of a trial in which a defendant has been convicted. Atty. Abu Hassan related the following to Yesh Din on the subject:

*There is a problem of access to the sentencing judgments of this court. I always go to the prosecutor, we talk about a plea bargain, sometimes he gets angry, I get angry, the atmosphere is not… Why? Because I cannot see [the prior sentences]. Maybe the prosecutor likes a certain attorney better and helps him more? Maybe he dislikes another attorney and hands down worse sentences on his client? Why does that happen? Because I cannot compare sentences. [...] I want to know specifically a certain charge – membership [in an unauthorized association], stone throwing, whatever – how much all the defendants accused of that offense got.*

231.   Yesh Din observation form no. 1407 (Judy Lotz). Judea Military Court case whose number is unknown to Yesh Din, hearing on August 1, 2007.

232.   Yesh Din observation form no. 1454 (Yehudit Elkana). Judea Military Court case 1375/06, hearing from August 14, 2007.

233.   IDF Spokesperson in response to the report draft, November 12, 2007.

234.   Ibid.

*What the level of punishment is. If there is a reason for aggravation or leniency – okay... I want to go in and speak to the Prosecution, negotiate, reach a bargain and finish the case. How can I convince him to give me less? I will bring him other cases he concluded with this punishment or that. That way, by negotiating, I will have something [that will help me] to convince him. [...] The prosecutor can, with the court computer network, go into all of the cases, the indictments, the records, all of the sentences. The Prosecution has that option, but I as a defense attorney do not have the same option.[235]*

Nor are the decisions of the Military Appellate Courts published regularly. So far the Military Advocate General has published a limited number of volumes or highlights of judgments by the Military Appellate Court. Some of the judgments by the Military Appellate Court find their way to a commercial company and can be found on its website for a charge, but for lawyers who operate in the Military Courts there is no systematic means of updating themselves regularly on the Court's judgments.

Occasionally, on a private initiative by chief justices in the Courts, CDs containing select judgments have been created and provided to attorneys on request. Atty. Anees said on this topic: "There are no judgments of the Appellate Court to be found. There are no such publications. There is no publication that I can obtain right now. All kinds of attempts have been made. For instance, [Col. Shaul] Gordon [who was president of the Military Appellate Court] used to collect a number of judgments every year, put them on a disk, and if you went and asked for it you would get it. But still, it is not [enough]."[236]

When they were asked how they keep themselves abreast of new judgments, and the ramifications thereof on their cases, several attorneys said that typically they hear about new judgments from colleagues who are counsel on the cases, and when they have a special interest in a particular judgment they ask the Prosecution or the Court for a copy. Atty. Adnan Rabi said a former chief justice of the Samaria Military Court provided a file folder in the defense attorneys' waiting room on the court premises with judgments by the Military Appellate Court, and the folder was occasionally updated. However, the folder is no longer current. When Yesh Din examined the folder in August 2007 it found judgments from the period between September 2005 and March 2006 alone. In the Judea Military Court there is no such file folder.

---

235.  The interview was conducted by Nura Resh and Lior Yavne at the Samaria Military Court on August 7, 2007.
236.  The interview was conducted by Nura Resh and Lior Yavne on August 7, 2007 at the Samaria Military Court.

119



## Legislation for "internal use" only

The OCSP (along with the Mandatory Defense (Emergency) Regulations), the Order Concerning Responsibility for an Offense, the Order Concerning Adjudication of Juvenile Offenders, along with a number of additional orders, constitute "primary legislation," on the bases of which persons suspected of security offenses are detained and defendants accused of committing them are tried. These orders were issued in the first years of the Israeli occupation of the OT and most of them have been amended and updated many times since.

