Unlike the Detention Law, Security Legislation in the West Bank does not determine the maximum duration of detention from the moment the interrogation has been completed until the indictment is filed, nor the maximum duration permitted between the indictment and the commencement of hearings in the trial (the "arraignment" hearing). The data gathered in observations by Yesh Din volunteers indicates that this fact allows for the scheduling of hearings a considerable time apart.

When information was given in court about the prolonging of proceedings between one hearing and the next, the Yesh Din observers noted it on their observation forms. A calculation of the average time elapsed between hearings attended by Yesh Din observers and the next hearing announced in the courtroom produced the following findings:

The average time elapsed between the hearing on detention until the end of proceedings and the reading of the indictment (the arraignment): 61 days. [257]

The time elapsed between the arraignment and the next court session: 51 days on average in the case of defendants who were in custody, and 71 days on average in the case of defendants who were not in custody. [258]

The average time that elapsed between hearings at stages after the arraignment (memoranda, evidence, judgment, etc.), in the case of defendants held in detention: 52 days. [259]

A comparative examination of the data with respect to the Samaria and Judea Military Courts indicates that the issue of delays between hearings is especially marked in the Samaria Military Court, with an average of 63 days in cases of defendants held in custody. In the Judea Military Court, the delay between hearings is 43.5 days.

In 83 of the 195 cases in which Yesh Din was able to assess the time between hearings (52 in the Samaria Military Court and 31 in Judea), the period between the hearing attended

257.    The figure is based on 31 observation forms relating to hearings regarding "detention until the end of proceedings" in which the date of the next hearing was announced (out of 38 observation forms on hearings on detention until the end of proceedings).

258.    The figures are based on 125 observation forms that relate to arraignment sessions, in which the date of the next hearing was announced (out of 164 arraignment hearings observed by Yesh Din observers).

259.    The figure is based on 195 observation forms relating to hearings that did not deal with "detention until the end of proceedings" or "arraignment," in which the date of the next hearing was announced. In a limited number of instances, Yesh Din observers noted the date of the next hearing in cases where the defendant was not under arrest: in six cases for which Yesh Din has data, the figure is 65 days.



by observers and the date set for the next hearing exceeded 60 days. Of those, the delay
exceeded 90 days in 15 cases (11 in Samaria Military Court, four in Judea).

## (d)    The duration of detention until the end of proceedings

The 1993 State Comptroller Report examined, *inter alia*, the workings of the Military
Prosecution and the Military Courts and delivered harsh criticism over the number of
detainees held until the end of proceedings for a year or even two years and more between
the years 1990 and 1992. The Comptroller noted "this situation is improper and constitutes
a delay of justice."[260] Data of the Military Courts Unit collected by Yesh Din indicate that
in recent years the number of defendants detained until the end of proceedings is several
times greater than during the period reviewed in the State Comptroller Report.

Thus, at the end of 2006, some 1,800 prisoners under detention until the end of proceedings
had been in detention for up to one year, and 189 for over one year. The statistics for the
five previous years are even more alarming: from 231 prisoners under detention until the
end of proceedings who had been in detention for over a year (among them 85 for over
two years) at the end of 2001, to 671 in detention for over a year (among them 78 for over
two years) at the end of 2004.

Chart 4: Prolonging of proceedings: Defendants in the Military Courts under detention
until the end of proceedings[261]



260.   State Comptroller, **Annual Report 43** (April 1993) (Hebrew), p. 871. The figures to which the State Comptroller referred
were in general low by comparison to later years: in January 1992 there were 35 prisoners who had been in custody for over
two years; and in April 1992 the number of those in detention for between one and two years was 174.

261.   The data relates to the number of detainees held at the end of each year mentioned, and not to the total number of
prisoners during those years. Source: MCU 2004, p. 16; MCU 2006, p. 17.

## (e)    Conclusion

The duration of periods of detention before and after the filing of an indictment determined by the Order Concerning Security Provisions deviates considerably from the provisions of the Israeli Detention Law. This discrepancy exists despite the fact that the Israeli law, too, is intended to deal with those suspected of security-related offenses and serious crimes within the State of Israel itself.

As a consequence of the combination of lengthy detention before a suspect is brought before a judge, the long period of time available for interrogation thereafter (up to 90 days, and in certain cases even more), and the authority of the interrogators to prevent the suspect from seeing a lawyer for up to 30 days, the suspect is essentially at the interrogators' mercy. This state of affairs is quite far from the standards of both Israeli and international law, which demand that a suspect be tried "promptly," "without undue delay" and within a reasonable time.

With the filing of the indictment, and after the detained suspect becomes a defendant, there is another delay in the legal proceedings. The findings of Yesh Din observers indicate that the average time elapsed between the filing of an indictment and the decision to keep the suspect under detention until the end of proceedings, on the one hand, and the first hearing in the defendant's trial, on the other, is 61 days – twice the maximum time permitted in these matters by the Israeli Detention Law. During this period, the accused is not given any opportunity to address the indictment against him in court.

Furthermore, in the course of the trial, there is an average of almost two months between hearings, and sometimes more than 90 days. It must be emphasized that this does not relate to hearings that were postponed for various reasons, but to the original dates on the court calendar, announced at the time of the hearings. This practice explains why many defendants are kept under detention for over a year, and in many cases for over two years, between indictment and sentencing.

In a judgment by the HCJ in February 2007, the Supreme Court Chief Justice Dorit Beinish wrote, *inter alia*, as follows:

> The time has come to implement in the Military Courts statutory procedures similar to those legislated by the Detention Law in Israel, in order to protect defendants' rights – all subject to the special circumstances of the Area. This applies with respect to the duration of detention between the filing of the indictment and

131



the beginning of the trial [...]; limitation of the duration of detention between the conclusion of the interrogation and the filing of the indictment [...]; and, similarly, reduction of the periods of detention determined by the Security Legislation in effect in the Area, which are significantly longer than those determined by the Detention Law in Israel.[262]

In May 2007, Atty. Sigal Shahab of the Association for Civil Rights in Israel approached the Military Advocate General, demanding that the periods of detention determined by Security Legislation be brought in line with those determined by the Israeli Detention Law, among other reasons, in the wake of the above-mentioned judgment by the Chief Justice Beinish.[263] In response, the Deputy Legal Advisor to the Judea and Samaria Area wrote that the Military Advocate General had begun a study to examine changing the Security Legislation "in an effort to reduce the harm to detainees' rights, as much as possible."[264] At the time of writing this report no changes had been made in the legislation related to detention in the OT.

