

A minor waiting for his hearing to start in the Samaria Military Court. Yesh Din's observation findings show that minors are usually seated together with adult defendants.

## (g)    Release from detention

Atty. Adnan Rabi notes that in his experience the Military Courts do not tend to show more flexibility on the matter of releasing minors from detention:

> They don't release them [on bail]. You know, in Israel they hardly even send them into detention. Here they don't release them. Only in rare cases, when there's reason to release even an adult defendant – only then do they release them. For instance when there's no danger [in the alleged crime]. There's no differentiation.[327]

---

327.    The interview was conducted by Nura Resh and Lior Yavne in the Samaria Military Court on August 7, 2007.



Nine hearings of the 48 minors' hearings observed by Yesh Din observers were detention hearings. In all nine sessions – which lasted three minutes and twenty seconds on average – the detentions were extended by periods of six to 28 days. Not one of the minors in these proceedings was released from detention.[328]

### (h)  Consideration of minority

In the vast majority of hearings documented, there was apparently no special consideration on the part of prosecutors or judges of the fact that the defendants were minors. The fact that the defendant or detainee was a minor was usually expressed by the defense lawyer alone. Generally the prosecutors only bothered to note that the defendant was a minor when explaining to the court the reasons the parties could agree to a plea bargain. In other cases the Prosecution demanded that the court ignore the defendant's minority. So, for example, the prosecutor told the court in one case that the fact the defendant was a minor (who, according to her, "chose as a way of life to commit security offenses") did not need to have a bearing on his punishment.[329]

The judges presiding over the hearings observed by Yesh Din observers also seldom addressed the fact that the defendant or detainee was a minor. The issue was mentioned by judges in only 13 of the 48 minors' hearings observed by Yesh Din. Then, too, the fact was raised almost exclusively in the context of the court's discussion of its considerations in whether to accept a proposed plea bargain.

### (i)  Punishment

A defendant's minority is not formally incorporated into procedures or any other proceedings in court . The only stage in which the fact receives any attention is at sentencing. Moreover, the leniency in punishment based on the minor's age is usually insignificant and depends on the kind of offense of which he is convicted. So, for instance, Atty. Khaled al-Arraj says:

> *Still – I say this cautiously – it depends what the alleged offense is. When the offense is throwing rocks – there is no difference. Almost the same punishment for an adult and a minor, maybe with a difference of one month. If it is an offense*

---

328.  Also in the eight further detention hearings where the Yesh Din observers could not determine if the detainee was a minor or an adult, no detainee was released from detention.

329.  Yesh Din observation form no. 1484 (Keren Ben Dov), Judea Military Court case 4233/06, hearing from August 21, 2007.

*of throwing a bomb, a Molotov cocktail, or I don't know what – there's a difference of four-five months between an adult and a minor. Other offenses – there is a difference, not a significant one but there is a difference.*[330]

Atty. Rabi too notes that the slight difference between punishment of minors and adults is the only expression of their minority in their trial procedures:

*Exactly the same. Totally. The same exact proceedings, the same procedure, everything is the same. There is no special interrogator for juveniles. There is no special judge as juvenile judge. It's the same judge for everybody – it is the same. The only thing is sometimes in the punishment – a little – there is a difference and only the... separation. And the separation is not always made, by the way. Sometimes they just put them together and that's it. As for treatment – the same treatment. In interrogation too. Even their interrogation – worse than adults. A minor needs a special interrogator who knows how to relate to him and that – they don't have that. It is the same interrogator for everybody. And a minor, even in the crime itself he just follows the others. He does not always understand the offense he is committing. And they do not always take that into account. His thinking is totally different thinking, not like an adult.*[331]

### (j)    Closing doors

The juvenile courts in Israel regularly operate *in camera* to protect the minors on trial. Although security regulation allows the Military Courts to hear minors' cases *in camera*, the practice is not customary there. Atty. Rabi noted that in several cases in which he requested that the court hold a session *in camera* his request was denied.

