# Exhibit 37

**MICHAEL SFARD** | **LAW OFFICE**

45 Yehuda Halevi Street • Tel Aviv, 65157 • Israel
Tel: 03.620.6947/8/9
Fax: 03.620.6950
contact@sfard.co.il

Michael Sfard, Adv.
Shlomy Zachary, Adv.
Emily Schaeffer, Adv.
Adar Grayevsky, Adv.
Anu Deuelle Luski, Adv.
Noa Amrami, Adv.

מיכאל ספרד | משרד עריכת דין

רחוב יהודה הלוי 45 • תל אביב • 65157
טלפון: 03.620.6947/8/9
פקס: 03.620.6950
contact@sfard.co.il

מיכאל ספרד, עו"ד
שלומי זכריה, עו"ד
אמילי שפר, עו"ד
אדר גרייבסקי, עו"ד
אנו דואל לוסקי, עו"ד
נועה עמרמי, עו"ד

# *Expert report by Adv. Michael Sfard*

## BACKGROUND & QUALIFICATIONS:

### A. Introduction

My name is Michael Sfard. I was born in Jerusalem and am a member of the Israel Bar Association. I am the founder of a law office in Tel-Aviv which specializes in International Human Rights Law, International Humanitarian Law and Israeli constitutional and criminal law. I have an LL.B. from the law faculty of the Hebrew University of Jerusalem and an LL.M. from the University College of London ("UCL"), specializing in International Human Rights Law. Counsel for the Palestinian Authority (PA) and the Palestine Liberation Organization (PLO) have requested that I serve as an expert witness in the case of *Sokolow v. PLO* and provide my opinions on issues that are within my field of expertise including (1) the nature of custodial interrogations of Palestinian suspects in security-related investigations, the voluntariness of the statements made by the suspects during the interrogations, and the reliability and credibility of the statements made in such interrogations; (2) the structure of the Israeli Military Court system and the adequacy of the due process protections afforded to Palestinian suspects in the system; and (3) the legal status of Israeli settlements in the Occupied Palestinian Territories[1] (hereinafter: "OPT") and their impact on Palestinian communities.

---

[1] For the purposes of this opinion, which focuses on the settlements and military courts located today only in the West Bank, my reference throughout to the Occupied Palestinian Territories (or "OPT") connotes the West Bank only, and the term the "West Bank" is often used interchangeably with the OPT.

**B. Qualifications to render my opinion**

My academic studies and legal training, as well as my decade-long practice as an attorney involved in some of the most important cases challenging Israeli policies and practices in the OPT, have provided me with the knowledge base and experience in the subject matter of my opinion.

Of these experiences, I highlight the following:

- I served as the legal counsel to the Israeli human rights organization "Yesh Din" (Hebrew for "There is a law") since its establishment in 2005. Yesh Din campaigns to enhance the respect and protection afforded to basic human rights of Palestinians in the OPT through, among others things, monitoring the operation of Israeli civil and military law enforcement agencies, litigating in the Israeli courts and military tribunals, publishing reports, and representing victims of human rights abuses before Israeli military and governmental authorities.

- For the last eight years I served as legal counsel for the Settlement Watch program, which was established by and operates within the biggest and oldest Israeli peace group – Peace Now. The program monitors the establishment and expansion processes of Israeli settlements and outposts in the OPT, publishes reports and initiates litigation to halt illegal construction and land theft.

- I was the editor and legal advisor of the Yesh Din Report: "Backyard Proceedings: The Implementation of Due Process Rights in the Military Courts in the Occupied Territories" (December 2007) (hereinafter: "Yesh Din Military Courts Report").

- I was the editor, legal advisor and one of the authors of the Yesh Din Report to the UN Fact Finding Mission on Israeli Settlements (November 2012) (hereinafter: "Yesh Din Settlements Report"). The Yesh Din Settlements Report examined the impact of the settlements and the settlement policy on basic rights and freedoms of the Palestinian community in the West Bank.

2

- I was and am the lead counsel for petitioners in at least three dozen Israeli High Court of Justice (hereinafter "HCJ") petitions filed in the last eight years arising from **settlement** or outpost expansion **activity** and/or denial of access to Palestinian farm lands. In those petitions I represent Israeli organizations as well as Palestinian individuals and communities.

- I have acted as defense counsel in numerous criminal cases in both Israeli civilian and military courts.

- I interned for a year and then served as an associate attorney for five years at the Avigdor Feldman Law Office, where I was involved in defending Palestinians accused of security-related offenses.

My Curriculum Vitae is attached as Exhibit A.

## C. Biography

I was born in Jerusalem in 1972. After high school graduation I served for three years in the Israeli army as a combat medic in the infantry. After my release from mandatory service I studied law at the Hebrew University of Jerusalem, after which I completed a year-long legal internship with one of Israel's most renowned human rights and criminal defense attorneys, Attorney Avigdor Feldman (1998-99).

In 1998 I refused on conscientious grounds to serve in the West Bank city of Hebron as part of my annual army reserve duty because I was not willing to participate in and facilitate what I saw as a system of occupation that was fundamentally discriminatory and unjust. I was sentenced in a disciplinary procedure by my commanders to 21 days in a military prison, which I served in July of 1998.

I was admitted to the Israel Bar Association in 1999. I worked as an associate in Attorney Feldman's law office for another five years, though I took leave for one year to study International Human Rights Law at University College London. I received an LL.M. degree in 2001, and in March of 2004 I opened my own practice in Tel-Aviv.

3

My law office consists of six attorneys, including me, and an intern. Our clients include Israeli human rights organizations, peace groups, Palestinian individuals and communities as well as Israeli, Palestinian and international peace activists and human rights defenders, among others. We were and are involved in most areas of litigation challenging Israeli policies and practices in the OPT including, the Israeli assassinations policy, settlement construction and expansion activity, violations of property rights, freedom of movement issues, criminal proceedings in the military courts, the construction of the separation barrier, accountability for human rights abuses, violations of prisoners' rights and more. I have filed dozens of petitions to the Israeli High Court of Justice and was the lead attorney in each of them.

In June 2013 I received the Emille Grintzweig Human Rights Award, which is awarded by the Association for Civil Rights in Israel to "an individual or NGO that has made a unique contribution to the advancement of human rights in Israel."

D. **Prior testimony as expert witness** - In the previous four years I have not testified as an expert witness in any trial. I provided an expert report for the defendants and was deposed by the plaintiffs in *Saperstein v. The Palestinian Authority*. I have also provided an expert report in the case of *Shatsky v. Syrian Arab Republic*.

E. **List of publications in the last ten years**

A list of all my publications is attached as Exhibit B.

F. **Terms of engagement and compensation** – I am being compensated at the rate of $300 per hour for my services as an expert in this case. The compensation is not conditioned on the content of the opinions expressed in this report, nor is my compensation contingent on the results of these proceedings.

G. **Material considered** – In addition to the materials cited in the report, I have also reviewed the materials listed in Exhibit C.

I have also reviewed expert reports submitted by the plaintiffs. I will refer to a number of them in this report and, in large part, to Adv. Nick Kaufman's report ("The Kaufman Report").

4

5

## SUMMARY OF OPINIONS:

I render the following opinions, all of which relate to the time period relevant to this litigation:

A. On the nature of custodial interrogations of Palestinian suspects in security-related investigations, the voluntariness of the statements made by the suspects during the interrogations, and the reliability and credibility of those statements:

   1. Statements made by a Palestinian suspect during a custodial interrogation of a security-related investigation (hereinafter: "custodial statements") are usually the end product of many hours or even days of interrogation by the Israeli General Security Service (hereinafter: "GSS"; also referred to as the "Israel Security Agency (ISA)" or the "Shin Bet").

   2. Given the GSS's coercive interrogation techniques and the opaqueness of the process, there is no way to make any general or blanket assertions as to the reliability or credibility of statements made by specific suspects during the interrogations.

   3. The case files supplied by the Plaintiffs do not include the GSS investigation files so it is not possible to assess whether and to what extent coercive methods were used to obtain custodial statements. Thus any serious analysis or informed findings as to the reliability and credibility of the custodial statements supplied by Plaintiffs is not possible. In my opinion, in the absence of the complete GSS investigation files, a determination cannot be made as to whether the custodial statements supplied by the Plaintiffs are reliable or credible.

B. On the structure of the Israeli Military Court system and the adequacy of the due process protections afforded to Palestinian suspects in the system:

   1. The military courts are a unit of an occupying army, who in practice preside over alleged offenses committed only by Palestinians; Israelis accused of similar offenses are not charged in this court.

   Proceedings in the military courts in the Occupied Palestinian Territories, at the times relevant to the rulings relied upon by the Plaintiffs, do not meet

6

international law standards of due process, which is the applicable and binding legal framework for Israeli activity in the OPT.

2. Regardless of the due process issues, the procedures and practices of the military courts cannot guarantee the reliability of facts that are determined based only on a guilty plea or on an agreement between the parties as to the facts.

C. On the legal status of Israeli settlements in the OPT and their impact on Palestinian communities:

The settlement enterprise[2] constitutes a violation of customary international humanitarian law and has had, and still has, a devastating impact on the rights and freedoms of Palestinian individuals and communities.

I reserve the right to author additional opinions or rebuttal opinions as new facts are disclosed to me.

---

[2] I define the "settlement enterprise" to be the establishment of Israeli settlements, outposts, and industrial zones in the OPT, the expansion thereof, and any activity that is aimed at facilitating their development and growth.

