# EXHIBIT M

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Estate of Esther Klieman, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| v. ) | Civil Action No. 04-1173(PLF/JMF) |
| ) | |
| The Palestinian Authority, *et al.*, ) | |
| ) | |
| Defendants. ) | |

## DECLARATION OF SULEIMAN EL DEEK

Pursuant to 28 U.S.C. § 1746, I, Suleiman al Deek, declare under penalty of perjury under the laws of the United States of America, as follows:

1. I currently reside in Ramallah, Palestine.

2. I am over eighteen years old, and I am competent to make this declaration. Unless otherwise stated herein, the facts set forth below are based on my personal knowledge.

3. I can read and speak Arabic. I have read and signed a translation of this Declaration in Arabic, and I understand it.

4. I have been continuously employed by the Institute for the Care of Martyrs' Families and the Injured (the "Institute") from January 2000 until the present. I currently serve as director for the Institute's office in the Ramallah Governorate. My office is located in Ramallah, Palestine.

### The Institute

5. The Institute was created in 1967 as a part of the Palestine Liberation Organization ("PLO"). When the Palestinian Authority ("PA") was created in 1994, the Institute

was placed under the PA's Ministry of Social Affairs and remained there until approximately 2005, when it was transferred back under the structure of the PLO.

6. The purpose of the Institute, at its inception, was to provide public assistance to the families of persons who were killed or permanently disabled in connection with, or as a result of, the occupation of Palestine by the State of Israel, as well as other conflicts such as the civil wars in Lebanon and Syria and violent events that have taken place in Jordan and Egypt. Historically, the Institute has provided public assistance to eligible families throughout the Palestinian diaspora, including those living in the West Bank, Gaza, Syria, Lebanon, Egypt, and Jordan.

7. During the period from 2000 to 2006, the PA made no regular public assistance payments to the families of persons who had been killed in the Gaza Strip or the West Bank. Rather, the Institute collected biographical data and transferred the information to the PA's Ministry of Social Affairs, later to the General Auditing Agency, and then to the Palestinian Economic Council for Development and Reconstruction (PECDAR). Those entities in turn provided that information to a third-party entity for the payment of any public assistance benefits to eligible families. Accordingly, the Institute made no monthly payments to eligible families in the Gaza Strip and the West Bank during the period 2000 to 2006.

8. Since the Institute's inception, scores of thousands of families living in its areas of operation in the West Bank, Gaza, Egypt, Jordan, Lebanon, and Syria have been provided public assistance through the program administered by the Institute. Currently, the Institute is administering public assistance to approximately 40,000 to 45,000 families. Of those families, nearly 8,000 reside in the West Bank and 15,000 reside in Gaza.

## *The Institute's Records*

9. The Institute creates a paper file for each family that applies for or seeks public assistance, and the file is opened up under the name of their family member who died or was permanently disabled. Generally, the file is created when family members of the deceased or permanently disabled person visit the Institute's offices to request and submit an application form, with the assistance of the Institute's staff. The Institute's staff often will complete the application form with the family, based on information provided by the family as well as information obtained from various other sources, including public sources and news media. Once the application form is completed, the Institute's staff rarely conducts independent investigations to ascertain the accuracy of the biographical information provided by the family in the application form. Generally, the Institute does not conduct any formal or other investigation regarding the factual details of the death or injury that are provided by the family or available in the media. The paper file also contains an eligibility determination by an Institute social worker, as well as the signatures of the person or persons who authorized that benefits be paid to the family or beneficiaries.

10. Once the Institute social worker obtains the family's application, including biographical data of the deceased or disabled person, he or she investigates whether the family of the deceased or disabled person is receiving funds from any other sources. If the family is not entitled to, or eligible for, alternative benefits such as insurance payments or payments from the Israeli government, the Institute is required to provide the family with public assistance. However, in keeping with the public assistance purpose of the Institute, if the person who died has no dependents or beneficiaries, the Institute has no obligation to make, and does not make, payments as a result of the person's death.

