**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARK I. SOKOLOW, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 04cv397 (GBD) (RLE) |
| ) | |
| THE PALESTINE LIBERATION ) | |
| ORGANIZATION, *et al.*, ) | |
| ) | |
| Defendants. ) | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION IN LIMINE**

MILLER & CHEVALIER CHARTERED
655 15th Street, NW, Suite 900
Washington D.C. 20005-6701
(202) 626-5800 (tel)
(202) 626-5801(fax)

*Counsel for Defendants the Palestinian Authority*
*and the Palestine Liberation Organization*

June 6, 2014

1431980.1

**TABLE OF CONTENTS**

Page

INTRODUCTION ........................................................................................................... 1

ARGUMENT .................................................................................................................. 1

I.    THE COURT SHOULD NOT PERMIT EITHER PARTY TO PUT THE
      ISRAELI-PALESTINIAN CONFLICT ON TRIAL................................................. 1

II.   EVIDENCE OF THE 21 CONVICTIONS IN THE ISRAELI MILITARY
      COURTS SHOULD NOT BE ADMITTED AT TRIAL; BUT IF THE COURT
      ADMITS THIS EVIDENCE, THE COURT SHOLD ALSO ADMIT EXPERT
      TESTIMONY ABOUT THE ISRAELI MILITARY COURTS ............................... 6

III.  DEFENDANTS WILL NOT ARGUE THAT THE JURY SHOULD BASE ITS
      VERDICT ON THE FOREIGN POLICY CONSEQUENCES OF ITS VERDICT . 12

IV.   DEFENDANTS WILL NOT CONDUCT PERSONAL ATTACKS ON
      PLAINTIFFS' CO-COUNSEL BUT THEY WILL EXPOSE THE BIAS OF
      PLAINTIFFS' EXPERT WITNESSES IF THEY ARE PERMITTED TO
      TESTIFY................................................................................................................. 12

V.    DEFENDANTS' FACT WITNESSES SHOULD NOT BE PRECLUDED FROM
      TESTIFYING AT TRIAL ........................................................................................ 14

VI.   DEFENDANTS' EXPERT RICK GASKINS SHOULD NOT BE PRECLUDED
      FROM TESTIFYING AT TRIAL ABOUT PLAINTIFFS' ALLEGED TOTAL
      ECONOMIC AND NON-ECONOMIC DAMAGES ............................................... 18

VII.  DEFENDANTS SHOULD BE PERMITTED TO PRESENT EXPERT
      TESTIMONY ON TERRORISM EXPERTISE IF THE COURT ADMITS
      PLAINTIFFS' EXPERTS' TESTIMONY ................................................................ 21

VIII. DEFENDANTS' EXPERTS' TESTIMONY ADDRESS ISSUES OF FACT
      THAT SHOULD BE DECIDED BY THE JURY .................................................... 24

CONCLUSION................................................................................................................ 25

1431980.1

## INTRODUCTION

Plaintiffs seek to exclude eight categories of evidence: (1) evidence alleging mistreatment of Palestinians by the State of Israel; (2) generalized evidence attacking the Israeli Military Courts; (3) arguments that a verdict in Plaintiffs' favor would interfere with U.S. foreign policy; (4) personal attacks on plaintiffs' co-counsel and their motives; (5) testimony by fact witnesses Plaintiffs claim Defendants did not previously identify; (6) expert testimony on damages based on judgments in other cases; (7) expert testimony on the "expertise" of other expert witnesses; and (8) expert testimony on law.  *See* DE 487.  As to some categories (items 2 and 3, for example), Plaintiffs' motion fails to identify specific *evidence* they seek exclude and instead wrongly speculates about arguments they think counsel may make.  Other categories (such as items 1, 2, and 4) will become moot if the Court denies the admissibility of the Israeli Military Court convictions and Plaintiffs' expert testimony on the Israeli-Palestinian conflict writ large, rather than on the specific shootings or bombings at issue.  Other categories (such as 5, 6, and 8) reflect a mischaracterization of the nature of the expert testimony or the facts.  Each category is addressed in turn below.

## ARGUMENT

### I.    THE COURT SHOULD NOT PERMIT EITHER PARTY TO PUT THE ISRAELI-PALESTINIAN CONFLICT ON TRIAL.

Plaintiffs are seeking to preclude Defendants from introducing evidence about the history, politics, and social conditions surrounding the Second Intifada (*see* DE 487 at 1-8), even though they are seeking to introduce that very evidence.  As an initial matter, neither party should be permitted to admit this evidence.  This is a tort case about seven shootings or bombings in or near Jerusalem in 2001-2004.  The issue in this case is simply whether Defendants are liable under the Anti-Terrorism Act for proximately causing the injuries allegedly

sustained by the Plaintiffs in the seven incidents. *See Rothstein v. UBS AG*, 708 F.3d 82, 95 (2d Cir. 2013). Defendants fully agree with Plaintiffs that the issue in this case is "not who is right in a decades-old conflict" over control of the land of Israel and Palestine (DE 487 at 7). Yet, four of Plaintiffs' experts barely mention the seven attacks at all in their reports. Instead, they opine on the history of the Palestinian-Israeli conflict, and Palestinian attitudes towards Israelis and Jews as allegedly reflected in political rhetoric, religious sermons, and media coverage – most of which cannot even be linked to the PA or PLO. The Court should preclude both parties from shifting the focus of the lawsuit from the attacks at issue to broader narratives of responsibility towards and attitudes about the longstanding Israeli-Palestinian conflict. A few examples of Plaintiffs' approach should suffice.

Plaintiffs have proffered the expert testimony of Efraim Karsh, who provides an overwrought, partisan overview of the history of the Palestinian-Israeli conflict. In his telling, Palestinians and Arabs have always conspired to destroy Israel. He begins his tale in 1949 when an Egyptian politician called for the return of refugees to Palestine and the destruction of the state of Israel. DE 500-17 at 9. He discusses the PLO's adoption in 1964 of the Palestinian National Covenant, which reportedly called for the "total rejection of Israel's right to exist." *Id.* at 10. From there, he discusses Yasser Arafat's alleged effort in 1968 "'to gradually transform the resistance into an armed revolution of the people'" (*id.* at 4) and the PLO's purported "phased strategy" of acquiring territory beginning in 1974 (*id.* at 4-9). Much of his report focuses on events in the 1990s, when Arafat supposedly "began a protracted series of evasive measures" to break promises he made during the Oslo Accords. *Id.* at 11. Remarkably, Karsh does not even get to the Second Intifada (the time period relevant to this lawsuit) until page 31 of

1431980.1

his 41-page report.  *See id.* at 31-41.  And he does not discuss any of the seven attacks at issue in this case at all.  *See id.*

