# EXHIBIT 1

## Expert report by Dr. Lori Allen

### I.    Introduction

I am an internationally acknowledged expert in Palestinian politics and society, having developed this expertise as a social anthropologist over the course of fifteen years in this field.  I have been in full-time employment at the internationally-renowned University of Cambridge since 2007, in addition to being a visiting professor at the University of Vienna in Austria.  I have also held prestigious post-doctoral fellowships at Harvard and Brown Universities, and I have been awarded numerous other fellowships that have recognized and supported my research and writing.

I am University Lecturer in Contemporary Middle Eastern Society and Politics in the Department of Middle Eastern Studies at the University of Cambridge.  I research and teach on contemporary Middle Eastern issues, with a focus on Palestinian society, history and politics.  I am also a Fellow at King's College, Cambridge, and have been affiliated with the Issam Faris Institute for Public Policy and International Affairs at the American University of Beirut.  I hold a PhD in Anthropology from the University of Chicago.

I have been awarded numerous prestigious grants and fellowships supporting my research in the United States and United Kingdom.  In the UK these have included a Fellowship from the Arts and Humanities Research Council (AHRC), as well as grants from the British Academy, the Newton Trust, the Nuffield Foundation, the Thriplow Charitable Trust, and the Cambridge Humanities Research Grant scheme. In the United States, I have received fellowships and grants from the United States Institute of Peace, the Harry Frank Guggenheim Foundation, the Woodrow Wilson National Fellowship Foundation, The Brookings Institution, Social Science Research Council (SSRC) Program on Global Security and Cooperation,  Social Science Research Council (SSRC) Program on the Middle East and North Africa – Dissertation Research Fellowship, the Wenner Gren Foundation for Anthropological Research, the Palestinian American Research Center, Fulbright-Hays Doctoral Dissertation Research Abroad Fellowship, the Council for Advanced Studies in Peace and International Cooperation, and the National Science Foundation.  I was also awarded a Fellowship to study Arabic at the University of Cairo, Center for Arabic Studies Abroad.

I have been conducting ethnographic fieldwork in the occupied Palestinian territories since 1997.  I lived almost continuously in the West Bank from November 2000 until February 2003, during the height of the second intifada, while I conducted research for my doctoral dissertation.  I conducted additional research trips of one to three months to the occupied Palestinian territories between 2003 and 2009.  I am fluent in spoken Palestinian Arabic, the language in which I conducted the vast majority of my research, and I am competent in reading Modern Standard Arabic, the language of news media in the occupied territories.

My book, *The Rise and Fall of Human Rights: Cynicism and Politics in Occupied Palestine* (Stanford: Stanford University Press, 2013), is an analysis of Palestinian human rights workers and institutions, covering the period from 1979 through the present.

My dissertation, titled S*uffering through a National Uprising: The Cultural Politics of Violence, Victimization and Human Rights in Palestine,* is an ethnography of Palestinian politics and society during the second intifada. My methodology for this research included: working with and interviewing people involved in human rights work, including the Palestinian Prisoners' Club (*Nadi Al-Asir*); interviewing victims of human rights violations and their families; participant-observation and interviewing people involved in community based organizations; interviewing people involved in commemorating Palestinians killed by Israeli forces; observing commemorative ceremonies; interviewing PA officials and officials of political factions; interviewing people who worked in local news media production; and collecting and reviewing local news media.

A complete list of my publications is available in my curriculum vitae, attached hereto as Exhibit A.

I have provided numerous services to the professional academic community worldwide. I am a member of the Arts and Humanities Research Council (UK) Peer Review College and the Wenner-Gren Foundation for Anthropological Research Review Panel. I am on the Academic Advisory Committee of the Centre for Gender Studies, University of Cambridge. I am also on the board of the Middle East Studies section of the American Anthropological Association. I have acted as scientific referee providing academic assessments of research grant applications, book, and article manuscripts for: *Acta Sociologica, American Anthropologist, American Ethnologist, Anthropology and Humanism, Arab Studies Journal,* Churchill College, Cambridge, *City and Society, Comparative Studies in Society and History, Critical Studies on Terrorism, Cultural Anthropology, differences, Environment and Planning A,* Economic and Social Research Council UK*, Feminist Review,* Fulbright, Girton College, Cambridge, *Humanity, Journal of Politics, Religion and Ideology, Journal of the Royal Anthropological Institute, Journal of Urban Affairs, History Journal, Home Cultures, International Journal of Middle East Studies, National Identities,* Oxford University Press, University of Pennsylvania Press, Pembroke College, Cambridge, *PoLAR,* Pluto Press, SSHRC of Canada, *South Atlantic Quarterly,* University of Vienna, and Zed Books.

I have been a member of the Committee of Management for the Council for British Research in the Levant (CBRL), UK, and a member of the Editorial Committee of *Middle East Report*.

I have been invited to give lectures at a range of academic institutions internationally, including: The Issam Fares Institute for Public Policy and International Affairs, American University of Beirut, Lebanon; American Studies Institute, Seoul National University, South Korea; Middle East Research Group, King's College London; Institute for Social Anthropology, Austrian Academy of Science, Vienna, Austria; Gender Studies Centre, University of Cambridge, UK; Center for Research in the Arts, Social Sciences and Humanities, University of Cambridge, UK; Dept. of

Anthropology, Duke University, USA; Student Politics Society, University of Cambridge, UK; Dept. of Anthropology, University of Kent, UK; University of California-Los Angeles Center for the Study of Women, USA; Centre for the Advanced Study of the Arab World, University of Edinburgh, UK; London Middle East Institute, School of Oriental and African Studies (SOAS), UK; Robert Schuman Centre for Advanced Studies, European University Institute, Florence, Italy; The Arabic Society, University of Cambridge, UK; Harvard University, Cambridge, MA, USA; Dept. of Anthropology, University of Illinois, Urbana-Champaign, IL, USA; Center for Middle East Studies, Law and Society Program, University of California, Santa Barbara, Santa Barbara, CA, USA; Dept. of Anthropology, Reed College, Portland, OR, USA; The Institute for Comparative and International Studies, Emory University, Atlanta, GA, USA; Middle East Studies Association, Washington, DC, USA; Brown University, Providence, RI, USA; University of Texas at Austin, Austin, TX, USA.

I have presented my research at international conferences and workshops, including those hosted by: Fletcher School of Law and Diplomacy, Tufts University, Boston, MA, USA; European University Institute, Florence, Italy; the American Anthropological Association, in San Francisco, CA, New Orleans, LA, Philadelphia, PA, San Jose, CA, Washington, DC, Chicago, IL, USA and Montreal, Canada; Center for Research in the Arts, Social Sciences and Humanities, University of Cambridge, UK; University of Sussex, UK; University of Vienna, Austria; Centre for Governance and Human Rights Research Group Seminar, University of Cambridge, UK: School of Oriental and African Studies (SOAS) Palestinian Society, UK; Max Planck Institute for Social Anthropology, Halle, Germany; George Washington University, Washington, DC, USA; Harvard University Academy for International and Area Studies, Cambridge, MA, USA; Council for British Research in the Levant, The British Academy, UK; Dept. of Middle Eastern Studies, University of Cambridge, UK; Centre for the Advanced Study of the Arab World, University of Edinburgh, UK; Middle East Studies Association, Boston, MA, Anchorage, AK, USA; Society for Cultural Anthropology, Milwaukee, WI; Urban Geographies of Conflict Workshop, University of Texas at Austin, TX, USA; American Ethnological Society, San Diego, CA, USA; Middle East Workshop, Columbia University, New York, NY; Semiotics Workshop, University of Chicago, Chicago, IL, USA; Wenner-Gren Foundation, New York, NY, USA; New School for Social Research, New York, NY, USA; CASPIC MacArthur Scholars' Conference, University of Chicago, Chicago, IL, USA; Reconceptualizing Torture Conference, University of Chicago, Chicago, IL; "The Uncertain State of Palestine: Futures of Research," University of Chicago, Chicago, IL, USA; and Yale University, New Haven, CT, USA.

In preparing my report, I have reviewed the Expert Reports of Alon Eviatar, Itamar Marcus, and Israel Shrenzel. I also reviewed the deposition of Jawad Amawi taken in *Saperstein v. Palestinian Authority*, 04-Civ-20225 (S.D. Fla.). Finally, I have reviewed Arabic language documents containing statements by PA officials, along with English translations thereof. In addition to the materials cited in the report, I have also reviewed the materials listed in Exhibit B.

I have never given expert testimony in a court case.

3

I am being compensated at a rate of US $ 200 per hour for my time spent on this matter. My compensation does not depend on my opinion in this matter or the outcome of this matter.

I may use as an exhibit in this case any of the documents cited in my report, or translations thereof.

## II.    Summary of Opinions

My opinion is that:

1.  The Palestinian Authority did not control the public discourse in the occupied Palestinian territories and was not responsible for shaping attitudes and sentiments regarding resistance to the Israeli occupation.

2.  The Palestinian Authority did not encourage its employees to engage in acts of violence against Israeli civilians, nor did its policies toward prisoners and martyrs reflect support for, or encourage acts of violence against Israeli civilians. Palestinian violent resistance to the Israeli occupation would have occurred in the absence of the Palestinian Authority as a reaction to the Israeli occupation.

3.  The Palestinian Authority was not responsible for suicide bombings, which were actions undertaken by individuals with their own motivations.

4.  The reports of Eviatar, Marcus, and Shrenzel present an overly simplistic account of the role of the Palestinian Authority in Palestinian society. These reports vastly over-estimate the influence of the Palestinian Authority on the behavior of Palestinians during the second intifada and do not take into account the variety of motives that Palestinians had for engaging in acts of violence during the second intifada.

## III.    Grounds for My Opinions

### A.    Analysis of Key Terms

The arguments advanced by Eviatar, Marcus, and Shrenzel rely heavily on incorrect definitions and imprecise key terms, including: a) martyrdom, b) terrorism, and c) the second intifada. Before turning to the grounds for my opinion, it is important to clarify key terms, and to explain the overall context in which the second intifada (2000-2005) occurred.

### a) Martyr/ Martyrdom

Palestinians referred to anyone who was deemed to have died as a result of the Israeli occupation as a martyr (*shahid*, in Arabic).[1] The Arabic term is derived from the root

---

[1] Lori Allen, "Martyr Bodies in the Media: Human Rights, Aesthetics, and the Politics of Immediation in the Palestinian *Intifada*." *American Ethnologist* (2009), 36(1):161-

*sh-h-d*, which refers to "witnessing." It indicates that the martyr is a witness to the truth of their faith. In the Palestinian context, this refers to both religious and political belief, including a faith in the rightness of their claims for a liberated national homeland. Children killed by Israeli forces while sitting in school were referred to as martyrs, just as were people who were killed while conducting militant operations against Israeli forces or conducting suicide operations.[2] Even Palestinian journalists killed while reporting would be considered martyrs: "Journalists who are killed on the job are considered martyrs to the national struggle, albeit ones who are killed for the 'truth' rather than any particular party or faction."[3] Palestinians referred not only to Palestinians as martyrs but also to foreigners killed by the occupation, including Harold Fischer, a German doctor,[4] Rachel Corrie, an American student,[5] Thomas Hurndall, a British student,[6] and James Miller, a British filmmaker,[7] all of whom were killed during the second intifada. The term is a label of respect that acknowledges the sacrifice made by someone who was killed in a nationalist context. As one anthropologist who conducted fieldwork in the occupied territories during the second intifada reported: "One cameraperson told me he filmed martyrs' funerals for much longer into the second Intifada than his editor considered them to be newsworthy. He did this out of respect for families he knew, who viewed his presence as an expression of social solidarity."[8] Calling someone a martyr is a form of reverence and

---

180, pg. 175, n.37; Nadia Taysir Dabbagh, *Suicide in Palestine: Narratives of Despair*. C Hurst & Co. Publishers Ltd, 2005, pg. 287.

