# EXHIBIT 2

Expert Report by Sharon Weill

## I.  Background & Qualifications

My name is Sharon Weill, Ph.D.  I am currently a research fellow at the Geneva Academy of International Humanitarian and Human Rights Law ("The Rule of Law in Armed Conflicts Project") and a visiting senior research fellow at the London School of Economics ("Security in Transition Project").  Since 2013, I have been coordinating the legal section of the Master in Humanitarian Action - CERAH, a joint program of the University of Geneva and the Graduate Institute of International Studies.

I am an expert in International Humanitarian Law ("IHL"), the law of military occupation, and military courts.  My particular fields of research and areas of expertise include the relationship between international and domestic law, the judicial enforcement mechanism of international law, the law of military occupation, and the Israeli Military Courts in the Occupied Palestinian Territories (OPT).   My CV, including a list of publications I have authored in the past 10 years, is included as Exhibit A to my report.

I have published several articles related to the Israeli Military Courts including, "The Investigation Mechanism of Torture Claims in Israel: An Analysis of the 2012 GSS Investigation Decision and the Türkel Report", in Stuart Melsen (ed) *The War Report*, Oxford University Press, Forthcoming December 2013; "Reframing the Legality of the Israeli Military Courts –Military Occupation or Apartheid?" in A. Baker & A. Matar (eds), *Threat - Palestinian Political Prisoners in Israel* (Pluto Press, London, 2011), pp. 136-148; and "The Judicial Arm of the Occupation: The Israeli Military Courts in the Occupied Territories," 89 International Review of the Red Cross, June 2007, pp. 395–420.

I am quite familiar with the Israeli Military Courts in the OPT.  In addition to my academic study, I have conducted field research there on a number of occasions. I have interviewed the former president of the Military Court of Appeals, Col. Shaul Gordon, Military Judge N. Benisho, and military prosecutors and defense lawyers in the Israeli Military Courts (2005-2006). I have taught courses on International Humanitarian Law and the law of military occupation in the law faculties of Tel Aviv University and Paris Assas University as well as at the Geneva University and at Science Politic Paris (Master in Human Rights and

1

Humanitarian Action). From 2007-2011, I taught a course on International Humanitarian Law at the law faculty of Tel Aviv University and regularly took my students on tours of the Israeli Military Courts. I also participated in a roundtable discussion organized by the Israeli Bar Association in Tel Aviv in 2008 by presenting a paper entitled "The Israeli Military Courts in the Occupied Territories: An International Law Perspective" (June 2008). The Israeli Military Courts in the OPT was the subject of my Master's thesis (University of Geneva, 2005-2006). My Ph.D. dissertation (Geneva University, under the supervision of Prof. Marco Sassoli) examined the role of national courts in applying International Humanitarian Law (forthcoming, Oxford University Press). Part of my research for the dissertation consisted of field research in Israeli Military Courts and Israeli civilian courts as well as in the Serbian war crimes chamber in the Balkans.

I am an Israeli citizen. After completing military service in the IDF, I studied law at the University of Tel Aviv (1995-1999). From 1999-2000, I received additional training at the State Prosecutor office (criminal division) in Tel Aviv. In 2000, I was admitted to the Israeli Bar.

I have never testified as an expert at either a trial or a deposition.

I have been asked by counsel for the Defendants to give an expert opinion in *Sokolow v. Palestine Liberation Organization (PLO)*, No. 1:04-cv-397 (S.D.N.Y.) on the Israeli Military Courts during the time period relevant to this lawsuit.

I am being compensated with a fee of $10,000. My compensation is not conditioned on the content of the opinions expressed in this report, nor is my compensation contingent on the results of these proceedings. My hourly rate for providing testimony is $200 plus expenses.

## II.        Summary of Report and Opinions Provided

In the first section of my report, I discuss the legal framework in which military courts operate to provide necessary context for my opinions. In this section, I outline the applicable law in the OPT and the authority of Israel, the military occupying power, to introduce new legislation and establish courts.

2

In the second section of my report, I examine whether the Israeli Military Courts comply with the rule of law standards and the recognized principles governing the administration of justice. Under Article 66 of Geneva Convention IV, military courts of an occupying power must be "properly constituted." I conclude that the Israeli Military Courts during the relevant period were not "properly constituted" because they (1) lacked an independent and impartial judiciary, (2) provided less favorable treatment to Palestinians than to Israeli civilians; and (3) failed to adequately inform Palestinians of the military laws to which they were being held accountable.

In the third section, I address the international law norms for providing due process to those accused of a crime. I conclude that, during the relevant period, the Israeli Military Court system failed to provide adequate due process because it: (1) failed to promptly notify the accused of the reason(s) for his or her arrest and the nature of the charges; (2) failed to ensure the right of the accused, upon detention, to appear before a judge without undue delay; (3) did not ensure sufficient access to defense counsel; (4) did not adopt the presumption of innocence, (5) did not guarantee the right to be tried without undue delay, and (6) relied on custodial statements produced by a system of interrogations tainted with a history of condoning torture.

### Part I: The Legal Framework in Which the Israeli Military Courts Operate

1. **Under the Law of Military Occupation, Israel Has Only Limited Authority to Displace Local Law While Occupying the Palestinian Territories.**

The applicable international law in the Occupied Palestinian Territories (OPT) is the law of military occupation, which includes International Humanitarian Law (IHL) and International Human Rights Law. As confirmed both by the International Court of Justice and the Israeli High Court of Justice, these bodies of law are complementary.[1] Thus, for example, as IHL

---

[1] Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territories, Advisory Opinion of the International Court of Justice, 9 July 2004, para.106; Israeli HCJ 769/02, *The Public Committee against Torture in Israel et al. v. The Government of Israel et al.*, December 2006, paragraph 14. In these cases the courts recognized the continuous applicability of Human Rights Law in situation of occupation as well as its extraterritorial application into occupied zones. See also, UN Human Rights Committee, General Comment No. 31, para. 11; Droege, Cordula, "The Interplay between International Humanitarian Law and International Human Rights Law in Situations of Armed Conflict", *Israel Law Review*, Vol. 40, No. 2 (2007), p. 310. See for example Article 75 (8) of Additional Protocol I, which provides the fundamental guarantees of fair trial: "No provision of this Article may be construed as limiting or infringing any other more favourable provision granting greater protection, under any applicable rules of international law…".

3

contains no provisions regulating arrest and detention during a criminal investigation, this lacuna will be filled by the provisions of international human rights law.

The rationale of the law of military occupation is that it is a "temporary state of affairs pending a peace agreement",[2] and during this period, the occupying power does not enjoy sovereign rights over the territories it occupies. Because the occupying power is not the new sovereign of the territory, it is not permitted to extend its own legal system to the occupied territories.

Accordingly, the local legal system, including its laws and its courts, remains in force just as it was prior to the occupation. According to Article 43 of the Hague Regulations, "The authority of the legitimate power having in fact passed into the hands of the occupant, the latter shall take all the measures in his power to restore, and ensure, as far as possible, public order and safety, *while respecting, unless absolutely prevented, the laws in force in the country.*"[3] Thus, the law of military occupation imposes a general obligation on the occupying power to respect the law that was in force prior to the occupation, unless absolutely prevented from doing so. In 1967, when Israel established a military government over the OPT, it indeed recognized the continued applicability of local law in Military Proclamation No. 2 of 7 June 1967:

> (2). The law that existed in the region on June 7, 1967 will remain in effect, to the extent that it contains no contradiction to this proclamation or to any proclamation or order issued by me, and with the revisions ensuing from the establishment of the Israel Defense Force's regime in the region.

> (3)(a). All authority of government, legislation, appointment and administration pertaining to the region or its residents will now be exclusively in the hand of the

---

[2] A. Roberts, "Transformative Military Occupation: Applying the Laws of the War and Human Rights" in M.N. Schmitt and J. Pejic (eds), *International Law and Armed Conflict: Exploring the Fault Lines: Essays in Honour of Yoram Dinstein* (Martinus Nijhoff Publishers, Leiden, 2007), p. 439-495, at p. 442. As stated by Oppenheim, "there is not an atom of sovereignty in the authority of the Occupying Power L. Oppenheim, 'The Legal Relations between an Occupying Power and the Inhabitants' (1917) 33 Law Quarterly Review 363, p. 364. See also Y. Dinstein, *The International Law of Belligerent Occupation* (Cambridge University Press, Cambridge, 2009), p. 49.

[3] Convention (IV) respecting the Laws and Customs of War on Land and its annex: Regulations concerning the Laws and Customs of War on Land. The Hague, 18 October 1907 (hereinafter: the Hague Regulations) (emphasis added), Article 43.

military commander and will be exercised only by him or by someone appointed by him for this purpose or by someone acting on his behalf. [4]

As noted, the Hague Regulations require the occupying power to respect the local laws "unless absolutely prevented." Article 64 (1) of Geneva Convention IV clarifies the limited situations in which the occupying power may repeal or suspend the local criminal law, namely (1) if the local law constitutes a threat to security, or (2) if the local law is an obstacle to fulfilling the Geneva Convention.[5] These two exceptions, according to the International Committee of the Red Cross (ICRC) commentary of Article 64(1), "are of a strictly limitative nature. The occupation authorities cannot abrogate or suspend the penal laws for any other reason, and not, in particular, merely to make it accord with their own legal conceptions".[6]

Article 64 (2) of Geneva Convention IV specifies three circumstances in which the occupying power may also exercise legislative authority. The occupying power is authorized to promulgate new legislation for the application of the Convention to maintain order and to ensure the occupying power's safety.[7] However, this legislative authority may be exercised only when it is *essential* to achieving order and safety. Significantly, the ICRC Commentary indicates that the legislative capacity of the occupying power may not serve as a means of oppressing the local population.[8]

Since the occupation began in 1967, Israel has issued more than 2600 orders, including 1700 orders that involve criminal laws.

---

[4] 'Proclamation Regarding Law and Administration (The West Bank Area) (No. 2) – 1967' (7 June 1967), '*Collection Proclamation, Orders and Appointments of the I.D.F. Command in the West Bank Area* (Hebrew and Arabic) reproduced in (1971) 1 Israel Yearbook on Human Rights.

[5] Article 64 (1) of Geneva Convention IV states: "The penal laws of the occupied territory shall remain in force, with the exception that they may be repealed or suspended by the Occupying Power in cases where they constitute a threat to its security or an obstacle to the application of the present Convention. Subject to the latter consideration and to the necessity for ensuring the effective administration of justice, the tribunals of the occupied territory shall continue to function in respect of all offences covered by the said laws".

[6] J. Pictet (ed), *Commentary: Fourth Geneva Convention Relative to the Protection of Civilian Persons in Time of War* (ICRC, Geneva, 1958), (hereinafter: Pictet, *Commentary*), p. 336.

[7] Art. 64(2) of the Geneva Convention IV (1949) provides that: "The Occupying Power may, however, subject the population of the occupied territory to provisions which are essential to enable the Occupying Power to fulfil its obligations under the present Convention, to maintain the orderly government of the territory, and to ensure the security of the Occupying Power, of the members and property of the occupying forces or administration, and likewise of the establishments and lines of communication used by them".

[8] Pictet, *Commentary*, p. 337.

