# EXHIBIT H.377


EXHIBIT 377

Date: 17th of Adar 5761  
March 12, 2001

Case No.: 3478/02

## The Military Court Beit El
### Transcript of the Hearing in a Panel Session

**Before the President of the Court : Major Eli Bar-On**  
                    **Judge: Captain Rafi Netz**  
                    **Judge: Captain Shlomi Friedman**

**Defendant: Abed Kariem Ratab Yunis Aweis, Identity No. 980136675/ Israel Prison Service**

### Sentence

The Defendant has been convicted of a long list of severe offenses. The amended indictment indicates that the Defendant was a member of the Al Aqsa Martyrs Brigades (hereinafter – "the Organization") from October 2000 until the day on which he was arrested, in late March 2002. The Defendant headed the Organization in Jenin until December 2001, when he moved from Jenin to Ramallah and joined the management of the Organization there. The Defendant enlisted into the Organization a number of persons, including his brother Hassan, appointed them to be responsible in the Organization and provided them money for the purpose of their activity in the Organization. The Defendant kept a large number of weapons during his activity in the Organization and transferred them to many other operatives in the Organization, teaching them how to use the weapons and how to make explosives and various explosive devices.

As soon as the events that were called "the Al Aqsa Intifada" started in October 2000, the Defendant enlisted a number of people for carrying out an attack, and with them shot at IDF soldiers near the Jenin bypass road.

A short time thereafter, the Defendant and his colleagues placed a landmine at Jalameh Junction in order to cause the death of IDF soldiers who would pass by the site, but fortunately the soldiers discovered the landmine and detonated it in advance.

Following his failures in the last two events mentioned, the Defendant decided to switch to firing mortars at Israeli targets. For this purpose, the Defendant contacted a number of people, including a professional turner, and manufactured a mortar and bombs suitable for this use with them. On May 2, 2001, the Defendant and his colleagues fired a mortar bomb at the settlement of Kadim, but the bomb did not reach the settlement and fell several hundred meters away from it. The day after, the Defendant and his colleagues fired two mortar bombs at an IDF camp in Bazak, but these bombs did not reach their objective either. Another day passed, and the Defendant and his colleagues fired two more mortar bombs at the settlement of Kadim.

                                                                                     [Stamp] P 5: 44

This time as well, their attempts to hit the settlement failed. On May 9, 2001, the Defendant and his colleagues fired an additional mortar bomb at an Israeli tank near Jenin.

In October 2001, the Defendant manufactured an explosive device weighing 15 kg in order for it to be placed inside the State of Israel by a cell that consisted of residents of Dir Hana. The Defendant instructed one operative, who was in contact with the Israeli cell, on how to activate the explosive device. That person transferred the explosive device to members of the Israeli squad and they laid the explosive device at Golani Junction, where the explosive device exploded but fortunately did not cause casualties.

[Stamp] P 5: 44 [continued]

Date: 17th of Adar 5761    Case No.: 3478/02
March 12, 2001

In the second half of 2001, the Defendant and his colleagues fired a "250" machine gun at an IDF jeep that was traveling on the Jenin bypass road. The Defendant and his colleague Akrama Stiti fired at IDF soldiers who entered Jenin Refugee Camp in November 2001.

In October 2001, the Defendant planned with his colleagues to carry out a large suicide attack in the settlement of Kadim. For this purpose, the Defendant enlisted three people who agreed to carry out the attack. According to the planning, the suicide terrorists had to murder the soldiers guarding the settlement and then enter one of the houses of the settlement, murder its occupants and barricade in the house in order to wage a battle with IDF forces that would arrive at the site until their death. The suicide terrorists were also filmed before departing on the attack and went out to execute it, but were unable to penetrate the settlement. On the following day, the Defendant and his colleagues filmed the settlement in order to plan the attack again. The Defendant enlisted two more suicide terrorists and dispatched them with one of the suicide terrorists who had been sent earlier in order to carry out the attack, but they returned without having performed the attack due to the presence of large military forces in the area.

In early November 2001, the Defendant and his colleagues decided to carry out an attack inside the State of Israel in order to cause the death of many Israeli civilians. The colleague of the Defendant, Ali Safouri, informed him that there were two people who were prepared to carry out a suicide attack in Afula and that during the attack they would shoot at Israeli civilians until they met their death from the gunfire of the security forces. The Defendant agreed to provide the weapons to the suicide terrorists and delivered to Ali two Kalashnikov rifles. The Defendant and his colleagues filmed the two suicide terrorists and the Defendant provided them money to purchase clothes for carrying out the attack. On the following day, the Defendant briefed a person to clear the way for the suicide terrorists to Afula. He purchased a vehicle for the suicide terrorists and on November 27, 2001 the two suicide terrorists were dispatched to carry out the attack. They arrived at the area of the central bus station in Afula, where they opened fire indiscriminately until they were killed by members of the security forces. As a result of the gunfire, 2 Israeli civilians, the late Michal Mor and the Noam Gozovsky were killed and dozens of other civilians were injured.

