# EXHIBIT H.426

PLAINTIFF'S
EXHIBIT
426



The Military Court                                          Court Case 3380/03
Judea
Before a panel

Court hearing on: November 9, 2003
            14 Heshvan 5764

                    Before the Presiding Judge: Lieutenant Colonel Nathaniel Benichou
                                  Judge: Lieutenant Colonel Hanan Rubinstein
                                  Judge: Captain Eli Bar-On

Defendant: Abdullah Ghaleb Abdullah Barghouti (Jamal) Identity No. (fictitious): 30300028
            Jordanian passport No. e-891198, born October 15, 1972, a resident of Beit Rima,
            detained since March 5, 2003.

## Sentence

1.    The Defendant has been convicted pursuant to his admission before us on June 1, 2003 to
      all of the facts of the indictment, consisting of 108 charges.

2.    This is a series of extremely grave offenses. The Defendant was convicted of an attempt to
      manufacture an explosive object, membership in an unlawful association, six offenses of
      military training without a permit, offenses of conspiring to commit an offense punishable
      by more than three years imprisonment, five offenses of trading in war materiel,
      manufacturing an explosive object, sheltering, three offenses of execution of a service for
      an unlawful association, 12 offenses of attempt

[Stamp] Military Appellate Court * Judea and Samaria [Signature]      [Stamp] Authentic copy

1

[Stamp] P7: 100

to cause intentional death, seven offenses of malicious damage to property, 66 offenses of causing intentional death, offenses involving licenses and documents that were issued under the Security Legislation, possession of a firearm and three offenses of manufacturing an incendiary device.

3.  The Defendant, for more than two years, was a member of the Az A-Din Al Qassam Brigades, the military arm of the Hamas organization, which is an unlawful association.

4.  The Defendant, within the framework of his activity in the military arm of the Hamas organization, was responsible for manufacturing explosive devices and training other people in manufacturing explosive devices. In view of his "success" in this function, the Defendant earned the nickname the Engineer.

5.  In May 2001, the Defendant met a military operative in the Hamas organization and asked to enroll in the military arm of the organization. The Defendant informed that operative that he could manufacture explosive devices for the organization. As a result of the initiative and the proposal of the Defendant he was indeed enrolled into the Az A-Din Al Qassam Brigades.

6.  In late 2001, the Defendant agreed to act under the command of the head of the Az A-Din Al Qassam Brigades in the Ramallah area and manufacture explosive devices for carrying out attacks against Israeli targets.

7.  In exchange for his activity, the Defendant received financial compensation to the amount of US $117,000. In addition, the Defendant received financial aid in the amount of $500 from Marwan Barghouti, the head of the Tanzim of the Fatah.

8.  In May-June 2001 or thereabouts, on several occasions, he met with a senior military operative of the Hamas organization and during those meetings the Defendant learned how to manufacture explosives, explosive devices, detonation mechanisms for the explosive devices, hand grenades and explosive belts. The Defendant learned how to camouflage an explosive device so that it would not be suspected as such. In addition, the Defendant learned how to manufacture poison that could be put into the explosive devices to transform them into chemical charges.

[Stamp] P7: 101

9.  In December 2000, the Defendant conspired with another person in the Hamas organization to participate in the abduction of Israel Defense Forces soldiers. The Defendant was charged with preparing an apartment for holding Israel Defense Forces soldiers who would be abducted. Within the scope of this plan, the Defendant prepared a room in his home in Beit Rima for holding Israel Defense Forces soldiers whom they planned to abduct.

[Stamp] Military Appellate Court * Judea and Samaria [Signature]      [Stamp] Authentic copy

2

[Stamp] P7: 101 [continued]

10. In June 2001, the Defendant received 15 kg of explosives and a pistol and a magazine with cartridges, and the Defendant concealed them and kept them with him.

11. Later, in a storeroom that the Defendant rented in Beit Rima, he set up a laboratory for manufacturing explosives and explosive devices.

12. The Defendant transferred to the laboratory 15 kg of explosives that he obtained, 20 liters of hydrogen peroxide, and a number of wireless mechanisms for activating the explosive devices that he intended to manufacture.

13. In his laboratory, the Defendant manufactured two explosive devices that were camouflaged as stones. One explosive device was transferred by the Defendant to a senior military operative of the Hamas organization and the other device he transferred personally to Bilal Ya'akub Barghouti, another senior military operative of the Hamas organization.

