# EXHIBIT H.464



PLAINTIFF'S
EXHIBIT
464

The Military Prosecutor v. Abdullah Ghaleb Abdullah Barghouti / Israel Prison Service

November 30, 2004

## The Military Court in Judea

**Before the Honorable Presiding Judge: Lieutenant Colonel Natanel Benishu**
**Judge: Lieutenant Colonel Hanan Rubinstein**
**Judge: Captain Sharon Keinan**

**The Military Prosecutor**

- v. -

**The Defendant:    Abdullah Ghaleb Abdullah Barghouti, Identity No.: 30300028 / Israel Prison Service - Present**

(Represented by Counsel, Adv. Ilya Theodori – Present)

## Sentence

Pursuant to his guilty plea, the Defendant has been convicted of 108 charges that are attributed to him in the indictment, the likes of which have not been seen by this veteran Court. This is a series of extremely grave offenses, including membership in an illegal organization, attempt to make explosives, six offenses of military training, conspiracy, five offenses of trading in war materiel, four offenses of making an explosive and incendiary object, sheltering, three offenses of execution of a service, 12 offenses of attempt to cause intentional death, seven offenses of malicious damage to property, possession of a firearm, offenses involving licenses and documents, and above all, 66 offenses of causing intentional death.

The Defendant, who was born in Kuwait and arrived in the Area in 1999, enlisted in May 2001 into the Az A-Din Alqassam Brigades, the military arm of the Hamas Organization. In May-June 2001, the Defendant met a senior military operative in the Hamas Organization on several occasions, who taught the Defendant how to make explosives, explosive devices and activation mechanisms. The Defendant also learned how to make poison that could be put into the explosive devices to transform them into chemical charges.

[Stamp] P 7: 7

Thereafter, the Defendant quickly became responsible for manufacturing explosive devices in his organization, and trained others in the making of such devices. In view of his "success" in this function, the Defendant acquired the nickname "the Engineer". In exchange for his activity, the Defendant received financial compensation to the amount of $117,000 and also financial aid of $500 from Marwan Barghouti, the head of the Tanzim.

Before that time, in December 2000, the Defendant conspired with another person to participate in the abduction of Israel Defense Forces soldiers. The Defendant was charged with preparing an apartment for holding the soldiers that would be abducted. The Defendant indeed prepared a room in his home for holding such soldiers.

In June 2001, the Defendant obtained 15 kg of explosives and a pistol and a magazine with cartridges.

Later, the Defendant rented a storeroom in his village and in it established a laboratory for manufacturing explosives and explosive devices. The Defendant transferred to the laboratory the explosives that he obtained, 20 liters of hydrogen peroxide, […]

---

1

Nevo
*nevo.co.il*

[Stamp] P 7: 7 [continued]

[...] and a number of wireless mechanisms for activating the explosive devices that he intended to manufacture. In his laboratory, the Defendant manufactured two explosive devices that were camouflaged as stones. The Defendant transferred the explosive devices to two military operatives in the Hamas Organization, among them Bilal Barghouti.

From the second half of 2001, the Defendant established a number of additional laboratories for manufacturing explosives and explosive devices. The Defendant habitually transferred to these laboratories various chemicals, which had been purchased by him or by the members of the Hamas organization. The Defendant used those chemicals to manufacture tens of kilograms of explosives from which he produced a large number of explosive devices of different types. The Defendant made the above mentioned explosive device with the aim of operatives in his organization using them to carry out attacks against Israeli targets. The Defendant briefed the operatives in his organization on how to activate the said explosive devices. The Defendant also made the effort to train and teach many people how to manufacture explosives and explosive devices and also forwarded to the head of the Az A-Din Alqassam Brigades in Ramallah magnetic media containing instructions on how to manufacture explosives and explosive devices.

In addition to the foregoing, the Defendant attempted to manufacture hand grenades and also obtained instructions on manufacturing Qassam rockets, which he decided that he could not do.

