UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

MARK I. SOKOLOW, *et al.*,

                Plaintiffs,

    vs.

THE PALESTINE LIBERATION
ORGANIZATION, *et al.*,

                Defendants.

No. 04 Civ. 00397 (GBD) (RLE)

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION FOR DISCOVERY SANCTIONS

ARNOLD & PORTER LLP
399 Park Avenue
New York, New York  10022
(212) 715-1000

*Attorneys for Plaintiffs*

May 15, 2014

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................... ii

PRELIMINARY STATEMENT ............................................................................... 1

FACTS ........................................................................................................................ 2

ARGUMENT ............................................................................................................. 5

I.       PLAINTIFFS ARE ENTITLED TO SANCTIONS ......................................... 5

II.     THE COURT SHOULD ENTER A PRECLUSION ORDER, AWARD
       ADVERSE INFERENCES AND ASSESS A MONETARY SANCTION ...................... 8

       A.      Preclusion Is an Appropriate Sanction .................................................. 9

       B.      Adverse Inference Instructions Are an Appropriate Sanction ............................. 10

              1.      Missing Documents Relate to the Involvement of PA Security
                     Officers in the Terror Attack That Killed Scott Goldberg ..................... 11

              2.      Missing Documents Relate to the Involvement of PA Security
                     Officers in the Terror Attack on the Bauer Family ................................... 13

              3.      Missing Documents Relate to the Involvement of PA Security
                     Officers in the Terror Attack on Shaul Mandelkorn ............................. 15

               4.      Missing Documents Relate to the Involvement of PA Security
                     Officers in the Jaffa Street Terror Attack .................................................. 16

              5.      Missing Documents Relate to the Involvement of a Senior PA
                     Military Officer in the Terror Attack on the Sokolow Family ................. 18

               6.      Missing Documents Relate to the Involvement of Abdullah
                     Barghouti in the Attack on Hebrew University That Killed Nine ........... 20

               7.      Missing Documents Relate to the Involvement of "Force 17"
                     Operatives in the Terror Attack on Joseph ("Oz") and Varda
                     Guetta ......................................................................................................... 22

       C.      A Monetary Sanction Is Also Appropriate ......................................... 24

CONCLUSION ........................................................................................................ 24

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<u>C</u><u>ASES</u>:

*Agiwal v. Mid Island Mortg. Corp.*,
 555 F.3d 298 (2d Cir. 2009)........................................................................................9

*Amaprop Ltd. v. Indiabulls Fin. Servs. Ltd.*,
 No. 11 Civ. 1291, 2012 WL 1889417 (2d Cir. May 25, 2012)..................................6

*Barsoum v. NYC Hous. Auth.*,
 202 F.R.D. 396 (S.D.N.Y. 2001) ............................................................................10

*Chin v. Port Auth.*,
 685 F.3d 135 (2d Cir. 2012).......................................................................................6

*Cordius Trust v. Kummerfeld*,
 No. 99 Civ. 3200 (DLC),
 2008 WL 113664 (S.D.N.Y. Jan. 11, 2008) .......................................................8, 10

*In re Sept. 11th Liab. Ins. Coverage Cases*,
 243 F.R.D. 114 (S.D.N.Y. 2007) ..............................................................................5

*In re WRT Energy Sec. Litig.*,
 246 F.R.D. 185 (S.D.N.Y. 2007) ............................................................10, 23, 24

*Kronisch v. United States*,
 150 F.3d 112 (2d. Cir. 1998).............................................................................10, 11

*Linde v. Arab Bank, PLC*,
 269 F.R.D. 186 (E.D.N.Y. 2010) ............................................................9, 10, 11, 23, 24

*Metro. Opera Ass'n v. Local 100, Hotel Emps. and Rest. Emps. Int'l Union*,
 212 F.R.D. 178 (S.D.N.Y. 2003) ..........................................................................7, 8

*R.F.M.A.S., Inc. v. So*,
 271 F.R.D. 13 (S.D.N.Y. 2010) ................................................................................6

*Residential Funding Corp. v. DeGeorge Fin. Corp.*,
 306 F.3d 99 (2d Cir. 2002)................................................................................*passim*

*S. New England Tel. Co. v. Global NAPS Inc.*,
 624 F.3d 123 (2d Cir. 2010)......................................................................................9

*Shcherbakovskiy v. Da Capo Al Fine, Ltd.*,
 490 F.3d 130 (2d Cir. 2007)......................................................................................8

*Short v. Manhattan Apartments, Inc.*,
    286 F.R.D. 248 (S.D.N.Y. 2012) ............................................................................6

*Valentini v. Citigroup, Inc.*,
    No. 11 Civ. 1355 (JMF),
    2013 WL 4407065 (S.D.N.Y. Aug. 16, 2013) ..........................................................6

*Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422 (S.D.N.Y. 2004) ............................................5, 8

## RULES:

Fed. R. Civ. P. 37 ................................................................................................8

Local Civ. R. 26.2 ..............................................................................................2

## PRELIMINARY STATEMENT

Defendants repeatedly violated the Court's discovery orders (as well as defendants' own discovery obligations) by failing to make a complete and timely production of documents from files of the Palestinian Authority's ("PA") General Intelligence Service ("GIS"). To this day, documents are missing from defendants' GIS production. Many of the documents that defendants did produce (many months late) ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇ But even beyond that, the documents that defendants did produce ▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ also show that they failed to produce relevant documents. In correspondence with plaintiffs and the Court, defendants effectively acknowledged that they failed to set up a litigation hold or to conduct adequate searches. The conclusion is inescapable that defendants failed to preserve relevant evidence and then failed to conduct an adequate search—either that, or they have purposefully withheld damaging documents.

