# EXHIBIT I.321

EXHIBIT
321

| | |
|---|---|
| **Military Appeals Court** | **Appeals, Judea and Samaria 2793/04** |
| **for Judea, Samaria and the Gaza Strip** | **Appeals, Judea and Samaria 1009/05** |

**Before a panel:**    Colonel Shaul Gordon – **President of the Court**
Colonel Moshe Matalon – **Judge**
Colonel Moshe Tirosh – **Judge**

**The Military Prosecution** (Appellant in File 2793/04 and Respondent in File 1009/05)
(Represented by Counsel, Captain Yosef Malko)

- v. -

**Munzar Mahmoud Khalil Noor, Identity No. 902442607** (Appellant in File 1009/05 and
Respondent in File 2793/04)
(Represented by Counsel, Adv. Ali Gozlan)

Appeal from the judgment of the Military Court, Judea (bench headed by the Honorable
President of the Court Lieutenant Colonel Shlomi Kochav and the Honorable Judges Captain
Shlomo Katz and Captain Menachem Lieberman) in File No. 3465/02, dated August 26, 2004

(The appeal in File 2793/04 was accepted,
the appeal in File 1009/05 was denied).

Hearing date: September 28, 2005; 24 Elul 5765.

## Judgment

**Court President, Colonel S. Gordon:**

**Principal Facts**

On January 27, 2002, a powerful blast shook Jaffa Road in Jerusalem. When the dust dissipated
and the smoke cleared, it became apparent that the late Pinhas Tokatli, a resident of the city, aged
about 80, had been killed in this blast; more than 150 people who were standing in the vicinity
had been wounded; and a great deal of damage had been caused to shops, adjacent buildings and
numerous vehicles.

[Stamp] P 3: 30

At the scene were found parts of the body of the female terrorist who carried the bomb on her person, which had scattered in all directions, and upon investigation it turned out that this was the body of one **Wafa Idris**, resident of the al-Amari Refugee Camp in the Ramallah District.

On April 17, 2002, **Munzar Noor**, a resident of the village of Anbata (hereinafter: the "**Appellant**") was arrested on suspicion of involvement in the said terrorist attack, as well as other security offenses. Ultimately, an indictment was filed against the Appellant, which attributed to him 6 counts, as follows:

a.  **Kidnapping in aggravated circumstances** – in that in 1993, when the Appellant was a member of the Fatah organization's youth movement, he participated in the kidnapping of a person who was suspected of collaboration with Israel.

b.  **Intentionally causing death** – in that in early 2002 he took part in the horrific terrorist attack mentioned above, and about his part in this episode we will address more extensively below.

c.  **Attempting to intentionally cause death** – in that he caused the wounding of 150 people in the said terrorist attack.

d.  **Malicious damage to property** – in that he caused severe damage to shops, buildings and vehicles in the said terrorist attack.

e.  **Attempting to incite another to trade in military material** – in that he proposed to a senior member of the Palestinian Authority's Military Intelligence to transport bombs by means of ambulances of the Red Crescent, an organization for which the Appellant worked.

f.  **Communicating information of military value** – in that he passed to that senior member of Military Intelligence information relating to Israel Defense Forces checkpoints, the movement of forces in the area, and the weapons with which they were equipped.

On August 26, 2004, the Lower Court decided to convict the Appellant of the crimes attributed to him, except for the kidnapping in the first count of the indictment, of which he was acquitted. On the same day the arguments in respect of penalty were heard, and subsequently the Court sentenced the Appellant to life imprisonment in respect of causing the death of the late Pinhas Tokatli, and a further 30 years' imprisonment, to be served consecutively, in respect of the other crimes of which he was convicted.

[Stamp] P 3: 31

## The Appeal

It turns out that both the Prosecution and the Defense were of the opinion that the Lower Court had erred. The Defense believed that the conviction of the Appellant for involvement in the suicide terrorist attack in Jerusalem should not stand, and that in any case there is room to also intervene in the penalty. In contrast, the Prosecution argued that the Lower Court had erred in that it did not sentence the Appellant to a further term of life imprisonment, in respect of the wounding of 150 people in the said terrorist attack, as it had requested in its arguments in respect of sentencing.

Hence, and before I address the parties' arguments, it seems that we must again examine the facts of the key count of the indictment in this case and determine, incidentally, the part played by the Appellant in this episode.

2

[Stamp] P 3: 31 [continued]

## The Terrorist Attack in Jaffa Road

In accordance with that which has been set forth above, the Appellant was arrested on April 17, 2005, and during the course of his interrogation the interrogators took three statements from him, as follows:

    a. Statement dated April 23, 2002 (P/1)

    b. Statement dated April 25, 2002 (P/2)

    c. Statement dated May 13, 2002 (P/3)

These statements were submitted to the Court by consent, and hence it is agreed that they correctly reflect the course of events. Notwithstanding certain differences between the different versions that were provided by the Appellant, the following picture emerges from them:

The Appellant worked as a medic with the Red Crescent in Ramallah, and in June 2001 met **Wafa Idris**, a divorcee who volunteered there.

In August 2001, as a result of a suggestion from **Wafa**, the Appellant met, at the Muqata in Ramallah, with one **Mohamed Mukhtasab**, also known by the name **Muhamad Khamal** and by the nickname "**Abu Talal**" (hereinafter: "**Mohamed**"), who served in the Military Intelligence of the Palestinian Authority. These meetings took place with a frequency of once to twice a week, and in effect the Appellant served as an informant for this **Mohamed**. That was so until on January 24, 2002, when the Appellant met with **Mohamed**, [and] the two spoke of suicide terrorist attacks. At some stage **Mohamed** said that he was interested in sending a woman for a suicide terrorist attack, and he raised **Wafa**'s name.

What happened at this stage can be learned from the Appellant's statement P/2 (page 2, line 3ff.):

> *"And then **Mohamed** said to me that in his view Wafa was suitable for carrying out a suicide terrorist attack... **Mohamed** also asked me to persuade Wafa to carry out a terrorist attack because we were good friends, and I said to him that this was hard for me because she is my good friend. **Mohamed** said, on the contrary, because I am a friend, I can persuade her better than others."*

And indeed, the Appellant discussed the matter with **Wafa**, either in private, as he stated in one of his versions, or at **Mohamed**'s home and in his presence, as he stated in another version.

