תאריך: 28/06/05      6      תיק מס': 5398/03

<u>עד התביעה אברהים ע"א חי</u>

גם עד זה, בדומה לעד הקודם ולרוב העדים בתיק זה, אישר בעדותו את אחריותו למעשים המיוחסים לו עליהם הודה במשפטו ובאמרותיו ואף נקב בשמותיהם של שותפיו, מלבד אחד – הנאשם. התביעה מייחסת לנאשם כי פעל ביחד עם העד בשלבים הראשונים של הוצאתו לפועל של פיגוע הרצח ברחוב יפו (פרט האישום השישי, ס"ק א-ה'). העד אישר, למעשה, בעדותו, את העובדות המדוברות בחלקן הרלוונטי של פרט האישום, למעט חלקו של הנאשם, שהעד ציין כי לא נכח בעת צילומו של המתאבד.

מתברר כי דווקא בעת משפטו שלו, הודה העד באחריותו למעשה הרצח ברחוב יפו, ובכלל העובדות בהן הודה אף המעשים המיוחסים לו עם הנאשם, כולל צילומו של המתאבד. התביעה ביקשה[12] להגיש את פרוטוקול הודאתו של העד במשפטו מכוח ס' 10 א', ואילו הסנגור הותיר את הבקשה לשיקול דעתו של בית המשפט[13]. בהחלטתנו מאותו היום קיבלנו את הבקשה להגשת הפרוטוקול ולהלן נצרף נימוקינו.

הסנגור טען בסיכומיו כי הודאתו של העד במשפטו שלו, במסגרת הסדר טיעון וללא שנשמעו עדים, לא יכולה לשמש כראיה במשפט זה, אולם לא הסביר הסבר של ממש מדוע כך הדברים, אף לא צירף אסמכתאות לחיזוק טענתו. דעתנו בעניין זה שונה. אך מובן הוא כי תשובה של נאשם לכתב"א הנאמרת באולם בית המשפט ואשר נרשמת בפרוטוקול, היא משום "אמירה" של אדם בכתב העונה על תנאי ס' 10 א' (ראה י. קדמי, "<u>על הראיות</u>", חלק ראשון, עמ' 274 פסקה 4.ב.ב). ולא רק שיש בו בפרוטוקול ההודאה משום אמרת-חוץ לפי ס' 10א', אלא שעל פני המדובר באמרה מהימנה מאין כמוה אשר חזקה עליה כי נאמרה מרצון טוב וחופשי ובעלת משקל ניכר, באשר העד מוסר אותה בתשובה לאישומים המופנים אליו גופו ובעוד הוא מיוצג ע"י עו"ד. מכאן שאין כל מניעה מלקבלה לפי ס' 10א' ואף להעניק לה משקל מלא.

טענתו של העד בעדותו[14] כי כתב האישום הוקרא לו באופן כללי ובכותרות וללא שהוזכרו השמות, רחוקה מלהיות אמת, כפי שמוכיחים הפרוטוקולים ממשפטו. מעיון בפרוטוקול משפטו של העד בתיק 6446/02 מיום 19/12/02 (ת/ 68) רואים אנו כי כתב האישום הוקרא לעד (הנאשם באותו תיק) במלואו לאור העובדה כי לא היה מיוצג באותו שלב וסירב לקבל על עצמו ייצוג (ראה החלטת בית המשפט באותו דיון, עמ' 2). העד/נאשם, אף חזל למסור תגובה מפורטת, המוכיחה כי עדותו בפנינו כאילו כתב האישום לא הוקרא לו במלואו – שקרית היא בעליל. עיון בפרוטוקול הודאתו של העד בתיקו מיום 29/06/03 (ת/ 69), יגלה כי לאחר מספר חודשים נמלך העד בדעתו והודה בכתב אישום מתוקן שעה שהוא מיוצג. גם הפעם הובהרה לעד מהות כתב האישום בעניינו. העד הודה בכתב האישום במילים ברורות, הן מפי סנגורו והן מפיו. הסנגור ביקש בסיכומיו להיאחז בעובדה כי העד לא הזכיר את הנאשם במסגרת תשובתו לכתב האישום, אולם ברור כי אין בכך להעלות או להוריד. המעיין בפרוטוקול ההודאה, יגלה כי העד הודה בכתב האישום ובעבירות המיוחסות לו <u>ולצד זאת ציין</u> עובדות בולטות מתוך המיוחס לו. קריאה תמה בפרוטוקול תגלה כי הזכרת שמות שותפיו ע"י העד היא לצד הודאתו בעובדות בכתב האישום המיוחס לו, ואיננה משום "רשימה סגורה".

לצד משקלו הברור של פרוטוקול המשפט של העד, נציין כי עדותו בפנינו לא הייתה נקייה מסתירות, למשל לעניין מידת היכרותו עם הנאשם[15].

אם כן – ראינו כי במשפטו הודה אברהים ע"א חי בעובדות עבירת גרימת המוות בכוונה לעניין הפיגוע ברחוב יפו, ובכלל זה חלקו של הנאשם. פרוטוקול זה הוא משום "אמרת-חוץ" של העד, ואנו קיבלנו אותה ומצאנו לנכון להעדיפה על פני עדותו בפנינו, אשר ממנה נשמט חלקו של הנאשם.

---

[12] ראה פרוטוקול הדיון מיום 14/06/04, עמ' 3 ש' 24-26.
[13] שם, עמ' 5 ש' 36-37.
[14] ראה פרוטוקול עדותו של אברהים ע"א חי מיום 30/03/04, עמ' 7 ש' 29-38.
[15] שם, עמ' 4 ש' 35, השווה שם עמ' 7 ש' 10-11.

תאריך: 28/06/05                                    7                    תיק מס׳: 5398/03

### עד התביעה אחמד ברגותי

נקל לראות כי עד זה איננו נמנה על העדים הבאים לומר את האמת בעדותם, או לשתף פעולה עם בית המשפט שעה שהוא מבקש להתחקות אחרי האמת. מייד עם עלותו לדוכן העדים אטם העד את אוזניו וסירב לענות לשאלות התובעת. לשאלות הסנגור ענה רק לאחר שבירר כי הוא עורך דינו של הנאשם וגם שעה שהשיב אישר את שינוי שאינו במחלוקת ע״י התביעה, דהיינו כי איננו מזכיר כלל וכלל את הנאשם.

