# EXHIBIT I.426



PLAINTIFF'S
EXHIBIT
426

The Military Court                                          Court Case 3380/03
Judea
Before a panel

Court hearing on: November 9, 2003
             14 Heshvan 5764

                    Before the Presiding Judge: Lieutenant Colonel Nathaniel Benichou
                                    Judge: Lieutenant Colonel Hanan Rubinstein
                                    Judge: Captain Eli Bar-On


Defendant: Abdullah Ghaleb Abdullah Barghouti (Jamal) Identity No. (fictitious): 30300028
           Jordanian passport No. e-891198, born October 15, 1972, a resident of Beit Rima,
           detained since March 5, 2003.


## Sentence


1.   The Defendant has been convicted pursuant to his admission before us on June 1, 2003 to
     all of the facts of the indictment, consisting of 108 charges.

2.   This is a series of extremely grave offenses. The Defendant was convicted of an attempt to
     manufacture an explosive object, membership in an unlawful association, six offenses of
     military training without a permit, offenses of conspiring to commit an offense punishable
     by more than three years imprisonment, five offenses of trading in war materiel,
     manufacturing an explosive object, sheltering, three offenses of execution of a service for
     an unlawful association, 12 offenses of attempt


[Stamp] Military Appellate Court * Judea and Samaria [Signature]     [Stamp] Authentic copy


1

[Stamp] P7: 100

to cause intentional death, seven offenses of malicious damage to property, 66 offenses of causing intentional death, offenses involving licenses and documents that were issued under the Security Legislation, possession of a firearm and three offenses of manufacturing an incendiary device.

3.    The Defendant, for more than two years, was a member of the Az A-Din Al Qassam Brigades, the military arm of the Hamas organization, which is an unlawful association.

4.    The Defendant, within the framework of his activity in the military arm of the Hamas organization, was responsible for manufacturing explosive devices and training other people in manufacturing explosive devices. In view of his "success" in this function, the Defendant earned the nickname the Engineer.

5.    In May 2001, the Defendant met a military operative in the Hamas organization and asked to enroll in the military arm of the organization. The Defendant informed that operative that he could manufacture explosive devices for the organization. As a result of the initiative and the proposal of the Defendant he was indeed enrolled into the Az A-Din Al Qassam Brigades.

6.    In late 2001, the Defendant agreed to act under the command of the head of the Az A-Din Al Qassam Brigades in the Ramallah area and manufacture explosive devices for carrying out attacks against Israeli targets.

7.    In exchange for his activity, the Defendant received financial compensation to the amount of US $117,000. In addition, the Defendant received financial aid in the amount of $500 from Marwan Barghouti, the head of the Tanzim of the Fatah.

8.    In May-June 2001 or thereabouts, on several occasions, he met with a senior military operative of the Hamas organization and during those meetings the Defendant learned how to manufacture explosives, explosive devices, detonation mechanisms for the explosive devices, hand grenades and explosive belts. The Defendant learned how to camouflage an explosive device so that it would not be suspected as such. In addition, the Defendant learned how to manufacture poison that could be put into the explosive devices to transform them into chemical charges.

[Stamp] P7: 101

9.  In December 2000, the Defendant conspired with another person in the Hamas organization to participate in the abduction of Israel Defense Forces soldiers. The Defendant was charged with preparing an apartment for holding Israel Defense Forces soldiers who would be abducted. Within the scope of this plan, the Defendant prepared a room in his home in Beit Rima for holding Israel Defense Forces soldiers whom they planned to abduct.

[Stamp] Military Appellate Court * Judea and Samaria [Signature]     [Stamp] Authentic copy

2

[Stamp] P7: 101 [continued]

10. In June 2001, the Defendant received 15 kg of explosives and a pistol and a magazine with cartridges, and the Defendant concealed them and kept them with him.

11. Later, in a storeroom that the Defendant rented in Beit Rima, he set up a laboratory for manufacturing explosives and explosive devices.

12. The Defendant transferred to the laboratory 15 kg of explosives that he obtained, 20 liters of hydrogen peroxide, and a number of wireless mechanisms for activating the explosive devices that he intended to manufacture.

13. In his laboratory, the Defendant manufactured two explosive devices that were camouflaged as stones. One explosive device was transferred by the Defendant to a senior military operative of the Hamas organization and the other device he transferred personally to Bilal Ya'akub Barghouti, another senior military operative of the Hamas organization.

14. In July 2001, the Defendant met his handler, Aiman Halawa, and the above mentioned individual informed the Defendant that he knew a person who was prepared to carry out a suicide attack inside Israel. At the request of his handler, the Defendant contacted Bilal Ya'akub Barghouti, a senior military operative in the Hamas organization and asked him to find a person who could bring a suicide terrorist into Israel in order to carry out a suicide attack with the intent of causing the deaths of as many people as possible.

15. On July 27, 2001, the Defendant obtained an explosive device that he put into a can of beer and to which he attached an activation device. The Defendant delivered the device to Bilal Barghouti in order for him to transfer it to people whom he had recruited and for them to carry out an attack using it with the intent of causing the deaths of as many people as possible.

16. The above mentioned explosive device was delivered to Ahlam Tamimi, who came to a Co-Op supermarket in Jerusalem, in HaMelech George Street in the heart of Jerusalem, while carrying in her bag the explosive device that she had received from the Defendant.

17. Ahlam Tamimi put the beer can containing the explosive device on a shelf of cans in the above mentioned supermarket, in order for the explosive device to explode and cause the deaths of people nearby at the time of the explosion. Ahlam Tamimi activated the explosive device and left the store immediately after.

[Stamp] P 7: 102

18. In the afternoon of July 30, 2001 [7.01..30], the above mentioned explosive device exploded in the said supermarket and caused a large amount of damage to property, but miraculously no loss of life.

[Stamp] Military Appellate Court * Judea and Samaria [Signature]     [Stamp] Authentic copy

3

[Stamp] P 7: 102

19.  On August 9, 2001, the Defendant asked his handler in the Hamas to give him a large explosive device and a suicide terrorist for the purpose of carrying out a suicide attack in order to harm and cause the deaths of people.

20.  The Defendant received a large explosive device that consisted of two shampoo bottles that were filled with explosives.

21.  At the request of Bilal Ya'akub Barghouti, the Defendant put the above mentioned explosive device inside a guitar. In addition to the above mentioned explosive device, the Defendant also put two plastic bags filled with explosives and screws into the guitar. The Defendant closed the guitar's hole using glass so that its content would not be visible. The Defendant connected the activation mechanism to this explosive device himself.

22.  The Defendant put the guitar into a black case and pulled an activation button with activation wires out from the case so that the device could be activated easily without opening the case.

23.  The Defendant reported to his handler that he had prepared the above mentioned explosive device and asked his handler to send a suicide terrorist to him.

24.  The Defendant transferred the explosive device to Bilal Barghouti in order for him to deliver it to a suicide terrorist, in order for the suicide terrorist to carry out a suicide attack using the explosive device that had been prepared, with the intent of causing the deaths of as many people as possible.

25.  During the day, Bilal Barghouti instructed the suicide terrorist on how to activate the explosive device that had been manufactured by the defendant.

26.  On August 9, 2001, at about 1:55 p.m., the terrorist, Az Aldin Shahil Ahmed Masri, carried the guitar with him while being led by Ahlam Tamimi to central Jerusalem.

27.  The above mentioned suicide terrorist carried the death guitar and went into the Sbarro restaurant in Jerusalem at noontime, while it was crowded with people who had come to eat.

28.  The suicide terrorist activated the activation mechanism that had been assembled by the Defendant, and as a result of the explosion of the explosive device, 15 innocent people – whose only wrongdoing was eating in the heart of Jerusalem – were killed.

[Stamp] P 7: 103

29.   A great amount of damage was caused to the restaurant and, as set forth, 15 people met their deaths.

30.   More than 127 people who were in the area of the explosion site were injured.

31.   In this incident, [the following] were killed: the late Frieda Mendelsohn, aged 62 at the time of her death; the late Lily Shimashvili Mesengiser, aged 33 at the time of her death; the late Tamara Shimashvili Mesengiser, aged 8 at the time of her death; the late Tehila Maoz, aged 20 at the time of her death; the late Michal Raziel,

[Stamp] Military Appellate Court * Judea and Samaria [Signature]      [Stamp] Authentic copy

[Stamp] P 7: 103 [continued]

aged 15 at the time of her death; the late Malka Roth, aged 15 at the time of her death; the late Yocheved Sasson, aged 10 at the time of her death; the late Mordechai Schijveschuurder, aged 44 at the time of his death; the late Tzira Schijveschuurder, aged 41 at the time of her death; the late Raya Schijveschuurder, aged 14 at the time of her death; the late Avraham Yitzhak Schijveschuurder, aged 4 at the time of his death; the late Hemda Schijveschuurder, aged 2 at the time of her death; the late Judith Lilian Greenbaum, aged 31 at the time of her death; the late Giora Balash, aged 69 at the time of his death; and the late Zvi Golombek, aged 26 at the time of his death.

32. Due to the acts of the Defendant, many people lost their lives and a great many others were injured. This was the goal of the Defendant, and he executed his goal with malice and without hesitation.

33. Starting in the second half of 2001, in or near Ramallah, the Defendant built a number of laboratories for manufacturing explosives and explosive devices. The Defendant would transfer various chemicals for use in making explosive devices to these laboratories. The above mentioned explosives were purchased both by the Defendant himself and by his fellow Hamas organization members.

