didn't know what it was. I remember everything because I didn't faint. I saw someone without legs—they were burned away. I was stunned—I forgot that my daughter had been with me. Suddenly I remembered. I went to find her. She was inside a ball of fire.[35]

Hussam Abu Hussein then ran into the street.

I realized there had been a terror attack. And I was afraid. Afraid because I am an Arab—that someone would think I had done it. I climbed into an ambulance and put my hand over my daughter's mouth so that she wouldn't scream and draw attention to us. I kept telling the driver, "Go! Go! Now! Go!" It later turned out that I had run 100 meters with a metal dowel in my back—it must have lodged in there when the bus blew up, maybe part of the bus.[36]

Hussam Abu Hussein and his daughter were both badly burned in this attack, which killed two and wounded fifty. According to Abu Hussein, his daughter's hair now does not grow normally, and the skin grafts she received to treat her burns have caused extensive scarring on her neck and the back of her left hand, "like the hand of an eighty year old woman," he described it. The two also suffer psychologically. "I suffer from nightmares. I wake up sweating, no matter how high I turn on the air conditioner. My daughter wakes up too, in the middle of the night, shouting, 'No, no, no.'"

Abu Hussein told Human Rights Watch:

How do I deal with this as a Palestinian? It's not easy. They [in the West Bank and Gaza] suffer—more than anybody. But when someone hurts you, you're angry. It doesn't matter if it's your mother, father, cousin, brother. When someone tries to kill you, you don't "understand" them. You don't care what their problem was at the moment—what their reason was, what they're suffering. As long as the damage is far from me, I'll try to understand. But when it's my body, my child—I'm angry. That's my immediate response. God gave life, and no one but God has the right to take it. This isn't the

---

[35] Human Rights Watch interview with Hussam Abu Hussein, Baka al-Gharbiya, June 26, 2002.

[36] Ibid.

way to conduct ourselves—on both sides. Violence never works—I strike you, you strike me —there's no end. It will solve nothing.[37]

**Attacks**

Since attacks against civilians resumed on January 1, 2001, the number of suicide bombings has increased dramatically.

They have become the type of attack that Israeli civilians expect and fear from Palestinian armed groups. March 2001 saw three attacks that killed five and wounded ninety. Another series of suicide bombings and a car bombing in the second half of May 2001 were eclipsed on June 1, 2001, when twenty-two-year-old Said Hutari blew himself up amidst a crowd of Israeli teenagers outside a popular Tel Aviv nightclub, the Dolphinarium.[38]

The Dolphinarium attack, the deadliest suicide bombing in more than four years, immediately killed seventeen, almost all of them recent immigrants from the former Soviet Union, and wounded between eighty-five and ninety. The death toll climbed to twenty-one over the following days. The Tel Aviv police chief, Commander Yossi Sedbon, said the bomb, though not large, had been filled with nails, screws, and ball bearings.[39] Islamic Jihad at first claimed responsibility, but then deferred to a subsequent claim by Hamas.[40]

President Arafat condemned the attack, which came as Israeli and Palestinian security officials resumed talks under U.S. auspices on implementing the recommendations of the report by the Sharm el-Sheikh Fact-Finding Committee, headed by former U.S. Senator George Mitchell. For the first time since clashes erupted, and under intense international pressure, Arafat publicly called for an immediate and unconditional cease-fire.[41]

---

[37] Ibid.

[38] The Associated Press reported that four car bombs over the previous week had "failed to cause casualties." Dan Perry, "Tel Aviv suicide bombing kills 17 Israelis," Associated Press, June 2, 2001.

[39] Allyn Fisher-Ilan, "Five from one school dead in attack; others saved by a 'twist of fate,'" *Jerusalem Post*, June 3, 2001.

[40] `Ala'a Saftawi, former editor-in-chief of the pro-Islamic Jihad weekly newspaper *Al-Istiqlal*, told Human Rights Watch that Hamas was responsible for the Dolphinarium attack. Human Rights Watch interview, Gaza City, May 15, 2002. News reports also cited Hamas' claims of responsibility for the attack. See Ewen MacAskill, "Arafat refuses to arrest bombers: Palestinian leader voices respect for extremist groups but warns of future roundup," *Guardian* (London), June 30, 2001. Some news reports at the time said that a previously unknown group, Palestinian Hizbollah, had also claimed responsibility.

[41] German Foreign Minister Joschka Fischer was in Ramallah at the time and, along with U.N. Special Coordinator Terje Larsen, worked with Arafat to draft the statement. Fatah

However, suicide bombings continued in July, August, and September. In the most notorious of these, a bomber entered a crowded Sbarro pizzeria at the busy intersection of Jaffa Road and King George Avenue in Jerusalem and detonated a bomb packed with nails, screws, and bolts. The blast gutted the restaurant, crowded with lunchtime diners, killing fifteen and wounding more than 130. "I cannot even describe in words the horror of it all," said one witness, who worked next door. "They were bringing the bodies of the wounded into our shop—children, women, covered in blood."[42] Islamic Jihad was the first to claim responsibility, but Hamas subsequently took credit, saying the bomber was twenty-three-year-old 'Izz al-Din al-Masri.[43]

The PA made several arrests in the wake of this attack, detaining the alleged driver and three other Hamas militants, including 'Abdallah Barghouti, the person Israel said had dispatched al-Masri.[44] President Arafat also fired Ramallah police chief Kamal al-Shaikh for allowing armed youths to celebrate the attack and ordered the closure of an exhibit erected several weeks later in Nablus by Hamas students at an-Najah University celebrating the attack.[45]

President Arafat made a well-publicized call for an end to attacks in mid-November 2001, and the PA reportedly made arrests and closed down several

agreed to comply with Arafat's call, but Hamas, Islamic Jihad, and the Popular Front for the Liberation of Palestine pointedly did not. George Tenet, director of the U.S. Central Intelligence Agency, negotiated a cease-fire agreement that was announced on June 13, 2001. Some Palestinian Authority-Israeli security contacts were re-established, and the number of serious incidents of Palestinian violence declined for several weeks. On June 23, 2001, the Palestinian Authority reportedly detained Islamic Jihad leader 'Abdallah Shami in Gaza for "acting against Palestinian interests" in criticizing the cease-fire. By mid-July, however, the level of violence initiated by Palestinians and Israelis had returned to that which prevailed prior to the Dolphinarium attack. On June 22 and July 16, 2001, Hamas and Islamic Jihad respectively carried out suicide bombing attacks that killed four IDF soldiers in Gaza and Binyamina and wounded ten others.

[42] Etgar Lefkowitz, "Fifteen killed in Jerusalem suicide bombing; cabinet deliberates retaliation for attack," *Jerusalem Post*, August 10, 2001.

[43] For a detailed account of the preparations for this attack and a portrait of al-Masri and his accomplices, see Sarah Helm, "The Human Time Bomb," *Sunday Times Magazine*, January 6, 2002.

[44] Alan Philips, "Arafat's arrest of militants fails to halt the 'martyrs,'" *Daily Telegraph*, August 13, 2001. Other reports identified two of those detained as 'Abdallah and Bilal Barghouti.

[45] On Ramallah, see "Israeli soldiers close further building as U.S. envoy starts talks," Deutsche Presse-Agentur, August 12, 2001; on Nablus, see "Arafat Closes 'Suicide Bombing' Art Show", BBC online news, 26 September 2001 at http://news.bbc.co.uk/1/hi/entertainment/arts/1564188.stm (accessed August 29, 2002).

Case 1:04-cv-00397-GBD-RLE    Document 530-91    Filed 06/13/13    Page 4 of 34

dozen charities and similar institutions affiliated with Islamist organizations.[46] However, these initiatives were followed by six suicide attacks on civilians in the first two weeks of December, killing twenty-nine and wounding close to two hundred.

The first days of December 2001 witnessed bombings in Jerusalem and Haifa that killed twenty-five and wounded hundreds. On the night of Saturday, December 1, 2001, two Palestinians blew themselves up moments apart near a row of packed cafés on Jerusalem's Ben Yehuda pedestrian mall, killing ten and wounding more than 170. Some twenty minutes later, a block away, a car bomb exploded. Michel Haroush, a French tourist, told reporters, "I fell down, and next thing I saw was half a human body lying by my foot."[47] Another witness, Yossi Mizrahi, said, "I saw people without arms. I saw a person with their stomach hanging open. I saw a ten-year-old boy breathe his last breath. I can't believe anybody would do anything like this."[48]

Scarcely twelve hours later, at midday on December 2, 2001, a young Palestinian blew himself up in a crowded Haifa city bus, killing fifteen and wounding three dozen. *Washington Post* reporter Lee Hockstader described the scene:

> In an instant, the bus became an inferno of death and blood. Corpses and fragments of bodies were strewn across the seats and aisles, and the wounded staggered out the doors and tumbled from the shattered windows. The bomb tore apart students and retirees, Filipino workers and Russian immigrants, soldiers and civilians—a random sampling of this working-class city's diverse population.[49]

Hamas claimed responsibility for the attack. Its leaflet called the Jerusalem and Haifa bombings "the natural retaliation by a people slaughtered day and

---

[46] On November 16, 2001, in a televised speech in Arabic marking the end of Ramadan, Yasir Arafat called for "the complete cessation of all military activities, especially suicide attacks, which we have always condemned," adding that the PA would "punish all planners and executors and hunt down the violators." Graham Usher, "Entering the storm," *Middle East International*, December 21, 2001, p. 7.

[47] Tracy Wilkinson, "Suicide bombers strike in heart of Jerusalem," *Los Angeles Times*, December 2, 2001.

[48] Ibid.

[49] Lee Hockstader, "Bomber on bus kills fifteen in Israel," *Washington Post*, December 3, 2001.

night, whose dignity is humiliated by the Zionist enemy's war machine."[50] Islamic Jihad claimed responsibility for two other attacks during this period.

