UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

MARK I. SOKOLOW, *et al.*,

Plaintiffs,

vs.

THE PALESTINE LIBERATION
ORGANIZATION, *et al.*,

Defendants.

No. 04 Civ. 00397 (GBD) (RLE)

## MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' MOTION IN LIMINE

ARNOLD & PORTER LLP
399 Park Avenue
New York, New York 10022
(212) 715-1000

*Attorneys for Plaintiffs*

June 6, 2014

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................... iii

LEGAL STANDARDS .............................................................................................. 2

    A.     Experts May Testify From Practical Experience ..................................... 2

    B.     Plaintiffs' Experts Are Not Required To Follow Scientific Principles.................. 3

    C.     Courts Favor The Use Of Experts In Terrorism Cases ........................... 5

    D.     Defendants' Criticisms Of The Experts' Conclusions Are Irrelevant ................... 6

    E.     Plaintiffs' Experts Are Entitled To Rely On Secondary Sources .......................... 7

    F.     Plaintiffs' Experts Will Not Directly Testify As To State Of Mind...................... 8

ARGUMENT ............................................................................................................. 8

I.     The Testimony Of Itamar Marcus Is Admissible .............................................. 8

    A.     Mr. Marcus Is Qualified To Testify...................................................... 9

    B.     Mr. Marcus' Testimony Is Based On An Appropriate Methodology.................. 13

    C.     Mr. Marcus' Testimony Is Appropriate Under Rule 403 .................................... 15

II.     The Testimony Of Alon Eviatar Is Admissible ................................................ 16

    A.     Mr. Eviatar Is Qualified To Testify ..................................................... 17

    B.     Mr. Eviatar's Testimony Is Based On An Appropriate Methodology.................. 19

III.     The Testimony Of Israel Shrenzel Is Admissible .......................................... 23

    A.     Mr. Shrenzel Is Qualified To Testify.................................................... 24

    B.     Mr. Shrenzel's Testimony Is Based On An Appropriate Methodology .............. 26

IV.     The Testimony Of Nicholas Kaufman Is Admissible....................................... 30

    A.     Mr. Kaufman Is Qualified To Testify ................................................... 31

    B.     Mr. Kaufman's Testimony Is Based On An Appropriate Methodology .............. 33

V.     The Testimony Of Jeffrey Addicott Is Admissible........................................... 36

A.      Professor Addicott Is Qualified To Testify.............................................................. 37

B.      Professor Addicott's Testimony Is Based On An Appropriate
        Methodology ........................................................................................................... 40

VI.   The Testimony Of Efraim Karsh Is Admissible ................................................................ 41

A.      Professor Karsh Is Qualified To Testify ................................................................ 42

B.      Professor Karsh's Testimony Is Based On An Appropriate Methodology.......... 44

VII.  The Testimony Of Matthew Levitt Is Admissible ............................................................ 46

A.      Dr. Levitt Is Qualified To Testify .......................................................................... 47

B.      Dr. Levitt's Testimony Is Based On An Appropriate Methodology .................... 50

CONCLUSION......................................................................................................................... 52

# TABLE OF AUTHORITIES

**Page(s)**

<u>C</u>ASES:

*Am. Universal Ins. Co. v. Falzone,*
    644 F.2d 65 (1st Cir. 1981),
    *abrogation on other grounds recognized by*
    *Smith v. Kmart Corp.*, 177 F.3d 19 (1st Cir. 1999)...................................................................27

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002)...........................................................................................................7

*Bank Brussels Lambert v. Credit Lyonnaise (Suisse) S.A.*,
    2001 WL 99506 (S.D.N.Y. Feb. 6, 2001)...................................................................................35

*Borawick v. Shay*,
    68 F.3d 597 (2d Cir. 1995).............................................................................................................2

*Caidor v. Onondaga Cnty.*,
    517 F.3d 601 (2d Cir. 2008).........................................................................................................21

*Cortland Racquet Club v. Oy Saunatec, Ltd.*,
    No. 96 Civ. 1671(GBD), 2003 WL 1108740 (S.D.N.Y. Mar. 12, 2003) ...................2, 6, 7, 26

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993)............................................................................................. *passim*

*E.E.O.C. v. Bloomberg L.P.*,
    2010 WL 3466370 (S.D.N.Y. Aug. 31, 2010).........................................................................3, 4

*Gates v. Syrian Arab Republic*,
    580 F. Supp. 2d 53 (D.D.C. 2008)...............................................................................................11

*Gill v. Arab Bank, PLC*,
    893 F. Supp. 2d 523 (E.D.N.Y. 2012) ............................................................................ *passim*

*In re Young Broadcasting Inc.*,
    430 B.R. 99 (Bankr. S.D.N.Y. 2010)...........................................................................................25

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999)......................................................................................................................3, 4

*Leibovitch v. Syrian Arab Republic*,
    2011 WL 444762 (N.D. Ill. Feb. 1, 2011),
    *rev'd on other grounds sub nom.*
    *Liebovitch v. Islamic Republic of Iran*, 697 F.3d 561 (7th Cir. 2012)......................................17

*Lincoln Nat'l Life Ins. Co. v. Transamerica Fin. Life Ins. Co.*,
2010 WL 3892860 (N.D. Ind. Sept. 30, 2010) ....................................................................20

*Linde v. Arab Bank, PLC*,
922 F. Supp. 2d 316 (E.D.N.Y. 2013) ............................................................. *passim*

*Lormé v. Delta Air Lines Inc.*,
2005 WL 1653871 (S.D.N.Y. July 13, 2005),
*aff'd*, 251 F. App'x 691 (2d Cir. 2007)................................................................18

*Martinez v. Ryan*,
132 S. Ct. 1309 (2012)................................................................................................34

*McCullock v. H.B. Fuller Co.*,
61 F.3d 1038 (2d Cir. 1995)........................................................................................3

*Owens v. Republic of Sudan*,
826 F. Supp. 2d 128 (D.D.C. 2011) ..........................................................................11

*Scott v. City of New York*,
591 F. Supp. 2d 554 (S.D.N.Y. 2008)..........................................................................2

*Soussi v. Chertoff*,
2009 WL 2579231 (E.D. Cal. 2009) ..........................................................................47

*Strauss v. Credit Lyonnais*,
925 F. Supp. 2d 414 (E.D.N.Y. 2013) ............................................................. *passim*

*Strickland v. Washington*,
466 U.S. 668 (1984)....................................................................................................33

*Thai Lao Lignite (Thailand) Co. v. Gov't of Lao People's Democratic Republic*,
924 F. Supp. 2d 508 (S.D.N.Y. 2013)........................................................................21

*United States v. Abdulqader*,
644 F. Supp. 2d 799 (N.D. Tex. 2009) ......................................................................47

*United States v. Abu Ghayth*,
2014 WL 978629 (S.D.N.Y. Feb. 28, 2014)..............................................................11

*United States v. Abu-Jihaad*,
553 F. Supp. 2d 121 (D. Conn. 2008)..........................................................................6

*United States v. Abu-Jihaad*,
600 F. Supp. 2d 362 (D. Conn. 2009)........................................................................11

*United States v. Al-Moayad*,
545 F.3d 139 (2d Cir. 2008)......................................................................................47

*United States v. Amawi,*
    695 F.3d 457 (6th Cir. 2012) ........................................................11

*United States v. Aref,*
    285 F. App'x 784 (2d Cir. 2008) ..................................................11

*United States v. Banki,*
    2010 WL 2076770 (S.D.N.Y. May 25, 2010) ............................47

*United States v. Benkahla,*
    530 F.3d 300 (4th Cir. 2008) ...........................................11, 12, 13

*United States v. Damrah,*
    124 F. App'x 976 (6th Cir. 2005) ................................................47

*United States v. Damrah,*
    412 F.3d 618 (6th Cir. 2005) ...........................................8, 29, 51

*United States v. Downing,*
    753 F.2d 1224 (3d Cir. 1985) ........................................................4

*United States v. Dukagjini,*
    326 F.3d 45 (2d Cir. 2003) ............................................................2

*United States v. El-Mezain,*
    664 F.3d 467 (5th Cir. 2011) ......................................................47

*United States v. Farhane,*
    634 F.3d 127 (2d Cir. 2011) ...................................................6, 10

*United States v. Hamilton,*
    538 F.3d 162 (2d Cir. 2008) ........................................................3

*United States v. Hammoud,*
    381 F.3d 316 (4th Cir. 2004),
    *vacated on other grounds,* 543 U.S. 1097 (2005) ....................47

*United States v. Hammoud,*
    483 F. App'x 865 (4th Cir. 2012) ................................................47

*United States v. Hassan,*
    742 F.3d 104 (4th Cir. 2014) ...............................................11, 12

*United States v. Ibrahimm,*
    529 F. App'x 59 (2d Cir. 2013) ..................................................47

*United States v. Joseph*,
    542 F.3d 13 (2d Cir. 2008),
    *abrogation on other grounds recognized by*
    *United States v. Ferguson*,
    676 F.3d 260 (2d Cir. 2012)......................................................3, 4, 25, 44

*United States v. Kadir*,
    718 F.3d 115 (2d Cir. 2013)..................................................................47

*United States v. Kassir*,
    2009 WL 910767 (S.D.N.Y. Apr. 2, 2009)............................................19

*United States v. Kaziu*,
    2014 WL 961065 (2d Cir. Mar. 13, 2014) (unpublished)..................6, 10

*United States v. Lopez*,
    547 F.3d 364 (2d Cir. 2008)....................................................................3

*United States v. Mohamud*,
    2013 WL 71806 (D. Or. Jan. 4, 2013) ..................................................11

*United States v. Mostafa*,
    2014 WL 1484758 (S.D.N.Y. Apr. 15, 2014).......................................16

*United States v. Mostafa*,
    2014 WL 1744717 (S.D.N.Y. Apr. 23, 2014).......................................11

*United States v. Paracha*,
    2006 WL 12768 (S.D.N.Y Jan. 3, 2006),
    *aff'd*, 313 F. App'x 347 (2d Cir. 2008)................................5, 8, 14, 29

*United States v. Paracha*,
    313 F. App'x 347 (2d Cir. 2008) ...............................................6, 11, 14

*United States. v. Rigas*,
    490 F.3d 208 (2d Cir. 2007)....................................................................7

*United States v. Sabir*,
    2007 WL 1373184 (S.D.N.Y. May 10, 2007) ......................................11

*United States v. Sedaghaty*,
    728 F.3d 885 (9th Cir. 2013) ................................................................11

*United States v. Starzecpyzel*,
    880 F. Supp. 1027 (S.D.N.Y. 1995)........................................................4

*United States v. Subasic*,
    2014 WL 1647522 (4th Cir. Apr. 25, 2014) .........................................11

*United States v. Vaghari*,
   735 F. Supp. 2d 197 (E.D.Pa. 2010) ...................................................47

*Wachsman v. Islamic Republic of Iran*,
   603 F. Supp. 2d 148 (D.D.C. 2009) ...................................................17

*Wyatt v. Syrian Arab Republic*,
   908 F. Supp .2d 216 (D.D.C. 2012) ...................................................47

<u>RULES AND OTHER AUTHORITIES</u>:

Fed. R. Evid. 403 ...................................................................................15, 16

Fed. R. Evid. 702 .....................................................................................2, 4, 5

Fed. R. Evid. 703 ...........................................................................................7

Fed. R. Evid. 803(8) ....................................................................................28

Fed. R. Evid. 803(22) ...........................................................................30, 34, 35

Fed. R. Evid. 702, Advisory Comm. Notes ....................................................2

36 Am. Jur. Proof of Facts 2d 747,
   "Impeachment of Witness by Criminal Conviction," §5 (1983) ...........35

Mark Hamblett,
   "Imam Convicted of 11 Counts of Supporting Terrorism,"
   *NYLJ* (May 20, 2014).................................................................................22

Molly Moore,
   "Israelis Pull Back After 10-Day Siege of Arafat's Complex; Decision Follows
   Strong U.S. Pressure," Wash. Post (Sept. 30, 2002)................................23

**MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANTS' MOTION IN LIMINE**

Defendants have continued their scorched-earth approach by moving in limine to exclude every single liability expert plaintiffs designated for their case in chief. Defendants repeatedly (and unsuccessfully) asked Judge Ellis to preclude these experts' testimony, have objected to all but three of plaintiffs' proposed trial exhibits, and have even refused to stipulate to the authenticity of their own records. Defendants' strategy is clear: oppose everything, agree to nothing, and make every conceivable argument (no matter how baseless) to try to put off the day of reckoning. Defendants' strategy will not work. Like their other attempts to keep evidence from the jury, their in limine motion is meritless.

Defendants move to exclude plaintiffs' experts under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), by attacking both the qualifications and the methodology of each expert. With respect to qualifications, their principal argument is that expert witnesses must have advanced academic credentials; indeed, their first argument against most of plaintiffs' experts is that they lack Ph.D.s. This ignores the well established principle—recognized by *Daubert*—that experts can testify from practical experience. A number of plaintiffs' experts—two former Israeli security officials, the head of a watchdog group that tracks statements about terrorism in the PA-controlled media, and a judge in the Israeli military courts—fall into this category. The courts have repeatedly qualified such experts.

Defendants attack the methodologies of plaintiffs' experts in two ways. First, although they pay lip service to the standards governing non-scientific expert testimony, they essentially fault plaintiffs' experts for not adhering to the *Daubert* standards for scientific and technical experts. These standards are not appropriate here, and plaintiffs' experts easily satisfy the methodology requirements for non-scientific experts.

