REDACTED - PUBLICLY FILED VERSION

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

MARK I. SOKOLOW, *et al.*,

                        Plaintiffs,

        vs.

THE PALESTINE LIBERATION
ORGANIZATION, *et al.*,

                        Defendants.

No. 04 Civ. 00397 (GBD) (RLE)

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

ARNOLD & PORTER LLP
399 Park Avenue
New York, New York  10022
(212) 715-1000

*Attorneys for Plaintiffs*

June 6, 2014

**Table of Contents**

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

FACTS .................................................................................................................... 2

    A.    Overview of the PLO, the PA, Fatah, and the AAMB ............................ 2

    B.    Defendants Directed, Incited and Authorized Terrorist Violence .......... 4

    C.    The Attacks ............................................................................................ 6

        1.    January 8, 2001 Shooting Attack ................................................ 6

        2.    January 22, 2002 Shooting Attack .............................................. 7

        3.    January 27, 2002 Bombing ......................................................... 8

        4.    March 21, 2002 Bombing ........................................................... 9

        5.    June 19, 2002 Bombing ............................................................. 10

        6.    July 31, 2002 Bombing .............................................................. 10

        7.    January 29, 2004 Bombing ......................................................... 12

SUMMARY JUDGMENT STANDARD .................................................................. 13

ARGUMENT .......................................................................................................... 13

I.    The Court Should Not Dismiss Count 1 (Anti-Terrorism Act) ........................ 13

    A.    Defendants Are Legally Responsible for the Attacks ............................ 14

        1.    Defendants Are Vicariously Liable ........................................... 15

            a.    Respondeat Superior Applies......................................... 15

            b.    The Evidence Meets Respondeat Superior Standards ................. 17

            c.    Monell Is Irrelevant....................................................... 20

            d.    Defendants Ratified the Tortious Acts of Their Employees......... 22

        2.    Defendants Committed Direct Violations of Anti-Terrorism Laws ......... 22

            a.    Defendants' Support for Fatah's AAMB and Its Members Violated the Anti-Terrorism Laws................................. 22

(i)      Personnel..................................................................... 22

(ii)     Weapons...................................................................... 23

(iii)    Funds.......................................................................... 24

(iv)     Harboring Terrorists.................................................... 25

b.      Defendants' Support for Hamas and Abdullah Barghouti
Violated the Anti-Terrorism Laws................................. 26

B.     Defendants Had the Required State of Mind ......................................... 27

C.     Defendants Proximately Caused Plaintiffs' Injuries............................... 29

D.     All Plaintiffs Suffered Actionable Injuries ........................................... 31

E.     Defendants' "No Evidence" Arguments Are Meritless.......................... 32

1.     The Guetta Family Should Proceed to Trial ............................... 32

2.     The Mandelkorn Family Should Proceed to Trial ...................... 34

3.     The Sokolow Family Should Proceed to Trial............................. 35

4.     Convictions Rendered in Israeli Military Courts Are Admissible........... 37

II.    The Court Should Not Dismiss the Non-Federal Claims................................... 41

A.     The Court Should Not Dismiss Count 2 (Wrongful Death) ................... 41

B.     The Court Should Not Dismiss Counts 4 and 5 (Assault and Battery)................ 42

C.     The Court Should Not Dismiss Count 6 (Loss of Consortium and Solatium)...... 44

D.     The Court Should Not Dismiss the Negligence Claims (Count 7)..................... 45

E.     The Court Should Not Dismiss Count 8 (Intentional Infliction of Emotional
Distress) ........................................................................................ 47

F.     The Court Should Not Dismiss Count 9 (Negligent Infliction of Emotional
Distress) ........................................................................................ 48

III.   Defendants May Not Re-Re-Litigate Personal Jurisdiction............................... 49

CONCLUSION............................................................................................. 50

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<u>CASES</u>

*Abecassis v. Wyatt*,
    785 F. Supp. 2d 614 (S.D. Tex. 2011) ...................................................................15

*Adams v. Ameritech Servs., Inc.*,
    231 F.3d 414 (7th Cir. 2000) ...............................................................................33

*Ahmad v. Christian Friends of Israeli Communities*,
    2014 WL 1796322 (May 5, 2014) ........................................................................28

*Ahmad v. Wigen*,
    726 F. Supp. 389 (E.D.N.Y. 1989), *aff'd*, 910 F.2d 1063 (2d Cir. 1990)................38

*Alford v. St. Nicholas Holding Corp.*,
    218 A.D.2d 622 (1st Dept. 1995).........................................................................43

*Almonte v. New York City Hous. Auth.*,
    1990 WL 113125 (S.D.N.Y. July 30, 1990) .........................................................16

*Am. Int'l Specialty Lines. Ins. Co v. Towers Fin. Corp.*,
    1997 WL 906427 (S.D.N.Y. Sept. 12, 1997)........................................................40

*Amnesty Am. v. Town of W. Hartford*,
    361 F.3d 113 (2d Cir. 2004)...........................................................................20, 21

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)...........................................................................................13

*Apollo Fuel Oil v. United States*,
    195 F.3d 74 (1999)..............................................................................................28

*AT&T Co. v. Winback and Conserve Program*,
    42 F.3d 1421 (3d Cir. 1994).................................................................................17

*Augeri v. Roman Catholic Diocese of Brooklyn*,
    225 A.D.2d 1105 (4th Dept. 1996) .......................................................................49

*Baker v. Dorfman*,
    239 F.3d 415 (2d Cir. 2000).................................................................................49

*Baldwin v. Powell*,
    294 N.Y. 130 (1945) ...........................................................................................42

*Batista v. Rodriguez*,
    702 F.2d 393 (2d Cir. 1983).................................................................................21

*Bender v. City of New York*,
    78 F.3d 787 (2d Cir. 1996).................................................................47

*Boim v. Holy Land Found. for Relief & Dev.*,
    549 F.3d 685 (7th Cir. 2008) ...............................................24, 27, 28

*Bruce v. Port Auth. of N.Y. and N.J.*,
    531 F. Supp. 2d 472 (E.D.N.Y. 2008) ..............................................17

*Buckley v. Metro North Commuter R.R.*,
    79 F.3d 1337 (2d Cir. 1996), *rev'd*, 521 U.S. 424 (1997) ......................49

*Buckley v. National Freight, Inc.*,
    90 N.Y.2d 210 (1997) ........................................................................45

*Calderon-Cardona v. Democratic Peoples Republic of Korea*,
    723 F. Supp. 2d 441 (D.P.R. 2010)....................................................31

*Chowdhury v. Worldtel Bangladesh Holding, Ltd.*,
    746 F.3d 42 (2d Cir. 2014)..................................................................22

*Church ex rel. Smith v. Callanan Indus., Inc.*,
    99 N.Y.2d 104 (2002) .........................................................................45

*Collins v. City of New York*,
    923 F. Supp. 2d 462 (E.D.N.Y. 2013) ...............................................21

*Colombini v. Westchester Cnty. Healthcare Corp.*,
    24 A.D.3d 712 (2d Dept. 2005) ..........................................................48

*Demjanjuk v. Petrovsky*,
    776 F.2d 571 (6th Cir. 1985), *vacated*, 10 F.3d 338 (6th Cir. 1993)......................38

*Disorbo v. Hoy*,
    74 F. App'x 101 (2d Cir. 2003) ..........................................................21

*Donnelly v. FAA*,
    411 F.3d 267 (D.C. Cir. 2005)............................................................37

*Dory v. Ryan*,
    999 F.2d 679 (2d Cir. 1993).................................................................44

*Eain v. Wilkes*,
    641 F.2d 504 (7th Cir. 1981) ..............................................................38

*Elwell v. Conair, Inc.*,
    145 F. Supp. 2d 79 (D. Me. 2001) ......................................................33

*Enzo Biochem, Inc. v. Amersham PLC,*
    902 F. Supp. 2d 308 (S.D.N.Y. 2012) ...................................................................50

*Estate of Parsons v. Palestinian Authority,*
    715 F. Supp. 2d 34 (D.D.C. 2010), *rev'd,* 651 F.3d 118 (D.C. Cir. 2011) .............17

*Estate of Parsons v. Palestinian Authority,*
    651 F.3d 118 (D.C. Cir. 2011) ...................................................................17, 26

*Estates of Ungar v. Palestinian Authority,*
    325 F. Supp. 2d 15 (D.R.I. 2004) ...................................................................31

*Ex Parte Quirin,*
    317 U.S. 1 (1942) ...................................................................39

*Farber v. Smolack,*
    20 N.Y. 2d 198 (1967) ...................................................................42

*Farkas v. Farkas,*
    168 F.3d 638 (2d Cir. 1999) ...................................................................44

*Foothill Capital Corp. v. Grant Thornton, LLP,*
    276 A.D.2d 437 (1st Dept. 2000) ...................................................................44

*George v. Celotex Corp.,*
    914 F.2d 26 (2d Cir. 1990) ...................................................................33

*Gilbert v. Stanton Brewery,*
    295 N.Y. 270 (1946) ...................................................................45

*Gill v. Arab Bank, PLC,*
    893 F. Supp. 2d 474 (E.D.N.Y. 2012) ...................................................................28, 29

*Gill v. Arab Bank, PLC,*
    893 F. Supp. 2d 542 (E.D.N.Y. 2012) ...................................................15, 16, 27, 34, 36

*Girden v. Sandals, Int'l,*
    262 F.3d 195 (2d Cir. 2001) ...................................................................17

*Goldberg v. UBS AG,*
    660 F. Supp. 2d 410 (E.D.N.Y. 2009) ...................................................................31

*Gorzynski v. JetBlue Airways Corp.,*
    596 F.3d 93 (2d Cir. 2010) ...................................................................27

*Halbrook v. Reichhold Chems., Inc.,*
    735 F. Supp. 121 (S.D.N.Y. 1990) ...................................................................32

*Hamm v. United States*,
    483 F.3d 135 (2d Cir. 2007).................................................................................19, 20

*Hartford Fire Ins. Co. v. Socialist People's Libyan Arab Jamahiriya*,
    2007 WL 1876392 (D.D.C. June 28, 2007)..............................................................37

*Hirota v. MacArthur*,
    338 U.S. 197 (1948)..................................................................................................39

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010)................................................................................................24, 26

*Howell v. New York Post Co.*,
    81 N.Y.2d 115 (1993)...............................................................................................47

*Hurst v. Socialist People's Libyan Arab Jamahiriya*,
    474 F. Supp. 2d 19 (D.D.C. 2007)............................................................................39

*In re Omeprazole Patent Litig.*,
    490 F. Supp. 2d 381 (S.D.N.Y. 2007).......................................................................32

*In re Parmalat Sec. Litig.*,
    474 F. Supp. 2d 547 (S.D.N.Y. 2007).......................................................................17

*In re Terrorist Attacks on Sept. 11, 2001*,
    714 F.3d 118 (2d Cir. 2013)................................................................................29, 30

*In re WorldCom, Inc. Secs. Litig.*,
    2005 WL 375315 (S.D.N.Y. Feb. 17, 2005)..............................................................40

*Ira S. Bushey & Sons v. United States*,
    398 F.2d 167 (2d Cir. 1968)......................................................................................16

*Jenco v. Islamic Republic of Iran*,
    154 F. Supp. 2d 27 (D.D.C. 2001).......................................................................31, 32

*Johnson v. New York*,
    37 N.Y.2d 378 (1975)................................................................................................49

*Jones v. Town of E. Haven*,
    691 F.3d 72 (2d Cir. 2012)........................................................................................21

*Knox v. PLO*,
    442 F. Supp. 2d 62 (S.D.N.Y. 2006).........................................................................16

*Kwon v. Yun*,
    606 F. Supp. 2d 344 (S.D.N.Y. 2009).......................................................................16

*Lando v. New York*,
   39 N.Y.2d 803 (1976) .................................................................................................48, 49

*Lee v. City of Philadelphia*,
   2008 WL 2697320 (E.D. Pa. July 3, 2008) ..............................................................20

*Lerner v. Fleet Bank, N.A.*,
   318 F.3d 113 (2d Cir. 2003) .....................................................................................29

*Leviston v. Jackson*,
   43 Misc. 3d 229 (Sup. Ct. N.Y. Co. 2013) ..............................................................47

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
   739 F.3d 45 (2d Cir. 2013) .......................................................................................41

*Linde v. Arab Bank*,
   04 Civ. 2799 (NG) (E.D.N.Y. Apr. 24, 2013) ..................................................15, 20

*Lloyd v. Am. Export Lines, Inc.*,
   580 F.2d 1179 (3d Cir. 1978) ...................................................................................37

*Lubecki v. City of N.Y.*,
   304 A.D.2d 224 (1st Dept. 2003) .......................................................................45, 46

*Matusick v. Erie Cnty. Water Auth.*,
   2014 WL 700718 (2d Cir. Feb. 25, 2014) ...........................................................21, 22

*Miglino v. Bally Total Fitness of Greater N.Y., Inc.*,
   92 A.D.3d 148 (2d Dept. 2011) (New York law), *aff'd*, 20 N.Y.3d 342 (2013) ...............45, 46

*Mike's Train House, Inc. v. Lionel, L.L.C.*,
   472 F.3d 398 (6th Cir. 2006) ....................................................................................40

*Milczarski v. Walaszek*,
   108 A.D.3d 1190 (4th Dept. 2013) ......................................................................41, 42

*Mohamad v. Palestinian Authority*,
   132 S. Ct. 1702 (2012) ..............................................................................................17

*Monell v. Dep't of Social Servs. of N.Y.*,
   436 U.S. 658 (1978) .............................................................................................20, 21

*Morissette v. United States*,
   342 U.S. 246 (1952) ..................................................................................................27

*Munaf v. Geren*,
   553 U.S. 674 (2008) ..................................................................................................39

*Neely v. Henkel,*
    180 U.S. 109 (1901)..........................................................................................39

*Nelson v. American-West African Line,*
    86 F.2d 730 (2d Cir. 1936)................................................................................18

*Neufeld v. Neufeld,*
    910 F. Supp. 977 (S.D.N.Y. 1996)....................................................................47

*Parilis v. Feinstein,*
    49 N.Y.2d 984 (1980) ..............................................................................41, 42

*Passucci v. Home Depot, Inc.,*
    67 A.D.3d 1470 (4th Dept. 2009) ....................................................................47

*Perry v. New Hampshire,*
    132 S. Ct. 716 (2012)........................................................................................32

*Perry-Rogers v. Obasaju,*
    282 A.D.2d 231 (1st Dept. 2001)......................................................................49

*Peterson v. Islamic Republic of Iran,*
    515 F. Supp. 2d 25 (D.D.C. 2007)........................................................31, 47, 49

*Phelan v. Local 305, United Ass'n of Pipefitters,*
    973 F.2d 1050 (2d Cir. 1992)............................................................................22

*Prince v. Cnty. of Nassau,*
    2014 WL 1465379 (2d Cir. Apr. 16, 2014) ......................................................48

*Rau v. Roberts,*
    640 F.3d 324 (8th Cir. 2011) ............................................................................19

*Riviello v. Waldron,*
    47 N.Y.2d 297 (1979) ................................................................................17, 18

*Robb Evans & Assocs. LLC v. Sun Am. Life Ins.,*
    10 Civ. 5999 (GBD), 2012 WL 488257 (S.D.N.Y. Feb. 14, 2012)..................42

*Ross v. Louise Wise Servs., Inc.,*
    8 N.Y.3d 478 (2007) ........................................................................................44

*Rothstein v. UBS AG,*
    708 F.3d 82 (2d Cir. 2013)........................................................................29, 30

