REDACTED - PUBLICLY FILED VERSION

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

MARK I. SOKOLOW, *et al.*,

                    Plaintiffs,

        vs.

THE PALESTINE LIBERATION
ORGANIZATION, *et al.*,

                    Defendants.

No. 04 Civ. 00397 (GBD) (RLE)

**PLAINTIFFS' RULE 56.1 RESPONSE**

Arnold & Porter LLP
399 Park Avenue
New York, New York 10022
(212) 715-1000

*Attorneys for Plaintiffs*

June 6, 2014

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................ 1

I.      SUMMARY OF MATERIAL FACTS TO BE TRIED ................................. 1

    A.      The Attacks ....................................................................................... 1

    B.      Liability ............................................................................................. 3

    C.      Injury and Damages .......................................................................... 6

II.     PLAINTIFFS' EVIDENCE SUPPORTING THEIR CONTENTIONS
       CONCERNING THE MATERIAL FACTS AS TO WHICH THERE EXISTS A
       GENUINE ISSUE TO BE TRIED ............................................................... 6

    A.      Defendants Controlled and Funded Fatah and the AAMB's Terrorist
           Activities .......................................................................................... 6

    B.      Defendants Encouraged and Incited Violence through Publications of and
           for the PA's Security Forces and through PA-Controlled Media Outlets
           Directed to the General Public .......................................................... 10

    C.      Defendants Supported, Promoted, and Directly Participated in Terrorism
           by Releasing Known Terrorists From Jail, Failing to Arrest Known
           Terrorists, and ████████████████████████ ....... 18

    D.      Defendants Provided Personnel, Monetary Support, and Weapons to
           Terrorist Organizations ..................................................................... 20

        1.      Defendants Provided Support and Weapons to Hamas During the
               Al-Aqsa Intifada ................................................................. 20

        2.      Defendants Provided Support to AAMB During the Al-Aqsa
               Intifada .............................................................................. 22

    E.      Defendants Supported and Glorified Terrorists through ████████
           ████████ and PA-Controlled Media .................................... 25

    F.      Defendants' Role in the Attacks ....................................................... 27

        1.      Shooting Attack on January 8, 2001 ................................... 27

        2.      Shooting Attack on January 22, 2002 ................................. 30

3.    Bombing on January 27, 2002 ................................................... 37

4.    Bombing on March 21, 2002 ................................................... 40

5.    Bombing on June 19, 2002 ....................................................... 45

6.    Bombing on July 31, 2002 ........................................................ 48

7.    Bombing on January 29, 2004 ................................................. 57

G.    Plaintiffs' Damages .......................................................................... 65

III.    PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT OF FACTS AS TO
WHICH DEFENDANTS CONTEND THERE IS NO GENUINE ISSUE TO BE
TRIED ...................................................................................................................... 71

A.    Defendants' Contentions Concerning Sovereign Immunity ................................. 71

B.    Defendants' Contentions Concerning Their Fourth Affirmative Defense
(Capacity) .............................................................................................................. 77

C.    Defendants' Contentions Concerning Service of Process ..................................... 80

D.    Defendants' Additional Contentions Concerning Their Fourth Affirmative
Defense (Capacity) ................................................................................................ 81

E.    Two Random General Contentions By Defendants ............................................... 83

F.    Defendants' Contentions Concerning Their Personal Jurisdiction Defense ......... 85

G.    Defendants' Contentions Concerning the Guetta Plaintiffs' Claims .................... 99

H.    Defendants' Contentions Concerning the Gould and Waldman Plaintiffs'
Claims ................................................................................................................... 116

I.    Defendants' Contentions Concerning the Sokolow Plaintiffs' Claims ............... 133

J.    Defendants' Contentions Concerning the Bauer Plaintiffs' Claims .................... 141

K.    Defendants' Contentions Concerning the Mandelkorn Plaintiffs' Claims ......... 151

L.    Defendants' Contentions Concerning the Coulter, Carter, Blutstein, and
Gritz Plaintiffs' Claims ....................................................................................... 160

M.    Defendants' Contentions Concerning the Goldberg Plaintiffs' Claims .............. 181

N.    Defendants' Contentions Concerning Plaintiffs' Complaint .............................. 201

# INTRODUCTION

The following Statement, filed under Local Civil Rule 56.1(b), addresses the matters that Defendants contend require summary judgment.

In Part I, Plaintiffs concisely summarize certain material facts as to which there exists a genuine issue to be tried, and which refute Defendants' contentions.  In Part II, Plaintiffs set forth evidence supporting that summary.  Parts I and II are provided solely to demonstrate to the Court the futility of Defendants' motion for summary judgment.  They are not a complete or exhaustive statement of the facts to be tried, nor a list of the issues that must be proved at trial for Plaintiffs to prevail.  In Part III, Plaintiffs respond to Defendants' statement of the material facts as to which Defendants contend there is no genuine issue to be tried.  Again, Part III is limited to demonstrating to the Court the futility of Defendants' motion for summary judgment.  It does not provide all evidence on any particular contested issue of fact, and is without prejudice to plaintiffs' ability to offer admissible evidence at trial on any issue relevant at trial.

All exhibits indicated as "Pls. Tr. Ex. __" refer to Plaintiffs' trial exhibits.

## I.    SUMMARY OF MATERIAL FACTS TO BE TRIED

### A.    The Attacks

1.    On January 8, 2001, Varda and Oz Guetta were attacked with machine guns by Fawzi Murar, a Lieutenant in Defendants' Force 17, and three unidentified coconspirators who were likely members of the Force 17 terrorist cell.  Part II ¶¶ 99-112.

2.    On January 22, 2002, Shayna Gould and Shmuel Waldman were attacked with an assault rifle by Sa'id Ramadan, a Palestinian Authority ("PA") maritime police officer.  Part II ¶¶ 113-20.  Ramadan conspired with others, including (1) Nasser Aweis, a captain in the PA's National Security Force, (2) Ahmed Barghouti, a sergeant in the PA's Civil Police Force, (3)

Majed al-Masri, a captain in the PA's Civil Police Force, (4) Mohammed Mousleh, a former

driver and bodyguard for Marwan Barghouti and an employee of the PA's Legislative Council,

and (5) Ibrahim Abdel Hai, a member of the PA's maritime police force.  Part II ¶¶ 120-57.

3.      On January 27, 2002, Mark, Rena, Lauren, and Jamie Sokolow were attacked by

Wafa Idris, who blew herself up on a crowded street in Jerusalem.  Part II ¶¶ 158-63.  Idris

conspired with others, including Kamal Al Abed (a/k/a "Mohamed Mukhtasab" and "Abu

Talal"), a lieutenant in the PA's Military Intelligence Unit, and members of the PA's General

Intelligence Service ("GIS").  Part II ¶¶ 161-75.

4.      On March 21, 2002, Alan and Yehonathan Bauer were attacked by Mohammed

Hashaika, a PA police officer, who blew himself up on a crowded street in Jerusalem.  Part II

¶¶ 176-80.  Hashaika conspired with others, including PA intelligence officer Abdel Karim

Aweis and the PA employees who released him or ordered his release from prison.  Part II ¶¶

180-213.

5.      On June 19, 2002, Shaul Mandelkorn was attacked by Sa'id Awada, who blew

himself up at a bus stop in the French Hill neighborhood of Jerusalem.  Part II ¶¶ 214-15.

Awada conspired with others, including Naef Abu Sharkh, a member of the PA's GIS and later

its Director of Civilian Personnel in the West Bank.  Part II ¶¶ 216-25.

6.      On July 31, 2002, Hamas operatives detonated a massive bomb in the Frank

Sinatra Cafeteria on the campus of the Hebrew University in Jerusalem, killing nine people,

including Benjamin Blutstein, Diane Carter, Janis Coulter, and David Gritz, and wounding 81

others.  Part II ¶¶ 266-83.  The bombing was one of a string of bombings perpetrated by a

terrorist cell of co-conspirators that included Ahmed Barghouti, Fatah Secretary General Marwan

Barghouti, PA Preventive Security Head Jibril Rajoub, and Hamas operative Abdullah Barghouti (a/k/a "the Engineer"), and others.  Part II ¶¶ 226-98.

7.     On January 29, 2004, Stuart Goldberg and others were attacked by Ali Ja'ara, a sergeant in the PA's Civil Police Force, who blew himself up on a public bus in Jerusalem. Part II ¶¶ 299-300.  Ja'ara conspired with others, including (1) Abdul Rahman Yousef Abdul Rahman Maqdad, a first class sergeant in the PA's Civil Police Force, (3) Ahmed Salah, a warrant officer in the PA's GIS, and (4) Hilmi Hamash, a sergeant in the PA's Civil Police Force.  Part II ¶¶ 300-49.

### B.    Liability

8.     The attacks involved violent acts or acts dangerous to human life.  *E.g.*, Part II ¶¶ 99-105, 114-44, 158-70, 176-98, 214-19, 224-89, 299-319.

9.     The attacks were a violation of criminal laws of the United States or of a State, or would be a criminal violation if committed within the jurisdiction of the United States or any State.  *Id.*

10.    Defendants are responsible for the actions of their employees in perpetrating the attacks under the rule of *respondeat superior* because their employees' conduct was not so unforseeable as to make it unfair to charge the defendants with liability.  *Id.*; *see, e.g.*, Part II ¶¶ 35, 37-48, 55-71, 77-78, 80-89, 91-98, 124-25, 183-86, 188-93, 248-50, 304-05, 316-17 (common pattern).

11.    The attacks resulted from the conscious choice of the PA/PLO, because they were attributable to authorized policymakers, they were done pursuant to PA/PLO policy as reflected in PA/PLO-controlled media outlets, and they were sufficiently widespread and persistent to

support a finding that they constituted a custom, policy, or usage of which supervisors must have

been aware.  *E.g.*, Part II ¶¶ 35-48, 50-62, 64-71, 74-76, 80-89, 91-98.

12.    Defendants breached the duty of care that they owed to Plaintiffs.  *Id.*

13.    Defendants ratified the attacks above by:

a.    harboring wanted terrorists;



b.

c.

d.    and

e.    glorifying the attackers through statements in PA-owned and controlled

media outlets, state-sponsored funerals, and public speeches and other

public acts by PA and PLO officials.

*E.g.*, Part II ¶¶ 61-70, 91-98, 107-09, 145-57, 164-65, 169-75, 199-213, 220-23, 305, 320-23,

326-44.

14.    Defendants provided material support and/or resources to the attackers including

cash, weapons, personnel, and freedom to operate.  *E.g.*, Part II ¶¶ 32-48, 64-71, 73-90, 124-25,

169-70, 183-86, 188-96, 234-37, 248-85, 303-05, 316-17, 325.

15.    Defendants provided material support and/or resources to Hamas and the Al-Aqsa

Martyrs Brigades ("AAMB"), which were designated terrorist organizations, including money,

weapons, and support such as freedom to operate.  *E.g.*, Part II ¶¶ 32-48, 64-71, 73-90.

16.     Defendants harbored wanted terrorists, including Abdel Karim Aweis, Nasser Aweis, Nasser Shawish, and Abdullah Barghouti, each of whom then committed one or more of the acts of international terrorism at issue in this case. *E.g.*, Part II ¶¶ 114-15, 120-25, 183-96, 234-37, 248-53, 266-83.

17.     Actions of the AAMB are attributable to Defendants because of the close and purposeful interconnection among the AAMB, Fatah, the PA, and the PLO. *E.g.*, Part II ¶¶ 28-49.

18.     Defendants' actions, including the attacks, appeared to have been intended to coerce or intimidate the civilian population of Israel or to influence the governments of Israel and the United States through coercion and intimidation. *E.g.*, Part II ¶¶ 36-49, 55-63.

19.     Defendants acted with knowledge or reckless disregard of the potentially deadly consequences of their actions. *See generally infra* Part II.

20.     Defendants' acts were a substantial factor in the sequence of responsible causation of Plaintiffs' injuries, and those injuries were reasonably foreseeable or anticipated as a natural consequence of Defendants' acts. *Id.*

21.     Israel was a dangerous place for civilians during the period January 2002 through January 2004. *Id.*; *see also* Part II ¶¶ 59-60.

22.     Defendants engaged in extreme and outrageous conduct. *Id.*

23.     Defendants intended to cause severe emotional distress. *Id.*; *see also* Part II ¶¶ 36, 49.

24.     Plaintiffs' injuries included severe emotional distress and mental anguish. *E.g.*, Part II ¶¶ 350-76.

25.     Defendants' conduct took the form of a continuing pattern and practice.  *E.g.*, Part II ¶¶ 35-48, 50-62, 64-71, 74-76, 80-89, 91-98.

26.     Defendants fraudulently concealed their responsibility for the Al-Aqsa Intifada by making misleading public condemnations of terrorism and hiding the true facts, which made it reasonable for Plaintiffs to forbear from commencing suit until January 2004.  Part III ¶¶ 137-38, 225, 267, 323, 325-26, 359, 458-62.

### C.     <u>Injury and Damages</u>

27.     Each Plaintiff was injured and suffered damages by reason of one of the attacks. *E.g.*, Part II ¶¶ 350-76.

## II.     PLAINTIFFS' EVIDENCE SUPPORTING THEIR CONTENTIONS CONCERNING THE MATERIAL FACTS AS TO WHICH THERE EXISTS A GENUINE ISSUE TO BE TRIED

### A.     <u>Defendants Controlled and Funded Fatah and the AAMB's Terrorist Activities</u>

28.     The PLO was formed in 1964.  Pls. Tr. Ex. 558 at 5-6 & n.8; *see also* Eviatar Rep. 19-22, 43.  Fatah, also known as the "Palestinian National Liberation Movement," was organized in 1959 around the goal of liberating Palestine through armed struggle, and became the "dominant" element within the PLO in the 1960s "and in effect took it over, up to the point that the two became almost completely identical."  *Id.* at 5; *see also* Eviatar Rep. 19-22, 43.

29.     Yasser Arafat served as the commander of Fatah from 1959 until his death in 2004.  Pls. Tr. Ex. 558 at 5-7; *see also* Eviatar Rep. 19-22, 43.

30.     Yasser Arafat also served as the chairman of the PLO from 1969 until his death in 2004.  *Id.*

31.     The PA was created by the PLO under bilateral agreement with the State of Israel in 1993 and acquired its current powers in the "Interim Agreement on the West Bank and the

Gaza Strip" in 1995.  Pls. Tr. Ex. 532.  In addition to being the commander of Fatah and

chairman of the PLO, Yasser Arafat also served as president of the PA from the date of its

inception until his death in 2004.  Pls. Tr. Ex. 558 at 5-7; *see also* Eviatar Rep. 19-22, 43.

32.    The finances of the PA, the PLO, and Fatah were intertwined.  *See, e.g.*, Al

Sheikh Dep. 140:09-20 ("Fatah and PLO are the same because the Fatah and the PLO budget are

with Arafat."); Fayyad Dep. 76:02-07 ("But money, I mean, in terms of sources of funding, after

the PA came into being, the PLO…ceased to have its own independent sources of

funding…funding for its own operations did come from the PA."), 82:25-83:15 (Fatah received

payments from the Palestinian National Fund ("PNF")); Shaqb'ua Dep. 14:18- 15:03 ("[t]he PA,

through the Ministry of Finance, finances the [PNF] since 1994."), 37:24-38:04 (PA paid for all

PLO expenses inside West Bank and Gaza during relevant timeframe), 45:08-12 (Palestinian

Ministry of Finance is the main source of funding for the PLO); Pls. Tr. Exs. ███173, 553

(showing payments from the PA to Fatah); DE 325 from *Saperstein v. Palestinian Auth.*, Civ.

No. 04-20225 at 18 (it is "a given:  there is a money flow from the PA to the PLO and from the

PLO to Fatah"); Eviatar Rep. 19-22, 43, 80-83.

33.    The PA, the PLO, and Fatah had (and still have) overlapping leadership and

personnel.  *See, e.g.*, Al Sheikh Dep. 146:08-147:03 ("Fatah has employed most of the people in

the PA."); Fayyad Dep. 46:19-47:21 ("The head of the Palestinian National Authority and the

head of the PLO Executive Committee were the same person since the inception of the

Palestinian Authority."); *see also* Eviatar Rep. 19-22, 43; Shrenzel Rep. 16-17.

34.    During the Al-Aqsa Intifada, the central positions in the PA were held by

members of the Fatah party, and the organizational system of the PLO supported the

organizational structure of the PA, and vice versa.  The three organizations each reported to

Arafat who, in "all of [his] capacities [chairman of the PLO, head of Fatah and president of the PA], dominated Palestinian politics" and "epitomized one man rule." Pls. Tr. Ex. 520; *see also* Al Sheikh Dep. 152:06-17; Eviatar Rep. 19-22, 43. According to a study by the RAND Corporation overseen by Defendants' own expert, Professor Robinson, "Arafat retained virtually exclusive control over the Palestinian security forces until his death in November 2004." Pls. Tr. Ex. 521 at 38; Robinson Dep. 49:06-10 (on the RAND study: "I was involved in each of those chapters, including the security one, to put together what I think was a very good final product."); *see also* Pls. Tr. Ex. 520.

35.     At the beginning of the Al-Aqsa Intifada, "Fatah operatives, many of whom were employed in the Palestinian Authority's security apparatus, began to be involved in terrorist activity against Israeli targets." Pls. Tr. Ex. 558 at 8; *see also* Pls. Tr. Ex. 451, Eviatar Rep. 45-50, 74-75.

36.     These attacks appeared to be intended to coerce and intimidate the State of Israel to withdraw from the West Bank and Gaza. *See, e.g.*, Pls. Tr. Ex. 497; *see also* Pls. Tr. Ex. 503 at 20 ("[M]odern suicide terrorism occurs mainly in campaigns of suicide attacks carried out by organized groups for specific political goals and extending over a considerable period of time.").

37.     During the end of 2000, Fatah operatives established the AAMB, "which were intended to serve as the Fatah's military wing for carrying out terrorist attacks against Israel." Pls. Tr. Ex. 558 at 9; *see also* Pls. Tr. Exs. ███████ 60, 228, 317A, 326; *see also* Pls. Tr. Ex. 451 (P 7: 000376-81), Eviatar Rep. 45-50, 74-75. The RAND study overseen by Defendants' own expert, Professor Robinson explained that "[t]he *al-Aqsa Martyrs Brigades* are an armed faction affiliated with Fatah." Pls. Tr. Ex. 521 at 37; *see also* Robinson Dep. 49:06-10.

38.     The AAMB was an integral part of Fatah.  Pls. Tr. Ex. 219; *see also* Pls. Tr. Ex. 451; Eviatar Rep. 45-56, 73-80.

39.     The AAMB was founded by Marwan Barghouti at the direction of Yasser Arafat. Pls. Tr. Ex. 928; *see also* Pls. Tr. Ex. 451 (P 7: 000376-81), Eviatar Rep. 74-75 & n.148.

40.     Fatah's military activity was conducted by the AAMB through two committees, one based in the West Bank and the other in the Gaza Strip.  Pls. Tr. Exs. 451 (P 7: 000376), 558 at 8, Eviatar Rep. 45.

41.     Marwan Barghouti directed the Committee in the West Bank in his role as Secretary General of Fatah, and was also the AAMB leader responsible for all of the "military operations" of Fatah in the West Bank.  Pls. Tr. Ex. 451; *see also* Pls. Tr. Exs. 447; 558 at 8; Eviatar Rep. 74, 77.

42.     Marwan Barghouti reported directly to Arafat.  *Id.*

43.     Marwan Barghouti █████████████████████████████████████████████████ ████████████████████████

44.     According to ███████████████████████████████████████████████ █████████████████  Pls. Tr. Ex. 143; *see also* Pls. Tr. Exs. 220; 451 (P 7:000376-81); 928; Eviatar Rep. 44, 54-55.

45.     Senior terrorism operatives within the AAMB, many of whom were also members of the PA security forces, reported directly to Marwan Barghouti.  Pls. Tr. Ex. 451; *see also* Pls. Tr. Ex. 558 at 9.  These senior operatives included Nasser Aweis, Ahmed Barghouti (Marwan Barghouti's bodyguard and driver, a/k/a "Ahmed Faransi"), and Mohammed Mousleh (a/k/a "Abu Satha"), *see* Pls. Tr. Ex. 451, all of whom were convicted of perpetrating one or more of the Predicate Attacks that caused plaintiffs' injuries.  *See* Part II ¶¶ 133, 135, 141.

46.     During 2000 and 2001, the AAMB focused its attacks on military personnel and civilians in the West Bank.  Pls. Tr. Exs. 558 at 8-9, 559, 616; *see also* Pls. Tr. Exs. 451 (P 7: 405-19), Shrenzel Rep. 74-75, Eviatar Rep. 76-77.

47.     In January 2002, the AAMB altered its approach and began to conduct suicide bombings and shootings directed at civilians within the 1949 borders of the State of Israel.  Pls. Tr. Ex. 558 at 8-9.  In March 2002, the United States designated the AAMB a "Foreign Terrorist Organization and a Specially Designated Global Terrorist Entity."  Pls. Tr. Exs. 537, 620, 622; *see also* Eviatar Rep. 80.

48.     The AAMB "were responsible for about one half (47%) of all the terrorist attacks against Israel carried out by the terrorist organizations, and for a third (33%) of all the fatalities on the Israeli side" during the Al-Aqsa Intifada.  Pls. Tr. Ex. 558 at 10.

49.     The attacks perpetrated by the AAMB and other terrorist groups created "widespread fear among the civilian population—as they were intended to do."  Pls. Tr. Ex. 492 at 1.  Indeed, "[t]he scale and systematic nature of the[] attacks…meet the definition of a crime against humanity."  *Id.* at 2.

**B.      Defendants Encouraged and Incited Violence through Publications of and for the PA's Security Forces and through PA-Controlled Media Outlets Directed to the General Public**

50.     Shortly prior to the start of the Al-Aqsa Intifada, Defendants controlled Palestinian media through tactics such as intimidation, arrests, and even violence.  Marcus Rep. 15-20, Pls. Tr. Ex. 636; *see also* Pls. Tr. Ex. 502 at 89, Robinson Dep. 28-29 (the PA's "state-building" process was characterized by "authoritarianism in decision-making the anti-institutional personalization of power and the pervasiveness of violence in the system").  In response to a study conducted by the Palestinian Human Rights Monitoring Group in November

10

1999, which documented the human rights abuses that Defendants inflicted upon journalists in order to control the Palestinian media during that time period, PA Director General of Press and Publications, Hani al-Masri, stated: "Judging the PNA in general or its policy towards media in Palestine in particular, must set out from its privacy or the factors that affect it, [especially] as the nightmare of the Israeli occupation with its aggressive military policies" continues. Pls. Tr. Ex. 636 at 47. Additionally, Director General al-Masri stated: "The PNA is in most of the cases forced to take measures related to the higher national interest…." *Id.*; *see also* Pls. Tr. Ex. 502 at 1 ("Threats, arrests, and abuse of journalists deemed critical of the Palestinian Authority, the Fatah party, and the Hamas party, have become routine.").

51.     Al-Hayat Al-Jadida is the PA's official daily newspaper. Marcus Rep. 20-21, Pls. Tr. Ex. 636 at 8; *see also* Pls. Tr. Ex. 502 at 75, Marcus. Reb. 19-21. It is partially funded by the PA, and most of the newspaper's employees receive their salaries from the Ministry of Finance. *Id.* It "has been described as the unofficial mouthpiece of the Palestinian National Authority" and "is distributed primarily at the ministries and government organizations…." Ex. 502 at 75. Defendants' own expert, Dr. Lori Allen, admitted during her deposition that it was her understanding that Palestinians regarded Al-Hayat Al-Jadida as being "associated with the Palestinian Authority," as being "reflective of the PA," and as being the "unofficial mouthpiece" of the PA. Allen Dep. 57:17-58:10.

52.     Al-Ayyam, also a daily newspaper, is closely associated with the PA. Pls. Tr. Exs. 502 at 74-75, 636 at 7-8; *see also* Marcus Reb. 19-21. Its editor-in-chief was a former advisor to Arafat. *Id.* at 75.

53.     Palestinian Authority TV ("PA TV") is part of the Palestinian Broadcasting Corporation ("PBC"), which was established by Arafat in 1994. Marcus Rep. 21; Defs.

11

Objections and Resps. to Pls. First Req. for Admissions to Defs. (to the Sokolow Pls.), dated 12/21/12, ¶ 2 (admitting that "the PBC serves as a news agency of the PA"); *see also* Pls. Tr. Exs. 502 at 78, 80-84, 636 at 15-25, 39-45, 638 (describing PBC as a "governmental institution"), Marcus Reb. 19-21.

54.    WAFA Palestine News and Information Agency ("WAFA") is "an official news agency of the PA."  Defs. Objections and Resps. to Pls. First Req. for Admissions to Defs. (to the Sokolow Pls.), dated 12/21/12, ¶ 3; *see also* Marcus Rep. 22, Marcus Reb. 19-21.

55.    Defendants, through the "Political Guidance" apparatus, published a number of daily announcements, weekly publications, and monthly journals directed at the PA national security and police forces during the Al-Aqsa Intifada—including monthly journals titled "Al Shurta," "Al Shuhuda," "Watani," and "Humat al-Areen."  Shrenzel Rep. 12-15.

56.    Defendants encouraged and incited violence by their own national security and police employees through the PA-controlled media outlets noted above during the Al-Aqsa Intifada.  *See* Shrenzel Rep. 12-15; *see, e.g.*, Pls. Tr. Exs. 175-79, 195, 198-204, 935-37, 949, 964-66; *accord* Marcus Rep. 55-62.  Many of these publications include a picture of Arafat on their front page, some even with a uniformed officer saluting him.  *See, e.g.*, Pls. Tr. Exs. 175-76, 202, 935-37, 964-66.  A few examples from these publications, among many more, demonstrate incitement to violence by Defendants:

- "We will defend our land with our blood."  Pls. Tr. Ex. 966 (P 1: 3019) (Humat al-Areen, Oct. 2000).

- "Salutations to our devoted martyrs, who have watered the soil of holy Palestine with their blood; and fervent wishes for a speedy recovery to our intrepid wounded.  May the Intifada continue until the establishment of the Palestinian State, with Jerusalem

as its capital."  Pls. Tr. Ex. 175 (P 1: 1009) (Al Shurta, Nov. 2000; bearing PNA seal and published by the "Palestinian Police Command").

- "I thank you for your brotherly and sincere felicitations on the occasion of the start of the blessed month of Ramadan, which comes upon us, this year, as our Palestinian people are persevering in the glorious Intifada…offering up legions of martyrs, and making the costliest and most precious sacrifice in the cause of realizing their legitimate aspirations of ending the Israeli occupation….I value highly your whole-hearted determination to protect and fortify our national unity…and in achieving clear victory." *Id.* at P 1: 1017 (Letter from Arafat to Chief of Police, dated Dec. 4, 2000).

- In describing a Palestinian killed by the Israeli Army:  "In the course of this total war that the Israeli government is launching against our Palestinian people and its National Authority….[t]his is a crime that by itself suffices to confer the credential of the Gestapo officers of the Nazi era….The soldiers were as far as possible from any image of human beings.  They were like a pack of wolves quite needing the smell of blood, and ripping apart their prey in a repugnant, animalistic manner….[T]his is an event that…is part of a long course of events that started with the killing of Muhammad Al-Durrah…."  Pls. Tr. Ex. 176 (P 1: 1020) (Al Shurta, Feb. 2001).

- Colonel Afif Saleh, Commissioner General of the National Security Force, stated: "[R]evolution is an ongoing sacrifice and the *intifada* is a revolution of living reality, and therefore we are determined to continue the Palestinian *intifada* until the Palestinian people achieve all the legitimate rights to return, self-determination, the establishment of the independent Palestinian state…and the return of the refugees…." Pls. Tr. Ex. 178 (P 1: 1043) (Watani, Feb.-Mar. 2001; bearing PNA seal).

- Similarly, Ahmad Hilas, Political Commissioner General of the border regions, stated:  "[T]he Palestinian people have made up their mind to rid themselves of this humiliating and insulting situation…even if the price is more blood, martyrs, wounded, detainees and prisoners[.]"  *Id.* at P 1: 1043.

- "Their [*i.e.*, the Jews] existence on our land is a crime; the creation of their western state on this very land is a crime; their insinuations are crimes; their smiles—like snake poison—are crimes….Honor is far from those creatures, and is not found in the dictionaries of their language[.]"  *Id.* at P 1: 1046.

- "Blessed are you, who offered a human sacrifice for your beloved Palestine, a human sacrifice to the eyes of precious Jerusalem.  Blessed are you and all your fraternity of martyrs, wounded and prisoners, as this homeland is worth the sacrifice, and justifies the human sacrifice."  *Id.*

- "Occupation is terrorism….As for those who resist this terrorism, they are the strugglers, and they are the fighters who are sacrificing their spirits and their possessions in order to end the oppression that is befalling them."  Pls. Tr. Ex. 198 (P 1: 3038) (Al Shuhada, Sept. 2001; published by the "Political Guidance for the Border-Region Forces").

- "A year has passed since the launch of the blessed Al Aqsa Intifada—a year of martyrdom, heroism, and defiance, and a year of Palestinian pride in confronting the occupation in an escalating mode, and with sacrifice….[W]henever a hero of our people has died a martyr, he has advanced us forward….They are becoming martyrs as a sacrifice for the Palestinian dream, and in compliance with the call of Al Aqsa." *Id.* at P 1: 3041.

14

- "[W]e must continue in the struggle, without relaxation….Glory—all the glory and immortality—to the righteous martyrs.  Shame and disgrace to the coward rulers of these conspiring regimes [*i.e.*, Israel and the U.S.]."  Pls. Tr. Ex. 199 (P 1: 3056) (Al Shuhada, Oct. 2001).

- Muhammad Abu Hajras, Political Commissioner for the Second Border Battalion, stated:  "[O]ur people shall continue the popular struggle and Intifada until achievement of the sought-after and historical goal, which is defeat of the occupation…establishment of an independent state…a return of the refugees…which we have taken on through our historical and continuous struggle…and through waterfalls of blood that the Palestinian people have offered up on a daily basis."  Pls. Tr. Ex. 200 (P 1: 3066) (Al Shuhada, Nov.-Dec. 2001).

- Othman Abu Gharbiya, Deputy Chief of Political and National Guidance Affairs and Political General Commissioner, stated:  "[A] distinction [should be made] between terrorism and resistance to occupation."  Pls. Tr. Ex. 179 (P 1: 1052) (Watani, Dec. 2001).  The publication goes on to state that "[r]esisting occupation is a just war waged by all peoples."  *Id.*

- "Like parasitic diseases, they [the Jews] live off of peoples and their civilizations, and their religion allows them to use every sordid means that other[s'] religious laws would not allow."  Pls. Tr. Ex. 201 (P 1: 3072) (Al Shuhada, Jan. 2002).

- Political Commissioner Muhammad Abu Hajras again stated:  "National unity is the quest, from both the Palestinian and Arab point of view, and the Palestinian people [who are] on the cusp of a new year need to set out soaring toward their convictions,

their choices, their right of return, and their [right to] an independent state…rejecting the occupation…."  Pls. Tr. Ex. 202 (P 1: 3078) (Al Shuhada, Jan. 2003).

57.    Defendants encouraged and incited violence by the general public, in addition to their own national security and police employees, through the PA-controlled media outlets noted above during the Al-Aqsa Intifada.  Marcus Rep. 23-31, 55-62; Marcus Reb. 6-18, 22-28; Shrenzel Rep. 9-11; Eviatar Rep. 62-68; *see, e.g.*, Pls. Tr. Exs. 305, 541-46, 563, 641-47, 649-60, 665-66, 670-72, 674, 685, 686-88, 690, 719, 724, 729, 753-56, 760-61, 792, 794-95, 797-98, 804-07, 809, 934, 1061-63, 1069-70.  A few examples, among many others, suffice here as well:

- "[T]he decisive battle…is coming without a doubt" and will end with the Muslims declaring victory over "the descendants of the monkeys and pigs [*i.e.*, the Jews] and their annihilation."  Pls. Tr. Ex. 646 (Al-Hayat Al-Jadida, May 18, 2001).

- "Blessing upon anyone who has saved a single bullet in order to put it through a Jew's head."  Pls. Tr. Ex. 645 (PA TV, Aug. 3, 2001).

- PA TV also broadcast programs in which children expressed their wish to engage in "shahada" (suicide) because "shahada" is beautiful, *see, e.g.*, Pls. Tr. Ex. 804 (June 9, 2002), and videos in which mothers provided their sons with machine guns and children were otherwise encouraged to take up arms.  *See, e.g.*, Pls. Tr. Exs. 651 (aired repeatedly from October 2002 on), 652 (aired repeatedly from May 2001 on).

- Arafat himself made a speech to a group of children in which he glorified a child killed in conflict with Israel, and led the children in a chant of "a million martyrs marching to Jerusalem."  Pls. Tr. Ex. 807 (PA TV, aired on Aug. 18, 2002 and Aug. 4, 2003).

16

- Al-Hayat Al-Jadida published an imaginary "letter" of a suicide bomber to his mother:  "I fastened determination, hopes and bombs to my body.  I asked [to reach] Allah and the fighting homeland.  The [explosive] belt makes me fly, strengthens me and urges me on….I launched my body, all my pains and oppression, towards the packs of beasts[,] who drink our blood[,] who demolish our homes[,] who burn our crops…."  Pls. Tr. Ex. 660 (Feb. 27, 2003).

58.     Defendants encouraged and incited violence through participating in the publication of the "Intifada Diaries" by the National and Islamic Forces.  *See, e.g.*, Pls. Tr. Exs. 192A-D, 277, 898-914, 916-17.  The following is an example from one such publication from August 12, 2001:  "The battle is open, bloody and fierce and nobody can escape its fire except by engaging in it side by side with our inalienable national rights...."  Pls.' Tr. Ex. 913 (P 1: 2755).

59.     Defendants encouraged and incited violence toward the United States and Americans in PA-controlled media throughout the Al-Aqsa Intifada.  DE 421 at 25-27.  At one Friday Sermon, aired on PA TV on October 13, 2000, a PA cleric called on Palestinians to, "[h]ave no mercy on the Jews anywhere in any country:  'Fight them wherever you are, wherever you meet them—kill them.'  Wherever you are—kill those Jews and those Americans who are like them and those who stand with them.  They are all together against the Arabs and the Muslims."  Pls. Tr. Ex. 644.  Defendants also co-opted symbols of anti-U.S. terrorism in their call to violence.  *See, e.g.*, Pls. Tr. Ex. 1072, 1073.  One political cartoon published in Al-Hayat Al-Jadida, for example, depicts Osama Bin Laden smiling and making a "V for Victory" sign on his right hand—with the "V" depicting the smoking twin towers.  Pls. Tr. Ex. 1072.

