# EXHIBIT A.206
## (2 of 8)

- Enhancing fiscal transparency by posting the budget speech, approved annual expenditure estimates and actual data for previous fiscal years and monthly expenditure reports on budget implementation on MOF's website.

Unfortunately, one of the most important accomplishments of the earlier reform agenda, the Central Treasury Account—which provided strong central management and transparency for PA finances—has been a casualty of the broader political standoff between the donor community and Hamas government. The reversal of donor support for this mechanism and donor refusal to finance the PA directly—instead channeling funds through the Office of the President (OOP)—has made the Central Treasury Account inoperable and raised the risk that this achievement may be undermined. The extent to which the PA's financial control and internal audit arrangements discussed later in this chapter are currently being applied to payments now made through the OOP is also unclear. Anecdotal evidence has raised concerns of a significant reduction in transparency and accountability because of erroneous reporting and a failure to submit financial reports regularly. This slide may be reversed if a broader political compromise is reached and donor funding resumes through normal channels. The prospects for doing so, and the extent to which PA capacity has been degraded, remain open questions.

Even in areas directly under the PA's control, there has been little further improvement in the two years since the CFAA was completed. To the PA's credit, progress was made in reforming procurement in the security sector with the passage of new legislation in 2004. There has been some progress in developing the internal audit and financial control functions, particularly the former, but there is continuing confusion in line ministries about their respective roles. There has been limited progress in establishing the new external audit institution (the Financial and Administrative Control Bureau) since the new law was promulgated one year ago. Although its president has been appointed and has begun work, the organization is severely hampered by lack of capacity and resources. There has been slow progress in external financial reporting. The audit report on the 2003 financial statements is still not available and the 2004 financial statements are of poor quality and have not yet been submitted for audit. MOF does not appear to have sufficiently appreciated the importance of audited aggregate financial statements in providing assurance that information is being correctly reported and that the underlying systems of control which produce this information are functioning adequately. Finally, there has been some progress in developing a medium term development plan (MTDP) to better prioritize expenditures through integrating planning and budgeting, and in particular to better integrate donor project funding into the budgetary exercise.

If the arrangements prevailing in 2005 and before are to be restored, there is a need for a new thrust by the PA to improve the PFM system through a clearly defined action plan focusing on developing PFM capacity and identifying the training and technical assistance needed to advance this agenda. This program must be demand driven and coordinated between all potential providers of technical assistance. In addition, the work in this report has indicated other ongoing PFM problems that need to be addressed. The main ones are:

- Reform of the accounting system, in particular reforming the chart of accounts and the classification system, and ensuring that the redevelopment of the central accounting system as far as possible meets the needs of line ministries.

- The need for line ministries to be more responsible for their own expenditure management and to locate this responsibility at the level of spending units within ministries.

- The need for the PIF's recent lapse in financial transparency to be rectified and for improvement in financial transparency in three important public institutions: the GPIC and the two major state owned enterprises, the Petroleum Corporation and Cement Company.

- The need for international donors to harmonize their project financial management requirements and as far as possible make use of the Central Treasury Account and the PA's accounting system.

This chapter examines in more detail upstream budgeting issues only briefly addressed in the CFAA—namely, the integration of planning and budgeting through the MTDP—reflecting the need to address the lack of any focus on performance, policy or priorities in budget development and execution, and to integrate donor projects into a more comprehensive budget. Reforms in this area being pursued by the PA are moving in the right direction, but there is a considerable way to go, including obtaining full involvement from MOF. Detailed recommendations are provided in the summary and conclusions section at the end.

Finally, to establish a baseline on the quality of the PA's PFM system, this report assesses the system by using the set of performance indicators developed by the Public Expenditure and Financial Accountability (PEFA) secretariat in 2005.[21] These indicators are presented in Attachment 1. They are expected to come into general usage over the next few years as the basic mechanisms for identifying weaknesses and the rate of improvement in country PFM systems.

### Credibility of the PA Budget

An important aspect of PFM performance is the extent to which budgets are realistic and are implemented. A comparison of actual out-turns for 2003–05 shows significant variances between actual aggregate expenditures and the approved budget, which worsened in 2005.

These over-expenditures more than offset higher than expected revenues for all three years. In 2003 the deviation over the budget was 6.3 percent, even given additional

---

[21] The PEFA measurement framework is intended to assess PFM progress within a country over time, rather than make comparisons between countries. More information about PEFA can be found on the following website: http://www.worldbank.org/wbi/governance/assessing/pdf/pefa_pres.pdf.

revenue collection. This increase in spending was the result of a rising wage bill that, when coupled with unforeseen net lending costs and lower external budget support, resulted in a deterioration of the PA's fiscal position. Similarly, in 2004 the deviation was 4.3 percent above the budget. During 2005 actual expenditures accelerated to 14 percent above budget as a result of additional hiring in the security forces during the third quarter, along with the acceleration of net lending costs (driven by subsidizes paid to the Petroleum Corporation to restrain petroleum costs) and the lower than anticipated external budget support.

When too many reallocations occur within budget lines and the composition of expenditure varies greatly from the original estimates, the budget loses its value as a policy tool. Analysis of the PA's adherence to budgeted expenditure composition during budget execution in 2003–05 reveals significant reallocation across budget items, reflecting implementation very different from the original approved budget in 2003 (table 2.1).[22] The situation improved for 2004–05, there were still significant reallocations but the position improved, reflecting a stricter adherence to the approved allocations. Nonetheless, such deviations are another indicator of the tight fiscal situation of the PA, where the unbudgeted rising wage bill and net-lending costs crowd out non-wage expenditures, and reallocation across budget items becomes necessary to cover non-budgeted obligations.

**Table 2.1: Expenditure Deviations and Variance in Excess of the Total Deviation**
(percent)

| | For PI-1* | | For PI-2** |
|---|---|---|---|
| Year | Total expenditure deviation | Total expenditure variance | Variance in excess of total deviation |
| 2003 | 6.3 | 32.0 | 25.7 |
| 2004 | 4.2 | 10.4 | 6.2 |
| 2005 | 13.9 | 19.8 | 5.8 |

*PI-1: Performance Indicator 1 – aggregate expenditure out-turns compared to original approved budget
*PI-2: Performance Indicator 2 composition of expenditure out-turn compared to original approved budget

The PA also recorded revenue out-turns above the budgeted forecasts for 2003–05 as a result of improvements in tax collection and administration and external shocks, rather than weaknesses in revenue forecasting.[23] In 2003 revenue inflows were 30 percent

---

[22] Variance in expenditure composition was calculated as the weighted average deviation between actual and originally budgeted expenditure, calculated as a percent of budgeted expenditure, on the basis of functional classification and using the absolute value of the deviation. This measures the extent to which reallocations between budget lines have contributed to the variance in expenditure composition beyond the variance in the overall level of expenditures.

[23] Revenue out-turns were calculated as the difference between actual and budgeted domestic revenues as a percent of budgeted revenues for last three years.

greater than budgeted, reflecting the GOI's decision to resume previously withheld clearance revenues. Furthermore, domestic tax collection increased in 2004 to 6 percent above budgeted revenues due to the broadening of the tax base and better administration. The revenue out-turn for 2005, at 23.4 percent above budget, reflects a combination of factors, including a shift in the composition of revenues. While indirect taxes remained at around 60 percent of total revenues, the share of VAT receipts gave way to a greater proportion of petroleum excises; hence, high oil prices had a positive impact on actual revenue collection. Finally, a higher than budgeted dividend payment from the PIF reflected its higher profits and also helped to boost revenue inflows.

