# EXHIBIT A.206
## (3 of 8)

The 2004 CFAA noted the major advances made in payroll controls through having all civil servants and security personnel paid through personal bank accounts (beginning March 2004), with the release of payment requiring validation of the employee's name by the bank (thus ensuring that payments are made only to real persons). A partial payroll audit by the Internal Audit Department of MOF in July 2005 focused on identifying partial and double dippers, ghost workers and the lack of documentation in awarding allowances. A more detailed follow-up audit is planned, as discussed in the next section. Given that payroll comprises such a large proportion of total expenditure, payroll controls are also assumed to have been reviewed by the external auditor of the PA's aggregate 2003 financial statements, but the extent or nature of payroll issues raised in the management letter resulting from this audit is not known.

- Decisions on adding civil servants to the payroll are highly centralized at the MOF and subject to strict controls.

- Control over recruitment at the security forces is not subject to such strict procedures. Recruitment and promotions for the security forces are the responsibility of the payroll department at the MOI, which is autonomous from the MOF and provides the input into the single payroll system operated by MOF for both the civil service and the security service. It does not necessarily observe the rules on recruitment and promotion which apply to all PA employment decisions.

- The linkage between the GPC, the MOF and the MOI systems is paper-based, resulting in limited integration between personnel records and the payroll data and no reconciliation of the information, increasing the possibility of error and data manipulation. However work is underway to create a unified human resource management database.

- The payroll system is not linked to the MOF accounting system and the fact that manual journals are used to post payroll entries to the accounts gives room for further manipulation and human error.

**Internal Audit**

Reflecting the lack of an adequate external audit institution, the previous Minister of Finance placed considerable emphasis on developing an internal audit function located in MOF and reporting directly to him. Initially it was linked with the ex ante financial control function, and their relationship was and is a source of some confusion in spending ministries. Internal audit is an ex post review function, as opposed to the ex ante role of financial control. As identified in the 2004 CFAA, developing a collaborative, non-competitive and synergistic role between internal audit and the new external audit institution is an issue which will need to be explored as the new external audit institution is established. It is clear that internal audit will confine itself to systems reviews and will not undertake any financial statement audit work.

By ministerial decree, a separate Internal Audit Department was created in MOF in May 2004 with a well-qualified Director-General appointed and a draft charter approved by the Minister of Finance.[42] The *Palestine Gazette* of September 2005 set out the legal responsibilities of the new department. Good progress has been made in developing this department, which now has a staff of 52 with 15 more to be added. All staff appointments have now been converted to civil servants, a change providing tenure and improved salaries. Most of the staff have undergone training under the EC financed financial control and internal audit technical advice and training program provided by Ernst and Young in 2002/03, and a second program commenced in 2006. Unfortunately, given current political situation and donor decisions this program has ceased.

One major audit of the payroll system has already been done, and follow-up work in this area was planned for 2006. Sixteen other key audits have also been undertaken covering areas such a customs and income tax administration, some public works activities and the Ministry of Foreign Affairs, with the selection based on risk assessment. A three-year strategic plan has been developed. A major audit of MOA is planned, both as a substantive audit and as a training exercise. The previous Minister of Finance stated that reports he received were valuable and had been acted on. The Director-General of the Department commented on general acceptance by ministries of the role of his department and their willingness to cooperate.[43]

As one of the PFM benchmarks for the MDTF, an internal audit committee has been established to oversee and coordinate the implementation of the three-year strategic plan and the recommendations from specific audits.[44] Under the second EC consultancy, Ernst and Young also reviewed the current development of internal audit and financial control. An agreement was reached with the Internal Audit Department to decentralize its functioning. It is proposed by MOF that in future major line ministries will have dedicated internal audit staff that report to an audit committee of that ministry. Smaller ministries and other budget entities would be served by a central pool of internal audit staff. The role of the Director-General would become one more of professional support, guidance and review. This proposed new arrangement will require the approval of the new Minister of Finance.

Good progress has been made in developing a viable internal audit function, but it will take some time before the Department becomes fully effective. The proposed new decentralized internal audit arrangements should help.

---

[42] This person has subsequently resigned (May 2006).

[43] Discussions by the PER team with line ministries have indicated some confusion in their finance directorates between the roles of financial control and internal audit which will need to be clarified over time. Some still perceive internal audit as ex ante expenditure approval.

[44] The committee comprises the Deputy Minister of Finance (chair), the Director-Generals of the Internal Audit Department and the MOF Budget Department, a Director-General from the Ministry of Education and a private sector auditor (from Ernst and Young).

### Financial Control

Reflecting the very lax expenditure control systems before 2002, the previous Minister of Finance obtained Cabinet approval in February 2004 to establish a strong ex ante expenditure approval department in MOF. Previously, each ministry had a financial controller reporting to its chief executive, who was responsible for this ex ante expenditure approval. A separate Department of Financial Control was established in MOF in 2004 with financial controllers out-posted to spending ministries as MOF staff members reporting to the Director-General of the Financial Control Department. The *Palestine Gazette* of September 2005 sets out the legal responsibilities of the new department. The Deputy-Director-General is located in Gaza and reviews the work of financial controllers located there.

Financial controllers have now been appointed in almost all ministries, with the exceptions of a few significant organizations such as the Customs and Income Tax departments. The security services have their own financial controller located in the finance directorate of the security services in Gaza who works independently of the Department of Financial Control and reports direct to the Minister of Finance.

The Financial Control Department had a total staff of 136 in December 2005, 74 located in West Bank and 62 in Gaza, nearly all of whom are contract staff. Training has been provided under the EC program and manuals developed. The Department is requesting an additional 25 financial controllers in West Bank and 15 for Gaza. For the longer term, the Director-General of the Department sees a need for some 300 staff in total. This may be unduly high, given the need for the finance directorates of line ministries to in due course to assume prime responsibility for financial control.

Apart from ex ante approval of payments, financial controllers also review proposals for persons to be added to the payroll, ensure that required bank reconciliations are carried out and that advance accounts are reconciled and review the information on payments made directly by the spending ministry from its own Bank accounts to MOF.[45] Issues in dispute between the financial controller and the ministry are forwarded to the Director-General for adjudication, and may in some cases be referred to the Minister of Finance.

With the development of the financial control function, MOF was intending to abandon its previous ex post review of all expenditure transactions, which was necessary before expenditure could be regarded as final and was one reason for the delay in preparation of financial statements. However, it is not clear whether this has been done. Given the normal responsibility of the finance directorate of a spending ministry itself for the tasks which are undertaken by the financial controller (as set out above), it may be argued that this second guessing adds another layer of control with the possibility of delays and little

---

[45] This approval involves checking that the payment has appropriate documentation, that calculations are correct, that funds are available and that the expenditure is otherwise legal.

value added.[46] Discussions between the PER team and five line ministries indicated mixed views of the operation of the financial control function.

MOF does not consider any relaxation of financial control arrangements to be appropriate now, fearing that there might be a return to previous fiscal indiscipline. However, as indicated in the 2004 CFAA, it appears appropriate to regard the existing financial control arrangements as an interim step, with greater devolution to line ministries occurring as the culture of financial control becomes further instilled in their operations. This was being addressed in the context of the EC funded review of internal audit and financial control and MOF tentatively agreed that the function should be further devolved to line ministries. However the details have yet to be worked out and would require the approval of the new Minister of Finance.

In summary, the financial control function appears to have provided increased assurance in the correctness and legitimacy of payments.[47] It is important that this function be undertaken in an efficient manner, avoiding unnecessary second guessing of line ministry finance departments. A proposed greater devolution to line ministries appears appropriate, although further detail is required before any firm conclusion can be reached.

