# EXHIBIT A.206

## (4 of 8)

## 4. Remuneration

***Base Salaries and Grade Distribution***. As part of the new civil service law, in 2005 the government adopted a uniform wage structure for civil servants with five regular grades and a superior grade that includes political appointees and high level managerial staff (see table 3.6). The starting salary for support level staff is about $300 a month, not including allowances, although many people in the lower category earn less. Skilled professionals in Grade 2 usually earn $400 to $500 dollars a month. In the case of professional medical and educational staff, the average salaries are $600 dollars a month. Director General level staff are expected to receive a gross salary of $1,500 dollars a month. Salaries for high-level managerial staff, Grade 1 and above, are on average lower than comparative professional salaries in the private sector. Reports of difficulties in recruiting and retaining high caliber level professional staff are confirmed by comparative public-private pay analysis (see figure 3.3). The compression ratio is around 4.4:1, which is higher than regional countries with extremely compressed salary structures (such as Yemen) but below target norms of 7:1.

### Table 3.6: Grade Distribution and Salaries, 2005

| Category | Total employment | Average base salary, USD | Average gross salary, USD |
|---|---|---|---|
| Senior | 927 | 940 | 1,750 |
| Grade 1 | 4,616 | 633 | 1,093 |
| Grade 2 | 34,615 | 396 | 612 |
| Grade 3 | 22,180 | 385 | 547 |
| Grade 4 | 2,756 | 306 | 471 |
| Grade 5 | 6,812 | 290 | 394 |
| Daily/Contractuals | 3,106 | 521 | 825 |

*Source*: Ministry of Finance.

The distribution of grades is in line with modern civil service standards. The bulk of the employment is in Grades 2 and 3, and the level of support staff is fairly low at only 11 percent. The share of top managerial personnel, Grade 1 and Senior, is around 6 percent. However, a more detailed look at individual ministries reveals a much greater discrepancy in the distribution of grades. In some ministries, high-level managerial staff are more than one-third of the total staff. For example, in the Ministry of Youth and Sports and the Environmental Authority, the top managerial staff exceeds 30 percent. The top-heavy nature of some of the PA ministries is a serious fiscal burden for the government. Job descriptions need to be incorporated into the ministerial development plans to avoid grade inflation in the future. In the near future, caps on future promotions need to be instituted in a number of government agencies.

The absence of clear regulations and lack of direction over distribution of salaries and allowances led to widespread abuses—irregular appointments, granting of special allowances and even the creation of departments to fit specific individuals for purely political purposes—creating a large body of personnel who receive salaries

disproportionate to their experience and qualification. Even in the wake of the recent Civil Service Law in 2005, ministries and agencies have been able to bypass the scrutiny of the GPC and MOF and appoint people to higher positions than would otherwise be allowed if the regulations were better defined.63

Just prior to 2006, the MOF began to play a more central role in all promotion and recruitment decisions. According to the new regulations, every agency must inform the payroll directorate at the MOF and the GPC before initiating a recruitment request. The MOF certifies the availability of funds for the position and only then can the recruitment process begin. Following the completion of competitive recruitment, the MOF again has to clear all appointments through certification of the Director General of Financial Control and then finally sign off on the appointments.

*Allowances*. Allowances on average represent 35 percent of total pay. According to the MOF, six allowances are available for PA employees. These include specialist allowance, social (family) allowance, transportation allowance, rarity allowance, job hazard and job type allowance, and an administrative allowance for high level staff. In addition to the allowances listed in the Civil Service Law, every employee is entitled to receive an automatic pay increase of 1.25 percent a year. These automatic pay increases, even if small, need to be avoided during a fiscal crisis. The civil service pay increases should be tied to changes in the standard of living and prevailing inflation rates as well as to overall revenues and expenditures in a given year.

Overtime pay presents a serious issue for the PA budget. In the past, poor record-keeping and lack of central oversight allowed employees in non-essential sectors to claim overtime for hours not spent at work. The internal payroll audit revealed serious violations by conducting spot checks during the summer of 2005. Based on the audit recommendations, the MOF proposed suspending overtime pay for all employees except for essential health services and border patrol. This recommendation and others were approved by President Abbas in January 2006 and later confirmed by the Council of Ministers. The current freeze on overtime should be kept until the GPC builds capacity to monitor attendance.

The new Civil Service Law and accompanying secondary legislation goes a long way in rationalizing the distribution of allowances. The law eliminated some of the older discretionary off-budget allowances previously provided through ministries and departments. The share of allowances in the total pay also decreased from an average of 55 percent to 35 percent. But there is room for further merging allowances into base pay, such as those for area of specialty and job type. Allowances where the internal audit of the MOF finds serious instances of abuse (transportation allowances, for example) should be suspended until proper monitoring is established.

---

[63] A ministerial management committee was formed at the end of 2005 to assess, recommend and approve candidates for senior positions within the PA ministries and governmental agencies. The committee is composed of the Minister of Finance, the Minister of Planning, the Cabinet Secretary and the Head of GPC. The work of the committee has been compromised by the internal political wrangling between Hamas and Fatah in the aftermath of the parliamentary elections.

***Public-Private Wage Comparisons***. Understanding how public sector and private sector salaries vary across the wage distribution in the West Bank & Gaza can greatly assist the PA in setting the proper wage and employment policies. Historically, estimation techniques distorted the gap between the public and private sector and led many civil servants to believe they are not adequately compensated for the services they provide. Figure 3.3, for example, reports information on nominal hourly wages for public and private sector employees. It reveals a gap between the mean hourly wages of public sector employees and their private sector counterparts, albeit one that was reduced from NIS 2.5 in 1999 to NIS 0.5 in 2005. This reduction occurred as private sector wages stagnated and public sector wages continued to increase.

A focus on mean salary levels in the two sectors can be misleading because the distribution of salaries in the public sector differs from the private sector due to wage compression. Recent regression techniques allow the comparison of workers with similar educational and professional backgrounds and enable researchers to probe the wage differential at different points along the distribution of salaries. This allows for a much richer, nuanced and more accurate analysis. Table 3.7 summarizes the results of such analysis. For all rounds of calculations between 1999 and 2005, the estimated coefficients are highly significant at the 95 percent confidence level and increase over time. These estimates suggest that in earlier years, particularly in the pre-*intifada* period, individuals with similar education, gender and age characteristics did on average earn less when they worked for the public sector. But this differential subsequently disappears and then reverses over time. In the first quarter of 2000 the public-private wage differential was estimated to be 13.3 percent in favor of private sector. However, from 2003, a clear public sector premium emerges and rises significantly in the last quarter of 2005, just prior to national elections.

**Figure 3.3: Comparative Public and Private Sector Hourly Wages in West Bank and Gaza, 1999-2005**



*Source:* Palestine Central Bureau of Statistics.

After controlling for differences in age, the level of education, marital status and skills, workers in public sector in the West Bank & Gaza on average earn a significant premium of around 15 percent over their private sector counterparts. The PA has fostered this development through a series of large salary increases in 2004 and 2005. These findings have serious policy implications in terms of the future sustainability of the wage bill and persistent arguments that public sector workers are underpaid. Compared to the private sector, they are not.

