# EXHIBIT A.292

(1 of 2)

PLAINTIFF'S EXHIBIT 292

[Line numbering in Hebrew original]

Date: 2 Shevat 5765
January 12, 2005

File Number: 2268/04

**Military Court, Judea**

Before the Honorable Presiding Judge: Major Yair Tirosh
Judge: Captain Renato Yarak
Judge: Captain Aryeh Dorani

**The Military Prosecution**
(represented by Lieutenant Yosef Malko)

**- v. -**

**Defendant: Mohamed Issa Mohamed Ma'ali Identity No. 907377113/ Prisons Service**
(represented by his attorney, Adv. Khaled al-Aghraj)

## SENTENCE

**The Honorable Judge Captain Aryeh Dorani:**

The Defendant has been convicted, on the basis of his written admission to the indictment before the Court, of the following crimes: **one crime of throwing a burning object and two crimes of throwing or placing a bomb**, pursuant to Regulation 58(b) of the Defense (Emergency) Regulations; **nineteen crimes of intentionally causing death and two crimes of attempting to intentionally cause death**, pursuant to Section 51(a) of the Security Provisions Order, and Section 7(c) of the Criminal Liability Order.

This sentence relates not only to the number of crimes, or their professional delineation in the law books, but is also a horrific description of one of the most terrible indictments to which a defendant in the Region has confessed: the transportation of a human time bomb to population centers, so as to murder and sow death, acts of the murder of children, women and infants, without distinction or mercy, the willingness to spill human blood until rivers of blood fill the streets of a bustling city.

The images of the horrors have been published. The rescue teams collect the body parts of nineteen people, putting name and form together, for they do not have bodily form, and their families will bury body parts – for those who are "privileged" to getting some reminder of their

[Stamp] P 2: 285

loved one from the inferno and the fire. And I, sitting in judgment, am asked by the Defendant's attorney, "Who is guilty?", as though there is some sort of understanding or some sort of justice to this vilest of deeds, in the eyes of the God of all souls and those who dwell on earth, an act of **murder of children, women, and older people, innocent travelers on the buses**.

Since we are commanded to put aside our feelings as human beings, and judge the Defendant at the cognitive level of the task of judgment, I will first describe the acts as they happened, and as he confessed to them, without any regret, the Defendant himself before the Court, accompanied by his defense attorney, as they are described in the indictment to which the Defendant confessed, and also in his statements, which were filed, by consent, with the Court, through his defense attorney.

At the beginning of October 2000, the Defendant threw a burning object, with the intent of causing the death or wounding of another person, specifically, on that date, the Defendant and his accomplices threw Molotov cocktails at Israel Defense Forces troops.

During April 2002, on a number of occasions, the Defendant and his accomplices threw pipe bombs at Israel Defense Forces troops passing through Bethlehem.



[Stamp] P 2: 285 [continued]

[Line numbering in Hebrew original]

Date: 2 Shevat 5765
January 12, 2005

File Number: 2268/04

During April 2004, the Defendant was an accomplice in placing a bomb, with the intention of causing the death or wounding of another person, specifically: the Defendant and his accomplices placed an explosive device weighting 12 kilograms near the Darwish gas station, in a location where military vehicles pass

On January 29, 2004, within and outside the Region, the Defendant was an accomplice in intentionally causing the deaths of others, specifically:

At the beginning of January 2004, or thereabouts, Abdul Rahman (Zaher) Yousef Abdul Rahman Maqdad (hereinafter: "**Abdul Rahman Maqdad**"), the military operative Ahmed Moughrabi, and Ali Mohamed Hamed Abu Haliel (hereinafter: "**Ali Abu Haliel**") planned to carry out terrorist attacks against Israeli targets, including suicide terrorist attacks. At around that time, the military operative Hilmi Abdel Karim Mohamed Hamash (hereinafter: "**Hilmi Hamash**") approached Ali Jaara and suggested that he meet with a military operative who would send him to carry out a suicide terrorist attack. Ali Jaara (hereinafter: "**the suicide terrorist**") expressed his willingness to do so.

Accordingly, Hilmi Hamash had the military operative Ahmed Salah Ahmed Salah (known as: Ahmed Abu-Ghadeb) (hereinafter: "**Ahmed Abu-Ghadeb**") meet with the suicide terrorist at a meeting, during which Ahmed Abu-Ghadeb checked with the suicide terrorist the extent of his willingness to carry out a suicide terrorist attack. The suicide terrorist expressed willingness as stated, and both of them began to prepare to carry out a suicide terrorist attack.

At around that time, Abdul Rahman Maqdad began preparing explosives for use in carrying out a suicide terrorist attack, using materials passed to him by the military operative Ali Abu Haliel. In addition, Ahmed Abu-Ghadeb brought Abdul Rahman Maqdad up to date on locating a suicide terrorist prepared to carry out the suicide terrorist attack, and asked him to urgently prepare the explosive bag, so that it could be used for carrying out the suicide terrorist attack.

Abdul Rahman Maqdad asked Ahmed Abu-Ghadeb to purchase for him materials for the production of an explosive bag (including, *inter alia*: a bag, batteries, switch, etc.). Ahmed Abu-Ghadeb consented and, together with Hilmi Hamash, purchased all that had been requested. In addition, Ahmed Abu-Ghadeb and Hilmi Hamash attempted to find a video camera, so as to film

[Stamp] P 2: 286

the suicide terrorist prior to execution of the terrorist attack, but they were unsuccessful – and so they decided to send the suicide terrorist to carry out the terrorist attack without filming him on video.

At about that time, Ahmed Abu-Ghadeb approached the **above named Defendant** and asked him to transport the suicide terrorist, armed with an explosive belt, to carry out a suicide terrorist attack within the territory of the State of Israel. The Defendant expressed his willingness to do so.

Accordingly, Ahmed Abu-Ghadeb introduced the Defendant to the suicide terrorist.

In parallel with that which has been stated above, Abdul Rahman Maqdad produced the explosive bag, with which the suicide terrorist attack would be carried out; he informed Ahmed Abu-Ghadeb of this, and asked that he come to take the explosive bag. Some minutes later, Ahmed Abu-Ghadeb, together with the suicide terrorist and the Defendant, came to the home of Abdul Rahman Maqdad; the Defendant waited outside, while the suicide terrorist and Ahmed Abu-Ghadeb went into Abdul Rahman Maqdad's home. The latter explained to Ahmed Abu-Ghadeb and the suicide terrorist how to set off the explosive bag, and gave them the explosive bag, to be used in the suicide terrorist attack, with the intention of causing the deaths of Israeli citizens.

