# EXHIBIT A.292
## (2 of 2)

ss.: New Jersey

On the [28] day of February, 2014 before me, the undersigned, personally appeared Rina Ne'eman, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is signed to this Declaration and acknowledged to me that he executed the same in his capacity, and that by his signature on this Declaration, the individual executed the Declaration.

Sworn to me this
28 day of February, 2014

Notary Public

HIRUT J MHRETE
NOTARY PUBLIC
STATE OF NEW JERSEY
MY COMMISSION EXPIRES SEPT. 7, 2015
I.D.# 2332704

תיק מס': 2268/04                                                    תאריך: ב' שבט, תשס"ה
                                                                        12 ינואר, 2005

בית המשפט הצבאי יהודה

בפני כב' האב"ד: רס"ן יאיר תירוש
שופט: סרן רנאטו יאראק
שופט: סרן אריה דורני

התביעה הצבאית
(באמצעות סגן יוסף מלקן)

נגד

הנאשם: מוחמד עיסא מוחמד מעאלי  ת.ז. 907377113 / שב"ס
(באמצעות ב"כ עו"ד חאלד אלאארג')

---

## גזר דין

### כב' השופט סרן אריה דורני:

הנאשם הורשע, על יסוד הודאתו בכתב האישום בפני ביהמ"ש, בעבירות הבאות:
**עבירה אחת של יידוי חפץ מבעיר ושתי עבירות של יידוי והנחת פצצה**, לפי תקנה
58(ב) לתקנות ההגנה; **תשע עשרה עבירות של גרימת מוות בכוונה ושתי עבירות
של ניסיון לגרימת מוות בכוונה**, לפי סעיף 51(א) לצו בדבר הוראות בטחון וסעיף
7(ג) לצו בדבר כללי האחריות לעבירה.

גזר דין זה לא מתייחס רק למספרי עבירות ולשמן המקצועי בספר החוקים, אלא
הינו תיאור איום של אחד הנוראים שבכתבי האישום בהם הודה נאשם באזור:
הובלתה של פצצת אדם מתקתקת למרכזי אדם כדי לרצוח ולזרוע מוות, מעשים של
טבח ילדים, נשים וטף ללא הבחנה וללא רחם, הרצון לשפוך דם אדם עד ימלאו
רחובותיה של עיר שוקקת חיים נחלי דם של מוות.

מראות הזוועה מתפרסמים. כוחות ההצלה מאספים חלקי גופתיהם של תשעה עשר
בני אדם יחדיו לצורה ושם, ואין להם דמות הגוף, ומשפחותיהם יקברו חלקי גוף
למי שכבר "זכה" לזכר יקירו מהתופת ומהשריפה. ואני, היושב בדין, נשאל על ידי
סניגורו של הנאשם מי הוא האשם, כאילו יש איזושהי הבנה או איזשהו הצדק
למעשיה הנתעב מכל, בעיני אלוהי הרוחות ושוכני ארץ, מעשה **רצח ילדים, נשים
ומבוגרים, נוסעי אוטובוס תמימים.**

כפי שמצווים אנו לכנס רגשותינו כבני אנוש, ולדון הנאשם במסגרת הקונגנטיבית של
מלאכת השפיטה, אתאר ראשית את המעשים כהוויתם וכפי שהודה בהם, ללא כל
חרטה, הנאשם בעצמו בפני ביהמ"ש, בליווי סניגורו, כפי שמתוארים הם בכתב
האישום בו הודה הנאשם, ואף באמרותיו, שהגשו בהסכמה לביהמ"ש באמצעות
סניגורו.

בתחילת חודש אוקטובר 2000, יידה הנאשם חפץ מבעיר בכוונה לגרום למותו של
אחר או פציעתו, דהיינו, במועד הנ"ל, הנאשם וחבריו יידו בקבוקי תבערה לעבר
כוחות צה"ל.

במהלך חודש אפריל 2002, במספר הזדמנויות, יידה הנאשם וחבריו מטעני צינור
לעבר כוחות צה"ל שעברו בבית לחם.

-1-

P 2: 285

תאריך: ב' שבט, תשס"ה          תיק מס': 2268/04
12 ינואר, 2005

במהלך חודש אפריל 2004 היה הנאשם שותף להנחת פצצה מתוך כוונה לגרום      1
למותו של אחר או לפציעתו, דהיינו, הנאשם וחבריו הניחו מטען חבלה במשקל 12      2
ק"ג סמוך לתחנת דלק "דרוויש", במקום בו עוברים כלי רכב צבאיים.      3
                                                                              4
בתאריך 29/01/04, באזור ומחוץ לאזור, היה הנאשם שותף לגרימת מותם של      5
אחרים בכוונה, דהיינו:      6
                                                                              7
בתחילת חודש ינואר 2004 תיכננו ע/רחמאן (זאהר) יוסף ע/רחמאן מקדאד (להלן -      8
ע/רחמאן מקדאד), הפעיל הצבאי אחמד מוגרבי ועלי מחמד חמאד ואבו הלאיל (להלן      9
- עלי אבו הלאיל) לבצע פיגועים נגד מטרות ישראליות, שכללו פיגועי התאבדות.      10
בסמוך לכך, פנה הפעיל הצבאי חלמי ע/כרים מחמד המאש (להלן - חלמי המאש)      11
אל עלי ג'עארה והציע להפעישו עם פעיל צבאי, שישלח אותו לבצע פיגוע התאבדות.      12
עלי ג'עארה (להלן - המתאבד) הביע נכונות לכך.      13
                                                                              14
בהתאם לכך, הפגיש חלמי המאש את הפעיל הצבאי אחמד צלאח אחמד צלאח      15
(המכונה: אחמד אבו עידב) (להלן - אחמד אבו ע/דב) עם המתאבד בפגישה,      16
שבמהלכה בירר אבו עידב עם המתאבד את מידת נכונותו לבצע פיגוע התאבדות.      17
המתאבד הביע נכונות כאמור, ושניהם החלו להתכונן לביצוע פיגוע התאבדות.      18
                                                                              19
בסמוך לכך, החל ע/רחמאן מקדאד בייצור חומר נפץ, שישמש בביצוע פיגוע      20
ההתאבדות, וזאת באמצעות חומרים שהעביר אליו הפעיל הצבאי עלי אבו הלאיל.      21
בנוסף, עידכן אחמד אבו עידב את ע/רחמאן מקדאד בדבר איתור מתאבד המוכן      22
לבצע את פיגוע ההתאבדות, וביקש ממנו כי יכין בדחיפות את תיק הנפץ כדי      23
שישמש בביצוע פיגוע ההתאבדות.      24
                                                                              25
ע/רחמאן ביקש מאבו עידב לקנות עבורו חומרים לייצור תיק הנפץ (שכלל, בין      26
היתר, תיק, סוללות, מפסק וכו). אחמד אבו עידב נענה בחיוב ורכש, ביחד עם חלמי      27
המאש, את כל שנתבקש. בנוסף, ניסו אחמד אבו עידב וחלמי המאש למצוא מצלמת      28
וידאו על מנת לצלם את המתאבד בטרם ביצוע הפיגוע, אולם לא הצליחו בכך,      29
ולפיכך החליטו להוציא את המתאבד לביצוע הפיגוע מבלי לצלמו במצלמת וידאו.      30
                                                                              31
בסמוך לכך, פנה אחמד אבו עידב אל הנאשם הנ"ל וביקש ממנו להוביל מתאבד,      32
החמוש בחגורת נפץ, לביצוע פיגוע התאבדות בתוך שטח מדינת ישראל. הנאשם      33
הביע נכונות לכך.      34
                                                                              35
בהתאם לכך, הפגיש אחמד אבו עידב את הנאשם עם המתאבד.      36
                                                                              37
במקביל לאמור לעיל, ייצר ע/רחמאן מקדאד את תיק הנפץ לביצוע פיגוע      38
ההתאבדות באמצעותו, עדכן את אחמד אבו עידב בכך וביקש כי יבוא לקחת את      39
תיק הנפץ. כעבור מספר דקות הגיע אחמד אבו עידב, יחד עם המתאבד והנאשם,      40
לביתו של ע/רחמאן מקדאד. האחרון הסביר לאחמד אבו עידב ולמתאבד על אופן      41
הפעלת תיק הנפץ, והעביר להם את תיק הנפץ על מנת שזה ישמש בפיגוע      42
ההתאבדות, וזאת בכוונה לגרום למותם של אזרחים ישראליים.      43
                                                                              44
בסמוך לכך, יצאו הנאשם, המתאבד ואחמד אבו עידב לכיוון האוניברסיטה בבית      45
לחם, שם ניטרל אחמד אבו עידב את מנגנון האבטחה של מטען החבלה על מנת      46
להכין אותו לפעולה. לאחר מכן עזב אחמד אבו עידב את הנאשם עם המתאבד.      47
                                                                              48

