# EXHIBIT A.357
## (2 of 5)

**Nature of the offense**: Causing intentional death, an offense under Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense**: The above mentioned Defendant, in the Area, on January 15, 2002 or thereabouts, caused the intentional death of another person, as follows:

1.  On January 14, 2002, Raed Karmi, who was a senior military operative in the "Tanzim" of the Fatah Organization, which is an illegal organization, was killed. Following the death of the above mentioned Raed Karmi, the head of the "Tanzim" of the Fatah in the area, Marwan Barghouti pitched a mourning tent in Albira.

2.  The above mentioned Defendant, on January 15, 2002, in the above mentioned mourning tent, met Mohamed Abed Rahman Salam Mousleh (alias "Abu Satha"), Mohamed Sami Ibrahim Abdullah, Fares Sadak Mohammed Ghanem (alias "al Hittawi"), Tarek Malhi A-Nuf and Zidan Mahareb Al Badawi.

3.  The Defendant informed his above mentioned colleagues that Marwan Barghouti, the head of the "Tanzim" of the Fatah in the Area, asked for them to carry out an attack immediately to avenge the death of the above mentioned Raed Karmi and cause the death of Israeli civilians.

4.  For the purpose of carrying out the said attack, the Defendant provided his above mentioned colleagues an MP-5 submachine gun, a "16" pistol and a Mazda vehicle bearing Israeli license plates.

5.  The above mentioned colleagues of the Defendant, in the above mentioned mourning tent, decided that in view of the demand of the Defendant, they would carry out an attack that very evening at the Hagivonim gas station, located on Highway 443, near the entrance to Givat Ze'ev, with the intent of causing the death of Israeli civilians.

6.  In the evening hours of that day, January 15, 2002, Mohamed Abdullah left the above mentioned mourning tent with Fares Ghanem. Mohamed Abdullah and Fares Ghanem traveled in an Isuzu pickup vehicle belonging to Fares Ghanem to the above mentioned gas station with the intent of carrying out the planned shooting attack there. Mohamed

[Stamp] P 5: 187

Mousleh, armed with a "14" pistol, Zidan Mahareb, armed with the above mentioned "16" pistol, and Tarek A-Nuf, armed with the above mentioned MP-5 submachine gun,

Prosecution Case 444/02 Amended

drove behind the above mentioned Isuzu vehicle. The three traveled in a Mazda vehicle, which they had received for this purpose from the Defendant.

7.    The above mentioned colleagues of the Defendant reached an earth mound that blocked the exit from the villages Bir Nabala and Aljib to Highway 443, about 100 meters from the Hagivonim gas station. The above mentioned colleagues of the Defendant parked their vehicles, the Isuzu and Mazda, facing the village Bir Nabala so that they could escape from the site immediately after carrying out the planned attack.

8.    Mohamed Mousleh, armed with a "14" pistol, Zidan, armed with a 16 pistol, and Tarek A-Nuf, armed with an MP-5, alighted form the vehicles and walked to the above mentioned gas station with the aim of carrying out the planned shooting attack and causing the death of Israeli civilians there.

9.    Mohamed Abdullah and Fares Ghanem stayed in the above mentioned vehicles in order to make sure that no IDF patrol or other people would come to the site. Mohamed Abdullah sat in the driver's seat of the Mazda vehicle so that he could immediately evacuate his three colleagues who had departed to carry out the planned attack immediately after executing the attack.

10.   Mohamed Mousleh and Tarek A-Nuf stood at the entrance to the above mentioned gas station.

11.   After a few minutes, at about 7:45 p.m., Mohamed Mousleh and Tarek A-Nuf noticed a white Fiat Uno vehicle, license No. 6424905, entering the above mentioned gas station, which was driven by the late Yoela Chen, and Rachel Eini was sitting next to her.

12.   Mohamed Mousleh and Tarek A-Nuf approached the above mentioned Fiat vehicle with the aim of carrying out a shooting attack against it and causing the death of the vehicle occupants. The occupants of the Fiat vehicle noticed the pistol that Mohamed Mousleh was holding and started to shout and sound the horn. Mohamed Mousleh put the pistol into his trousers and told the vehicle occupants not to fear.

[Stamp] P 5: 187 [continued]

Prosecution Case 444/02 Amended

13. At this stage, Tarek A-Nuf opened fire with burst from the MP-5 submachine gun, which the Defendant provided, at the occupants of the Fiat vehicle with the intent of causing their death. Then, Mohamed Mousleh took out his pistol to and started to shoot at the vehicle occupants with the intent of causing their death.

14. Mohamed Mousleh and Tarek A-Nuf fired at very close range a large number of rounds at the late Yoela Chen, and at Rachel Eini, who were in the above mentioned Fiat vehicle.

15. Approximately 28 bullets, which were fired by Mohamed Mousleh and Tarek A-Nuf, hit the front windshield of the vehicle, a number of bullets hit the side of the vehicle and the driver's door window.

16. During the commission of the described shooting attack, Zidan, who was standing a short distance behind Mohamed Mousleh and Tarek A-Nuf, served as a lookout and spotter.

17. Fares Ghanem, immediately after hearing the gunfire, drove from the site with his Isuzu vehicle in order to inform his colleagues whether there were checkpoints on the way to Ramallah.

[Stamp] P 5: 187 [continued]

Prosecution Case 444/02 Amended

18. Mohamed Mousleh, Tarek A-Nuf and Zidan, after having carried out the shooting attack as set forth above, ran back to the Mazda vehicle in which Mohamed Abdullah was waiting. After the three got into the vehicle, Mohamed Abdullah drove them to Ramallah.

19. In Ramallah, Mohamed Mousleh, Tarek A-Nuf, Mohamed Abdullah and Zidan met Fares Ghanem.

20. Thereafter, Mohamed Mousleh met the Defendant in Ramallah, returned the MP-5 submachine gun and the Mazda vehicle to him and reported the attack that he had carried out as described above.

21. By his acts described above, the Defendant caused the intentional death of **the late Yoela Chen**, who died at the scene as a result of gunshot wounds from bullets that were fired by Mohamed Mousleh and Tarek A-Nuf.

