# EXHIBIT A.364

Felony Case (Tel Aviv) 1137/02                State of Israel v. Nasser Mahmoud Ahmad Aweis

PLAINTIFF'S EXHIBIT 364

**The Courts**

**Tel Aviv – Jaffa District Court**                      **Felony Case 001137/02**

**Before:**      the Honorable Judges:                  **Date: May 5, 2003**
          **S. Timan – Presiding Judge, N. Achituv,**
          **O. Salomon-Czerniak**

In the matter of:      **State of Israel**                          **Prosecutor**
                 **represented by Counsel, Adv. Devora Chen**
                 **and Adv. Tamar Anis**

                          – v. –

                 **Nasser Mahmoud Ahmad Aweis**                **Defendant**
                 **represented by Counsel, Adv. Bulus**

Verdict summary:

Sentences – when should consecutive life sentences be imposed? –

The Defendant was convicted, *inter alia*, of 14 counts of murder and eight counts of attempted murder, with respect to his responsibility for a number of terrorist attacks, as the commander of the al-Aqsa Martyrs' Brigades in the Nablus and Northern Samaria area. The Court ruled that he should be sentenced to 14 consecutive life sentences plus an additional sentence of 50 years' imprisonment for all of the remaining offenses, to be served consecutively. It was ruled that, from both the legal and the ethical standpoints, this sentence reflects the value which society attributes to the peace and security of its citizens.

## Verdict

1.     The Defendant before us, Nasser Aweis, who was born in 1970, from the Balata refugee camp near Nablus, played – as we have proved and determined – a senior role in two Terrorist Organizations, as this term is defined in the Prevention of Terrorism Ordinance of 1948. He was the commander of the Tanzim terrorist organization in the Nablus and Northern Samaria area and served as the commander of the *Kitaab Shuhadaa al-Aqsa* (al-Aqsa Martyrs' Brigades) organization in that area. Aweis was directly subordinate to Marwan Barghouti, the head of the Tanzim organization in the Judea and Samaria area, who was subordinate to the Chairman of the Palestinian Authority, Yasser Arafat.

[Stamp] P 5: 281

1

2.  Since the outbreak of the violent events in September 2000, which are known as the "al-Aqsa Intifada", which were directed against Israeli soldiers and civilians, the Defendant initiated, planned, organized, approved, launched and financed terrorist attacks against Israeli targets, within the State of Israel and in the Judea and Samaria area. For this purpose, he purchased, obtained and ensured the manufacture of various kinds of materiel, for the use of suicide bombers or other terrorist attackers. He interviewed terrorist attackers who were referred to him; trained them; supplied them with weapons and ammunition and explosive charges; arranged for their transportation to the locations of the terrorist attacks; using video cameras and ordinary cameras, he filmed and photographed the terrorist attackers reading posters

[Stamp] P 5: 281 [continued]

Nevo Publishing Ltd.                    nevo.co.il                    The Israeli Legal Database

which he himself composed, before they set out on their missions, and he arranged for the distribution of these films and photographs to the media, after the terrorist attacks were carried out. He did all these things himself and with the assistance of his subordinates in the terrorist organizations and other members thereof, some of whom have appeared before us as witnesses.

In quite a number of cases, the Defendant himself took part in shooting attacks against military targets in the Nablus area.

3. The Defendant was convicted of all of the facts in the indictment, which includes eight counts, each of which describes a terrorist incident or a series of terrorist incidents in which the Defendant was involved:

The first was a terrorist attack which was perpetrated in the **Seafood Market Restaurant** in Tel Aviv, by a terrorist by the name of Ibrahim Hasuna, who was sent by the Defendant, was prepared and supplied with weapons by him, and came to the restaurant during the nighttime hours, armed with an M-16 rifle, hand grenades and a knife, when it was full of diners and a musical performance was under way. The terrorist began shooting in all directions, threw the hand grenades (which did not explode), and stabbed everyone who crossed his path. Before the terrorist was shot and killed by the security forces, he succeeded in stabbing to death two diners and the first policeman who arrived on the scene and charged at him, and wounded scores of persons, some of them seriously.

The second was a terrorist attack which was perpetrated by Abd al-Salaam Hasuna, in the **Armon David event hall** in Hadera, when a Bat Mitzvah celebration for a young girl named Nina Kardashov, with many invited guests, was being held there.

The terrorist, who was sent, briefed and supplied with weapons by the Defendant, came to the hall at the height of the celebration, armed with an M-16 rifle, ammunition clips and hand grenades. He burst in and fired a number of bursts in all directions before a number of unarmed guests at the celebration charged at him, risking their lives to do so; they overcame him and dragged him outside the hall, where he was shot and killed by the security forces who arrived on the scene. Before he was overcome, the terrorist succeeded in murdering six persons (between 25 and 63 years of age) and wounded scores of others, some of them seriously.

The third was a terrorist attack which was perpetrated in **Jerusalem, on the corner of Jaffa Road and Lunz Street**, which was crowded with people at the time. After having been interviewed, photographed and supplied with an M-16 rifle and ammunition clips by

[Stamp] P 5: 282

3

the Defendant, who also coordinated his transportation, the terrorist, Said Ramadan, arrived on the scene and began firing in all directions, with a view to harming as many people as possible. As a result, two women who were walking down the street were murdered and scores were wounded, some of them seriously, before policemen – some of whom happened to be there and others were summoned to the scene – shot and killed him, after a brief chase.

The fourth was a terrorist attack which was perpetrated **in the area of the hotels in Netanya**. Two terrorists, Shahadi al-Najmi and Said Bata, were sent, photographed and supplied with M-16 rifles and fragmentation grenades by the Defendant, who also gave instructions for their transportation to the scene of the terrorist attack. They arrived near the **Jeremy Hotel** in Netanya, began shooting in bursts and threw fragmentation grenades into the lobby, causing the death of a one year old baby girl and wounding scores of others, some of them seriously.

The terrorists retreated from the scene when the security forces arrived; at the end of the chase, they hid in a dark niche in another hotel building. On their way, they kidnapped a Jewish passerby and held him hostage; he was shot and killed while the terrorists were being subdued by the security forces. Both of the terrorists were also shot and killed in the same niche.

