# EXHIBIT A.384
## (2 of 3)

**First**, it must be noted that the Defendant himself answers this question in his statement[19], in which he confirms his nickname from childhood as "Bazbaz". This is the place to indicate that it is not a common or usual nickname (such as the teknonym-based naming of a person after his firstborn son, such as "Abu Mohamed", of which there are thousands of instances). The uniqueness of this nickname, along with the other personal details of the Defendant, indicates the congruence between him and the Defendant.

But the conviction of the Defendant for the severe offenses that are attributed to him does not rely on this alias only, but also on his personal identification by the witnesses of the prosecution, with whom he had good relations. Concerning the arguments that the prosecution witnesses had "gotten confused" or that they meant another person, extensive examination of the evidence material reveals that there is no substance behind this. The Defendant confirms in his statements his acquaintance with the other "protagonists" of the events, the prosecution witnesses who incriminate him, and also admits to committing security offenses with them. Thus, the Defendant admits[20] his acquaintance with Nasser Aweis and shooting, together with him, at an IDF position, and also performing an attempt at shooting. The Defendant was also expelled with Nasser Aweis from the Area in 1992, and they traveled to Baghdad together[21]. The conjecture that Nasser Aweis did not know the Defendant and had referred to another Majed Masri in his words is truly fallacious in these circumstances. The Defendant further confirms in his statements that he had delivered money to Mansour Sharim and Mohamed Naifa, and that he also confirmed his personal acquaintance with them. He also confirmed the transfer of a Kalashnikov rifle to Mohamed Naifa (according to the account of the Defendant, due to an internal conflict)[22].

[Stamp] P 6: 24

---

[19] **P/ 1**, page 8 lines 22-25.
[20] See **P/ 1**, page 2 lines 5-12.
[21] See **P/ 2**, page 5 lines 13-24.
[22] See **P/ 1**, page 3 line 26 to page 5 line 21.

Therefore, the acquaintance of the Defendant with the witnesses of the prosecution is explicitly shown by his own statements. But the prosecution witnesses did not stand idle, and they went into further detail concerning their acquaintance with the Defendant. Mansour Sharim identified the Defendant by his full name in his testimony before him and stated that the Defendant was his friend[23]. Fahed Sharia gave in his statement[24] an exact description of the Defendant, including his workplace as an officer in the Palestinian Police, his age, marital status and his being a father of two daughters (details that the Defendant himself confirmed in his statement) and added that the nickname of the Defendant was "Bazbaz". The prosecution witness Riad Ouda, who even in his biased testimony[25] confirmed his personal acquaintance with the Defendant in view of their joint service in the Palestinian Police, also noted in his statement[26], which was received and preferred over his testimony, the alias of the Defendant and the fact that he was a member of the "Al Aqsa Brigades" Organization. there is no concern that prosecution witness Ibrahim Habisha would forget the Defendant after he had caused his severe injury when he played with a grenade launcher that he was holding. He also mentioned[27] the Defendant by his name and alias and stated his membership in the terrorist organization. **The prosecution witness Mohamed Naifa stated[28] the cellular telephone number of "Bazbaz", 059-200596, which is surprisingly similar to the number that the Defendant himself gave in his statement[29], 059-200569.**

The Defense Counsel contended that there were genuine flaws in the investigation, insofar as no identity line-up had been held for the witnesses. The Defense Counsel did not provide references to prove his argument and we have not found any substance in it. It seems from all that which has been expansively set forth above that the witnesses know the Defendant well, provided many details that identified him, some of them pointed him out in the courtroom (even if they withdrew their incrimination or gave various odd explanations to account for it). If this is the case, we have before us a situation of witnesses who "pointed out" the Defendant, as a person whom they knew beforehand, rather than the identification of an unfamiliar person using various visual methods (identity line-up), and there is no duty to hold an identity line-up in these circumstances. See also **Y. Kedmi**, On Evidence (1999 edition), second part, pp. 851-852.

This is also the place to address the statistical question of whether it is possible that it is another Majed Masri. The Defendant asked to submit for this purpose a record of the Palestinian Ministry of the Interior concerning the frequency of the name Majed Masri. The defense asked to submit the document based on the testimony of the Defendant.

[Stamp] P 6: 24 [continued]

---

[23] See the transcript of the testimony of Mansour Sharim dated November 30, 2003, page 1 lines 35-50

[24] See **P/ 70**, page 1 lines 19-22.

[25] See transcript of the testimony of Riad Ouda dated March 30, 2004, page 9 lines 18-22, page 10 lines 34-39.

[26] See **P/ 3**, page 4 lines 4-8.

[27] See **P/ 61**, page 2 line 17 and page 3 line 2.

[28] See **P/ 60**, page 25 line 12.

[29] See **P/ 1**, page 2 line 25.

Date: June 28, 2005        **10**        Case No.: 5398/03

[The circumstances of the submission were also odd, to say the least. The submission of the document was not requested in the direct examination, but suddenly emerged in the reexamination. The Defendant purported to confirm the list that the Defense Counsel showed, without any explanation as to why this list was authentic or in what ways it was produced.].

The prosecution objected to the submission of the document, and we accepted[30] its position that the document could not be accepted other than through its originator. However, in order to placate him, we suggested – which suggestion the parties accepted – that the prosecution submit an agreed upon document that would be produced by the Ministry of the Interior at the Civil Administration.

An inspection of the query indicates that a number of people in the Nablus area answer to the name of Majed Masri, but all of them are especially old or especially young and do not match the description of the Majed Masri who is mentioned in the testimonies of the prosecution as a person aged about 30 – except for one person, who is the Defendant before us. Concerning the argument of the Defendant[31] that he once learned that there was another person called Majed Ismail Mohamed al-Masri, who took a loan at a bank under his name – inspection of the query will reveal the extent to which this argument is a lie, as the Defendant is the only person who answers to this four part name, not only in the relevant age profile and not just in the Nablus District but throughout the West Bank and even the Gaza Strip.

**Therefore, we determine that the Defendant before us is the same Majed Masri, known as "Bazbaz", who appears in most of the prosecution evidence. We must now examine whether this evidence is enough to lead to the conviction of the Defendant for the acts attributed to him.**

### The counts of the indictment that are attributed to the Defendant

The proof of the counts of the indictment is based on the evidence of the prosecution as set forth below. The Defendant did not address the matter of proving the facts of the indictment from the evidence material (but sufficed with denying them).

### First count of indictment

[Stamp] P 6: 25

---

[30] See transcript of June 14, 2004, pages 11-12.
[31] *Ibid*, page 11, lines 16-20.

This count of indictment attributes to the Defendant membership in the well-known terrorist organization the "All Aqsa Brigades". The Defendant is incriminated on this count by three of the prosecution witnesses, Fahed Sharia, Ibrahim Habisha and Riad Ouda. These testimonies dovetail with one another, support each other and fulfill the requirement of the evidentiary addition.

## Second count of indictment

This count of indictment attributes to the Defendant holding an office in the prohibited organization, insofar as he headed the Al Aqsa Brigades in the Nablus area in 2002, commanded the military operations that the organization performed during that bloody year, coordinated the activity of the military operatives, provided them with arms and financing, which he received from Marwan Barghouti and others and used to take responsibility for the acts of the organization in the media.

Contrary to the insistent denials of the Defendant, it seems that the abundant activity in which the Defendant engaged and his status in the organization were burned into the memory of many operatives, who remembered that he commanded them, the money with which he had enriched them and the weapons that he had provided to them. A long list of prosecution witnesses incriminate the Defendant of that which has been attributed to him in this count of the indictment, as expansively set forth in the summations of the prosecution. For example, Mansour Sharim describes the status of the Defendant in the organization, the large amounts of money that he received from him on several occasions for the purpose of carrying out attacks and that the Defendant had taken the responsibility for attacks on behalf of the organization. Thus, Nasser Aweis described the Defendant as the financer who financed him and also received from him a sum of NIS 12,000. Thus, Mohamed Naifa described the Defendant as the commander of the Al Aqsa Brigades in Nablus, as the one who cleared him to carry out attacks and took responsibility for them on behalf of the organization (the witness sent to him for this purpose a photocopy of the will of Sirhan Sirhan, the murderer in the Kibbutz Metzer attack) and as the one who financed the execution of attacks and provided weapons for that purpose. Fahed Sharia also described at length the status of the Defendant as the one who would give him instructions; as the one who organized processions for the organization, for which purpose he ordered him to distribute photographs of martyrs and shoot in processions; and as the one who transferred weapons from one operative to another on a series of occasions. These testimonies support one another and fully satisfy the demand of the evidentiary addition, and the place of the statement of the Defendant is not amiss in this regard. The Defendant did try, as per his habit, to distance himself from both his membership in the organization and the office that he held therein, but in his statement, he also gave details that verified the incriminating statements made by his colleagues, including the fact that he had transferred money to the people who had incriminated him of doing so (Nasser

[Stamp] P 6: 25 [continued]

Date: June 28, 2005                    **11**                    Case No.: 5398/03

[…] Aweis, Mohamed Naifa, Mansour Sharim), that he had received money from Marwan Barghouti, Munir Makdah (also mentioned by Nasser Aweis) and others, that he had supplied weapons to Naifa, that he had made contact with Arabic television stations, that he had helped build a website for the organization and more.

