# EXHIBIT A.384
## (3 of 3)

תאריך: 28/06/05                                      6                    תיק מס׳ 5398/03:

עד התביעה אברהים ע״א חי

גם עד זה, בדומה לעד הקודם ולרוב העדים בתיק זה, אישר בעדותו את אחריותו למעשים
המיוחסים לו עליהם הודה בשמפטו ואף נקב בשמותיהם של שותפיו, מלבד אחד –
הנאשם. התבביעה מייחסת לנאשם כי פעל ביחד עם העד בשלבים הראשונים של הוצאתו לפועל של
פיגוע הרצח ברחוב יפו (פרט האישום השישי, סייק א-ח׳). העד אישר, למעשה, בעדותו, את
העובדות המוזכרות בחלק הרלוונטי של פרט האישום, למעט חלקו של הנאשם, שהגד ציין כי לא
נכח בעת צילומו של המתאבד.

מתברר כי דווקא בעת משפטו שלו, הודה העד באחריותו למעשה הרצח ברחוב יפו, ובכלל
העובדות בהן הודה אף המעשים המיוחסים לו עם הנאשם, כולל צילומו של העד. התבביעה
ביקשה[12] להגיש את פרוטוקול הודאתו של העד במשפטו מכוח סי 10 א׳, ואילו הסנגור הותיר את
הבקשה לשיקול דעתו של בית המשפט[13]. בהחלטתנו מאותו חיים קיבלנו את הבקשה להגשת
הפרוטוקול ולהלן נצרף נימוקינו.

הסנגור טען בסיכומיו די הודאתו של העד במשפטו שלו, במסגרת הסדר טיעון וללא שנשמעו
עדים, לא יכולה לשמש כראיה במשפט זה, אולם אם הסביר הסבר של ממש מדוע כך הם הדברים,
אף לא צירף אסמכתאות לחיזוק טענתו. דעתנו בעניין זו שונה. אך מובן הוא כי תשובה של נאשם
לכתיא הנאשמת באולם בית המשפט ואשר נרשמת בפרוטוקול, היא משום "אמרחי" של אדם
בכתב הענוה אל תנאי סי 10 א׳ (ראה י. קדמי, "על הראיות", חלק ראשון, עמי 274 פסקה ב.ג.ב.).
ולא רק שיש בו בפרוטוקול ההודאה משום אמרת-חוץ לפי סי 10א׳, אלא שעל פני המדובר
באמרה מהימנה מאין כמוה אשר חזקה עליה כי נאמרה מרצון טוב וחופשי ובצלא משקל ניכר,
באשר העד מוסר אותה בתשובה לאשמומיים המופנים אליו גופו ובעד הוא מיוצג ע״י עו״ד. מכאן
שאין כל מניעה מלקבלה לפי סי 10א׳ ואף להעניית לה להעניית לה משקל מלא.

טענתו של העד בעדותו[14] כי כתב האישום הוקרא לו באופן כללי ובכותרות וללא שהוזכרו השמות,
רחוקה מלהיות אמת, כפי שמוכיחים הפרוטוקולים הממשפטו. מעיון בפרוטוקול משפטו של העד
בתיק 6446/02 מיום 19/12/02 (ת/ 68) רואים אנו כי כתב האישום הוקרא לעד (הנאשם באותו
תיק) במלואו לאור העובדה כי לא היה מיוצג באותו שלב וסירב לקבל על עצמו ייצוג (ראה חלקתם
בית המשפט באותו דיון, עמי 2). העד/נאשם, אף חחל למסור תגובה מפורטת, המוכיחה כי עדותו
בפנינו כאילו כתב האישום לא הוקרא לו במלואו – שקריא היא בעליל. עיון בפרוטוקול הודאתו
של העד בתיק מיום 29/06/03 (ת/ 69), יגלה כי לאחר מספר חודשים נמלך העד ודעתו והודתו
בכתב אישום מתוקן שעה שהוא מיוצג. גם הפעם הוהברחה לעד מהות כתב האישום בעניינו. העד
הודה בכתב האישום במילים ברורות, הן מפי סנגורו וחן במו פיו. הסנגור ביקש בסיכומיו להאיחת
בעובדה כי העד לא הזכיר את הנאשם במסגרת תשובתו לכתב האישום, אולם ברור כי אין בכך
לחעלות או להוריד. המעיין בפרוטוקול החודאה, יגלה כי העד הודה בכתב האישום ובעבירות
המיוחסות לו ולצד זאת ציין עובדתית בולטות מתוך המיוחס לו. קריאת תמה בפרוטוקול תגלה כי
הזכרת שמות שותפו ע״י העד הייתה היא לצד הודאתו בעובדותו בכתב האישום המיוחס לו, ואיננה
משום "רשימה סגורה".

לצד משקלו הברור של פרוטוקול המשפט של העד, נציין כי עדותו בפנינו לא הייתה נקייה
מסתירות, למשל לעניין מידת היכרותו עם הנאשם[15].

אם כן – ראינו כי במשפטו הודה אברהים ע״א חי בעובדות עבירת גרימת המוות בכוונה לעניין
הפיגוע ברחוב יפו, ובכלל זה חלקו של הנאשם. פרוטוקול זה הוא חלקו של העד משום "אמרת-חוץ" של העד,
ואנו קיבלנו אותה ומצאנו לנכון להעדיפה על פני עדותו בפנינו, אשר ממנה נשמט חלקו של
הנאשם.

[12] ראה פרוטוקול הדיון מיום 14/06/04, עמי 3 שי 24-26.
[13] שם, עמי 5 שי 36-37.
[14] ראה פרוטוקול עדותו של אברהים ע״א חי מיום 30/03/04, עמי 7 שי 29-38.
[15] שם, עמי 4 שי 35, השווה שם עמי 7 שי 10-11.

### עד התביעה אחמד ברגותי

נקל לראות כי עד זה איננו נמנה על העדים הבאים לומר את האמת בעדותם, או לשתף פעולה עם
בית המשפט שעה שהוא מבקש להתחקות אחרי האמת. מייד עם עלותו לדוכן העדים אטם העד
את אוזניו וסירב לענות לשאלות התובעת. לשאלות הסנגור ענה רק לאחר שבירר כי הוא עורך דינו
של הנאשם וגם שעה שהשיב אישר את שאינו שנוי במחלוקת ע״י התביעה, דחיינו כי אינmembers מזכיר
כלל וכלל את הנאשם.

