# EXHIBIT A.390B



PLAINTIFF'S
EXHIBIT
390 B

Date: 7 Av 5764                                                    File No.:3262/02
        July 25, 2004

## Judea Military Court

**Before the Hon. President of the Court:** **Lieutenant Colonel Nathaniel Benichou**
                                                                **Captain Eli Tussia-Cohen**
                                                                **Captain Avraham Einhorn**

**The Military Prosecution**                                [Stamp]  Notary
(represented by Captain Sergei Morine)                              Yitzhak Weinberg

                                        v.

**The Defendant: Fares Sadeq Mohamed Ghanem  Identity No. 25806985 / Israel Prison
Service – present**
(represented by counsel, Adv. Osama Sa'adi)

---

### Decision

An indictment containing 32 counts was brought against the Defendant for the following
offenses:

1.  Membership in a prohibited association under Regulation 85 of the Defense Regulations
    (Time of Emergency), 1945, in that, from 2002 until his arrest, he was a member of a
    military squad, which set itself the goal of carrying out terrorist attacks against Israelis.
    This squad operated under the auspices of the al Aqsa Martyrs Brigades, the military arm
    of the Fatah organization. Mohamed Maslah, Mohammed Abdullah, Hussam Shahada,
    Haitham Hamdan, Zidan Albadawi, Nizar Wahadan and Ali Alian operated together with
    the Defendant in the squad.

2.  Eight offenses of causing death intentionally under Section 51 (a) of the Security
    Provisions Order, 5730-1970, and Section 14 (a) of the Rules of Liability for an Offense
    Order, and five offenses of attempting to commit that offense. These offenses encompass a
    series of terrorist attacks in which the Defendant took part, as a result of which eight
    Israelis lost their lives and an attempt was made to cause the deaths of many others.

    On July 26, 2001, the Defendant met with Hussam Shahada and Ali Alian, members of his
    squad. Ali Alian, who was armed with two weapons, told the Defendant and Hussam that

                                                                [Stamp] P 6: 320

he intended to carry out a shooting attack in the area of Givat Zeev. The Defendant and Hussam expressed their consent to participate in said attack. The three drove to the area of Kfar Aljib, where the Defendant remained in the vehicle in order to serve as a lookout and deterrent while his partners placed themselves near Road 436. At around 10:50 p.m., when they detected a Nissan Almara vehicle carrying Shmuel Landau, Meir Levy and Ronen Landau, and other vehicles, among which was a truck driven by Motti Namir, they opened fire at them. Several bullets that hit the car caused the death of the late Ronen Landau.

On August 25, 2001, Hussam Shahada once again asked the Defendant and Ali Alian to carry out shooting attacks, this time in the area of Road 443. The three decided that they would film the attack and, therefore, they recruited Haitham Hamdan to act as the photographer. The Defendant and his partners approached Mohamed Maslah and requested weapons from him. The latter provided them with an MP5 submachine gun. Then the four drove to the area of Road 443, with the Defendant riding in an Isuzu vehicle about a kilometer ahead of the vehicle in which Hussam, Ali and Haitham were riding, for the purpose of informing his partners of roadblocks along the way. At around 10:30 p.m., near the Dor Energy gas station, they detected a Volkswagen Passat, in which were riding the Ben Shalom couple, their daughter and Doron Yosef Sviri.

[Stamp] P 6: 320 [continued]

Date:  7 Av 5764                                          File No.:3262/02
       July 25, 2004

[Stamp]   Notary
          Yitzhak Weinberg

Ali Alian, who was driving the vehicle, overtook the family's vehicle and drove parallel to
it. At that stage, Hussam Shahada and  Haitham Hamdan opened fire at the occupants of
the vehicle. With that shooting, they intentionally caused the deaths of the late couple
Yaniv and Sharon Ben Shalom and of the late Doron Yosef Sviri and the wounding of the
daughter of the late Yaniv and Sharon Ben Shalom.

On September 15, 2001, the Defendant met with Mohammed Abdullah, Hussam Shahada,
Haitham Hamdan and Ali Alian. The Defendant arrived at this meeting armed with an MP-
5 submachine gun and Ali Alian arrived armed with a pistol. The Defendant and his
partners decided to go to Jerusalem and carry out a shooting attack with the aim of causing
the deaths of Israeli civilians. Therefore, they drove at night from Ramallah to Jerusalem in
the Defendant's Isuzu vehicle. The Defendant drove his partners to Road 9, which connects
the Ramot neighborhood with the French Hill neighborhood. There the Defendant showed
his partners where to carry out the planned attack and how to flee afterwards. At the end of
this tour, they returned to Ramallah. At around 10:30 p.m., Mohammed Abdullah, Haitham
Hamdan and Hussam Shahada drove to Jerusalem with the aim of carrying out the planned
attack. The Defendant drove in his vehicle before the three in order to inform them of
roadblocks along the way. The Defendant's partners placed themselves on Road 9 and
waited for a single vehicle to pass by. At around 11:10 p.m., a Renault Express vehicle
arrived in which Moshe Weiss and Meir Weissboiz were riding. The three overtook the
vehicle and Hussam and Haitham opened fire at it, as a result of which Meir Weissboiz was
killed and Moshe Weiss was critically wounded in the head.

On January 15, 2002, one day after a senior Tanzim military operative, Raed Karmi, had
been killed, the Defendant met with Mohammed Abdullah, Mohamed Maslah, Tarek A-
Nuf, Zidan Albadawi and Ahmed Barghouti. The latter said that Marwan Barghouti wanted
the Defendant and his partners to carry out a revenge attack immediately. For that purpose,
Ahmed gave Mohamed Maslah an MP-5 submachine gun and a pistol. The Defendant and
his partners decided to carry out the terrorist attack that same evening. Therefore, they
departed in the direction of the Givonim gas station near the entrance to Givat Zeev. The
Defendant and his partners parked their vehicle near the site. Mohamed Maslah and Tarek
A-Nuf departed to carry out the terrorist attack while the Defendant and

[Stamp] P 6: 321

Mohammed Abdullah waited in order to warn of the arrival of IDF forces, and to drive the shooters from the scene after they had carried out the attack. At around 7:45 p.m., Rochelle Eini and Yoela Chen, who were driving in a Fiat vehicle, arrived at the site and entered the gas station. Mohamed Maslah and Tarek A-Nuf approached the vehicle and shot at it. The late Yoela Chen was killed as a result of that shooting and Rochelle Eini was moderately injured. The Defendant departed from the site in order to see whether there were any roadblocks along the way.

In the middle of January 2002, the Defendant contacted Mohammed Abdullah and informed him that Ahmed Barghouti wanted to bring a suicide terrorist into the city of Jerusalem and suggested that he transport the terrorist together with him. Mohammed Abdullah agreed to the proposal. On January 22, 2002, the Defendant once again contacted Mohammed Abdullah and informed him that everything was ready for carrying out the terrorist attack. The Defendant and Mohammed took a preliminary drive to find a route on which there were no roadblocks. Afterwards, they returned to Ramallah where they were introduced to the suicide terrorist, who was armed with an M-16 rifle. The Defendant and Mohammed concealed the weapon in the vehicle and drove the terrorist to Strauss Street, where the terrorist alighted from the car and they explained to him that he must go to Jaffa Street and there he must open fire. The two fled from the scene. The terrorist opened fire in all directions and murdered the late Ora (Svetlana) Sandler and the late Sarah Hamburger, and wounded 45 other civilians.

3.   Four additional offenses of attempting to cause death intentionally under Section 51 (a) of the Security Provisions Order, 5730-1970, and Section 19 of the Rules of Liability for an Offense Order, in that on August 18, 2001, the defendant and his partners decided to carry out a shooting attack in Jerusalem. The Defendant traveled in his Isuzu vehicle in front of his partners with the aim of informing them of roadblocks along the way and he served as the lookout and deterrent. They all reached the intersection near Neve Yaakov,

Date: 7 Av 5764                                                    File No.:3262/02
      July 25, 2004

[Stamp]   Notary
          Yitzhak Weinberg

where the Defendant's partners opened fired at an Egged bus on the 45 line with the aim of causing the deaths of the passengers. As a result of that shooting, Ruth Shapira, age 6, and Andrew Feizouche were wounded. A number of bullets also hit a transit type of vehicle. On October 3, 2001, he decided to carry out another shooting attack with his partners. To that end, they armed themselves with weapons. The Defendant and his partners drove to Jerusalem with the Defendant examining whether there were roadblocks along the way. The Defendant led his partners to Begin Road and instructed them where to carry out the terrorist attack. From there all of them returned to Beit Hanina. After that, Mohammed Abdullah and Mohamed Maslah drove to Begin Road. At around 11:35 p.m., Mohammed Abdullah shot at a vehicle that was driving along Begin Road. Later, the two drove along Road 9 and there they shot at another vehicle in which Malka and Pinchas Cohen were riding. The two were moderately wounded. The shooters returned to Beit Hanina , where they were picked up by the defendant and the other partners.

At the end of January 2001, the Defendant contacted Mohammed Abdullah and informed him that Ahmed Barghouti wanted to bring another suicide terrorist into Jerusalem. The Defendant and Mohamed agreed that they would transport the terrorist. Several days later, they picked of the terrorist, who was armed with an M-16 rifle, and they drove him in the direction of Jerusalem. When they reached Shu'afat, the terrorist requested to stop and to pray at the mosque. The Defendant and Mohamed agreed to his proposal and they left the terrorist in the mosque while they drove to Givat Shaul in order to locate a suitable place for carrying out the terrorist attack. From there they returned to Shu'afat, but the terrorist had disappeared.

4.   Eight offenses of possession of a weapon under Section 53 (a) of the Security Provisions Order, 5730-1970, in that in the framework of his actions, as described in Subsection 2 above, he was in possession of various weapons.

