# EXHIBIT A.426

PLAINTIFF'S
EXHIBIT
426



The Military Court                                      <u>Court Case 3380/03</u>
<u>Judea</u>
Before a panel

Court hearing on: November 9, 2003
          14 Heshvan 5764

                    Before the Presiding Judge: Lieutenant Colonel Nathaniel Benichou
                              Judge: Lieutenant Colonel Hanan Rubinstein
                              Judge: Captain Eli Bar-On

Defendant: Abdullah Ghaleb Abdullah Barghouti (Jamal) Identity No. (fictitious): 30300028
          Jordanian passport No. e-891198, born October 15, 1972, a resident of Beit Rima,
          detained since March 5, 2003.

## <u>Sentence</u>

1.   The Defendant has been convicted pursuant to his admission before us on June 1, 2003 to
     all of the facts of the indictment, consisting of 108 charges.

2.   This is a series of extremely grave offenses. The Defendant was convicted of an attempt to
     manufacture an explosive object, membership in an unlawful association, six offenses of
     military training without a permit, offenses of conspiring to commit an offense punishable
     by more than three years imprisonment, five offenses of trading in war materiel,
     manufacturing an explosive object, sheltering, three offenses of execution of a service for
     an unlawful association, 12 offenses of attempt

[Stamp] Military Appellate Court * Judea and Samaria [Signature]      [Stamp] Authentic copy

1

[Stamp] P7: 100

to cause intentional death, seven offenses of malicious damage to property, 66 offenses of causing intentional death, offenses involving licenses and documents that were issued under the Security Legislation, possession of a firearm and three offenses of manufacturing an incendiary device.

3.  The Defendant, for more than two years, was a member of the Az A-Din Al Qassam Brigades, the military arm of the Hamas organization, which is an unlawful association.

4.  The Defendant, within the framework of his activity in the military arm of the Hamas organization, was responsible for manufacturing explosive devices and training other people in manufacturing explosive devices. In view of his "success" in this function, the Defendant earned the nickname the Engineer.

5.  In May 2001, the Defendant met a military operative in the Hamas organization and asked to enroll in the military arm of the organization. The Defendant informed that operative that he could manufacture explosive devices for the organization. As a result of the initiative and the proposal of the Defendant he was indeed enrolled into the Az A-Din Al Qassam Brigades.

6.  In late 2001, the Defendant agreed to act under the command of the head of the Az A-Din Al Qassam Brigades in the Ramallah area and manufacture explosive devices for carrying out attacks against Israeli targets.

7.  In exchange for his activity, the Defendant received financial compensation to the amount of US $117,000. In addition, the Defendant received financial aid in the amount of $500 from Marwan Barghouti, the head of the Tanzim of the Fatah.

8.  In May-June 2001 or thereabouts, on several occasions, he met with a senior military operative of the Hamas organization and during those meetings the Defendant learned how to manufacture explosives, explosive devices, detonation mechanisms for the explosive devices, hand grenades and explosive belts. The Defendant learned how to camouflage an explosive device so that it would not be suspected as such. In addition, the Defendant learned how to manufacture poison that could be put into the explosive devices to transform them into chemical charges.

[Stamp] P7: 101

9.    In December 2000, the Defendant conspired with another person in the Hamas organization
to participate in the abduction of Israel Defense Forces soldiers. The Defendant was
charged with preparing an apartment for holding Israel Defense Forces soldiers who would
be abducted. Within the scope of this plan, the Defendant prepared a room in his home in
Beit Rima for holding Israel Defense Forces soldiers whom they planned to abduct.

[Stamp] Military Appellate Court * Judea and Samaria [Signature]        [Stamp] Authentic copy

2

[Stamp] P7: 101 [continued]

10. In June 2001, the Defendant received 15 kg of explosives and a pistol and a magazine with cartridges, and the Defendant concealed them and kept them with him.

11. Later, in a storeroom that the Defendant rented in Beit Rima, he set up a laboratory for manufacturing explosives and explosive devices.

12. The Defendant transferred to the laboratory 15 kg of explosives that he obtained, 20 liters of hydrogen peroxide, and a number of wireless mechanisms for activating the explosive devices that he intended to manufacture.

13. In his laboratory, the Defendant manufactured two explosive devices that were camouflaged as stones. One explosive device was transferred by the Defendant to a senior military operative of the Hamas organization and the other device he transferred personally to Bilal Ya'akub Barghouti, another senior military operative of the Hamas organization.

14. In July 2001, the Defendant met his handler, Aiman Halawa, and the above mentioned individual informed the Defendant that he knew a person who was prepared to carry out a suicide attack inside Israel. At the request of his handler, the Defendant contacted Bilal Ya'akub Barghouti, a senior military operative in the Hamas organization and asked him to find a person who could bring a suicide terrorist into Israel in order to carry out a suicide attack with the intent of causing the deaths of as many people as possible.

15. On July 27, 2001, the Defendant obtained an explosive device that he put into a can of beer and to which he attached an activation device. The Defendant delivered the device to Bilal Barghouti in order for him to transfer it to people whom he had recruited and for them to carry out an attack using it with the intent of causing the deaths of as many people as possible.

16. The above mentioned explosive device was delivered to Ahlam Tamimi, who came to a Co-Op supermarket in Jerusalem, in HaMelech George Street in the heart of Jerusalem, while carrying in her bag the explosive device that she had received from the Defendant.

17. Ahlam Tamimi put the beer can containing the explosive device on a shelf of cans in the above mentioned supermarket, in order for the explosive device to explode and cause the deaths of people nearby at the time of the explosion. Ahlam Tamimi activated the explosive device and left the store immediately after.

[Stamp] P 7: 102

18. In the afternoon of July 30, 2001 [7.01..30], the above mentioned explosive device exploded in the said supermarket and caused a large amount of damage to property, but miraculously no loss of life.

[Stamp] Military Appellate Court * Judea and Samaria [Signature]     [Stamp] Authentic copy

3

[Stamp] P 7: 102

19. On August 9, 2001, the Defendant asked his handler in the Hamas to give him a large explosive device and a suicide terrorist for the purpose of carrying out a suicide attack in order to harm and cause the deaths of people.

20. The Defendant received a large explosive device that consisted of two shampoo bottles that were filled with explosives.

21. At the request of Bilal Ya'akub Barghouti, the Defendant put the above mentioned explosive device inside a guitar. In addition to the above mentioned explosive device, the Defendant also put two plastic bags filled with explosives and screws into the guitar. The Defendant closed the guitar's hole using glass so that its content would not be visible. The Defendant connected the activation mechanism to this explosive device himself.

22. The Defendant put the guitar into a black case and pulled an activation button with activation wires out from the case so that the device could be activated easily without opening the case.

23. The Defendant reported to his handler that he had prepared the above mentioned explosive device and asked his handler to send a suicide terrorist to him.

24. The Defendant transferred the explosive device to Bilal Barghouti in order for him to deliver it to a suicide terrorist, in order for the suicide terrorist to carry out a suicide attack using the explosive device that had been prepared, with the intent of causing the deaths of as many people as possible.

25. During the day, Bilal Barghouti instructed the suicide terrorist on how to activate the explosive device that had been manufactured by the defendant.

26. On August 9, 2001, at about 1:55 p.m., the terrorist, Az Aldin Shahil Ahmed Masri, carried the guitar with him while being led by Ahlam Tamimi to central Jerusalem.

27. The above mentioned suicide terrorist carried the death guitar and went into the Sbarro restaurant in Jerusalem at noontime, while it was crowded with people who had come to eat.

28. The suicide terrorist activated the activation mechanism that had been assembled by the Defendant, and as a result of the explosion of the explosive device, 15 innocent people – whose only wrongdoing was eating in the heart of Jerusalem – were killed.

[Stamp] P 7: 103

29. A great amount of damage was caused to the restaurant and, as set forth, 15 people met their deaths.

30. More than 127 people who were in the area of the explosion site were injured.

31. In this incident, [the following] were killed: the late Frieda Mendelsohn, aged 62 at the time of her death; the late Lily Shimashvili Mesengiser, aged 33 at the time of her death; the late Tamara Shimashvili Mesengiser, aged 8 at the time of her death; the late Tehila Maoz, aged 20 at the time of her death; the late Michal Raziel,

[Stamp] Military Appellate Court * Judea and Samaria [Signature]     [Stamp] Authentic copy

4

aged 15 at the time of her death; the late Malka Roth, aged 15 at the time of her death; the late Yocheved Sasson, aged 10 at the time of her death; the late Mordechai Schijveschuurder, aged 44 at the time of his death; the late Tzira Schijveschuurder, aged 41 at the time of her death; the late Raya Schijveschuurder, aged 14 at the time of her death; the late Avraham Yitzhak Schijveschuurder, aged 4 at the time of his death; the late Hemda Schijveschuurder, aged 2 at the time of her death; the late Judith Lilian Greenbaum, aged 31 at the time of her death; the late Giora Balash, aged 69 at the time of his death; and the late Zvi Golombek, aged 26 at the time of his death.

32. Due to the acts of the Defendant, many people lost their lives and a great many others were injured. This was the goal of the Defendant, and he executed his goal with malice and without hesitation.

33. Starting in the second half of 2001, in or near Ramallah, the Defendant built a number of laboratories for manufacturing explosives and explosive devices. The Defendant would transfer various chemicals for use in making explosive devices to these laboratories. The above mentioned explosives were purchased both by the Defendant himself and by his fellow Hamas organization members.

