# EXHIBIT A.433



PLAINTIFF'S
EXHIBIT
433

(Judea and Samaria) /          The Military Prosecution v. Mohamed Hassan Ahmed Arman

### The Military Court
### Judea
### - Transcript -

Court hearing dated:               Before the Deputy:    Lieutenant Colonel Nathaniel Benichou
November 20, 2003

Judge:    Captain Avraham Ainhoren
Judge:    Captain Eli Tusia-Cohen

Prosecutor: Judicial Officer Rostislav Pasak
Defense Counsel: Adv. Akram Samara
**Defendant: Mohamed Hasan Ahmed Arman, Identity No. 901056259 / IPS – present**
**Defendant: Walid Abed Aziz Abed Hadi Anjas, Identity No. 906448105 / IPS – present**

Stenographer: Corporal Sivan Kadmi
Interpreter: Sergeant Naaman Madi

### Sentence

We first wish to state that because the two Defendants in the above mentioned cases acted together, we have seen fit to write their verdicts together.

Some of the worst indictments that have been seen by this court have been filed against the Defendants, in which the military prosecution listed the terrible acts in which the Defendants were involved, acts which lead to the deaths of 35 people and the injury of hundreds more.

The Defendant in Case 3925/02, Mohamed Hassan Ahmed Arman, was enlisted in late 2001 into the ranks of the Az A-Din Al-Qassam Brigades, the military arm of the Hamas Organization, by Ibrahim Hamad. That same individual, Ibrahim, charged the Defendant to enlist others into the Organization while at the same time appointed the Defendant as the contact person between him and Hamas operatives who operated out of the territory of the State of Israel as bearers of Israeli identity cards, members of a cell that came to be known by the name the "Silwan" cell.

Within the framework of this capacity, the Defendant served as the right hand man of Ibrahim Hamad. The Defendant purchased for him weapons, chemicals and cellular handsets that were intended for the activation of explosive devices and coordination of the joint activity of the terrorist network that operated under his orchestration. The Defendant also underwent military training that trained him in the preparation of explosive devices.

[Stamp] P 7: 1

At the same time, the Defendant enlisted three others into the ranks of his Organization, including the Defendant in Case 3931/01, Walid Abed Aziz Abed Hadi Anjas. This Defendant, who was a member of the Islamic students' movement back in 1995, was trained by Mohamed Arman and become his accessory and accomplice in the execution of the bombing attacks, some of which were extremely deadly. This outline of attacks, ten

[Stamp] P 7: 1 [continued]

(Judea and Samaria) /          The Military Prosecution v. Mohamed Hassan Ahmed Arman

in number, is amazingly similar. After receiving a direction from Ibrahim Hamad to execute an attack within the Green Line, Mohamed Arman approached Waal Qassam, a leader of the Israeli cell, who in turn found, through members of his cell a suitable place for carrying out that attack. Arman was updated by Waal and returned with the required information to his commander. Then the two Defendants manufactured explosive devices or received them from Ibrahim Hamad, transported them to Waal Qassam and delivered them to him, preparing the explosive devices for operation and instructing Waal on how to use them. In both cases in which the attacks were carried out using suicide terrorists, the two Defendants also led the suicide bomber, who had already been equipped with an explosive device, to a meeting place at which he would be handed over to the responsibility of Waal Qassam.

In this manner, the Defendants took part in the bombing attack that occurred at the Moment Café in Jerusalem on March 9, 2002. The Defendant Arman received a request from his supervisor Ibrahim Hamad to prepare an attack inside Israel with the intent of causing the deaths of as many people as possible. Ibrahim Hamad informed Arman that there was a person who was prepared to carry out a suicide attack and asked him to approach Waal Qassam so that he would find a suitable place for carrying out the attack. Arman gave the instructions of Hamad to Qassam and after a few days, Qassam returned to him and informed him that the Moment Café had been found suitable for carrying out the attack. The Defendant Arman checked the access routes from Ramallah to Beit Hanina along with Walid Anjas and once they learned that there were no security forces on the way, the two led the suicide terrorist, who carried on his person an explosive belt, to the area of Beit Hanina, where they met Waal Qassam. Waal Qassam led the suicide terrorist to the Moment Café. At about 10:30 p.m., the terrorist entered and detonated the explosive belt that was on his person.

As a result of this act, the following persons were murdered:

**The late Avraham Rachamim**

**The late Nir Borochov**

**The late Limor Ben Shoham**

**The late Dan Aimoni**

**The late Danit Dagan**

[Stamp] P 7: 2

**The late Uri Felix**

**The late Baruch Lerner**

**The late Tali Eliyahu**

**The late Livnat Dvash**

**The late Orit Ozerov**

**The late Natanel Cochavi**

In this attack, 65 additional people were injured.

