# EXHIBIT A.451
## (2 of 11)

he, Aweis, was involved – sometimes directly and sometimes through Majad Almitzri – knowing that Aweis carried out terrorist attacks against Israeli targets. In one case, the Defendant gave Aweis a check that had been approved by Chairman Arafat (on pp. 6 – 7). Aweis also said during the course of his interrogation that he was in contact with the Defendant for an extended period of time; when asked if the Defendant knew that he was carrying out terrorist attacks against Israeli targets, he answered (on pp. 4-5):

> **"Yes he knows and my name was also publicized in newspapers, on television and on the radio and I would speak with him occasionally and when the political situation deteriorated and was bad for us, he asked that we continue the terrorist attacks and when Shimon Peres and Omri Sharon met with leaders from the Palestinian Authority, Marwan Barghouti called me and asked us to stop the terrorist attacks... During that period, Zinni was in the area and Marwan said that it would be preferable not to carry out terrorist attacks in the name of the al-Aqsa Martyrs Brigades while General Zinni was meeting with leaders of the Palestinian Authority. It should be noted that when the talks progressed, no terrorist attacks were perpetrated."**

Speaking to Agent John Doe No. 1, the Defendant expressed anger that Aweis had confessed during the course of his interrogation, how the Defendant had behaved during General Zinni's visit to the region (Prosecution/113 (a) Sections 8 – 9, Prosecution/114 (a) Section 8, which were submitted and verified by an interrogator by the name of "Robert", on p. 154; and transcript of the interrogation of the Defendant Prosecution/98 (h), on p. 3).

22.  With respect to his relationship with the Defendant, Aweis said in his Israel Security Agency interrogation that he had submitted requests for assistance from several field operatives to the Defendant and that he himself had received money from the Defendant three times (Transcript Prosecution/178 (a) Section 10). The Defendant was a supervisor in the Tanzim and sometimes transferred financial assistance to himself and to other operatives, after receiving approval from Chairman Arafat (Prosecution/178 (b) Section 10). Generally, Aweis received the money from the Defendant through the middleman Majad Almitzri but sometimes the Defendant would send him money directly; Aweis did not usually tell the Defendant the purpose of the money, but throughout the West Bank, the nature of Aweis's activity was well known (Prosecution/178 (d) Section 5 (k)).

[Stamp] P 7: 000383

Aweis said during the course of his interrogation that the terrorist attacks of the Tanzim were perpetrated with the knowledge and assistance of the Tanzim leadership. After the terrorist attack in the Hadera banquet hall and the entire time that talks were being with Israel, they would give orders to cease the terrorist attacks; however when the talks did not progress, the operatives renewed the terrorist attacks until they were given a new order by their leaders to stop them. In this framework, the Defendant gave orders to cease the terrorist attacks during the visit of General Zinni and leaders from Russia and Europe in Israel (Prosecution/170 8 (d) Section 5 (j)).

23. Aweis's description of his relationship with the Defendant, in accordance with that which has been set forth during the course of his interrogation, is supported by statements that the Defendant made during his Israel Security Agency interrogation. When the Defendant and Aweis met during the course of their interrogation (Prosecution/79 (b)) and Aweis began to read his police statement, the Defendant ordered him to say that it was a forgery, and indeed Aweis quickly said this (interrogator "Zadok", on p. 84). However, the Defendant himself confirmed during interrogation that Aweis was the most senior military operative of the Tanzim Fatah in Nablus and that he was in charge of the al-Aqsa Martyrs Brigades in Nablus (Transcript Prosecution/90 Section 7, which was submitted and verified by an interrogator by the name of "Steve", on p. 53). The Defendant admitted that he knew that Aweis was involved in extensive "military operations" and when he wanted to ensure that the terrorist attacks were halted, he would contact Aweis and instruct him to cease the terrorist attacks (Transcript Prosecution/24 Section 6, which was submitted and verified by an interrogator by the name of "Smith", on p. 85; and Transcript of Conversation Prosecution/98 (i) on pp. 2 – 3).

The Defendant admitted that he sent Aweis, through Majad Almitzri and Ahmed Barghouti, approximately 20,000 New Israeli Shekels (NIS) and possibly even NIS 50,000 – NIS 70,000 in order to finance his activities and that he had received approval for this from Chairman Arafat, but without noting the purpose of the financial aid (Transcript Prosecution/19 Section 16, which was submitted and verified by an interrogator by the name of "Mofaz", on p. 58; Transcript Prosecution/38 Section 4, which was submitted and verified by an interrogator by the name of "Smith", on p. 85; Transcripts Prosecution/40 Section 8 and Prosecution/41 Section 9, which were submitted and verified by an interrogator by the name of "Mofaz", on p. 58; Conversation Transcript Prosecution/98 (i) on pp. 3-4). The Defendant even admitted

that some of the money that he gave Aweis was intended for the purchase of 1,000 bullets for an M-16 rifle and for a Galil type rifle and even declared that he "**takes responsibility for all of the money that Nasser (Aweis) had obtained for the funding of terrorist attacks in the Occupied Territories, for the purchase of weapons and ammunition**" (Prosecution/41 Sections 6 – 9).

The Defendant also confirmed during the course of his interrogation that Aweis operated cells that were organized under the command of the Defendant (Transcript Prosecution/29 Section 1, which was submitted and verified by an interrogator by the name of "Smith", on p. 85). However, the Defendant emphasized that he himself did not order Aweis to carry out terrorist attacks (Transcript Prosecution/31 Section 6). In spite of this, Agent John Doe No. 1 testified that the Defendant told him that he had given Aweis orders to carry out terrorist attacks (on p. 104).

The Defendant also admitted that subsequent to the terrorist attack in Neve Ya'akov or on the Atarot Bridge (the Defendant could not remember which) Aweis sent him the poster taking responsibility and the Defendant approved it in a conversation with Aweis (Transcript Prosecution/49 Section 7, which was submitted and approved by an interrogator by the name of "Emile", on p. 54; and Transcript Prosecution/52 that was submitted and verified by an interrogator by the name of "Smith", on p. 85).

#### (2) Nasser Naji Abu Hamid

24. Nasser Abu Hamid (hereinafter – "**Abu Hamid**") is one of the senior terrorism operatives of the Tanzim and al-Aqsa Martyrs Brigade in the Jerusalem and Ramallah and he, too, was subordinate to the Defendant and received assistance from him in order to carry out terrorist attacks against Israel. For this activity, Abu Hamid was sentenced, on the basis of his confession, to seven life sentences and another 50 consecutive years in prison (Prosecution/148 (a) – (b)). In his testimony, Abu Hamid refused to answer any questions; he was declared a hostile witness and his police statements were submitted in accordance with Section 10 (a) of the Rules of Evidence (on pp. 40 – 41). These statements (Prosecution 149 (a) – (d)) were submitted by the police interrogators Ibrahim Elkura'an, Ya'akov Barazani and Moshe Levy (on pp. 194 – 195, 207, 211) who testified that Abu Hamid gave them of his own free will and signed them. The statements were made in Hebrew, at the request of Abu Hamid, whom the interrogators said speaks Hebrew well.

