# EXHIBIT A.451
## (3 of 11)

He claimed that the interrogators wrote things in his statement that he had not said and denied the contents of his statement (on pp. 192 – 194). Abu Radaha's statement (Prosecution/183) was submitted by an interrogator by the name of Meir Cohen, who testified that the statement was given by Abu Radaha of his own free will and that it was taken in Arabic but written down in Hebrew (which is not in accordance with that which is customary and required) and that he had signed it.

57. In his statement, Abu Radaha stated that the weapons and ammunition that he had used in order to perpetrate the terrorist attack had been received from the Defendant and Ahmed Barghouti, who also gave the members of the cell money for ongoing expenses (on pp. 2 – 6). In his police interrogation, the Defendant denied what Abu Radaha had said (Prosecution/104, on p. 3). However, his statements are supported by many pieces of evidence with respect to the Defendant's activity supplying money and weapons to members of the Tanzim in the field for the perpetration of terrorist attacks against Israel.

## (17) Ashraf Jabar

58. Ashraf Jabar (hereinafter – "**Jabar**") was also a Tanzim operative who carried out terrorist attacks against Israeli targets, together with others, including Abu Radaha. Jabar refused to respond to questions during his testimony (on p. 185 – 197) and therefore his statement was submitted, together with the diagram that he drew, (Prosecution/184 (a) – (b)) by an interrogator by the name of Moshe Levy, who testified that the statement was given by Jabar of his own free will; it was taken in Arabic and translated into Hebrew (on p. 212).

59. In his statement Prosecution/1848, Jabar talked about the terrorist attacks that he had perpetrated and noted that he had approached the office of the Defendant with a request for ammunition and money for members of the cell; the Defendant promised that he would pay for the ammunition and did indeed do so through Ahmed Barghouti; the bullets were given to him in exchange for NIS 3000. Jabar explained that he gave the bullets to the Defendant because he was the head of the Tanzim and that he would distribute them to Tanzim operatives (on pp. 3 – 4).

During the course of his interrogation, the Defendant confessed that Jabar had asked him for financial support and weapons, but said that he did not remember exactly what he had given him (Transcript Prosecution/48 Sections 2 – 3, that was submitted and verified by an interrogator by the name of "Robert", on p. 62).

[Stamp] P 7: 000395

**D.    Statements of the Defendant During Interrogation and Other Evidence with Respect to His Role and Involvement in Terrorist Attacks against Israel**

**(1)    The liability of the Defendant for the activity of the terrorist cells and the degree of his control over them**

60.    In accordance with that which has been set forth above, during his Israel Security Agency interrogation, the Defendant did not deny that he was the commander and leader of the Fatah field operatives on the West Bank and that he was the commander of the Fatah and the Tanzim in the West Bank, that he had established the al-Aqsa Martyrs Brigades and that he was in charge of their operations. He also confirmed that he was in charge of the supply of money, weapons and explosives to the field cells and that he was in charge of their military operations (see Section 17, above). The Defendant explained during the course of his interrogation that he found himself involved more and more with the "military cells," which would approach him with requests for various types of assistance, since people such as Ra'ed Karmi and Nassar Awis considered him to be the commander. He also said that his connection with the members of the cells was through his assistant and personal driver Ahmed Barghouti. The Defendant made a distinction between terrorist attacks in Israel, for which he refused to take responsibility, and terrorist attacks that the Fatah had carried out in the West Bank, for which he assumed full responsibility during the course of his interrogation (Transcript Prosecution/25 Section 20 that was submitted and verified by an interrogator by the name of "Mofaz", on p. 58). The Defendant emphasized that he was in charge of the operations of the Fatah on the West Bank but was not an expert on the details, such as the type of weapons that had been used, the way in which they had been purchased, the planning of terrorist attacks and their perpetration (Transcript Prosecution/27 Section 1 that was submitted and verified by an interrogator by the name of "Smith", on p. 85).

During the course of some of his interrogations, the Defendant claimed that he was not directly responsible, from the command perspective, for the operations of the field cells (Transcript Prosecution/42 Section 7, that was submitted and authorized by an interrogator by the name of Wadi, on p. 96). However, in later stages

of his interrogation, the Defendant confessed that he was responsible for the operations of the cells that worked with Ahmed Barghouti and Abu Satha, because they were close to them and he funded their operations; in further detail, he noted that he considered himself to be responsible for three terrorist attacks, in Givat Ze'ev, French Hill and the Atarot Bridge (Introduction to Transcript Prosecution/38 that was submitted and verified by an interrogator by the name of "Smith", on p. 85). By his own description here, the Defendant did not consider himself responsible for terrorist attacks that have been carried out by the cells of Aweis, Manzur Sharam and others and he did not consider himself to be their commander. Of his relationship with Aweis, the Defendant said: "**I have control based upon respect over Nassar but not actual control**" (Transcription of Conversation Prosecution/98 (k) on p. 17). When speaking about the field cells that had carried out terrorist attacks against Israel during the course of his interrogation the Defendant said:

> "**These cells found themselves more than one address. What is an address? An address is someone you can turn to ask for money, to coordinate work. I am one of those addresses, I am one address among several addresses. The heads of the security forces are also addresses.**"

Based upon these statements by the Defendant, it seems that at least some of the cells coordinated their terrorist attacks with him and considered him an address for funding, as indeed emerges from much of the evidence that has been presented to us. In this regard, the Defendant said that his connection with the cells was indirect because he did not want to get involved in the military field and did not want to be involved in "destruction" (Transcription of Conversation Prosecution/90 8 (k), on p. 6). Indeed, for the most part, the Defendant's connection with the terrorist attack cells was through the contact people who were close associates of the Defendant, especially Ahmed Barghouti. As the Defendant said about Ahmed Barghouti: "**He makes contact with these cells either directly or indirectly, meaning that without him I would not have a direct connection with any cell**" (Transcription of Conversation Prosecution/98 (k), on p. 8).

The Defendant claimed that the field cells would have perpetrated terrorist attacks even in the absence of his support and even without the financial and organizational support that he gave them (Transcript Prosecution/63 Section 18 - 20 that was submitted and verified by an interrogator by the name of "Naor", on p. 82). This claim does not in any way mitigate the liability of the Defendant for the terrorist attacks that were carried out by these cells.

