# EXHIBIT A.451
## (4 of 11)

87.  On September 15, 2001, at 9:15 p.m., shots were fired from an ambush on a vehicle traveling on Route No. 9 in Jerusalem, from French Hill towards Golda Meir Boulevard. The vehicle, a white Renault Express, was driven by Moshe Weiss, who testified that he was injured by a bullet that is lodged in his body – in his spine – to this day, and his cousin Meir Weissboiz, of blessed memory, was killed by the shots (on p. 138, Death Certificate Prosecution/132 (b), Action Report of Superintendent Leor Nadivi Prosecution/132 (c) and the testimony of Nadivi on p. 132, and also the Photograph Board Prosecution/132 (c)). Bullet shells were collected at the scene and sent to DIFS for examination, which determined that they were apparently fired from a pistol and an MP5 submachine gun from which the fatal shots that killed the three people mentioned in incident No. 4, above, were fired (DIFS Expert Opinion Prosecution/132 (d)).

88.  Hussam Shahada said in his Statement Prosecution/160 (a) on p. 6, that was collected by Advanced Staff Sergeant Major Mark Dahan (on p. 198 of the transcript) that he received the pistol and the MP5 submachine gun from Ahmed Barghouti and traveled with two other people (Faris and Heitham) in the car until they reached Route No. 9 in the direction of Ramot and French Hill. When they saw the white utility vehicle, they began to fire at its passengers and fled to Ramallah. After the incident, Shehada asked Abu Satha, who worked in the office of the Defendant, to report to the Defendant and to Ahmed Barghouti about the shooting. The following day, he heard that one of the passengers who was injured by the shots had died of his wounds (see also Section 85 above, with respect to Shahada's testimony). Shahada's statements are supported by comments said by Ahmed Barghouti and Abu Satha in their interrogations (see Section 85 above).

89.  The connection of the Defendant to this terrorist attack, like the attack in Section 4 above, which was also perpetrated by Shahada, is not direct, since no evidence was submitted with respect to the Defendant's involvement in this terrorist attack. The indirect connection of the Defendant to this terrorist attack is derived from the fact that it was executed by his close associates and assistants, Ahmed Barghouti and Abu Satha, whose activities the Defendant funded, including the purchase of weapons.

The legal question of whether this is sufficient to substantiate the criminal liability of the Defendant for the act of murder that was carried out during this terrorist attack, when there is no evidence connecting the Defendant directly to this particular terrorist attack, will be examined in the chapter of conclusions.

**(6)  Murder of Eliahu Cohen, of blessed memory, in the shooting terrorist attack on Route 443 near Givat Ze'ev**

[Stamp] P 7: 000408

90. On December 21, 2000, at 8:30 p.m., shots were fired from an ambush at the car of Eliahu Cohen, of blessed memory, traveling on Route 443 approximately 1.5 km [0.93 miles] from the settlement Givat Ze'ev (see the Death Certificate Prosecution/133 (a), Pathology Opinion Prosecution/133 (c) and the report of the mobile DIFS Laboratory Prosecution/133 (c) about which Superintendent Chelouche testified on p. 127). Brian Malcolm Shapiro, an eyewitness to the terrorist attack, testified about it (on p. 149). Examination of the bullet shells that were gathered at the scene found that the weaponry used in this terrorist attack was apparently the Kalashnikov rifle that was also used to murder the Kahane couple, of blessed memory (see Opinion Prosecution/133 (d) and Prosecution/128 (f)).

91. During the course of his interrogation, Abu Hamid spoke about the activities of the Ahmed Gandor cell, which perpetrated this terrorist attack (Statement Prosecution/149 (a) on pp. 10 – 12, which was collected by Elkura'an: his testimony is on p. 194). Abu Hamid said during interrogation that he supplied Gandor with the Kalashnikov rifle and ammunition that he received for this purpose from Ahmed Barghouti and that he gave Gandor permission to perpetrate a shooting terrorist attack on Route 443 where Eliahu Cohen, of blessed memory, was killed. Abu Hamid also said that the terrorist attack was carried out by Muhannad and Shawish on the basis of what Muhannad told him after the terrorist act. Muhannad was not a witness in this trial, and the interrogation of Shawish, who did testifiy before us, did not relate to this event and this terrorist attack was not included in the indictment filed against Shawish (Prosecution/157 (a)).

In light of that which was mentioned above, we have before us only the testimony of Abu Hamid, in which he said that he approved a shooting terrorist attack against an Israeli vehicle on Route 443 in late 2000, and that he supplied the weapon to the perpetrators. We do not have before us any admissible evidence with respect to the identity of the person who perpetrated the terrorist attack, meaning that we do not have any admissible evidence connecting the Defendant to a terrorist attack perpetrated through Abu Hamid.

[Stamp] P 7: 000408 [continued]

The only evidence before us is that the Defendant assisted Abu Hamid in purchasing weapons and ammunition for terrorist attacks and that Abu Hamid gave the weapon that was purchased with the assistance of the Defendant to Gandor in order to perpetrate a shooting terrorist attack (this is the same situation as in the case of the murder of the Kahane couple, of blessed memory, which was carried out using the same weapon; see Chapter E (1) above).

**(7)** **Murder of Yoela Chen, of blessed memory, near the Givonim gas station on Route 443**

92. On January 15, 2002, at 7:55 p.m., Yoela Chen, of blessed memory, arrived in a Fiat Uno at the gas station near the Givonim intersection. Rochelle Eini was sitting next to her. Two terrorists approached her car and shot dozens of bullets at the two, from short range. As a result of the shooting, Yoela Chen, of blessed memory, was murdered (Death Certificate 134 (a)) and Rochelle Eini was injured in her head and shoulder. An eyewitness to the event, Sammy Vaknin, testified he saw a young man running away towards the neighboring village of al-Jib after the shooting, and he helped rescue the travelers (on p. 143). Superintendent Ami Leifer and Senior Staff Sergeant Major Eli Kojman described the incidents in similar manner (on p. 130 of the transcript and Reports Prosecution/134 (b)-(d.1), in addition to the Photograph Board Prosecution/134 (b) and Prosecution/134 (d.2)).

93. The terrorist attack in which Yoela Chen, of blessed memory, was murdered was carried out following direct orders given by the Defendant in revenge for the killing of Ra'ed Karmi the day before the terrorist attack, as the Defendant admitted during the course of his interrogation. During the interrogation, the Defendant said that he instructed his close associate, Ahmed Barghouti, to perpetrate this revenge terrorist attack and that Ahmed reported to him that the terrorist attack had been perpetrated. The Defendant even took responsibility for perpetrating this attack and noted that this was the first time that Fatah had perpetrated an attack deep within Israel (see Section 66 (a) above.)

