# EXHIBIT A.451
## (7 of 11)

of the perpetration but rather an external motivation for the operation.

As was explained above, assistance in this respect can be found in the examination of the existence of a 'relationship of control.' The existence of a 'relationship of control' will confirm that the group leader is a 'joint perpetrator' with everything that derives therefrom; in an instance where there is no 'relationship of control' as explained above, this will be an indication of the possibility that is a case of involvement that gives rise solely to the liability of a 'solicitor'."

166. The Honorable Justice Y. Kedmi reiterated this approach in Criminal Appeal 4720/98, 5310/98, 5454/98, **Nahman Cohen** *et al.* **v. The State of Israel**, *Dinin Elyon*, Volume 57 366. In this case, Nahman was convicted as a joint perpetrator after it was proved that he was the one who had initiated, requested and led the murder plot and the one who confirmed the identification of the intended victim when he was presented with it. The Honorable Justice Y. Kedmi wrote (in Section 9):

"As I see things, and as I have explained this on more than occasion in the past, 'the leader' of a group, who initiates and leads the perpetration of a crime by the group, is included among the 'perpetrators." The leader 'participates' in the commission of the crime in accordance with the meaning of this requirement in Section 29 of the Penal Code. His fate is entwined with the fate of the actual perpetrator; he bears liability as if he were 'right next to' the perpetrators while they were committing the crime. This is the legal standing of the 'leader' and this is the legal standing of 'the planners' and those who fulfill other 'essential roles' whose contribution to the act formally 'end' before it actually begins but remain an inseparable part thereof. The fate of these – the leader, the planner and their ilk – is connected to the fate of those who actually commit the act: they are one body, and all of the limbs bear responsibility for what the 'hands' do.

As I see things, the leader of the 'group' whose members have committed a crime did not 'solicit' the members of the group but rather he is their leader who 'guides' them to the realization of their joint scheme. The solicitor is outside of the inner circle of 'commission'; the act of solicitation is pure solicitation, in other words: it is an independent and separate act from the overall effort of perpetration. Whoever 'participates' in the perpetration – and as I see matters, as required by that which has been set forth above, must give the concept 'participation' in this context a broad meaning – cannot be a 'solicitor.' The 'solicitor' and the perpetration of the crime are 'separated' by the perpetrator who is characterized by 'playing a role' in the perpetration, and instead of the 'solicitor' being accompanied by 'participation in a role' in accordance with that which has been set forth above – the person before us is not a 'solicitor' but rather a 'joint perpetrator'."

[Stamp] P 7: 000448

**3.** **Conclusions with Respect to the Defendant's Liability as a Joint Perpetrator, Solicitor and Accessory**

167. Analysis of the evidence presented above leads to the following factual conclusions with respect to the share and role of the Defendant in the terrorist attacks that are the subject of the indictment:

a.  The Defendant was the commander of the Fatah and Tanzim in the West Bank. He was a field leader of the Fatah in the West Bank and responsible for the "military operations" of the Fatah in all parts of the West Bank. The expression used by the Defendant, such as "military operations", is nothing more than a euphemism for terrorist attacks against Israel that have been carried out by the field cells of the Fatah, which were organized into the Tanzim movement and the framework of the al-Aqsa Martyrs Brigades. The Defendant established the al-Aqsa Martyrs Brigades and was responsible for their activities as the leader and commander of the members of the field cells and their commanders. For these activities, the Defendant was directly subordinate to the chairman of the Palestinian Authority, Yasser Arafat. The "military" activity of the Defendant described above continued in parallel with his political activity as Secretary General of the Fatah in the West Bank and as a member of the Palestinian Legislative Council.

b.  The Defendant was of the opinion that Fatah was obligated to lead the "armed struggle against Israel," and therefore publicly supported terrorist attacks against soldiers and settlers. This was the declared position of the Defendant, who explained that from his perspective, women and children living in the settlements were also considered an enemy to be attacked. The Defendant was opposed, a matter of principle, to terrorist attacks within Israel, meaning over the Green Line, and also opposed suicide terrorist attacks. However, in practice he did not cease his support for his men and helped them by supplying money, weapons and explosives even after he learned time and again that they were carrying out terrorist attacks, including suicide terror attacks, inside Israel. Thus, the Defendant expressed his agreement to all types of terrorist attacks that have been carried out by people in the field who were affiliated with Fatah. This position of the Defendant was also expressed in his media appearances, in which he encouraged Fatah operatives and others to carry out terrorist attacks against Israel and also praised those who perpetrate the terrorist attacks – including those that were carried out within Israel.

[Stamp] P 7: 000449

c. The Defendant did not have complete control over members of the cell and their commanders. However, he did have a great degree of influence over them, because he was their leader and because of the assistance that he extended to them, including money, weapons and explosives. The influence of the Defendant on members and commanders of the cells is also evident in that he would, on occasion, instruct them to cease the terrorist attacks against Israel and then later call for them to renew the terrorist attacks – sometimes in accordance with orders that he received from Arafat. Yasser Arafat would not give his orders in an explicit manner, but would make sure that his subordinates clearly understood when he was interested in a cease-fire and when he was interested in terrorist attacks against Israel. Arafat himself also considered the Defendant to be the person who controlled people in the field and therefore he would reprimand him when a terrorist attack was carried out against the opinion of the Chairman.

d. Members of cells in the field and their commanders did have a great degree of independence when carrying out terrorist attacks. They generally did not involve the Defendant in the planning of the terrorist attacks and there is no evidence that they would report to him prior to the perpetration of a terrorist attack (other than a few solitary cases). In spite of this, the Defendant would receive a report from the commanders subsequent to each terrorist attack. This pattern of activities is an outgrowth of the Defendant's desire, and the desire of the field commanders, to protect the Defendant from Israel and to maintain him as a "political figure," who is not involved, as it were, in the murderous terrorist attacks against Israel. For this reason the Defendant did not have direct contact with those who carried out terrorist attacks, other than in exceptional cases. Thus, the Defendant also was careful not to personally assume responsibility on behalf of the Fatah or al-Aqsa Martyrs Brigades after the terrorist attacks had been perpetrated; this was done by the cell commanders. The Defendant was satisfied with taking general responsibility through the media in an indirect overall manner, without relating to any specific terrorist attack, by expressing support for the terrorist attacks that had been perpetrated.

e.  Other than the overall supreme liability of the Defendant for all of the members of the Tanzim and al-Aqsa Martyrs Brigades, insofar as he was the commander, he also had better control over a few cells that operated under the command of people who were his close advisors and benefited from his special assistance and support, such as Ahmed Barghouti, Aweis, Abu Hamid and Abu Satha.

