# EXHIBIT A.451
## (10 of 11)

ישראל).

הנאשם:    כן, לא בישראל... זאת אומרת שאני לא רוצה פיגועים בישראל".

הנאשם סיפר כי למחרת קיבל דיווח מאחמד ברגותי שפיגוע ההתאבדות נכשל, וכי הרכב התפוצץ לא רחוק מהמחסום, ושני חברי החוליה נהרגו.

**130.**    מן האמור לעיל עולה כי הוכחה מעורבותו של הנאשם באישור פיגוע ההתאבדות הנ"ל, וזאת גם על פי גרסתו. הנאשם אמנם הורה שהפיגוע יתבצע במקום אחר, אך לכך אין כל משמעות מבחינת אחריותו הפלילית לניסיון הפיגוע. דברי הנאשם בחקירתו נתמכים בגרסת מקורבו אחמד ברגותי, אם כי הלה "שיפץ" את העובדות, וטען כי הנאשם הורה שלא לבצע את הפיגוע כלל. מדברי הנאשם ברור כי הוא הורה לבצע את הפיגוע במקום אחר.

חלק שלישי:    הערכת הראיות ומשקלן

**131.** הואיל והנאשם בחר שלא להעיד ולא להביא עדים מטעמו, ואף הורה לנציגי הסנגוריה הציבורית שמנו לייצגו להמנע מחקירתם הנגדית של עדי התביעה - מבוססות הראיות כנגד הנאשם על כמה נדבכים שונים.

**ראשית,** דברים שאמר הנאשם בחקירתו בשב"כ, אשר חלקם הועלו על הכתב בתמצית בזכ"דים שרשמו החוקרים, ואשר הוגשו על ידם, וחלקם הוקלטו ותומללו. במסגרת זו כלולים גם דברים שאמר הנאשם בשיחות שהוקלטו ללא ידיעתו עם מקורבו אחמד ברגותי, ועם המדובבים "פלוני 1" ו-"פלוני 3".

**שנית,** עדויות המפלילות את הנאשם, שמסרו פעילי הטרור מקרב הפת"ח לאחר מעצרם. הכוונה להודעות שמסרו בחקירותיהם בשב"כ ובמשטרה, שכן כולם - כאיש אחד - סרבו להשיב על שאלות כלשהן בבית המשפט, כאשר הובאו כעדים מטעם התביעה.

**שלישית,** דברים שאמר הנאשם בכלי התקשורת בתקופה שקדמה למעצרו.

**רביעית,** מסמכים שנתפסו במשרדו של הנאשם ובמשרדי הרשות הפלסטיניאית במבצע "חומת מגן".

**חמישית,** עדויותיהם של נפגעי הטרור, עדי הראיה לפיגועים נשוא כתב האישום והעדים שעסקו בחקירתם.

**132.** לענין הערכת הראיות ומשקלן יש להעיר את ההערות הבאות:

**א.** הימנעותו של הנאשם מלהעיד ולחשוף עצמו לחקירה נגדית עשויים לשמש חיזוק למשקל הראיות כנגדו, ואף להווות סיוע לראיות התביעה מקום שדרוש לחן סיוע, כקבוע בסעיף 162(ב) לחוק סדר הדין הפלילי [נוסח משולב], תשמ"ב-1982 (להלן: "**החסד"פ**"). כמו-כן, הימנעותו של הנאשם מלהשיב על כתב האישום, כפי שעשיה, עשויה לשמש חיזוק למשקל ראיות התביעה, כקבוע בסעיף 152(ב) לחסד"פ. דברים אלו הובהרו לנאשם על ידי בית המשפט.

ענין זה מקובל משנה חשיבות לאור העובדה שעל פי הדין נדרש חיזוק להודעתם של עדים שסרבו להעיד במשפט, או התכחשו לתוכן הדברים שמסרו בחקירותיהם (ראה ס"ק ג)(5) להלן). כך פסק בית המשפט שמסרו עדים במשפט, ואשר טענות חיזוק לפי סעיף 10א(ד) לפקודת הראיות [נוסח חדש], התשל"א-1971 (להלן: "**פקודת הראיות**") (ע"פ 1497/92 **מדינת ישראל נ' צוברי**, פ"ד מז(4) 177, בעמ' 202). בית המשפט הבהיר באותו ענין: "**הנאשם השותק - להבדיל מן העד השותק - פועל במסגרת הדין; אולם לבית המשפט נתונה הרשות לפרש את התנהגותו לפי התרשמותו והבנתו**" (בעמ' 203, וראה גם ד"נ 308/91 **קוזלי נ' מדינת ישראל**, פ"ד מה(4) 441, בעמ' 486).

אמנם, בית המשפט רשאי שלא ליתן משקל לשתיקת הנאשם כאשר יש לה הסבר סביר (ראה: ע"פ 277/81 **הלוי נ' מדינת ישראל**, פ"ד לח(2) 369, בעמ' 386). אולם, משנדחו הטענות המקדמיות של הנאשם בענין סמכות בית המשפט לשפוט אותו - לא היה בידיו כל הסבר סביר ומוצדק להימנעותו ממתן עדות. ברור למדי כי הנאשם, אשר נחשף במהלך

חקירתו לראיות המפלילות שנצברו כנגדו, ידע היטב כי הוא איננו יכול להתמודד איתן במישור המשפטי, ולכן נמלט אל חיקו החם של המישור הפוליטי. כך אמר הנאשם מספר פעמים בחקירתו, כי ברור לו שהוא יועמד לדין ויורשע, וכי הוא מתכוון לנהל משפט פוליטי.

בעניין זה חשוב לציין כי למרות שהנאשם הצהיר שהוא איננו מנהל פרשת הגנה, כפי שאכן נהג, הוא נשא נאומים פוליטיים, ולעתים אף התייחס לראיות שהופנו כנגדו - אך זאת מספסל הנאשמים, ולא מדוכן העדים. על פי הדין, איננו יכולים ליתן משקל לדברים שנאמרו בצורה זו, באופן שלא ניתנה לתביעה אפשרות לחקור את הנאשם עליהם. אשר לדברים הרבים שהשמיע הנאשם במישור המדיני והפוליטי, הן במהלך המשפט והן בסיכומיו, איננו רשאים להתייחס אליהם, בהיותם בלתי רלבנטיים לשאלת אשמתו של הנאשם בעבירות המיוחסות לו. דברים אלו הובחרו בחלטתה הנוגעת לעניין סמכות בית המשפט: אדם הפועל מחוץ למסגרת של לחימה חוקית, ואשר מבצע פעולות טרור שמטרתן לפגוע ללא אבחנה באוכלוסיה אזרחית, חושף עצמו לסנקציות הפליליות הרגילות של המשפט הפלילי הלאומי (ראה החלטה של בית המשפט בתיק זה מיום 19.1.03 בעמ' -29 33). התנגדות לכיבוש, כפי שטוען הנאשם, איננה מהווה צידוק על פי דין כלשהו לביצוע מעשי הרג כנגד אזרחים חפים מפשע. זאת ועוד: מקומה של טענה זו - אם בכלל - הוא בטיעונים לעונש, שכן היא נוגעת למניע לביצוע העבירות, להבדיל מן הכוונה הפלילית הדרושה לשם הוכחתן.

ב. הואיל והנאשם בחר שלא לנהל פרשת הגנה, הוא גם לא העלה טענות כלשהן כנגד קבילות הראיות של משקלן. ואולם בית המשפט שמע מחוייב לבחון שאלה זו ביוזמתו, ולהתעלם מראיות בלתי קבילות שהתביעה הגישה או הסתמכה עליהן בסיכומיה (כגון, עדויות שמיעה הכלולות בהודעות העדים, וכ"זים והודעות שלא הוגשו על ידי החוקרים שרשמו אותם, חוות דעת הנסמכות על ידיעות מודיעיניות וראיות שלא הוגשו במשפט, והתייחסות בכד"ים לממצאי פוליגרף).

בחנו את חומר הראיות גם מזוית הראיה של הנאשם, ולא רק מנקודת מבטה של התביעה כפי שפורטה בסיכומיה. עם זאת, כפופים אנו לכלל כי נאשם שלא העיד במשפטו איננו רשאי להסתמך על דברים הכלולים באמרות חוץ שמסר: אמרות אלו כשרות כראיות כנגדו, אך לא לטובתו, שהרי לא ניתן היה לחקור אותו על אמרותיו (ראה ע"פ 205/75 **קרנץ נ' מדינת ישראל**, פ"ד ל(2) 471, בעמ' 474).

ג. התביעה זימנה לעדות 21 מפקדי שטח ופעילי טרור הקשורים לפיגועים נשוא כתב האישום, והקשר של הנאשם איתם פורט לעיל. עדים אלו, בלא יוצא מן הכלל, סרבו להשיב על שאלות ב"כ התביעה, ונראה כי אין מדובר בהחלטה אישית של כל אחד מהם, אלא בהנחיה מגבוה. עדים אלו לא היו מוכנים להעיד כנגד מפקדם ומנהיגם, והדברים ברורים. בשיחה שהתנהלה בין הנאשם לבין אחמד ברגותי בעת מעצרם, ואשר הוקלטה ללא ידיעתם, הזהיר אחמד מפני העדויות שימסרו פעילי הטרור שנעצרו, והנאשם השיב לו, כשהוא נשמע צוחק : **"כולם בבית המשפט יכחישו את מה שהודו בו... כולם יבטלו... אמרו לי החוקרים. אמרתי להם שאיש לא יודה בבית משפט"** (תמליל 127ג' עמ' 109). כך אמר הנאשם, וכך אכן אירע.

בנסיבות אלו הוכרזו כל אותם פעילי טרור כעדים עוינים, והודעותיהם בחקירה הוגשו לפי סעיף 10א. לפקודת הראיות. לגבי עדים אלו יש להעיר כדלקמן :

(1)    חלק מעדי התביעה העידו לאחר סיום משפטם, ורובם הורשעו, בין היתר, במעורבותם בפיגועים נשוא כתב אישום זה על פי הודאתם. בהודאותיהם בעובדות

כתבי האישום שהוגשו כנגדם, מפלילים עדים אלו את הנאשם. אולם, ההלכה בעניין זה כי הודאת נאשם שכזו, מפי אדם שהוא עד במשפט, נחשבת אמנם כאמרת חוץ שחל עליה סעיף 10א. לפקודת הראיות, אך אין ליתן להודאה זו משקל של ממש. מבחינתו של העד - ההודאה שהוא מוסר במשפטו מרוכזת כל כולה בעובדות הנוגעות אליו, וספק רב אם הוא מודע אותה שעה להשלכות שיש לחלקים בהודעתו על אחרים (ראה: ע"פ 4541/90 **אליהו סלע נ' מדינת ישראל**, תק-על 91(2) 2086).

(2)     ככלל, אמרת חוץ של עד היא עדות שמיעה הפסולה כראיה לאמיתות תוכנה. החריג לכלל נקבע בסעיף 10א(א) לפקודת הראיות ולפיו בית המשפט רשאי לקבל אמירה שכזו, ואף להסתמך עליה ולהעדיפה על עדות העד בבית המשפט, כאשר העד במשפט מסרב להעיד, או שהוא מתכחש לגרסה שמסר בחקירתו.
מטרתו של סעיף זה להתמודד עם התופעה הנפוצה של עדים המתכחשים לגרסה שמסרו בחקירתם, ועל מנת למנוע מצב שבו לא ניתן יהיה לעשות אותם במשפט עם הגרסה שמסרו בחקירתם (ראה: דברי ההסבר להצעת החוק לתיקון פקודת הראיות, תשל"ד-1974). ודוק: עד אשר הוזמן להעיד והתייצב על דוכן העדים נחשב כ"עד במשפט", גם אם סרב להשיב על שאלות, ולפיכך חל עליו סעיף 10א(א) הנ"ל, ולא סעיף 10א(ב) המתייחס למקרה בו לא ניתן כלל להביא עד לבית המשפט מהטעמים המפורטים בסעיף (ראה: דנ"פ 4390/91 **מדינת ישראל נ' חאג' יחיא**, פ"ד מז(3) 673; והשווה דעתו של א. שטיין, "**סעיף 10א. לפקודת הראיות: פרשנותו הראויה ופסיקתו של בית המשפט העליון**", משפטים כ"א תשנ"ב, עמ' 325, בעמ' 336-338).

