# EXHIBIT A.464



PLAINTIFF'S EXHIBIT 464

The Military Prosecutor v. Abdullah Ghaleb Abdullah Barghouti / Israel Prison Service

November 30, 2004

## The Military Court in Judea

**Before the Honorable Presiding Judge: Lieutenant Colonel Natanel Benishu**
**Judge: Lieutenant Colonel Hanan Rubinstein**
**Judge: Captain Sharon Keinan**

**The Military Prosecutor**

- v. -

**The Defendant:     Abdullah Ghaleb Abdullah Barghouti, Identity No.: 30300028 / Israel Prison Service - Present**

(Represented by Counsel, Adv. Ilya Theodori – Present)

## Sentence

Pursuant to his guilty plea, the Defendant has been convicted of 108 charges that are attributed to him in the indictment, the likes of which have not been seen by this veteran Court. This is a series of extremely grave offenses, including membership in an illegal organization, attempt to make explosives, six offenses of military training, conspiracy, five offenses of trading in war materiel, four offenses of making an explosive and incendiary object, sheltering, three offenses of execution of a service, 12 offenses of attempt to cause intentional death, seven offenses of malicious damage to property, possession of a firearm, offenses involving licenses and documents, and above all, 66 offenses of causing intentional death.

The Defendant, who was born in Kuwait and arrived in the Area in 1999, enlisted in May 2001 into the Az A-Din Alqassam Brigades, the military arm of the Hamas Organization. In May-June 2001, the Defendant met a senior military operative in the Hamas Organization on several occasions, who taught the Defendant how to make explosives, explosive devices and activation mechanisms. The Defendant also learned how to make poison that could be put into the explosive devices to transform them into chemical charges.

[Stamp] P 7: 7

Thereafter, the Defendant quickly became responsible for manufacturing explosive devices in his organization, and trained others in the making of such devices. In view of his "success" in this function, the Defendant acquired the nickname "the Engineer". In exchange for his activity, the Defendant received financial compensation to the amount of $117,000 and also financial aid of $500 from Marwan Barghouti, the head of the Tanzim.

Before that time, in December 2000, the Defendant conspired with another person to participate in the abduction of Israel Defense Forces soldiers. The Defendant was charged with preparing an apartment for holding the soldiers that would be abducted. The Defendant indeed prepared a room in his home for holding such soldiers.

In June 2001, the Defendant obtained 15 kg of explosives and a pistol and a magazine with cartridges.

Later, the Defendant rented a storeroom in his village and in it established a laboratory for manufacturing explosives and explosive devices. The Defendant transferred to the laboratory the explosives that he obtained, 20 liters of hydrogen peroxide, […]

---

1

Nevo
*nevo.co.il*

[Stamp] P 7: 7 [continued]

The Military Prosecutor v. Abdullah Ghaleb Abdullah Barghouti / Israel Prison Service

[...] and a number of wireless mechanisms for activating the explosive devices that he intended to manufacture. In his laboratory, the Defendant manufactured two explosive devices that were camouflaged as stones. The Defendant transferred the explosive devices to two military operatives in the Hamas Organization, among them Bilal Barghouti.

From the second half of 2001, the Defendant established a number of additional laboratories for manufacturing explosives and explosive devices. The Defendant habitually transferred to these laboratories various chemicals, which had been purchased by him or by the members of the Hamas organization. The Defendant used those chemicals to manufacture tens of kilograms of explosives from which he produced a large number of explosive devices of different types. The Defendant made the above mentioned explosive device with the aim of operatives in his organization using them to carry out attacks against Israeli targets. The Defendant briefed the operatives in his organization on how to activate the said explosive devices. The Defendant also made the effort to train and teach many people how to manufacture explosives and explosive devices and also forwarded to the head of the Az A-Din Alqassam Brigades in Ramallah magnetic media containing instructions on how to manufacture explosives and explosive devices.

In addition to the foregoing, the Defendant attempted to manufacture hand grenades and also obtained instructions on manufacturing Qassam rockets, which he decided that he could not do.

In July 2001, the Defendant met his handler and the mentioned individual informed the Defendant that he was familiar with a person who was prepared to carry out a suicide attack in Israel. At the request of his handler, the Defendant turned to Bilal Barghouti and asked him to find a person to bring the suicide terrorist into Israel in order for him to carry out an attack with the aim of causing the deaths of as many people as possible. At the same time, on July 27, 2001, the Defendant obtained an explosive device that he put into a beer can and attached an activation device to it. The Defendant delivered the device to Bilal Barghouti in order for him to transfer it to people whom he had enlisted and for them to carry out an attack using it. On July 30, 2001, the explosive device was delivered to Ahlam Tamimi, who put it on one of the shelves of beverage cans in a Co-Op Supermarket in Hamelech George Street in Jerusalem. After activating it, Ahlam left the store. At noontime the explosive device exploded and caused a large amount of damage to property, but miraculously no loss of life.

[Stamp] P 7: 8

On August 9, 2001, the Defendant asked his Hamas handler to transfer to him a large explosive device and a suicide terrorist for the purpose of executing a suicide attack. The Defendant received such an explosive device and, at the request of Bilal Barghouti, concealed it inside a guitar. The Defendant also put two plastic bags filled with explosives and screws into the guitar. The Defendant connected the activation mechanism to this explosive device. The Defendant put the guitar into a black case and extracted an activation button from the case so that the device could be activated easily without opening it. The Defendant transferred the explosive device to Bilal Barghouti in order for him to deliver it to a suicide terrorist, who would use it to carry out an attack. At the said time, at about 1:55 p.m., the terrorist Az Aldin Masri was dispatched, while carrying the booby trapped guitar, to central Jerusalem. Ahlam Tamimi led the terrorist to the center of Jerusalem and he went into the Sbarro Restaurant with the death guitar, where he activated the explosive device that had been assembled by the Defendant. As a result of the explosion of the explosive device, 15 of the diners in the restaurant were murdered and more than 127 others were injured.

In this incident, the following people were murdered:

**The late Frieda Mendelsohn**, aged 62 at the time of her death;

**The late Lily Shimashvili-Messengeiser**, aged 33 at the time of her death;

**The late Tamara Shimashvili-Messengeiser**, aged 8 at the time of her death;

**The late Tehila Maoz**, aged 20 at the time of her death;

**The late Michal Raziel**, aged 15 at the time of her death;

[Stamp] P 7: 8 [continued]

**The late Malka Roth**, aged 15 at the time of her death;

**The late Yocheved Sasson**, aged 10 at the time of her death;

**The late Mordechai Raphael Schijveschuurder**, aged 44 at the time of his death;
His wife, **the late Tzira Schijveschuurder**, aged 41 at the time of her death;
And their children, **the late Raya Schijveschuurder**, aged 14 at the time of her death;
**The late Avraham Yitzhak Schijveschuurder**, aged 4 at the time of his death;
**The late Hemda Schijveschuurder**, aged 2 at the time of her death;

**The late Judith Lilian Greenbaum**, aged 31 at the time of her death;

**The late Giora Balash**, aged 69 at the time of his death;

**The late Zvi Golombek**, aged 26 at the time of his death;

During November 2001, the Defendant manufactured three additional explosive devices in his laboratory. He put the first explosive device into a computer case; he put the second into a fabric bag; and the Defendant used the third to prepare an explosive belt. In addition to the explosives, the Defendant inserted nails and nuts into the devices, in order for the explosive device to injure severely as many people as possible. In addition, the Defendant laced the explosive devices with toxic material. The Defendant provided the three explosive devices to a Hamas operative in order for the operatives of the organization to carry out bombing attacks using them.

