# EXHIBIT A.492
## (1 of 6)



PLAINTIFF'S
EXHIBIT
492

# Erased In A Moment:

## Suicide Bombing Attacks Against Israeli Civilians

**Human Rights Watch**
New York  •  Washington  •  London  •  Brussels

Copyright © October 2002  by Human Rights Watch.
All rights reserved.
Printed in the United States of America

ISBN:  1-56432-280-7
Library of Congress Control Number:  2002114404

Cover photos:
Relatives and friends mourn during a funeral for victims of a March 9,
2002, suicide bombing attack at the Cafe Moment in Jerusalem.  Eleven
civilians were killed and more than fifty were injured in the attack.
Hamas claimed responsibility. (c) 2002 Reuters Ltd.

An Israeli civilian injured in the May 19, 2002, suicide bombing attack
at the Netanya market receives help.  Three civilians were killed and
more than thirty were injured.  The attack was claimed by Hamas and the
Popular Front for the Liberation of Palestine. (c) 2002 Reuters Ltd.

Cover design by Rafael Jiménez

Addresses for Human Rights Watch
350 Fifth Avenue, 34th Floor, New York, NY  10118-3299
Tel: (212) 290-4700, Fax: (212) 736-1300, E-mail: hrwnyc@hrw.org

1630 Connecticut Avenue, N.W., Suite 500, Washington, DC  20009
Tel: (202) 612-4321, Fax: (202) 612-4333, E-mail: hrwdc@hrw.org

2nd Floor, 2-12 Pentonville Road London N1 9HF, UK
Tel: (44 20) 7713 1995, Fax: (44 20) 7713 1800, E-mail: hrwuk@hrw.org

15 Rue Van Campenhout, 1000 Brussels, Belgium
Tel: (32 2) 732-2009, Fax: (32 2) 732-0471, E-mail: hrwbe@hrw.org

Web Site Address: http://www.hrw.org
Web Site Address in Arabic: http//www.hrrw.org/arabic

Listserv address: To subscribe to the list, send an e-mail message to
hrw-news-subscribe@igc.topica.com  with "subscribe hrw-news" in the body of
the message (leave the subject line blank).

Human Rights Watch is dedicated to
protecting the human rights of people around the world.

We stand with victims and activists to prevent
discrimination, to uphold political freedom, to protect people from inhumane
conduct in wartime, and to bring offenders to justice.

We investigate and expose
human rights violations and hold abusers accountable.

We challenge governments and those who hold power to end abusive practices
and respect international human rights law.

We enlist the public and the international
community to support the cause of human rights for all.

## HUMAN RIGHTS WATCH

Human Rights Watch conducts regular, systematic investigations of human rights abuses in some seventy countries around the world. Our reputation for timely, reliable disclosures has made us an essential source of information for those concerned with human rights. We address the human rights practices of governments of all political stripes, of all geopolitical alignments, and of all ethnic and religious persuasions. Human Rights Watch defends freedom of thought and expression, due process and equal protection of the law, and a vigorous civil society; we document and denounce murders, disappearances, torture, arbitrary imprisonment, discrimination, and other abuses of internationally recognized human rights. Our goal is to hold governments accountable if they transgress the rights of their people.

Human Rights Watch began in 1978 with the founding of its Europe and Central Asia division (then known as Helsinki Watch). Today, it also includes divisions covering Africa, the Americas, Asia, and the Middle East. In addition, it includes three thematic divisions on arms, children's rights, and women's rights. It maintains offices in New York, Washington, Los Angeles, London, Brussels, Moscow, Tashkent, Tblisi, and Bangkok. Human Rights Watch is an independent, nongovernmental organization, supported by contributions from private individuals and foundations worldwide. It accepts no government funds, directly or indirectly.

The staff includes Kenneth Roth, executive director; Michele Alexander, development and outreach director; Rory Mungoven, advocacy director; Carroll Bogert, communications director; John T. Green, operations director, Barbara Guglielmo, finance and administration director; Lotte Leicht, Brussels office director; Patrick Minges, publications director; Maria Pignataro Nielsen, human resources director; Joe Saunders, interim program director; Wilder Tayler, legal and policy director; and Joanna Weschler, United Nations representative. Jonathan Fanton is the chair of the board. Robert L. Bernstein is the founding chair.

The regional division directors of Human Rights Watch are Peter Takirambudde, Africa; José Miguel Vivanco, Americas; Brad Adams, Asia; Elizabeth Andersen, Europe and Central Asia; and Hanny Megally, Middle East and North Africa. The thematic division directors are Steve Goose, Arms (acting); Lois Whitman, Children's Rights; and LaShawn R. Jefferson, Women's Rights.

The members of the board of directors are Jonathan Fanton, Chair; Robert L. Bernstein, Founding Chair, Khaled Abou El Fadl, Lisa Anderson, Lloyd Axworthy, David Brown, William Carmichael, Dorothy Cullman, Irene Diamond, Edith Everett, Michael Gellert, Vartan Gregorian, Alice H. Henkin, James F. Hoge, Jr., Stephen L. Kass, Marina Pinto Kaufman, Wendy Keys, Bruce Klatsky, Joanne Leedom-Ackerman, Josh Mailman, Joel Motley, Samuel K. Murumba, Jane Olson, Peter Osnos, Kathleen Peratis, Catherine Powell, Bruce Rabb, Sigrid Rausing, Orville Schell, Sid Sheinberg, Gary G. Sick, Domna Stanton, John J. Studzinski, Shibley Telhami, Maureen White, and Maya Wiley. Emeritus Board: Roland Algrant, Adrian DeWind, and Malcolm Smith.

**ACKNOWLEDGEMENTS**

This report was researched and written by Joe Stork, Washington director of the Middle East and North Africa division of Human Rights Watch. Miranda Sissons, researcher for the Middle East and North Africa division and Johanna Bjorken, a consultant, assisted in research and writing. Jessica Bonn, a consultant, conducted additional interviews. Hanny Megally, executive director of the Middle East and North Africa division, edited the report. Wilder Tayler, the legal and policy director, provided legal review. Research assistance was provided by Dalia Haj Omar and James Darrow, associates with the Middle East and North Africa division; Tahirih Sariban and Juan Valdivieso, interns; and Na'ameh Razon, a 2002 Everett Fellow. Dalia Haj Omar and Mohamed Abdel Dayem, an associate with the Middle East and North Africa division, assisted with Arabic translation. The report was prepared for publication by Jonathan Horowitz, program coordinator; Leila Hull, associate with the Middle East and North Africa division; Patrick Minges of the communications division, and Jessica Thorpe, a consultant.

Human Rights Watch also thanks the many individuals who agreed to speak with us in the course of this research, as well as others who provided assistance in interpreting, locating information referred to in the report, but who wished not to be acknowledged by name.

Human Rights Watch acknowledges the support of NOVIB, the Dutch Organization for International Development Cooperation, Member of Eurostep and Oxfam International, for its research in Israel, the Occupied West Bank and Gaza Strip, and Palestinian Authority Territories.

## ABOUT THIS REPORT

This report is based on field research, expert and witness interviews, and examination of public documents. Field research was carried out during two Human Rights Watch investigative missions to Israel, the West Bank, and the Gaza Strip in May-June 2002. During these visits, Human Rights Watch interviewed members of armed groups, victims, families of perpetrators, PA officials, current and former PA security officers, Israeli and Palestinian analysts and security experts, diplomats and other foreign officials, and Palestinian activists and militants.

