# EXHIBIT A.496

PLAINTIFF'S
EXHIBIT
496

Report Pursuant to Title VIII of Public Law 101-246
Foreign Relations Authorization Act
for Fiscal Year 1990-91, As Amended

This report is submitted in accordance with Title VIII of Public Law 101-246 (the PLO Commitments Compliance Act of 1989 - PLOCCA), as amended. It covers the period from December 16, 2001 to June 15, 2002 and is consistent with Section 566 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 2002. Events occurring after June 15, 2002 will be covered in the next report.

This report describes actions and statements of the Palestine Liberation Organization (PLO) and, as relevant, the performance of the Palestinian Authority (PA) with respect to commitments set forth in Chairman Arafat's September 9, 1993, letters to Israeli Prime Minister Rabin and Norwegian Foreign Minister Holst and to those contained in, and resulting from, the good faith implementation of the Declaration of Principles (DOP). Under the commitments in these letters and accords, the PLO, inter alia, (1) recognizes Israel's right to exist in peace and security; (2) accepts UN Security Council Resolutions 242 and 338; (3) commits itself to the Middle East peace process and to a peaceful resolution of its conflict with Israel; (4) undertakes to submit to the Palestine National Council (PNC) changes to the PLO Covenant necessary to eliminate articles that deny Israel's right to exist; (5) renounces the use of terrorism and other acts of violence, confirms that it will call on Palestinians in the West Bank and Gaza Strip to refrain from violence, and assumes responsibility over all PLO elements and personnel to assure their compliance, prevent violations and discipline violators; and (6) agrees to strengthen cooperation with Israel on a wide range of security issues. The Wye River Memorandum of October 23, 1998, signed by Prime Minister Netanyahu and Chairman Arafat, further detailed both parties' commitments related to the 1995 Interim Agreement, including Palestinian obligations regarding security cooperation and revision of the PLO Charter. In the Sharm el-Sheikh Memorandum of September 4, 1999, signed by Prime Minister Barak and Chairman Arafat, both sides reiterated their commitment to implement the obligations emanating from the Wye River Memorandum, and further undertook to ensure the effective handling of any incident involving a threat or act of terrorism. This specifically included cooperating in the exchange of information, coordinating policies, and taking

-2-

measures to prevent an act of terrorism, violence or incitement.

## Overview of the Reporting Period

The sustained violence between Israelis and Palestinians, which broke out on September 28, 2000, intensified during this reporting period. According to statistics maintained by the U.S. Government, between December 16, 2001 and June 15, 2002, 179 Israelis, including 151 civilians and 28 IDF members, were killed and 1165 Israelis, including 66 IDF members and 1016 civilians, were wounded in violent incidents. During the same period, 679 Palestinians were killed and 1514 were wounded.

Terrorist groups including Hamas, Palestinian Islamic Jihad (PIJ), the Popular Front for the Liberation of Palestine (PFLP) and the Al Aqsa Martyrs Brigades (AAMB) continued to be very active during the reporting period. These groups utilized a variety of terrorist tactics, including suicide bombs, pipe bombs, mortar attacks, roadside bombings and ambushes, drive-by shootings, and shooting at Israeli homes and military and civilian vehicles.

There were numerous major suicide bombings during the reporting period, including a March 27 bombing at a Passover celebration in Netanya that killed 29, and a March 31 bombing of a restaurant in Haifa that killed 14. A May 15 attack at a pool hall in Rishon Letzion killed 15. Hamas claimed responsibility for each of these attacks, and several others. A bombing March 2 that killed nine Israelis and injured 51 in Jerusalem was claimed by the Al-Aqsa Martyrs Brigades. Another bombing in Jerusalem on April 12 which killed 6 was also claimed by AAMB. An Islamic Jihad suicide bomber killed 17 Israelis on a bus in Northern Israel on June 5. There were numerous shooting attacks directed against Israeli civilians and security forces, both inside Israel and in West Bank and Gaza settlements. At the same time, Israel increased the scope and duration of its incursions into Palestinian-controlled territory, mostly on the West Bank. Overall, the period was marked by a near-constant high level of violence.

