# EXHIBIT A.521
## (3 of 17)

On the surface, then, permeability could foster economic viability and political legitimacy at the cost of security. Of course, it is not that simple. Better economic and political conditions, thanks in part to permeability, could enhance stability and increase Palestinians' stake in security. On the other hand, sealing off Palestine from Israel will substantially reduce but probably not eliminate suicide attacks or other terrorist threats against Israeli civilians altogether.

In sum, permeability is basic to economic and political viability, as well as to long-term security. But it raises major security issues. If Israel itself deals with the dangers inherent in permeable borders, the potential for conflict would be high. If Israel is to be convinced to entrust others with responsibility for the security of permeable Israeli-Palestinian borders, the demands on the United States and its partners could be substantial and long lasting.

### Contiguity

Palestinian political legitimacy and economic viability will depend on contiguity of land no less than and perhaps more than on the permeability of its borders. A Palestine of enclaves is likely to fail. Moreover, political and social development requires that Palestinians be free to move within and among Palestinian territories (e.g., between the West Bank and Gaza). Successful economic development further requires that movement of goods within and among Palestinian territories be as free as possible.

This study concludes that none of the major conditions of success—security, political legitimacy, economic viability, social welfare—can be realized unless Palestinian territory is substantially contiguous. In a territorially noncontiguous state, economic growth would be adversely affected, resulting in poverty that would aggravate political discontent and create a situation where maintaining security would be very difficult if not impossible. In any case, a Palestine divided into several or many parts would present its government with a complex security challenge since a noncontiguous state would hamper law enforcement coordination; require duplicative and, therefore, expensive capabilities; risk spawning rivalries among security officials, as happened between Gaza and the West Bank under the PA; and result in immense operational security problems. Even the most challenging peacekeeping experiences—Cyprus, Bosnia, and Kosovo—might seem easy by comparison.

### Security

We explicitly describe options for structuring internal security arrangements in a subsequent chapter of this book. Here, we provide a brief overview of options facing an independent Palestinian state, Israel, and the international community.

Security is a precondition for successful establishment and development of all other aspects of a Palestinian state. The challenge is how to ensure security in order to advance Palestine's economic and political goals while recognizing that extreme security measures inhibit political and economic development.

One critical dimension of security is the trust of Palestinian citizens in the stability of their new state. They must be confident that they live under the rule of law. In our analysis, we explore how to build a judicial and police system on which citizens can rely for safety and equitable treatment.

The other key dimension of security for a new Palestinian state will be protection against political violence. Various groups may reject the validity of the accord with Israel and continue to try to attack Israel to undermine the peace agreement and the Palestinian government that agreed to it. Such groups might also rekindle internal violence. It is to address these possibilities that we will examine external security issues in a forthcoming volume.

Accordingly, we explore how the United States and other countries might reorganize, train, equip, and directly support an internal security force that could defeat challenges to the new state's authorities without resorting to repressive methods.

## Estimating the Costs of Success

This book differs from other studies of Palestinian state building because we have estimated the costs of developing institutions for some of the areas we examine. Below we describe the estimating approaches we used. We emphasize that the estimates are approximations; with better data and more clarity about the approaches to be taken, the estimates can be improved. Furthermore, our analysis could not cover all relevant sectors of a Palestinian state. Some important development areas, such as transportation and energy, were outside the scope of the volume but will certainly require considerable resources in their own right. (Some of these issues are discussed at a community level in a forthcoming RAND publication.[10])

RAND has an extensive history of estimating the costs of both U.S. and non-U.S. defense and nondefense projects and, in the process, has developed some of the basic tools and approaches used in creating cost estimates.[11] There are three primary ways in which cost estimating is done, which we refer to as "bottom-up," "parametric," and

---

[10] Suisman et al., 2005.

[11] Much of RAND's research on cost has been undertaken for military weapons systems. See, for example, Harold Asher, *Cost-Quantity Relationships in the Airframe Industry,* R-291, 1956; Brent D. Bradley, R. E. Clapp, and R. L. Petruschell, *A New Cost Model to Support Air Force Long-Range Planning,* P-3133, 1965; David Novick, *Beginning of Military Cost Analysis, 1950–1961,* P-7425, 1988; Ronald W. Hess and H. P. Romanoff, *Aircraft Airframe Cost Estimating Relationships: Study Approach and Conclusions,* R-3255-AF, 1987. RAND has also conducted a great deal of research using cost analysis techniques to estimate the costs for a wide range of civilian projects. See, for example, Edward W. Merrow, Lorraine McDonnell, and R. Y. Argüden, *Understanding the Outcomes of Mega-Projects: A Quantitative Analysis of Very Large Civilian Projects,* R-3560-PSSP, 1988; Bridger M. Mitchell, *Incremental Capital Costs of Telephone Access and Local Use,* R-3764-ICTF, 1989; Craig B. Foch, *The Costs, Effects, and Benefits of Preventive Dental Care: A Literature Review,* N-1732-RWJF, 1981; John L. Birkler and William Micklish, *Comparing Project Investment Costs: A Methodology and Baseline for the Refining Industry,* N-2389-PSSP, 1986.

"analogy." The three methodologies have different levels of data requirements and are appropriate in different situations; all three methods have been used in this book. A brief discussion of the three methods helps to illuminate the complexities of developing cost estimates for this analysis.

Bottom-up estimating involves identifying all of the individual items involved in a project, which are then summed to produce a final estimate for the entire project. Bottom-up estimating for social programs can be an extremely costly process and requires a great deal of research and robust data. For example, in the field of education, bottom-up estimating would ideally start with a needs assessment. Analysts could determine the educational goals of the state, the desired level of education and the fields of study, and the number of students who will need schooling over the next few decades. The next step would be to determine existing current assets and identify any additional assets that would be needed. Data might include the number of existing schools, their physical condition, and the number of students they can serve. Insight would be needed about the number of available teachers, their training, and ways to recruit and train additional teachers. What school supplies—including books, computers, and Internet connections—are available or would be needed?

As the list is developed, costs of incremental investment can be estimated, perhaps by getting bids from construction companies for the cost of schools. This information is collected, the costs are estimated and added, and a total cost estimate is reached.

Parametric estimation involves developing an equation (using some form of regression analysis) in which the changes in the information desired—the dependent variable—are modeled based on known relationships to some group of independent or explanatory variables. These equations are referred to as cost estimating relationships.

Generally, the parametric approach involves developing a database of historical information that can be used as inputs to the model. For example, if the decision were made to invest in a shipping port in Gaza, the costs of such a port could be estimated by taking information from other port construction projects and developing a model including key variables that affected cost. In this case, cost may be affected by the desired size and capacity of the port and the depth of the relevant body of water. Information from the construction of other port projects, the specific details of the site, and the requirements could be used to estimate a likely cost.

Another example of the use of parametric estimating is the development of the cost of educating a student for one year. Large school systems often have these costs available in their budget systems. Thus, to estimate the cost of a school system, the number of students per year would be the independent variable and the dependent variable would be the total cost of educating the group per year. The parametric approach avoids the detail required for a bottom-up estimate but in this case requires gathering data from other school systems on costs per pupil per year and adjusting them for the Palestine case (for example, changing the average teacher's salary).

