# EXHIBIT A.521
## (4 of 17)

be disregarded. The proliferation of heavily armed militias and gangs and a spreading ethos that favors suicidal violence as a mode of political self-expression are harbingers of a potentially grim and turbulent future. The increasingly permeable boundary between authorized law enforcement and paramilitary entities and terrorist organizations darkens this picture even more.

The present study, which focuses on the decade following independence, assumes that much of this intramural violence will have been stanched prior to statehood. Indeed, if it is not, there is unlikely to be a Palestinian state. Nevertheless, the possibility that constituent groups will reject the validity of the final status accord with Israel that created the state—and by implication the Palestinian government that was party to it—is undeniable. It is also possible that a well-established opposition group, like Hamas, will support an insurgency in pursuit of a religiously based political and social order that a majority of Palestinian voters would reject. A variety of other such rationales for insurrection could plausibly be postulated, especially in an environment where poverty is widespread, and there is no recent tradition of trust in governmental authority or belief in its primacy.

Hence the focus in this chapter is on the requirements for state security. Specifically, we ask how best to restructure the existing welter of security-related entities, ensure that they are not only well-trained and equipped, but accountable and transparent in their operations and in the strongest position possible to stave off or counter violent challenges to the constitutional authorities of the new state.

Our discussion has four parts. First, we provide a historical overview that highlights key issues since the 1993 Oslo Accords. Second, we identify the most important challenges confronting the Palestinian internal security system, including conditions that might engender renewed internal strife. Third, we outline options for an effective internal security system that helps promote domestic order and a durable peace with Israel. Fourth, we discuss the costs associated with those options.

## Historical Overview

This section offers a brief overview of the key historical issues since the September 1993 *Declaration of Principles on Interim Self-Government Arrangements* (Oslo Accords) and the May 1994 *Agreement on the Gaza Strip and the Jericho Area.* The dates are important because they mark the beginning of limited Palestinian autonomy in the area of internal security. Prior to the Oslo Accords, the Palestinians lacked an autonomous police force and criminal justice system, both of which functions were provided by the Israeli government.

## Phases of Internal Security

The evolution of the Palestinian internal security system can be divided into three phases. During the first period, lasting from the Oslo Accords until approximately late 1995, Palestinian security forces were constituted mostly from members of the Palestinian Liberation Army and Gaza refugees. However, the Palestinian Authority failed to create effective institutions and the security forces gradually lost support. Corruption, mismanagement, and human rights violations quickly eroded their credibility.

During the second period, lasting from approximately 1996 to the beginning of the al-Aqsa intifada in 2000, there were sporadic efforts at reform. However, the Palestinian security institutions suffered from a notable lack of "process." Corruption was still rampant, and people with resources were able to establish their own private justice. Security courts became the preferred method of prosecuting accused spies, opposition figures, and many criminals. Such trials were not subject to public oversight and disregarded due process.

The third major period began with the al-Aqsa intifada in 2000, during which members of the Palestinian internal security forces participated in anti-Israeli violence. These actions enjoyed strong public support. In consequence, however, Israeli Defense Forces (IDF), took over virtually all security functions, destroyed much of the police infrastructure, and killed police officers involved in the uprising.

## Terrorist and Militant Groups

The salient internal security issue has been the activity of numerous terrorist and militant organizations.[1] Between 1993 and 2003, 1,188 people were killed by terrorist attacks in Israel, the West Bank, and Gaza; over 60 percent of those were between 2001 and 2003.[2] Several major organizations have been active over the last decade: Tanzim, al-Aqsa Martyrs Brigades, Hamas, Palestinian Islamic Jihad, the Popular Front for the Liberation of Palestine, the Democratic Front for the Liberation of Palestine, and Hezbollah.

*Tanzim* is a loosely organized militia of Fatah, the largest faction of the Palestine Liberation Organization (PLO). The organization has been involved in violence during the al-Aqsa intifada, and its members played prominent roles in two previous cycles of violence: the Nakba riots of May 2000 and the "Tunnel Riots" of September 1996.

---

[1] Used in this context, *terrorist group* refers to any substate organization that uses violence—or the threat of violence—against noncombatants to achieve political aims or motives. Defining terrorism and terrorist groups is a highly contentious endeavor, particularly in the context of the Israeli-Palestinian conflict. We have designated Hamas, PIJ, Tanzim, al-Aqsa Martyrs Brigades, PFLP, and Hezbollah as terrorist groups because they use violence (including suicide attacks) against noncombatants. This is consistent with the U.S. government's definition. See, for example, U.S. Department of State (2003), p. 99.

[2] The figures are from the Casualties and Incidents Database. They include the following years and numbers: 1993 (25), 1994 (215), 1995 (46), 1996 (78), 1997 (42), 1998 (21), 1999 (9), 2000 (31), 2001 (193), 2002 (356), 2003 (172).

The *al-Aqsa Martyrs Brigades* are an armed faction affiliated with Fatah, which emerged after the start of the al-Aqsa intifada. They have carried out numerous attacks on Israelis, worked closely with other groups, and deployed the first female suicide bomber of the intifada.

*Hamas,* whose declared goal is an Islamic state in Palestine, has been a key combatant since the early stages of the first intifada. Its robust social and political infrastructure has since enabled it to expand its support base from Gaza into the West Bank.[3] This organization is an important rival for power within Palestine and has periodically challenged the supremacy of the Fatah-oriented Palestinian Authority. In the wake of Yasser Arafat's death, Hamas has declared that it still will not participate in elections, raising again the question of its transformation into a normal political party. Since the late 1970s, several radical Palestinian Islamic factions have acted under the rubric of *Palestinian Islamic Jihad* (PIJ). The PIJ Fathi Shikaki faction, which likewise calls for an armed struggle to establish an Islamic state in Palestine, has been active as well.

Violent groups of a secular bent exist as well. *The Popular Front for the Liberation of Palestine* (PFLP), a Marxist-Leninist group founded in 1967 by George Habash, has conducted attacks against Israelis—including the October 2001 assassination of Israeli Tourism Minister Rehavam Ze'evi. It sees itself as "a progressive vanguard organization of the Palestinian working class," with the aim of "liberating all of Palestine and establishing a democratic socialist Palestinian state."[4] The *Democratic Front for the Liberation of Palestine,* which was founded in 1969 when it broke away from the PFLP, is a secular Marxist-Leninist group whose members believe that Palestinian goals can only be achieved by a popular uprising throughout the Arab world led by the proletariat.

Finally, *Hezbollah,* a Shi'ite militant organization and Lebanese political party, has targeted Israel from Lebanon with the support of Syria and Iran since the early 1980s. It has adopted a "strategic partnership" with Palestinian groups through joint training in Lebanon on guerrilla warfare, political coordination, intelligence-sharing, and the transfer of some weapons and financial assistance.[5] Hezbollah is judged by the United States and Israel to be the most capable of the terrorist organizations now operating in the region.

The IDF asserts that it has severely degraded the capacity of these terrorist groups. (This claim does not apply to Lebanese Hezbollah.) In particular, the army believes that Palestinian bomb-making capabilities have been severely reduced by capturing or killing of some of the most experienced bomb engineers.[6] According to IDF staff, roughly 90 percent of the terrorist attacks for which there is pre-incident intelligence are thwarted. Jaffee Center expert Shlomo Brom (BGen ret.) argued that, "'Defensive

---

[3] Mishal and Sela (2000); Hroub (2000).

[4] For an excellent review of these and other Palestinian rejectionist organizations, see Strindberg (2000).

[5] Strindberg (2003); Sobelman (2003).

[6] Interview with senior officials, Israeli Defense Forces, May 23, 2003.

Shield' has accomplished most of its aims. Much of the terrorist infrastructure has been destroyed. And while precise figures are not yet known, it appears that hundreds of Palestinian gunmen have been killed and many others wounded."[7] Some IDF officers went further, stating that Operation Defensive Shield was successful in reestablishing Israeli deterrence.[8] Nevertheless, attacks by Hamas, PIJ, al-Aqsa Martyrs Brigades, and other groups continued throughout 2004, although at a vastly lower tempo.[9] The persistence of attacks is an indicator of powerful motivation and the ability, albeit degraded, to replace personnel who are removed from the scene through death or capture.

