# EXHIBIT A.532
## (1 of 5)



PLAINTIFF'S
EXHIBIT
532

 Israel Ministry of Foreign Affairs

## THE ISRAELI-PALESTINIAN INTERIM AGREEMENT

28 Sep 1995

AGREEMENT | ANNEX I | ANNEX II | ANNEX III | ANNEX IV | ANNEX V | ANNEX VI | ANNEX VII | MAPS | MAIN POINTS

### Israeli-Palestinian Interim Agreement on the West Bank and the Gaza Strip
#### Washington, D.C., September 28, 1995

The Government of the State of Israel and the Palestine Liberation Organization (hereinafter "the PLO"), the representative of the Palestinian people;

#### PREAMBLE

**WITHIN** the framework of the Middle East peace process initiated at Madrid in October 1991;

**REAFFIRMING** their determination to put an end to decades of confrontation and to live in peaceful coexistence, mutual dignity and security, while recognizing their mutual legitimate and political rights;

**REAFFIRMING** their desire to achieve a just, lasting and comprehensive peace settlement and historic reconciliation through the agreed political process;

**RECOGNIZING** that the peace process and the new era that it has created, as well as the new relationship established between the two Parties as described above, are irreversible, and the determination of the two Parties to maintain, sustain and continue the peace process;

**RECOGNIZING** that the aim of the Israeli-Palestinian negotiations within the current Middle East peace process is, among other things, to establish a Palestinian Interim Self-Government Authority, i.e. the elected Council (hereinafter "the Council" or "the Palestinian Council"), and the elected Ra'ees of the Executive Authority, for the Palestinian people in the West Bank and the Gaza Strip, for a transitional period not exceeding five years from the date of signing the Agreement on the Gaza Strip and the Jericho Area (hereinafter "the Gaza-Jericho Agreement") on May 4, 1994, leading to a permanent settlement based on Security Council Resolutions 242 and 338;

**REAFFIRMING** their understanding that the interim self-government arrangements contained in this Agreement are an integral part of the whole peace process, that the negotiations on the permanent status, that will start as soon as possible but not later than May 4, 1996, will lead to the implementation of Security Council Resolutions 242 and 338, and that the Interim Agreement shall settle all the issues of the interim period and that no such issues will be deferred to the agenda of the permanent status negotiations;

**REAFFIRMING** their adherence to the mutual recognition and commitments expressed in the letters dated September 9, 1993, signed by and exchanged between the Prime Minister of Israel and the Chairman of the PLO;

**DESIROUS** of putting into effect the Declaration of Principles on Interim

Self-Government Arrangements signed at Washington, D.C. on September 13, 1993, and the Agreed Minutes thereto (hereinafter "the DOP") and in particular Article III and Annex I concerning the holding of direct, free and general political elections for the Council and the Ra'ees of the Executive Authority in order that the Palestinian people in the West Bank, Jerusalem and the Gaza Strip may democratically elect accountable representatives;

**RECOGNIZING** that these elections will constitute a significant interim preparatory step toward the realization of the legitimate rights of the Palestinian people and their just requirements and will provide a democratic basis for the establishment of Palestinian institutions;

**REAFFIRMING** their mutual commitment to act, in accordance with this Agreement, immediately, efficiently and effectively against acts or threats of terrorism, violence or incitement, whether committed by Palestinians or Israelis;

**FOLLOWING** the Gaza-Jericho Agreement; the Agreement on Preparatory Transfer of Powers and Responsibilities signed at Erez on August 29, 1994 (hereinafter "the Preparatory Transfer Agreement"); and the Protocol on Further Transfer of Powers and Responsibilities signed at Cairo on August 27, 1995 (hereinafter "the Further Transfer Protocol"); which three agreements will be superseded by this Agreement;

**HEREBY AGREE** as follows:

### CHAPTER I - THE COUNCIL

### ARTICLE I
**Transfer of Authority**

1. Israel shall transfer powers and responsibilities as specified in this Agreement from the Israeli military government and its Civil Administration to the Council in accordance with this Agreement. Israel shall continue to exercise powers and responsibilities not so transferred.

2. Pending the inauguration of the Council, the powers and responsibilities transferred to the Council shall be exercised by the Palestinian Authority established in accordance with the Gaza-Jericho Agreement, which shall also have all the rights, liabilities and obligations to be assumed by the Council in this regard. Accordingly, the term "Council" throughout this Agreement shall, pending the inauguration of the Council, be construed as meaning the Palestinian Authority.

3. The transfer of powers and responsibilities to the police force established by the Palestinian Council in accordance with Article XIV below (hereinafter "the Palestinian Police") shall be accomplished in a phased manner, as detailed in this Agreement and in the Protocol concerning Redeployment and Security Arrangements attached as Annex I to this Agreement (hereinafter "Annex I").

4. As regards the transfer and assumption of authority in civil spheres, powers and responsibilities shall be transferred and assumed as set out in the Protocol Concerning Civil Affairs attached as Annex III to this Agreement (hereinafter "Annex III").

5. After the inauguration of the Council, the Civil Administration in the West Bank will be dissolved, and the Israeli military government shall be withdrawn. The withdrawal of the military government shall not prevent it from exercising the powers and responsibilities not transferred to the Council.

6. A Joint Civil Affairs Coordination and Cooperation Committee (hereinafter "the CAC"), Joint Regional Civil Affairs Subcommittees, one for the Gaza Strip and the other for the West Bank, and District Civil Liaison Offices in the West Bank shall be established in order to provide for coordination and cooperation in civil affairs between the Council and Israel, as detailed in Annex III.

7. The offices of the Council, and the offices of its Ra'ees and its Executive

Authority and other committees, shall be located in areas under
Palestinian territorial jurisdiction in the West Bank and the Gaza Strip.

## ARTICLE II
### Elections

1. In order that the Palestinian people of the West Bank and the Gaza Strip
may govern themselves according to democratic principles, direct, free
and general political elections will be held for the Council and the Ra'ees
of the Executive Authority of the Council in accordance with the provisions
set out in the Protocol concerning Elections attached as Annex II to this
Agreement (hereinafter "Annex II").

2. These elections will constitute a significant interim preparatory step
towards the realization of the legitimate rights of the Palestinian people
and their just requirements and will provide a democratic basis for the
establishment of Palestinian institutions.

3. Palestinians of Jerusalem who live there may participate in the election
process in accordance with the provisions contained in this Article and in
Article VI of Annex II (Election Arrangements concerning Jerusalem).

4. The elections shall be called by the Chairman of the Palestinian
Authority immediately following the signing of this Agreement to take place
at the earliest practicable date following the redeployment of Israeli forces
in accordance with Annex I, and consistent with the requirements of the
election timetable as provided in Annex II, the Election Law and the
Election Regulations, as defined in Article I of Annex II.

## ARTICLE III
### Structure of the Palestinian Council

1. The Palestinian Council and the Ra'ees of the Executive Authority of the
Council constitute the Palestinian Interim Self-Government Authority,
which will be elected by the Palestinian people of the West Bank,
Jerusalem and the Gaza Strip for the transitional period agreed in Article I
of the DOP.

2. The Council shall possess both legislative power and executive power,
in accordance with Articles VII and IX of the DOP. The Council shall carry
out and be responsible for all the legislative and executive powers and
responsibilities transferred to it under this Agreement. The exercise of
legislative powers shall be in accordance with Article XVIII of this
Agreement (Legislative Powers of the Council).

3. The Council and the Ra'ees of the Executive Authority of the Council
shall be directly and simultaneously elected by the Palestinian people of
the West Bank, Jerusalem and the Gaza Strip, in accordance with the
provisions of this Agreement and the Election Law and Regulations, which
shall not be contrary to the provisions of this Agreement.

4. The Council and the Ra'ees of the Executive Authority of the Council
shall be elected for a transitional period not exceeding five years from the
signing of the Gaza-Jericho Agreement on May 4, 1994.

5. Immediately upon its inauguration, the Council will elect from among its
members a Speaker. The Speaker will preside over the meetings of the
Council, administer the Council and its committees, decide on the agenda
of each meeting, and lay before the Council proposals for voting and
declare their results.

6. The jurisdiction of the Council shall be as determined in Article XVII of
this Agreement (Jurisdiction).

7. The organization, structure and functioning of the Council shall be in
accordance with this Agreement and the Basic Law for the Palestinian
Interim Self-government Authority, which Law shall be adopted by the
Council. The Basic Law and any regulations made under it shall not be
contrary to the provisions of this Agreement.