The defense attorneys in the Military Courts testify that nobody informs them of the publication of amendments to the military orders, rather they learn about them only by rumor or during a hearing in the courtroom. Atty. Khaled al-Arraj says that "if there is an amendment, I don't know about it until [the Prosecution or the Court] tells me."[237] Atty. Wisam Fallah shared that when he was a military prosecutor he was unable to obtain updated copies of the relevant military orders:

*"Once I tried to obtain it, the entire legislation, even when I was a prosecutor, and I couldn't. I tried the IDF Military Justice School. I said 'come on, at least give it to the Prosecution...' How is a Palestinian defense attorney going to get it? How should he even know there is a Military Justice School? The Legal Advisor to the Judea and Samaria Area? As a defense attorney you have no possibility at all... Who is going to answer you at the Military Justice School or at the [office of the] Legal Advisor to the Judea and Samaria Area and tell you 'I'll send you the order?'"[238]*

When Yesh Din petitioned the office of the Legal Advisor to the Judea and Samaria Area to receive the current version of a number of orders, it turned out that even in the latter's office – which is responsible, among other things, for amending and updating the Security Legislation – there were no official versions containing all of the amendments made to the military orders over the years. The following was the response of Capt. Harel Weinberg, Consulting Officer in the Security and Criminal Department of the Office of the Legal Advisor to the Judea and Samaria Area:

---

237.  The interview was conducted by Judy Lotz and Lior Yavne on August 12, 2007 in Jerusalem.

238.  The interview was conducted by Judy Lotz and Lior Yavne on August 12, 2007 in Jerusalem.

120

"I hereby inform you that the orders listed in your referenced letter, and the amendments made to them over the years, were published over the years in the booklets of the **Proclamations, Orders and Appointments**, but we do not have an official combined versions of the orders listed in your referenced letter with their amendments."[239] Capt. Weinberg provided Yesh Din with copies of several orders the organization had requested, but stressed: "These copies are of unofficial versions, which were made for our internal use."

Based on interviews conducted by Yesh Din with defense attorneys, and from the answer given by the Office of the Legal Advisor to the Judea and Samaria Area, it is therefore apparent that there is no official, combined and available version of the current Security Legislation provisions: neither the Defense, nor the Prosecution, nor anyone else has a copy.[240]

## (n)    Conclusion

The Military Commander heavily relies on Palestinian organizations to serve as a sort of "public defense" for the detainees and defendants in the Military Courts. The Palestinian attorneys employed by those organizations are not permitted to visit their clients in prison in Israel, as part of the travel restrictions imposed by the Military Commander himself. Israeli lawyers and residents of East Jerusalem who visit the prison facilities inside Israel are often exposed to harassment. The conditions under which they are forced to meet their clients are prohibitive, impair the preparation of a legal defense, and raise concerns as to violation of the privilege and confidentiality applying to communications between them. Palestinian lawyers are forced to appear in court themselves, or send their articling interns in their place, in order to photocopy the investigation material. They are not permitted to send for this purpose another employee the cost of whose employment is lower. The investigation material they photocopy is almost all written in Hebrew, a language in which many of the defendants, and the Palestinian lawyers that represent them, are not proficient. GSS interrogation material is often delivered only in response to a request, and belatedly.

---

239.    Letter from Capt. Harel Weinberg to Atty. Michael Sfard, July 30, 2007.

240.    On September 3, 2007 the Military Prosecution's website published a number of military orders. However, the orders that were published did not include the Security Legislation upon which Palestinians are adjudicated in the military courts. The only order that was published that deals with courts is the one about the jurisdiction of the Rabbinical Courts in the OT. See http://www.aka.idf.il/patzar/klali/default.asp?catid=58262&docid (Hebrew).



The current judgments and legislation are not available freely to the attorneys, whether Palestinian or Israeli. This impairs their ability to prepare a defense, to consider practically the options facing their clients and to counsel them accordingly. Even when they do manage to obtain copies of judgments or legislation, these documents are available only in Hebrew.