The Military Courts suffer from an enormous case load that falls on the shoulders of a limited number of prosecutors and judges. Seeking a solution to this problem, the Military Courts encourage plea bargaining as a substitute for evidentiary trials. Plea bargains are agreements at which the prosecutor and defense attorney arrive and, according to which, in most cases, the defendant agrees to plead guilty to some or all of the charges against him in exchange for a sentence agreed upon in advance. The Courts are not obliged to accept the agreements reached between the two parties, which are subject to court approval, but only rarely do they reject them.

Simpler cases, in which the charges are not of a serious nature, are generally resolved quickly by the Prosecution and the Defense, agreeing to a plea bargain at an early stage of the legal proceedings, soon after the indictment has been filed. Complex cases involving more serious charges take a longer time, because of the difficulty of reaching agreement on the level of sentencing.

In the next section we will expand on the problematic nature of the policy of encouraging plea bargaining. In any event, it is clear that plea bargaining cannot be a substitute for a full legal process that fulfills all the requirements of due process, as defined in international

---

262.  HCJ 10720/06 Fried v. Military Appellate Court (unpublished).

263.  Letter from Atty. Sigal Shahab of the Association for Civil Rights in Israel to the Military Advocate General, May 6, 2007.

264.  Letter from Lt.-Col. Eli Bar-On, Deputy Legal Advisor to the Judea and Samaria Area, to Atty. Sigal Shahab, May 29, 2007.

law. As will be seen below, a system based on plea bargaining creates a serious and dangerous situation in which a defendant who refuses a plea bargain risks the hostility of the Court, merely because of his insistence on his right to a hearing.

Yesh Din hopes that the legislation will indeed be amended so as to bring it into compliance with both the Israeli Detention Law and the provisions of international law. This is not enough, however. In order for the Courts to cope with the large number of cases brought before them every year, the number of personnel assigned to the Prosecution and to the Courts themselves must be increased.

## (f)   Recommendations

**1.** The Order Concerning Security Provisions is to be amended so as to significantly reduce periods of time allowed for detention during investigation and after the filing of indictments.

**2.** The Order Concerning Security Provisions must be amended such that it determines the maximum amount of time a person may remain in detention until the conclusion of the interrogation, the maximum time until the indictment is filed, the maximum time from the indictment until his arraignment, and the maximum time between court hearings.

**3.** Additional personnel must be immediately allocated to the Military Prosecution and the Military Courts in order to avoid prolonging the legal process, on the one hand, and pressure on defendants to accept a plea bargain with the Prosecution on the other.





## IN RESPONSE TO THE DRAFT OF THIS REPORT, THE IDF SPOKESPERSON STATED ON BEHALF OF THE MILITARY COURTS UNIT:

→ The workload in the courts is very great, the number of judiciary hours and the number of courtrooms are limited, and this necessarily affects the interval between hearings. However, it should be emphasized that the statistical data regarding the closing of cases in 2006 indicates that a "hostile act of terrorism' case closed on average after 7.5 months, a "violation of civil order" case after 3.9 months, and a "criminal" case after 5.4 months. This proves, with proven and validated facts, that the right to trial without delay is meticulously upheld by the Military Courts.

→ It should be stressed that in the past there was no limit to prolonging detention. The limitation was enacted due to clear and unequivocal call by the Military Courts for the legislator to change the situation (case 1313/00 Miscellaneous Appeals 108/02 Military Court Prosecution v. Amro). Only following the Military Courts' ruling, was the law amended.

## ON BEHALF OF THE MILITARY ADVOCATE GENERAL, THE IDF SPOKESPERSON WROTE:

→ Even though the legal arrangement for limiting the period of detention after prosecution declaration has yet to be explicitly incorporated in region law, the appeal court ruling has established the principles thereof and in practice, Courts-Martial conform to that ruling despite the great number of investigation files processed by Military Court prosecution.

→ It is true that nominal detention periods in the region are different, longer, than those permissible in Israel. This is an inevitable consequence of the extent and severity of offenses perpetrated in the region.[.. ]We should also assert that the legal ordinance regarding periods of detention in the region have been repeatedly put the scrutiny of the Supreme Court which dismissed all these petitions.

134

## 06    THE RIGHT TO PLEA AND PRESENT EVIDENCE

### (a)    International legal standards

The right of defendants standing trial in military courts to present evidence and call witnesses is entrenched in the preamble to Article 72 of the Fourth Geneva Convention: "Accused persons shall have the right to present evidence necessary to their defense and may, in particular, call witnesses." Within the context of the minimum defenses available to a defendant, Article 14(3)(e) of the ICCPR provides that any defendant in a criminal case is entitled to exercise the following rights:

> To examine, or have examined, the witnesses against him and to obtain the attendance and examination of witnesses on his behalf under the same conditions as witnesses against him;

On this subject, the UN Human Rights Committee notes that this provision is intended to ensure that the defendant is able to summon witnesses to appear in court for examination by the Defense, just as the Prosecution does.[265] Similar provisions appear in the ECHR (Article 6(3)(d)) and the ACHR (Article 8(2)(f)).

### (b)    Security Legislation

According to the OCSP, summoning witnesses is the prerogative of the Court, which is "permitted" to do so at the request of the Prosecution or the Defense, or on its own initiative " if it deems that such a summons is useful in clarifying a question that has bearing on the trial."[266] The Court, as mentioned, may compel witnesses to attend a hearing, and order the presentation of documents by them, or by another who was not summoned to give testimony.[267]

Section 18 stipulates that witnesses who give testimony before the Court will be subject to direct examination, cross-examination and redirect examination. Section 29(b) requires that a defendant who is not represented by legal counsel, and who denies the charges brought against him, will be given the opportunity to cross-examine the Prosecution witnesses.

---

265.    General Comment 13, paragraph 12.

266.    Order Concerning Security Provisions, Section 16(a). Emphases added.

267.    Ibid., Section 16(b)-(e).



The provisions in Section 31, which deal with laying the Defense's case, include a provision stating that the Court will hear the testimony of the defendant, if he wishes to testify, and the testimony of "all the witnesses that were summoned to testify."[268] If the defendant declares that he has witnesses who are not present in court, "the Court, at its discretion, may postpone the remainder of the hearing, as well as order, if it deems appropriate, measures to ensure the appearance of such witnesses at a date that it determines."[269]

### (c)    Plea bargains as a substitute for the right to plea

The monitoring conducted by Yesh Din observers, combined with interviews with defense attorneys for the purpose of this report, indicate that in general there are no particular problems with respect to the technical side of summoning Defense witnesses – when they are called – and their examination in court. The matter is almost irrelevant in the Military Courts, however, considering the small number of evidentiary hearings that take place therein.

Data provided to Yesh Din by the IDF Spokesperson, and gathered from the annual reports of the activity of the Military Courts Unit, indicate that only a few legal proceedings are conducted to the very end – from the indictment, through the case for the Prosecution and the case for the Defense, to judgment based on evidence presented to the Court and testimony given by witnesses in the framework of a full evidentiary trial.