Yesh Din petitioned the IDF Spokesperson for the latter's data regarding hearings *in camera* in the Military Courts.[332] In reply the Spokesperson answered that because closing the doors in the Military Courts is a "rare exception," the Military Court's computerized system holds no data on this matter.[333]

---

330.    The interview was conducted by Judy Lotz and Lior Yavne in Jerusalem on August 12, 2007.

331.    The interview was conducted by Nura Resh in the Samaria Military Court on August 7, 2007.

332.    Yesh Din petition to the IDF Spokesperson, August 29, 2007. The request referred to all hearings and not only those in minors' cases.

333.    IDF Spokesperson's reply to Yesh Din petition, October 14, 2007.



### (k)    Conclusion

In recent years minors comprise four to six and a half percent of all detainees and defendants in the Military Courts. Considering these numbers the Military Court system's lack of regard for these minors and youths is conspicuous.

The IDF, as previously mentioned, refrained from erecting military courts in the OT for the adjudication of minors, and the prosecutors and judges handling their cases undergo no training in the treatment of minors. As such, these minors are prosecuted and tried under conditions identical to those of adult defendants, and by prosecutors and judges whose regular activity is the adjudication of adults. Minors are usually seated in the dock alongside adults, and their cases are heard before and after adults' cases, usually in public sessions.

In accordance with Security Legislation, minors are tried as adults from the moment they turn 16 years old, even if the crime of which they are accused was committed before they had reached that age.

With the Israeli-Palestinian conflict in the background, the punishment of youths is determined without taking into consideration the possibility of rehabilitation – neither with regard to "security" offenses nor with regard to regular criminal offenses.

### (l)    Recommendations

1. Security Legislation is to be amended to the effect that a person is defined a minor until he is 18 years of age.

2. Sections 4 and 5 of the Order Concerning Adjudication of Juvenile Offenders are to be amended so that the determining date relating to the penalizing of minors shall be the time of committing the offense and not the time of sentencing.

3. The closing of courtroom doors during sessions in the matter of minors must be strictly observed.

4. Special juvenile courts are to be established, in which prosecutors and judges specially trained in juvenile matters and proceedings will serve.

5. Until the establishment of a juvenile court, absolute separation must exist between adults and minors in the military courtrooms.

162



**IN RESPONSE TO THE DRAFT OF THIS REPORT, THE IDF SPOKESPERSON STATED ON BEHALF OF THE MILITARY COURTS UNIT:**

→ Military court rulings consistently take into account the necessity for leniency in castigating minors and paying heed to their minority upon sentencing, both on account of very serious and lesser offenses. Rulings emphasize time and again the need to attribute considerable significance to an accused person's youth.

**ON BEHALF OF THE MILITARY ADVOCATE GENERAL, THE IDF SPOKESPERSON WROTE:**

→ The rulings index (of the military appeals court) list dozens of appeal court verdicts[334] grouped together under the category of "minors". And therein, the minority of persons is explicitly addressed, with respect to punishment as well as to a host of other aspects pertaining to rehabilitation and commitment to trial, and all this in addition to clear military law provisions regarding this issue.

→ The plaintiff in case 4233/06 refers to a minor who was party to a long series of grave felonies, including the manufacturing and use of Molotov cocktails, trafficking a detonative vest, and conspiring to carry out a stabbing attack on an IDF road block.

---

334.   In translating the original Hebrew version of this report, Yesh Din translated the same term as "judgment."



# CONCLUSIONS

International law allows the creation of military courts in occupied territories, though it foresees the difficulties entailed in maintaining due process when military officers try civilians. However, the drafters of the international conventions did not address a situation in which the occupation persists over the course of four decades. The findings of this study raise the question of whether a fair legal system can be maintained, in a non-democratic regime, for such an extended period.

The courtrooms of the Military Courts, surrounded by the protective perimeter walls of the military bases within which they are located, have been operating since the beginning of the occupation under virtually an absolute veil of darkness. Journalists do not frequent the courtrooms and do not report on what transpires therein as is customary in the courtrooms of Israel; retirees do not frequent them out of interest, as they do in the courtrooms in Tel-Aviv and Haifa; sentences levied by them do not raise public discourse in the Israeli public at large or even in the legal and academic community.

The accused brought to the Military Courts are judged according to military orders, the current versions of which are not readily available, for committing crimes ranging from casual conversation to premeditated murder, based on indictments not written in their language. The working conditions forced upon their defense attorneys make consultation with them impossible, and defense of their clients is expressed primarily in business meetings with a prosecutor present.