**DISCUSSION AND GROUNDS FOR OPINIONS**

The bases for the opinions stated in the section above include the following:

## Part One:

## The Investigation and Interrogation of Palestinian Suspects

**A.  The Detention and Interrogation of Palestinians Suspected of Security-related Offenses:**

1. I am familiar with the legal framework and the actual practice of security investigations into alleged security-related offenses in Israel during the relevant timeframe for this case. Such investigations share a number of traits, including the following:

2. **(i) GSS involvement in security-related investigations:** According to the Israeli *General Security Service Act, 5772-2002* (hereinafter: "the GSS Act"), the GSS is the Israeli authority entrusted with the protection of the security of the state from threats of terror, espionage and subversion (Article 7(a) of the GSS Act). To that end, the GSS is authorized to conduct investigations of "suspects and suspicions" of offenses aimed at damaging state security or disrupting the democratic process or institutions, and to hold investigations intending to preempt such offenses (Article 8(3) of the GSS Act).

3. In practice, the GSS is responsible, among other things, for investigating militant Palestinians in the West Bank and Gaza, and it is also responsible for gathering information about the activity of such persons through various means.

4. **(ii) Detention of the suspect:** The GSS investigation process is usually conducted while the suspect is in detention. If the suspect is a Palestinian resident of the West Bank, the authority for pre-indictment detention in the relevant timeframe was established by a military order, *Order Concerning Security Provisions (Judea and Samaria) (No.378), 1970*, Article 78. Pursuant to this order, investigators have the power to arrest and detain suspects for up to 8 days without a judicial arrest warrant, and a Military Court judge may prolong such detention by up to 30 days at a time, and altogether up to 90 days. There are procedures for further extension of detention in extreme cases, and the authority for such extensions lies with the Military Court of Appeals. By comparison, Israeli citizens suspected of crimes, including

8

security-related offenses, may only be detained for a maximum of 24 hours by the investigating body before they must be brought before a judge, and magistrate judges have the authority to extend such detention by up to 15 days at a time and up to a total of 30 days. There are special procedures for longer detentions, but such motions must be accompanied by the personal approval of the Israeli Attorney General or even a Supreme Court justice.

5.  **(iii) Order preventing the suspect from meeting his/her lawyer:** In investigations relating to serious security offenses, the GSS has the power to prevent a suspect from meeting his/her attorney for a period of up to 30 days. All attempts to obtain official figures on the frequency of use of this measure have failed. A freedom of information petition, filed by the Israeli human rights organization Yesh Din to the Israeli HCJ in this matter, was dismissed (HCJ 2662/09 The Freedom of Information Movement, Yesh-Din et. al. v. The Prime Minister's Office et. al.). From my experience, an order preventing attorney-client meetings was usually issued when the suspect was believed to be directly involved in a terror attack.

6.  **(iv) Gag orders:** The GSS may request a judicial gag order from the court prohibiting any publication regarding a security-related investigation. Most gag orders prevent publication of the fact that a suspect (or suspects) has/have been detained as well as the suspect's identity. There are no official figures regarding the frequency of such gag orders, but from my experience, many investigations into terror attacks against Israel and Israelis are obscured by gag orders preventing the media from reporting about them, until they are concluded, or at least until a very advanced stage of investigation.

7.  **(v) Use of physical means of interrogation, including torture and inhumane or degrading treatment:** In 1999 the Israeli HCJ concluded that any *advance*-authorization permitting GSS investigators to use one of five physical means in interrogation of suspects is illegal (HCJ 5100/1994 The Public Committee Against Torture in Israel v. The State of Israel, PD 53(4) 817) – "the PCATI case") (emphasis added). But the Court also held that the "necessity defense," found in the Israeli Penal Code, could serve to allow GSS investigators to employ such interrogation practices and then defend them after the fact pursuant to the "necessity defense." In practice, Israeli human rights organizations have regularly documented complaints of use of physical means in GSS interrogations since the PCATI case was decided. According to the Public Committee against Torture in Israel, between 2001 and 2011 more than 700 Palestinians detained by the GSS have filed complaints alleging physical abuse. All complaints

(filed to a special ombudsman who is a GSS employee working in the Israeli Ministry of Justice) were dismissed.

8. **(vi) GSS interrogatees are not "Mirandized" before being interrogated:** Unlike the policy and practice regarding police investigations in the United States, from my understanding, and in Israeli civilian courts, in GSS-led investigations the suspects are <u>not</u> warned that they have the right to remain silent, that anything they say may be used against them and that they have a right to consult an attorney ("the warning"). In fact, a suspect's silence can be, and frequently is, used as evidence against him or her. In 1999, the Israeli Supreme Court held that the absence of a 'Miranda'-style warning in GSS investigations does not make an admission/confession inadmissible in court proceedings, and that in security-related investigations conducted by the GSS there are ample reasons that justify refraining from warning the suspect prior to interrogation. Criminal Appeal 6613/1999 <u>Steven Smirck v. The State of Israel</u>.

9. **(vii) The involvement of a police interrogator in GSS investigations:** In practice, GSS investigation teams are escorted by a (civilian) police officer whose tasks are, *inter alia*, to file investigation-related motions to the court (requests for gag orders, orders enabling wire-taps, orders to produce documents, etc.) and to conduct "police-style" interviews/interrogations of the suspect at the end of every GSS investigation stage. In this later role, prior to the interview/interrogation, the policeman will receive memoranda from the GSS team summarizing the investigation activities so far, and the policeman will direct the suspect to repeat things he has "already told the GSS team", this time in a written statement that begins with a proper warning of the suspect's right to remain silent and to consult an attorney.

10. **(viii) Use of informants:** In many GSS investigations the suspect is sent for a few days to a prison cell with inmates who are supposedly Palestinian members of militant groups. The suspects are then accused by their cellmates of collaborating with Israel and are threatened. This leads, in many cases, to the suspect's attempt to "legitimize" himself by describing his important role and activity in combating Israel. Many suspects who went through such investigation tricks report that they have lied or exaggerated about their activities in order to convince their cellmates that they are not collaborators. In practice, these "militant cellmates" often turn out to be informants acting on behalf of Israel who then testify against the suspect

reporting the cellblock statements, which if given under the said circumstances are clearly unreliable.

**B. The Reliability and Credibility of Statements Made During Custodial Interrogations:**

11. GSS investigations, as described above, seek to minimize the suspect's freedom of choice and ability to resist the demand to provide information and admit guilt. The failure to warn suspects of a right to remain silent and to consult an attorney, the lengthy period of pre-indictment detention, the isolation from the outer world (by way of gag orders and prevention of attorney-client consultation), the use of physical means of interrogation and the use of informants significantly increase the likelihood of false admissions and the disclosure of false information in general.

**C. The Reliability and Credibility of the Custodial Statements of the Detainees Involved in the Underlying Incidents in this Case**

    **i.    GSS involvement – absence of relevant material**

12. The Plaintiffs in *Sokolow v. PLO* have provided 21 military court files, which purport to contain the case files of the Palestinians allegedly involved in some of the attacks that are the subject of this lawsuit.

13. I have reviewed all 21 files. Many of them include alleged custodial statements made by suspects during their interrogations by the Israel Police. Most statements are admissions of guilt. Those statements are the primary, and in some cases only, evidence brought by the military prosecution to the Israeli Military Courts against the suspects. In some cases, the custodial statements of the suspect serve as evidence against their alleged co-conspirators as well.

14. **The files supplied by the Plaintiffs are <u>not</u> the full investigation files. In fact, they form <u>a very small part</u> of the investigation files.**

15. As explained above, security investigations are conducted by the Israeli GSS, and police interrogators interview the suspects only at the end of the GSS investigation stage. In order to fully assess the reliability and credibility of the custodial statements to the police included in the files supplied by the Plaintiffs, the full GSS investigation file must be provided. Such a file

should include memoranda from interviews with the suspects, documentation of investigation techniques, including sleep deprivation, lengthy interrogations, exposure to psychological or physical threats, solitary confinement, prevention of client-attorney meetings, gag orders, and more.

16. GSS investigations, as explained above, are conducted in an environment designed to minimize the suspect's freedom of choice and ability to resist the demand to provide information and admit guilt. There is an inherent risk that GSS investigations as described may coerce admissions of guilt. Such coercive admissions of guilt may include false admissions extracted from a suspect who has reached the condition under which he would do anything to end the interrogation.

17. In the 2012 documentary "The Gatekeepers," the former head of the GSS, Carmi Gilon, acknowledged that a suspect who was detained in the Jerusalem main GSS detention facility "would admit to killing Jesus." A suspect who is willing to confess to having "killed Jesus" to his GSS interrogators will repeat any similar false confession when a police officer enters the room and the suspect is instructed by the GSS interrogators to repeat what he already said for purposes of a police statement.

18. Hence, the GSS investigation material is central and essential to any assessment of the reliability and credibility of statements made by suspects in security investigations, even if such statements were repeated in a subsequent police interview.

19. **Assessing the credibility of the suspect's statements made in the police interview alone, without regard to, and knowledge of, the contents of the GSS investigation file, is like forming a view on the healthiness of a foodstuff according to its appearance without knowledge of its ingredients and manner of preparation.**

20. During the relevant timeframe, it was the practice of the military prosecution not to provide the defense with the GSS investigation file, unless the defense attorney specifically requested it. Experienced defense attorneys who operated in the military courts knew that they had to ask for the GSS material in order to provide their clients with an effective and professional defense.

21. I did not find in 20 of the 21 military court files provided by the Plaintiffs any sign that the defense attorneys representing the suspects in the underlying cases requested to review the GSS

investigation material, which suggests there was a significant failure to provide adequate representation to the suspects in these cases.

22. I understand that in August 2011 the United States District Court for the Southern District of New York, which presides over the *Sokolow* case, issued a letter of request for international judicial assistance, to the relevant Israeli governmental authority, requesting the GSS documentation of the investigations conducted into the attacks that are at issue.

23. I also understand that the Israeli authorities have not replied, and that none of the documents requested have been supplied.