11. The Institute's eligibility determination does not take into account the precise cause of the person's death or injury, except to the extent that the death or injury occurred in connection with, or as a result of, the occupation of Palestine by the State of Israel, as well as other conflicts such as the civil wars in Lebanon and Syria and violent events that have taken place in Jordan and Egypt. The deceased or permanently disabled person's alleged membership or affiliation in any religious, political, social or other organization is not considered in determining eligibility. In other words, no family member of a deceased or permanently disabled person will receive, or be denied, benefits because the deceased or permanently disabled person was, or was not, a member of a particular religious, political, social or other organization.

### *The Institute's Record-Keeping*

12. The Institute's paper files are not kept in one location. Rather, the Institute has a local office in every region in which it operates, including every governorate in the West Bank and Gaza. Each local office maintains the paper files for beneficiaries within that office's responsibility. The Institute's paper files have not been systematically digitized and stored electronically. There is no central database containing electronic versions of all of the Institute's paper files.

13. Following a determination that a family of a deceased or permanently disabled person is eligible for receiving benefits, the Institute creates electronic records that contain data tracking the benefits paid to that family. Those electronic records do not reflect all of the information contained in the Institute's paper files. For example, the electronic records do not import whatever information is contained in the portion of the family's application entitled "how the accident happened."

1371229.1

### The Murar File

14. I understand that the Plaintiffs filed a motion in this case on June 25, 2013 seeking to have the PLO and PA search for and produce "the Martyr's files as identified in [Plaintiffs'] May 23, 2013 letter," in other words, "all hard copies and digital/electronic files" relating to "all martyrs who are referenced as being affiliated with the Al Aqsa Martyrs Brigade and/or the military wing of Fatah." I also understand that Plaintiffs included with their May 23, 2013 letter and their motion a document that they described as "official, standard paper form" used by the Institute in making an eligibility determination for a deceased person named "Fawzi Murar."

15. I further understand that, in another case pending in this Court against the PA and PLO, counsel for the PLO obtained from the Institute, and produced to counsel for the plaintiffs in that case, a copy of a paper file that the Institute had for a deceased person named "Fawzi Hamdi Mustafa Murar," which was assigned the following production number by counsel for the PLO: Nos. 06:000070-06:000073 (the, "Murar File").

16. I was the Institute employee who opened the Murar File, including receiving and processing application information from the family of Fawzi Murar. To my knowledge, no other employee of the Institute was substantively involved in the processing of the Murar File.

17. The first page of the Murar File states that Fawzi Murar died on March 5, 2002. I had never met, did not know and had never communicated with Fawzi Murar prior to his death. I did not and do not have any personal knowledge regarding the circumstances of Fawzi Murar's death, and any background information reflected in the Murar File came from other sources, including members of Fawzi Murar's family or media reports. The Murar File indicates that I made a determination of eligibility for public assistance relating to the family of Fawzi Murar on

March 17, 2002, less than two weeks after his death. In the twelve days between his death and my determination that the family of Fawzi Murar was entitled to public assistance, I never conducted any formal investigation of Fawzi Murar, including the circumstances of his death as provided by his family or reported in the media.

18. It is my understanding that the Plaintiffs have focused their arguments in this case on certain information in the Murar File, specifically the following sentence in the section of the application form entitled "How The Accident Happened": "The three [Fawzi Murar, Muhannad Diriya and Omar Qa'adan] were prominent activists in the Intifada uprising and in the Al Aqsa Martyrs Brigades (the military wing of the Fatah movement)." It is also my understanding Plaintiffs have argued (a) that this portion of the Murar file represents a "statement by PA officials" that demonstrates "their knowledge of the Al Aqsa Martyrs Brigades as the military arm of the Fatah movement"; (b) that it "document[s] the relationship between the two entities"; and (c) that the Murar File is a "PA official document" in which the PA "admits and confirms that according to the PA, the Al Aqsa Martyrs Brigade was in fact the military arm of Fatah."