Plaintiffs' expert Itamar Marcus, the director of Palestinian Media Watch, also does not discuss any of the specific attacks at issue in this case.  *See* DE 500-4.  Instead, he broadly indicts the PA for every violent act that took place during the Second Intifada.  *See id.* at 14 ("The Palestinian Authority bears overall responsibility for the violence and killings of the intifada in general and every particular act of killing in particular." ).  He attempts to support his sweeping conclusion with statements reported in the media during and after the Second Intifada that, according to him, either incited violence or glorified violence.  *See generally id.*  Yet, he frequently cites highly inflammatory statements made by Palestinians who were not even PA officials.  For example, he cites a sermon in which the cleric allegedly stated:  "'[t]he Jews have bared their teeth . . . they will not be deterred except by the color of the blood of their filthy people.'"  *Id.* at 25.  Marcus claims the speaker is a "Palestinian Authority cleric" (*id.*), but he admitted at his deposition that he was simply a cleric in the area that the PA governs (DE 500-5 at 255:10-17).  Rather than providing opinions relevant to the seven attacks at issue, Marcus instead provides opinions on "what [wa]s happening in Palestinian society" at the time of the Second Intifada.  *See* DE 500-5 (Marcus Tr. at 110:14-111:10).

Plaintiffs' experts Jeffrey Addicott, the Director of the Center for Terrorism Law at St. Mary's University School of Law (DE 500-14 at 1), and Matthew Levitt, a senior fellow at the Washington Institute for Near East Policy (DE 500-11 at 1), also do not directly discuss the seven attacks.  Addicott's opinion covers such wide-ranging topics as the causes of the Second Intifada (DE 500-14 at 12-14), sermons allegedly calling for violence (*see id.* at 16-18), the

1431980.1

number and names of Americans killed during the Second Intifada[1] (*see id.* at 18-20), and Congressional legislation during the Second Intifada (*see id.* at 20-26).  Levitt similarly opines that "the PA promoted and supported terrorism against Israelis" throughout the Second Intifada (DE 500-11 at 1) but does not attempt to establish the PA's involvement in any of the seven attacks at issue in this case (*see id.* at 13-26). [2]

Plaintiffs are seeking to exclude Defendants' expert testimony that is offered largely to respond to the one-sided narrative about the Israeli-Palestinian conflict presented by Plaintiffs' experts.  To be sure, the fact that Plaintiffs are seeking to introduce irrelevant evidence does not authorize Defendants to do the same.  *See Linde v. Arab Bank, PLC*, 920 F. Supp. 2d 282, 284 (E.D.N.Y. 2011) ("Defendant cannot bootstrap its way to relevance by claiming that plaintiffs are making the converse argument.").  Indeed, both sides should be precluded from injecting broader issues related to the Israeli-Palestinian conflict into the trial.   The jury should hear evidence related to the seven attacks at issue, not either side's experts' views on whose fault it is that the Second Intifada erupted, or Palestinians' views of Israelis or Israelis views of Palestinians.  Defendants are at significant risk of undue prejudice by having to defend an Anti-Terrorism Act case less than a mile from the site of the September 11 attacks, before a jury pool who likely has already been exposed to a one-sided view of the Israeli-Palestinian conflict and may harbor preconceived (and inaccurate) stereotypes about Palestinians.   The best way to avoid unfair prejudice, confusing the issues, and wasting time is to exclude any evidence that is not tied directly to whether Defendants proximately caused the plaintiffs' injuries.  If, however, the Court

---

[1] Addicott references the June 19, 2002 attack and the July 31, 2002 attack when he lists Americans wounded or killed during the Second Intifada.  DE 500-14 at 18-20.

[2] Levitt briefly refers to the March 21, 2002 attack.  DE 500-11 at 24.

1431980.1

allows Plaintiffs' experts to introduce evidence about the Israeli-Palestinian conflict, then Defendants are entitled to respond.

In their motion in limine, Plaintiffs have excised those quotes from Defendants' experts' reports that might *appear* inflammatory when taken out of context. *See* DE 487 at 2-7. But a review of the context in which those statements were made shows that they are proper rebuttal evidence. For example, Plaintiffs complain that "Dr. Allen asserts that women were 'forced to give birth at checkpoints because Israeli soldiers would not let them through to a hospital' and that Israel had unjustly 'detained' thousands of Palestinians." DE 487 at 3. But Dr. Allen's reference to women giving birth at checkpoints was an example of *media coverage* of human suffering that was common among all of the news outlets covering the Second Intifada. *See* Exh. 1 (Allen Report) at 14-15. Allen's opinion on the nature of media coverage – that "[a]ll Palestinian media, including media not affiliated with the PA, presented coverage of events in similar ways, using similar kinds of language and images" (*id.* at 13) – is relevant to rebut the opinions of Marcus, Eviatar, and Shrenzel that the PA promoted terrorism through the media (*id.* at 12). Similarly, her reference to the unjust detention of Palestinian prisoners explicitly rebuts the opinions of Marcus and Eviatar that all Palestinian prisoners were "terrorists." *Id.* at 8-9. Further, Plaintiffs' claim that Dr. Allen's "use of rhetoric about what she calls 'Zionist forces' raise[s] serious questions about her bias" (DE 487 at 3) (internal citations omitted) ignores the fact that she was citing to a scholar who was referring to "Zionist forces *in 1947-1948*" (Exh. 1 at 19) (emphasis added), when the state of Israel had not yet been founded. In short, Plaintiffs have distorted the meaning of Defendants' rebuttal evidence in an effort to block its admission.

1431980.1

## II.  EVIDENCE OF THE 21 CONVICTIONS IN THE ISRAELI MILITARY COURTS SHOULD NOT BE ADMITTED AT TRIAL; BUT IF THE COURT ADMITS THIS EVIDENCE, THE COURT SHOLD ALSO ADMIT EXPERT TESTIMONY ABOUT THE ISRAELI MILITARY COURTS.

In their motion in limine, Plaintiffs devote *one* paragraph to the admissibility of the Israeli military court (IMC) convictions (*see* DE 487 at 9), *one* paragraph to the importance of those convictions to Plaintiffs' case (*see id.* at 9-10), and *eight* paragraphs to the admissibility of expert testimony about the IMC at trial (*see id.* at 10-12).  In other words, Plaintiffs breeze past the preliminary question of whether this Court should admit the 21 IMC convictions and try to focus the conversation on the scope of expert testimony about the IMC convictions.  But the Court should not admit the IMC convictions in the first place.  Defendants submitted the expert reports of Michael Sfard and Sharon Weill, in part, because they inform the Court's ruling on the admissibility of the 21 IMC convictions.  If the Court excludes the IMC convictions, Sfard and Weill would not testify about the IMC at trial.