[2] *See* the *Guardian* report on the shooting death of an 11-year-old girl, critically wounded by Israeli gunfire while she was sitting in her UN school in Gaza. Associated Press, "Girl, 11, Shot in Gaza School." 13 October 2004, *The Guardian*. Available at:
http://www.guardian.co.uk/world/2004/oct/13/israelandthepalestinians.schoolsworldwide

[3] Amahl A. Bishara, *Back Stories: U.S. News Production and Palestinian Politics*. Stanford: Stanford University Press, 2012, pg. 158. Arab journalists of other nationalities killed while reporting have also been referred to as martyrs. http://www.pbs.org/newshour/updates/baghdadreporters_04-08-03.html

[4] http://news.google.com/newspapers?nid=1755&dat=20001116&id=8oAfAAAAIBA J&sjid=dn8EAAAAIBAJ&pg=6830,1478881

[5] http://www.motherjones.com/politics/2003/09/death-rachel-corrie

[6] http://unispal.un.org/unispal.nsf/e9abb7dfb6e319c90525675900535dba/2f19177e9b2 f6ca285256ea1005b9649?OpenDocument, http://news.bbc.co.uk/1/hi/world/middle_east/4625355.stm

[7] http://news.bbc.co.uk/1/hi/world/middle_east/3010767.stm

[8] Bishara, *Back Stories: U.S. News Production and Palestinian Politics* at 124.

recognition,[9] and a show of support for the families of the departed.[10]  Marcus is therefore incorrect in defining "shahid" as "Holy Islamic Martyrs, a term only used for those who have accomplished a supreme positive Islamic act" (Marcus, pg. 32).

Marcus incorrectly states that "Palestinian Intifada culture" focused on Islamic beliefs about martyrdom, and he misinterprets a poem about martyrdom as relating to the belief that a martyr is granted 72 maidens in Paradise, "and therefore Palestinian Martyrdom is a 'wedding'" (Marcus, pg. 30).  Marcus has made an incorrect inference about this literary reference.  In fact, the reference to Palestinian men who have been "martyred" as grooms at a wedding comes from a long tradition of Palestinian nationalist art, poetry, and other discourse, that depicts the national homeland as a lover or bride.  The wedding therefore is not about virgins, but the homeland. [11]

There is no necessary connection between Islam and terrorism or suicide bombings.  This assertion is supported by University of Chicago political scientist, Richard Pape, who argues that, worldwide, only 43% of suicide bombers between 1980 and 2003 were religious.[12]  Other scholars have pointed out that secular groups began to refer to martyrdom and jihad partly in response to Islamic groups' influence in resistance to the occupation.[13]  As political sociologist Robert Brym has aptly noted "[s]uicide bombing, despite its frequent religious trappings, is fundamentally the expression of a territorial dispute."[14]

Shrenzel is incorrect in defining *shuhada*, the plural of the Arabic word for martyr, as "a word meaning 'holy martyrs'" (Shrenzel, pg. 13), since the word "holy" would suggest that the term is derived from or related to a solely religious context.  The term is in fact fundamentally a political term, even if it draws on religious imagery.  The

---

[9] Lori Allen, "The Polyvalent Politics of Martyr Commemorations in the Palestinian Intifada." *History and Memory* (2006), 18(2):107-13, pp. 130-131, n.2.

[10] Lori Allen, "Palestinians Debate 'Polite' Resistance to Occupation," *Middle East Report* 225: 38-43, pp. 34, 36. Available at: www.merip.org/mer/mer225/225_allen.html

[11] Lori Allen, "Mothers of Martyrs and Suicide Bombers: The Gender of Ethical Discourse in the Second Palestinian Intifada." *Arab Studies Journal* (2009), 17(1): 32-61, pg.14; Kamal Boullata, "Artists Re-member Palestine in Beirut." *Journal of Palestine Studies* (2003), 32(4), Summer: 22-38, pg. 27.

[12] Richard A. Pape, *Dying to Win: The Strategic Logic of Suicide Terrorism*. New York: Random House (2005), pg. 210.

[13] Ilana Feldman, review of *The Making of a Human Bomb: An Ethnography of Palestinian Resistance* by Nasser Abufarha *PoLAR: Political and Legal Anthropology Review*, 33(2): 389–391, November 2010, pg. 390.

[14] Robert Brym, "Six Lessons of Suicide Bombers." *Contexts* 6(4): 40-45, pg. 41. Available at: http://projects.chass.utoronto.ca/soc101y/brym/six.pdf.

view of martyrdom in the occupied Palestinian territories is very similar to that
common in Europe during the First and Second World Wars, when dead soldiers were
likened to redeemed martyrs.[15]

Eviatar's use of the term—"shahid martyrs (that is, terrorists)" (Eviatar, pp. 26, 32)—
is ideologically driven rhetoric, rather than an analytically useful or scientifically
accurate term.  Contrary to Eviatar's usage (pp. 61-62) "martyr" is not synonymous
with suicide bomber.

Although suicide bombers were a specific kind of "martyr" because these people
engaged in violent acts that were expected to result in their own death, such acts were
not considered by all to be so distinct from other forms of resistance.  As one
anthropologist has noted, given the extreme risk to physical safety of the general
population living under occupation, and the high rate of casualties among youth
participating in stone-throwing demonstrations, "[t]here is already a suicidal tendency
exhibited in those practices well before they materialize in the form of suicide
bombing."[16]

*b) Terrorism*

The use of the words "terror" and "terrorism" in the Plaintiffs' expert reports is
consistently vague and undefined.  For example, Marcus and Shrenzel refer to the
entirety of the second intifada as "the Palestinian terror campaign" (Marcus, pg. 14;
Shrenzel, pg. 3), and equate any Palestinian resistance to Israeli occupation to "terror"
(Marcus, pg. 15).  Eviatar uses the word "terrorism" and "terrorist operative" many
times but does not define it.

Because the words "terror," "terrorism," and "terrorist" can be used in emotionally
charged, imprecise ways that conflate many different kinds of action under one label,
and because that usage is intended to delegitimize those actions, — a phenomenon
that has been the subject of various academic studies [17] — it is preferable to use the
clear definition provided in the report of the Mitchell Commission, officially called
the Sharm el-Sheikh Fact-Finding Committee, which was headed by former United
States Senator George Mitchell

---

[15] George L. Mosse, *Fallen Soldiers: Reshaping the Memory of the World Wars*. New
York: Oxford University Press, 1990, pp. 35-36, 80.

[16] Ghassan Hage, "'Comes a Time We Are All Enthusiasm': Understanding
Palestinian Suicide Bombers in Times of Exighophobia," *Public Culture*, 2003,
15(1):65-89, pp. 77-78.

[17] http://www.ksk.edu.ee/wp-
content/uploads/2012/12/KVUOA_Toimetised_14_4_rene_vark.pdf

"Terrorism involves the deliberate killing and injuring of randomly selected noncombatants for political ends. It seeks to promote a political outcome by spreading terror and demoralization throughout a population."[18]

The benefit of this definition is that it distinguishes between, on the one hand, acts that were performed deliberately to harm non-combatants for political ends, and on the other hand, legitimate acts of resistance against armed members of an occupying army. It is a widely shared understanding among Palestinians living in the occupied territories that armed resistance to occupation is their right. Much of the resistance during the second intifada was directed at the Israeli military rather than civilians.[19] There is no explicit prohibition under international law that makes armed struggle for self-determination illegal.[20] Armed action, and in particular armed action against an occupying army, is therefore not terrorism, contrary to Eviatar's assertion (pp. 48, 74).

The Eviatar, Marcus, and Shrenzel reports use "terrorism" in an overly broad and simplistic way. In the logic of Eviatar's report, for example, anyone wanted by Israel for what Israeli authorities declared were security reasons is assumed to be guilty of "terrorism" (see Eviatar, pp. 56, 61). Eviatar's report provides no specific evidence that all of these individuals "wanted" by Israel were guilty of "terrorist activity," rather than actions against the Israeli occupying army. Given the fact that children as young as twelve-years-old are "wanted" by Israel,[21] and that Israel arrests and detains Palestinians without charge,[22] and given that confessions are often extracted from Palestinians as a result of their being tortured and intimidated,[23] it is not enough to assume that any Palestinian wanted or imprisoned by Israel is actually guilty of "terrorism."

The reports of Marcus (e.g., pg. 54) and Eviatar (pg. 29) similarly dismiss all Palestinian prisoners as "terrorists." Since so many Palestinians were held in Israeli prisons as "administrative detainees" who had not been charged, it is impossible to claim with any certainty what, if any, offense many Palestinians in Israeli prisons may have committed. According to the Israeli human rights organization, B'Tselem, between December 2001 and December 2002, there was a sharp, three-fold increase in the number of Palestinians detained in Israeli prisons, from 1,023, to 3,076. This number included 34 administrative detainees on 5 December 2001, and 960

---

[18] http://2001-2009.state.gov/p/nea/rls/rpt/3060.htm

[19] Julie M. Norman, *The Second Palestinian Intifada: Civil Resistance.* Routledge, 2010, pg. 71.

[20] http://www.diakonia.se/sa/node.asp?node=3144

[21] http://www.btselem.org/detainees_and_prisoners/minors_in_custody

[22] http://www.btselem.org/topic/administrative_detention

[23] http://www.btselem.org/torture/20111213_hamidah_verdict

administrative detainees by 8 December 2002.[24]  Thousands more Palestinians were detained in sweeping arrest raids.  The arrest of more than 8,500 Palestinians between 27 February and 20 May 2002 included many who were held incommunicado and in degrading conditions, according to Amnesty International.[25]  Israeli Military Order No. 378 allows Palestinians to be arrested "without warrant and without 'reasonable suspicion' that a person has committed any criminal offence."[26]  Given that Israeli officials involved with the military courts during the first intifada admitted that "legal compromises" were made "in order to contend with the deluge of arrests,"[27] it is likely that similar "compromises" were being made while processing over 8,000 prisoners during the second intifada.  The absence of due process guarantees for Palestinian detainees means that many Palestinians imprisoned by Israel during the second intifada may have been innocent of any offense, or imprisoned for exercising their internationally-recognized right to resist occupation.  A Palestinian prisoner is not synonymous with "terrorist."  Moreover, armed struggle against an occupying army is not terrorism, contrary to Eviatar's assertions (pg. 46).

As Richard Falk, Professor of International Law and Practice Emeritus at Princeton University has observed, "The question of the Palestinians' legitimate rights [of resistance] under current conditions tends to be avoided in almost all discussions of recent phases of the Israeli-Palestinian encounter."[28]  Falk notes that the focus of discussion has failed to take "into account the highly problematic relationship that has evolved over the years between the occupying state and the occupied people.  At issue is the substantive question of the right of a people living for decades under such oppressive circumstances to act in opposition."[29]  Palestinians—like activists opposing the system of apartheid in South Africa and resistance fighters opposing the Nazi regime in France—have an internationally recognized right to fight against oppression through the use of peaceful protests, passive resistance, and armed uprising.

This principle of the legitimacy of resistance to occupation was recognized by the United Nations General Assembly in the 1960 Declaration on the Granting of Independence to Colonial Countries and Peoples wherein it declared the principle that

---

[24] http://www.btselem.org/statistics/detainees_and_prisoners

[25] http://www.amnesty.org/en/library/asset/MDE15/074/2002/en/cad64b36-d844-11dd-9df8-936c90684588/mde150742002en.html

[26] http://www.amnesty.org/en/library/asset/MDE15/074/2002/en/cad64b36-d844-11dd-9df8-936c90684588/mde150742002en.html

[27] Lisa Hajjar, *Courting Conflict: The Israeli Military Court System in the West Bank and Gaza.* Berkeley: University of California Press, 2005, pg. 11.

[28] Richard Falk, "Azmi Bishara, the Right of Resistance, and the Palestinian Ordeal." *Journal of Palestine Studies* 31(2) (Winter 2002):19-33, pg. 20.