Altogether, the law in the OPT comprises several layers of legislation:

- International law of military occupation (IHL and human rights law);
- The legislation that existed prior to the beginning of the occupation in 6 of June 1967 (mainly Jordanian legislation but also British and Ottoman acts);
- Palestinian legislation, subsequent to the establishment of the PA under the Oslo Accords in 1995, when the Palestinian Authority was granted legislative authority in certain limited areas;
- Israeli executive military orders; and
- Certain Israeli parliamentary acts, which were defined to have extraterritorial application within the OPT.

**2. Under Geneva Convention IV, to Conform with International Humanitarian Law, the Israeli Military Courts Should be Properly Constituted, Non-Political and Located in the Occupied Territories.**

Article 66 of Geneva Convention IV grants the military commander of an occupying power the authority to establish military courts for the purpose of prosecuting offences, enacted on the basis of Article 64(2) of Geneva Convention IV. The military courts shall be "properly constituted, non-political" and located in the occupied territories.[9] The Israeli Military Courts in the West Bank and the Gaza Strip are the only example of military courts that claim to derive their authority from Article 66 of Geneva Convention IV.

The Israeli Military Courts were established immediately upon the assumption of governmental authority in the OPT by Israel.[10] On 7 June 1967, the Israeli army issued Proclamation No 3, to which was annexed the Security Provisions Order (West Bank region) 1967, and which authorized the military commander to establish military courts, stipulated their rules of procedure, and enumerated the offences punishable by the courts.[11] On the same day, the military commander also ordered the establishment of military courts.[12]

---

[9] Art. 66 of Geneva Convention IV states: "In case of a breach of the penal provisions promulgated by it by virtue of the second paragraph of Article 64 the Occupying Power may hand over the accused to its properly constituted, non-political military courts, on condition that the said courts sit in the occupied country. Courts of appeal shall preferably sit in the occupied country".

[10] Z. Hadar, 'The Military Courts', in M. Shamgar (ed), *Military Government in the Territories Administered by Israel 1967-1980,* vol 1 (1982), pp. 171, 173.

[11] The numerous amendments have twice been incorporated into consolidated versions. First in 1970, in the Security Provisions Order (Judea and Samaria) No 378, 1970, and again in 2009, in the Security Provisions

The first five Israeli Military Courts were established in 1967 in Hebron, Nablus, Jenin, Jericho and Ramallah. Since then the number of courts has been reduced or enlarged according to security and political considerations.[13]  Also, the Israeli Military Courts have issued hundreds of thousands of decisions involving criminal procedures. During 2001-2004, only two courts of first instance and one Court of Appeals functioned in the West Bank and one court of first instance in Gaza. These courts were responsible for administering justice in matters under their jurisdiction for the entire OPT. Whether they alone could handle this task is highly questionable.[14]

Courts "properly constituted" under Geneva Convention IV must comply with the standards required by the rule of law.[15] In *Hamdan v. Rumsfeld*, 548 U.S. 557 (2006), the U.S. Supreme Court interpreted the term "regularly constituted court" of Common Article 3 of the Geneva Conventions when reviewing the legality of the military commission established in Guantanamo Bay, Cuba. The U.S. Supreme Court held that a "regularly constituted court" of Common Article 3 is identical to the term "properly constituted courts" of Article 66, and that it "must be understood to incorporate at least the barest of those trial protections that have been recognized by customary international law. Many of these are described in Article 75 of Protocol I to the Geneva Conventions of 1949, adopted in 1977 (Protocol I)."[16] Similarly, the ICRC Commentary emphasizing that "the idea of a regular trial is so

---

Order [Consolidated Version] (Order No 1651) - 2009. During 2001-2004 the military courts operated under the terms of the 1970 consolidated version of this order (hereinafter: Security Provision Order No. 378).

[12] Order regarding Establishment of Military courts (West Bank Area) (No 3) 1967, 7 June 1967, Compilation of Proclamations, Orders and Appointments No 1, p. 25.

[13] N. Benisho, ''Criminal law in the West Bank and Gaza'', IDF Law Review, Vol. 18 (2005), p. 299, at p. 300 (in Hebrew), p. 302.

[14] As a defense attorney explained, "[the military courts] have many cases, perhaps more than the Magistrate Court in Jerusalem. But they have fewer judges, fewer prosecutors, fewer courtrooms – and so they don't have time. And all of that is to the detriment of whom? Of the defendants and their attorneys". Yesh Din, *Backyard Proceedings: The Implementation of Due Process Rights in the Military Courts in the Occupied Territories* (2007), p. 93. Available at http://www.yesh-din.org/site/images/BackyardProceedingsEng.pdf. *See also* Sharon Weill, "The judicial arm of the occupation: the Israeli military courts in the occupied territories", Volume 89, June 2007, at footnote 4.

[15] Raz identified eight fundamental elements of the rule of law, common to all legal systems: (1) all law should be prospective, open, and clear; (2) the law should be relatively stable; (3) the making of particular laws (particular legal orders) should be guided by open, stable, clear, and general rules; (4) the independence of the judiciary must be guaranteed; (5) the principles of natural justice must be observed; (6) the courts should have review powers over the implementation of the other principles; (7) the courts should be easily accessible; and (8) the discretion of the crime-prevention bodies should not be allowed to pervert the law. J. Raz, 'The Rule of Law and Its Virtue' (1977) 93 The Law Quarterly Review 2.

[16] 548 U.S. at 633.

important" indicates that military courts will "be set up in accordance with the recognized principles governing the administration of justice."[17]   Indeed, the severity of the accusation (including charges of "terrorism") does not lower the standard for determining whether a court is properly constituted. As the U.S. Supreme court concluded:

> We have assumed… that Hamdan is a dangerous individual ... But in undertaking to try Hamdan and subject him to criminal punishment, the Executive is bound to comply with the Rule of Law that prevails in this jurisdiction.[18]

Similarly, the rule of law must prevail in the Israeli Military Courts.

Article 66 of Geneva Conventions IV requires the creation of non-political courts. Indeed, any legal procedure has to be decided by a competent, independent and impartial tribunal established by law. This requirement is prescribed by numerous human rights documents and treaties,[19] and has been recognized as a founding principle in domestic systems bound by the rule of law.[20]

The Basic Principles on the Judiciary, adopted by UN General Assembly Resolution, established the conditions and procedures necessary to guarantee the independence of judges.[21] These include establishing the qualifications necessary to be a judge, determining the terms of judicial appointment,[22] establishing efficient, fair and independent judicial

---

[17] Pictet, *Commentary*, p. 340.

[18] 548 U.S. at 635.

[19]See for example the International Covenant of Civil and Political Rights, December,16, 1966 [hereinafter: the ICCPR], Article 14(1);  the European Convention for Human Rights and Fundamental Freedoms, November 5, 1950 [hereinafter: the European Convention], Article 6(1); The American Convention on Human Rights, November 22, 1969 [hereinafter American Convention], Article 7(4); Articles 8(1) and 27(2); and African Charter on Human and Peoples' Rights, June 27, 1981 [hereinafter African Convention], Articles 7(1) and 26.

[20] A. Marmor, 'The Ideal of the Rule of Law' in D. Patterson (ed), *A Companion to Philosophy of Law and Legal Theory* (2nd edn, Wiley-Blackwell, Oxford, 2010), p. 666. A. Watts, 'The International Rule of Law' (1993) 36 German Yearbook of International Law 15, p. 18. See also, for example, I. Brownlie, *The Rule of Law in International Affairs: International Law at the Fiftieth Anniversary of the United Nations* (Martinus Nijhoff Publisher, The Hague, 1998), p. 212.

[21] Basic Principles on the Independence of the Judiciary, UN General Assembly resolution 40/32, November 29,1985 and resolution 40/146, December 13, 1985 [hereinafter: Basic Principles on the Independence of the Judiciary].

[22] Basic Principles on the Independence of the Judiciary, Principle 10.

disciplinary proceedings,[23] and providing adequate salaries[24] and proper training[25] to enable the judiciary to properly perform its functions.[26]

The next part examines whether Israeli Military Courts in the OPT comply with the rule of law and the recognized principles governing the administration of justice.

### Part II:   The Military Courts in the OPT Do Not Qualify As "Properly Constituted" for Purposes of Article 66 of Geneva Convention IV.

#### 1.  The Judiciary in the Israeli Military Courts Do Not Meet the International Law Standard for Impartiality and Independence.

##### a.  The Appointment Procedure for the Israeli Military Court Judges

According to Article 3(b) of the Security Provision Order No. 378, Israeli Military Court judges are appointed by the army commander "on the recommendation of the Chief Military Attorney." Accordingly, judges operating in Israeli Military Courts in the OPT are dependent on the prosecution and executive authorities because they are appointed following the recommendation of the head of the prosecution unit. Moreover, from 1967-2004, the judges of the Israeli Military Courts belonged to the Military Advocate General's Corps, the same military unit as the military prosecutors who appeared before them, and the unit which influences the content of military legislation.

Moreover, the Israeli Military Court judges are members of the Israeli armed forces. They are therefore subject to military discipline; they are evaluated for promotions; and they are subordinate to the executive power. Due to the foregoing, a strong argument can be made that the Israeli Military Courts in the OPT do not comply with the structural requirement of the independence of the judiciary.

This improper constitution of the court was not corrected until April 2004, when the Military Courts Unit was established and subordinated to the Courts-Martial Unit (instead of the Military Advocate General's Corps). In addition, in 2004, the authority to recommend the

---

[23] *Id.*, Principles 17-20.

[24] *Id.*, Principle 11.

[25] *Id.*, Principle 10.

[26] *Id.*, Principle 7.

appointment of judges to the military commander was transferred from the Military Advocate General to the Committee for the Appointment of Military Judges.

American Professor Lisa Hajjar observed that "law enforcement in the occupied territories is not disinterested; it is provided primarily by soldiers, most of whom, by all accounts, are deeply hostile to and suspicious of Palestinians".[27]  The fact that all military judges must be officers of the same occupying army, and therefore by definition in a control position *vis-a-vis* the population of those that they judge, raises a serious doubt about their ability to be impartial.

### b.  The Lack of Legal Training of the Israeli Military Court Judges

It goes without saying that judges must possess the necessary competence and legal skills in order to fulfil their judicial duties in an independent and professional manner.  This is especially true in complex criminal cases.

Between 1967-2004, the Israeli Military Courts in the OPT prosecuted hundreds of thousands of Palestinian civilians, some of them for the most serious offences in the criminal code.[28]  Yet, not all judges were required to have a legal background.  Many judges were regular army officers, usually quite young, who lacked any legal education.[29]  As a result, most of the serious cases that were prosecuted in the Israeli Military Courts were decided by benches of three judges, only one of whom had any legal training. This improper constitution of the courts, in force since 1967, was not corrected until October 2004 by Amendment No. 89 to the Security Provision Order, which prescribed that all judges must have legal education.[30]

---

[27] L. Hajjar, *Courting Conflict - The Military Court System in the West Bank and Gaza*, (2005), at p. 112.

[28] Indictments filed against Palestinians in the military courts are divided into five categories: Hostile terrorist activity; disturbances of the peace; regular criminal offenses (such as robbery); illegal presence in Israel; and traffic cases. According to official data the number of indictments filed was 7804 in 2003; and 10,121 in 2004. (source of the data: Military Advocate General's Corps Headquarters, Annual Report on Activity for 2003 p. 216, 249; Annual Report on Activity for 2004 p. 126).