[Stamp] P 5: 45

In November 2001, the Defendant and his colleagues carried out three shooting attacks at Israeli vehicles on the Jenin bypass road, but were unable to cause loss of life as they had planned.

In December 2001, the Defendant attempted to make explosives using chemicals for detonation against IDF forces that would try to enter the Jenin Refugee Camp. The Defendant failed in the manufacturing attempt.

In February 2002, the Defendant conspired with other military operatives in his organization to carry out a shooting attack in Atarot against Israeli targets. The colleagues of the Defendant departed to carry out the attacks, but the Defendant did not participate in the execution of the attacks themselves.

In early February 2002, the Defendant was approached by his colleague Nasser Shawish who informed him that he had talked with a young girl called Darin Abu Aisha, who had expressed her wish to carry out a suicide attack. The Defendant stated that he had agreed to dispatch Darin to perform the attack and that he was to prepare an explosive device for her for this purpose, and instructed Nasser to film her before departing for the attack. On February 27, 2002, the Defendant and his collages came to Darin and equipped her with an explosive belt. They instructed her to come to the Israel Police station in Jaffa and detonate the explosive device on her person in order to cause the deaths of Israeli civilians. The Defendant looked after arrangements for transferring Darin to Israel. On that evening, the vehicle transporting Darin was stopped for inspection at the Maccabim checkpoint. The Defendant instructed the occupants of the vehicle, by telephone, to instruct Darin to detonate the explosive device on her person with the aim of causing the deaths of the policemen at the checkpoint. Darin did so, and as a result three policemen were injured and Darin was killed.

[Stamp] P 5: 45 [continued]

Date: 17th of Adar 5761  
March 12, 2001

Case No.: 3478/02

In February 2002, the Defendant delivered weapons to three people in order for them to carry out a shooting attack in Beit El. The three did shoot at the guard of the settlement. The Defendant also tried to execute that month a shooting attack on the Ramallah bypass road leading to Beit El but the attack did not take place after the intended perpetrators changed their minds. A short time later, the Defendant and his colleagues planned to carry out a shooting attack against IDF soldiers at a checkpoint near Bir Zeit, but the massive presence of military forces at the site foiled the attack.

In March 2002, the Defendant conspired with Ahmed Barghouti and another person to send a suicide terrorist into the State of Israel. The Defendant and his colleagues enlisted the terrorist, equipped him with a weapon and filmed him before his departure for the attack. The suicide terrorist was trained in the use of weapons by the Defendant and his colleagues and was led to an apartment that served as a hideout in Ramallah before departing on the attack. In the end, the attack did not take place after the intended suicide terrorist left the apartment.

That month, the Defendant tried to execute an additional suicide attack with two suicide terrorists, but the two suicide terrorists were arrested en route to the Defendant and the attack did not take place.

That month, the Defendant approached a person called Ghassan Statiti and convinced him to carry out a suicide attack in Tel Aviv. The Defendant and his fellow members of the Organization planned to carry out the attack using a powerful explosive device. The suicide terrorist was filmed before departing for the attack and was briefed on how to activate the explosive device that would be on his person. The Defendant and his colleagues dispatched the suicide terrorist to carry out an attack on two consecutive days, but each time they had to return him due to checkpoints of the security forces, so the attack did not go ahead. On March 5, 2002, Muhannad Abu Halawa, an operative in the Organization of the Defendant, was killed. Following his death, the Defendant met Nasser Abu Hamid, another military operative in his Organization, and asked him to carry out a revenge attack in which many Israeli civilians would be killed. The day after, the Defendant and his colleagues dispatched Ghassan to Jerusalem, who was supposed to commit suicide in Tel Aviv, with an explosive device on his person, but Ghassan encountered IDF soldiers at the Kalandia checkpoint and fled from the site.

[Stamp] P 5: 46

After the death of the brother of the Defendant, the Defendant approached his colleague Nasser Shawish and informed him that he had a person who was prepared to carry out a suicide attack to