14. In July 2001, the Defendant met his handler, Aiman Halawa, and the above mentioned individual informed the Defendant that he knew a person who was prepared to carry out a suicide attack inside Israel. At the request of his handler, the Defendant contacted Bilal Ya'akub Barghouti, a senior military operative in the Hamas organization and asked him to find a person who could bring a suicide terrorist into Israel in order to carry out a suicide attack with the intent of causing the deaths of as many people as possible.

15. On July 27, 2001, the Defendant obtained an explosive device that he put into a can of beer and to which he attached an activation device. The Defendant delivered the device to Bilal Barghouti in order for him to transfer it to people whom he had recruited and for them to carry out an attack using it with the intent of causing the deaths of as many people as possible.

16. The above mentioned explosive device was delivered to Ahlam Tamimi, who came to a Co-Op supermarket in Jerusalem, in HaMelech George Street in the heart of Jerusalem, while carrying in her bag the explosive device that she had received from the Defendant.

17. Ahlam Tamimi put the beer can containing the explosive device on a shelf of cans in the above mentioned supermarket, in order for the explosive device to explode and cause the deaths of people nearby at the time of the explosion. Ahlam Tamimi activated the explosive device and left the store immediately after.

[Stamp] P 7: 102

18. In the afternoon of July 30, 2001 [7.01..30], the above mentioned explosive device exploded in the said supermarket and caused a large amount of damage to property, but miraculously no loss of life.

[Stamp] Military Appellate Court * Judea and Samaria [Signature]     [Stamp] Authentic copy

3

[Stamp] P 7: 102

19. On August 9, 2001, the Defendant asked his handler in the Hamas to give him a large explosive device and a suicide terrorist for the purpose of carrying out a suicide attack in order to harm and cause the deaths of people.

20. The Defendant received a large explosive device that consisted of two shampoo bottles that were filled with explosives.

21. At the request of Bilal Ya'akub Barghouti, the Defendant put the above mentioned explosive device inside a guitar. In addition to the above mentioned explosive device, the Defendant also put two plastic bags filled with explosives and screws into the guitar. The Defendant closed the guitar's hole using glass so that its content would not be visible. The Defendant connected the activation mechanism to this explosive device himself.

22. The Defendant put the guitar into a black case and pulled an activation button with activation wires out from the case so that the device could be activated easily without opening the case.

23. The Defendant reported to his handler that he had prepared the above mentioned explosive device and asked his handler to send a suicide terrorist to him.

24. The Defendant transferred the explosive device to Bilal Barghouti in order for him to deliver it to a suicide terrorist, in order for the suicide terrorist to carry out a suicide attack using the explosive device that had been prepared, with the intent of causing the deaths of as many people as possible.

25. During the day, Bilal Barghouti instructed the suicide terrorist on how to activate the explosive device that had been manufactured by the defendant.

26. On August 9, 2001, at about 1:55 p.m., the terrorist, Az Aldin Shahil Ahmed Masri, carried the guitar with him while being led by Ahlam Tamimi to central Jerusalem.

27. The above mentioned suicide terrorist carried the death guitar and went into the Sbarro restaurant in Jerusalem at noontime, while it was crowded with people who had come to eat.

28. The suicide terrorist activated the activation mechanism that had been assembled by the Defendant, and as a result of the explosion of the explosive device, 15 innocent people – whose only wrongdoing was eating in the heart of Jerusalem – were killed.

[Stamp] P 7: 103

29. A great amount of damage was caused to the restaurant and, as set forth, 15 people met their deaths.

30. More than 127 people who were in the area of the explosion site were injured.

31. In this incident, [the following] were killed: the late Frieda Mendelsohn, aged 62 at the time of her death; the late Lily Shimashvili Mesengiser, aged 33 at the time of her death; the late Tamara Shimashvili Mesengiser, aged 8 at the time of her death; the late Tehila Maoz, aged 20 at the time of her death; the late Michal Raziel,

[Stamp] Military Appellate Court * Judea and Samaria [Signature]      [Stamp] Authentic copy

4

[Stamp] P 7: 103 [continued]

aged 15 at the time of her death; the late Malka Roth, aged 15 at the time of her death; the late Yocheved Sasson, aged 10 at the time of her death; the late Mordechai Schijveschuurder, aged 44 at the time of his death; the late Tzira Schijveschuurder, aged 41 at the time of her death; the late Raya Schijveschuurder, aged 14 at the time of her death; the late Avraham Yitzhak Schijveschuurder, aged 4 at the time of his death; the late Hemda Schijveschuurder, aged 2 at the time of her death; the late Judith Lilian Greenbaum, aged 31 at the time of her death; the late Giora Balash, aged 69 at the time of his death; and the late Zvi Golombek, aged 26 at the time of his death.