In July 2001, the Defendant met his handler and the mentioned individual informed the Defendant that he was familiar with a person who was prepared to carry out a suicide attack in Israel. At the request of his handler, the Defendant turned to Bilal Barghouti and asked him to find a person to bring the suicide terrorist into Israel in order for him to carry out an attack with the aim of causing the deaths of as many people as possible. At the same time, on July 27, 2001, the Defendant obtained an explosive device that he put into a beer can and attached an activation device to it. The Defendant delivered the device to Bilal Barghouti in order for him to transfer it to people whom he had enlisted and for them to carry out an attack using it. On July 30, 2001, the explosive device was delivered to Ahlam Tamimi, who put it on one of the shelves of beverage cans in a Co-Op Supermarket in Hamelech George Street in Jerusalem. After activating it, Ahlam left the store. At noontime the explosive device exploded and caused a large amount of damage to property, but miraculously no loss of life.

[Stamp] P 7: 8

On August 9, 2001, the Defendant asked his Hamas handler to transfer to him a large explosive device and a suicide terrorist for the purpose of executing a suicide attack. The Defendant received such an explosive device and, at the request of Bilal Barghouti, concealed it inside a guitar. The Defendant also put two plastic bags filled with explosives and screws into the guitar. The Defendant connected the activation mechanism to this explosive device. The Defendant put the guitar into a black case and extracted an activation button from the case so that the device could be activated easily without opening it. The Defendant transferred the explosive device to Bilal Barghouti in order for him to deliver it to a suicide terrorist, who would use it to carry out an attack. At the said time, at about 1:55 p.m., the terrorist Az Aldin Masri was dispatched, while carrying the booby trapped guitar, to central Jerusalem. Ahlam Tamimi led the terrorist to the center of Jerusalem and he went into the Sbarro Restaurant with the death guitar, where he activated the explosive device that had been assembled by the Defendant. As a result of the explosion of the explosive device, 15 of the diners in the restaurant were murdered and more than 127 others were injured.

In this incident, the following people were murdered:

**The late Frieda Mendelsohn**, aged 62 at the time of her death;

**The late Lily Shimashvili-Messengeiser**, aged 33 at the time of her death;

**The late Tamara Shimashvili-Messengeiser**, aged 8 at the time of her death;

**The late Tehila Maoz**, aged 20 at the time of her death;

**The late Michal Raziel**, aged 15 at the time of her death;

Nevo
*nevo.co.il*

[Stamp] P 7: 8 [continued]

**The late Malka Roth**, aged 15 at the time of her death;

**The late Yocheved Sasson**, aged 10 at the time of her death;

**The late Mordechai Raphael Schijveschuurder**, aged 44 at the time of his death;
His wife, **the late Tzira Schijveschuurder**, aged 41 at the time of her death;
And their children, **the late Raya Schijveschuurder**, aged 14 at the time of her death;
**The late Avraham Yitzhak Schijveschuurder**, aged 4 at the time of his death;
**The late Hemda Schijveschuurder**, aged 2 at the time of her death;

**The late Judith Lilian Greenbaum**, aged 31 at the time of her death;

**The late Giora Balash**, aged 69 at the time of his death;

**The late Zvi Golombek**, aged 26 at the time of his death;

During November 2001, the Defendant manufactured three additional explosive devices in his laboratory. He put the first explosive device into a computer case; he put the second into a fabric bag; and the Defendant used the third to prepare an explosive belt. In addition to the explosives, the Defendant inserted nails and nuts into the devices, in order for the explosive device to injure severely as many people as possible. In addition, the Defendant laced the explosive devices with toxic material. The Defendant provided the three explosive devices to a Hamas operative in order for the operatives of the organization to carry out bombing attacks using them.

On December 1, 2001, at about 11:36 p.m., at the entrance to Ben Yehuda Street from Zion Square in Jerusalem, a suicide terrorist activated the explosive device that had been concealed inside a computer case. At that time, at the junction of the streets Ben Yehuda and Luntz, in Jerusalem, a second suicide terrorist activated the explosive belt that had been manufactured by the Defendant. A few minutes later, a third explosive device that had been placed inside an automobile that had been parked in Harav Kook Street was activated.