Because defendants failed to comply with the Court's orders—by ignoring the Court's first order that they produce all requested GIS documents, and then by failing to make a complete production after the Court ordered them to do so a second time—the principal question at this juncture is what remedy is appropriate. Plaintiffs respectfully request three remedies:

*First*, and most obviously, the Court should enter an order precluding defendants from challenging the reliability of the GIS documents at trial. Defendants have already indicated that they intend to assert that the GIS documents are unreliable. Having failed to search for, preserve and produce *complete* files, including many underlying investigative reports, defendants cannot be allowed to complain about the conclusions made in their own documents.

*Second*, the jury should be permitted to make specific inferences about what the missing

files and documents would have shown.  We describe below certain documents that are obviously missing from defendants' production; we also describe evidence relating to the seven terrorist attacks at issue in this case, which strongly supports inferences that the missing documents would show that defendants knowingly supported or participated in the attacks.

*Third*, the Court should award plaintiffs a monetary sanction.

## FACTS

There is no record that defendants ever placed a litigation hold on any documents.

During discovery, plaintiffs requested documents that defendants knew would be contained in GIS files and (after defendants failed to produce any GIS documents), specifically requested documents from the files of the GIS.  Declaration of Kent A. Yalowitz (April 23, 2014) ("Yalowitz Decl."), Exs. A.1–A.14 (discovery requests).  Instead of producing the responsive documents, defendants served a purported "privilege log" after the close of discovery.  Yalowitz Decl. Ex. A.8.  The log violated Local Civil Rule 26.2, which requires detailed information about the documents' date, type, subject matter, author, recipients, and the privilege claimed.

Plaintiffs moved to compel.  The Court rejected defendants' claims of privilege because they "failed to justify the redactions in their privilege log."  DE 327 at 5 (July 26 Order).  Defendants did not object to the July 26 Order.  Instead, they produced 202 pages of heavily redacted GIS documents and asked the Court to "modify its Order in order to permit these redactions."  Yalowitz Decl. Ex. C.1 (Letter from Hill to Judge Ellis (Aug. 13, 2013)).

After receiving extensive additional briefing, the Court issued a second order, explaining that defendants had been "unambiguously required . . . to produce the GIS documents" and that by redacting the documents and continuing to argue about those redactions, defendants did

"precisely what is forbidden in this District: rather than treating the July 26 Order as a directive, [they] regarded it as the beginning of a new conversation in which they apparently feel entitled to advance new legal theories." DE 380 (November 4 Order).

Finally, on November 6, 2013—nearly a year late—defendants produced 331 pages of unredacted GIS documents. A comparison of the unredacted documents with the redacted documents reveals that very few of defendants' redactions were of the type that defendants claimed, such as names of confidential informants. A few examples are attached as Yalowitz Decl. Exs. A.16-A.17. In other words, defendants *never* had a good-faith basis for asserting that the vast majority of the documents were privileged.

The production was also woefully incomplete. Typically, GIS documents include "(a) an abundance of handwritten notes, containing information about the subject; and (b) substantive reports about the subject's adult life." Yalowitz Decl. Ex. B, ¶ 5(a) (Decl. of Arieh Dan Spitzen (Aug. 27, 2013) ("Spitzen Decl."); *see* ███████████████████████████████████ ████████████████[1] There were almost no such documents in defendants' production, which instead consisted ███████████████████████████████████ ███████████████████████████████████ It is "extremely unlikely that such reports, created years after the events in question [were] created solely from memory. Instead, it is far more likely that the reports were prepared using underlying source documents that have not been produced by defendants." Spitzen Decl. ¶ 5(b). ███████████████████████████████████

---

[1] All of plaintiffs' trial exhibits that are cited in this memorandum are compiled behind Tab I of the Yalowitz Declaration.

██████████████████████████████████████████████████

██████████████████

    Some of the documents produced by defendants ███████████████████

█████████████████████████ Many of these were not produced either.  Plaintiffs

detailed these omissions, Spitzen Decl. ¶ 5(c), providing the defendants with a *non-exhaustive*

list of missing documents.  Yalowitz Decl. Ex. C.2 (Letter from Yalowitz to Hill (Dec. 20,

2013)).  Defendants responded by making additional productions in January 2014, but each

production consisted *only* of documents identified on plaintiffs' list of explicitly missing

documents—and only some of these.  DE 423, Ex. A (Letter from Yalowitz to Hill (Jan. 28,

2014)).  Defendants eventually provided a declaration of General Khaled Abu Al-Yaman, who

stated that the defendants' efforts to locate the newly produced material consisted only of "a

search for the documents on the [December 20 List]."  DE 418, Ex. A (Decl. of Gen. Khaled

Abu Al-Yaman (Jan. 27, 2014) ("Al-Yaman Decl.")).

    Plaintiffs pointed out that the Al-Yaman Declaration effectively admitted that defendants

had *never* conducted an adequate search:  "There is no indication in your papers whether all

regional and field offices were searched, or only some.  Please inform us which is the case. . . .

If we do not hear from you, we will understand that defendants did not search in all responsive

locations."  DE 423, Ex. A (Letter from Yalowitz to Hill (Jan. 28, 2014)).