[Stamp] P 3: 32

Ultimately, **Wafa** agreed to carry out a suicide terrorist attack, although at some stage she changed her mind about carrying out the suicide attack, and instead asked to carry out a terrorist attack that would not end with her death.

This is how the events are described in the Appellant's statement P/2 (page 2, line 19ff):

> *"... I called **Mohamed** and told him that **Wafa** was prepared to carry out the terrorist attack, and **Mohamed** asked that on Friday, January 25, 2002, we come to his office in the Muqata, and we came to the office, **Wafa** and I, and there she said ([Heb. amar] Should be amra [feminine] – S.G.) to **Mohamed** that she does not want to carry out the terrorist attack, and we were surprised. **Mohamed** began to speak to her, to persuade her, but she did not want to listen to him, and also when I wanted to speak she cut me off and asked that I leave the room. **Mohamed** and **Wafa** remained alone in the room for about a quarter of an hour, and then **Mohamed** asked that I take **Wafa** and he asked me, as we were leaving the room, to persuade **Wafa**. And we left, **Wafa** and I, and we sat*

3

[Stamp] P 3: 32 [continued]

Appeals, Judea and Samaria 2793/04+1009/05

> *at a cafe in Ramallah, and I asked her why doesn't want to do a*
> *terrorist attack, and she said that she doesn't want to die, but she*
> *agreed to place a bomb. And then I took her back to her home*
> *and I said to* Mohamed *afterwards that Wafa was prepared to*
> *place a bomb…"*

Later, the Appellant was asked by **Mohamed** to explain to **Wafa** how to get to Jaffa Road in Jerusalem, when the latter went to undertake a preliminary reconnaissance of the site for the terrorist attack. The Appellant also assisted her in returning to Ramallah, after she lost her way in Jerusalem and needed his instructions by telephone.

After **Wafa** returned to Ramallah, the Appellant picked her up in his vehicle and the two traveled to **Mohamed**'s office. What happened at this stage was described by the Appellant in his statement P/2 (page 3, line 13ff):

> *"… And we traveled to* Mohamed*'s office at the Muqata and sat*
> *with him. Wafa said that she could get to Jerusalem via Beit*
> *Hanina and Shuafat, but in Jaffa Road she saw many soldiers*
> *and there was no good opportunity to place a bomb and leave the*
> *place, but she would try to do so.* Mohamed *asked me to bring a*
> *bag from behind the door of his office, and to bring it…*
> Mohamed *said to me to be careful when I bring the bag and not*
> *to open it, and to place it on the floor next to Wafa.* Mohamed
> *said to Wafa to pick up the bag and see what its weight was, and*
> *she said ([Heb.* amar*] Should be* amra *[feminine] – S.G.) that it's*
> *not very heavy. Wafa asked how to operate the bomb and*
> Mohamed *said that he would explain to her the following day,*
> *and we, Wafa and I, left the Muqata and I went home."*

On Sunday morning, January 27, 2002, **Wafa** left for Jerusalem, taking the bomb with her. According to one of the versions she was to hand over this bomb to another person, but ultimately she chose to carry the bomb herself and her plan was approved by **Mohamed**. Since the bomb was connected to a clock, which was supposed to cause the bomb's detonation, **Mohamed** called **Wafa** and warned her seven minutes prior to the time of detonation. He did so again three minutes before the detonation time. At the designated time the bomb that **Wafa** was carrying exploded, whether it was her intention to commit suicide or whether it exploded before she had an opportunity to put it down, and the horror that the bomb left was described above and also preserved in a series of horrific pictures, which was submitted to the Court.

[Stamp] P 3: 33

## The Appellant's Role

One of the central arguments by the Appellant's counsel is that his client, even if he knew that it was **Wafa**'s intention to carry out a terrorist attack in Jerusalem, he did not encourage her to do so nor was he a partner to her plan. As evidence, the Defense Attorney referred to the Appellant's statements, which indicate that the Appellant himself was opposed to suicide terrorist attacks, and in his conversations with **Wafa** he stated that "*if she was satisfied with the matter* (carrying out a suicide terrorist attack – S.G.) *then I am also satisfied with the matter, and if not, then not, and she should do what she wants.*"

In other words, at most the Appellant can be accused of not preventing a crime, but no more than that.

4

[Stamp] P 3: 33 [continued]

With all due respect, this argument should be summarily dismissed. The picture obtained from the whole of the evidence can leave no doubt that the Appellant chose to associate himself with execution of the terrorist attack. Not only did the Appellant know that it was **Mohamed**'s intention to recruit **Wafa** to carry out the suicide terrorist attack, but he even assisted in recruiting her for this mission, at **Mohamed**'s command.

The Appellant spoke with **Wafa** on more than one occasion regarding the said terrorist attack, and took care to update **Mohamed** with developments. Thus, at a certain stage the Appellant stated that "*I called* **Mohamed** *and I said to him that Wafa is prepared to carry out the terrorist attack*" (P/2 page 2, lines 19-20), and later, when **Wafa** changed her mind, preferring rather to carry out the terrorist attack by means of placing a bomb without committing suicide, he hastened to pass her request to **Mohamed**.

The Appellant took part in all the meetings that occurred in connection with the said terrorist attack, and in effect it may be said that there were three individuals involved in this episode: **Mohamed**, who was undoubtedly the initiator; **Wafa**, who agreed to carry out the terrorist attack; and the **Appellant** who, being **Wafa**'s friend on the one hand and **Mohamed**'s agent on the other, sought to persuade **Wafa** and mediated between the two.

It is true that **Wafa** preferred not to involve the Appellant nor include him in her plans, out of concern that he might be harmed, but notwithstanding this the Appellant continued to involve himself in the execution of the terrorist attack. Thus, the Appellant instructed **Wafa** as to how to get to Jaffa Road in Jerusalem when she left to undertake a preliminary reconnaissance, and also helped her return to Ramallah after she lost her way in Jerusalem. Also, when she returned to Ramallah, the Appellant hastened to pick her up in his vehicle and bring her to a meeting with **Mohamed** (whether this was in the latter's office, as stated in one of the versions, or at his home in Bitunya).

During this meeting, the Appellant gave **Wafa** the bomb that had been brought there by **Mohamed**, and the Appellant was also able to say that a clock had been attached to the bomb.

The series of meetings, attempts at persuasion, instruction as to how to get to Jaffa Road in Jerusalem, transport of the female terrorist to meetings in **Mohamed**'s office or at his home, handing the bomb over to **Wafa**: all these cannot but indicate full partnership in execution of the terrorist attack.