ואכן התביעה איננה חולקת כי העד אינו מזכיר כלל את הנאשם, ואף הצהירה כי לא לשם כך הביאה את העד לעדות, אלא על מנת להוכיח את חלקו השני של פרט האישום השישי, חלק אשר אפילו אליבא דכתב האישום הנאשם לא נטל בו חלק. שאלה נכבדה היא לשם מה כלל צריכים אנו להידרש לשאלת עדותו של העד אשר אין מחלוקת כי כלל אינו מפליל את הנאשם, אולם לאור תשובתו של הסנגור כי אפילו עצם קרות האירוע איננו מוסכם!![16], דומה כי אין מנוס מכך.

לא התלבטנו רבות בבואנו להכריע בשאלת העדפת פרוטוקול ההודאה ממשפטו של העד כנאשם על פני עדותו (?) בפנינו, אשר ספק רב האמנם ״עדות״ ייקרא לה, ומכל מקום אין היא משכנעת. לעומת עדותו השרירותית והמגוחכת של העד בפנינו, עומד פרוטוקול הודאתו של העד במשפטו שלו, בעוד הוא מיוצג ע״י עו״ד. מן הטעמים האמורים מעלה לעניין אברהים ע״א חי, מצאנו לנכון להעדיף את פרוטוקול המשפט על פני העדות.

### עד התביעה ריאד עודה

גם עד זה, בדומה לפהד שראיעה, תלה את קולר הפללתו הנחרצת את הנאשם, באמצעים פסולים שהופעלו כנגדו במשפטו, אולם גם הוא לא העלה - משום מה - טענות אלו במשפטו שלו[17]. מאותן נימוקים הנזכרים מעלה, המצטרפים לעדותו המגמתית והמתחמקת של העד (התחמק מלהשיב לשאלה האם הוא מכיר את הנאשם, ואף לא ידע למי הכוונה, למרות שנכח רק נאשם אחד בתא הנאשמים), מצאנו לנכון להעדיף על פני עדותו את אמרתו של העד, אשר סימני האמת ניכרים בה בעליל, ובכלל זה העובדה כי כתב אותה בכתב ידו, כי הוזהר כחוק טרם גבייתה והוא חתום בתחתית כל דף בה.

### עד התביעה אברהים חבישה

עד זה, בעלותו על הדוכן, חזר על הקו של חבריו וגם הוא אישר את הכתוב באמרתו ואת המעשים הרשומים שם, למעט נקודה הנוגעת לנסיבות היכרותו עם הנאשם. לטענת העד, החוקר אילץ אותו לכתוב כי נפצע מידיו של מאג׳ד מצרי (אותו, לטענתו, אינו מכיר כלל) שעה שהיו בדרכם לבצע פיגוע הנחת מטען.

בבקשו להרחיק את הנאשם בכל מחיר מן הפללה המפורשת אותה הפליל, ואגב כך להטיל רפש בחוקרו, נשתכחה מאברהים חבישה העובדה הפשוטה כי באמרתו כלל אין מוזכר הנאשם בהקשר של פיגוע מתוכנן, אלא דווקא נראה כי הפציעה היתה במסגרת ״תאונת אימונים״, כאשר הנאשם החל לשחק במטול רימונים שבידיו, תוך כדי פגישת היכרות של חוליות שונות בארגון. כלומר, לטענת העד כי החוקר ביקש לאלצו להודות כי נפצע תוך כדי הכנות לפיגוע עם הנאשם, אין שחר - אפילו לא מתוך האמרה הכתובה.

ממילא גרסתו של העד אינה משכנעת כלל. העד לא ידע ליתן הסבר של ממש כיצד נפצע. הוא אף לא טרח למסור הסבר של ממש כיצד אילץ אותו החוקר להפליל את הנאשם הפללת שווא ומדוע רק חלק זה באמרתו כוזב ואילו כל השאר נכון.

אל מול כזביו של העד, עומדת אמרתו, אותה כתב בכתב ידו, לאחר אזהרה כחוק ועליה הוא חתום. התנאים לקיום סי׳ 10 א׳ מתקיימים, שכן העד מזהה את אמרתו וסותר את תוכנה. לאור העובדה כי עדותו לא עוררה בנו רושם של מהימנות ודווקא אמרתו נושאת עליה את סימני האמת, מצאנו לנכון להעדיפה על פני העדות.

---
[16] ראה פרוטוקול הדיון מיום 30/03/04, עמ׳ 8 שו׳ 31-37.
[17] ראה פרוטוקול עדותו של ריאד עודה מיום 30/03/04, עמ׳ 10 שו׳ 15-17.

### פרשת ההגנה

עדות הנאשם בפרשת ההגנה היתה קצרה, רוויית סתירות ובלתי משכנעת. ראשית יש לציין כי למרות הררי חומר הראיות מטעם התביעה, אשר נסקר בהרחבה לעיל, בחר הנאשם כמעט ולא להתייחס ישירות לראיות אלו ועדותו בחקירה הראשית היתה קצרה ולאקונית.

אלא שאפילו מתוך עדותו של הנאשם, עולות הסתירות. טענת הנאשם בחקירה הראשית היתה כי ישנם אנשים רבים באזור שכם בשם מאג'יד מצרי, כי המדובר במשפחה הגדולה ביותר באזור והוא עצמו מכיר אדם בשם זהה לשלו העובד אף הוא ברשות הפלסטינית. לחיזוק טענתו זו ציין הנאשם כי אפילו שניים מן המפלילים אותו, מנצור שריר ומוחמד נאיפה, שעה שהובאו בפניו לעימות במהלך החקירה, ציינו מייד כי הנאשם איננו מאג'יד מצרי, אליו התכוונו בהפללתם. עם זאת בחקירה הנגדית שינה הנאשם מטעמו "יוליתר בטחון" הוסיף גם את הגרסה כי השניים הפלילו אותו בשל סכסוך קודם, וזאת לאור העובדה כי במסגרת תפקידו עצר את השניים בהיותם גנבי רכבים.

ברור כי שתי הגרסאות אינן יכולות לדור בכפיפה אחת. ואם אכן מוחמד נאיפה ציין מייד בפני חוקרי השב"כ כי הנאשם איננו מאג'יד מצרי נשוא הפללותיו, מדוע הנאשם איננו מדבר איתו, בבחינת "עם מי שעושה לי דבר כזה, אין לי מה לדבר"[18]?

סתירות אלו מצטרפות למגמתו הכללית של הנאשם להרחיק עצמו, ובכל מחיר, מקשר כלשהו לפעילות בטחונית, גם בדברים שהודה בהם באמרתו, ואין כל ספק שאין בהם לקשרו ולו במאום לפרטי האישום החמורים המיוחסים לו. כך מכחיש הנאשם בעדותו גם ירי כללי לעבר כוחות בטחון, בו הודה באמרתו, העברות כספים בהם היה מעורב ועוד נושאים, המפורטים בהרחבה בעמודים 26-27 לסיכומי התביעה. הנאשם, בניסיונו למלט עצמו, אף הצניע את קשריו עם נאצר עויס, על אף העובדה כי השניים התארעו בראשית שנות התשעים בירדן ובבגדד, כעולה מאמרותיו.