34. In his laboratories, using the above mentioned chemicals, the Defendant manufactured dozens of kilograms of explosives. Using the explosives that he had made, the Defendant prepared a large number of explosive devices of various types.

35. The Defendant manufactured the above mentioned explosive devices with the aim of Hamas organization operatives carrying out attacks using them against Israeli targets. The Defendant briefed the Hamas organization on the activation of the above mentioned explosive devices. In addition to the aforementioned, the Defendant attempted to manufacture hand grenades and also obtained instructions on manufacturing Qassam rockets, but he decided that he was unable to manufacture the rockets.

36. The Defendant also made the effort to train and teach other people to manufacture explosives and explosive devices.

37. During November 2001, the Defendant manufactured explosives in his laboratory and using them, manufactured three additional explosive devices. He put the first explosive device into a computer case. He put the second explosive device into a black fabric bag. The Defendant prepared the third explosive device in the form of an explosive belt.

[Stamp] P 7: 104

38. In addition to the explosives, the Defendant inserted nails and nuts into the devices that he had prepared, in order for the explosive device to injure severely as many people as possible. In addition, the Defendant laced the explosive devices with toxic material, in order for the explosive devices to be more lethal.

[Stamp] Military Appellate Court * Judea and Samaria [Signature]     [Stamp] Authentic copy

5

[Stamp] P 7: 104 [continued]

39. The Defendant passed on the three explosive devices to a Hamas operative in order for the operatives of the organization to carry out bombing attacks using them with the intent of causing the deaths of as many people as possible.

40. On December 1, 2001, at about 11:36 p.m., at the entrance to Ben Yehuda Street from Zion Square in Jerusalem, a suicide terrorist activated the explosive device that had been manufactured by the Defendant and concealed inside a computer case, with the intent of causing the deaths of as many people as possible. The above mentioned explosive device exploded when it was activated.

41. At that time, at the junction of Ben Yehuda and Luntz Streets, in Jerusalem, near the site of the previous explosion, a second suicide terrorist activated the explosive device that was inside the explosive belt that had been manufactured by the Defendant, with the intent of causing the deaths of as many people as possible. The second explosive device also exploded.

42. A few minutes after the activation of the two explosive devices by two suicide bombers, the third explosive device that had been placed inside an automobile that had been parked near the detonation of the two previous explosive devices, in Harav Kook Street, near the corner of Jaffa Street in Jerusalem, was activated. The explosive device was activated with the intent of causing the deaths of as many people as possible.

43. As a result of the detonation of the three explosive devices that had been made by the defendant himself, 10 people were killed and about 191 people were injured.

44. In this attack, the following people were murdered: the late Assaf Avitan, aged 15; the late Guy Vaknin, aged 19; the late Yoni Korganov, aged 20; the late Yaakov Israel Danino, aged 17; the late Michael Dahan, aged 20; the late Golan Turgeman, aged 15; the late Adam Weinstein, aged 14; the late Moshe Yedid-Levy, aged 19; and the late Nir Haftzadi, aged 19.

45. Very heavy damage was sustained by houses and businesses in the area of the streets Ben Yehuda, Luntz, Jaffa and Harav Kook and to vehicles that were in the area.

46. In late 2001, the Defendant manufactured, at the request of Marwan Barghouti, the head of the Tanzim of the Fatah, two additional explosive devices that were intended for use if the Israel Defense Forces were enter Ramallah.

[Stamp] P 7: 105

47. In late 2001, the Defendant manufactured three explosive devices that were concealed inside juice cartons, and four more explosive devices that were camouflaged as stones. These devices were also transferred to operatives in the Hamas organization.

48. In early March 2002, the Defendant was requested by his handler in the Hamas to manufacture an explosive belt again, for a suicide terrorist, in order for him to carry out a suicide attack with the intent of causing the deaths of as many people as possible.

[Stamp] Military Appellate Court * Judea and Samaria [Signature]     [Stamp] Authentic copy

6

[Stamp] P 7: 105 [continued]

49. The Defendant agreed to this and manufactured an explosive belt that was assembled by him and he was also the one to attach the activation mechanism to the explosive belt.

50. The defendant transferred the belt to operatives in the Hamas, in order to execute a suicide attack against Israeli targets.

51. On March 9, 2002, at about 10:30 a.m., a suicide terrorist, who was carrying on his person the explosive belt that had been prepared by the Defendant. The suicide terrorist entered the Moment Café in Jerusalem, which was crowded at that time. The suicide terrorist activated the explosive belt with the intent of causing the deaths of as many people as possible.

52. As a result of the activation of the explosive belt, 10 who were then at the Moment Café were killed and 65 people were injured.

53. The people who were killed at the Moment Café were the late Nir Borochov, the late Limor Ben-Shoham, the late Dan Imani, the late Danit Dagan, the late Uri Felix, the late Baruch Lerner, the late Tali Eliyahu, the late Livnat Dvash, the late Orit Ozerov and the late Natanel Kochavi.

54. In addition to 10 people being murdered and dozens more people being injured as set forth, heavy damage was sustained by the Moment Café located in Aza Street in Jerusalem.

55. In March-April 2002 or thereabouts, the commander of the military arm of the Hamas organization in the Ramallah area asked the Defendant through an intermediary to manufacture explosive devices and an explosive bag for carrying out a suicide attack.

56. The Defendant agreed to the request and manufactured an explosive belt that had similar assembly to the explosive belt that he had prepared for the suicide terrorist who had detonated himself at the Moment Café.

57. In addition, the defendant prepared an explosive device that he put into a bag, to which screws were also added to increase the destructive power of the explosive device.

58. The defendant delivered the above mentioned explosive belt to another person in the organization in order for it to be delivered to a suicide terrorist.

[Stamp] P 7: 106

59. The suicide terrorist, with the assistance of others, arrived, on May 7, 2003 [Translator's note: as written], at the Sheffield Club in the new industrial zone of Rishon le Zion while wearing the explosive belt that had been prepared by the Defendant. The suicide terrorist entered the above mentioned club, activated the explosive belt, which exploded, with the intent of causing the deaths of as many people as possible.

[Stamp] Military Appellate Court * Judea and Samaria [Signature]     [Stamp] Authentic copy

7

[Stamp] P 7: 106 [continued]

60. As a result of the explosion, 15 people were killed and 59 were injured.

61. In this incident, the following people were murdered: the late Rahamim Kimhi, the late Rafael Haim, the late Anat Teremforush, the late Avraham Bayaz, the late Eti Bablar, the late Yitzhak Bablar, the late Israel Shikar, the late Shoshana Magmari, the late Sharuk Rassan, the late Nawa Hinawi, the late Nir Lovatin, the late Regina Malka Boslan, the late Dalia Masa, the late Pnina Hikri and the late Edna Cohen.

62. As a result of the detonation of the explosive belt that had been prepared and manufactured by the Defendant, the Sheffield Club and the whole building containing the club were heavily damaged.

63. On May 23, 2002, the Defendant attempted to cause the intentional deaths of people. During May the Defendant met a military operative in the Hamas organization, who asked him to manufacture an additional explosive device, in order to carry out a bombing attack. The Defendant agreed to this and made an explosive device that could be attached to iron using magnets that the Defendant attached to the explosive device, and which could be operated by cellular telephone.

64. The Defendant delivered the explosive device that he had prepared above to another person in Hamas, in order to carry out the planned bombing attack.

65. The explosive device that had been prepared by the Defendant was attached to the bottom of a fuel tank in a fuel tanker by another person in the Hamas using a magnet. The tanker made its way to the Pi Glilot site, followed by the operators of the explosive device, who activated the explosive device by cellular telephone, with the intent of causing the deaths of as many people as possible.

66. The above mentioned explosive device, which had been manufactured and assembled by the Defendant, exploded and caused serious damage to the fuel tanker, but miraculously nobody was hurt.

67. In June 2002, the Defendant was requested by the commander of the military arm of the Hamas organization in the Ramallah area to manufacture an explosive device that is activated by cellular telephone for the purpose of a bombing attack with the intent of causing the deaths of as many people as possible. The Defendant prepared such an explosive device, as requested, while being well aware of the purpose for which the explosive device was intended.

[Stamp] P 7: 107

68. In the morning of June 30, 2002, other people in the Hamas, to whom the explosive device that the Defendant had prepared, put it on railroad tracks in Lod.

69. When those other people identified a train approaching the area in which the explosive device had been laid, they activated it and the explosive device exploded.

[Stamp] Military Appellate Court * Judea and Samaria [Signature]      [Stamp] Authentic copy

8

70. As a result of the explosion of the explosive device, four people were injured and damage was sustained by the locomotive and the railroad track.

71. During June 2002, the Defendant was requested again to prepare an additional explosive device, activated by cellular telephone, for carrying out a bombing attack with the intent of causing the deaths of as many people as possible.

72. The Defendant agreed to that request, manufacturing such an additional explosive device while being well aware of the purpose for which he was preparing the explosive device. Thereafter, the Defendant transferred the explosive device that he had prepared to other people in the Hamas.

73. The above mentioned explosive device was placed on the railroad track near the exit from Rehovot next to Kfar Gvirol, and on the following day, July 21, 2002, in the early morning hours, the device was detonated by Hamas people with the intent of causing the deaths of people. As a result of the explosion of the explosive device, one person was injured and damage was caused to a locomotive and to the railroad.