Palestinian officials, while denouncing the attacks on Israeli civilians, implicitly sought to justify them by pointing to the provocative impact of incidents such as an alleged" Israeli booby-trap bomb that killed five young boys in Khan Yunis on November 22, 2001. "Everyone should realize that atrocities lead to atrocities," said Nabil Sha'ath, the PA minister of planning and international cooperation. "This is the inevitable outcome of the accumulation of atrocities committed by the Israeli army against our civilians, the humiliation, the torment, the unmitigated persecution," Sha'ath said.[51]

On December 21, 2001, following clashes with PA security forces that left seven Palestinians dead and scores injured, Hamas's `Izz al-Din al-Qassam Brigades issued a leaflet announcing that it would "suspend" attacks within "land occupied since 1948"—i.e. Israel. Battles with guns and clubs had broken out when PA security forces attempted to arrest `Abd al-`Aziz al-Rantisi, a senior Hamas leader. Eventually al-Rantisi agreed to "a form of house arrest" and to refrain from issuing public statements.[52] Arafat told the Israeli daily, *Ha'aretz*, on December 21 that securing the Hamas statement "wasn't easy, and the declaration came after we pressured them." The PA's campaign did produce a month, from December 16 until January 17, with no attacks against civilians inside Israel.[53]

The respite for Israeli civilians was not to last. On January 17, 2002, three days after the assassination of local al-Aqsa Martyrs' Brigades leader Ra'id al-Karmi, twenty-seven-year-old Ahmad Hassouna killed six Israelis and wounded thirty when he attacked a bat mitzvah celebration in Hadera with an assault rifle and grenades.[54] The al-Aqsa Brigades also claimed a second shooting attack, in

---

[50] Ibid.

[51] Khalid Amayreh, "Pushing Arafat into a corner," *Middle East International*, December 7, 2001, p. 5.

[52] The *Jerusalem Post* cited an unnamed "senior Israeli official" as dismissing the PA effort: "Rantisi is a symbol and the least of the real terrorists. And these people [Arafat] is not arresting. He is going for the symbols." Lamia Lahoud, "Hamas, Fatah strike deal to prevent Rantisi's arrest," *Jerusalem Post*, December 22, 2001.

[53] During the lull, shooting attacks against Israeli military targets and settlements continued. The break on attacks inside Israel was interrupted from the Palestinian side when Hamas militants ambushed and killed four Israeli soldiers in Israel near the Gaza border on January 9, 2002. Israel the next day destroyed some fifty-nine homes in Gaza's Rafah refugee camp.

[54] Graham Usher, "Six Shot Dead at Bat Mitzvah," *Guardian* (London), January 18, 2002.

downtown Jerusalem on January 22. Two civilians were killed, including a seventy-eight-year-old woman, and fourteen were injured.[55]

On January 27, 2002, twenty-six-year-old Wafa' Idris from al-Amari refugee camp, killed an eighty-one-year-old man and wounded over one hundred in downtown Jerusalem. This first suicide bombing attack claimed by the al-Aqsa Martyrs' Brigades was also the first in which a woman was the perpetrator.[56] Though hardly a justification, the al-Aqsa Brigades' adoption of suicide bombing tactics and attacks against civilians inside Israel reflected at least in part a growing fear by Fatah that it was losing political ground to the Islamist groups that had been carrying out such attacks, especially Hamas. "When the al-Aqsa Brigades started [suicide bombing] operations, it was the decision of all districts," one Fatah leader in the Jenin refugee camp told Human Rights Watch. "The political leaders feared they would lose their influence in the street and in the [National and Islamic Forces] Front. The push of Israeli policies is to shift all influence [in Palestinian armed groups] from the political [wing] to the military."[57]

The number of attacks continued to mount. In March 2002, twelve suicide bombings of civilian targets killed some eighty civilians and injured more than 450. The al-Aqsa Martyrs' Brigades claimed responsibility for five of these attacks, Hamas for three, Islamic Jihad for three, and the PFLP for one.[58] The

---

[55] "Ceasefire Offer Follows Bus Stop Attack," *Guardian* (London), January 23, 2002.

[56] In Lebanon, Hizbollah's al-Manar television first claimed, on behalf of Hamas, that the bomber was a twenty-year-old woman student from al-Najah University in Nablus. Hamas leader Shaikh Yassin later said that "in this phase, the participation of women is not needed in martyr operations like men." See "We don't need women suicide bombers: Hamas spiritual leader," Agence France-Presse, February 2, 2002. A second suicide bombing attack carried out by a woman, and also claimed by the al-Aqsa Martyrs' Brigades, wounded three Israeli police at a checkpoint on February 27, 2002.

[57] Interview with 'Ata Abu Rumaila, Jenin refugee camp, June 11, 2002. An official in the PA General Intelligence Service told Human Rights Watch, "When the al-Aqsa Brigades responded to Karmi's assassination—this was not a political decision on the level of the central committee. We were shocked. I knew what the Palestinian answer would be—not Arafat's or Fatah's, but the friends and neighbors. And what I expected happened." Human Rights Watch interview, Ramallah, June 5, 2002. A Western security official involved in security negotiations in 2001-2002 told Human Rights Watch, "the December-January cease-fire was effective because it was informal and locally based…. The [Israeli] assassinations have been timed to destroy cease-fires." Human Rights Watch interview, Jerusalem, June 6, 2002.

[58] The March 7 attack by the PFLP on a hotel on the outskirts of Ariel settlement wounded fifteen. The other PFLP suicide bombing attack, on February 16, killed three and wounded more than thirty in a pizzeria in the Karnei Shomron settlement.

Hamas attack during a Passover Seder in Netanya's Park Hotel was the deadliest, killing twenty-nine civilians, many elderly, and injuring one hundred.

The March 2002 attacks began just after 7:00 p.m. on the evening of March 2, when a bomber blew himself up in a car among ultra-Orthodox worshippers as they streamed onto the street in the Me'ah Shearim neighborhood of west Jerusalem following prayers marking the end of the Sabbath. The blast killed eleven, including four children from one family—one a baby girl. More than fifty were wounded. Palestinian security sources identified the bomber as Muhammad Daraghmeh, a seventeen-year-old from Dheisheh refugee camp near Bethlehem. The al-Aqsa Martyrs' Brigades claimed responsibility.[59]

On Saturday night, March 9, 2002, Fu'ad Hourani, a twenty-year-old from al-Arroub refugee camp near Hebron, stepped into Café Moment and detonated a powerful bomb that killed eleven and wounded more than fifty. (See victim testimonies above.) A Hamas statement claimed responsibility for it as "a brave attack... to avenge the Israeli massacres against our people."[60] The Café Moment bombing came two hours after two Palestinians opened fire and tossed grenades at a seafront hotel in Netanya, killing a baby and one other person and wounding more than thirty. The perpetrators of that attack, responsibility for which was claimed by the al-Aqsa Martyrs' Brigades, were killed in a shootout with Israeli police.

Another suicide bombing occurred on March 20, 2002, aboard Bus No. 283 near Umm al-Fahm, in the Galilee region, killing four soldiers and three civilians. Fifteen of the twenty-nine wounded were not Jewish but Palestinian Arab citizens of Israel. The perpetrator was twenty-four-year-old Rafat Abu Diyak, from the town of Jenin. The Islamic Jihad organization claimed responsibility. Bus No. 283 had been attacked by suicide bombers twice before, in Afula on March 5, 2002 and near Pardes Hanna on November 29, 2001. (See Appendix One.)

The next day, March 21, 2002, the al-Aqsa Martyrs' Brigades claimed credit for a suicide bombing on a crowded shopping street in Jerusalem that killed three and wounded at least sixty. Al-Aqsa Martyrs' Brigades sources reportedly confirmed Israeli allegations that the perpetrator, a twenty-two-year-

---

[59] Some reports give Daraghmeh's age as twenty and his full name as Muhammad Daraghmeh Ashouani; Human Rights Watch uses the name and age as given by his family.

[60] "Hamas claims responsibility for Jerusalem bombing," Reuters, March 9, 2002.

old former policeman, had at one time been detained by PA security forces but was released during the Israeli incursions into Ramallah earlier in March.[61]

The deadliest single Palestinian suicide bombing attack occurred on March 27, 2002, when twenty-five-year-old ʿAbd al-Basit ʿAwdah, a Hamas activist from Tulkarem, blew himself up in a Netanya hotel as some 250 people sat down to a Passover Seder. The blast killed at least nineteen Israelis immediately and wounded scores of others; the death toll later climbed to twenty-nine. Clara Rosenberger, one of the many people badly injured in the blast (see above), had chosen to attend the hotel Seder specifically because there had been a shooting attack in Netanya several weeks earlier and she had wanted to feel safe.[62] Entire families were reportedly among those killed and wounded, including some visiting from elsewhere.

Palestinian sources confirmed that the PA had earlier detained ʿAwdah at the request of Israel, but only briefly.[63]

The perpetrators of the March attacks generally tried to justify them as retaliation for Israeli abuses, or as legitimate acts of resistance. Mahmud al-Titi, for example, an al-Aqsa Martyrs' Brigades leader in Balata refugee camp near Nablus, said on March 8, "While [Israeli forces] were attacking Balata refugee camp, our groups in Bethlehem were preparing retaliation."[64] Hamas, the main

---

[61] "Suicide Bomb Stalls Mideast Peace Talks," *Boston Globe*, March 22, 2002.

[62] Human Rights Watch interview with Rachel Klirs, daughter of Clara Rosenberger, Jerusalem, July 2, 2002.