Second, defendants spend countless pages arguing that the conclusions of plaintiffs' experts are incorrect. Indeed, much of their motion is little more than a preview of the cross-examination they intend to present at trial. As *Daubert* and its progeny make clear, disagreements with an expert's conclusions are not a basis for excluding testimony.

Defendants' arguments not only lack merit, but many of them are frivolous. Their motion should be denied.

## LEGAL STANDARDS

"'*Daubert* reinforces the idea that there should be a presumption of admissibility of evidence … it emphasizes the need for flexibility in assessing whether evidence is admissible.'" *Cortland Racquet Club v. Oy Saunatec, Ltd.*, No. 96 Civ. 1671(GBD), 2003 WL 1108740, at *4 (S.D.N.Y. Mar. 12, 2003) (quoting *Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995)); *see United States v. Dukagjini*, 326 F.3d 45, 52 (2d Cir. 2003) ("the 'Rules of Evidence provide a liberal standard for the admissibility of expert testimony'").

### A.  Experts May Testify From Practical Experience

Rule 702 permits experts to testify from their "knowledge, skill, experience, training or education" if their "scientific, technical *or other specialized knowledge*" will help the trier of fact. Fed. R. Evid. 702 (emphasis added). The Advisory Committee notes to Rule 702 state that "[t]he fields of knowledge which may be drawn upon are not limited merely to the 'scientific' and 'technical' but extend to all 'specialized' knowledge." Thus, "[p]ermissible experts are not limited to specialists in the hard sciences and mathematical disciplines." *Scott v. City of New York*, 591 F. Supp. 2d 554, 562 (S.D.N.Y. 2008).

All of plaintiffs' liability experts meet the relevant standard. Four have many years of practical experience: Itamar Marcus (expert in PA-controlled media, which he monitors for statements by defendants regarding terrorism); Alon Eviatar and Israel Shrenzel (former high-

ranking intelligence officers in the Israeli government); and Nicholas Kaufman (judge in the Israeli military court where most of the perpetrators who attacked the plaintiffs were convicted). The remaining three (Jeffrey Addicott, Efraim Karsh and Matthew Levitt) are academics who specialize in various aspects of terrorism and the Israeli-Palestinian conflict. Contrary to defendants' complaint, there is no requirement that an expert have a Ph.D. or any other particular academic credential. As the Second Circuit has stated: "the place to 'quibble with [an expert's] academic training' is 'on cross-examination' and goes to his 'testimony's weight . . . not its admissibility.'" *United States v. Joseph*, 542 F.3d 13, 21–22 (2d Cir. 2008), *abrogation on other grounds recognized by United States v. Ferguson*, 676 F.3d 260, 266 n.14 (2d Cir. 2012) (quoting *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995)). *See also United States v. Lopez*, 547 F.3d 364, 373 (2d Cir. 2008) (detective with 17 years of experience investigating drug crimes was "well qualified" to give an expert opinion); *United States v. Hamilton*, 538 F.3d 162, 174 (2d Cir. 2008) (detective's 14 years of relevant experience "firmly established" his qualifications).

### B.      Plaintiffs' Experts Are Not Required To Follow Scientific Principles

In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999), the Court emphasized that "the test of reliability is 'flexible,' and *Daubert*'s list of specific factors [for evaluating scientific evidence] neither necessarily nor exclusively applies to all experts or in every case." Instead of robotically applying a checklist, the trial court must ensure that "an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152. Indeed, "there are areas of expertise, such as the social sciences in which the research, theories and opinions cannot have the exactness of hard science methodologies." *E.E.O.C. v. Bloomberg L.P.*, 2010 WL 3466370, at *14 (S.D.N.Y. Aug. 31, 2010).

Although defendants acknowledge these principles, their attack on the methodologies of plaintiffs' experts ignores the *Kumho* standard and instead essentially attempts to impose a standard reserved for *scientific* experts—that the expert's theory "can be (and has been) tested," that it be subjected to "peer review and publication," that there be a "known or potential rate of error," and that the theory or technique enjoy "'general acceptance'" within a "'relevant scientific community.'" *Daubert*, 509 U.S. at 593–94 (quoting *United States v. Downing*, 753 F.2d 1224,1248 (3d Cir. 1985)).

Such tests generally do not apply to non-scientific experts. As the Second Circuit has stated, "[s]ocial science 'research, theories and opinions cannot have the exactness of hard science methodologies'" and "'[p]eer review, publication potential error rate, etc. … are not applicable to this kind of testimony, whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it.'" *Joseph*, 542 F.3d at 21 (citations omitted); *accord Bloomberg*, 2010 WL 3466370, at *13–14 ("The fact that a social scientist's approach might have 'inherent methodological limitations,' and does not produce 'a testable hypothesis' or a 'known or potential rate of error,' does not necessarily render the resulting testimony unreliable under Rule 702. 'Instead, the Court must perform its gatekeeping assessment on measures of reliability that are appropriate to the particular testimony in question.'") (citations omitted); *United States v. Starzecpyzel*, 880 F. Supp. 1027, 1029 (S.D.N.Y. 1995) ("experts, who acquire their skills through practical training, apprenticeships, and long years of practice, are generally not expected to be able to articulate and justify the theoretical bases underlying their practice, to expose their techniques to a larger community of practitioners through peer-reviewed publication, or to subject those techniques to extensive testing").

These principles are regularly applied in terrorism cases. *See Linde v. Arab Bank, PLC*, 922 F. Supp. 2d 316, 321 (E.D.N.Y. 2013) ("an expert need not have formal training in her area of expertise" and "Rule 702 does not require that published studies or similar authority unequivocally support the expert's conclusions"); *Strauss v. Credit Lyonnais*, 925 F. Supp. 2d 414, 439 (E.D.N.Y. 2013) (accepting methodology of former Israeli security official, which involved a "somewhat subjective weighing of the evidence" because his expertise "is in a social science field where there are not the type of hard data and neat conclusions that would be expected with a hard science.").

A common formulation of the methodology test for non-science experts—which is frequently applied to terrorism experts—is as follows: "gathering multiple sources of information, including original and secondary sources, cross-checking and juxtaposing new information against existing information and evaluating new information to determine whether [the expert's] conclusions remain consonant with the most reliable sources." *United States v. Paracha*, 2006 WL 12768, at *20 (S.D.N.Y. Jan. 3, 2006), *aff'd*, 313 F. App'x 347 (2d Cir. 2008). Plaintiffs' experts satisfy this test.

## C.     Courts Favor The Use Of Experts In Terrorism Cases

The list of decisions in terrorism cases allowing expert testimony by the kinds of experts offered by plaintiffs is very long, reflecting the courts' recognition of the importance that expert testimony can play. In qualifying a number of experts, including former Israeli security officials and academic terrorism experts, Judge Weinstein recently explained the importance of such testimony in an ATA case, *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 523 (E.D.N.Y. 2012):

> The relationships among, and situations of the various relevant organizations were constantly changing; the image was dynamic not static; pixels and factoids, discrete details and snippets of information, must be established and analyzed to provide the jury

with an understandable and relevant story-line whose reliability
they can agree upon.

With so many vectors at play—most of which will not be familiar
to jurors—a wide gateway to large amounts of evidence must be
provided. Jurors will not have the broad background knowledge
and hypotheses they bring to bear in the run-of-the-mill cases
within their ken. *Id.* at 529.

*            *            *

In sum, each proffered witness's testimony must be approached
applying a strong policy in favor of full admissibility required for
the jury to understand the complex details of this case. Those
particulars are remote from the normal life experience upon which
jurors rely when deciding cases. Admissibility of expert reports
and testimony is therefore strongly favored. *Id.* at 530–31.

Innumerable other decisions, in this Circuit and elsewhere, have qualified such experts in
terrorism cases. *E.g.*, *United States v. Farhane*, 634 F.3d 127, 158–60 (2d Cir. 2011) (qualifying
al Qaeda media expert similar to Mr. Marcus); *United States v. Kaziu*, 2014 WL 961065 (2d Cir.
Mar. 13, 2014) (unpublished) (same media expert); *United States v. Paracha*, 313 F. App'x 347,
351 (2d Cir. 2008) (same media expert); *Strauss*, 925 F. Supp. 2d at 437–46 (same media expert,
plus former Israeli security officials and one of plaintiffs' academic experts); *Linde*, 922 F. Supp.
2d at 320–32 (qualifying a member of Mr. Shrenzel's support team and same academic expert);
*United States v. Abu-Jihaad*, 553 F. Supp. 2d 121, 124 (D. Conn. 2008) ("numerous district
courts in the Second Circuit and beyond have approved of the use of terrorism experts") (citing
cases).

D. **Defendants' Criticisms Of The Experts' Conclusions Are Irrelevant**

A great deal of defendants' brief is devoted to criticizing the conclusions of plaintiffs'
experts. It is well established, however, that such criticisms are irrelevant under *Daubert*. As
this Court stated in *Cortland Racquet Club*:

> [I]t is not for this Court to preclude expert testimony simply
> because there is additional contradictory testimony that will be
> available to the jury. … This Court must evaluate the methodology
> used by the proposed expert in determining whether or not to admit
> his or her testimony, not his or her conclusions. It is the jury's
> responsibility to evaluate the expert's conclusions and to weigh
> this evidence . . . ." 2003 WL 1108740, at *4.

Indeed, this principle comes straight out of *Daubert*: "The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." 509 U.S. at 595. Rather, the conclusions of an expert should be challenged not by excluding the testimony but by "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Id.* at 596. As the Second Circuit has cautioned: "[i]n undertaking this flexible inquiry" under *Daubert*, "the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002).

## E. **Plaintiffs' Experts Are Entitled To Rely On Secondary Sources**

Much of the material on which plaintiffs' experts rely is admissible.[1] Experts, of course, are not limited to relying on admissible evidence; under Rule 703 they may rely on inadmissible evidence that is reasonably relied on by experts in the same field. Defendants nonetheless repeatedly take plaintiffs' experts to task for relying on such materials, especially for their use of secondary sources like books and articles on defendants' involvement in terrorism, even though defendants' own experts rely on such materials. These complaints are foreclosed by Rule 703.

---

[1] Several of those experts will also testify as summary witnesses to present admissible documentary evidence and non-expert opinion testimony to the jury. *See United States. v. Rigas*, 490 F.3d 208, 224 (2d Cir. 2007); *cf. Linde*, 922 F. Supp. 2d at 332–33 (denying in limine motion to exclude summary witness).

Indeed, courts have emphasized that it is particularly appropriate for terrorism experts to rely on such secondary sources. For example, in *United States v. Damrah*, 412 F.3d 618 (6th Cir. 2005), the Sixth Circuit rejected a challenge to an expert who relied, in part, on "certain books … press releases and newspaper articles," *id.* at 625 n.4, stating: "Given the secretive nature of terrorists, the Court can think of few other materials that experts in the field would rely upon." *Id.* at 625. Courts in this circuit have reached the same conclusion. *See Strauss*, 925 F. Supp. 2d at 439 ("as other courts have noted in the past, it is reasonable that an expert in terrorism would have to rely on hearsay as opposed to relying solely on fieldwork, as terrorist organizations necessarily are secretive and dangerous, and there may be political reasons against meeting with reputed terrorists"); *Gill*, 893 F. Supp. 2d at 532 (noting that expert report "necessarily relies on secondary sources to opine about secretive terrorist organizations") (quoting *Paracha*, 2006 WL 12678, at *21). Defendants' challenges to the use of secondary sources must be rejected.

F. **Plaintiffs' Experts Will Not Directly Testify As To State Of Mind**

Finally, defendants complain that several of plaintiffs' experts purport to testify as to the state of mind of the defendants and the perpetrators. This claim is a red herring. These experts will give testimony from which the *jury* can make reasonable inferences as to defendants' state of mind, but they will not testify directly as to state of mind. To the extent defendants interpret isolated statements by plaintiffs' experts to suggest that they intend to give such direct testimony, they are misreading them.

**ARGUMENT**

I. **The Testimony Of Itamar Marcus Is Admissible**

As discussed in our response to defendants' motion for summary judgment, the PA's official media incited and glorified terrorism throughout the Al Aqsa Intifada, thereby showing a

culpable state of mind, *respondeat superior* and ratification. The jury needs to see defendants' own words, repeatedly urging Palestinians to slaughter Jews and even encouraging children to "martyr" themselves.

Plaintiffs will submit much of this evidence through Itamar Marcus, who monitors the official Palestinian media to track its support for terrorism and who has studied Palestinian politics and society for two decades. Mr. Marcus will serve both as a summary witness to document the support of the PA-controlled media for terrorism during the Al Aqsa Intifada and as an expert to explain that media and how the PA's messages were likely to be understood by Palestinians. It is no accident that Mr. Marcus is the first expert attacked in defendants' motion because they know how devastating his testimony will be. Defendants fail to tell the Court, however, that numerous decisions—including multiple decisions from the Second Circuit—have repeatedly approved such testimony in terrorism cases. The same result is required here.