*Rux v. Republic of Sudan,*
    461 F.3d 461 (4th Cir. 2006) ............................................................................26

*Salamon v. Friedman*,
    11 A.D.3d 700 (2d Dept. 2004) ...................................................................43

*Schmidt v. Polish People's Republic*,
    742 F.2d 67 (2d Cir. 1984)...........................................................................43

*Scott v. Sheahan*,
    2013 WL 3938501 (E.D.N.Y. July 30, 2013) .............................................32

*SEC v. Sekhri*,
    2002 WL 31100823 (S.D.N.Y. July 22, 2002) ...........................................40

*Sheldon v. PHH Corp.*,
    135 F.3d 848 (2d Cir. 1998)........................................................................45

*Shrader v. CSX Transp., Inc.*,
    70 F.3d 255 (2d Cir. 1995)..........................................................................49

*Small v. United States*,
    544 U.S. 385 (2005)....................................................................................37

*Stanford v. Kuwait Airways Corp.*,
    89 F.3d 117 (2d Cir. 1996)..........................................................................29

*Strauss v. Credit Lyonnais, S.A.*,
    925 F. Supp. 2d 414 (E.D.N.Y. 2013) ..............................................30, 38

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*,
    250 F.3d 87 (2d Cir. 2001)..........................................................................17

*Sutherland v. Islamic Republic of Iran*,
    151 F. Supp. 2d 27 (D.D.C. 2001) ..............................................................32

*Thomas v. TWA, Inc.*,
    46 Misc. 2d 162 (Sup. Ct. N.Y. Co. 1965) .................................................42

*Thomas v. Washington Metro. Area Transit Auth.*,
    907 F. Supp. 2d 144 (D.D.C. 2012).............................................................32

*Tolan v. Cotton*,
    134 S. Ct. 1861 (2014).................................................................................13

*Tracy v. Islamic Republic of Iran*,
    2003 U.S. Dist. LEXIS 15844 (D.D.C. Aug. 21, 2003) ............................20

*U.S. Fidelity & Guar. Co. v. E.W. Smith Co.*,
    46 N.Y.2d 498 (1979)..................................................................................43

*United States v. Al Kassar,*
    660 F.3d 108 (2d Cir. 2011) ............................................................... 24

*United States v. Amawi,*
    695 F.3d 457 (6th Cir. 2012) ............................................................... 23

*United States v. Garland,*
    991 F.2d 328 (6th Cir. 1993) ............................................................... 37

*United States v. Jackson,*
    540 F.3d 578 (7th Cir. 2008) ............................................................... 36

*United States v. Kivanc,*
    714 F.3d 782 (4th Cir. 2013) ............................................................... 36

*United States v. Koskerides,*
    877 F.2d 1129 (2d Cir. 1989) .............................................................. 41

*United States v. Lopez,*
    937 F.2d 716 (2d Cir. 1991) ............................................................... 41

*United States v. Manafzadeh,*
    592 F.2d 81 (2d Cir. 1979) ................................................................. 37

*United States v. Moore,*
    653 F.2d 384 (9th Cir. 1981) ............................................................... 37

*United States v. Mustafa,*
    No. 04-cr-356 (KFB) .......................................................................... 37

*United States v. Pena-Espinoza,*
    47 F.3d 356 (9th Cir. 1995) ................................................................ 40

*United States v. Price,*
    134 F.3d 340 (6th Cir. 1998) ............................................................... 36

*United States v. Rodarte,*
    596 F.2d 141 (5th Cir. 1979) ............................................................... 37

*United States v. Saget,*
    377 F.3d 223 (2d Cir. 2004) ............................................................... 36

*United States v. Salim,*
    855 F.2d 944 (2d Cir. 1988) .......................................................... 44, 41

*United States v. Sattar,*
    314 F. Supp. 2d 279 (S.D.N.Y. 2004), *aff'd sub nom. United States v. Stewart,* 590
    F.3d 93 (2d Cir. 2009) ................................................................... 23, 24

*United States v. Sturman*,
 951 F.2d 1466 (6th Cir. 1991) ...........................................................40

*United States v. Twentieth Century Fox Film Corp.*,
 882 F.2d 656 (2d Cir. 1989).............................................................28

*Vasquez v. Wood*,
 190 Misc. 2d 427 (Sup. Ct. Queens Co. 2001) ................................43

*Weimer v. Lake*,
 268 A.D.2d 741 (3d Dept. 2000) ......................................................43

*Williamson v. United States*,
 512 U.S. 594 (1994).........................................................................36

*Wu v. City of New York*,
 934 F. Supp. 581 (S.D.N.Y. 1996)...................................................48

*Wultz v. Bank of China Ltd.*,
 2013 WL 1641179 (S.D.N.Y. Apr. 16, 2013)...................................42

*Wultz v. Islamic Republic of Iran*,
 755 F. Supp. 2d 1 (D.D.C. 2010) ...............................................31, 46

*Yong Wen Mo v. Gee Ming Chan*,
 17 A.D.3d 356 (2d Dept. 2005) ........................................................49

## STATUTES AND RULES

18 U.S.C. § 371.........................................................................................14

18 U.S.C. § 832.........................................................................................23

18 U.S.C. § 921(a) ....................................................................................23

18 U.S.C. § 956.........................................................................................23

18 U.S.C. § 1111.......................................................................................14

18 U.S.C. § 1992.......................................................................................14

18 U.S.C. § 2331............................................................................13, 15, 17

18 U.S.C. § 2332............................................................................14, 23, 26

18 U.S.C. § 2333.................................................................................*passim*

18 U.S.C. § 2334.......................................................................................15

18 U.S.C. §§ 2339A-C ................................................................................ *passim*

28 U.S.C. § 1350 .................................................................................................17

28 U.S.C. § 1367 .................................................................................................43

28 U.S.C. § 2467 .................................................................................................37

42 U.S.C. § 1983 .................................................................................................20

CPLR 202 ...........................................................................................................42

CPLR 207 .................................................................................................43, 44, 47

CPLR 208 ......................................................................................................42, 47

CPLR 213-b ...................................................................................................43, 47

CPLR 215 ...........................................................................................................42

CPLR 217-a ........................................................................................................46

CPLR 302 ...........................................................................................................43

Fed. R. Crim. P. 11 ...............................................................................................40

Fed. R. Evid. 403 .................................................................................................33

Fed. R. Evid. 803 ........................................................................................ *passim*

Fed. R. Evid. 804(b) .......................................................................................35, 36

Fed. R. Evid. 902(5) ............................................................................................34

N.J. Stat. Ann. § 2:C:38-5(b) ...............................................................................22

N.Y. Laws 2012, c. 500, § 79 ..............................................................................46

N.Y. Laws 2013, c. 24, § 7 ..................................................................................46

N.Y. Penal Law § 490.10 .....................................................................................22

### OTHER AUTHORITIES

5 *Modern Federal Jury Instructions—Civil*, ¶ 87-79 (2013) ....................................29

11 *Moore's Federal Practice* ¶ 56.11[5][b] ..........................................................27

21A Carmody-Wait 2d § 130:69 ............................................................................42

37 N.Y. Jur. *Death* § 614 ...........................................................................................42

1972 Advisory Comm. Notes to Fed. R. Evid. 804(b)(3).................................35, 36

Mark Hamblett, "Past Overseas Convictions Introduced at Terror Trial," N.Y.L.J.
    (May 13, 2014)...........................................................................................37

*Restatement (Third) of Torts: Physical & Emotional Harm* § 47................................31

*Restatement (Third) of Agency* § 7.07 (2006)...........................................................16

Vincent C. Alexander, *Practice Commentaries to CPLR 217-a* (McKinney's 2013).................46

## PRELIMINARY STATEMENT

*"For the foreseeable future, the most direct threat to America at home and abroad remains terrorism."*

—President Obama
West Point, May 28, 2014

Defendants have American blood on their hands. Their officers and employees committed, were convicted of and are in jail for terrorist crimes of horrific violence. ████████ ██████████████████████████████████████████ while defendants lionize them as national heroes. Defendants also ██████████████ terrorists killed in suicide operations ████████████████████ ██████████████████████ are but one piece of the ample evidence that proves defendants incited, supported, orchestrated, executed, and then ratified the terrorist crimes for which the eleven American families before the Court seek justice.

The Al-Aqsa Intifada began in 2000 and lasted until after Yasser Arafat died in 2004. Its origins are debated—some are convinced that Arafat himself planned it in advance. Shrenzel Rep. 5. Defendants' expert denies that, but even he concedes that Arafat did his best "to steer [the violence] as best he could to his advantage." Pls. Tr. Ex. 504 at 4. In service of that "advantage," defendants used their iron-fisted control of Palestinian "security" apparatuses, of government funds, and of their own media outlets. Defendants ████████████████████████ ██████████████████████████████ They released known terrorists from their jails. Through their official publications, and the television stations and newspapers that they controlled, defendants directed the members of their own security forces (and called on members of the Palestinian public) to commit acts of violence. They provided weapons, funding, safe houses, personnel, and other resources and support to terrorists and terrorist organizations. And they glorified and rewarded the perpetrators of violence with ████████████████ state-sponsored funerals, and media accolades.

The purpose of this terror campaign was to intimidate and coerce the civilian population of Israel—and the Israeli and U.S. governments—to end the Israeli presence in the West Bank and Gaza Strip.  It was a protection racket writ large:  arrange for the killing and injuring of thousands of civilians, disingenuously condemn "violence," then announce that the violence would end only if Israel withdrew from territory sought by defendants.

On this motion, the question is merely whether a jury reasonably could find that defendants directed, controlled, materially supported or ratified the acts of the terrorists who killed or injured plaintiffs in violation of the Anti-Terrorism Act.  The answer is a resounding "yes."

Defendants are desperate to avoid a trial.  Recently, they told the Court that it would be a serious problem for them to have a "New York jury sit in judgment of [our] employment and social welfare policies" with regard to convicted terrorists.  DE 508 at 9.  Indeed it would.  The evidence is overwhelming, disturbing, and ultimately repulsive.

## FACTS

### A.    Overview of the PLO, the PA, Fatah, and the AAMB

According to defendants' own expert, Glenn Robinson, Yasser Arafat "epitomized one-man rule."  Pls. Tr. Ex. 520 at 1.  From 1959 until 2004, he was the commander of the "Palestinian National Liberation Movement," better known as "Fatah."  *See* Pls. Tr. Ex. 558 at 5-7; Eviatar Rep. 19-22, 43.  Arafat was Chairman of the Palestinian Liberation Organization ("PLO") from 1969 until 2004.  *Id.*  He was President of the Palestinian Authority ("PA") from its formation in 1993 until 2004.  *Id.*  And, according to a study by the RAND Corporation (overseen by defendants' expert Professor Robinson), "Arafat retained virtually exclusive control over the Palestinian security forces until his death in November 2004."  Pls. Tr. Ex. 521 at 38.

The finances, personnel, and activities of the PLO, the PA, and Fatah were inextricably

intertwined.  The PA's former Finance Minister (and recently retired Prime Minister) acknowl-edged that "in terms of sources of funding, after the PA came into being, the PLO…ceased to have its own independent sources of funding…for its own operations did come from the PA." Fayyad Dep. 76.  Senior PA Minister (and former Fatah Secretary General) Hussein Al Sheikh admitted, "Fatah and PLO are the same because the Fatah and the PLO budget are with Arafat." Al Sheikh Dep. 140; 56.1 Stmt., Part II ¶¶ 32-34.

Fatah members held the leadership positions in the PA, the PA answered to the PLO, and all three reported to Arafat—Chairman of the PLO, Commander of Fatah and President of the PA—who in "all of these capacities dominated Palestinian politics."  56.1 Stmt., Part II ¶¶ 29-34.

At the beginning of the Al-Aqsa Intifada, "Fatah operatives, many of whom were em-ployed in the Palestinian Authority's security apparatus, began to be involved in terrorist activity against Israeli targets."  Pls. Tr. Ex. 558 at 8.  To that end, Fatah's al-Aqsa Martyrs Brigades ("AAMB") "were intended to serve as the Fatah's military wing for carrying out terrorist attacks against Israel."  *Id.* at 9.  The RAND study overseen by defendants' expert Professor Robinson explained that "[t]he *al-Aqsa Martyrs Brigades* are an armed faction affiliated with Fatah."  Pls. Tr. Ex. 521 at 37; *see* 56.1 Stmt., Part II ¶¶ 35-37.  Al Sheikh even seemed "insulted when asked whether the brigade is under Arafat's control.  'Of course, there is control,' he [snapped].  'What do you think?  That we are just a bunch of gangs?'"  Pls. Tr. Ex. 538 at 3.

Marwan Barghouti led Fatah's "military operations" in the West Bank.  Pls. Tr. Exs. 451, 447.  According to ████████████████████████████████████████████ Pls. Tr. Ex. 143.  He reported directly to Arafat, and his lieutenants included Nasser Aweis, Ahmed Barghouti (Marwan Barghouti's bodyguard and driver, a/k/a "Ahmed Faransi"), Mohammed Mousleh (a/k/a "Abu Satkha"), and Nasser Shawish, each of whom was convicted of perpetrat-

3

ing one or more of the attacks that caused plaintiffs' injuries.  56.1 Stmt., Part II ¶¶ 41-45.

Defendants also set aside their on-again-off-again political rivalry with Hamas—a designated terrorist organization that calls for the complete destruction of Israel—and developed a unified front.  Fatah and Hamas coordinated their activities via the "National and Islamic Forces" steering committee, as reflected in the pro-terrorism polemics they published jointly.  Eviatar Rep. 7-18, 16; *see* 56.1 Stmt., Part II ¶¶ 72-76.  "The PA, PLO, Fatah, and Hamas [had] a shared interest in carrying out terrorist attacks and, accordingly, display[ed] a great deal of inter-organizational cooperation and coordination."  Eviatar Rep. 7; *see* 56.1 Stmt., Part II ¶¶ 72-76.

### B.    Defendants Directed, Incited and Authorized Terrorist Violence

Through media outlets owned and controlled by the PA, and speeches by PA and PLO officials, defendants directed, authorized, and incited terrorist violence against Israeli civilians.  Most important were magazines published for PA police and security forces—published by the PA, edited and authored in many cases by the PA's and PLO's so-called "Political Guidance" apparatus, and distributed to security and police personnel.  This "Political Guidance" apparatus had representatives in all PA security forces; its job was to "educate" PA security personnel by delegitimizing the existence of the State of Israel and encouraging terrorist attacks and "martyrdom seeking operations."  *See* Shrenzel Report 12-15; 56.1 Stmt., Part II ¶¶ 55-56.  A few examples illustrate the nature of this "political guidance":

- "A call...A call...A call..., from our negotiating delegation headed by our emblematic Commander Abu Ammar [Yasser Arafat] to our heroic Palestinian people, [exhorting], 'Get ready, for the battle of Jerusalem has begun.'  This is what the return of the Palestinian delegation to the territory of the homeland indicates is coming next…."  Pls. Tr. Ex. 935.

- "Their [*i.e.*, Jews] existence on our land is a crime; the creation of their western state on this very land is a crime; their insinuations are crimes;

4

their smiles—like snake poison—are crimes….Honor is far from those creatures, and is not found in the dictionaries of their language."  Pls. Tr. Ex. 178.

- "Like parasitic diseases, [the Jews] live off of peoples and their civilizations, and their religion allows them to use every sordid means that other religious laws would not allow." (Pls. Tr. Ex. 201).