60.     As Defendants continued to incite and encourage violence against Americans through their media outlets, their campaign of terrorism in fact succeeded in killing and injuring

17

scores of American citizens.  *See generally* Addicott Rep.  This was the case even though the United States government repeatedly complained to Defendants of American casualties and injuries, thereby putting them on notice that the violence was harming Americans.  *Id.* at 18-27.

61.    Defendants glorified the acts of terrorists, including the terrorists responsible for injuring Plaintiffs, by portraying them as national heroes through state-sponsored funerals and television programs and print media honoring their "sacrifices."  *See* Marcus Rep. 31-51; *see, e.g.*, Part II ¶¶ 109, 148-49, 171, 173-74, 206, 291-92, 298, 315, 323, 330-32, 336, 341-43.

62.    In addition to encouraging and inciting violence, Defendants praised violent attacks after they occurred.  For example, following an attack on the Café Moment in Jerusalem, Ahmad Abd al-Rahman, one of Arafat's advisors and Secretary of the PA Cabinet, confirmed that:  "This is the normal response from the Palestinian resistance for all the Israelis have done in the refugee camps, to Palestinian civilians, women and children….The Israelis have to expect such operations whenever they escalate their military attacks against our civilians."  Pls.' Tr. Ex. 492 at 32-33.

63.    On April 10, 2002, al-Rahman reiterated his position by describing a bus attack as "a natural response to what is taking place in Palestinian camps" (Pls. Tr. Ex. 492 at 37), and in May 2002, he stated that suicide bombings are "the highest form of national struggle.  There is no argument about that."  *Id.*

C.    **Defendants Supported, Promoted, and Directly Participated in Terrorism by Releasing Known Terrorists From Jail, Failing to Arrest Known Terrorists, and** ██████████████████████████████████████

64.    In addition to inciting violence, Defendants caused violence to occur by failing to arrest known terrorists, releasing known terrorists from PA jails, and ████████████████ ██████████████████████████    *See* Pls. Tr. Ex. 492 at 3 ("Arafat and the PA pursued a

policy whereby suspects, when they were detained, were not investigated or prosecuted, but typically were soon let out onto the streets again."); *see, e.g.*, Part II ¶¶ 183-86, 191-93, 234-37, 248-50.

65.    Indeed, "the PA routinely failed to investigate, arrest and prosecute persons believed to be responsible for these attacks, and did not take credible steps to reprimand, discipline, or bring to justice those members of its own security services who, in violation of declared PA policy, participated in such attacks."  Pls. Tr. Ex. 492 at 109.

66.    At least fifteen of the perpetrators of the Predicate Attacks ███████████

██████████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████ 317A (Fawzi Murar), 360-61 (Ibrahim Abdel Hai).

67.    Of those fifteen, ████████████████████████████████

████████████████████ *See, e.g.*, Shrenzel Rep. 31, 46, 52, 59-60, 65, 67-68, 70; *see also* Pls. Tr. Ex. 129.

68.    A number of the perpetrators of the Predicate Attacks were arrested and prematurely released by the PA, including Abdullah Barghouti, Abdel Karim Aweis, Nasser Shawish, and Mohammed Hashaika.  *See, e.g.*, Part II ¶¶ 183-86, 191-93, 234-37, 248-50.

69.    As of November 21, 2012, there were at least ninety-seven members of the PA police forces serving time in Israeli prisons for security crimes.  Pls. Tr. Ex. 276.  The highest-ranking individual in Israeli prison, Majed al-Masri, was convicted for one of the Predicate Attacks that injured Plaintiffs here.  *Id.*; Pls. Tr. Ex. 384.

70.     These individuals were employed, ███████████████████████

███  *See, e.g.*, Pls. Tr. Ex. 36B ██████.  And, as conceded by Defendants' own expert,

Professor Glenn Robinson, Arafat "maintained a firm grip on the authority's security forces until

his dying day."  Pls. Tr. Ex. 520; *see also* Pls. Tr. Ex. 521 at 38 (RAND Corporation Study

overseen by Glenn Robinson stating that "Yasser Arafat retained virtually exclusive control over

the Palestinian security forces until his death in November 2004."); Robinson Dep. 49:06-10.

71.     During a broadcast on official PA TV, Ashraf Ajami stated:  "Without a doubt

[t]he master of the [armed] resistance is the *shahid* martyr, Yasir Arafat....The largest number of

prisoners are from the security forces.  They are the ones who bore arms and carried out the

greatest and most important operations against the Israeli occupation…."  Pls. Tr. Ex. 725.

Additionally, Mutawakkil Taha, a senior PA/PLO official, stated that PA security forces carried

out most of the attacks during the Al-Aqsa Intifada.  Pls. Tr. Ex. 939.

**D.      Defendants Provided Personnel, Monetary Support, and Weapons to Terrorist Organizations**

**1.      Defendants Provided Support and Weapons to Hamas During the Al-Aqsa Intifada**

72.     Hamas was designated as a terrorist organization in the 1990s.  Pls. Tr. Ex. 620;

U.S. Dep't of State, FTOs, *available at* http://www.state.gov/j/ct/rls/other/des/123085.htm.

73.     In the fall of 2000, the PA released many known Hamas terrorists at the request of

Hamas, including terrorists who had committed suicide bombing attacks in the 1990s, from PA

jail.  *See, e.g.*, Pls. Tr. Ex. 218.

74.     The PA security forces aided, protected, and hid Hamas leaders and operatives

during the Al-Aqsa Intifada.  *See, e.g.*, Pls. Tr. Exs. 217, 235.

75.     Defendants set aside their on-again-off-again political rivalry with Hamas and developed a "unified front."  Fatah and Hamas coordinated their activities via the "National and Islamic Forces" steering committee, as reflected in the pro-terrorism polemics that they published jointly.  Eviatar Rep. 7-18, 16.  "The PA, PLO, Fatah, and Hamas [had] a shared interest in carrying out terrorist attacks and, accordingly, display[ed] a great deal of inter-organizational cooperation and coordination."  *Id.*

76.     Hamas continued to carry out suicide bombings and shooting attacks targeting civilians during the Al-Aqsa Intifada; and the PA both failed to detain, and prematurely released, known Hamas operatives throughout this time.  *See, e.g.*, Eviatar Rep. 40; Part II ¶¶ 234-37, 248-50.

77.     Jibril Rajoub, the head of the PA's Preventive Security Forces, released Abdullah Barghouti (a/k/a "the Engineer"), the terrorist responsible for making the bomb that killed fifteen civilians at a Sbarro Restaurant in Jerusalem, into the custody of Fatah leader Marwan Barghouti, after only a few short weeks in prison.  Jibril Rajoub reported directly to Arafat.  *See, e.g.*, Al Sheikh Dep. 29:20-22, Eviatar Rep. 11-12; *see* Part II ¶¶ 248.

78.     Ahmed Barghouti, a member of the PA police force and a senior AAMB official, provided Abdullah Barghouti with a safe house for months after he was released from custody, and Marwan Barghouti provided him with monetary support.  *See, e.g.*, Pls. Tr. Exs. 250B, 359; *see also* Part II ¶¶ 250-52.

79.     Within weeks of his release, Abdullah Barghouti renewed his bomb-making activities, including making the explosive device that killed nine civilians, including four of the family members of the Plaintiffs in this case, in the Frank Sinatra Cafeteria of the Hebrew University in July 2002.  *See* Part II ¶¶ 253-85.

## 2.    Defendants Provided Support to AAMB During the Al-Aqsa Intifada

80.     Many of the individuals who perpetrated terrorist attacks on behalf of the AAMB were members of the PA's police and security forces.  Pls. Tr. Ex. 276.

81.     Several of the most senior terrorism operatives in the AAMB, including ███



████████████████████████████████████████████████████████████

████████████████████████████ *see also* Pls. Tr. Ex. 451.

82.     At least ten of the individuals convicted of the Predicate Attacks in this case ███

███████████████████████████████ *E.g.*, Pls. Tr. Exs. 131 ████████████,

133 ███████, 135 ████████████ 136 ████████, 140 ████████, 143

████████████, 146 ████████, 159 ████████████, 167 ████████████.



(*E.g.*, Pls. Tr. Exs. 17, 19, 23, 60), ████████████ and Fawzi Murar (*E.g.*, Pls. Tr.

Exs. ██317A, 326).  Of these individuals, ████████████████████████

████████████████████████████████████████████

████████████████████████████████317A (Fawzi Murar).

83.     Defendants provided financial support, which was used to fund terror, to the AAMB and its members.  According to a Human Rights Watch report relied on by Defendants' experts, the fact that "Arafat and other senior PA officials, as well as many rank-and-file Fatah members, ha[d] overlapping identities as employees or officials of the PA, on the one hand, and as members of Fatah on the other…appears to have facilitated the use of PA resources to fund Fatah activities directly and indirectly, including payments to individual al-Aqsa Brigades activists."  Pls. Tr. Ex. 492 at 95; *see, e.g.*, Pls. Tr. Ex. 496 (PLOCCA Report stating that "[d]ocuments seized by the Israeli Defense Forces during incursions into Palestinian-controlled

areas in March and April show direct payments from the PA to Fatah party activists, some of whom were also affiliated with the Al-Aqsa Martyrs Brigade, who had been involved in violence.  The payments were likely made with the knowledge that the intended recipients had been involved in violence and terrorism."), 631, Eviatar Rep. 58-60.

84.    In September 2001, senior Fatah member Hussein Al Sheikh sent a letter to Arafat requesting that Arafat make payments to AAMB members, including Ra'ed al Karmi.  Arafat signed the letter and authorized payment of $600 to each of them.  Pls. Tr. Ex. 539; Al Sheikh Dep. 203:16-204:03, 205:15-209:19 (testifying that the handwriting on the request for payment to Ra'ed al Karmi is his handwriting and Arafat's handwriting); *see also* Pls. Tr. Ex. 631 at 13.  In addition, on July 1, 2002, Arafat authorized payment of $350 to twelve individuals involved in violent attacks.  Pls. Tr. Ex. 539.  Similarly, on July 9, 2002, Arafat signed a letter authorizing the disbursement of payments to Fatah activists, including AAMB commanders.  Pls. Tr. Ex. 539.  And, in November 2003, the BBC reported that "[a] total of up to $50,000 a month is being sent to members of the al-Aqsa Martyrs' Brigades."  Pls. Tr. Exs. 517, 539.

85.    In early 2002, Arafat signed a check for then-fugitive Nasser Shawish, who later carried out the January 22, 2002 shooting at issue in this case.  Shawish had submitted his request for money to Mohamed Halawa, who forwarded it to Marwan Barghouti.  Barghouti submitted the request to Arafat, who approved it.  Pls. Tr. Ex. 1113.

86.    In general, Defendants provided monetary support to AAMB members through Marwan Barghouti.  "[T]errorism operatives from the al-Aqsa Martyrs Brigades directed their requests for financial assistance for the purchase of weapons and the perpetration of terrorist attacks to [Marwan Barghouti], who would subsequently approach the chairman of the Palestinian Authority and leader of the Fatah, Yasser Arafat, in their name and on their

behalf." Pls. Tr. Ex. 451 (P 7: 000377); *see also* Pls. Tr. Ex. 492 at 83 ("Barghouti functioned as a patron on behalf of several al-Aqsa Brigades groups, referring requests for individual financial assistance to Yassir Arafat.").

87.     Fuad Hejazi Shubaki, the head of the PA's Finance Office and a senior member of Fatah, assisted in the provision of funds to the AAMB. Pls. Tr. Exs. 15, 889. According to Shubaki's Israeli court conviction, Shubaki would receive a request for money from Marwan Barghouti for the purpose of acquiring weapons for, and paying salaries to, members of the AAMB; he would then forward the request to Arafat and, at Arafat's direction, pay the money from the PA's Ministry of Finance. Pls. Tr. Ex. 889 at 46; *see also* Pls. Tr. Ex. 631 at 4 ("Arafat distributes, through the PA 'Finance Ministry' and via Fuad Shubaki, large sums of money for the funding of the terror infrastructures.").

88.     Defendants supplied AAMB members with weapons and other material for carrying out terrorist attacks. For example, according to Shubaki, in the early days of the Al-Aqsa Intifada Arafat gave an instruction to Shubaki, as head of the PA's Finance Office, and to the heads of the PA security organizations, to purchase weapons from any possible place, Pls. Tr. Ex. 889 at 1, and, in response, "each of the security organizations purchased material in large quantities and [Shubaki] approved the payment. All of the al-Aqsa Martyrs organizations used the weapons which were supplied by the security forces which carried out the massive procurement." *Id.* at 43. "Yasser Arafat gave an instruction that all of the weapons would be purchased by the Palestinian Authority…so that he himself would be able to control everything that happened. In this way, Yasser Arafat would be able to control the strength of the intifada." *Id.* at 43.

89.     Defendants made public statements in support of the AAMB's terrorist operations and adopted the AAMB as their own.  For example, in March 2002, Jibril Rajoub stated:  "The Aqsa Brigades are the noblest phenomenon in the history of Fatah, because they restored the movement's honor and bolstered the political and security echelon of the Palestinian Authority."  Pls. Tr. Exs. 492 at 37; 624.  In 2004, Rajoub stated that "[t]he Al-Aqsa Martyrs Brigades is part of Fatah."  Pls. Tr. Ex. 509.  Prime Minister Ahmed Qurei reiterated this sentiment in 2004 when he told the press that "[t]he Al-Aqsa Martyrs Brigades, military wing of the Fat[a]h movement will not be dissolved and Fat[a]h will never relinquish its military wing."  Pls. Tr. Exs. 507-08.

90.     

Pls. Tr. Exs. 17 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, 157 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, 317A (Murar martyr file; same).

**E.     Defendants Supported and Glorified Terrorists through ▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮, and PA-Controlled Media**

91.     Defendants provided, and continue to provide, the families of "martyrs" with monthly payments through the PA's and PLO's Institute for the Care of the Families of Martyrs and the Wounded.  According to the World Bank, "[t]he program is clearly not targeted to the poorest households," and "the level of resources devoted to the Fund for Martyrs and the Injured does not seem justified from a welfare or fiscal perspective.  In 2005, for example, the Fund is estimated to have commanded nearly the same level of resources as the entire [Special Hardship Case Program, the main public social assistance program]."  Pls. Tr. Ex. 206 at 170; *see also id*. at 165, Eviatar Rep. 25-27.

92.     Defendants, through the PA's Ministry of Detainees' Affairs, provide financial incentives to "security prisoners," *i.e.*, individuals convicted of terrorist acts who are in jail in Israel. Eviatar Rep. 27-38. The Ministry provides canteen payments to the convicted while they are in jail, and monthly stipends to their families. *See* Pls. Tr. Exs. 241, 512.

93.     Pursuant to the Palestinian Law for Prisoners and Released Prisoners, passed in 2004, as well as the implementing regulations, all prisoners "who [are] kept in prisons of the occupation for offenses of *participating in the struggle against the occupation*," are entitled to financial incentives in the form of a monthly salary, an opportunity for education, and employment upon their release, among other things. Pls. Tr. Ex. 512 (emphasis added); *see also* Eviatar Rep. 28-30.

94.     The PA increases a prisoner's salary based upon the number of years he has been in prison. Pls. Tr. Ex. 512, Art. 20; *see also* Eviatar Rep. 28-30. According to the World Bank, "[d]uring 2005 monthly expenditures for these benefits averaged about NIS 10.3 million ($2.3 million), or NIS 1,710 ($380) per detainee family. Average benefits are therefore nearly 90 percent of the poverty line, making this the most generous PA program. It is also the most expensive social protection program, and is second only to public pensions in terms of the resources devoted." Pls. Tr. Ex. 206 at 170.

95.     Under the Prisoners' Law, prisoners who have "served a sentence of five years' imprisonment or more as a result of [their] struggle against the occupation" are guaranteed a position in the PA government following their release. Pls. Tr. Ex. 512, Eviatar Rep. 34-36.

96.     The PA budget for payments to families of martyrs and security prisoners is approximately NIS 44 million per month, or 6% of the PA budget. Eviatar Rep. 26.

97.    "These two programs alone absorbed more than 1 percent of GDP in 2004, and may have accounted for as much as 1.3 percent in 2005.  Yet collectively they provide benefits to fewer than 20,000 families."  Pls. Tr. Ex. 206 at 170.

98.    ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████    *E.g.*, Part II ¶¶ 145, 204, 321, 338.  For example, ███████

████████████████████████████████████████████████████

*See, e.g.*, Pls. Tr. Exs. 36D, 76 (02:009303), 91, 112, 122, 896 ████████, 36C (02:008964), 105,

110, 113 ████████; *see also* Shrenzel Rep. 18-30.

### F.    Defendants' Role in the Attacks

#### 1.    Shooting Attack on January 8, 2001

99.    After the AAMB was established in late 2000, members of the PA security forces, and, in particular, members of Force 17—the commando unit responsible for protecting Arafat— engaged in shooting attacks on Israeli Defense Forces ("IDF") personnel and Israeli civilians in the West Bank.  *See, e.g.*, Pls. Tr. Exs. 558 at 8, 559, 616; *see also* Shrenzel Rep. 74-75, Eviatar Rep. 74-77.

100.    Members of the PA security forces, including senior terrorist operatives Ahmed Barghouti and Mohammed Mousleh, participated in these attacks.  *E.g.*, Shrenzel Rep. 74-75, Pls. Tr. Exs. 250B, 418-19.

101.    On January 8, 2001, four armed men with machine guns fired on Plaintiffs Varda Guetta and her then minor son Oz on a road at Givon Junction, outside of Jerusalem.  Pls. Tr. Ex. 325, V. Guetta Dep. (03/18/07; Arab Bank) 07:23-09:10, V. Guetta Dep. (06/27/12) 27:17-23, 29:25-30:03, V. Guetta Dep. (05/07/13) 273:23-274:02, 297:22-23, Shrenzel Rep. 73-74.

102.    Oz Guetta's date of birth is ████████ 1998.  O. Guetta Dep. 09:19-23.  He was twelve years old at the time of the attack and fifteen years old when this lawsuit was filed.

103.    Although three of the attackers remain unidentified, Varda Guetta identified the fourth attacker as Fawzi Murar.  E-mail from Tolchin to Hibey (02/19/13); *see also* Pls. Tr. Ex. 334 (photo array, picture "I").

104.    Fawzi Murar was a member of Force 17 and worked with others in the commando unit to execute a string of terror attacks between October 2000 and February 2002.  Pls. Tr. Exs. 317A, 326, 1109; *see also* Shrenzel Rep. 76-77.

105.    Perpetrators involved in these other attacks confirmed Fawzi Murar's involvement in attacks similar to the January 8 shooting by the Force 17 terror cell during this same time period and in the same geographic area.  *See, e.g.*, Pls. Tr. Exs. 317C, 327, 329, 331, 335; *see also* Shrenzel Rep. 76-77.

106.    Fawzi Murar was killed alongside another Force 17 member in March 2002 during armed hostilities.  Pls. Tr. Exs. 317A, 326, 1109; *see also* Shrenzel Rep. 76-77.

107.    Defendants, through the PA's and PLO's Institute for the Care of the Families of Martyrs and the Wounded, granted Fawzi Murar the official status of a "martyr" of the al-Aqsa Intifada, and made payments to his family.  Pls. Tr. Exs. 317A, 326; Shrenzel Rep. 76-77.

108.    Fawzi Murar's martyr file also identifies him as a lieutenant in Force 17 and as a "prominent activist[] in the Intifada and in the Al Aqsa Martyrs Brigades," and notes that the AAMB is "the military wing of the Fatah movement."  *Id.*

109.    Following Fawzi Murar's death, Marwan Barghouti eulogized him:  "[A]llow me to express our deep sorrow over the martyrdom of the heroic commander, Mohamad Abu Halawah, and his comrades, Fawzi and Amar….[O]ur people [are] bidding farewell to a leader

and founder of the al-Aqsa Martyrs Brigades, one of the knights of Force 17 and the Fatah movement, one of the outstanding fighters who carried out acts of bravery that shook the Israeli army and the Israeli settlers.  This is a cowardly, treacherous action, to which [we] will react[.]" Pls. Tr. Ex. 196; *see also* Pls. Tr. Ex. 1109.

110.    Varda Guetta's identification of Fawzi Murar resulted from a photo array of fifteen pictures provided to her by her counsel in February 2013.  Letter from Yalowitz to Judge Ellis (06/13/13); *see also* V. Guetta Dep. (05/07/13) 390:08-395-08, E-mail from Weiser to Hill (05/03/13) (enclosing photo array), Pls. Tr. Ex. 334 (photo array).

111.    During her depositions in this, and other cases, Varda Guetta testified that she was physically present during the January 8, 2001 shooting attack on her and her son, and that she observed—with her own eyes—the four men carrying out the attack.  *See, e.g.*, V. Guetta Dep. (03/18/07; Arab Bank) 23:25-24:03 ("Q:  And your best recollection is that there were four gunmen, is that right?  A:  Yes."), V. Guetta Dep. (06/27/12) 29:25-30:13 ("Q:  Were you able to see the people inside the car?  A:  I saw four of them, yes.  Q:  Did you recognize any of them?  A:  One—I think, yes.  I can see one. *** Q:  How did you recognize this person?  A:  Because I saw the face, and I—I can see the face every time that I close my eyes."), V. Guetta Dep. (05/07/13) 370:05-07 ("A:  …There were two at the window and two who came in back of them.  There were four of them at two windows.").

112.    Varda Guetta also described the shooter that she recognized as having "a mustache, he was dark skin, and he smiled.  He shot and smiled."  V. Guetta Dep. (06/27/12) 31:23-32:07; *see also* V. Guetta Dep. (05/07/13) 365:25-366:17 ("[U]ntil my dying day, I won't forget him….[T]hat's something that's engraved in me for eternity.").

2.     **Shooting Attack on January 22, 2002**

113.     On December 16, 2001, after the Al-Aqsa Intifada had been in full force for over a year, Arafat, under enormous pressure from Israel and the United States, declared a ceasefire. Pls. Tr. Exs. 30, 174 (07:000003).

114.     During this same month, United States peace envoy Anthony Zinni presented Arafat with a list of thirty-three terrorists most wanted by Israel and requested that the PA arrest these individuals.  Pls. Tr. Ex. 354.

115.     This list included Nasser Aweis— ███████████████████████ ████████ and close associate of Marwan Barghouti.  *Id.*; *see also* Pls. Tr. Exs. ████ 451 (P 7:000382-84), Shrenzel Rep. 20-21, 25-26, Eviatar Rep. 84-88.

116.     On January 14, 2002, Israeli military forces killed Ra'ed al Karmi, an AAMB leader and close associate of Marwan Barghouti, in a military action.  The very next day, the Washington Post published an Op-Ed, by Barghouti, titled "Want Security? End the Occupation."  Pls. Tr. Ex. 497.

117.     In the Op-Ed (Part II ¶ 116), Marwan Barghouti asserted that Israel would obtain security only if it withdrew from the West Bank and the Gaza Strip.  *Id.*

118.     A week later, the AAMB issued a statement "that 'if Israel doesn't lift the siege on Arafat within 24 hours, we will perpetrate another suicide attack within a day.'"  Pls. Tr. Ex. 395.

119.     On January 22, 2002, less than one week after Marwan Barghouti's Op-Ed (Part II ¶¶ 116-17), and the day after the AAMB warning (Part II ¶ 118), the AAMB executed a shooting attack on a busy street in West Jerusalem.  The attack killed two women and injured forty-five other civilians, including Plaintiffs Shayna Gould and Shmuel Waldman.  *See, e.g.*,

30

Pls. Tr. Exs. 250B (P 11-8: 199), 250C (P 11-8: 201), 364 (P 5: 282), S. Gould Dep. 16:05-08, S. Waldman Dep. 199:21-200:02; *see also* Shrenzel Rep. 18-38.

120.    The perpetrators of the January 22, 2002 attack included no fewer than six ███████████████████████████████████ including senior members of AAMB and close associates of Marwan Barghouti:

    a.  Nasser Aweis, ████████████████████████████ (Pls. Tr. Exs. ████████████████ 364 (P 5: 281));

    b.  Ahmed Barghouti, ███████████████████████ (Pls. Tr. Exs. ████████ 359 (P 5: 212-13));

    c.  Majed al-Masri, ███████████████████████ (Pls. Tr. Ex. ████████ 584 (P 6: 14));

    d.  Mohamed Mousleh, ███████████████████████ ███████████████████████████████ (Pls. Tr. Exs. ████████ 418 (P 6: 54-56), 419-20);[1]

    e.  Ibrahim Abdel Hai, an officer in the PA's Maritime Police Force (Pls. Tr. Exs. 360-61); and

    f.  Sa'id Ramadan, ███████████████████████ (Pls. Tr. Exs. 36A, 60, 62, 89).

*See also* Pls. Tr. Ex. 451 (discussing Nasser Aweis, Ahmed Barghouti, and Mohammed Mousleh), Shrenzel Rep. 18-38.

---

[1] According to his statement to the Israeli Police on February 25, 2002, Mohammed Mousleh also served in the PA's Preventive Security Service with pay.  Pls. Tr. Ex. 421.

121.    Nasser Aweis was the commander of AAMB in the Nablus and Northern Samaria area, and "was directly subordinate to Marwan Barghouti, the head of the Tanzim organization in the Judea and Samaria area, who was subordinate to the Chairman of the Palestinian Authority, Yasser Arafat."  Pls. Tr. Ex. 364 (P 5: 281); *see also* Pls. Tr. Ex. 451 (P 7:000382-84), Shrenzel Rep. 18-27, Eviatar Rep. 84-88.

122.    ███████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████████ Pls. Tr. Ex. 140 (02:009919).

123.    Nasser Aweis was involved in a number of other terror attacks, including a shooting and grenade attack at a catering hall in Hadera on January 17, 2002 during a Bat Mitzvah, and a similar attack at a Seafood Market restaurant in Tel Aviv on March 5, 2002.  Pls. Tr. Exs. 355, 362, 365; *see also* Pls. Tr. Ex. 451 (P 7:000382-84; 409-11; 413-14), Shrenzel Rep. 24-25, Eviatar Rep. 84-88.

124.    Nasser Aweis ████████████████████████████████████
████████████████ (Pls. Tr. Ex. 76 (02:009302)), █████████████████████
(*id.* at 02:009297, 9301).  Shrenzel Rep. 20, 24, Eviatar Rep. 84-88.

125.    █████████████████████████████████ (Part II ¶ 122) ██
████████████████████████████████████████████████████████
████████████████ Pls. Tr. Exs. 91, 112; *see also* Shrenzel Rep. 20, 24.

126.    Ahmed Barghouti was the head of the AAMB in the Ramallah area (Pls. Tr. Ex. 250B (P 11-8: 198)), and served "from 1996 until his arrest, as the driver and bodyguard of Marwan Barghouti" (Pls. Tr. Ex. 359 (P 5: 213)).  *See also* Pls. Tr. Ex. 451 (P 7:000385-88), Shrenzel Rep. 18-22, 27-30.

127.    As his driver and bodyguard, Ahmed Barghouti "became the right-hand man of [Marwan Barghouti], had close ties with the heads of the Al Aqsa Martyrs Brigades…and also served as the contact man between them and Marwan Barghouti."  Pls. Tr. Ex. 359 (P 5: 213); *see also* Pls. Tr. Exs. 250B (P 11-8: 198), 451 (P 7:000385-88), Shrenzel Rep. 18-22, 27-30.

128.    Ahmed Barghouti was involved in a number of terror attacks, including the March 5, 2002 attack at a Seafood Market restaurant in Tel Aviv (*see* Part II ¶ 123).  Pls. Tr. Exs. 357-59, 616; *see also* Pls. Tr. Ex. 451 (P 7:000385-88, 413-14), Shrenzel Rep. 28.

129.    With respect to the January 22, 2002 attack at issue in this case, a few days after the death of Ra'ed Karmi, Ahmed Barghouti called Nasser Aweis and requested personnel for a terrorist attack.  Pls. Tr. Exs. 359 (P 5: 213), 362 (P 5: 265-66); *see also* Shrenzel Rep. 18-38.

130.    In response to Ahmed Barghouti's request for personnel to carry out a terrorist attack, Nasser Aweis sent Sa'id Ramadan to Barghouti in Ramallah.  *Id.*

131.    Once Ramadan arrived in Ramallah, Ahmed Barghouti provided Sa'id Ramadan with weapons and ammunition for the attack, and arranged for his transportation into Jerusalem so that he could carry out the shooting attack.  *Id.*

132.    After receiving assistance from Ahmed Barghouti and others, Sa'id Ramadan opened fire on civilians on a crowded street in the middle of Jerusalem on January 22, 2002.  *Id.*

133.    Ahmed Barghouti pled guilty to the charges against him and was sentenced to thirteen terms of life imprisonment.  Pls. Tr. Ex. 359 (P 5: 217).

134.    In his last statement to the court, Ahmed Barghouti stated:  "I say that Sharon must be given a death sentence in this Court.  I have no regrets."  Pls. Tr. Ex. 359 (P 5: 211).

135.    Nasser Aweis also confessed to his role in the attack and was sentenced to fourteen terms of life imprisonment.  Pls. Tr. Ex. 364 (P 5: 287).

136. Just before Nasser Aweis's arrest in the spring of 2002, and after the United States designated the AAMB as a Foreign Terrorist Organization ("FTO") (Pls. Tr. Exs. 537, 620, 622), he told the press that the FTO designation was "a medal of honor that we wear on our chests." Pls. Tr. Ex. 623.

137. Majed al-Masri was also convicted for his role in the January 22, 2002 attack. Pls. Tr. Ex. 384.

138. For his part, Majed al-Masri "received the suicide terrorist [*i.e.*, Sa'id Ramadan] in an apartment in the Balata Camp and[ ] filmed him holding a rifle and a book of the Koran…." *Id.* (P 6: 28); *see also* Shrenzel Rep. 18-22, 30-34.

139. Majed Al-Masri then dispatched Sa'id Ramadan to carry out the shooting. *Id.* (P 6: 28); *see also* Shrenzel Rep. 18-22, 30-34.

140. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████ Pls. Tr. Ex. 127.

141. Mohammed Mousleh, also convicted for his role, was Ahmed Barghouti's right-hand man in preparing Sa'id Ramadan for this attack, including, among other things, ensuring that Ramadan was supplied with everything that he needed—such as food, clothing, weapons, and transportation. Pls. Tr. Exs. 418 (P 6: 54-56), 419-20; *see also* Shrenzel Rep. 18-22, 34-37.

142. In addition to the January 22 shooting attack, Mohammed Mousleh was involved in a number of other terror attacks. Pls. Tr. Exs. 255, 418-20, 616; *see also* Pls. Tr. Ex. 451 (P 7:000388), Shrenzel Rep. 35-36.

143. Ibrahim Abdel Hai introduced Sa'id Ramadan to Nasser Aweis, who in turn, introduced Sa'id Ramadan to Ahmed Barghouti. Pls. Tr. Exs. 360 (P 5: 222), 361.

34

144.    Ibrahim Abdel Hai also assisted in preparing Sa'id Ramadan for the attack, including, among other things, providing him with transportation to meet with the other perpetrators involved in this attack, and taking him to visit his family one last time before the shooting. *Id.*

145.    Following the attack, █████████████████████████



a.    ███████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

███████████████████████████    *See, e.g.*, Pls. Tr. Exs. 36D, 76 (02:009303), 91, 112, 122, 896

██████ ; Exs. 36C (02:008964), 105, 110, 113 ████████ ; *see also*

Shrenzel Rep. 18-30.

b.    ██████████████████████████

███████████████████████████████    Pls. Tr. Ex. 36C

(02:008965-66); *see also* Shrenzel Rep. 29.

c.    ██████████████████████████

███████████████████████████████

██████████████████████████████

██████████████████████████████

████████████████████████    *See, e.g.*, Pls. Tr. Exs. 75 (02:009292), 109, 118

██████ ; Exs. 36B, 106, 115 (02:009549), 121, 126 ████████ .

d. ███████████████████████████████

████ Pls. Tr. Ex. 123.

146. █████████████████████████████████████████

█████████████████████████████████████████████

███████████ Pls. Tr. Exs. 76 (02:009304; ████), 96 (02:009495; █████); *see also*

Shrenzel Rep. 22, 33-34.

147. █████████████████████████████████████████

█████████████████████ Pls. Tr. Exs. 140 (02:009919; ████), 142 (02:009925;

████████).

148. Defendants also honored perpetrators of this attack through PA media. *See, e.g.*,

Pls. Tr. Exs. 56-57, 236, 396, 399, 706, 715-16; *see also* Marcus Rep. 50-51.

149. Defendants published *on their own website* the names and ranks of Ahmed

Barghouti and Majed al-Masri on a list of PA security employees who are in prison for killing

civilians. Pls. Tr. Ex. 276.

150. ████████████████████████████████████

██████████████████████████████████ Pls. Tr. Exs. 36A, 60.

151. ██████████████████████████████████████

████████████████████████ Pls. Tr. Ex. 60 (02:009053).

152. ███████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████ *Id.* (02:009051).

153. ████████████████████████████████████

█████████████████████████████████████████████



Pls. Tr. Ex. 153.

154.    Other individuals convicted for their roles in the January 22, 2002 attack include Feras Ghanem (*see, e.g.*, Pls. Tr. Exs. 386, 388, 390B) and Mohammed Sami Abdullah (*see, e.g.*, Pls. Tr. Exs. 422, 424-25).

155.    Specifically, Feras Ghanem and Mohammed Sami Abdullah assisted in transporting Ramadan into Jerusalem for the purpose of carrying out the January 22, 2002 shooting attack.  *See, e.g.*, Pls. Exs. 386, 388, 390B, 422, 424-25, Shrenzel Rep. 37.

156.    ████████████████████████████████████████ Pls. Tr. Exs. 136, 146.

157.    Defendants ██████████████████████████████████████████████████████████████████████████████████████████████████████████████

*See, e.g.*, Pls. Tr. Exs. 36E, 37, 85, 117 (██████); Exs. 38, 66 (██████); *see also* Shrenzel Rep. 37.