**Donor Practices**

The PA is highly dependent on external financial assistance through both budget support and project financing.[24] In the 2005 budget, external assistance accounted for over 50 percent of total revenues. In 2004 and 2005 budget support was provided by several donors through a multi-donor trust fund administered by the World Bank that was subject to the PA meeting certain specified policy benchmarks. Prior to this, the Bank initiated the Emergency Services Support Project (ESSP) in 2002, which funds PA budget non-wage spending in the social ministries (Education, Health and Social Affairs). As of June 2006 $174 million had been provided by the Bank and eight other donors, making this a key budget support instrument. In addition, a number of bilateral Arab donors have made direct and unconditional payments to the PA. Further details of donor assistance in relation to overall PA expenditures are set out in the fiscal chapter of this PER.

Donors have traditionally funded the great bulk of PA capital expenditures. Unfortunately, full information on the various sources of donor project funding is not readily available. The Ministry of Planning (MOP) is mandated by Cabinet to endorse and sign all external projects and program agreements, although it has not always adhered to this requirement. Prior to 2006, the MOP was successful in having most donor funds channeled through the Central Treasury Account and information on such funding is readily available. Some donors prefer or are required by their own laws to establish management and accounting systems for project assistance outside the PA's systems. Project financial assistance is funded by a number of donors through the Palestinian Economic Council for Development and Reconstruction (PECDAR), which in light of its importance in overseeing donor projects is discussed separately below. Donors have shown varying degrees of willingness to share information on their projects with MOP.

The MOP has now developed a project database covering projects approved since 2002 that is available on its website, but this database is neither complete nor fully accurate.[25] In some cases (for example, for United Nations Development Programme and U.S.

---

[24] Although not directly part of the PA or its budget, it is worth noting that the United Nations Relief and Works Agency (UNRWA) provides social services (education, health and income support) through its own administrative structures to the 40 percent or so of the Palestinian population who are registered refugees. Likewise, international NGOs, who tend to work directly with community groups, municipalities or line ministries, undertake significant service delivery in some sectors.

[25] See www.mop.gov.ps/amc/

Agency for International Development funded projects), no financial information is available, although other information is provided. Information for the database comes directly from donors and, in some cases, from PECDAR and the line ministries. The database is not linked directly with the Central Treasury Account through the central accounting system, and the classification system is not adequate for project management.

Since March 2006, the majority of external finance has been channeled through the Office of the President (OOP). According to the OOP, bilateral funds received between March and October 2006 amount to $265.5 million, of which $246 million has been provided from Arab League States, including Saudi Arabia, Qatar and Kuwait. The remaining $19.5 million has been received from Russia, Norway, Spain and Sweden.

Funds have also been received through the Temporary International Mechanism (TIM) endorsed by the Quartet on May 9, 2006. Under TIM, total commitments made by the EU amounted to €90 million (approximately $114.7 million). The TIM has three windows:

- *Window I.* Commitments made through the World Bank administered ESSP, including €10 million ($12.7 million) for essential supplies and running costs of hospitals and health care centers.

- *Window II.* The Interim Emergency Relief Contribution, which aims at financing the procurement of fuel for hospitals in both the West Bank and Gaza, received a €40 million ($51 million) commitment from the EU for uninterrupted supply of energy utilities.

- *Window III.* The Cash-Transfer Scheme, which provides allowances for both front-line health sectors workers and for the poor, received €40 million ($51 million) to support vulnerable Palestinians through the payment of social allowances.

Under Window III, payments as of October 20 include €12.9 million ($16.5 million) in the first three installments of social allowances to nearly 12,000 workers in the health sector. Payments were also made to 44,609 low income cases (LICs) and 5,126 retirees to the amount of €13.6 million ($17.3 million). A second round of payments was made to LICs (both civil servants and pensioners), with health care workers included in the scheme during October. The number of beneficiaries in this round reached 61,627 beneficiaries with total payments reaching €16.8 million ($21 million). Additionally, €9.6 million ($12.2 million) was paid to 35,047 social hardship cases. Around €12 million ($15.2 million) has been allocated by the European Commission (EC) outside of TIM for technical assistance and capacity building to the OOP (TIM 2006).[26]

Following U.S. Office of Foreign Asset Control (OFAC) prohibitions, a number of banks stopped all transactions with the PA after the elections. Chief among them is the Arab Bank, which maintained the PA's central treasury account. A major achievement of the

---

[26] Numbers obtained by phone interviews with TIM staff, in addition to the TIM activity report (2006).

reform agenda during the past five years, this system was developed to consolidate financial flows and allow for more accountable and transparent financial management. A key consequence of the current crisis is that the Central Treasury Account is no longer operational, which has raised concerns about how comprehensively external finance is being accounted for and whether an overall weakening of transparency in financial management is taking place.

Another key challenge is how to physically transact and disburse donor funds. For example, some donors have historically maintained special accounts with the local banks through which donor funds are disbursed to the PA. Checks can be written against these accounts by relevant authorities. But following OFAC prohibitions, local banks refused to allow replenishments into donor special accounts. This policy was later reversed in a few cases, although new accounts are not allowed. There are also restrictions in place for funds flowing in the reverse direction, from the PA to donors.

Looking beyond the current difficult political environment, the donor community will need to move toward meeting the commitments made at the Paris High Level Forum of 2005 to harmonize donor financial management and reporting requirements as far as possible and to use country financial management systems wherever they are adequate rather than require parallel ones. Many current donor practices are failing to positively impact the role of the PA budget as a policy instrument.

**Palestinian Council for Development and Construction**

The Palestinian Council for Development and Construction (PECDAR) was established in 1993 as a funding recipient and implementing agency for donor projects. It focuses on infrastructure projects, which have so far totaled about $585 million. PECDAR carries out project preparation, implementation and monitoring in conjunction with donors. It maintains its own engineering and other project staff. PECDAR focuses more on infrastructure type projects rather than social assistance projects.

PECDAR's operating expenditures are financed by a contribution to its salaries from the PA budget, plus a four percent management fee charged against all projects. It publishes a separate annual report which includes audited financial statements, which have received "clean" opinions from the private auditors. It has a well-functioning accounting system and has been able to produce the financial reports required by donors as well as its own audited financial statements. Although line ministries and other agencies have gradually assumed a greater role in implementation of donor-financed projects, PECDAR continues to be used by donors, including the World Bank, and appears to have performed to the satisfaction of most donors.

PECDAR operates in a relatively autonomous manner in that it reports direct to the President and does not answer to the Palestinian Legislative Council. A proposal submitted in June 2005 to merge PECDAR with the Ministry of Public Works was rejected by the Cabinet. Transactions through PECDAR are not made through the Central Treasury Account. Payments are authorized by the Managing Director of PECDAR and

all payments over $10,000 also require the signature of the President. The MOF has no involvement in or information concerning PECDAR's financial operations. Ensuring that all PECDAR payments are made through the Central Treasury Account once it again becomes operational—which will require the compliance of all donors currently utilizing PECDAR's services—would contribute to overcoming the problem of a lack of comprehensive information available to MOF and MOP concerning the implementation of donor projects.