### Aggregate Financial Statements

The Organic Budget Law (Articles 65 and 66) provides for the PA to present preliminary consolidated financial statements to the Council of Ministers within six months of the end of the financial year and final accounts for subsequent submission to the Palestinian Legislative Council within 12 months of the end of the year.[48] The Financial and Administrative Control Bureau Law of 2004 has slightly different provisions, requiring presentation of preliminary consolidated financial statements to the Bureau within six months of the end of the year (although no reference is made to auditing them) with final accounts to be presented to the Bureau within 12 months of the end of the year, with the Bureau to "study and make relevant observations" before referring them to the Palestinian Legislative Council.

The absence of such provisions in the Organic Budget Law thus implies that the Palestinian Legislative Council might receive un-audited statements, which would seem inappropriate. The Organic Budget Law also sets out some general requirements for the content of the statements (repeated in the Financial and Administrative Control Bureau Law), which are reporting "opening and closing balances of the consolidated fund and the special funds," and "details of financial operations implemented to manage the fiscal deficit and the net public debt." These requirements fall far short of requiring meaningful information on key issues as the financial position of the PA. Reflecting CFAA

---

[46] The Financial Control Department has set a performance standard of dealing with all payment requests within three days.

[47] It is not known to what extent these financial control arrangements are being applied to payments now being made through the Office of the President.

[48] As pointed out in the 2004 CFAA, this period of time seems unduly long and should be reduced to six months.

recommendations, the General Budget and Financial Affairs Regulations 2005 require reporting on financial assets and liabilities as well as budget execution. Clearly, there is a need to develop more consistent and meaningful requirements for the content of the consolidated financial statements, and for these to be in the Organic Budget Law.

No financial statements were prepared until 2002. The 2002 statements were submitted to the Palestinian Legislative Council in January 2004 but were not audited. Although they marked a reasonable attempt to provide meaningful information on the extent that donors utilized the Central Treasury Account, they were largely a statement of budget execution and they were difficult to follow, comprising a number of sub-statements that were insufficiently linked to each other.

The preliminary 2003 statements were posted on the MOF website in April 2004. Terms of reference for an external audit to be carried out by a private auditing firm were developed by MOF in consultation with the World Bank in late 2004.[49] Price Waterhouse Coopers was selected and the audit was completed in January 2006, following which a detailed management letter of some 100 pages was sent to the PA for response. No response was received, so there is as of yet no audit report available on the 2003 statements. It now appears questionable whether any such audit report will ever be issued or if, given the passing of time, its contents will be very relevant.

Reflecting the recommendations of the 2004 CFAA that the statements need to be more than just statements of budget execution, but should also provide information on the financial position of the PA,[50] some of this information was included in the 2003 statements. However, none was included in the 2004 statements, apparently reflecting a view in MOF that cash based statements could not include information on accrual based concepts such as assets and liabilities. As discussed above, it should be possible to produce aggregate statements on a quarterly basis to assist in the monitoring of the PA's overall financial position on a more regular basis. The International Public Sector Accounting Standard (cash basis), which provides for reporting on a cash basis as well as the disclosure of supplementary information on an accruals basis (assets and liabilities), would be an appropriate future framework for these statements.

The 2004 preliminary financial statements were completed by end of June 2005 and sent to the Palestinian Legislative Council in July, but have not been posted on the MOF website and as yet no arrangements have been made for their audit. Based on the translated English version they appear to be less satisfactory than the 2003 statements, difficult to follow and limited to a summary statement of budget execution (no supplementary information on financial assets or liabilities or any reference to the PA's financial position). The calculation of the financing balance is also difficult to understand.

---

[49] The use of private sector auditors was seen as an interim measure, pending the establishment of an effective Palestinian external audit institution.

[50] For example, inclusion of PIF investments and other financial assets, inclusion of public debt, amounts owed to Palestinian commercial banks, ordinary creditors including arrears and other long-term debt, contingent liabilities, write offs and use of the budget contingency reserve.

The position concerning aggregate financial reporting is very unsatisfactory. As of June 2006 no timely, adequate or audited financial statements for the PA have been produced. This appears to reflect two problems. The first is inadequate technical resources and guidance in the accounting department of MOF. For example, there are no manuals or instructions concerning the end of year closing of accounts. The delay in closing or reconciling various advance accounts to obtain final expenditure figures has also delayed production of the accounts. The second problem is a lack of priority from the MOF for the preparation of these statements. There does not appear to have been sufficient appreciation of the importance of audited financial statements to the financial credibility of the PA and to the ability of donors to maintain budget support. Not only would a satisfactory audit report lend credibility to the reported information, but the auditors' review of the adequacy of the control systems in place would also provide an independent professional opinion on whether the financial control framework is adequate and operating as intended.

## 4.   External Audit

The 2004 CFAA identified the lack of a credible, professional external audit institution as a major deficiency in West Bank and Gaza's PFM system. It noted that while a formal external audit institution, the General Control Institute (GCI) had been created under Law 17 of 1995 it lacked independence, capacity and impact. It reported formally to the President, but neither reported to nor was responsive to the Palestinian Legislative Council. While the GCI's mandate contained some desirable features of an external audit organization, such as adequate budgetary independence and the power to obtain information, its reports were not forwarded to the Palestinian Legislative Council nor made public by the President, nor apparently followed up. The President was also able to exempt any organization from audit. Anecdotal evidence from auditees suggested that its capacity was weak and the quality of its work low. Overall, it appears to have had no discernible effect on public accountability.

In 2004 the Palestinian Legislative Council passed law No. 15, creating a new national audit institution, the Financial and Administrative Control Bureau. Please put the President sentence back – it is important – even if a law is passed the President has to sign it before it can be implemented The legislation has a number of deficiencies, such as combining within the organization the separate functions of administrative review and audit and not clearly providing for both performance and financial auditing, including an audit opinion on the PA's financial statements. But the Bank and the EC have assessed the legislation as providing an overall adequate basis for the functioning of a new external audit institution. In particular, it provides for the Council to report to both the President and the Palestinian Legislative Council (at any time, quarterly and annually) and requires Palestinian Legislative Council endorsement of the nomination of the President of the Bureau, who is approved by the President of the PA on nomination by the Cabinet. It provides for coverage of all PA entities, including local government, and for reporting to the Palestinian Legislative Council on the quarterly budget execution reports prepared by MOF.

Case 1:04-cv-00397-GBD-RLE   Document 547-155   Filed 06/25/14   Page 8 of 27

Unfortunately, implementation of the new law has proceeded extremely slowly, with the appointment of the new President of the Bureau being made only in December 2005. The Minister of Finance correctly took the view that the development of this institution was the responsibility of the Palestinian Legislative Council or the President's or Prime Minister's Office, rather than of MOF, given the MOF's position as an auditee. A benchmark in the MDTF requiring the development by the PA of an action plan for the establishment of the new institution was not met.

The 132 staff of GCI have been transferred to the new Bureau. Of the two other statutory appointments, both of which are nominated by the President of the Council but subject to the approval of the Cabinet, the Vice-President has been appointed and the Director-General is about to be appointed. All staff are civil servants and the Bureau is administratively attached to the PA President's Office.

The action plan, which was a benchmark of the MDTF, was designed to incorporate the following:

- Assessing the human and other resource needs of the new institution.

- Developing the priorities and methodologies to be adopted.

- Assessing the extent to which transferred GCI staff and existing methodologies may be suitable to the new organization.

- Assessing gaps in human resource capacity and methodologies.

- Developing a plan for filling these gaps.