**Table 3.7: Summary of Regression Statistics for Private and Public Wage Differentials, 2000–2005**

| Coefficients | 2000 Q1 | 2000 Q4 | 2001 Q4 | 2002 Q4 | 2003 Q4 | 2004 Q4 | 2005 Q4 |
|---|---|---|---|---|---|---|---|
| Age | 0.021 | 0.019 | -0.007 | 0.021 | 0.015 | 0.021 | 0.031 |
| Yrs. school | 0.023 | 0.028 | 0.023 | 0.026 | 0.033 | 0.032 | 0.034 |
| Tenure | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.000 |
| Male | 0.226 | 0.299 | 0.130 | 0.240 | 0.252 | 0.202 | 0.201 |
| Married | 0.111 | 0.099 | 0.088 | 0.090 | 0.128 | 0.111 | 0.114 |
| Professional | 0.130 | 0.163 | 0.184 | 0.200 | 0.235 | 0.192 | 0.184 |
| **Public Sector** | **-0.133** | **-0.262** | **-0.206** | **-0.131** | **0.046** | **0.014** | **0.154** |

*Source:* World Bank calculations.

As figure 3.4 indicates, the public sector wage premium is highest for low-wage earners and diminishes for high-wage earners. From an administrative vantage point, such an arrangement is the inverse of what is desired. Governments typically want to ensure that the public sector has access to staff with skills in high demand areas such as information technology or financial management, and to do so requires paying salaries that are broadly competitive with the private sector. The across-the-board pay increases recently granted are both unnecessary (given that attrition rates within the PA are very low) and inefficient (given that, to the extent that they do take place, pay increases should be targeted towards staff with skills in heavy demand in the public sector.)

**Figure 3.4: Comparing Public and Private Sector Wage Distributions in 2000 and 2005**



*Source:* World Bank calculations.

This analysis has important policy implications. Because most PA civil servants are not underpaid vis-à-vis their private sector counterparts, the PA should impose a moratorium on all future salary increases for the next two to three years. Beyond that point, increases should be carefully crafted and narrowly targeted towards employees with particular sets of skills that are in short supply. A second implication is that the sizeable public sector wage premium has led to perverse labor market incentives, with individuals preferring to wait in unemployment for a public sector job than accept lower paid jobs in the private sector. In an environment of acute fiscal crisis, the PA cannot afford to be the employer of first resort.

## 5.   Improving Establishment Control and Human Resource Management

Since mid-2006, a number of ad hoc arrangements have been put in place to pay civil service salaries, such as the Temporary International Mechanism (TIM) endorsed by the Quartet in May 2006 or the World Bank–administered Emergency Services Support Program (ESSP). This analysis is focused upon medium- and long-term measures for improving the quality of Palestinian practices and does not address the adequacy of these temporary measures.

From 2003 to 2005, a number of important initiatives improved payroll oversight and regularized the process of promotions and appointments in the civil service. The most significant have been in expanding the role of the MOF in overseeing civil servant salary payments. Payroll control was brought fully under the purview of the MOF, which operated a unified payroll management system covering all security and civil service employees in West Bank and Gaza.

***Promotions and Recruitment.*** The process of promotions and recruitment in the PA has become both more routine and transparent and more cumbersome—the latter being the unfortunate byproduct of stemming unauthorized appointments. Requests for new appointments are initiated by the relevant ministry, and the Minister of Finance and Chairman of the GPC are involved in the recruitment process from beginning to end. After putting forward the initial request, the agency receives a signed authorization from the MOF confirming sufficient budget for the position. The request is forwarded to the GPC to initiate recruitment through open search and examination. The positions are advertised in the official gazette, and an exam committee composed jointly of the GPC and the relevant ministry administers the test. (All candidates below the deputy minister level are a subject to examination.) The candidate is evaluated on a point system according to his or her years of experience, level of education and performance on the exam. The system is fairly transparent but needs greater standardization. For example, the rules governing what is included in the civil service examination are not readily available and vary by agency and ministry.

Once the person is selected, the budget directorate at the MOF again certifies that there are sufficient funds for the position. After the approval from the Minister of Finance, the payroll department receives an order to include the new employee in the payroll. Following the completion of the recruitment process, the procedures are reviewed by the

***Internal Audit Department of the MOF.*** Finally, all new appointments are subject to the signature of the Minister of Finance. The detailed day-to-day management of the civil service by the MOF provides formal checks on the public sector growth and is a regrettable necessity given the PA's legacy of unrestrained recruitment. Eventually, the MOF should cede operational controls to the GPC and the line ministries and focus instead on indirect financial controls. Decentralizing control over the civil service would improve responsiveness and lead to efficiency gains. Specific recommendations include consolidating civil service and security service payroll under the MOF and clarifying the roles of the GPC and the MOF in managing human resources under the new civil service legislation.

***Oversight of Wage Bill Expenditure and Payroll Systems.*** Each month the payroll and audit department review reports generated by the payroll system on the exceptional number of new employees added and compare monthly totals of current to previous payroll expenditures. The reports are reviewed by the internal control and payroll directorate before the new payments are released. The current system is set up to track the aggregate changes but does not preclude systemic manipulations. For example, positions for each ministry are identified in terms of a set of budgetary appropriations and cumulative totals for staff. Ministries and agencies lack manning tables, which allows for easy transfer of employees within the ministry. While sometimes this practice allows flexibility for task managers, in the West Bank & Gaza it has often been abused.

The system does not oversee "frozen" posts—posts that were previously authorized but are currently held vacant for financial reasons. Salaries are distributed according to authorized posts and not according to the actual number of staff, so ministries tend to overbid for salaries. The current civil service legislation also does not provide for fixed contract employment. Many contractual employees who are hired on donor-financed projects often remain with the PA long after the project has ended.

The MOF operates an electronic payroll system that tracks all MOF-approved civil service and security services personnel in the West Bank and Gaza. The GPC system operates an Access-based personnel management database that covers all civil service employees except for the Ministry of Education and the Ministry of the Interior. The GPC has no clear provisions for intra and interministry electronic communications, so data management remains a labor-intensive manual process. The Ministry of the Interior maintains its own filing system that it regularly sends to the MOF. The payroll records of the MOF and the personnel files of the GPC and the MOI are not reconciled.

Without the integrated system, all exchanges between the GPC, MOF and MOI relating to promotions, recruitment and terminations remain paper-based, which gives ample room for tampering. The 2005 internal audit of the payroll found that some people are receiving salaries even though they have been absent from their job for more than two years, as well as a number of other violations. Near-term recommendations include ensuring that the payments for salaries are released according to actual staff numbers and not to the total number of positions in each ministry. They would also include providing greater security over access to the payroll and personnel database. (For example, until

recently it was possible to manually change the date of recruitment without authorization from a manager.) When the current political crisis is resolved, the GPC and MOF need to resume efforts integrate their payroll and personnel records between their systems in West Bank and Gaza, along with those of the Ministry of Education, and the Ministry of Interior.

*Irregularities in Salary Payments.* All government employees, including security services, receive their salaries via direct transfer to their bank accounts. The banks are required to validate the bank account against the employee name before releasing the payment. The payroll system is also supposed to automatically identify multiple payments to one bank account. However, multiple payments are common. For example, the internal audit revealed a number of employees who receive several salaries from within the civil service and from both the civil service and the security services.