Soon after that, the Defendant, the suicide terrorist, and Ahmed Abu-Ghadeb left in the direction of the university in Bethlehem; there Ahmed Abu-Ghadeb neutralized the safety mechanism of the explosive device, so as to prepare it for operation. Subsequently, Ahmed Abu-Ghadeb left the Defendant with the suicide terrorist.



[Stamp] P 2: 286 [continued]

[Line numbering in Hebrew original]

Date: 2 Shevat 5765
January 12, 2005

File Number: 2268/04

After Ahmed Abu-Ghadeb left them, at around 6:30 a.m., the Defendant took the suicide terrorist to Jerusalem via Walaja village, until they approached the Malha Mall in Jerusalem, where the Defendant took his leave from the suicide terrorist and returned to the Region.

Soon thereafter, the suicide terrorist boarded an Egged Number 19 bus traveling in the direction of France Square. When the bus reached the corner of Arlosorov and Gaza Streets, at around 8:45 a.m., the suicide terrorist set off the explosive bag that he held, with the intention of causing the deaths of a large number of people. As a result, the explosive bag blew up within the bus (hereinafter: "**the suicide terrorist attack**").

The said suicide terrorist attack caused the deaths of:

**the late Avraham Balhasan;**
**the late Hannah Bonder;**
**the late Anat Darom;**
**the late Yechezkel Goldberg;**
**the late Vladi Zadik Menbere;**
**the late Viorel Octavian Florescu;**
**the late Rose Boneh;**
**the late Dana Itach;**
**the late Roman Hondiashvili;**
**the late Eli Tzipora;**
**the late Natalia Gamril**.

In addition, and as a result of the terrorist attack, over **fifty civilians** were also wounded, at levels of injury ranging from severe to light.

The above named Defendant, within and outside the Region, on February 22, 2004, was an accomplice in intentionally causing the deaths of others, specifically:

Some days prior to the above date, Abdul Rahman Maqdad and the military operative Izz A-Din Ali Alian planned to carry out a suicide terrorist attack, with the aim of causing the deaths of Israeli citizens.

[Stamp] P 2: 287

Izz A-Din Ali Alian informed Abdul Rahman Maqdad that he had found a person named Mohamed Za'ul (hereinafter: "**the suicide terrorist**") who was prepared to carry out a suicide terrorist attack.

On February 17, 2004, or thereabouts, Izz A-Din Alian met with the suicide terrorist in the village of Husan; during the meeting the suicide terrorist agreed to carry out the planned suicide terrorist attack. At the end of the meeting, Izz A-Din Alian arranged with the suicide terrorist to meet near the Church of the Nativity in Bethlehem on February 21, 2004, at 4:00 p.m.

Izz A-Din Alian updated Abdul Rahman Maqdad as to the content of the meeting, and of the suicide terrorist's consent to carry out the suicide terrorist attack; accordingly, Abdul Rahman Maqdad made contact with his brother, the military operative Maher, who lived in Gaza, informed him of the plan to carry out the suicide terrorist attack, and asked him for the amount of NIS 3,000, so that he could prepare the explosive bag for the suicide terrorist, and to purchase a video camera to film the suicide terrorist, this being in accordance with Maher Maqdad's request to film the suicide terrorist before execution of the suicide terrorist attack.

Maher Maqdad consented, and transferred to the Arab Bank account in Bethlehem, registered in the name of Abdul Rahman Maqdad, **the amount of NIS 3,000 to fund the suicide terrorist attack**, as agreed with Abdul Rahman Maqdad.



[Stamp] P 2: 287 [continued]

[Line numbering in Hebrew original]

Date: 2 Shevat 5765
January 12, 2005

File Number: 2268/04

On February 18, 2004, or thereabouts, Abdul Rahman Maqdad went to the Arab Bank in Bethlehem, and withdrew the amount of money transferred to him from Maher Maqdad.

Abdul Rahman Maqdad purchased, with part of the amount, a video camera and a regular camera, for filming the suicide terrorist. Similarly, he passed an amount of money to Ali Abu Haliel and Ahmed Abu-Ghadeb, so that they could purchase materials for the preparation of the explosive bag for the suicide terrorist attack.

Accordingly, Ali Abu Haliel received from military operative Haitham Zakariya Mahmoud al-'Aarj (hereinafter: "**Haitham al-'Aarj**") four liters of the chemical hydrogen peroxide, and from the military operative Ahmed Odeh forty liters of the chemical acetone; Ali Abu Haliel passed to Abdul Rahman Maqdad twelve liters of the chemical hydrogen peroxide and twelve liters of the chemical acetone.

On February 20, 2004, Abdul Rahman Maqdad, Ali Abu Haliel and Izz A-Din Alian produced the explosive bag intended for execution of the suicide terrorist attack.

At around that time, Abdul Rahman Maqdad asked Ahmed Abu-Ghadeb to check with the Defendant whether he was prepared to transport the suicide terrorist to carry out the suicide terrorist attack. Accordingly, Ahmed Abu-Ghadeb met with the Defendant, and asked him to transport another suicide terrorist to carry out a suicide terrorist attack within the territory of the State of Israel. The Defendant consented to do so.

On that same day, during the evening, Ahmed Abu-Ghadeb came to the home of Abdul Rahman Maqdad, having in his possession a poster on which was written "The Ayman Judeh Cell of the al-Aqsa Martyrs Brigades Organization"; Ahmed Abu-Ghadeb gave the poster to Abdul Rahman Maqdad, so as to serve as a backdrop while filming the suicide terrorist – similarly, he informed Abdul Rahman Maqdad that the Defendant was prepared to transport the suicide terrorist.

The next morning, Ahmed Abu-Ghadeb gave Abdul Rahman Maqdad iron nails, so that the latter should glue them to the explosive belt, this being to increase and intensify the injuries when the explosive device was detonated. Abdul Rahman Maqdad received the iron nails, and glued them to the explosive bag.

[Stamp] P 2: 288

That same day, at approximately 4:10 p.m., Izz A-Din Alian, accompanied by the suicide terrorist, came to the home of Abdul Rahman Maqdad, to prepare him to set out for the terrorist attack.