-2-

תיק מס׳ : 2268/04                                    תאריך : ב׳ שבט, תשס״ה
                                                    12 ינואר, 2005

לאחר שאחמד אבו עידב עזב אותם, בסמוך לשעה 06:30, הוביל הנאשם את       1
המתאבד לירושלים דרך כפר וולג׳ה, עד שהגיעו סמוך לקניון מלחה בירושלים. שם    2
נפרד הנאשם מן המתאבד וחזר ל״אזור״.                                    3
                                                                    4
בסמוך לכך, עלה המתאבד לאוטובוס אגד בקו 19 שנסע לכיוון כיכר צרפת. כשהגיע     5
האוטובוס לפינת הרחובות ארלוזורוב ועזה, סמוך לשעה 08:45, הפעיל המתאבד    6
את תיק הנפץ שהחזיק עליו, בכוונה לגרום למות מספר רב של בני אדם. כתוצאה    7
מכך, התפוצץ תיק הנפץ בתוך האוטובוס (להלן - **פיגוע ההתאבדות**).         8
                                                                    9
כתוצאה מפיגוע ההתאבדות האמור נגרם מותם של :                          10
                                                                    11
**אברהם בלחסן ז״ל;**                                                 12
**חנה בונדר ז״ל;**                                                   13
**ענת דרום ז״ל;**                                                    14
**יחזקאל גולדברג ז״ל;**                                              15
**ולדי צדיק מנברה ז״ל;**                                             16
**ויורל אוקטביא פלורסקו ז״ל;**                                       17
**רוזה בונה ז״ל;**                                                   18
**דנה איטח ז״ל;**                                                    19
**רומן חונדיאשווילי ז״ל;**                                           20
**אלי צפורה ז״ל;**                                                   21
**נטליה גמריל ז״ל.**                                                 22
                                                                    23
בנוסף, וכתוצאה מהפיגוע, נפצעו גם יותר מ**חמישים אזרחים** בדרגות פציעה קשות    24
וקלות.                                                              25
                                                                    26
הנאשם הנ״ל, באזור ומחוץ לאזור, בתאריך 22/02/04, היה שותף לגרימת מותם    27
בכוונה של אחרים, דהיינו :                                            28
                                                                    29
מספר ימים לפני המועד הנ״ל תיכננו ע/רחמאן מקדאד והפעיל הצבאי עז אלדין     30
עלייאן לבצע פיגוע התאבדות, זאת במטרה לגרום למותם של אזרחים ישראליים.     31
                                                                    32
עז אלדין עלייאן הודיע לע/רחמאן מקדאד כי איתר אדם בשם מוחמד זעול (להלן -    33
**המתאבד**) המוכן לבצע פיגוע התאבדות.                                 34
                                                                    35
ביום 17/02/04, אז בסמוך לכך, נפגש עז אלדין עלייאן עם המתאבד בכפר חוסאן.   36
במהלך הפגישה הסכים המתאבד לבצע את פיגוע ההתאבדות המתוכנן. בסיומה,       37
סיכם עז אלדין עלייאן עם המתאבד להיפגש עימו בסמוך לכניסיית המולד לבית לחם    38
ביום 21/02/04 בשעה 16:00.                                           39
                                                                    40
עז אלדין עלייאן עידכן את ע/רחמאן מקדאד בדבר תוכן הפגישה ובדבר הסכמתו של    41
המתאבד לבצע את פיגוע ההתאבדות. בהתאם לכך, יצר ע/רחמאן מקדאד קשר עם     42
אחיו, הפעיל הצבאי מאהר שגר בעזה, עידכן אותו בדבר תכנון לבצע פיגוע        43
התאבדות, וביקש ממנו סכום של 3000 ש״ח של מנת להכין את תיק הנפץ לפיגוע    44
ההתאבדות, וכן לקנות מצלמת וידאו לצורך צילום, זאת בהתאם לבקשתו של       45
מאהר מקדאד לצלם את המתאבד בטרם ביצוע פיגוע ההתאבדות.                  46
                                                                    47
מאהר מקדאד נענה בחיוב והעביר לחשבון בבנק הערבי בבית לחם, שרשום על שמו    48
של ע/רחמאן מקדאד, **סכום של 3,000 ש״ח לצורך מימון פיגוע ההתאבדות**, וזאת    49
כפי שסוכם עם ע/רחמאן מקדאד.                                          50

-3-

תיק מס׳: 2268/04                                    תאריך: ב׳ שבט, תשס״ה
                                                    12 ינואר, 2005

ביום 18/02/04, או בסמוך לכך, ניגש ע/רחמאן מקדאד לבנק הערבי בבית לחם
ומשך את סכום הכסף שהועבר אליו ממאהר מקדאד.

ע/רחמאן מקדאד רכש באמצעות חלק מסכום הכסף מצלמת וידאו ומצלמות רגילה,
לצורך צילום המתאבד. כמו כן, העביר לעלי אבו הלאיל ואחמד אבו ע/דב סכום
כסף, זאת על מנת, שירכשו חומרים לצורך הכנת תיק הנפץ לפיגוע ההתאבדות.

בהתאם, עלי אבו הלאיל קיבל מהפעיל הצבאי חאתם זכריא מחמוד אלאערג׳ (להלן
– **חאתם אלאערג׳**) ארבעה ליטרים חומר כימי מסוג מי חמצן, ומהפעיל הצבאי
אחמד עודה ארבעים ליטר חומר כימי מסוג אציטון. עלי אבו הלאיל העביר
לע/רחמאן מקדאד שנים עשר ליטרים חומר כימי מסוג מי חמצן, ושנים עשר
ליטרים חומר כימי מסוג אציטון.

ביום 20/02/04 ייצרו ע/רחמאן מקדאד, עלי אבו הלאיל ועז אלדין עליאן את תיק
הנפץ המיועד לביצוע פיגוע ההתאבדות.

בסמוך לכך, ביקש ע/רחמאן מקדאד מאחמד אבו ע/דב לבדוק עם הנאשם הנ״ל אם
הוא מוכן להוביל את המתאבד לביצוע פיגוע התאבדות. בהתאם לכך, נפגש אחמד
אבו ע/דב עם הנאשם, וביקש ממנו שיובל מתאבד נוסף לביצוע פיגוע התאבדות
בתוך שטח מדינת ישראל. הנאשם נענה בחיוב לכך.

באותו יום, בשעות הערב, הגיע אחמד אבו ע/דב לביתו של ע/רחמאן מקדאד כאשר
ברשותו כרוז עליו כתוב ״חוליית איימן ג׳ודה של ארגון ג׳דדי חללי אלאקצא״.
אחמד אבו ע/דב העביר את הכרוז לע/רחמאן מקדאד כדי שישמש כתמונת רקע בעת
צילומו של המתאבד. כמו כן, עידכן ע/רחמאן מקדאד כי הנאשם מוכן להוביל את
המתאבד.

למחרת בבוקר, העביר אחמד אבו ע/דב לע/רחמאן מקדאד מסמרי ברזל על מנת
שהאחרון ידביק אותם לתיק הנפץ, זאת כדי להגביר ולחחמיר את הפגיעות בעת
פיצוץ מטען הנפץ. ע/רחמאן מקדאד קיבל את מסמרי הברזל והדביק אותם לתיק
הנפץ.

באותו יום, סמוך לשעה 16:10, הגיע עז אלדין עליאן, מלווה במתאבד, לביתו של
ע/רחמאן מקדאד, על מנת להכין אותו לקראת היציאה לפיגוע.

בנוסף, הביא אחמד אבו ע/דב לע/רחמאן מקדאד רובה קלצ׳ניקוב ורימון יד, זאת על
מנת שזה יצלם את המתאבד כשהוא מחזיק ברשותו אמל״ח זה.