**Twenty fifth count: (detailed incident 39/02 Binyamin)**

**Nature of the offense:** Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 14(A) and 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, on January 15, 2002 or thereabouts, attempted to cause the intentional death of another person, as follows:

The above mentioned Defendant, at the above mentioned time, in the described in the previous count of the indictment, by his acts set forth in the previous count of the indictment, attempted to cause the intentional death of Rachel Eini, who was traveling in a white Fiat Uno vehicle, license No. 6424905, described in the previous count of the indictment. One of the bullets that were fired by Mohamed Abed Rahman Salam Mousleh (alias "Abu Satha") and Tarek Malhi A-Nuf using the weapons that had been delivered to them by the Defendant for the purpose of carrying out the shooting attack, as described in the previous count of the indictment, hit Rachel Eini in the head and two other bullets hit her left shoulder, injuring her moderately.

**Twenty sixth count: (Detailed Incident 502/02 Zion)**

[Stamp] P 5: 188

Prosecution Case 444/02 Amended

**Nature of the offense:** Causing intentional death, an offense under Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on January 22, 2002 or thereabouts, caused the intentional death of another person, as follows:

1.  The above mentioned Defendant, in January 2002, the Defendant decided that he wanted to execute a suicide attack inside the territory of the State of Israel in order to cause the death of as many Israeli civilians as possible.

2.  The above mentioned Defendant telephoned Nasser Mahmoud Aweis, a senior operative of the "Tanzim" of the Fatah, which is an illegal organization, in Nablus. The Defendant asked Nasser Aweis to send him a person who would be prepared to carry out a suicide attack. The Defendant told Nasser Aweis that he himself would see to bringing the suicide terrorist into Jerusalem in order to carry out a suicide attack there.

3.  A few days later, on January 22, 2002, in Ramallah, the Defendant met Sa'id Ramadan, a resident of Kfar Tal in the Nablus district, who informed the Defendant that he had been sent by Nasser Aweis for the purpose of carrying out a suicide attack.

4.  The Defendant called Mohamed Abed Rahman Salam Mousleh (alias "Abu Satha") and asked the latter to come to him.

5.  Mohamed Mousleh met the Defendant and the above mentioned Sa'id Ramadan that day in Ramallah. The Defendant introduced the two to each other. The Defendant and Mohamed Masalah took Sa'id Ramadan to a barber shop to have his hair cut before carrying out the planned suicide attack.

6.  Thereafter, the Defendant and Mohamed Masalah called Fares Sadak Mohammed Ghanem (alias "Hittawi") and asked the latter to transport a suicide terrorist from Ramallah to Jerusalem in order for the suicide terrorist to carry out a suicide attack in Jerusalem and cause the death of as many Israeli civilians as possible.

7.  Fares Ghanem came to Ramallah with Mohamed Sami Ibrahim Abdullah, after the latter agreed to participate in driving the suicide terrorist from Ramallah to Jerusalem. Fares Ghanem came to the meeting in his Isuzu pickup vehicle with Israeli license plates.

[Stamp] P 5: 188 [continued]

Prosecution Case 444/02 Amended

8.   According to the instruction of the Defendant, Fares Ghanem and Mohamed Abdullah traveled in the above mentioned Isuzu vehicle from Ramallah to Jerusalem in order to find a way that had no police or IDF checkpoints, with the aim of driving the suicide terrorist who would carry out the planned attack in Jerusalem later using the same route.

[Stamp] P 5: 188 [continued]

Prosecution Case 444/02 Amended

9.   Mohamed Abdullah and Fares Ghanem traveled from Ramallah via Rafat and arrived at the Atarot Industrial Zone, where the two returned to the Jerusalem – Ramallah main road and traveled left to the junction leading to the Rama Camp, where they turned right and traveled to Adam Junction. At Adam Junction the two turned right and traveled to Hizma Junction, where they turned right and entered Anta. Through Anta, they arrived at the French Hill Junction, where the two turned right and returned to Ramallah. Mohamed Abdullah and Fares Ghanem saw that on the way that they were traveling the suicide terrorist could be driven to Jerusalem without being stopped at police or IDF checkpoints.

10.  At the same time, in Ramallah, the Defendant and Mohamed Mousleh took the above mentioned Sa'id Ramadan to pray and also bought for the above mentioned Sa'id Ramadan food, new clothes and shoes. The Defendant paid with his own money for these purchases in the amount of NIS 1,200.

11.  Mohamed Mousleh, at the instruction of the Defendant, brought an M-16 assault rifle and 3 magazines for the said assault rifle, filled with cartridges two of which were connected with a magazine coupler ("jungle clip").

12.  According to the plan of the Defendant and his above mentioned colleagues, Sa'id Ramadan should have arrived in Jerusalem and shoot there at Israeli civilians with the intent of causing their death until he himself would be killed by the Israeli security forces.

13.  Thereafter, on the same day, the Defendant, Mohamed Mousleh and Sa'id Ramadan met Mohamed Abdullah and Fares Ghanem in the area of the City Inn Hotel in Albira. The Defendant introduced Sa'id Ramadan to Mohamed Abdullah and to Fares Ghanem.

14.  The Defendant explained to Mohamed Abdullah and to Fares Ghanem that the above mentioned Sa'id Ramadan was the suicide terrorist that they had to drive to Jerusalem in order for him to carry out a suicide attack by shooting at Israeli civilians with the aim of causing the death of as many Israeli civilians as possible.

15.  Mohamed Abdullah and Fares Ghanem hid the above mentioned M-16 assault rifle and magazines in the above mentioned Isuzu vehicle.

[Stamp] P 5: 189

Prosecution Case 444/02 Amended

16. The Defendant and Mohamed Mousleh wished Sa'id Ramadan luck and the three traveled to Jerusalem. The Defendant told Mohamed Abdullah and Fares Ghanem that they would have to take Sa'id Ramadan to carry out the suicide attack in any place in Jerusalem of their choosing.

17. Fares Ghanem drove the Isuzu vehicle, Sa'id Ramadan sat in the seat next to the driver's seat and Mohamed Abdullah sat in the rear seat.

18. Mohamed Abdullah and Fares Ghanem transported Sa'id Ramadan to Jerusalem on a route that they had inspected earlier that day as described above.