The fifth was a mass terrorist attack, which was prevented. Two terrorists, armed with M-16 rifles and hand grenades, and carrying explosives, made their way into Israel in a stolen car; there, **in the vicinity of Baqa al-Gharbiya**, they encountered a force of Border Patrol policemen. During

[Stamp] P 5: 282 [continued]

Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

the encounter, the terrorists shot at the policemen and threw a fragmentation grenade which was in their possession. One of them blew up an explosive charge which was in the car (the charge may have exploded as a result of the policemen's gunfire). Before the terrorists were shot and killed by an additional force, they succeeded in causing the death of one Border Patrol policeman and seriously wounding another policemen.

The terrorists set out for Israel with the approval of the Defendant, who – through his personnel – arranged to supply them with explosives and weapons. Moreover, the Defendant gave one of his subordinates money for the purchase of the stolen car, in which the terrorists traveled to Israel, with a view to perpetrating a terrorist attack and causing the death of many persons.

The sixth count describes **a mass terrorist attack which was planned to be carried out in Jerusalem**. Two terrorists, armed with Kalashnikov rifles and hand grenades, were stopped at an Israel Defense Forces roadblock, on their way to carry out the attack, which was miraculously prevented. The terrorists were recruited with the Defendant's knowledge; they were trained and supplied with weapons by the Defendant's personnel and according to his instructions.

The seventh count also deals with **a mass terrorist attack which was planned to be carried out in Jerusalem**. The attack was prevented when the armed terrorist was arrested by policemen near Beit Hanina and was shot and killed by them.

This terrorist as well was recruited, briefed and supplied with weapons by the Defendant's personnel, with the Defendant's knowledge and approval.

The eighth count describes **shooting attacks which the Defendant himself perpetrated** (along with his co-conspirators – whom he supplied with weapons): a number of shooting attacks against an Israel Defense Forces position which was located near Joseph's Tomb; a number of shooting attacks against Israel Defense Forces positions on Mount Gerizim; against the Ein Beit camp and against Israel Defense Forces patrols which were patrolling in the area of the Balata camp, as well as against military targets in the area of the Hawara camp.

In addition, **he supplied weapons to other activists in the terrorist organization**, for the purposes of a shooting attack on the settlement of Homesh; placing an explosive charge on the Zuata-Asira bypass road; a shooting attack against a military patrol in Deir Sharm; and placing an explosive charge.

[Stamp] P 5: 283

5

4.   With respect to his activity as described above, <u>he was accused, and was convicted by us</u>, of the following offenses:

-   14 counts of premeditated murder, pursuant to Section 300 (a) (2) of the Penal Code, 5737-1977 (hereinafter: the "**Law**"), the penalty for which is mandatory life imprisonment.

-   8 counts of attempted murder, pursuant to Section 305 (1) of the Law, the penalty for which is 20 years' imprisonment.

-   5 counts of causing bodily harm with aggravated intent, pursuant to Section 329 (1) of the Law, the penalty for which is 20 years' imprisonment.

-   2 counts of attempt to cause bodily harm with aggravated intent, pursuant to Section 329 (1) of the Law, in combination with Section 25 of the Law, the penalty for which is 20 years' imprisonment.

-   8 counts of conspiracy to commit a crime, pursuant to Section 499 of the Law, the penalty for which is seven years' imprisonment.

-   8 counts of unlawfully carrying a weapon, pursuant to Section 144 (b) of the Law, the penalty for which is 10 years' imprisonment.

-   8 counts of activity (holding a position, according to the definitions) in a terrorist organization, pursuant to Section 2 of the Prevention of Terrorism Ordinance, the penalty for which is 20 years' imprisonment.

-   8 counts of membership in a terrorist organization, pursuant to Section 3 of the Prevention of Terrorism Ordinance, the penalty for which is five years' imprisonment.

[Stamp] P 5: 283 [continued]

Nevo Publishing Ltd.                    nevo.co.il                    The Israeli Legal Database

Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

5.  It should be recalled that, even though the Defendant did not take part in the trial, and instructed his defense attorney to refrain from any intervention in the course thereof, his conviction is well-founded, on the basis of his detailed confessions to the police, as written in his own handwriting, and the confessions of his subordinates and co-conspirators and fellow members in the terrorist organization, along with descriptions by eyewitnesses and policemen, which created a uniform and solid fabric of evidence, which proves the Defendant's guilt with respect to all of the offenses attributed to him, beyond any reasonable doubt.

6.  At the outset of her arguments for sentencing, **the learned prosecuting attorney** presented us with a printout of previous convictions, including one conviction by the Military Court in Nablus, which indicates that, as early as 1985 (even before the first intifada), the Defendant was a member of a proscribed organization, was engaged in the manufacture of weapons and ammunition and in disorderly conduct, and that he served a sentence of four years' imprisonment with respect thereto. It appears that the suspended sentence which was given to him at that time could no longer be activated by the time when he began the offenses of which he has been convicted by us.

    Subsequently, the prosecuting attorney attempted to emphasize the Defendant's central position in the hierarchy of terrorist organizations, whereby he recruits, coordinates, approves, finances, supplies weapons and ammunition, is in charge of relations with the media, for the purpose of glorifying and praising the terrorist attacks, the killing and the attackers, and even carries out shooting attacks himself.

    The prosecuting attorney added that the Defendant is responsible for the murder of 14 persons, and for wounding scores of others, leaving behind him bereaved families and families burdened with the care of the wounded, whose lives were altered and destroyed in a moment, as well as destruction and harm to the sense of security of this country's citizens.

    This being the case, the prosecuting attorney has asked us to sentence the Defendant with the mandatory penalty for each of the acts of murder, consecutively with the mandatory penalties for the other acts of murder, as is fitting and proper, and as we have been instructed by the case law handed down by the Supreme Court (Criminal Appeal 399/89, **Zalum Case**, *PD* 46 (2) 259, and Criminal Appeal 9742/91, **Ami Popper Case**, *PD* 51 (5) 259, which went the same way), and as the District Courts also customarily do in similar cases.

[Stamp] P 5: 284

7

Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

In addition, the prosecuting attorney has petitioned for the imposition of consecutive sentences upon the Defendant for the additional offenses.