The facts that are elaborated in this count of the indictment concerning the function of the Defendant, his place in the hierarchy of the organization at the given time and the various actions that he took within his function will be discussed again when we point out the responsibility of the Defendant for the offenses that were carried out on behalf of the organization.

**Third count of indictment**

This count attributes to the Defendant an offense of shooting at a person, insofar as on a number of occasions, he carried out shooting with his fellow organization members at IDF soldiers. Prosecution witness Nasser Aweis incriminated him in the commission of shooting acts with him. The Defendant also indicated in his statement an act of shooting that was carried out with Nasser Aweis, which provides full evidential infrastructure for the conviction of the Defendant for this count of indictment.

**Fourth count of indictment**

The prosecution withdrew this charge and we are exempt from discussing it.

**Fifth count of indictment**

This charge attributes to the Defendant the offense of attempted shooting, insofar as he departed with Nasser Aweis to shoot at IDF soldiers, but in the end they changed their minds after they were discovered by military forces. The Defendant and Nasser Aweis described the event similarly in their statements and we have seen fit to convict the Defendant for this offense.

**The responsibility of the Defendant for the acts of murder by virtue of his function**

The severe counts of indictment numbers 6-18 attribute to Defendant the responsibility for the deaths of 10 people in the suicide attacks on Jaffa Street in Jerusalem, in the settlement Hermesh and in Kibbutz Metzer, and the injury and attempted murder of others in the same events. All of these murderous acts were carried out by suicide terrorists who had been dispatched on behalf of the Al Aqsa Brigades Organization and by the Defendant and his accomplices.

[Stamp] P 6: 26

Naturally, it is not possible to prosecute the suicide terrorist who sacrificed himself on the altar of the shameful ideology. This does not mean that the people who stood behind him, and who used him as a tool for fulfilling their shameful goals, should evade punishment. Penal law has also recognized the possibility of imposing culpability, including full culpability, on a person who pursuant to his function or status (even an unofficial status, see the "Meshulam" case mentioned below) motivated others to commit offenses.

**The responsibility of the heads of the terrorist organization for the acts of the members of the organization – the normative aspect**

It is well known that military legal theory accepts the doctrine of "command responsibility", whereby a higher ranking operative is responsible for the acts of his subordinates that have been carried out by his order and with his approval, even if in effect he took a minor or even insignificant practical part in the acts themselves. We feel that anybody who has eyes in his head cannot fail to reach the categorical conclusion that parallel responsibility, albeit in completely different circumstances, must also be imposed on the heads of criminal and terrorist organizations who direct their criminal activity and order the execution of murders by "remote control".

The statements of Honorable Justice Kedmi in Criminal Appeal 5589/98 **Bisan Sultan v. State of Israel**, Supreme Court Compendium 99(3) 98 applies to this case. In that case, the appellant was convicted of the offense of premeditated murder, after it had been proved that he gave his consent and approval to execute the murder and dispatched the primary perpetrator to carry out the murder, and also guided him concerning the method of execution. Justice Kedmi emphasized that were it not for the consent of the appellant, the murder would not have been carried out, and therefore the giving of the approval to carry out the murder was akin to "**the start signal that is fired to signal an athlete to start a race**", and it constitutes "an act of participation in the commission of the offense". Therefore the appellant was convicted as the co-perpetrator and not for soliciting the act, and was the "mastermind of the gang", while one who solicits is outside the inner circle of execution. The Honorable Justice Kedmi further

[Stamp] P 6: 26 [continued]

stated that in the circumstances described above, in which the appellant gave a "green light to murder" and the operative directions as to the manner of execution, his behavior constituted at least "**a hefty amount of solicitation by way of encouragement**".

In Further Criminal Hearing 1294/96 **Uzi Meshulam *et al.* v. State of Israel**, PD 52 (5) 1, the Honorable Justice A. Matza ruled that: "**Such a participant – who has full control over the execution and whose action includes not only actions of solicitation and preparation but also directing the acting offenders and overseeing their activity – is to be considered a co-perpetrator to all intents and purposes**". He emphasized that presence at the crime scene is not a vital basis for a person to be a co-perpetrator, and said:

> "**In the new legal reality, making presence at the scene a condition for direct responsibility would mean that 'godfathers' and leaders of criminal groups, who dispatch to the scene of the act the "small fry" who answer to them, while they lead the criminal activity remotely, would not be considered as co-perpetrators but only as having solicited the offense. And this possibility, which certainly does not reflect the desirable legal theory, is not mandatory in the legal system that is in place either**".

The same judgment was handed down after a thorough analysis of the character of Rabbi Uzi Meshulam and the conclusions of the judges concerning the authority that he held over his followers.

These principles are expressed not only concerning criminal organizations, but also concerning senior officers in terrorist organizations, in the instructive judgment of the Tel Aviv District Court, in Felony Case 1158/02 **State of Israel v. Marwan Barghouti**. See also similar principles that are cited in the above mentioned Barghouti judgment, which are cited in the articles of M. Kremnitzer "**The Perpetrator in Penal Law, a Character Portrait**", Plilim A (5740-1990) 65, p. 72, and M. Gur-Arieh, "**Parties to an offense – Amendment 39 to the Penal Code in the Test of Case Law**", Megamot Beplilim, p. 83.

**From the specific to the general**

[Stamp] P 6: 27

There is no easier task than proving the senior status of the Defendant in the Al Aqsa Brigades Organization in and around Nablus, and his absolute control over the military activity of the organization while he served as the head of the organization in the city. We have seen that the Defendant acted as the commander of the Al Aqsa Brigades in the Nablus area in 2002, and the operatives of the organization answered to him directly. The Defendant was involved in the distribution of money to the operatives of the organization – money which powered the wheels of terrorism. The Defendant coordinated the activity of the members of the organization in the Area and was in contact with Marwan Barghouti, the commander of the Tanzim Organization. The Defendant provided weapons to operatives for executing their tasks and was also involved in additional aspects of the activity of the organization, such as organizing processions and building a website and other such illicit actions.

The following facts of the count of the indictment will reveal how the Defendant was involved in the preliminary preparations for carrying out suicide attacks and how a military operative contacted him in order to get his approval for murdering innocents. It is blatantly obvious that he considered himself the arbiter of life and death in the Nablus area. At the initiative, with the approval and with the blessing of the Defendant, the suicide attacks described below were launched, and he assumes lawful liability for them.

We shall conclude this chapter by mentioning the symbolic fact that within the framework of his capacity, the Defendant was the one who hastened to assume responsibility on behalf of the organization for the suicide attacks that the organization carried out. However, when standing trial for his actions, the Defendant feigned shyness and did not repeat this, but things seem to speak for themselves, and show why there is no room for letting the Defendant evade the responsibility that he assumes, within the framework of his position, for the murderous acts committed by the organization that he headed and for which he hastened to be proud.

**But the responsibility of the Defendant for the murderous acts does not end with the "ministerial" level alone**, for the Defendant was also involved in performing actual deeds within the execution of the suicide attacks in question, which acts lead him into the framework of the "inner circle" of the perpetrators of the offense, who assume responsibility as direct perpetrators. We shall not discuss the part of the Defendant within the framework of the execution of each of the attacks.

### The general chain of events

The Defendant's denial of the charges against him was general and categorical. The Defendant did not show us any clearly delineated point of dispute, even concerning the parts of the counts of the indictment that had no bearing on him. The defense demanded the proof of every letter and punctuation mark in them, including concerning the events that were carried out after the Defendant was no longer in the picture [Stamp] P 6: 27 [continued]

(see the chapter dealing with the testimony of Ahmed Barghouti that is referred to above) and was unable to provide a position even concerning the fact of the occurrence of the attacks.

The act of the defense in persistently using a categorical denial, even to the fact of the death of the victims, is regrettable, particularly when the technical material that substantiates these facts was filed with its consent. Unfortunately, we have not been seized by the concern that the Defendant would be held accountable for murders that were not carried out. The large amount of technical evidence that was filed with the consent of the defense substantiates the facts of the events described and the terrible pictures of the murder victims, including small children and leave no room for doubt in this regard.

In effect there is no genuine dispute concerning the chain of events relating to the stages of execution of the attacks either. If we look further, beyond the dust clouds that the prosecution witnesses have attempted to kick up in their various evasive maneuvers, it seems that they (Mohamed Naifa, Mansour Sharim, Nasser Aweis, Ibrahim Abdel Hai) do not effectively deny the execution processes of the murderous acts and focus primarily on (the denial of) the part of the Defendant. In any case, a reading of their statements extensively and elaborately reveals the chain of these events (including the preparations, arming and filming of the suicide attackers and driving them to the murder scene and so on).

Therefore, we have found that the general chain of events has been adequately proved out of the evidence that was brought before us, and it is doubtful whether it is truly disputed, and we shall now focus our view on the part of the Defendant.