ואכן התביעה איננה חולקת כי העד אינו מזכיר כלל את הנאשם, ואף הצהירה כי לא לשם כך
הביאה את העד לעדות, אלא על מנת להוכיח את חלקו השני של פרט האישום השישי, חלק אשר
אפילו אליבא דכתב האישום הנאשם לא נטל בו חלק. שאלה נכבדת היא לשם מה לשם מה צריכים אנו
להידרש לשאלת עדותו של העד אשר את העד אינו מפליל את הנאשם, אולם לאור
תשובתו של הסנגור כי אפילו עצם קרות האירוע אינו מוסכם!!!,[16] דומה כי אין מנוס מכך.

לא התלבטנו רבות בבואנו להכריע בשאלת העדפת פרוטוקול ההודאה ההודאה של העד כנאשם
על פני עדותו (?) בפנינו, אשר ספק רב האמנם ״עדותו״ יקרא לה, ומכל מקום אין היא משכנעת.
לעומת עדותו השירירותית והמגוהכת של העד בפנינו, עומד פרוטוקול הודאתו של העד במשפטו
שלו, בעוד הוא מיוצג ע״י עו״ד. מן הטעמים האמורים מעלה לעניין אברהים ע״א חי, מצאנו לנכון
להעדיף את פרוטוקול המשפט על פני העדות.

### עד התביעה ריאד עודה

גם עד זה, בדומה לפעת קודמתו, תלה את קולר הפללתו הנחרצת את הנאשם, באמצעים פסולים
שהופעלו כנגדו במשפטו, אולם גם הוא לא העלה - משום מה - טענות אלו במשפטו שלו.[17] מאותו
נימוקים הנזכרים מעלה, המצטרפים לעדותו הגמגמנית וamingמתחמקת של העד (התחמק מלהשיב
לשאלה האם הוא מכיר את הנאשם, ואף לא ידע למי הכוונה, למרות שנכח רק נאשם אחד בתא
הנאשמים), מצאנו לנכון להעדיף על פני עדותו את אמרתו של העד, אשר סימני האמנם ניכרים בה
בעליל, ובכלל זה העובדה כי כתב אותה בכתב ידו, כי הוזהר כחוק טרם גבייתה והוא חתום
בתחתית כל דף בה.

### עד התביעה אברהים חביישה

עד זה, בעלותו על הדוכן, חזר על תוכן של חבריו וגם הוא אישר את הכתוב באמרתו ואת המעשים
הרשומים שם, למעט נקודה תנועמ לנסיבות היכרותו עם הנאשם. לטענת העד, החוקר אילץ אותו
לכתוב כי נפצע מידיו של מאג'יד מצרי (אותו, לטענתו, אינו מכיר כלל) שעה שחיו בדרכם לבצע
פיגוע תחת מטען.

בבקשו להרחיק את הנאשם בכל מחיר מן הפללה המפורשת אותו הפלילו, ואגב כך להטיל רפש
בחוקרו, נשתבחחו מאברהים חביישה העובדה הפשוטה כי באמרתו לא באמרתו כלל אין מוזכר הנאשם בהקשר
של פיגוע מתוכנן, אלא דווקא כמי כי הפציעה היתה במסגרת ״תאונת אימונים״, כאשר הנאשם
החל לשחק במטול רימונים שבידיו, תוך כדי פגישת הכירות של חוליית שונות בארגון. כלומר,
לטעונת העד כי החוקר ביקש לאלפו להודות כי נפצע תוך כדי הכנת לפיגוע עם הנאשם, אין שחר -
אפילו לא מתוך האמרה הכתובה.

ממילא גרסתו של העד אינה משכנעת כלל. העד לא ידע ליתן הסבר של ממש כיצד נפצע. הוא אף
לא טרח למסור הסבר של ממש כיצד אילץ אותו החוקר להפליל את הנאשם ומדוע ומדוע
רק חלק זה באמרתו כוזב ואילו כל השאר נכון.

אל מול כוביו של העד, עומדת אמרתו, אותה כתב בכתב ידו, לאחר אזהרה כחוק ועליה הוא
חתום. התנאים לקיום ס׳ 10 א׳ מתקיימים, שכן העד מזהה את אמרתו וסותר את תוכנה. לאור
העובדה כי עדותו לא עוררה בנו רושם של מהימנות ודווקא אמרתו נושאת עליה את סימני האמנם,
מצאנו לנכון להעדיפה על פני העדות.

---

[16] ראה פרוטוקול הדיון מיום 30/03/04, עמי 8 שי 37-31.

[17] ראה פרוטוקול עדותו של ריאד עודה מיום 30/03/04, עמי 10 שי 17-15.