5.   Three offenses of conspiracy under Section 22 of the Rules of Liability for an Offense Order, in that in the middle of 2000, he conspired with others to carry out a shooting attack on Road No. 1, in that in July 2001, he conspired with others to carry out terrorist attacks against Israeli targets, and in that in February 2002, he conspired with others to bring a third suicide terrorist into Jerusalem. This plan was not implemented, despite the preparations of the conspirators, due to their arrest.

[Stamp] P 6: 322

6.  Trading in war matériel, an offense under Section 2 of the Prohibition on Trading in War Matériel Order, in that in the middle of 2001, he purchased an MP-5 submachine gun.

7.  Military training, an offense under Regulation 62 of the Defense Regulations (Time of Emergency), 1945, in that in August 2001, he taught Hussam Shahada and Mohammed Abdullah how to use an M-16 rifle.

8.  Malicious damage to property, an offense under Section 53 (c) of the Security Provisions Order, 5730-1970, in that in the framework of the terrorist attack that was carried out on Jaffa Street on January 22, 2002, the terrorist who had been transported by the Defendant damaged a large number of stores, buses, vehicles and other structures.

The arguments of the parties

The Prosecutor requested to convict the Defendant of the offenses with which he was charged on the basis of the evidence that was submitted by the consent of the parties, which indicates the Defendant's culpability as a full partner in all the offenses. The Prosecutor noted that the Defendant had the *mens rea* required for the various offenses, particularly the offenses of causing death intentionally and attempting to cause death intentionally.

[Stamp] P 6: 322 [continued]

Date:  7 Av 5764                                          File No.:3262/02
        July 25, 2004

[Stamp]  Notary
         Yitzhak Weinberg

Counsel for the defense, for his part, initially noted that the Defendant did not take any active part in the act of shooting  and did not even hold a weapon. Counsel for the defense further noted that the Prosecution's refrainment from bringing witnesses that were within its reach, who were also partners in the offenses, should be considered the basis for weakening its evidence. Counsel for the defense argued that some of the statements by the witnesses are hearsay evidence that cannot be relied upon and, alternatively, that there is no satisfactory corroborating evidence for the purpose of conviction according to the statements of the witnesses. Counsel for the Defendant also attacked the content of the witnesses' testimony as illogical, unreliable and even as contradicting each other.

Evidence

All the evidence in this file was submitted by consent of the parties and marked as follows:
– P/1: Statement of the witness Hussam Shahada, dated February 18, 2002.
– P/2: Statement of the witness Hussam Shahada, dated February 19, 2002.
– P/3: Statement of the witness Hussam Shahada, dated March 12, 2002.
– P/4: Statement of the witness Hussam Shahada, dated March 15, 2002.
– P/5: Statement of the witness Mohammed Abdullah, dated March 11, 2002.
– P/6: Statement of the witness Mohammed Abdullah, dated April 1, 2002.
– P/7: Statement of the witness Mohammed Maslah, dated February 25, 2002.
– P/8: Statement of the witness Mohammed Maslah, dated March 19, 2002.
– P/9: Statement of the Defendant, dated February 24, 2002.
– P/10: Statement of the Defendant, dated April 7, 2002.
– P/11: Statement of the witness Haitham Hamdan, dated April 3, 2002.
– P/12: Statement of the witness Haitham Hamdan, dated April 11, 2002.

This consent was restricted by the need to present corroborating evidence for the purpose of the conviction pursuant to each one of the above mentioned statements.

Similarly, at the hearing on May 20, 2003, the parties gave notice that the facts described in indictment counts 5, 6, 9, 11-14, 16, 17, 19, 20, 22, 23, 25-28 are not denied and the only thing in dispute between them is the part played by the Defendant in these offenses.

The Defendant also waived his right to testify in the framework of the defense case, provided that the prosecution would not seek to deem that waiver as corroborating evidence.

[Stamp] P 6: 323

As such, and in view of the narrowing of the dispute on many counts of the indictment on the question of the Defendant's culpability for the offenses with which he is charged, all that remains to us is to examine whether the military prosecution has set before us a sufficient evidentiary basis for the purpose of convicting the Defendant.

From this point and hereinafter, we will review the counts of the indictment, one by one.

However, before we turn to that task, a number of preliminaries are required as follows.

**The fundamentals of the offense of causing death intentionally**

Section 51 (A) of the Security Provisions Order, 5730-1970 states as follows:

[Stamp] P 6: 323 [continued]

Date:  7 Av 5764                                                    Case No.: 3262/02
       July 25, 2004

> **"He who intentionally causes the death of another person is
> liable for death or another sentence as ordered by the Court".**

The factual foundation of this offense is crystal clear. It is necessary for the acts of the Defendant to lead to a deadly outcome. The mental foundation on his part does not require the premeditation necessitated under Section 300(2) of the Israeli Penal Code. It is therefore enough for the Defendant to have formed the decision to carry out the deadly attack and wishing for the deadly outcome.

Concerning the offenses of attempting to cause intentional death, things are just as clear. They were summarized as follows by this Court in another case:

> **"There is no need to go into a lengthy analysis of this offense, which has been
> given comprehensive interpretation in the case law of the Courts. It may be
> said in a nutshell that in order to prove an attempt to cause death, there is a
> need, in the factual plane, to show that the defendant has committed an overt
> act in preparation for the commission of the offense, as stated in Section 20 of
> the Rules of Liability for an Offense Order, 5728-1968:**

> > **"Has started to execute his intentions… using means that are
> > suitable for executing his intent and also expressing his intent
> > through an overt act".**

> **[See comprehensive interoperation of the overt act in Criminal Appeal
> 5150/93** Seris v. State of Israel, **Supreme Court Verdict 48 (2) 183 and
> Criminal Appeal 9511/01** Kovkov v. State of Israel, **and see also Y. Kadmi On
> Criminal Law, fifth chapter, page 122, and in the Area Judea and Samaria
> Appeal 102/01** Ghoulma v. the Military Prosecutor. **And concerning the effect
> of Amendment 39 to the Penal Code** Hamishpat **C (1996) 297].**

> **Concerning the mental foundation required for the offense, we shall cite the
> above mentioned Judea and Samaria Appeal 222/93 in which the Military
> Appellate Court ruled as follows:**

[Stamp] P 6: 324

9

"It has already been ruled that there is no difference between attempted manslaughter and attempted murder (Section 305 of the Penal Code), and in both cases, the genuine lethal intent, i.e. whether the perpetrator wanted the victim to die, must be proved, and less than that is not enough (recklessness concerning that outcome). On the other hand, there is no need to prove that all of the intentions of "premeditation" either (see Y. Kadmi, ibid, Chapter 19, seventh mark and Chapter 20, third mark and the case law cited there, and the guiding verdict in this case, Criminal Appeal 155/59 Deri v. the Attorney Court Verdict, Supreme Court Verdict 14 233, Criminal Appeal 11/89 Saliman Ben Fahed v. State of Israel – unpublished).

If this holds true for attempted manslaughter, then it applies all the more so to an attempt to cause intentional death. From now on it will be said that if in order to prove the complete offense of causing intentional death it is enough to prove a mental foundation of recklessness concerning the deadly outcome, in offenses of attempting to the same offense, criminal intent of a high level, i.e. wishing the death of the victim, must be proved".

There is therefore a need, on the one hand, for there to be an overt act, and on the other hand there must be awareness of the nature of the act and a wish for a deadly outcome." [see Court Case 4603/01].

- 5 -

[Stamp] P 6: 324 [continued]

Date:  7 Av 5764                                              Case No.: 3262/02
       July 25, 2004

<u>The rules of aiding and abetting in the Area</u>

It must first be mentioned that a person may be held liable for an offense as the "principal", i.e. as the person who committed one of the acts enumerated in the elements of the offense, or as an accomplice or an accessory to the offense, whose involvement in the responsibility for its commission lies in behavior that is concomitant to the behavior of the principal, without being one of the components of the *actus reus* of the offense. The words of the Supreme Court in Criminal Appeal 5235/93 **Levi v. State of Israel**, Supreme Court Verdict 48(5) 550 apply to this case:

> **"At the foundation of the expansion of criminal liability pursuant to aiding and abetting rules, beyond the primary, complete commission of the offense, lies the view that whoever is prepared to contribute to the fulfillment of a common goal, while being aware at least of the possibility that the fulfillment of that goal involves the undermining of a certain value – is liable to be punished. There is an interrelation between the mental foundation (i.e. the willingness to contribute to the joint undermining of a certain social value) and the factual foundation prescribed in the offense. This is because once this "mental" foundation has been proved, the assignment of roles between the persons involved in the offense is no longer important. This means that the criterion for the existence of aiding and abetting for an offense is the awareness of the parties involved in the criminal incident of the possibility of undermining a certain social value due to their joint activity".**

Sections 14 and 15 of the Rules of Liability for an Offense Order, 5728-1968 prescribe the rules of aiding and abetting, aiding and solicitation in the Area.

The relevant clause in our case states as follows:

> **"Section 14 (A): if an offense has been committed, each of the persons below will be considered as having participated in the commission of the offense and as guilty of the offense, and may be accused of committing the offense: (1) Any person who has actually performed the act or one of the acts, or has committed the default or one of the defaults constituting the offense.**
>
> **(2) Any person who by act or default has allowed another person to commit the offense or has aided him in committing the offense.**

[Stamp] P 6: 325

11

**(3) Any person who aids another person in the commission of an offense, whether present at the time of the commission of the offense or is absent at the time of the commission of the offense. A person will be considered as having aided if he is present at the place of commission of the offense to overpower resistance or to support the decision of the true perpetrator of the offense or to ensure the execution of the offense that is about to be carried out"**

According to subsection 1, the responsibility of a person as a co-perpetrator does not require the execution of the elements of criminal behavior that is required for conviction. It is enough for the defendant to have joined others and contributed to a slight degree to the occurrence of the criminal act [see Criminal Appeal 2798/95 **John Doe v. State of Israel**, Supreme Court Verdict 51 (3) 388 and Supreme Court Verdict 4389/93 **Mordechai v. State of Israel**, Supreme Court Verdict 50 (3) 239].