34. In his laboratories, using the above mentioned chemicals, the Defendant manufactured dozens of kilograms of explosives. Using the explosives that he had made, the Defendant prepared a large number of explosive devices of various types.

35. The Defendant manufactured the above mentioned explosive devices with the aim of Hamas organization operatives carrying out attacks using them against Israeli targets. The Defendant briefed the Hamas organization on the activation of the above mentioned explosive devices. In addition to the aforementioned, the Defendant attempted to manufacture hand grenades and also obtained instructions on manufacturing Qassam rockets, but he decided that he was unable to manufacture the rockets.

36. The Defendant also made the effort to train and teach other people to manufacture explosives and explosive devices.

37. During November 2001, the Defendant manufactured explosives in his laboratory and using them, manufactured three additional explosive devices. He put the first explosive device into a computer case. He put the second explosive device into a black fabric bag. The Defendant prepared the third explosive device in the form of an explosive belt.

[Stamp] P 7: 104

38. In addition to the explosives, the Defendant inserted nails and nuts into the devices that he had prepared, in order for the explosive device to injure severely as many people as possible. In addition, the Defendant laced the explosive devices with toxic material, in order for the explosive devices to be more lethal.

[Stamp] Military Appellate Court * Judea and Samaria [Signature]    [Stamp] Authentic copy

5

[Stamp] P 7: 104 [continued]

39. The Defendant passed on the three explosive devices to a Hamas operative in order for the operatives of the organization to carry out bombing attacks using them with the intent of causing the deaths of as many people as possible.

40. On December 1, 2001, at about 11:36 p.m., at the entrance to Ben Yehuda Street from Zion Square in Jerusalem, a suicide terrorist activated the explosive device that had been manufactured by the Defendant and concealed inside a computer case, with the intent of causing the deaths of as many people as possible. The above mentioned explosive device exploded when it was activated.

41. At that time, at the junction of Ben Yehuda and Luntz Streets, in Jerusalem, near the site of the previous explosion, a second suicide terrorist activated the explosive device that was inside the explosive belt that had been manufactured by the Defendant, with the intent of causing the deaths of as many people as possible. The second explosive device also exploded.

42. A few minutes after the activation of the two explosive devices by two suicide bombers, the third explosive device that had been placed inside an automobile that had been parked near the detonation of the two previous explosive devices, in Harav Kook Street, near the corner of Jaffa Street in Jerusalem, was activated. The explosive device was activated with the intent of causing the deaths of as many people as possible.

43. As a result of the detonation of the three explosive devices that had been made by the defendant himself, 10 people were killed and about 191 people were injured.

44. In this attack, the following people were murdered: the late Assaf Avitan, aged 15; the late Guy Vaknin, aged 19; the late Yoni Korganov, aged 20; the late Yaakov Israel Danino, aged 17; the late Michael Dahan, aged 20; the late Golan Turgeman, aged 15; the late Adam Weinstein, aged 14; the late Moshe Yedid-Levy, aged 19; and the late Nir Haftzadi, aged 19.

45. Very heavy damage was sustained by houses and businesses in the area of the streets Ben Yehuda, Luntz, Jaffa and Harav Kook and to vehicles that were in the area.

46. In late 2001, the Defendant manufactured, at the request of Marwan Barghouti, the head of the Tanzim of the Fatah, two additional explosive devices that were intended for use if the Israel Defense Forces were enter Ramallah.

[Stamp] P 7: 105

47. In late 2001, the Defendant manufactured three explosive devices that were concealed inside juice cartons, and four more explosive devices that were camouflaged as stones. These devices were also transferred to operatives in the Hamas organization.

48. In early March 2002, the Defendant was requested by his handler in the Hamas to manufacture an explosive belt again, for a suicide terrorist, in order for him to carry out a suicide attack with the intent of causing the deaths of as many people as possible.

[Stamp] Military Appellate Court * Judea and Samaria [Signature]     [Stamp] Authentic copy

6

[Stamp] P 7: 105 [continued]

49. The Defendant agreed to this and manufactured an explosive belt that was assembled by him and he was also the one to attach the activation mechanism to the explosive belt.

50. The defendant transferred the belt to operatives in the Hamas, in order to execute a suicide attack against Israeli targets.

51. On March 9, 2002, at about 10:30 a.m., a suicide terrorist, who was carrying on his person the explosive belt that had been prepared by the Defendant. The suicide terrorist entered the Moment Café in Jerusalem, which was crowded at that time. The suicide terrorist activated the explosive belt with the intent of causing the deaths of as many people as possible.

52. As a result of the activation of the explosive belt, 10 who were then at the Moment Café were killed and 65 people were injured.

53. The people who were killed at the Moment Café were the late Nir Borochov, the late Limor Ben-Shoham, the late Dan Imani, the late Danit Dagan, the late Uri Felix, the late Baruch Lerner, the late Tali Eliyahu, the late Livnat Dvash, the late Orit Ozerov and the late Natanel Kochavi.

54. In addition to 10 people being murdered and dozens more people being injured as set forth, heavy damage was sustained by the Moment Café located in Aza Street in Jerusalem.

55. In March-April 2002 or thereabouts, the commander of the military arm of the Hamas organization in the Ramallah area asked the Defendant through an intermediary to manufacture explosive devices and an explosive bag for carrying out a suicide attack.

56. The Defendant agreed to the request and manufactured an explosive belt that had similar assembly to the explosive belt that he had prepared for the suicide terrorist who had detonated himself at the Moment Café.

57. In addition, the defendant prepared an explosive device that he put into a bag, to which screws were also added to increase the destructive power of the explosive device.

58. The defendant delivered the above mentioned explosive belt to another person in the organization in order for it to be delivered to a suicide terrorist.

[Stamp] P 7: 106

59.  The suicide terrorist, with the assistance of others, arrived, on May 7, 2003 [Translator's note: as written], at the Sheffield Club in the new industrial zone of Rishon le Zion while wearing the explosive belt that had been prepared by the Defendant. The suicide terrorist entered the above mentioned club, activated the explosive belt, which exploded, with the intent of causing the deaths of as many people as possible.

[Stamp] Military Appellate Court * Judea and Samaria [Signature]      [Stamp] Authentic copy

7

[Stamp] P 7: 106 [continued]

60.  As a result of the explosion, 15 people were killed and 59 were injured.

61.  In this incident, the following people were murdered: the late Rahamim Kimhi, the late Rafael Haim, the late Anat Teremforush, the late Avraham Bayaz, the late Eti Bablar, the late Yitzhak Bablar, the late Israel Shikar, the late Shoshana Magmari, the late Sharuk Rassan, the late Nawa Hinawi, the late Nir Lovatin, the late Regina Malka Boslan, the late Dalia Masa, the late Pnina Hikri and the late Edna Cohen.

62.  As a result of the detonation of the explosive belt that had been prepared and manufactured by the Defendant, the Sheffield Club and the whole building containing the club were heavily damaged.

63.  On May 23, 2002, the Defendant attempted to cause the intentional deaths of people. During May the Defendant met a military operative in the Hamas organization, who asked him to manufacture an additional explosive device, in order to carry out a bombing attack. The Defendant agreed to this and made an explosive device that could be attached to iron using magnets that the Defendant attached to the explosive device, and which could be operated by cellular telephone.

64.  The Defendant delivered the explosive device that he had prepared above to another person in Hamas, in order to carry out the planned bombing attack.

65.  The explosive device that had been prepared by the Defendant was attached to the bottom of a fuel tank in a fuel tanker by another person in the Hamas using a magnet. The tanker made its way to the Pi Glilot site, followed by the operators of the explosive device, who activated the explosive device by cellular telephone, with the intent of causing the deaths of as many people as possible.

66.  The above mentioned explosive device, which had been manufactured and assembled by the Defendant, exploded and caused serious damage to the fuel tanker, but miraculously nobody was hurt.

67.  In June 2002, the Defendant was requested by the commander of the military arm of the Hamas organization in the Ramallah area to manufacture an explosive device that is activated by cellular telephone for the purpose of a bombing attack with the intent of causing the deaths of as many people as possible. The Defendant prepared such an explosive device, as requested, while being well aware of the purpose for which the explosive device was intended.

[Stamp] P 7: 107

68. In the morning of June 30, 2002, other people in the Hamas, to whom the explosive device that the Defendant had prepared, put it on railroad tracks in Lod.

69. When those other people identified a train approaching the area in which the explosive device had been laid, they activated it and the explosive device exploded.

[Stamp] Military Appellate Court * Judea and Samaria [Signature]      [Stamp] Authentic copy

8

[Stamp] P 7: 107 [continued]

70.  As a result of the explosion of the explosive device, four people were injured and damage was sustained by the locomotive and the railroad track.

71.  During June 2002, the Defendant was requested again to prepare an additional explosive device, activated by cellular telephone, for carrying out a bombing attack with the intent of causing the deaths of as many people as possible.

72.  The Defendant agreed to that request, manufacturing such an additional explosive device while being well aware of the purpose for which he was preparing the explosive device. Thereafter, the Defendant transferred the explosive device that he had prepared to other people in the Hamas.

73.  The above mentioned explosive device was placed on the railroad track near the exit from Rehovot next to Kfar Gvirol, and on the following day, July 21, 2002, in the early morning hours, the device was detonated by Hamas people with the intent of causing the deaths of people. As a result of the explosion of the explosive device, one person was injured and damage was caused to a locomotive and to the railroad.