Likewise, the Defendants were accomplices in a similar attack that occurred at the Sheffield Club in Rishon le Zion on May 7, 2002. There too, Ibrahim Hamad informed the Defendant Arman that he had a person who was prepared to serve as a human bomb. On the said day, the Defendant Anjas led this terrorist to the Safa area, where they met the Defendant Arman, who delivered to the suicide terrorist an explosive belt and an additional explosive device that was put inside a bag. Arman transported the suicide terrorist in his vehicle to Beit Iksa, where he was transferred to the responsibility of Waal Qassam, who transported him to the said club.

At about 10:50 p.m., the suicide terrorist entered the club and detonated the explosive devices that were in his possession, thus causing the deaths of:

[Stamp] P 7: 2 [continued]

(Judea and Samaria) /          The Military Prosecution v. Mohamed Hassan Ahmed Arman

**The late Rachamim Kimchi**

**The late Rafael Chaim**

**The late Anat Temporush**

**The late Avraham Biaz**

**The late Eti Bablar**

**The late Yitzhak Bablar**

**The late Israel Shikar**

**The late Shoshana Magmari**

**The late Sharuk Rassan**

**The late Nava Hinawi**

**The late Nir Lobatin**

**The late Regina Malkah Boslan**

**The late Daliah Massah**

**The late Pnina Hikri**

**The late Edna Cohen**

and 59 additional people were injured.

Likewise, the Defendants executed, on July 31, 2002, the bombing attack at the Frank Sinatra Cafeteria on the campus of the Hebrew University. In this attack, the Defendant Arman did not make do with transporting the explosive device but also manufactured it with his own hands and thereafter traveled with the Defendant Anjas and delivered it to Waal Qassam. They explained to him how to activate it. The explosive device was laid for the first time on July 28, 2002, by members of the "Silwan Cell" in the cafeteria, but as a result of a fault did not explode.

[Stamp] P 7: 3

Therefore, it was returned to the Defendants, repaired by Arman and delivered again by the two to Waal Qassam. The members of the "Silwan Cell" laid the explosive device in the cafeteria and detonated it at about 1:30 p.m. because according to information that they had gathered, at that time there was supposed to be a large concentration of persons at the site.

In this attack, the following individuals lost their lives:

**The late Daphna Spruch**

**The late Marla Anne Bennett**

**The late Dina Carter**

**The late Benjamin Thomas Blustein**

**The late Revital Barashi**

**The late David (Diego) Ladowski**

**The late Levina Shapira**

**The late Janis Ruth Coulter**

**The late David Gritz**

In addition, 81 additional people were injured.

Likewise, the Defendant Arman was behind the execution of bombing attacks against the fuel tanker that exploded at the "Pi Glilot" site on May 23, 2002, laying of explosive devices on the railway track near Lod on June 30, 2002 and near Kfar Gvirol on July 21, 2002, attacks in which five civilians were injured, and an additional attack against a fuel tanker in the Pisgat Ze'ev neighborhood on August 7, 2002. Walid Anjas assisted the Defendant in various ways in the preparation of these attacks. It should also be noted that the arrest of Arman and Qassam also prevented the execution of attacks at a restaurant at Re'em Junction and at the Tzavta club in Tel

[Stamp] P 7: 3 [continued]

(Judea and Samaria) /        The Military Prosecution v. Mohamed Hassan Ahmed Arman

Aviv, for which attacks Mohamed Arman had already prepared explosive devices that had been delivered to Waal, with the assistance of Anjas. Finally, we must point out that the Defendant Mohamed Arman was also behind a list of conspiracies for carrying out additional bombing attacks and shooting attacks.

The Prosecutor, in his summations, asked us to sentence the Defendants to 36 cumulative terms of life imprisonment, indicating the need to emphasize the sanctity of life versus the lowly actions of the Defendants, who acted with determination and persistence, even at the price of sacrificing embers of their own people, to murder innocent civilians. The Prosecutor stated that the remaining members of the cell that the Defendant Arman ran were sentenced at the District Court in Jerusalem to cumulative terms of life imprisonment for each of the persons whom they had killed and to long years of imprisonment for their other acts. The Prosecutor added that Mohamed Arman had already faced this court in 1999, and claimed in a two-faced manner that he had returned to his prime and wished to live a normative life.

The Defense Counsel did not say much and contended that the part of the Defendants was not central and boiled down to assistance only. Therefore, the Defense Counsel asked the Court to sentence them to prison terms measured in long years or alternatively a single life imprisonment term.

Within the framework of the pleas for sentencing, we were also forced to hear the last words of Arman, which his accomplice Anjas joined. The two tried to justify their acts due to the operations of the Israel Defense Forces in the Area. We shall immediately emphasize that this attempt will not work. It is enough to clarify again that the laws of war strictly prohibit the deliberate attacking of civilians, whatever the circumstances may be. It is true that in recent years we have witnessed an increase in terrorist acts whose aim is similar to that of the Defendants standing before us today, and it concentrates around attacking innocent civilians. However, this cannot justify such unacceptable acts and change the basic human morality to which we are bound.