[Stamp] P 7: 000384

25. In his statement, Abu Hamid listed the murderous terrorist attacks against Israelis in which he was involved, and said that he approached the Defendant for financial assistance in order to purchase ammunition, and that the Defendant had referred him to his associate, Ahmed Barghouti, who is known as "al-Fransi," who did in fact give Abu Hamid money for the purchase of weapons and ammunition on several occasions (Prosecution/149 (a), on p. 9; Prosecution/149 (c), on pp. 5 – 6). Other members of Abu Hamid's cell also approached the Defendant for money in order to purchase weapons (Prosecution/149, on p. 6). At a certain stage, Abu Hamid asked the Defendant to pay for the purchase of a machine gun, and he eventually was given money for this purpose by Ahmed Barghouti (Prosecution/149 (c), on p. 7). Abu Hamid also said that the Defendant met with a weapons dealer with respect to the purchase of hand grenades but in the end they were only shock grenades (on pp. 7 – 8).

Abu Hamid said that he established the al-Aqsa Martyrs Brigade after the beginning of the *intifada* in December 2000 (on p. 4). He explained that he received an offer to join the cell that was under the leadership of the head of the Palestinian Authority's security agency, Tawfik Tirawi, but that he preferred the Defendant's offer that he be subordinate to him and receive a salary for himself and his men, since he considered the Defendant "a political leader who would not lie" (Prosecution/149 (a), on pp. 15 – 16).

After that, Abu Hamid recruited additional operatives to support the Defendant, established the al-Aqsa Martyrs Brigades and began to carry out terrorist attacks against Israel Defense Forces roadblocks and settlers (on p. 17). With respect to the Defendant, he said that he considered him "a political leader" although he himself was a member of the military branch of the organization (on p. 17). When the commander of the cell was killed, Abu Hamid introduced the successor to the Defendant (Prosecution/149, on p. 7).

In one of his statements, Abu Hamid related an event at which he was present, together with other members of the cell, and one of them told the Defendant of his intent to perpetrate a terrorist attack in the Nablus area, and asked the Defendant for assistance in purchasing a weapon and a car. He also asked the Defendant to contact Aweis for him so that he could help him with the terrorist attack. Abu Hamid said the Defendant contacted Aweis, who did indeed help the cell perpetrate a terrorist attack; after the terrorist attack he reported to the Defendant that in an encounter with Israel Defense Forces soldiers, the members of the cell lost their weapons, and the Defendant promised to take care of the matter (Prosecution 149 (c), on p. 9).

[Stamp] P 7: 000384 [continued]

Towards the end of 2001, when mortar shells began to be fired at Israeli settlements, Abu Hamid discussed with the Defendant the necessity of obtaining mortars with a larger range. Abu Hamid approached the Defendant for the purpose of funding the purchase of mortar shells but the Defendant answered that they were too expensive and that "he has a surprise" in this regard and that Ahmed Barghouti would explain it to him; the latter explained to Abu Hamid that they already had a mortar and shells (Prosecution/149 (c), on p. 10). Abu Hamid also reported to the Defendant that mortar shells had been fired at the settlement of Psagot and the Defendant asked him not to tell anyone about it and said that if Arafat knew he would put him in jail (on p. 11).

26.  From the statements of Abu Hamid, it is possible to get the impression that he tried to prevent the Defendant from becoming directly involved in terrorist attacks and that he even told other operatives not to ensnare the Defendant in their actions, since the Defendant needed to remain "a political leader" (Prosecution/149 (c) on pp. 8 – 9, 12). In the context of Abu Hamid's attempts to cover up the involvement of the in terrorist attacks, he also tried to minimize the involvement of Ahmed Barghouti in the murder of Talia and Benyamin Kahane, of blessed memory, who were killed with the weapon that Ahmed Barghouti had given to the terrorist (Prosecution/149 (d), on p. 5; see also details of the incident in Chapter E (1) below).

27.  The Defendant admitted during the course of his interrogation that he had instructed Ali Aidiya (his finance person) to purchase weapons and explosives for Tanzim activities and to transfer them to Abu Hamid. During the course of his interrogation, the Defendant also referred to the event that Abu Hamid had described in the statement, with respect to the purchase of non-functional hand grenades (Transcript Prosecution/43 Sections 2 – 5, which was submitted and verified by an interrogator by the name of "Robert", on p. 62). The Defendant admitted that the cells that had been led by Abu Hamid had received assistance from him totaling approximately NIS 40,000 (Transcript Prosecution/63 Section 20, which was submitted and verified by an interrogator by the name of "Naor", on p. 82). The Defendant said that when he made the strategic decision to carry out terrorist attacks, he established the cell, while the terrorist attacks were led by, *inter alia*, Abu Hamid (Transcript Prosecution/35 Section 1, which was submitted and verified by an interrogator by the name of "Danny", on p. 90). When the Defendant was asked during the course of his interrogation who were the people who belonged to the terrorist cells under his control, he said of Abu Hamid: "**he is considered by me**" [sic] (Transcription of Conversation Prosecution/98 (k), on p. 34, where it mistakenly says "Ahmed" in the Hebrew instead of Abu Hamid).

[Stamp] P 7: 000385

### (3) Ahmed Barghouti

28.  Ahmed Barghouti (who is known as "al-Fransi") is a family member of the Defendant and
     was his close assistant, in addition to being the Defendant's driver and bodyguard (see his
     Statement Prosecution/165 (a) on p. 1; and Transcript Prosecution/165 (f), which was
     submitted and verified by an interrogator by the name of "Adam" and "Danny", on pp.
     200-201).

     During the course of his interrogation, Ahmed Barghouti said that he had been under the
     complete direct control of the Defendant (Transcript Prosecution/165 (j), which was
     submitted and verified by an interrogator by the name of "Adam", on p. 201). It is not a
     coincidence that Ahmed Barghouti was arrested together with the Defendant, since his
     name appears in the evidence in many contexts related to the terrorist attacks perpetrated
     by the field operatives of the Tanzim and al-Aqsa Martyrs Brigades.

     Ahmed Barghouti refused to answer any questions during his testimony (on pp. 161-163),
     and after he was declared a hostile witness, his police statements were submitted in
     accordance with Section 10 (a) of the Rules of Evidence (Prosecution/165 (a)-(e)).

     These statements were submitted and verified by the police officers David Mizrahi,
     Yitzchak Ya'akoboff and Moshe Moshe (on pp. 171, 184 and 206-207). The interrogators
     testified that they interrogated Ahmed Barghouti in Arabic but that they wrote down his
     testimony in Hebrew (which is not in accordance with that which is customary and
     required). All of the interrogators testified that he gave all of the statements of his own free
     will.