[Stamp] P 7: 000396

61.  At the beginning of his Israel Security Agency interrogation, the Defendant denied that he was responsible for the provision of money and weapons for the purposes of carrying out terrorist attacks (Transcript Prosecution/14 Section 4, that was submitted and verified by an interrogator by the name of "Gabi", on p. 93, Transcript Prosecution/10 Section 1 that was submitted and verified by an interrogator by the name of "Danny", on p. 90). However, as the interrogation continued, the Defendant admitted (Transcript Prosecution/29 Section 1 (c)-(d) that was submitted and verified by an interrogator by the name of Smith, on p. 85):

> **"Within the framework of my position as secretary general of the Fatah, I was responsible for everything that was done, such as the supply of money to cells, the purchase of weapons and the perpetration of terrorist attacks. There are many cells in the field, some of them organized under my command by way of a number of people such as Ahmed Barghouti [and] Nassar Aweis. In the field, there are also cells that were not organized by the Fatah and I did not have any connection with them."**

The Defendant did not deny his ability to influence terrorist cells that he helped with money and by the provision of weapons; when speaking about these cells he said (Interrogation Transcript Prosecution/98 (d) on p. 32): "**If you buy them weapons, if you give them weapons, if you plan for them, you can influence them**." However the Defendant also added, "**Influence, you cannot control**." (*op. cit.*, on p. 37).

62.  During the course of his interrogation, the Defendant said that when he made a strategic decision to carry out terrorist attacks against Israel in order to oppose the occupation, he established cells and supplied them, indirectly, with money, weapons and explosives for the purpose of carrying out terrorist attacks. He noted that the terrorist attacks were led by mainly by Abu Hamid, Ahmed Barghouti, and Aweis (Transcript Prosecution/35 Section 1, that was submitted and verified by an interrogator by the name of Danny, on p. 90). From his perspective, the people who handled the military operations in the Ramallah area were Ahmed Barghouti and Abu Hamid, who operated several cells (Transcript Prosecution/27, Section 2) that was submitted and verified by an interrogator by the name of Smith, on p. 85).

[Stamp] P 7: 000396 [continued]

The Defendant confessed that he had supported Ahmed Barghouti and had supplied him with money and that he knew that he was responsible for the perpetration of a variety of terrorist attacks (Transcript Prosecution/98 (h) on pp. 20 – 24). In addition, the Defendant confessed that he had encouraged Ra'ed Karmi to carry out "operations against the occupation," and assisted him financially, while requests for assistance were transferred to Arafat, who approved them (Transcript Prosecution/67 Section 8, that was submitted and verified by an interrogator by the name of "Emile," on p. 54). By contrast, during the course of his police interrogation, the Defendant denied any connection to Ra'ed Karmi (Prosecution/104, on p. 8) and at the beginning of his Israel Security Agency interrogation claimed that he transferred money to him without knowing for what purpose it was intended (Transcript, Prosecution/18 Section 5 that was submitted and verified by an interrogator by the name of "Nadav", on p. 78).

63. The Defendant's connections with terrorism operatives of the Fatah and the regular assistance that he provided for them emerge clearly from the documents that were seized by the Israel Defense Forces from the offices of the organizations including the office of the Defendant during Operation Protective Shield (Binder Prosecution/5).

The Prosecution submitted an Expert Opinion by an expert from the Division of Identification and Forensic Science (DIFS) of the Israel Police, stating that the Defendant had signed some of the documents and from others it is possible to draw the necessary conclusions from the very fact that they were sent to the Defendant and were found in his office. Major L., the deputy commander of the unit that deals with the collection of captured documents, testified about the capture of the documents, their marking and the manner in which they were sorted (on pp. 46 – 48). The captured documents were transferred to a Israel Security Agency interrogator by the name of "Ogen" (see his testimony on p. 48). During his testimony, he identified the documents that were appended to the transcript from the interrogation of the Defendant (on pp. 48 – 50). In the conversation between the Defendant and Ahmed Barghouti, which was recorded without their knowledge, the Defendant said that this referred to documents that had been seized in his office and the two were very concerned about the fact that the Defendant's "entire archive" had been seized. The Defendant said, "**the entire archive of the office [is] here**" (Prosecution/127 (c), on pp. 61 – 62).

The Expert Opinion of the DIFS with respect to the Defendant's handwriting (Prosecution/5) was rendered by Yair Ben Shemesh and is based on three samples of his handwriting that the Defendant confirmed during the course of his interrogation as being written in his hand (the three documents in Prosecution/5 are 94 – 96, 112 and 35, which the Defendant related to in Transcript Prosecution/28, Prosecution/28 (b), Prosecution/47,

[Stamp] P 7: 000397

Prosecution/85, and Prosecution/85 (a) that were submitted and verified by the Israel Security Agency interrogators "Wadi", on p. 96 and "Ofir", on p. 37). The interrogator from the DIFS divided the documents into four categories: those with respect to which there is no real doubt were written by the Defendant, those that might reasonably have been written by the Defendant, those that very likely were written by him, and those that the Defendant identified during the course of his interrogation as having been written by him. During the course of his police interrogation, the Defendant denied that his handwriting appeared on any of the documents that he had been shown (Prosecution/108-109).

64. Document Prosecution/5 (3-5) is a report that was sent to the Defendant on May 8, 2001, and which reviews the operations of the al-Aqsa Martyrs Brigades in the Jenin area. This report includes the number of people in the al-Aqsa Martyrs Brigades, their division into Brigades, details of their activities and the results of the terrorist attacks that they had perpetrated.

The activities listed in this document include shooting terrorist attacks on roads in Judea and Samaria, killing and injuring settlers, and terrorist attacks within Israeli territory (Uhm al-Fahm) in which an Israeli officer was killed and a civilian was injured. In addition, it includes a letter that requested financial assistance for the Brigades.

(2)   **The Defendant's personal involvement in the terrorist attacks that have been carried out by the cells under his command**

65. Immediately subsequent to his arrest, the Defendant claimed that he was a "political person" who is not involved in military operations or in the perpetration, planning, funding or guidance of terrorist attacks against security forces or against Israelis (Transcript Prosecution/6 Section 3 and Prosecution/9 Section 2 that were submitted and verified by an interrogator by the name of "Robert", on p. 62; Transcript Prosecution/14 Section 4 that was submitted and verified by an interrogator by the name of "Gabi", on p. 93). However, as his Israel Security Agency interrogation continued, the Defendant admitted to deep involvement in "military" operations, which is a euphemism for the perpetration of murderous terrorist attacks against Israeli civilians. In certain instances, it can be understood from the Defendant's statements, he even issued specific orders for the perpetration of terrorist attacks or gave his

[Stamp] P 7: 000397 [continued]

advance approval for their perpetration.

The Defendant claimed during the course of his interrogation that he himself had never planned the details of a terrorist attack and that the cells would involve Ahmed Barghouti and not himself in carrying out terrorist attacks and he did not always agree with them (Transcript Prosecution/72 Section 3 that was submitted and verified by an interrogator by the name of "Danny", on p. 90). Thus, for example, the Defendant emphasized that he rejected all of Ahmed Barghouti's attempts introduce him to people who would perpetrate suicide terrorist attacks (Transcript Prosecution/53 Sections 11 – 13 that was submitted and verified by an interrogator by the name of "Mofaz", on p. 58). In spite of this, the Defendant confessed that "**there is collective responsibility for the activity of Fatah's military members**" (Transcript Prosecution/21 Section 14, which was submitted and verified by an interrogator by the name of "Robert", on p. 63). The Defendant said during the course of his interrogation: "**I did not issue orders to any cells** [that said] **'hey we've come, and hey we want to carry out a certain terrorist attack in a particular place, this we are leaving for it and for its atmosphere, and personal desire...** (Transcript of Conversation Prosecution/98 (k) on p. 9).