The Defendant's comments during the course of his interrogation are consistent with thosee of Ahmed Barghouti, Abu Satha and Musafar during their interrogations (see Sections 30 and 53 above; Abu Satha's Statement Prosecution/156 (b) on pp. 5-6 about which collection Dahan testified, on p. 198; and the Statement of Ahmed Barghouti Prosecution/165 (a) on p. 3 and Prosecution/165 (c) on pp. 1-2, about which collection Mizrahi testified, on p. 184.) They described the terrorist attack that was carried out at the gas station by shooting at a Fiat Uno car in which one woman was murdered and her companion was injured. Abu Satha, who actually fired the shots, claimed that he originally decided not to shoot at the two because they were women but after they began to shout, he shot at them, as did his comrade Tarek.

[Stamp] P 7: 000409

Abu Satha claimed that he perpetrated the terrorist attack in accordance with the orders given by Ahmed Barghouti, while the latter claimed that Abu Satha was the one who initiated the terrorist attack and therefore he gave him the MP5 rifle. Ahmed Barghouti claimed in his statement that Abu Satha told him that he had reported his intentions to perpetrate a terrorist attack before he perpetrated it and the Defendant told him not to undertake this terrorist attack.

Ahmed Barghouti explained that Abu Satha was the Defendant's bodyguard and driver and that the Defendant feared for his life. In the conversation between the Defendant and Ahmed Barghouti after they were arrested, which was recorded without their knowledge, the two coordinated versions with respect to this terrorist attack and Ahmed Barghouti told the Defendant that he emphasized during the course of his interrogation that he had given the orders to perpetrate this terrorist attack behind the Defendant's back (Transcript of Conversation Prosecution/128 (c) on pp. 14, 17). However, the Defendant, as noted above, admitted that he gave orders to perpetrate this terrorist attack and therefore it is clear that his close associate Ahmed Barghouti tried to save him from being directly involved in this terrorist attack, like other terrorist attacks.

**(8)** **Murder of six people in David's Palace Banquet Hall in Hadera**

94.   On January 17, 2002, at 10:45 p.m., a shooting terrorist attack was carried out at David's Palace Banquet Hall in Hadera. The terrorist, Abdel Salaam Hasouna, shot the security guard at the entrance to the hall, charged in, and began firing an automatic weapon at the crowd, until several people overtook him and he was shot to death (Pathologist's Opinion Prosecution/135 (j)). They were celebrating at the Bat Mitzvah party of Nina Kardashova. As a result of this shooting, six people were murdered and dozens were injured, some of them seriously. Those who were murdered are: Boris Melikhov, of blessed memory, (Death Certificate Prosecution/135 (b)); Dina Binayev, of blessed memory, (Death Certificate Prosecution/135 (c)); Anatoly Bakshayev, of blessed memory, (Death Certificate Prosecution/135 (d)); Avi Yazdi, of blessed memory, (Death Certificate Prosecution/135 (e)); Edward

Bakshayev, of blessed memory, (Death Certificate Prosecution/135 (f)); and Aharon Ben Yisrael-Ellis, of blessed memory, (Death Certificate Prosecution/135 (g)). During his testimony, eyewitness Constantine Kardashov related the course of events (on p. 125), and the incident can also be seen in the police presentation and cassettes that were recorded during the incident (Prosecution/135 (a), Prosecution/135 (k) – (l)). An M-16 assault rifle and a grenade that were used by the terrorist were seized at the scene (see Opinion Prosecution/135 (g) – (i) and the testimony of Superintendent Leifer on p. 130).

95. Nasser Aweis was responsible for the perpetration of this terrorist attack and he was the one who provided the terrorist Hasouna with the weapon for this purpose (see his statement Prosecution/172 (b), about which collection Major Amar testified on p. 191). This also emerges from the statement given by Ahmed Barghouti who said that Aweis reported to him on the terrorist attack that was carried out in the banquet hall in Hadera (Statement Prosecution/165 (d) about which collection Staff Sergeant Major Ya'akoboff testified on p. 171). Ahmed Barghouti said that he heard about perpetration of the terrorist attack on television while he was with the Defendant and immediately called Aweis, who took responsibility for perpetrating the terrorist attack.

Abdul Hamid also related to this terrorist attack during the course of his interrogation and he also explained that it was in revenge for the targeted assassination of Ra'ed Karmi and therefore the terrorist departed from Tulkarm, where Karmi had lived (Prosecution/149 (b) on pp. 14-15 about which collection Staff Sergeant Major Elkura'an testified on p. 194).

96. There is no direct evidence that the Defendant was directly involved in the planning of the above mentioned terrorist attack or knew about its perpetration in advance. The Defendant claimed that he would hear reports of terrorist attacks from Ahmed Barghouti and Aweis only after they occurred, and in his conversation with Agent John Doe No. 1 he said that he knew about this terrorist attack only after the fact (Report Prosecution/118 Section 4 that was submitted by "Robert"). The indirect connection of the Defendant to the terrorist attack in Hadera is created by the fact that he supplied Aweis with money, weapons and explosives in order to carry out terrorist attacks and that the latter considered him a leader and commander and therefore reported to him after every terrorist attack. The Defendant admitted to providing Aweis with money in order to purchase weapons and said that when he wanted to ensure that the terrorist attacks would cease he would also contact Aweis about this (see Section 23, above). In spite of this, the Defendant did not consider himself responsibile for the activities of Aweis unlike the activities of Ahmed Barghouti, Abu Satha and Abu Hamid (see Sections 60 and 65, above). During the course of his

[Stamp] P 7: 000410

interrogation, Aweis also said that he perpetrated the terrorist attacks that he initiated within the framework of Tanzim Fatah for which the Defendant was responsible, and that the Defendant helped them with funding terrorist attacks and supplying weapons. He noted that the Defendant was his superior (see Sections 21-22, above).

The legal question of whether all this is sufficient to substantiate the Defendant's criminal liability for the acts of murder that have been carried out during this terrorist attack – when there is no evidence directly connecting the Defendant to the terrorist attack – will be examined in the chapter of conclusions.

### (9) Murder of two women in the shooting terrorist attack at the corner of Jaffa Road and Lunz Street in Jerusalem

97.  On January 22, 2002, at 4:20 p.m., the terrorist Sa'id Ramadan opened fire with an M-16 rifle at passersby on Jaffa Street, at the corner of Lunz, in Jerusalem until he was shot and killed. As a result of the shooting, Sarah Hamburger, of blessed memory, and Ora Sandler, of blessed memory, were murdered (Death Certificates Prosecution/136 (b) – (c)), and dozens of civilians were injured. Hanan Ben Naim, who killed the terrorist, testified regarding this incident (on p. 121). Similarly, a police presentation with respect to the incident was submitted in addition to the action report of Superintendent Nadivi, who testified during the trial (Prosecution/136 (a), Prosecution/136 (d) and testimony on p. 132). The terrorist's weapon was seized and sent to DIFS (Prosecution/136 (e) and testimony of Sergeant Major Azulai and Superintendent Leifer on pp. 130 – 134).