The Defendant took responsibility during an interrogation for the activities of the groups that operate under the command of these people (other than Aweis), although he claimed that he was only one of the "addresses" to which these people turned in order to receive assistance and funding, and that he did not have complete control of them but rather only influence over them.

f.  The Defendant generally did not have direct contact with people in the field who perpetrated the terrorist attacks; the connection was through people who were close associates of Defendant and who worked in his environs, including Ahmed Barghouti, Aweis, Abu Hamid and Abu Satha. These people worked in the Defendant's environs and with his support, planned and brought about murderous attacks, using the money, weapons and explosives which the Defendant was careful to supply them with for this purpose.

g.  The Defendant was responsible for the supply of money, weapons and explosives to cells in the field through his associates, including Ahmed Barghouti, Aweis, Abu Hamid and Abu Satha. He would refer their requests to Arafat for his approval and was responsible for the purchase of weapons and supplying the cell members through his close associates. The Defendant also proffered assistance to wanted men and to the families of the terrorists.

h.  In spite of the fact that the Defendant, like his men, was generally careful not to involve himself personally in the planning and the perpetration of the terrorist attacks, unequivocal evidence was submitted with respect to four terrorist attacks that had been carried out with the knowledge, approval and encouragement of the Defendant. He even initiated two of them.

The terrorist attack at the gas station in Givat Ze'ev, in which Yoela Chen, of blessed memory, was murdered, was carried out as a result of direct orders given by the Defendant to his men, in revenge for the assassination of Ra'ed Karmi, and the Defendant admitted to responsibility for this terrorist attack during the course of his interrogation.

[Stamp] P 7: 000450

Thus, too, in the case of terrorist attack in which the Greek Orthodox monk Tzibouktzakis Germanos, of blessed memory, was murdered in Ma'ale Adumim as a result of the Defendant's being contacted by the terrorist Radaida, who wished to perpetrate a suicide terrorist attack.

The Defendant referred Radaida to a person who could teach him and supply him with a weapon and instructed him to perpetrate a shooting terrorist attack rather than a suicide terrorist attack. As a result, Radaida set out to perpetrate the terrorist attack and shot a Greek Orthodox monk to death, thinking that he was a Jew.

In addition, the Defendant gave his approval for the terrorist attack at the Seafood Market Restaurant in Tel Aviv, and that was prior to the departure of the terrorist to his target. The Defendant did indeed instruct his people that the terrorist attack should take place in a settlement or near a military roadblock and not within Israel, but he did approve the terrorist attack itself.

Similarly, Defendant gave approval to his men for the perpetration of a suicide terrorist attack by way of the detonation of a car bomb, even though he did instruct them that the terrorist attack should take place in the Occupied Territories and not within Israel. This incident ended with the death of the two terrorists near the Malha Mall in Jerusalem, when they exploded in their car while they were en route to the perpetration of the terrorist attack.

[Stamp] P 7: 000450 [continued]

i.  Other than the four terrorist attacks that have been set forth in subsection (h) above, no evidence was submitted that ties the Defendant personally and directly to involvement in the terrorist attacks that are the subject of the indictment. From the Defendant's conversation with his associate, Ahmed Barghouti, which was recorded without their knowledge, there emerges significant concern that the Defendant knew far more than what he and his people have revealed during the course of interrogation, but it is not possible to determine this with the degree of certainty that is required by a criminal court on the basis of the existing evidence.

One way or another: it is clear from the evidence that has been submitted that more than a few of the murderous terrorist attacks that have been set forth in the indictment were planned and executed  by field commanders who operated in proximity to the Defendant and with his support, using weapons that the Defendant helped supply and which were given to the terrorists by the cell commanders who were close to the Defendant (Ahmed Barghouti, Aweis, Abu Satha and Abu Hamid). The Defendant received reports from his men with regard to these terrorist attacks after they were perpetrated and gave his consent – at least by way of his silence and behavior – to continuing the attacks.

168. The analysis of the evidentiary material in accordance with that which has been set forth above leads to the conclusion that the Defendant made a substantive contribution to the terrorist attacks that have been carried out by the Fatah cells, the Tanzim and the al-Aqsa Martyrs Brigades, even if he did not take part in the perpetration.

The assistance in the form of the provision of weapons, explosives and money to those cells, the recruitment of field operatives, the making of arrangements for their training and the assistance to their families – all of these created the necessary conditions for the perpetration of acts of murder by the terrorist cells. Without a doubt, the Defendant was aware of this fact. He also knew that the field operatives that he supported were going to continue to perpetrate murderous terrorist attacks against Israel, and he acted with the clear goal of helping them to continue in this way. This is not simply a reasonable suspicion or "turning a blind eye" on the part of the Defendant, but rather genuine knowledge that the members of the cells were perpetrating, and would continue to perpetrate, murderous terrorist attacks against Israel, using the weapons, explosives and money that the Defendant supplied to them for this specific purpose. More than that: the Defendant was not only aware of the acts of murder that some members were perpetrating but rather he gave them assistance, in accordance with that which has been set forth above, out of a goal and aspiration that they would act in this manner.