(3)     על פי סעיף 10א(א) לפקודת הראיות, קבלת אמרת חוץ של עד במשפט, אשר מכחיש את תוכן העדות שמסר בחקירתו, מותנת בכך שמתן האמרה הוכח, שנותן האמרה הוא עד במשפט וניתנה לצדדים הזדמנות לחקרו. תנאים אלה מתקיימים בענייננו לגבי 21 פעילי הטרור הנ"ל.

(4)     בית המשפט רשאי לסמוך על אמרת חוץ שהתקבלה לפי סעיף     10א. לפקודת הראיות, ואף להעדיפה על פני עדות העד במשפט, "**אם ראה לעשות כן לנוכח נסיבות העניין, לרבות נסיבות מתן האמרה, הראיות שהובאו במשפט, התנהגות העד במשפט ואותות האמת שנתגלו במהלך המשפט, והטעמים ירשמו**" (סעיף 10א(א) לפקודת הראיות).

(5)     על פי סעיף 10א(ד) לפקודת הראיות, לא יורשע אדם על סמך אמרת חוץ שהתקבלה לפי סעיף זה, אלא אם יש בחומר הראיות דבר לחיזוקה. הכוונה היא לתוספת ראייתית המחזקת את אמינותה של אמרת החוץ, ומפיגה את החשש כי אין בה אמת (ראה: י. קדמי, **על הראיות**, בעמ' 354-365).

בעניין זה יש לציין כי אמרת חוץ של עד אחד, שהיא עצמה טעונה חיזוק, יכולה לשמש כחיזוק לאמרת חוץ של עד אחר (ספרו הנ"ל י. קדמי בעמ' 366, והפסיקה המצוטטת שם). כאמור לעיל, גם שתיקים הנאשם במשפט עשויה להוות חיזוק לאמרת חוץ של עד, וכך גם הימנעותו מלחקור עד זה בחקירה נגדית (י. קדמי הנ"ל בעמ' 369-371, והפסיקה המצוטטת שם).

ההלכה הפסוקה היא כי הימנעות נאשם מחקירת עדי התביעה - מחזקת אף היא את ראיות התביעה (ראה: ע"פ 4736/91 **פטאיר נ' מדינת ישראל**, תק-על 94(2) 1866). הנאשם לא ישמע לאחר מכן בטענה שהעדים לא נחקרו בחקירה נגדית

(ראה: ע"פ 1632/95 **עוזי משולם נ' מדינת ישראל**, פ"ד מט(5) 534, בעמ' 550, שבו התנהל המשפט ללא נוכחות הנאשם, על פי רצונו, והסגניגור הוגשה שלא לחקור את העדים). נאשם איננו יכול לסכל את ההליך המשפטי המתנהל נגדו בעצם הימנעותו מלהתגונן.

**במקרה דנא,** הרשעתו של הנאשם נסמכת על מארג רחב ואמין של ראיות, הכוללות הודאות שמסר הנאשם בחקירתו, דברים שאמר הנאשם בכלי התקשורת, מסמכים שנתפסו אצל הנאשם וברשות הפלסטינאית, ועדויות רבות של פעילי הטרור שנמסרו בחקירתם, ואשר תומכות זו בזו ומהוות חיזוק האחת לרעותה. כפי שעולה מן התשתית הראייתית שפורטה לעיל. ברור לחלוטין כי פעילי הטרור החליטו להימנע ממתן עדויות במשפטו על מנת לסכל את ההליך, ולהימנע מחשיפת הגרסה שמסרו בחקירותיהם. הנאשם הביע כעס בחקירתו על הדברים המפלילים שמסרו פעילי השטח נגדו (ראה: דו"ח הפצעות של הנאשם עם עויס ת/77ב; דברים שאמר הנאשם למדובב "פלוני 3" ת/123 עמ' 1 ות/124א סי' 1; דברים שאמר הנאשם למדובב "פלוני 1" ת/112א סי' 6-7, ת/114א סי' 7, ת/115א סי' 13, 14, ת/116 סי' 9, ושיחתו של הנאשם עם אחמד ברגותי ת/127ג עמ' 3, 4, 72, 84), ועובדה זו מחזקת את המסקנה שפעילי הטרור אמרו בחקירתם דברים נכונים לגבי הנאשם.

בנסיבות אלו, יש להעדיף את האמרות שמסרו עדים אלו בחקירותיהם על פני עדויותיהם במשפט, כאשר נמצא הרבה יותר מאשר "חיזוק" לאמרות החוץ שמסרו בחקירות. ההודעות שמסרו פעילי הטרור משתלבות כדבר האחת ברעותה, ויחד עם הדברים שאמר הנאשם בחקירתו, והמסמכים שנתפסו ברשות הפלסטינאית, נחשפה תמונה ברורה המצביעה על חלקו של הנאשם ותפקידו בפיגועים נשוא כתב האישום.

133.  לא מצאנו כל סיבה להטיל ספק במהימנותם של חוקרי השב"כ, אשר העידו כי הזכ"דים שרשמו בחקירותיו של הנאשם משקפים בצורה הולמת את עיקרי הדברים שאמר. ככל שמדובר במשקל הדברים, יש להביא בחשבון את הכללים שביארנו בהרחבה בתפ"ח 1074/02 **מדינת ישראל נ' עאצי מוחסין** (תק-מח 2003 (2) עמ' 3553, סי' 76-84). זכ"דים אלה מהווים אמרות של הנאשם, אך בניגוד למקובל בחקירה משטרתית הם כוללים רק תמצית של החקירה; לא תמיד ניתנה לנחקר אזהרה בדבר זכויותיו; הנחקר איננו יכול לקרוא את הדברים הנרשמים בזכ"ד, ואינגו חותם עליו; הזכ"ד נרשם לא פעם בשפה העברית גם כאשר החקירה היא בערבית, בניגוד להנחיה הברורה בפסיקתו. עם זאת, חשוב להדגיש כי, זכ"דים אלו בחתלק מהווים ראיות קבילות, כאשר לעניין משקלם יש להביא בחשבון את היקף וצורת הרישום והתיעוד שלהם (ראה: ע"פ 6613/99 **סמירק נ' מדינת ישראל**, פד"י נו(3), 529, בעמ' 553).

**במקרה דנא,** גובו זכ"דים רבים בתמליל הקלטות מהחקירה, בהם נשמע הנאשם מדבר בקולו, בשפה העברית בה הוא מיטיב להתבטא, תוך המסיר חשש לגבי מהימנותם. כמו כן, נאמר לנאשם במפורש לאורך כל חקירתו כי אינו חייב לומר דבר, וכי הדברים שיאמר עשויים לשמש כראייה נגדו, והנאשם אף נפגש עם עו"ד במהלך חקירתו (ראה להלן). זאת ועוד: הדברים שאמר הנאשם בחקירתו בשב"כ, כפי שנרשמו בזכ"דים והוקלטו ותומללו בחלקים ניכרים מהם, נתמכים היטב בעדויותיהם של פעילי הטרור שפורטו לעיל, ולעיתים גם במסמכים שנתפסו אצל הנאשם, ובראיונות שנתן באמצעי התקשורת האלקטרוניים. במצב דברים זה, אין עלינו לסמוך אך ורק על הזכ"דים שרשמו חוקרי השב"כ מפי הנאשם, ואף לא רק על הדברים שאמרו פעילי הטרור בחקירותיהם (שהרי אלה סירבו להעיד במשפט, או שהתכחשו לדברים שאמרו בחקירותיהם). אלא יכולים אנו להתרשם מדברי הנאשם בחקירתו בשב"כ, בצורה בלתי אמצעית, כפי שאלה הוקלטו ותומללו.

134.  בעניין הערכת משקל דבריו של הנאשם בחקירתו בשב"כ, הבאנו בחשבון - הגם שהנאשם עצמו לא העלה טענות כלשהן בנושא זה - כי מדובר בחקירה ארוכה ומתישה. הנאשם היה נתון

P 7: 000423

לחקירות ארוכות ביותר במהלכן ישן שינה מועטה, כשהוא יושב כבול על כסא, והוא הגדיר זאת בשיחתו עם המדובב "פלוני 1" (ת/112 (1) עמ' 3-4) – כעינוי.

לנאשם הובהר כי כל עוד לא ישתף פעולה בחקירה יהיה צורך להמשיכה, ואף נגרמו לו כי הדרך לפגוש את בני משפחתו היא לשתף פעולה (זכ"ד ת/12 סי' 13). באחת החקירות נאמר לנאשם כי חקירתו לא תסתיים עד אשר ימסור את האמת, כפי שהיה הדבר לגבי פעילי הטרור שהודו בסופו של דבר בחלקן של הנאשם במעשים המיוחסים לו (זכ"ד ת/63 סי' 9-10). באחת החקירות סרב הנאשם להמשיך בחקירה כל עוד לא יינתן לו פרק זמן סביר לישון, והחוקר הבהיר לו כי לא יתאפשר לו לישון עד אשר יודה לפחות בראשי פרקים לגבי פעילותו, אך הנאשם דחה הצעה זו (זכ"ד ת/21 סי' 26-28). כמו כן, הופעל על הנאשם לחץ מוסרי להודות ולהתנהג כמנהיג הנוטל אחריות על מעשי פקודיו, במקום להתכחש לדברים שעשו פקודיו, ולהציג אותם כשקרנים (זכ"דים ת/16-ת/17).

בעניין חקירתו של הנאשם במשך שעות ארוכות, חשוב לציין כי הנאשם נעצר במהלך מבצע "חומת מגן", בתקופה של ביצוע פיגועי טרור רבים כנגד ישראל. בנסיבות אלו ברור כי היתה חשיבות רבה להשלים את חקירתו במהירות האפשרית, שכן חקירתו התנהלה לא רק לצורך בירור אשמתו, אלא גם, ואולי בעיקר, לצורך סיכול פיגועים נוספים. חוקרי השב"כ הסבירו עד כמה היה חשוב להם להגיע במהרה לפעילי טרור ולחוליות טרור שהיו קשורות לנאשם, וכי חקירת הנאשם היתה בעיקרה מודיעינית (החוקר "איתי" בעמ' 154 והחוקר "ואדי" בעמ' 97).

חקירת הפשעים החמורים בהם הואשם הנאשם, והצורך המודיעיני בקבלת מידע מפיו מהר ככל האפשר, חייבו את חקירתו הרצופה במשך שעות רבות. אין בכך להביא לפסילת הודעותיו של הנאשם, כאשר ברור שהוא מסר לחוקריו רק את הדברים שרצה לומר, והיתה הצדקה עניינית לדרך חקירה זו ונסיבתה הביטחוניות שיחררו אז (ראה: י. קדמי, **על הראיות**, חלק ראשון, מהד' תשס"ד-2003 בעמ' 55-58).