On December 1, 2001, at about 11:36 p.m., at the entrance to Ben Yehuda Street from Zion Square in Jerusalem, a suicide terrorist activated the explosive device that had been concealed inside a computer case. At that time, at the junction of the streets Ben Yehuda and Luntz, in Jerusalem, a second suicide terrorist activated the explosive belt that had been manufactured by the Defendant. A few minutes later, a third explosive device that had been placed inside an automobile that had been parked in Harav Kook Street was activated.

As a result of the detonation of the three explosive devices that had been made by the defendant, 10 people were killed and 191 were injured.

In this attack, the following people were murdered:

**The late Yosef El-Ezra,** aged 18 at the time of his death;

**The late Assaf Avitan,** aged 15 at the time of his death;

**The late Guy Vaknin,** aged 19 at the time of his death;

**The late Yoni Korganov,** aged 17 at the time of his death;

**The late Yaakov Israel Danino,** aged 17 at the time of his death;

**The late Michael Dahan,** aged 20 at the time of his death;

**The late Golan Turgeman,** aged 15 at the time of his death;

**The late Adam Weinstein,** aged 14 at the time of his death;

**The late Moshe Yedid-Levy,** aged 19 at the time of his death;

**The late Nir Haftzadi,** aged 19 at the time of his death;

Needless to say, very heavy damage was sustained by buildings and vehicles in the area of the attack.

In late 2001, at the request of Marwan Barghouti, the Defendant manufactured two additional explosive devices that were intended for use against the security forces when they would enter the town of Ramallah.

Later, the Defendant manufactured three explosive devices that were concealed inside juice cartons, and four more explosive devices that were camouflaged as stones. These devices were also transferred to Hamas operatives.

[Stamp] P 7: 9 [continued]

The Military Prosecutor v. Abdullah Ghaleb Abdullah Barghouti / Israel Prison Service

In early March 2002, the Defendant was requested by his handler in the Hamas to again manufacture an explosive belt for a suicide terrorist. Indeed, the Defendant manufactured an explosive belt as set forth, and transferred it to Hamas operatives. On March 9, 2002, at about 10:30 p.m., a suicide terrorist, who was carrying on his person the explosive belt that had been prepared by the Defendant, entered the Moment Café in Jerusalem, which was crowded at that hour. The terrorist activated the explosive belt and caused the deaths of 10 people and the injury of 65.

In this attack, the following people were murdered:

**The late Avraham Rahamim;**

**The late Nir Borochov;**

**The late Limor Ben-Shoham;**

**The late Dan Imani;**

**The late Danit Dagan;**

**The late Uri Felix;**

**The late Baruch Lerner;**

**The late Tali Eliyahu;**

**The late Livnat Dvash;**

**The late Orit Ozerov;**

**The late Natanel Kochavi.**

Property was damaged in this attack as well.

In March through April 2002, the Defendant was requested by the commander of the military arm of the Hamas organization in the Ramallah area to manufacture explosive devices and an explosive bag for carrying out a suicide attack. The Defendant prepared an explosive belt and an explosive device, which he put into a bag, to which screws were also added. The Defendant delivered the explosive devices to another operative in his organization. [...]

[Stamp] P 7: 10

[...] On May 7, 2002, a suicide terrorist entered the Sheffield Club in Rishon le Zion while wearing the explosive belt that had been prepared by the Defendant. The terrorist activated the explosive belt, thus causing the deaths of 15 people, the injury of 59 more, and great destruction to the building in which the club was housed.

In this attack, the following people were murdered:

**The late Rahamim Kimhi;**

**The late Rafael Haim;**

**The late Anat Teremforush;**

**The late Avraham Bayaz;**

**The late Eti Bablar;**

**The late Yitzhak Bablar;**

**The late Israel Shikar;**

**The late Shoshana Magmari;**

**The late Rassan Sharouk;**

**The late Nawa Hinawi;**

**The late Nir Lovatin;**

**The late Regina Malka Boslan;**

**The late Dalia Masa;**

**The late Pnina Hikri;**

**The late Edna Cohen;**

[Stamp] P 7: 10 [continued]

During May 2002, the Defendant met a military operative in the Hamas organization who asked him to manufacture an additional explosive device, in order to carry out a bombing attack using it. The Defendant agreed to the request and made an explosive device with cellular activation that could be attached to metals through the use of magnets. The Defendant delivered the explosive device to the Hamas operative, who, on May 23, 2002, attached it to the bottom of a fuel tank on a fuel tanker. The tanker made its way to the Pi Glilot site, followed by the operators of the explosive device. When the tanker arrived in Pi Glilot, the above mentioned individuals activated the device by cellular telephone. The device exploded and caused serious damage to the tanker, but miraculously no loss of life.

In June 2002, the Defendant was requested by the commander of the military arm of Hamas **in the Ramallah area to manufacture an explosive device for the purpose of carrying out an additional bombing attack. The Defendant did so**, and delivered the explosive device, which was placed, in the morning hours on June 30, 2002, on the railway track in the Lod area. When those laying the explosive device identified a train approaching the area, they activated it. The explosive device exploded, which caused the injury of four people and damage to the locomotive and the railway.

During that same month, the Defendant manufactured an additional explosive device that was also placed on the railway track near the exit from Rehovot. The device was detonated on July 21, 2002, in the early morning hours. As a result of the explosion, one person was injured and damage was caused to a locomotive and to the railway.

In July 2002, the Defendant was requested by the commander of the military arm of Hamas in the Ramallah area to manufacture an explosive device that was concealed inside a bag, in order to carry out a bombing attack. The Defendant made such an explosive device, and also made the extra effort to fill the bag with iron nuts in order to increase the destructive power of the device. The Defendant also prepared a wireless activation mechanism for the device and delivered the device to an individual from Hamas. The explosive device was placed inside a cafeteria in the Frank Sinatra Building on the campus of the Hebrew University on Mount Scopus in Jerusalem. On July 31, 2002, at about 1:00 p.m. – at a time during which there is usually a large concentration of people in the cafeteria – the explosive device was detonated. As a result of the explosion of the device, which had been prepared by the Defendant, nine people were murdered and 81 other people were injured. In addition, damage was caused to the cafeteria building.