Documents consulted included those that Israel says were seized by the Israel Defense Forces (IDF) from Palestinian Authority offices in April-May 2002 and at other times, and made public on the websites of the IDF and the Israeli Ministry of Foreign Affairs, along with extensive commentary by official Israeli analysts. In addition, Human Rights Watch asked Israeli government officials to provide any additional evidence or documentation to support the government's charges concerning Palestinian Authority complicity in suicide bombings against civilians. The information provided by the government in response to this request largely reproduced information already available.

Human Rights Watch has assumed the authenticity of these documents, although we note that PA officials have dismissed the released documents in general terms as fabrications. Where Human Rights Watch has used these documents, it has done so based upon its own analysis and translation. Human Rights Watch notes that the documents have been released selectively, over time, and in various configurations, hampering any rigorous assessment of the significance and sequence of incidents described in them. Human Rights Watch also notes that the IDF official analysis and commentary concerning the documents made available frequently appears to be based on additional materials that, though mentioned in the IDF analysis and commentary, were themselves not publicly accessible at the time of writing.

## Table of Contents

I. SUMMARY ...................................................................................................1

II. RECOMMENDATIONS ...........................................................................7

To the Groups Responsible for Perpetrating Suicide Bombings and Other
Attacks on Civilians ...........................................................................................7
To President Arafat and the Palestinian Authority ...........................................7
To the Government of Israel................................................................................9
To the International Community .........................................................................9

III. SUICIDE BOMBING  ATTACKS ON CIVILIANS....................................11

Introduction .......................................................................................................11
Previous Use of Suicide Attacks Against Civilians...........................................14
Stated Rationales for Suicide Bombing Attacks................................................15
Victims ..............................................................................................................17
Attacks...............................................................................................................25
Martyrdom, Public Officials, and the Role of the Media ................................35

IV. LEGAL STANDARDS..............................................................................43

Obligations of the Palestinian Authority and Armed Palestinian Groups.......44
Crimes Against Humanity ................................................................................45
War Crimes: The Prohibition Against Targeting Civilians ..............................47
Murder and Willful Killings........................................................................49
Justifications Offered by Palestinian Armed Groups.......................................50
Wars Against Alien Occupation or in Exercise of the Right of Self-
Determination...............................................................................................51
Retaliation and Reprisals.............................................................................52
Who is a Civilian? .......................................................................................54
Civilian Residents of Illegal Settlements as "Legitimate Targets".............54
All Israelis are Reservists ...........................................................................56
Imbalance of Means ....................................................................................56
Individual and Command Responsibility for Crimes Against Humanity and
War Crimes........................................................................................................57
The Participation of Children in Hostilities......................................................59

V. STRUCTURES AND STRATEGIES OF THE PERPETRATOR
ORGANIZATIONS ....................................................................................................62

    Hamas (harakat al-muqawama al-islamiyya, Islamic Resistance Movement)64
        Background ........................................................................................................64
        Involvement in Suicide Bombings...................................................................66
        Structure ...........................................................................................................67
    Islamic Jihad.........................................................................................................71
        Background ........................................................................................................72
        Involvement in Suicide Bombings...................................................................73
        Structure ...........................................................................................................75
    The al-Aqsa Martyrs' Brigades ...........................................................................77
        Background ........................................................................................................78
        Involvement in Suicide Bombings...................................................................78
        Structure ...........................................................................................................79
    Popular Front for the liberation of Palestine (PFLP)......................................87
        Background ........................................................................................................87
        Involvement in Suicide Bombings...................................................................88
        Structure ...........................................................................................................89
    Recruitment and Use of Children .......................................................................89

VI. FINANCIAL AND LOGISTICAL SUPPORT ............................................94

    Funding Overview of Perpetrator Groups ........................................................94
    State Support for Suicide Attacks Against Civilians ........................................96
        Iran ....................................................................................................................96
        Syria ..................................................................................................................99
        Iraq .................................................................................................................100
    Other Forms of Funding or Support ...............................................................101
    Payments to Family Members of Those Who Carry Out Attacks Against
    Civilians. ...........................................................................................................104

VII. THE ROLE OF THE PALESTINIAN AUTHORITY.............................109

    Security Role of the PA Since September 2000 .............................................110
    Failure to Bring to Justice those who Ordered, Planned, or Participated in
    Suicide Attacks on Civilians............................................................................114
    Palestinian Authority Payments to Armed Militants .....................................125
    Requests for Palestinian Authority Financial Assistance from Armed Groups
    ...........................................................................................................................130
    Participation of PA Security Officials in Suicide Bombings or Other Attacks
    on Civilians.......................................................................................................132
    Security Officials' Protection of Individuals "Wanted" by Israel ...............138

Conclusion................................................................................139

APPENDIX ONE: CHRONOLOGY OF ATTACKS....................................141

Chronology of suicide bombing attacks on civilians and military targets from
September 30, 2000 to August 31, 2002......................................................141

APPENDIX TWO: CHARTS ........................................................................149

## I.   SUMMARY

More than 415 Israeli and other civilians have been killed, and more than two thousand injured, as a result of attacks by armed Palestinians between September 30, 2000 and August 31, 2002. The majority of these deaths and injuries were caused by so-called suicide bombings carried out by Palestinians. Typically, the bombers, who surrendered their own lives in the process, sought to set off their explosions in places where civilians were gathered, including restaurants and places of entertainment—"soft" targets where they could expect to cause the largest number of casualties. Typically, too, the bombers packed the explosives with nails and pieces of metal for extra deadly effect. In addition to the toll of deaths and injuries, the bombings have sown widespread fear among the civilian population—as they were intended to do.

Hamas and Islamic Jihad, two Islamist Palestinian groups, had previously carried out suicide bombings against Israeli targets in the mid-1990s, as part of their opposition to the Oslo Accords and, at times, the Palestinian Authority (PA). At that time the PA clamped down, arresting some 1,200 leaders and activists, and the bombings ceased. Some of those detained were held for long periods without charge or trial. The PA freed those who remained in detention soon after the current uprising—widely known as the al-Aqsa Intifada—began in September 2000. Within months, following a rapid escalation of violence on both sides, Hamas again resorted to suicide bombings against Israeli civilians when, on January 1, 2001, a suicide bomber blew himself up at a crowded bus station in Netanya, wounding at least twenty civilians. Islamic Jihad resumed suicide attacks against civilians shortly afterwards.

Throughout 2001, there was a rash of such attacks, peaking in March, November, and early December. Israel charged that President Yasir Arafat and the PA were responsible because they had failed to rein in the Islamist groups. In June and again in December 2001, in response to mounting international pressure, the PA obtained a cessation of suicide bombings (though not all attacks) against civilians. These lasted for some six weeks beginning in early June and for some four weeks beginning in mid-December. On January 14, 2002, Israeli forces killed a local West Bank leader of the al-Aqsa Martyrs' Brigades (the al-Aqsa Brigades), which had been formed at the start of the current clashes and is affiliated with Arafat's Fatah organization. The al-Aqsa Brigades carried out their first suicide bombing two weeks later—the first to be carried out by a female perpetrator. The blast killed one civilian and injured one hundred. A fourth group, the Popular Front for the Liberation of Palestine (PFLP), also carried out suicide bombings in 2002.

Each of these four groups has attacked civilians repeatedly. The scale and systematic nature of these attacks in 2001 and 2002 meet the definition of a crime against humanity. When these suicide bombings take place in the context of violence that amounts to armed conflict, they are also war crimes. Human Rights Watch unreservedly condemns these atrocities.