This report adheres to the requirements of the PLO Commitments and Compliance Act of 1989 and will therefore not address Israel's compliance with its commitments under Oslo and other agreements. Specifically, it will concentrate on Palestinian performance with respect to the following specific commitments:

-3-

(1) to recognize Israel's right to exist in peace and security;

(2) to accept UN Security Council Resolutions 242 and 338;

(3) to commit itself to the Middle East peace process and to a peaceful resolution of its conflict with Israel;

(4) to undertake to submit to the Palestine National Council (PNC) changes to the PLO Covenant necessary to eliminate articles that deny Israel's right to exist;

(5) to renounce the use of terrorism and other acts of violence, call on Palestinians in the West Bank and Gaza to refrain from violence, and assume responsibility over all PLO elements and personnel to assure their compliance, prevent violations and discipline violators; and

(6) to strengthen cooperation with Israel on a wide range of security issues.

The Palestinians' record regarding these commitments during the reporting period is mixed at best, with specific serious concerns about their commitment to renounce the use of terrorism and violence, assume responsibility for all PLO elements, and discipline violators. The renunciation of violence and the pursuit of a negotiated solution to the conflict between Israel and the Palestinians have remained the official policy of both the PLO and the PA, although their actions often called into question their commitment to these policies. The PLO has continued to stand by the recognition of Israel's right to exist in peace and security, acceptance of Security Council Resolutions 242 and 338, and commitment to the peace process, as contained in Chairman Arafat's letter of September 9, 1993 to former Israeli Prime Minister Rabin. PLO or PA figures implicated in the violence have said that their objective was to force an Israeli withdrawal from the West Bank, Gaza, and East Jerusalem, not the destruction of Israel.

At the same time, available evidence indicates that elements with varying degrees of affiliation with the PLO, specifically the Al Aqsa Martyrs Brigade, Tanzim, and members of other security forces, were frequently involved in acts of violence against Israelis. The Al Aqsa Martyrs

Brigades' use of terror intensified during the reporting period. While there is no conclusive evidence that these groups carried out specific attacks with the prior approval and encouragement of the PLO and PA leaderships, it is clear that these armed elements were not disciplined. The PA and PLO senior leadership made only sporadic and ineffective efforts to issue clear instructions to refrain from violence or to assume responsibility over violent elements. Moreover, some senior PLO and PA leaders did little to prevent - and in some cases encouraged - acts of violence and an atmosphere of incitement to violence in the Palestinian media and through the public statements of Palestinian officials.

PLO Involvement in Violence

The renunciation of terrorism and violence remained the Palestinian leadership's official policy. However, they failed to consistently and effectively call on Palestinians to refrain from violence, did not assume responsibility over PLO elements and personnel to assure their compliance, and did not make a consistent effort to discipline PA and PLO officials who instigated or engaged in violence. In addition, senior PLO officials were involved in smuggling large quantities of weapons and explosives into the Occupied Territories, in violation of their Oslo commitments.

There is no conclusive evidence that the senior leaderships of the PA or PLO were involved in planning or approving specific acts of violence. However, some leaders of Palestinian security forces were involved in planning and/or supporting violent attacks on Israelis. Further, during this reporting period some high level PA and PLO officials were involved in the smuggling of more sophisticated weapons into the West Bank and Gaza. Most notably, senior PLO official Fuad Shubaki was implicated in directing an attempt to smuggle a large shipment of firearms, ammunition, rockets, and explosives into Gaza aboard the Karine A, which was seized by Israeli forces in January. Shubaki and other PA officials involved work very closely with PA Chairman Arafat, raising serious questions of his involvement and foreknowledge. In the wake of the Karine A incident, Arafat declared that the operation was in contravention of PA policy and acknowledged his responsibility as PLO and PA leader for the acts of his subordinates. On Arafat's orders, Shubaki was arrested, and arrest warrants were issued for other PA officials still at large outside the West Bank and Gaza. Shubaki is currently under custody in Jericho at a Palestinian prison facility monitored by UK and U.S. observers. Also imprisoned in

Jericho are four Popular Front for the Liberation of Palestine (PFLP) operatives convicted by a PA court of involvement in the assassination of Israeli Tourism Minister Rehavam Zeevi last year. PFLP chief Ahmed Sa'adat is also in custody, though as yet he has not faced charges.