An approach related to the parametric method is to estimate by analogy. With this approach, an analyst selects a similar or related situation and makes adjustments for

differences. Analogy works well when there are reasonable comparisons, or for derivative or evolutionary improvements. Its main advantage over the bottom-up approach is that only the changes or differences must be separately estimated—thus saving time and cost.

However, analysts must have a good starting baseline of similar projects to use this method. For example, they may have a lot of information about the costs of an internal security system in Iraq. Although there are many key differences between Iraq and a likely Palestinian state, the baseline information from the Iraqi case can be adjusted for these differences to derive an estimate using reasoning by analogy. Similarly, knowing the differences between the existing Palestinian security capabilities and the desired ones may allow for the development of an evolutionary cost assessment.

From this discussion, it may seem that the bottom-up approach would provide the greatest fidelity. Indeed, if all the required data could be perfectly captured, that would be the case. However, given the many unknown factors, the difficulty of collecting accurate data, and the difficulties involved in predicting future needs, the bottom-up approach may not necessarily yield a better estimate than the other two methodologies. In addition, omitting requirements is often the largest risk in using this approach. Because of its costs and extensive data, using the bottom-up approach to estimate the costs of a new Palestinian state would require resources far beyond the scope of this study.

Parametric estimating is commonly used in developing cost estimates for new weapons systems where cost estimating relationships between such inputs as weight and material and such outcomes as cost have been developed over a number of years with many data points. The building of a Palestinian state can be compared to situations such as those in Kosovo, Bosnia, and Iraq. However, the number of variables that affect cost is large enough that any relationships developed using this relatively limited number of cases would be of questionable validity.

For the most part, the authors in this volume use the analogy approach, with cost estimates that either assess the cost of evolutionary or derivative changes from the current situation, or they use case studies of situations that are comparable along one or more dimensions. The analogy approach is used in the "Internal Security" and "Health" chapters. Some chapters also list the detailed cost elements that would need to be collected in a bottom-up approach. These elements provide insight into the complex nature of the state-building task. The "Education" chapter provides some bottom-up information. The "Water" chapter uses a previously developed parametric model that the authors have modified based on the scenarios they develop. The "Economics" chapter uses a simple growth model to estimate Palestinian economic growth under different assumptions about economic integration with Israel and territorial contiguity. Two of the chapters ("Governance" and "Demography") do not involve cost estimates, although some of the institutional structures called for in the "Governance" chapter, such as certain issues relating to the justice system, are estimated in the "Internal Security" chapter.

CHAPTER TWO

## Governance

*Glenn E. Robinson*

### Summary

To be successful, a new Palestine state will need to be characterized by good governance, including a commitment to democracy, the rule of law, and elimination of the present corruption. An important precursor for good governance is for the state to enjoy a high level of political support and legitimacy in the eyes of its own people. The key variables that will determine such support and the state's legitimacy in the eyes of Palestinians are: the size of the state, the contiguity of its lands, and the nature of its presence in Jerusalem.

Good governance will likewise be enhanced if Palestine's borders are permeable, its economy prosperous, its refugee absorption manageable, its security guaranteed, and its early years bolstered by significant international assistance. Given their mutually reinforcing relationship, the actual practice of good governance in Palestine will contribute to the long-term legitimacy of the state.

To achieve good governance, authoritarian practices and corruption that characterized rule under the Palestinian Authority must not be repeated.

If good governance is to be achieved in a Palestinian state, a number of issues must be addressed: the promotion of the rule of law, the empowerment of parliamentary democracy, and the promotion of meritocracy in the civil service. Specific recommendations on how to promote these goals in Palestine are discussed.

### Introduction

The success of Palestinian statehood will depend, in large part, on whether it is characterized by good governance, including a commitment to democracy and the rule of law. A number of factors will help determine the prospects for good governance in Palestine initially.[1] The most important of these is whether or not the state is legitimate in the eyes of the Palestinian people. While the shape and characteristics of any Palestinian state will not please everyone (particularly rejectionists who will

---

[1] Throughout this chapter, "Palestine" refers to a newly created state of Palestine.

settle for nothing less than all of historic Palestine), opinion polls consistently show that a large majority of Palestinians in the West Bank and Gaza are prepared to live in peace with Israel.[2] It is for this critical population mass that the new state must pass the legitimacy test.

A Palestinian state's legitimacy in the eyes of most Palestinians will be based fundamentally on three factors. Those factors are the size and contiguity of the lands of a new Palestinian state and the nature of its presence in Jerusalem. A new Palestinian state is likely to be seen as more legitimate in the eyes its people the more closely its borders follow the "Green Line" (the Green Line is the name given to the 1949–1967 division between Israel and the West Bank), the more contiguous those lands are (apart from the unavoidable separation of the West Bank from Gaza), and the more credible its presence in Jerusalem.[3]

Assuming that basic state legitimacy is secured in a final status agreement with Israel, the foundations and practices of good governance must be established in the new state. This will mean the dealing with many important issues and reversing common practices of the present corrupt and authoritarian Palestinian Authority (PA).[4]

The correction of existing problems needs to be coupled with a vision of what good governance should entail in an independent state of Palestine. The third section of this chapter focuses attention on positive requirements for the rule of law and democratic governance in an independent Palestinian state.[5] We focus on specific recommendations that would help promote the rule of law, empower parliamentary democracy, and bolster bureaucratic meritocracy.

---

[2] Polls conducted by the Palestinian Center for Policy and Survey Research (www.pcpsr.org) and the Jerusalem Media and Communications Center (www.jmcc.org) regularly include questions pertaining to Palestinian acceptance of Israel in the framework of a two-state solution. Typically, about 70 percent of Palestinians in the West Bank and Gaza support such a framework.

[3] These requirements are met in the unofficial Geneva Accord announced in October 2003. The Roadmap for Peace (developed by the United States in cooperation with Russia, the European Union, and the United Nations and presented to Israel and the PA on April 30, 2003) is less clear on these critical elements of Palestinian statehood.

[4] The PA has executive, legislative, and judicial branches. However, for simplicity's sake and conforming to standard practice, we use the acronym PA to refer exclusively to the executive branch of government. References to legislative and judicial branches are clear in context.

[5] The task of reforming PA institutions has received significant attention in recent years. Indeed, such reforms became a prerequisite for restarting peace negotiations between Palestinians and Israelis. Because this book seeks to take the long view of Palestinian governance, we do not discuss near-term considerations in this chapter. Near-term issues have been well covered elsewhere. See, for example, Brown (2002); Shikaki (2003); and various reports by the Independent Task Force on Strengthening Palestinian Public Institutions, sponsored by the Council on Foreign Relations.