### The Palestinian Security Structure

The domestic security forces were officially created in May 1994 following the signing of the Israeli-Palestinian Agreement on the Gaza Strip and the Jericho Area.[10] The agreement established several branches: Civil Police, Public Security, Intelligence, Emergency Services and Rescue, and the Coastal Police. In September 1995, the Israeli-Palestinian Interim Agreement added two more branches: the Preventive Security Service, which dealt with subversion, and the Amn al-Ri'asah, which was charged with protecting Yasser Arafat, then president of the Palestinian Authority (PA).[11] By 2004, the security apparatus in the West Bank and Gaza had expanded to include additional services such as military intelligence and military police.

Despite the upheaval of the intifada, as well as strong European, American, and domestic pressure for security sector reform, Yasser Arafat retained virtually exclusive control over the Palestinian security forces until his death in November 2004. To prevent challenges to his authority, he encouraged conflict and competition between the various branches and individual leaders of the security services.[12] Following Arafat's death, the Palestinian Authority leadership controlled the security forces.

Table 3.1 illustrates the functions of Palestinian security institutions as of 2004.[13] The Civil Police handles routine law enforcement functions, e.g., traffic control and public safety; the National Security Force patrols borders, but also has municipal patrol duties; the Preventive Security Service deals with subversion and violent political dissidents; the Coast Guard's mission is to detect and stop smuggling of contraband and ensure maritime safety; and the Civil Defense serves as the fire and rescue service. In addition, there are several intelligence services: General Intelligence gathers intel-

---

[7] Brom (2002).

[8] Goodman (2002); Henkin (2003); Levitt and Wilkas (2002).

[9] See, for example, the data from the Casualties and Incidents Database.

[10] *Agreement on the Gaza Strip and the Jericho Area* (1994), Article VIII, Article IX, and Annex I.

[11] Usher (1996); Weinberger (1995); Sayigh (1995).

[12] Luft (2000, 2002); Blanche (2001).

[13] For a description of the Palestinian security services, see Luft (1999).

**Table 3.1**
**Palestinian Internal Security Forces**

| Security Force | Function |
| --- | --- |
| Civil Police (Al-Shurta) | Keeps public order, directs traffic, and arrests common criminals |
| National Security Force (Al-Amn al-Watani) | Guards checkpoints, patrols borders, and conducts joint patrols |
| Preventive Security Service (Al-Amn al-Wiqa'i) | Handles subversion, counterespionage, and dissident organizations |
| Coast Guard (Shurta Bahariya) | Patrols territorial waters off of Gaza Strip |
| Civil Defense (Al-Difa'aal-Madani) | Conducts rescue and fire services |
| General Intelligence (Mukhabarat Salamah) | Gathers intelligence and conducts counterespionage operations |
| Military Intelligence (Istikhabarat al-Askariya) | Arrests and interrogates opposition activists and investigates other security bodies |
| Special Security Force (Al-Amn al-Khass) | Gathers information about opposition groups and monitors other security bodies |
| Presidential Security Service, Force 17 (Al-Amn al-Ri'asah) | Protects Arafat and other top PA officials, and arrests opposition activists and suspected collaborators with Israel |

ligence inside and outside the Palestinian territories and conducts counterespionage operations; Military Intelligence arrests and interrogates opposition activists; and the Special Security Force gathers intelligence on the Palestinian Authority's other security services and monitors their activity. Finally, the Presidential Security Service, (PSS or Force 17), serves as the personal security of top PA leaders. The PSS also suppresses opposition activists and individuals accused of clandestine collaboration with Israeli security services. The duplicative nature of this grab bag of police and paramilitary organizations reflects their fundamentally political origins and purposes.

### Administration of Justice

During the period of Israeli administration from 1967 to 1994, Palestinian courts did not handle security or political cases. Rather, East Jerusalem came under the jurisdiction of Israeli domestic law, and Israeli military courts and military committees retained jurisdiction over criminal matters in the West Bank and Gaza.[14] This changed in 1993 following the Oslo Accords, when a Palestinian criminal justice system was created that included a legal system, courts, and a ministry of justice.[15]

The current Palestinian legal system is an amalgam of British, Ottoman, Jordanian, and Israeli laws. All of Palestine practiced a form of British common law during

---

[14] Zureik (1988).

[15] For an overview of the Palestinian justice system, see UNSCO (1999).

the Mandate period. However, in the years following 1948, the legal systems in the West Bank and Gaza Strip diverged. The West Bank, then under Jordanian control, followed the Hashemite Kingdom in adopting French-based civil law. The legal system in Gaza, which was under Egyptian military administration, retained its British flavor. The Palestinian Authority has also established comprehensive laws that apply to both Gaza and the West Bank, while a number of Ottoman and Israeli laws and decrees persist in both regions. The Palestinian Legislative Council has the authority to draft and adopt laws that apply to the whole Palestinian Authority. Furthermore, the judicial system encompasses an array of courts—Conciliation, District, Municipal, and High Courts—that have jurisdiction over all levels of criminal infractions and civil claims. In addition, the State Security Courts and Military Courts have jurisdiction over cases involving threats to internal and external security, including crimes by civilians against security forces and suspected Israeli collaborators. Islamic shari'a courts adjudicate personal status cases. Finally, the Ministry of Justice oversees the administration and structure of the courts and judiciary and is home to an attorney general who is appointed by the president.

## Internal Security Challenges

By any objective measure, Palestinian security and justice institutions are deficient in their structure and operation. The general problems include a lack of independence from the political structure, a lack of oversight by and accountability to democratically elected legislative structures, political patronage, and a lack of resources to create professional security organizations that meet modern standards of performance. (These deficiencies and their consequences are covered in more detail in other places throughout this section.) These serious problems will not be remedied overnight.

The physical capital of the security forces has been destroyed since the al-Aqsa intifada began in September 2000.[16] Despite Palestinian Authority promises to restructure the security forces and reduce the number of services, there is no evidence that this has been done. Installations such as police stations in the West Bank and Gaza have been closed or destroyed by the Israeli Defense Forces. For instance, after Hamas gunmen entered an Israeli settlement in Gaza in October 2001 and killed two Israelis, the IDF responded by demolishing ten Palestinian police posts located nearby.[17] Israel has justified these attacks against Palestinian installations by accusing members of the Palestinian security forces of taking up arms against Israelis and failing to crack down on organizations such as Hamas and PIJ.[18] Indeed, there is significant evidence of

---

[16] Luft (2001, 2002).

[17] Dudkevitch and Lahoud (2001).

[18] On Fatah and the al-Aqsa intifada, see Rabbani (2001) and Paz (2001).

collusion between the Palestinian Authority security forces and anti-Israeli terrorists. Examples include cooperation between PIJ, Hamas, and the PA's General Intelligence and Preventive Security Service in the Jenin area, Tulkarm, Ramallah, and Nablus.[19] Furthermore, the Israeli reoccupation of significant portions of the West Bank has crippled the security forces' ability to perform even such perfunctory duties as directing traffic, patrolling cities, or investigating nonterrorist-related crimes.

In sum, the Palestinian security forces, which were never highly effective to begin with, have been weakened in at least three ways: Their physical infrastructure (buildings, weapons caches, police posts) has been destroyed; they have lost control and authority over significant portions of the West Bank and Gaza; and the Palestinian Authority has neglected to consolidate the vast security apparatus. The lack of institutional reforms to the security apparatus in Palestine, combined with the physical damage to the infrastructure, ensures the need for much reorganization and rebuilding.