8. The Council shall be responsible under its executive powers for the
offices, services and departments transferred to it and may establish,

within its jurisdiction, ministries and subordinate bodies, as necessary for the fulfillment of its responsibilities.

9. The Speaker will present for the Council's approval proposed internal procedures that will regulate, among other things, the decision-making processes of the Council.

## ARTICLE IV
### Size of the Council

The Palestinian Council shall be composed of 82 representatives and the Ra'ees of the Executive Authority, who will be directly and simultaneously elected by the Palestinian people of the West Bank, Jerusalem and the Gaza Strip.

## ARTICLE V
### The Executive Authority of the Council

1. The Council will have a committee that will exercise the executive authority of the Council, formed in accordance with paragraph 4 below (hereinafter "the Executive Authority").

2. The Executive Authority shall be bestowed with the executive authority of the Council and will exercise it on behalf of the Council. It shall determine its own internal procedures and decision making processes.

3. The Council will publish the names of the members of the Executive Authority immediately upon their initial appointment and subsequent to any changes.

4. a. The Ra'ees of the Executive Authority shall be an ex officio member of the Executive Authority.

b. All of the other members of the Executive Authority, except as provided in subparagraph c. below, shall be members of the Council, chosen and proposed to the Council by the Ra'ees of the Executive Authority and approved by the Council.

c. The Ra'ees of the Executive Authority shall have the right to appoint some persons, in number not exceeding twenty percent of the total membership of the Executive Authority, who are not members of the Council, to exercise executive authority and participate in government tasks. Such appointed members may not vote in meetings of the Council.

d. Non-elected members of the Executive Authority must have a valid address in an area under the jurisdiction of the Council.

## ARTICLE VI
### Other Committees of the Council

1. The Council may form small committees to simplify the proceedings of the Council and to assist in controlling the activity of its Executive Authority.

2. Each committee shall establish its own decision-making processes within the general framework of the organization and structure of the Council.

## ARTICLE VII
### Open Government

1. All meetings of the Council and of its committees, other than the Executive Authority, shall be open to the public, except upon a resolution of the Council or the relevant committee on the grounds of security, or commercial or personal confidentiality.

2. Participation in the deliberations of the Council, its committees and the Executive Authority shall be limited to their respective members only. Experts may be invited to such meetings to address specific issues on an ad hoc basis.

## ARTICLE VIII
### Judicial Review

Any person or organization affected by any act or decision of the Ra'ees of the Executive Authority of the Council or of any member of the Executive Authority, who believes that such act or decision exceeds the authority of the Ra'ees or of such member, or is otherwise incorrect in law or procedure, may apply to the relevant Palestinian Court of Justice for a review of such activity or decision.

## ARTICLE IX
### Powers and Responsibilities of the Council

1. Subject to the provisions of this Agreement, the Council will, within its jurisdiction, have legislative powers as set out in Article XVIII of this Agreement, as well as executive powers.

2. The executive power of the Palestinian Council shall extend to all matters within its jurisdiction under this Agreement or any future agreement that may be reached between the two Parties during the interim period. It shall include the power to formulate and conduct Palestinian policies and to supervise their implementation, to issue any rule or regulation under powers given in approved legislation and administrative decisions necessary for the realization of Palestinian self-government, the power to employ staff, sue and be sued and conclude contracts, and the power to keep and administer registers and records of the population, and issue certificates, licenses and documents.

3. The Palestinian Council's executive decisions and acts shall be consistent with the provisions of this Agreement.

4. The Palestinian Council may adopt all necessary measures in order to enforce the law and any of its decisions, and bring proceedings before the Palestinian courts and tribunals.

5. a. In accordance with the DOP, the Council will not have powers and responsibilities in the sphere of foreign relations, which sphere includes the establishment abroad of embassies, consulates or other types of foreign missions and posts or permitting their establishment in the West Bank or the Gaza Strip, the appointment of or admission of diplomatic and consular staff, and the exercise of diplomatic functions.

b. Notwithstanding the provisions of this paragraph, the PLO may conduct negotiations and sign agreements with states or international organizations for the benefit of the Council in the following cases only:

(I) economic agreements, as specifically provided in Annex V of this Agreement:

(2) agreements with donor countries for the purpose of implementing arrangements for the provision of assistance to the Council,

(3) agreements for the purpose of implementing the regional development plans detailed in Annex IV of the DOP or in agreements entered into in the framework of the multilateral negotiations, and

(4) cultural, scientific and educational agreements. Dealings between the Council and representatives of foreign states and international organizations, as well as the establishment in the West Bank and the Gaza Strip of representative offices other than those described in subparagraph 5.a above, for the purpose of implementing the agreements referred to in subparagraph 5.b above, shall not be considered foreign relations.

6. Subject to the provisions of this Agreement, the Council shall, within its jurisdiction, have an independent judicial system composed of independent Palestinian courts and tribunals.

## CHAPTER 2 - REDEPLOYMENT AND SECURITY ARRANGEMENTS

### ARTICLE X
### Redeployment of Israeli Military Forces

1. The first phase of the Israeli military forces redeployment will cover

populated areas in the West Bank - cities, towns, villages, refugee camps and hamlets - as set out in Annex I, and will be completed prior to the eve of the Palestinian elections, i. e., 22 days before the day of the elections.

2. Further redeployments of Israeli military forces to specified military locations will commence after the inauguration of the Council and will be gradually implemented commensurate with the assumption of responsibility for public order and internal security by the Palestinian Police, to be completed within 18 months from the date of the inauguration of the Council as detailed in Articles XI (Land) and XIII (Security), below and in Annex I.

3. The Palestinian Police shall be deployed and shall assume responsibility for public order and internal security for Palestinians in a phased manner in accordance with XIII (Security) below and Annex I.

4. Israel shall continue to carry the responsibility for external security, as well as the responsibility for overall security of Israelis for the purpose of safeguarding their internal security and public order.

5. For the purpose of this Agreement, "Israeli military forces" includes Israel Police and other Israeli security forces.

### ARTICLE XI
### Land

1. The two sides view the West Bank and the Gaza Strip as a single territorial unit, the integrity and status of which will be preserved during the interim period.

2. The two sides agree that West Bank and Gaza Strip territory, except for issues that will be negotiated in the permanent status negotiations, will come under the jurisdiction of the Palestinian Council in a phased manner, to be completed within 18 months from the date of the inauguration of the Council, as specified below:

a. Land in populated areas (Areas A and B), including government and Al Waqf land, will come under the jurisdiction of the Council during the first phase of redeployment.

b. All civil powers and responsibilities, including planning and zoning, in Areas A and B, set out in Annex III, will be transferred to and assumed by the Council during the first phase of redeployment.

c. In Area C, during the first phase of redeployment Israel will transfer to the Council civil powers and responsibilities not relating to territory, as set out in Annex III.

d. The further redeployments of Israeli military forces to specified military locations will be gradually implemented in accordance with the DOP in three phases, each to take place after an interval of six months, after the inauguration of the Council, to be completed within 18 months from the date of the inauguration of the Council.

e. During the further redeployment phases to be completed within 18 months from the date of the inauguration of the Council, powers and responsibilities relating to territory will be transferred gradually to Palestinian jurisdiction that will cover West Bank and Gaza Strip territory, except for the issues that will be negotiated in the permanent status negotiations.

f. The specified military locations referred to in Article X, paragraph 2 above will be determined in the further redeployment phases, within the specified time-frame ending not later than 18 months from the date of the inauguration of the Council, and will be negotiated in the permanent status negotiations.

3. For the purpose of this Agreement and until the completion of the first phase of the further redeployments:

a. "Area A" means the populated areas delineated by a red line and

shaded in brown on attached map No. 1;

b. "Area B" means the populated areas delineated by a red line and shaded in yellow on attached map No. 1, and the built-up area of the hamlets listed in Appendix 6 to Annex I, and

c. "Area C" means areas of the West Bank outside Areas A and B, which, except for the issues that will be negotiated in the permanent status negotiations, will be gradually transferred to Palestinian jurisdiction in accordance with this Agreement.

## ARTICLE XII
### Arrangements for Security and Public Order

1. In order to guarantee public order and internal security for the Palestinians of the West Bank and the Gaza Strip, the Council shall establish a strong police force as set out in Article XIV below. Israel shall continue to carry the responsibility for defense against external threats, including the responsibility for protecting the Egyptian and Jordanian borders, and for defense against external threats from the sea and from the air, as well as the responsibility for overall security of Israelis and Settlements, for the purpose of safeguarding their internal security and public order, and will have all the powers to take the steps necessary to meet this responsibility.