In the last few months the Israeli judicial authority's website (www.court.gov.il) has featured a page enabling users to search the archive of the judgments of the first instance and appellate Military Courts. However, an attempt to conduct such a search produces an announcement that "the page does not exist." In a letter sent by the State Attorney's HCJ Department to Yesh Din in response to a petition submitted by the organization (see box on p. 85) it was stated, among other things, that "an administrative endeavor to examine the possibility of establishing a website for the Military Courts Unit is currently underway. The [MCU] intends to publish on the website the records of the hearings and decisions of the Military Courts. As soon as the website is launched there will be increased access to the records and decisions of the Military Courts."[241]

As a footnote it should be mentioned that if indeed the judgments of the Military Courts are published on a website or in any other way, while it would constitute a welcome development in itself, it would not suffice as long as the decisions and judgments are not published in the Arabic language.[242]

Based on the circumstances described above, it appears that the Military Court system in the OT, the IDF in general, and even the IPS have shirked their responsibility to provide detainees and defendants with the conditions that would allow them to prepare an effective defense, as required by international law. The consequences of that situation go well beyond a theoretical discussion: hundreds of defendants do not manage to obtain, for themselves and through their attorneys, the optimal legal defense to which they are entitled.

## (o)    Recommendations

1. The IDF is to move Palestinian detainees and defendants to detention and incarceration facilities located within the boundaries of the West Bank, as required by international law.

---

241.  Letter from Attorney Dana Briskman, Chief of HCJ Affairs at the State Attorney's Office, to Atty. Michael Sfard, July 4, 2007. To view the letter see Yesh Din's website http://www.yesh-din.org.

242.  On this matter, see p. 94.

**2.** Alternatively, and as long as the policy denying Palestinian civilians entry to Israel is in effect, the IDF must provide Palestinian lawyers with entry permits that will allow them to reach the locations in Israel where their clients, Palestinian detainees and defendants, are held. Denying such permits must be the exception rather than the rule, and must be done only in rare instances in which such denial cannot be avoided.

**3.** The IPS must amend its regulations so as to reduce the waiting time of attorneys at detention facilities to the minimum required.

**4.** Concerns regarding the use of listening devices in privileged attorney-client communications must be removed by disposing of the telephone receivers through which these conversations are currently conducted, and an alternative means of enabling communication must be found, e.g. a mesh-screen.

**5.** Palestinian lawyers must be allowed to appoint agents to photocopy case material at the prosecution offices in the military courts.

**6.** The number of photocopy machines available to lawyers for the purpose of photocopying case material is to be increased, and the elimination of payment for photocopying should be considered.

**7.** Indictments and case material must be routinely translated into Arabic.

**8.** The military prosecution is to be instructed to permanently make GSS interrogation documents, together with the rest of the case material, available to defense counsel upon the filing of an indictment.

**9.** All judgments of the Military Courts, both at the first instance and appellate levels, must be published on a regular basis and made available. Such publication must appear, at the very least, in Arabic and Hebrew, and responsibility for its execution must be assigned to the MCU and not the Military Advocate General, which supervises the prosecutors.

**10.** The Security Legislation must be published on a regular basis with any amendments and updates, in Arabic and Hebrew, and in a way that is accessible to defense attorneys as well as the general public.





**IN RESPONSE TO THE DRAFT OF THIS REPORT, THE IDF SPOKESPERSON STATED ON BEHALF OF THE MILITARY COURTS UNIT:**

→ The Military Courts do not avoid appointing a defense attorney funded by the Civil Administration. They do this not only in severe cases, but also in minor cases where there is no obligation to appoint a defense attorney. The key data that should be noted, is that in 99.9% of the cases, the accused is represented by a defense attorney.

→ Throughout the years, select Military Court rulings.[243] are published from the first instance and from the appeals instance. As of 2000, these files are published regularly, once a year. The formulation of these files is carried out by functionaries in the Military Court system alone. The files are sent to all the legal libraries in academic institutions, to courts, and also to the Bar's libraries. If this does not suffice, all Military Court of appeals rulings are distributed, by known procedure, according to the order worked out together with representatives from the Military Courts Attorneys' Committee, to four different attorneys from all districts, who have volunteered to distribute the rulings to their friends. Moreover, the select rulings were also given to the attorneys who asked for them, as were select legislation files prepared by the court system, which were also given to anyone who asked for them. Indeed, attorneys who appear in the Military Courts come equipped with the relevant legislation, and there have been no charges of lack of access to the rulings.