Thus, of the 9,123 cases concluded in Military Courts in 2006, full evidentiary trials were conducted in only 130 – 1.42% – of them.[270] Evidentiary hearings in cases that were concluded in 2005 and 2006 that concerned Hostile Terrorist Activity, public disturbances and other criminal offenses (excluding IPI and traffic cases) were held in 3.62% of such cases in 2005, and 2.53% in 2006.[271]

Cases that conclude with a plea bargain are not unique to the Military Courts. Many court cases in Israel itself are concluded with plea bargains, but there appears to be a lack of consensus on the extent of the phenomenon.[272]

---

268.    Ibid., 31(a).

269.    Ibid., 31(c). Emphases added.

270.    Response of IDF Spokesperson to questions by Yesh Din, July 30, 2007.

271.    MCU, 2006, p. 12.

272.    On the difficulty of gathering data regarding plea bargains in Israeli courts, see Sarah Leibowitz-Dar, The Arrangements Law, Maariv, July 6, 2007 [Hebrew].

According to data furnished by the IDF Spokesperson to Yesh Din, only 51.5% of the cases concluded in the Judea Military Court in 2006 ended with a plea bargain, while in the Samaria Military Court the figure was 75%.[273] In response to a query by Yesh Din regarding the discrepancy between the number of cases ending with plea bargains and those concluded after full evidentiary trials, the IDF Spokesperson replied that in the remaining cases the defendant confessed without a plea bargain, or the legal proceedings were suspended after the indictment was filed.[274]

However, all the defense attorneys interviewed for this report refuted those figures, contending that a far higher number of cases concluded with a plea bargain. This assessment was substantiated by the Chief Military Prosecutor, Col. Liron Liebman, who stated at a meeting with the Israel Bar Association that the rate of plea bargains in Military Courts was 95%.[275] Yesh Din requested further clarification from the IDF Spokesperson and was informed that "there are different statistical categories relating to the manner in which a case is concluded with a plea bargain [...] It is quite possible that the figures [given to Yesh Din by the IDF Spokesperson on this subject] relate to a particular category."[276]

Yesh Din observers also monitored the number of plea bargains accepted by the Court, and particularly those referred to as "settled" (that is, the Prosecution and the Defense had agreed on the sentence). These data reveal that the Court accepts these agreements with almost no exception. Of the 99 "settled" plea bargains documented by Yesh Din, the Court accepted 95 of them in their entirety. In two cases the defendant was handed a harsher sentence than agreed upon in the plea bargain; in two others the Court was more lenient.[277]

As such, it may be established with certainty that, in the words of one of the attorneys interviewed for this report, in the Military Courts "the system is based on plea bargains."[278]

In order to reach an agreement on a plea bargain, the defense attorney approaches one of the military prosecutors. In the Judea Military Court, there are three members of the Military

---

273.   IDF Spokesperson's response to questions by Yesh Din, May 27, 2007.

274.   IDF Spokesperson's response to questions by Yesh Din, July 30, 2007.

275.   Col. Liebman, at a joint meeting of the Military and Security Committee and the Rule of Law Committee of the Israel Bar Association, minutes from September 18, 2006.

276.   Letter from Yesh Din to IDF Spokesperson, August 29, 2007; reply of IDF Spokesperson, October 14, 2007.

277.   In two additional cases the court accepted the plea bargain, but the Yesh Din observers were unable to determine whether the sentence was identical to or different from what was agreed upon.

278.   Interview with Atty. Riad Anees, conducted by Nura Resh and Lior Yavne at the Samaria Military Court on August 7, 2007.



Prosecution who have been authorized to negotiate plea bargains with defense attorneys. In the Samaria Court, the Chief of the Military Prosecution has reserved that prerogative for himself.

During the negotiations, the two sides review the charges and the evidentiary material in each case. The prosecutor strikes charges for which the evidence is relatively weak, or to which the defense attorney objects and insists on striking. In return, the defendant pleads guilty to the other charges as they stand, or after amendment, all according to the understanding reached between the prosecutor and the defense attorney. Atty. Fallah, on the basis of his experience as a military prosecutor, confirmed that in many cases details are introduced into the indictment at the very beginning for the express purpose of deleting them later as part of the plea bargain.[279] If this is in fact the case, this tactic constitutes a serious ethical violation on the part of the prosecutors, who are expected to sign an indictment only if they are truly convinced that the suspects indeed perpetrated the offenses of which they are accused, and only if they believe they have sufficient evidence to put them on trial for said offenses. Introducing charges for other reasons is improper and amounts to an abuse of the authority with which the prosecutors are invested.

Atty. Fares Abu Hassan briefly described the process of settling a plea bargain:

> *First we check the evidence. If there are problems with the evidence, with certain items, we strike [the indictment items], without hearing witnesses and so on. If the evidence "seals" the details, if there is nothing to talk about, nothing to plead, then instead of wasting court time and hearing witnesses, we plead guilty, in order to shorten the proceedings and [eliminate] some of the charges. The Prosecution always deletes those kinds of small items that don't add much [to the sentencing], and leaves the main charges. Then we talk about the sentence.[280]*

There are several reasons for the widespread use of plea bargaining.

**Admissions of guilt:** Palestinians suspected of security offenses are sometimes interrogated by the GSS rather than the Israel Police. The combination of two factors – the methods of interrogation employed by the GSS, which include physical measures and threats not

---

279.   The interview was conducted by Judy Lotz and Lior Yavne in Jerusalem on August 12, 2007.

280.   The interview was conducted by Nura Resh and Lior Yavne at the Samaria Military Court, August 7, 2007.

used by the Police,[28'] and the fact that many suspects are prevented from consulting an attorney during their detention and interrogation – results in most indictments being filed with the Military Courts after the suspect has confessed during his interrogation to the charges against him, or has been incriminated by others.

**Work load:** The work load of cases in the Military Courts is enormous for everyone involved. An inadequate number of judges, prosecutors and attorneys deal with thousands of cases every year. Consequently, the military judges encourage plea bargaining, and prosecutors and defense attorneys prefer to reach an agreement as a quick means of bringing the case to a conclusion.