In the Military Courts, as in any system operating without external review, arbitrariness plays a central role. Family members, who cannot meet their detained relatives except in court, are permitted to send only two representatives into the courtroom because that is what somebody decided, once; a junior officer has independent discretion as to the limits of the right to a public trial – who shall be permitted (after providing advanced notice) the privilege of a courtroom visit and what shall be the criteria for such permission; it is left to the interpreters to decide what they translate and what they do not; a young prosecutor decides a defendant's fate for the many years to come in a short hallway exchange with a defense lawyer; judges are appointed to their positions without the measurement of their qualifications by any type of standard, other than the period of time lapsed since their certification as attorneys.

The Military Courts operate in the State of Israel's backyard – the Occupied Territories. This judicial system constitutes a central pillar of the continuing Israeli control and occupation mechanisms in the West Bank. These control mechanisms direct the flow of accused persons to this judicial system – suspects, detainees, murderers (one percent of the accused) and those who tried to make a living in Israel without a permit. In light of the volume of activity in the military judicial system, one may learn that few homes in the West Bank have fates not somehow interlinked with it, but the Israeli public, which seldom peeks into its backyard, and refrains from investing in it, does not show any kind of interest in the system.

Under this limited public scrutiny, the courts have continued working throughout the years on their own. A detention is extended ("I examined the classified report"); an indictment is submitted ("membership in an unauthorized association, a crime according to the Defense (Emergency) Regulations 1945"); a plea bargain is agreed upon ("I ask that the plea bargain be adopted"); a defendant is convicted ("the plea bargain is not outside reasonable bounds"). Not all are convicted, of course, for what is a court without acquittals? And indeed, there are defendants who leave the court with a judgment that says they have committed no crime. There are some. Zero point twenty-nine percent in 2006.

Over the course of forty years of activity several reforms have taken place within the Military Court arrangement. An appeals court erected here, field officers replaced with lawyers as lay judges there. These reforms, though discussed within the system internally for many years, occurred in the end because of external constraints. Here some critique from HCJ judges; there a disgruntled judge-officer "spills the beans" to a journalist.

The military judicial system adopted Israeli laws of evidence. However, in 2006 this fact was only reflected in one hundred and thirty trials that were concluded during that year. Only in those one hundred and thirty did a full evidentiary trial take place in which witnesses gave testimony, evidence was examined and closing arguments were made. One hundred and thirty full evidentiary trials of 9,123 cases closed.

This report examined one aspect of the conduct in the Military Courts. Due process rights are a foundation for the existence of a fair trial, but are, of course, not the only ingredient. The report is full of recommendations for changes and amendments. Implementation of the recommendations will not make the Military Courts and their activity exemplary, but it will at least assist in doing the very minimum required of the IDF in its trial of the residents of the Occupied Territories.



# APPENDICES



**APPENDIX 1: ISRAEL PRISON SERVICE RESPONSE**

Israel Prison Service
Unclassified

## Office of IPS Spokesperson

Date:                        3 Kislev, 5768
                             November 13, 2007
File: Spokesperson's Office, outgoing mail
Public affairs: reactions to public queries and
petitions
Reference: 85719807

To: Mr. Lior Yavne
Research Director
Yesh Din-Volunteers for Human Rights
11 Rothschild Blvd.
Tel Aviv 66881
By fax 03516-6119

Re: <u>Backyard Proceedings: The Implementation of Due Process Rights
in the Military Courts in the Occupied Territories</u>

Reference: your letter of October 30, 2007

1. I hereby confirm receipt of the referenced report on the topic of: "The implementation of
due process rights in the Military Courts." The IPS was asked to respond to the subjects related
to it:

a. Attorney-client meetings.

b. Security procedures in the Military Courts and visits by family members of defendants in
the Military Courts.

168

BACKYARD PROCEEDINGS

Our response is as follows:

Introduction

The Israel Prison Service has 28 prison facilities all over the country. When the IPS became a national incarceration authority, three large prison facilities were transferred from the IDF to the IPS (Ofer, Meggido and Ketziot), in which are held security convicts and detainees who were convicted or detained for various lengths of time.

At the three prisons – Ketziot, Meggido (Salem) and Ofer, there are Military Courts.