24. **Under these circumstances, an analysis of the reliability and credibility of the custodial statements in the underlying cases is not possible. <u>In my opinion, until full disclosure of the GSS investigation files allows a more specific review, the custodial statements supplied by the Plaintiffs suffer from the inherent reliability and credibility flaws described in this report. Kaufman's reliance on these statements and the derivative statements in the files produced by the Plaintiffs are therefore not a reliable methodology for determining either the credibility and reliability of the statements or due process afforded in the subsequent proceedings on which those statements were based.</u>**

## ii. Statements recorded in Hebrew

25. Even without reviewing the GSS files the language of the statements presents significant reliability and credibility issues.

26. All but one of the custodial statements provided by the claimants were written in Hebrew. At the end of each statement, the policeman declares in writing that the suspect has signed the statement "after it was read to him and translated [orally] to Arabic".

27. International law requires that any criminal investigation be held in a language mastered by the suspect (see, e.g. Article 14 of the International Convention on Civil and Political Rights (ICCPR) of 1966; Article 72 of the Fourth Geneva Convention of 1949). Breach of this fundamental principle would amount to a breach of the suspect's right to be notified of the charges against him/her.

28. Israeli law, too, is very clear that the interrogation must take place in the suspect's native language: The Criminal Procedure (Suspect Interrogation) Act, 2002 stipulates in Article 2 that "the interrogation of a suspect will be conducted in his language or in a language that the suspect understands and speaks, including sign language." Article 8 of the same Act states that "with regard to the documentation language of a suspect's interrogation in a [police] station, the following instructions shall apply: (1) if the suspect's interrogation has been documented in writing only, the documentation shall be conducted in the language of the interrogation; (2) if documenting the interrogation in the language in which it is conducted is not possible, the investigation shall be documented visually or by audio recording."

29. The above provisions led the Israeli Supreme Court to hold that breach of the duty to document interrogations in the suspect's language significantly reduces the credibility attributed to the statements, and in some cases, renders them inadmissible (see Crim. App. 1746/00 Brilev v. The State of Israel, PD 55 (5) 145; Crim. App. 788/77 Bader v. The State of Israel, PD 34(2) 818; Crim. App. 3695/99 Abu-Kaf v. The State of Israel, PD 54 (5) 547).

30. In one seminal case, the Israeli Supreme Court held the following: "In recording Musa's statements ... there was a grave defect, because although the two were interrogated in Arabic, their statements were recorded in Hebrew. As such, the interrogators did not proceed according to the requirement of Article 8(1) of the Criminal Procedure Act... The interrogators did not make use of the proposed alternatives either ... We would not have attributed to the statements ... great evidentiary weight, and we even could have ignored them entirely" (Criminal Appeal 2285/05 State of Israel v. Ashak Hamed, para. 4).

31. As noted above, all but one of the custodial statements made by the suspects in the underlying cases were written in Hebrew. All of the suspects are Palestinians who are Arabic speakers, and their oral interrogations were conducted in Arabic (GSS interrogators are usually fluent in Arabic). No court file suggests that the police recorded the interview by either visual or audio means. In those circumstances, if such statements had been brought before an Israeli civilian (criminal) court, under Israeli laws of evidence, the court would have given the statements very little weight, if any.

32. The Israeli Criminal Procedure Act, however, does not apply to the military criminal justice system in the OPT.

14

33. In any event, one cannot assign any significance to the signatures of the suspects on the documents, as there is no reliable record to indicate that the Hebrew language statements contained therein accurately reflect what was said to, or by, the suspects.


## Part Two:

## The Structure of the Israeli Miltiary Court System and the Adequacy of the Due Process Protections Afforded to Palestinian Suspects

34. In this part I will analyze the institutional due process failures in the Israeli Military Court system. Where appropriate, I will address Adv. Nick Kaufman's analysis as presented in his expert report. I will also cite files supplied by Plaintiffs according to the number given to them by Kaufman (see Kaufman Report, pp. 7-8).

35. At the outset, it should be noted that according to his own description of his expertise, for nearly 20 years Adv. Kaufman has worked in the Israeli civilian and military legal systems. He began in the Legal Department of the Military Advocate General Corps (hereinafter: "MAG Corps"), where he performed his IDF service for over a year. The MAG Corps, among other things, oversaw and regulated the Military Courts, their proceedings and procedures, and the prosecution of Palestinians in the occupied territories suspected of crimes against the security of Israel (as well as other non-security related crimes). Later, for some 16 years, his work as Assistant Jerusalem District Attorney entailed, though not exclusively, the prosecution of suspects in Israel under GSS investigation for suspicion of crimes against the security of the State of Israel (hereinafter: "security suspects"), who are predominantly Palestinian citizens of Israel, or "Arab Israelis." Although today Adv. Kaufman is no longer an advocate for the State or the military in cases involving GSS investigated suspects, he continues, as he has for the last decade (since 2002) to serve in his reserve duty as a judge in the Judea Military Court (presiding over investigations and prosecutions from the southern half of the West Bank).

36. In other words, for nearly 20 years, Adv. Kaufman has represented, defended and/or adopted the practices and conclusions of GSS interrogations and interrogators. Even when he may have

15

cast doubt on the credibility of individual statements due to their particular circumstances, he has upheld the overall credibility, reliability and efficacy of the rules and procedures of the GSS and of the Military Court systems regarding security suspects, and to this day remains loyal to those systems, at least implicitly, by serving as a reserve judge in the Military Courts.

37. It is my opinion that since Adv. Kaufman has served as a military court judge in the relevant timeframe (and still does), he cannot be considered sufficiently impartial and unbiased to adequately assess the extent to which the Military Courts' investigations and prosecutions comport with due process standards. His service as a judge in that system, by its very nature, renders him bound, if not professionally then logically, to defend its fairness, decency and credibility, at least on the whole. In fact, in his expert opinion he is essentially evaluating his own work, something that cannot be claimed to be objective. Thus, Adv. Kaufman's objectivity as an expert must be called into question, and in turn the contents of his report as well.

## A. Legal framework for establishment and operation of the military courts:

38. I am familiar with the legal framework – international as well as Israeli military – under which the military courts in the OPT operate and according to which their scope of jurisdiction is set. These include at the relevant timeframe:

 i. The Fourth Geneva Convention Relative to the Protection of Civilian Persons in Times of War (1949) IV, mainly articles 64-68.

 ii. Proclamation Concerning the Takeover of the Administration by the Israel Defense Forces, Proclamation (No. 1) (West Bank); Proclamation Concerning the Takeover of the Administration by the Israel Defense Forces, Proclamation (No. 1) (Gaza Strip Area); Proclamation Concerning Administrative and Judiciary Procedures (West Bank Area) (No. 2), 5727-1967; Proclamation Concerning Administrative and Judiciary Procedures (Gaza Strip Area) (No. 2), 5727-1967; Order Concerning the Establishment of Military Courts (West Bank Area) (No. 3), 5727-1967; Proclamation Concerning Entry Into Force of the Order Concerning Security Provisions (West Bank Area) (No. 3), 5727-1967; Proclamation Concerning Entry Into Force of the Order Concerning Security Provisions (Gaza Strip Area) (No. 3), 5727-1967;

iii.   The Order Concerning Security Provisions (West Bank) (No. 378) 5730-1970; The Order Concerning Security Provisions (Gaza Strip Area) (No. 19) 5730 – 1970;

iv.   The Defense (Emergency) Regulations, 1945; and

v.   Other relevant military orders.

**B.   The Structure and Jurisdiction of the Israeli Military Court System – A Separate System for Palestinians**

39. The laws enforced on Palestinian residents of the West Bank who are suspected of committing crimes in the West Bank or in Israel against Israel or Israelis are different from those enforced over Israeli citizens suspected of committing similar or analogous crimes.

40. During the first days of Israel's occupation of the West Bank and Gaza in June 1967, Israeli military commanders established military courts in both territories with jurisdiction to try any person in those territories accused of breaching, among other things, Israeli Security (military) Legislation. Today the military courts are in operation in the West Bank only.

41. Under international humanitarian law (specifically, Article 66, et. al. of the Fourth Geneva Convention), an occupying power has the authority to establish "properly constituted, non-political military courts" to try residents of the occupied territory for offenses harming security and public order. However, Israel has deviated from its authority under international law, by both expanding and restricting the jurisdiction of its military courts.

42. According to Israeli military order in force at the relevant time (Sec. 7 of the Order Concerning Security Provisions (Judea and Samaria) (No. 378), 5272-1967), Israeli military courts have extra-territorial jurisdiction over any person, resident or non-resident, in the occupied territories, and for any offense committed within or outside the occupied territories.

43. Indeed, tens of thousands of Palestinians have been prosecuted in these courts each year for a full spectrum of crimes. Non-security related crimes (from theft and robbery to traffic violations) have made up a significant proportion of the indictments filed against Palestinians and prosecuted in the military courts over the years. As of 2006, non-security related crimes constituted over two-thirds of the indictments in the Israeli Military Courts (Yesh Din Military Courts Report, p. 42-43).

17

44. Security-related crimes prosecuted in the Military Courts range from violent crimes against Israeli civilians, military personnel or property, to non-violent crimes such as membership in banned associations or organizations that Israel has determined to advocate violence against Israel or present a threat to Israel's security, to unauthorized protest or political assembly.

45. On the other hand, as will be discussed below, according to regularly renewed Israeli emergency regulations, law enforcement over Israeli civilians in the occupied territories is delegated to the Israeli police, the Attorney General, and the Israeli civilian courts within the borders of the State of Israel.

46. As such, Israeli citizens and residents (and foreign citizens with Israeli tourist visas) arrested for crimes committed in the West Bank are arrested, processed and tried by Israel's civilian legal system, which has significantly different facilities, procedures, laws, and penalties. The Israeli civilian legal system is far more modern, and adheres much better to the set of internationally recognized due process rights. I will return to and expand upon this point below.