19. Neither I nor any other employee of the Institute was the original source of the information contained in the statement in the Murar File regarding his alleged affiliation with something called the "Al Aqsa Martyrs Brigades" or its alleged relationship with the Fatah political movement. Such information would have come either from the family of Fawzi Murar during the application process or from my review of media reports at the time. The name "Al Aqsa Martyrs Brigades" was frequently used in media reports and public discourse during the Second Intifada, and it was reported in the media that various militants who were fighting the occupation during the Second Intifada claimed association with that name. However, I had and have no personal knowledge of the "Al Aqsa Martyrs Brigades," nor did I have personal

knowledge regarding what affiliations any groups or individuals claiming the name "Al Aqsa Martyrs Brigades" supposedly had or have with other organizations, including the Fatah political movement.

20. I have never been authorized by the Institute, the PLO or the PA to make any statements regarding the existence or non-existence of any organization known as the "Al Aqsa Martyrs Brigades." I am not competent, trained or authorized to make any such statements on behalf of the Institute, the PLO or the PA.

21. My determination on March 17, 2002 that the family of Fawzi Murar was eligible for public assistance as a result of the death of Fawzi Murar was not based in any way on the alleged membership of Fawzi Murar in any religious, political, social or other organization, including any relationship Fawzi Murar may or may not have had with any organization using the name "Al Aqsa Martyrs' Brigades."

22. To my knowledge, the Institute has never paid, or sought funding for payment to, any alleged organization known as the "Al Aqsa Martyrs' Brigades."

*The Court's January 6, 2014 Order*

23. I understand that, on January 6, 2014, that the Court entered an order in this case requiring the PA and PLO to produce "all documents in their possession, custody or control" which (a) "discuss any payments to families of persons denominated as martyrs" and (b) "include the words 'Al Aqsa.'" It is also my understanding that the Court imposed a deadline of February 5, 2014 for the production of any such documents.

24. As noted above, most of the records of the Institute are paper files which are spread across multiple locations and have not been digitized for electronic searching. The electronic records the Institute does have simply track the public assistance payments to eligible

families of those who have died or been permanently disabled and does not include all of the information submitted by the families with their applications. Accordingly, searching for any documents in the Institute's files that might contain the words "Al Aqsa" will require a manual review of all of the Institute's files in multiple locations files. The Institute does not have the existing staff to conduct such a search within the deadline set by the Court, even if the Court's order were limited to a search of and production from the active files for the 8,000 eligible families residing in the West Bank who currently receive public assistance from the Institute (as opposed to closed files where there are no remaining eligible beneficiaries or where benefits were terminated for some other reason).

25. If the Court's order requires a search of all of the Institute's files (both active and closed) in all of the Institute's offices, it is impossible for me at this time to estimate the time, personnel, logistics and funding that would be needed to conduct and complete such a search. The Institute has never been required to undertake such a search and thus has no experience estimating the time, personnel, logistics and cost of such a project. In my opinion, such a project would take many months, require the hiring of additional personnel and would depend on obtaining substantial new funding beyond the Institute's current budget, the source and availability of which are very uncertain given the extreme financial difficulties of the PA and PLO.

26. Because of the Hamas takeover of Gaza in 2007, the Institute does not have access to any files that remain in Gaza. Accordingly, the Institute would be unable to comply with the Court's order to the extent it requires a review of the Institute's files located in Gaza.

1371229 1

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 14th day of January, 2014, at Ramallah, Palestine.

/s/Suleiman El Deek
SULEIMAN EL DEEK

المحكمة الأقليمية للولايات المتحدة الأمريكية

لأقليم مقاطعة كولومبيا

| |
|---|
| ممتلكات استير كليمان ( Esther Klieman) وآخرين بصفتهم (المدعين) |
| ضد |
| السلطة الفلسطينية وآخرين ويُشار إليهم فيما بعد باسم المدعى عليهم |

القضية المدنية رقم 04-1173 (PLF/JMF)

<u>إقرار سليمان الديك</u>

بمقتضى المادة رقم 1746 من القانون 28 للولايات المتحدة الأمريكية، أقر أنا سليمان الديك، وأتحمل عقوبة الحنث باليمين بموجب قوانين الولايات المتحدة الأمريكية، بما يلي:

1- أنني مقيم حاليا في رام الله، فلسطين.