As discussed in Defendants' motion for summary judgment, the IMC convictions are not admissible at trial.  *See* DE 497 at 32-37.  First, they are not admissible under Federal Rule of Evidence 803(22), Judgment of a Previous Conviction, because they are not convictions of a United States court.  *See id.* 32-34.  The Supreme Court's holding in *Small v. United States*, 544 U.S. 385 (2005), that the phrase "convicted in any court" of the felon-in-possession statute applies only to domestic convictions (544 U.S. at 387-94) directs this Court to hold that foreign convictions are not admissible under 803(22).  *See* DE 497 at 32-34.  Plaintiffs' reliance on *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414 (E.D.N.Y. 2013) (*see* DE 487 at 9), is unavailing.  *Strauss* is not binding precedent in this jurisdiction.  Moreover, the court in *Strauss* was not asked to consider – and did not consider – whether a foreign court conviction is a conviction within the meaning of Rule 803(22).  *See id.* at 447-48.

6

Even if Rule 803(22) applies to foreign convictions, evidence of the IMC convictions would still not be admissible because, as Sfard and Weill show, "they were rendered 'under a judicial system that does not provide impartial tribunals or procedures compatible with due process of law.'"  *See* DE 497 at 34 (quoting Restatement (Third) of Foreign Relations (1987) § 482(1)(a) (providing grounds for nonrecognition of foreign judgments)).  The Court is required to consider evidence about the fairness of a foreign judicial system in deciding whether to recognize judgments from that system.  *See* Restatement (Third) of Foreign Relations (1987) § 482(1)(a); *see also Chevron Corp. v. Donziger*, 11-cv-00691, DE 1874 at 430 (S.D.N.Y. Mar. 4, 2014) (holding that the Court is required "to pass judgment as to the fairness of the judicial system of another country" when deciding whether to recognize a foreign judgment).  In this case, IMC convictions do not meet the criteria for recognition of foreign judgments because the IMC subjects Palestinians to an unequal judicial system because of their nationality, the judiciary was not independent and impartial during the relevant time period, and defendants in the IMC do not, in practice, receive adequate due process.  *See* DE 497 at 34-36; *see also* DE 500-43; Exh. 2 (Weill Expert Report).

Plaintiffs' claim that evidence of the 21 convictions should be admitted because they "will show through the testimony of their expert, Nick Kaufman . . . and through the admissions of defendants' own expert" that the 21 individuals received due process in their cases (DE 487 at 9) is wrong.  Tellingly, Plaintiffs provide no evidence whatsoever to support their claim.  *See id.* Instead, they state that the "conviction records are central evidence in this case" (*id.*), even though the importance of the evidence to Plaintiffs' case does not make them admissible.  In fact, Plaintiffs cannot show that the 21 IMC defendants received due process.

First, Plaintiffs have provided insufficient information about the cases from which one *could* conclude that a defendant received due process. Plaintiffs produced only the information in the court record for each case. *See* 500-36 at 44:1-5. But the 21 case records are missing records of pre-trial detention hearings, immunity certificates issued to withhold the disclosure of evidence, gag orders, client-attorney prevention orders, and records of trial testimony. *See* DE 500-43 at 29-30; DE 500-44 at 164:25-165:13; 222:25-223:1; 247:12-19. At his deposition, Sfard testified that "these are very partial files." DE 500-44 at 144:11. He referred to the case file of Mohammed Messalah as a "very, very slim file" ( *id.* at 234:2) and to the case file of Uzz-a-din Hamamra as a "very partial file" (*id.* at 285:14).

Most importantly, the court records do not contain the records of the General Security Service (GSS), the Israeli entity that initially interrogated the IMC defendants, even though the defendants' custodial statements were "the primary, and in some cases only, evidence brought by the military prosecution . . . against the suspects." DE 500-43 at 11. As Sfard explained, "we don't have the GSS files, which [are] . . . the flesh and blood [of] the cases." DE 500-44 at 144:12-14. The GSS records are "the basis for understanding what happened . . . in the investigation." *Id.* at 46:21-22. They contain "memoranda from interviews with suspects, documentation of investigation techniques, including sleep deprivation, lengthy interrogations, exposure to psychological or physical threats, solitary confinement, prevention of client-attorney meetings, gag orders, and more." DE 500-43 at 11-12. Without access to the full GSS records, one cannot conclude that the defendants' custodial statements were reliable or that the defendant received due process. *Id.* at 12-13. That is because the GSS may interrogate individuals suspected of state security offenses without access to an attorney for up to 90 days; the GSS has the power to prevent the defendant from meeting with his lawyer for up to 30 days; the GSS may

request and obtain a gag order preventing disclosure of the investigation; the GSS investigator

may invoke the "necessity" defense to use torture or inhumane or degrading treatment against the

suspect; a suspect is informed that his silence may be used against him at trial; and the GSS

employs informants in jail cells to trick suspects into admitting guilt.  *See id.* at 8-11.[3]  Even

Kaufman admitted that he would like to have seen what happened during those interrogations.

DE 500-36 at 87:19-25.

Plaintiffs did not produce any information that would be found outside the court record,

such as the files of the prosecutor or the defense attorney (DE 500-36 at 69:19-25), police reports

(*id.* at 69:16-18), or crime scene photographs (*id.* at 71:17-72:4), even though an assessment of

due process in a criminal case requires consideration of information found *outside* the court

record.  *Martinez v. Ryan*, 132 S. Ct. 1309, 1317-18 (2012) (stating "the right to counsel is the

foundation for our adversary system" and "[i]neffective-assistance claims often depend on

evidence outside the trial record").  In sum, no expert could reliably conclude, based exclusively

on his review of the information in the court record, that any of the 21 defendants received due

process.

Second, despite the limited information in the case files, numerous due process violations

appear in the records of the 21 cases.[4]  *See* DE 500-43 at 27-33; DE 500-44 at 149:17-286:24.

---

[3] Israeli human rights organizations have documented more than 700 allegations of physical abuse by Palestinian defendants between 2001 and 2011.  DE 500-43 at 9.  Carmi Gilon, the former head of the GSS, acknowledged that a Palestinian suspect interrogated in the main GSS detention facility in Jerusalem "'would admit to killing Jesus.'"  *Id.* at 12.

[4] Contrary to Plaintiffs' representation (DE 487 at 10), Sfard "has much to say about the actual convictions in this case."  He devotes a section of his report to due process violations in the 21 cases.  *See* 500-43 at 27-33.  At his deposition Plaintiffs' counsel asked Sfard about each case individually and Sfard provided robust answers to counsel's questions.  *See* 500-44 at 149:17-286:24.  Indeed, of the seven-plus hours that Plaintiffs' counsel examined Sfard (*see id.* at 296:19), roughly half of that time was devoted to discussing the 21 cases.  *See generally id.* at 6:10-296:23.  Sfard even gave Plaintiffs' counsel his detailed notes of his review of the 21 case files, which document due process violations in each of the cases.  *See id.* at 152:5-12, 155:8-157:13.