[29] *Id.*

"forcible resistance to forcible denial of self-determination…is legitimate."[30]
Subsequently, in December 1973, the UN General Assembly adopted Resolution
3103 which provides that "colonial peoples have the inherent right to struggle by all
necessary means at their disposal against colonial Powers and alien domination in
exercise of their right of self-determination."[31]  The General Assembly in 1974
declared the applicability of those principles specifically to the Palestinian people
when it recognized in Resolution 3236 "the right of the Palestinian people to regain
its rights by all means in accordance with the purposes and principles of the Charter
of the United Nations."[32]  As Eviatar's report notes (pg. 51), Palestinians are aware of
this legitimate right to resist occupation and exercise that right through a variety of
forms.

### c) Second Intifada

Contrary to the claim that the second intifada was a "wave of terrorist incidents in
Israel and in the Territories" (Shrenzel, pg. 3) and "was synonymous with acts of
killing civilians" (Marcus, pg. 23), the term was used by Palestinians to refer to acts
of resistance against Israeli occupation.  The word comes from the Arabic root that
means a "shaking off."

The peace process initiated in Oslo in 1993 did not result in Palestinians' hoped for
independence.  The lack of improvement and dashed hopes, in combination with the
daily frustrations and humiliations suffered by Palestinians living under occupation,
as well as the stifled economy and high rate of unemployment, converged to ignite the
intifada that began in late September 2000, often referred to as the second intifada.
As the internationally recognized Israeli journalist Amira Hass has argued, the second
intifada occurred because "the Palestinian public was tired of this situation of
occupation."[33]

The second intifada initially consisted of demonstrations and clashes across the West
Bank and the Gaza Strip at locations with a large Israel Defense Forces ("IDF")
presence, such as checkpoints and religious sites. [34]  As in the previous intifada, the
IDF responded with rubber-coated steel bullets and live ammunition.  As the

---

[30] *Id. at* 27.

[31] The Resolution is entitled, "Basic Principles of the Legal Status of Combatants
Struggling Against Colonial and Alien Domination and Racist Regimes." Available
at: http://daccess-dds-
ny.un.org/doc/RESOLUTION/GEN/NR0/281/75/IMG/NR028175.pdf?OpenElement

[32] http://www.un.org/ga/search/view_doc.asp?symbol=A/RES/3236%28XXIX%29&L
ang=E&Area=RESOLUTION

[33] http://www.haaretz.com/print-edition/opinion/they-don-t-see-the-occupation-
1.67668

[34] http://unispal.un.org/unispal.nsf/5ba47a5c6cef541b802563e000493b8c/4a5fcb3241
d55a7885256a1e006e75ad?OpenDocument

distinguished jurists acting as investigators on the United Nations Human Rights Inquiry Commission stated in their report in 2001: "The Palestinians associate casualties on their side mainly with what they view as Israeli/IDF overreaction to these demonstrations. It was the clear judgment of the Commission that Palestinian casualties were indeed mainly associated with these direct encounters, but that, to the best of our knowledge, the IDF, operating behind fortifications with superior weaponry, endured not a single serious casualty as a result of Palestinian demonstrations and, further, their soldiers seemed to be in no life-threatening danger during the course of these events."[35] These demonstrations involved unarmed, mostly young men, who threw stones by hand or sling-shot, at armed, helmeted IDF soldiers positioned behind army jeeps.

As the Mitchell Commission Report noted, "for the first three months of the current uprising, most incidents did not involve Palestinian use of firearms and explosives." In its report, the Commission recognized "the humiliation and frustration that Palestinians must endure every day as a result of living with the continuing effects of occupation, sustained by the presence of Israeli military forces and settlements in their midst."[36] These frustrations were, in fact, the root cause of the second intifada.

As noted, Palestinian demonstrations that occurred during the first months of the intifada were largely non-violent. But as the IDF fired 1.3 million bullets in the West Bank and Gaza Strip during the first few weeks of the second intifada, deliberately "fann[ing] the flames" and killing more than 270 Palestinians in the first three months,[37] this prompted more armed confrontations between Israeli forces and Palestinian gunmen. Israel responded to Palestinian small arms fire with tank shells and artillery, including the shelling of civilian neighborhoods in the West Bank and Gaza. With the conflict escalating and Israeli violence against Palestinian civilians increasing, Palestinian suicide attacks against Israeli civilians, settlers and soldiers became more common. As Israeli scholar Neve Gordon has demonstrated, Israeli assassinations of suspected militants and bystanders, which were blatant violations of human rights principles, occurred with growing frequency, with 150 killed by this method in three-and-a-half years.[38] Israel set up checkpoints and roadblocks cutting off the free flow of people and goods between Palestinian areas. A period of massive invasions into Palestinian areas began in 2002, one result of which was the destruction of all but two Palestinian ministries, numerous police stations, and the

---

[35] http://unispal.un.org/UNISPAL.NSF/0/4A5FCB3241D55A7885256A1E006E75AD

[36] http://2001-2009.state.gov/p/nea/rls/rpt/3060.htm

[37] Neve Gordon, *Israel's Occupation.* Berkeley: University of California Press, 2008, pp. 198.

[38] Neve Gordon, "Rationalising Extra-Judicial Executions: The Israeli Press and the Legitimisation of Abuse." *International Journal of Human Rights* (2004), 8(3): 305-324, pg. 308. http://www.israeloccupation.info/files/Assassinations.pdf

total or partial destruction of 65 Non-Governmental Organizations ("NGOs").[39] This was the motivating context for all the forms of resistance to Israeli occupation that took place during the second intifada.

The goal of the second intifada for Palestinians was not "killing civilians," nor did the majority of Palestinian activity consist of the deliberate killing and injuring of randomly selected non-combatants. The primary goal of the second intifada was ending the occupation, its humiliations and frustrations, and achieving independence.

Among the activities that Palestinians engaged in to resist the occupation during the second intifada were also many non-violent actions,[40] including street demonstrations, strikes, peaceful marches by children, literary production — such as plays and movies expressing Palestinians' rejection of the occupation and explaining its injustices—museum exhibits, human rights campaigns, and efforts to lobby international diplomats and activists. This non-violent resistance followed on a long history of Palestinian civil resistance activities.[41]

    *B.*    *The Palestinian Authority Did Not Incite Terrorism.*

In their reports, Eviatar, Marcus, and Shrenzel opine that the Palestinian Authority had a controlling role in creating "the public atmosphere that supported terrorist actions" (Eviatar, pg. 5) by glorifying militancy and martyrdom through 1) the media, 2) education, 3) the public discourse of the political leadership, and 4) public religious discourse. In my opinion, the Palestinian Authority did not control the public discourse in the occupied Palestinian territories. The PA's messaging reflected the dominant attitudes and sentiments of the public, and was not responsible for shaping those attitudes and sentiments. Moreover, the PA was not responsible for instigating and encouraging violence during the intifada. Palestinian violent resistance to the Israeli occupation would have occurred in the absence of the Palestinian Authority as a reaction to the Israeli occupation.

        1.   The PA Did Not Incite Violence Through the Media.

The first main claim of the Eviatar, Marcus, and Shrenzel reports is that the Palestinian Authority glorified terrorism (Eviatar, pp. 5, 14, 15, 64-67), was involved with "the ongoing direction of the terrorist offensive" (Shrenzel, pp. 5-6), and promoted terrorism "through the media that the Palestinian Authority owns and completely controls" (Marcus, pg. 14), in broadcasts that "included many close up

---

[39] Lori Allen, "Getting By the Occupation: How Violence became Normal during the Second Palestinian *Intifada*." *Cultural Anthropology* (2008), 23(3):453-487, pp. 454-455.

[40] *See* Norman, *The Second Palestinian Intifada: Civil Resistance*; http://www.foreignpolicy.com/articles/2011/05/18/palestines_hidden_history_of_non violence.

[41] Joost R. Hiltermann, *Behind the Intifada: Labor and Women's Movements in the Occupied Territories.* Princeton, NJ: Princeton University Press, 1991.

pictures of dead and injured Palestinians, as well as pictures of Palestinians attacking Israelis with stones and weapons" (Marcus, pg. 26).

This argument can be refuted with four facts: 1. All Palestinian media, including media not affiliated with the PA, presented coverage of events in similar ways, using similar kinds of language and images. Across both Palestinian and non-Palestinian media there was coverage of all victims of the occupation, including martyrs, political prisoners, fighters, and others who had been harmed by Israeli occupation measures. 2. Sources other than news media circulated similar images and stories about Palestinian victims of Israeli violence, including publications by human rights NGOs, political demonstrations, martyr funerals and other commemorative ceremonies, and martyr posters. 3. These various media represented the suffering of victims of the occupation as both a form of solidarity with victims and their families, and as a way of making a political argument about the injustices and brutalities of the Israeli occupation. 4. The Palestinian media—both government affiliated and privately owned—covered the second intifada in similar ways. This was a reflection of dominant attitudes and sentiments in Palestinian society, rather than necessarily a shaper of those attitudes.

Based on interviews I conducted with Palestinian media professionals who worked for a variety of news outlets, I do not believe that the Palestinian Authority controlled or was primarily responsible for the content of news media output during the second intifada. Representations of victims of the occupation during the second intifada emerged through a variety of media. The four major newspapers in circulation during the second intifada were: *al-Hayat al-Jadida*, considered the Palestinian Authority's official newspaper; *Al-Ayyam*, an independently-owned newspaper which is generally regarded as supportive of the Palestinian Authority; *Al-Quds,* also an independently-owned paper that supports the Palestinian Authority and the peace process with Israel; and *Wafa*, which is the official Palestinian News Agency. There are a number of other weeklies, monthlies, and supplements in circulation. Numerous TV channels are also available in the occupied Palestinian territories, including Palestine TV, which is associated with the PA. Most people, however, watched satellite channels during the 2000-2005 period and continue to do so today. Studies indicate that most Palestinians did not consult media associated with the PA as their primary news sources.[42] According to one poll, the majority of Palestinians in the West Bank and Gaza Strip go to Al-Jazeera as their primary news source, with only 12.8 percent of respondents claiming Palestine TV as their most watched channel.[43] Moreover, the major news dailies most directly associated with the PA were not generally viewed as credible by much of the population.[44] Most Palestinians considered television to be

---

[42] Miriam Berger, "Palestine's Occupied Fourth Estate: An Inside Look at Palestinian Print Journalists." *Arab Media & Society* Issue 15 (Winter 2013). Available at: http://www.arabmediasociety.com/?article=810.

[43] Noah Bonsey and Jeb Koogler, "Does the Path to Middle East Peace stop in Doha?" *Columbia Journalism Review* 16 February 2010. Available at: http://www.cjr.org/campaign_desk/does_the_path_to_middle_east_p.php.

[44] Nabil Khatib, "Media-Communication Strategies: The Palestinian Experience." Passia seminar 1999, Media and Communication Skills.

their most important source of information from the media, and among the TV stations available,[45] *Al-Jazeera* was the most popular station.[46] The examples that Marcus cites from *Al-Quds, Al-Ayyam, and Al-Hayat al-Jadida* newspapers (pp. 28-38) do not support the argument that Palestinians were influenced by these statements, since, as noted above, only a small percentage of Palestinians considered these newspapers to be trustworthy sources of information.[47] By Marcus's logic, since *Al-Quds* newspaper is subject to daily military censorship by Israel's Government Press Office,[48] the Israeli government supported terrorism because it allowed a columnist to publish views in support of the struggle against occupation (Marcus, pg. 42).

Throughout the first two years of the intifada, I reviewed two Palestinian daily newspapers, *Al-Ayyam* and *Al-Quds*, on a daily basis. I also occasionally looked through *Wafa*, the official PA newspaper. I also watched local and international news coverage of the second intifada, including programs produced by Al-Watan TV, Al-Jazeera TV, PA TV, and Bethlehem TV. I talked with media personnel involved with three different TV outlets, including Bethlehem TV. The staff of Bethlehem TV had a variety of political positions, from secular left, to those leaning towards Fatah. That station's programming bore no trace of a recognizable political affiliation, other than a nationalist one. In addition, I reviewed editions of different magazines produced by different political factions, including *Sawt al-Watan* and others. As it relates to the ways that events during the second intifada were portrayed by these various outlets, there was nothing to distinguish their coverage.[49]

All of these news outlets broadcast news and images about the second intifada that heavily emphasized the suffering of Palestinians subject to occupation measures. The style and content of coverage was very similar across all news sources, including Arab television channels such as *Al-Jazeera.* Support for the second intifada and sympathy with those deemed to have died as a result of the occupation was widespread throughout Palestine and the region. This coverage reflected opinions and

---

[45]http://www.internews.org/sites/default/files/resources/Palestinians&Media070314.pdf, pg.30

[46]http://www.internews.org/sites/default/files/resources/Palestinians&Media070314.pdf, pg.5

[47]http://www.internews.org/sites/default/files/resources/Palestinians&Media070314.pdf; also *see* Nabil Khatib, "The Structure of the Palestinian Media," The Palestinian Media Seminar No. 1, February 7-8, 2003, Ma'ale Hachamisha. Available at: http://spirit.tau.ac.il/socant/peace/psp/downloads/s1p2.pdf, pg. 2.