[29] According to Article 4 (a) of Security Provision Order No. 378:  "A military court of three will be composed of three judges who are IDF officers, of which at least one will be a jurist judge." According to Article 3(b)(1) of the Security Provision Order No. 378 a jurist judge is an army officer  who is  "in possession of legal training and at the rank of captain or higher". See also, Benisho, at p. 312-313.

[30] Military Order No. 1550, Security Provision Order (West Bank) (Amendment 1550) (No. 89) – 2004, 12 October 2004.

### c. Centralization of Power under the Israeli Military Commander

Until 2009, the Israeli Military Courts operated in accordance with the terms of Security Provision Order No. 378 (1970), which was issued by the Israeli army.[31] The same military order also established the criminal code, rule of procedures and due process applicable in the OPT, as well as the regulations for the appointment of judges. Since1967, Security Provisions Order No. 378 has been amended more than a hundred times by the Israeli military executive authorities, the very same authorities in charge of the prosecution of these offences and the appointment of the judges.

In *Hamdan*, the U.S. Supreme Court ruled that the military commission at Guantanamo Bay did not conform with the requirements of a "regularly constituted court" because of the centralized power of the Executive. The Court stated:

> Further evidence of this tribunal's irregular constitution is the fact that its rules and procedures are subject to change midtrial, at the whim of the Executive. See Commission Order No. 1, §11 (providing that the Secretary of Defense may change the governing rules from time to time).[32]

Yet, this is exactly the situation in the military courts in the OPT, in which the executive has legislative and judiciary authority.

Human rights law, which was developed after the drafting of the Geneva Conventions, prohibits the trial of civilians by military courts exactly because they generally do not comply with the requirement of an independent and impartial judiciary.[33] For example the UN Human Rights Committee notes that "the existence…of military or special courts which try civilians…present serious problems as far as the equitable, independent and impartial

---

[31] In 2009 it was replaced by Security Provisions Order [Consolidated Version] (Judea and Samaria) (No. 1651) (2009).

[32] 548 U.S. at 633, n. 65.

[33] Articles 14 (1) of ICCPR requires that "in the determination of any criminal charge against him, or of his rights and obligations in a suit at law, everyone shall be entitled to a fair and public hearing by a competent, independent and impartial tribunal established by law". As the jurisdiction granted by international humanitarian law contrasts with a human rights law provision, it is generally accepted, that in order to solve this conflict of law, the law more specifically designed for the situation (*lex specilais*), in that case international humanitarian law, will prevail.

administration of justice is concerned"[34]; and the United Nations Special Rapporteur on the independence of judges and lawyers concluded that "international law is developing a consensus as to the need to restrict drastically, or even prohibit, that practice."[35]  In this context, the ICRC Customary law study states that:

> In order to be independent, a court must be able to perform its functions independently of any other branch of the government, especially the executive. In order to be impartial, the judges composing the court must not harbour preconceptions about the matter before them, nor act in a way that promotes the interests of one side…Regional human rights bodies have found that the trial of civilians by military courts constitutes a violation of the right to be tried by an independent and impartial tribunal.[36]

Indeed, the drafting of the Fourth Geneva Convention in 1949 was based on the rationale that occupation is a temporary situation. The Geneva Convention was not designed to regulate, and cannot be construed to authorize, a situation in which for a period in excess of 40 years, Palestinian civilians, including children, would come under the criminal jurisdiction of an alien army's judicial order, which functions as the executive, the legislative and the judicial authority.  In addition, human rights law prohibits the trial of civilians by a military court, because of such court's lack of structural independence and impartiality.

---

[34] UN Human Rights Committee, General Comment No. 13 on Art. 14 of the ICCPR, (12 April 1984), UN Doc.HRI/GEN/1/Rev.1.

[35] UN document E/CN.4/1998/39/Add.1, paragraph 78. See also: "The existence of independent and impartial courts and the observance of the norms of due process are basic requirements for the proper administration of justice established under international human rights law.... The reality is that, on the whole, as far as ensuring that justice is dispensed independently and impartially is concerned, military courts do not adhere to general principles and international standards and their procedures are in breach of due process" - Federico Andreu-Guzmán, *Military Jurisdiction*, International Commission of Jurists (2001), p. 10.

[36] JM Henckaerts and L. Doswald-Beck, *Customary International Humanitarian law, Volume I: Rules,* Cambridge University Press (2005), (hereinafter: ICRC Customary IHL study), p. 356.

## 2. The Israeli Military Courts Do Not Provide Equal Treatment to Palestinians and Israelis Living in the OPT, in Violation of International Law.

Equality is a fundamental requirement of the rule of law. The law must be equally applicable to all the subjects under a given jurisdiction, and all subjects should be equal before the law. Article 14(1) of the International Covenant of Civil and Political Rights provides that "All persons shall be equal before the courts and tribunals" and has been interpreted as meaning that all persons must have the right of equal access to a court without any discrimination. This means that establishing separate courts for different groups of people based on their race, color, sex, language, religion, political or other opinion, national or social origin, property, birth or other status is a contravention of Article 14(1).

### a. Jurisdiction *Ratione Persona*: Segregation between Jewish and Palestinian Defendants

Israeli Security Provisions Order (No. 378) establishes the territorial jurisdiction of the Military Courts over crimes committed in the OPT regardless of the nationality of the offender, whether he is Israeli, Palestinian or a foreigner.[37] However, the jurisdiction has been constantly expanded or restricted according to the nationality of the perpetrator, in order to guarantee, on the one hand, jurisdiction over the civilian Palestinian population, and, on the other, to exclude the Jewish Israeli population from being subject to it. In order to avoid a situation in which Israelis residing in the Occupied Territories would fall under the jurisdiction of Israeli military law and tribunals, the Israeli Parliament enacted the Emergency Regulations (West Bank and Gaza – Criminal Jurisdiction and Legal Assistance) Law in 1967, which states in Art. 2(a):

> Israeli courts have jurisdiction to try according to Israeli law any person who is present in Israel and who committed an act in the Region, and any Israeli who committed an act in the Palestinian Authority, if those acts would have constituted an offence had they occurred in the territory under the jurisdiction of Israeli courts.

---

[37] *See* Article7 (a) of the Security Provision Order N. 378.

At the same time, to prevent the extension of regular Israeli criminal law to Palestinians, section 2(c) provides that "this Regulation does not apply to residents of the Region or the Palestinian Authority, who are not Israelis."

As a result of this legislation, a system of concurrent jurisdiction was created; both Israeli civil and military courts have jurisdiction over offences committed in the OPT by Israelis. However, although two very different legal structures are competent to exercise their authority over crimes committed by Israelis in the OPT, there is no law regulating which system has priority in adjudicating. Thus, a selective policy emerged. In the 1960s and 1970s, the parallel jurisdiction of the Israeli courts did not deprive military courts of their authority to adjudicate cases involving Israeli Jews defendants.[38] However, this practice soon came to an end. Since the violent events committed by Jewish settlers during the evacuation of Yamit settlement in Sinai in 1979, Jewish Israelis are no longer tried before the Israeli Military Courts as a matter of policy.

According to the former President of the Military Court of Appeals, Col. Shaul Gordon, this policy of unequal treatment of Palestinians and Jewish Israeli nationals was introduced for two main reasons. Legally, it ensures that the Israeli Jewish defendant will enjoy the extensive procedural rights guaranteed by Israeli law which, as discussed below, do not apply in the Israeli Military Courts. Second, practically, it was dangerous to detain Jewish and Palestinian detainees in the same detention units.[39]

Yet, this policy of judging Israeli Jews in Israeli domestic courts instead of in Israeli Military Courts has also resulted in unequal treatment between Jewish and Palestinian Israeli nationals.

While Israeli Jews have been excluded from the Israeli Military Courts' jurisdiction as a matter of policy (even when they live and commit crimes within the territorial jurisdiction of the military courts), Palestinians with Israeli nationality (especially Palestinians from East Jerusalem)[40] who are charged with offences committed within the OPT, have always been

---

[38] HCJ *Levy v. General in Chief*, 21 PD 2 (1967); HCJ 507/72 *Arnon v. Attorney General* 27(1) PD 233, 238; English summary: 9 *IYHR* (1979) p. 334.

[39] Interview with Col. Shaul Gordon, President of the military court of appeals, at his office at Ofer military camp in 4.12.2005.

[40] As East Jerusalem was annexed by Israel, Israeli law became applicable there, and the Palestinian residents there could be granted Israeli nationality.

tried in the Israeli Military Court. Whenever Israeli Palestinians have argued before Israeli Military Courts that they should be tried in an Israeli civilian court, their claim has been systematically rejected on the formal grounds that the Emergency Regulations Law does not annul the jurisdiction of the military courts.[41] The legal lacuna, i.e., the non determination of the rules of priority to regulate the concurrency of jurisdictions, facilitates the practice of a segregation policy. Accordingly, if two persons – one Israeli Jewish and the other Palestinian - commit the same crime in the same place in the OPT, they will nonetheless be adjudicated by distinct and unequal systems of criminal law. In other words, the applicable systems of criminal legislation, procedural rights, rules regarding the severity of punishment, and the structural independence of judges, will depend solely on the nationality of the perpetrator.

**b. Concurrent Jurisdiction with Israeli Civilian Courts and the Application of Two Different Criminal Codes**

The U.S. Supreme Court ruled in *Hamdan* that a "regularly constituted court" means a court established and organized in accordance with the laws and procedures already in force in a country.[42]

Not only do the Israeli domestic courts and the Israeli Military Courts have different criminal codes and rules of procedure but in the absence of any regulation specifying which court has jurisdiction, the choice of jurisdiction is arbitrary. And, as discussed below, that choice will have a major impact on the procedures governing the defendant's trial.

For offences committed in Israel by Palestinians from the OPT, both the Israeli Military Courts[43] and the Israeli civilian courts will have territorial jurisdiction. Because the priority in jurisdiction is not regulated by law, the decision about where to try a Palestinian defendant is left to the whims of the prosecuting authorities. This decision will be significant for the Palestinian defendant because the law is different in each court.

---

[41] HCJ 6743/97, *Zrari v. Israeli Police* (unpublished, 1997). MC, *The Israeli Police v. Nabulsi* (1990), 7 *SJMC* 189, at p.198.

[42] 548 U.S. at 632.

[43] Section 7 (c) of the Security Provision Order N. 378 set the jurisdiction of the military courts as the following: The military court will also have jurisdiction as noted in sub-section (a) over a person who committed an act outside of the region which would constitute an offense if it had been committed in the region and the act harmed or was intended to harm the security of the region or public order.

For example, in Israeli civilian courts, a person is not criminally responsible for an attempted offence if it proven that he prevented the commission of the offense as a result of a change of heart.[44] However in Israeli Military Courts, a defendant is criminally responsible even if he had a change of heart. In that situation, he will be charged with an attempt and will be punished. In the case of *Noursi,* for example, the appellant was arrested in 2001 in Haifa, a city in the north of Israel, after he decided to refrain from committing a bombing attack because "he had mercy on the women and children who were present in the place [where he was supposed to blow himself up] as they reminded him of his mother and brothers."[45] The Israeli Military Court of first instance charged him with attempted murder and sentenced him to 13.5 years' imprisonment, and the court of appeals reduced his sentence to seven years. But, if Mr. Noursi had been tried in an Israeli civilian court in Haifa, where he was arrested, no criminal responsibility could have been imposed on him.