avenge the death of the brother, but this person was detained at the Mukta'ah complex in Ramallah. The Defendant had that person released. At the request of the Defendant, Nasser enlisted a female suicide terrorist, a resident of Asira Shimalia, for the attack too. The male and female suicide terrorists were filmed in the safe house in Ramallah and the Defendant briefed the male suicide terrorist on how to carry out the attack. At this stage, Nasser decided that he did not want the female suicide terrorist to participate in the attack and she fled to Jordan. The Defendant brought explosives from the office of Tawfik Tirawi, the Head of the General Intelligence of the Palestinian Authority, and manufactured an explosive device for the purpose of the attack. The Defendant also enlisted a young woman called Kahira Sa'adi to bring the suicide bomber into the State of Israel and Nasser enlisted for that purpose another young woman called Sana'a Shahada. On March 20, 2002, Nasser met Marwan Barghouti, the Head of the Tanzim in the West Bank, and informed him of the intent to dispatch a suicide terrorist into Israeli territory. Barghouti took interest, asking whether the Defendant and Nasser needed assistance in the execution of the attack, but Nasser answered that they did not. Despite this, Barghouti gave the Defendant a sum of $600 for the attack. On the following day, the Defendant met Sana'a and the suicide terrorist and briefed them on departing to Jerusalem for the purpose of carrying out the attack. Thereafter, the Defendant, Nasser and the suicide terrorist visited the office of Hassin A-Sheikh, the secretary general of the Fatah Organization in the West Bank, and received from him money and two grenades for the purpose of the attack. At noontime that day, the Defendant and Nasser dispatched the suicide terrorist to Jerusalem, accompanied by Kahira and Sana'a. The two led the suicide terrorist to King George Street in Jerusalem, where the suicide terrorist detonated the explosive device that was on his person inside a crowd of people who were at the site. As a result of the explosion, the late Gadi Shemesh, his wife, the late Tzipora, who was four months pregnant

[Stamp] P 5: 46 [continued]

Date: 17th of Adar 5761  
March 12, 2001

Case No.: 3478/02

and the late Yitzhak Cohen were killed. In addition, 81 people were injured in the attack and heavy damage was sustained by buildings and businesses at the site.

A short time after the attack in King George Street, the Defendant manufactured an explosive device for a person called Louis Ouda using chemicals that Louis had provided to him; Louis informed the Defendant that he intended to carry out an attack against a military jeep on the Ramallah bypass road using that explosive device.

In mid-March 2002, the Defendant and Mohamed Arda, a military operative of the Islamic Jihad, agreed to execute a suicide attack in which two suicide terrorists would be participating, one from the Organization of the Defendant and the other from the organization of Mohamed. The arrest of the Defendant prevented the execution of the said attack.

In late March 2002, the Defendant instructed a person called Mohamed Kablawi to murder a senior Jewish officer and Border Guard policemen who shopped at a grocery store in Azaria. The Defendant equipped Mohamed with a pistol and instructed him to perform the attack that evening. Mohamed told the Defendant that he did not succeed in performing the attack on that day and the Defendant instructed him to perform it a day or two later, but a few days after that, on March 30, 2002, the Defendant was arrested, putting an end to his activity.

At the beginning of the session today, the parties informed me that they had reached an arrangement concerning the sentence of the Defendant. The parties suggested to the Court to sentence the Defendant to six cumulative life imprisonment terms: five life imprisonment terms for causing the intentional death of each of the five Israeli victims who met their deaths as a result of the acts of the Defendant and another life imprisonment term for all of the other offenses of which the Defendant has been convicted.

It is noted that a plea bargain in cases in which the sentence of a person is measured in life imprisonment terms is an extraordinary one, but we have found nothing wrong with it. We have seen fit to ask the prosecution whether there was no room for sentencing the Defendant to a separate life imprisonment term for the attacks in which he had already dispatched the suicide terrorists on their way, thus concluding the execution of all of the actions that he had to perform from his point of view in order for the attacks to be executed and take human lives. Thus, for example, we mentioned above the attack in which the Defendant instructed a female suicide terrorist to low herself up near security forces personnel at the Maccabim checkpoint in order to ensure their deaths, and she did so, leading to the injury of people.

[Stamp] P 5: 47

7

It would seem that for this offense, the Defendant should be sentenced to a separate term of life imprisonment. The Prosecution answered the question of the Court by stating that in the circumstances of this case, when the Defendant had been convicted in any case of causing the intentional death of five people and he was not being prosecuted only for the events in which people did not meet their deaths, the Prosecution had decided to make a penal distinction between the two different types of offenses – those that lead to death of victims and those that did not. The Prosecution also mentioned that the sentence of life imprisonment is in any case an unlimited sentence that lasts throughout the life of the prisoner, and therefore this distinction, which also respects the principle of the sanctity of life and the befitting separate sentence for causing the death of that person, can be formed. While the answer of the prosecution did not completely satisfy us, we have not found it to be unfounded, and we accept that the sentence that the Prosecution has offered is not one that cannot be justified in the circumstances of the matter, while also taking into account the fact that the Defendant had admitted all of that which had been attributed to him at the first opportunity, without posing any difficulties before the prosecution and the Court, thus taking full responsibility for his acts.