32. Due to the acts of the Defendant, many people lost their lives and a great many others were injured. This was the goal of the Defendant, and he executed his goal with malice and without hesitation.

33. Starting in the second half of 2001, in or near Ramallah, the Defendant built a number of laboratories for manufacturing explosives and explosive devices. The Defendant would transfer various chemicals for use in making explosive devices to these laboratories. The above mentioned explosives were purchased both by the Defendant himself and by his fellow Hamas organization members.

34. In his laboratories, using the above mentioned chemicals, the Defendant manufactured dozens of kilograms of explosives. Using the explosives that he had made, the Defendant prepared a large number of explosive devices of various types.

35. The Defendant manufactured the above mentioned explosive devices with the aim of Hamas organization operatives carrying out attacks using them against Israeli targets. The Defendant briefed the Hamas organization on the activation of the above mentioned explosive devices. In addition to the aforementioned, the Defendant attempted to manufacture hand grenades and also obtained instructions on manufacturing Qassam rockets, but he decided that he was unable to manufacture the rockets.

36. The Defendant also made the effort to train and teach other people to manufacture explosives and explosive devices.

37. During November 2001, the Defendant manufactured explosives in his laboratory and using them, manufactured three additional explosive devices. He put the first explosive device into a computer case. He put the second explosive device into a black fabric bag. The Defendant prepared the third explosive device in the form of an explosive belt.

[Stamp] P 7: 104

38.  In addition to the explosives, the Defendant inserted nails and nuts into the devices that he had prepared, in order for the explosive device to injure severely as many people as possible. In addition, the Defendant laced the explosive devices with toxic material, in order for the explosive devices to be more lethal.

[Stamp] Military Appellate Court * Judea and Samaria [Signature]      [Stamp] Authentic copy

5

[Stamp] P 7: 104 [continued]

39. The Defendant passed on the three explosive devices to a Hamas operative in order for the operatives of the organization to carry out bombing attacks using them with the intent of causing the deaths of as many people as possible.

40. On December 1, 2001, at about 11:36 p.m., at the entrance to Ben Yehuda Street from Zion Square in Jerusalem, a suicide terrorist activated the explosive device that had been manufactured by the Defendant and concealed inside a computer case, with the intent of causing the deaths of as many people as possible. The above mentioned explosive device exploded when it was activated.

41. At that time, at the junction of Ben Yehuda and Luntz Streets, in Jerusalem, near the site of the previous explosion, a second suicide terrorist activated the explosive device that was inside the explosive belt that had been manufactured by the Defendant, with the intent of causing the deaths of as many people as possible. The second explosive device also exploded.

42. A few minutes after the activation of the two explosive devices by two suicide bombers, the third explosive device that had been placed inside an automobile that had been parked near the detonation of the two previous explosive devices, in Harav Kook Street, near the corner of Jaffa Street in Jerusalem, was activated. The explosive device was activated with the intent of causing the deaths of as many people as possible.

43. As a result of the detonation of the three explosive devices that had been made by the defendant himself, 10 people were killed and about 191 people were injured.

44. In this attack, the following people were murdered: the late Assaf Avitan, aged 15; the late Guy Vaknin, aged 19; the late Yoni Korganov, aged 20; the late Yaakov Israel Danino, aged 17; the late Michael Dahan, aged 20; the late Golan Turgeman, aged 15; the late Adam Weinstein, aged 14; the late Moshe Yedid-Levy, aged 19; and the late Nir Haftzadi, aged 19.

45. Very heavy damage was sustained by houses and businesses in the area of the streets Ben Yehuda, Luntz, Jaffa and Harav Kook and to vehicles that were in the area.

46. In late 2001, the Defendant manufactured, at the request of Marwan Barghouti, the head of the Tanzim of the Fatah, two additional explosive devices that were intended for use if the Israel Defense Forces were enter Ramallah.