As a result of the detonation of the three explosive devices that had been made by the defendant, 10 people were killed and 191 were injured.

In this attack, the following people were murdered:

**The late Yosef El-Ezra,** aged 18 at the time of his death;

**The late Assaf Avitan,** aged 15 at the time of his death;

**The late Guy Vaknin,** aged 19 at the time of his death;

**The late Yoni Korganov,** aged 17 at the time of his death;

**The late Yaakov Israel Danino,** aged 17 at the time of his death;

**The late Michael Dahan,** aged 20 at the time of his death;

**The late Golan Turgeman,** aged 15 at the time of his death;

**The late Adam Weinstein,** aged 14 at the time of his death;

**The late Moshe Yedid-Levy,** aged 19 at the time of his death;

**The late Nir Haftzadi,** aged 19 at the time of his death;

Needless to say, very heavy damage was sustained by buildings and vehicles in the area of the attack.

In late 2001, at the request of Marwan Barghouti, the Defendant manufactured two additional explosive devices that were intended for use against the security forces when they would enter the town of Ramallah.

Later, the Defendant manufactured three explosive devices that were concealed inside juice cartons, and four more explosive devices that were camouflaged as stones. These devices were also transferred to Hamas operatives.

3

[Stamp] P 7: 9 [continued]

The Military Prosecutor v. Abdullah Ghaleb Abdullah Barghouti / Israel Prison Service

In early March 2002, the Defendant was requested by his handler in the Hamas to again manufacture an explosive belt for a suicide terrorist. Indeed, the Defendant manufactured an explosive belt as set forth, and transferred it to Hamas operatives. On March 9, 2002, at about 10:30 p.m., a suicide terrorist, who was carrying on his person the explosive belt that had been prepared by the Defendant, entered the Moment Café in Jerusalem, which was crowded at that hour. The terrorist activated the explosive belt and caused the deaths of 10 people and the injury of 65.

In this attack, the following people were murdered:

**The late Avraham Rahamim;**

**The late Nir Borochov;**

**The late Limor Ben-Shoham;**

**The late Dan Imani;**

**The late Danit Dagan;**

**The late Uri Felix;**

**The late Baruch Lerner;**

**The late Tali Eliyahu;**

**The late Livnat Dvash;**

**The late Orit Ozerov;**

**The late Natanel Kochavi.**

Property was damaged in this attack as well.

In March through April 2002, the Defendant was requested by the commander of the military arm of the Hamas organization in the Ramallah area to manufacture explosive devices and an explosive bag for carrying out a suicide attack. The Defendant prepared an explosive belt and an explosive device, which he put into a bag, to which screws were also added. The Defendant delivered the explosive devices to another operative in his organization. […]

[Stamp] P 7: 10

[...] On May 7, 2002, a suicide terrorist entered the Sheffield Club in Rishon le Zion while wearing the explosive belt that had been prepared by the Defendant. The terrorist activated the explosive belt, thus causing the deaths of 15 people, the injury of 59 more, and great destruction to the building in which the club was housed.

In this attack, the following people were murdered:

**The late Rahamim Kimhi;**

**The late Rafael Haim;**

**The late Anat Teremforush;**

**The late Avraham Bayaz;**

**The late Eti Bablar;**

**The late Yitzhak Bablar;**

**The late Israel Shikar;**

**The late Shoshana Magmari;**

**The late Rassan Sharouk;**

**The late Nawa Hinawi;**

**The late Nir Lovatin;**

**The late Regina Malka Boslan;**

**The late Dalia Masa;**

**The late Pnina Hikri;**

**The late Edna Cohen;**

[Stamp] P 7: 10 [continued]

During May 2002, the Defendant met a military operative in the Hamas organization who asked him to manufacture an additional explosive device, in order to carry out a bombing attack using it. The Defendant agreed to the request and made an explosive device with cellular activation that could be attached to metals through the use of magnets. The Defendant delivered the explosive device to the Hamas operative, who, on May 23, 2002, attached it to the bottom of a fuel tank on a fuel tanker. The tanker made its way to the Pi Glilot site, followed by the operators of the explosive device. When the tanker arrived in Pi Glilot, the above mentioned individuals activated the device by cellular telephone. The device exploded and caused serious damage to the tanker, but miraculously no loss of life.