    Defendants never contested that conclusion.  Defendants also represented to the Court

that they had remedied the deficiencies in their production of GIS documents, claiming that

"plaintiffs have now got all the stuff that the client has."  DE 430, Hearing Tr. (Feb. 10, 2014)

at 7.  That representation was incorrect.  On March 10, 2014, defendants produced yet another

document responsive to the GIS requests.  Defendants claim that they happened upon this

document fortuitously.  Yalowitz Decl. Ex. C.3 (Letter from Hill to Judge Ellis (Mar. 27, 2014)).

Thus, even today, defendants have failed to conduct a complete search.

In a pre-motion conference, this Court stated:  "I've already indicated that it was my belief that defendants had not complied in a timely manner with the court's order.  As to what's going to be an appropriate remedy for that I think as I said to the extent that it involves how Judge Daniels conducts his trial I will have to have further conversations with him."  DE 430, Hearing Tr. (Feb. 10, 2014) at 8.

## ARGUMENT

We review briefly the justifications for imposing sanctions in this case, and then discuss the specific remedies that are appropriate based upon the available evidence.

## I.    PLAINTIFFS ARE ENTITLED TO SANCTIONS

A court should award sanctions when it concludes:  "(1) that the party having control over the evidence had an obligation to timely produce it; (2) that the party that failed to timely produce the evidence had 'a culpable state of mind'; and (3) that the missing evidence is 'relevant' to the party's claim or defense such that a reasonable trier of fact could find it would support that claim or defense." *In re Sept. 11th Liab. Ins. Coverage Cases*, 243 F.R.D. 114, 125 (S.D.N.Y. 2007)  (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002)).  These elements are met here.

*First*, defendants had an obligation to search for, preserve, and produce the GIS documents.  Indeed, the Court twice ordered the documents produced.  DE 327, 380. Defendants' obligation included instituting a litigation hold so that "all sources of potentially relevant information are identified and placed 'on hold' . . . ." *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 431-32 (S.D.N.Y. 2004).

*Second,* the evidence shows that defendants had a "culpable state of mind." In the Second Circuit, "negligence is sufficient to establish culpability." *R.F.M.A.S., Inc. v. So*, 271 F.R.D. 13, 23 (S.D.N.Y. 2010) (citing *Residential Funding*, 306 F.3d at 108). The evidence here exceeds that standard:

- Defendants never placed a litigation hold on the GIS documents, obviously failed to identify "all sources of relevant information" with respect to the GIS documents, and did not timely search for GIS documents. Those failures weigh in favor of sanctions. *See, e.g., Chin v. Port Auth.*, 685 F.3d 135, 162 (2d Cir. 2012).

- Defendants violated two Court orders in failing to turn over the documents. Indeed, even after they were told that their production was facially incomplete, they failed to conduct a comprehensive search. Repeated violation of the Court's orders supports sanctions. *E.g., Valentini v. Citigroup, Inc.*, No. 11 Civ. 1355 (JMF), 2013 WL 4407065, at *2-*3 (S.D.N.Y. Aug. 16, 2013) (sanctions warranted given defendants' repeated failures to produce discovery materials, in violation of court order); *Short v. Manhattan Apartments, Inc.*, 286 F.R.D. 248, 254 (S.D.N.Y. 2012) ("[R]epeated refusal to turn over relevant documents—in direct violation of three separate Court orders—is enough to establish culpability.").

- Defendants' improper redactions also indicate bad faith. *E.g., Amaprop Ltd. v. Indiabulls Fin. Servs. Ltd.*, No. 11 Civ. 1291, 2012 WL 1889417, at *2-*3 (2d Cir. May 25, 2012) (bad faith finding included improper redactions).

- Defendants' misrepresentations that plaintiffs had received all existing responsive

GIS documents also reflect bad-faith. "[R]epeated representations of full production" which turn out to be false, "constitute[] such gross negligence as to rise to intentional misconduct." *Metro. Opera Ass'n v. Local 100, Hotel Emps. and Rest. Emps. Int'l Union*, 212 F.R.D. 178, 221-22 (S.D.N.Y. 2003).

- Finally, defendants' response after plaintiffs complained of the incomplete production indicated further bad faith. Defendants' approach guaranteed that defendants searched *only* for missing documents that plaintiffs identified with exact specificity. But plaintiffs' ability to know which of defendants' documents were missing was extremely limited, in contrast to defendants' complete access to their own documents. In effect, defendants tried to turn the process into a game of "blind man's buff."

In response, defendants have claimed that they are "not used to American style civil discovery." DE 430, Hearing Tr. (Feb. 10, 2014) at 6. That statement cannot be reconciled with the sworn statements of Salam Fayyad, the Prime Minister of the PA, in a declaration given in connection with motions to vacate default judgments in this and other courts. In that declaration, Prime Minister Fayyad swore that he had instructed defendants' counsel to "participate fully in this and other litigation, in a cooperative manner, including complete participation in the discovery process." Yalowitz Decl. Ex. D, ¶ 11 (Decl. of Salam Fayyad (Oct. 30, 2007)) ("Fayyad Decl."). Prime Minister Fayyad swore that "[t]he importance of this was not fully appreciated by the PA government, as a whole, until recently. Now we can act on that understanding, and we therefore seek to contest this litigation, fully and responsively." *Id.* ¶ 13. Moreover, these defendants are seasoned litigants in the federal courts (*e.g.*, in the lengthy *Klinghoffer* litigation, and in the *Ungar*, *Biton*, *Knox*, *Gilmore*, and *Klieman* actions), and are

represented by experienced and capable counsel who may be presumed to have understood and advised defendants of their discovery obligations. *See e.g. Zubulake*, 229 F.R.D. at 431-35 (detailing an attorney's duties of ensuring client's understanding of and compliance with its discovery obligations); *Metro. Opera Ass'n*, 212 F.R.D. at 221-24 (same).