[Stamp] P 3: 34

Even if **Mohamed**'s role was greater than that of the Appellant, something which no one disputes, this is not sufficient to lessen the role of the latter in any way. With all due respect, this is not simply a case of knowledge of **Wafa**'s intentions, but of **active** participation, such as would indicate that he truly wanted to see the terrorist attack through to its implementation.

Hence, I can state without any hesitation that the Appellant was a **full partner** in executing the said bloody terrorist attack, and hence bears full responsibility for its horrific results.

## Change in the Method of Execution

A further key argument raised by the Appellant's attorney is that even if the Appellant involved himself and assisted **Mohamed** and **Wafa**, his intention was, at most, to lend a hand to a terrorist attack by means of placing a bomb. When **Wafa** changed her mind, choosing to carry out a suicide terrorist attack instead of placing the bomb, then in effect it was a **different terrorist attack** that was carried out from that which he intended, and so he bears no responsibility for its results.

5

[Stamp] P 3: 34

With all due respect, this argument should also be rejected.

First, from the outset it had been discussed that **Wafa** would carry out a suicide terrorist attack, and we do not find that at that stage the Appellant opposed this plan. Moreover, when **Wafa** announced that she had changed her mind about carrying out the suicide terrorist attack and that she preferred to carry out a bomb attack instead, the Appellant was surprised and even attempted to persuade her otherwise. Thus, this is not the case of an act to which the Appellant objected, and the Appellant cannot complain that ultimately the terrorist attack was carried out as originally planned.

Second, and this is the main point, there is no significance to the manner in which the terrorist attack was carried out. The Appellant lent a hand to carrying out the crime of intentionally causing death, and this took place. Moreover, the Appellant knew that it was **Wafa**'s intention to cause the deaths of innocent civilians in Jaffa Road in Jerusalem by detonating explosives. The fact that the Appellant thought that the terrorist attack would be carried out by placing the bomb in a busy street and not as a suicide terrorist attack makes no difference.

It has already been ruled on more than one occasion that even where a criminal used a **totally different** weapon from that which he planned to use initially, this does not exempt his accomplices from responsibility for the outcome, which in itself was desirable to those accomplices. Thus it was ruled in **Lugasi** (Criminal Appeals 35/89, **Lugasi *et al*. v. State of Israel**, *PD* 44 (1) 102, at 112-113), that -

> *"We have already made it clear above that there is no importance for our purposes if use was made of a handgun that had previously been prepared, or a knife that had been taken from the scene of the murder, since there is no significance to the question of which weapon was used by the criminal in advancing the joint goal in which violence was within the bounds of expectation."*

See also: Criminal Appeal 147/77 **Saadia *et al*. v. State of Israel**, *PD* 31 (3) 421, at 425.

Hence, whether the Appellant thought that it was **Wafa**'s intention to only plant a bomb, or whether he took into account that she may carry out her intention through a suicide terrorist attack; in any case he knew that he was lending a hand to the murder and wounding of innocent civilians. That being the case, it is not another terrorist attack that was carried out here, but the same terrorist attack as had been planned from the outset, absolutely identical to the planned terrorist attack in terms of the identical perpetrator, the identical site for the terrorist attack and the identical means used to bring about the fatal outcome.

[Stamp] P 3: 35

Although unnecessary, I would add that just as the Appellant cannot be saved because of a change of location of a terrorist attack, for example, had **Wafa** chosen to blow herself up in another street, so too a change in the mode of the terrorist attack, had there indeed been such a change, cannot save him.

That being the case, I find no merit in the Defense's appeal insofar as it is directed at the issue of conviction, and the Lower Court was correct in holding him responsible for carrying out the bloody terrorist attack.

6

[Stamp] P 3: 35 [continued]

## As to the Sentence

Having found that the Appellant was a full partner in executing the said terrorist attack, there is certainly no justification for reducing his punishment. Even if the Appellant was not the initiator of the terrorist attack, once he lent his hand to its realization, he bears full responsibility for its outcome.

Therefore, it is difficult to conceive of a reason that justifies a sentence that is less than life imprisonment.

On the other hand, I find merit in the Prosecution's appeal, according to which it would have been appropriate to also sentence the Appellant to life imprisonment for attempting to cause the deaths of 150 innocent civilians. The Military Prosecutor was right in pointing out that not only had the Prosecution **explicitly** requested the said sentence, but that it would have been right to do so in keeping with the case law of this Court.

There is no doubt that had this terrible terrorist attack ended only with the wounding of civilians, it would have been appropriate to sentence the Appellant to life imprisonment, but once he was able to bring about the death of a person, there is no room for leniency because of this fact alone.

The Appellant expected that the said bomb would cause the deaths and wounding of numerous people, and since in fact this plot was realized, it is appropriate for him to bear the consequences. I did not find, in the reasoning of the Lower Court, the slightest hint of a reason justifying a deviation from the doctrine applying in these instances. More than once have we ruled that where a person has attempted to cause death, in circumstances in which serious injury was caused to a person, or where the act was intended to injure the lives of many, and certainly in the circumstances in which both of these conditions were fulfilled together, as in the present instance, the criminal should be put away behind bars for the rest of his life (see, for example: Appeals, Judea and Samaria 183, 190/03, **Military Prosecutor v. Jarar**, where this Court imposed a sentence of life imprisonment for participation in an attempt to carry out a suicide terrorist attack, which never took place).

In order to give expression not only to the value of human life, but also to the right to bodily integrity, the Court must make it clear that the penalty of life imprisonment imposed for causing death does not provide an exemption from punishment for the wounding of others. Only **separate severe** punishment will make it clear that just as punitive expression is given for each soul whose death was caused by criminal action, so too will be done in respect of those who,

[Stamp] P 3: 36

miraculously, were only injured. This is so in the ordinary case, and is especially true in the case of horrific, mass terrorist attacks – in which the victims bear the scars of the horror on their bodies and psyche for many years.

## Conclusion

One who views the evidence in the Court File, one who reads the testimony of the numerous wounded, and one who examines the horrific pictures of wrack and ruin, cannot but be horrified. The Appellant, who worked as a medic and was trained to save lives, lent a hand to a base terrorist attack, which was intended at harming innocent civilians, women, old people, and children.