לשקריו של הנאשם אודות קיומו של אדם אחר העונה לשמו המרובע, ראה להלן בפרק העסק בזיהוי הנאשם.

סוף דבר, לא מצאנו כי עדותו של הנאשם בפנינו יש בה לעורר רושם של מהימנות. הנאשם נכשל - ואף לא טרח - בעדותו מלהפריך את שלל ראיות התביעה והסתפק בהכחשה גורפת ולאקונית, גם במעשים המצומצמים בהם הודה באמרותיו. תוך כדי כך הסתבך הנאשם בגרסאות סותרות ושקרים של ממש, אשר אף בהם אין להחמיא למשקל עדותו.

### סיכום ביניים:

הנה כי כן, מצאנו כי יש מקום להעדיף את ראיות התביעה על פני עדות הנאשם בפרשת ההגנה, את אמרות עדי התביעה על פני עדויותיהם המגמתיות והשקריות - הכל מן הנימוקים האמורים מעלה בהרחבה. ראיות אלו משתלבות זו בזו ומציגות גרסה סדורה וקוהרנטית ממנה עולה דמותו של הנאשם כרב-מחבלים העוסק, ביחד עם שותפים נוספים, בשילוח מחבלים מתאבדים. כעת נבחן האם אחריותו של הנאשם למיוחס לו, עולה מתוך ראיות.

### זיהויו של הנאשם:

דומה כי השאלה המרכזית בתיק זה נוגעת לעניין זיהויו של הנאשם אשר בפנינו, כדמות המופיעה בהפללות הרבות של עדי התביעה כרב-המעוללים לו מיוחסים המעשים המתוארים בכתב האישום. עדי התביעה השונים מתארים אדם בשם מאג'יד מצרי, מוסרים פרטים אישיים שונים שלו ואף נוקבים בכינוי בו הוא מוכר, "בזבז". לטענת הנאשם אין כך הדבר, אין לו כינוי כלשהו, ובוודאי לא "בזבז". עוד טען הנאשם כי משפחת מצרי היא משפחה גדולה באזור שכם, ומן הסתם יש בה אנשים נוספים העונים לשם מאג'יד. לטענת הנאשם, ישנו אדם נוסף בשם מאג'יד מצרי אשר אף הוא עובד ברשות הפלסטינית. האם הנאשם שבפנינו הוא אותו "בזבז"?

---

[18] ראה פרוטוקול עדות הנאשם בפרשת ההגנה מיום 14/06/04, עמ' 9, ש' 48-52.

תאריך: 28/06/05                         9                 תיק מס׳ 5398/03

**ראשית**, יש לציין כי הנאשם עונה בעצמו על שאלה זו באמרתו[19], בה הוא מאשר את כינויי מילדות "בזבז". כאן המקום לציין כי אין המדובר בכינויי שגור או נפוץ (כגון כינויי של אדם על שם בנו בכורו, למשל "אבו מוחמד", כינויי אשר כמוהו ימצאו לאלפים). ייחודו של הכינוי, בצירוף שאר הפרטים האישיים של הנאשם, מצביע על החפיפה בינו לבין הנאשם.

אלא שהרשעתו של הנאשם בעבירות החמורות המיוחסות לו, אינה נשענת על כינויי בלבד, אלא גם על זיהויו באופן פרסונאלי ע״י עדי התביעה, איתם עמד בקשרים טובים. באשר לטענות כי עדי התביעה "התבלבלו" או כיוונו לאדם אחר, הרי שבחינה מעמיקה של חומר הראיות תגלה כי אין בכך ממש. הנאשם מאשר באמרותיו את היכרותו עם שאר "גיבוריי" האירועים, עדי התביעה המפלילים אותו, ואף מודה בביצוע עבירות בטחוניות עמם. כך מודה[20] הנאשם בהיכרותו עם נאצר עוויס ובביצועם ירי עמו לעבר עמדת צה״ל וכן ביצוע ניסיון ירי. ביחד עם נאצר עוויס אף גורש הנאשם בשנת 1992 מהאזור וביחד נסעו לבגדד[21]. הסברה כי נאצר עוויס אינו מכיר את הנאשם וכיוון בדבריו למאג׳ד מצרי אחר, מופרכת ממש בנסיבות אלו. עוד מאשר הנאשם באמרותיו כי מסר כספים למנצור שרים ומוחמד נאיפה והוא אף מאשר את היכרותו האישית עמם. הוא אף מאשר העברת רובה קלצ׳ניקוב לידיו של מוחמד נאיפה (על פי גרסת הנאשם, בשל סכסוך פנימי)[22].

אם כן, ההיכרות של הנאשם עם עדי התביעה עולה במפורש מאמרותיו של עצמו. אלא שגם עדי התביעה לא טומנים ידם בצלחת ומרחיבים בעניין היכרותם עם הנאשם. מנצור שרים זיהה את הנאשם בשמו המלא בעדותו בפנינו וציין כי הנאשם הוא חברו[23]. פחד שראייעה מוסר באמרתו[24] תיאור מדויק של הנאשם, כולל מקום עבודתו כקצין במשטרה הפלסטינית, גילו, מצבו המשפחתי והיותו אב לשתי בנות (פרטים אותם מאשר הנאשם עצמו באמרתו) ומוסיף כי כינויו של הנאשם הוא "בזבז". עד התביעה ריאד עודה, אשר אפילו בעדותו[25] המגמתית אישר את היכרותו האישית עם הנאשם לאור שירותם המשותף במשטרה הפלסטינית, מציין גם הוא באמרתו[26], שנתקבלה והועדפה על פני עדותו, את כינויו של הנאשם ואת העובדה כי הוא חבר בארגון "גדודי אל אקצה". אין לחשוד בעד התביעה אברהים חבישה כי ישכח את הנאשם, לאחר שזה גרם לפציעתו הקשה שעה ששיחק במטול רימונים שהתחזק. גם הוא מזכיר[27] את הנאשם בשמו ובכינויו ומציין את חברותו בארגון הטרור. **עד התביעה מוחמד נאיפה מוסר[28] את מספר הטלפון הסלולארי של "בזבז", 059-200596, הדומה באופן מפתיע למספר שמוסר הנאשם עצמו באמרתו[29], -059 200569.**