74. In July 2002, the Defendant was requested by the commander of the military arm of the Hamas organization in the Ramallah area to manufacture an explosive device that would be concealed inside a bag, in order to carry out a bombing attack with the intent of causing the deaths of as many people as possible.

75. The Defendant agreed to manufacture such an explosive device, knowing for what purpose the explosive device would be used.

76. The Defendant manufactured such an explosive device, which was concealed inside a bag, and the Defendant also made the effort to fill the bag with iron nuts in order to increase the destructive power of the device.

77. The Defendant also prepared a wireless activation mechanism for the device that he had manufactured and delivered the device to a Hamas man.

78. The explosive device was laid by Hamas people inside a cafeteria in the Frank Sinatra Building on the campus of the Hebrew University on Mount Scopus in Jerusalem and was activated on July 31, 2002, at about 1:00 p.m., because at this time there was usually a large concentration of people in the cafeteria.

[Stamp] P 7: 108

79. As a result of the explosion of the explosive device that the Defendant had manufactured, nine people were killed and 81 more people were injured.

80. As a result of the detonation of the explosive device, at noontime of that day, [the following] were killed: the late Daphna Spruch; the late Marla Anne Bennett; the late Dina Carter; the late Benjamin Thomas Blutstein; the late Revital Barashi; the late David (Diego) Ladowski; the late Levina Shapira; the late Janis Ruth Coulter and the late David Gritz.

81. As a result of the explosion, heavy damage was sustained by the Frank Sinatra Building in the campus of the Hebrew University.

[Stamp] Military Appellate Court * Judea and Samaria [Signature]      [Stamp] Authentic copy

9

[Stamp] P 7: 108 [continued]

82. In August 2002, the Defendant was requested to prepare two explosive devices that were concealed inside biscuit boxes for the purpose of carrying out a bombing attack with the intent of causing the deaths of as many people as possible. The Defendant agreed to manufacture these explosive devices, well aware of the purpose for which they were intended, and also actually manufactured these explosive devices.

83. The Defendant prepared two explosive devices and attached activation mechanisms to them as requested. These were two explosive belts, which were intended for use by suicide terrorists.

84. The Defendant delivered the explosive devices inside the explosive belts to another person in the Hamas organization, well aware of the purpose for which they would be used.

85. On September 19, 2002, at noontime, a suicide bomber, who was carrying on his person one of the explosive belts that the Defendant had prepared, boarded a bus on line no. 4 in Tel Aviv and detonated the explosive device with the aim of causing the deaths of as many people as possible.

86. As a result of the explosion, six people were killed and about 84 more who were on or near the bus at the time of the explosion were injured

87. As a result of the explosion, the following people were killed: the late Yossi Mamistavlov, the late Ofer Zinger, the late Rosanna Siso, the late Yaffa Shem-Tov, the late Solomon Hoenig and the late Jonathan Jesner.

88. Extensive damage was sustained by the bus that the suicide terrorist had boarded and extensive damage was sustained by the stores and businesses that were near the attack site.

89. The Defendant prepared the second explosive belt as described earlier and delivered it to others in order for it to be used in a suicide attack.

90. On October 11, 2002, at about 8:15 p.m., a suicide terrorist, who was also carrying on his person an explosive belt that the Defendant had prepared, attempted to enter the Yotvata restaurant located on the promenade in Tel Aviv and to detonate it in order kill the people who were then in the restaurant.

[Stamp] P 7: 109

91.   The guard at the site noticed the attacker and suspected him and therefore did not let him enter the restaurant. The attacker was apprehended. By this act the Defendant was a full accomplice in an attempt to cause the intentional deaths of people.

[Stamp] Military Appellate Court * Judea and Samaria [Signature]      [Stamp] Authentic copy

[Stamp] P 7: 109 [continued]

92.   In February 2003 the Defendant taught another person who had been sent to him by the head of the Az A-Din Al Qassam Brigades in the Ramallah area how to manufacture explosive devices and electrical circuits for activating explosive devices and taught him how to manufacture activation mechanisms for explosive devices.

93.   During 2003 until and up to the time of his arrest, the Defendant transferred to the head of the Az A-Din Al Qassam Brigades in Ramallah computer diskettes on which there were instructions on how to manufacture explosives and explosive devices. The Defendant knew that these diskettes were intended to be transferred to an operative of the Palestinian Islamic Jihad organization who asked to learn to manufacture explosives and explosive devices.

94.   Thus, over a very long period, the Defendant had a clear, determined purpose of manufacturing lethal explosive devices that were intended to be used in suicide attacks and bombing attacks, with the aim of causing the deaths of as many Israelis and Jews as possible in cruel, criminal terrorist actions.

95.   The Defendant is responsible for the murder of dozens of innocent human beings and the injury of hundreds more.

96.   It must be assumed that had the Defendant not been apprehended, he would have continued to manufacture more and more explosive devices and explosive belts, serving as a kind of factory manufacturing death mechanisms.

97.   The Defendant admitted everything that had been attributed to him in the indictment as described above and was convicted of all of the offenses as described here in the sentencing case.

98.   The Defendant expressed no remorse. The Defendant caused destruction and carnage and the explosive devices that he prepared were seeds of death that were scattered in many places throughout the State of Israel.

99.   The Defendant did not satisfy himself with the preparation of explosive devices in his laboratory but also made the effort to teach others to prepare such explosive devices.

100.  It is clear that in this case there is no room for consideration of any personal concerns of the Defendant as mitigating concerns.

[Stamp] P 7: 110

101.  The Defendant was a key senior accomplice as a primary perpetrator of unflinching murders and injury of civilians, constituting a significant link in the terrorist network wielded against the State of Israel and its civilians.

102.  The wish of the Defendant was to kill as many Jews as possible and he knew that the explosive belts and explosive devices that he had prepared would kill a very large number of people and injure whoever would be in the effective range of the explosive devices.

[Stamp] Military Appellate Court * Judea and Samaria [Signature]      [Stamp] Authentic copy

11

[Stamp] P 7: 110 [continued]

103. The Defendant is a highly dangerous person and his acts are criminal to the extreme, meaning that the sentencing should be maximal in order to keep him away from society and the public at large for the rest of his life.

104. The murderous terrorist spree that the Defendant committed has been one of the worst we have known. His acts are felonious and atrocious.

105. The Defendant dealt for a very long period in the manufacturing of explosive devices, in order to sow destruction and death, bereavement and pain among the citizens of the State of Israel.

106. Most of the victims did not have the opportunity to live a full and real life, and were killed at a very young age. Some of the victims are innocent children. Often, the attacks wiped out whole families in a single bitter moment.

107. After hearing the pleas of the parties, we considered all of the aggravating and mitigating arguments.

108. The truth that must be heard is that we have found almost no mitigating argument except for the confession of the Defendant before us. However, this confession came with no remorse and therefore its mitigating weight is negligible.

109. We have considered the severity of the offenses and the great damage that was sustained by the victims of the offenses and their families.

110. This is pain and bereavement to the families of the injured and the dead from the many terrorist actions, and there are hundreds if not thousands of relatives who remain with scars of pain on their souls, in addition to the pain, agony and hellfire that the casualties themselves experienced, some of whom will bear their disability until the end of their lives, without any possibility of ever being freed from the suffering that struck them like thunder out of the blue.

111. In the case before us, it is blatantly clear that the public interest, that is, deterrence of the terrorism mechanisms and the operators of the cruel, merciless terrorist mechanisms, should be preferred over any personal interests of the Defendant.

112. The judicial system should have deterrent ability towards terrorist operatives and towards the head of the terrorism hierarchy.

[Stamp] P 7: 111

113.  The terrorism today that is striking at the State of Israel is vicious and cruel and makes no distinction at all between serviceman, civilian, infant, elderly, disabled, tourist, man, woman or any human.

[Stamp] Military Appellate Court * Judea and Samaria [Signature]      [Stamp] Authentic copy

12

[Stamp] P 7: 111 [continued]

114.    The aim of Palestinian terrorism is to strike at Jews and kill as many Jews as possible and to intimidate and terrorize those that remain alive. The purpose of terrorism is to incapacitate normal, stable life in the country.

115.    Terrorism is an intolerable thing and the sentencing for a person who wields terrorism and is part of the chain of terrorism mechanisms should be painful and maximal.

116.    The legal system should make its contribution to reduce acts of terrorism to the extent possible, whenever possible and feasible.

117.    The Defendant before us must be sentenced in a manner that will deter offenders like him, pay him back for his cruel, criminal actions and will express the revulsion of any human and of any society concerning the offenses for which he has been convicted.

118.    In many, terrible cases of terrorism such as this one for which the Defendant is responsible as part of the mechanism of terrorism, as one who manufactured the explosive devices that sowed destruction and death, the maximum sentence prescribed by the legislator should be a starting point and an end point.

119.    In our opinion, if we had the authority to do so, the Defendant should be sentenced to death as the fitting sentence.

120.    Leaving a maximum sentence as a dead letter would contravene the explicit direction of the legislator, in contravention of his opinion that a death sentence should be handed down to a defendant.

121.    To pass down a death sentence under the Security Provisions Order, a unanimous decision must be made by a panel of three judges who are jurisprudents of Lieutenant Colonel rank at least.

122.    The current panel of the Court does not satisfy this condition and is therefore not authorized to sentence the Defendant to death, despite this being the sentence that in our opinion should be inflicted on the Defendant.

123.    When terrorism is so cruel, massive and strikes indiscriminately right and left, sometimes frequently, for an extended period, and kills dozens of human beings in many events and when a person such as the Defendant is an accomplice in the above mentioned mechanism in so many cases, the correct and fitting sentence is the death sentence.