[63] "Israeli source says Netanya bombing 'declaration of war', 20 dead," BBC Monitoring Middle East, March 28, 2002. According to the *Jerusalem Report*, an Israeli biweekly, ʿAwdah joined Hamas after Israeli security forces had prevented him from crossing the Allenby bridge to Amman to marry his fiancée prior to the intifada. See Khaled Abu Toameh, "Love and Hate," *Jerusalem Report*, May 20, 2002, p. 27. Yaʿov Limor, writing in the daily *Maʿariv* on August 17, 2001, many months before the Netanya attack, reported that Nahid Abu Ishaq, a Hamas activist detained by the Israeli Defense Force in connection with the Sbarro pizzeria bombing in Jerusalem, "was found in possession of the last testament of Basit ʿAwdah, who was about to carry out another suicide attack," in "Terror map of Hamas and Islamic Jihad," *Maʿariv*, translated in Foreign Broadcast Information Service (FBIS), Near East and South Asia, August 20, 2001, FBIS-NES-2001-0817. At around that time it appears that ʿAwdah went underground. He was reportedly on the list of persons sought by Israeli forces during the IDF incursion into Tulkarem in January 2002, but escaped capture at that time. (The IDF raid on Tulkarem is discussed in Human Rights Watch, "In a Dark Hour: The Use of Civilians during IDF Arrest," *A Human Rights Watch Report*, vol. 14, no. 2 (E), April 2002, pp. 16-19.)

[64] Mohammed Daraghmeh, "Militia leader seeks to build Palestinian liberation arm," Associated Press, March 8, 2002. Al-Titi said in the same interview, "I believe that they have put me on the assassination list. So, sooner or later they are going to assassinate me, so I'll kill them, as many as I can." Al-Titi and three others were killed when an Israeli tank targeted them on May 22, 2002.

Palestinian opposition group, said that its attacks were also intended to disrupt moves towards political negotiations. A Hamas statement claimed that one purpose of the Netanya Park Hotel Passover Seder attack was to derail diplomatic initiatives at an Arab League summit in Beirut. "The summit resolutions are below the aspirations and the sacrifices of the Palestinian people," said `Usama Hamdan, a Hamas spokesman in Beirut.[65]

The Palestinian Authority agreed that "this operation against Israeli civilians is in essence an attack against the Arab summit and against [U.S. Special Representative Anthony] Zinni's mission." It went on to say that "the leadership strongly denounces any endangering of Palestinian or Israeli civilians and will not practice leniency with parties claiming responsibility and will take firm measures to bring those responsible before a court."[66]

President Yasir Arafat routinely condemned these suicide bombing attacks against civilians. Following the March 2 attack, the PA issued a statement saying that it "denounces strongly and unambiguously any operations targeting civilians whether Israelis or Palestinians, including the operation executed this evening, Saturday, March 2, 2002, in the center of a civilian neighborhood in Jerusalem"[67] Arafat also condemned the March 21 al-Aqsa Martyrs' Brigades attack against "innocent Israeli civilians." "We will take the appropriate and immediate measures to put an end to such attacks," he said.[68]

Seeming public justifications of the bombings, however, came from figures close to Arafat, especially after the al-Aqsa Martyrs' Brigades began carrying out suicide bombing attacks against civilians in early 2002. Ahmad `Abd al-Rahman, an Arafat advisor and secretary of the PA Cabinet, responded to the March 9, 2002 attack on the Café Moment in Jerusalem by saying: "This is the normal response from the Palestinian resistance for all the Israelis have done in the refugee camps, to Palestinian civilians, women and children.... The Israelis have to expect such operations whenever they escalate their military attacks

---

[65] Hussein Dakroub, "Militant Palestinian Groups Reject Arab Peace Overture to Israel," Associated Press, March 28, 2002.

[66] "The leadership strongly denounces Netanya operation against Israeli civilians and decides to prosecute those involved or responsible, " WAFA (official PA news agency), March 27, 2002. Translated from Arabic by Human Rights Watch.

[67] "The Palestinian Authority denounces any operations targeting Palestinian and Israeli civilians, " WAFA (official PA news agency), March 2, 2002. Translated from Arabic by Human Rights Watch.

[68] "Suicide Bomb Stalls Mideast Peace Talks," *Boston Globe*, March 22, 2002.

against our civilians."[69] Marwan Barghouti, the West Bank general secretary of Fatah, wrote in January 2002 that he, "and the Fatah movement to which I belong, strongly oppose attacks and the targeting of civilians inside Israel, our future neighbor...."[70] But following the March 21 al-Aqsa Martyrs' Brigades suicide bombing on a crowded Jerusalem shopping street that killed three and wounded sixty, Barghouti commented to reporters, "Our people have resorted to resistance because we have reached an impasse. The more the Israelis tighten the blockades around us and increase the killing, the more there will be a response."[71]

Despite the sometimes equivocal condemnations of the PA leadership, the al-Aqsa Martyrs' Brigades' suicide bombings did not stop. Just before 2:00 p.m. on March 29, an eighteen-year-old woman from Dheisheh refugee camp outside Bethlehem, Ayat Muhammad al-'Akhras, detonated an explosive belt she was wearing in a supermarket in the Jerusalem suburb of Kiryat Hayovel. The blast killed two and wounded more than twenty. Al-'Akhras reportedly carried an explosive device in her handbag that failed to explode. The al-Aqsa Martyrs' Brigades claimed responsibility. Al-'Akhras, in a pre-recorded videotape, condemned Arab leaders for "watching while Palestinian women" fought the Israeli occupation.[72]

In Operation Defensive Shield, beginning at the end of March 2002, Israeli forces re-occupied most of the Palestinian-controlled "Area A" of the West Bank, which included the major Palestinian population centers apart from East Jerusalem and about 18 percent of the total area.[73] The Israeli operation did not stop suicide bombings, although the pace of the attacks dropped. On March 30, at 9:30 p.m., a suicide bombing attack in a central Tel Aviv restaurant wounded some twenty people, one of whom eventually died. The al-Aqsa Martyrs' Brigades identified the perpetrator as twenty-three-year-old Muhannad Ibrahim Salahat, from the village of al-Faraa, near Nablus. In the first of two attacks on March 31, 2002, a suicide bomber seriously wounded three people near a volunteer medic station in Efrat, one of the Gush Etzion bloc settlements near

---

[69] Greg Myre, "Israel destroys Arafat's Gaza office after suicide bombing in Jerusalem," Associated Press, March 10, 2002.

[70] "Want Security? End the Occupation," *Washington Post*, January 16, 2002.

[71] "Suicide Bomb Stalls Mideast Peace Talks," *Boston Globe*, March 22, 2002.

[72] "Suicide bomber kills two in Jerusalem supermarket," Reuters, March 29, 2002.

[73] For a detailed account of one component of this operation, see Human Rights Watch, "Jenin: IDF Military Operations," *A Human Rights Watch Report*, vol. 14, no. 3 (E), May 2002.

Bethlehem. The al-Aqsa Martyrs' Brigades named the perpetrator as Jamal Hamaid, seventeen years old, from Bethlehem. The same day, Hamas took responsibility for an attack in Haifa in which twenty-three-year-old Shadi Abu Tubassi from Jenin refugee camp killed fifteen and wounded more than thirty when he blew himself up in a restaurant crowded with Israeli citizens, both Jewish and Palestinian Arab.

The first suicide bombing after the Israel Defense Forces (IDF) operation had ended, in a pool hall in Rishon Letzion on May 7, 2002, killed fifteen and wounded fifty. The Palestinian Authority issued a statement saying that it "promptly condemns the violent attack against Israeli civilians" and said that it had "decided to take effective measures against those involved in this dangerous operation and those who are standing behind it. And we will not go easy with these groups...."[74] President Arafat, in a televised address the next day, said, "I gave my orders and directions to all the Palestinian security forces to confront and prevent all terror attacks against Israeli civilians from any Palestinian side or parties."[75] In response to initial reports that the perpetrator was affiliated with Hamas and may have come from Gaza, PA security forces rounded up more than a dozen rank-and-file Hamas members there.[76] In the following days, Israeli forces killed two Palestinian security officers in Halhoul and arrested others elsewhere in the West Bank, but these were apparently not persons wanted in connection with the Rishon Letzion bombing.[77]

During May and June 2002, Palestinian militants carried out nine suicide bombings and made numerous attempts that were thwarted. The al-Aqsa Martyrs' Brigades claimed responsibility for five of the nine attacks. The first was carried out by Jihad al-Titi, a nephew of prominent al-Aqsa Martyrs' Brigades leader Mahmud al-Titi. The attack immediately followed Israel's assassination of Mahmud al-Titi in Balata camp.[78] A statement from al-Aqsa Martyrs' Brigades called suicide attacks its "sole weapon to end the

---

[74] Statement as published in the *New York Times*, May 8, 2002.

[75] Greg Myre, "Palestinians arrest Hamas members; Bethlehem talks break down," Associated Press, May 9, 2002.

[76] Phil Reeves, "Arafat tries to stave off Gaza assault with arrests," *The Independent* (London), May 10, 2002.

[77] For a detailed account of the killings in Halhoul, see Edward Cody, "Israel pursues focused attacks: In killing of West Bank intelligence agents, a pattern resumes," *Washington Post*, May 16, 2002.

[78] Three other persons, two of them al-Aqsa Martyrs' Brigades members, were also killed by the Israeli tank shell that killed al-Titi. Israel asserted that al-Titi was responsible for the deaths of at least eleven Israelis, mostly in attacks employing automatic weapons.

occupation."[79] In an attempted attack two days later, an Israeli security guard shot and killed the driver of a car loaded with pipe bombs as the car sped towards a crowded Tel Aviv nightclub.[80]

Hamas and the PFLP claimed joint responsibility for a May 19 attack on a Netanya outdoor market. The perpetrator, dressed as a soldier, killed an elderly man and a teenage boy and wounded dozens. Hamas also claimed responsibility for two other suicide attacks, including an attack on a bus traveling from the Israeli settlement of Gilo to Jerusalem on June 18, 2002, which killed nineteen and wounded at least seventy-four. The al-Aqsa Martyrs' Brigades claimed responsibility for an attack the following day at a bus stop near the French Hill settlement in East Jerusalem.