### A. Mr. Marcus Is Qualified To Testify

Mr. Marcus is the founder and Director of Palestinian Media Watch ("PMW"), which has researched Palestinian society and government since 1996 by monitoring and analyzing Palestinian media and education sources and has compiled an extensive library documenting the PA's support and encouragement of terrorism. Marcus Rep. 1–2. Mr. Marcus is a world-renowned authority in this area, having presented his findings before United States Congressional committees and subcommittees as well as the Australian, German, Canadian, French and British Parliaments. Marcus Rep. 1, 10–11. He has also advised government agencies in several countries, including the United States and Israel, and he was Israel's representative in negotiations with the PA concerning the prevention of incitement of terrorism under the 1998 Wye River Accords signed by President Clinton, Chairman Arafat and Prime Minister Netanyahu. Marcus Rep. 3, 11–12.

Mr. Marcus has testified as an expert in numerous terrorism cases in Israel. Marcus Rep. 13. He has also delivered lectures at multiple academic conferences and universities and has written extensively on the PA's support for terrorism and on Palestinian society, authoring articles, reports, chapters, a book, and bulletins published and cited around the globe. Marcus Rep. 3–10; Marcus Reb. 3–10, 13.

Defendants argue that, despite this wealth of experience, Mr. Marcus is not qualified because he lacks a Ph.D. and because he has no "specialized education in the Palestinian Media." Br. 12–13. As discussed at pages 2–3 above, however, such formal credentials are not required. Tellingly, both the Second Circuit and a number of other courts have repeatedly ruled that a very similar expert who monitors the public statements of al Qaeda is qualified to give the same kind of testimony that Mr. Marcus will provide. In *United States v. Farhane*, 634 F.3d at 158–60, the Court upheld a decision allowing an expert named Evan Kohlman to testify as an expert on al Qaeda's media operations. The court found that Mr. Kohlman was qualified because he worked for organizations that track the statements and activities of terrorist organizations and because his experience consisted of "efforts to collect, analyze, and catalogue written, audio, and visual materials relevant to terrorism generally and al Qaeda in particular." *Id.* at 159. This is exactly what Mr. Marcus does with respect to the PA and the PLO.

The Second Circuit reaffirmed this result less than three months ago, holding that Mr. Kohlman's "specialized research" about al Qaeda's "propaganda through 'media wings'" qualified him to give such testimony. *Kaziu*, 2014 WL 961065, at *4. Similarly, the *Strauss*

court qualified Mr. Kohlman and confirmed the value of his large "digital collection of terrorist multimedia and propaganda." 925 F. Supp. 2d at 446.[2]

Mr. Marcus is cut from the same cloth. Like Mr. Kohlman, he has devoted years to tracking and analyzing the statements of an organization that foments terrorism and has built up a comprehensive library of the PA's public statements to support his testimony. There can be no doubt that the Second Circuit would find him just as qualified as Mr. Kohlman.

Defendants argue that Mr. Marcus is not qualified because the PMW monitors only media originating in the West Bank and Gaza and does not monitor the broadcasts of Al Jazeera Television, an Arab television channel based in Qatar, or MBC, a channel based in Dubai. Br. 13. This argument makes no sense. The purpose of Mr. Marcus' testimony is to review statements in media that *defendants* own or control, as relevant to state of mind, messaging to employees, *respondeat superior*, and ratification of terrorism. At his deposition, when asked why he did not analyze Al Jazeera, Mr. Marcus replied: "Our goal was to find out what the Palestinian Authority was saying to its people by the structures it controlled." Marcus Dep. 207: 6–11. Programming from non-PA channels from other countries is irrelevant to these topics.

Defendants also argue (Br. 12–14, 17) that Mr. Marcus is not qualified to testify about the PA's control and censorship of the media in the West Bank, but they offer no legitimate basis for this claim. To the contrary, having devoted years to studying the PA and the media in the West

---

[2] Other courts have permitted Mr. Kohlman to give such expert testimony. *E.g.*, *United States v. Subasic*, 2014 WL 1647522, at *1 (4th Cir. Apr. 25, 2014); *United States v. Hassan*, 742 F.3d 104, 131 (4th Cir. 2014); *United States v. Sedaghaty*, 728 F.3d 885 (9th Cir. 2013); *United States v. Amawi*, 695 F.3d 457, 479 (6th Cir. 2012); *United States v. Aref*, 285 F. App'x 784, 792 (2d Cir. 2008); *United States v. Benkahla*, 530 F.3d 300, 305 (4th Cir. 2008); *Paracha*, 313 F. App'x at 351; *United States v. Mostafa*, 2014 WL 1744717, at *5 (S.D.N.Y. Apr. 23, 2014); *United States v. Abu Ghayth*, 2014 WL 978629, at *1 (S.D.N.Y. Feb. 28, 2014); *Linde*, 922 F. Supp. 2d at 332; *United States v. Mohamud*, 2013 WL 71806, at *3–4 (D. Or. Jan. 4, 2013); *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128 (D.D.C. 2011); *United States v. Abu-Jihaad*, 600 F. Supp. 2d 362, 366 n.2 (D. Conn. 2009); *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 59 n.5 (D.D.C. 2008); *United States v. Sabir*, 2007 WL 1373184, at *11 (S.D.N.Y. May 10, 2007).

Bank, Mr. Marcus is the ideal person to testify on these subjects. Moreover, his report contains an extensive discussion of the PA's control of the media that sets forth the many facts on which he bases his conclusions on this issue—including the fact that PA TV was established by Yasser Arafat in 1994 when the PA was created, as well as statements by senior PA officials confirming the PA's control. Marcus Rep. 15–22. Although defendants complain (Br. 14–15) that some of his supporting materials are hearsay, experts are entitled to rely on such materials. In any event, defendants' suggestion that the PA's official and unofficial media outlets are not controlled by the PA makes no sense. Even defendants' own expert acknowledged that certain newspapers are understood to be mouthpieces for the PA. Allen Dep. 57:17–58:12.

Finally, defendants challenge Mr. Marcus' explanation of the meaning that Palestinians, especially Islamic extremists, would likely assign to terms, such as "martyrdom" and "resistance," used by the PA media. Br. 14, 19–20. Specifically, he explains that these terms are generally understood as referring to terror against civilians. Such testimony is no different than testimony before a non-US jury on terms like "pro-choice" in a case about abortion, or "capo" in a case about organized crime. In fact, the courts have allowed Mr. Kohlman to give such testimony. The Fourth Circuit qualified him to "testify about the 'meaning and context of various words and phrases used by defendants which are commonly used by persons practicing extreme Islam" because those words "involved terminology and concepts that were likely to be unfamiliar to jurors. In such settings, the relevance of expert testimony is quite evident." *United States v. Hassan*, 742 F.3d 104, 130–131 (4th Cir. 2014). Similarly, in *United States v. Benkahla*, the court upheld a decision to allow such testimony because "[t]he evidence in this

case was complicated, touching by necessity on a wide variety of ideas, *terms*, people and organizations connected to radical Islam."  530 F.3d 300, 309 (4th Cir. 2008) (emphasis added).[3]

## B.    Mr. Marcus' Testimony Is Based On An Appropriate Methodology

Defendants challenge Mr. Marcus' methodology, alleging that he neither has nor discusses one.  Br. 17.  Both statements are incorrect.  On the first page of his report, Mr. Marcus described his methodology as follows:

> Sources include newspapers; television; radio; speeches, statements, reports, and announcements from government and society leaders and governmental institutions; and the internet.  All materials are studied in their original Arabic.  In these sources, PMW identifies ideologies, political processes and tactics, and social trends in the West Bank and in the Gaza Strip with special focus on Israeli-Palestinian relations, particularly the peace process.  PMW documents and publishes examples and analyses of its findings in written reports and videos.

> As founder and Director, I monitor, study, and am responsible for the activities, analyses, and publications of PMW.  PMW employs Arabic-language researchers who read the 3 daily newspapers in the Palestinian Authority, *Al-Hayat Al-Jadida, Al-Ayyam,* and *Al-Quds.* Additionally, PMW staff records and views television channels produced and broadcasted in the West Bank and the Gaza Strip, including Palestinian Authority Television (PA TV), PA Palestine Live TV, and Al Aqsa-TV of Hamas.  Materials are read and recorded based on a list of approximately 30 topics, including the peace process, demonization, women's issues, children, martyrs and martyrdom, and violence.  Marcus Rep. 1.

This is precisely the kind of methodology that is appropriate for non-scientific experts, and the courts have repeatedly upheld this type of methodology in considering challenges to Mr. Kohlman.  For example, the court in *Linde* stated as follows:

---

[3] Defendants' other claims about terminology are baseless.  For example, they complain that Mr. Marcus does not explain why he refers to the Al Aqsa Intifada as a "terror campaign." Br. 19.  This is like complaining that a witness in a case involving the war in Iraq failed to explain why he referred to that conflict as a "war."  The whole world, including innumerable terror victims, knows that the Al Aqsa Intifada involved a "terror campaign."

> Mr. Kohlman has demonstrated the reliability of his methodology; he reviews videos, recordings, or published writings of terrorists; terrorist organizations' official websites; newspaper articles, television news reports, and reputable books and magazines. He synthesizes this material and pulls together common themes in reaching his conclusions. Any challenges to his methodology are more appropriately raised on cross-examination. Mr. Kohlman's testimony, including his expert analysis of materials that might otherwise be inadmissible hearsay, will help the jury understand the terror attacks at issue in this case.

*Linde*, 922 F. Supp. 2d at 332. Similarly, in *Paracha*, 2006 WL 12768, at *20, the Court found that this "methodology is similar to that employed by his peers in his field" and that although it is "not readily subject to testing and permits of no ready calculation of a concrete error rate, it is more reliable than a simple cherry-picking of information from websites and other sources." The Second Circuit affirmed, stating: "Kohlman's methodology was sufficiently reliable and his testimony relevant to the jury's understanding of al Qaeda so as to be admissible." 313 F. App'x at 351; *see also Strauss*, 925 F. Supp. 2d at 446 (Kohlman's "research and archival methodology appear to be consistent with those in the terrorist field, as other courts have recognized") (citing cases).

Defendants have two specific criticisms of Mr. Marcus' methodology. First, they argue that the official PA media outlets on which he focuses are not as widely viewed by Palestinians as independent outlets like Al Jazeera. Br. 15–16. As noted above, this argument fails because foreign, non-PA media sources are irrelevant to state of mind, ratification and *respondeat superior*. Moreover, plaintiffs do not contend that the defendants' incendiary statements turned the entire Palestinian population into terrorists. In any event, this is (at most) an issue for cross-examination and has nothing to do with assessing methodology under *Daubert*. As discussed at page 7 above, under *Daubert* the courts do not consider challenges to an expert's conclusions; they consider only the methodology used to reach those conclusions.

Second, defendants argue at length that Mr. Marcus failed to take into account other evidence.  Br. 18–19.  For example, they contend that he "discounted any condemnation of terror by the PA or its leaders found in the media because he believed that these condemnations were not authentic expressions of PA policy."  *Id.* at 18.  Mr. Marcus' report, however, contains a detailed discussion as to why he concluded that these condemnations were not genuine, were likely issued only under pressure from the U.S., and did not detract from the PA's message of support for terror to the Palestinian population.  Marcus Rep. 51–54.  Again, this argument involves a disagreement with Mr. Marcus' conclusions, not his methodology, and is therefore irrelevant under *Daubert*.

The same is true of defendants' argument that Mr. Marcus did not consider whether the attacks at issue in this case were a reaction to Israeli settlements on the West Bank or other policies of the government of Israel, rather than to any support or incitement provided by defendants.  Br. 18–19.  Moreover, as set forth in plaintiffs' motion in limine, defendants' argument that the attacks were caused—or justified—by the actions of the Israeli government should have no part in this case, and it certainly should have no part in assessing Mr. Marcus' ability to testify.

### C.    Mr. Marcus' Testimony Is Appropriate Under Rule 403

Finally, defendants seek to exclude Mr. Marcus' testimony about a PA TV broadcast of a sermon that contained a statement that "The Jews . . .  are all liars  . . . They must be butchered and they must be killed."  Defendants assert that this statement is "highly inflammatory" and therefore unduly prejudicial under Rule 403.  Br. 21–22.  This claim is astounding.  As Mr. Marcus explained, this "official Friday sermon" was broadcast shortly after a visit by Ariel Sharon to the Temple Mount, an event that is associated with the start of the Al Aqsa Intifada.  Marcus Rep. 24.  And as plaintiffs' expert Efraim Karsh explained, such Friday prayers are a

15

traditional source of anti-Israel incitement. Karsh Rep. 33. The jury is entitled to infer that the PA's decision to broadcast this sermon on the government television station at such a highly charged moment was a deliberate call to violence, reflecting a culpable state of mind. Yes, the statement is inflammatory, but it is defendants' own statement. And it is offered not for the truth, but to demonstrate defendants' state of mind, their official policies, and the message they were conveying to their own citizens. Defendants' desire to hide their endorsement of abhorrent hate speech is understandable, but they cannot hide behind Rule 403. *See United States v. Mostafa*, 2014 WL 1484758, at *11–13 (S.D.N.Y. Apr. 15, 2014) (rejecting Rule 403 challenge to video tape evidence in which defendant says that it is "okay to sell and to kill infidels" and refers to "these dirty Jews, Christians, most of them homosexual persons" because it was relevant and no more inflammatory than the charged conduct).