- "Blessed are you, who offered a human sacrifice for your beloved Palestine, a human sacrifice to the eyes of precious Jerusalem. Blessed are you and all your fraternity of martyrs, wounded and prisoners, as this homeland is worth the sacrifice, and justifies the human sacrifice."  Pls. Tr. Ex. 178.

Defendants echoed this instruction in general-interest publications they controlled.  A few examples (among scores):

- "Blessings upon anyone who has saved a single bullet in order to put it through a Jew's head."  Pls. Tr. Ex. 645.

- "[T]he decisive battle…is coming without a doubt" and will end with the Muslims declaring victory over "the descendants of the monkeys and pigs [*i.e.*, the Jews] and with their annihilation."  Pls. Tr. Ex. 646.

- "Have no mercy on the Jews anywhere in any country:  'Fight them wherever you are, wherever you meet them—kill them.'  Wherever you are—kill those Jews and those Americans who are like them and those who stand with them.  They are all together against the Arabs and the Muslims."  Pls. Tr. Ex. 644.

- "The martyrdom seekers [*i.e.*, the September 11 attackers] are the finest successors of the finest predecessors.  These martyrdom seekers are the salt of the earth and the engines of history….They are more honorable than us all…."  Pls. Tr. Ex. 1074.

- "Blessed are the people who strap bombs onto their bodies or those of their sons."  Pls. Tr. Ex. 492 at 38.

*See* 56.1 Stmt., Part II ¶¶ 50-54, 57-60.

PA TV (owned and controlled by defendants) broadcast programs in which children expressed their wish to engage in "*shehada*" (suicide martyrdom) because "*shehada* is beautiful," and videos in which adult women hand machine guns to teenage boys.  Pls. Tr. Exs. 651, 804;

*see also* 56.1 Stmt., Part II ¶¶ 50-54, 57-60.  Arafat appeared in public with his machine gun and

made public speeches encouraging violence—including a notorious one to a group of children in

which he glorified a child who committed suicide and then led the children in a chant of "a mil-

lion martyrs marching to Jerusalem."  Pls. Tr. Ex. 807; s*ee* 56.1 Stmt., Part II ¶¶ 50-54, 57-60.

Defendants glorified the acts of terrorists, including those who injured plaintiffs, portray-

ing them as national heroes through state-sponsored funerals and television programs honoring

their "sacrifices."  *E.g.*, Marcus Rep. 31-51, Pls. Tr. Ex. 276; *see* 56.1 Stmt., Part II ¶¶ 61-63.

### C.    The Attacks

As a result of defendants' pro-terror policies during the Al-Aqsa Intifada, scores of the

PA's security and police employees are in jail in Israel, having been convicted of terrorist crimes

during that period—as defendants' own officials and websites proudly confirm.  56.1 Stmt., Part

II ¶¶ 28-98.  Many others were killed while carrying out terrorist attacks.  *Id.*  Among these were

more than a dozen of defendants' employees who participated in the seven attacks at issue here.

### 1.    January 8, 2001 Shooting Attack

On January 8, 2001, four men armed with machine guns opened fire on Varda Guetta and

her son Oz (age 12) as they drove on a road just North of Jerusalem.  Oz was severely wounded.

Varda suffered severe emotional trauma.  56.1 Stmt., Part II ¶¶ 99-101, 350-51.  Three shooters

remain unidentified, but Ms. Guetta identified the fourth attacker as Fawzi Murar in a photo ar-

ray.  Murar was a Lieutenant in Force 17 (the commando unit responsible for protecting Yasser

Arafat himself) and a prominent terrorist in Fatah's AAMB.  56.1 Stmt., Part II ¶¶ 103-05.

In 2000 and 2001, members of Force 17 perpetrated a series of similar shooting attacks

against Jewish civilians on roads north of Jerusalem.  Perpetrators involved in those other attacks

confirmed Murar's involvement in like attacks, and Murar was killed together with a Force 17

6

terrorist during armed hostilities.  56.1 Stmt., Part II ¶¶ 99-100, 105-06.  Defendants violated the

Court's orders by failing to produce documents concerning the involvement of Force 17 mem-

bers in the January 8 attack.  *See* Mem. dated May 15, 2014, In Support of Motion (DE 507) for

Sanctions ("Sanctions Mem.") at 22.  After Murar was killed, defendants' Institute for the Care

of the Families of Martyrs and the Wounded officially designated him a "martyr" of the so-called

"Al-Aqsa Intifada" and began making payments to his family.  56.1 Stmt., Part II ¶ 107.

### 2.    January 22, 2002 Shooting Attack

On January 22, 2002, Sa'id Ramadan, a PA Maritime Police Officer, opened fire with an

assault rifle on a Jerusalem street, killing two and wounding 45 civilians, including plaintiffs

Shayna Gould and Shmuel Waldman.  Six members of the PA police and security force partici-

pated in the attack.  Nasser Aweis and Ahmed Barghouti—two of Marwan Barghouti's top lieu-

tenants—were convicted as the primary architects.  Aweis, a captain in the PA's National Securi-

ty Forces, ████████████████████ and was on the so-called "Zinni List" of most-

wanted terrorists (presented to Arafat by U.S. envoy Anthony Zinni in December 2001).  Ahmed

Barghouti, ██████████████████ was head of Fatah's AAMB in the West

Bank town of Ramallah.  Mohammed Mousleh ███████████████████████

Majed al-Masri ██████████████████████ and Ibrahim Abdel Hai (a PA

Maritime Policeman) were also convicted for their roles.  56.1 Stmt., Part II ¶¶ 114-15, 119-26.

The PA ███████████████████████████████

██ Defendants' ███████████████████████████

████████████ Pls. Tr. Ex. 163.  As for the shooter, Sa'id Ramadan, who died in the at-

tack, the PA ███████████████████████

████████████████████████████████

██████  Pls. Tr. Exs. 36A, 60.  Defendants also honored the perpetrators in PA-controlled media

outlets.  56.1 Stmt., Part II ¶¶ 145-57.

        **3.**      **January 27, 2002 Bombing**

On January 27, 2002, Wafa Idris blew herself up on a crowded street in Jerusalem, killing

one and wounding over 150, including plaintiffs Mark, Rena, Lauren, and Jamie Sokolow.  The

bombing was planned by a senior official from the PA's Military Intelligence unit, Kamal Al

Abed (a/k/a "Mohamed Mukhtasab" a/k/a "Abu Talal").  Abu Talal asked an informant he knew

named Munzar Noor for a woman to carry out an attack.  Noor suggested Idris, a Fatah "activist"

and informant to the PA military intelligence service.  When Idris balked, according to Noor,

"[i]n the home of Abu Talal, we sat down, Abu Talal and Wafa Idris and I, and we talked about

the subject; I mean a suicide attack [by Idris]."  Pls. Tr. Ex. 465.  Abu Talal then gave Idris the

bomb and instructions.  Evidence also shows that the PA's most senior intelligence officers knew

of the bombing in advance:  on the day of the bombing, even before Idris's identity was released,

Tawfiq Tirawi, the head of the PA's General Intelligence Service ("GIS"), asked Idris's family to

delay disclosing her identity.  56.1 Stmt., Part II ¶¶ 158-69.

Defendants made Idris a national hero because she was the first female suicide bomber to

attack Israeli civilians.  Defendants ████████████████████████████████████



████████████████████████████  Marwan Barghouti attended Idris's

funeral and told the press that her attack reflected the strategy of "the Fatah movement."  To this

day, defendants glorify her in PA-controlled media outlets.  56.1 Stmt., Part II ¶¶ 171-74.

Noor is serving a life sentence.  Defendants ██████████████████████████

████████████████████████████  56.1 Stmt., Part II ¶ 175. ████████

████████████████████ ██████████████████████████ 56.1
Stmt., Part II ¶¶ 164-65, 170.  Defendants withheld all intelligence documents about him in vio-

lation of Judge Ellis's discovery orders.  Sanctions Mem. 19-20.

### 4.    March 21, 2002 Bombing

On March 21, 2002, Mohammed Hashaika, ████████████████blew himself up on a

street in Jerusalem, killing three and wounding 81, including plaintiffs Alan and Yehonathon

Bauer (age 7).  Yehonathon suffered a serious brain injury.  Hashaika was ████████████

██████████████████████████  Before the attack, he and Nasser Shawish

(another perpetrator of the bombing) were arrested by PA police for attempting "to perpetrate a

suicide operation."  Pls. Tr. Ex. 1060.  Arafat was informed of their arrest and interrogation.  *Id*.

However, the PA released Hashaika and Shawish just a few weeks later.  (Defendants failed to

turn over any documents concerning their interrogation and release.  Sanctions Mem. 14-15.)

Hashaika perpetrated the attack shortly after his release, with Shawish's assistance.  While

Shawish was a fugitive in the weeks before the bombing, he received funds approved by Arafat

himself.  After the attack, defendants ████████████████████████████

████████████████████████████████████████

██████████████████████  Pls. Tr. Exs. 23-24.  Defendants ████████

██████████████████ 56.1 Stmt., Part II ¶¶ 176-86, 199-03, 363.

Abdel Karim Aweis, ████████████████████████and a senior member of

Fatah's AAMB, planned the attack.  He had earlier been convicted of murdering a fellow Pales-

tinian he suspected of being an informant, but he was released by Israel in connection with peace

talks ██████████████████████  Like Nasser Aweis (who was con-

victed of the January 22, 2002 attack), Abdel Karim Aweis was one of the 33 most wanted ter-

9

rorists on the Zinni List.  The day before the March 21 attack, he met Marwan Barghouti to discuss the plan and received money for the attack from Barghouti.  He also received money and weapons from Al Sheikh.  He confessed in open court.  56.1 Stmt., Part II ¶¶ 187-98.

Defendants ███████████████████████████████████████████ ███████ Defendants have honored other individuals convicted for the attack, including Shawish, in PA-owned and controlled media outlets.  56.1 Stmt., Part II ¶¶ 204-13.

### 5.    June 19, 2002 Bombing

On June 19, 2002, Sa'id Awada, a member of Fatah's AAMB, blew himself up at a bus stop in the French Hill neighborhood of Jerusalem, killing seven and wounding 35 others, including plaintiff Shaul Mandelkorn.  Defendants' ██████████████████████████ ███████████████████████████████████████████████████████ █████████████████████████████████████████████ 56.1 Stmt., Part II ¶¶ 214-15, 220-23.

Naef Abu Sharkh, a member of the ████████████████████████████████ ████████████████████organized the bombing.  He organized suicide bombings on other occasions, as well.  Pls. Tr. Ex. 606.  Based (expressly) on his involvement in this and other terror attacks, the State of Israel seized Abu Sharkh's bank accounts in an operation to confiscate terror funds.  Pls. Tr. Ex. 339.  Mazen Freitakh, ██████████████████████ was also implicated.  Abu Sharkh and Freitakh were killed during military operations.  56.1 Stmt., Part II ¶¶ 216-19, 224-25.  Defendants produced facially incomplete copies of their intelligence files concerning Abu Sharkh and Freitakh in violation of the Court's orders.  Sanctions Mem. 15-16.

### 6.    July 31, 2002 Bombing

On July 31, 2002, Hamas operatives detonated a massive bomb at lunchtime in the Frank

Sinatra Cafeteria on the campus of Hebrew University in Jerusalem. The explosion killed nine, including Benjamin Blutstein, Diane Carter, Janis Coulter, and David Gritz, and wounded 81 others. Hamas operative Abdullah Barghouti (a/k/a "the Engineer") manufactured the bomb and delivered it to his Hamas co-conspirators. Hamas was (and remains) designated a "Foreign Terrorist Organization" under United States law. 56.1 Stmt., Part II ¶¶ 72, 226-28, 281-83.

Abdullah Barghouti was a notorious terrorist. He had made a bomb that ripped through a crowded Sbarro restaurant in downtown Jerusalem in August 2001, killing 15 and wounding 130. The Israeli government had advance warning and demanded that the PA arrest Abdullah Barghouti, but the PA did not act on that request until the day of the Sbarro bombing, when the bomber was already en route. Defendants gave Abdullah Barghouti a cell phone while he was in prison after the Sbarro bombing, and he used it to call a Hamas co-conspirator. Then, less than three weeks after he was jailed, the commander of the PA's Preventive Security Services personally released him. Upon his release, Abdullah Barghouti regained possession of bomb-making materials the PA had found when he was arrested. 56.1 Stmt., Part II ¶¶ 230-54.

Abdullah Barghouti immediately rejoined Hamas and resumed his killing spree. He delivered bombs in November 2001 to senior PLO leader Marwan Barghouti and made bombs that Hamas used in terror attacks in December 2001, March 2002, May 2002 (two attacks), June 2002, and July 2002 (two attacks). PLO leader Marwan Barghouti and PA Police Officer Ahmed Barghouti provided him with money, a gun, and a safe house. ███████████████ ████████████████████████████████████████ Pls. Tr. Exs. 164, 1038; *see* 56.1 Stmt., Part II ¶¶ 248-65, 287. In violation of the Court's discovery orders, defendants failed to produce documents ███████████████ Sanctions Mem. 20-21.

Eventually, Abdullah Barghouti and his co-conspirators were arrested, tried, and convict-

ed.  Abdullah Barghouti pled guilty to committing 66 murders.  At sentencing, he admitted his crimes, saying:  "I do not regret any of the acts that I have carried out, and the Court knows that I have taught dozens of engineers to do the work better than me."  Pls. Tr. Ex. 435.  Defendants ██████████████████████████████ while he serves his 67 life sentences.  Defendants glorify his heinous crimes even to this day in their media outlets.  56.1 Stmt., Part II ¶¶ 284-98.

### 7.    January 29, 2004 Bombing

On January 29, 2004, Stuart Goldberg and ten others were killed in a suicide bombing on a public bus in Jerusalem.  The mastermind (Abdul Rahman Maqdad), the bomber (Ali Ja'ara), and two others (Ahmed Salah and Hilmi Hamash) were members of the PA police and security forces.  Maqdad ███████████████████████████████████and was in-volved in attacks against Israelis as early as 2001.  Maqdad and Salah had earlier held hostages in the Church of the Nativity in Bethlehem; the PA ████████████████████████████████ ████████  56.1 Stmt., Part II ¶¶ 299-05.  Maqdad admitted his crime in open court, and defend-ants' ██████████████████████████████████████ ████████████████████████████████████████████ ████████  Pls. Tr. Ex. 129.  Hamash—████████████████████████████with a criminal record dating back to 1991—was also convicted.  56.1 Stmt., Part II ¶¶ 308-09.

Ja'ara (the bomber) was ██████████████████████████████ ████████████████████████████  56.1 Stmt., Part II ¶¶ 325-32.  Defendants ████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████  Pls. Tr. Ex. 22.  Defendants ████████████████████████████ and aired his state funeral—including a military honor guard—on PA TV.  56.1 Stmt., Part II ¶¶ 325-32.

12

Defendants embraced the other PA employees involved in the bombing, too.  Maqdad



Salah

Defendants'

Pls. Tr. Ex. 131.  Defendants                              Three others convicted in

the attack—Ali Abu Haliel, Ahmed Sa'ad, and Mohammed Ma'ali—

56.1 Stmt., Part II ¶¶ 320-23, 333-48.

## SUMMARY JUDGMENT STANDARD

It is axiomatic that "in ruling on a motion for summary judgment, '[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'"  *Tolan v. Cotton*, 134 S. Ct. 1861, 1863, 1867-68 (2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), and reversing because the lower court improperly "credited the evidence of the party seeking summary judgment and failed properly to acknowledge key evidence offered by the party opposing that motion").  On summary judgment, the Court does not weigh the evidence or draw inferences against the non-moving party.  *Id.* at 1866.