### 3.    Bombing on January 27, 2002

158.    Five days after the January 22, 2002 attack planned by Ahmed Barghouti and Nasser Aweis, and less than two weeks after Marwan Barghouti's Op-Ed in the Washington Post, the AAMB executed another attack against civilians in Jerusalem, this time a suicide bombing that killed one person and injured over 150 others, including Mark, Rena, Lauren and Jamie Sokolow.  *See, e.g.*, Pls. Tr. Exs. 321-23, 473-76 (forensic report on suicide bomber's

death and related pictures), 477 (crime scene forensic report), 630 at 229-30, M. Sokolow Dep. 37:07-15, R. Sokolow Dep. 41:07-18; *see also* Shrenzel Rep. 38-44.

159.    Jamie Sokolow's date of birth is ███████1989.  J. Sokolow Dep. 06:09.  She was thirteen years old at the time of the attack and fifteen years old when this lawsuit was filed.

160.    ████████████████████████████████████████████

████████████████████████  Pls. Tr. Ex. 17 (02:006762); *see also* Shrenzel Rep. 41.

161.    The bombing was planned by Kamal Al Abed (a/k/a "Mohamed Mukhtasab" and "Abu Talal"), a senior PA official from the PA's Military Intelligence unit.  Pls. Tr. Exs. 321 (P 3: 32), 322 (P 3: 41), 323 (P 3: 44), 465, 467, 880-83; *see also* Shrenzel Rep. 38-44.

162.    Abu Talal asked another individual, Munzar Noor, to send him a woman to carry out a suicide bombing attack.  *Id.*

163.    Abu Talal also provided the bomb and instructions for carrying out the bombing, and, thereafter, Wafa Idris executed the attack.  Pls. Tr. Exs. 321 (P 3: 33), 465, 467; *see also* Shrenzel Rep. 38-44.

164.    At the time of the attack, ██████████████████████████

████████████████████████

165.    ██████████████████████████████████  Pls. Tr. Ex. 897.

166.    For his role in the bombing, Munzar Noor was convicted of murder and is serving a life sentence.  Pls. Tr. Exs. 321, 324; *see also* Shrenzel Rep. 43.

167.    Although Abu Talal was not apprehended, the Israeli court deciding Munzar Noor's case stated the following concerning Abu Talal's role in the terror attack:

> In January 2002, there met with the Defendant [Noor] a person known as Abu Talal [Al Abed], who was a senior operative in the Palestinian Authority's Military Intelligence.  Abu Talal [Al Abed] informed the

Defendant that he intended to send a woman to carry out a suicide
terrorist attack in Israeli territory.  Abu Talal [Al Abed] asked the
Defendant to persuade his female friend, Wafa Idris, to carry out the
terrorist attack, and the Defendant agreed to do so.

Pls. Tr. Ex. 323 (P 3: 44); *see also* Pls. Tr. Ex. 465 (P 8: 102) ("In the home of Abu Talal, we sat

down, Abu Talal and Wafa Idris and I, and we talked about the subject; I mean a suicide attack

[by Idris].").

168.     Wafa Idris and Munzar Noor, both Fatah operatives, also served as confidential

informants for the PA's Military Intelligence Unit.  Pls. Tr. Exs. 321, 465, 467; *see also* Shrenzel

Rep. 38-44.

169.     Numerous senior officials in the PA's GIS had knowledge of Wafa Idris's identity

as the bomber before the medics or the press identified her.  On the day of the bombing—before

any group took responsibly and before Idris's identity was released to the media—Tawfiq

Tirawi, the head of the PA's GIS, contacted Idris's family and asked them not to announce that

she had been the bomber.  Pls. Tr. Exs. 233 (PA Preventive Security letter reporting on Tirawi's

request), 880-83 (Defendants' interrogatory responses providing information about handwriting

on Pls. Tr. Ex. 233); *see also* Shrenzel Rep. 38.

170.     

Pls. Tr. Ex. 137

; *see also* Pls. Tr. Ex. 1032 (same).

171.     After the attack took place, Defendants celebrated and glorified Wafa Idris.  *See,*
*e.g.*, Pl. Tr. Exs. 472, 682-88, 690-97; *see also* Marcus Rep. 39-45, Shrenzel Rep. 40-42.

172. ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████ Pls. Tr. Ex.

17 (02:006764); *see also* Shrenzel Rep. 40-42.

173. Marwan Barghouti attended Idris's funeral, held on January 31, 2002, and told the press that "the Fatah movement has not changed its strategy. This is a clear strategy based primarily on continuation of the struggle against the Israeli occupation, which bears full responsibility for the Zionist terror policy going on against our people, in many and varied unending ways." Pls. Tr. Ex. 196; *see also* Shrenzel Rep. 38.

174. Marwan Barghouti visited Idris's family shortly after the attack, and told the press that Israel had "provok[ed] [the] violence by killing a leader of Al Aqsa Brigades in Tulkarm, on the West Bank, on Jan. 14 with a hidden bomb." Pls. Tr. Ex. 491.



175. ████████████████████████ For example, ███████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████ Pls. Tr. Exs. 18, 26, 322, 324; *see also* Shrenzel Rep. 42-44.

### 4. <u>Bombing on March 21, 2002</u>

176. In March 2002, Marwan Barghouti told the press: "Our people have resorted to resistance because we have reached an impasse. The more the Israelis tighten the blockades around us and increase the killing, the more there will be a response." Pls. Tr. Ex. 492 at 33.

177. On March 21, 2002, the AAMB claimed responsibility for a suicide bombing that killed three people and injured eighty-one others on King George Street in Jerusalem. Pls. Tr.

Exs. 374, 492 at 30-31, 377 (P 5: 46-47), 630 at 207-08; *see also* Shrenzel Rep. 45-56, Eviatar Rep. 69-73.

178.    Alan and Yehonathan Bauer were among the injured.  A. Bauer Dep. 08:10-15.

179.    Yehonathan Bauer's date of birth is ████████ 1995.  Y. Bauer Dep. 09:06.  He was seven years old at the time of the attack and nine years old when this lawsuit was filed.

180.    The suicide bomber, Mohammed Hashaika, █████████████████████ officer.  Pls. Tr. Exs. ███████ *see also* Shrenzel Rep. 54-56, Eviatar Rep. 70.

181.    █████████████████████████████████████████████████ █████████████████████████ *See, e.g.*, Pls. Tr. Exs. 14, 90, 95 (02:009457); *see also* Shrenzel Rep. 54-56.

182.    ████████████████████████████████████ ████████████████████████████████████ █████████████████████████ *Compare* Pls. Tr. Exs. 14, 90 *with* Pls. Tr. Ex. 95 (02:009457); *see also* Shrenzel Rep. 54-56.

183.    On February 10, 2002, Mohammed Hashaika was arrested by the PA police—along with Nasser Shawish (another terrorist involved in carrying out the March 21 bombing, discussed below)—because he "wanted to perpetrate a suicide operation."  Pls. Tr. Ex. 1060; *see also* Pls. Tr. Ex. 353. Shrenzel Rep. 45-51, 54-56, Eviatar Rep. 69-70.

184.    PA President Yasser Arafat was personally informed of the arrest.  Pls. Tr. Ex. 1060.  Specifically, the GIS document concerning this arrest states that Mohammed Hashaika and Nasser Shawish had been arrested by the PA, that Hashaika "wanted to perpetrate a suicide operation," for which Shawish had "recruited…[and] equipped him," that the two were being interrogated, and that "[t]he matter is at your Excellency's [*i.e.*, Arafat's] discretion."  *Id.*

41

185.    After transferring Mohammed Hashaika to Ramallah, the PA released him from prison just a few weeks later.  Pls. Tr. Ex. 353; *see also* Pls. Tr. Ex. 377 (P 5: 46-47), Shrenzel Rep. 47-48, Eviatar Rep. 69-70.

186.    ███████████████████████████████████████████████

███████████████████████████████████████████████

████████  Pls. Tr. Ex. 148 (02:009953).

187.    The March 21, 2002 attack was planned by Abdel Karim Aweis, ██████████

███████████████████████ and a senior member of AAMB.  *See, e.g.*, Pls. Tr. Exs.

█365, 371, 377; *see also* Shrenzel Rep. 45-58, Eviatar Rep. 69-73, 83-84, 86-88.

188.    In 1991, Abdel Karim Aweis was convicted of murder for killing a Palestinian whom he suspected of being an informant.  Pls. Tr. Ex. 377 (P 5: 48); *see also* Shrenzel Rep. 46; Eviatar Rep. 86.

189.    Although convicted, Abdel Karim Aweis was released in connection with peace talks with the Palestinians.  *Id.*

190.    █████████████████████████████████████████████

Shrenzel Rep. 46-51; *see also* Pls. Tr. Exs. 2, 58.

191.    In addition, Abdel Karim Aweis was one of the thirty-three terrorists wanted by Israel contained on the Zinni List provided to Arafat in December 2001.  Pls. Tr. Ex. 354; *see also* Shrenzel Rep. 46-51; Eviatar Rep. 83-84, 86-88.

192.    Although Palestinian security services did arrest Abdel Karim Aweis in December 2001, the PA released him shortly thereafter.  Pls. Tr. Exs. 354; 365; *see also* Shrenzel Rep. 46-51, Eviatar Rep. 83-84, 86-88.

193.    Prior to planning the March 21, 2002 attack at issue here, Abdel Karim Aweis was involved in a number of other attacks against Israeli civilians and soldiers, including an attempted suicide bombing earlier in March 2002, in which Aweis conspired with Ahmed Barghouti.  *See, e.g.*, Pls. Tr. Exs. 359 (P 5: 214), 377 (P 5: 46).

194.    The day before the March 21, 2002 attack took place, Abdel Karim Aweis met with Marwan Barghouti and informed him of the plan for the suicide bombing.  Pls. Tr. Ex. 377 (P 5: 46); *see also* Shrenzel Rep. 45, Eviatar Rep. 72.

195.    Marwan Barghouti provided Abdel Karim Aweis with money for the attack.  *Id.*

196.    Abdel Karim Aweis was subsequently provided with additional money, and two grenades, by Hassan Al Sheikh, the Secretary General of Fatah in the West Bank.  *Id.*

197.    Abdel Karim Aweis admitted to his role in the attack in open court and stated:  "I confessed before the Court with respect to what I confessed, and I do not regret it."  Pls. Tr. Ex. 371.

198.    In his last statement to the Court, Abdel Karim Aweis said:  "I am proud of the acts that I have committed and there is a just reason for my having done them….If I could have murdered more Jews, I would not hesitate."  Pls. Tr. Ex. 376 (P 5: 43).

199.    Following the attack, ███████████████████████████ ████████████████████████████████████████████ ████████████████████████████ Pls. Tr. Exs. 23-24; *see also* Shrenzel Rep. 54-56.

200.    ████████████████████████████████████ ████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████████████ *Id.*

201.    ███████████████████████████████████████████

██████ Pls. Tr. Exs. 23 (02:007316), 24 (02:007319).

202.    ███████████████████████████████████████

█████████████████████████████████████████████████████

*See, e.g.*, Pls. Tr. Exs. 23, 93; *see also* Shrenzel Rep. 54-56.

203.    ███████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████ Pls. Tr. Ex. 148 (02:009953).

204.    ███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████ *See, e.g.*, Pls. Tr. Exs. 58, 103; *see also* Shrenzel Rep. 46-51.

205.    Other individuals convicted for their roles in the March 21, 2002 attack include

Nasser Shawish, who received financial support for terror attacks directly from Arafat (*see, e.g.*,

Pls. Tr. Exs. 246-47, 367, 919, 1113), Kahira Sa'adi (*see, e.g.*, Pls. Tr. Exs. 346, 349-50); and

Sana'a Shehadeh (*see, e.g.*, Pls. Tr. Ex. 342B-C, 345-46).

206.    Defendants honored Nasser Shawish, Kahira Sa'adi, and Sana'a Shehadeh

through PA media.  *See, e.g.*, Pls. Tr. Exs. 352, 368-70, 372-73, 561, 602-04, 706-14; *see also*

Marcus Rep. 48-50.

207.    █████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████ Pls. Tr. Exs. 157, 167.

208.    In court, Nasser Shawish also stated the following:  "I was the organizer of five suicide terrorist attacks, and it is an honor for me to defend my people….I do not regret my actions.  I don't recognize the authority of the Court, I was kidnapped from the areas of the [Palestinian] Authority.  I was in the Palestinian Intelligence."  Pls. Tr. Ex. 246 (P 11-3: 229).

209.    ███████████████████████████████████████████████████ ███████████████████████████████ Pls. Tr. Ex. 83 (02:009327).

210.    ██████████████████████████████████████████ ████████████████████████████████ Pls. Tr. Ex. 154 (02:009970).

211.    ████████████████████████████████████████████ ████████████████████████████ *Id.* (02:009971).

212.    ██████████████████████████████████████████████ ████████████ *Id.*

213.    █████████████████████████████████████████ ███████████████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████ *See, e.g.*, Pls. Tr. Exs. 52, 83 (██████); Exs. 53, 64 (████████); Exs. 54, 63 (██████); *see also* Shrenzel Rep. 51-56.



### 5.    <u>Bombing on June 19, 2002</u>

214.    Throughout the spring of 2002, AAMB took responsibility for additional attacks, including a June 19, 2002 suicide bombing at a bus stop in the French Hill neighborhood of

Jerusalem that killed seven people and injured thirty-five others, including Shaul Mandelkorn.

Pls. Tr. Exs. 338, 630 at 161-62, S. Mandelkorn Dep. 16:07-09; *see also* Shrenzel Rep. 56-58.

215. ███████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████ Pls. Tr. Ex. 139.

216.    Awada did not act alone.  Naef Abu Sharkh, ████████████████

████████████████████████████████ was also involved.  (Abu Sharkh was killed

during a military operation in 2004.)  *See, e.g.*, Pls. Tr. Exs. ██████336, 339, ████954; *see also*

Shrenzel Rep. 56-58.

217. ███████████████████████████████████████████

██████████████████████████████████ Pls. Tr. Exs. 155

(02:009973), 169 (02:010193, 95).

218.    Other evidence implicates Mazen Freitakh, ███████████████████ who

was killed during a military operation in 2003.  *See, e.g.*, Pls. Tr. Exs. 45, 92, 337, 340; *see also*

Shrenzel Rep. 56-58.

219. ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████ Pls. Tr. Ex. 145 (02:009942).

220.    Within weeks of the attack, ████████████████████████████

████████████████████████████████████ Pls. Tr. Exs. 16, 19

(02:006830), 21; *see also* Shrenzel Rep. 57.

221. 

*See, e.g.*, Pls. Tr. Exs. 16, 21; *see also* Shrenzel Rep. 57.

222.

Pls. Tr. Ex. 19 (02:0068727); *see also* Shrenzel Rep. 57.

223.

Pls. Tr. Ex. 19 (02:006834) (emphasis added); *see also* Shrenzel Rep. 57.

224.    As discussed in Part II ¶¶ 80-90, Defendants provided monetary support, as well as other forms of support, to AAMB.  Arafat authorized the payment of $20,000 to AAMB around the time of the June 19, 2002 attack, and Abu Sharkh distributed funds to terrorist operatives on account of their terrorist activities.  *See* Shrenzel Rep. 57 & n.252-53; *see also* Pls. Tr. Ex. 606.

225.    An Israeli Ministry of Foreign Affairs  report, Pls. Tr. Ex. 339, sets forth the following factual findings from a legally authorized investigation that was conducted by the Israeli Security Agency, the IDF, and Israel's Attorney General's Office:  (1) that Abu Sharkh was a "senior fugitive of the Tanzim infrastructure in Nablus….who was behind the…19 June 2002 suicide bombing…at the French Hill intersection in northern Jerusalem," and (2) that, as a result of his participation in the June 19, 2002 bombing, as well as other terrorist activity, his bank account had been seized by the IDF and Israeli police forces during an operation aimed at confiscating terror funds.

47

6.      **Bombing on July 31, 2002**

226.    On August 9, 2001, a suicide bomber killed fifteen people and injured over 130 others in a crowded Sbarro Restaurant in downtown Jerusalem (the "Sbarro bombing").  Pls. Tr. Exs. 426 (P 7: 101, 103), 427 (P 7: 125-26), 464 (P 7: 8), 492 at 142; *see also* Eviatar Rep. 4.

227.    Hamas took responsibility for the attack.  *Id.*

228.    The person who manufactured this bomb, Abdullah Barghouti, also known as "the Engineer," was a chief Hamas bomb maker during the Al-Aqsa Intifada and known by all to be extremely dangerous.  Pls. Tr. Ex. 464 (P 7: 7); *see also* Pls. Tr. Exs. 427-30, 432, Eviatar Rep. 8-13.

229.    Initially, Abdullah Barghouti attempted to join AAMB; however, through a relative of his named Bilal Barghouti, he joined the Az A-Din Al Qassam Brigades of Hamas in May 2001.  Pls. Tr. Ex. 427 (P 7: 117); *see also* Pls. Tr. Ex. 464 (P 7: 7), Eviatar Rep. 8-9.

230.    Abdullah Barghouti was trained by an expert Hamas bomb maker named Aiman Halawa.  Pls. Tr. Exs. 426 (P 7 101-02), 427 (P 7: 118-20).

231.    Aiman Halawa taught Abdullah Barghouti to manufacture, among other things, Um al Abed explosive devices, hand grenades, explosive belts, drink can bombs, and even poison from potatoes.  Pls. Tr. Ex. 427 (P 7: 118-19) ("Um al Abed" is literally translated as "Mother of Satan."  It is acetone peroxide, an unstable chemical compound favored by terrorists for use in homemade bombs.)

232.    During this time period, Abdullah Barghouti set up a laboratory for manufacturing explosive devices in a storeroom located in an area of Ramallah called Beit Rima, and he received bomb making materials and weapons from Halawa.  Pls. Tr. Ex. 427 (P 7: 120-21).

233.    Abdullah Barghouti made bombs for other attacks, in addition to the Sbarro bombing, from the Beit Rima laboratory.  *See, e.g.*, Pls. Tr. Exs. 426 (P 7: 102-03), 427 (P 7: 121-26).

234.    Prior to the Sbarro bombing, the PA was warned by Israel that Abdullah Barghouti—"the Engineer"—was planning a suicide attack and that the government of Israel was calling for his arrest.  Pls.' Tr. Ex. 464 (P 7: 7); *see also* Pls. Tr. Ex. 436, Eviatar Rep. 6-7, 9.

235.    Defendants admitted the following:  "The PA was notified by Israel and/or the United States between September 1, 2000 and July 31, 2002 to detain or arrest Abdullah Barghouti."  Defs.' Objections and Resps. to Pls. First Req. for Admissions to Defs. (to the Sokolow Pls.), dated 12/21/12, ¶ 42.

236.    The United States similarly called for Abdullah Barghouti's arrest following the Sbarro bombing.  Eviatar Rep. 6; *see also* Pls. Tr. Ex. 957.

237.    On the same day as the Sbarro bombing, and far too late to prevent the mass casualties that resulted, Jibril Rajoub, the head of the PA Preventive Security Force in the West Bank, arrested Abdullah Barghouti.  Pls. Tr. Ex. 427 (P 7: 126), M. Yousef Dep. 112:03-17; *see also* Eviatar Rep. 6, 9-10, Pls. Tr. Ex. 957.

238.    Abdullah Barghouti was arrested along with Bilal Barghouti.  Pls. Tr. Ex. 427 (P 7: 126); *see also* Pls. Tr. Ex. 957 (Shaked Interview), M. Yousef Dep. 106:09-107:24, Eviatar Rep. 8.

239.    In his statement to the Israeli police on March 12, 2003, Abdullah Barghouti explained that after he had been arrested, he directed PA authorities to his laboratory in Beit Rima, where he had stored both prepared explosive devices and raw materials for manufacturing such devices.  Pls. Tr. Ex. 427 (P 7: 124-25); *see also* Eviatar Rep. 10.

240.    However, PA authorities seized only the prepared devices and left the bomb making materials behind (such as a large quantity of $H_20_2$, an ingredient for use in making acetone peroxide).  *Id.*

241.    PA authorities also did not interrogate Abdullah Barghouti; instead, officials asked him "only questions."  Pls. Tr. Ex. 427 (P 7: 126); *see also* Eviatar Rep. 10-11.

242.    During this period of detention, both Marwan Barghouti and Ahmed Barghouti were permitted to, and did, visit Abdullah Barghouti on a number of occasions.  Pls. Tr. Ex. 427 (P 7: 127).[2]

243.    During their visits to Abdullah Barghouti, Marwan Barghouti brought him clothes and arranged, through Ahmed Barghouti, for his wife to visit.  Pls. Tr. Ex. 427 (P 7: 127).

244.    Marwan Barghouti also visited Abdullah Barghouti with Hassan Yousef, a Hamas leader.  Pls. Tr. Ex. 1111; *see also* Eviatar Rep. 12.

245.    During this visit, a PA Preventive Security Officer, named Abu Ali Tarifi, gave Abdullah Barghouti a mobile phone, which he used to contact Aiman Halawa.  *Id.*

246.    Through this call, Abdullah Barghouti told Halawa that "[t]he tomatoes are spoiled" and that he had to come to Ramallah to take them; this was code for weapons that Aiman Halawa had delivered and which were not working properly.  *Id.*

247.    Following his release from PA custody, Abdullah Barghouti stated that he spoke with Aiman Halawa, who informed him that he understood the coded message and the faulty weapons had been picked up.  Pls. Tr. Ex. 1111; *see also* Eviatar Rep. 12.

---

[2] Ahmed Barghouti is also known as Ahmed Faransi and Ahmed al-Franzi.  *See, e.g.*, Pls. Tr. Ex. 451 (P 7: 000385), Eviatar Rep. 12.

248.    On August 27, 2001, Abu Ali Mustafa, the head of the Popular Front for the Liberation of Palestine, was killed by Israeli forces during a military action.  On the same day, Jibril Rajoub personally released Abdullah Barghouti, after less than three weeks in custody, to Marwan Barghouti.  Pls. Tr. Exs. 427 (P 7: 127), 957 (Abdullah Barghouti states that he was detained for approximately three weeks by the PA); *see also* Pls. Tr. Ex. 359 (P 5: 214), Eviatar Rep. 6, 10-11, M. Yousef Dep. 104:04-108:03, 113:02-115:07.

249.    Abdullah Barghouti was subsequently provided with a safe house, materials for bomb making, and weapons by Marwan Barghouti and Ahmed Barghouti.  Pls. Tr. Exs. 359 (P 5: 214), 427 (P 7: 127-28), 428 (P 7: 131-32), 431, 452 (P 7: 39, P 7: 46), Eviatar Rep. 12.

250.    Ahmed Barghouti acted "with the knowledge, blessing and assistance of his commander, Marwan Barghouti."  Pls. Tr. Ex. 359 (P 5: 214); *see also* Eviatar Rep. 12.

251.    Ahmed Barghouti was convicted of sheltering and aiding Abdullah Barghouti by providing him with a safe house and weapons.  Pls. Tr. Exs. 357 (P 5: 202), 358, 359 (P 5: 214); *see also* Eviatar Rep. 12.

252.    Marwan Barghouti also provided Abdullah Barghouti with financial assistance during this time.  Pls. Tr. Exs. 426 (P 7: 101), 428 (P 7: 144), 464 (P 7: 7); *see also* M. Yousef Dep. 114:19-115:07; 116:05-09, Eviatar Rep. 11.

253.    As soon as Abdullah Barghouti was released from PA jail, he restarted his bomb making activities.  Pls. Tr. Exs. 426, 427 (P 7: 127-30), 428, 464; *see also* Eviatar Rep. 11-12.

254.    In November 2001 alone, Abdullah Barghouti manufactured three explosive devices intended for terrorist attacks and provided them to Hamas operatives.  Pls. Tr. Exs. 426 (P 7: 104-05), 427 (P 7: 128), 429 (P 7: 148-49), 464 (P 7: 9).

255.    On December 1, 2001, Hamas operatives used the three explosive devices to carry out three different attacks against civilians.  *Id.*  Ten people were killed and 191 others were injured in the three attacks.  *Id.*

256.    At the request of Marwan Barghouti, Abdullah Barghouti made two additional explosive devices at the end of 2001, intended for attacks against Israeli security forces.  Pls. Tr. Exs. 426 (P 7: 105), 427 (P 7: 128-29), 464 (P 7: 9).

257.    After learning that IDF forces would not be entering Ramallah in the immediate future, Marwan Barghouti asked Abdullah Barghouti to hold onto the bombs.  Pls. Tr. Ex. 427 (P 7: 129).

258.    A Hamas operative—acting on behalf of Ibrahim Hamed (a Hamas leader, also known as "Salah 1")—took the bombs that Abdullah Barghouti had built for Marwan Barghouti from Abdullah Barghouti's laboratory.  *Id.* (P 7: 127-29).

259.    This was also not the only time Marwan Barghouti asked for explosives from Hamas operatives.  *See* Pls. Tr. Ex. 12 (aide to Marwan Barghouti asked Mosab Hassan Yousef, son of Hamas leader Sheikh Hassan Yousef, for explosives for suicide bombers); *see also* M. Yousef Dep. 08:04-19.

260.    Shortly after Abdullah Barghouti built bombs for Marwan Barghouti (Part II ¶¶ 256-57), Ibrahim Hamed approached him about working together to perpetrate a string of terror attacks.  Pls. Tr. Exs. 427 (P 7 129-30), 428.

261.    Abdullah Barghouti agreed, and went on to both manufacture bombs and teach others to do the same at the instruction of Hamed.  *Id.*

262.     Abdullah Barghouti often communicated with "Salah 2"—Sid Abed Karim Khader Sheikh-Qassam—who was one of Ibrahim Hamed's middlemen.  *See* Pls. Tr. Exs. 427 (P 7: 130), 428, 429.

263.     Between December 2001 and March 2002, Abdullah Barghouti manufactured at least seven additional explosive devices and provided them to Hamas operatives.  Pls. Tr. Exs. 426 (P 7: 105), 428 (P 7: 139-40), 464 (P 7: 9).

264.     In March 2002, at the request of a Hamas operative, Abdullah Barghouti manufactured a suicide belt and provided it to members of Hamas.  Pls. Tr. Exs. 426 (P 7: 105-06), 428 (P 7: 140-42), 464 (P 7: 10); *see also* Pls. Tr. Ex. 427.  This suicide belt was used in an attack at the Moment Café in Jerusalem on March 9, 2002, killing ten people and injuring sixty-five others.  *Id.*

265.     Throughout the spring and summer of 2002, Abdullah Barghouti continued to manufacture and provide explosive devices to Hamas, resulting in, among other attacks, a suicide bombing on May 7, 2002, which killed fifteen people and injured fifty-nine others, as well as two separate bombings of railway tracks, which injured five people.  Pls. Tr. Exs. 426 (P 7: 106-07), 428 (P 7: 141-42), 464 (P 7: 10-11).

266.     In July 2002, Ibrahim Hamed (Salah 1) requested that Abdullah Barghouti manufacture an explosive device that would be concealed in a bag.  Pls. Tr. Exs. 426 (P 7: 108), 428 (P 7: 142), 429 (P 7: 149), 431, 452 (P 7: 57), 464 (P 7: 11).

267.     In response to Ibrahim Hamed's request for a bomb (Part II ¶ 266), Abdullah Barghouti built one and even filled the bag with iron nuts in order to increase the destructive power of the device.  *Id.*  He also prepared a wireless activation mechanism.  *Id.*

268.    Abdullah Barghouti then delivered the bomb and activation device to Salah 2, who, in turn, delivered the bomb to Salah 1.  Pls. Tr. Exs. 431, 452 (P 7: 57).

269.    After receiving the bomb from Salah 2 (Part II ¶ 268), Salah 1 instructed Mohamed Arman, a Hamas operative in what came to be known as the "Silwan" cell, to find a place to carry out a terror attack.  Pls. Tr. Exs. 431, 433 (P 7: 3), 452 (P 7: 57).

270.    Mohamed Arman was enlisted into the Az A-Din Al Qassam Brigades by Ibrahim Hamed in late 2001.  Pls. Tr. Ex. 433 (P 7:1).

271.    Mohamed Arman was tasked with enlisting others into the organization, and was the contact person between Ibrahim Hamed and other members of the "Silwan" cell.  *Id.*

272.    Mohamed Arman was, in other words, "the right hand man of Ibrahim Hamed." *Id.*

273.    Another member of this cell, enlisted by Mohamed Arman, was Walid Anjas.  *Id.*

274.    Together, Mohamed Arman and Walid Anjas executed a string of terror attacks, along with Ibrahim Hamed and Abdullah Barghouti.  *Id.*

275.    After receiving instructions to find a location to carry out a terrorist attack from Salah 1 (Part II ¶ 269), Mohamed Arman in turn contacted Wael Qassam, another member of the Silwan cell, and asked him to find a location for an attack.  Pls. Tr. Exs. 431, 433 (P 7: 3), 452 (P 7: 57).

276.    Upon learning that Walid Anjas had found a location for the attack—Hebrew University—Salah 1 delivered the bomb and activation device to Mohamed Arman.  Pls. Tr. Exs. 431, 452 (P 7: 57-58); *see also* Pls. Tr. Ex. 433 (P 7: 3).

277.    Mohamed Arman added three bottles of shampoo filled with explosives to the bomb that Abdullah Barghouti had built, and, thereafter, with Walid Anjas, delivered the bomb and activation device to Wael Qassam.  Pls. Tr. Exs. 431, 433 (P 7: 3), 452 (P 7: 58).

278.    On July 28, 2002, Wael Qassam, along with Mohamed Odeh (another member of the "Silwan" cell), placed the bomb in the cafeteria of Hebrew University; however; it did not explode due to some problem with the device.  Pls. Tr. Exs. 431, 433 (P 7: 3), 452 (P 7: 58).

279.    The next day, Wael Qassam met with Mohamed Arman and Walid Anjas about the faulty bomb.  *Id.*

280.    Mohamed Arman repaired it, and he and Walid Anjas delivered the fixed device to Wael Qassam on July 30, 2002.  *Id.*

281.    Finally, on July 31, 2002, Wael Qassam and Mohamed Odeh were successful in placing the bomb in the cafeteria of Hebrew University once again.  *Id.*

282.    During lunchtime, when the cafeteria was filled with students and faculty, the conspirators detonated the bomb.  *Id.*

283.    The explosion killed nine people, including four family members of the Plaintiffs in this case—Diane Carter, Janis Coulter, Benjamin Blutstein, and David Gritz—and injured over eighty-one others.  Pls. Tr. Exs. 426 (P 7: 108), 428 (P 7: 142-43), 431, 433 (P 7: 3), 452 (P 7: 58), 464 (P 7: 11); *see also* Eviatar Rep. 4.

284.    Abdullah Barghouti was arrested by Israel on March 5, 2003 and subsequently pled guilty to 108 charges, including building the bomb for the Hebrew University attack.  Pls. Tr. Exs. 426, 431, 435, 452, 464.

285.    Following the Hebrew University attack in July 2002, and prior to his arrest in March 2003, Abdullah Barghouti continued building bombs for use in other terror attacks.  *See, e.g.*, Pls. Tr. Exs. 426 (P 7: 109-110), 464 (P 7: 11-12).

286.    During his sentencing proceedings, Abdullah Barghouti said:  "I do not regret any of the acts that I have carried out, and the Court knows that I have taught dozens of engineers to do the work better than me.  In the future you will see cases that are ten times greater than my case.  I promise that."  Pls. Tr. Ex. 435 (P 7: 19).

287.    ███████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████ Pls. Tr. Ex. 141 (02:009922); *see also* Pls. Tr. Ex. 164 (02:010034) (same).

288.    Abdullah Barghouti's activities were financed by both Hamas and Marwan Barghouti.  *See, e.g.*, Pls. Tr. Exs. 426 (P 7: 101), 427-32, 452, 464 (P 7: 7).

289.    During an interview conducted by Ronni Shaked, Abdullah Barghouti calmly confessed to his bomb making activities and working with Hamas to execute terror attacks, including the Sbarro bombing, saying that he could not accept what he termed "the Occupation."  Pls. Tr. Ex. 957.

290.    Defendants condoned and glorified his actions after his conviction.  For example, ████████████████████████████████████████████████
██████  Pls. Tr. Exs. 73, 893; *see also* Eviatar Rep. 14, 31.

291.    The Minister of Detainees paid a solidarity visit to Abdullah Barghouti's family to show his support.  Pls.' Tr. Ex. 441.

292.    Defendants glorified Abdullah Barghouti through PA media.  *See, e.g.*, Pls. Tr. Exs. 438, 441, 449, 699-701, 1059; *see also* Marcus Rep. 45-46.

293.    Ibrahim Hamed, Mohamed Arman, and Walid Anjas were also convicted for their part in the Hebrew University attack, and other terror attacks.  Pls. Tr. Exs. 249, 433, 459.

294.    ███████████████████████████████████

███████████████████ (Pls. Tr. Exs. 40, 61), ████████ (Pls. Tr. Exs. 42, 65), ████

█████ (Pls. Tr. Exs. 41, 71), █████████████ (Pls. Tr. Exs. 39, 72), █████████████ (Pls. Tr. Ex. 86).

295.    ██████████████████████████████

█████████████████████████████████████ Pls. Tr. Ex. 138 (02:009911).

296.    ████████████████████████████████████

*Id.* (02:009912).

297.    ███████████████████████████████████

██████████████████████████ Pls. Tr. Ex. 165 (02:010039).

298.    The Silwan cell was also glorified through PA media.  *See, e.g.*, Pls. Tr. Exs. 236, 434, 440, 442-43, 699, 702-03, 705; *see also* Marcus Rep. 46-48.

### 7.    Bombing on January 29, 2004

299.    AAMB attacks continued throughout 2002 and 2003, and, on January 29, 2004, a bomb exploded on the Number 19 Bus in Jerusalem killing eleven people, including Stuart Goldberg, and injuring forty-five others.  *See, e.g.*, Pls. Tr. Exs. 295 (P 2: 316), 311, 489, 630 at 80-82, Shifra Goldberg Dep. 08:13-21; *see also* Shrenzel Rep. 58-73.

300.     The mastermind of the attack (Abdul Rahman Maqdad), the suicide bomber (Ali Ja'ara), and two others (Ahmed Salah and Hilmi Hamash) involved in executing the attack were members of the PA police and security forces, as discussed below.  *See* Shrenzel Rep. 58-73; *see, e.g.*, Part II ¶¶ 302, 324-25, 333-34, 337-39.