PECDAR projects are included in the MTDP and require the same Cabinet approval as all other donor financed projects. They were included in the budget book for 2006, along with other donor financed projects, and are thus intended to be part of the budget preparation dialogue in the future. This will assist in improving overall expenditure prioritization, as discussed later.

### The Legal Framework for Public Financial Management

The legal framework for PFM comprises the financial management provisions of the Basic Law, the Organic Budget Law (1998), the Annual Budget Law, the Financial and Administrative Control Council Law No. 17 (2004) and the Regulations for General Budget and Financial Affairs (2005).

The Basic Law contains some PFM provisions that are largely repeated in the Organic Budget Law. Provisions in the Basic Law have constitutional level protection. Some provisions in the law concerning the responsibility for the implementation of the budget, the Central Treasury Account and the budget contingency reserve should be more clearly defined to provide this level of protection.

Both the Organic Budget Law and the Annual Budget Law are administered by MOF. The former gives permanent authority, and the latter annual authority. There are instances of the Annual Budget Law being used for purposes for which there should be a permanent provision—for example, each Annual Budget Law has provided that the PA may not borrow from the Palestinian Monetary Authority (PMA).

The Organic Budget Law provides a framework for budget management that is reasonable, albeit general and incomprehensive in its provisions. Some aspects of the law have not yet been implemented: internal audit (Article 63), external audit (Articles 18, 66 and 68) and the requirement to hold the consolidated fund balance at the Palestinian Monetary Authority (Article 13)—at present this balance is held in commercial banks. The Organic Budget Law defines roles for the revenue collection agencies, spending agencies, MOF, Legislative Council and Council of Ministers and defines terms such as public funds, special funds, current expenditure and capital expenditure.

The Organic Law covers ministries and agencies and other public institutions such as autonomous budget funded institutions. It does not cover companies or corporations owned in part or in full by the PA, nor does it cover public enterprises, which operate

under the Companies Law. It provides the institutional basis for a number of important processes, requirements and principles, such as:

- The preparation, submission and authorization of budgets, together with an established budget calendar providing the dates at which actions are to be taken.

- Financial procedures in the event the budget law is not enacted in time for the start of the financial year (which has been the case in 2006).

- Use of the Central Treasury Account for pooling government revenues.

- Expenditures to be drawn from the Central Treasury Account only in accordance with the budget law.

- The required contents of the budget circular and Annual Budget Law and the requirement for the latter to be a public document.

- Execution of the budget, including the MOF's leading role in this area.

- Lapse of unused funds at year-end.

- The annual budget to establish the upper limit for government borrowing.

- Procedures for preparing and submitting quarterly reports and annual financial statements.

- Entering into loan agreements or providing guarantees, both of which require approval from the Minister of Finance.

While the Organic Law is adequate on budgeting issues, its provisions regarding accounting could be strengthened. Accounts and audit are covered in only four Articles (63–66), including one on internal audit. Clear deficiencies in the existing legislation appear to be:

- A lack of clarity concerning virement or the ability to transfer funds between budget items during the year (Article 50; see discussion below).

- Lack of a specific requirement for reporting on the use of the budget contingency reserve (Article 37).

- Lack of clearly defined responsibilities of line ministries for managing their own finances, including lack of a clear definition of the individuals who may commit expenditure and a clear separation of this role from approving payments.

- Lack of a similar designation of responsibility within MOF, for example for the role of an Accountant-General position or its equivalent, with responsibility for the preparation of budget execution reports and aggregate fiscal statements.

- The matters to be covered in annual financial statements are only briefly indicated.

- There is no formal requirement for an audit of these financial statements.

- A separate accounting manual should set out the procedure to be followed for consolidating accounts and preparing the aggregate statements.

The *Regulations for General Budget and Financial Affairs 2005,* comprising some 80 pages (in English), replaces the previous Financial Regulations 1997–98 (known as the Fiscal Directives). The new regulations are a mixture of very detailed procedural provisions (for example, custody and submission of forms) which would be better placed in an accounting manual and principles; in some cases, they duplicate identical provisions in the Organic Budget Law. The Financial Control Department of MOF has begun to develop an extensive training program for MOF and line ministry staff on the new regulations.

## 2.   Scope of the Budget

Chapter 3 of the Organic Budget Law sets out detailed and appropriate procedures for Budget construction. The budget includes all PA ministries and agencies in addition to public institutions such as the Environment Authority, Ports Authority, Tobacco Authority, Civil Aviation Authority, National Radio and Television, Palestine Information Center, Palestine News Agency and Palestine Water Authority. Their expenditures are covered by budget appropriations and their revenues are paid into the Central Treasury Account. In 2005, there were some 63 budget entities (though these seem to change annually) comprising a mix of major ministries and relatively small agencies grouped under eight broad categories: general administration, security, fiscal administration, foreign affairs, economic development, social affairs, culture and information affairs and transport and communications.

The Annual Budget Law covers only recurrent expenditures plus the relatively small amount of capital expenditures funded from PA revenues (about 13 percent of the budget in 2005). Most capital expenditure is funded by donors, for which the Ministry of Planning (MOP), created in 2003, is the coordinating agency. A gradual expansion of the scope of the budget exercise began in 2003 with the inclusion in budget documentation of the capital expenditures (estimated at $212 million in that year) financed by those donors who use sub-accounts within the Central Treasury Account for their project assistance. As discussed later, from 2006 a de facto capital budgeting exercise managed by MOP and MOF has been developed and the budget circular issued by MOF and the intended budget dialogue for 2006 are designed to include as far as possible all expenditures on behalf of

the PA, whether formally part of the Annual Budget Law or not.[27] While MOP is responsible for aid coordination and capital expenditure planning, under the Organic Budget Law the Minister of Finance has the sole authority to conclude loan agreements with donors.[28] For financial assistance grants (as opposed to loans) authority rests with MOP because of a Cabinet decision that MOP should maintain the MTDP, which covers all projects, whether funded by the PA or by donors. There is a strong case for locating this responsibility in MOF given its overall responsibility for fiscal and financial management.

### Budget Classification

For each budget entity, expenditure is broken down into two chapters, current expenditures and capital and development expenditures. The two chapters are broken down further in accordance with a standard 14-item input classification, and each item is broken down into sub-items, there being some 60 in the case of current expenditures.

The classification system and chart of accounts are inadequate in a number of significant respects. A standard chart of accounts is used, consisting of eight digits, of which only four are used to analyze expenditures—by ministry or agency, chapter, item and sub-item. This does not include a breakdown of expenditure by spending unit or activity, reflecting the fact that budgets may be held centrally within ministries and not allocated to individual spending units. Nor is there any allowance for a program or activity classification which will be needed in a future move to a more performance oriented budgeting system. Nor is there provision for classification by function, such as the United Nations COFOG or International Monetary Fund GFS system. To provide information on a responsibility center and program/activity basis the chart of accounts will need to be expanded to around 30–40 digits. In addition, the 14 item economic (object) basis of classification is not consistent with the GFS economic classification, and some of the line items are not mutually exclusive, leading to possible inconsistency in information.

### Nature of Budget Appropriations

Since the budget is cash based, budget appropriations are an authority to make payments. There is no formal system of commitment control, an issue MOF will need to consider as it further improves the PFM system (see discussion below). Budget appropriations extend only to the two chapters and 14 items set out above, and are thus at a relatively high level of aggregation. The Organic Budget Law (Article 50) provides that funds cannot be reallocated between chapters without Palestinian Legislative Council approval, in effect requiring a revised appropriation. The Annual Budget Law also provides that budget entities may not reallocate from one of the 14 predefined expenditure items without the approval of MOF. Article 50 of the Organic Budget Law provides for such a rule to be incorporated in the Annual Budget Law and, by implication, be potentially subject to change, rather than incorporated, as is more general practice in the Organic Budget Law.