The new institution has commenced work, but it is severely hampered by lack of capacity and resources, including having only 18 staff in the whole West Bank and having no functioning office in Ramallah. It has taken steps to require declaration of financial interests by Ministers and members of the Palestinian Legislative Council, which it intends to extend in due course to civil servants. It is currently focusing on reviewing the functioning of the MOF financial controllers system and the work of the MOF Internal Audit Department, which will be the subject of its first report.[51] It has developed a general master plan and a work plan for 2006 which includes capacity building and professional development and financial control activities

While this plan includes some of the elements set out above, more work is required in needs assessment and methodology development. Consideration has to be given to the relative roles of the Bureau and the Internal Audit Department of MOF and appropriate coordination is necessary to avoid overlap and duplication of activity. The Palestinian Legislative Council and the PA President's Office should also have input into this plan.

---

[51] This review should use rather than duplicate the review of these issues already conducted by Ernst and Young.

External assistance, by way of a peer review by another national audit institution, would also be highly desirable in finalizing the plan, as would significant external assistance in methodology and training from one or more national audit institutions to develop capacity. The donor community should stand ready to offer all necessary technical assistance.

A key priority for the new institution should be to develop its financial auditing capacity so that it is able to undertake the external audit of the PA's financial statements, which have been audited by private external auditors as an interim arrangement, and to undertake the audit of financial statements of donor funded projects. The latter would be consistent with the donor community's commitment to move to the use of country systems in project FM arrangements to the greatest extent possible.

There is as of yet no adequately functioning external audit institution. Developing the capacity of the new Financial and Administrative Control Bureau is a high priority.

**Palestinian Authority Commercial Investments**

***Cement Company.*** This wholly owned PA company is the monopoly supplier of cement in West Bank and Gaza. It is part of the PIF portfolio, and is thus overseen by the PIF board. As it is also a state-owned enterprise, the PIF board should ensure that it publishes separate audited financial statements.

***Petroleum Corporation.*** This is the largest state owned enterprise, with a monopoly on the importation of petroleum products (from Israel) and their distribution. Control of the corporation was transferred to MOF in 2004 to combat alleged widespread corruption in its operations. Since 2005 it has been receiving significant transfers from the budget to subsidize the price of petroleum, but no annual audited financial statements appear to have been prepared, which is a significant lapse in terms of fiscal transparency.

***Palestine Investment Fund (PIF).*** Since its establishment the PA has invested in a range of commercial undertakings, both with a view to generating revenue for the PA, and to stimulating economic growth in West Bank and Gaza through strategic local investments.

PIF was formally established by Presidential decree in October 2002 as a component of the 100 days Palestinian Reform Plan to manage the PA's commercial investments. PIF is an autonomous entity wholly owned by the PA and is incorporated under PA Companies legislation. Under the decree it is illegal for the PA to conduct any commercial activity or hold commercial assets outside of PIF. PIF is allowed to invest liquid funds in temporary investments, but is not allowed to lend to the PA budget. PIF transfers a share of its profits to the budget as determined by the Minister of Finance.

PIF replaced the previous Palestine Commercial Service Organization (PCSC), which used PA revenues not paid into the budget (petroleum, tobacco and alcohol excises plus on-going profits from these commercial operations) for investment in some 79 commercial undertakings, both within West Bank and Gaza and abroad. These included

monopolies in cement and petroleum, which were acquired at an early date. There was little transparency and accountability concerning its operations.

In late 2002 the new PIF board engaged the international firm of Standard and Poors to undertake a valuation and "transparency assessment" of the companies in which PIF held shares. A report was issued on 9 March 2003 listing all investments along with their valuation.[52] In addition, the report listed current bank accounts formerly controlled by the Palestinian Commercial Services Company (PCSC). The report was presented to and discussed by the Palestinian Legislative Council. The transparency assessment reviewed the availability and reliability of financial and other data, as well as how each entity is owned, organized and operated, and whether based on the findings it will be judged both "transparent and respectable" by international standards. Anti-competitive behavior, unfair or preferential relationships with the PA and corruption issues were included in the diagnostics.

The articles of association of PIF outline the authorities and responsibilities of the Board of Directors and the management of the company and provide for proper management and governance of the PIF. Three directors' signatures are required for any investment decision. Apart from the Articles of Association, a detailed policies and procedures manual governs its operations. The governance arrangements for PIF have recently undergone a major change, with a Presidential decree providing for its transfer to the Office of the President. The Chief Executive is now officially an adviser to the President and chairmanship of PIF has moved to an external appointee rather than the Minister of Finance. The Minister of Finance, along with the Minister of Economy, remains a member of the board, which has a private sector majority.

Under its Articles PIF is required to prepare an annual report within a "reasonable time" of the end of the financial year. It is also required to prepare quarterly statements (which although not formally audited include an audit review to determine the likelihood of material misstatement) and annual audited financial statements. In April 2004 PIF presented its first annual financial statements, those for the year 2003. These were audited by the international firm Ernst and Young and received an unqualified audit opinion. The financial statements for 2004 were made publicly available through the PIF website on 16 May, 2005 and were formally published as part of the PIF Annual Report issued on 15 September, 2005. They also received an unqualified audit opinion.

The 2005 statements indicate a net equity of $956 million at 31 December 2005, compared with net equity of $713 million at 31 December 2004. This net equity increased to $1,292 million at 31 March 2005, the most recent period for which interim statements are available on the PIF website. PIF has thus been a highly profitable undertaking, achieving particularly significant returns from its investments outside West Bank and Gaza in the Orascom Telecommunications Holdings. While at 31 December 2004 investments in West Bank and Gaza were only one-quarter of total investments, this

---

[52] Investments totalled some $633 million at that date. The Standard and Poor report along with PIF by-laws are published on the PIF website, www.pa-inv-fund.com/lasse.asp

proportion is now increasing following the sale of the Orascom Telecommunications holdings program using PIF funds.

In 2004 PIF paid a dividend of $74.5 million to the budget (compared with a budget provision of $35 million), compared with $31 million in 2003 and nothing in 2002. In 2005, according to the former Minister of Finance, some $120 million ($60 million more than the proposed dividend set out in the PIF 2004 financial statements) was transferred from PIF to the PA budget by way of dividend, reflecting in part the high level of PIF profits in 2004. A further $156 million went to support the social care program included in the 2005 budget,[53] leaving net equity in PIF of $858 million at end-2005. In addition, the former Minister states that $443 million of PIF assets were used as collateral for borrowing from commercial banks for 2005 budget (Fayyad 2006).

It has not been possible to verify these figures as no financial statements for PIF have been presented since March 2005. This disappointing decline in fiscal transparency reflects in part recent difficulties in West Bank and Gaza as well as the change in PIF's governance and management arrangements and some apparent lack of documentation of key PIF board decisions made in 2005. Audited financial statements for 2005 were expected to be available in early June 2006.

The new PIF board is proposing a change in investment strategy which would see greater involvement in longer term strategic PA development needs, such as investment in the Gaza off-shore gas project, a second broadband license for West Bank and Gaza, a guarantee fund for Palestinian entrepreneurs and Gaza housing. While it is intended to at least partly offset the lower shorter-term returns from such investments by a change to higher return (and thus higher risk) investments outside West Bank and Gaza, the net result is likely to be some decline in the value of the PIF portfolio and in PIF profits in the medium term. The PIF board has also recently agreed to transfer some $100 million to the President's Office to cover urgent PA expenditures.

## 5.   Policy Recommendations

Drawing upon the discussion in the chapter above, box 2.2 provides a detailed set of policy recommendations for the broader PFM reform agenda.