Tracking double dippers is complicated by the existing irregularities in the system. The internal audit revealed employees on the payroll who have no file in the GPC and were apparently brought on without the explicit approval of the GPC chairman. Some actions have been taken to correct the abuse, and the GPC and the Internal Audit Department at the MOF began a review of seconded employees in other agencies and ministries. Their internal audit found a number of employees who receive a salary while working outside the country. The practice of seconding employees became popular in the mid-1990s when numerous staff were on the payroll of one ministry but were overseas or working elsewhere. The GPC payroll, for example, listed some 2,000 employees working elsewhere in the civil service.

The lack of detailed job descriptions intensifies the already tenuous link between civil service headcount and ministerial budgets. The GPC has had difficulty containing exceptional promotions, which are often granted without the approval either of the Minister of Finance or the GPC chairman. Exceptional appointments increased during the transfer to the new salary scale, which coincided with the election year. Most of the promotions were in higher echelons of the civil service corps. Between May and October 2005, nearly 14 percent of Grade 2 employees were promoted and around 10 percent of Grade 1 employees received a higher rank.

Without a comprehensive external payroll audit, estimating the financial cost of irregularities is difficult. Occasional spot checks on the part of the MOF and the GPC, such as sending out a list of all employees on each ministry's payroll for confirmation that the person is actually working, are ineffective. The previous Fatah government created an Administrative Affairs committee to review cases of irregular promotions. The new Hamas cabinet also called for a review of all new appointments granted between November 2005 and March 2006. The decision reflects a concern that many of the new appointments at the end of the year were politically motivated, and many new civil servants entered the ranks without a proper review of their qualification. The outcome of the appointment review and the total number of irregular staff is not clear, but it does not appear to be large.

A comprehensive external audit of the payroll to identify double-dippers and ghost employees, can be a joint exercise between the government and an external audit consultancy firm. It would further identify redundant political appointees not assigned a specific task, employees whose professional qualifications can be better utilized elsewhere and workers who regularly do not show up for work. The GPC may also consider creating a pool of surplus employees who could undergo targeted training programs and reassignment to other units.

Note that the tracking of payroll records may deteriorate if the current fiscal crisis is not resolved quickly. If civil servants are paid irregularly or not at all, individual agencies may resort to setting up alternative payroll systems. In spring 2006, reports revealed that some agencies are paying their employees in cash or finding alternative sources of financing. The lack of regular oversight may lead to serious problems down the road, which may take time to reverse.

***Legal Framework for HR Management.*** One of the most significant recent developments has been the adoption of Civil Service Law No. 4 in July 2005. The law was first developed in 1998, but it was not passed until 2005 due to the internal disagreements within the Cabinet. It replaced a collection of old Egyptian, British mandate, Jordanian and Israeli military laws and represents a significant step forward in rationalizing the management of the civil service.

The new Civil Service Law is fairly detailed. On the one hand, the broad reach of the law limits discretion in interpretation; on the other, it requires legislative approval for small changes. In many Organization for Economic Cooperation and Development (OECD) countries, the civil service law would focus on fundamental principles and practices and leave more detailed implementation procedures for secondary legislation or regulations. The new employment regulations developed by the GPC may help to modify some of the law's rigidity, but the extent to which the law's central principles can be modified is limited. As the interpreter and enforcer of this legislation, the GPC is given little scope and definition. The law should further clarify the GPC's responsibilities, as well as those of individual ministries and agencies, and allow such agencies to take responsibility for developing secondary legislation and common standards for civil service management.

The GPC approves the general description for each group or position within the civil service. For each position, the GPC specifies the required minimum degree, work history and experience. The current law bases promotions almost solely on the number of years in service. The law also specifies life-time employment, with only passing reference to contractual employment. The law is not well equipped to deal with exceptional appointments, which have become a common staple of PA politics in the past two years. Even when the Civil Service Law was passed in July, it was not specific enough to identify manning tables, which allowed ministries and agencies to bypass the scrutiny of the MOF and appoint people to higher positions than they would have otherwise been allowed if the regulations were stricter. The PA needs to develop clear organizational charts for ministries, which include job descriptions to avoid undue promotions and appointments in the future.

## 6.  Organizational Structure of the PA

The number of institutions of the Palestinian Authority (PA) expanded along with the PA civil service staff. When the PA took over the Israeli-imposed Civil Administration, some 20,000 Palestinians were spread across 14 agencies. By 1996, the number of major ministries in the PA increased to 23. At its peak in early 2002, the PA had some 84 different agencies and 33 ministries (some ministers were without a portfolio). Currently 25 ministries operate across 114 regional offices. (The OECD average is around 14.) In addition there are a number of semi-independent public authorities (for example, the Tobacco Authority, Civil Aviation Authority and the Ports Authority) and 14 district governors with overlapping jurisdictions. In total, the PA budget lists some 63 budget entities.[64] The sheer number of institutions in the PA makes policy coordination difficult.[65]

Competing mandates and duplication of function are legacies of the ad hoc institutional planning in the mid-1990s and threaten coherent policymaking. Examples abound. The Ministry of Local Government and the Ministry of Planning compete over urban planning and zoning. The Ministry of Detainees, the Ministry of Social Affairs and the Ministry of Labor offer competing and overlapping social protection programs. Another example is the separation of the Ministry of Education and Higher Education and Science and the Ministry of Youth and Sports. And in addition to a separate Ministry of Information, the President's office maintains three departments in charge of information dissemination: public relations department, foreign information department and a department for Arab press and local media.

**Table 3.8: Duplication of Selective PA Functions**

| | | | |
|---|---|---|---|
| **Education and Youth** | Ministry of Education and Higher Education | Ministry of Youth and Sports | |
| **Economic Planning** | Ministry of Finance | Ministry of Economy | Ministry of Planning |
| **Social Protection** | Ministry of Labor | Ministry of Social Affairs | Ministry of Detainees |
| **Public Works** | Ministry of Public Works and Housing | Ministry of Transportation | |

*Source*: General Personnel Council.

---

[64] The section does not consider the relationship between the PA and the PLO institutions. A number of PLO agencies duplicate the functions of PA institutions but a thorough review of these institutional arrangements was not completed.

[65] Policy formulation is also complicated by the restrictions of travel between West Bank and Gaza and the resulting inability to formulate policy in a centralized way. Meeting irregularly and generating policy decisions through video and teleconferencing puts a serious strain on the PA's ability to act as a coherent body. It also strains Palestinian finances because of the extra staff (especially at the higher level) necessary for policy coordination and guidance.

***Institutional Restructuring.*** One of the first priorities of the PA since 2004 has been eliminating redundant agencies. In the past two years, the government has reduced the number of autonomous agencies to 47 and greater reductions are planned. Some agencies have been incorporated under a flagship ministry. For example, the MOF incorporated previously self-standing tobacco, petroleum and natural resources agencies. Other agencies are waiting to be restructured.