In addition, Ahmed Abu-Ghadeb brought Abdul Rahman Maqdad a Kalashnikov rifle and a hand grenade, so that he could film the suicide terrorist holding these weapons.

Abdul Rahman Maqdad and Izz A-Din Alian gave the suicide terrorist food and new clothes. After eating the evening meal together with the suicide terrorist, Izz A-Din Alian wrote a testament for the suicide terrorist; Abdul Rahman Maqdad and Izz A-Din Alian filmed the suicide terrorist reading out his testament. When they finished filming the suicide terrorist, Abdul Rahman Maqdad began preparing the explosive bag that would serve in carrying out the suicide terrorist attack. At around 5:50 a.m., the next day, Abdul Rahman finished production of the explosive bag.

When he finished making the explosive bag, as stated, on April 22, 2004, Abdul Rahman Maqdad called Ahmed Abu-Ghadeb, informed him that all was ready, and asked him to come and send the suicide terrorist out to execute the suicide terrorist attack.



[Stamp] P 2: 288 [continued]

[Line numbering in Hebrew original]

Date: 2 Shevat 5765
January 12, 2005

File Number: 2268/04

Accordingly, Ahmed Abu-Ghadeb made contact with the Defendant, and asked him to meet with him. The two met, and together drove in the direction of Abdul Rahman Maqdad's house, where the suicide terrorist was hiding. Ahmed Abu-Ghadeb asked the Defendant to wait near that location, in Bethlehem.

At approximately 6:00 a.m., Ahmed Abu-Ghadeb came to Abdul Rahman Maqdad's house, took from him the explosive bag, and left together with suicide terrorist in the direction of central Bethlehem; there he introduced the suicide terrorist to the Defendant. From there the suicide terrorist, together with the Defendant, left in the direction of Jerusalem, passing through the village of Walaja, so as to carry out the planned suicide terrorist attack.

The Defendant took the suicide terrorist to a place located near the Malha Mall in Jerusalem; there he took his leave from him, and returned to the Region.

Soon thereafter, the suicide terrorist boarded an Egged Number 14 bus traveling from Denya in the direction of Liberty Bell Park. When the bus stopped at a traffic light, the suicide terrorist set off the explosive bag, with the intention of causing the deaths of a large number of people. As a result, the explosive bag blew up within the bus (hereinafter: "**the suicide terrorist attack**").

The above mentioned suicide terrorist attack caused the deaths of:

**the late Yaffa Ben Shimol;**
**the late Yuval Ozana;**
**the late Rahamim Doga;**
**the late Yehuda Haim;**
**the late Ilan Avisidris;**
**the late Benaya Yehonatan Zuckerman;**
**the late Lior Azulay;**
**the late Netanel Havshush.**

In this instance too, as a result of that terrorist attack, over **fifty civilians** were wounded, with levels of injury ranging from severe to light.

[Stamp] P 2: 289

These actions of the Defendant's were carried out against a civilian population, and against Israel as a state. They are part of the "uprising" being carried out by striking at the morale and the psychological strength of a whole state and a restrained Israeli people. The beginning of the act was in the "Region", while its principal outcome was in Israel.

The Defendant sought to justify his actions, through his defense attorney, on the basis of the harsh life in the refugee camps and at the checkpoints, the economic situation, Palestinian national honor, and so on. It is appropriate to relate to this, not from the point of view of the Defendant's absolute guilt, but from the point of view of those who read his actions within his social environment, the definition of those actions in the national context, in the eyes of the nations of the world, and the perspective of the whole picture in the eyes of nation and nations.

The President of the Supreme Court of the State of Israel, Justice Aharon Barak, in HCJ 7015+7019/02, mentioned the following, before he knew what is known to all now, in December 2004. To date, over 1000 Israelis have been murdered in terrorist attacks, thousands more have been wounded, and who knows what the future holds. This is what he wrote in 2002:

> **"Since the end of September 2000, severe fighting is being carried on in the regions of Judea, Samaria and the Gaza Strip. This is not a police action. This is an armed conflict. As part of it, there have been carried out**



[Stamp] P 2: 289 [continued]

[Line numbering in Hebrew original]

Date: 2 Shevat 5765
January 12, 2005

File Number: 2268/04

**about 14,000 terrorist attacks against life, the persons and property of innocent Israeli citizens and residents, among them old and young, men and women. Over 600 citizens and residents of the State of Israel have been killed. Over 4500 wounded, some most severely…**

**… Israel's fighting is complicated. The Palestinian side uses, *inter alia*, guided human bombs. These suicide terrorists arrive wherever there are Israelis (within the boundaries of the State of Israel and within the Israeli settlements in the regions of Judea, Samaria and the Gaza Strip). They sow death and blood in towns and communities. Indeed, the forces fighting Israel are terrorists; they are not members of a regular army; they do not wear uniforms; they hide behind the civilian Palestinian population in the region, including in the holy sites; they enjoy the support of part of the civilian population in general, as well as the support of family members and relatives in their villages. A new, harsh reality faces the State of Israel, which is fighting for its security and that of its citizens. This reality has, more than once, found its way to this Court [*see* HCJ 2936/02 Physicians for Human Rights v. Commander of the IDF in the West Bank, *Piskei Din* 56 (3) 3; HCJ 2117/02 Physicians for Human Rights v. Commander of the IDF in the West Bank, *Piskei Din* 56 (3) 28; HCJ 3451/02 Al-Mandi v. Minister of Defense, *Piskei Din* 56 (3) 30, 36].**

**In this struggle of Israel's against terror it has conducted – by virtue of its right to self-defense – special military operations (Operation Defensive Shield, which began in March 2002, and Operation Determined Path, which began in June 2002 and has not yet ended). The aim of these operations was to overcome the Palestinian terror infrastructure and prevent the recurrence of terrorist attacks. In these operations, IDF forces enter numerous areas which had, in the past, been under their**