ע/רחמאן מקדאד ועז אלדין עליאן נתנו למתאבד אוכל ובגדים חדשים. לאחר
שסעדו ביחד עם המתאבד את ארוחת הערב, כתב עז אלדין עליאן צוואה עבור
המתאבד. ע/רחמן מקדאד ועז אלדין עליאן צילמו את המתאבד כשהוא מקריא את
הצוואה שלו. כשסיימו לצלם את המתאבד, החל ע/רחמאן מקדאד לייצר את תיק
הנפץ שישמש בביצוע פיגוע ההתאבדות. סמוך לשעה 05:30 בבוקר יום המחרת
סיים ע/רחמאן מקדאד לייצר את תיק הנפץ.

כשסיים לייצר את תיק הנפץ, כאמור ביום 22/02/04, התקשר ע/רחמאן מקדאד אל
אחמד אבו ע/דב והודיע לו כי הכל מוכן וביקש ממנו לבוא על מנת להוציא את
המתאבד לביצוע פיגוע ההתאבדות.

-4-

תיק מסי : 2268/04

תאריך : ב׳ שבט, תשס״ה
12 ינואר, 2005

1   בהתאם לכך, יצר אחמד אבו עידב קשר עם הנאשם וביקש ממנו כי ייפגש עימו.
2   שניהם נפגשו וביחד נסעו לכיוון ביתו של ע/רחמאן מקדאד, בו הסתתר המתאבד.
3   אחמד אבו עידב ביקש מהנאשם להמתין בסמוך למקום, הנמצא בבית לחם.
4
5   בסמוך לשעה 06:00 הגיע אחמד אבו עידב לביתו של ע/רחמאן מקדאד, לקח ממנו
6   את תיק הנפץ ויצא ביחד עם המתאבד לכיוון מרכז בית לחם, שם הפגיש את
7   המתאבד עם הנאשם. משם יצא המתאבד יחד עם הנאשם לכיוון ירושלים כאשר
8   הם עוברים דרך כפר וולג׳ה, זאת על מנת לבצע את פיגוע ההתאבדות כמתוכנן.
9
10   הנאשם הוביל את המתאבד למקום הנמצא בסמוך לקניון מלחה בירושלים, שם
11   נפרד ממנו וחזר לאזור.
12
13   בסמוך לאחר מכן, עלה המתאבד לאוטובוס אגד בקו 14 שנסע מכיוון דניה לכיוון גן
14   הפעמון בירושלים. כשנעצר האוטובוס באחד הרמזורים, הפעיל המתאבד את תיק
15   הנפץ בכוונה לגרום למות מספר רב של בני אדם. כתוצאה מכך, התפוצץ תיק הנפץ
16   בתוך האוטובוס (להלן - **פיגוע ההתאבדות**).
17
18   כתוצאה מפיגוע ההתאבדות הנ״ל נגרם מותם של :
19
20      **יפה בן שימול ז״ל;**
21      **יובל אוזנה ז״ל;**
22      **רחמים זדוגה ז״ל;**
23      **יהודה חיים ז״ל;**
24      **אילן אביסדריס ז״ל;**
25      **בניה יונתן צוקרמן ז״ל;**
26      **אזולאי ליאור ז״ל;**
27      **נתנאל חבשוש ז״ל.**
28
29   גם במקרה זה, כתוצאה מהפיגוע הנ״ל, נפצעו יותר מ**חמישים אזרחים** בדרגות
30   פציעה קשות וקלות.
31
32
33   מעשיו אלה של הנאשם נעשו כנגד אוכלוסיה אזרחית אל מול ישראל כמדינה. הם
34   חלק מ״התקוממות״ בדרך של פגיעה במורל ובחוסן הנפשי של מדינה שלמה ושל
35   אומה ישראלית מאופקת. תחילתו של המעשה ב״אזור״, ותוצאתו העיקרית
36   בישראל.
37
38   הנאשם ביקש להצדיק את מעשיו באמצעות סניגורו בטענת החיים הקשים במחנות
39   הפליטים ובמחסומים, המצב הכלכלי, הכבוד הלאומי הפלסטיני ועוד. לעניין זה
40   ראוי להתייחס לא מצד אשמו המוחלט של הנאשם, אלא מצד קוראי מעשיו
41   בסביבתו החברתית, הגדרת המעשים בהקשר הלאומי בעיני מדינות עולם, וראיית
42   התמונה השלמה בעיני עם ועמים.
43
44   נשיא ביהמ״ש העליון של מדינת ישראל, השופט אהרון ברק, בבג״ץ 7019/02+7015
45   מצויין את הדברים הבאים, בטרם ידע ומה את הידוע והמפורסם לנו היום, דצמבר
46   2004. עד היום נרצחו בפיגועים למעלה מ-1000 ישראלים, אלפים אחרים נפצעו, ומי
47   יודע מה צפונות העתיד. וכך הוא כותב ב-2002 :
48
49   **״מאז סוף חודש ספטמבר 2000 מתנהלת באזורי יהודה והשומרון וחבל עזה**
50   **לחימה קשה. אין זו פעילות משטרתית. זהו סכסוך מזויין. במסגרתו בוצעו**

-5-

תאריך: ב' שבט, תשס"ה                                          תיק מס': 2268/04
12 ינואר, 2005

כ-14,000 פיגועים נגד החיים, הגוף והרכוש של אזרחים ותושבים
ישראלים חפים מפשע, ובהם זקנים וילדים, גברים ונשים. למעלה מ-600
אזרחים ותושבים של מדינת ישראל נהרגו. למעלה מ-4500 נפצעו, חלקם
באורח קשה ביותר...

... לחימתה של ישראל סבוכה היא. הצד הפלסטיני מתשמש, בין השאר,
במצבעים-אדם מונחות. מתאבדים אלה מגיעים לכל מקום בו מצויים
ישראלים (בתחומי מדינת ישראל ובתחומי הישובים היהודיים באזורי
יהודה והשומרון וחבל עזה). הם זורעים הרג ודם בערים ובישובים. אכן,
הכוחות הנלחמים בישראל הם טרוריסטים; הם אינם נמנים על צבא סדיר;
הם אינם לובשים מדים; הם מסתתרים בתוך האוכלוסיה הפלסטינית
האזרחית באזור, לרבות במקומות קדושים; הם זוכים לתמיכת חלק
מהאוכלוסיה האזרחית בגלל וכן לתמיכתם של בני משפחה וקרובים
בכפרם. מציאות חדשה וקשה ניצבת בפני מדינת ישראל, הנלחמת על
בטחונה ובטחון אזרחיה. מציאות זו מצאה לא פעם את דרכה לבית משפט
זה [ראו בג"ץ 2936/02 עמותת רופאים לזכויות אדם נ' מפקד כוחות צה"ל
בגדה המערבית, פ"ד נו (3) 3; בג"ץ 2117/02 עמותת רופאים לזכויות אדם
נ' מפקד כוחות צה"ל בגדה המערבית, פ"ד נו (3) 28; בג"ץ 3451/02 אלמדני
נ' שר הבטחון, פ"ד נו (3) 30, 36].

במאבק זה של ישראל כנגד הטרור היא נוקטת - מכוח זכותה להגנה עצמית
- במבצעי לחימה מיוחדים (מבצע "חומת מגן", שהחל במרץ 2002, ומבצע
"דרך נחושה", שהחל ביוני 2002 וטרם הסתיים). מטרת המבצעים היתה
הכרעת תשתית הטרור הפלסטינית ומניעת הישנותם של פיגועי הטרור.
במסגרת פעולות אלה נכנסות כוחות צה"ל לשטחים רבים שהיו בעבר
בשליטתו של מכוח תפיסה לוחמתית ואשר העברו בהסכמים לשליטתה
(המלאה או החלקית) של הרשות הפלסטינית. הצבא היתקל סגרים וכתרים
על אזורים שונים, נאספו כלי נשק וחומרי חבלה, נעצרו מבוקשים...

... מבחינה משפטית המקור לסמכותו ולכוחו של המפקד הצבאי באזור
הנתון לתפיסה לוחמתית הוא בכללי המשפט הבינלאומי הפומבי, שעניינם
תפיסה לוחמתית (occupatio bellica), והמהווים חלק מדיני המלחמה [בג"ץ
393/82 ג'מאית אסכאן אלמעלמון אלתעאונויה אלמחדודה נ'
מפקד כוחות צה"ל באזור יהודה והשומרון, פ"ד לז (4) 785, 793]."