19. In Jerusalem, Mohamed Abdullah and Fares Ghanem traveled to Sheikh Jarah St. There they took out the M-16 assault rifle and magazines that were hidden inside the vehicle and handed them over to Sa'id Ramadan. Mohamed Abdullah moved to the seat next to the driver's seat while Sa'id Ramadan moved to the back seat, holding the M-16 assault rifle and the magazines in his hands.

20. Mohamed Abdullah and Fares Ghanem drove Sa'id Ramadan to Hanevi'im Street.

21. During the journey, Sa'id Ramadan complained to Mohamed Abdullah and Fares Ghanem that his new shoes, which the Defendant had purchased for him for the attack, were too small and pinched him. Mohammed Abdullah took of his "Reebok" shoes and handed them over to Sa'id Ramadan saying "go up to heaven with "Reebok" shoes".

22. Upon reaching the junction of Strauss and Hanevi'im Streets, Mohammed Abdullah and Fares Ghanem stopped the Isuzu vehicle.

23. Mohammed Abdullah and Fares Ghanem told Sa'id Ramadan to walk down to Jaffa Street and start to shoot at a place where he would see many people.

24. After Sa'id Ramadan got out of the vehicle with the M-16 assault rifle and the ammunition, Muhammad Abdullah and Fares Ghanem drove away from the site in the Isuzu vehicle, departed through the Musrara neighborhood to Highway No. 1 and from there drove by way of the main road to Ramallah.

25. Sa'id Ramadan, a few minutes after having got out of the vehicle of Mohamed Abdullah and Fares Ghanem, arrived at Jaffa Street.

[Stamp] P 5: 189 [continued]

Prosecution Case 444/02 Amended

26.    At about 4:20 p.m., while standing opposite Building No. 47 on Jaffa Street or
thereabouts, Sa'id Ramadan loaded the M-16 assault rifle that he was carrying, shouted
"Allahu Akbar" and discharged automatic gunfire indiscriminately at the people who
were on Jaffa Street, at the bus stop at the site, aboard the "Egged" bus No. 27 that was at
this stop at the time and at the people who were within the stores nearby with the aim of
causing the death of as many people as possible. Sa'id Ramadan, while continuing to fire,
fled from the site towards the parking lot in Harav Kook Street. There, Sa'id Ramadan
changed magazines and continued to shoot at civilians with the aim of causing their
death. Sa'id Ramadan fired through the M-16 assault rifle that he carried more than 38
cartridges. Sa'id Ramadan continued to shoot at civilians until he was killed by civilians
and policemen who arrived at the site.

[Stamp] P 5: 189 [continued]

Prosecution Case 444/02 Amended

27. By his acts described above, the above mentioned Defendant caused the intentional death of **the late Ora (Svetlana) Sandlar**, who died as a result of gunshot wounds caused by the bullets that were fired by Sa'id Ramadan.

28. After the Defendant learned about the execution of the above mentioned attack, the Defendant approached Ali Faraj Barghouti and received from the latter the amount of 1,000 U.S. dollars for executing the said attack. The Defendant gave Mohamed Mousleh, Mohamed Abdullah and Fares Ghanem 100 U.S. dollars each for their participation in the execution of this attack.

**Twenty seventh count: (Detailed Incident 502/02 Zion)**

**Nature of the offense:** Causing intentional death, an offense under Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on January 22, 2002 or thereabouts, caused the intentional death of another person, as follows:

The above mentioned Defendant, at the time set forth, at the place set forth in the previous count of the indictment, by his actions described in the previous count of the indictment, caused the intentional death of **the late Sarah Hamburger**, who died of gunshot wounds from the bullets that were fired by Sa'id Ramadan, who was dispatched to carry out the above shooting attack by the Defendant.

**Twenty eighth count: (Detailed Incident 502/02 Zion)**

**Nature of the offense:** Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 14(A) and 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on January 22, 2002 or thereabouts, attempted to cause the intentional death of another person, as follows:

[Stamp] P 5: 190

Prosecution Case 444/02 Amended

The above mentioned Defendant, at the time set forth, at the place set forth in the twenty sixth count of the indictment, by his actions described in the twenty sixth count of the indictment, attempted to cause the intentional death of as many civilians as possible who at the time were on and near Jaffa Street. As a result of the gunfire at the site that was fired by Sa'id Ramadan, who was dispatched to carry out the above shooting attack by the Defendant, **more than 45 civilians were injured**.

**Twenty ninth count: (Detailed Incident 502/02 Zion)**

**Nature of the offense:** Malicious damage to property, an offense pursuant to Section 53C of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on January 22, 2002 or thereabouts, maliciously and unlawfully destroyed or damaged property, as follows:

The aforesaid Defendant, at the above mentioned time, at the place set forth in the twenty sixth count of the indictment, through his actions described in the twenty sixth count of the indictment, maliciously and unlawfully damaged a large amount of property, including stores on Jaffa Street, an "Egged" bus stop, an "Egged" company bus, No. 27, and many vehicles, which were damaged by the gunfire that was discharged at the site by Sa'id Ramadan, who was dispatched to carry out the said attack by the Defendant.

[Stamp] P 5: 190 [continued]

Prosecution Case 444/02 Amended

**Thirtieth count:**

**Nature of the offense:** Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Section 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, in late January – early February, 2002 or thereabouts, attempted to cause the intentional death of another person, as follows:

1. The above mentioned Defendant, at the above mentioned time, in Ramallah or thereabouts, met Zafir Abed Jawad Abed Rahman Rimawi.

2. Zafir Rimawi informed the Defendant that his cousin, Mujahed Khader Rimawi, was prepared to carry out a suicide attack.

3. At the request of the Defendant, Zafir Rimawi arranged a meeting between the Defendant and the above mentioned Mujahed Rimawi.

4. After the above mentioned meeting, the Defendant consented to the suggestion of Zafir Rimawi to send Mujahed Rimawi to carry out a suicide attack in Jerusalem in order for Mujahed Rimawi to cause the death of as many Israeli civilians as possible.

5. The plan was for Mujahed Rimawi to carry out a suicide attack using a rifle, i.e. he would shoot at Israeli civilians in Jerusalem with the intent of causing the death of as many Israeli civilians and possible and would continue to fire until he would be killed by the Israeli security forces.