7.  This petition by the prosecuting attorney gives rise to two issues: one legal-procedural, and the other ethical.

We shall first consider the legal question. That question – as was determined by the Honorable Chief Justice Shamgar in the above-cited **Zalum Case** (paragraph 4, page 190) – is also divided into two parts:

> **"The first concerns the legal interpretation of the provisions of the Penal Code, which pertain to the matter before us, and the second is in the area of sentencing policy."**

With respect to the first question, the Honorable Chief Justice stated as follows (on page 190):

> **"Anyone who, by means of a single act, causes a number of deaths (for example, by placing an explosive charge or negligent driving) may be charged with a number of offenses of manslaughter equal to the number of persons who were killed, or with one comprehensive offense which includes the entire act, at the discretion of the prosecution. Generally speaking, one penalty will be imposed (Section 186 of the**

[Stamp] P 5: 284 [continued]

8

> Code of Criminal Procedure (Combined Version), 5742-1982; see also: Nacht v. Attorney General, *PDI* 11 1552). The Court, however, is entitled to decide, in light of the special nature and special circumstances of the offenses, that separate penalties will be imposed, and, if so, whether they will be concurrent or consecutive... Although, as a rule, one penalty will be imposed with respect to offenses which are rise from the same incident, this is not a universal rule, and there are circumstances which require the imposition of consecutive penalties...
>
> Section 45 (a) of the above-cited Code states that anyone who is given, in a single trial, sentences of imprisonment for various offenses, where the Court has not ordered him to serve them, in whole or in part, one after another, he shall serve only the sentence involving the longest period of imprisonment. All of that which has been set forth above results in the following two conclusions:
>
> (a) If the Defendant is convicted, according to one indictment, of a number of acts of murder, a separate penalty should be imposed for each of the acts of murder.
>
> (b) Pursuant to that set forth in the above-cited Section 45 (a), the penalties for the acts of murder will be concurrent, unless the Court expressly rules otherwise."

And with respect to the appropriate sentencing policy, the Honorable Chief Justice stated – *inter alia* – as follows (on page 192):

> "The decision with respect to concurrent or consecutive sentencing is relevant, even if we do not address the question of predefined periods of sentencing. Each conviction of a separate offense stands on its own feet; moreover, it is fitting and proper for the taking of a human life to be expressly, identifiably and separately reflected in the imposition of penalties. Sentencing a person to concurrent terms of imprisonment for a plurality of acts of murder – even if those acts of murder were conducted within a single series – implies a certain minimization of the atrocity of maliciously and deliberately causing the death of a series of people. The existence of the custom of predefining the actual time to be served for a mandatory life sentence naturally reinforces the sense of unsuitability of a single, concurrent penalty for a plurality of murders.

[Stamp] P 5: 285

Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

> **In any event, our belief in the sanctity of human life must also be reflected in the sentencing of a criminal and in the emphasis to be placed on the significance which we attribute to the taking of a human life. Accordingly, I accept the view which holds that it is not only necessary to pronounce a separate sentence for each offense, but also, that separate acts of harm to human life must also be reflected in consecutive sentences."**

8.  In the **Ami Popper Case** (the above-cited Criminal Appeal 1742/91), the Defendant assembled a number of Arab laborers, took their identity cards away from them, and shot them with automatic fire, moving his weapon from right to left and back. Only after seven laborers had been killed and 10 more wounded did he stop firing and escape in a car which belonged to two of them.

    The District Court convicted him of seven acts of murder and 10 counts of attempted murder, and sentenced him with seven terms of life imprisonment plus 20 years' imprisonment for attempted murder. The Court ruled that all of the sentences would be served consecutively.

    The Supreme Court denied his appeal and followed the precedent set by the ruling in the **Zalum Case**, whereby the Honorable Justice Dorner added statements of an ethical nature. In the case before us, however, her reference to the victims of the acts of violence who remained alive (as is the case in the matter before us) is also important.

[Stamp] P 5: 285 [continued]

10

These, *inter alia*, are her words (on page 303):

> "Moreover, where acts of violence are concerned, each of the victims has an independent interest in his bodily integrity. Harm to the bodily integrity of one person does not constitute harm to the bodily integrity of another. Even if, from the 'technical' standpoint, the case involves one series of acts which resulted in a plurality of victims, these should be considered as separate acts of bodily harm.

> This conclusion is also inevitable from the moral point of view, which recognizes the sanctity of human life as a basic value. The value of human life, and our profound repugnance vis-à-vis acts which harm it, must also be expressly and separately reflected in pronouncing sentence, with regard to both the number of penalties which should be imposed upon the defendant and the consecutive nature thereof. Even though an act of murder of a single person, in and of itself, is a uniquely grave crime, the pronouncement of the same sentence for someone who murdered one person and for someone who murdered many is likely to be interpreted as weakening the significance of the value of human life, and is even likely to detract from the degree of deterrence. After all, what will stop a murderer from adding to the number of his victims, if he does not expect any additional penalty with respect to the additional victims?"

And the Honorable Justice Heshin added, *inter alia*, the following (on page 307):

> "A human being – every human being – is a world unto himself. A human being – every human being – is individual, special and unique. And no person is like any other. He who was will no longer be, and he who has departed will not return, and Rabbi Moses Maimonides has already taught us of the unique nature of each human being (*Book of Judges, Laws of the Sanhedrin* [Hebrew], 12:3):

> 'Adam was created alone in the world, to teach us that whoever destroys one life in the world is considered to have destroyed an entire world, and whoever saves one life in the world is considered to have saved an entire world. After all, everyone who comes into the world is created in the form of the first man, and yet no one's face is like the face of another. Therefore, everyone can say: The world was created for me.'

[Stamp] P 5: 286

This is what a human being is, and this is his uniqueness. What kind of person would say such a thing about a book or a safe? We are told that each person's uniqueness is given to him by the fact that God created him in His image and according to his form: '... in His own image, in the image of God created He him...' (Genesis 1:27). I tell myself that the uniqueness of the human being – every human being – is given to him by the fact that he was created in the image of humankind. That is the beginning of the Bible. And that is its end as well.

This is so with respect to the offense of murder; and this is so with respect to the sentenced to be imposed on anyone who has murdered. It is true that a life sentence for the offense of murder means imprisonment until [the murderer's] soul leaves his body. Conceptually – and naturally – there are no consecutive life sentences. It seems, however, that we cannot express the depth of the atrocity invited in the actions of anyone who murders a plurality of persons other than by imposing consecutive sentences upon him. 'Whoso sheddeth man's blood, by man let his blood be shed' (Genesis 9:6).