**Counts 6-8 of the indictment, the attack on Jaffa Street**

These counts of the indictment attribute to the Defendant responsibility for the murder of the late Ora Sandler and Sarah Hamburger and an attempt to cause the death of 45 civilians who were injured in the event. The event was executed on behalf and in the name of the Al Aqsa Brigades Organization. The Defendant is charged with having received the suicide terrorist in an apartment in the Balata Camp and having filmed him holding a rifle and a book of the Koran along with Mahmoud Titi. Thereafter, the Defendant dispatched the suicide terrorists, Sa'id, on his last way. After these things, Sa'id departed for Ramallah, where he was sent by Ahmed Barghouti to Jerusalem, where he opened fire [at others] indiscriminately until he was vanquished, but not before he had caused the murder of two women and injured dozens of others.

[Stamp] P 6: 28

Prosecution witness Ibrahim Abdel Hai talks about the part of the Defendant, as set forth in the transcript of his confession in his trial (**P/ 69**, Subsection 6 of the sixth count of the indictment) and the part of the charge relating to the Defendant is based on this testimony. We learn about the background leading up to the event from the statements of Abdel Hai and of Nasser Aweis. The statements of prosecution witnesses 16, 17, Mohamed Masleh and Mohamed Abdullah were filed consensually[32] and their content is considered to be agreed to (**Judea and Samaria Single Judge Appeal 114/01, Abu Hilal**). From these statements, along with the transcript of the confession of Ahmed Barghouti, we learn about the responsibility of that Sa'id after having been sent and filmed by the Defendant. The technical material indicates the deadly results of the event. But it is understood that all of the evidence comes together to provide support that greatly exceeds the high level of support that is required for the testimony of Abdel Hai.

It seems that at present, one does not need much imagination concerning the meaning of the act of filming a suicide terrorist who is reading his will before departing on his last journey, and the act of the Defendant in this context speaks for itself. This act, along with the status of the Defendant referred to above, substantiate his place as part of the "inner circle" of the dispatchers of the suicide terrorist and his full responsibility for the attack and its murderous results.

For these reasons, we convict the Defendant for responsibility for the suicide attack on Jaffa Street in Jerusalem, the injury of the civilians and the attempt to murder others.

### Counts 9-12 of the indictment, the attack in the settlement Hermesh

This attack was executed by Mohamed Naifa, with the assistance of Akram Abu-Bakar, Osama Eshkar and Amjad Yahya. The Defendant is charged (Subsection A & I of the count of the indictment) of being the one to give explicit approval to Mohamed Naifa to carry out the attack, after which he took responsibility for it on behalf of the organization and transferred to Naifa the sum of $3,000. In the event, the late Linory Seroussi, Hadas Turgeman and Orna Eshel were murdered and Yuval Eshel was injured.

[Stamp] P 6: 28 [continued]

---

[32] See transcript of hearing dated June 14, 2004, page 1 lines 21-22.

The part of the Defendant arises from the statements of Naifa, which we saw fit, as stated above, to accept. Naifa describes how, after Akram Abu Bakar told him that he had a suicide terrorist who  was prepared to carry out an attack, he contacted the Defendant, who approved his execution of the murderous act (or in the words of the Defendant, "Why not?"[33]). It shall be emphasized from the words of Naifa that he instructed Akram to continue to work on the attack only after his talk with the Defendant and receipt of approval from him. Naifa also describes how, after the attack, the Defendant assumed responsibility for the attack on behalf of the organization and also transferred the amount of money to him.

Naifa's words are supported by none other than the statement of the Defendant, who confirmed that he had handed money over to Naifa the day after the attack for erecting a mourning tent for the martyr[34]. The other persons involved in the attack, whose statements were filed consensually[35], substantiate the facts of the charge in general and the technical material substantiates its deadly results and the injury of Yuval Eshel, whose late wife Orna was murdered before his very eyes.

We can see how the Defendant had complete control over the execution of the attack, and its perpetrators answered to him, by words and by actions, before it and after it. The Defendant assumes full responsibility for the event that was dispatched with his blessing, approval and financing, and which he hastened to assume responsibility for, and we convict him for this responsibility.

### Counts 13-18 of the indictment, the Metzer attack

In this event, too, the suicide terrorist, Hayat Hadem Sirhan Sirhan, was dispatched by Mohamed Naifa to Kibbutz Metzer. In his shooting spree in the kibbutz, Sirhan murdered the children of the Ochayon family, Matan and Noam, their mother Revital and kibbutz residents, the late Tirza Damari and Yitzhak Dori.

Examination of the statements of Naifa indicates that once again, he contacted the Defendant, informing him that he had another suicide terrorist who was prepared to be dispatched and a request to arm him with a weapon, and the Defendant saw to this. Thereafter, Naifa asked the Defendant to take responsibility for the attack, and had the film of Sirhan reading his will transferred to him.

[Stamp] P 6: 29

---

[33] See **P/ 60**, page 4 line 25.
[34] See **P/1**, page 5 lines 5-9.
[35] See transcript of September 2, 2003, page 3 lines 27-28.

The Defendant himself supports the statements of Naifa significantly (while taking the sting out of those things, as per his habit) by indicating in his statement that he had provided Naifa with a weapon (he contended that this was following an encounter that Naifa had with another person) and that after the attack he called the television station to announce that he objected to carrying out attacks within the State of Israel. Needless to say, this endnote alongside the account of the Defendant is not reliable for our purposes. The Defendant made no effort to repeat this evasive account in his testimony and distanced himself from any involvement with Naifa and providing a weapon.

The other prime suspect involved in the event, Osama Sakar, who did not mention the Defendant, substantiated the facts of the indictment related to the preparations for sending Sirhan on the murder mission and the technical material from the scene of the massacre confirms its deadly results.

The hierarchy of relations between Naifa and the Defendant have already been described above and the acts that were performed before and after the attack substantiate the responsibility of the Defendant pursuant to his authority over the perpetrators of the murder and giving the approval for the attack and taking responsibility for it. But this time too, besides "ministerial responsibility", the Defendant also has significant responsibility for the attack as the one who actually provided the murderers with the weapon that took the lives of the residents of the Kibbutz. There is no doubt that the Defendant bears full responsibility for the murderous event and we convict him of this.

## 19th count of the indictment

This count attributes to the Defendant the offense of conspiring to cause intentional death, insofar as he was involved in the plot to dispatch Sirhan to carry out another attack after the Metzer attack.

This charge is also based on the statements of Mohamed Naifa, who described how it was decided, after finding that Sirhan was still alive after the murderous attack in Kibbutz Metzer, to send him again to carry out a suicide attack,

[Stamp] P 6: 29 [continued]

**Date: June 28, 2005**                    **15**                    **Case No.: 5398/03**

for which purpose he contacted the Defendant. The Defendant gave his consent to the plan and also granted the request of Naifa to provide him with a weapon, and the gang members also departed to Nablus to meet him and take the weapon from him, but they were arrested before they did so.

We have already dealt with the considerable support for the statements of Naifa on a series of matters. There is no doubt that this conspiracy is part of a single "factual sequence", which relates to terrorist attacks that were carried out by Naifa and the Defendant within the framework of the organization and through Sirhan; therefore, we consider these to support the matter of incrimination of the Defendant for this charge too.

We have also discussed the course of action and the connection between the Defendant and Naifa and there is no doubt that the approval of the murderous plan by the Defendant and his commitment to provide a weapon make him an accomplice in the conspiracy.

**In summation, we convict the Defendant of all of that which has been attributed to him, except for the fourth count of the indictment, which the prosecution has withdrawn.**


**Right of appeal as prescribed by law**


Handed down and notified, June 28, 2005, at the office. The court clerk will provide a copy to the parties.


| [Signature] | [Signature] | [Signature] |
|:---:|:---:|:---:|
| **Judge** | **President of the Court** | **Judge** |


[Stamp] P 6: 30

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

MARK I. SOKOLOW, *et al.*,

                 Plaintiffs,

   vs.

THE PALESTINE LIBERATION
ORGANIZATION, *et al.*,

                 Defendants.

No. 04 Civ. 00397 (GBD) (RLE)

## DECLARATION OF RINA NE'EMAN

Rina Ne'eman hereby certifies as follows:

1.    The attached translation from Hebrew to English is an accurate representation of the document received by Rina Ne'eman Hebrew Language Services, to the best of my knowledge and belief. The document is designated as P6: 11-15.

2.    I am a professional translator with a B.A. in International Relations from the Hebrew University of Jerusalem (Israel) and 30 years of translation experience. I am fluent in Hebrew and English, and I am qualified to translate accurately from Hebrew to English.

3.    To the best of my knowledge and belief, the accompanying text is a true, full and accurate translation of the Hebrew-language document bearing the bates number, P6: 11-15.

Rina Ne'eman

ss.: New Jersey

On the 28 day of February, 2014 before me, the undersigned, personally appeared Rina
Ne'eman, personally known to me or proved to me on the basis of satisfactory evidence to be the
individual whose name is signed to this Declaration and acknowledged to me that he executed
the same in his capacity, and that by his signature on this Declaration, the individual executed the
Declaration.

Sworn to me this
28 day of February, 2014


Notary Public

MIRUT J MIHRETE
NOTARY PUBLIC
STATE OF NEW JERSEY
MY COMMISSION EXPIRES SEPT. 7, 2015
I.D.# 2392704

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

MARK I. SOKOLOW, *et al.*,

                Plaintiffs,

            vs.

THE PALESTINE LIBERATION
ORGANIZATION, *et al.*,

                Defendants.