תאריך: 28/06/05                8                תיק מס': 5398/03

## פרשת ההגנה

1
2
3
עדות הנאשם בפרשת ההגנה היתה קצרה, רווייה סתירות ובלתי משכנעת. ראשית יש לציין כי
4
למרות הררי חומר הראיות מטעם התביעה, אשר נסקר בהרחבה לעיל, בחר הנאשם כמעט ולא
5
להתייחס ישירות לראיות אלו ועדותו בחקירה הראשית היתה קצרה ולאקונית.
6
7
אלא שהפילו מתוך עדותו של הנאשם, עולות הסתירות. טענת הנאשם בחקירה הראשית היתה כי
8
ישנם אנשים רבים באזור שכם בשם מאג'ד מצרי, כי המדובר במשפחה הגדולה ביותר באזור והוא
9
עצמו מכיר אדם בשם זהה לשלו העובד אף הוא ברשות הפלסטינית. לחיזוק טענתו זו ציין הנאשם
10
כי אפילו שניים מן המפעילים אותו, מצער שרים ומוחמד נאיפה, שעה שהובאו בפניו לעימות
11
במהלך החקירה, ציינו מייד כי הנאשם איננו אותו מאג'ד מצרי, אליו התכוונו בהכללתם. עם זאת
12
בחקירתו הנגדית שינה הנאשם מטעמו "יולייתר בטחון" הוסיף גם את הגרסה כי השניים הפלילו
13
אותו בשל סכסוך קודם, וזאת לאור העובדה כי במסגרת תפקידו עצר את השניים בהיותם גנבי
14
רכבים.
15
16
ברור כי שתי הגרסאות אינן יכולות לדור בכפיפה אחת. ואם אכן מוחמד נאיפה ציין מייד בפני
17
חוקרי השב"כ כי הנאשם איננו מאג'ד מצרי נשוא הפללותיו, מדוע הנאשם איננו מדבר איתו,
18
בבחינת "עם מי שעושה לי דבר כזה, אין לי מה לדבר"[18]?
19
20
סתירות אלו מצטרפות למגמתו הכללית של הנאשם להרחיק עצמו, ובכל מחיר, מקשר כלשהו
21
לפעילות בטחונית, גם בדברים שהודה בהם באמרתו, ואין כל ספק שאין בהם לקשור ולו במאום
22
לפרטי האישום החמורים המיוחסים לו. כך מכחיש הנאשם בעדותו גם ירי כללי לעבר כוחות
23
בטחון, בו הודה באמרתו, העברות כספים בהם היה מעורב ועוד נושאים, המפורטים בהרחבה
24
בעמודים 26-27 לסיכומי התביעה. הנאשם, בניסיונו למלט עצמו, אף הציע את קשריו עם נאצר
25
עוויס, על אף העובדה כי השניים התרועעו בראשית שנות התשעים בירדן ובבדד, כעולה
26
מאמרותיו.
27
28
לשקריו של הנאשם אודות קיומו של אדם אחר הענוה לשמו המרובע, ראה להלן בפרק העוסק
29
בזיהוי הנאשם.
30
31
סוף דבר, לא מצאנו כי עדותו של הנאשם בפנינו יש בה לעורר רושם של מהימנות. הנאשם נכשל -
32
ואף לא טרח - בעדותו מלהפריך את שלל ראיות התביעה וחסתפק בהכחשה גורפת ולאקונית, גם
33
במעשים המפומצצמים בהם הודה באמרותיו. תוך כדי כך הסתבך הנאשם בגרסאות סותרות
34
ושקרים של ממש, אשר אף בהם אין להחמיה למשקל עדותו.
35
36
37
## סיכום ביניים:
38
39
הנה כי כן, מצאנו כי יש מקום להעדיף את פני ראיות התביעה על פני עדות הנאשם בפרשת ההגנה,
40
את אמרותו עדי התביעה על פני עדויותיהם המגמתיות והשקריות - הכל מן הנימוקים האמורים
41
מעלה בהרחבה. ראיות אלו משתלבות זו בזו ומצערות גרסה סדורה וקוהרנטית ממנה עולה דמותו
42
של הנאשם כרב-מחבלים העוסק, ביחד עם שותפים נוספים, בשילוח מחבלים מתאבדים. כעת
43
נבחן האם אחריותו של הנאשם למיוחס לו, עולה מתוך אותן ראיות.
44
45
46
## זיהויו של הנאשם:
47
48
דומה כי השאלה המרכזית בתיק זה נוגעת לענין זיהויו של הנאשם אשר בפנינו, כדמות המופיעה
49
בהפללות הרבות של עדי התביעה על פני עדויותיהם המגמתיות לו מיוחסים המעשים המתוארים בכתב האישום.
50
עדי התביעה השונים מתארים אדם בשם מאג'ד מצרי, מוסרים פרטים אישיים שונים שלו ואף
51
נוקבים בכינוי בו הוא מוכר, "בובוי". לטענת הנאשם אין כך הדבר, אין לו כינוי כלשהו, ובודאי
52
לא "בובוי". עוד טען הנאשם כי משפחת מצרי היא משפחה גדולה באזור שכם, ומן הסתם יש בה
53
אנשים נוספים הענוים לשם מאג'ד. לטענת הנאשם, ישנו אדם נוסף בשם מאג'ד מצרי אשר אף
54
הוא עובד ברשות הפלסטינית. האם הנאשם שבפנינו הוא אותו "בובוי"?
55

[18] ראה פרוטוקול עדות הנאשם בפרשת ההגנה מיום 14/06/04, עמ' 9, ש' 52-48.

תאריך: 28/06/05                    9                    תיק מס׳: 5398/03

ראשית, יש לציין כי הנאשם עונה בעצמו על שאלה זו באמרתו[19], בה הוא מאשר את כינויו
מילדות "בוגד". כאן המקום לציין כי אין המדובר בכינוי שגור או נפוץ (כגון כינוי של אדם על שם
בנו בכורו, למשל "אבו מוחמד", כינוי אשר כמוהו ימצאו לאלפים). ייחודו של הכינוי, בצירוף שאר
הפרטים האישיים של הנאשם, מצביע על החפיפה בינו לבין הנאשם.

אלא שהרשעתו של הנאשם בעבירות החמורות המיוחסות לו, אינה נשענת על כינויו בלבד, אלא גם
על זיהויו באופן פרסונאלי ע״י עדי התביעה, איתם עמד בקשרים טובים. בשאר לטענות כי עדי
התביעה "התקבלבלו" או כיוונו לאדם אחר, הרי שבחינה מעמיקה של חומר הראיות תגלה כי אין
בכך ממש. הנאשם מאשר באמרותיו את היכרותו עם שאר "גיבורי" האירועים, עדי התביעה
המפלילים אותו, ואף מודה בביצוע עבירות בטחוניות עמם. כך מודה[20] הנאשם בהיכרותו עם
נאצר עווים ובביצוע ירי עמו לעבר עמדת צה״ל וכן ביצוע ניסיון ירי. ביחד עם נאצר עווים אף גרש
הנאשם בשנת 1992 מהאזור וביחד נסעו לבגדד[21]. הסברה כי נאצר עווים אינו מכיר את הנאשם
וכיוון בדבריו למאציד מצרי אחר, מופרכת ממש בנסיבות אלו. עוד מאשר הנאשם באמרותיו כי
מסר כספים למנצור שרים ומוחמד נאיפה והוא אף מאשר את היכרותו האישית עמם. הוא אף
מאשר העברת רובה קלצ׳ינקוב לידיו של מוחמד נאיפה (על פי גרסת הנאשם, בשל סכסוך פנימי)[22].