In the current case it is also fitting to mention that when a number of criminals join forces according to early planning:

**"As a rule, the responsibility of a 'co-perpetrator' is based on a number of persons 'joining forces' to commit a common criminal task, each of the members of the gang having a 'role' as a the overall executor of the 'fulfillment of the task' "** [Criminal Appeal 5589/98 Sultan v. State of Israel, and see also the above mentioned **John Doe** case, p. 404].

- 6 -

[Stamp] P 6: 325 [continued]

Date:  7 Av 5764                                                                           Case No.: 3262/02
        July 25, 2004

### Identification of the defendant as the person who has been incriminated by the statements of the witnesses

Witness Hussam Shahada states in P/1 that he knew a person called "Fares Ghanem Hitawi, aged 27, married, who has children, I think three or four; his family has a digging company and they have Baggers and he works on a Bagger". In P/4, the witness adds that his good friend Fares Ghanem Sadak Hitawi lives in Samir Amis.

Witness Mohamed Abdullah states in P/5 that "Fares Sadak Ahmed Ghanem, aged about 27 from Kfar Akab, married with four children and has a digging company", met him in the company of Hussam Shahada. The witness also states in P/6 that "His friend for more than ten years Fares Sadak Ghanem, married and father of four children, works in earthworks and his family has a large earthworks company".

Witness Mohamed Masleh mentions in P/8 "Fares Hitawi, aged about 30, from Samir Amis, working on a Bagger tractor, with a full build, and he has a brown commercial double cabin Isuzu".

Witness Haitham Hamdan mentions in P/11 "Fares Hitawi, aged about 27, married, known as "Abu Adib", works with his father as a Bagger tractor driver, lives in Samir Amis and has a gray Isuzu commercial vehicle".

In his statement P/10, the Defendant confirms that the details that were provided above are his personal details. The Defendant also states that his family has another surname, Al Hitawi, that he lives at the junction of Kfar Akab – Samir Amis, that he works as a Bagger driver in his father's digging company and that the company has a number of vehicles, including a gray Isuzu that he uses according to his needs. The Defendant also confirmed acquaintance with Hussam Shahada, Mohamed Masleh and Mohamed Abdullah. The Defendant also stated that he was married to two wives and a father of four children.

We can see that the identification of the Defendant as mentioned in the statements of the prosecution witnesses poses no difficulty.

### Consensual filing of the evidence material

As set forth, all of the evidence material in this case has been filed consensually.

[Stamp] P 6: 326

13

This consent has important evidential significance, which was discussed by the Appellate Court, when it ruled:

> "**It has already been ruled on more than one previous occasion that the consensual filing of written statements, without any denial of or objection to their content, means consent to the words therein**" [Judea and Samaria Appeal 85/94 **Abu Mahasen v. the Military Prosecutor, Selected Verdicts of the Military Court in the Held Territories** 9 359 and see also Judea and Samaria Appeal 512/03 **the Military Prosecutor v. Khalilia** and Judea and Samaria Single Judge Appeal 114/01 **the Military Prosecutor v. Abu Hilal** in which the Court discussed again the validity of filing evidence in this manner].

In addition, even if evidence that is inadmissible may be found in the evidence material, the consent of the parties to file it has legitimized it [see Y. Kadmi **On Evidence**, Part B, page 914 and the case law cited therein].

In accordance with that which has been set forth above, the parties have made their consent to the filing of the evidence conditional to the presence of further supporting evidence in order to convict the Defendant pursuant to that evidence. It must immediately be stated that inspection of the evidence reveals that such an addition is abundant, because as the acts of the Defendant constituted a single, ongoing chain of [...]

- 7 -

[Stamp] P 6: 326 [continued]

14

Date:  7 Av 5764                                                        Case No.: 3262/02
        July 25, 2004

[…] acts against the security of the Area that was carried out by a single gang, it is enough to verify the details relating to each of the offenses to verify all of the words of each and every witness and provide the required additional evidence. As we shall see, further to our statements, many counts of indictment are substantiated by a number of different sources of evidence and we can therefore determine even at this point that the words of the various witnesses in their statements support one another sufficiently to support the conviction of the Defendant thereby [a lot has been written about the nature of a "supportive evidence" as verifying evidence that may be gained even from statements that by themselves require support; we therefore apply to Y. Kadmi **On Evidence** 172 and Judea and Samaria Single Judge Appeal 9/01 **the Military Prosecutor v. Za'atari,** Selected Verdicts of the Military Court in the Held Territories 11 285].

These words are in the public domain, but the defense counsel asks us to deviate from them and examine the statements with a critical view to the point of negating their evidential weight. We have examined this motion and we believe that it must be dismissed. Firstly, we must point out, with significant degree of outcry, that had the defense counsel asked, at any stage of the trial, to pose conditions to his consent to the filing of the evidence, in contravention of the common, known practice, he should have done so when they were filed, so that the prosecution would have had the opportunity to bring forth its witnesses. Secondly, deviation from a rule that is rooted hereabouts requires grounds of great import, and we have not found in the words of the defense counsel even a shred of reasoning to substantiate such a deviation. The rule of the Military Appellate Court that we have discussed is rooted in healthy logic and common sense whereby if the Defendant disputes words that appear to be his, he must give an account to the contrary. The Defendant before us not only did not contend at any stage of the hearing that the statements of the witnesses did not reflect but truth, but kept silent and opted not to testify when he was given an opportunity to do so. In this state, as the Defendant did not provide an account contravening the account arising from the words of all of the witnesses, we cannot rely on the speculations of the defense counsel.

Moreover, we have repeatedly attended to the question of why we must hand down this verdict while the Defendant did not dispute any of the clear evidence of the prosecution and did not provide any line of defense to the contrary.

We have not found any answer to this question and therefore we must fulfill our lawful duty and settle the question of the responsibility of the Defendant for the offenses that are attributed to him in the indictment.

[Stamp] P 6: 327

15

### First count of the indictment

That which has been set forth in this account attributes to the Defendant an offense of membership in a military cell that operated under the auspices of the "Al Aqsa Martyrs Brigades".

This count of indictment is properly substantiated in the evidence of the prosecution. See P/6 (pages 1, 2, primarily line 23 onward), P/11 (page 1 line 11 onward) and P/12 (page 1 line 8 and onward).

### Second count of the indictment

This count of indictment is expressed by P/4 (page 7 line 19 onward). Once the Defendant conspired with Hussam Shahada to carry out a shooting attack against vehicles driving on the highway between Tel Aviv and Jerusalem, he must also be convicted of this offense.

- 8 -

[Stamp] P 6: 327 [continued]

Date:  7 Av 5764                                                  Case No.: 3262/02
        July 25, 2004

## Third count of the indictment

Witness Mohamed Abdullah discusses an MP-5 type weapon that the Defendant purchased (P/6, page 11 line 3 onward). However, we must point out that the weapon purchased did not work and was therefore returned by the Defendant to the person who had sold it.

## Fourth count of the indictment

This count is expressed by P/6 (page 1 line 25 onward).

## Counts 5, 6, 7 of the indictment:

The facts described in these counts are also expansively described by Hussam Shahada in P/4, from page 1 line 18 onward.

The Defendant did not do any shooting in the event described, but his responsibility as a full accomplice to the offense is not cast in doubt. The Defendant and his colleague Hussam Shahada approached Ali Alian and the three agreed to carry out a shooting attack. Thereafter the three met again, Ali Alian having brought two weapons with him. The three traveled to the area of Givat Ze'ev, the Defendant possessing a weapon. While the Defendant remained in the vehicle to guard it, his two colleagues went to the main road and when an Israeli vehicle arrived, opened fire at it and causing the death of a 17 year old teenage boy.

We can see that the Defendant took part in the stage of planning the attack and in the stage of execution, by serving as the driver of the cell. These actions of the Defendant put him among those who took a significant part in the execution of the attack, and as a result, the Defendant must be assigned to the inner circle of the offense. Concerning the mental foundation of the Defendant, there can be no doubt that a person who departs with his colleagues for a shooting attack while armed with offensive weapons has reconciled with the decision to cause the intentional deaths of others.

As the other facts set forth in these counts are undisputed, and the participation of the Defendant is also clear, we are only left to convict the Defendant of the offenses attributed to him in these counts.

## The eighth count of the indictment

Witness Mohamed Abdullah describes in his statement (P/6 page 2 line 4 onward) the military training described in this count.

[Stamp] P 6: 328

17

**Counts 9, 10 of the indictment**

For these counts too, the factual basis is well established [see P/4, page 2 line 22 onward, to which P/6 page 2 line 9 onward may be attached]. In this attack too, the Defendant was a full partner by taking part in making the decision to carry out the attack and serving as a spotter, lookout and pathfinder for his colleagues. In view of the character of the act, the intent of the participants, the Defendant among them, was clear, and here too there is no doubt concerning the need to convict the Defendant of the offenses that are attributed to him in these counts.

- 9 -

[Stamp] P 6: 328 [continued]

Date:  7 Av 5764                                                    Case No.: 3262/02
       July 25, 2004

### Counts 11, 12, 13, 14, 15 of the indictment

Concerning these counts, there is a large amount of evidence material. Three other persons involved in the attack, Hussam Shahada, Mohamed Abdullah and Haitham Hamdan, give detailed descriptions on the chain of events by which the Defendant and his accomplices led to the death of the late Ben-Shalom couple, the late Doron Yosef Sviri and the injury of the daughter of the couple [see the works of Hussam Shahada in P/4 page 3 line 19 onward, Mohamed Masaleh in P/8 page 3 line 2, and Haitham Hamdan in P/11 page 1 line 11 onward and P/12 page 1 line 28 onward]. Upon reading the words of the witnesses, the responsibility of the Defendant for these counts of the indictment cannot be cast in doubt, in accordance with our words above in which was stated that as the Defendant had fulfilled a key function within the framework of the cell that had departed to carry out the attack, he is a full accomplice in the acts of his colleagues and therefore in the causation of death.