74.  In July 2002, the Defendant was requested by the commander of the military arm of the Hamas organization in the Ramallah area to manufacture an explosive device that would be concealed inside a bag, in order to carry out a bombing attack with the intent of causing the deaths of as many people as possible.

75.  The Defendant agreed to manufacture such an explosive device, knowing for what purpose the explosive device would be used.

76.  The Defendant manufactured such an explosive device, which was concealed inside a bag, and the Defendant also made the effort to fill the bag with iron nuts in order to increase the destructive power of the device.

77.  The Defendant also prepared a wireless activation mechanism for the device that he had manufactured and delivered the device to a Hamas man.

78.  The explosive device was laid by Hamas people inside a cafeteria in the Frank Sinatra Building on the campus of the Hebrew University on Mount Scopus in Jerusalem and was activated on July 31, 2002, at about 1:00 p.m., because at this time there was usually a large concentration of people in the cafeteria.

[Stamp] P 7: 108

79. As a result of the explosion of the explosive device that the Defendant had manufactured, nine people were killed and 81 more people were injured.

80. As a result of the detonation of the explosive device, at noontime of that day, [the following] were killed:  the late Daphna Spruch; the late Marla Anne Bennett; the late Dina Carter; the late Benjamin Thomas Blutstein; the late Revital Barashi; the late David (Diego) Ladowski; the late Levina Shapira; the late Janis Ruth Coulter and the late David Gritz.

81. As a result of the explosion, heavy damage was sustained by the Frank Sinatra Building in the campus of the Hebrew University.

[Stamp] Military Appellate Court * Judea and Samaria [Signature]       [Stamp] Authentic copy

9

[Stamp] P 7: 108 [continued]

82. In August 2002, the Defendant was requested to prepare two explosive devices that were concealed inside biscuit boxes for the purpose of carrying out a bombing attack with the intent of causing the deaths of as many people as possible. The Defendant agreed to manufacture these explosive devices, well aware of the purpose for which they were intended, and also actually manufactured these explosive devices.

83. The Defendant prepared two explosive devices and attached activation mechanisms to them as requested. These were two explosive belts, which were intended for use by suicide terrorists.

84. The Defendant delivered the explosive devices inside the explosive belts to another person in the Hamas organization, well aware of the purpose for which they would be used.

85. On September 19, 2002, at noontime, a suicide bomber, who was carrying on his person one of the explosive belts that the Defendant had prepared, boarded a bus on line no. 4 in Tel Aviv and detonated the explosive device with the aim of causing the deaths of as many people as possible.

86. As a result of the explosion, six people were killed and about 84 more who were on or near the bus at the time of the explosion were injured

87. As a result of the explosion, the following people were killed: the late Yossi Mamistavlov, the late Ofer Zinger, the late Rosanna Siso, the late Yaffa Shem-Tov, the late Solomon Hoenig and the late Jonathan Jesner.

88. Extensive damage was sustained by the bus that the suicide terrorist had boarded and extensive damage was sustained by the stores and businesses that were near the attack site.

89. The Defendant prepared the second explosive belt as described earlier and delivered it to others in order for it to be used in a suicide attack.

90. On October 11, 2002, at about 8:15 p.m., a suicide terrorist, who was also carrying on his person an explosive belt that the Defendant had prepared, attempted to enter the Yotvata restaurant located on the promenade in Tel Aviv and to detonate it in order kill the people who were then in the restaurant.

[Stamp] P 7: 109

91.    The guard at the site noticed the attacker and suspected him and therefore did not let him enter the restaurant. The attacker was apprehended. By this act the Defendant was a full accomplice in an attempt to cause the intentional deaths of people.

[Stamp] Military Appellate Court * Judea and Samaria [Signature]      [Stamp] Authentic copy

[Stamp] P 7: 109 [continued]

92. In February 2003 the Defendant taught another person who had been sent to him by the head of the Az A-Din Al Qassam Brigades in the Ramallah area how to manufacture explosive devices and electrical circuits for activating explosive devices and taught him how to manufacture activation mechanisms for explosive devices.

93. During 2003 until and up to the time of his arrest, the Defendant transferred to the head of the Az A-Din Al Qassam Brigades in Ramallah computer diskettes on which there were instructions on how to manufacture explosives and explosive devices. The Defendant knew that these diskettes were intended to be transferred to an operative of the Palestinian Islamic Jihad organization who asked to learn to manufacture explosives and explosive devices.

94. Thus, over a very long period, the Defendant had a clear, determined purpose of manufacturing lethal explosive devices that were intended to be used in suicide attacks and bombing attacks, with the aim of causing the deaths of as many Israelis and Jews as possible in cruel, criminal terrorist actions.

95. The Defendant is responsible for the murder of dozens of innocent human beings and the injury of hundreds more.

96. It must be assumed that had the Defendant not been apprehended, he would have continued to manufacture more and more explosive devices and explosive belts, serving as a kind of factory manufacturing death mechanisms.

97. The Defendant admitted everything that had been attributed to him in the indictment as described above and was convicted of all of the offenses as described here in the sentencing case.

98. The Defendant expressed no remorse. The Defendant caused destruction and carnage and the explosive devices that he prepared were seeds of death that were scattered in many places throughout the State of Israel.

99. The Defendant did not satisfy himself with the preparation of explosive devices in his laboratory but also made the effort to teach others to prepare such explosive devices.

100. It is clear that in this case there is no room for consideration of any personal concerns of the Defendant as mitigating concerns.

[Stamp] P 7: 110

101.  The Defendant was a key senior accomplice as a primary perpetrator of unflinching murders and injury of civilians, constituting a significant link in the terrorist network wielded against the State of Israel and its civilians.

102.  The wish of the Defendant was to kill as many Jews as possible and he knew that the explosive belts and explosive devices that he had prepared would kill a very large number of people and injure whoever would be in the effective range of the explosive devices.

[Stamp] Military Appellate Court * Judea and Samaria [Signature]      [Stamp] Authentic copy

11

[Stamp] P 7: 110 [continued]

103. The Defendant is a highly dangerous person and his acts are criminal to the extreme, meaning that the sentencing should be maximal in order to keep him away from society and the public at large for the rest of his life.

104. The murderous terrorist spree that the Defendant committed has been one of the worst we have known. His acts are felonious and atrocious.

105. The Defendant dealt for a very long period in the manufacturing of explosive devices, in order to sow destruction and death, bereavement and pain among the citizens of the State of Israel.

106. Most of the victims did not have the opportunity to live a full and real life, and were killed at a very young age. Some of the victims are innocent children. Often, the attacks wiped out whole families in a single bitter moment.

107. After hearing the pleas of the parties, we considered all of the aggravating and mitigating arguments.

108. The truth that must be heard is that we have found almost no mitigating argument except for the confession of the Defendant before us. However, this confession came with no remorse and therefore its mitigating weight is negligible.

109. We have considered the severity of the offenses and the great damage that was sustained by the victims of the offenses and their families.

110. This is pain and bereavement to the families of the injured and the dead from the many terrorist actions, and there are hundreds if not thousands of relatives who remain with scars of pain on their souls, in addition to the pain, agony and hellfire that the casualties themselves experienced, some of whom will bear their disability until the end of their lives, without any possibility of ever being freed from the suffering that struck them like thunder out of the blue.

111. In the case before us, it is blatantly clear that the public interest, that is, deterrence of the terrorism mechanisms and the operators of the cruel, merciless terrorist mechanisms, should be preferred over any personal interests of the Defendant.

112. The judicial system should have deterrent ability towards terrorist operatives and towards the head of the terrorism hierarchy.

[Stamp] P 7: 111

113.   The terrorism today that is striking at the State of Israel is vicious and cruel and makes no distinction at all between serviceman, civilian, infant, elderly, disabled, tourist, man, woman or any human.

[Stamp] Military Appellate Court * Judea and Samaria [Signature]        [Stamp] Authentic copy

12

114.  The aim of Palestinian terrorism is to strike at Jews and kill as many Jews as possible and to intimidate and terrorize those that remain alive. The purpose of terrorism is to incapacitate normal, stable life in the country.

115.  Terrorism is an intolerable thing and the sentencing for a person who wields terrorism and is part of the chain of terrorism mechanisms should be painful and maximal.

116.  The legal system should make its contribution to reduce acts of terrorism to the extent possible, whenever possible and feasible.

117.  The Defendant before us must be sentenced in a manner that will deter offenders like him, pay him back for his cruel, criminal actions and will express the revulsion of any human and of any society concerning the offenses for which he has been convicted.

118.  In many, terrible cases of terrorism such as this one for which the Defendant is responsible as part of the mechanism of terrorism, as one who manufactured the explosive devices that sowed destruction and death, the maximum sentence prescribed by the legislator should be a starting point and an end point.

119.  In our opinion, if we had the authority to do so, the Defendant should be sentenced to death as the fitting sentence.

120.  Leaving a maximum sentence as a dead letter would contravene the explicit direction of the legislator, in contravention of his opinion that a death sentence should be handed down to a defendant.

121.  To pass down a death sentence under the Security Provisions Order, a unanimous decision must be made by a panel of three judges who are jurisprudents of Lieutenant Colonel rank at least.

122.  The current panel of the Court does not satisfy this condition and is therefore not authorized to sentence the Defendant to death, despite this being the sentence that in our opinion should be inflicted on the Defendant.

123.  When terrorism is so cruel, massive and strikes indiscriminately right and left, sometimes frequently, for an extended period, and kills dozens of human beings in many events and when a person such as the Defendant is an accomplice in the above mentioned mechanism in so many cases, the correct and fitting sentence is the death sentence.