Moreover, through the defamatory words of the Defendant, we could learn their danger to society and their gross contempt human life, even for the lives of members of their own people, for there was much cynicism in the words of the Defendants who justified the sacrificing of the Palestinian People for its "liberation", while in fact they took no risk at all and sent "human bombs" who were members of their own people to their deaths without mercy for them or of course for their innocent victims.

[Stamp] P 7: 4

The actions of the Defendants are not acts of heroism, as some residents of the Area may erroneously think, but lowly acts of heartless people who sought to strike, time after time, at the most exposed individuals without taking any risk at all by themselves.

But beyond the inflammatory statements that the Defendants made, their facial expressions and smiles when the Prosecutor mentioned their atrocious deeds and the memory of the victims cannot leave any doubt as to their lack of conscience. It seems that the lives of others are meaningless to them.

Arch-criminals such as the Defendants, despite not staining their hands with blood, bear responsibility that is not less than and even exceeds those whom they dispatched on attacks.

The attempt of the defense counsel to down play the severity of the acts of the Defendants will not work either. The Defendants contributed, with willingness and great desire, sickening persistence and determination, to the occurrence of the events, in guidance and supplying live and material means. It may be said, without straying from the truth, that Mohamed Arman was the living spirit behind the attacks and he was the one who translated, with the aid of Walid Anjas, the destructive wishes of his commander Ibrahim Hamad

[Stamp] P 7: 4 [continued]

(Judea and Samaria) /        The Military Prosecution v. Mohamed Hassan Ahmed Arman

into actions. The acts of the Defendants give rise to revulsion in their own right, but it must also be remembered how much more severe the outcomes of their acts would have been if the other attacks that they had conceived and attempted to execute would have succeeded in full, particularly the one that was aimed against the "Pi Glilot" site, which was barely spared a disaster of dimensions that we hope we shall never witness.

The Defendants carried out acts of murder, killing and attacks on civilians, after precision planning, with chilling equanimity and with a wish to kill as many Jews as possible. For this purpose, their direction to the members of the Israeli cell was clear and boiled down to the need to look for crowded places without any consideration for the identity of the victims. A person who has his heart set on taking the lives of women, men and children without mercy is not fit to be in the society of human beings and we also believe that his thirst for spilling human blood has reduced him to such a low level that it is doubtful whether he should be called a human being.

The Defendant Arman served as the right hand man of his handler in the Hamas organization and supervised, with the assistance of Anjas, the well oiled killing machine that he constantly fed, stooping to any means, not having mercy on anyone, with the sole purpose of destroying, killing and wiping out Israelis and Jews indiscriminately.

The heart may weep at the long list of victims who belong not only to the backbone of Israeli society but also Jews at large, whose lives were suddenly extinguished by lowly terrorists. In view of the unbearable loss and suffering, we would want to lower our heads in silence, because what has been done cannot be undone, but we cannot remain indifferent to the sound of the blood of our brethren calling to us from the ground. Our strength as a court can do little to help. We cannot take time back and we cannot repay the Defendants in kind. The only thing we can do in view of the atrocious acts of the Defendants is to order them removed from human society permanently. Handing down this sentence, which has an air of eternity and terminality to it, however small in scale in comparison with the suffering and the cruel fate that was inflicted on the innocent victims and their families, is what is necessary, even if it cannot cure the wrongs.

We agree with the Military Prosecutor that emphasizing the sanctity of the life of each of the victims requires handing down a separate life imprisonment sentence for each of the terrible murders. This approach is universal both in the Area and in Israel. The words of Honorable Justice Heshin apply well here, when he stated:

[Stamp] P 7: 5

"A person – every person – is a world unto himself. A person – every person, is one, unique and special. Whoever used to be will not come again and whoever has gone will not return. Maimonides has already taught us of the uniqueness of man (Book of Judges, Hilchot Sanhedrin 12, 3):

"...man was created alone in the world, to teach that whosoever destroys a single soul of the world, it is as though he had destroyed a complete world; and whosoever preserves a single soul in the world, it is as though he had preserved a complete world. For all those who come to the world in the stamp of the first man are created, and yet not one of them resembles his fellow. Therefore every single person may to say: the world was created for my sake".

That is man, and that is his uniqueness. Who may say the same thing about a book or a vault? We are told that the uniqueness of man is because God created him in his image as his figure: "in his own image, in the image of God created him..." (Genesis 1:27).