     Similarly, a document was submitted that was written by Ahmed Barghouti in his own
     handwriting and in Arabic and was translated (Prosecution/165(c) (1 – 2)). During the
     course of his interrogation, he admitted that the handwriting in this document is his
     handwriting (Mizrahi, on p. 185). In addition, Israel Security Agency interrogators
     submitted the transcripts that were taken down during the interrogation of Ahmed
     Barghouti (Prosecution/165 (f)-(p), which were submitted and verified as follows:
     Prosecution/165 (f) by "Adam", on p. 201 and by "Danny", on p. 200; Prosecution/165 (j)
     by "Adam", on p. 201; Prosecution/165 (m) by

"Adam", on p. 201; Prosecution/165 (n) by "Danny", on p. 200). Transcripts Prosecution/165 (g) – (h), Prosecution/165 (k) – (l) and Prosecution/165 (p) were not mentioned in the testimony of any of the Israel Security Agency interrogators, "Mickey," "Arbel," "Adam" and "Dekel" and therefore they are to be ignored.

29.   Ahmed Barghouti said during the course of his interrogation that he and Aweis were in charge of the al-Aqsa Martyrs Brigades during the year preceding his arrest (Statement Prosecution/165 (e)). In his statement he also related his direct and indirect involvement in terrorist attacks that have been carried out against Israel and about the weapons and the vehicle that he supplied to the field operatives who went out to carry out the various terrorist attacks in the Judea and Samaria area and also within Israel, including suicide terrorist attacks.

With respect to the terrorist attack at the **Seafood Market** Restaurant in Tel Aviv, Ahmed Barghouti said when he received the announcement that the terrorist Ibrahim Hasouna would soon depart for the terrorist attack, and when he was told that he had already departed with his escort, he called the Defendant and told him about this; the Defendant authorized the terrorist attack **before** it was carried out but gave orders that it should not be perpetrated in Israel but rather in the territories; Ahmed Barghouti told him, "It will be okay" (Transcript Prosecution/165 (m), which was submitted and verified by an interrogator by the name of "Adam", on p. 201; and Transcript Prosecution/165 (n), which was submitted and verified by an interrogator by the name of "Danny", on p. 200). Immediately after the terrorist attack at Seafood Market, in which Ahmed Barghouti himself was personally involved, he called the Defendant at 3:15 a.m. and reported to him on the perpetration of the terrorist attack; the Defendant sounded annoyed (Statement Prosecution/165 (c) on p. 1, Transcript Prosecution/165 (n)). According to Ahmed Barghouti, the Defendant told him to tell Aweis not to take responsibility for this attack before speaking with the Defendant, since the Defendant was interested in wording the announcement (Prosecution/165 (d) on p. 1, Transcript Prosecution/165 (n)) Ahmed Barghouti was asked why he reported on the terrorist attack to the Defendant and he answered: "**I reported to Marwan Barghouti in the usual manner**."

30. During the course of his interrogation, Ahmed Barghouti also spoke about the terrorist attack at the **gas station in Givat Ze'ev,** which was carried out as revenge for the targeted assassination of Ra'ed Karmi. He claimed that he asked that the perpetrator, Abu Satha, not inform the Defendant about it in advance. However, Abu Satha did discuss it with the Defendant and the Defendant told him not to carry out the terrorist attack, apparently because he feared for the life of Abu Satha, who was his bodyguard (Transcript Prosecution/165 (c) on p. 2 and Transcript Prosecution/165 (m) that was submitted and verified by an interrogator by the name of "Adam", on p. 201). This is one example of Ahmed Barghouti's efforts during the course of his interrogation to cover up the Defendant's actions, since the Defendant himself took responsibility for this terrorist attack during his own interrogation and it is clear from his statements that he gave orders for its perpetration (see Sections 66 (5) and Chapter E (7), below).

In another instance that Ahmed Barghouti spoke about during the course of his interrogation, the Defendant rejected the request of the young 15 year old woman to perpetrate a suicide terrorist attack, saying, "**She is too young to do this**", and instructed Ahmed Barghouti to tell her that (Prosecution/165 (c), on p. 4; and Transcript Prosecution/165 (m) Section 2 (j), which was submitted and verified by an interrogator by the name of "Adam", on p. 201). A similar version emerges from the comments of the Defendant during the course of his interrogation (Transcript Prosecution/25 Sections 6 – 7, which was submitted and verified by an interrogator by the name of "Smith"; on p. 85, and the transcript of the Interrogation Prosecution/98 (j), on pp. 8 – 9).

In an additional incident that was described by Ahmed Barghouti, Jihad Jawara called the Defendant and asked to commit a terrorist attack, and Defendant told him not to do it in Israel or in Jerusalem. However, Jawara left the car bomb that exploded the following day next to the Malha Mall in Jerusalem despite the Defendant's orders (Prosecution/165 on p. 18). This description was confirmed by the Defendant during the course of his interrogation (see Section 66 (e) and Chapter E (20), below).

31. Throughout the course of his entire interrogation, Ahmed Barghouti showed a clear tendency to minimize the Defendant's involvement in various terrorist attacks. When he referred to the Defendant by name he would usually do so in order to say that the Defendant opposed the perpetration of the terrorist attack. However, Ahmed Barghouti did confirm in the statement, which he wrote by his own hand, that a series of field operatives in the cells received money from office of the Defendant, with his knowledge, and that the money received from the Defendant was used, by himself and by others, to carry out terrorist attacks (Statement Prosecution/165 (c) (1) on p. 6, Statement Prosecution/

165 (c) on p. 2 and Statement Prosecution/165 (m) Sections 2 (c) and 2 (g) that was submitted and verified by an interrogator by the name of "Adam", on p. 201).

Similarly, it is clear from the statements that were made by Ahmed Barghouti that the Defendant would occasionally instruct him to cease or to postpone the perpetration of a terrorist attack (Transcript Prosecution/165 (m) Section 2 (g), which was submitted and verified by an interrogator by the name of "Adam", on p. 201). From this, it becomes apparent that in other cases, they were perpetrated with the Defendant's authorization, even if he did not know in advance about each and every terrorist attack.

32.   At the beginning of his interrogation, the Defendant tried to protect his family member, Ahmed Barghouti, and he claimed that he had been arrested with him because he "just happened to be passing by" (Transcript Prosecution/9 Section 10 that was submitted and verified by an interrogator by the name of "Robert", on p. 62). The Defendant claimed that Ahmed Barghouti had stopped working for him as a driver eight months before his arrest and that there was no connection between them with regard to the perpetration of terrorist attacks (Transcript Prosecution/10 Section 1, which was submitted and verified by an interrogator by the name of "Danny", on p. 90; and Transcript Persecution/21 Section 23, which was submitted and verified by an interrogator by the name of "Robert", on p. 63). In his police interrogation, Defendant claimed that Ahmed Barghouti was neither his secretary nor his bodyguard (Prosecution/104 on p. 4). In a meeting between the Defendant and Ahmed Barghouti at the time they were arrested, which was recorded without their knowledge, the two coordinated their positions with respect to the interrogation, and Ahmed Barghouti told the Defendant that he had claimed during the course of his interrogation that he is not connected to the Defendant but only served as his driver; the Defendant said he told them the same thing (Transcription of Conversation Prosecution/127 (c) on pp. 2-3). Ahmed Barghouti told the Defendant at that meeting exactly what he had said during the course of his interrogation with respect to the Defendant and his relationship to the various terrorist attacks that Ahmed Barghouti mentioned during the course of his interrogation (on p. 4).