According to the Defendant, after Ra'ed Karmi was killed in January 2001, the terrorist attacks were brought into Israeli territory. He tried to use his influence over the cells that followed his orders in order to moderate the terrorist attacks within Israel, but he was not always able to do so (Transcript Prosecution/70 Section 17 (g) that was submitted and verified by an interrogator by the name of "Steve", on p. 53). An example of this is the case of Manzur Sharam, who was responsible for the suicide terrorist attack in Hadera in revenge for the killing of Karmi.

The Defendant discussed this with Aweis and Mansour after the attack and reported it to Arafat (Transcript Prosecution/45 Sections 6 – 11 that was submitted and verified by an interrogator by the name of "Wadi", on p. 96). It should be noted that Manzur Sharam was Ra'ed Karmi's replacement, and this appointment had been approved by the Defendant (see the comments by Ahmed Barghouti in his Statement Prosecution/165 (m) on p. 5).

During the course of his interrogation, the Defendant said that in general he heard about the terrorist attacks after they were perpetrated, from either Aweis or Ahmed Barghouti, and that he would not go into details about how exactly the terrorist attack was carried out and by which cell; during the course of his interrogation, he listed the terrorist attacks about which he received reports after they were perpetrated (Transcript Prosecution/70 Sections 9, 12, 17 that was submitted and verified by an interrogator by the name of "Steve", on

page 53; and Transcript Prosecution/39 Section 8 that was submitted and verified by an interrogator by the name of "Wadi", on p. 96). However, throughout the course of his entire interrogation, the Defendant emphasized that with one exception he had not been personally involved in taking public responsibility for terrorist attacks that have been carried out by the al-Aqsa Martyrs Brigades. The person who issued the public statements subsequent to attacks was Aweis, in coordination with Ahmed Barghouti. Beyond this, Ahmed Barghouti served as an extension of the long arm of the Defendant, but the Defendant himself added to the above mentioned comment and said: "**I provide coverage for this issue. Politically in the media… I talk about the issue… I call for a struggle, I appraise the terrorist attacks as part of the struggle etc**…" (Transcript of Conversation Prosecution/98 (m) pages 40 – 46). In other words, the Defendant would take responsibility for the terrorist attacks through the media in an indirect and general manner without relating to a specific terrorist attack, while his subordinates would take specific responsibility for each individual attack.

What is clear from the Defendant's words is that the terrorist cell commanders considered him their leader and he supported them and assisted them by supplying weapons and explosives for the duration of their activity, although he knew that they were perpetrating murderous terrorist attacks against military and civilian targets in the Judea and Samaria region as well as within Israel, including suicide terrorist attacks, which the Defendant claims displeased him. When the Defendant continued supporting these operatives and assisting them after they reported the terrorist attacks to him, even when these were suicide terrorist attacks within Israel, the Defendant thereby expressed his support for their continued activity, including the activity that he supposedly did not support.

During the course of his interrogation, the Defendant himself said that Yasser Arafat had reprimanded him for the terrorist attacks that had been carried out within Israel (Transcript Prosecution/141 Section 10, which was submitted and verified by an interrogator by the name of "Robert", on p. 58); from this it follows that Arafat also considered the Defendant responsible for all of the terrorist attacks that have been carried out by the Tanzim and the cells of the al-Aqsa Martyrs Brigades that were under the command of the Defendant.

[Stamp] P 7: 000398 [continued]

The Defendant gave his approval, if only after the fact, to the terrorist attacks that have been carried out by the cells that accepted his authority: some he supported explicitly and some he supported by his behavior or with his silent agreement. He operated the cells under his command in an indirect manner through his subordinates and close associates such as Ahmed Barghouti, Abu Hamid, Abu Satha and Aweis, while keeping his distance from the people who actually perpetrated the attacks and intentionally avoiding getting himself personally involved with the planning and perpetration of the terrorist attacks. Even taking responsibility for the terrorist attacks was done by the Defendant in a "clean," indirect manner, not by way of a public statement issued by the al-Aqsa Martyrs Brigades, but rather in a political – as it were – implied manner in the media.

66. From that which has been set forth above, it becomes apparent that the Defendant confessed during the course of his interrogation to the things that also emerge from the testimony of the terrorist operatives, meaning that from a command perspective, he was responsible for the operations of the Tanzim and of the al-Aqsa Martyrs Brigade in the West Bank, which considered him their leader; he assisted terrorism operatives by providing money, weapons and explosives in order to carry out terrorist attacks; he personally led some of the terrorism cells, through his close associates; he encouraged the terrorist cells to carry out terrorist attacks against Israel; he received reports from the cells subsequent to the perpetration of terrorist – all of this while knowing that these cells were perpetrating murderous and suicidal terrorist attacks both within Israel and against civilians.

Furthermore: during the course of his interrogation, the Defendant even confessed to **personal** involvement in specific murderous terrorist attacks of the cells that he led, as follows:

**(aa) Terrorist attack at the gas station in Givat Ze'ev**

After the killing of Ra'ed Karmi on January 14, 2002, the Defendant, speaking on Abu Dhabi television, called on the al-Aqsa Martyrs Brigades to perpetrate revenge attacks against Israel (Prosecution/3 from January 14, 2002); however, the Defendant was not satisfied with this public statement. He instructed Ahmed Barghouti to bring to fruition a terrorist attack avenging Karmi. Indeed, in the evening of January 15, 2002, Ahmed Barghouti gave a weapon to Abu Satha for the purpose of perpetrating the above mentioned terrorist attack. On the evening of that day, members of Abu Satha's cell fired at the car of Yoela Chen, of blessed memory, near Givat Ze'ev, murdered her and injured the passenger who was with her (on this terrorist attack, see Chapter E (7), below).