98.  Ahmed Barghouti took responsibility for the perpetration of this terrorist attack (see Statement Prosecution/165 (a) on pp. 4 – 5, about which collection Mizrahi testified on p. 184). He said that he decided to insert a suicide terrorist bomber into Israel and for that was assisted by Aweis, who sent the terrorist Sa'id Ramadan to him. The two prepared the terrorist for the terrorist attack, took him to pray, bought him clothing and obtained an M-16 rifle and bullets for him. That day, in the afternoon, Ahmed heard about the terrorist attack that had been perpetrated in Jerusalem.

There is no direct evidence that connects the Defendant to this terrorist attack and he even said during the course of his interrogation that he and Arafat were angry at Ahmed Barghouti because this terrorist attack had been perpetrated (Transcript of Conversation Prosecution/98 (k) on p. 32). The indirect involvement of the Defendant in the terrorist attacks that had been carried out by Ahmed Barghouti and Aweis, by themselves or through others, was explained above. The legal question about whether this is sufficient in order to substantiate the Defendant's criminal liability for the acts of murder that have been carried out by this terrorist attack – where there is no evidence connecting the Defendant directly to the terrorist attacks – will be examined in the chapter of conclusions.

**(10) <u>Shooting terrorist attack in the Neve Ya'akov neighborhood in Jerusalem, in which police officer Galit Arbiv, of blessed memory, was killed</u>**

99.    On February 25, 2002, at 6:25 p.m., a terrorist attack was carried out by a single terrorist armed with an M-16 rifle and a hand grenade on the main road of the Neve Ya'akov neighborhood in Jerusalem.

From the testimony of an eyewitness, police officer Adam Garfield, it becomes apparent that the terrorist opened fire on vehicles that were traveling on the road and also at civilians and police officers who were at the scene. Police officer Galit Arbiv, of blessed memory, was sitting in the police car with Garfield, and charged at the terrorist with her pistol drawn. The terrorist murdered police officer Arbiv, of blessed memory, by shooting her (Death Certificate Prosecution/137 (b)), seriously injured police officer Garfield, who remains disabled to this day, and police officer Amichai Dahan. The grenade that was thrown by the terrorist did not explode (see Garfield's testimony on p. 127, the testimony of Superintendent Leor Nadivi on p. 132 and the reports and photographs that were submitted in Prosecution/137 (c), Prosecution/137 (g) plus Presentation Prosecution/137 (a) and the Photograph Board Prosecution/137 (g)). The terrorist weapons, the hand grenade that did not explode and the spent bullet shells were collected and sent to DIFS for examination (testimony of Superintendent Ami Leifer on p. 130, Opinion of Superintendent Avi Kaufman Prosecution/137 (d) – (e) and the Opinion of Superintendent Yaniv Ron Prosecution/137 (e)).

100.    The terrorist who was captured during the attack is Rami Nur, in accordance with that which has been set forth by Abu Hamid in his Statement Prosecution/149 (c) on pp. 11 – 12 (which was submitted by Sergeant Major Ya'akov Barazani on p. 207). Abu Hamid said that when he and his brother Haloum Abu Hamid saw the terrorist attack in Neve Ya'akov on television, his brother reminded him that the terrorist Rami Nur had been in their home the previous day, and Haloum said that he was the one who had given Rami Nur

[Stamp] P 7: 000411

the M-16 rifle and bullets and sent him to perpetrate a terrorist attack after filming a video tape, which he showed his brother Nasser after the terrorist attack. Haloum told his brother Nasser that he had received the weapon and the terrorist Rami Nur from Ahmed Barghouti. In his above mentioned statement, Abu Hamid expressed anger about this and explained that this terrorist attack might entrap the Defendant because of his close ties to Ahmed Barghouti, when it transpired that the terrorist had survived and would be interrogated by the Israel Security Agency.

In his above mentioned statement, Abu Hamid also said that Yasser Arafat summoned the Defendant and Ahmed Barghouti to his office as a result of this terrorist attack. Ahmed Barghouti fled and told Abu Hamid that it is likely that they would arrest the Defendant because of this terrorist attack. The Defendant told Abu Hamid later that he explained to Arafat that there was no instruction with respect to a cease-fire at that time and then he – the Defendant – stood behind his people as long as Arafat had not issued a presidential order to stop the terrorist attacks. Abu Hamid also said in his statement that Ahmed Barghouti admitted to him that he had given the weapon to the brother of Abu Hamid (Haloum) in order to perpetrate the terrorist attack in Neve Ya'akov.

101. From that which has been set forth above, it becomes apparent that Nasser Abu Hamid did not take part in the planning and perpetration of this terrorist attack, but that it was done by his brother Haloum and by Ahmed Barghouti, who were witnesses at the trial. Haloum Abu Hamid was convicted, on the basis of his confession, for several acts of terrorism, including responsibility for implementing the above mentioned terrorist attack in Neve Ya'akov (see item 13 in the amended Indictment Prosecution/161 (a), and Ruling Prosecution/161 (b)). Haloum told of his responsibility for the above mentioned terrorist attack, in accordance with that which has been set forth above, in his Statement Prosecution/162 (a)-(b), which was collected by Ibrahim Elkura'an (his testimony is on p. 194) and Staff Sergeant Major David Mizrahi (his testimony is on p. 184).

In his above mentioned statement (Prosecution/162 (a) on pp. 6-9, Prosecution/162 (b) on pp. 2-4), Haloum said that he prepared Rami Nur for the terrorist attack, arranged for someone to transport him, and gave him the shrapnel grenade and an M-16 rifle with bullets. While he was preparing Rami Nur for the terrorist attack, Ahmed Barghouti came to inquire about how preparations for the terrorist attack were progressing. Ahmed Barghouti wanted the terrorist attack to be perpetrated in a crowded part of Jerusalem; however, they finally agreed that it would perpetrated in northern Jerusalem

[Stamp] P 7: 000411 [continued]

because of the roadblocks, and Ahmed Barghouti gave his approval for this.

102. During the course of his interrogation, Ahmed Barghouti confirmed his connection to the terrorist attack in Neve Ya'akov. In his statement Prosecution/165 (a), he said that Nasser Aweis sent the terrorist Rami Nur to him in order to perpetrate the terrorist attack in Neve Ya'akov, and he referred Rami Nur to Haloum Abu Hamid so that he could assist him in entering Jerusalem (Statement Prosecution/165 (a) on p. 6, which was gathered by Staff Sergeant Major Mizrahi in accordance with his testimony on p. 184). Ahmed Barghouti, like his friend Nasser Abu Hamid, said during the course of his interrogation that he was summoned, together with the Defendant, to Arafat's office as a result of this terrorist attack; the Defendant asked him if he was responsible for the terrorist attack and Ahmed Barghouti responded in the affirmative, and heard from the Defendant that Arafat was angry about the terrorist attack (Statement Prosecution/165 (c) on p. 5 that was collected by Staff Sergeant Major Mizrahi in accordance with his testimony on p. 184).