[Stamp] P 7: 000451

In spite of this, other than the four instances that have been set forth above, there is no evidence that the Defendant had been involved in the planning and the perpetration of the terrorist attacks or that he had known in advance about the terrorist attacks that were going to be perpetrated by the men in the field and the commanders of the cells, whom he supported and for whom he was, effectively, their commander. In fact, Ali Aidiya did say during the course of his interrogation that the Defendant knew about the events and had approved the shooting terrorist attacks that had been perpetrated by members of the Tanzim (see Section 40 above). However, other than this sole testimony, given by a person who was not close to the Defendant, there is no other evidence that the Defendant knew in advance about all of the terrorist attacks that were going to be perpetrated, and he himself denied this claim. The Prosecution also does not claim that Defendant knew in advance about all of the terrorist attacks (see page 47 of its summations).

169. Furthermore: from the evidentiary material, it becomes apparent that the Defendant did not have total control over the commanders of the cells and the men in the field. Although he was considered to be their leader and commander and he did have influence over them, they did in any case have a significant degree of independent discretion in planning the terrorist attacks and their perpetration; there is no evidence that they would consult with the Defendant in this regard. From the overall body of evidence, it becomes apparent that the al-Aqsa Martyrs Brigades were not an organized body under one leader, but rather a collection of field cells, with each one having its own commander. A fact that emerges from the evidentiary material is that the Defendant's men did indeed perpetrate suicide terrorist attacks, and terrorist attacks inside of the Green Line, in contravention of the Defendant's stated position and sometimes contrary even to the opinion of Chairman Arafat. In addition, it emerges from the evidentiary material that the men the field who were involved in the terrorist attacks made an effort to distance the Defendant and to sever him from personal involvement in those terrorist attacks, in order protect him from Israel and to maintain him as a "political figure."

The Defendant himself also tried to keep as far as possible from "military" activity and any direct connection to the cells that perpetrated the terrorist attacks which were carried out by the field commanders, some of whom were close associates of the Defendant and operated under his control, with his assistance and with his encouragement (such as Ahmed Barghouti, Abu Hamid, Abu Satha and Aweis). This fact reinforces the conclusion that the Defendant generally did not know in advance about the terrorist attacks and was not personally involved in their planning or approval because this pattern of activity was intentionally chosen by him and by his people.

Therefore, the Prosecution states in its summations (on p. 47) that:

> **"Within the context of the organizational arrangement of terrorist organizations, the field commanders and operatives were given extensive powers and a great deal of room for maneuvering when carrying out terrorist attacks, and they were not required to obtain the approval of the Defendant for all of the terrorist activities that were perpetrated, in accordance with the policy that was designed by the Defendant and the organizations' leadership, in accordance with that which has been set forthabove.**
>
> **The Defendant was aware of the activities conducted by the people subordinate to him and he was kept up to date about them, sometimes in advance and sometimes after the fact, in accordance with the these organizations' operational concept as mentioned above."**

170. The law, in accordance with that which has been set forth above, is that assistance must be **consciously directed to a particular crime with a concrete purpose**, and it must be proved that the accessory was aware of the fact that the principal was almost certainly going to perpetrate this crime, meaning – a crime with a concrete purpose. It is not sufficient that the accessory knows that the principal has a vague willingness to commit a crime. Although there is no need to prove that an accessory was aware of all of the details of the crime, such as its exact location (the above mentioned Criminal Appeal 11131/02, in the matter of **Yosefov**) or the identity of the victim of a crime or the time its commission (the above mentioned Criminal Appeal 426/67, the matter of **Be'eri**): it is sufficient that he was aware of the fact that the principal was going to commit a particular crime of the type that was ultimately committed and in spite of this, he assisted in its commission.

[Stamp] P 7: 000452

However, in the current case – with respect to most of the terrorist attacks that are the subject of the indictment, other than the four terrorist attacks in which the Defendant was personally involved – there is no evidence that the Defendant knew of the intent to commit them, in the sense of an intent to commit a **specific crime with a concrete purpose**, as required by the rulings. The Defendant had general knowledge that the men in the field who belonged to the organization that he led occasionally perpetrated murderous terrorist attacks against Israelis, using the weapons, explosives and money that he took care to provide them. However, no evidence was brought connecting the assistance provided by the Defendant to any specific terrorist attack (other than the murder of the Greek Orthodox monk, which will be discussed below). There is no evidence that the Defendant supplied weapons, explosives or money for the purpose of committing any specific terrorist attack. Indeed, in some cases it was proved that the terrorist attack was carried out using a weapon that was given to the terrorist by one of the Defendant's close associates, such as Aweis, Abu Hamid or Ahmed Barghouti.

Pursuant to the evidence that has been set forth, the assistance that the Defendant rendered to his close associates in this regard was general, and did not relate to any particular terrorist attack or any particular terrorist: in general, the Defendant made certain that men in the field were equipped with weapons, explosives and money, and this was through his close associates and the field commanders who accepted his authority, knowing that the weapons, explosives and money would be used for the purpose of terrorist attacks. However, in accordance with the case law that has been cited above, this is not sufficient in order to convict the Defendant as an accessory for each of the murderous terrorist attacks that have been carried out by the men who received his general assistance, through his associates, for the purpose of the perpetration of terrorist attacks.

171. This is a situation in which a person assists people who accept his authority with the knowledge that they are about to commit a particular

[Stamp] P 7: 000452 [continued]

concrete crime although he does not know where, when, by what manner or by whom his people will commit the crime and who will be its victim. In this case, there is no evidence that ties the Defendant to the commission of a particular crime, with respect to either the factual basis for the crime or its mental basis, since has not been proven that the Defendant knew anything of the plans for the perpetration thereof. In these circumstances, for most of the terrorist attacks that are the subject of the indictment – it is not possible to ascribe to the Defendant the general comprehensive crime of being an accessory to premeditated murder in the cases of these terrorist attacks solely due to his general awareness that his men were carrying out terrorist attacks using the weapons, explosives and money that he took care to obtain for them.