**135.**     ברור ממהלך החקירה כי הנאשם התלבט רבות, ובקול רם, אם להודות בקשר שלו לפיגועים נשוא כתב האישום, והוא אף הסביר כי הדבר עלול להכשיל בעתיד כמנהיג את ההסכם עם הפלסטינאי (ראה למשל, זכ"ד ת/24 סי' 7, זכ"ד ת/68 סי' 6). בסופו של דבר החליט הנאשם להודות בחלק מהדברים שעשה, לאחר שהכין שפעילי השטח הודו בחקירותיהם והפלילו אותו, וכי יש בידי החוקרים ראיות מוצקות בנוגע לאשמות שייחסו לו. לכן הודה הנאשם רק בדברים שנשמו הודו בהם קודם לכן, וזה לאחר שדבריהם הוצגו לו על פי דרישתו, והוא אף הבהיר חזור והבהר כי יודה אך רק בדברים שיוצגו שוכנו בפניו, ואשר הינם נכונים (זכ"ד ת/22 סי' 8-9, שהוגש ואושר על ידי החוקר "מופז" בעמ' 58, וזכ"ד ת/23 סי' 9, שהוגש ואושר על ידי החוקר "דני" בעמ' 90). הנאשם ביקש להיפגש עם ראש השב"כ, ואמר כי הוא מוכן להודות בדברים שיש לו אחריות עליהם, אם יראו לו שאחרים כבר הודו בהם (תמליל חקירה ת/98א' עמ' 16-18, 26-28).

יש להדגיש בהקשר זה כי הנאשם אמר עצמו בשיחתו עם המדובב "פלוני 1", כי הסתבר לו בחקירתו שפעילי השטח שנעצרו מסרו ידיעות רבות ומהימנות לגביו. כאשר נשאל על ידי המדובב אם היידיעות שמסרו לגביו הן אמיתיות השיב: "**רבות, יעני יש הוכחה וזיון**" (תמליל שיחה ת/112 ג (1) עמ' 6). עוד אמר הנאשם למדובב "פלוני 1" כי הנהג שלו (אחמד ברגותי) מסר הודאה הקושרת את הנאשם ל- 8 פיגועי התאבדות בישראל, וכאשר נשאל הנאשם האם אחמד ברגותי "סגר אותו בהודאות" - הוא השיב בחיוב (זכ"ד ת/114א עיף 7). לכל אורך שיחותיו של הנאשם עם "פלוני 1" ניתן לראות כי נושא ההודאות שמסרו פעילי השטח בחקירותיהם הטריד אותו מאד, והוא היה מודע לכך שהם מסרו מידע אמיתי ומפליל לגביו (ראה דו"חות ת/112א(1), ת/113א, ת/113ג, ת/114א, ת/114ג, ת/115א, ת/115ג(1)(1), ת/116א).

הנאשם אמר ל"פלוני 1" כי הוא אמנם טוען בחקירתו שהוא מנהיג פוליטי, אך ההודאות שמסרו אחרים כנגדו, והחומר הרב שנתפס במשרדי ובמשרדי הרשות הפלסטינאית יאלצו אותו **"לדבר**

**בחקירה"** (דו"ח ת/117 סי 29, 32 שהוגש על ידי החוקר "רוברטי").
זה היה הרקע שהביא את הנאשם להודות בדברים שממילא כבר היו ידועים לחוקרים ממקורות אחרים.

136.    המפנה בחקירת הנאשם חל ביום 21.4.02, כשבוע לאחר מעצרו של הנאשם, כאשר הוא החליט לספר את העובדות מנקודות ראותו ואחריותו, אך דרש כי קודם לכן יוצגו בפניו הדברים שאמרו אנשיו בחקירה, ושיתאפשר לו להיפגש עם ראש השב"כ אז סגנו (זכ"דים ת/20-ת/19). הנאשם קיבל את הצעת החוקרים לעשות אבחנה בין סירובו למסור הודעה מפללית במשטרה, שתיחשף בעתיד, לבין מסירת פרטים על פעילותו בחקירתו בשב"כ (זכ"ד ת/20 סי 10-12, זכ"ד ת/24 סי 7). הנאשם יצא מתוך הנחה שדברים שדברים שיאמר במשטרה יחשפו בציבור וייחיבו אותו, וזאת בניגוד לדברים בחקירתו בשב"כ - שאותם תכנן הנאשם להכחיש, כפי שאכן עשה בחקירתו במשטרה ובמשפטו. כך אמר הנאשם במפורש בשב"כ, כאשר נאמר לו כי הזכד"יים הנרשמים במהלך חקירתו יוגשו כראיה בבית המשפט כאילו היו עדות משטרתית (זכ"ד ת/25 סי 23, שהוגש ואושר על ידי החוקר "מופזי" בעמי 58).

בעניין זה יש לציין כי יש שישה ימים לאחר מעצרו נחקר הנאשם, והוזהר בדרך המקובלת כי איננו חייב לומר דבר על פי החוק, וכי הדברים שיאמר עשויים לשמש ראיה כנגדו (ראה זכ"ד ת/40 סי 1, ועדותו של החוקר "מופזי" בעמי 59). החוקר "מופזי" העיד כי אזהרות כאלה ניתנו לנאשם במהלך כל חקירתו, וכך בא העד החוקר "אמילי" (עמי 57, 59, ואזהרות הכלולות בזכד"יים ת/41 סי 1, ת/44, ת/25, תמליל חקירה ת/98 עמי 37). לעיתים אמנם נרמז לנאשם כי לא בהכרח יועמד לדין, שכן קיימת אפשרות שהוא יגורש, אך הנאשם ציין כי הוא מעדיף את האפשרות של העמדה לדין, ואף אמר כי ברור לו שהוא יועמד לדין ויישלח לכלא לשנים רבות (זכד"יים ת/10, ת/11, ת/14 ו-ת/19 סי 5, וזכ"ד ת/63 סי 25).

137.    הנאשם אמר בחקירתו כי הוא מתכוון לנהל משפט פוליטי, תוך התעלמות  מהראיות שתוגשנה נגדו במשפטו (זכ"ד ת/42 סי 8 שהוגש ואושר על ידי החוקר "ואדיי" בעמי 96, וזכ"ד ת/56 סי 3 שהוגש ואושר על ידי החוקר "סמיתי" בעמי 85). בשיחותיו של הנאשם עם המדובב "פלוני 1", הוא הסביר לו את הטקטיקה בה הוא נוקט בחקירתו, לפיה הוא איננו מודה אלא בדברים שהחוקרים יודעים עליו, ומנסה למשוך זמן ולהבין מה החוקרים יודעים עליו, כדי לא להפליל אחרים.

הוא גם אמר לעורך-דינו כי לא ימסור כל הודעה במשטרה (ראה דו"חות ת/118 סי 3, ת/120 סי 2, ודבריו ל"פלוני 3" בדו"ח ת/122 סי 1). יש לציין בהקשר זה כי הנאשם נפגש לראשונה עם פרקליטו, עו"ד בולוס, שלושה ימים לאחר מעצרו (מוצג **ת/164**, וזכ"ד **ת/111** סעיף 14). במהלך חקירתו נפגש הנאשם עם עו"ד בולוס כמה פעמים (זכ"ד ת/90 סי 1).

138.    **סיכומו של דבר**: אין לנו סיבה לסבור שהוד אתנו של הנאשם בחקירתו בשב"כ ניתנה עקב אמצעים פסולים כלשהם שהופעלו כנגדו, אשר הביאו לשלילת רצונו החופשי של הנאשם, והנאשם גם לא טען זאת. במהלך המשפט, וכן בעת חקירתו במשטרה, כאשר הוצגו לנאשם הדברים שאמר בחקירתו בשב"כ, הוא חזר וטען כי מדובר "בשקר וזיוף". הוא לא טען כי הופעלו כנגדו אמצעים פסולים בחקירה, והתרשמנו בבירור שהחוקרים נהגו בנאשם בכבוד, כפי שגם אמר הנאשם בחקירתו בשב"כ (זכ"ד ת/75 סי 2, זכ"ד ת/90 סי 1 ותמליל חקירת הנאשם ת/98 עמי 29). בעת מתן עדויותיהם במשפט, לחץ הנאשם את ידם של חלק מחוקרי השב"כ, וגם עובדה זו מעידה כי אין בלבו של הנאשם תחושות כלשהן כנגד חוקריו.

לנאשם הייתה שליטה מלאה על הדברים שאמר לחוקרי השב"כ: הוא החליט אלה דברים היה מוכן לומר בחקירתו, ואשר להערכתו כבר היו ידועים לחוקרים ממילא, ואלה דברים הוא מתכוון להסתיר מהם. הנאשם היה זהיר ביותר בחקירתו, ולא פעם סירב לענות על שאלות שנשאל, או

שענה בצורה עקיפה ומרומזת. הוא בחר לעצמו טקטיקה במהלך החקירה, לפיה ירחיב בעניינים פוליטיים ויקמץ בעניינים הקשורים לפעולות הטרור, ובכל מקרה לא ימסור אלא פרטים שלהערכתו כבר נמצאים בידיעת החוקרים.

כפי שהעיד המדובב "פלוני 1", אמר לו הנאשם: **"גם אם כל העם הפלסטינאי מודה עליו, הוא יקבע מה יאמר בחקירה"** (ת/110 ס׳ 10). מכל האמור לעיל, ברור שהנאשם מסר את הודעותיו מרצון חופשי.

חלק רביעי :    **ניתוח משפטי ומסקנות**

**.1    פעילות וחברות בארגון טרוריסטי**

**.139**    בכתב האישום מיוחסות לנאשם, בין היתר, העבירות של פעילות וחברות בארגון
טרוריסטי. סעיפים 3-1 לפקודת מניעת טרור, התש״ח-1948 קובעים לאמור :

## .1"    *פירושים*

"ארגון טרוריסטי" פירושו חבר אנשים המשתמש בפעולותיו במעשי
אלימות העלולים לגרום למותו של אדם או לחבלתו, או באיומים במעשי
אלימות כאלה;
"חבר בארגון טרוריסטי" פירושו אדם הנמנה עליו, וכולל אדם המשתתף
בפעולותיו, המפרסם דברי תעמולה לטובת ארגון טרוריסטי, פעולותיו או
מטרותיו, או אוסף כספים או חפצים לטובת ארגון טרוריסטי או
פעולותיו".

## .2    *פעילות בארגון טרוריסטי*

אדם הממלא תפקיד בהנהלה או בהדרכה של ארגון טרוריסטי, או משתתף
בדיוניו או בקבלת החלטותיו של ארגון טרוריסטי, או משמש חבר בבית-
דין של ארגון טרוריסטי, או נואם נאום תעמולה באסיפה פומבית או ברדיו
מטעם ארגון טרוריסטי, ייאשם בעבירה, ובצאתו חייב בדין, יהא צפוי
לעונש מאסר עד עשרים שנה.

.3    *חברות בארגון טרוריסטי*
אדם שהוא חבר בארגון טרוריסטי, ייאשם בעבירה, ובצאתו חייב בדין,
יהא צפוי לעונש מאסר עד חמש שנים".

סעיף 7 לפקודת מניעת טרור קובע כי :

.7"    *הוכחה על קיום ארגון טרוריסטי*
כדי להוכיח בכל דיון משפטי, שחבר אנשים מסויים הוא ארגון טרוריסטי, יספיק
להוכיח כי —

(א)    מטעם אותו חבר אנשים או בפקודתו ביצע אחד או יותר מחבריו בכל זמן
שהוא לאחר ה' באייר תש״ח (14 במאי 1948) מעשי אלימות העלולים
לגרום למותו של אדם או לחבלתו, או איומים במעשי אלימות כאלה; או

(ב)    חבר אנשים, או אחד או יותר מחבריו מטעמו או בפקודתו, הכריז שאותו
חבר אנשים אחראי למעשי אלימות העלולים לגרום למותו של אדם או
לחבלתו, או איומים במעשי אלימות כאלה, או שהכריז שחבר האנשים
היה מעורב במעשי אלימות או איומים במעשי אלימות כאלה, בתנאי שמעשה האלימות או
האיומים נעשו אחרי ה' באייר תש״ח (14 במאי 1948)".