In this attack, the following people were murdered:

**The late Daphna Spruch;**

**The late Marla Anne Bennett;**

**The late Dina Carter;**

**The late Benjamin Thomas Blutstein;**

**The late Revital Barashi;**

**The late David (Diego) Ladowski;**

**The late Levina Shapira;**

**The late Janis Ruth Coulter;**

**The late David Gritz.**

In August 2002, the Defendant was asked to prepare two explosive devices. The Defendant abided by this request and prepared two explosive belts, which he delivered to an operative of Hamas. On September 19, 2002, a suicide bomber, who was carrying on his person one of the explosive belts that the Defendant had prepared, boarded a bus on Line No. 4 in Tel Aviv and detonated the explosive device. As a result of the explosion, six people were killed and 84 others were injured. Extensive damage was caused to the bus and to businesses that were near it.

In this attack, the following people were murdered;

**The late Yossi Mamistavlov**, aged 39 at the time of his death;

5

[Stamp] P 7: 11 [continued]

The Military Prosecutor v. Abdullah Ghaleb Abdullah Barghouti / Israel Prison Service

**The late Ofer Zinger**, aged 29 at the time of his death;

**The late Rosanna Siso**, aged 63 at the time of her death;

**The late Yaffa Shemtov**, aged 49 at the time of her death;

**The late Solomon Hoenig**, aged 79 at the time of his death;

**The late Jonathan Jesner**, aged 19 at the time of his death;

On October 11, 2002, at about 8:15 p.m., an additional suicide terrorist, who was also carrying on his person an explosive belt that had been prepared by the Defendant, attempted to enter the Yotvata Restaurant in Tel Aviv with the aim of blowing himself up and causing the deaths of as many people as possible. The guard, who was at the entrance to the premises, suspected the man and prevented him from entering the restaurant. The terrorist was later apprehended.

The murderous terrorist spree that the Defendant committed has been one of the worst we have ever known in the bloody history that we have shared since the creation of the State of Israel.

The Defendant acted unflaggingly, for a very long period, in the manufacture of explosive devices that were as lethal as possible, which were intended to be used in suicide attacks and bombing attacks, with but a single aim, of causing the deaths of as many people as possible.

The Defendant is directly responsible for the murders of dozens of innocent human beings and the injuries of hundreds more. We fail to understand how the Defendant could put to use the scientific knowledge that he had acquired, which was intended from the outset to improve human life, for sowing so much destruction and carnage. We found a partial answer to this question in the words of the Defendant in the framework of the pleas for sentencing in this case, from which one could sense with no difficulty whatsoever the inexhaustible hatred that consumed all of his humanity. The Defendant expressed no remorse, but was instead proud of having trained dozens of engineers whom he hoped would cause much worse attacks than those than those that he himself had caused.

[Stamp] P 7: 12

It was difficult to hear the deviant pleas of the Defendant, who tried to associate his monstrous acts with the operations of the Israel Defense Forces in the Area, let alone without having involved the actions of the Americans in Kuwait, the immigration from the Former Soviet Union and the policy of the government as other factors that led him to act. The Defendant concluded his address by promising that the Hamas organization would cause the destruction of the State of Israel, in accordance with the vision of Ahmed Yassin.

In view of the words of the Defendant, it may be assumed that had he not been caught, he would have continued his murderous activity. But without making hypotheses, it is enough for us to look at the unbearably long list of the names of the Defendant's victims to see the scale of the disaster that he had caused, not only to his victims and their families, but to society as a whole. The explosive devices that the Defendant had prepared were akin to seeds of death that were scattered in many places around the State of Israel, throughout its length and breadth. The Defendant's composure and the use he made of science and technology for deliberate, systematic killing can only remind us of some of the darkest periods in the history of the Jewish people, which we thought would not recur after the founding of the State of Israel.

What can be said in view of the taking of the lives of the victims, some of whom were elderly and some of whom were in infanthood? What can we say about whole families that were wiped out in a single bitter moment?

The voice of the blood of our brothers cries up from the earth.

6

[Stamp] P 7: 12 [continued]

The Military Prosecutor v. Abdullah Ghaleb Abdullah Barghouti / Israel Prison Service

We cannot heal the physical and mental scars of whose who experienced the hellfire. The casualties themselves, and not only them, but also their relatives and bystanders, who will carry the picture of suffering that befell them like lightning out of the blue for the rest of their lives.

What will be the sentence of a person who enslaved all of his wishes and actions to the task of murdering members of his own kind? There is no doubt that there is no room to consider any personal circumstances in such a case. In view of criminal acts of the type that were committed by the Defendant, there is no doubt that the maximum sentence is called for, both in light of the need to prevent the danger of the Defendant to others and in view of the attempt to pay back for his evil.

Any legal system worthy of its name should have the ability to deter offenders of all types. Terrorism that is currently snapping at the State of Israel is cruel and merciless and makes no differentiation between soldiers, civilians, infants, the aged, disabled persons or tourists, men or women.

We must therefore make our contribution to quell terrorism, to the extent that this is possible. For this purpose there is not a shadow of doubt that the Defendant and those like him must be sentenced in a manner that will not only pay them back for their cruel, criminal acts and express the revulsion of any human being and any good society over their criminal behavior, but that will also constitute a degree of deterrence.

Based on this view, we must determine that in the multiple terrible cases of terrorism such as those for which the Defendant is responsible pursuant to doing his part in a well-oiled terrorist machine, the maximum sentence that the Legislative body has prescribed should be not just a starting point for sentencing, but often the end point as well.

When the acts of terror in which the Defendant participated are so cruel, massive and long-lasting to the point that we may call it an "industry" of terrorism with unbearable results, the most appropriate and correct sentence is death. And it has already been said in our Scriptures: **"Whoever sheds human blood, by humans shall their blood be shed; for in the image of God has God made mankind"**.

[Stamp] P 7: 13

Certainly, while up to this point this sentence has remained unused and the Courts have satisfied themselves with handing down sentences of life imprisonment, in our opinion, this practice, which has been common, must not be done out of force of habit alone, and the Court must examine each case on its merits and give due respect to the explicit deliberation of the Legislative body whereby in appropriate cases a defendant who is convicted of the offense of causing intentional death must himself be sentenced to death.

In view of this unequivocal deliberation of the Legislative body, the Court is exempt from the need for discussing questions that are related to the degree of appropriateness of this sentence owing to the principles of justice and morality, and due to reality. However, it appears to us that when we have before us a person such as the Defendant, who as set forth has killed incessantly, indiscriminately and mercilessly, in a calculated, uninhibited manner, to the point of reducing himself to the lowest level of humanity possible and who doubtfully deserves to be called a human, it would be just and moral not to leave this provision of the law as a dead letter.