Of the four groups, three have an adversarial relationship with Arafat and the PA: Hamas, Islamic Jihad, and the PFLP. The fourth, the al-Aqsa Martyrs' Brigades, proclaims its support for Arafat and the PA. Inevitably, the attacks carried out by the al-Aqsa Brigades have provoked the most questions, with intense speculation as to whether they were sanctioned by, or carried out at the behest of, Arafat. This report examines that question, among others.

The Palestinian Authority is not a state, and is therefore not a party to the major international humanitarian law treaties, but it has on several occasions signaled its willingness to abide by those standards. International humanitarian law, through the well established doctrine of command responsibility, requires that those who occupy positions of authority cannot escape accountability for war crimes or other grave abuses committed by persons under their control if they ordered their subordinates to commit such crimes, failed to take reasonable preventive action, or failed to punish the perpetrators. This doctrine is particularly relevant to those in the military chain of command, but the doctrine also extends to political and other leaders insofar as they have "effective responsibility and control" over the actors in question.[1] The leaders of Hamas and Islamic Jihad, in particular, appear to be criminal offenders under that doctrine: many of them have openly espoused, encouraged, or endorsed suicide bombing attacks against Israeli civilians, and appear to have had the capacity to turn the bombings on and off at will. The PFLP, which has claimed responsibility for car bombings as well as several suicide bombings that targeted civilians, appears to have a similar degree of internal cohesion and centralized authority, thus making its leadership also criminally liable.

Human Rights Watch sought particularly to obtain information that would enable it to assess the role and responsibility of the PA, as the entity charged with maintaining security in select areas of the West Bank and Gaza Strip. Our conclusion, on the basis of the available public information, is that there are important steps that Arafat and the PA could and should have taken to prevent or deter suicide bombings directed against civilians. The failure to take those steps implies a high degree of responsibility for what occurred. Individual members of the al-Aqsa Brigades have even been among the beneficiaries of payments

---

[1] Rome Statute of the International Criminal Court, Article 28(b), U.N. Doc. no. A/CONF. 183/9 (July 17, 1998), 37 I.L.M. 999.

approved by Arafat personally at a time when he knew or should have known that such individuals were alleged to have been involved in planning or carrying out attacks on civilians.

The greatest failure of President Arafat and the PA leadership—a failure for which they must bear heavy responsibility—is their unwillingness to deploy the criminal justice system decisively to stop the suicide bombings, particularly in 2001, when the PA was most capable of doing so. President Arafat and the PA also failed to take aggressive measures to ensure that the intensely polarized political atmosphere not serve as a justification for such attacks. Certain Israeli actions, such as the destruction of PA police and security installations, gradually undermined the PA's capacity to act. But even when their capacity to act was largely intact, Arafat and the PA took no effective action to bring to justice those in Hamas, Islamic Jihad, the PFLP, and the al-Aqsa Martyrs' Brigades who incited, planned or assisted in carrying out bombings and other attacks on Israeli civilians. Instead, Arafat and the PA pursued a policy whereby suspects, when they were detained, were not investigated or prosecuted, but typically were soon let out onto the street again. Indeed, the PA leadership appeared to treat its duty to prosecute murderers as something that was negotiable and contingent on Israel's compliance with its undertakings in the Oslo Accords, not as the unconditional obligation that it was.

The PA sought to explain these releases by citing the danger to detainees when Israeli forces bombed places of detention. But the PA has not explained why suspects were never investigated, charged, or tried — steps that could have been taken with little or no risk to the suspects' physical well-being. Further, while Arafat has repeatedly and publicly condemned suicide bombings and other attacks against Israeli civilians, he has done little to confront or correct the positive portrayal of the bombers within the Palestinian community as "martyrs." Indeed, several PA officials have praised attacks on civilians. Again, steps to delegitimize attacks on civilians could have been taken despite Israel's degradation of the PA's administrative and security apparatus. Finally, Arafat and the PA failed to take available administrative steps to ensure that there were no financial incentives for carrying out attacks on civilians. In a handful of cases, President Arafat authorized modest payments to people whom he knew or should have known had attacked civilians. More commonly, President Arafat and the PA did not take adequate steps as the established authority in the area to prevent special payments, by the PA or others, to such perpetrators and their families. This inaction fostered an environment that allowed Palestinian armed groups to believe they could attack civilians with impunity.

On the basis of what was publicly available as of the end of September 2002, Human Rights Watch did not find evidence that Arafat and the PA

planned, ordered, or carried out suicide bombings or other attacks on Israeli
civilians. Despite the links between President Arafat's Fatah organization and
the al-Aqsa Martyrs' Brigades, we found no evidence that the al-Aqsa Brigades,
when planning or carrying out suicide bombings or other attacks on civilians,
took their orders from or sought the endorsement of Arafat or other senior PA or
Fatah leaders. Rather, the al-Aqsa Brigades appear to operate with a wide degree
of local discretion and to maintain only a loose relationship with Arafat and the
senior Fatah leadership. Such a relationship does not meet the criteria required
to establish that Arafat and top PA officials have command responsibility—that
is, criminal liability—for the attacks against civilians carried out by the al-Aqsa
Brigades. Similarly, the PA's failure to exercise its administrative and criminal
justice powers to rein in independent actors does not establish command
responsibility under the current state of international law. However, the lack of
command responsibility in no way diminishes Arafat's and the PA's significant
political responsibility for the repeated deliberate killing of civilians.

Palestinian armed groups have sought to justify suicide bombing attacks on
civilians by pointing to Israeli military actions that have killed numerous
Palestinian civilians during current clashes, as well as the continuing Israeli
occupation of the West Bank and much of the Gaza Strip. Such excuses are
completely without merit. International humanitarian law leaves absolutely no
doubt that attacks targeting civilians constitute war crimes when committed in
situations of armed conflict, and cross the threshold to become crimes against
humanity when conducted systematically, whether in peace or war. As the latter
term denotes, these are among the worst crimes that can be committed, crimes of
universal jurisdiction that the international community as a whole has an
obligation to punish and prevent.

International humanitarian law governing situations of armed conflict
prohibits even attacks against civilians that are said to have been carried out in
reprisal for attacks against one's own civilian population. This principle is set
out in both the Fourth Geneva Convention and in Additional Protocol I. Even
apart from these treaties, a strong trend has developed in international customary
law over the past two decades to prohibit reprisals against civilians. This ban on
reprisals is not dependent on reciprocal compliance by opposing forces. Even in
the face of Israeli violations of international human rights and humanitarian law,
Palestinian armed groups have a duty to refrain from reprisals against civilians.

Palestinian groups have also argued that they are engaged in a "liberation
war" against Israel's continuing occupation, and so are somehow exempt from
the obligation to respect international humanitarian law. This claim of
exemption is also false. Additional Protocol I to the Geneva Conventions, which
by its terms governs wars of national self-determination, states that the "civilian

population as such, as well as individual civilians, shall not be the object of attack," and that "[a]cts or threats of violence the primary purpose of which is to spread terror among the civilian population are prohibited." That is, the first treaty to recognize wars of national liberation also reaffirms the prohibition of attacks on civilians. In addition, the core principles of the Geneva Conventions and their protocols are part of international customary law, indicating that they have achieved the highest degree of international consensus regardless of treaty ratifications. These include the principle requiring attacking forces to distinguish between civilians and military objects, the principle of granting civilian immunity from deliberate attack, and the prohibition against targeting civilians. All parties to a conflict are obliged unconditionally to respect these principles.