There is evidence that PA and PLO officials have fomented violence on some occasions, while at some other times they worked to bring it under control. Documents seized by the Israeli Defense Forces during incursions into Palestinian-controlled areas in March and April show direct payments from the PA to Fatah party activists, some of whom were also affiliated with the Al-Aqsa Martyrs Brigade, who had been involved in violence. The payments were likely made with the knowledge that the intended recipients had been involved in violence and terrorism. While the documents show a close connection between the PA and these groups, and in some cases are signed by PLO Chairman Arafat, they do not conclusively establish that Arafat ordered or had foreknowledge of specific attacks.

The PA leadership and PLO Chairman Arafat on numerous occasions during the reporting period condemned acts of violence and terror. On December 16, following a bloody two-week period of suicide attacks that killed and injured dozens of Israelis, Arafat announced on Palestinian television a "complete and immediate" halt to all "armed operations" including "suicide operations" and mortar attacks, with the aim of implementing the Tenet security work plan and Mitchell Committee recommendations. The speech was followed by several weeks of relative quiet, during which the PA arrested 15 members of the Palestinian security services for involvement in violent attacks, and closed some Hamas and Islamic Jihad offices in the West Bank. However, this period also saw the seizure of the Karine A, a ship chartered by senior PLO and PA officials, carrying a large quantity of sophisticated armaments originating in Iran for apparent delivery in Gaza. By mid-January, the relative quiet had broken down in a series of Palestinian attacks and Israeli reprisals, including the targeted killings of Palestinian militants. On January 18 a Palestinian gunman opened fire on a Bar Mitzvah celebration in the Israeli town of Hadera, killing 6 and injuring 30. The Al-Aqsa Martyrs Brigade claimed credit for the operation that they said came in response to the IDF's targeted killing of a leading AAMB figure the previous week. Arafat publicly declared ceasefires, and routinely condemned terror attacks during the reporting period. On May 8, following a bomb attack on a pool hall in Rishon Letzion, the PA leadership issued a statement condemning the attack and

announcing "deterrent measures" to be taken against militant groups that carry out such attacks. Arafat issued a statement under his own name announcing he had given orders to "confront and prevent any terrorist attacks against Israeli civilians from any Palestinian party." PA security services reportedly arrested 15 Hamas activists in the wake of the attack. Just after the end of the reporting period, on June 18 and 19, two suicide bombers killed 26 Israelis in Jerusalem. Hamas and the Al Aqsa Martyrs Brigade claimed responsibility. On June 19, Arafat issued a statement declaring "my absolute condemnation of all operations targeting Israeli civilians. Such operations are not related to our legitimate right to resistance..."

During the reporting period the PLO did not abide in a consistent or effective manner by its commitment to "call on Palestinians to refrain from violence." PA actions and rhetoric in many important respects at least tolerated an atmosphere that promoted or supported the use of violence. Some programs broadcast on the PA and PLO-controlled or influenced mass media had the effect of inciting Palestinians to violence. For example, some Palestinian TV and radio broadcasts were accused of glorifying martyrdom and legitimizing the use of violence. PA statements and actions against terrorism, outside of the brief period following Arafat's December 16 speech, were largely ineffective. In many cases, PA actions and rhetoric sent mixed signals. In January and February, the PA arrested PFLP leader Ahmed Sa'adat and four PFLP operatives suspected in the October 17, 2001 assassination of Israeli tourism minister Rehavam Zeevi. However, the PA continued to recognize a distinct "military wing" and "political wing" of the PFLP, and shortly after the end of the reporting period, condemned an EU decision to designate the PFLP a terrorist organization, saying the PFLP was "committed to the principles of the PLO." PA officials recognized this distinction with other terrorist groups as well. In early June, Arafat invited Hamas and Islamic Jihad to join his new government, though he never seriously pursued this option and neither group joined the revised cabinet.