## The Relationship Between State Legitimacy and Good Governance

State legitimacy and good governance are synergistic. As policymakers and negotiators create an independent Palestinian state in the coming years, it will be essential that this synergy be fully understood if Palestine is to succeed. The greater the legitimacy of the state at its founding, the more likely good governance will take hold; the better governance is in an independent Palestinian state, the more likely the state will retain and consolidate its legitimacy.

A discontinuous and isolated state with control over a relatively small area of the West Bank and without a credible sovereign presence in Jerusalem would likely be rejected by most Palestinians.

### The Importance of the 1967 Borders[6]

There is nothing particularly "natural" about the two parts of historical Palestine that remained in Arab hands at the conclusion of the 1948 war. Indeed, it was an article of Palestinian nationalism until the 1970s that the West Bank and Gaza bore no particular significance apart from the whole of mandate Palestine. In part as a reaction to what has been a strong international consensus in support of Israel's 1967 borders, the Palestine Liberation Organization (PLO) gradually changed its policies, beginning haltingly in 1974, to accept the 1967 borders as the basis for a two-state solution. The acceptance of the 1967 borders is now part of a broad Palestinian national consensus, as reflected in numerous surveys and case studies. Rejecting the 1967 borders would bring into serious doubt the basis upon which the Palestinians have recognized Israel and have entered into negotiations to end the conflict permanently.

The foundational documents noted in the 2003 Roadmap for Peace, including UN Security Council Resolutions 242 and 338 and the Arab League peace initiative, either explicitly or implicitly adopt the 1967 borders as the borders separating Israel and Palestine, leaving open the possibility of small and mutually acceptable land swaps. The negotiations that took place in Taba, Egypt, in January 2001 discussed an Israeli annexation of about 4 percent of the West Bank in exchange for an equal amount of swapped land annexed to Palestine from Israel. The unofficial "Geneva Accord" announced in October 2003 posited an Israeli annexation of about 2 percent of the West Bank in exchange for ceding to Palestine an equal amount of territory adjacent to Gaza.[7]

Maximizing the land area of an independent Palestinian state has practical consequences beyond state legitimacy. While this book finds that large and rapid refugee

[6] The 1967 borders (West Bank, Gaza, and East Jerusalem) comprise about 23 percent of the lands of historic Palestine, as delineated under the British Mandate for Palestine.

[7] The actual percentages vary according to how one defines the West Bank, which may or may not include East Jerusalem and the northwest section of the Dead Sea. For a good discussion of competing percentages, see Pressman (2003).

settlement in Palestine would pose serious problems for the new state, some resettlement will no doubt occur. In addition, Palestinians in the West Bank and Gaza have one of the highest birth rates in the world. Land, and the resources that come with it, will be needed to accommodate potentially large increases in population following statehood (see Suisman et al., 2005).

### Contiguity of Land

Also, basic land contiguity in Palestine will be essential not only for the pragmatic operation of the state, but for its sense of legitimacy as well. A discontinuous Palestine will not enjoy popular legitimacy, and will therefore risk greater levels of internal dissent.

The construction of large numbers of Israeli settlements in the occupied territories has made the construction of a contiguous and viable new independent state vastly more difficult. The U.S. government and the larger international community view these settlements as "illegal" under international law.[8] Certainly the expansion of settlements helped undermine the Oslo peace process and made the already distant prospect of good governance in Palestine even more remote.

### Jerusalem and State Legitimacy

Jerusalem will also play a key role in Palestine's legitimacy in the eyes not only of Palestinians, but also of Arabs and Muslims more generally. A new Palestinian state that does not have a viable sovereign presence in Jerusalem will likely lack basic state legitimacy in the eyes of its people. This is true for two reasons. First, as noted above, the 1967 boundaries—which include East Jerusalem—have gained a central place in the Palestinian national consensus over peace. Second, given the religious importance to all Muslims of the Haram al-Sharif, or Temple Mount, in Jerusalem, particularly the al-Aqsa Mosque, no Muslim leader of Palestine could afford to formally relinquish all of Jerusalem. Indeed, some form of Muslim-Palestinian sovereignty over the Muslim holy sites in Jerusalem will almost certainly be critical to selling a peace deal to the larger Muslim world.

There have been numerous plans conceived over the years concerning the best way to share Jerusalem between Israel and Palestine, including split sovereignty in East Jerusalem or shared sovereignty over the whole of the city of Jerusalem. Some have proposed redrawing the municipal boundaries of Jerusalem to make the sharing of sovereignty more appealing to both sides.[9] We make no recommendation in this book

---

[8] Official U.S. policy holds that these settlements violate the Fourth Geneva Convention of 1949 and are "inconsistent with international law." Excerpts from the State Department's legal finding may be found at http://www.fmep. org/documents/opinion_OLA_DOS4-21-78.html. While political language has softened over time (e.g., settlements as "an obstacle to peace"), the United States has never repudiated its formal opinion that such settlements are illegal and, indeed, has reconfirmed it on a number of occasions at the United Nations. President Bush's April 2004 letter to Prime Minister Sharon indicated that a final negotiated peace would likely leave in place some Israeli settlements in the West Bank, but did not renounce the official legal opinion set out above.

[9] See, for example, IPCRI (1999).

over which plan for Jerusalem is best. Rather, we observe that without a credible sovereign presence in Jerusalem, the new state of Palestine will suffer a serious legitimacy deficit among its people that, in addition to other problems, will make the emergence of good governance and a stable state problematic.

### Legitimacy and Violence

A negotiated solution that fails to achieve political support is likely to exacerbate political violence in at least two ways. First, the various Islamist and nationalist groups that have carried out violence in recent years will feel free to continue, and perhaps increase, the violence. If the legitimacy of the new state is doubtful, they would likely find a more supportive population. A second source of renewed political violence would be the regional Palestinian refugee community, primarily in Lebanon, Jordan, and Syria. Since effective refugee absorption would be impossible under these conditions, refugees would express their opposition to a settlement that in their eyes is "unsatisfactory" and to the Palestinian government that negotiated it. While most of this opposition would no doubt be political in nature, it might lead to an increase in violence against local states where refugees are concentrated. Hashemite rule in Jordan would be especially susceptible to such instability.

**Good Governance Bolsters Legitimacy.** Just as state legitimacy is a necessary ingredient for good governance, good governance is vital to state legitimacy. Poor governance has contributed to the failure of many states. However, the "tools" of legitimacy are not enough. Good decisions are also crucial, as are strong, transparent, and accountable institutions and a healthy and vibrant civil society.

Although the impact of perceptions of state legitimacy on governance may be felt immediately, the effect of governance on legitimacy would only be apparent over a longer period of time. However, even with the time lapse, there is still no question that, if endemic corrupt and authoritarian political practices continue, they will drain Palestine of its political legitimacy, both in the eyes of its own people and in the eyes of the international community.

### Other Variables Affecting Good Governance

In addition to land and its contiguity, and security, which have all been discussed, other factors noted below also will affect the legitimacy and a new Palestinian state including:

- **Permeability.** The permeability of the borders of the new state will significantly affect its economic development.
- **Security Arrangements.** The arrangements that govern security inside Palestine, and between Palestine and its neighbors, will critically affect all sectors of Palestinian life, including governance. Good governance in the absence of adequate security is difficult to envisage (see Chapter Three).