Against the backdrop of these significant incapacities, the new state may find itself beset by intensified internecine violence. One or any combination of three plausible scenarios could bring this about. First, most conceivable variations on a Palestinian-Israeli final status accord will leave one or another rejectionist group unsatisfied and prepared to continue the fight against Israel.[20] Indeed, if a large part of the Palestinian population believes that a peace settlement failed to meet the minimum requirements of statehood, it will be difficult for a Palestinian government to co-opt members of militant groups. Recognizing that the Hamas charter may well be revised or reinterpreted in the wake of a peace accord, its currently accepted text warns: "Initiatives, the so-called peaceful solutions, and international conferences to resolve the Palestinian problem all contradict the beliefs of the Islamic Resistance Movement. Indeed, giving up any part of Palestine is tantamount to giving up part of its religion. There is no solution to the Palestinian problem except by Jihad."[21] Some militants are dedicated to the destruction of Israel and the reconstitution of pre-1948 Palestine. The IDF estimates that several hundred Palestinian militants are dedicated to combat against Israel and several thousand more actively support the infrastructure by offering money, transportation, housing, religious indoctrination, equipment, or training, and occasionally attacking IDF forces.[22]

Several factors may complicate efforts to counter irredentist violence. Deteriorating economic conditions in a Palestinian state, worsened by the return of refugees competing for scarce resources, could strengthen the leverage of organizations, such as

[19] See, for example, the documents captured by the IDF during Operation Defensive Wall, which are published on the IDF's web site at www.idf.il.

[20] These "rejectionist groups" would invariably lose power and prestige in the event of the formation of a Palestinian state. For a review of these groups and their individual focus, see Strindberg (2000).

[21] Hamas (1988), Article 13.

[22] Interview with senior official, Israeli Defense Forces, May 23, 2003.

Hamas, that sponsor both armed wings and massive social service efforts.[23] Under these conditions Hamas, in combination with other disaffected factions, could exploit social and economic dislocation in Palestine and win support for a violent challenge to the authority of the elected leadership. Another trigger for violence could be supplied by the large international presence that would descend on Palestine after independence. The UN and NGO presence, already large, would probably balloon. The deployment of U.S. or other international peacekeeping forces along the borders of a Palestinian state or in other areas could lead to violent attacks by armed groups against such troops, bases, or other symbolic structures—as happened in Lebanon in the 1980s and now in Iraq, where international NGO personnel are targeted by Sunni terrorists.

Competition for control of the new state and/or disputes over its ideological foundation could spark internecine fighting or even a civil war, with neighboring countries proffering support for rival factions. Khalil Shikaki maintains that if the Palestinian Authority suppresses internal opponents, it risks "being seen, if successful, as an Israeli lackey or even another Sa'd Haddad [the commander of the South Lebanon Army created by Israel in the late 1970s to provide security for northern Israel]."[24] If unsuccessful, it faces civil war. Although the PA and Palestinian militant organizations have worked assiduously to avoid armed confrontation with each other over the past decade, the PLO has historically been involved in violent confrontations with the Jordanian and Syrian armies, Lebanese militias, and Palestinian factions, such as those led by Abu Musa and Abu Nidal.[25] There were also sporadic periods of confrontation in the 1990s, such as after the February and March 1996 suicide bombings in Israel.[26]

Although the Palestinian Authority has maintained good relations with Egypt and Jordan, several other states could threaten the power of a Palestinian government, depending on the nature of a peace settlement and the makeup of the government. Syria and Iran, for example, have provided financial support, training, safe haven, and weapons to such organizations as Hamas, Palestinian Islamic Jihad, and PFLP.[27] There is also evidence that Saudi Arabia and other Arab states have supplied funding and encouragement to Palestinian militant organizations.[28] Consequently, these states could become disaffected with a Palestinian government and attempt to destabilize or overthrow it through covert activity, perhaps through Iran and Syria's relationship with Hezbollah.[29] A peace accord that resolves the status of the West Bank and Gaza but not the Golan Heights may increase the likelihood of Syrian intervention.

---

[23] Mishal and Sela (2000).

[24] Shikaki (2002a), p. 104.

[25] Kimmerling and Migdal (2003), pp. 240–273; Rubin and Rubin (2003), pp. 37–99.

[26] Mishal and Sela (2000), pp. 75–76; Davis (1996); Battersby (1996a).

[27] On Iranian and Syrian support for Palestinian groups see U.S. Department of State (2003), pp. 77, 81; Jane's Terrorism Intelligence Center; Levitt (2002, 2003).

[28] Mishal and Sela (2000).

[29] On Hezbollah's relations with Syria and Iran, see Warn and Strindberg (2003) and Goldberg (2002).

Case 1:04-cv-00397-GBD-RLE    Document 547-372    Filed 06/25/14    Page 10 of 28

These challenges could be compounded by the territorial configuration agreed upon as part of a final status accord, which in turn will set the overall context for Palestinian internal security and administration of justice arrangements. As noted elsewhere in this report, the greater Palestine's territorial contiguity the more efficiently it can be administered. Conversely, the costs of a noncontiguous state are demonstrable. Palestinian authorities, for example, have dealt with the division of Palestine between the West Bank and Gaza by duplicating services. Many ministries, including those responsible for internal security, have deputies for both areas. The construction of a land corridor connecting Bayt Hanun in the northern part of Gaza with Hebron in the West Bank, which was discussed during the Camp David and Taba negotiations, would improve contiguity challenges by facilitating movement between the areas without eliminating them entirely.[30]

Although the continuing presence of Israeli settlements in an independent Palestine is unlikely, and it is somewhat improbable that Palestine would agree to the sort of territorial dispensation that would retain Israeli sovereignty over settlements within the West Bank, these contingencies cannot be ignored. If the settlements remain, the Israelis would face the challenge of securing their safety. The Palestinians would need either to create self-standing security forces in the Palestinian areas that are isolated by the settlements or to address the logistical challenges of quickly moving Palestinian police and security forces through Israeli checkpoints to respond to incidents in Palestine. As one planning representative argued: "It is very difficult to plan, let alone complete, Palestinian infrastructure with the settlements."[31] Although in theory it is possible to build connecting corridors through the settlements, such an approach would be expensive and difficult to maintain. If some Israeli settlements remained and international peacekeeping forces were deployed to Palestinian territory to assist the government, these forces would need to liaison with the Israeli forces securing the settlements.

A final issue is the security barrier that is currently being constructed near the Green Line[32] separating Israel from Palestinian territory, around Jerusalem, and in various areas within Palestinian territory. The barrier was officially approved by the Israeli Defense Cabinet in July 2001, following the recommendations of a steering committee headed by the director of the National Security Council. Construction began shortly thereafter to prevent the infiltration of terrorists and criminals into Israel.[33]

The barrier has the potential to both exacerbate and improve the security situation. Supporters argue that it will increase Israel's ability to deny entry to suicide attackers.[34] Reducing suicide attacks would remove a major irritant in Palestinian-

[30] See, for example, "Moratinos Nonpaper" (2002), p. 83.

[31] Interview with senior Palestinian planning official, May 21, 2003.

[32] The Green Line is the name given to the 1949–1967 division between Israel and the West Bank.

[33] *Seam Zone* (2003). Also see B'Tselem (2002b) and Sheehan (2003).

[34] Elizur (2003); Steinberg (2003); Bennet (2002); *Seam Zone* (2003).

Israeli relations and, on balance, reduce the security burden on the Palestinian internal security service.[35]

### Administration of Justice

States derive much of their legitimacy from their ability to maintain public order. The Palestinian Authority's law enforcement and judicial infrastructure has been eroded beyond what can remotely be considered effective.[36] As a World Bank report concluded: "Legal development, despite public statements to the contrary, has not been a priority of the Palestinian Authority."[37] The justice system has little independent power and accountability over the Palestinian security forces. The security forces have consistently and systematically ignored orders of the Palestinian High Court to release detainees, judges have been removed from office without reasonable cause, and the courts are powerless to prosecute security officers who commit crimes.

Moreover, the absence of external accountability over the security forces has led to numerous allegations of human rights abuses.[38] For example, Human Rights Watch argues that the security forces have frequently detained Palestinians without charges or trial, arrested alleged collaborators without sufficient evidence and warrants, denied prisoners access to lawyers and independent doctors, tortured prisoners under interrogation, and refused to prosecute vigilante killings against suspected Israeli collaborators.[39] According to the Palestinian Human Rights Monitoring Group, at least 28 detained prisoners have been killed while in custody since 1995.[40] A number of the detained prisoners who were killed in custody were accused of collaborating with Israel.