2. Agreed security arrangements and coordination mechanisms are specified in Annex I.

3. A Joint Coordination and Cooperation Committee for Mutual Security Purposes (hereinafter "the JSC"), as well as Joint Regional Security Committees (hereinafter "RSCs") and Joint District Coordination Offices (hereinafter "DCOs"), are hereby established as provided for in Annex I.

4. The security arrangements provided for in this Agreement and in Annex I may be reviewed at the request of either Party and may be amended by mutual agreement of the Parties. Specific review arrangements are included in Annex I.

5. For the purpose of this Agreement, "the Settlements" means, in the West Bank the settlements in Area C; and in the Gaza Strip - the Gush Katif and Erez settlement areas, as well as the other settlements in the Gaza Strip, as shown on attached map No. 2.

## ARTICLE XIII
### Security

I. The Council will, upon completion of the redeployment of Israeli military forces in each district, as set out in Appendix 1 to Annex I, assume the powers and responsibilities for internal security and public order in Area A in that district.

2. a. There will be a complete redeployment of Israeli military forces from Area B. Israel will transfer to the Council and the Council will assume responsibility for public order for Palestinians. Israel shall have the overriding responsibility for security for the purpose of protecting Israelis and confronting the threat of terrorism.

b. In Area B the Palestinian Police shall assume the responsibility for public order for Palestinians and shall be deployed in order to accommodate the Palestinian needs and requirements in the following manner:

(I) The Palestinian Police shall establish 25 police stations and posts in towns, villages, and other places listed in Appendix 2 to Annex I and as delineated on map No. 3. The West Bank RSC may agree on the establishment of additional police stations and posts, if required.

(2) The Palestinian Police shall be responsible for handling public order incidents in which only Palestinians are involved.

(3) The Palestinian Police shall operate freely in populated places where police stations and posts are located, as set out in paragraph b(1) above.

(4) While the movement of uniformed Palestinian policemen in Area B outside places where there is a Palestinian police station or post will be carried out after coordination and confirmation through the relevant DCO, three months after the completion of redeployment from Area B, the DCOs may decide that movement of Palestinian policemen from the police stations in Area B to Palestinian towns and villages in Area B on roads that are used only by Palestinian traffic will take place after notifying the DCO.

(5) The coordination of such planned movement prior to confirmation through the relevant DCO shall include a scheduled plan, including the number of policemen, as well as the type and number of weapons and vehicles intended to take part. It shall also include details of arrangements for ensuring continued coordination through appropriate communication links, the exact schedule of movement to the area of the planned operation, including the destination and routes thereto, its proposed duration and the schedule for returning to the police station or post.

The Israeli side of the DCO will provide the Palestinian side with its response, following a request for movement of policemen in accordance with this paragraph, in normal or routine cases within one day and in emergency cases no later than 2 hours.

(6) The Palestinian Police and the Israeli military forces will conduct joint security activities on the main roads as set out in Annex I.

(7) The Palestinian Police will notify the West Bank RSC of the names of the policemen, number plates of police vehicles and serial numbers of weapons, with respect to each police station and post in Area B.

(8) Further redeployments from Area C and transfer of internal security responsibility to the Palestinian Police in Areas B and C will be carried out in three phases, each to take place after an interval of six months, to be completed 18 months after the inauguration of the Council, except for the issues of permanent status negotiations and of Israel's overall responsibility for Israelis and borders.

(9) The procedures detailed in this paragraph will be reviewed within six months of the completion of the first phase of redeployment.

### ARTICLE XIV
### The Palestinian Police

1. The Council shall establish a strong police force. The duties, functions, structure, deployment and composition of the Palestinian Police, together with provisions regarding its equipment and operation, as well as rules of conduct, are set out in Annex I.

2. The Palestinian police force established under the Gaza-Jericho Agreement will be fully integrated into the Palestinian Police and will be subject to the provisions of this Agreement.

3. Except for the Palestinian Police and the Israeli military forces, no other armed forces shall be established or operate in the West Bank and the Gaza Strip.

4. Except for the arms, ammunition and equipment of the Palestinian Police described in Annex I, and those of the Israeli military forces, no organization, group or individual in the West Bank and the Gaza Strip shall manufacture, sell, acquire, possess, import or otherwise introduce into the West Bank or the Gaza Strip any firearms, ammunition, weapons, explosives, gunpowder or any related equipment, unless otherwise provided for in Annex I.

### ARTICLE XV
### Prevention of Hostile Acts

1. Both sides shall take all measures necessary in order to prevent acts of

terrorism, crime and hostilities directed against each other, against individuals falling under the other's authority and against their property and shall take legal measures against offenders.

2. Specific provisions for the implementation of this Article are set out in Annex I.

## ARTICLE XVI
### Confidence Building Measures

With a view to fostering a positive and supportive public atmosphere to accompany the implementation of this Agreement, to establish a solid basis of mutual trust and good faith, and in order to facilitate the anticipated cooperation and new relations between the two peoples, both Parties agree to carry out confidence building measures as detailed herewith:

1. Israel will release or turn over to the Palestinian side, Palestinian detainees and prisoners, residents of the West Bank and the Gaza Strip. The first stage of release of these prisoners and detainees will take place on the signing of this Agreement and the second stage will take place prior to the date of the elections. There will be a third stage of release of detainees and prisoners. Detainees and prisoners will be released from among categories detailed in Annex VII (Release of Palestinian Prisoners and Detainees). Those released will be free to return to their homes in the West Bank and the Gaza Strip.

2. Palestinians who have maintained contact with the Israeli authorities will not be subjected to acts of harassment, violence, retribution or prosecution. Appropriate ongoing measures will be taken, in coordination with Israel, in order to ensure their protection.

3. Palestinians from abroad whose entry into the West Bank and the Gaza Strip is approved pursuant to this Agreement, and to whom the provisions of this Article are applicable, will not be prosecuted for offenses committed prior to September 13, 1993.

## CHAPTER 3 - LEGAL AFFAIRS

## ARTICLE XVII
### Jurisdiction

1. In accordance with the DOP, the jurisdiction of the Council will cover West Bank and Gaza Strip territory as a single territorial unit, except for:

a. issues that will be negotiated in the permanent status negotiations: Jerusalem, settlements, specified military locations, Palestinian refugees, borders, foreign relations and Israelis; and

b. powers and responsibilities not transferred to the Council.

2. Accordingly, the authority of the Council encompasses all matters that fall within its territorial, functional and personal jurisdiction, as follows:

a. The territorial jurisdiction of the Council shall encompass Gaza Strip territory, except for the Settlements and the Military Installation Area shown on map No. 2, and West Bank territory, except for Area C which, except for the issues that will be negotiated in the permanent status negotiations, will be gradually transferred to Palestinian jurisdiction in three phases, each to take place after an interval of six months, to be completed 18 months after the inauguration of the Council. At this time, the jurisdiction of the Council will cover West Bank and Gaza Strip territory, except for the issues that will be negotiated in the permanent status negotiations.

Territorial jurisdiction includes land, subsoil and territorial waters, in accordance with the provisions of this Agreement.

b. The functional jurisdiction of the Council extends to all powers and responsibilities transferred to the Council, as specified in this Agreement or

in any future agreements that may be reached between the Parties during
the interim period.

c. The territorial and functional jurisdiction of the Council will apply to all
persons, except for Israelis, unless otherwise provided in this Agreement.

d. Notwithstanding subparagraph a. above, the Council shall have
functional jurisdiction in Area C, as detailed in Article IV of Annex III.

3. The Council has, within its authority, legislative, executive and judicial
powers and responsibilities, as provided for in this Agreement.

4. a. Israel, through its military government, has the authority over areas
that are not under the territorial jurisdiction of the Council, powers and
responsibilities not transferred to the Council and Israelis.

b. To this end, the Israeli military government shall retain the necessary
legislative, judicial and executive powers and responsibilities, in
accordance with international law. This provision shall not derogate from
Israel's applicable legislation over Israelis in personam.

5. The exercise of authority with regard to the electromagnetic sphere and
air space shall be in accordance with the provisions of this Agreement.

6. Without derogating from the provisions of this Article, legal
arrangements detailed in the Protocol Concerning Legal Matters attached
as Annex IV to this Agreement (hereinafter "Annex IV") shall be observed.
Israel and the Council may negotiate further legal arrangements.