→ It has recently been decided that amendments to legislation be published, in Hebrew and in Arabic – in the defense attorneys' room in the courthouse.

→ Besides that, as mentioned, the courts system has no objection that rulings be published on the internet, the staff work for which is already underway.

---

243.  In translating the original Hebrew version of this report, Yesh Din translated the same term as "judgment."

→ During the investigation stage, the Military Courts act as is common in Israel, meaning: the police is given the right to file a confidential report to the judge, and it is

not disclosed to the defense. There is no difference between the Military Courts and the courts in Israel in this matter.

**ON BEHALF OF THE MILITARY ADVOCATE GENERAL, THE IDF SPOKESPERSON WROTE:**

→ The order to deprive a person of legal consultation exists in the detention laws of the state of Israel as well (albeit valid for different periods of time and rendered under different authorities). There are certain situations where meeting with an attorney might impede investigation or immediately compromise security in the region. This is why the relevant legal provisions have been instituted. This is all the more necessary since the most of the lawyers who are active in the region are not subordinate to the Israel Bar or constrained by effective enforcement of ethical principles. Regretfully, too often lawyers have even been involved in outright obstruction of justice, including conveyance of messages or even mobile phones to detainees.

→ The rule set forth in section 74 of the criminal procedure law concerning the right to peruse investigation documents is constantly and continuously observed by Courts-Martial. It does sometimes happen that parties disagree as to the nature or scope of this material, but this is not different, by all means, than what transpires in Israel, and the court renders decisions in these matters.

→ The Xerox machines at the prosecution offices are available to all lawyers and are operated by a civilian franchiser. Military Court Prosecution is unaware of any complaints of lawyers pertaining to difficulties in obtaining photocopies. Although the report states otherwise, memorandums of ISA interrogations are included in the prosecution file and the defending attorney may photocopy it whenever he or she please.



## 05   THE RIGHT TO TRIAL WITHOUT UNDUE DELAY

### (a)   International legal standards

The ICRC commentary attaches paramount importance to the provision in Article 71 of the Fourth Geneva Convention, that "accused persons who are prosecuted by the Occupying Power [...] shall be brought to trial as rapidly as possible," especially during times of occupation, when delays in the course of the investigation may result in the extension of the detention of the defendant while awaiting trial.[244] Article 9(3) of the ICCPR provides that:

> Anyone arrested or imprisoned on a criminal charge shall be brought promptly before a judge or other officer authorized by law to exercise judicial power, and shall be entitled to trial within a reasonable time or to release.[245]

Article 14 reiterates that the defendant should "be tried without undue delay,"[246] as part of the minimum guarantees provided by the Covenant. The United Nations Human Rights Committee (General Comment 13) determined that the aforementioned "relates not only to the time by which a trial should commence, but also the time by which it should end and judgment be rendered; all proceedings – both in first instance and on appeal – must take place "without undue delay." To make this right effective, wrote the authors of the General Comment, the authorities must create a procedure "in order to ensure that the trial will proceed 'without undue delay.'"[247] The demand for commencing a trial "within a reasonable time" of the defendant's arrest is common to the three regional conventions,[248] as well as to additional international conventions.[249]

---

244.   Pictet, p. 354.

245.   With the ratification of the Covenant by the State of Israel in October 1991, the State submitted a derogation regarding Article 9. The derogation stated that in the light of the state of emergency in Israel declared in May 1948, the Government of Israel "found it necessary to take measures to the extent strictly required by the exigencies of the situation for the defense of the State and for the protection of life and property, including the exercise of powers of arrest and detention. Insofar as any of these measures are inconsistent with article 9 of the Covenant, Israel derogates from its obligations under that provision." It should be noted that the period of time the State of Israel has maintained the "state of emergency" – almost 60 years – does not stand the test of reasonableness with respect to the derogation submitted by the State. On this issue, see Article 10 of General Comment 24 of the UN Human Rights Committee.