In one of the hearings attended by Yesh Din observers, they witnessed pressure to accept a plea bargain exerted on the defendant by all parties, even though he refused at first:

→ *The defense attorney asks the judge for permission to bring the defendant's father and cousin into court and let them talk to the defendant, since the defendant refuses to accept the plea bargain, and his father wants to persuade him to do so. Deviating from normal procedure, the judge allows the father to sit close to the defendants' dock so as to speak with his son, and what ensues is a long and loud conversation between them. Under the pressure of the father, the attorney and the judge, the defendant finally agrees to accept the plea bargain and begin the hearing.[282]*

The prolonging of proceedings in the Military Courts (see below) also leads defense attorneys to prefer a plea bargain over a full evidentiary trial. Atty. Adnan Rabi offered an illustration from a case in which he appeared on the day of the interview:

*I had a case of a minor today [August 7, 2007], attempted assault. They found a knife on him, and he said "I attempted..." First, I saw that he had no chance of being released on bail – according to the evidence and my experience. But, as the saying goes: step on the gas – but not in gear. I requested that the trial should at least begin as soon as possible, and that the witnesses should be brought in. No. They scheduled it for October. In my opinion, he would only be*

---

281.    On the matter of methods of interrogation, see (for example) the joint report of B'Tselem and Hamoked – Center for the Defense of the Individual, **Absolute Prohibition: The Torture and Ill-Treatment of Palestinian Detainees** (May 2007); report by the Public Committee Against Torture in Israel, **"Ticking Bombs": Testimonies of Torture Victims in Israel** (May 2007); report by B'Tselem, **Torture of Palestinian Minors at the Gush Etzion Police Station** (July 2001).

282.    Yesh Din Observation Form No. 657 (Judy Lotz and Ruth Ben Shaul), case 3491/06 in the Judea Military Court, hearing on January 17, 2007.



*jailed for a few months. If I go to trial, the proceedings will take over four months – something like six months. But if I go for a plea bargain, it'll come out to three or four months.*[283]

**Fear of a heavy sentence:** Attorneys representing suspects and defendants in the Military Courts believe that conducting a full evidentiary trial, including summoning witnesses and presenting testimony, generally results in a far harsher sentence, as a 'punishment' the Court imposes on the defense attorney for not securing a plea bargain. That opinion is shared by Atty. Abu Hassan:

*You have to make deals here. Why? If you don't make a deal, and you go all the way with the evidence, you'll get double the sentence you could have gotten with a deal. If you were convicted on the evidence [in a trial], and you brought out a precedent, with identical charges, that got four years [imprisonment] in a plea bargain – so, because you introduced testimony, you'll get eight years. In other words, even if you show precedents and everything, they [the Court] will tell you: 'That ended in a plea bargain. Because you wasted the Court's time, etc., you'll get more.'*[284]

This impression is not merely an unsubstantiated feeling. This approach by the Court emerged in a number of the hearings at which Yesh Din observers were present. At a hearing in the Judea Military Court, for example, Yesh Din observers documented the advice the judge gave the defense attorney:

→ *After the defense attorney announced that the defendant pleads not guilty, the judge asked the names of those who recorded the testimony on which the indictment was based. Their names are M.L. and Y.Y. The judge orders them brought to the next hearing. Then the judge tells the attorney that he should persuade the defendant that he is making a mistake [by] taking a path that may result in a more severe sentence.*[285]

**Lack of trust in the Military Courts** leads many defendants and their families to put pressure on the defense attorneys to secure a plea bargain, in order to avoid a convicting judgment by the Military Court and a sentence that could be stiffer than one on which the

283.   The interview was conducted by Nura Resh and Lior Yavne in the Samaria Military Court, August 7, 2007.

284.   The interview was conducted by Nura Resh and Lior Yavne in the Samaria Military Court, August 7, 2007.

285.   Yesh Din observation form no. 1098 (Judy Lotz and Ruth Ben Shaul). Judea Military Court case 4108/06, hearing on December 26, 2006. The full names are on file with Yesh Din.

two sides agree. An attorney that fails to deliver a plea bargain could find himself out of work, as Atty. Jamal Mahameed explains:

*We are part of the whole thing, because if you don't do it, you are thrown out of the system. That means that your reputation among the defendants' families is damaged. They'll say that you're not good, that your clients get heavy sentences, that [the Court] doesn't accept your deals [...] That's when the attorney starts making plea bargains. Plea bargains are a part of the system, such a crappy system – forgive the expression – that you have to be a part of it. If not, you're out. You're rejected.[286]*

### (d)    Conclusion

The right of the defendant to call and examine witnesses of his choosing and question them is not unequivocally entrenched in the Order Concerning Security Provisions, as it is in international law. Nevertheless, it seems that there are no particular problems in this regard in the Military Courts. According to Atty. Anees, in an interview with Yesh Din, the defense witnesses he calls are generally in detention themselves anyway, and thus there is no difficulty in summoning them.

The problem with the Military Courts, therefore, is not the technical issue of calling witnesses and pleading the case, but rather the threat hanging over the defendant that calling witnesses will result in a stiffer sentence, whether in a plea bargain agreed upon after the witnesses have testified, or at the conclusion of a full evidentiary trial with no plea bargain.

The chances of a Palestinian defendant indicted by a Military Court to be acquitted at the end of his trial are low, to say the least. As mentioned previously, in 2006 only 0.29% of the defendants in the Military Courts were acquitted. All of the defendants who were found not guilty had conducted evidentiary trials and not agreed on a plea bargain with the Prosecution. In that year, in fact, a relatively high proportion of those who conducted full evidentiary trials were acquitted: about twenty percent. Nevertheless, the lack of trust in the courts, the fear of harsher sentences imposed on defendants who insist on their right to an evidentiary trial, and additional reasons enumerated above, all guide most defendants and their attorneys to the Offices of the Prosecution to work out a plea bargain.

---

286.    The interview was conducted by Nura Resh and Lior Yavne in the Samaria Military Court, August 7, 2007.



Plea bargaining has in effect replaced full legal proceedings in the Military Courts, but the practice is perceived as serving the interests of all sides: the defendants are generally given some reduction of sentence in comparison with what might have been expected after a conviction in an evidentiary trial; the Prosecutor and the Defense are able to conclude the case without the need for summoning and examining witnesses; and the work load of the Court is reduced. The question of whether justice is served in this manner, or whether it increases the danger of distortion of justice, is outside the framework of this report, but it is a subject worthy of examination. It should only be noted that it is not by accident that lawmakers in every country, Israel included, have legislated procedures for a full evidentiary trial in which witnesses can be heard and examined, and each side can present its arguments in a comprehensive manner – all this as a guarantee of a fair trial in which the danger of a miscarriage of justice is minimized to the fullest extent possible.

BACKYARD PROCEEDINGS



**IN RESPONSE TO THE DRAFT OF THIS REPORT, THE IDF SPOKESPERSON STATED ON BEHALF OF THE MILITARY COURTS UNIT:**

→ The settlements[287] mechanism is common in Israeli courts, just as it is common in courts in the region […] In Israel too it is common for an accused person who confesses in court to be entitled to an easement of his sentence, while persons denying guilt, prolonging their trial and who are found guilty are not entitled to such easement.