2.      Attorney-client meetings

The issue of meetings between attorneys and security prisoners is regulated by Commission Order 04.34.00 (posted on the IPS website). Coordination of the meeting, its conditions and its location are regulated the aforementioned order in accordance with the law. The IPS operates according to what is required and set forth in the order. The IPS operates according to the order and the timetable set forth therein (according to the law).

Following an inquiry within the main prison facilities in which most of the security detainees are held (after indictments are filed), and where security prisoners are held, we were told that in general meetings take place between attorneys and detainees/ prisoners within 24 hours of a request to arrange a meeting, while in some prison facilities the length of time is between 24 and 48 hours. The meetings are made possible at the earliest time possible, considering the number of requests at those times.

It should be added that many times attorneys request that the meeting take place at specific times later on, as is convenient for them, and this is arranged.

The IPS's experience has been that security prisoners and detainees possess particular features with regard to meetings with attorneys. Thus, one common phenomenon is that many security detainees and prisoners meet with a number of different attorneys who come to the prison separately, and on the basis of a separate power of attorney given to each one.

And so it is common for a given security prisoner or detainee to meet within a short period of time with a number of different attorneys on different occasions. This becomes increasingly common the more the detainee or prisoner is considered a leader of the organization to which he belongs, even when, to the best of the IPS's

169



knowledge, there is no pending legal procedure regarding the prisoner. This creates an unusual volume of visits to security prisoners and detainees.

Likewise, many attorneys who represent security prisoners and detainees come to the prison for meetings with a number of different prisoners or detainees on the same day. It is common for an attorney who represents security prisoners and detainees to conduct a series of meetings at the prison with different clients one after another (this is not the case when attorneys meet criminal prisoners). This situation requires advance coordination in order to hold the meetings, because without such coordination we cannot guarantee in advance that all the meetings will be able to take place and that there will not be significant delays that could disrupt the orderly management of the prison in addition to burdening the lawyers themselves. All of the above considerations are the reason for the need to coordinate the aforementioned meetings in advance with the security prisoners and detainees.

3.    Security procedures and family visits to the Military Courts

   a.    Possessing firearms in the courtroom – from September 2000 all of the wardens of the Ofer prison who worked in the court were instructed not to possess firearms in the courtrooms. If a violent incident develops with prisoners or family members, the incident is handled by the use of other means.

   b.    Visit by a family member of one of the defendants who wants to enter the courtroom – visits by immediate [first-degree] family members of prisoners take place in the courtrooms on a regular basis. If there is a visit by someone who is not an immediate relative this requires permission from the Court Secretary prior to entry into the courtroom. Visits by a non-immediate relative must be coordinated and approved in advance with the MCU's public affairs officer, as has been practiced throughout the IDF period to this day.

   c.    New procedures have been prepared by the Ofer prison and approved as to maintaining public order there.
         The only cases in which a person may not enter the prisons, regardless of the place of their residence, is harm to state security or harm to public order in the court.
         Responsibility for the order, organization and security in the court is

170

maintained by the Ofer prison. In general we do not decide who can enter
the court compound given the powers of legal jurisdiction. The management
of the Ofer prison is not prohibited from letting any person in as long as they
have the relevant and appropriate permit.

4.      Regarding section 15 – recommendations – p. 67 in the draft report

• According to law, there is no eavesdropping on conversations between attorneys
and clients in accordance with the legal principle of attorney-client privilege.

• The IPS operates as required and as much as possible to allow prisoners to consult
their attorneys in the optimal conditions required by the law according
to security considerations.

• Security prisoners and detainees are subject to different restrictions than criminal
prisoners and detainees. Prison Commission Order number 03.02.00 sets forth the
special rules that apply to security prisoners – Article 1 of the aforementioned order
explains the rationale for those conditions as follows:

"Prisoners convicted of offenses against state security usually constitute a real potential
to endanger state security in general, and to endanger the order and discipline in the
prisons in particular, in light of the kind of offense they committed, their past, their
motives and their involvement in activities against state security. Therefore every
security prisoner is defined as a prisoner under warning."

"The security risk inherent in the security prisoners requires them to be
imprisoned separately from the criminal prisoners and subjected to special
restrictions as far as contact with the outside, including matters of leaves, visits,
phone calls..."