47. In fact, through hundreds of military orders and Knesset (Israeli parliament) legislation, Israel has created a reality of legal segregation in the West Bank. Accordingly, **different law applies to Israelis than to Palestinians living in the same territory,** the West Bank. These dual legal systems play out in the following ways and were created through the following three methods:

48. **(i) Military orders with personal application** - Over the years, the Military Commander of the West Bank has issued hundreds of orders that function as legislation by fiat. Some of them apply to the entire territory – and population – of the West Bank; others are directed at Palestinians and apply to them alone; and some apply deliberately and explicitly to Israelis. A primary example of such personal legislation is the "Seam Zone Permit Regime". This is a Closed Military Zone Order encompassing approximately 2.5% of the West Bank and establishing a vast legal and bureaucratic arrangement, under which entry to and exit from the "Seam Zone" *by Palestinians only* requires the proper permits. This arrangement creates grave hardships on Palestinian daily life, from accessing land for agricultural purposes, to travelling to and from work, school, and hospitals, to maintaining contact with friends and family located outside the "seam zone." On the other hand, the order and its legal structure exempt Israelis (and tourists holding Israeli visas) entirely from any permit requirements.

49. **(ii) The importation of Israeli law (mainly administrative) into the settlements** – This legal technique is called "channelling": via two broad military orders regarding the regional and local settlement councils, from 1979 and 1981 respectively, the Military Commander serves as a channel for applying Israeli Knesset legislation enacted within the State of Israel to Israeli settlement areas.

50. The majority of the legal provisions channelled into the law applying to settlement areas in the West Bank regulate the status and authority of the Israeli authorities and governmental institutions within the boundaries of the settlements, including in the following areas: welfare, family law, statistics, education, health, labour, agriculture, housing, environment, consumer protection, industry, trade and communications. It is this channelling that grants the Israeli Ministry of Education, for instance, authority over schools within the boundaries of the settlements, grants the Israeli Ministry of Health authority over medical facilities, and so forth. The overall impact of this channelling, or importing of Israeli administrative law into the settlements, is that it creates *de facto* Israeli enclaves or "islands" of Israeli law within the West Bank.

51. **(iii) Israeli legislation granted extraterritorial application** – Certain primary legislation enacted by the Knesset provides personal-extraterritorial application over Israelis residing or located in the West Bank (rather than territorial application, as is customary). Similarly, Israel's secondary legislator (the executive branch) is authorized to institute regulations and issue various decrees, the application of which is also personal-extraterritorial, over Israelis in the West Bank.

52. The most outstanding, and perhaps the most important, example of this sort of legislation is the law extending the power of the Emergency Regulations (Judea and Samaria and the Gaza Strip – Adjudication of Offences and Legal Aid), 1977, authorizing the courts and tribunals in Israel to adjudicate matters involving Israelis and events occurring in the West Bank *according to Israeli Law*. Among other such matters, these Regulations authorize Israeli criminal courts to try Israeli civilians suspected of committing criminal offences in the West Bank, according to the penal code and criminal procedure laws of the State of Israel.

53. The result is the creation of two **parallel criminal legal systems.** As such, two neighbours, a Palestinian and an Israeli, residing in the same territory (the West Bank), suspected of the same

crime, can be arrested, interrogated, prosecuted and sentenced in vastly different systems that operate according to vastly different procedural and substantive laws.

54. For instance, if an Israeli West Bank resident (a settler) is suspected of manslaughter, he will be arrested by the Israeli Police and questioned by them. He will have the right to consult with his lawyer immediately. He can only be held in custody for up to 24 hours and then an extension of his detention and interrogation must be sought, which requires that he be brought before a judge. Should he be indicted, he will be entitled to publicly funded counsel if he cannot afford a lawyer, and he will be tried in Hebrew (with few exceptions his native tongue, and when needed translation will be provided) and afforded the high level of due process protections present in the Israeli criminal justice system. If convicted, he will be subject to a penalty of up to 20 years in prison, which is the maximum penalty for manslaughter in the Israeli criminal law.

55. If his Palestinian neighbour is suspected of manslaughter, he will be arrested by any number of authorities (the Israeli Police, the IDF or the Border Police). He can be held and interrogated for up to 8 days before he must be brought before a judge, and the power to extend his detention rests with a military judge. Procedures to prevent him from meeting and consulting an attorney are available and allow longer prevention. If indicted, he will have to secure his own lawyer (there is no public defender system in the Military Courts). He will be tried in Hebrew (with few exceptions a language which he has not mastered and usually does not even speak) in the Military Court system, which as will be expanded later in this report, falls short in almost every area of the fundamental due process rights required under international law, and certainly cannot be compared to the level of rights guaranteed in the system that would try him, were he an Israeli civilian. If convicted, he will be subject to life sentence, which is the maximum penalty for manslaughter in the military court.

56. It should be noted that almost without exception ideologically-motivated crimes committed by Israeli civilians in the West Bank, the equivalent of which, if committed by a Palestinian, would be treated as security offenses, are tried as regular crimes in the Israeli civilian criminal justice system. That said, were an Israeli settler to be suspected of a security offense, such as membership in a terror organization, he would still be tried in the Israeli civilian court system, be subject to the Israeli criminal procedure and enjoy the due process rights enshrined in Israeli law described above. The only difference would be that his attorney-client meeting could be

postponed with the approval of the Supervising Police Officer for up to 48 hours under certain exigent circumstances (as opposed to 24 were he a non-security prisoner), and under additional extreme circumstances, for up to 10 additional days and, upon approval of the Chief District Court Justice and the Attorney General, up to 21 additional days. The remainder of the procedures and proceedings would be identical to those of the Israeli civilian criminal justice system.

57. In sum, the outcome of all the aforementioned legal procedures is the same: one set of harsher laws is applied to a *Palestinian* in the West Bank and another set of more lenient laws to an *Israeli* in the West Bank.

58. The military court system, the subject of my analysis in this part, exclusively tries Palestinians who have allegedly committed crimes in the West Bank or Israel. Israelis who are charged with committing crimes in the West Bank or Israel (and usually foreign nationals as well), will be tried in the Israeli magistrate's and district courts. This legal segregation alone is an affront to justice and human dignity.

## C.    The Structure and Goals of the Israeli Military Court System

59. The military prosecution in the West Bank, as well as the military courts, form a justice system in which soldiers and army officers are appointed to prosecute and try civilians; in which the judges, prosecutors and administrative staff are Israelis and the defendants are Palestinians; in which the courts are an army unit and thus are committed to the goals of that army.

60. It is important to further understand that the military courts are a body of a government which, almost five decades ago, established in the OPT (then in both the West Bank and Gaza) a non-democratic regime.  The military courts are a central mechanism used by that regime to secure domination over the occupied territory and to suppress resistance by its inhabitants, the Palestinians.

61. As such, and taking into account the institutional due process failures detailed herein, it is my experience that many defense attorneys who act on behalf of defendants in the military court system do not trust it as a serious, impartial, professional and just judicial system, and thus, instead of investing their energy in litigation, are focused on securing plea bargains for their clients.

62. In fact, the military court system directs all parties to plea, and everyone involved is under pressure to do so – the defendants and their families who do not trust the court, the defense attorneys who do not believe they can reach a satisfactory result through full litigation of the matter, and the judges and military prosecution who understand that the military courts could not deal with the workload if more than a tiny fraction of cases would undergo a full evidentiary trial.

63. The ultimate result is a system that generates a judicial product that is infected with, and susceptible to, extreme injustice.

64. Given all the above, it is no wonder that when Israeli authorities apprehended Marwan Barghouti, a decision was made to hold his trial in the Tel-Aviv district court rather than – as was and is the practice – in the military court system. Israel could not take the risk that such a high profile case, with worldwide interest, would be held in a system that suffers from so many due process flaws. Israel could not, and would not, take the chance that journalists from all over the world would be exposed to the military court system, an exposure that undoubtedly would undermine the reputation of the Israeli justice system. Barghouti's trial began in 2002 and ended in 2004, exactly in the timeframe in which most of the trials of the suspects charged with the attacks that are the basis of the claim at hand took place in the military court system.

**D. Legal framework for due process rights:**

65. The main sources of international law standards of due process include the following treaties and conventions (which have been applied and interpreted by international and domestic tribunals).

    i.    The Universal Declaration of Human Rights, 1948;

    ii.    The International Covenant on Civil and Political Rights, 1966 (including General Comments issued by the UN Human Rights Committee);

    iii.    The European Convention for the Protection of Human Rights and Fundamental Freedoms; The Inter-American Convention on Human Rights; The African Charter on Human and People's Rights; The UN Convention on the Rights of the Child (including General Comments issued by the UN Committee on the Rights of the Child);

      iv.     The Fourth Geneva Convention of 1949;

      v.     ICRC study of the rules of customary international humanitarian law (mainly rules 100-103);

All of the above are recognized and relied upon sources of international law according to Art. 38 of the Statute of the International Court of Justice.

66. Based on the sources listed above, the fundamental due process rights of a criminal suspect or defendant include the following:

      i.     The right to presumption of innocence;

      ii.     The right to a public trial;

      iii.     The right to be notified of the charges;

      iv.     The right to legal counsel and the right to prepare an effective defense (including the right to interpretation of the proceedings and to translation of relevant material into a language understood by the defendant or suspect);

      v.     The right to trial without undue delay; and

      vi.     The right to make arguments, present evidence and cross-examine witnesses.

**E.  Failures of due process in the Israeli military courts – in general:**

67. Based on my review of the sources described above and my own experience, review of previous studies, conversations with Israeli and Palestinian attorneys who participate in military court proceedings, and my work as editor and legal advisor on the Yesh Din Report "Backyard Proceedings" (December 2007) (hereinafter: "Yesh Din Military Courts Report"), I **conclude that the Israeli Military Courts failed, in the relevant timeframe, to safeguard each of the due process rights mentioned above.**

68. The support for the foregoing conclusion is reflected in the Yesh Din Military Courts Report which I have attached to this report.