2- أنني أبلغ من العمر أكثر من ثمانية عشر عاما، وأنني قادر على تقديم هذا الإقرار. وما لم يتم النص على غير ذلك، فإن الوقائع المبينة أدناه مبنية على معرفتي الشخصية.

3- أنني أستطيع أن أقرأ وأتحدث اللغة العربية، وأنني قرأت وقمت بالتوقيع على ترجمة هذا الإقرار باللغة العربية، وأنني أفهمه.

4- أنه تم تعييني بشكل دائم من قبل مؤسسة رعاية أسر الشهداء والجرحى (ويُشار إليها بلفظ "المؤسسة") خلال الفترة من يناير عام 2000 وحتى تاريخه. وأعمل حاليا مديرا لمكتب المؤسسة في محافظة رام الله. ومكتبي كائن في رام الله، فلسطين.

1

1227248.1

## المؤسسة

5- تم إنشاء المؤسسة في عام 1967 كجزء من منظمة التحرير الفلسطينية. وعندما تم إنشاء السلطة الفلسطينية في عام 1994، تم وضع المؤسسة تحت إشراف وزارة الشئون الاجتماعية بالسلطة الفلسطينية وظلت كذلك حتى عام 2005 تقريبا، حيث تم نقلها مرة أخرى في إطار هيكل منظمة التحرير الفلسطينية.

6- كان الغرض من المؤسسة في بداية إنشائها هو تقديم المساعدة العامة لأسر الأشخاص الذين قتلوا أو أصيبوا بأعاقة دائمة على خلفية أو نتيجة لاحتلال فلسطين من قبل دولة إسرائيل، بالإضافة إلى غير ذلك من الصراعات مثل الحروب الأهلية في لبنان وسوريا وأحداث العنف التي وقعت في الأردن ومصر. وفي الماضي، قدمت المؤسسة المساعدة العامة للأسر المستحقة في جميع أنحاء الشتات الفلسطيني، بما في ذلك تلك الأسر التي تعيش في الضفة الغربية وقطاع غزة وسوريا ولبنان، ومصر والأردن. وفي الوقت الراهن، وتقدم المؤسسة المساعدة لأسر الأشخاص الذين قتلوا في الضفة الغربية وقطاع غزة، وسوريا ولبنان ومصر والأردن.

7- خلال الفترة 2000-2006، لم تقدم السلطة الفلسطينية أي مبالغ خاصة بالمساعدات العامة العادية لأسر الأشخاص الذين قتلواخلال تلك الفترةفي قطاع غزة أو الضفة الغربية. وبدلا من ذلك، قامت المؤسسة بجمع بيانات السيرة الذاتية ونقل المعلومات إلى وزارة الشؤون الاجتماعية بالسلطة الفلسطينية، وفي وقت لاحق قامت بنقل تلك المعلومات إلى هيئة الرقابة العامة، ومن ثم إلى المجلس الاقتصادي الفلسطيني للتنمية وإعادة الإعمار (PECDAR). وبدورها قامت تلك الكيانات بتقديم تلك المعلومات إلى طرف ثالث بغرض دفع أي من استحقاقات المساعدة العامة للأسر المستحقة. وطبقا لذلك، لم تقم المؤسسة بتقديم أي دفعات شهرية للأسر المستحقة في قطاع غزة والضفة الغربية خلال الفترة من 2000 إلى2006.

8- منذ إنشاء المؤسسة، تم تقديم المساعدات العامة لعشرات الآلاف من الأسر التي تعيش داخل مناطق عملياتالمؤسسة في الضفة الغربية وقطاع غزة ومصر والأردن ولبنان، وسوريا من خلال البرنامج الذي تديره المؤسسة.وفي الوقت الراهن، تقوم المؤسسة بإدارة المساعدات العامة لما يقرب من 40,000 إلى 45,000 أسرة. ومن بين تلك الأسر، هناك ما يقرب من 8,000 أسرة تقيم في الضفة الغربية وحوالي 15,000 تقيم في غزة.