9

Page limitations prevent a comprehensive discussion of the due process violations in each case so a few patterns will have to suffice.

- In many of the cases, the defendants were subjected to pre-indictment detention for *months* during which time they were interrogated and likely denied access to counsel. *See* DE 500-44 at 157:15-158:9; 174:11-18; 187:16-21; 201:24-202:2; 236:1-9; 254:14-16; 270:10-11; 278:7-9; 280:18-281:2; and 283:23-284:3. A number of the defendants alleged that they were subjected to physical abuse during their interrogations. *Id.* at 183:16-184:13; 201:19-23; 207:2-18; 213:5-9; 226:2-12; 232:18-19. These allegations of physical abuse were not investigated by the IMC, and documentation about the interrogations was not in the case files provided by Plaintiffs' counsel and may not have been disclosed to the defendants' lawyers. *See* DE 500-43 at 31; DE 500-36 at 88:1-4.[5]

- In many of the cases, the defense attorney consented to the admission of the prosecution's evidence, including the incriminating, out-of-court statements of adverse witnesses. DE 500-36 at 163:15-164:9. As a result, the prosecution's witnesses were not required to testify. *Id.* at 164:5-9. In many of the trials, there was no testimony heard at all. *Id.* at 164:10-13. In the case of Moonzer Nur, for example, the defendant was convicted because his attorney consented to the admissibility *and truth* of his client's own incriminating statements. *Id.* at 148:8-149:1 (emphasis added). Kaufman acknowledged that nothing in the court records indicates that the defendant told his attorney to consent to the admission and truth of the statements. *Id.* at 150:8-11. In the case of Pharess Ghanem, where the defendant had not confessed to any crimes, the defense consented to the admission of the incriminating, out-of-court statements of accomplices. DE 500-44 at 238:6-14; DE 500-36 at 173:20-174:2. The defense consented to those statements without reservation, meaning that the defense agreed that the incriminating, out-of-court statements were true. DE 500-36 at 175:23-176:6. As Sfard testified, "I cannot understand how waiving the right to cross-examine a witness that implicates your client is a reasonable thing to do." DE 500-44 at 240:9-11.

- Hilmi Hamash was convicted based on evidence from *his lawyer's other client,* Ahmed Salah. DE 500-36 at 189:2-14 (emphasis added). Indeed, these two defendants and two other defendants were charged in connection with the same incident and yet were represented by the same attorney. *Id.* at 186:8-11. The lawyer representing all four of

---

[5] One of the IMC defendants even alleged in court that he was abused, threatened, and strip-searched by his escort guards on the day that he pled guilty. DE 500-44 at 274:24-275:7. In response, the court simply stated, "'We are convinced that the prison authorities will behave according to the law and assume that what was done, if done, will be examined.'" *Id.* at 275:12-14. Nonetheless, Kaufman writes in his report, "Furthermore, nothing in the materials which I have been supplied suggests that…his guilty plea was anything other than genuine." DE 500-34 at 27.

the defendants was attorney Awdeh, who, according to Kaufman, "effectively admitted malpractice" by "allowing his client, Ahmed Sa'ad, to plead guilty to facts for which…there was no evidence." DE 500-34 at 28; DE 500-36 at 185:7-12. Meanwhile, a different defendant, Kahira Sa'adi, was represented by an attorney who had business relations with one of the judges presiding over her case. DE 500-34 at 13. The judge never asked the defendant if she objected to the conflict of interest. DE 500-36 at 198:9-13.

- In the case of Ibrahim Hamed, the defendant was detained for three years before his trial even began (DE 500-36 at 243:23-25) and for another three years until his trial concluded (DE 500-44 at 220:4). Hamed was convicted as a result of his decision not to testify. DE 500-36 at 218:15-18. In fact, his refusal to testify "was a major factor leading to his conviction." DE 500-34 at 17. The other evidence against the defendant was a "note taken from the investigative interview of a co-perpetrator called Arman." *Id.* at 18. Arman testified at the trial (DE 500-36 at 225:21-23) and did not incriminate Hamed (*id.* at 224:24-225:1). Arman also testified that he was beaten during his interrogation. DE 500-43 at 32. Thus, Hamed was convicted based on (1) his refusal to testify, and (2) the out-of-court statement of an alleged co-conspirator who exculpated Hamed on the stand and claimed that his out-of-court incriminating statement was the product of physical abuse.

Thus, this Court should not admit evidence of the 21 IMC convictions.

Assuming, *arguendo*, that the Court admits evidence of the 21 convictions, Defendants would still be entitled to present the expert testimony of Sfard and Weill about the IMC. Admission of a conviction under Rule 803(22) does not bestow conclusive proof of the facts comprising the conviction. *See* Fed. R. Evid. 803(22) Advisory Committee's Note (1972). Rather, the evidence of the prior conviction is admissible "for what it is worth." *Id.* Indeed, in *Lloyd v. American Export Lines, Inc.*, 580 F.2d 1179 (3d Cir. 1978), the Third Circuit ruled that the opponent of a prior conviction admitted under Rule 803(22) "is free to offer such explanation or mitigating circumstances with respect to the proceedings or judgment as may be deemed admissible by the district court in this connection." *Id.* at 1190.

11

Accordingly, expert testimony about the IMC is admissible to help the jury evaluate the reliability of the IMC convictions. One cannot divorce systemic due process failures from those that are unique to the individual cases, as Plaintiffs suggest. For this reason, Sfard references "the broader institutional due process failures enumerated above" in his discussion of the due process violations in the 21 cases. *See* DE 500-43 at 30. Plaintiffs can hardly disagree; their expert on the 21 case files, Kaufman, provides an opinion about the quality of due process in the IMC before he discusses the individual cases. In fact, the very first line in Kaufman's report states, "I have been requested to deliver an expert opinion on the quality of justice dispensed by the Israeli military courts on the West Bank . . . ." DE 500-34 at 1. This shows that (once again) Plaintiffs are seeking to keep Defendants from presenting the same type of evidence that Plaintiffs seek to present. In sum, Defendants should be permitted to introduce expert testimony about the IMC *if* the Court admits evidence of the 21 convictions.

## III.    DEFENDANTS WILL NOT ARGUE THAT THE JURY SHOULD BASE ITS VERDICT ON THE FOREIGN POLICY CONSEQUENCES OF ITS VERDICT.

Citing parts of two lines from the background section of Glenn Robinson's 69-page expert report, Plaintiffs suggest that Defendants will seek to have the jury base its verdict on the foreign policy consequences of its verdict. *See* DE 487 at 12-13. Defendants will do no such thing; they will ask the jury to base its verdict exclusively on the evidence and lack of evidence in the case.