[48] Khatib, "The Structure of the Palestinian Media," at 2; Israeli censorship of *Al-Quds* newspaper also mentioned in Freedom House, *Freedom of the Press 2009 - Israeli-Occupied Territories and Palestinian Authority*, 1 May 2009, available at: also http://www.refworld.org/category,,FREEHOU,,PSE,4b27420c28,0.html

[49] Allen, "Martyr Bodies in the Media: Human Rights, Aesthetics, and the Politics of Immediation in the Palestinian *Intifada*." at 172.

political positions that were not peculiar to Palestinians, and were certainly not unique to Palestinian Authority positions or forms of expression.

The coverage focused on what, to western eyes, might have seemed like particularly explicit and gruesome images of people who had been wounded or killed by Israeli military violence. They also focused on stories of people who had been victimized by Israeli violence, including political prisoners; women who had been forced to give birth at checkpoints because Israeli soldiers would not let them through to a hospital; children whose friends were killed by Israeli forces, and so on. As I have discussed extensively in my writings, the very graphic media coverage that focused on portraying the very physical, visceral dimensions of their suffering, was a way for Palestinians to prove their humanity.[50] Anthropologist Julie Peteet, among other scholars, has also written about the importance of suffering in Palestinian nationalist narratives and uprisings.[51] Because Palestinians know they are condemned in much of western media and political discourse as inhumane terrorists, they feel compelled to prove that they are human like any other, and that they deserve human rights because of their basic humanity. Like in many nationalist contexts characterized by a focus on a people's victimhood by an oppressor, "Palestinians too present their wounded bodies to governing authorities and international observers—both official and not—in an attempt to seek relief."[52]

News media representations of the second intifada and Palestinian victims were similar to representations that circulated in other forms. Images of martyrs and representations of Palestinian suffering were covered across a wide range of media, not just that produced by outlets affiliated with the Palestinian Authority. As one of hundreds of examples, the stories of Muhammad al-Durra, a Palestinian boy who was shot by Israeli forces while huddling at the side of his father, circulated widely across different forms of media, including the internet and human rights publications.[53] The

---

[50] Allen, "Martyr Bodies in the Media: Human Rights, Aesthetics, and the Politics of Immediation in the Palestinian *Intifada*" at 161-180; Allen, "Getting By the Occupation: How Violence became Normal during the Second Palestinian *Intifada*" at 453-487; Lori A. Allen, S*uffering through a National Uprising: The Cultural Politics of Violence, Victimization and Human Rights in Palestine.* Ph.D. dissertation, Department of Anthropology, University of Chicago*, Chicago, IL, (2005).

[51] Julie Peteet, "Male Gender Rituals of Resistance in the Palestinian *Intifada*: A Cultural Politics of Violence." *American Ethnologist* (1994), 21(1):31-49, pg. 42; Iris Jean-Klein, "Nationalism and Resistance: The Two Faces of Everyday Activism in Palestine During the Intifada." *Cultural Anthropology* (2001), 16(1):83-126; Muhammad Abu Samra, "The Palestinian 'Wailing Wall': A Palestinian in Dhahiat al-Barid Records a Life Transformed." *Jerusalem Quarterly* (2007), 30:99-118, pg. 105.

[52] Allen, "Martyr Bodies in the Media: Human Rights, Aesthetics, and the Politics of Immediation in the Palestinian *Intifada*," at 163.

[53] *See*, for example, coverage in Defence for Children International/Palestine Section (DCI/PS). 2001. *A Generation Denied: Israeli Violations of Palestinian Children's Rights, 2000.* Ramallah, West Bank, pp. 47-49.

death of al-Durra and other children turned them into icons of suffering. Moreover, people carried images of Palestinian victims of Israeli violence during a range of public demonstrations. For example, during martyr funerals, which consisted of public processions in which the body of the deceased was carried to the burial site, images of the dead person were sometimes raised aloft, and cars that had the "martyr poster" of the deceased pasted on its windows would sometimes drive along with the procession.[54] Martyr posters commemorating individuals killed during the second intifada, including children, were so ubiquitous that many Palestinians ceased to notice them.[55] Such commemorative images were not inciting, but rather, had become part of the backdrop of everyday life.

Representations of Palestinian suffering and victimhood were also circulated in human rights publications and on their websites,[56] and people discussed their own victimhood and suffering regularly.[57] Interest in media coverage of intifada events dropped off and the images came to be perceived as "normal."[58] These forms of conversation and modes of expression were not inciting, nor were they produced by the Palestinian Authority.

All of these representations of Palestinians' suffering were ways in which people offered their respect, solidarity, and public support to the families and friends of people victimized by the occupation. The representation in photos and posters of those who died as a result of the occupation as martyrs is also a way that people cope with their losses.[59] They are part of social processes in which individual experiences—the death of a particular person, the grief of a single family—are recognized as being part of a national context, in which the suffering of individuals is recognized as shared suffering caused by a common condition of living under Israeli occupation. They are not incitements to violence, but efforts to tell the truth of what Palestinians experienced during the second intifada,[60] to tell the world about the

---

[54] Lori Allen, "The Polyvalent Politics of Martyr Commemorations in the Palestinian Intifada." *History and Memory* (2006), 18(2):107-113.

[55] Allen, "Getting By the Occupation: How Violence became Normal during the Second Palestinian *Intifada*." pp. 463, 469.

[56] Allen, "Martyr Bodies in the Media: Human Rights, Aesthetics, and the Politics of Immediation in the Palestinian *Intifada*," at 162.

[57] *Id*. at 167-168.

[58] Naomi Sakr, ed. *Arab Media and Political Renewal: Community, Legitimacy and Public Life*. I.B. Tauris, 2007, pg. 92.

[59] Mahmoud Abu Hashhash, "On the Visual Representation of Martyrdom in Palestine," *Third Text* (2006) 20(3-4):391-403, pg. 391.

[60] Allen, "Martyr Bodies in the Media: Human Rights, Aesthetics, and the Politics of Immediation in the Palestinian *Intifada*," at 171.

conditions of life and death under occupation,[61] and they are expressions of sympathy with people in a shared situation of vulnerability to Israeli violence.

Palestinian news media generally also covered situations of fighting between Israeli forces and armed Palestinians. Such coverage was not incitement to terror, as Marcus argues (pg. 22); it was, rather, a kind of public service. In some coverage by Bethlehem TV, for example, audiences were advised to avoid certain areas in town where there was heavy fighting. As a specific example, the "breaking news" announcements that were posted on Bethlehem TV throughout the day on 6 May 2002, as gunfights between Israeli forces and Palestinian fighters took place, were a form of solidarity during a very dangerous time. They were also pragmatic announcements, urging viewers, for example, to be careful when passing through one area of town or another where Israeli snipers had been spotted. One text announcement on Bethlehem TV read: "An urgent national call forbidding citizens from moving in the areas of confrontations (*al-ishtibakat*) to protect themselves and to take their families to the lowest floor and stay down... The injured are in need of O negative blood and people should donate at Beit Jala Hospital."[62]

Shrenzel claims that people involved in suicide bombings were publicly commemorated by PA media (pg. 6). Any such public notice would have been typical of Palestinian media generally, and not specific to PA media. Many martyrs were publicly recognized, and suicide bombers were seen by many Palestinians as being just as much victims of the occupation as any other.

Marcus infers from a report about news censorship by the PA that the PA was able to exert "total control" over the media (Marcus, pg. 15). In reality, the PA was not in control of *all* media, nor was the PA able to dictate media content. In any event, and as noted above, Palestinians did not have much interest in the local newspapers, which were regarded as not very credible.

The Palestinian National Authority Press and Publications Law of 1995 eliminated direct censorship, and Article 27 of the amended Palestinian Basic Law (2003) emphasized media freedom.[63] Even where the 1995 law restricted publications from

---

[61] Mahmoud Abu Hashhash, "On the Visual Representation of Martyrdom in Palestine," *Third Text* (2006) 20(3-4):391-403, pg. 395.

[62] Allen, S*uffering through a National Uprising: The Cultural Politics of Violence, Victimization and Human Rights in Palestine* at 258-259; Allen, "Martyr Bodies in the Media: Human Rights, Aesthetics, and the Politics of Immediation in the Palestinian *Intifada*," at 170. Also *see* Palestine Report: "For The Record: PR interviews Daoud Kuttab on local TV." November 29, 2000, http://web.archive.org/web/20020627141540/http://www.jmcc.org/media/report/2000/Nov/5.htm and Walid Batrawi, *Private Television in Palestine*. M.A. Thesis. Mass Communications, Leicester University, UK April 2001.

[63] http://www.dcaf.ch/content/download/35976/527169/file/Palestinian%20Media%20Legislation%20and%20Security%20Sector%20Governance%20(ENG).pdf, pg. 7.

harming national security or morality,[64] the imposition of such restrictions on the press is distinct from actively shaping news media form and content.

A recent ethnography about Palestinian journalists in the occupied Palestinian territories published by the Stanford University Press details the long history of Palestinian nationalism and the prevalence of nationalist ideology among journalists.[65]  In my professional opinion, news media form and content, including the laudatory nature of coverage of militant anti-occupation activities, was a result of the context of heightened nationalism and was not caused by the PA.  Expressions of solidarity with the suffering of victims of the occupation, and expressions of support for those seen to be resisting the occupation, are an expected feature of nationalist contexts.[66]  For example, similar forms of nationalist iconography and nationalist discourse that positively recognize the sufferings of victims and praise resistance are found in scholarship on "the Troubles" in Northern Ireland, among many other contexts.[67]  There was similar content across all media, including that produced by outlets not affiliated with the PA.  It is therefore impossible to causally link any action or attack to PA media.

Even if media could have what Marcus describes as an inciting effect to "kill Jews and Israelis during the years 2000-2005" (Marcus, pg. 27)—and this is an unproven assumption that relies on unspecified theories regarding the ways that media can influence behavior—it would be impossible to distinguish the effects of media produced by PA-funded outlets from those produced by other media.  Without clear indication by people who took up arms against Israeli soldiers or civilians, it is impossible to know if exposure to particular media had any effect on their attitudes or willingness to take up arms or commit violent acts.  Moreover, and contrary to

---

[64] http://www.pchrgaza.org/files/S&r/English/study1/Section2.htm

[65] Bishara, *Back Stories: U.S. News Production and Palestinian Politics*. Stanford: Stanford University Press, 2012.

[66] Benedict Anderson, *Imagined Communities: Reflections on the Origin and Spread of Nationalism*. (revised edition) Verso: London & New York, [1983] 1991.

[67]Begona Aretxaga, *Shattering Silence: Women, Nationalism, and Political Subjectivity in Northern Ireland*.  Princeton: Princeton University Press, 1997. Allen Feldman, *Formations of Violence: The Narrative of the Body and Political Terror in Northern Ireland*.  Chicago: University of Chicago Press, 1991; Allen Feldman, "Political Terror and the Technologies of Memory: Excuse, Sacrifice, Commodification, and Actuarial Moralities." *Radical History Review* (2003), 85:58-73.  Research on a variety of nationalist contexts reveals similar patterns, including in Lebanon and Yugoslavia.  *See* Lamia Rustum Shehadeh, "Women in the Lebanese Militias." Chapter 9 in *Women and War in Lebanon*. Ed. Lamia Rustum Shehadeh. Gainesville: University Press of Florida, 1999; Bette Denich, "Dismembering Yugoslavia: Nationalist Ideologies and the Symbolic Revival of Genocide." *American Ethnologist* (1994), 21(2):367-390. As political philosopher Hanna Arendt averred, "the passion of compassion has haunted and driven the best men of all revolutions." Hannah Arendt, *On Revolution*.  London: Viking Press, 1963, pg. 71.