In addition, in the Israeli military legislation, unlike in Israeli civilian legislation applicable in Israeli courts within Israel, there is no prohibition against the retroactivity of criminal legislation.

### 3. The Israeli Military Court System Does Not Adequately Comply with Geneva Convention IV, Article 65's Requirement That the Occupying Power's Law Shall Be Known, Published and Not Retroactive

The requirement that the Occupying power's penal law must be known, published and not retroactive is a fundamental principle of the rule of law.[46] Geneva Convention IV sets down in Art. 65 the following obligation:

> The penal provisions enacted by the Occupying Power shall not come into force before they have been published and brought to the knowledge of the inhabitants in their own language.

In the military legislation applicable in the Military Courts in the OPT, there is no provision requiring the publication of orders in an official gazette. Indeed, the first military

---

[44] Art. 35 (a) of the Israeli Criminal Code (1977).

[45] MCA 225/02 *Muhamad Tawalba called 'Noursi' v. The Military Prosecutor,* (unpublished) (2004) p. 4.

[46] "No crime can be committed, no punishment can be imposed without having been prescribed by a previous penal law " - this principle was incorporated in the European Convention on Human Rights, article 7(1) and in the Rome Statute of the International Criminal Court, articles 22 and 23.

commander in OPT, announced in 1967 that any enactment would be published "in any manner I find appropriate."[47]

In practice, although some military orders are not published at all, such as those regarding administrative provisions and matters concerning settlements,[48] most orders eventually are published in the IDF official Gazette in the West Bank:  "Proclamation, Orders and Appointments."   But the distribution of published orders is very poor and often much delayed.  Military orders, however, usually are made effective on the date of issue.  Thus, from the moment the Israeli military commander has signed an order, it is deemed binding even though it is not published.  During this period, from the date of its issue until its publication, the law is in force without anyone but the army knowing about it.

The military orders are published only in the Gazette as they are issued, and are not collected together in any official publication, or Code.  Therefore, in practice it is very difficult to find an order and to know whether it is the current one, as they are frequently amended. The decisions of Israeli Military Courts, which interpret the military law, are also not systematically published. The few selected rulings which are published are available only in Hebrew.

Palestinian defendants and their lawyers often discover the law for the first time in court. This situation simply does not happen to Israelis tried in Israeli civilian courts.

### Part III:  The Israeli Military Court System Does Not Provide Adequate Due Process to Palestinians

#### A.  International Humanitarian Law Prohibits Arbitrary Detention and Guarantees the Right to a Fair Trial

Article 9(1) of the UN International Covenant on Civil and Political Rights of 1966 (ICCPR) provides that: "Everyone has the right to liberty and security of person. No one shall be

---

[47]Art. 6 of Military Proclamation No. 2 (1967).

[48] E. Benvenisti, *The International Law of Occupation* (2nd edn, Princeton University Press, 2004), p. 116.

subjected to arbitrary arrest or detention".[49] The prohibition on arbitrary deprivation of liberty is a customary rule of IHL.[50]

The general right of individuals not to be subjected to arbitrary arrest is dependent on the fulfillment of a number of procedural requirements which have been developed by human rights law, and which constitute customary IHL rules.[51]  These requirements include (1) the duty to promptly inform an arrestee of the reason for his or her arrest; (2) the duty to allow consultation with a lawyer, and (3) the duty to provide access to a judge so that the detainee may challenge his or her detention (the right to *habeas corpus*).

Article 71 of Geneva Convention IV provides:  "No sentence shall be pronounced by the competent courts of the Occupying Power except after a regular trial." The ICRC commentary to Article 71 clarifies that "The inclusion in the Convention of the express rule that no sentence may be pronounced by the competent courts of the Occupying Power except after 'a regular trial' introduces into the law of war a fundamental notion of justice as it is understood in all civilized countries."[52]  It is an IHL customary rule that "No one may be convicted or sentenced, except pursuant to a fair trial affording all essential judicial guarantees."[53] The right to a fair trial is provided for in detail in Geneva Convention IV, Articles 5 and 66–75 and Additional Protocol I, Article 75(4). The ICCPR, the Convention on the Rights of the Child of 1989 and the regional human rights conventions all provide for the right to fair trial.[54]

The fulfilment of the right to a fair trial depends on the respect for several procedural obligations upon the judicial and prosecutorial authorities.  First, the accused must be promptly notified of the nature and particulars of the criminal charge(s) against him or her. Second, the accused must be brought before a judge without undue delay.  Third, the accused

---

[49] See also European Convention, Article 5(1); Convention on the Rights of the Child, Article 37(b); American Convention, Article 7(3); African Charter, Article 6.

[50] See Rule 99 of the ICRC Customary IHL Study.

[51] See ICRC Customary IHL Study, pp. 349-352.

[52] Pietet, *Commentary*, p. 353.

[53] Rule 100 of the ICRC Customary IHL Study.

[54] ICCPR, Article 14(1); Convention on the Rights of the Child, Article 40(2)(b)(iii); European Convention, Article 6(1); American Convention, Article 8(1); African Charter, Article 7. In its General Comment on Article 4 of the ICCPR, the UN Human Rights Committee stated that the fundamental principles of fair trial rights may never be derogated from. UN Human Rights Committee, General Comment No. 29 (Article 4 of the ICCPR).

must have access to competent attorney.  Fourth, the accused must be presumed innocent, and the burden of proof is placed on the prosecution.[55]  Fifth, the accused is entitled to a trial without undue delay.  And, sixth, the accused has a right to be free from torture.  Each of these obligations, as it is applied in the OPT, is discussed in the next section.

> **B. There Are Key Disparities Between the International Law Norms for Due Process and the Due Process Received by Palestinians in the Israeli Military Courts, in Contrast to the Due Process Received by Israeli Civilians in Israeli Criminal Courts**

The following section outlines the procedural rights guaranteed to all criminal defendants under international law and then examines their implementation in the Israeli Military Courts and in the Israeli civilian courts. In doing so, it exposes major disparities between the two courts, and the due process shortcomings of the Israeli military courts, when measured against international humanitarian law norms.

> **1.   Notice:  The right of the accused to be notified of the reason(s) for his or her arrest and the nature of the charges.**

<u>Notice re Reasons for Arrest -- International Law Norms</u>:

Article 75(3) of Additional Protocol I (1977), which constitutes a customary rule of IHL,[56] states that "any person arrested, detained or interned ... shall be informed promptly, in a language he understands, of the reasons why these measures have been taken". Similarly, Article 9(2) of the ICCPR provides that "Anyone who is arrested shall be informed, at the time of arrest, of the reasons for his arrest and shall be promptly informed of any charges against him."[57]  The ICCPR thus imposes a duty on the arresting authority to inform the arrestee of the reasons for the arrest *at the time of arrest*. In addition, an arrestee shall be *promptly* informed of the criminal accusations against him. There must be sufficient information so as to permit the accused to challenge the legality of his or her detention.[58]

---

[55] ICRC Customary IHL Study, p. 348.

[56] ICRC Customary IHL Study, p. 346.

[57] *See also* the European Convention Article 5(2); The American Convention, Article 7(4); Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment, UN General Assembly resolution 43/173, December 9, 1988, Principle 10; 1992 Resolution on the Right to Recourse Procedure and Fair Trial of the African Commission on Human and Peoples' Rights, Paragraph 2(B).

[58] For example, the European Court of Human Rights has held that an arrested person shall "be told, in simple, non-technical language that he can understand, the essential legal and factual grounds for his arrest, so as to be able, if he sees fit, to apply to a court to challenge its lawfulness." However, the Court also held that it was not

Notice re Reasons for Arrest -- Israeli Law:

The obligation to inform a detainee of the reason(s) for his or her arrest is explicitly set out under Israeli law. Article 24 of the Criminal Procedure Law (Powers of Enforcement – Arrest), 1996 states that when a police officer arrests a person he or she must "inform him immediately that he is arrested and will - as soon as possible while executing the arrest - explain to him the reason for the arrest." However, such parallel obligation applicable to arrests executed in the OPT does not exist. There is no provision in Security Provision Order No. 378 that entitles an arrestee to be informed of the reasons of his or her arrest.  In practice, arrests in the OPT are usually carried out by soldiers who in many instances do not possess any information concerning the reasons for the arrest, nor do they necessarily speak the language of the arrested person. Instead, they simply transfer the detainees into the hands of the Israeli police or to the General Security Services (GSS) for interrogations.

Notice re Nature of Criminal Charges -- International Law Norms:

The obligation to promptly notify an accused of the criminal charges against him or her in a language the person understands is set out in Article 71(2) of Geneva Convention IV:

> Accused persons who are prosecuted by the Occupying Power shall be promptly informed, in writing, in a language which they understand, of the particulars of the charges preferred against them [....].[59]

The ICRC commentary to Article 71(2) notes that "The nature and grounds for the charge must be notified to the accused without delay; the protected person accused must know the reasons for his arrest in time to prepare his defense. The notification must give full particulars in a language the person concerned can understand and in writing, in order to avoid the possibility of changes being made in the charge preferred".[60] Similarly, Article 14(3)(a) of the ICCPR states that every person accused of a crime shall be entitled "To be informed promptly and in detail in a language which he understands of the nature and cause of the charge against him."   The UN Human Rights Committee indicated that this obligation can never be

---

necessary to give a full description of the charges at the moment of arrest. European Court of Human Rights, *Fox, Campbell and Hartley, case no.* 18/1989/178/234-236), Judgment of August 30, 1990, para. 40.

[59] See also Additional Protocol I, Article 75(4)(a).

[60] Pictet, *Commentary*, p. 357.

dispensed with.[61] The duty to inform includes the obligation to provide an exact legal description of the offense ("nature") and of the facts underlying it ("cause") and is thus broader than the corresponding rights granted under Article 9(2) of the ICCPR applicable to arrests. The rationale behind this duty is that the information provided must be sufficient to allow for the preparation of a defense. Therefore, the information must be provided promptly and in a language the accused understands.

Notice re Nature of Charges -- Israeli Law:

There is no procedural provision in the law applicable to the Israeli Military Courts in the OPT limiting the time within which an indictment shall be filed. Article 21 of the Security Provision Order No. 378 only instructs that "a copy of the indictment will be given to the defendant prior to his trial." Thus, there is no formal requirement that the charges be promptly made known to the defendant as soon as the indictment is finalised. In practice, according to the Israeli human rights organization Yesh Din, "indictments against defendants who are in custody are presented to their defense attorneys on the day of the hearings regarding the prosecutor's request to detain the accused until the end of proceedings."[62]

The spoken language of the Palestinian defendants is typically Arabic. This is also true for the majority of the defense attorneys. However, indictments and all other investigative documents and materials related to the case are written only in Hebrew. To make matters worse, the defendants and their lawyers will usually not receive the often-lengthy indictments until they are in court. Since there is no requirement under the applicable law in the Israeli Military Courts to provide a written translation of the indictment into Arabic, as international law requires, "many accused are not fully aware of the nature of the charges against them, nor of the particulars. This applies especially to those whose defense attorneys are not proficient in the Hebrew language".[63] Although Article 21 of Security Provision Order No. 378 only provides that at "the beginning of the trial, the court will read the indictment to the defendant and will explain to him, if it perceives a need to do so, its content," in most cases, an oral translation of the indictment is done only upon request. By contrast, in Israeli civilian courts, indictments are always submitted in writing in Arabic when this is asked; Arabic is one of the official languages of the State of Israel.