The acts that the Defendant has committed must arouse feelings of atrocity and abomination in any human who has been educated on universal principles of morality. For about a year and a half, the Defendant devoted his life to the killing of innocent civilians, in the Area and in Israel, while attempting to justify

[Stamp] P 5: 47 [continued]

Date: 17th of Adar 5761  
March 12, 2001

Case No.: 3478/02

the murder of those civilians by claiming that all of his actions were directed against the Israeli occupation and against the killing of innocent Palestinian civilians by the forces of the Israeli Army. However, according to the Defendant, if he only could, he would kill more Jews, as many as possible. Thus, the Defendant proved that his actions were not carried out only for achieving a declared goal that is ending the occupation, but also due to blind hatred that guided the Defendant to murder people owing to their collective affiliation rather than owing to their connections to the occupation against which he rose up. The murder of innocent civilians cannot be justified in any case. It is not recognized as legitimate in any human society and all monotheist religions, including Islam, ban the murder of innocent civilians. The declaration of the Defendant that he regretted not having been able to kill more Jews than he did, attests that even today, about a year after his arrest, he is consumed by merciless hatred. The Defendant contended that the Israeli military murdered Palestinian civilians every day and mentioned as an example the killing of his brother Samer. However, we did not find that the actions of murdering civilians that the Defendant employed and the matter of the Defendant's brother, who met his death while leading a suicide terrorist to the Defendant, whom he intended to send to murder additional civilians, could be compared. By these words, we are not expressing any position concerning the justification of the killing of the brother, and we only wish to emphasize that even if this killing were justified, the Defendant would certainly not be given moral justification to killing civilians.

As indicated by the evidence that the Prosecution has put forth before us, the Defendant had already been convicted in 1991 for causing the intentional death of a resident of the camp in which the Defendant lived, who was suspected by the Defendant and his colleagues of collaboration with Israel. The Defendant and his colleagues murdered that person by him with a knife and using an axe that the Defendant swung into his head. For this murder, the Defendant was sentenced to life imprisonment, but was freed within the peace gestures with the Palestinians. The offenses for which the defendant is answering today prove that the gesture that was made with him was not justified and that it led to the killing of additional innocent civilians. The Defendant was obviously dangerous after he had already been convicted of murder in the past. The need to keep him away from human society forever is also eminently clear. After his release, the Defendant proved that this gesture was not justified and members of many Israeli families paid the high price for it.

[Stamp] P 5: 48

9

In the end, after considering all of the circumstances related to the matter before us, we have decided to sentence the defendant as follows:

**Life imprisonment for causing the intentional death of the late Michal Mor.**

**Life imprisonment for causing the intentional death of the late Noam Gozovsky.**

**Life imprisonment for causing the intentional death of the late Gadi Shemesh.**

**Life imprisonment for causing the intentional death of the late Tzipora Shemesh.**

**Life imprisonment for causing the intentional death of the late Yitzhak Cohen.**

**Life imprisonment for all of the other counts of the indictment of which the Defendant has been convicted, including injuring dozens of innocent civilians and countless attempts to hurt other civilians and soldiers.**

**The life imprisonment sentences are to be served cumulative to one another, and in total the Defendant is to serve a sentence of six cumulative life imprisonment terms starting from the day of his arrest.**

A right of appeal within 30 days is granted.

Handed down and announced on this day, March 12, 2003, in public and in the presence of the parties.

| [Signature] | [Signature] | [Signature] |
|---|---|---|
| **Judge** | **President of the Court** | **Judge** |

[Stamp] P 5: 48 [continued]

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

MARK I. SOKOLOW, et al.,

                  Plaintiffs,

vs.

THE PALESTINE LIBERATION
ORGANIZATION, et al.,

                  Defendants.

No. 04 Civ. 00397 (GBD) (RLE)

## DECLARATION OF RINA NE'EMAN

Rina Ne'eman hereby certifies as follows:

1. The attached translation from Hebrew to English is an accurate representation of the document received by Rina Ne'eman Hebrew Language Services, to the best of my knowledge and belief. The document is designated as P5: 44-48.

2. I am a professional translator with a B.A. in International Relations from the Hebrew University of Jerusalem (Israel) and 30 years of translation experience. I am fluent in Hebrew and English, and I am qualified to translate accurately from Hebrew to English.

3. To the best of my knowledge and belief, the accompanying text is a true, full and accurate translation of the Hebrew-language document bearing the bates number, P5: 44-48.

_____
Rina Ne'eman

ss.: New Jersey

On the 28 ] day of February, 2014 before me, the undersigned, personally appeared Rina Ne'eman, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is signed to this Declaration and acknowledged to me that he executed the same in his capacity, and that by his signature on this Declaration, the individual executed the Declaration.

Sworn to me this
28 day of February, 2014

_____
Notary Public

```
HIRUT J MHRETE
NOTARY PUBLIC
STATE OF NEW JERSEY
MY COMMISSION EXPIRES SEPT. 7, 2015
I.D.# 2332704
```