[Stamp] P 7: 105

47.  In late 2001, the Defendant manufactured three explosive devices that were concealed inside juice cartons, and four more explosive devices that were camouflaged as stones. These devices were also transferred to operatives in the Hamas organization.

48.  In early March 2002, the Defendant was requested by his handler in the Hamas to manufacture an explosive belt again, for a suicide terrorist, in order for him to carry out a suicide attack with the intent of causing the deaths of as many people as possible.

[Stamp] Military Appellate Court * Judea and Samaria [Signature]        [Stamp] Authentic copy

6

[Stamp] P 7: 105 [continued]

49. The Defendant agreed to this and manufactured an explosive belt that was assembled by him and he was also the one to attach the activation mechanism to the explosive belt.

50. The defendant transferred the belt to operatives in the Hamas, in order to execute a suicide attack against Israeli targets.

51. On March 9, 2002, at about 10:30 a.m., a suicide terrorist, who was carrying on his person the explosive belt that had been prepared by the Defendant. The suicide terrorist entered the Moment Café in Jerusalem, which was crowded at that time. The suicide terrorist activated the explosive belt with the intent of causing the deaths of as many people as possible.

52. As a result of the activation of the explosive belt, 10 who were then at the Moment Café were killed and 65 people were injured.

53. The people who were killed at the Moment Café were the late Nir Borochov, the late Limor Ben-Shoham, the late Dan Imani, the late Danit Dagan, the late Uri Felix, the late Baruch Lerner, the late Tali Eliyahu, the late Livnat Dvash, the late Orit Ozerov and the late Natanel Kochavi.

54. In addition to 10 people being murdered and dozens more people being injured as set forth, heavy damage was sustained by the Moment Café located in Aza Street in Jerusalem.

55. In March-April 2002 or thereabouts, the commander of the military arm of the Hamas organization in the Ramallah area asked the Defendant through an intermediary to manufacture explosive devices and an explosive bag for carrying out a suicide attack.

56. The Defendant agreed to the request and manufactured an explosive belt that had similar assembly to the explosive belt that he had prepared for the suicide terrorist who had detonated himself at the Moment Café.

57. In addition, the defendant prepared an explosive device that he put into a bag, to which screws were also added to increase the destructive power of the explosive device.

58. The defendant delivered the above mentioned explosive belt to another person in the organization in order for it to be delivered to a suicide terrorist.

[Stamp] P 7: 106

59. The suicide terrorist, with the assistance of others, arrived, on May 7, 2003 [Translator's note: as written], at the Sheffield Club in the new industrial zone of Rishon le Zion while wearing the explosive belt that had been prepared by the Defendant. The suicide terrorist entered the above mentioned club, activated the explosive belt, which exploded, with the intent of causing the deaths of as many people as possible.

[Stamp] Military Appellate Court * Judea and Samaria [Signature]       [Stamp] Authentic copy

7

[Stamp] P 7: 106 [continued]

60. As a result of the explosion, 15 people were killed and 59 were injured.

61. In this incident, the following people were murdered: the late Rahamim Kimhi, the late Rafael Haim, the late Anat Teremforush, the late Avraham Bayaz, the late Eti Bablar, the late Yitzhak Bablar, the late Israel Shikar, the late Shoshana Magmari, the late Sharuk Rassan, the late Nawa Hinawi, the late Nir Lovatin, the late Regina Malka Boslan, the late Dalia Masa, the late Pnina Hikri and the late Edna Cohen.

62. As a result of the detonation of the explosive belt that had been prepared and manufactured by the Defendant, the Sheffield Club and the whole building containing the club were heavily damaged.

63. On May 23, 2002, the Defendant attempted to cause the intentional deaths of people. During May the Defendant met a military operative in the Hamas organization, who asked him to manufacture an additional explosive device, in order to carry out a bombing attack. The Defendant agreed to this and made an explosive device that could be attached to iron using magnets that the Defendant attached to the explosive device, and which could be operated by cellular telephone.

64. The Defendant delivered the explosive device that he had prepared above to another person in Hamas, in order to carry out the planned bombing attack.

65. The explosive device that had been prepared by the Defendant was attached to the bottom of a fuel tank in a fuel tanker by another person in the Hamas using a magnet. The tanker made its way to the Pi Glilot site, followed by the operators of the explosive device, who activated the explosive device by cellular telephone, with the intent of causing the deaths of as many people as possible.

66. The above mentioned explosive device, which had been manufactured and assembled by the Defendant, exploded and caused serious damage to the fuel tanker, but miraculously nobody was hurt.