In June 2002, the Defendant was requested by the commander of the military arm of Hamas **in the Ramallah area to manufacture an explosive device for the purpose of carrying out an additional bombing attack. The Defendant did so,** and delivered the explosive device, which was placed, in the morning hours on June 30, 2002, on the railway track in the Lod area. When those laying the explosive device identified a train approaching the area, they activated it. The explosive device exploded, which caused the injury of four people and damage to the locomotive and the railway.

During that same month, the Defendant manufactured an additional explosive device that was also placed on the railway track near the exit from Rehovot. The device was detonated on July 21, 2002, in the early morning hours. As a result of the explosion, one person was injured and damage was caused to a locomotive and to the railway.

In July 2002, the Defendant was requested by the commander of the military arm of Hamas in the Ramallah area to manufacture an explosive device that was concealed inside a bag, in order to carry out a bombing attack. The Defendant made such an explosive device, and also made the extra effort to fill the bag with iron nuts in order to increase the destructive power of the device. The Defendant also prepared a wireless activation mechanism for the device and delivered the device to an individual from Hamas. The explosive device was placed inside a cafeteria in the Frank Sinatra Building on the campus of the Hebrew University on Mount Scopus in Jerusalem. On July 31, 2002, at about 1:00 p.m. – at a time during which there is usually a large concentration of people in the cafeteria – the explosive device was detonated. As a result of the explosion of the device, which had been prepared by the Defendant, nine people were murdered and 81 other people were injured. In addition, damage was caused to the cafeteria building.

[Stamp] P 7: 11

In this attack, the following people were murdered:

**The late Daphna Spruch;**

**The late Marla Anne Bennett;**

**The late Dina Carter;**

**The late Benjamin Thomas Blutstein;**

**The late Revital Barashi;**

**The late David (Diego) Ladowski;**

**The late Levina Shapira;**

**The late Janis Ruth Coulter;**

**The late David Gritz.**

In August 2002, the Defendant was asked to prepare two explosive devices. The Defendant abided by this request and prepared two explosive belts, which he delivered to an operative of Hamas. On September 19, 2002, a suicide bomber, who was carrying on his person one of the explosive belts that the Defendant had prepared, boarded a bus on Line No. 4 in Tel Aviv and detonated the explosive device. As a result of the explosion, six people were killed and 84 others were injured. Extensive damage was caused to the bus and to businesses that were near it.

In this attack, the following people were murdered;

**The late Yossi Mamistavlov**, aged 39 at the time of his death;

---

5

[Stamp] P 7: 11 [continued]

The Military Prosecutor v. Abdullah Ghaleb Abdullah Barghouti / Israel Prison Service

**The late Ofer Zinger**, aged 29 at the time of his death;

**The late Rosanna Siso**, aged 63 at the time of her death;

**The late Yaffa Shemtov**, aged 49 at the time of her death;

**The late Solomon Hoenig**, aged 79 at the time of his death;

**The late Jonathan Jesner**, aged 19 at the time of his death;

On October 11, 2002, at about 8:15 p.m., an additional suicide terrorist, who was also carrying on his person an explosive belt that had been prepared by the Defendant, attempted to enter the Yotvata Restaurant in Tel Aviv with the aim of blowing himself up and causing the deaths of as many people as possible. The guard, who was at the entrance to the premises, suspected the man and prevented him from entering the restaurant. The terrorist was later apprehended.

The murderous terrorist spree that the Defendant committed has been one of the worst we have ever known in the bloody history that we have shared since the creation of the State of Israel.

The Defendant acted unflaggingly, for a very long period, in the manufacture of explosive devices that were as lethal as possible, which were intended to be used in suicide attacks and bombing attacks, with but a single aim, of causing the deaths of as many people as possible.