      *Third*, as we discuss below, the missing GIS documents are relevant.

## II.    THE COURT SHOULD ENTER A PRECLUSION ORDER, AWARD ADVERSE INFERENCES AND ASSESS A MONETARY SANCTION

      "Where, as here, the nature of the alleged breach of a discovery obligation is the non-production of evidence, a district court has broad discretion in fashioning an appropriate sanction." *Residential Funding*, 306 F.3d at 107.  Rule 37 provides that the sanctions must be "just"; therefore, "the severity of the sanction must be commensurate with the non-compliance." Fed. R. Civ. P. 37(b)(2)(A); *Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 140 (2d Cir. 2007).  The broad discretion afforded under Rule 37(b) allows a court to select from a wide range of sanctions.  *Residential Funding Corp.*, 306 F.3d at 101 (sanction may be imposed even where evidence at issue was not destroyed, but producing party engaged in "purposeful sluggishness" resulting in non-production of evidence); *Cordius Trust v. Kummerfeld*, No. 99 Civ. 3200 (DLC), 2008 WL 113664, at *3-*4 (S.D.N.Y. Jan. 11, 2008) ("Defendants' . . . long-term and purposeful evasion of discovery requests give rise to an inference that the evidence sought would be unfavorable to them.").

      In evaluating the appropriateness of a particular sanction, courts often consider the following factors:  "(1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance, and (4) whether the non-compliant party had been warned of the consequences

of noncompliance." *S. New England Tel. Co. v. Global NAPS Inc.*, 624 F.3d 123, 144 (2d Cir. 2010) (quoting *Agiwal v. Mid Island Mortg. Corp.*, 555 F.3d 298, 302 (2d Cir. 2009)).  While the harshest sanctions are reserved for willful or bad-faith conduct, "sanctions are available even absent such a finding, since failure to comply with court-ordered discovery 'occur[s] along a continuum of fault—ranging from innocence through the degrees of negligence to intentionality.'" *Linde v. Arab Bank, PLC*, 269 F.R.D. 186, 196-97 (E.D.N.Y. 2010) (quoting *Residential Funding Corp.*, 306 F.3d at 101, 108).

Courts also consider the intent of the disobedient party and the probable content of the non-produced evidence. *Kronisch v. United States*, 150 F.3d 112, 126 (2d. Cir. 1998).  This "task is unavoidably imperfect, inasmuch as, in the absence of the [withheld] evidence, [a court] can only venture guesses with varying degrees of confidence as to what the missing evidence may have revealed." *Id.* at 127.

A.    **Preclusion Is an Appropriate Sanction**

To remedy defendants' discovery violations, the Court should begin by precluding defendants from challenging the accuracy and reliability of the GIS documents they did produce. Defendants have already indicated that they intend to contest the accuracy and reliability of the GIS documents.  *See* Yalowitz Decl. Ex. E (Decl. of Majed Faraj (May 23, 2013)), ¶ 15 ("[T]he information contained in the files is not necessarily completely reliable or accurate."); DE 418, Ex. A (Al-Yaman Decl.) ("The information in these documents . . . is of varying degrees of reliability and accuracy.").

Defendants should not be permitted to challenge the "reliability and accuracy" of documents where they have failed to produce the underlying source files on which those documents are based.  To allow defendants to undermine their own documents when they have

9

not produced the complete files would reward defendants for their violation of the Court's orders and give defendants an unfair advantage arising out of their own misconduct. *See, e.g., In re WRT Energy Sec. Litig.*, 246 F.R.D. 185, 200 (S.D.N.Y. 2007) (precluding party who had permitted evidence to be destroyed from challenging representativeness of the limited evidence offered by injured party); *Barsoum v. NYC Hous. Auth.*, 202 F.R.D. 396, 401 (S.D.N.Y. 2001) (precluding testimony about meeting where videotape of meeting was not produced because "[defendant], unlike [plaintiff] has had the benefit of having listened to a tape recording of the meeting and even of taking notes herself of the recording"); *Linde*, 269 F.R.D. at 204 (precluding defendant from "making any argument about its state of mind that would find proof or refutation in the withheld documents" such as "that it has no knowledge that a certain Bank customer was a terrorist if it did not produce that person's complete account records").

### B.    Adverse Inference Instructions Are an Appropriate Sanction

"[T]he prejudiced party may be permitted an inference in his favor so long as he has produced some evidence suggesting that a document or documents relevant to substantiating his claim would have been included among the destroyed files." *Kronisch v. United States*, 150 F.3d 112, 128 (2d. Cir. 1998). While the quantum of evidence sufficient to support an inference about the content of wrongfully withheld evidence "will necessarily vary from case to case . . . 'care should be taken' not to require too specific a level of proof" lest withholding parties profit from their disobedience and "innocent parties meant to benefit from the adverse inference . . . receive no benefit at all, having been deprived of evidence that may be crucial to their case." *Id.*; *Residential Funding Corp.*, 306 F.3d at 112-13 (adverse inference warranted based on producing party's "purposeful sluggishness" resulting in non-production of evidence); *Cordius Trust*, 2008 WL 113664, at *3-*4 (imposing adverse inference where evidence at issue was not destroyed but

withheld by disobedient party); *Linde*, 269 F.R.D. at 202 (imposing adverse inference sanction

that jury may infer existence of non-produced documents). The evidentiary burden under

*Kronisch* "should not be construed to place stringent requirements on parties seeking sanctions

for non-production or destruction of evidence." *Linde*, 269 F.R.D. at 202. Indeed, in *Kronisch*,

the Second Circuit found a "chain of circumstantial evidence . . . sufficient to suggest the

reasonable possibility" that missing documents "may have contained evidence" to substantiate

the plaintiff's claim was sufficient to support an adverse inference in the plaintiff's favor. 150

F.3d at 129.