The Appellant, who was aware of the distress that his friend was suffering, not only did not attempt to dissuade her from carrying out her scheme, but even supported her and assisted her in implementing her plan. This Appellant, who showed no mercy for the lives of others, is not worthy of again walking out among normal men, and it would be appropriate to bring to bear on him the full weight of the law.

That being the case, and if my opinion should be accepted, I would reject the Defense's appeal, accept the appeal of the Prosecution, and sentence the Appellant to two terms of life imprisonment, one in respect of intentionally causing the death of the late Pinhas Tokatli, and the second in respect of the attempt to cause the deaths of additional civilians, many of whom were wounded in the said terrorist attack.

7

[Stamp] P 3: 36 [continued]

Appeals, Judea and Samaria 2793/04+1009/05

Similarly it would be appropriate to sentence the Appellant to 10 years' imprisonment, in respect of the other crimes of which he was convicted, including that in which he proposed making use of Red Crescent ambulances for the transportation of bombs.

These sentences, it should be so ordered, are all to be served consecutively.

**Judge Colonel M. Matalon:**

I concur.

**Judge Colonel M. Tirosh:**

I concur.

Decided as stated in the judgment of Court President Colonel S. Gordon.

Given and announced this day, January 30, 2006, 1 Shevat 5766, in the presence of the Appellant, his attorney and the Military Prosecution.

| (-) | (-) | (-) |
|:---:|:---:|:---:|
| Judge | President of the Court | Judge |

8

[Stamp] P 3: 37

Similarly it would be appropriate to sentence the Appellant to 10 years' imprisonment, in respect of the other crimes of which he was convicted, including that in which he proposed making use of Red Crescent ambulances for the transportation of bombs.

These sentences, it should be so ordered, will all be served consecutively.

**Judge Colonel M. Matalon:**

*I concur.*

**Judge Colonel M. Tirosh:**

Decided as stated in the judgment of _____.

Given and announced this day, _____, 2005, _____ 5766, in the presence of the Appellant, his attorney and the Military Prosecution.

| [Signature] | [Signature] | |
|:---:|:---:|:---:|
| Judge | President of the Court | Judge |

8

[Stamp] P 3: 38

Similarly it would be appropriate to sentence the Appellant to 10 years' imprisonment, in respect of the other crimes of which he was convicted, including that in which he proposed making use of Red Crescent ambulances for the transportation of bombs.

These sentences, it should be so ordered, will all be served consecutively.

**Judge Colonel M. Matalon:**

**Judge Colonel M. Tirosh:**

*I concur.*

Decided as stated in the judgment of _____.

Given and announced this day, _____, 2005, _____ 5766, in the presence of the Appellant, his attorney and the Military Prosecution.

|                          |                          | [Signature]              |
| ------------------------ | ------------------------ | ------------------------ |
| Judge                    | Presiding Judge          | Judge                    |

[Stamp] M/0345059
Colonel Moshe Tirosh
Judge of the Military
Appeals Court

8

[Stamp] P 3: 39

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

MARK I. SOKOLOW, *et al.*,

                              Plaintiffs,

     vs.                                            No. 04 Civ. 00397 (GBD) (RLE)

THE PALESTINE LIBERATION
ORGANIZATION, *et al.*,

                              Defendants.

## DECLARATION OF RINA NE'EMAN

Rina Ne'eman hereby certifies as follows:

1.   The attached translation from Hebrew to English is an accurate representation of the

     document received by Rina Ne'eman Hebrew Language Services, to the best of my

     knowledge and belief.  The document is designated as P3: 30-39.

2.   I am a professional translator with a B.A. in International Relations from the Hebrew

     University of Jerusalem (Israel) and 30 years of translation experience.  I am fluent in

     Hebrew and English, and I am qualified to translate accurately from Hebrew to English.

3.   To the best of my knowledge and belief, the accompanying text is a true, full and

     accurate translation of the Hebrew-language document bearing the bates number, P3: 30-

     39.

                                                 _____
                                                 Rina Ne'eman

ss.: New Jersey

On the [28] day of February, 2014 before me, the undersigned, personally appeared Rina Ne'eman, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is signed to this Declaration and acknowledged to me that he executed the same in his capacity, and that by his signature on this Declaration, the individual executed the Declaration.

Sworn to me this
28 day of February, 2014

Notary Public

MIRUT J MHRETE
NOTARY PUBLIC
STATE OF NEW JERSEY
MY COMMISSION EXPIRES SEPT. 7, 2015
ID 2372704

<div dir="rtl">

ע' איו״ש 2793/04                    בית המשפט הצבאי לערעורים
ע' איו״ש 1009/05                    באיו״ש      ובאזח״ע

בפני **הרכב:**    אל״ם שאול גורדון      - **אב״ד**
                 אל״ם משה מטלון      - **שופט**
                 אל״ם משה תירוש      - **שופט**

**התובע הצבאי** (המערער בתיק 2793/04 והמשיב בתיק 1009/05)(באמצעות ב״כ סרן יוסף מלקה)

נגד

**מונזר מחמוד חליל נור, ת״ז 902442607** (המערער בתיק 1009/05 והמשיב בתיק 2793/04)
(באמצעות ב״כ עו״ד עלי גוזלן)

ערעור על פסק דינו של ביהמ״ש הצבאי יהודה (הרכב בראשות כב׳ הנשיא סא״ל שלומי כוכב
וכב׳ השופטים סרן שלמה כ׳ן וסרן מנחם ליברמן)בתיק מס׳ 3465/02 מיום 26.8.04

(הערעור בתיק 2793/04 התקבל,
הערעור בתיק 1009/05 נדחה)

תאריך הישיבה: 28 בספטמבר 2005, כ״ד באלול התשס״ה.

## פסק דין

<u>הנשיא אל״ם ש׳ גורדון:</u>

<u>עיקרי העובדות</u>

ביום 27.1.02 החריד פיצוץ עז את רחוב יפו בירושלים. משנמוג האבק והתפזר העשן, התברר כי
בפיצוץ זה נהרג פנחס טוקטלי ז״ל, תושב העיר כבן 80, למעלה מ-150 בני אדם אשר עמדו בקרבת
מקום נפצעו, ונזק רב נגרם לחנויות, בנ”ינים סמוכים וכלי רכב רבים.