טוען הסנגור כי נפלו בחקירה פגמים של ממש בכך שלא נערך לעדים מסדר זיהוי. הסנגור לא הביא אסמכתאות להוכחת טענתו, ואנו לא מצאנו בה כל ממש. ניכר מכל האמור למעלה בהרחבה כי העדים מכירים את הנאשם היטב, מוסרים פרטים מזהים רבים שלו, חלקם אף הצביעו עליו באולם בית המשפט (גם אם חזרו בהם מהפללתם או תירצו אותה בהסברים שונים ומשונים). אם כן – בפנינו מצב של "הצבעה" של העדים על הנאשם, כעל מי שהם מכירים אותו היכרות מוקדמת ולא זיהויו של אדם לא מוכר באמצעים חזותיים שונים (מסדר זיהוי), ואין כל חובה קיום מסדר זיהוי בנסיבות אלו. ראה גם י. **קדמי**, על הראיות (מהדורת 1999), חלק שני, עמ׳ 851-852.

כאן המקום אף להידרש לשאלה הסטטיסטית, האמנם יתכן כי המדובר במאג׳ד מצרי אחר? הנאשם ביקש להגיש, לצורך כך, רישום של משרד הפנים הפלסטיני באשר לשכיחות השם מאג׳ד מצרי. את המסמך ביקשה ההגנה להגיש על סמך עדותו של הנאשם..

---

[19] ת/1, עמ׳ 8 ש׳ 22-25.
[20] ראה ת/1, עמ׳ 2 ש׳ 5-12.
[21] ראה ת/2, עמ׳ 5, ש׳ 13-24.
[22] ראה ת/1, עמ׳ 3 ש׳ 26 ועד עמ׳ 5 ש׳ 21.
[23] ראה פרוטוקול עדותו של מנצור שרים מיום 30/11/03, עמ׳ 1 ש׳ 35-50.
[24] ראה ת/70, עמ׳ 1, ש׳ 19-22.
[25] ראה פרוטוקול עדותו של ריאד עודה מיום 30/03/04, עמ׳ 9, ש׳ 18-22, עמ׳ 10, ש׳ 34-39.
[26] ראה ת/3, עמ׳ 5, ש׳ 4-8.
[27] ראה ת/61, עמ׳ 2 ש׳ 17 ועד עמ׳ 3 ש׳ 2.
[28] ראה ת/60, עמ׳ 5 ש׳ 12.
[29] ראה ת/1, עמ׳ 2 ש׳ 25.

P 6: 24

תאריך: 28/06/05          10          תיק מס': 5398/03

1  [ גם נסיבות בקשת ההגשה היו, לכל הפחות, מוזרות. הגשת המסמך כלל לא נתבקשה בחקירה
2  הראשית, אלא צצה לפתע בחקירה החוזרת. הנאשם התיימר לאשר את הרשימה שהציג הסנגור,
3  בלא כל הסבר מדוע רשימה זו אותנטית או מה היו דרכי הפקתה..].
4
5  התביעה התנגדה להגשת המסמך, ואנו קיבלנו[30] את עמדתה כי לא ניתן לקבל את המסמך שלא
6  באמצעות עורכו. עם זאת, ועל מנת להפיס את הדעת הצענו - והצדדים קיבלו את הצעתנו - כי
7  התביעה תגיש מסמך מוסכם שיופק ע"י משרד הפנים במנהל האזרחי.
8
9  מעיון בשאילתא עולה כי מספר אנשים באזור שכם עונים לשם מאג'ד מצרי, אולם כולם מבוגרים
10 במיוחד או צעירים במיוחד ולא עונים על תיאורו של מאג'ד מצרי הנזכר בעדויות התביעה, כאדם
11 כבן 30 - כולם למעט אדם אחד, הוא הנאשם שבפנינו.. באשר לטענת הנאשם[31] כי פעם נוכח לדעת
12 שישנו אדם נוסף בשם מאג'ד אסמעיל מוחמד אלמצרי, אשר לקח הלוואה בבנק על שמו - עיון
13 בשאילתא יגלה עד כמה הטענה שקרית, שכן הנאשם הוא האדם היחיד העונה לשם מרובע זה, לא
14 רק בחתך הגילאים הרלוונטי ולא רק באזור נפת שכם אלא בכל הגדה ואף רצועת עזה!!
15
16
17 אם כן, אנו קובעים כי הנאשם שבפנינו הוא אותו מאג'ד מצרי, המכונה "בזבז" המופיע לרוב
18 בראיות התביעה. כעת שומה עלינו לבחון האמנם יש באותן ראיות כדי להביא להרשעת הנאשם
19 במיוחס לו.
20
21
22                            פרטי האישום המיוחסים לנאשם
23
24 הוכחת פרטי האישום מתבססת על ראיות התביעה, כמפורט להלן. ההגנה לא נדרשה לעניין הוכחת
25 עובדות האישום מתוך חומר הראיות (אלא הסתפקה בהכחשתם).
26
27                            פרט אישום ראשון
28
29 פרט אישום זה מייחס לנאשם חברות בארגון הטרור הנודע "גדודי אל-אקצה". הנאשם מופלל
30 בפרט זה ע"י שלושה מעדי התביעה, פהד שריעה, אברהים חבישי וריאד עודה. עדויות אלו
31 משתלבות זו בזו, מחזקות זו את זו ועונות על דרישת התוספת הראייתית.
32
33                            פרט אישום שני
34
35 אישום זה מייחס לנאשם נשיאת משרה בארגון האסור, דהיינו כי עמד בראש "גדודי אל-אקצה"
36 באזור שכם בשנת 02', פיקד על הפעולות הצבאיות שביצע הארגון באותה שנת-דמים, תיאם את
37 פעילות הפעילים הצבאיים, סיפק להם נשק ומימון אותו קיבל מידי מרואן ברגותי ואחרים וכן
38 נהג ליטול אחריות על מעשי הארגון בכלי התקשורת.
39
40 בניגוד להכחשותיו הנמרצות של הנאשם, נראה כי שפע העשייה שפעל הנאשם ומעמדו בארגון,
41 נחקקו בזכרונם של פעילים רבים, אשר זכרו לו את פיקודו עליהם, את הכספים שהעתיר עליהם
42 והנשקים שסיפק להם. שורה ארוכה של עדי תביעה מפלילים את הנאשם במיוחד לו בפרט אישום
43 זה, כמפורט בהרחבה בסיכומי התביעה. כך, למשל, מנצור שריס מתאר את מעמדו של הנאשם
44 בארגון, את הכספים הרבים שקיבל מידיו במספר הזדמנויות לצורך ביצוע פיגועים וכן כי הנאשם
45 נטל אחריות על פיגועים מטעם הארגון. כך, נאצר עוויס המתאר את הנאשם כאיש הכספים אשר
46 היה ממממן אותו ואף קיבל מידיו סכום של 12,000 ש"ח. כך, מוחמד נאיפה המתאר את הנאשם
47 כמפקד "גדודי אל-אקצה" בשכם, כמי שאישר לו לבצע פיגועים וכן נטל עליהם אחריות בשם
48 הארגון (העד שלח לו לצורך כך את צילום צוואתו של סירחאן סירחאן, הרוצח בפיגוע קיבוץ מצר)
49 וכן כמי שימון ביצוע פיגועים וסיפקו לשם כך כלי נשק. כך גם פהד שריעה המתאר ארוכות את
50 מעמדו של הנאשם כמי שחילק לו הוראות, כמי שנהג לארגן תהלוכות מטעם הארגון ולצורך כך
51 הורה לו להפיץ תמונות שהידים וליריות בתהלוכות וכן כמי שהעביר כלי נשק מפעיל אחד למשנהו
52 בשורה הזדמנויות. שורת עדויות אלו מחזקות זו את זו ועונות למכביר על דרישת התוספת
53 הראייתית, אולם גם מקומה של אמרת הנאשם לא נפקד לעניין זה. הנאשם אמנם, כדרכו, מנסה
54 להתרחק מחברותו בארגון ומהתפקיד שנשא בו, אולם גם הוא מוסר באמרתו פרטים המאמתים
55 את אשר מפלילים אותו חבריו, ובכלל זה כי העביר כספים לאנשים המפלילים אותו בכך (נאצר