[Stamp] P 7: 112

124.  Contentions are being made that the death sentence is not a deterrent and is ineffective. Maybe this is correct concerning suicide attackers who are not deterred by this attack because they have sentenced themselves and others to death in any case when performing a suicide attack.

[Stamp] Military Appellate Court * Judea and Samaria [Signature]      [Stamp] Authentic copy
[Stamp] Nathaniel Benichou, Advocate

[Stamp] P 7: 112

125. However, suicide terrorists do not usually work alone and of their own accord. They are part of a wider terrorist system that includes aiders of various kinds and includes people such as the Defendant, who assemble and manufacture death bombs. People of the Defendant's kind rank high in the hierarchy of terrorism.

126. The death sentence that may be inflicted in the appropriate cases should be not only a written letter but also a practiced provision of law.

127. The Hamas is a cruel terrorist organization that must be fought in all existing legal ways, and the Court must have its say within the sentencing of a man who joined the Hamas in order to murder as many Jews as possible and also executed his plots to a massive scale.

128. Against suicide terrorists, against those who equip them, against their accessories, against the makers of the explosive belts and the explosive devices that are deployed against an innocent population, a strong hand and the strictest sentencing possible must be used.

129. Maximum sentencing may deter the handlers and prepares of explosive devices and the assisters and reduce the wave of suicide terrorists.

130. A person such as the Defendant acted as part of a murderous, bloodthirsty terrorist system; thirsty for the blood of innocent civilians whose sole crime was being Jews living in the Land of Israel and by whose bad luck they happened to be on a bus or in a restaurant or café at the time of the arrival of a suicide murderer who killed them all at once.

131. A person of the kind of the Defendant is fit for death and should be sentenced to death.

132. We believe that the Defendant before us should be sentenced to death for his acts. The death penalty in the case before us would represent doing justice.

133. Because we do not have the authority to do so, and in order to express our position concerning the criminal acts of the Defendant, we sentence the Defendant to one separate life imprisonment term for each person who was murdered as a result of activation of the explosive devices that the Defendant manufactured. The life imprisonment sentences are to be cumulative.

[Stamp] Military Appellate Court * Judea and Samaria [Signature]        [Stamp] Authentic copy

14

134.   In addition to this, although we have sentenced the Defendant to cumulative life imprisonment terms for the murders in which he was an accessory, the additional offenses that he has committed, the injuring of hundreds of people as a result of his acts, cannot be ignored, and he is to be punished for the additional offenses by an additional sentence too.

135.   In view of all that which has been set forth above, we sentence the Defendant to 66 terms of life imprisonment for the murder of 66 human beings, each life sentence to be served cumulatively.

For the remaining offenses that the Defendant has committed we hand down an additional life sentence that will also be cumulative to all of the other life sentences that we have handed down to him.

A right of appeal within 30 days of today is conferred.

Handed down and announced this day, November 9, 2003, in public and in the presence of the Military Prosecutor, the Defendant and his counsel.

Lieutenant Colonel
Hanan Rubinstein
Judge

Lieutenant Colonel
Nathaniel Benichou
Presiding Judge

Major Eli Bar-On
Judge

[Stamp] Military Appellate Court * Judea and Samaria [Signature]      [Stamp] Authentic copy

[Stamp] P 7: 114

Page 1 of 1

<u>Unclassified</u>

Israel Defense Forces

November 30, 2004

**Judea**

**Court Case 3880/03**

### **Imprisonment Order**

To Israel Police officer / prison guard / soldier

I, a Military Court Judge, hereby order the imprisonment of:

Abdullah Ghaleb Abdullah Barghouti, 1162167

and to deliver him with this imprisonment order to the prison guard, in order for him to be imprisoned for:

67 terms of life imprisonment.

This order serves as a reference to arrest him and keep him incarcerated by whoever is qualified by law to do so.

[Signature]
Lieutenant Colonel Nathaniel Benichou
Assisting Presiding Judge

Handed down on November 30, 2004

For use by the police / the prison

Particulars of the prisoner:

[Stamp] P 7: 115

Abdullah Ghaleb Abdullah Barghouti, 1162167

The above mentioned individual was admitted to the incarceration facility / prison on _____

[Stamp] Military Appellate Court * Judea and Samaria [Signature]        [Stamp] Authentic copy

http://hm9605mgw1/magen/Tables/Decisions/TETemplateBody.asp?CourtID=2&Deci...
November 30, 200[obscured]

[Stamp] P 7: 115 [continued]

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

MARK I. SOKOLOW, *et al.*,

              Plaintiffs,

    vs.

THE PALESTINE LIBERATION
ORGANIZATION, *et al.*,

              Defendants.

No. 04 Civ. 00397 (GBD) (RLE)

**DECLARATION OF RINA NE'EMAN**

Rina Ne'eman hereby certifies as follows:

1.    The attached translation from Hebrew to English is an accurate representation of the document received by Rina Ne'eman Hebrew Language Services, to the best of my knowledge and belief. The document is designated as P 7: 100-15.

2.    I am a professional translator with a B.A. in International Relations from the Hebrew University of Jerusalem (Israel) and 30 years of translation experience. I am fluent in Hebrew and English, and I am qualified to translate accurately from Hebrew to English.

3.    To the best of my knowledge and belief, the accompanying text is a true, full and accurate translation of the Hebrew-language document designated bearing the bates number P 7: 100-15.

Dated: March 6, 2014

Rina Ne'eman

ss.: New Jersey

On the _6_ day of March, 2014 before me, the undersigned, personally appeared Rina Ne'eman, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is signed to this Declaration and acknowledged to me that he executed the same in his capacity, and that by his signature on this Declaration, the individual executed the Declaration.

Sworn to me this
_6_ day of March, 2014

Notary Public

**LEONOR TROYANO**
ID # 2385580
NOTARY PUBLIC OF NEW JERSEY
Commission Expires 5/6/2014



<div dir="rtl">

תיק בית משפט 1380.03

בבית המשפט הצבאי

יהודה

בפני הרכב

דיון בימ"ש מיום : 9.11.03

בפני האב"ד : סא"ל נתנאל בנישו          י"ד חשוון . תשס"ד

שופט : סא"ל חנן הוברמייד

שופט : רס"ן אלי בר-און

נאשם:   עבדאללה צ'אלב עבדאללה ברגותי (נמל) ת.ז. (פיקטיבי ) 030300028 , דרכון ירדני -ש
891198 יליד 10.72..15, הושב בית רימא, עצור מיום 5.3.03.

## גזר-דין

1. הנאשם הורשע, עד פי הודאתו בפניו ביום 1 ביוני 2003 בכל עובדות כתב האישום אשר בו
108 אישומים.

2. נדוגם בסדרת עבירות חמירות ביותר, הנאשם הורשע בעבירות ליצר חפו נפיץ. בתקרית
בתאחזית ברקי מירקה. ב-0 עבירות אימנים צבארים שלא בחדית. בעבירות ישירות נושר תחבר
גבירה קודות מיני יריה שנות נפצה נאטקה ב-8 עבירות ינר קהר בציד מרחבית. ביצור חפו נפיץ.
בשב הרגנו ב-1 עבירות ביצע יטרות עמר תקאחזית בלקי מירקה. ב-2] עבירות של נישוי

</div>





לגרימת מוות בכוונה. ב-7 עבירות חידה בזדון לרכוש. ב-66 עבירות גרימת מוות בכוונה. עבירות

בלישינות ומסמכים שהוצאו עפ"י תחיקת הביטחון, בהחזקת כלי יריה וב-3 עבירית יצור חפץ

מסוכר.

3.  הנאשם במסגרת פעילות מישנתים היה חבר ב"גדודי עז א-דין אל קסאם" . הזרוע הצבאית של ארגון
    ההמאס . שהוא התאחדות בלתי מותרת.

4.  הנאשם . במסגרת פעילותי בזירוע הצבאית של ארגון החמאס. היה אחראי על ייצור  מטעני חבלה
    יאימן אנשים אחרים ביצור מטעני חבלה. ואור "הצלחתי" בתפקיד האמיר הנאשם "זכה"
    לכבני "המוקדס" .

5.  בחודש מאי 2001 נפגש הנאשם עם פעיל צבאי בארגון החמאס וביקש להצטרף לזרוע הצבאית
    של הארגון . הנאשם מסר לאחר פעיל כי הוא יכול לייצר מטעני חבלה עבור הארגון . כתוצאה
    ביוזמתו של הנאשם והצעתו אינגם ציריך וגוייס לגדודי עז א-דין אל קסאם.

6.  בסוף שנת 2001 הסכים הנאשם לפעילית  תחת פיקודי של ראש מזודי עד א-דין אל קאסם באזור
    רמאללה  ולייצר מטעני חבלה לצורך ביצוע פיגועים נגד מטרות ישראליות.

7.  בתמורה לפעילותו זו של ייצור מטעני חבלה ואימון אחרים קיבל הנאשם תמורה כספית בסכום של
    $117000 ארה"ב.. כמו-כן קיבל הנאשם סיוע כספי בסך $500 מידי מריאן ברעותי  ראש
    התנודב של הפתא"ח.