On June 20, in response to these attacks, the IDF launched "Operation Determined Path," in which it again re-occupied seven out of eight major Palestinian West Bank cities. Prime Minister Sharon said, "This is not occupation, but we will remain in Palestinian areas for as long as necessary to carry out essential operations."[81] On August 20, IDF troops staged a negotiated withdrawal from Bethlehem, on condition that PA Security forces would prevent future armed activities there.[82]

### Martyrdom, Public Officials, and the Role of the Media

Public statements by officials have delivered mixed messages on suicide attacks. Palestinian officials, as noted above, have frequently condemned suicide attacks against civilians. But Palestinian and regional officials have also made statements that support and, at times, promote them. Israeli authorities and critics of the PA have also argued that Palestinian media have fostered public support for such attacks.

Media in the Occupied Territories consist of local, privately funded television and radio; PA-funded television and radio; and satellite channels broadcast from surrounding countries, including *al-Manar,* affiliated with the Lebanese movement Hizbollah. Of three major Palestinian newspapers, *al-Ayyam* and *al-Hayat al-Jadedah* are published in the West Bank and *al-Quds* is published in East Jerusalem after clearance by the Israeli military censor. Many

---

[79] John Kifner, "Israel thwarts bomb attack, but fears more to come," *New York Times,* May 25, 2002.

[80] The encounter set off a blast that injured one person.

[81] Gil Hoffman and Margot Dudkevitch, "Sharon: Massive Assault on Hamas Underway in Gaza," *Jerusalem Post,* June 25, 2002.

[82] Serge Schmeann, "Israel Will Start Pullout in Gaza and Bethlehem," *New York Times,* August 19, 2002. As of late September, the IDF pullout has been limited to Bethlehem.

residents of the Occupied Territories also have access to Israeli television, radio, and print media, in both Arabic and Hebrew. As curfews and limits on movement have become increasingly restrictive, the importance of media—and particularly television—as the primary source of public information has increased. Palestinian and Arabic regional media outlets have followed the events of the Israeli-Palestinian clashes closely, and the degree of media coverage reflects the immense impact that the clashes have had on Palestinian and Arab society.

Israeli and other critics have argued that the Palestinian media contribute to suicide attacks on civilians by placing an inappropriate, commendatory emphasis on martyrdom. The concept of martyrdom—of sacrifice for the sake of one's beliefs or principles—is neither exclusively Muslim nor exclusively religious. In the context of the current clashes, the term "martyr" is applied to all individuals killed, wounded, or imprisoned in events related to what has become known as the "al-Aqsa intifada," including those who carried out suicide attacks. The term "martyr" is even applied as an honorific to some prominent individuals who, since September 2000, died of natural causes.[83]

In Palestinian Arabic, the phrase for a bombing attack in which the perpetrator is killed is an *amaliyya istishhadiyya*, a "martyrdom operation," or an *amaliyya fida'iyya,* a "sacrificial operation." In the Israeli Arabic-language media, the preferred term is an *amaliyya intihariyya,* a "suicide operation."[84]

The media coverage comprises only part of a larger atmosphere of social respect for those who have died in the intifada, expressed through street posters, pamphlets, internet sites, murals, banners, public discourse, and attendance by public officials at funerals or memorial ceremonies. Virtually all societies engaged in armed struggle honor those who die as part of the struggle. What is wrong, however, is to equate individuals who are victims of attacks or who have carried out attacks that are permissible under international humanitarian law with individuals who die while committing war crimes or crimes against humanity.

Public officials, because of the political authority they embody, should never legitimize attacks on civilians. Yet political leaders have made statements that appear to endorse attacks against civilians, both within the Occupied Territories and externally. These span the range from ambiguity to outright

---

[83] For example, the late Palestine Liberation Organization representative, Faisal Husseini, for whom posters were prominently displayed in East Jerusalem in 2001-2002.

[84] Arabic-language media in other countries have used varying terms. See, for example, Daniel Sobelman, "Saudi Media Drops Shaheed in Coverage of Suicide Attacks," *Ha'aretz,* May 22, 2002.

support, and undermine other statements condemning attacks against civilians.[85] Political leaders such as President Arafat have repeatedly praised "martyrs," without distinguishing between those who die as victims of attacks or while attacking military targets and those who intentionally die in the course of a deliberate attack against civilians.[86] Yasir Abed Rabbo, the PA minister of culture and information, reportedly defended the use of the term "martyr" with reference to suicide bombers. "You can call him a *shahid* and denounce what he does politically," he said.[87]

Other officials have expressed more unequivocal support for attacks on civilians. On April 10, 2002, PA Cabinet Secretary-General Ahmad 'Abd al-Rahman described that day's attack on a Haifa bus as a "natural response to what is taking place in Palestinian camps."[88] Six weeks later, 'Abd al-Rahman described suicide bombings in an interview with the Qatar-based satellite television station al-Jazeera as "the highest form of national struggle. There is no argument about that."[89] Other officials have praised the armed groups that perpetrate the attacks, rather than the attacks themselves. In March 2002, after repeated al-Aqsa Martyrs' Brigades attacks on civilians, West Bank Preventive Security chief Jibril Rajoub reportedly told a local newspaper, "The Aqsa Brigades are the noblest phenomenon in the history of Fatah, because they restored the movement's honor and bolstered the political and security echelon of the Palestinian Authority."[90]

Statements approving of suicide attacks have also been made by government officials of neighboring countries. On March 27, the day of the

---

[85] See for example, "Statement in the name of Mr. President and Palestinian Leadership: Condemning all terrorist acts targeting civilians, be they Israelis or Palestinians, including state, group or individuals terrorism," April 13, 2002 at http://www.jmcc.org/banner/banner1/bayan/pasterror.htm (accessed September 3, 2002).

[86] See for example, interviews by Arafat with Abu Dhabi Television on March 29, 2002, re-broadcast by PA TV the same day. See transcript of the interview in "Palestinian leader says "morale is high" among followers in compound," BBC Monitoring Middle East, March 29, 2002.

[87] "The cancer of suicide bombing," *New York Times*, April 3, 2002.

[88] See report by Palestinian Satellite Channel TV Gaza in "Palestinian official says suicide bomb "natural response" to Israeli offensive," BBC Monitoring Middle East, April 10, 2002.

[89] See transcript of interview with al-Jazeera in Jerusalem Media and Communication Centre Daily Report, May 13, 2001.

[90] Arieh O'Sullivan and Lamia Lahoud, "Rajoub praises Aksa Martyrs' Brigades," *Jerusalem Post*, March 19, 2002.

bombing of the Park Hotel, Syrian President Bashar al-Asad said in a speech to the Arab Summit in Beirut:

> We have heard today in a speech by one of the guests on the doctrine governing attacks on civilians and the innocent.... The doctrine governing attacks on civilians and the innocent is a correct one …but it is not applicable in this situation. We are now facing occupation. Attacking civilians when there are two neighboring states that are involved in military operations is one thing, but when there is occupation it is a different issue.[91]

In a June 2002 interview with the London-based Arabic newspaper, *al-Sharq al-Awsat,* the Saudi ambassador to the U.K said, "I wish I would die a martyr despite the fact that I am of an age that does not allow me to carry out a martyrdom operation."[92] Such comments glorify individuals who die in order to attack civilians. They contribute to public acceptance of such attacks, and, in the context of ongoing suicide attacks against civilians, publicly legitimize war crimes or crimes against humanity. Public officials have a responsibility not to make such statements—and to discourage others from making them.

Apologetic statements by public officials have also been accompanied by the broadcast of incendiary statements on publicly funded television. There were several recorded instances of such broadcasts on the official PA television channel in 2001, particularly in the broadcasts of weekly Friday prayer sermons. Among these were the live broadcasts of Shaikh Ibrahim Ma'adi delivering sermons from a Gaza mosque on June 8, 2001, and again on August 3, 2001. "Blessed are the people who strap bombs onto their bodies or those of their sons," Ma'adi said on the first of these occasions. On the second, he explicitly called for bombings in Tel Aviv, Hadera, Ashkelon, and other Israeli cities, adding:

---

[91] Speech by His Excellency the President Bashar al-Asad in the Opening Session of the Fourteenth     Arab     Summit,     March     27,     2002,     Beirut     at http://www.arabsummitbeirut.org/submenu2c_a_syriacomplete.htm (accessed June 5, 2002). Ellipses in original text. Translated from Arabic by Human Rights Watch.

[92] Interview by Huda al-Husayni with Ghazi al-Qusaybi, Saudi Ambassador  to the United Kingdom, *al-Sharq al-Awsat,* 5 June 2002, pp. 8-9. FBIS Daily Report, FBIS-NES-2002-0605. In September 2002, Ambassador al-Qusaybi was recalled from his post. There was no indication from Saudi authorities if his well-publicized endorsements of suicide bombings were a factor.