## II.    The Testimony Of Alon Eviatar Is Admissible

Alon Eviatar is an expert on Palestinian terrorism, including the involvement of the PA, the PLO, and other Palestinian groups in terrorism. His report covers the PA's support for terrorism, the relationship between defendants and Fatah (which was responsible for many of the attacks in this case), Fatah's terrorist activities during the Al Aqsa Intifada, close cooperation between the defendants and other terrorist organizations such as Hamas, ████████████ ████████████████████████████████████████████████████████████ ██████ the PA's "revolving door" practice of arresting suspected terrorists purely "for show" and then releasing them to commit more crimes, and the role of Yasser Arafat in supporting terrorism. Mr. Eviatar will also testify, both as a summary witness (to present admissible documents to the jury) and as an expert witness, with respect to the July 31, 2002 bombing at Hebrew University that killed four plaintiffs.

### A.      Mr. Eviatar Is Qualified To Testify

Mr. Eviatar spent 27 years in the Israel Defense Forces ("IDF") where he served as an intelligence officer. Between 2001 and 2004—the time covered by the attacks in this case—he served as an IDF Commander of Coordination and Liaison Administration, assisting security forces fighting terrorism and dealing directly with the PA and other Palestinian groups. Eviatar Rep. 1. Beginning in 2004, he served as head of the IDF's Department of Palestinian Affairs, advising senior officials in the government of Israel on Palestinian affairs, including terrorism. *Id.* at 1–2. During the course of his IDF career, he reviewed thousands of intelligence items regarding the activities of the defendants and other Palestinian organizations, *id.* at 2, and he wrote a paper on the Al Aqsa Intifada. *Id.* at 1.

Courts in terrorism cases have repeatedly qualified former Israeli government security officials like Mr. Eviatar and another plaintiffs expert, Israel Shrenzel, as experts on Palestinian terrorism. For example, in the *Gill* case, Judge Weinstein qualified several terrorism experts, most of whom had worked at the same Israeli security agencies as Messrs. Eviatar and Shrenzel. *Gill*, 893 F. Supp. 2d at 531–34. Similarly, in the *Linde* case, the court found that three former Israeli security officials, two of whom also worked at those agencies, were qualified. *Linde*, 922 F. Supp. 2d 322, 329–31. In *Leibovitch v. Syrian Arab Republic*, 2011 WL 444762, at *3–4 (N.D. Ill. Feb. 1, 2011), *rev'd on other grounds sub nom. Liebovitch v. Islamic Republic of Iran*, 697 F.3d 561 (7th Cir. 2012), the court relied on an expert whose background was remarkably like Mr. Eviatar's—three decades as an intelligence officer with the IDF—as an expert on Iran's support for terrorism in Israel. And in *Wachsman v. Islamic Republic of Iran*, 603 F. Supp. 2d 148, 153 n.1 (D.D.C. 2009), the court relied on an official from the Military Intelligence Branch of the IDF as an expert on Islamic terrorism.

Defendants' response to Mr. Eviatar's years of high-level experience is that he lacks a Ph.D. and that his master's degree "does not pertain to the role of the PA or PLO in the Second Intifada." Br. 49. This is not disqualifying and, in any event, he earned his advanced degree many years before the Al Aqsa Intifada began.[4]

Defendants also assert that Mr. Eviatar should not be allowed to testify because he had access to confidential information at the IDF that remains (in the words of defense counsel) "in [his] mind." Br. 51. Mr. Eviatar, however, is not relying on that information; he is relying on the hundreds of sources cited in his report. If mere prior access to confidential materials was sufficient to disqualify an expert whose report relies on sources available to the other side, no former security official could ever qualify. As discussed above, courts have repeatedly allowed such persons to testify in terrorism cases. Defendants point to *Gill v. Arab Bank, PLC*, in which the court excluded the testimony of certain retired Israeli security officials on the ground that their testimony was based almost entirely on confidential government information, thereby preventing the defendants from cross-examining them effectively. 893 F. Supp. 2d at 541 ("Much, if not all, of [the witness's] testimony is based on facts developed through confidential [government] investigations and investigatory methods."). That is not the case with Mr. Eviatar. Defendants are free to use his sources for cross-examination.

---

[4] Defendants complain that the description in Mr. Eviatar's report of his duties at the IDF is similar to the description of the duties of plaintiffs' expert, Israel Shrenzel, who worked on Palestinian terror at Israel's General Security Service. Br. 50. The wording of the job descriptions of Messrs. Eviatar and Shrenzel is irrelevant, and the importance defendants ascribe to this argument—which has nothing to do with *Daubert*—shows that they have no legitimate basis to attack Mr. Eviatar's qualifications. Even if Mr. Eviatar had used Mr. Shrenzel's language, that would not justify disqualification. As this Court has stated, "precluding testimony from the expert under [Rule 26] is a drastic remedy and should only be applied in cases where the party's conduct represents flagrant bad faith and callous disregard of the federal rules." *Lormé v. Delta Air Lines Inc.*, 2005 WL 1653871, at *4 (S.D.N.Y. July 13, 2005) (citations omitted), *aff'd*, 251 F. App'x 691 (2d Cir. 2007).

Defendants broadly assert that Mr. Eviatar is not qualified to testify on *any* of the topics in his report, but they focus almost entirely on the Hebrew University bombing attack, which they state—falsely—"receives the most attention in his report." Br. 51.[5] Their principal charge is that Mr. Eviatar was not responsible for investigating this attack when he was serving in the IDF. There is no requirement, however, that an expert witness on terrorism must have engaged in the original investigation of an attack in order to testify. To the contrary, experts typically lack personal knowledge of the events in a case.

**B.      Mr. Eviatar's Testimony Is Based On An Appropriate Methodology**

As discussed on pages 3–5 above, the appropriate methodology for a non-scientific expert like Mr. Eviatar consists of "gathering multiple sources of information, including original and secondary sources, cross-checking and juxtaposing new information against existing information and evaluating new information." *United States v. Kassir*, 2009 WL 910767, at *6 (S.D.N.Y. Apr. 2, 2009). That is precisely what Mr. Eviatar did. His 88-page report contains a detailed discussion of the basis for his conclusions. It is also meticulously documented with 176 footnotes citing a wealth of supporting materials, including primary source documents and a wide variety of secondary materials.[6]

Defendants' principal attack on Mr. Eviatar's methodology is not that his methodology is flawed, but that it is not his own. Mr. Eviatar's report is based on a draft report prepared by a prior expert (Ronni Shaked) who had to withdraw shortly before expert reports were due because his wife became seriously ill. Br. 52–54. Plaintiffs quickly retained Mr. Eviatar as a substitute,

---

[5] The discussion of this attack comprises only 13 pages of his 88-page report. Eviatar Rep. 4–16.

[6] The documents on which Mr. Eviatar relies include defendants' own statements, statements by the perpetrators, copies of demands by Israel that the PA detain suspected terrorists, ███████ ████████████████████████████████████████████████████ records of the criminal proceedings against the perpetrators, statements by PA officials, and reports on terrorism by the government of Israel.

but defendants, to their discredit, tried to exploit Mrs. Shaked's illness by opposing the substitution. DE 405. Judge Ellis promptly allowed the substitution but, undeterred, defendants then asked him—as they now ask this Court—to disqualify Mr. Eviatar because his report was based on Mr. Shaked's draft report.

This request was meritless when defendants made it to Judge Ellis, and it is meritless now. Since Mr. Shaked withdrew very shortly before reports were due, the only way that Mr. Eviatar could produce a timely report was to work from Mr. Shaked's draft, making whatever changes were necessary. DE 405. Defendants concede that Mr. Eviatar made changes to the draft, but they complain that he did not change it more. This simply reflects the fact that Mr. Shaked had prepared a high quality report. Moreover, the case law on replacing an expert makes clear that the new expert must hew to the opinions of the original expert.[7]

Defendants also complain that—*before* his deposition—Mr. Eviatar found and corrected a mistake in his report regarding his past work. Br. 52–53; Eviatar Dep. 42:24–43:3. Defendants' claim that an expert witness should be disqualified because he appropriately—and timely—corrected a minor error regarding his background makes no sense.

Defendants' attempt to disqualify Mr. Eviatar on these grounds is also barred because they asked Judge Ellis to disqualify Mr. Eviatar (as well as another plaintiffs expert, Jeffrey Addicott) for these very same reasons, and Judge Ellis denied their request.[8] Defendants did not

---

[7] *E.g., Lincoln Nat'l Life Ins. Co. v. Transamerica Fin. Life Ins. Co.*, 2010 WL 3892860, at *2 (N.D. Ind. Sept. 30, 2010) ("the substitute expert's report and testimony is frequently limited to the subject matter and theories already espoused by the former expert") (citing cases).

[8] Defendants' pre-motion conference letter, plaintiffs' response, and defendants' reply show that defendants made the same arguments then that they make now. DE 401, 405 and 406. Judge Ellis denied their request in a telephone conference on December 17, 2013. Due to technical difficulties with the Court's telephone system, the conference was not recorded, but Judge Ellis' ruling on this point is set forth in DE 411 ("the Court denied Defendants' request to preclude the testimony of two of Plaintiffs' liability experts for the reasons explained on the record").

object to that ruling, so they have waived this point. *See Caidor v. Onondaga Cnty.*, 517 F.3d 601, 605 (2d Cir. 2008) ("litigant who fails to object timely to a magistrate's order on a non-dispositive matter waives the right to appellate review of that order"); *Thai Lao Lignite (Thailand) Co. v. Gov't of Lao People's Democratic Republic*, 924 F. Supp. 2d 508, 517 (S.D.N.Y. 2013) (same). Moreover, it was improper for defendants to fail to tell the Court that they already lost this issue before Judge Ellis.

Defendants' remaining attacks on Mr. Eviatar's methodology consist of little more than quibbling. As discussed on pages 6–7 above, such criticisms do not justify disqualification and must be reserved for cross-examination. In any event, their quibbles lack merit. For example, defendants contend that Mr. Eviatar should not be allowed to testify about the Hebrew University bombing—which killed nine people, wounded over 100 others and was one of the most notorious attacks of the Al Aqsa Intifada—because he fails to cite any documents confirming the location of the attack. Br. 54. Failing to cite a "document" locating the "Hebrew University bombing" at "Hebrew University" is like failing to provide "documentation" that the "9/11 hijackers" committed their crimes on September 11, 2001.

Defendants also dispute Mr. Eviatar's conclusion that the PA's arrest of Abdullah Barghouti (a/k/a "the Engineer"), who made the bomb used in this attack, was a sham. As Mr. Eviatar reports, the PA arrested Barghouti in August 2001, but released him three weeks later. One piece of evidence to which Mr. Eviatar points to support his conclusion that the arrest was a sham is that—as Barghouti himself admitted—the PA provided him a telephone while he was in prison, which he used to coordinate with other members of the Hamas terrorist organization. Defendants assert that "[t]here is nothing untoward about letting a prisoner use a telephone in jail." Br. 55–56. Actually, providing a phone to a terrorist for use in coordinating with his

terrorist co-conspirators *is* a crime, of which one high-profile defendant was just convicted. *See* Mark Hamblett, "Imam Convicted of 11 Counts of Supporting Terrorism," *NYLJ* (May 20, 2014) ("Mustafa's credibility was badly damaged when he dissembled about helping the Yemeni hostage takers, buying them the phone…"). Defendants' argument to the contrary says nothing about Mr. Eviatar's methodology—and volumes about their own lack of self-awareness.

Other criticisms are simply false. For example, defendants allege that Mr. Eviatar failed to document his claim that ███████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████

Defendants also criticize Mr. Eviatar for pointing to the PA's refusal to arrest one of its top officials, Tawfiq Tirawi (who headed the PA's General Intelligence Service), after Israel demanded his arrest due to his complicity in terrorism. Defendants do not deny that Israel made that demand, but they challenge Mr. Eviatar's conclusion that the PA's refusal to hand him over indicates that the PA failed to crack down on terrorism on the ground that "[t]he PA might not have known that Tirawi was wanted by Israel." Br. 57. This claim is incredible. Tirawi was one of the most well-known and notorious men in the West Bank, and the fact that Israel wanted him arrested—and that the PA shielded him from the Israeli authorities by allowing him, and other men wanted for terrorism, to hide out in Yasser Arafat's compound—was widely reported by the

international press. For example, a Washington Post story about Israel's attempt to arrest terrorists in Arafat's compound stated:

> "Israeli authorities earlier had demanded that Arafat arrest or surrender individuals they accused of terrorist acts who were believed to be inside the building. The Israelis identified in particular Tawfiq Tirawi, the head of the Palestinians' general intelligence services for the West Bank. . . ."[9]

Defendants' suggestion that the PA might not have known of Israel's demand that the PA turn over Tirawi is nonsense. It shows only that defendants' motion does little more than string together a series of potential cross-examination questions, apparently with no thought as to whether asking those questions will embarrass the defendants.

## III.     The Testimony Of Israel Shrenzel Is Admissible

Israel Shrenzel, a former Israeli government intelligence analyst with decades of experience analyzing Palestinian affairs, including terrorism, will serve dual roles at trial. First, he will testify on the defendants' role in the campaign of terror that occurred during the Al Aqsa Intifada. Second, Mr. Shrenzel will serve as a summary and expert witness with respect to six of the seven terrorist attacks in this case, presenting admissible documentary evidence to the jury describing each attack, using his expertise to help the jury understand that evidence and to explain facts bearing on defendants' liability.[10] Defendants' criticisms of Mr. Shrenzel are very similar to their criticisms of Mr. Eviatar, and this Court should reject them for the same reasons.

---

[9] Molly Moore, "Israelis Pull Back After 10-Day Siege of Arafat's Complex; Decision Follows Strong U.S. Pressure," Wash. Post, at A10 (Sept. 30, 2002).