## ARGUMENT

**I.    The Court Should Not Dismiss Count 1 (Anti-Terrorism Act)**

The Anti-Terrorism Act ("ATA") provides a private right of action for "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism."  18 U.S.C. § 2333(a).  "International terrorism" means activities that involve "violent acts…that are a violation of the criminal laws of the United States or of any State" (or "would be a criminal violation if committed" locally), if those activities appear to be intended to "intimidate or coerce a civilian population" or to "influence the policy of a government by intimidation or coercion."  18 U.S.C. § 2331(1).

Defendants do not deny that the seven attacks took place.  They do not deny that the attackers committed acts of violence that violated federal and state law or would be criminal if committed locally in the United States.  And they do not deny that the violence "appeared to be intended to" intimidate or coerce the civilian population of Israel and to influence the policy of Israel and the United States by intimidation or coercion.

Instead, defendants contend that:  (1) no reasonable jury could conclude that defendants can be held responsible for criminal conduct of their employees, agents, and co-conspirators under traditional tort law; (2) no reasonable jury could conclude that defendants acted knowingly or recklessly; (3) no reasonable jury could conclude that defendants proximately caused plaintiffs' injuries; and (4) ATA recovery is limited to plaintiffs who suffered physical injury rather than emotional injury.  Finally, defendants argue that summary judgment is required based upon drastic evidentiary rulings they urge upon the Court to exclude important evidence from the summary judgment record.  Each of defendants' arguments is meritless.

### A.    Defendants Are Legally Responsible for the Attacks

Defendants' employees committed—among other things—murder and attempted murder (18 U.S.C. §§ 1111, 2332), use of a destructive device on a mass transportation vehicle (18 U.S.C. § 1992), and detonating an explosive device on a public transportation system (18 U.S.C. § 2332f), as well as conspiracy to commit those acts (18 U.S.C. § 371).[1]

---

[1] Defendants argue (Br. 19) that plaintiffs may not reference these crimes now because they were not listed by code section in the First Amended Complaint ("FAC") (DE 4).  That is frivolous. The FAC states that plaintiffs were killed or injured in a series of terrorist attacks in public places or on public buses with M-16 assault rifles or powerful explosive devices.  FAC ¶¶ 54-125. The FAC states:  "The actions of defendants violate, or if committed within U.S. jurisdiction would violate, literally scores of federal and state criminal statutes prohibiting, *inter alia* and without limitation:  homicide, battery, assault and the construction and use of explosive devices…."  *Id.* at ¶ 127.  If defendants needed a list, they should have sought one during discovery.

Defendants are liable for two reasons.  *First*, defendants are vicariously liable—the ATA incorporates *respondeat superior* liability; the evidence easily meets that or any other standard of entity liability; and defendants ratified the acts of the perpetrators.  *Second*, defendants violated the anti-terrorism laws directly by providing material support and resources to terrorists.

### 1.     Defendants Are Vicariously Liable
#### a.     *Respondeat Superior* Applies

Every court to have answered the question has held that the doctrine of *respondeat superior* is available to plaintiffs seeking to establish entity-level liability under the ATA.  *See Linde v. Arab Bank*, 04 Civ. 2799 (NG), Hearing Tr. (DE 943) at 71-72 (E.D.N.Y. Apr. 24, 2013) ("I see no reason that traditional tort principles do not apply here.  There's so much in the history of the ATA that tells us that we are to apply traditional tort principles and of course those principles include that entity is liable for the acts of agents who act with apparent authority."); *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 542, 558 (E.D.N.Y. 2012) ("*Gill II*") ("Plaintiff is correct in contending that the ATA provides for corporate liability on a theory of *respondeat superior*."); *Abecassis v. Wyatt*, 785 F. Supp. 2d 614, 650 (S.D. Tex. 2011) (plaintiffs' "allegations [were] sufficient to survive a motion to dismiss on the *respondeat superior* claim" under the ATA).

These holdings are sound.  Congress expressly imposed liability on *any* "entity" violating the statute.  18 U.S.C. §§ 2334(a) (authorizing civil action against "any person"), 2331(3) (defining "person" as "an individual or entity capable of holding a legal or beneficial interest in property").  Defendants' theory is that Congress should have *also* said that the entity is liable for the acts of its officials, employees or agents.  Br. 9-10.  But an entity can *only* act through its officials, employees or agents.  Congress did not need to say more, because "when enacting the ATA's civil remedy provision, [it] 'intended to incorporate general principles of tort law…into

15

the [civil] cause of action under the ATA.'" *Gill II*, 893 F. Supp. 2d at 558; *accord Knox v. PLO*, 442 F. Supp. 2d 62, 77 (S.D.N.Y. 2006) (the ATA's "legislative history, in combination with the language of the statute itself, evidences an intent to codify general common law tort principles and to extend civil liability for acts of international terrorism to the full reaches of traditional tort law"). Defendants concede that "courts must analyze claims arising under the ATA according to traditional tort law principles." Br. 41.

Under traditional tort principles, a defendant is liable for the acts of its employees "engaging in a course of conduct subject to the employer's control." *Restatement (Third) of Agency* § 7.07 (2006). In the leading case of *Ira S. Bushey & Sons v. United States*, 398 F.2d 167, 170 (2d Cir. 1968) (Friendly, J.), the court explained that *respondeat superior* applies where the employee's tortious "conduct was not so 'unforeseeable' as to make it unfair to charge the [defendant] with responsibility." Indeed, "for purposes of *respondeat superior* liability, even an employee who commits an intentional tort may be found to have acted within the scope of his employment." *Kwon v. Yun*, 606 F. Supp. 2d 344, 363 (S.D.N.Y. 2009); *Almonte v. New York City Hous. Auth.*, 1990 WL 113125, at *3 (S.D.N.Y. July 30, 1990) (jury could hold Housing Authority liable for beating administered by its police officers because such conduct was foreseeable). As Judge Brown explained in *Estate of Parsons v. Palestinian Authority*, "[r]espondeat superior liability is an elementary principle of tort law and must therefore inform our interpretation of the federal torts created in the Anti-Terrorism Act. Thus, the Palestinian Authority is liable for the acts its employees committed within the scope of their employment." 651 F.3d 118, 148 (D.C. Cir. 2011) (concurring opinion).[2] The leading New York state decision is to the same effect:

---

[2] Defendants rely on a snippet from a (reversed) District Court opinion in *Parsons*, which said "we have no basis on which to assign vicarious liability to the PA for the alleged criminal acts of

Footnote continued on next page

"where the element of general foreseeability exists, even intentional tort situations have been found to fall within the scope of employment." *Riviello v. Waldron*, 47 N.Y.2d 297, 304 (1979).

Defendants mistakenly suggest (Br. 10) that a rejection of aiding and abetting liability necessarily requires a rejection of *respondeat superior* liability. That is incorrect. The unavailability of aiding and abetting liability is irrelevant to the "quite separate matter of whether a principal may be held liable for the…violation of its agent on the basis of the principal's status" as employer. *In re Parmalat Sec. Litig.*, 474 F. Supp. 2d 547, 552 (S.D.N.Y. 2007) (following *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 100-01 (2d Cir. 2001)); *see AT&T Co. v. Winback and Conserve Program*, 42 F.3d 1421, 1430-31 (3d Cir. 1994) (under agency theories like *respondeat superior*, the "principal is held liable not because it committed some wrongdoing outside the purview of the statute which assisted the wrongdoing prohibited by the statute, but because its status merits responsibility for the tortious actions of its agent.").

### b.    The Evidence Meets *Respondeat Superior* Standards

"'[B]ecause the determination of whether a particular act was within the scope of the servant's employment is so heavily dependent on factual considerations, the question is ordinarily one for the jury.'" *Bruce v. Port Auth. of N.Y. and N.J.*, 531 F. Supp. 2d 472, 476 (E.D.N.Y. 2008) (quoting *Riviello*, 47 N.Y.2d at 303); *see Girden v. Sandals, Int'l*, 262 F.3d 195, 205 (2d

---

Footnote continued from previous page

a few employees." 715 F. Supp. 2d 27, 34 (D.D.C. 2010), *rev'd*, 651 F.3d 118 (D.C. Cir. 2011). The snippet was plainly in the context of the Court's discussion of the *evidence* concerning the *particular attack* and did not discuss the *legal availability of respondeat superior under the ATA*. In fact, defendants thought so little of their *respondeat superior* theory that they did not even raise it in their brief to the DC Circuit. 651 F.3d at 128-39. Defendants also rely on *Mohamad v. Palestinian Authority*, 132 S. Ct. 1702 (2012), but that case hurts defendants here: Defendants won that case because "the term 'individual' as used in the [Torture Victim Protection] Act encompasses only natural persons." *Id.* at 1705. This statute—unlike that one—reaches "any individual *or entity*." 18 U.S.C. § 2331(3); *compare* Note following 28 U.S.C. § 1350 ("Any individual…."). How would an entity *ever* violate this statute, if not through the acts of its employees and agents?

Cir. 2001). The fact issue for the jury is foreseeability. Thus, in the leading case of *Nelson v. American-West African Line*, 86 F.2d 730, 731 (2d Cir. 1936) (L. Hand, J.), the Circuit reversed summary judgment for the defendant where the defendant's drunken employee rousted plaintiff out of his bunk with a blow, saying "[g]et up, you big son of a bitch, and turn to" and then beat the plaintiff. And in *Riviello*, the New York Court of Appeals held that a jury reasonably found a restaurant liable because its short order cook threw a knife at a customer. *Id.* at 304.

The evidence here would certainly allow a jury to hold defendants liable under the relevant standard. Each of the attacks involved ███████████████████████████

- **January 8, 2001:** Fawzi Murar, a lieutenant in Force 17, and three unidentified coconspirators who were probably also members of the Force 17 terrorist cell;

- **January 22, 2002:** (1) ██████████████████████████ (2) ██████████████████████████ (3) ██████████████████████████ (4) ██████████████████████████ (5) Ibrahim Abdel Hai, a PA Maritime police officer, and (6) ████████████████████;

- **January 27, 2002:** (1) ██████████████████████████████████████████████and (2) Colonel Tawfiq Tirawi, commander of the GIS in the West Bank;

- **March 21, 2002:** (1) ██████████████████████████ (2) ██████████████████████;

- **June 19, 2002:** ████████████████████████████;

- **July 31, 2002:** (1) ██████████████████████████████████, (2) Jibril Rajoub, head of the Preventive Security Force, and (3) Marwan Barghouti, Secretary General of Fatah in the West Bank and ████████████████████ ████████████████; and

- **January 29, 2004:** (1) ██████████████████████████ (2) ██████████████████████████████████ (3) ██████████████████████████and (4) ██████████████████████

18

██████████████████████

The attacks all took place during the Al-Aqsa Intifada, when defendants were inciting, promoting, facilitating, and rewarding their employees' acts of terrorism.  Defendants ████████ ████████████████████████ Defendants used their extensive command and control apparatus to direct their employees' terrorist activities.  ██████████████ █████████████████ confirm that terrorism by defendants' employees was commonplace.  Surely a jury could conclude that it was foreseeable that defendants' employees would engage in terrorism, in light of the evidence showing that defendants incited, encouraged, organized, and funded acts of terrorism by their employees, provided money and supplies for such acts, █████████████████████████ 56.1 Stmt., Part II ¶¶ 28-98.  Moreover, the jury could infer that missing documents (withheld in violation of the Court's discovery orders) would inculpate defendants even further.  *See* Sanctions Mem. 10-24.

The PA has already been held liable in a similar case in Israel, where the court found:

> [I]n the course of the Second Intifada, the various organizations made joint efforts to perpetrate terrorist attacks against Isarael and against Israelis, and it was proved beyond all doubt that they did this under the direct command and supervision of the Head of the Palestinian Authority— Yasser Arafat—who guided them and ensured the funding for their activities, including the approval of money for the terrorist attackers and their families and specified the sums to be given to them.
>
> The depth of Arafat's involvement in the activity of the organizations is clearly evidenced in the documents….
>
> [T]he activities of the various organizations—including the Tanzim and the al-Aqsa Brigades—were all conducted under the orchestration and with the funding of the Palestinian Authority.

*Mentin v. Bezeq Israeli Tel. Co.* (Pls. Tr. Ex. 948) at 59.[3]

---

[3] Defendants cite *Rau v. Roberts*, 640 F.3d 324 (8th Cir. 2011) and *Hamm v. United States*, 483 F.3d 135 (2d Cir. 2007), to argue that plaintiffs cannot establish *respondeat superior* as a matter of law.  Br. 15-16.  But these cases involve very different facts.  *Rau* involved an off-duty police

Footnote continued on next page

### c.    *Monell* **Is Irrelevant**

Defendants argue that the PA cannot be held liable absent a showing that its employees' wrongful conduct was pursuant to a "custom, policy or practice" under the rule announced in *Monell v. Dep't of Social Servs. of N.Y.*, 436 U.S. 658, 694-95 (1978). But *Monell* is irrelevant. It does not apply here and, if it did, the evidence would easily meet its requirements.

"Respondeat superior is a firmly established doctrine of federal common law applicable to a wide field of…statutes. The *Monell* doctrine under 42 U.S.C. § 1983 is an exception to the rule." *Lee v. City of Philadelphia*, 2008 WL 2697320, at *3 n.10 (E.D. Pa. July 3, 2008). The *Monell* exception arose from specific language in § 1983 ("subject or cause to be subjected") and concerns expressed by members of the 42nd Congress (which enacted § 1983 during Reconstruction) that without this limitation the statute might infringe on State sovereignty. *Monell*, 436 U.S. at 690-94. In sharp contrast to § 1983, the ATA's text and legislative history provide a strong basis for believing that the 102d Congress intended to incorporate *respondeat superior*.[4]

Of course, the Court need not rule now on defendants' *Monell* argument because the evidence easily meets *Monell*. A plaintiff's § 1983 claim against a municipality can arise from the

---

Footnote continued from previous page

officer where there was "no evidence that [he] was conducting any work-related activities." *Id.* In *Hamm*, it was undisputed that the accident occurred "purely on [the Army reservist's] own time in order to commute to his place of employment." 483 F.3d at 138. The court said only that more "case-specific" evidence was required. *See id.* at 139. Here, the case-specific evidence of control and foreseeability is ample. For this reason, defendants' *respondeat superior* cases involving sexual assaults committed by rogue employees (*see* Br. 16-17) are inapposite.

[4] Defendants cite *Tracy v. Islamic Republic of Iran*, 2003 U.S. Dist. LEXIS 15844 (D.D.C. Aug. 21, 2003), an unpublished decision under the Foreign Sovereign Immunities Act. That case is unpersuasive. It applied the *Monell* standard in a case of a foreign sovereign, but did not explain why *Monell* would apply in such a case. In any event, defendants are not foreign sovereigns, so whatever weak persuasive force *Tracy* may have is simply absent here. *See Linde*, No. 04-CV-02799 (NG) Hearing Tr. Apr. 24, 2013 at 71-72 ("The bank has relied in particular on foreign sovereign immunity act cases. But I think those cases are different. They deal with foreign states and they do not provide persuasive reasoning for this case.").