301.     AAMB claimed responsibility for the operation.  *See, e.g.*, Pls. Tr. Exs. ████ ████████ 630 at 80-82.

302.     ████████████████████████████████████████████████████ ████████████████████████████

303.     Abdul Rahman Maqdad was involved in attacks against Israelis beginning as early as 2001.  Pls. Tr. Ex. 297 (P 2: 318-20); *see also* Shrenzel Rep. 59-60, 64-67.

304.     Abdul Rahman Maqdad, along with Ahmed Salah, ████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████ ████████████ 262 (P 2: 168), 297 (P 2: 318; P 2: 320); *see* Shrenzel Rep. 59-60, 64-69.

305.     ████████████████████████████████████████████████ ████████  Pls. Tr. Exs. 111, 116, 125; *see* Shrenzel Rep. 58-60, 64-67.

306.     In early 2004, Abdul Rahman Maqdad acquired bomb making materials for the Bus Number 19 attack, and prepared an explosive device for the suicide bomber, Ali Ja'ara, a PA police officer.  Pls. Tr. Ex. 297 (P 2: 319); *see also* Shrenzel Rep. 58-67.

307.     Abdul Rahman Maqdad delivered the explosive device to Ali Ja'ara and showed him how to detonate it.  *Id.*

308.     Abdul Rahman Maqdad admitted his role in the attack in open court.  Pls. Tr. Ex. 295.  In his last statement to the Court, Maqdad said: "I admitted to all of the individuals whom

I killed in Israel, but I am not guilty, because that is my right:  a response to the tens of thousands whom you have killed for no reason, only because you think that you are the best in the world and if you continue this method in your lives, you shall not hear or feel peace or security…."  *Id.* (P 2: 315).

309.



Pls. Tr. Ex. 129 (02:009866).

310.

Pls. Tr. Ex. 129 (02:009868).

311.    Ahmed Salah was also convicted for his role in introducing Ali Ja'ara to Abdul Rahman Maqdad.  Pls. Tr. Exs. 260, 262; *see also* Shrenzel Rep. 58-60, 67-69.

312.    Ahmed Salah also helped Abdul Rahman Maqdad make the bomb that Ali Ja'ara used to murder the eleven civilians, and arranged for another individual (Mohamed Ma'ali, noted below in Part II ¶¶ 344-45) to transport Ja'ara to Jerusalem in order to carry out the bombing. Pls. Tr. Exs. 260, 261 (P 2: 152-53); *see also* Shrenzel Rep. 58-60, 67-69.

313.    Ahmed Salah admitted his role in the bombing in open court.  Pls. Tr. Ex. 260 (P 2: 146).

314.    Hilmi Hamash, ███████████████████ was also convicted for his role in the attack.  Pls. Tr. Exs. ████████313, 485-86, 921; *see also* Shrenzel Rep. 58-60, 70-73.

315.    Hilmi Hamash is listed on Defendants' own website in connection with a list of PA security employees who are in prison for killing civilians.  Pls. Tr. Ex. 276.

316.    Hilmi Hamash had a long criminal record, dating back to 1991.  *See, e.g.*, Pls. Tr. Exs. 480-482; *see also* Shrenzel Rep. 58-60, 70-73.

317.    ████████████████████████████████ *Id.*

318.    With respect to the January 29, 2004 attack at issue in this case, Hilmi Hamash had heard that Ahmed Salah was looking for an individual to carry out a suicide bombing, and he introduced Ali Ja'ara to Salah, who, in turn, introduced him to Abdul Rahman Maqdad.  Pls. Tr. Exs. 313 (P 2: 55), 485 (P 8: 61); *see also* Shrenzel Rep. 58-60, 70-73.

319.    Hilmi Hamash also assisted in making the bomb used in the attack by purchasing some of the materials used to make it.  *Id.*



320.    ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████ Pls. Tr. Ex. 116 (02:009555); *see also* Pls. Tr. Ex. 47.

321.    ████████████████████████████████ Pls. Tr. Exs. 47, 116, 119; *see* Shrenzel Rep. 58-60, 64-67. ████████████████ ████████████████ (Pls. Tr. Ex. 116), ████████████████ ████████████████ (Pls. Tr. Ex. 119), ████████████████ ████████████ (*see* Pls. Tr. Ex. 47, ████████████████████████).  *See also* Shrenzel Rep. 58-60, 64-67.

322. 

*See* Pls. Tr. Ex. 47 (

); *see also* Shrenzel Rep. 66 (                        ).

323.    Finally, Abdul Rahman Maqdad's wife, supported by the PA, has even launched a project "to help life prisoners who are spending the best years of their lives in jail.  Once the prisoner leaves prison he will find a house waiting for him."  Pls. Tr. Ex. 229; *see also* Shrenzel Rep. 66-67.

324.    Ali Ja'ara, the suicide bomber,

*see also* Shrenzel Rep. 58-64.



325.

(Pls. Tr. Ex. 88; *see also* Pls. Tr. Ex. 94 (02:009452)),

*See* Pls. Tr. Ex. 8; *see also* Shrenzel Rep. 58-64.

326.

Pls. Tr. Ex. 22 (02:007291, 02:007293); *see also* Shrenzel Rep. 58-64.

327.

*Id.* (02:007291).

328.

Pls. Tr. Exs. 22, 28-29; *see also* Shrenzel Rep. 58-64.

329. ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████  Pls. Tr. Ex. 132 (02:009888).

330.    Ali Ja'ara was also provided a state funeral by the PA in Bethlehem, when his remains were given to the PA by Israel.  *See, e.g.*, Pls. Tr. Exs. 124 (PA TV honoring Ja'ara: "This is Palestine, honoring its martyrs who are nobler than us all, and telling the entire world that our martyrs are not in Arqam [cemeteries] but are a candle lighting our peoples' path to freedom and independence."), 266 (coverage of funeral, with photos), 267-73 (WAFA photos of funeral), 278-84 (color photos of funeral), 286-87 (Wafa coverage of funeral; *e.g.*, "[W]ith intense sadness and emotion, the Governorate of Bethlehem received the bodies of its two martyrs Ali Ja'ara…and Mohamed Zaoul…."), 304 (PA TV broadcast of funeral), 677 (same), 678 (PA TV broadcast honoring Ja'ara), 679 (same); *see also* Shrenzel Rep. 58-64, Marcus Rep. 38-39.

331.    The funeral—during which an official escort accompanied the remains of Ali Ja'ara and the remains of another "martyr," through the streets of Bethlehem—was aired on PA TV.  *See, e.g.*, Pls. Tr. Exs. 304, 677; *see also* Shrenzel Rep. 58-64, Marcus Rep. 38-39.

332.    At Ali Ja'ara's state funeral, it was stated:  "Our martyrs are now among us after being in our hearts, in our minds, and in our veins.  We did not forget them for a moment, we will never forget them, and we will always remain faithful to their vow….We ask Allah to gather you in the uppermost heaven, along with the prophets, the righteous, and the Martyrs."  Pls. Tr. Ex. 304.  It was also stated that:  "Our people, headed by the Palestinian leadership, welcome these Martyrs with great honor."  Pls. Tr. Ex. 677.

333. ███████████████████████████████

████████████████████████████████████

███████████████████████████ Pls. Tr. Exs. 7, 48,

104; *see also* Shrenzel Rep. 58-60, 67-69.

334. ███████████████████████████████

████████████████████████████████████████

████████████████ Pls. Tr. Ex. 131 (02:009880; 9884).

335. ███████████████████████████ *Id.*

(02:009880).

336.    On July 13, 2013, the Minister of Detainees' and Ex-Detainees' Affairs visited

Ahmed Salah's family to show support for detainees in Israeli prisons.  Pls. Tr. Ex. 296.

337. ██████████████████████████

██████ Pls. Tr. Exs. 10, 49 (02:009019-21), 67 (02:009231).

338. ██████████████████████████

████████████████████████████████

█████████████ Pls. Tr. Exs. 114, 120; *see also* Shrenzel Rep. 58-60, 70-73.

339. ████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████ Pls. Tr. Ex. 130 (02:009872). ████████████

██████████████████████████████

███████████ *Id.* (02:009874).

340.    ███████████████████████████████████

███████████████████████  *See* Pls. Tr. Ex. 49 (02:009019-21); *see also* Pls. Tr.

Ex. 67, Shrenzel Rep. 71 (explaining distinction).

341.    In 2010, the Minister of Detainees' and Ex-Detainees' Affairs, and a delegation

from the Ministry and the Fatah Movement, visited Hilmi Hamash's family's home to show

support for prisoners.  Pls. Tr. Ex. 264; *see also* Shrenzel Rep. 73.

342.    In 2012, the Director of the Bethlehem police visited Hilmi Hamash's family to

show solidarity.  Pls. Tr. Ex. 285; *see also* Shrenzel Rep. 72.

343.    In 2013, the Minister of Detainees' and Ex-Detainees' Affairs again visited

Hamash's family to show his support.  Pls. Tr. Ex. 296.

344.    Three other individuals who were convicted in connection with this attack—Ali

Abu Haliel (*see, e.g.*, Pls. Tr. Exs. 288, 299, 301-03), Ahmed Sa'ad (*see, e.g.*, Pls. Tr. Exs. 259,

293-94, 298), and Mohamed Ma'ali (*see, e.g.*, Pls. Tr. Exs. 290-92)—████████████████

████████████████████████████████████████

████████████████████████████  *See, e.g.*, Pls. Tr. Exs. 50,

894 (████); Exs. 51, 84 (████); Ex. 87 (████); *see also* Shrenzel Rep. 73.

345.    ██████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████  Pls. Tr. Exs. 133 (02:009890), 135 (02:009900).

346.    ██████████████████████████████████

████████████████████████████████████

████████████  Pls. Tr. Ex. 133 (02:009890, 02:009892).

347.      Pls. Tr. Ex. 134 (02:009895-96).

348.     Finally, following the January 29, 2004 attack—*a mere two days after the bombing*—Arafat stated on PA TV:  "With our souls and our blood we will redeem you, oh Palestine!...Towards Jerusalem are marching millions of martyrs!"  Pls. Tr. Ex. 305.

349.     The Al-Aqsa Intifada continued until after the death of Arafat in late 2004, and the attacks diminished over the course of 2005.  Eviatar Reb. 17.

### G.     <u>Plaintiffs' Damages</u>

350.     Oz Guetta was shot multiple times  Since the attack, These injuries Friedman Rep. (OG) 5-10; O. Guetta Dep. 47, 52, 67-69, 80-90. *Id.* at 113-14, Strous Rep. (OG) 3. O. Guetta Dep. 21.

351.     Varda Guetta suffers from Strous Rep. (VG) 3-4, V. Guetta Dep. (06/27/12) 101, 105-106.  She also bears a resulting economic loss amounting to Weinstein Am. Rep. (VG) 10.

352.     Shayna Gould was She was

███████████ ████████████████████████ Friedman Rep. (SG) 5-6; S. Gould Dep. 33-35, 37-39, 42-43, 46. ██████████████████████████████████████

██████████████████████████ *Id.* at 87-90; *see also* Strous Rep. (SG) 4.  Shayna Gould also bears a resulting economic loss of ████████ Soudry Rep. (SG) 1.

353.    Elise Janet Gould, Shayna's mother, ████████████████████████

██████████████████████████████████████████

████████████████████████ Strous Expert Rep. (EG) 4, E. Gould Dep. 44-50, 60, 65-66.

354.    Ron Gould and Jessica Rine, Shayna's father and sister, have suffered significant mental and emotional trauma and pain as a result of Shayna's terror attack injuries.  R. Gould Dep. 7-10, J. Rine Dep. 58-60.

355.    Shmuel Waldman was shot twice ████████████████ ██████████ ████████████████████████ Since then, ████████████████ ██████████████ Friedman Rep. (SW) 5-6.

████████████████████████████████████████

████████████████████ Strous Rep. (SW) 4, S. Waldman Dep. 100-01.

356.    Henna, Morris, and Eva Waldman, Shmuel's wife and parents, suffered significant mental and emotional trauma and pain as a result of Shmuel's terror attack injuries.  M. Waldman Dep. 20-21, E. Waldman Dep. 28-30, H. Waldman Dep. 29-32.  Additionally, Henna Waldman was living in Israel at the time of the shooting.   H. Waldman Dep. 11:18-20.

357.    Mark Sokolow ████████████████████████████

██████████████████████████████████████████

████████████████████████████████████



███ Friedman Rep. (MS) 5-7, M. Sokolow Dep. 13-25. ████████████

███████████████████████████████████████████

██████. *Id.* at 35, Strous Rep. (MS) 4.

358.    Rena Sokolow ████████████████████████████

███████████████████████████████████

███ Friedman Rep. (RS) 8, R. Sokolow Dep. 16-18. ████████████

███████████████████████████████ Strous Rep.

(RS) 4, R. Sokolow Dep. 33.

359.    Jamie Sokolow █████████████████████████████

██████████████████ from the suicide bombing.  Friedman Rep. (JS) 7, J.

Sokolow Dep. 20-22. ███████████████████████

█████████████ *Id*. at 38-40, Strous Rep. (JS) 4.

360.    Lauren Sokolow ██████████████  ████████████

██████████████████████ Friedman Rep. (LS) 5,

L. Sokolow Dep. 12-14, 17-18. ██████████████████████

████████████████████ *Id*. at 27-28,

Strous Expert Rep. (LS) 3.

361.    Elana Sokolow was not present at the scene of the terror attack, but was in Israel.

E. Sokolow Dep. 11.  As a result of what happened to her family, ████████████████

██████████████████████████ which directly results

from the injuries that her family members suffered in the suicide bombing.  *Id*. at 10-14, Strous

(ES) Rep. 3-4.

362.    Alan Bauer ███████████████████ ███████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████ Friedman Rep. 5-7, A. Bauer Dep. 38-39.  Alan

███████████████████████████ as a result of the terror attack in which he and

his son were seriously injured.  *Id.* at 24.

363.    As a result of the suicide bombing, Yehonathan Bauer ████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████ Friedman (YB) Rep. 5-10.  Yehonathan ██████████████

██████████████████████████ as a result of the attack.  Y. Bauer Dep. 47.

364.    Revital, Binyamin, Daniel, and Yehuda Bauer (Yehonathan's mother and

brothers/Alan's wife and sons) also suffered significant mental injuries as a result of the terrorist

attack and the injuries that resulted to Alan and Yehonathan Bauer.  A. Bauer Dep. 18, R. Bauer

Dep. 34-36.  All four were living in Israel at the time of the terror attack.  A. Bauer Dep. 251.

365.    Shaul Mandelkorn was shot, and sustained serious injuries ████████████████

████████████████ Friedman (SM) Rep. 5, S. Mandelkorn Dep. 32-22.  ████████████████

████████████ *Id.* ██████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████ Strous Rep. (SM) 4-

5, L. Mandelkorn Dep. 25-27.  Shaul Mandelkorn also bears an economic loss amounting to

██████████████████████████ Weinstein Am. Rep. (SM) 11.

366.    Rabbi Leonard Mandelkorn ████████████████████████████████

since his son was injured in a terrorist shooting attack. ████████████████████

████████████████████████████████████████████████████████

██████████████████ Strous (LM) Rep. 3-4, L. Mandelkorn Dep. 117-18.  Rabbi

Mandelkorn lived in Israel at the time his son was injured in a terror attack.  L. Mandelkorn Dep.

5.

367.    Nurit Mandelkorn ████████████████████████████████████████

████████████████ since her son was severely injured in a terror bombing, ███████████

████████████████████████ Strous (NM) Rep. 3.  Nurit lived in Israel at the time

her son was injured in a terror attack.  N. Mandelkorn Dep. 5.

368.    David Gritz's life was cut short when he died violently in the Hebrew University

bombing on July 31, 2002.  Pls. Tr. Ex. 1012, N. Gritz Dep. 14:04-09, 17:08-20.

369.    David Gritz's family suffered pecuniary loss including loss of income and

financial support of a projected earning potential of ████████  Weinstein Am. Rep. (DG) 9, N.

Gritz Dep. 43-46.  David's parents also suffered serious emotional trauma from the loss of their

only child, especially in such a sudden, violent, and unfathomable fashion.  N. Gritz Dep. 17:08-

20, 28-29, 30:14-18; 33:16-18.  Nevanka Gritz ████████████████████████

████████████████████████ Strous Rep. (NG) 3.

370.    Benjamin Blutstein's life was cut short when he died violently in the Hebrew

University bombing on July 31, 2002.  Pls. Tr. Ex. 971, K. Blutstein Dep. 08:17-21.

371.    Benjamin Blutstein's family suffered pecuniary loss including loss of income and

financial support of a projected earning potential of ████████  Soudry Supp. Rep. (BB) 3,

Richard Blutstein Dep. 61-63.  Benjamin's parents and sister suffered emotionally from the loss

of their son and brother, ████████████████████████████████████

████████████████████████████████████ *Id*. at 32-35, Strous Rep. (Richard

Blutstein) 3, Strous Rep. (Rebekah Blutstein) 4, Strous Rep. (Katherine Baker) 4.

372.    Janis Coulter's life was cut short when she died violently in the Hebrew

University bombing on July 31, 2002.  Pls. Tr. Ex. 993, R. Coulter, Sr. Dep. 11, 13-14.

373.    Janis Coulter's family suffered pecuniary loss including loss of income and

financial support of a projected earning potential of █████████ Soudry Supp. Rep. (JC) 7.

Janis's father and sister suffer emotionally from the loss of Janis ████████████████████

████████████████████████████████████████████████████████████████ R.

Coulter, Sr. Dep. 11, 13-14, 23, D. Miller Dep. 12-14, R. Coulter, Jr. Dep. 35, Strous Rep. (R.

Coulter, Sr.) 4-5, Strous Rep. (DM) 4.

374.    Diane Carter's life was cut short when she died violently in the Hebrew

University bombing on July 31, 2002.  Pls. Tr. Ex. 987, L. Carter Dep. 92:01-11.

375.    Diane Carter's family suffered pecuniary loss including loss of income and

financial support of a projected earning potential of █████████ Soudry Rep. (DC) 5.  Diane's

father and sister suffer emotionally from the loss of their daughter and sister, and Diane's father

████████████████████████████████████████████████████████████████ L.

Carter Dep. 97, S. Choffel Dep. 63, Strous Rep. (LC) 3.

376.    Stuart Scott Goldberg's life was cut short when he died violently in a suicide bus

bombing on January 29, 2004.  *See* Death Cert. of Scott Goldberg, Shifra Goldberg Dep. 8-9.

Stuart Scott Goldberg's family suffered pecuniary loss, including loss of income and financial

support, loss of household services, and loss of parental guidance as follows:  approximately

████████████ in earning potential of Scott Goldberg (Weinstein Am. Rep. (SG) 1), and ████████ in

losses incurred by decreased earning potential of Shifra Goldberg (Weinstein Rep. (SG) 3). All

of the children in the family 

*See* Ya. Goldberg Dep. 13, Yi. Goldberg Dep. 46-47, Es. Goldberg Dep. 33,

C. Goldberg Dep. 86, 97, S. Goldberg Dep. 121-30. The entire family

Strous

Reps. on C. Goldberg at 4; El. Goldberg at 3; Es. Goldberg at 3; Shifra Goldberg at 4; Sh.

Goldberg at 3; Ya. Goldberg at 3; Yi. Goldberg at 3-4; Z. Goldberg at 2.

### III. PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT OF FACTS AS TO WHICH DEFENDANTS CONTEND THERE IS NO GENUINE ISSUE TO BE TRIED

#### A. <u>Defendants' Contentions Concerning Sovereign Immunity</u>

1.      The PLO was founded in 1964 by the Arab League and was recognized as the

representative of the Palestinian People by Israel as part of the Oslo Accords in 1993. *See* Ex. 1,

Abu-Libdeh Dep. 25:20-24; *see also* Ex. 2, Safieh Dep. 20:12-21; Ex. 3, Fayyad Dep. 48:17-

49:12.

**Response**: AGREED.

2.      The PA was established by the PLO after the Oslo Accords to serve as the

governing authority for the Occupied Palestinian Territories in the West Bank and Gaza Strip.

Ex. 1, Abu-Libdeh Dep. 118:2-11, 200:12-16; Ex. 2, Safieh Dep. 86:1-12, 87:10-23, 132:10-15;

Ex. 3, Fayyad Dep. 47:2-11.

**Response**: DISPUTED, in part. The politically-loaded term "Occupied Palestinian

Territories" does not appear anywhere in the Oslo Accords. The question of whether the

territories are "occupied" or "Palestinian" is a matter for legal and political debate, and that

debate and its outcome are wholly immaterial to this case and subject to plaintiffs' motion in limine. The geographical terms used in the Oslo Accords are "West Bank" and "Gaza Strip."

AGREED, in part, that the PA was established by the PLO after the Oslo Accords to serve as the local governing authority in the West Bank and Gaza Strip.

3.      A state is an entity that is accepted in the international community by other states as having the status of a state. *See* Ex. 4, Quigley Dep. 16:6-11, 89:1-4, 118:7-8, 124:24-125:3, 140:15-140:25, 170:17-20.

**Response**: DISPUTED.  This is not a statement of "fact," but an assertion of law—and one that Defendants have litigated and lost.  The Court was correct to rule against Defendants on this point.  The Second Circuit and courts in this District have held that there is no "state of Palestine" that meets the legal criteria for statehood applicable to the Court's adjudication of the issue.  For these purposes, "a state is an entity that has [(1)] a defined territory and a [(2)] permanent population, [(3)] under the control of its own government, and that [(4)] engages in, or has the capacity to engage in, formal relations with other such entities."  Restatement (Third) of Foreign Relations Law § 201; *see Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 47 (2d Cir. 1991); *Knox v. PLO*, 306 F. Supp. 2d 424, 434-38 (S.D.N.Y. 2004).  The *Knox* court held that the PLO and PA do not meet, nor are they part of any entity that meets, the statehood criteria because, first, the PLO and PA do not sufficiently "control" Palestine, and, second, they do not have sufficient capacity to engage in foreign relations.  306 F. Supp. 2d at 434, 438.  In addition, the Constitution delegates the task of recognition and non-recognition of statehood solely to the Executive Branch. *The Maret*, 145 F.2d 431, 441-42 (3d Cir. 1944).  "The [E]xecutive [B]ranch, not the [J]udiciary, is uniquely empowered to delineate the bounds of international comity." *Knox*, 306 F. Supp. 2d at 447.  The United States has never recognized a "state" of Palestine. *Cf.*

*United States v. Belmont*, 301 U.S. 324, 330 (1937).  In fact, the United States affirmatively opposes the notion that a sovereign Palestine presently exists.

In addition, the only "evidence" Defendants cite is the deposition testimony of a law professor who was unfamiliar with the controlling Second Circuit decision and who disagrees with the analysis that the Second Circuit undertook.  Quigley Dep. (Defs. Ex. 4) 180.

Finally, Plaintiffs object to this statement as immaterial and as erroneous legal argument with political motivations improperly included in Defendants' Rule 56.1 Statement.

4.      Palestine is a state.  *Id.* at 104:3-5, 112:11-13, 116:14-17.

**Response**:  DISPUTED.  This is not a statement of "fact," but an assertion of law—and one that Defendants have litigated and lost.  The Court was correct to rule against Defendants on this point.  Palestine is uncontrovertibly not a State under U.S. or international law.

In addition, the only "evidence" that Defendants cite is the deposition testimony of a law professor who was unfamiliar with the controlling Second Circuit decision and who disagrees with the analysis that the Second Circuit undertook.  Quigley Dep. (Defs. Ex. 4) 180.

Finally, Plaintiffs object to this statement as immaterial and as erroneous legal argument with political motivations improperly included in Defendants' Rule 56.1 Statement.

5.      The overwhelming majority of member states in the United Nations have accepted Palestine as a state by, *inter alia,* voting for the November 2012 resolution admitting Palestine to the UN as a nonmember observer state, and by voting to admit Palestine to the UN Economic, Social and Cultural Organization ("UNESCO").  *Id.* at 142:15-24, 145:1-146:13, 148:2-5, 148:25-149:4, 150:11-153:2, 154:7-157:2; *see also* Ex. 5, DTE 58.

**Response**:  DISPUTED, for the reasons stated in response to paragraphs 3-4 above. Plaintiffs also note that Defendants do not fairly characterize their Exhibit 5, which is a non-

binding resolution by the General Assembly that "[e]xpresses the hope that the Security Council will consider favourably the application submitted on 23 September 2011 by the State of Palestine for admission to full membership in the United Nations."  Defs. Ex. 5 at 5.

6.      The Holy See also has nonmember observer state status at the UN, and is accepted by the international community as a state.  Ex. 4, Quigley Dep. 169:15-170:6.

**Response**:  DISPUTED.  Plaintiffs respectfully incorporate Responses #3-5 above.

7.      The state of Palestine also holds full membership in the Economic and Social Commission for Western Asia and the Group of Asia-Pacific States, the League of Arab States, the Movement of Non-Aligned Countries, the Organization of Islamic Cooperation and the Group of 77 and China.  Ex. 5, DTE 58 at 3.

**Response**:  DISPUTED.  Plaintiffs respectfully incorporate Responses #3-5 above.

8.      Israel and the United States have also accepted Palestine as a state by, *inter alia,* entering into negotiations and accords with the PLO and encouraging negotiations between Israel and the PLO through the "Road map to peace."  Ex. 4, Quigley Dep. 142:15-143:16, 158:6-169:11, 173:13-174:8, 194:25-195:1.

**Response**:  DISPUTED.  Plaintiffs respectfully incorporate Responses #3-5 above.  In addition, the text of the referenced documents contradicts Defendants' assertion.  As an initial matter, neither the Declaration of Principles on Interim Self-Government Arrangements (the "DOP"), the Interim Agreement on the West Bank and the Gaza Strip, nor any other of the Oslo Accords purports to create a state of Palestine.  *See* 32 I.L.M. 1525, 1527 ("DOP"), 36 I.L.M. 551 ("Interim Agreement").  The Interim Agreement explicitly states that the "status" of the occupied Palestinian territories "will be preserved during the interim period."  *See id.*, Art. XXXI(8), at 568.  A logical inference from these facts, and from the title of the Interim

74

Agreement as "Interim," is that the Oslo Accords aim towards some other permanent arrangement, not that the Oslo Accords have already created an independent state of Palestine. An examination of the details of those agreements confirms this inference because the Oslo Accords consciously apportion political, administrative, and diplomatic authority as between Israel and Palestine so as to make it clear that, under the relevant and well-established legal test, there does not exist, at present, an independent sovereign state of Palestine.  *See Knox*, 306 F. Supp. 2d at 434.  Again, Palestine is uncontrovertibly not a State under U.S. or international law. *See also* Responses #3-5.

In addition, Plaintiffs object to this statement as immaterial and as erroneous legal argument with political motivations improperly included in Defendants' Rule 56.1 Statement.

9.      Between 130 and 160 out of 190 countries have granted diplomatic recognition to the state of Palestine.  *Id.* at 196:14-197:23; Ex. 5, DTE 58 at 3 ("to date, 132 States Members of the United Nations have accorded recognition to the State of Palestine").

**Response**:  DISPUTED.  Plaintiffs respectfully incorporate Responses #3-5 and #8 above.  Palestine is uncontrovertibly not a State under U.S. or international law.  In addition, Plaintiffs object to this statement as immaterial and as erroneous legal argument with political motivations improperly included in Defendants' Rule 56.1 Statement.

10.     The fact that Palestine has not been granted diplomatic recognition as a state by the United States or Israel does not negate its statehood.  Ex. 4, Quigley Dep. 140:19-141:9, 174:9-176:20, 185:9-12, 188:25-190:22, 200:20-201:7.

**Response**:  DISPUTED.  Plaintiffs respectfully incorporate Responses #3-5 and #8 above.  In addition, recognition by the Executive Branch—not to be second-guessed by the Judiciary—is essential to establishing diplomatic status.  *Restatement (Third) of Foreign*

*Relations Law* § 461.  The Second Circuit has held that the assertion of diplomatic and sovereign immunity is precluded where there is no recognition of the purported foreign state.  *United States v. Lumumba*, 741 F.2d 12, 15 (2d Cir. 1984).  Palestine is uncontrovertibly not a State under U.S. or international law.

In addition, Plaintiffs object to this statement as immaterial and as erroneous legal argument with political motivations improperly included in Defendants' Rule 56.1 Statement.

11.    The United States also initially refused to recognize the Soviet Union as a state, but that refusal of recognition did not negate the Soviet Union's statehood during that time.  *Id.* at 201:8-21.

**Response**:  DISPUTED.  Plaintiffs respectfully incorporate Responses #3-5 and #8-9 above.  In addition, as a matter of public policy, the United States affirmatively opposes the notion that a sovereign Palestine presently exists.  *Knox*, 306 F. Supp. 2d at 424; *cf. Belmont*, 301 U.S. at 330 (noting recognition of Soviet Union).  In fact, United States' non-recognition policy in regard to Palestine can be ascertained to be longstanding, unambiguous, and deliberate.  *Knox*, 306 F. Supp. 2d at 447.  At least two examples confirm this observation.  In December 1988, the United States voted against a U.N. resolution that "the designation 'Palestine' should be used in place of the designation 'Palestine Liberation Organization' in the U.N. system.'"  *Id.* (quoting G.A. Res. 177, U.N. GAOR, 43rd Sess., Supp. No. 49, at 62, U.N. Doc. A/RES/43/177 (1988)).  In July 1998, the United States voted against a U.N resolution to confer certain additional U.N. privileges to the observer mission of Palestine, effectively granting it "super-observer" status.  *Id.* (citing G.A. Res. 250, U.N. GAOR, 52nd Sess., Supp. No. 49, at 4, U.N. Doc. A/RES/52/250 (1998)).  Palestine is uncontrovertibly not a State under U.S. or international law.

In addition, Plaintiffs object to this statement as immaterial and as erroneous legal argument with political motivations improperly included in Defendants' Rule 56.1 Statement.

12.    The fact that Palestine is under a belligerent occupation by Israel does not negate its statehood.  *Id.* at 43:3-17, 137:20-138:10, 198:17-23.

**Response**:  DISPUTED.  Plaintiffs respectfully incorporate Responses #3-5 and #8-11 above.  Palestine is uncontrovertibly not a State under U.S. or international law and is not under "occupation," belligerent or otherwise.  In addition, Plaintiffs object to this statement as immaterial and as erroneous legal argument with political motivations improperly included in Defendants' Rule 56.1 Statement.

### B.    Defendants' Contentions Concerning Their Fourth Affirmative Defense (Capacity)

13.    The PLO is a governing authority of the state of Palestine.  *Id.* at 105:3-6, 106:6-17.

**Response**:  DISPUTED, in part.  Plaintiffs respectfully incorporate Responses #3-5 and #8-11 above.  Palestine is uncontrovertibly not a State under U.S. or international law.

In addition, Plaintiffs object to this statement as immaterial and as erroneous legal argument with political motivations improperly included in Defendants' Rule 56.1 Statement.

AGREED, in part, that the PLO represents some Palestinians around the world (*see* Aaron D. Pina, CRS Report for Congress: Palestinian Factions (June 8, 2005), *available at* http://www.fas.org/sgp/crs/mideast/RS21235.pdf), and that the PLO performs functions assigned to it by the Interim Agreement, which provides that the PLO may "conduct negotiations and sign agreements with states or international organizations" in limited spheres—economic relations,

regional development, donor assistance, and cultural, scientific and educational goals. Interim Agreement, Art. 9.5(b), Pls. Tr. Ex. 532.

14.    The PLO's governmental functions involve representing the state of Palestine at the international level. *Id.* at 108:3-8, 110:16-20, 135:9-13.

**Response**: DISPUTED, in part. Plaintiffs respectfully incorporate Response #3-5 and #8-11 above. Palestine is uncontrovertibly not a State under U.S. or international law. In addition, Plaintiffs object to this statement as immaterial and as erroneous legal argument with political motivations improperly included in Defendants' Rule 56.1 Statement.

AGREED, in part, that the PLO performs functions assigned to it by the Israeli-Palestinian Interim Agreement on the West Bank and the Gaza Strip (the "Interim Agreement") (Pls. Tr. Ex. 532), which provides that the PLO may "conduct negotiations and sign agreements with states or international organizations" in limited spheres—economic relations, regional development, donor assistance, and cultural, scientific and educational goals." Interim Agreement, Art. 9.5(b), Pls. Tr. Ex. 532.

15.    The PA is also a governing authority of the state of Palestine. *Id.* at 104:24-105:2,106:6-17.

**Response**: DISPUTED, in part. Plaintiffs respectfully incorporate Responses #3-5 and #8-11 above. Palestine is uncontrovertibly not a State under U.S. or international law. In addition, Plaintiffs object to this statement as immaterial and as erroneous legal argument with political motivations improperly included in Defendants' Rule 56.1 Statement.

AGREED, in part, that the PA provides many domestic governmental services under the Interim Agreement (Pls. Tr. Ex. 532), which transferred specified "powers and responsibilities" from the Government of Israel to the PA, and established executive, legislative, and judicial

functions for the PA.  Under the Interim Agreement, the government services provided by the

PA include local policing and civil authority over traditional matters such as agriculture,

banking, employment, environmental protection, unclaimed property, health, labor, zoning,

postal services, social welfare, telecommunications, transportation, water and sewage.  *Id.*  The

PA has a police force and levies taxes and performs other governmental services.  *Id.*; *see also*

Interim Agreement, Annex III, Pls. Tr. Ex. 532.

16.     The PA carries out the kinds of functions that governments normally do in

administering certain of the territories of the state of Palestine.  *Id.* at 106:23-107:2, 110:16-20,

131:4-135:8.

**Response**:  DISPUTED, in part.  Plaintiffs respectfully incorporate Responses #3-5 and

#8-11 above.  Palestine is uncontrovertibly not a State under U.S. or international law.  In

addition, Plaintiffs object to this statement as immaterial and as erroneous legal argument with

political motivations improperly included in Defendants' Rule 56.1 Statement.

AGREED, in part, that under the Interim Agreement, the PA provides many domestic

governmental services.  *See* Responses #13-15.

17.     The PLO is not an individual.  *See* Ex. 6, Guetta Response to RFA at No. 46; *see*

*also* Ex. 7, Gould & Waldman Response to RFA at No. 458; Ex. 8, Sokolow Response to RFA at

No. 158; Ex. 9, Bauer Response to RFA at No. 197; Ex. 10, Mandelkorn Response to RFA at

No. 60; Ex. 11, Carter, Coulter and Gritz Response to RFA at No. 307; Ex. 12, Goldberg

Response to RFA at No. 263.