---

[27] That is, to the extent that donors make such information available.
[28] With the exception of past activities of the Islamic Development Bank and the Saudi government, this requirement appears to have been observed.

Article 37 of the Organic Budget Law provides for a budget contingency allowance, or reserve, which is controlled by the Minister of Finance and subject to the approval of the Council of Ministers. It is intended for emergency or unforeseen expenditures. This figure is high by international comparisons, at about 3 percent of the total budget, which makes it particularly important that the use of this reserve is reported in budget execution reports and eventually in the audited financial statements, so that it does not become a source of significant non-transparent expenditure. The use of the reserve is reported as it occurs in the monthly budget execution statements. It would also be desirable that the use of this reserve be separately accounted for in the aggregate financial statements and thus subject to audit to ensure that its use has been consistent with the law. It is generally accepted PFM practice that the use of this reserve should thus be reported to and reviewed by the legislature as part of its review of budget execution.

As mentioned above, the budget appropriations are at a high level of aggregation based only on ministry or agency and expenditure item or object. The Organic Law (Article 45) gives each minister the responsibility to allocate the budget estimates across spending units in his/her budget entity. The Annual Budget Law thus does not allocate funds to particular spending units or responsibility centers, such as hospitals or educational institutions. MOF does not monitor the implementation of the budget in this way, rather on the more aggregate information as set out in the Annual Budget Law. The budget documents do not provide any information at this level, thus limiting the information base for the budget dialogue. While some ministries may allocate budgets to spending units (for example, MOH uses a chart of accounts in its stand alone accounting system which includes location, cost center, funding source and detailed object items), it appears that in some ministries, particularly those constrained by using the central MOF accounting system, spending units may not have an assigned budget.

### Establishing Line Ministry Accountability for Expenditure Control

The fact that MOF makes various payments centrally on behalf of line ministries over which they have no control results in a situation where spending units either do not or cannot take responsibility for the management of their own budgets.[29] Typical items of expenditure paid directly by ministries and agencies are office expenditures, maintenance, transportation and consumable stores. The proportion of such direct expenditure varies between ministries. For example, the Ministry of Social Affairs only directly pays around 5 percent of its budgeted expenditures; for the Ministry of Health the figure is around 50 percent. Line ministries do not receive reports from the MOF until the end of the year on expenditures paid directly by the MOF. In effect, they are not considered responsible for managing this expenditure and therefore have no need to know

---

[29] These payments include salaries and operating expenditures such as rent; utilities such as electricity and water;  and travel, training and capital expenditures.

about it. Thus line ministries are in effect managing only a small part of their budget, which also limits the possibility of tradeoffs between different expenditure items.[30]

Thus the current system does not allow line ministries to account for the use of resources in a way that enforces responsibility and accountability for expenditure. This negatively affects the incentives for line ministries to deploy resources in the most efficient and effective way and may actually prevent them from doing so.

There is also a need to establish financial accountability for unit-level spending by providing for it in the chart of accounts. This would not of itself necessitate formal budget appropriations made in greater detail, only appropriations supported by more detailed information. It is also important to review the central payment of operating expenditures by MOF so as to provide incentives for line ministries to prioritize or trade-off within their total operating expenditures. MOF, rather than the relevant line ministry, appears to "own" these expenditure items.

## Budget Timetable

The Organic Budget Law (Article 25) requires the preparation by MOF by 1 May of a comprehensive report to the Cabinet on the macroeconomic and fiscal situation along with forecasts and expenditure commitments, likely available resources for the remainder of the fiscal year and recommendations for policy initiatives to respond to the emerging macroeconomic scenario—in effect, an early mid-year review of budget progress. The Cabinet is intended to use this report to establish guidelines and policy directives for preparing the budget for the coming fiscal year. However, it does not appear that such a report is prepared on the basis of this timetable, which further limits the Cabinet's input into the budget process. Article 26 provides for the budget circular to reflect indicators and policy objectives from the Cabinet, but it is not clear to what extent such prior discussion within the Cabinet exists.

The budget circular must be issued to line ministries and agencies by 1 July (Article 26 of the Organic Budget Law). The budget circular contains indicative appropriation figures developed by the Budget Department of MOF. Ministries and agencies have one month to respond with their proposed budget. Following this, line ministries and MOF engage in detailed discussions of ministries' needs. The Palestinian Legislative Council Budget and Financial Affairs Committee is consulted on the contents of the circular before it is issued.

Under the Organic Budget Law the proposed budget should be submitted by MOF to the Council of Ministers (Cabinet) by 15 October. In turn, the Cabinet is required to present the budget to the Palestinian Legislative Council by 1 November, to be passed before the commencement of the Fiscal Year on 1 January. While this timetable does not provide much time for serious consideration by the Cabinet or Palestinian Legislative Council,

---

[30] A broader issue is the central management of personnel costs through MOF, which provides no incentive for line ministries to trade off personnel costs against other operating expenditures. This can be addressed only in the longer term.

the lack of serious review of the budget more likely reflects the budget's current role largely of a detailed costing of inputs, rather than a policy document explicitly focusing on the PA's strategic priorities, and the highly aggregated nature of the budget appropriations. It may also reflect a lack of budget literacy on the part of the Palestinian Legislative Council. In future the budget timetable will need to incorporate review of the MTDP and upstream Cabinet and Palestinian Legislative Council involvement in this review would improve their input into the budget.

The timetable has been adhered to, except for minor slips, since the 2003 budget. (Prior to this there was no meaningful budget system at either the preparation or execution stage.) However, the budget has not been passed by the Palestinian Legislative Council prior to the commencement of the fiscal year. The 2003 budget was not passed until 1 February 2003, the 2004 budget was not passed until 15 January 2004 and the 2005 budget was not approved until 31 March 2005. Given the current special circumstances in West Bank and Gaza, the 2006 budget presented by the previous administration has not yet been passed. It also appears that for various reasons the macroeconomic framework is sometimes finalized only after the budget discussions with line ministries and within the Cabinet have taken place, meaning that MOF may find it necessary to make unilateral changes in the budget presented to the Palestinian Legislative Council.

If the budget is not passed before 1 January, the law provides for monthly expenditure to continue at the rate of one-twelfth of the previous year's budget appropriation for up to three months. There has been a difference of opinion between the executive and the Palestinian Legislative Council as to whether this provision applies if, as was the case with the 2006 budget, the budget is not formally presented to the Palestinian Legislative Council.[31]

In summary, there is a clear budget timetable which has generally been followed. In the future, the timetable will need to allow for full consideration of the MTDP and include greater upstream involvement by the Cabinet and Palestinian Legislative Council in the MTDP.

## Budget Documentation

The key budget document is the Budget book which is published around March of each year. While this document contains a range of detailed information, there is scope for improving both the comprehensiveness and quality of public budget information. Although this is a public document (published in Arabic), it is not widely available. Only about 400 copies are generally printed and it is not posted on the MOF website. The 2005 book contains the Annual Budget Law in a comprehensive document consisting of some 300 pages of revenue and expenditure tables, figures and narrative explanation.[32] The 2005 book provides information on each budget entity's actual expenditure in 2003, the

---

[31] In June 2006 the PLC passed a law that allows the government to submit the Annual Budget Law after the three-month period. It also allows MOF to collect revenues and continue expenditures until the end of the year at the rate of one-twelfth of the 2005 budget allocations.