---

[53] Although this would mean transfers to the budget in 2005 exceeded realized PIF profits for the year, running down net equity is permissible provided net equity does not go below the level of authorized equity capital and statutory reserve of $580 million.

### Box 2.2: Public Financial Management Policy Recommendations

*Donor Practices:*
- When circumstances allow, donors should resume channeling their assistance through the Central Treasury Account and the PA accounting system as soon as possible and close all accounts with the Office of the President.
- Donors should move to meet international commitments to harmonize project financial management requirements.
- All donors should respect the MOP's mandate to endorse all projects and programs and provide accurate and comprehensive information on their activities to the MOP's database.
- Donors should fully and actively support the MOP's efforts in the formulation and implementation of a Palestinian Harmonization and Aid Effectiveness Action Plan.
- Ensure that PECDAR becomes accountable to the executive branch of government, with its financial transactions being part of the Central Treasury Account.

*Scope of the Budget:*
- Consider transferring responsibility for approval of all external financial assistance grants to the MOF.

*Nature of Budget Appropriations:*
- Ensure separate reporting on the use of the budget contingency reserve in the aggregate financial statements, to be thus audited and then reviewed by the Palestinian Legislative Council.

*Budget Classification and Establishing Line Ministry Accountability for Expenditure Control:*
- Revise the chart of accounts to make it consistent with international classification systems and to provide for reporting by spending unit and program in the redevelopment of the accounting system.
- Review the current system of the MOF directly paying much of the operating expenditures for line ministries and departments.

*Budget Documentation:*
- Improve budget documentation by including narrative information on the role, responsibilities and activities of budget entities and by providing explanations of previous year's out-turns against budget.
- Provide the full budget documents on the MOF website to ensure wide availability.

*Budget Development Dialogue:*
- Deepen the level of discussion with MOI on the security service budgets.

*Improving Expenditure Prioritization:*
- Continue with the development of the MTDP, paying close attention to the full involvement and collaboration of the MOF, MOP, line ministries, PECDAR and the donor community.
- Over the medium term, consider merging MOP into MOF so as to more fully integrate the planning and budgeting functions.

*Role of the Palestinian Legislative Council in Budget Development and Execution:*
- Review the budget timetable to allow for more effective review of the proposed budget.
- Formally involve the Committee in reviewing reports on the budget contingency reserve.

*Budget Execution and Enhancing Predictability of Funding to Line Ministries:*
- Increase the predictability of funding for line ministries from the MOF budget department operating expenditures by establishing a transparent system for the release of funds, both for items paid by MOF and those paid by line ministries from their own bank accounts.
- Develop a formal commitment control system as part of the redevelopment of the accounting systems and consider a formal role for financial controllers in approving commitments as well as payments.

*Budget Execution and Cash Management:*
- MOF should sweep all bank accounts on a daily basis, with consideration being given in the longer term to consolidating all banking arrangements into one account with sub-accounts as necessary for ministry and agency operations. MOF should ensure that all ministries (MOF and line ministries) regularly carry out bank reconciliation.
- MOF should also ensure that line ministries do not issue payment orders until funds are available.

*Continued...*

- A system of cash forecasting (involving a Cash Management Committee comprising different parts of MOF) should be developed, in order to alleviate the current short-term (day by day) approach to funds release and to provide a basis for monitoring the extent to which the budget (both revenues and expenditures) is on track.
- Provisions governing limits on borrowing should be incorporated into the Organic Budget Law. These provisions should include appropriate reporting on actual levels of borrowing to the Palestinian Legislative Council.

**Managing Palestinian Authority Debt and Liabilities:**

- Develop regular (quarterly) production of aggregate financial statements which will enable the overall financial position of the PA to be monitored on a regular basis.
- Improve financial accountability of GPIC, including the presentation of timely and audited financial statements, and ensure that these are reviewed by MOF and Palestinian Legislative Council.

**The Accounting System:**

- Using appropriate external technical resources undertake a review of the existing accounting systems strategy. This review would examine:
  - The appropriateness of the "in house" approach to the current redevelopment of the central system operated by MOF.
  - Possible strategies to ensure the management information needs of line ministries are met, while avoiding the proliferation of separate ministry systems which may become increasingly difficult to operate and maintain.
  - The system implications of moving to a more detailed process of budget development and assignment of budgets to spending units.
  - Ensure that the redevelopment of the accounting system includes a commitment control module.

**Payroll Issues:**

- Bring security services payroll under the direct control of MOF.
- Accelerate work on the integration of the payroll and personnel systems.
- As part of the redevelopment of the accounting system, provide for a direct link between the payroll and MOF central accounting systems.

**Internal Audit:**

- Develop a collaborative relationship with the new external audit institution as it becomes established on a sound footing.
- Proceed with the proposed decentralized arrangement for the internal audit function.

**Financial Control and Reporting:**

- Amend the Organic Budget Law to require financial statements to be finalized and presented for audit within six months of the end of the financial year, and for audited statements to be presented to the Palestinian Legislative Council within nine months of the end of the year.
- Adhere to this timeframe for the production and audit of these statements.
- Improve the form and content of the financial statements so that they comply with the International Public Sector Accounting Standard (cash basis).
- Seek the external technical assistance necessary for MOF to improve both the timeliness and form and content of the statements.

**External Audit:**

- Proceed expeditiously to make the new Financial and Administrative Control Bureau operational, developing a detailed action plan as discussed above and seeking external assistance from another national audit institution in doing this and in ongoing capacity development.
- Ensure that particular emphasis is placed on developing the Bureau's capacity to audit financial statements.

**Palestinian Authority Commercial Investments:**

- Ensure the previous standards of timely financial reporting by the PIF are reestablished.
- Ensure timely audited financial statements are produced by the Petroleum Corporation.
- Ensure the publication of separate timely audited financial statements by the Cement Company.

## References

Hovland, O., and K. Nashashibi. 2002. Fiscal Management Reform Strategy. September. P24

Fayyad, Salaam. 2006.  P25, n22

PEFA (Public Expenditure and Financial Authority). 2005. Public Financial Management Performance Measurement Framework. June. <www.pefa.org>.  P3

TIM. 2006. TIM consolidated activity report 26 June 2006 to 8 September 2006.  P7

## CHAPTER 3: THE CHALLENGE OF CIVIL SERVICE REFORM

### 1.  Key Issues and Challenges

Since the Oslo Accords, the Palestinian Authority (PA) has become both the main service provider for the Palestinian population and the largest employer in the West Bank and Gaza. But its long-term viability has been sorely tested as public sector salaries have largely gone unpaid throughout most of 2006 and wage arrears owed to PA employees from March to October exceeding $572 million. Several partial salary payments were made by the PA and the Arab League through the Office of the President (OOP), but only amount to about 40 percent of the total. Until August 2006, ministries were operating with around 70 percent of their staff in attendance, absenteeism higher in the West Bank than in Gaza. In September 2006, a crippling public sector strike broke out. No official data is available on the number of workers striking, but informal estimates place it higher than 75 percent in the West Bank and much lower in Gaza. A recent poll by the Center for Policy and Survey Research revealed that nearly half (48.2 percent) of Palestinian respondents believe the PA must be dissolved if it fails to pay the salaries (2006).

The implosion of revenues after March 2006 would have thrown any government into turmoil, and little could have been done technically or administratively to cushion the blow. That so many employees continued to work even though they had not been paid in months is a credit to the PA. But the seeds of the current crisis were laid more than a decade ago, as both the PA and the donor community repeatedly failed to address core issues of public administration reform, resulting in a civil service establishment that is an excessive burden upon PA finances and does not provide services worth the considerable resources invested in it. While the current crisis was unavoidable, policies pursued over time have made the PA vulnerable to any disruption in external aid flows and exacerbated the depth and impact of the crisis.