Whether the recent restructuring has actually led to increased efficiency and fiscal savings is debatable. Many of the units subsumed in 2004 and 2005 had only 20 to 40 employees. Care also needs to be taken in reforming agencies made non-operational by conflict. One example is the Civil Aviation Authority (CAA), which was founded in 1999 to prepare for the reopening of the Gaza airport. The agency continues to employ pilots and air traffic controllers even though many have second jobs or work overseas. At the end of 2005, the GPC listed 415 employees working for the Civil Aviation Authority in Gaza, even though 50 were employed in its West Bank branch.

There is significant scope for rationalization and realignment of functions among the PA institutions. Detailed functional reviews should provide a basis for reorganization and elimination of duplication. For dormant but necessary agencies like the CAA temporary re-assignment of staff to other government institutions where the demand for staff is greater should be considered. The design of PA institutions should reflect the Palestinian aspirations for a viable, comprehensive state apparatus capable of providing a wide range of public services.

Rationalizing government ministries and agencies should be subject to a thorough review that establishes the guidelines for institutional planning in the medium term. As part of the streamlining process, the government commissioned Birzeit University Law Center to develop a library of the legislation that establishes the mandates for all government ministries and agencies. Once the legal database is completed, the government may be ready to take steps to reduce the number of government agencies and streamlining functions.

***Reorganization within Ministries.*** The number of ministries in the PA was reduced by three to 25 at the end of 2005 to include 23 ministries and two ministries of state. As part of the internal streamlining process, the previous cabinet approved the Organizational Development Plans (ODP) for 22 ministries and a few key government agencies. The ODPs present the detailed structure for every department and unit within a ministry. They clarify the scope of activity of each department within the ministry and limit the expansive recruitment patterns employed in the past. This clarification of ministerial mandates and establishment of new patterns of recruitment are important positive steps in developing more detailed organizational descriptions for civil service jobs.

However, the ODPs were drafted without an integrated functional framework that looks at government institutions as an organic whole. The ministerial plans do not include detailed manning tables and a description of posts. The ministries still can hire above their official headcount if they stay below the budget provided by the MOF. There are

still very few incentives for the line ministries to economize on staff because any payroll savings cannot be transferred to non-wage expenditures.

Ministries and agencies should be rewarded for reducing non-performing staff by allowing the ministries to keep a part of their budgetary savings for other operational expenditures. Ministers and sector managers should have incentives and appropriate authority to ensure that staff numbers and skills are appropriate for actual needs, and they should be held accountable for using that authority effectively. Ministerial restructuring plans need to be integrated into a comprehensive framework so that redundant functions can be phased out and operational effectiveness improved.

## 7.  Anticorruption

***Public Opinion and International Comparators***. During the January 2006 elections, the Palestinian public rated the PA's weak performance and perceived corruption as their most important concerns following unemployment and the Israeli closures. Anticorruption themes were also prominent in the local and presidential elections (Palestinian Center for Policy and Survey Research, 2005). The polls did note regional variation in the results, with residents in Gaza more likely to complain about corruption than those in the West Bank. Public perceptions of the integrity, honesty and performance of the PA remain largely negative, with corruption and nepotism considered significant problems. According to a PCPSR poll in 2004, 77 percent of Palestinians in the West Bank and Gaza believed that public sector jobs were largely obtained through "connections" (wasta), 84 percent believed that there is a widespread corruption in the PA, and 87 percent strongly supported calls for reforms.

Palestine also does not fair well in global surveys of integrity and anticorruption. In 2005, it ranked 112th on Transparency International's Global Corruption Perceptions Index, worse than Lebanon (83rd) and Yemen (104th). Only Iraq and Libya have lower scores among the Arab countries. On the World Bank Institute governance indicators, which include control of corruption, the West Bank and Gaza scores significantly below the regional average. The share of Palestinians who believe that the PA has significant corruption increased from approximately 50 percent in 1996 to 91 percent in late 2005 (PCPSR 2005). Concerns with corruption relate mostly to the lack of transparency within the PA and the belief that it caters to insiders and the politically well connected, while traditional problems such as bribery or petty corruption are given relatively less weight (World Bank 2002). In one World Bank study, Palestinian businesspeople pointed to corruption as the second greatest impediment to private sector activity (after political instability and uncertainty), although only 21 percent reported having to pay bribes regularly (2001).

The PA faces two significant challenges in addressing corruption in a comprehensive manner—a weak legal framework and a lack of enforcement measures. No special anticorruption law exists, and the applicable framework has many gaps, particularly in identifying certain forms of corruption. Enforcement measures are even weaker—due to the lack of political will to combat corruption, a general breakdown in law and order and

inefficient judicial and prosecutorial systems. Bodies established to monitor corruption remain weak and without the necessary resources to achieve their mandates. And the occupation has stunted the development of judiciary and public prosecution, presenting difficulties not only in addressing corruption, but also in deferring attention to conflict-related problems.

Until now the PA has not adopted a comprehensive national anticorruption strategy, and the limited anticorruption activities undertaken have been ad hoc rather than part of a systematic approach to combating corruption. However, the January 2006 election victory of Hamas in the Palestinian Legislative Council (PLC) elections may provide a new political impetus for addressing corruption. Civil society has filled some of this gap by proposing anticorruption measures. In particular, Aman—the Coalition for Accountability and Integrity, the local counterpart of Transparency International—issued a comprehensive three-year action plan to combat corruption in all branches of government and civil society. But this plan is dependent on donor funding.

*Legislative Framework.* The primary legislation that addresses anticorruption issues include the Basic Law, the Law on Illicit Gains, the Law on Duties and Rights of the Members of the Legislative Council, the Civil Service Law and the Criminal Code. And although these laws together cover a number of activities and various higher-level public officials, there are still gaps in the legislation. For example, these laws are mostly silent on nepotism and conflict of interest, two of the most prominent forms of corruption in West Bank and Gaza. There is no freedom of information legislation, although a draft law is presently before the PLC. The highlights of the legislative framework are laid out in box 3.2.

*Enforcement.* There is no specific enforcement body covering all aspects of anticorruption. The Office of the Commissioner established pursuant to the *Law on Illicit Gains* is responsible for investigating allegations of illicit wealth involving higher-level public officials. But while a Commissioner has been appointed, the office is not yet functional. The Auditor General also has a limited role in addressing corruption. A number of laws, including the Law on Illicit Gains and the Law on Duties and Rights of Members of the Legislative Council, require PA officials to provide financial disclosure forms, but compliance with requirements is weak at best.

Equally important to addressing corruption is the Office of the Attorney General. The Attorney General and public prosecutors are responsible for both investigating and prosecuting cases of corruption. In general, the Office of the Attorney General has been slow to launch investigations. In January of 2006, the Attorney General announced that roughly 50 investigations of high-level PA officials were currently underway. However, these cases do not appear, as of yet, to be part of a larger systematic approach to combating corruption. The general inefficiency of the court system also hampers enforcement.

### Box 3.2: Anticorruption Legislation in the West Bank & Gaza

**Basic Law:** The Basic Law requires the prime minister, ministers and PLC members to provide a financial disclosure statement, including property of spouses and dependent minor children. The disclosure must include all movable and immovable property including securities and cash owned in Palestine or abroad. The statement must be submitted to the President's office.