[Stamp] P 2: 290

> **control by virtue of belligerent occupation, and which had been transferred, under agreements, to the control (full or partial) of the Palestinian Authority. The Army imposed closures and encircled various areas, weapons and explosives were collected, wanted persons were arrested…**
>
> **… From a legal perspective, the sources for the authority and power of the Military Commander in the Region subject to belligerent occupation is in the rules of public international law, dealing with *occupatio bellica*, and which constitute part of the laws of war [HCJ 393/82, *Jama'it Iskan al-Ma'almun al-Tha'auniya al-Mahdoda al-Mashuliya* v. Commander of IDF Forces in the Judea and Samaria Region, *Piskei Din* 37 (4) 785, 793]."**

As to human rights and the dignity of persons at the checkpoints, and the various restrictions on freedom of movement, Justice Barak mentions in the above mentioned ruling:

> **"… The authority is preventative, that is, it looks toward the future, and use should not be made of it unless necessary to prevent foreseen danger… This authority cannot be exercised… unless the entirety of the evidence brought before the Military Commander indicates a foreseeable future danger from the Petitioner, if the steps taken and intended to limit his activity and prevent a significant portion of the damage expect from him are not taken [HCJ 554/81 Baransa v. Commanding Officer, Central Command, *Piskei Din* 36 (4) 247, 249; *see also* 615/85 Zaki Mohamed Abu Satiha v. Commander of IDF Forces].**
>
> **… The Supreme Court, sitting as the High Court of Justice, exercises judicial review over the lawfulness of exercise of the Military Commander's discretion. The starting point guiding this Court is, that the Military Commander and his subordinates are public servants, carrying out a public role pursuant to the law [HCJ 393/82 supra, at 809].**



[Stamp] P 2: 290 [continued]

[Line numbering in Hebrew original]

Date: 2 Shevat 5765
January 12, 2005

File Number: 2268/04

**In this judicial review, we do not make ourselves experts in matters of security. We do not replace the security considerations of the Military Commander with our own security considerations. We do not take any position as to the manner of conducting security matters [compare HCJ 3114/02 Baraka v. Minister of Defense, *Piskei Din* 46 (3) 11, 16]. Our role is to preserve the boundaries and ensure the existence of the conditions that constrain the discretion of the Military Commander [*see* HCJ 680/88 Schnitzer v. Chief Military Censor, *Piskei Din* 42 (4) 617, 640].**

**... The State of Israel is going through a difficult period. Terror is striking at its residents. Human lives are being cut down. Hundreds are killed. Thousands wounded. The Arab population in the Judea and Samaria region and the Gaza Strip region is also suffering unbearably. All this, because of the acts of murder, killing and destruction being carried out by terrorists. Our hearts go out to Mrs. Kessler, who lost her daughter in a vile act of terror, and to all the other Israelis who have lost their dear ones, or have themselves been severely harmed by the terror incidents. The State is doing all that is within its power to protect its citizens and ensure the security of the region. These measures are limited. The limitations are, first and foremost, military and operational. It is hard to fight someone who is prepared to turn themselves into a living bomb. These limitations are also normative. The State of Israel is a freedom-loving democracy. It is a democracy that is defending itself, as part of its right to self-defense – a right recognized by the United Nations Charter. The State seeks to act within the framework of the legal possibilities available to it, under the international law which applies to it, and under its own internal law. Indeed, the State of Israel is waging a harsh struggle against terror. This is a struggle being done by law, and with the tools that the law makes available to it. There is a**

[Stamp] P 2: 291

**well-known saying, that at times of war, laws fall silent (Inter arma silent leges). [*See also* All the Laws but One, W. Rehnquist (1998), 218]. This saying reflects neither the actual, nor the desirable, law. It was well put by Lord Atkin, in the case of Anderson v. Liversidge All E.R. (1941) 3 338, 361, when he stated:**

> **'In England, amidst the clash of arms, the laws are not silent. They may be changed, but they speak the same languages in war as in peace. it has always been one of the pillars of freedom, one of the principles of liberty for which… we are now fighting, that the judges… stand between the subject and any attempted encroachments on his liberty by the executive, alert to see that coercive action is justified in law.'**

**… Indeed, even when the cannons roar, the Military Commander must still keep to the law. The strength of a society to stand up against its enemies is based on the recognition that it is fighting for values that are worthy of being defended. The rule of law is one of those values" [HCJ 168/91 Morkos v. Minister of Defense, *Piskei Din* 45 (1) 467, 470]. "We have established here a law-abiding state, which implements its national goals and the vision of the generations, but which does so while recognizing and implementing human rights, in general, and human dignity in particular" [HCJ 3451/02 Al-Mandi v. Minister of Defense, *Piskei Din* 56 (3) 30, 35]. It was well stated by my colleague, Justice M. Cheshin, when he said:**

**"We will not weaken our efforts to act for the rule of law. We undertook by oath to rule justly, to be the servants of the law, and we will be faithful to our oath and to ourselves. Even when the trumpets of war cry out, the rule of law will make its voice heard" [HCJ 1730/96 Sabih v. Commander of IDF Forces in the Judea and Samaria Region, *Piskei Din* 50 (1) 353, 369].**



[Stamp] P 2: 291 [continued]

[Line numbering in Hebrew original]

Date: 2 Shevat 5765
January 12, 2005

File Number: 2268/04

> **... Indeed, the situation of the State of Israel is serious. Our task, as judges, is also not easy. We do all that is within our power to find an appropriate balance between human rights and the security of the region. In this balance, human rights cannot obtain full protection, as though there were no terror, and the security of the State cannot obtain full protection, as though there were no human rights. A sensitive, fine balance is required. That is the price of democracy. It is a costly price, but one that is worth paying. It strengthens the power of the State. It gives reason to its struggle. As for us, as judges, our task is difficult. But we cannot, nor do we wish to, avoid this difficulty..."**

Until today, December 2004, the number of victims of murderous terrorist attacks under the auspices of "political reasons" has exceeded 1000 killed, and thousands of others wounded.

The Defendant in this case, Mahmoud [sic, should be Mohamed] Ma'ali, did not operate in a vacuum, but rather in an atmosphere of terror and murders that starts from the top of the Palestinian pyramid, and from there, there is no longer a need for exact direction for all this release of evil, so familiar from the taking of the lives of others throughout history.

The law is the same in Israel and in all countries, and the law is the same in the Region. A murderer seeks reasons of justice, while the spilled blood demands appropriate punishment, but more than anything else, the actions of the Defendant shall be seen in the overall, broad context of the atmosphere of terror.