באשר לזכויות אדם וכבודם של האנשים במחסומים ובהגבלות שונות על חופש
התנועה, מציין השופט ברק בפסק הדין הנ"ל:

"... הסמכות היא מניעתית היינו פניה אל העתיד ואין לעשותו בה שימוש,
אלא אם כן מתחייב הדבר כדי למנוע סכנה צפויה... לא ניתן להפעיל את
הסמכות... אלא אם כן היה בה במכלול הראיות, שהובאו בפני המפקד הצבאי,
כדי להצביע על סכנה, הצפויה מן העותר חלק נכבד מן הנזק הצפוי ממנו [בג"ץ
554/81 בראנסטה נ' אלוף פיקוד המרכז, פ"ד לו (4) 247, 249; ראו גם בג"ץ
615/85 זכי מחמד אבו סתייחה נ' מפקד כוחות צה"ל].

... בית המשפט העליון, בשבתו כבית משפט גבוה לצדק, מפעיל ביקורת
שיפוטית על חוקיות הפעלת שיקול דעתו של המפקד הצבאי. נקודת המוצא
המדריכה בית משפט זה היא ,כי המפקד הצבאי ועושי דברו הם עובדי
ציבור הממלאים תפקיד ציבורי על פי דין [בג"ץ 393/82 הנ"ל, בעמ' 809].

-6-

תיק מס': 2268/04                                    תאריך: ב' שבט, תשס"ה
                                                    12 ינואר, 2005

בביקורת שיפוטית זו, אין אנו עושים עצמנו למומחים בענייני בטחון. אין
אנו ממירים את השיקול הבטחוני של המפקד הצבאי בשיקול הבטחוני
שלנו. אין אנו נוקטים כל עמדה באשר לאופן ניהול ענייני הבטחון [השוו
בג"ץ 3114/02 <u>ברכה נ' שר הבטחון</u>, פ"ד נו (3) 11, 16]. תפקידנו הוא
בשמירת הגבולות ובהבטחת קיומם של התנאים התוחמים את שיקול
הדעת של המפקד הצבאי [ראו בג"צ 680/88 <u>שניצר נ' הצנזור הצבאי
הראשי</u>, פ"ד מב (4) 617, 640].

... תקופה קשה עוברת על מדינת ישראל. הטרור פוגע בתושביה. נקטפים
חיי אדם. מאות נהרגים. אלפים נפצעים. גם האוכלוסיה הערבית באזור
יהודה והשומרון ואזור חבל עזה סובלת סבל קשה מנשוא. כל זאת, בשל
פעולות רצח, הרג והרס שמבצעים מחבלים. ליבנו עם הגב' קסלר ששכלה
את בתה במעשה טרור נפשעי ועם כל הישראלים האחרים שאיבדו את
יקיריהם ונפגעו הם עצמם קשות מאירועי הטרור. המדינה עושה כל
שביכולתה כדי להגן על אזרחיה ולהבטיח את בטחון האזור. אמצעים אלה
מוגבלים הם. ההגבלות הן, בראש ובראשונה, צבאיות ואופרטיביות. קשה
להילחם במי שמוכנים להפוך עצמם לפצצות חיות. הגבלות אלה הן גם
נורמטיביות. מדינת ישראל היא דמוקרטיה שוחרת חרות. היא דמוקרטיה
מתגוננת הפועלת במסגרת זכויות להגנה עצמית - זכות המוכרת על ידי
מגילת האומות המאוחדות. המדינה מבקשת לפעול במסגרת האפשרויות
החוקיות העומדות לרשותה על פי המשפט הבינלאומי חל עליה ועל פי
משפטה הפנימי שלה. כתוצאה מכך, לא כל אמצעי אפקטיבי הוא גם
אמצעי חוקי. אכן, מאבק קשה מנהלת מדינת ישראל כנגד הטרור. זהו
מאבק הנעשה במשפט ובכלים שהמשפט מעמיד לרשותה. ידועה האמרה
כי בעת מלחמה מחרישים החוקים (Inter arma silent leges) [ראו גם <u>All The
Laws But One</u>, W. Rehnquist (1998) 218]. אמרה זו אינה משקפת את הדין
המצוי והרצוי. היטיב להביע זאת השופט אטקין [Lord Atkin] בפרשת
<u>Anderson Liversidge v. All E.R.</u> (1941) 338, 361 בציינו:

> 'In England, amidst the clash of arms, the laws are not silent. The may
> be changed, but they speak the same languages in war as in peace. It has
> always been one of the pillars of freedom, one of the principles of liberty
> for which... we are now fighting, that the judges... stand between the
> subject and any attemped encroachments on his loberty by the
> executive, alert to see that coercive action is justified in law.'

... אכן, "גם כאשר התותחים יורים, חייב המפקד הצבאי לשמור על החוק.
כוחה של חברה לעמוד כנגד אויביה מובב על הכרתה, כי היא נלחמת עבור
ערכים הראוים להגנה. שלטון החוק הוא אחד מערכים אלה" [בג"ץ 168/91
<u>מורכוס נ' שר הבטחון</u>, פ"ד מה (1) 467, 470]. "הקמנו כאן מדינה שומרת
חוק, המגשימה את יעדיה הלאומיים ואת חזון הדורות, והעושה זו תוך
הכרה בזכויות האדם, בכלל, ובכבד האדם בפרט והגשמתם" [בג"ץ 3451/02
<u>אלמדני נ' שר הבטחון</u>, פ"ד נו (3) 30, 35]. היטב הביע זאת חברי, השופט
מ' חשין, בציינו:

> "לא ניחלש במאמצינו לעשות לשלטון החוק. חייבנו עצמו בשבועה לשפוט
> משפט צדק, להיות משרתיו של החוק, ונהיה נאמנים לשבועתנו ולעצמנו.
> גם בהריע שופרות המלחמה ישמיע שלטון החוק את קולו" [בג"ץ 1730/96
> <u>סביח נ' מפקד כוחות צה"ל באזור יהודה והשומרון</u>, פ"ד נ (1) 353, 369].

                                -7-

P 2: 291

תיק מס׳: 2268/04

תאריך: ב׳ שבט, תשס״ה
12 ינואר, 2005

... אכן, קשה הוא מצבה של מדינת ישראל. גם תפקידנו שלנו כשופטים
אינו קל. עושים אנו ככל יכולתנו לאזן כראוי בין זכויות האדם לבין בטחון
האזור. באיזון זה, זכויות האדם אינן יכולות לקבל את מלוא ההגנה, כאילו
אין טרור, ובטחון המדינה אינו יכול לקבל את מלוא ההגנה, כאילו אין
זכויות אדם. נדרש איזון עדין ורגיש. זהו מחיר הדמוקרטיה. זהו מחיר
יקר, אשר כדאי לשלמו. הוא מחזק את כוחה של המדינה. הוא נותן טעם
למאבקה. ואשר לנו כשופטים, קשה מלאכתנו. מקושי זה לא נוכל ולא
נרצה להימנע...״.

עד היום, דצמבר 2004, מספר הקורבנות מפיגועי הטרור הרצחניים בחסות ״הסיבה
הפוליטית״ הם למעלה מ-1000 איש שנרצחו, ועוד אלפי אנשים שנפצעו.

הנאשם בפרשה שבתיק זה, מחמוד מעאלי, לא פעל בחלל ריק אלא באטמוספירה
של טרור ורציחות המתחוללת מראשיה הפירמידה הפלסטינית, ומכאן כבר לא נדרשת
הכוונה מדוייקת לכל פורקנו של רוע, המוכר בנטילת חייהם של אחרים לכל אורך
ההיסטוריה.

אחת הדין בישראל ובכל מדינה, ואחת הדין באזור. רוצה יבקש טעמי הצדק והדם
השפוך יחייג את העוישה ההולמת, אך יותר מכל, יראו מעשיו של הנאשם בהקשר
הכולל והרחב באטמוספירה של טרור.