6. The Defendant took an M-16 assault rifle and a number of magazines for the above mentioned assault rifle filled with cartridges from Nasser (Halum) Mohamed Yusef Naji (Abu-Hamid) for the purpose of carrying out the planned suicide attack.

7. The Defendant contacted Mohamed Sami Ibrahim Abdullah, Fares Sadak Mohammed Ghanem (alias "al Hittawi") and Tarek Malhi A-Nuf. At the request of the Defendant, the above mentioned three individuals arrived in Ramallah and met the Defendant there.

[Stamp] P 5: 191

Prosecution Case 444/02 Amended

8.  The Defendant informed his above mentioned colleagues that he was asking them to bring another terrorist into Jerusalem, who would carry out a suicide attack in Jerusalem, such as the attack described in the twenty-sixth count of the indictment, with the aim of causing the death of as many civilians as possible. The above mentioned colleagues of the Defendant consented to participate in the driving of this suicide terrorist to Jerusalem.

9.  The Defendant provided Mohamed Abdullah and Fares Ghanem with a gray Subaru vehicle, which belonged to the family of the Defendant. Mohamed Abdullah returned with the Subaru vehicle to his home in Bir Nabala, while Fares Ghanem traveled with his Isuzu pickup vehicle to his home in Kfar Aqab.

10. On the following day, The Defendant called Mohamed Abdullah and Fares Ghanem and instructed them to come to the gas station located in downtown Ramallah, pick up the suicide terrorist from there and drive him to Jerusalem in order for him to carry out the suicide attack there with the aim of causing the death of as many civilians as possible.

11. Mohamed Abdullah traveled in the Subaru vehicle until the Kalandia checkpoint, where he parked the vehicle and boarded the Isuzu vehicle of Fares Ghanem, who arrived at the site. From there, the two continued to the said meeting place.

12. In Ramallah, at the above mentioned gas station, Mohamed Abdullah and Fares Ghanem met the Defendant, who introduced them to Mujahed Rimawi, who was the suicide terrorist. The Defendant handed the above mentioned M-16 assault rifle and the above mentioned three magazines filled with cartridges for M-16 assault rifles over to Mujahed Rimawi.

13. Mohamed Abdullah and Fares Ghanem hid the M-16 assault rifle and the magazines inside the Isuzu vehicle.

14. Mohamed Abdullah and Fares Ghanem traveled together with the suicide terrorist to Jerusalem with the aim of the latter carrying out a shooting attack there and causing the death of as many civilians as possible.

[Stamp] P 5: 191 [continued]

Prosecution Case 444/02 Amended

15.    Mohamed Abdullah, Fares Ghanem and Mujahed Rimawi arrived at the Kalandia Checkpoint and bypassed it. Thereafter, Mohamed Abdullah switched to the Subaru vehicle, which he had left at the site earlier and drove to A-Ram Junction. Mohamed Abdullah passed the A-Ram checkpoint in the Subaru vehicle and waited at the site for Fares Ghanem and Mujahed Rimawi, who had bypassed the A-Ram checkpoint on foot.

[Stamp] P 5: 191 [continued]

Prosecution Case 444/02 Amended

Thereafter, Fares Ghanem returned, boarded the Isuzu vehicle, in which the weapon was hidden, and passed the A-Ram checkpoint while driving alone in the Isuzu vehicle with the weapon.

16. Mohamed Abdullah drove the suicide terrorist up to a mosque in Shuafat. Fares Ghanem also arrived at this site in the Isuzu vehicle with the weapon and the ammunition.

17. There, the suicide terrorist, Mujahed Rimawi, asked to enter the mosque and to pray prior to carrying out the suicide attack. Mohamed Abdullah and Fares Ghanem agreed to this request.

18. While Mujahed Rimawi was praying at the above mentioned mosque, Mohamed Abdullah and Fares Ghanem traveled in the above mentioned Subaru vehicle to Givat Shaul in Jerusalem with the aim of checking whether there were IDF or police checkpoints on the way. The two decided to drive the suicide terrorist to Givat Shaul with the aim of carrying out the planned shooting attack there, because there were many civilians at this site.

19. When Mohamed Abdullah and Fares Ghanem returned to the mosque in Shuafat in order to pick up Mujahed Rimawi and drive him to Givat Shaul with the aim of him carrying out the planned shooting attack there, the two did not find the suicide terrorist in the mosque.

[Stamp] P 5: 191 [continued]

Prosecution Case 444/02 Amended

20.     Mohamed Abdullah and Fares Ghanem called the Defendant and reported to him that the suicide terrorist had fled from them. The Defendant instructed Mohamed Abdullah and Fares Ghanem to return to Ramallah.

21.     Mohamed Abdullah and Fares Ghanem returned to Ramallah, met the Defendant there and handed over to him the above mentioned Subaru vehicle, the above mentioned M-16 assault rifle and the above mentioned magazines. The Defendant returned the above mentioned M-16 assault rifle to Nasser (Halum) Mohamed Yusef Naji (Abu-Hamid).

22.     The Defendant informed Zafir Rimawi that his cousin had fled when he was on his way to carrying out a shooting attack in Jerusalem.

**Thirty first count:**

**Nature of the offense:** Undermining the security of the area, an offense pursuant to Section 53(A) (4) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970.

**Details of the offense:** The above mentioned Defendant, in the Area, in February 2002 or thereabouts, committed an act or an omission constituting an undermining of or damage to, disruption of or danger to the security of the Area or the security of IDF forces and soldiers or the action, use or security of any of the following: a ship, aircraft, port, quay, jetty, dock, airport, railway, sea lane, road, dirt road, locomotive, vehicle, any cargo or other public transport or public communication device, or any factory, institute or equipment that is used or is capable of being used for the manufacture, supply, storage, transfer, delivery or distribution of water, fuel, gas or electricity or any property of the State of Israel or the Israel Defense Forces, as follows:

The above mentioned Defendant, at the time set forth, in Ramallah or thereabouts, met Mohamed Naifa, alia "Abu Rabia" and Abed Karim Rateb Yunes Aweis. The two above mentioned individuals informed the Defendant that they had a suicide terrorist and requested the help of the Defendant. The Defendant consented to help send the suicide terrorist into the State of Israel in order for him to carry out a suicide attack and cause the death of as many Israeli civilians as possible.