In our time and in our country, human blood is no longer shed as an official act. Nor can one person be executed twice. Yet it is possible to impose consecutive life sentences on anyone who has taken lives maliciously. One life sentence for each human being and for each soul."

[Stamp] P 5: 286 [continued]

12

Felony Case (Tel Aviv) 1137/02   State of Israel v. Nasser Mahmoud Ahmad Aweis

And Chief Justice Barak concurred with his fellow judges.

9. And this, in fact, is what the District Courts customarily do, in similar cases, so that we are not required to set precedent. This is what they do with a single terrorist attacker, and there is no visible reason why not to do so in the case of a master murderer, such as the Defendant, whom we are sentencing today.

And now to the ethical question:

We have heard the moving and painful stories of victims and eyewitnesses of the terrorist attacks which have been attributed to the Defendant. We have heard people who have lost their dear ones; whose friends I hope I him or her were murdered before their eyes; who remained handicapped; whose lives changed in an instant.

These were living, concrete reminders of the horrific sights which we witness all the time; but not a muscle appeared to move in the Defendant's face in the course of their testimony.

The Defendant devoted his days and his nights, in the name of a political and ideological war of liberation, to the planning and organization of murderous acts of terrorism, which were intended to harm as many innocent civilians as possible: men, women and children, in every possible place, without distinction; with no conscience pangs, with no thoughts of remorse, to no benefit, and in contravention of every moral and human precept which could in any way justify the alleged objective. The Defendant sent the terrorist attackers out to sow death, bereavement, suffering, destruction and fear, and to disrupt the routine of all our lives.

For these actions, of which he is proud, society must have its say, in the form of a heavy sentence, which expresses – at least to a small degree – the value which it attributes to the peace and security of its citizens.

10. In accordance with all that set forth above, we sentence the Defendant to **the mandatory penalty of life imprisonment for each of the 14 acts of murder of which he has been convicted, whereby these penalties shall be consecutive** (in other words, 14 terms of life imprisonment); and for the remaining offenses of which he has been convicted, we sentence him to **50 years' imprisonment**, which he shall serve **consecutively with the life sentences** which were imposed upon him above.

[Stamp] P 5: 287

13

Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

The date on which he began to serve his sentence of imprisonment is the date of his arrest (April 13, 2002).

[The Defendant has] the right of appeal for 45 days from today.

**Handed down and notified in public, in the presence of the prosecution, the Defendant and his defense attorney, on this day, May 5, 2003.**

| | | |
|---|---|---|
| **S. Timan, Presiding Judge** | **N. Achituv, Judge** | **O. Salomon-Czerniak, Judge** |

[Stamp] P 5: 287 [continued]

Nevo Publishing Ltd.                    nevo.co.il                    The Israeli Legal Database

Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

This version is subject to changes in editing and phrasing.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

MARK I. SOKOLOW, *et al.*,

                    Plaintiffs,

vs.                                                    No. 04 Civ. 00397 (GBD) (RLE)

THE PALESTINE LIBERATION
ORGANIZATION, *et al.*,

                    Defendants.

### DECLARATION OF RINA NE'EMAN

Rina Ne'eman hereby certifies as follows:

1.     The attached translation from Hebrew to English is an accurate representation of the document received by Rina Ne'eman Hebrew Language Services, to the best of my knowledge and belief. The document is designated as P5: 281-288.

2.     I am a professional translator with a B.A. in International Relations from the Hebrew University of Jerusalem (Israel) and 30 years of translation experience. I am fluent in Hebrew and English, and I am qualified to translate accurately from Hebrew to English.

3.     To the best of my knowledge and belief, the accompanying text is a true, full and accurate translation of the Hebrew-language document bearing the bates number, P5: 281-288.

                                                    _____
                                                    Rina Ne'eman

ss.: New Jersey

On the 28 ] day of February, 2014 before me, the undersigned, personally appeared Rina Ne'eman, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is signed to this Declaration and acknowledged to me that he executed the same in his capacity, and that by his signature on this Declaration, the individual executed the Declaration.

Sworn to me this
28 day of February, 2014

Notary Public

HENRY J WHITNEY
NOTARY PUBLIC
STATE OF NEW JERSEY
MY COMMISSION EXPIRES SEPT. 7, 2015
I.D.# 2332704

בתי המשפט

| בית משפט מחוזי תל אביב-יפו | | פח 001137/02 | |
|---|---|---|---|
| כבוד השופטים:<br>ש' טימן - אב"ד, נ' אחיטוב, ע' סלומון צרניאק | בפ<br>ני: | תארי<br>ך: | 05/05/03 |

בענין :     מדינת ישראל                                מאשימה

ע"י עו"ד דבורה חן ותמר אניס

נ ג ד

נאסר מחמוד אחמד עוויס                     נאשם

ע"י עו"ד בולוס

מיני-רציו:

עונשין — מתי יוטלו עונשי מאסר עולם מצטברים ? —

הנאשם הורשע, בין היתר, ב- 14 עבירות רצח ו- 8 עבירות נסיון לרצח, בגין אחריותו למספר פיגועי טרור,
בהיותו מפקד "גדודי חללי אלאקצה" של איזור שכם וצפון השומרון. ביהמ"ש קבע, כי יש להטיל עליו 14
עונשי מאסר עולם מצטברים זה לזה ועונש נוסף של 50 שנות מאסר בגין כל העבירות הנוספות, לריצוי באופן
מצטבר. נפסק, כי הן מבחינה משפטית והן מבחינה ערכית מבטא עונש כזה את הערך שהחברה מייחסת לשלומם
ולבטחונם של אזרחיה.

### גזר דין

1. הנאשם שבפנינו, נאסר עוויס, יליד 1970 ממתחה בלאטה, שליד שכם, מילא — כך הוכח ונקבע על
ידנו — תפקיד בכיר, בשני ארגונים טרוריסטיים, כפי הגדרתם בפקודה למניעת טרור משנת 1948. הוא היה
המפקד של אזור שכם וצפון השומרון של הארגון הטרוריסטי "תנזים" ושימש כמפקד ארגון "כתאב
שוהדא אלאקצא" (גדודי חללי אלאקצה) באזור זה. עוויס היה כפוף ישירות למרואן ברגותי, ראש ארגון
"התנזים" באיזור יהודה ושומרון, שהיה כפוף ליו"ר הרשות הפלסטינאית, יאסר ערפאת.