No. 04 Civ. 00397 (GBD) (RLE)

## DECLARATION OF RINA NE'EMAN

Rina Ne'eman hereby certifies as follows:

1.    The attached translation from Hebrew to English is an accurate representation of the document received by Rina Ne'eman Hebrew Language Services, to the best of my knowledge and belief. The document is designated as P 6: 16-30.

2.    I am a professional translator with a B.A. in International Relations from the Hebrew University of Jerusalem (Israel) and 30 years of translation experience. I am fluent in Hebrew and English, and I am qualified to translate accurately from Hebrew to English.

3.    To the best of my knowledge and belief, the accompanying text is a true, full and accurate translation of the Hebrew-language document bearing the bates number, P 6: 16-30.

                                  Rina Ne'eman

ss.: New Jersey

March

On the [ 6 ] day of February, 2014 before me, the undersigned, personally appeared Rina Ne'eman, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is signed to this Declaration and acknowledged to me that he executed the same in his capacity, and that by his signature on this Declaration, the individual executed the Declaration.

Sworn to me this March
 6  day of February, 2014

_Leonor Troyano_
Notary Public

LEONOR TROYANO
ID # 2385580
NOTARY PUBLIC OF NEW JERSEY
Commission Expires 5/8/2014

תאריך: 06/02/05                1                תיק מס': 5398/03

בית המשפט הצבאי
ש ו מ ר ו ן
- פ ר ו ט ו ק ו ל -

| | | בפני ההרכב: סא"ל אריה חסון | אב"ד |
| | | רס"ן אליהו ניימני | -שופט |
| | | סרן ארז סרי | -שופט |

תובע: סרו אירית דייטש
סניגור: עו"ד דראוושה

נאשם: מאג'ד אסמאעיל מוחמד מצרי   ת.ז.: 904460862

רשמת: סמל אלינה
מתורגמן: סמל בהאא

- אב"ד זיהה את הנאשם -

## הכרעת דין

עקב היקפיו הגדולים של תיק זה, נימוקי הכרעת הדין נמצאים עדיין בשלבי כתיבתם. עם זאת, נמסור כעת את תמצית הכרעת הדין.

מצאנו לנכון להרשיע את הנאשם בעבירות המיוחסות לו בכת"א, למעט פ"א 4, ממנו חזרה התביעה בסיכומיה. הנאשם מורשע בעבירות הבאות:

**חברות בהתאחדות בלתי מותרת** – עבירה לפי תקנה 85 (1) (א) לתקנות ההגנה (שעת חירום), 1945.
**נשיאת משרה** – עבירה לפי תקנה 85 (1)(ב) לתקנות ההגנה (שעת חירום), 1945.
**ירי לעבר אדם** – עבירה לפי תקנה 58(א) לתקנות ההגנה (שעת חירום), 1945.
**ניסיון ירי לעבר אדם** – עבירה לפי תקנה 58(א) לתקנות ההגנה (שעת חירום), 1945 ולפי סע' 19,20 לצו בדבר כללי האחריות לעבירה (יהודה והשומרון) (מס' 225), תשכ"ח – 1968.
**גרימת מוות בכוונה** – עבירה לפי סע' 51 לצו בדבר הוראות ביטחון (יהודה ושומרון) (מס' 378), התש"ל – 1970 (**10 פרטי אישום**).
**ניסיון גרימת מוות בכוונה** – עבירה לפי סע' 51 לצו בדבר הוראות ביטחון (יהודה ושומרון) (מס' 378), התש"ל – 1970 ולפי סע' 19,20 לצו בדבר כללי האחריות לעבירה (יהודה והשומרון) (מס' 225), תשכ"ח – 1968 (**3 פרטי אישום**).
**קשירת קשר לגרימת מוות בכוונה** – עבירה לפי סע' 51 לצו בדבר הוראות ביטחון (יהודה ושומרון) (מס' 378), התש"ל – 1970 ולפי סע' 21,22 לצו בדבר כללי האחריות לעבירה (יהודה והשומרון) (מס' 225), תשכ"ח – 1968.

יובהר כי לעניין פרטי האישום המרכזיים, דהיינו עבירות הרצח, מורשע הנאשם כשותף עיקרי וזאת לאור מעמדו הבכיר בארגון, העובדה כי היה מעורב בשלבים אופרטיביים של ביצוע מעשי הרצח ובהם צילום המתאבד, מימון הפיגוע ומסירת כלי הנשק אשר שימש בו.

ניתן והודע היום, 06/02/05, בפומבי ובמעמד הצדדים.



| שופט | | אב"ד | | שופט |

תאריך: 06/02/05                    2                    תיק מס׳: 5398/03

ראיות לעונש
ת: אין ראיות לעונש
ס: אין ראיות לעונש

תובעת מסכמת:
היום נותן הנאשם את הדין בגין אחריותו  כמצבע עיקרי לגרימת מותם של 10 בני אנוש.
לצד זאת, הורשע הנאשם בפעילות ביטחונית חמורה ונעיפה, תוך שגם מסקירת מעשים אלו
ברורה נחישותו ותחירותו כדי מטרה אחת- גדיעת חיי אדם. הנאשם אמנם נותן את הדין
אחרון בזמן, לאחר כל "גיבורי", מבצעי הפיגועים במצר וחרמשי, אולם מטעמי, מבחינות
רבות, ניתן לראות בו ראש וראשון להם.

לא ניתן להתעלם כהינבט לחומרה ממעמדו הבכיר בארגון התנזים. למדנו, לצערנו, כי
הטרור, הנם שהינו מכה באופן עיוור בקורבנות מקריים, פעמים רבות יש בו דזוקא חוקים
או ביתר דיוק אינטרנסנטיות, ציניות בחיי אדם. לעתים נוח לבצע פיגוע זה או אחר במועד
מסויים, בתמזון מסויים, בישוב מסויים, בתוך תחומי הקו הירוק או מחוצה לו. וכאן,
לטעמה של התביעה, נכנס תפקידו המכריע של הנאשם כמעין פוסק באותם חיים של
קורבנות עלומים עתידיים, ירצה יבוצע פיגוע רצח, לא ירצה יינצלו הפעם מחייהם.

אדגיש כי עובר לפיגוע בחרמשי נתבקשה הסכמתו המפורשת של הנאשם לביצוע הפיגוע על
ידי בכיר המרצחים, מוחמד נאיפה, הסכמתו של הנאשם ניתנה ורק לאחריה יצאו לפועל
השלבים הבאים, שהביאו כזכור למותם של שלושה בני אנוש. הנאשם אף הגדיל לעשות
לאחר ביצוע הפיגוע, אולי כשלמוני החצלחה, העביר הנאשם למוחמד נאיפה, בדיוק בשל
"הצלחתו" של הפיגוע סכום כסף. ואם יתמה התמוה על כך, גם זה אינו מקרה, שכן
הנאשם נשא תפקיד אשר במסגרתו העביר כספים בהזדמנויות רבות ובשיטתיות לפעילים
מרכזיים בארגון.

גם לביצוע הפיגוע במצר נודעה תרומה מכרעת לפועלו של הנאשם, היות שהוא זה שהעביר
למעשה את כלי המשחיט לידי המרצחים, בסופו של דבר. על תרומה זו ודאי שאין צורך
להכביר מילים אשר לקשר הסיבתי בין מעשיו כאן ובין קורות התוצאה.

בנוגע לפיגוע ברחוב יפו בירושלים, שימם הנאשם כצלם של המתאבד לפני יציאתו לפיגוע.
התביעה טוענת לא אחת לפני בימ״ש נכבד זה, אודות הקרדינליות שהיא מוצאת בפעולה זו.
אדגיש בקצרת כי פאן נוסף חמור של פיגוע ההתאבדות שבאו בקבקנו הינו ההד
התקשורתי שבא בעקבותן, בו יש למעשה להפחיד, לשתק ולזרוע אימה בחייו של כל
ישראלי, באשר הוא ישראלי. תרומה רבה לכך יש לציצלומי מוות של אותם מתאבדים, זאת
גם מהבחינה שהם משמשים דוגמא מצולמת גם לבאים בעקבותם. יתר מכך, לטעמה של
התביעה, באקט הצילום יש כדי לאפשר במשירין, בסופו של דבר, את ביצוע העבירה
עצמה על ידי אותו מתאבד בכך שלמעשה יש באקט זה משום עידוד רוחו של אותו
מתאבד, חיזוק החלטתו לצאת לביצוע הפיגוע.

התביעה תפנה לעניין זה לטיעוניה בתיקו של איאד נאצר, תיק בימ״ש 5572/03. בתיק זה
נגזר על הנאשם מאסר עולם ואולם אם מן הטעם שביקשה התביעה, היינו השתתפותו
בצילום המתאבד, אלא אם כי ריבוי העבירות שיוחסו לו. עם זאת, אציין כי התביעה
הגישה ערעור בתיק זה והוא עדנו תלוי ועומד בביהמש״ש לערעורים.
כן אבקש להפנות לתיקו של כמאל שעבלו, שנדון בבימ״ש זה, שם קיבל ביהמ״ש את
עמדתה של התביעה באשר לתרומה הממשית של אותו אקט של צילום המתאבד.