אם כן, החיכרות של הנאשם עם עדי התביעה עולה במפורש מאמרותיו של עצמו. אלא שגם עדי
התביעה לא טומנים ידם בצלחת ומרחיבים בעניין היכרותם עם הנאשם. מנצור שרים זיהה את
הנאשם בשמו ומלא בעדותו בפניו וציין כי הנאשם הוא חברו[23]. פחד שראיעה מוסר באמרתו[24]
תיאור מדויק של הנאשם, כולל מקום עבודתו כקצין במשטרה הפלסטינית, גיל, מצבו המשפחתי
והיותו אב לשתי בנות (פרטים אותם מאשר הנאשם עצמו באמרתו) ומוסיף כי כינויו של הנאשם
הוא "בוגד". עד התביעה ריאד עודה, אשר אפילו בעדותו[25] המגמתית אישר את היכרות האישית
עם הנאשם לאור שירותם המשותף במשטרה הפלסטינית, מציין גם הוא באמרתו[26], שנתקבלה
והועדפה על פני עדותו, את כינויו של הנאשם ואת העובדה כי הוא חבר בארגון "ג׳דעי אל אקצה"י.
אין לחשוד בעד התביעה אברהים חביישה כי ישכח את הנאשם, לאחר שזה גרם לפציעתו הקשה
שעת ששיחק במטול רימונים שהחזיק. גם הוא מזכיר[27] את הנאשם בשמו ובכינויו ומציין את
חברותו בארגון חסרור. **עד התביעה מוחמד נאיפה מוסף**[28] **את מספר הטלפון הסלולארי של**
**"בגד"**, 200596-059, הדומה באופן מפתיע למספר שמוסר הנאשם עצמו באמרתו[29], -059
.200569

טוען הסנגור כי נפלו בחקירה פגמים של ממש בכך שלא נערך לעדים מסדר זיהוי. הסנגור לא
הביא אסמכתאות להוכחת טענתו, ואנו לא מצאנו בה כל ממש. ניכר מכל האמור למעלה בהרחבה
כי העדים מכירים את הנאשם היטב, מוסרים פרטים מזהים רבים שלו, חלקם אף הצביעו עליו
באולם בית המשפט (גם אם חזרו בהם מהפללתם או תירצו אותה בהסברים שונים ומשונים). אם
כן – בפנינו מצב של "הצבעות" של העדים על הנאשם, כעל מי שהם מכירים אותו היכרות מוקדמת
ולא זיהויו של אדם לא מוכר באמצעים חזותיים שונים (מסדר זיהוי), ואין כל חובת קיום מסדר
זיהוי בנסיבות אלו. ראה גם **י. קדמי**, על הראיות (מהדורת 1999), חלק שני, עמ׳ 852-851.

כאן המקום אף לחידרש לשאלה הסטטיסטית, האמנם יתכן כי המדובר במאג׳יד מצרי אחר?
הנאשם ביקש להגיש, לצורך כך, רישום של משרד הפנים הפלסטיני באשר לשכיחות חשם מאג׳יד
מצרי. את המסמך ביקשה להגיש להגנה על סמך עדותו של הנאשם..

---

[17] ת/ 1, עמ׳ 8 ש׳ 25-22.

[20] ראה ת/ 1, עמ׳ 2 ש׳ 12-5.

[21] ראה ת/ 2, עמ׳ 5, ש׳ 24-13.

[22] ראה ת/ 1, עמ׳ 3 ש׳ 26 ועד עמ׳ 5 ש׳ 21.

[23] ראה פרוטוקול עדותו של מנצור שרים מיום/ 30/11/03, עמ׳ 1 ש׳ 50-35.

[24] ראה ת/ 70, עמ׳ 1, ש׳ 22-19.

[25] ראה פרוטוקול עדותו של ריאד עודה מיום 30/03/04, עמ׳ 9, ש׳ 22-18, עמ׳ 10, ש׳ 39-34.

[26] ראה ת/ 3, עמ׳ 5, ש׳ 8-4.

[27] ראה ת/ 61, עמ׳ 2 ש׳ 17 ועד עמ׳ 3 ש׳ 2.

[28] ראה ת/ 60, עמ׳ 5 ש׳ 12.

[29] ראה ת/ 1, עמ׳ 2 ש׳ 25.

[ גם נסיבות בקשת ההגשה היו, לכל הפחות, מוזרות. הגשת המסמך כלל לא נתבקשה בחקירה 1
הראשית, אלא צצה לפתע בחקירה החוזרת. הנאשם התיימר לאשר את הרשימה שהציג הסנגור, 2
בלא כל הסבר מדוע רשימה זו אותנטית או מה היו דרכי הפקתה..]. 3
4
התביעה התנגדה להגשת המסמך, ואנו קיבלנו[30] את עמדתה כי לא ניתן לקבל את המסמך שלא 5
באמצעות עורכו. עם זאת, ועל מנת להסיר את הדעת הצענו - והצדדים קיבלו את הצעתנו - כי 6
התביעה תגיש ממסמך מוסכם שיוכן ע״י משרד הפנים במנהל האזרחי. 7
8
מעיון בשאילתא עולה כי מספר אנשים באזור שכם עונים לשם מאגד מצרי, אולם כולם מבוגרים 9
במיוחד או צעירים במיוחד ולא עונים על תיאורו של מאג״ד מצרי הנזכר בעדויות התביעה, כאדם 10
כבן 30 - כולם למעט אדם אחד, הוא הנאשם שבפנינו.. באשר לטענת הנאשם[31] כי פעם נוכח לדעת 11
ששמו אדם נוסף בשם מאג״ד אסמעיל מוחמד אלמצרי, אשר לקח הלוואה בבנק על שמו - עיון 12
בשאילתא יגלה כי כמה הטענה שקרית, שכן הנאשם הוא האדם היחיד העונה לשם מרובע זה, לא 13
רק בחוך הגליאים הרלוונטי ולא רק באזור נפת שכם אלא בכל הגדה ואף רצועת עזה!! 14
15
16
**אם כן, אנו קובעים כי הנאשם שבפנינו הוא אותו מאג׳ד מצרי, המכונה ״בזבז״ המופיע לרוב** 17
**ראיות התביעה. כעת שומה עלינו לבחון האמנם יש באותן ראיות כדי להביא להרשעת הנאשם** 18
**במיוחס לו.** 19
20
21
<u>פרטי האישום המיוחסים לנאשם</u> 22
23
הוכחת פרטי האישום מתבססת על ראיות התביעה, כמפורט להלן. ההגנה לא נדרשה לעניין הוכחת 24
עובדות האישום מתוך חומר הראיות (אלא הסתפקה בהכחשתם). 25
26
<u>פרט אישום ראשון</u> 27
28
פרט אישום זה מייחס לנאשם חברות בארגון הטרור הנודע ״גדודי אל-אקצה״. הנאשם מופלל 29
בפרט זה ע״י שלושה מעדי התביעה, פהד שריעה, אברהים חביישה וראאד עודה. עדויות אלו 30
משתלבות זו בזו, מחזקות זו את זו ועונות על דרישת התוספת הראייתית. 31
32
<u>פרט אישום שני</u> 33
34
אישום זה מייחס לנאשם נשיאת משרה בארגון האסור, דהיינו כי עמד בראש ״גדודי אל-אקצה״ 35
באזור שכם בשנת 02׳, פיקד על הפעולות הצבאיות שביצע הארגון באותה שנת-דמים, תיאם את 36
פעילות הפעילים הצבאיים, סיפק להם נשק ומימון אותו קיבל מידי מרואן ברגותי ואחרים וכן 37
נהג ליטול אחריות על מעשי הארגון בכלי התקשורת. 38
39
בניגוד להכחשותיו הנמרצות של הנאשם, נראה כי שפע העשייה שפעל הנאשם ומעמדו בארגון, 40
נחקקו בזכרונם של פעילים רבים, אשר זכרו לו את פיקודו עליהם, את הכספים שהעמיד עליהם 41
והמשרים שסיפק להם. עצות ארוכה של עדי תביעה מפלילים את הנאשם במיוחס לו בפרט אישום 42
זה, כמפורט בהרחבה בסיכומי התביעה. כך, למשל, מצעור שרים מנתאר את מעמדו של הנאשם 43
בארגון, את הכספים הרבים שקיבל מידו במספר הזדמנויות לצורך ביצוע פיגועים וכן כי הנאשם 44
נטל אחריות על פיגועים מטעם הארגון. כך, נצצר עוויץ המתאר את הנאשם כאיש הכספים אשר 45
היה ממומן אותו ואף קיבל מידיו סכום של 12,000 ש״ח. כך, מוחמד נאיפה המתאר את הנאשם 46
כמפקד ״גדודי אל-אקצה״ בשכם, כמי שאשיא לו לבצע פיגועים וכן נטל עליהם אחריות בשם 47
הארגון (העד שלח לו לצורך כך את צילום צוואתו של סירחאן סירחאן, הרוצח בפיגוע קיבוץ מצר) 48
וכן כמי שמימן ביצוע פיגועים וסיפק לשם כך כלי נשק. כך גם פהד שריעה המתאר ארוכות את 49
מעמדו של הנאשם כמי שחיילק לו הוראות, כמי שנהג לארגן תהלוכות מטעם הארגון ולצורך כך 50
הורה לו להפיץ תמונות שהיידה ולירות בתהלוכות וכן כמי שהעביר כלי נשק מפעיל אחד למשנהו 51
בשורת הזדמנויות. שורת עדויות אלו מחזקות זו את זו ועונות למבחר על דרישת התוספת 52
הראייתית, אולם גם מקומה של אמרת הנאשם לא נפקד לעניין זה. הנאשם אמנם, כדרכו, מנסה 53
להתרחק מחברותו בארגון ומתפקידי שנשא בו, ואלם גם הוא מוסר באמרתו פרטים המאמתים 54
את אשר מפלילים אותו חבריו, ובכלל זה כי העביר כספים לאנשים המפלילים אותו בכך (נאצר 55