### Counts 16, 17, 18 of the indictment

These counts of the indictment have also been covered extensively by the witnesses [see the words of Haitham Hamdan in P/11 page 3 line 21 onward, Mohamed Abdullah in P/6 page 2 line 25 onward, Hussam Shahada in P/4 page 5 line 23 and onward, Mohamed Masleh in P/8 page 4 line 1 onward].

The role of the Defendant in this attack was similar to the role that he had in the other attacks, and therefore his degree of responsibility is identical.

### Counts 19, 20, 21

The base of evidence to that which is described in these counts of indictment is solid. Hussam Shahada, Mohamed Abdullah, Mohamed Masleh and Haitham Hamdan all give extensive descriptions of the acts of the cell, including the acts of the Defendant [see P/4, page 6 line 21 onward, P/6 page 4, line 6 onward, P/8 page 4 line 17 onward and P/12 page 5 line 15 onward].

We may only concur with the exact analysis of the Prosecutor concerning the responsibility of the Defendant for the two shooting attacks that were carried out by his accomplices. Once the Defendant and his accomplices had decided to carry out a shooting attack in the tunnels of the "Begin" Road, and once the Defendant had driven his colleagues to the site and instructed them, as described in the 19th count of the indictment, he is to be considered responsible for all of their subsequent acts, pursuant to the provisions of Section 15 of the Rules of Liability for an Offense Order, 5728-1968.

[Stamp] P 6: 329

19

**Counts 22, 23, 24 of the indictment**

Concerning these counts of the indictment too, there is a large amount of evidence material [see Mohamed Abdullah in P/6 page 6 and line 17 onward, Mohamed Masleh in P/8 page 5 line 21]. These direct testimonies were also directly supported the words of Haitham Hamdan and Hussam Shahada.

Here too, the responsibility of the Defendant as an accomplice in the offenses is not cast in doubt, and therefore he must be convicted of them.

**Counts 25, 26, 27, 28, 29 of the indictment**

The part of the Defendant in dispatching the suicide terrorist who carried out the shooting attack that is the object of these counts of the indictment is unclear. The Defendant was involved in the planning and executing the transport of the terrorist up to […]

- 10 -

[Stamp] P 6: 329 [continued]

Date:  7 Av 5764
       July 25, 2004

Case No.: 3262/02

[…] Hanevi'im Street, as indicated by P/6 page 8 line 1 onward. These words are supported by P/8 page 7 line 6 onward.

### Counts 30, 31 of the prosecution

Mohamed Abdullah states in P/6 page 9 line 13 onward that which was described in these counts of the indictment.

Once the Defendant started to execute his intent to cause the deaths of others using the suicide terrorist whom he transported, while the Defendant and the said suicide terrorist possessed the means suitable for performing the offense, he is to be considered responsible for the offense of attempting to cause intentional death and possession of war material, as described in the indictment [see Judea and Samaria Appeal 311&318/03 and Judea Case 42947/01 concerning the foundations of the offense of attempting to cause intentional death].

### Count 32 of the indictment

Evidence has been found for this count of the indictment in the words of Hussam Shahada and Mohamed Abdullah [P/4, page 8 lines 13-23, P/5 page 1 line 21].

### Endnote

In view of the conclusions above and after all of the counts of the indictment that have been attributed to the Defendant have been founded to be properly substantiated in the evidence of the prosecution, we convict the Defendant of them.

**Handed down and announced this day, July 25, 2004, in public and in the presence of the parties.**

| [Signature] | [Signature] | [Signature] |
| --- | --- | --- |
| **Judge** | **President of Court** | **Judge** |

- 11 -

[Stamp] P 6: 330

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

MARK I. SOKOLOW, *et al.*,

     Plaintiffs,

             No. 04 Civ. 00397 (GBD) (RLE)

 vs.

THE PALESTINE LIBERATION
ORGANIZATION, *et al.*,

     Defendants.

## DECLARATION OF RINA NE'EMAN

Rina Ne'eman hereby certifies as follows:

1. The attached translation from Hebrew to English is an accurate representation of the document received by Rina Ne'eman Hebrew Language Services, to the best of my knowledge and belief. The document is designated as P 6: 320-330.

2. I am a professional translator with a B.A. in International Relations from the Hebrew University of Jerusalem (Israel) and 30 years of translation experience. I am fluent in Hebrew and English, and I am qualified to translate accurately from Hebrew to English.

3. To the best of my knowledge and belief, the accompanying text is a true, full and accurate translation of the Hebrew-language document designated as P 6: 320-330.

Dated: May 8, 2014

                    Rina Ne'eman

ss.: New Jersey

On the 8 day of May, 2014 before me, the undersigned, personally appeared Rina Ne'eman, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is signed to this Declaration and acknowledged to me that he executed the same in his capacity, and that by his signature on this Declaration, the individual executed the Declaration.

Sworn to me this
8 day of May, 2014

Notary Public

SHELLY TESSEIN
Notary Public
State of New Jersey
My Commission Expires Nov. 16, 2017
I.D.# 2427073

<div dir="rtl">

תיק מס׳: 3262/02                              תאריך: ז׳ אב, תשס״ד
                                              25 יולי, 2004

ב י ת   ה מ ש פ ט   ה צ ב א י   י ה ו ד ה

בפני כב׳ האב״ד: סא״ל נתנאל בנישו
שופט: סרן אלי תושיח-כהן
שופט: סרן אברהם איינהורן

התביעה הצבאית
(באמצעות סגן סרגיי מורין)

נגד

הנאשם: פארס צאדק מחמד ע/אנס   ת.ז 25806985 / שב״ס - נופח
(באמצעות ב״כ עו״ד אוסאמה סעדי)

## ה כ ר ע ת   ד י ן

נגד הנאשם הוגש כתב אישום המייחס לו 32 עבירות כדלקמן:

1.  חברות בהתאחדות בלתי מותרת לפי תקנה 85 לתקנות התגנה (שעת חירום),
    1945, בכך שהחל משנת 02׳ ועד מעצרו היה חבר בחוליית צבאית אשר שמה
    לה למטרה ביצוע פיגועים נגד ישראלים. חוליייה זו פעלה בחסות גדודי חללי
    אלאקצה, הזרוע הצבאית של ארגון פתח. יחד עם הנאשם פעלו בחולייה
    האמורה מוחמד מבלח, מוחמד עבדאללה, חוסאם שחדה, הייתם חמדאן,
    זידאן אלבדווי, ניזר והדאן ועלי עליאן.

2.  שמונה עבירות של גרימת מוות בכוונה לפי סעיף 51 (א) לצו בדבר הוראות
    ביטחון תש״ל - 1970 וסעיף 14 (א) לצו בדבר הוראות כללי האחראיות
    לעבירות וחמש עבירות של ניסיון לעבור עבירה זו. בעבירות אלה מגולמים
    שורה של פיגועים בהן נטל הנאשם חלק, אשר כתוצאה מהן קיפחו חייהם
    שמונה ישראלים ונעשה ניסיון לגרום למותם של רבים נוספים.
    ביום 26/07/01 נפגש הנאשם עם חוסאם שחאדה ועלי עליאן, חברי חוליייתנו.
    עלי עליאן, שהיה חמוש בשני כלי נשק, מסר לנאשם ולחוסאם כי בכוונתו
    לבצע פיגוע ירי באזור גבעת זאב. הנאשם וחוסאם הביעו את הסכמתם
    להשתתף בפיגוע האמור. השלושה נסעו לאזור כפר אלגייב שם נשאר הנאשם
    ברכב על מנת לשמש כשומר ומתריע בעת שחבריו התמקמו בסמוך לכביש
    436. בסמוך לשעה 22:50 משהבחינו ברכב מסוג ניסאן אלמרה בו נסעו
    שמואל לנדאו, מאיר לוי ורונן לנדאו, וכלי רכב נוספים בינהם משאית
    שהיתה נהוגה בידי מוטי נמיר, פתחו לעבר באש. מספר קליעים שפגעו
    ברכב גרמו למותו של רונן לנדאו ז״ל.
    ביום 25/08/01 שוב פגה חוסאם שחאדה לנאשם ולעלי עליאן לבצע פיגועי
    ירי, הפעם באזור כביש 443. השלושה החליטו כי יצלמו את הפיגוע ועל כן
    גייסו את הייתם חמדאן לשמש כצלם. הנאשם וחבריו פנו למוחמד מבלח
    וביקשו ממנו נשק. זה סיפק להם תמ״ק MP.5. אז נסעו הארבעה באזור כביש
    443, כשהנאשם נסע ברכב איסוזו כקילומטר לפני הרכב בו נסעו חוסאם, עלי
    והייתם, במטרה להודיע לחבריו על מחסומים בדרך. בסמוך לשעה 22:30
    הבחינו ליד תחנת הדלק דור אנרגיה, ברכב מסוג פולקסווגן פאסאט בו נסעו
    בני הזוג בן שלום, בתם ודורון יוסף סווירי.

</div>

P 6: 320

תיק מס' : 3262/02

תאריך : ז' אב, תשס"ד
25 יולי, 2004

עלי עליאן, שנהג ברכב, עקף את רכב המשפחה ונסע במקביל אליו. בשלב זה
פתחו חוסאם שחאדה והייתם חמדאן באש לעבר יושבי הרכב. בירי זה גרמו
למותם בכוונה של בני הזוג גילה וישרון בן שלום ז"ל ושל דורון יוסף סוורידי
ז"ל ולפציעת בתם של חניה ושרון ז"ל.