[Stamp] P 7: 112

124.   Contentions are being made that the death sentence is not a deterrent and is ineffective. Maybe this is correct concerning suicide attackers who are not deterred by this attack because they have sentenced themselves and others to death in any case when performing a suicide attack.

[Stamp] Military Appellate Court * Judea and Samaria [Signature]       [Stamp] Authentic copy
[Stamp] Nathaniel Benichou, Advocate

[Stamp] P 7: 112

125.  However, suicide terrorists do not usually work alone and of their own accord. They are part of a wider terrorist system that includes aiders of various kinds and includes people such as the Defendant, who assemble and manufacture death bombs. People of the Defendant's kind rank high in the hierarchy of terrorism.

126.  The death sentence that may be inflicted in the appropriate cases should be not only a written letter but also a practiced provision of law.

127.  The Hamas is a cruel terrorist organization that must be fought in all existing legal ways, and the Court must have its say within the sentencing of a man who joined the Hamas in order to murder as many Jews as possible and also executed his plots to a massive scale.

128.  Against suicide terrorists, against those who equip them, against their accessories, against the makers of the explosive belts and the explosive devices that are deployed against an innocent population, a strong hand and the strictest sentencing possible must be used.

129.  Maximum sentencing may deter the handlers and prepares of explosive devices and the assisters and reduce the wave of suicide terrorists.

130.  A person such as the Defendant acted as part of a murderous, bloodthirsty terrorist system; thirsty for the blood of innocent civilians whose sole crime was being Jews living in the Land of Israel and by whose bad luck they happened to be on a bus or in a restaurant or café at the time of the arrival of a suicide murderer who killed them all at once.

131.  A person of the kind of the Defendant is fit for death and should be sentenced to death.

132.  We believe that the Defendant before us should be sentenced to death for his acts. The death penalty in the case before us would represent doing justice.

133.  Because we do not have the authority to do so, and in order to express our position concerning the criminal acts of the Defendant, we sentence the Defendant to one separate life imprisonment term for each person who was murdered as a result of activation of the explosive devices that the Defendant manufactured. The life imprisonment sentences are to be cumulative.

[Stamp] Military Appellate Court * Judea and Samaria [Signature]        [Stamp] Authentic copy

14

134.  In addition to this, although we have sentenced the Defendant to cumulative life imprisonment terms for the murders in which he was an accessory, the additional offenses that he has committed, the injuring of hundreds of people as a result of his acts, cannot be ignored, and he is to be punished for the additional offenses by an additional sentence too.

135.  In view of all that which has been set forth above, we sentence the Defendant to 66 terms of life imprisonment for the murder of 66 human beings, each life sentence to be served cumulatively.

For the remaining offenses that the Defendant has committed we hand down an additional life sentence that will also be cumulative to all of the other life sentences that we have handed down to him.

A right of appeal within 30 days of today is conferred.

Handed down and announced this day, November 9, 2003, in public and in the presence of the Military Prosecutor, the Defendant and his counsel.

| Lieutenant Colonel<br>Hanan Rubinstein<br>Judge | Lieutenant Colonel<br>Nathaniel Benichou<br>Presiding Judge | Major Eli Bar-On<br>Judge |
|---|---|---|

[Stamp] Military Appellate Court * Judea and Samaria [Signature]     [Stamp] Authentic copy

[Stamp] P 7: 114

Page 1 of 1

<u>Unclassified</u>

Israel Defense Forces

November 30, 2004

**Judea**

**Court Case 3880/03**

## **Imprisonment Order**

To Israel Police officer / prison guard / soldier

I, a Military Court Judge, hereby order the imprisonment of:

Abdullah Ghaleb Abdullah Barghouti, 1162167

and to deliver him with this imprisonment order to the prison guard, in order for him to be imprisoned for:

67 terms of life imprisonment.

This order serves as a reference to arrest him and keep him incarcerated by whoever is qualified by law to do so.

<div align="right">

[Signature]
Lieutenant Colonel Nathaniel Benichou
Assisting Presiding Judge

</div>

Handed down on November 30, 2004

For use by the police / the prison

Particulars of the prisoner:

[Stamp] P 7: 115

Abdullah Ghaleb Abdullah Barghouti, 1162167

The above mentioned individual was admitted to the incarceration facility / prison on _____

[Stamp] Military Appellate Court * Judea and Samaria [Signature]     [Stamp] Authentic copy

http://hm9605mgw1/magen/Tables/Decisions/TETemplateBody.asp?CourtID=2&Deci...
November 30, 200[obscured]

[Stamp] P 7: 115 [continued]

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

MARK I. SOKOLOW, *et al.*,

                Plaintiffs,

        No. 04 Civ. 00397 (GBD) (RLE)

vs.

THE PALESTINE LIBERATION
ORGANIZATION, *et al.*,

                Defendants.

**DECLARATION OF RINA NE'EMAN**

Rina Ne'eman hereby certifies as follows:

1.     The attached translation from Hebrew to English is an accurate representation of the document received by Rina Ne'eman Hebrew Language Services, to the best of my knowledge and belief. The document is designated as P 7: 100-15.

2.     I am a professional translator with a B.A. in International Relations from the Hebrew University of Jerusalem (Israel) and 30 years of translation experience. I am fluent in Hebrew and English, and I am qualified to translate accurately from Hebrew to English.

3.     To the best of my knowledge and belief, the accompanying text is a true, full and accurate translation of the Hebrew-language document designated bearing the bates number P 7: 100-15.

Dated: March 6 , 2014

                                        Rina Ne'eman

ss.: New Jersey

On the $6$ day of March, 2014 before me, the undersigned, personally appeared Rina Ne'eman, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is signed to this Declaration and acknowledged to me that he executed the same in his capacity, and that by his signature on this Declaration, the individual executed the Declaration.

Sworn to me this
$6$ day of March, 2014

Leonor Troyano
Notary Public

LEONOR TROYANO
ID # 2385580
NOTARY PUBLIC OF NEW JERSEY
Commission Expires 5/8/2014



תיק בית משפט 03.1380

בבית המשפט הצבאי

יהודה

בפני הרכב

דיון בימ"ש מיום : 03.11.9

י"ד חשוון . תשס"ד

בפני האב"ד : סא"ל נתנאל בנישו

שופט : סא"ל חנן הוברצשיין

שופט : רס"ן אלי בר-און

נאשם:    עבדאללה צ'אלב עבדאללה ברגותי (במל) ת.ז. (פיקטיבי) 030300028 . דרכון ירדני -ש

891198 יליד 10.72..15. תושב בית רימא, עצור מיום 03.5.3.

גזר-דין

1. הנאשם הורשע, עד פי הודאתו בפניו ביום 1 ביוני 2003 בכל עבירות כתב האישום אשר בו

108 אישומים.

2. מדובר בסדרת עבירות חמירות ביותר, הנאשם הורשע בעבירות ליצר הפן נפיץ, בחבירית

בהראהות ברצי מירהה, ב-6 עבירות אימונים צבאים שלא בחירה, בעבירת שורית עצר ועבר

בבירה מידומה מייד עריית שגות נשבה, ב-8 עבירות שד עמר בצייר מידומה, בייצר הפן נפיון,

בית הרמן, ב-4 עבירות בצעו שירות עמר האדמת בלתי מירה, ב-12 עבירות של נישוי





[redacted]

לגרימת מוות בכוונה, ב-7 עבירות היזק בזדון לרכוש, ב-66 עבירות גרימת מוות בכוונה, עבירות ברישיונות ומסמכים שהוצאו עפ"י תחיקת הביטחון, בהחזקת כלי ירייה וב-3 עבירות ייצור חפץ מבעיר.

3. הנאשם במשך למעלה משנתיים היה חבר ב"גדודי עז א-דין אל קסאם" , הזרוע הצבאית של ארגון החמאס , שהוא התאחדות בלתי מותרת.

4. הנאשם , במסגרת פעילותו בזרוע הצבאית של ארגון החמאס, היה אחראי על ייצור מטעני חבלה ואימון אנשים אחרים בייצור מטעני חבלה. לאור "הצלחתו" בתפקיד האמור הנאשם "זכה" לכינוי "המהנדס".

5. בחודש מאי 2001 נפגש הנאשם עם פעיל צבאי בארגון החמאס וביקש להצטרף לזרוע הצבאית של הארגון . הנאשם מסר לאותו פעיל כי הוא יכול לייצר מטעני חבלה עבור הארגון . כתוצאה מיוזמתו של הנאשם והצעתו איננס צירף וגייס לגדודי עז א-דין אל קסאם.

6. בסוף שנת 2001 הסכים הנאשם לפעול תחת פיקודו של ראש גדודי עז א-דין אל קאסם באזור רמאללה ולייצר מטעני חבלה לצורך ביצוע פיגועים כנגד מטרות ישראליות.

7. בתמורה לפעילותו זו של ייצור מטעני חבלה ואימון אחרים קיבל הנאשם תמורה כספית בסכום של $117000 ארה"ב.. כמו-כן קיבל הנאשם סיוע כספי בסך $500 מידי מרואן ברגותי ראש התנזים של הפתא"ח.