[Stamp] P 7: 5 [continued]

(Judea and Samaria) /        The Military Prosecution v. Mohamed Hassan Ahmed Arman

> When I say to myself that the uniqueness of man – every man – is given to him because he was created in the image of Adam, that is the beginning of the Bible, and that is its end too.
>
> And this applies to the offense of murder. And with respect to the sentence that is to be inflicted on he who has murdered, LIFE imprisonment for the offense of murder is indeed imprisonment until the end of life. Conceptually speaking, and this is the way of nature, life imprisonment terms are not cumulative. But it seems that we shall not be able to express the extent of the atrocity embodied in the acts of he who has murdered many unless we inflict cumulative sentences on him.
>
> "Whoever sheds human blood, by humans shall their blood be shed" (Genesis 9:6).
>
> In our times and places we no longer shed the man of blood. It is also not possible to execute a person twice. But cumulative life imprisonment sentences may be handed down to he who has taken life maliciously.
>
> Life imprisonment for every person and soul." (Criminal Appeal 1742/91 – Ami Popper v. The State of Israel. Supreme Court Verdict 51(5), 289, pp. 304-305.).

We find nothing wrong in the request of the prosecution for us to hand down an additional sentence of life imprisonment for the additional offenses of which the Defendant was convicted.

We have found special severity in the fact that this is not the first time that Mohamed Arman has been standing trial in this court; despite having served two prison terms previously, this was not enough to deter him and he rapidly returned to his unrighteous track, yet with more vigor.

As an endnote, although we could not escape the bad sensation of helplessness before the absolute evil that the Defendants have inflicted, we must do our job and we decide unanimously to sentence each of the Defendants to 36 cumulative terms of life imprisonment.

**A right of appeal within 30 days is conferred.**

**Handed down and announced this day, November 30, 2003, in public and in the presence of the parties.**

[Stamp] P 7: 6

| Judge | Presiding Judge | Judge |
|-------|-----------------|-------|

Avraham Ainhoren 54678313-/

The text of this document is subject to wording and editing changes.

Nevo publishing Ltd. nevo.co.il the Israeli legal database

[Stamp] P 7: 6 [continued]

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARK I. SOKOLOW, *et al.*, | |
| Plaintiffs, | No. 04 Civ. 00397 (GBD) (RLE) |
| vs. | |
| THE PALESTINE LIBERATION ORGANIZATION, *et al.*, | |
| Defendants. | |

## DECLARATION OF RINA NE'EMAN

Rina Ne'eman hereby certifies as follows:

1.   The attached translation from Hebrew to English is an accurate representation of the document received by Rina Ne'eman Hebrew Language Services, to the best of my knowledge and belief. The document is designated as P7: 1-6.

2.   I am a professional translator with a B.A. in International Relations from the Hebrew University of Jerusalem (Israel) and 30 years of translation experience. I am fluent in Hebrew and English, and I am qualified to translate accurately from Hebrew to English.

3.   To the best of my knowledge and belief, the accompanying text is a true, full and accurate translation of the Hebrew-language document bearing the bates number, P7: 1-6.

_____
Rina Ne'eman

ss.: New Jersey

On the [24th] day of February, 2014 before me, the undersigned, personally appeared Rina Ne'eman, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is signed to this Declaration and acknowledged to me that he executed the same in his capacity, and that by his signature on this Declaration, the individual executed the Declaration.

Sworn to me this
23rd day of February, 2014


Notary Public

HALA Y GOBRIAL
Notary Public
State of New Jersey
My Commission Expires Apr. 18, 2017
I.D.# 2419990

בית המשפט הצבאי
י ה ו ד ה
- פ ר ו ט ו ק ו ל -

דיון בית משפט מיום: 30/11/2003                    בפני המשנה לנשיא: סא״ל נתנאל בנישו
                                                    השופט: סרן אברהם איינהורן
                                                    השופט: סרן אלי תוסיה -

כהן
תובע: קמ״ש רוסטיסלב פסק
סניגור: עו״ד אכרם סמארה

**נאשם: מחמד חסאן אחמד ערמאן    ת.ז.: 901056259 / שב״ס - נוכח**
**נאשם: וליד ע/עזיז ע/האדי אנג׳אס    ת.ז. 906448105 / שב״ס – נוכח**

רשמת: רב״ט סיון קדמי
מתורגמן: סמל נעמן מאדי

## גזר דין

בתחילת דברינו מבקשים אנו לציין כי מאחר ששני הנאשמים בתיקים הנ״ל פעלו
בצוותא חדא, מצאנו לנכון לכנוס לאחד את גזר דינם.

נגד הנאשמים הוגשו שני כתבי אישום מן החמורים שנראו בבימ״ש זה, ובהם גוללה
התביעה הצבאית את המעשים הנוראיים בהם היו מעורבים הנאשמים, מעשים
אשר הביאו למותם של 35 בני אדם ולפציעתם של מאות נוספים.

הנאשם בתיק 3925/02, מחמד חסן אחמד ערמאן, גויס בסוף שנת 2001 לשורות
גדודי עז א-דין אל-קסאם, הזרוע הצבאית של ארגון החמאס, על ידי אברהים
חאמד. אותו אברהים הטיל על הנאשם לגייס נוספים לארגון ובמקביל מינהו לאיש
הקשר בינו לבין פעילי חמאס אשר פעלו מתוך שטח מדינת ישראל בהיותם נושאים
בתעודות זהות ישראליות, חברי חוליה אשר זכתה לכינוי, חולית "סילואוני".