[Stamp] P 7: 000387

However, during his Israel Security Agency interrogation, the Defendant confirmed that he knew that Ahmed Barghouti was connected to several cells and the perpetration of many terrorist attacks against Israel, and that when he wanted to stop the terrorist attacks, he would also tell this to Ahmed Barghouti. He claimed that he had told Ahmed Barghouti that he "does not permit" carrying out terrorist attacks within Israel (Transcript Prosecution/98 (k) on pp. 18-20). The Defendant said that there was coordination between himself and Ahmed Barghouti, which included reporting and providing money, and that he considered Ahmed Barghouti in charge of military operations in the Ramallah region, together with Abu Hamid, and that the two would carry out terrorist attacks by using several cells (Transcript Prosecution/27 Sections 2-3 that was submitted and verified by an interrogator by the name of "Smith", on p. 85).

The Defendant admitted that he gave money to Ahmed Barghouti and supported his activity although he claimed that Ahmed Barghouti did not report to him **prior** to the perpetration of terrorist attacks (Transcript Prosecution/98 (h) on pp. 3, 17, 20-24; and Transcript/24 Section 4, which was submitted and verified by an interrogator by the name of "Smith", on p. 85).

The Defendant admitted that Ahmed Barghouti would report to him **subsequent to** carrying out terrorist attacks (Transcript Prosecution/98 (g) on pp. 19-25, 40; Transcript Prosecution 98 (k) on p. 9). In his conversation with Agent John Doe No. 1, the Defendant said that Ahmed Barghouti dispatched four suicide terrorist attacks with his approval (Testimony of the agent on p. 106). These statements are consistent with those stated by the Defendant during the course of his interrogation when he took responsibility for several terrorist attacks that he had personally authorized (see Section 66, below).

[Stamp] P 7: 000387 [continued]

The Defendant did not hide the fact that he had given Ahmed Barghouti tens of thousand of dollars for the purchase of a variety of weapons, including assault rifles and pistols, for members of the cells that had mounted terrorist attacks against Israel. Ahmed Barghouti was responsible, on behalf of the Defendant, for the purchase of the weapons. He worked under the command of the Defendant and was in charge of "military operations" in the Ramallah region. The Defendant admitted that he knew that Ahmed Barghouti was connected to terrorist attacks against Israel, including the terrorist attacks in Jerusalem and at the Seafood Market Restaurant in Tel Aviv (with respect to all of these see: Transcript Prosecution/23 Sections 4-5 that was submitted and verified by an interrogator by the name of "Danny", on p. 90; Transcript Prosecution/25 Sections 10-11 that was submitted and verified by an interrogator by the name of "Mofaz", on p. 58; Prosecution/27 Sections 2, 4 and Prosecution/29 Section 1 that were submitted and verified by an interrogator by the name of "Smith", on p. 85; Prosecution/28 Section 4 that was submitted and verified by an interrogator by the name of "Abu Wadi", on p. 96; Prosecution/65 Section 4 and Prosecution/70 Section 9 that were submitted and verified by an interrogator by the name of "Steve", on p. 53; see also the Defendant's comments in Transcript Prosecution/98 (g) on pp. 2-6, Transcript Prosecution/98 (h) on pp. 20-24, Prosecution/98 (j) on pp. 10-11 and Prosecution/98 (k) on p. 8).

**In order to summarize the relationship between the Defendant and Ahmed Barghouti,** it can be stated that the connection of the Defendant with terrorism operatives was through his family member and close associate, Ahmed Barghouti. As the Defendant stated when he was being questioned about Ahmed: **"He makes contact with the cells, both directly and indirectly. That is to say that without him I would not have direct communication with any**

cells" (Transcript Prosecution/98 (k) on p. 8). When the Defendant was asked during questioning who headed the terrorist cells that operated under his control, the Defendant said, "**Ahmed Barghouti was partially under my control and partially worked with Nassar (Aweis)**" (Transcript of Conversation Prosecution/98 (k) on p. 34).

### (4) Mohamed Maslah (Abu Satha)

33.  Mohamed Maslah "Abu Satha" (hereinafter – "**Abu Satha**") was another field operative who headed a cell that perpetrated murderous terrorist attacks. He was also the Defendant's bodyguard for a time, as well as his close associate. For this activity, Abu Satha was convicted, on the basis of his confession, and sentenced to nine cumulative terms of life imprisonment (Prosecution/155 (a) – (c)). In his testimony, Abu Satha began by stating that he did not have any connection with the Defendant and the Defendant was "**a political person**" who had no connection to the "military operations." Beyond this, Abu Satha was not willing to answer any other questions and therefore was declared a hostile witness and his police statements Prosecution/156 (a) – (c) were submitted in accordance with Section 10 (a) of the Rules of Evidence (on pp. 66 – 68). The Statement Prosecution/156 (a) was not submitted by an interrogator by the name of to whom it was given (the police officer Ya'akov Barazani) and therefore should be ignored. The Statements Prosecution/156 (b) – (c) that were submitted and verified by the police officers Marco Dahan and Moshe Levi (on pp. 198, 210) who testified that the statements were given by Abu Satha of his own free will. The interrogation was conducted in Arabic but the statements were written in Hebrew (which is not in accordance with that which is customary and required).

     In his statement, Abu Satha describes the terrorist attacks that he perpetrated and from his statements it becomes apparent that Ahmed Barghouti, the Defendant's close assistant, was involved in many of them in a concrete manner.

34.  The Defendant confirmed during the course of his interrogation that Abu Satha worked in his office and operated under his responsibility, through Ahmed Barghouti, and that he knew that Abu Satha had carried out various terrorist attacks against civilians in Givat Ze'ev and Pisgat Ze'ev (Transcript Prosecution/30 Sections 2 – 3, which was submitted and verified by an interrogator by the name of "Emile", on p. 54, Prosecution/98 (k) on p. 35). When the Defendant was asked about the leaders of the terrorist attacks cells that operated under his control, he included Abu Satha among them, and said "**I am not running away from this**" (Transcript Prosecution/98 (k) on p. 34).

[Stamp] P 7: 000388

### (5) Jamal Ahawil

35.    Jamal Ahawil (hereinafter – "**Ahawil**") was an additional field operative who assisted the Defendant and was his contact person in the Jenin refugee camp.