[Stamp] P 7: 000399

The Defendant confessed during the course of his interrogation that after the death of Karmi, he told Ahmed Barghouti that he was interested in a revenge terrorist attack, and that Ahmed and his comrades perpetrated the terrorist attack in Givat Ze'ev and reported to him later that one person was killed in the terrorist attack (Transcript Prosecution/98 (k), on pp. 44 – 45). He even confessed that this terrorist attack was carried out in accordance with his orders and took responsibility for its perpetration (Transcript Prosecution/23 Sections 8 – 10, which was submitted and verified by an interrogator by the name of "Danny", on p. 90; Transcript Prosecution/24 Section 5 and the introduction to Transcript Prosecution/38 that were submitted and verified by an interrogator by the name of "Smith", on p. 85; Transcript Prosecution/26 Sections 3 – 6, which was submitted and verified by an interrogator by the name of "Nadav", on p. 79). The Defendant said, "**I said in the mourners' tent, that we need to avenge and respond to an event like this**… ", although he claimed that he did not "command" Ahmed Barghouti. During one of his interrogations, the Defendant confessed, "**We said to Ahmed something like implement a terrorist attack**" (Conversation Transcript Prosecution/98 (g) on p. 19 and also on pp. 20 – 45).

The Defendant explained that the assassination of Karmi led him to lose control of Fatah, and therefore he "**called for a response to the targeted assassination of Ra'ed Karmi in all media outlets… and responses did begin. For the first time, Fatah crossed the red line and carried out terrorist attacks within Israel**" (Transcript of Interrogation Prosecution/98 (j) on pp. 30-31 and Prosecution/98 (k) on pp. 9-

10, 12-15, 44-45). He noted during the course of his interrogation that the order that was given to perpetrate a terrorist attack in revenge for the killing of Ra'ed Karmi derived from his feeling of responsibility for the death of Karmi during a cease-fire, when the Defendant had called on all of the factions to stop the terrorist attacks because of the commitment given by the head of the Israel Security Agency that there would not be any targeted assassinations against leaders of Fatah; this was the only time when he went against Arafat who, at the time, asked that there be no terrorist attacks (Transcript Prosecution/31 Section 12, which was submitted and verified by an interrogator by the name of "Mofaz", on p. 58; Conversation Transcript Prosecution/98 (j) on pp. 29 – 31; Conversation Transcript Prosecution/98 (k) on pp. 11 – 13).

This confession of the Defendant corresponds with statements that were made by Ahmed Barghouti during the course of his interrogation (see Section 30, above), as well as with statements that were made by Abu Satha (Statement Prosecution/156 (b) on p. 5) and Masafur (see Section 53 above).

### (bb) Murder of the Greek Orthodox monk in Ma'ale Adumim

The Defendant confirmed that when Radaida proposed the perpetration of a suicide terrorist attack, he referred him to Muhannad so that he could direct him towards the type of terrorist attacks that Fatah cells carry out. The result of this was the terrorist attack in Ma'ale Adumim, in which the Greek Orthodox monk was murdered because it was thought he was a Jew (see statements by Radaida in Sections 42 – 43 above and Chapter E (3) below that deals with this terrorist attack).

### (cc) Terrorist attack on the Seafood Market Restaurant in Tel Aviv

During the course of his interrogation, the Defendant clearly connected himself to the terrorist attack at the Seafood Market Restaurant in Tel Aviv, in which three people were murdered (on this terrorist attack see Chapter E (12) below). Although at the beginning of his Israel Security Agency interrogation, the Defendant claimed that he did not have any connection to this terrorist attack, which Aweis was behind, and that Arafat was very angry about the perpetration of this terrorist attack (Transcript Prosecution/25 Section 12-13, which was submitted and verified by an interrogator by the name of "Mofaz", on p. 58). However, as his interrogation continued, the Defendant admitted that he knew about the intent to perpetrate this terrorist attack from his close associate Ahmed Barghouti, who was one of the people who planned the terrorist attack, and this was approximately one week **before** it was carried out ; Ahmed informed the Defendant that Ibrahim Hasouna – the terrorist – was ready to perpetrate a terrorist attack. The Defendant emphasized that he was not the one who supervised the perpetration of the terrorist attack and that he had instructed Ahmed Barghouti to perpetrate the attack in Judea and Samaria,

[Stamp] P 7: 000400

in a settlement or at a military roadblock, and not within Israel (Transcript Prosecution/44 Sections 3-7 and Prosecution/53 Section 3, which were submitted and verified by an interrogator by the name of "Mofaz", on p. 58; Transcript Prosecution/50 Section 1, which was submitted and verified by an interrogator by the name of "Wadi", on p. 96; Transcript Prosecution/52 that was submitted and verified by an interrogator by the name of "Smith" on p. 85).

These statements by the Defendant correspond with his version during the interrogation of Ahmed Barghouti [Translator's note: as written], aside from the fact that the latter said during the course of his interrogation that he reported to the Defendant not a short time prior to the terrorist attack but rather when the terrorist was already on his way, and that the Defendant was involved in wording the announcement taking responsibility after the terrorist attack was carried out (see Section 29 above). The Defendant, in contrast, said that he was not involved in wording the announcement taking responsibility for this terrorist attack although he did admit to giving his approval to the announcement taking responsibility for another terrorist attack that was carried out on the Atara Bridge (Terrorist Attack No. 18 in the appendix to the indictment) (Transcript Prosecution/52 as referenced above and Transcript Prosecution/58 Section 3, which was submitted and verified by an interrogator by the name of "Mofaz", on p. 58).

**In conclusion**: Despite what emerges from the words of Ahmed Barghouti, the Defendant admitted that he gave advance approval for perpetrating this particular terrorist attack, even if the orders were to kill other people in a different place.

### (dd) Attempted terrorist attack near the Malha Mall in Jerusalem

During his interogation, the Defendant said that he had provided assistance, by means of Ahmed Barghouti, to the terrorism operatives who perpetrated attacks in the Hebron area. One day, Ahmed Barghouti reported that one of these operatives (Jihad Jawara) was planning a suicide terrorist attack in Jerusalem. The Defendant said that he issued orders, by means of Ahmed Barghouti, that the terrorist attack should be in the Occupied Territories and not within Israel (for more on this terrorist attack, see Chapter E (20) below). The next day, he received a report that the suicide terrorist attack

near the Malha Mall in Jerusalem had failed (Transcript Prosecution/36, which was submitted and verified by an interrogator by the name of "Smith", on p. 85). In this case, too, the Defendant approved the terrorist attack against Israel, although in a different location.

**(3)**   **Provision of funds, weapons and explosives for carrying out terrorist attacks**

67.   At the beginning of his Israel Security Agency interrogation, the Defendant claimed that he was not involved in terrorism and that he never given anyone weapons and had not shot a gun (Transcript Prosecution/10 Section 1, which was submitted and verified by an interrogator by the name of "Danny", on p. 90). However, later in the interrogation the Defendent did admit that he had been responsible for giving money, weapons and explosives to the field cells belonging to the Tanzim and al-Aqsa Martyrs Brigades and that he knew that they were using them for terrorist attacks against Israel.

As the Defendant said, "**As part of my position as Secretary General of the Fatah, I was responsible for everything that was done, including supplying money to cells, purchasing weapons and carrying out terrorist attacks.**" (See the quote in Transcript Prosecution/29 Section 61 as mentioned above, and also Transcript Prosecution/59 Section 7, which was submitted and verified by an interrogator by the name of "Wadi", on p. 96).