103. On the basis of the above mentioned, the terrorist attack was planned by Aweis and Ahmed Barghouti. During the meeting between Ahmed Barghouti and the Defendant after their arrests, when they were recorded without their knowledge, Ahmed repeated several times and emphasized to the Defendant that during the course of his interrogation he had said that the Defendant heard about this terrorist attack only after it was carried out (Transcript of the Conversation Prosecution/127 (c) on pp. 4, 11).

There is no evidence that connects the Defendant directly to this terrorist attack, other than the connection created by his general, indirect involvement to the terrorist attacks that were planned and perpetrated by Ahmed Barghouti and Aweis, as explained above (see Sections 80, 86 and 96 above). There is a reason that Yasser Arafat summoned Barghouti for clarification after this terrorist attack was carried out, since he also thought that the Defendant was the end-point for complaints in this matter. The legal question of whether this is sufficient in order to substantiate the Defendant's criminal liability for the act of murder that was carried out in this terrorist attack – where there is no evidence connecting the Defendant directly to this terrorist attack – will be examined in the chapter of conclusions.

**(11)  Murder of Gad Rejwan, of blessed memory, in the Bashkevitz factory in Atarot**

104. On February 22, 2002, at 6:30 a.m., Gad Rejwan, of blessed memory, was murdered in the Bashkevitz factory in the Atarot industrial area by Abdel Majid Mehadi, who had been employed in the factory in the past (Death Certificate Prosecution/138 (a) and Pathologist's Opinion Prosecution/138 (b)). Zaharan Shahada, who was at the scene, said that when he

heard shots, he saw a man running from the scene and Gad Rejwan lying on the floor and asking for someone to call for help (on p. 146).

Gad Rejwan, of blessed memory, died from the shooting, and his death was pronounced at the scene (see Action Report 138 (c) and the testimony of Superintendent Leor Nadivi on p. 132, as well as the report from the mobile laboratory that was recorded by Superintendent Nissim Mizrahi Prosecution/138 (d) and his testimony on p. 131). The photographs of the scene of this event were submitted as Exhibition Prosecution/138 (d) and 138 (f) by Mizrahi and Nadivi during their testimony. The murder was carried out with a pistol (Opinion Prosecution/138 (e)); a number of the bullets fired from it caused fatal wounds in the body of the deceased (Opinion Prosecution/138 (b)).

105. Abu Hamid said in his Statement Prosecution/149 (b) (on pp. 25-28) that he was approached by Abdel Majid who said that he had worked in the Rejwan family's factory and wanted to perpetrate a terrorist attack together with a person named the Ramzi. The three met together and planned the attack; Abu Hamid gave each of them a pistol. Twenty minutes later, Ramzi reported to Abu Hamid that they had perpetrated a terrorist attack, and Abdel Majid related how he had shot Rejwan, of blessed memory, to death.

Abu Hamid called the police and took responsibility for the terrorist attack in the name of the al-Aqsa Martyrs Brigades (Statement of Abu Hamid that was submitted by Staff Sergeant Major Elkura'an on p. 194).

106. From that which has been set forth above, it becomes apparent that there is no direct evidence with respect to the identity of the perpetrators, since that which Abdel Majid, who did not testify in this Court, told Abu Hamid is inadmissible hearsay evidence.

However, on the basis of unequivocal circumstantial evidence it can be determined that the terrorist attack was carried out by al-Majid with Abu Hamid's assistance and authorization, as Abu Hamid said in his testimony. Abu Hamid said that Abdel Majid told him that he was going to perpetrate a terrorist attack in the factory of the Rejwan family, in which he had once worked, and for this purpose he equipped him

with a pistol. A short time later, Abdel Majid reported to him that he had shot and killed Gad Rejwan, of blessed memory, who was indeed murdered by pistol shots.

There is no evidence that connects the Defendant directly to this terrorist attack, other than the connection created by his general, indirect involvement to the terrorist attacks that were planned and perpetrated by Abu Hamid, as explained above (see Sections 27 and 60 – 65 above). The legal question of whether this is sufficient in order to substantiate the Defendant's criminal liability for the act of murder that was carried out in this terrorist attack – where there is no evidence connecting the Defendant directly to this terrorist attack – will be examined in the chapter of conclusions.

**(12)** **Terrorist attack in the Seafood Market Restaurant in Tel Aviv**

107. On March 5, 2002, at 2:30 a.m., a terrorist attack was carried out at the Seafood Market Restaurant in Tel Aviv by the terrorist Ibrahim Hasouna, who arrived at the scene armed with an M-16 rifle, hand grenades and a knife. The incident was described by eyewitnesses Willis Hazan (on p. 148) and Leon Gorenstein (on p. 129), who were present in the restaurant at the time the terrorist attack. With the rifle in his hands, the terrorist opened fire at the people sitting in the restaurant until the weapon jammed and the hand grenade he threw did not explode. At this stage Hasouna began to stab people, including police officer Staff Sergeant Major Salim Barakat, of blessed memory, who tried to stop the shooting spree and was stabbed to death by the terrorist. In addition to Staff Sergeant Major Barakat, Yosef Habi, of blessed memory, and Elihu Dahan, of blessed memory, were also murdered in this terrorist attack (see the Pathologist's Opinion Prosecution/139 (b) through Prosecution/139 (d)). Many others were injured. The terrorist himself was shot and killed during the terrorist attack and it was learned that he was Ibrahim Hasouna (Pathologist's Opinion Prosecution/139 (k) and the DNA Tests Prosecution/139 (g)).

The result of this terrorist attack can be seen on the Photograph Board Prosecution/139 (f) that was submitted by police officer Effi Yamin (on p. 151) and the presentation prepared by the Police (Prosecution/139 (a)). Effi Yamin also submitted the Action Report that he wrote at the time. He was the person who took the terrorist's bloodied knife, a smashed bullet, bullet shells, bullets and the M-16 rifle (Prosecution/139 (e)). The weapon that was seized and brought to the DIFS for examination (Prosecution/139 (h) and testimony of Superintendent Ami Leifer on p. 130).