This does not mean that the Defendant does not bear any criminal liability for his deeds that led to the terrorist attacks being perpetrated using the weapons, explosives and money that he took care to obtain for the commanders in the field. For this purpose, there is the general crime of activity in a terrorist organization, which carries a sentence of imprisonment of up to 20 years, and the general crime (for which the Defendant has not been indicted) of providing the means for committing a crime in accordance with Section 498 of the Penal Code, 5737 – 1977. This crime was intended for the case of providing means for implementing **any crime**, when is not possible to prove that the person providing the means had knowledge of the intent to commit a particular crime (see: Criminal Appeal 507/79 **State of Israel v. Eliyahu Asraf**, High Court Decision 33 (3) 620, on pp. 622 – 623). This is the case before us.

172. The above mentioned conclusions relating to the crime of being an accessory also apply to the crime of soliciting murder, with which the Defendant is charged. Just as it is not possible to convict a person in Israel for a general crime of being an accessory to an act of murder, so it is not possible to convict him for a general crime of soliciting an act of murder. Just as the assistance must relate to a particular crime with a concrete purpose, so, too, must solicitation occur between one specific person and another, and the solicitation must relate to a particular crime with a concrete purpose. This conclusion is necessary for solicitation *a fortiori*, since the punishment of one who solicits a crime, unlike the accessory, is identical to the punishment of the principal offender. When a Defendant is not aware in any way of the intent to commit a particular crime, it is not possible to prove the causal relationship, namely: that the principle perpetrator was solicited by him in order to perpetrate the crime.

[Stamp] P 7: 000453

In the case that is currently at hand, with regard to the group of terrorist attacks that are the subject of the indictment (other than the four terrorist attacks that will be discussed below) there is no evidence that the Defendant influenced the field commanders under his leadership or the members of the cells to perpetrate them because, there is no proof that the Defendant even knew of any intent to perpetrate these terrorist attacks. From the evidence submitted, it seems that no one needed to solicit them: the field commanders and the members of the cells acted, in general, on the basis of their independent initiative and judgment, while being careful not to involve the Defendant personally in the planning or the perpetration of the terrorist attacks. Similarly, it is not possible to convict the Defendant of a sweeping crime of the solicitation of the acts of murder that are the subject of this indictment because of what could be called "solicitation that is directed toward the public", meaning: the Defendant's words of incitement to the media, when he called on the people under his leadership and others to carry out terrorist attacks against Israel. Toward this end, there are the general offenses of incitement to violence or terrorism, activity in a terrorist organization, etc. (see Section 161 above).

173. On the basis of the legal principles and the law described above, it is also impossible to consider the Defendant as a joint perpetrator in all of the terrorist attacks that are the subject of the indictment, together with the terrorists and planners who actually perpetrated them, since there is no evidence they he was aware of the intent to perpetrate them (other than the four terrorist attacks in which he was personally involved, as will be described below). Despite the very broad interpretation that rulings have given to the words "participation in the perpetration of a crime by taking action to commit them" and the rulings relating to the liability of a leader in a criminal group – it is not possible to accept the Prosecution's claim that this Defendant should be considered a joint perpetrator in all of the terrorist attacks that are the subject of the indictment. According to the rulings explained above,

[Stamp] P 7: 000453 [continued]

the minimum requirement for assigning the liability of a co-defendant to the leader of a group who was not present at the scene of the crime, is participation in the planning of the crime or in the conspiracy to commit it; the giving of orders or approval prior to the commission of the crime; the supervision of the crimes that have been perpetrated; or the proposal of the idea for the crime, in addition to assistance or planning. Each of these might be considered in accordance with the rulings as "acting to commit the crime", which is the basis for the liability of a joint perpetrator. However, it is not sufficient that the leader controls his men and those who accept his authority, in order to assign to him the responsibility of joint perpetrator for all of the crimes committed by his men, when there is no evidence connecting the leader in any way to their planning or perpetration, and there is not even any evidence that he knew about the intentions to commit them.

The Prosecution must prove that the Defendant is connected in some way to a **particular** crime – both the factual basis of the crime and the mental basis, and this was not proven, with the exception of the four cases that shall be set forth below.

The Prosecution has chosen to stake its case upon the case law that was established in the above mentioned Additional Criminal Hearing 1294/96 in the matter of **Meshulam**, in its petition to convict the Defendant as a joint perpetrator in all of the terrorist attacks that are the subject of the indictment.

However, **Meshulam** was convicted as a joint perpetrator, together with his group of disciples who surrounded him and who committed a variety of crimes, after it was determined that he gave orders to his men, supervised their activities, had control over them and intentionally refrained from instructing them to cease committing the crimes (the Honorable Justice A. Matza on pp. 30, 32). In addition, it was determined that he was present at the scene of the crimes immediately prior to their commencement, while simultaneously propelling the criminal plan forward, and was even the one who had planned the operation (the Honorable Presiding Justice A. Barak on pp. 50 – 51); and had planned and carried out the "rebellion" prior to his arrest (the Honorable Justice Cheshin on p. 61).

The Honorable Justice Kedmi also referred in his statements to **Meshulam** as a person whose involvement in the perpetration was manifested by way of planning, guidance and assigning roles, and noted that Meshulam had refrained from instructing his men to cease from committing the crimes (on pp. 63, 66 – 67).

[Stamp] P 7: 000454

These characteristics – of total control over the perpetrators of the crime, presence alongside them at the scene of the crime up until such time as it commenced, involvement in planning the crime, the giving of orders for its perpetration and supervision over the acts of the perpetrators – do not exist in the matter that is currently at hand, where it has not been proven that the Defendant knew in advance of the intent to perpetrate most of the terrorist attacks that are the subject of the indictment.