‫140.‬    ‫עובדת היותם של הפת"ח, התנזים וגדודי חללי אלאקצא ארגונים טרוריסטיים, כפי‬
‫שנאמר בחוות דעתו של תא"ל קופרווסר ת/1, הוכחה בבירור ממסמכי השלל שנתפסו במבצע‬
‫"חומת מגן" והוצגו כראיות בפנינו, כמו גם מעדויותיהם של פעילי הטרור והנאשם עצמו (ראה‬
‫לעיל: סעיפים 7-10; עדותו של עויס בסעיפים 21-23; עדותו של אבו חמיד בסעיף 25; עדותו של‬
‫אחמד ברגותי בסעיף 29; עדותו של אחויל בסעיף 35; עדותו של עיאדיה בסעיף 40; עדותו של‬
‫שריף בסעיף 55; עדותו של אבו רדאחה בסעיף 57; ודברי הנאשם בחקירתו כמפורט בסעיפים -60‬
‫64). הפיגועים נשוא כתב האישום, ורבים אחרים, בוצעו על ידי פעילי השטח של הפת"ח – אנשי‬
‫התנזים – ועל ידי חוליות שהתאגדו במסגרת המכונה "גדודי חללי אלאקצא". הנאשם היה מנהיג‬
‫הפת"ח בגדה, ומפקד התנזים וגדודי חללי אלאקצא, כפי שהודה בחקירתו, וכפי שהוכח בראיות‬
‫נוספות רבות (ראה סעיף 17 וסעיפים 60-65 לעיל).‬

‫תפקידיו של הנאשם בהנהגת ארגוני הטרור פורטו בהרחבה אף הם (ראה חלק שני, פרק ד' לעיל).‬
‫הנאשם היה מפקדם של ארגוני הטרור וחוליות הטרור, גם אם לעיתים אלה חרגו מהנחיותיו, והוא‬
‫דאג לספק להם אמצעי לחימה וכספים לצורך פעילותם (ראה חלק שני פרק ד(1) ו-(3) לעיל). הוא‬
‫אף היה מעורב באופן אישי בחלק מן הפיגועים שביצעו הארגונים שבהנהגתו (ראה חלק שני פרק ד(‬
‫2) לעיל). הנאשם אף טיפל בסיוע למבוקשים ולמשפחות העצורים והחללים, ובגיוס פעילים‬
‫לארגוני הטרור והדרכתם (ראה חלק שני פרק ד(4)-(5) לעיל). הוא היה האדם אשר ביטא את‬
‫עמדתם של ארגוני הטרור באמצעי התקשורת (ראה פרק ד(6) לעיל).‬

‫אין מדובר, איפוא, אך ורק "באדם הממלא תפקיד בהנהלה או בהדרכה של ארגון טרוריסטי",‬
‫כלשון סעיף 2 לפקודת מניעת טרור, אלא הנאשם הוא מי שעמד בראש ארגוני הטרור הנ"ל, התווה‬
‫את מדיניותם ונשא נאומי תעמולה מטעמם באמצעי התקשורת.‬
‫בכך הוכחו יסודות סעיפים 2 ו- 3 לפקודת מניעת טרור, קרי חברות בארגון טרוריסטי ופעילות‬
‫בארגון שכזה.‬

## 2.    ‫אחריותו של מבצע בצוותא, משדל ומסייע והאבחנה ביניהם‬

‫141.‬    ‫כתב האישום מייחס לנאשם אחריות ישירה של "מבצע בצוותא" לגבי כל מעשי הרצח‬
‫וניסיון הרצח נשוא כתב האישום, כאשר מדובר ב- 37 פיגועים שונים.‬
‫כתב האישום מייחס לנאשם גם את העבירות של סיוע ושידול לרצח, אם כי טענת המאשימה‬
‫בסיכומיה היא, כי יש לראות בנאשם מבצע בצוותא של עבירות אלו, ולא רק מסייע או משדל‬
‫לביצוען, וזאת עקב היותו מנהיג ארגוני טרור, והאחראי העיקרי לביצוע פיגועי טרור שהוציאו‬
‫ארגונים אלה לפועל. יש לסקור, איפוא, את מידת אחריותו הנטענת של הנאשם לפיגועי הטרור‬
‫נשוא כתב האישום: ראשית - כמי שביצע את מעשי הרצח בצוותא חדא עם פעילי השטח‬
‫והמפגעים; שנית – כמי ששידל לביצוע מעשים אלה; שלישית – כמי שסייע לביצוע מעשי הרצח.‬
‫במסגרת זו יש לבחון מה הקווים המאפיינים את "המבצע בצוותא", תוך הבחנתם מן המאפיינים‬
‫את המסייע והמשדל.‬

‫142.‬    ‫סעיף 29(ב) לחוק העונשין, התשל"ז-1977 קובע את אחריותו של המבצע בצוותא,‬
‫כדלקמן:‬

‫"המשתתפים בביצוע עבירה תוך עשיית מעשים לביצועה, הם מבצעים בצוותא, ואין‬

‫נפקה מינה אם כל המעשים נעשו ביחד, או אם נעשו מקצתם בידי אחד ומקצתם בידי‬

אחר״.

סעיף 30 לחוק העונשין, התשל״ז-1997 קובע את אחריותו של המשדל כדלקמן:

‏״המביא אחר לידי עשיית עבירה בשכנוע, בעידוד, בדרישה, בהפצרה או בכל דרך שיש בה
משום הפעלת לחץ, הוא משדל לדבר עבירה״.

סעיף 31 לחוק העונשין, התשל״ז-1977 קובע את אחריותו של המסייע כדלקמן:

‏״מי אשר, לפני עשיית העבירה או בשעת עשייתה, עשה מעשה כדי לאפשר את הביצוע,
להקל עליו או לאבטח אותו, או למנוע את תפיסת  המבצע, גילוי העבירה או שללה, או כדי
לתרום בדרך אחרת ליצירת תנאים לשם עשיית העבירה, הוא מסייע״.

143. על מנת שאדם יחשב כמבצע העבירה בצוותא עם אחרים, צריך להתקיים התנאי הבסיסי
של ״עשיית מעשים לביצועה״ של העבירה, כפי שמורה סעיף 29(ב) לחוק.

הפסיקה נתנה פירוש רחב למושג ״ביצועי״, כשהיא מגדירה בצורה רחבה את מהות המעשה הנדרש
לצורך כך. באופן דומה קבעה הפסיקה אמות מידה גמישות בנוגע למידת הקירבה הנדרשת של
המשתתף למעגל המבצעים, וליכולתו להשפיע על הביצוע (דנ״פ 1294/96, 1365/96 **עוזי משולם
ואח׳ נ׳ מדינת ישראל**, פ״ד נב(5) 1, בעמ׳ 21 (כב׳ השופט א. מצא), בעמ׳ 54-55 (כב׳ השופט מ.
חשין), ובעמ׳ 63-64 (כב׳ השופט י.קדמי)).

אשר למעשה הנדרש על מנת שניתן יהיה לראות באדם מבצע בצוותא, נפסק כי די במעשה לביצוע
העבירה החורג מהכנה גרידא (זה אף המבחן לקיומה של עבירת ניסיון), ואשר מלווה ביסוד הנפשי
המתאים (דנ״פ 1294/96 הנ״ל בענין **משולם**, בעמ׳ 23-24). מעשה זה איננו חייב להיות חיוני
להצלחת העבירה, ואף איננו חייב להיות מעשה הנמנה עם רכיבי היסוד העובדתי שבעבירה; די בכך
שהמעשה משולב בתוכנית  העבירה, ומהווה השתתפות בביצועה, כמו למשל תכנון העבירה, מתן
הנחיות לביצועה או חלוקת התפקידים בין המשתתפים (דנ״פ 1294/96 הנ״ל בענין **משולם**, בעמ׳
63-64 (כב׳ השופט י. קדמי).

א. <u>מבצע בצוותא לעומת מסייע</u>

144. ההבחנה בין "מבצע בצוותא" של העבירה לפי סעיף 29(ב) לחוק העונשין, לבין "מסייע" לפי סעיף 31 לחוק, הפכה להיות בעלת חשיבות מעשית רבה לאחר שנכנס לתוקף חוק העונשין (תיקון מס' 39) (חלק מקדמי וחלק כללי), התשנ"ד-1984, שכן על-פי סעיף 32 לחוק כנוסחו היום - עונשו של המסייע הוא מחצית מעונשו של המבצע בצוותא, בעוד שעל-פי הדין הקודם עונשם היה זהה. עונשו המירבי של המסייע לרצח הוא 20 שנות מאסר (סעיף 32(1) לחוק), בעוד שהמבצע עבירת רצח בצוותא עם אחר, בהעדר נסיבות של אחריות מופחתת, דינו מאסר-עולם חובה.

בע"פ 8573/96, 8620, 8710, 8873, 8901 **מרקדו ואח' נ. מדינת ישראל** ("משפט **הדיסקונטאים**"), פ"ד נא(5) 481, אמר כבוד השופט א. גולדברג בעמ' 545:

> "תיקון מס' 39 לחוק מבטא את ההכרה שהאשמה המוסרית, והמסוכנות הסובייקטיבית והאובייקטיבית שבסיסית פחותות מאלה שבביצוע בצוותא. פער זה הוא שעומד ביסוד ההבחנה בתוצאות העונשיות בין מבצע בצוותא למסייע, והוא זה שגם צריך להנחות אותנו בקביעת המבחנים המשמשים להבחנה בין מבצע עיקרי למסייע".

145. ההבחנה בין "מבצע בצוותא" לבין "מסייע" הובהרה בע"פ 4389/93, 4497/93 **יוסי מרדכי ואח' נ. מדינת ישראל**, פ"ד נו(3) 239, בע"פ 2796/95, 2813/95, 2814/95 **פלונים נ. מדינת ישראל**, פ"ד נא(3) 388, דנ"פ 1294/96 הנ"ל בענין **משולם**; ע"פ 8573/96 הנ"ל בעניין **מרקדו**, בעמ' 543-550; וע"פ 2111/99 **חיירו נ' מדינת ישראל**, פ"ד נח(1) 411 ההבחנה בין מבצע בצוותא לבין מסייע מצויה הן ביסוד העובדתי של העבירה, והן ביסוד הנפשי שלה. בעיקרון, "**איכות תרומתו של המסייע לביצוע העבירה פחותה מאיכות תרומתו של המבצע העיקרי**" (ע"פ 8573/96 הנ"ל, בעמ' 545).

אשר **ליסוד העובדתי** של העבירה - ההבחנה העיקרית היא בין שותף ישיר לביצוע העבירה לבין שותף עקיף לביצועה. המבצעים בצוותא הם "**משתתפים בביצוע העבירה תוך עשיית מעשים לביצועה**", אך לא נדרש כי כל אחד מהם יבצע בעצמו את כל היסודות העובדתיים של העבירה (סעיף 29(ב) לחוק). לעומת זאת, המסייע עושה מעשה שיש בו כדי לתרום בדרך כלשהי "**ליצירת תנאים לשם עשיית העבירה**" (סעיף 31 לחוק). המבצע בצוותא הוא חלק מן המעגל הפנימי של ביצוע העבירה, בעוד שתרומתו של המסייע לביצוע העבירה היא חיצונית בלבד. לכן, בוחן בית-המשפט את מידת הקירבה של כל אחד מן המשתתפים לביצוע העבירה, קרי: האם הוא מהווה חלק מן המעגל הפנימי של המשימה העבריינית (ע"פ 3390/98 **רוש נ. מדינת ישראל**, פ"ד נג(5) 871

878). זהו, איפוא, **"מבחן הקירבה"**, שהובהר על ידי כב' הנשיא א. ברק בע"פ 4389/93 הנ"ל בעניין **מרדכי**, בעמ' 250:

"השוני בין המבצע בצוותא לבין המסייע מתבטא בכך שהמבצעים בצוותא משמשים גוף אחד לביצוע המשימה העבריינית. כולם עבריינים ראשיים... תרומתו של כל אחד מהמבצעים בצוותא היא 'פנימית'... אכן, לעניין הביצוע בצוותא תיתכן חלוקת עבודה בין העבריינים, באופן שהם יפעלו במקומות שונים ובזמנים שונים, ובלי שכל אחד מהם מיצה את העבירה, ובלבד שחלקו הוא מהותי להגשמת התכנית המשותפת. אחדות המקום והזמן אינה חיונית, ובלבד שחלקו של כל אחד מהם הוא חלק פנימי של המשימה העבריינית".