We must also state that even if we are aware of the contentions whereby the death sentence is not a deterrent and is ineffective in the Area, if this appears to be correct in the case of suicide terrorists, it is important to remember that they do not operate based on their own resources alone or as individuals, and those individuals who established the broad terrorist network that makes and dispatches human bombs will take care not to be hurt themselves, meaning that the deterrent factor in such sentencing is upheld.

7

Nevo
*nevo.co.il*

[Stamp] P 7: 13 [continued]

The Military Prosecutor v. Abdullah Ghaleb Abdullah Barghouti / Israel Prison Service

In our opinion, the Defendant should be sentenced to death and inflicting such a sentence would be lawful and just.

However, it must be remembered that the Legislative body has limited the possibility of passing the death sentence by a list of qualifications, the main one being that the three judges of the panel are to be of the rank of Lieutenant Colonel [Section 47 (A) (8) of the Security Provisions Order, 5730-1970].

Pursuant to this deliberation, we are barred from acting according to our consciences and we do not have the authority to hand down the sentence that Defendant deserves.

Under these circumstances, all we have left to do therefore is to hand down a separate sentence of life imprisonment to the Defendant for each person who was murdered as a result of his actions. We also decree that the terms of life imprisonment are to be cumulative, so that it is known that for us, our loss of each and every victim represents the loss of a whole world. In addition to this, we also see fit to give expression to the list of additional offenses that were committed by the Defendant, some of which led to the injury of hundreds of individuals.

Therefore, in view of our statements above, we sentence the Defendant to 67 cumulative terms of life imprisonment.

**The right of appeal within 30 days is conferred.**

**Handed down and announced this day, November 30, 2004, in public and in the presence of the parties.**


| Natanel Benishu 54678313-3380/03 | | |
|---|---|---|
| **Judge** | **Presiding Judge** | **Judge** |

**The text of this document is subject to changes in wording and editing.**

Click here concerning editing and changes in ruling, legislation and other documents on the Nevo website

8

Nevo
*nevo.co.il*

[Stamp] P 7: 14

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

MARK I. SOKOLOW, *et al.*,

                                    Plaintiffs,

                                                              No. 04 Civ. 00397 (GBD) (RLE)

        vs.

THE PALESTINE LIBERATION
ORGANIZATION, *et al.*,

                                    Defendants.

## DECLARATION OF RINA NE'EMAN

Rina Ne'eman hereby certifies as follows:

1.    The attached translation from Hebrew to English is an accurate representation of the
      document received by Rina Ne'eman Hebrew Language Services, to the best of my
      knowledge and belief. The document is designated as P7: 7-14.

2.    I am a professional translator with a B.A. in International Relations from the Hebrew
      University of Jerusalem (Israel) and 30 years of translation experience. I am fluent in
      Hebrew and English, and I am qualified to translate accurately from Hebrew to English.

3.    To the best of my knowledge and belief, the accompanying text is a true, full and
      accurate translation of the Hebrew-language document bearing the bates number, P7: 7-
      14.

                                                        _____
                                                        Rina Ne'eman

ss.: New Jersey

On the [28th] day of February, 2014 before me, the undersigned, personally appeared Rina Ne'eman, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is signed to this Declaration and acknowledged to me that he executed the same in his capacity, and that by his signature on this Declaration, the individual executed the Declaration.

Sworn to me this
28th day of February, 2014

_Hala Y. Gobrial_
Notary Public

> **HALA Y GOBRIAL**
> Notary Public
> State of New Jersey
> My Commission Expires Apr. 18, 2017
> I.D.# 2419990

תיק מס׳: 3 380/03

תאריך: י״ז כסלו, תשס״ה
30 נובמבר, 2004

ב י ת  ה מ ש פ ט  ה צ ב א י  י ה ו ד ה



בפני כב׳ האב״ד: סא״ל נתנאל בנישו
שופט: סא״ל חנן רובינשטיין
שופט: סרן שרון קינן

התביעה הצבאית

נגד

הנאשם: עבדאללה ע׳אלב עבדאללה ברגותי   ת.ז. 030300028 / שב״ס - נוכח
(באמצעות ב״כ עו״ד אוליה תאודורי - נוכח)

---

### ג ז ר  ד י ן

הנאשם הורשע על פי הודאתו ב-108 אישומים שיוחסו לו בכתב האישום, אשר לא
נראה כדוגמתו בבית משפט ללמוד ניסיון זה. המדובר בסידרה של עבירות חמורות
ביותר, בהן חברות בהתאחדות בלתי מותרת, ניסיון לייצר חפץ נפץ, שש עבירות של
אימונים צבאיים, קשירת קשר, חמש עבירות של סחר בציוד מלחמתי, ארבע
עבירות של ייצור חפץ נפץ ומביער, מתן מקלט, שלוש עבירות של ביצוע שירות, 12
עבירות של ניסיון לגרימת מוות בכוונה, שבע עבירות של נזק לרכוש בזדון, החזקת
כלי יריה, עבירות ברשיונות ומסמכים, ומעל לכל, 66 עבירות של גרימת מוות
בכוונה.

הנאשם, יליד כווית, שהגיע לאזור בשנת 1999, הצטרף בחודש מאי 2001 לגדודי עז
א-דין אלקסאם, הזרוע הצבאית של ארגון החמאס. בחודשים מאי-יוני 2001 נפגש
הנאשם במסקבר הזדמנויות עם פעיל צבאי בכיר בארגון החמאס, אשר לימד את
הנאשם כיצד לייצר חומרי נפץ, מטעני חבלה ומנגנוני הפעלה, רימוני יד וחומרי נפץ.
הנאשם למד אף כיצד להסוות את אותם מטעני החבלה. הנאשם למד עוד כיצד
לייצר רעל אותו ניתן להכניס למטעני החבלה על מנת להפך אותם למטענים
כימיים.

לאחר מכן הפך הנאשם במהרה לאחראי על ייצור מטעני החבלה בארגונו, ואימן
אחרים בייצור מטענים כאמור. לאור ״הצלחתי״ בתפקיד זה, זכה הנאשם בכינוי
״המהנדס״. בתמורה לפעילותו קיבל הנאשם תמורה כספית בסכום של $117,000
ואף סיוע כספי בסך $500 מידי מרואן ברגותי, ראש התנזים.

עוד קודם לכן, בחודש דצמבר 2000, קשר הנאשם קשר עם אחר להשתתף בחטיפת
חייל צה״ל. על הנאשם הוטל להכין דירה בה יוחזקו החיילים אשר ייחטפו. הנאשם
אכן הכין חדר בדירתו לצורך החזקת החיילים כאמור.

בחודש יוני 2001 קיבל הנאשם לידיו 15 ק״ג של חומר נפץ, וכן אקדח ומחסנית עם
כדורים.