Finally, Palestinian groups have argued that Israeli settlers in the West Bank, by virtue of their presence in an occupied territory, are not civilians, and that because many Israeli adults are members of the military reserve, they, too, are legitimate military targets. These claims also run counter to international humanitarian law. Even though Israel's policy of maintaining and expanding civilian settlements in the West Bank and Gaza Strip is illegal under international humanitarian law, a person who resides in an illegal settlement continues to be a civilian unless he or she directly participates in hostilities. Except in those circumstances of direct participation in armed conflict, these residents are entitled to full protection as civilians. Similarly, international humanitarian law leaves no doubt that reserve members of military or security forces, while not on active duty, are not combatants and thus benefit from protection as civilians.

The arguments put forward to justify or excuse suicide bombings and other Palestinian attacks on civilians are without foundation. Those who articulate them either fail to understand or have decided to ignore their obligations under international humanitarian law. There can be no doubt that such attacks are grave crimes. In most, if not all cases, they are crimes against humanity. International law defines those who perpetrate these atrocities as criminals. So are those who incite, plan, and assist them. They should be brought to justice.

In this report, Human Rights Watch examines the nature and consequences—the human toll—of the suicide bombings and other attacks on civilians, reviews the relevant international humanitarian law standards and the obligations they impose, and describes the nature, structure, and objectives of the Palestinian armed groups that have carried out these attacks. As indicated, we also examine the role of the Palestinian Authority, including President Arafat.

We include specific recommendations on the steps to be taken, without delay or equivocation, to end attacks on civilians. We call on the PA and

6       Erased in a Moment: Suicide Bombing Attacks Against Israeli Civilians

Palestinian armed groups to end all suicide attacks against civilians and to abide by the principles of international human rights and humanitarian law. We also urge Israel to ensure that all measures to prevent or respond to suicide or other attacks against civilians conform to international humanitarian and human rights law. We call on the respective parties' international supporters to endorse these recommendations and try to enforce them, so as to help bring an end to the attacks that have cruelly claimed civilian lives and the impunity that allows these attacks to continue.

## II.  RECOMMENDATIONS

**To the Groups Responsible for Perpetrating Suicide Bombings and Other Attacks on Civilians**

Human Rights Watch unreservedly condemns suicide bombings as war crimes and crimes against humanity. We call on those responsible to desist immediately and to renounce their use unconditionally. In particular, Human Rights Watch calls on the leaders of Hamas, Islamic Jihad, the al-Aqsa Martyrs' Brigades, and the Popular Front for the Liberation of Palestine to:

- Cease such attacks immediately and declare publicly that they will not resort to such attacks in the future under any circumstances.

- Commit publicly to respecting the basic principles of international humanitarian law, and instruct all members of their organizations to do so, in particular those principles applying to the protection of civilians during armed conflict and the duty to arrest and deliver to the authorities for prosecution anyone who fails to do so.

- Cease the recruitment or use of persons under eighteen years of age in any military activities, including activities in a support role, and communicate this policy to all supporters of the group.

**To President Arafat and the Palestinian Authority**

Human Rights Watch recognizes that in 2002, the Palestinian Authority's capacity to maintain law and order and conduct juridical procedures is greatly diminished. Still, many of the recommendations below can be immediately implemented while others should be acted upon as the capacity of the PA is restored. Human Rights Watch calls on President Yasir Arafat and other senior officials of the Palestinian Authority to:

- Make clear that suicide bombings and other attacks on civilians constitute grave crimes; that those who incite, plan, assist, attempt, or carry out such attacks will face criminal charges; and that the PA will take all possible measures to ensure that they are brought to justice.

- Instruct the law enforcement agencies of the PA to take all possible steps, in accordance with internationally accepted human rights norms,

7

to identify and bring to justice anyone who incites, plans, assists, or attempts to carry out suicide bombings or other attacks against civilians.

- Instruct all members of the Palestinian Authority security forces that they will be severely punished if they provide any assistance, including intelligence, logistical, or other support, to those responsible for planning, assisting, or carrying out suicide bombings or other attacks on civilians. Anyone disobeying such orders should be immediately suspended, arrested, and prosecuted in a civilian court in accordance with international fair trial standards and, if convicted, sentenced to prison terms that reflect the seriousness of their crime.

- Call on all Palestinians living in the West Bank and Gaza Strip to assist the PA in bringing to an end suicide bombings and other attacks against civilians. Such an appeal should state that even if the PA's own law enforcement capacities may be diminished, the PA remains committed to fulfilling its responsibilities to end these atrocities. The PA should also set up hotlines enabling members of the public to phone in with information about potential attacks or perpetrators.

- Utilize all available media and public information systems to communicate the above messages to Palestinians in the West Bank and Gaza, and to Palestinian Arab citizens of Israel, and to call for an immediate, unconditional, and permanent halt to all suicide bombings and other attacks against civilians. Clarify that the PA does not consider as "martyrs" persons who die in the course of carrying out attacks that deliberately or indiscriminately aim to kill or cause great suffering among civilians.

- Conduct a thorough, independent investigation to identify those persons, including members of Hamas, Islamic Jihad, the Popular Front for the Liberation of Palestine, and the al-Aqsa Martyrs' Brigades who are responsible for inciting, planning, assisting, or carrying out suicide bombings or other attacks on civilians; arrest such persons; and ensure that they are prosecuted in a civilian court in accordance with international fair trial standards and, if convicted, sentenced to prison terms that reflect the seriousness of their crime. To the extent that these crimes have been carried out by or under the auspices of these organizations, take action immediately to freeze the organization's

assets in order to secure them against any future claims for compensation that may be made by or on behalf of the victims.

- Take all feasible measures to prevent the recruitment and use of persons under eighteen years of age in armed hostilities, including the adoption of legal measures to prohibit and criminalize such practices.

- Declare to the Swiss Ministry of Foreign Affairs that the PA undertakes to apply the provisions of Additional Protocol I of 1977 to the Geneva Conventions of 1949, in accordance with article 96 (3) of the Protocol.

**To the Government of Israel**

- Ensure that all measures to prevent or respond to suicide or other attacks against civilians conform to international humanitarian and human rights law.

- Cease targeting police posts and other installations that are part of the Palestinian criminal justice infrastructure when such attacks are solely in reprisal for Palestinian attacks on Israeli targets and do not make an effective contribution to military action.

- Ensure that any restrictions on freedom of movement are implemented only when and where necessary to prevent specific acts of violence. Provide travel permits valid for use in times of closure to judges and law enforcement authorities who are essential to the functioning of the Palestinian criminal justice system. Instruct Israeli security personnel to honor such permits at checkpoints and to facilitate the passage of people holding them.

- Publicly announce that places employed by the PA for the detention of suspects and convicted prisoners will not be the object of military attack and ensure that this policy is followed.

- Immediately ratify Additional Protocol I of 1977 to the Geneva Conventions of 1949.

**To the International Community**

- All governments, publicly and through diplomatic channels, should refrain from any action that appears to encourage, support or endorse

suicide bombings or other attacks against civilians, and use all possible influence with the perpetrator groups to make them cease such attacks immediately and unconditionally. In particular, regional governments should use the public information media available to them to make clear that they oppose such bombings against civilians and consider those who plan or carry them out to be criminals who should be brought to justice, not "martyrs."