Following an escalating series of suicide bombing and shooting attacks in February and March, culminating in the March 27 Passover bombing in Netanya that killed 29 Israelis, the IDF undertook extensive military incursions into PA-controlled areas. During these incursions, the PA security forces in the West Bank were severely damaged, both in manpower and equipment. The headquarters of the PA's principal security service in the West Bank was destroyed by the IDF. The IDF at the time said there were individuals in

the headquarters wanted in connection with terrorism. As a result of these events, the PA security services' capacity combat terror and violence, while never exercised adequately since the outbreak of the intifada, is now very significantly diminished. While PA capabilities in Gaza were not affected as significantly, they were not deployed consistently and effectively against terrorism during the reporting period.

The PLO did not abide in a clear and sustained manner by its commitment to "assume responsibility over all PLO elements and personnel to assure their compliance, prevent violations and discipline violators." It was clear that some members of the PA security forces and Chairman Arafat's Fatah faction within the PLO were deeply involved in the violence. The Al-Aqsa Martyrs Brigade, self-designated cells of largely young militants from refugee camps, emerged as a leading cause of increasing terror attacks in the West Bank and in Israel. Members of AAMB are drawn largely from grass roots Fatah Tanzim. During the reporting period, the Al-Aqsa Martyrs Brigade increasingly used suicide bombs, to enormously destructive effect. On March 26, the Secretary of State designated the Al-Aqsa Martyrs Brigade as a Foreign Terrorist Organization. Although the PA made some rhetorical calls to suppress attacks from this group, those efforts were neither serious nor sustained. Members of Fatah's "Tanzim," a term used for street-level Fatah activists, also were involved in a significant number of attacks. In previous reporting periods, there was evidence that members of the Presidential Security Force (Force 17) were involved in violent attacks, in some cases in coordination with other Fatah-affiliated groups or with Hamas or Palestinian Islamic Jihad. There have been fewer such reports in during this reporting period. Some mid-level PA and Fatah officials, including those associated with the Tanzim, have publicly advocated violence.

While there is no conclusive evidence that Chairman Arafat or the senior PA or PLO leadership approved or had advance knowledge of planned attacks, they clearly knew that Al-Aqsa Martyrs Brigades, and elements of Tanzim and the Palestinian security forces were involved in the violence and they did not take effective or sustained action to rein them in. As noted previously, a very limited number of PA security forces were reportedly arrested in December following PLO Chairman Arafat's declaration of a cease-fire

## Security Cooperation

The ongoing violence has had a profoundly negative effect on the PLO's carrying out its commitment to "strengthen cooperation with Israel on a wide range of security issues." There were a number of high-level meetings between Israeli and Palestinian security officials during the reporting period, as well as trilateral meetings that included U.S. participation. These took place particularly during the visits of U.S. Senior Advisor Gen. Anthony Zinni in December and March. However, the extensive working level contacts maintained prior to the outbreak of violence were sporadic and ineffective during the reporting period.

During the visits of General Zinni, the Palestinians reiterated their desire to resume security cooperation via implementation of the security workplan negotiated by DCI George Tenet in June 2001 and the security recommendations of the Mitchell Committee report. However, the two sides were unable to agree on the timing and sequence of steps required under those documents. Following the March and April IDF operations in the West Bank, the PA security forces ability to resume regular security cooperation is significantly diminished. Many PA security facilities and much of their equipment and weaponry have been destroyed or confiscated. Hundreds of PA forces were arrested during the operations, and many remained in IDF custody during the reporting period. As noted above, the PA has reported some arrests of Hamas and Islamic Jihad militants, and PA security personnel it says were involved in violent attacks. In April, Israeli and Palestinian negotiators reached an agreement whereby five PFLP members wanted for involvement in the assassination of Tourism Minister Zeevi, along with PLO official Fuad Shubaki, wanted for involvement in the Karine A smuggling incident, would be removed from Arafat's headquarters in Ramallah and kept under PA custody in Jericho with U.S. and UK monitors. As a result, IDF forces agreed to withdraw from Ramallah. The six prisoners remained in PA custody at the end of the reporting period.