- **Refugee Return.** The issue of refugees returning to Palestine after statehood will also complicate the challenges of good governance. There are nearly four million UN-registered Palestinian refugees and their descendants.[10] After statehood is established, up to a million refugees may wish to "return" to the West Bank. Many will likely come from Lebanon.[11] Palestinians in Lebanon are the poorest and least educated of all the diaspora Palestinian populations and will constitute a significant strain on the ability of the new state to prosper.[12]

Refugee return has three important components. First is the *scale* of the return, ranging anywhere from tens of thousands to over a million. Second is the *quality* of the returnees. Educated, middle-class Palestinians returning from Jordan pose a very different set of issues from the more likely scenario of the Lebanese return. Third, and most important, is the *timing* of the return: a rapid return versus a gradual return over many years.

The worst-case scenario in terms of straining Palestinian governance is a large, rapid return of the most destitute Palestinians in the diaspora. Such a scenario would have obvious and deleterious effects on all sectors under consideration. Conversely, a relatively small and gradual return of refugees would put far less strain on new state institutions in Palestine. Indeed, if the scale of return is small and the timing of the return gradual, then the quality of the returnees matters less.

Over the long run, returning Palestinians will no doubt provide a source of vitality and dynamism to the state. And refugee absorption will provide a legitimacy litmus test for the new state. Inevitably, a Palestine that is seen to be dragging its heels on refugee absorption will likely lose some of its legitimacy in the eyes of the diaspora community. This catch-22 is unavoidable.

In the short run, however, the stresses and strains of a large returning population will degrade the ability of new state institutions to function well. Indeed, one can imagine a state of emergency arising if the new state institutions are overwhelmed. Certainly a significant and immediate return from Lebanon must be anticipated, even with the likely negative consequences for governance and security it would entail in the near term.

---

[10] About 750,000 Palestinian refugees were created in the 1948 war. Only those refugees who met the UN's definition of a Palestinian refugee and who registered in a timely manner with the UN are formally considered refugees. They and their direct descendants currently number about four million. In addition, about 300,000 Palestinians, some of whom were refugees from 1948, were displaced in the 1967 war. The "displaced persons" from 1967 have a different legal status than the "refugees" from the 1948 war. For an interesting overview of the Israeli-Palestinian negotiations on this issue, see Tamari (1996).

[11] The vast majority of Palestinian refugees hail from what is now Israel proper, so speaking of a "return" to the West Bank is not exactly accurate. Palestinian refugees in Lebanon come mostly from northern Israel, especially the Galilee region.

[12] We need not concern ourselves with the issue of refugees returning to Israel proper. Such a return, if it happens at all, is likely to be small and should not affect the viability of a Palestinian state in the West Bank and Gaza.

- **Economic Development.** Almost always, greater per-capita wealth leads to a higher likelihood of democratic governance. Economic development in Palestine will increase the chances for good governance in the new state; however, for political as well as economic reasons, it is important that economic development in Palestine not be entirely state-directed, but rather occur primarily in the private sector; this will help reduce corruption and cronyism. Resource flows into Palestine can help or hinder economic development and good governance, depending on where they are directed.
- **International Support.** As with economic development, sustained international support will be critical if a new Palestine is to be democratic. That support takes two forms. First, and most obviously, Palestine will need significant international aid to overcome its present stagnation and to deal successfully with the world's largest refugee population. Such an aid package would be most effective if it is part of the settlement itself.

   However, the international community must carefully balance its aid to Palestinian state and society. Both state and society will have legitimate needs for assistance. Funneling all or most assistance through the Palestinian government directly, however well-intentioned, will diminish the prospects for democracy and good governance. International aid is critically important, but it needs to be distributed carefully to have the desired impact.

### PA Authoritarianism

If authoritarianism in the PA were a "natural" condition, then trying to create good governance in Palestine would be a hopeless task. Fortunately, such need not be the case. Although the Palestinian national movement under Yasser Arafat always had a strong authoritarian streak—not uncommon in revolutionary or underground movements—three political factors in the 1990s and the first few years of the new century reinforced this tendency. Two of them were transitional in nature. While a full discussion of PA authoritarianism can be found elsewhere (e.g., Robinson, 1997, chapter 7), a brief overview of the problem is necessary in order to gauge the problems and prospects of reforming such a system. We argue that given the transitional nature of much of PA authoritarianism, reform is possible. However, policymakers must be cognizant of a third, structural, cause of PA authoritarianism that can be ameliorated with prudent assistance.

A first transitional cause of PA authoritarianism concerned the consolidation of power by the new Palestinian regime created by the Oslo Accords. The Oslo Accords led to the return to Palestine from Tunisia of the PLO power structure and bureaucracy, along with about 100,000 supporters of this outside elite.[13] While PLO officials both inside Palestine and those returning from decades of exile shared many familial and

---

[13] A good overview of this elite split based on survey polls can be found in Shikaki (2002). Shikaki uses the term "Old Guard" instead of Oslo elite and the analytic categories vary somewhat, but the basic distinction is the same.

political ties, they tended to have evolved on different political trajectories. "Inside" Palestinian leaders tended to favor more institutionalized and less personalized politics, and they were considerably more committed to democracy in theory and in practice than their "outside" or "Tunisian" counterparts. In order to neutralize the power of potential rivals, the "old guard" (to use Khalil Shikaki's phrase) adopted authoritarian practices. As the integration of the "outsiders" into West Bank/Gazan society strengthens and post-Arafat politics are sorted out, it is likely that this distinction—and the authoritarian practices it produced—will diminish with time.

A second transitional cause of PA authoritarianism concerned the vast imbalance of power between the PA and Israel. As a weak "term taker," the PA was powerless to stop Israel from creating more settlements, which generated significant ill will among Palestinians both toward Israel and toward their government's impotence. The doubling of settlers during the Oslo years is another example of the results of the power imbalance. The PA responded in two authoritarian ways: It quashed voices of dissent directed at the PA, and it engaged in populist demagoguery itself to deflect criticism. While the imbalance of power will not disappear with the establishment of a successful Palestinian state, its political importance will be mitigated. In other words, the significant international intervention needed to launch a Palestinian state and see it through will itself displace the consequences of the power imbalance.

A third cause of PA authoritarianism concerns the type of political economy built in Palestine in the 1990s. As more than 70 percent of PA government revenues came from bulk transfers to the treasury—and not from the direct taxation of its own people—the PA's political economy came to look increasingly like those of the oil states in the region.[14] In such "rentier"[15] or "distributive" states, no social contract is developed between state and society over the relationship between taxation and expenditures. Instead, the one-way flow of resources from state to society tends to promote personalized authoritarianism. It is critical for the democratic development of Palestine's political cal economy that steps be taken to reverse this trend. Primarily, this means that capital transfers to Palestine should go increasingly to nongovernmental and local government sectors and less into central government coffers.