The emergence of an empowered Palestinian Authority has not significantly altered the legal landscape. In many ways it has simply substituted one system of patrimony with another.[41] The absence of synchronized laws has compounded the serious shortcomings in the current system, including a lack of consistency in the application of the rule of law as well as the proliferation of judicial bodies with significant overlap in their mandates.[42] There are eight types of Palestinian courts: the Magistrates Court, District Court, Municipal Court, Court of Appeals, High Court of Justice, Supreme

---

[35] Palestinian militant groups would likely adopt countermeasures to a barrier. They could, for example, increase efforts to enter Israel by sea, recruit militants from the Arab community in Israel, or fire Katyusha or Qassam rockets over the barrier.

[36] Luft (2001, 2002).

[37] Ierley (2001), p. 17.

[38] Shikaki (2002b).

[39] Human Rights Watch (2001).

[40] Palestinian Human Rights Monitoring Group (www.phrmg.org).

[41] For a fuller account of this phenomenon, see Brynen (1995).

[42] Interview with Hiba I. Husseini, Palestinian Attorney, Ramallah, PA territories, May 21, 2003.

Judicial Council, Military Courts, and the State Security Courts.[43] In reality, few of these courts are currently functioning, and there is little indication that they were effective, even at the height of Palestinian court effectiveness between 1996 and 1999.

The Palestinian legal community is under-resourced and ill-trained. The entire Palestinian legal profession comprises just 1,000 lawyers to service the approximately three million people living under the administration of the Palestinian Authority.[44] Similar shortfalls affect judges, as well as the staffing of the court's necessary administrative positions. Criminal cases routinely take three to five years for initial adjudication, a length that far exceeds international standards.[45]

An effective Palestinian state must be able to perform a number of such basic law enforcement tasks as patrolling cities and towns, investigating crimes, directing traffic, and punishing criminals. Palestinian police have already had to deal with a wide array of crimes, such as murder, kidnapping, theft, and arson, and the creation of a Palestinian state may increase the challenges to public order. First, the potential flow of Palestinians from overcrowded and impoverished Gaza to the West Bank could increase policing problems in the West Bank. The establishment of a state will likely cause a net flow of people from Gaza to the West Bank. Because Gaza has a higher unemployment rate, lower per-capita income, and lower levels of educational attainment,[46] a significant movement of Palestinians from Gaza to the West Bank could increase both the likelihood of intercommunal conflict and the number of incidents of common crime.

Second, as noted earlier, the return of Palestinian refugees following a peace settlement could also increase public order challenges.[47] About 2.5 million registered refugees reside outside of the West Bank and Gaza, primarily in Jordan, Lebanon, and Syria.[48] Many are poor, and the repatriation of even a small percentage of those refugees may raise crime rates because of their economic marginalization.

Third, the absence of competent institutions has strengthened the role of informal, tribal, and unofficial modes of enforcement and administration of justice at the expense of the limited progress made between 1994 and 2000. The refugee camps are a particular locus for patron-based forms of dispute resolution and maintenance of public order.

---

[43] The initial six are described in LAW (1999), with the final two noted as recent additions in Sayigh and Shikaki (1999), p. 42.

[44] Ierley (2001), p. 7.

[45] Al-Haq (2002).

[46] World Bank (2002).

[47] Sayigh (2000/2001).

[48] UNRWA (2003).

## Internal Security Options

To create an effective and workable system for the administration of justice and what the United States might call homeland security, a Palestinian state will require external assistance. However, it will be up to Palestinians themselves to implement the substantial institutional changes—establishing an independent judiciary, eliminating executive control over the security forces, and reducing corruption and patrimonialism—that will be required if U.S. and international assistance is to be effective. In this section, we focus on constructing a viable Palestinian administration of justice system and accountable "homeland security" services, and we discuss the critical role that the United States and the international community should play in providing assistance and fostering reforms.

### Administration of Justice

The long-term goal of the United States and the international community should be to ensure that a Palestinian government has robust and self-sustaining capacities in the administration of justice. Critical objectives include

- increasing the independence, transparency, and accountability of security and justice institutions in Palestine
- improving human rights conditions
- encouraging capital investments in court buildings, police stations, prisons, and detention facilities
- unifying the myriad laws in the West Bank and Gaza
- improving the competency of judges, prosecutors, and police officers through training
- providing such necessary equipment as legal texts, computers, forensic tools, and basic paraphernalia of routine law enforcement.

This subsection examines areas in which the United States and international community can encourage restructuring of the justice system and provide financial assistance, equipment, training, and other aid to a Palestinian government without becoming directly involved in the implementation of policies. We concentrate on three topics: staffing levels for major justice administration functions; capital investments; and basic reforms for judges and courts, police, prosecutors, and detention facilities.

**Staffing Levels.** Although choices about assistance to a Palestinian government—in the form of training, technical aid, and related support—will in part be dictated by the security environment, they will largely be determined by the capacity of the Palestinian institutions to receive assistance. Put another way, the amount of indirect aid required will be proportional to, or at least a function of, the size and efficiency of the internal security institutions that the Palestinians create. States and organizations

providing assistance will also look closely at the Palestinians' commitment to respecting human rights and the Palestinian institutions' resistance to corruption.

The available evidence tells a confusing and incomplete story about the nature of Palestinian internal security institutions. For example, Jenin's Magistrate Court has been cited as particularly shorthanded, with just one judge serving a jurisdiction of 250,000 people.[49] In contrast, Palestinian law enforcement ratios have been high. The ratio of police to citizens in Palestinian-controlled areas has been estimated at 1:50, whereas the United States averages a ratio of 1:400.[50]

To clarify staffing levels that might be appropriate for Palestinian internal security, we examined staffing ratios in other countries. For comparison purposes, we chose Afghanistan, Bosnia, Bulgaria, Egypt, Haiti, Jordan, Kosovo, Poland, and Turkey. Each of these countries bears some similarity to Palestine. Many (Afghanistan, Bosnia, Bulgaria, Haiti, Kosovo, and Poland) have been through recent seminal transitions in the structure and operation of their national governments. Others, such as Jordan, Egypt, and Turkey, are primarily Muslim and offer potential important cultural comparisons. Because good data on the United States are generally available, we also use it as a point of comparison.

Table 3.2 shows that there is considerable variation in the staffing levels of the comparison countries. Egypt, for example, maintains an estimated 37.7 police per 100,000 population, while Bosnia maintains more than 700.[51] Fewer data are available on prosecution functions, but Turkey appears to have the lowest staffing ratio, while Egypt has the highest. Similar ranges are found in the area of the courts and detention facility staff. We were unable to find information about how other countries staff their counterterrorism and counterinsurgency functions.

The wide variation in internal security staffing ratios across these countries suggests that there is no absolute level of staffing associated with internal security. To further clarify the choices, we developed "low," "medium," and "high" staffing levels in relation to the estimated population of Palestine. We present these findings in Table 3.3.

The data from Table 3.3 help define the choices available for the development of Palestinian public safety institutions. If Palestine staffed policing at the same per-capita ratio as Egypt, 1,369 officers would be needed; if it staffed at the same ratio as Bosnia, 25,940 officers would be needed. The number of Palestinian prosecutors could range from a low of 160 to over 1,000. If a Palestinian government pushed for judges and court staff at the same ratio as Egypt, it would need a total of 57; using the ratio for Bosnia it would be nearly 800. Finally, the total number of jail and prison staff could range from a low of 53, using the per-capita ratio for Egypt, to a high of nearly 3,000,

---

[49] LAW (1999), p. 38.

[50] Luft (1999).

[51] The Bosnian figure is probably inflated by the inclusion of security personnel in the count of policing staff.