7. Israel and the Council shall cooperate on matters of legal assistance in
criminal and civil matters through a legal committee (hereinafter "the Legal
Committee"), hereby established.

8. The Council's jurisdiction will extend gradually to cover West Bank and
Gaza Strip territory, except for the issues to be negotiated in the
permanent status negotiations, through a series of redeployments of the
Israeli military forces. The first phase of the redeployment of Israeli military
forces will cover populated areas in the West Bank - cities, towns, refugee
camps and hamlets, as set out in Annex I - and will be completed prior to
the eve of the Palestinian elections, i.e. 22 days before the day of the
elections. Further redeployments of Israeli military forces to specified
military locations will commence immediately upon the inauguration of the
Council and will be effected in three phases, each to take place after an
interval of six months, to be concluded no later than eighteen months from
the date of the inauguration of the Council.

## ARTICLE XVIII
### Legislative Powers of the Council

1. For the purposes of this Article, legislation shall mean any primary and
secondary legislation, including basic laws, laws, regulations and other
legislative acts.

2. The Council has the power, within its jurisdiction as defined in Article
XVII of this Agreement, to adopt legislation.

3. While the primary legislative power shall lie in the hands of the Council
as a whole, the Ra'ees of the Executive Authority of the Council shall have
the following legislative powers

a. the power to initiate legislation or to present proposed legislation to the
Council;

b. the power to promulgate legislation adopted by the Council; and

c. the power to issue secondary legislation, including regulations, relating
to any matters specified and within the scope laid down in any primary
legislation adopted by the Council.

4. a. Legislation, including legislation which amends or abrogates existing
laws or military orders, which exceeds the jurisdiction of the Council or
which is otherwise inconsistent with the provisions of the DOP, this

Agreement, or of any other agreement that may be reached between the two sides during the interim period, shall have no effect and shall be void ab initio.

b. The Ra'ees of the Executive Authority of the Council shall not promulgate legislation adopted by the Council if such legislation falls under the provisions of this paragraph.

5. All legislation shall be communicated to the Israeli side of the Legal Committee.

6. Without derogating from the provisions of paragraph 4 above, the Israeli side of the Legal Committee may refer for the attention of the Committee any legislation regarding which Israel considers the provisions of paragraph 4 apply, in order to discuss issues arising from such legislation. The Legal Committee will consider the legislation referred to it at the earliest opportunity.

## ARTICLE XIX
### Human Rights and the Rule of Law

Israel and the Council shall exercise their powers and responsibilities pursuant to this Agreement with due regard to internationally-accepted norms and principles of human rights and the rule of law.

## ARTICLE XX
### Rights, Liabilities and Obligations

1. a. The transfer of powers and responsibilities from the Israeli military government and its civil administration to the Council, as detailed in Annex III, includes all related rights, liabilities and obligations arising with regard to acts or omissions which occurred prior to such transfer. Israel will cease to bear any financial responsibility regarding such acts or omissions and the Council will bear all financial responsibility for these and for its own functioning.

b. Any financial claim made in this regard against Israel will be referred to the Council.

c. Israel shall provide the Council with the information it has regarding pending and anticipated claims brought before any court or tribunal against Israel in this regard.

d. Where legal proceedings are brought in respect of such a claim, Israel will notify the Council and enable it to participate in defending the claim and raise any arguments on its behalf.

e. In the event that an award is made against Israel by any court or tribunal in respect of such a claim, the Council shall immediately reimburse Israel the full amount of the award.

f. Without prejudice to the above, where a court or tribunal hearing such a claim finds that liability rests solely with an employee or agent who acted beyond the scope of the powers assigned to him or her, unlawfully or with willful malfeasance, the Council shall not bear financial responsibility.

2. a. Notwithstanding the provisions of paragraphs I.d through I.f above, each side may take the necessary measures, including promulgation of legislation, in order to ensure that such claims by Palestinians including pending claims in which the hearing of evidence has not yet begun, are brought only before Palestinian courts or tribunals in the West Bank and the Gaza Strip, and are not brought before or heard by Israeli courts or tribunals.

b. Where a new claim has been brought before a Palestinian court or tribunal subsequent to the dismissal of the claim pursuant to subparagraph a. above, the Council shall defend it and, in accordance with subparagraph I.a above, in the event that an award is made for the plaintiff, shall pay the amount of the award.

c. The Legal Committee shall agree on arrangements for the transfer of all

materials and information needed to enable the Palestinian courts or tribunals to hear such claims as referred to in subparagraph b. above, and, when necessary, for the provision of legal assistance by Israel to the Council in defending such claims.

3. The transfer of authority in itself shall not affect rights, liabilities and obligations of any person or legal entity, in existence at the date of signing of this Agreement.

4. The Council, upon its inauguration, will assume all the rights, liabilities and obligations of the Palestinian Authority.

5. For the purpose of this Agreement, "Israelis" also includes Israeli statutory agencies and corporations registered in Israel.

## ARTICLE XXI
### Settlement of Differences and Disputes

Any difference relating to the application of this Agreement shall be referred to the appropriate coordination and cooperation mechanism established under this Agreement. The provisions of Article XV of the DOP shall apply to any such difference which is not settled through the appropriate coordination and cooperation mechanism, namely:

1. Disputes arising out of the application or interpretation of this Agreement or any related agreements pertaining to the interim period shall be settled through the Liaison Committee.

2. Disputes which cannot be settled by negotiations may be settled by a mechanism of conciliation to be agreed between the Parties.

3. The Parties may agree to submit to arbitration disputes relating to the interim period, which cannot be settled through conciliation. To this end, upon the agreement of both Parties, the Parties will establish an Arbitration Committee.

## CHAPTER 4 - COOPERATION

## ARTICLE XXII
### Relations between Israel and the Council

1. Israel and the Council shall seek to foster mutual understanding and tolerance and shall accordingly abstain from incitement, including hostile propaganda, against each other and, without derogating from the principle of freedom of expression, shall take legal measures to prevent such incitement by any organizations, groups or individuals within their jurisdiction.

2. Israel and the Council will ensure that their respective educational systems contribute to the peace between the Israeli and Palestinian peoples and to peace in the entire region, and will refrain from the introduction of any motifs that could adversely affect the process of reconciliation.

3. Without derogating from the other provisions of this Agreement, Israel and the Council shall cooperate in combating criminal activity which may affect both sides, including offenses related to trafficking in illegal drugs and psychotropic substances, smuggling, and offenses against property, including offenses related to vehicles.

## ARTICLE XXIII
### Cooperation with Regard to Transfer of Powers and Responsibilities

In order to ensure a smooth, peaceful and orderly transfer of powers and responsibilities, the two sides will cooperate with regard to the transfer of security powers and responsibilities in accordance with the provisions of Annex I, and the transfer of civil powers and responsibilities in accordance with the provisions of Annex III.

## ARTICLE XXIV
### Economic Relations

The economic relations between the two sides are set out in the Protocol on Economic Relations signed in Paris on April 29, 1994, and the Appendices thereto, and the Supplement to the Protocol on Economic Relations all attached as Annex V, and will be governed by the relevant provisions of this Agreement and its Annexes.

### ARTICLE XXV
**Cooperation Programs**

1. The Parties agree to establish a mechanism to develop programs of cooperation between them. Details of such cooperation are set out in Annex VI.

2. A Standing Cooperation Committee to deal with issues arising in the context of this cooperation is hereby established as provided for in Annex VI.

### ARTICLE XXVI
**The Joint Israeli-Palestinian Liaison Committee**

1. The Liaison Committee established pursuant to Article X of the DOP shall ensure the smooth implementation of this Agreement. It shall deal with issues requiring coordination, other issues of common interest and disputes.

2. The Liaison Committee shall be composed of an equal number of members from each Party. It may add other technicians and experts as necessary.

3. The Liaison Committee shall adopt its rules of procedures, including the frequency and place or places of its meetings.

4. The Liaison Committee shall reach its decisions by agreement.

5. The Liaison Committee shall establish a subcommittee that will monitor and steer the implementation of this Agreement (hereinafter "the Monitoring and Steering Committee"). It will function as follows:

a. The Monitoring and Steering Committee will, on an ongoing basis, monitor the implementation of this Agreement, with a view to enhancing the cooperation and fostering the peaceful relations between the two sides.

b. The Monitoring and Steering Committee will steer the activities of the various joint committees established in this Agreement (the JSC, the CAC, the Legal Committee, the Joint Economic Committee and the Standing Cooperation Committee) concerning the ongoing implementation of the Agreement, and will report to the Liaison Committee.

c. The Monitoring and Steering Committee will be composed of the heads of the various committees mentioned above.

d. The two heads of the Monitoring and Steering Committee will establish its rules of procedures, including the frequency and places of its meetings.