246.   ICCPR, Article 14(c)(3).

247.   General Comment 13, Article 10.

248.   ECHR, Article 6(1); ACHR Article 7(5); and ACHPR, Article 7(1)(d).

249.   For example, Article 40(2)(b)(3) of the Convention on the Rights of the Child, and Article 67(1)(c) of the Rome Statute of the International Criminal Court.

## (b)    Security Legislation

The Order Concerning Security Provisions (OCSP) states that an army officer of the rank of captain, or a police officer of the rank of superintendent, is authorized to order the detention of a suspect for eight days before the person is brought before a judge for an extension of his detention.[250] Military judges are authorized to extend a person's detention for thirty days, and to extend that period repeatedly as long as the judge's detention does not exceed ninety days. The eight days before the detainee is brought before a judge are not included in those 90 days.[251] Even after the 90 days have elapsed, a military appellate judge may extend the detention for an additional three months if requested to do so by the Legal Advisor to the Judea and Samaria Area.[252]

After an indictment has been filed, a judge may order the detention of the defendant until the end of proceedings – a detention that could extend up to two years, according to the provisions of the court order. In the event that the trial has not been concluded at the end of two years, the defendant's case is reviewed by a military appellate judge, who may release him or extend his detention because of the seriousness of the offenses of which he is accused, the danger he constitutes, the fear that he may flee, or in consideration of the reasons for prolonging the proceedings.[253] At this stage, the military appellate judge may extend the defendant's detention by six months at a time, again and again, with no limitation.[254]

In Israel, by comparison, the law with respect to a defendant who has been placed under detention until the end of proceedings limits his detention to nine months, after which a Supreme Court judge may extend the detention from time to time by no more than three months. In other words, the initial period of arrest, customary in the military judicial system in the West Bank, is equivalent to detention until the end of proceedings after five extensions approved by a Supreme Court judge in Israel.

---

250.    OCSP, Section 78(e1)(2).

251.    Ibid., Section 78(f)(1).

252.    Ibid., Section 78(f)(2).

253.    Ibid., Section 78(k)(2)(a).

254.    Ibid., Section 78(k)(2)(b).



## (c)    The prolonging of proceedings in Military Courts

The maximum periods of detention determined by the Order Concerning Security Provisions, whether before or after filing the indictment, are significantly longer than those allowed by Israeli law.

The State of Israel's Criminal Procedure (Powers of Enforcement – Arrest) Law of 1996 [hereinafter: "Detention Law"] determines far shorter periods of arrest and arraignment of a suspect than those determined by the OCSP. Thus, for example, under the Detention Law, a person can be held for no more than 24 hours before being brought before a judge;[255] and each extension of detention for the purpose of interrogation is limited to fifteen days, for a maximum period of thirty days.[256]

The following table demonstrates the main differences between the Security Legislation in force in the Occupied Territories and Israeli Detention Law:

**Table 5: Comparison between maximum periods of detention of suspects and defendants in Israeli law and Security Legislation in the West Bank**

|  | Israeli "Detention Law" | OCSP |
| --- | --- | --- |
| Detention until brought before a judge | 24 hours | 8 days |
| Total period of detention authorized by a judge | 30 days (up to 75 days on the authority of the Attorney General) | 90 days (up to 180 days on the authority of a judge of the Military Appeal Court) |
| Detention from the end of investigation until indictment | 5 days | |
| Detention from filing indictment until arraignment | 30 days | two years |
| Detention from arraignment until end of proceedings | 9 months | |
| Judge's approval of extension of detention if proceedings have not concluded | 90 days (Supreme Court judge) | 6 months (judge of the Military Appeal Court) |

255.    *Criminal Procedure (Powers of Enforcement-Detention) Law, 5756-1996*, Section 29.

256.    Ibid., Section 17. A further extension can only be authorized by the Attorney General.