→ According to the method of law common in Judea and Samaria and in Israel, the court orders that settlements be upheld if they do not deviate radically from the common and reasonable level of punishment. Therefore, once the accused has decided to reach a settlement through his attorney, the court will usually honor the settlement. Settlements are usually a definite public interest, that in the reality of the region can greatly benefit accused persons whose attorneys believe have a high chance of being convicted. Assuming that the defense attorney has carried out his work properly, in such a case the interest to reach settlement is first and foremost the interest of the accused person who can minimize the severity of the indictment filed against him, and that of his sentence. Therefore, there is no flaw in reaching settlements.

---

287.    In translating the original Hebrew version of this report, Yesh Din translated the same term as "plea bargain."



## 07    INTERPRETATION

### (a)    International legal standards

In order to guarantee that a defendant is able to defend himself in court (as well as properly provide his account during questioning), explicit instructions have been established in international law regarding the occupying power's obligation to provide an interpreter for suspects and accused persons. Article /2 of the Fourth Geneva Convention states, among other things, that

> Accused persons shall, unless they freely waive such assistance, be aided by an interpreter, both during preliminary investigation and during the hearing in court. They shall have the right at any time to object to the interpreter and to ask for his replacement.

The minimum protections determined by the ICCPR, the ECHR[288] and the ACHR (the latter also requires the services of a translator – for the translation of documents – in addition to an interpreter of the hearing)[289] use similar language, guaranteeing the accused "the free assistance of an interpreter if he cannot understand or speak the language used in court."[290]

General Comment 13 indicates that the right to interpretation services is a basic right, especially in cases when unfamiliarity with the court's customary language or difficulties understanding it may be a substantial barrier to the realization of the accused's right to defend himself in court.[29·]

### (b)    Security Legislation

The rule requiring the services of an interpreter during sessions in the Military Courts was adopted in Section 12 of the OCSP, which, following the instructions in the Fourth Geneva Convention, stipulates:

> If the accused does not know Hebrew, the Military Court will appoint an interpreter in order to interpret the proceedings and the Court's decisions, unless the accused

---

288.    ECHR, Article 6(3)(e).

289.    ACHR, Article 8(2)(a).

290.    ICCPR, Article 14(3)(f).

291.    General Comment 13, Para. 13.

freely waives the entire interpretation or part of it. The accused has the right to oppose an interpreter and request a replacement.

## (c)    Military Court procedures

Yesh Din petitioned the IDF Spokesperson for copies of the regulations on interpretation in the Military Courts and, among other things, the translation of court proceedings.[292] In response, the IDF Spokesperson said that "there are no written regulations in the Military Courts Unit related to translation of evidential material, proceedings and judgments, or for the training of interpreters."[293]

As for interpretation during hearings, the IDF Spokesperson noted in his answer that

At Military Court hearings, a translator is regularly present, simultaneously translating what is said by the parties to the court proceedings and by the Court. The judgments given by the Court are read aloud in the court, and therefore are interpreted accordingly as well. Additionally, a copy of the judgment is given to the parties.[294]

## (d)    Interpreters in the Military Courts

In each of the Military Courts – Samaria and Judea – nine to ten interpreters serve under the supervision of an interpretation officer of the MCU. One interpreter in each court is a career serviceperson, termed "senior interpreter."

The interpreters are regular soldiers, mostly of Druze origin, whose native language is Arabic and who learned Hebrew in elementary and high school. These soldiers are not singled out for this position by the IDF before they enlist, but rather are assigned service in the Military Courts immediately upon enlistment, with no prior professional background in interpretation. At a certain point after beginning their work, the interpreters complete training in an army course.

---

292.    Questionnaire handed to IDF Spokesperson's Unit representatives at a meeting on March 15, 2007.

293.    IDF Spokesperson's answer to Yesh Din's questions, July 30, 2007.

294.    Ibid.



### (e)    Interpreter training

As to the training of the interpreters in the Military Courts, the IDF Spokesperson shared with Yesh Din:

For the position of interpreter in the Military Courts Unit, regular soldiers are recruited who speak the Arabic and Hebrew languages fluently. Additionally, the interpreter training includes an interpreters' course. The unit also includes career-service interpreters, selected from amongst the regular soldiers who stood out as exceptionally professional.[295]

The training of interpreters takes place in the Military Advocate General's Military Justice School, at irregular intervals determined by the availability of budget and human resources.[296] The three-week course includes content related to translation of documents, simultaneous oral interpretation, translation of judgments and sentences, legal terminology, and lectures about various subjects, such as GSS interrogations and security offenses.[297]

In 2005, in the course of a study, Shira Lipkin, a Masters Degree candidate in the Translation Department of Bar-Ilan University, interviewed every one of the interpreters serving at the Judea Military Court at the time. The interpreters interviewed for Lipkin's study testified they were sent to an interpretation course after a period of active duty several months to a year and a half long.[298] One of them noted that in his opinion, the level of the interpreters would increase if the new interpreters were sent to the course immediately upon enlistment.[299]

Despite the formal training given to interpreters at some point (sometimes many months after they have started their work), lawyers appearing in the Military Courts are not satisfied with the quality of the interpretation. Among other things, some of the lawyers place blame on the decision to make use of regular soldiers, assigned this position only because of their mastery of both languages. Atty. Riyadh Anees, for instance, says:

*I have been an attorney since 1976. Sit me down here to translate [interpret], me, a native speaker of Arabic who has learned Hebrew since the fourth grade,*

295.    Ibid.

296.    Shira Lipkin, Norms and Ethics Among Military Court Interpreters: The Unique Case of the Yehuda Court. (December 2006: Bar-Ilan University, Department of Translation and Interpreting Studies), pp. 88.

297.    Appendices 13-15 of Lipkin's study present the training plans of three interpreters' courses.

298.    Lipkin, pp. 66-69.

299.    Ibid., pp. 69-70.

*in a Hebrew-speaking school, and at Tel Aviv University, if you sat me down and asked me to translate – I could not translate. Translation is a profession. With all due respect to all of these people... Who are we talking about? We are talking about soldiers, who just finished the twelfth grade, and come and translate. I see what happens in the district court in Haifa. I appear in Haifa and in Tel-Aviv. There, if your defendant, or a witness, does not understand Hebrew, the court brings in people from a special company, people for whom this is a profession, translation. And even they have a hard time. Because you have to understand, this is legal translation. That not every one... it's not just anybody's profession.[300]*

Atty. Jamal Mahameed is also not impressed with the interpreters' skill, even after they have passed military training:

*These youngsters do not know Hebrew, they've hardly finished their twelfth-grade schooling, they come here on compulsory duty. At most they get some course but it's not enough. Many things go un-translated. After all, these youngsters don't know the legal jargon. They make mistakes to no end. You see it every day.[301]*