Sincerely,

Yaron Zamir, Deputy Warder
IPS Spokesperson

171



## APPENDIX 2: ORDER CONCERNING THE ESTABLISHMENT OF MILITARY COURTS

The text of the Order Concerning the Establishment of Military Courts in the West Bank, as published in the booklet of "Proclamations, Orders and Appointments No. 1" of the IDF Command in the West Bank Area, August 11, 1967.

Israel Defense Forces
Order No. 3

## Order Concerning the Establishment of Military Courts

By my authority as IDF Commander in the West Bank, and in accordance with Section 5 of the Order Concerning Security Provisions (Area of the West Bank), I hereby establish Military Courts, as follows:

1.     Military Court for the Jerusalem District
2.     Military Court for the Hebron District
3.     Military Court for the Jenin and Western Nablus District
4.     Military Court for the Eastern Nablus District
5.     Military Court for the Ramallah and Jericho District.

This Order shall be known as "Order Regarding the Establishment of Military Courts (West Bank Area) (No. 3) 5727–1967."

25 Iyar 5727
June 7 1967

Maj.-Gen. Chaim Herzog
Commander, Israel Defense Forces
West Bank Area

**APPENDIX 3: PROCEDURAL RULES IN THE MILITARY COURTS**

The Procedural Rules in the Military Courts were defined in Point No. 2 of the Order Concerning Security Provisions (OCSP), under the heading "Trial Proceedings." Laws pertaining to arrest and detention are laid out in Chapter 4 of the same Order. There follows a description of the general plan of legal process in the Military Courts, as per the provisions of the Order.[335]

## Arrest and detention

The Military Court tries Palestinians accused of offenses under the Security Legislation, divided into the following categories: Public Disturbance, Hostile Terrorist Activity, Illegal Presence in Israel and other criminal offenses, as well as persons accused of traffic violations.

Police or soldiers are authorized to arrest a suspect and detain him for up to four days.[336] A ranking police officer is authorized to extend this initial detention by four additional days.[337] Any further detention requires an order signed by a Military Court judge.

A military judge is authorized to extend the detention of a suspect for 30 days at a time for the purpose of interrogation, up to a maximum detention of 90 days.[338] A military appellate judge may extend detention for more than 30 days if requested to do so by the Legal Advisor to the Judea and Samaria Area, but in any event, the entire duration of a suspect's detention must not exceed three months.[339]

Hearings regarding extension of detention for the purpose of interrogation may take place in the Military Courts adjoining GSS interrogation facilities (the police station in the Russian Compound, Jerusalem; Petah Tikva police station; Kishon jail at the Jalameh junction; Ashkelon), at the Judea Military Court (Ofer Base near Ramallah) or at the Samaria Military Court (near Kafr Salem).[340]

---

335.    The detail in this chapter is intended to give the reader an idea of the legal procedures in the military courts. A more detailed description may be found in the OCSP, Sections 8-46.

336.    OCSP, Section 78(c)(1).

337.    Ibid., Section 78(d)(1).

338.    Ibid., Section 78(f)(1).

339.    Ibid., Section 78(f)(2).

340.    For a survey based on observations of detention extension hearings in the Military Courts, see MachsomWatch: In the Eyes of Justice: Observations at Military Courts in the State of Israel (October 2006).



## Preliminary proceedings

The Military Prosecution is required to file an indictment within 90 days of the initial extension of detention by a judge. If the suspect is not under arrest, there is no deadline for filing the indictment. The indictment is filed according to the geographical division between the Judea Military Court (for defendants from the southern West Bank) and the Samaria Military Court (northern West Bank). The prosecutor is the one who decides, in theory and in practice, whether the case will come before one judge or a panel of three,[341] according to the seriousness of the offenses with which the suspect is charged, and he notes this decision in the heading of the indictment.