69. The Yesh Din Military Courts Report was a result of a collaborative enterprise of Yesh Din professional staff and volunteers which included an unprecedented extensive study of the work of the military courts through the examination of three types of information: (a) more than 800 observations of military court hearings conducted by Yesh Din volunteers; (b) interviews with military court personnel and defense attorneys; (c) publicly available information and information gathered through freedom of information proceedings. The data contained in the Yesh Din Military Courts Report, and as such my opinion herein, refers exclusively to the years leading up to the report's publication at the end of 2007, which are the years relevant for the legal proceeding at hand.

70. The Israeli Military Courts failed to protect each of a suspect's fundamental due process rights. Below are some examples of the repeated failures:

71. (i) **Right to be notified of the charges:** The Israeli Military Courts failed to supply the defense with an Arabic translation of the indictment and the investigation material. The Kaufman Report notes that "most counsel practicing before the military courts, save a few exceptions, understand and speak both Arabic and Hebrew" (p. 5). This is a misunderstanding of the right to understand the charges and evidence against the suspect. If the defendant does not understand the investigation material he will not be fully aware of the evidence presented against him, and he will not be able to assist his lawyer. These are the exact failures that the right is meant to preempt.

72. (i) **Right to interpretation**: The Israeli Military Courts failed to supply professional legal interpreters in court, and, as a result, failed to ensure that the defendant understood the proceedings and could mount an effective defense. The Kaufman Report states that native Arabic speakers (Druze or Bedouin soldiers serving in the military court unit) interpret the proceedings for the accused (p.5). The Druze and Bedouin soldiers are not trained in the law and receive minimal training before they are put to work as interpreters. The Yesh Din Military Courts Report study concluded that in practice those "interpreters" interpret the proceedings in full in only a small minority of cases. Of 648 observations conducted by Yesh-Din, only 23% of the hearings were translated fully (Yesh Din Military Courts Report , p. 149).

73. (iii) **Right to legal counsel (1):** In contravention of Article 76 of the Fourth Geneva Convention, which requires the occupying power to detain protected persons inside the

24

occupied territory, Israel detains Palestinian prisoners in facilities inside Israel. The majority of Palestinian attorneys are not allowed to enter Israel and therefore have no physical access to their clients. Attorney-client meetings are essential to preparing a defense and thus the right to the adequate assistance of counsel is severely limited in the majority of cases, as Palestinian West Bank resident attorneys comprise the majority of attorneys representing Palestinian suspects and defendants in the military courts (see Yesh Din Military Courts Report, p. 108).

74. **(iv) Right to legal counsel (2):** Even where physical access by the attorney is not a barrier, such as in cases in which the defense attorney is an Israeli citizen or resident, or the Palestinian attorney has a permit to enter Israel, attorney-client meetings may be barred or delayed for up to 30 days, as noted above. Such delays effectively bar a suspect's right to consult with an attorney during the course of investigation and present a significant obstacle to the preparation of an effective defense (see Yesh Din Military Courts Report, p. 111).

75. **(v) Right to effective defense:** Military orders and military court rulings during the relevant timeframe, on which defense attorneys in the military courts must rely in presenting legal arguments on behalf of their clients, were not always published in full or were available only in places where most Palestinian attorneys do not have physical access, such as in the IDF Civil Administration offices (see Yesh Din Military Courts Report, p.79-89). This created a significant barrier to the ability of the majority of defense attorneys in the military court system to provide adequate legal representation.

76. **(vi) Presumption of innocence, right to trial without undue delay:** Given all of these failures and others, it is not surprising that only 0.29% of defendants whose trials were concluded in 2006 were acquitted (23 out of 9,123 cases). Additionally, pre-trial and trial proceedings in the military courts are prolonged for long periods, reaching up to several years (See Yesh Din Military Court Report, p. 69-70, 130).

77. **(vii) Right to be tried by a competent professional and impartial tribunal:** Military courts are made up of a three-judge panel. Until 2002, one of the three judges was a jurist (a military judge with a legal education) while the other two were lay judges who were IDF officers with no legal training. As of 2004, the permanent military courts' judges must have at least five years' "legal experience" and appeals court judges must have seven. In practice, most of them are trained lawyers, many of whom have served in the MAG Corps, but not all of whom

25

necessarily have a background in criminal law. Alongside these judges, two reservists who are also lawyers typically sit, but they do not necessarily practice criminal law during the remainder of the year when they are not serving their reserve duty. According to data provided to Yesh Din by the IDF Spokesperson, at the end of 2006, there were 14 permanent military judges and approximately 140 reservist judges serving in the military courts (see Yesh Din Military Courts Report, p. 47-51). Thus, everyone involved in the Military Court process, except for the defendant and his or her lawyer, is part of the same military system including the judges, prosecutors, translators, clerks, guards, etc.

78. **(viii) Right to a public trial:** The Israeli Military Courts failed to hold trials and court hearings open to the public. The Kaufman Report discusses at length the right to a public hearing and uses NGO entrance and family member entrance as examples of how the hearings are public (p. 5). The Israeli Military Courts limited access to the hearings to just two family members per detainee, however. Additionally, any member of the public who wishes to observe the proceedings is required to apply for a permit to enter the compound (see Yesh Din Military Courts Report, p. 82-84).

79. Several procedural and evidentiary features of the Israeli Military Court system are also relevant. They include the following:

    a.    The trials in the military courts are always trials by a judge or a panel of judges, which, as mentioned above, are usually composed of a permanent military judge and reservist lawyers not necessarily trained in criminal law. The military courts do not hold jury trials.

    b.    The right against self-incrimination, as practiced in the Israeli Military Courts and in the Israeli criminal courts, does not entail a prohibition on using the defendant's silence against him or her. As a matter of fact, the law applicable in the military courts provides that a defendant's choice to remain silent is considered as having corroborative weight to the incriminating evidence produced against him or her.

    c.    According to the rules of admissibility which apply in the Israeli Military Courts and are based on Israeli law and jurisprudence, an out-of-court statement of a witness is admissible if the witness's testimony in court is materially different from his or her out-of-court statement, and he is available for cross examination. There

are however exceptions which allow the admissibility of out-of-court statements even when cross examination or **effective** cross examination is not possible: Taking the stand satisfies the requirement of availability for cross examination, even if the witness refuses to testify, does not answer questions or "babbles" (replies illogically to questions). An out-of-court statement is also admissible when the court is satisfied that the unavailability of a witness for the trial is a consequence of an unlawful act which deterred or prevented the witness from testifying, even if the act is not attributed to the defendant. Kaufman fails to mention these exceptions to the requirement that effective cross examination is enabled as a precondition to admissibility of witness out-of-court statements (see page 4 of his report).

Therefore, if the evidence brought against an accused includes the out-of-court statement of an accomplice witness who decides not to answer questions in cross examination or is not available at all because he was assaulted or intimidated even if through no fault of the accused, and the accused chooses to refrain from testifying in the trial, the court, in this theoretical example, will be allowed by law to admit the out-of-court statement and convict the defendant solely on that statement with the corroborative weight of the defendant's silence.

**F.  The reliability of in-court admissions of facts by defendants**

80. Of the 21 case files that the Plaintiffs provided, only 5 of them involved a detailed judgment by the military court analyzing evidence and determining facts (defendants: Munther Mahmood Khalil Nur [case no.1],Nasser Jamal Mussa Shawish [case no.3], Ibrahim Hamed [case no.7], Fares Ghanem [case no.11], Majid al-Masri [case no.12 ). The remaining 16 cases were resolved by a guilty plea or an agreement between the parties as to the facts leaving the court only to assess the legal implications. In 8 of these cases a guilty plea was entered as part of a plea bargain which included admission of an amended indictment (defendants: Abd el Karim Aweis [case no.2], Kahira Sai'd Ali Sa'adi [case no.4], Sana'a Mohammed Shehada [case no.5], Mohammed Musleh [case no.9], Mohammed Sami Abdallah [case no.10], Ibrahim Abd al Hai [case no.19], Bashar Barghouti [case no.20], Ezz-a-din Hamamra [case no.21]); in 3 cases the accused entered a guilty plea without any agreement with the prosecution (defendants: Abdallah Barghouti [case no.6], Ahmed Barghouti [case no.8], Mohammed Issa Mohammed Ma'ali [case no.17]); and, in 5 other cases the parties agreed on the submission of evidence, and

27

thus on the facts, and argued only about the legal conclusions from those facts (defendants: Ali Mohammed Hamed Abu Hliel [case no.13], Abd al Rahman Muqdad [case no.14], Hilmi Abd al Karim Hamash [case no.15], Ahmed Salah Ahmed Salah [case no.16], and Ahmed Mohammed Ahmed Sa'ad [case no.18]).

81. In other words, in eleven cases the military court rendered judgments convicting the defendants based on a guilty plea, and in another five cases the military court was relieved of the task of ascertaining facts, as they were agreed upon by the parties.

82. It is my opinion that regardless of the due process issues addressed above, the procedures and practices of the military courts cannot guarantee the reliability of a fact determined in a ruling that is based on a guilty plea or an agreement between the parties as to the facts.

83. The reasons for my opinion are the following:

84. **(i) No verification of facts or allocution:** The military courts do not ask a defendant who is entering a guilty plea (as part of a plea agreement or without), to agree to a proffer of facts in open court. Instead, after the defense attorney has announced the decision of a defendant to enter a guilty plea, the judge will simply ask the defendant if he/she admits the content of the indictment (or the amended indictment). If the defendant says yes or "I confess" the judge will not inquire further. As discussed above, the defendant will not have received a translated copy of the indictment and no one will confirm that the defendant knows what is in the indictment.

85. Following a guilty plea, the military court will render a very short judgment convicting the defendant of the offences. The court usually will not detail the facts which constitute the offences. During the sentencing phase, the court will simply "copy and paste" the facts as described in the indictment. This means that no real procedure has been conducted to verify the accuracy of the facts that the defendant has affirmed in his guilty plea.