سجلات المؤسسة

9- تقوم المؤسسة بإعداد ملف ورقي لكل أسرة من الأسر التي تتقدم بطلب المساعدات العامة، ويتم فتح الملف باسم فرد العائلة الذي توفي أو أصيب بأعاقة دائمة. وبشكل عام، يتم فتح الملف عندما يقوم أفراد أسرة الشخص المتوفى أو المصاب بعاهات مستديمة بزيارة مكاتب المؤسسة لطلب المساعدة وتقديم نموذج الطلب، وذلك بمساعدة موظفي المؤسسة. وعادة ما يقوم موظفو المؤسسة باستكمال نموذج الطلب مع الأسرة بناء على المعلومات التي تقدمها تلك الأسرة وكذلك المعلومات التي يتم الحصول عليها من مصادر أخرى مختلفة، بما في ذلك المصادر العامة ووسائل الإعلام. وبمجرد الانتهاء من تعبئة نموذج الطلب، نادرا ما يقوم موظفو المؤسسة بإجراء تحقيقات مستقلة للتأكد من دقة المعلومات المتعلقة بالسيرة الذاتية التي تقدمها الأسرة في نموذج الطلب. وبشكل عام، لا تقوم المؤسسة بإجراء أي تحقيق رسمي أو غير ذلك بشأن التفاصيل الواقعية للوفاة أو الإصابة التي تقدمها الأسرة أو المتاحة بوسائل الإعلام. كما يحتوي الملف الورقي قرار تحديد الأحقية من جانب الأخصائي الاجتماعي بالمؤسسة، فضلا عن توقيعات الشخص أو الأشخاص الذين يأذنوا بدفع تلك الاستحقاقات للأسرة أو المستفيدين.

10- بمجرد حصول الأخصائي الاجتماعي للمؤسسة على الطلب المقدم من الأسرة، بما في ذلك بيانات السيرة الذاتية للشخص المتوفى أو المصاب، يقوم بالتحقق مما إذا كانت عائلة الشخص المتوفى أو المصاب تتلقى أموالا من أي مصادر أخرى. وإن لم تكن الأسرة مستحقة أو مؤهلة للحصول على استحقاقات بديلة مثل مدفوعات التأمين أو مدفوعات مقدمة من الحكومة الإسرائيلية، يطلب من المؤسسة تزويد الأسرة بالمساعدة العامة. ولكن تمشيا مع غرض المساعدة العامة للمؤسسة، إذا كان الشخص المتوفى ليس له معالين أو مستفيدين، لن تكون المؤسسة ملزمة ولا تقوم بتقديم مدفوعات نتيجة وفاة الشخص.

11- عند تحديد الأهلية أو الاستحقاق، لا تأخذ المؤسسة بعين الاعتبار السبب الدقيق لوفاة أو إصابة الشخص، إلا بالقدر الذي تكون فيه الوفاة أو الإصابة مرتبطة أو نتيجة لاحتلال فلسطين من قبل دولة إسرائيل، والصراعات الأخرى مثل الحروب الأهلية في لبنان وسوريا وأحداث العنف التي وقعت في الأردن ومصر. ولا يتم أخذ عضوية الشخص المتوفى أو المصاب بعاهات مستديمة في أي منظمة دينية أو سياسية أو اجتماعية أو غيرها أو انتمائه لها في الاعتبار عند تحديد الأحقية. وبعبارة أخرى، لن يحصل أي عضو من عائلة الشخص المتوفى أو المصاب بعاهات مستديمة، أو يحرم من الحصول على الاستحقاقات بسبب أن الشخص المتوفى أو المصاب بعاهات مستديمة كان أو لم يكن عضوا في منظمة دينية أو سياسية أو اجتماعية معينة أو غيرها.