## IV.    DEFENDANTS WILL NOT CONDUCT PERSONAL ATTACKS ON PLAINTIFFS' CO-COUNSEL BUT THEY WILL EXPOSE THE BIAS OF PLAINTIFFS' EXPERT WITNESSES.

Plaintiffs have asked the Court to prohibit "personal attacks" on their Israeli counsel, Nitsana Darshan-Leitner. *See* DE 487 at 13. Defendants have no intention of conducting personal attacks on Darshan-Leitner. If the Court admits the testimony of Plaintiffs' expert

1431980.1

witnesses, however, Defendants may impeach their credibility with evidence of bias by questioning them about their relationship with Darshan-Leitner and her organization, the Shurat Hadin Israel Law Center (Shurat Hadin).  To the extent Plaintiffs' motion is interpreted to preclude this line of cross-examination, Defendants oppose it.

The Federal Rules of Evidence permit evidence of bias to impeach a witness's credibility.  *See United States v. Abel*, 469 U.S. 45, 51 (1984).  "Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony."  *Id.* at 52.  The relevance of evidence of bias does not change just because the witness is an expert.  "'An expert witness's bias . . . *should* be brought out on cross-examination.'"  *Norwest Financial, Inc. v. Fernandez*, 86 F. Supp. 2d 212, 228 n.15 (S.D.N.Y. 2000) (quoting 4 Weinstein's Federal Evidence § 702.06[8], at 702-59 (2d ed. 1999)) (emphasis added).  In fact, as one district court explained, the principle of bias cross-examination "is of particular import with regard to an expert witness who has no connection with the case other than that one of the parties hired the expert to render an expert opinion about a specific aspect of the case."  *United States v. Foghorn*, 2005 U.S. Dist. LEXIS 21915, at *3 (D.N.M. July 25, 2005).

Evidence of bias includes a witness's relationship to counsel.  *See, e.g., id.* at *2-4.  In *Foghorn*, the defendant sought to preclude the government from cross-examining the defendant's medical expert about the fact that the expert had performed medical tests on the defendant's lawyer more than 20 years earlier.  *Id.* at *2.  Even though the expert did not have any recollection of having conducting the tests, the government claimed that cross-examination about the tests would impeach the expert's objectivity in reaching his conclusions on an unrelated matter in the case.  *Id.* at *2.  The district court allowed the cross-examination because it was

"reluctant to restrict questions that go to bias, which can be some of the most powerful modes of impeachment." *Id.* at *4.

In this case, expert discovery has revealed a close relationship between certain experts retained by Plaintiffs and Darshan-Leitner and/or Shurat Hadin. Dov Weinstein, Plaintiffs' damages expert, has served as an auditor for Shurat Hadin for the past five years and for Darshan-Leitner personally for eight or nine years. *See* Exh. 3 (Weinstein Tr. at 58:1-59:10). He is also the plaintiff in an unrelated lawsuit brought by Shurat Hadin. *Id.* at 12:4-9. Israel Shrenzel, another liability expert, did not even draft his own expert report; rather, he made edits to a draft report that was prepared by a "team of colleagues" at Shurat Hadin. DE 500-31 at 14:9-15:11. At his deposition, he admitted that he reviewed each document "with varying degrees of attention" and that he "relied, to a very great extent, on the *team* which had examined the documents over a very long period of time." *Id.* at 20:2-7 (emphasis added). Thus, Defendants are entitled to elicit evidence about the experts' relationship to Darshan-Leitner and/or Shurat Hadin to expose their bias to the jury.

## V.    DEFENDANTS' FACT WITNESSES SHOULD NOT BE PRECLUDED FROM TESTIFYING AT TRIAL.

Plaintiffs' claim that Defendants did not properly disclose their fact witnesses pursuant to Federal Rules of Civil Procedure 26(a)(1)(A)(i) and 26(e)(1) and should therefore be precluded from presenting their testimony at trial pursuant to Rule 37(c)(1) (DE 487 at 14-17) is wrong. Defendants have complied with their discovery obligations. And even if they had not, exclusion of the witnesses would not be warranted under the circumstances.

To begin with, Plaintiffs' own actions prevented Defendants from disclosing the names of witnesses who might support their defenses at the time of their initial disclosures, pursuant to Rule 26(a)(1)(A)(i). Specifically, Plaintiffs failed to inform Defendants of the factual bases for

Plaintiffs' claims and allegations in their Complaint, in their own initial disclosures under Rule 26(a)(1)(A), and in their responses to Defendants' written discovery requests pursuant to Rules 33 and 34.  Indeed, Plaintiffs disclosed aspects of their claims to Defendants only after the close of fact discovery and even continued to do so after the filing of the proposed Joint Pre-Trial Order ("JPTO").  Thus, Defendants were hardly in a position at the time of their initial disclosures to know all of the individuals who might support their defenses.  Regardless, most of the 21 proffered fact witnesses do not support Defendants' defenses; rather, they would be called as rebuttal witnesses to explain documents offered by Plaintiffs in their case-in-chief *if* the Court admits those documents.

Moreover, Plaintiffs cannot reasonably complain that they were unaware of any of the 21 witnesses until Defendants listed them in Exhibit 1-2 of the JPTO.  On July 27, 2011, Plaintiffs indicated in their initial Rule 26(a)(1)(A) disclosures that they may support their claims with "[t]he transcripts of all depositions in the matter of *Saperstein v. Palestinian Authority*," which includes the deposition transcripts of Salam Fayyad (witness #17 in Exhibit 1-2 to the JPTO) and Jawad Amawi (#25).[6]  Plaintiffs also listed Fayyad (#17) on their list of fact witnesses at trial (*see* Exhibit 1-2 of the JPTO at 3) and Hasan-Abu-Libdeh (#29), Mazen Jadallah (#27), and Fayyad (#17) on their list of deposition designations at trial (*see* Exhibit 2-2 of the JPTO at 6, 8).

Defendants also put Plaintiffs on notice about the witnesses listed in Exhibit 1-2 during fact discovery.  On May 29, 2012, Defendants produced the deposition transcript of Amawi (#25) taken in *Saperstein*, and the deposition transcripts of Amawi (#25), Mohamed Edwan (#26), Jadallah (#27), Majed Faraj (#28), Abu-Libdeh (#29) and Afif Safieh (#30) taken in *Klieman v. The Palestinian Authority*, 04-cv-1173 (D.D.C.).  On December 3, 2012, Defendants

---

[6] Defendants provided reciprocal notice in their Rule 26(a)(1)(A)(ii) disclosures of their intent to use "[a]ny documents identified by Plaintiffs in their disclosures pursuant to Fed. R. Civ. P. 26(a)(1)(A)(ii)."