Marcus' argument, there is evidence that media coverage of suicide bombings
motivated people to pursue *non-violent* means of resistance, rather than armed
resistance. As one former militant told researcher Dr. Julie Norman, images of
violence prompted him to consider civilian suffering on both sides and refocus his
efforts on unarmed struggle. This shows that viewers can interpret media images in a
variety of ways, and that media can motivate a wide range of activities, according to
an individual's own decisions.[68]

2.   The PA Did Not Incite Violence Through the Educational<br>Curriculum.

Shrenzel asserts that the Palestinian Authority is responsible for the "incitement and
the indoctrination at the basic level" (Shrenzel, pg. 8), through PA educational
curricula. He also asserts that the materials in PA textbooks "lead to a solution that is
considered to be essential (as the textbooks used in the Palestinian Authority state),
which is: The elimination of Israel by way of an armed struggle – a jihad" (Shrenzel,
pg. 9).

This claim is refutable with reference to five facts: 1. The majority of Palestinians
involved in armed activity during the second intifada, who were in their 20s and
older, would not have been students in PA schools during the 1999-2000 school year.
It is books from this year that Shrenzel apparently cites (pg. 8) (although the citation
is incomplete). 2. Palestinian hostility to Israel, and to the Israeli military occupation,
comes out of the Palestinian experience of occupation, the consistent violation of their
rights, and the dispossession of their lands. It is not a result of the PA educational
materials. 3. The Palestinian curriculum does not incite hatred, violence, and anti-
Semitism. 4. The Palestinian Authority educates Palestinian children through
methods beyond textbooks, and in these methods it seeks to moderate school
children's participation in nationalist activities. 5. Palestinian students are educated in
a variety of institutions, including private schools and UNRWA schools, just as some
school-age children also attend extracurricular classes and training provided by NGOs
and cultural institutions. The Palestinian Authority is not responsible for everything
that Palestinian children learn about Israel.

The Palestinian nationalist movement has existed for decades. From shortly after the
establishment of the Israeli state, and well before the establishment of the PLO or PA,
Palestinians have been fighting for their independence, through a variety of means,
both violent and non-violent.[69] Since the 1950s Palestinians have sought redress for
the dispossession of their land and for the situation of 750,000 Palestinian refugees
who were forced to flee their homes by Zionist forces in 1947-1948.[70] Palestinian
nationalism, and hostility towards an Israeli government that pursues the occupation

---

[68] Norman, *The Second Palestinian Intifada: Civil Resistance* at 61.

[69] Benny Morris, *Israel's Border Wars, 1949-56: Arab Infiltration, Israeli Retaliation
and the Countdown to the Suez War.* Oxford: Oxford University Press, 1993.

[70] Benny Morris, *The Birth of the Palestinian Refugee Problem, 1947-1949.*
Cambridge: Cambridge University Press, 1987.

and supports the building of settlements on their land, has a much longer history than that of the Palestinian Authority. It is a history that is well documented in numerous scholarly works.[71] The events of 2000 through 2005 were most often referred to by Palestinians as the second intifada, placing it on a continuum with the first intifada (1987-1993). Given this long history of struggle against Israel and its occupation, which predates the Palestinian Authority and its school curriculum, it would be impossible to claim that the Palestinian Authority is primarily responsible for creating the atmosphere in which actions during the second intifada took place. The frustration felt by people who grew up under years of Israeli occupation is the defining feature of the context in which the second intifada took place. Accounts of individual militants' lives and motivations show clearly that the occupation planted the seeds of the second intifada in those who would take up arms years before the Palestinian Authority existed.[72]

An exhaustive analysis of the Palestinian curriculum which refutes claims about the PA's inciting violence was written in 2001 by Nathan Brown, a Professor of Political Science and International Affairs at George Washington University and a respected political analyst who publishes with such United States think tanks as the Carnegie Endowment for International Peace. A UNESCO report surveying studies of the Palestinian Curriculum described Brown's report to be "the most balanced view of the 'incitement debate'" among the ten papers assessed in their report.[73] In his examination, which focuses on "issues of history and identity" in Palestinian textbooks, Brown states unequivocally that the Palestinian curriculum is nationalistic, but "not a war curriculum... it does not incite hatred, violence, and anti-Semitism."[74] Brown's analysis takes into account the second generation of PA teaching materials issued beginning in 2000 (the first generation having been issued in 1994).[75] He demonstrates that arguments similar to Shrenzel's (pp. 8-10) have been widely

---

[71]Helena Cobban, *The Palestinian Liberation Organisation: People, Power and Politics*. Cambridge: Cambridge University Press, 1984; Baruch Kimmerling and Joel S. Migdal, *Palestinians: The Making of a People*. New York: The Free Press, 1993; Rashid Khalidi, *Palestinian Identity: The Construction of Modern Consciousness*. New York: Columbia University Press, 1997; Ann Mosely Lesch, *Arab Politics in Palestine, 1917-1939*. Ithaca and London: Cornell University Press, 1979; Muhamad Y. Muslih, *The Origins of Palestinian Nationalism*. New York: Columbia University Press, 1988; Glenn E. Robinson, *Building a Palestinian State: The Incomplete Revolution*. Bloomington, IN: Indiana University Press, 1997; Yezid Sayigh, *Armed Struggle and the Search for State: The Palestinian National Movement, 1949-1993*. Oxford: Oxford University Press, 1999.

[72] For example, Laetitia Bucaille, *Growing Up Palestinian*. Princeton, NJ: Princeton University Press, 2004, pp. 3-4.

[73] http://unesdoc.unesco.org/images/0015/001515/151551e.pdf, pg.11

[74] Nathan Brown, *Democracy, History, and the Contest Over the Palestinian Curriculum*. Prepared for Adam Institute, November 2001, pg.1.

[75] *Id.* at 2.

20

circulated in the United States, but are based on false or partial readings of the textbooks. Brown concludes that, "far from inciting schoolchildren, the books generally treat sensitive political questions as tangential."[76]

In contrast to Shrenzel's argument that the Palestinian Authority curriculum contributed to inciting the second intifada, Brown states that "issues that remain ambiguous or hotly contested among Palestinians—such as borders, the nature of a final settlement with Israel, and even methods of resistance against the Israeli occupation—receive elliptical treatment when they are dealt with at all. A poem referring indirectly to stones in the intifada is couched within a sixth-grade Arabic lesson on Gandhi and nonviolence."[77] A UNESCO report summarizing the PA Ministry of Education Curriculum Plan notes that the Palestinian curriculum is guided by several principles, including the principle that "Palestine is a peace-loving state, working towards international understanding and cooperation based on equality, liberty, dignity, peace and human rights."[78]

In addition to Nathan Brown's analysis, numerous articles have been published which refute the claim that the Palestinian curriculum incites violence against Israel.[79] Israeli journalist, Akiva Eldar, quotes a Middle East Working Group of the EU as stating that the Palestinian textbooks "are free of inciteful content ... constituting a valuable contribution to the education of young Palestinians."[80] Eldar also cites a report by the Israeli office of the government coordinator, dated November 2000, which asserts that an "effort by the Palestinians to moderate the feelings of hostility toward Israel is discernible."[81] The UNESCO survey of Palestinian curriculum studies concluded that "there is considerably more evidence that sensitive issues are 'ducked' and omitted from the curriculum than there is evidence of incitement."[82] A

---

[76] *Id.* at 9.

[77] *Id.* at 14.

[78] UNESCO, ED/PEQ/PHR/2006/FRP/H/1. Studies on the Palestinian Curriculum and Textbooks, Consolidated Reports. http://unesdoc.unesco.org/images/0015/001515/151551e.pdf, pg.23

[79] http://www.miftah.org/PrinterF.cfm?DocId=3060

[80] Akiva Eldar, "Reading, Writing –and Propaganda." *Ha'aretz*, 10 September, 2004 http://www.haaretz.com/reading-writing-and-propaganda-1.134402

[81] *Id.*

[82] UNESCO, ED/PEQ/PHR/2006/FRP/H/1. Studies on the Palestinian Curriculum and Textbooks, Consolidated Reports. http://unesdoc.unesco.org/images/0015/001515/151551e.pdf, pg. 12. Also *see* Susan Nicolai, Fragmented Foundations: Education and Chronic Crisis in the Occupied Palestinian Territory. UNESCO International Institute for Educational Planning and Save the Children UK, 2007. http://unesdoc.unesco.org/images/0015/001502/150260e.pdf, pg. 91.

US State Department-funded report issued in February 2013 states that dehumanizing and demonizing characterizations of Israel were "very rare" in Palestinian textbooks.[83]

Indeed, according to an article in *The Jerusalem Post*, beginning in 2002, the PA Education Ministry banned schoolchildren from participating in demonstrations or any violent activities. The Education Ministry also prohibited schools from hanging posters of "martyrs" killed in the second intifada on school buildings."[84]

### 3. The PA Did Not Incite Violence Through Political Discourse.

The Eviatar, Marcus, and Shrenzel reports claim that the Palestinian Authority encouraged terrorism and "the killing of civilians, Jews and Israelis, at every opportunity" (Marcus, pg. 14) through the public discourse of the political leadership (Marcus, pg. 55, 63; Shrenzel, pg. 53), including that of PA President Arafat (Eviatar, pp. 5, 52).

At the outset, it must be noted that the PA did not encourage the killing of civilians. To the contrary, it repeatedly issued condemnations of attacks in which civilians were killed. The statements that the Plaintiffs' experts reference are statements in which Palestinian leaders oppose the occupation and reject Israeli policies towards Palestinians. The Plaintiffs' experts read into the Palestinian leadership's rejection of Israeli policies a call to violence that simply was not there. For example, there is nothing in the Mahmoud Abbas quote that Marcus cites to support the claim that the "PA ordered the terrorists to kill." Marcus's interpretation that Abbas's use of the term "resistance" is a "euphemism for terror" (Marcus, pg. 55) is incorrect. As noted above, the term has a historical context, refers to Palestinians' legitimate right to resist Israeli occupation, and was not used in the coded way that Marcus asserts. In fact, most resistance against Israeli occupation was carried out against the Israeli occupation army, which under international law, is a legitimate form of resistance and does not fit the definition of "terrorism." Similarly, when it brings attention to the plight of political prisoners, the PA is not calling for the release of "people sent to kill on their [PA] orders" (Marcus, pg. 55), but rather, it is seeking to ensure prisoner rights. The Israeli human rights organization, B'Tselem, other human rights organizations, as well as the United Nations, have extensive documentation of the torture and forced confessions that Palestinian political prisoners are subjected to in Israeli jails, and it is therefore incumbent on the PA to call attention to these issues.[85]

---

[83] http://www.israelipalestinianschoolbooks.blogspot.com/ , pg. 13

[84] Khalid Abu-To'amah, "PA Education Ministry Bans 'Martyr' Worship," *The Jerusalem Post*, September 3, 2003, http://groups.yahoo.com/group/MewNews/message/14982.

[85] http://www.btselem.org/topic/torture, http://www.phr.org.il/default.asp?PageID=116&ItemID=1669, http://www.stoptorture.org.il/en/node/1808; In 2008 a coalition of Israeli and Palestinian NGOs reported to the United Nations that "The Israel Security Agency/General Security Service (henceforth: GSS/ISA) has

Moreover, when it calls for the release of Palestinian prisoners, many of whom have been imprisoned by Israel without due process, including some who are held in "administrative detention" and have not even been charged with a crime,[86] the PA is not, as Marcus argues, sanctioning "terror."