---

[61] UN Human Rights Committee, General Comment No. 29 (Article 4 of the ICCPR).

[62] *Yesh Din Report*, p. 94.

[63] *Yesh Din Report*, p. 99.

### 2. The right of the accused to be brought before a judge without undue delay

<u>International Law Norms:</u>

Judicial intervention prevents arbitrariness.[64]  Therefore, the right to have the lawfulness of detention reviewed by a court and to be released where it is not lawful – the right to *habeas corpus* – has a distinguished historical pedigree and is recognized by most legal systems as a fundamental principle guaranteeing the rule of law. It is also recognized as a principle of customary international law.[65] Article 9(3) of the ICCPR refers specifically to the rights of a person arrested or detained on a criminal charge, who "shall be brought promptly before a judge or other officer authorized by law to exercise judicial power and shall be entitled to trial within a reasonable time or to release."  Promptness has been interpreted by the UN Human Rights Committee to mean that the period of custody, before an individual is brought before a judge or other judicial officer, may not exceed "a few days."[66] Article 5(3) of the European Convention for the Protection of Human Rights and Fundamental Freedoms of 1950 similarly provides that "Everyone arrested or detained in accordance with the provisions of paragraph 1(c) of this Article shall be brought promptly before a judge or other officer authorized by law to exercise judicial power.'" The term "promptly" was interpreted by the European Court of Human Rights in *Borgan v. U.K.*, in which it held that detaining terrorism suspects in Northern Ireland for four days and six hours, without having been brought before a judge, was a violation of the Convention:

> The degree of flexibility attaching to the notion "promptness" is limited, even if the attendant circumstances can never be ignored for the purposes of the assessment under paragraph 3. Whereas promptness is to be assessed in each case according to its special features, the significance to be attached to those features can never be taken to the point of impairing the very essence of the right guaranteed by Article 5(3), that is

---

[64] *See* N. Rodley, *The Treatment of Prisoners Under International Law* (2nd ed., Oxford University Press, 2000) p. 340.

[65] See Rule 99 of ICRC Customary IHL Study. The interwoven right of access to justice – the ability of an individual "to go before an independent and impartial judge and to have their claims duly considered by [a] judge" has been held to be a *jus cogens* international norm by the late Professor Antonio Cassese: Special Tribunal for Lebanon, *Order Assigning Matter to Pre-Trial Judge*, Case No. CH/PRES/2010/01, 15 April 2010, paras. 28-29.

[66] Human Rights Committee, General Comment No. 8, July 27, 1982, para 2. The Inter-American Commission has held that a week is too long (Inter-American Commission Seventh Report on the Situation on Human Rights in Cuba, 1983 OEA Ser L/V/11 61.doc 29 rev 1, at 41).

the point of effectively negating the State's obligation to ensure a prompt release or a prompt appearance before a judicial authority. [67]

Israeli Law:

*First judicial review*: In Israeli civilian courts, the Criminal Procedure Law imposes an obligation to bring a detainee before a judge within **24 hours**.[68] In contrast, in the Israeli Military Courts, Article 78(d)(1) of the Security Provision Order No. 378 authorizes a police officer to arrest and detain an individual for up to **8 days** without any judicial review.[69] According to Adv. Ramaty, a defense lawyer practicing in the Israeli Military Courts, the common practice is to automatically detain arrested persons for 8 days and, in addition, to do so without allowing access to lawyer.[70]

*Authorized period of detention before issuance of indictment*: In Israeli civilian courts, a judge can authorize the period of detention for investigation purposes for 15 days each time, for a maximum period of **30 days**, and up to 75 days only following the authorization of the Attorney General.[71] In the Israeli Military Courts, military judges can prolong the period of detention for up to **90 days** (and up to 180 days on the authority of a judge of the Military Appeal Court).[72] Moreover, since 2007, military judges can authorize the detention of detainees for up to 25 days without having the detainee even being present in the

---

[67] *Brogan et al. v. United Kingdom,* 10/1987/133/184-187, November 29, 1988, para. 62.

[68] Article 29(a) of the Criminal Procedure (Enforcement Powers Detentions) Law-1996. As for detention of military soldiers, section 237A of the Military Justice Law-1955 provides that the detainee is to be brought before a military judge within 96 hours. The Israeli HCJ reviewed this provision, and concluded that it was unconstitutional. The law was amended and it now provides that in detaining a military soldier under the Military Justice Law, the detainee is to be brought before a judge within 48 hours. HCJ 6055/95 *Tzemach v. Minister of Defense.*

[69] Article 78(e)(1)and (2) of the Security Provision Order N. 378. Originally, Security Provision Order No. 378 provided that a detention order without access to a judge for a period of up to 18 days could be issued. This has been the practice for over 20 years. After the *Commission of Inquiry into the Methods of Investigation of the General Security Service Regarding Hostile Terrorist Activity* (Landau Commission), found on 30 October 1987 that detention "without judicial supervision for a period of 18 days not acceptable" (see Report of the Commission of Inquiry Concerning the Methods of Investigation of the Israel Security Agency Regarding Hostile Terrorist Activity', Jerusalem, October 1987 at para 4.17) Security Provision Order No. 378 was amended, and the detention period without judicial intervention was modified to 8 days.

[70] Phone interview with Adv. Nery Ramaty, 1 July 2013.

[71] Article 17 of the Criminal Procedure (Enforcement Powers Detentions) Law-1996.

[72] Article 78(f)(1) and (2) of the Security Provision Order No. 378.

proceedings.[73] The parallel Israeli law was found to be unconstitutional by the Israeli Supreme Court,[74] yet, it was upheld by the Military Appeal Court in the OPT in 2010.[75]

### 3. The right of the accused to have access to an attorney to prepare an effective defense

International Law Norms:

The duty to facilitate the necessary conditions for an accused person to prepare an effective defense is set out both by the Geneva Conventions and international human rights law. It includes the right to be represented by a defense lawyer and to be given adequate time and facilities to prepare a defense, as well as the right of the accused to communicate freely with his or her defense lawyer, and the right of counsel to visit the accused freely during all stages of the proceedings.[76]

The Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment, adopted by the UN General Assembly, specifies that "a detained person shall be entitled to have the assistance of a legal counsel,"[77] and that detainees shall "be entitled to communicate and consult with his legal counsel."[78]  In order to challenge the lawfulness of one's detention, the assistance of a lawyer is required.[79] The right to freely meet with a lawyer and to have contact with the outside world is particularly significant in pre-trial detention in order to prevent torture or other mistreatment during investigation. Similarly, during a criminal trial, an effective defense requires legal representation, and thus "[a]ll persons are entitled to call upon the assistance of a lawyer of their choice to protect and establish their rights and to defend them in all stages of criminal proceedings."[80] The need for early access to a lawyer before the trial, as well as at all important stages of the trial, has been emphasized

---

[73] Amendment N. 95 to Security Provision Order No. 378 (6 April 2007).

[74] 8823/07 HCJ *John Doe v. The State of Israel* (2010).

[75] *See* Ofer Military Court of Appeals, 4757/07, *Marwan Ibrahim Muhamad Aziz v. The Military Prosecutor* (2010).

[76] ICRC Customary IHL Study, pp. 360-363.

[77] Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment, Principle 17.

[78] Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment, Principle 18(1).

[79] See ICRC Customary IHL Study, p. 352.

[80] The Basic Principles on the Role of Lawyers, Principle 1.

numerous times by the UN Human Rights Committee and regional human rights bodies.[81] International law does not explicitly prescribe maximum periods by which access to a lawyer may be provided. The Basic Principles on the Role of Lawyers specifies that allowing access to legal counsel must be "not later than forty-eight hours from the time of arrest or detention".[82] The Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment specifies that communication with a lawyer may not be denied for more than "a matter of days".[83] The UN Commission on Human Rights has indicated that the right to be defended by a lawyer of one's own choice can never be dispensed with.[84]

Article 72(1) of Geneva Convention IV states that:

> Accused persons shall have the right to present evidence necessary to their defence and may, in particular, call witnesses. They shall have the right to be assisted by a qualified advocate or counsel of their own choice, who shall be able to visit them freely and shall enjoy the necessary facilities for preparing the defence.

The ICRC Commentary to this article instructs that "The defending counsel must be given by the judicial authorities concerned all the facilities and freedom of action necessary for preparing the defence. Above all, he must be allowed to study the written evidence in the case, to visit the accused and interview him without witnesses and to get in touch with persons summoned as witnesses"[85]. Similarly, Article 14(3)(d) of the ICCPR provides that accused persons have the right to "adequate time and facilities for the preparation of his defense and to communicate with counsel of his own choosing."[86]

---

[81] The UN Human Rights Committee has stated that "all persons who are arrested must immediately have access to counsel." (Concluding Observations of the Human Rights Committee, Georgia, UN Doc. CCPR/C/79 Add.75, April 1, 1997 para. 27). *See also* the Report of the Special Rapporteur on the Independence of Judges and Lawyers regarding the Mission of the Special Rapporteur to the United Kingdom, UN Doc. E/CN.4/1998/39/Add.4, March 5, 1998, para. 47; UN Committee against Torture, Report of the Committee against Torture on the Situation in Turkey, UN Doc. A/48/44/Add.1, 15 November 1993, para. 48; European Court of Human Rights, *Aksoy v. Turkey*, Judgement, 18 December 1996, Reports of Judgements and Decisions 1996-VI, para. 83. For other sources see the ICRC Customary IHL Study, p. 361.

[82] Basic Principles on the Role of Lawyers, Principle 7.

[83] The Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment, Principle 15.

[84] UN Human Rights Committee, *Saldias Lopez v. Uruguay*.

[85] Pictet, *Commentary*, p. 356

[86] *See also* European Convention, Article 6(3)(b); American Convention, Article 8(2)(c); African Commission Resolution Article 2(E)(1); and ICC Statute, Articles 67(1)(b) and 67(2).

The right to adequate time and facilities for the preparation of a defense applies not only to the defendant but also to his or her defense counsel and it has to be observed in all stages of the proceedings.[87] The term *facilities* has been interpreted to mean, *inter alia*, that the accused and **defense** counsel must be granted access to appropriate information, files and documents necessary for the preparation of a defense and that the defendant must be provided with facilities enabling communication, in confidence, with defense counsel.[88] Indeed, the right to an effective defence is fulfilled only when the defense attorney is given access to the documents, witnesses, legislation, case law, and all other material related to the case.

Israeli Law:

Generally, defendants in the Israeli Military Courts are entitled to meet promptly with an attorney. Article 78B (c) of Security Provision Order No. 378 states:

> If the detainee requests to meet with an attorney, or an attorney appointed by a person related to the detainee asks to meet with the detainee, the commander of the detention facility will permit this as soon as possible.

But in practice defendants in the Israeli Military Courts are not permitted access to counsel for an extended period of time. Security Provision Order No. 378 does not set out minimum conditions or procedures for the effective fulfilment of this right through provisions facilitating private conversations and/or meetings with a lawyer. Moreover, the right to meet a lawyer during the investigation, as set in this article, has many exceptions and limitations. First, a detainee who falls within the ambit of Article 78(e)(1) of Security Provision Order No. 378 as a person who is "detained in the region during operational activity in the fight against terror and the circumstances of his detention raise suspicion that he endangers or is liable to endanger the security of the region, the security of the IDF forces or security of the public", is automatically deprived of the right to legal counsel for two days from the time of his or her

---

[87] Basic Principles on the Role of Lawyers, Principle 21.