67. In June 2002, the Defendant was requested by the commander of the military arm of the Hamas organization in the Ramallah area to manufacture an explosive device that is activated by cellular telephone for the purpose of a bombing attack with the intent of causing the deaths of as many people as possible. The Defendant prepared such an explosive device, as requested, while being well aware of the purpose for which the explosive device was intended.

[Stamp] P 7: 107

68.  In the morning of June 30, 2002, other people in the Hamas, to whom the explosive device that the Defendant had prepared, put it on railroad tracks in Lod.

69.  When those other people identified a train approaching the area in which the explosive device had been laid, they activated it and the explosive device exploded.

[Stamp] Military Appellate Court * Judea and Samaria [Signature]    [Stamp] Authentic copy

8

[Stamp] P 7: 107 [continued]

70. As a result of the explosion of the explosive device, four people were injured and damage was sustained by the locomotive and the railroad track.

71. During June 2002, the Defendant was requested again to prepare an additional explosive device, activated by cellular telephone, for carrying out a bombing attack with the intent of causing the deaths of as many people as possible.

72. The Defendant agreed to that request, manufacturing such an additional explosive device while being well aware of the purpose for which he was preparing the explosive device. Thereafter, the Defendant transferred the explosive device that he had prepared to other people in the Hamas.

73. The above mentioned explosive device was placed on the railroad track near the exit from Rehovot next to Kfar Gvirol, and on the following day, July 21, 2002, in the early morning hours, the device was detonated by Hamas people with the intent of causing the deaths of people. As a result of the explosion of the explosive device, one person was injured and damage was caused to a locomotive and to the railroad.

74. In July 2002, the Defendant was requested by the commander of the military arm of the Hamas organization in the Ramallah area to manufacture an explosive device that would be concealed inside a bag, in order to carry out a bombing attack with the intent of causing the deaths of as many people as possible.

75. The Defendant agreed to manufacture such an explosive device, knowing for what purpose the explosive device would be used.

76. The Defendant manufactured such an explosive device, which was concealed inside a bag, and the Defendant also made the effort to fill the bag with iron nuts in order to increase the destructive power of the device.

77. The Defendant also prepared a wireless activation mechanism for the device that he had manufactured and delivered the device to a Hamas man.

78. The explosive device was laid by Hamas people inside a cafeteria in the Frank Sinatra Building on the campus of the Hebrew University on Mount Scopus in Jerusalem and was activated on July 31, 2002, at about 1:00 p.m., because at this time there was usually a large concentration of people in the cafeteria.

[Stamp] P 7: 108

79. As a result of the explosion of the explosive device that the Defendant had manufactured, nine people were killed and 81 more people were injured.

80. As a result of the detonation of the explosive device, at noontime of that day, [the following] were killed: the late Daphna Spruch; the late Marla Anne Bennett; the late Dina Carter; the late Benjamin Thomas Blutstein; the late Revital Barashi; the late David (Diego) Ladowski; the late Levina Shapira; the late Janis Ruth Coulter and the late David Gritz.

81. As a result of the explosion, heavy damage was sustained by the Frank Sinatra Building in the campus of the Hebrew University.

[Stamp] Military Appellate Court * Judea and Samaria [Signature]      [Stamp] Authentic copy

9

[Stamp] P 7: 108 [continued]

82.  In August 2002, the Defendant was requested to prepare two explosive devices that were concealed inside biscuit boxes for the purpose of carrying out a bombing attack with the intent of causing the deaths of as many people as possible. The Defendant agreed to manufacture these explosive devices, well aware of the purpose for which they were intended, and also actually manufactured these explosive devices.

83.  The Defendant prepared two explosive devices and attached activation mechanisms to them as requested. These were two explosive belts, which were intended for use by suicide terrorists.

84.  The Defendant delivered the explosive devices inside the explosive belts to another person in the Hamas organization, well aware of the purpose for which they would be used.

85.  On September 19, 2002, at noontime, a suicide bomber, who was carrying on his person one of the explosive belts that the Defendant had prepared, boarded a bus on line no. 4 in Tel Aviv and detonated the explosive device with the aim of causing the deaths of as many people as possible.