The Defendant is directly responsible for the murders of dozens of innocent human beings and the injuries of hundreds more. We fail to understand how the Defendant could put to use the scientific knowledge that he had acquired, which was intended from the outset to improve human life, for sowing so much destruction and carnage. We found a partial answer to this question in the words of the Defendant in the framework of the pleas for sentencing in this case, from which one could sense with no difficulty whatsoever the inexhaustible hatred that consumed all of his humanity. The Defendant expressed no remorse, but was instead proud of having trained dozens of engineers whom he hoped would cause much worse attacks than those than those that he himself had caused.

[Stamp] P 7: 12

It was difficult to hear the deviant pleas of the Defendant, who tried to associate his monstrous acts with the operations of the Israel Defense Forces in the Area, let alone without having involved the actions of the Americans in Kuwait, the immigration from the Former Soviet Union and the policy of the government as other factors that led him to act. The Defendant concluded his address by promising that the Hamas organization would cause the destruction of the State of Israel, in accordance with the vision of Ahmed Yassin.

In view of the words of the Defendant, it may be assumed that had he not been caught, he would have continued his murderous activity. But without making hypotheses, it is enough for us to look at the unbearably long list of the names of the Defendant's victims to see the scale of the disaster that he had caused, not only to his victims and their families, but to society as a whole. The explosive devices that the Defendant had prepared were akin to seeds of death that were scattered in many places around the State of Israel, throughout its length and breadth. The Defendant's composure and the use he made of science and technology for deliberate, systematic killing can only remind us of some of the darkest periods in the history of the Jewish people, which we thought would not recur after the founding of the State of Israel.

What can be said in view of the taking of the lives of the victims, some of whom were elderly and some of whom were in infanthood? What can we say about whole families that were wiped out in a single bitter moment?

The voice of the blood of our brothers cries up from the earth.

6

[Stamp] P 7: 12 [continued]

The Military Prosecutor v. Abdullah Ghaleb Abdullah Barghouti / Israel Prison Service

We cannot heal the physical and mental scars of whose who experienced the hellfire. The casualties themselves, and not only them, but also their relatives and bystanders, who will carry the picture of suffering that befell them like lightning out of the blue for the rest of their lives.

What will be the sentence of a person who enslaved all of his wishes and actions to the task of murdering members of his own kind? There is no doubt that there is no room to consider any personal circumstances in such a case. In view of criminal acts of the type that were committed by the Defendant, there is no doubt that the maximum sentence is called for, both in light of the need to prevent the danger of the Defendant to others and in view of the attempt to pay back for his evil.

Any legal system worthy of its name should have the ability to deter offenders of all types. Terrorism that is currently snapping at the State of Israel is cruel and merciless and makes no differentiation between soldiers, civilians, infants, the aged, disabled persons or tourists, men or women.

We must therefore make our contribution to quell terrorism, to the extent that this is possible. For this purpose there is not a shadow of doubt that the Defendant and those like him must be sentenced in a manner that will not only pay them back for their cruel, criminal acts and express the revulsion of any human being and any good society over their criminal behavior, but that will also constitute a degree of deterrence.

Based on this view, we must determine that in the multiple terrible cases of terrorism such as those for which the Defendant is responsible pursuant to doing his part in a well-oiled terrorist machine, the maximum sentence that the Legislative body has prescribed should be not just a starting point for sentencing, but often the end point as well.

When the acts of terror in which the Defendant participated are so cruel, massive and long-lasting to the point that we may call it an "industry" of terrorism with unbearable results, the most appropriate and correct sentence is death. And it has already been said in our Scriptures: **"Whoever sheds human blood, by humans shall their blood be shed; for in the image of God has God made mankind"**.

[Stamp] P 7: 13

Certainly, while up to this point this sentence has remained unused and the Courts have satisfied themselves with handing down sentences of life imprisonment, in our opinion, this practice, which has been common, must not be done out of force of habit alone, and the Court must examine each case on its merits and give due respect to the explicit deliberation of the Legislative body whereby in appropriate cases a defendant who is convicted of the offense of causing intentional death must himself be sentenced to death.