   For each of the seven attacks in this case, the evidence strongly suggests that defendants

failed to produce relevant GIS documents. We review such evidence for each of the attacks, as

well as the inferences to be drawn about the missing documents.

### 1. Missing Documents Relate to the Involvement of PA Security Officers in the Terror Attack That Killed Scott Goldberg

   On January 29, 2004, Ali Yousef Ja'ara ("Ja'ara"), a member of the PA police force,

blew himself up on a public bus in Jerusalem, killing 11 people (including Scott Goldberg,

husband and father of the Goldberg plaintiffs) and wounding 45 others.

   PA Police Officer Ja'ara did not act alone. He was controlled by ███████████████████

███████████████ named Abdul Rahman Maqdad ("Maqdad") and assisted by other members

of the PA police and security forces, including Ahmed Salah ("Salah"), ███████████████████

███████and Hilmi Abdel Karim Mohammed Hamash ("Hamash"), ███████████████████

███████These individuals were convicted for their roles in the bombing. Pls. Trial Exs. 260,

295, 313.

Defendants produced two pages from the GIS concerning Ja'ara, six pages concerning

Maqdad and 13 pages concerning Salah.[2] ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████

But the GIS production is obviously incomplete. ████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████.

The evidence strongly suggests that, had defendants effectuated a litigation hold,

---

[2] Defendants produced additional publicly available documents concerning some of the perpetrators, in response to plaintiffs' GIS requests. Those documents are not included in these tallies, or any of the other tallies provided below.

searched all relevant locations and made a complete production of responsive GIS documents, such documents would have provided relevant evidence of (1) defendants' knowledge that Maqdad and Salah participated in terrorist attacks before 2004, but continued to employ them; and (2) defendants' knowledge about this particular terror attack.

### 2. Missing Documents Relate to the Involvement of PA Security Officers in the Terror Attack on the Bauer Family

On March 21, 2002, PA police officer Mohammed Hashaika ("Hashaika") blew himself up on a crowded street in Jerusalem, killing three people and wounding 81 others. Plaintiffs Alan and his seven-year old son, Y.B., were among the wounded. Y.B. suffered a permanently disabling brain injury.



PA records indicate that Hashaika was ███████████████████ ███████████████ Pls. Trial Ex. 14. Ten days later, the PA arrested Hashaika because he "wanted to perpetrate a suicide operation." Pls. Trial Ex. 1060. PA President Yasser Arafat was personally informed of the arrest. *Id.* According to the Israeli government, the PA released Hashaika from prison a few weeks later. Pls. Trial Ex. 353. Following his release, ████████████████████████████████ ████████████████

Hashaika did not act alone. The bombing was masterminded by Abdel Karim Aweis, █ ████████████████ Pls. Trial Exs. 2, 377, 558. Nasser Shawish ("Shawish"), an individual who had been arrested with Hashaika by the PA before the March 21, 2002 bombing, "recruited [Hashaika and] equipped him." Pls. Trial Ex. 1060. The Israeli government apprehended Shawish, and he was convicted for his role in the March 21, 2002 bombing, as well as for other activities.." Pls. Trial Ex. 247. Shawish is now serving four life

sentences for his crimes.  *Id.* ████████████████████████████████████

███████████  ████████████████████████████████████████

██████████████

Abdel Karim Aweis was also convicted for his role in the planning and execution of the March 21 bombing.  Pls. Trial Ex. 377.  He confessed that he conspired directly with senior PLO leaders Marwan Barghouti and Hussein Al-Sheikh, who provided Abdel Karim Aweis with money and weapons.  *Id.*  He admitted his role in open court and stated:  "I confessed before the Court with respect to what I confessed, and I do not regret it."  Pls. Trial Ex. 371 at 5.  ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

In the November production, defendants produced four pages of GIS documents concerning Hashaika, 12 pages concerning Shawish and *zero* pages concerning Abdel Karim Aweis.  In March 2014, defendants produced an additional GIS document in which Tawfik Tirawi, the head of the GIS, informed Yasser Arafat that Hashaika and Shawish had been arrested and were being interrogated.  Pls. Trial Ex. 1060.

The GIS production concerning these terrorists was obviously incomplete.  ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████Defendants never produced that report.  Defendants also have not produced *any* GIS documents concerning the questioning by the PA of Hashaika or Shawish, or the circumstances surrounding their release, even though the Tirawi/Arafat letter (Pls. Trial Ex. 1060) confirms that they were being questioned by the PA (before their release and before the March 21, 2002 bombing).  Defendants also did not produce a single GIS document concerning

14

Abdel Karim Aweis, even though he implicated high-ranking PLO officials in his confession █

██████████████████████████████████████████████████████████████████

The evidence strongly suggests that, had defendants effectuated a litigation hold,

searched all relevant locations and made a complete production of responsive GIS documents,

such documents would have provided relevant evidence of (1) defendants' knowledge of

Hashaika's and Shawish's terrorist activities and plans; (2) the relationship between Shawish

(who recruited and equipped Hashaika) and Abdel Karim Aweis (the senior PA officer who

masterminded the bombing, according to his conviction and his own statements in open court);

(3) the relationship between Abdel Karim Aweis and senior PLO officials; and (4) defendants'

knowledge about this particular terror attack.