</div>

ע' איו"ש 2793/04+1009/05

בזירת האירוע נמצאו חלקי גופתה של המחבלת אשר נשאה על גופה את מטען התופח ואשר התפזרו לכל עבר, ובחקירה הוברר כי מדובר בגופתה של אחת **ווּפא אדריס**, תושבת מחנה הפליטים אל-אמערי שבנפת רמאללה.

ביום 17.4.02 נעצר **מונזר נור**, תושב הכפר ענבתא (להלן: **המערער**), בחשד למעורבות בפיגוע האמור, כמו גם בעבירות ביטחוניות נוספות. סופם של דברים, הוגש נגד המערער כתב אישום אשר ייחס לו 6 פרטי אישום כדלהלן:

א.    **חטיפה בנסיבות מחמירות** – בכך שבשנת 1993, עת היה המשיב חבר בתנועת הנוער של ארגון הפת"ח, השתתף בחטיפתו של אדם אשר נחשד בשיתוף פעולה עם ישראל.

ב.    **גרימת מוות בכוונה** – בכך שבראשית שנת 2002 נטל חלק בפיגוע התופח הנזכר מעלה, ואשר על חלקו בפרשה זו עוד נעמוד בהרחבה בהמשך.

ג.    **ניסיון לגרימת מוות בכוונה** – בכך שגרם לפציעתם של 150 בני אדם בפיגוע האמור.

ד.    **היזק בזדון לרכוש** – בכך שגרם נזק כבד לחנויות, בניינים וכלי רכב בפיגוע האמור.

ה.    **ניסיון לשידול לסחר בציוד מלחמתי** – בכך שהציע לבכיר במודיעין הצבאי של הרשות הפלסטינית, להעביר מטעני חבלה באמצעות אמבולנסים של "הסהר האדום", ארגון בו עבד המערער.

ו.    **מסירת ידיעות בעלות ערך צבאי** – בכך שהעביר לאותו בכיר במודיעין הצבאי מידע הנוגע למחסומי צה"ל, תנועת הכוחות במקום ואמצעי לחלימה בהם מצוידים הם.

ביום 26.8.04 החליט ביהמ"ש קמא להרשיע את המערער בעבירות שיוחסו לו, זולת בעבירת החטיפה שבפרט האישום הראשון, ממנה זוכה. בו ביום נשמעו הטיעונים לענש, ולאחריהם גזר ביהמ"ש למערער עונש של מאסר עולם בגין גרימת מותו של פנחס טוקטלי ז"ל, ועד 30 שנות מאסר במצטבר בגין שאר העבירות בהן הורשע.

**הערעור**

מסתבר, כי הן התביעה והן ההגנה היו בדעה כי שגגה יצאה תחת ידו של ביהמ"ש קמא. ההגנה סברה, כי הרשעת המערער במעורבות בפיגוע ההתאבדות בירושלים אינה יכולה לעמוד, וממילא יש מקום להתערב אף בעונש. לעומתה, טענה התביעה, שגה ביהמ"ש קמא בכך שלא גזר למערער עונש מאסר עולם נוסף, בגין פציעתם של 150 בני אדם בפיגוע האמור, כפי שעתרה בטיעוניה לענש.

מכאן, וקודם שאדרש לטענות הצדדים, דומה כי יש לשוב ולבחון עובדותיו של פרט האישום המרכזי בתיק זה, ולעמוד, אגב כך, על חלקו של המערער בפרשה זו.

2

ע׳ איו״ש 1009/05+2793/04

<u>הפיגוע ברחוב יפו</u>

כאמור, המערער נעצר ביום 17.4.05, ובמהלך חקירתו גבו ממנו חוקריו שלוש הודעות כדלהלן :

א.  אמרה מיום 23.4.02 (ת/1).

ב.  אמרה מיום 25.4.02 (ת/2).

ג.  אמרה מיום 13.5.02 (ת/3).

אמרות אלו הוגשו לביהמ״ש בהסכמה, ומכאן שמוסכם כי משקפות הן את מהלך הדברים. חרף
הבדלים מסוימים בין הגרסאות השונות אשר מסר המערער, עולה מהן תמונה הבאה :

המערער עבד כחובש ב״סהר האדום״ ברמאללה, ובחודש יוני 2001 הכיר את <b>וופא אידריס</b>, גרושה
אשר התגדרה במקום.

בחודש אוגוסט 2001, בעקבות הצעתה של <b>וופא</b>, נפגש המערער במוקטעה ברמאללה עם אחד
<b>מחמד מוחתסב</b>, המוכר אף בשם <b>מחמד כתאל</b> ובכינוי ״אבו-טלאל״ (להלן : ״<b>מחמד</b>״), אשר שימש
במודיעין הצבאי ברשות הפלסטינית. מפגשים אלה התקיימו בתדירות של פעם עד פעמיים בשבוע,
ולמעשה שימש המערער כמקור של אותו <b>מחמד</b>. כך, עד שביום 24.1.02, עת נפגש המערער עם
<b>מחמד</b>, דיברו השניים אודות פיגועי התאבדות. בשלב כלשהו, אמר <b>מחמד</b> כי מעוניין להוציא
אישה לפיגוע התאבדות, והעלה את שמה של <b>וופא</b>.

על אשר אירע בשלב זה ניתן ללמוד מהודעתו של המערער ת/2 (עמ׳ 2 ש׳ 3 ואילך) :

<blockquote>
<i>״ואז מחמד אמר לי כי לדעתו וופא מתאימה לעשות פיגוע התאבדות... מחמד
גם ביקש ממני לשכנע את וופא לבצע פיגוע כי היינו חברים טובים ואמרתי לו
כי קשה לי כי היא חברה טובה שלי. מחמד אמר להיפך בגלל שאני חברה אני
יכול לשכנע אותה טוב יותר מאחרים.״</i>
</blockquote>

ואכן, המערער שוחח בעניין זה עם <b>וופא</b>, בין אם ביחידות, כפי שמסר באחת מגרסאותיו, ובין אם
בביתו של <b>מחמד</b> ובנוכחותו, כפי שמסר בגרסה אחרת. סופם של דברים, הסכימה <b>וופא</b> לבצע פיגוע
התאבדות, הגם שבשלב כלשהו חזרה בה מכוונתה לבצע פיגוע התאבדות, ותחת זאת ביקשה לבצע
פיגוע אשר לא יסתיים במותה.