---
[30] ראה פרוטוקול מיום 14/06/04, עמ' 11-12.
[31] שם, עמ' 11, ש' 16-20.

P 6: 25

תאריך: 28/06/05                                       11                    תיק מס': 5398/03

1  עוויס, מוחמד נאיפה, מנצור שריים), כי קיבל כספים מידי מרואן ברגותי, מוניר מקדח (המוזכר גם
2  ע"י נאצר עוויס) ואחרים, כי סיפק נשק לידיו של נאיפה, כי יצר קשר עם תחנות טלוויזיה ערביות,
3  כי סייע להקים אתר אינטרנט עבור הארגון ועוד.
4
5  העובדות המפורטות בהרחבה בפרט אישום זה לעניין תפקידו של הנאשם, מקומו בהיראריכת
6  הארגון בזמן הנתון והפעולות השונות אשר נקט במסגרת תפקידו, ישובו ויידונו שעה שנבקש
7  להצביע על אחריותו של הנאשם לעבירות שבוצעו מטעם הארגון.
8
9
10 **פרט אישום שלישי**
11
12 פרט זה מייחס לנאשם עבירה של ירי של עבר אדם, וזאת בכך שבמספר הזדמנויות ביצע ירי ביחד
13 עם חבריו לארגון לעבר חיילי צה"ל. עד התביעה נאצר עוויס מפליל אותו בביצוע מעשי ירי ביחד
14 עמו. גם הנאשם מציין באמרתו מעשה ירי שביצע ביחד עם נאצר עוויס, כך שבפנינו תשתית
15 ראייתית מלאה להרשעת הנאשם בפרט אישום זה.
16
17 **פרט אישום רביעי**
18
19 התביעה חזרה בה מאישום זה, ופטורים אנו מלדון בו.
20
21 **פרט אישום חמישי**
22
23 אישום זה מייחס לנאשם עבירת ניסיון לירי, כך שביחד עם נאצר עוויס יצא לירות לעבר חיילי
24 צה"ל, אולם בסופו של דבר נמלכו בדעתם לאחר שנחשפו ע"י כוחות הצבא. גם הנאשם וגם נאצר
25 עוויס מתארים את האירוע באופן דומה באמרותיהם ומצאנו לנכון להרשיע את הנאשם בגין
26 עבירה זו.
27
28
29
30 **אחריות הנאשם למעשי הרצח מכוח תפקידו**
31
32 פרטי האישום החמורים 6-18 מייחסים לנאשם אחריות למותם של 10 בני אדם בפיגועי
33 ההתאבדות ברחוב יפו בירושלים, בישוב חרמש ובקיבוץ מצר, וכן את פציעתם וניסיון רציחתם
34 של נוספים באותם אירועים. כל מעשי הרציחות הללו בוצעו ע"י מחבלים מתאבדים אשר נשלחו
35 מטעם ארגון "גדודי אל-אקצה" וע"י הנאשם ושותפיו.
36
37 מטבע הדברים, אין אפשרות להעמיד לדין את המחבל המתאבד אשר מוסר את נפשו על מזבח
38 האידאולוגיה הבזויה. אין זאת אומרת כי אלו העומדים מאחוריו, ואשר עשוהו ככלי שרת בידם
39 למילוי מטרותיהם הבזויות, צריכים לחמוק מן העונש. דיני העונשין הכירו גם באפשרות להטיל
40 אחריות, ואף אחריות מלאה, על מי שמכוח תפקידו או מעמדו (וייהיה זה גם מעמד בלתי רשמי -
41 ראה עניין "משולם" הנזכר להלן) הניע אחרים לביצוע עבירות.
42
43 **אחריות ראשי הארגון הטרוריסטי למעשי חברי הארגון - הפן הנורמטיבי**
44
45 כידוע, מקובלת בתורת המשפט הצבאי דוקטרינת ה"אחריות הפיקודית", לפיה אחראי בעל דרג
46 פיקודי בכיר למעשי פקודיו אשר נעשו על פי הוראתו ואישורו, גם אם בפועל נטל הוא חלק מעשי
47 קטן או אף שולי במעשים עצמם. דומה כי כל בני שעיניים לו בראשו, לא יוכל לחמוק מן המסקנה
48 החותכת כי אחריות מקבילה, להבדיל אלפי הבדלות, יש להטיל גם על ראשי ארגוני פשע וטרור
49 המכוונים את פעילותם הנפשעת והמורים על ביצועם של מעשי רצח ב"שלט רחוק".
50
51 יפים לעניין זה דברי כב' השופט קדמי בע"פ 5589/98 **ביסאן סולטאן נ. מדינת ישראל**, תק-על
52 99(3) 98. באותו עניין הורשע המערער בעבירת רצח בכוונת תחילה, כאשר הוכח שנתן את הסכמתו
53 ואישורו לביצוע הרצח, ושלח את המבצע העיקרי להוציא לפועל את הרצח, ואף הנחה אותו לגבי
54 שיטת הביצוע. השופט קדמי הדגיש שלולא הסכמתו של המערער לא היה הרצח מתבצע, ולכן מתן
55 האישור לבצע את הרצח היה משול "לירית ההזנקה המשלחת ספורטאי למרוץ", והיא עולה כדי
56 "מעשה" של השתתפות בביצוע העבירה". לכן הורשע המערער כמבצע בצוותא ולא כמשדל, ובית
57 המשפט הדגיש כי הוא היה מצוי "במעגל הפנימי של הביצוע", כמי שהיה לו תפקיד בביצוע, והיה
58 "המוח של החבורה", בעוד שמשדל מצוי מחוץ למעגל הפנימי של הביצוע. כב' השופט קדמי הוסיף