8.  בחודשים מאי יוני 2001 או במסור לכך  במספר הזדמנויית נפגש עם פעיל צבא בכור של ארגון
    החמאס ובמהלך הפגישעם הנ"ל למד הנאשם כיצד לייצר חומר נפץ. מטעני חבלה . מנגנוני
    הפעלה לטטעני החבלה . ריטינו יד ותכורות נפץ הנאשם למד כיצד להכוות את מטעני החבלה
    באופן שלא יושדו בם כאבה.. כמי כן הנאשם למד כיצד רייצד רעל שאוטו ניתן להפגיב אל
    מטעני החבלה על מנת לזבכב לטטעני חבלה כירים

9.  בחודש דצמבר 2000 ישר הנאשם קיצר יום אחר בארבון החמאם לחשתתק בהיקפת חיילי צה"ר
    יכל הנאשם חיטר תוכני דרכו בה יחזרי חיילי צה"ר אחר שיוהטסו ע"י אנטי החמאס במסמרת
    תוכב זו הכון הנאשם מידי כדריכ בבית רינא יצירך התוקת חיידי צה"ר שלמנתו רחייה



[redacted]

10. בחודש יוני 2001 קבל הנאשם לידיו 15 ק"ג של חומר נפץ וכן אקדח ומחסנית עם כדורים והנאשם הסתירם והחזיקם עמו.

11. לאחר מכן במחסן אשר אותו שכר בבית ריימא הקים הנאשם מעבדה לייצור חומרי נפץ ומטעני חבלה.

12. הנאשם העביר למעבדה 15 ק"ג של חומר נפץ, 20 ליטר של מי חמצן וכן מספר מנגנונים אלחוטיים להפעלת מטעני החבלה שהתכוון לייצר.

13. במעבדת ייצר הנאשם שני מטעני חבלה המוסווים לאבנים. מטען אחד הועבר ע"י הנאשם לידי פעיל צבאי בכיר בארגון החמאס ואת המטען השני העביר באופן אישי לבלאל יעקוב ברגותי פעיל צבאי בכיר אחר בארגון החמאס.

14. בחודש יולי 2001 נפגש הנאשם עם מפעילו איימן חלאווה והנ"ל מסר לנאשם כי הוא מכיר אדם המוכן לבצע פיגוע התאבדות בתוך ישראל. עפ"י בקשת מפעילו הנאשם פנה אל בלאל יעקוב ברגותי, פעיל צבאי בכיר בארגון החמאס וביקש מהלה למצוא אדם אשר יוכל להכניס מחבל מתאבד לתוך ישראל על מנת לבצע פיגוע התאבדות בכוונה לגרום למותם של אנשים רבים ככל האפשר.

15. ביום 27.7.01 קבל הנאשם לידיו מטען חבלה קטן והוא הכניסו לתוך פחית בירה והרכיב מנגנון הפעלה. הנאשם מסר את המטען הנ"ל לידי בילאל ברגותי על מנת שהאחרון ימסור המטען לאנשים שהוא גייס וזאת על מנת שיבצעו באמצעותו פיגוע בכוונה לגרום למותם של אנשים רבים ככל הניתן.

16. המטען הנ"ל נמסר לידי אחלאם תמימי שהגיעה אל חנות סופרמרקט בקו-אופ, בירושלים ברחוב המלך ג'ורג', בלבה של ירושלים, כאשר בתיקה נמצא המטען שקיבלה מהנאשם.

17. אחלאם תמימי הניחה את פחית הבירה אשר בתוכה המטען על גבי מדף של פחיות בחנות הסופר מרקט הנ"ל וזאת על מנת שהמטען החבלה יתפוצץ ויגרום למותם של אנשים שיהיו בקרבת מקום ברגע הפיצוץ. אחלאם תמימי הפעילה את המטען ועזבה את החנות מיד לאחר מכן.

18. בשעות הצהריים ביום 30.7.01 מטען החבלה הנ"ל התפוצץ בחנות הסופר מרקט האמורה. גרם נזק רב לרכוש ובנס אף אדם לא נפגע.

19. ביום 9 אוגוסט 2001 בריש יבאשם מטספעידי בחמאס כי יעבי̇ר איזי מטעןַ חבלה גדול לכן מתהלך
מתאבד יצוריך הוצאה לפועל של פיגוע התאבדות על מנת לפגוע באנשים ולגרום לנזיהם.

20. הנאשם קיבל לידיו מטען חבלה גדול שהיה טורבב מיטעני בטקני̇ק שמפו שהיו מלאים בחומר נפץ.

21. עפ"י בקשת בלאל יעקוב בריגיתי הכניס הנאשם את מטען התחבלה הנ"ל אך תוך ניטרה , בנוסף
למטען התחברה הנ"ך הכניס הנאשם אל תוך הגיטרה שתי שקיות ניילון מלאות בחומרי נפץ וכן
הוסף ברכיב לתככני הניטרה , את פקח הגיטרה סגר הנאשם באמצעות זמיכית כך שלא ניתן יהיה
לראות מה יש בתוכה,ואת מטען התחבלה הנ"ר חיבר הנאשם עצמו בנגגוֹן הפעולה.

22. את הגיטרה הכניס הנאשם לתוך ניתיך שחיר וכפתור הפעלה המחובר בחוטי הפעילה הוציא אל
מחוין לגרהית באופן שניתן יהית בקלות להפעיל את המטען בכי לפתיח כלל את הגיטריגֶ,

23. הנאשב דיווח למפעילו כי הכון את המטען הנ"ל וביקש שמפעילו כי ישלח אריי טחבר טיאבד

24. הנאשם העביר את הכטעני אל בלאל בריגיתי על מנת שהלה יעבייו לידי מחבל מתאבד ועד מנת
שׁהמחבל המתאבד יבצע פיגוע התאבדות באמצעות המטען שהוכן זאת בכירינה לקרים לטהיום של
אנשים רבים ככל שניתן,

25. ביום בלאל ברגותי הדריך את המחבר המתאבד ביצד מפעילים את מטען התחבלה אשר יצר ע"י
הנאשם.

26. ביום 9.8.01 בסמוך לשעה 13:55 המחבר המתאבד , עז א-דין שהיל אחמד מצרי נשא עמו את
הגיטרה כשהיא מובל ע"י אהלאב תמימי אל מרכז ירושלים.

27. ביטרת המזוית, ניטשאה ע"י המתאבד הג"ל אשר נכנכ למסעדה סבארו בירישלים בטעוני הצהריים
בשהיא תימה בי אדם שבאו עד מנת לסעודה את לחם.

28. המחבר המתאבד הפיל את מטעני התחבלה שהירכב ע"י הנאשם, וכתוצאה מהתפיצצות המטען
נהרגי 15 בני אדם תמירים שכך חטאם היה שבאו לכעוד את כבם בליבה שד העיר ירושלים?

29. נזה רב נגרם למסעדה ובאזיר 15 בי אדם מצאו את מלותם.

30. יכעוד מ-127 בני אדם שהיו באיזיר גרים הההפיצצות נפצעו.

31. בארינו זה נהרגו פריחה ענירכין בת 2.01רג, ארי שימעיאטוריי, מטנינטר ז"ל בת 33 במותה,
חנה שימעיאטוריי מטנונר ז"ר בת 8 במותה, חהיה בצוי ז"ל בת 20 במיתה, מיכל חזאר ז"ר



, בת 15 במותה, מלכה רוט ז"ל, בת 18 במותה, יוכבד עשון ז"ל, בת 10 במותה, מרדכי רפאל

סחיוסחירדר ז"ל , בן 44 במותו, צירת סחייוסחירדר ז"ל, בת 41 במותה, רציה סחיוסחירדר

ז.ל. בת 14 במותה, אברהם יצחק סחייס חירדר ז"ל, בן 4 במותו, חמדה סלימחולדר ז"ל, בת

שערים במותה, נדדית דיר/אן נרעביב ז"ל, בת 31 במותה, נזירא בלאש ז"ל, בן 69 במותו, ,

צבי צולומבק ז"ל, בן 26 במותו.

32. נקב מעשיו של הנאשם זיפד/ חרתם אנשים רבים זרבים מאוד נפצעו. זו היתה מטרתו של הנאשם

ואת מטרתו הוציא מן הכוח אל הפועל בזדון ובקור רוח.

33. החל מהמחצית השנייה של שנת 2001 בראשה ובכמך לראשלית הקים הנאשם מספר מעבדות

ליצר חומרי נפץ ונעשעו חבלה . אל המעבדות הנ"ל נגע הנאשם לזעביר חומרים כטרוס שנים

המ/מטמ לזצר חומרי נפץ. חומרי הנפץ הנ"ל נרכשו הן ע"י הנאשם עצמו הן ע"י חבריו בארגן

החמאס.

34. הנאשב ייצר במעבדותיו מהחטרים הכרכיב הנ"ל עשרית קילורגמים של חומרי נפץ. מחומרי

הנפץ אותם ייצר הנאשם חכן מספר רב של מטעני חבלה מסוגים שונים .

35. הנאשם ייצר את מטעני החבלה הנ"ל בכדירה שמעטי ארגון החמאס יבצעו באמצעותם פיגועים

נגד מטרות ישראליות, הנאשם הדרך את פעילי ארגון החמאס איך להפעיל את מטעני החבלה

הנ"ל. בנוסף לאמור דלעיל הנאשם נסה ליצר רימוני יד יקיבל אף הוראות ליצר טילי קטאם

אורסהחחיים כי אין ביכולתו ליצר את הטילים.

36. הנאשם אף טרח לאמן וללמד אנשים רבים אחרים בצד ליצר חומרי נפץ ומטעני חבלה.