> The Jews have bared their teeth. They have said what they have said
> and done what they have done. And they will not be deterred except
> by the color of the blood of their filthy people. They will not be
> deterred unless we willingly and voluntarily blow ourselves up
> among them.[93]

In the context of the Israeli-Palestinian conflict, such statements constitute incitement to crimes against humanity. Under international criminal law, the PA has a responsibility to ensure they are neither broadcast nor published, and should bring to justice those who make them. The PA is also obliged to prevent such incitement under article XII (1) of the 1994 Gaza-Jericho Agreement and Article II (3) (c) of Annex I to the Israel-Palestinian Interim Agreement on the West Bank and the Gaza Strip.[94] These Friday sermons are broadcast live, usually from a prominent mosque in Gaza or the West Bank, implying that the broadcaster has limited control over the message. However, the PA has a responsibility to ensure that individuals speaking on live broadcasts are aware that they will be held criminally liable if they incite the commission of crimes against humanity or war crimes. Those who contravene such warnings should be held accountable and brought to justice.

Hani al-Masri, an official in the PA Ministry of Information and outspoken critic of suicide bombing attacks on civilians, told Human Rights Watch that PA television programming policies have changed since December 2001. "There is more coverage [of suicide bombings] on CNN than on Palestinian TV," Masri said.[95]

> Journalists used to be more supportive of the suicide bombings,
> reflecting public opinion, but now they have come out more clearly
> against them. The editors determine what gets broadcast, and they
> reflect the line of the PA. Before December 16 [2001] the message
> was a mixed one. The PA now seems to be trying hard through TV.
> The dominant sound bite is that armed resistance is for the Occupied

---

[93] Copy of broadcasts provided to Human Rights Watch by Itamar Marcus of the Israel-based Palestinian Media Watch

[94] *Agreement On The Gaza Strip And The Jericho Area*, between the State of Israel and the PLO, May 4, 1994, Article XII (1); Annex I, "Protocol Concerning Redeployment and Security Arrangements, The Israeli-Palestinian Interim Agreement on the West Bank and the Gaza Strip," Washington D.C., September 28, 1995, Article II (3) (c).

[95] Human Rights Watch telephone interview with Hani al-Masri, Ramallah, June 19, 2002.

Territories only, against the occupation forces. But people here are extremely disenchanted with the PA after Oslo, after the Israeli reoccupation. And the PA has no say in the mosques, which are much more important than the media.... We can't say there's been a media campaign against these attacks, but debates and critical discussions are more frequent.[96]

Ziad Abu `Amr, a Palestinian legislator in Gaza and prominent critic of PA policies, agreed with Masri:

The debate about suicide bombers is growing, but it's still largely overwhelmed by the desperateness of our situation. The problem is that few people here watch Palestine TV. They watch Jazeera and Manar. You want to see incitement? That's where it is.[97]

Systematic monitoring required to evaluate such assessments of Palestinian media is beyond the scope of Human Rights Watch's research. Ghassan Khatib, founder and director of the Jerusalem Media and Communications Center, also argued that the prime sources of media encouragement for suicide bombings are not under the control of the PA. "Look at the media—it's a free platform for Hamas," he said, speaking of Gulf states' support for Hamas. "Jazeera has not been at all professional in the way it favors Hamas over other factions, and promotes anything that's critical of the PA and PLO [Palestine Liberation Organization]."[98]

Palestinian public debate over suicide attacks against civilians has grown since March 2002. For example, on June 19, 2002, in a full-page advertisement in the Palestinian daily *al-Quds*, fifty-five public personalities and intellectuals published an "Urgent Appeal to Stop Suicide Bombings." Sari Nusseibeh, the president of al-Quds University and the PLO representative for Jerusalem, reportedly organized the initiative that Palestinian newspapers both welcomed and criticized. The following day, President Arafat welcomed the petition in an interview with *Ha'aretz*, and repeated his condemnation of attacks on

---

[96] Ibid.

[97] Human Rights Watch interview with Ziad Abu `Amr, Washington, D.C., June 28, 2002.

[98] Human Rights Watch interview with Ghassan Khatib, Jerusalem, June 6, 2002. Khatib was subsequently appointed minister of labor in the PA cabinet.

civilians.[99] More than four hundred additional signatures were gathered in subsequent days, triggering criticism from Hamas and a counter-petition in support of "all means" of armed struggle, supported by some one hundred and fifty signatures.[100] Some PA officials subsequently spoke out more strongly against suicide bombings. On August 30, PA Interior Minister `Abd al-Razaq Yahya gave a widely-publicized interview with the Israeli newspaper *Yediot Ahronoth*, in which he urged all armed groups to stop suicide attacks because

---

[99] See Akiva Eldar, "Arafat to Ha'aretz: I Accept Clinton's Proposal to Bring Order," *Ha'aretz*, June 21, 2002. Translated from Hebrew by Human Rights Watch. See text of statement from WAFA (official PA news agency) in "Arafat Receives Chinese Official, Condemns Violence Against Civilians," BBC Monitoring Middle East, June 20, 2002.

[100] For an English translation of the text and some critical responses from Palestinian political figures, including Hamas' `Abd al-`Aziz al-Rantisi, see Middle East Media Research Institute, "Special dispatch no. 393, A Palestinian Communiqué Against Martyrdom Attacks," June 25, 2002 at http://www.memri.org  (accessed August 29, 2002). See also James Bennet, "Gingerly, Arabs Question Suicide Bombings," *New York Times*, July 3, 2002.

42        Erased in a Moment: Suicide Bombing Attacks Against Israeli Civilians

they were "contrary to the Palestinian tradition, against international law and harm[ed] the Palestinian people."[101]

---

[101] See Mark Lavie, "Palestinian: Stop Suicide Bombings," Associated Press, August 30, 2002.

## IV. LEGAL STANDARDS

In any armed conflict the right of the parties to choose the methods and means of warfare is not unlimited. On the contrary, those choices are strictly regulated by the customs and provisions of the law of armed conflict, referred to here as international humanitarian law (IHL). [102] IHL also regulates cases of total or partial military occupation, as in the case of the Palestinian territories. Against this background, certain episodes of violence that rise to the level of armed conflict are governed by general principles of the laws of war. Some of the rules of IHL form part of international customary law, which are binding on all states and also on non-state actors—in this case, Palestinian armed groups. [103]

Many rules of IHL have been codified in international treaties, such as the Geneva Conventions and their additional protocols. The Geneva Conventions have achieved widespread acceptance among states as authoritative standards of behavior for parties in situations of armed conflict, and have been ratified by more than 190 states. [104] The 1977 Additional Protocols to the Geneva Conventions were negotiated at a diplomatic conference where representatives from non-state armed groups campaigning for national self-determination were also present, including the Palestine Liberation Organization (PLO). [105] Many of the provisions are recognized as customary international law.

[102] Article 2, paragraph 2, common to the four Geneva Conventions of August 12, 1949. The Geneva Conventions of August 12, 1949; the Protocols Additional to the Geneva Conventions of June 8, 1977; and their commentaries are available at http://www.icrc.org/ihl (accessed September 3, 2002).

[103] A rule is customary if it reflects state practice and there exists a conviction in the international community that such practice is required as a matter of law. While treaties only bind those states that have ratified them, customary law binds all states. See International Committee of the Red Cross (ICRC), "Treaties and Customary Law" at http://www.icrc.org/Web/eng/siteeng0.nsf/iwpList2/Humanitarian_law:Treaties_and_cust omary_law (accessed September 3, 2002). For a discussion on customary law binding individuals and non-state actors, see Lindsay Moir, *The Law of Internal Armed Conflict* (United Kingdom: Cambridge University Press, 2002), pp. 57-58; and Rene Provost, *International Human Rights and Humanitarian Law* (United Kingdom: Cambridge University Press, 2002), pp. 98-99.

[104] Including Algeria, Bahrain, Iran, Iraq, Israel, Egypt, Jordan, Kuwait, Lebanon, Libya, Morocco, Oman, Qatar, Sudan, Saudi Arabia, Syria, Tunisia, Turkey, the United Arab Emirates, and Yemen.

[105] The non-state participants in the meeting, which also included the African National Congress, did not vote.

44    Erased in a Moment: Suicide Bombing Attacks Against Israeli Civilians

**Obligations of the Palestinian Authority and Armed Palestinian Groups**

The rules and obligations of IHL are clearest when applied to conflict between sovereign states. The responsibilities of non-state actors may differ from those of sovereign states, but non-state actors, too, have clear responsibilities under IHL. Many customary rules of IHL apply to all parties to a conflict, including non-state actors, provided that the confrontation is of an intensity that places it beyond the threshold of a mere disturbance.[106]

Although it is not a sovereign state, the Palestinian Authority has explicit security and legal obligations set out in the Oslo Accords, an umbrella term for the series of agreements negotiated between the government of Israel and the PLO from 1993 to 1996. The PA obligations to maintain security and public order were set out in articles XII to XV of the 1995 Interim Agreement on the West Bank and Gaza Strip.[107] These responsibilities were elaborated further in Annex I of the interim agreement, which specifies that the PA will bring to justice those accused of perpetrating attacks against Israeli civilians. According to article II (3) (c) of the annex, the PA will "apprehend, investigate and prosecute perpetrators and all other persons directly or indirectly involved in acts of terrorism, violence and incitement."[108]

Similarly, PA leaders, including President Arafat, have repeatedly pledged in meetings with international human rights organizations and in radio broadcasts, as well as in the Oslo Accords, that the PA intends to abide by internationally recognized human rights norms.[109] In a situation of clashes that

---

[106] Article 3 common to the four Geneva Conventions of August 12, 1949 (Common Article 3), accepted as customary law, has wide scope. The authoritative commentary of the ICRC to the Fourth Geneva Convention justifies applying the provision to non-state actors, saying "[t]here can be no drawbacks in this, since the Article in its reduced form, contrary to what might be thought, does not in any way limit the right of a State to put down rebellion, nor does it increase in the slightest the authority of the rebel party. It merely demands respect for certain rules, which were already recognized as essential in all civilized countries, and embodied in the municipal law of the States in question, long before the Convention was signed." ICRC, "Commentary: Convention (IV) relative to the Protection of Civilian Persons in Time of War. Geneva, 12 August 1949" at http://www.icrc.org/ihl (accessed September 3, 2002).