[10] In Mr. Shrenzel's words, he will testify as to "the degree of involvement of the Palestinian Authority in six terrorist attacks that are at the center of this action, and in the encouragement, support and assistance in the execution of these attacks." Shrenzel Rep. 3.

## A.     Mr. Shrenzel Is Qualified To Testify

As discussed above, the courts have regularly qualified former Israeli security officials as experts in terrorism cases, and Mr. Shrenzel fits well within that rubric.  He has "decades of professional experience analyzing the Palestinian arena" and he is eminently qualified to testify on defendants' role in the campaign of terror that occurred during the Al Aqsa Intifada.

*See* Shrenzel Rep. 1–3.  At the start of his career, Mr. Shrenzel served five years as a research officer in the Intelligence Branch of the Israel Defense Forces ("IDF"), where his research focused on Palestinian and Syrian affairs.  In 1988, Mr. Shrenzel joined Israel's main domestic intelligence and security agency, the Israeli Security Agency ("ISA"),[11] as an intelligence analyst working on terrorism issues.  He worked for the ISA for over fifteen years, including the entire period of the Al Aqsa Intifada.[12]  Mr. Shrenzel held a rank equivalent to colonel and was a Department Head in the ISA's Research Division, where he focused on the activities of "Palestinian groups, organizations, institutions and personalities."  *Id.* at 1.  His work involved "a cross-section of subjects, key issues, such as policy of the Palestinian Authority with respect to different issues, policy and actions with respect to terrorism."  Shrenzel Dep. 38:9–12.  He supervised 15 to 20 research and assessment personnel within the ISA, drafted research and policy papers, and briefed senior government officials in Israel and abroad—all with a focus on

---

[11] In his report, Mr. Shrenzel refers to the ISA (also popularly known as the Shin Bet) by its former name, the "General Security Service ('GSS')."

[12] Defendants suggest that Mr. Shrenzel appeared at his deposition "on behalf of" the ISA. Br. 63.  Mr. Shrenzel said nothing of the sort.  That quote is taken from his response to questions about whether Israeli law prohibited him from answering questions about interrogations at the ISA.  Mr. Shrenzel answered:  "I don't know.  I'm no legal expert.  I am present here without any legal counsel, on behalf of my former employer."  Shrenzel Dep. 80:2–4.  Mr. Shrenzel was merely pointing out that no one was present on behalf of the ISA to respond to defendants' request to talk about interrogations.

Palestinian affairs. Shrenzel Rep. 1. Like Mr. Eviatar, he has reviewed literally thousands of intelligence items regarding defendants and their support for terrorism. *Id.*

Mr. Shrenzel has also edited two books that deal with the issue of Palestinian terrorism[13] and written numerous articles in the newspaper, Ha'aretz. Shrenzel Rep. 1–2 (listing publications). In 2007, Mr. Shrenzel served as an aide to the Winograd Commission, an Israeli government-appointed commission that investigated the conflict between Israel and Hezbollah. He is also an adjunct professor at Tel Aviv University, where he teaches a course on Modern Islamic Thought. Shrenzel Rep. 1–2.

Defendants do not even attempt to explain why thirty years of studying Palestinian entities and their involvement with terrorism is insufficient to establish Mr. Shrenzel's expertise. Rather, as with Mr. Eviatar, they complain that Mr. Shrenzel "does not have a Ph.D." and that "[h]is name did not even appear on the cover of [a book that he edited]." Br. 58. As discussed above, a Ph.D. is not necessary where an expert is qualified based on his professional experience, and defendants surely cannot expect the Court to question an expert's qualifications based on a book cover. *See, e.g.*, *United States v. Joseph*, 542 F.2d at 21 ("quibble with [an expert's] academic training is on cross-examination"); *In re Young Broadcasting Inc.*, 430 B.R. 99, 122 (Bankr. S.D.N.Y. 2010) (collecting cases) ("These bases for qualification are disjunctive such that practical experience may be crucial for one type of expert opinion while academic training may be essential for another.").

Defendants try to discredit Mr. Shrenzel by repeating their claim that the description of his job responsibilities resembles Mr. Eviatar's description. *See supra* n. 4. As discussed above, this claim is meritless. Similarly, defendants engage in semantics by objecting to Mr. Shrenzel's

[13] Guy Aviad, The Politics of Terror, An Essential Hamas Lexicon (2008); A Ticking Bomb (Haggai Golan & Shaul Shay et al. eds. 2006).

statement that his expertise involves "the Palestinian arena." Br. 59. If defendants did not understand this phrase they were free to question Mr. Shrenzel during his deposition.

Defendants also complain that Mr. Shrenzel "would not explain the nature of his work at GSS." *Id.* This misstates his testimony. The only GSS work that Mr. Shrenzel declined to discuss involved interrogations because GSS counsel was not present to advise him on whether he was permitted to speak about interrogations. Shrenzel Dep. 78:1–80:13. Defendants did not bother to ask Mr. Shrenzel to elaborate on his other duties as an intelligence analyst. In any event, he was "very strict about relying upon materials that, of course, could be cited as references, as proof, as evidence. And all of those materials are either open source or were provided to us by the other side." *Id.* at 51:7–11. As discussed earlier, prior exposure to classified materials does not provide a basis for disqualifying an expert on security matters.

Finally, as with Mr. Eviatar, defendants complain that Mr. Shrenzel did not personally investigate the six terrorist attacks he discusses. Br. 60. Again, there is no requirement for expert or summary witnesses to have such personal involvement.

### B.    Mr. Shrenzel's Testimony Is Based On An Appropriate Methodology

Defendants cannot deny that Mr. Shrenzel's report is both comprehensive (77 pages) and carefully documented (329 footnotes). His report reflects a meticulous analysis of thousands of pages of materials, including court files, ███████████████████ press coverage, video recordings, and various other open source materials.[14] It provides both

---

[14] Defendants assert that Mr. Shrenzel has "cherry-picked data" because he chose to quote an incendiary portion of one of Yasser Arafat's speeches without reference to another, allegedly peaceful, quote from the same speech. Br. 67. However, as an expert on these types of materials, Mr. Shrenzel is permitted to make the determination that the latter quote need not appear in his report. *See, e.g.*, *Cortland Racquet Club*, 2003 WL 1108740, at *4 ("[I]t is not for this Court to preclude expert testimony simply because there is additional contradictory testimony that will be available to the jury.").

extensive generalized evidence on defendants' support for terrorism, as well as detailed

discussions of the facts of each of the six attacks and defendants' involvement in them.  *Id.* at

18–77.  In addition, he shows how defendants' role in those six attacks is consistent with their

attitude toward terrorism during the Al Aqsa Intifada.  *Id.* at 18–77; *see also* Shrenzel Dep. 81:

23–82:6.[15]

Any claim that this detailed report does not satisfy the methodology requirements for

non-scientific experts is baseless, and defendants do not even try to make such a claim.  Rather,

they attack Mr. Shrenzel's report on the ground that a team of researchers assisted him in

reviewing the voluminous source materials and prepared an initial draft.  Br. 61-62.  This is

essentially the same claim defendants made—and Judge Ellis rejected—with respect to

Mr. Eviatar's reliance on Mr. Shaked's work, and it is meritless.  The law permits experts to

work with assistants in their field.  *Am. Universal Ins. Co. v. Falzone*, 644 F.2d 65, 66 (1st Cir.

1981), *abrogation on other grounds recognized by Smith v. Kmart Corp.*, 177 F.3d 19, 25 n.1

(1st Cir. 1999) (fire marshal permitted to testify on basis of report prepared by a team of

investigators under his supervision); *see Linde*, 922 F. Supp. 2d at 322 (admitting testimony of

one of Mr. Shrenzel's team members).[16]

---

[15] Defendants object to Mr. Shrenzel's reference to the PA's "attitude" toward terrorism, suggesting that it is improper "state of mind" testimony.  Br. 67–68.  This is more semantics. Mr. Shrenzel clarified that his goal was "'not necessarily to get inside the head of [the PA], but . . . to focus on . . . concrete evidence from which we can deduce things with respect to the conduct and attitudes of the Palestinian Authority."  Shrenzel Dep. 82:9–16.

[16] Defendants also argue that Mr. Shrenzel's testimony (as well as that of Nicholas Kaufman) should be excluded because he had allegedly not yet begun to work on his report when plaintiffs sought to extend the date for expert reports.  Br. at 80–81.  This argument fails for several reasons.  First, defendants' statement that plaintiffs did not seek an extension to file expert reports until after the deadline had passed is false; plaintiffs moved for such an extension on November 19, 2012, over two months before the deadline.  DE 267–70.  In response to that motion, Judge Ellis made it clear that the schedule was going to change, but he did not set a new date until February 2013.  Second, the team assisting Mr. Shrenzel had in fact done a great deal of work by the time plaintiffs asked Judge Ellis to adjust that date.  *See* Shrenzel Dep. 20:2–7.

Footnote continued on next page

Defendants argue that Mr. Shrenzel does not offer any expert opinions because a significant portion of his report discusses the facts of the six attacks. Br. 57–58. As defendants are well aware, however, Mr. Shrenzel will testify not only as an expert, but also as a summary witness to present admissible documentary evidence about those attacks, their perpetrators, and the defendants' support for them.[17] As discussed above, the case law in the Second Circuit makes clear that an expert may serve such a dual role. In any event, the reason that Mr. Shrenzel is serving as a summary witness is that his decades of experience studying the defendants' involvement in terrorism will allow him to help put this evidence in context.

Defendants assert that Mr. Shrenzel's discussion of the six attacks "transmit[s] hearsay." Br. 62. Most of the documents on which he relies, however, are fully admissible—indeed, many of them are defendants' own records. Defendants criticize Mr. Shrenzel's reliance on a report by the Israeli Ministry of Foreign Affairs regarding two of the attacks (*id.* at 62–63), but that report is admissible as a public record under Fed. R. Evid. 803(8).[18] In any event, a *Daubert* motion is not the place to determine the admissibility of evidence offered by a summary witness.

Footnote continued from previous page
Finally, and most importantly, it is far too late for defendants to try to relitigate the deadline (over a year ago) for submitting expert reports, let alone to request the drastic remedy of excluding such important testimony. *See supra* note 4.

[17] Plaintiffs' portion of the proposed Joint Pretrial Order expressly states that, in addition to providing expert testimony, Mr. Shrenzel and certain other of plaintiffs' experts would serve as summary witnesses about the attacks.

[18] Having worked at the IDF and ISA for many years, Mr. Shrenzel is well-positioned to evaluate the trustworthiness of such government reports, and he explained his basis for crediting it. *See* Shrenzel Dep. 108:24–110:1 (explaining evidence that corroborates the Israeli report that the PA refused to arrest the terrorist Nasser Aweis at the request of U.S. envoy General Zinni); *id.* at 140:10–19 (explaining that reliance on the report was warranted in part because he was "not aware that, subsequent to the publication of this document, a Palestinian claim or argument was raised that contradicts this determination").

Defendants also criticize Mr. Shrenzel for relying on secondary sources, but experts are permitted to rely on secondary sources.[19]  As discussed above, reliance on secondary sources is particularly appropriate for terrorism experts because terrorist organizations operate in secret. *E.g.*, *Paracha*, 2006 WL 12768, at *21 (qualifying terrorism expert and noting that he "necessarily relies on secondary sources to form his opinion about secretive terrorist organizations"); *United States v. Damrah*, 412 F.3d 618, 625 (6th Cir. 2005) ("Given the secretive nature of terrorists, the Court can think of few other materials that experts would rely upon.").

Defendants also point to a few statements in Mr. Shrenzel's report that have no citation. Br. 64–65.  At his deposition, Mr. Shrenzel acknowledged each instance and told defendants repeatedly that "it [would] be possible, if necessary, to provide the concrete evidence …." *E.g.*, Shrenzel Dep. 115:20–21.  In any event, such a tiny number of omissions cannot possibly justify excluding the testimony of an expert whose report contains over 300 footnotes documenting virtually every assertion.

Finally, defendants again use their motion to preview their cross-examination.  They criticize Mr. Shrenzel because he describes the attack on the Guetta family as being "identical" to other attacks carried out by PA security personnel on the ground that the attacks were not literally "identical."  Br. 66.  This ignores the fact that Mr. Shrenzel also used the term "similar" to compare these attacks.  Shrenzel Rep. 74.  Whatever value such semantics may have on cross-examination, they have no place in a *Daubert* motion.

---

[19] Defendants point to Mr. Shrenzel's citation of a book by a former U.S. foreign policy official to support his claim that Yasser Arafat personally approved the payment of funds to the perpetrators of one of the attacks.  Br. 63.  Not only was this proper for an expert witness, but Mr. Shrenzel testified that he was aware of the book's underlying source data.  Shrenzel Dep. 146:6–15.

Other attacks on Mr. Shrenzel are, to say the least, flimsy. Defendants criticize him for stating that "the evidence indicates" that some of the perpetrators of the January 22, 2002 attack on the Gould and Waldman plaintiffs "

█████████████" Br. 66. ███████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████

## IV.     The Testimony Of Nicholas Kaufman Is Admissible

Most of the perpetrators of the attacks in this case were convicted by the Israeli Military Courts ("IMCs") in the West Bank. Plaintiffs intend to introduce the records of those convictions, which are admissible under Fed. R. Evid. 803(22) and principles of comity. Another court recently admitted records of IMC convictions in an ATA case, assuming without deciding that Rule 803(22) requires the foreign court to observe "some minimum due process" and that "[T]he record reflects that many of the basic rights that accused persons have in American courts are also applicable to defendants in Israeli military courts." *Strauss*, 925 F. Supp. 2d at 448.[20]

Nicholas Kaufman, who has served for many years as a part-time judge in the IMCs and as a prosecutor and defense attorney in the civilian and military courts in Israel, will provide that

---

[20] The *Strauss* decision also stated that any criticism of the IMCs "affects the weight of the evidence, not admissibility." *Id.*

record here. He will testify both as a summary witness to introduce the records and as an expert to show that the perpetrators at issue received due process.