"actual practice" or even a "single tortious decision or course of action" if it "may be said to represent the conscious choice of the municipality itself"—that is, "where it is taken by, or is attributable to," an "authorized policymaker" or where "'the authorized policymakers approve[d] a subordinate's decision and the basis for it.'" *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 125-26 (2d Cir. 2004). The evidence of the official sanction by defendants is overwhelming: it includes public incitement to violence by Arafat, Marwan Barghouti, and other senior PA and PLO leaders; encouragement and authorization of violence through official PA police publications and PA-owned and controlled media outlets; and post-conduct ██████████████ and glorification of terrorists. 56.1 Stmt., Part II ¶¶ 50-63. Defendants' argument that the seven attacks were "isolated acts" by rogue employees is frivolous. Even if the jury somehow believed that—a dubious prospect—isolated acts by non-policymaking employees still "can be the basis of liability if 'they were done pursuant to municipal policy, or were sufficiently widespread and persistent to support a finding that they constituted a custom, policy, or usage' of which supervisors must have been aware." *Matusick v. Erie Cnty. Water Auth.*, 2014 WL 700718, at *24 (2d Cir. Feb. 25, 2014) (quoting *Jones v. Town of E. Haven*, 691 F.3d 72, 81 (2d Cir. 2012)); *see Disorbo v. Hoy*, 74 F. App'x 101, 104 (2d Cir. 2003) (affirming jury verdict because city's inadequate discipline of officers involved in police brutality, as well as subsequent promotion of those officers, constituted "ample basis for finding municipal liability under *Monell*").[5]

Liability under *Monell* also attaches when "there is evidence that 'a policymaking official

---

[5] *Accord Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983) ("[T]he persistent failure to discipline subordinates who violate civil rights could give rise to an inference of an unlawful municipal policy of ratification of unconstitutional conduct within the meaning of *Monell*."); *Collins v. City of New York*, 923 F. Supp. 2d 462, 477-78 (E.D.N.Y. 2013) ("a policymaker's response to constitutional violations can support an inference that the violation conformed to preexisting policy" as well as indicate that subordinates were "effectively encourage[d]" to engage in the wrongful conduct at issue).

ordered or ratified the employee's actions—either expressly or tacitly." *Id.*  Here, the jury could

so conclude from the facts that defendants ████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████  publicly glorified terrorists in PA-owned and controlled media outlets, and hid

incriminating documents from the Court.  56.1 Stmt., Part II ¶¶ 28-98; Sanctions Mem. 2-5.

### d.    Defendants Ratified the Tortious Acts of Their Employees

Under common-law agency principles, ratification occurs "when the principal, having

knowledge of the material facts involved in a transaction, evidences an intention to ratify it."

*Phelan v. Local 305, United Ass'n of Pipefitters*, 973 F.2d 1050, 1062 (2d Cir. 1992); *see*

*Chowdhury v. Worldtel Bangladesh Holding, Ltd.*, 746 F.3d 42, 53 & n.11 (2d Cir. 2014) (af-

firming jury verdict for torture; jury instructions ratification were correct, as agency law "can

provide a theory of tort liability").  Here, a jury could conclude that defendants ratified the perpe-

trators' actions by ████████████████████████████████████████████████████████

████████████████████  and publicly glorifying their crimes, with knowledge of the facts.

### 2.    Defendants Committed Direct Violations of Anti-Terrorism Laws

In addition to vicarious liability, plaintiffs may also prove direct violations of the ATA

because defendants provided support for Fatah's AAMB, Hamas, and individual terrorists.

### a.    Defendants' Support for Fatah's AAMB and Its Members Violated the Anti-Terrorism Laws

Defendants' support of AAMB terrorists violated antiterrorism laws including 18 U.S.C.

§§ 2339, 2339A, 2339B, 2339C, N.Y. Penal Law § 490.10, and N.J. Stat. Ann. § 2:C:38-5(b).

**(i)    Personnel—**As discussed above, many of the individuals who perpetrated terror-

ist attacks on behalf of Fatah's AAMB were actual members of the PA's police and security

forces.  Pls. Tr. Ex. 276.  Indeed, several of the most senior terrorism operatives in the AAMB,

including Nasser Aweis, Ahmed Barghouti, and Mohammed Mousleh, were also PA "security" officers.  At least ten of defendants' own employees convicted of or killed perpetrating the attacks in this case ███████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████  These individuals are "personnel" provided by the defendants to AAMB in violation of Section 2339A and state anti-terrorism laws, which forbid the provision of "material support or resources" knowing or intending that they are to be used to carry out an act of violence such as a bombing in violation of §§ 832, 2332a and 2332f,[6] or a murder in violation of §§ 956 and 2332.  The term "material support or resources" is read broadly.[7]  It includes providing personnel "who are jointly involved" in the crimes.  *United States v. Amawi*, 695 F.3d 457, 497 & n.6 (6th Cir. 2012); *United States v. Sattar*, 314 F. Supp. 2d 279, 298 (S.D.N.Y. 2004), *aff'd sub nom. United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009).

    **(ii)**    **Weapons—**Defendants also supplied AAMB and its members with weapons, in violation of §§ 2339A, 2339B, and state antiterrorism laws.  Fuad Hejazi Shubaki—a senior PA official and close Arafat associate—admitted that Arafat gave him an instruction, as head of the PA's Finance Office, to purchase weapons from any possible place, Pls. Tr. Ex. 889 at 1, and, in response, "each of the security organizations purchased material in large quantities and [Shubaki] approved the payment.  All of the al-Aqsa Martyrs organizations used the weapons which were supplied by the security forces which carried out the massive procurement."  *Id.* at

---

[6] Sections 832 and 2332a reach bombings.  *See* §§ 2332a(c)(2)(A) ("weapon of mass destruction" includes "destructive device"), 921(a)(4)(A)(i) ("destructive device" includes a bomb), 832(d)(2) (incorporating § 2332a(c)).

[7] The definition means "any property…or service," including currency, lodging, safehouses, communications equipment, weapons, explosives, and personnel.  18 U.S.C. § 2339A(b)(1).

43. Shubaki also admitted: "Yasser Arafat gave an instruction that all of the weapons would be purchased by the Palestinian Authority…so that he himself would be able to control everything that happened. In this way, Yasser Arafat would be able to control the strength of the intifada." *Id*. "Weapons" are expressly included in the definition of "material support or resources." After the State Department designated AAMB a "Foreign Terrorist Organization" in March 2002, providing it with weapons became a violation not just of § 2339A and state law, but also of § 2339B. That statute forbids the provision of "material support or resources to a foreign terrorist organization," if the defendant knows that the organization is a designated terrorist organization or that the organization has engaged in terrorism. Section 2339B prohibits the provision of material support to designated terrorist organizations like the AAMB "without regard to what the support is for." *Stewart*, 590 F.3d at 113. In other words, the mental state for § 2339B is "knowledge about the organization's connection to terrorism," and "not specific intent to further the organization's terrorist activities." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 16-17 (2010); *United States v. Al Kassar*, 660 F.3d 108, 129 (2d Cir. 2011).

(iii)    **Funds**—Defendants also gave money to the AAMB and its members in violation of §§ 2339A, 2339B, 2339C, and state antiterrorism laws. Section 2339C forbids providing funds with the knowledge that such funds "are to be used, in full or in part, in order to carry out" terrorist acts. Section 2339C(a)(3) makes it clear that "it shall not be necessary that the funds were actually used to carry out a predicate act." All that is required is providing funds and knowing their intended use. *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 693-95 (7th Cir. 2008) (money is also within the definition of "material support or resources").

The overlapping leadership and membership of the PA and Fatah "facilitated the use of PA resources to fund Fatah activities directly and indirectly, including payments to individual al-

Aqsa Brigades activists." Pls. Tr. Ex. 492 at 95.[8] Defendants' own expert acknowledged that defendants made payments to the AAMB—and tacitly acknowledged that defendants knew that the AAMB were terrorists. Robinson Dep. 211-12. Others agree. A State Department report concludes that "[d]ocuments seized by the Israeli Defense Forces during incursions into Palestinian-controlled areas in March and April show direct payments from the PA to Fatah party activists, some of whom were also affiliated with the Al-Aqsa Martyrs Brigade, who had been involved in violence. The payments were likely made with the knowledge that the intended recipients had been involved in violence and terrorism." Pls. Tr. Ex. 496. These payments were approved at the highest levels. For example, in September 2001, senior Fatah member Hussein Al Sheikh sent a letter to Arafat requesting that Arafat make payments to AAMB members, including Ra'ed al Karmi. Al Sheikh authenticated the letter and Arafat's signature authorizing payment. Al Sheikh Dep. 203-09; Pls. Tr. Ex. 962. Senior PLO leader Marwan Barghouti's conviction indicates that he, too, was directly involved in the provision of monetary support to AAMB members. Pls. Tr. Ex. 451. Shubaki (head of the PA's Finance Office), provided funds to the AAMB by coordinating requests for money, forwarding the requests to Arafat, and (on approval) making payments from the PA's Ministry of Finance. Pls. Tr. Ex. 889 at 46; *see* Pls. Tr. Ex. 631 at 4 ("Arafat distributes, through the PA 'Finance Ministry' and via Fuad Shubaki, large sums of money for the funding of the terror infrastructures."). 56.1 Stmt., Part II ¶¶ 83-89.

(iv)    **Harboring Terrorists**—Defendants protected wanted terrorists (who went on to commit the crimes at issue here) in violation of § 2339, which forbids harboring a person who the defendant knows has committed or is about to commit terrorist acts such as using a bomb in

---

[8] Defendants' own experts vouched for the reliability of the Human Rights Watch Report. *See*, *e.g.*, Robinson Dep. 100-01. It is admissible under Fed. R. Evid. 803(18).

violation of § 2332a (*see supra* n.5), and § 2339A, which forbids providing a "safehouse."[9]  The sheltered perpetrators here included Nasser Aweis and Abdel Karim Aweis, both of whom were on the Zinni List of most wanted terrorists, "Abu Talal," who was harbored in Arafat's personal compound, and Nasser Shawish.  *See* 56.1 Stmt., Part II ¶¶ 114-15, 121, 170, 190-93, 85.

### b.    Defendants' Support for Hamas and Abdullah Barghouti Violated the Anti-Terrorism Laws

Defendants' conduct with regard to Hamas and Abdullah Barghouti was also a direct entity-level violation of anti-terrorism statutes.  As discussed above, Abdullah Barghouti was a Hamas operative and a known terrorist—U.S. and Israeli officials demanded that the PA arrest him before he could strike again.  The PA *did* arrest him briefly in August 2001.  After just three weeks, the PA released him into the care and protection of senior PLO figure Marwan Barghouti, who gave him a safe house, money, and a gun.[10]  The PA knew he had bomb-making supplies—and not only let him keep them, but gave him more.  After his release from prison, Abdullah Barghouti and other members of his Hamas cell continued their killing spree by planting bombs, including the one at Hebrew University.  56.1 Stmt., Part II ¶¶ 228-68.

To begin, these actions violated 18 U.S.C. § 2339A, which forbids the provision of "material support or resources," including not just physical resources, but "an act done for the benefit…of another."  *Holder*, 561 U.S. at 23-24.  In *Parsons*, "an 'understanding' between the checkpoint security forces and whoever planted the bomb that they would not interfere in his actions [was] sufficient to raise a genuine dispute of material fact as to whether checkpoint security

---

[9] When a foreign government shelters or harbors terrorists in its territory, it provides a "safehouse" within the meaning of § 2339A.  *See, e.g.*, *Rux v. Republic of Sudan*, 461 F.3d 461, 470-71 (4th Cir. 2006).

[10] This conduct was part of a pattern—the PA released many Hamas terrorists from PA jails in 2000, after which Hamas began carrying out attacks targeting civilians.  *See, e.g.*, Pls. Tr. Ex. 492 at 114-16; *see also* Pls. Tr. Ex. 218, Eviatar Rep. at 7.

personnel were provided to whoever planted the bomb." 952 F. Supp. 2d at 68. This is a stronger case than *Parsons*, because the evidence here shows not just "looking the other way," but actually giving Abdullah Barghouti a safehouse, money, communications equipment, weapons, and bomb-making supplies—all while on notice that he was a terrorist.

Defendants also violated §§ 2339 (harboring terrorists) and 2339A by releasing Abdullah Barghouti into the care of Marwan Barghouti, who gave him a safe house and helped him operate freely, and § 2339C (financing terrorism) by giving him money. Indeed, allowing Hamas as an organization to operate in and from PA-controlled territory was also a violation of § 2339A. *See* Eviatar Rep. 5-8 (defendants allowed Hamas to operate freely).

Hamas was designated as a foreign terrorist organization in 1997; thus, a reasonable jury could conclude that defendants violated § 2339B by freeing Abdullah Barghouti from jail and giving him money, a phone, weapons, bomb-making supplies, and freedom to operate as a terrorist, knowing of Hamas's status and connection to terrorism.

### B.  Defendants Had the Required State of Mind

A defendant is subject to liability under the ATA when acting recklessly or knowingly. *Boim*, 549 F.3d at 693-95; *Gill II*, 893 F. Supp. 2d at 555 ("[I]t must be shown that the defendant's alleged actions were reckless, knowing, or intentional."). The Second Circuit has "repeatedly emphasized 'the need for caution about granting summary judgment'" where the merits turn on a dispute as to intent. *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010) (employment discrimination); *see* 11 *Moore's Federal Practice* ¶ 56.11[5][b] ("summary judgment will…be difficult to obtain in many cases in which a party's state of mind is a material issue."). Indeed, "the question of [criminal] intent can never be ruled as a question of law, but must always be submitted to the jury." *Morissette v. United States*, 342 U.S. 246, 274 (1952).

Intent (even criminal intent) is imputed to an employer when its managerial agents with such intent act "within the scope of their authority."  *See United States v. Twentieth Century Fox Film Corp.*, 882 F.2d 656, 660 (2d Cir. 1989); *Apollo Fuel Oil v. United States*, 195 F.3d 74, 76 (1999) ("a corporation can be guilty of 'knowing' or 'willful' violations of regulatory statutes through the doctrine of *respondeat superior*.").

In addition, direct knowledge may be shown in many ways—even merely with evidence that "the recipients of the aid have publicly stated terrorist goals or are associates of established terrorist organizations."  *Ahmad v. Christian Friends of Israeli Communities*, 2014 WL 1796322, at *3 (May 5, 2014).  Here, there is ample evidence from which a jury could infer that defendants acted knowingly or recklessly—including defendants' repeated statements of support for AAMB, the widely known terrorist goals of Hamas, and defendants' ███████████████  ███████████████████  *See generally* 56.1 Stmt., Part II.  A jury could also infer knowledge from the missing documents (Sanctions Mem. 23), from defendants' hate-based racist "political guidance" for its armed "security" officers, and from incitements to violence broadcast and published in the PA's state-owned media outlets.  *See* 56.1 Stmt., Part II ¶¶ 50-63.   And a jury could infer knowledge from defendants' pattern of hiring terrorists and arming them and re- leasing known terrorists from incarceration.  *See* 56.1 Stmt., Part II ¶¶ 64-90.  *Boim*, 549 F.3d at 693 ("To give a small child a loaded gun would be a case of criminal recklessness and therefore satisfy the state of mind requirement for liability under section 2333 and the statutes that it in- corporates by reference.  For the giver would know he was doing something extremely danger- ous and without justification.") (emphasis omitted).