**Response**:  AGREED.

18.     The PA is not an individual.  Ex. 6, Guetta Response to RFA, No. 45; Ex. 7,

Gould & Waldman Response to RFA, No. 457; Ex. 8, Sokolow Response to RFA, No.157; Ex.

9, Bauer Response to RFA, No. 196; Ex. 10, Mandelkorn Response to RFA, No. 59; Ex. 11, Carter, Coulter and Gritz Response to RFA, No. 306; Ex.12, Goldberg Response to RFA, No. 262.

**Response**: AGREED.

19.    The PLO is not a partnership.  Ex. 2, Safieh Dep. 20:23-27:4; Ex. 1, Abu Libdeh Dep. 32:20-33:8.

**Response**: AGREED.

20.    The PA is not a partnership.  Ex. 2, Safieh Dep. 86:25-87:23; Ex. 1, Abu Libdeh Dep. 31:1-32:17.

**Response**: AGREED.

21.    The PLO is not a corporation.  Ex. 2, Safieh Dep. 20:23-27:4; Ex. 1, Abu Libdeh Dep. 32:20-33:8.

**Response**: AGREED.

22.    The PA is not a corporation.  Ex. 2, Safieh Dep. 86:25-87:23; Ex. 1, Abu Libdeh Dep. 31:1-32:17.

**Response**: AGREED.

**C.    Defendants' Contentions Concerning Service of Process**

23.    Plaintiffs served the Complaint on Hassan Abdel Rahman, whom the Court has concluded was the Chief Representative of the PLO and the PA in the United States at the time of service.  DE 87 at 5.

**Response**: AGREED.

24.    Plaintiffs effectuated service in this matter pursuant to Rule 4(h)(1)(B), which governs service on a domestic or foreign corporation, a partnership, or other unincorporated

association.  DE 87 at 5; Fed. R. Civ. P. 4(h)(1)(B); *see also* DE 83 at 4 (Plaintiffs arguing that "Mr. Abdel Rahman...has repeatedly been found to be a valid agent for service of process on the PA and PLO under Fed. R. Civ. P. 4(k)(1)([C]) and 4(h).").

**Response**:  DISPUTED.  This is not a statement of "fact," but an assertion of law, which is not appropriate for a Rule 56.1 Statement.  It is also incorrect.  As Plaintiffs explained to the Court on April 11, 2014, they effected service pursuant to 18 U.S.C. § 2334(a), which provides that "[p]rocess in such a civil action [under section 2333] may be served in any district where the defendant resides, is found, or has an agent."

25.    Because Defendants are neither corporations nor partnerships, Plaintiffs necessarily served Mr. Rahman as a representative of Defendants *qua* unincorporated associations.  SOMF ¶¶19-24.

**Response**:  DISPUTED.  This is not a statement of "fact," but an assertion of law, which is not appropriate for a Rule 56.1 Statement.  It is also incorrect.  As Plaintiffs explained to the Court on April 11, 2014, they effected service pursuant to 18 U.S.C. § 2334(a), which provides that "[p]rocess in such a civil action [under section 2333] may be served in any district where the defendant resides, is found, or has an agent."

### D.    Defendants' Additional Contentions Concerning Their Fourth Affirmative Defense (Capacity)

26.    Plaintiffs have admitted that the PLO is a foreign unincorporated association.  DE 202, ¶ 6, (Declaration from Robert. J. Tolchin stating "in respect to a foreign unincorporated association such as the PLO").

**Response**:  DISPUTED.  This is not a statement of "fact," but a characterization of an assertion of law by counsel, which is not appropriate for a Rule 56.1 Statement.  It is also a

mischaracterization.  Counsel's argument was not an admission of fact.  Indeed, Mr. Tolchin's

declaration states at ¶ 4, "Defendants [PA and PLO] have not provided any evidence whatsoever

regarding their status and capacity to be sued under New York law (which is why their motion

should be summarily denied).  Therefore, Plaintiffs seek discovery of facts relevant to

determining whether the PA and the PLO have capacity to be sued under New York law," and at

¶ 6, "the law of New York determines capacity by looking to the legal regime under which the

association operates.  *See, e.g. Textile Properties v. M.J. Whittall*, 157 Misc. 108, 282 N.Y.S. 17

(N.Y. Sup. 1934).  Therefore, Plaintiffs would seek discovery regarding whether the PLO has the

capacity to be sued in its home jurisdiction—*i.e.* in the West Bank."

27.    Other courts have found that the PLO is an unincorporated association.  *Estate of

Parsons v. Palestinian Auth.*, No. 07-cv-1847, DE 14 at 13-14 (D.D.C. Sept. 30, 2008); *Estate of

Klieman v. Palestinian Auth.*, 467 F. Supp. 2d 107, 113 (D.D.C. 2006); *Klinghoffer v. S.N.C.

Achille Lauro*, 739 F. Supp. 854, 858 (S.D.N.Y. 1990).

**Response**:  DISPUTED.  This is not a statement of "fact," but a characterization of

decisional law, which is not appropriate for a Rule 56.1 Statement.  Moreover, the issue in this

matter has not been adjudicated by any court, including those cited by Defendants.  In addition,

Plaintiffs object to this statement as immaterial and as erroneous legal argument improperly

included in Defendants' Rule 56.1 Statement.

28.    Other courts have found that the PA is an unincorporated association.  *Estate of

Parsons v. Palestinian Auth.,* No. 07-cv-1847, DE 14 at 13-14 (D.D.C. Sept. 30, 2008); *Estate of

Klieman v. Palestinian Auth.*, 467 F. Supp. 2d 107, 113 (D.D.C. 2006); *Estates of Ungar v.

Palestinian Auth.*, 153 F. Supp. 2d 76, 89 (D.R.I. 2001).

**Response**: DISPUTED. This is not a statement of "fact," but a characterization of decisional law, which is not appropriate for a Rule 56.1 Statement. Moreover, the issue in this matter has not been adjudicated by any court, including those cited by Defendants. In addition, Plaintiffs object to this statement as immaterial and as erroneous legal argument improperly included in Defendants' Rule 56.1 Statement.

### E.    <u>Two Random General Contentions By Defendants</u>

29.    Under the terms of the Oslo Accords, the PA does not have jurisdiction over Jerusalem, Israelis or settlements. *See* Ex. 13, Shehadeh Dep. 34:9-22.

**Response**: DISPUTED, in part. Article 17 of the Interim Agreement states, in part:

> In accordance with the DOP, the jurisdiction of the [PA] will cover West Bank and Gaza Strip territory as a single territorial unit, except for:
>
> a. issues that will be negotiated in the permanent status negotiations: Jerusalem, settlements, specified military locations, Palestinian refugees, borders, foreign relations and Israelis; and
>
> b. powers and responsibilities not transferred to the Council.

Pls. Tr. Ex. 532. However, as Defendants' own expert admitted on cross-examination, the Interim Agreement also imposed substantial and specific obligations on the PA to combat terrorism, expressed in Article 15 of the Agreement and Article 2 of Annex I. *See* Pls. Tr. Ex. 532; Shehadeh Dep. 80-90.

30.    During the Second Intifada, the PA's security agencies headquarters were demolished by Israeli Forces, PA security personnel were arrested or detained by Israeli Forces at checkpoints and otherwise, and many PA security personnel stopped reporting for duty. *See* Ex. 14, Faraj Dep. 31:24-33:17.

**Response**: DISPUTED. Defendants did not disclose this witness during discovery and may not use his testimony to support their case-in-chief for reasons explained in Plaintiffs'

motion in limine. The snippet of testimony offered does not support the sweeping

generalizations that the witness makes, which appear to be in the form of metaphors, nor the

inference that the PA had no command and control abilities over its own security forces. Indeed,

General Faraj's own testimony undercuts this contention. He testified that, from 2000 to

approximately 2003, he was Chairman of the Preventive Security Agency in Hebron, and in 2003

and 2004, he was "the director of training and planning in the Preventive Security Service."

Faraj Dep. 21. Further, Defendants cannot offer General Faraj's deposition at trial, since the

witness is their own employee. If General Faraj testifies at trial, his sweeping and metaphorical

generalizations relied on by Defendants will be subject to cross-examination, as well as an

adverse inference, since Defendants withheld documents from the PA's GIS in violation of the

Court's discovery orders. Finally, other evidence in the record conflicts with the generalizations

on which Defendants rely. For example, Defendants' own expert witness, Glenn Robinson,

opined that Chairman Arafat "maintained a firm grip on the authority's security forces until his

dying day." Pls. Tr. Ex. 520 at 1. In addition, Human Rights Watch—an organization that many

of Defendants' own experts found to be a reliable reporter of the facts—disputed the PA's claims

of impotence:

> PA officials also claim that Israeli actions, such as the destruction of PA
> police and security installations, have undermined the PA's capacity to
> act. However, the record indicates that the PA for the most part did not
> attempt to exercise its capacity to prevent or punish such crimes even
> when it had the ability to do so. At least until the IDF's reoccupation of
> Palestinian cities and towns in April 2002, the PA retained some degree
> of law enforcement capacity. In June 2001, and again in mid-December
> 2001, the PA showed that it still commanded enough influence with the
> perpetrator groups, using political negotiations as well as coercive law
> enforcement measures, to bring about cessations of suicide bombings,
> even though its law enforcement capacities had been diminished by
> Israeli attacks.

Pls. Tr. Ex. 492 at 114.

### F. Defendants' Contentions Concerning Their Personal Jurisdiction Defense

31.     During the relevant time period, the PLO had its headquarters in Gaza, the West Bank, and Amman, Jordan.  Ex. 1, Abu-Libdeh Dep. 105:9-17; Ex. 2, Safieh Dep. at 32:22-33:10.

**Response**:  DISPUTED.  Defendants did not disclose the witnesses during discovery and may not use their testimony to support their case-in-chief for reasons described in Plaintiffs' motion in limine.  Because Defendants never disclosed these witnesses nor the topic on which they now proffer them, Plaintiffs had no opportunity to develop evidence to test their assertions, and to permit their testimony now would be unfairly prejudicial.  The deposition is also hearsay, and if the witnesses were allowed to testify, their self-serving testimony would be subject to cross-examination.  In addition, Plaintiffs object to this statement because it relates to Defendants' motion for reconsideration regarding personal jurisdiction, which has been denied.[3]

32.     During the relevant time period, the PA had its headquarters in Gaza and the West Bank.  Ex. 2, Safieh Dep. at 167:21-168:23.

---

[3] Moreover, with regard to Defendants' assertions in Part III ¶¶ 31-66, this Court has already held that "the PLO and the PA purposely engaged in numerous activities that resulted in both entities having a continuous and systematic presence within the United States."  DE 87 at 7.  The Court found that the PLO and the PA "operated a fully and continuously functional office" in Washington, DC (*id*. at 9), staffed it with a dozen PLO employees (*id*. at 8), "retained a consulting and lobbying firm through a multi-year, multimillion dollar contract" which "engaged in numerous political activities on behalf of the PA such as office and lunch meetings with various U.S. government officials and departments" (*id*. at 9-10), received "consulting and public relations services" (including "weekly memoranda on developments in Washington which are relevant to the Palestinian Authority") (*id*. at 10), "had a substantial promotional presence in the United States" (*id*.), and "engaged in extensive public relations activities throughout the United States, ranging from interviews and speeches to attending and participating in various public events."  *Id*.

**Response**:  DISPUTED.  Defendants did not disclose the witness during discovery and may not use his testimony to support their case-in-chief for reasons described in Plaintiffs' motion in limine.  Because Defendants never disclosed this witness nor the topic on which they now proffer him, Plaintiffs had no opportunity to develop evidence to test his assertions, and to permit his testimony now would be unfairly prejudicial.  The deposition is also hearsay, and if the witness were allowed to testify, his self-serving testimony would be subject to cross-examination.  In addition, Plaintiffs object to this statement because it relates to Defendants' motion for reconsideration regarding personal jurisdiction, which has been denied.

33.     The Treasury of the PLO is known as the Palestine National Fund ("PNF").  *See* Ex. 15, Shaqbu'a Dep. 21:9-22:2, 92:18-24.

**Response**:  DISPUTED.  Defendants did not disclose the witness during discovery and may not use his testimony to support their case-in-chief for reasons described in Plaintiffs' motion in limine.  Because Defendants never disclosed this witness nor the topic on which they now proffer him, Plaintiffs had no opportunity to develop evidence to test his assertions, and to permit his testimony now would be unfairly prejudicial.  The deposition is also hearsay, and if the witness were allowed to testify, his self-serving testimony would be subject to cross-examination.  In addition, Plaintiffs object to this statement because it relates to Defendants' motion for reconsideration regarding personal jurisdiction, which has been denied.

34.     Between 1998 and 2004, the PNF's only source of revenue was the PA.  *Id.*  At 30:22-31:9.

**Response**:  DISPUTED.  Defendants did not disclose the witness during discovery and may not use his testimony to support their case-in-chief for reasons described in Plaintiffs' motion in limine.  Because Defendants never disclosed this witness nor the topic on which they

now proffer him, Plaintiffs had no opportunity to develop evidence to test his assertions, and to permit his testimony now would be unfairly prejudicial. The deposition is also hearsay, and if the witness were allowed to testify, his self-serving testimony would be subject to cross-examination. In addition, Plaintiffs object to this statement because it relates to Defendants' motion for reconsideration regarding personal jurisdiction, which has been denied.

35.     In 2000, the PNF received $18 million from the PA. *Id.* at 73:24-74:5.

**Response**: DISPUTED. Defendants did not disclose the witness during discovery and may not use his testimony to support their case-in-chief for reasons described in Plaintiffs' motion in limine. Because Defendants never disclosed this witness nor the topic on which they now proffer him, Plaintiffs had no opportunity to develop evidence to test his assertions, and to permit his testimony now would be unfairly prejudicial. The deposition is also hearsay, and if the witness were allowed to testify, his self-serving testimony would be subject to cross-examination. In addition, Plaintiffs object to this statement because it relates to Defendants' motion for reconsideration regarding personal jurisdiction, which has been denied.

36.     In 2001, the PNF received $13 million from the PA. *Id.* at 74:4-5.

**Response**: DISPUTED. Defendants did not disclose the witness during discovery and may not use his testimony to support their case-in-chief for reasons described in Plaintiffs' motion in limine. Because Defendants never disclosed this witness nor the topic on which they now proffer him, Plaintiffs had no opportunity to develop evidence to test his assertions, and to permit his testimony now would be unfairly prejudicial. The deposition is also hearsay, and if the witness were allowed to testify, his self-serving testimony would be subject to cross-examination. In addition, Plaintiffs object to this statement because it relates to Defendants' motion for reconsideration regarding personal jurisdiction, which has been denied.

37.     In 2002, the PNF received $13 million from the PA.  *Id.* at 74:8-9.

**Response**:  DISPUTED.  Defendants did not disclose the witness during discovery and may not use his testimony to support their case-in-chief for reasons described in Plaintiffs' motion in limine.  Because Defendants never disclosed this witness nor the topic on which they now proffer him, Plaintiffs had no opportunity to develop evidence to test his assertions, and to permit his testimony now would be unfairly prejudicial.  The deposition is also hearsay, and if the witness were allowed to testify, his self-serving testimony would be subject to cross-examination.  In addition, Plaintiffs object to this statement because it relates to Defendants' motion for reconsideration regarding personal jurisdiction, which has been denied.

38.     In 2002, the PA had an overall budget of $6 billion, 392 million Shekels.  *See* Ex. 16, Jadallah Dep. 175:5-21.

**Response**:  DISPUTED.  Defendants did not disclose the witness during discovery and may not use his testimony to support their case-in-chief for reasons described in Plaintiffs' motion in limine.  Because Defendants never disclosed this witness nor the topic on which they now proffer him, Plaintiffs had no opportunity to develop evidence to test his assertions, and to permit his testimony now would be unfairly prejudicial.  The deposition is also hearsay, and if the witness were allowed to testify, his self-serving testimony would be subject to cross-examination.  In addition, Plaintiffs object to this statement because it relates to Defendants' motion for reconsideration regarding personal jurisdiction, which has been denied.

39.     Between 2000 and 2004, the budget for the PA's presidential office alone was normally about $2 million a month.  *Id.* at 48:1-6.

**Response**:  DISPUTED.  Defendants did not disclose the witness during discovery and may not use his testimony to support their case-in-chief for reasons described in Plaintiffs'

motion in limine.  Because Defendants never disclosed this witness nor the topic on which they now proffer him, Plaintiffs had no opportunity to develop evidence to test his assertions, and to permit his testimony now would be unfairly prejudicial.  The deposition is also hearsay, and if the witness were allowed to testify, his self-serving testimony would be subject to cross-examination.  In addition, Plaintiffs object to this statement because it relates to Defendants' motion for reconsideration regarding personal jurisdiction, which has been denied.

40.    In 2002, the PA had over 100,000 employees.  *Id.* at 175:22-176:10.

**Response**:  DISPUTED.  Defendants did not disclose the witness during discovery and may not use his testimony to support their case-in-chief for reasons described in Plaintiffs' motion in limine.  Because Defendants never disclosed this witness nor the topic on which they now proffer him, Plaintiffs had no opportunity to develop evidence to test his assertions, and to permit his testimony now would be unfairly prejudicial.  The deposition is also hearsay, and if the witness were allowed to testify, his self-serving testimony would be subject to cross-examination.  In addition, Plaintiffs object to this statement because it relates to Defendants' motion for reconsideration regarding personal jurisdiction, which has been denied.

41.    During the January 1998 to January 2004 period, the PLO had only two offices in the United States:  the PLO Mission to the United States in Washington, D.C. and the Permanent Observer Mission of Palestine to the United Nations.  DE 50 at 10-11; DE 83 at 6-19; DE 84 ¶ 2 (citing *Estate of Ungar v. Palestinian Authority*, 325 F. Supp. 2d 15 (D.R.I. 2004)).

**Response**:  AGREED.  However, Plaintiffs object to this statement because it relates to Defendants' motion for reconsideration regarding personal jurisdiction, which has been denied.

42.    The parties dispute whether the PLO Mission to the United States can be treated as an office of the PA.  Other than that office, which Defendants maintain was not a PA office,

the PA did not operate any other offices in the United States during the January 1998 to January 2004 period. DE 50 at 10-11; DE 83 at 6-19; DE 84 112 (citing *Estate of Ungar v. Palestinian Authority*, 325 F. Supp. 2d 15 (D.R.I. 2004)).

**Response**: DISPUTED. This is legal argument. The *Ungar* court, cited by Defendants above, and by this Court in its opinions, has already ruled on this issue. "*Ungar* conducted an extraordinarily detailed analysis of the PA's and PLO's U.S. contacts and concluded that plaintiffs had demonstrated minimum contacts by a preponderance of the evidence. *Ungar*, 325 F. Supp. 2d at 47-59. Specifically, *Ungar* found that: 1) Notwithstanding defendants' claims to the contrary, the so-called 'PLO Mission' office in Washington, D.C. serves as the office of both the PLO and the PA…." DE 83 at 6; *see also* DE 83 at 5-19. "*Ungar* (as well as *Biton*, *Klieman*, *Saperstein*, *Parsons* and *Mohamad*) found that both the PLO and PA have an office in the District of Columbia—*i.e.*, that the 'PLO Mission' in D.C. is the office of both the PLO and PA." *Id.* at 10. Plaintiffs object to this statement because it relates to Defendants' motion for reconsideration regarding personal jurisdiction, which has been denied.

43. Following personal jurisdiction discovery, Plaintiffs lack any admissible evidence that either the PA or the PLO own any real property in the United States other than the office of the Permanent Observer Mission of Palestine to the United Nations. DE 83; Ex. 68, Defs.' Objs. & Answers to Pls.' Personal Jurisdiction Interrogs, at INT Nos. 7 & 8.

**Response**: DISPUTED. Defendants did not disclose a witness on this topic during discovery and may not use their self-serving interrogatory answers to support their case-in-chief for reasons described in Plaintiffs' motion in limine. Because Defendants never disclosed this witness nor the topic on which they now proffer him, Plaintiffs had no opportunity to develop evidence to test his assertions, and to permit his testimony now would be unfairly prejudicial.

The deposition is also hearsay, and if he were allowed to testify, his self-serving testimony would be subject to cross-examination. In addition, Plaintiffs object to this statement because it relates to Defendants' motion for reconsideration regarding personal jurisdiction, which has been denied.

44.    During the January 1998 to January 2004 period, the PLO Mission to the United States had a total of 14 employees, not all of whom were employed at any one time. *See* Ex. 68 at INT No. 1; *see also* Ex. 71 ¶ 19.

**Response**: DISPUTED. Defendants did not disclose this witness on this topic during discovery and may not use his testimony or their self-serving interrogatory answers to support their case-in-chief for reasons described in Plaintiffs' motion in limine. Because Defendants never disclosed this witness nor the topic on which they now proffer him, Plaintiffs had no opportunity to develop evidence to test his assertions, and to permit his testimony now would be unfairly prejudicial. The deposition is also hearsay, and if he were allowed to testify, his self-serving testimony would be subject to cross-examination. In addition, Plaintiffs object to this statement because it relates to Defendants' motion for reconsideration regarding personal jurisdiction, which has been denied.

45.    Throughout the January 1998 to January 2004 period, the New York office of the Permanent Observer Mission of Palestine to the United Nations employed 21 individuals, though not all were employed at any one time. *Id.* at INT No. 2.

**Response**: DISPUTED. Defendants did not disclose a witness on this topic during discovery and may not use their self-serving interrogatory answers to support their case-in-chief for reasons described in Plaintiffs' motion in limine. If a witness were allowed to testify, the witness's self-serving testimony would be subject to cross-examination. In addition, Plaintiffs

object to this statement because it relates to Defendants' motion for reconsideration regarding personal jurisdiction, which has been denied.

46.    Following personal jurisdiction discovery, in opposing Defendants' Renewed Motion to Dismiss, Plaintiffs did not cite any jurisdictionally relevant contracts to which either the PA or PLO was a party other than the contract with lobbying firm Bannerman & Associates. DE 83 at 6-19.

**Response**:  DISPUTED.  This is a legal argument, which is improper in a Rule 56.1 Statement.  The only citation is to a brief that Plaintiffs filed, which is not evidence.  This Court has already found that there were sufficient contacts to establish personal jurisdiction, as has every court since *Ungar*.  "Thus, the defendants bear the burden to prove that their U.S. contacts have changed since *Ungar*.  But the defendants have failed to assert—much less show—any such change.  Defendants have not made such a showing because they cannot.  Every federal court to have considered the issue in the years since *Ungar* has concluded that the PA and PLO each have sufficient minimum contacts with the United States….It would be wasteful in the extreme, if not absurd, to set aside principles of collateral estoppel and the presumption of continuity, and allow defendants to relitigate from scratch….Defendants easily have sufficient contacts with [the] United States."  DE 83 at 9, 14.  In addition, Plaintiffs object to this statement because it relates to Defendants' motion for reconsideration regarding personal jurisdiction, which has been denied.  Nothing can be inferred from what Plaintiffs did not cite in their opposition to Defendants' motion for reconsideration, which the Court correctly denied from the bench.

47.    Following personal jurisdiction discovery, Plaintiffs lack admissible evidence of any commercial activity the PA or PLO conducted in the United States during the January 1998-January 2004 period.  *Id.*; *see also* Ex. 68.

**Response**:  DISPUTED.  This is legal argument, which is improper in a Rule 56.1 Statement.  Defendants did not disclose a witness on this topic during discovery and may not use their self-serving interrogatory answers to support their case-in-chief for reasons described in Plaintiffs' motion in limine.  If a witness were allowed to testify, and the witness's self-serving testimony would be subject to cross-examination.  This Court considered the contractual relationship with Bannerman to be commercial activity.  "[T]he entire contractual-commercial relationship between the PA and Bannerman should be viewed as a fully cognizable 'contact.'" DE 83 at 12.  Moreover, Plaintiffs object to this statement because it relates to Defendants' motion for reconsideration regarding personal jurisdiction, which has been denied.

48.    Following personal jurisdiction discovery, Plaintiffs lack admissible evidence of any fundraising activity the PA or PLO conducted in the United States during the January 1998-January 2004 period.  DE 83 at 6-19; Ex. 68.

**Response**:  DISPUTED.  This is legal argument, which is improper in a Rule 56.1 Statement.  Defendants did not disclose a witness on this topic during discovery and may not use their self-serving interrogatory answers to support their case-in-chief for reasons described in Plaintiffs' motion in limine.  If a witness were allowed to testify, the witness's self-serving testimony would be subject to cross-examination.  The Court has already ruled that Defendants' fundraising activities are irrelevant.  "Defendants next make the hairsplitting and baseless argument that Klinghoffer differentiated between 'public speaking' and 'proselytizing,' and also required 'fundraising' in order to establish jurisdiction.  Clearly, there is no substantive difference between 'public speaking' in support of a cause and 'proselytizing,' and even if there were, defendants engaged in both activities.  Nor is there any basis to believe that absent 'fundraising' activities[,] 'public speaking' and 'proselytizing' are insufficient."  DE 83, at 19.

Additionally, Plaintiffs object to this statement because it relates to Defendants' motion for reconsideration regarding personal jurisdiction, which has been denied.

49.     Following personal jurisdiction discovery, Plaintiffs lack any admissible evidence that the PA or PLO leadership (other than the Head of the PLO Mission to the United States and the Head of the Permanent Observer Mission of Palestine to the United Nations) conducted any activity in the United States in their official capacity.  DE 83 at 6-19; Ex. 68.

**Response**:  DISPUTED.  This is legal argument, which is improper in a Rule 56.1 Statement.  Defendants did not disclose a witness on this topic during discovery and may not use their self-serving interrogatory answers to support their case-in-chief for reasons described in Plaintiffs' motion in limine.  If a witness were allowed to testify, the witness's self-serving testimony would be subject to cross-examination.  Defendants' citation to a brief filed by Plaintiffs is not evidence.  Thus, the documents cited to do not support the contention. Additionally, Defendants' most senior officials visited Washington, D.C. on numerous occasions, and also published statements in mainstream U.S. media outlets, in furtherance of their attempt to influence the governments of the United States and Israel by linking the violence that they themselves caused to their political objectives, in violation of (or related to their violation of) Section 2333.  *See, e.g.,* Pls. Tr. Ex. 395 (Marwan Barghouti); Defs. Ex. 28, DTE 35 (Yasser Arafat).  Plaintiffs object to this statement because it relates to Defendants' motion for reconsideration regarding personal jurisdiction, which has been denied.

50.     *Sokolow v. PLO*, 2011 U.S. Dist. LEXIS 36022 (S.D.N.Y. Mar. 30, 2011) (DE 87).  The Court found that Defendants "expended substantial amounts of money—often exceeding $200K every six months—on these activities."  *Id.* at *21.

**Response**:  AGREED.  However, Plaintiffs object to this statement because it relates to Defendants' motion for reconsideration regarding personal jurisdiction, which has been denied.

51.    The Court also found that Defendants "operated a fully and continuously functional office in Washington, D.C., during the relevant period," with approximately 12 employees.  *Id.* at *16-18.

**Response**:  AGREED.  However, Plaintiffs object to this statement because it relates to Defendants' motion for reconsideration regarding personal jurisdiction, which has been denied.

52.    During the six-month period ending in September 1998, the PLO Mission to the United States received $226,936.64 from the PA's Ministry of Finance and spent $232,728.78. DE 84, Ex.2.

**Response**:  AGREED.  Plaintiffs object to this statement because it relates to Defendants' motion for reconsideration regarding personal jurisdiction, which has been denied.

53.    During the six-month period ending in March 1999, the PLO Mission to the United States received $142,319.66 from the PA's Ministry of Finance and spent $199,247.66. DE 84, Ex. 3.

**Response**:  AGREED.  Plaintiffs object to this statement because it relates to Defendants' motion for reconsideration regarding personal jurisdiction, which has been denied.

54.    During the six-month period ending in September 1999, the PLO Mission to the United States received $352,894.79 from the PA's Ministry of Finance and spent $263,824.53. DE 84, Ex. 4.

**Response**:  AGREED.  Plaintiffs object to this statement because it relates to Defendants' motion for reconsideration regarding personal jurisdiction, which has been denied.

55.     During the six-month period ending in March 2000, the PLO Mission to the United States received $125,838.84 from the PA's Ministry of Finance and spent $215,846.53. DE 84, Ex. 5.

**Response**:  AGREED.  Plaintiffs object to this statement because it relates to Defendants' motion for reconsideration regarding personal jurisdiction, which has been denied.

56.     During the six-month period ending in September 2000, the PLO Mission to the United States received $384,238.47 from the PA's Ministry of Finance and spent $300,698.66. DE 84, Ex. 6.

**Response**:  AGREED.  Plaintiffs object to this statement because it relates to Defendants' motion for reconsideration regarding personal jurisdiction, which has been denied.

57.     During the six-month period ending in March 2001, the PLO Mission to the United States received $169,026.93 from the PA's Ministry of Finance and spent $250,816.95. DE 84, Ex. 7.

**Response**:  AGREED.  Plaintiffs object to this statement because it relates to Defendants' motion for reconsideration regarding personal jurisdiction, which has been denied.

58.     For the six-month period ending in September 2001, the PLO Mission to the United States received $211,381.60 from the PA's Ministry of Finance and spent $214,502.83. DE 84, Ex. 8.

**Response**:  AGREED.  Plaintiffs object to this statement because it relates to Defendants' motion for reconsideration regarding personal jurisdiction, which has been denied.

59.     For the six-month period ending in March 2002, the PLO Mission to the United States failed to report its income, expenditures or activities because its papers were in storage. DE 84, Ex. 9.

**Response**:  AGREED.  Plaintiffs object to this statement because it relates to Defendants' motion for reconsideration regarding personal jurisdiction, which has been denied.

60.    During the six-month period ending in September 2002, the PLO Mission to the United States received $201,655.91 from the PA's Ministry of Finance and spent $92,237.66. DE 84, Ex. 10.

**Response**:  AGREED.  Plaintiffs object to this statement because it relates to Defendants' motion for reconsideration regarding personal jurisdiction, which has been denied.

61.    During the six-month period ending in March 2003, the PLO Mission to the United States received $431,828.50 from the PA's Ministry of Finance and spent $296,128.60. DE 84, Ex. 11.

**Response**:  AGREED.  Plaintiffs object to this statement because it relates to Defendants' motion for reconsideration regarding personal jurisdiction, which has been denied.

62.    During the six-month period ending in September 2003, the PLO Mission to the United States received $417,994.52 from the PA's Ministry of Finance and spent $418,666.34. DE 84, Ex. 12.

**Response**:  AGREED.  Plaintiffs object to this statement because it relates to Defendants' motion for reconsideration regarding personal jurisdiction, which has been denied.

63.    During the period 1998 to 2004, the PLO also maintained and staffed over seventy-five (75) embassies, missions and delegations in countries or organizations outside the United States.  The PLO currently maintains over ninety (90) embassies, missions or delegations in countries or organizations outside the United States.  Ex. 71 ¶ 17.

**Response**:  DISPUTED.  Defendants did not disclose the witness during discovery and may not use his testimony to support their case-in-chief for reasons described in Plaintiffs'

motion in limine.  Because Defendants never disclosed this witness nor the topic on which they now proffer him, Plaintiffs had no opportunity to develop evidence to test his assertions, and to permit his testimony now would be unfairly prejudicial.  The deposition is also hearsay, and if he was allowed to testify, his self-serving testimony would be subject to cross-examination.  In addition, Plaintiffs object to this statement because it relates to Defendants' motion for reconsideration regarding personal jurisdiction, which has been denied.

64.    During the period 1998 to 2004, the PLO employed at various times approximately 1,300 persons to work at its embassies, missions and delegations in countries or organizations outside the United States.  During the same period, the PLO employed thousands of persons worldwide.  *Id.* ¶ 18.

**Response**:  DISPUTED.  Defendants did not disclose the witness during discovery and may not use his testimony to support their case-in-chief for reasons described in Plaintiffs' motion in limine.  Because Defendants never disclosed this witness nor the topic on which they now proffer him, Plaintiffs had no opportunity to develop evidence to test his assertions, and to permit his testimony now would be unfairly prejudicial.  The deposition is also hearsay, and if he was allowed to testify, his self-serving testimony would be subject to cross-examination.  In addition, Plaintiffs object to this statement because it relates to Defendants' motion for reconsideration regarding personal jurisdiction, which has been denied.

65.    The PLO Mission to the United States was one of the smaller PLO embassies, missions or delegations during the 1998-2004 period, measured by number of personnel working at the locations of the various embassies, delegations or missions.  *Id.* ¶ 19.

**Response**:  DISPUTED.  Defendants did not disclose the witness during discovery and may not use his testimony to support their case-in-chief for reasons described in Plaintiffs'

motion in limine.  Because Defendants never disclosed this witness nor the topic on which they now proffer him, Plaintiffs had no opportunity to develop evidence to test his assertions, and to permit his testimony now would be unfairly prejudicial.  The deposition is also hearsay, and if he was allowed to testify, his self-serving testimony would be subject to cross-examination.  In addition, Plaintiffs object to this statement because it relates to Defendants' motion for reconsideration regarding personal jurisdiction, which has been denied.

66.    During the 1998-2004 period, there were several embassies, missions and delegations maintained by the PLO around the world that were larger than the PLO Mission to the United States measured by the number of personnel serving at those locations, including the embassies, missions and delegation in the following countries:  Jordan, Egypt, Lebanon, France, Chile, the People's Republic of China, Japan, South Africa, Germany, Russia and Brazil.  *Id.*

**Response**:  DISPUTED.  Defendants did not disclose the witness during discovery and may not use his testimony to support their case-in-chief for reasons described in Plaintiffs' motion in limine.  Because Defendants never disclosed this witness nor the topic on which they now proffer him, Plaintiffs had no opportunity to develop evidence to test his assertions, and to permit his testimony now would be unfairly prejudicial.  The deposition is also hearsay, and if he was allowed to testify, his self-serving testimony would be subject to cross-examination.  In addition, Plaintiffs object to this statement because it relates to Defendants' motion for reconsideration regarding personal jurisdiction, which has been denied.