[32] It appears that no Budget book was prepared for 2006.

budget for 2004, the estimated actuals for 2004 and the proposed budget for 2005. For each budget entity, expenditure is broken down into the 14 expenditure items. It indicates proposed financing transactions, both external and internal, including borrowing from the banking system to cover the financing gap. It also includes comprehensive data on authorized civil service employment and sets a legal limit on civil service employment growth.

PECDAR transactions were first included in the 2005 Budget book, a practice which was intended to be continued in 2006. This information is included in the brief description of all PA development projects, which is in an annex to the Budget book.

As the scope of the budget dialogue expands to include donor funded projects, more information is needed on whether project disbursements take place through government accounts and are reflected in the government's books of accounts, and on the responsibilities, objectives and activities covered by line ministry expenditures.

The Minister's budget speech and a summary budget document are published in English on the MOF website, but this budget summary does not provide details of individual revenue and expenditure items, and could usefully be expanded. Likewise, the whole Budget book could be included on the MOF website. For completed financial years, actual expenditure against approved budget estimates should be reported.

**Macroeconomic Forecasting**

Since 2003 the budget documents have been prepared on the basis of careful macroeconomic analysis involving the MOF, Palestine Central Bureau of Statistics (PCBS), the World Bank and the International Monetary Fund (IMF). This has led to one common set of macro-planning indicators. The budget documentation typically offers three macroeconomic scenarios based on alternative political developments and discusses exchange rate assumptions and monetary statistics.

Revenue estimation is extraordinarily difficult given uncertainties about the continuation of closures and their economic impact, the likely levels of donor budget support and the stability of the transfers of customs and VAT revenues by Israel. The ability to accurately forecast and control revenues is an essential precondition for sound PFM. The resolution of such issues is fundamentally political in nature and lies beyond technical PFM issues. Revenue fluctuations can be mitigated, though not eliminated, through the development of several annual planning scenarios, as was done for both the 2003 and 2004 budgets. More timely preparation of the macroeconomic framework would facilitate this task. Revenue estimation is further complicated by the fact that the MTDP and budget documents may in part reflect efforts to raise donor funds rather than produce a considered estimate of likely receipts.

Case 1:04-cv-00397-GBD-RLE     Document 547-154     Filed 06/25/14     Page 16 of 27

**Budget Development Dialogue**

The 2006 budget circular, issued on 15 July 2005, gave line ministries a month to respond with their proposed budget. It set out the medium-term macroeconomic framework and provided estimates of medium term (2006 to 2008) budget funding by donors. In terms of signaling expenditure priorities, it referred to the need to limit public service and security service staff numbers and salary increases, limit overtime and travel costs and expenditure on new accommodation and vehicles and give priority to the education, health and judicial sectors. It required ministries to submit extensive detail in support of their budget requests, including information on expected external grants and assistance and domestic and foreign loans. For the first time ministries were also required to submit details of all capital and development projects, whether financed from the budget or from external sources, over the three years 2006–08, thus laying the foundation for a more comprehensive and medium-term budget dialogue, covering both recurrent and capital expenditures.

The information presented by budget entities on 2007 and 2008 expenditures does not appear to have been directly used by MOF. Rather, this requirement was intended to force budget entities to think in terms of a multi-year budget framework. It also assisted in the identification of future recurrent cost implications of donor projects.

Discussions with budget entities on their recurrent expenditure proposals appear to involve a reasonable dialogue, but focus on costing inputs rather than on policy, priority or performance related issues. Discussion of the salaries item has focused on determining the accuracy of the number of people employed and their salary level. Likewise, discussion of those operating expenditure items paid directly by the MOF appears limited. There is a pronounced lack of ownership and limited incentive for budget entities to suggest possible savings or trade-offs against other items. Funding pressures have frequently resulted in the MOF reducing expenditure levels agreed to prior to submission of the budget to the Palestinian Legislative Council. There is a general discussion for all budget entities on the level of the expenditure arrears and the provisions of funds to clear them.

Discussions with MOI on the security services (which account for around 25 percent of the total budget) take place at an aggregate level, and the depth of these discussions is questionable, despite efforts by the MOF Budget Department. The security services have taken the view that certain budget items may not be discussed and have successfully resisted MOF pressure. In the past, the President has not supported the provision of more detailed information on security services expenditures to MOF and Palestinian Legislative Council. Information on security services expenditure is presented in the same level of detail, even though that is rather aggregated, as other budget entities.

In the end, the nature of the budget dialogue should change to reflect a more policy-driven process as the budget becomes more comprehensive through the development of the MTDP.

### Improving Expenditure Prioritization

The 2004 CFAA identified two major weaknesses in budget construction. First, the budget dialogue between MOF and line ministries on the recurrent budget appears to have been focused almost entirely on costing necessary inputs (salaries, travel, transfers). It was not informed by any strategic policy objectives and had no explicit focus on performance or prioritization beyond a general commitment for greater emphasis on health and education to meet increased demand due to population growth. There was no discussion on or incentives for budget entities for trading off between different inputs (for example, replacing personnel costs with increased operating expenditures). Second, most donor funding was still excluded, making it difficult to properly determine priorities and to integrate capital or developmental expenditures with recurrent expenditures into the budget.

Several steps are required to improve this position and some of them are now underway. A key priority is to change the mindset that no prioritization or re-prioritization is possible, given that much of the PA's budget expenditure is on salaries perceived as "fixed" items. This view ignores the fact that additional staff are added to the PA payroll each year to meet emerging needs (such as in education and health), and that funding for additional positions may also become available in the medium-term by attrition. There is also a need to prioritize, as part of a more comprehensive budget exercise, the significant expenditures provided by donors by way of project assistance, which for some ministries (like the MOH and MOE) provide funding for key service delivery. And there is a need to ensure that the allocation of this project assistance reflects PA priorities rather than donor priorities.

In addition, as identified in the 2004 CFAA, the following steps are necessary to improve the overall prioritization of expenditures through the integration of planning and budgeting:

- A well-formulated and articulated medium-term PA development strategy.

- Coordination among donors and between donors and the PA to ensure that their expenditures collectively address the key development and relief needs of the Palestinian population in a coherent manner.

- A system under which the PA (MOP and MOF) has full information about donor activity.

In addition, there is the need for collective ownership, or "buy in," by the Cabinet of the budget as a whole, which can be facilitated by its involvement in a more comprehensive and policy-based budget through the MTDP. The previous Cabinet is said to have been extensively involved in the MTDP, but the real extent of this involvement in terms of prioritization and ownership is difficult to determine. There is also a need for full coordination between MOF, MOP, spending ministries and PECDAR. The key role of

MOF and MOP in managing any competition between ministries in dealings with donors needs to be developed further.

Some progress is being made on all of these fronts, although there is still a considerable way to go. With the assistance of the UK Department for International Development, which is providing technical advice on improving the integration of planning and budgeting, MOP has developed an interim Medium Term Development Plan (MTDP) covering all expenditures, both budget and donor funded, for 2006–08. A Cabinet decision requires all projects to be included in the MTDP and for all project agreements to pass through MOP for approval. MOF is also involved in clearing any recurrent cost implications as well as the proposed financial management and reporting arrangements for each project. The outgoing administration intended to present the interim MTDP to the Consultative Group Meeting in April 2006 and to use it as the basis for an expanded budget dialogue in 2006.