In the six years since the start of the second Palestinian uprising, total public sector employment grew by nearly 70 percent. Public sector salaries increased significantly, particularly after the substantial 2005 pay increases awarded to both security and civil service employees. In the last quarter of 2005, the wage bill averaged $93.4 million a month, almost a 20 percent increase from the first two quarters, according to Ministry of Finance data. By early 2006, formal spending on public sector salaries represented more than 91 percent of the PA's total revenue and about two-thirds of current expenditures. (Informally, senior PA officials have indicated that the wage bill was actually $112 to $120 million a month.) Given that the PA's net revenues were approximately $108 million a month in the last quarter of 2005, its revenues were unsustainable even prior to the election of Hamas in January 2006. As the public sector has expanded, it has reduced the resources available for non-wage expenditures, degraded the quality of service delivery and made the PA particularly vulnerable to disruptions in the flow of clearance revenues and external assistance.

This wage expansion has not occurred in a vacuum. Powerful pressures were at work that would have been difficult for any government to resist. Difficulties in transportation and restraints on movement make it hard to rationalize and optimize the distribution of staff. Heavy demographic pressures, combined with the private sector's limited capacity to absorb new entrants into the labor market, have pressured the PA to provide employment. In the past five years, the public sector served as a buffer against the loss of jobs in Israel due to movement restrictions following the *intifada*. The deteriorating security situation and rise of private militias have pressured the security services to expand.

In spite of the fiscal shortcomings, a number of concerted efforts at civil service reform have been made. The government passed a Civil Service Law in 2005, which identified stricter recruitment rules and outlined measures for non-compliance. The law rationalized the number of allowances and reduced managerial discretion. The role of the General Personnel Council (GPC), the chief body responsible for oversight of civil service statutes, was strengthened and much of the alleged corruption and lax administrative practices prevalent earlier cleaned up. The role of the Ministry of Finance (MOF) in monitoring fiscal flows and controlling the payroll has reduced fraud. Some administrative structures have been rationalized, and the security services have begun important reforms. The institutional infrastructure to manage the reform process is in place, and these efforts should provide the foundation for future reforms.

Ultimately, the PA's success depends on its ability to pursue a sustainable fiscal policy, which in turn depends on controlling the wage bill, far and away the largest single item of expenditure. Generating employment through the public sector may have worked episodically in the past, but such days are over. Even after donor funding resumes, the PA has exhausted its capacity to absorb any additional excess labor. It cannot, in fact, afford the establishment it currently has. Because existing commitments cannot be fully honored, the PA and donor community have two choices. They may either address this problem directly in a sophisticated, equitable, and comprehensive fashion. Or they may continue to act on an informal and ad hoc basis by simply paying a portion of salaries owed as resources become available and hoping that adequate resources will materialize and the day of fiscal reckoning be postponed.

## 2.  Evolution of Employment Policy in the PA

When formed in 1993, the PA had 20,000 employees, largely from the Israeli Civil Administration. The majority were doctors and teachers. Some who assumed largely managerial positions in the PA came from the PLO. Between 1995 and 2000, the number of PA employees more than doubled, equivalent to an annual growth rate of 12.3 percent. In the early years, this expansion could be justified as the PA was acquiring new responsibilities and assuming greater control over services and security in the Palestinian territories. Overtime, the rate of hiring was clearly outpacing the PA's capacity to provide improved public services. By 1998–1999, the Bank and other donors began expressing serious concerns of fiscal sustainability.

The situation grew worse with the second *intifada*, when the PA created jobs to soften the blow on the private sector. In the first year, public sector employment grew by 12.8 percent. In 2002 and 2003 the public sector grew an additional 10 percent a year.54 In 2004 public employment continued to grow but generally remained within the general proportions imposed by agreement with the international donors. The civil service added 3,924 new employees, just 424 employees over the number stipulated in the budget. The bulk of the civil service hiring was in Health, Education and the Ministry of Social Affairs. The security services, however, added an additional 3,443 employees even though the budget stipulated a freeze on more hiring.

Figure 3.1: Public Sector Hiring and Wage Bill Growth, 1999–2005



Source: MOF and GPC.

The PA granted significant salary increases, averaging more than 20 percent, to civil servants in 2003 when the new civil service legislation was implemented. However, a clear tipping point occurred in 2005 when the PA was found in violation of the ongoing Public Financial Management Reform Program tied to the Reform Trust Fund. Donors were particularly concerned with PA's performance against the Wage Bill Containment Plan targets and pension reform. Wage increases at the end of the year exceeded projections by an additional $300 million. Neither the higher revenue increases nor anticipated levels of donor support were likely to cover the wage bill (See Table 3.2 below).

The MOF initially estimated that retrenchment and retirements would offset the budget impact of the salary increases. It identified 8,000 non-performing security service employees and about 2,000 non-performing civil service staff. Eliminating these employees would have saved an estimated $85 million a year. But despite the repeated promises to take action, none of the identified non-performing personnel were removed from the payroll. Additionally, the implementation of the Unified Pension Law (UPL) in September 2005 did not lead to significant retirements in civil service personnel. The Pension Law passed for the security services did not lead to substantial savings because

---

54 Meanwhile, unemployment in the Palestinian territories rose to 25.5 percent in 2002 and 30 percent in 2003, reflecting the increasing uncertainty of job prospects in Israel and declining economic opportunities in the Palestinian territories.

the pension payments were equivalent to or even exceeded the salaries of active employees.

In 2005, the wage bill increased significantly following implementation of the new Civil Service Law and additional hiring into the security services. The civil service added 3,666 employees, almost 90 percent for the Ministries of Education and Health. The security services added an additional 13,852 new recruits funded from the transfer budget of the Ministry of the Interior (MOI). The security service recruits do not appear on the payroll of the MOI and are paid a stipend of NIS 1,065 a month. Some government bodies such as the MOF, the President's Office and the GPC witnessed reductions in total staffing levels, but most reductions were due to the reallocation of staff to different agencies and Ministries.[55]

Average wages increased by 28 percent for security and by 13 percent for civil service personnel in 2005, eclipsing the rate of inflation and the average wages for the private sector and workers employed in Israel. As a result of hiring and wage increases, the total security and civil service wage bill eclipsed $1 billion in 2005, up from $870 million in 2004. By the end of the year, the wage bill swallowed up nearly 23 percent of the West Bank & Gaza's annual GDP and 82 percent of gross government revenues—nearly three times the equivalent MENA average.[56] Wage bill payments reached 55.1 percent of current expenditure in 2005, slightly lower than in the past several years due to improved revenue performance and strong donor support. In the last quarter of 2005, the wage bill was formally averaging $93 million a month (although as noted above, informal assessments by authoritative PA sources place it significantly higher), with net revenues at approximately $115 million a month (see Table 3.1 below).

**Table 3.1: Average Monthly Expenditures and Revenue for 2005, in Million USD**

| PA Revenues and Expenditures | 2005 Budget | Q1 Jan–March | Q2 Apr–June | Q3 July–Sept | Q4 Oct–Dec |
|---|---|---|---|---|---|
| Gross wages | 78 | 79 | 78 | 84 | 93 |
| Civilian | 47 | 49 | 50 | 51 | 55 |
| Security | 31 | 29 | 29 | 33 | 38 |
| Transfers | 52 | 15 | 48 | 20 | 42 |
| Non-wage operating expenditure | 20 | 12 | 24 | 19 | 18 |
| PA development expenditure | 2 | 1 | 6 | 5 | 3 |
| Total expenditure* | 153 | 107 | 136 | 148 | 155 |
| Net revenue | 88 | 85 | 114 | 97 | 115 |

*Source*: International Monetary Fund.
Figures on total expenditure do not include spending on net lending.