**Law on Illicit Gains:** This Law defines "illicit gains" as any gain in personal wealth from sources other than what the civil service post provides from the moment the civil servant is appointed. It provides for the establishment of an independent authority to ensure implementation—the Office of the Commissioner. The Law covers, inter alia, the president; prime minister; ministers; PLC members; members of the judiciary and public prosecution; heads and directors of the security forces and the police; members of local government structures; chairs, board members and CEOs of public shareholding companies; civil service staff in Grades 1 and 2; staff of entities that receive financing from the national PA Budget; and any other person that the Council of Ministers decides to should come under the scope of this Law. The Law provides for fines, imprisonment and restrictions on future public employment.

**Law on Duties and Rights of the Members of the Legislative Council:** This Law prohibits Legislative Council members from engaging in any business or holding posts at the PA besides that of a parliament member. Each member must provide a financial statement of their assets, as well as the assets of spouses and minor children, including real property and debt.

**Civil Service Law:** The Civil Service Law prohibits civil servants from taking advantage of their posts for personal gain or profit, or to accept directly or indirectly any gift, reward, grant or commission for carrying out their duties. The Law provides penalties that include suspension, downgrading and termination.

**Criminal Codes:** Both the West Bank and Gaza Criminal Codes criminalize bribes, receipt of gifts or personal gain by public servants from their posts. The Gaza Code also includes abuse of public position. Penalties include fines and imprisonment.

***Recommended Next Steps.*** In April 2005, the World Bank funded a mission of an anticorruption expert to the West Bank and Gaza. Given the current climate of reform and the public perception that corruption remains a problem, the PA should take a proactive approach to resolving corruption problems. Undertaking quick and comprehensive assessments of corruption would provide the PA with the necessary information to mount an effective anticorruption campaign and dispel any public misperceptions as to the extent of corruption. Steps that need to be taken include:

*Adoption of a National Integrity Strategy:* As a matter of priority, the PA should develop a comprehensive anticorruption strategy. The first step would be adopting a brief policy paper emphasizing the three key components of the strategy: enforcement, prevention and public education. This policy paper should include the next steps to be taken, a timetable and a breakdown of the resources necessary for strategy preparation. The paper should be produced in several months. The anticorruption strategy can be finalized after completion of the analytical work and public consultations.

*Analytical Work:* The PA should facilitate an assessment of where corruption is located and how it should be addressed. This assessment should include: identification of corruption-related concerns inside and outside the government; analysis of the current legal framework related to anticorruption; detailed information of the efficacy of current agencies involved in anticorruption work; and identification of selected agencies perceived to be at risk for corruption. This analytical work can begin immediately, and

should take into account the analytical work already conducted by Aman and other civil society organizations.

*Public Consultation*: Because public consultation is a key component of an effective anticorruption strategy, the PA should commission a survey of public views on specific questions of anticorruption. A civil society organization, such as the Palestinian Independent Commission for Civil Rights (PICCR) or Aman, should carry out the survey. The PA could then produce a paper detailing PA polices to combat anticorruption based on the specific issues raised in the public survey. Public feedback will be instrumental in developing the anticorruption strategy, so the public survey should be conducted immediately.

*Consideration of an Independent Anticorruption Agency*: The PA should consider the establishment of an anticorruption agency: either develop a new agency or expand the mandate of an already existing agency, such as PICCR or the Office of the Commissioner created by the Law on Illicit Gains. Any such body needs the ability to fully investigate all claims of corruption. Since special anticorruption agencies have proven beneficial in other countries, immediate attention should be given to this issue.

*Parallel Activities:* In addition to specific anticorruption activities the PA should ensure other activities related to anticorruption and good governance are furthered, including: strengthening governmental record keeping, reporting and disclosure; supporting the PLC and groups of parliamentarians; and adoption and implementation of freedom of information legislation. These activities can begin immediately.

## 8.   Establishing the Institutional Infrastructure for Reform

On paper, several important agencies and offices exist for advancing the public sector reform agenda in the West Bank & Gaza. In practice, the institutional infrastructure is ill equipped for such a complex and politically sensitive task and has further been compromised by the fiscal and political isolation imposed on the PA. In the past five years, a Ministerial Reform Committee (MRC) has been established to oversee the broader reform agenda throughout the PA, and a Reform Coordination and Support Unit (RCSU) under the office of the Prime Minister and the Minister of Planning exists to help manage the reform. The MRC met infrequently and had little logistical support. The RCSU has a broad remit but limited staff, and it has been bounced around institutionally between the Prime Minister's Office and the Ministry of Planning.

Before the new Hamas government took over, the necessary leadership by the Prime Minister (who was responsible for the entire reform agenda) was largely absent. The Minister of Planning (who has a specific responsibility for civil service reform) played a more active role but was not able to ensure that the public sector reform agenda was consistently pursued. The MRC would be strengthened by meeting much more frequently. The RSCU's current agenda has effectively been put on hold. If the RCSU is to perform an effective secretariat function for the MRC and other PA bodies in the future, its capacity will need to be significantly strengthened. It may need to increase staff

and secretarial support. So far, much of the public sector reform agenda is donor-driven. For any future success of the reform program, the government needs to take more ownership over the agenda and define actionable targets and ensure their implementation.

In terms of day-to day management of the civil service, the GPC has begun to implement a series of important internal reforms. The council issues regulations for implementing the Civil Service Law and oversees compliance with the legislation. It is also responsible for confirming appointments, maintaining database on civil servants and advising Cabinet on proposed HR management changes. The GPC's mandate covers both oversight and policy formulation. But for years, the GPC had little independence from the President's Office and acted as the de facto agency for implementing what were essentially patronage-driven decisions regarding recruitment.

With the death of Chairman Arafat, the council has begun transforming itself into a modern civil service office by adopting a medium-term development plan and taking a lead on implementing an integrated human resource management system. Yet the GPC lacks the capacity and the political clout to push through an overarching civil service reform agenda. It is generally overloaded with tasks, and the separation of the GPC offices in the West Bank and Gaza creates significant bottlenecks and delays. The new Civil Service Law expands the GPC's mandate to manage the civil service. The organizational development plan put together with RSCU further strengthens the capacity of its departments, but building up capacity of the GPC to effectively manage the reform effort will require time and effort.

The PLC, through its budget committee and other channels, has been one of the strongest proponents of civil service reform. The cooperation of the executive and legislative branches will be critical for any future overhaul of the civil service. As noted above, a number of NGOs are also active on the good governance and anticorruption agenda. The involvement of civil society groups will be critical in any future effort to establish efficient and responsive Palestinian institutions. Just as the effort to strengthen coordination of the reform agenda should be supported from the top, so should the empowerment of civil society groups to track the implementation of this agenda from the bottom.

## Box 3.3: Civil Service Reform Policy Recommendations

*Wage Bill:*

- Ensure the long-term affordability of the public sector by committing to a donor-supported action plan for a fixed monthly wage bill to be allocated across employees at a fixed rate, with the understanding that any savings through staff reductions will increase the proportion of PA wages allocated to other PA employees.
- Eliminate automatic yearly salary raises and impose a moratorium on all future increases, which should be based only on the implementation of ministerial restructuring plans and job descriptions.
- Create a surplus labor pool under the General Personnel Council or the Ministry of Social Affairs where employees made redundant by ministerial restructuring can either take a retirement package or continue receiving a fraction of their salaries.