**<u>To the matter of the Defendant in the case before us</u>**

In the two terrorist attacks in which the Defendant in the case before us participated, 19 people were murdered. The blood of the elderly, adults, women and children cry out to mankind as a whole from the earth. And we, who sit in judgment, seek to do the work of Heaven, to judge one who spills human blood. Into our hands is given the responsibility to quantify the punishment of

[Stamp] P 2: 292

this individual in the eyes of families weeping over the loss of human life, the loss of life of their dear ones. All that is left for us is to take the law of the region, and to apply strict justice, to the extent that the power of any judge reaches in punishing the person who carries out the most heinous of crimes – a "terrorist attack", "intentionally causing death", a "murder."

A national struggle and civil disobedience should not operate through the murder of a civilian population. If the region is in a state of "war" or "conflict", then the actions of the Defendant and his gang are a **"war crime" or a "crime in conflict."** If we are talking of security criminality in the "region," then these are crimes of murder in the **most severe circumstances in human history**. The "heroism of cowards" against children, women and unarmed civilians.

A serial killer or vile rapist – no one doubts that they are despicable and to be excluded from all society. Ostensibly, the blowing up of a bus full of civilians, women and children, claiming that it was done because of the "occupation", or the harsh life of the refugee camps, or the difficulties of making a living, or the instructions of the soldier at the checkpoint leading into Israel, might be thought by one person in the world as being different, but it is not so. Herein lies the great danger in the consciousness of any society.

Every murderer generally has a "reason". One will murder for control in the underworld, another will murder for "control in the world above"; one because his share of heaven has run out, and the other because the heavens opened; this one because he was not betrayed in love, and that one because he fell in love with the act; one for money, the other because of poverty… Most of them have a reason or purpose for their act. "Murder is by intent, not by apathy," and thus the question is asked, is there a society that is prepared to find justifications for spilling the blood of one of its members? Is there a society that is prepared to see murder as a tool for expressing protest? Is there a society that is prepared to see its infants burned on the buses, its girls with their pretty braids, and its families torn apart into body parts scattered in all directions, because someone



[Stamp] P 2: 292 [continued]

[Line numbering in Hebrew original]

Date: 2 Shevat 5765
January 12, 2005

File Number: 2268/04

has a reason? Because one man has the superiority to allow himself or his flock to murder another human being on this earth? A society that justifies the reason is itself the murderer, and it is that society that should stand in the dock.

The Defendant murdered 19 people, and wounded about one hundred – helpless, innocent – others, on buses on their way to their daily routine. The blood of the other, the different, may be spilled, and it is proper for this Court that the laws of human reason support it in doing universal justice, justice of all human beings, wherever they may be, and I have no doubt that this sentence would have been given, word for word, in any normal country peopled by an enlightened people – the sentence of a sane humankind.

The terrorist himself died in his murderous suicide, as he had planned. The Defendant here, who was a full accomplice, is alive and stands before us, a despicable human being. The lowest level of humanity stands before us in a military courtroom, in front of the whole world, and all we can do is count the nineteen murder victims, and give him the corresponding number of terms of life imprisonment. To imagine the dozens of wounded, who lost limbs, and others, and to add more terms of life imprisonment. The inkwell on my desk would seek to burst at the sight of the broken families of the murdered, the cities of Israel in mourning, and it would ask judicial logic – how can one be so helpless at a time of such evil, and how can one be so helpless in punishing this evil in its proper measure?

Our Defendant was not pulled in, willy-nilly, but rather was in on the secret, an accomplice who made his contribution by tricks and deceit, with advance knowledge as to the goal and the method, and because of his "success" in bringing a suicide terrorist into the State of Israel the first time, he was given that mission a second time. At the end of each of bloody task, the Defendant says that "**he went back to sleep**." He, the Defendant, was capable of going back to sleep, while whole families did not sleep, and will not sleep, at night, for many years, because of the loss of their loved ones, and many of the wounded will re-experience, in the midst of their sleep, the horrific sights of amputated and burned limbs, and will awaken in fear for years.

The Defendant was not an innocent victim of persuasion, who only discovered after the terrorist attack that the person whom he guided and transported into Israel was a human time bomb. Rather, he carried out his wishes, as in the past, when with his own strength he threw Molotov cocktails, and later pipe bombs, at soldiers. After that, he placed a 12 kilogram explosive device

[Stamp] P 2: 293

near a gas station where vehicles would pass. And it is only on the basis of knowledge, willingness and a farewell blessing for the suicide terrorist, that he led – via secret paths known to himself, a suicide terrorist to a place thronging with people, near the Malha Mall in Jerusalem, within Israel, and caused the deaths of 11 people and the wounding of dozens. **Three weeks had not passed from then**, and he is already carrying out the same act, bringing another suicide terrorist into Israel, and causing – in a devilish partnership – the deaths of a further 8 people, and the wounding of dozens. A human animal, who at the age of 26 chose to kill as many as possible – old people, women, children. Such is the Defendant before us.

The Defendant, in 2000, himself threw Molotov cocktails at soldiers of the Israel Defense Forces, one of them at **Rachel's Tomb**, a place holy to the Jewish religion, where Rachel, the mother [sic, should be wife] of Jacob, one of the fathers of the Jewish nation according to Jewish tradition, is buried. Similarly, the Defendant and his accomplices threw Molotov cocktails at Israeli soldiers near **the church in Bethlehem**, a place holy to the Christians. On a later occasion, when he had to flee after placing the bomb, the Defendant and his accomplices fled to the **Church of the Nativity** in Bethlehem. Before the departure of the suicide terrorist, the Defendant blessed him. It was important to the Defendant that the terrorist attack be associated with the **al-Aqsa Martyrs Brigades**. **Everything is holy, and so to the most horrific of acts.** The business of this Court is not with heavenly holiness, but with earthly law, which the Defendant attacked.

The *mens rea* of the Defendant as a full accomplice is reflected in his prior knowledge as to his role as part of the terrible murderous operation of mass murder, in transport of the suicide murderer



[Stamp] P 2: 293 [continued]

[Line numbering in Hebrew original]

Date: 2 Shevat 5765
January 12, 2005

File Number: 2268/04

into Israel, in his awareness and personal wish for the desired outcome, while deceiving others as to the road by which he will take the suicide terrorist. In his own words, from his statement, filed by consent, the Defendant said:

> **"But I didn't say to Ahmed that I was taking him to the Walaja Road... I was afraid that Ahmed would tell someone and I would be discovered, and this is also '*akhtiatath*', security preparations... and Walaja is a road where there are no checkpoints and it's a safe road..."**

The Defendant knew the environs of the Malha Mall, the largest shopping center in Jerusalem, and it is to near there that he brought the suicide terrorist.