<u>לעניין הנאשם בפרשה שלפנינו</u>

בשני הפיגועים בהם השתתף הנאשם בפרשה שלפנינו נרצחו 19 בני אדם. קול דמם
של זקנים, מבוגרים, נשים וילדים זועקים אל האנושות כולה מן האדמה. ואנו
היושבים בדין, מלאכת שמיים מבקשים לעשות, לדון את שופך דם האדם. בידינו
ניתנה האחריות לכמת את עונשו של זה בעיניהן של משפחתם בוכיות על אובדן
הנפש, אובדן החיים של יקיריהן. לנו לא נותר אלא לאחוז בדין האזור ולמצות את
הדין בכל שיד כל שופך משגח בעניישת הפשע הנורא מכל - הוא ״פיגועי״, הוא
״גרימת מוות בכוונה״, הוא ״רצח״.

מאבק לאומי ומרי אזרחי אסור שיעברו דרך רצח אוכלוסיה אזרחית. אם האזור
מצוי ב״מלחממה״ או ״לוחמה״, הרי מעשיו של הנאשם וחבריתו הם <b>״פשע מלחמה״</b>
<b>או ״פשע לוחמה״</b>. אם מדובר בעבריינות בטחונית ב״אזורי״, הרי אלה עבירות של
רצח בנסיבות <b>מהחמורות בתולדות האדם</b>. ״גבורת פחדינים״ אל מול ילדים, נשים
ואזרחים לא חמושים.

רוצח סדרתי או אנס מתועב, אין חולק כי נאלחים הם ומוקעים הם מכל חברה.
לכאורה פיצץ אוטובוסים של אורחים, נשים וטף בטענה כי בוצע בשל ״הכיבוש״
והחיים הקשים במחנות הפליטים, תנאי המחיה הקשים, והוראות החייל
במחסומים לתוך ישראל, עלול אדם לחשוב כי יש יש לחלק ויש להבדיל,
ולא היא. כאן טמונה הסכנה הגדולה בתודעה של חברה.

לכל רוצח בדרך כלל ״יש סיבה״. האחד רוצח על רקע שליטה בעולם התחתון, והשני
רוצח על רקע ״שליטה בעולם העליון״, האחד כי נגמרו לו השמיים, והשני כי נפתחו
לו אלה, האחד כי לא נגבר באהבה, והשני כי התאהב במעשה, האחד בעבור כסף
והשני בשל העוני... לרוב ״יש סיבה או מטרה״ למעשה. ״רצח הוא בכוונה ולא
מתוך אדישות״, ומכאן תישאל השאלה היש חברה המוכנה למצוא הצדקים
לשפיכת דמו של אחד מתוכה? היש חברה המוכנה לראות ברצא כלי לביטוי מחאה?
היש חברה המוכנה לראות את עולליה נשרפים באוטובוסים, בגויתיה בצמתותיהן
היפות, ומשפחותיה מתפרקרות לחלקי גופת ניתוזים לכל רוח רק משום שלמישהו

-8-

P 2: 292

תיק מס׳: 2268/04

תאריך : ב׳ שבט, תשס״ה
12 ינואר, 2005

סיבה? כי לאדם אחד יש העליונות להתיר לעצמו או לצאן מרעיתו לרצוח בן אנוש 1
אחר על פני האדמה? חברה שתתצדיק את הסיבה היא הרוצחת עצמה והיא זו 2
שתעמוד על דוכן הנאשמים. 3
4
הנאשם רצח 19 אנשים, ופצע כמאה אחרים, חסרי אונים, "תמימי דרך", 5
באוטובוסים בדרכם לשגרת יומם. הותר דמו של האזרח, של השוטח, וטוב לו לבית 6
משפט זה שחוקי השכל האנושי מלווים לו לעשות צדק אוניברסאלי, צדק של כל בני 7
האדם באשר הם, ואין בלבי ספק כי גזר הדין הזה היה ניתן ככתבו וכלשונו בכל 8
מדינה מתוקנת של עם נאור - גזר דינה של האנושות השפויה. 9
10
המחבל עצמו מת בהתאבדותו הרצחנית כפי שתכנן. הנאשם דן, שהינו השותף 11
המלא, חי ועומד לפנינו כאחד הנקלים שבאדם. שפל המדרגה האנושית ניצב בפנינו 12
באחד מאולמות ביהמ״ש הצבאי קיבל עם ועולם, ואין בידינו אלא לספור את תשעה 13
עשר הנרצחים וליתן כמניינים מאסרי עולם. לבכר את עשרות הפצועים חסרי הגפיים 14
והאחרים בעיני רוחנו, ולהוסיף עוד מאסרי עולם. קסת הדיו שעל שולחני תבקש 15
להתנפץ בראותה משפחות הנרצחים שבורות ושני ישראל וערי ישראל בוכיות, וישאל השכל 16
השיפוטי, כיצד ניתן להיות כה חסרי אונים בעת הרישעה ממש, וכיצד ניתן להיות 17
חסרי אונים בעגישת הרישעה כדי רשעתה. 18
19
הנאשם דן לא היה נסחף נגרר, אלא שותף סוד, שתרם תרומתו בתחבולות 20
והטעייה, מתוך ידיעה מראש באשר למטרה ולדרך, ובזכות "הצלחתו" להביא 21
מתאבד לתוככי מדינת ישראל בראשונה, קיבל המשימה גם בשנית. בסיוס כל 22
משימת דמים, סיפר הנאשם כי "חזר הוא לישוו". הוא, הנאשם, היה מסוגל לחזור 23
לישוו, ואילו משפחות שלמות אחר כך לא ישנו, ולא תישנה, בלילות משך שנים 24
רבות באובדן יקיריהן, ופצועים רבים יחוו מראות הזוועה של איברים כרותים 25
ושרופים באמצע שנתם, ויתעוררו בחרדה משך שנים. 26
27
הנאשם לא היה משודל תמים, שגילה רק לאחר הפיגוע כי האדם אותו הדריך 28
והוליך לתוככי ישראל היה פצצת אדם מתקתקת, אלא הנאשם רצונו כמי שעבר 29
בכוחותיו עצמו יידה בקבוקי תבערה, ולאחר מכן מטעני ציונר לעבר חיילים. לאחר 30
מכן הניח מטען חבלה של 12 ק״ג סמוך לתחנת דלק בה עוברים רכבים. ורק מתוך 31
ידיעה, רצון ומתן ברכה למתאבד, הוביל, בדרך סתרים אותה ידע והכיר, מחבל 32
מתאבד למקום הומה אדם ליד קניון מלחה בירושלים שבתוככי ישראל, וגרם 33
למותם של 11 איש ולפציעתם של עשרות, **ולא עברו שלושה שבועות אחר כך**, וכבר 34
ביצע אותו מעשה בעצוית והיבטיר מתאבד נוסף לתוככי ישראל, וגרם 35
ב"שותפותו שטנית" למותם של עד 8 בני אדם ולפציעתם של עשרות. חיית אדם, 36
שבילי 26 בחר להמית הרבה ככל הניתן, זקנים, נשים וטף הוא הנאשם שלפנינו. 37
38
הנאשם, בשנת 2000, זרק בעצמו בקבוקי תבערה נגד כוחות צבא הגנה לישראל. 39
אחד מהם על **קבר רחל**, מקום המקודש לדת היהודית, שם נקברה רחל אם יעקב, 40
מאבות האומה היהודית על פי המסורת היהודית. כן זרקו הנאשם וחבריו בקבוקי 41
תבערה על חיילים ישראליים ליד **הכנסייה בבית לחם**, מקום קדוש לנוצרים. במועד 42
אחר, כשהיה צריך להימלט לאחר הנחת מטען חבלה, ברחו הנאשם וחבריו 43
ל"**כנסיית המולד**" בבית לחם. לפני צאתו של המתאבד ברך אותו הנאשם. היה 44
חשוב לנאשם שהפיגוע יתייחד ל"שוותדא אלאקצא". **הכל קדוש, ומכאן גם הנורא** 45
**שבמעשה**. עניינו של בימ״ש זה אינו בקודש השמימי, אלא בחוק הארצי, בו שלח 46
הנאשם ידו. 47
48
היסוד הנפשי של הנאשם כשותף מלא בא לידי ביטוי מוקדמת באשר 49
לתפקידו במסגרת מבצעי הקטל הנורא של רצח המון אדם, בחברת רוצח מתאבד 50

-9-

תאריך: ב' שבט, תשס"ה
12 ינואר, 2005

תיק מס': 2268/04

לתוככי ישראל, במגדעות וחפץ עצמו לתוצאה המיוחלת, <u>תוך הטעייה של אחרים</u>
כאשר לדרך בה יוליך את המתאבד. במילותיו מתוך אמרתו שהוגשה בהסכמה
אומר הנאשם:

‏"אבל לא אמרתי שלקחתי אותו לאחמד ל"דרך הוולג'ה"... פחדתי שאחמד
‏יסער למישהו ואני אתגלה וזה גם "אתחייאתא" הכנות בטחוניות...
‏ו"הוולג'ה" היא דרך שאין בה מחסומים ודרך בטוחה..."‏.