The Defendant reached the apartment in Ramallah in which were "Abu Rabia", Abed Karim Aweis and a person who wanted to carry out a suicide attack. The Defendant talked to Muhannad Bader Mahmoud Al-Shaar (hereinafter: the Suicide Terrorist) and felt that the latter had serious intentions.

[Stamp] P 5: 192

Prosecution Case 444/02 Amended

The above mentioned Suicide Terrorist informed the Defendant that his father was also a "martyr" because he had been killed by IDF soldiers.

The Defendant transferred to Abu Rabi an M-16 assault rifles and 4 magazines filled with cartridges in order for him to deliver them to the above mentioned Suicide Terrorist for the purpose of carrying out the planned suicide attack.

On the following day, the Defendant returned to the above mentioned apartment with a video camera. Abed Karim filmed using the above mentioned video camera the above mentioned Suicide Terrorist, while he was reading out a leaflet, in preparation for his departure for carrying out the suicide attack inside the State of Israel. The Defendant and his above mentioned colleagues trained the above mentioned Suicide Terrorist in the use and firing of the M-16 assault rifle. Thereafter, the Defendant transferred the above mentioned Suicide Terrorist to the apartment of the Defendant in downtown Ramallah. The Defendant let the above mentioned Suicide Terrorist sleep in his home in order for him to depart from there on the following day to carry out the planned suicide attack.

When on the following morning the Defendant and Abed Karim Aweis came to the above mentioned apartment of the Defendant, the two discovered that the suicide terrorist had disappeared. In view of the disappearance of the above mentioned suicide terrorist, the above mentioned plan for executing the suicide attack was not put into action.

**Thirty second count:**

**Nature of the offense:** Undermining the security of the area, an offense pursuant to Section 53(A) (4) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970.

**Details of the offense:** The above mentioned Defendant, in the Area, in February 2002 or thereabouts, committed an act or an omission constituting an undermining of or damage to, disruption of or danger to the security of the Area or the security of IDF forces and soldiers or the action, use or security of any of the following: a ship, aircraft, port, quay, jetty, dock, airport, railway, sea lane, road, dirt road, locomotive, vehicle, any cargo or other public transport or public communication device, or any factory, institute or equipment that is used or is capable of being used for the manufacture, supply, storage, transfer, delivery or distribution of water, fuel, gas or electricity or any property of the State of Israel or the Israel Defense Forces, as follows:

[Stamp] P 5: 192 [continued]

Prosecution Case 444/02 Amended

The above mentioned Defendant, at the time set forth, talked by telephone with Nasser Mahmoud Aweis, the Head of the "Al Aqsa Martyrs' Brigades", the military arm of the "Tanzim" of the Fatah in the Nablus area. Nasser Aweis informed the Defendant that he was sending to him two suicide terrorists. It was agreed between the Defendant and Nasser Aweis that the Defendant would have delivered weapons and hand grenades to the above mentioned suicide terrorists and have them brought to the western part of Jerusalem in order for them to carry out the suicide attack in which they would fire at Israeli civilians, with the intent of causing

[Stamp] P 5: 192 [continued]

Prosecution Case 444/02 Amended

the death of as many Israeli civilians as possible and continue to shoot until they would be killed by the Israeli security forces.

According to the instruction of the above mentioned Nasser Aweis, on February 17, 2002, Ahmed Abu Khader, a senior operative of the "Al Aqsa Martyrs Brigades", sent from Nablus to Ramallah, to the Defendant, Saadi Jihad Mohamed-Ali Makboul, Alaa Mohamed Ali Hassan (Abed Aziz) (alias "Aswad"), who were accompanied by Ula Juma Mustafa. The two were already armed with two hand grenades.

Saadi Makboul and Alaa Hassan were supposed to carry out the suicide attack as the Defendant and Nasser Aweis had planned.

Within the preparation for the above mentioned suicide attack, in the home of Mahmoud Abu Khader, the brother of the above mentioned Ahmed Abu Khader, in the Balata Refugee Camp, Ahmed Abu Khader, using a video camera, filmed Saadi Makboul and Alaa Hassan holding M-16 assault rifles. The two also read before the video camera a leaflet of the "Al Aqsa Martyrs Brigades". Ahmed Abu Khader provided Alaa Hassan and to Saadi Makboul training in the use of weapons in preparation for carrying out the planned attack.

On February 17, 2002, Saadi Makboul and Alaa Hassan departed from Nablus to Ramallah along with Ula Mohamed Juma Mustafa and Aiman Alaa Salah Bader. Ahmed Abu Khader explained to the four that they must travel to Ramallah in the taxi of Aiman Bader. Ahmad Abu Khader explained that Ula Mustafa would be responsible for Alaa Hassan and Saadi Makboul to meet "Al Aqsa Martyrs Brigades" operatives in Ramallah, who would supply them weapons and driver them to Jerusalem according to this planning.

The above mentioned four individuals were not able to come to Ramallah and meet the Defendant for the purpose of executing the planned suicide attack. The four were arrested at an IDF checkpoint, near the village Douma in the Ramallah region. The two hand grenades that were in the above mentioned taxi were detonated at the site by an explosive ordnance disposal technician.

**Thirty third count:**

**Nature of the offense:** Conspiring to cause intentional death, an offense under Section 22 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 57828-1968 and Section

[Stamp] P 5: 193

Prosecution Case 444/02 Amended

51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970.

**Details of the offense:** The above mentioned Defendant, in the Area, in mid-February 2002 or thereabouts, conspired with another person to cause the intentional death of another person, as follows:

The above mentioned Defendant, on February 15, 2002 or thereabouts, in Ramallah or thereabouts, met Mohamed Sami Ibrahim Abdullah, Hussam Akel Rajb Shahada and Fares Sadak Mohammed Ghanem (alias "Al Hittawi").

During the above mentioned meeting, the Defendant asked his above mentioned colleague to bring into Jerusalem a suicide terrorist, who would carry out a suicide attack with the aim of causing the death of as many people as possible. The above mentioned colleagues of the Defendant agreed to the said proposal. The Defendant promised to pay his above mentioned colleagues 300 U.S. dollars in exchange for the transport of the suicide terrorist to Jerusalem. The Defendant informed his above mentioned colleagues that he would bring to them the suicide terrorist in another day or two or so.