2. מאז פרוץ האירועים האלימים בחודש ספטמבר 2000, המכונים "אינתיפאדת אל אקצא", שכוונו
כנגד חיילים ואזרחים ישראליים, יזם הנאשם, תיכנן, ארגן, אישר, הפעיל ומימן פיגועים, כנגד מטרות
ישראליות, בתוך מדינת ישראל ובאיזור יהודה ושומרון. לצורך זה רכש, השיג ודאג לייצור של אמצעי
לחימה מסוגים שונים, לשימושם של מפגעים מתאבדים או מפגעים אחרים. הוא ראיין מפגעים שהופנו
אליו ; הדריך אותם ; צייד אותם בכלי נשק ותחמושת ומטעני נפץ ; הסדיר הובלתם למקומות הפיגוע ;
צילמם במצלמות וידאו ובמצלמות רגילות, לפני צאתם של המפגעים למשימתם, כשהם קוראים כרוז

1

שחיבר בעצמו, ודאג להפיץ סרטים ותמונות אלה לאמצעי התקשורת, לאחר ביצועם של פיגועים. כל אלה עשה בעצמו, ובעזרת הכפופים לו בארגונים הטרוריסטיים וחברים אחרים בהם, שחלקם הופיעו בפנינו כעדים.

במקרים לא מעטים, נטל הנאשם עצמו חלק בירי אל עבר מטרות צבאיות באזור שכם.

3.    הנאשם הורשע בכל עובדות כתב האישום, המונה שמונה אישומים, שכל אחד מהם מתאר אירוע או שורת אירועי טרור, שהנאשם היה מעורב בהם :

<u>הראשון</u> – פיגוע שבוצע ב**מסעדת "סי פוד מרקט"** בתל-אביב, ע"י מחבל בשם איברהים חסונה, שנשלח ע"י הנאשם, הוכן וצויד בנשק על ידו, והגיע למסעדה, בשעות הלילה, כשהיא מלאה בסועדים ובמהלך מופע מוסיקלי, כשהוא חמוש ברובה מסוג M-16, רימוני יד וסכין. המחבל החל לירות לכל עבר, הטיל את רימוני היד שלא התפוצצו, ודקר את כל מי שנקרה בדרכו. עד שנורה המחבל למוות ע"י כוחות הביטחון, הספיק לדרור למוות שני סועדים, ואת השוטר הראשון שהגיע למקום והסתער עליו, ופצע עשרות אנשים שלחלקם נגרמו חבלות חמורות.

<u>השני</u> – פיגוע שבוצע ע"י המחבל עבד אל סאלם חסונה, ב**אולם האירועים "ארמון דוד"** בחדרה, בעת שהתקיימה שם מסיבת בת מצווה, מרובת משתתפים, של הנערה נינה קרדשוב.

המחבל, שנשלח, תודרך וצויד בנשק ע"י הנאשם, הגיע לאולם בשיאה של השמחה, כשכרשותו רובה מסוג M-16, מחסניות ורימוני יד, התפרץ פנימה ויירה לכל עבר מספר צרורות, עד שכמה מבאי המסיבה, הסתערו עליו, כשאינם חמושים, תוך חירוף נפש ; השתלטו עליו, וגררו אותו אל מחוץ לאולם, שם נורה למוות בידי כוחות הביטחון שהגיעו למקום. עד להשתלטות עליו, הצליח המחבל לרצוח ששה אנשים (בגילאים שבין 25 ועד 63) ולפצוע עשרות אחרים, כשלחלקם מהם נגרמו חבלות חמורות.

<u>השלישי</u> – פיגוע שבוצע ב**ירושלים, ברח' יפו פינת לונץ**, כשהמקום הומה אנשים. המחבל, סעיד רמאדן, הגיע למקום, לאחר שרואיין, צולם, צויד ברובה מסוג M-16 ומחסניות, ע"י הנאשם, שגם תיאם הובלתו, התחיל לירות לכל עבר, במטרה לפגוע במספר רב ככל הניתן של אנשים. כתוצאה מכך, נרצחו שתי נשים שעברו ברחוב, ונפצעו עשרות, ובהם כאלה שנחבלו באופן חמור, עד ששוטרים שנזדמנו והוזעקו למקום ירו בו למוות, לאחר מרדף קצר.

<u>הרביעי</u> – פיגוע שבוצע ב**איזור בתי המלון בנתניה**, שני מחבלים : שהדי אל נג'מי וסעיד בטא, שנשלחו, צולמו, וצוידו ברובים מסוג M-16 וברימוני רסס, ע"י הנאשם שהורו גם על הסעתם למקום הפיגוע – הגיעו סמוך ל**מלון "ג'רמל"** בנתניה, ופתחו בירי בצרורות, והשלכת רימוני רסס, אל עבר אולם הכניסה, כשהם גורמים למוות של תינוקת בת שנה, ולפציעתם של עשרות אנשים, שלחלקם נגרמו חבלות חמורות.

המחבלים נסוגו מהמקום עם הגיע כוחות הביטחון, ובתום מרדף הסתתרו בגומחה חשוכה, בבניין של מלון אחר, כשהם חוטפים בדרכם ומחזיקים עמם, כבן ערובה, עובר אורח יהודי, שנורה למוות במהלך ההשתלטות של כוחות הביטחון עליהם. גם שני המחבלים נורו למוות באותה גומחה.

<u>החמישי</u> – פיגוע המונע שנמנע, כשאנשי מחבלים חמושים ברובי M-16 וברימוני יד, וכן בחומרי נפץ, עשו דרכם לישראל במכונית גנובה גנובה, ונתקלו, ב**סמוך לבאקה אל גרביה** בכוח של שוטרי מג"ב. במהלך

2

P 5: 282

ההיתקלקלות ירו המחבלים לעבר השוטרים וזרקו רימון רסס שהיה ברשותם. אחד מהם פוצץ מטען נפץ שהיה במכונית (או שהמטען התפוצץ כתוצאה מירי השוטרים), ועד שנורו המחבלים למוות בידי כוח נוסף, הספיקו לגרום למותו של שוטר מג"ב ולגרום לחבלה חמורה לשוטר אחר.