היום נגזר מעגל. דמם של קורבנות הנאשם זועק אל ביהמ״ש והתביעה תבקש כי עונשו
ייגזר ל-10 עונשי מאסר עולם מצטברים בגין כל נפש ונפש אותה קטע. כן תבקש התביעה
מאסר נוסף קצוב בשנים, בגין יתר העבירות בהן הורשע הנאשם.

תאריך: 06/02/05                    3                    תיק מס׳: 5398/03

<u>**סניגור מסכם:**</u>

1. הנאשם הכחיש לאורך כל הדרך את כל המיוחס לו בכתב״א, אולם בהרשעתו היום בפני
2. ביהמ״ש מהווה מכה קשה לנאשם ולמשפחתו. הנאשם בחקירה הראשית ובחקירתו
3. הנגדית בביהמ״ש, וגם בחקירתו במשטרה, הוא הוקיע מעשי אלימות נגד מדינת ישראל.
4. מדובר בנאשם שאפילו בחליך המשפטי שהיה בפני ביהמ״ש נגרמו לו עוגות דין.
5. מדובר בנאשם בן 32 שנים. הוא המפרנס היחידי למשפחתו, אשר מורכבת משני ילדים.
6. אשתו נמצאת כאן וגם אימו החולה. לנאשם יש המון חובות ומשכנתא. הנאשם עובר
7. לאירוע נשוא כתב״א עבד בתור קצין במשטרה הפלשתינאית. הוא עבד במסירות ובנאמנות.
8. מצבו הפיננסי של הנאשם רעוע מאוד. ילדיו הקטנים לומדים בבי״ס ויש צורך שאביהם
9. יתמוך בהם מבחינה כלכלית וחשוב שאביהם ימצא לידם.
10. הנאשם הוא אדם חולה, יש לו בעיות ברגליים.
11. יש לי טיעונים אחרים, הואיל ועוד לא קיבלתי את הנימוקים לידיי. לנאשם אין דם על
12. הידיים- זה מה שהוא טען לאורך כל הדרך. אפילו התנהגותו של הנאשם היום, אינה כמו
13. של הנאשמים האחרים, אשר היו מודים במעשים שעשו, אך הנאשם לא עושה זאת.
14. אנו מבקשים שביהמ״ש יתחשב בנסיבות.
15.
16. **נאשם:**
17. אני מהתחתלה הבאתי את הראיות לביהמ״ש. התביעה בהתחלה קבעה את גורלי. אני
18. אמרתי שאני לא מפחד רק מאלוהים ואני נגד רצח של אזרחים ישראלים ופלשתינים.
19. הייתי קצין במשטרה הפלשתינית והפלילו אותי גנבי רכבים. אני כיבדתי את הבימ״ש עד
20. עכשיו. אני מקווה שתיקח בחשבון את כל הדברים האלו, אתה מטפל בילדים שלך, גם לי
21. יש ילדים.
22.
23.
24.
25.
26.
27.

תאריך: 06/02/05          4          תיק מס' : 5398/03

## גזר דין

| | |
|---|---|
| הנאשם הורשע, כאמור בהכרעת הדין, בעבירות המיוחסות לו בכתב האישום (למעט פרט האישום הרביעי, ממנו חזרה התביעה). המדובר בשורת עבירות קשות וחמורות, שאין חמורות מהן, מהן עולה אחריותו של הנאשם לרציחתם של עשרה בני אדם וכן שורת עבירות נוספות ובהם עבירות ניסיון לגרימת מוות בכוונה, ירי ועוד. | 1<br>2<br>3<br>4<br>5<br>6<br>7 |
| הנאשם נשא בתפקיד ראש "גדודי אל אקצה" באזור שכם, ובתפקידו זה משך בחוטיהם של פיגועים רבים אשר יצאו תחת הנחייתו, במימונו, בברכתו ותוך שימוש בכלי הנשק שמסר. | 8<br>9<br>10<br>11 |
| הנאשם היה מעורב בשורת פיגועי התאבדות כאשר הוא וחבריו לארגון צמא-הדם, שילחו בזה אחר זה מפגעים מתאבדים אשר זרעו בחוצות ערי ישראל רצח ומוות. עובדות כתב האישום, בהם הורשע הנאשם, מתארות ארוכות את השלבים המפורטים שקדמו להוצאת המרצחים לעבר זירת הקטל. | 12<br>13<br>14<br>15<br>16 |
| הנאשם, בתפקידו הבכיר, הוא זה שניצח על תעשיית מוות בזויה זו ומסר הוראות לפעילים הכפופים לו לשלח מפגעים למעשי רצח המוניים. אולם הנאשם לא הסתפק בתפקיד "מיניסטריאלי" בלבד, אלא שלח ידו גם בשותפות מלאה לשלילת המפגעים ממש, ובכלל זה צילום מתאבד במקרה אחד, מימון פיגוע אחר והספקת כלי הרצח בארוע שלישי. | 17<br>18<br>19<br>20<br>21 |
| כאן המקום להדגיש, את אשר אף עולה מהכרעת הדין, כי אחריותו המלאה של הנאשם למעשים נלמדת הן ממידת מעורבותו ה"אופרטיבית", אולם גם ממעמדו הבכיר העולה לאורך כל חומר הראיות. מתברר כי הנאשם היה, באזור שכם, פוסק בעניני חיים ומוות, והוא ניצל את מרותו על פני אחרים לשם שילוח מרצחים. הנאשם הוא שמיהר אף ליטול אחריות על מעשי הרצח, בפני אמצעי התקשורת. | 22<br>23<br>24<br>25<br>26<br>27<br>28 |
| הנאשם הוא האחראי, ביחד עם שאר חבריו לכנופיית המרצחים, לפיגועי הדמים ברחוב יפו בירושלים, ביישוב חרמש ובקיבוץ מצר. כתוצאה ממעשיו מצאו את מותם עשרה בני אדם, בהם שני ילדים רכים בקיבוץ מצר, אמם שנרצחה ביחד עמם, שניים תושבי הקיבוץ, נערות שנרצחו מרחק קצר מביתם ביישוב חרמש, נשים שהלכו ברחוב יפו בירושלים. פיגועי הדמים ברחוב יפו, ביישוב חרמש ובקיבוץ מצר זיעזעו את המדינה באכזריותם ובשפלותם. | 29<br>30<br>31<br>32<br>33<br>34 |
| הנאשם לא חדל ממעשיו, גם כאשר הלכו ורבו קורבנותיו, גם כאשר הלך ופחת גילם. גם לנוכח הירצחם של ילדים רכים, לא נח הנאשם ממעשיו והוסיף לטוות את קורי המוות תחת ידו. הנאשם לא היסס והורה לשלוח את חיית-האדם, את הרוצח סירחאן סירחאן, לביצוע מעשה רצח נוסף, אשר למרבה המזל לא יצא אל הפועל. | 35<br>36<br>37<br>38<br>39 |
| ואכן, מלבד מעשי הרצח בהם הורשע, ומלבד הפציעות שגרם לאלו ששרדו את התקפות התופת של המפגעים ששילח, עוד שלח הנאשם את ידו במעשה ירי וניסיון לירי. | 40<br>41<br>42<br>43 |

P 6: 14

תאריך:06/02/05        5        תיק מס׳ : 5398/03

כפי שציינו בהכרעת הדין, מצאנו כי חלקו של הנאשם הוא של שותפות מלאה. ואכן,
העובדה כי הנאשם נהג בפחדנות והסתתר מאחורי מצלמת הווידאו ושלח אחרים להרוג
ולהרג, כי התחבא מאחורי מתן הוראות לאחרים, כי עטף בשטרות כסף את מוג לבו, כי
נטל אחריות על מעשי אחרים, עובדת פחדנותו של הנאשם אינה מחייבת כי יחמוק מן
העונש הראוי לו ולשכמותו. הנאשם אחראי באופן מלא למותם של עשרה בני אדם חפים
מפשע, ומאחריותו זו לא יחמוק.

**אנו גוזרים עם הנאשם 10 מאסרי עולם מצטברים.**

**זכות ערעור כחוק  החל מיום המצאת נימוקי הכרעת הדין לידי הצדדים**
ניתן והודע, 06/02/05 , בפומבי ובמעמד הצדדים.

שופט                אב״ד                שופט

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20

תאריך: 28/06/05                   1                   תיק מס': 5398/03

בית המשפט הצבאי
ש ו מ ר ו ן
- פ ר ו ט ו ק ו ל -

בפני הרכב: סא"ל    ארז    חסון    -אב"ד
            רס"ן    אליהו    ניבוני    -שופט
            סרן    ארז    סרי    -שופט

תובע: סרו אירית דייטש
סניגור: עו"ד דראוושה

נאשם: מאג'ד אסמאעיל מוחמד מצרי    ת.ז.: 904460862

- אב"ד זיהה את הנאשם -

הכרעת דין

האישומים וזירת המחלוקת:

ביום/ 06/02/05 מסרנו את הכרעת דינו של הנאשם וגזרנו את דינו. כמובטח, להלן נימוקינו
המפלאים להכרעת הדין:

כנגד הנאשם הוגש כתב אישום קשה וארוך, הן מבחינת חומרת העבירות והן מבחינת היקפן.
מיוחד לנאשם כי בשנת 2002 שימש כראש "גדודי אל-אקצה" באזור שכם ומתוקף תפקידו ניצח
על הוצאתם לפועל של מספר פיגועים - ובהם פיגועי הדמים ברחוב יפו בירושלים, בישוב חרמש
ובקיבוץ מצר - בהם מצאו את מותם 10 אנשים, בהם 2 פעוטות ואמם, ונפצעו עשרות אחרים. עוד
מיוחסים לנאשם מעשי ירי וניסיון לירי לעבר אדם וקשירת קשר לגרימת מוות בכוונה.