[30] ראה פרוטוקול מיום 14/06/04, עמ׳ 11-12.
[31] שם, עמ׳ 11, ש׳ 16-20.

עוויס, מוחמד נאיפה, מנצור שרים), כי קיבל כספים מידי מרואן ברגותי, מונייר מקדח (המוזכר גם
עייי נאצר עוויס) ואחרים, כי סיפק נשק לידיו של נאיפה, כי יצר קשר עם תחנת טלוויזיה ערבית,
כי סייע להקים אתר אינטרנט עבור הארגון ועוד.

העובדות המפורטות בהרחבה בפרט אישום זה לעניין תפקידיו של הנאשם, מקומו בהיררכית
הארגון בזמן הנתון והפעולות השונות אשר נקט במסגרת תפקידו, ישובו וידונו שעה שנבקש
להצביע על אחריותו של הנאשם לעבירות שבוצעו מטעם הארגון.

### פרט אישום שלישי

פרט זה מייחס עבירה של ירי לעבר אדם, וזאת בכך שבמספר הזדמנויות ביצע ירי ביחד
עם חבריו לארגון לעבר חיילי צהייל. עד התביעה נאצר עוויס מפליל אותו בביצוע מעשי ירי ביחד
עמו. גם הנאשם מציין באמרתו מעשה ירי שביצע ביחד עם נאצר עוויס, כך שבפנינו תשתית
ראייתית מלאה להרשעת הנאשם בפרט אישום זה.

### פרט אישום רביעי

התביעה חזרה בה מאישום זה, ופטורים אנו מלדון בו.

### פרט אישום חמישי

אישום זה מייחס לנאשם עבירה של ניסיון לירי, כך שביחד עם נאצר עוויס יצא לירות לעבר חיילי
צהייל, אולם בסופו של דבר נמלכו בדעתם לאחר שנתשפו עייי כוחות הצבא. גם הנאשם וגם נאצר
עוויס מתארים את האירוע באופן דומה באמרותיהם ומצאנו לנכון להרשיע את הנאשם בגין
עבירה זו.

### אחריות הנאשם למעשי הרצח מכוח תפקידו

פרטי האישום החמורים 6-18 מייחסים לנאשם אחריות למותם של 10 בני אדם בפיגועי
התאבדות ברחבי יפו בירושלים, בישוב חרמש ובקיבוץ מצר, וכן את פציעתם וניסיון רציחתם
מטעם הארגון "גדודי אל-אקצה" ועייי הנאשם ושותפיו.

מטבע הדברים, אין אפשרות להעמיד לדין את המחבל המתאבד אשר מוסר את נפשו על מזבח
האידיאולוגיה הבזויה. אין זאת אומרת כי אלו העומדים מאחוריו, ואשר עשותו ככלי שרת בידם
למילוי מזורותיהם הבזויות, צריכים לחמוק מן העונש. דיני העונשין הכירו גם באפשרות להטיל
אחריות, ואף אחריות מלאה, על מי שמכוח תפקידו או מעמדו (ויהיה זה גם מעמד בלתי רשמי -
ראה עניין "משולם" הנזכר להלן) הניע אחרים לביצוע עבירות.

### אחריות ראשי הארגון הטרוריסטי למעשי חברי הארגון - הפן הנורמטיבי

כידוע, מקובלת בתורת המשפט הצבאי דוקטרינת ה"אחריות הפיקודית", לפיה אחראי בעל דרג
פיקודי בכיר למעשי פקודיו אשר נעשו על פי הוראתו ואישורו, גם אם בפועל נטל הוא חלק מעשי
קטן או אף שולי במעשיית עצמם. דומה כי כל נוי שעניינים לו בראשו, לא יוכל לחמוק מן המוסכנה
החותכת כי אחריות מקיילה, להבדיל אלפי הבדלות, יש להטיל גם על ראשי ארגון פשע וטרור
המכוונים את פעילותם הנפשעת והומרים על ביצועם של מעשי רצח בשולם רחוקיי.