ביום 15/09/01 נפגש הנאשם עם מחמד עבדאללה, חוסאם שחאדה, היתים
חמדאן ועלי עליאן. הנאשם הגיע למפגש זה כשהוא חמוש בתמ"ק MP-5 ואילו
עלי עליאן הגיע חמוש באקדח. הנאשם וחבריו החליטו לצאת לירושלים
ולבצע פיגוע ירי במטרה לגרום למותם של אזרחים ישראליים. על כן, נסעו
בשעות הלילה מרמאללה לירושלים ברכבו של הנאשם מסוג איסוזו. הנאשם
הסיע את חבריו לכביש 9 הממוצב בין שכונת רמות לשכונת הנבעת הצרפתית.
שם הראו הנאשם לחבריו איפה לבצע את הפיגוע הממוכנן ואיך להימלט
לאחר מכן. בסיום סיור זה חזרו לרמאללה. בסביבות השעה 22:30 נסעו
מחמד עבדאללה, היתים חמדאן וחוסאם שחאדה לירושלים במטרה לבצע
את הפיגוע שתוכנן. הנאשם נסע ברכבו לפני השלושה על מנת להודיע להם על
מחסומים בדרך. חבריו של הנאשם התמקמו בכביש 9 והמתינו למעבר רכב
בודד. בסמוך לשעה 23:10 הגיע למקום רכב מסוג רנו אקספרס וזבו נסעו
משה וייס ומאיר וייסבויז. השלושה עקפו את הרכב וחוסאם והייתם פתחו
לעברו באש, אשר כתוצאה ממנו נהרג מאיר וייסבויז ז"ל ואילו משה וייס
נפצע קשה בראשו.

ביום 15/01/02, יום לאחר שנהרג צבאי בכיר בתנועה, ראאד כרמי,
נפשו הנאשם, מחמד עבדאללה, מחמד מצלח, טארק א-נוף, זידאן אלבדווי
ואחמד ברגותי. האחרון מסר כי מרואן ברגותי מבקש שהנאשם וחבריו
יבצעו פיגוע נקמה באופן מיידי. לצורך זה מסר אחמד למחמד מצלח תמ"ק
MP-5 ואקדח. הנאשם וחבריו החליטו לבצע פיגוע עוד באותו ערב. על כן יצאו
לכיוון תחנת דלק בגבעונים בסמוך לכניסה לגבעת זאב. הנאשם וחבריו החנו
את כלי רכבם בסמוך למקום. מחמד מצלח וטארק א-נוף יצאו לבצע את
הפיגוע בעוד הנאשם ומחמד עבדאללה ממתינים על מנת להתריע מפני הגעת
כוחות צה"ל ולמלט את היורים לאחר ביצוע הפיגוע. בסמוך לשעה 19:45
הגיעו למקום רש"ל עיני ויואלה חן שנסעו ברכב פיאסו וניכנסו לתחנת הדלק.
מחמד מצלח וטארק א-נוף התקרבו לרכב וירו לעברן. יואלה חן ז"ל נהרגה
כתוצאה מירי זה ואילו רש"ל עיני נפצעה באורח בינוני. הנאשם נסע מן
המקום כדי לבחון האם קיימים בדרך מחסומים.

באמצע חודש ינואר 2002 התקשר הנאשם למחמד עבדאללה והודיע לו כי
אחמד ברגותי מבקש לחכניס מחבל מתאבד לעיר ירושלים והציע לו להסיע
את המחבל ביחד עימו. מחמד עבדאללה הסכים להצעה. ביום 22/01/02
התקשם שוב הנאשם למחמד עבדאללה והודיע לו כי הכל מוכן לביצוע
הפיגוע. הנאשם ומחמד ביצעו נסיעה מקדימה למצוא דרך בה אין מחסומים.
לאחר מכן חזרו לרמאללה, שם הכירו את המחבל המתאבד שהיה חמוש
ברובה מ"סר אם-16. הנאשם ומחמד הסתירו את כלי הנשק ברכב והסיעו את
המחבל לרחוב שטראוס, שם הורידו את המחבל תוך שהם מסבירים לו כי
עליו לרדת לרחוב יפו ושם לפתוח בירי. השניים ברחו מן המקום. המחבל
פתח בירי לכל עבר ורצח את אורה (סבטלנה) סנדלר ז"ל ושרה המבורגר ז"ל
ופצע 45 אזרחים נוספים.

3. 4 עבירות נוספות של ניסיון לגרימת מוות בכוונה לפי סעיף 51)א( לצו בדבר
הוראות ביטחון תש"ל - 1970, וכן סעיף 19 לצו בדבר כללי האחריות לעבירה
בכך שבים 18/08/01 החליטו הנאשם ושותפיו לבצע פיגוע ירי בירושלים.
הנאשם נסע ברכבו מסוג איסוזו לפני חבריו במטרה לחום אודות
מחסומים בדרך ולשמש כשומר ומתריע. כולם הגיעו לצומת בסמוך לנווה

<div dir="rtl">

תיק מס׳: 3262/02          תאריך : ז׳ אב, תשס״ד
25 יולי, 2004

יעקב, שם פתחו חבריו של הנאשם בירי לעבר אוטובוס אגד קו 45 במסתרה   1
לגרום למות הנוסעים בו. כתוצאה מירי זה נפצעו רות שפירא בת שש שנים   2
ואנדרו פיצ'וש. מספר קליעים אף פגעו ברכב מסוג טרנזיט. ביום 10/01/03   3
החליט לבצע פיגוע ירי נוסף עם חבריו. לשם כך הצטיידו בכלי נשק. הנאשם   4
ושותפים נסעו לירושלים כשהנאשם בוחן האם קיימים מחסומים בדרך.   5
הנאשם הוביל את חבריו לכביש "בגין" והראה להם היכן לבצע את הפיגוע.   6
מכאן חזרו כל השותפים לבית חנינא. משם נסעו מחמד עבדאללה ומחמד   7
מצלח לכביש "בגין". בסמוך לשעה 23:35 ירה מחמד עבדאללה לעבר רכב   8
שנסע בכביש "בגין". בהמשך נסעו השניים לכביש 9 ושם ירו לעבר רכב נוסף   9
בו נסע בני חזוז מלכה ונפסח כהן. השניים נפצעו בארוע בינוני. היורים חזרו   10
לבית חנינא שם נאספו על ידי הנאשם ויתר השותפים.   11

בסוף חודש ינואר 2001 התקשר הנאשם למחמד עבדאללה והודיע לו כי   12
אחמד ברגותי מבקש להכניס מחבל מתאבד מתאבד נוסף לירושלים. הנאשם ומחמד   13
סיכמו כי יסייעו את המחבל. מספר ימים לאחר מכן אספו את המחבל שהיה   14
חמוש ברובה אס-16 והסיעו אותו לכיוון ירושלים. בהגיעו לשטעפאט ביקש   15
המחבל לעצור ולהתפלל במסגד. הנאשם ומחמד הסכימו לחצעון והותירו את   16
המחבל במסגד בעוד הם נוסעים לבצעת שאול על מנת לאתר מקום מתאים   17
לביצוע הפיגוע. משם חזרו לשטעפאט אך המחבל נעלם.   18

  19

4.   8 עבירות של החזקת נשק לפי סעיף 53(א) לצו בדבר הוראות ביטחון תש״י -   20
1970 בכך שבמסגרת פעולותיו שתוארו בסעיף קטן 2 לעיל החזיק בכלי נשק   21
שונים.   22

  23

5.   3 עבירות של קשירת קשר לפי סעיף 22 לצו בדבר כללי האחריות לעבירה   24
בכך שבאמצע שנת 2000 קשר קשר עם אחרים לבצע פיגוע ירי בכביש מס׳ 1,   25
בך שביולי 2001 קשר עם אחרים לבצע פיגועים נגד מטרות ישראליות ובכך   26
שבפברואר 2002 קשר עם אחרים להכניס מחבל מתאבד שלישי לירושלים.   27
תוכנית זו לא  יצאה אל הפועל למרות הכנותיהם של הקושרים בעקבות   28
מעצרם.   29

  30

6.   סחר בציוד מלחמתי, עבירה לפי סעיף 2 לצו בדבר איסור סחר בציוד   31
מלחמתי, בכך שבאמצע שנת 2001 רכש תמ״יק ג-MP.   32

  33

7.   אימונים צבאיים, עבירה לפי תקנה 62 לתקנות ההגנה (שעת חירום), 1945   34
בכך שבחודש אוגוסט 2001 לימד את חוסאם שחאדה ומחמד עבדאללה   35
להשתמש ברובה אס-16.   36

  37

8.   היזק לרכוש בזדון, עבירה לפי סעיף 53ג לצו בדבר הוראות ביטחון תש״י -   38
1970 בכך שבמסגרת הפיגוע שבוצע ברחוב יפו 22/01/02 פגע המחבל שהובל   39
על ידי הנאשם במספר רב של חנויות, באוטובוסים, בכלי רכב ובמבנים   40
נוספים.   41

  42

<u>טענות הצדדים</u>   43

  44

התובע ביקש לחרשיע את הנאשם בעבירות המיוחסות לו על סמך חומר הראיות   45
שהונח בהסכמת הצדדים, ממנו עולה אחריותו של הנאשם כשותף מלא לכלל   46
העבירות. התובע ציין כי לנאשם היה היסוד הנפשי הדרוש לעבירות השונות, בראשן   47
עבירות גרימת המות בכוונה וניסיון לגרימת מות בכוונה.   48