8. בחודשים מאי יוני 2001 או בסמוך לכך במספר הזדמנויות נפגש עם פעיל צבאי בכיר של ארגון החמאס ובמהלך המפגשים הנ"ל למד הנאשם כיצד לייצר חומר נפץ, מטעני חבלה , מנגנוני הפעלה למטעני החבלה . רימוני יד וחגורות נפץ הנאשם למד כיצד להסוות את מטעני החבלה באופן שלא יחשדו בם בבדיקה.. כמו כן הנאשם למד כיצד לייצר רעל שאותו ניתן להכניס אל מטעני החבלה על מנת להפכם למטעני חבלה כימיים

9. בחודש דצמבר 2000, קשר הנאשם קשר עם אחד בארגון החמאס להשתתף בחטיפת חייל צה"ל. יעד הנאשם הוטל להכין דירה בה יוחזק חייל צה"ל האחר שייחטף ע"י אנשי החמאס. במסגרת תוכנית זו הכין הנאשם חדר בדירתו בבית רימא שיועד להחזקת חייל צה"ל שתכננו לחטוף

10. בחודש יוני 2001 רכל הנאשם לידי 15 ק"ג של חומר נפץ וכן אקדח ותחמושת עם כדורים והנאשם הסתירם יחדיהם עמו.

11. לאחר מכן במחסן אשר אותו שכר בבית רימא הקים הנאשם מעבדה לייצור חומרי נפץ ומטעני חבלה.

12. הנאשם העביר למעבדה 15 ק"ג של חומר נפץ, 20 ריטר של מי המצן וכן מספר מנגנונים אלקטוניים להפעלת מטעני חבלה שהתכוון לייצר.

13. כמעבדת ייצר הנאשם שני מטעני חבלה המיכיים לאבנים. מטעני אחד העביר על הנאשם לידי פעיר צבאי בכיר בארגון החמאס את המטען חשני העביר באופן אישי לבלאל יעקוב ברניתי פעיר צבא בכיר אחר בארגון החמאס.

14. בחודש יולי 2001 נפגש הנאשם עם מפעילו אירמן חלאוזה והכ"ל מסר לנאשם כי הוא מכיר אדם המוכן לבצע פיגוע התאבדות בתוך ישראל עפ"י בקשת מפעילו הנאשם פנה אל בלאל יעקוב ברניתי. פעיל צבאי בכיר בארגון החמאס ובקיהש מהלה למצוא אדם אשר יוכל להכנים מחבל מתאבד לתוך ישראל על מנת לבצע פיגוע התאבדות במטונה לגרים למותם של אנשים רבים ככל האפשר.

15. ביום 27.7.01 קבל הנאשם לידיו מטען חבלה קטן והוא הכניסו לתוך פחית בירה והריכיב מנגנון הפעלה. הנאשם מסר את המטען הכ"ל לידי בלאל ברנותי על מנת שיהאחרון ימסיר המטען לאנשים שהא ג"ים ואת על מנת שיבצעו באמצעותי פיגוע בכיונה לגרום למותם של אנשים רבים כל הכיהן.

16. המטען הכ"ל נמסר לידי אהלאם תמימי שהגישה אל חנות סופרמרקט ביקן-אופ. ביירושלים ברחוב הברף ג'ירהל. ברכב שך ירושלים. באשר בחריה נמצא המטען שרבלה מהכוינת.

17. אהראם תמימי הניה את פחית הבירה אשר בתוכה המטען על גבי גדף שך פדיית בחונת הסופרמרקט הכ"ל זאת על מנת שהמטען יתבלרד וירכיב למותם שך אנשים שיהיו בקרבת מרום ברגע הפיציו. אהיראם הניך הפצירה את המטען יעזבה את החנות מיד לאחר מכן.

18. בשעות הצהרים ביום 30.01 ק' מטען הכ"ד חבריה הכ"ל הפפצין בחנות הסופר מריהר האמורה. גרם מנה רב רמבינ יבנם את אדב לא נכון.



19. ביום 9 באוגוסט 2001 בריש יצאשם מטספעידי בחמאס כי יצבר אריד מטטן חבלה גדול לכן מתוכך מתאבד וצורף הוצאה לפועל של פיגוע התאבדות על מנת לפגוע באנשים ולהרוג לטורים.

20. הנאשם קיבל לידי מטטן חבלה גדול שהיה טורבב מיטט בסכולי שמפו שהיו מלאים בחומר נפץ.

21. עפ"י בקשת בלאל יעריב ברינתי הכניס הנאשם את מטטן החבלה הנ"ל את תוך גיטרה, בנוסף למטטן החבלה הנ"ל הכניס הנאשם אל תוך הגיטרה שתי שקיות גיילון מלאות בחומר נפץ וכן הוסיף ברכם לתוכבי הגיטרה, את פקח הגיטרה סגר הנאשם באמצעות זכירית כך שלא ניתן יהיה לראות מה יש בתוכה, את מטטן התבלה הנ"ל חיבר הנאשם עצמו ומנגנ הפעולה.

22. את הגיטרה הכניס הנאשם לתוך גיתיק שחור וספתור העלעה המחובר בחומי הפעלה הוציא אל מחוץ לגיתריק באופן שניתן יהיה בקלות להפעיל את המטטן בכי לפתיח בלל את הגירהק.

23. הנאשב דווח למפעילו כי הכן את המטטן הנ"ל וביקש מטמפעילו כי יטלח אריו מחבר מתאבד.

24. הנאשם העביר את הכניטן אל בלאל ברינתי על מנת שהלה יעביריו לידי מתאבד ויעד מנת שהמחבל המתאבד יבצע פיגוע התאבדות באמצעות המטטן שהוכן ואת בטרינה לקרים לטורה על אנשים רבים ככל שיוכל.

25. ביום בלאל ברינתי הדריך את המחבר המתאבד ביצד מפעילים את מטטן החבלה אשר יוצר ע"י הנאשם.

26. ביום 9.8.01 בספעיד לשעה 13:55 המחבר המתאבד, עז א-דין שהיל אחמד מצרי נשא עמו את הגיטרה כשהיא מובל ע"י אהלאב תוימל אל מרכז ירושלים.

27. ביטרת הטוויג, נישאה ע"י המתאבד הנ"ל אשר נבנט למטעודת סבארו בירוטלים בטעות הצהריים כשהיא הימה בי אדם שבאו על מנת יסעוד את לבם.

28. המחבר המתאבד הפעיל את מטטן התפעלה שהירכב ע"י הנאשם ובתוצאה מהתפוצצות המטטן נהרגי 15 בני אדם תמירים טבך חטאב חיה שבאו לטעוד את רבם ביובה צד העיר ירוטולים?

29. מה רב נגרם למטעידה וסאטיר 15 בי אדם מצאו את מיתם.

30. יפטרה מ-127 בני אדם שהיו מאריר בריב מהתפצעות נפצעו.

31. בארינד זה נהרגו פרידה מנדריבית בת 2.10 ל, ארי שיטיאאטיריי, מבנוטר ז"ל בת 33 במותה, תגה שימאטאשריי מבנוטר ז"ל בת 8 במותה, תהיה בעיו ז"ל בת 20 במותה, מיכל הזאל ז"ל



, בת 15 במותה. מלכה רינ ז"ל, בת 16 במותה. יובב עש'ון ז"ל. בת 10 במותה. מרדכי רפאל

סהיוסחוירדר ז"ל , בן 44 במותו. צירה סהיוסחוירדר ז"ל. בת 41 במותה. רעיה סהיוטסוחורדר

ז.ל. בת 14 במותה. אברהם יצחק סהייוס חורדר ז"ל, בן 4 במותו. חמדה סמימחורדר ז"ל, בת

שנרים במותה. ג'ודית דיליאן נ'רינביב ז"ל, בת 31 במותה. ג'ורא בלאש ז"ל, בן 69 במותו. \*

צבי צהרובסק ז"ל, בן 26 במותו.

.32 עקב מעשיו של הנאשם נפדי חרתם אנשים רבים ירבים מאוד נפצעו. זו היתה מטרתו של הנאשם

ואת מטרתו הוציא מן הכוח אל הפינ'ני  בזידון ובקור רוח .

.33 החל מהמחצית הש'נ'יה של שנת 2001 בירמאלהה ובכמוך לריאלרלת הקים הנאשם מספר מעבדות

ליצר חומרי נפ'ו וכ'נענ' חבלה . אל המעבדות הנ"ל נגע הנאשם לחעביר חומרים בטורים שנים

המש'מ'שנ להיצר חומרי נפץ. חומרי הנפץ הנ"ל נרכשו הן ע"י הנאשם עצמו הן ע"י חבריו בארג'ון

החמאס.

.34 הנאשב ליצר במעבדותיו מהחטרים הכרכיים הנ"ל עשרירת קילונרמים של חומרי נפ'ן. מחומרי

הנפין אותם ליצר הנאשם חכן מספר רב של מטע'ני חבלה מסוגים שונים .

.35 הנאשם ליצר את מטעני החבלה הנ"ל בכירה שעפ'יד' ארגון החמאס יבצעו באמצעותם פיגועים

נגד מטרות ישראליות. הנאשם הדרך את פ'ל'ד' ארגון החמאס איך להפעיל את מטעני החבלה

הנ"ל. בנוסף לאטור דלעיל הנאשם נסה ליצר ר'מונ' יד  יקיבל אף הוראות ליצר ט'ל' קפאם

אורהבחחירט כי אין ביצוהו לרצר את הט'רים.

.36 הנאשם אף טרח לאמן ולרמד אנשים רביב אחרים בצד ליצר חומר' נפץ וטעעני חבלה.