במסגרת תפקידו זה שימש הנאשם כמוציא והמביא של אברהים חאמד. הנאשם
רכש עבורו כלי נשק, חומרים כימיים ומכשירים סלולריים שיועדו להפעלת מטעני
חבלה ולתיאום פעילותם המשותפת של רשת הטרור שפעלה בניצוחו. הנאשם אף
עבר אימונים צבאיים שהכשירוהו בהכנת מטעני נפץ.

במקביל גייס הנאשם שלושה נוספים לשורות הארגון, בינהם הנאשם בתיק
3931/02, וליד ע/ עזיז ע/האדי ע׳אנג׳אס. נאשם זה, שחבר עוד בשנת 1995 לתנועת
התלמידים האיסלמית, אומן ע״י מחמד ערמאן והפך לעוזרו ושותפו להוצאתם
לפועל של פיגועי תופת, חלקם קטלניים במיוחד. מתווה פיגועים אלה, עשרה

נבו הוצאה לאור בע"מ nevo.co.il   המאגר המשפטי הישראלי

http://www.nevo.co.il/psika_word/army/02039310-f22.doc

P 7: 1

במספרם, דומה להפליא. לאחר קבלת הנחייה מאברהים חמאד להוציא לפועל פיגוע
בתחומי הקו הירוק, פנה מחמד ערמאן לואאל קאסם, מנהיג החוליה הישראלית,
וזה איתר באמצעות חברי חולייתו מקום מתאים לביצוע אותו פיגוע. ערמאן עודכן
ע"י ואאל וחזר עם האינפורמציה הנדרשת למפקדו. או אז יצרו שני הנאשמים מטעני
חבלה או קיבלו אותם לרשותם מידי אברהים חמאד, הובילו אותם לואאל קאסם
ומסרו אותם לידיו, תוך הכנת המטענים לפעולה והדרכתו של ואאל אודות אופן
השימוש בהם. בשניים מהמקרים בהם בוצעו הפיגועים באמצעות מחבלים
מתאבדים אף הובילו שני הנאשמים את המתאבד, שכבר צוייד בחגורת נפץ, למקום
מפגש בו נמסר לאחריותו של ואאל קאסם.

כך נטלו הנאשמים חלק בפיגוע התופת שהתרחש בקפה "מומנטו" בירושלים ביום
09/03/02. הנאשם ערמאן קיבל פנייה מהאחראי עליו אברהים חמאד להכנת פיגוע
בתוך מדינת ישראל בכוונה לגרום למותם של אנשים רבים ככל האפשר. אברהים
חמאד מסר לערמאן כי ישנו אדם המוכן לבצע פיגוע התאבדות וביקש ממנו כי יפנה
לואאל קאסם על מנת שזה יאתר מקום מתאים לביצוע הפיגוע. ערמאן מסר את
הוראות חמאד לקאסם ולאחר מספר ימים חזר אליו קאסם והודיע לו כי קפה
"מומנטו" נמצא מתאים לביצוע הפיגוע. הנאשם ערמאן בדק את דרכי הגישה
מרמאללה לבית חנינה ביחד עם וליד אנג'אס ומשנוכחו לדעת כי אין כוחות בטחון
בדרך הובילו השניים את המחבל המתאבד שנשא על גופו חגורת נפץ לאיזור בית
חנינה, שם נפגשו עם ואאל קאסם. ואאל קאסם הוביל את המחבל המתאבד לקפה
"מומנטו". בסמוך לשעה 22:30 נכנס המחבל ופוצץ את חגורת הנפץ שהייתה על גופו.

כתוצאה ממעשה זה נרצחו:

**אברהם רחמים ז"ל**
**ניר בורוכוב ז"ל**
**לימור בן שוהם ז"ל**
**דן אימוני ז"ל**
**דנית דגן ז"ל**
**אורי פליקס ז"ל**
**ברוך לרנר ז"ל**
**טלי אליהו ז"ל**
**לבנת דבש ז"ל**
**אורית אוזרוב ז"ל**
**נתנאל כוכבי ז"ל**

בפיגוע זה אף נפצעו 65 בני אדם נוספים.

כך היו הנאשמים שותפים לפיגוע דומה שארע במועדון "שפילד קלאב" בראשון
לציון ביום 07/05/02. גם שם הודיע אברהים חמאד לנאשם ערמאן כי ברשותו אדם
המוכן לשמש כפצצה אנושית. ביום האמור הוביל הנאשם אנג'אס מחבל זה לאיזור
צפא שם נפגשו עם הנאשם ערמאן שמסר למתאבד חגורת נפץ ומטעני חבלה נוסף
שהטמנה בתוך תיק. ערמאן הסיע את המחבל ברכבו את המחבל המתאבד לבית איכסא שם נמסר
לאחריות ואאל קאסם אשר הוביל אותו למועדון האמור.