Ahawil was not willing to answer any questions during the course of his testimony; he was declared a hostile witness and his police statements were submitted in Prosecution/166, in accordance with Section 10 (a) of the Rules of Evidence (on pp. 164 – 165), by the police officer Matans Hadad to whom it was made (on p. 169). Ahawil gave his statement in his own handwriting and Hadad translated it into Hebrew.

Ahawil operated within the framework of the al-Aqsa Martyrs Brigades and stated during the course of his interrogation that he had received financial, among other, assistance from the Defendant and that he would distribute this money to other operatives, including some operatives who were wanted by the Israel Defense Forces; some of the money was used for the purchase of weapons (Prosecution/166 on p. 1). Ahawil was in continuous contact with the Defendant and would report to him about the operations of the al-Aqsa Martyrs Brigades and on offenses in the Jenin camp; sometimes operatives from these Brigades would report to the Defendant directly, as was the case with Aweis (Prosecution/166 on p. 5).

The Defendant, in his police interrogation, denied that he was acquainted with Ahawil (Prosecution/106 on p. 6). However, while being interrogated by the Israel Security Agency, the Defendant did say that Ahawil was a leader from the Jenin refugee camp and a member of the al-Aqsa Martyrs Brigades that belong to the cells of Aweis. The Defendant was well acquainted with Ahawil but claimed that he never gave him weapons or money, although

[Stamp] P 7: 000388 [continued]

Ahawil had asked him for assistance; the Defendant explained that he worked with Aweis, and Aweis was the one who would answer Ahawil's requests (Transcript Prosecution/31 Sections 7 – 9, which was submitted and verified by an interrogator by the name of "Mofaz", on p. 58). Similarly, the Defendant confirmed that he sent requests for assistance from Ahawil to Arafat (Transcript Prosecution/67 Section 4 that was submitted and verified by an interrogator by the name of "Emile", on p. 54).

### (6) Nasser al-Shawish

36.    Nasser al-Shawish (hereinafter "**Shawish**") was another operative who was involved in terrorist attacks that were carried out by the al-Aqsa Martyrs Brigades. For this activity, he was convicted, on the basis of his confession, and sentenced to four cumulative life sentences (Prosecution/157 (a) – (d)). Shawish refused to answer any questions during his testimony but did claim that the Defendant was a political leader who did not have any connection to "military affairs." He was declared a hostile witness, denying the things that he said during the course of his interrogation and even claimed that he had not admitted anything (on pp. 69 – 71). Shawish's Statements Prosecution/158 (a) – (b) were submitted in accordance with Section 10 (a) of the Rules of Evidence by the police officers Matans Hadad and Awad Ataaf (on pp. 165, 168).

Regarding his statement, he testified that it was written in Arabic in his own handwriting, of his own free will, and translated into Hebrew by the interrogators. Police officer Hadad testified that he was present at the trial of Shawish and that he verified his statement before his conviction, since he did not have a defense attorney.

37.    During the course of his interrogation (Statement Prosecution/158 (a), on p. 6 and Statement Prosecution/158 (b), on pp. 2 – 4) Shawish said that he had received an explosive belt weighing approximately 18 kg from the headquarters of the Counter-intelligence Force in Ramallah in order to store it in his car. Later, he met the Defendant at the hospital where his wife was being treated and Defendant asked to speak with him privately. During the course of their conversation, he was asked by the Defendant if he was acquainted with anyone who knew how to prepare an explosive belt or any one who had an explosive belt. At that time, Shawish called the person who had given him the explosive belt (Muzid Almitzri) called him and received his agreement for giving it to the Defendant. The Defendant informed him that Ahmed Barghouti would discuss the matter with him. The next day Ahmed Barghouti called Shawish and the latter gave him the explosive belt. Shawish heard later that day that the person who was carrying the belt had been caught in Jerusalem on his way to perpetrate a suicide terrorist attack.

[Stamp] P 7: 000389

Shawish was asked during the course of his interrogation if the Defendant knew about the suicide terror attacks and military operations. He answered that the day before the suicide terrorist attack was carried out by Mohammed Hashayka, Shawish met with the Defendant and told him that a person named Abdel Kareem was supposed to be sending the suicide bomber to Israel; the Defendant told Shawish to call him if he needed anything for the terrorist attack and gave him $600 and asked to be informed of details of the terrorist attack (on pp. 6 – 7). The terrorist attack was carried out in Jerusalem, and then the Defendant called Shawish, who told him that the terrorist attack had been perpetrated by the al-Aqsa Martyrs Brigades. The Defendant asked him to bring him the videotape of the suicide [bomber] Hashayka (on pp. 6 – 7 of Statement Prosecution/158 (a)). In his second statement Prosecution/158 (b), Shawish spoke about the financial assistance that he had received from the Defendant (on p. 5).

38.    The Defendant denied in his police interrogation that he was acquainted with Shawish and in his statement he also denied the statements made by Shawish (Prosecution/106 on pp. 7 – 9). No additional evidence was presented to us with respect to the events that Shawish described during the course of his interrogation and therefore they are not supported and it is not possible to use them to support findings.

## (7) Ali Aidiya

39.    Ali Aidiya (hereinafter – "**Aidiya**") was a Tanzim operative who was primarily involved in training young people in the use of weapons, and in this matter he received orders from the Defendant. Similarly, he participated in shooting terrorist attacks aimed at soldiers. Aidiya refused to answer any questions during his testimony and claimed that the Defendant was a "man of peace" (on pp. 169 – 171). Therefore, he was declared a hostile witness and his Statement Prosecution/168 was submitted in accordance with Section 10 (a) of the Rules of Evidence by the police officer Ya'akov Barazani, who took the statement in the Arabic language and who translated it into Hebrew (on p. 208).

[Stamp] P 7: 000389 [continued]

40. During the course of his interrogation, Aidiya spoke of the Defendant's participation in the shooting course for young people (Prosecution/168, on pp. 1 – 2) and the terrorist attacks that he himself had perpetrated. Similarly, Aidiya said: "**The head of the Tanzim, Marwan Barghouti, would know about all of the shooting incidents that have been carried out by Tanzim operatives before they had been perpetrated, and he had approved them**" (on p. 5). He noted that several months before his arrest, the Defendant asked him "to buy a weapon of any type" and to transfer it by way of Abu Hamid (Transcript Prosecution/43 Section 3, which was submitted and verified by an interrogator by the name of "Robert", on p. 92), which supports what Aidiya said during the course of his interrogation.

### (8) Ismail Radaida, Muhannad Abu Halawa and Khamal Abu Wahr

41. Ismail Radaida (hereinafter – "**Radaida**") wanted to perpetrate a terrorist attack and approached the Defendant for that purpose. He perpetrated the shooting terrorist attack near Ma'ale Adumin, where the Greek Orthodox monk Germanos Tsibouktzakis [Translator's note: as written], of blessed memory, was murdered (see Chapter E (3), below). For his terrorist activity, Radaida was convicted, on the basis of his confession, and sentenced to life in prison and another 20 consecutive years' imprisonment. In his testimony in this case (on pp. 42 – 44), Radaida refused to answer questions; he was declared a hostile witness and his police statement was submitted on the basis of Section 10 (a) of the Rules of Evidence (Statements Prosecution/151 (a) – Prosecution/151 (c), handwritten Statement Prosecution 151 (d) that was torn, reconstructed and translated and the recording in which Radaida reenacted the murder of the monk and its transcript – Prosecution/151 (a)).