The Defendant explained that he would transmit cells' requests for the purchase of weapons to Yasser Arafat under the heading "Personal Assistance" or "Financial Assistance" (Transcripts Prosecution/22 Section 6 and Prosecution/25 Section 14 that were submitted and verified by an interrogator by the name of "Mofaz", on p. 58). The Defendant also admitted that by purchasing weapons for cells, he acquired influence over their activities (see Section 61, above). In addition, the Defendant admitted that he gave financial assistance to Ahmed Barghoui and Ra'ed Karmi and supported them so they could perpetrate terrorist attacks (see Section 62 above).

Document Prosecution/5 (70 – 73) that was seized during Operation "Protective Shield" is a letter dated January 20, 2002, from Ra'ed Karmi to the Defendant, in which Karmi requests assistance for a list of operatives, including those who were involved in terrorists attacks in accordance with evidence presented in this case; the Defendant directed the request to Yasser Arafat in his own handwriting (in accordance with the Opinion of DIFS Prosecution/5). Another seized letter is Prosecution/5 (104) in which a wanted man named Salah Abu Hanish wrote to the Defendant asking that he return his weapons that had been confiscated; the Defendant's handwriting appears on the document (Opinion of DIFS Prosecution/5). In Letter Prosecution/5 (103), a group of operatives approached the

[Stamp] P 7: 000401

Defendant with a request to purchase weapons and noted that they have perpetrated many attacks against the army and settlers and have become wanted; the Defendant's handwriting is also found on this document (in accordance with the Expert Opinion of DIFS Prosecution/5).

68.   During the course of his interrogation, the Defendant explained that the cells, as well as individual cell members, would approach him to ask for money to fund the purchase of weapons and for other reasons, and he would submit their requests to Yasser Arafat (Transcript Prosecution/19 Section 14, Transcript Prosecution/22 Section 6 and Transcript Prosecution/25 Sections 14, 19, which were submitted and verified by an interrogator by the name of "Mofaz", on p. 58; Transcript Prosecution/70 Section 10, which was submitted and verified by an interrogator by the name of "Steve", on p. 53; transcripts of the Defendant's interrogation: Prosecution/98 (d) on pp. 13 – 16, 20 – 21; Prosecution/98 (k) on pp. 7, 17 – 18, 30; and Prosecution/90 8 (j) on pp. 13 – 14). He said that his requests to Arafat would not specify that the money was intended for the purchase of weapons (Transcript Prosecution/30 Section 6, which was submitted and verified by an interrogator by the name of "Emile", on p. 54). In context of this activity, approximately 15 weapons and ammunition for them were purchased and used for terrorist attacks (Transcript Prosecution/29 Section E, which was submitted and verified by an interrogator by the name of "Smith", on p. 85; Transcript Prosecution/60 Section 5, which was submitted and verified by an interrogator by the name of "Emile", on p. 54).

The Defendant emphasized that the military operations could not have taken place without funding from Arafat (Prosecution/60, as mentioned above, Section 7). He explained the issue: "**There is someone who comes and says 'I want a thousand shekels', he might receive a thousand shekels. I do not ask him, maybe next week he will go shoot, I do not care**" (Prosecutions/98 (k) on p. 30). During the course of his interrogation, the Defendant could not remember the details of the financial assistance that he gave to Fatah field operatives and explained that hundreds of operatives would approach him with requests for financial assistance in order to fund military activities (Transcript Prosecution/49 Section 10, which was submitted and verified by an interrogator by the name of Emile on p. 54).

69.   Within the framework of purchasing weapons for terrorism operatives, the Defendant agreed to purchase a mortar for the price of 1,500 dinar, and the Defendant described the operational problems involved in its operation during the course of his interrogation (Transcript Prosecution/29 Section F and Transcript Prosecution/38 Section 2, which were submitted and verified by an interrogator by the name of "Smith", on p. 85; Transcript Prosecution/42 Sections 13-15, which were submitted and verified by an interrogator by the name of "Wadi", on p. 96; Transcript of the interrogation of the Defendant Prosecution/98 (k) on pp. 7-8). The Defendant said

[Stamp] P 7: 000401 [continued]

during interrogation that he himself opposed firing mortars at Israel because it had been proven that this does not cause damage to Israelis but could cause significant damage to the Palestinians (Transcript Prosecution/38 as mentioned above). The Defendant's version corresponds with that given by Abu Hamid, who explained that the mortar was fired at the settlement of Psagot but the Defendant asked him not to talk about it with anyone (see Section 25 above).

**(4)   Assistance for wanted men and the families of the people arrested or killed**

70.   The Defendant funded not only terrorism operatives but also members of their families. He admitted during the course of his interrogation that he had transferred to Yasser Arafat requests for assistance to families of suicide terrorists, and even justified this by saying that there is no difference between someone who perpetrated a suicide attack and someone who was killed; in his eyes they were all "martyrs", meaning they had died a holy death (Transcript Prosecution/10 that was submitted and verified by an interrogator by the name of "Danny", on p. 90; Transcript Prosecution/54 Section 5, which was submitted and verified by an interrogator by the name of "Wadi", on p. 96; Conversation of the Defendant with Agent John Doe No. 3 Prosecution/124 (c) on pp. 7, 22 – 23). Similarly, the Defendant made sure to fund families of Fatah operatives who had been arrested or were wanted (Conversation of the Defendant with Agent John Doe No. 3 Prosecution/124 (c) on pp. 22 – 23).

A large number of documents that are related to this subject were seized during Operation "Protective Shield", which constitute requests for assistance that the wanted men had addressed to the Defendant, asking to purchase weapons or explosives, and in order to relieve them of the necessity of earning a living (see: Prosecution/5 (2 – 12), which the Defendant verified during the course of his interrogation and which was documented in Transcript Prosecution/47 that was submitted and verified by an interrogator by the name of "Wadi", on p. 96; Prosecution/5 (64 – 65); Prosecution/5 (87); Prosecution/5 (105); Prosecution/5 (117); Prosecution/5 (118)). Moreover, the Defendant took the trouble to arrange for job appointments or places of employment for wanted men (see, for example, the Letters Prosecution/5 (78 – 79), which, in accordance with the Expert Opinion of DIFS Prosecution/5 would be very reasonable to assume that they had been written by the Defendant.

An additional document is Prosecution/5 (133), which includes a request to the Defendant for assistance to members of the Fatah movement who carried out terrorist attacks and were arrested by Israel, and for other wanted men; the Defendant noted on this document: "**It is a priority to include them in the assistance**" and in accordance with the Expert Opinion of DIFS Prosecution/5 this comment was, leaving no real doubt, written by the Defendant.