108. The terrorist attack at the Seafood Market was carried out by Ibrahim Hasouna and was planned by Ahmed Barghouti, Abu Hamid and Aweis, as Ahmed Barghouti said during the course of his interrogation (see Section 29 above). Abu Hamid's brother (Sharif Naji) was

[Stamp] P 7: 000413

also involved in the terrorist attack, as he explained during the course of his interrogation (see Section 55 above). He also connected Ahmed Barghouti to its planning. During the course of his interrogation, Ahmed Barghouti said that the terrorist Ibrahim Hasouna had been sent to him by Aweis and he gave him money, bought him clothing and made sure that there was someone who could drive him to Israel in order to perpetrate the attack (Tarek Malahi). He reported to the Defendant by telephone that the terrorist attack was ready to go, and the Defendant said that he did not wish for the attack to be perpetrated within Israel. Ahmed Barghouti also said that that after the terrorist attack, the Defendant told him to tell Aweis not take responsibility for the terrorist attack in the media before he discussed it with the Defendant (see Section 29 above).

During the course of the conversation between the Defendant and Ahmed Barghouti after their arrests, when they were recorded without their knowledge, Ahmed made certain to emphasize to the Defendant several times that he had said that he only discussed the terrorist attack on the telephone with the Defendant **after** it had occurred and added, "**Be careful, I was not with you, I was not with you, I talked with you on the telephone**" (Transcript of Conversation Prosecution/127 (c) on pp. 4 – 5, 11). The two coordinated their versions with respect to their interrogation on this point.

During the course of his interrogation, Abu Hamid also told about his involvement in the terrorist attack (Statement Prosecution/149 (b) on p. 6 that was submitted by Staff Sergeant Major Elkura'an on p. 194). He supplied hand grenades, and bullets for an M-16 rifle for the purpose of the terrorist attack when he saw that Hasouna was equipped with an M-16 rifle, before he departed for the terrorist attack. When the terrorist attack was reported during the night, including the fact that Hasouna had stabbed a police officer to death, Abu Hamid remembered that Nasser Haloum (Abu Hamid's brother) had given the terrorist a knife and explained to him to use it if the rifle jammed.

During the course of his interrogation, Haloum Abu Hamid explained his involvement in the terrorist attack (Statement Prosecution/162 on p. 9, which was submitted by Staff Sergeant Major Elkura'an on p.

194, and Statement Prosecution/162 (b) on p. 4 that was submitted by Staff Sergeant Major Mizrahi on p. 184). Haloum said that he trained Hasouna in the use of the M-16 rifle. Sharif Naji Abu Hamid (he is Abu Hamid's brother) said during the course of his interrogation that he accompanied the terrorist to Tel Aviv and obtained a car for the terrorist attack (Statement Prosecution/182, which was submitted by Staff Sergeant Major Ben Lulu on p. 182).

109. The Defendant is indirectly connected to the terrorist attacks that were planned and perpetrated by Ahmed Barghouti, Abu Hamid and Aweis, in accordance with that which has been set forth above. However, with regard to the terrorist attack at the Seafood Market, which was planned and executed by all three of them, the Defendant is also personally responsible for its perpetration. The subject of the liability of the Defendant for this terrorist attack has been set forth above (see Sections 29, 55 and 66 (c) above). The Defendant admitted during interrogation that he gave Ahmed Barghouti his approval for this terrorist attack **before** it actually happened, although he did give orders that the terrorist attack should be in the Judea and Samaria region and not within Israel. This also emerges from that which Ahmed Barghouti said during the course of his interrogation.

### (13)  Shooting terrorist attack in the Jeremy Hotel in Netanya

110. On March 9, 2002, at 8:25 p.m., two terrorists entered the Jeremy Hotel in Netanya armed with M-16 rifles and hand grenades. The two of them threw the hand grenades and fired at passersby and tourists. The incident was described by the eyewitness known by his initial "G", who was a squad commander in the "Almog" Border Police unit. He arrived at the hotel within 30 seconds after hearing shots fired and encountered injured people while the terrorists were still shooting. "G" began to chase the terrorists, and both of them were identified on the stairs of a shopping mall in the immediate vicinity; they were shot and killed (see Pathologist's Opinion on the terrorist Shahdi al-Najimi Prosecution/140 (h) and also the Expert Opinion with respect to the second terrorist Prosecution/140 (i)). "G" confirmed in his testimony that, most unfortunately, some of the injured were hurt by shots that had been fired by border police (on pp. 117 – 118). In this terrorist attack, the baby girl Avia Malka, of blessed memory, and Israel Yihye, of blessed memory, were murdered (see the Notification of Death Form Prosecution/140 (b)).

Cadet Rami Malka submitted the report of the DIFS technician's attendance at the scene of the terrorist attack, which describes the resultant findings of the scene (Prosecution/140 (f) and his testimony on p. 118) and photographs of the scene (Prosecution/140 (g)). The Expert

[Stamp] P 7: 000414

Opinion of the Police Bomb Disposal Department states that a hand grenade was thrown at the hotel, and it exploded (Prosecution/140 (e)). From the report of Staff Sergeant Major Malka it becomes apparent that the two M-16 rifles that were used by the terrorists were seized at the scene (see also the testimony of Superintendent Leifer on p. 130).

111. During the course of his interrogation, Nasser Aweis said that he had perpetrated this shooting terrorist attack in Netanya but that it was carried out by two people whose names he did not know. The two were sent to him by another terrorism operative (Ahmed Abu Khadr), and Aweis organized transportation for the two through Mahmoud Titi, and even gave Ahmed Abu Khadr two hand grenades and two M-16 rifles. Several hours after the two were transported to Baka el-Sharkia, from where they entered Israel on foot, Aweis heard on television that there had been a terrorist attack at a hotel in Netanya. He called media outlets and assumed responsibility for the perpetration of the terrorist attack (Aweis's Statement Prosecution/174 (b) on p. 5, which was submitted by Advanced Staff Sergeant Major Ronny Amar, on p. 119).

With regard to this terrorist attack: it is again possible to determine on the basis of unequivocal circumstantial evidence that Aweis was behind this above mentioned terrorist attack, which was carried out a short time after he equipped the terrorists with M-16 rifles and hand grenades and transported them to the point on the Green Line closest to Netanya. The terrorist attack was indeed perpetrated by two terrorists armed with M-16 rifles and hand grenades just several hours after Aweis arranged transportation for them to Netanya, and from all this it is clear that this is the terrorist attack about which Aweis talked during the course of his interrogation.

There is no evidence that directly connects the Defendant to this terrorist attack, other than the connection created by his general and indirect involvement in the terrorist attacks that were planned and perpetrated by Aweis (see Section 96 above). The legal question of whether this is sufficient

in order to substantiate the Defendant's criminal liability for the acts of murder that have been carried out during this terrorist attack – when there is no evidence connecting the Defendant directly to the terrorist attack – will be examined in the chapter of conclusions.