The Defendant was not personally involved in the initiation, planning of perpetration of the terrorist attacks that are the subject of the indictment (other than the few terrorist attacks that shall be set forth below). The Defendant did not give orders or approval for the perpetration of these terrorist attacks, nor did he assist or solicit the perpetration of [these terrorist attacks] specifically, in accordance with that which has been set forth above. Thus, the issue of the control of the Defendant over the perpetrators and the planners of the terrorist attacks is not devoid of doubt, in accordance with that which has been set forth above. In spite of the fact that the Defendant had the unofficial title of Commander of the Tanzim and the al-Aqsa Martyrs Brigades, there is no proof that the Defendant had played any role in the joint decision to commit the terrorist attacks that are the subject of this indictment, or that he had taken part in the perpetration or planning thereof. In the absence of all of the above, and on basis of the principles that have been established in the case law and in the provisions of the Penal Code, it is not possible to consider the Defendant a joint perpetrator in the terrorist attacks that are the subject of the indictment, with respect to which he had no personal involvement or knowledge, simply by virtue of the fact that he was the uncrowned leader of the Tanzim and the al-Aqsa Martyrs Brigades, or because of his close relationship to the planners of the terrorist attacks and the general assistance that he had provided to them.

174. To summarize the above, the legal situation that prevails in the State of Israel does not make it possible to convict the leader of a criminal group or a terrorist organization as a joint perpetrator of crimes that were committed by members of the said group or organization, not even for being an accessory or solicitor to the perpetration thereof, when he himself was not personally involved, on an individual basis, in any part of the crimes themselves, either prior to or during the course of their commission. This is the situation, even when it is clear that this

[Stamp] P 7: 000454 [continued]

leader has given his blessing to the perpetration of these crimes and gave his men general assistance, that was not for the purpose of the commission of any specific crime.

In the the case that is currently at hand, the Defendant encouraged and motivated the cell commanders and the men in the field to carry out terrorist attacks and he made sure that they would have the money, weapons and explosives that were needed in order to perpetrate the terrorist attacks. He was the leader of the commanders and of the men in the field, and he had a not insignificant degree of influence over them.

Many of the terrorist attacks that are the subject of the indictment were perpetrated and planned by the field commanders who were close to the Defendant and were supported by him. In spite of all of the above, it is not possible to attribute the Defendant, in accordance with Israeli law, the criminal liability of a joint perpetrator, an accessory or a solicitor – to the extent that this pertains to terrorist attacks for which there is no evidence that links the Defendant to them and with respect to which it has not been proven that he knew of the intent to perpetrate them.

Therefore, there is a discrepancy between the general and collective liability of the Defendant for the perpetration of the terrorist attacks that are the subject of this indictment, not to mention the moral responsibility for the perpetration thereof, and the legal possibility of the attribution of criminal liability for the perpetration of specific terrorist attacks to him, when it has not been proven that he knew about the plans to perpetrate them. We are unaware of any precedent for the conviction of a person for the crime of murder, or solicitation of or accessory to murder, when there is no evidence that links him to this act in a specific manner. The Defendant does indeed bear heavy and terrible responsibility for the terrorist attacks that are the subject of this indictment, in which many people have lost their lives, because he was the leader and commander of the terrorist cells that perpetrated the terrorist attacks. However, this is command responsibility that is "quasi ministerial" and not liability that can be substantiated in terms of the laws the Penal Code. We must not extend the provisions of the Penal Code beyond their natural limits, even though in the case that is currently at hand, we are faced with a problem that is difficult for the Court to resolve by way of the existing provisions of the law.

[Stamp] P 7: 000455

This legal outcome is far from being a satisfactory one, and is even infuriating. This is what Prof. M. Kremnitzer was referring to in his statements as cited above, whereby the accepted concepts of accessory and solicitation are not appropriate for the criminal phenomena of organized crime and terrorism, and therefore a proposal has been set forth by Prof. M. Gur-Arye to amend the Penal Code in a manner in which it would be possible to consider a leader of this type to be "perpetrating a crime by way of another person" (see Section 164 above). In the above mentioned Additional Criminal Hearing 1294/96 in the case of **Meshulam**, the Court rejected the possibility of considering the leader of a group of criminals as "perpetrating a crime by way of another person" in accordance with Section 29 (c) of the Penal Code, although Justice M. Cheshin fashioned an analogy based on the provision of the law with respect to the liability of the joint perpetrator as compared to the liability of a solicitor (on pp. 59 – 60).

175. Recently, the Legislature has made an effort to deal with this legal problem, if only partially. The Knesset [Israeli Parliament] enacted the Law on Combating Criminal Organizations, 5763 – 2003, which makes it possible to sentence the head of a criminal organization to imprisonment of up to 20 years, when the organization commits felonies for which the punishment is more than 20 years' imprisonment. This law does not apply to the crimes of the type that are the subject of this indictment, which were perpetrated prior to its enactment; however, it does extend to terrorist organizations and their leaders (see the first addendum that applies the law to crimes in accordance with Section 4 of the Prevention of Terrorism Ordinance, and the explanatory notes to the legislative bill: Legislative Bill 5762 [2002] 3155, on p. 762). From the explanatory notes to the legislative bill, it may be understood that the Legislature is aware of the legal problem that derives from the inability to convict people who head criminal organizations for the crimes that have been committed by their subordinates, due to their distance from the crime. The explanatory notes state (on p. 762):

> **"The proposed Law on Combating Criminal Organizations, 5762 – 2002, is intended to address, on the legislative level, the phenomena of organized crime and the structure of criminal organizations that frequently make it difficult to prove the connection between the heads and leaders of organizations of this type and the crimes that have been committed by others, all in light of the hierarchal structure of some of these organizations,**

[Stamp] P 7: 000455 [continued]

> which creates distance between the decision makers and the policy
> makers and those who commit the crimes."