**146.** בפסקי הדין שצוטטו לעיל, סקר בית-המשפט העליון את המבחנים השונים שהוצעו בפסיקה ובספרות המשפטית לשם תיחום הגבולות בין מבצע בצוותא לבין מסייע. יש אשר שמים דגש על **"מבחן השליטה"**, כמאפיין של המבצע בצוותא: למבצע בצוותא יש שליטה, יחד עם האחרים, על ביצוע העבירה; הוא מהווה חלק מן התוכנית המשותפת לביצוע העבירה, ופועל יחד עם האחרים להגשמתה. על מעמדו של המבצע בצוותא לאור "מבחן השליטה", אמר כבוד הנשיא א. ברק בע"פ 2796/93 הנ"ל בעניין **פלונים** (פסקה 28):

"המאפיין את המבצע בצוותא שהוא אדון לפעילות העבריינית. בידיו השליטה הפונקציונאלית-מהותית, יחד עם המבצעים בצוותא האחרים, על העשיה העבריינית. הוא חלק מהחלטה משותפת לביצוע העבירה. הוא חלק מהתוכנית הכוללת להגשמת הפעולה העבריינית האסורה. הוא פועל יחד עם המבצעים בצוותא האחרים, כך שכל אחד מהם שולט - יחד עם האחרים – על הפעילות כולה. מעמדו ביחס להחלטה לביצוע העבירה הוא של איש 'פנים'. תרומתו היא 'פנימית'. חלקו הוא מהותי להגשמת התכנית המשותפת...".

כך גם נפסק בע"פ 8573/96 הנ"ל בעניין **מרקדו**, בעמ' 548-547. לעומת זאת, בהתייחסו למסייע אמר כבוד הנשיא ברק כי המסייע **"אינו אבי הרעיון"** לביצוע העבירה, ובפסקה 30 אמר כדלקמן:

"המסייע הוא שותף עקיף ומשני (פרשת מרדכי, פסקה 14). הוא מצוי מחוץ למעגל הפנימי של הביצוע. הוא גורם "חיצוני". אין הוא יוזם הביצוע ואף לא משדל לביצועו... אין הוא המחליט על הביצוע ואין הוא שולט על הביצוע...".

P 7: 000431

(ראה גם ע"פ 4389/93 הנ"ל בענין **מרדכי**, פסקאות 13-14).

**147.** לעומת "מבחן השליטה", יש המדגישים את ה"**מבחן הפונקציונאלי**", לפיו מבצע בצוותא הוא מי שנטל חלק מהותי בביצוע העבירה גופה, בעוד שחלקו של המסייע מתבטא בפעולות עזר החיצוניות לעבירה.

מבחן זה מוצא את ביטויו בלשון סעיף 29(ב) לחוק ("**משתתפים בביצוע העבירה תוך עשיית מעשים לביצועה**"). בע"פ 2796/93 הנ"ל בענין **פלונים** (פסקה 27), אמר כבוד הנשיא א. ברק בהתייחסו למבצעים בצוותא:

"הם השותפים הראשיים בביצוע העבירה. השותפות ביניהם מתבטאת בכך שהם נטלו חלק בביצוע העבירה כמבצעים ישירים. הם משמשים גוף אחד לביצוע המשימה העבריינית... כל אחד מהם נוטל חלק בביצוע העיקרי של העבירה".

ובהמשך דבריו (פסקה 27) אמר כבוד הנשיא ברק:

"ביצוע בצוותא מחייב תיכנון משותף. הוא מבוסס על חלוקת עבודה בין המבצעים...".

דברים ברורים באשר לחשיבותו המכרעת של ה"מבחן הפונקציונאלי" אמר כבוד השופט י. קדמי בע"פ 5206/98 **חליל עבוד נ. מדינת ישראל**, פ"ד נב(4) 185 (פסקה 2):

"'המבצעים בצוותא' אינם רק אלה המשתתפים בעשית 'מעשה' העבירה גופו; אלא – נמנה עליהם כל מי ש'נוטל חלק' בביצועה של העבירה, במובן הרחב של המושג 'ביצוע'. ואילו כל מי שרק 'תורם' לביצוע, מבלי לקחת בו חלק – לאמור: מבלי למלא 'תפקיד' במסגרתו – נותר ב'מעגל החיצוני' של האחראים לביצוע. הוא אינו משתתף בביצוע; וחלקו מצטמצם ל'סיוע' גרידא למימושו של הביצוע.

ההבחנה בין הנמנים עם ה'מעגל הפנימי' – 'המבצעים בצוותא' – לבין הנמנים עם
ה'מעגל החיצוני' – 'המסייעים', נעוצה, איפוא, בטיב ואופי מעורבותם בביצוע: אם
'נטלו-חלק-בביצוע' – קרי: אם היה להם 'תפקיד' בביצוע הריהם 'מבצעים בצוותא';
ואילו אם אך 'תרמו' לו מבחוץ – הריהם 'מסייעים' בלבד'".

בהמשך דבריו מבהיר כבוד השופט קדמי כי ההבחנה בין מבצע בצוותא למסייע **אינה** תלויה
בשאלה האם היה בהתנהגותו של הנאשם משום סיוע לביצוע העבירה, שכן גם מבצע בצוותא
מסייע לביצועה; השאלה היא "אם **נטל חלק** – קרי: אם **מילא תפקיד** – בביצוע העבירה'".

בדנ"פ 1294/96, 1365 **משולם ואח' נגד מדינת ישראל**, פ"ד נב(5)1, בעמ' 63, אמר כבוד השופט י.
קדמי:

"'מעשה-של-השתתפות' אינו חייב לבטא פעילות המשולבת בביצוע ה'מעשה', הנמנה
עם רכיבי היסוד העובדתי שבעבירה, ומשמעותו רחבה ומקיפה כל 'מעשה' המבטא
'השתתפות' בביצועה של העבירה. סעיף 29 לחוק העונשין, המגדיר 'מעשה-של
השתתפות', אינו דורש ש'המעשה' ייעשה **תוך כדי ביצוע** היסוד העובדתי של העבירה,
ודי שיהא בו לבטא 'השתתפות' בביצוע. 'השתתפות', כאמור, יכול שתתחיל בהעלאת
הרעיון בפני המיועדים לבצע את העבירה...'"

כבוד השופט מ. חשין ציין באותו עניין כי החוק איננו דורש שמעשה ההשתתפות בביצוע העבירה
ייעשה תוך כדי ביצוע בפועל, או בסמוך לכך (עמ' 53-54).

148. בדנ"פ 1294/96 הנ"ל בענין **משולם**, הבהיר בית-המשפט העליון כי "מבחן השליטה" הינו
מבחן עזר, שאיננו מבחן יחיד ובלעדי, ויש לשלבו עם מבחנים ושיקולים אחרים; שליטה בביצוע
מהווה אמנם ראיה חשובה להיותו של אדם מבצע בצוותא, אך היעדר שליטה, או העדר תרומה
פיזית חיונית לביצוע העבירה, אינם שוללים בהכרח מסקנה זו (כבוד הנשיא א. ברק בעמ' 50;
כבוד השופט א. מצא בעמ' 27-24; כבוד השופט י. קדמי בעמ' 65). זאת ועוד; גם כאשר בית-
המשפט נזקק ב"מבחן השליטה", נעשה הדבר תוך הדגשה כי אין מדובר ביכולת שליטה רצופה
במהלך ביצוע העבירה כולה, אלא מדובר ב"**שליטה במשבצת הביצוע שהוקנתה למבצע**

**המסיים**" (כבוד השופט י. קדמי בעמ' 64).

**149.** אשר **ליסוד הנפשי** של העבירה – הרי שיחסו הנפשי של המסייע נמצא בדרגה נמוכה יותר מזו של המבצע העיקרי, בכל הנוגע למידת מודעותו לפרטים הנוגעים לביצוע העבירה, ורצונו להגשימה. לגבי מסייע, נפסק כי די בכך שהוא מודע לכך שהתנהגותו תורמת ליצירת התנאים הדרושים לשם ביצוע העבירה העיקרית, ושהמבצע העיקרי עומד לבצעה. בנוסף, לנגד עיני המסייע צריכה לעמוד המטרה לסייע למבצע העיקרי לעבור את העבירה, או להקל עליו את ביצועה. ואולם, כאשר העבירה העיקרית היא תוצאתית, ונדרש בה יסוד של פזיזות או כוונה מיוחדת – אין צורך להוכיח שגם המסייע פעל מתוך כוונה שכזו, או שהוא התכוון לכך שהמבצע העיקרי יגשים את מטרתו. כך למשל, בעבירת רצח אין צורך להוכיח שהמסייע התכוון שהמבצע העיקרי ירצה את הקורבן, או שהוא חפץ בכך: די בכך שהמסייע שם לנגד עיניו את המטרה לסייע לעבריין העיקרי, יהיו מניעיו של המסייע אשר יהיו (הלכות אלו הובהרו בע"פ 320/99 **פלונית נ' מדינת ישראל**, פ"ד נה(3) 22, בעמ' 31-37).

לעומת זאת, כאשר במבצע בצוותא עסקינן, יש להוכיח מעורבות נפשית גבוהה ומודעות מצידו לפרטי העבירה המתבצעת, בנוסף על רצונו להגשימה:

"המבצע בצוותא תורם את תרומתו לאירוע העבריייני רב-משתתפים מתוך יחס נפשי של יוצר העבירה auctoris onimo. הוא רואה את עשייתו העבירה כעניינו הוא, ולא של אחר" (דברי ש"ז פלר, בספרו **יסודות בדיני עונשין**, שצוטטו בע"פ 4389/93 הנ"ל בעניין **מרדכי**, בעמ' 251).

**כללו של דבר:** המבצע בצוותא, בניגוד למסייע, צריך להיות בעל יסוד נפשי זהה לזה של מבצעי העבירה האחרים, וצריכים להתקיים לגביו כל מרכזי היסוד הנפשי שנקבעו בחוק לגבי העבירה שהוא נוטל חלק בביצועה (ע"פ 2796/95 הנ"ל בעניין **פלונים**, בעמ' 402).

בע"פ 8573/96 הנ"ל בעניין **מרקדו**, אמר כבוד השופט א. גולדברג, בעמ' 549-548, כי סיווגו של הנאשם כמבצע בצוותא או כמסייע מתקבל כתוצאה ממבחן משולב של היסוד הנפשי והיסוד העובדתי – מבחן אשר כמוהו כמקבילית כוחות:

"ככל שהיסוד הנפשי של עושה העבירה (מבחינת מידת העניין שלו בביצועה) רב יותר, יש מקום להסתפק בדרגה נמוכה יותר של היסוד העובדתי. ברוח זו כבר נאמר כי 'משהוכח יסוד 'נפשי' זה (המודעות – א' ג'), אין עוד חשיבות לחלוקת התפקידים בין המעורבים באירוע' (ע"פ 4188/95, 5235 הנ"ל [43], בעמ' 550). ולהפך, ככל שמידתו של

**היסוד העובדתי אצל עושה העבירה, מבחינת איכות תרומתו לביצועה, רבה יותר, כן ניתן להסתפק בדרגה נמוכה יותר של היסוד הנפשי".**

דברים אלו אושרו בדנ"פ 1294/96 בעניין **משולם** הנ"ל (בעמ' 27, מפי כב' השופט א. מצא).

150.    מן ההלכות שצוטטו לעיל עולה, כי השתתפות בתכנון העבירה מהווה סממן מובהק של מבצע בצוותא, ובמקרה שכזה אין צורך בנוכחות פיזית בזירת העבירה על מנת להיחשב כמבצע בצוותא.