בהמשך, שכר הנאשם מחסן בכפרו והקים בו מעבדה לייצור חומרי נפץ ומטעני
חבלה. הנאשם העביר למעבדה את חומר הנפץ והפך אותו קיבל, 20 ליטר של מי חמצן,
וכן מספר מנגנונים על-חוטיים להפעלת מטעני החבלה שהתכוון לייצר. במעבדתו

-1-

<div dir="rtl">

תאריך : י"ז כסלו, תשס"ה                    תיק מס' : 3 380/03
30 נובמבר, 2004

1   ייצר הנאשם שני מטעני חבלה המוטווים לאבנים. הנאשם העביר את מטען החבלה
2   לשני פעילים צבאיים בארגון החמאס, ביניהם בילאל ברגותי.
3
4   החל מהמחצית השנייה של שנת 2001 הקים הנאשם מספר מעבדות נוספות לייצור
5   חומרי נפץ ומטעני חבלה. הנאשם נהג להעביר אל המעבדות הנ"ל חומרים כימיים
6   שונים, אשר נרכשו על ידו או על ידי חברי ארגון החמאס. הנאשם ייצר באמצעות
7   אותם חומרים כימיים עשרות קילוגרמים של חומרי נפץ, מהם הפיק מספר רב של
8   מטעני חבלה מסוגים שונים. הנאשם ייצר את המטעניים הנ"ל במטרה שפעילי
9   ארגונו יבצעו באמצעותם פיגועים נגד מטרות ישראליות. הנאשם תדרך את פעילי
10  ארגונו איך להפעיל את המטענים האמורים. הנאשם אף טרח לאמן וללמד אנשים
11  רבים כיצד לייצר חומרי נפץ ומטעני חבלה ואף העביר לידי ראש גדודי עז א-דין
12  אלקסאם ברמאללה מדיה מגנטית ועליה הוראות כיצד לייצר חומרי נפץ ומטעני
13  חבלה.
14
15  בנוסף לאמור לעיל, ניסה הנאשם לייצר רימוני יד ואף קיבל הוראות לייצר טילי
16  קסאם, אולם החליט כי אין ביכולתו לעשות זאת.
17
18  בחודש יולי 2001 נפגש הנאשם עם מפעילו והנ"ל מסר לנאשם כי הוא מכיר אדם
19  המוכן לבצע פיגוע התאבדות בישראל. על פי בקשת מפעילו, פנה הנאשם לבלאל
20  ברגותי וביקש ממנו למצוא אדם שיוביל את המתאבד לתוך ישראל, על מנת שזה
21  יבצע פיגוע בכוונה לגרום למותם של רבים ככל האפשר. במקביל, ביום 27/07/01
22  קיבל הנאשם לידיו מטען חבלה קטן אותו הכניס לתוך פתיח בירה והרכיב לו מטען
23  הפעלה. הנאשם מסר את המטען לבילאל ברגותי, על מנת שזה יעבירו לאנשים
24  אותם גייס ואלה יבצעו באמצעותו פיגוע. ביום 30/07/01 המטען נמסר לידי אחלאם
25  תמימי, שהניחה אותו על גבי אחד המדפים של פחית המשקה בסופרמרקט קו-אופ
26  ברחוב המלך ג'ורג' בירושלים. לאחר שהפעילה אותו, עזבה אחלאם את החנות.
27  בשעות הצהריים התפוצץ המטען וגרם לנזק רב לרכוש, אך בנס לא לפציעות בנפש.
28
29  ביום 09/08/01 ביקש הנאשם ממפעילו בחמאס כי יעביר אליו מטען חבלה גדול
30  ומחבל מתאבד לצורך הוצאתו לפועל של פיגוע התאבדות. הנאשם קיבל מטען
31  כאמור, והסתיר אותו. על פי בקשת ברגותי, לתוך גיטרה. הנאשם הכניס
32  לגיטרה אף שתי שקיות ניילון מלאות בחומרי נפץ וברגים. הנאשם חיבר למטען זה
33  מנגנון הפעלה. את הגיטרה הכניס הנאשם לתוך נרתיק שחור, והוצא כפתור הפעלה
34  אל מחוץ לנרתיק באופן שיהיה ניתן להפעיל את המטען בקלות, מבלי לפתוחו כלל.
35  הנאשם העביר את המטען לבילאל ברגותי על מנת שזה ימסור אותו למחבל מתאבד,
36  שיבצע באמצעותו פיגוע. במועד האמור, בסמוך לשעה 13:55, נשלח המחבל עז
37  אלדין מצרי כשהוא נושא עימו את הגיטרה הממולכדת אל מרכז ירושלים. אחלאם
38  תמימי הובילה את המחבל עד למרכז ירושלים וזה נכנס עם גיטרת המוות למסעדת
39  סבארו, שם הפעיל את המטען שהורכב על ידי הנאשם. כתוצאה מהתפוצצות המטען
40  נרצחו 15 מסועדי המסעדה ונפצעו למעלה מ-127 נוספים.
41
42  באירוע זה נרצחו :
43  פרידה מנדלסון ז"ל, בת 62 במותה;
44  לאלי שימשאשוילי-מסגניסר ז"ל, בת 33 במותה;
45  בתה, **תמר שימשאשוילי-מסגניסר** ז"ל, בת 8 במותה;
46  תהילה מעוז ז"ל, בת 20 במותה;
47  **מיכל רזיאל** ז"ל, בת 15 במותה;
48  מלכה רוט ז"ל, בת 15 במותה;
49  יוכבד שושן ז"ל, בת 10 במותה;

</div>



-2-

תאריך : י"ז כסלו, תשס"ה
30 נובמבר, 2004

תיק מס' : 3380/03

מרדכי רפאל סחיוסחורדר ז"ל, בן 44 במותו ; 1
אישתו, צירה סחיוסחורדר ז"ל, בת 41 במותה ; 2
וילדיהם, רעיה סחיוסחורדר ז"ל, בת 14 במותה ; 3
אברהם יצחק סחיוסחורדר ז"ל, בן 4 במותו ; 4
חמדה סחיוסחורדר ז"ל, בת שנתיים במותה ; 5
גידית ליליאן גרינבוים ז"ל, בת 31 במותה ; 6
גיורא בלאו ז"ל, בן 69 במותו ; 7
צבי גולומבק ז"ל, בן 26 במותו. 8
9

במהלך חודש נובמבר 2001 ייצר הנאשם במעבדתו שלושה מטעני חבלה נוספים. את 10
המטען הראשון הכניס הכניס לתוך מארז מחשב, את השני הכניס לתוך תיק יד, 11
ובאמצעותם השלישי הכין הנאשם חגורת נפץ. בנוסף לחומר הנפץ הכניס הנאשם 12
לתוך המטענים מסמרים ואומים, וזאת על מנת שהמטען יפגע בצורה קשה יותר 13
במספר רב ככל הניתן של אנשים. כמו כן, הכניס הנאשם למטענים חומר רעיל. 14
הנאשם מסר את שלושת מטעני החבלה לפעיל חמאס על מנת שפעילי הארגון יבצעו 15
בהם פיגועי תופת. 16
17