- All governments providing or authorizing funding or any other assistance to groups who have claimed responsibility for suicide bombings or other attacks against civilians should cease such support immediately in the absence of a public and verifiable declaration from such groups, including Hamas, Islamic Jihad, the al-Aqsa Martyrs' Brigades, and the PFLP, that they no longer associate themselves with such crimes and that they are taking effective steps to ensure that their members cease their involvement in such activities and that those who carry out the attacks are brought to justice.

- Provide technical and material support to strengthen the investigative capacity of the Palestinian Authority's law enforcement agencies including, if necessary and appropriate, through the temporary secondment of suitably qualified police investigators to work alongside Palestinian officers and to assist them in pursuing and bringing to justice those responsible for suicide bombings or other attacks against civilians.

### III. SUICIDE BOMBING  ATTACKS ON CIVILIANS

**Introduction**

"Your whole life—erased in a moment," said Moti Mizrachi, who suffered life-threatening injuries in a March 9, 2002 attack on a Jerusalem cafe. A piece of shrapnel just missed his aorta, his left hand was almost severed, and he suffered a large head wound from shrapnel.

> One quick minute and everything is radically changed. It's like your life was erased—everything that you did until age thirty-one vanished into nothing. I used to be active, to play soccer two or three times a week, I was on teams, I danced....[2]

Now, Moti Mizrachi's hand and arm are held together with pins. His life has become one of intense, protracted pain and frequent hospital visits.

The powerful bomb, detonated at the Moment Café, in the affluent Rehavia neighborhood of Jerusalem, was packed with nails and small pieces of metal. It killed eleven civilians, and wounded more than fifty.[3]

The Moment Café bombing was one of forty-eight suicide bomb attacks against Israeli civilians carried out by armed Palestinian groups between January 1, 2001 and August 31, 2002.[4] Armed groups also carried out suicide attacks directed against Israeli military targets, but this report does not address these attacks. The forty-eight attacks on civilians constituted grave crimes, including crimes against humanity. Thirty-eight of the suicide bomb attacks on civilians were carried out in Israel, including West Jerusalem; ten were carried out in the West Bank and Gaza, including East Jerusalem.

With the onset of Israeli-Palestinian clashes in September 2000, armed attacks against Israeli civilians initially took the form of shootings along roads and in built-up areas such as the settlement of Gilo on the southern outskirts of Jerusalem. Several Palestinian suicide bomb attacks against military targets were carried out during the next three months. These include car bombings that killed four Israeli civilians and wounded scores in November 2000. Islamic Jihad took credit for the first, near the popular Mahane Yehuda market in Jerusalem, which

---

[2] Human Rights Watch interview with Moti Mizrachi, age thirty-one, Jerusalem, June 23, 2002.

[3] The bombing occurred not far from the official residence of Prime Minister Sharon, who was reportedly at his Negev ranch at the time.

[4] For a full list of suicide bombing attacks against civilians from September 30, 2000 to August 31, 2002, see Appendix One.

killed two and wounded eleven.[5] Several weeks later, on November 21, a car packed with nail-studded explosives killed two and wounded more than fifty, three seriously, in the northern Israeli town of Hadera.[6]

The first suicide bomb attack against civilians after the resumption of clashes between Palestinians and Israelis in September 2000 occurred at a bus stop in Netanya on January 1, 2001. Responsibility for the attack, which wounded twenty, was claimed by Hamas (an acronym for *harakat al-muqawama al-islamiyya,* or Islamic Resistance Movement). The frequency and intensity of suicide bomb attacks on civilians soon increased, and the tactic has been embraced by large sections of the Palestinian public, making these attacks a key feature of the current Palestinian-Israeli clashes.[7]

Four groups claimed responsibility for the forty-eight suicide bomb attacks that targeted civilians. The Islamist groups Hamas and Islamic Jihad, both opponents of Yasir Arafat and the Palestinian Authority, claimed responsibility for carrying out eighteen and twelve  of the attacks, respectively. The secular Popular Front for the Liberation of Palestine, another group long critical of, and opposed to Arafat and his Fatah movement, said it carried out three. The al-Aqsa Martyrs' Brigades, which is closely allied to Fatah, claimed responsibility for thirteen of the attacks, including some of the most devastating in terms of civilian casualties. Three attacks were claimed by more than one group, and

[5] This attack pre-empted a planned joint announcement by Prime Minister Ehud Barak and President Yasir Arafat of a truce brokered by U.S. President Bill Clinton several weeks earlier. Phil Reeves, "Truce hangs in the balance after car bomb explodes in Jerusalem," *The Independent* (London), November 3, 2000.

[6] Dina Kraft, "Two dead, more than fifty injured, in car bomb explosion in northern Israel," Associated Press, November 21, 2000. Human Rights Watch has been unable to identify a claimant for the attack.

[7] In separate reports Human Rights Watch has documented multiple violations of international humanitarian and human rights law committed during the clashes by Israeli security forces (including the excessive use of lethal force, collective punishments, the use of human shields by IDF forces, and willful killings) and Palestinian armed groups (including attacks targeting Israeli civilians and attacks that put Palestinian civilians at risk). See Human Rights Watch, "Jenin: IDF Military Operations," *A Human Rights Watch Report,* vol. 14, no. 3 (E), May 2002; Human Rights Watch, "In A Dark Hour: the Forced Use of Civilians during IDF Arrest Operations," *A Human Rights Watch Report,* vol. 14, no. 2 (E), April 2002; Human Rights Watch, "Justice Undermined: Balancing Security and Human Rights in the Palestinian Justice System," *A Human Rights Watch Report,* vol. 13, no. 4 (E), November 2001; Human Rights Watch, *Center of the Storm: A Case Study of Human Rights Abuses in Hebron District* (New York: Human Rights Watch, 2001); and Human Rights Watch, "Investigation into the Unlawful Use of Force in the West Bank, Gaza Strip and Northern Israel October 4 Through October 11," *A Human Rights Watch Report,* vol. 12, no. 3(E), October 2000.

information is not available for two attacks. All of these groups carried out other attacks on Israeli civilians, including roadside shootings in the Occupied Territories and large-scale shooting attacks, such as that on the guests at a bat mitvah party in Hadera on January 18, 2002, in which six civilians were killed and more than thirty injured.

The pace of attacks ebbed and flowed, indicating that those responsible were able to exercise at least some degree of control. Some attacks were carried out after Israeli assassinations of prominent leaders of Palestinian political and armed groups. Others appeared to have been timed to disrupt actual or potential political negotiations internally or at the international level.

Initially, only Hamas and Islamic Jihad carried out suicide bombings; these peaked in late November/early December 2001, prior to a one-month truce observed by all factions. Beginning in mid-January 2002, the al-Aqsa Martyrs' Brigades, and in February 2002, the PFLP, also carried out suicide bombings against civilians. The involvement of the al-Aqsa Martyrs' Brigades marked a significant increase in the incidence of attacks. March 2002 was the bloodiest month to date; Palestinian suicide bomb attacks killed at least eighty Israeli civilians and wounded or maimed some 420.[8]

Prior to the outbreak of clashes in late September 2000, Palestinian public support for armed attacks against Israeli targets ranged from a low of 21 percent in March 1996 to more than 40 percent at various points in the 1997-2000 period. With the collapse of the Camp David talks in July 2000, support for militant actions increased.[9] A year later, and nine months into the current clashes, Palestinian researchers found that 92 percent of Palestinians supported

---

[8] Statistics on wounded are minimum estimates based on Israeli official information and press accounts from the time; when the authorities' and press accounts varied, Human Rights Watch used the lower figure. No breakdown on the proportion of civilian vs. military is available for the wounded.