## PLO Charter

As mentioned in previous reports, the PLO convened its Executive Committee and the Palestinian Central Council to reaffirm the letter of January 22, 1998, from Chairman Arafat to former President Clinton concerning the nullification of the PLO Charter provisions that are inconsistent with the letters exchanged between the PLO and the Government of Israel on September 9-10, 1993. The

Israeli government's position continues to be that the Palestinians have met their obligations concerning the revision of the PLO Charter.

### Arab League Boycott of Israel

As previously reported the PLO reiterated its stand against the Arab boycott of Israel when it signed the September 28, 1995, Joint Declaration of the Washington Summit which called, inter alia, for an end to the boycott as soon as possible. Additionally, senior Palestinian Authority economic and trade official Ahmed Quray (now Speaker of the Palestinian Council) made the following commitment in an October 17, 1996, letter to then U.S. Trade Representative Mickey Kantor: "The PLO and the Palestinian Authority and its successors will support all efforts to end the boycott of Israel and will not enforce any elements of the boycott within the West Bank and Gaza Strip." That remains the Palestinian position on the Arab boycott, although in practice the PA has occasionally tried to prevent the entry of Israeli goods into the Gaza Strip in response to Israeli blocking of Palestinian exports.

### Status of the PLO Office

The State Department's Office of Foreign Missions designated the PLO office in Washington a "foreign mission" under the Foreign Missions Act on June 21, 1994, to provide a statutory basis for regulating the office. The designation was published in the Federal Register on July 20, 1994. The PLO office and personnel are not accorded diplomatic status, privileges or immunities. The office may not portray itself as a diplomatic mission or embassy, but may portray itself as representing the PLO. Office personnel support U.S. travel by members of the PLO and the Palestinian Authority and have testified before Congress and participated in discussions with U.S. Government officials and in numerous meetings and media events. Mr. Hassan Abdel Rahman currently heads the office.

On April 15, 2002, President Bush exercised his authority to permit the PLO Office to remain open for an additional six months.

### Assistance to Palestinians

The United States has continued to work with the international donor community to meet the humanitarian and developmental needs of the Palestinian people. The United States provides no programmatic funds to the Palestinian

10

Authority, Palestinian Legislative Council, PLO, or to any international funds established to contribute money directly to these entities. U.S. foreign assistance to the West Bank and Gaza funds contractors and non-governmental organizations hired to carry out specific projects, and these organizations are carefully audited by USAID. Furthermore, USAID vets all Palestinian NGOs that are the recipients of funds to ensure that there are no links to terrorist organizations or to organizations that advocate or practice violence. In some cases -- primarily related to water projects -- equipment, materials, and infrastructure developed by these contractors and NGOs have been turned over to PA agencies or instrumentalities.

The U.S. Agency for International Development continues to implement scrupulously its procedures for the monitoring and supervision of activities performed by USG-funded non-governmental organizations and contractors to ensure that funds are only used for their intended purposes. The Secretary of State has certified, in accordance with Section 571 of the FY 2002 Foreign Operations, Export Financing and Related Programs Appropriations Act, that procedures have been established to assure that the Comptroller General will have access to appropriate U.S. financial information in order to review the uses of United States assistance for the ESF Program for the West Bank and Gaza.

The United States had been actively engaged, together with other donors, in supporting ongoing efforts to reform Palestinian public institutions and increase the accountability of the Palestinian Authority and its financial operations.

OTHER PLOCCA ISSUES

The PLO Commitments Compliance Act also calls for information the following issues:

- On June 3, 1998, FBI agents arrested Muhammad Rashid. He is currently being prosecuted in the U.S. District Court for the District of Columbia for the August 11, 1982 bombing of a Pan Am flight from Tokyo to Honolulu. The parties currently are waiting for a trial date to be set by the court.

- As reported in previous reports there are no U.S. criminal charges against Abu Abbas and the Israeli government has announced that it has no plans to seek his arrest. There were no further developments during the reporting period.