## Requirements for Good Governance in Palestine

Good governance will most easily emerge out of the existing reality and existing institutions. The Oslo Accords created, altered, and empowered a series of institutions,

---

[14] Jordan has been particularly adept at securing strategic rents from the United Kingdom, the Gulf states, and the United States, depending on the era. Typically, Jordan relied on strategic rents to cover half of its government budget every year, and its foreign policy would shift depending on who was providing the rents. For a fascinating study of this history, see Brand (1994).

[15] An excellent review essay on the rentier argument may be found in Cooley (2001).

laws, rules, and relationships governing the West Bank and Gaza. Policymakers will be best served by fixing these extant institutions (in some cases radically), as opposed to trying to apply a boilerplate solution from scratch. The institutional base for creating a functioning democracy in the Arab world is present in Palestine. Finally, the recent death of Yasser Arafat provides a rare opportunity to strengthen Palestinian institutions in order to ameliorate the excessively personalized nature of PA governance under Arafat.

According to evidence presented at a recent World Bank conference[16] the Palestinian Authority's effectiveness, ability to control corruption, and institution of a viable rule of law have plummeted over the past several years. As Figure 2.1 indicates, by 2002 the Palestinian Authority was in the bottom 16 percent of countries worldwide in controlling corruption, among the bottom 12 percent in government effectiveness, and in the bottom 50 percent in the effectiveness of the rule of law. As Figure 2.2 illustrates, the percentage of Palestinians who believe there is significant corruption in Palestinian Authority institutions has increased from approximately 50 percent in 1996 to 85 percent in 2004.

By way of overview, the Oslo Accords created a strong office of the presidency (*ra'is*) and an 88-member parliament, neither of which had existed in the West Bank

**Figure 2.1**
**Governance Indicators for the West Bank and Gaza**



SOURCE: World Bank Governance Research Indicators Dataset.
RAND MG146-2.1

---

[16] Douglas Ierley, *Law and Judicial Reform in Post-Conflict Situations: A Case Study of the West Bank Gaza,* World Bank Conference, July 2001, p. 17.

22  Building a Successful Palestinian State

**Figure 2.2**
**Palestinian Perceptions of Corruption**



SOURCE: Palestinian Center for Policy and Survey Research.
RAND MG146-2.2

and Gaza under Israeli occupation. Elections judged free and fair by international observers were held in January 1996. While the parliament (Palestinian Legislative Council, or PLC) had significant powers on paper, in reality it was actually subservient to the president and his cabinet. A prime minister's office was added in 2003 with an eye toward diminishing the power of the president and creating more of a parliamentary system rather than a presidential one. The system remains a hybrid one today. A Palestinian judicial system that included both civil and criminal courts predated the Oslo Accords but had largely become irrelevant under Israel's occupation. Reviving a judicial branch of government was a major challenge during the 1990s and remains a key challenge today. Ministries reporting to the executive branch of government became large and influential under the Oslo Accords. They were highly politicized at the top levels, and employment within the ministries served as a principal source of regime patronage.

In short, Palestine already has executive, legislative, and judicial branches of government in place. The main challenge, therefore, is not to create new institutions but to reform, strengthen, and make functional existing institutions by taking existing realities into account. We find that there are three basic challenges to reforming Palestine's governmental framework so that it can promote and sustain good governance: promoting the rule of law, empowering parliamentary democracy, and promoting meritocracy in the civil service. We treat each topic in turn and raise critical questions that will need to be answered before a new state can be governed successfully.

### Promoting the Rule of Law

There is no substitute for the rule of law as the cornerstone of good governance. Among other things, the rule of law enhances accountability in governance, bolsters trade and promotes economic growth, and provides citizens the security to lead productive lives. Given the right political context, Palestine has the necessary attributes to sustain the rule of law. Its reasonably educated population; middle class sensibilities; and an increasingly distant history of civil courts, secular law, and a (relatively) independent judiciary make it feasible to create a society based on the rule of law. However, the growing political and social fragmentation in Palestine over the past four years will impede a transition to rule of law. Two elements will be essential to the development of rule of law in Palestine: empowering the judiciary and adopting a good constitution.

**Empowering the Judiciary.** A non-shari'a judiciary charged with applying secular civil and criminal law has existed in Palestine since the mid-19th century, although its modern variant dates from the British Mandate. A major judicial problem in recent decades, including under the PA, has been the lack of true authority vested in the judiciary. Reforms are required to empower the judiciary and are within the realm of the possible. Creating a strong and independent judicial branch that can check executive power will require four steps.

*Step 1: Empower Judges.* Judges have been underpaid and disempowered by the PA (and under Israeli military rule as well). Although Supreme Court justices are supposed to have lifetime appointments, the PA has dismissed several chief justices. While a judicial council is supposed to oversee the judiciary, in practice those powers were usurped by the executive branch, often through fiat.[17]

Under strong internal and external pressure, Arafat took steps in 2002–2003 to reverse the degradation of judicial independence, especially through the promulgation of the law on judicial independence that had been sitting on his desk for four years. This effort needs to be expanded by his successors. In structuring a Palestinian state, a firm commitment to the empowerment and independence of the judiciary is a necessary step toward the realization of the rule of law.

An empowered judiciary (and concomitant enforcement of judicial decisions) will also be a boon to private property rights in Palestine. The institution of private property is firmly rooted in Palestinian law, in both the West Bank and Gaza.[18] Private property rights exist on paper and are zealously guarded by Palestinian citizens. However, respect for the rule of law concerning those property rights has not always been practiced by the PA. For example, the PA's heavy-handed confiscation of private property to establish the Gaza airport remains a powerful symbol of distrust of government

---

[17] For an overview of the legal system under PA rule, see Brown (2003), chapter 2; and Robinson (1997).

[18] The Ottoman Land Law of 1858 explicitly recognized large private land holdings, an institution continued during the British Mandate and its successors. Small private land holdings known as *mulk* lands were codified in Islamic law centuries earlier and were enforced by the Ottomans in Palestine and elsewhere. In short, the institution of private property has a long history in Islam.

in Gaza. The new government of Palestine must do better than the PA in protecting property rights.

It should be stressed that enforcement of commercial law, particularly contracts, is an important and necessary component of the respect for private property. Indeed, this is the sine qua non for building a prosperous and fair private-sector economy. A vibrant, independent, and strong judicial branch is essential for the protection of private property and commercial activities already guaranteed under law.[19]

*Step 2: Integrate the West Bank and Gaza Legal Systems into a Single Set of Laws.* In brief, Gazan law is a holdover from British common law introduced under the British Mandate in the 1920s, whereas West Bank law is primarily a reflection of the French Napoleonic law adopted by Jordan and implemented in the West Bank during Jordanian rule (1950–1967).[20] A number of steps have been taken in recent years to try to integrate these two very different systems into a unified whole, some developed under World Bank, U.S., and Australian auspices. Much remains to be done, however, and this must be a high priority in the new Palestinian state in order to promote the rule of law.