**Table 3.2**
**Staffing Ratios for Internal Security Functions, Selected Countries**

|  | Number of Personnel per 100,000 Population | | | |
|---|---|---|---|---|
|  | Police | Prosecution | Judges and Court Staff | Jail and Prison Staff |
| Afghanistan | 187 | NA | NA | NA |
| Bosnia | 714 | NA | 22 | 75 |
| Bulgaria | NA | 11 | NA | NA |
| Egypt | 38 | 28 | 2 | 2 |
| Haiti | 68 | NA | NA | NA |
| Jordan | 83 | NA | 20 | NA |
| Kosovo | 143 | NA | 14 | 53 |
| Palestinian Territories | 370 | 2 | 2 | NA |
| Poland | 260 | 11 | 15 | NA |
| Turkey | 254 | 4 | 9 | 39 |
| United States | 244 | 10 | 10 | 141 |

SOURCES: United Nations Surveys of Crime Trends and Operations of Criminal Justice Systems, covering the period 1990–2000, http://www.unodc.org/pdf/crime/seventh_survey/567sc.pdf; Jordanian police figures modified with data from http://www.1upinfo.com/country-guide-study/jordan/jordan143.html.

**Table 3.3**
**Palestinian Internal Security Staffing Needs, by Function**

| Population: 3,634,495 | Estimated Number of Personnel | | | |
|---|---|---|---|---|
|  | Low | Medium | High | U.S. |
| Police | 1,369[c] | 9,465[e] | 25,940[a] | 8,863 |
| Prosecution | 160[f] | 410[b] | 1,016[c] | 343 |
| Judges and court staff | 57[c] | 496[d] | 789[a] | 379 |
| Jail and prison staff | 53[c] | 1,937[e] | 2,732[b] | 5,132 |

NOTES: These figures were extrapolated from the staffing levels of the selected countries presented in Table 3.2, taking into account the population of Palestinian territory. Letters correspond to the country from which the staffing estimate is derived: [a]Bosnia; [b]Bulgaria; [c]Egypt; [d]Kosovo; [e]Poland; [f]Turkey. "Low," "high," and "U.S." represent the lowest, highest, and U.S. staffing ratios among the countries for which data are available. "Medium" represents the staffing ratio for the country closest to the average among countries for which data are available.

using the ratio for Bulgaria. The figures are also useful for thinking about cost and timing factors, which are discussed in the last section of this chapter.

**Capital Investment.** It is important not to underestimate the needs of the various components of the Palestinian justice system. A USAID evaluation described the system as in "a state of virtual collapse" and "moribund and decapitated."[52] The capabilities and infrastructure of the Palestinian police and security forces have been

[52] U.S. Agency for International Development survey quoted in UNSCO (1999), p. 12.

destroyed during the al-Aqsa intifada. In 2003, over 40 Palestinian police installations that housed prisons, training centers, and forensic laboratories were destroyed. Some Palestinians estimate the cost of the damages at $27 million.[53]

Although a host of countries and global institutions have embarked on over $100 million worth of projects to address the needs of the Palestinian justice system, only one-tenth of total aid has been earmarked for construction and refurbishment of physical infrastructure.[54] The destruction of the physical infrastructure necessitates significant capital investment. By functional area, the key capital investment requirements are the following:

- *Judges and courts:* Work facilities, courts, and office space. In addition, a training facility that allows judges and court personnel to remain current on international adjudication standards is required.
- *Police:* Work facilities and equipment, including office space, uniforms, patrol cars, communication gear, and protective gear such as helmets and flak jackets. Also, a training facility is required to ensure that the Palestinian police are current on basic practices in patrol, investigation, dispute resolution, use of force, and respect for human rights.
- *Prosecutors:* Work facilities, such as office space. In addition, a case-tracking system is required.
- *Detention facilities:* The Palestinians need prisons, jails, and pretrial detention facilities. Ideally, these facilities would separate those arrested for serious felonies from misdemeanants during pretrial custody and segregate violent and nonviolent offenders. A training facility on custodial matters is also needed. The training facility would emphasize basic human rights, the provision of basic medical care, and an understanding and commitment to the rule of law.

**Basic Reforms.** The Palestinians' greatest justice needs are in such areas as creating and maintaining an independent judiciary; improving the operational capacity of law enforcement; reconstituting effective forensic capacity; operating secure detention facilities; and improving the capabilities of judges, police, and prosecutors through training. We discuss four areas in detail: judges and courts, police, prosecutors, and detention facilities.

In general, structural reform is needed to ensure that justice and security functions are distinct and under the domain of separate ministries. The Ministry of Justice should have broad responsibility for the administration of justice in Palestine. The civil police, court system, and civil defense programs would operate under the Ministry of Justice's control. The civil police would work in close contact with the court system

[53] Leggett (2003).

[54] UNSCO (1999).

both to investigate criminal acts and to prosecute arrested subjects. It is important that civil police forces, which are dedicated to traditional criminal concerns, be controlled by a ministry that has a strong basis in law enforcement and a strong connection to the courts, and that these functions be distinctly separated from the internal security functions of domestic intelligence, border patrol, and other quasi-military functions.

*Judges and Courts.* Creating an independent judicial system and developing an effective rule of law have not been central concerns for the Palestinian Authority. Consequently, the United States and international community should strongly encourage steps to create an independent judiciary. A functioning judicial system in Palestine would be responsive and accountable to the populace. Responsiveness would ensure that the Palestinian state pursues criminal cases on the behalf of all victims of codified crimes, regardless of their political affiliations and resources. Accountability would include transparent processes for judicial review and appeal.

An independent judicial system is fundamental to good governance and a viable internal security system. High-priority reforms include the unconditional acceptance by the executive branch of judicial independence as laid out in the Palestine Basic Law and the Judicial Authority Law, in addition to an independent Ministry of Justice.[55] A possible litmus test would be the cessation of presidential decrees, which are widely interpreted as superseding established law. In addition, there is a need to empower and reorganize the Supreme Judicial Council, a body whose responsibility for nominating and promoting judges is vital to the strengthening of judicial authority vis-à-vis the executive and legislative branches.[56]

Another step should be to unify the myriad laws and procedures in the West Bank and Gaza. This might include establishing a permanent secretariat to coordinate the various law commissions working in these areas, and providing them with technical and support staff, office space, legal materials, and supplies.[57] A Palestinian government would also need to unify the separate court systems and their overlapping jurisdictions in the West Bank and Gaza. This might include abolishing the Military and State Security Courts, which conduct extrajudicial trials, are closed to the public, and offer no right of appeal—despite the fact that these courts handle many routine criminal cases. As an interim first step, the executive authority should clearly define the functions of these courts, make them transparent, permit credible defense, and provide for appeal.[58]

---

[55] The Palestine Basic Law (Article 89) states: "Judges shall be independent, and shall not be subject to any authority other than the authority of law while exercising their duties. No other authority may interfere in the judiciary or in the justice affairs." On establishing an independent judiciary, also see LAW (1999).

[56] Sayigh and Shikaki (1999, 2003).

[57] The construction of a Legal Databank System, or Al-Muqtafi, at Birzeit University's Institute of Law is a laudable step in efforts to unify legislation by compiling all legislation enacted in Palestine since the middle of the nineteenth century. For access to the Al-Muqtafi online, see lawcenter.birzeit.edu.

[58] Sayigh and Shikaki (1999), pp. 9–10.

The United States and the international community can play an important role in supplying equipment and providing training for judges and staff. A greater number of trained, well-paid, and independent judges will be critical in creating a viable administration of justice, as will training for bailiffs and clerks and the establishment of a national judicial training facility.[59] In the past, the PA has had insufficient revenue to pay judges enough to mitigate the possibility of corruption.

**Police.** The United States and the international community can be of significant service in encouraging police reform and providing financial assistance and training. Structural reform and financial assistance will be required to develop the two major elements of democratic policing—responsiveness and accountability—that are missing from Palestinian policing.[60] *Responsiveness* is the ability of the police to take its cues from individual members of the public, not from state and government. The most obvious example of responsiveness is a 911-type call system. Such a system demonstrates the power of the individual to summon police assistance, regardless of social and political standing. Responsiveness brings two advantages. First, it shows that police are accountable to diverse interests, including those of minority ethnic background or political opinions. Second, it shows that the authority of the state will be used in the interest of the people. *Accountability* is the police authority's submission to and acceptance of outside supervision. Courts, legislatures, the media, ombudsmen, and complaint processes are all forms of accountability. Accountability is critical because it demonstrates, transparently, that police are responsible to laws, not governments. Several steps should be taken to develop the responsiveness and accountability of the Palestinian police system.