### ARTICLE XXVII
**Liaison and Cooperation with Jordan and Egypt**

1. Pursuant to Article XII of the DOP, the two Parties have invited the Governments of Jordan and Egypt to participate in establishing further liaison and cooperation arrangements between the Government of Israel and the Palestinian representatives on the one hand, and the Governments of Jordan and Egypt on the other hand, to promote cooperation between them. As part of these arrangements a Continuing Committee has been constituted and has commenced its deliberations.

2. The Continuing Committee shall decide by agreement on the modalities of admission of persons displaced from the West Bank and the Gaza Strip in 1967, together with necessary measures to prevent disruption and disorder.

3. The Continuing Committee shall also deal with other matters of common concern.

### ARTICLE XXVIII
**Missing Persons**

1. Israel and the Council shall cooperate by providing each other with all necessary assistance in the conduct of searches for missing persons and bodies of persons which have not been recovered, as well as by providing information about missing persons.

2. The PLO undertakes to cooperate with Israel and to assist it in its efforts to locate and to return to Israel Israeli soldiers who are missing in action and the bodies of soldiers which have not been recovered.

### CHAPTER 5 - MISCELLANEOUS PROVISIONS

### ARTICLE XXIX
**Safe Passage between the West Bank and the Gaza Strip**

Arrangements for safe passage of persons and transportation between the West Bank and the Gaza Strip are set out in Annex I.

### ARTICLE XXX
**Passages**

Arrangements for coordination between Israel and the Council regarding passage to and from Egypt and Jordan, as well as any other agreed international crossings, are set out in Annex I.

### ARTICLE XXXI
**Final Clauses**

1. This Agreement shall enter into force on the date of its signing.

2. The Gaza-Jericho Agreement, except for Article XX (Confidence-Building Measures), the Preparatory Transfer Agreement and the Further Transfer Protocol will be superseded by this Agreement.

3. The Council, upon its inauguration, shall replace the Palestinian Authority and shall assume all the undertakings and obligations of the Palestinian Authority under the Gaza-Jericho Agreement, the Preparatory Transfer Agreement, and the Further Transfer Protocol.

4. The two sides shall pass all necessary legislation to implement this Agreement.

5. Permanent status negotiations will commence as soon as possible, but not later than May 4, 1996, between the Parties. It is understood that these negotiations shall cover remaining issues, including: Jerusalem, refugees, settlements, security arrangements, borders, relations and cooperation with other neighbors, and other issues of common interest.

6. Nothing in this Agreement shall prejudice or preempt the outcome of the negotiations on the permanent status to be conducted pursuant to the DOP. Neither Party shall be deemed, by virtue of having entered into this Agreement, to have renounced or waived any of its existing rights, claims or positions.

7. Neither side shall initiate or take any step that will change the status of the West Bank and the Gaza Strip pending the outcome of the permanent status negotiations.

8. The two Parties view the West Bank and the Gaza Strip as a single territorial unit, the integrity and status of which will be preserved during the interim period.

9. The PLO undertakes that, within two months of the date of the inauguration of the Council, the Palestinian National Council will convene and formally approve the necessary changes in regard to the Palestinian Covenant, as undertaken in the letters signed by the Chairman of the PLO and addressed to the Prime Minister of Israel, dated September 9, 1993 and May 4, 1994.

10. Pursuant to Annex I, Article IX of this Agreement, Israel confirms that the permanent checkpoints on the roads leading to and from the Jericho Area (except those related to the access road leading from Mousa Alami to the Allenby Bridge) will be removed upon the completion of the first phase of redeployment.

11. Prisoners who, pursuant to the Gaza-Jericho Agreement, were turned over to the Palestinian Authority on the condition that they remain in the Jericho Area for the remainder of their sentence, will be free to return to their homes in the West Bank and the Gaza Strip upon the completion of the first phase of redeployment.

12. As regards relations between Israel and the PLO, and without derogating from the commitments contained in the letters signed by and exchanged between the Prime Minister of Israel and the Chairman of the PLO, dated September 9, 1993 and May 4, 1994, the two sides will apply between them the provisions contained in Article XXII, paragraph 1, with the necessary changes.

13. a. The Preamble to this Agreement, and all Annexes, Appendices and maps attached hereto, shall constitute an integral part hereof.

b. The Parties agree that the maps attached to the Gaza-Jericho Agreement as:

a. map No. 1 (The Gaza Strip), an exact copy of which is attached to this Agreement as map No. (in this Agreement "map No. 2");

b. map No. 4 (Deployment of Palestinian Police in the Gaza Strip), an exact copy of which is attached to this Agreement as map No. 5 (in this Agreement "map No. 5"); and

c. map No. 6 (Maritime Activity Zones), an exact copy of which is attached to this Agreement as map No. 8 (in this Agreement "map No. 8"; are an integral part hereof and will remain in effect for the duration of this Agreement.

14. While the Jeftlik area will come under the functional and personal jurisdiction of the Council in the first phase of redeployment, the area's transfer to the territorial jurisdiction of the Council will be considered by the Israeli side in the first phase of the further redeployment phases.

**Done at Washington DC, this 28th day of September, 1995.**

_____
*For the Government of
the State of Israel*

_____
*For the PLO*

**Witnessed by:**

_____
*The United States of America*

_____
*The Russian Federation*

_____
*The Arab Republic of Egypt*

_____
*The Hashemite Kingdom of Jordan*

_____
*The Kingdom of Norway*

_____
*The European Union*

Close

 Israel Ministry of Foreign Affairs

## THE ISRAELI-PALESTINIAN INTERIM AGREEMENT-Annex I

28 Sep 1995

AGREEMENT | ANNEX I | ANNEX II | ANNEX III | ANNEX IV | ANNEX V | ANNEX VI | ANNEX VII | MAPS | MAIN POINTS

### THE ISRAELI-PALESTINIAN INTERIM AGREEMENT ON THE WEST BANK AND THE GAZA STRIP
### Annex I
### Protocol Concerning Redeployment and Security Arrangements

#### INDEX

ARTICLE I - Redeployment of Israeli Military Forces and Transfer of Responsibility
ARTICLE II- Security Policy for the Prevention of Terrorism and Violence
ARTICLE III - Coordination and Cooperation in Mutual Security Matters
ARTICLE IV - The Palestinian Police
ARTICLE V - Security Arrangements in the West Bank
ARTICLE VI - Security Arrangements in the Gaza Strip
ARTICLE VII - Guidelines for Hebron
ARTICLE VIII - Passages
ARTICLE IX - Movement Into, Within and Outside the West Bank and the Gaza Strip
ARTICLE X - Safe Passage
ARTICLE XI - Rules of Conduct in Mutual Security Matters
ARTICLE XII - Security Arrangements Concerning Planning, Building and Zoning
ARTICLE XIII - Security of the Airspace
ARTICLE XIV - Security along the Coastline to the Sea of Gaza

APPENDIX 1 - Redeployment of Israeli Military Forces
APPENDIX 2 - Deployment of Palestinian Policemen
APPENDIX 3 - Palestinian Civil Police Stations and Posts
APPENDIX 4 - Jewish Holy Sites
APPENDIX 5 - Protocol Regarding Arrangements with Respect to Passages
APPENDIX 6 - List of Hamlets included in Area B

#### ARTICLE I
#### Redeployment of Israeli Military Forces and Transfer of Responsibility

*First Phase of Redeployment*

1. The first phase of Israeli military forces redeployment will cover populated areas in the West Bank - cities, towns, villages, refugee camps and hamlets, as shown on map No. 1. This redeployment will be effected in stages, as set out in the schedule attached to this Annex as Appendix 1, and will be completed prior to the eve of the Palestinian elections, i.e., 22 days before the day of elections.

2. In order to maintain the territorial integrity of the West Bank and the Gaza Strip as a single territorial unit, and to promote their economic

growth and the demographic and geographical links between them, both sides shall implement the provisions of this Annex, while respecting and preserving without obstacles, normal and smooth movement of people, vehicles, and goods within the West Bank, and between the West Bank and the Gaza Strip.