## (f)    The role of the interpreters: maintaining order

An integral part of the interpreters' function in the courts is to ensure the order and proper conduct of the proceedings. This function is manifested, among other ways, by bringing in detainees and defendants whose cases are to be heard, removing them from the courtroom afterwards and bringing others in their place. The function of the interpreters is detailed in regulations. Copies of a document entitled "Standing Orders for Interpreters" are posted on the Samaria courtroom walls. The document details the interpreters' obligations before, during and after the day's proceedings. The document's 12 articles describe at length the procedural functions for which the interpreters are responsible – the procedures for the entry of detainees into the courtroom, change of personnel between interpreters, courtroom cleanliness, and more – yet there is not a single reference to their duties relating to the interpretation work itself.[302]

One of the prominent findings of Lipkin's study is the fact that the interpreters consider the main part of their function to be maintaining order in the courtroom. Lipkin notes in

---

300.   The interview was conducted by Nura Resh and Lior Yavne in the Samaria Military Court on August 7, 2007.

301.   The interview was conducted by Nura Resh and Lior Yavne in the Samaria Military Court on August 7, 2007.

302.   See full text of the document "Standing Orders for Interpreters" in the Samaria Military Court, Appendix 4.



her study that when asked about their position and job description in the courtroom, most interpreters referred mainly to the administrative aspects of the position. Furthermore, Lipkin writes that most of the interpreters she interviewed believed the importance of their work derived from the fact that they determined the court's schedule and were responsible for bringing detainees and defendants in and out of the courtroom.[303]

One interpreter Lipkin interviewed was asked for his opinion on the topic of the neutrality required by his position. However, he did not understand the question, and in his response he spoke of the importance he attributes to the role he plays:

> *The interpreter's job is in my opinion like such an important position, for instance calling the prosecutor to come into the courtroom, to call the defense lawyer, to bring in the detainees from the cell... To bring in the detainees' families, to coordinate between the prosecutor, when he comes in, for instance I have four cases, I bring in four detainees, two prosecutors show up – you've got to coordinate with the other prosecutor, you've got to, a case is scheduled for nine-thirty, the lawyer still hasn't got there, you can't sit down... you have to update the judge, tell him what's going on, I need to call the clerk so she'll be ready in the court, it's a job... [...] I'm under pressure all the time.[304]*

Both the interpretation officer and one of the veteran interpreters interviewed by Lipkin for her study agreed that the interpretation work in the Military Courts would improve if the interpreters were to deal only with interpretation.[305] The observation data Yesh Din Collected in the courts, and the words of attorneys who regularly appear there, indicate there is indeed much room for improvement.

## (g)    The volume and quality of interpretation

One of the indicators measured by Yesh Din observers is the scope of the translation provided for the accused, their attorneys and their families during proceedings. The observers, most of whom do not speak Arabic, were not asked for their opinion of the translation's quality, but rather asked to note their impression of the degree to which the interpreter conveyed the pleadings within the proceedings in full, such that the defendant and family members in attendance could, as much as possible, understand them.

---

303.    Lipkin, pp. 82-85.

304.    Quoted in Lipkin, p. 83

305.    Ibid, p. 102.

Of 648 observation forms on which the observers noted their impression of the scope of
the translation, only 23% of the forms indicated that the translation was "full," and 37%
of the forms assessed the translation as "reasonable." On the other hand, in 35% of the
hearings observed by Yesh Din observers the translation was "partial or sloppy," and in
another five percent there was no translation whatsoever.

Chart 5: Extent of interpretation at hearings monitored by Yesh Din



In some cases Yesh Din observers recorded their impressions of the interpreters' work
and behavior. For example, the observers commented about the proceedings in one of the
courtrooms of the Judea Military Court on the morning of June 12, 2007:

→ *Throughout the entire morning's hearings, the interpretation was sloppy. The interpreter
did not always follow what was going on, he was sprawled on his seat with his legs
wide open and his hands behind his head and intermittently and sloppily interpreted the
proceedings. The judge commented on it again and again to no avail.*[306]

In other cases interpretation only resumed due to remarks by a defense attorney or judge.
One Yesh Din observer reported as much on the hearings in the Samaria Military Court
courtroom on February 6, 2007, noting that "the hearing is not being interpreted. Probably
because this is the ninth case, almost in succession, that is not being interpreted, the judge
turns to the interpreter and sarcastically says 'don't interpret, feel free.' From that point on,
the interpreter starts working again."[307] On another observation form, it was noted about
the proceedings in a minor's trial that "from time to time there is no interpretation at all.

---

306.    Yesh Din observation report no. 1246 (Judy Lotz and Ruth Ben Shaul).

307.    Yesh Din observation report no. 728 (Roi Maor). The comment refers to the hearings that took place in the Samaria
Military Court on February 6, 2007.



The defense attorney gets angry and says he will interpret himself and the interpretation resumes. As the charges are read out the defendant protests constantly but his words are not interpreted."[308]

Attorneys who appear frequently in the Military Courts note that there are clear gaps in some interpreters' professional skills. Atty. Abu Hassan, when asked for an evaluation of the level of the Court interpreters, responded: "There are interpreters who interpret very nicely and accurately, but there are others... it depends on each and every one. They are not all the same."[309]

In some cases the interpreters' ignorance of legal terminology may harm a witness's ability to defend himself effectively. Atty. Sahar Frances says, on this topic:

*Some interpreters try, but it's not accurate, to such a degree that the cross-examination is impaired... . For example, in the hearing I just attended, when the judge explained to the [Palestinian] witness about his right to avoid self-incrimination, the term 'self-incrimination' was translated incorrectly – if I hadn't known Hebrew I would not have understood the term myself, the way it was translated.[310]*

The translation in courtrooms is intended to allow the defendant – and his attorney, if the latter is not fluent – to understand the proceedings. Often interpreters do not bother to interpret exchanges between the Prosecution, the Defense and the judges in the courtroom, although they are significant to the proceedings. Atty. Abu Hassan believes the defendants and family members attending (who do not speak Hebrew) hardly understand the proceedings:

*The detainees and their families understand less than fifty percent of what goes on in the courtroom. Less... maybe they understand thirty percent. And it depends on the interpreter, whether he interprets and you can hear him, or whether he interprets...[311]*

308.   Yesh Din observation report no. 1177 (Judy Lotz and Ruth Ben Shaul). Judea Military Court case 3665/06, hearing from May 9, 2007.

309.   The interview was conducted by Nura Resh and Lior Yavne in the Samaria Military Court on August 7, 2007.

310.   The interview was conducted by Lior Yavne at the Judea Military Court on August 1, 2007.

311.   The interview was conducted by Nura Resh and Lior Yavne at the Samaria Military Court on August 7, 2007.

Indeed, Lipkin's study indicates that most interpreters testify that they interpret only what goes on the record. As one interpreter stated, "the procedural arguments between the judges and the Defense or the Prosecution are not relevant, and we are instructed that they need not be interpreted, unless something of importance to the defendant is said."[312] Yesh Din courtroom observations indicate that in many cases even when things are said that are of importance to the defendant, they are not interpreted.