If the Military Prosecution requests it, there is a hearing soon after the filing of the indictment on extending the detention of the suspect – who has now become a defendant – until the end of legal proceedings regarding his case. The proceedings could take up to two years,[342] after which a judge of the Military Court of Appeals has the authority to extend the detention repeatedly for periods of six months at a time.[343]

In the next stage, called "the arraignment," the judge is supposed to read the indictment to the suspect, and ensure, "if he finds it necessary,"[344] that the suspect has understood the charges brought against him. Nevertheless, the Court usually dispenses with this stage, as is permitted by the Order Concerning Security Provisions,[345] if the defense attorney assures the court that he has read and explained the content of the indictment to the defendant. Upon the reading of the indictment follows the defendant's response: he can either plead guilty, not guilty, or not guilty while admitting all or some of the facts.[346]

At this stage, the hearing turns to various requests: postponement of the hearing in order to arrange for defense counsel, or to allow the Defense to receive and study material from the investigation, as well as various memoranda – all this to ensure that both sides are prepared for the trial before the evidentiary stage begins.

---

341.  OCSP, Section 21(a).
342.  Ibid., Section 78(k)(2)(a).
343.  Ibid., Section 78(k)(2)(b).
344.  Ibid., Section 21(b).
345.  Ibid.
346.  Ibid., Sections 21(d)-(e).

### Evidentiary stage

If the defendant pleads not guilty to the charges brought against him, the evidentiary stage begins. The Prosecution presents its evidence, and its witnesses testify in court. Every witness undergoes direct examination by the prosecutor, cross-examination by the Defense, and redirect examination by the prosecutor.

After the Prosecution's case has been presented, the Defense may claim "no case to answer," if it believes that the evidence presented is insufficient to support part or all of the charges against the defendant. If the Court accepts this claim, the defendant is acquitted of those charges.[347] If the Court rejects the claim, the trial continues to the case for the Defense.

If the defendant chooses to testify, he will be the first of the defense witnesses to take the stand. He too, like the other defense witnesses, is subject to direct examination by his defense attorney, cross-examination by the prosecutor, and redirect examination by his attorney.

### Closing stage

Upon close of the Defense's case, the Prosecution and the Defense present their closing arguments. This stage may be conducted in writing, orally, or a combination of the two. The Prosecution presents its summary first, followed by the Defense.[348]

### The judgment

In handing down its judgment, the court announces whether it finds the defendant guilty or not guilty of the various charges against him. If the defendant is convicted on all or some of the charges, the Prosecution presents arguments for sentencing and evidence that may influence the nature or severity of the sentence. Following this stage, the Defense presents its own arguments, at which point the defendant has the right to make a statement on his behalf and to call witnesses and introduce evidence that may help reduce his sentence. This stage too concludes with a closing statement by the Prosecution and the Defense.[349] The Court passes its sentence and informs the defendant of his right to appeal the judgment, the sentence or both. The defendant is allowed a period of 30 days to file an appeal.[350]

---

347.    Ibid., Section 30.

348.    Ibid., Section 32.

349.    Ibid., Section 34(b).

350.    Ibid., Section 40(d).



## APPENDIX 4: STANDING ORDERS FOR INTERPRETERS – NOT A WORD ABOUT INTERPRETING

Military Courts Unit 132
Samaria Military Court
Tel.   –   04-651-2702
Fax   –   04-651-2757
Date:        July/9/2007
Monday, 23 Tammuz, 5767


File: Standing Orders


Re: Standing Orders for Interpreters

1. Standing Orders for Interpreters – the following regulations must be strictly observed:
   (a) It is the interpreters' responsibility to begin the hearing at 9:30 a.m., after all preparations have been made.
   (b) The interpreters answer to the judges, from whom they will receive guidelines for the order of the hearings and for the number of defendants allowed in the courtroom.
   (c) The interpreters will ensure that the court escorts do not bring detainees into the courtroom without their permission.
   (d) The interpreters are responsible for verifying that there are always security personnel in the courtroom, in accordance with the number of detainees.
   (e) At the end of the recess, it is the responsibility of the interpreters to return to the hearing on time, at 1 p.m., or according to the instructions of the presiding judge.
   (f) Interpreters are not allowed to relieve each other without permission from the judges.
   (g) If the interpreters are relieved with the judge's permission, it is obligatory that they have an overlap period.
   (h) The interpreters are responsible for keeping order and silence in the courtroom during all the hearings, for preventing [people] entering and leaving the courtroom [during sessions], and for assisting the judge in controlling the courtroom.
   (i) The interpreters are responsible for keeping the courtrooms clean.
   (j) [The interpreters] must check that the daily schedule of hearings is posted at the entrance to the courtrooms.
   (k) At the end of the [day's] hearings, [the interpreters] must prepare the courtrooms for the following day.