86. **(ii) Many of the facts are immaterial to defendant's guilt and severity of the crime:** It is clear that many of the facts contained in the indictments do not reflect the defendant's guilt or severity of conduct. Thus, even if one accepts the notion that admission of guilt has inherent reliability (a notion I reject as explained herein), one cannot attribute inherent reliability to facts that were confirmed by a defendant as part of an admission of guilt, but do not reflect on his/her moral and legal responsibility.

28

87. **(iii) Some defendants exaggerate their guilt:** While in the "normal" criminal case it may be expected that a defendant will minimize his involvement in the alleged crime in anticipation of acquittal or in hopes of reducing his sentence, this 'normal' behavior is often not true of Palestinian defendants who are charged with crimes against Israel/is. Many see themselves as "freedom fighters" and "soldiers of their people." They are seen by their communities as heroes and leaders. Because defendants do not believe that they will receive a fair judgment or sentence, they often perceive it as being in their interest to enhance their conduct in order to increase the respect they and their families receive from large sections of Palestinian society.

88. Hence, the "normal" logic that leads "normal" defendants to minimize their role in the crime does not always operate when dealing with ideologically driven Palestinian militants. There is always the risk that a defendant of this type will gladly admit to facts which portray him as a central figure responsible for much more than he actually was.

## G. Due process issues arising from the military court files supplied by claimants:

89. **Missing documents:** As noted above, the Plaintiffs provided 21 military court files, documenting 21 cases brought against 21 Palestinian defendants who were charged with involvement in attacks against Israeli civilians, which are the subject of this lawsuit.

90. All 21 defendants in the military court trials were convicted. Some of them pleaded guilty, while others were convicted at trial based almost exclusively on their custodial statements. The custodial statements were the primary, and, in some cases, only, evidence against the defendants.

91. As previously discussed, the military court files do not include the investigative documents which detail the process leading up the defendants' alleged confession or that of their co-conspirators.

92. In addition to the absence of investigative documents, the files provided by the Plaintiffs do not include the following important judicial records:

    a. Transcripts or even minutes of pre-trial detention hearings; and

b.  Immunity certificates issued to withhold disclosure of evidence. According to the evidence law applicable in the military courts, the prosecution may file a certificate signed by the military commander of the Israeli forces in the West Bank to the court which lists evidence relevant to the trial which must remain classified and cannot be used by any of the parties. The defendant may ask a Military Appellate Court judge to review ex parte the classified evidence and if the judge concludes that it may assist the defense, s/he must instruct the prosecution to either disclose the evidence or to withdraw the indictment against the accused. In practice, it is extremely rare that such evidence is disclosed. **In none of the case files which were provided by the Plaintiffs did I find a trace of the defense invoking a Military Appellate Court review of the classified evidence.**

93. In addition to the broader institutional due process failures enumerated above, there are more specific failures apparent on a case-by-case basis, including:

94. **(i) Lack of Translation:** The indictment, investigation file and trial minutes are all in Hebrew. This means that the defendants, all of whom are Palestinian and most very likely did not read, speak, or understand Hebrew, would have had great difficulty understanding the charges they were facing and the proceedings taking place. This also means that they would be significantly limited in participating in their defense.

95. **(ii) Inadequate Representation:** There were significant limitations on the ability of the lawyers to provide adequate representation, including:

a.  <u>Orders prohibiting client-attorney meetings</u>: Without the ability to review the investigation files we cannot know which of the 21 defendants was barred from meeting an attorney in the pre-trial investigation phase, and for how long. My experience is that **in most security investigations conducted by the GSS against suspects of terror activity a defendant is denied access to his attorney.** I therefore believe that most, if not all, of the 21 defendants were barred from meeting their attorneys and receiving legal advice, at least in the initial stages of their interrogation. Usually the ban on such meetings is only lifted once the suspect has confessed and incriminated himself and/or others.

30

b. <u>Failure to request GSS files</u>: As mentioned above, only one of the trial files showed that defense counsel had received the GSS investigation files. If only one of the defense attorneys received the GSS investigation material, it means that there was a significant failure to provide adequate representation to the defendants.

c. <u>Waiver of defense of the right to cross-examine adverse witnesses</u>: In many of the cases the defense simply agreed that the incriminating out-of-court statements of others would be admitted at trial. The defense even waived the right to cross examine the prosecution's witness(es). An example of this is case number 3262/02 (defendant – Fares Ghanem), in which the defense agreed in four consecutive hearings to the admission of out-of-court statements of adverse witnesses, and waived the right to cross-examine any of the witnesses. In fact, only in 5 of the 21 trials did cross examination take place at all. There is no evidence that any such failures of counsel were understood, let alone approved, by the defendants who were thereby convicted.

d. As explained above, in none of the case files which were provided by the Plaintiffs did I find a trace of the defense requesting a Supreme Court review of the classified evidence.

96. **(iii) Denial of right of cross-examination.** As explained above, the law in the Israeli Military Courts allows admission of out-of-court statements without cross-examination.

a. In the trial of Majd al-Masri (number 12), for example, the court admitted into evidence eight incriminating out-of-court statements allegedly made by witnesses who in court either denied those statements or refused to testify or answer questions posed by the parties. The right to cross examine witnesses was denied in this case.

b. It is no wonder that in Kaufman's analysis of the Al-Masri case, he wrote that: "the evidential hearings were conducted in a textbook fashion with no out of the ordinary occurrences." In the case of the Military Courts, it is "the textbook" itself that results in the regular denial of due process to the accused.

97. **(iv) Failure to investigate allegations of torture in custody:** In four cases allegations of physical and mental abuse in interrogation were raised.

31

a. Admission of witness testimony given under the use of physical abuse or torture:

98. In the **Nasser Shawish** case (3739/02, case number 3) four witnesses testified that they were abused, intimidated and coerced to sign statements. As they were prosecution witnesses and not the accused, no "trial within a trial" to verify admissibility of their out-of-court statements was conducted, and all of their out-of court statements were admitted.

99. In the **Ibrahim Hamed** case (4646/06, case number 7), two of the witnesses on whose incriminating statements the defendant's conviction was based raised allegations at trial of physical abuse during their GSS interrogations. One claimed that he identified the defendant in a photograph presented to him only when he was beaten, badly bleeding and nearly unconscious, and denied the veracity of his statements given under interrogation. A GSS investigator confirmed at trial only that he had "slapped" the witness and invoked the "necessity defense." The witness was declared a hostile witness and all of his out-of-court statements, including his identification of the defendant, were admitted.

100. A second witness claimed that his incriminating statements about the defendant were taken while under physical abuse, including beatings. One GSS interrogator confirmed that he had slapped the witness and forced him to sit in uncomfortable and painful positions, invoking the "necessity defense." Another GSS interrogator confirmed having witnessed the above. The witness was declared a hostile witness and all of his out-of-court statements were admitted.

101. It should be noted that during trial, both of the above witnesses insisted that their custodial statements had been made only because of the physical coercion to which they were subjected.

b. Admission of defendant confessions given under the use of physical abuse or torture:

102. Two of the witnesses in case number 3 mentioned above were themselves defendants in other cases (Kahira Sa'adi 3529/02, case number 4, and Sanaa Shehade, 3544/02, case number 5). They alleged, *inter alia*, physical abuse, threats of rape, threats to arrest family members, long solitary confinement and intimidation. From the files I have received it seems that both pled guilty before the question of their out-of-court statements' admissibility was examined.

103. **(v) Long detention periods:** Cases in the Israeli Military Courts drag on for years. Most of the accused in the cases at issue in this lawsuit were held several years in detention before their

trials were concluded. Shorter trials were secured by those defendants who confessed in court to the charges (in the framework of a plea bargain or without).

## Part Three:

# The Settlement Enterprise and Its Impact on Palestinian Communities

### A. Legal authorities for the opinion on the legality of settlements:

104. The following are the legal authorities upon which I am basing my opinion in this section:

    i.  Article 49 of the Fourth Geneva Convention (1949);

    ii.  The Rome Statute of the International Criminal Court (1998);

    iii.  The International Court of Justice ruling in the case concerning *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory* (2004);

    iv.  Additional decisions, resolutions and declarations of UN bodies, including Security Council and General Assembly, UN treaty bodies and UN specialized agencies;

    v.  Academic writings of international law experts;

    vi.  Declarations of heads of States.

    vii.  The recent report of the UN independent international fact finding mission set to investigate the implications of the Israeli settlements on the civil, political, economic, social and cultural rights of the Palestinian people throughout the Occupied Palestinian Territory, including East Jerusalem (February 7, 2013);

    viii.  Dozens of Israeli High Court of Justice rulings affirming the Occupied status of the West Bank.

105. Based on the above I conclude, as have all international bodies and most nations and scholars, that Israeli settlements in the OPT are illegal.

106. Based on my experience and familiarity with the Israeli settlement enterprise, I also conclude that the prohibition set in international law seeks to prevent the exact danger that the policy of settlements in the OPT has created and continues to create.

**B.    The International Community's Consensus on the Illegality of Settlements in the West Bank**

107. Following the end of the British Mandate, the State of Israel was created in part of what had been Mandatory Palestine by a United Nations (UN) partition with the aim of establishing two democratic states – one with a Jewish majority and the other with a Palestinian Arab majority (see UN General Assembly Resolution 181 (II), 1947). Following the 1948-49 civil war in Mandatory Palestine and simultaneous war between Israel and the Arab countries, an inviolable Armistice Line (Green Line) was established by agreements between Israel and the Arab states of Egypt, Lebanon, Syria and Jordan in 1949, which replaced the borders from those of the "UN Partition Plan" (see UN Security Council (UNSC) Resolution 72, February 23, 1949. [S/1264]; UNSC Res. 72, March 23, 1949. [S/1296]; UNSC Res. 72, April 3. [S/1302]; UNSC Res. 72, July 20, 1949. [S/1353]). The Armistice Agreements must be read in conjunction with UN Security Council Resolution 62 of 16 November 1948, which obliged the parties to establish "permanent armistice demarcation lines" in order to ensure "the transition to permanent peace in Palestine" ([S/1080]).