1227248.1

## حفظ السجلات في المؤسسة

12- لا يتم الاحتفاظ بالملفات الورقية الخاصة بالمؤسسة في مكان واحد. وبدلا من ذلك، لدى المؤسسة مكتب محلي في كل منطقة يعمل بها، بما في ذلك كل محافظات الضفة الغربية وقطاع غزة. ويحتفظ كل مكتب محلي بالملفات الورقية للمستفيدين تحت مسؤوليته. ولم يتم ترقيم الملفات الورقية للمؤسسة بطريقة منهجية ولم يتم تخزينها إلكترونياوليس هناك قاعدة بيانات مركزية تحتوي على نسخ إلكترونية من جميع الملفات الورقية للمؤسسة.

13- بعد تحديد استحقاق أسرة الشخص المتوفي أو المصاب بعاهات مستديمة، تقوم المؤسسة بإنشاء سجلات ألكترونية تحتوي على بيانات تتبع الاستحقاقات المدفوعة لتلك العائلة. ولا تعكس تلك السجلات الإلكترونية كافة المعلومات الواردة في الملفات الورقية للمؤسسة. على سبيل المثال، لا تنقل السجلات الإلكترونية أيا من المعلومات الواردة في جزئية الطلب المقدم من الأسرة المستحقة بشأن "كيفية وقوع الحادث".

## ملف مرار

14- أدرك أن المدعين رفعوا دعوى في هذه القضية بتاريخ 25 يونيو 2013 يطلبون فيها قيام منظمة التحرير الفلسطينية أو السلطة الفلسطينية بالبحث عن وإنتاج "ملفات الشهيد" على النحو المحدد في خطاب [المدعين] بتاريخ 23 مايو 2013 أو بعبارة أخرى"جميع النسخ الورقية والملفات الرقمية/ الإلكترونية" التي تتعلق بـ"جميع الشهداء الذين يشار إلى أنهم تابعين لكتائب شهداء الأقصى و/أو الجناح العسكري لحركة فتح". كما أدرك أيضا أن المدعين ضمنوا خطابهم بتاريخ 23 مايو 2013 ودعواهم وثيقة وصفوها بأنها "النموذج الورقي القياسي الرسمي" الذي تستخدمه المؤسسة في إجراء تحديد أهلية أو أحقية شخص متوفى يدعى "فوزي مرار".

15- كما أدرك أيضا أنه في قضية أخرى معلقة في هذه المحكمة ضد السلطة الفلسطينية ومنظمة التحرير الفلسطينية، قام مستشار/ محام منظمة التحرير الفلسطينية بالحصول على نسخة من ملف ورقي كان لدى المؤسسة لشخص متوفى يدعى "فوزي مرار" وقدمه إلى مستشار/ محام المدعين في تلك القضية، والذي كان يحمل رقم الإنتاج التالي من قبل مستشار/ محام منظمة التحرير الفلسطينية: PLO Nos 06:000073-06:000070("ملف مرار").

16- كنت أنا موظف المؤسسة الذي افتتح ملف مرار، بما في ذلك تلقي وتناول معلومات الطلب المقدم من عائلة فوزي مرار. وعلى حد علمي، لا يوجد موظف آخر من موظفي المؤسسة اشترك بشكل جوهري في تناول ملف مرار.

17- تفيد المعلومات الواردة في الصفحة الأولى من ملف مرار أن فوزي مرار توفي في 5 مارس 2002. ولم ألتقِ أبدا ولم أكن أعرف ولم أتواصل أبدا مع فوزي مرار قبل وفاته. لم يكن لدى وليس لدي أي معرفة شخصية تتعلق بظروف أو ملابسات وفاة فوزي مرار وليس لدي أية معلومات أساسية واردة في ملف مرار جاءت من مصادر أخرى، بما في ذلك أي معلومات واردة من أفراد أسرة فوزي مرار أو تقارير لوسائل الإعلام. ويشير ملف مرار إلى أنني حددت أهلية أو أحقية الحصول على المساعدة العامة المتعلقة بأسرة فوزي مرار بتاريخ 17 مارس 2002، أي بعد أقل من أسبوعين من وفاته. وخلال الاثنتي عشر يوما بين وفاته وتحديدي لأحقية عائلة فوزي مرار للمساعدة العامة، لم أقم بإجراء أي تحقيق رسمي بشأن فوزي مرار، بما في ذلك ظروف وفاته على النحو الوارد من قبل عائلته أو الواردة في تقارير وسائل الإعلام.