1431980.1

produced the deposition of Amawi (#25) taken in *Shatsky v. The Syrian Arab Republic*, 02-cv-2280 (D.D.C.).  In addition, the names of Hussein al-Araj (#18) and Fayyad (#17) were disclosed in the deposition of Abu-Libdeh (#29).  *See* Exh. 4 (Abu-Libdeh Tr. at 76, 186).  Radwan El Hilo (#24) was disclosed in the deposition of Jadallah.  *See* Exh. 5 (Jadallah Tr. at 160).

Other names in the JPTO were identified in Defendants' responses to Plaintiffs' interrogatories and document requests.  Specifically,  Mohammad Jibrini (#20) was identified in Defendants' Supplemental and Second Supplemental Objections and Responses to the Blutstein, Carter, Coulter and Gritz Plaintiffs' First Set of Interrogatories (*see id.* at 7); Jibreen Al-Bakri (#35) was identified in Defendants' Second Supplemental Objections and Responses to the Blutstein, Carter, Coulter and Gritz Plaintiffs' First Set of Interrogatories (*see id.* at 7); Maher Dweikat (#33) was identified in Defendants' Supplemental and Second Supplemental Objections and Responses to the Bauer Plaintiffs' Second Set of Interrogatories (*see id.* at 7); Mohammed Al Ghoul (#34) was identified in Defendants' Second Supplemental Objections and Responses to the Bauer Plaintiffs' Second Set of Interrogatories (*see id.* at 7); Sabri Tmaize (#31), Amneh Reehan (#36), and Hilal Abdel-Haq (#37) were identified in Defendants' initial, Supplemental, Second Supplemental, and Third Supplemental Objections and Responses to the Sokolow Family Plaintiffs' First Set of Interrogatories (*see id.*); Ghaleb al-Nobani (#32) was identified in Defendants' Third Supplemental Objections and Responses to the Sokolow Family Plaintiffs' First Set of Interrogatories (*see id.*); and Suleiman al-Deek (#21), Fatmah al Mashni (#22), and Amani Habibeh (#23) were disclosed in documents bearing the Bates ranges 02:006761-6774 and 02:007290-7303.  All of these disclosures occurred prior to the close of fact discovery.[7]

---

[7] As to Khaled Abu Al-Yaman (#19), his rebuttal testimony on the GIS files did not become potentially relevant until the Court ruled that Plaintiffs were entitled to the GIS files in 2013.  *See* DE 327.  Plaintiffs were certainly aware of Al-Yaman by October 2, 2013, when they referred to him in a letter to the Court.

1431980.1

The fact that Defendants disclosed the information by producing deposition transcripts and responding to interrogatories and document requests rather than by filing a supplemental initial disclosure does not constitute a violation of Rule 26.  Rule 26(e)(1)(A)'s requirement that a party "must supplement or correct its disclosure or response in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect" applies only "if the additional or corrective information has not otherwise been made known to the other parties during the discovery process in writing."  Fed. R. Civ. P. 26(e)(1)(A).  Because the additional information was made known to Plaintiffs during discovery, Defendants did not violate Rule 26(e)(1)(A) and the purpose of Rule 26(a)(1)(A)(i) was not thwarted.  *See* Moore's Federal Practice (2013 ed.) § 26.22[4][a][i] ("The purpose of requiring the parties to disclose the identities of their prospective witnesses early in the litigation is to assist the other parties in deciding whom they wish to depose without the necessity of first serving multiple boilerplate interrogatories seeking this information.").

Even assuming, *arguendo*, that Defendants had violated Rule 26(a) or (e), exclusion of the witnesses under Rule 37(c)(1) would not be warranted.  A court may not exclude evidence under Rule 37(c)(1) if the violation "was substantially justified or is harmless."  *See* Fed. R. Civ. 37(c)(1).  Moreover, preclusion of evidence under Rule 37(c)(1) is a "drastic remedy" that should be imposed only "in those rare cases where a party's conduct represents *flagrant bad faith* and *callous disregard* of the Federal Rules of Civil Procedure."  *Ward v. National Geographic Society*, 2002 U.S. Dist. LEXIS 310, at *8 (S.D.N.Y. Jan. 11, 2002) (emphasis in original) (internal quotation marks omitted).  In this case, Plaintiffs' failure to inform Defendants of the factual bases for their claims in a timely manner, Defendants' disclosure of the witnesses during the fact discovery period, and the fact that the witnesses are primarily rebuttal witnesses who will

17

be called to explain certain documents if those documents are admitted at trial show that any violation of Rule 26(a) or (e) was justified, is harmless, and does not represent "flagrant bad faith and callous disregard of the Federal Rules of Civil Procedure." Thus, the Court should not exclude the testimony of the 21 fact witnesses listed in Exhibit 1-2 to the JPTO.

## VI.   DEFENDANTS' EXPERT RICK GASKINS SHOULD NOT BE PRECLUDED FROM TESTIFYING AT TRIAL ABOUT PLAINTIFFS' ALLEGED TOTAL ECONOMIC AND NON-ECONOMIC DAMAGES.

Plaintiffs argue that Rick Gaskins, Defendants' expert in forensic economics, should not be permitted to testify at trial about the opinions he expressed in reports that they claim "cover[] non-economic damages." DE 487 at 17-18. From the outset, Plaintiffs' argument fails because its very premise is flawed: Gaskins did not prepare any reports solely on non-economic damages. *Id.* at 17-18. In one series of reports, Gaskins critiqued the written opinions of Plaintiffs' economic experts, who purported to calculate certain plaintiffs' economic damages (the "Critique Reports").[8] Gaskins also prepared a second series of reports, which address certain plaintiffs' *total* personal damages — which includes both economic and non-economic damages (the "Personal Damages Reports").[9] Thus, Plaintiffs seek to preclude Gaskins from testifying about one aspect of his analysis in the Personal Damages Reports. The Court should deny their request.

---

[8] For example, in one Critique Report, Gaskins found that Plaintiffs' expert had failed to identify the legal model he applied to his analysis, failed to deduct the decedent's personal consumption from the calculation of lost earnings, and applied a reference period that was not based on the life expectancy of the decedent. *See generally* Letter from Rick Gaskins to Brian Hill re: Estate of Benjamin Blutstein / Economic Report of Michael Soudry, MBA (July 15, 2013) (attached as Exhibit 6).

[9] For example, Gaskins stated in one Personal Damages Report that he analyzed "total awards for economic and non-economic damages in cases reasonably like the death of the plaintiff," and provided "indicators for total economic and non-economic damages" based on the relevant data. Letter from Rick Gaskins to Brian Hill re: Death of Benjamin Blutstein at 2-3 (July 15, 2013) (attached as Exhibit 7).