Putting aside the factual misrepresentations in their reports, the claims of the Plaintiffs' experts rest on an assumption that the speeches of the PA leadership were very influential, and disregard three main facts: 1. Opposition to the Israeli occupation was a result of Palestinians' frustration with life under occupation. The primary goal of those Palestinians who participated in or supported the second intifada was to bring to an end Israel's occupation of Palestinian land. 2. A secondary motivation for participating in intifada activity was frustration with the Palestinian Authority. Because the second intifada was in many respects an uprising against the Palestinian Authority, the Palestinian Authority's official discourse was treated by many Palestinians as inconsequential. 3. The Palestinian Authority knew, as a political organization with aspirations to being a democratic representative of the people, that it had to respond to the people's wishes and attitudes. Because the Palestinian Authority knew that the population was largely dissatisfied with their leadership, the PA had to respond in ways that resonated with local attitudes.

The eruption of the second intifada was not a surprise to many Palestinians, given the failure of the Oslo Peace Process to achieve any gains. The second intifada was at its core a rejection of Israeli occupation policies and Israel's refusal to negotiate in good faith.[87] The goal of the second intifada—to bring an end to the occupation[88]—was

---

employed torture in the interrogation of dozens if not hundreds of Palestinian detainees since the UN Committee Against Torture (henceforth: CAT, the Committee) considered Israel's previous report."
http://www2.ohchr.org/english/bodies/cat/docs/ngos/PublicCommittee_Israel42.pdf,
pg. 1. During the intifada the United Nations Committee Against Torture "reiterated that no exceptional circumstances could be invoked as justification for torture."
http://unispal.un.org/unispal.nsf/4a59b1c6672db080852572f2006c74a4/7bd711bd71f
ac76a85256b1000753b07?OpenDocument
Palestinians continue to be tortured to death in Israeli custody. See, for example,
http://www.phr.org.il/default.asp?PageID=116&ItemID=1710.
As the UN Special Rapporteur on Torture (2004-2010) said: "in Israel, where there have been 600 complaints [against the Israeli Security Agency] and not a single conviction. Why? Because if the same body that is accused of torturing is investigating its own colleagues, then, of course, the esprit de corps comes into play and the investigation just does not work."
http://adalah.org/Public/files/English/Publications/On-Torture/On-Torture-English-6-
Novak-21-30.pdf, pg. 24.

[86] On Israel's imprisonment of Palestinians without indictment or trial, *see* the Israeli human rights NGO, B'Tselem:
http://www.btselem.org/topic/administrative_detention;
http://www.btselem.org/administrative_detention/statistics

[87] Also see Bishara, *Back Stories: U.S. News Production and Palestinian Politics* at 3.

evident from the slogans chanted during demonstrations and the other forms of cultural production and publications.

In addition to opposing the Israeli occupation, the second intifada was an expression of frustration at the inability of the Palestinian Authority to liberate Palestinians from Israel's military occupation and the expanding settlement project. The failure of the Oslo Accords to improve conditions on the ground for most Palestinians, or to produce a meaningful peace, also precipitated the second intifada.[89] Demonstrations during the second intifada often included slogans decrying the Palestinian Authority, which reflected the extent to which the Palestinian public had become frustrated with the Palestinian Authority's incompetence and corruption, sentiments which had intensified in the lead-up to and during the second intifada. People often talked of their loss of faith in the Palestinian Authority. Ethnographic observation by other scholars who conducted research in the West Bank confirms that PA officials were widely seen as corrupt and self-interested. At times, the leaders of the Palestinian Authority were even seen as "collaborating" with Israel.[90] The International Crisis Group, a widely respected Brussels-based think tank which derives much of its analysis from fieldwork, noted that since the "early days of the second intifada" many Palestinians had lost respect for the Palestinian Authority: "many have come to see the Palestinian Authority as one big municipality" – as opposed to the government of an emerging state – that functions as a 'subcontractor of the occupation.'"[91] Given the broad hostility towards, and suspicion about, the Palestinian Authority,[92] and given that its "nominal leadership" was in many ways marginalized by events on the ground,[93] the speech of their political leadership would not have been regarded as very credible and least of all, as a call to arms.

---

[88] Lori Allen, "Palestinians Debate 'Polite' Resistance to Occupation," *Middle East Report* 225, (Winter): 38-43. Available at: www.merip.org/mer/mer225/225_allen.html.

[89] Gordon, *Israel's Occupation* at 22, 191; Joel Beinin, "Forgetfulness for Memory: The Limits of the New Israeli History." *Journal of Palestine Studies* 34(2):6-23, pg. 16; Joel Beinin and Rebecca Stein, Histories and Futures of a Failed Peace, in *The Struggle for Sovereignty: Palestine and Israel, 1993-2005*. Eds. Joel Beinin and Rebecca Stein. Stanford, CA: Stanford University Press, 2006, pg. 2.

[90] Tobias Kelly, *Law, Violence and Sovereignty Among West Bank Palestinians*. Cambridge: Cambridge University Press, 2006, pg. 144; Tobias Kelly, "In a Treacherous State: The Fear of Collaboration among West Bank Palestinians." In S. Thiranagama & T Kelly (eds), *Traitors: Suspicion, Intimacy and the Ethics of State-Building*. University of Pennsylvania Press, Philadelphia, 2010, pg. 181.

[91] International Crisis Group. The Emperor Has No Clothes: Palestinians and the End of the Peace Process. Crisis Group Middle East Report N°122, 7 May 2012, pg. 26.

[92] Bishara, *Back Stories: U.S. News Production and Palestinian Politics* at 208.

[93] Nathan Brown, *Palestinian Politics After the Oslo Accords: Resuming Arab Palestine*. Berkeley: University of California Press, 2003, pg.105.

24

Those affiliated with the PA or Fatah who in public statements claimed that Arafat and the PA caused and led the second intifada (Eviatar, pp. 53-54; Marcus, pp. 56-57) were often trying to give Fatah or the PA credit for an uprising which had the overwhelming support of the vast majority of Palestinians in the occupied Palestinian territories. The statements referenced by Eviatar and Marcus were politically opportunistic statements on behalf of or from supporters of the PA and Fatah, uttered by people who understood that popular opinion was in favor of resistance to the occupation, which is what the second intifada was seen to be. In addition, it is important to note that the second intifada consisted of a wide range of resistance activities, including everything from street demonstrations and other forms of non-violent resistance,[94] to rock-throwing, as well as armed resistance against the Israeli occupation forces. Statements of support for "resistance" or the "intifada" do not constitute support for the killing of civilians.[95]

On the other hand, because the Palestinian Authority knew it had a weak political standing among its people, it was not in a position to speak out against actions that the majority of the Palestinian population supported. But when suicide bombings became prevalent during the second intifada, the PA began to make strong statements against the use of violence in resistance to Israel. After the massive Israeli invasions of Palestinian areas in the spring of 2002, more Palestinians began gradually to speak out openly against the second intifada's militarization. The Palestinian Center for Policy and Survey Research polls show that by November 2002, those supporting armed attacks against Israeli civilians inside Israel had dropped to 53%.[96] Nevertheless, support for suicide bombings remained strong in some sectors of the Palestinian population. When a letter signed by many prominent Palestinian intellectuals was published in a local newspaper calling for an end to suicide bombings, several articles were published condemning this letter.[97]

---

[94] *See* Norman, *The Second Palestinian Intifada: Civil Resistance.*

[95] Eviatar (pg. 58) cites the Israeli Prime Minister's Office as evidence for his claim that "Arafat gave the terrorists 'ideological encouragement' and approved financial aid." Eviatar, however, fails to consider that the Israeli government is not an impartial source as it had an interest in characterizing everything that Arafat did as "terrorism." In addition, it should be noted that some of the examples that Marcus provides of PA affiliates taking credit, on behalf of the PA, for "directing" the intifada (e.g., pp. 56-57) are far beyond the date range in question. According to Marcus' citations, the statements were made in 2005 and 2009, long after the events that gave rise to this case had taken place.

[96] http://www.pcpsr.org/survey/polls/2002/p6a.html

[97] Lori Allen, "Palestinians Debate 'Polite' Resistance to Occupation," *Middle East Report* 225:38-43. Available at: www.merip.org/mer/mer225/225_allen.html.

Nevertheless, even though the public was not always receptive, the PA did condemn suicide bombings in many statements, from early on in the second intifada. On 2 June 2001 Yasir Arafat read publicly a statement condemning a bombing outside a nightclub in Tel Aviv and ordered an immediate and unconditional ceasefire."[98] In December 2001, in an address broadcast on Palestinian television, Arafat "called for a halt to all armed activities, including suicide bombings against Israelis."[99] He published an article in the New York Times in February 2002 that condemned terrorist attacks against Israeli civilians.[100] Another statement issued on 13 April 2002 in the name of the PA President and leadership condemned all acts of terrorism targeting civilians, whether Israeli or Palestinian, as did another statement on 8 May 2002.[101] Another condemnation came in a communiqué issued on 19 June 2002 calling for international help to put a stop to the bloodshed of Palestinians and Israelis,[102] and in another statement on 31 July 2002, condemning the suicide bombing at Hebrew University. On 9 September 2002, Yasir Arafat opened the Palestinian National Council session with a speech in which he condemned suicide bombings and expressed "opposition to 'all types of terrorism, whether it is state terror or individual terror.'"[103] That this statement referred to the bombing as a "terrorist operation" is significant, as the term conveys both a strong sense of moral condemnation, and its use suggests a level of political bravery on the part of the PA. The word "terrorism" is an ideologically and emotionally loaded word in the occupied

---

[98] "Chronology." *Journal of Palestine Studies* 31(1) (Autumn 2001): 154-178, pg. 158.

[99] "Arafat: 'We are Not Asking for the Impossible.'" CNN.com 16 December 2001 Sunday. http://archives.cnn.com/2001/WORLD/meast/12/16/arafat.transcript/. Also *see* translation "Statement by President Yasser Arafat Ramallh, December 16, 2001 [Excerpts]."

[100] Yasir Arafat, "The Palestinian Vision of Peace." *New York Times*, 3 February 2002.

[101] "Bayyan b-ism al-sayyid al-ra'is wa-l-qayyadah al-filastiniyya: Idanat kafat al-`amal alety tastahdaf al-medaniyin sawa' kanu isra'iliyin ow filastiniyin wa sawa' kan hadha al-irhab irhab dowly ow jama`at ow afrad." [Communiqué in the name of the President and leadership: Condemnation of all operations that target civilians, whether they were Israelis or Palestinians, and whether that terrorism was state terrorism, or by groups or individuals.] Palestinian National Information Center, 13 April 2002 at Bates 02:006779-80; "Tasrih `an al-ra'is `Arafat b-idanat al-`amaliyat al-irhabiyya did al-madaniyin al-isra'iliyin wa-l-filastiniyin." [President Arafat's statement condemning terrorism operations against Israeli and Palestinian civilians.] 8 May 2002 at Bates 02:006781.

[102] "Al-qiyyadah tastankir `amaliyat al-quds wa tad`au li irsal muraqibin dowlayin `ala al-fowr" [The leadership condemns the operation in Jerusalem and calls for international monitors immediately.] Ramallah, 19 June 2002 at Bates 02:006410-11.

[103] "Chronology." *Journal of Palestine Studies* 32d(2) (Winter 2003):172-194, pg. 177.

Palestinian territories, and many Palestinians believe that it is usually used unjustly, most often to unfairly attack them, stereotype them, and revile them. It was politically risky for the PA to use a word to describe a Palestinian action that might have offended many Palestinians.