[88] UN Human Right Committee, General Comment 13, para 9. Basic Principles on Lawyers, Principle 21. The European Commission has stated that this right permits the defense to have reasonable access to the prosecution's files (*X v. Austria* (7138/75), 5 July 1977, 9 DR 50) but that this may be subject to reasonable security restrictions (*Haase v. Federal Republic of Germany* (7412/76), 12 July 1977, 11 DR 78).

arrest[89]. Second, the interrogation authorities may prevent a detainee from meeting with an attorney for a period of up to **30 days**. According to Article 78C(c) of Security Provision Order No. 378, in cases where a detainee is suspected of a security crime, the head of the investigation may order that the person be prevented from meeting with a lawyer for a period of 15 days, if the head of the investigation thinks that it is necessary for the security of the area or for the benefit of the investigation. An approving authority can then deny access to counsel for an additional 15 days, if it is believed to be necessary for the security of the area or the benefit of the investigation.

By contrast, in Israeli civilian courts, the Criminal Procedure Law allows investigative bodies – the GSS, the Israel Police or the IDF – to prevent security suspects from meeting their attorneys for only up to **six days**, or up to 10 days with the approval of a higher authority.[90]

Furthermore, for Palestinian lawyers with a Palestinian ID it is difficult and sometimes even impossible to meet their clients in order to prepare their defense, since in most of the cases, the detainees, in violation of IHL, are detained in Israel and Palestinians are routinely prohibited from entering Israel. Most of the Palestinian detainees are held in detention facilities in Israel, under the terms of Article 6(b) of the Law Concerning the Extension of Validity of the Emergency Regulations (Judea and Samaria and Gaza Strip – Judgment in Offenses and Legal Aid), 5727-1967 which states: "The arrest and detention of a person against whom an arrest warrant or a detention order was issued in the Area under the terms of the authority granted by a Commander's proclamation or order may be executed in Israel in the manner in which an arrest warrant or a detention order are executed, and such person may be transferred to detention in the area in which the offense was committed." This is in violation of Geneva Convention IV, since Article 49 (1) forbids the deportation of protected persons from the Occupied Territories. Thus, Palestinian lawyers are often not able to visit their clients, nor do they enjoy the necessary facilities to prepare their defense. Moreover, not only are Palestinian prisoners prevented in many cases from meeting with their Palestinian lawyers, but they are also not allowed to communicate over the telephone with them.

---

[89] Article 78(e)(4) states: "Despite the aforementioned in articles 78(b) and 78(c), the detainee shall not meet with his attorney during the two days from the day of his detention."

[90] Secondary Regulations 2(a) and 2(b) of the Criminal Procedure Regulations (Enforcement Powers – Arrests) (Postponing Meeting of Detainee on Security Offenses with a Lawyer), 5757-1997.

Therefore, in light of these significant impediments, most defense lawyers do not engage in an adversarial process and they most often agree to a plea bargain with the prosecution.

Adequate time for the preparation of a defense will depend on the nature of the proceedings and the factual circumstances of a case. Factors to be taken into account include, but are not limited to, the complexity of a case, the defendant's access to evidence, and the time limits set in the criminal code. In practice, as noted by the Israeli NGO Yesh Din:

> Against the backdrop of the numerous restrictions Israel imposes on meetings between attorney and client during the interrogation period, the first meeting between the two is held, in many cases, only on the day of the hearing. Sometimes an attorney and client speak in the courtroom itself, immediately before or after the hearing, and in other cases attorneys proceed to the doors of the detention cells where detainees and defendants are held within the court complexes. In this case the attorney talks to his client through a small opening in the detention cell door, and the former is required to stand approximately one meter from the door of the cell. Naturally, the content of the conversation is completely open to all those held in the cell and to the guards stationed nearby.[91]

In the Israeli Military Courts, there is no explicit requirement that evidentiary material be fully disclosed to the defendant or any instruction on when disclosure should occur. Thus, Security Provision Order No. 378 contains no provision(s) relating to lawyers' access to evidence, witnesses, or other legal material necessary to prepare his or her client's defense. In practice, when an indictment is filed, the defendant's attorney is allowed to photocopy material collected by the investigative authorities. However, not all the material is provided. For example, the investigation memorandums of the General Security Services are not disclosed to the defense without a special request of the defense attorney. Moreover, according to binding jurisprudence, if the defense does not explicitly request to have GSS memorandums disclosed it relinquishes its right to examine them.[92] As a result, defense attorneys sometimes handle complex cases without knowing that the material provided to them is incomplete. Equally defective is the length of time between an attorney's request for the GSS interrogation material and its delivery.

---

[91] Yesh Din Report, p. 111

[92] Arrest Appeal (West Bank) 1311/05 *Muhammad Ashqirat v. The Military Prosecutor.*

Moreover, there is no statutory obligation to provide all the information necessary for the preparation of a defense, including the evidentiary material and legal sources, in Arabic. Indeed, evidentiary material, protocols for hearings and court decisions (including key legal precedents), are not translated into Arabic. Moreover, the relevant legislation and jurisprudence are not systematically published and remain difficult to access.

### 4.    The right to a presumption of innocence

<u>International Law Norms:</u>

The presumption of innocence means that any person subject to penal proceedings must be presumed to be not guilty of the act he or she is charged with until proven otherwise. It is a customary IHL rule, set in Article 75(4)(d) of Additional Protocol I.[93] According to Article 14(2) of the ICCPR "Everyone charged with a criminal offense shall have the right to be presumed innocent until proved guilty according to law."[94] The ICRC commentary to Article 71 of Geneva Convention IV states that "there are other rules relating to penal procedure which are not expressly laid down in the Convention, but must nevertheless be respected as they follow logically from its provisions. One is the principle that any accused person is presumed to be innocent until he is proven guilty. This essential rule applies to occupied territory'"[95]

As a basic component of the right to a fair trial, the presumption of innocence, *inter alia*, means that the burden of proof in a criminal trial lies on the prosecution and that the accused has the benefit of the doubt.[96] It also means that guilt must be proven according to a determined standard: "beyond a reasonable doubt."[97]

<u>Israeli Law:</u>

In the Israeli Military Courts, there is no provision establishing the presumption of innocence. The burden of proof is discussed in Article 30 of Security Provision Order No. 378:  "If the

---

[93] See also ICRC Customary IHL Study, p. 357.

[94] *See also* European Convention, Article 16(2); American Convention, Article 8(2); African Charter, Article 7(1)(b); and ICC Statute, Article 66(1).

[95] Pictet, *Commentary*, p. 353-354.

[96] *See e.g.*, ICC Statute, Article 66; UN Human Rights Committee, General Comment No. 13 (Article 14 of the ICCPR).

[97] ICRC Customary IHL Study, p. 357.

court sees, at the conclusion of the prosecution's case, that the evidentiary material does not warrant the defendant responding to a certain charge, the court will acquit the defendant from said charge." Nevertheless, for assisting or taking part in an illegal association – one of the most commonly prosecuted offences – the burden of proof has been shifted to the defense pursuant to Article 85 of Defense Regulations, which criminalizes the conduct of:

—(1) Any person who — (c) performs any work or performs any service for an unlawful association, unless he proves that he bona fide believed that the work or service was not for an unlawful association, or …

(e) permits or support any meeting of an unlawful association to be held in any house, building or place belonging to or occupied by him or under his control, unless he proves that he did not know of or connived at the meeting or that he bona fide believed that the meeting was not a meeting of an unlawful association.

### 5.   The right of the accused to a trial without undue delay

<u>International Law Norms:</u>

Article 71(2) of Geneva Convention IV provides that accused persons, who are prosecuted by the Occupying Power shall "be brought to trial as rapidly as possible". The ICRC Commentary to Article 71(2) of Geneva Convention IV states that:

> The accused is to be brought to trial as rapidly as possible. This provision is of the utmost importance in time of occupation when delays in the preliminary investigation may tend to prolong the period spent under arrest awaiting trial.[98]

Article 14(3)(c) of the ICCPR similarly provides that defendants should "be tried without undue delay." According to General Comment 13 of the UN Human Rights Committee, this obligation relates not only to "the time by which a trial should commence, but also the time by which it should end and judgment be rendered". The duty to commence a trial "within a

---

[98] Pictet, *Commentary*, p. 354.

reasonable time" from the time of arrest is also set in other international and regional human rights conventions.[99]

<u>Israeli Law:</u>

<u>Detention before start of criminal proceedings</u>: The periods of detention permitted by Security Provisions Order No. 378 before the start of a trial in the Israeli Military Courts are significantly longer than the time allowed by Israeli law in the Israeli civilian courts. In Israeli civilian courts, the maximum permissible detention period between the end of an investigation and the charges being set out in an indictment is 5 days; and from the filing of an indictment to the start of the trial the maximum period is 30 days, thought it can be extended to 75 days on the authority of the Attorney General.[100] In contrast, in the Israeli Military Courts, a detainee can be kept in detention until the indictment is filed for 90 days (and up to 180 days following a decision of the Military Court of Appeal).[101] There is no limit on the period of detention from the end of investigation until criminal charges are filed in an indictment, nor is there a maximum period of detention between the filing of the indictment and the start of the trial. There is simply no provision that governs these issues in the applicable procedures before the Israeli Military Courts.

<u>Detention until the end of criminal proceedings</u>: While in Israeli civilian courts a criminal trial shall be held within 9 months,[102] in the Israeli Military Courts a trial need not be held for two years.[103] If the trial is not concluded within two years, the military appellate judge may extend the defendant's detention by six months at a time, with no limitation.[104] In Israel, by comparison, if the trial is not concluded within 9 months, a Supreme Court judge may extend the detention by no more than 3 months each time.[105]

---

[99] See Convention on the Rights of the Child, Article 40(2)(b)(3) and ICC Statute, Article 67(1)(c); European Convention, Article 6(1); American Convention, Article 7(5); and African Charter, Article 7(1)(d).

[100] Criminal Procedure Regulations (Enforcement Powers – Arrests), Article 17.

[101] Articles 78(f)(1)and 78(f)(2) of Security Provision Order.

[102] Criminal Procedure Regulations (Enforcement Powers – Arrests), Article 61

[103] Article 78 (K)(2)(a), Security Provision Order No. 378.

[104] Article 78(K)(2)(b), Security Provision Order No. 378.

[105] Criminal Procedure Regulations (Enforcement Powers – Arrests),  Article 62

### 6. The right to be free from torture

<u>International Law Norms:</u>

The ICRC commentary to Article 71 of Geneva Convention IV notes that:

> The safeguards provided in the Articles dealing with penal legislation … and those prescribed elsewhere, particularly in Article 32 [of the Fourth Geneva Convention], which prohibits torture and all other forms of brutality, obviously represent conditions which must be fulfilled if a trial is to be regular.[106]

The right to be free from torture is among the rare legal principles holding the status of *jus cogens*: peremptory norms binding upon all nations without exception.[107] The prohibition on torture under any circumstances is codified in the 1984 UN Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT) as well as the International Covenant on Civil and Political Rights, which emphasizes the duty to treat suspects and detainees humanely and with dignity.[108] IHL similarly establishes an absolute prohibition on torture in situations of armed conflict.[109] Moreover, a violation of the absolute prohibition entails not only state responsibility but also individual criminal responsibility,[110]

---

[106] Pictet, *Commentary*, p. 353.