86.  As a result of the explosion, six people were killed and about 84 more who were on or near the bus at the time of the explosion were injured

87.  As a result of the explosion, the following people were killed: the late Yossi Mamistavlov, the late Ofer Zinger, the late Rosanna Siso, the late Yaffa Shem-Tov, the late Solomon Hoenig and the late Jonathan Jesner.

88.  Extensive damage was sustained by the bus that the suicide terrorist had boarded and extensive damage was sustained by the stores and businesses that were near the attack site.

89.  The Defendant prepared the second explosive belt as described earlier and delivered it to others in order for it to be used in a suicide attack.

90.  On October 11, 2002, at about 8:15 p.m., a suicide terrorist, who was also carrying on his person an explosive belt that the Defendant had prepared, attempted to enter the Yotvata restaurant located on the promenade in Tel Aviv and to detonate it in order kill the people who were then in the restaurant.

[Stamp] P 7: 109

91.   The guard at the site noticed the attacker and suspected him and therefore did not let him enter the restaurant. The attacker was apprehended. By this act the Defendant was a full accomplice in an attempt to cause the intentional deaths of people.

[Stamp] Military Appellate Court * Judea and Samaria [Signature]     [Stamp] Authentic copy

[Stamp] P 7: 109 [continued]

92. In February 2003 the Defendant taught another person who had been sent to him by the head of the Az A-Din Al Qassam Brigades in the Ramallah area how to manufacture explosive devices and electrical circuits for activating explosive devices and taught him how to manufacture activation mechanisms for explosive devices.

93. During 2003 until and up to the time of his arrest, the Defendant transferred to the head of the Az A-Din Al Qassam Brigades in Ramallah computer diskettes on which there were instructions on how to manufacture explosives and explosive devices. The Defendant knew that these diskettes were intended to be transferred to an operative of the Palestinian Islamic Jihad organization who asked to learn to manufacture explosives and explosive devices.

94. Thus, over a very long period, the Defendant had a clear, determined purpose of manufacturing lethal explosive devices that were intended to be used in suicide attacks and bombing attacks, with the aim of causing the deaths of as many Israelis and Jews as possible in cruel, criminal terrorist actions.

95. The Defendant is responsible for the murder of dozens of innocent human beings and the injury of hundreds more.

96. It must be assumed that had the Defendant not been apprehended, he would have continued to manufacture more and more explosive devices and explosive belts, serving as a kind of factory manufacturing death mechanisms.

97. The Defendant admitted everything that had been attributed to him in the indictment as described above and was convicted of all of the offenses as described here in the sentencing case.

98. The Defendant expressed no remorse. The Defendant caused destruction and carnage and the explosive devices that he prepared were seeds of death that were scattered in many places throughout the State of Israel.

99. The Defendant did not satisfy himself with the preparation of explosive devices in his laboratory but also made the effort to teach others to prepare such explosive devices.

100. It is clear that in this case there is no room for consideration of any personal concerns of the Defendant as mitigating concerns.

[Stamp] P 7: 110

101. The Defendant was a key senior accomplice as a primary perpetrator of unflinching murders and injury of civilians, constituting a significant link in the terrorist network wielded against the State of Israel and its civilians.

102. The wish of the Defendant was to kill as many Jews as possible and he knew that the explosive belts and explosive devices that he had prepared would kill a very large number of people and injure whoever would be in the effective range of the explosive devices.

[Stamp] Military Appellate Court * Judea and Samaria [Signature]     [Stamp] Authentic copy

11

[Stamp] P 7: 110 [continued]

103.  The Defendant is a highly dangerous person and his acts are criminal to the extreme, meaning that the sentencing should be maximal in order to keep him away from society and the public at large for the rest of his life.

104.  The murderous terrorist spree that the Defendant committed has been one of the worst we have known. His acts are felonious and atrocious.

105.  The Defendant dealt for a very long period in the manufacturing of explosive devices, in order to sow destruction and death, bereavement and pain among the citizens of the State of Israel.

106.  Most of the victims did not have the opportunity to live a full and real life, and were killed at a very young age. Some of the victims are innocent children. Often, the attacks wiped out whole families in a single bitter moment.

107.  After hearing the pleas of the parties, we considered all of the aggravating and mitigating arguments.

108.  The truth that must be heard is that we have found almost no mitigating argument except for the confession of the Defendant before us. However, this confession came with no remorse and therefore its mitigating weight is negligible.

109.  We have considered the severity of the offenses and the great damage that was sustained by the victims of the offenses and their families.