In view of this unequivocal deliberation of the Legislative body, the Court is exempt from the need for discussing questions that are related to the degree of appropriateness of this sentence owing to the principles of justice and morality, and due to reality. However, it appears to us that when we have before us a person such as the Defendant, who as set forth has killed incessantly, indiscriminately and mercilessly, in a calculated, uninhibited manner, to the point of reducing himself to the lowest level of humanity possible and who doubtfully deserves to be called a human, it would be just and moral not to leave this provision of the law as a dead letter.

We must also state that even if we are aware of the contentions whereby the death sentence is not a deterrent and is ineffective in the Area, if this appears to be correct in the case of suicide terrorists, it is important to remember that they do not operate based on their own resources alone or as individuals, and those individuals who established the broad terrorist network that makes and dispatches human bombs will take care not to be hurt themselves, meaning that the deterrent factor in such sentencing is upheld.

---

7

[Stamp] P 7: 13 [continued]

The Military Prosecutor v. Abdullah Ghaleb Abdullah Barghouti / Israel Prison Service

In our opinion, the Defendant should be sentenced to death and inflicting such a sentence would be lawful and just.

However, it must be remembered that the Legislative body has limited the possibility of passing the death sentence by a list of qualifications, the main one being that the three judges of the panel are to be of the rank of Lieutenant Colonel [Section 47 (A) (8) of the Security Provisions Order, 5730-1970].

Pursuant to this deliberation, we are barred from acting according to our consciences and we do not have the authority to hand down the sentence that Defendant deserves.

Under these circumstances, all we have left to do therefore is to hand down a separate sentence of life imprisonment to the Defendant for each person who was murdered as a result of his actions. We also decree that the terms of life imprisonment are to be cumulative, so that it is known that for us, our loss of each and every victim represents the loss of a whole world. In addition to this, we also see fit to give expression to the list of additional offenses that were committed by the Defendant, some of which led to the injury of hundreds of individuals.

Therefore, in view of our statements above, we sentence the Defendant to 67 cumulative terms of life imprisonment.

**The right of appeal within 30 days is conferred.**

**Handed down and announced this day, November 30, 2004, in public and in the presence of the parties.**

| | | |
|---|---|---|
| Natanel Benishu 54678313-3380/03 | | |
| **Judge** | **Presiding Judge** | **Judge** |

**The text of this document is subject to changes in wording and editing.**

Click here concerning editing and changes in ruling, legislation and other documents on the Nevo website

8

Nevo
*nevo.co.il*

[Stamp] P 7: 14

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

MARK I. SOKOLOW, *et al.*,

                              Plaintiffs,

vs.                                                          No. 04 Civ. 00397 (GBD) (RLE)

THE PALESTINE LIBERATION
ORGANIZATION, *et al.*,

                              Defendants.

### DECLARATION OF RINA NE'EMAN

Rina Ne'eman hereby certifies as follows:

1.      The attached translation from Hebrew to English is an accurate representation of the
        document received by Rina Ne'eman Hebrew Language Services, to the best of my
        knowledge and belief. The document is designated as P7: 7-14.

2.      I am a professional translator with a B.A. in International Relations from the Hebrew
        University of Jerusalem (Israel) and 30 years of translation experience. I am fluent in
        Hebrew and English, and I am qualified to translate accurately from Hebrew to English.

3.      To the best of my knowledge and belief, the accompanying text is a true, full and
        accurate translation of the Hebrew-language document bearing the bates number, P7: 7-
        14.

                                                            _____
                                                            Rina Ne'eman

ss.: New Jersey

On the [28th] day of February, 2014 before me, the undersigned, personally appeared Rina Ne'eman, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is signed to this Declaration and acknowledged to me that he executed the same in his capacity, and that by his signature on this Declaration, the individual executed the Declaration.

Sworn to me this
28th day of February, 2014


_____
Notary Public

**HALA Y GOBRIAL**
Notary Public
State of New Jersey
My Commission Expires Apr. 18, 2017
I.D.# 2419990