        **3.**       **Missing Documents Relate to the Involvement of PA Security Officers in the Terror Attack on Shaul Mandelkorn**

On June 19, 2002, Sa'id Wadah Hamid Awada ("Awada") blew himself up at a bus stop

in the French Hill section of Jerusalem, killing seven people and wounding 35 others, including

plaintiff Shaul Mandelkorn. ████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

Awada did not act alone. Evidence implicates Naef Abu Sharkh ("Sharkh"), ████████

███████████████████████████████████████████, who was killed during a

military operation in 2004. *See, e.g.*, Pls. Trial Exs. 44, 336, 339. Other evidence implicates

Mazen Freitakh ("Freitakh"), who was killed during a military operation in 2003. *See, e.g.*, Pls.

Trial Exs. 337, 340.

Defendants produced seven pages of GIS documents concerning Sharkh and only a

single, one-page typed document (dated 2012) concerning Freitakh (who at that point had been dead for nine years).  This production was facially incomplete. ███████████████



The evidence strongly suggests that, had defendants effectuated a litigation hold, searched all relevant locations and made a complete production of responsive GIS documents, such documents would have provided relevant evidence of (1) the roles in the terror attack of Sharkh and Freitakh, who were implicated for this crime in other materials; (2) the relationship among Freiktakh, Sharkh and other senior PA officials; and (3) defendants' knowledge about this particular terror attack.

### 4.  Missing Documents Relate to the Involvement of PA Security Officers in the Jaffa Street Terror Attack

On January 22, 2002, PA Maritime Police Officer Sa'id Ramadan ("Ramadan") opened fire on civilians with an M-16 on a busy street in Jerusalem.  The attack killed two people and wounded 45 others, including plaintiffs Shayna Gould and Shmuel Waldman.

The perpetrators of the Jaffa Street shooting attack included six other members of the PA police and security forces, as well:  Nasser Aweis ███████████████████ ███████████████ Ahmed Barghouti ███████████████████████ and the "right hand man" of senior PLO leader Marwan Barghouti, Pls. Trial Exs. 36C, 359 at 8); Mohammed Mousleh ███████████████████████████████████████ and Majed al-Masri (████████ member of the PA police, Pls. Trial Exs. 36B, 384), and Ibrahim Abdel Hai (who served in the PA Maritime Police, Pls. Trial Exs. 360, 361).

Nasser Aweis and Ahmed Barghouti were the primary architects of the attack. Among other things, Ahmed Barghouti "provided [Ramadan with] weapons and ammunition . . . , while instructing him, having arrived in Jerusalem, on how to open fire at civilians with the intent of causing their deaths until he himself would be killed." Pls. Trial Ex. 359 at 9. Ahmed Barghouti pled guilty to the charges against him and was sentenced to 13 terms of life imprisonment. In his last address to the court, he announced that he did not regret his actions. Pls. Trial Ex. 359 at 7. Nasser Aweis also confessed to recruiting Ramadan at the request of Ahmed Barghouti, and was sentenced to 14 life sentences for his part in the Jaffa Street attack and others. Pls. Trial Ex. 364.

████████████████████████████████████████████████████████

████████████████████████████████████████████████

Defendants produced a total of six pages on Ahmed Barghouti and two pages on Nasser Aweis. The production is obviously deficient. ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████

The two pages that defendants produced on Nasser Aweis contain no information on Nasser Aweis's role in the Jaffa Street shooting or the other terror attacks for which he was convicted. It is simply not credible that the GIS never collected that information during Nasser Aweis's trial in Israel or afterward, ████████████████████████████████████

The evidence strongly suggests that, had defendants effectuated a litigation hold,

searched all relevant locations and made a complete production of responsive GIS documents, such documents would have provided relevant evidence of (1) the mastermind roles of Nasser Aweis and Ahmed Barghouti, both high-ranking officials in the PA, in the Jaffa Street shooting; and (2) defendants' knowledge about this particular terror attack.

      **5.**    **Missing Documents Relate to the Involvement of a Senior PA Military Officer in the Terror Attack on the Sokolow Family**

On January 27, 2002, Wafa Idris ("Idris") blew herself up on a crowded street in Jerusalem, killing one and injuring 150, including members of the Sokolow family. Idris was the first female Palestinian suicide bomber and became a hero among Palestinians. *See, e.g.*, Yalowitz Decl. Ex. G.2 (Expert Report of Itamar Marcus (March 22, 2012)), at 39-45.

Idris did not act alone. Evidence incriminates a PA Military Intelligence officer, ███████ Kamal Al Abed ("Al Abed") (a/k/a "Mohamad Mukhtasah" a/k/a "Abu Talal"), among others. Israeli courts found that Al Abed asked an informant named Munzar Noor ("Noor") to recruit Idris. *E.g.*, Pls. Trial Ex. 321. Al Abed also provided the bomb and instructions for Idris to carry out the attack. *Id.* ███████████████████ ████████████████████████. ████████████ ███████████████████████

For his own role in the bombing plot, Noor was convicted of murder and is serving two life sentences. Pls. Trial Ex. 321. Although Al Abed was not apprehended, the court deciding Noor's case had this to say about Al Abed's role in the terror attack:

> [Al Abed] served in the Military Intelligence of the Palestinian Authority. . . . Mohamed [Al Abed] said the he was interested in sending a woman for a suicide terrorist attack, and he raised Wafa's name. . . . Mohamed [Al Abed] asked [Noor] to persuade Wafa to carry out a terrorist attack because [Noor and Wafa] were good friends. . . ."