וכך מתוארים הדברים באמרתו של המערער ת/2 (עמ׳ 2 ש׳ 19 ואילך) :

<blockquote>
<i>״...התקשרתי למחמד ואמרתי לו כי וופא מוכנה לבצע הפיגוע ומחמד ביקש כי
ביום שישי 25.1.02 נגיע למשרדו במוקטעה והגענו למשרד אני וופא ושם היא
אמר (צריך להיות ״אמרה״ – ש״ג) למחמד כי אינה רוצה לעשות הפיגוע ואנחנו
התפלאנו. מחמד התחל לדבר איתה לשכנעה והיא לא רצתה לשמוע אותו וגם
כשאני רציתי לדבר היא קטעה אותי וביקשה כי אצא מהחדר. מחמד וופא
נשארו לבד בחדר כרבע שעה ודיברו ואז מחמד ביקש כי אקח את וופא וביקש
ממני בעוד אנו יוצאים מהחדר כי אשכנע את וופא. ויצאנו אני וופא וישבנו</i>
</blockquote>

3

ע' איו"ש 1009/05+2793/04

*בבית קפה ברמאללה ושאלתי אותה למה היא לא רוצה לעשות פיגוע, והיא*
*אמרה כי לא רוצה למות אבל היא מסכימה להניח מטען. ואז החזרתי אותה*
*לביתה ואמרתי למחמד לאחר מכן כי וופא מוכנה להניח מטען..."*

בהמשך, התבקש המערער ע"י **מחמד** להסביר ל**וופא** כיצד להגיע לרחוב יפו בירושלים, שעה שזו
יצאה לערוך סיור מקדים בזירת הפיגוע. כן סייע המערער בידה לחזור לרמאללה, לאחר שזו
איבדה דרכה בירושלים ונזקקה להדרכתו הטלפונית.

לאחר ש**וופא** חזרה לרמאללה, אסף אותה המערער ברכבו והשניים נסעו למשרדו של **מחמד**. על
אשר אירע בשלב זה מסר המערער באמרתו ת/2 (עמ' 3 ש' 13 ואילך):

*"...ונסענו למשרדו של מחמד במוקטעה וישבנו איתו. וופא אמרה כי היא*
*יכולה להגיע לירושלים דרך בית חנינא ושוופאס אבל ברחוב יפו ראתה הרבה*
*חיילים וכי אין אפשרות טובה להניח מטען ולעזוב המקום אבל היא תנסה*
*לעשות זאת. מחמד ביקש ממני להביא תיק מאחורי הדלת של משרדו ולהביא*
*אותו...מחמד אמר לי להיזהר שאני מביא את התיק ולא לפתחו ולהניחו ליד*
*וופא על הרצפה. מחמד אמר לוופא להרים את התיק ולראות מה משקלו והיא*
*אמר (צריך להיות "אמרה" – ש"ג) שהוא לא כבד הרבה. וופא שאלה איך*
*להפעיל את המטען ומחמד אמר כי למחרת יסביר לה, ויצאנו אני וופא*
*מהמוקטעה והלכתי הביתה."*

ביום ראשון בבוקר, 27.1.02, יצאה **וופא** לירושלים כשמטען הנפץ עמה. לפי אחת הגרסאות היה
עליה לחבּצר מטען נפץ זה לאחר, אך סופם של דברים בחרה היא להוביל את המטען בעצמה
ותוכניתה זו אושרה על-ידי **מחמד**. הואיל ולמטען חובר שעון, אשר אמור היה לגרום לפיצוץ
המטען, התקשר **מחמד** ל**וופא** והתריע בפניה שבע דקות קודם מועד הפיגוע. כך חזר ועשה
אף שלוש דקות קודם שעת הפיצוץ. בשעה היעודה התפבצץ המטען אשר נשאה **וופא**, בין אם
התכוונה להתאבד ובין אם התפבצץ קודם שהיה סיפק בידה לחנֱיחו, והתוצאה אשר הותיר המטען
הלוא כבר תוארה מעלה ואף הונצחה בשורה שֵל תמונות קשות לצפֵייה, אשר הוגשו לביהמ"ש.

## חלקו של המערער

אחת מטעננותיו המרכזיות של ב"כ המערער היא, כי מרשו, אף אם ידע כי בכוונת **וופא** לבצע פיגוע
בירושלים, לא עודדה לעשותו כן ואף לא היה שותף לתוכניתה. לראיה, הפנה הסנגור לאמרתיו של
המערער, מהן עולה כי המערער עצמו התנגד לפיגועי התאבדות, ובשיחותיו עם **וופא** ציין כי *"אם*
*היא מרוצה מהעניין (ביצוע פיגוע התאבדות – ש"ג) גם אני מרוצה מהעניין ואם לא אז ומה*
*שתרצה שתעשה".*

לשון אחרת; לכל היותר ניתן להאשים את המערער באי מניעת עבירה, הא ותו לא.

4

ע' איו״ש 2793/04+1009/05

טענה זו, בכל הכבוד, דינה להידחות על הסף. התמונה המתקבלת ממכלול הראיות, אינה יכולה להותיר ספק כי המערער בחר לשתף עצמו בהוצאת הפיגוע אל הפועל. המערער לא רק שידע כי בכוונת **מחמד** לגייס את **וו'פא** לביצוע פיגוע התאבדות, אלא אף נתן יד לגיוסה למשימה זו, במצוותו של **מחמד**.

המערער שוחח עם **ווּפא** לא אחת ולא שתיים אודות הפיגוע האמור, והקפיד לעדכן את **מחמד** בהתפתחויות. כך, בשלב מסוים מסר המערער כי *"התקשרתי למחמד ואמרתי לו כי וופא מוכנה לבצע הפיגוע"* (ת/2 עמ' 2 ש' 20-19), ובהמשך, כשנתינתה **ווּפא** טעמה והעדיפה לבצע פיגוע באמצעות מטען, מבלי להתאבד, מיהר להעביר בקשתה **למחמד**.

המערער נטל חלק בכל המפגשים שהתקיימו ביחס לפיגוע האמור, ולמעשה ניתן לומר כי בפרישה זו היו מעורבים שלושה: **מחמד**, אשר ללא ספק היה הרוח היוזם, **ווּפא**, אשר נאותה לבצע את הפיגוע ו**המערער**, אשר בחינתו חברה של **ווּפא**, מחד גיסא, ושלוחו של **מחמד**, מאידך גיסא, דיבר על ליבה של **ווּפא** ותיווך בין השניים.