תאריך: 28/06/05     12     תיק מס': 5398/03

1. ואמר כי בנסיבות המתוארות לעיל, כאשר המערער נתן "אור ירוק לרצח" וההנחיות אופרטיביות
2. בדבר דרך הביצוע, היה בהתנהגותו לפחות "מנה גדושה של שידול על דרך העידוד".
3.
4. בדנ"פ 1294/96 **עוזי משולם ואח' נ' מדינת ישראל**, פ"ד נב(5) 1, פסק כב' השופט א. מצא כי: "יש
5. לראות במשתתף כזה — שבידו שליטה מלאה על הביצוע ושעשייתו כוללת לא רק פעולות שידול
6. והכנה, אלא גם הנחיית העבריינים הפועלים ופיקוח על פעילותם - מבצע בצוותא לכל דבר".
7. הוא הדגיש כי נוכחות בזירת העבירה איננה יסוד חיוני להיותו של אדם מבצע בצוותא, ואמר:
8.
9. "במציאות המשפטית החדשה, התנייית האחריות הישירה בנוכחות, פרושה ש'סנדיקים'
10. ומנהיגי קבוצות עבריינים, המשלחים לזירת הביצוע את 'דגי הרקק' הסרים למרותם,
11. בעוד הם מנהיגים את הפעילות הפלילית מרחוק, יראו לא כמבצעים בצוותא אלא רק
12. כמשדלים. ואפשרות זו, שבוודאי אינה משקפת את הדין הרצוי, איננה מתחייבת אף מן
13. הדין המצוי".
14.
15. אותו פסק דין ניתן לאחר ניתוח מעמיק של דמותו של הרב עוזי משולם ומסקנת השופטים באשר
16. למרות שהטיל על חסידיו.
17.
18. עקרונות אלו באו לידי ביטוי לא רק לעניין ארגוני פשע, אלא גם לעניין נושאי משרה בכירה בארגוני
19. טרור, בפסק דינו המאלף של בית המשפט המחוזי תל אביב, תפ"ח 1158/02 **מ"י נ' מרואן ברגותי**.
20. ראה גם עקרונות דומים המצוטטים בפס"ד ברגותי הנ"ל, המובאים במאמריהם של מ. קרמניצר
21. "**המבצע בדיני העונשין קווים לדמותו**", פלילים-א' (תש"ן-1990) 65, בעמ' 72, ומ. גור-אריה,
22. "**צדדים לעבירה - תיקון 39 לחוק העונשין במבחן הפסיקה**", מגמות בפלילים, עמ' 83.
23.
24. מן הפרט אל הכלל
25.
26. אין לך משימה קלה מאשר הוכחת מעמדו הבכיר של הנאשם בארגון גדודי אל-אקצה בשכם
27. וסביבותיה ושליטתו המוחלטת בפעילות הצבאית של הארגון בזמן ששימש כראש הארגון בעיר.
28. ראינו כי הנאשם פעל כמפקד "גדודי אל-אקצה" באזור שכם בשנת 02', ולמרותו סרו פעילי
29. הארגון באופן ישיר. הנאשם היה מעורב בחלוקת הכספים לפעילי הארגון - כספים אשר הזינו את
30. גלגלי הטרור. הנאשם תיאם על פעילות חברי הארגון באזור ועמד בקשר עם מפקד ארגון התנזים,
31. מרואן ברגותי. הנאשם סיפק כלי נשק לפעילים לביצוע משימותיהם ואף היה מעורב בצדדים
32. נוספים בפעילות הארגון כגון ארגון תהלוכות והקמת אתר אינטרנט ועוד כהנה וכהנה מרעין
33. בישין.
34.
35. עובדות פרטי האישום הבאים יגוללו כיצד היה הנאשם מעורב בהכנות המקדימות לביצוע פיגועי
36. התאבדות, כיצד פנה פעיל צבאי אליו על מנת לקבל את אישורו לרצח חפים מפשע. נראה בעליל כי
37. ראה עצמו כפוסק בעניני חיים ומוות באזור שכם. ביוזמתו, באישורו ובברכתו של הנאשם יצאו
38. לדרכם פיגועי ההתאבדות המתוארים להלן, ובדין נושא הוא באחריות אליהם.
39.
40. נסיים פרק זה ולו באזכור העובדה הסמלית כי במסגרת תפקידו הנאשם הוא זה שמיהר ליטול
41. אחריות בשם הארגון על פיגועי ההתאבדות שביצע הארגון. אמנם, בבואו לתת את הדין על
42. מעשיו, נתקף הנאשם בביישנות מעשה ולא חזר על כך, אולם דומה כי הדברים מדברים בעד
43. עצמם ומצביעים מדוע אין מקום ליתן לנאשם לחמוק מהאחריות לה הוא נושא במסגרת תפקידו
44. למעשי הרצח שביצע הארגון בראשו עמד ואשר מיהר להתגאות בהם.
45.
46.
47. אלא שאחריותו של הנאשם למעשי הרצח לא מתמצה במישור "**המיניסטריאלי**" בלבד. שכן
48. הנאשם גם שלח ידו בביצוע מעשים של ממש במסגרת הוצאתם לפועל של פיגועי ההתאבדות
49. הנדונים, מעשים המביאים אותו אל מסגרת "**המעגל הפנימי**" של מבצעי העבירה, הנשאים
50. באחריות כמבצעים ישירים. נדון כעת בחלקו של הנאשם במסגרת הוצאתם לפועל של כל אחד
51. מהפיגועים.
52.
53. השתלשלות האירועים הכללית
54.
55. כפירתו של הנאשם באישומים כנגדו היתה כללית וגורפת. הנאשם לא הציג בפנינו כל זירת
56. מחלוקת מתוחמת, אפילו ביחס לחלקים מתוך פרטי האישום אשר כלל אינם נוגעים לו. ההגנה
57. עמדה על הוכחת כל פסיק ותג בהם, גם ביחס לאירועים שבוצעו לאחר שיצא הנאשם מן התמונה

תאריך: 28/06/05                    13                  תיק מס׳: 5398/03

(ראה הפרק הדן בעדותו של אחמד ברגותי הנזכר מעלה) ולא ידעה למסור עמדה אפילו באשר
לעצם קרות הפיגועים.