37. במהלך חודש בדצמבר 2001 ייצר הנאשם במעבדתו חומר נפץ וטמנו יצר שליושה מטעני חבלה .

את המטען הראשון הכניס הנאשם לתוך מארז מחשב, את דעטען השני הכניס הנאשם לתוך תיק

בד שחור . את המטען השלישי הכין הנאשם בצורית של חגורת נפץ.

38. בנוסף החומר הנפץ הכניס הנאשם לתוך המטעים שהכין מסמרים אימים יאת על מנת שהמטענים

יפגע במירה רשה יותר בנוסף יב כמה ונתן של אנשם. במי מן הכניס הנאשם אל שלושת מטעני

החבלה חומר רעיל יאת גם על מנת שהמטעים והני יכרדיב יותר.



39. התאשם פרר את שלישת מטעני החבלה שיצר לצורך הפגוע אחר על מנת שהלה יעביר לפעילי
הארגון אשר באמצעיהב יצועו פינויי תופת בכוונה הגרום למותם של אנשים רבים ככל הניתן.

40. ביב 01.12.1 בסמוך לשעה 23:36 בפנטסה מעיבר ציון לרחוב בן יהודה בירושלים פוצר מתאבד
הפעיל את מטען החבלה אשר יצר ע"י התאשם והוסתר בתוך מארו של מהשב וזאת בכוונה הגרים
למותם של אנשים רבים ככל האפשר. מטעני החבלה הנ"ל התפוצץ בשדירפעל.

41. באותו מועד בצעות הרחובות בן יהודה- לנגן בירושלים, בסמוך למקום הפיגוע הקודם ציהבל
מתאבד שני הפעיל את מטען החבלה שהיה בתוך תגורת הגפן ואשר יצר ע"י התאשם וזאת בכוונה
לגרים למרתם של אנשים רבים ככל שניתן, מטען החבלה השני התפוצין אף הוא.

42. דקות מפורות לאחר הפצוה שני המטעים ע"י שני מתאבדים הגעיד המטעני השלישי שהונח בתוך
מכונית ואשר תנה בסמוך לפיצוץ שני המטענים הודמים , ברחוב הרב ליה בסמוך לפינה רחוב
יפו בירושלים , מטעני החבלה הופעל בכוונה לגרים למותם של אנשים רבים ככל הניתן.

43. בתוצאה מפיצוץ שלישת מטעני החבריה שהוכמנ ויצרי ע"י התאשם עצמו נהרגו 10 אנשים ונפצעו
כ- 191 בני אדם.

44. בפיגוע זה מרצחו אסף אביצן ז"ל בן 15 , גיא יפקןן ז"ל . בן 19, יוסי קורוגביב ז"ל . בן 20.
יעקב ישראל דיעני .ז"ל. בן 17, מיכאל דהאן ז"ל. בן 20, גולן תרדגלמן ז"ל. בן 15, אדב ויגשויני
. בן 14, משה ידר הוי ז"ל . בן 19, ניר חפצדי ז"ל. בן 19.

45. נזק מכד ביורה נגרם לבתים ולבתי עסק הנמצאים באדיר הרחובות בן יהודה- לנגן-יפו- הרב קוק
ולכרי רכב שחיו במקום.

46. בסוף שנת 2001 עפ"י בירשתי של מראון ברגיתי , ראש התגוים של הפתא"ה יצר התאשם שי
מטעני חבריה על מנת שיועשה בהב שימוש אם ניתות צוי"ל יכנסו לרמאללה.

47. בסף שנת 2001 יצר התאשם עוד שהונח מטעי חבלה מוסוים בריקונגים של מ"ד ובן ארבעד
מטעני חבלה נכבבו שניד ניסויים באמביב, מטעני החבלה הנ"ל הוצברו לפעידיים בארגון התואם.
בתחלת חודש נרם 2002 חתביתש התאשם ע"י מפעילו בתמאס ליצר עוב הגרות נפן עבור נחב"
מתאבד כך מנת שרה יצעו פינוי התאבדות בכוונה לגרים לצותם של אנשים רבים ככל הניתן.





40. הנאשם הסכים לכך וייצר חגורת נפץ שהורכבה על ידי יחיא זה שאף הרכיב את מנגנון ההפעלה להגברת הנפץ.

50. הנאשם העביר את החגורה לפעילדיב בהנאמס זאת עד מנת להוציא לפועל פיגוע התאבדות כנגד מטרות ישראליות.

51. ביום 9 מרץ 2002 בסמוך לשעה 22:30 נשא על גופו חבל מתאבד את החגורה הנ"ל שהכין הנאשם במו ידיו. המחבל המתאבד נכנס לבית הקפה מימנט בירושלים אשר היה באותה שעה הומה בני אדם . המתאבד הפעיל את חגורת הנפץ בכוונה לגרום למותם של אנשים רבים ככל הניתן.

52. כתוצאה מהפעלת חגורת הנפץ נהרגו 10 בני אדם שהגו אותה עת בבית הקפה מימנט ונפצעו 65 בני אדם.

53. נהרגו בבית הקפה מימנט נדב בייריבוב ז"ל, מיטיר בן שוהם ז"ל, דן אימוני ז"ל, דנה הנן ז"ל, אורי פליקס ז"ל, ברוך דרכי ז"ל, טלי אליהו ז"ל, רבקה הבצ ז"ל, אוריית אוחזיו ז"ל, נתנאל מכבי ז"ל.

54. בנוסף לכך נערכבו 10 בני אדם ונפצעו כאמור עשירות אנשים נגרם נזק כבד לבית הקפה מימנט הנמצא ברחוב עזה בירושלים.

55. בסמוך לחדישים מרץ –אפריל 2002 מפקד הזרוע הצבאית של ארגון החמאס באיזור רמאללה ביקש מהנאשם באמצעות מתווך לייצר מטעני חבלה ותיק נפץ לצורך ביצוע פיגוע התאבדות.

56. הנאשם הסכים וביקשה וייצר חגורת נפץ הדומה במהרכבה לחגורית הנפץ שהכין עבור המתאבד שפוצצו עצמי בבית הקפה מימנט.

57. כמו כן הכין הנאשם מטעני נפץ אשר הרכב ליתך תיק אלו הוכנמו גם ברגים להגברת עוצמה הפגיעה של מטען החבלה.

58. הנאשם מטר את חגורת הנפץ וריק תיק ה אחר באמצון עד מנת שתמסר ליד מחבל מיתאבד

59. התרחב המתאבד בעניין אחרים הניח הבין ביום 7.5.03 למועדין שפיית קראב באחור התנועה חדשי בראשוני הציוני בטושאיו קעוויק הכבין שהיתמה צ"י הנאשם המחבר המתאבד נסב למועדון הנ"ל . הפציר את חגירת הנפץ אשר התפוצצה זאת בכוונה לגרום למותם של אנשים רבים ככל האפיניד



נאמן למקור



60. כתוצאה מהפיצוץ נהרגו 15 בני אדם ונפצעו 89.

61. באירוע זה נרצחו רחמים כמהי ז"ה, רפאל חיים ז"ל, שנת טרמפיריש ז"ל, אברהם בויד ז"ל, אתי בבראר ז"ל, יצחק בבראר ז"ה, ישריאל שירא ד ז"ל, שישנה ממרי ז"ל, שאריק רימאו ז"ל, גיאה חנאיו ז"ל, גיר לובבין ז"ל, חניה מלכה בוסין ז"ל, דריה מסה ז"ל, פננה הזרי ז"לעהדה כהן ז"ל.

62. כתוצאה מהפיצוץ הנורא הנפץ שהוכנה ייוצרה ע"י הנאשם גרם נזק כבד למיעדון שפייד-קלאב וכר לכל הנבנין בו נמצא המיעדון.

63. ביום 23.5.02 נסה הנאשם לגרום למותם של אנשים. הנאשם נפגש במהלך הודש מאי עם פעיל צבא בארגון התנאס שבריש מנני רייצר מטען חבלה כדי לבצע פיגוע תופת. הנאשם המכים לכך וייצר מטען חבלה שניתן להצמידו לכרויל באצצעית מגנטים אותם הרכיב הנאשם עי מטען החבלה יאשר ניתן היה להפעילו באמצעיית טלפון סלולרי.

64. הנאשם מסר את המטען שהכן דלעיר לאחר בהמאס על מנת להוציא לפיעל פיגוע תופה שתוכנן.

65. המטען שהוכן ע"י הנאשם הוצמד ע"י אחר בהמאס באמצעית מגגט רחלקן התחתון שד טיכל דלה של מיכלית דלק, המיכרית נסעה לאתר פיינגלייות כשבנתבותיה המפעילים של מטען החבלה אשר הפעילי את מטעני החברה באצצעית טלפון סלולרי. וזאת בכוונה לגרום למיתם של אנשים רבים מכל האפשר.

66. מטעני החבלה הנ"ל , אשר יוצר והורכב ע"י הנאשם. התפוצץ וגרם נזק כבד למיכלית הדלק. אך בנס לא נפגע איש.

67. בחודש יוני 2002, התבקש הנאשם ע"י מפקד הזרוע הצצאית של ארגון החמאס באיזור רמאללה ייצר מטעני חבלה חלופובר ע"י שלפן סלולרי- יצייך פיגוע תופה בכוונה לכריום למותם של אנשים רבים בכל הגיחו. הנאשם הכין מטעני נזה. כפי שהלכבריט. בידיעה לצורך מת מיעד המטען

68. בשעות הבוקר ביום 30.6.02 , אנשים אחריים בהמאס. אייהם הזבער המטען איתר הכין הנאשם.