[107] The Government of Israel and the Palestine Liberation Organization, "The Israeli-Palestinian Interim Agreement on the West Bank and the Gaza Strip," Washington D.C., September 28, 1995.

[108] See article II (3) (c) in Annex I, "Protocol Concerning Redeployment and Security Arrangements, The Israeli-Palestinian Interim Agreement on the West Bank and the Gaza Strip," Washington D.C., September 28, 1995.

[109] Under article XI (1) of Annex I, "Protocol Concerning Redeployment. . ." of the interim agreement of September 28, 1995, the Palestinian Police "will exercise powers and responsibilities to implement this Memorandum with due regard to internationally

rise to the level of armed conflict, PA security forces and other organized factions that engage in armed actions should abide by fundamental principles of international humanitarian law. They are also obliged to ensure respect for such principles by armed groups operating from territory under their effective control.

The Palestinian Authority exists independently from the Palestine Liberation Organization. From 1974 to 1977, the PLO was one of several national liberation movements "recognized by the regional intergovernmental organizations" to participate in the diplomatic negotiations on the text of the two Additional Protocols to the Geneva Conventions.[110] Under article 96 of Protocol I, non-state actors may commit, under certain specific circumstances, to apply the conventions and the protocol if they declare their willingness to do so to the Swiss government. The PLO has never made a declaration under article 96, and Israel is not a party to Protocol I. As a result, Protocol I does not apply to the current clashes, except for the provisions of Protocol I that are considered customary international law.

The PLO Executive Committee wrote to the Swiss Federal Department of Foreign Affairs in June 1989 to inform it that, being "entrusted with the functions of the Government of the State of Palestine by decision of the Palestinian National Council," it had decided on May 4, 1989 to adhere to the Geneva Conventions and their additional protocols.[111] Due to the "uncertainty within the international community as to the existence or non-existence of a State of Palestine," the Swiss government informed states that it could not decide whether the PLO letter constituted a valid instrument of accession. As a result of their unilateral declaration, the PLO and its constituent factions have nevertheless undertaken what is, at minimum, a strong moral commitment to uphold the most fundamental standards contained in the Geneva Conventions and Protocol I.

**Crimes Against Humanity**

The scale and systematic nature of the attacks on civilians detailed in this report meets the definition of a crime against humanity. Hamas and Islamic Jihad have claimed responsibility for suicide bombing attacks on civilians since

---

accepted norms of human rights and the rule of law, and will be guided by the need to protect the public, respect human dignity, and avoid harassment."

[110] *Final Act of the Diplomatic Conference of Geneva of 1974-1977,* Geneva, June 10, 1977.

[111] ICRC, "Geneva Conventions of 12 August 1949 and Additional Protocols of 8 June 1977: Ratifications, accessions and successions" at http://www.icrc.org/Web/Eng/siteeng0.nsf/iwpList74/77EA1BDEE20B4CCDC1256B66 00595596#a6 (accessed September 3, 2002).

1994, and such attacks clearly represent organizational policy at the highest levels. Since January 2002, the al-Aqsa Martyrs' Brigades and the PFLP have also claimed responsibility for organizing and carrying out such attacks.

The notion of "crimes against humanity" refers to acts that, by their scale or nature, outrage the conscience of humankind. Crimes against humanity were first codified in the charter of the Nuremberg Tribunal of 1945. Since then, the concept has been incorporated into a number of international treaties, including the Rome Statute of the International Criminal Court (ICC). Although definitions of crimes against humanity differ slightly from treaty to treaty, all definitions provide that the deliberate, widespread, or systematic killing of civilians by an organization or government is a crime against humanity.[112] Unlike war crimes, crimes against humanity may be committed in times of peace or in periods of unrest that do not rise to the level of an armed conflict.

The most recent definition of crimes against humanity is contained in the Rome Statute of the ICC, which entered into force on July 1, 2002. The statute defines crimes against humanity as the "participation in and knowledge of a widespread or systematic attack against a civilian population," and "the multiple commission of [such] acts...against any civilian population, pursuant to or in furtherance of a State or organizational policy to commit such attack." The statute's introduction defines "policy to commit such attack" to mean that the state or organization actively promoted or encouraged such attacks against a civilian population. The elements of the "crime against humanity of murder" require that (1) "the perpetrator killed one or more persons," (2) "[t]he conduct was committed as part of a widespread or systematic attack directed against a civilian population," and (3) "[t]he perpetrator knew that the conduct was part

---

[112] One example of a definition is contained in article 18 of the Draft Code of Crimes Against the Peace and Security of Mankind, drafted by the expert members of the International Law Commission. Article 18 uses a definition of crimes against humanity based on the Nuremberg Charter, but also takes into account developments in international law since Nuremberg. It sets out two conditions that must be met for acts such as murder, enslavement, mutilation, and rape to qualify as crimes against humanity. The first was that the act be committed "in a systematic manner or on a large scale," meaning that it must have been committed as a result of a deliberate plan or policy, usually resulting in repeated acts. The second condition was that the acts be directed against multiple victims, either "as a result of the cumulative effect of a series of inhumane acts or the singular effect of an inhumane act of extraordinary magnitude." See "Article 18—Crimes Against Humanity" in chapter II, "Draft Code of Crimes Against the Peace and Security of Mankind" in the *International Law Commission Report*, 1996 at   http://www.un.org/law/ilc/reports/1996/chap02.htm#doc3   (accessed September 3, 2002).

of, or intended the conduct to be part of, a widespread or systematic attack against a civilian population."[113]

Those who commit crimes against humanity, like war crimes, are held individually criminally responsible for their actions. Crimes against humanity give rise to universal jurisdiction, they do not admit the defense of following superior orders, and they do not benefit from statutes of limitation. International jurisprudence and standard setting of the last ten years have consolidated the view that those responsible for crimes against humanity and other serious violations of human rights should not be granted amnesty.[114] As in the case of war crimes, all states are responsible for bringing those who commit crimes against humanity to justice.

The pattern of suicide bombing attacks against Israel civilians that emerged in 2001 and intensified during 2002 clearly meets the criteria of a crime against humanity.

## War Crimes: The Prohibition Against Targeting Civilians

A fundamental rule of international humanitarian law is that civilians must enjoy general protection against danger arising from military operations. The rule of civilian immunity is one of "the oldest fundamental maxims" of international customary law, meaning that it is binding on all parties to a conflict, regardless of whether a conflict is international or non-international in character.[115] Non-state parties to a conflict are also obliged to respect the norms of customary international law. At all times, it is forbidden to direct attacks

[113] Article 7(1)(a), "Finalized draft text of the Elements of Crimes Adopted by the Preparatory Commission for the International Criminal Court," November 2, 2000, U.N. Document PCNICC/2000/1/Add.2.

[114] For example, on July 7, 1999, the Special Representative of the Secretary-General attached a disclaimer to the Sierra Leone Peace Agreement, saying "The United Nations interprets that the amnesty and pardon in article nine of this agreement shall not apply to international crimes of genocide, crimes against humanity, war crimes, and other serious violations of international humanitarian law." See also, Commission on Human Rights, resolutions 1999/34 and 1999/32; the Annual Report of the U.N. Committee Against Torture to the General Assembly, 09/07/1996,A/51/44, para. 117; and U.N. Human Rights Committee General Comment 20, April 10, 1992.

[115] Dieter Fleck (ed.), *The Handbook of Humanitarian Law in Armed Conflict* (Oxford: Oxford University Press, 1995), p. 120. "The general prohibition against indiscriminate warfare applies independently of Arts. 48 and 51 [of Protocol I]. The relevant provisions of the Additional Protocols merely codify pre-existing customary law, because the principle of distinction belongs to the oldest fundamental maxims of established customary rules of humanitarian law. It is also virtually impossible to distinguish between international and non-international armed conflicts in this respect."

against civilians; indeed, to attack civilians intentionally while aware of their civilian status is a war crime. It is thus an imperative duty for an attacker to identify and distinguish non-combatants from combatants in every situation.

In addition to its status as established customary law, the principle of civilian immunity has been codified in numerous treaties. One of the clearest expressions of the principle is set out in article 51(2) of Additional Protocol I to the Geneva Conventions, which states:

> The civilian population as such, as well as individual civilians, shall not be the object of attack. Acts or threats of violence, the primary purpose of which is to spread terror among the civilian population, are prohibited.[116]

By deliberately targeting civilians, suicide bombing attacks clearly violate this most fundamental rule of the laws of war. The prohibition against targeting civilians holds in all circumstances, including when a party undertakes such attacks in retaliation for attacks on its own civilians (discussed below).[117]

The principle of distinction between civilian and military targets is enshrined in article 48 of Protocol I:

> In order to ensure respect for and protection of the civilian population and civilian objects, the Parties to the conflict shall at all times distinguish between the civilian population and combatants, and between civilian objects and military objectives, and accordingly shall direct their operations only against military objectives.[118]

Military objectives are defined as "those objects, which by their nature, location, purpose or use make an effective contribution to military action."[119] Under international humanitarian law, attacks that are not, or as a result of the method of attack *cannot*, be aimed at military targets, are considered "indiscriminate." They are prohibited under Protocol I and, under the same treaty, constitute war

---

[116] Protocol Additional to the Geneva Conventions of August 12, 1949, and relating to the Protection of Victims of International Armed Conflicts (Protocol I), June 8, 1977 at http://www.unhchr.ch/html/menu3/b/93.htm (accessed October 8, 2002).

[117] Protocol I, Art. 51(6).

[118] Protocol I, Art. 48.