A.    <u>**Mr. Kaufman Is Qualified To Testify**</u>

Mr. Kaufman has practiced criminal law in Israel since 1995. After a stint in the International Law Department of the IDF's Office of the Military Advocate General, he served as an assistant district attorney prosecuting crimes—with a particular emphasis on prosecuting security crimes against Israel—for over sixteen years. Kaufman Rep. 1. During that time, he took two leaves to serve as a prosecutor at the International Criminal Tribunal for the Former Yugoslavia and the International Criminal Court. *Id.* at 2. Since leaving the prosecutor's office, he has worked as a criminal defense attorney, representing such high profile individuals as former officials of the Congo and the children of Muammar Gaddafi, in the ICC as well as both the civilian and military criminal courts in Israel. *Id.* at 2; Kaufman Dep. 34:20–35:8.

Since 2002, he has also served as a part-time judge in the Judea Military Court, which is the IMC responsible for the southern part of the West Bank near Jerusalem. In that capacity, he has "presided over countless trials and detention remand applications—both contested and agreed." As a result, he is "extremely familiar with the working of the IMC." Kaufman Rep. 2.

Defendants make only a half-hearted attempt to argue that Mr. Kaufman is not qualified to opine on the workings of the IMCs. Their principal argument is that Mr. Kaufman is, "by his own admission," a practicing lawyer and part-time judge, that he does not have a Ph.D., and that he is "is not a social scientist" and "has not received training on social science methodological techniques." Br. 69. Do defendants really expect this Court to rule that only a social scientist

can testify about the workings of a criminal court system, and that a lawyer who has both practiced criminal law[21] and served as a judge in that court for years cannot do so?

Defendants complain that Mr. Kaufman has sat as a judge on only one of the three IMCs (one of which is an appeals court) that cover the West Bank, but most of the cases at issue were in the IMC in Judea where he serves, and defendants do not—and cannot—point to any difference between that court and the other IMC trial court in Samaria. Br. 69. Similarly, defendants note that he has sat as a judge less often during the last two years, ignoring the fact that the convictions at issue were from an earlier period. Br. 69–70.

Mr. Kaufman's experience contrasts sharply with that of defendants' expert witness on the IMCs, Michael Sfard. Mr. Sfard admitted that he has done only "a very small amount" of criminal defense work and conceded that the few criminal cases he has handled were mostly for "very minor offenses." Sfard Dep. 21:2–14. Mr. Kaufman, by contrast, has presided over "countless trials" in security cases in the IMCs. In addition, Mr. Sfard admitted that most of his work in security cases was in Israeli civilian courts—the same charge that defendants incorrectly level against Mr. Kaufman. Sfard Dep. 46:4–8. It appears that defendants did not even stop to consider the qualifications of their own expert before they attacked Mr. Kaufman.

Defendants also complain that Mr. Kaufman issues decisions only in the cases before him and does not provide "opinions about the 'system as a whole." Br. 70. But it is the job of judges to decide the cases before them, not to write critiques of the entire system. They also argue that Mr. Kaufman could not testify as to the out-of-court practices of prosecutors and defense counsel in the West Bank. Br. 70–71. The issue, however, is not what lawyers in the West Bank do

---

[21] Defendants assert that Mr. Kaufman has worked as a criminal defense attorney only in the Israeli civilian courts, not in the IMCs. Br. 69. This is incorrect. Kaufman Dep. 34:20–35:8.

outside of court; it is whether the courts themselves provide sufficient due process to make their records admissible.

### B. Mr. Kaufman's Testimony Is Based On An Appropriate Methodology

Defendants assert that Mr. Kaufman has no "academic methodology" or "scientific method," again ignoring the fact that he is (appropriately) not a social scientist and that, as an expert who testifies based on practical experience, he is not required to adhere to such a methodology. Br. 71, 76. They also criticize him, Br. 71, for referring to the United Nation's 1948 Universal Declaration of Human Rights to assess the level of due process afforded by the IMCs, even though defendants themselves offered that document as a trial exhibit and even though that is the very first document that Mr. Sfard cited as one of the "main sources of international law standards of due process" that should be used to assess the IMCs. Sfard Rep. 22. Defendants should look to their own expert's methodology before criticizing Mr. Kaufman's.

Defendants' principal attack on Mr. Kaufman's methodology is that he assessed the fairness of the IMC proceedings against the 21 perpetrators by reviewing the records of those proceedings. The problem for defendants is that those records show that the IMCs accorded them due process.[22] Accordingly, defendants try to shift the focus away from the IMCs, arguing that the perpetrators' defense counsel might have been ineffective,[23] that the prosecutors might

---

[22] As set forth in plaintiffs' motion in limine, most of defendants' attacks on the IMCs are generalized attacks on the IMC system as a whole that defendants cannot tie to any of the 21 individual proceedings. *See* Plaintiffs' Mem. In Support of Motion in Limine at 9–11 (DE 487).

[23] Defendants argue that Mr. Kaufman improperly "assumed that defense counsel were competent and acted in good faith." Br. 74. In fact, that assumption was proper. As the Supreme Court held in *Strickland v. Washington*, 466 U.S. 668, 689 (1984), when the competence of a criminal defense attorney is challenged "[j]udicial scrutiny of counsel's performance must be highly deferential" and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is the

Footnote continued on next page

have acted unfairly, or that the perpetrators (most of whom confessed) might have been innocent. Thus, they argue at length that Mr. Kaufman's methodology was inadequate because he did not interview the lawyers involved in those cases and did not obtain and review either their private files or the investigative files of the GSS that were not introduced at the trials.[24] Br. 72–79. Defendants' own expert did not conduct such interviews either, Sfard Dep. 40:21–41:8, and there is no reason to think that those lawyers would breach the attorney-client privilege or hand over their confidential work product.

Simply put, defendants' argument is that Mr. Kaufman cannot testify—and that the convictions cannot be admitted—unless he can both reinvestigate the 21 cases from scratch and convince this Court that, in a perfect world, it would have reached the same results reached by the IMCs. This is obviously unworkable and would vitiate Rule 803(22); the whole point of that rule is that evidence of prior convictions is admissible without the need to retry the criminal case. We are aware of no cases—and defendants cite none—requiring a party who offers the records of a criminal conviction to reinvestigate the case, including the competency of defense counsel, before the court can admit the conviction.[25]

---

Footnote continued from previous page

defendant must overcome the presumption . . . ." In any event, the strategies of the perpetrators' defense counsel are not at issue.

[24] As Mr. Kaufman explained, these files (the equivalent of the FBI's investigative files) are not generally kept in the court's files, just as the files of the federal district courts do not contain complete FBI files in terrorism cases. Kaufman Reb. 4. Mr. Sfard, of course, did not obtain or review the GSS files either.

[25] The only case defendants cite for the proposition that Mr. Kaufman should be required to review materials outside the court records is *Martinez v. Ryan*, 132 S. Ct. 1309 (2012). That case is irrelevant. *Martinez* involved a petition for a writ of habeas corpus challenging a criminal conviction based on alleged ineffective assistance of counsel. Such claims have nothing to do with the standards for the admissibility of prior convictions, and defendants' citation of this case underscores the lack of any case law supporting their position.

Rather, the issue is whether the IMCs accorded the 21 defendants some reasonable measure of due process. The only way to determine that is to review the records of the actual court proceedings, as Mr. Kaufman has done, to ensure that the IMCs' rules provide for a reasonable amount of due process and that the courts followed those rules. As one commentator has stated, foreign criminal convictions can be used "[a]s long as the foreign jurisdiction accords the minimum of due process to an accused and has followed its own procedures during the criminal trial."[26] That is what Mr. Kaufman's testimony shows.

This is not to say that defendants are powerless to rebut the convictions. As Judge McKenna has stated: "Generally under Rule 803(22), [t]he prior conviction usually is not conclusive evidence of the facts determined in the prior action" and "the party against whom the evidence was offered . . . may attempt to rebut such evidence by offering whatever explanation there may be . . . ." *Bank Brussels Lambert v. Credit Lyonnaise (Suisse) S.A.*, 2001 WL 99506, at *3 (S.D.N.Y. Feb. 6, 2001) (citations omitted). The right to rebut the convictions, however, does not go to their admissibility. Thus, to the extent defendants wish to challenge the competency of defense counsel in order to cast doubt on the guilt of their employees, they may cross-examine Mr. Kaufman at trial or, to the extent they have preserved their right to do so, they may seek to introduce appropriate evidence in their case in chief. Br. 77–79. Such evidence is not relevant under *Daubert,* however, because it challenges the expert's conclusions, not his qualifications.

---

[26] 36 Am. Jur. Proof of Facts 2d 747, "Impeachment of Witness by Criminal Conviction," §5 (1983). Although this section's title refers to the use of convictions for impeachment purposes, it also makes clear that "[a] conviction in a foreign country is *admissible* in most jurisdictions unless the trial or proceeding giving rise to the conviction lacked basic due process protections as to render it grossly unfair" (emphasis added).

Finally, defendants resort to semantics, arguing that Mr. Kaufman's report affirmatively stated that some defendants were afforded due process, while stating that he saw no evidence that other defendants were not afforded due process. Br. 76–77. As defendants' concede, Mr. Kaufman explained that he varied his language to avoid sounding "robotic" and that these differences in phraseology do not suggest a difference in meaning. Kaufman Dep. at 97:18–98:2. Defendants' suggestion that Mr. Kaufman's writing style brings his methodology into question is frivolous.[27]

## V.    The Testimony Of Jeffrey Addicott Is Admissible

Lt. Col. (U.S. Army, ret.) Jeffrey Addicott, an internationally recognized authority on state-sponsored and state-supported terrorism and national security law, has submitted both an original and a rebuttal report. The overarching theme of his testimony, based on his broad base of knowledge of international terrorism, will be to demonstrate how defendants have acted in the ways that governments supporting terrorism act. For example, he will testify that, like terrorist supporters elsewhere, defendants often acted through affiliates and front groups.[28] He will also

---

[27] Defendants also argue that Mr. Kaufman should be barred from testifying because some of the IMC records he relied on were not produced to defendants before the close of fact discovery. Br. at 82–83. This claim is completely without merit. Plaintiffs timely produced the IMC records in their possession, but Mr. Kaufman decided to review additional records that had to be obtained from the court's files. There is no requirement for experts to produce publicly available materials on which they rely, that were not in the possession of the parties that hired them, prior to the deadline for submitting expert reports. The other experts in this case cited to hundreds of documents that were not produced in fact discovery, and Mr. Kaufman is no different. The statements of Judge Ellis that defendants quote are not to the contrary; as defendants concede, he stated that experts could not rely on "*responsive* documents not produced during discovery." Br. 82 (citing July 10, 2012 hearing transcript) (emphasis added). Publicly available documents that were not in the possession of the plaintiffs during fact discovery are not "responsive." In any event, if defendants thought that their complaint had any merit they should have raised it with Judge Ellis over a year ago when Mr. Kaufman submitted his report, and there is no justification for using this stale and unsupportable complaint to exclude his testimony.

[28] *See* Addicott Dep. 183:5–11 ("[T]hat's what groups, governments, organizations that engage in terrorism do. They don't take responsibility directly. They use people. They use organizations to carry out their bidding. And when they are confronted with it, they deny all responsibility.").

testify that defendants' public statements purporting to renounce terror—statements on which defendants rely heavily—are predictable for such organizations and do not detract from their ongoing support for terrorism.[29]  In addition, he will testify that terrorism continued to kill and injure scores of American citizens, even though the United States government repeatedly complained to defendants, thereby putting them on notice that the violence was harming Americans.  Addicott Rep. 18–27.

### A.    Professor Addicott Is Qualified To Testify

Professor Addicott, who is a Professor of Law and the Director of the Center for Terrorism Law at St. Mary's University School of Law, has devoted his career to the study of international terrorism.  Addicott Rep., Ex. A (CV).  His focus on terrorism began as an officer in the Judge Advocate General's Corps (JAG Corps) in the 1980s.  Addicott Dep. 150:6–151:11.  He remained at the JAG Corps for twenty years, ultimately serving as the senior legal advisor to the United States Army's Special Forces.  He also served as the Deputy Chief of the International and Operational Law Division at the Pentagon.  Addicott Rep. 2; Addicott Rep., Ex. A.  During that time Professor Addicott taught several courses at the JAG School about national security law and terrorism.  *Id.*

Professor Addicott has an L.L.M. and an S.J.D. from the University of Virginia School of Law, and he has taught terrorism and national security law at various law schools in the United States and abroad.  He coined the phrase "terrorism law" and founded St. Mary's Center for Terrorism Law.  Addicott Dep. 152:6–12.  Professor Addicott is a prolific writer on the subject

---

[29] *See* Addicott Dep. 144:14–145:2 ("You would expect that the government … would not claim direct responsibility ….  You would expect them to incite, to use these groups to do their bidding on the one hand, while on the other hand holding out the olive branch of peace, and we're trying to do everything we can.  So you would expect that duplicity to be evident, particularly in times of violence.").

of terrorism. He has authored over 40 books and publications (Addicott Rep. 3), most recently *Terrorism Law: Cases, Materials, Comments* (7th ed. 2014), and is a frequent contributor to governmental, professional, academic, and news media organizations in the United States and abroad, including the Middle East, on the topics of terrorism, national security, and radical Islam. Addicott Rep., Exs. B–C. He has testified multiple times before Congress on issues of terrorism and national security law, and he also regularly teaches a course on those subjects at the FBI, with whom he also consults on various terrorism matters. Addicott Rep. 11–12.