Defendants' assertion that plaintiffs cannot establish the required knowledge is based primarily on a stunningly inaccurate characterization of *Gill v. Arab Bank, PLC* ("*Gill I*").  De-

fendants claim that *Gill I* held the plaintiffs to a standard of proving not merely intent to cause

injury, but intent to injure *Americans*.  In truth, *Gill I* says exactly the opposite:

> Nothing in section 2333(a)'s text or history suggests that a plaintiff must
> plead and prove, as an element of his cause of action, a defendant's
> knowledge or intent regarding the plaintiff's (or the plaintiff's decedent's)
> status as an American national.  Requiring such a showing would seem
> inconsistent with traditional principles of American tort law.…And
> requiring such a showing would be perverse in another respect:  doing so
> would make it more difficult, in many terrorism cases, for private
> plaintiffs to recover in tort than for the government to obtain a criminal
> conviction.

893 F. Supp. 2d 474, 505-06 (E.D.N.Y. 2012).

### C.    Defendants Proximately Caused Plaintiffs' Injuries

Proximate cause is required to state a claim under § 2333(a).  *In re Terrorist Attacks on

Sept. 11, 2001*, 714 F.3d 118, 123-24 (2d Cir. 2013); *Rothstein v. UBS AG*, 708 F.3d 82, 95 (2d

Cir. 2013).  Proximate cause is shown where a defendant's "'acts were a substantial factor in the

sequence of responsible causation and [a plaintiff's] injury was reasonably foreseeable or antici-

pated as a natural consequence." *Rothstein*, 708 F.3d at 91 (quoting *Lerner v. Fleet Bank, N.A.*,

318 F.3d 113, 123 (2d Cir. 2003)); *see* 5 *Modern Federal Jury Instructions—Civil*, ¶ 87-79

(2013) ("[a]n act is a proximate cause of an injury if it was a substantial factor in bringing about

that injury, and if the injury was a reasonably foreseeable consequence of the defendant's act.").

Proximate cause is often a question of fact for the jury.  *See Stanford v. Kuwait Airways

Corp.*, 89 F.3d 117, 125-27 (2d Cir. 1996) (reversing judgment as a matter of law in a terror case,

where "the district court impermissibly substituted its judgment for that of the jury" on the issue

of proximate cause).  Defendants do not even try to argue a lack of causation under vicarious lia-

bility theories, as there can be no doubt that the terrorists injured the plaintiffs.  Even without

vicarious liability, the Second Circuit's analysis of the complaint in *Rothstein* highlights why the

facts here would support a jury's finding that defendants proximately caused plaintiffs' injuries. In *Rothstein*, the complaint did "not allege that UBS was a participant in the terrorist attacks that injured plaintiffs." 708 F.3d at 97. Here, in contrast, the evidence shows that defendants *were* participants in the terrorist attacks. The *Rothstein* complaint did "not allege that UBS provided money to" terrorist organizations. *Id.* Here, in contrast, the evidence shows that defendants *did* provide money, weapons, and services to terrorists and terrorist organizations. The *Rothstein* complaint did "not allege that if UBS had not transferred U.S. currency to Iran, Iran, with its billions of dollars in reserve, would not have funded the attacks in which plaintiffs were injured." *Id.* Here, in contrast, the evidence shows that the PA's own employees directly injured most of the plaintiffs and that defendants' extensive support of terrorists and terrorist organizations included providing cash, weapons, safehouses, personnel, and communications equipment. Moreover, defendants publicly incited and publicly ratified the attacks. On this record, a jury would be hard-pressed not to find that defendants' conduct was "a substantial factor in the sequence of responsible causation" of plaintiffs' injuries.

Defendants argue that *In re Terrorist Attacks on Sept. 11, 2001* requires plaintiffs to establish that the defendants "made any pre-attack payments to the individuals or organizations alleged to be associated with the shootings or bombings at issue." Br. at 7. Not true. The theory of liability in that case was that those defendants provided financial support and services to charities that, in turn, supported terrorists. Here, in contrast, defendants' provision of material support to the terrorists and terror groups who carried out the attacks was direct. *See Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 433 (E.D.N.Y. 2013) (jury may find proximate cause where terrorists "carried out the attacks during the same period of time within which the money was transferred").

30

### D.    All Plaintiffs Suffered Actionable Injuries

Defendants claim that some of the plaintiffs cannot recover for emotional injuries absent physical injury.  They are wrong.  Courts have uniformly agreed that Section 2333(a) makes actionable "'[a]ny invasion of a personal right, including mental suffering' in addition to physical or financial suffering."  *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 43 (D.D.C. 2010).  "[E]very court that has construed § 2333(a) has reached the same conclusion."  *Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 426 (E.D.N.Y. 2009).  Defendants concede that ATA precedent is uniform.  Br. 40.  But they argue that the words "injured in his or her person" are different from "personal injury."  They do not explain why this would matter, and they cannot overcome the uniform conclusion of the courts allowing such claims to go forward.

Defendants also argue that the Court should impose a "physical presence" requirement for recovery under the ATA for emotional injuries.  Def. Mot. at 41.  No court has ever done so.  To the contrary, the courts have made significant awards to plaintiffs who endured the trauma and emotional impact of having a relative killed or injured in a terrorist attack without being present.  *See, e.g.*, *Estates of Ungar v. Palestinian Authority*, 325 F. Supp. 2d 15, 67 (D.R.I. 2004) ($85 million to family members who were not present); *see also Calderon-Cardona v. Democratic Peoples Republic of Korea*, 723 F. Supp. 2d 441, 461 (D.P.R. 2010) (collecting cases).  There is also no "presence" requirement for common-law intentional infliction of emotional distress.  *See Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 44 (D.D.C. 2007) ("claims for intentional infliction of emotional distress may be brought by family members without having to establish a presence requirement"); *Restatement (Third) of Torts: Physical & Emotional Harm* § 47.  A physical presence requirement makes no sense where, as here, persons not at the scene were also intended victims of the tortious conduct.  *See, e.g.*, *Jenco v. Islamic Republic of*

31

*Iran*, 154 F. Supp. 2d 27 (D.D.C. 2001); *Sutherland v. Islamic Republic of Iran*, 151 F. Supp. 2d 27 (D.D.C. 2001). Defendants' terrorism was intended to (and did) affect family members.

### E.    Defendants' "No Evidence" Arguments Are Meritless

Defendants make four evidence-based arguments: they attack the claims of three families in particular and then contend that the convictions of the perpetrators should be excluded. The evidentiary arguments are meritless—and in some cases frivolous. In addition, while the Court certainly has the discretion to make evidentiary rulings on summary judgment, these issues should be deferred to trial, since "evidentiary issues are best resolved on a full trial record."[11]

### 1.    The Guetta Family Should Proceed to Trial

Defendants seek summary judgment against the Guetta family based upon their hope that the Court will exclude from the summary judgment record Ms. Guetta's testimony identifying Fawzi Murar as one of the four men who attacked her and her young son with machine guns. However, unless there is specific evidence of improper state conduct, the witness identification goes to the jury. *Perry v. New Hampshire*, 132 S. Ct. 716, 728 (2012). Ms. Guetta's identification of her attacker resulted from a photo array of fifteen pictures provided by private counsel in February 2013. 56.1 Stmt., Part II ¶ 103. Her identification of Murar was "not police-arranged"; thus, defendants are "limited to the constitutional safeguards available during all trials— compulsory process and cross-examination—in challenging the reliability of the identification testimony." *Scott v. Sheahan*, 2013 WL 3938501, at *6 (E.D.N.Y. July 30, 2013).

Defendants' arguments that Ms. Guetta lacks "personal knowledge" of the shooter's identity and that her identification is not "rationally based on [her] perceptions" are frivolous. Ms.

---

[11] *Thomas v. Washington Metro. Area Transit Auth.*, 907 F. Supp. 2d 144, 149 (D.D.C. 2012); *In re Omeprazole Patent Litig.*, 490 F. Supp. 2d 381, 453 n.39 (S.D.N.Y. 2007); *Halbrook v. Reichhold Chems., Inc.*, 735 F. Supp. 121, 128 (S.D.N.Y. 1990).

Guetta was present during the attack and saw Murar with her own eyes. 56.1 Stmt. ¶ 101. She testified: "until my dying day, I won't forget him…. [T]hat's something that's engraved in me for eternity." VG Dep. (05/07/13) 365-66. The jury should assess Ms. Guetta's credibility in light of her live testimony and the other evidence of defendants' culpability, including the pattern of similar attacks by their employees and their violation of the Court's discovery orders. *See* 56.1 Stmt., Part II ¶¶ 99-101, 104-06; Sanctions Mem. 22.

Defendants' demand to exclude the identification under Rule 403 is also meritless. Rule 403 "is an extraordinary remedy that must be used sparingly." *George v. Celotex Corp.*, 914 F.2d 26, 30-31 (2d Cir. 1990). While a court has *power* to invoke Rule 403 at summary judgment, "normally the balancing process contemplated by that rule is best undertaken at trial itself." *Adams v. Ameritech Servs., Inc.*, 231 F.3d 414, 428 (7th Cir. 2000). Some courts have characterized a Rule 403 motion at the summary judgment stage as "a waste of the court's time." *E.g.*, *Elwell v. Conair, Inc.*, 145 F. Supp. 2d 79, 84 (D. Me. 2001). Here, the identification is highly relevant, for it links defendants to the attack. In contrast, the "prejudice" defendants fear is not that members of the jury will be distracted by things of tangential relevance, or inflamed by things that are upsetting, but rather that they will *believe the testimony*. We have more faith in the jury's ability to evaluate Ms. Guetta's testimony than do the defendants. Perhaps that is because defendants rely on the report of an expert who admittedly did not consider all the relevant facts. The expert admitted during his deposition that his analysis failed to consider Ms. Guetta's earlier rejection of another possible suspect, even though such negative identification attempts are "quite important." Wells Dep. 58, 199-200. He admitted that he might have a different opinion if he had considered the prior unsuccessful identification attempt. *Id.* at 207. And he admitted that he cannot establish that the identification of Murar is inaccurate. *Id.* at 211-12.

33

## 2.    The Mandelkorn Family Should Proceed to Trial

Defendants' claims regarding the Mandelkorn family are even more attenuated. They argue that there is "no admissible evidence" inculpating senior PA employee Abu Sharkh for his involvement in the June 19, 2002 bombing. They are wrong. An Israeli Ministry of Foreign Affairs report concludes that Abu Sharkh "was behind the…19 June 2002 suicide bombing…at the French Hill intersection." Pls. Tr. Ex. 339. The report (which is self-authenticating under Fed. R. Evid. 902(5)) is a public record admissible under Rule 803(8) because it sets out "factual findings from a legally authorized investigation," and "neither the source of information nor other circumstances indicate a lack of trustworthiness." The report was based on an investigation conducted by security and law enforcement agencies and "the legal elements of the ISA, IDF and the Attorney General's Office—all of who authorized the operation." Pls. Tr. Ex. 339. Defendants point to no particularized evidence casting doubt on the trustworthiness of the report's findings. They cite *Gill II*, 893 F. Supp. 2d at 571, but the documents at issue in *Gill* appeared to have been based on statements about the nature of a shadowy and unknown organization by a person whom the Court deemed unreliable under those unique circumstances. Here, in contrast, there is no shadow organization. The jury should assess the report in light of the live testimony of the expert who relies on it and the other evidence of defendants' culpability, including the pattern of similar conduct by Abu Sharkh and defendants' failure to produce documents about him in violation of the Court's discovery orders. *See* 56.1 Stmt., Part II ¶¶ 214-25. Sanctions Mem. 15-16.

Even without the Abu Sharkh evidence, a jury may hold defendants liable on a ratification theory. Rather than disown Sa'id Awada (the suicide bomber), ██████████████ ██████████████████████████████████████ Pls. Tr. Exs. 16, 19, 21. Similarly, the jury could reasonably conclude that defendants' support of AAMB was a substantial con-

tributing factor to the bombing even without the Abu Sharkh evidence. Fatah publicly took credit for the attack and carried it out through its "military wing," AAMB. Shrenzel Rep. 56. AAMB had by then been designated a foreign terrorist organization. Pls. Tr. Exs. 537, 620, 622. Defendants' support of AAMB is well documented. *See, e.g.*, 56.1 Stmt., Part II ¶¶ 37-45.

### 3. The Sokolow Family Should Proceed to Trial

Defendants' demand to dismiss the Sokolow family's case is frivolous. Defendants ratified Wafa Idris's attack by ███████████████████████████████ and turning her into a national heroine. *E.g.*, 56.1 Stmt., Part II ¶¶ 80-90. A PA law enforcement document states "[PA] General Intelligence are involved in the issue of Wafa Idris." Pls. Tr. Ex. 233.[12]

The Israeli courts identified a senior PA intelligence officer as the mastermind of the plot. 56.1 Stmt., Part II ¶¶ 161-67. Indeed, in his police interview, one of the perpetrators directly implicated this officer, whom he called "Abu Talal," admitting: "In the home of Abu Talal, we sat down, Abu Talal and Wafa Idris and I, and we talked about the subject; I mean a suicide attack [by Idris]." Pls. Tr. Ex. 465. Contrary to defendants' argument, Br. 29-30, this and similar contentions obviously meet Rule 804(b)(3). It is well-settled that "exposure to criminal liability satisfies the against-interest requirement." 1972 Advisory Comm. Notes to Fed. R. Evid. 804(b)(3). "Even the confessions of arrested accomplices may be admissible if they are truly self-inculpatory, rather than merely attempts to shift blame or curry favor. For instance, a declarant's squarely self-inculpatory confession—'yes, I killed X'—will likely be admissible under Rule 804(b)(3) against accomplices of his who are being tried under a co-conspirator liability theory."

---

[12] Defendants refuse to admit that this document is authentic, but they answered interrogatories about it and identified the individuals whose handwritten names are on it. Pls. Tr. Exs. 880-83. Notably, defendants have offered a declaration by the document's principal subject, Tawfiq Tirawi, and yet he is conspicuously silent about this document. *See* Yalowitz Dec. Ex. D.3.

*Williamson v. United States*, 512 U.S. 594, 603 (1994); *see United States v. Saget*, 377 F.3d 223, 231 (2d Cir. 2004) (upholding admission of co-conspirators' statements about defendant acting alone because, in context of entire scheme, statements were self-inculpatory).

Defendants claim that this, and similar statements, do not fall under Rule 804(b)(3) "because the 'assumption' underlying the rule…does not apply to Palestinian militants."  Br. 39. This contention is a non-sequitur.  Rule 804(b)(3)(A) allows admission of statements if they are "in fact" against interest.  1972 Advisory Comm. Note to Fed. R. Evid. 804(b)(3).  Defendants' argument that the declarant may have had ulterior motives might go to the weight of the evidence, but not its admissibility in a civil case.  *See United States v. Kivanc*, 714 F.3d 782, 792 (4th Cir. 2013) (corroborating circumstances of trustworthiness not required in a civil case).[13]

The jury should assess the confession and other evidence inculpating Abu Talal in light of the live testimony of the expert who relies on it and other evidence of defendants' culpability, including their own admission that "General Intelligence was involved" and their failure to produce a single intelligence document about Abu Talal, in violation of the Court's discovery orders.  *See* 56.1 Stmt., Part II ¶¶ 158-75.  Sanctions Mem. 18-20.

---

[13] In addition, defendants' evidence attacking the trustworthiness of these confessions is unpersuasive.  Defendants rely on two sources.  The first is the opinion of one of their experts, Michael Sfard.  Br. 39.  But Mr. Sfard has no basis to opine on the motivations of Palestinian terrorists' custodial statements.  He is an Israeli lawyer whose practice focuses on defending Israeli and Palestinian human rights organizers charged with "minor offenses," such as civil disobedience.  Sfard Dep. at 21.  He has litigated "one or two cases" in the military courts.  *Id.* at 22.  Second, defendants rely on *Gill II*, 893 F. Supp. 2d at 569-71 (Br. 39), but that case concerned "logos" on a videotape and double hearsay about an organization publicly claiming credit for an attack—not a self-inculpatory statement by an individual suspect.