G.    **Defendants' Contentions Concerning the Guetta Plaintiffs' Claims**

67.    Varda Guetta is not a U.S. National.  *See* Ex. 17, V. Guetta Dep. 10:17-11:5.

**Response**:  AGREED.

68.     In January 2001, Varda and Oz Guetta resided in Givat Zeev, which is near Jerusalem.  *Id.* at 8:7-15; *see also* Ex. 18, O. Guetta Dep. 13:9-21.

**Response**:  AGREED.

69.     Oz Guetta was injured on January 8, 2001.  *Id.* at 55:21-56:3; *see also* Ex. 19, V. Guetta (AB) Dep. 23:20-22.

**Response**:  AGREED.

70.     Oz Guetta is not aware of the identity of the person or persons who injured him. Ex. 18, O. Guetta Dep. 81:5-12.

**Response**:  DISPUTED, in part.  Oz Guetta did not see the shooter, and has no *personal* knowledge of the identity of the person or persons who injured him.  However, there is a genuine issue of fact to be tried concerning the identity of the shooters and the culpability of Defendants. For evidence concerning Varda Guetta's identification of one of the shooters, *see* V. Guetta Dep. (06/27/12) 29:25-32:07; V. Guetta Dep. (05/07/13) 366:11-17, 390:08-12, 392:15-393:02, 394:14-23, 399:10-16, 401:03-13, 420:05-18.  Her identification is reliable and is supported by other credible and probative evidence.  *See* Response #111.

71.     Varda Guetta was not injured on January 8, 2001.  Ex. 19, V. Guetta (AB) Dep. 23:23-24.

**Response**:  DISPUTED.  Varda Guetta was severely and permanently psychologically and emotionally traumatized by the shooting and by the serious and permanent injuries to her son requiring her full-time attention and care.  *See* Strous Rep. for V. Guetta; V. Guetta Dep. (06/27/12) at 101, 105-106.

72.     Oz Guetta was injured around 8:00 or 8:30 in evening.  Ex. 17, V. Guetta Dep. 27:17-20.

**Response**:  AGREED.

73.     It was nighttime and dark.  *Id.* at 27:24-25, 278:7-9.

**Response**:  DISPUTED.  It was nighttime, but Varda Guetta had her headlights on, there were street lights on in the street, the shooters came out of a neighborhood that was all lit up, and the area ahead of her was lit up.  "On the road everything was lit up…It was dark, but it was light."  V. Guetta Dep. (06/27/12) at 28:24-29:06.

74.     Varda Guetta was driving a Hyundai Lancer.  *Id.* at 274:22-24.

**Response**:  AGREED.

75.     Oz Guetta was in the passenger seat.  *Id.* at 277:19-21.

**Response**:  AGREED.

76.     Varda Guetta drove to an intersection.  *Id.* at 278:4-6.

**Response**:  AGREED.

77.     Another car came into the intersection and blocked Varda Guetta's car.  *Id.* at 278:13-18.

**Response**:  AGREED.

78.     Varda Guetta saw flashes coming from the other car.  *Id.* at 278:13-18.

**Response**:  AGREED.

79.     Varda Guetta focused on the flashes of light.  *Id.* at 324:2-4.

**Response**:  DISPUTED.  Varda Guetta did not testify that she was focused on the flashes of light.  She was referencing where the focus was in the questioning by the attorney before a break had been taken—on the flashes of light.  V. Guetta Dep. (05/07/13) at 323:23-324:04.

80.     At first, Varda Guetta did not comprehend they were being shot at.  *Id.* at 278:23-279:5, 369:6-11.

**Response**:  AGREED.

81.    Oz Guetta told her that they were being shot at.  *Id.* at 279:6-8, 324:5-7.

**Response**:  AGREED.

82.    The shooters never got out of the car.  *Id.* at 279:14-24.

**Response**:  AGREED.

83.    Varda Guetta looked at the guns and saw four guns.  *Id.* at 297:18-23.

**Response**:  AGREED.

84.    Varda Guetta became nervous and very confused.  *Id.* at 324:8-11, 327:2-14.

**Response**:  AGREED.

85.    Varda Guetta wanted to save her son.  *Id.* at 324:12-14.

**Response**:  AGREED.

86.    Varda Guetta turned to Oz Guetta and pushed him down with her hands.  *Id.* at 325:6-7.

**Response**:  AGREED.

87.    Varda Guetta put herself on top of Oz Guetta.  *Id.* at 325:8-9.

**Response**:  AGREED, in part.  She was still able to see out of the car and was looking to see what was happening when she was trying to protect him.  *Id*. at  325:11-24.

88.    The shooting episode lasted a matter of seconds.  *Id.* at 327:14-15.

**Response**:  DISPUTED.  Varda also testified at an earlier deposition in the *Linde v. Arab Bank* case that she could not remember how long it took, minutes or more or less than a minute. V. Guetta (AB; 03/18/07) Dep. 25:02-11.

89.    It is very difficult for Varda Guetta to remember some things about the shooting. *Id.* at 344:2-5.

**Response**: AGREED, in part. However, Varda Guetta remembers the face of the man who shot her son. "Q: How did you recognize this person? A: Because I saw the face, and I—I can see the face every time that I close my eyes." V. Guetta Dep. (06/27/12) 30:09-13; *see also* V. Guetta Dep. (05/07/13) 365:25-366:17 ("[U]ntil my dying day, I won't forget him….[T]hat's something that's engraved in me for eternity.").

90.    Varda Guetta spoke to the police about the shooting later that night. *Id.* at 344:6-345:6.

**Response**: AGREED.

91.    Varda Guetta did not provide a description of the shooters to the police. *Id.* at 345:25-346:6.

**Response**: AGREED, in part. The police did not get into details about her description of the shooter. V. Guetta Dep. (05/07/13) 345:25-346:15.

92.    Varda Guetta did not tell the police that one of the shooters had a moustache. *Id.* at 346:7-12.

**Response**: AGREED, in part. The police did not get into details about her description of the shooter. *Id.* at 345:25-346:15.

93.    The police never showed Varda Guetta pictures or had her try and identify anyone. *Id.* at 349:6-11.

**Response**: AGREED.

94.    Six years later, in March 2007, Varda Guetta was deposed in another matter and testified that she had seen the shooters' faces, but could not identify them. Ex. 19, V. Guetta (AB) Dep. 25:18-20.

**Response**:  DISPUTED.  Varda Guetta explained in other testimony that she did not

know the shooters' names.  She says explicitly that she can identify a shooter by face and give a

full description, but does not know his name.   V. Guetta Dep. (06/27/12) at 29:25-32:07.

95.    In March 2007, Varda Guetta was asked if there was anything about the faces that

allowed her to tell who they were, and she shook her head and answered "no."  *Id.* at 25:21-26:3,

Ex. 17, V. Guetta Dep. 363:2-6.

**Response**:  AGREED that Varda Guetta said this, but she explained in other testimony

that she did not know the shooters' names.  She says explicitly that she can identify a shooter by

face and give a full description, but does not know his name.  V. Guetta Dep. (06/27/12) at

29:25-32:07.

96.    Varda Guetta did not provide any description of the shooters at her March 2007

deposition.  *Id.* at 365:19-24.

**Response**:  DISPUTED, in part.  She was not asked to describe the shooters in detail at

her March 2007 deposition.  V. Guetta Dep. (05/07/13) 365:19-366:17.

97.    Varda Guetta did not claim that any of the shooters had a moustache at her March

2007 deposition.  *Id.* at 365:25-366:3.

**Response**:  DISPUTED, in part.  She was not asked this question.  V. Guetta Dep.

(05/07/13) 365:19-366:17.

98.    In March 2007, Varda Guetta testified that she could not tell by looking at them

whether the shooters' were Palestinians or Israelis.  Ex. 19, V. Guetta (AB) Dep. 26:7-10.

**Response**:  AGREED.  However, it would be impossible for a reasonable person to tell

the difference between a Palestinian and an Israeli just by sight, any more than one could

distinguish a resident of Brooklyn or Manhattan by looking at them.

99.     Three years later, at her first deposition in this case in June 2010, Varda Guetta testified that she could see the face of one shooter with a mustache and dark skin when she closed her eyes, but that she did not know the person or his name.  Ex. 17, V. Guetta Dep. 30:4-16, 31:23-32:7.

**Response**:  AGREED.

100.     The first time Varda Guetta reviewed photographs to try and identify the shooters was in February 2013.  *Id.* at 390:8-12, 403:3-10.

**Response**:  DISPUTED.  Varda Guetta had been shown photographs of an individual that she was unable to identify as one of the shooters involved in the January 8, 2001 shooting attack, as discussed at a discovery conference before Judge Ellis on November 20, 2012.  Hearing Tr. (11/20/12) at 26:02-05.[4]  These photographs were disclosed to defense counsel in June 2012, and the unsuccessful identification was also referenced in correspondence from the Plaintiffs to Judge Ellis concerning a discovery dispute on November 19, 2012.  *See* E-mail from Tolchin to Hill (07/06/12) (enclosing photos); Letter from Tolchin to Judge Ellis (11/19/12), p. 3; *see also* Pls. Tr. Exs. 320A-C (photos).

101.     Plaintiffs' counsel Robert Tolchin brought Ms. Guetta an envelope of pictures.  V. Guetta Dep. 394:24-395:8.  The envelope contained 15 head shots of men.  Only two of the men, including the individual subsequently picked by Ms. Guetta, had a significant mustache. Whereas most of the photographs have a red background, the photograph picked by Ms. Guetta was one of two with a blue background.  *See* Ex. 69, PTE 334.

---

[4] The date on this transcript incorrectly appears as November 20, 2011; however, this is a typographical error.

**Response**:  DISPUTED.  Six out of fifteen men in the photo array have moustaches; three are significant.  There were eleven pictures with red backgrounds, two with blue and two with white.  Pls. Tr. Ex. 334.

102.    Varda Guetta assumed that the pictures Mr. Tolchin gave her were of potential terrorists, and assumed and hoped that the right picture was in the group.  Ex. 17, V. Guetta Dep. 397:14-398:2.

**Response**:  DISPUTED.  Varda Guetta responded affirmatively to a leading question as represented by Defendants, V. Guetta Dep. (05/07/13) at 397-402, but she had earlier been shown photographs of a suspect and made a negative identification.  *See* Response #100.  Therefore, the inference that Defendants would have the Court draw from this testimony—*i.e.*, that her identification was unreliable—is not warranted.  In addition, she testified that she was not told what she was looking for or how the shooter might look.  V. Guetta Dep. (05/07/13) at 397-402.

103.    Mr. Tolchin did not tell Ms. Guetta that the shooter might not be in the group of pictures.  *Id.* at 398:14-19.

**Response**:  AGREED.

104.    Varda Guetta reviewed the photographs in Mr. Tolchin's presence at 5:30 pm on February 17, 2013, but she did not make any identification.  *Id.* at 407:3-408:10; 478:16-19.

**Response**:  DISPUTED.  Varda Guetta testified that she was being distracted by her grandson and therefore decided to look later in the day.  *Id.* at 411:08-09; 412:16-17.

105.    Mr. Tolchin then left and left the photographs with Ms. Guetta who set them aside.  *Id.* at 413:10-12.

**Response**:  AGREED.

106.    Varda Guetta reviewed the photographs a second time for a long time starting at 9:00 pm that same day.  *Id.* at 415:9-15, 419:25-420:4.

**Response**:  AGREED.

107.    She eventually selected a photo marked with the letter "I," put it aside, and went to sleep.  *Id.* at 420:8-421:20.

**Response**:  AGREED.

108.    The next morning, she again looked at photo "I," because she wanted to be certain.  *Id.* at 421:12-16.

**Response**:  AGREED.

109.    On February 19, 2013, Varda Guetta told Mr. Tolchin that had selected a photo.  *Id.* at 477:13-478:5.

**Response**:  AGREED.

110.    Varda Guetta does not know the name of the person whose image appears in the photograph which she ultimately selected in February 2013. V. Guetta Dep.  *Id.* at 478:12-15.

**Response**:  AGREED.

111.    The chances that an individual in Varda Guetta's circumstances could acquire the type of detailed memory for the face of a stranger that would permit a reliable identification of the gunman among a set of other dark skinned individuals with mustaches is nearly zero.  *See* Ex. 20, G. Wells Report, at 12-13.

**Response**:  DISPUTED.  Varda Guetta clearly remembers the face of the man who shot at her and her son, V. Guetta Dep. (06/27/12) at 30:09-13, 31:23-32:07, V. Guetta Dep. (05/07/13) at 365:25-366:17.  Her identification of the shooter as Fawzi Murar (a member of Force 17) was supported by other credible and probative evidence showing that after the Al-Aqsa

Martyrs Brigades ("AAMB") was established in late 2000, members of the PA security forces

that members of Force 17—the commando unit responsible for protecting Arafat—engaged in

shooting attacks against Israeli civilians in the West Bank at that time.  Pls. Exs. 451 (P 7: 405-

19), 558 at 8, 559, 616, Shrenzel Rep. 73-77, Eviatar Rep., pp. 76-77.  Other perpetrators of such

attacks confirmed Murar's involvement in attacks similar to the January 8 shooting.  Pls. Exs.

317A, 317C, 326-27; 329, 331, 335, 1109, Shrenzel Rep. 76-77.  As to whether the person in the

photograph that Ms. Guetta identified (Ex. 334, picture "I") is, in fact, Fawzi Murar—this is a

determination that the jury is entitled to make at trial based, in part, upon comparison of that

photograph to other known official pictures of Fawzi Murar.  *See, e.g.*, Pls. Tr. Exs. 316, 317B;

*see also* Fed. R. Evid. 901(3).  Finally, Dr. Wells's opinions are problematic and subject to cross-

examination.  *See, e.g.*, Response #113, *infra* (discussing problems with Dr. Wells's opinion).

112.    This is an extreme case of a long retention interval, and the reliability of any

identification at this point is so close to zero as to be negligible.  *Id.* at 13-14.

**Response**:  DISPUTED.  Varda Guetta clearly remembers the face of the man who shot

at her and her son, her identification was reliable and supported by other credible and probative

evidence, and Dr. Wells's opinions are problematic and subject to cross-examination.  *See*

Responses #111, 113.

113.    A proper eyewitness identification procedure involves five critical elements that

help safeguard against mistaken identification.  First, the only proper lineup identification

procedure (whether photographic or live) is one in which an a-priori suspect is embedded among

known-innocent fillers.  Second, the fillers must all fit the verbal description that the witness

gave of the culprit.  Third, witnesses must be explicitly told that the culprit might not be in the

lineup, that they should not guess, and that they do not need to make an identification.  Fourth,

the person who interacts with the witness regarding the lineup (*e.g.*, delivers instructions, gives the photos to the witness, observes the witness attempting the identification, takes the witness's statement) should not have direct involvement in the case (*e.g.*, should not know which photo might be that of the suspect) but instead should be a neutral party. Finally, immediately following the identification of any individual the eyewitness must be asked by the neutral party to state how certain she or he is that the identified person is the culprit and a clear record must be made of the answer. *Id.* at 14-15.

**Response**: DISPUTED. Dr. Wells's opinions about witness identification are not sufficient to take Varda Guetta's identification from the jury. Ms. Guetta's identification of Murar resulted from a reliable photo array of fifteen pictures provided to her by her counsel in February 2013. Letter from Yalowitz to Judge Ellis (06/13/13); *see also* V. Guetta Dep. (05/07/13) at 390:08-395:08; E-mail from Weiser to Hill (05/03/13) (enclosing photo array); Pls. Tr. Ex. 334 (photo array).

Moreover, Dr. Wells admitted that he cannot determine whether the identification was correct. *See, e.g.*, Wells Dep. 50:12-52:17; 207:02-06; 211:22-212:04. Dr. Wells additionally acknowledged that the presence of the factors that he identified in his expert report as indicators of unreliability in this case did not mean that it would be impossible for Ms. Guetta to make an accurate identification. *See, e.g.*, Wells Dep. at 123:09-124:11 (lighting conditions and distance); 127:13-128:05 (length of viewing time); 128:06-17 (fear and stress); 134:16-22 (weapon focus); 135:25-136:03 (discussing circumstances of being shot at while in a car); 137:10-14 (presence of family member during shooting); 140:20-25 (passage of time); 150:20-24 (effect of post-event information); 171:15-21 (significance of witness descriptions). Dr. Wells also acknowledged that he did not consider Ms. Guetta's prior negative identification in forming

his opinions, and that such a negative identification would be an important fact.  *See, e.g.*, Wells Dep. 199:03-201:19, 207:07- 208:17.  That prior negative identification eliminates any assumption that "the witness could have chosen anyone, even at random, and that person would then be named as the gunman."  *See* Wells Rep. 15.  Moreover, Ms. Guetta clearly remembers the face of the man who shot at her and her son, her identification was reliable and supported by other credible and probative evidence.  *See* Response #111.

114.     With respect to there being only one a-priori suspect and the remaining photos being known-innocent fillers, the evidence suggests that this was not the case.  At a hearing on November 20, 2012, before Magistrate Judge Ellis, counsel for the plaintiffs stated that they intend to show Varda Guetta photos and that they "picked out the names of *17* people who are people who operate in this kind of MO in that area during that time period."  Tr. 25:20-23. Counsel for the plaintiffs have not confirmed that the individuals in the other photos were not also potential suspects.  If the others were also potential suspects, then this is not an identification test at all; there was no way to fail the test because the witness could have chosen anyone, even at random, and that person would then be named as the gunman.  Ex. 20, G. Wells Report at 15.

**Response**:  DISPUTED.  A hearing transcript is not evidence.  Moreover, Dr. Wells's opinions about witness identification are not sufficient to take Varda Guetta's identification from the jury.  *See* Responses #113.  Dr. Wells admitted that he cannot determine whether the identification was correct.  *Id.*  Dr. Wells also acknowledged that he did not consider Ms. Guetta's prior negative identification in forming his opinions, and that such a negative identification would be an important fact.  *Id.*  Moreover, Ms. Guetta clearly remembers the face of the man who shot at her and her son, her identification was reliable and supported by other

credible and probative evidence. *See* Response #111. Furthermore, mustaches can be removed and regrown, and their absence in some filler photos is therefore irrelevant.

115.    On the matter of the suitability of the fillers (if they were in fact fillers rather than also being potential suspects), they fall far short of meeting the criteria for a proper identification procedure. Based on Varda Guetta's profoundly sparse description in her 2012 deposition, the gunman had a mustache. More than half of the photos can be eliminated on that basis alone. And, with the exception of one other individual, only the photo she picked has a mustache of any significance. *Id.* at 15.

**Response**:  DISPUTED.  Dr. Wells's opinions about witness identification are not sufficient to take Varda Guetta's identification from the jury. *See* Response #113. Dr. Wells admitted that he cannot determine whether the identification was correct. *Id.* Dr. Wells also acknowledged that he did not consider Ms. Guetta's prior negative identification in forming his opinions, and that such a negative identification would be an important fact. *Id.* Moreover, Ms. Guetta clearly remembers the face of the man who shot at her and her son, her identification was reliable and supported by other credible and probative evidence. *See* Response #111.

116.    Varda Guetta was not given any cautionary instruction (often called a pre-lineup admonishment) warning her that the culprit might not be in the lineup, that she should not guess, and that she need not make an identification. In fact, Varda Guetta testified that when she received the photos from her lawyer, she believed that they were photos of "terrorists" and that she "assumed" that the shooter was among the photos. *Id.* at 15.

**Response**:  DISPUTED.  Dr. Wells's opinions about witness identification are not sufficient to take Varda Guetta's identification from the jury. *See* Response #113. Dr. Wells admitted that he cannot determine whether the identification was correct. *Id.* Dr. Wells also

acknowledged that he did not consider Ms. Guetta's prior negative identification in forming his opinions, and that such a negative identification would be an important fact. *Id.* Moreover, Ms. Guetta clearly remembers the face of the man who shot at her and her son, her identification was reliable and supported by other credible and probative evidence. *See* Response #111. She was not told what she was looking for or how the shooter might look. V. Guetta Dep. (05/07/13) at 397-402.

117. The photos were delivered by the plaintiff's attorney, an initial examination of the photos occurred in the presence of the plaintiff's attorney, and the witness reported her pick to that same attorney. No recordings were made of any of this identification procedure. *Id.* at 15.

**Response**: AGREED.

118. There was no protocol for taking a clear statement from the witness at the time of identification with regard to her certainty and making a record of that. The identification decision was not taken at the time the photos were delivered. Instead, Varda Guetta was allowed to take possession of the photos and examine them for more than 24 hours. *Id.* at 16.

**Response**: DISPUTED. Dr. Wells's opinions about witness identification are not sufficient to take Varda Guetta's identification from the jury. *See* Response #113. Dr. Wells admitted that he cannot determine whether the identification was correct. *Id.* Dr. Wells also acknowledged that he did not consider Ms. Guetta's prior negative identification in forming his opinions, and that such a negative identification would be an important fact. *Id.* Moreover, Ms. Guetta clearly remembers the face of the man who shot at her and her son, her identification was reliable and supported by other credible and probative evidence. *See* Response #111.

119. There is no admissible evidence that the photograph picked by Varda Guetta in February 2013 is an image of Fawzi Murar.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

120.    There is no admissible evidence that Fawzi Murar caused the shooting that injured Oz Guetta.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

121.    There is no admissible evidence that the PA or PLO caused the shooting that injured Oz Guetta.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

122.    There is no admissible evidence that "terrorist units" of the PA or PLO caused the shooting that injured Oz Guetta.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

123.    There is no admissible evidence that the PA or PLO authorized, ordered, instructed, solicited or directed the shooting that injured Oz Guetta.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

124.    There is no admissible evidence that Fatah caused the shooting that injured Oz Guetta.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

125.    There is no admissible evidence that Fawzi Murar acted as an agent of Fatah at the time of the shooting that injured Oz Guetta.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

126.    There is no admissible evidence that Fawzi Murar acted within the scope of any agency he may have had with Fatah in connection with the shooting that injured Oz Guetta.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

127.    There is no admissible evidence that Fatah was an agent of the PLO in connection with the shooting that injured Oz Guetta.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

128.    There is no admissible evidence that the PA was an agent of the PLO in connection with the shooting that injured Oz Guetta.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

129.    There is no admissible evidence that Fatah was an agent of the PA in connection with the shooting that injured Oz Guetta.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

130.    There is no admissible evidence that Fawzi Murar was an employee of the PLO.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

131.    There is no admissible evidence that Fawzi Murar acted within the scope of any employment by the PA in connection with the shooting that injured Oz Guetta.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

132.    There is no admissible evidence that the PA or PLO provided material support to Fawzi Murar which was used for the shooting that injured Oz Guetta.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

133.    There is no admissible evidence that any funds provided to Fawzi Murar by the PA were used for the shooting that injured Oz Guetta.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

134.    There is no admissible evidence that the PA or PLO provided material support to Fatah which was used for the shooting that injured Oz Guetta.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

135.    There is no admissible evidence that any funds provided to Fatah by the PA were used for the shooting that injured Oz Guetta.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

136.    The Israelis did not prosecute anyone, including any PA or PLO officials, for involvement in the shooting that injured Oz Guetta.  Ex. 18, 0. Guetta Dep. 81:17-20.

**Response**: AGREED, in part. Fawzi Murar died as a fugitive and the State of Israel

therefore had no opportunity to prosecute him for the attack. *See* Pls. Tr. Ex. 1109. Plaintiffs

object to the characterization of the State of Israel as "the Israelis" as an improper attempt to

delegitimize the State of Israel and to politicize the case.

### H.    Defendants' Contentions Concerning the Gould and Waldman Plaintiffs' Claims

137.    On December 16, 2001, President Arafat delivered a speech to the Palestinian

people in which he said, *inter alia*, "Dear brothers, we have declared a state of emergency, and

have undertaken a series of steps and measures that we intend to pursue, including as declaring

outside the law all illegal organizations and bodies that carry out terrorist activities. We have

undertaken a cease fire initiative, and it is imperative that all respect and abide by this initiative

without exception." Ex. 21, DTE 33 at 2.

**Response**: AGREED, in part. The speech was delivered.

DISPUTED, in part. Defendants left out the part where Arafat first showed honor to

those who gave their own flesh and blood or who are languishing in prison, creating a "heroic

legend" for the purpose of "freedom and independence." *Id*. In addition, the veracity, sincerity,

and materiality of the statement, and its intended effect and application, are subjects for the jury.

Finally, "[o]ne of the key elements in Arafat's policy and approach was doubletalk, lies, and

absolute untrustworthiness, totally dependent on interests and circumstances." Eviatar Reb. ¶ 20;

*see also* Eviatar Reb. ¶¶ 21-23.

138.    During that same December 16, 2001 speech, President Arafat also said: "Once

again, I reaffirm today the full and immediate cessation of all armed operations. Again, I call for

the total halt of all operations, particularly suicide attacks, that we have always denounced, and

we shall hold accountable all those who facilitate and plan them….Any violation of this decision will be deemed as causing grave damage to the supreme national interests of our people and of the Arab nation, and all violators will be relentlessly prosecuted." *Id.* at 3.

      **Response**:  AGREED, in part.  The speech was delivered.

      DISPUTED, in part.  It is noteworthy that Arafat first showed honor to those who gave their own flesh and blood or who are languishing in prison, creating a "heroic legend" for the purpose of "freedom and independence."  *Id.*  The veracity, sincerity, and materiality of the statement, and its intended effect and application, are subjects for the jury.  Finally, "[o]ne of the key elements in Arafat's policy and approach was doubletalk, lies, and absolute untrustworthiness, totally dependent on interests and circumstances."  Eviatar Reb. ¶ 20; *see also* Eviatar Reb. ¶¶ 21-23.

      139.    Shayna Gould and Shmuel Waldman were injured on January 22, 2002.  *See* Ex. 22, S. Waldman Dep. 80:18-20; *see also* Ex. 23, S. Gould (AB) Dep. 21:9-11.

      **Response**:  AGREED.

      140.    On January 22, 2001, Shmuel and Henna Waldman resided in Israel.  *See* Ex. 24, H. Waldman Dep. 11:18-20.

      **Response**:  DISPUTED, in part.  The relevant date is January 22, 2002.

      141.    On January 22, 2001, Shayna Gould resided in Israel.  Ex. 23, S. Gould (AB) Dep. 11:22-12:8; *see also* Ex. 25 E. Gould Dep. 27:9-20.

      **Response**:  DISPUTED, in part.  Shayna Gould was studying temporarily in Israel at that time.  *Id.*  In addition, the relevant date is January 22, 2002.

      142.    Ronald Gould was not present when Shayna Gould and Shmuel Waldman were injured.  Ex. 7, Gould and Waldman Response to RFA, No. 1.

**Response**:  AGREED.

143.    Elise Gould was not present when Shayna Gould and Shmuel Waldman were injured.  Ex. 7, Gould and Waldman Response to RFA, No. 2.

**Response**:  AGREED.

144.    Jessica Rine was not present when Shayna Gould and Shmuel Waldman were injured.  Ex. 7, Gould and Waldman Response to RFA, No. 3.

**Response**:  AGREED.

145.    Henna Waldman was not present when Shayna Gould and Shmuel Waldman were injured.  Ex. 7, Gould and Waldman Response to RFA, No. 4.

**Response**:  DISPUTED, in part.  Henna Waldman was living in Israel at the time of the attack.  H. Waldman Dep. 11:18-20.

146.    Morris Waldman was not present when Shayna Gould and Shmuel Waldman were injured. Ex. 7, Gould and Waldman Response to RFA, No. 5.

**Response**:  AGREED.

147.    Eva Waldman was not present when Shayna Gould and Shmuel Waldman were injured.  Ex. 7, Gould and Waldman Response to RFA, No. 6.

**Response**:  AGREED.

148.    Shmuel Waldman did not see the person or persons who injured him.  Ex. 22, S. Waldman Dep. 63:5-20.

**Response**:  AGREED.

149.    Shayna Gould cannot identify the person that injured her.  *See* Ex. 26, S. Gould Dep. 33:4-10.

**Response**:  AGREED.

150.    There is no admissible evidence that the PA or PLO caused the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

151.    There is no admissible evidence that "terrorist units" of the PA or PLO caused the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

152.    There is no admissible evidence that the PA or PLO authorized, ordered, instructed, solicited or directed the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

153.    There is no admissible evidence that Fatah caused the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

154.    There is no admissible evidence that Said Ramadan caused the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

155.    There is no admissible evidence that Nasser Aweis caused the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

156.    There is no admissible evidence that Ahmed Barghouti caused the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

157.    There is no admissible evidence that Ibrahim Abdel Hai caused the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

158.    There is no admissible evidence that Majed al-Masri caused the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

159.    There is no admissible evidence that Mohamed Mousleh caused the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

160.    There is no admissible evidence that Feras Ghanem caused the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

161.    There is no admissible evidence that Mohammed Abdullah caused the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

162.    There is no admissible evidence that Mahmoud al-Titi caused the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

163.    There is no admissible evidence that Bashar Barghouti caused the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

164.    There is no admissible evidence that Said Ramadan acted as an agent of Fatah at the time of the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

165.    There is no admissible evidence that Said Ramadan acted within the scope of any agency he may have had with Fatah in connection with the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

166.    There is no admissible evidence that Nasser Aweis acted as an agent of Fatah at the time of the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

167.     There is no admissible evidence that Nasser Aweis acted within the scope of any agency he may have had with Fatah in connection with the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

168.     There is no admissible evidence that Ahmed Barghouti acted as an agent of Fatah at the time of the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

169.     There is no admissible evidence that Ahmed Barghouti acted within the scope of any agency he may have had with Fatah in connection with the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

170.     There is no admissible evidence that Ibrahim Abdel Hai acted as an agent of Fatah at the time of the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

171.     There is no admissible evidence that Ibrahim Abdel Hai acted within the scope of any agency he may have had with Fatah in connection with the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

172.    There is no admissible evidence that Majed al-Masri acted as an agent of Fatah at the time of the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

173.    There is no admissible evidence that Majed al-Masri acted within the scope of any agency he may have had with Fatah in connection with the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

174.    There is no admissible evidence that Mohamed Mousleh acted as an agent of Fatah at the time of the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

175.    There is no admissible evidence that Mohamed Mousleh acted within the scope of any agency he may have had with Fatah in connection with the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

176.    There is no admissible evidence that Firas Ghanem acted as an agent of Fatah at the time of the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

177.    There is no admissible evidence that Firas Ghanem acted within the scope of any agency he may have had with Fatah in connection with the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

178.    There is no admissible evidence that Mohammed Abdullah acted as an agent of Fatah at the time of the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

179.    There is no admissible evidence that Mohammed Abdullah acted within the scope of any agency he may have had with Fatah in connection with the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

180.    There is no admissible evidence that Mahmoud al-Titi acted as an agent of Fatah at the time of the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

181.    There is no admissible evidence that Mahmoud al-Titi acted within the scope of any agency he may have had with Fatah in connection with the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

182.     There is no admissible evidence that Bashar Barghouti acted as an agent of Fatah at the time of the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

183.     There is no admissible evidence that Bashar Barghouti acted within the scope of any agency he may have had with Fatah in connection with the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

184.     There is no admissible evidence that Fatah was an agent of the PLO in connection with the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

185.     There is no admissible evidence that the PA was an agent of the PLO in connection with the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

186.     There is no admissible evidence that Fatah was an agent of the PA in connection with the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

187.    There is no admissible evidence that Said Ramadan was an employee of the PLO.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

188.    There is no admissible evidence that Said Ramadan acted within the scope of any employment by the PA in connection with the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

189.    There is no admissible evidence that the PA or PLO provided material support to Said Ramadan which was used for the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

190.    There is no admissible evidence that any funds provided to Said Ramadan by the PA were used for the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

191.    There is no admissible evidence that Nasser Aweis was an employee of the PLO.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

192.    There is no admissible evidence that Nasser Aweis acted within the scope of any employment by the PA in connection with the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**: This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

193.    There is no admissible evidence that the PA or PLO provided material support to Nasser Aweis which was used for the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**: This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

194.    There is no admissible evidence that any funds provided to Nasser Aweis by the PA were used for the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**: This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

195.    There is no admissible evidence that Ahmed Barghouti was an employee of the PLO.

**Response**: This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

196.    There is no admissible evidence that Ahmed Barghouti acted within the scope of any employment by the PA in connection with the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**: This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

197.    There is no admissible evidence that the PA or PLO provided material support to Ahmed Barghouti which was used for the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

198.    There is no admissible evidence that any funds provided to Ahmed Barghouti by the PA were used for the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

199.    There is no admissible evidence that Ibrahim Abdel Hai was an employee of the PLO.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

200.    There is no admissible evidence that Ibrahim Abdel Hai acted within the scope of any employment by the PA in connection with the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

201.    There is no admissible evidence that the PA or PLO provided material support to Ibrahim Abdel Hai which was used for the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

202.    There is no admissible evidence that any funds provided to Ibrahim Abdel Hai by the PA were used for the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

203.     There is no admissible evidence that Majed al-Masri was an employee of the PLO.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

204.     There is no admissible evidence that Majed al-Masri acted within the scope of any employment by the PA in connection with the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

205.     There is no admissible evidence that the PA or PLO provided material support to Majed al-Masri which was used for the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

206.     There is no admissible evidence that any funds provided to Majed al-Masri by the PA were used for the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

207.     There is no admissible evidence that Mohamed Mousleh was an employee of the PLO.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

208.     There is no admissible evidence that Mohamed Mousleh acted within the scope of any employment by the PA in connection with the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

209.     There is no admissible evidence that the PA or PLO provided material support to Mohamed Mousleh which was used for the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

210.     There is no admissible evidence that any funds provided to Mohamed Mousleh by the PA were used for the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

211.     There is no admissible evidence that Firas Ghanem was an employee of the PA or PLO at the time of the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

212.     There is no admissible evidence that Firas Ghanem acted as an agent of the PA or PLO at the time of the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

213.    There is no admissible evidence that the PA or PLO provided material support to Firas Ghanem which was used for the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

214.    There is no admissible evidence that Mohammed Abdullah was an employee of the PA or PLO at the time of the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

215.    There is no admissible evidence that Mohammed Abdullah acted as an agent of the PA or PLO at the time of the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

216.    There is no admissible evidence that the PA or PLO provided material support to Mohammed Abdullah which was used for the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

217.    There is no admissible evidence that Mahmoud al-Titi was an employee of the PA or PLO at the time of the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

218.    There is no admissible evidence that Mahmoud al-Titi acted as an agent of the PA or PLO at the time of the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

219.    There is no admissible evidence that the PA or PLO provided material support to Mahinoud al-Titi which was used for the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

220.    There is no admissible evidence that Bashar Barghouti was an employee of the PA or PLO at the time of the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

221.    There is no admissible evidence that Bashar Barghouti acted as an agent of the PA or PLO at the time of the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

222.    There is no admissible evidence that the PA or PLO provided material support to Bashar Barghouti which was used for the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

223.     There is no admissible evidence that any funds provided to Fatah by the PA were used for the shooting that injured Shayna Gould and Shmuel Waldman.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

I.     **Defendants' Contentions Concerning the Sokolow Plaintiffs' Claims**

224.     Mark, Rena, Jamie and Lauren Sokolow were injured on January 27, 2002.  *See* Ex. 27, M. Sokolow Dep. 17:3-5.

**Response**:  AGREED.

225.     On February 3, 2002, the New York Times published an "Op-Ed" by Yasir Arafat that stated, *inter alia,* "let me be very clear.  I condemn the terrorist attacks carried out by terrorist groups against Israeli civilians.  These groups do not represent the Palestinian people or their legitimate aspirations for freedom.  They are terrorist organizations, and I am determined to put an end to their activities."  *See* Ex. 28, DTE 35.