Although the interim MTDP has been very important in beginning the process and potentially improving the dialogue with donors, there are a number of important steps still required before it can be fully effective as the basis for a comprehensive and well prioritized annual budget.[33]

- It needs to be developed within an overall medium-term fiscal framework, which is all the more important given the uncertainty that surrounds both domestic revenues and external assistance. While work has commenced on the MTFF, it is not yet complete.

- There is a need for well-defined and costed sectoral plans or strategies which are owned by the PA and the relevant line ministry and supported by key donors. In some sectors there is no useful plan; in other sectors there are several competing or mutually inconsistent plans.[34] The capacity of line ministries in planning and prioritization should be developed through the establishment of ministry planning units, which are linked with the budget unit.

- Full information on all donor funded activities is necessary.

- There needs to be full and close collaboration between MOF and MOP in the MTDP's development. In the past there was some reluctance by MOF to become fully involved in the MTDP, perhaps reflecting its preoccupation with shorter-term budgetary pressures. Collaboration between MOF and MOP has since improved and the draft MTDP exercise appears to have been useful in ensuring better identification of the recurrent cost implications of donor project assistance to the PA budget.

---

[33] MOP states that its objective is to reach this position for the 2008 budget.
[34] For example, there are said to be four separate strategies developed for the water sector

The latter two points raise the important issue of the likely advantages of merging the MOF and MOP to create one organization managing the raising and allocation of PA funds.[35] This would ensure consistency of approach, integrate the planning and budgeting systems and avoid the current fragmentation of responsibilities. This issue should be given careful consideration by the PA. Any such change would involve MOP shedding its current physical or spatial planning responsibilities and relocating them within an appropriate spending ministry. In the interim, the MOF should become more closely involved in the MTDP, working collaboratively with the MOP.

### Role of Palestinian Legislative Council in Budget Development and Execution

The Palestinian Legislative Council Committee on Budget and Financial Affairs, which consists of 15 members from the total council membership of 120, has potentially important roles in both budget development and budget execution and follow-up.[36] It performs several valuable functions determined by the Palestinian Legislative Council. It can review the draft budget law, proposing reductions in expenditure but not increases, and recommend approval/rejection of the law to the Palestinian Legislative Council. It can question the government on its financial plans and issues of fiscal stability. It can question ministers on financial matters, and it can discuss and approve proposed budget amendments during the year.

In general only the Minister of Finance and MOF officials participate in Committee meetings. The Committee has access to some professional support, and a researcher and a legal advisor have been attached to the Palestinian Legislative Council office in Ramallah. The Committee may also request an investigation into the financial operations of any ministry or agency. The Organic Budget Law (Article 52) requires the quarterly reports on budget execution to be submitted to the Council of Ministers and to Palestinian Legislative Council. While this is now being done, it does not appear that the Palestinian Legislative Council yet makes significant use of these reports.

As discussed above under the Organic Budget Law, the budget is required to be submitted to Palestinian Legislative Council by 1 November and passed before the beginning of the fiscal year. The Palestinian Legislative Council may reduce proposed appropriations, but may not increase them. It was the general practice of the previous Minister of Finance to discuss the proposed content of the budget circular with the Committee before its issuance. The Committee's stance has typically been to try to reduce staffing increases sought in the draft budget (except in health and education) so as to protect the level of operating expenditures. It has also expressed views on the priority given to various payments in view of the PA's difficult budgetary situation, stressing the importance of expenditures on infrastructure rehabilitation and medicines and payments

---

[35] For a discussion of the general issue of integrating recurrent and capital budgets, and their implications for the roles of separate ministries of finance and planning, see the 2005 Implementation Note, "Integrating Recurrent and Capital Budgets," available on the PEFA website.

[36] PLC members themselves select which committee they will serve on. Each member may serve on two committees. Other committees currently include those covering economic, legal, human rights, interior/security and education/health issues.

to families of prisoners, among other items. One future issue for the Committee will be to develop its role in the scrutiny of the security services budget.

The development of the MTDP provides an opportunity for more robust involvement of the Committee in the development of the budget, given the greater scope and information base of the budget compared with the Annual Budget Law. Likewise, the availability of more detail on proposed expenditures, in particular on proposed expenditures not appropriated by spending unit and activity, would provide a better information base for discussion of the budget.

The Committee has undertaken detailed and useful work on key legislation. The previous chairman was largely responsible for drafting the Organic Budget Law of 1997. The detailed work on the development of the new Law on Finance and Administrative Control Bureau (the external audit institution) was undertaken by the Committee, as was work on the new Pensions Law and Anticorruption Law (the Law on Illicit Gains).

MOF provides quarterly budget execution reports to the Palestinian Legislative Council, as required by the Organic Budget Law. The Committee discussed budget execution issues with the Minister of Finance weekly until movement restrictions put in place by Israel made it difficult to meet on a regular basis. The work of the Committee has been hampered by lack of time to review the proposed budget (less than two months) as well as the lack of detailed budget information and annual audited financial statements. The establishment of the new external audit institution, the Financial and Administrative Control Bureau, with a direct reporting line to the Palestinian Legislative Council will strengthen the role of the Committee in the review of budget execution. However, it will take some time for the new organization to become fully effective. In addition, the Committee should become formally involved in reviewing reports on the use of the budget contingency reserve.

Revamping the budget dialogue through the MTDP will provide an enhanced information base for the Palestinian Legislative Council review of the budget. The provision of more detailed information below the budget chapter levels would also assist this review function. The work of the Committee would benefit from greater time to review the proposed budget, improved detail on budget expenditure information and access to audited financial statements covering both budget execution and financial position. Developing a well-functioning national audit institution once the Financial and Administrative Control Bureau becomes operational would provide the basis for an enhanced role for the Committee in reviewing budget execution.

**Budget Execution and Predictability of Funding To Line Ministries**

Civil service and security service salaries, which are paid centrally by MOF, are the first priority expenditure and have until now always been paid on time. But given the precarious and volatile financial position of the PA—reflecting both inadequate funds to finance the budget and the lack of predictability on the revenue side (budget support from the donor community and PA clearance revenues transferred by Israel)—this

predictability of salary funding comes at the expense of predictability for other expenditures. Predictability (and adequacy) of funding for operational expenditures continues to be a perennial problem.

In theory, line ministries are to receive one-twelfth of their budget allocation each month. In practice, this does not and cannot occur because of funding shortfalls. It is not clear on what basis the MOF budget department determines the release of funds for payments on behalf of line ministries as opposed to those paid directly by line ministries. But it is clear that even in 2005 funding for line ministry direct expenditure was highly unpredictable and the criteria used by the budget department of MOF for the release of funds are not transparent (box 2.1). In 2006 the situation was much worse for all ministries and departments.

### Box 2.1: Examples of Unpredictable Funding

*Ministry of Public Works and Housing.* As of early December 2005 the ministry had received only one-third of its operating expenditure budget for the year. In February 2005 it received 4 months of its 2004 allocation to be used to pay off expenditure arrears.

*Ministry of Agriculture.* As of December 2005 NIS 5 million of the NIS 15 million operating budget had been funded. This prevented the ministry from providing agreed counterpart funding for some donor projects.