---

[55] The GPC used to carry some 2,000–2,500 surplus staff on its payroll. These were largely political appointees and staff working for the security services. The current head of the GPC vowed to end the practice of seconded employees and it appears that the problem has been largely fixed.
[56] The recent World Bank estimates indicate that civil service wages for MENA range from 6 to 19 percent of GDP (Bulmer 2000).

This wage bill increase has left little room for non-wage operating expenditures and transfers. Transfers were reduced from the budgeted $52 million a month to an average of $31 million. (Transfers include social security payments—the government's contribution of 12.5 percent as employer to the civil service pension fund, members of the Gaza Pension and Insurance Corporation and West Bank pensions.) PA non-wage operating expenditures were also reduced, albeit less severely. The budget anticipated $20 million in monthly expenditures but actually averaged $18 million. PA spending on development projects is almost entirely depended upon donors.

The impact of these shifting expenditure patterns is particularly pronounced at the sectoral level. A recent assessment of the Ministry of Health, for example, showed that its salary budget had risen by more than 70 percent in 2000–2005; in contrast, budget funding for non-salary expenditures was flat or declining for much of this period. In 1997–2001 allocations for health declined from 14 to 9 percent of budgetary expenditures, and allocation for education fell from 22 to 17 percent. The PA was able to survive this diminished support for non-salary expenditure only through a large increase in donor funding. This in turn severely reduced budget predictability and increased vulnerability to exogenous shocks, such as the withdrawal of donor support in early 2006.

***Recent Developments.*** Before the new government took over in March 2006, a number of policy measures were put on the table to reduce the wage bill. The MOF proposed in December 2005 to form a presidential committee to remove 5,000 civil service and security employees "not at post;" retire an additional 5,000 personnel and offer 500 people early retirement; impose a complete freeze on any renewal or extension of contracts of persons over the retirement age of 60; and review all security service appointments in 2005, which included 15,000 new recruits. Other proposed measures included elimination of all overtime payments except those for doctors and border guards and an audit of all oversees posts.

The estimated fiscal impact of these measures is approximately $85 million a year, or 5 percent of PA expenditures. The estimated savings could close roughly half of the gap between the projected wage bill in 2006 and the original target of the Wage Bill Containment plan proposed under the Reform Trust Fund. However, only a few measures were implemented, including the formation of the presidential committee to review all new appointments and the suspension of all overtime payments to civil servants.

In the first quarter of 2006, PA finances further deteriorated following the withdrawal of donor support and Israel's refusal to transfer clearance revenues. The PA initially expressed interest in rationalizing public employment, but so far has been reticent to take drastic steps. Despite the fiscal squeeze, the PA managed to add 1,388 additional civil service employees (including 1,186 in the Ministry of Education). Some replacement hiring has also occurred under the new government. On the security services side, PA hiring brought the total number of new recruits since August 2005 to 17,021. This is in addition to some 3,984 permanent security service personnel added to the payroll of the Ministry of Interior. Reports indicate that a corresponding increase in the president's

executive forces also took place during the same period, putting the total number of security service personnel at 65,000.

The additional hiring took place during a paralyzing general public sector strike. Nearly all staff in the MOF and the Ministry of Planning were on strike, and most other central government ministries operated with fewer than half their employees. Widespread absenteeism, disintegration of financial and managerial controls, delays and reductions in social support payments, and electricity shortages compromised the work of those frontline providers, such teachers and doctors, who continued to come to work despite the adverse circumstances.

**Table 3.2: Growth of PA Wages and Salaries, 1996–2005**

| Year | Salaries (USD million) | Growth rate in percent | Salaries (percent of current expenditure) | Salaries (percent of GDP) |
|------|------------------------|------------------------|-------------------------------------------|---------------------------|
| 1996 | 403 | - | 57 | 10.9 |
| 1997 | 471 | 14 | 54 | 10.7 |
| 1998 | 467 | 0 | 55 | 9.9 |
| 1999 | 523 | 10 | 56 | 10.8 |
| 2000 | 619 | 15 | 51.9 | 13.1 |
| 2001 | 678 | 8 | 62 | 18.4 |
| 2002 | 642 | -5 | 69.6 | 25.7 |
| 2003 | 743 | 10 | 66.7 | 26.5 |
| 2004 | 870 | 9 | 64.4 | 21.8 |
| 2005 | 1001 | 15 | 55.1 | 23.3 |

*Source:* Ministry of Finance.

### 3.   Description of PA Employment

*Aggregate Staffing Levels.* When compared with the size of the population, PA employment is not significantly out of line with international comparators. At the end of 2005, the PA employed 45,691 government employees in the West Bank and 31,747 in Gaza. At approximately 80,000 employees, the civil service constitutes about 35 percent of total labor force and about 3 percent of population. In comparison, the average for the Middle East and North Africa (MENA) is 30 and 9 percent, respectively. The PA's immediate neighbors, Lebanon, Egypt, Jordan and Syria, have larger ratios of civil service to population and labor force, although the MENA region has large public sectors in comparison to other regions.57 Compared with Latin America and Eastern Europe, however, the Palestinian public sector is overstaffed, particularly considering the PA is not yet a state and does not provide the full range of services that come with statehood.

Most PA employees are concentrated in the West Bank, with some key departments and institutions based in Gaza. For example, the majority of health professionals work in Gaza, while the overwhelming number of teachers and support staff are located in the

---

[57] The central government wage bill in Egypt is 31.2 percent of current expenditures, 22 percent in Jordan, 54 percent in Syria and 25 percent in Lebanon.

West Bank, in large part because of the education services the UN Refugees and Works Agency (UNRWA) provides to the refugees in Gaza. Table 3.3 presents a selective geographic distribution of employees.

**Table 3.3: Geographic Distribution of Government Workforce, 2005**

| Sector | West Bank | Gaza | Total | Percent of Total |
|---|---|---|---|---|
| Presidential Office | 499 | 57 | 556 | 0.7 |
| Health (MOH) | 4,393 | 7,658 | 12,051 | 15 |
| Education (MOE, Youth and Sports, Science) | 28,918 | 11,607 | 40,525 | 51 |
| Labor and Social Protection (MOL, Detainees, MOSP) | 918 | 1,053 | 1,957 | 2.5 |
|  | 486 | 860 | 1,346 | 1.7 |
| Media (WAFA, Broadcasting, Radio and Television) | 1,590 | 1,357 | 2,947 | 3.7 |
| Finance and Economic Development (MOF, MOP, MOE) |  |  |  |  |
| Infrastructure (MOT, Public Works) | 781 | 1,018 | 1,799 | 2.3 |
| Other (Justice, Autonomous Agencies, etc.) | 11,182 | 7,537 | 18,799 | 23 |

*Source*: General Personnel Council.

UNRWA supplies education and health services, as well as emergency services and basic social support programs, to some 40 percent of registered refugees. UNRWA employs 26,000 workers, approximately 5,000 in the West Bank and 21,000 in Gaza. Other bilateral and multilateral aid agencies and international NGOs provide a wide range of services for the population. Taking alternative providers into account, PA employment ratios appear less favorable vis-à-vis other Middle Eastern countries. The PA may indeed be overstaffed in social and education sectors.[58]

*Gender and Age Profile.* Palestine Central Bureau of Statistics (PCBS) data shows that public sector employees are on average older and better educated, are more likely to be married and professional but less likely to be male than the Palestinian private sector. Approximately 31 percent of public sector employees are women. The ratio is higher in social sectors—health and education—where the female employees are the majority. Compared with other countries in the Middle East, Palestinian women have greater access to public sector jobs, but still face gender bias in wages—although it is not high compared with other countries in the region.[59]

---

[58] The total student population between 2000 and 2004 increased on average by 4.5 percent a year. The number of teachers during the same period increased by 5 percent a year, and the number of non-teaching support staff in the Ministry of Education and Higher Education increased by a further 5.35 percent. This is all in addition to scaled up UNRWA operations during the same period.