*Civil Service Size:*

- Implement comprehensive external audit of the payroll to identify redundancies as a joint exercise between the PA and an external audit consultancy firm.
- Take action (including termination) against various categories of employees who have in one way or another been abusing the system, including employees working abroad or out of post for more than two years, those working past retirement age, double dippers and ghost workers.
- Impose a blanket freeze on recruitment for the next two years, except for replacement-related recruitment in education and health.

*Reform of Security Services:*

- To ensure transparency, place all security service personnel (including trainees) formally on the MOI payroll. Ensure all security services are incorporated in the PA comprehensive personnel audit.
- Integrate MOI payroll under the purview of the MOF and empower the MOF to veto security service recruitment as needed.
- Achieve the Ward/Dayton mission objective of reducing the number of security services from 13 to 3. Eliminate units within the security services that are no longer needed, such as honorary or political cadres.
- Bring the total number of security service employment down to the original Oslo estimates, taking into account population growth rates and (to a limited extent) broader strategic considerations regarding eliminating private militias.
- Retract the January 2005 Security Services Pension Law and prepare new legislation that is affordable and in line with international practices with regard to contributions and benefits.

*Donor Practices:*

- Donors must give top priority to helping the PA develop a sustainable wage strategy for the civil and security services. This objective in turn will require: (1) a joint plan to address overstaffing in a comprehensive and systematic manner through a combination of budget support and targeted incentive packages; and (2) avoiding dysfunctional practices that are likely to increase the wage bill in the long term (such as paying salary top-ups or the recruitment of project-specific staff).
- Donors should support MOP and GPC efforts in the formulation and implementation of ministerial restructuring plans and in the strengthening of establishment controls.

*Establishment Control:*

- Eliminate paper-based exchanges between the GPC, MOI and the MOF related to recruitment and promotions. Strengthen efforts by the GPC to develop a computerized human resource database covering all PA employees to and develop an integrated human resource management information system (MIS) (that includes a biometric identification system) linking the databases of the GPC, MOF and MOI.
- Develop clear organizational charts for ministries, including manning charts and job descriptions, to avoid irregular promotions and appointments.

*Continued...*

- Disallow hiring above the official agency headcount by preparing detailed job descriptions; reward agencies for staying below their payroll budget by allowing them to obtain greater resources for operating expenses.

*Organizational Restructuring:*
- Complete the legal database that establishes mandates for all government ministries and agencies.
- Reform the PA organizational structure by combining or merging functions and institutions to attain target of approximately 22 ministries; reduce the number of independent agencies by approximately one-third.
- Implement previously approved organizational development plans (ODP) for ministries and government agencies; add detailed job descriptions.
- Create a competitive organizational restructuring program that rewards individual agencies with gradual wage increases based on clearly verifiable reform criteria.

*Payroll Management:*
- Restore all payments to employee bank accounts when political conditions allow; eliminate payments of salaries in cash; ensure that bank verify employee name before releasing the payment.
- Ensure that salaries are released according to the actual staff numbers and not to the total number of positions within each ministry.

*Allowances:*
- Impose strict restrictions on overtime pay except for essential services where life and property are at risk.
- Merge allowances for job type and specialty into base pay.
- Suspend the transportation allowance and other allowances where auditors find substantial abuses until corrective measures are taken.

*Civil Service Legislation:*
- Continue with the development of secondary legislation and regulations supporting the new Civil Service Law, with emphasis upon clarifying the responsibilities of the GPC and individual ministries and departments.
- Address the issues of redundancy and termination of service directly through secondary legislation.

*Performance Management and Recruitment:*
- Standardize entrance exams across the civil service.
- Eliminate exceptional promotions and ensure that no promotions are granted without the explicit agreement of the GPC and the MOF.
- Review all past exceptional promotions and demote persons promoted illegally.
- Reward ministries for reducing non-performing staff by allowing the ministries to keep a part of the budgetary savings for non-wage expenses.

*Anticorruption:*
- Conduct analytic work to identify the extent to which corruption exists and the areas where it is particularly problematic.
- Develop a comprehensive anticorruption strategy emphasizing enforcement, prevention and public education, and assess the feasibility of establishing an independent anticorruption agency.
- Equip the Office of the Commissioner established pursuant to the Law on Illicit Gains.

*Strengthen Institutions Involved in Reform Coordination:*
- Reactivate the Ministerial Reform Committee (MRC) under the chairmanship of the Prime Minister.
- Strengthen the capacity of the Reform Coordination and Support Unit (RCSU) to serve as MRC secretariat and help guide the reform agenda; pursue a limited increase in its staffing and budget.
- Involve PLC budget committee and other key players within the PLC in the civil service reform agenda.

## References

Bulmer, Elizabeth Ruppert. 2000. "Rationalizing Public Sector Employment in the MENA Region." Working Paper 19, World Bank, P4.

Center for Policy and Survey Research. 2006. *Results of Palestinian Public Opinion Poll No. 23. September 7-9.* An-Najah National University,P1.

Squaring the Circle: Security-Sector Reform and Transformation and Fiscal Stabilization in Palestine. Report Prepared for the UK Department for International Development. January 16, 2006. Prepared by Nicole Ball, Peter Bartu and Adriaan Verheul.

Palestinian Center for Policy and Survey Research. 2005. *Public Opinion Poll No. 16* (June 9-11, 2005). Ramallah, West Bank and Gaza. P14.

Palestinian Center for Policy and Survey Research. 2005. *Results of PSR Exit Polls for Palestinian Presidential and Local Elections, December 2004 – January 2005.* Ramallah, West Bank and Gaza. P24.

Palestinian Center for Policy and Survey Research. 2004. *Public Opinion Poll # 11*, March 14–17, 2004. Ramallah, West Bank and Gaza.  P24.

Rand Corporation. 2005. *Building a Successful Palestinian State.* The Rand Palestinian Study Team. Rand Press. P12.

Samuels, David. 2005. "In a Ruined Country." *Atlantic Monthly.* September, Volume 296, 2, P60-91.

Sewel, David. 2001. *Governance and the Business Environment in West Bank/Gaza.* Working Paper 23. World Bank. May. Washington D.C.  P24.

Ward Group. 2005. *Palestinian Security Forces Staffing.* World Bank staff meeting with Ward Group, December 2005.

World Bank. 2002. *Long-Term Policy Options for the Palestinian Economy.* July. West Bank and Gaza Office.

Case 1:04-cv-00397-GBD-RLE    Document 547-156    Filed 06/25/14    Page 20 of 27

## CHAPTER 4: REFORMING INTERGOVERNMENTAL FISCAL RELATIONS

### 1.  Key Issues and Challenges

The Palestinian intergovernmental system was not created by design. Rather, it has been shaped over time by a variety of factors, including legal ordinances issued by various administrative regimes pre-dating the Palestinian Authority (PA), ongoing practices, adopted policies and, eventually, an overarching legal framework reflected in the Law on Local Authorities (LLA 1997). This piecemeal evolution of the system has left many legal and policy gaps and contradictions, particularly relating to the way local governments understand and perform their functions and authorities. For instance, in the West Bank, many practices carried over from the period of Jordanian control derive from that legal system. In Gaza, municipalities often continue practices more in line with the Egyptian legal ordinances applied prior to the emergence of the PA.