The two explosive devices were in a "**school bag**," and, as the Defendant explained in his statement, filed by consent: "He (the terrorist) wore a school bag, which was the explosive device, and in his hand he held books, **so that they would think he was a school student**..."

The Defendant received the task of transporting the first suicide terrorist from Ahmed Abu-Ghadeb who was, in his words, an operative of the **Palestinian Authority's Intelligence**.

A sinister bestial urge motivated the Defendant to spill human blood. The Defendant made this clear in his words:

> **"I knew exactly when I took the suicide terrorists that they were going to execute a suicide terrorist attack in Jerusalem."**

The Defendant took the suicide terrorist, but was not present at the time of the explosion. Appeals (Judea and Samaria) 64+66/02 The Military Prosecution v. Abdul Karim Aziz Abdul Karim Hanini and Appeals (Judea and Samaria) 101/03 Shadi Ibrahim Qasam Ghamouri v. The Military Prosecution have already established that the accomplice's presence at the scene of the crime is not a condition for his being defined as an accomplice.

[Stamp] P 2: 294

The ruling of the Supreme Court of Israel, Criminal Appeals 426/67 Be'eri v. State of Israel, establishes that one who provides information, which serves in the commission of the crime, or one who provides the means for carrying out the crime, will be considered a full accomplice in the crime, if this assistance was given with the intention of assisting the principal perpetrator. The present Defendant knew that others needed the Angel of Death's road. He knew, he took him, hand in hand, he blessed him, he rejoiced in the outcome, and sought to murder again.

In the **ruling in Appeals (Judea and Samaria) 4/04 Bachar Mohamed Amin Abu Abid v. The Military Prosecution**, the defendant drove the suicide terrorist. Although he was not involved in initiating and planning the terrorist attack, but was only in contact with the person dispatching the suicide terrorist and drove the terrorist into Israel, with knowledge of the purpose, the court there ruled that he was nothing less than a full accomplice and key player, who implemented the terrorist attack. There too he was sentenced to two cumulative terms of life imprisonment for two crimes of intentionally causing death, and one of attempting to intentionally cause death.

The Defendant and his accomplices were the operators, while the suicide terrorist was the tool and an object in their hands, a time bomb which they had prepared and through which they carried out their sinister desire. The Defendant was aware, active, independent, contributing, helping, an accomplice with a unique key role to the one and only goal, bringing about the murderous outcome of masses of people, their blood flowing from them.

The public interest overrides the private interest, the deterrent over the individual, considerations of defense over the public weal [and in this regard mention has already been made of the ruling of the District Court in Tel Aviv, Criminal Cases 1135/00 State of Israel v. Shahar Romano, and also Criminal Appeals 490/89 John Doe v. State of Israel. Similarly, reference to the plague



[Stamp] P 2: 294 [continued]

[Line numbering in Hebrew original]

Date: 2 Shevat 5765
January 12, 2005

File Number: 2268/04

of this region and a common crime, for its purposes, was made in Criminal Appeals 796/79 Avshalom Tzur et al v. State of Israel, Criminal Appeals 257/89 Yigal Sebag v. State of Israel, and Criminal Appeals 329+332/87 State of Israel v. Uri Bar On).

The imposition of life imprisonment for the crime of attempting to intentionally cause death has been brought before us in the rulings in Appeals (Judea and Samaria) 120+122+151+153/02 Ashraf Nufal *et al* v. The Military Prosecution, Appeals (Judea and Samaria) 251/03 Basisi v. The Military Prosecution, and Appeals (Judea and Samaria) 312/02 The Military Prosecution v. Jerouf. This list allows the Court suitable leeway in terms of penalty, appropriate to each individual instance, from imprisonment for a period of time through to the total nation of the individual's freedom through life imprisonment. In the present case, fifty wounded in each terrorist attack are deserving of life imprisonment for each instance separately. Two incidents of attempted murder, 50 people in each, in my view require two separate terms of life imprisonment on the level of a message, since what difference is there between 20 terms of life imprisonment, or 21 terms, all of which only serve to express the immensity of the tragedy.

Mankind has expressed its revulsion at the intentional murder of innocents, even in times of war or violent conflict in disputed territories. All those who use the political, or even military, conflict to carry out crimes against the population, anywhere in the world, such as "ethnic cleansing" or "murder of innocent women and children," do not have a place among freedom fighters, but rather among war criminals. Thus were placed on trial those criminals and murderers who released their vile inclinations, under the guise of ideological struggle, which they submerged in the blood of women and children.

Terror is not merely murder for criminal reasons, as was brought before this Court. Rather, its essence is to intentionally strike at or endanger the innocent, so as to sow fears, for political purposes. To ignore the defect in the act, given its motives and ideas, is to take its sting away. A freedom fighter fights against oppression, but does not impair the rights of the innocent. Therefore, he cannot justify taking the lives of civilians, children, passersby, or innocent bus travelers on their way to work. Any attack against these is an act that no man in tomorrow's world, and particularly today's, can interpret as being different from "murder," "terror" or a "war crime," worthy of a deterrent penalty and a broad, universal and international message.

[Stamp] P 2: 295

**Terrorists fight against the law, by breaking it. This Court is called upon to fight the battle of the law against those who rise up against it.**

Following the Second World War, and specifically in its aftermath, the world sought to learn its lesson. In international conventions, in the principles of the war against universal crimes, and also in disputes between nations. Rules were established under which, even in belligerent conflict, there are customary universal values, foremost among them that innocent civilians are not to be attacked.

Unbounded democracy, freedom and pluralism, in the world in general and in this Region in particular, when war has been declared against terror, may themselves be the seeds of their own destruction. Therefore, every court, both in the Region and throughout the world, must deal severely with any phenomenon in which terror lies at its foundation.

Even if there is uncertainty in this "region" as to its political future, we cannot but base the laws and the legal principles on the struggle against murderous acts of terror, which make the individual afraid to walk in the street, or ride on the bus. The Defendant, and those who are like him, sought – and seek – to sow dread, and so this Court, and [those] in all parts of the enlightened world, are required to have its say, loudly, in the face of the silence of fear.