הנאשם הכיר את סביבת "קניון מלחה", מרכז הקניות הגדול בירושלים, וליד
המקום הזה הביא את המתאבד.

שני מטעני הנפץ היו ב"<b>תיק בית ספר</b>", וכפי שהסביר הנאשם באמרתו, שהוגשה
בהסכמה: "הוא (המחבל) לבש תיק בית ספר שזה היה המטען חבלה והחזיק ביד
ספרים <b>בשביל שיחשבו שהוא תלמיד בית ספר...</b>"‏.

את המשימה להסיע את המחבל המתאבד הראשון קיבל הנאשם מאחמד אבו עידב,
שהיה לדבריו פעיל <b>במודיעין של הרשות הפלסטינית</b>.

יצר אפל של חייתיות הניע את הנאשם לשפוך דם אדם באדם. הנאשם הבהיר
בדבריו:

‏"אני ידעתי בדיוק כשלקחתי את המתאבדים שהם הולכים לעשות פיגוע
התאבדות בירושלים"‏.

הנאשם הוביל את המתאבד, אך לא נכח בזמן הפיצוץ. ע' איו"ש 66/02+64 <u>התוב"ץ</u>
<u>נ' ע/אכים עזיז ו/ערכים חניני</u> ו-ע' איו"ש 101/03 <u>שאדי אברהים קאסם עאמורה נ'</u>
<u>התוב"ץ</u> כבר קבעו כי אין נוכחותו של שותף במקום הפשע תנאי להגדרתו כשותף.

פסק דינו של ביהמ"ש העליון בישראל, ע"פ 426/67 <u>אארי נ' מדינת ישראל</u>, קובע כי
נותן מידע, אשר שימש בביצוע העבירה, או מי שסיפק אמצעים לביצועה של
העבירה, הרי זה יחשב כשותף מלא לעבירה, אם סיוע זה ניתן מתוך כוונה לסייע
למבצע העיקרי. הנאשם דנן ידע שאחרים היו צריכים את דרכו של מלאך המוות.
ידע, הוביל יד ביד, בירך ושמח בתוצאה, וביקש לחזור ולרצוח.

<b>בפסק הדין ע' איו"ש 4/04 <u>בכר מחמד אמין אבו עביד נ' התוב"ץ</u></b>, הסיע נאשם את
המתאבד המתאבד. על אף שלא היה מעורב בהליך ייזום ותכנון ה-פיגוע, אלא רק
עמד בקשר עם משלחו של המתאבד והסיע את המפגע לתוככי ישראל מתוך ידיעה
המטרה, קבע ביהמ"ש שם כי אין זה אלא שותף מלא ופעיל מרכזי, שהוציא את
הפיגוע מן הכוח אל הפועל. שם אף נגזרו עליו שני מאסרי עולם מצטברים בגין שתי
עבירות של גרימת מוות בכוונה, ואחת של ניסיון לגרימת מוות בכוונה.

הנאשם וחבריו היו המפעילים, ואילו המתאבד היה כלי וחפץ בידם, פצצה
מתקתקת אותה הכינו ובאמצעותה עשו רצון יצרם האפל. הנאשם היה מודע פעיל
בעל חפץ עצמאי, תורם, עוזר, שותף בעל תפקיד מרכזי וייחודי למטרה אחת ויחידה,
הבאת התוצאה הרצחנית בהמון אדם שותת דם.

האינטרס הציבורי גובר על האינטרס הפרטי, ההרתעתי מול האישי, שיקולים של
הגנה על שלום הציבור [ולעניין זה כבר צויינו פס"ד המחוזי בת"א ת"פ 1135/00 <u>מ"י</u>
<u>נ' שחר רומנו</u>, וכן ע"פ 490/89 <u>פלוני נ' מדינת ישראל</u>. כמו כן, ההתייחסות למכת

-10-

P 2: 294

תאריך : ב' שבט, תשס"ה          תיק מס' : 2268/04
12 ינואר, 2005

1    האזור ולעבירה נפצה לעניינה הובאו ב-ע"פ 796/79 <u>אבשלום צור ואח' נ' מ"י</u>, ע"פ
2    257/89 <u>יגאל סבג נ' מ"י</u>, ו-ע"פ 332+329/87 <u>מ"י נ' אורי בר און</u>].
3
4    מתן מאסר עולם בגין עבירת ניסיון לגרימת מוות הובא בפנינו בפסקי הדין ע' איו"ש
5    153/02+151+122+120 <u>אשרף נופל ואח' נ' התוב"ץ</u>, ע' איו"ש 251/03 <u>בסיסי נ'</u>
6    <u>התוב"ץ</u>, ו-ע' איו"ש 312/03 <u>התוב"ץ נ' גירוף</u>. רשימה זו מאפשרת לביהמ"ש מרחב
7    עניישתי הולם וראוי בכל מקרה ומקרה, ממאסר לפרק זמן ועד לשלילתה הטוטאלית
8    של חירות הפרט במאסר עולם. במקרה דנן, חמישה פצועים בכל פיגוע ראוייים כל
9    אחד למאסר עולם בפני עצמו. שני אירועים של ניסיון לרצח, 50 אנשים כל אחד,
10    מחייבים לדי(י) שני מאסרי עולם נפרדים כרמה של מסר, שהריו מה לך 20 מאסרי
11    עולם, או 21 מאסרי עולם, שהכל לא באו אלא לבטא את גודל הטרגדיה.
12
13    האנושות הביעה סלידתה מרצח מכוון של חפים מפשע גם בעתות מלחמה או סכסוך
14    אלים באזור מריבה. כל אלה שהשתמשו במריבה הפוליטית-מדינית, ואף הצבאית,
15    לביצוע פשעים כנגד אוכלוסיה בכל מקום בעולם, כדוגמת "ייהרוו אתני" או "רצח
16    נשים וטף של לא עוול כפם", לא היה מקומם בין לוחמי חופש אלא בין פושעי
17    המלחמה. כך עומדים לדין פושעים ורוצחים עברייניים שקראו דרור ליצרם האפל
18    באיצטלה של מאבק אידיאולוגי אותו טבלו בדם נשים וילדים.
19
20    טרור אינו רק רצח על רקע פלילי, כפי שהוא מובא בפני ביהמ"ש זה, אלא שתמצותו
21    פגיעה או סיכון בכוונה תחילה של חפים מפשע, כדי להטיל פחד לשם מטרות
22    פוליטיות. דווקא התעלמות מהפסול שבמעשה, על רקע מניעיו ורעיונו, נוטלים ממנו
23    את עוקצו. לוחם חופש נלחם נגד דיכוי ואינו פוגע בכוונות חפים מפשע. לפיכך, אין
24    הוא יכול להצדיק נטילת חיי אזרחים, ילדים, עוברי אורח או נוסעי אוטובוס
25    תמימים בדרכם לעבודה. כל פגיעה באלה, אין היא אלא מעשה שאל לאיש בעולם
26    של מחר, ובמיוחד של היום, ליתן לו פרשנות אחרת, שונה מ"רצח", "טרור" ו"פשע
27    מלחמה או פשע לוחמה", הראויים לענישה מרתיעה ולמסר אוניברסלי ובינלאומי
28    נרחב.
29
30    **הטרוריסטים נלחמים כנגד החוק ותוך הפרתו. בימ"ש זה מתבקש להילחם את**
31    **מלחמתו של החוק כנגד הקמים עליו.**
32
33    לאחר מלחמת העולם השנייה, ודווקא באשר לעתידו הפוליטי-מדיני, ביקש העולם להפיק חלק
34    מהלקחים. באמנות בינלאומיות, בעקרונות המלחמה בפשעים אוניברסליים, וגם
35    בסכסוכים בין עמים. נקבעו כללים לפיהם גם במאבק לוחמני יש ערכים
36    אוניברסליים מקובלים, העיקרי שבהם שאין לפגוע באזרחים חפים מפשע.
37
38    דמוקרטיה, חירות ופלורליזם ללא גבולות, בעולם בכלל ובאזור בפרט, בימי הכרזת
39    המלחמה של הטרור, עלולים להיות עצמם זרע ללכיונם. לפיכך, כל בימ"ש, באזור
40    ובמדינות העולם, חייב למצות את הדין עם כל תופעה שגילויי טרור הם ביסודותיה.
41
42    גם אם ב"אזור" שוררת אי וודאות באשר לעתידו הפוליטי-מדיני, אין מנוס אלא
43    להשתית את החוקים והעקרונות המשפטיים במאבק נגד פעולות רצחניות של טרור,
44    המביאות לפחדו של הפרט יליד ברחוב, לנסוע באוטובוס. הנאשם ודומיו יקשו
45    ומבקשים לזרוע אימה, ועל כל ביהמ"ש הזה ובכל מקום בעולם הנאור, מחויב לומר
46    את דברו בקול רם אל מול שתיקותו של הפחד.
47
48    **המשפט הבינלאומי אוסר כל התקפה שיטתית על בני אדם שאינם לוחמים. זהו**
49    **מעשה בלתי מוסרי ובלתי צודק, ואיסורו הפלילי הוא עד כדי קביעתו של המשפט**
50    **הבינלאומי כי מדובר בפשע מלחמה.**