The Defendant also gave his above mentioned colleagues a Subaru vehicle bearing Israeli license plates, in order for his above mentioned colleagues to drive the suicide terrorist in it to Jerusalem.

Mohamed Abdullah, Fares Ghanem and Hussam Shahada planned to bring the suicide terrorist into Jerusalem in an Isuzu pickup vehicle belonging to Fares Ghanem. The above mentioned colleagues of the Defendant planned to transport the suicide terrorist to one of the places in Jerusalem that had many people in it for the suicide terrorist to carry out the planned suicide attack there. Mohamed Abdullah, Fares Ghanem and Hussam Shahada also conducted a tour of Jerusalem and chose the places that in their opinion were suitable for carrying out a shooting attack against Israeli civilians. Among other places, the above mentioned colleagues of the Defendant chose the "Ramada" hotel, the tunnels of the Begin Highway and the French Hill Junction.

The above mentioned plan of the Defendant and his above mentioned colleagues did not go ahead because about two days after the above mentioned meeting, on February 17, 2002, Hussam Shahada was arrested by the Israeli security forces, and after a day, on February 18, 2002, Fares Ghanem was arrested by the Israeli security forces.

[Stamp] P 5: 193 [continued]

Prosecution Case 444/02 Amended

According to the instruction of the Defendant, after the arrest of Fares Ghanem [and] Hussan Shahada, Mohamed Abdullah, met Mohamed Zadek Mohamed Ghanem, the brother of the above mentioned Fares Ghanem, and Tarek Malhi A-Nuf, on February 19, 2002 or thereabouts, in Ramallah,. During the said meeting, Mohamed Abdullah and Mohamed Ghanem agreed to the suggestion of Tarek A-Nuf to drive a suicide terrorist into Jerusalem in order for him to carry out a suicide attack there with the aim of causing the death of as many people as possible.

This plan did not go ahead either because Mohamed Abdullah himself was arrested on the following day, February 20, 2002, by the Israeli security forces.

[Stamp] P 5: 193 [continued]

Prosecution Case 444/02 Amended

**Thirty fourth count: (Detailed Incident 483/02 Shafat)**

**Nature of the offense:** Causing intentional death, an offense under Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on February 25, 2002 or thereabouts, caused the intentional death of another person, as follows:

1.  The above mentioned Defendant, in mid-February 2002, in Ramallah or thereabouts, the Defendant decided to send a suicide terrorist to Jerusalem in order to carry out a shooting attack against Israeli targets with the aim of causing the death of as many civilians as possible. The Defendant planned for the suicide terrorist to shoot at Israeli civilians until he would be killed by the Israeli security forces.

2.  The Defendant made telephone contact with Nasser Mahmoud Aweis, a senior military operative in the "Tanzim" of the Fatah, an illegal organization, in Nablus. The Defendant asked Nasser Aweis to send a suicide terrorist to him in Ramallah for the purpose of carrying out the planned suicide attack.

3.  After a few days, Rami Mohamed Mahmoud Nur contacted the Defendant and informed him that he had been sent by Nasser Aweis for the purpose of carrying out the planned suicide attack and that he was in Ramallah.

4.  According to the instruction of the Defendant, Tarek Malhi A-Nuf met Rami Nur. Tarek A-Nuf brought Rami Nur to the Defendant.

5.  The Defendant talked to Rami Nur and thereafter took Rami Nur to a barber shop in order for the latter to have his hair cut in preparation for executing the planned suicide attack.

6.  The Defendant purchased clothes for Rami Nur, for which he paid NIS 1,000 out of his own funds.

7.  Thereafter, the Defendant led Rami Nur to an apartment in Ramallah, in which the Defendant, Tarek A-Nuf and Zidan Ramadan lived (hereinafter: "the Apartment").

[Stamp] P 5: 194

Prosecution Case 444/02 Amended

8.    On February 23, 2002, Sharif Mohamed Yusef Naji (Abu-Hamid) also came to the apartment, bringing an M-16 assault rifle which he had received from the Defendant for executing the planned attack. Sharif Naji (Abu-Hamid) also brought magazines for the above mentioned M-16 assault rifle from the home of his brother, Nasser Naji (Abu-Hamid).

9.    In the evening hours on that day, Sharif Naji (Abu-Hamid) and Zidan Ramadan provided Rami Nur with information about the place at which Rami Nur was assigned to carry out the planned attack. The Defendant and his colleagues explained to Rami Nur that he had to carry out the planned attack in the Neve Ya'akov neighborhood in Jerusalem, at a place about which Sharif Naji and Zidan Ramadan had gathered information earlier.

10.   The Defendant, along with others, filmed Rami Nur with a video camera in the framework of the preparations for the execution the planned attack.

11.   At the request of Sharif Naji (Abu-Hamid), his brother, Nasser (Halum) Naji (Abu-Hamid), contacted Kamil Ghanem and asked the latter to drive Rami Nur to Jerusalem.

12.   On February 25, 2002, in the evening, Rami Nur departed from Ramallah towards Jerusalem in the vehicle of Kamil Ghanem, in which the above mentioned M-16 assault rifle, the magazines and a hand grenade, which Rami Nur Nasser (Halum) Naji (Abu-Hamid) had delivered, were hidden.

13.   Rami Nur arrived at the main road in the Neve Ya'akov neighborhood in Jerusalem.

14.   Rami Nur got out of the above mentioned vehicle at the site specified above, armed with the above mentioned M-16 assault rifle, magazines and a hand grenade. Rami Nur approached the bus stop of the number 25 "Egged" bus line, which was at the site, and discharged automatic gunfire from the above mentioned M-16 assault rifle at vehicles that passed by and at Israeli civilians who were at the site with the aim of causing the death of as many people as possible. A police car arrived at the site and Rami Nur discharged automatic gunfire at two policemen of the Israel Police who were in the above mentioned police car with the aim of causing their deaths. The rounds that were fired by Rami Nur hit the two above mentioned policemen, who rushed towards Rami Nur and shot at him. As a result of the gunshot wounds from the rounds that were fired by Rami Nur, the late policewoman Galit Arviv was wounded and fell to the ground. Rami Nur

[Stamp] P 5: 194 [continued]

Prosecution Case 444/02 Amended

53

approached the late policewoman Galit Arviv and fired an additional burst at her from close range. As a result of the gunshot wounds from the bullets that were fired by Rami Nur, the late policewoman Galit Aviv died a few hours later.