המחבלים יצאו לישראל באישורו של הנאשם, שדאג – באמצעות אנשיו – לצייד בחומר נפץ ובנשק, וגם העביר לאחד מפיקודיו כסף לרכישת המכונית הגנובה, שעמה הגיעו המחבלים, במטרה לבצע פיגוע ולגרום למותם של אנשים רבים.

__השישי__ – מתאר __פיגוע המוני שתוכנן להתבצע בירושלים__, כששני מחבלים, מצוידים ברובי קלצ'ניקוב ורימוני יד, נעצרו במחסום של צה"ל, בדרכם לביצוע הפיגוע, שנמנע בדרך נס. המחבלים גויסו בידיעתו של הנאשם ; תודרכו וצוידו בנשק ע"י אנשיו של הנאשם ועפ"י הוראותיו.

__השביעי__ – עוסק גם הוא, __בפיגוע המוני שתוכנן להתבצע בירושלים__, ונמנע כשהמחבל החמוש נעצר ע"י שוטרים ליד בית חנינה, נורה ונהרג על ידם.

גם המחבל הזה גויס, תודרך וצויד בנשק ע"י אנשיו של הנאשם, בידיעתו ובאישורו של הנאשם.

__השמיני__ – מתאר __פיגועי ירי שביצע הנאשם עצמו__ (עם חבריו לקשר – להם סיפק כלי נשק) : כמה וכמה פיגועי ירי לעבר עמדת צה"ל, שמוקמה ליד קבר יוסף; כמה וכמה פיגועי ירי לעבר עמדות של צה"ל בהר גריזים; לעבר מחנה עין-בית ולעבר סיורים של צה"ל בסמוך למחנה בלטה ומטרות צבאיות באיזור חוארה.

כמו כן __סיפק נשק לפעילים אחרים בארגון הטרוריסטי__, לצורך פיגועי ירי על התנחלות "חומש" ; הנחת מטען חבלה בכביש עוקף זועתה-עצירה ; פיגוע כנגד סיור צבאי בדיר שראם והנחת מטען.

4.    בשל פעילותו המתוארת לעיל, __הואשם והורשע על ידנו__, בעבירות הבאות :

-    14 עבירות של רצח בכוונה תחילה, לפי סעיף 300(א)(2) לחוק העונשין תשל"ז-1977 (להלן : "החוק"), שהעונש עליה הוא מאסר עולם, חובה.

-    8 עבירות של ניסיון לרצח לפי סעיף 305(1) לחוק, שהעונש עליה הוא מאסר 20 שנה ;

-    5 עבירות של גרימת חבלה בכוונה מחמירה, לפי סעיף 329(1) לחוק, שהעונש עליה הוא מאסר 20 שנה ;

-    2 עבירות של ניסיון לגרימת חבלה בכוונה מחמירה, לפי סעיף 329(1) ביחד עם סעיף 25 לחוק, שהעונש עליה 20 שנות מאסר ;

-    8 עבירות של קשירת קשר לביצוע פשע, לפי סעיף 499 לחוק, שהעונש עליה הוא 7 שנות מאסר ;

-    3 עבירות של נשיאת נשק שלא כדין, לפי סעיף 144(ב) לחוק, שהעונש עליה 10 שנות מאסר ;

-    8 עבירות של פעילות (מילוי תפקיד, על פי ההגדרות) בארגון טרוריסטי, לפי סע' 2 לפקודת מניעת טרור ; שהעונש עליה 20 שנות מאסר ;

-    8 עבירות של חברות בארגון טרוריסטי, לפי סעיף 3 לפקודת מניעת טרור, שהעונש עליה 5 שנות מאסר.

3

5.    ראוי להזכיר, כי אף שהנאשם לא נטל חלק במשפט, והורה לסניגורו להימנע מכל

התערבות במהלכו, הרי שהרשעתו מבוססת היטב על הודאותיו המפורטות במשטרה, כפי שנכתבו בכתב-ידו, ועל הודאות פיקודיו ושותפיו לקשר ולארגון הטרוריסטי, ביחד עם תיאורים של עדי ראיה ושוטרים, שיצרו מארג אחיד ומוצק של ראיות, המוכיחות אשמתו של הנאשם, בכל העבירות שיוחסו לו, מעבר לכל ספק סביר.

6.    בפתח טיעוניה לעונש, הציגה בפנינו **התובעת המלומדת** פלט הרשעות קודמות, הכולל

הרשעה אחת של בית הדין הצבאי בשכם, ממנה עולה כי כבר בשנת 1985 (עוד קודם לאינתיפאדה הראשונה), היה הנאשם חבר בהתאגדות אסורה, עסק בייצור נשק ותחמושת ובהתנהגות פרועה, וכי ריצה עונש מאסר של 4 שנים, בשל כך. דומה שהמאסר המותנה שהוטל עליו שם, כבר איננו בר הפעלה, עד תחילת העבירות, בהן הורשע על ידנו.

בהמשך ביקשה התובעת להדגיש את מקומו המרכזי של הנאשם בהיררכית הארגונים הטרוריסטיים, כשהוא מגייס, מרכז, מאשר, ממומן, מספק כלי נשק ותחמושת, ממונה על הקשר עם אמצעי התקשורת, במטרה להאדיר ולפאר את מעשי הפיגוע, וההרג ואת מבצעיהם, ואפילו מבצע פיגועי ירי בעצמו.

הנאשם אחראי לרציחתם של 14 איש, ולפציעתם של עשרות אחרים – מוסיפה התובעת – כשהוא מותיר אחריו משפחות שכולות, משפחות מטופלות באנשים שנחבלו וכל חייהם נהרסו ונשתנו באחת; הרס ופגיעה בהרגשת הביטחון של אזרחי הארץ הזאת.

כיוון שכך מבקשת מאתנו התובעת להטיל על הנאשם את עונש החובה בגין כל אחד ממעשי הרצח – במצטבר לעונש החובה על מעשי הרצח האחרים; כפי הראוי וכפי שהורתה לנו הפסיקה של בית המשפט העליון (ע"פ 399/89 **בעניין זלום**, פ"ד מו (2) 259, וע"פ 9742/91 **בעניין עמי פופר**, פ"ד נא(5)259, שהלך באותה דרך), וכפי שנוהגים גם בתי המשפט המחוזיים, במקרים דומים.