הנאשם כפר בכל המיוחס לו, הן בתשובתו לאישום וכן (במרבית המיוחס לו) בחקירתו
המשטרתית והאשים כנגדו מבוסס על הפללת רבות מאת חבריו ושותפיו לארגון ולמעשי הרצח.
כבר בתחילת הדברים יש לציין כי הסוגיה המרכזית בתיק זה, נוגעת לזיהויו של הנאשם, אשר
לרוב מכונה ע"י חבריו בכינויו "בזבזי" - כינוי אותו מכחיש הנאשם.

לצד הכחשתו של הנאשם את מעורבותו שלו במעשי הרצח, הרי שאין מחלוקת של ממש באשר
לקרות האירועים (לאור הסכמת הגנה להנשם חומר הראיות הטכני'), ונראה כי אף לא לחלקם
של שאר המעורבים, אשר ברובם נשפטו והורשעו זה מכבר על מעשיהם.

חומר הראיות:

אמרות הנאשם:

העיד בפנינו גובה 2 אמרותיו של הנאשם, רס"מ מטאנס חדאד. מעדותו עולה כי חקירתו של
הנאשם התנהלה באופן רגיל. ואכן לא נטענו מצד הנאשם כל טענות זוטא, לא בכלל ולא כלפי העד
חדאד בפרט, וההגנה אף הסכימה כי יוגשו אמרותיו של הנאשם שנגבו ע"י העד.

בסיכומיה ביקשה הההגנה לקבוע כי יש ליתן משקל מופחת לאמרותיו של הנאשם, וזאת עקב
העובדה כי האמרה לא נכתבה בערבית, כי לא הוקלטה וכי העד לא ערך לנאשם מסדר זיהוי.

¹ ראה פרוטוקול מיום 2/09/03, עמי 1.

לא ראינו לנכון לקבל את טענות ההגנה במישור זה. מעיון בשתי אמרותיו של הנאשם ברור כי
הוצע לנאשם לכתוב את אמרותיו בכתב ידו, אולם הוא סירב לעשות כן ואף סירב לחתום. ציון כי
באמרה הראשונה אף ניסח הנאשם סירובו זה בכך שהוא אינו "מכיר בחוקיות החוקים
המשפטיים של הכיבוש הישראלי". ציון עד כי אקט ההצעה לכתוב את האמרה וסירובו לה,
נעשו ע"י חוקר המשטרה חדאד בנוכחות עמיתו לתפקידה, רס"מ לוטוף מרעי. לאור דברים אלו, לא
ברור מה הרבותא בכתיבת האמרה בערבית או בעברית.

הסנגור לא הציג בפנינו מהו המקור הסטטוטורי לחובה, כביכול, של החוקר להקליט את החקירה
ומדוע יש בכך כדי לפסול את האמרה, כטענתו. מעיון באמרות ובעדות גובה האמרה, עולה כי
תנאי "תקנות השופטים", המכשירים קבילותו של אמרות, התקיימו ובכלל זה מתן אזהרה כחוק,
מתן הזדמנות לכתיבת האמרה וחתימה עליה, הקראת האמרה המתורגמת בסוף החקירה וכו'.
הקלטת החקירה איננה תנאי על פי דיני ראיותנו לקבילות האמרה ואינה פוגמת במשקלה.

באשר למסדר הזיהוי[2], כפי שהצביעה התובעת[?], לא היה גובה האמרה ממונה על חקירתו הכוללת
של הנאשם ושאלות בתחום מחדלי חקירה, לטענת ההגנה, יש להפנות לחוקריו. באשר לסוגיית
חובת עריכת ריהוי, נדרש בהמשך.

באשר למשקל האמרות, לא מצאנו מקום להפחית ממשקלן, להיפך. ניכר מן האמרות כי החקירה
התנהלה באווירה חיובית, ובמהלכה אף הוצעו לנאשם כוס תה וסיגריה והוא יצא לארוחות
צהריים[3]. הנאשם אישר ע"ר הוא חש בטוב. באמרות מאשר הנאשם את קשריו עם שאר עדי
התביעה, בהם יזובר לחלן. הנאשם מוסר תיאורים מפורטים של חבריתו כסמים שביצע, קשריו -
שידע עליות ומודעות - עם פעילים אחרים, כתובות אינטרנט בהן השתמש וכו"ב פרטים אשר
ניכר בהם כי הם באים ממקור ראשוני.

באשר לטענת ההגנה בסיכומיה כי "הנאשם הכחיש את המיוחס לו בכתב האישום, שיתף פעולה
עם חוקריו בחקירתו המשטרתית נתן פרטים מלאים ואינפורמציה מלאה, אולם בכל חקירתו
במשטרה ובבתה המשפט הכבד הנאשם הכחיש לא הודית מעשוש המיוחסים לו" (סעיף ג' לסיכומי
ההגנה) - מוטב היה לדברים, התלושים לגמרי מן המציאות, שלא היו עולים על הכתב, שכן קריאה
תמה באמרה היתה חוסכת את כתיבתם.

סוף דבר - מצאנו לקבל את אמרותיו של הנאשם ולהעניק להן משקל מלא.

## עד התביעה מוחמד נאיפה:

העדיה בפנינו העד מוחמד נאיפה ביום 02/09/03, עדות אשר כללה, למעשה, את החקירה הראשית
בלבד, וזאת לאור סירובו של העד להמשיך את עדותו, כמפורט בעמ' 6 לפרוטוקול מאותו היום.
אין מחלוקת של ממש כי המדובר במי שאחראי לפיגועי הדמים ביישוב חרמש ובקרב מצר.

ראשית עלינו להידרש לטענת ההגנה כי נגרם לנאשם עיוות דין בכך שלא הושלמה חקירתו הנגדית
של העד וכי במצב דברים זה אין לקבל את אמרותיו מכוח סי' 10 א'. אכן, העד הובא למסור עדות
ובית המשפט והצדדים התכנסו על מנת לשמוע את עדותו במלואה. עדות זו נקטעה בשל רצונו של
העד בלבד, אשר סירב להמשיך ולהשיב לשאלות שנשאל. בית המשפט נקט בשורת צעדים על מנת
להמשיך את שמיעת העדות ובכלל זה קריאת הסנגור שכ קריאה של העד, אולם העד התמודד במריו (ראה
מהלך הדברים בעמ' 6-7 לפרוטוקול אותו דיון, ובכלל זה התלבטנו החותמת את העדות).

כידוע, מאז ניתן פסק דינו הנודע של בית המשפט העליון בענין חג'-יחיא, דנ"פ 4390/91, **מדינת**
**ישראל נ' חג' יחיא**, פ"ד מו (3) 661, עומדת על מכונה ההלכה בענין מעמדו של ה"עד השותק",
הלכה אשר ניתנה ע"י הרכב מורחב של שופטי בית המשפט העליון, אשר ראה אף בעד השותק כעד
אשר ניתנו לצדדים הזדמנות לחוקרו, ומכאן שפתוחה הדרך להגשת אמרותיו על פי ס' 10 א'
לפקודת הראיות. עוד ראה לענין זה, ע' אי"ש 99/00+114, הוכר אף בחלוטגנו מאותו היום.
הסנגור הביא בסיכומיו שורת אסמכתאות מהן ניתן ללמוד - לטענתו - כי בהעדר חקירה נגדית, יש
לבטל את משקל העדות כולה, אולם המדובר בפסקי דין ישנים ביותר, משינוים השבעים ועוד קודם
לכן, אשר כולם נמסרו טרם שנתקבלה הלכת חג'-יחיא, חלקם אפילו עוד לפני שנחקק תיקון ס' 10
א' לפקודת הראיות..

[2] שם, עמ' 2, ש' 24-22.
[3] ראה ת/1, עמ' 2, ש' 1; עמ' 5, ש' 26-25.

תיק מס׳ 5398/03:          3          תאריך: 28/06/05:

שאר התנאים העומדים ביסוד ס׳ 10 א׳ התקיימו, ובכלל זה העובדה כי העד אישר את מתן
אמרותיו[1] וכן קיומן של סתירות מהותיות בין העדות לבין האמרה (התובעת עיינה שורה ארוכה
של סתירות בסיכומיה בלא שהתגנה חלקה על כך בסיכומיה. נזכיר, למשל, את הבדלי הגרסאות
בין העדות לאמרה לעניין ויהוי הנאשם, הרקע לקבלת הסכום של $3,000 וכו׳ וכו׳).