יפים לעניין זה דברי כבי השופט קדמי בעיימ 5589/98 **ביטאן סולטאן נ. מדינת ישראל**, תק-על
99(3) 98. באותו עניין הורשע המערער בעבירות רצח בכוונה תחילה, כאשר הוכח שנתן את הסכמתו
ואישורו לביצוע הרצח, ושלח את המבצע העיקרי להוציא לפועל את הרצח, ואף תכנה אותו לבי
שיטות הביצוע. השופט קדמי הדגיש שלולא הסכמתו של המערער לא היה הרצח מתבצע, ולכן מתן
האישור לבצע את הרצח היה משול "ליריית הזקנה המשלחת ספורטאי למרוץ", והיא עולה כדי
"מעשה של השתתפות בביצוע העבירה". לכן הורשע המערער כמבצע בצוותא ולא כמשדל, ובית
המשפט הדגיש כי הוא היה מצוי "במעגל הפנימי של הביצוע", כמי שהיה לו תפקיד בביצוע, והיה
"המוח של התבוזרה", בעוד שמשדל מצוי מחוץ למעגל הפנימי של הביצוע. כבי השופט קדמי הוסיף

P 6: 26

ואמר כי בנסיבות המתוארות לעיל, כאשר המערער נתן "אור ירוק לרצח" וההנחיות אופרטיביות 1
בדבר דרך הביצוע, היה בהתנהגותו לפחות "מנה גדושה של שידול על דרך העידוד".  2
3
בדנ"פ 1294/96 **עוזי משולם ואח׳ נ׳ מדינת ישראל**, פ"ד נב(5) 1, פסק כב׳ השופט א. מצא כי: "יש 4
לראות במשתתף כזה — שבידיו שליטה מלאה על הביצוע ושעושיית כולל לא רק פעולות שידול 5
והכנה, אלא גם הנחיית העבריינים הפועלים ופיקוח על פעילותם - מבצע בצוותא לכל דבר". 6
הוא הדגיש כי נוכחות בזירת העבירה איננה יסוד חיוני להיותו של אדם מבצע בצוותא, ואמר: 7
8
"במציאות המשפטית החדשה, התניית האחריות היישירה בנוכחות, פרושה ש׳סנדיקים׳ 9
ומנהיגי קבוצות עברייניים, הממשלחים לזירת הביצוע את ׳דגי הרקק׳ ׳הסרים למרותם, 10
בעדר הם מנהיגים את הפעילות הפלילית מרחוק, יראו לא כמבצעים בצוותא אלא רק 11
כמשדלים. ואפשרות זו, שבוודאי איננה משקפת את הדין הרצוי, איננה מתחייבת אף מן 12
הדין המצוי". 13
14
אותו פסק דין ניתן לאחר ניתוח מעמיק של דמותו של הרב עזי משולם ומסקנת השופטים באשר 15
למרות שהטיל על חסידיו. 16
17
עקרונות אלו באו לידי ביטוי לא רק לענין ארגוני פשע, אלא גם לענין נושאי משרה בכירה בארגוני 18
טרור, בפסק דינו המאלף של בית המשפט המחוזי בתל אביב, תפ"ח 1158/02 **מ"י נ׳ מרואי ברגותי**. 19
ראה גם עקרונות דומים המצוטטים בפס"ד ברגותי חנ"ל, המובאים במאמרים של מ. קרמניצר 20
"**המבצע בדיני העונשין קווים לדמותו**", פלילים-א׳ (תשי"ן-1990) 65, בעמ׳ 72, ו“מ. גור-אריה, 21
"**צדדים לעבירה-תיקון** 39 **לחוק העונשין במבחן הפסיקה**", מגמות בפלילים, עמ׳ 83. 22
23
**מן הפרט אל הכלל** 24
25
אין לך משיימה קלה מאשר הוכחת מעמדו ומכירו של הנאשם בארגון גדולי אל-אקצא בשכם 26
וסביבותיה ושליטתו המוחלטת בפעילות הצבאית של הארגון בומן שמישמש כראש הארגון בעיר. 27
ראינו כי הנאשם פעל כמפקד "גדודי אל-אקצה" באזור שכם בשנת 02׳, ולמראותו סרר פעולי 28
הארגון באופן ישיר. הנאשם היה מערב בחלקים הכספים לפעילי הארגון - כספים אשר הזין את 29
גלגלי הטרור. הנאשם תיאם על פעילות חברי הארגון באזור ועמד בקשר עם מפקד ארגון התנזים, 30
מרואי ברגותי. הנאשם סיפק כלי נשק לפעיליים לביצוע משימותיהם ואף היה מערב בצדדים 31
נוספים בפעילות הארגון כגון ארגון תהלוכות והקמת אתר אינטרנט ועוד כהנה וכהנה מרעין 32
בישין. 33
34
עובדות פרט האישום הבאים יגללו כיצד היה הנאשם מערב בהכנות המקדימות לביצוע פיגועי 35
התאבדות, כיצד פנה מפעיל צבאי אליו על מנת לקבל את אישורו לרצח חפים מפשע. נראה בעליל כי 36
ראה עצמו כפוסק בעניין חיים ומות באזור שכם. ביוזמתו, באישורו וברכתו של הנאשם יצאו 37
לדרכם פיגועי ההתאבדות המתוארים להלן, ובדין נושא הוא באחריות אליהם. 38
39
נסיים פרק זה ולו באזכור העובדה הסמלית כי במסגרת תפקידו הנאשם הוא זה שמיהר ליטול 40
אחריות בשם הארגון על פיגועי ההתאבדות שביצע הארגון. אמנם, בבואו לתת את הדין על 41
מעשיו, נתקף הנאשם בביישנות מעשמת ולא חזר על כך, אולם דומה כי הדברים מדברים בעד 42
עצמם ומצביעים מדוע אין מקום ליתן לנאשם לחמוק מהאחריות לה הוא נושא במסגרת תפקידו 43
למעשי הרצח שביצע הארגון בראשו עמד ואשר מיהר להתנאות בהם. 44
45
46
**אלא שאחריותו של הנאשם למעשי הרצח לא מתמצה במישור "המיניסטריאלי" בלבד.** שכן 47
הנאשם גם שלח ידו בביצוע מעשים של ממש במסגרת הוצאתם לפועל של פיגועי ההתאבדות 48
הנדונים, מעשים המביאים אותו אל מסגרת "מבצע הפנימי" של מבצעי העבירה, הנושאים 49
באחריות כמבצעים ישירים. נדון כעת בחלקו של הנאשם במסגרת הוצאתם לפועל של כל אחד 50
מהפיגועים. 51
52
**השתלשלות האירועים הכללית** 53
54
כפירתו של הנאשם באשימותו כנגדו היתה כללית וגורפת. הנאשם לא הציג בפנינו כל זירת 55
מחלוקת מתוחמת, אפילו ביחס לחלקים מתוך פרטי האישום אשר כלל אינם נוגעים לו. תחונה 56
עמדה על הוכחת כל פסיק ותג בהם, גם ביחס לאירועים שבוצעו לאחר שיצא הנאשם מן התמונה 57

תאריך: 28/06/05                    13                    תיק מס׳: 5398/03

(ראה הפרק הדן בעדותו של אחמד ברגותי הנזכר מעלה) ולא ידעה למסור עמדה אפילו באשר לעצם קרות הפיגועים.