-3-

</div>

תיק מס׳ : 3262/02

תאריך : ז׳ אב, תשס״ד
25 יולי, 2004

1
הסניגור, מצידו, ציין בתחילה כי הנאשם לא לקח כל חלק פעיל במעשה הירי, ואף לא
2
החזיק בנשק. הסניגור ציין עוד כי יש לראות בהימנעות התביעה להביא עדים
3
הנמצאים תחת ידה ושגם הם היו שותפים לעבירות בסיס לחתחלשת ראיותיה.
4
הסניגור טען כי חלק מדברי העדים הינם עדות שמיעה שאין לסמוך עליה ולחילופין
5
כי אין תוספת ראייתית מספקת לשם הרשעה על פי דברי העדים. הסניגור אף תקף
6
את תוכנן של העדויות כבלתי הגיוניות, בלתי מהימנות ואף סותרות זו את רעותה.
7
8
__הראיות__
9
10
כל הראיות בתיק זה הוגשו בהסכמת הצדדים וסומנו כדלקמן :
11
12
-    ת/1 : אמרת העד חוסאם שחאדה מיום 18/02/02.
13
-    ת/2 : אמרת העד חוסאם שחאדה מיום 19/02/02.
14
-    ת/3 : אמרת העד חוסאם שחאדה מיום 12/03/02.
15
-    ת/4 : אמרת העד חוסאם שחאדה מיום 15/03/02.
16
-    ת/5 : אמרת העד מחמד עבדאללה מיום 11/03/02.
17
-    ת/6 : אמרת העד מחמד עבדאללה מיום 01/04/02.
18
-    ת/7 : אמרת העד מחמד מצלח מיום 25/02/02.
19
-    ת/8 : אמרת העד מחמד מצלח מיום 19/03/02.
20
-    ת/9 : אמרת הנאשם מיום 24/02/02.
21
-    ת/10 : אמרת הנאשם מיום 07/04/02.
22
-    ת/11 : אמרת העד חיית חמדיה מיום 03/04/02.
23
-    ת/12 : אמרת העד חיית חמדיה מיום 11/04/02.
24
25
הסכמה זו סוייגה בצורך בהצבת תוספת ראייתית לשם הרשעה על פי כל אחת מן
26
האמרות הנ״ל.
27
28
כמו כן, בישיבה מיום 20/05/03 הודיעו הצדדים כי העובדות המתוארות בפרטי
29
אישום 5,6,9,11-14,16,17,19,20,22,23,25-28 אינן מוכחשות וכל שבמחלוקת בינתם
30
הוא חלקו של הנאשם בעבירות אלה.
31
32
הנאשם אף ויתר על זכותו להעיד במסגרת פרשת ההגנה ובלבד שהתביעה לא
33
תבקש לראות בוויתור זה תוספת ראייתית לראיותיה.
34
35
משכך, ולאור צמצום יריעת המחלוקת בפרטי אישום רבים לשאלת אחריות הנאשם
36
לעבירות המיוחסות לו בהם, כל שנותר לנו הוא לבדוק האם התביעה הצבאית
37
העמידה בפניני תשתית ראייתית מספיקה לשם הרשעת הנאשם.
38
39
מכאן ולהבא נסקור, על כן, את פרטי האישום אחד לאחד.
40
41
אך בטרם נפנה למלאכה זו מתחייבות מספר הקדמות כדלקמן.
42
43
__יסודות עבירת גרימת המוות בכוונה__
44
45
סעיף 51(א) לצו בדבר הוראות ביטחון תש״ל - 1970 קובע כי :
46
47

─+─

P 6: 323

תיק מס׳: 3262/02                                    תאריך: ז׳ אב, תשס״ד
                                                   25 יולי, 2004

"הגורם בכוונה למותו של אחר דינו דין מוות או עונש אחר כפי שיורה בית        1
המשפט".                                                                   2
                                                                         3
חיסודד העובדתי של העבירה הינו ברור ביותר. נדרש כי מעשי הנאשם יביאו לתוצאה   4
קטלנית. היסוד הנפשי מצידו אינו דורש אותה כוונה תחילה המתחייבת בתהאם        5
לסעיף 300(2) לחוק העונשין הישראלי. די, על כן, כי נתגבשה אצל הנאשם ההחלטה   6
לבצע את מעשה החמתה וחחפץ בתוצאת המוות.                                     7
                                                                         8
באשר לעבירת הנסיון לגרום למוות בכוונה הדברים אינם ברורים פחות. וכך הם     9
סוכמו על ידי בית משפט זה במקום אחר:                                       10
                                                                         11
"אין צורך להכביר מילים אודות ניתוח עבירה זו, אשר זכתה לפרשנות            12
מקיפה בפסיקת בתי המשפט. ניתן לומר בתמצית כי על מנת להוכיח ניסיון        13
לגרימת מוות, קיים צורך, מהצד העובדתי, להראות כי הנאשם עשה מעשה         14
גלוי לקראת ביצוע העבירה, כלשון סעיף 20 לצו בדבר כללי האחריות           15
לעבירה, תשכ"ח - 1968:                                                 16
                                                                         17
"התחיל להוציא מן הכוח את הפועל את כוונתו... באמצעים               18
מתאימים לביצוע כוונתו וכשהוא מביא לידי ביטוי את כוונתו על ידי    19
מעשה גלוי".                                                      20
                                                                         21
[ראה פרשנות מקיפה על המעשה הגלוי בע"פ 5150/93 סריס נ׳ מד״יל ע"פ         22
מח (2) 183, וע"פ 9511/01 קובבקין נ׳ מד״יל. וראה עוד י. קדמי על הדין     23
בפלילים, פרק חמישי, עמוד 122, ובאיזור ע׳ איו"ש 102/01 עיולמה נ׳        24
התובע"ץ. ובאשר להשפעת תיקון 39 לחוק העונשין המשפט ג׳ (1996) 297].     25
                                                                         26
באשר ליסוד הנפשי הדרוש לעבירה, נפנה לע׳ איו"ש 222/93 הנ"ל בו קבע        27
ביהמ"ש הצבאי לערעורים כדלקמן:                                             28
                                                                         29
"כבר נקבע כי אין בין ניסיון להדריגה לבין ניסיון לרצח (סעיף 305       30
לחוק העונשין) ולא כלום, ובשני המקרים יש להוכיח את כוונת           31
הקטילה הממשית, קרי את החפץ במות הקורבן, ואין סגי פחות            32
מזה (מזיזוזת לגבי אותה תוצאה). מאידך, גם אין צורך להוכיח את כל    33
יסדותה ה"כוונה תחילה" (ראה י. קדמי, שם, פרק 19 סימן שביעי       34
ופרק 20 סימן שלישי והפסיקה המובאת שם, ופסק הדין המנחה         35
לעניין זה ע"פ 155/59 דרעי נ׳ היועץ המשפטי פ"ד יד 233, ע"פ     36
11/89 סלימון בן פאהד נ׳ מד״יל - לא פורסם).                       37
ואם בניסיון להדריגה כך, הרי בניסיון לגרימת מוות בכוונה על אחת    38
כמה וכמה. אמור מעתה, שאם על מנת להוכיח את העבירה              39
המושלמת של גרימת מוות בכוונה די להוכיח יסוד נפשי של מזיזות     40
לגבי התוצאה הקטלנית, הרי שבעבירת הנסיון לאותה העבירה, יש      41
להוכיח את הכוונה הפלילית ברמתה הגבוהה, קרי החפץ במות         42
הקורבן".                                                       43
                                                                         44
קיים צורך, על כן, מחד במעשה גלוי, ומאידך במודעות לטיב המעשה ובחפץ         45
בתוצאה הקטלנית." [ראה תיק ביימ״ש 4603/01].                               46
                                                                         47
                                                                         48
                                                                         49

-5-

תיק מס׳: 3262/02

תאריך: ז׳ אב, תשס״ד
25 יולי, 2004

1 **דיני השותפות באזור**

2

3 תחילה מן הראוי להזכיר כי אדם יכול שיחוב אחריות לעבירה הן ״כמבצע עיקרי״,

4 דהיינו כמי שעשה אחד מהמעשים הנמנים על יסודות העבירה, והן כשותף או

5 כמסייע לעבירה, אשר מעורבותו באחריות לביצועה נעוצה בהתנהגות המלווה את

6 התנהגותו של המבצע העיקרי, מבלי שהיא נמנית בין מרכיבי האקטוס ראוס של

7 העבירה. ויפים למקרה זה דברי בית המשפט העליון בע״פ 5235/93 לוי נ. מדינת

8 ישראל פ״ד מח(5) 550:

9

10 ״ביסוד הרחבת האחריות הפלילית מכח דיני השותפות, מעבר לביצוע

11 עיקרי ומושלם של העבירה, מונחת ההשקפה כי מי שנכון לתרום להגשמת

12 מטרה משותפת, כשהוא מודע לפחות לאפשרות שהוגשמה אותה מטרה

13 כרוכה בפגיעה בערך חברתי מסוייים - ראוי לענישה. בין היסוד הנפשי

14 (קרי: הנכונות לתרום לפגיעה משותפת בערך חברתי מסויים) לבין היסוד

15 העובדתי הקבוע בעבירה קיימת זיקת גומלין. שכן משהוכח יסוד ״נפשי״

16 זה, אין עוד חשיבות לחלוקת התפקידים בין המעורבים באירוע. מכאן

17 שאבן הבוחן לקיומה של שותפות היא מודעות המעורבים באירוע העבריייני

18 לאפשרות המגיעה בערך חברתי מסוייים עקב פעילותם המשותפת״.

19

20 סי׳ 14 ו-15 לצו בדבר כללי האחריות לעבירה, תשכ״ח - 1968 קובעים את דיני

21 השותפות, הסיוע והשידול באזור.

22

23 הסעיף הרלוונטי לענייננו קובע כדלקמן:

24 ״סי׳ 14(א): אם בוצעה עבירה ייחשב כל אחד מן האנשים כדלקמן, כאילו

25 השתתף בביצוע העבירה וכאילו אשם בעבירה, ואפשר להאשימו בביצוע

26 העבירה, זאת אומרת:

27 (1) כל אחד שבפועל עשה את המעשה או את אחד המעשים, או אשר חדל

28 את המחדל, או אחד המחדלים המהווים את העבירה.