.37 במהלך חודש נובמבר 2001 ליצר הנאשם במעבדחו חומר נפץ וטמנו ליצר של'שה מטעי חבלה .

את המטעני הראשונ' הסני הנאשם לתוך מארז מחשב. את דעטען הטני הכניס הכ'רס הנאשם ל'תוך ה'ק

בד שהדר . את העטעני המ'ש'לט' הכ'ן הנאשם בקוריית על תניירת נפ'ן.

.38 בנוסף החומר הנפין הכני הנאשם ל'תך יעטטגם שיחכן' מטמרים אישים יאת על מנ'ת שהצטען

יפע'ב כריר' היה' ייכ' במספר 'ב' כמ' הנכ' של אנשים. כמ' מן הכני הנאשם א' של'ישת מטעי

חבכת חומר הער' יאת גם על מנ'ת שהטטנים והי יכ'ביב 'תכר



39. הנאשם מכר את שלישת מטעני החבלה שיצר לבוצר לבנין הנאב אחר  על מנת שהלה יעביר לפעיל הארנון אשר באמצעותם יבצעו פיגועי חומרה בכוונה לגרום למותם של אנשים רבים ככל הניתן.

40. ביום 1.12.01 בסמוך לשעה 23:36 בכניסה מעיבר ציון לרחוב בן יהודה בירושלים פוצר מתאבד הפעיל את מטען החבלה אשר יצר ע"י הנאשם והוסתר בתוך מארז שול מהשב וזאת בכוונה לגרום למותם של אנשים רבים ככל האפשר. מטעו החברה הנ"ל התפוצץ בפועל.

41. באותו מועד בצינה הרחובות בן יהודה- לגן בירושלים, בסמוך למקום הפיגוע הקודם ציוזר מתאבד שני הפעיל את מטעו החבלה שהיה בתוך מכונית הנפץ ואשר יצר ע"י הנאשם וזאת בכוונה לגרום למותם של אנשים רבים ככל שניתן. מטען החבלה השני התפוצץ אף הוא.

42. לרות כפירות לאחר הפצות שי המטענים ע"י שי מתאבדים הגיעד המטעו השלישי שהניח הנאשם בתוך מכונית ואשר חנה בסמוך לפיצון שני המטענים הוודמים . ברחוב הרב ליה בסמוך לפניה רחוב יפו בירושלים . מטעו החבלה הופעל בכוונה לגרום למותם של אנשים רבים ככל הניתן.

43. בתוצאה מפיצון שישית מטמני החברית שהוכמני וויצרי ע"י הנאשם עצמי נהרגו 10 אנשים ונפצעו כ- 191 בני אדם.

44. בפיגוע זה נרצחו אסף אביצן ז"ל בן 15 . גיא יעקבזן ז"ל . בן 19, יומי קורונביב ז"ל . בן 20, יעקב ישראל דינו ז"ל, בן 17, מיכאל דהאן ז"ל, בן 20, גולן תרזלמן ז"ל, בן 15, אדב וינשטיין , בן 14, משה חי חיי ז"ל , בן 19, גיר חפצדי ז"ל, בן 19.

45. נזק מבד ביורה נגרם לבתים ולבתי עסק הנמצאים באזור הרחובות בן יהודה- לגן-יפו- הרב קוה והכרי הרב שביו במרחב.

46. בסוף שנת 2001 עפ"י בהישתי של מריאן ברגותי . ראש התנים של הפתא"ה יצר הנאשם שי מטעוי חברה על מנת שיעושה בהם שיסיס אם ניתח צול"ר יכנט לישראלרה.

47. בסף שנת 2001 יצר הנאשם עוד שהושה מטעי חבלה מוסווים ברסוגנט יד ע"י מך בן ארבעד ומטעו חבלה נבמבר נוסי נכסוים באמניב, מטמני החברה הנ"ל העביר לפעירים בארגון התואם. בתהות תהיים נרם 2002 תהביש הנאשם ע"י נפעירלו בתמאב ריצר עוב הגירת נפי עברי וחב"ל מהאבד כר מנה שרדה יצעו פיגוע התאבדות בכניסה לגרם לצוות של אנשים רבים ככל הניתן.



P 7: 105



.49 הנאשם הסכים לכך וייצר חגורת נפץ שהורכבה על ידי יחיא זה שאף הרכיב את מנגנון ההפעלה להגורת הנפץ.

.50 הנאשם העביר את החגורה לפעילידם בהנאאס זאת עד מת להוציא לפועל פיגוע התאבדות כנגד מטרה ישראלית.

.51 ביום 9 מרץ 2002 בסמוך לשעה 22:30 נישא על גופו חבל מתאבד את החגורה הנ"ל שהכין הנאשם במו ידיו, המחבל המתאבד נכנס לבית הקפה מימנט בירושלים אשר היה באותה שעה הומה בני אדם, המתאבד הפעיל את חגורת הנפץ במטונה לגרום למותם של אנשים רבים ככל הניתן.

.52 כתוצאה מהפעלת חגורת הנפץ נהרגו 10 בני אדם ששהו אותה עת בבית הקפה מימנט ונפצעו 65 בני אדם.

.53 נהרגו בבית הקפה מימנט נדב בירייב ז"ל, מיטל בן שוהם ז"ל, דן אימוני ז"ל, דנה הגן ז"ל, אורי פלרמס ז"ל, ברוך דריך דריך ז"ל, שרי אליהו ז"ל, רבקה הבט ז"ל, אוריית אוחדוב ז"ל, נתנאל מכבי ז"ל.

.54 בנוסף לכך נערכבדו 10 בני אדם ונפצעו כאמור עשרית אנשים נגרם נזק כבד לבית הקפה מימנט הנמצא ברחוב עזה בירושלים.

.55 בסמוך לחדישים מרץ -אפריל 2002 מפקד הזרוע הצבאית של ארגון התמאס באיזור רמאללה ביקש מהנאשם באמצעות מתווך לייצר מטעני חבלה ותיק נפץ לצורך ביצוע פיגוע התאבדות.

.56 הנאשם הסכים לבקשה, וייצר חגורת נפץ הדומה במהרכבה לחגורת הנפץ שהכין עבור המתאבד שפוצץ עצמו בבית הקפה מימנט.

.57 כמו כן חבל הנאשם מטען נפץ אשר הכהב לתוך תיק אלץ הכמגם גם ברנים להגברת עצמה הפגיעתי של מטען החבלה.

.58 הנאשם מסר את חגורת הנפץ ותיק ה ... לאחר בארגון עד מנה שתמסרי ידי מחבל מתאבד

.59 התובב הנאשם בסעיף אחרים אינם ביום 7.5.03 למועדין שמירה קראב באיזור התעשיה החדש ... המחבב המתאבד נכ ... הכין הנאשם ... הכן ... המחבב לעוב ... מטעין רבים של אנשים רבים ככל האפשרי



נאמן למקור



60. כתוצאה מהפיצוץ נהרגו 15 בני אדם ונפצעו 59.

61. בארועי זה נרצחו רחמים כמהי ז"ל, רפאל חיים ז"ל, שנת טרמפוריש ז"ל, אברהם בית ז"ל, אתי בבראר ז"ל, יצחק בבראר ז"ל,ישראל שירא ך ז"ל, שושנה מזמרי ז"ל, שאריק רפאו ז"ל, גיאה חונאירי ז"ל, ניר לובנין ז"ל, חניה מלכה בוסיו ז"ל, דויה מסה ז"ל, פבינה הדרי ז"ל,לעהנה כהו ז"ל.

62. כתובאה מהפיצוץ הנזרת הפגז שהוכנה יוצרה ע"י הנאשם נגרם נזק ככד למישורו שפייד-קלאב וכך לכל רכבניו בו נמצא המיעדיו.

63. ביום 23.5.02 ניסה הנאשם לגרום לטוחם של אנשים. הנאשם נפגש במהלך הודש מאי עם פעיל צבא בארגון התמאס שברש מנני רייצר מטען חבלה כדי לבצע פיטוע תופת. הנאשם המכים לכך וייצר מטעם חבלה שניתן להצמידו לפריד באמצעית מגנטים אותם הרכיב הנאשם על מטען הזבלה אשר ניתן הית להפעילו באמצעית טלפון סלולרי.

64. הנאשם מסר את המטען שהכן דלעיר לאחר בהטאם על מנת להוציא לפועל פיגוע תופה שתוכנן.

65. המטען שהוכן ע"י הנאשם הוצמד ע"י אחר בהמאם באמצעית מגגט לחלקו התחתון שד מיכל דלק של מיכלית דלק, המיכרית נעשה האתר פיגנליות כשבכותיה המפעילים של מטען הזבלה אשר הפעילו את מטען החברה באטצעית טלפון סלולרי. וזאת בכוונה לגרום למיתם של אנשים רבים מכל האפשר.

66. מטען הזבלה הנ"ל , אשר יוצר והירכב ע"י הנאשם, התפוצץ וגרם נזק כבד למיבלית הדלק. אך בנם לא נפגע איש.

67. בחודש יוני 2002 התבקש הנאשם ע"י מפקד הזרוע הצבאית של ארגון התמאס באיזור רפאל הוא רייצר מטען חבלה המיפער ע"י טלפון סלולרי- צייך פיגוע תופת בכוונה לגרום לטוחת של אנשים רבים בכל חניהו. הנאשם הכו מטעו בזה, כפי שהוזברט. בירוע היטב לצירך מה מיעד המטען.