בסמוך לשעה 22:50 נכנס המחבל המתאבד למועדון ופוצץ את מטעני החבלה שהיו
ברשותו ובכך גרם למותם של:

**רחמים קמחי ז״ל**
**רפאל חיים ז״ל**
**ענת טרמפורוש ז״ל**
**אברהם בייז ז״ל**
**אתי בבלאר ז״ל**
**יצחק בבלאר ז״ל**
**ישראל שיקאר ז״ל**
**שושנה מזגרי ז״ל**
**שארוק רסאן ז״ל**
**נואה חינאווי ז״ל**
**ניר לובטין ז״ל**
**רגינה מלכה בוסלן ז״ל**
**דליה מסה ז״ל**
**פנינה הקרי ז״ל**
**עדנה כהן ז״ל**

ונפצעו 59 אדם נוספים.

כך הוציאו לפועל הנאשמים, ביום 31/07/02, את פיגוע התופת בקפיטריה על שם פרנק סינטרה בקמפוס האוניברסיטה העברית. כאשר בפיגוע זה הנאשם ערמאן לא הסתפק בהובלת המטען אלא ייצר אותו במו ידיו ולאחר מכן נסע ביחד עם הנאשם אנג׳אס ומסרוהו לואאל קאסם תוך שהם מסבירים לו כיצד להפעילו. המטען הונח בפעם הראשונה ביום 28/07/02 ע״י חברי ״חוליית סילואן״ בקפיטריה, אך כתוצאה מתקלה לא התפוצץ. אשר על כן, הוחזר לנאשמים, תוקן ע״י ערמאן ונמסר בשנית ע״י השניים לידי ואאל קאסם. חברי ״חוליית סילואן״ הניחו את המטען בקפיטריה ופוצצו אותו בסמוך לשעה 13:30 מאחר שלפי המידע שאספו בשעה זו אמור להיות ריכוז גדול של בני אדם במקום.

בפיגוע זה קיפחו חייהם :

**דנה שפרוך ז״ל**
**מרלה אן בנט ז״ל**
**דינה קרטר ז״ל**
**בנימין תומס בלוטשטיין ז״ל**
**רויטל בראשי ז״ל**
**דוד (דיאגו) לדובסקי ז״ל**
**לוינא שפירה ז״ל**
**ג׳ניס רות קולטר ז״ל**
**דוד גריץ ז״ל**

כמו כן, נפצעו 81 בני אדם נוספים.

כך עמד הנאשם ערמאן מאחורי ביצוע פיגועי התופת במיכלית הדלק שהתפוצצה באתר ״פי גלילות״ ביום 23/05/02, הנחת מטעני חבלה על פסי הרכבת בסמוך ללוד ביום 30/06/02 ובסמוך לכפר גבירול ביום 21/07/02, פיגועים בהם נפצעו חמישה אזרחים, ופיגוע נוסף במיכלית דלק בשכונת פסגת זאב ביום 07/08/02. וליד אנג׳אס סייע לנאשם בדרכים שונות בהכנת פיגועים אלה. מן הראוי לציין עוד כי מעצרם של ערמאן וקאסם אף מנע ביצוע פיגועים במסעדה בצומת ראם ובמועדון צוותא בתל

3

אביב, פיגועים להם כבר הכין מחמד ערמאן מטעני חבלה שנמסרו לואאל והכל
בסיועו של אנג'אס. לבסוף נציין כי הנאשם מחמד ערמאן אף עמד מאחורי שורה של
קשרים לביצוע פיגועי תופת ופיגועי ירי נוספים.

התובע בסיכומיו לעונש ביקש כי נטיל על הנאשם 36 מאסרי עולם מצטברים,
בציינו את הצורך בהדגשת קדושת החיים מול מעשיהם השפלים של הנאשמים אשר
פעלו בנחישות ובהתמדה, אף במחיר הקרבת בני עמם, לשם רצח אזרחים תמימים.
התובע ציין כי יתר חברי החולייה אותה הפעיל הנאשם ערמאן, נשפטו בביהמ"ש
המחוזי בירושלים לעונשי מאסר עולם מצטברים בגין כל אחד ואחד מבני אדם
אותם קטלו ולשאות מאסר ארוכות בגין יתר מעשיהם. התובע הוסיף וציין כי מחמד
ערמאן כבר עמד בפני ביהמ"ש זה בשנת 1999 ומתוך דו פרצופיות טען כי חזר
למוטב וכי רצונו לחיות חיים נורמטיביים.

הסניגור המעיט בדברים וטען כי חלקם של הנאשמים לא היה מרכזי והסתכם
בסיוע. על כן, ביקש הסניגור כי ביהמ"ש יטיל עליהם עונשי מאסר הנמדדים בשנים
ארוכות או לחילופין מאסר עולם אחד.