Radaida's statement was submitted by an interrogator by the name of Marco Dahan and Yitzchak Ya'akoboff who heard his statement in Arabic but recorded in Hebrew (which is not in accordance with that which is customary and required), and testified that it was given by Radaida of his own free will. Radaida wrote his Statement Prosecution/151 (d) in his own handwriting, in the presence of Ya'akoboff (on pp. 171, 198). The person who conducted the re-enactment (Marco Dahan) made no reference to this fact in his testimony and therefore the recording of the re-enactment is not to be considered, as it is an external statement of a witness that was not submitted as required by law.

[Stamp] P 7: 000390

42. In his first statement, Radaida (Prosecution/15 (a)) said that he decided to perpetrate the terrorist attack when he saw on television that a Palestinian baby girl had been killed, and therefore he went to the office of the Defendant. The conversation between them was held in private and Radaida told the Defendant that he wanted to perpetrate the terrorist attack and demanded a weapon for that purpose. The Defendant referred Radaida to a person by the name of Muhannad (Abu Halawa) who is known as "Alaa" (hereinafter – "**Muhannad**") and instructed Muhannad to obtain a weapon for Radaida. In his second statement (Prosecution/15 (b)), Radaida added that he made it clear to the Defendant that he required the weapon in order to carry out terrorist attacks against Israeli targets, and then the Defendant had referred him to Muhannad. Muhannad told Radaida that that he would obtain two Kalashnikov rifles for him and that from now on his contact would be with Muhannad and not with the Defendant. About two weeks later, Muhannad called Radaida – who had meanwhile added another person to the terrorist attack – and told him that the weapons were ready. Radaida received weapons and ammunition from Muhannad, who instructed him and his comrade in their operation.

After several days of preparation for the terrorist attack, Radaida and his comrade Yasser went to an observation point on the Ma'ale Adumin Road; they carried out the terrorist attack by shooting at the car in which the monk was traveling, and then fled. The next day, Radaida learned from the news that he had killed a Greek monk and Muhannad called him to complain about this; Radaida explained that he thought it was a settler. During the course of his interrogation, Radaida was asked why he went to the Defendant when he wanted to perpetrate a terrorist attack and he answered that he had seen the Defendant several times on television and understood "**that he is the only person who could help me to obtain a weapon**" (on p. 5).

In his third Statement (Prosecution/15 (c)), Radaida revealed that his original intent was to perpetrate a suicide terrorist attack but the Defendant told him, "**Suicide attacks are the work of Hamas and the Islamic Jihad; the Tanzim carries out attacks against the army and the settlers.**"

[Stamp] P 7: 000390 [continued]

**Radaida** continued, saying, "**Marwan Barghouti said that he was willing to give me weapons and explosives so that I could carry out attacks against soldiers and settlers**" (on p. 1). This version by Radaida also emerges from the document that he wrote in his own hand (Prosecution/15 (d)), although in a more condensed version.

43.  Radaida's story is also supported by the Defendant's version during the course of his interrogation (Transcript Prosecution/98 (k) on pp. 37-38; and Transcript Prosecution/98 (d) on pp. 2-4, 11-12, where it mistakenly reads Ismail Aldeba instead of Ismail Radaida). In his police interrogation, the Defendant denied that Muhannad worked in his office or was his deputy and said that Muhannad was not connected to the Tanzim (Statement Prosecution/102 on p. 3, Prosecution/103 on p. 5, Prosecution/105 on p. 2, Prosecution/106 on p. 1). Early during the course of his interrogation by the Israel Security Agency, the Defendant also denied that he was acquainted with Radaida and said that Muhannad worked in his office (Transcript Prosecution/9 Sections 8-9 and Transcript Prosecution/21 Section 22 that were submitted and verified by an interrogator by the name of "Robert", on pp. 62-63).

However, as the interrogation continued, the Defendant admitted that Radaida had come to him to propose the perpetration of a suicide terrorist attack and that the Defendant told him, "**We do not work with suicide attacks**." The Defendant referred Radaida to Muhannad and told Muhannad that Radaida "**needs training… find something for him**." Similar the Defendant said, "**Muhannad reached an agreement with him that he would try to carry out an attack here in Ma'ale Adumim or somewhere else, I knew about it later… then they fired on a car and injured some fellow Elhouri… meaning they killed him**" ("Elhouri" means "Priest" in Arabic – A.B.). A similar confession with respect to the recruitment of Radaida by way of Muhannad emerges from points that he had made during the interrogation (see: Transcript Prosecution/22 Sections 12-16 and Transcript Prosecution/40 Section 9 that were submitted and verified by an interrogator by the name of "Mofaz", on p. 58, Transcript Prosecution/23 Section 6 that was submitted and verified by an interrogator by the name of "Danny", on p. 90; and transcript of the interrogation of the Defendant Prosecution/98 (d) on pp. 21-26; and Prosecution/98 (g), on p. 8).

The Defendant further admitted that he met with Muhannad and gave him money for the purpose of carrying out terrorist attacks, after Muhannad told him that his cell had perpetrated several terrorist attacks, including the murder of the Kahane couple, of blessed memory. The Defendant said that he gave Muhannad a sum of approximately $3,000, as well as weapons (Transcript Prosecution/43 Sections 14-16 that was submitted and verified by

[Stamp] P 7: 000391

an interrogator by the name of "Robert", on p. 62; Transcript Prosecution/59 Section 10 that was submitted and verified by an interrogator by the name of "Wadi", on p. 56; Transcript Prosecution/67 Section 6 that was submitted and verified by an interrogator by the name of "Emile", on p. 54; Transcript Prosecution/68 that was submitted and verified by an interrogator by the name of "Steve", on p. 53).

In the transcript of the interrogation of the Defendant (Prosecution/98 (d), on pp. 21-23) he said that Muhannad informed him that his cell had been caught and explained that Muhannad was referring to "**those for whom we arranged weapons**."