[Stamp] P 7: 000402

Imad al-Shakir was a Tanzim operative who murdered in an Israeli in Salfit and when he became a wanted man, he asked the Defendant for assistance and even told him about the murder he had perpetrated. He explained in his testimony that he approached the Defendant because the Defendant was known as a person who would help in cases like his but he also described the Defendant as "**a political person who did not participate in military affairs**" (on pp. 182 – 184).

### (5)   Recruiting and training operatives for terrorist organizations

71.   During his Israel Security Agency interrogation, the Defendant confirmed the points that Abu Hamid told the Police regarding the financial assistance that the Defendant gave for constructing a military training camp for Tanzim operatives, in order to train them in guerrilla warfare and in the use of weapons (Statement of Abu Hamid Prosecution/149 (c) on pp. 1 – 2). The Defendant even confirmed that he personally interviewed the young people who were training in his office (Transcript Prosecution/28 Sections 10 – 11, which was submitted and verified by an interrogator by the name of "Wadi", on p. 96; Transcript Prosecution/34 Section 3, which was submitted and verified by an interrogator by the name of "Itai", on p. 52; and Transcript of the Defendant's interrogation Prosecution/98 (k), on p. 9). In his police interrogation, the Defendant denied any connection to the training or instruction of field operatives (Prosecution/106 on p. 3).

In his above mentioned statement (on pp. 6-7), Abu Hamid spoke about how the Defendant appointed Muhannad as the cell commander after the death of the previous commander. During the course of his interrogation, the Defendant also confirmed the statements that Radaida told the Police with respect to the process by which he was recruited by means of the Defendant's involvement (see Section 43 above). From the comments of the Defendant and Radaida, it becomes apparent that the Defendant heard from Radaida that he intended to perpetrate a shooting terrorist attack and, therefore, referred him to Muhannad, who was a senior field commander and had carried out terrorist attacks against Israeli targets. The terrorist attack in which the Greek Orthodox monk was murdered was a result of this contact.

[Stamp] P 7: 000402 [continued]

**(6)   The Defendant's public calls to carry out terrorist attacks against Israel**

72.   As already explained above, the Defendant did not deny, during the course of his interrogation, his support for terrorist attacks against military and civilian targets in the West Bank, meaning soldiers and settlers (see Sections 13 – 16 above). The Defendant also explained that he would sometimes instruct the cells that accepted his authority to stop the terrorist attacks and would then inform them to resume them anew, using public television broadcasts (see Section 16 above). The Defendant was aware of the influence his words had on people carrying out terrorist attacks and said, "**I have influence because I speak through the media. That is to say that I state the position using media outlets… My word is heard as if I were speaking in the name of the Fatah movement**." (Transcript of interrogation Prosecution/98 (d) on p. 33; see also pages 37-39). The Defendant did not deny that cell members would turn to him to ask for assistance because he appeared as a spokesman for Fatah in the media and took a position calling for an armed struggle (Transcript of interrogation Prosecution/98 (e) on p. 61). He admitted that during his public appearances he would encourage the operatives to carry out terrorist attacks within the territories against the army (Transcript of Investigation Prosecution/98 (j) on p. 25, and Transcript Prosecution/29 Section 1 (b), which was submitted and verified by an interrogator by the name of Smith, on p. 85.)

73.   The Defendant's public calls for the perpetration of terrorist attacks against Israel were documented by the Intelligence Branch and were submitted in Binder Prosecution/3 (including the original cassettes, Prosecution/3 (a) – (b)) by the head of the Research Division of the Intelligence Branch, Brigadier General Y. Cooperwasser (on p. 38). With respect to this issue, the documents that have been included in Binder Prosecution/3, which do not document the words that the Defendant himself said on radio and television and were recorded, are to be ignored. Newspaper articles or other news items that attribute statements of one type or another to the Defendant are not admissible in accordance with the Rules of Evidence, due to the fact that their testimony is considered to constitute hearsay.

In general, based on statements that were made by the Defendant in the various media outlets, it can be said that he clearly emerges as someone speaking in the name of the al-Aqsa Martyrs Brigades and the Tanzim, and as their leader. The Defendant calls in these organizations – sometimes clearly and sometimes by inference – for the continuation of the perpetration of terrorist attacks against Israel. After each Israeli action, he announced on behalf of the Fatah movement and the al-Aqsa Martyrs Brigades that revenge would not be slow to follow (see, for example, the interviews on Abu Dhabi television on January 14, 2002, and August 15, 2001). Despite the Defendant's claims that he opposed terrorist attacks within Israel, in several interviews he is heard supporting terrorist attacks that have been carried out within Israel and even praised the perpetrators (see justification of the terrorist attack in Netanya in the television interview with Al Jazeera on May 18, 2001; justification for the terrorist attack in Jerusalem on Al Jazeera television on August 9, 2001; and an additional attack in Jerusalem that the Defendant justified on Watan Television on October 31, 2002.)

74. During the funeral of Emad Elanati on October 2, 2000, the Defendant said on Watan Television Ramallah, "**The days in which we just offer sacrifices are over. We must seek revenge. Israelis should be killed. Israelis should be killed. Yes. We have bullets. We have rifles and they are aimed at the occupation**."

In a telephone interview with the newspaper Asharq al-Awasat on March 1, 2001, the Defendant was asked if Palestinian resistance might evolve from rocks to weapons, and he answered, "**The armed struggle is a part of the *intifada* already and it is not limited to rocks. Since the *intifada* began, we have succeeded in killing 66 of them and injuring 416, and this is a good outcome**."

On October 29, 2001, the Defendant was interviewed on Watan Television Ramallah and he was asked his reaction to the two terrorist attacks that had been perpetrated that day in Hadera and in Baka al-Gharbiya, and he answered: "**It is the right of Palestinian people, and in essence an obligation of its fighters, to respond to aggression and to avenge the slaughter that has taken place in Beit Rima, Bethlehem and Tulkarm. Therefore, what happened today is a natural response of Palestinian fighters to Israeli acts of slaughter**."

On March 4, 2002, the Defendant was interviewed for the al-Zamam newspaper, which is published in London, and in accordance with reporter Nitzal Alliyati, the Defendant said

[Stamp] P 7: 000403 [continued]

that the two suicide terrorist attacks (in Beit Yisrael and Ofra) were "**Messages addressed to the Israelis that they should cease their support for Sharon.**"

After the death of Ra'ed Karmi on January 14, 2002, the Defendant spoke on Abu Dhabi television and called on the al-Aqsa Martyrs Brigades to carry out terrorist attacks against Israelis in revenge, (Prosecution/3 – dated January 14, 2002). The Defendant admitted this during the course of his interrogation (Transcript of Conversation Prosecution/98 (g) on p. 78).