**(14) <u>Murder of Constantine Danilov, of blessed memory, in Baka al-Garbiyeh</u>**

112. On March 30, 2002, at 1:00 p.m., a team of Border Police officers identified a vehicle that was traveling at very high speed in the direction of Baka al-Garbiyeh with two suspicious individuals in it. As the team followed the terrorists, the terrorists began shooting and murdered Constantine Danilov, of blessed memory, (see Death Certificate Prosecution/141 (i)). The other members of the team shot the terrorists and the explosive belt that one of them was wearing detonated. The two terrorists were killed, after they threw a hand grenade at the team (see the testimony of Chief Superintendent Farid Ghanem, who participated in the incident, on p. 122).

Photographs of the incident were submitted with the Civil Servant Certificate of Prosper Ohana (Prosecution/141 (c)). The DIFS examination determined that one of the terrorists was carrying an explosive belt that detonated on his body (Prosecution/141 (e)).

113. During the course of his interrogation, Aweis said that he sent the terrorists with Mahmoud Titi and Ahmed Abu Khadr, and that he obtained an explosive belt for one of them, for the perpetration of a terrorist attack within Israel. That same suicide [bomber] traveled, wearing the explosive belt, with another person to perpetrate a terrorist attack in Israel, but was killed with his companion in an exchange of fire with Border Police officers in Baka al-Garbiyeh, after they killed another Border Police officer (Statement Prosecution/173 (b) on pp. 9-10 that was submitted by Advanced Staff Sergeant Major Amar on p. 191). Aweis also said during the course of his interrogation that this terrorist attack was supposed to have been perpetrated in Hadera (Statement Prosecution/172 (b) on p. 3 that was submitted by Amar on p. 191).

114. There is also unequivocal circumstantial evidence that this terrorist attack was carried out by people who were dispatched by Aweis after he equipped them with an explosive belt. The legal question of whether this is sufficient in order to substantiate the Defendant's criminal liability for the acts of murder that have been carried out during this terrorist attack – when there is no evidence connecting the Defendant directly to the terrorist attack – will be examined in the chapter of conclusions.

**(15) <u>Shooting terrorist attack between Ateret and Bir Zeit</u>**

[Stamp] P 7: 000415

On February 25, 2001, at 1:00 p.m., shots were fired from an ambush on Route 465 in the direction of Yosef Cohen's car (GMC), which was traveling from the direction of Ateret to Bir Zeit. The shots were fired from a passing car. Cohen was seriously injured in the terrorist attack and his car went off the road onto the shoulder (his testimony is on p. 142). Dozens of bullets were fired at his car and he was hit in the head by three [bullets] and in the neck by two [bullets], but he miraculously remained alive (see Transcript with regard to the condition of the car Prosecution/142 (c) and the Report on Seizure and Marking of the Bullet Casings Prosecution/142 (b) that was submitted by Moshe Lavie on p. 124, and also the Report of the Car Inspection Prosecution/142 (d) that was submitted by police officer Mizrahi on p. 131).

A description of the scene of the terrorist attack appears on Photograph Board Prosecution/142 that was submitted by Superintendent Mizrahi on p. 139.

116. Ahmed Barghouti explained about this terrorist attack during the course of his interrogation (Statement Prosecution/165 (a) on p. 1 that was submitted by Staff Sergeant Major Mizrahi, on p. 184; and Transcript Prosecution/165 (f) that was submitted by an interrogator by the name of "Danny" on p. 200), how he planned this terrorist attack together with Muhannad, Abu Satha and others, who asked him for weapons and a car in order to perpetrate a terrorist attack. Ahmed Barghouti gave them

an MP5 rifle and bullets, as well as his car. Several hours, later they returned the car and the gun to him and told him that they had shot at a car in the area of the Atara Bridge while passing it, and that the driver of the car had been injured. Ahmed Barghouti's description is consistent with the evidence with regard to the way in which the terrorist attack was carried out, its location and results; therefore, there is unequivocal circumstantial evidence from which it becomes apparent that the terrorist attack about which Ahmed Barghouti told is the above mentioned attack near the Atara Bridge.

There is no evidence that ties the Defendant directly to this terrorist attack other than his general indirect connection to the terrorist attacks planned by Ahmed Barghouti and Abu Satha (see Section 80 above). The legal question of whether this is sufficient in order to substantiate the Defendant's criminal liability for the acts of murder that were carried out during this terrorist attack – when there is no evidence connecting the Defendant directly to the terrorist attack – will be examined in the chapter of conclusions.

### (16) Attempted terrorist attack in the Biancini Pub in Jerusalem

117. On May 19, 2001, at 3:00 a.m., Dina Dagan, the owner of the Biancini Pub in Jerusalemm, discovered an explosive device that had been placed in the bathroom on the premises by Sa'ad A-Din Jabar, who was known to her as a Palestinian from Ramallah who occasionally sold her products for hookah water pipes. In her testimony (on pp. 139 – 142), Dagan said that Jabar sat with her in the restaurant in order to write an order for products and then went into the bathroom without anything in his hands. Several moments later, he exited the bathroom with a plastic bag that he placed in the center of the pub. When she asked him what was in the bag, he told her that it contained clothes. She approached the bag in order to check it and discovered that it was an explosive device hidden under a jacket, and at this stage Jabar disappeared.

At the time, there were approximately 150 – 170 youths in the pub. Dagan displayed praiseworthy resourcefulness and bravery: she picked up the explosive device and yelled to one of the Palestinian employees there to evacuate the young people. He also helped her to move the explosive device outside of the restaurant. The police arrived at the scene and detonated the device, in a manner that caused damage to stores in the area. This is the picture that emerges from the testimony of police sapper Eyal Albo (on p. 119, see also Expert Opinion from the Explosives Laboratory Chief Inspector Yaniv Ron Prosecution/143 (a); Expert Opinion of DIFS given by Sarah Abramowitz-Bar Prosecution/143 (b); and the Photograph Board Prosecution/143 (a)).

[Stamp] P 7: 000416

118. During the course of his interrogation, Abu Hamid said (Statement Prosecution/149 (b) on pp. 10 – 12, which was submitted by Staff Sergeant Major Elkura'an, on p. 194) that Sa'ad A-la-Din approached him at the beginning of May 2002, and asked him to prepare an explosive device so that he could place it in a pub on Jaffa Street in Jerusalem. He explained to Abu Hamid that the owner of the establishment was in the habit of purchasing products for hookahs from him and he drew the pub for Abu Hamid. Abu Hamid instructed him where to place the explosive device and explained to him how to connect the wires to a fire extinguisher that housed the charge. (Indeed, it emerges from Opinion Prosecution/143 (a) that the charge was housed in a fire extinguisher.)