The explanatory notes to the legislative bill also states (on p. 763) that Section 2 of the law that permits a sentence of up to 20 years' imprisonment for the head of a criminal organization "**is intended to address the difficulty in proving the relationship between officials in criminal organizations and the crimes that have actually been committed. It states that the very act of heading, managing or funding the organization, etc. is sufficient in order to constitute a crime...** "

It was further stated in the explanatory ntoes that with respect to members of criminal organizations at lower echelons, "**it will remain necessary to prove a tie to a specific crime**."

Hence, it is clear that the law is intended to deal with the issue that is also being decided in the case that is currently at hand, specifically, the inability, in accordance with the existing legal situation, to convict the leader of a criminal organization or a terrorist organization for the perpetration, solicitation or constituting an accessory to a specific crime that is committed by the members of the organization.

However, this law does not provide a response to the question that was posed by the Honorable Justice M. Cheshin in the above mentioned Additional Criminal Hearing 1294/96 in the matter of **Meshulam** (on p. 59), in which he asks: "**Would it be acceptable for the mastermind to be beneath the 'soldiers' who do his bidding?**" Even in accordance with this law, the punishment of the person who heads the crime organization is less than the punishment of those who obey him, when they have committed the crime of murder, which carries a sentence of life imprisonment. Furthermore, to the extent that we are dealing with a terrorist organization, this law is not necessary, insofar as in accordance with Section 2 of the Prevention of Terrorism Ordinance, the head of a terrorist organization can, in any event, be sentenced to 20 years imprisonment simply by virtue of the fact that he holds a management role in the organization (see subchapter 1, above).

176. That which has been set forth above pertains to most of the terrorist attacks that have been attributed to the Defendant in the indictment, as these have been set forth in Chapter 5 of Part II of this verdict. For these terrorist attacks, as was explained above, it is not possible to convict the Defendant for the crimes of being an accessory or for the solicitation of acts of murder, and not even for being a joint perpetrator. Notwithstanding, clear, persuasive evidence has been filed with respect to the involvement of the Defendant in three terrorist attacks that have been perpetrated by his men and an additional case attempting to perpetrate a terrorist attack, as follows:

[Stamp] P 7: 000456

**A.**    **The Murderous Terrorist Attack at the Gas Station in Givat Ze'ev**

In this terrorist attack, which occurred on January 15, 2002, Yoela Chen, of blessed memory, was murdered and the passenger who was traveling with her was injured. From the evidence that has been set forth, it emerges clearly that when they were in the mourners' tent that was set up subsequent to the assassination of Ra'ed Karmi on January 14, 2002, the Defendant ordered his close associate, Ahmed Barghouti, to perpetrate a terrorist attack in order to avenge him. Ahmed Barghouti gave a weapon to Abu Satha, who was also a close associate of the Defendant and obeyed his authority, and members of Abu Satha's cell perpetrated the murder, and immediately thereafter reported to the Defendant on the results thereof.

The Defendant confessed that this terrorist attack was performed upon his orders, and took responsibility for the perpetration thereof, while emphasizing that this was the first terrorist attack that Fatah had carried out within Israel. In this case, the Defendant is directly liable for the commission of murder, insofar as he himself had given the orders for the murder to be carried out.

Certainly. this type of order given by the Defendant to people who obey his authority consitutes solicitation to murder, even if the Defendant did not take specific interest in the venue and the manner in which the terrorist attack was to be carried out. When the Defendant gave orders to perpetrate a revenge terrorist attack, it was clear to him and to his people that the intent was to murder Israelis. However, the liability of the Defendant is not just that of a solicitor but rather that of a joint perpetrator, together with the other perpetrators, who are Ahmed Barghouti, Abu Satha and his men. The Defendant was part of the joint plan to

[Stamp] P 7: 000456 [continued]

commit the terrorist attack, as the one who initiated the perpetration thereof. He had a high level of emotional involvement and knowledge of the fact that the crime was going to be committed in accordance with his orders. The Defendant not only caused others to commit a crime in this case and not only did he give his approval for the commission of the crime, but he also **ordered** them to commit the crime; and because of his standing as the leader and commander and on account of his relationship with Ahmed Barghouti and Abu Satha, this order can be compared to the pulling of the trigger that caused the murder of Yoela Chen, of blessed memory.

The Honorable Justice D. Beinisch was referring to this state of affairs in the above mentioned Criminal Appeal 8469/99 in the matter of **Eskin**: "**In special circumstances, it is possible that 'consent' to the commission of the crime can be considered to constitute participation 'in the commission of a crime while performing actions with respect to the perpetration thereof' in accordance with that which has been set forth in Section 29 of the Penal Code.**" The Honorable Justice Y. Kedmi also ruled in this manner in the above mentioned Criminal Appeal 5589/98 in the matter of **Sultan**, whereby giving the "**green light to murder**" is analogous to **"the firing of the opening shot that dispatches the athlete to embark upon his race"** and can be considered tantamount to **"an act of participation in the commission of the crime"** (see Section 163 above).

In the above mentioned Additional Criminal Hearing 1294/96 in the matter of the **Meshulam**, the Honorable Justice M. Cheshin stated (on p. 59): "**the evil spirit of the leader pervades the entire criminal operation, his mind wound the spring of the perpetrator of the crime before it was set in action and at the time when the crime was being committed he was 'present' among the criminals as a joint perpetrator with them**." This also can be said of the Defendant who is before us and therefore he should be convicted for this murderous terrorist attack as a joint perpetrator in premeditated murder and not solely for solicitation.