בדנ"פ 1294/96 הנ"ל בעניין **משולם**, בעמ' 64, פסק כב' השופט י. קדמי:

**"'השתתפות', כאמור, יכול שתתחיל בהעלאת הרעיון בפני המיועדים לבצע את העבירה, ומכל מקום, לשיטתי, אין ספק, שתכנון הביצוע, מתן הנחיות והתוויית קווי הפעולה, לרבות חלוקת תפקידים בין המשתתפים, מהווים 'מעשה' המבטא 'השתתפות' כאמור".**

בע"פ 3596/93 **חמוד אבו סרור נ. מדינת ישראל**, פ"ד נב(3) 481, אמר כבוד השופט א' מצא בעמ' 491:

**"תרומתו המעשית של המערער לביצוע הרצח אכן היתה קטנה משל שני מרעיו. ואולם השתתפותו בפעילות המכינה, ותפקיד המתריע אותו מילא, היקנו לו שליטה על הוצאתה לפועל של התוכנית הרצחנית. מכך שהשתתף בהכנות לביצוע ופעל להצלחת התוכנית עולה, כי היה בעל המחשבה הפלילית הנדרשת לשכלול אחריותו בגין עבירת רצח בכוונה תחילה".**

בע"פ 2796/95 הנ"ל בעניין **פלונים**, הורשעו ארבעה נערים בביצוע רצח בכוונה תחילה, למרות שרק אחד מהם השליך את הרימון שגרם למותו של קורבן העבירה. האחד (זאב) הורשע כמבצע בצוותא משום שנטל חלק בכל שלבי התכנון והביצוע, ונכח בזירת ביצוע העבירה, למרות שהחליט שלא לזרוק את הרימון הקטלני בעצמו (**"הוא לא ביצע את אקט הקטילה. אין בכך כלום, שכן מבצע בצוותא אחראי גם אם לא ביצע בעצמו את כל יסודות העבירה..."** – עמ' 407). השני (גרשון) הורשע כמבצע בצוותא, אף כי לא נכח כלל בזירת הרצח, וכל תפקידו היה לדווח לתקשורת על המעשה לאחר ביצועו, משום שביצע את התפקיד שהוקצה לו מראש לשם הגשמת העבירה (עמ' 408). השלישי (טל) הורשע כמבצע בצוותא, למרות שגם הוא לא נכח בזירת ביצוע הרצח, משום

שהשתתף בתכנון העבירה, היווה חלק מן החבורה שהחליטה לבצע את הרצח, ואף עמד בראשה (עמ' 408-409).

151.    כאשר לעבירה העיקרית קדמה קשירת קשר לביצועה, תהא הנטיה לראות בכל אחד מן הקושרים מבצע בצוותא של העבירה העיקרית, ובלבד שנטל חלק ממשי בביצועה. הטעם לכך הוא שקשירת קשר לביצוע עבירה מעידה על עניין על לכל אחד מהקושרים בביצועה. כדברי ש"יז פלר, שצוטטו בע"פ 8573/96 הנ"ל בעניין **מרקדו**, בעמ' 550: "**קשירת קשר בין שני אנשים, או יותר, לביצוע עבירה פלילית, טומנת בחובה גיבוש מחשבה משותפת למימוש מטרת הקשר – כל אחד במעמד עתידי של מבצע ישיר, ברוח יצירת animo auctoris."**

בע"פ 3390/98 הנ"ל בעניין **רוש**, בעמ' 878, אמר כבוד השופט א' מצא:

"**המבחן הנוסף בדבר 'קירבת המעשה', שעל-פיו נדרש שחלקו של כל אחד מהמבצעים בצוותא יהיה 'חלק פנימי של המשימה העבריינית', נועד אך להבטיח שעשיית מעשה גבולי, שלפי טיבו עשוי להיכנס להגדרה של 'ביצוע', לא תטיל על העושה אחריות כמבצע בצוותא כאשר טיב יחסו הנפשי לביצוע העבירה מוטל בספק (דנ"פ 1294/96 משולם נ' מדינת ישראל (להלן – פרשת משולם [3]), בעמ' 21-22.**

**לא כן הדבר ביחס לקביעת אחריותו של מי אשר מעיקרה נימנה עם המשתתפים בהכנת התוכנית העבריינית, ואין מתעורר כל ספק ביחס להיותו בעל המחשבה הפלילית הנדרשת לשכלולה של העבירה המתוכננת. צד כזה לעבירה נושא באחריות כ'מבצע בצוותא', אפילו אם תרומתו הפיזית לביצועה אינה גדולה מתרומתו של מסייע (ע"פ 3596/93 אבו סרור נ' מדינת ישראל [4], בעמ' 491)".**

152.    אשר לנוכחות בזירת ביצוע העבירה, הרי שזו איננה הכרחית על מנת לראות באדם מבצע בצוותא, ובלשונו של כבוד הנשיא א. ברק בע"פ 2796/95 הנ"ל בעניין **פלונים** (פסקה 27): "**ביצוע בצוותא אינו מבוסס בהכרח על אחידות המקום והזמן**" (ראה גם דנ"פ 1294/96 הנ"ל בעניין **משולם**, בעמ' 30, 38, 49, 51, 53-54 ו-64). עם זאת, נוכחות שאינה אקראית של אדם בזירה בה מתבצעת עבירה, יוצרת חזקה הניתנת לסתירה להיותו מבצע בצוותא של העבירה (ראה: ע"פ 3006/96 **מטיאס נ. מדינת ישראל**, דינים עליון, כרך נב 526).

ב.    **עבירת הסיוע**

P 7: 000436

153. היסוד העובדתי והנפשי של עבירת הסיוע בכלל, והסיוע לרצח בפרט, הובהרו לאחרונה
בפסק דינו של כבוד הנשיא א' ברק בע"פ 320/99 **פלונית נגד מדינת ישראל**, פ"ד נה(3) 22, בעמ'
31-37 (אושר בע"פ 11131/02 **אנג'ליקה יוסופוב נ' מדינת ישראל**, טרם פורסם). ניתן לסכם את
ההלכות שנפסקו בפסק דין זה כדלקמן :

א.    המאפיין את ההתנהגות המסייעת הוא, שהיא מהווה תרומה עקיפה ומשנית לביצועה של
העבירה העיקרית : התרומה של המסייע נחשבת עקיפה ומשנית, משום שהוא איננו נוטל
חלק בביצוע העיקרי של העבירה, אלא רק תורם בעקיפין להגשמתה של העבירה העיקרית.
המסייע הוא גורם "חיצוני", אשר מצוי מחוץ למעגל הפנימי של ביצוע העבירה (ראה גם :
ע"פ 7085/93 **נג'אר ואח' נ' מדינת ישראל**, פ"ד נא(4) 221, בעמ' 238).

ב.    **היסוד העובדתי** של עבירת הסיוע, שהיא עבירת התנהגות, הוא מעשה או מחדל שיש בו כדי
ליצור את התנאים להגשמתו של היסוד העובדתי בעבירה המבוצעת על ידי המבצע העיקרי.
הסיוע צריך להיות "מסוגל" לסייע להגשמת העבירה העיקרית, אך אין דרישה שהסיוע
יהיה אפקטיבי, או תנאי שבלעדיו העבירה העיקרית לא היתה מתבצעת (ראה גם ע"פ
4317/97 **פולאיקוב נ' מדינת ישראל**, פ"ד נג(1) 289, בעמ' 307). כמו כן אין דרישה
שהעבירה העיקרית תתבצע בפועל, שכן עבירת הסיוע איננה עבירה תוצאתית. בנוסף, יש
צורך להוכיח, כחלק מהיסוד העובדתי של עבירת הסיוע, את הנסיבה הנוגעת לפליליותה
של ההתנהגות שהסיוע מהווה לה גורם משני ועקיף.

ג.    הסיוע צריך שיופנה כלפי עבירה בעלת ייעוד מוחשי, דהיינו, פעולה הנעשית על מנת לסייע
לביצועה של עבירה **מסוימת**, להבדיל מעבירה סתם (ראה גם ע"פ 426/67 **יוסף בארי ואח'
נ' מדינת ישראל**, פ"ד כב(1) 477, בעמ' 481 ; ע"פ 7085/93 הנ"ל בעניין **נג'אר**, בעמ' -238
239).

ד.    **היסוד הנפשי** של עבירת הסיוע כולל שלושה תנאים מצטברים :

(1)    מודעות לטיב ההתנהגות המסייעת, קרי : לכך שההתנהגות תורמת ליצירת
התנאים לשם עשיית עבירה עיקרית בעלת ייעוד מוחשי ;

(2)    מודעות לקיום הנסיבות הרלבנטיות בעת ההתנהגות המסייעת, דהיינו : מודעות לכך
שהמבצע העיקרי מבצע, או עומד לבצע עבירה, הגם שלא נדרשת מודעות לכל פר'
מפרטי העבירה (ראה גם ע"פ 7085/93 הנ"ל בעניין **נג'אר**, בעמ' 239-238).

(3)    לנגד עיניו של המסייע צריכה לעמוד המטרה לסייע למבצע העיקרי לבצע את
העבירה, או להקל עליו את הביצוע.

על דרישה זו ניתן להחיל את "הילכת הצפיות", דהיינו : מודעותו של המסייע לכך
שהתנהגותו עשויה, קרוב לוודאי, להוות תרומה מסייעת למבצע העיקרי – שקולה
כנגד המטרה לסייע לו, גם אם הוא לא חפץ כלל בביצוע העבירה העיקרית (ראה גם
דעת המיעוט של כבוד השופט י' אנגלרד בע"פ 4317/97 הנ"ל בעניין **פולאיקוב**,
בעמ' -320 323, ודעתו של כבוד השופט מ' אילן בע"פ 807/99 **מדינת ישראל נ'
עזיזיאן**, פ"ד נג(5) 747, בעמ' 757-758).

ה.    כאשר העבירה העיקרית היא תוצאתית, ונדרש בה יסוד נפשי של פזיזות או כוונה מיוחדת –

אין צורך להוכיח שגם המסייע פעל מתוך פזיזות או כוונה שכזו, או שהוא התכוון לכך שהמבצע העיקרי יגשים את מטרתו. כאשר מדובר בסיוע לרצח, פירוש הדבר הוא שאין צורך להוכיח שהמסייע התכוון שהמבצע העיקרי ירצח את הקורבן, או אפילו שהוא חפץ בכך. המחשבה הפלילית של המסייע אינה צריכה להיות זהה למחשבתו של העבריין העיקרי: די בכך שהמסייע שם לנגד עיניו את המטרה לסייע לעבריין העיקרי, יהיו מניעיו של המסייע אשר יהיו.

154.    לעניין דרגת ההסתברות כי העבריין העיקרי יבצע את העבירה, חשוב לציין כי על פי ההלכה שנפסקה מפי כבוד הנשיא א' ברק בע"פ 320/99 הנ"ל בעניין **פלונית**, די בכך שהמסייע **מודע** לכך שהמבצע העיקרי עומד לבצע עבירה בעלת ייעוד מוחשי (עמ' 32-31 לפסק הדין). הדרישה למודעות בדרגת הסתברות **קרובה לוודאי**, נוגעת ליסוד המטרה, קרי: מודעותו של המסייע לכך שהתנהגותו עשויה, קרוב לוודאי, לתרום לביצוע העבירה העיקרית; מודעות שכזו, שקולה כנגד המטרה לסייע לעבריין העיקרי. כפי שאמר הנשיא א' ברק: **"היסוד הנפשי של מטרה (/כדי/) מכוון איפוא כלפי פעולת הסיוע ולא כלפי פעולתו של העבריין העיקרי"** (עמ' 35).

בהקשר זה מתעוררת השאלה מתי נאמר כי לנאשם היתה "מודעות" לכך שהעבריין העיקרי עומד לבצע עבירה בעלת ייעוד מוחשי.