ביום 01/12/01, בסמוך לשעה 23:36, בכניסה מכיכר ציון לרחוב בן יהודה 18
בירושלים, הפעיל מחבל מתאבד את מטען החבלה שהוסתר בתוך מארז של מחשב. 19
באותו מועד, בצומת הרחובות בן יהודה-לוני, בירושלים, הפעיל מתאבד שני את 20
חגורת הנפץ שיוצרה על ידי הנאשם. דקות ספורות לאחר מכן, הופעל מטען שלישי 21
שהונח בתוך מכונית שהוחנתה ברחוב הרב קוק. 22
23

כתוצאה מפיצוץ שלושת המטמנים שיוצרו על ידי הנאשם נהרגו 10 אנשים ונפצעו 24
191. 25
26

בפיגוע זה נרצחו : 27
יוסף אעזרה ז"ל, בן 18 במותו ; 28
אסף אביטן ז"ל, בן 15 במותו ; 29
גיא וקנין ז"ל, בן 19 במותו ; 30
יוני קורגוב ז"ל, בן 17 במותו ; 31
יעקב ישראל דנינו ז"ל, בן 17 במותו ; 32
מיכאל דהאן ז"ל, בן 20 במותו ; 33
גולן תורג'מן ז"ל, בן 15 במותו ; 34
אדם וינשטיין ז"ל, בן 14 במותו ; 35
משה ידיד-לוי ז"ל, בן 19 במותו ; 36
ניר חפצדי ז"ל, בן 19 במותו. 37
38

למותר לציין כי נגרם נזק כבד ביותר לבניינים ולכלי רכב באזור הפיגוע. 39
40

בסוף שנת 2001 ייצר הנאשם, על פי בקשתו של מרואן ברגותי, שני מטעני חבלה 41
נוספים אשר יועדו לשימוש נגד כוחות הבטחון כאשר אלה יכנסו לעיר רמאללה. 42
43

בהמשך ייצר הנאשם שלושה מטעני חבלה מוסווים בקרטונים של מיץ, וארבעה 44
מטענים נוספים שהוסוו כאבנים. גם מטענים אלה הועברו לפעילים בארגון החמאס. 45
46

בתחילת חודש מרץ 2002 התבקש הנאשם על ידי מפעילו בחמאס לייצר שוב חגורת 47
נפץ עבור מחבל מתאבד. ואכן ייצר הנאשם חגורת נפץ כאמור, והעבירה לפעילים 48
בחמאס. ביום 09/03/02, בסמוך לשעה 22:30, נכנס מחבל מתאבד, שנשא על גופו 49

-3-

תיק מס׳ : 3380/03

תאריך : י״ז כסלו, תשס״ה
30 נובמבר, 2004

את חגורת הנפץ שהוכנה על ידי הנאשם, לבית הקפה ׳מומנט׳ בירושלים, שהיה  1
באותה שעה הומה אדם. המחבל הפעיל את חגורת הנפץ וגרם למותם של 10 בני  2
אדם, ולפציעתם של 65.  3

  4
בפיגוע זה נרצחו :  5
**אברהם רחמים ז״ל ;**  6
**ניר בורוכוב ז״ל ;**  7
**לימור בן שוהם ז״ל ;**  8
**דן אימוני ז״ל ;**  9
**דנית דגן ז״ל ;**  10
**אורי פליקס ז״ל ;**  11
**ברוך לרנר ז״ל ;**  12
**טלי אליהו ז״ל ;**  13
**לבנת דבש ז״ל ;**  14
**אורית אוזרוב ז״ל ;**  15
**נתנאל כוכבי ז״ל.**  16

  17
אף בפיגוע זה נגרם נזק לרכוש.  18

  19
בחודשים מרץ-אפריל 2002 נתבקש הנאשם על ידי מפקד הזרוע הצבאית של ארגון  20
החמאס באזור רמאללה לייצר מטעני חבלה ותיק נפץ לצורך ביצוע פיגוע התאבדות.  21
הנאשם הכין חגורת נפץ ומטען חבלה, אותם הכניס לתוך תיק, אליו צורפו גם ברגים.  22
הנאשם מסר את מטעניו הנפץ לפעיל אחר בארגונו. ביום 07/05/02 נכנס מחבל  23
מתאבד למועדון ׳שפילד׳ קלאב׳ בראשון לציון כשעליו חגורת הנפץ שהוכנה על ידי  24
הנאשם. המחבל הפעיל את חגורת הנפץ ובכך גרם למותם של 15 בני אדם, לפציעתם  25
של 59 נוספים, ולהרס רב לבניין בו שכן המועדון.  26

  27
בפיגוע זה נרצחו :  28
**רחמים קמחי ז״ל ;**  29
**רפאל חיים ז״ל ;**  30
**ענת טרמפורוש ז״ל ;**  31
**אברהם בייז ז״ל ;**  32
**אתי בבלאר ז״ל ;**  33
**יצחק בבלאר ז״ל ;**  34
**ישראל שיקאר ז״ל ;**  35
**שושנה מגמרי ז״ל ;**  36
**שארוק רסאן ז״ל ;**  37
**נואה חינגאווי ז״ל ;**  38
**ניר לובטין ז״ל ;**  39
**רגינה מלכה בוסלו ז״ל ;**  40
**דליה משה ז״ל ;**  41
**פנינה הקרי ז״ל ;**  42
**עדנה כהן ז״ל.**  43

  44
במהלך חודש מאי 2002 נפגש הנאשם עם פעיל צבאי בארגון החמאס, שביקש ממנו  45
לייצר מטען חבלה נוסף, על מנת לבצע באמצעותו פיגוע תופת. הנאשם הסכים  46
לבקשה, וייצר מטען חבלה בהפעלה סלולרית, שניתן להצמידו למתכות באמצעות  47
מגנטים. הנאשם מסר את המטען לפעיל החמאס, וזה הצמיד אותו, ביום 23/05/02,  48
לחלקו התחתון של מיכל דלק במיכלית דלק. המיכלית עשתה את דרכה לאתר ״פי  49

-4-

תאריך : י"ז כסלו, תשס"ה  תיק מס' : 3380/03
30 נובמבר, 2004

גלילות"י, כשכיבבותיה המפעילים של מטעו החבלה. כאשר הגיעה המיכלית לי"פי 1
גלילות"י, העפילו הני"ל את המטען באמצעות טלפון סלולרי. המטען התפוצץ וגרם 2
נזק כבד למיכלית, אך בנס לא לפגיעה בנפש. 3
 4

בחודש יוני 2002 נתבקש הנאשם על ידי מפקד הזרוע הצבאית של ארגון החמאס 5
באזור רמאללה לייצר מטעו חבלה לצורך ביצוע פיגוע תופת נוסף. הנאשם עשה כן, 6
ומסר את המטעו, שהונח ביום 30/06/02 בשעות הבוקר על פסי הרכבת באזור לוד. 7
כשהבחינו מניחי המטעו ברכבת מתקרבת לאזור, הפעילו אותו. המטעו התפוצץ, 8
דבר שגרם לפציעתם של ארבעה בני אדם ולנזק לקטר הרכבת ולמסילת הברזל. 9
 10