[9] The July 27-29, 2000 public opinion survey by the Palestinian Center for Policy and Survey Research  showed an increase from the previous March from 44 to 52 percent of those who favored "violent confrontations" in the absence of an agreement on Palestinian statehood by the Oslo deadline of September 13, 2000. Palestinian Center for Policy and Survey Research, "Public Opinion Poll #1, Camp David Summit, Chances for Reconciliation and Lasting Peace, Violence and Confrontations, Hierarchies of Priorities, and Domestic Politics, 27-29 July 2000," www.pcpsr.org/survey/polls/2000/p1a, p. 4 (accessed August 29, 2002). In this and most other PCPSR polls, the questions did not distinguish between civilians or military targets. One poll that did, conducted in August-September 1995 by Palestinian Center for Policy and Survey Research, found that 70 percent of those questioned supported attacks on soldiers and settlers; 19 percent also favored attacks on residents of Israel and nearly 74 percent opposed such attacks. Palestinian Center for Policy and Survey Research "Public Opinion Poll # 19," http://www.pcpsr.org/survey/cprspolls/95/poll19a (accessed August 29, 2002).

armed confrontations against Israeli troops and 58 percent supported attacks against civilians inside Israel.[10] The same researchers found in a May 2002 survey that support for attacks against civilians in Israel had declined, but only to 52 percent.[11] Since May 2002, Palestinians have increasingly debated the use of suicide attacks against Israeli civilians, including the cumulative impact of such attacks on Palestinian society. (See below.)

**Previous Use of Suicide Attacks Against Civilians**

This is not the first time that Palestinian armed groups have used suicide bombings to target Israeli civilians, although the scale and intensity of the current wave of attacks is unprecedented. Between September 1993 and the outbreak of the latest clashes between Palestinians and Israelis in late September 2000, Palestinian groups carried out fourteen suicide bombing attacks against Israeli civilians, mostly in 1996-97, killing more than 120 and wounding over 550.[12] Hamas said it committed most of the attacks; Islamic Jihad claimed responsibility for the others.

The PA responded by detaining hundreds of Hamas and Islamic Jihad members and supporters, but they were not charged or brought to trial in connection with the bombings. Following these detentions, the bombings ceased. Many of the detainees, however, were released from PA custody once the clashes between Palestinians and Israelis resumed in September 2000.

---

[10] Palestinian Center for Policy and Survey Research, "Public Opinion Poll #2, The Mitchell Report, Cease Fire, and Return to Negotiations; Intifada and Armed Confrontations; Chances for Reconciliation; and, Internal Palestinian Conditions, 5-9 July 2001," www.pcpsr.org/survey/polls/2001/p2a (accessed August 29, 2002).

[11] Palestinian Center for Policy and Survey Research, "Public Opinion Poll #4, Palestinians Give Less Support For Bombings Inside Israel While Two Thirds Support The Saudi Plan And 91% Support Reforming The PA, But A Majority Opposes Arrests And Opposes The Agreements That Led To Ending The Siege On Arafat's Headquarter, Nativity Church, And Preventive Security Headquarter, 15-19 May 2002," at www.pcpsr.org/survey/polls/2002/p4a, p. 2 (accessed August 29, 2002). A different survey, by the Jerusalem Media and Communications Center in late May, indicated 68 percent (down from 72 percent) support for suicide bombings against civilians: Jerusalem Media and Communications Center, "JMCC Public Opinion Poll no. 45 - May 29- 31, June 1-2, 2002, On The Palestinian Attitudes Towards The Palestinian Situation in General" at http://www.jmcc.org/publicpoll/results/2002/index.htm (accessed August 29, 2002).

[12] Suicide bombing attacks against Israeli civilians in late February and early March 1996 killed fifty-six and injured more than 150. Five attacks in 1997 killed twenty-nine and wounded more than two hundred. The last suicide bombing prior to the current unrest was an attack in November 1998 that wounded twenty-four. There were no Palestinian suicide bomb attacks against civilians in 1999 or 2000.

Coincidentally or not, the new round of suicide bombings began within a few months, again under the auspices of Hamas and Islamic Jihad.

Various other groups around the world have also used suicide bombings to try to advance their political goals.[13] They include other Middle Eastern groups such as Hizbollah in Lebanon, which also attacked Israeli military targets and Israel's former proxy, the South Lebanese Army. But the group that has probably made greatest use of suicide bombings is the Tamil separatist group in Sri Lanka, the Liberation Tigers of Tamil Eelam (LTTE), commonly known as the "Tamil Tigers."[14] The Tamil Tigers committed numerous bombings during the 1980s and 1990s aimed at both military and civilian targets, including leading Sri Lankan government officials and politicians.

### Stated Rationales for Suicide Bombing Attacks

Fathi `Abd al-`Aziz al-Shikaki, one of Islamic Jihad's founders, was among the first to advocate openly the Palestinian use of bombing tactics against Israelis. In 1988, he publicly advocated a strategy of "exceptional" martyrdom according to which Palestinian militants would penetrate "enemy territory," that is, Israel, and set off explosions that the Israelis would be unable to prevent. According to al-Shikaki:

All these results can be achieved through the explosion, which forces the *mujahid* (struggler) not to waver, not to escape, to execute a successful explosion for religion and jihad, and to destroy the morale of the enemy and plant terror into the people.[15]

Within Hamas, Yahya `Ayyash, the organization's "master" bomb-maker, urged the leadership in the early 1990s to use "human bombs" as a way to "make the cost of the occupation that much more expensive in human lives, that

---

[13] For two discussions of suicide bombings more generally, see the essay by Navid Kermani ("A dynamite of the spirit: Why Nietzsche, not the Koran, is the key to understanding the suicide bombers,") in the *Times Literary Supplement* ( March 29, 2002, pp. 13-15) and the review by Walter Lacquer, "Life as a weapon," also in the *TLS* (September 6, 2002, pp. 3-4).

[14] According to one report, the Liberation Tigers of Tamil Eelam (LTTE) has "dispatched more suicide bombers than anyone in the world," carrying out 220 suicide bomb attacks (Celia W. Dugger, "After ferocious fighting, Sri Lanka struggles with peace," *New York Times*, April 8, 2002). An LTTE suicide bomber also killed Indian Prime Minister Rajiv Gandhi.

[15] Nasra Hassan, "An Arsenal of Believers," *New Yorker*, November 19, 2001.

16      Erased in a Moment: Suicide Bombing Attacks Against Israeli Civilians

much more unbearable."[16] `Ayyash was killed by Israeli forces on January 5, 1996. Hamas claimed at the time that three suicide bombing attacks against Israeli civilians in late February and early March 1996 were in retaliation for the killing of `Ayyash.[17]

Leaders of the perpetrator groups have openly acknowledged that they favor suicide bombings because such attacks have the potential to cause a large number of casualties. They include civilians as well as military targets, in gross breach of their obligations under international humanitarian law. "The main thing is to guarantee that a large number of the enemy will be affected," said one senior Hamas leader. "With an explosive belt or bag, the bomber has control over vision, location, and timing."[18] Such weapons use readily available materials and are relatively inexpensive to produce.