- Regarding the issue of PLO compensation to American citizen victims of PLO terrorism, the PLO, among others, was sued in Federal District Court in Rhode Island in connection with a 1996 drive-by shooting in Israel in which American citizen Yaron Ungar was killed and two other Americans injured. One of the suspects in that shooting is in Palestinian custody and four are in Israeli custody. The State Department is not a participant in these legal proceedings and is not in a position to address the positions of any of the parties to the suit. The State Department was also not a participant in the Klinghoffer family's litigation and has no information on the terms of the 1997 settlement. At this time, the State Department does not have information available on any other recent compensation claims against the PLO by or on behalf of American victims of terrorism.

- Issues relating to the Hawari group were reported in the January 1994 report. We have no further information.

Prior to the second Intifada, the PLO agreed to cooperate with our requests for information available to them that could shed light on the status of U.S. nationals known to have been held by the PLO or factions thereof in the past. Currently, we do not have an ongoing relationship with the PLO on these matters.

Unilateral Declaration of Palestinian Statehood

In the Interim Agreement, both Israel and the PLO agreed that, "Neither side shall initiate or take any step that will change the status of the West Bank and the Gaza Strip pending the outcome of the permanent status negotiations." The Wye River Memorandum states "neither side shall initiate or take any step that will change the status of the West Bank and the Gaza Strip in accordance with the Interim Agreement." The sides reiterated that commitment in the Sharm el-Sheikh Memorandum. In the trilateral statement issued after the Camp David summit, the two leaders agreed to a set of principles to guide their negotiations. Point four of that statement says, "the two sides understand the importance of avoiding unilateral actions that prejudge the outcome of negotiations and that their differences will be resolved only by good faith negotiations." On September 11, 2000, the Palestinian National Council (PNC) decided to defer declaring statehood and agreed to meet again on November 15. On November 15 the PNC, citing Israeli restrictions on travel within the West

Bank and Gaza and the ongoing violence, announced that its meeting had been postponed. There was no further official action by the PLO or PA toward a unilateral declaration during the reporting period.

## Agreements Signed by the PLO

We have no evidence the PLO has signed any agreements for the benefit of the PA not within the areas allowed in its agreements with Israel (economic agreements, agreements with donor countries for the purpose of implementing arrangements for the provision of assistance to the Council, agreements for the purpose of implementing the regional development plans, and cultural, scientific, and educational agreements). We also have not seen any evidence that Palestinian offices abroad issue Palestinian passports or other Palestinian travel documents.

## PA Offices Outside Its Jurisdiction

Under Israeli-Palestinian agreements, the Palestinian Authority may only maintain offices in the areas under its territorial jurisdiction, which do not include Jerusalem. In response to Israeli complaints in previous years, the Palestinians moved several institutions -- including the Vocational Training Center, the Mapping and Geography Department, the Central Bureau of Statistics, the Palestinian Broadcasting Corporation, Institute for Professional Training, the Society for Development and Welfare of Jerusalem and the Youth and Sports Department -- out of Jerusalem, mostly to Ramallah. The PA produced written declarations that offices that remained in Jerusalem did not carry out functions for the PA. Israeli officials welcomed these moves and allowed the offices to remain open. On April 5, 1999, Israeli police distributed orders to close three offices in the Orient House building in East Jerusalem. A court order suspended implementation of the closure acts, and the two sides conducted some discussions to try to reach a solution out of court. The Israeli government had until August 9, 2001 effectively suspended those efforts. However, on August 9, following a suicide bomb attack at a pizzeria in Jerusalem that killed 14 Israelis and wounded 140 more, the Israeli government seized and shut down Palestinian offices at Orient House and several other locations in East Jerusalem. Israel later claimed documents found at Orient House and elsewhere showed unauthorized PA activity was carried out at these locations, a charge the Palestinians denied.

One of the obstacles to more democratic Palestinian institutions is the weakness of the Palestinian Legislative Council (PLC) as an institution providing oversight and checks on the executive. USAID's Democracy and Governance program has in the past provided assistance to the PLC to enhance its ability to act as a legislative body. The U.S. will be looking for ways to increase the effectiveness of the PLC in support of Palestinian efforts to reform PA institutions.