*Step 3: Repair the Infrastructure.* An appropriate physical infrastructure is necessary for the proper functioning of courts. Put bluntly, the physical infrastructure of the judicial system is decrepit. The two major courthouses in Gaza and Ramallah are in severe disrepair; the regional courthouses are worse. It is difficult to cultivate respect for rule of law when the physical symbols of the law are in a state of disrepair. In addition to the poor condition of courthouses, many important internal functions (such as archiving documents and transcribing trials and decisions) are in dramatic need of modernization. Some improvements to the physical infrastructure were made under the PA, but much more needs to be done. Indeed, a large international investment in building new courthouses using modern technologies would go a long way toward providing tangible, physical proof of the commitment to the rule of law in the new state.

*Step 4: Enforce Legal Decisions.* Legal decisions should be enforced in a consistent and transparent manner. The inconsistent and politically driven enforcement of both civil and criminal legal decisions breeds contempt for the rule of law. The judiciary is incapable of compelling enforcement of decisions alone, and the executive branch has been at the root of this problem. Lecturing executive authorities on respect for the rule of law is not the remedy. Rather, the key to compelling enforcement of legal decisions is to make police and security forces accountable to the legislative branch of government.

---

[19] A number of studies have focused on these issues. Private-sector development has been a major concern of the World Bank; see, for example, World Bank (2002). Likewise, the Israel/Palestine Center for Research and Information (I/PCRI) focused its attention on private property and commercial law in the PA during the 1990s. See, for example, Molkner and Hamid (1994) and Kalman et al. (1997). These and other works can be found at www.ipcri.org.

[20] Both areas also have an overlay of Israeli military orders, but those laws were enforced by Israeli tribunals and officials, not by Palestinian civil and criminal courts.

Answering to parliament in an open fashion would lead to higher levels of enforcement than is currently the case in a closed system dominated by the executive branch.

**Adopting a Good Constitution.** A well-constructed constitution is necessary for the rule of law to succeed. A Basic Law was promulgated by President Arafat in the spring of 2002, having been passed by the Palestinian Legislative Council five years earlier. In many states, including Israel and the United Kingdom,[21] a Basic Law is a functional substitute for a constitution. Nevertheless, a draft constitution was released a month later by the PLO under Nabil Sha'th's direction. A more current iteration of the draft constitution was released in February 2003 and was amended the next month in order to accommodate a new office of prime minister.[22]

There are two schools of thought about a final Palestinian constitution. The first school wants the Palestinian constitution to look a lot like constitutions elsewhere in the Arab world, with an overly strong executive branch and a substantive formal recognition of Islam as the official religion of the state. The second school wants a truly liberal, democratic constitution along Western lines that does not merely mimic uninspired Arab constitutions. The Palestinian legal and legislative communities prefer the second model, but face considerable political opposition from other quarters.

The current draft constitution leaves many significant powers in the hands of the president, among them foreign affairs (including negotiations with Israel), military and security matters (as "supreme commander"), the power to appoint and dismiss the prime minister, and the power to dissolve parliament. Most Palestinian reformers seek to have the presidency become a more ceremonial office, but that has not yet occurred. In November 2004, as Arafat was on his deathbed, top PLO and PA officials stripped the presidency of key powers, especially regarding control over security forces, and gave them to the office of the prime minister. It falls to the parliament to codify constitutionally these and other steps to transform the relationship between president and prime minister.

### Empowering Parliamentary Democracy[23]

The idea that a functioning democracy is essential to good governance has become orthodox. On paper, Palestine currently has a relatively democratic system—indeed, relatively free and fair elections were held in 1996. However, three steps must be taken to enhance parliamentary democracy in the context of actual statehood: empower-

---

[21] Indeed, the PA's Basic Law was superior to those of the United Kingdom and Israel. Unlike the UK's, the PA's Basic Law is written, and it is more comprehensive than Israel's. Also, it should be noted that several Arab countries, including Saudi Arabia, preferred the use of the term "Basic Law" over "Constitution" for their own political reasons. We thank Nathan J. Brown for this insight.

[22] The current draft constitution can be found at www.jmcc.org.

[23] There is a robust debate in academic circles concerning sociocultural barriers to democracy in the Arab-Islamic world. Some authors argue that elements within Islam and/or tribal-clan cultures militate against the adoption of modern democratic institutions. Other scholars have rebutted these assertions, primarily on the grounds that they

ing the legislature, adopting a single-district proportional representation system, and strengthening the powers of the new office of prime minister.

**Empowering the Legislature.** The Palestinian Legislative Council, like all parliaments in the Arab world, is an important venue for discussion and debate, but it lacks significant real powers. To have a functioning democracy, Palestine must have a parliament with real powers, and parliamentary power anywhere can be judged by a single criterion: the power of the purse. Parliaments that have real budgetary authority have real power; parliaments that lack real budgetary authority lack real power. Although the executive branch of the PA is legally mandated to submit budgets to the PLC, it has often done so late and as a mere formality. PLC votes have mattered little. In short, the PA, not the PLC, made most important budget decisions. Thus, for democracy to emerge in Palestine, the parliament must be given true budgetary authority.

**Adopting a Single-District Proportional Representation System.** Electoral districts have emerged as a significant issue in Palestinian legislative elections. The major problem is that Palestinian electoral districts are highly fragmented. For example, Israel has twice the population and four times the geographic size as Palestine. Yet while Israel is a single district in a proportional representation (PR) system, Palestine has 16 electoral districts, each with its own "first-past-the-post" winner-take-all system. The Palestinian electoral system devised for the 1996 elections is chaotic and needs to be reformed. Slicing a tiny country like Palestine up into 16 electoral districts has complicated the political process because it has encouraged tribalization. Local familial notables without national standing could be—and were—elected to parliament under such a system. Conversely, national movements with broad support suffer under such a system and are thus more inclined to take their politics outside the legal process. Palestine would be better served by a single district proportional representation electoral system.

Empowering broad national movements at the expense of tribal chiefs and clan elders has an added benefit. It will compel these movements to have a vested interest in settling their political differences within the confines of parliamentary rules,

reify abstractions and do not give enough credence to the pragmatic and evolving ways in which any religious or cultural group actually practices its belief system. Still other scholars reject such cultural approaches to understanding democracy as inconsequential when compared with more important and more explanatory variables. Without entering this broader debate, we assume that neither the fact that most Palestinians are Muslim nor that most Palestinians enjoy strong extended family (clan, tribe) networks will decisively work against democracy in Palestine. In other words, while there are serious obstacles to democracy in Palestine, neither Islam nor familial structures count among them. We posit this based on the actual experience of elections in the West Bank and Gaza over many years. In addition to the parliamentary and presidential elections of 1996, Palestinians in the West Bank and Gaza have participated in vigorous and democratic elections in universities, professional associations, and local jurisdictions for three decades. Islamic groups have not only participated in these elections, they have often done quite well, and have accepted the results. The same thing is true for members of Palestinian clans (singular, *hamula*), although Palestinians have rarely politically mobilized in elections along clan lines. In sum, whatever the truth of general arguments of Islam and democracy in the Arab-Muslim world, at least in the case of the Palestinians, such sociocultural realities have not inhibited democratic practices. The boldest statement of sociocultural impediments to democracy in the Arab world can be found in Kedourie (1992). More-scholarly treatments of the subject can be found in Salame (1994); Brynen, Korany, and Noble (1995 and 1998); and Esposito and Voll (1996).

which often include compromise through coalitional politics. Put more bluntly, adopting a single-district PR system may make it possible to tame the politics of those in Hamas willing to work within a legitimate system. A PR approach would enhance the prospects for co-opting Hamas into participating in Palestine's governance, rather than encouraging further radicalization and violence. Playing electoral games—such as micro-districting—intended to disempower national movements like Hamas will only encourage the polarization of Hamas in the new Palestinian state.