Palestinian law enforcement must be held accountable by an independent and effective judiciary. This not only includes preventing police impunity from prosecution but also involves such steps as requiring police to secure warrants from a judge before conducting such activities as wiretapping. A weak judicial system that is corrupt and plagued by patrimonialism will increase the likelihood of human rights violations by Palestinian police.[61]

Palestinian law enforcement would also benefit from foreign training in police management, investigative techniques, crime scene investigations, riot control, traffic control, juvenile justice, and proper interview and interrogation techniques. Such training helps make responsiveness part of the organization's core values. Training police forces has been common in past nation-building operations. For example, beginning in 1994 the U.S. Justice Department's International Criminal Investigative Assistance Program (ICITAP) trained Haitian law enforcement officials in administrative and

---

[59] A national judicial training facility might include training in such areas as juvenile justice, labor issues, and fiscal and administrative law. See, for example, UNSCO (1999), p. 25.

[60] National Institute of Justice (1997).

[61] On patrimonialism in Palestinian territory, see Brynen (1995).

managerial capabilities, as well as in such specialized skills as investigative policing and forensics.[62] (Of course, foreign assistance programs must be tailored to local Palestinian traditions and practices.) Also necessary would be the construction of a national training institution with a systematized curriculum that incorporates human rights and other international standards.[63]

Finally, it will be important to develop an independent forensic science capacity. Immediate needs include the ability to conduct fingerprint identification and basic evidentiary forensic testing. Also important would be the construction of forensic crime labs and the training of relevant police officials in basic explosive detection and in preserving evidence for prosecution.

*Prosecutors.* A Palestinian state should be strongly encouraged to improve the prosecutorial system. There will likely be a need to increase the number of Palestinian lawyers and improve their training.[64] Aid will be required to establish a more universal training program designed to regulate the profession and ensure that basic competencies are achieved before lawyers are fully licensed to practice.[65] Such a program would serve to institutionalize accepted procedures and to create the potential for continuity in the application of law between the West Bank and Gaza. Licensing procedures should also include the passage of a bar association law that addresses at least minimum criteria for admission to the bar. International donor assistance for the construction of law university facilities will be necessary to mitigate the strain on existing infrastructure. In the past, support for the Palestinian prosecutorial system has come from Germany (through the Konrad Adenauer Foundation), Norway, the United Nations, and Birzeit University's Institute of Law.

*Detention Facilities.* Structural reform and assistance will be necessary for detention facilities. Palestinian detention custodians require training in the proper treatment of prisoners. This training should include such factors as respecting detainees' human rights and giving them basic medical care. International assistance will be necessary to supply such basic necessities as blankets, kitchen facilities, and medical facilities. The creation of an independent judiciary is also critical for the establishment of effective detention facilities, since Palestinian jail and prison staff have generally answered to the executive branch rather than to the courts.[66]

The international community can greatly improve the prospects for successful reform of the justice system by deploying international police and helping to vet and

---

[62] Bailey, Maguire, and Pouliot (1998); Perito (2002).

[63] On the Palestinian police and human rights violations, see Human Rights Watch (2002).

[64] Legal professionals have frequently requested training and further development of the technical capacity of their staff. See, for example, UNSCO (1999), p. 19.

[65] The current system requires a law degree from a licensed university and a two-year apprenticeship; however, the latter is largely unstructured and provides no established benchmarks indicating proficiency in the field.

[66] Brown (2002), p. 31.

recruit judges, attorneys, police officers, and others involved with the administration of justice.[67] This relatively intrusive approach would be warranted by the extremely limited Palestinian capacity to follow through on reforms and the fact that the judicial selection process is currently tainted. A buildup time will likely be needed to establish optimum capabilities and force-to-population ratios. During this interim period, the international community might need to play a more direct role in such areas as law enforcement, detention facilities, and the justice system.

Several potential roles might be envisioned:

- Vetting, recruiting, and selecting judges and police
- Monitoring and supervising local law enforcement officials
- Training and mentoring local police forces through joint patrols
- Occasionally performing law enforcement functions
- Assisting in detention facilities and monitoring human rights conditions.

In its mildest form, direct involvement in the Palestinian judicial system might take the form of helping to vet, recruit, and approve judges. This has been done in several nation-building operations and would involve sending a team of U.S. or international jurists to work with the Palestinian government to help select judges, take inventory of courts, and catalogue the qualifications of judges. Experienced jurists would need to interview potential judges and perhaps prosecuting attorneys to make a judgment about their competence and qualifications. The current absence of appropriately trained legal professionals in Palestinian territory suggests that outside expertise would be beneficial.

The team of outside judicial experts might also be used to recruit qualified candidates rather than waiting or relying on those suggested by the administration. Though perhaps more difficult for outsiders to perform, this task might be completed through personal interviews with members of the bar, other portions of the legal system, and Palestinian advocacy groups who have monitored the legal system.

An international panel could play a similar role in helping to select, train, and monitor key officials with responsibility for law enforcement, including leaders of the police and security services. In this case, the vetting panel would be drawn from serving and retired U.S. and international police, intelligence, and other government sectors with security expertise. In addition to the vetting panel, personnel for monitoring ongoing effectiveness might be necessary. This task would be important to prevent known human rights abusers, criminals, and terrorists from serving in Palestinian law enforcement.

A stronger form of direct aid would involve the use of U.S. or international police to assist Palestinian police in such functions as patrol, investigation, arrest, and ensuring safe passage of returning refugees or displaced persons. This has been done in a

---

[67] On direct intervention in past nation-building operations, see Schmidl (1998) and Perito (2002), pp. 1–10.

number of nation-building operations, such as Haiti, Bosnia, and Kosovo, with the assistance of American police, Italian *carabinieri,* French *gendarmerie,* Spanish *guardia civil,* Dutch *marechaussee,* and others.[68] These cases have included the deployment of armed international police to monitor, train, mentor, and sometimes substitute for indigenous forces until a proficient domestic police force is created. In Haiti, for example, several thousand international police, armed with weapons and given the power to arrest, were deployed in support of military peacekeepers. They assisted the Haitian National Police by conducting joint patrols, mentoring, and establishing standardized reporting forms to evaluate police performance and effectiveness.[69]

As Figure 3.1 illustrates, if countrywide deployment of international police were attempted in a Palestinian state on the same scale as in Kosovo, Somalia, Bosnia, or Haiti beginning in 2003, the force could range from zero to a high of more than 8,000 per year.

Finally, a third party could play a significant role in detention, as occurred after the Oslo Accords. One of the primary functions for U.S. observers was to ensure that terrorists and criminals convicted by the PA remained in custody. A direct aid role might involve allowing international prison guards and jailers to assist in the custodial care of inmates, monitor human rights conditions, and perhaps take inventory of detention facilities.

### Reform of the Security Services

One of the most important internal security challenges for a nascent Palestinian state will be to restructure the Palestinian security services and curb the activity of terrorist



**Figure 3.1**
**International Police Projections for West Bank and Gaza**

RAND MG146-3.1

[68] Perito (2002); Dobbins et al. (2003); Oakley, Dziedzic, and Goldberg (1998).

[69] Perito (2002), pp. 38–47.

organizations and other militant groups that may seek to attack Israel, undermine a peace accord, or destabilize the Palestinian government.

The long-term goal of the United States and the international community should be to ensure that the Palestinian government has a self-sufficient capability to counter militant organizations operating from its territory. To reach this goal, Palestinians, working with the United States and other countries, must

- restructure the security services by decreasing their total number
- eliminate executive control over them
- establish an oversight mechanism
- improve a range of vital capabilities including airport security, bomb detection, monitoring of terrorist financing, VIP protection, hostage rescue, and crisis management
- develop a tactical capability sufficient to disrupt terrorist cells and dismantle terrorist infrastructure within Palestine territory
- establish productive intelligence liaison relationships with key regional countries, including Israel, and with the United States.