3. Any security arrangements and measures which become effective commensurate with the redeployment of the Israeli military forces will not undermine the importance of, nor will they prejudice, the Palestinian development programs and projects for reconstruction and development of the West Bank and the Gaza Strip, as well as the moral and physical dignity of the Palestinian people in the West Bank and the Gaza Strip.

4. After the inauguration of the Palestinian Council, the unity and integrity of the Palestinian people in the West Bank and the Gaza Strip shall be maintained and respected. All Palestinian people residing in the West Bank and the Gaza Strip will be accountable to the Palestinian Council only, unless otherwise provided in this Agreement.

5. After the inauguration of the Palestinian Council, the Israeli Civil Administration will be dissolved and the Israeli military government will be withdrawn. 6. The Council will assume powers and responsibilities for civil affairs, as well as for public order and internal security, according to this Agreement.

7. Nothing in this Article shall derogate from Israel's security powers and responsibilities in accordance with this Agreement.

8. There will be a period of 10 days prior to each stage of redeployment according to paragraph I of this Article, during which the commanders of the Israeli military forces will acquaint the respective commanders of the different echelons of the Palestinian Police with the respective area and its specific problems.

*Further Redeployments After the Inauguration of the Palestinian Council*

9. The further redeployments of Israeli military forces to specified military locations will be gradually implemented in accordance with the DOP in three phases, each to take place after an interval of six months, after the inauguration of the Council, to be completed within 18 months from the date of the inauguration of the Council.

10. The specified military locations referred to in Article X, paragraph 2 of this Agreement will be determined in the further redeployment phases within the specified time-frame ending not later than 18 months from the date of the inauguration of the Council, and will be negotiated in the permanent status negotiations .

### ARTICLE II
### Security Policy for the Prevention of Terrorism and Violence

1. The Palestinian security policy as defined by the Palestinian Authority on March 9, 1995, for the Gaza Strip and the Jericho Area will also be implemented in the rest of the West Bank in areas which come under Palestinian security responsibility as follows:

a. The Palestinian Police is the only Palestinian security authority.

b. The Palestinian Police will act systematically against all expressions of violence and terror.

c. The Council will issue permits in order to legalize the possession and carrying of arms by civilians. Any illegal arms will be confiscated by the Palestinian Police.

d. The Palestinian Police will arrest and prosecute individuals who are suspected of perpetrating acts of violence and terror.

2. Both sides will, in accordance with this Agreement, act to ensure the immediate, efficient and effective handling of any incident involving a threat or act of terrorism, violence or incitement, whether committed by

Palestinians or Israelis. To this end, they will cooperate in the exchange of information and coordinate policies and activities. Each side shall immediately and effectively respond to the occurrence or anticipated occurrence of an act of terrorism, violence or incitement and shall take all necessary measures to prevent such an occurrence.

3. With a view to implementing the above, each side shall, in accordance with the provisions of this Agreement, carry out the following functions in the areas under its security responsibility:

a. protect all residents of, and all other persons present in, these areas;

b. actively prevent incitement to violence, including violence against the other side or persons under the authority of the other side;

c. apprehend, investigate and prosecute perpetrators and all other persons directly or indirectly involved in acts of terrorism, violence and incitement; and

d. prevent and deal with any attempt to cause damage or harm to infrastructure serving the other side, including, inter alia, roads, water, electricity, telecommunications and sewage infrastructure.

4. Both sides undertake to deal with the issue of persons who are present in the areas in violation of this Agreement, and to take further measures in accordance with procedures to be determined by the JSC.

## ARTICLE III
### Coordination and Cooperation In Mutual Security Matters

1. Joint Security Coordination and Cooperation Committee

a. A Joint Coordination and Cooperation Committee for Mutual Security Purposes is hereby established (hereinafter "the JSC"). It will deal with all security matters of mutual concern regarding this Agreement in the West Bank and the Gaza Strip.

b. The JSC shall:

(I) recommend security policy guidelines for the approval of the Joint Israeli-Palestinian Liaison Committee and implement such approved guidelines;

(2) deal with security issues raised by either side;

(3) provide the proper channel for exchanging information between the two sides, needed to solve security problems; (4) provide directives for the Joint Regional Security Committees (hereinafter "the RSCs") and for the Joint District Coordination Offices (hereinafter "the DCOs"); and

(5) subject to the provisions of Article XXVI (the Joint Israeli Palestinian Liaison Committee), and Article XXI (Settlement of Differences and Disputes) of this Agreement, deal with alleged violations, as well as differences relating to the application or implementation of the security arrangements set out in this Agreement.

c. The JSC shall comprise between five and seven members from each side. Decisions of the JSC will be reached by agreement between the two sides.

d. The JSC shall determine its rules of procedure. Meetings of the JSC shall be held every two weeks. In the event that either side requests a special meeting, it shall be convened within forty-eight (48) hours.

e. Unless otherwise agreed by the two sides, JSC meetings will be hosted by each of the sides alternately.

f. The JSC shall develop a comprehensive plan to ensure full coordination between the Israeli military forces and the Palestinian Police during the interim period, starting from the date of signing of this Agreement.

g. This coordination will be implemented through the RSCs in the West Bank and the Gaza Strip and the DCOs, as mentioned hereafter in this

Article.

h. The comprehensive plan will include a plan for the West Bank, consisting of arrangements for the entry of the Palestinian Police and the introduction of police arms, ammunition and equipment, as well as arrangements intended to facilitate the smooth transfer of authority and assumption by the Palestinian Police of its security responsibilities according to this Agreement.

i. The above mentioned comprehensive plan will also include two regional plans that will include arrangements for coordination and cooperation in security matters after the redeployment is effected.

j. These regional plans will be reviewed every six months, or whenever needed, by the JSC and the relevant RSC.

2. Regional Security Committees

a. Two RSCs are hereby established, one in the West Bank and one in the Gaza Strip.

b. Each RSC shall:

(1) guide the relevant DCOs with security policy guidelines; (2) deal with security issues referred to it by the DCOs;

(3) ensure proper transfer of information and guidelines to the relevant DCOs; and

(4) propose to the JSC security policy guidelines, and forward issues to the JSC for determination.

c. The Israeli side and the Palestinian side in the RSCs will maintain contact with each other as follows:

(l) regular as well as special meetings shall be held between the commander of the Israeli military forces and the commander of the Palestinian Police in the West Bank or in the Gaza Strip, as appropriate; and

(2) each side will operate a regional security coordination office 24 hours a day, with direct and constant communication links between the two sides.

d. The RSCs shall commence operations immediately upon the signing of this Agreement and shall determine by agreement their mode of procedure.

3. District Coordination Offices

a. DCOs are hereby established in the West Bank and the Gaza Strip, as set out below.

b. The location of the DCOs is as detailed on attached map Nos. 2 and 4.

c. Each DCO shall:

(l) monitor and manage matters requiring coordination as determined by the JSC and/or the relevant RSC, according to the policy and guidelines established by either of them;

(2) monitor and manage all matters of a joint nature within the respective district of the DCO, including the coordination of activities by one side which may affect the other side;

(3) review, investigate and report to the relevant RSC on the overall situation within the DCO's respective district, with special regard to specific events, incidents and activities occurring in the district; and

(4) direct the Joint Patrols and the Joint Mobile Units set up in accordance with paragraphs 4 and 5 of this Article and Article V, paragraph 2.c below, operating within the DCO's respective district. d. The DCOs shall commence operations immediately upon the signing of this Agreement.

e. Each DCO will be continuously staffed by a team of up to six officers

from each side, comprising one commander and five duty officers.

f. The DCOs will be operated jointly by both sides, 24 hours a day. At least one duty officer from each side, as well as the necessary number of assistants, will be present during each eight-hour shift.

g. With a view to preventing friction and to enabling the two sides to deal with possible incidents, both sides shall ensure that the relevant DCO shall immediately be notified of any of the following events:

(1) routine, scheduled or unscheduled activity or deployment by the Israeli military forces or the Palestinian Police that directly affects the security responsibility of the other side. This includes activity or deployment in the proximity of Settlements or Palestinian populated localities, as the case may be;

(2) events that pose a threat to public order;

(3) activities that disturb the regular flow of traffic on the main roads, including roadblocks and roadworks;

(4) incidents involving both Israelis and Palestinians, such as road accidents, rescue of casualties or persons in mortal danger, engagement steps or any incident in which a weapon is used;

(5) a terrorist action of any kind and from any source;

(6) infiltrations between the West Bank, the Gaza Strip and Israel; and

(7) all cases in which Israelis are hospitalized in the West Bank or the Gaza Strip, or in which Palestinians of the West Bank or the Gaza Strip are hospitalized in Israel.

h. Each DCO shall notify the relevant Israeli and Palestinian headquarters, as well as the Joint Patrols operating in the relevant district, of the occurrence of any of the events listed in subparagraph g. above.

i. The JSC may modify the content of the list of events included in subparagraph g. above.

j. Any event involving injury to Israelis, at any location within the West Bank or the Gaza Strip shall be immediately reported to Israel through the relevant DCO. Israel may employ any means necessary for the evacuation and treatment of such injured persons, and will coordinate such activity through the relevant DCO.

k. The DCOs shall be equipped with the necessary means of communication to enable direct and immediate contact both with the Joint Patrols and the relevant RSC, as well as with each side's respective police or military district headquarters.