## (h)    Conclusion

One of the Court interpreters with whom Yesh Din met spoke of his work:

> *It is boring. Every day the same work. The same people, the same words, the same thing. Listen, a year and a half is okay, but three years? You just go nuts. [...] As far as physical fatigue, you can rest for an hour, or two or three. But if you are tired in here [points at his heart] like, you can't.... hear three or four witnesses in one day, you go home and you can't even talk. But what can you do, you have to do three years [of military service].[313]*

Although the Military Courts in the OT are intended to try Arabic-speaking civilians, all proceedings in the Courts are conducted entirely in Hebrew. The indictment is submitted in Hebrew, the hearings are conducted in Hebrew, the records are written in Hebrew, and Hebrew is also the language in which the judgments are written.[314] Even defense attorneys whose Hebrew is poor usually prefer Hebrew when addressing the courtroom.

Some of the interpreters – if not most of them – try, so it seems, to perform their duties as best they can. However, the IDF's choice to rely on cheap human resources composed primarily of regular soldiers with absolutely no professional background – either as translators, in general, or more specifically as legal interpreters – who learn the profession as they work, severely harms the scope and quality of the interpretation provided. The IDF Spokesperson admitted that the Military Courts Unit has no regulations or written instructions whatsoever regarding the interpretation of hearings and translation of various documents. This fact illustrates the contempt with which the military authorities view their obligation to ensure that a defendant standing trial, or a detainee brought to a detention hearing, fully comprehends what transpires during the hearings over his matter.

---

312.  Lipkin, p. 86.

313.  The interpreter's name is on file with Yesh Din. The conversation took place in August 2007.

314.  For the matter of the translation of indictments and judgments, see above.



The fact that, in addition to their interpretation work, interpreters are required to act as escorts in the courts, hampers their ability to boost their professional skills and to devote their full attention to their interpretation duties. As a result, the quality of the interpretation is less than adequate, and the defendants' right to a full interpretation of the proceedings in their trials is not realized.

## (i)    Recommendations

**1.** The Military Courts Unit must set clear professional procedures for interpretation in the courtrooms.

**2.** The use of regular soldiers as interpreters must cease, and professional interpreters must be employed, as is customary in courtrooms in the State of Israel.

**3.** Until regular soldiers functioning as interpreters are replaced by professional interpreters, the functions of attendant and interpreter are to be clearly separated, and no further soldiers enlisted for the purpose of serving as interpreters shall serve in this capacity until they have undergone a comprehensive professional course, as soon as possible after their enlistment.



**IN RESPONSE TO THE DRAFT OF THIS REPORT, THE IDF SPOKESPERSON STATED ON BEHALF OF THE MILITARY COURTS UNIT:**

→ The Military Courts system gives utmost importance to the translation[315] of its hearings. To this end, soldiers with high personal abilities are recruited, who undergo admissions tests, a professional course, and constant on-the-job training, as well as advanced professional training. The unit translations officer, who serves as a professional guide, conducts a periodic review of the quality of the translations, and translators who are not up to standard are reassigned to other duties. Furthermore, several judges in the unit speak Arabic at mother tongue level, and they too supervise the level of translation and serve as professional guides for the translators.

→ In order to raise the quality of the translation, career-service translators were recruited. There is no need to mention that in cases where a defense attorney is not satisfied with the level of translation, this is brought to the court's knowledge, and later to the attention of the translations officer for review and in order to find suitable solutions.

→ Nevertheless, we acknowledge that the quality of translation varies, as by translator, and measures are being taken in the system to rectify this. One of the measures is augmenting the number of commissioned translators. The Judea court, for example, currently employs 3 translators in career service instead of just one as before. Clearly, the more permanent service commissions instituted, the better the translations obtained.

---

315.  In translating the original Hebrew version of this report, Yesh Din translated the same term as "interpretation."

יש דין
**Yesh Din**
بيش دين

## 08   MINORS

### (a)   International legal standards

The Fourth Geneva Convention does not include special instructions on the subject of the rights of minors put on trial by an occupying power. International human rights law, on the other hand, sets clear guidelines regarding the treatment of minors in criminal proceedings, and the requirement to take the fact of their minority into account at all times.

Article 14(d) of the ICCPR requires the adjustment of legal procedures in the courtroom to the minor's age:

> In the case of juvenile persons, the procedure shall be such as will take account of their age and the desirability of promoting their rehabilitation.

Article 40 of the *Convention on the Rights of the Child*,[316] relating to children "alleged as, accused of, or recognized as having infringed the penal law," sets forth a detailed list of the rights of such children. The rights listed in Article 40 are principally identical to the basic protections required by international human rights law vis-à-vis adult defendants, while paying special attention to the fact that the accused is a minor, considering the accused's age and condition, involving the minor's parents (if possible) in the proceedings, and respecting the child's privacy entirely, at all stages.

In paragraphs 36-38 of the United Nations Committee on the Rights of the Child's *General Comment 10: Children's Rights in Juvenile Justice*, the Committee calls signatory states parties to the Convention on the Rights of the Child to define the threshold for legal majority as 18 and no lower. The Committee also asserts that a "key requirement" for securing the rights of minors suspected of criminal offenses is that professionals coming in contact with such minors – including police officers, prosecutors, judges and others – undergo comprehensive and continuous training. Specifically, the Committee refers to training about "the child's, and particularly about the adolescent's physical, psychological, mental and social development."[317]

A central tenet of the requirements of international law regarding criminal procedures for minors is separating them from adults, mainly during detention (Article 37(b) of the

---

316.   The Convention was signed by the State of Israel on July 3, 1990 and ratified on August 4, 1991.

317.   Paragraph 40 of the UN Committee on the Rights of the Child's General Comment no. 10.

Convention on the Rights of the Child). All practices in criminal law emphasize rehabilitation as the goal of criminal proceedings and criminal punishment when relating to minors.[318]

### (b)    Security Legislation

The adjudication of minors charged with criminal offenses is mainly regulated by the *Order Concerning Adjudication of Juvenile Offenders (West Bank Area) (no. 132), 1967*. The Decree lists three categories of minors: a "child" is defined as "a person not yet twelve years of age"; a "youth" is one who has already reached twelve years of age but not yet fourteen years of age; a "young adult" is one already fourteen years of age but not yet sixteen years of age.[319] Above the age of sixteen, excluding one caveat to be discussed below, a person is considered an adult.

Section 2 of the Order absolves "children" (under the age of 12) from arrest and criminal trial.[320] Section 3 asserts that a "youth" or "young adult" (that is, ages 12-16) must be held in custody separately from adults.