BACKYARD PROCEEDINGS

(l) In an emergency situation, all the interpreters will assist the security personnel in escorting the detainees to the security rooms [adjacent to the courtroom], and the families and attorneys to the family rest area.

Sincerely,

Yvette --------------, Sgt.-Maj.

NCO, Samaria Military Court

The text above is an exact [translated] transcription of the Order that is posted on the walls of the Samaria Military Courtrooms.

177



## APPENDIX 5: EXTENSION OF DETENTION HEARINGS IN THE MILITARY COURTS, 2000-2006



Note: The data relates to all the Military Courts, including military courtrooms within the borders of the State of Israel, and the Military Court in the Gaza Strip until its closure in August 2005.

Data source: MAG 2004, p. 126; MCU 2006, p. 16.

BACKYARD PROCEEDINGS

**APPENDIX 6: INDICTMENTS FILED FOR OFFENSES OF HOSTILE TERRORIST ACTIVITY CATEGORY, 1998-2006**



Data source: MCU 2006, p. 13



## APPENDIX 7: FINES IMPOSED IN THE MILITARY COURTS, 2002-2006

| Year | Total fines imposed (NIS) | Defendants whose trials were concluded | Average fine per defendant (NIS) |
|------|---------------------------|----------------------------------------|----------------------------------|
| 2002 | 7,05',305 | 5,849 | ',206 |
| 2003 | 9,'96,385 | 6,635 | ',386 |
| 2004 | '7,073,686 | 9,485 | ',800 |
| 2005 | '4,373,700 | 9,986 | ',439 |
| 2006 | '',906,670 | 9,'23 | ',305 |

Data source: MAG 2002, p. 262; MAG 2003, p. 248; MCU 2004, p. 10; MCU 2005, p. 10; MCU 2006, p. 10.

**APPENDIX 8: THE NUMBER OF DETAINEES HELD UNDER ADMINISTRATIVE DETENTION IN THE MONTH OF DECEMBER, 2001-2006**



Data source: Statistics from the Israel Defense Forces (IDF) and the Israel Prison Service (IPS), as given to B'Tselem. The figures do not reflect the total number of detainees held in administrative detention each year. The figures relate to different dates in the month of December in different years, as supplied by the IDF and the IPS. For comments and further reservations, see the B'Tselem website: www.btselem.org/english/administrative_detention/statistics.asp

181

The military justice system in the Occupied Territories adjudicates thousands of Palestinian civilians prosecuted by the Israel Defense Forces every year. The Military Courts, which have existed for four decades, operate virtually under complete darkness. The report, Backyard Proceedings, provides the Israeli and international public, for the rst time in more than 15 years, with information about a system that serves as a cornerstone of Israeli rule in the West Bank. The report examines the degree to which this system upholds and implements the due process rights of Palestinian detainees and defendants brought before the Military Courts. The report evaluates, among other things, the realization of a defendant's right to know the charges against him, to prepare an effective defense, and to enjoy the presumption of innocence. The report further assesses how the principle of a public trial is applied in the Military Courts, how minors are adjudicated in the system and other related subjects. Additionally, the report examines whether the Security Legislation applying to the Occupied Territories meets the requirements of international law regarding due process of law. Through hundreds of observations, the report provides ndings about the proceedings in the courtrooms.

The ndings of the research described in the report reveal a series of grave defects and lapses in the implementation of due process rights in the Military Courts. On the basis of those ndings Yesh Din offers recommendations for reforming legislation and policies.

Yesh Din-Volunteers for Human Rights was founded in March 2005, and since then its volunteers have been working for structural and long-term improvement of the human rights situation in the Occupied Territories. The organization collects and disseminates credible and current information on systematic human rights abuses in the Occupied Territories; applies public and legal pressure on the state authorities to stop them; and raises public awareness of human rights abuses in the Occupied Territories. In order to realize its goals effectively, Yesh Din operates according to a unique model among human rights organizations in Israel: The organization is run and staffed by volunteers and is assisted on a daily basis by a professional staff of lawyers, human rights experts and strategic and communications consultants.

www.yesh-din.org



Hearing in Gaza Military Court, August 1967