108. Following the 1967 war between Israel and its Arab neighbors, Egypt, Jordan and Syria, which resulted in Israel taking belligerent military control of the West Bank and East Jerusalem, among other territories, the UN Security Council began expressing its consistent and continuous position that these territories are occupied and must be returned (see United Nations Security Council Resolutions 242 and 338). East Jerusalem was annexed by Israel in 1980, but this annexation has not been recognized by any state (see UN SC Council Resolution 478).

34

109. Since 1967, numerous UN General Assembly and Security Council resolutions, as well as the reports and General Comments of the human rights bodies, have reinforced the position that Israel is occupying the West Bank and have reiterated the prohibition under international law on the establishment of Israeli civilian settlements there (namely according to the Fourth Geneva Convention, Article 49(6)). Included among them are: UN General Assembly Resolutions: 446, 465; UN Human Rights Committee General Comments on the civil and political rights violations caused by the settlement enterprise in the OPT: U.N. Doc. CCPR/C/79/Add.93 (1998); U.N. Doc. CCPR/CO/78/ISR (2003); U.N. Doc. CCPR/C/ISR/CO/3 (2010); Opinions published by the Committee on the Elimination of all Forms of Racial Discrimination on the impact of settlements: U.N. Doc. A/49/18, paras. 73-91 (1994); U.N. Doc. CERD/C/304/Add.45 (1998); U.N. Doc. CERD/C/ISR/CO/13 (2007); U.N. Doc. CERD/C/ISR/CO/14-16 (2012); Reports of the Committee on Economic, Social and Cultural Rights on the settlements: U.N. Doc. E/C.12/1/Add.27 (1998); U.N. Doc. E/C.12/1/Add.90 (2003); U.N. Doc. E/C.12/ISR/CO/3 (2011); Reports of the Committee Against Torture on the settlements: U.N. Doc. A/49/44, paras. 159-171 (1994); U.N. Doc. A/53/44, paras. 232-242 (1998); U.N. Doc. CAT/C/XXVII/Concl.5 (2001); U.N. Doc. CAT/C/ISR/CO/4 (2009); Reports of the Committee on the Elimination of Discrimination Against Women on the settlements in the OPT: U.N. Doc. A/60/38, paras. 221–268 (2005); U.N. Doc. CEDAW/C/ISR/CO/5 (2011).

110. Additionally, the International Court of Justice (ICJ), in its *Advisory Opinion on the Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory*, ICJ Reports 2004 136 (ICJ Opinion) held that: "the Israeli settlements in the OPT (including East Jerusalem) have been established in breach of international law" (para. 120). Similar conclusions have been reached, as previously mentioned, by the UN Security Council and General Assembly, the High Contracting Parties to the Geneva Conventions, the authoritative ICRC study on customary international humanitarian law (ICRC study on illegality of settlements under customary international law), as well as the majority of legal scholars, including many Israelis. It is the official foreign policy of most of Israel's allies, including the United States, United Kingdom and the majority of the European Union members, that Israeli settlement of the West Bank is illegal and must not be continued.

### A Note on the 2012 Levy Commission Report on Settlements in the West Bank

111. On June 21, 2012, the Israeli Prime Minister was provided with a report of the commission that he and the Minister of Justice had appointed in order to examine questions related to land and building regulations and land disputes in the West Bank, but which also addressed the legal status of the West Bank and Israel's settlement enterprise. The Commission was chaired by former Israeli Supreme Court Justice Levy and is thus referred to as the "Levy Commission."

112. Despite my assessment that the Commission's establishment was fundamentally flawed and that it deviated dramatically from its narrow mandate, thereby detracting from the legitimacy of the Commission and its resulting report, I respond briefly to the main conclusions contained therein, as they manifest a new trend of denying that Israel is occupying the West Bank and that settlements are thus illegal.

113. I stress that as of this writing, more than a year after the Levy Commission Report was published, the Government of Israel has not adopted it, despite the fact that pro-settlement parties and politicians have applied extreme pressure on the government to do so.

114. In my capacity as legal advisor to Yesh Din, I participated in preparing a letter to the members of the Levy Commission explaining Yesh Din's position regarding the legitimacy of the Commission and, thus, its reason for declining the Commission's invitation to submit a report to it.

115. The Levy Commission took the liberty of expanding its mandate from land and building in the West Bank to a discussion of whether Israel, via the IDF, has occupied the West Bank. In concluding that the situation in the West Bank is one of continued and expanding Israeli presence, but not of occupation, and that that presence and the construction of settlements and outposts were done with the backing of successive Israeli governments, the Levy Report asserts that the majority of outposts are not illegal, and therefore could be retroactively authorized. As a result, it also concluded that there is no legal prohibition against the continued settlement of the West Bank.

116. First, this conclusion is flawed because it flagrantly disregards the relevant agreements,, UN resolutions, rulings, opinions and academic writings mentioned above (paras. 107-110).

Moreover, the Levy Report patently ignores the international consensus regarding the fact of Israel's continued occupation of the West Bank and the illegality of civilian settlement within the occupied territory, as outlined above.

117. It should also be noted that while the Israeli Supreme Court has opted not to rule on the question of the legality of Israeli settlements in the occupied territories, leaving the question to the political branches of government, a long line of Israeli Supreme Court rulings recognize Israel, via the IDF, as the Belligerent Occupying Power over the West Bank (and Gaza, in judgments rendered prior to the 2005 "Disengagement").

118. The seminal case in which the Israeli Supreme Court confirmed that Israel is maintaining an occupation over the West Bank (and Gaza at the time), and that those territories *are not a part of the State of Israel* is the case of the Gaza Coast Regional (settlement) Council, filed months before the scheduled "disengagement" in 2005 (see HCJ 1661/0 Gaza Coast Regional Council v. Israeli Knesset (2005). It should be noted that Former Supreme Court Justice Edmond Levy wrote the sole dissenting opinion out of a panel of 11 justices in the Gaza Coast case.

119. Not surprisingly, the Israeli Supreme Court's position on the status of the West Bank has not changed since or in light of the Levy Report. Such a change in position would not only contradict decades of previous Supreme Court rulings, but it would also contradict the prevailing opinion of the international community, both on diplomatic and legal levels.

120. It should also be noted that as recently as in 2005, former Deputy State Attorney (for Special Affairs), Talia Sasson, was commissioned to conduct a comprehensive study of the West Bank outposts, from both a legal and factual standpoint. The "Sasson Report," which concluded that the outposts were in fact illegal, was approved by the Attorney General and adopted by the Israeli government in an official decision.

### C. Impact of settlements on Palestinian communities:

121. Based on my experience as legal counsel to numerous Palestinian communities, my academic and professional study of the settlements, my visits to the West Bank, my familiarity with governmental and non-governmental reports on the subject, I conclude that **the establishment and continued existence of illegal settlements, and the official and unofficial practices they attract, results in a multi-dimensional, devastating trauma for**

the neighboring Palestinian communities, as well as for the many Palestinians displaced by the settlements.

122. In support of my opinion, I am hereby attaching and incorporating by reference the Yesh Din Report to the United Nations Fact Finding Mission on Israeli Settlements (submitted in November 2012). The Fact Finding Mission was established by a resolution of the Human Rights Council on March 22, 2012 (A/HRC/RES/19/17), with a mandate "to investigate the implications of the Israeli settlements on the civil, political, economic, social and cultural rights of the Palestinian people throughout the Occupied Palestinian Territory, including East Jerusalem."

123. I edited and co-authored Yesh Din's submission to the Fact Finding Mission, which details the impact of settlements on the Palestinian neighboring communities' and individuals' right to life and security, right to property, freedom of movement, right to equality, and the collective sovereignty over natural resources. In further support of my opinion I attach, and incorporate by reference, the February 7, 2013 Report of the UN Fact-Finding Mission (A/HRC/22/63: Independent international fact-finding mission to investigate the implications of the Israeli settlements on the civil, political, economic, social and cultural rights of the Palestinian people throughout the Occupied Palestinian Territory, including East Jerusalem, hereinafter: UN Settlements Report) on the implications of the settlements on Palestinians in the OPT, specifically relating to the basic rights I mentioned above. The settlements within the OPT impact the basic rights of Palestinians living in the West Bank in numerous ways, including:

124. **(i) Loss of property rights or ability to use property.** This is probably the main affront to the rights of Palestinians and the main source of other violations. The Israeli-Palestinian conflict is a territorial conflict, and the friction between settlers and Palestinians results primarily from a dispute over the legitimacy of each side's claims to the land. The policies and practices implemented in the OPT by Israel and the settlers impact property rights of Palestinians in numerous ways, including:

   a. The government of the State of Israel, the Civil Administration, the Israeli army and the settler community have all employed a variety of land, planning and security policies and practices which enlarge the inventory of lands allocated for the settlement project at the expense of Palestinian towns and villages. All of these policies and practices are

38

discriminatory, and none of them is recognized as legal by the international community, *see* ¶ 111(i)(c), *infra*.

b.  In addition, a failure on the part of Israeli law enforcement agencies to enforce criminal law on violent settlers serves to deny many Palestinian farmers access to their agricultural lands. Often those lands are taken at some stage by settlers and used for either housing or cultivation. This failure to apply the law equally to all residents of the OPT also results in a daily violation of the right to life and security of many Palestinians who are physically attacked and abused by violent settlers.