18- أدرك أن المدعين قد ركزوا حجتهم في هذه القضية على معلومات معينة في ملف مرار، وتحديدا العبارة التالية في قسم نموذج الطلب تحت عنوان "كيف وقع الحادث": "كان_الثلاثة_[فوزي مرار ومهند ديريا وعمر قعدان]_من النشطاء البارزين في الانتفاضة وفي كتائب شهداء الأقصى (الجناح العسكري لحركة فتح)". كما أفهم أن المدعين قد جادلوا بأن (أ) هذا الجزء من ملف مرار يمثل "بيان من قبل مسئولي السلطة الفلسطينية" يوضح "معرفتهم بكتائب شهداء الأقصى على أنها الذراع العسكري لحركة فتح"، (ب) أنه "يوثق العلاقة بين الكيانين"، (ج) أن ملف مرار هو "وثيقة رسمية للسلطة الفلسطينية" "تعترف فيها السلطة الفلسطينية وتؤكد أنه وفقا للسلطة الفلسطينية، كانت كتائب شهداء الأقصى في الواقع هي الذراع العسكري لحركة فتح".

19- لم أكن أنا أو أي موظف آخر بالمؤسسة بمثابة المصدر الأصلي للمعلومات الواردة في البيان الموجود في ملف مرار بخصوص انتمائه المزعوم لما يسمى بكتائب شهداء الأقصى أو علاقته المزعومة بحركة فتح السياسية. وقد تأتي هذه المعلومات إما من عائلة فوزي مرار أثناء عملية تناول الطلب أو من خلال مراجعتي لتقارير وسائل الإعلام في ذلك الوقت. كان اسم "كتائب شهداء الأقصى" يكثر استخدامه في تقارير وسائل الإعلام والخطاب العام خلال فترة الانتفاضة الثانية، وورد في وسائل الإعلام المختلفة أن مختلف المقاتلين الذين كانوا يقاتلون الاحتلال خلال الانتفاضة الثانية ادعوا ارتباطهم بهذا الاسم. ولكن، لم يكن لدي معرفة شخصية بكتائب شهداء الأقصى ولم يكن لدي معرفة شخصية بشأن ماهية الانتماءات

5

1227248.1

الخاصة بأي مجموعة أو أفراد يدعون اسم كتائب شهداء الأقصى وما يفترض أن يكون لها علاقة بالمنظمات الأخرى، بما في ذلك حركة فتح السياسية.

20- لم أحصل على تفويض من المؤسسة أو منظمة التحرير الفلسطينية أو السلطة الفلسطينية بالإدلاء بأي تصريحات بشأن وجود أو عدم وجود أي منظمة تعرف باسم "كتائب شهداء الأقصى". كما أنني لست مختصا أومدربا أو مخولا بالإدلاء بأي من هذه البيانات نيابة عن المؤسسة أو منظمة التحرير الفلسطينية أو السلطة الفلسطينية.

21- كان قراري في 17 مارس 2002 بأن عائلة فوزي مرار مؤهلة للحصول على المساعدة العامة، نتيجة وفاة فوزي مرار ولم يكن مبنيا بأي حال من الأحوال على عضوية فوزي مرار المزعومة في أي منظمة سياسية أو اجتماعية أو دينية أخرى، بما في ذلك أي علاقة كانت أو تكون لفوزي مرار بأية منظمة تستخدم اسم "كتائب شهداء الأقصى".

22- على حد علمي، لم تدفع المؤسسة أبدا، ولم تسعى للحصول على التمويل من أجل الدفع لأي منظمة مزعومة معروفة باسم "كتائب شهداء الأقصى".