1431980.1

First, contrary to Plaintiffs' assertion, *see* DE 487 at 19, Gaskins is unquestionably qualified to testify about Plaintiffs' total personal damages.  As Gaskins explains in his declaration, he is a forensic economist with thirty-five years of experience "addressing damages for personal injury, wrongful death, employment torts, commercial damages, and business and financial asset valuation."  Exh. 8 (Gaskins Declaration) at § 2.  He does not claim expertise in determining non-economic damages, and he does not opine on the proper amount of non-economic damages for any of the Plaintiffs.  *See id.*  He does, however, have expertise in the analysis and presentation of different sources of economic data.  *Id.*  And this is precisely what he has provided here.  *See id.* § 4.[10]

Second, Gaskins applied a reliable methodology to reliable data.  During discovery, Plaintiffs failed to produce "reasonable documentary evidence and/or relevant supporting expert opinions" to substantiate their damages claims.  *Id.* § 5.  As a result, Gaskins applied "the well-accepted appraisal approach and provided multiple relevant and unbiased indicators of damages to present a range of values for consideration by the jury."  *Id.* § 5.  And all three of the sources on which Gaskins relied — (1) comparable jury verdict data, (2) data on U.S. veterans' disability compensation, and (3) the 9/11 Victim Compensation Fund model — "are widely applied in the course of ordinary forensic economic analysis outside this litigation, and two of them were established and are administered by the U.S. government."  *Id.*  Because Gaskins is qualified to present the opinions set forth in the Personal Damages Reports and because he applied a reliable methodology to reliable data in reaching those opinions, he should be permitted to testify.  *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

---

[10] This conclusion does not change simply because Gaskins is not an expert in each of the specific sources of data used in his analysis.  *See* DE 487 at 19-20.  No forensic economist is required to be an expert in each set of data he or she applies.  *See* Exh. 8 at § 5 ("All three of the relevant sources of indicators of reasonable damages that I used are widely applied in the course of ordinary forensic economic analysis outside this litigation…").

1431980.1

Plaintiffs' remaining arguments are meritless.  They claim that Gaskins' proposed

testimony based on the Personal Damages Reports would invade the province of the jury.  *See*

DE 487 at 18-19.  Yet, Gaskins has not suggested which indicator is "best" or even that a correct

answer necessarily lies between the low and high indicators.  Indeed, his approach respects rather

than invades the province of the jury, which is free to accept, reject or consider it as the jury sees

fit.  *See* Exh. 8 at § 3.1.  Plaintiffs cite a handful of cases for the proposition that the jury is

capable of determining non-economic damages on its own.  Plaintiffs' cases, however, are

inapposite:  none address whether it is appropriate for a forensic economist to present data that

would assist the jury in fairly assessing a plaintiff's total personal damages.[11]

Plaintiffs also argue that Gaskins' testimony about their "non-economic damages" would

be irrelevant, unduly prejudicial, and improper under *Daubert*, DE 487 at 20, because, they

claim, Gaskins has "lowball[ed]" the data he provided to intentionally "slant[]" his analysis.  *Id.*

at 22.  Gaskins has done no such thing.  His practice has been balanced between equal

engagements by plaintiff's counsel and defense counsel.  Exh. 8 at § 2.  His Personal Damages

Reports reflect his belief that "the jury should hear evidence of a range of fair and just damages

for each relevant plaintiff," to avoid "the injustice of unfairly high awards for damages [that]

would be compounded by . . . an automatic punitive trebling of damages."  *Id.* § 3.1.  His data

sources are reliable and unbiased, and are presented in an unbiased manner.  *Id.* § 4.  And he

---

[11] In *Allen v. Bank of Am., N.A.*, 933 F. Supp. 2d 716 (D. Md. 2013), the court held that it was "not convinced that an expert whose opinion is based almost entirely on *asking laypersons how a particular event has affected their enjoyment of life* would provide any assistance to the jury in making that determination for themselves."  933 F. Supp. 2d at 734 (emphasis added).  This is clearly not the methodology that Gaskins applied in the Personal Damages Reports.  *Sullivan v. United States Gypsum Co.*, 862 F. Supp. 317 (D. Kan. 1994), rejected expert testimony "on precise damage calculations for loss of enjoyment of life."  862 F. Supp. at 321.  Again, this is not the testimony Gaskins would provide.  And while Plaintiffs claim that "Mr. Gaskins' testimony about what *other* courts or juries or panels have done in *other* cases would invade the jury's province," DE 487 at 19 (emphasis in original), that is precisely the type of data that the court considered in *Hall v. N. Am. Indus. Servs.*, No. 1:06-cv-0123, 2008 U.S. Dist. LEXIS 22527, at *35-38 (E.D. Cal. Mar. 21, 2008), the other case on which Plaintiffs rely.

1431980.1

provided the reference data for the jury's consideration precisely because Plaintiffs themselves failed to produce information from which their damages could be assessed.  *Id.* §§ 3.2, 5. Gaskins' approach is therefore neither irrelevant nor prejudicial.

Finally, the court should deny Plaintiffs' throw-away request to exclude three of Defendants' proposed trial exhibits that relate to the 9/11 Victim Compensation Fund.  *See* DE 487 at 22.  Plaintiffs do not argue that the exhibits themselves are inadmissible.  Defendants are permitted to use them at trial to the extent allowed by the Federal Rules of Evidence.

## VII.   DEFENDANTS SHOULD BE PERMITTED TO PRESENT EXPERT TESTIMONY ON TERRORISM EXPERTISE IF THE COURT ADMITS PLAINTIFFS' EXPERTS' TESTIMONY.

Plaintiffs' claim that Defendants should not be permitted to present David Miller's expert testimony and the portion of Glenn Robinson's expert testimony that focuses on Plaintiffs' experts (*see* DE 487 at 22) is wrong.   As an initial matter, this Court should consider the opinions of Miller and Robinson in evaluating the admissibility of Plaintiffs' case in chief liability experts.  Should the Court exclude the testimony of Plaintiffs' case in chief liability experts, Defendants would not seek to admit Miller's testimony or the portion of Robinson's opinions that focuses on Plaintiffs' experts.  If the Court admits the testimony of Plaintiffs' case in chief liability experts, Defendants should be permitted to admit the expert testimony of Miller and Robinson.  Plaintiffs do not explain how Miller's and Robinson's proffered testimony is inadmissible under Federal Rule of Evidence 702.  *See* DE 487 at 22-23.  For good reason: the testimony meets the criteria.