After an explosion in the Beit Yisrael area of West Jerusalem, the PA issued yet another condemnation: "The Palestinian Authority condemns the attack in Jerusalem tonight, just as it condemns all attacks targeting civilians, whether Israelis or Palestinians," just as it condemned the bombing on a bus near Umm al-Fahm and "called for an end to attacks on civilians inside Israel."[104] In another statement on 5 March 2003 condemning the explosion of a bus in Haifa, the PA leadership reaffirmed its position against terrorism and against revenge. The statement asserted that such actions against civilians were detrimental to the Palestinian national cause.[105]

Many of these statements condemned "terrorism." In some of the PA statements, reference is made to the Palestinian national context or "national consensus."[106] Using these terms is a way of making the language more persuasive to a Palestinian audience. This language is a way of calling on the shared principles of nationalist solidarity and the primacy of national welfare, which carried great moral weight. However, given the extreme stress that Palestinians were living under during the second intifada, as Israeli attacks increased in scope and intensity and people felt generally unsafe and insecure, it is likely that many people would have dismissed these statements by the PA as almost traitorous. Such statements could have decreased the PA's credibility even more, because Palestinians were feeling so frustrated, and were so desperate that they looked for any kind of action, including violent action, if it could defend them from Israeli violence.

Marcus argues that official PA condemnations of suicide bombings were not intended to truly condemn the bombings but were instead intended to appease the international community by giving "lip service" to its requests (Marcus, pg. 53), and Eviatar claims the PA condemnations were only mild (pp. 68, 82). The repeated PA condemnations of suicide bombings denounced attacks on both Israeli and Palestinian civilians, focusing on the impact of the occupation on Palestinian civilians. The leadership took this approach because that is the way in which most Palestinians living under occupation would expect their leadership to express itself. In addition, as noted, the condemnation of suicide bombings in local newspapers by local intellectuals provoked a strong backlash in the Palestinian public. Those who objected were people who felt that any critique of those seen to be trying to end the occupation was close to treachery. In a context of heightened nationalist sentiment like this, it is not surprising that the political leadership would express itself in a careful way. Had the PA condemned suicide bombings more aggressively, its legitimacy among the

---

[104] http://unispal.un.org/UNISPAL.NSF/0/E23633414650942385256DCF005B4D16

[105] "Tasrih sadr `an al-qiyyada al-filastiniyya." [Statement from the Palestinian leadership.'] Wafa: Palestine News Agency. 5 March 2003 at Bates 02:006782.

[106] Translated document starting with text "Under the Presidency of President Yasser Arafat" At Bates:02:008344-47.

majority of the people would likely have diminished even further, leaving the political field further open to other political groups like Hamas.

Even before his election to President, as early as 2002, Mahmoud Abbas had repeatedly called for an end to the violence.[107] Despite his appeal to the Palestinians at large, Abbas' calls were rejected by many.[108] Although the PA made repeated efforts to put an end to terrorist violence, the political context in which the statements against terrorism were made was very difficult. Most Palestinians, so frustrated and aggrieved under decades of Israeli occupation and years of intensified violent attack and incursions by Israel during both the first and the second intifadas, could not be persuaded by such calls. After the death of Yasir Arafat in 2004, Abbas called for an end to violence as part of renewed negotiations efforts with Israel and he announced in an editorial published in the *Wall Street Journal* in 2005 that "we have declared a policy of non-violence and negotiations and we have worked hard to secure and maintain a cease-fire to which all factions signed on."[109] In July 2005, Mahmoud Abbas responded to a bombing outside a mall in Netanya in strong language, saying: "We condemn this terrorist attack. It's a crime against the Palestinian people. Those traitors are working against the Palestinian interest… They did a stupid thing that they should be punished for."[110]

> 4. The PA Did Not Incite Violence Through Religious Discourse.

The Eviatar, Marcus, and Shrenzel reports assert that the Palestinian Authority mobilized religious leaders to encourage "terrorism," by religiously justifying the killing of Jews (Marcus, pp. 14, 24-26; Eviatar, pg. 62, Shrenzel, pg. 9).

This claim of PA control over the sermons of religious leaders is not substantiated in any of the reports. In fact, under Articles (18) and (19) of the Amended Palestinian Basic Law of 2003, the PA was prohibited from censoring religious speech. In support of his contention that the PA was able to control religious speech during the second intifada but chose not to do so, Shrenzel points to 2009 press accounts of the Palestinian Authority's efforts to control the messages delivered in Friday sermons. Just because the Palestinian Authority sought to exercise some limited control over

---

[107] "Mahmoud Abbas's Call for a Halt to the Militarization of the Intifada." *Journal of Palestine Studies* 32(2) (Winter 2003): pp. 74-78.

[108] Andy Mosher, "Abbas Says Violence by Palestinians Should End." *Washington Post Foreign Service*, 15 December 2004 http://www.washingtonpost.com/wp-dyn/articles/A62928-2004Dec14.html

[109] Mahmoud Abbas, "Is the Road Map at a Dead End?" *Wall Street Journal*, 20 October 20, 2005. Available at: http://online.wsj.com/article/SB112977056304073951.html

[110] Michele K. Esposito, "Chronology." *Journal of Palestine Studies* 35(1) (Autumn 2005):206-228, pg. 218.

arguably inciting religious messaging in 2009 does not mean they could do so during the second intifada when conditions were extremely different.

C.      *The Palestinian Authority Did Not Encourage Its Employees to Engage in Acts of Violence Against Israeli Civilians, nor Did Its Policies Toward Prisoners and Martyrs Reflect Support For, or Encourage Acts of Violence Against Israeli Civilians. Palestinian Violent Resistance to the Israeli Occupation Would Have Occurred in the Absence of the Palestinian Authority as a Reaction to the Israeli Occupation.*

The Shrenzel (pp. 8, 44) and Eviatar (pp. 47-48, 61) reports claim that the involvement of Palestinian Authority employees in violent attacks proves the Palestinian Authority's responsibility for those acts.

While some Palestinians involved in acts of armed resistance to the Israeli occupation were employees of the Palestinian Authority,[111] this alone does not support the argument that the Palestinian Authority was responsible for everything those individuals did. Indeed, numerous analysts have noted that as a result of Israeli attacks following the outbreak of the second intifada, "Arafat's command structure and security forces was [sic] severely disrupted, if not shattered." Israel persistently shelled Palestinian police stations across the West Bank and Gaza even as it called for the reform of the security forces and "held the policemen of the Palestinian Authority responsible for arresting militiamen and terrorists."[112]

Eviatar claims that the PA was responsible for terrorism because PA training for members of Palestinian security organizations "qualified members of the security organizations to become terrorist operatives" and "[t]herefore, the full extent of the responsibility is incumbent upon the PA" (pg. 61). As the US Congressional Research Service reports, however, the United States government also provided support and training for members of PA security. Indeed, "covert U.S. counterterrorism assistance programs to the Preventive Security Organization reportedly continued during the [second] intifada."[113] The training was provided in the context of state-building, and neither the PA nor the United States government can be said to be responsible for Palestinian "terrorism" on those grounds.

It is my professional opinion that the majority of militants took part in violent activities because of a combination of their desire to see an end to the occupation,

---

[111] International Crisis Group. Squaring the Circle: Palestinian Security Reform under Occupation. Middle East Report N°98 – 7 September 2010, pg. 7, n.46.

[112] Anthony H. Cordesman, *Israel versus the Palestinians: The "Second Intifada" and Asymmetric Warfare."* Center for Strategic and International Studies, Working Draft, July 2002, http://csis.org/files/media/csis/pubs/israelvspale_intafada%5B1%5D.pdf, pg. 76.

[113] Jim Zanotti, "U.S. Security Assistance to the Palestinian Authority." Congressional Research Service, 7-5700, R40664, January 8, 2010, http://www.fas.org/sgp/crs/mideast/R40664.pdf, pp. 6-7.

their personal histories of deprivation caused by the Israeli occupation, and their sense of responsibility to and solidarity with the Palestinian people as a whole. Palestinians saw their actions as a form of resistance to oppression, and were motivated to fight against that oppression. Many men who were employed by the PA security services had grown up under Israeli occupation, many living in conditions of severe deprivation in refugee camps. It was the frustration and anger at these stifling conditions that led them to take part in violent actions against the occupation. Many people echoed the sentiment that "if there was no occupation we would have nothing to resist."[114]

The Marcus and Shrenzel reports, which assert that the PA and Yasir Arafat "caused the intifada" (Marcus, pg. 61), point to what are described as "the intricate preparation actions that the Palestinian Authority took" (Shrenzel, pg. 6). The April 30, 2001 report of the Sharm el-Sheikh Fact-Finding Committee (sometimes referred to as the Mitchell Commission because it was headed by then-United States Senator George Mitchell), however, present a different picture.[115] The Commission, which undertook an extensive investigation into the causes of the violence during the second intifada, stated that it had "no basis on which to conclude that there was a deliberate plan by the PA to initiate a campaign of violence." At various stages in the report, the point is emphasized again: "neither were we provided with persuasive evidence that the PA planned the uprising."

As the Commission explained in its report, the roots of the violence of the second intifada extended "much deeper" than any single event, and could not be attributed to the PA. As part of their explanation for the violence, the Commission stressed "the humiliation and frustration that Palestinians must endure every day as a result of living with the continuing effects of occupation, sustained by the presence of Israeli military forces and settlements in their midst" as a key aspect of the context in which the second intifada began. The Report likewise emphasized Israel's "closure policies" —which restrict freedom of movement for persons and goods throughout the occupied territories—as contributing to the "escalation" of violence. As confirmed by an anthropologist who spent significant time conducting field research in the West Bank during and after the second intifada, "there is no single explanation for the intifada, which has largely been a fragmented conflict, with multiple driving forces."[116]

Marcus claims that the "people who killed felt they were participating in a national fight under orders of the PA leaders" (Marcus, pg. 63). I have seen no evidence that such orders were issued, but even if they had been there is no reason to believe that they would be followed. There is no evidence in Marcus's report that he had special access to the feelings of people involved in killing. In my professional opinion,

---

[114] Lori Allen, "Mothers of Martyrs and Suicide Bombers: The Gender of Ethical Discourse in the Second Palestinian Intifada." *Arab Studies Journal* (2009), 17(1):32-61.

[115] http://2001-2009.state.gov/p/nea/rls/rpt/3060.htm

[116] Tobias Kelly, "The attractions of Accountancy: Living an Ordinary Life during the Second Palestinian Intifada." *Ethnography* (2008), 9(3):351–376, pg. 356.

which is derived from the way people I knew in the occupied territories talked about the second intifada, and the way I saw it portrayed in a variety of media and news outlets, foremost in most people's minds was resistance to the occupation, not obeying any orders of PA leadership. The Palestinian Authority was viewed as a problematic structure, which some people regarded with suspicion. Many expressed the belief that it was a lackey to the Israeli occupation authorities and to the United States. Given that the PA had such little credibility, it is unlikely that its views would carry much authoritative weight with most Palestinians.

The claim that the PA and PLO promoted terrorism through the provision of financial support to the families of those killed by Israeli forces, imprisoned by Israel, wounded by Israeli forces, or released from Israeli prisons (Eviatar, pg. 6, 25, 36-37; Marcus, pg. 54; Shrenzel, pg. 39) mischaracterizes the motives of those taking part in the second intifada, and mischaracterizes what they were motivated to do.

The families of people killed during the second intifada could receive financial support from various sources including the Palestinian Authority, political factions, and in some cases, Arab governments. In my professional opinion, people became involved in fighting the occupation for political reasons, not because they were paid and not in the hopes that their families would receive compensation. To the contrary, many people who were killed as "martyrs" were individually motivated to take part in resisting the occupation, regardless of the sacrifice it might entail. In one case, a man offered to divorce his wife because she was trying to dissuade him from taking part in stone throwing clashes.[117] Accounts from eyewitnesses during the second intifada detail the willingness or desire of some to die as martyrs.[118] Because of the nationalist context, and the level of frustration that people were feeling as a result of living under a prolonged belligerent occupation, it is my opinion that Palestinians would have been involved in anti-occupation activities with or without the presence of the Palestinian Authority. In fact, Palestinians have been involved in anti-occupation and resistance activities long before the Palestinian Authority came into existence. Palestinians who have no relationship with the Palestinian Authority, or who have antipathy towards it, continue to resist the occupation, including by engaging in militant actions.

It was widely known among Palestinians that it was the policy of the Israeli forces to demolish the family home of the suicide bomber in retaliation for the execution of a suicide attack.[119] This, of course, caused severe economic hardship for the families of

---

[117] Allen, S*uffering through a National Uprising: The Cultural Politics of Violence, Victimization and Human Rights in Palestine* at 117.