[107] Manfred Nowak and Elizabeth McArthur, *The United Nations Convention Against Torture – A Commentary*, Oxford University Press, Oxford, 2008, pp. 117–18; International Criminal Tribunal for the former Yugoslavia (ICTY), *Prosecutor v. Furundžija*, Judgment (Trial Chamber) (Case No. IT–95–17/1-T), 10 December 1998, §§137–38, 153.

[108] ICCPR, Articles 7 and 4.2, and the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, December 10, 1984 [hereinafter: CAT], Article 2(2) set the absolute character of the prohibition.

[109] Common Article 3 to all four 1949 Geneva Conventions anchors the prohibition of torture and cruel treatment and of mutilation. This Article applies explicitly to people being held in detention. The Geneva Convention IV lays down the absolute prohibition on torture and other inhumane treatment of protected persons. Article 27 of 1949 Geneva Convention IV anchors the right of protected persons to have humane treatment, and to be protected from any act or threat of violence. Article 31 of the Convention prohibits any physical or moral coercion with the intention of obtaining information. In addition, Article 32 lays down a broad prohibition of torture and all brutal measures.

[110] Torture is defined as a war crime under Articles 8(2)(a)(ii) and 8(2)(b)(xxi) of the ICC Statute, as well as Art. 147 of 1949 Geneva Convention III and Art. 129 of 1949 Geneva Convention III. Art. 4 of CAT imposes on state the obligation to ensure that acts of torture are offences under their criminal law.

while international human rights law and IHL impose a duty upon states to investigate allegations of torture and, where torture is identified, to prosecute those responsible.[111]

<u>Torture and Inhumane Treatment by Israeli Interrogation Authorities</u>

In 1987, the use by Israeli General Secret Service agents of 'a moderate measure of physical pressure' in a wide range of circumstances, was officially institutionalized, based on the 'necessity' defence clause in the Israeli penal code. The clause stipulated that a person will be exempt from criminal liability for an act required in an immediate manner in order to save his or someone else's life, liberty, or property, when no alternative course of action is available. The state-appointed Landau Committee interpreted this clause as conferring general, *ex ante* permission to use 'moderate physical pressure' in interrogations, and its recommendations were adopted in their entirety by the Israeli government at the time.[112] This legal construction remained intact for more than a decade, and resulted, according to the Israeli NGO B'tselem, in the use of physical methods that constituted torture against 850 persons a year.[113]

In 1999, the Israeli High Court of Justice rendered its landmark ruling on torture.[114] In that ruling, the President of the HCJ, Aharon Barak, recognized the absolute prohibition of torture and inhuman treatment under international law, stating that "They have no exceptions and no balances."[115] The HCJ further rejected the state's position that the Penal Code's necessity defence provides an *ex ante* authorization of the use of otherwise illegal methods, explicitly noting that "the government or the heads of the General Security Service do not have the authority to establish guidelines, rules, and permissions concerning the use of physical force during interrogation of persons suspected of terrorist activities."[116] Nonetheless, the Israeli

---

[111] IHL imposes an obligation upon states to investigate and prosecute grave breaches of the Geneva Conventions, including torture and ill-treatment. See Art. 129 of 1949 Geneva Convention III, Art. 146 of 1949 Geneva Convention IV, and Rule 158 of ICRC) Customary IHL Study.

[112] The Landau Commission also found that for many years GSS staff had systematically lied to the courts and sought to change this situation. The commission's report noted 'the feeling on the part of the interrogators that their actions not only enjoyed the backing of their superiors but were also known to elements outside the service who gave their tacit consent. It was claimed that these elements include the prosecution system – both civilian and the military, the courts, and the political echelon.' *The Landau Commission Report.*, pp. 28–29.

[113] B'Tselem, 'Routine Torture: Interrogation Methods of the General Security Service', February 1998, pp. 5, 16 <http://www.btselem.org/publications/summaries/199802_routine_torture>.

[114] HCJ (5100/94), *Public Committee Against Torture in Israel v Government of Israel*, 1999 [hereinafter: *Torture case* (1999)].

[115] *Ibid.*, paragraph 27.

[116] *Torture case* (1999), paragraph 23, 35.

High Court of Justice permitted an important deferral to the discretion of the Executive, which would permit (albeit to a lesser extent) torture and ill treatment practices to persist. The HCJ ruled that the Attorney General "can establish guidelines regarding circumstances in which investigators shall not stand trial, if they claim to have acted from 'necessity.'"[117] Thus, on the one hand, the Israeli High Court of Justice affirmed that the 'necessity defence' could not serve as a legal authorization to use torture,[118] while on the other hand, it allowed the Attorney General, who stands at the head of the state prosecutorial system and serves as the state's legal advisor, to define the circumstances in which interrogators should not be prosecuted, when they claimed to have used a prohibited method of torture due to 'necessity'.

Therefore, since the Israeli High Court of Justice ruling in 1999, hundreds of allegations of torture in detailed affidavits have been submitted. According to the Israeli Ministry of Justice, between years 2001-2004, 388 torture complaints were submitted against GSS interrogators.[119] Yet, not one of the hundreds of complaints of torture has led to a single criminal investigation. An analysis of correspondence between complainants and the Attorney General's office shows that the grounds given for shelving complaints of torture and ill-treatment fall into one of two main categories: justification under the necessity defence or denial.[120]

Among the many allegations of torture and abuse, sleep deprivation and prolonged interrogations are commonplace, as are such acts as being bound to a chair in painful positions, beatings, slapping, kicking, threats, verbal abuse, and degradation. Special methods include bending the body into painful positions, manacling from behind for long periods of time, intentional tightening of handcuffs, exposure to extreme heat and cold, permanent exposure to artificial light, and detention in sub-standard conditions contrary to the basic standards set down by the UN. Various forms of psychological torture, such as threats and

---

[117] *Ibid.*, paragraph 38.

[118] *Ibid.*, paragraph 37: 'The principle of "necessity" cannot serve as a basis of authority.'

[119] In year 2001 - 65 complaints were submitted, in 2002 – 81 complaints, in 2003 – 127 complaints and in 2004 – 115 complaints. See the Letter of Attorney Boaz Oren, head of the International Agreements Unit, Ministry of Justice, 26 June 2006 addressed to the Israeli NGO B'Tselem in response to B'Tselem's request for information on torture complaints (on file with the author).

[120] See Sharon Weill and Irit Ballas, "The Investigation Mechanism of Torture Claims in Israel: An Analysis of the 2012 GSS Investigation Decision and the Türkel Report", in Stuart Melsen (ed) *The War Report*, Oxford University Press, Forthcoming December 2013.

exploitation of family members, are also commonly used.[121] Allegations include denying the right to contact attorneys and family members, often for extended periods of time. These allegations have not gone unnoticed by the international bodies. For example, in its concluding observations of May 2009, the Committee Against Torture expressed its concern about the use of illegal methods of interrogation: "The Committee is concerned that there are numerous, ongoing and consistent allegations of the use of methods by Israeli security officials that were prohibited by the September 1999 ruling of the Israeli Supreme Court."[122]

## Conclusion

During the relevant time period, the Israeli Military Courts violated international law in multiple ways. Structurally, they failed to provide independent and impartial judges and they treated defendants differently – and unequally – based on their nationality. Procedurally, the Israeli Military Courts failed to extend basic due process protections to Palestinian defendants. By contrast, Israeli defendants charged with identical offences enjoyed (and continue to enjoy) more robust due process protections in the Israeli civilian courts. Finally, torture, which is prohibited under all circumstances under international law, is sanctioned by the Israeli High Court of Justice, allegations of torture during the relevant time period were common, and no independent and effective investigations have ever been made.

Respectfully Submitted,

_____

Sharon Weill, Ph.D.

July 15, 2013

Date

---

[121] See Irit Ballas, 'Family Matters, Public Committee Against Torture, 2012; Maya Rosenfeld, 'When the exception becomes the rule', Public Committee Against Torture, 2012; Elkhatib Samakh, 'Shackling as a form of torture and ill treatment', Public Committee Against Torture, 2009.

[122] Committee Against Torture, 'Concluding Observations: Israel', UN doc. CAT/C/ISR/CO/4, 14 May 2009, paragraph 19.

Documents Provided to Sharon Weill

- First Amended Complaint in *Sokolow v. PLO*
- *Sokolow v. PLO*, 583 F. Supp. 2d 451 (S.D.N.Y. 2008)
- Expert Report of Nick Kaufman, dated April 10, 2013, in *Sokolow v. PLO*
- Expert Report of Nick Kaufman, dated April 12, 2013, in *Shatsky v. Syrian Arab Republic*
- Expert Report of Alon Eviatar, dated June 14, 2013, in *Sokolow v. PLO*
- *Hamdan v. Rumsfeld*, 548 U.S. 557 (2006)
- *Boumediene v. Bush*, 553 U.S. 723 (2008)
- Military Commissions Act of 2006
- Military Commissions Act of 2009
- Exhibits referenced in Nick Kaufman's Report, including
  1. Munzar Mahmoud Halil Noor (P 11-1:1-184)
  2. Abdel Karin Rathob Younis Aweiss (P 11-2:1-102)
  3. Nasser Jamal Mussa Shawish (P 11-3:1-402)
  4. Kahura Sa'id Ali Sa'adi (P 11-4:1-177)
  5. Sanah Mohamed Shahedeh (P 11-5:1-230)
  6. Abdullah Barghouti (P 11-6:1-250)
  7. Ibrahim Hamed (P 11-7:1-429)
  8. Ahmed Barghouti (P 11-8:1-206)
  9. Mohamed Mousleh (P 11-9:1-103)
  10. Mohamad Sami Ibrahim Abdullah (P 11-10:1-43)
  11. Fares Ghanem (P 11-11: 1-92)
  12. Majed al-Masri (P 11-12: 1-296)
  13. Ali Mohammed Hamed Abu Haleil (P 11-13: 1-70)
  14. Abdal-Rahman Maqdad (P 11-14: 1-205)
  15. Hilmi Abdal Karim Mohamed Hamash (P 11-15: 1-252)
  16. Ahmed Salah (P 11-16: 1-232)
  17. Mohammed Issa Mohamed Ma'ali (P 11-17: 1-79)
  18. Ahmed Mohamed Ahmed Sa'ad (P 11-18: 1-588)
  19. Ibrahim Abdel Hai (P 11-19: 1-127)
  20. Bashar Barghouti (P 11-20: 1-124)
  21. Izzadin Hamamra (P 11-21: 1-81)

# EXHIBIT A



**CURRICULUM VITAE**

**Dr. Sharon Weill**

**Address: 29 rue Pixèrècourt, Paris - 75020, France**
**Tel.: 00 33 770413484**
**s_weill@graduateinstitute.ch**

<u>**EDUCATION**</u>

- **2007 –2012**

**PhD in international humanitarian law**

Department of Public International Law and International Organization, the Faculty of Law, University of Geneva
Supervisor: Prof. Marco Sassoli
Scholarship: Swiss National Fund for Scientific Research

Dissertation to be published by Oxford University Press (2014)
Title: "The Role of National Courts in Applying International Humanitarian Law: From Apology to Judicial Activism" (highest mention).

<u>Field research:</u>

Winter semester 2009-2010: Visiting researcher at Tel Aviv University under the academic supervision of Prof. Eyal Benvenisti.