110.  This is pain and bereavement to the families of the injured and the dead from the many terrorist actions, and there are hundreds if not thousands of relatives who remain with scars of pain on their souls, in addition to the pain, agony and hellfire that the casualties themselves experienced, some of whom will bear their disability until the end of their lives, without any possibility of ever being freed from the suffering that struck them like thunder out of the blue.

111.  In the case before us, it is blatantly clear that the public interest, that is, deterrence of the terrorism mechanisms and the operators of the cruel, merciless terrorist mechanisms, should be preferred over any personal interests of the Defendant.

112.  The judicial system should have deterrent ability towards terrorist operatives and towards the head of the terrorism hierarchy.

[Stamp] P 7: 111

113.  The terrorism today that is striking at the State of Israel is vicious and cruel and makes no distinction at all between serviceman, civilian, infant, elderly, disabled, tourist, man, woman or any human.

[Stamp] Military Appellate Court * Judea and Samaria [Signature]        [Stamp] Authentic copy

12

[Stamp] P 7: 111 [continued]

114. The aim of Palestinian terrorism is to strike at Jews and kill as many Jews as possible and to intimidate and terrorize those that remain alive. The purpose of terrorism is to incapacitate normal, stable life in the country.

115. Terrorism is an intolerable thing and the sentencing for a person who wields terrorism and is part of the chain of terrorism mechanisms should be painful and maximal.

116. The legal system should make its contribution to reduce acts of terrorism to the extent possible, whenever possible and feasible.

117. The Defendant before us must be sentenced in a manner that will deter offenders like him, pay him back for his cruel, criminal actions and will express the revulsion of any human and of any society concerning the offenses for which he has been convicted.

118. In many, terrible cases of terrorism such as this one for which the Defendant is responsible as part of the mechanism of terrorism, as one who manufactured the explosive devices that sowed destruction and death, the maximum sentence prescribed by the legislator should be a starting point and an end point.

119. In our opinion, if we had the authority to do so, the Defendant should be sentenced to death as the fitting sentence.

120. Leaving a maximum sentence as a dead letter would contravene the explicit direction of the legislator, in contravention of his opinion that a death sentence should be handed down to a defendant.

121. To pass down a death sentence under the Security Provisions Order, a unanimous decision must be made by a panel of three judges who are jurisprudents of Lieutenant Colonel rank at least.

122. The current panel of the Court does not satisfy this condition and is therefore not authorized to sentence the Defendant to death, despite this being the sentence that in our opinion should be inflicted on the Defendant.

123. When terrorism is so cruel, massive and strikes indiscriminately right and left, sometimes frequently, for an extended period, and kills dozens of human beings in many events and when a person such as the Defendant is an accomplice in the above mentioned mechanism in so many cases, the correct and fitting sentence is the death sentence.

[Stamp] P 7: 112

124.  Contentions are being made that the death sentence is not a deterrent and is ineffective. Maybe this is correct concerning suicide attackers who are not deterred by this attack because they have sentenced themselves and others to death in any case when performing a suicide attack.

[Stamp] Military Appellate Court * Judea and Samaria [Signature]     [Stamp] Authentic copy
[Stamp] Nathaniel Benichou, Advocate

[Stamp] P 7: 112

125. However, suicide terrorists do not usually work alone and of their own accord. They are part of a wider terrorist system that includes aiders of various kinds and includes people such as the Defendant, who assemble and manufacture death bombs. People of the Defendant's kind rank high in the hierarchy of terrorism.

126. The death sentence that may be inflicted in the appropriate cases should be not only a written letter but also a practiced provision of law.

127. The Hamas is a cruel terrorist organization that must be fought in all existing legal ways, and the Court must have its say within the sentencing of a man who joined the Hamas in order to murder as many Jews as possible and also executed his plots to a massive scale.

128. Against suicide terrorists, against those who equip them, against their accessories, against the makers of the explosive belts and the explosive devices that are deployed against an innocent population, a strong hand and the strictest sentencing possible must be used.

129. Maximum sentencing may deter the handlers and prepares of explosive devices and the assisters and reduce the wave of suicide terrorists.

130. A person such as the Defendant acted as part of a murderous, bloodthirsty terrorist system; thirsty for the blood of innocent civilians whose sole crime was being Jews living in the Land of Israel and by whose bad luck they happened to be on a bus or in a restaurant or café at the time of the arrival of a suicide murderer who killed them all at once.