*Id.*

The evidence also shows that numerous senior officials in the PA's GIS had knowledge of Idris's identity as the bomber before medics or the press identified her. On the day of the bombing—before any group took responsibility and before Idris's identity was released to the media—Tawfik Tirawi, the head of the GIS, contacted Idris's family and asked them not to announce that she had been the bomber. *See* Pls. Trial Ex. 233 (PA Preventative Security letter reporting on Tirawi's request); Pls. Trial Ex. 880 (defendants' interrogatory response providing information about handwriting on Pls. Trial Ex. 233); Yalowitz Decl. Ex. G.3 (Expert Report of Israel Shrenzel (April 22, 2012)), at 38 (referencing letter). These senior GIS officials knew Idris's identity as a suicide terrorist before it became public.

The Sokolow plaintiffs requested documents related to Al Abed. Given ███████ ██████████████████ and the public findings concerning his involvement in a notorious terrorist incident, one would expect to see documents reflecting the GIS's investigation into those allegations and his character and fitness to serve as an officer. Yet defendants' initial production included only one document relating to Al Abed— ████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████ ██████ Defendants produced a second GIS document about Al Abed, ██████████████████ ████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████████████████████████████ █████████████████████████████████████████████

███████████████████████████████████

████ It is highly unlikely that ███████████████ found to have been involved in a

notorious terrorist incident would have a GIS file as thin as defendants' productions suggest.

The evidence strongly suggests that, had defendants effectuated a litigation hold,

searched all relevant locations and made a complete production of responsive GIS documents,

such documents would have provided relevant evidence of (1) Al Abed's role in the Idris

bombing; and (2) defendants' knowledge about this particular terror attack.

**6.      Missing Documents Relate to the Involvement of Abdullah Barghouti in the Attack on Hebrew University That Killed Nine**

On July 31, 2002, Hamas operatives detonated a massive bomb in the Frank Sinatra

Cafeteria on the campus of the Hebrew University in Jerusalem.  The explosion killed nine

people, including Benjamin Blustein, Diane Carter, Janis Coulter and David Gritz, and wounded

81 others.  Pls. Trial Ex. 464.  Hamas operative Abdullah Barghouti (a/k/a "the Engineer")

manufactured the bomb and delivered it to his co-conspirators.  *Id.*  Hamas was, and is, a

designated terrorist organization.

At the time of this attack, Abdullah Barghouti was already a notorious terrorist.  He had

made the bomb that ripped through a crowded Sbarro restaurant in downtown Jerusalem in

August 2001.  Pls. Trial Ex. 492 at 142.  The Israeli government had received advance warning

of the Sbarro bombing and had demanded that the PA arrest Abdullah Barghouti to prevent it.

Yalowitz Decl. Ex. G.1 (Expert Report of Alon Eviatar (Sept. 29, 2013) ("Eviatar Report")),

at 8-9.  The PA failed to act on that request until the day of the Sbarro bombing, when the killer

was already en route.  Barghouti's detention was brief.  On August 27, 2001, the commander of

the PA's Preventative Security Services personally released Abdullah Barghouti—less than three

weeks after he was taken into custody.  *See* Yalowitz Decl. Ex. F.1 (Deposition of Mosaab

Hassan Yousef (Jan. 10, 2012)), at 106-07.

As soon as the PA released Abdullah Barghouti, he rejoined his Hamas coconspirators

and resumed his killing spree.  He delivered bombs in November 2001 to senior PLO leader

Marwan Barghouti and made bombs that his co-conspirators used in terror attacks in December

2001, March 2002, May 2002 (two attacks), June 2002 and July 2002 (two attacks).  Pl. Trial Ex.

426.  In addition to releasing Abdullah Barghouti so that he could continue his Hamas activities,

defendants' senior officers provided material support for his crimes, including a cell phone and

safe house.  *See* Eviatar Report at 12-13.

Defendants produced 18 pages concerning Abdullah Barghouti.  ███████ ████████████

████████████████████████████████████████████ ████████████████████████████████████████

████████████████████ ████████████████████Neither of the documents describes

████████████████████████Neither of the documents mentions Abdullah Barghouti's arrest and

release in 2001, or his killing spree in 2001 and 2002.

The evidence strongly suggests that, had defendants effectuated a litigation hold,

searched all relevant locations and made a complete production of responsive GIS documents,

such documents would have provided relevant evidence of (1) defendants' knowledge of

Abdullah Barghouti's Hamas activities ████████████████████both before and after

his August 2001 arrest; (2) defendants' knowledge, at the time they released him, that Abdullah

Barghouti would continue his bomb-making activities; (3) defendants' knowledge that the bombs

Abdullah Barghouti made were being provided to Hamas for use in terrorist attacks; and (4)

defendants' knowledge about this particular terror attack.

## 7.    Missing Documents Relate to the Involvement of "Force 17" Operatives in the Terror Attack on Joseph ("Oz") and Varda Guetta

On January 8, 2001, four men armed with machine guns fired on Varda Guetta and her son Oz on a road at Givon Junction, outside of Jerusalem.  Three of the attackers remain unidentified.  Ms. Guetta identified the fourth attacker as Fawzi Murar ("Murar").  Yalowitz Decl. Ex. C.4 (Letter from Tolchin to Hibey (Feb. 19, 2013)); *see* Pls. Trial Ex. 334 (line-up).