נכון הוא, כי **ווּפא** העדיפה שלא לערב את המערער ולשתפו בתוכניותיה, מחשש שיבולע לו, אך חרף זאת המשיך המערער לערב עצמו בהוצאת הפיגוע אל הפועל. כך, תידרך המערער את **ווּפא** כיצד להגיע לרחוב יפו בירושלים, עת יצאה לסייר המקדים, וכך סייע בידה לחזור לרמאללה לאחר שאיבדה את דרכה בירושלים. גם מחשבה לרמאללה מיהר המערער ואספה ברכבו, והובילה לפגישה עם **מחמד** (בין אם במשרדו של זה, כמצוין באחת הגרסאות, ואם בביתו שבעיתונּיא).

במהלך פגישה זו, מסר המערער **לווּפא** את המטען שהובא למקום על-ידי **מחמד**, והמערער אף ידע לספר כי למטען הוצמד שעון.

רצף המפגשים, ניסיונות השכנוע, החדרכה כיצד להגיע לרחוב יפו בירושלים, הסעת המתבלת לפגישות במשרדו של **מחמד** או בביתו, מסירת המטען לידיה של **ווּפא**, כל אלה אינם יכולים אלא להצביע על שותפות מלאה בהוצאת הפיגוע אל הפועל.

אף אם חלקו של **מחמד** עולה על חלקו של המערער, ועל כך לא יחלוק איש, הרי שאין בכך כדי להפחית במאומה מחלקו של האחרון. בכל הכבוד, לא ידיעה סתמית אודות כוונותיו של **ווּפא** יש כאן, אלא פעילות **אקטיבית**, כזו המלמדת על חפץ מלא בהוצאת הפיגוע מן הכוח אל הפועל.

אשר על כן, מוצא אני לקבוע ללא כל היסוס, כי המערער היה **שותף מלא** בביצוע פיגוע הדמים האמור, וממילא נושא הוא באחריות מלאה לתוצאותיו המזוויעות.

### שינוי אופן הביצוע

טענה מרכזית נוספת אשר הועלה ב״כ המערער היא, כי אף אם עירב המערער עצמו וסייע בידי **מחמד ווּפא**, הרי שהתכוונו, לכל היותר, לתת יד לפיגוע הנחת מטען. כשנתינתה **ווּפא** טעמה, ובחרה לבצע פיגוע התאבדות חלף הנחת המטען, הרי שבפועל בוצע **פיגוע אחר** מזה שהתכוונו לו, וממילא אין הוא נושא באחריות לתוצאותיו.

אף טענה זו, בכל הכבוד, דינה להידחות.

ראשית, מלכתחילה דובר כי **וופא** תבצע פיגוע התאבדות, ולא מצאנו כי באותו שלב התנגד המערער לתוכנית זו. יתרה מכך, משהודיעה **וופא** כי חוזרת היא בה מכוונתה לבצע פיגוע התאבדות וכי מעדיפה היא לבצע פיגוע מטעין תחתיו, התפלא המערער ואף ניסה לדבר על ליבה. הנה כי כן ; אין מדובר במעשה לו התנגד המערער, ומה לו למערער כי ילין על שלבסוף בוצע הפיגוע כפי שתוכנן מלכתחילה.

שנית, וכאן העיקר, אין כל משמעות לאופן בו בוצע הפיגוע. המערער נתן ידו לביצוע עבירה של גרימת מוות בכוונה, וזו בוצעה. יתרה מכך, המערער ידע כי בכוונתה של **וופא** לגרום למותם של אזרחים חפים מפשע ברחוב יפו בירושלים, באמצעות פיצוץ חומר נפץ. העובדה כי המערער סבר שהפיגוע יבוצע על דרך הנחת המטען ברחוב הומה אדם, ולא על דרך של פיגוע התאבדות, אינה מעלה ואינה מורידה.

לא אחת כבר נפסק כי אף מקום בו השתמש עבריין בכלי נשק **שונה לחלוטין** מזה שתוכנן לשימוש מלכתחילה, אין בכך כדי לפטור את שותפיו מאחריות לתוצאה, אשר היא כשלעצמה הייתה לרצון השותפים. כך נפסק בעניין **"לוגסי"** (ע"פ 35/89 **לוגסי ואח'** נ' **מדינת ישראל**, פ"ד מד(1) 102, בעמ' 112-113), כי –

> *"כבר הבהרנו לעיל כי אין חשיבות לכך לצורך ענייננו אם נעשה שימוש באקדח*
> *שהוכן מראש או בסכין שניטלה ממקום הרצח, שהרי אין חשיבות לשאלה*
> *באיזה כלי משחית השתמש העבריין בקידום המטרה המשותפת בה הייתה*
> *האלימות בגדר הציפיות."*

כן ראה: ע"פ 147/77 **סעדיה ואח'** נ' **מדינת ישראל**, פ"ד לא(3) 421, 425.

אמור מעתה ; בין אם סבר המערער כי בכוונתה של **וופא** אך להניח מטען, ובין אם הביא בחשבון כי עשויה היא לחוציא את כוונתה אל הפועל בדרך של פיגוע התאבדות, הרי שבין כך ובין כך ידע כי נותן הוא יד לרציחתם ולפציעתם של אזרחים חפים מפשע. משכך, לא **פיגוע אחר** בוצע כאן, אלא אותו פיגוע אשר תוכנן מלכתחילה, הזהה לחלוטין לפיגוע המתוכנן, הן בזהות המבצע, הן בזהות מקום הפיגוע והן בזהות האמצעי אשר שימש בגרימת התוצאה הקטלנית.

למעלה מן הצורך אוסיף כי כשם שלא יכול היה המערער להיוושע משינוי מקום הפיגוע, לו למשל הייתה **וופא** בוחרת לפוצץ עצמה ברחוב אחר, כך אין בשינוי אופן ביצוע הפיגוע, אם יש בו כלל משום שינוי, כדי להושיעו.

אשר על כן, לא מצאתי ממש בערעור הסנגוריה ככל שמכוון הוא לעניין ההרשעה, ובדין ראה ביהמ"ש קמא להרשיעו באחריות לביצוע פיגוע הדמים האמור.

6

<u>אשר לעונש</u>

משנמצא כי המערער היה שותף מלא להוצאת הפיגוע האמור אל הפועל, הרי שבודאי אין כל הצדקה להקל בעונשו. אף אם המערער לא היה יוזם הפיגוע, הרי משנתן יד להגשמתו, נושא הוא באחריות מלאה לתוצאותיו.