נוהגה זה של ההגנה להתמיד בהכחשה הגורפת, גם באשר לעצם מותם של הקורבנות, יש להצטער
עליו, בפרט שהחומר הטכני המבסס עובדות אלו הוגש בהסכמה. לצערנו, לא התגנב ללבנו
החשש שמא עומד הנאשם ליתן את הדין בגין מעשי רצח שלא בוצעו. הראיות הטכניות הרבות
שהוגשו בהסכמת ההגנה, מבססות את עובדות האירועים המתוארים והתמונות הקשות של
קורבנות מעשי הרצח, בהם פעוטות רכים בשנים, לא מותירות מקום לספק בעניין זה.

למעשה, אין מחלוקת של ממש גם ביחס להשתלשלות העניינים הנוגעת לשלבי הוצאתם לפועל של
הפיגועים. אם נעמיק ראות, מעבר לענני האבק שביקשו עדי התביעה להערים בהתחמקויותיהם
השונות, נראה כי למעשה הללו (מוחמד נאיפה, מנצור שרים, נאצר עוויס, אברהים ע״א חי) אינם
מכחישים את תהליכי ההוצאה לפועל של מעשי הרצח, ומתמקדים בעיקר ב (בהכחשת) חלקו של
הנאשם. מכל מקום, קריאה באמרותיהם, מעלה באופן נרחב ומפורט את השתלשלות אירועים זו
(ובכלל זה ההכנות, חימוש המתאבדים, צילומם, הסעתם לעבר זירת הרצח וכו׳).

אם כן, מצאנו השתלשלות האירועים הכללית, הוכחה כדבעי מתוך הראיות שהובאו בפנינו, וספק
האם היא שנויה במחלוקת אמיתית, וכעת נמקד מבטנו לעבר חלקו של הנאשם.

### פרטי האישום 6-8, הפיגוע ברחוב יפו

פרטי אישום אלו מייחסים לנאשם אחריות לרציחתן של אורה סנדלר ושרה המבורגר ז״ל וניסיון
גרימת מותם של 45 אזרחים שנפצעו באירוע. האירוע הוצא לפועל מטעמו ובשמו של ארגון ״גדודי
אל-אקצה״. מיוחס לנאשם כי הוא קיבל לידיו את המחבל המתאבד בדירה במחנה בלאטה וביחד
עם מחמוד טיטי צילם אותו כשהוא מחזיק ברובה וספר קוראן. לאחר מכן שילח הנאשם את
המתאבד, סעיד, לדרכו האחרונה. לאחר הדברים האלה יצא סעיד לכיוון רמאללה שם נשלח ע״י
אחמד ברגותי לירושלים, מקום בו פתח ביריות לכל עבר, עד אשר הוכרע, אולם לא טרם שגרם
לרצח שתי נשים ופציעת עשרות רבות.

על חלקו של הנאשם מספר עד התביעה אברהים ע״א חי, כאמור בפרוטוקול הודעתו במשפטו
(ת/ 69, ס״ק 6 לפרט האישום השישי בכתב האישום) ועל עדותו מתבסס החלק באישום הנוגע
לנאשם. על הרקע לאירוע, למדים אנו מאמרותיהם של ע״א חי ושל נאצר עוויס. אמרותיהם של
עדי התביעה 16,17, מוחמד מצלח ומוחמד עבדאללה הוגשו בהסכמה[32] ורואים בתוכנן כמוסכם
(עד״י אי/״ש 114/01, אבו הלאל). מאמרות אלו, בצירוף פרוטוקול הודאתו של אחמד ברגותי,
למדים אנו על אתריתו של אותו סעיד לאחר שנשלח וצולם ע״י הנאשם. מן החומר הטכני למדנו
על התוצאות הקטלניות של האירוע. אך מובן הוא כי שלל הראיות משתלבות זו בזו ומהוות הרבה
מעבר לחיזוק המוגבר הנדרש לעדותו של ע״א חי.

דומה כי בימים אלו אין אדם נדרש לדמיון רב באשר למשמעותו של אקט צילום מתאבד, כשהוא
מקריא את צוואתו טרם צאתו לדרכו האחרונה, ומעשהו של הנאשם בהקשר זה מדבר בעד עצמו.
אקט זה, בצירוף מעמדו של הנאשם הנזכר מעלה, מבססים את היותו חלק מן ״המעגל הפנימי״
של משלחי המתאבד ואת אחריותו המלאה לפיגוע ולתוצאותיו הרצחניות.

מטעמים אלו מרשיעים אנו את הנאשם באחריות לפיגוע ההתאבדות ברחוב יפו בירושלים,
לפציעת האזרחים והניסיון לרצוח נוספים.

### פרטי האישום 9-12, הפיגוע ביישוב חרמש

פיגוע זה הוצא לפועל ע״י מוחמד נאיפה, בסיועם של אכרם אבו-בכר, אוסאמה אשכר ואמגיד
יחיא. מיוחס לנאשם (ס״ק א׳+ט׳ לפרט האישום) כי הוא זה שנתן אישור מפורש למוחמד נאיפה
לבצע את הפיגוע, ולאחריו אף נטל אחריות עליו בשם הארגון וכן העביר לידיו של נאיפה סכום של
$3,000. באירוע נרצחו לינוי סרוסי, הדס תורג׳מן ואורנה אשל זכרן לברכה וכן נפצע יובל אשל.

---
[32] ראה פרוטוקול הדיון מיום 14/06/04, עמ׳ 1 ש׳ 21-22.

תאריך: 28/06/05    14    תיק מס': 5398/03

1
2   חלקו של הנאשם עולה מתוך אמרותיו של נאיפה אותן מצאנו, כזכור, לקבל. נאיפה מתאר כיצד
3   לאחר שסיפר לו אכרם אבו-בכר כי ברשותו מתאבד המוכן לבצע פיגוע, יצר קשר עם הנאשם
4   שאישר לו לבצע את מעשה הרצח (או בלשונו של הנאשם, "למה לא?"[33]). יודגש מתוך דבריו של
5   נאיפה כי הורה לאכרם להמשיך בגלגול הפיגוע, רק לאחר שיחתו עם הנאשם וקבלת האישור
6   ממנו. עוד מתאר נאיפה כיצד, לאחר הפיגוע, נטל הנאשם אחריות לפיגוע בשם הארגון ואף העביר
7   לו את סכום הכסף.
8
9   חיזוק לדבריו של נאיפה אנו מוצאים לא אחרת מאשר באמרתו של הנאשם המאשר כי מסר
10  לנאיפה סכום כסף יום לאחר הפיגוע להקמת סוכת אבלים לשהיד[34]. שאר המעורבים באירוע,
11  שאמרותיהם הוגשו בהסכמה[35], מבססים את עובדות האישום בכללו והחומר הטכני מבסס את
12  תוצאותיו הקטלניות ופציעתו של יובל אשל, שאשתו אורנה ז"ל נרצחה לנגד עיניו.
13
14
15  רואים אנו כי הנאשם היה בעל שליטה מוחלטת בהוצאתו לפועל של הפיגוע, ומבצעיו סרו למרותו,
16  הן באומר והן במעשה, הן לפניו והן אחריו. הנאשם נושא באחריות מלאה לאירוע שיצא בברכתו,
17  באישורו ובמימונו ושעליו הזדרז ליטול אחריות ואנו מרשיעים אותו באחריות לו.
18
19  **פרטי האישום 18-13, פיגוע מצר**
20
21  גם באירוע זה, נשלח המחבל המתאבד, חיית האדם סירחאן סירחאן, ע"י מוחמד נאיפה לקיבוץ
22  מצר. במסע הירי שלו בקיבוץ רצח סירחאן את ילדי משפחת אוחיון, מתן ונועם, את אמם רויטל
23  וכן את תושבי הקיבוץ תרצה דמארי ויצחק דורי, זכרם לברכה.
24
25  מעיון באמרותיו של נאיפה עולה כי פעם נוספת פנה לנאשם, בציינו באוזניו כי ברשותו מתאבד
26  נוסף המוכן לשיגור ובבקשה לחמשו בכל נשק, והנאשם דאג לעשות כן. לאחר מכן, פנה נאיפה אל
27  הנאשם כי ייקח אחריות על הפיגוע, ואף דאג להעביר לידיו את סרט הצילום של סירחאן מקריא
28  את צוואתו.
29
30  הנאשם בכבודו ובעצמו מחזק את דבריו של נאיפה באופן מובהק (תוך הוצאת העוקץ מן הדברים,
31  כהרגלו) כאשר הוא מציין באמרתו כי מסר לנאיפה כלי נשק (לטענתו, בעקבות סכסוך של נאיפה
32  עם אדם אחר) וכן כי לאחר הפיגוע התקשר לתחנת הטלוויזיה להודיע כי הוא מתנגד לביצוע
33  פיגועים בתוך תחומי מדינת ישראל..לומר לציין כי הסיפא שבצד גרסתו של הנאשם, לא אמין
34  בעינינו. הנאשם לא טרח לחזור לחזור אפילו על גרסה מתחמקת זו בעדותו והרחיק עצמו מכל מעורבות
35  עם נאיפה או מתן כלי נשק.
36
37  המעורב העיקרי הנוסף באירוע אוסאמה אשכר, אשר אינו מזכיר את הנאשם, מבסס את עובדות
38  כתב האישום הנוגעות להכנות לשילוח סירחאן למשימת הרצח והחומר הטכני מזירת הטבח
39  מאשש את תוצאותיו הקטלניות.
40
41
42  דפוס ההיראריכיה שבין נאיפה לנאשם, כבר תואר להלן והמעשים שנעשו לפני ואחרי הפיגוע,
43  מבססים את אחריותו של הנאשם מכוח מרותו על מבצעי הרצח ומתן האישור לפיגוע ונטילת
44  האחריות עליו. אלא שגם הפעם, מלבד האחריות "המיניסטריאלית", נושא הנאשם באחריות
45  מובהקת לפיגוע בתור מי שהמציא לידיהם של הרוצחים בפועל את כלי הנשק שקטל את תושבי
46  הקיבוץ. אין ספק כי הנאשם נושא באחריות מלאה לאירוע הרצח ואנו מרשיעים אותו בכך.
47
48  **פרט האישום 19**
49
50  פרט זה מייחס לנאשם עבירת קשירת קשר לגרימת מוות בכוונה, זאת בכך שהיה שותף למזימה
51  לשלח את סירחאן, לביצוע פיגוע נוסף לאחר פיגוע מצר.
52
53  גם אישום זה מתבסס על אמרותיו של מוחמד נאיפה, המתאר כיצד משנתברר כי סירחאן נותר
54  בחיים לאחר ההתקפה הרצחנית בקיבוץ מצר, הוחלט לשלוח אותו שוב לבצע פיגוע התאבדות,

---

[33] ראה ת/60, עמ' 4 ש' 25.
[34] ראה ת/1, עמ' 5 ש' 9-5.
[35] ראה פרוטוקול מיום 02/09/03, עמ' 3 ש' 28-27.

תאריך: 28/06/05          15          תיק מס׳: 5398/03

1  ולשם כך התקשר אל הנאשם. הנאשם מסר את הסכמתו לתוכנית ואף נענה לבקשת נאיפה
2  להמציא לידיו כלי נשק, ובני החבורה אף יצאו לשכם לפגשו ולקחת מידיו את הנשק, אולם נעצרו
3  קודם לכן.
4
5  אודות החיזוקים הרבים לאמרותיו של נאיפה בשורת עניינים - עמדנו זה מכבר. אין ספק כי
6  הקשר הנדון, הוא חלק מתוך "מסכת עובדתית" אחת, הנוגעת לפיגועי טרור שבוצעו ע״י נאיפה
7  והנאשם במסגרת הארגון ובאמצעות סיירתאן, ועל כן רואים בהם כחיזוקים גם לעניין הפללתו את
8  הנאשם לעניין אישום זה.
9
10 גם באשר לדפוס הפעולה והקשר בין הנאשם ונאיפה, עמדנו זה מכבר ואין ספק כי אישורו של
11 הנאשם את התוכנית הרצחנית והתחייבותו להמציא כלי נשק, הופכים אותו לשותף בקשירת
12 הקשר.
13
14
15
16 סוף דבר, מרשיעים אנו את הנאשם בכל המיוחס לו, למעט פרט האישום הרביעי, ממנו
17 חזרה התביעה.
18
19
20
21 זכות ערעור כחוק
22 ניתן והודע, 28/06/05, בלשכה. המזכירות תמציא עותק לידי הצדדים.
23
24
25  שופט          אב״ד          שופט
26
27
28

P 6: 30