נבוחנוי עני פני רכבת בריד

בהמבחדני אותם אדריב בי רכבת מהרכבת יאזור בי יוגה המטען הפעילוהו והקטעני הכפיצין.



70. כתוצאה מפיצוץ המטען נפצעו 4 בני אדם ונגרם נזק לצבר הרכבת וולמסילות הברזל.

71. במהלך חודש יולי 2002נתבקש שוב הנאשם להכין מטען חבלה נוסף המופעל ע"י טלפון סלולרי לצורך ביצוע פיגוע נוסף בבניינו הרים לפגיעה של אנשים רבים מכל הניתן.

72. הנאשם הסכים לבקשה זו. יצר מטען כזה בידיעו היכה ראיה צריך הוא מכין את המטען. לאחר מכן הנאשם העביר את המטען שהכין לאנשים אחרים בחמאס.

73. המטען הג"ל הונח על פני הרכבה במטוך ייצאת מרחובות ליד כפר גבירול וביום ברדרת, 21.7.02. בשעת הבקיר ומידקית הופעל המטען ע"י אנשי חמאס כמותה לגרום למוות של אנשים. כתוצאה מהפיצוץ של מטען החבלה נפצע אדם אחד ונגרם נזק לצבר ומסילת הברזל.

74. בחודש יולי 2002 נתבקש הנאשם ע"י פקיד הזרוע הצבאית של ארגן החמאס באיזור רמאללה לייצר מטען חבלה המוסתר בתיך תיק כדי לבצע פיגוע תיופ במטוטה לגרום למוות של אנשים רבים בכל האפשר.

75. הנאשם הסכים לייצר מטען מזה בידיעו מזה לאיזה צורך ישמש המטען.

76. הנאשם ייצר מטען מזה אשר הוסתר בתוך תיק והנאשם טרח גם למלא את התיק באומי ברזל לצורך הגברת עוצמת הפגיעה של המטען.

77. הנאשם אף הכין מנגנון הפעלה אלחוטי למטען שיצר ומסר את המטען לאיש חמאס.

78. המטען שיצר הנאשם הונח ע.י אנשי חמאס אחרים בתוך הפיטריה הנמצאת בבנין ע"ש פרנק סינטרה בקמפוס האוניברסיטה העברית בהר הצופים בירושלים והופעל ביום 31.7.02 בסמוך לשעה 13:00 מאחר ובשעה זו בד"כ היה ריבוי גדול של בני אדם בקפיטריה.

79. כתוצאה מפיצוץ המטען שיצר הנאשם נהרגו 9 בני אדם ונפצעו 81 נוספים.

80. כתוצאה מפיצוץ המטען נהרגו בצהרי יום זין רבקה שפירד ז"ל, טירה אן בנו ז"ל, דינה ברוך ז"ל, בנימין בלרשטיין ז"ל, רייצל קריני ז"ל, דוד (דיאנו) דיבסקי ז"ל, ליהנא נפתחה ז"ל, ג'נט ריב הרטיר ז"ל, דוד ברוך ז"ל.

81. כתוצאה מהפיצוץ נגרם נזק כבד לבנין בקריה בקמפוס האוניברסיטה העברית





82. בחודש אוגוסט 2002 נתברר לנאשם לחבו שני מישני חבלה המתאריכים בתוך קופסאות של ביסקוויטים לצירוך ביצוע פיגוע תופת בכוונה הרגום למיהם יהיו אנשים רבים ככל האפשר. הנאשם הסכם ליצר מטעני חבלה אלו בידיהו היבב זאיזה צורך נועדו ואך יצר בפועל את הטטעניה הללו.

83. הנאשם הכן שני מטעני חבלה והצמיד אריהב מנגוני הפעלה כפי שנתבקש. מדובר בשתי חגירות בפן שיועדו לשימיש ע"י מפגעות מתאבדים.

84. הנאשם מסר את מטעני החבלה בתוך חגירית הנפן לאחד בארגון התנאם בידיעה היטב לצירך מה ישטשי.

85. ביב 19.9.02 בשעות הצהרים עלה מחבל מתאבד באיר על גיפי אחת מחגירית הנפן שהבין הנאשם על קו אוטובוס מספר 4 בתל אביב יפוצץ המטען במשרה הגרים למיהם של אנשים רבים ככל האפשר.

86. כתוצאה מהפיצרין נהרגו 6 בני אדם ונפצעו כ- 84 נטפים שהיו באיטבוס יסמטוך אלי בעת הפיצרין.

87. כתוצאה מהפיצרין נהרגו באירתי יום יוסי ציצי מיצבקטרוב ז"ל, עופר דינגר ד"ל, ריזנה סוסו ז"ל, יפה שם מוב ז"ל, סלומון הונגג ז"ל, יונתן גלמר ז"ל.

88. נזק רב נגרם לאוטובוס אליי עלה המפגע המתאבד יכן נגרם נזק רב לחגריות ולבתי עסק שהיו בקרבת מקום הפיגיע.

89. את חגרת הנפן השניה הכן הנאשם כמתואר קודם לכן מסר לאחרים על מנה שתשעוש לביצוע פיגיע התאבדות.

90. ביב 11.10.02 בסביך לישעה 20:15 מחבר מתאבד אשר נשא על גיפי את חגירית הנפן שוהכין הנאשם ניסה להיכנס לקספרת יצבקה תמצאת בעיירת בתר אביב ויפוצצה על מנה להרוג בני אדם שהיו באריזה כד במסהבה.

91. מאבטח שהיה במרכז הבוהו במפגע יחטר בי יספיד לא נתן לי להיכנס לקהיב המבעדה המפגע הסמב. במוקשה זה היה הנאשם שירתה נלא ניצטרו הגרים למיהב של אנשים בפנינה.



נאמן למקור



92. בחודש פברואר 2003 לידד הנאשם אדם אחר שעוסקה אריי ע"י ראש גדודי עז א-דין אל קסאם
באיזור רמאללה כיצד ליצר מטעני חבלה ומנועים חשמליים לצורך הפעלת המטענים מבעבר חבלה וכן לימד
את הלה כיצד ליצר מגנעוני הפצרה למטעני החבלה.

93. במהלך שנת 2003 ועד למעצרו העביר הנאשם לידי ראש גדודי עז א-דין אל קסאם ברמאללה
דיסקים של נחשב וקידם הוראות כיצד ליצר חינרי נפץ ומטעני חבלה. הנאשם ידע כי
דיסקים אלו מיועדים להיות מיועברים לפעיל ארגון הג'האד האסלאמי הפלשתיני אשר בייקש
ללמוד ליצר חומרי נפץ ומטעני חבלה.

94. הנה כי כן הנאשם במשך תקופה אריכה מאוד שם לו למטרה ברורה וגחושה ליצר מטעני חבלה
ולהכניים שירותיו רישמש לפיגועי התאבדות ופיגועי תופת תוך על מנה לחרוג כמה שייתר
ישראלים יהודים בפעוליות טרור אכזריות ופשעיות.

95. הנאשם אחראי לרצח של עשריית בני אדם חפוב מטשע ולפציעתם של מאות אחרים.

96. יש לחנית כי אלמרא נתפס הנאשם היה ממשיך ליצר עוד יעוד מטעני חבלה וחגורות נפץ כשהוא
מישמש מפזז בית חרישית העיצר מבנועני מוות.

97. הנאשם חודה בכל מה שיוחס לו בכתב האישום עפ"י מה שהתואר דלעיל וזהורשע בכל העבירות
במתואר כאן בפרישת גזר הדין.

98. הנאשם לא הביע חרטה. הנאשם גרם לחרם וקטל ומטעני החבלה שהכין היו זרעו מוות שפוזרו
במקומות רביב ברחבי מדינת ישראל.

99. הנאשם לא הסתפק בהכנת מטעני חבלה במעמדתו אלא טרח אף ללמד אחרים כיצד להכין מטענים
כאלי.

100. ברייה כי אין במקרדה דעי כל מקום להתחשב בעיקולים איעניים כלשהם של הנאשים כשיקולים
לקירא

101. הנאשם הזה שזוקף מרכזי וכביר בנמצאן עירהרי של מלטשי רצח הרע ופגיעה באורחים בכיר רית.
כשהוא מקוה אחריו ששטנטיות בריכ העביר העמנפעלת בגנר מדינת ישיאר אירחהרו.

102. יבוע של הנאשב וזה רחוב מעה עירחי יהודים וידע כי חנורות הנפץ ימטעני החבלה שוהכן
יבקרו אנשים רביב מאזד יפצעו כי עד עירחות בעוזה הפעית של מטענני החבלה.



103. הישוב הוא אדם מסוכן בידיו, ומעשיו נמשכים עד מאוד יעל כן העניישה צריכה להיות מורכבת
על מנת להרחיקו יכך ימי חייו מחברה ומצביריו בני אדם

104. מטבע העניה הרצתיית שהפעיל הנאשם היא מהמורה ביותר שידעני אז פעם מעשיו נפשעים
יוויסדים.

105. הנאשב עסק תקופה ממושבת בצער בעצמו תחבה  ותבל על מנת לזרוע הרס ומוית. שביר וכאב
בריב אזרחי מדינת ישראל.

106. חלק גדול מהנרצחים לא הספיקו לחיות חיים מלאים ימכמיים ונקטוי בגיר צעיר מאוד. חלק
מהנרצחים ילדים ומיטם לשיתם היה מדובר בפגועים אשר רטלי משפחות שלימות, ברגע פר
אחד.

107. לאחר שמועת שיבעני הצדדים שהוגי את כך הנציכים לחומרא ילקולא.

108. האמת ניתנת להאמר כי לא מצאני כניעט ניטוק בסיחוי לקויא פרט להדיידותי של הנאשם בפנינו
אילק הודייה זו לא היתה בכ חרטה בעדה חלבן מעולות בשיקות לקויא לכל מעשה.

109. שקרני את חומרת העבירות ונזוק הרב שנגרם לקורבנות העבירות ולמשפחותיהם.

110. מדובר בכאב, שכר למשפחת הפגועים יהרוגם בפציעות הרבות הרבות וכן מדובר במאות או
בכיר יותר להביה באלפי קרובי משפחה שנותרו עם צילקות כאב בנפשם יואת בנוסף לכאב.
היימורים והתקות שתי הפצועים עצמם  שחלקם ישאו את נכותם עד סוף ימי חייהם ולא כל
אפשירית לחשתאחרו אי פעם מהסבר שפקד אותם כריפם ביום בהיר.

111. במיכרה שבפנני בריק בעליל כי יש להעדיף את האינטרס הצריבורי, דהיינו, הרתעה מגנני
הכריר ומקעלי מנכוני הטריר האכבר וחסר הרחוקים עד פני אינטרסים אישיים ביישוב של
הנאשם.

112. מעיכת הניטפט צריסה להיות בעטת בערי הרתעה ברפני מפעלי הטריר יכלף ראשי פירמידת
הטרר.

113. קרירה חיים כנטנ במדינת ישראל הוא יטנה יאמרי ואנו נבחין בזה בין היל, אזרח.
ישעל.וזקן, נבה טייר איש אי אלם בישלו.



12

P 7: 111



114. הטריר הפלסטיני עוכרי הבית היהודי והחתן יהודים רבים בכל הבנין ובן להפחיד ולגלא
אימה את ארי עשיריר בחריב. מטרת הטרור להרבות חיים תלויים ויוצרים בעזרכ'נ.

115. טריר הוא דבר ביהו נבכה הוענשה לפי שעמצ'ר טרור וחיק משרשרת מטגגני הטרור צריכה
להיות מאויבה ומירבית.

116. מטרכת המטיבכ צריכה לקרים את תרומתה להפחתת מעשי הברור ככל האפשר, במידת האפשר
ובכל הנתון.

117. יש החוק על המאנום שבמבני עשוש שיש בה ניטוב הרתעת עבריינים בנוהי, וכניל על
מטשיו הפעשות והאבנרים ואשר הביש סידרה של כל בן אנוש ועל בן חביה ותהעביריות בגוגן
הריטע.

118. במקרי טרור נראיים רבים כיו אין שהשאשב אחראי ותם בחלקו מטננגגו טרדי זואת כמי
שיעצר את מטונכ מחבבה שזרי חרכ ומורת תקרת תנונב התירבי שתבע המחלוקת צריכה להיות
נטודת המוצא ונקודת הטיוב.

119. לדעתני. איהו היתה סמבית בירנו תעישה הראייה מאשם היא הטלת עונש מוות.

120. היתרת עונע מירבי בגדר " הלכה יאין מורין על פיה" עימדתתבוגויד לתנוחיתו המפריטת של
העימוקכ. ובמגנה לדעתי כי במרחים האיאטיים יש ותטל על נאשב עונש מוית.

121. על מפת להביל עונע ביית ער פי הצו בדכר הוראות בטחון י שליקבד את ההתלטה פה אהד על"י
הרכב שלושה שעמטים משטטאיים אשר דרכתם איוה פחותה מסא"ל.

122. הרכב הנוכחי של בית המשפט איננו מטלא תנאי זה ולטיכך אין זה מסמכותני להטיד על המאשב
עוגע מוית. לקרית זות העונע אשר דדעתני ראי ונכון להטיל על המאשום.

123. מאשר הערור הוא כה אכזרי .מסבכ. ונכח היא הבחפה על יצין עיר ישמאל , לעיתים תמונפיה.
התופה מרטבת וחונל עשריית בני אדם באירטב רבים יכאשר אדם כנו המאשם שוחף לעגגנו
ה"ר בטחריים כה רבים  הנונע תנפן ויראשר הוא עונע מיית.

124. משטעת עוטרה כי עונע מוית אינו מרתיע יאינו אפיריבי  איהי צני הדכר וכני יסמגיה-
מתאברים אותם טעטע כזה אני ורקיעי כיין ושטרה על שטטב ועיר אהרם עוגע מוית יעוריא בני
בטצ'נ מינני תאכריה.

13
לקונאל בניטר, שוד-77



נאמן למקור



125. יחד עם זאת מצטיע מראביב אנם פיטרים בדרך כלל מכזה טענט ואנם מיצדים לבד, הם
חלק ממערכת טרור רחבה יותר שכוללת טירטים לאניהם וכן טלילת אנשים כמו הגאשם
המרכזיים ושיקצרים פצצות מווח, אנשים כטוגי של הגאשם עומדים במקום גבוה בפירמידה
הטרור.

126. טנש המווח אשר ניתן להטירי במקרים המיוחדיים צריך שיח הלא רק את כתובה אלא את
היראה חרם מוקפלה.

127. החמאס הוא ארגון טרור אכזרי אשר יש יחידתם בי בכל הרלכים הטוקיות הקיימות ועל בית
המטפט לאמיר את דברי במסגרת שייתי איש שחבר את החמאס על מנת לרצח יהודים רבים
בכל הבוקן ואף היציא זמר מן הבית אך הטיטל בצריח נטיבית.

128. אל פורו המתאבדים, אל מיד אחי הנצידיב אוחם, אל מיד מיטניהם, אל טוול מבני חגרית
הנפן וטמוטני החברה אשר מוטילים בגגד אוכלוסיה חפה מפשע יש לקנוס ביד חוקה ובטטניה
החמירה ביותר הקיימת האפשרית.

129. טניטה מהכימלית יפול ותרתיע את המטגרלים את מכיני חגרית הנפן ואת הסייעבים ותפחית
את נהושל המתאבדים.

130. אדם במו הנאשם פעל מהלר ממוטכת טרור רצחנית וצמאת דם, דם אזרהיב חפים מפטע וכבר
חטאם היה היותם יהודים החיים בארץ ישראל ואשר מולם הרע היה שנקלעו לאוטובוס או
למטעדה או לבית הפה בעת שירצח מתאבד הגיע למקום הימצאם יקטל אותם ברגע אחד.

131. אדם מטוגו של הנאשם בן מווח הוא ייש הגזר עליו דין בווית.

132. סבורים אנו כי ראי היה להוטיח על הנאשם שבטבוני ואיר מעטטי עונש מווח, טונט מווח
בברירה שבפטני הוא עטיית דין צדי.

133. כיון שאין בסמכותנו לעטית כן ועל מנת לבטא את טמדתנו לגבי מעטי הפטעים של הנאשם
אנו כירים על הנאשם טוגט מאבר טרם נפיד בנין בל אדם אשר נרצח כתוצאה מהפטלה טיטני
החברה טיצר הנאשם ואכרי טעלם יהיו מצטבר.





134. בנוסף לכך צר אף שנותנינו על האשמת עונשו מאסר עולם במצטבר בגין מעשי הרצח להם היה
שותף לא ניתן להתעלם מהעבירות הנוספת שבוצעו, מפעילתם של מאות אנשים כתוצאה ממעשי
ידיו ויש להענישו אף בגין העבירות הנוספת בענישתה נפסקת.

135. לאור כל האמור לעיל אנו גוזרים  על הנאשם 66 מאסרי עולם בגין רציחתם של 66 בני אדם
כאשר כל מאסרי העולם יהיו במצטבר זה לזה.

בגין כל יתר העבירות שבוצעו הנאשב אנו גוזרים  מאסר עולם נוסף  שיהיה אף הוא במצטבר לכל
מאסרי העולם האחרים שנגזרו עליו.

יבית ערעור תוך 30 יום מהיום.

ניתן והודע היום, 9.11.03 בפומבי ובמעמד הרובע הצבא", הנאשם ובא-כוחו.

| סא"ל חנן רובינשטיין | סא"ל נתנאל בנישו | רס"ן אלי בר-און |
|---|---|---|
| שופט | אב"ד | שופט |



עמוד 1 מתוך 1

בלמ"ס
צבא הגנה לישראל
جيش الدفاع الاسرائيلي

30/11/2004

יהודה

תיק בימ"ש 3380/03

## פקודת מאסר

לשוטר משטרת ישראל / סוהר / חייל

אני, שופט בית המשפט הצבאי, מצווה בזאת לאסור את:

עבדאללה ע'אלב עבדאללה ברגותי    1162167

ולמסרו עם פקודת מאסר זו לסוהר בבית הסוהר, על מנת שיהיה אסור ל:

67 מאסרי עולם.

פקודה זו משמשת אסמכתא לעוצרו ולהחזיקו במאסר על ידי כל מי שמוסמך לכך בדין.

סא"ל נתנאל בנישו
המשנה לנשיא

ניתן ביום 30/11/2004

לשימוש המשטרה / בית הסוהר

פרטי האסיר:

עבדאללה ע'אלב עבדאללה ברגותי    1162167

הנ"ל התקבל למתקן הכליאה / בית סוהר ביום _____