[119] Protocol I, Art. 52(2).

crimes.[120] The protocol's provisions prohibiting indiscriminate warfare are considered to be norms of customary international law, binding on all parties in a conflict, regardless of whether it is an international or internal armed conflict.[121] That is, they are binding on all parties to the Israeli-Palestinian conflict, even though Israel has not ratified Protocol I.

### Murder and Willful Killings

In all situations of armed conflict, the deliberate killing of civilians is a war crime. Common Article 3 of the 1949 Geneva Conventions prohibits "violence to life and person, in particular murder of all kinds, mutilation, cruel treatment, and torture" when perpetrated against persons "taking no active part in the hostilities." As noted, Israel has ratified the 1949 Geneva Conventions. The obligation contained in Common Article 3 is absolute. It applies regardless of whether a party to the conflict is a state.[122] Serious violations of Common Article 3 are increasingly considered to be war crimes, and have been defined as such in the statutes of the International Criminal Court, the International Criminal Tribunal for the former Yugoslavia (ICTY), and the International Criminal Tribunal for Rwanda.[123]

Willful killing, that is, *intentionally* causing the death of civilians, and "willfully causing great suffering or serious injury" when wounding victims, are

---

[120] Indiscriminate attacks are "those which are not directed against a military objective," "those which employ a method or means of combat which cannot be directed at a specific military objective," or "those which employ a method or means of combat, the effects of which cannot be limited as required by the Protocol," and "consequently, in each such case, are of a nature to strike military objectives and civilians or civilian objects without distinction." Definitions of war crimes under Protocol I are contained in article 85.

[121] Fleck (Ed.), *The Handbook of Humanitarian Law*, p. 120.

[122] The ICRC commentary notes that the term "each Party" also binds a "non-signatory Party—a Party, moreover, which was not yet in existence [at the time of the Diplomatic Conference] and which need not even represent a legal entity capable of undertaking international obligations." The commentary continues, "[t]he obligation is absolute for each of the Parties." It further states: "If an insurgent party applies Article 3, so much the better for the victims of the conflict. No one will complain. If it does not apply it, it will prove that those who regard its actions as mere acts of anarchy or brigandage are right." ICRC, Commentary to the Fourth Geneva Convention at http://www.icrc.org/ihl (accessed September 3, 2002).

[123] S.R. Ratner, "Categories of War Crimes" in Roy Gutman and David Rieff (eds.), *Crimes of War,* (New York: W.W. Norton and Co., 1999).

war crimes.[124]    Persons who commit, order, or condone war crimes are individually liable under international humanitarian law for their crimes.

### Justifications Offered by Palestinian Armed Groups

Representatives of armed Palestinian groups often acknowledge they are aware that suicide attacks against civilians breach fundamental norms of international humanitarian law. However, they frequently invoke several arguments in an attempt to justify suicide attacks. The first argument is that such attacks do not target civilians. The second is that international humanitarian law does not regulate the conduct of Palestinian armed groups. The third is that those targeted in the suicide bombing attacks are some how not entitled to civilian status. The fourth is that suicide bombing attacks on civilians are legitimate because there is no other way to compensate for the imbalance of means between armed Palestinian groups and the Israeli security forces. None of these arguments has merit.

Despite overwhelming evidence to the contrary, members of armed Palestinian groups frequently deny that their operations target civilians. When a founding member of the al-Aqsa Martyrs' Brigades, Mahmud al-Titi, was interviewed on March 8, 2002 about a shooting attack at a Tel Aviv restaurant three days earlier, al-Titi maintained—without much apparent conviction—that he had instructed the perpetrator to target soldiers or police. "I believe he saw soldiers or guards next to the restaurant or maybe he didn't find soldiers or police and so attacked the closest target."[125] Shortly before he was assassinated on May 22, 2002, al-Titi publicly tried to distance himself from the al-Aqsa Martyrs' Brigades' string of civilian attacks: "I want to fight whoever is in charge of the government of Israel, not civilians," he said. "We were delivering the wrong message to the world."[126]

---

[124] Those violations of international humanitarian law that are "grave breaches" of the Fourth Geneva Convention are enumerated in article 147, and include willful killing, torture or inhuman treatment, and "willfully causing great suffering or serious injury to body or health." These violations, including acts of willful killing, are also specified as war crimes under article 8 of the Rome Statute establishing the International Criminal Court, which has jurisdiction over these crimes after July 1, 2002 for states that have ratified the statute, or in situations in which the U.N. Security Council refers the conduct to the ICC for prosecution.

[125] Mohammed Daraghmeh, "Militia leader seeks to build Palestinian liberation arm," Associated Press, March 8, 2002.

[126] C.J. Chivers, "Palestinian militant group says it will limit bombings," *New York Times,* April 23, 2002. In this interview, al-Titi used his *nom de guerre*, Abu Mujahid. He was identified by his real name in an interview published several days later. Mohammad Bazzi, "Out of hiding for interview, al-Aqsa leader is defiant," *Newsday,* April 25, 2002.

Since October 2000, Hamas has carried out eighteen suicide attacks against civilians, more than any other group. In an on-line interview, Salah Shehadah, the leader of the Hamas military wing, was asked: "There are allegations against Hamas that it targets civilians through martyrdom operations, what's your take on that?" Shehadah responded, implicitly conceding that some categories of civilians were targeted:

> Our stand is not to target children, the elderly, or places of prayer— even though these places of prayer incite the killing of Muslims. Up until now we have not targeted schools ...nor do we target hospitals, even though they are an easy target. That is because we are working in accordance with certain values ...we don't fight Jews because they are Jewish but because they occupy our lands. So if children are killed it is something outside of our hands.[127]

### Wars Against Alien Occupation or in Exercise of the Right of Self-Determination

Palestinian groups and spokespersons have claimed that the practice of targeting civilians is somehow exempt from condemnation as a war crime or crime against humanity because of the exceptional character of their struggle for "national liberation." A typical example is a statement by Hassan Salameh, a Hamas member from Gaza now imprisoned for life for his role in the 1996 suicide bombings: "I am not a murderer.... Even if civilians are killed, it's not because we like it or are bloodthirsty. It is a fact of life in a people's struggle against a foreign occupier. A suicide bombing is the highest level of jihad and highlights the depth of our faith."[128]

However, article 1(4) of Additional Protocol I, which was expressly intended to cover wars of national liberation, states that the Protocol and all its principles and provisions cover "armed conflicts in which people are fighting against colonial domination and alien occupation and against racist regimes in the exercise of their right of self-determination...."[129] As mentioned, the PLO,

---

Al-Titi and two fellow al-Aqsa Martyrs' Brigades militants were assassinated on May 22, 2002.

[127] Anonymous article entitled, "Head of the military wing of Hamas discloses for the first time secrets of martyrs, their operations and their weapons," posted on `Izz al-Din al-Qasasm website, www.qassam.net/chat/salah3.html (in Arabic) (accessed August 8, 2002). Translated by Human Rights Watch. .

[128] Jerrold M. Post and Ehud Sprinzak, "Terror's Aftermath: A convicted Hamas terrorist talks about his mission to destroy Israel," *Los Angeles Times*, July 7, 2002.

[129] Protocol I, Art. 1(4).

as the recognized representative of the Palestinian people, participated in the negotiation of Additional Protocol I from 1974 to 1977. Israel has not ratified Protocol I, and this particular provision is not considered customary international law. However, given the wide extent of the ratification of Protocol I, article 1(4) represents a significant trend in establishing that the fundamental rules of international humanitarian law apply even in wars of national liberation.[130]

The language of Protocol I expressly prohibits attacks against civilians, as discussed above. Article 51(2) of Additional Protocol I states unambiguously that "[t]he civilian population as such, as well as individual civilians, shall not be the object of attack. Acts or threats of violence, the primary purpose of which is to spread terror among the civilian population, are prohibited."[131]

### Retaliation and Reprisals

Palestinian groups responsible for suicide bombing attacks against civilians have commonly claimed that such attacks are legitimate because they are carried out in retaliation for real or perceived Israeli violations of international humanitarian law. For example, Hamas leader Ismail Abu Shanab told Human Rights Watch:

> It's not targeting civilians. It is saying that if you attack mine I'll attack yours. If we say yes, we'll stop—can the world guarantee Israel will stop? The rules of the game were set by the other side. If you follow all our martyrdom operations, you will find that they all came after their massacres. We would accept the rules [of international humanitarian law] if Israel would use them. If you ask us to comply, that is not difficult. Islamic teachings support the Geneva Conventions. They are accepted. When it comes to the other party, if they don't abide, we cannot be obliged to them, except insofar as we can achieve something."[132]

Islamic Jihad and Fatah leaders have made similar statements. But this argument is both incorrect and, insofar as others are encouraged to act according to this view, damaging.

---

[130] As of September 1, 2002, 159 states had become parties to Additional Protocol I.

[131] Protocol I, Art. 51(2).

[132] Human Rights Watch interview with Ismail Abu Shanab, Gaza City, May 15, 2002.

The idea that suicide attacks against Israeli civilians are legitimate retaliation for Israeli attacks has had great resonance with Palestinian public opinion. Public opinion polls indicate that the overwhelming majority of Palestinians, including many who are opposed to attacks against civilians, also oppose PA arrests of members of the perpetrator groups.[133] One Palestinian academic told Human Rights Watch: "None of us want to do these things. It is imposed on us. We know about the Geneva Conventions, the need to distinguish, but what we see on the ground is something different."[134]

Under international humanitarian law, a failure by one party to a conflict to respect the laws of war does not relieve the other of its obligation to respect those laws. That obligation is absolute, not premised on reciprocity.

The Geneva Conventions specifically *prohibit* reprisals against civilians, private property of civilians in occupied territory, or enemy foreigners on friendly territory.[135]   Additional Protocol I is similarly unambiguous on reprisals: "Attacks against the civilian population or civilians by way of reprisals are prohibited."[136] Although the relevant provision of Protocol I has not yet reached the status of customary law, it expresses the prevailing trend in IHL to prohibit reprisal attacks against civilians—and thereby pre-empt the vicious spirals of reprisal and counter-reprisal that frequently follow.[137]

---

[133] In a survey by the Palestinian Center for Policy and Survey Research (PSR), 86 percent of respondents opposed the arrest of individuals who had carried out attacks inside Israel. PSR Public Opinion Poll no. 4, May 15-19, 2002 at http://www.pcpsr.org/survey/polls/2002/p4a.html (accessed September 3, 2002).

[134] Human Rights Watch interview, name withheld, Jenin, June 10, 2002.

[135] Fourth Geneva Convention, Art. 33(3).

[136] Protocol I, Art. 51(6). According to the ICRC commentary, "This provision is very important," noting that the belligerents in World War II, after declaring publicly that attacks are only permissible against military objects, subsequently "on the pretext that their own population had been hit by attacks carried out by the adversary, they went so far, by way of reprisals, as to wage war almost indiscriminately, and this resulted in countless civilian victims." ICRC, "Commentary to Protocol Additional to the Geneva Conventions of 12 August 1949, and relating to the Protection of Victims of International Armed Conflicts (Protocol I), 8 June 1977" at http://www.icrc.org/ihl (accessed September 3, 2002).

[137] See generally, T. Meron, "The Humanization of Humanitarian Law," 94 *American Journal of International Law*, 239, 249-251. Israel could help dispel any doubt about the applicability of the rule against reprisals by ratifying Protocol I.

### Who is a Civilian?

Another justification put forward by the perpetrators of attacks against civilians is that the individuals targeted are somehow not entitled to civilian status. As discussed earlier, the distinction between civilians and combatants is fundamental to the protections of international humanitarian law.

Under IHL, anyone who is not a combatant is considered a civilian.[138] Reserve or off-duty soldiers are considered civilians unless they take part directly in hostilities, or become subject to military command. Civilians lose their civilian protection if they directly participate in armed hostilities, but only during the period of that participation; they regain civilian status once they are no longer directly engaged in hostilities.

### Civilian Residents of Illegal Settlements as "Legitimate Targets"

Palestinian armed groups that have targeted Israeli civilians argue that Israeli settlers in the Occupied Territories have forfeited their civilian status because they reside in settlements that are illegal under international humanitarian law.[139] Leaders of Hamas and Islamic Jihad, the groups that pioneered the use of suicide bomb attacks against civilians, have further stated that they consider all of Israel to be "occupied territory," all Jewish Israelis to be settlers, and thus all Israelis to be legitimate targets.

This position is exemplified by statements such as those of Hamas's leader, Shaikh Ahmad Yassin. In August 2001, in the aftermath of the suicide bombing attack on the Sbarro pizzeria, Yassin said, "The Geneva Convention protects civilians in occupied territories, not civilians who are in fact occupiers. All of

---

[138] Under article 50(1) of Protocol I a civilian is defined as someone who is not a member of any organized armed forces of a party to a conflict. The same article adds that "[i]n cases of doubt whether a person is a civilian, that person shall be considered to be a civilian." Under article 51(3), civilians that directly participate in hostilities lose civilian protection for the duration of such participation.

[139] Article 49(6) of the Fourth Geneva Convention states that "[t]he Occupying Power shall not deport or transfer parts of its own civilian population into the territory it occupies." Successive Israeli governments have given active support to the settlement policy since 1967, inconsistent with the aims of the Fourth Geneva Convention, which was intended to protect the civilian population of occupied territories from 'colonization' and other similar policies detrimental to their well being. See ICRC Commentary to the Fourth Geneva Convention at http://www.icrc.org/ihl (accessed September 3, 2002). Civilian settlements also violate the prohibition on creating permanent changes in the occupied territories that are not for the benefit of the occupied population ("protected persons"), as reflected in article 55 of the 1907 Hague Regulations.

Israel, Tel Aviv included, is occupied Palestine. So we're not actually targeting civilians—that would go against Islam."[140]

Even Palestinians who criticize attacks against civilians frequently excuse attacks against settlers. The fact that many individual settlers carry arms, arguably for their own defense, appears to have given a new argument to armed groups to justify attacks against civilians. "They are not civilians," Islamic Jihad spokesperson Ismail Abu Shanab told Human Rights Watch.

> Not because the settlements are not legal but because the settlers are militias. They are not civilians. They have guns and are armed. Every home and settler has a gun, and all these people are militants and targets. They can't hide in the uniform of a civilian.... If I see women and children I must not shoot. We can't behave without humanity. But in principle, settlers are considered targets, legally.[141]

In an interview with Human Rights Watch, Hussein al-Sheikh, a Fatah official, made the same distinction. "We sent a message to al-Aqsa: 'Don't touch Israeli civilians. Never. Focus on the army and settlers. We don't consider settlers to be civilians.'"[142]

These assertions are inconsistent with international humanitarian law. The illegal status of settlements under international humanitarian law does not negate the rights of the civilians living there. The fact that a person lives in a settlement, whether legal or not, does not make him or her a legitimate military target. Under international humanitarian law, intentional attacks on civilians, or attacks that do not distinguish between military targets and civilians, are prohibited under all circumstances. Israeli civilians living in the settlements, so long as they do not take up arms and take an active part in hostilities, are noncombatants.

When individual settlers take an active part in hostilities, as opposed to acting in legitimate self-defense, they lose their civilian protection and become legitimate military targets during the period of their participation, just as Palestinian militants who take an active part in armed conflict become legitimate military targets during that period. However, even in a situation in which armed settlers were to become combatants, their presence among the larger civilian

---

[140] "No Israeli targets off-limits, Hamas spiritual chief warns," Flore de Preneuf interview with Shaikh Ahmad Yassin, *St. Petersburg Times* (Florida), August 11, 2001.

[141] Human Rights Watch interview, Gaza City, May 15, 2002.

[142] Human Rights Watch Interview, Ramallah, May 14, 2002.

settler population would not negate the requirement that Palestinian combatants distinguish between military and civilian targets during that time, desist from attacking civilians, take all feasible precautions to avoid harm to civilians, and refrain from attacks that cause disproportionate harm to civilians.

### All Israelis are Reservists

Hamas and Islamic Jihad further argue that Israel's military reservist system makes almost all of its Jewish citizens, except for children and the elderly, legitimate targets of armed attacks. "Are there civilians in Israel?" Shaikh Yassin asked in an *al-Hayat* interview, shortly after the end of Operation Defensive Shield.

> They are all in the military, men and women…. They wear civilian clothes inside Israel, and military clothes when they are with us…. The 20,000 or 30,000 reserve soldiers, where did they come from? Are they not part of the Israeli people? Were they not civilians?[143]

International humanitarian law makes clear, however, that reserve or off-duty soldiers who are not at that moment subject to the integrated disciplinary command of the armed forces are considered civilians until the time that they become subject to military command—meaning, until they are effectively incorporated into the armed forces. Their incorporation into the regular armed forces is most frequently signified by wearing a uniform or other identifiable insignia.

### Imbalance of Means

Another justification offered by Palestinian armed groups for attacks against civilians is that the groups lack the weaponry and training available to the Israelis, and thus have no other means of fighting for the Palestinian cause. In an interview with the *Washington Post,* Hamas spokesman `Abd al-`Aziz al-Rantisi said:

> We don't have F-16s, Apache helicopters and missiles…. They are attacking us with weapons against which we can't defend ourselves. And now we have a weapon they can't defend themselves against….

---

[143] Fathi Sabbah, "Hamas leader to al-Hayat: Resistance, not reform, is the Palestinian demand right now," *al-Hayat,* May 22, 2002, translated in *Mideast Mirror* (London), May 22, 2002.

> We believe this weapon creates a kind of balance, because this weapon is like an F-16.[144]

Many Palestinians interviewed by Human Rights Watch said attacks on civilians were their only weapon with which to respond to repeated IDF use of tanks, attack helicopters, missiles, and warplanes.

Many conflicts, whether internal or international, take place between parties with radically differing means at their disposal. This is true of almost all wars that could potentially qualify under Additional Protocol I, article 4(1) as wars of national liberation, where one party frequently has vastly more sophisticated technical and military means than the other. Yet Protocol I reaffirms that all the basic rules of international humanitarian law still apply in those circumstances. Indeed, such a practice would be an exception that would virtually swallow the rules of international humanitarian law, since most wars are between forces of unequal means. The prohibition against intentional attacks against civilians is absolute. It cannot be justified by reference to a disparity of power between opposing forces.

### Individual and Command Responsibility for Crimes Against Humanity and War Crimes

Under international law, persons who commit, order, or condone war crimes or crimes against humanity are criminally responsible individually for their actions. In certain circumstances, IHL also holds commanders criminally liable for war crimes or crimes against humanity committed by their subordinates.[145]

The responsibility of superior officers for atrocities by their subordinates is commonly known as command responsibility. Although the concept originated in military law, it now also includes the responsibility of civil authorities for abuses committed by persons under their direct authority.[146] The doctrine of command responsibility has been upheld in recent decisions by the international

---

[144] Molly Moore and John Ward Anderson, "Suicide Bombers Change Mideast's Military Balance," *Washington Post,* August 17, 2002.

[145] See Major-General (Retired) A.P.V. Rogers, "Command Responsibility Under the Law of War," lecture given at the Lauterpracht Resesarch Center for International Law, Cambridge University, 1999 at http://www.law.cam.ac.uk/RCIL/Archive.htm (accessed September 3, 2002).

[146] Article 28 of the Rome Statute of the International Criminal Court, "Responsibility of commanders and other superiors."