Defendants do not challenge Professor Addicott's expertise in the fields of international state-sponsored terrorism and national security law. Instead, they argue that he is not qualified because he does not speak Arabic, because has not conducted actual field work in the West Bank, because his trips to the West Bank have been too "cursory," and because (although the law plainly does not require this) he has no peer-reviewed publications on the precise topics of his reports. Br. 33. These arguments are, at most, fodder for cross-examination and do not come close to questioning his qualifications.

Defendants' primary challenge to Professor Addicott's qualifications is that he does not specialize in Palestinian terrorism. *Id*. at 33–35. For example, they claim that he has "given no lectures relevant to the opinions expressed in his reports" and that "at most, only one of [his media] appearances relates to the opinions in his reports." *Id*. at 33. These statements are not correct. Professor Addicott testified that, having made hundreds of speeches and thousands of media appearances in his career, he was not able to remember each specific instance in which he discussed the topic of the PA or the Al Aqsa Intifada. Nonetheless, he pointed to several instances that "stand out." Addicott Dep. 64:1–65:19. For example, he testified that Palestinian terrorism was a topic during his frequent lectures to the FBI. *Id*. at 69. He also described in

detail a conference in Israel where he was a panel member and discussed the PA, Fatah and the Al Aqsa Intifada. Addicott Dep. 88:21–90:11. Professor Addicott participated in other such conferences where he had discussions with Palestinian scholars who contributed to his knowledge on Palestinian terrorism. *Id*. at 93–94.

Defendants argue that Professor Addicott is not qualified because he allegedly "tried to equate the PA with 'radical Islam." Br. 33. This seriously distorts his testimony. In his deposition, Professor Addicott made clear that, as is the case with radical Islamic terrorists, defendants "will use, or misuse, religion as a justification for terrorist acts." Addicott Dep. 71:20–21. Far from calling his qualifications into question, this is an example of how Professor Addicott will use his broad knowledge of international terrorism to show how defendants' actions demonstrate their support of terrorism. In any event, such disagreements with his conclusions are irrelevant under *Daubert*.

Defendants also suggest that Professor Addicott lacks expertise on Palestinian issues because he referred to the PA, rather than the PLO, as the "sole legitimate representative of the Palestinian people." Br. at 33–34. As Professor Addicott explained, he was referring to the fact that Yasser Arafat controlled both the PLO and the PA and so was the effective representative of the Palestinian people. Addicott Dep. 251:4–252:2.

In addition to showing that defendants acted the way international terrorists act, Professor Addicott will also demonstrate why defendants had notice that their campaign of terrorism was harming Americans but took no action to stop it. For example, as he will explain, during the relevant period the United States government repeatedly condemned defendants for their role in the violence and called on them to stop it. Addicott Rep. 18–27.

Defendants do not question Professor Addicott's qualifications to give this testimony, but they allege that it improperly attests to state of mind. Br. at 40. As discussed earlier, this is not correct. Professor Addicott will simply explain why defendants were on notice of the United States Government's position that they were killing Americans. The jury can infer their state of mind from that testimony.

**B.** **Professor Addicott's Testimony Is Based On An Appropriate Methodology**

The weakness of defendants' claim that Professor Addicott lacks an appropriate methodology is apparent from their principal argument on this point: as with Mr. Eviatar, they claim that his methodology is not his own because he replaced another expert. Br. at 35–36. As explained above (pp. 19–21), Judge Ellis has already rejected defendants' request to strike Professor Addicott's report on this ground, so their claim is not only barred, it is highly improper for them to assert it without telling this Court that they lost it before.

In any event, this claim is meritless. Plaintiffs engaged Professor Addicott because another expert had to withdraw just before reports were due. That expert had already prepared his report, which plaintiffs furnished to Professor Addicott. DE 405. Professor Addicott testified that he carefully reviewed the draft—including reading the sources cited in it—that he added some additional material because he thought that one part of the draft was too "one-sided," and that he signed the report only after a thorough review and making all necessary changes because "I do not sign anything unless I can affirm that it reflects my professional opinion." Addicott Dep. 15:20–16:1, 29:1–3.

Much of defendants' argument about methodology consists of nit-picking a few words in his report. Br. at 37–39. In particular, they argue at great length that his testimony that the word "martyr" reflected Yasser Arafat's use of the "rhetoric of Jihad" took Arafat's remarks out of context. *Id.* at 37–38. Defendants' attempt to whitewash Arafat's incendiary language lacks

merit, but that is not the point. Disagreements about Mr. Addicott's conclusions are irrelevant under *Daubert* and must be reserved for cross-examination.

Professor Addicott's reports and testimony easily satisfy the requirements for a non-scientific expert under *Daubert*. He reviewed (and cited) numerous documents, including government publications, periodicals, news reports, and scholarly works. Addicott Rep. 11. He then evaluated them in the context of his specialized knowledge, which he has honed over years of studying international terrorism. Specifically, as explained at his deposition, Professor Addicott studies the methods and motivation behind terrorist attacks to determine the degree (if any) of the host nation's culpability. Addicott Dep. 84:13–85:18. Some of the criteria relevant to Professor Addicott's analysis are: (1) whether the act is used as a tactic to achieve political or other goals, *id.* at 71:2–6; (2) how the act was funded, *id.* at 85:14–18; (3) whether the terrorist act "emanate[s] from . . . a hierarchy," *id.*; and (4) the existence of themes, slogans and/or rhetoric in support of the acts, *id.* at 117:15–18:14. Indeed, defendants acknowledge this methodology, Br. 36, and their claim that it is not sufficient is simply one more example of their insistence that plaintiffs' experts must follow the kind of formulaic methodology that *Daubert* requires for scientific and technical experts.

**VI.    The Testimony Of Efraim Karsh Is Admissible**

Professor Efraim Karsh is one of the world's most prominent scholars on the Palestinian-Israeli conflict. He will testify on the defendants' long history of support for terrorism, especially during the period from the establishment of the PA following the 1993 Oslo Accords through the beginning of the Al Aqsa Intifada in the fall of 2000. He will also explain how statements made by Yasser Arafat and defendants to the world community were designed to curry favor for political and diplomatic purposes but varied dramatically from the messages defendants sent to the Palestinian people supporting terrorism.

A.     <u>Professor Karsh Is Qualified To Testify</u>

Efraim Karsh is a Professor of Middle East & Mediterranean Studies at King's College in London, where he founded the Middle East & Mediterranean Studies Program twenty years ago. Karsh C.V. 1.  He is also a professor at Bar-Ilan University in Israel.  Karsh Dep. 8:18–9:11.  He received his Ph.D. and M.A. in International Relations from Tel-Aviv University.  *Id.*  Prior to coming to King's College, he taught at Tel-Aviv University and served as an Intelligence Analyst in the Israel Defense Forces.  *Id.* at 2.  He has been a fellow and visiting professor at leading universities around the world, including Columbia, Harvard and the London School of Economics, and he has also lectured at numerous conferences.  *Id.*  His areas of expertise are the history, politics, military and strategic affairs of the Middle East.  He has a "special emphasis on the Palestinian-Israeli conflict,"  Karsh Rep. 1, and he both teaches a course that focuses on defendants' role in the Al Aqsa Intifada and speaks on that issue at conferences and academic meetings.  Karsh Dep. 54:8–55:1.

Professor Karsh is a leading scholar in the field of Middle Eastern studies, with 15 authored books, 15 edited volumes, and over 100 academic articles to his credit.  Karsh C.V. 3. Although based abroad, he is considered one of the top Middle Eastern experts in the United States.  *Id.*  He has acted as a peer reviewer for numerous academic journals and publishers, *id.* at 3–4, and he both founded the journal *Israel Affairs* and served as founding editor of a series of over 50 books on Israel.  *Id.* at 1, 6.  He has served on numerous academic and professional boards involving the Middle East, has consulted with the British Ministry of Defence and Foreign and Commonwealth Office regarding Middle East and Israeli affairs, and has briefed committees of the British Parliament on those issues.  *Id.* at 4.

In addition to his scholarly pursuits, Professor Karsh is a leading commentator on Middle Eastern affairs.  He has published over 60 op-ed pieces and articles in such publications as The

New York Times, The Wall Street Journal, The New Republic, The Los Angeles Times, The London Times, The Jerusalem Post and various other newspapers and magazines around the world. *Id.* at 3–4. He has also appeared on such television and radio programs as Nightline, 48 Hours, All Things Considered and The Larry King Show. *Id.* at 4.

Defendants' arguments that, notwithstanding these credentials, Professor Karsh is not qualified to testify are wholly without merit. Defendants insinuate that his expertise on the Middle East does not include the Palestinian-Israeli conflict, arguing that the Middle East & Mediterranean Studies Program, which he founded, "does not focus on Palestinian politics" and that "it focuses more broadly on the 'fields of Middle East & Mediterranean history, politics and international relations, culture and society." Br. 41. This claim is seriously misleading. It is not surprising that the Program as a whole has a broader scope than the conflict between Israel and the Palestinians; the Program has seven full-time staff, three teaching fellows, six visiting fellows and nearly 50 research students doing interdisciplinary work in a variety of subjects regarding the Middle East. Karsh C.V. 8. As noted above, however, Professor Karsh himself has a "special emphasis on the Palestinian-Israeli conflict." Karsh Rep. 1. There is no justification for arguing that Professor Karsh is not qualified because the program where he teaches encompasses the study of related issues ranging beyond his personal specialty. Nor does the fact that some of Professor Karsh's writings deal with other topics involving the Middle East, such as Israeli Arabs and the 1948 partition of Palestine (Br. 41), detract from his credentials as a specialist on the Palestinian-Israeli conflict.

Ironically, defendants' other claim regarding Professor Karsh's qualifications involves the fact that he wrote a book (*Arafat's War: The Man and his Battle for Israeli Conquest*) about the subject of his report: defendants' support for terrorism during the Al Aqsa Intifada. Br. 42.

Defendants argue that this book was "published by a trade publisher and was not peer-reviewed." *Id.*[30] This argument is frivolous. As discussed above, Professor Karsh has written numerous scholarly books that have been published by such prestigious academic publishers as Harvard, Yale, Princeton and Oxford, and he has also published over 100 academic articles and performed peer review for those and other publishers and academic journals. Karsh C.V. 3. In addition to this large body of academic work, however, he also writes for a broader audience on issues of major public interest, including the Al Aqsa Intifada. *Id. Arafat's War* is just one such work. The fact that Professor Karsh is a prolific author on the subjects at issue both in academic circles and beyond enhances his qualifications to testify.

### B. Professor Karsh's Testimony Is Based On An Appropriate Methodology

Defendants' principal attack on Professor Karsh's methodology is that his report is based on the research he conducted for *Arafat's War.* They argue "that the research is accepted for publication in a reputable scientific journal after being subjected to the usual rigors of peer review is a significant indication that it is taken seriously by other scientists, *i.e.,* that it meets at least the minimal criteria of good science." Br. 42. This argument does not, however, meet the minimal criteria of good law because it ignores the decisions, discussed on pages 3–5 above, holding that non-scientific experts are not required to follow *Daubert's* rules for scientific experts. Professor Karsh's detailed and heavily documented (110 footnotes citing well over 200 sources ) report easily satisfies the methodology requirements for non-scientific research.

---

[30] As discussed on pages 3–5 above, the Second Circuit has expressly stated that peer-reviewed publications are not necessary for non-scientific experts. *United States v. Joseph*, 542 F.3d at 21. In any event, although the publisher did not arrange for technical peer review of *Arafat's War,* Professor Karsh asked a number of scholars to review the work so that it would be effectively peer-reviewed. Karsh Dep. at 24:5–17.

Much of defendants' critique consists of complaints about Professor Karsh's sources. For example, they take him to task for not considering a 2004 Israeli Military Intelligence report regarding the Al Aqsa Intifada (an unusual charge since they criticize other experts for citing reports from the government of Israel). Br. 43. He testified, however, that he is familiar with the conclusions of the report and believes that they are incorrect. Karsh Dep. 255:9–256:12. They criticize him for not taking certain media stories into account, but in the very next sentence they attack him for citing media stories. *Id.* They also assert that he cannot prove that the media sources he cites are reliable and they complain that some of the articles he cites quote unnamed sources. Br. 44. They even go so far as to point to a review of Professor Karsh's book that criticized it for citing secondary sources. Br. 43. All of these arguments are matters for cross-examination, and they also ignore the fact that experts can rely on secondary sources.

Defendants also disagree with a number of Professor Karsh's conclusions. For example, they repeat the nonsensical charge they leveled against Mr. Marcus that he improperly assumed that the PA's official media outlets are "controlled" by the PA. Br. 45–46. They also charge that he wrongly attributed a remark about suicide bombers to Arafat. Br. 46. In addition, they argue that, in concluding that defendants supported terror, Professor Karsh ignored defendants' statements that purported to denounce terror. Br. 47. As discussed above, such disagreements with an expert's conclusions are not relevant under *Daubert.* Moreover, defendants' claim that Professor Karsh "ignores" their self-serving statements denying responsibility for terrorist attacks is not true; as they concede, he considered those statements but concluded that they were

not credible.[31]  As noted above, defendants' willingness to make such duplicitous statements while they continued to support terrorism will be a major theme of Professor Karsh's testimony.

Similarly, defendants attack Professor Karsh's conclusions regarding the meaning of certain terms used by defendants that might sound innocuous to persons not steeped in the conflict, but that Palestinians would likely understand as calling for the destruction of Israel. Br. 48.  As defendants acknowledge, Professor Karsh's conclusions are based on more than 30 years of studying Palestinian parlance, but defendants nonetheless argue that he cannot give this testimony because he lacks any "special training" in such parlance.  *Id.*  This argument ignores the well established case law allowing experts to testify from personal experience and without any formal training requirements.  As the *Linde* court stated, "an expert need not have formal training in her area of expertise."  922 F. Supp. 2d at 321; *see also* pages 3–5 above.

## VII.    The Testimony Of Matthew Levitt Is Admissible

Several of the attacks in this case were carried out by the Al-Aqsa Martyrs Brigades ("AAMB"), which was responsible for many of the terrorist attacks during the Al Aqsa Intifada. Dr. Matthew Levitt, a Senior Fellow and Director of the Stein Program on Counterterrorism and Intelligence at The Washington Institute for Near East Policy, will testify that the AAMB— which was designated as a terrorist organization by the United States—was the military wing of Fatah (the dominant faction of the PLO) and that defendants promoted and supported terrorist activities by the AAMB and others.

Dr. Levitt has been qualified as an expert in numerous terrorist cases; indeed, as discussed below, more than one court has referred to him as the "gold standard' for experts in

---

[31] For example, defendants note that Professor Karsh concluded that, in making statements denouncing terrorism, "Arafat was speaking from both sides of his mouth."  Br. 47.

international terrorism.  Defendants' motion to exclude such a recognized authority is yet one more example of their willingness to make baseless arguments.

### A.    Dr. Levitt Is Qualified To Testify

Dr. Levitt is a noted expert in international terrorism, with a focus on Middle Eastern terrorist groups and particular expertise in their logistical and financial support networks.  Levitt Rep. 1. Several courts, including the Second Circuit, have already determined that Dr. Levitt is qualified to testify on Middle Eastern terrorism.[32]  Dr. Levitt holds both a Masters of Law and Diplomacy and a Ph.D. in International Relations from The Fletcher School of Law and Diplomacy.  *Id.*  His dissertation examined the impact of terrorism on the Arab-Israeli peace process. *Id.* at 1–2.

In November 2001, Dr. Levitt joined the Washington Institute for Near East Policy (the "Washington Institute"), a leading public educational foundation devoted to the Middle East whose board includes several former Secretaries of State, as a Senior Fellow in Terrorism Studies.  *Id.* at 2.  In February 2007, Dr. Levitt became a Senior Fellow and Director of the Stein Program on Counterterrorism and Intelligence at the Washington Institute.  *Id.*  His work includes the study of Middle Eastern terrorist groups, front organizations and state sponsors, their ideologies, and their support networks.  *Id.* at 3.  He has traveled extensively in the Middle East, and has conducted fieldwork in the West Bank and Gaza Strip.  *Id.*

---

[32] *United States v. Ibrahimm*, 529 F. App'x 59, 62-63 (2d Cir. 2013); *United States v. Kadir*, 718 F.3d 115, 121–122 (2d Cir. 2013); *United States v. Hammoud*, 483 F. App'x 865, 870–871 (4th Cir. 2012); *United States v. El-Mezain*, 664 F.3d 467, 515-516 (5th Cir. 2011); *United States v. Al-Moayad*, 545 F.3d 139, 157 n.14 (2d Cir. 2008); *United States v. Damrah*, 124 F. App'x 976, 983–984 (6th Cir. 2005); *United States v. Hammoud*, 381 F.3d 316, 335-340 (4th Cir. 2004), *vacated on other grounds,* 543 U.S. 1097 (2005); *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 437–441 (E.D.N.Y 2013); *Linde*, 922 F. Supp. 2d at 324–325; *Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216 (D.D.C. 2012); *Gill*, 893 F. Supp. 2d at 533; *United States v. Vaghari*, 735 F. Supp. 2d 197, 206 (E.D.Pa. 2010); *United States v. Banki*, 2010 WL 2076770 (S.D.N.Y. May 25, 2010); *Soussi v. Chertoff*, 2009 WL 2579231 (E.D. Cal. 2009); *United States v. Abdulqader*, 644 F. Supp. 2d 799, 801 n.1 (N.D. Tex. 2009).

Dr. Levitt has held a variety of government posts regarding terrorism. Prior to joining the Washington Institute, he served as a counterterrorism intelligence analyst with the FBI where he provided tactical and strategic analysis in support of counterterrorism operations, focusing on financial and logistical support for Middle East terrorist groups. *Id.* at 2. From November 2005 through January 2007, he served as Deputy Assistant Secretary for Intelligence and Analysis in the United States Department of the Treasury. *Id.* In that capacity, Dr. Levitt served both as a senior official within the department's terrorism and financial intelligence branch and as deputy chief of the Office of Intelligence and Analysis. *Id.* In 2008-09, Dr. Levitt served as an advisor on counterterrorism and intelligence for the U.S. State Department's Special Envoy Middle East Regional Security *Id.*

In addition to his work in government and at the Washington Institute, Dr. Levitt lectures and consults for the Departments of State, Homeland Security and Justice, as well as for the government of Canada and for private firms. *Id.* at 3–4. He has served as a Professorial Lecturer in International Relations and Strategic Studies at Johns Hopkins University's School of Advanced International Studies. *Id.* at 3. He is a life member of the Council on Foreign Relations and was a member of the Council's task force on terrorist financing. *Id.* at 4. He is also a member of the international advisory boards for the Institute for Counter-terrorism in Israel and the International Centre for Political Violence & Terrorism Research in Singapore. *Id.* He served as a fellow at the Combating Terrorism Center at the U.S. Military Academy and currently holds a senior fellowship at George Washington University's Homeland Security Policy Institute. *Id.*

Dr. Levitt is frequently called upon to testify before the United States Senate and House of Representatives as an expert on international terrorism, militant Islam, and terrorist financing.

*Id.* He is also a frequent analyst and commentator on terrorism issues for major media outlets such as CNN, ABC, NBC, CBS, PBS, The New York Times, The Washington Post, the Wall Street Journal and the BBC. *Id.* at 2. He is the author and editor of several books on terrorism, as well as numerous journal articles. *Id.* at 5–7.

Despite Dr. Levitt's credentials, defendants argue that he is not qualified because has done insufficient work involving Fatah, the AAMB and the defendants, as opposed to other terrorist groups in the Middle East. Br. 22–24. A similar argument was rejected in *Linde*, which held that Mr. Levitt is qualified to testify on a range of terrorist groups involved in the Second Intifada. 922 F. Supp. 2d at 325. In any event, most of defendants' carefully paraphrased arguments on this point reflect the fact that the Al Aqsa Intifada ended a decade ago so that, for example, Dr. Levitt could not remember, off the top of his head, the names of specific persons he spoke to in the West Bank or the media outlets that interviewed him years ago about the AAMB and the defendants. His testimony makes clear, however, that he has done extensive work on these subjects. When asked whether he has done "any field research on the relationship between the AAMB and Fatah," he stated that is "what I do as a professional researcher on these issues," Levitt Dep. 29:9–16, and he elaborated as follows:

> "for the period of the second Intifada, like many others focused on counter-terrorism and interested in Israeli-Palestinian peace, I was highly focused on the issue of terrorism, as it relates to the peace process, and spent time interviewing people here in Washington, in Europe, in Israel, and in the West Bank, many different times on terrorism from all these parties, not only Fatah or Al Aqsa Martyrs, but Hamas for Jewish extremist groups, and the full spectrum" Levitt Dep. 30:14–31:3.

Dr. Levitt also testified that he provided "plenty of analysis and commentary on the Al Aqsa Martyrs Brigades and Fatah, their relationship, their relationship to the PA" (Levitt Dep. 56:1–4) and that he was sure that he had given interviews on those issues. Levitt Dep. 67:12–68:1. He further explained that while he could not recall specifics, he attended

"many meetings" relating to the subjects of his report because this "was one of the things I was most focused on at the time." (Levitt Dep. 68:17–69:6). He testified that he read "reams, reams and reams" of materials relating to the relationship between AAMB, Fatah and the PA (Levitt Dep. 72:6–15) and confirmed that "at the time, I was doing a tremendous amount of focused research on these issues." Levitt Dep. 136:1–3.[33] He further testified that the issues in this case are "something that I was spending a lot of time researching here and there on the ground in Israel and the West Bank." Levitt Dep. 122:12–14.

### B. Dr. Levitt's Testimony Is Based On An Appropriate Methodology

Although defendants assert that Dr. Levitt did not use an appropriate methodology, they actually quote from his description of his methodology:

> In my efforts to study and understand terrorism and militant Islamist ideology I interview experts, officials, academics and others with insight into these issues, both in the United States and Europe and in the Middle East. I engage in private, personal meetings, public conferences, group discussions, and talks that are both on and off the record. I travel to the Middle East regularly, including trips to the Palestinian territories, Israel, Jordan, Egypt, Bahrain, Qatar, the UAE and Turkey. I also attend conferences and academic and professional lectures, and read books, newspapers, academic and policy journals, and research these materials on the internet (including the websites, video and audio clips and images on sites geared towards counterterrorism and those of terrorist groups and their sympathizers as well). These are the standard sources and methods in the academic and policy communities for developing the kind of specialized knowledge and expertise I have accumulated – and for which I have been awarded and commended – in my field. Compiling information from sources such as these, I study and evaluate the information and

---

[33] With respect to Dr. Levitt's academic research on defendants, Fatah, and the AAMB, defendants assert that "[h]is purportedly 'extensive' research also does not qualify him as an expert in this case," even though "he reviewed the materials cited in his report," Br. 24, but they do not even try to explain why this might be so. The materials cited in his report are extensive and, combined with his years of experience and close study of these entities during the Al Aqsa Intifada, are more than sufficient to qualify him. Similarly, defendants' argument (*id.*) that he has not previously given expert testimony on this precise topic means nothing.

> data I collect, and write about and lecture on my findings. I
> engage in regular discussions with other experts both to compare
> notes and as a means of affording myself an ongoing process of
> peer-review and fact-checking. Levitt Rep. 3.

As noted above, the courts have recognized Dr. Levitt's methodology "as the 'gold standard' in the field of international terrorism.'" *Linde*, 922 F. Supp. 2d 316 at 325; *see Damrah*, 412 F.3d at 625. Defendants charge that he failed to follow his methodology here, but that claim is based on the same kind of memory test about the names of the people he spoke to and the conferences he attended a decade ago. Br. 26–27. Defendants' argument that Dr. Levitt "did not establish relevant criteria and then undertake a systematic analysis," Br. 26, is not only belied by the detailed discussion in his report, which contains 97 footnotes of supporting materials; it is also one more example of their inappropriate demand for the same kind of methodology required for scientific and technical experts.

The bulk of defendants' attacks on Dr. Levitt's methodology is based on their claim that he "ignored contrary evidence to come to his desired conclusion." Br. 27–30. Again, such attacks on an expert's conclusions are irrelevant under *Daubert* and must be reserved for cross-examination. In any event, as explained in his testimony, Dr. Levitt did not ignore defendants' arguments; he considered and rejected them on the ground that they were not correct. For example, far from ignoring a Human Rights Watch report about the relationship between AAMB and Fatah, Dr. Levitt explained that he reviewed it, analyzed it and rejected it because he believed its conclusions were incorrect. Levitt Dep. 127:6–131:13.

Defendants also assert that Dr. Levitt should not have relied on posters and letters written by AAMB leaders that bear the logos of both the AAMB and Fatah as evidence of their close relationship because, they theorize, the AAMB might have used Fatah's logo without authorization. Br. 30. It may well be that the AAMB did not hire trademark counsel and enter

into a formal licensing agreement with Fatah before creating these documents, but that possibility does not disqualify Dr. Levitt.

Similarly, defendants criticize Dr. Levitt because he uses some secondary sources, especially Israeli government documents, that allegedly transmit hearsay. Br. 30–31. Again, as discussed in pages 7–8 above, as an expert witness he was fully entitled to do so. Defendants will be free to cross-examine him on those sources, but their antipathy towards reports prepared by the State of Israel is not the stuff of expert disqualification.

## CONCLUSION

For the foregoing reasons, defendants' motion in limine should be denied.

Dated: New York, New York
     June 6, 2014

ARNOLD & PORTER LLP

By: _____
    Kent A. Yalowitz
    Philip W. Horton
    Sara K. Pildis
    Ken L. Hashimoto
    Carmela T. Romeo
    Tal R. Machnes

399 Park Avenue
New York, New York 10022
Telephone: (212) 715-1000
Facsimile: (212) 715-1399

*kent.yalowitz@aporter.com*
*philip.horton@aporter.com*
*sara.pildis@aporter.com*
*ken.hashimoto@aporter.com*
*carmela.romeo@aporter.com*
*tal.machnes@aporter.com*