To the extent that there is a genuine dispute about the trustworthiness of custodial statements, the Court should consider the testimony of plaintiffs' experts (who have extensive experience with Palestinian terrorism and who relied on the statements as trustworthy) and the corroborating circumstances of trustworthiness, particularly the fact that the declarants were not trying to exculpate suspects with whom they had close relationships.  *See United States v. Jackson*, 540 F.3d 578, 589 (7th Cir. 2008); *United States v. Price*, 134 F.3d 340, 348 (6th Cir. 1998).

####       4.       Convictions Rendered in Israeli Military Courts Are Admissible

Defendants claim that the Court should exclude the convictions of two dozen PA employees and their co-conspirators.  They assert that Rule 803(22) of the Federal Rules of Evidence permits admission only of *domestic* criminal convictions, and not *foreign* criminal convictions.  Br. 32-33.  Defendants are wrong.  Foreign judgments of conviction are routinely admitted.[14]  Indeed, only last month, a member of this Court did so in another terror case.[15]

Defendants' theory is that the drafters of the Rules of Evidence inadvertently left a gap by failing to name foreign convictions expressly.  Not only is that theory contrary to the cases, it would make no sense.  Foreign convictions are relevant in a range of matters, and Congress even made them expressly relevant in certain cases.  *See, e.g.*, 18 U.S.C. § 2333(c); 28 U.S.C. § 2467.  Congress would not have made foreign convictions an element of proof under certain statutes without giving the courts power to admit the convictions as evidence.  Defendants rely on *Small v. United States*, 544 U.S. 385 (2005), but *Small* concerned a particular statute, not rules of evidence applicable to all cases in the federal courts.

Most of the convictions at issue here were obtained in the Israeli Military Courts as a result of guilty pleas by individuals represented by counsel.  Defendants argue that these convic-

---

[14] *Donnelly v. FAA*, 411 F.3d 267, 270-71 (D.C. Cir. 2005) ("principles of comity suggest that [a foreign] judgment should be given weight as *prima facie* evidence of the facts underlying it," and the challenging party has the burden of impeaching the reliability of such judgment); *United States v. Garland*, 991 F.2d 328, 335 (6th Cir. 1993) ("a foreign judgment that shows no sign of being unreliable should be admitted"); *Lloyd v. Am. Export Lines, Inc.*, 580 F.2d 1179, 1190 (3d Cir. 1978) (district court erred in refusing to accept Japanese conviction under Rule 803(22)); *Hartford Fire Ins. Co. v. Socialist People's Libyan Arab Jamahiriya*, 2007 WL 1876392, at *10 (D.D.C. June 28, 2007) (following *Donnelly*); *see United States v. Moore*, 653 F.2d 384, 390 (9th Cir. 1981) (admitting conviction obtained in Belize); *United States v. Rodarte*, 596 F.2d 141, 146 (5th Cir. 1979) (Mexico); *United States v. Manafzadeh*, 592 F.2d 81, 90-91 (2d Cir. 1979) (Iran).

[15] Mark Hamblett, "Past Overseas Convictions Introduced at Terror Trial," N.Y.L.J. (May 13, 2014) (reporting on decision from the bench in *United States v. Mustafa*, No. 04-cr-356 (KFB)).

tions are inadmissible because they were rendered under a judicial system that does not provide "procedures compatible with due process." Br. 34. But, as defendants' own expert admits, "a fair trial and due process rights are considered to be human rights in Israel." Sfard Dep. 96-97. He is correct. Israel's constitutional protection of human rights applies to all courts, including the Military Courts. Reisner Reb. 33. Indeed, the courts of the United States have uniformly found that Israel's courts act fairly and provide due process. *Demjanjuk v. Petrovsky*, 776 F.2d 571, 583 (6th Cir. 1985), *vacated on other grounds*, 10 F.3d 338 (6th Cir. 1993); *Eain v. Wilkes*, 641 F.2d 504, 512 n.9 (7th Cir. 1981); *Strauss*, 925 F. Supp. 2d at 447-48; *Ahmad v. Wigen*, 726 F. Supp. 389, 416 (E.D.N.Y. 1989), *aff'd*, 910 F.2d 1063 (2d Cir. 1990).

In *Strauss*, the court held expressly that Israel's Military Courts comport with American notions of due process. 925 F. Supp. 2d at 448. That recent holding from a Judge of the Eastern District of New York is not only exactly on point, but fully consistent with the admissions of defendants' own expert, who acknowledged that:

- The accused has the right to a lawyer, and indeed a court-appointed lawyer, for a crime for which the sentence exceeds 10 years. Sfard Dep. 67.

- The accused is entitled to all exculpatory evidence—even if that evidence is classified—and if exculpatory classified evidence is not produced, the indictment will be dismissed. *Id.* at 107-08.

- The court is obliged to permit counsel adequate time to prepare a defense. *Id.* at 102.

- The same rules of evidence apply as the laws of evidence in civilian courts. *Id.* at 67-68.

- The accused is entitled to an interpreter and may object to an interpreter. *Id.* at 75.

- The accused is entitled to be present during the whole trial, so long as he conducts himself properly. *Id.* at 89.

- The defendant has the right to summon witnesses and the court can hold witnesses in contempt if they fail to obey the summons. *Id.* at 76.

- The defendant has the right to examine, cross-examine, and re-examine

38

witnesses.  *Id.* at 76.

- All forms of torture, cruel, degrading, and inhumane treatment are forbidden under the law of Israel.  *Id.* at 132; *accord* Reisner Reb. 76 ("Israeli law categorically and undeniably prohibits all forms of torture and inhumane or degrading treatment").

- If the court concludes that a post-arrest statement was coerced, the statement must be excluded.  *Id.* at 114; Reisner Reb. 73-75 (statement must be "free and voluntary," and "the nature and circumstances of any and all confessions must be thoroughly reviewed by the court before being accepted as statements of fact.").

- If there is insufficient evidence, the court must acquit.  *Id.* at 101, 57.

- Before accepting a guilty plea, the court must be satisfied that the accused fully understands the nature of the charge brought against him and the implications of his admission of guilt.  *Id.* at 89.

- A defendant has a right to appeal a final judgment.  *Id.* at 112.

- Post-conviction, a defendant may seek a re-trial at any time based on actual innocence or material new evidence.  *Id.* at 94, 32-33.

- Judicial officers in the military court are required to be independent of the investigators and prosecutors, free of bias, and authorized to release a detainee.  *Id.* at 96.[16]

Even leaving aside Rule 803(22), it is black letter law that "principles of comity and respect for foreign sovereigns" generally "preclude judicial scrutiny of foreign convictions"— including convictions by military tribunals.  *Munaf v. Geren*, 553 U.S. 674, 699-700 (2008); *see Hirota v. MacArthur*, 338 U.S. 197 (1948) (*per curiam*) (military tribunal in occupied Japan); *Neely v. Henkel*, 180 U.S. 109, 123 (1901) (military tribunal in occupied Cuba); *Hurst v. Socialist People's Libyan Arab Jamahiriya*, 474 F. Supp. 2d 19, 33-36 (D.D.C. 2007) (three-judge Scottish panel sitting by international agreement in the Netherlands); *cf. Ex Parte Quirin*, 317 U.S. 1 (1942) (military commission permitted to try saboteurs captured on U.S. soil).

---

[16] Defendants' "independence" claim is not that the judiciary was actually "dependent" but that there was a technical structural flaw in the selection process.  This argument is belied by the expert reports of Reisner and Newton.  Reisner Reb. at 50-54; Newton Reb. at 24-26.  Defendants also rely on a highly controversial NGO report, Defs. Ex. V at 61-243, but that report has been discredited.  Reisner Reb. at 7-8.

Any claim that the Israeli Military Courts are not to be trusted falls particularly ill in the mouths of the PLO and the PA, since they expressly agreed—in the 1995 "Interim Agreement" establishing the PA—that Israel would continue to exercise criminal jurisdiction over security crimes by Palestinian individuals, and that such jurisdiction would be exercised through the judicial arm of the military government—that is, Israel's Military Courts.  *See* Weill Dep. 140-41.

Defendants also make a series of hearsay objections to various kinds of documents.  They say that indictments, records of plea hearings, and sentencing records are hearsay.  But these documents are components of the judgments under Rule 803(22), and are also admissible as public records.  *See, e.g.*, *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 411-13 (6th Cir. 2006) (admitting Korean notices of arrest, complaint, investigative reports, and indictments under 803(8) and 803(22)); *SEC v. Sekhri*, 2002 WL 31100823, at *12 (S.D.N.Y. July 22, 2002) (statements from plea allocution admissible to prove truth); *Am. Int'l Specialty Lines. Ins. Co v. Towers Fin. Corp.*, 1997 WL 906427, *4 n.7 (S.D.N.Y. Sept. 12, 1997) (same).[17]

Defendants also complain that records of court hearings are hearsay; minor differences in reporting style between foreign and American courts are not a basis for exclusion.  *See United States v. Pena-Espinoza*, 47 F.3d 356, 360 (9th Cir. 1995) (summaries admissible if they constitute a "factual condensation" without opinion or interpretation); *United States v. Sturman*, 951 F.2d 1466, 1480 (6th Cir. 1991) (affirming admissibility of foreign depositions even though Swiss law prevented verbatim transcription); *United States v. Salim*, 855 F.2d 944, 951-52 (2d

---

[17] Defendants cite *In re WorldCom, Inc. Secs. Litig.*, 2005 WL 375315, at *9 (S.D.N.Y. Feb. 17, 2005), but the court there merely held that a *U.S.* indictment did not fall under Rule 803(22) and was not needed to understand the relevant plea allocution.  Here, in contrast, the guilty pleas are to the "indictment," with no federal-style allocution.  *Compare* Fed. R. Crim. P. 11 *with* Pls. Tr. Ex. 295.  The result of Israeli procedural practice is that the judgment can be understood only by looking at the sentencing opinion, the plea, and the indictment.

Cir. 1988) (foreign deposition testimony of witness admissible even though certain statements were not given under oath and transcript did not reflect verbatim translation and recording).

Finally, defendants argue that the interpreters' translations of particular defendants' inculpatory statements are hearsay. Wrong again. "Except in unusual circumstances, an interpreter is 'no more than a language conduit and therefore his translation [does] not entail an additional level of hearsay.'" *United States v. Lopez*, 937 F.2d 716, 724 (2d Cir. 1991) (bracket in original); *United States v. Koskerides*, 877 F.2d 1129, 1135 (2d Cir. 1989).

## II.    The Court Should Not Dismiss the Non-Federal Claims

Defendants' arguments concerning the non-federal claims need not detain the Court. Preliminarily, we note that the choice of law standard for loss-allocation rules is set out in our memorandum dated May 2, 2014, in support of plaintiffs' summary judgment motion at pages 12-14 (DE 492), and the standard for conduct-regulating rules is set out in *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 739 F.3d 45, 50-51 (2d Cir. 2013) (*en banc*).

### A.    The Court Should Not Dismiss Count 2 (Wrongful Death)

Defendants argue that dismissal of the wrongful death claims is required on the theory that plaintiffs have no evidence of "pecuniary injury." Br. 46. Not so. "Generally, because it is difficult to provide direct evidence of wrongful death damages, the calculation of pecuniary loss 'is a matter resting squarely within the province of the jury.'" *Milczarski v. Walaszek*, 108 A.D.3d 1190, 1190 (4th Dept. 2013) (quoting *Parilis v. Feinstein*, 49 N.Y.2d 984, 985 (1980)).

As defendants' own expert on the law of Israel explained, Israeli law allows recovery for "shortening of life," based on an "intuitive assessment." Dahleh Rep. ¶ 65. Mr. Dahleh added: "The shortening of life expectancy for the deceased has to do basically with the fact that the life has been shortened and, therefore, the deceased lost the enjoyment of life." Dahleh Dep. 140. In

addition, under New York law, "pecuniary loss" for wrongful death "includes loss of income and financial support, loss of household services, loss of parental guidance, as well as funeral expenses and medical expenses incidental to death." *Milczarski*, 108 A.D.3d at 1190.

Where, as here, there is proof of the "age, character and condition of the decedent and the circumstances of his distributees," the case may not be taken from the jury. *Parilis*, 49 N.Y.2d at 985-86. Such evidence is readily available, as defendants are well aware from the depositions of plaintiffs and from the expert reports of economists, Soudry and Weinstein. Plaintiffs' Rule 56.1 Stmt., Part II ¶¶ 368-69 (Gritz), 372-73 (Coulter), 374-75 (Carter), 376 (Goldberg).[18]

## B.    The Court Should Not Dismiss Counts 4 and 5 (Assault and Battery)

Defendants' only basis for seeking dismissal of plaintiffs' assault and battery claims is their theory that such claims are barred by CPLR 215, the one-year New York statute of limitation (relevant under New York's borrowing statute, CPLR 202).[19] They are mistaken.

*First*, CPLR 208 tolled the statute for Jamie Sokolow, Yehonathon Bauer, Joseph Guetta and other plaintiffs who were below 18 when the case was filed. 56.1 Stmt. ¶¶ 159, 179, 102.

---

[18] Defendants also claim an absence of personal representatives. Personal representatives were appointed for the four U.S. decedents. Yalowitz Dec. Exs. D.11-D.14.. Scott Goldberg, a non-U.S. decedent, did not need one. He was a citizen and resident of Israel and died in Israel. Yalowitz Dec. Ex. D.2. (Goldberg Death Certificate); (Shifra Goldberg Dep. 9 (citizen of Israel)). Israel's Civil Wrongs Ordinance provides a right of action for family members to recover damages arising out of a wrongful death of their relative, without appointment of a personal representative. *See* Shnoor Rep. ¶¶ 59-62. "A right of action for wrongful death created by an otherwise applicable foreign statute will ordinarily be enforced in our courts even though the remedy provided therein may differ from the remedy provided by the New York statute." 21A Carmody-Wait 2d § 130:69 (citing *Baldwin v. Powell*, 294 N.Y. 130, 132-33 (1945), *overruled in part on other grounds*, *Farber v. Smolack*, 20 N.Y. 2d 198 (1967)); 37 N.Y. Jur. *Death* § 614 (citing *Baldwin* and *Thomas v. TWA, Inc.*, 46 Misc. 2d 162, 163 (Sup. Ct. N.Y. Co. 1965)).

[19] New York's statute of limitations applies where the Court exercises supplemental jurisdiction. *See Robb Evans & Assocs. LLC v. Sun Am. Life Ins.*, 10 Civ. 5999 (GBD), 2012 WL 488257, at *2 (S.D.N.Y. Feb. 14, 2012). CPLR 202 requires application of the shorter of New York's or Israel's relevant limitations period. The Israeli period is seven years. *Wultz v. Bank of China Ltd.*, 2013 WL 1641179, at *1 (S.D.N.Y. Apr. 16, 2013). Therefore, the only basis for dismissal would be on a shorter New York limitations period.

*Second*, CPLR 213-b set a seven-year period of limitations the Gould, Waldman, Bauer, and Goldberg families, because they were injured by defendants' employees who were convicted of the crimes. 56.1 Stmt., Part II ¶¶ 133-41, 154, 166, 197-98, 205. A "crime victim" may commence an action against a defendant "convicted of a crime" "within seven years of the date of the crime." CPLR 213-b. Section 213-b applies to a victim's cause of action against an employer based upon *respondeat superior*. *Vasquez v. Wood*, 190 Misc. 2d 427, 430-31 (Sup. Ct. Queens Co. 2001); *cf. Alford v. St. Nicholas Holding Corp.*, 218 A.D.2d 622, 622 (1st Dept. 1995) (analogous "statutory language, which requires that the two proceedings be against 'the same defendant,' is broad enough to include persons so related to the criminal defendant as to be vicariously liable for his or her intentional torts") (disagreeing with other Departments).

*Third*, CPLR 207 tolled all limitations for Varda Guetta, because she could not separately obtain jurisdiction over defendants under New York law. Under CPLR 207, the period of limitations does not run while the defendant is outside the State of New York, unless "'jurisdiction may be obtained over an out-of-state defendant through use of the long-arm statute.'" *Salamon v. Friedman*, 11 A.D.3d 700, 701 (2d Dept. 2004) (quoting *Weimer v. Lake*, 268 A.D.2d 741, 742 (3d Dept. 2000)); *see U.S. Fidelity & Guar. Co. v. E.W. Smith Co.*, 46 N.Y.2d 498, 503 (1979) (CPLR 207 applies where "foreign defendant was not in New York either prior to or during the occurrence upon which the cause of action was predicated."); *cf. Schmidt v. Polish People's Republic*, 742 F.2d 67, 71 (2d Cir. 1984). Varda Guetta meets this statute because she did not have an independent statutory basis for personal jurisdiction over defendants until her claim was joined with those of others pursuant to 28 U.S.C. § 1367: there is no CPLR 302 jurisdiction in this case, and she is not a U.S. national with an ATA claim. Since Varda Guetta did not have a basis for acquiring jurisdiction over defendants until other plaintiffs commenced this action,

CPLR 207 preserved her claim.

*Fourth*, equitable estoppel bars defendants from raising statute of limitations defenses against any plaintiff.  "'[W]hen the defendant fraudulently conceals the wrong, the time does not begin running until the plaintiff discovers, or by the exercise of reasonable diligence should have discovered, the cause of action.'"  *Dory v. Ryan*, 999 F.2d 679, 681 (2d Cir. 1993).  To be sure, "'mere silence or failure to disclose the wrongdoing is insufficient.'"  *Ross v. Louise Wise Servs., Inc.*, 8 N.Y.3d 478, 491-92 (2007).  But here, a jury may conclude that defendants' continual "condemnations" of terrorism constituted a fraudulent concealment of their wrongful acts.  56.1 Stmt., Part III, Responses to Defendants' ¶¶ 137-38, 225, 267, 323, 326, 458-62.

As late as September 2002, a respected human rights NGO deemed the PA's role "[o]ne of the most contested questions in the debate about Palestinian suicide attacks on Israeli civilians," in part because "[t]he PA denies having any role in attacks against civilians."  Pls.' Tr. Ex. 492 at 109.  That organization repeatedly said that it would look to the evidence made public in the Marwan Barghouti trial for answers.  *Id.* at 78, 84.  Ultimately, Marwan Barghouti was not convicted until May 2004—after plaintiffs commenced this case.  Pls. Trial Ex. 451.

"Equitable estoppel involves questions of fact" for the jury.  *Farkas v. Farkas*, 168 F.3d 638, 641 n.3 (2d Cir. 1999).  Drawing all inferences in plaintiffs' favor, a jury could reasonably conclude that plaintiffs' forbearance from suit was reasonable in light of defendants' misleading denials of their hidden involvement and public "condemnations" of terrorism.  *See Foothill Capital Corp. v. Grant Thornton, LLP*, 276 A.D.2d 437, 438 (1st Dept. 2000) (forbearance satisfies the reliance element of a fraud cause of action).

### C.    The Court Should Not Dismiss Count 6 (Loss of Consortium and Solatium)

"Israeli courts treat the principle victim's relatives as legitimate plaintiffs, who will re-

ceive compensation if they will prove compensable harm." Shnoor Rep. ¶ 59. Recoverable

damages include both monetary losses and non-pecuniary damages. *Id.* In contrast, New York

law recognizes claims for loss of consortium only for a surviving spouse, *Buckley v. National*

*Freight, Inc.*, 90 N.Y.2d 210, 214 (1997), and not for surviving children or parents. *Sheldon v.*

*PHH Corp.*, 135 F.3d 848, 852 (2d Cir. 1998); *Gilbert v. Stanton Brewery*, 295 N.Y. 270, 273

(1946). In other words, under Israeli law, all family claims are valid, while New York law

would limit recovery for loss of consortium to Mrs. Goldberg. As we explained in our memo-

randum for summary judgment, for loss-allocation rules like limitations on damages, the law of

Israel governs where, as here, defendants seek to invoke a loss-limiting rule unavailable to them

in Israel. *See* Pls. Mot. for S.J. at 489. In *Sheldon*, 135 F.3d at 853-54, the Second Circuit ap-

plied New York law where New York family members sought compensation, but recognized that

a more generous law of a foreign state would apply where domiciliaries of the more generous

state lost a loved one. That is the case here.

### D. The Court Should Not Dismiss the Negligence Claims (Count 7)

Defendants say that the negligence claims should be dismissed because "plaintiffs have

no admissible evidence of any duty of care." Br. 47. The existence of a duty of care is a ques-

tion of law. *Church ex rel. Smith v. Callanan Indus., Inc.*, 99 N.Y.2d 104, 110-11 (2002). More

than a dozen armed "security" officers employed by the PA were convicted of or killed while

directing deadly force against plaintiffs and other civilians. The laws of Israel and New York

both recognize that in utilizing deadly physical force, police officers are held to a duty of care to

take steps not to harm civilians. *See Lubecki v. City of N.Y.*, 304 A.D.2d 224, 233-34 (1st Dept.

2003); *accord* Shnoor Rep. ¶¶ 22-26 (Israeli law). Under both Israeli and New York law, stat-

utes imposing safety obligations also create a duty of care. *Miglino v. Bally Total Fitness of*

*Greater N.Y., Inc.*, 92 A.D.3d 148, 155-57 (2d Dept. 2011) (New York law), *aff'd*, 20 N.Y.3d 342 (2013); *see Wultz*, 755 F. Supp. 2d at 67-73 (Israeli tort law); Shnoor Rep. ¶¶ 38-50 (same).

Defendants also say that there is no admissible evidence of a breach of duty. Br. 47. But cases of police negligence present "sharp factual disputes not amenable to summary dismissal and the jury must determine the issue of liability." *Lubecki*, 304 A.D.2d at 233 (upholding jury verdict for negligent police use of deadly force). Surely the evidence described at length above and in plaintiffs' Rule 56.1 statement would allow a jury to conclude, as the court did in the *Mentin* case, that defendants are liable for acts of terrorism caused by their employees and co-conspirators during the Al-Aqsa Intifada. *See generally* 56.1 Stmt., Part II. Indeed, defendant's own expert on the law of Israel, when given hypotheticals tracking the facts of this case, concluded that the PA would be liable. Dahleh Dep. 64-71.

Finally, defendants invoke the one-year-and-90-day limitation period in CPLR 217-a. They are mistaken. CPLR 217-a applies only to actions accruing after June 15, 2013. N.Y. Laws 2012, c. 500, § 79, amended by N.Y. Laws 2013, c. 24, § 7. In addition, "CPLR 217-a applies only to tort actions against political *subdivisions* of the state (cities, counties, towns and the like) and public authorities and their ilk if a notice of claim is a prerequisite to suit." Vincent C. Alexander, *Practice Commentaries to CPLR 217-a* (McKinney's 2013). These defendants are not political subdivisions or political authorities of New York, so they would not fall within CPLR 217-a even if the cause of action had accrued after June 2013. The ordinary three-year statute of limitations for negligence applies. The only plaintiffs who fall outside that period are Oz and Varda Guetta. Their non-federal claims are not barred for the reasons described above.

**E.    The Court Should Not Dismiss Count 8 (Intentional Infliction of Emotional Distress)**

Israeli law permits recovery by family members who suffer emotional injuries.  Shnoor Rep. ¶¶ 61-62.  So does New York law.  The elements of a claim for intentional infliction of emotional distress are:  "(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress."  *Bender v. City of New York*, 78 F.3d 787, 790 (2d Cir. 1996) (citing *Howell v. New York Post Co.*, 81 N.Y.2d 115, 121 (1993)).  "The tort is as limitless as the human capacity for cruelty."  *Howell*, 81 N.Y.2d at 122.  Defendants incorrectly contend there is a "physical impact" requirement.  Br. 48.  A claim for intentional infliction of emotional distress does not contain such a requirement.  *See, e.g.*, Shnoor Rep. ¶¶ 61-62 (Israeli law); *Leviston v. Jackson*, 43 Misc. 3d 229, 237-39 (Sup. Ct. N.Y. Co. 2013) (summary judgment denied on claim arising from internet posting); *see also Peterson*, 515 F. Supp. 2d at 44 ("claims for intentional infliction of emotional distress may be brought by family members without having to establish a presence requirement" under the law of New York and other states).

Defendants argue for a time bar.  The limitations period for intentional infliction of emotional distress is one year.  *Passucci v. Home Depot, Inc.*, 67 A.D.3d 1470, 1471 (4th Dept. 2009).  As discussed above, plaintiffs' claims are preserved by CPLR 207, 208, 213-b, and equitable estoppel.  *See supra* pp. 43-45.  In addition, the jury could conclude that defendants' conduct was a continuing pattern and practice that tolled the statute through 2004.  *See Neufeld v. Neufeld*, 910 F. Supp. 977, 981-83 (S.D.N.Y. 1996).  The *Neufeld* court reasoned that when intentional infliction of emotional distress takes the form of a continuing pattern and practice, the statute of limitations is tolled until the last outrageous act of the pattern.  Here, this was after January 2004.  *E.g.*, 56.1 Stmt. ¶ 91-98, 320-23, 330-44, 348-49; Eviatar Reb. at 17-18.

Defendants cite authority that public policy gives a "government entity" a defense to claims sounding in infliction of emotional distress.  Br. 48.  Other New York cases, however, permit such claims against government entities.  *E.g.*, *Prince v. Cnty. of Nassau*, 2014 WL 1465379, at *4 (2d Cir. Apr. 16, 2014) (approving jury verdict for intentional infliction of emotional distress); *Wu v. City of New York*, 934 F. Supp. 581, 592 (S.D.N.Y. 1996) ("an intentional infliction of emotional distress claim is viable against the City").  New York's Court of Appeals permits *negligent* infliction claims against government entities.  *Lando v. New York*, 39 N.Y.2d 803, 804-05 (1976).  There is no reason to believe that it would adopt immunity for *intentional* infliction.  And if New York law did adopt such immunity, it would conflict with the law of Israel.  *See* Shnoor Rep. ¶¶ 2-7 (discussing cases holding PA and PLO liable in Israel), 25 ("there is a broad tendency in the Israeli case law to hold public authorities liable for negligence"); Pl. Ex. 948 (*Mentin* case, holding PLO and PA liable); Dahleh Dep. 45 (*defendants'* Israeli law expert: "So sitting here today, the courts of Israel do not recognize any immunity for the PA or the PLO? Is that fair to say?  A. That's true.").  Under the same choice of law rules presented in plaintiffs' affirmative summary judgment brief (regarding capacity), the claim should proceed to the jury.

### F.    The Court Should Not Dismiss Count 9 (Negligent Infliction of Emotional Distress)

Defendants claim that a plaintiff must have been in the "zone of danger" to recover.  Br. 48.  If this were a requirement, a triable issue of fact would exist as to who was in the zone of danger during the Al-Aqsa Intifada, which was intended to coerce and intimidate the entire population of Israel.  *E.g.*, 56.1 Stmt. ¶ 36, 46-49.  *See Colombini v. Westchester Cnty. Healthcare Corp.*, 24 A.D.3d 712, 716 (2d Dept. 2005) (presence in zone of danger is a jury question).

But defendants are incorrect on the law.  There is no "zone of danger" requirement under

48

the law of Israel.  Shnoor Rep. ¶¶ 61-62.  So too under New York law. "There is no requirement

that the plaintiff must be in fear of his or her own physical safety."  *Perry-Rogers v. Obasaju*,

282 A.D.2d 231, 231-32 (1st Dept. 2001).  New York recognizes that a plaintiff has a claim for

negligent infliction of emotional distress—even without fear for his or her own physical safety—

where there is "'an especial likelihood of genuine and serious mental distress, arising

from...special circumstances, which serves as a guarantee that the claim is not spurious.'"  *Baker*

*v. Dorfman*, 239 F.3d 415, 421 (2d Cir. 2000) (quoting *Johnson v. New York*, 37 N.Y.2d 378,

382 (1975)).  Thus, the Court of Appeals permitted the recovery of damages for mental anguish

by a father whose daughter disappeared from a state hospital, and whose body was found 11 days

later.  *Lando*, 39 N.Y.2d at 804-05.  In a terrorism case, there is indeed an "especial likelihood of

genuine and serious mental distress" for family members—such distress is the very aim of the

terrorists.  *Peterson*, 515 F. Supp. 2d at 43-44.  Defendants rely (Br. 48) on *Buckley v. Metro*

*North Commuter R.R.*, 79 F.3d 1337, 1343 (2d Cir. 1996), *rev'd*, 521 U.S. 424 (1997), but that

case was not decided under New York law.

Defendants again invoke the statute of limitations.  In New York, the limitations period

for negligent infliction claims is three years.  *Yong Wen Mo v. Gee Ming Chan*, 17 A.D.3d 356,

358 (2d Dept. 2005); *Augeri v. Roman Catholic Diocese of Brooklyn*, 225 A.D.2d 1105, 1106

(4th Dept. 1996).  The only plaintiffs who fall outside that period are Oz and Varda Guetta.

Their claims are not barred for the reasons described above.

### III.    Defendants May Not Re-Re-Litigate Personal Jurisdiction

Once again, defendants claim that the Court should revisit personal jurisdiction.  Where,

as here, "the moving party seeks solely to relitigate an issue already decided," the court should

adhere to its prior decision.  *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995).  The

courts in this District do not consider decisions denying motions for reconsideration to be start-

ing points for further relitigation of the issues the court already decided.  *See Enzo Biochem, Inc.*

*v. Amersham PLC*, 902 F. Supp. 2d 308, 313 (S.D.N.Y. 2012) (adhering on summary judgment

to court's previous denials of "repeated requests for reconsideration and attempts to relitigate" an

issue).  If the Court were to revisit personal jurisdiction (yet again), it would have to deny the

motion for the reasons in Plaintiffs' Opposition to Defendants' Motion to Reconsider (DE 474).

**CONCLUSION**

     The Court should deny defendants' motion for summary judgment.

Dated:  New York, New York
       June 6, 2014

                        **ARNOLD & PORTER LLP**

                        By:_____

                           Kent A. Yalowitz
                           Philip W. Horton
                           Sara K. Pildis
                           Ken L. Hashimoto
                           Lucy S. McMillan
                           Carmela T. Romeo
                           Tal R. Machnes

                           399 Park Avenue
                           New York, New York  10022
                           Telephone:    (212) 715-1000
                           Facsimile:    (212) 715-1399

                           *kent.yalowitz@aporter.com*
                           *philip.horton@aporter.com*
                           *sara.pildis@aporter.com*
                           *ken.hashimoto@aporter.com*
                           *lucy.mcmillan@aporter.com*
                           *carmela.romeo@aporter.com*
                           *tal.machnes@aporter.com*