**Response**:  AGREED that the "Op-Ed" was published.  Arafat also wrote that "[C]ondemnations do not stop terrorism.  To stop terrorism, we must understand that terrorism is simply the symptom, not the disease."  *Id.*  The veracity, sincerity, and materiality of the statement, and its intended effect and application, are subjects for the jury.  Finally, "[o]ne of the key elements in Arafat's policy and approach was doubletalk, lies, and absolute untrustworthiness, totally dependent on interests and circumstances."  Eviatar Reb. ¶ 20; *see also* Eviatar Reb. ¶¶ 21-23.

226.     Elana Sokolow was not present when Mark, Rena, Jamie and Lauren Sokolow were injured.  *See* Ex. 29, E. Sokolow Dep. 9:8-11; *see also* Ex. 8, Sokolow Response to RFA No. 1.

**Response**:  DISPUTED, in part.  Elana testified that she was not "present at the bombing," (E. Sokolow Dep. 09:08-11), but she was in Jerusalem.  E. Sokolow Dep. 11.

227.     Mark, Jamie and Lauren Sokolow did not see the person or persons who caused the explosion that injured them.  Ex. 27, M. Sokolow Dep. 38:17-39:8; *see also* Ex. 30, J. Sokolow Dep. 16:20-17:9; Ex. 31, L. Sokolow 10:3-11:2.

**Response**:  AGREED.

228.     Rena Sokolow did not see the person or persons who caused the explosion that injured her prior to, or at the time of, the explosion.  *See* Ex. 32, R. Sokolow Dep. 41:19-24, 42:9-12.

**Response**:  AGREED.

229.     Rena Sokolow saw the head of a person after the explosion, but is not able to identify that person.  *Id.* at 43:25-44:5, 45:18-46:14.

**Response**:  AGREED.

230.     There is no admissible evidence that the PA or PLO caused the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

231.     There is no admissible evidence that "terrorist units" of the PA or PLO caused the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

232.    There is no admissible evidence that the PA or PLO authorized, ordered, instructed, solicited or directed the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

233.    There is no admissible evidence that Fatah caused the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

234.    There is no admissible evidence that Wafa Idris caused the explosion that injured Jamie and Lauren Sokolow.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

235.    There is no admissible evidence that Munzer Noor caused the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

236.    There is no admissible evidence that Kamal El Abed caused the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

237.    There is no admissible evidence that Tewfiq Tirawi caused the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

238.     There is no admissible evidence that Wafa Idris acted as an agent of Fatah at the time of the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

239.     There is no admissible evidence that Wafa Idris acted within the scope of any agency she may have had with Fatah in connection with the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

240.     There is no admissible evidence that Munzer Noor acted as an agent of Fatah at the time of the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

241.     There is no admissible evidence that Munzer Noor acted within the scope of any agency he may have had with Fatah in connection with the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

242.     There is no admissible evidence that Kamal El Abed acted as an agent of Fatah at the time of the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

243.    There is no admissible evidence that Kamal El Abed acted within the scope of any agency he may have had with Fatah in connection with the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

244.    There is no admissible evidence that Tewfiq Tirawi acted as an agent of Fatah at the time of the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

245.    There is no admissible evidence that Tewfiq Tirawi acted within the scope of any agency he may have had with Fatah in connection with the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

246.    There is no admissible evidence that Kamal El Abed was an employee of the PLO.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

247.    There is no admissible evidence that Kamal El Abed acted within the scope of any employment by the PA in connection with the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

248.     There is no admissible evidence that the PA or PLO provided material support to Kamal El Abed which was used for the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

249.     There is no admissible evidence that any funds provided to Kamal El Abed by the PA were used for the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

250.     There is no admissible evidence that Tewfiq Tirawi was an employee of the PLO.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

251.     There is no admissible evidence that Tewfiq Tirawi acted within the scope of any employment by the PA in connection with causing the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

252.     There is no admissible evidence that the PA or PLO provided material support to Tewfiq Tirawi which was used for the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

253. There is no admissible evidence that any funds provided to Tewfiq Tirawi by the PA were used for the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

254. There is no admissible evidence that Wafa Idris was an employee of the PA or PLO.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

255. There is no admissible evidence that Wafa Idris acted as an agent of the PA or PLO in connection with the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

256. There is no admissible evidence that the PA or PLO provided material support to Wafa Idris which was used for the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

257. There is no admissible evidence that Munzer Noor was an employee of the PA or PLO.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

258.     There is no admissible evidence that Munzer Noor acted as an agent of the PA or PLO in connection with the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

259.     There is no admissible evidence that the PA or PLO provided material support to Munzer Noor which was used for the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

260.     There is no admissible evidence that Tawfiq Tirawi knew in advance of the explosion that injured Mark, Rena, Jamie and Lauren Sokolow that the explosion was going to occur.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

261.     There is no admissible evidence that Tawfiq Tirawi was involved in planning the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

262.     There is no admissible evidence that the PA or PLO provided material support to Fatah which was used for the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

263.    There is no admissible evidence that any funds provided to Fatah by the PA were used for the explosion that injured Mark, Rena, Jamie and Lauren Sokolow.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

### J.    Defendants' Contentions Concerning the Bauer Plaintiffs' Claims

264.    Revital Bauer is not a U.S. National.  *See* Ex. 33, R. Bauer Dep. 11:21-12:2.

**Response**:  AGREED.

265.    On March 21, 2002, the Bauer Plaintiffs resided in Jerusalem.  *See* Ex. 34, A. Bauer (AB) Dep. 8:5-12.

**Response**:  AGREED.

266.    Alan and Yehonathon Bauer were injured on March 21, 2002.  *See* Ex. 35, A. Bauer Dep. 8:10-15.

**Response**:  AGREED.

267.    On April 13, 2002, a statement was released on behalf of the President and the Palestinian Leadership which stated, *inter alia*, "President Yasser Arafat and the Palestinian Leadership express their condemnation of all terrorist activities that target civilians, whether Israeli or Palestinian, and regardless of whether this terrorism is sponsored by a state, group or individual.  This is based on a well-established principle that rejects resorting to violence and terrorism as a means to achieving political goals.  We have declared this position in 1988, when the Oslo Agreement was signed at the White House, and have repeated it numerous times, including on December 16, 2001 and thereafter . . . .We strongly condemn the violent attacks targeting Israeli civilians, especially the last attack in Jerusalem . . . ."  *See* Ex. 36, DTE 37, at 2.

**Response**:  AGREED, in part.  The statement was released.

DISPUTED, in part.  The statement also said that security can only be achieved through peace and not through occupation.  *Id*. at 3.  The veracity, sincerity, and materiality of the statement, and its intended effect and application, are subjects for the jury.  Finally, "[o]ne of the key elements in Arafat's policy and approach was doubletalk, lies, and absolute untrustworthiness, totally dependent on interests and circumstances."  Eviatar Reb. ¶ 20; *see also* Eviatar Reb. ¶¶ 21-23.

268.    Revital Bauer was not present when Alan and Yehonathon Bauer were injured.  Ex. 9, Bauer Response to RFA, No. 1.

**Response**:  DISPUTED, in part.  Revital Bauer was in Israel.  R. Bauer Dep. 4, 14.

269.    Binyamin Bauer was not present when Alan and Yehonathon Bauer were injured.  Ex. 9, Bauer Response to RFA, No. 2.

**Response**:  DISPUTED, in part.  Binyamin Bauer was in Jerusalem.  A. Bauer Dep. 251.

270.    Daniel Bauer was not present when Alan and Yehonathon Bauer were injured.  Ex. 9, Bauer Response to RFA, No. 3.

**Response**:  DISPUTED, in part.  Daniel Bauer was in Jerusalem.  A. Bauer Dep. 251.

271.    Yehuda Bauer was not present when Alan and Yehonathon Bauer were injured.  Ex. 9, Bauer Response to RFA, No. 4.

**Response**:  DISPUTED, in part.  Yehuda Bauer was in Jerusalem.  A. Bauer Dep. 251.

272.    Alan Bauer did not see the person or persons who caused the explosion that injured him. Ex. 25, A. Bauer Dep. 110:7-13.

**Response**:  AGREED.

273.    Yehonathon Bauer does not remember anything about the explosion that injured him. *See* Ex. 37, Y. Bauer Dep. 9:22-10:17.

**Response**:  AGREED.

274.     There is no admissible evidence that the PA or PLO caused the explosion that injured Alan and Yehonathon Bauer.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

275.     There is no admissible evidence that "terrorist units" of the PA or PLO caused the explosion that injured Alan and Yehonathon Bauer.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

276.     There is no admissible evidence that the PA or PLO authorized, ordered, instructed, solicited or directed the explosion that injured Alan and Yehonathon Bauer.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

277.     There is no admissible evidence that Fatah caused the explosion that injured Alan and Yehonathon Bauer.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

278.     There is no admissible evidence that Mohammed Hashaika caused the explosion that injured Alan and Yehonathon Bauer.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

279.     There is no admissible evidence that the PA released Mohammed Hashaika in early 2002.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

280.    There is no admissible evidence that Abdel Karim Aweis caused the explosion that injured Alan and Yehonathon Bauer.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

281.    There is no admissible evidence that the PA released Abdel Karim Aweis in late 2001 or early 2002.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

282.    There is no admissible evidence that Nasser Shawish caused the explosion that injured Alan and Yehonathon Bauer.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

283.    There is no admissible evidence that the PA released Nasser Shawish in early 2002.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

284.    There is no admissible evidence that Kahira Saadi caused the explosion that injured Alan and Yehonathon Bauer.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

285.    There is no admissible evidence that Sanaa Shehadeh caused the explosion that injured Alan and Yehonathon Bauer.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

286.    There is no admissible evidence that Mohammed Hashaika acted as an agent of Fatah at the time of the explosion that injured Alan and Yehonathon Bauer.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

287.    There is no admissible evidence that Mohammed Hashaika acted within the scope of any agency he may have had with Fatah in connection with the explosion that injured Alan and Yehonathon Bauer.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

288.    There is no admissible evidence that Abdel Karim Aweis acted as an agent of Fatah at the time of the explosion that injured Alan and Yehonathon Bauer.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

289.    There is no admissible evidence that Abdel Karim Aweis acted within the scope of any agency he may have had with Fatah in connection with the explosion that injured Alan and Yehonathon Bauer.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

290.     There is no admissible evidence that Nasser Shawish acted as an agent of Fatah at the time of the explosion that injured Alan and Yehonathon Bauer.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

291.     There is no admissible evidence that Nasser Shawish acted within the scope of any agency he may have had with Fatah in connection with the explosion that injured Alan and Yehonathon Bauer.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

292.     There is no admissible evidence that Kahira Saadi acted as an agent of Fatah at the time of the explosion that injured Alan and Yehonathon Bauer.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

293.     There is no admissible evidence that Kahira Saadi acted within the scope of any agency she may have had with Fatah in connection with the explosion that injured Alan and Yehonathon Bauer.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

294.     There is no admissible evidence that Sanaa Shehadeh acted as an agent of Fatah at the time of the explosion that injured Alan and Yehonathon Bauer.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

295.    There is no admissible evidence that Sanaa Shehadeh acted within the scope of any agency she may have had with Fatah in connection with the explosion that injured Alan and Yehonathon Bauer.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

296.    There is no admissible evidence that Fatah was an agent of the PLO in connection with the explosion that injured Alan and Yehonathon Bauer.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

297.    There is no admissible evidence that the PA was an agent of the PLO in connection with the explosion that injured Alan and Yehonathon Bauer.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

298.    There is no admissible evidence that Fatah was an agent of the PA in connection with the explosion that injured Alan and Yehonathon Bauer.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

299.    There is no admissible evidence that Mohammed Hashaika was an employee of the PLO.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

300.    ████████████████████████████████████████

████ *See* Ex. 70, DTE 34.

**Response**:  DISPUTED.  ███████████████████████████████████

███████████████████████████████████████

██████████████████████████████████ *Compare* Pls. Tr. Exs. 14,

90 *with* Ex. 95 (02:009457); *see also* Shrenzel Rep. 54-56.

301.     There is no admissible evidence that Mohammed Hashaika acted within the scope

of any employment by the PA in connection with the explosion that injured Alan and

Yehonathon Bauer.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local

Rule 56.1 and the Court's order of May 16, 2014, no response is required.

302.     There is no admissible evidence that the PA or PLO provided material support to

Mohammed Hashaika which was used for the explosion that injured Alan and Yehonathon

Bauer.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local

Rule 56.1 and the Court's order of May 16, 2014, no response is required.

303.     There is no admissible evidence that any funds provided to Mohammed Hashaika

by the PA were used for the explosion that injured Alan and Yehonathon Bauer.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local

Rule 56.1 and the Court's order of May 16, 2014, no response is required.

304.     There is no admissible evidence that Abdel Karim Aweis was an employee of the

PLO.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local

Rule 56.1 and the Court's order of May 16, 2014, no response is required.

305.     There is no admissible evidence that Abdel Karim Aweis acted within the scope of any employment by the PA in connection with the explosion that injured Alan and Yehonathon Bauer.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

306.     There is no admissible evidence that the PA or PLO provided material support to Abdel Karim Aweis which was used for the explosion that injured Alan and Yehonathon Bauer.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

307.     There is no admissible evidence that any funds provided to Abdel Karim Aweis by the PA were used for the explosion that injured Alan and Yehonathon Bauer.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

308.     There is no admissible evidence that Nasser Shawish was an employee of the PA or PLO at the time of the explosion that injured Alan and Yehonathon Bauer.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

309.     There is no admissible evidence that Nasser Shawish acted as an agent of the PA or PLO at the time of the explosion that injured Alan and Yehonathon Bauer.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

310.     There is no admissible evidence that the PA or PLO provided material support to Nasser Shawish which was used for the explosion that injured Alan and Yehonathon Bauer.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

311.    There is no admissible evidence that Kahira Saadi was an employee of the PA or PLO at the time of the explosion that injured Alan and Yehonathon Bauer.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

312.    There is no admissible evidence that Kahira Saadi acted as an agent of the PA or PLO at the time of the explosion that injured Alan and Yehonathon Bauer.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

313.    There is no admissible evidence that the PA or PLO provided material support to Kahira Saadi which was used for the explosion that injured Alan and Yehonathon Bauer.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

314.    There is no admissible evidence that Sanaa Shehadeh was an employee of the PA or PLO at the time of the explosion that injured Alan and Yehonathon Bauer.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

315.    There is no admissible evidence that Sanaa Shehadeh acted as an agent of the PA or PLO at the time of the explosion that injured Alan and Yehonathon Bauer.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

316.    There is no admissible evidence that the PA or PLO provided material support to Sanaa Shehadeh which was used for the explosion that injured Alan and Yehonathon Bauer.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

317.    There is no admissible evidence that any funds provided to Fatah by the PA were used for the explosion that injured Alan and Yehonathon Bauer.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

318.

**Response**:  This paragraph is unnumbered.  No response is required.

### K.    Defendants' Contentions Concerning the Mandelkorn Plaintiffs' Claims

319.    Shaul Mandelkorn is not a U.S. National.  *See* Ex. 38, S. Mandelkorn Dep. 6:18-20.

**Response**:  AGREED.

320.    Nurit Mandelkorn is not a U.S. National.  *See* Ex. 39, N. Mandelkorn Dep. 5:16-18.

**Response**:  AGREED.

321.    In 2002, Leonard and Nurit Mandelkorn resided in Shiloh, which is a settlement in the West Bank.  *See* Ex. 40, L. Mandelkorn Dep. 5:8-7:15, 9:22-24; Ex. 39, N. Mandelkorn 8:23-10:21.

**Response**:  AGREED, in part.  Leonard and Nurit Mandelkorn resided in Shiloh.

DISPUTED, in part.  With regard to the remainder of the paragraph, Plaintiffs object to this statement as immaterial and because Defendants' allegation has political motivations and appears to be an improper attempt to justify a suicide bombing.

322.    In 2002, Shaul Mandelkorn resided at his parents' home in Shiloh, and in a high school dormitory in Israel.  Ex. 40, L. Mandelkorn Dep. 27:24-29:2.

**Response**:  AGREED.

323.    On May 8, 2002, a statement was released on behalf of President Arafat that stated, *inter alia*, "In my capacity as President of the Palestine Liberation Organ and the Palestinian National Authority, I reaffirm my commitment and participation with the United States and the international community in their war on terrorism.  I have given my orders to the Palestinian Security Forces to confront and prevent any terrorist attacks by any Palestinian entities against Israeli civilians…."  *See* Ex. 41, DTE 39, at 2.

**Response**:  AGREED, in part.  The statement was released.

DISPUTED, in part.  The veracity, sincerity, and materiality of the statement, and its intended effect and application, are subjects for the jury.  Finally, "[o]ne of the key elements in Arafat's policy and approach was doubletalk, lies, and absolute untrustworthiness, totally dependent on interests and circumstances."  Eviatar Reb. ¶ 20; *see also* Eviatar Reb. ¶¶ 21-23.

324.    Shaul Mandelkorn was injured on June 19, 2002.  Ex. 38, S. Mandelkorn Dep. 16:7-9.

**Response**:  AGREED.

325.    On June 19, 2002, a statement was released on behalf of the Palestinian Leadership that stated, *inter alia*, "Yesterday and today, two tragic attacks befell the citizens of Israel.  The leaders and people of Palestine wholly condemn these despicable acts, which further

deteriorated security and resulted in the deaths of both Israeli and Palestinian civilians. . . . We have issued this statement in order to clearly denounce and condemn all acts of violence against Israeli civilians, and to announce our intention to pursue the perpetrators of these heinous acts, and bring them to justice . . . . We repeat our denunciation and condemnation of these operations targeting civilians . . ." *See* Ex. 42, DTE 40, at 2.

Response: AGREED, in part. The statement was released.

DISPUTED, in part. The veracity, sincerity, materiality, and its intended effect and application of the statement, are subjects for the jury. Finally, "[o]ne of the key elements in Arafat's policy and approach was doubletalk, lies, and absolute untrustworthiness, totally dependent on interests and circumstances." Eviatar Reb. ¶ 20; *see also* Eviatar Reb. ¶¶ 21-23.

326.     On June 19, 2002, a statement was also made by President Arafat to the Palestinian people that stated, *inter alia*, "By virtue of my national and nationalist position and responsibility, I find it necessary to stand before our Palestinian people . . . and declare . . . my unqualified condemnation of all attacks that target Israeli civilians . . . . Targeting civilians, whether Israeli or Palestinian, is an act condemned and rejected by the Leadership, myself and the international community . . . I have to be honest with you about the necessity for a complete cessation of these attacks that have been condemned in many Palestinian Leadership statements, and against which we have taken many decisive steps for the benefit of our people's supreme national interest." *See* Ex. 43, DTE 42, at 2.

Response: AGREED, in part. The statement was made.

DISPUTED, in part. The veracity, sincerity, and materiality of the statement, and its intended effect and application, are subjects for the jury. Finally, "[o]ne of the key elements in

Arafat's policy and approach was doubletalk, lies, and absolute untrustworthiness, totally dependent on interests and circumstances."  Eviatar Reb. ¶ 20; *see also* Eviatar Reb. ¶¶ 21-23.

327.     Leonard Mandelkorn was not present when Shaul Mandelkorn was injured. Ex. 40, L. Mandelkorn Dep. at 69:16-19; Ex. 10, Mandelkorn Response to RFA, No. 1.

**Response**:  DISPUTED, in part.  Leonard Mandelkorn was in Israel.  L. Mandelkorn Dep. 5.

328.     Nurit Mandelkorn was not present when Shaul Mandelkorn was injured.  Ex. 39, N. Mandelkorn Dep. 64:24-65:3; Ex. 10, Mandelkorn Response to RFA, No. 2.

**Response**:  DISPUTED, in part.  Nurit Mandelkorn was in Israel.  N. Mandelkorn Dep. 5.

329.     Shaul Mandelkorn did not see the person or persons who caused the explosion that injured him.  Ex. 38, S. Mandelkorn Dep. at 22:25-23:5.

**Response**:  AGREED.

330.     There is no admissible evidence that the PA or PLO caused the explosion that injured Shaul Mandelkorn.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

331.     There is no admissible evidence that "terrorist units" of the PA or PLO caused the explosion that injured Shaul Mandelkorn.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

332.     There is no admissible evidence that the PA or PLO authorized, ordered, instructed, solicited or directed the explosion that injured Shaul Mandelkorn.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

333.    There is no admissible evidence that Fatah caused the explosion that injured Shaul Mandelkorn.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

334.    There is no admissible evidence that Naef Abu Sharah caused the explosion that injured Shaul Mandelkorn.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

335.    There is no admissible evidence that Mazen Freitah caused the explosion that injured Shaul Mandelkorn.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

336.    There is no admissible evidence that Said Awada caused the explosion that injured Shaul Mandelkorn.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

337.    There is no admissible evidence that Naef Abu Sharah acted as an agent of Fatah at the time of the explosion that injured Shaul Mandelkorn.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

338.    There is no admissible evidence that Naef Abu Sharah acted within the scope of any agency he may have had with Fatah in connection with the explosion that injured Shaul Mandelkorn.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

339.    There is no admissible evidence that Mazen Freitah acted as an agent of Fatah at the time of the explosion that injured Shaul Mandelkorn.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

340.    There is no admissible evidence that Mazen Freitah acted within the scope of any agency he may have had with Fatah in connection with the explosion that injured Shaul Mandelkorn.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

341.    There is no admissible evidence that Said Awada acted as an agent of Fatah at the time of the explosion that injured Shaul Mandelkorn.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

342.    There is no admissible evidence that Said Awada acted within the scope of any agency he may have had with Fatah in connection with the explosion that injured Shaul Mandelkorn.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

343.    There is no admissible evidence that Fatah was an agent of the PLO in connection with the explosion that injured Shaul Mandelkorn.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

344.    There is no admissible evidence that the PA was an agent of the PLO in connection with the explosion that injured Shaul Mandelkorn.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

345.    There is no admissible evidence that Fatah was an agent of the PA in connection with the explosion that injured Shaul Mandelkorn.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

346.    There is no admissible evidence that Naef Abu Sharah was an employee of the PLO.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

347.    There is no admissible evidence that Naef Abu Sharah acted within the scope of any employment by the PA in connection with the explosion that injured Shaul Mandelkorn.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

348.    There is no admissible evidence that the PA or PLO provided material support to Naef Abu Sharah which was used for the explosion that injured Shaul Mandelkorn.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

349.    There is no admissible evidence that any funds provided to Naef Abu Sharah by the PA were used for the explosion that injured Shaul Mandelkorn**.**

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

350.    There is no admissible evidence that Mazen Freitah was an employee of the PA or PLO.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

351.    There is no admissible evidence that Mazen Freitah acted as an agent of the PA or PLO in connection with the explosion that injured Shaul Mandelkorn.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

352.    There is no admissible evidence that the PA or PLO provided material support to Mazen Freitah which was used for the explosion that injured Shaul Mandelkorn.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

353.    There is no admissible evidence that Said Awada was an employee of the PA or PLO.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

354.     There is no admissible evidence that Said Awada acted as an agent of the PA or PLO in connection with the explosion that injured Shaul Mandelkorn.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

355.     There is no admissible evidence that the PA or PLO provided material support to Said Awada which was used for the explosion that injured Shaul Mandelkorn.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

356.     There is no admissible evidence that the PA or PLO provided material support to Fatah which was used for the explosion that injured Shaul Mandelkorn.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

357.     There is no admissible evidence that any funds provided to Fatah by the PA were used for the explosion that injured Shaul Mandelkorn.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

358.     There is no admissible evidence that Israelis prosecuted anyone, including any PA or PLO officials, for involvement in the explosion that injured Shaul Mandelkorn.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

**L.    Defendants' Contentions Concerning the Coulter, Carter, Blutstein, and Gritz Plaintiffs' Claims**

359.    On July 31, 2002, a statement was released on behalf of Palestinian Leaders that stated, *inter alia*, "The Leaders of Palestine were shocked and disgusted when, just this morning, a terrorist attack took the lives of six people and injured 40 others.  We decry this act of terrorism against civilians at the Hebrew University.  We consider this attack a subhuman act that demolishes totally the image of the Palestinian people in the eyes of the international community . . . . We reiterate our stance against these attacks, as they are fundamentally contradictory to the interest of our people . . . ."  *See* Ex. 44, DTE 43, at 2.

**Response**:  AGREED, in part.  The statement was released.

DISPUTED, in part.  Defendants left out the part of the statement that references the Palestinians' "legitimate struggle to reclaim their lands" and establish the future nation of Palestine with Jerusalem as her capital.  Moreover, the veracity, sincerity, and materiality of the statement, and its intended effect and application, are subjects for the jury.  Finally, "[o]ne of the key elements in Arafat's policy and approach was doubletalk, lies, and absolute untrustworthiness, totally dependent on interests and circumstances."  Eviatar Reb. ¶ 20; *see also* Eviatar Reb. ¶¶ 21-23.

360.    Robert Coulter Sr. was not present when Janis Coulter was allegedly killed.  Ex. 11, Carter, Coulter, and Gritz Response to RFA, No. 1.

**Response**:  AGREED.  However, Plaintiffs object to and DISPUTE the use of the word "allegedly."  There is no question Janis Coulter was killed in the Hebrew University bombing on July 31, 2002.  Pls. Tr. Ex. 993; R. Coulter, Sr. Dep. 11, 13-14.

361.    Diane Coulter Miller was not present when Janis Coulter was allegedly killed.  Ex. 11, Carter, Coulter, and Gritz Response to RFA, No. 2.

**Response**:  AGREED.  However, Plaintiffs object to and DISPUTE the use of the word "allegedly."  Pls. Tr. Ex. 993; R. Coulter, Sr. Dep. 11, 13-14.

362.    Robert Coulter Jr. was not present when Janis Coulter was allegedly killed. Ex. 11, Carter, Coulter, and Gritz Response to RFA, No. 3.

**Response**:  AGREED.  However plaintiffs object to and DISPUTE the use of the word "allegedly."  There is no question Janis Coulter was killed in the Hebrew University bombing on July 31, 2002.  Pls. Tr. Ex. 993; R. Coulter, Sr. Dep. 11, 13-14.

363.    There is no admissible evidence that Robert Coulter Sr. is the duly appointed personal representative of the Estate of Janis Coulter.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

364.    In 1990, Diane Carter moved to Israel.  *See* Ex. 45, S. Choffel Dep. 73:19-21.

**Response**:  AGREED.

365.    Larry Carter and Shaun Coffel did not have any communications with Diane Carter between May of 1990 and 2002.  Ex. 45, S. Coffel Dep. 46:21-25.

**Response**:  AGREED.  Diane Carter had cut off communication with her family, but they still loved her and had faith that she would return.  *Id*. at 48-49.

366.    Larry Carter was not present when Diane Carter was allegedly killed.  Ex. 11, Carter, Coulter, and Gritz Response to RFA, No. 4.

**Response**:  AGREED.  However, Plaintiffs object to and DISPUTE the use of the word "allegedly."  There is no question Diane Carter was killed in the Hebrew University bombing on July 31, 2002.  Pls. Tr. Ex. 987; L. Carter Dep. at 92:02-11.

367.    Shaun Coffel was not present when Diane Carter was allegedly killed.  Ex. 11, Carter, Coulter, and Gritz Response to RFA, No. 5.

**Response**:  AGREED.  However, plaintiffs object to and DISPUTE the use of the word "allegedly."  There is no question Diane Carter was killed in the Hebrew University bombing on July 31, 2002.  Pls. Tr. Ex. 987; L. Carter Dep. 92:02-11.  Moreover, Plaintiffs object to this statement as immaterial and/or the materiality of it is an issue of fact, and, therefore, it is improperly included in Defendants' statement of material facts as to which there is no genuine issue.

368.    Larry Carter and Shaun Coffel have not seen the remains of Diane Carter. *See* Ex. 46, L. Carter Dep. 91:21-22; Ex. 45, S. Coffel Dep. 50:6-9.

**Response**:  AGREED.

369.    There is no admissible evidence that Diane Carter was killed in an explosion at the Hebrew University in Jerusalem on July 31, 2002.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

370.    There is no admissible evidence that Larry Carter is the duly appointed personal representative of the Estate of Diane Carter.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

371.    In July 2002 Benjamin Blutstein was living in Israel.  *See* Ex. 47, K. Baker Dep. 15:14-15.

**Response**:  DISPUTED, in part.  Benjamin Blutstein was present in Israel at that time for the purpose of his studies.  *Id.*

372.    Richard Blutstein was not present when Benjamin Blutstein was allegedly killed. Ex. 11, Carter, Coulter, and Gritz RFA, No. 6.[5]

**Response**:  AGREED.  However, Plaintiffs object to and DISPUTE the use of the word "allegedly."  There is no question Benjamin Blutstein was killed in the Hebrew University bombing on July 31, 2002.  Pls. Tr. Ex. 971, K. Baker Dep. 08:17-21.

373.    Katherine Baker was not present when Benjamin Blutstein was allegedly killed. Ex. 11, Carter, Coulter, and Gritz RFA, No. 7.

**Response**:  AGREED.  However, Plaintiffs object to and DISPUTE the use of the word "allegedly."  There is no question Benjamin Blutstein was killed in the Hebrew University bombing on July 31, 2002.  Pls. Tr. Ex. 971, K. Baker Dep. 08:17-21.

374.    Rebekah Blutstein was not present when Benjamin Blutstein was allegedly killed. Ex. 11, Carter, Coulter, and Gritz RFA, No. 8.

**Response**:  AGREED.  However, Plaintiffs object to and DISPUTE the use of the word "allegedly."  There is no question Benjamin Blutstein was killed in the Hebrew University bombing on July 31, 2002.  Pls. Tr. Ex. 971, K. Baker Dep. 08:17-21.

375.    Richard Blutstein, Katherine Baker and Rebekah Blutstein have not seen the remains of Benjamin Blutstein.  *See* Ex. 48, Richard Blutstein Dep. 50:5-11; Ex. 47, K. Baker Dep. 154:3-7; *see also* Ex. 49, Rebekah Blutstein Dep. 10:7-12.

**Response**:  AGREED.

---

[5]  Defendants claim in a footnote that the Blutstein Plaintiffs did not respond to Defendants' Requests for Admission within 30 days, and, therefore, Defendants' Requests for Admission are admitted as to the Blutstein Plaintiffs.  *See* Fed. R. Civ. P. 36(a)(3).  In fact, Plaintiffs timely responded to all of Defendants' RFAs, including those directed at the Blutstein Plaintiffs, in accordance with Judge Ellis's order (DE 298) on or before January 10, 2013.  This is the first time that Defendants have raised this false allegation.

376.    There is no admissible evidence that Benjamin Blutstein was killed in an explosion at the Hebrew University in Jerusalem on July 31, 2002.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

377.    There is no admissible evidence that Richard Blutstein or Katherine Baker is the duly appointed personal representative of the Estate of Benjamin Blutstein.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

378.    In July 2002 David Gritz was living in Jerusalem. *See* Ex. 50, N. Gritz Dep. 16:7-14.

**Response**:  DISPUTED, in part.  David Grtiz was present in Israel at that time for the purpose of his studies.  *Id.*

379.    Norman Gritz was not present when David Gritz was allegedly killed.  Ex. 11, Carter, Coulter, and Gritz Response to RFA, No. 9.

**Response**:  AGREED.  However, Plaintiffs object to and DISPUTE the use of the word "allegedly."  There is no question David Gritz was killed in the Hebrew University bombing on July 31, 2002.  Pls. Tr. Ex. 1012; N. Gritz Dep. 14:04-09, 17:08-20.

380.    Nevenka Gritz was not present when David Gritz was allegedly killed.  Ex. 11, Carter, Coulter, and Gritz Response to RFA, No. 10.

**Response**:  AGREED.  However, Plaintiffs object to and DISPUTE the use of the word "allegedly."  There is no question David Gritz was killed in the Hebrew University bombing on July 31, 2002.  Pls. Tr. Ex. 1012; N. Gritz Dep. 14:04-09, 17:08-20.

381.    Norman Gritz and Nevenka Gritz have not seen the remains of David Gritz. Ex. 50, N. Gritz Dep. 17:8-18:18.

**Response**:  AGREED.

382.    There is no admissible evidence that David Gritz was killed in an explosion at the Hebrew University in Jerusalem on July 31, 2002.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

383.    There is no admissible evidence that Norman Gritz or Nevenka Gritz is the duly appointed personal representative of the Estate of David Gritz.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

384.    There is no admissible evidence that the PA or PLO caused the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

385.    There is no admissible evidence that "terrorist units" of the PA or PLO caused the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

386.    There is no admissible evidence that the PA or PLO authorized, ordered, instructed, solicited or directed the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

387.     There is no admissible evidence that Fatah caused the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

388.     There is no admissible evidence that Marwan Barghouti caused the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

389.     There is no admissible evidence that Abdullah Barghouti caused the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

390.     There is no admissible evidence that the PA released Abdullah Barghouti in August 2001.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

391.     There is no admissible evidence that Ahmed Barghouti caused the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

392.    There is no admissible evidence that Mohammed Arman caused the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

393.    There is no admissible evidence that the PA released Mohammed Arman in 2001.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

394.    There is no admissible evidence that Ibrahim Hamed caused the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

395.    There is no admissible evidence that Wael Qasam caused the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

396.    There is no admissible evidence that Walid Anjas caused the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

397.    There is no admissible evidence that Mohammed Odeh caused the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

167

398.    There is no admissible evidence that Marwan Barghouti acted within the scope of any agency he may have had with Fatah in connection with the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

399.    There is no admissible evidence that Marwan Barghouti acted as an agent of Hamas at the time of the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

400.    There is no admissible evidence that Marwan Barghouti acted within the scope of any agency he may have had with Hamas in connection with the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

401.    There is no admissible evidence that Abdullah Barghouti acted as an agent of Fatah at the time of the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

402.    There is no admissible evidence that Abdullah Barghouti acted within the scope of any agency he may have had with Fatah in connection with the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

403.    There is no admissible evidence that Abdullah Barghouti acted as an agent of Hamas at the time of the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

404.    There is no admissible evidence that Abdullah Barghouti acted within the scope of any agency he may have had with Hamas in connection with the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response:**  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

405.    There is no admissible evidence that Ahmed Barghouti acted as an agent of Fatah at the time of the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

406.    There is no admissible evidence that Ahmed Barghouti acted within the scope of any agency he may have had with Fatah in connection with the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

407.    There is no admissible evidence that Ahmed Barghouti acted as an agent of Hamas at the time of the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

408.    There is no admissible evidence that Ahmed Barghouti acted within the scope of any agency he may have had with Hamas in connection with the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

409.    There is no admissible evidence that Mohammad Arman acted as an agent of Fatah at the time of the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

410.    There is no admissible evidence that Mohammad Arman acted within the scope of any agency he may have had with Fatah in connection with the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

411.    There is no admissible evidence that Mohammad Arman acted as an agent of Hamas at the time of the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

412.    There is no admissible evidence that Mohammad Arman acted within the scope of any agency he may have had with Hamas in connection with the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

413.    There is no admissible evidence that Ibrahim Hamed acted as an agent of Fatah at the time of the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

414.    There is no admissible evidence that Ibrahim Hamed acted within the scope of any agency he may have had with Fatah in connection with the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

415.    There is no admissible evidence that Ibrahim Hamed acted as an agent of Hamas at the time of the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

416.    There is no admissible evidence that Ibrahim Hamed acted within the scope of any agency he may have had with Hamas in connection with the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

417.    There is no admissible evidence that Wael Qasam acted as an agent of Fatah at the time of the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

418.    There is no admissible evidence that Wael Qasam acted within the scope of any agency he may have had with Fatah in connection with the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

419.    There is no admissible evidence that Wael Qasam acted as an agent of Hamas at the time of the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

420.    There is no admissible evidence that Wael Qasam acted within the scope of any agency he may have had with Hamas in connection with the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

421.    There is no admissible evidence that Walid Anjas acted as an agent of Fatah at the time of the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

422.    There is no admissible evidence that Walid Anjas acted within the scope of any agency he may have had with Fatah in connection with the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

423.    There is no admissible evidence that Walid Anjas acted as an agent of Hamas at the time of the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

424.    There is no admissible evidence that Walid Anjas acted within the scope of any agency he may have had with Hamas in connection with the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

425.    There is no admissible evidence that Mohammed Odeh acted as an agent of Fatah at the time of the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

426.    There is no admissible evidence that Mohammed Odeh acted within the scope of any agency he may have had with Fatah in connection with the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

427.    There is no admissible evidence that Mohammed Odeh acted as an agent of Hamas at the time of the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

428.    There is no admissible evidence that Mohammed Odeh acted within the scope of any agency he may have had with Hamas in connection with the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

429.    There is no admissible evidence that Marwan Barghouti was an employee of the PA or PLO.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

430.     There is no admissible evidence that Marwan Barghouti acted within the scope of any employment by the PA or PLO in connection with the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

431.     There is no admissible evidence that the PA or PLO provided material support to Marwan Barghouti which was used for the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

432.     There is no admissible evidence that any funds provided to Marwan Barghouti by the PA were used for the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

433.     There is no admissible evidence that Abdullah Barghouti was an employee of the PA or PLO.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

434.     There is no admissible evidence that Abdullah Barghouti acted as an agent of the PA or PLO in connection with the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

435.     There is no admissible evidence that the PA or PLO provided material support to Abdullah Barghouti which was used for the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response:**  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

436.     There is no admissible evidence that Ahmed Barghouti was an employee of the PLO.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

437.     There is no admissible evidence that Ahmed Barghouti acted within the scope of any employment by the PA in connection with the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

438.     There is no admissible evidence that the PA or PLO provided material support to Ahmed Barghouti which was used for the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

439. There is no admissible evidence that any funds provided to Ahmed Barghouti by the PA were used for the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

440. There is no admissible evidence that Mohammad Arman was an employee of the PA or PLO.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

441. There is no admissible evidence that Mohammad Arman acted as an agent of the PA or PLO in connection with the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

442. There is no admissible evidence that the PA or PLO provided material support to Mohammad Arman which was used for the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

443. There is no admissible evidence that Ibrahim Hamed was an employee of the PA or PLO.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

444.     There is no admissible evidence that Ibrahim Hamed acted as an agent of the PA or PLO in connection with the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

445.     There is no admissible evidence that the PA or PLO provided material support to Ibrahim Hamed which was used for the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

446.     There is no admissible evidence that Wael Qasam was an employee of the PA or PLO.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

447.     There is no admissible evidence that Wael Qasam acted as an agent of the PA or PLO in connection with the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

448. There is no admissible evidence that the PA or PLO provided material support to Wael Qasam which was used for the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

449. There is no admissible evidence that Walid Anjas was an employee of the PA or PLO.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

450. There is no admissible evidence that Walid Anjas acted as an agent of the PA or PLO in connection with the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

451. There is no admissible evidence that the PA or PLO provided material support to Walid Anjas which was used for the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

452. There is no admissible evidence that Mohammed Odeh was an employee of the PA or PLO.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

179

453.    There is no admissible evidence that Mohammed Odeh acted as an agent of the PA or PLO in connection with the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

454.    There is no admissible evidence that the PA or PLO provided material support to Mohammed Odeh which was used for the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

455.    There is no admissible evidence that the PA or PLO provided material support to Fatah which was used for the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

456.    There is no admissible evidence that the PA or PLO provided material support to Hamas which was used for the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

457.    There is no admissible evidence that any funds provided to Fatah by the PA were used for the explosion that allegedly killed Janis Coulter, Diane Carter, Benjamin Blutstein and David Gritz.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

### M.     Defendants' Contentions Concerning the Goldberg Plaintiffs' Claims

458.     On March 5, 2003, a statement was released on behalf of Palestinian Leadership that stated, *inter alia*, "This afternoon . . . in the city of Haifa, an Israeli bus transporting Israeli and Palestinian civilians was bombed.  The Leadership declares that it strenuously condemns and deplores this bombing attack whose victims were innocent Israeli and Palestinian civilians . . . . The Leadership considers this bombing attack against civilians to be a departure from the responsible Palestinian national position which rejects these acts, particularly those targeting civilians . . . . The Palestinian Leadership rejects this logic of revenge.  It also rejects the targeting of civilians on moral and political grounds."  *See* Ex. 51, DTE 44, at 2.

**Response**:  AGREED, in part.  The statement was released.  DISPUTED, in part. Defendants left out the portion of the statement that reads "…whose victims were innocent Israeli and Palestinian civilians with no role or responsibility for the savage crimes and extermination war being perpetrated by the Israeli occupation army against our people on our beloved Palestinian land."  *Id.*  Defendants also left out the portion of the statement that reads that the reason for the condemnation is because it gives Israel an excuse to "expand the scope of the campaign of killing, destruction and oppression carried out by the Israeli occupation army in all of our cities, villages and camps…These bombings…smear the reputation of our people and their sacrifices with claims of terrorism against civilians, which are used by the government of Israel to cover up the barbaric massacres it perpetrates against our children, our women and our people."  *Id.*  Moreover, it is noteworthy that *a mere two days after the Goldberg bus bombing—* Arafat stated on PA TV:  "With our souls and our blood we will redeem you, oh

Palestine!...Towards Jerusalem are marching millions of martyrs!"  Pls. Tr. Ex. 305.  The

veracity, sincerity, and materiality of the statement, and its intended effect and application, are

subjects for the jury.

Finally, "[o]ne of the key elements in Arafat's policy and approach was doubletalk, lies,

and absolute untrustworthiness, totally dependent on interests and circumstances."  Eviatar Reb.

¶ 20; *see also* Eviatar Reb. ¶¶ 21-23.

459.    On May 18, 2003, an official statement was issued by the PA and PLO that stated,

*inter alia*, "The Palestinian Leadership deplores all violent acts against Israeli and Palestinian

civilians, and calls for the immediate cessation to all aggressions against civilians in all areas

without exception . . . .  We again express our denunciation of all acts of violence against

Palestinian and Israeli civilians."  *See* Ex. 52, DTE 45, at 2.

**Response**:  AGREED, in part.  The statement was issued.

DISPUTED, in part.  The veracity, sincerity, and materiality of the statement, and its

intended effect and application, are subjects for the jury.  In addition, "[o]ne of the key elements

in Arafat's policy and approach was doubletalk, lies, and absolute untrustworthiness, totally

dependent on interests and circumstances."  Eviatar Reb. ¶ 20; *see also* Eviatar Reb. ¶¶ 21-23.

460.    On June 11, 2003, a statement was on behalf of President Arafat that stated, *inter

alia*, "I urge an immediate cessation of all types of operations and shootings.  The hellish hollow

circle of terrorist operations by all parties must stop now and immediately.  I strongly condemn

the terrorist operations that targeted Israeli civilians in Jerusalem today."  *See* Ex. 53, DTE 46,

at 2.

**Response**:  AGREED, in part.  The statement was made.

182

DISPUTED, in part.  The veracity, sincerity, and materiality of the statement, and its intended effect and application, are subjects for the jury.  In addition, "[o]ne of the key elements in Arafat's policy and approach was doubletalk, lies, and absolute untrustworthiness, totally dependent on interests and circumstances."  Eviatar Reb. ¶ 20; *see also* Eviatar Reb. ¶¶ 21-23.

461.    On September 10, 2003, a statement was released on behalf of the Chairman of the Palestinian Legislative Council and Acting Prime Minister that stated, *inter alia*, "We reaffirm the established Palestinian position of rejecting all acts of murder and assassination, and the targeting of innocent civilians, both Palestinian and Israeli.  In this context, we condemn the latest Jerusalem operation, which harms our cause and the interest of our people."  *See* Ex. 54, DTE 47, at 2.

**Response**:  AGREED, in part.  The statement was released.

DISPUTED, in part.  The veracity, sincerity, and materiality of the statement, and its intended effect and application, are subjects for the jury.  In addition, "[o]ne of the key elements in Arafat's policy and approach was doubletalk, lies, and absolute untrustworthiness, totally dependent on interests and circumstances."  Eviatar Reb. ¶ 20; *see also* Eviatar Reb. ¶¶ 21-23.

462.    On January 29, 2004, a statement was released on behalf of the PA Prime Minister that stated, *inter alia*, "Prime Minister Ahmed Qurei Abu Alaa denounced today the bus bombing that struck downtown Jerusalem this morning leaving many dead and injured."  *See* Ex. 55, DTE 48 at 2.

**Response**:  AGREED, in part.  The statement was made.

DISPUTED, in part.  Defendants left out the portion of the statement that reads:  "And so continues the cycle of violence washing over our people, after Israeli forces murdered nine citizens and injured scores more yesterday in Gaza," apparently attempting to justify the

murders.  *See id.*  The veracity, sincerity, and materiality of the statement, and its intended effect

and application, are subjects for the jury.  In addition, "[o]ne of the key elements in Arafat's

policy and approach was doubletalk, lies, and absolute untrustworthiness, totally dependent on

interests and circumstances."  Eviatar Reb. ¶ 20; *see also* Eviatar Reb. ¶¶ 21-23.

463.     On January 29, 2004, the Goldberg Plaintiffs resided in Beitar Illit, which is a

settlement in the West Bank.  *See* Ex. 56, Shifra (Karen) Goldberg Dep. 29:24-32:20.

**Response**:  AGREED, in part.  The Goldberg Plaintiffs resided in Beitar Illit.

DISPUTED, in part.  With regard to the remainder of the paragraph, Plaintiffs object to

this statement as immaterial and because Defendants' allegation has political motivations and

appears to be intended to justify a suicide bombing.

464.     Karen Goldberg was not present when Stuart Scott Goldberg was allegedly killed.

Ex. 12, Goldberg Response to RFA, No. 1.

**Response**:  DISPUTED, in part.  Karen Goldberg was in Israel.  Shifra Goldberg Dep. 5,

20:19-21, 36:14-17.  In addition, there is no question Stuart Scott Goldberg was killed in a

suicide bus bombing on January 29, 2004.  *See* Death Cert. of Scott Goldberg; Shifra Goldberg

Dep. 8-9.

465.     Chana Goldberg was not present when Stuart Scott Goldberg was allegedly killed.

Ex. 12, Goldberg Response to RFA, No. 2.

**Response**:  DISPUTED, in part.  C. Goldberg Dep. 7.  In addition, there is no question

Stuart Scott Goldberg was killed in a suicide bus bombing on January 29, 2004.  *See* Death Cert.

of Scott Goldberg; Shifra Goldberg Dep. 8-9.

466.     Esther Goldberg was not present when Stuart Scott Goldberg was allegedly killed.

Ex. 12, Goldberg Response to RFA, No. 3.

**Response**: DISPUTED, in part. E. Goldberg Dep. 7. In addition, there is no question Stuart Scott Goldberg was killed in a suicide bus bombing on January 29, 2004. *See* Death Cert. of Scott Goldberg; Shifra Goldberg Dep. 8-9.

467. Yitzhak Goldberg was not present when Stuart Scott Goldberg was allegedly killed. Ex. 12, Goldberg Response to RFA, No. 4.

**Response**: DISPUTED, in part. Yitzhak Goldberg was in Israel. Shifra Goldberg Dep. 27:03-08. In addition, there is no question Stuart Scott Goldberg was killed in a suicide bus bombing on January 29, 2004. *See* Death Cert. of Scott Goldberg; Shifra Goldberg Dep. 8-9.

468. Shoshana Goldberg was not present when Stuart Scott Goldberg was allegedly killed. Ex. 12, Goldberg Response to RFA, No. 5.

**Response**: DISPUTED, in part. Shoshana Goldberg was in Israel. Shifra Goldberg Dep. 27:3-08. In addition, there is no question Stuart Scott Goldberg was killed in a suicide bus bombing on January 29, 2004. *See* Death Cert. of Scott Goldberg; Shifra Goldberg Dep. 8-9.

469. Eliezer Goldberg was not present when Stuart Scott Goldberg was allegedly killed. Ex. 12, Goldberg Response to RFA, No. 6.

**Response**: DISPUTED, in part. Eliezer Goldberg was in Israel. Shifra Goldberg Dep. 27:3-08. In addition, there is no question Stuart Scott Goldberg was killed in a suicide bus bombing on January 29, 2004. *See* Death Cert. of Scott Goldberg; Shifra Goldberg Dep. 8-9.

470. Yaakov Goldberg was not present when Stuart Scott Goldberg was allegedly killed. Ex. 12, Goldberg Response to RFA, No. 7.

**Response**: DISPUTED, in part. Yaakov Goldberg was in Israel. Shifra Goldberg Dep. 27:3-08. In addition, there is no question Stuart Scott Goldberg was killed in a suicide bus bombing on January 29, 2004. *See* Death Cert. of Scott Goldberg; Shifra Goldberg Dep. 8-9.

471.    Tzvi Goldberg was not present when Stuart Scott Goldberg was allegedly killed. Ex. 12, Goldberg Response to RFA, No. 8.

**Response**:  AGREED, in part.  However there is no question Stuart Scott Goldberg was killed in a suicide bus bombing on January 29, 2004.  *See* Death Cert. of Scott Goldberg; Shifra Goldberg Dep. 8-9.

472.    None of the Goldberg Plaintiffs have seen the remains of Stuart Scott Goldberg. Ex. 56 Shifra Goldberg Dep. 48:6-21; *see also* Ex. 57, Chana Goldberg Dep. 19:3-11; Ex. 58, Esther Goldberg Dep. 15:24-16:9; Ex. 59, Yitzhak Goldberg Dep. 56:13-15; Ex. 60, Shoshana Goldberg Dep. 35:21-23; Ex. 61, Eliezer Goldberg Dep. 44:21-45:4.

**Response**:  AGREED.

473.    Stuart Scott Goldberg is not a U.S. National.  S. Goldberg Dep. 9:12-14.

**Response**:  AGREED.

474.    There is no admissible evidence that Stuart Scott Goldberg was killed in an explosion in explosion in Jerusalem on January 29, 2004.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

475.    There is no admissible evidence that Karen Goldberg is the duly appointed personal representative of the Estate of Stuart Scott Goldberg.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

476.    There is no admissible evidence that the PA or PLO caused the explosion that allegedly killed Stuart Scott Goldberg.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

477.     There is no admissible evidence that "terrorist units" of the PA or PLO caused the explosion that allegedly killed Stuart Scott Goldberg.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

478.     There is no admissible evidence that the PA or PLO authorized, ordered, instructed, solicited or directed the explosion that allegedly killed Stuart Scott Goldberg.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

479.     There is no admissible evidence that Fatah caused the explosion that allegedly killed Stuart Scott Goldberg.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

480.     There is no admissible evidence that Ali Ja'ara caused the explosion that allegedly killed Stuart Scott Goldberg.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

481.     There is no admissible evidence that Abdel Maqdad caused the explosion that allegedly killed Stuart Scott Goldberg.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

482.    There is no admissible evidence that Ahmed Salah caused the explosion that allegedly killed Stuart Scott Goldberg.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

483.    There is no admissible evidence that Hilmi Hamash caused the explosion that allegedly killed Stuart Scott Goldberg.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

484.    There is no admissible evidence that Izzadin al-Hamamra caused the explosion that allegedly killed Stuart Scott Goldberg.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

485.    There is no admissible evidence that Ali Abu Haliel caused the explosion that allegedly killed Stuart Scott Goldberg.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

486.    There is no admissible evidence that Mohamed Maali caused the explosion that allegedly killed Stuart Scott Goldberg.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

487.    There is no admissible evidence that Ahmed Saad caused the explosion that allegedly killed Stuart Scott Goldberg.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

488.    There is no admissible evidence that Ali Ja'ara acted as an agent of Fatah at the time of the explosion that allegedly killed Stuart Scott Goldberg.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

489.    There is no admissible evidence that Ali Ja'ara acted within the scope of any agency he may have had with Fatah in connection with the explosion that allegedly killed Stuart Scott Goldberg.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

490.    There is no admissible evidence that Ali Ja'ara acted as an agent of Hamas at the time of the explosion that allegedly killed Stuart Scott Goldberg.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

491.    There is no admissible evidence that Ali Ja'ara acted within the scope of any agency he may have had with Hamas in connection with the explosion that allegedly killed Stuart Scott Goldberg.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

492.    There is no admissible evidence that Abdel Maqdad acted as an agent of Fatah at the time of the explosion that allegedly killed Stuart Scott Goldberg.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

493.    There is no admissible evidence that Abdel Maqdad acted within the scope of any agency he may have had with Fatah in connection with the explosion that allegedly Plaintiffs Stuart Scott Goldberg.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

494.    There is no admissible evidence that Abdel Maqdad acted as an agent of Hamas at the time of the explosion that allegedly killed Stuart Scott Goldberg.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

495.    There is no admissible evidence that Abdel Maqdad acted within the scope of any agency he may have had with Hamas in connection with the explosion that allegedly killed Stuart Scott Goldberg.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

496.    There is no admissible evidence that Ahmed Salah acted as an agent of Fatah at the time of the explosion that allegedly killed Stuart Scott Goldberg.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

497.    There is no admissible evidence that Ahmed Salah acted within the scope of any agency he may have had with Fatah in connection with the explosion that allegedly killed Stuart Scott Goldberg.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

498.     There is no admissible evidence that Ahmed Salah acted as an agent of Hamas at the time of the explosion that allegedly killed Stuart Scott Goldberg.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

499.     There is no admissible evidence that Ahmed Salah acted within the scope of any agency he may have had with Hamas in connection with the explosion that allegedly killed Stuart Scott Goldberg.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

500.     There is no admissible evidence that Hilmi Hamash acted as an agent of Fatah at the time of the explosion that allegedly killed Stuart Scott Goldberg.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

501.     There is no admissible evidence that Hilmi Hamash acted within the scope of any agency he may have had with Fatah in connection with the explosion that allegedly killed Stuart Scott Goldberg.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

502.     There is no admissible evidence that Hilmi Hamash acted as an agent of Hamas at the time of the explosion that allegedly killed Stuart Scott Goldberg.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

503.    There is no admissible evidence that Hilmi Hamash acted within the scope of any agency he may have had with Hamas in connection with the explosion that allegedly killed Stuart Scott Goldberg.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

504.    There is no admissible evidence that Izzadin al-Hamamra acted as an agent of Fatah at the time of the explosion that allegedly killed Stuart Scott Goldberg.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

505.    There is no admissible evidence that Izzadin al-Hamamra acted within the scope of any agency he may have had with Fatah in connection with the explosion that allegedly killed Stuart Scott Goldberg.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

506.    There is no admissible evidence that Izzadin al-Hamamra acted as an agent of Hamas at the time of the explosion that allegedly killed Stuart Scott Goldberg.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

507.    There is no admissible evidence that Izzadin al-Hamamra acted within the scope of any agency he may have had with Hamas in connection with the explosion that allegedly killed Stuart Scott Goldberg.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

508.    There is no admissible evidence that Ali Abu Haliel acted as an agent of Fatah at the time of the explosion that allegedly killed Stuart Scott Goldberg.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

509.    There is no admissible evidence that Ali Abu Haliel acted within the scope of any agency he may have had with Fatah in connection with the explosion that allegedly killed Stuart Scott Goldberg.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

510.    There is no admissible evidence that Ali Abu Haliel acted as an agent of Hamas at the time of the explosion that allegedly killed Stuart Scott Goldberg.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

511.    There is no admissible evidence that Ali Abu Haliel acted within the scope of any agency he may have had with Hamas in connection with the explosion that allegedly killed Stuart Scott Goldberg.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

512.    There is no admissible evidence that Mohamed Maali acted as an agent of Fatah at the time of the explosion that allegedly killed Stuart Scott Goldberg.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

513.     There is no admissible evidence that Mohamed Maali acted within the scope of any agency he may have had with Fatah in connection with the explosion that allegedly killed Stuart Scott Goldberg.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

514.     There is no admissible evidence that Mohamed Maali acted as an agent of Hamas at the time of the explosion that allegedly killed Stuart Scott Goldberg.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

515.     There is no admissible evidence that Mohamed Maali acted within the scope of any agency he may have had with Hamas in connection with the explosion that allegedly killed Stuart Scott Goldberg.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

516.     There is no admissible evidence that Ahmed Saad acted as an agent of Fatah at the time of the explosion that allegedly killed Stuart Scott Goldberg.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

517.     There is no admissible evidence that Ahmed Saad acted within the scope of any agency he may have had with Fatah in connection with the explosion that allegedly killed Stuart Scott Goldberg.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

518.    There is no admissible evidence that Ahmed Saad acted as an agent of Hamas at the time of the explosion that allegedly killed Stuart Scott Goldberg.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

519.    There is no admissible evidence that Ahmed Saad acted within the scope of any agency he may have had with Hamas in connection with the explosion that allegedly killed Stuart Scott Goldberg.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

520.    There is no admissible evidence that Ali Ja'ara was an employee of the PLO.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

521.    ███████████████████████████████████████████ *See* Ex. 62, PTE 88; PTE 94 at 02:009450, 02:009452.

**Response**:  DISPUTED.  Ja'ara, the suicide bomber, ███████████████ Pls. Tr. Exs. █ ██████ *see also* Shrenzel Rep. 58-64.  ████████████████████████████ ████████████████████████████████████ (Pls. Tr. Ex. 88; *see also* Pls. Tr. Ex. 94 (02:009452)), ████████████████████████████████ ████████████████████████████ *See* Pls. Tr. Ex. 8; *see also* Shrenzel Rep. 58-64.  ████████████████████████████████████ ████████████████████ Pls. Tr. Ex. 22 (02:007291).



522.    There is no admissible evidence that Ali Ja'ara acted within the scope of any employment by the PA in connection with the explosion that allegedly killed Stuart Scott Goldberg.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

523.    There is no admissible evidence that the PA or PLO provided material support to Ali Ja'ara which was used for the explosion that allegedly killed Stuart Scott Goldberg.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

524.    There is no admissible evidence that any funds provided to Ali Ja'ara by the PA were used for the explosion that allegedly killed Stuart Scott Goldberg.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

525.    There is no admissible evidence that Abdel Maqdad was an employee of the PLO.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

526.    There is no admissible evidence that Abdel Maqdad acted within the scope of any employment by the PA in connection with the explosion that allegedly killed Stuart Scott Goldberg.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

527.    There is no admissible evidence that the PA or PLO provided material support to Abdel Maqdad which was used for the explosion that allegedly killed Stuart Scott Goldberg.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

528. There is no admissible evidence that any funds provided to Abdel Maqdad by the PA were used for the explosion that allegedly killed Stuart Scott Goldberg.

**Response:** This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

529. There is no admissible evidence that Ahmed Salah was an employee of the PLO.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

530. There is no admissible evidence that Ahmed Salah acted within the scope of any employment by the PA in connection with the explosion that allegedly killed Stuart Scott Goldberg.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

531. There is no admissible evidence that the PA or PLO provided material support to Ahmed Salah which was used for the explosion that allegedly killed Stuart Scott Goldberg.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

532. There is no admissible evidence that any funds provided to Ahmed Salah by the PA were used for the explosion that allegedly killed Stuart Scott Goldberg.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

533. There is no admissible evidence that Hilmi Hamash was an employee of the PLO.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

534.     Employment by the PA in connection with the explosion that allegedly killed Stuart Scott Goldberg.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

535.     There is no admissible evidence that the PA or PLO provided material support to Hilmi Hamash which was used for the explosion that allegedly killed Stuart Scott Goldberg.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

536.     There is no admissible evidence that any funds provided to Hilmi Hamash by the PA were used for the explosion that allegedly killed Stuart Scott Goldberg.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

537.     There is no admissible evidence that Izzadin al-Hamamra was an employee of the PLO.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

538.     There is no admissible evidence that Izzadin al-Hamamra acted within the scope of any employment by the PA in connection with the explosion that allegedly killed Stuart Scott Goldberg.

**Response**: This assertion is unsupported by citations to evidence. Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

539.    There is no admissible evidence that the PA or PLO provided material support to Izzadin al-Hamamra which was used for the explosion that allegedly killed Stuart Scott Goldberg.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

540.    There is no admissible evidence that any funds provided to Izzadin al-Hamamra by the PA were used for the explosion that allegedly killed Stuart Scott Goldberg.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

541.    There is no admissible evidence that Ali Abu Haliel was an employee of the PA or PLO.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

542.    There is no admissible evidence that Ali Abu Haliel acted as an agent of the PA or PLO in connection with the explosion that allegedly killed Stuart Scott Goldberg.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

543.    There is no admissible evidence that the PA or PLO provided material support to Ali Abu Haliel which was used for the explosion that allegedly killed Stuart Scott Goldberg.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

544.    There is no admissible evidence that Mohamed Maali was an employee of the PA or PLO.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

545.    There is no admissible evidence that Mohamed Maali acted as an agent of the PA or PLO in connection with the explosion that allegedly killed Stuart Scott Goldberg.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

546.    There is no admissible evidence that the PA or PLO provided material support to Mohamed Maali which was used for the explosion that allegedly killed Stuart Scott Goldberg.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

547.    There is no admissible evidence that Ahmed Saad was an employee of the PA or PLO.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

548.    There is no admissible evidence that Ahmed Saad acted as an agent of the PA or PLO in connection with the explosion that allegedly killed Stuart Scott Goldberg.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

549.    There is no admissible evidence that the PA or PLO provided material support to Ahmed Saad which was used for the explosion that allegedly killed Stuart Scott Goldberg.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

550.    There is no admissible evidence that the PA or PLO provided material support to Fatah which was used for the explosion that allegedly killed Stuart Scott Goldberg.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

551.    There is no admissible evidence that the PA or PLO provided material support to Hamas which was used for the explosion that allegedly killed Stuart Scott Goldberg.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

552.    There is no admissible evidence that any funds provided to Fatah by the PA were used for the explosion that allegedly killed Stuart Scott Goldberg.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

### N.    Defendants' Contentions Concerning Plaintiffs' Complaint

553.    In the First Court of their Complaint, which is a claim brought under the Anti-Terrorism Act (18 U.S.C. § 2333), Plaintiffs allege that "Defendants acts' constitute a violation of the criminal laws of the United States and of the several States" prohibiting "homicide, battery, assault and the construction and use of explosive devices; as well as the criminal prohibitions against aiding and abetting, serving as an accessory to, solicitation of and conspiracy to commit these and other such felonies."  Compl. ¶ 127.

**Response**:  AGREED.

554.    No admissible evidence exists in this case to support Plaintiffs' allegations set forth in Paragraph 127 of their Complaint.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

555.    Plaintiffs allege that defendants acted "pursuant to and as implementation of an established policy of utilizing terrorist attacks in order to achieve their goals."  Compl. ¶ 128.

**Response**:  AGREED.

556.    No admissible evidence exists in this case to support Plaintiffs' allegations set forth in Paragraph 128 of their Complaint.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

557.    Plaintiffs allege that the "Defendants' acts were dangerous to human life, by their nature and as evidenced by their consequences."  Compl. ¶ 129.

**Response**:  AGREED.

558.    No admissible evidence exists in this case to support Plaintiffs' allegations set forth in Paragraph 129 of their Complaint.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

559.    Plaintiffs allege that the "acts of defendants are . . . 'acts of international terrorism' and their behavior "constitutes aiding and abetting acts of international terrorism, and conspiracy to commit acts of international terrorism."  Compl. ¶ 131.

**Response**:  AGREED.

560.    No admissible evidence exists in this case to support Plaintiffs' allegations set forth in Paragraph 131 of their Complaint.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

561.    Plaintiffs allege that "plaintiffs were caused severe injury" as "a direct and proximate result of the acts of international terrorism committed by defendants."  Compl. ¶ 132.

**Response**:  AGREED.

562.    No admissible evidence exists in this case to support Plaintiffs' allegations set forth in Paragraph 132 of their Complaint.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

563.    Plaintiffs allege that "Defendants' conduct was outrageous in the extreme, wanton, willful and malicious, and constitutes a threat to the public at large . . . . "  Compl. ¶ 134.

**Response**:  AGREED.

564.    No admissible evidence exists in this case to support Plaintiffs' allegations set forth in Paragraph 134 of their Complaint.

**Response**:  This assertion is unsupported by citations to evidence.  Pursuant to Local Rule 56.1 and the Court's order of May 16, 2014, no response is required.

565.    None of the Plaintiffs who were deposed in this matter possesses any admissible evidence to support the allegations against the PA or PLO set forth in their Complaint.  *See* Ex. 17, V. Guetta Dep. 173:14-175:11; Ex. 18, O. Guetta Dep. 75:13-78:16, 79:21-80:5; Ex. 26, S. Gould Dep. 81:15-82:17; Ex. 63, R. Gould Dep. 42:18-44:3; Ex. 25, E. Gould Dep. 116:2-24, 120:4-20; Ex. 64, J. Rine Dep. 58:2-21; Ex. 27, M. Sokolow Dep. 69:24-75:20; Ex. 32, R. Sokolow Dep. 69:11-22; Ex. 30, J. Sokolow Dep. 50:25-51:5, 53:19-24; Ex. 31, L. Sokolow Dep. 35:4-38:23; Ex. 29, E. Sokolow Dep. 24:15-28:25; Ex. 38, S. Mandelkorn Dep. 105:2-

107:18; Ex. 35, A. Bauer Dep. 159:20-160:6; Ex. 33, R. Bauer Dep. 72:22-25; Ex. 37, Y. Bauer

Dep. 68:4-15; Ex. 40, L. Mandelkorn Dep. 74:14-82:25, 109:12-110:3; Ex. 39, N. Mandelkorn

Dep. 73:21-78:6; Ex. 65, R. Coulter Sr. Dep. 15:12-16:4, 53:5-23; Ex. 66, D. Miller Dep. 60:14-

22; Ex. 67, R. Coulter Jr. Dep. 59:17-24; Ex. 46, L. Carter Dep. 99:14-21; Ex. 45, S. Coffel Dep.

60:21-61:8; Ex. 48, Richard Blutstein Dep. 180:3-183:17; Ex. 47, K. Baker Dep. 166:8-18; Ex.

49, Rebekah Blutstein Dep. 32:7-34:2; Ex. 50, N. Gritz Dep. 23:16-24:18; Ex. 56, Shifra

Goldberg Dep. 53:22-25, 54:16-55:18; Ex. 57, Chana Goldberg Dep. 24:8-25:6; Ex. 58, Esther

Goldberg Dep. 64:7-11; Ex. 59, Yitzhak Goldberg Dep. 54:7-56:9; Ex. 60, Shoshana Goldberg

Dep. 39:5-20; Ex. 61, Eliezer Goldberg Dep. 49:3-51:8.

**Response**:  DISPUTED.  Varda Guetta has relevant personal knowledge about the

identity of one of her attackers.  *See* Response #111.  In addition, Plaintiffs have information and

will testify about their injuries and damages, about the circumstances of the terror attacks in

which they were injured, and the constant threat and fear they lived under during the Al-Aqsa

Intifada.  *See, e.g.*, Part II ¶¶ 350-76.  In addition, Plaintiffs, though their counsel, have amassed

an overwhelming record supporting the allegations in the Amended Complaint.  *See generally*

*supra* Parts I-II.

Dated:  June 6, 2014
         New York, New York

**ARNOLD & PORTER LLP**

By: _____

Kent A. Yalowitz
 *kent.yalowitz@aporter.com*
Philip W. Horton
 *philip.horton@aporter.com*
Sara K. Pildis
 *sara.pildis@aporter.com*
Ken L. Hashimoto
 *ken.hashimoto@aporter.com*
Lucy S. McMillan
 *lucy.mcmillan@aporter.com*
Carmela T. Romeo
 *carmela.romeo@aporter.com*
Tal R. Machnes
 *tal.machnes@aporter.com*

399 Park Avenue
New York, New York 10022
(212) 715-1000

205