*Ministry of Labour and Social Affairs.* This ministry had received only one-twelfth of its operating expenditure allocation by November 2005.

*Source*: The ministries concerned.

Funding of expenditures from donor project funds, which in the case of ministries such as Education and Health comprise a significant portion of their total expenditure, is clearly dependent on the funding provider rather than MOF except in cases where local counterpart funds are required. Project funding through PECDAR appears more predictable, but depends on the behavior of individual donors. Funding through ESSP also appears more predictable.

The result of this unpredictability in the release of funds is that line ministries accumulate expenditure arrears based on the implicit assumption that these will be paid by funding from MOF in due course. While the formal budget allocation is normally regarded as the upper limit on the level of commitment, this may not always be the case given the lack of any formal system of commitment control. There is strong evidence that the accumulation of payment arrears has led suppliers to increase their prices to compensate for delays in payment. Ministries are required to advise MOF every month of the level of their expenditure arrears as recorded in unpaid purchase orders where goods or services have been provided, and to account fully for arrears, including copies of invoices at the end of the year, so that funding of these arrears may be provided in the ensuing budget year. This information is checked by the financial controller in each ministry. MOF budget department may release funds to line ministries, either in the current or following year, for the payment of such arrears. However, there does not appear to be any clear and widely understood system for determining which arrears are paid when, or for

determining the relative priority of arrears held by line ministries as opposed to those held centrally for payments made by MOF. In summary, funding of line ministry operating expenditures, in particular those paid directly by line ministries themselves, is highly unpredictable and is not governed by transparent processes, with consequent adverse impact on service delivery.

## Budget Execution and Cash Management

Before 2006, all PA revenues were channeled through the Central Treasury Account. A separate MOF unit had been set up to monitor the receipt of these revenues. IMF monitoring and a review by the 2004 CFAA team confirmed that clearance revenues from Israel, receipts of individual spending units, profits from PA commercial undertakings and budget support provided by donors were being paid into the Central Treasury Account. This latter practice has also been verified in the operation of the MDTF.

The balance of the Central Treasury Account was held in several commercial bank accounts. Spending agencies could choose (with MOF approval) from about 15 commercial banks for the operation of bank accounts from which their expenditures are funded. In 2004 the chart of accounts consisted of a relatively large number of bank accounts for both revenues and expenditures, including more than 1,500 accounts and sub-accounts and over 400 accounts used for advances only. This situation changed in 2006, as several Palestinian Banks elected not to hold PA accounts to avoid being blacklisted by the United States Office of Foreign Assets Control for "terrorist financing."

The cash management arrangements that were in place immediately prior to 2006 already represent a considerable improvement. There is, however, still scope for further improvement.

- Revenue and expenditure accounts could be swept daily rather than weekly (with a system of zero bank balance at the end of each day's business) and the number of bank accounts could be further reduced. Consideration should be given in the longer term to consolidating all bank accounts into one single account, with sub-accounts added as necessary.

- More attention should be given to regular checks between accounting records and bank statements (bank reconciliations), and the practice of writing and holding payment orders before issuing them should be eliminated.

- The practice of borrowing from commercial banks should be brought under strict control, with the Palestinian Legislative Council involved in approving both temporary and end-of-year borrowing limits and receiving reports of actual borrowing compared with agreed borrowing limits. Under the 2003 Annual Budget Law the PA cannot now borrow from the PMA or other PA

institutions. In due course such controls on borrowing should be incorporated into the Organic Budget Law.

It is hardly surprising that no systematic cash forecasting system governing both cash management and budget execution exists. This reflects the continuing unpredictable fiscal conditions. At present, expenditure releases are determined by two factors: available liquid funds and an assessment of day-to-day priorities, leading to highly unpredictable funding of operating expenditure payments. With a return to more normal conditions, cash forecasting will be necessary for better cash management and budget execution. Such conditions would permit a more systematic approach to cash management.

As explained in a previous IMF report on West Bank and Gaza, financial planning is needed for both smooth budget execution and minimal borrowing costs (Hovland and Nashashibi 2002). A cash plan should be prepared to support the orderly execution of the budget. Such plans should be regularly updated to reflect changes in key parameters. It may not be possible to implement the budget as planned for the West Bank and Gaza due to revenue unpredictability.  But a Cash Management Committee with representation from the Budget, Treasury and Revenue Departments of MOF could be an effective means of ensuring regular and frequent updates in budget execution and cash management plans.

**Monitoring Palestinian Authority Debt and Liabilities**

The Annual Budget Laws since 2002 have provided that the PA cannot borrow from the PMA or from other PA institutions, such as PIF. In due course, such intended generic provisions concerning borrowing should be incorporated in the Organic Budget Law. However, it should be noted that the PMA law allows PA borrowing up to 10 percent of the estimated budget deficit. Even through the PMA is not a central bank, it is not unreasonable to provide for some borrowing during the course of the year from such an institution, subject to limits and to clear reporting. The Organic Budget Law (Article 55) requires that the Annual Budget Law establish limits on new borrowing and on borrowing from commercial banks but it does not appear that this is done.

Given the absence of regular reporting on the state of PA finances (the monthly budget execution reports do not discuss liabilities) it is difficult for the PA to monitor its overall position. The production of regular consolidated accounts, preferably on a quarterly basis, which include timely information on the PA's financial assets and liabilities would facilitate such monitoring. The amount of the first two categories below debts to suppliers and to commercial banks, is more regularly managed and monitored as part of the budget execution process. The size of these debts reflects the significant fiscal problems being faced by the PA.

Case 1:04-cv-00397-GBD-RLE    Document 547-154    Filed 06/25/14    Page 24 of 27

The following liabilities or debts exist:

- *Private sector suppliers*, most of which is in arrears, are clearly a major concern, although the exact magnitude is currently unknown. They were a problem in 2005, and anecdotal evidence indicates that they have exploded in 2006 as a consequence of the PA's severe fiscal compression.

- *Commercial banks* for short-term borrowing to finance the budget estimated by previous the Minister of Finance at $540 million at end-2005.

- *Civil service and security service pension schemes.* The two separate civil service pension schemes—the now closed West Bank "pay as you go" scheme and the Gaza contributory scheme—are not financially sustainable in the long term. The West Bank scheme has been closed to new entrants and all new civil service appointees join the Gaza scheme. Although a new Unified Pension Law was passed in 2005, it has not yet been implemented.[37] For both the current schemes there is a PA liability estimated at $253 million at end of 2005 covering employee deductions.[38] Previously there was no pension scheme for the security services, although a small number of older employees are now covered. While there is currently no scheme for the rest of the security services, it appears that salary deductions have been made in anticipation of the establishment of one, creating an additional liability. The two schemes are administered by GPIC, which holds assets amounting to some $120 million.

- *Public debt.* Debt recording and management is a responsibility of a unit in the Treasury Department of the MOF. It uses the UNCTAD (DMFAS) debt information system installed at the end of 2001. There was previously no central recording of PA debt and debt servicing payments were not always made on time, leading at one stage to a suspension of World Bank loan disbursements. The system is deemed to operate satisfactorily, but an independent audit (as part of the audit of the annual financial statements) would be required to confirm this. The amount of public debt is reported in detail in each year's Budget book and is required to be reported in the annual consolidated financial statements. Total debt at end-2005 is stated by the former Minister of Finance to be $1,060 million, with $480 million of this being a series of "soft loans" from the Islamic Development Bank which are intended to be, and therefore are better classified as grants (Fayyad 2006).

There appears to have been a lack of attention to the long-term liabilities being accumulated under the two pension schemes and a lack of financial accountability by GPIC, which has been chaired by the Minister of Finance with a governing board

---

[37] World Bank analysis suggests that the scheme is not financial sustainable. There are also serious concerns about its proposed governance arrangements.

[38] This figure does not include the long-term actuarial unfunded liability, which is estimated at several billions dollars.

comprising other ministers. GPIC has prepared audited financial statements for 2002 and 2003 (the latter presented only in June 2006) but no financial statements, audited or otherwise, since then. The World Bank has been providing advice on improving the governance arrangements for the schemes and strengthening the operations of GPIC. However, the GPIC information systems appear to operate well. The Bank has also assisted in a review of GPIC's investment portfolio, which has yielded low returns. There is an urgent need for improved financial accountability by GPIC, including the timely production of audited financial statements. There is also a need for pro-active monitoring of pension liabilities by MOF.

There are said to be no significant contingent liabilities by way of guarantees which require monitoring. This requires verification, and would normally be addressed by the external auditor of consolidated financial statements. Guarantees may be issued only by the Minister of Finance (Article 58 of the Organic Budget Law). No limit is placed on the amount, although the guarantees must be reported in the official *Palestine Gazette*.

### 3.  The Accounting System

The current accounting system is a significant area of weakness in the PA PFM system. It does provide adequate control over the accurate and safe recording of receipts and the making of payments throughout the PA. But it does not provide adequate information for management by line ministries except in cases where ministries have developed their own accounting systems, which provide for more detailed breakdown of expenditures. Nor does it provide adequate information for MOF to be able to fully monitor budget execution. This reflects the proliferation of stand-alone accounting systems in line ministries which do not provide adequate information to MOF for this purpose. The redevelopment of the central MOF system is taking place without adequate involvement of and regard for the needs of line ministries.

The system is based on cash payments, reflecting the cash basis of budget appropriations, and does not include a commitment module, which is a major deficiency. It is also not integrated with the payroll system, so a manual interface is necessary.

The accounting system has two main parts: a central system (Oracle-based) operated by MOF, and separate systems operated by line ministries and agencies based on varying platforms. The first part covers the Central Treasury Account, which the MOF operates in accordance with the authorized budget, making payments on budget lines that it controls directly (the main ones are wage-related line ministry operating expenditures for which it makes payment and interest payable). There is no accounting manual to provide procedures and other operating guidance to accounting staff.

The second part concerns monthly transfers from the Central Treasury Account into bank accounts controlled by the line agencies. Line ministries make payments from these accounts in accordance with the budget lines for which they are responsible, and are also responsible for accounting for them. Ministries and agencies report their monthly expenditure to MOF, drawing from separate accounting records based either on the

central system, their own accounting system or on manual systems. Thus the information technology solution varies from agency to agency. Some have accounting manuals. Some report quickly and accurately, others do not. The detail and frequency of management reporting for expenditures also varies. Some ministries (MOLSA and MOE) have developed their own systems in house, and these appear to operate satisfactorily. They may also provide more than a payments control function—the MOLSA and MOE systems also integrate stores accounting whereas the MOH systems covers only cash payments. On the other hand a purpose built system developed with donor assistance for MOH is apparently now being set aside in favor of the existing MOF system.

In summary, responsibility for accounting is partly centralized in MOF and partly decentralized to line ministries. The uniform chart of accounts, a single set of financial regulations and uniform reporting requirements bring the two parts of the accounting system together. For such a system to provide accurate, timely and complete consolidated reports, two conditions must be fulfilled. First, line ministries must report their final expenditures to MOF in a form suitable for aggregate monitoring and reporting. Line ministries need good accounting systems to produce, or their expenditures can only be reported in a preliminary way, as lump sum advances received. Second, MOF must establish and comply with standard accounting procedures and carry out comprehensive accounting routines according to a set schedule. This involves, among other things, carrying out regular proofs of accuracy to ensure that final figures can be easily prepared, verified, aggregated and reported.[39]

The central accounting systems itself has some strengths. It automates all financial transactions from initiation to final settlement. It also automatically generates accounting records and permits financial reporting. The system has a single point of data entry and thus a transaction is entered only once. All authorizations are automated through the system. Access to the accounting system is restricted to authorized personnel who only have access to modules under their assigned duties. The new central accounting system provides a wide range of financial reports to MOF, including balance sheet data, bank balances, payment status and advances. Backup is made daily by MOF.

The new central system has combined the two previously separate West Bank (the Bisan system, an off-the-shelf system) and Gaza (Al Bakr, an internally developed system) systems. It is being redeveloped in house rather than being based on any customized off–the-shelf system. Whether this approach will become degraded through lack of adequate in-house technical skills to maintain the system requires further study, but clearly there are some risks in departing from off-the-shelf systems. The redevelopment commenced two years ago and the system was scheduled to develop direct connections with separate line ministry systems in 2006, which should significantly speed up the preparation of the annual financial statements as well as improve the quality of information in the monthly

---

[39] A donor project to develop a comprehensive GFMIS (Government Financial Management Information System) commenced by the World Bank in 1994 and later taken over by another donor was eventually abandoned.

and quarterly budget execution reports.[40] The new system is being piloted at MOF and will be rolled out to all line ministries within 12–24 months, with priority given to the ministries of health and education.

Currently, the MOF loads the annual budget of all line ministries into the budget module at the beginning of the fiscal year. In the future, budget data will be entered at the level of the line ministries or their basic units and aggregated at the MOF level. This will facilitate budget preparation and execution and also expedite the implementation of changes to budget allocations that may happen during the fiscal year. The Palestinian Legislative Council will be given access to the system and will thus be able to directly review budget execution. Procurement and commitment control modules will be added in the future.

It appears that the redevelopment of the central accounting system is taking place without full involvement of and consultation with accounting staff of line ministries. The Steering Committee for this redevelopment comprises two information technology and two accounting specialists, but none of them represents a line ministry.

While there has been no review of the functionality of the separate systems operated by line ministries, it seems clear that lack of adequate technical staff may make it increasingly costly and difficult to operate and maintain this range of separate systems. It also appears that some may be focused more on transactions processing than on producing financial reports. A particular limitation of the central accounting system information is that it is not sufficiently detailed for all line ministries, going only to budget entity and line item information and not to spending at the unit level; it is also clear that overall the redeveloped central MOF system will not be capable of meeting all perceived needs for management information on behalf of the line ministries. There is a need to standardize these separate systems as far as possible and ensure that their information can be integrated with the MOF system.

### Payroll Issues

Transferring the function of payroll control from the GPC to the MOF was an important step to improve payroll management, along with control over recruitment, promotions and other salary increases.[41] The fact that the MOF operates a payroll management system that covers both civil servants and security services personnel in both West Bank and Gaza facilitates the linkage between personnel decisions and budget appropriations. The personnel management function still rests at the GPC, which handles all personnel profiles in an Access-based system, with the exception of the MOI, MOE and MOH electronic personnel systems.

---

[40] A senior treasury official suggests that this should enable the production of the financial statements within six months of the end of the year.

[41] This section summarizes the payroll arrangements that existed prior to March 2006. A more detailed discussion can be found in Chapter 3 of the PER.