[59] The analysis of PCBS data shows that in 2000 all males earned a wage premium compared with their female counterparts, especially in the lower income percentiles. In the past six years, this gender bias decreased over the income distribution except at the top percentiles where the gender bias increased. By the

The age distribution of public sector employment is relatively well balanced. Thirty-five percent of public sector employees are between ages 31 and 40 and 22 percent are young people between ages 18 and 31 (see figure 3.1). The PA civil service regulations limit employment for people over 60, and only under exceptional circumstances can a person past the age of retirement of 60 remain at her post. This stipulation was not fully enforced in the past. On average, more than 500 exemptions a year were issued to employees past their age of retirement. The number of workers working past the age of 60 was reduced significantly in 2005 with only 66 employees over the age of 60 in their positions at the end of the year. There are 7,667 people over the age of 50 and 3,208 over the age of 55 who may be eligible for early retirement.

**Figure 3.2: Age Distribution for PA Employees, 2005**



*Source:* General Personnel Council.

The PA employs daily and contractual workers. Although the GPC does not closely track their employment, anecdotal evidence suggests their number fluctuates between 2,000 and 3,000 on a yearly basis. The wages of contractual employees in the civil service come from either foreign donor support or the operational budgets of the ministries. In cases where the operational budgets do not allow additional contractual employees, the ministry often adds employees on a permanent basis, leaving contractual employees on the ministry payroll long after the project is completed. Standardizing the employment of contractual workers through secondary legislation would allow fixed-term appointments to mitigate under-staffing in key positions.

last quarter of 2005, though still positive, the gender bias had decreased significantly, particularly at the lower income levels. It dropped slightly at the higher income percentiles and remained more or less flat across the middle-income distribution.

*Attrition Levels.* The attrition rate for the PA civil servants is quite low, at about 1.8 percent annually (see table 3.4). The majority is due to retirement; the GPC reports that 470 employees retired in 2005. These relatively low attrition rates work against using a hiring freeze as the principal method for reducing the wage bill, although it may be useful combined with other measures.

Only a small number of civil servants are dismissed for non-compliance. According to the most recent data for 2005, 28 people in the West Bank and 92 employees in Gaza were dismissed for lack of attendance and other violations of civil service law in 2005.

**Table 3.4: Public Employment Attrition for West Bank and Gaza, 2005**

| Termination of service for 2005 | West Bank | Gaza | Total |
|---|---|---|---|
| Total yearly attrition | 707 | 719 | 1426 |
| Retirement | 215 | 255 | 470 |
| Resignation | 151 | 170 | 321 |
| Dismissal for noncompliance | 28 | 92 | 120 |
| Other (not specified) | 300 | 215 | 515 |

*Source*: General Personnel Council.

PA civil service legislation does not directly address redundancy and termination of service, nor does it envision any early retirement schemes. Removal of poorly performing employees is a cumbersome and politically sensitive process. While the Civil Service Law mentions attendance, the secondary legislation is too weak to ensure compliance. For example, violations of civil service legislation are specified (15 days absence from duty station, for example), but disciplinary actions such as suspending salary payments or terminating an employee are difficult.[60] The law does require a one-year probation period for employees entering the civil service, however, and probation and evaluation procedures can be tightened to ensure that only the best civil servants become permanent employees.

Neither by-laws nor the Civil Service Law include detailed criteria regarding the evaluation process. According to the new regulations, an existing employee has to be evaluated once a year with a secret appraisal report issued by his superior. The reports are forwarded to the GPC, which is tasked with reviewing the files and imposing penalties for unsatisfactory performance. However, despite regular evaluations, there is little

---

[60] Currently the impetus for removing an employee from the payroll for misconduct comes from the senior staff in the employing agency. For example, in the Ministry of Labor, the direct supervisor monitors the compliance of the employees. If an employee is in a serious violation, an internal directorate may apply administrative sanctions, such as administrative notice, deduction of pay and reduction of yearly paid holidays. Only in cases of serious non-compliance will the GPC intervene. But even the GPC is not fully empowered to weed out non-performing personnel. The ministries have their own internal supervision departments whose quality varies from ministry to ministry. Often, departments in charge of oversight are not willing to challenge politically connected personnel fearing financial and social reprimand.

follow up except in exceptional cases of abuse. The GPC does not have the capacity to enforce the law and investigate cases on its own. Even simple administrative reprimands are difficult to implement.

Another significant problem of the current civil service framework is the lack of an appeals system. Employees do not have formal means of redress against a decision of a disciplinary committee. The employee accused of misconduct may take the case to the court, but the judicial system is already slow and overburdened and does not provide a good venue for administrative hearings. The GPC initiated a temporary appeals board composed of retired judges and members of the academic community to deal with the process of appeals, but a permanent means for administrative redress is needed. The GPC has started developing a code of conduct for civil servants and plans to introduce it into all ministries.

*Security Services.* The security services have grown rapidly in the recent years. Founded in 1994, they were initially grouped into the Civil Police, Public Security, Intelligence, Emergency Services and Rescue and the Coastal Police. The interim agreement between the GOI and the PA added two additional branches: Preventive Security (which deals with internal political threats) and the Presidential Security Force. By 2004, the security apparatus had expanded to 13 branches, including military intelligence and the military police.

The Ministry of the Interior (MOI) had 59,207 security service employees on the payroll at the end of 2005. Some 13,852 trainees were receiving a modest stipend from the transfer budget of the MOI. An additional 3,000 Hamas recruits and nearly 7,000 new trainees were added to the security forces in early 2006. The total number of Palestinian security forces nearly equals the total of civil service employees.

PA police and security services reform has received extensive attention from a handful of donors, including the European Union and the United States. Work was under way to reduce the number of services from 13 to 3, to rationalize staffing and to integrate operations and deployment. Broader goals included bringing police force under civilian authority and making it subject to political oversight by the legislature. The European Commission also had a program on police training and equipment support.

An audit of security service employment would go a long way towards identifying the most serious abuses by non-performing staff. While the MOF has control over employment in the civil service, its powers are greatly circumscribed when it comes to security service appointments. The Finance Minister may refuse to release the payment of salaries for new staff, but the MOF cannot block the initial recruitment into the security services.

Increasing oversight of the security services payroll is critical to bringing fiscal stability to the PA budget. The security forces absorb one-third of all PA government expenditure, and more than all operating expenditures and all non-wage education and health expenditures combined. By the end of 2005, the PA was spending nearly $44 million on

MOI wages. The distribution of the security service wages is slightly different than for the civil service. A large portion of the security service salaries went to the lower income brackets as the proportion of low-ranking police and security personnel is higher than the lower grade mix for the civil service.

The Palestinian Civil Police represents some 30 percent of total forces, smaller groups like the Preventive Security and General Intelligence 20 percent, and the military 50 percent. Of the over 58,000 security personnel, around 11,000 provide various type of support for the 48,000 security forces. Of this 48,000 only 36,000 directly contribute to preserving law and order. Several elements of the police and security forces, such as honorary officers or political officers, are clearly redundant.

In 2005, the MOI initially identified 14,000 non-compliant personnel but later reduced this number to 8,000. The number of non-performing personnel varies widely by source. In one estimate, 40 to 50 percent of total security service employees do not show up for work. This is a "soft" estimate as attendance records are not systematized across the security services. The rate of absenteeism increased dramatically in recent months as salaries are not paid regularly and the security infrastructure (cars, weapons) is in short supply.

The current size of the PA security forces is more than twice the figure stipulated under the Oslo II Agreement, which proposed a baseline of 30,000 personnel spread across seven services.61 International comparisons also find PA security staffing high. The ratio of police to population in Palestine is estimated at 1:191 in the West Bank and 1:84 in Gaza, whereas the United States and Turkey average 1:400 and 1:192 respectively (Rand Corporation 2005). The PA falls somewhat in the middle relative to its neighbors (see table 3.5). It has more policemen per citizen than Lebanon but fewer than Jordan and Egypt. In terms of military strength, the PA's staffing levels are similar to Syria and Morocco, but lower than Jordan and Lebanon. The optimal staffing ratio for the police and military services in the PA is difficult to determine because the PA does not operate under normal circumstances—when size of the security forces can be determined through analyzing the security situation and the available funding. Both security and funding have deteriorated rapidly in the recent year.

---

[61] The report prepared for the U.K. Department for International Development on security sector reform in 2005 also estimates staffing needs by using the Oslo levels plus population growth (DFID 2006). The consultants estimate that with the assumption of 30 percent overall growth and the civilian staff ratio of 25 percent, a staffing level of 52,000 security personnel should be expected.

Table 3.5: Comparative Military and Police Staffing, 2005

| Country | Military spending, percent of GDP | Population, million | Military personnel | Cost per soldier, USD | Police personnel | Cost per policeman, USD | Military to population ratio | Police to population ratio |
|---|---|---|---|---|---|---|---|---|
| Georgia | 0.6 | 4,667 | 15,000 | 1,533 | 52,000 | 8,290 | 1:312 | 1:90 |
| Jordan | 14.6 | 5,760 | 85,000 | 17,647 | 61,000 | 21,428 | 1:67 | 1:94 |
| Yemen | 7.8 | 20,727 | 67,000 | 13,208 | 88,000 | 3,887 | 1:309 | 1:235 |
| Romania | 2.5 | 22,330 | 66,000 | 14,924 | 94,000 | 18,551 | 1:338 | 1:238 |
| Turkey | 5.0 | 69,600 | 402,000 | 29,850 | 321,000 | 22,095 | 1:173 | 1:216 |
| Lebanon | 3.1 | 3,826 | 72,100 | 7,489 | 16,000 | 8,832 | 1:53 | 1:239 |
| Albania | 1.5 | 3,563 | 10,000 | 5,600 | 128,000 | 18,800 | 1:356 | 1:28 |
| West Bank | 5.6 | 2,385 | 12,000 | 8,333 | 12,400 | 8,333 | 1:198 | 1:192 |
| Gaza | 15.0 | 1,376 | 15,800 | 7,278 | 16,400 | 7,278 | 1:87 | 1:84 |

*Source*: Ward Group, 2005.

***Broader Pressures to Increase Public Employment in West Bank and Gaza.*** For the better part of a decade, the size and wage structure of the public sector has received considerable attention from donors and policymakers, with a variety of explanations for the PA's perceived inability to contain the rise in wage expenditure. Some focus on persistent shocks to the economy and the lack of available private sector alternatives— factors that have been exacerbated by frequent border closures and the precipitous decline of work in Israel. Others focus on patronage and the creation of jobs within the PA to bolster political legitimacy. Still others see a general lack of accountability of the executive branch, the prevalence of prevailing social norms such as nepotism and favouritism (i.e. wasta) or weak mechanisms for establishment control. Donor failure to rigorously enforce benchmarks on prudent fiscal policy, combined with large inflows of foreign aid, is also a contributing factor to the continued growth of the wage bill.

At a political economy level, the pressures on public sector employment are understandable. The public sector was seen as a buffer against the private sector loss of jobs owing to increased closures and movement restrictions following the *intifada*. Employment in the public sector expanded as the economic situation worsened. During the height of the *intifada* and the Israeli security responses, total private sector employment within Gaza and the West Bank had declined by 25 percent. Before September 2000, Palestinian workers were generally free to enter or exit Israel without interference and around 146,000 were working in Israel (23 percent of the labor force). This figure has subsequently declined by 90 percent. In 2005, unemployment in the West Bank was at 30 percent, and unemployment in Gaza was close to 40 percent. With such high rates of joblessness, the public sector became an extremely attractive source of income for the population.

Another pressure on public employment is the high birth rate and the large number of youth entering the labor market. With estimated overall population growth of 3.3 percent

a year, around 45,000 new employees enter the labor market each year. For people between ages 21 to 24 the estimated unemployment rate is 50 percent. The problem of youth unemployment was especially evident in 2005 when scores of armed young militiamen assaulted PA institutions demanding jobs. Although the bulk of public sector salaries went to middle income groups, young people entering the security services mainly came from low income households with few prospects for jobs in the private sector.

The PA's propensity to expand public employment goes beyond the very real pressures of border closures, an anemic private sector and sheer demographics, however. Employment within the civil and security services has long been used by leading Palestinian politicians to consolidate informal political networks of patronage and clientilism. Jobs were offered as political favors to placate supporters or to co-opt members of competing groups. Many PA positions were filled by under-qualified personnel, often through patronage appointments which rewarded political loyalty. Positions of deputy ministers, general directors and heads of agencies were predominantly awarded to Fatah party loyalists.[62] As the anecdotal evidence in box 3.1 indicates, expansion in public employment was often driven more by political connections than administrative necessity. These perceptions are so strong among Palestinians that a public opinion poll by the Palestinian Center for Policy and Survey Research in June 2005 revealed that 95 percent of the population believed that wasta or "connections" are necessary to secure a job in the public sector.

---

**Box 3.1: Institutional Planning under Yasser Arafat**

"Nafiz had worked for many years as a physics teacher but was fed up with his low wages. He had gone to the Director General of the Ministry of Transport, a former friend of his father, and asked for a job. The Director General told Nafiz that he would like to employ him, but that he had no money to do so. Nafiz then wrote a letter to President Yasser Arafat, explaining that his father had worked for the PLO in Syria before his *ightiyal* (assassination) in the 1970s. A few weeks later Nafiz received a letter signed by Yasser Arafat instructing the Ministry of Finance to pay his wages. As a result Nafiz was made a *mudir* (director) in the Ministry of Transport."

Nafiz's story was fairly typical of the people who received senior positions in the PA during Yasser Arafat's tenure. A senior official within the Palestinian Legislative Council commented that the president's policy was to employ as many people as possible to create dependency and limit political opposition. The irregular appointment of civil personnel became known as the "Fatah Bonus," the practice by which individuals connected to the ruling coalition would get preferential treatment in getting the civil service jobs.

Political patronage permeated not only the process of appointments but also extended more broadly to public administration. It was not uncommon to find ad hoc departments and even agencies created for specific individuals or groups. As one official put it, legal niceties had often fallen by the wayside in the process of institutional creation:
"If Arafat was told 'this Ministry does not need people, it is filled,' he'd say, 'OK' and then create another ministry. In this he built the main basis for the state."

*Sources:* Samuels 2005; interviews with PA staff.

---

[62] For an elaboration of this view, see *State Formation in Palestine,* edited by Mushtaq Husain Khan, George Giacaman and Inge Amundsen (London: Routledge Press, 2004).