Despite such obstacles, the system must be improved to ensure that Palestinian local governments adhere to basic standards and sound financial management practices to improve public expenditure management. As entities authorized to raise revenues and manage public funds, local governments have as much an obligation as other public agencies to ensure that funds are managed effectively and accountably.

This chapter reviews the intergovernmental fiscal system with particular focus on public expenditure management. It considers legal and policy issues, expenditure and revenue assignment authorities, structural and functional relationships within the system, and the effect of these factors on policy outcomes and service delivery. A key recommendation is the need to realign and consolidate the legal and administrative framework to ensure greater coordination among national and local agencies. Inconsistency in laws and divergence in practices will continue to undermine effective public expenditure management system if not addressed in the near term.

To its credit, the Ministry of Local Government (MOLG) began reviewing such issues in 2004 in its Local Government Sector Diagnostic Report and Local Government Reform Strategy. The local government elections of December 2004—the first in 30 years—were a cornerstone of this strategy. Aimed at making local governments more responsive and accountable, this reform process has stalled.  It must be reactivated. Particularly at a time when economic contraction has reduced municipal revenues, local officials must manage expenditure as efficiently as possible.

***The Local Government Sector within the Broader Fiscal Context.*** In comparison to federal states and other decentralized countries, the size of local government in the West Bank and Gaza (WBG) is relatively small—its share of public expenditure about 17.5percent (figure 4.1).[66] In a region of unitary states with central control over most

---

[66] Palestine's municipal share of public expenditure represents a pre-*intifada* four-year average (1996–99). By comparison, Egypt represents Governorate expenditures, whereas municipal expenditures are negligible.

aspects of government, however, Palestinian local governments are among the most autonomous. WBG average per capita subnational expenditure ($75 in 2002) is well above that of Jordan ($15 in 2000), yet behind other comparator countries, such as Brazil ($931 in 1998), Iran ($109 in 2004) and Egypt ($83 in 2005).

**Figure 4.1: Subnational Share of Total Public Expenditures, Selected Countries**



*Source:* Government Finance Statistics Yearbook, IMF, March 2006; selected World Bank Country Studies.

***Palestinian Local Government Fiscal Autonomy.*** Palestinian local government autonomy is illustrated by a low dependency ratio on central government financial support. World Bank survey data indicate that even when the *intifada* increased municipal dependency transfers to West Bank local governments never exceeded 2 percent of revenue. Even Gaza's higher 17 percent is still modest by regional standards. Utility and public service and market expenditures make up the bulk of expenditures in the West Bank and Gaza (70 and 77 percent respectively), figures which correspond closely to revenues from these sources (figure 4.2).

This regional anomaly can be explained by Palestine's historical evolution. The PA arose out of the Oslo peace process in 1993, but many Palestinian municipalities have existed for a century or more, long providing many services to their citizens—at high levels of satisfaction. This experience differs from that of other MENA countries, where local governments merely represent the centralized state. Despite the West Bank & Gaza's different heritage, few concrete actions have been taken to improve coordination and ensure effective delivery of local services.

These indicators mask areas of concern that have emerged during the second *intifada*: spiraling arrears in municipal finance, troubling reliance on utility surcharges as a source of revenue and growing shares of local expenditures for general administration and wages. Capital expenditures have declined in relative terms, raising questions about service quality and coverage, especially with high population growth.

**Figure 4.2: Composition of Local Government Expenditure in West Bank and Gaza, 2001–2005**




## 2.   Intergovernmental Fiscal System—Structural Issues

***Gaps, Inconsistencies and Structural Flaws in the Intergovernmental Fiscal System.*** The flaws of the intergovernmental fiscal system are not surprising given the rapid emergence of the PA. Little attention was devoted to harmonizing facts on the ground with principles of governance and fiscal policy. Although the same law, the Law on Local Authorities (1997), applies to local governments in West Bank and Gaza, fiscal management differs between the two—and remains largely outside the purview of the PA. For example, Gaza municipalities collect property taxes directly while those in the West Bank rely on the Ministry of Finance (MOF) to do so.

Financial accounting and reporting is uneven and does not conform to international standards. A unified chart of accounts has not been adopted to provide common accounting for revenues and expenditures. Budget preparation and review takes place with little central government oversight. Irregular and ineffective audits do not prevent financial distress.

***Structural and Functional Problems.*** In the West Bank and Gaza, parallel processes take place with limited coordination among agencies (figure 4.3). One agency sometimes undermines another. Emergency transfers to municipalities, authorized by the President's office, have undermined the MOF's withholding of shared tax revenues to penalize nonpayment of water and electricity utilities. Such transfers, though highly irregular in volume from year to year, represented about 20 percent of aggregate local expenditures in 2004.

Many donors' focus on project-specific outcomes, though understandable, is inadequate for institution building. Bilateral arrangements between donors and select municipalities have undermined PA efforts to restore stability. Strengthening recurrent cost budgeting for needed operations and maintenance of donor investments is a particular priority.

Figure 4.3: Intergovernmental Fiscal Structure in the West Bank and Gaza



***Intergovernmental Fiscal Policy Coordination.*** This report recommends establishing an Intergovernmental Fiscal Policy Commission, including the Ministries of Finance, Local Government and Planning, the Palestinian Central Bureau of Statistics, the Municipal Development Fund and possibly the Association of Palestinian Local Authorities (or direct local government representation). Such a commission would provide needed follow up to the recommendations of this report, ensuring that policy coordination is institutionalized. The Commission's agenda should address issues that have relevance across agencies, including municipal arrears, intergovernmental transfers (both equalization and performance-based grants), revenue and expenditure assignment, and donor aid coordination to local governments. The Commission should seek better ways to integrate local government budgets and finances into national systems, while maintaining local autonomy and better defining it within the law.

***Proliferation of Palestinian Local Governments.*** The decision to expand the number local governments, taken in the early years of the PA, complicated the fiscal system. Through ambiguities in the law, all local units—nearly 500 of them—have the same role in providing services, reporting finances, preparing and implementing budgets, and so on. This arrangement has created a sense of entitlement while limiting resources for larger municipalities. The PA has recognized the importance of this issue and initial steps have been promising. One initiative has limited financing to local governments of a particular size (many donors are focusing their efforts on the 118 municipalities). The remaining local governments, mainly village councils, are encouraged to submit joint funding proposals. Such initiatives consolidate budgetary resource management without canceling mechanisms for political representation. They merit further exploration.

**Table 4.1: Categorization of Local Government Units in the West Bank and Gaza**

| Category | Number | Criteria |
|---|---|---|
| Class A Municipality | 14 | Governorate Centers (major cities) |
| Class B Municipality | 24 | Established before 1994 |
| Class C Municipality | 41 | Established after 1994, with a population of more than 15,000 |
| Class D Municipality | 40 | Established after 1994, with a population of between 5,000 and 15,000 |
| Village Councils | 251 | Population of less than 5,000 |
| Project Communities | 127 | Very small communities |
| **TOTAL** | **497** | |

*Source:* The Ministry of Local Government Report 2003.

***Palestinian Municipal Development Fund as a Policy Instrument.*** The Emergency Municipal Services Rehabilitation Project (EMSRP), a pilot program financed by the World Bank, showed the effectiveness of performance-based grants as tools of reform. In its second round of financing in 2004, EMSRP payments were conditioned on local governments' adherence to financial management standards. This conditionality improved submission and disclosure from 20 percent to more than 80 percent. The PA then established the Palestinian Municipal Development Fund (MDF) to induce local governments to increase revenue collection, adopt sound accounting practices, improve spending management and boost accountability and reporting. The MDF also includes a capacity-building program to help local governments meet objectives. If these measures help local governments access market-based finance, it would reduce the burden on the central government (box 4.1).

### 3.   Expenditure Assignment Issues

***Government Responsibilities and the Local Authorities Law.*** Under the law, local expenditure authority encompasses at least 22 areas. Health and education are notably missing, although West Bank governments often build schools and health clinics. Local governments in both the West Bank and Gaza rely on the PA for staffing, curriculum development and health care policies. Table 4.2 outlines the differences between formal legal responsibilities and local practices.

## Table 4.2: Expenditure Responsibility in Law and Practice

| | WB | Gaza |
|---|---|---|
| 1997 LGL Assignments for Local Governments | **Current Practice** | |
| Town planning and road construction | Yes | Yes |
| Building licensing and control | Yes | Yes |
| Electricity supply, construction and management | Yes | No |
| Water supply, construction and management | Yes | Yes |
| Sewage supply, construction and management | Yes | Yes |
| Public markets management | Yes | Yes |
| Cultural and sport activities | Yes | Yes |
| Building demolition | No | No |
| Advertisement control | Yes | Yes |
| Hotel operation control | No | No |
| Public entertainment control | Yes | Yes |
| Sale of closed roads | Yes | Yes |
| Control of beggars | No | No |
| Public transport | No | No |
| Public health including collection and disposal of solid waste and slaughterhouse | Yes | Yes |
| Canine control | Yes | Yes |
| Weights and measures control | No | No |
| Control of peddlers and open markets | Yes | Yes |
| Cemeteries | Yes | Yes |
| Public parks | Yes | Yes |
| Budget and LGU Personnel | Yes | Yes |
| Management of LGU Assets | Yes | Yes |

*Source:* Local Government Law 1997; Interviews with central and local government representatives; UNDP Report 2004.

### Box 4.1: The Palestinian Municipal Development Fund

Established in 2003, the Municipal Development Fund (MDF) advances several goals. It channels reliable, rule-based funding to local governments. It builds financial management capacity by creating local credit markets. It moves from emergency assistance to more effective donor mobilization and coordination.

A review of several other "first stage" municipal development funds around the world showed that "rationalizing the ad hoc, arbitrary and sometimes politically guided process of resource transfers from central to local governments, an MDF can introduce criteria based funding (reliant on the strong technical capacity of MDF management) that can strengthen local capacity, provide incentives for good financial performance, improve the selection of investment priorities, and markedly enhance the quality of local project finance" (El-Daher 2000).

The Palestinian MDF pools donor aid and PA financing in a multiyear financing mechanism. Specific institutional development criteria drive eligibility. As local governments "graduate" to creditworthy status, they will become more independent and begin to access market finance. Once the institutional development performance criteria have been met, all projects will be screened against investment impact criteria, applying standard cost-benefit analysis.

The municipal development fund (not itself a lender) will bridge the gap between local governments and commercial financial institutions. If it succeeds in its first mission, it will introduce new financial tools—guarantee instruments, bond issuance, and so on—that can leveraging private capital. At present, local commercial banks offer only very short term finance (2–3 years), wholly inadequate for infrastructure investments. Success in the first stage would lay the groundwork for more sustainable finance and greater fiscal decentralization.

*Unclear Expenditure and Service Responsibilities.* Despite efforts to define municipal service responsibilities in the law, ambiguities remain. Municipalities have different capacities to deliver assigned services. Conflicts arise between local and national mandates, and the ambiguities create gaps in local services. Expenditure assignment should be based on rational considerations—economies of scale or the proximity of users and service providers. Services with large local effects, such as health, education, social services and fire fighting are not legally assigned to municipalities. In many countries, at least certain aspects of such services are assigned locally. In the absence of a reliable public administration system, some WBG municipalities have felt compelled to extend services beyond the provisions of the law, particularly those that matter most to their constituencies. Hebron, for instance, builds schools and fights fires. The debate on expenditure assignment and service delivery needs to take place through a consultative process that informs any effort to reform the intergovernmental fiscal system.

*Asymmetries in Capacity.* The Local Government Law does not recognize asymmetries in service delivery capacity, treating the smallest village councils and the largest cities the same.[67] This system requires revision. Responsibilities are too broadly defined for small local government units (LGUs) but too narrowly defined for large municipalities. Older and larger municipalities have well-established service and regulatory mechanisms— roads, water, electricity, sanitation, markets, libraries, fire abatement, slaughter houses, land use planning, solid waste management, parks and recreation and business and professional licensing (World Bank 2000). These functions are mandatory, but most

[67] The Local Authorities Law refers to "local authorities", which may include municipalities, local councils, village councils, administrative committees, project committees, or other types of councils. None of these terms is further defined or explained (MOLG 2004 and World Bank 2000).

villages are not able to fulfill them. Regulations are needed to address the asymmetries between larger and smaller LGUs. These regulations would then drive budgeting.

## 4.   Expenditure Trends

***Expenditure After the Intifada***. Though still large, the local government share of public expenditure is shrinking. After the second *intifada*, WBG municipalities cut expenditures to match declining revenues (figure 4.4). The West Bank's post-*intifada* (2001–2005) average per capita expenditure fell 18 percent below the pre-*intifada* (1999–2000) average. The decline is more severe in Gaza—an estimated 29 percent.

**Figure 4.4: WBG Local Share of Public Expenditure, 1999-2005**



*Source:* Figures derived from World Bank Municipal Finance Survey and IMF Central Government Budget figures.

The wage share of expenditure is increasing, eroding the resources available for services and capital expenditures, especially in Gaza. While WBG municipalities cut wages after the *intifada*, they cuts non-wage expenditures more—60 percent in Gaza. Anecdotal evidence suggests that many municipalities had to cut their capital expenditures because they were unable or unwilling to cut wages.

Trend analysis highlights changing local expenditures. Public functions, market services, and capital and development expenditures have increased while utility expenditures have declined. Moderate general administrative expenditures continue. This analysis shows the importance of efficiency, effectiveness and capacity issues in public service functions and market services. Such expenditures are a major source of difference in expenditure needs and fiscal capacities across West Bank and Gaza municipalities.

The utility share of expenditure in the post-*intifada* period is well below pre-*intifada* levels in both the West Bank and Gaza, despite a rebound after 2003. Although utility expenditures dropped, utility salaries rose, raising suspicions that the utility infrastructure is not getting the attention it needs. Anecdotal evidence supports this diagnosis: Services and infrastructure are deteriorating in many municipalities. One remedial measure could involve encouraging smaller municipalities to use Joint Service Councils. Benefiting from economies of scale, towns could cut expenditure without sacrificing quality.