**International law forbids all systematic attacks on non-combatants. This is an immoral and unjust act, and its criminal prohibition goes so far as to its being determined, under international law, as a war crime.**



[Stamp] P 2: 295 [continued]

[Line numbering in Hebrew original]

Date: 2 Shevat 5765
January 12, 2005

File Number: 2268/04

The Defendant, through all his actions, struck at human dignity and the right to life and liberty. This attack on the principle of the sanctity of life leaves the court with no choice but to prevent him from having freedom for the whole of his life.

The whole idea of terror and the terrorist attacks in the Region and in Israel is only aimed at **striking at the population** only by virtues of their **being a population**. It is known that the whole purpose of bus attacks is to strike at and kill the largest number of innocent civilians as possible, specifically because they are innocent, and apart from the fact that this causes shock, fear and disruption to the routine of normal life, **so that those living in Israel or in the Region should not be able to maintain, as do their fellow citizens of the world, a peaceful, normal life in their countries.**

The Defendant cannot seek "national justification" for the murder of 19 innocent people, and wounding of approximately one hundred. The citizens of a state that had brought the bones of its people back to life, the bones of the Jews who were burned in the killing pits and crematoria of Europe. The Defendant knowingly transported human bombs, which killed twenty-one people, burned on that bus, and wounded a bleeding nation once again.

The Defendant chose terror, with all that this entails, as a way of life, while identifying strongly and searching unceasingly to carry out murderous acts. Therefore, the Court would be derelict toward mankind, and toward all the nations of the worlds, were it not to remove the Defendant from society in general, and forever. The law in this Court will speak with a single tongue and few words, under which the murder should be removed for all time, for all of his life, for having taken the life of another.

Intentionally causing death, in the circumstances of murder of an innocent population, should be seen as bearing – since time immemorial – the stamp of an international, universal crime, forbidden by all the laws of nations for being the murder of innocents. This is so, even at times of conflict between peoples, even in war, as in peacetime, particularly in a region where a permanent settlement has not yet been arranged, and specifically because it is such.

[Stamp] P 2: 296

The murder of a civilian population, and included in that is the murder of women and infants on their innocent journeys by bus – such a crime draws after it universal criminal liability, as well as giving each and every country, and certainly judicial tribunals in the region of conflict, the jurisdiction to judge one who lent his hand to this crime, and to punish him.

In sitting in judgment, I am commanded to suppress my feelings, and sentence this Defendant by the criteria that this Court has courageously established, even in the trying circumstances of the mounting slaughter of Jews and Israelis, being a court in the "Region" that has a broad view of the law in the Region, and of universal human laws.

In respect of the defense attorney's critique of cumulative terms of life imprisonment, for each life taken through the Defendant's actions, I would quote the words of a justice of the Supreme Court of Israel, the Honorable Dalia Dorner, in the Popper case, in which the murderer of Arabs was convicted and sentenced to cumulative terms of life imprisonment [Criminal Appeals 1742/91 Popper v. State of Israel, *Piskei Din* 51 (5) 289, 303, 307].

> **"... When it comes to acts of violence, each of the victims has an independent interest of bodily integrity. The attack against the bodily integrity of the one does not constitute an attack against the bodily integrity of another. Even if, from a 'technical' point of view, this is a single sequence of acts that led to a number of victims, it should be addresses as separate acts of assault.**



[Stamp] P 2: 296 [continued]

[Line numbering in Hebrew original]

Date: 2 Shevat 5765
January 12, 2005

File Number: 2268/04

**18. This conclusion is also necessary from a moral point of view, which recognizes the sanctity of human life as a fundamental value. The value of human life, and our deep revulsion from acts that strike at it, must also find explicit and separate expression in the framework of sentencing, both in regard to the number of penalties to which the Defendant should be sentenced, and to their being cumulative. Although the act of murder of a single person is, in itself, a serious, vile act, second to none, to impose the same penalty on someone who murdered one person, and on someone who murdered many, may be interpreted as weakening the significance of the value of human life, and may even affect the extent of deterrence. Since, what would stop a murderer from multiplying his victims, if for all of the additional victims, he would not be liable to any additional sentence?**

**For these reasons, a terrorist, who with a knife stabbed people waiting at a bus stop, and others he encountered in his way, thus causing the deaths of two and the wounding of three, was sentenced to two separate terms of life imprisonment, and ten years imprisonment for each of the crimes of attempted murder. It was set that these punishments should be served cumulatively. As [Court] President Shamgar stated, in Criminal Appeals 399/89, State of Israel v. Zalum, *Piskei Din* 46 (2) 187: 'To impose overlapping terms of imprisonment for a number of acts of murder – even in relation to those carried out in a single series – may, by implication, minimize the horror of maliciously, intentionally causing the deaths of a series of people… Our belief in the sanctity of human life must also find its expression in the punishment of the offender, and in emphasis of the significance of each life taken before us.' I therefore accept the view that not only should a separate penalty be imposed for each crime, but that the separate acts of taking human lives should also find expression in the punishments being cumulative.**

[Stamp] P 2: 297

> **For similar reasons, it has been ruled that, with a person already sentenced to life imprisonment for an act of murder, who commits a further murder, the penalty of life imprisonment for the additional crime should be cumulative to the life imprisonment for the previous crime."**

The words of the Honorable Justice M. Cheshin, in that same judgment, deepened the foundations for the theoretical concept of life imprisonment for each life. As stated, in this instance a Jew murdered seven Arabs, residents of the territories, as they were about to leave for their daily routine:

> **"In a certain place, on the side of the highway connecting Rishon Lezion and Nes Ziona, Arab workers from the territories gather each morning, before setting off for their day's work. The Appellant came to that assembly point, with a Galilon rifle in his hands, collected the workers, who were standing apart, and had them sit on the ground in rows. Subsequently he aimed the rifle at those sitting there, and fired on them on automatic, from right to left and left to right. Seven workers were killed, and ten more wounded.**
>
> **5. … In HCJ 4162/93 <u>Federman v. State Attorney General</u>, *Piskei Din* 47 (5) 309, 329-330, the following is written:**
>
>> **"One who intentionally causes a life to be lost from the world is a murderer, and shall bear the punishment appropriate to a murderer. That is what the criminal codex states. And if he took the lives of a hundred people, a thousand, ten thousand, a hundred thousand people? A criminal codex drawn up for daily life in human society has no answer to that question. The dictionary on our table has no definition for such acts. It is our duty to think from first principles, if you like: to put words together, and to form legal definitions. Thus you have the Nazi and Nazi Collaborators (Punishment) Law, within which are definitions for crimes against the Jewish people, crimes against humanity, war crimes, and crimes against oppressed peoples."**



[Stamp] P 2: 297 [continued]

[Line numbering in Hebrew original]

Date: 2 Shevat 5765
January 12, 2005

File Number: 2268/04

**So too with the acts of people whose "dimensions and force were like those of natural phenomenon" (ibid., 330). Customary behavioral norms are insufficient, and so a unique regime of norms was applied to those acts.**

**7. A man – any man – is a world for himself. A man – any man – is one, single and unique. One who was will not be again, one who has passed on will not return. It was Maimonides who taught us of the uniqueness of man (Book of Judges, Laws of Sanhedrin, 12, 3):**

> **"Man was created alone in the world, to teach: that one who destroys a single life from the world, it is considered as though he destroyed a whole world, and one who preserves a single life in the world, it is considered as though he preserved a whole world. All of the people of the world are created in the form of Adam, the first human, yet the face of one is not like that of his fellow. Thus, each and every individual may say: the world was created for me."**

**This is man, and this is his uniqueness. Can this be said about a book, or a safe? We are told that the uniqueness of the individual comes to him because God created him in His image: "In his image, in the image of God He created him…" (Genesis 1:27). While I myself say, that the uniqueness of man – every man – is that he was created in the image of man. This is the beginning of the Bible. And this is also its end.**

**8. This is also the case in regard to the crime of murder. This is also the case in regard to the punishment to be imposed on one who has murdered. Indeed, life imprisonment for the crime of murder is imprisonment until one's soul departs. From a**

[Stamp] P 2: 298

**conceptual point of view – and this is natural – there are not cumulative life terms. But it seems that we cannot express the depth of our horror at the acts of one who murdered the many, unless we impose upon him cumulative sentences. "Whoever sheds the blood of man, by man shall his blood be shed" (Genesis 9:6). In our day and age, we no longer– as a governmental act – spill human blood. It is also not possible to execute the same man twice. But cumulative terms of life imprisonment can be imposed on one who maliciously took human life. One life imprisonment for each soul."**

I have gone on long enough, because the written words are an integral part of the acts of punishment, for its normative purpose, in the Region and between peoples. Although it is generally held that the punishment should speak for itself, this is not the case where even the idea itself is deviant, and the Defendant is the poisoned fruit, and it is not the case when – frequently – all that remains of this are the written letters.

In light of the above, I propose that my colleagues sentence the Defendant as follows:

**For causing the death of the late Avraham Balhasan – life imprisonment.**
**For causing the death of the late Hannah Bonder – life imprisonment.**
**For causing the death of the late Anat Darom – life imprisonment.**
**For causing the death of the late Yechezkel Goldberg – life imprisonment.**
**For causing the death of the late Vladi Zadik Menbere – life imprisonment.**
**For causing the death of the late Viorel Octavian Florescu – life imprisonment.**
**For causing the death of the late Rose Boneh – life imprisonment.**
**For causing the death of the late Dana Itach – life imprisonment.**
**For causing the death of the late Roman Hondiashvili – life imprisonment.**
**For causing the death of the late Eli Tzipora – life imprisonment.**
**For causing the death of the late Natalia Gamril – life imprisonment.**



[Stamp] P 2: 298 [continued]

[Line numbering in Hebrew original]

Date: 2 Shevat 5765
January 12, 2005

File Number: 2268/04

**For causing the death of the late Yaffa Ben Shimol – life imprisonment.**
**For causing the death of the late Yuval Ozana – life imprisonment.**
**For causing the death of the late Rahamim Doga – life imprisonment.**
**For causing the death of the late Yehuda Haim – life imprisonment.**
**For causing the death of the late Ilan Avisidris – life imprisonment.**
**For causing the death of the late Benaya Yehonatan Zuckerman – life imprisonment.**
**For causing the death of the late Lior Azulay – life imprisonment.**
**For causing the death of the late Netanel Havshush – life imprisonment.**

For attempting to cause the deaths of dozens of others, the wounding of about one hundred people in the first and second terrorist attacks, and the other offenses of which the Defendant is convicted, the Defendant is sentenced to two additional terms of life imprisonment.

In total, the Defendant shall serve twenty-one terms of life imprisonment. All of the terms of life imprisonment shall be served cumulatively.

**The Honorable Presiding Judge, Major Yair Tirosh:**

I concur.

**The Honorable Judge Captain Renato Yarak:**

I concur *with the sentence of my colleague, Judge Dorani, and which the fundamentals of his reasoning.*

It is therefore decided as stated in the judgment of the Honorable Judge Captain Aryeh Dorani.

In conclusion, we sentence the Defendant to 21 (twenty-one) terms of life imprisonment, to be served cumulatively.

[Stamp] P 2: 299

**Right of appeal within 30 days.**

**Given and notified this day, January 12, 2005, in public and in the presence of the parties.**

| [Signature] | [Signature] | [Signature] |
|---|---|---|
| **Judge** | **Presiding Judge** | **Judge** |

-15-

[Stamp] P 2: 299 [continued]

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARK I. SOKOLOW, *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>THE PALESTINE LIBERATION ORGANIZATION, *et al.*,<br><br>Defendants. | No. 04 Civ. 00397 (GBD) (RLE) |

**DECLARATION OF RINA NE'EMAN**

Rina Ne'eman hereby certifies as follows:

1. The attached translation from Hebrew to English is an accurate representation of the document received by Rina Ne'eman Hebrew Language Services, to the best of my knowledge and belief. The document is designated as P2: 285-299.

2. I am a professional translator with a B.A. in International Relations from the Hebrew University of Jerusalem (Israel) and 30 years of translation experience. I am fluent in Hebrew and English, and I am qualified to translate accurately from Hebrew to English.

3. To the best of my knowledge and belief, the accompanying text is a true, full and accurate translation of the Hebrew-language document bearing the bates number, P2: 285-299.

[signature]
Rina Ne'eman