-11-

P 2: 295

הנאשם פגע בכל מעשיו בכבוד האדם ובזכותו לחירות ולחיים. פגיעתו זו בעקרון
קדושת החיים אינה מותירה לביהמ"ש אלא למנוע ממנו חירות לכל חייו.

כל רעיון הטרור והפיגועים באזור ובמדינה לא בא אלא לגרום **לפגיעה באוכלוסיה**
רק בשל **היותה אוכלוסייה**. ידוע שכל מטרת פיגועי אוטובוסים הינה פגיעה והרג
מספר גדול ככל האפשר של אזרחים חפים מפשע דווקא בשל היותם תמימי דרך,
ובכלל שהדבר יגרום לזעזוע, פחד ושיבוש שגרת חיים נורמלית. **לבל יזכו החיים**
**בישראל או החיים באזור להיות כאחיהם אזרחי העולם, המקיימים שגרת חיים**
**שלווה במדינותיהם.**

אל יבקש לעצמו הנאשם "הצדק לאומי" לרצח 19 בני אדם חפים מפשע ופציעתם
של כמאה. אזרחיה של מדינה שתחייתה עצמותיו של עם, עצמות יהודים שנשרפו
בכורות ההריגה ובמשרפות באירופה כולה. הנאשם הוביל במודע פצצות אדם
הממיתות באחת עשרות אנשים, הנשרפים באותו אוטובוס, ופצע בפצעיה של אומה
שותתת דם בנשמה.

הנאשם בחר את הטרור, על כל הכרוך בו, כדרך חיים, תוך הזדהות עמוקה וחיפוש
בלתי נלאה אחר ביצוע פעולות רצחניות. לפיכך, יפשע ביהמ"ש כלפי האנושות,
וכלפי כל מדינות העולם, אם לא ירחיק את הנאשם מהחברה בכלל ולצמיתות עולם.
החוק בבימ"ש זה ידבר שפה אחת ודברים אחדים, לפיהם רוצח יורחק לצמיתות,
לכל ימי חייו, תחת אשר נטל חייו של אחר.

גרימת המוות בכוונה, בנסיבות של רצח אוכלוסיה חפה מפשע, יש לראותה כנשאת
מאז ימות עולם את החתום של פשע בינלאומי ואוניברסלי, שנאסר על ידי כל חוקי
המדינות בהיותו רצח חפים מפשע. כך גם בתקופת סכסוך בין עמים, גם בזמן
לוחמה, וגם בעת שלום, במיוחד באזור שטרם הוגדר בהסדר קבע ודווקא בשל
היותו כזה.

רצח של אוכלוסיה אזרחית, ובכללה רצח נשים ועוללים בנסיעתם התמימה
באוטובוסים, פשע זה גורר אחריו אחריות פלילית אוניברסלית, כמו גם מקנה לכל
מדינה ומדינה, ובכלל טריבונלים שיפוטיים באזור המריבה, את הסמכות לשפוט
את מי שנתן ידו לפשע זה ולהענישו.

מצווה אני, היושב בדין, על כיבוש הרגש וגזירת עונשו של נאשם זה על פי פי אמות
המידה שהעמיד בגבורה אנושית בימ"ש זה גם בנסיבות קשות של טבח יהודים
וישראלים מצטבר, בהיותו בית משפט ב"אזור " הרואה ראייה רחבה של הדין
באזור וחוקי האדם האונברסאליים.

ולעניין ביקורת הסניגור בדבר עונשי העולם המצטברים בעבור כל נפש
שנקטפה במעשה הנאשם, יובאו דברי שופטת ביהמ"ש העליון בישראל, דליה דורנר
הנכבדה, בפרשת פופר, בה הורשע ונשפט למאסרי עולם מצטברים רוצח ערבים [ע"פ
1742/91 פופר נ' מדינת ישראל, פ"ד נא (5) 289, 303, 307].

"... כאשר מדובר במעשי אלימות, קיים לכל אחד מהנפגעים אינטרס
עצמאי לשלמות גופו. הפגיעה בשלמות גופו של אחד אינה מהווה פגיעה
בשלמות גופו של אחר. גם אם מבחינה "טכנית" מדובר ברצף אחד של
מעשים שגרם למספר קורבנות, יש להתייחס לכך כאל מעשי פגיעה
נפרדים.

-12-

P 2: 296

תאריך : ב׳ שבט, תשס״ה                                  תיק מס׳ : 2268/04
12 ינואר, 2005

18. מסקנה זאת היא הכרחית גם מנקודת מבט מוסרית. המכירה בקדושת
חייו של אדם כערך יסוד. ערך חיי אדם וסלידתנו העמוקה ממעשים
הפוגעים בו חייבים למצוא ביטוי מפורש ונפרד גם במסגרת גזירת העונש,
הן לעניין מספר העונשים שיש לגזור על הנאשם, והן לעניין הצטברותם.
אף כי מעשה רצח של אדם בודד הוא כשלעצמו מעשה נפשע וחמור מאין
כמותו, גזירה של אותו עונש על מי שרצח אדם אחד ועל מי שרצח רבים
עלולה להתפרש כהחלשה של משמעות ערך חיי האדם, ואף עלולה לפגוע
במידת ההרתעה. שכן, מה יעצור רוצח מלהרבות את קורבנותיו אם בגין
הקורבנות הנוספים הוא לא יהיה צפוי לכל תוספת עונש ?

מטעמים אלה נגזרו על מחבל, אשר דקר בסכין אנשים שהמתינו בתחנת
אוטובוס ואחרים שניקרו בדרכו, וגרם באופן זה למותם של שניים
ולפציעתם של שלושה, שני עונשי מאסר עולם נפרדים, ועשר שנות מאסר
בגין כל אחת מעבירות הניסיון לרצח. נקבע כי עונשים אלה יצטברו זה לזה.
כדברי הנשיא שמגר ב-ע״פ 399/89 מדינת ישראל נ׳ זלום, פ״ד מו (2) 187:
גזירת עונשי מאסר חופפים על מספר מעשי רצח - אף אם מדובר בכאלה
שבוצעו ברצף אחד - יש בה מכללא משום מיעוט של הזוועה שגרמם המוות
הזדוני והמכוון של שורה של אנשים... האמונה שלנו בקדושת חיי האדם
חייבת למצוא את ביטויה גם בעניינו של עבריין ובהדגשת משמעותו של כל
קיפוח חיי אדם בעינינו. מקובלת עלי, על כן, ההשקפה כי לא רק שיש
לגזור עונש נפרד על כל עבירה, אלא כי מעשי פגיעה נפרדים בחיי אדם
צריכים גם למצוא ביטויים בעונשים המצטברים זה לזה.

מטעמים דומים נפסק כי אדם שנשפט כבר למאסר עולם בגין מעשה רצח
ועבר עבירת רצח נוספת, עונש מאסר העולם בגין העבירה הנוספת יצטבר
לעונש מאסר העולם בגין העבירה הקודמת."

דבריו של כב׳ השופט מ׳ חשין הנכבד באותו פסק הדין העמיקו את יסודות התפיסה
הערכיונית של מאסר עולם בגין כל נפש באמור, במקרה זה רצח יהודי שבעה ערבים
תושבי שטחים לקראת צאתם לשגרת יומם :

"במקום פלוני, על גדות הכביש המקשר בין ראשון לציון לבין נס ציונה,
נאספים מדי בוקר פועלים ערבים מן השטחים לקראת צאתם לעבודת
היום. המעֵרֵע בא אל אותו מקום היאספות ורובה "גלילון" בידו, קיבץ את
הפועלים שעמדו פזורים, והושיבם על הארץ שורות שורות. לאחר מכן כיוון
את הרובה אל היושבים וירה בהם אש אוטומטית, מימין לשמאל ומשמאל
לימין. שבעה פועלים נהרגו ועשרה אחרים נפצעו.

5. ... בבג״ץ 4162/93 פדרמן נ׳ היועץ המשפטי לממשלה, פ״ד מז (5) 309,
329-330, נכתבו דברים אלה:

"המאבד נפש מן העולם בכוונה תחילה הוא רוצח, ויישא בעונש
שרוצה ראוי לו. זה דברו של הקודקס הפלילי. ואם איבד חייהם של
מאה אנשים, אלף, עשרת אלפים, מאה אלף אנשים? קודקס פלילי
שנברא לחיי יומיום בחברה אנושית אין בו תשובה לשאלה. המילוי
הממונה על שולחננו לא תימצא בו הגדרה למעשים אלה. שומה עלינו
לחשוב מבראשית, אם תרצה: לצרף מלים אל מלים ולכונן הגדרה
במשפט. הנה הוא החוק לעשיית דין בנאצים ובעוזריהם, ובו
הגדרות לפשע כלפי העם היהודי, פשע כלפי האנושות, פשע מלחמה
ופשעים כלפי בני אדם נרדפים."

-13-

תיק מס׳: 2268/04

תאריך: ב׳ שבט, תשס״ה
12 ינואר, 2005

כך הוא במעשי אדם ש״ממדיהם ועוצמתם היו כתופעות טבע״ (שם, 330). נורמות התנגדות מן־המניין קצרה ידן מהושיע, ועל־כן הוחל על אותם מעשים מישטר נורמות לעצמו.

7. אדם - כל אדם - הוא עולם לעצמו. אדם - כל אדם - הוא אחד, יחיד ומיוחד. ואין אדם כאדם. מי שהיה לא עוד יהיה, ומי שהלך לא ישוב. וכבר לימדנו הרמב״ם על ייחודו של האדם (ספר שופטים, הילכות סנהדרין, יב, ג):

״נברא אדם יחידי בעולם, ללמד: שכל המאבד נפש אחת מן העולם - מעלין עליו כאילו איבד עולם מלא, וכל המקיים נפש אחת בעולם - מעלין עליו כאילו קיים עולם מלא. הרי כל־באי עולם בצורת אדם הראשון הם נבראים ואין פני כל־אחד מהם דומין לפני חברו. לפיכך כל־אחד ואחד יכול לומר: בשבילי נברא העולם.״

כך הוא האדם, וזה ייחודו. מי הוא זה ואיזה הוא שיאמר כך על ספר או על כסף? אומרים לנו כי ייחודו של האדם בא לו משום שהאלוהים בראו בצלמו כדמותו: ״בצלמו בצלם אלוהים ברא אותו...״ (בראשית א׳ כ״ז). כשאני לעצמי אומר, כי ייחודו של האדם - כל אדם - בא לו משום שנברא בצלם האדם. זו תחילתו של מיקרא. זה גם סופו.

8. כך הוא באשר לעבירת הרצח. כך הוא גם באשר לעונש שיוטל על מי שרצח. אכן, מאסר עולם בעבירות רצח הוא מאסר עד צאת הנשמה. מבחינה מושגית - וזה דרך הטבע - אין מאסרי עולם מצטברים. ואולם דומה, כי לא נוכל לבטא את עומק הזוועה שבמעשהו של מי שרצח את הרבים אלא אם נטיל עליו עונשים מצטברים. ״שופך דם האדם באדם דמו יישפך״ (בראשית ט׳ ו׳). בימינו ובמקומנו אין עוד שופכים - כמעשה־ממלכה - את דם האדם. גם אין ניתן להוציא אותו הורג אדם אדם שתי פעמים. אך מאסרי עולם מצטברים ניתן להטיל על מי שקיפח חיים בזדון. מאסר עולם תחת כל נפש ונשמה.״

הארכתי די, וזאת בהיות המילים הכתובות חלק בלתי נפרד ממעשי העונשה למטרתו הנורמטיבית באזור ובין עמים. למרות שכלל נקוט בידינו, כי העונש ידבר בעד עצמו, לא כן הוא במקום בו גם הרעיון עצמו הוא הסטטה והנאשם הוא פרי המורעל, ולא כן כאשר לא אחת לא נותר מזה אלא אותיותיו הכתובות.

לאור כל האמור לעיל, אציע לחבריי לגזור עונשו של הנאשם כדלקמן:

בגין גרימת מותו של אברהם בלחסן ז״ל - מאסר עולם.
בגין גרימת מותה של חנה בוגדר ז״ל - מאסר עולם.
בגין גרימת מותה של ענת דרום ז״ל - מאסר עולם.
בגין גרימת מותו של יחזקאל גולדברג ז״ל - מאסר עולם.
בגין גרימת מותו של ולדי צדיק מנברה ז״ל - מאסר עולם.
בגין גרימת מותה של ויורל אוקטביא פלורסקו ז״ל - מאסר עולם.
בגין גרימת מותה של רוזה בונה ז״ל - מאסר עולם.
בגין גרימת מותה של דנה איטח ז״ל - מאסר עולם.
בגין גרימת מותו של רומן חונדיאשווילי ז״ל - מאסר עולם.
בגין גרימת מותו של אלי צפורה ז״ל - מאסר עולם.
בגין גרימת מותה של נטליה גמריל ז״ל - מאסר עולם.

P 2: 298

תיק מס׳: 2268/04

תאריך: ב׳ שבט, תשס״ה
12 ינואר, 2005

1   בגין גרימת מותה של יפה בן שימול ז״ל – מאסר עולם.
2   בגין גרימת מותו של יובל אחונה ז״ל – מאסר עולם.
3   בגין גרימת מותו של רחמים דוגה ז״ל – מאסר עולם.
4   בגין גרימת מותו של יהודה חיים ז״ל – מאסר עולם.
5   בגין גרימת מותו של אילן אביסדריש ז״ל – מאסר עולם.
6   בגין גרימת מותו של בניה יונתן צוקרמן ז״ל – מאסר עולם.
7   בגין גרימת מותו של אזולאי ליאור ז״ל – מאסר עולם.
8   בגין גרימת מותו של נתנאל חבשוש ז״ל – מאסר עולם.
9
10  בגין ניסיון לגרימת מותם של עשרות נוספים, פציעתם של כמאה איש בפיגוע
11  הראשון והשני, ושאר עבירות בהן הורשע הנאשם, נגזרים על הנאשם שני מאסרי
12  עולם נוספים.
13
14  סך הכל, יהא על הנאשם לרצות עשרים ואחד מאסרי עולם. כל מאסרי העולם ירוצו
15  במצטבר זה לזה.
16
17
18  כב׳ האב״ד רס״ן יאיר תירוש:
19
20  אני מסכים.
21
22
23  כב׳ השופט סרן רנאטו יאראק:
24
25  אני מסכים. [חתימה] _____
26
27  הוחלט כאמור בפסק דינו של כב׳ השופט סרן אריה דורני.
28
29  סוף דבר, אנו גוזרים על הנאשם 21 (עשרים ואחד) מאסרי עולם שירוצו במצטבר זה
30  לזה.
31
32
33
34  זכות ערעור תוך 30 יום.
35
36  ניתן והודע היום, 12/01/2005, בפומבי ובמעמד הצדדים.
37
38
39

_____                    _____                    _____
שופט                                      אב״ד                                        שופט

-15-