15. After Rami Nur ran out of ammunition, he threw the hand grenade that he was carrying at an IDF jeep that had arrived at the site with the intent of causing the death of IDF soldiers. Only after Rami Nur was wounded and was out of ammunition were the policemen and civilians who were at the site able to overpower him.

16. By his acts described above, the above mentioned Defendant caused the intentional death of the late policewoman **Galit Arviv**.

[Stamp] P 5: 194 [continued]

Prosecution Case 444/02 Amended

**Thirty fifth count**: (Detailed Incident 483/02 Shafat)

**Nature of the offense**: Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 14(A) and 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense**: The above mentioned Defendant, whether within the Area or outside of it, on February 25, 2002 or thereabouts, attempted to cause the intentional death of another person, as follows:

The above mentioned Defendant, at the time set forth, by his acts described in the previous count of the indictment, attempted to cause the intentional death of as many Israeli civilians as possible. As a result of the gunshot wounds from the bullets that were fired by Rami Mahmoud Nur, who was dispatched to carry out the said attack by the Defendant, eight Israeli civilians and policemen were wounded.

**Thirty sixth count**: (Detailed Incident 483/02 Shafat)

**Nature of the offense**: Malicious damage to property, an offense pursuant to Section 53C of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense**: The above mentioned Defendant, whether within the Area or outside of it, on January 22, 2002 or thereabouts, maliciously and unlawfully destroyed or damaged property, as follows:

The above mentioned Defendant, at the time set forth, in the place set forth in the thirty fourth count of the indictment, by his acts described in the thirty fourth count of the indictment, maliciously and unlawfully caused damage to the bus stop of "Egged" line 25 in Neve Ya'akov, proximate to homes and vehicles that were at the above mentioned site, which were damaged by the gunfire that was discharged by Rami Mohamed Mahmoud Nur.

**Thirty seventh count**: (Detailed Incident 4258/02 Yarkon)

**Nature of the offense**: Causing intentional death, an offense under Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

[Stamp] P 5: 195

Prosecution Case 444/02 Amended

55

**Details of the offense**: The above mentioned Defendant, whether within the Area or outside of it, on March 5, 2002 or thereabouts, caused the intentional death of another person, as follows:

1.  The above mentioned Defendant, in early March 2002, in Ramallah or thereabouts, made telephone contact with Nasser Mahmoud Aweis, a senior military operative of the "Tanzim" of the Fatah, which is an illegal organization, in Nablus.

2.  Nasser Aweis informed the Defendant that he was sending him another suicide terrorist in order for the Defendant to dispatch him into the State of Israel in order to commit a shooting attack. The plan was for the suicide terrorist to shoot at Israeli civilians with the intent of causing the death of as many civilians as possible and continuing to fire until being killed by the gunfire of the Israeli security forces.

3.  On March 4, 2002, the Defendant contacted Ibrahim Hasouna, a policeman in the Naval Police of the Palestinian Authority, who stated that he had come to Ramallah at the instruction of Nasser Aweis and that he was the suicide terrorist for the purpose of carrying out the planned shooting attack. According to the instruction of the Defendant, Tarek Malhi A-Nuf met Ibrahim Hasouna in Ramallah.

4.  On that day, in Ramallah, Tarek A-Nuf met Sharif Mohamed Yusef Naji (Abu-Hamid). During the said meeting, Tarek A-Nuf introduced Ibrahim Hasouna to Sharif Naji (Abu-Hamid).

5.  Tarek A-Nuf informed Sharif Abu-Hamid that the Defendant had brought the above mentioned Ibrahim Hasouna from Nablus in order for him to carry out a suicide attack with the intent of causing the death of as many Israeli civilians as possible.

6.  According to the instruction of the Defendant, Tarek A-Nuf took Ibrahim Hasouna to a barber shop in order for him to have his hair cut in preparation for carrying out the planned suicide attack. In addition, Tarek A-Nuf and Sharif Naji (Abu-Hamid) purchased new clothes for Ibrahim Hasouna. Tarek A-Nuf paid for these clothes NIS 1,000, which he had received from the Defendant for this purpose.

7.  Thereafter, according to the instruction of the Defendant, Tarek A-Nuf led Ibrahim Hasouna to an apartment in downtown Ramallah, in which Tarek A-Nuf, Zidan Ramadan and the Defendant lived (hereinafter: "the Apartment").

[Stamp] P 5: 195 [continued]

Prosecution Case 444/02 Amended

8.  The Defendant arrived at the Apartment and filmed Ibrahim Hasouna with a video camera in preparation for carrying out the planned suicide attack.

[Stamp] P 5: 195 [continued]

Prosecution Case 444/02 Amended

9. The Defendant instructed Tarek A-Nuf to drive Ibrahim Hasouna into the State of Israel in order for the latter to carry out the planned suicide attack there. The Defendant instructed Tarek A-Nuf to bring a weapon to Ibrahim Hasouna for the purpose of carrying out the planned attack.

10. The above mentioned colleagues of the Defendant started to look for a person who would bring Ibrahim Hasouna into the State of Israel in order for the latter to carry out the planned suicide attack there and to cause the death of as many Israeli civilians as possible.

11. Sharif Naji (Abu-Hamid) contacted Murad Nazmi Rizak Ajluni, the holder of an Israeli identity card living in Jerusalem, and asked the latter to come to Ramallah urgently.

12. Sharif Naji (Abu-Hamid) met the above mentioned Murad Ajluni in a café in Ramallah and asked him to drive a suicide terrorist into the State of Israel. Murad Ajluni agreed to this suggestion, but asked for Sharif Naji (Abu-Hamid) to make sure to supply a vehicle that was not stolen with Israeli license plates for this purpose.

13. Sharif Naji (Abu-Hamid), Zian Ramadan and Murad Ajluni met Mohamed Mohamed Yusef Naji (Abu-Hamid), who was with Mazen Mahmoud Omar Alkadi, in Ramallah. Mazen Alkadi drove a Ford Transit vehicle with Israeli license plates, license plate No. 7014515 (hereinafter: the Vehicle). The above mentioned persons asked Mazen Alkadi for the vehicle and the licenses of the vehicle for the purpose of driving a suicide terrorist into the territory of the State of Israel in order for the suicide terrorist to carry out a suicide attack there. Mazen Alkadi handed the vehicle over to Sharif Naji (Abu-Hamid) and Zidan Ramadan, but he asked that he himself be the one to drive it.

14. At this stage, Tarek A-Nuf and Ibrahim Hasouna went to the apartment. There, Ibrahim Hasouna showered and put on the new clothes, which had been purchased for him according to the instruction of the Defendant as set forth above.

15. At about 8:00 p.m., Sharif Naji (Abu-Hamid), Zidan Ramadan and Mazen Alkadi, who traveled in the vehicle, met Tarek A-Nuf and Ibrahim Hasouna in the Clock Square in Ramallah. Tarek A-Nuf and Ibrahim Hasouna, who were armed with an M-16 assault rifle, six magazines filled with cartridges and two hand grenades, got into the vehicle. Nasser (Halum) Mohamed Yusef Naji (Abu-Hamid) also arrived at the site, and handed over to Ibrahim Hasouna a commando knife of approximately 25 cm length.

[Stamp] P 5: 196

Prosecution Case 444/02 Amended

Nasser Abu-Hamid told Ibrahim Hasouna to stab Israeli civilians in order to cause their death after running out of ammunition.

16. All of the above mentioned persons traveled in the vehicle to Refidin Square in Ramallah, because there were not many passersby there.

17. In the above mentioned Refidin Square, Nasser (Halum) Naji (Abu-Hamid), Tarek A-Nuf and Ibrahim Hasouna field stripped the above mentioned M-16 assault rifle and put it into the side door of the vehicle.

18. Sharif Naji (Abu-Hamid), Tarek A-Nuf and Zidan Ramadan kissed Ibrahim Hasouna and wished him success.

19. Murad Ajluni informed his friends that he was working in Tel Aviv and therefore knew a place in Tel Aviv at which the planned suicide attack could be carried out.

20. It was decided that after Murad Ajluni and Mazen Alkadi would drop off Ibrahim Hasouna in Tel Aviv in a crowded place, Ibrahim Hasouna would wait a few minutes in order for his above mentioned colleagues to have time to escape from the site in the vehicle and would thereafter discharge automatic gunfire from the above mentioned M-16 assault rifle at Israeli civilians who would be at the site, with the aim of causing the death of as many Israeli civilians as possible and would continue to fire until being killed by gunfire from the Israeli security forces that would arrive at the site.

21. Ibrahim Hasouna got into the vehicle, which Mazen Alkadi was driving, with Murad Ajluni sitting beside him, and the three traveled towards Tel Aviv in order to carry out the planned suicide attack there.

22. During the journey of Murad Ajluni, Mazen Alkadi and Ibrahim Hasouna to Tel Aviv, Sharif Naji (Abu-Hamid) talked to them by cellular telephone.

23. On that night, after Mazen Alkadi, Murad Ajluni and Ibrahim Hasouna had arrived in Tel Aviv, near Ma'ariv Bridge on Petach Tikva Road, Murad Ajluni showed Ibrahim Hasouna a crowded place and instructed him to carry out the planned attack there.

24. Ibrahim Hasouna took out the above mentioned M-16 assault rifle, magazines and hand grenades, which had been concealed in the door of the vehicle as set forth above.

[Stamp] P 5: 196 [continued]

Prosecution Case 444/02 Amended

25.    At about 2:15 a.m., on March 5, 2002 or thereabouts, Mazen Alkadi and Murad Ajluni let Ibrahim Hasouna, who was armed with the above mentioned M-16 assault rifle, hand grenades and commando knife, out of the vehicle near the "Seafood Market" restaurant located on Petach Tikva Road in Tel Aviv (hereinafter: the Restaurant) in order for him to carry out the planned attack.

26.    Murad Ajluni and Mazen Alkadi drove away from the site towards Jerusalem in the vehicle.

27.    Ibrahim Hasouna approached the "Seafood Market" restaurant and discharged automatic gunfire from the M-16 assault rifle at the occupants of the restaurant and passersby in Petach Tikva Road with the intent of causing their death.

28.    Thereafter, Ibrahim Hasouna threw the two above mentioned hand grenades at the restaurant with the intent of causing the death of the occupants of the restaurant and passersby, but the two hand grenades did not detonate.

[Stamp] P 5: 196 [continued]

Prosecution Case 444/02 Amended

29. After the M-16 assault rifle, which Ibrahim Hasouna carried, ceased firing due to a stoppage, Ibrahim Hasouna took out the above mentioned commando knife and started to stab Israeli civilians who were at the site with the intent of causing their death.

30. The late policeman Master Sergeant Salim Birkat arrived at the said site. The late Master Sergeant Salim Birkat rushed at Ibrahim Hasouna and overpowered him. The late Master Sergeant Salim Birkat had the chance to inform his commanders of having overpowered the terrorist.

31. At this stage, Ibrahim Hasouna stabbed the late Master Sergeant Salim Birkat in the neck using the above mentioned commando knife with the intent of causing his death. As a result of this stab wound, the late Master Sergeant Salim Birkat died at the site.

32. By his acts described above the above mentioned Defendant caused the intentional death of **the late Master Sergeant Salim Birkat.**

33. After Sharif Naji (Abu-Hamid) learned from the television broadcasts that the planned attack had been carried out as set forth above, he contacted the Defendant and updated the latter of the execution of the said attack.

34. Immediately thereafter, the Defendant informed Marwan Barghouti, the head of the "Tanzim" of the Fatah in the Area, and Nasser Mohamed Yusef Naji (Abu-Hamid), the Head of the "Al Aqsa Martyrs' Brigades", the military arm of the "Tanzim" of the Fatah, of the attack that had been carried out. In addition, the Defendant contacted the Reuters news agency and announced the attack that had been carried out as set forth above.

**Thirty eighth count: (Detailed Incident 4258/02 Yarkon)**

**Nature of the offense:** Causing intentional death, an offense under Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on March 5, 2002 or thereabouts, caused the intentional death of another person, as follows:

[Stamp] P 5: 197

Prosecution Case 444/02 Amended

61