בנוסף על כך, עותרת התובעת להטיל על הנאשם עונשים מצטברים על העבירות הנוספות.

7.    עתירתה זו של התובעת, מעוררת שתי סוגיות: משפטית-פרוצדורלית, וערכית.

<u>נתייחס תחילה לשאלה המשפטית</u>. וגם זו – כך קובע כב' הנשיא שמגר **בעניין זלום** הנ"ל (פסקה 4, ע' 190) – מתחלקת לשתיים: "**הראשונה** עניינה הפרשנות המשפטית של הוראות חוק העונשין, הנוגעות לענייננו, **והשניה** היא בתחום מדיניות הענישה".

אשר לשאלה הראשונה, אומר כב' הנשיא (בעמ' 190):

"מי שגורם במעשה אחד למספר מקרי מוות (למשל על ידי הנחת מטען נפץ או נהיגה רשלנית), יכול לאשם במספר עבירות של גרם מוות כמספר ההרוגים או בעבירה כוללת אחת החובקת את כל המעשה, הכל לפי שיקול דעת התביעה. בדרך כלל יוטל עונש אחד (סעיף 186 לחוק סדר הדין הפלילי (נוסח

4

C:\Users\Owner\Desktop\to bates stamp\Nasser Aweis Sentencing.doc

משלול), התשמ"ב-1982; ראה גם: נכט נ' היועץ המשפטי, פד"י י"א 1552).
אולם בית המשפט רשאי להחליט לאור המהות המיוחדת של העבירות
ונסיבותיהן המיוחדות כי יוטלו עונשים נפרדים, ואם כן, אם אלו יהיו חופפים
או מצטברים... שאם כי בדרך כלל יוטל עונש אחד בגין עבירות העולות מאותו
אירוע, אין זה כלל אוניברסלי ויש והנסיבות דורשות הטלת עונשים
מצטברים....

סעיף 45(א) לחוק הנ"ל קובע כי מי שנידון במשפט אחד לעונשי מאסר בשל
עבירות שונות, ולא הורה בית המשפט שיישאם, כולם או מקצתם, בזה אחר
זה, לא יישא אלא את עונש המאסר של התקופה הארוכה ביותר. מכל האמור
לעיל נובעים שניים אלה:

(א)   אם הנאשם מורשע לפי כתב אישום אחד במספר מעשי רצח, יש להטיל
      עונש נפרד עבור כל אחד ממעשי הרצח.

(ב)   על פי האמור בסעיף 45(א) הנ"ל יהיו העונשים על מעשי הרצח חופפים,
      אלא אם בית המשפט יורה מפורשות אחרת".

ובשאלת מדיניות הענישה הראויה, אומר – בין היתר – כב' הנשיא (בעמ' 192):

"ההחלטה בדבר חפיפה או הצטברות היא ולבנטית אף אם אין נפנים לשאלת
הקציבה. כל הרשעה בעבירה נפרדת עומדת על רגליה היא, ומעבר לכך, קיפוח
חייו של אדם מן הראוי והנכון שימצאו ביטוי מפורש, מזוהה ונפרד בצעדים
העונשיים. גזירת עונשי מאסר חופפים על מספר מעשי רצח – אף אם מדובר
בכאלה שבוצעו ברצף אחד – יש בה מכללא משום מיזעור של הזוועה שבגרם
המוות הזדוני והמכוון של שורה של אנשים. קיומם של נוהג הקציבה של עונש
מאסר עולם חובה מחדד, כמובן, את תחושת אי ההתאמה שבין מספר רציחות
לבין עונש חופף אחד.

מכל מקום, האמונה שלנו בקדושת חיי אדם חייבת למצוא ביטויה גם בענישה
של עבריין ובהדגשת משמעותו של כל קיפוח של חיי אדם בעינינו. מקובלת
עלי, על כן, ההשקפה כי לא רק שיש לגזור עונש נפרד על כל עבירה אלא כי
מעשי פגיעה נפרדים בחיי אדם צריכים גם למצוא ביטויים בעונשים
המצטברים זה לזה. "

8.   **בעניינו של עמי פופר** (ע"פ 1742/91 הנ"ל), קיבץ הנאשם פועלים ערבים, נטל מהם תעודות הזהות,
וירה לעברם אש אוטומטית, כשהוא מעביר נשקו מימין לשמאל וחזרה. רק לאחר שנהרגו שבעה פועלים
ונפצעו עוד עשרה, חדל לירות, ונמלט במכוניתם של שניים מהם.

בית המשפט המחוזי הרשיע אותו בשבעה מעשי רצח, ועשר עבירות של ניסיון לרצח, כשהוא מטיל עליו
7 מאסרי עולם ועד 20 שנות מאסר בגין הניסיון לרצח, וקבע שכל העונשים ירוצו במצטבר.

ביהמ"ש העליון דחה את ערעורו, והלך בעקבות פסה"ד **בעניין זלום**, כשכב' השופטת דורנר מוסיפה
אמירות במישור הערכי; אך לעניינינו חשובה התייחסותה גם לנפגעים ממעשי אלימות, שנותרו בחיים (כפי
המצב בעניין שלפנינו).

5

וכך היא אומרת – בין היתר (עמ' 303) :

"זאת ועוד : כאשר מדובר במעשי אלימות קיים לכל אחד מן הנפגעים אינטרס עצמאי לשלמות גופו. הפגיעה בשלמות גופו של אחד אינה מהווה פגיעה בשלמות גופו של אחר. גם אם מבחינה "טכנית" מדובר ברצף אחד של מעשים שגרם למספר קורבנות, יש להתייחס לכך כאל מעשי פגיעה נפרדים.

מסקנה זאת היא הכרחית גם מנקודת-מבט מוסרית, המכירה בקדושת חייו של אדם כערך יסוד. ערך חיי האדם וסלילתנו העמוקה ממעשים הפוגעים בו חייבים למצוא ביטוי מפורש ונפרד גם במסגרת גזירת העונש, הן לעניין מספר העונשים שיש לגזור על האשם והן לעניין הצטברותם. אף כי מעשה רצח של אדם בודד הוא כשלעצמו מעשה נפשע וחמור מאין כמותו, גזירה של אותו עונש על מי שרצח אדם אחד ועל מי שרצח רבים עלולה להתפרש כהחלשה של משמעות ערך חיי האדם, ואף עלולה לפגוע במידת ההרתעה. שכן, מה יעצור רוצח מלהרבות את קורבנותיו אם בגין הקורבנות הנוספים הוא לא יהיה צפוי לכל תוספת עונש?!".

ומוסיף כב' השופט חשין, בין היתר (בעמ' 307) :

"אדם – כל אדם – הוא עולם לעצמו. אדם – כל אדם – הוא אחד, יחיד ומיוחד. ואין אדם כאדם. מי שהיה לא עוד יהיה ומי שהלך לא ישוב, וכבר לימדנו הרמב"ם על ייחודו של האדם" (ספר שופטים, הילכות סנהדרין, יב, ג) :

"נברא אדם יחידי בעולם, ללמד : שכל המאבד נפש אחת מן העולם – מעלין עליו כאילו איבד עולם מלא, וכל המקיים נפש אחת בעולם – מעלין עליו כאילו קיים עולם מלא. הרי כל באי עולם בצורת אדם הראשון הם נבראים ואין פני כל אחד מהם דומין לפני חברו. לפיכך כל אחד ואחד יכול לומר : בשבילי נברא העולם".

כך הוא האדם, וזה ייחודו. מי הוא זה ואיזה הוא שיאמר כך על ספר או על כספת? אומרים לנו כי ייחודו של האדם בא לו משום שהאלוהים בראו בצלמו כדמותו : "בצלמו בצלם אלוהים ברא אותו..." (בראשית א' כ"ז). כשאני לעצמי אומר, כי ייחודו של האדם – כל אדם – בא לו משום שנברא בצלם האדם. זו תחילתו של מיקרא. זה גם סופו.

כך הוא באשר לעבירת הרצח. כך הוא גם באשר לעונש שיוטל על מי שרצח. אכן, מאסר עולם בעבירת רצח הוא מאסר עד צאת הנשמה. מבחינה מושגית – זה דרך הטבע – אין מאסרי עולם מצטברים. ואולם דומה כי לא נוכל לבטא את עומק הזוועה שבמעשהו של מי שרצח את הרבים אלא אם נטיל עליו עונשים מצטברים. "שופך דם האדם באדם דמו יישפך" (בראשית ט' ו').

בימנו ובמקומנו אין עוד שופכים – כמעשה-ממלכה – את דם האדם. גם אין ניתן להוציא להורג אותו אדם שתי פעמים. אך מאסרי עולם במצבטא ניתן להטיל על מי שקיפח חיים רבים בזדון. מאסר עולם תחת כל נפש ונשמה".

6

נבו הוצאה לאור בע"מ nevo.co.il המאגר המשפטי הישראלי

C:\Users\Owner\Desktop\to bates stamp\Nasser Aweis Sentencing.doc

וכב' הנשיא ברק מסכים לדברי חבריו.

9.    וכך, אכן, נוהגים בתי המשפט המחוזיים, במקרים דומים, עד שאיננו נדרשים לחריש

ראשון. כך נוהגים במפגע בודד, ואין שום סיבה נראית לעין שלא לנהוג כך ברב-מרצחים כמו הנאשם,
שאת עונשו אנו גוזרים היום.

<u>ומכאן לשאלה הערכית:</u>

שמענו סיפוריהם המרגשים והכואבים, של נפגעים ועדי ראיה לפיגועים המיוחסים לנאשם. שמענו
אנשים שאיבדו יקיריהם; שחבריהם נרצחו לנגד עיניהם; שנותרו נכים; שחייהם השתנו באחת.

היו אלה תזכורות חיות ומוחשיות, למראות-הזוועה שאנו חוזים בהם בכל העת; אך דומה שאף שריר לא
זז בפניו של הנאשם, במהלך עדותם.

הנאשם הקדיש ימיו ולילותיו – בשמה של מלחמת שחרור פוליטית ואידיאולוגית, לתכנון וארגון
פעולות טרור רצחניות המיועדות לפגוע במספר גדול ככל האפשר של אזרחים תמימים: אנשים נשים וטף,
בכל מקום אפשרי- ללא אבחנה; ללא נקיפות מצפון, ללא הרהורי חרטה, ללא תועלת ובניגוד לכל כלל
מוסרי ואנושי, שיש בו כדי להצדיק במשהו את המטרה הנטענת. הנאשם שילח את המפגעים לדרכם כדי
לזרוע מוות, שכול, סבל, הרס ופחד, ולשבש את שגרת החיים של כולנו.

<u>על מעשיו אלה, שהוא גאה בהם, חייבת החברה לומר את דברה בעונשה מכבידה, שתביע –ולו במקצת-
את הערך שהיא מייחסת לשלומם וביטחונם של אזרחיה.</u>

10.   על פי כל אלה, אנו גוזרים על הנאשם **עונש חובה של מאסר עולם בגין כל אחד מ-14**

**מעשי הרצח שהורשע בביצועם, כשעונשים אלה מצטברים זה לזה** (דהיינו – 14 מאסרי עולם); ועל
יתר העבירות בהן הורשע, אנו גוזרים עליו **עונש מאסר של 50 שנים,** אותו ירצה **במצטבר לעונשי מאסר
העולם** שהוטלו עליו כדלעיל.

תחילת ריצוי המאסר, ביום מעצרו (13.4.02).

זכות ערעור 45 ימים מהיום.

**ניתן והודע בפומבי, בנוכחות התביעה, הנאשם וסניגורו, היום 5.5.03**


- - - - - - - - - - - - - - - - - - - - - - -     - - - - - - - - - - - - - - - - - -    - - - - - - - - - - - - - - - - - -

ע' סלומון צ'רניאק, שופטת       נ' אחיטוב, שופטת      ש' טימן, שופט, אב"ד

7

נבו הוצאה לאור בע"מ nevo.co.il   המאגר המשפטי הישראלי

נוסח זה כפוף לשינויי עריכה וניסוח

נבו הוצאה לאור בע"מ   nevo.co.il   המאגר המשפטי הישראלי

C:\Users\Owner\Desktop\to bates stamp\Nasser Aweis Sentencing.doc