לאחר שמצאנו כי התקיימו התנאים לקבילות אמרותיו של מוחמד נאיפה עי״פ ס׳ 10 א׳ לפקודת
הראיות, מצאנו אף להעדיף את אמרותיו על העד על פני עדותו החלקית ובפנינו. ננמק מדוע:

– ראשית, חשוב לציין באופן כללי, כי אפילו מתוך עדותו החלקית והשיריריותית של העד בפנינו,
  מאשר העד את עיקרי הפללתו את הנאשם באמרתו. העד מאשר בעדותו בפנינו, גם אם לאחר
  התמקמקויות שונות, כי קיבל[2] נשק מידיו של אדם בשם "בוב׳" ואף קיבל מידיו סכום של
  $3,000 לאחר פיגוע חרמש. אמנם העד טוען כי הנאשם איננו אותו בוב׳, אולם הדבר אינו
  מעלה ואינו מוריד, כי הרי גם מתוך עדותו שלו לא עולה כי פגש את אותו "בוב׳", אלא יצר
  איתו קשר על סמך מספר טלפון שקיבל מידיו בירושה מראאד כרמי, שעה שהחליף את מקומו
  כראש "מדודי אל-אקצאה" באזור טול-כרם. גם את הנשקים והכספים לא קיבל מידיו של
  "בוב׳" שירותו אלא באמצעות שליחים. גם מתוך גרסתו, חלקיותה אף היא, של הנאשם
  באמרתו, עולה כי העברתה הכספים והנשק מידיו לעד היו באמצעות שליחים. מכאן, שאפילו
  מתוך גרסתו המצמצמת של העד, עדיין עומדת הפללתו את הנאשם על כנה.

– באמרותיו השונות, מרחיב העד עוד יותר מאשר הגרסה המצמצמת שמסר בעדותו החלקית
  בפנינו. אינט לכנו לקבל את אמרותיו של העד. ניכר מעיון באמרות כי המדובר באמרות
  בעלות משקל רב ביותר. העד כתב את אחת האמרות בכתב ידו וחתל לכתוב גם את האחרת,
  אך הפסיק את כתיבתה מרצונו. האמרות ניתנו ע״י העד לאחר שהוזהר כחוק והוא חתום
  בתחתית דפי האמרות. באמרות נטול על עצמו העד אחריות למעשי רצח קשים ואיומים תוך
  פירוט נרחב של הניסיבות שקדמו לביצועם. השוואה של תוכן האמרות לשאר החומר הראייתי
  שבא בפנינו - ובכלל זה לאמרות הנאשם, המאשר את היכרותו עם העד וכן את העברת הנשק
  והכספים לידיו - מחזקת עוד יותר את משקל אמרותיו של העד.

אם כן, מצאנו לנכון לקבל את אמרותיו של העד, הן מכוח אימוץ תוכנן, באופן כללי, ע״י העד
במהלך עדותו והן מכוח (ובכל שהדברים נוגעים בסתירות שבין גרסת העד לבין הרשום באמרות),
מכוח ס׳ 10 א׳, וזאת מן הנימוקים האמורים מעלה.

<u>עד התביעה מנצור שרים:</u>

גם עד זה, שהעיד בפנינו ביום 30/11/03, נושא על גבו קופת שרצים ואף הוא אחראי לשורת מעשי
רצח קשים.

ראשית, נידרש לסוגיית בקשת התביעה בסיכומיה לקבל את אמרתו של העד מכוח ס׳ 10 א׳.
כעולה מבקשת התביעה, נשתכחה הגשת האמרה ממנה בזמן הדיוני ביום 14/06/04, וכעת מבקשת
היא לתקן את הטעות. הסנגור מתנגד להגשת האמרה כעת, מאחר והבקשה נעשית לאחר תום
פרשת התביעה ויש בדבר משום פגיעה בהגנת הנאשם.

לא נותר לנו אלא לשוב ולהיזקק, פעם נוספת, לאזכורו ע׳ איו״ש 99/00+114, אשר נזכר קודם
לכן בהכרעת דיננו זו בהקשר אחר, ואף מצוטט ע״י התביעה המלומדת בסיכומיה. בית המשפט
לערעורים נדרש לדברים הידועים של בני הנשיא וזמרה המנעה, אשר דומה כי מאז אשר נאמרו -
כבר בערעור הפלילי הראשון שנדון בבית משפטהה העליון של מדינת ישראל!!! - מצאו את מקומם
במנהתם סדר הדין הפלילי. ואכן, הורנו הנשיא וזמרה כי סדר דין פלילי אינו כאותו משחק שח-
מט אשר די במהלך שגוי אחד לחרוץ את גורלו לעד. בית המשפט לערעורים הכיר באפשרות לזמן
עדים גם לתגינע ראיות מטעם מטעם התביעה לאחר תום השלב הדיוני - גם אם יש להתיר בקשות כאמור
בצמצום, גם אם על התביעה להימנע מכך וכל בכפוף לסייג כי אין בדבר לפגוע בהגנת הנאשם.

בנסיבות העניין שבפנינו, לא ראינו מדוע קבלת בקשת התביעה, אפילו בשלב הסיכומים, יש בה
פסול כלשהו. <b>ראשית,</b> אין ספק כי בקשת התביעה נעשתה בתום לב ולא מתוך שיקול פסול. עיון
בפרוטוקול הדיוני מיום 14/06/04 יגלה כי התביעה הגישה שורת בקשות להגשת חומר מכוח ס׳ 10

[1] ראה פרוטוקול עדותו של מוחמד נאיפה מיום 02/09/03, עמ׳ 5 ש׳ 14-30.
[2] שם, עמ׳ 3 ש׳ 46 ועד עמ׳ 4 ש׳ 13 ; עמ׳ 5 ש׳ 42-45+.

א׳, ואין ספק כי הבקשה להגשת אמרתו של מנצור שרים, נשתכחה ממנה בהיסח הדעת. 1
**שנית,** כל הפתעה אין בבקשת התביעה. התביעה העידה את העד מנצור שרים, עימתה אותו עם 2
דבריו באמרתו, הודיעה מראש ובמילים ברורות על כוונתה להעיד את גובה אמרתו יעקב ברוזי[6], 3
ואף העידה את גובה האמרתו ביחס לנסיבות גבייתה (מהלך שאין לו כל הסבר אחר, זולת רצונה 4
להגיע את אמרתו של העד מכוח סי׳ 10 א׳). **שלישית,** כל פגיעה אין בהגנת של הנאשם בבקשת 5
המאוחרת להגשת אמרתו של מנצור שרים. העד העידד ונחקר ע״י הצדדים, ובכלל זה חקירה נגדית 6
ע״י ב״כ הנאשם. לנאשם ניתנה אף הזדמנות לחקור את גובה אמרתו. הנאשם אף התייחס 7
בעדותו[7] בפרשת ההגנה להפללתו של מנצור שרים **באמרתו** ומסר גרסה באשר אליה. הבקשה 8
להגשת אמרתו של העד, אין בה כל פגיעה בהגנת הנאשם. 9
10
לאחר שצלחנו את משוכת השלב הדיוני להגשת הבקשה, נגלה חיש מהר כי התנאים הקבועים 11
בצדו של סי׳ 10 א׳ לקבלת האמרה, מתקיימים במלואם, שהלא העד העיד וניתנה לצדדים 12
הזדמנות לחקור, מתן הסבר להוכח, הן מעדותו של העד שזיהה את אמרתו וחן מעדותו גובה 13
האמרה, וכן לאור קיומו של סתירות מהותיות בין האמרה ובין העדות. כעת נדרש לשאול כלום 14
יש מקום להעדיף את האמרה על פני העדות! תשובתנו לשאלה זו חיובית ולהלן נימוקינו : 15
16

א. גם עדותו של מנצור שרים היתה מבולבלת ככל שנתבקש ליתן הסבר להפללות המפורשות 17
שהפליל את הנאשם באמרתו, הפללות מתן ביקש הוא לחזור במהלך עדותו. העד אישר כי 18
חתם על האמרה וכי החוקר אף הקריא לו את תוכנה, אולם דבק בטענתו כי החוקר כתב 19
דברים אחרים מאלו שאמר הוא עצמו במהלך גביית האמרה. העד אף התיישר לקבוע 20
בפסקנות כי החוקר חוסיף דברים על אמרתו לאחר שזו נכתבה בפניו, אולם לשאלות התובע 21
לא ידע לפרט על אלו עניינים מדובר. 22

ב. באשר למשקל גרסת ההכחשה של העד את דברי כנגד הנאשם באמרתו, אשר ניתנה במהלך 23
החקירה הנגדית בעוד העד משיב כתוכי לסדרת שאלות מדריכות בעליל בתחום לגרסה שם 24
הסנגור בפיו, מוטב לא להרחיב את הדיון[8]. באופן מוזר, וללא הסבר מלבד הרצון לחזור על 25
הגרסה המוכנה מראש, הפך הנאשם, במהלך עדותו של מנצור שרים, מחבר (בחקירה 26
הראשית) לשוטר רשע (בנגדית) אשר עצר אותו בגין גניבת רכבים, נהג בו בקשיחות, דבר 27
שעורר בעד תחושה קשה - גרסה, אשר באופן בלתי מפתיע, עתידה לחזור פעם נוספת מספר 28
ישיבות לאחר מכן בעדות הנאשם. למותר לציין, כי בנו לא עורר חדברים רשם של מהימנות 29
כלל וכלל. 30

ג. העד אישר בדבריו כי היה חבר בארגון גדודי אל-אקצה, וכעולה מאמרותיו, אף היה אחראי 31
לשורות מעשי רצח קשים מטעם הארגון, בכעל עמדה בכיר בארגון. העד אף ידע למסור תיאור 32
מדויק של שרשרת "יתחלפת תפיקודי" על הארגון באזור שכם, החל באשר עויית ועבר 33
במתמוד תיתר, אולם משנשאל באשר לזהות מחליפו של תיתר (לטענת התביעה, הנאשם), 34
נתמלא לפתע שכחת מעשה, טען כי לא ידע את זהות ראש הארגון באזור שכם (אליו היה 35
כפוף הוא עצמו) ואף לא טרח לנסות לברר זאת. 36

ד. לעומת עדותו המעורות והממגמתית של מנצור שרים בפנינו, עומדת אמרתו. משקלה של זו 37
עולה הן מעדותו של גובה האמרה רס״מ יעקב ברוזי - אשר העיד בפנינו ביום 14/06/04 38
ובעדותו הכחים את טענותיו של העד וציין כי האמרה נגבתה על פי הכללים הרגילים – והן 39
מעיון בגוף האמרה עצמה, עליה חתום העד לאחר אזהרה. מקריאת בגוף הדברים וכעולה 40
מעדות גובה האמרה, נראה כי האמרה מבוססת על דברים שכתב העד בכתב ידו. יש להצטער 41
על כך שלא נתאפשר לעד לכתוב את אמרתו בכתב ידו, אולם בנסיבות העניין, ולאחר שהוכח 42
להנחת דעתנו – הן מהתרשמותנו מן העדים הן מתוך השוואה לשאר חומר הראיות שבא 43
בפנינו - כי הכתוב בגוף האמרה משקף את דברי של העד שהוקראו לו לפני פסק דינו המאלף של כב׳ 44
לא סברנו כי יש פגם במשקלה של האמרה (ראה לענין זה גם את פסק דינו המאלף של כב׳ 45
השופט אלימא פרידמן בעי איי״ש 1137/04+1130+1136+1129). 46
47
אם כן, מצאנו לדחות את עדותו של מנצור שרים ולהעדיף על פניה את אמרתו. 48
49

### עד התביעה פהד שראיעה
50
51
עד זה העיד בפנינו ביום 30/11/03 ובעדותו מיהר להתכחש לאמנת החפללה המפורשת שמסר כנגד 52
הנאשם, בה הוא מתאר כיצד הסיע את הנאשם, ביחד עם אחרים, לבצע פיגואי ירי. משתבקש 53

---
[6] ראה פרוטוקול מיום 30/03/04, עמ׳ 11 ש׳ 22-23, במקום "גובה עמדתו של מנצור שרים", צ״ל "אמרתו".
[7] ראה פרוטוקול עדות הנאשם מיום 14/06/04, עמ׳ 10 ש׳ 12-17
[8] ראה פרוטוקול עדותו של מנצור שרים מיום 30/11/03, עמ׳ 4.

ליתן הסבר לתקלתו המפורשת את הנאשם באמרתו, טען כי זו הוצאה ממנו באמצעים פסולים, 1
כי הוכרח לחתום עליה, כי הופתע למראה כתב האישום שהוגש כנגדו הכולל אשמות בהן לא הודה 2
וכיו״ב. עד היינו טורחים לפרט את הסתירות שעלו בגרסת העד לעניין זה, אלמלא היה עולה 3
באופן ברור כי את טענות הזוטא באשר למשקל אמרותיו, שמר העד לעדותו בתיקו של הנאשם 4
בלבד, ואילו במשפטו[9] שלו לא העלה אף אחת מאותן טענות, ואף הסכים להגשת אמרותיו, ובכללן 5
האמרה המדוברת, אשר ביחס אליה עלו לפתע מן האוב טענות הזוטא שבעדותו. אך מובן הוא כי 6
טענות זוטא של נחקר ביחס לאמרתו, אשר מופיעות במשפטי אחרים ולא במשפטו שלו עצמו, אין 7
בהן לשכנע. 8

9

בשל כל אלו, מצאנו לנכון לדחות את גרסת העד ביחס לאמרתו, לקבל את האמרה (לאחר 10
שהתנאים האמורים בסעיף 10 א׳ התקיימו) ולהעדיפה על פני עדותו. 11

12

## עד התביעה נאצר עוויס 13

14

עד זה העיד בפנינו ביום 30/03/04. על אף הפללות קשות שהפליל את הנאשם, כשותפו לשילוח 15
המחבל המתאבד אשר ביצע את הרצח ברחוב יפו בירושלים וכן כשותף למעשי ירי, הכחיש העד 16
את הדברים בעדותו. כך טען העד כי הוא מכיר את הנאשם בשמו הפרטי בלבד, למרות שלו רק 17
מתוכן עדותו בלבד עולה כי היכרותו עמו מקיפה ומרחבה (על אחת כמה וכמה שממאמרותיו 18
ומאמרות הנאשם, עולה כי השניים היו מקשרים הדוקים, ואף גורשו מן האיזור וגילו תקופה 19
בירדן ובבגדד – ראה בהמשך). את העובדה כי באמרותיו הוא מפליל את הנאשם, הסביר העד 20
בטענותו שתעלה כנגד החוקר רוני עמאר שאמר שהבריח אותו לכתוב דברים (העד עצמו לא זכר מיהו 21
החוקר שחקר אותו ולא זיהה אותו, אף ציין כי המדובר בשוטר קירח), אולם לא ידע לפרט מהו 22
אותו טענות (״עם החוקר הזה הייתה הבעיה. איני זוכר את הפרטים[10]״). העד טען כי אינו מזהה 23
את אמרותיו שהוצגו בפניו ואת כתב ידו, אולם דבריו לא עוררו בנו רושם, שכן העד בקושי טרח 24
לעיין באמרותיו טרם שהשיב. 25

26

העיד בפנינו החוקר רוני עמאר, אשר גבה את אמרותיו של העד ועדותו עוררה בנו רושם מהימן 27
לגמרי. בעדותו אישר החוקר שאמר כי גבה את אמרותיו של העד עוויס וכי הוא (עוויס) זה שכתב 28
את אמרותיו בכתב ידו (כפי שגם עולה מעיון באמרות עצמן). עוד הכחיש החוקר את טענת העד כי 29
ניתן אמרות נוספות בהן מכ[?] דברים אחרים, דבר העולה גם מעיון באמרות הנשאות מספר 30
סידורי. 31

32

33

אם כן, עדותו של נאצר עוויס, שהיתה עדות מבולבלת ושריריותית (,הכל רשום אצלכם בתיקים, 34
לא צריך להיכנס לפרטים״ ; ״אני לא חייב לענות לאף אחד[11] ) לא עוררה בנו רושם של מהימנות. 35
התנאים להגשת אמרותיו במשטרה מכוח סי׳ 10 א, התמלאו לאחר שחקר העדה, מתן האמרות 36
הוכח בעדותו של החוקר רוני עמאר והעד סתר את אמרותיו בעדותו. מצאנו לנכון להעדיף 37
את האמרות על פני עדותו. מול העדות המבולבלת והבלתי-משכנעת, מצאנו את האמרות 38
כמהימנות ובעלות משקל. כאמור, עולה מקריאת האמרות כי הן ניתנו ע״י העד לאחר התנהלה 39
כתוב ולאחר שחתם על האמרות, אותן **כתב בכתב ידו**. עולה עוד כי גביית האמרות התנהלה 40
באווירה חיובית, וכי העד שהה קפה ועישן סיגריות במהלך גביית האמרות. גם מעדותו של רוני 41
עמאר עולה כי גביית האמרות התנהלה באופן סטנדרטי ותוך שיתוף פעולה של העד. ממילא יוזכר 42
כי אפילו נותן השוואה בין עדותו של העד לבין תוכן אמרותיו, עולה כי הוא באופן כללי 43
מאשר את אחריותו לפיגועים ברחוב יפו וכן במסעדת ״סי פוד מרקט״ בת״א, מאשר את שמות 44
המתאבדים ששלח, **והכל מתוך התאמה לתוכן אמרותיו.** דהיינו, העד נאצר עוויס בעצמו מאשר 45
את נכונות אמרותיו, למעט הקטע הנוגע תנונע לנאשם, בלא הסבר של ממש מדוע דווקא חלק זה לוקה. 46

47

לאור דברים אלו, מצאנו לנכון להעדיף את האמרות על פני העדות. 48

49

50

51

---

[9] ראה פרוטוקול משפטו של העד (שומרון 5004/03) מימים 04/05/03 ו 16/07/03 (ת/ 73+72) וכן פרוטוקול הארכת מעצרו מיום 12/12/02 (ת/ 71). הפרוטוקולים ממשיכים של העד, התקבלו בהתאם לבקשת התובעת בדיון מיום 14/06/04 לאחר שהסנגור הותיר את השאלה לשיקול דעת בית המשפט ובהיות הפרוטוקולים משום תעודה ציבורית המתקבלת בלא עדות עורכה.

[10] ראה פרוטוקול עדותו של נאצר עוויס מיום 30/03/04, עמ׳ 3 ש׳ 10-5.

[11] שם, עמ׳ 2 ש׳ 16 ; ש׳ 48-47.