נוחנה זה של התגנה להתמיד בהכחשה הגורפת, גם באשר לעצם מותם של הקורבנות, יש להצטער עליו, בפרט שהחומר הטכני המובסס עובדתיים אלו הוגש בהסכמתה. לצערנו, לא התנגב לליבנו חחשש שמא עמד הנאשם ליתן את הדין בגין מעשי רצח שלא בוצעו. הראיות הטכניות הרבות שהוגשו בהסכמת הגנה, מבססות את עובדות האירועים המתוארים והתמונות הקשה של קורבנות מעשי הרצח, בהם פצועות רכים בשנים, לא מותירות מקום לספק בענין זה.

למעשה, אין מחלוקת של ממש גם ביחס להשתלשלות העניינים הנוגעת לשלבי הוצאתם לפועל של הפיגועים. אם נעמיק ראות, מעבר לענני האבק שביקשו עדי התביעה להעלית בהתחמקויותיהם השונות, נראה כי למעשה הללו (מוחמד נאיפה, מנצור שריט, נאצר עזויט, אברהים ע״א חי) אינם מכחישים את תהליכי ההוצאה לפועל של מעשי הרצח, ומתמקדים בעיקר ב (בהכחשת) חלקו של הנאשם. מכל מקום, קריאות באמרותיהם, מעלה באופן נרחב ומפורט את השתלשלות אירועים זו (ובכלל זה ההכנות, חימוש המתאבדים, צילומם, הסעתם לעבר זירת הרצח וכו').

אם כן, מצאנו השתלשלות האירועים הכללית, הוכחה כדבעי מתוך הראיות שהובאו בפנינו, וספק האם היא שנויה במחלוקת אמיתית, וכעת נמקד מבטנו לעבר חלקו של הנאשם.

## פרטי האישום 6-8, הפיגוע ברחוב יפו

פרטי אישום אלו מייחסים לנאשם אחריות לרציחתן של אורה סנדלר ושרה המבורגר ז״ל וניסיון גרימת מותם של 45 אזרחים שנפצעו באירוע. האירוע הוצא לפועל מטעמו ובשמו של ארגון ״ג׳דודי אל-אקצה״. מיוחס לנאשם כי הוא קיבל לידיו את המחבל המתאבד בדירה במכתנה בלאכנה ובייחד עם מחוגל טויט צילם אותו כשהוא מחזיק ברובה וספר קוראן. לאחר מכן שילח הנאשם את המתאבד, סעיד, לדרכו האחרונה. לאחר הדבריים האלה יצא סעיד לכיוון רמאללה שם נשלח ע״י אחמד ברגותי לירושלים, מקום בו פתח בירייה לכל עבר, עד אשר הוכרע, אולם לא טרם שגרם לרצח שתי נשים ופציעת עשרות רבות.

על חלקו של הנאשם מסר עד התביעה אברהים ע״א חי״ר, כאמור בפרוטוקול הודאתו במשפטו (ת/69, ס״ק 6 לפרטי האישום השישי בכתב האישום) ועל עדותו מתבסס החלק באישום הנוגע לנאשם. על הרקע לאירוע, למדים אנו מאמרותיהם של ע״א חי ושל נאצר עזויט. אמרותיהם של עדי התביעה 16,17, מוחמד מצלח ומוחמד עבדאללה הוגש בהסכמה[32] ורואים בתוכנן כמוסכם (עד״י איי״ש 114,01, אבו הלאס). מאמרות אלו, בצירוף פרוטוקול הודאתו של אחמד ברגותי, למדים אנו על אחריותו של אותו סעיד לאחר שנשלח וצולם ע״י הנאשם. מן החומר הטכני המצורף למדנו על התוצאות הקטלניות של האירוע. אך מובן הוא כי שלל הראיות משתלבות זו בזו ומהוות הרבה מעבר לחיזוק המוגבר הנדרש לעדותו של ע״א חי.

דומה כי בימים אלו אין אדם נדרש לדמיון רב באשר למשמעותו של אקט צילום מתאבד, כשהוא מקריא את צוואתו טרם צאתו לדרכו האחרונה, ומעשהו של הנאשם בהקשר זה מדבר בעד עצמו. אקט זה, בצירוף מעשהו של הנאשם הנזכר מעלה, מבססים את היותו חלק מן ״המעגל הפנימי״ של משלחי המתאבד ואת אחריותו המלאה לפיגוע ולתוצאותיו הרצחניות.

מטעמים אלו מרשיעים אנו את הנאשם באחריות לפיגוע ההתאבדות ברחוב יפו בירושלים, לפציעת האזרחים והניסיון לרצות נוספים.

## פרטי האישום 9-12, הפיגוע ביישוב חרמש

פיגוע זה הוצא לפועל ע״י מוחמד נאיפה, בסיועם של אכרם אבו-בכר, אוסאמה אשכר ואמג׳ד יחיא. מיוחס לנאשם (ס״ק א׳+ס׳ לפרטי האישום) כי הוא זה שנתן אישור מפורש למוחמד נאיפה לבצע את הפיגוע, ולאחריו אף נטל אחריות עליו בשם הארגון ע״י העביר לידיו של נאיפה סכום של 3,000$. באירוע נרצחו לינוי סרוסי, חדס תורג׳מן ואורנה אשל וכרן לברכה וכן נפצע יובל אשל.

---

[32] ראה פרוטוקול הדיון מיום 14/06/04, עמ׳ 1 ש׳ 22-21.

תאריך: 28/06/05                     14                     תיק מס': 5398/03

חלקו של הנאשם עולה מתוך אמרותיו של נאיפה אותן מצאנו, כזכור, לקבל. נאיפה מתאר כיצד, לאחר שסיפר לו אכרם אבו-בכר כי ברשותו מתאבד מוכן לבצע פיגוע, יצר קשר עם הנאשם שאישר לו לבצע את מעשה הרצח (או בלשונו של הנאשם, "למה לא?!"[33]). יודע13 מתוך דבריו של נאיפה כי הורה לאכרם להמשיך בגלגול הפיגוע, רק לאחר שיחתו עם הנאשם וקבלת האישור ממנו. עוד מתאר נאיפה כיצד, לאחר הפיגוע, נטל הנאשם אחריות לפיגוע בשם הארגון ואף העביר לו את סכום הכסף.

חיזוק לדבריו של נאיפה אנו מוצאים לא אחרת מאשר באמרותיו של הנאשם המאשר כי מסר לנאיפה סכום כסף יום לאחר הפיגוע להקמת סוכת אבלים לשהיד[34]. שאר המעורבים באירוע, שאמרותיהם הוגשו בהסכמה[35], מבססים את עובדתה האישום בכללו וחותמר הטכני מבסס את תוצאותיו הקטלניות ופציעתו של יובל אשל, שאשתו אורנה ז"ל נרצחה לנגד עיניו.

רואים אנו כי הנאשם היה בעל שליטה מוחלטת בהוצאתו לפועל של הפיגוע, ומבצעיו סרו למרותו, הן באומר והן במעשה, הן לפניו והן אחריו. הנאשם נושא באחריות מלאה לאירוע שיצא ברכתו, באישורו ובמימונו ושעליהו הדדרז ליטול אחריות ואנו מרשיעים אותו באחריות לו.

### פרטי האישום 13, 18-18, פיגוע מצר

גם באירוע זה, נשלח המחבל המתאבד, חיית האדם סירחאן סירחאן, ע"י מוחמד נאיפה לקיבוץ מצר. במטע הירי שלו בקיבוץ רצח סירחאן את ילדי משפחת אוחיון, מתן ונועם, את אמם רויטל וכן את תושבי חקיבוץ חקיבוץ תרצה דמארי ויצחק דורי, זכר לברכה.

מעיון באמרותיו של נאיפה עולה כי פעם נוספת פנה לנאשם, בציינו באוזניו כי ברשותו מתאבד נוסף המוכן לשיגור ובבקשתו לחמשו בכל נשק, והנאשם דאג לעשות כן. לאחר מכן, פנה נאיפה אל הנאשם כי ייקח אחריות על הפיגוע, ואף דאג להעביר לידיו את סרט הצילום של סירחאן מקריא את צוואתו.

הנאשם בכבודו ובעצמו מחזק את דבריו של נאיפה באופן מובהק (תוך הוצאת העוקץ מן הדברים, כהרגלו) כאשר הוא מציין באמרתו כי מסר לנאיפה כלי נשק (לטענות, בעקבות סכסוך של נאיפה עם אדם אחר) וכן כי לאחר הפיגוע התקשר לתחנת הטלוויזיה להודיע כי הוא מתבצע לבצוע פיגועים בתוך תחומי מדינת ישראל..למותר לצין כי הסיפא שבצד גרסתו של הנאשם, לא אמין בעיניו. הנאשם לא טרח לחזור אפילו על גרסה מתחמקת זו בעדותו והרחיק עצמו מכל מערכות עם נאיפה או מתן כלי נשק.

המעורב העיקרי הנוסף באירוע אוסאמה אשכר, אשר אינו מזכיר את הנאשם, מבסס את עובדות כתב האישום הנוגעות להכנות לשילוח סירחאן למשימת הרצח והחומר הטכני מזירת הטבח מאשש את תוצאותיו הקטלניות.

דפוס ההירארכיה שבין נאיפה לנאשם, כבר תואר לחל והמעשים שנעשו לפני ואחרי הפיגוע, מבססים את אחריותו של הנאשם מכוח אחזיו אל מבצעי הרצח ומתן האחריות לפיגוע ונטילת האחריות עליו. אלא שגם הפעה, מלבד האחריות "המניסטריאלית", נושא הנאשם באחריות מובהקת לפיגוע בתור מי שהמצאיא לידיהם של הרוצחים בפועל את כלי הנשק שקטל את תושבי הקיבוץ. אין ספק כי הנאשם נושא באחריות מלאה לאירוע הרצח ואנו מרשיעים אותו בכך.

### פרט האישום 19

פרט זה מייחס לנאשם עבירת קשירת קשר לגרימת מוות בכוונה, זאת בכך שהיה שותף למזימה לשלוח את סירחאן, לבצוע פיגוע נוסף לאחר פיגוע מצר.

גם אישום זה מתבסס על אמרותיו של מוחמד נאיפה, המתאר כיצד משנתברר כי סירחאן נותר בחיים לאחר ההתקפה הרצחנית בקיבוץ מצר, הוחלט לשלוח אותו שוב לבצע פיגוע התאבדות,

---
33 ראה ת/ 60, עמ' 4 ש' 25.
34 ראה ת/ 1, עמ' 5 ש' 9-5.
35 ראה פרוטוקול מיום 02/09/03, עמ' 3 ש' 28-27.

ולשם כך התקשר אל הנאשם. הנאשם מסר את הסכמתו לתוכנית ואף נענה לבקשת נאיפה    1
להמציא לידיו כלי נשק, ובני החבורה אף יצאו לשכם לפגשו ולקחת מידיו את הנשק, אולם נעצרו    2
קודם לכן.    3
     4
אודות התחזוקים הרבים לאמרותיו של נאיפה בשורת עניינים - עמדנו זה מכבר. אין ספק כי    5
הקשר הנדון, הוא חלק מתוך "מסכת עובדתית" אחת, הנוגעת לפיגועי טרור שבוצעו ע"י נאיפה    6
והנאשם במסגרת הארגון ובאמצעות סירחאן, ועל כן רואים בהם כחיזוקים גם לעניין הפללתו את    7
הנאשם לעניין אישום זה.    8
     9
גם באשר לדפוס הפעולה והקשר בין הנאשם ונאיפה, עמדנו זה מכבר ואין ספק כי אישורו של    10
הנאשם את התוכנית הרצחנית והתחייבותו להמציא כלי נשק, הופכים אותו לשותף בקשירת    11
הקשר.    12
     13
     14
     15
**סוף דבר, מרשיעים אנו את הנאשם בכל המיוחס לו, למעט פרט האישום הרביעי, ממנו**    16
**חזרה התביעה.**    17
     18
     19
     20
**זכות ערעור כחוק**    21
ניתן והודע,28/06/05, בלשכה. המזכירות תמציא עותק לידי הצדדים.    22
     23
     24
שופט          אב"ד          שופט    25
     26
     27
     28