29 (2) כל העושה או חדל מלעשות איזה מעשה כדי לאפשר לאדם אחר את

30 ביצוע העבירה או כדי לסייע בידיו בביצוע העבירה.

31 (3) כל אדם המסייע בידי אדם אחר בביצוע העבירה בין שהוא נוכח בשעת

32 ביצוע העבירה ובין שאינו נוכח בשעת ביצוע העבירה. אדם נחשב כאילו

33 סייע, אם נוכח במקום שבו נעשה העבירה כדי להתגבר על התנגדות או כדי

34 לחזק את החלטתם של מבצע העבירה האמיתי או כדי להבטיח את ההוצאה

35 לפועל של העבירה העומדת להיעשות״

36

37 על פי סעיף קטן 1 אחריותו של הנאשם כמבצע בצוותא אינה מצריכה ביצוע של כל

38 רכיבי העבירה הפלילית הנדרשת לחרשעה. די אם חבר הנאשם לאחרים ותרם

39 במקצת לחתרחשות המעשה הפלילי [ראה ע״פ 2798/95 פלוני נ׳ מד״יי פ״די נא (3)

40 388 וע״פ 4389/93 מרדכי נ׳ מד״יי פ״י ד (3) 239].

41 במקרה הנוכחי אף מן הראוי להזכיר כי כאשר חוברים מספר עבריינים על פי תכנון

42 מוקדם:

43

44 ״ככלל עומדת בבסיס האחריות של ׳מבצע בצוותא׳ ׳חבירה׳ של מספר בני

45 אדם לביצועה של משימה עבריינית משותפת, כאשר לכל אחד מהחברים

46 בחבורה ׳תפקיד׳ כמבצע הכולל של ׳הגשמת המשימה׳״ [ע״פ 5589/98

47 סולטאן נ׳ מד״יי וראה גם עניין פלוני הנ״ל עמ׳ 404].

48

49

-6-

תאריך : ז' אב, תשס"ד                  תיק מס' : 3262/02
25 יולי, 2004

<u>זיהוי הנאשם כאדם המופלל באמרות העדים</u>

העד חוסאם שחאדה מוסר בת/1 כי מכיר אדם ושמו "פראס עיאנם חיטאוי בן 27 
נשוי ויש לו ילדים אני חושב שלושה או ארבעה יש למשפחתו חברת חפירות ויש
להם באזורים והוא עובד על באגר". בת/4 מוסיף העד כי חברו הטוב פראס עיאנם
צאדק חיטאוי גר בסמיר אמיס.

העד מחמוד עבדאללה מוסר בת/5 כי "פראס צאדק אחמד עיאנם כבן 27 מכפר עקב
נשוי עם ארבעה ילדים ולו חברה לחפירות" נפגש עימו בחברת חוסאם שחאדה. כך
גם מוסר העד בת/6 כי "חברו מזה יותר מזה עשר שנים פראס צאדק אחמד עיאנם
נשוי ואב לארבעה ילדים עובד בעבודות עפר ולמשפחתו חברה גדולה לעבודות עפר".

העד מחמוד מצלח מוסר בת/8 אודות "פראס חיטאוי כבן 30 מסמיר עמיס עובד על
טרקטור באגר בעל גוף מלא ויש לו רכב מסוג איסוזו מסחרי דאבל קבינה בצבע
חום".

העד הייתם חמדאן מוסר בת/11 אודות "פראס חיטאוי כבן 27 נשוי מכונה "אבו
אדיב" עובד עם אביו כנהג על טרקטור באגר גר בסמיר אמיס ויש ברשותו רכב
מסחרי מדגם איסוזו בצבע אפור".

באמרתו ת/10 מאשר הנאשם כי הפרטים שנמסרו לעיל הינם פרטיו האישיים. כן
מוסר הנאשם כי למשפחתו שם משפחה נוסף, אל חיטאוי, כי הוא מתגורר בצומת
כפר עקב - סמיר עמיס, כי הוא עובד כנהג באגר בחברת החפירות של אביו וכי
לחברה מספר כלי רכב, ביניהם איסוזו בצבע אפור שבו הוא עושה שימוש על פי
צרכיו. הנאשם אף אישר הכרות עם חוסאם שחאדה, מחמוד מצלח ומחמוד
עבדאללה. הנאשם אף ציין כי הוא נשוי לשתי נשים ואב לארבעה ילדים.

עניין הרואות כי זיהוי הנאשם כמי שהוזכר באמרותיהם של עדי התביעה אינו
מעורר כל קושי.

<u>הגשת חומר ראיות בהסכמה</u>

כאמור כל חומר הראיות הוגש בתיק זה הוגש בהסכמה.

להסכמה זו משמעות ראייתית חשובה, עליה עמד ביהמ"ש לערעורים כאשר קבע:

**"כבר נפסק לא אחת בעבר כי הגשת אמרות בכתב בהסכמה, ללא כפירה או
הסתייגות מתוכנן, פירושה הסכמה לאמור בתוך" [ע' אוי"ש 85/94 אבו מחסן
נ' התוב"צ** פש"מ ט 359 וראה גם ע' אוי"ש 512/03 **התוב"ץ נ' חליליה ועד"י
אוי"ש 114/01 התוב"ץ נ' אבו תלאל** בו חזר ודן ביהמ"ש בנפקות הגשת
ראיות בדרך זו].

כמו כן, גם אם תמצא בחומר הראיות ראייה אשר פסולה היא, הרי שהסכמת
הצדדים לתגשה הכשירה אותה [ראה י' קדמי **על הראיות** חלק ב' עמוד 914
והפסיקה המצוטטת שם].

כאמור לעיל, הצדדים סיגנו הסכמתם לתגשת הראיות בהימצאות דבר לחיזוק לשם
הרשעת הנאשם על פי אותן ראיות. יאמר מיד כי עיון בראיות מלמד שתוספת
כאמור נמצאה לרוב, מאחר שבהיות מעשיו של הנאשם מסכת מתמשכת אחת של

-7-

P 6: 326

<div dir="rtl">

תאריך: ז' אב, תשס"ד                                              תיק מס': 3262/02
25 יולי, 2004

1  מעשים נגד בטחון האזור שבוצעו בחבורה אחת, די באימות פרטים המתייחסים
2  לאחת מן העבירות כדי לאמת את כלל דברי של כל כד ועד ולספק את התוספת
3  הראייתית הנדרשת. כפי שנראה בהמשך דברנו פרטי אישום לא מועטים מגובים
4  במספר מקורות ראייתיים שונים, ועל כן, נוכל לקבוע כבר עתה כי דברי העדים
5  השונים באמרותיהם מחזקים אלה את אלה במידה מספקת לסמוך הרשעת הנאשם
6  על פיהם [אודות מהות ה"דבר לחיזוק" כראיה מאמתת אותה ניתן לדלות אף
7  מאמרות הטענונת חיזוק בעצמן נכתב רבות נפנה על כך לי: קדמי על הראיות 172
8  ולע"י איו"יש 9/01 התוב"צ נ' זעתרי פש"מ יא 285] .

9
10  דברים אלה הינם נחלת הכלל ואולם הסניגור מבקש כי נסטה מהם ונבחן את
11  האמרות בעין ביקורתית עד כדי שלילת משקלם הראייתי. בחנו בקשה זו וסבורים
12  אנו כי יש לדחותה. ראשית, עלינו לציין, במידה לא מועטה של תרעומת, כי לו ביקש
13  הסניגור, בשלב כל שהוא מן המשפט, לסייג את הסכמתו להגשת האמרות, בניגוד
14  להלכה המקובלת והידועה, היה עליו לעשות כן בשלב הגשתן, כך שהייתה ניתנת
15  הזדמנות לתביעה להביא את עדיה. שנית, סטיה מהלכה כח מושרשת במקומותינו
16  מחייבת טעמים כבדי משקל ואנו לא מצאנו בדברי הסניגור ולא קוצו של יוד לחאחז
17  בו. הלכת ביחמ"ש הצבאי לערעורים עליה עמדנו, שורשיח בהגיון הבריא ובשכל
18  הישר לפני אם הנאשם חולק על הדברים הנחזים לחיות שלו, עליו למסור להם
19  גירסה נגדית. הנאשם שבפנינו, לא רק שלא טען בשלב כלשהו של הדיון כי אמרות
20  העדים אינן משקפות את האמת, אלא מילא פיו מים ובחר שלא לתערך כאשר ניתנה
21  לו הזדמנות לעשות כן. במצב זה, משלא העמיד הנאשם גירסה נגדית לגרסה העולה
22  מדברי העדים כולם, איננו יכולים להתלות בספקולציות הסניגור.

23
24  יתרה מזן, חזרנו ונדרשנו לשאלה מדוע עלינו לחבר הכרעת דין זו כשבפועל הנאשם
25  לא חלק על ראיה אחת מן הראיות חברורות של התביעה ולא העמיד כל קו הגנה
26  נגדי.

27
28  לתמיה זו לא מצאנו תשובה ועל כן, אין לנו אלא למלא אחר חובתנו על פי דין
29  ולהכריע בדבר אחריותו של הנאשם לעבירות המיוחסות לו בכתב האישום.

30
31
32  <u>פרט האישום הראשון</u>
33
34  האמור בפרט אישום זה מייחס לנאשם עבירה של חברות בחוליה צבאית שפעלה
35  תחת חסות "גדודי חללי אלאקצא".
36
37  פרט אישום זה מבוסס כדבעי בראיות התביעה. כך בת/6 (עמ' 1,2 בעיקר שורה 23
38  ואילך), ת/11 (עמ' 1 שורה 11 ואילך) ות/12 (עמ' 1 שורה 18 ואילך).
39
40  <u>פרט האישום השני</u>
41
42  פרט אישום זה מוצא את ביטויו בת/4 (עמ' 7 שורה 19 ואילך). משקשר הנאשם קשר
43  עם חוסאם שחאדה לבצע פיגוע ירי לעבר כלי רכב הנעים בכביש בין תל אביב
44  לירושלים, הרי שיש להרשיעו גם בעבירה זו.
45

</div>

-8-

תיק מס׳ : 3262/02

תאריך : ז׳ אב, תשס״ד
25 יולי, 2004

<u>פרט האישום השלישי</u>

העד מחמד עבדאללה מוסר אודות נשק מסוג 5-MP אותו רכש הנאשם (ת/6 עמ׳ 11
שורה 3 ואילך). עם זאת, נציין כי הנשק שנרכש היה מקולקל ועל כן הוחזר על ידי
הנאשם לאדם שמכרו.

<u>פרט האישום הרביעי</u>

פרט אישום זה מוצא את ביטויו בת/6 (עמ׳ 1 שורה 25 ואילך).

<u>פרטי אישום 5,6,7:</u>

אף העובדות המתוארות בפרטי אישום אלה מתוארות בהרחבה על ידי חוסאם
שחאדה ב-ת/4 החל מעמ׳ 1 שורה 18 ואילך.

הנאשם אומנם לא ירה בארוע המתואר, ואולם אחריותו כשותף מלא לעבירה אינה
מוטלת בספק. הנאשם פנה יחד עם חברו חוסאם שחאדה לעלי עליאן והשלושה
סיכמו לבצע פיגוע ירי. לאחר מכן נפגשו השלושה פעם נוספת כשעלי עליאן מביא
עימו שני כלי נשק. השלושה נסעו לאזור גבעת זאב, כשהנאשם מחזיק בנשק. בעוד
הנאשם נותר ברכב לשמור עליו, פנו שני חבריו לכביש הראשי ובהגיע רכב ישראלי,
פתחו לעברו בירי אשר גרם למותו של נער בן 17.

עינינו הרואות כי הנאשם נטל חלק חן בשלב התכנון של הפיגוע והן בשלב הביצוע
כשישימש כנהג החולייה. פעולותיו אלה של הנאשם מצביעות אותו בין אלה שנטלו
חלק משמעותי בהוצאת הפיגוע אל הפועל, ומשכך יש להציב את הנאשם במעגל
הפנימי של העבירה. אף באשר ליסוד הנפשי של הנאשם, לא יכול להיות כל ספק כי
מי שיוצא עם חבריו לפיגוע ירי כשברשותו כלי נשק תקפיים, גמלה בליבו ההחלטה
לגרום למותם של אחרים בכוונה.

משהעובדות הנוספות שפורטו בפרטים אלה אינן במחלוקת, ומשהשתתפותו של
הנאשם גם היא ברורה, כל שנותר לנו הוא להרשיע את הנאשם בעבירות המיוחסות
לו בפרטים אלה.

<u>פרט האישום השמיני</u>

העד מחמד עבדאללה מתאר באמרתו (ת/6 עמ׳ 2 שורה 4 ואילך) אודות האימון
הצבאי המתואר בפרט אישום זה.

<u>פרטי אישום 9,10</u>

גם באשר לפרטי אישום אלה, התשתית העובדתית מבוססת היטב [ראה ת/4 עמ׳ 2
שורה 22 ואילך, אליה יש לצרף את ת/6 עמ׳ 2 שורה 9 ואילך]. גם לפיגוע זה היה
הנאשם שותף מלא כשנטל חלק בקבלת ההחלטה לבצע את הפיגוע ושימש כשומר,
מתריע ומסמן לחבריו. נוכח אופי המעשה, ברורה כוונתם של השותפים, ביניהם
הנאשם, וגם כאן לא נותר כל ספק באשר לצורך להרשיע את הנאשם בעבירות
המיוחסות לו בפרטים אלה.

-9-

P 6: 328

<div dir="rtl">

תיק מס׳ : 3262/02

תאריך : ז׳ אב, תשס״ד
25 יולי, 2004

<u>פרטי אישום 11,12,13,14,15</u>

לגבי פרטי אישום אלה קיים חומר ראיות רב היקף. שלושה מעורבים נוספים בפיגוע, חוסאם שחאדה, מחמד עבדאללה והייתם חמדאן, מוסרים תאורים מפורטים באשר להשתלשלות הארועים בהם הביאו הנאשם ושותפיו למותם של בני הזוג בן שלום ז״ל, של דורון יוסף סוויירי ז״ל ולפציעתם של בתם של בני הזוג [ראה דבריהם של חוסאם שחאדה ב-ת/4 עמ׳ 3 שורה 19 ואילך, מחמד מצלח ב-ת/8 עמ׳ 3 שורה 2, והייתם חמדאן ב-ת/11 עמ׳ 1 שורה 11 ואילך ו-ת/12 עמ׳ 1 שורה 28 ואילך]. למקרא דבריהם של העדים, אחריותו של הנאשם בגין פרטי אישום אלה אינה יכולה להיות מוטלת בספק, בהתאם לדברינו דלעיל לפיהם, משמילא הנאשם תפקיד מרכזי במסגרת החוליה שיצאה לבצע את הפיגוע, הינו שותף מלא למעשיו של חבריו ומכאן לגרימת המוות.

<u>פרטי אישום 16,17,18</u>

אף פרטי אישום אלה זכו להתייחסות נרחבת מצד העדים [ראה דבריהם של הייתם חמדאן ב-ת/11 עמ׳ 3 שורה 21 ואילך, מחמד עבדאללה ב-ת/6 עמ׳ 2 שורה 25 ואילך, חוסאם שחאדה ב-ת/4 עמ׳ 5 שורה 23 ואילך, מחמד מצלח ב-ת/8 עמ׳ 4 שורה 1 ואילך].

תפקידזו של הנאשם בפיגוע זה היה דומה לתפקידו אותו מילא בפיגועים האחרים, ועל כן גם מידת אחריותו זהה.

<u>פרטי אישום 19,20,21</u>

הבסיס הראייתי למתוארר בפרטי אישום אלה מוצק. הן חוסאם שחאדה, הן מחמד עבדאללה, הן מחמד מצלח, והן הייתם חמדאן מוסרים תיאורים נרחבים של מעשי החוליה, בינניהם מעשיו של הנאשם [ראה ת/4 עמ׳ 6 שורה 21 ואילך, ת/8 עמ׳ 4 שורה 6 ואילך, ת/8 עמ׳ 4 שורה 17 ואילך, ו-ת/12 עמ׳ 5 שורה 15 ואילך].

אין לנו אלא להצטרף לניתוח המדוייק של התובע באשר לאחריותו של הנאשם לשני ארעי הירי שבוצעו על ידי שותפיו. משיקבע הנאשם עם שותפיו לבצע פיגוע ירי במנהרת של כביש ״בגין״, ומשהסיע הנאשם את חבריו למקום והדריכם, כמתבואר בפרט אישום 19, הרי שיש לראותו אחראי לכלל מעשיהם לאחר מכן, זאת מכוח הוראות סעיף 15 לצו בדבר כללי האחריות לעבירה, תשכ״ח - 1968.

<u>פרטי אישום 22,23,24</u>

גם בנוגע לפרטי אישום אלה קיים חומר ראייתי רב היקף [ראה מחמד עבדאללה ב-ת/6 עמ׳ 6 שורה 17 ואילך, מחמד מצלח ב-ת/8 עמ׳ 5 שורה 21]. לעדויות ישירות אלה אף נמצאו תימוכין בדבריהם של הייתם חמדאן וחוסאם שחאדה.

גם כאן אחריותו של הנאשם כשותף לעבירות אינה מוטלת בספק, ועל כן דין הוא כי יורשע בהן.

<u>פרטי אישום 25,26,27,28,29</u>

חלקו של הנאשם בשליחת המחבל המתאבד שביצע את פיגוע הירי נשוא פרטי אישום אלה ברור. הנאשם היה מעורב בתכנון ובביצוע הובלתו של המחבל עד לרחוב

-10-

</div>

P 6: 329

תיק מס׳: 3262/02

תאריך : ז׳ אב, תשס״ד
25 יולי, 2004

1    הנביאים, כפי שעולה מ-ת/6 עמ׳ 8 שורה 1 ואילך. דברים אלה מוצאים חיזוק ב-ת/8
2    עמ׳ 7 שורה 6 ואילך.
3
4    <u>**פרטי אישום 30,31**</u>
5
6    מחמד עבדאללה מוסר ב-ת/6 עמ׳ 9 שורה 13 ואילך אודות המתואר בפרטי אישום
7    אלה.
8
9    משהתחיל הנאשם להוציא מן הכוח אל הפועל את כוונתו לגרום למותם של אחרים
10   באמצעות אותו מחבל מתאבד אותו הוביל, כשברשותו של הנאשם והמחבל
11   המתאבד עמדו האמצעים המתאימים לביצוע העבירה, הרי יש לראות אותו
12   אחראי לעבירה של ניסיון לגרימת מוות בכוונה ושל חחזקת אמצעי לחימה,
13   כמתואר בכתב האישום [באשר ליסודות עבירת הניסיון לגרימת מוות בכוונה, ראה
14   בהרחבה ב-ע/ איו״ש 311+318/03 ובתיק יהודה 42947/01].
15
16   <u>**פרט אישום 32**</u>
17
18   לפרט אישום זה נמצאו ראיות בדבריהם של חוסאם שחאדה ומחמד עבדאללה [ת/4
19   עמ׳ 8 שורות 13-23, ת/5 עמ׳ 1 שורה 21].
20
21   <u>**סוף דבר**</u>
22
23   נוכח מסקנותנו דלעיל ומשנמצאו כל פרטי האישום שיוחסו לנאשם מבוססים
24   כדבעי בראיות התביעה, אנו מרשיעים בהם את הנאשם.
25
26
27   **ניתן והודע היום, 25/07/2004, במומבי ובמעמד הצדדים.**
28
29
30
31
32   שופט                        אב״ד                        שופט
33
34
35

-11-