68. בשעות הביקר ביום 30.6.02 , אנשים אחרים ביטאם. אירהם היגבר המטען אתך חכן הנאשם. הנחותו עב פני רכבת בריד

במהבחדני אותם אדרינב בי רבכה מהרבבה יאווה בי רגח המטען הפעילוהו והקטעו התפיצין.



8



70. כתוצאה מפיצוץ המטען נמצאו 4 בני אדם ונרצם נזק לקיר הרכבת וליצמריות הרכזל.

71. במהלך חודשי יוני 2002נתבקשו שוב הנאשם להכין מטען חבלה נוסף המוטמן ע"י טלפון סלולרי לצורך ביצוע פיגוע תוסף בכירות הרים לשומה של אנשים רבים מכל הגיתן.

72. הנאשם הסכים לבקשה זו, יצר מטען כזה בידיעו היטב ראשה צריך היא מכין את המטען, לאחר מכן האשם העביר את המטען שהכין לאנשים אחרים בחמאס.

73. המטען הב"ר הונח על קפי הרכבה במטיך ריצאת מרחובות ליד כפר גבידיול וביים בזהרת, 21.7.02 בשעת הביקר ומירקדית היפעל המטען ע"י אנשי חמאס בכוונה לגרום למותם של אנשים. כתוצאה מהפיצוץ של נטוען חחבלה נפצעו אדם אחד ונגרם נזק לקיר ולמכילת הרכזל.

74. בחדיש יולי 2002 נתבקשו הנאשם ע"י פעקד הזרוע הצבאית של ארגון החמאס באיזור רמאללה לייצר מטעני חבלה המוכרך בתוך תיק כדי לבצע פיגוע תוסף בכוונה לגרום לגרום למותם של אנשים רבים בכל האפשר.

75. הנאשם הסכים לייצר מטען כזה בידעו מזה לאיזה צירך ישמש המטען.

76. הנאשם ייצר מטען כזה אטיר וחסבר בתוך תיק והנאשם טרה גם למלא את התיק באומו ברזל לצירך הגברת עוצמת הפגיזה של המטען.

77. הנאשם אף הכין מנגנון הפעלה אחטיני למטען שיצר לממסר את המטען לאיש חמאס.

78. המטען שיצר הנאשם הונח ע־ אנשי חמאס אחרים בתוך הפיטריה הנמצאת במבין ע"ש פרנק סינטרה בקמפוס האונצברסיטה העברית בהר הצופים בירושלים והופעל ביום 31.7.02 בסמוך לשעה 13:00 לאחר ובשעה זו בד"כ היה רובני גדול של בני אדם בקטריה.

79. כתוצאה מפיצוץ המטען שיצר הנאשב נהרגו 9 בני אדם ונפצעו 81 נוספים.

80. כתוצאה מפיצוץ המטען נהרגו בצהרי רב זין רבנה שפרוד ז"ל, טירה או בנו ז"ל, דינה כרטי ז"ל, בנימין יוטשצין ז"ל, רייצר ביאנצ'ו ז"ל, יין (דיאנו) דודסני ז"ל, ליומא נפרטא ז"ל, גנינ ביב תרוקר ז"ל, דזר מרון ז"ל.

81. כתוצאה מהפיצוץ נוטב נזק כבד לבנין בקיר סינטרה האונברסיטה העברית



נאמן למקור

P 7: 108



82. בחודש אוגוסט 2002 נתפרסם הנאשם לתכין שני מיתווני הבליה המסתיים בתוך תופעאת של
ביסקריוטים לציורך ביצוע פיגוע תופף בסוגיר הרגם לקורבם יש אנשים רבים ככל האפשר.הנאשם
הסכם ליצר מטעני הבליה אלו בידהו היבב יאנוה צורך נעודו ואף יצר בפועל את המטענים ללכי

83. הנאשם תכן שני מטעני הבליה והצניד אריהב מגגיני הפעלה כפי שנתבתינו, מדוכר בשקי הגירית,
נפין שיוחד לשימיש ע'י מפעיום מתאבדים.

84. הנאשם מסר את מטעני הבליה בתוך הגירית הנפין לאחד בארגון תחמאס בירדשו היבב לצורך מה
ישנויו.

85. ביד 19.9.02 בשעות הצהרים עלה מהבל מתאבד כאיר על גיפי אחת מהגירית הנפף שהבין
הנאשם על קו אוטובוס מספר 4 בתר אבב יפוצץ המטען במשטרה הגרים למותם של אנשים רבים
ככל האפשר.

86. כתוצאה מהפיצין נהרגו 6 בני אדם ונפצעו כ- 84 נטמפים שהיו באוטובוס יבמסוך אלרי בעת
הפיצין.

87. כתוצאה מהפיצין נהרגו באיתו יום יוסי יסקי מצרמטרוב ז"ק, עויף זינגר ז"ל, רוונה סיסו ז"ל, יפה שם
טוב ז"ל, סלומון הונגג ז"ל, יונבן גלמר ז"ל.

88. נזק רב נגרם לאוטובוס אלרי עלה המפגע המתאבד יכן נגרם נזק רב לחגירית ולבתי עסק שהיו
בקרבת מקום הפיגוע.

89. את חזרת הנפין השעירה הכין הנאשם כמתואר קודם לכן מסר לאחרים על מנה שהשמשו לביצוע
פיגוע התאבדות.

90. ביד 11.10.02 בסמיך לישעה 20:15 מחבר מתאבד אשר נשא על גיפי את הגירית הנפין שהכין
הנאשם ניסה להיכנס לקפסית יובבתה תמצאת בניירית בתר אבב ויפוצצה על מנת להרוג בני
אדם שהיו בארוחה עך במסודה.

91. מאבטח שהית במרכז הבתיו כמתינ וחושד בי יפוצר לא נתן ין להגומ לתחום המבקה המפגע
נספה במסומה זה היה הנאשם שירה ולא ניסטיו הגרם למירם של אנשים בסוינה.



נאמן למקור



92. בחודש פברואר 2003 לידר הנאשם אדם אחר שנשלח אריי ע"י ראש גדודי עז א-דין אל קסאם באיזור רמאללה כיצד לייצר מטעני חבלה ומנגנים חבלליים. לצורך הפעלת מטעני חבלה זכה. וכן לימד את הלה כיצד לייצר מגנוני התפצה למטעני התבלה.

93. במהלך שנת 2003 ועד לכישלרי העביר הנאשם לידי ראש גדודי עז א-דין אל קסאם ברמאללה דיבקרים של נחוצב ויכירתם הוראות כיצד לייצר חינרי נפץ ומטעני חבלה. הנאשם ידע כי דיבקרים אלו מיוערדים להיות מיעברים לפעני ארגון הג'האד האסלאמי הפליטתיני אשר ביקושו ללמיד לייצר חומרי נפץ ומטעני חבלה.

94. הנה כי כן הנאשם במשך תקיפה אריכה מאוד שם לו למשרה ברורה ונחושה לייצר מטעני חבלה כלכיוש שירשדו רישמש לפיגועי התאבדות ופיגועי תופת חאת על מנה לחרוג כמה שיותר ישראלים יהודים בפעולית טרור אכזריות ופשעיות.

95. הנאשם אחראי לריצה של עשריית בני אדם חפים מטשע ולפציעתם של מאות אחרים.

96. יש לחנית כי אלמרא נחפם הנאשם היה מטשיך לייצר עוד יעוד מטעני חבלה וחגורות נפץ כשהיא מטבשש מפוז בית חרישש העייצר מכנוני מוות.

97. הנאשם הודה בכל מה שיוחסכ לו בכתב האישום עפ"י מה שתואר דלעיל וחורשע בכל העבירות כמתואר כאן בפרישת גזר הדין.

98. הנאשם לא הביע חרטה . הנאשם גרם לחרם ומטעני התבלה שהכן היו זרעי מוות שפוזרו במקומות רבב ברחבי מדינת ישראל.

99. הנאשם לא הסתפק בהכנת מטעני חבלה במעמבתו אלא טרח אף ללמד אחרים כיצד להכין מטעניים כאלי.

100. בריה כי אין במקרדה דנ כל מקום להתחשב בטיקולים איעניים כלשהים של הנאשם כטיקולרים לקריא

101. הנאשם הרה שקוע בכקכי שיקכ הרבצ מנמצן צירהרי של מלמשי רצח הרכ ופצעה באודיהם בכיר רות. כטיחא מקוח חיהיר שיטנטטיות בריית הכריה המיפעלת בגני מודות ישראל אירחה.

102. יבני שד הנאשב חד רשליך מנה שירכר יהודים וידע כי חגורות הנפץ ומטעני החבלה שהכן יכרה אנטטשם רבב מאיד יפצעו בני צד שיחות בשוה הפעולות של מטעני התבלה





103. הישוב הוא אדם מסוכן בידיו, ומעשיו נמשכים עד מאוד יעד כן העניישה צריכה להיות מורכבית
על מנת להרחיקו יכך ימי חייו מחברה ומציבור בני אדם

104. מסכת העויר הרפואית שהפעיר האאשם היא מהחמורות ביותר שידענו אי פעם מעשיו נפשעים
ונועזים.

105. האאשם עסק תקופה ממושכת בעבור מעשיו חבלה, והבל עך מנת לזרוע הרס ומוות, שמר וכאב
בקרב אורחי מדינת ישראל.

106. חלק גדול מהנרצחים לא הספיקו לחיות חיים מלאים ומכשירים ונקטוו בגיד צעיר מאוד, חלק
מהנרצחים ילדים וכיוטם לעיתם היה מדובר בפגיעים אשר רטלי מעשחות שלימות, ברגע מר
אחד.

107. לאחר שמיעת טיעוני הצדדים שהיגנו את כל הנזיקים לחוטרא ילקולא.

108. האמת ניתנת להאמר כי לא מצאני כמעט נימוק בתשוחי לקולא פרט להורייתי של האאשם בפניני
. אולם הודייה זו לא הויתה בכ חרטה בצידה ולכן מעליחה מעטיקול לקולא כל כמהה.

109. שקרטי את חומרת העבירות ונזוק הרב שנגרם לקורבנת העבירות לעחפטותיהם.

110. מדובר בכאב, שכר למשפחות הפצועים ומהרוגים בפציעות השרר הרבות וכן מדובר בסאית, או
בכיר יותר להרחב באלפי קרובי משפחה שנותרו עם צילקות כאב בנפשם ואת בניוסף לכאב,
היסורים והתחנה שהיו הפצועים עצמם שחולקם ישאו את נבותם עד סוף ימי חייהם ולא כל
אפשריית להשתחרר אי פעם מהסבי שפקד אותם כיום בהיר.

111. בטירה שבפנני בריר בעריל כי יש להעדיף את האינטרס הצבורי, דהיינו, הרחעת מנגנוני
הטרור ומעטילי מנגנוני הטרור ואכרי וחסר הרחמים עד פני אינטרטים אישיים כלישהב של
האשם.

112. מעטכת העונשה תעידה צריכה להיות בעטה בקרב הרחעה כדפני מעפילי הטרור ויכלתי ראשי פרימידת
הטרור.

113. טיברה חיים כנוס בנחיות ישראל הוא ישה יאמרי ואני מבחוד בניה בך חייל, אזרח.
ישעחי ושן, נכה חיד אדם אישה אי אדם בישלי.





114. הטריה הפלסטינית צריכה לקבוע יסודות רבים בכל הנוגע ובן להפחיד ולמלא אימה את אדי שונאיה בחרב. משרת הטרור מחובתה חיים תקינים ויציבים במדינה.

115. טריד הוא דבר ביתי נבכד הנעשה לפי שמועיר טרור וחלק משירשרת מגנוני הטרור צריכה להיות מאויבה ומירכבית.

116. מערכת המשפב צריכה לקיום את תרומתה להפחתת מעשי הטרור כפד האפשר, במידת האפשר ובכל הנוגע.

117. יש להטיל על הנאשם שבפנינו עונשה שיש בה גינוב הרתעת עבריינים בנוהג, ויכויל על מעשיו העפשעים והאבזריים ואשר הביע סידדה על כל בן אנוש ועל כל חברה מתעבירות בגינן הרישע.

118. במקרי טרור נוראיים ירבים כיוו אין שהנאשם אהראי יהם בחלקי מעונגנו ועריי וזאת כמי שיציר את מעונג מחכבה שוועני חרב ומורת תקרת תענוע המירכבי שתפבע המחלקה צריכה להיות גזורת המוצא וכפורת הניוב.

119. לדעתני, אילו היתה סמכית בידנו העישה הראייה לנאשם היא הטלת עונש מוות.

120. היתרת עונש מירכי בגד " הלקה יאין מורין על פיה" עימהתבעונגד להנוחיתו המפורישת של העוחזק, ופבינה לדעתני כי כמהרים האראשינים יש להטיל על נאשב עונש מוות.

121. עד מפת להטיל עונש מוות על פי הצו בדבר הוראות בטחון י שלליקד את הההלקה פה אהד ע"י הרכב שלושה שופטים משפטאיים אשר דרכתם אינה פחותה נסא"ל.

122. הרכב הנוכחי של בית המשפט איננו מטלא הבאי זה ולפיכך אין זה מסמכותני להטיל על הנאשם עונג מוות לפיכות עזה העונש אשר לדעתני ראי ונכון לחטול עוד הנאשום.

123. כאשר העריד הוא כה אבזרי .מסביב. ובכה ריא הפחתה על יצון עיר שמאל . לעולים תמופיק. הכחפה מרתבב ולחטוד עקריית בני אדם באירעים רבים וכאשר אדם כמו הנאשם שוחף למעונון הב"ל בטלריים כה רבים העונש תכבן ויראער הוא עונש מוות.

124. נטשעות נעורה כי עונש מוות אינו מיחיע יאינו אפליכב . אירו עבי הבר וובר יספונה= מתארביב אותם עונש כה אני ורקינ כיין ושורי עד שעונ עוד אהרים עונ מוית ומירא בכה בעינו מינוע תאברית.

נאמן למקור

13   נהנאל כריסאר שודק77-
       Daniel Kpiper conn-

P 7: 112



125. יחד עם זאת מצטיינים-מראביב אינם פועלים בדרך כלל מכוח עצמם ואינם פיצרים לבד, הם
חלק ממערכת טרור רחבה יותר שכוללת ארגונים למיניהם וכן כללות אנשים כמו הגאנב
הערביים ושיצרים פצצות מות, אנשים מסוגי של הגאנב עומדים במקום גבוה בפירמידה
הטרור.

126. עונש המות אשר ניתן להטיל במקרים המתאימים צריך שיה חלא רק את כתובה אלא את
הראא הרף מופעלה.

127. החמאס הוא ארגון טרור אכזרי אשר יש יהודתם כי בכל הרלכים המוייקות הקריטות יעל בית
המשפט לאמור את דברו במפורש עניישתי איש שהכר את החמאס על מנת לרצח יהודים רבים
בכל הבית ואף היציא זמר מן הבוח את הפעיל בצריה נסיבית.

128. אי פרו המתאבדים, אל מיד אהי הצדידיב אותם, אל מיד פרעניתם, אל מול מבני הגדריה
הנפין ומטבני החברה אשר מופעלים מגנ אוכלסיה חפף מפשע יש לנקוט ביד חזקה ובעונשה
החמירה בירתר הקריאת האפשיריל.

129. עניש מקטימליל יטיל ותרתיע את הבצערולם יאת לביני הגוריית הנפץ ואת הקייעביכ ותפחית
את נחשול המתאבדים.

130. אדם במו הנאשמ פצל מחלך ממערכת טרור רצחנית וצמאת דם, דם אזרהוב חפים מפשע טבל
חטאמ היה היותם יהודים החיים בארץ ישיאל יאשר מולח הרע היה שקרלעי לאיטובוס או
למכנעה או לבית חפה בעת שריצח מתאבד הגיע למקום הימצאם יקטל אותם בריגע אהד.

131. אדם כמוגו של הנאשם בן מות הוא ייש הגזר עליו דין בוית.

132. סבורים אנו כי ראי היה להוציח על הנאשם שבפנייני יאור מעטי עונש מות, עונש מות
בחירה שבפני הוא עונש דין צדר.

133. כאין שאין בסמכותני ושיעית בן ועל מגת לבנא את עמדתנו לכבי מעטיי הטפטים של הנאשם
אנו קוריים על הנאשם צינע נאמר צרלם נפיד בגן כי אדם אשר נרצח כתוצאה מהפעלת משוני
החברה שיצר הנאשם, נאכרי יעולם יהיו מעצובה.





134. בנוסף לכך צר אף שעתהני על האשם עוגעי נאסר עירם במעצכר בגין מעשי הרצח להם היה
שותף הא ניתן להתעלם מהעבירות הנוספרת שבוצעו , מפעיעתם של מאות אנשים כתוצאה ממעשי-
ידיו ויש להעגישו את בגין העבירות הנוספות בעונשיה נפסק.

135. לאור כל האמור לעיל אני גוזרים   על האשם 66 מאסרי עולם בגין רציחתם של 66 בני אדם
כאשר כל מאסרי העולם יהיו במעצבר זה היה.

בגין כל יתר העבירות שבוצעו האשב אני גוזרים  מאסר עולם נוסף  שיהיה אף הוא במעצבר לכי
מאסרי העולם האחרים שגזרנני עליו.

יפית ערעור תוך 30 יום מהיום.

ניתן והודע היום, 9.11.03 בפומכי יבמועד הרובע הצבא", האשם ובא-כוחו.

_____          _____          _____
רס"ן אלי בר-און            סא"ל נתנאל בנישו            סא"ל חנן רובינשטיין
שרפט                      אב"ד                        שרפט



עמוד 1 מתוך 1

בלמ"ס
צבא הגנה לישראל
جيش الدفاع الاسرائيلي

30/11/2004

יהודה

תיק בימ"ש 3380/03

## פקודת מאסר

לשוטר משטרת ישראל / סוהר / חייל

אני, שופט בית המשפט הצבאי, מצווה בזאת לאסור את:

עבדאללה ע'אלב עבדאללה ברגותי    1162167

----------------------------------------------------------------

ולמסרו עם פקודת מאסר זו לסוהר בבית הסוהר. על מנת שיהיה אסור ל:

67 מאסרי עולם.

פקודה זו משמשת אסמכתא לעוצרו ולהחזיקו במאסר על ידי כל מי שמוסמך לכך בדין.

סא"ל נתנאל בנישו

המשנה לנשיא

ניתן ביום 30/11/2004

לשימוש המשטרה / בית הסוהר

פרטי האסיר:

עבדאללה ע'אלב עבדאללה ברגותי    1162167

הנ"ל התקבל למתקן הכליאה / בית סוהר ביום _____

נאמן למקור