במסגרת הטיעונים לעונש נאלצנו אף לשמוע את דבריו האחרונים של ערמאן,
אליהם הצטרף שותפו אנג'אס. השניים ניסו לכרוך את מעשיהם עם פעולות צה"ל
באיזור. נדגיש מייד כי נסיון זה לא יצלח. די לחזור ולהבהיר כי דיני המלחמה
אוסרים בתכלית האיסור פגיעה מכוונת באזרחים יהיו נסיבותיה אשר יהיו. אמת,
עדים אנו בשנים האחרונות להגברת מעשי הטרור אשר מטרתם דומה לזו של
הנאשמים העומדים בפנינו היום והיא כולה מתרכזת סביב הפגיעה באזרחים חפים
מפשע. אולם, אין בכך כדי להביא להצדקת מעשים פסולים כאלה ולשנות מן
המוסר האנושי הבסיסי בו אנו דבקים.

יתרה מזו, באמצעות דברי הבלע של הנאשמים יכולנו לעמוד על מסוכנותם לחברה
ועל זלזולם הבוטה בחיי אדם אף אם אלה שייכים לבני עמם, שהרי כמה ציניות
בדברי הנאשמים אשר הרימו על נס את הקרבת העם הפלסטיני ל"שחרורו", כאשר
בפועל לא הסתכנו במאומה ושלחו למותם "פצצות אנושיות" מבני עמם ללא כל
רחם עליהם וכמובן לא על קורבנותיה התמימים.

לא מעשי גבורה הם מעשי הנאשמים, כפי שאולי יטעו חלק מתושבי האיזור לחשוב,
אלא מעשים שפלים של מוגי לב שחיפשו לפגוע, פעם אחר פעם בחשופים ביותר
מבלי שהסתכנו כאמור, כלל ועיקר.

אף מעבר לדברי ההסתה אותם השמיעו הנאשמים, הבעת פניהם וחיוכם את הזכיר
התובע את רוע מעלליהם ואת זכרון קורבנותיהם, אינם יכולים להותיר ספק באשר
לחוסר מצפונם. ניכר היה כי חיי זולתם הינם כאין וכאפס עבורם.

רבי עבריינים כנאשמים, על אף שלא החתימו את ידיהם בדם, אחריותם אינה
נופלת ואף עולה על זו של אלה אותם שלחו לפגוע.

נסיונו של הסניגור להמעיט מחומרת מעשיהם של הנאשמים אף הוא לא יצלח.
הנאשמים תרמו בחפץ לב, ברצון עז, בהתמדה ובנחישות מבחילים, להתרחשות
הפיגועים הן בהנחיה והן באספקת אמצעים חיים או חפציים. ניתן לומר, מבלי
לחטוא אל האמת, כי מחמד ערמאן היה הרוח הרוח החיה מאחורי הפיגועים והוא זה
שתירגם, בסיועו של וליד אנג'אס, את רצונות ההרס של מפקדו אברהים חאמד

נבו הוצאה לאור בע"מ    nevo.co.il    המאגר המשפטי הישראלי

http://www.nevo.co.il/psika_word/army/02039310-f22.doc

P 7: 4

לכדי מעשים. מעשי הנאשמים מעוררים פלצות בזכות עצמם ואולם יש גם לזכור עד כמה חמורות יותר היו יכולות להיות תוצאות מעשהם אם יתר הפיגועים אותם הגו ואף ניסו לבצע היו מצליחים במלואם ובעיקר זה שכוון נגד אתר ״פי גלילות״, אשר כפסע היה בינו לבין אסון בממדים שאנו תקווה שלא נכירם לעולם.

הנאשמים ביצעו מעשי רצח, הרג ופגיעה באזרחים, לאחר תכנון מדוקדק בקור רוח מקפיא ומתוך רצון לקטול כמה שיותר יהודים. לשם כך התחיירתם לחברי החוליה הישראלית היתית ברורה והסתכמה בצורך בחיפוש מקומות הומי אדם ללא כל התחשבות בזהותם של הקורבנות. מי ששם את כל מאוויו בקיפוח חייהם של נשים, גברים וטף ללא כל רחם אינו ראוי להמצא בחברת בני אנוש ואף סבורים אנו כי צימאונו לשפוך דם הורידוהו לדרגה כה שפלה שספק רב אם ראוי הוא לכינוי אדם.

הנאשם ערמאן שימש כמוציא והמביא של האחראי עליו בארגון החמאס ופיקח בסיועו של אנגאם על מכונת הרג משומנת היטב, אותה דאג להזין כל העת כאשר לא בחל בשום אמצעי, לא חס על איש והכל למטרה אחת ויחידה, להשמיד, להרוג ולאבד ישראלים ויהודים באשר הם.

הלב נקרע למקרא רשימת הקרבנות הארוכה המאפיינים לא רק את כל שדרות החברה הישראלית אלא אף את אחד יהודי הניכר, אשר בין רגע נגדע פתיל חייהם בידי מחבלים בני עוולה. לנוכח האבדן והסבל הקשים מנשוא, היינו רוצים להרבין ראש ולהחריש, שהרי את הנעשים אין להשיב ואולם לא נוכל להושיב את הנשאר אדישים למשמע כל דמי אחינו הזועקים אלינו מן האדמה. כוחנו כבית משפטו דלמטה דל מלהושיע. לא נוכל להחזיר את הגלגל לאחור ואף לא נוכל לנהוג בנאשמים מידה כנגד מידה. כל שבכוחנו לעשות לנוכח מעשיהם המזוויעים של הנאשמים הוא לצוות על הרחקתם מחברת אדם בצורה תמידית. הטלת עונש זה, אשר בו נופך של נצחיות וסופיות, דגמגא בזעיר אנפין, לסבל ולגורל האכזר שנגזר על הנרצחים התמימים ועל משפחותיהם, מחוייב המציאות, הגם שאין בו כדי לרפא.

תמימי דעים אנו עם התובע הצבאי כי הדגשת קדושת חייו של כל אחד מן הנרצחים מחייבת הטלת עונש מאסר עולם נפרד בגין כל אחד ואחד ממעשי הרצח הנוראים. גישה זו הינה נחלת הכלל הן באיזור והן בישראל. ויפים הם דבריו של כב׳ השופט חשין אשר קבע:

״אדם - כל אדם - הוא עולם לעצמו. אדם - כל אדם - הוא אחד, יחיד ומיוחד. ואין אדם כאדם. מי שהיה לא עוד יהיה ומי שהלך לא ישוב. וכבר לימדנו הרמב ״ם על ייחודו של האדם (ספר שופטים, הילכות סנהדרין, יב, ג׃)

״נברא אדם יחידי בעולם, ללמד: שכל המאבד נפש אחת מן העולם - מעלין עליו כאילו איבד עולם מלא, וכל המקיים נפש אחת בעולם - מעלין עליו כאילו קיים עולם מלא. הרי כל-באי עולם בצורת אדם הראשון הם נבראים ואין פני כל-אחד מהם דומין לפני חברו. לפיכך כל-אחד ואחד יכול לומר: בשבילי נברא העולם.״

כך הוא האדם, וזה ייחודו. מי הוא זה ואיזה הוא שיאמר כך על ספר או על כסתא? אומרים לנו כי ייחודו של האדם בא לו משום שהאלוהים בראו בצלמו כדמותו: ״בצלמו בצלם אלוהים ברא אותו...״ (בראשית א׳ כ״ז).

כשאני לעצמי אומר, כי ייחודו של האדם - כל אדם - בא לו משום שנברא בצלם האדם. זו תחילתו של מיקרא. זה גם סופו.

כך הוא באשר לעבירת הרצח. כך הוא גם באשר לעונש שיוטל על מי שרצח. אכן, מאסר עולם בעבירת רצח הוא מאסר עד צאת הנשמה. מבחינה מושגית - וזה דרך הטבע - אין מאסרי עולם מצטברים. ואולם דומה כי לא נוכל לבטא את עומק הזוועה שבמעשהו של מי שרצח את הרבים אלא אם נטיל עליו עונשים מצטברים.

"שופך דם האדם באדם דמו יישפך" (בראשית ט׳ ו׳).

בימינו ובמקומומנו אין עוד שופכים - כמעשה-ממלכה - את דם האדם. גם אין ניתן להוציא להורג אותו אדם שתי פעמים. אך מאסרי עולם במצטבר ניתן להטיל על מי שקיפח חיים בזדון.

מאסר עולם תחת כל נפש ונשמה. " (ע"פ 1742/91 - עמי פופר נ׳ מדינת ישראל . פ"ד נא(5), 289, עמ׳ 305-304.).

אף לא מצאנו כל פגם בבקשת התביעה, כי נטיל מאסר עולם נוסף בגין העבירות הנוספות בהן הורשע הנאשם.

חומרה מיוחדת מצאנו בעובדה כי אין זו הפעם הראשונה שמחמד ערמאן נותן את הדין בביהמ"ש זה ועל אף שבעבר ריצה שתי תקופות מאסר, לא היה בכך כדי להרתיעו והוא חזר לסורו במהרה וביתר שאת.

סוף דבר, על אף שלא יכולנו להשתחרר מתחושה קשה של חוסר אונים אל מול הרוע המוחלט אותם גרמו הנאשמים, את מלאכתנו עלינו לעשות ואנו מחליטים פה אחד לגזור על כל אחד מן הנאשמים 36 מאסרי עולם מצטברים.

זכות ערעור תוך 30 יום.

ניתן והודע היום, 30/11/03, בפומבי ובמעמד הצדדים.

| _____ | _____ | _____ |
| שופט | אב"ד | שופט |

אברהם איינהורן 54678313-/

נוסח מסמך זה כפוף לשינויי ניסוח ועריכה

נבו הוצאה לאור בע"מ nevo.co.il  המאגר המשפטי הישראלי

http://www.nevo.co.il/psika_word/army/02039310-f22.doc