44.   The relationship between the Defendant and Muhannad also emerges from remarks that Khamal Abu Wahr (hereinafter – "**Wahr**") made in his statement with respect to money that he had received from Muhannad, with the knowledge and the approval of the Defendant. In this manner, he received from the Defendant, by way of Muhannad, the sum of approximately NIS 25,000, most of which was intended for the purpose of the manufacture of mortars and the purchase of pistols. At a certain stage, the Defendant began to call Wahr directly, in order to clarify his needs. In addition, Wahr said said during the course of his interrogation that the Defendant would also transfer money to him by way of Jamal Ahawil, and that, after the terrorist attack in Meirav, the Defendant had contacted him in order to find out the names of the people who participated in that terrorist attack, in order to transfer money to them (Prosecution/181 (b), on pp. 4-5; and Transcript Prosecution/181 Section 6). Wahr stated during the course of his interrogation that he and Muhannad would decide between them what he needed and then the Defendant would send them the money; the Defendant would call Wahr to verify that the money that he had sent him by way of Muhannad had in fact arrived (Transcript Prosecution/18 (d) Section 6.1). At a certain stage, the relationship between Wahr and Muhannad was broken off and the Defendant told Wahr that he was having financial problems and that he did not have money to buy bullets. At this point, the Defendant referred Wahr to Jamal Ahawil, in order to receive money (Transcript Prosecution/181 (c) Section 15 and Prosecution/18 (d) Section 6.1).

45.   Wahr carried out several shooting terrorist attacks in the context of the operations of the al-Aqsa Martyrs Brigades, and he listed the terrorist attacks in which he participated in his police statement and during the course of his interrogation by the Israel Security Agency. During his testimony, he refused to answer questions (on pp. 181-189), and therefore his police statement (Prosecution/181 (a)-b) was submitted in accordance with Section 10 (a) of the Rules of Evidence, by an interrogator by the name of Gadir Salah who testified that Wahr gave the statement of his own free will in Arabic, but that it

[Stamp] P 7: 000391 [continued]

was written down in Hebrew (on p. 209). Similarly, the transcript from Wahr's interrogation by the Israel Security Agency was submitted (Prosecution/181 (c) – (d) which was submitted by an interrogator by the name of "Naveh", on p. 205). Although Wahr's external statements are not supported by additional evidence, there is a great deal of other evidence with respect to the assistance that the Defendant offered to people in the field for the purpose of the purchase of weapons in order to carry out terrorist attacks.

**(9) Nasser (Haloum) Naji Abu-Hamid**

46.  Nasser Haloum Naji Abu-Hamid (hereinafter – "**Haloum**") is the brother of Abu Hamid and he perpetrated shooting terrorist attacks within the framework of the al-Aqsa Martyrs Brigades. Haloum was involved in the terrorist attack in which the police officer Galit Arbiv of blessed memory, was shot to death in Neve Ya'akov, Jerusalem (see Chapter E (10), below). He also participated in the preparation of the fatal terrorist attack at the Seafood Market Restaurant in Tel Aviv (see Chapter E (12), below). He was convicted, on the basis of his confession, and sentenced to five consecutive life sentences (Prosecution/161 a-b).

In his testimony, Haloum refused to answer questions (on pp. 73-76) but claimed that the Defendant was a political leader who has no connection with "military issues." Therefore his police statement (Prosecution/162 a-c) was submitted by police officers Mizrahi and Elkaua'an on pp. 184, 194). Haloum's connection was with Ahmed Barghouti, who was the Defendant's close assistant.

**(10) Ziyad Hamuda**

47.  Ziyad Hamuda (hereinafter – "**Hamuda**") was an operative in the Tanzim. In his testimony, Hamuda refused to respond to questions and his police statement was submitted in accordance with Section 10 (a) of the Rules of Evidence, after he was declared a hostile witness. He claimed that he had signed his statement so that he could undergo surgery for appendicitis (on pp. 166-197). He denied that which he had set forth in his Statement Prosecution/167 (b) and claimed that the Defendant was "a man of peace." The statement by Hamuda was taken by police officer Avi Akiva, who was not brought to testify and therefore, the statement was not filed in a lawful manner and it must be ignored.

Hamuda was convicted, on the basis of his confession, for a long series of security crimes (Prosecution/167 (a)). In the indictment to which Hamuda confessed, it is claimed that he had been recruited to the Tanzim by the Defendant for the purpose of military training, and that he had been promised that the Defendant would see to financial assistance for him. In addition, in the indictment to which Hamuda confessed, it is similarly claimed that that he

[Stamp] P 7: 000392

had asked the Defendant for a weapon, in order to perpetrate a shooting terrorist attack near the settlement of Psagot and that the Defendant had referred him to Muhannad in order to receive the weapon (Items No. 5 and No. 7 of the indictment). In his Israel Security Agency interrogation, the Defendant confirmed that Hamuda had asked him for a weapon but that, to the best of his recollection, he did not receive it (Transcript Prosecution/34 Section 5 that was submitted and then verified by an interrogator by the name of "Itai", on p. 52).

On another occasion, during the course of his interrogation, the Defendant said that it was likely that Hamuda had received an MP5 rifle from him (Transcript of Interrogation Prosecution/98 (e), on p. 67). There is nothing in the evidence that incriminates the Defendant other than the confession by Hamuda to the charges in the indictment, on the basis of which he was convicted and it is not possible to substantiate any findings on the basis of a confession of this type (see Section 132 (c), below). However, a great deal of additional evidence was brought forth with respect to the assistance that the Defendant gave to people in the field in order to purchase weapons for the purpose of the perpetration of terrorist attacks.

**(11) <u>Riad Amor</u>**

48. Riad Amor (hereinafter – "**Amor**") was another field operative of the Tanzim who described, during the course of his interrogation, the terrorist attacks in which he took part. During his testimony, he refused to respond to questions (on pp. 172 – 174), and claimed that he did not have any connection with the Defendant. He was declared a hostile witness and his statements Prosecution/169 (a) – (b) were submitted by police officers David Mizrahi and Ya'akov Barazani, who testified that Amor had made these statements and signed them of his own free will (on pp. 186, 208). The statements were taken in Arabic but were written down in Hebrew (which is not in accordance with that which is customary and required). Amor was convicted of perpetrating a large number of terrorist attacks, on the basis of his confession (Prosecution/169 (c) – (d)).

49. During the course of his interrogation, Amor said that he met the Defendant approximately six months prior to his arrest and that the Defendant told him that he was pleased with the operations of Amor and his comrades in Bethlehem, but that he would prefer that they perpetrate terrorist attacks against the army, not against civilian targets, because "**this creates problems**" and "**it causes a headache for the Chairman**" (Prosecution/169 (a), on p. 3, Prosecution/169 (b), on p. 11). The Defendant claimed in his police interrogation that he is not acquainted with Riad Amor in any way. (Prosecution/14 on p. 9) and there is no evidence to contradict this claim other than an external statement by Amor which requires support that was not found. Notwithstanding, there is a great deal of additional evidence with respect to the general position of the Defendant favoring terrorist attacks against soldiers and settlers.

**(12) Nasser Haj**

50. Nasser Haj (hereinafter – "**Haj**") also worked in the framework of the Fatah and described in his statement Prosecution/178, the terrorist attacks in which he took part. In his testimony, he refused to respond to any questions and later denied everything that he had said during the course of his interrogation (on pp. 175 – 176). Therefore, his statement was filed in accordance with Section 10 (a) of the Rules of Evidence, by an interrogator by the name of Moshe Levy, who testified that Haj gave his statement of his own free will, after he was given a warning with respect to his rights (on pp. 211 – 212).

In his above mentioned statement, Haj said that he, together with other operatives, had approached the office of the Defendant with a request to receive money and weapons. The Defendant told them to look for weapons because he would finance the purchase. Later, the Defendant gave him $1,200 in order to purchase weapons (on pp. 4-5). There is nothing in the evidence that supports this above mentioned external statement by Haj, which requires support, but there is a great deal of additional evidence of the assistance that the Defendant gave to people in the field for the purpose of the purchase of weapons in order to carry out terrorist attacks.

**(13) Tahrir Barghouti**

[Stamp] P 7: 000393

51.  Tahrir Barghouti (hereinafter – "**Tahrir**") is a family member of the Defendant who, in accordance with his statements during the course of his interrogation, carried out a large number of shooting terrorist attacks. He refused to respond to questions in Court (on pp. 177 – 178) and therefore his statements were filed in accordance with Section 10 (a) of the Rules of Evidence, (Prosecution/171 (a) – (d)) by police officer Ya'akov Barazani, who took them and testified that the statements were given by Tahrir, of his own free will, in the Arabic language, and that they were later translated into Hebrew (on p. 207).

52.  During the course of his interrogation, Tahrir stated that he had asked the Defendant to help him to establish a cell. The Defendant promised to help Tahrir with money and ammunition and to help his people in the event that they were arrested. The Defendant also proposed that Tahrir be in charge of the cell, but that he distance himself from the actual operations. Tahrir explained during the course of his interrogation that he had approached the Defendant in order to receive weapons for the cell that he had established (Prosecution/171 (d), on p. 3). Later, the relationship was continued through Muhannad, who hinted to him that the Defendant was not interested in having him take part in the activity; the Defendant himself explained to Tahrir that this position derived from the fact that the members of the cell were scoundrels (Prosecution/171, on p. 4).

In his police interrogation, the Defendant denied all of the statements that had been made by Tahrir (Prosecution/104, on pp. 9 – 10). However, in his Israel Security Agency interrogation, the Defendant did admit that Tahrir had approached him with respect to the perpetration of terrorist attacks and had asked for weapons for this purpose. Yet, the Defendant claimed that he did not accede to this request (Transcript Prosecution/30 Section 1 that was submitted and verified by an interrogator by the name of "Emile", on p. 54). There is nothing in the evidence that supports this external statement by Tahrir, which requires support that was not found for the contradiction of the claim of the Defendant. However, there is a great deal of additional evidence of the assistance that the Defendant had rendered to people in the field for the purchase of weapons in order to perpetrate suicide attacks.

**(14) <u>Ahmed Musafar</u>**

53.   Ahmed Musafar was a weapons dealer who supplied weapons to members of the Tanzim and the al-Aqsa Martyrs Brigades. In his testimony (on pp. 186 – 188), he refused to respond to questions and he denied everything that he had stated during the course of his interrogation. Musafar was declared a hostile witness and his police statements were filed in accordance with Section 10 (a) of the Rules of Evidence (Prosecution/179) by an interrogator by the name of Ya'akov Barazani, who testified that the statement had been made after Musafar had been warned about his rights and that he had signed the statement, which had been taken in Arabic but had been written down in Hebrew (on p. 208).

In his statement, Musafar spoke about his meeting and that of his comrades at the office of the Defendant, two days before Ra'ed Karmi was killed. The Defendant told them that they need to continue their operations in the village where they reside, not in Ramallah, and he promised to help them. After the death of Karmi, Musafar received orders to perpetrate a terrorist attack in revenge; the order came from Mahmoud Jabar, who worked at the office of the Defendant, and therefore Musafar understood that it came from the Defendant (Prosecution/179, on pp. 6 – 7). During the course of his police interrogation, the Defendant denied what Musafar had said (Prosecution/104, on p. 3), and there is no evidence that supports this external statement by Musafar, with the exception of the many pieces of evidence that were presented with respect to the Defendant's call to avenge the death of the Karmi in the form of a terrorist attack.

## (15) Sharif Naji

54.   Sharif Naji (hereinafter – "**Sharif**") was a member of the cell that was led by his brother, Abu Hamid, which carried out terrorist attacks against Israeli citizens. He was also the bodyguard for the Defendant. Sharif was the one who escorted the suicide [terrorist] Ibrahim Hasouna, who perpetrated the terrorist attack on the Seafood Market [restaurant] in Tel Aviv. In his statement, he set forth all of his deeds.

Sharif, like all of his comrades, refused during his testimony to respond to questions other than claiming that he was acquainted with the Defendant only from television. He was declared a hostile witness and his statement Prosecution/182, to which his handwritten translation into Arabic Prosecution/182a was appended, was submitted by an interrogator by the name of Avi Ben Lulu, who testified that the statement was given by Sharif of his own free will (on p. 210).

[Stamp] P 7: 000394

55. In his statement Prosecution/182, Sharif talked about the shooting terrorist attacks that he had perpetrated against soldiers and settlers, within the framework of the Fatah Tanzim. He explained that he had perpetrated the terrorist attacks so that the *intifada* would continue, specifically because he was interested in peace and added: "**That is what Arafat, Marwan Barghouti and Hussein al-Sheikh were saying on Palestinian television and Al Jazeera... they would say that if the *intifada* were to continue, we can receive more territory and more things from Israel**" (on p. 4). During the course of his police interrogation, Defendant denied having said these things (Prosecution/103, on p. 5).

After Sharif's cell was dismantled, due to the death of Mohammed Omasi, Sharif began to serve as a bodyguard for the Defendant, for a period of approximately six months until his arrest. When interrogated about the Defendant he said: "**I would hear him telling his people that they should continue to carry out terrorist attacks and he would say this freely on Israeli and Arabic television**" (on p. 5). In the second part of his statement, Sharif spoke about his role in a terrorist attack at the Seafood Market Restaurant in Tel Aviv and the involvement of Ahmed Barghouti in the attack (on pp. 5 – 11). During the course of his interrogation, the Defendant denied having any connection at all with Sharif, although he was acquainted with him (Transcript Prosecution/34 Section 4, which was submitted and verified by an interrogator by the name of "Itai", on p. 52). However, the statements that were made by Sharif are supported by many pieces of evidence that were submitted with respect to the manner in which the Defendant would make use of the media in order to call for terrorist attacks against Israel and how he called on his people to do so, as well.

### (16) Amid Abu Radaha

56. Amid Abu Radaha (hereinafter – "**Abu Radaha**") was another Tanzim operative who perpetrated shooting terrorist attacks that targeted soldiers and settlers, as he talked about during the course of his interrogation. During his testimony, he claimed that he did not have any connection with the Defendant or with Ahmed Barghouti and that he did not receive a weapon from the Defendant but rather from the Palestinian Authority.