On May 19, 2001, Watan Television Ramallah broadcast a procession that was led by the Defendant and a senior official from Hamas. During the procession, the Defendant spoke to the crowd using a loudspeaker and praised those people who had been killed during the course of the *intifada*, including the perpetrator of the terrorist attack in Netanya. In addition, the Defendant promised to continue terrorist attacks against the settlers and praised those perpetrating suicide attacks against settlers.

[Stamp] P 7: 000404

**E.   The Connection of the Defendant to the Terrorist Attacks That Are the Subject of the indictment**

75.   In the indictment, the Defendant is charged with involvement in 37 terrorist attacks that were set forth in the appendix to the indictment, and which were perpetrated by field commanders and terrorism operatives who were subordinate to the Defendant.

In its summation, the Prosecution attributed to the Defendant only 21 terrorist attacks from the list that had been appended to the indictment, and therefore this verdict will relate only to those 21 terrorist attacks for which, in accordance with the Prosecution's claims, evidence was presented that connects the Defendant to the perpetration of the attacks. Discussion of these terrorist attacks will include the evidence that has been set forth  with respect to the events of the terrorist attack itself, who planned and perpetrated it, and what the Defendant's relationship was to the terrorist attack or its planners or its perpetrators.

**(1)   Murder of Talia and Binyamin Kahane, of blessed memory, near Ofra**

76.   On December 31, 2000, at 6:30 a.m., shots were fired from an ambush on the car of the couple, Talia and Binyamin Kahane, of blessed memory, and their five children, on Route No. 60 near the settlement Ofra. As a result of the shots, the car rolled into a ditch alongside the road. The Kahane couple were murdered in this terrorist attack (Death Certificate Prosecution/128 (a)-(b)) and their five children were injured (See the Action Report of Eli Kojman and Superintendent Ofer Chelouche Prosecution/128 (c)-(d), Photograph Boards Prosecution/128 (h)-(i) that were submitted by Kojman and Chelouche during their testimony, on pp. 121, 127; and the Statement of a Public Employee given by Superintendent Ovadya Prosecution/128 (e)). The interrogation conducted by DIFS found, on the basis of the bullet shells from a Kalashnikov rifle that were collected at the scene, that the weapon used in this terrorist attack was also used in terrorist attack No. 6 on the list appended to the indictment, in which Eliahu Cohen, of blessed memory, was murdered near Givat Ze'ev (Expert Opinion of Howard Silverwater Prosecution/128 (f)-(g)).

77.   In his police interrogation, Abu Hamid intimated that he was the one who supplied the weapon and ammunition to the terrorist who murdered the Kahane couple, of blessed memory, Ahmed Gandor (Statement by Abu Hamid Prosecution/149 (a) on pp. 4-6, which was collected by staff Sergeant Major Ibrahim Elkura'an, on the basis his testimony on p. 194). In the statement, Abu Hamid said that Gandor asked him for a weapon (Kalashnikov) and ammunition in order to perpetrate a terrorist shooting attack on an Israeli vehicle near Ramallah and the next day the murder of the Kahane couple, of blessed memory, was reported to him, as he learned from the report on the radio.

[Stamp] P 7: 000405

In this case we are permitted to consider only the testimony of Abu Hamid and commanded to ignore the things that Gandor told him about the manner in which the terrorist attack was carried out, because this is hearsay evidence. Consequently, this Court does not have admissible evidence showing that this murder was committed using the weapon that Abu Hamid gave to Gandor. Therefore, we do not have any evidence connecting the Defendant to the murder of the Kahane couple, of blessed memory (the Defendant said during the course of his interrogation that he was acquainted with Gandor, who was killed by an accidentally discharged bullet – Transcript Prosecution/68 Section 2). Indeed, a large quantity of evidence was submitted with respect to the Defendant's comprehensive and supreme responsibility for the terrorist attacks perpetrated by members of Fatah on the West Bank, as the person who led this activity, who called for its perpetration and who assisted its actualization by supplying money, weapons and explosives. However, there is no admissible evidence that this particular terrorist attack was indeed perpetrated by members of the Fatah.

The only admissible evidence in this matter is that the Defendant assisted Abu Hamid to purchase weapons and ammunition for the purpose of carrying out terrorist attacks, as Abu Hamid and the Defendant admitted during interrogation (see Chapter C (2) above) and that Abu Hamid did indeed give a weapon that he purchased with the assistance of the Defendant to Gandor for the purpose of perpetrating a terrorist attack. Beyond this, we have no evidence.

**(2)** **Murder of Akiva Pashkos, of blessed memory, in the Atarot industrial area**

78. On January 25, 2001, at 6:25 p.m., shots were fired from an ambush at the vehicle of Elazar Akiva Pashkos, of blessed memory, in the Atarot industrial area. The deceased was traveling in a GMC van and was shot with a 9 mm caliber pistol (see DIFS Opinion Prosecution/129 (c)). As a result of this shooting, the deceased died (Death Certificate Prosecution/129 (a)) and was found lifeless in his van approximately one minute after the shooting (See the testimony of Herman Sapek on p. 150, report of Superintendent Leor Nadivi, Prosecution/129 (b), and his testimony on p. 132). The event is also depicted by pictures photographed by Avinoam Alia that are appended

[Stamp] P 7: 000405 [continued]

to the public documents that were submitted (Prosecution/129 (d)).

79.   Ahmed Barghouti admitted during interrogation that he gave Abu Satha and another person a vehicle in order to perpetrate a terrorist attack, and after several hours, the two reported to him that they had shot a Jew traveling in a GMC in the Atarot area, who was injured by the shots (Statement Prosecution/165 (a) on p. 3, which was submitted by Staff Sergeant Major David Mizrahi on p. 184.)

Abu Satha admitted that he perpetrated a terrorist attack in the Atarot industrial area and shot a pistol at the driver of a gray GMC Safari (as can be seen in the pictures Prosecution/129 (d) which were photographed after the terrorist attack) and later reported this to Ahmed Barghouti, who was, in accordance with Abu Satha, the Defendant's "**driver and right-hand man**" (Statement Prosecution/156 (b), which was submitted and verified by the police officer Marco Dahan, on p. 198).

80.   The Prosecution does not have any evidence that directly connects the Defendant to the above mentioned terrorist attack. However, a large quantity of general evidence has been presented showing that Ahmed Barghouti was the Defendant's close assistant and operated with his knowledge and under his sponsorship for organizing and carrying out terrorist attacks. The Defendant admitted that he funded terrorist attacks in which Ahmed Barghouti was involved, that he supported his activity and that Ahmed Barghouti would report to him after the terrorist attack was completed. The Defendant also admitted that from his perspective, Ahmed Barghouti was responsible for the military operations in the Ramallah area and that he operated in coordination with Defendant. The Defendant explained during the course of his interrogation that his connection with the terrorist cells was through Ahmed Barghouti (see Chapter C (3) above).

Abu Satha was also close to the Defendant and during one period served as his bodyguard. The Defendant confirmed during the course of his interrogation that Abu Satha worked in his office and under his responsibility, through Ahmed Barghouti, and he knew that the two were carrying out terrorist attacks against civilians in the Jerusalem area (see Chapter see C (4) above).

The Defendant also said during interrogation that he considered himself responsible for the activities of the cells that worked with Ahmed Barghouti and Abu Satha – unlike other cells – because the two were close to him and he funded their activities (see Section 60 above). The Defendant also acknowledged that he acquired influence over the cells' activities through the assistance and weapons that he gave them (see Section 61 above).

[Stamp] P 7: 000406

All this is in addition to the Defendant's overall responsibility as the commander and leader of all of the terrorism operatives of the Fatah on the West Bank, as he himself admitted (see Section 65 above) and in addition to the fact that the Defendant encouraged terrorism operatives, both publicly and individually, to carry out terrorist attacks.

The difficult legal question of whether this is enough to substantiate the Defendant's criminal liability for the act of murder that was committed in this case – when there is no evidence that ties him directly to the terrorist attack – will be considered in the chapter of conclusions.

**(3)** **Murder of the Greek Orthodox monk Tsibouktzakis Germanos, of blessed memory, in Ma'ale Adumim**

81.    On June 12, 2001, at 10:30 p.m., shots were fired from an ambush on the road between Jerusalem and Ma'ale Adumim, at the private car of the Greek Orthodox monk Tsibouktzakis Germanos, of blessed memory. The car, a Peugot utility-type model, had Israeli license plates. Germanos, of blessed memory, was murdered by those shots (Certificate of Death Prosecution/132 (a) and Pathology Expert Opinion of Professor Hiss Prosecution/130 (b)). Superintendent Nissim Mizrahi (on p. 131), who submitted the report of the preliminary visit to the scene and photographs (Prosecution/130 (c)-(d)), and Senior Staff Sergeant Major Avi Levi of DIFS, who submitted a Statement of a Public Employee (Prosecution/130 (f)) both testified on this terrorist attack. The bullet shells that were gathered at the scene were checked by the DIFS (see the expert opinion of Superintendent Avi Kaufman, Prosecution/130 (g)-(i)).

82.  Radaida admitted during interrogation that he perpetrated the above mentioned terrorist attack and described the reasons for it. He said that he asked the Defendant about perpetrating a suicide terror attack. The Defendant referred him to Muhannad and instructed Muhannad to give a weapon to Radaida, and so he did. The Defendant also told Radaida that the Tanzim perpetrates terrorist attacks against the army and the settlers but not suicide terrorist attacks and that he had given him the weapon for this purpose. And indeed, the weapon (Kalashnikov) that Radaida received from Muhannad, in accordance with the Defendant's direct orders, was the one used to murder the monk Germanos, of blessed memory, as he described during the course of his interrogation, explaining that he erroneously thought that he was a settler (see Chapter C (8) above Sections 41-42).

83.  The Defendant himself confirmed Radaida's words during the course of his interrogation and said that he had referred him to Muhannad after he asked to commit suicide, and later heard that he had erroneously killed a Greek monk (see Section 43 above). On the basis of all this, the direct personal liability of the Defendant to this terrorist attack is clear.

**(4)  Murder of Yaniv and Sharon Ben-Shalom, of blessed memory, and Doron Yosef Sviri, of blessed memory, on Route 443**

84.  On August 5, 2001, at 10:30 p.m., the couple Yaniv and Sharon Ben-Shalom, of blessed memory, and Doron Yosef Sviri, of blessed memory (Sharon's brother) were murdered while traveling together with their two children in a Passat model car with Israeli license plates, on Route 443 by the Dor Energy gas station (see Death Certificates and Pathology Opinion Prosecution/131 (a) – (c)).

The results of the terrorist attack were described by police officers Haim Toledano and Advanced Staff Sergeant Major Shaby Ovadya (on pp. 123, 139 and their Action Report Prosecution/131 (d) – (e), accompanied by Photograph Board Prosecution/131 (f)). The bullets that were gathered at the site were sent to DIFS for study and it was found that they were fired from two weapons: an MP5 submachine gun and a Kalashnikov (Expert Opinion Prosecution/131 (f)).

[Stamp] P 7: 000407

85. Ahmed Barghouti said during the course of his interrogation that he gave his MP5 rifle to Abu Satha after Abu Satha requested it for his cell, and a short time later, he heard from Abu Satha and also on the news that a member of his cell perpetrated a terrorist attack in which three Jews were killed near Beit Ghur (Statement Prosecution/165 (a) on p. 2, which was submitted by Staff Sergeant Major Mizrahi, on p. 184). Abu Satha also said during interrogation that he received the MP5 rifle and a full cartridge of bullets from Ahmed Barghouti and gave them to two members of his cell, Hussam and Faris. The two told him that they perpetrated the terrorist attack near Beit Ghur in which three Israelis were killed (Statement Prosecution/156 (b) on p. 3, which was submitted by an interrogator by the name of Dahan on p. 198).

The terrorist who perpetrated the attack, Hussam Shahada, confirmed during interrogation that he and another person perpetrated the terrorist attack near Beit Ghur on Route 443 by the Dor Energy gas station by firing at a white Passat car (see photographs). He noted that the shots were fired with an MP5 rifle that he received from Ahmed Barghouti and that his partner in the terrorist attack was armed with a Kalashnikov. On the following day, Shahada heard that three Israelis were killed as a result of the terrorist attack and reported this to Ahmed Barghouti, who passed a report on to the Defendant (Statement Prosecution/160 (a) on pp. 4 – 5, which was submitted by Dahan on p. 198). Shahada refused to answer questions during his testimony. Consequently, he was declared a hostile witness and his statements Prosecution/160 (a) – (c) were submitted together with the indictment verdict and sentence in his case (Prosecution/159 (a) – (d)). During his testimony he said only, "**I have said what I had to say and do not want to say anything else**" (on p. 73). Shahada was convicted of perpetrating this terrorist attack.

86. No evidence was presented connecting the Defendant to this terrorist attack other than his indirect connection, in accordance with that which has been set forth above, in the cases of the terrorist attacks in which his close associates, Ahmed Barghouti and Abu Satha, were involved (see Section 80 above). The Defendant supplied money and weapons to the members of the cell, by way of Ahmed Barghouti, in order to carry out terrorist attacks and the weaponry used for this terrorist attack was supplied by Ahmed Barghouti.

The question of whether this is sufficient to substantiate the Defendant's criminal liability for the acts of murder which were perpetrated during this terrorist attack when there is no evidence connecting the Defendant directly to this terrorist attack, will be examined in the chapter of conclusions.

**(5)** **Murder of Meir Weissboiz, of blessed memory, on Route No. 9 in Jerusalem**