Subsequently, Abu Hamid sent Jabar to the pub, and Jabar covered the device with a jacket. When Jabar arrived at the pub, he called Abu Hamid and used a code sentence to inform Abu Hamid that he was about to place the explosive device in the pub, which Abu Hamid authorized him to do.

Jabar called Abu Hamid and told him that the pub owner had seen him place the explosive device and that he had heard on the news that the explosive device had been detonated by the police.

119. From that which has been set forth above, it becomes apparent that the attempted terrorist attack in the pub was carried out by Jabar, with guidance and assistance from Abu Hamid. The details that Abu Hamid gave during the course of his interrogation are consistent with the testimony of Dagan, as well as the findings at the scene.

There is no evidence that ties the Defendant directly to this terrorist attack other than his general indirect connection

to the terrorist attacks planned by Abu Hamid (see Sections 27, 60-65 above). The legal question of whether this is sufficient in order to substantiate the Defendant's criminal liability for the acts of murder that have been carried out during this terrorist attack – when there is no evidence connecting the Defendant directly to the terrorist attack – will be examined in the chapter of conclusions.

**(17)**  **Shooting terrorist attack on Route No. 9, near French Hill in Jerusalem**

120. On October 3, 2001, at 11:30 p.m., shots were fired at a passing car that was traveling towards French Hill, in which Mali and Pinhas Cohen were traveling. They were wounded by the shots (see the Report of Preliminary Visit to the Scene by Superintendent Leor Nadivi and his testimony on p. 132; Seizure and Marking Report by Superintendent Nadivi Prosecution/144 (b), Report of Preliminary Visit to the Scene by Superintendent Leifer and his testimony on p. 130, and the Report of the Weapons Lab Prosecution/144 (d)).

121. During the course of his interrogation, Abu Satha (Statement Prosecution/156 (b) on pp. 4 – 5, which was submitted by Advanced Staff Sergeant Major Dahan, on p. 198) said that he had perpetrated this terrorist attack together with Mohamed Sami Abdullah when they were traveling in a Mazda car and he had with him the MP5 rifle, which he had received from Ahmed Barghouti for the purpose of shooting at Israeli targets. During the course of his interrogation, he said that after he shot at the car going into the tunnel in the direction of French Hill, he realized that it was a female driver and therefore he stopped shooting and told his companion that the gun had jammed. After this, he continued traveling in the direction of French Hill, and there he shot at another car while passing it. The next day they heard on the radio that a man and woman had been injured.

122. The evidence that has been set forth by the Prosecution with regard to this terrorist attack is very weak and includes only the reports of the police's preliminary visits to the scene, meaning that any information about the way in which the terrorist attack was carried out is hearsay evidence. Similarly, it is difficult to know if Abu Satha's statements relate to this terrorist attack since the date of the events he described and the type of car at which he shot are not clear.

The only evidence we have before us is that Abu Satha perpetrated shooting terrorist attacks against Israeli targets, using a weapon that he received from Ahmed Barghouti, who was the Defendant's assistant and close associate. Furthermore, Abu Satha himself was the Defendant's bodyguard. The Defendant himself confirmed that Abu Satha worked in his office, was subordinate to him, and that he knew that Abu Satha carried out terrorist attacks against civilians in Givat Ze'ev and Pisgat Ze'ev (see Sections 33-34 above).

[Stamp] P 7: 000417

**(18)  Attempted suicide terrorist attack in Beit Hanina in Jerusalem**

123.  On March 8, 2002, at 4:15 p.m., the terrorist Mahmoud Salah was captured on his way to perpetrating a suicide terrorist attack in Jerusalem, while he was wearing an explosive belt. The terrorist attempted to detonate the charge while he was lying on the ground and was then shot and killed (see the testimony of Chief Superintendent Doron Yedid on p. 133, and the Report from the Explosives Lab Prosecution/145 (d)).

124.  During the course of his interrogation, Ahmed Barghouti said that Louis Ouda asked him to prepare an explosive belt for a suicide [bomber] and he referred Ouda to Nassar Shawish, who gave him an explosive belt. The suicide [bomber] stayed in an apartment that Ahmed Barghouti rented in Ramallah, and was outfitted with the explosive belt there. Later, Ahmed Barghouti learned that he had been killed by shots fired by Israel Defense Forces soldiers in the Beit Hanina area, on his way to perpetrating the terrorist attack (Statement Prosecution/165 (b) on pp. 2, 11, which was submitted by Staff Sergeant Major Ya'akoboff, on p. 171).

Aweis also related during the course of his interrogation, (Statement Prosecution/173 (b) on p. 4, which was submitted by Advanced Sergeant Major Amar, on p. 191) that Louis Ouda, whom he had recruited for the al-Aqsa Martyrs Brigades, recruited a suicide [bomber] for him but that the terrorist attack failed because the suicide [bomber] was shot by police officers before perpetrating the attack, at the entrance to Jerusalem.

125.  From that which has been set forth above, it becomes apparent that Aweis and Ahmed Barghouti were involved in this attempted terrorist attack. There is no evidence tying the Defendant to this terrorist attack in a direct manner other than the connection derived from his general and indirect involvement

[Stamp] P 7: 000417 [continued]

in terrorist attacks that were prepared and perpetrated by the two, in accordance with that which has been set forth above. The legal question of whether this is sufficient in order to substantiate the Defendant's criminal liability for the acts of murder that have been carried out during this terrorist attack – when there is no evidence connecting the Defendant directly to the terrorist attack – will be examined in the chapter of conclusions.

**(19)** **Shooting terrorist attack on the Beit El – Psagot Road**

126. On March 17, 2002, at 6:45 a.m., shots were fired from an ambush with automatic weaponry at the car (Volkswagen Passat) of Samir Kersh, and he was injured by the shooting (see the Report of Visit to the Crime Scene Prosecution/146 (a) and photographs of Senior Staff Sergeant Major Eli Kojman that were submitted during his testimony on p. 121).

The Prosecution did not submit any additional evidence about this terrorist attack and Kojman's report is only hearsay evidence with regard to the manner in which the terrorist attack was carried out .

In its summations, the Prosecution attributes responsibility for this terrorist attack to Ahmed Barghouti, and he did admit to his involvement in this terrorist attack and was convicted for this (Prosecution/165 (g) – (q), Indictment Item No. 43). Other than this, the Prosecution did not refer to any other evidence from statements by Ahmed Barghouti or things that he said during his Israel Security Agency interrogation. Therefore, no evidence was presented with regard to this terrorist attack that makes it possible to establish a clear, factual foundation for Ahmed Barghouti's connection to this terrorist attack, and the evidence with regard to the actual manner in which the terrorist attack was carried out is very weak.

**(20)** **Attempted terrorist attack in the Malha Mall in Jerusalem**

127. On March 26, 2002, at 10:30 a.m., a Renault Express car with two sappers [Translator's note: as written; this is clearly a typo for terrorists] (Shahadi Ibrahim Hamamra and Mousa Yusuf Mohamed Haled – see Corpse Transport Report Prosecution/147b, which was submitted by Ilan Granot on p. 135, and Report Prosecution/147 (c), which was submitted by Senior Staff Sergeant Major Asaf Azulai in his testimony on p. 134) who were on their way to perpetrate a terrorist attack, exploded.

[Stamp] P 7: 000418

128. During the course of his interrogation, Ahmed Barghouti said (Statement Prosecution/165 (c) on p. 5 that was submitted by Staff Sergeant Major Ya'akoboff on p. 171, and Transcript Prosecution/165 (k) Section 15 that was submitted by Israel Security Agency interrogator "Adam", on p. 201) that Jihad Jawara had called the Defendant the day before the car was found next to the mall in Jerusalem and told him that he wanted to perpetrated a terrorist attack. The Defendant told him not to perpetrate the attack within Israel, and referred Jawara to Ahmed Barghouti to discuss it with him. Ahmed Barghouti claimed that he also told Jawara not to perpetrate the terrorist attack in Israel or Jerusalem. However, the next day Jawara called Ahmed Barghouti and told him that he had sent the car that exploded next to the mall in Jerusalem to perpetrate terrorist attack in Jerusalem.

129. The Defendant himself said during the course of his interrogation (Transcript Prosecution/36 that was submitted by Israel Security Agency interrogator "Smith", on p. 85) that Ahmed Barghouti reported to him on the plans of Jihad's men to perpetrate a suicide terrorist attack in Jerusalem. The Defendant said that he had instructed Ahmed Barghouti that the terrorist attack should not take place within Israel, but rather within the Judea and Samaria region. The Defendant said on this matter during the course of his interrogation, when talking about Ahmed Barghouti's appeal to him about Jihad's desire to perpetrate a terrorist attack (Transcript of Conversation Prosecution/198 (k) on pp. 19-20):

> "**Defendant:** ... that Jihad, he said to him that we have an action. We have terrorist attacks, etc. So I said to Ahmed, I said to him that what is important is that there should be no terrorist attack within Israel.
>
> **Investigator:** OK and when he comes officially and tells you that they want to perpetrate a suicide terrorist attack, what did you say to them?
>
> **Defendant:** I told him no, I do not allow it.
>
> **Investigator:** No. That is not what you told me. You said to him, no problem. But not 'inside' (within

Israel).

**Defendant:** **Yes, not in Israel... that is to say, that I do not want terrorist attacks in Israel."**

The Defendant said that the next day he received a report from Ahmed Barghouti with regard to the failed attempt at a suicide terrorist attack, and that the car had exploded not far from the roadblock and two cell members were killed.

130. Based on the above, it becomes apparent that there is proof of the Defendant's involvement in approving this suicide terrorist attack, even in accordance with his version. The Defendant did give orders that the terrorist attack be perpetrated in a different place, however this is not significant for his criminal liability for this attempted terrorist attack. That Defendant's version during the course of his interrogation is supported by the version of his close associate, Ahmed Barghouti, even though the latter "renovated" the facts and claimed that the Defendant gave orders not to perpetrate a terrorist attack at all. From the statements by the Defendant, it is clear that he gave orders to perpetrate the terrorist attack in another location.

[Stamp] P 7: 000419

**Part III:    Evaluation of the Evidence and Its Significance**

131. Since the Defendant chose not to testify or bring any witnesses on his behalf and even instructed the representatives of the Office of the Public Defender that were appointed to represent him to abstain from the cross-examination of the Prosecution witnesses, the evidence against the Defendant is founded on several different layers.

**First**, comments that were made by the Defendant during the course of his Israel Security Agency interrogation. Some were summarized and written up in the transcript that had been prepared and submitted by the interrogators and some were recorded and transcribed. This category also includes those statements that were made by the Defendant in conversations that were recorded without his knowledge, with his close associate Ahmed Barghouti and with agents John Doe No. 1 and John Doe No. 3.

**Second**, incriminating testimony against the Defendant that was given by terrorism operatives from the Fatah after their arrest, meaning the statements that they gave during the course of Israel Security Agency and police interrogations, since all of them – as if in unison – refused to answer any questions in Court, when they were brought as Prosecution witnesses.

**Third**, statements that were made by the Defendant by way of the media, during the period of time prior to his arrest.

**Fourth**, documents that were seized in the office of the Defendant and at the offices of the Palestinian Authority during the course of Operation Defensive Shield.

**Fifth**, testimony that was given by victims of the terrorist attacks, eyewitnesses to the terrorist attacks that are the subject of the indictment, and witnesses involved in their interrogation.

132. With respect to the evaluation of the evidence and its significance, the following comments must be made:

[Stamp] P 7: 000420

A. The Defendant's abstention from testifying during the trial and exposing himself to cross-examination can be used to reinforce the significance of the evidence against him and even in order to support Prosecution evidence in places where support is necessary, in accordance with that which has been set forth in Section 162 (b) of the Criminal Procedures Law [Consolidated Version] 5742 – 1982 (hereinafter – "the **Criminal Procedures Law**"). Similarly, the Defendant's abstention from responding to the indictment, as he did, can be used to reinforce the significance of Prosecution evidence, in accordance with that which has been set forth in Section 152 (b) of the Criminal Procedures Law. These points were made clear to the Defendant by the Court.

This matter acquires additional significance in light of the fact that, in accordance with law, statements made by witnesses who refuse to testify in Court, or who deny the content of their statements during interrogation, require support (see Subsection C (5) below). This is in accordance with the Supreme Court's ruling that a Defendant's abstention from testifying serves as significant reinforcement of the statements given by witnesses during the trial that require reinforcement, in accordance with Section 10 (A) (d) of the Rules of Evidence [New Version] 5731 – 1971 (hereinafter: "the **Rules of Evidence**") (Criminal Appeal 1497/92 **State of Israel v. Tzubari**, PD 47 (4) 177, on p. 202). The Court explained this matter: "**The silent Defendant – differentiated from the silent witness – is acting within the framework of the Law; however, the Court is given the right to interpret his behavior on the basis of its perceptions and understanding**" (on p. 203, see also Additional Proceeding 308/91 **Kuzli v. The State of Israel**, PD 45 (4) 441, on p. 486).

Indeed, the Court is entitled not to give any weight to the silence of the Defendant when there is a reasonable explanation for it (see: Criminal Appeal 277/81 **Halevy v. The State of Israel**, PD 38 (2) 369, on p. 386). However, since the Defendant's preliminary claims with respect to be authority of this Court to try him were rejected, we did not have any reasonable and justifiable explanation for his abstention from giving evidence. It is quite clear that the Defendant, who during the course of

[Stamp] P 7: 000420 [continued]