**B.**    **Murder of the Greek Orthodox monk Tzibouktzakis Germanos, of blessed memory, in Ma'ale Adumim**

This terrorist attack was also perpetrated the at the order and initiative of the Defendant, on June 12, 2001. The terrorist Radaida asked the Defendant for a weapon in order to perpetrate a suicide terrorist attack.

[Stamp] P 7: 000457

The Defendant instructed him not to perpetrate a suicide terrorist attack, but rather a terrorist shooting attack "as is customary for the Tanzim", and referred him to Muhannad in order to receive a weapon and training on how to shoot with it, with the clear knowledge that Radaida was about to carry out a shooting terrorist attack and would murder Israelis in accordance with his instructions. In fact, Radaida did so together with another terrorist, when they received two Kalashnikov rifles from Muhannad, as well as training on how to use them – all this at the order of the Defendant. In this terrorist attack, the Greek Orthodox monk Tzibouktzakis Germanos, of blessed memory, was murdered in Ma'ale Adumim, because the terrorists mistakenly thought that he was a Jew.

In this case, as well, the liability of the Defendant for the murder of the Greek Orthodox monk is that of a joint perpetrator, not merely that of solicitor. The Defendant not only convinced Radaida to perpetrate the murderous shooting terrorist attack but also instructed him how to do it, helped him to obtain a weapon and training for the purpose of the terrorist attack and ordered him to whom he should turn in order to carry out the terrorist attack. At the same time, the Defendant instructed his people to assist Radaida in the perpetration of the terrorist attack, and they in fact acted in accordance with the orders of the Defendant.

According to case law, solicitation, if it is accompanied by an act of perpetration such as planning or giving orders for perpetration – constitutes participation in the commission of the crime, and not merely solicitation. As the Honorable Presiding Justice A. Barak wrote in the above mentioned Criminal Appeal 2796/95 in the matter of **John Does**: "**the more intensive the solicitation of the solicitor and the more it involves only not only activities on the mental level but also on the factual level, the closer the solicitor moves to becoming a joint perpetrator**." (See Section 161 above). Therefore, in the same case of the minor known as "T", he was convicted as a joint perpetrator and not merely as a solicitor because he participated in the planning of the crime and was "the head and leader of them all".

In this case as well, the liability of the Defendant as the joint perpetrator is derived from his status as leader and commander, and from the instructions that he gave to Radaida and to his people with regard to the manner in which the terrorist attack should be perpetrated. The Defendant was not only an accessory to the terrorist attack and did not only solicit its perpetration by encouraging Radaida to act as he did, but rather the Defendant was

part of the joint plan to carry out this terrorist attack and he in effect gave orders for the perpetration thereof. We have explained the significance of orders of this kind in subsection (A) above, and accordingly, the Defendant should also be convicted for this terrorist attack as a joint perpetrator in premeditated murder.

**C.**    <u>**Murderous Terrorist Attack in the Seafood Market Restaurant in Tel Aviv**</u>

This terrorist attack was carried out on March 5, 2002, in the Seafood Market Restaurant in Tel Aviv by the terrorist Ibrahim Hasouna, who murdered Yosef Habi, of blessed memory; Elihu Dahan, of blessed memory; and Staff Sergeant Major Barakat, of blessed memory, during the attack. From the evidence that was set forth, it becomes apparent that this terrorist attack was planned and executed by close associates of the Defendant, Ahmed Barghouti, Abu Hamis and Aweis, and that Ahmed Barghouti reported to the Defendant before the terrorist attack was carried out that it was about to happen. The Defendant authorized the terrorist attack although he instructed that it not take place within Israel but rather in a settlement or at the military check point in the West Bank. Immediately after the terrorist attack was carried out, Ahmed Barghouti called the Defendant in order to report to him about it. The Defendant ordered Aweis not to take responsibility for the terrorist attack since it was carried out within Israel.

From the evidence in accordance with that which has been set forth above, the liability of the Defendant for this terrorist attack as a joint perpetrator is clear. The Defendant was a partner in planning the terrorist attack, gave orders with respect to the location of its execution and approved the perpetration thereof. The fact that the perpetrators did not follow the orders of the Defendant does not detract in any manner whatsoever from his criminal liability. As was explained above, the liability of the Defendant for this terrorist attack is not only in his capacity as a solicitor, because he also gave approval for the perpetration of the murderous terrorist attack, which is an act of participation in the commission of the crime. The Defendant was the part of the plan for the terrorist attack, and gave orders to the people who were perpetrating the terrorist attack with respect to its location, and also received a report from them immediately subsequent to the attack. The leader of a criminal group who authorizes an act of murder and gives orders for the commission thereof bears liability for murder as a joint perpetrator, not only for solicitation, in accordance with the case law that has been set forth above. Therefore, in this case, as well, the Defendant should be convicted for this terrorist attack for liability as a joint perpetrator for the premeditated murder of three people.

[Stamp] P 7: 000458

**D.    The Attempted Terrorist Attack Near the Malha Mall in Jerusalem**

The day before this terrorist attack, the perpetrator of the attack, Jihad Jawara, informed the Defendant of his plan to detonate a car bomb, and the Defendant authorized the terrorist attack but ordered him not perpetrate it within Israel but rather on the West Bank. In fact, the two terrorists exploded with the car bomb near the Malha Mall in Jerusalem on their way to perpetrate the attack. In this terrorist attack, the Defendant was assisted by his close associate Ahmed Barghouti.

Here, too, the liability of the Defendant is not simply for solicitation but rather as a joint perpetrator who gave the "green light for murder" together with orders for perpetration. Since the terrorist attack failed, the Defendant is to be convicted, in this case, for the crime of attempted murder.

**Part V:      Summation**

177. The Defendant declared during the stage of summations: "**I am opposed to the killing of innocent people, I am against the murder of children and women. We need**

[Stamp] P 7: 000458 [continued]

**to oppose the occupation of the territories, I am against military operations or suicides. It is not true that I am responsible for the fact that there were suicides**" (on p. 24 of the session that took place on September 29, 2003). However, in actuality it has been proved beyond all doubt that the Defendant has taken part in and led murderous activities with the goal of hurting innocent people – both in the areas of Judea and Samaria and within the "Green Line" – including suicide terrorist attacks.

178. The Defendant chose not to defend himself against the serious charges that arise from the evidence that has accumulated against him, in accordance with that which has been set forth above. The claims that he has set forth during the course of the hearing and the statements of summation that he has made focus on the question of this Court's authority to hear this case and the justification for what he considers to be opposition to the Israeli occupation. We addressed these claims on the part of the Defendant in our Preliminary Decision that was handed down on January 19, 2003 – to the extent that this refers to claims that are not limited only to the political level. We have denied these claims and ruled as follows:

   a. Courts in Israel are authorized to hear "external crimes" against the security of the state, or against Israeli citizens or residents, wherever they may be perpetrated in accordance with Sections 13 (a) – (b) of the Penal Code, 5737 – 1977, although most of the crimes that are the subject of the indictment are "internal crimes" that relate to terrorist attacks that have been carried out within Israel.

   b. The Implementation of the Interim Agreement on the West Bank and the Gaza Strip Law (Jurisdictions and other Provisions) 5756 – 1996, which validates the Israeli-Palestinian interim agreement with respect to the West Bank and the Gaza Strip, as well as the Regulation 2 to the addendum to the Law for the Extension the Validity of Emergency Regulations (Judea and Samaria and the Gaza Strip – Jurisdiction Over Offenses and Legal Assistance), 5738 – 1977) do not negate the authority of an Israeli Court to hear the external crimes or the internal crimes that have been attributed to the Defendant. These items of legislation transferred to the Palestinian Authority the jurisdiction with respect to Palestinians who committed a crime within its territory, but not for crimes that have been perpetrated against citizens or residents of Israel in the territory of the State of Israel or in the areas of Judea and Samaria and the Gaza Strip.

   c. The Defendant does not have any immunity from the crimes with which he is charged in this indictment even though he was serving as a member of the Palestinian Legislative Council, for international law does not recognize immunity of this type.

[Stamp] P 7: 000459

d. The Defendant is not entitled to the status of "prisoner of war" in accordance with the Third Geneva Convention, and therefore there is no reason not to try him for the crimes that he has committed as an illegal combatant. A person who acts outside of the framework of legal combat and against the rules of war, who is involved in perpetrating acts of terrorism for the purpose of causing indiscriminate harm to the civilian population exposes himself to the ordinary criminal sanctions of international criminal law, and is not entitled to any of the protection that is provided under international law.

e. Opposition to the occupation, as this has been argued by the Defendant, does not constitute justification in accordance with any law for the perpetration of acts of killing that are directed at innocent civilians. Terrorist activity that violates the laws of war and does not distinguish between military targets and civilian targets is not considered to combat activity that is recognized in accordance with the principles of international law, even if the objective is the removal of the occupation – as is being argued by the Defendant.

179. **In conclusion**: In light of all the grounds that have been set forth in this verdict, we have not found any legal foundation for the conviction of the Defendant for the perpetration of the entire list of terrorist attacks that are the subject of this indictment, and the law requires us to convict him for the general crimes with which he has been charged in the indictment, and crimes of murder and attempted murder that pertain to four of the terrorist attacks that appear in the indictment (No. 3,

[Stamp] P 7: 000459 [continued]

No. 7,  No. 12 and No. 36 in the Appendix to the indictment).

On the basis of the set of evidence and in light of the legal analysis that appears above, we [hereby] convict the Defendant of the following crimes:

a. **Premeditated murder in accordance with Section 300 (a) (2) of the Penal Code, 5737 – 1977 (for three cases in which five people were murdered);**

b. **Attempted murder in accordance with Section 305 (1) of the Penal Code, 5737 – 1977;**

c. **Activity in a terrorist organization in accordance with Section 2 of the Prevention of Terrorism Ordinance, 5708 – 1948;**

d. **Membership in a terrorist organization in accordance with Section 3 of the Prevention of Terrorism Ordinance, 5708 – 1948;**

e. Crime of **conspiracy to commit a crime in accordance with Section 499 of the Penal Code, 5737 – 1977** was also proved with regard to four terrorist attacks for which the Defendant was convicted and is subsumed within the principal crimes of premeditated murder and attempted murder.

**Handed down and announced on this day, 29 Iyar 5764 (May 20, 2004) in the presence of Counsel for the Prosecution, the Public Defender and the Defendant.**

| | | |
|---|---|---|
| **Sarah Sirota, Vice President Presiding Judge** | **Avraham Tal, Judge** | **Dr. Amiram Benyamini, Judge** |

[Stamp] P 7: 000460

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

MARK I. SOKOLOW, *et al.*,

                Plaintiffs,

    vs.

THE PALESTINE LIBERATION
ORGANIZATION, *et al.*,

                Defendants.

No. 04 Civ. 00397 (GBD) (RLE)

## DECLARATION OF RINA NE'EMAN

Rina Ne'eman hereby certifies as follows:

1.    The attached translation from Hebrew to English is an accurate representation of the document received by Rina Ne'eman Hebrew Language Services, to the best of my knowledge and belief. The document is designated as P7 371-460.

2.    I am a professional translator with a B.A. in International Relations from the Hebrew University of Jerusalem (Israel) and 30 years of translation experience. I am fluent in Hebrew and English, and I am qualified to translate accurately from Hebrew to English.

3.    To the best of my knowledge and belief, the accompanying text is a true, full and accurate translation of the Hebrew-language document designated bearing the bates number P7 371-460.

Dated: March  6 , 2014

                                       Rina Ne'eman