ההלכה היא כי "עצימת עיניים", המכונה אף "עיוורון מכוון", שקולה כנגד מודעות לטיב המעשה ולקיום הנסיבות. הלכה זו, מוצאת כיום את ביטויה ב**סעיף 20(ג)(1) לחוק העונשין**, אשר קובע כדלקמן:

> "רואים אדם שחשד בדבר טיב ההתנהגות או בדבר אפשרות קיום הנסיבות
> כמי שהיה מודע להם, אם נמנע מלבררם".

(וראה: י' קדמי, **על הדין בפלילים**, עדכון והשלמה (1996), חלק ראשון, בעמ' 37, וע"פ 3417/99 <u>מרגלית הר-שפי נ' מדינת ישראל</u>, פ"ד נה(2) 735, בעמ' 757-758).

בספרו הנ"ל של י' קדמי נאמר, בעמ' 37:

> "א.    סעיף 20(ג)(1) לתיקון, מעגן בהוראה חקוקה, את הכלל שלפיו: מקום שאדם
> 'חשד', בפועל, שטיב התנהגותו מביא אותה בגדרה של התנהגות אסורה או שיש
> אפשרות, מעשית, שמתקיימות הנסיבות הדרושות להרשעה, והוא נמנע מלברר את
> 'אמיתותו' של החשד, רואים אותו כמי שהיה מודע לטיבה האמיתי של ההתנהגות
> ולקיומה של הנסיבה (אם מתברר כי נתקיימה בפועל).
>
> ב.    גם כאן... נראה כי רמת החשד צריכה להיות לפחות 'רמה מסתברת', לאמור: כי
> סביר יותר שהחשד אמיתי מאשר שאין לו אחיזה".

ההלכה בעניין זה מבוארת בספרו של פרופ' ש"ז פלר, **יסודות בדיני עונשין** (כרך א', תשמ"ד), בעמ' 519, כפי שאף הפנה אליה כבוד השופט מי' חשין בע"פ 3417/99 הנ"ל, בעמ' 758, לאמור:

> "מודעות **לאפשרות** קיום הנסיבה, בה תלויה העבירה, מחייבת את האדם לבדוק, עובר
> לביצוע מעשהו, את המצב בכל הנוגע לאותה נסיבה, כדי להימנע ממנו, במקרה שקיום
> הנסיבה מתאושש.

אם חרף החשד, לא עשה האדם כן, בין משום שבכל תנאי היה מנוי וגמור עמו לעשות את
המעשה, ובין משום שהיה לו נוח יותר שלא לדעת או מכל שיקול אחר, פירוש הדבר
שהשלים עם דבר קיומה של הנסיבה.
לכן, שקולה ההתעלמות *המודעת* מאפשרות הקיום של מערכת נסיבות כנגד *מודעות* לעצם
קיום זה; שהרי מערכת נסיבות זו עמדה לנגד עיני האדם, אלא שלא טרח לבדוק את מצב
הדברים כדי לברר. אם מתברר בדיעבד כי הנסיבות הרלוואנטיות אכן התקיימו, שקולה
המודעות לאפשרות קיומן עקב החשד בכך, כנגד המודעות לעצם קיומן".

בספרו הנ"ל של י' קדמי, בעמ' 37, נאמר באשר לרמת החשד הדרושה לצורך יישום ההלכה בדבר
"עצימת עיניים", כי לפני תיקון תשנ"ד לחוק העונשין נעה ההלכה הפסוקה בין רמה "סבירה" לבין
רמה "גבוהה". בעניין זה נאמר בספרו של פרופ' פלר, **דיני עונשין**, כרך א', עמי 523, כדלקמן:

"אין לדעתנו כל יסוד לסברה כי, מלבד רציונאליות החשד – הסוביייקטיבית כמובן – או,
ביתר דיוק, במקום הרציונאליות שלו, צריך החשד להיות גם בדרגה גבוהה, עד כדי
הסתברות קרובה לוודאי, או עד כדי העדר ספק של ממש בלבו של אדם בדבר אמיתותו...
לשם השתתת 'עצימת עיניים' למודעות, די במודעות לחשד רציונאלי בדבר אפשרות קיומן
של הנסיבות ובהמנעות מלברר את הדבר לאשורו".

ובעמ' 524 נאמר:

"לסיכום, די בהיות החשד מעוגן במציאות, כלומר רציונאלי, כדי להגדיר את המעשה
כמבוצע תוך 'עצימת עיניים', אם, עובר למעשה, נמנע העושה מלבדוק את החשד ומלעמוד
על מצב הדברים לאשורו. אין צורך בדרגה גבוהה של הסתברות אובייקטיבית של אמיתות
החשד".

המבחן לקיומה של "עצימת עיניים" העולה כדי מודעות הוא, כאמור לעיל, סובייקטיבי. עם זאת,
בתי המשפט נוהגים להיעזר לצורך קביעת רמת מודעותו הסובייקטיבית של הנאשם גם במבחן
האובייקטיבי של האדם הסביר (וראה: ע"פ 15/78 **משה ביבס נ. מדינת ישראל**, פ"ד לב(3) 64,
בעמ' 83; ע"פ 5612/92 **מדינת ישראל נ. באר ואח'**, פ"ד מחן(1) 302, בעמ' 363; והשוו להחלת
מבחן האדם הסביר בנוגע למודעות הנאשם להסתברות גבוהה של פגיעה בבטחון המדינה: ע"פ
3116/99 **יהודה גיל נ. מדינת ישראל**, פ"ד נד (4) 193, בעמי 204).

מן ההלכות שפורטו לעיל, ובעיקר אלו שנפסקו בע"פ 320/99 הנ"ל בעניין **פלונית**, עולה כי
**155.** אדם אשר חושד כי חברו עומד לבצע עבירה מסוימת, אך נמנע מלברר את העניין, ואף מסייע לחברו
לבצע את העבירה מתוך מודעות לכך שמעשהו יסייע, לביצוע העבירה בידי חברו - אם
תבוצע - נחשב כמסייע על פי סעיף 31 לחוק העונשין. מהלכות אלו עולה כי אין צורך להוכיח
שהמסייע צפה את ביצוע העבירה העיקרית כאפשרות קרובה לוודאי: די בכך שהיה מודע לאפשרות
ההגיונית, הסבירה והמשמעית של ביצוע העבירה העיקרית, וחרף כך סייע לביצועה, מתוך מודעות
לכך שהתנהגותו עשויה, לסייע למבצע העיקרי. כמו כן אין צורך להוכיח שהמסייע
חפץ בביצוע העבירה העיקרית, או כי פעל מתוך כוונה שהעבירה העיקרית תבוצע.

ואולם, בע"פ 11131/02 הנ"ל בעניין **יוסופוב** נפסק מפי כב' השופט א. ריבלין כי התביעה צריכה
להוכיח שהנאשם ידע שהתנהגותו עשויה לסייע, קרוב לוודאי, לביצוע עבירת רצח על ידי העבריין

העיקרי וכי: "**על מנת שתוחל הלכת הצפיות, יש להראות, כאמור, מודעות בדרגה של קרוב לוודאי לאפשרות ביצוע העבירה...**" (פסקה 19 לפסק הדין). דברים אלו שונים בנימתם מאלה שנאמרו בע"פ 320/99 הנ"ל בעניין **פלונית**, כאשר גם כב' השופט ריבלין אמר בע"פ 11131/02 הנ"ל בתחילת פסק הדין (פסקה 9), כי:

> "**המודעות – הן לטיב ההתנהגות המסייעת והן לנסיבה של ביצוע העבירה העיקרית – יכול שתהיה מוחלפת בחשד באשר לטיבה המסייע של ההתנהגות, ובמודעות לאפשרות התקיימות הנסיבה של ביצוע העבירה על ידי העבריין העיקרי, בהתאם להוראת סעיף 20 (ג)(1) לחוק העונשין ("עצימת עיניים")".**

156. מן ההלכות דלעיל עולה כי לא נדרשת הוכחה לכך שהנאשם היה מודע לכל פרט מפרטי העבירה שלביצועה הוא מסייע. בעניין זה נאמרו בע"פ 11131/02 הנ"ל בעניין **יוסופוב**, מפי כב' השופט א. ריבלין, דברים בעלי חשיבות לענייננו:

> "בצדק ציין בית המשפט קמא, כי מודעותו לכך שהמבצע העיקרי עומד לבצע עבירה אין משמעה מודעות לכל פרט מפרטי העבירה אותה הוא מתכנן (ראו למשל: ע"פ 7085/93 **נג'אר נ' מדינת ישראל**, פ"ד נא(4) 221, 239). בענייננו, המערערת ידעה כי זייד, אליו התלוותה, נושא עימו חומר נפץ, כי הוא ביצע כבר פיגוע בעבר, וכי הוא מבקש לנקום את מות אחיו, אשר נהרג בפעולות של כוחות הביטחון. בית המשפט קמא הרשים מעדותה של המערערת, כי זו הבינה היטב שזייד עומד לבצע פיגוע בעיר תל אביב. אין חשיבות, בהקשר זה, לשאלה אם ידעה באיזה מיקום מדויק מתכוון הוא להניח את חומר הנפץ".

עוד נפסק מפי כב' השופט ריבלין באותו עניין:

> "אכן, כפי שכבר ציינו, אין המסייע נדרש להיות מודע לכל הפרטים של העבירה אותה עומד לבצע המבצע העיקרי. יחד עם זאת, עליו להיות מודע, בעת שהוא מגיש את הסיוע למבצע העיקרי, לכך שקיימת אפשרות כי פעולתו תסייע למבצע העיקרי בביצועה של עבירה ממשית, ובמילים אחרות – לכך שלמבצע העבירה היה "ייעוד מוחשי" (ראו גם: ע"פ 426/67 באריו נ' מדינת ישראל, פ"ד כב(1) 477, 481–482; ע"פ 5544/91 מואל נ' מדינת ישראל (לא פורסם). אין די בידיעה על נכונות ערטילאית והיפותטית של המבצע לבצע עבירה, כדי להפוך אדם למסייע.

> ייתכן אמנם, כפי שכבר ציינו, כי המודעות לקיום הנסיבה שביסוד העובדתי – כלומר מודעות לכך שהמבצע העיקרי עומד לבצע עבירה – תוחלף במודעות לאפשרות שהוא עומד לבצע עבירה.

> אך על מנת שנאמר כי המסייע "עצם את עיניו" עלינו להשתכנע כי התקיים, בפועל, חשד רציונאלי-סובייקטיבי בעיני רוח של המסייע, לפיו עומדת להתבצע עבירה (ש"ז פלר בספרו הנ"ל (כרך א') 524-521, 530).

> זאת ועוד, על המסייע להיות ער לאפשרות שהעבירה תבוצע, בעת שהוא מושיט את הסיוע. אם סבור המסייע, בעת שהוא מבצע את הפעולות העולות לכדי סיוע, כי לא מתקיימת עוד אפשרות ממשית שהמבצע העיקרי עומד לבצע את העבירה, הרי שאין לראות בו מסייע – אף אם העריך, בשלב קודם, כי התקיימה אפשרות

שכזו".

בעניין הדרישה למודעות לגבי כוונת המבצע העיקרי לבצע עבירה בעלת יעוד מוחשי, פסק כב׳ השופט מ. לנדוי (כתוארו אז) בע״פ 426/67 **יוסף בארי ואח׳ נ׳ מדינת ישראל**, פד״י כב (1) 477, בעמ׳ 481, כי כאשר הסיוע מתבטא באספקת כלי לביצוע העבירה, כגון רכב או נשק – די בכך שהמסייע מספק את הכלי ששימש לביצוע העבירה למטרת ביצוע עבירה מאותו סוג שבוצע, ולאו דווקא אותה עבירה ממש. כב׳ השופט לנדוי אמר שהלכה זו, הנסמכת על פסיקה אנגלית, תחול "לפחות לגבי אותם מקרים, בהם משאיר המסייע ׳שיקול דעת׳ לעבריין העיקרי, לבחירת שעת הכושר ומקום הכושר להגשמת הכוונה הפלילית המשותפת לשניהם".

כך פסק כב׳ השופט לנדוי, במקרה הנ״ל, כי אילו הוכח שהמערער (אשר זוכה לבסוף) מסר את מכוניתו למבצע העיקרי של מעשה השוד על מנת להקל על הסתלקותו ממקום הפשע – לא היה צורך להוכיח שהוא התכוון דווקא לשוד התירת שנשדדה לבסוף.

**157.** הדרישה למודעות לנאשם לקיומה של עבירה ספציפית בעלת יעוד מוחשי, מרוככת גם על ידי "הכלל בדבר כוונה מועברת", המוצא את ביטויו בסעיף 20(א)(2) לחוק העונשין, התשל״ז-1977.

סעיף זה קובע לגבי הכוונה הפלילית כי : **"אין נפקה מינה אם נעשה מעשה באדם אחר או בנכס אחר, מזה שלגביו אמור היה המעשה להיעשות"** (וראה: י. קדמי, **על הדין בפלילים – עדכון והשלמה**, מהד׳ 1966, חלק ראשון, בעמ׳ 38). על יסוד כלל זה נפסק עוד לפני שחוקק סעיף 20(א)( 2) לחוק בשנת תשנ״ד, כי : **"המתכוון לרצות את זה והרג את זה, דינו דין רוצח"** (ע״פ 406/72 **שניר נ׳ מדינת ישראל**, פד״י כח(1) 234, בעמ׳ 243-242; ע״פ 388/76 **אברהים נ׳ מדינת ישראל**, פד״י לא(1) 601, בעמ׳ 607; ע״פ 6059/92 **שיבאם נ׳ מדינת ישראל**, תק׳-על 93(4) 255; ע״פ 887/96 **בטון נ׳ מדינת ישראל**, תק׳-על 97(1) 848). כפי שאמר כב׳ השופט ח. כהן בעניין **שניר** הנ״ל: **"אין רואים כוונה פלילית כאילו מכוונת היא לאדם מסוים דווקא"**. זהו אף הכלל במשפט האנגלי, כפי שציין כב׳ השופט ח. כהן.

<u>ג.    עבירת השידול והאבחנה בין מבצע בצוותא למשדל</u>

**158.** סעיף 34ד. לחוק העונשין, תשל״ז-1977 קובע:

**"מלבד אם נאמר בחיקוק או משתמע ממנו אחרת, כל דין החל על הביצוע העיקרי של העבירה המושלמת חל גם על ניסיון, שידול, ניסיון לשידול או סיוע, לאותה עבירה".**

מכאן נובע כי חבותו של המשדל היא כחבותו של המבצע העיקרי, שכן המשדל נחשב כשותף ראשי של המבצע בצוותא – שלא כמו המסייע הנחשב כשותף משני – בשל תרומתו המהותית להתרחשות העבירה, המתבטאת בכך שהוא מביא אדם אחר לידי ביצוע עבירה (ראה: דברי כב׳ הנשיא א. ברק בע״פ 2796/95 הנ״ל בעניין **פלונים**, בעמ׳ 404, אשר מתייחס אל המשדל, חרף הדברים הללו, כאל "שותף עקיף", ודברי כב׳ השופטת ד. בינישה בע״פ 8464/99 **אבגידור אסקין נ. מדינת ישראל**, פ״ד נה(2) 65, בעמ׳ 83-82, למול דברי כב׳ השופט מ. חשין בעניין **פלונים** הנ״ל, בעמ׳ 416, המסתייג מן הביטוי "שותף עקיף", שכן לדעתו תרומתו של משדל הינה תרומה ישירה, ממש כתרומתו של המבצע העיקרי).

ההוראה הכלולה בסעיף 34ד. לחוק העונשין, נגזרת מן ההתייחסות אל המבצע כאל שותף ראשי לביצוע העבירה: לכן נקבע בהוראה זו, דבר שהודגש אף בפסיקה, כי עונשו של המבצע זהה לעונשו של המבצע העיקרי (ראה: ע״פ 2796/95 הנ״ל בעניין **פלונים**, בעמ׳ 402-401, 415; ע״פ 8469/99 הנ״ל בעניין **אסקין**, בעמ׳ 82 ; דנ״פ 1294/96 הנ״ל בעניין **משולם**, בעמ׳ 43-42).

159.    בע״פ 2796/95 הנ״ל בעניין **פלונים**, הביהר כב׳ הנשיא א. ברק (בעמ׳ 404) את אחריותו של המבצע לביצוע העבירה ומהותה, לאמור :

"תרומתו של המשדל מתבטאת בכך שהוא הביא את המבצע לידי קבלת ההחלטה לבצע את העבירה (ראה פלר, בספרו הנ״ל (8), בעמ׳ 228). הוא זה שהשפיע על המבצע – אם המבצע העצמי (או העיקרי) ואם המבצע בצוותא – והביא לידי כך שהתגבשה בו ההחלטה לבצע העבירה, ונעשו צעדים להגשמתה (בגדרי ניסיון או ביצוע מושלם). הוא 'האב הרוחני' של העבירה' (מ. גור אריה "הצעת חוק העונשין (חלק מקדמי וחלק כללי), התשנ״ב-1992" (13), בעמ׳ 46). אכן, החברה מבקשת להגן על עצמה לא רק כלפי מי שמבצע עבירה – אם כמבצע עצמי ואם כמבצע בצוותא – אלא גם כלפי חוג רחב יותר של אנשים המביאים לידי כך שאחרים מבצעים עבירות...

'קירבתו' של המשדל מתבטאת בכך שהוא זה שנטע בלב העבריין העיקרי את המחשבה הפלילית לביצוע עבירה. הוא 'המבצע האינטלקטואלי' –
'auteur intellectuel' של העבירה' (ראה פלר, בספרו הנ״ל (8), בעמ׳ 226-225). הוא זה שהביא לידי כך שאצל המבצע נתגבש הרעיון לבצע את העבירה – אם בכך שהוא נטע בו את הרעיון מראש, ואם על ידי כך שהטה את הכף במקום בו המבצע היסס".

כב׳ השופט מ. חשין פסק בעניין **פלונים** הנ״ל בעמ׳ 415, כי פעילותו של המשדל מתבטאת בעיקרה בכך שבשיחו עם אחר הוא גורם לו לבצע עבירה, אשר לולא המשדל אפשר שלא היתה מתבצעת כלל.

דברים אלו מובילים לשאלת קשר הסיבתיות הנדרש בין השידול לבין ביצוע העבירה בידי המשודל. כב׳ הנשיא ברק פסק, בקטע המצוטט לעיל, כי המשדל הוא זה שהשפיע על המבצע להחליט לבצע את העבירה, בין אם נטע בראשו את הרעיון, ובין אם הטה את הכף במקום בו המבצע היסס (עמ׳ 404).

בע״פ 8469/99 הנ״ל בעניין **אסקין**, פסקה כב׳ השופטת ד. ביניש (בעמ׳ 79-78), לגבי מהות השידול ודרישת הקשר הסיבתי, כי: **"העיקרי הוא כי התנהגות המשדל תהא בעלת 'אפקטיביות פוטנציאלית' העשויה להשפיע על המשודל לבצע את העבירה נשוא השידול, כך שמתקיים קשר סיבתי בין ההתנהגות המשדלת לתחילת ביצוע העבירה"**. ואולם – הוסיפה כב׳ השופטת ביניש (בעמ׳ 79) :

"במסגרת יסודות השידול, אין זה הכרחי, ואף אין זה מספיק, כי היוזמה או הרעיון לביצוע העבירה יהיו של 'המשדל'. הרכיב הנסיבתי בעבירת השידול – קיומו של אחר ('משודל') הטעון הנעה מנטלית לצורך קבלת ההחלטה לבצע את העבירה – עשוי להתקיים גם במצבים שבהם הרעיון העברייני עלה לראשונה במחשבתו של 'המשודל',

אך טרם גובשה אצלו החלטה לבצעו. במקרה כאמור, אם ההתנהגות המשדלת הביאה להחלטתו הסופית של 'המשודל' לבצע את העבירה, הרי נתקיים היסוד העובדתי הנדרש בעבירת השידול".

**160.** לעניין היסוד הנפשי של עבירת השידול פסקה כב' השופטת ד. ביניש בע"פ 8469/99 הנ"ל בעניין <u>אסקין</u>, בעמ' 81:

"ככלל, לצורך התקיימות היסוד הנפשי במסגרת פעולת השידול יש להוכיח התקיימותן של שתי דרישות: ראשית, על המשדל להיות מודע לכך שיש בהתנהגותו כדי להביא את האחר (ה'משודל') לידי ביצוע העבירה נושא השידול. דרישה זו עניינה מודעות לטיב ההתנהגות המשדלת וכן מודעות לקיומו של אחר הזקוק להנעה מנטלית על מנת לבצע את העבירה נושא השידול. שנית, על המשדל להתכוון להביא את המשודל לידי ביצוע העבירה יעד השידול. לשון אחר, השידול צריך להיות מלווה בשאיפה – מטרה – מצד המשדל כי העבירה נושא השידול אכן תבוצע, על כל יסודותיה, על ידי ה'משודל' (ראו פלר בספרו הנ"ל (כרך ב) (18), בעמ' 234)".

**161.** בפסיקה הנוגעת לאחריותו של משדל – להבדיל מן הפסיקה הנוגעת לאחריותו של מסייע – לא צויין שהשידול צריך להתייחס לעבירה מסוימת בעלת ייעוד מוחשי, אולי משום שהדבר ברור מאליו. אך דרישה זו מובנית ביסודות עבירת השידול, ומתבקשת מקל וחומר בעניינו של המשדל, שעונשו זהה לעונשו של המבצע העיקרי (לעומת המסייע שעונשו הוא מחצית מעונשו של המבצע העיקרי). לצורך הוכחת עבירת השידול יש להראות קשר סיבתי בין השידול לבין ביצוע העבירה העיקרית בידי המשודל, ואף מטרה ושאיפה מצד המשדל שהעבירה אכן תבוצע. כל אלו מחייבים שהשידול יתייחס לעבירה ספציפית בעלת ייעוד מוחשי, כפי שנפסק אף לגבי עבירת הסיוע. וכך נאמר בספרו של ש"ז פלר, **יסודות בדיני עונשין**, תשמ"ז – 1987, כרך ב' בעמ' 226:

"ראוי להבהיר מראש כי מושג השידול, כצורה שותפה לדבר עבירה, הוא בעל משמעות שאינה תמיד הולמת את המשמעות הרגילה של מטבע לשון זה. המדובר במשמעות הנתונה ביטוי ליחס בין פרט לפרט, משדל למשודל, ולא גם ליחס בין פרט לבין קהל מקום שהפרט מסית, מדיח, מתסיס, קהל מסויים או קהל בלתי מוגדר, ללא הבדל הזהות הפרטית של הנמנים על אותו קהל, לבצע עבירה פלילית.

פעולות כאלה עשויות להצמיח עבירות ספציפיות, ואפילו משתמשים בו בתבה "שדל" לשם הגדרתן, אין זה אותו "שידול", כצורה של שותפות לדבר עבירה, בו נדון בהמשך".

עם זאת, כפי שנפסק לגבי סיוע, אין צורך להוכיח שהמשדל היה מודע לכל פרט מפרטי העבירה נושא השידול, ודי בכך שהוא שידל את המבצע לעבור עבירה מאותו סוג של העבירה שבוצעה לבסוף (ראה סעיף 156 לעיל). זאת ועוד, גם לעניין השידול, כמובן, חל הכלל בדבר כוונה מועברת: אין נפקה מינה שהעבירה נושא השידול נעשתה לבסוף לגבי אדם אחר.

**כללו של דבר:** לא ניתן להרשיע אדם בעבירת שידול כללית לביצוע מעשי רצח, כאשר הוא קורא