עוד באותו חודש ייצר הנאשם מטעו נוסף אשר אף הוא הונח על פסי הרכבת בסמוך 11
ליציאה מרחובות. ביום 21/07/02 בשעות הבוקר המוקדמות הופעל המטעו. 12
כתוצאה מהפיצוץ נפצע אדם אחד וגרם נזק לקטר ולמסילת הברזל. 13
 14

בחודש יולי 2002 התבקש הנאשם על ידי מפקד הזרוע הצבאית של ארגון החמאס 15
באזור רמאללה, לייצר מטעו חבלה המוסתר בתוך תיק, על מנת לבצע פיגוע תופת. 16
הנאשם ייצר מטעו כאמור, ואף טרח למלא את התיק באומי ברזל לצורך הגברת 17
עוצמת הפגיעה של המטעו. הנאשם אף הכין מגנונן הפעלה אלחוטי למטעו ומסר את 18
המטעו לאיש חמאס. המטעו הינה בתוך קפיטריה הנמצאת בבניין עי"ש פרנק 19
סינטרה בקמפוס האוניברסיסית העברית בהר הצופים בירושלים. ביום 31/07/02 20
בסמוך לשעון 13:00, שעה בה ברגיל קיים ריכוז גדול של בני אדם בקפיטריה, הופעל 21
המטעו. כתוצאה מפיצוץ המטעו, שהוכן על ידי הנאשם, נרצחו 9 בני אדם ונפצעו 81 22
נוספים. כמו כן, נגרם נזק לבניין הקפיטריה. 23
 24

בפיגוע זה נרצחו: 25
**דפנה שפרוך ז"ל;** 26
**מרלה און בנט ז"ל;** 27
**דינה קרטר ז"ל;** 28
**בנימין תומאס בלוטשטיין ז"ל;** 29
**רויטל בראשי ז"ל;** 30
**דוד (דיאגו) לדובסקי ז"ל;** 31
**לוינא שפירא ז"ל;** 32
**ג'ניס רות קולטר ז"ל;** 33
**דוד גריץ ז"ל.** 34
 35



בחודש אוגוסט 2002 נתבקש הנאשם להכין שני מטעני חבלה. הנאשם נענה לבקשה 36
זו והכין שתי מטעו חגורות נפץ, אותן מסר לפעיל בארגון החמאס. ביום 19/09/02 עלה 37
מחבל מתאבד, אשר נשא על גופו אחת מחגורות הנפץ שהכין הנאשם, על אוטובוס 38
קו 4 בתל אביב ופוצץ את המטעו. כתוצאה מהפיצוץ נהרגו שישה בני אדם ונפצעו 84 39
נוספים. נזק רב נגרם לאוטובוס ולבתי עסק שהיו בקרבתו. 40
 41

בפיגוע זה נרצחו: 42
**יוסי ממיסטלוב ז"ל,** בן 39 במותו; 43
**עופר זינגר ז"ל,** בן 29 במותו; 44
**רוונה סיסו ז"ל,** בת 63 במותה; 45
**יפה שם-טוב ז"ל,** בת 49 במותה; 46
**סלומון הוניג ז"ל,** 79 במותו; 47
**יונתן ג'סנר ז"ל,** בן 19 במותו; 48
 49

-5-

תאריך : כ"ז כסלו, תשס"ה
30 נובמבר, 2004

תיק מס' : 3380/03

ביום 11/10/02, בסמוך לשעה 20:15, ניסה מחבל מתאבד נוסף, שגם הוא נשא על  1
גופו חגורת נפץ שהוכנה על ידי הנאשם, להיכנס למסעדת יוטבתה בתל אביב במטרה  2
לפוצץ את עצמו ולגרום למותם של רבים ככל האפשר. המאבטח שהיה במקום חשד  3
באיש ומנע את כניסתו למסעדה. מאוחר יותר נתפס המחבל.  4
                                                                          5
                                                                          6
מסכת הטרור הרצחנית שהפעיל הנאשם היא מהחמורות שידענו אי פעם  7
בהיסטוריה העקובה מדם לה אנו שותפים מאז הקמת מדינת ישראל.  8
                                                                          9
הנאשם פעל ללא לאות, במשך תקופה ארוכה מאוד, בייצור מטעני חבלה קטלניים  10
ככל האפשר, שיועדו לשמש לפיגועי התאבדות ולפיגועי תופת, וזאת לשם מטרה  11
אחת ויחידה, גרימת מותם של רבים ככל האפשר.  12
                                                                          13
הנאשם אחראי במישרין לרציחתם של עשרות בני אדם חפים מפשע, ולפציעתם של  14
מאות אחרים. נשגב מבינתנו להבין איך יכל הנאשם לרתום את הידע המדעי אשר  15
רכש, אשר יועד מלכתחילה לשיפור חיי האדם, לשם זריעת הרס וחורבן כה רב.  16
תשובה חלקית לתמיהה זו מצאנו בדברי הנאשם במסגרת הטיעונים לעונש בתיק  17
זה, מהם ניתן היה להתרשם ללא כל קושי מן השנאה התהומית אשר כילתה מתוכו  18
כל אנושיות. הנאשם לא הביע כל חרטה, אלא התגאה בכך שהכשיר עשרות  19
מהנדסים, אשר הוא מקווה כי יגרמו לפיגועים קשים הרבה יותר מאלה שחוללו על  20
ידו.  21
                                                                          22
קשה הייתה שמיעתם של טיעוניו הנלוזים של הנאשם, שניסה לקשור את מעשיו  23
המפלצתיים עם פעולותיו של צה"ל באזור, לא מבלי שיערב גם את פעולת  24
האמריקאים בכווית, את העליית מברית המועצות לשער, ואת מדיניות הממשלה  25
כגורמים שהביאו אותו לפעול. הנאשם סיים את דבריו בכך שהבטיח שארגון  26
החמאס יגרום להתפרקות מדינת ישראל, בהתאם לחזונו של אחמד יאסין.  27
                                                                          28
נוכח דבריו של הנאשם, יש להניח כי אלמלא נתפס, היה ממשיך בפעילותו הרצחנית.  29
אך גם מבלי לשער השערות, די לנו להתבונן ברשימת שמות קורבנותיו של הנאשם,  30
הארוכה מנשוא, כדי לעמוד על גודל האסון אותו המיט, לא רק על קורבנותיו  31
ומשפחותיהם, אלא על החברה כולה. מטעני החבלה אותם הכין הנאשם היו כזרעי  32
מוות שפוזרו במקומות רבים ברחבי מדינת ישראל, לאורכה ולרוחבה. קור רוח של  33
הנאשם והשימוש שעשה במדע ובטכניקה לשם הרג מכוון ושיטתי, אינם יכולים  34
אלא להזכיר לנו תקופות מן האפלות ביותר שבהיסטוריית העם היהודי, אשר סברנו  35
לתומנו כי, עם הקמתה של מדינת ישראל, לא יחזרו על עצמן.  36
                                                                          37
מה נאמר ומה נדבר לנוכח גדיעת חייהם של הנרצחים, חלקם עולי ימים,  38
תינוקות של ממש. מה נוכל לבשר למשפחות השלומות שברגע אחד נקטלו?  39
                                                                          40
קול דמי אחינו זועקים אלינו מן האדמה.  41
                                                                          42
אין בכוחנו לרפא את הצלקות הפיזיות והנפשיות של אלה שחוו את התופת.  43
הפצועים עצמם, אך לא רק הם, אלא גם קרובי המשפחה והסובבים, אשר ישאו את  44
רושם הסבל שפקד אותם כרעם ביום בהיר עד סוף ימי חייהם.  45
                                                                          46
מה יהא עונשו של מי ששיעבד את כל רצונותיו ומעשיו לשם רצח בני מינו? ללא  47
ספק, אין כל מקום להתחשבות בנסיבותיו אישיות כלשהן במקרה שכזה. לנוכח  48
מעשים נפשעים כגון אלה שבוצעו על ידי הנאשם, אין כל ספק כי העונישה צריכה  49

-6-

תאריך : י"ז כסלו, תשס"ה
30 נובמבר, 2004

תיק מס' : 3380/03

להיות מירבית, הן לנוכח הצורך שבמניעת מסוכנותו של הנאשם, והן לאור הניסיון
לגמול לו כרשעתו.

מערכת משפט הראויה לשמה צריכה להיות בעלת כושר הרתעה כלפי עבריינים
לסוגיהם השונים. הטרור הנוגע היום במדינת ישראל הינו אכזרי וחסר רחמים
ואינו מבחין כלל בין חייל, אזרח, תינוק, זקן, נכה או תייר, איש או אישה, באשר
הם.

עלינו, על כן, לתרום את תרומתנו למיגור הטרור, עד כמה שהדבר אפשרי. לצורך כך
אין כל צל של ספק כי יש להטיל על הנאשם, ועל שכמותו, עונשים אשר לא רק
שתגמול להם על מעשיהם הנפשעים והאכזריים ותביא את סלידת כל בן אנוש וכל
חברה מתוקנת מהתנהגותם הנפשעת, אלא אף יהא בה מימד של הרתעה.

מתוך השקפה זו, עלינו לקבוע כי במקרי טרור נוראיים ורבים כגון אלה שהנאשם
אחראי להם מכוח מילוי חלקו במנגנון טרור משומן, העונש המירבי שקבע המחוקק
צריך להיות לא רק נקודת המוצא לענישה, אלא אף לעיתים קרובות נקודת הסיום.

כאשר מעשי הטרור להם היה שותף הנאשם הינם כה אכזריים, מאסיביים,
וממושכים, עד שנינו לומר כי בפנינו "תעשייה" של טרור בעלת תוצאות קשות
מנשוא, העונש הראוי והנכון הינו עונש מיתה. וכבר נאמר במקורותינו : "שופך דם האדם
באדם דמו ישפך כי בצלם אלוקים עשה את האדם".

אמנם עד כה עונש זה נותר "הלכה ואין מורין כן", ובתי המשפט הסתפקו בהטלת
עונש של מאסר עולם. לדעתנו, מנהג זה, אשר היה חנהג המקובל כאמור, אסור לו
להפוך למצוות אנשים מלומדה, ועל ביהמ"ש לבחון כל מקרה לגופו מתוך הענקת
הכבוד הראוי לקביעתו המפורשת של המחוקק, לפיה במקרים מתאימים יש להטיל
על נאשם, המורשע בעבירת גרימת מוות בכוונה, עונש מוות.

לנוכח קביעה חד משמעית זו של המחוקק, פטור ביהמ"ש מן הצורך לדון בשאלות
הנוגעות למידת ההתאמה של עונש זה הן לעקרונות משפט צדק ומוסר והן
למציאות. יחד עם זאת, לנו נראה כי כאשר בפנינו אדם כנאשם, שכאמור קטל ללא
הרף, ללא תבחנה וללא רחמים, באופן מחושב וקר רוח, עד כי דרדר את עצמו לשפל
המדרגה האנושית וספק אם ראוי הוא להיקרא אדם, מוצדק ומוסרי שלא להותיר
את הוראת החוק כאות מתה.

אף נציין כי גם אם עריש אנו לטענות לפיהן עונש המוות אינו מרתיע ואינו אפקטיבי
באזור, הרי שאם הדבר נראה כך לגבי מפגעים מתאבדים, חשוב לזכור כי אלה
אינם פועלים מכוח עצמם ואף לא כיחידים, ואותם אלה, המרכיבים את מערכת
הטרור הרחבה המייצרת את פצצות האדם ומשלחתם, נזהרים מלהיפגע בעצמם, כך
שגורם ההרתעה שבעונש האמור נשמר.

לדעתנו, ראוי על כן הנאשם לעונש מוות, ואך בהטלת עונש שכזה ייעשה דין צדק.

אלא שיש לזכור כי המחוקק סייג את האפשרות בהטלת עונש המוות בשלל סיינים,
אשר העיקרי שבהם נוגע לכך ששלושת שופטי ההרכב ישאו דרגת סא"ל [סעיף
47(א)(8) לצו בדבר הוראות ביטחון, תשי"ל - 1970].

-7-

תיק מס׳ : 3380/03

תאריך : י״ז כסלו, תשס״ה
30 נובמבר, 2004

בהתאם לקביעה זו, מנועים אנו מלפעול על פי צו מצפוננו האמור, ואין בסמכותנו
לגזור על הנאשם את העונש המגיע לו.

בנסיבות אלה, כל שנותר לנו הוא לגזור, על כן, לנאשם עונש מאסר עולם נפרד בגין
כל אדם אשר נרצח כתוצאה ממעשיו. אף אנו קובעים כי עונשי המאסר יהיו
מצטברים, זאת למען ידעו כי עבורנו, אובדנו של כל אחד ואחד מן הקורבנות מהווה
אובדן עולם מלא. בנוסף על כך, אנו מוצאים אף לנכון לתת ביטוי לשורת העבירות
הנוספות שבוצעו על ידי הנאשם, אשר חלקן הביאו לפציעתם של מאות בני אדם.

אשר על כן, נוכח דברינו דלעיל, אנו גוזרים על הנאשם 67 מאסרי עולם מצטברים.

**זכות ערעור תוך 30 יום.**

**ניתן והודע היום, 30/11/2004 , בפומבי ובמעמד הצדדים.**

שופט                    אב״ד                    שופט

-8-