The perpetrator organizations have also sought to use the bombings to build publicity for their cause, to drum up new recruits for suicide missions, and to sow anxiety and terror among Israelis. Before sending bombers on their suicide missions, the sponsoring organizations frequently had them make video testimonies that were then distributed and publicized through the media. The organizers sought to portray the bombers as "martyrs"—that is, as heroes prepared to make the ultimate sacrifice in defense of their people. In the same vein, they sought to compensate the bombers' families by providing some financial support. (See Section VI, Structures and Strategies of the Perpetrator Organizations.) In this way, those responsible for the bombings aimed to build an aura around the bombers and to exploit their actions even after their deaths. In fact, many of the bombers may have been motivated by a sense of personal self-sacrifice. However, their targeting of civilians, often using perfidious methods, made them and their sponsors, criminals. Their actions and disregard for basic human rights has tainted and undermined the wider struggle for Palestinian human rights.

Some suicide bombers, especially those sponsored by Hamas or Islamic Jihad, have cited Islam to justify their actions. Toward the same end, these organizations have invoked Muslim scholars and, through them, authoritative religious texts. Other prominent Muslim clerics have spoken against this invocation of religion to promote nationalist political goals. For Hamas and Islamic Jihad, the stated goal is the creation of a Palestinian Islamist state

---

[16] Ibid.

[17] Another Hamas suicide bombing on February 25, 1996, killed one IDF soldier and wounded thirty-four.

[18] Hassan, "An Arsenal…," *New Yorker.*

comprising not only the West Bank and Gaza Strip, but also the entire territory over which Israel has held sovereignty since 1948. The PFLP also calls for a Palestinian state encompassing Israel, though not an Islamist one. By contrast, the nationalist agenda of the al-Aqsa Martyrs' Brigades calls for establishing Palestinian rule over the territories of the West Bank and Gaza Strip and for freeing those territories from Israeli military occupation.

**Victims**

One factor that makes suicide bombing particularly terrifying is the sense that there is no possible shelter. Suicide bombers have targeted shopping malls, popular cafes and restaurants, quiet religiously observant neighborhoods, and commuter buses. Their target is everyday life.

Moti Mizrachi, mentioned earlier, had been a regular at the Moment Café. On March 9, he had agreed to meet friends at the fashionable cafe, like many other nights. Because of the crowd, the owner initially refused them access to the inside area, so Mizrachi and his friend waited outside for their turn to get in. Mizrachi told Human Rights Watch:

> At some point the owner moved away, and I said, "I'll just go inside to see my friends and say hi." I went in, took three to four steps and then there was an explosion. I fell to the floor. After a few seconds, I woke up. Everything around was torn apart. There was blood, body parts, people, water squirting from the ceiling, maybe from a burst pipe. My left hand was cut off just above the wrist. It was attached to my arm by just a bit of flesh, hanging. I picked myself up to get help. I was bleeding heavily. I know that I needed someone to stop the bleeding. I caught my left hand with my right, but I slipped from all the mess on the floor.[19]

Daniel Turjeman, a twenty-six-year-old patron, had two friends who were already inside. He and two others managed to convince the guard to let them in. It was so crowded that Turjeman and one friend went back outside, where they met a girl they knew.

> We greeted each other, and she introduced me to her girlfriend.... Just at that moment my friend came out, and before we had time to exchange even a word, everything exploded. We flew twenty meters

---

[19] Human Rights Watch interview with Moti Mizrachi, age thirty-one, Jerusalem, June 23, 2002.

> from the blast, literally across the road, and fell onto the street. I lost consciousness and came to after a few minutes. There was screaming and ambulances. I felt that my arm was not connected to my body. It was barely connected to my shoulder. The friend who had invited me that evening came looking for me. He saw immediately that my arm was a mess. I also held one eye closed because it was full of metal. He asked me what was in his eye. I didn't want to tell him that his eye was hanging out, attached by just a few ligaments. It makes me sick to remember this.

> There was such chaos there, people who were not badly injured were just getting into their cars and driving away, as quickly as possible. I knew I had to move or be run over. I caught my left arm, with the help of my jacket, and started making my way towards the ambulances. I had use of only one eye and couldn't see much, so I just kept walking towards the red lights.[20]

Turjeman's injuries include the loss of the use of one arm, ruptured eardrums, and a scratched cornea. He is recovering from temporary waist-down paralysis caused by hemorrhaging of his spine, and hopes to regain the use of both legs.

> My friends who went out with me that night: one has a scratched cornea and is still full of shrapnel. He has pressure bandages for his arm, which was severely burned. He's suffering more than I am. My neighbor escaped without a scratch. My friend's two friends, one got a lot of nuts in his lower back, and was badly burned on his left side. The other fellow was killed. The girl who I spoke with outside had stepped into the bathroom at the time of the explosion, she survived. But the friend she introduced me to died.[21]

Efrat Ravid, age twenty, had been sitting at the bar at the Moment Café for two and a half hours when the explosion struck, shattering her thigh bone and causing a head injury. Unable to speak for a week after regaining consciousness, she now walks awkwardly with the aid of crutches. Her body is covered with scars. She doesn't smile.

---

[20] Human Rights Watch interview with Daniel Turjeman, age twenty-six, Jerusalem, June 23, 2002.

[21] Ibid.

We were at Moment for two and a half hours, sitting at the bar.
Suddenly I heard a tremendous explosion and immediately blacked
out. I must have blacked out from the pain, because my thighbone
was broken into smithereens, and a major artery was ruptured. I had a
serious head injury with hemorrhaging in the brain and stayed
unconscious for three days....

When I woke up I understood right away what had happened. I
couldn't talk at all then—for an entire week I couldn't talk, because
my head injury was at the front of my brain. I stayed in the hospital
for three months. My biggest fear was that they would amputate my
leg—there were so many people in that hospital with missing limbs.
They told me not to worry—they did an artery transplant, and said
that even if it got infected later, there'd be enough time to do surgery.
I've had ten operations since the attack. I also had a nail just a few
millimeters from my heart. I think: what would have happened if it
were just one millimeter over?

The friend I had been with was also injured—her intestines spilled
right out. We don't talk any more. It brings up too many bad
memories. The girl sitting on the other side of me—I didn't know
her—she was killed. My friends don't go out any more. They realized
when this happened to me; it could have been them. I had a lot of
fears in the beginning. I still don't watch the news. When I do hear
about an attack, it pinches me right in the heart. I know what it's like,
I was there.[22]

Frequently, several family members are victims of an attack. Olesya
Sorokin had immigrated to Israel in 2000 from Russia, with her husband and
child. Her excitement over her opportunities in Israel ended on May 18, 2001,
when a suicide bomber struck a shopping mall in Netanya.

My birthday had been on May 11, so we went to the mall to buy me a
present: me, [my husband], my six-year-old son Sasha, and my
friend Julia [Tritikov], my brother's girlfriend. I had only been there
once before. It was before noon. We were at the entrance to the mall
when there was a very loud "boom." I remember opening my eyes,

---

[22] Human Rights Watch interview with Efrat Ravid, age twenty, Ma'aleh Adumim, June
12, 2002.

> half conscious. A doctor was looking over me, staring at me with big,
> frightened eyes. That's what it's like in a terror attack—people are in
> shock. People are lying, wounded, all around. I saw bones protruding
> from my foot. I could hear nothing. I have holes in my eardrums from
> the explosion. When I remember these moments, I just cry.[23]

Sorokin's husband and friend were killed in the attack; her son's jaw was
broken, as was Sorokin's leg and jaw. Burns scarred her right arm, breast, and
face. "I couldn't look into the mirror for the longest time. I've had many
surgeries on my face—I don't go out because I'm not supposed to be in the sun,
and because I'm embarrassed."[24] She said to Human Rights Watch:

> What can I say. My soul is empty. I'm a widow at twenty-six. I have
> money now, from the Defense Ministry—an apartment …but I want
> to return everything and get my husband back. I have no happiness. I
> don't laugh with my son. We had such a good relationship, my
> husband and I. We had dreams. I met him when I was seventeen and
> he was twenty-five. When I try to remember the life that I once had, I
> can't believe that all this happened. Maybe I'm sleeping. Maybe it
> didn't happen. Now I have to deal with life, alone. I know, I'm
> young, and there's time, but my head is full.[25]

Even when multiple family members are not directly affected, the entire
family can be drawn into the tragic consequences. Clara Rosenberger, a seventy-
six-year-old woman, was injured by shrapnel during an attack at the Park Hotel
in Netanya during a Passover Seder on March 29, 2002. The friend she was with
was killed. The shrapnel severed Rosenberger's spinal cord, leaving her
bedridden; the blast also caused bleeding in her lungs and burst her eardrums.
When Human Rights Watch saw her in the hospital, she barely communicated,
sunken into her own world.[26] Her daughter described the impact it had had on
her family.

---

[23] Human Rights Watch interview with Olesya Sorokin, age twenty-seven, Rishon Le
Tzion, June 14, 2002.

[24] Ibid.

[25] Ibid.

[26] Human Rights Watch visits to Clara Rosenberger, Jerusalem, June 13, 2002 and June
23, 2002.

> When she was first hospitalized, we were in the hospital day and
> night. That's something you don't hear about terror attacks. The
> victim's entire family becomes devoted exclusively to caring for the
> wounded. We were all involved—my brother, my children, my
> nieces and nephews, and me. The first hospital she was taken to was
> in Hadera, several hours north, and not where we live. Early on, her
> mental state deteriorated and she was transferred to a psychiatric
> hospital…. She's now in rehabilitation [in Jerusalem], but she still
> doesn't communicate much with visitors—doesn't read, or watch
> TV…. My children have been extremely helpful, but it is difficult for
> them to handle this and she's not easy to help. She cannot thank
> them, barely recognizes them. Her former life is over and her present
> life, she doesn't want it. It hurts so much—if only we could help her
> find something that gave her meaning.[27]

Clara Rosenberger had survived three and a half years as a prisoner in
Auschwitz. Surviving members of the family split up, and Rosenberger came to
Israel in 1947 as a war refugee. Her daughter told Human Rights Watch about
Rosenberger's life and how it had been changed.

> She was involved in all kinds of senior citizen's activities…. Now
> she is very dependent. She has no strength to deal with it—it was
> punishment enough that her life, with its tragedies, was as it was. She
> can't sit up because she is paralyzed from the underarms down, so
> she has no chest muscles. From the first moment we spoke after the
> attack, she said, "What happened to me was the very thing I did not
> want to happen to me, to be a burden on others." She won't ever be
> able to return home, she won't be able to live in her room…. Last
> week she was working on bringing a cup to her lips without it
> spilling. From total independence to this.[28]

By targeting public places, suicide bombings affect all sectors of Israeli
society, not only Israeli Jews. Lin Jin Mou was a Chinese construction worker
who came to Israel on a legal visa, supporting a family at home with his modest
income. On April 12, 2002, he was boarding a bus with three friends at the
Mahane Yehuda open-air market in Jerusalem when a suicide bomber blew up

---

[27] Human Rights Watch interview with Rachel Klirs, daughter of Clara Rosenberger,
Jerusalem, July 2, 2002.

[28] Ibid.

the bus. Ben Tsion Maltabashi, a sixty-five-year-old man whose leg had to be amputated, was also there and described what happened:

> There are a lot of buses that come to that stop: the 27, 13, 11, 39, and others. I saw [my bus] and thought, "Great, I'll go right home." There was a line onto the bus. I stood in line—there were tons of people. Everyone was going home on account of the Sabbath. One got on, then another, then another, and then "boom." As if the entire roof fell on my head.[29]

Lin lost his left arm and his left leg, which was amputated because of severe burns. Two of his friends who had already boarded were among the six killed in that attack.[30]

Sabrina Belhadev, a French citizen in Israel on a study-abroad program, was visiting Jerusalem with friends for a weekend on December 1, 2001, when two Palestinians blew themselves up moments apart near a row of packed cafés on Jerusalem's Ben Yehuda pedestrian mall, killing ten and wounding more than 170.

> I didn't understand what happened. Everyone was screaming, 'Run, run—there may be another bomber here,' but I didn't have the strength. There was an enormous confusion and mess. Chairs and tables were strewn everywhere. Everyone was crying. There was someone I saw passed out in a chair, and there was blood coming out of his head; I think he was dead. And people drenched in blood.[31]

Belhadev's friend, Eva Krief, a fellow French student on the study-abroad program, escaped the suicide bombing attacks inside the café, but was injured by a car bomb when she tried to leave the scene. "A few minutes after [Sabrina] entered the café, there was an explosion. It felt like an earthquake. It wasn't that the noise was so loud—just the destruction. I was stunned. I forgot about my friends. I didn't understand what had happened at all." Krief walked another

---

[29] Human Rights Watch interview with Ben Tsion Maltabashi, age sixty-five, Jerusalem, June 13, 2002.

[30] Human Rights Watch interview with Li Yuan Wong, age twenty-eight, assistant to Lin Jin Mou, age forty-one, Jerusalem, June 23, 2002.

[31] Human Rights Watch interview with Sabrina Belhadev, age twenty, Jerusalem, June 17, 2002.

friend, who had a head wound, to an ambulance and met a third friend, who suggested going back to the dormitory.

> So we decided to go up a side street—HaRav Kook. On our way up the street, a car bomb exploded from a parking space off the side. I was struck in the leg—not by shrapnel, but some other flying object—and in my left eye. My hair was also quite singed, though I only noticed this later. Everything was hot, hot.[32]

Krief permanently lost the sight in her left eye. "I am quite afraid now," she said. She explained to Human Rights Watch:

> It began in the hospital—every slamming door, every noise scared me. I'm slowly getting back to life, but it's been very hard. I'm afraid of going on the bus, afraid of going out. When I hear about attacks every few days, on the news... everything comes back. It's one thing if you're in an attack, and you recuperate, and there are no more. But they keep happening.[33]

Krief said that she had previously been undecided about whether she might stay in Israel or return to France. "Since my injury it is clear to me that I have to stay here. I can't say why, but due to what has happened, this is my place, more than ever."[34]

Palestinian Arab citizens of Israel have also been victims of bomb attacks. Hussam Abu Hussein had taken his sixteen-month-old daughter to Hadera for an outing on November 22, 2000.

> When we arrived, she started asking for pizza. She likes to eat it with ketchup—more for the fun than for the flavor. I took her to a pizza place where I know the owners.... I was sitting in the pizzeria—my daughter was in my arms. Suddenly, I found myself somewhere and the child was somewhere else. I thought a gas balloon had blown up. Everywhere was filled with dark smoke. I tasted something bad in my mouth. Thick smoke. The smell of burning flesh in my mouth. I

---

[32] Human Rights Watch interview with Eva Krief, age twenty, Jerusalem, July 5, 2002.

[33] Ibid.

[34] Ibid.