A further advantage of a PR system in Palestine would be to downplay the cleavage between the West Bank and Gaza. The current system locks in a structural division between the two, further aggravating centrifugal forces between them. Under the current system, the West Bank has twice the population of Gaza, 11 districts to Gaza's 5, and 51 seats in parliament to Gaza's 37. The population disparity will likely grow in the future because refugees will most likely be resettled in the West Bank. Such a situation could engender resentment among Gazans at the West Bank's domination of politics, even though on a percentage basis Gaza has greater parliamentary representation than its population share alone would warrant.

A two-district PR system in which both the West Bank and Gaza have their own single districts would present the same disadvantages. That is, such a system would tend to aggravate the existing cleavage rather than to lessen any differences. Devising a two-district system would create a series of practical problems as well. Assigning each district an equal number of seats in parliament would disadvantage the more populous West Bank. Assigning the number of seats on a straight population split would tend to encourage the West Bank bloc to act in concert, out-voting Gaza on all important issues. Moreover, refugee absorption will likely be done entirely in the West Bank, rapidly altering the population balance and creating new tensions with Gaza as the West Bank increases its percentage of representatives.

Under a PR system, each political party would have the flexibility to adjust its electoral lists according to different criteria, including geographic origin. No doubt this would still lead to more representation from the West Bank, as befits its larger population, but the cleavage would not be codified structurally. Moreover, political parties that are based on ideologies and philosophies instead of familial ties and geography are by nature less concerned about the geographic origins of their candidates. Thus, by privileging ideology over primordial ties, a political culture that reflects this advantageous hierarchy is more likely to emerge and be strengthened.

**Strengthening the Office of Prime Minister.** Under pressure internally from Palestinian reformers and externally from the United States and Israel, the PA created the position of prime minister in March 2003. As noted above, the powers of the prime minister were significantly strengthened on the eve of Yasser Arafat's death. However, these changes have not been codified by the parliament, nor do they go far enough. To enhance the prospects for good governance in Palestine, the distribution of powers between the president and prime minister will need to be clarified and reordered.

Consistent with the type of parliamentary democracy described above, Palestine will need to have a more empowered prime minister and a more ceremonial position of president. This would also be consistent with the political system Palestinians know well—Israel—where the prime minister is the head of government and the president is the ceremonial head of state. An added benefit of advocating an empowered prime minister is that this is consistent with the wishes of the internal reform movement in Palestine. However, given the Palestinian conviction that a strong president is essential in negotiations with Israel, a fully empowered prime minister should not be expected until after statehood.

### Promoting Meritocracy in the Civil Service

Good governance requires that those who make and implement policies be competent in their duties and transparent in their actions. Palestine has an abundance of highly trained and capable technocrats both inside the West Bank and Gaza and in the diaspora. A number of these technocrats have been employed by the PA, although many more have been reluctant to serve in the PA's ministries.

Those who have served have often been ineffectual due to the overtly politicized and personalized decisionmaking process. By the end of 2002, 84 percent of Palestinians viewed the PA as corrupt, a number that had doubled in only six years.[24] The corruption is grounded in the personalized nature of power and appointments, where rank in the hierarchy was trumped by ties to Arafat. A dramatic example of this was the departure of the Palestinian Minister of Agriculture, who resigned in protest because his deputy—a man close to Arafat—kept countermanding his orders without penalty.

A merit-based civil service in Palestine is essential for good governance. Creating such a service is not impossible; it has been done in many countries around the world. Indeed, Palestine does have a merit-based civil service on paper, but its full implementation has been blocked to date. A patronage-driven bureaucracy allows leaders to maintain power through the distribution of jobs and resources based on personal loyalty. Creating an atmosphere that ensures a certain level of autonomy for technocrats to carry out their duties relatively free of intrusive politicking is a necessary condition for good governance to materialize in Palestine.[25]

### Costs

Most chapters in this book present estimates of the costs required to strengthen the specific Palestinian institutions discussed in those chapters. This chapter does not, for several reasons.

---

[24] Shikaki (2003), p. 6.

[25] Palestine would do well to learn from Japan about building an autonomous technocratic civil service protected from the winds of politics. See Johnson (1982).

Many government activities, while important, are beyond the scope of this study. For example, the Palestinian Foreign Ministry or Ministry of Finance will need a budget for attracting investments from abroad. The government will also need to hold elections and set up and operate a national parliament. However, these activities represent just a small portion of the total costs of governance.

Some of the largest governance-related costs are discussed in other chapters. For example, costs associated with strengthening the Palestinian judicial system, including the courts and police, appear in Chapter Three. Chapters Six, Seven, and Eight discuss and provide cost estimates for various functions that the Palestinian government will either perform directly or oversee, such as regulating water safety, health care facilities and providers, and the educational system. Chapter Five discusses how government policies can encourage economic and social development, and provides growth estimates for a variety of scenarios.

Good governance will affect nearly every area of Palestinian life. The following chapters provide greater detail.

## Conclusion

Our findings on good governance in Palestine may be summarized as follows:

- State legitimacy is a most important element for promoting good governance in Palestine. Without a high level of legitimacy in the eyes of its own people, Palestine will have no chance to practice good governance. The most important elements for state legitimacy will be determined in the negotiations: the size of Palestine, its territorial contiguity and border permeability, and the status of Jerusalem.
- The actual practice of good governance including the elimination of corruption, will help ensure Palestine's long-term legitimacy both in the eyes of its own people and in the view of the international community. Good governance in this context means full democracy under the rule of law.
- A Palestine that is crafted in a way that fails to promote good governance and basic state legitimacy will likely be an endemic source of violence and instability.
- Good governance will also be affected by the vitality of the economy, the level of security, the size and rate of refugee absorption, and the amount and nature of international assistance.
- For the rule of law to be practiced, Palestine must legally empower the judiciary, fully integrate and unify the legal systems in Gaza and the West Bank, significantly upgrade the physical infrastructure of its courts, and enforce legal decisions in a consistent and transparent manner.

- Good governance in Palestine will be positively affected by the adoption of a liberal constitution as advocated by the professional legal establishment in Palestine.
- Parliamentary democracy will be enhanced by giving the legislature full budgetary authority; adopting a single district, proportional representation electoral system; strengthening the office of the prime minister as the head of government; and transforming the office of the president to a largely ceremonial, head-of-state position.
- Good governance will be strengthened through the promotion of meritocracy in the Palestinian civil service.

## Bibliography

Brand, Laurie A., *Jordan's Inter-Arab Relations: The Political Economy of Alliance Making,* New York: Columbia University Press, 1994.

Brown, Nathan J., "The Palestinian Reform Agenda," *Peaceworks,* No. 48, Washington, D.C.: United States Institute of Peace, December 2002.

———, *Palestinian Politics After the Oslo Accords: Resuming Arab Palestine,* Berkeley: University of California Press, 2003.

Brynen, Rex, Bahgat Korany, and Paul Noble, eds., *Political Liberalization and Democratization in the Arab World,* Volumes 1 and 2, Boulder and London: Lynne Rienner, 1995 and 1998.

Cooley, Alexander A., "Booms and Busts: Theorizing Institutional Formation and Change in Oil States," *Review of International Political Economy,* Vol. 8, No. 3 (Spring 2001), pp. 163–180.

Esposito, John L., and John O. Voll, *Islam and Democracy,* New York and Oxford: Oxford University Press, 1996.

Ierley, Douglas, *Law and Judicial Reform in Post-Conflict Situations: A Case Study of the West Bank Gaza,* St. Petersburg, Russia: World Bank Conference, July 2001.

Israel/Palestine Center for Research and Information's (IPCRI), *Projections for Jerusalem's Future,* Jerusalem: IPCRI, May 1999.

Johnson, Chalmers A., *MITI and the Japanese Miracle: The Growth of Industrial Policy, 1925–1975,* Stanford, CA: Stanford University Press, 1982.

Kalman, Daniel, et al., *Commercial Contract Enforcement in the Palestinian Territories,* Jerusalem: IPCRI, February 1997.

Kedourie, Elie, *Democracy and Arab Political Culture,* Washington, D.C.: The Washington Institute Press, 1992.

Molkner, Keith, and Ra'ed Abdul Hamid, *The Legal Structure for Foreign Investment in the West Bank and Gaza Strip,* Jerusalem: IPCRI, October 1994.

Pressman, Jeremy, "Visions in Collision: What Happened at Camp David and Taba?" *International Security,* Vol. 28, No. 2, Fall 2003, pp. 5–43.

Robinson, Glenn E., *Building a Palestinian State: The Incomplete Revolution,* Bloomington and Indianapolis: Indiana University Press, 1997.

Salame, Ghassan, ed., *Democracy Without Democrats? The Renewal of Politics in the Muslim World,* London and New York: IB Tauris, 1994.

Shikaki, Khalil, *Building a State, Building a Peace; How to Make a Roadmap that Works for Palestinians and Israelis,* Washington, D.C.: The Saban Center for Middle East Policy at the Brookings Institution, December 2003.

———, "Palestinians Divided," *Foreign Affairs,* January/February 2002, pp. 89–105.

Suisman, Doug, Steven N. Simon, Glenn E. Robinson, C. Ross Anthony, and Michael Schoenbaum, *The Arc: A Formal Structure for a Palestinian State,* Santa Monica, Calif.: RAND Corporation, MG-327-GG, 2005.

Tamari, Salim, *Palestinian Refugee Negotiations: From Madrid to Oslo II,* Washington, D.C.: Institute for Palestine Studies, 1996.

The World Bank, *Long-Term Policy Options for the Palestinian Economy,* Washington, D.C.: July 2002.

## Internal Security

*Kevin Jack Riley, Seth G. Jones, Steven N. Simon,*
*and David Brannan with Anga R. Timilsina*

### Summary

Internal security will be critical to the viability of a Palestinian state. However, it is unlikely that the Palestinians will be able to set up an effective internal security system on their own; the United States and the international community will need to help. In this chapter we examine the Palestinian internal security system and offer options that the United States and the international community could pursue to help the Palestinians develop an effective internal security system capable of providing public order and domestic stability, as well as improving peace with Palestine's neighbors. We conclude the following:

- The Palestinian internal security system is in disarray. Though it was never highly functional, its capacity has been further eroded in recent years. Facilities have been destroyed, a number of personnel have been killed. Many internal security functions have been assumed by Israel.
- Terrorist and militant organizations pose a grave threat to both interstate security (through attacks against Israel and multinational troops that might be sent there) and intrastate security (through violent opposition to legitimate authority). Suppression of these organizations, to the extent they cannot be co-opted into the political process, will be the most pressing internal security concern.
- Two areas in which the United States and the international community could make valuable contributions are supporting the administration of justice and the formation of a competent and law-abiding internal security capacity. By "internal security," we mean dismantling groups that seek to undermine constitutional authority or use violence to change the political order. Support for the administration of justice and internal security will require the reorganization of the existing welter of security services and the separation of law enforcement departments that investigate common crimes and patrol the streets from counterterrorist, counter-intelligence and counter-subversion agencies.
- In the broadest terms, options for U.S. and international assistance in these areas range from financial support for construction of new facilities, equipment, and training to the deployment of police or military personnel.

33

- More specifically, assistance for the administration of justice should aim to facilitate the emergence of an independent judicial system by funding construction of courthouses, police stations and jails, and providing legal texts, computers, forensic laboratories, and the kind of equipment that police need to carry out their law enforcement duties. A more intensive program would include deployment of international police, and vetting and recruiting judges, prosecutors, police officers, and others involved in the administration of justice.
- Assistance in the realm of internal security would entail technical advice on how best to restructure the existing labyrinth of security services as well as transfer or procurement of essential equipment. The United States and others could conduct training, monitor and evaluate performance, and assess compliance with human rights standards.
- RAND estimates overall reconstruction costs to be at least $600 million per year, and as much as $7.7 billion over ten years.

## Introduction

Perhaps the most important indicator of Palestine's success will be the degree to which security prevails there. If the halting and uncertain transition to stable democracy in Iraq has shown anything, it is that in the absence of security, civil society cannot survive, let alone thrive. This means, first and foremost, that Palestinian citizens must feel safe in the streets and in their homes. In a successful state, they would be confident that they enjoy equal recourse to law enforcement if they are robbed or injured by criminals, that crimes will be investigated swiftly and professionally, and that a criminal justice system will adjudicate such cases fairly and with due process. Citizens of the new state would be correspondingly confident that they will not be subjected to political persecution under cover of judicial or police authority.

At this point, Palestinians are far from enjoying this sort of security. Thus, the first objective of this chapter is to show how a structure for the effective and impartial administration of justice can be built in Palestine. Among other factors, the analysis explores the infrastructural, training, equipping, staffing, and monitoring requirements for the development of a judicial and police system in a society that has never had one.

Just as the citizens of Palestine must enjoy a palpable sense of personal security, the democratic political order that will—hopefully—be established prior to independence must be secured against the challenge of political violence. Given the level of internecine violence that now marks Palestinian society and the striking incapacity of the Palestinian Authority to monopolize the use of force, the possibility of armed confrontation between opposition movements and the state after independence cannot