Currently, internal security institutions operate largely under the control of the Palestinian Authority leadership. There are few checks and balances on these security institutions, and their functioning is opaque to external observers. Palestinian internal security forces are generally organized by the "rule of the perceived patron" rather than by the rule of law. An additional problem with the current structure is that it tends to blend quasi-military and justice administration functions either under a single ministry or with overlapping lines of authority. Thus, even if the Palestinian Authority ultimately invests its ministers with true executive authority, internal security forces are still structured, and thus likely to perform, in a suboptimal manner. It is important to separate the military and intelligence functions of the internal security apparatus from those departments that are strictly responsible for the administration of justice.

**Restructuring the Security Services.** It is necessary to separate administration of justice and security functions in the executive hierarchy. The realignment proposed below for the security functions is drawn from the current list of internal security forces presented in Table 3.1. A revamped Ministry of Interior should be created. In past agreements, the Palestinian Authority has been specifically denied the ability to maintain a Ministry of Defense. A Ministry of Defense might normally be seen as the appropriate part of government to direct organizations such as the various intelligence agencies and preventive security forces that are likely to deal with terrorism. In the absence of this option, the Ministry of Interior is the next-likely place from which to direct these organizations.

The major components grouped under the Ministry of Interior are outlined in Table 3.4. They exclude the police and Civil Defense (rescue and fire services), which should be organized within the Ministry of Justice.

Under this realignment, the National Security Force would guard checkpoints and patrol borders. Its mandate would necessitate ongoing interaction and coordination with border patrol, military, and intelligence bodies from Israel, Egypt, Jordan, and other relevant parties. The Preventive Security Service would handle issues related to subversion, counterespionage, and dissident organizations within the Palestinian state. General Intelligence would gather intelligence and conduct counterespionage operations. Although not designed as exclusively counterterrorist in nature, this service would need to work with counterterrorism agencies in other countries such as Israel, Jordan, and Egypt to be effective. The Presidential Security Service would protect various leaders within the government, including the president and prime minister. The Coast Guard would patrol territorial waters off of Gaza and monitor activity in the Dead Sea. In this proposed realignment, the Special Security Force and Military Intelligence would be eliminated because their functions largely overlap with the Preventive Security Service, and the judicial and legislative branches would ideally have oversight over the security services.

In the United States, these security functions typically receive a high degree of oversight from the U.S. Congress. Other democratic countries generally exert some combination of executive and legislative oversight over such forces, and the judicial branch holds them accountable. Given the degree to which political—as opposed to genuine executive—control has been a problem in Palestine, a model of strong legislative oversight seems appropriate.

**Table 3.4**
**Proposed Security Service Realignment**

| Security Service | Function | Size[a] |
|---|---|---|
| National Security Force (Al-Amn al-Watani) | Guard checkpoints and patrol borders | 18,000 |
| Preventive Security Service (Al-Amn al-Wiqa'i) | Handle subversion, counterespionage, and dissident organizations | 3,500 |
| General Intelligence (Mukhabarat Salamah) | Gather intelligence and conduct counterespionage operations | 3,000 |
| Presidential Security Service (Al-Amn al-Ri'asah) | Protect top Palestinian officials | 500 |
| Coast Guard (Shurta Bahariya) | Patrol territorial waters off of Gaza | 200 |
| Total | | 25,200 |

[a] These numbers are based on past estimates of their size taken from International Strategic Studies Association (2002), pp. 1320–1321 and IISS (2002), p. 115.

Case 1:04-cv-00397-GBD-RLE   Document 547-372   Filed 06/25/14   Page 24 of 28

**Improving Capabilities.** The United States and the international community can also provide equipment, monitoring, training, and other assistance to the Palestinian security services. Since the long-term goal should be to establish Palestinian self-sufficiency, the international role should be a temporary one. A Palestinian government will need to adopt a combination of two strategies—co-option and enforcement—to deal with terrorist and other militant organizations. *Co-option* involves offering inducements to militants to wean them from the use of violence, guarantees regarding participation in the political process if they jettison their commitment to armed struggle, amnesties and early release from prison, or jobs in the public or private sector. Indeed, since organizations such as Hamas have political arms, it is conceivable that a portion of them may decide to participate in the political process if a Palestinian state is created.

However, it is plausible to assume that there will be some rejectionists who will not give up armed struggle because they are unhappy with a peace settlement, are frustrated with the organizational makeup or policies of a Palestinian government, or wish to continue jihad against Israel. This means that a Palestinian government will need to adopt an *enforcement* strategy as well, especially the arrest and prosecution of militants.

For much of the 1990s, the Palestinian Authority was somewhat effective at dealing with organizations such as Hamas and PIJ when it wanted to be.[70] The PA demonstrated some willingness to confiscate arms and to arrest, jail, and even kill individuals. For example, following the February and March 1996 suicide bombings in Israel, Palestinian forces led by Muhammad Dahlan, head of the Palestinian Preventive Security Service, targeted Hamas's Ezzedin al-Qassam wing in Gaza that was planning attacks against both Israelis and PA leaders. In a six-week sweep in March and April 1996, Palestinian police arrested more than 600 Islamic militants.[71] In April 1997, the IDF and the Palestinian Authority, led by West Bank security chief Jibril Rajoub, dismantled the Hamas "Halhoul" cell in the West Bank. This led to violent clashes between Palestinian police and Palestinian demonstrators in Hebron. In October 1998, the PA placed Hamas spiritual leader Sheikh Ahmed Yassin under house arrest following a bombing in Gush Katif, and Dahlan organized the arrest of dozens of Hamas activists.[72]

These steps were often taken in coordination with Israeli intelligence services.[73] However, the Palestinian Authority's actions were neither comprehensive nor frequent enough throughout the 1990s, and the police and security forces often violated basic human rights by resorting to torture or assassination.

---

[70] See Mishal and Sela (2000), especially pp. 49–112.

[71] Davis (1996) p. 2; Battersby (1996b).

[72] Harman and Dudkevitch (1998); Kershner (1999).

[73] Black (1997).

Since a Palestinian government is likely to utilize an enforcement strategy against rejectionists, the United States and the international community can assist in at least three areas: providing capacity-building training, offering military and other counter-terrorism assistance, and improving intelligence cooperation and provide intelligence monitoring.

*Capacity Building.* Security and combat training would improve the capacity of the Palestinian security and law enforcement personnel to take strong, decisive action against terrorist and militant organizations.[74] Of particular importance will be training in such areas as bomb detection, sniper training, firearms training, VIP protection, covert communications, terrorist financing, interrogation techniques, and human rights. Indeed, the United States has provided this type of assistance since the early 1990s, when the CIA's Middle East operations chief Frank Anderson resurrected U.S. contact with the PLO. The Central Intelligence Agency subsequently trained members of the Palestinian Preventive Security Services and General Intelligence in Jericho, Ramallah, and the United States. The training covered a wide range of areas from firearms training to interrogation techniques and bomb disposal.[75] The U.S. State Department's Anti-Terrorism Assistance (ATA) Program, managed by the Bureau of Diplomatic Security, also provides such training to foreign governments.[76] The Egyptian and Jordanian intelligence services could also offer security and other training to the Palestinian security services, as they have in the past.[77]

*Military and Counterterrorism Assistance.* The United States and the international community should supply equipment and financial aid to the Palestinians. Non-lethal assistance might include navigation equipment, such as global positioning systems, radios, and other communications equipment; protective gear, such as helmets and flak jackets; and handcuffs, night-vision devices, intelligence equipment, and all-terrain vehicles.[78] Appropriate lethal aid might include sniper rifles, submachine guns, light semiautomatic rifles, and ammunition. Since the Oslo Accords, the CIA and U.S. government have supplied a wide range of sophisticated equipment to Palestinian security and intelligence services, including miniature listening and observation devices, night-vision equipment, photography equipment, and communications scanners.[79] It

---

[74] Indyk (2003).

[75] Shapiro (2003); Blanche (2001); Toameh and Lahoud (2003); "What the CIA Can Teach the PLO" (1998); Weiner (1998).

[76] See, for example, U.S. Department of State (2002). Other U.S. counterterrorism programs include the International Law Enforcement Academies, in which the Departments of Treasury and Justice provide on-site training for foreign governments, and the Justice Department's Overseas Prosecutorial Development and Assistance Training Program (OPDAT) and the International Criminal Investigation Training Assistance Program.

[77] Anderson (2003); Lahoud (2002); Dunn (2002).

[78] In 1994 and 1995, for example, the Department of Defense provided the Palestinian police with trucks, jeeps, uniforms, and medical equipment. U.S. General Accounting Office (2001b), p. 4.

[79] Shapiro (2003).

is unlikely that Palestinian security and police forces will need to be heavily militarized to be effective, but good intelligence, light weapons, and sound counterterrorism tactics will be important.

The United States and the international community could also examine the viability of supplying or operating biometric or other technological aids for use along Palestinian borders and at border crossings. At Palestinian border crossings, such as the Allenby Bridge or Erez checkpoints, travelers are subject to background and bag checks using X-ray machines and material that can detect explosives.[80]

Current Palestinian identification cards are paper only. They are easily forged, and some Israeli observers report that Israeli intelligence devotes substantial resources to monitoring suspected forgers. One solution would be to embed identification cards with a biometric device (such as a fingerprint) that would allow authorities to verify the identities of border crossers. Palestinians willing to use such identification methods could conceivably be precleared for unchecked crossings, passively screened, or directed to special, faster screening points. Current technologies that might be considered along Palestinian borders and at checkpoints include remote sensing tools from satellites and aircraft, acoustic and ground-based sensors, and nonintrusive inspection equipment and radiation detection devices.[81]

Biometrics have been implemented to a limited degree in U.S. border control systems—especially by the INS at airports. Biometric technologies include facial recognition, fingerprint recognition, hand geometry, iris recognition, retina recognition, signature recognition, and speaker recognition. Using biometrics is appealing because biometric identification can help bind a traveler tightly to his or her physiological or behavioral characteristics, and it is less easily lost or fabricated than other forms of identification. However, biometrics are still at an early stage of development and there are potential drawbacks—high cost, longer waiting lines, technological flaws, and privacy concerns.[82] This is why the United States largely relies on visa and passport processing, as well as port-of-entry inspections, to examine travelers, trucks, and cargo along its borders with Mexico and Canada.

*Intelligence Cooperation and Monitoring.* The United States and the international community could provide assistance in the area of intelligence and monitoring. One way is to monitor Palestinian compliance in arresting terrorists and insurgents, as well as destroying their infrastructure. Organizations such as the Central Intelligence Agency can—and should—play an important role in monitoring whether terrorist and insurgent groups are being dismantled. Are individuals being jailed or is there a revolving-door policy? Are the capabilities of organizations increasing or decreasing?

[80] de Quetteville (2003).

[81] See, for example, United Nations Institute for Disarmament Research (1999).

[82] U.S. General Accounting Office (2002); Woodward et al. (2001); Lee (2003).

Are organizations being permitted to raise money or otherwise operate on Palestinian territory?

The United States—and especially the CIA—have had experience with monitoring as part of the Israeli-Palestinian peace process. In the 1990s, the Palestinian Authority agreed to share with the United States its working plan against militant groups and their infrastructure. A bilateral America-Palestinian committee was established to examine steps implemented by the PA to combat terror, and U.S.-Israeli-Palestinian committees were set up to monitor arms smuggling and political incitement.[83]

The United States and the international community could also help a nascent Palestinian state build and improve its intelligence collaboration with important partners such as Israel, Jordan, Egypt, and the United States. An effective counterterrorism campaign in a Palestinian state will require substantial cooperation with other governments regarding the transborder movement of terrorists, insurgents, and their goods; the location of weapons caches, hideouts, and other infrastructure; terrorist financial support; and links with criminal elements such as drug- and arms-trafficking organizations. Indeed, terrorist and militant organizations currently operating in Palestinian territory have connections with—or operate in—numerous countries, such as Jordan, Lebanon, Syria, Libya, Sudan, and Algeria.

In sum, the United States and the international community should assist a Palestinian state by providing training to police and security forces, offering military and other counterterrorism aid, and assisting with monitoring and intelligence cooperation. The fact that the United States has been willing to do this in the past is a good indication that it can—and will—provide assistance in the future. In 2003, for example, it provided approximately $300 million in assistance through the Central Intelligence Agency to Palestinian police and security forces for such purposes as training forces, constructing jails, and purchasing communications equipment and vehicles.[84] The European Union gave $8 million in 1997, $7 million in 2000, and $4 million in 2001 for a variety of counterterrorism purposes such as training the PA security services.[85]

## Costing the Options

The preceding sections of this chapter outlined the challenges associated with creating effective internal security functions in a Palestinian state. This section estimates general reconstruction costs, such as training and equipping police and other internal security forces, rebuilding infrastructure, and providing other assistance.

---

[83] *The Wye River Memorandum* II A 1 (a); Tenet (1998); Shapiro (2003), pp. 100–106; O'Sullivan (1998); Gates (1998); Bearden (1998); Weiner (1996).

[84] Weisman (2003a,b); Zacharia (2003).

[85] European Commission (2003).

**General Reconstruction Costs**

One of the most significant costs in rebuilding the Palestinian internal security system will be operating, equipping, and training justice administration components and the various security forces: the police, national security force, civil defense force, preventive security force, and coast guard. *Operating* includes administration expenditures necessary to operate these agencies. *Equipment* incorporates the cost of uniforms and a range of lethal and nonlethal equipment from handcuffs to munitions. This will be necessary both because of the destruction that the Israelis have inflicted during the second intifada and because it is not clear that the Palestinians have ever adequately provided for their internal security. Several kinds of equipment may be particularly useful. For example, Palestinian police would benefit from state-of-the-art surveillance and forensic equipment for investigative purposes. A national security communications network would also be useful to facilitate communication within the Ministry of Interior agencies, as well as among them. Finally, *training* includes deploying and paying international advisers, building training academies, supplying training equipment, and providing necessary field support for advisers and trainers. Training is necessary to ensure that security and justice officials are current on effective standards and procedures and to improve the probability that effective reform of these institutions will occur.

Capital investments will also be necessary. These include building and refurbishing courts, Ministry of Justice buildings, prisons, detention centers, police stations, firehouses, and Ministry of Interior buildings. In general, we expect capital costs to be one-time charges (perhaps spread out over many years) associated with the construction or establishment of permanent assets.

It is not possible to make precise estimates for rebuilding the Palestinian internal security system in advance of a peace agreement, since it is impossible to predict infrastructure conditions and the availability of equipment at that time. However, it is possible to make reasonable estimates. This chapter assumes that the costs of rebuilding Palestine's internal security system will be roughly proportional to the costs of rebuilding Iraq's internal security system, in per-capita terms.[86] Both areas have suffered significant damage due to warfare, will require substantial internal security assistance, and will likely be well funded.[87] Consequently, we used Coalition Provisional Authority (CPA) budget figures on the cost of rebuilding Iraq's internal security system, calculated per person costs in a range of categories by dividing CPA estimates by Iraq's

---

[86] Some might argue that the U.S. reconstruction of Iraq has not been successful to date and that Iraq is thus a poor frame of reference for estimating the cost of successful development of an independent Palestinian state. In our view, however, the lack of success in Iraq has not principally been due to inadequate financial resources. In both absolute and per-capita terms, the resources available for Iraqi reconstruction have been high relative to other recent nation-building efforts. Rather, U.S. challenges have more likely been a result of the absence of planning for reconstruction and a variety of other factors. See, for example, Dobbins et al. (2003).

[87] For instance, external assistance per capita in Iraq is considerably higher than it has been in Afghanistan since 2002, and it is also higher in real terms than in several other U.S.-led nation-building efforts over the past two decades.