4. Joint Patrols

a. The mission of the Joint Patrols shall be to assist in ensuring free, unimpeded and secure movement along the roads designated in Articles V and VI below.

b. Unless the JSC decides otherwise, the Joint Patrols shall each be composed of two 4-wheel drive vehicles, one Palestinian and one Israeli, equipped with adequate communications systems. The vehicles shall be marked so as to be easily distinguishable from all other vehicles in the area. In each vehicle there will be an officer and three uniformed and armed guards.

c. The Joint Patrols will patrol 24 hours a day, in vehicles along their routes of activity, or as directed by the relevant DCO. Joint Patrols on the Lateral Roads in the Gaza Strip will also patrol on foot along their routes of activity, and on the adjacent sides of the roads upon which the security of the traffic along these roads is dependent.

d. On roads under Israeli security responsibility, the Israeli vehicle will be the leading vehicle. On roads under Palestinian security responsibility, the Palestinian vehicle will be the leading vehicle. The Joint Patrols will be

under the direction of the relevant DCO.

e. The Joint Patrols shall continuously monitor movement within their area of operation and shall act to prevent and deal with incidents that may threaten or endanger persons using the roads. They shall report any such incident or threat thereof, as well as any action taken, to the relevant DCO, and to the respective Israeli military and Palestinian police district headquarters.

f. On reaching the scene of an incident, the Joint Patrol will take all measures necessary to deal with the incident, and provide assistance as necessary. The Joint Patrol shall verify that the appropriate measures have been taken and report to the relevant DCO accordingly.

5. Joint Mobile Units

a. The mission of the Joint Mobile Units (hereinafter "JMUs") is to provide rapid response in the event of incidents and emergency situations, in order to ensure free, unimpeded and secure movement along their designated routes of activity, or in their areas of activity. b. The composition of the JMUs will be similar to that of the Joint Patrols.

c. In areas under Israeli security responsibility, the Israeli vehicle will be the leading vehicle. In areas under Palestinian security responsibility, the Palestinian vehicle will be the leading vehicle. The Joint Mobile Units will be under the direction of the relevant DCO.

d. The functions of the JMUs are:

(1) to monitor movement along their designated routes of activity from their stationary locations, from where they may patrol on agreed roads as directed by the relevant DCO, in which case their duties will be the same as those of the Joint Patrols;

(2) in the event of an incident involving both Israelis and Palestinians, to reach the site of the incident in order to provide assistance and to investigate; and

(3) any other function determined by the relevant DCO.

6. Joint Liaison Bureaus

Joint Liaison Bureaus established by the two sides shall operate at crossing points and at terminals as described in Articles V, VI and VIII of this Annex.

7. Other joint activities may be agreed upon in the JSC and/or the RSC.

## ARTICLE IV
## The Palestinian Police

1. Duties and Functions

As detailed in the Palestinian law, the Palestinian Police shall carry out its duties and functions in accordance with this Agreement as follows:

a. maintaining internal security and public order;

b. protecting the public and all other persons present in the areas, as well as protecting their property, and acting to provide a feeling of security, safety and stability;

c. adopting all measures necessary for preventing crime in accordance with the law;

d. protecting public installations, infrastructure and places of special importance; e. preventing acts of harassment and retribution;

f. combating terrorism and violence, and preventing incitement to violence; and

g. performing any other normal police functions.

2. Structure and Composition

a. The Palestinian Police shall consist of one integral unit under the control of the Council. It shall be composed of six branches:

(1) Civil Police (Al Shurta);

(2) Public Security;

(3) Preventive Security;

(4) Amn Al Ri'asah;

(5) Intelligence; and

(6) Emergency Services and Rescue (Al Difa'a Al Madani).

In each district, all members of the six Police branches shall be subordinate to one central command.

b. The Palestinian Police shall have a Palestinian Coastal Police unit in accordance with Article XIV of this Annex.

3. Deployment

a. During the interim period, the total number of policemen of the Palestinian Police in all its branches in the West Bank and the Gaza Strip will be no more than 30,000 out of which up to 12,000 policemen may be deployed in the West Bank and up to 18,000 policemen in the Gaza Strip. These numbers may be changed by agreement, if necessary. The Palestinian side will notify Israel of the names of the policemen recruited to the Palestinian Police in the Gaza Strip.

b. In accordance with the stages of the first phase of redeployment of Israeli forces in the West Bank, up to 6,000 of the above-mentioned 12,000 Palestinian policemen may be deployed in the West Bank in Area A and, as set out in paragraph 3 of Article V, in Area B, as detailed in Appendix 2.

c. The remaining 6,000 Palestinian policemen will be deployed in the West Bank according to the phases of the further redeployments or as needed, as agreed upon by the two Parties.

d. The Palestinian Police shall be deployed as shown on attached map Nos. 3 and 5.

4. Recruitment

a. The Palestinian Police shall consist of policemen recruited locally, and from abroad (from among individuals holding Jordanian passports or Palestinian documents issued by Egypt). The number of Palestinian recruits from abroad shall not exceed 5,000 in the West Bank and 7,000 in the Gaza Strip.

b. Palestinian policemen coming from abroad may be accompanied by their spouse and sons and daughters.

c. The Palestinian policemen to be recruited pursuant to this Agreement shall be West Bank or Gaza Strip residents who will be duly trained to perform police functions.

d. The Palestinian side will notify Israel of any candidate for recruitment to the Palestinian Police. Should Israel object to the recruitment of any such candidate, that person shall not be recruited.

e. In accordance with Palestinian law, the employment of policemen who have been convicted of serious crimes, or have been found to be actively involved in terrorist activities subsequent to their recruitment, will be immediately terminated, and their weapons and police identification documentation will be confiscated.

5. Arms, Ammunition and Equipment

a. In the West Bank and the Gaza Strip, uniformed policemen may carry arms, and plainclothes policemen on duty who hold special accreditation may carry personal light arms concealed in their clothing, in accordance

with this Agreement.

b. In the West Bank, the Palestinian Police will possess the following arms and equipment:

(1) up to 4,000 rifles;

(2) up to 4,000 pistols;

(3) up to 120 machine guns of 0.3" or 0.5" caliber; and

(4) up to 15 light, unarmed riot vehicles of a type to be agreed on between the two sides in the JSC.

c. In the Gaza Strip, the Palestinian Police will possess the following arms and equipment:

(1) 7,000 light personal weapons;

2) up to 120 machine guns of 0.3" or 0.5" caliber; and

(3) up to 45 wheeled armored vehicles of a type to be agreed on between the two sides, and of which 22 will be deployed in protecting Council installations. The use of wheeled armored vehicles in the Security Perimeter, on the Lateral Roads and on their adjacent sides, or in the vicinity of the Settlements shall be approved through the relevant DCO. Movement of such vehicles along the central North-South road (Road No. 4) in the Gaza Strip may take place only after providing notification to the relevant DCO.

d. The number of arms or items of equipment specified in subparagraphs b. and c. above may be increased subject to the agreement of both sides.

e. The Palestinian Police will maintain an updated register of all weapons held by its personnel.

f. The Palestinian Police may possess communication systems, subject to Article 36 of Annex III, and distinctive uniforms, identification badges and vehicle markings.

g. In this Annex, the term "weapons" includes firearms, ammunition and explosives of all kinds.

6. Introduction of Arms. Equipment and Foreign Assistance

a. All foreign contributions and other forms of assistance to the Palestinian Police must comply with the provisions of this Agreement.

b. The introduction of arms, ammunition or equipment intended for the Palestinian Police shall be coordinated through the JSC, in accordance with its established practices.

7. Movement

Movement of Palestinian policemen between the West Bank and the Gaza Strip will be conducted in accordance with Article X of this Annex.

## ARTICLE V
### Security Arrangements in the West Bank

1. Coordination and Cooperation in the West Bank

As shown on map No. 4, eight DCOs will function in the West Bank, as follows:

a. a DCO for the Jenin District, located at the Quabatiya junction or in its vicinity;

b. a DCO for the Nablus District, located at the Hawara Junction;

c. a DCO for the Tulkarm District, located at the Kaddouri Junction;

d. a DCO for the Qalqilya District located at Tsufin Junction;

e. a DCO for the Ramallah District, located at the Beth El junction or in its

vicinity;

f. a DCO for the Bethlehem District, located at the Panorama Hills in Beit Jala;

g. a DCO for the Hebron District, located at Har Manoakh (Jabal Manoah); and

h. a DCO for the Jericho District, located at Vered Yericho, that will maintain a subordinate Joint Liaison Bureau in the Allenby Terminal.

2. Area A

a. The Council will, upon completion of the redeployment of Israeli military forces it each district, as set out in Appendix 1 to this Annex, assume the powers and responsibilities for internal security and public order in Area A in that district.

b. Jewish Holy Sites

(1) The following provisions will apply with respect to the security arrangements in Jewish holy sites in Area A which are listed in Appendix 4 to this Annex:

(a) While the protection of these sites, as well as of persons visiting them, will be under the responsibility of the Palestinian Police, a JMU shall function in the vicinity of, and on the access routes to, each such site, as directed by the relevant DCO.

(b) The functions of each such JMU shall be as follows:

(i) to ensure free, unimpeded and secure access to the relevant Jewish holy site; and

(ii) to ensure the peaceful use of such site, to prevent any potential instances of disorder and to respond to any incident.

(c) Given the Jewish religious nature of such sites, Israeli plainclothes guards may be present inside such sites.

(2) The present situation and the existing religious practices shall be preserved.

c. Clarifications Concerning the Jericho Area

With regard to the definition of the Jericho Area, as delineated on attached map No. 1, it is hereby clarified that Route No. 90 crossing Auja from South to North and the East-West road connecting Route No. 90 with Yitav, and their adjacent sides, shall remain under Israeli authority. For the purpose of this Article, the width of each such road and its adjacent sides, as shown on attached map No. 1, shall extend at least 12 meters on each side measured from its center.

3. Areas B and C

a. There will be a complete redeployment of Israeli military forces from Area B. Israel will transfer to the Council and the Council will assume responsibility for public order for Palestinians. Israel shall have the overriding responsibility for security for the purpose of protecting Israelis and confronting the threat of terrorism.

b. In Area B the Palestinian Police shall assume the responsibility for public order for Palestinians and shall be deployed in order to accommodate the Palestinian needs and requirements in the following manner:

(l) The Palestinian Police shall establish 25 police stations and posts in towns, villages, and other places listed in Appendix 3 to this Annex and as delineated on map No. 3. The West Bank RSC may agree on the establishment of additional police stations and posts, if required.

(2) The Palestinian Police shall be responsible for handling public order incidents in which only Palestinians are involved.

(3) The Palestinian Police shall operate freely in populated places where police stations and posts are located, as set out in paragraph b.l above.

(4) While the movement of uniformed Palestinian policemen in Area B outside places where there is a Palestinian police station or post will be carried out after coordination and confirmation through the relevant DCO, three months after the completion of redeployment from Area B, the DCOs may decide that movement of Palestinian policemen from the police stations in Area B to Palestinian towns and villages in Area B on roads that are used only by Palestinian traffic will take place after notifying the DCO.

(5) The coordination of such planned movement prior to confirmation through the relevant DCO shall include a scheduled plan, including the number of policemen, as well as the type and number of weapons and vehicles intended to take part. It shall also include details of arrangements for ensuring continued coordination through appropriate communication links, the exact schedule of movement to the area of the planned operation, including the destination and routes thereto, its proposed duration and the schedule for returning to the police station or post. The Israeli side of the DCO will provide the Palestinian side with its response, following a request for movement of policemen in accordance with this paragraph, in normal or routine cases within one day and in emergency cases no later than 2 hours.

(6) The Palestinian Police and the Israeli military forces will conduct joint security activities on the main roads as set out in this Annex.

(7) The Palestinian Police will notify the West Bank RSC of the names of the policemen, number plates of police vehicles and serial numbers of weapons, with respect to each police station and post in Area B.

(8) Further redeployments from Area C and transfer of internal security responsibility to the Palestinian Police in Areas B and C will be carried out in three phases, each to take place after an interval of six months, to be completed 18 months after the inauguration of the Council, except for the issues of permanent status negotiations and of Israel's overall responsibility for Israelis and borders.

(9) The procedures detailed in this paragraph will be reviewed within six months of the completion of the first phase of redeployment.

4. Joint Patrols

a. Joint Patrols led by a Palestinian vehicle will operate on each of the following roads, as indicated on map No. 4:

(l) the main north-south road (Route No. 60) crossing Jenin;

(2) the main north-south road (Route No. 60) crossing Nablus;

(3) the main east-west road (Route Nos. 57 and 60) crossing Nablus;

(4) the main east-west road (Route No. 57) crossing Tulkarm;

(5) the main east-west road (Route No. 55) crossing Qalqilya;

(6) the main north-south road (Route No. 60) crossing Ramallah;

(7) the main east-west road (Route No. 3) crossing Ramallah;

(8) the main north-south road (Route No. 60) crossing Bethlehem;

(9) the main east-west road crossing Beit Jala;

(10) the main north-south road (Route No. 90) crossing Jericho; and

(11) the road crossing Hebron, as set out in Article VII (Hebron) below. The operation of the Joint Patrols in each district will commence after the completion of redeployment in the respective district.

b. Each DCO will be allowed, within 3 months after the completion of the redeployment in its respective district, to decide that Joint Patrols will function on roads crossing areas A, B and C.

5. Joint Mobile Units

a. Joint Mobile Units will operate in Area B and will be led by the Israeli vehicle. Three such Joint Mobile Units shall be located at each

DCO. One will be on alert 24 hours a day. The two others will perform missions as directed by the DCO during daylight hours.

b. A Joint Mobile Unit shall be located at the Auja junction being the intersection of Route No. 90 and the road to Yitav. This unit shall be led by the Israeli vehicle, and may be directed by the DCO to deal with certain incidents occurring on the road between Auja and Jericho in which Palestinians are involved.

c. A Joint Mobile Unit shall be located at the Nahal Elisha junction on the road from Jericho to the Mousa Allami project.

6. Movement of Palestinian Policemen

Movement of uniformed policemen, whether armed or unarmed, as well as armed on-duty plainclothes policemen, in Area C, will be confirmed and coordinated by the relevant DCO. Movement of such policemen between Area A and Area B will be approved by the relevant DCO.

7. Rachel's Tomb

a. Without derogating from Palestinian security responsibility in the City of Bethlehem, the two sides hereby agree on the following security arrangements regarding Rachel's Tomb which will be considered a special case during the Interim Period:

(I) While the Tomb, as well as the main road leading from Jerusalem to the Tomb, as indicated on map No.l, will be under the security responsibility of Israel, the free movement of Palestinians on the main road will continue.

(2) For the purpose of protecting the Tomb, three Israeli guard posts may be located in the Tomb, the roof of the Waqf building, and the parking lot.

b. The present situation and existing practices in the Tomb shall be preserved.

## ARTICLE VI
### Security Arrangements in the Gaza Strip

1. The Delimiting Line

a. For the purpose of the present Agreement only, and without prejudice to the permanent status negotiations on borders, the line delimiting the northern and eastern edge of the Gaza Strip follows the fence on the ground, as delineated on attached map No. 2 by an unbroken green line (hereinafter "the Delimiting Line") and shall have no other effect.

b. The Parties reaffirm that, as long as this Agreement is in force, the security fence between the Gaza Strip and Israel shall remain in place, and that the line demarcated by the fence shall be authoritative only for the purpose of this Agreement.

2. Security Perimeter

a. There will be a security perimeter along the Delimiting Line inside the Gaza Strip as delineated on attached map No. 2 by a broken green line (hereinafter "the Security Perimeter").

b. In accordance with the provisions of this Agreement, the Palestinian Police will be responsible for security in the Security Perimeter.

c. The Palestinian Police will enforce special security measures aimed at preventing infiltrations across the Delimiting Line or the introduction into the Security Perimeter of any arms, ammunition or related equipment, except for the arms, ammunitions or equipment of the Palestinian Police, authorized through the relevant DCO.