Sections 4 and 5 stipulate a maximum period of confinement for "youths" (up to six months of confinement) and for "young adults" (up to a year of confinement, unless the "young adult" has been convicted of an offense entailing five or more years of confinement), but the date used to classify the minor is his age at the time of sentencing – and not his age at the time of the offense of which he has been convicted. However, Section 5a provides that "when determining the punishment of a youth or young adult, the Court will take into consideration, among other things, his age at the time of the offense." Combining the fact that the age involved in the question of minority is the day of sentencing, and not the day of the crime, with the above details about prolonged proceedings in the Military Courts, it is inevitable that in many cases minors who committed offenses become adults by the date of their sentencing. Moreover, these problematic circumstances exert pressure on defense lawyers to bring minors' trials to an end before they turn sixteen years old.

---

318.    Rehabilitation is also a goal in adult cases, but with them a more central role is attributed to other goals, such as deterrence and retaliation.

319.    *Order Concerning Adjudication of Juvenile Offenders (West Bank Area) (no. 132), 1967* [hereinafter: "Order Concerning Adjudication of Juvenile Offenders"], Section 1.

320.    Section 4 of the *Order Concerning Rules of Liability (Judea and Samaria) (no. 225), 1967* asserts that "one not yet twelve years of age will not be held criminally liable for any action or omission."



Section 6 stipulates that if a monetary fine has been imposed on a minor, the Court may require his parents or legal guardians to pay the fine, including ordering the minor's father, mother or legal guardian to serve a prison sentence in place of the fine. Sections 7(a)-(c) of the order detail various provisions regarding the obligation of parents or legal guardians to deposit a financial guarantee (bond) for the release of a 12-16 year old suspected or convicted of a crime. For these matters alone, a person is considered a minor until the age of 18.[32]

An isolated reference in the OCSP to the protection of minors on trial in the Military Court system can be found in Section 11(a), under which the Military Commander instructs that the Court "may" order an *in camera* hearing for a variety of reasons, including the protection of "a minor's well-being."

## (c)    Military Court procedures

In response to Yesh Din's petition to receive copies of regulations, guidelines or orders instated in the Military Courts or in other military units regarding minors on trial in the Military Courts, the IDF Spokesperson referred Yesh Din to the Order Concerning Adjudication of Juvenile Offenders, the provisions of which are outlined above.

## (d)    Proportion of minors' trials at the Military Courts

International law awards special protection to minors standing trial. However, the IDF has refrained from erecting a special juvenile court in the OT, for instance like the one in Israel. Therefore, minors stand trial in the regular Military Courts, in proceedings identical to those of adults. This is the case both for minors ages 16-18 years, as well as minors not yet 16 years of age.

The IDF has refrained from collecting data as to the number of minors put on trial in the Military Courts.[322] However, one may gain insight on the matter from the data regarding Palestinian minors held under detention or incarcerated by the IDF and the Israeli Prison Service (IPS).

---

321.   Order Concerning Adjudication of Juvenile Offenders, Sections 6(b) and 7(e).

322.   IDF Spokesperson's response to Yesh Din's questions, May 27, 2007.

Table 6: Minors above and below the age of 16 held under detention or incarcerated by IDF and IPS, 2005-2007[323]

|  | Under ·6 | Age ·6– ·7 | Total |
|---|---|---|---|
| December 2005 | 6· | 2·· | 272 |
| December 2006 | 34 | 327 | 36· |
| April 2007 | 29 | 355 | 384 |

Extension of detention hearings and trial hearings for minors comprise a significant portion of the hearings in the Military Courts. Table 7 shows that in the years 2001-2006, minors constituted four to six percent of all Palestinians detained and incarcerated by IDF and IPS, and it may be estimated that the relative volume of their cases in the Courts was similar.

Table 7: The proportion of minors under the age of 18 among confined persons detained and imprisoned by the IDF and IPS, 2001-2007[324]

|  | Total confined | Of them minors | Minors' percentage of total |
|---|---|---|---|
| 200· | ·,854 | ··6 | 6.26% |
| 2002 | 4,5·· | 279 | 6.·8% |
| 2003 | 5,944 | 235 | 3.95% |
| 2004 | 7,787 | 355 | 4.56% |
| 2005 | 8,·76 | 272 | 3.33% |
| 2006 | 9,·78 | 36· | 3.93% |
| 2007 (April) | 9,337 | 369 | 3.95% |

323.  Source: IDF and IPS data given to B'Tselem. The data do not include detainees in administrative detention, detainees and persons convicted of "criminal" category offenses, and do not include minors detained and held by the Israel Police. The data relate to a specific point of time in each year and do not constitute the total number detained that year.

324.  Source: IDF and IPS data given to B'Tselem. The data do not include detainees in administrative detention, detainees and persons convicted of "criminal" category offenses, and do not include minors detained and held by the Israel Police. The data relate to a specific point of time in each year and do not constitute the total number detained that year.



Forty-eight of the defendants and detainees in the 810 observations made by Yesh Din observers in the Military Courts were minors under the age of 18. In 52 additional cases the observers found it difficult to ascertain whether the detainee or defendant was a minor or an adult. The fact that the MCU denied Yesh Din access to the records of the proceedings until near the end of the observations made it difficult to determine precisely whether the person was a minor or a legal adult.

## (e)    Training of prosecutors and judges to adjudicate minors

As previously mentioned, the UN Committee on the Rights of the Child established that there is a series of "key conditions" that investigators, prosecutors and judges who deal with criminal proceedings against minors must fulfil, and central to them is comprehensive and continuous training.

Atty. Fallah served as military prosecutor in the Judea Military Court for two years. When asked about the training of prosecutors and judges for dealing with the prosecution and trial of minors he replied: "No. Nothing. Nothing. Much to my regret, they are tried like any other person. Like an adult – the same."[325]

## (f)    Separation from adult defendants

As a rule, minors detained or imprisoned are held separately from adults, as required by international law. However, when they are brought to court and during their trial proceedings the separation from adults is not always strictly maintained. Atty. Adnan Rabi, who represents many minors within the framework of the Defence for Children International organization, notes on this topic:

> *Sometimes they bring them [to court] with the adults and when we ask them to do so they separate them. Other times they bring them in an orderly fashion. "Nahshon" [the IPS escort unit] takes care to separate minors from adults. But not always, there are problems there too: sometimes they are placed with adults.*[326]

Yesh Din observers reported that minors brought into the courtrooms are seated, except for some isolated cases, in the dock alongside adults, and that their hearings are not held separately from those of adults.

325.    The interview was conducted by Judy Lotz and Lior Yavne in Jerusalem on August 12, 2007.

326.    The interview was conducted by Nura Resh and Lior Yavne in the Samaria Military Court on August 7, 2007.

158