The conclusion of the UN Settlements Report highlights the direct link between the violation of Palestinian property rights and the lack of adequate law enforcement by the Israeli authorities against settlers whose criminal acts of harassment, intimidation and trespass often lead to the takeover of Palestinian land by settlers for housing or cultivation, in para. 107 of the report:

> *The mission noted that the identities of settlers who are responsible for violence and intimidation are known to the Israeli authorities, yet these acts* **continue with impunity.** *It is led to the clear conclusion that institutionalized discrimination is practiced against the Palestinian people when the issue of violence is addressed. The mission believes that the motivation behind this violence and the intimidation against the Palestinians and their properties is to drive the local populations away from their lands and allow the settlements to expand.*

c.  Based on claims of the security needs of the settlers and settlements, the Israeli government and army have imposed a set of practices that result in the loss of Palestinian land, including, expropriation of land for public use, military seizure of land for security needs, establishment of Special Security Zones around settlements and outposts, erection of the separation barrier, and declaration of land as a closed military zone.

d.  The UN Settlements Report notes the negative impact of restrictive permit and prior coordination regimes on Palestinian access to lands and livelihood, as well as the discriminatory aspect, in para. 73:

*The outer expanses of many settlements incorporate Palestinian private property, and access to this land is regulated through the prior coordination regime whereby the Palestinian landowners are granted a permit for access to their land for a limited number of days each year, normally coinciding with harvest time and based on prior coordination with the Israeli authorities. This regime is in place for Palestinian landowners in some 90 communities with land **in the environs of some** 55 settlements. In some cases, the prior coordination regime is applied to private Palestinian land that has been **unilaterally fenced off by settlers** without authorization by the Israeli authorities. The widespread access restrictions **in and around the wall in the** form of gate and permit regimes particularly affect access to agricultural land in the seam zone and, as previously noted, these restrictions only apply to the Palestinian population.*

e.  A legal mechanism based on an interpretation of a 19th century Ottoman law was developed by the Civil Administration of the OPT to allow the declaration of over a million dunams of lands (a dunam is approximately a quarter of an acre) as "state lands" (or public lands). The aim of these declarations was to enlarge the inventory of public lands after the Israeli High Court of Justice ruled in 1979 that establishment of settlements on private land seized by the army was illegal (see HCJ 390/79 *Dweikat v. Government of Israel* (1979) 34 (1) PD 1). According to figures obtained in FOIA proceedings, 37% of those declared state lands have been allocated to Israeli settlements and only 0.7% to Palestinian development (FOIA initiated by the Israeli Human Rights NGO's The Association for Civil Rights in Israel and BIMKOM).

f.  In addition to the above, denial of access to Palestinian farm lands is achieved through acts of violence and property destruction by extreme elements in the settler community (see, e.g. Yesh Din, A Semblance of Law: Law Enforcement upon Israeli Civilians in the West Bank (June 2006); Yesh Din, The Road to Dispossession: A Case Study – The Outpost of Adei Ad (February 2013), especially Chapter 5).

125.**(ii) Severe denial of the freedom of movement due to practices which are meant to facilitate and secure settlements.**

The following policies and practices contribute to the denial of the freedom of movement:

a. Palestinians are denied entrance to settlements and cannot obtain permits to enter the settlements.

b. The Declaration of Special Security Zones has made certain security zones around settlements off-limits to Palestinians.

c. The Declaration of the seam zone (discussed above) has made the area between the separation fence and wall and 1949 ceasefire lines, known as "the green line," off-limits to Palestinians.

d. Palestinians are regularly denied access to certain roads.

e. The system of checkpoints located in the West Bank controls Palestinians' movement around settlements and within the West Bank.

f. Palestinians are denied access to farming land through violence and property destruction by extreme elements in the settler community, and Israeli law enforcement agencies have failed to secure accountability for such offenses.

The UN Settlements Report addresses these practices and concludes that they violate Palestinian rights, both by restricting their freedom of movement and by discriminating against them. For instance, in para. 40, the UN Settlements Report states:

> Israelis and Palestinians are also treated differently by the same laws; for instance, some military orders designate areas in the Occupied Palestinian Territory as closed military zones/areas. With the exception of military training or firing zones, only Palestinians are prohibited from entering such areas unless they have a permit, even if the area encompasses Palestinian land, thereby denying Palestinians access to or ownership of land. The so-called seam zone is closed to Palestinians, while Israelis and foreign visitors have unrestricted access. Certain other Israeli laws expressly discriminate against Palestinians.

41

Additionally, the UN settlements report states in para. 72:

> *The mission received information according to which* ***the vast majority of restrictions on the freedom of movement of Palestinians seem to be directly linked to the settlements,*** *and include restrictions aimed at protecting the settlements, securing areas for their expansion, and improving the connectivity between settlements and with Israel itself. The restrictions themselves come in many forms, including settler-only roads, a regime of checkpoints and crossings (closure obstacles), impediments created by the wall and its gate and permit regime, as well as administrative restrictions. The Office for the Coordination of Humanitarian Affairs reports more than 540 closure obstacles in 2012. Although there have been significant easing measures in recent years (which have improved connectivity between the main Palestinian cities and towns), movement restrictions reportedly remain in place in areas around settlements* (emphasis added).

126.  **(iii) The plundering of natural resources**: Settlement activity is responsible for the plundering of natural resources, mainly gravel, located in the West Bank, by Israeli companies and almost exclusively for use by Israeli civilians in the West Bank and Israel. The UN Settlements Report states in para. 36: "The settlements, including the associated restrictions, impede Palestinian access to and control over their natural resources." In addition, the UN Settlements Report refers, under the general category of denial of access to natural resources, to the specific issue of access to water resources (as well as all of Section IV.B(7)), and in the same paragraph states:

> *In his report, the Secretary-General noted that Palestinians had virtually no control over the water resources in the West Bank. Eighty six per cent of the Jordan Valley and the Dead Sea is under the de facto jurisdiction of the settlement regional councils. Settlements exploit mineral extraction and fertile agricultural lands, denying Palestinians access to their natural resources.*

127.  **(iv) The right to earn a livelihood:** As a direct outcome of the practices and policies described above, Palestinian communities' livelihood (largely dependent on agriculture) suffers grave damage. The UN Settlements Report, too, addresses the issue, such as in para.

73: "The mission notes that restrictions on freedom of movement have a detrimental impact on the access of Palestinians to their land, and have direct consequences for their ability to work and earn a livelihood." In fact, the UN Settlements Report dedicated an entire section (Section IV.B(8)) to the issue, labeling it "impact on economic rights," and notes, for instance, in para. 89:

> *The agricultural sector, considered the cornerstone of Palestinian economic development, has not been able to play its strategic role because of dispossession of land and the denial of access for farmers to agricultural areas, water resources and domestic and external markets. This has led to a continuous decline in the **share of agricultural production** in GDP and employment since 1967.*

128. **(v) Limitation on planning and the right to development/self-determination:** The proximity to an Israeli settlement brings about serious *de facto* limitations on urban planning in Palestinian communities. This is achieved, among other ways, through the declaration of Special Security Zones, closed military areas, nature reserves and more. The UN Settlement Report stresses the violation of the Palestinian people's right to self-determination and devotes the entire first section of its discussion of the impact of settlements (Section IV.A) to the concept. It concludes, in para. 38:

> *The mission considers that the right to self-determination of the Palestinian people, including the right to determine how to implement self-determination, the right to have a demographic and territorial presence in the Occupied Palestinian Territory and the right to permanent sovereignty over natural resources, is clearly being violated by Israel through the existence and ongoing expansion of the settlements. The transfer of Israeli citizens into the Occupied Palestinian Territory, prohibited under international humanitarian law and international criminal law, is a central feature of the practices and policies of Israel.*

129. **(vi) Institutional discrimination and the right to equality:** The differences in the living conditions and the attitude of the authorities toward the settlers and Palestinians in the West

Bank make it virtually impossible to speak of equality in this context. One population belongs to the ruling group and enjoys civil rights enabling it to influence decisions and policy; the other lacks rights and is often perceived by the regime as an enemy.

130. Nevertheless, based on my personal expertise, my opinion focuses especially on the creation and development **of a double and segregated legal system** in the OPT over five decades of occupation.

131. As was previously discussed, over this period, two legal systems have been created in the OPT: one which applies to Palestinians and the other to Israelis. The former is military in character; the latter is civilian.

132. The UN Independent Fact-Finding Mission devoted much attention to this issue and referred to it extensively in its ensuing report (*see* Section IV.B of the UN report). Among its findings, the UN report states:

> *Palestinians in the Occupied Palestinian Territory endure a discriminatory application of a military court system that does not comply with international standards of fair trial and administration of justice. In testimony to the mission, a witness explained that two individuals in the West Bank may commit the same offence. One is investigated by the police in the West Bank and brought before a military court, and can be detained up to eight days without seeing a judge. The Israeli who has done the same is investigated and brought before a civilian judge, and enjoys all the safeguards of a modern criminal process. Both face different penalties. The prevailing legal systems in Occupied Palestinian Territory translate into stark inequality before the law (para. 46).*
>
> ...
>
> *The legal regime of segregation operating in the Occupied Palestinian Territory has enabled the establishment and the consolidation of the settlements through the creation of a privileged legal space for settlements and settlers. It results in daily violations of a multitude of the human rights of the Palestinians in the Occupied Palestinian Territory, including,*

44

*incontrovertibly, violating their rights to **non-discrimination, equality before the law and equal protection of the law*** (para. 49, emphasis added).

133. In sum, the detrimental harm caused by the settlement enterprise is confirmed and detailed in the February 7, 2013 UN Settlements Report. I will conclude by quoting the UN Settlements Report's conclusions:

> **The existence of the settlements has had a heavy toll on the rights of the Palestinians. Their rights to freedom of self-determination, non-discrimination, freedom of movement, equality, due process, fair trial, not to be arbitrarily detained, liberty and security of person, freedom of expression, freedom of access to places of worship, education, water, housing, adequate standard of living, property, access to natural resources and effective remedy are being violated consistently and on a daily basis.**

July 15th 2013

Michael Sfard, Adv.

z:\documents\cases\sokolow\sfard report-final.doc

45