حكم المحكمة بتاريخ 6 يناير 2014

23- أدرك أنه بتاريخ 6 يناير 2014، أصدرت المحكمة حكما في هذه القضية يطلب من السلطة الفلسطينية ومنظمة التحرير الفلسطينية بإنتاج "جميع الوثائق الكائنة في حوزتهم أو تحت تصرفهم أو تحت سيطرتهم" والتي (أ ) "تناقش أي مدفوعات لأسر الأشخاص الملقبين بالشهداء" و (ب) "تشمل عبارة (الأقصى)". كما أدرك أيضا أن المحكمة حددت موعدا نهائيا في 5 فبراير 2014 لإنتاج أي وثائق من هذا القبيل.

24- كما ذكر أعلاه، فإن معظم سجلات المؤسسة عبارة عن ملفات ورقية منتشرة في مواقع متعددة ولم يتم ترقيمها بغرض البحث الإلكتروني. وبالسجلات الإلكترونية للمؤسسة، هناك ببساطة تتبع لمدفوعات المساعدة العامة للأسر المستحقة لأولئك الأشخاص الذين توفوا أو أصيبوا بعاهات مستديمة، ولا تشمل كافة المعلومات المقدمة من الأسر عند تقديم الطلب. وطبقا لذلك، يتطلب البحث عن أي وثائق في ملفات المؤسسة قد تحتوي على عبارة "الأقصى" مراجعة يدوية لكافة الملفات الخاصة بالمؤسسة في مواقع متعددة للملفات. وليس لدى المؤسسة موظفين في الوقت الراهن يقومون بإجراء مثل هذا البحث ضمن

6

1227248.1

المهلة التي حددتها المحكمة، حتى لو كان حكم المحكمة يقتصر على تفتيش وإنتاج الملفات النشطة للأسر المؤهلة البالغ عددها 8,000 أسرة والمقيمة في الضفة الغربية حاليا والتي تتلقى المساعدات العامة من المؤسسة (بدلا من الملفات المغلقة التي لا يوجد فيها مستفيدين مؤهلين متبقين أو التي أنهيت استحقاقاتها لأسباب أخرى).

25- إذا تطلب حكم المحكمة البحث في كافة ملفات المؤسسة (سواء النشطة والمغلقة) في جميع مكاتب المؤسسة، فإنه من المستحيل بالنسبة لي في هذا الوقت تقدير المدة والموظفين والتمويل والخدمات اللوجستية المطلوبة لإجراء واستكمال هذا البحث. ولم يُطلب من المؤسسة إجراء مثل هذا البحث وبالتالي ليس لديه الخبرة اللازمة لتقدير الوقت والموظفين والخدمات اللوجستية والتكلفة لمثل هذا المشروع في الوقت الراهن. وفي رأيي، يستغرق مثل هذا المشروع عدة أشهر ويتطلب تعيين موظفين إضافيين ويعتمد على الحصول على تمويل كبير جديد يتجاوز الميزانية الحالية للمؤسسة، ويعد مصدر ومدى توافر هذا التمويل غير مؤكد بشكل قاطع نظرا للصعوبات المالية البالغة التي تمر بها السلطة الفلسطينية ومنظمة التحرير الفلسطينية.

26- بعد أن سيطرت حماس على قطاع غزة عام 2007، لم تتمكن المؤسسة من الحصول على أي ملف من الملفات الموجودة في غزة. وبناءً على ذلك لن تكون المؤسسة قادرة على الامتثال لحكم المحكمة إلى الحد الذي يتطلب مراجعة ملفات المؤسسة الموجودة في غزة.

أقر، وأتحمل عقوبة الحنث باليمين، بموجب قوانين الولايات المتحدة الأمريكية بأن كافة المعلومات السابقة حقيقية وصحيحة.

تحرر في هذا اليوم الثلاثاء الموافق 2014/1/14، رام الله، فلسطين

سليمان الديك

1227248.1