First, Miller and Robinson are qualified to provide their expert opinions.  Miller is a professor of sociology at the University of Bath.  Exh. 9 (Miller C.V.) at 1.  He earned a Ph.D. in sociology from Glasgow University and he has published peer-reviewed articles on terrorism

expertise. *Id.* at 1-4. For example, his 2009 article, "The Terror Experts and the Mainstream Media: The Expert Nexus and its Dominance in the News Media," was published in the peer-review journal, *Critical Studies on Terrorism*, and examined the way the press and academia evaluated expertise in terrorism. *Id.* In 2012 he received a Global Uncertainties Leadership Fellowship from the Economic and Social Research Council, the main public social science funding agency in the UK, to further develop his research on terrorism expertise. *Id.*

Instead of evaluating Miller's credentials or publications, Plaintiffs simply assert – without providing any evidence or support – that "there is no such thing as an 'expert on expertise.'" DE 487 at 22. But this assertion is incorrect. Miller would not have received a Ph.D. from a prestigious university, published articles in peer-reviewed publications on the topics in his expert report, and received a public grant to conduct his research if there was "no such thing" as the study of terrorism expertise. Nor is it correct that "[o]nly an expert in the subject matter fields covered by plaintiffs' liability experts could assess their sources or methodology" (*id.*). Federal courts have admitted the expert testimony of academics who criticize the claims made by forensic scientists even though they are not forensic scientists. *See, e.g., United States v. Velazquez*, 64 F.3d 844 (3d Cir. 1995) (reversing conviction because the district court excluded the testimony of a law professor who called into question the reliability and credibility of the government's handwriting expert even though the professor was not a handwriting expert); *United States v. Mitchell*, 365 F.3d 215, 227-229, 251 (3d Cir. 2004) (stating that expert testimony by academics about the reliability of fingerprint evidence is admissible at trial); *but see A.V. By Versace, Inc. v. Gianni Versace S.p.A.*, 446 F. Supp. 2d 252, 268 n.15 (S.D.N.Y. 2006) (excluding expert testimony of professor criticizing field of handwriting analysis).

1431980.1

Robinson is an associate professor in the Department of Defense Analysis at the Naval Postgraduate School in California. DE 500-2 at 1. He previously served for ten years as co-director of the Center on Terrorism and Irregular Warfare. *Id.* He has a Ph.D. in political science and he has published numerous books and articles in peer-reviewed publications on Palestinian politics. *See* 500-3, Exh. A at 1-11. He is also a member of various professional associations in his field and a reviewer of manuscripts for various publications in his field. *See id.* at 14. As such, he is well-positioned to evaluate whether Plaintiffs' experts are viewed in the academic community as experts on Palestinian politics and whether Plaintiffs' experts have relied on the kind of data that "experts in the particular field would reasonably rely on . . . in forming an opinion" (Fed. R. Evid. 703). *See, e.g.,* DE 500-3 at 65 (noting that Levitt relies on documents allegedly seized by the Israeli Defense Forces in 2002 which "are not considered reliable by professionals in my field").

Second, Miller and Robinson employ a reliable methodology in reaching their conclusions. Unlike Plaintiffs' experts, both of them describe their methodology in evaluating Plaintiffs' experts before applying that methodology to the facts. *See* DE 500-1 at 1-2 (discussing four methodological techniques for measuring terrorism expertise); DE 500-3 at 59-62 (discussing five criteria for qualifying as an academic expert on Palestinian politics).

Finally, the proposed testimony would be helpful to the jury. Given the importance of Plaintiffs' terrorism experts to their case, the proposed expert testimony would help the jury evaluate the reliability of Plaintiffs' experts' testimony. Plaintiffs concede the relevance of the proposed testimony by acknowledging that Miller's opinions "might be fodder for cross-examination" (DE 487 at 22). But cross-examination alone would not be helpful because an average juror will be ill-equipped to appreciate the deficiencies in Plaintiffs' experts'

1431980.1

methodologies absent expert testimony about what constitutes a reliable methodology.

Moreover, the proposed testimony would not invade the province of the jury because Miller will

not testify about the accuracy or validity of Plaintiffs' experts' opinions. Rather, he will testify

about how expert knowledge is created in this field and why Plaintiffs' experts' methodologies

do not measure up to accepted standards. *See generally* DE 500-1. Regardless, it is not even

clear that the concern with invading the province of the jury applies to expert testimony about

expert witnesses as opposed to fact witnesses. *See* 6 *Weinstein's Federal Evidence* §

702.06[1][a] (2d ed. 2013) ("The protection of the trier of fact's exclusive power to determine

credibility extends to the use of expert testimony to bolster a *fact* witness, as well as to

impeach.") (emphasis added). Thus, the Court should admit the expert testimony of Miller and

Robinson if the Court admits Plaintiffs' experts' testimony.[12]

## VIII.  DEFENDANTS' EXPERTS' TESTIMONY ADDRESS ISSUES OF FACT THAT SHOULD BE DECIDED BY THE JURY.

Plaintiffs' claim that the expert testimony of Muhammad Dahleh, John Quigley, Michael

Sfard, Raja Shehadeh, and Sharon Weill should be excluded because their opinions touch on

legal issues (*see* DE 487 at 23-25) is wrong.

Defendants will not seek to admit the testimony of Muhammad Dahleh, a Jerusalem-

based attorney, unless the Court holds that Israeli or Palestinian law (as opposed to New York

law) governs the non-federal claims. If the Court so holds, Dahleh's explanation and calculation

of damages under Israeli or Palestinian Law would be proper expert testimony for the jury

because it addresses a factual question, namely, the amount of damages that the plaintiffs should

receive.

---

[12] Should the Court not permit Miller to testify about Plaintiffs' experts, he should be permitted to testify in general about the true markers of terrorism expertise.

Defendants would be entitled to call Professor John Quigley to testify about the history and status of the PA and the PLO if the Court permits Plaintiffs to introduce evidence about the history of the Arab-Israeli conflict, as discussed in Part I (supra).

Defendants will not seek to admit the expert testimony of Sharon Weill about the IMC, unless the Court admits any of the 21 convictions in the IMC. If the Court admits any of the convictions, her opinions are relevant to the jury's evaluation of those convictions, as discussed in Part II (supra).

Defendants would be entitled to present the expert testimony of Michael Sfard and Raja Shehadeh about the settlements, the status of Jerusalem, and the occupation if the Court permits Plaintiffs to present evidence about the political and social conditions of the Second Intifada, as discussed in Part I (supra).

## **CONCLUSION**

For the reasons stated above, the Court should deny Plaintiffs' motion in limine.

June 6, 2014                         Respectfully Submitted,

/s/ Brian A. Hill
Brian A. Hill
Mark J. Rochon
Laura G. Ferguson
Michael J. Satin
Dawn E. Murphy-Johnson
MILLER & CHEVALIER CHARTERED
655 15th Street, NW, Suite 900
Washington, DC  20005-6701
(202) 626-5800 [tel]
(202) 626-5801 [fax]
bhill@milchev.com [email]

*Counsel for Defendants the Palestinian Authority and the Palestine Liberation Organization*

1431980.1