[118] *See*, e.g.,
http://asp.alhaq.org/zalhaq/site/books/files/Annual%20Report%20Combo.pdf, pg. 38.

[119] *See* Israeli human rights NGO report on home demolitions as a form of punishment, http://www.btselem.org/topic/punitive_demolitions; also http://asp.alhaq.org/zalhaq/site/books/files/Annual%20Report%20Combo.pdf, pp. 246-247. Also, Araj confirms that the amounts provided to some martyrs' families "did not come close to covering the families' losses, including in many cases its main provider, its home (typically destroyed by the Israeli army)... the evidence does not

bombers, and yet, the policy had no deterrent effect on the bomber. Indeed, as Pape notes, Palestinian suicide bombers consistently claim as the motivating factor, not financial incentives, but the desire to end the occupation:

> Individual suicide bombers routinely leave martyr videos testifying to the altruistic motive for the suicide attack as a means to end Israeli occupation. Although one might doubt the sincerity of these claims, it is important to recognize that there is a strong material basis for why the Palestinian community would find them credible: since 1998, Israel has systematically demolished the homes of suicide bombers' families. Although many reportedly receive cash compensation from Hamas and other groups worth approximately $10,000, the loss of a home worth many times this value is a strong signal that the motive for the attack was indeed to promote the communal good. To this day, Palestinian suicide bombers continue to reveal their identities although it is common knowledge that their families will suffer harsh consequences.[120]

This refutes Eviatar's claim that PA support of Palestinian victims of Israeli occupation is an "incentive… based on the knowledge that, if they die or are wounded, the terrorist incident will not create a burden for their families" (pg. 25). To the contrary, Palestinians know that resistance to the occupation in any form can have severe repercussions for themselves and their families. Financial calculations are not priorities for people involved in resistance activities. As a University of Toronto sociologist has shown, "Palestinian suicide missions are in most cases prompted less by strategic cost-benefit calculations than by such human emotions as revenge and retaliation."[121]

Polls conducted in 2002 and 2003 showed that more Palestinians than not supported the continuation of the second intifada even if it had negative effects on their financial situation.[122] Based on my understanding of the second intifada and the people involved in it, I do not believe that payments motivated suicide bombers. I know of no scholarly study that provides evidence that suicide bombers were motivated by a desire for "reward money." Many studies of suicide bombers assert that poverty is not the overriding factor motivating these attacks.[123] It is my opinion that the primary

---

support the argument that financial incentives motivated suicide bombers." Bader Araj, "The Motivations of Palestinian Suicide Bombers in the Second Intifada (2000 to 2005)." *Canadian Sociological Association Review* (2012) 49(3):211-232, pp. 223-224.

[120] Pape, *Dying to Win: The Strategic Logic of Suicide Terrorism* at 193.

[121] Brym, "Six Lessons of Suicide Bombers," at 43. Available at: http://projects.chass.utoronto.ca/soc101y/brym/six.pdf; also Yoram Schweitzer, "The Rise and Fall of Suicide Bombings in the Second Intifada." *Strategic Assessment* (2010) 13(3):39-48, pg. 42.

[122] http://www.miftah.org/Doc/Polls/poll108.pdf, pg. 4.

[123] *See* Araj, "The Motivations of Palestinian Suicide Bombers in the Second Intifada

motivations were a combination of ideological and political beliefs, occurring in a nationalist context in which all forms of resistance to occupation were deemed necessary and laudable by many in the occupied Palestinian territories. In my years of research, I have come across no indication that financial compensation "constituted a central incentive to terrorist attacks by suicide bombers" (Eviatar, pg. 27), whereas there is a plethora of data indicating that people had personal and political motives for committing suicide bombing attacks.

Similarly, Eviatar's claim that Palestinians engage in resistance activities in order to be imprisoned (pg. 31) is highly implausible. The brutality of prison conditions for Palestinian security detainees is well-documents, as are the severity of the repercussions for their families. Moreover, there is no academic study of which I am aware that substantiates the claim that Palestinian security detainees are motivated to engage in resistance activities in order to receive a regular salary. If Palestinian security detainees being held together in the same cell "reinforce[s] social and organizational cohesion, and the ties existing between security prisoners," which Eviatar claims encourages terrorist activity (pg. 37), this is Israel's responsibility, as it is the Israeli prison authorities who are in control of where Palestinians are imprisoned.

> D.    *The Palestinian Authority Was Not Responsible for Suicide Bombings, Which Were Actions Undertaken by Individuals with Their Own Motivations.*

The Eviatar, Marcus, and Shrenzel reports assert that the Palestinian Authority was specifically responsible for encouraging the actions of suicide bombers. There is no evidence that the PA caused suicide bombings. Sociologists have concluded that "desire for revenge against Israeli forces and their harsh repressive measures" was a primary motivation of Palestinian suicide bombers during the second intifada, while religious motivations and desire to liberate the homeland were also important for some.[124] People, of their own volition, and because of their difficult circumstances, lined up to volunteer to carry out suicide attacks.

As others have discussed, the socio-economic deprivation experienced by most Palestinians living under occupation, including that caused by "the increasing encroachment of Jewish settlers on Palestinian land,"[125] "is one of the most important factors to consider when trying to understand the emergence of the PSBs [Palestinian Suicide Bombers]."[126] The view that poverty and "a deep sense of national humiliation" can be a factor in explaining suicide bombings is echoed by many

_____

(2000 to 2005)" at 212, 222.

[124] Araj, "The Motivations of Palestinian Suicide Bombers in the Second Intifada (2000 to 2005)" at 211.

[125] Pape, *Dying to Win: The Strategic Logic of Suicide Terrorism*, at 48.

[126] Ghassan Hage, "'Comes a Time We Are All Enthusiasm': Understanding Palestinian Suicide Bombers in Times of Exighophobia," *Public Culture* (2003) 15(1): 65-89, pp. 77-78.

scholars.[127]  Although the majority of people who carried out suicide attacks were educated, the broader context in the occupied territories was, and is, one of a sense of collective victimization by the occupation.

Significantly, this perspective that Palestinians' victimization by Israeli occupation was the major cause of suicide bombings was also commonly expressed in public debate in the West Bank.  As then Director of the Forced Migration and Refugee Studies Program at the American University in Cairo observed, "the state of desperation in the OPT [occupied Palestinian territories], Israel's brutal behaviour and unbridled crimes in Gaza and West Bank, the Israeli destruction of Palestinian institutional structures and the failure of the international community to step in and provide any kind of protection for Palestinians, all create an environment where any form of 'resistance' becomes acceptable out of sheer frustration."[128]  Another scholar explained, "It is only because of the failure of the political [process] that such…violence emerges as a matter-of-fact possibility."[129]

Opinion polls conducted throughout the second intifada show fluctuations in rates of support for suicide bombings, but rates during 2001-2003 were generally high.  In December 2001, for example, the Palestinian Center for Policy and Survey Research reported that, "[a]n overwhelming majority [of people surveyed], ranging between 81%-87%" did not view a suicide bombing in Tel Aviv as terrorism.[130]  By May 2002, only 52% of those surveyed still supported bombings inside Israel.[131]  In October 2003, however, 75% of those polled supported a suicide attack at a restaurant in Haifa.  In his analysis, the pollster argued that the increased support was due to a high level of pessimism and frustration at the lack of progress in the peace negotiations with Israel.[132]  Also significant in these polls is the data indicating that majorities of Palestinians opposed PA efforts to stop bombing attacks inside Israel.  In May 2002, 86% opposed the arrest of those who carried out bombing attacks inside Israel.[133]  In August 2002, 53% opposed internal Palestinian efforts to end bombing attacks against civilians inside Israel.[134]

---

[127] Hilal Khashan "Collective Palestinian Frustration and Suicide Bombings." *Third World Quarterly* (2003) 24(6): 1049–1067, pp. 1049, 1062.

[128] Fatih Azzam, "Waiting for Justice: Al-Haq in 2004: A Twenty Five Year Prospective." In *Al-Haq: 25 Years Defending Human Rights (1979-2004)*, ed. Rouba Al-Salem. Ramallah: Al-Haq, 2005.
 http://asp.alhaq.org/zalhaq/site/books/files/Annual%20Report%20Combo.pdf, pg.13

[129] Ghassan Hage, "'Comes a Time We Are All Enthusiasm': Understanding Palestinian Suicide Bombers in Times of Exighophobia," *Public Culture* (2003), 15(1):65-89, pg.75.

[130] http://www.pcpsr.org/survey/polls/2001/p3a.html#terrorism

[131] http://www.pcpsr.org/survey/polls/2002/p4a.html

[132] http://www.pcpsr.org/survey/polls/2003/p9a.html

[133] http://www.pcpsr.org/survey/polls/2002/p4a.html

There is no evidence that participants in martyrdom operations were coerced, ordered, or recruited by the PA.[135]  Instead, the *New Yorker* reported in 2001 that there were large numbers of volunteers offering to conduct suicide bombing operations either on their own behalf or in coordination with various non-governmental militant groups.[136] Many people felt that, given the brutality to which they were subjected under Israel's occupation, and given the high probability that they might die as a result of Israeli occupation actions, they were "all martyrs with execution on hold."[137]  As such, from their perspective it was better to be in control of the manner of their death in a suicide operation.  There is no indication that any suicide bombers were ordered by the Palestinian Authority to undertake these acts.  Nor is there any indication, given the low esteem in which the PA was held in Palestinian public opinion, that anyone would submit to such orders if they received them.

As the Arab uprisings of the last few years show, people living under brutal conditions and systemic forms of oppression eventually try to throw off their yoke. World history is full of examples of people who resist colonialism, dictatorships, authoritarian regimes, and occupation.  Palestinians are no different than other oppressed peoples seeking freedom.  They have been resisting the theft of their land, the forcible settlement of foreigners on that land, and the violation of their human rights for decades, well before the Palestinian Authority came into existence.  It is my professional opinion that the second intifada would have occurred regardless of the Palestinian Authority's existence, and regardless of its views.  Given the frustrations, the extreme pressures and the sense of widespread insecurity under which Palestinians were living as Israel's attacks increased during the second intifada, and given the PA's fundamental weakness and disorganization, it is not surprising that some Palestinians decided to engage in militant forms of resistance.  As Palestinian psychiatrist and recipient of the Physicians for Human Rights Award, Eyad Sarraj pointed out, "the people who are committing the suicide bombings in this intifada are the children of the first intifada—people who witnessed so much trauma as children. So as they grew up, their own identity merged with the national identity of humiliation and defeat, and they avenge that defeat at both the personal and national levels."[138]

---

[134] http://www.pcpsr.org/survey/polls/2002/p5a.html

[135] Bader Araj, "Harsh State Repression as a Cause of Suicide Bombing: The Case of the Palestinian–Israeli Conflict." *Studies in Conflict & Terrorism* (2008) 31(4):284-303, pg. 298.

[136] Nasra Hassan, "Letter from Gaza - An Arsenal of Believers: Talking to the 'human bombs.'" *The New Yorker*, 19 November 2001. http://www.newyorker.com/archive/2001/11/19/011119fa_FACT1?currentPage=all

[137] Nasser Abufarha, *The Making of a Human Bomb: An Ethnography of Palestinian Resistance.* Durham: Duke University Press, 2009, pp.128, 138; also Nadia Taysir Dabbagh, *Suicide in Palestine: Narratives of Despair.* C Hurst & Co. Publishers Ltd, 2005, pg.238.

[138] http://www.middleeast.org/launch/redirect.cgi?num=16&a=13

It is impossible to get into the mind of a suicide bomber, but it is possible to try to understand how multiple factors in the context in which they lived influenced their decisions to take their own and others' lives in these dramatic ways. It is my opinion, based on my understanding of how frustrated Palestinians felt living their lives under a crushing occupation during the second intifada, and based on the statements I have read of suicide bombers, that the extreme stresses of living under military occupation, the overall nationalist context, and each individual's personal circumstances and motivations, are the primary factors that led to these actions.

Lori A. Allen

July 15, 2013