September 2007: Field research at the Belgrade War Crimes Chamber in Serbia

- **2004 - 2006**

L.L.M in International Humanitarian Law
University Centre for International Humanitarian Law - CUDIH (today the *Geneva Academy of International Humanitarian and Human Rights Law*), University of Geneva

1

Full scholarship from the Swiss Confederation.

Master thesis: "The Jurisdiction of the Israeli Military Courts in the Occupied Territories". Supervisor: Prof. Marco Sassoli

As part of my LLM studies, I conducted a field research on the Israeli military courts in the Occupied Palestinian Territories from September 2005 to January 2006. An article based on that research was published in the International Review of the Red Cross (Cambridge, June 2007).

- **Summer 2003**

Post Graduate Summer course, United Nations, Geneva
"Proposed ways and means to strengthen the UN capability for collective action".

- **2001 – 2002**

M.A in Human Rights and Democratization
Faculty of Law, University of Malta.
Graduated with distinction. Full scholarship from the European Union.
Masters thesis: "The pressure of the press" - a comparative study between the Egyptian and the Israeli press and their coverage of the Israeli military operation in Jenin refugee camp in April 2002.

- **2000**

Admitted to the Israeli Bar

- **1995 - 1999**

Lord Law Bachelor (L.L.B).
Faculty of Law, University of Tel-Aviv
Participant at the Human Rights Clinique

## LANGUAGES

English, French and Hebrew: excellent level in speaking, reading and writing.

2

## PROFESSIONAL EXPERIENCE

Academic coordinator of the legal unit and lecturer, Masters program in Humanitarian Action (CERHA), University of Geneva and the Graduate Institute for International Studies and Development (since 2013).

### Lecturing

**Semester Courses**

- "Contemporary issues in international humanitarian and criminal law", Masters program in International Humanitarian and Human Rights Law at the law faculty of Panthéon-Assas University - Paris II (2009-today)
- "International law in domestic courts" / "Law and conflict", Masters program in Human Rights and Humanitarian Action at Science-Po Paris (2012-today)
- "The law of military occupation and its application by the Israeli High Court of Justice", law faculty of Tel Aviv University (2008-2012)

### Research

- Research Fellow, "The Rule of Law in Armed Conflict" (RULAC) project, The Geneva Academy of International Humanitarian Law and Human Rights Law (2007- 2009, 2012-today)

- Visiting Senior Research Fellow, "Security in Transitions Project", London School of Economics (2013-2016).

### Consulting

- UN Office of the High Commissioner for Human Rights

Hebrew researcher and Legal Consultant and for the UN Fact Finding Mission on the Gaza Conflict ("Goldstone Report") and for the follow-up Committee of Experts Geneva (summer 2009 and summer 2010).

- Legal Consultant for the Mayor of Geneva in his visits to Bosnia (June 2009) and Israel and Palestine (March 2010) on the occasion of the 60th anniversary of the Geneva Conventions.

3

**Conferences and Round tables**

- *International Law As a Profession* - The 5th European Society of International Law Research Forum. Presentation of a paper on the panel "The International Lawyer in the Domestic Legal Order" (25 May 2013).

- Expert Meeting, The Geneva Conventions – a commentary, The Geneva Academy of International Humanitarian and Human rights Law

- *The Politics of Justice: From a human rights revolution to global justice*? - The 9th annual conference of the Hague Academic Coalition, the International Institute of Social Studies, The Hague, Netherlands. Presentation of a paper: "The Role of National Courts in Applying International Humanitarian Law: from apology to utopia" (13 October 2012); To be published in an edited by Cambridge University Press (forthcoming).

- "The Use of Weapons under International Human Rights Law", workshop at the George Washington University. This was the second review conference of a number of commissioned papers that will lead to the publication of a book by Cambridge University Press, edited by Stuart Casey-Maslen of the Geneva Academy. It was attended by police and military experts, non-governmental organizations as well as academics. The paper, which I presented, dealt on the use of weapons under IHL (September 2012).

- "New approaches to the Israeli Palestinian conflict", two day experts workshop at the London School of Economics (November 2011).

- "The follow up to the Goldstone report", Malaga, in a three day experts meeting organized by the Palestinian center for human rights (October 2010).

- "The application of the Geneva Conventions and the prosecution of war crimes" - public workshops and conferences organized by the Mayor's office for the sixty years' anniversary of the Geneva Conventions, the City of Geneva (May 2010).

- "The International Rule of Law in Post-Conflict Situations: the Role of Domestic Courts", The Amsterdam Centre for International Law (October 2009). Presentation of the paper "National War Crimes Prosecution in Post-Conflict Era and Pluralism of Jurisdictions: the Experience of the Belgrade War Crimes Chamber."

- "Israël-Palestine. La Paix par le droit est-elle possible ? " – round table organized by Amnesty International, Université Panthéon-Assas, Paris (April 2009).

- "The Israeli Military Courts in the occupied territories: an international law perspective", roundtable organized by The Israeli Bar Association, Tel Aviv (June 2008).

**Training for lawyers and human rights practitioners**

"State and personal immunity in case of torture", seminar at the Public Committee Against Torture in Israel, Jerusalem (March 2012).

"The enforcement of international humanitarian law", a module in an International humanitarian law course for NGOs professionals, Association for Civil Rights in Israel, Tel Aviv Office (November 2010, November 2011, November 2012).

"International humanitarian law and human rights", International humanitarian law annual course of the ICRC, Warsaw (June 2011).

"Universal jurisdiction", Seminar for lawyers, Israeli NGO Gisha - Legal Center for Freedom of Movement in Gaza (March 2009).

"Practical issues in International Criminal Law", Seminar at Hamoked, an Israeli human rights NGO, Jerusalem (November 2008).

"Arrests in Gaza and the 'Unlawful combatant law'", workshop for lawyers defending or prosecuting detainees from Gaza, The Israeli Bar Association, Beer Sheva (July 2008).

"Judging war criminals – from theory to practice", a seven-lectures seminar for human rights and media practitioners, New Horizon Institute, Tel Aviv (Spring 2008).

**The Making of the TV documentary film "Borders" (52 minutes)**

2003-2005: I wrote and directed a documentary film together with an Italian colleague. The film is a road movie set in the Mediterranean region and deals with borders and conflicts. It was financed by the European Commission, and produced by a French production company in Paris (8+ Production & Les films du Grain de Sable). The making of the film included several months of development, one month of shooting in Israel, Palestine, Lebanon, Syria, Turkey and both sides of Cyprus; and 4 months of editing in Paris. the film was aired on the French TV channel LCP (the parliamentary channel) in August 2008.
The film was screened as a part of a university seminar on human rights and conflicts that I held in different universities including:

- Law Faculty, University of Durban, South Africa (April, 2008).

- Master in human rights and democratization in Africa, Pretoria Centre for Human Rights, South Africa (April, 2008).

- Master en droits de l'homme et droit humanitaire, Université Evry-Val d'Essonne, France (December 2007,  December 2008).

- Master in human rights, Irish Centre for Human Rights, Galway, Ireland  (January 2007)…

## PUBLICATIONS

### Book

*The Application of IHL by National Courts – a Critical Study*, Oxford University Press, Forthcoming 2014.

### Book Chapters

- "The Use of Weapons under International Humanitarian Law", in S. Casey-Maslen (ed), *Weapons under International Human Rights Law*, Cambridge University Press, (forthcoming 2013).

- "The Investigation Mechanism of Torture Claims in Israel: An Analysis of the 2012 GSS Investigation Decision and the Türkel Report", in S. Malsen (ed), *The War Report*, Oxford University Press (Forthcoming, 2013).

- "Communication with the Outside World" in A. Clapham, M. Sassoli and P. Gaeta (eds), *A Commentary to the Geneva Conventions,* Oxford University Press (forthcoming 2014).

- Sharon Weill, "The follow up to the Goldstone report in Israel and beyond" in C. Meloni and G. Tognoni (eds), *Is There A Court for Gaza?- A Test Bench for International Justice* (Asser/Springer, The Hague, 2012), pp. 105-120.

- Sharon Weill and Ivan Jovanovic, "National War Crimes Prosecution in Post-Conflict Era and Pluralism of Jurisdictions: the Experience of the Belgrade War Crimes Chamber" in A. Nollkaemper, C. Ryngaert and E. Kristjánsdóttir (eds.), *Importing International Law in Post-Conflict States: The Role of Domestic Courts* (Intersentia, Antwerp, 2012), pp. 241-268.

- Sharon Weill, "Reframing the Legality of the Israeli Military Courts –Military Occupation or Apartheid?" in A. Baker & A. Matar (eds), *Threat - Palestinian Political Prisoners in Israel* (Pluto Press, London, 2011), pp. 136-148.

### Academic Journals

- "The role of the Israeli HCJ – From occupation to segregation", *The Leiden Journal of International Law* (under peer review).

- "The role of national courts in generating respect for IHL", *International Review of the Red Cross* (Forthcoming 2014).

- "Israel's Unwillingness? The Follow up Investigations to the UN Gaza Conflict Report and International Criminal Justice"*, International Criminal Law Review*, Vol. 12, no. 5, November 2012 (with Valentina Azarov).

- "The Targeted Killing of Salah Shehadeh – From Gaza to Madrid", *International Journal of Criminal Justice*, 2009 7(3), pp. 617-631.

- Sharon Weill, "The judicial arm of the occupation: the Israeli military courts in the occupied territories", 89 *International Review of the Red Cross*, June 2007, pp. 395-420.

**NGO reports**

- "Shielded From Accountability - Israel's Unwillingness to Investigate and Prosecute International Crimes", Report for the Fédération Internationale des Droits de L'Homme - FIDH, September 2011.

- "Social and cultural right in Israel and the occupied territories", Report for the Fédération Internationale des Droits de L'Homme- FIDH, forthcoming.

**Internet, Press and TV**

- "The Investigation Mechanism of Torture Claims in Israel", Adalah's Newsletter, Issue 105, June 2013 (with Irit Ballas)

- "International law developments", Adalah - The Legal Center for Arab Minority Rights in Israel, Electronic Journal, Volume 93, May 2012.

- "Does International Law Shelter States from Accountability? The International Court of Justice decision in Germany v. Italy", Adalah - The Legal Center for Arab Minority Rights in Israel, Electronic Journal, Volume 91, March 2012.

- "A Survey on the Follow-up to the Goldstone Report", Adalah - The Legal Center for Arab Minority Rights in Israel, Electronic Journal, Vol. 72, May- June 2010

- "Israël, le tribunal Russell contre l'impunité", Le Blog du Monde Diplomatique, January 2013

- "La Cour pénale internationale en question", Le blog du Monde Diplomatique, August 2011

- "De Gaza à Madrid, l'assassinat ciblé de Salah Shehadeh", Le Monde Diplomatique, September 2009 (printed edition).

- "Interaction between humanitarian law and human rights in armed conflicts", The RULAC project, 2009.

- "Borders", documentary film (8+ Production & Les films du Grain de Sable), 52 minutes – available at the audio-visual library, Graduated Institute of International Studies, Geneva.

The film was aired several times on the French TV channel – LCP (the parliamentary channel) during August 2008.

It is also a part of a resources book on human rights education published by the Euro-Mediterranean Human Rights Network (EMHRN), "Resources for Human Rights Education in the Euro-Mediterranean region – A practical introduction to methodologies in non-formal education", September 2008, pp. 9-10.

8