131. A person of the kind of the Defendant is fit for death and should be sentenced to death.

132. We believe that the Defendant before us should be sentenced to death for his acts. The death penalty in the case before us would represent doing justice.

133. Because we do not have the authority to do so, and in order to express our position concerning the criminal acts of the Defendant, we sentence the Defendant to one separate life imprisonment term for each person who was murdered as a result of activation of the explosive devices that the Defendant manufactured. The life imprisonment sentences are to be cumulative.

[Stamp] Military Appellate Court * Judea and Samaria [Signature]      [Stamp] Authentic copy

14

[Stamp] P 7: 113

134.   In addition to this, although we have sentenced the Defendant to cumulative life imprisonment terms for the murders in which he was an accessory, the additional offenses that he has committed, the injuring of hundreds of people as a result of his acts, cannot be ignored, and he is to be punished for the additional offenses by an additional sentence too.

135.   In view of all that which has been set forth above, we sentence the Defendant to 66 terms of life imprisonment for the murder of 66 human beings, each life sentence to be served cumulatively.

For the remaining offenses that the Defendant has committed we hand down an additional life sentence that will also be cumulative to all of the other life sentences that we have handed down to him.

A right of appeal within 30 days of today is conferred.

Handed down and announced this day, November 9, 2003, in public and in the presence of the Military Prosecutor, the Defendant and his counsel.

| Lieutenant Colonel | Lieutenant Colonel | |
|---|---|---|
| Hanan Rubinstein | Nathaniel Benichou | Major Eli Bar-On |
| Judge | Presiding Judge | Judge |

[Stamp] Military Appellate Court * Judea and Samaria [Signature]     [Stamp] Authentic copy

[Stamp] P 7: 114

Page 1 of 1

<u>Unclassified</u>

Israel Defense Forces

November 30, 2004

**Judea**

**Court Case 3880/03**

### **Imprisonment Order**

To Israel Police officer / prison guard / soldier

I, a Military Court Judge, hereby order the imprisonment of:

Abdullah Ghaleb Abdullah Barghouti, 1162167

and to deliver him with this imprisonment order to the prison guard, in order for him to be imprisoned for:

67 terms of life imprisonment.

This order serves as a reference to arrest him and keep him incarcerated by whoever is qualified by law to do so.

[Signature]
Lieutenant Colonel Nathaniel Benichou
Assisting Presiding Judge

Handed down on November 30, 2004

For use by the police / the prison

Particulars of the prisoner:

[Stamp] P 7: 115

Abdullah Ghaleb Abdullah Barghouti, 1162167

The above mentioned individual was admitted to the incarceration facility / prison on _____

[Stamp] Military Appellate Court * Judea and Samaria [Signature]      [Stamp] Authentic copy

http://hm9605mgw1/magen/Tables/Decisions/TETemplateBody.asp?CourtID=2&Deci...

November 30, 200[obscured]

[Stamp] P 7: 115 [continued]

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

MARK I. SOKOLOW, *et al.*,

                Plaintiffs,

vs.

THE PALESTINE LIBERATION
ORGANIZATION, *et al.*,

                Defendants.

No. 04 Civ. 00397 (GBD) (RLE)

**DECLARATION OF RINA NE'EMAN**

Rina Ne'eman hereby certifies as follows:

1. The attached translation from Hebrew to English is an accurate representation of the document received by Rina Ne'eman Hebrew Language Services, to the best of my knowledge and belief. The document is designated as P 7: 100-15.

2. I am a professional translator with a B.A. in International Relations from the Hebrew University of Jerusalem (Israel) and 30 years of translation experience. I am fluent in Hebrew and English, and I am qualified to translate accurately from Hebrew to English.

3. To the best of my knowledge and belief, the accompanying text is a true, full and accurate translation of the Hebrew-language document designated bearing the bates number P 7: 100-15.

Dated: March 6, 2014

Rina Ne'eman

ss.: New Jersey

On the _6_ day of March, 2014 before me, the undersigned, personally appeared Rina Ne'eman, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is signed to this Declaration and acknowledged to me that he executed the same in his capacity, and that by his signature on this Declaration, the individual executed the Declaration.

Sworn to me this
_6_ day of March, 2014

Notary Public

LEONOR TROYANO
ID # 2385580
NOTARY PUBLIC OF NEW JERSEY
Commission Expires 5/8/2014