Murar was a member of Force 17, the commando unit in the PA's security forces responsible for protecting Yasser Arafat.  Throughout late 2000 and 2001, members of Force 17 engaged in a series of similar shooting attacks against Jewish civilians in suburbs of Jerusalem. *See, e.g.*, Pls. Trial Exs. 558 at 8, 559, 616.  Perpetrators who were involved in those other attacks confirmed Murar's involvement in like attacks during 2001.  *See, e.g.*, Pls. Trial Exs. 317A, 317C.  Murar and other Force 17 members worked together in executing a string of terror attacks between October 2000 and February 2002, and Murar was killed together with such a Force 17 member during armed hostilities.  Yalowitz Decl. Ex. H (*Gilmore et al. v. PA et al.*, No. 1:01-cv-00853, DE 333-20).

In their requests for GIS documents, the Guetta plaintiffs sought "[a]ll documents concerning the [January 8, 2001] Attack."  Yalowitz Decl. Ex. A.5, ¶ 3.  Defendants did not produce a single page in response to that request.

The evidence strongly suggests that, had defendants effectuated a litigation hold, searched all relevant locations and made a complete production of responsive GIS documents, such documents would have provided relevant evidence of:  (1) the involvement of members of Force 17, including Murar, in shooting attacks, including the January 8, 2001 attack that wounded plaintiffs Oz and Varda Guetta; and (2) defendants' knowledge about such attacks.

Thus, the Court should instruct the jury that they may draw the following inferences

concerning the contents of the missing documents:

1.    In January 2001, members of Force 17, including Fawzi Murar , carried out the January 8, 2001 shooting, and their employer, the PA knew of their activities.

2.    In January 2001, Nasser Aweis and Ahmed Barghouti planned the January 22, 2002 shooting, and their employer, the PA knew of their activities.

3.    In January 2002, Kamal Al Abed planned the January 27, 2002 bombing, and his employer, the PA, knew of his activities.

4.    In February 2002, PA security officers released Mohammed Hashaika and Nasser Shawish at a time when they knew that Hashaika and Shawish were planning to perpetrate a terrorist attack.

5.    In March 2002, Karim Abdel Aweis planned the March 21, 2002 bombing, and his employer, the PA, knew of his activities.

6.    In June 2002, GIS officer Naef Abu Sharkh, along with Mazen Freitakh, planned and perpetrated the June 19, 2002 bombing, and Sharkh's employer, the PA knew, of their activities.

7.    In August 2001, the defendants released Abdullah Barghouti, knowing of his intent to continue his bomb-making activities for Hamas.

8.    In the period August 2001 through July 2002, PA and PLO officials knew of Abdullah Barghouti's bomb-making activities for Hamas.

9.    In January 2004, Abdel Rahman Maqdad and Ahmed Salah planned the January 29, 2004 bombing, and their employer, the PA, knew of their activities.

10.   Before each of the foregoing attacks took place, defendants knew, or were reckless regarding the fact that, the perpetrators would execute the attack.

*Linde* is instructive.  In *Linde*, as here, the defendant attempted to avoid producing the documents the plaintiff sought by asserting that the documents were protected by privilege.  269 F.R.D. at 192.  There, as here, the court rejected the defendant's claim of privilege.  *Id.* at 193. As here, the defendant in *Linde* continued to persist in its refusal to produce even after the court had overruled the objection.  *Id.* at 194.  Defendant there, as here, made deficient productions. *Id.* at 198-99.  Finally, as plaintiffs have done above, the plaintiff in *Linde* provided "ample evidence from which the court can infer that the withheld evidence would be of the character

23

asserted and would substantiate plaintiffs' claims." *Id.* at 199.  The *Linde* court found that a jury instruction relating to the state of mind of the defendants and adverse inferences as to specific facts suggested by the evidence, were appropriate sanctions.  *Id.* at 202-03.

### C.    A Monetary Sanction Is Also Appropriate

Defendants' intransigence and their "scorched earth" tactics also warrant a monetary sanction, both as a deterrent and to compensate plaintiffs for having been forced to pursue the discovery through improper privilege claims, bad faith redactions, willful violations of the Court's orders and continued efforts to reargue meritless positions—even after the Court ordered defendants to produce the documents.

In such circumstances, although they cannot substitute for the evidential sanctions that are warranted here, monetary sanctions are also warranted as an additional sanction.  *See, e.g.*, *In re WRT Energy Sec. Litig.*, 246 F.R.D. at 201 (in addition to preclusion, monetary award—equal to cost of sanctions motion and cost of expert analysis required to extrapolate missing data— appropriate to "punish the offending party for its actions or to deter the litigant's conduct," and to make "the opposing party whole for costs incurred" as a result of the offending party's conduct); *Linde*, 202 F.R.D. at 204-05 (awarding costs to plaintiffs, in addition to adverse inference and preclusion, in view of the "extensive delays and waste of resources" caused by defendants' refusal to produce).

### CONCLUSION

The Court should grant plaintiffs' motion for sanctions.

Dated: New York, New York
       May 15, 2014

ARNOLD & PORTER LLP

By:_____
     Kent A. Yalowitz
       *KENT.YALOWITZ@APORTER.COM*
     Philip W. Horton
       *PHILIP.HORTON@APORTER.COM*
     Lucy S. McMillan
       *LUCY.MCMILLAN@APORTER.COM*
     Ken L. Hashimoto
       *KEN.HASHIMOTO@APORTER.COM*
     Carmela T. Romeo
       *CARMELA.ROMEO@APORTER.COM*
     Tal R. Machnes
       *TAL.MACHNES@APORTER.COM*

399 Park Avenue
New York, New York  10022
(212) 715-1000