על כן, קשה להעלות על הדעת נימוק המצדיק גזירת עונש הנופל ממאסר עולם.

מנגד, מצאתי ממש בערעור התביעה, לפיו היה מקום לגזור למערער עונש של מאסר עולם אף בגין הניסיון לגרימת מוות של 150 אזרחים חפים מפשע. בצדק ציין התובע הצבאי, כי לא רק שהתביעה עתרה <b>במפורש</b> לעונש כאמור, אלא שכך נכון היה לנהוג בהתאם להלכות בימ״ש זה.

אין ספק כי אילו הסתיים פיגוע נורא זה, אך בפציעתם של אזרחים, נכון היה לגזור למערער עונש של מאסר עולם, ומשעלה בידו לגרום למותו של אדם, אין מקום להקל עימו בשל כך בלבד.

המערער צפה כי המטען האמור יגרום למותם ולפציעתם של רבים, ומשבפועל התממשה מזימה זו, דין הוא כי ישא בתוצאות. לא מצאתי בנימוקיו של ביהמ״ש קמא, בדל-נימוק המצדיק סטייה מן ההלכה הנוהגת במקרים אלה. לא אחת פסקנו כי מקום בו נוסח אדם לגרום מוות, בנסיבות בהן נגרמה לאדם חבלה חמורה, או מקום בו כוון המעשה לפגוע בחיי רבים, ובוודאי בנסיבות בהן התממלאו שני תנאים אלה כאחד, כמו בענייננו, יישלח העבריין אל מאחורי סורג ובריח לכל ימי חייו (וראה לדוגמה: ע׳ אירי״ש 190/03, 183, <b>התובע הצבאי נ׳ ג׳ראר,</b> שם גזר בימ״ש זה עונש מאסר עולם בגין שותפות לניסיון פיגוע התאבדות, אשר לא יצא כלל אל הפועל).

כדי ליתן ביטוי לא רק לערך חיי האדם, אלא אף לזכות לשלמות הגוף, על ביהמ״ש להבהיר כי עונש מאסר עולם המוטל בשל גרימת מוות, לא יפטור מעונש בשל פציעתם של אחרים. רק עונישה <b>נפרדת ומחמירה</b> תבהיר כי כשם שיינתן ביטוי עונשי לכל נפש אשר נגרם מותה בעבירה, כך ייעשה אף ביחס לאלה אשר דרך נס נפצעו בלבד. כך ברגיל, ובפיגועי תופת המוניים – בהם נושאים הפצועים על גופם ובנפשם את צלקות החתופת שנים ארוכות - על אחת כמה וכמה.

<u>סוף דבר</u>

המעיין בחומר הראיות שבתקי ביחמ״ש, הקורא את עדויותיהם של הפצועים הרבים ותבוחן את תמונות הזוועה של התרס והחורבן, אינו יכול שלא להתהלחל. המערער, אשר עבד כחובש ואמון על הצלת חיים, נתן ידו לפיגוע שפל, אשר כוון לפגוע באזרחים חפים מפשע, נשים, זקנים וטף.

המערער, אשר היה מודע למצוקה בה הייתה נתונה חברתו, לא רק שלא ניסה להניאה מלממש זממה, אלא תמך בה וסייע בידה בהגשמת תכניתה. מערער זה, אשר לא חס על חיי אחרים, אינו ראוי לבוא עוד בקרב חבריות, ודין הוא כי נמצה עמו את מלוא חומרת הדין.

אשר על כן, ואם תישמע דעתי, הייתי דוחה את ערעור ההגנה, מקבל את ערעור התביעה וגוזר למערער עונש של שני מאסרי עולם, אחד בגין גרימת מותו בכוונה של פנחס טוקטלי ז״ח והשני בגין הניסיון לגרום למותם של אזרחים נוספים, אשר רבים מהם נפצעו בפיגוע האמור.

P 3: 36

ע' איו"יש 2793/04+1009/05

כן יש מקום לגזור למערער עונש של 10 שנות מאסר, בגין שאר העבירות בהן הורשע, לרבות זו שבה הציע לעשות שימוש באמבולנסים של "הסהר האדום" להעברת מטעני חבלה.

עונשים אלה, כך יש להורות, ירוצו כולם במצטבר זה לזה.

<u>**השופט אל"ם מ' מטלון:**</u>

אני מסכים.

<u>**השופט אל"ם מ' תירוש:**</u>

אני מסכים.

הוחלט כאמור, בפסק דינו של הנשיא אלי"ם ש' גורדון.

ניתן והודע היום,  30 בינואר 2006, א' בשבט התשס"ו, בנוכחות המערער, ב"כ והתובי"ץ.

| (-) | (-) | (-) |
|-----|-----|-----|
| שופט | אב"ד | שופט |

8

TOTAL P.02

ע' אישיש 2793/04+1009/05

כן יש מקום לגזור למערער עונש של 10 שנות מאסר, בגין שאר העבירות בהן הורשע, לרבות זו
שבה הציע לעשות שימוש באמבולנסים של "הסחר האדום" להעברת מטעני חבלה.

עונשיכ אלה, כך יש להורות, ירוצו כולם במצטבר זה לזה.

<u>השופט אל"ם מ/ מטלון:</u>

אני מסכים ,

<u>השופט אל"ם מ/ תירוש:</u>

הוחיט כאמור, בפסק דינו של _____ .

ניתי והודע היום, _____ 2005, _____ חתשסיו, בנוכחות המערער, ב"כ והתובי"ץ.

_____         _____         _____
שופט                    אב"ד                   שופט

ר/ומת:

8

כן יש מקום לגזור למערער עונש של 10 שנות מאסר, בגין שאר העבירות בהן הורשע, לרבות זו שבה הציע לעשות שימוש באמבולנסים של "הסהר האדום" להעברת מטעני חבלה.

עונשים אלה, כך יש להורות, ירוצו כולם במצטבר זה לזה.

**השופט אל"מ מ' מטלון:**

**השופט אל"מ מ' תירוש:**

אני מסכים.

הוחלט כאמור, בפסק דינו של ________.

ניתן והודע היום, ________ 2005, ________ התשס"ו, בנוכחות המערער, ב"כ והתובע"צ.

שופט | אב"ד | שופט

מ"ר 0345059 אל"מ משה תירוש
שופט ביהמ"ש הצבאי לערעורים

רשמת: