# EXHIBIT A.532
## (2 of 5)

d. Activities of the Palestinian Police inside the Security Perimeter will be coordinated through the relevant DCO. Security activities in Israel in the vicinity of the Delimiting Line that directly affect the other side will be coordinated with the Palestinian Police through the relevant DCO.

3. The Israeli Settlements

a. In accordance with the DOP, during the interim period, the Gush Katif and Erez settlement areas, as well as the other settlements in the Gaza Strip, as delineated on attached map No. 2 by a blue line, will be under Israeli authority.

b. Palestinians will be free to move along the coast road and along the road from the Netzarim Junction to the seashore.

4. The Yellow Area

a. In the areas delineated by a broken red line and shaded in yellow in attached map No. 2 (hereinafter "the Yellow Area"), and without derogating from Palestinian authority, responsibility will be shared as follows: the Israeli authorities will have the overriding responsibility and powers for security, and the Council will have the responsibility and powers for civil affairs, subject to this Agreement. In addition, with regard to the Yellow Area, cooperation and coordination in security matters, including Joint Patrols, as agreed, will be implemented.

b. Entry of Palestinian policemen into the Yellow Area and their activity therein may take place as agreed upon through the relevant DCO.

c. Without derogating from the above, while the Palestinian side shall have responsibility and powers for public order for Palestinians in the Mawasi Area, Israel shall retain the responsibility and powers for internal security. Accordingly, the area shall be treated as Area B throughout the interim period in accordance with the provisions of paragraph 3 of Article V above. For the purpose of exercising Palestinian public order responsibility and powers, Palestinian uniformed Civil Police (Al Shurta) policemen may enter the Mawasi Area after coordination and confirmation of their movement and activity through the relevant DCO.

5. The Mawasi Area

a. As shown on map No. 2, two Joint Patrols will operate in the Mawasi area, the fishermen's wharves of Rafah and Khan Yunis and along the coast road, led by the Israeli vehicle.

b. Access of Palestinians to the Mawasi area, as delineated on attached map No. 2, will be by the following roads:

(1) Rafah - Tel Sultan - Mawasi;

(2) Khan Yunis - El Bahr Village; and

(3) Deir El Ballah - along the beach to the Mawasi.

c. The Mawasi Beach

(1) Notwithstanding Israeli authority over the Gush Katif settlement area, the Council may operate sections of the Mawasi beach page extending to the east up to the coast road, totaling, together with the Rafah and Khan Yunis wharves, five (5) kilometers. Israel has notified the Palestinian Authority of the locations of these sections.

(2) These sections may be used for the following purposes:

(a) sport and recreation, including boat hire facilities;

(b) operating food establishments,

(c) enlarging the wharves;

(d) expanding the facilities for fishermen, such as offices, warehouses and cold storage facilities; and

(e) an hotel.

(3) In these sections, the Council, in exercising its civil authority, will be able to grant licenses for businesses, collect fees and taxes, set and enforce public health standards and develop and manage the tourist sector.

(4) In each of the fishermen's wharves, the Council may have an office building which shall be protected.

(5) There will not be any construction by Israelis of new sites along the beach.

(6) During a period of three months from the signing of this Agreement, Israel may consider, in light of the security situation, the use by the Council of additional beach sections.

6. The Egyptian Border

The Military Installation Area along the Egyptian border in the Gaza Strip, as delineated on attached map No. 2 by a blue line and shaded in pink, will be under Israeli authority.

The village of Dahaniya will remain part of the Military Installation Area pending a declaration of a general amnesty for the residents of the village, and provision having been made for their protection. Upon realization of the above amnesty and protection, the village of Dahaniya will become part of the Yellow Area.

7. Lateral Roads to the Settlements

a. Without derogating from Palestinian authority and in accordance with the Declaration of Principles:

(I) On the three lateral roads connecting the Israeli settlements in the Gaza Strip to Israel, namely the Kissufim - Gush Katif road; the Sufa - Gush Katif road; and the Karni - Netzarim road, as indicated by a light blue line on attached map No. 2, including the adjacent sides upon which the security of traffic along these roads is dependent (hereinafter "the Lateral Roads"), the Israeli authorities will have all necessary responsibilities and powers in order to conduct independent security activity, including Israeli patrols.

(2) Joint Patrols will operate along the Lateral Roads. Such joint patrols will be led by the Israeli vehicle.

(3) Where the Israeli authorities carry out engagement steps, they will do so with a view to transferring, at the earliest opportunity, the continued handling of the incidents falling within the Palestinian responsibility, to the Palestinian Police.

(4) Overpasses will be constructed on intersections between the Lateral Roads and the central North- South road (Road No. 4).

b. Where the Lateral Roads overlap the Security Perimeter, the two sides, in the exercise of their respective powers and responsibilities, will fully coordinate their activity in order to prevent friction.

8. The Central North-South Road (Road No. 4)

A Joint Patrol led by the Palestinian vehicle will be operated along the central North-South road (Road No. 4) in the Gaza Strip between Kfar Darom and Wadi Gaza.

9. Joint Mobile Units

a. Joint Mobile Units will be located at the following junctions:

(I ) the Nissanit junction;

(2) the Netzarim junction,

(3) the Deir el-Ballah junction; and

(4) the Sufa-Morag junction.

b. At the Netzarim junction, the Israeli side of this Joint Mobile Unit will

check Israeli vehicles, which will then be able to continue their journey without interference. This Joint Mobile Unit will also operate as a Joint Patrol between the Netzarim junction and Wadi Gaza under the direction of the relevant DCO.

10. Coordination and Cooperation in the Gaza Strip

Two DCOs will function in the Gaza Strip as follows:

a. A DCO for the Gaza district, located at the Erez crossing point with subordinate Joint Liaison Bureaus at the Erez and Nahal Oz crossing points.

b. A DCO for the Khan Yunis district, located at the Nuriya Camp with subordinate Joint Liaison Bureaus at the Sufa crossing points and at the Rafah Terminal.

### ARTICLE VII
### Guidelines for Hebron

1. a. There will be a redeployment of Israeli military forces in the city of Hebron except for places and roads where arrangements are necessary for the security and protection of Israelis and their movements. The areas of such redeployment are delineated by red and blue lines and shaded in orange stripes on a yellow background on attached map No. 9 (hereinafter "Area H-l").

b. This redeployment will be completed not later than six months after the signing of this Agreement.

2. a. The Palestinian Police will assume responsibilities in Area H-1 similar to those in other cities in the West Bank.

b. All civil powers and responsibilities, set out in Annex III of this Agreement, will be transferred to the Council in the City of Hebron as in the other cities in the West Bank.

c. Palestinian police stations or posts will be established in Area H-l, manned by a total of up to 400 policemen, equipped with 20 vehicles and armed with 200 pistols, and 100 rifles for the protection of those stations.

d. The Palestinian Police shall operate freely in Area H-l. Any activity or movement by it outside this area will be carried out after coordination and confirmation through the DCO established in paragraph 6 of this Article.

e. The Imara will be turned over to the Palestinian side upon the completion of the redeployment, and will become the headquarters of the Palestinian Police in the city of Hebron.

3. According to the DOP, Israel will continue to carry the responsibility for overall security of Israelis for the purpose of safeguarding their internal security and public order.

4. a. In the area of the city of Hebron from which Israel military forces will not redeploy, as delineated by red and blue lines on attached map No. 9 (hereinafter "Area H-2"), Israel will retain all powers and responsibilities for internal security and public order.

b. In Area H-2, the civil powers and responsibilities will be transferred to the Council; except for those relating to Israelis and their property which shall continue to be exercised by Israeli Military Government.

c. In Area H-2, plainclothes unarmed municipal inspectors will monitor and enforce vis-a-vis Palestinians, compliance with the laws and regulations, within the civil powers and responsibilities transferred to the Council in Hebron.

5. The municipality of Hebron will continue to provide all municipal services to all parts of the city of Hebron.

6. a. A DCO will be located at Har Manoakh (Jabal Manoah).

b. Upon completion of the redeployment of Israeli military forces, a JMU

will operate throughout the city of Hebron, including in the Old City, if required to do so by the abovementioned DCO.

c. A Joint Patrol will function in Hebron on the road from Ras e-Jura to the north of the Dura junction via E-Salaam road and on Route No. 35.

d. Three months after the completion of the redeployment, the DCO will consider the reassignment of the Joint Patrol to other parts of Hebron.

7. Measures and procedures for normalizing life in the Old City and on the roads of Hebron will be taken immediately after the signing of this Agreement, as follows:

a. opening of the wholesale market - Hasbahe, as a retail market;

b. removal of the barrier on the road leading from Abu Sneineh to Shuhada Road in order to facilitate the movement on these roads;

c. reopening of the main entrance to the Islamic College;

d. replacement of the closed roadblock at the Ras e-Jura junction by a normally open traffic supervision system;

e. replacement of the roadblock at the Harsina junction by a regular position;

f. opening of the route from the Sa'air Shiukh road to Hebron;

g. opening of the Tnuva Road; and

h. removal of the two barriers in the vicinity of the Raranta School near the North Dura junction.

8. A high level Joint Liaison Committee will be established in order to deal with the security situation in Hebron after completion of the redeployment.

9. a. Since the two sides are unable to reach agreement regarding the Tomb of the Patriarchs / Al Haram Al Ibrahimi, they have agreed to keep the present situation as is.

b. Three months after the redeployment the high level Joint Liaison Committee will review the situation.

10. There will be a Temporary International Presence in Hebron (TIPH). Both sides will agree on the modalities of the TIPH, including the number of its members and its area of operation.

11. Immediately after the completion of the redeployment, measures must be taken to ensure a stable and secure situation throughout the Hebron area, free from efforts to undermine this Agreement or the peace process.

12. Hebron will continue to be one city, and the division of security responsibility will not divide the city.

## ARTICLE VIII
### Passages

1. General

a. While Israel remains responsible during the interim period for external security, including along the Egyptian and Jordanian borders, border crossing shall take place according to the arrangements included in this Article. These arrangements aim at creating a mechanism that facilitates the entry and exit of people and goods, reflecting the new reality created by the DOP, while providing full security for both sides.

b. The arrangements included in this Article shall apply to the following border crossings:

(1) the Allenby Bridge crossing; and

(2) the Rafah crossing.

c. A joint Israeli-Palestinian committee will decide on applying the arrangements included in this Article to the Damya Bridge crossing and, in

parallel, on alternatives.

d. The provisions of the Protocol Regarding Arrangements with Respect to Passages, signed on October 31, 1994 in Casablanca, as amended and attached to this Annex as Appendix 5 (hereinafter "Appendix 5"), will continue to be applicable for the duration of this Agreement, unless otherwise agreed upon. Immediately upon the signing of this Agreement, the CAC shall review the amended Protocol and, in this context, consider the Palestinian request that with regard to the administration of the passages, the Israel Airport Authority be replaced by the Israeli military government.

e. The same arrangements will be applied by the Parties, with the necessary adjustments, to agreed seaports, airports or other international crossings, such as the Abdullah bridge.

f. The two sides are determined to do their utmost to maintain the dignity of persons passing through the border crossings. To this end, the mechanism created will rely heavily on brief and modern procedures.

g. In each border crossing there will be one terminal, consisting of two wings. The first wing will serve Palestinian residents of the West Bank and the Gaza Strip and visitors to these areas (hereinafter "the Palestinian Wing"). The second wing will serve Israelis and others (hereinafter "the Israeli Wing"). There will be a closed Israeli checking area and a closed Palestinian checking area, as set out below.

h. Special arrangements applicable to VIPs crossing through the Palestinian Wing, are set out in Appendix 5.

2. Control and Management of the Passages

a. For the purpose of this Article, "passage" is defined to mean the area from the crossing barrier at the Egyptian border or the Allenby Bridge, passing through and including the terminal and:

(1) with regard to the Allenby Bridge crossing, from the terminal up to the Jericho Area; and

(2) with regard to the Rafah crossing, from the terminal up to the outer limit of the Israel military location along the Egyptian border.

b. (1) Israel will have the responsibility for security throughout the passage, including for the terminal.

(2) An Israeli director-general will have the responsibility for the management and security of the terminal.

(3) The director-general will have two deputies who will report to him.

(a) an Israeli deputy who will be the manager of the Israeli Wing. Israel will have exclusive responsibility for the management of the Israeli Wing; and

(b) a Palestinian deputy, appointed by the Council, who will be the manager of the Palestinian Wing.

(4) Each deputy will have an assistant for security and an assistant for administration. The assignments of the Palestinian deputies for security and administration are set out in Appendix 5.

(5) The Palestinian deputy director-general at the Allenby Bridge terminal will be able to travel between this terminal and the Jordanian terminal for the purpose of exercising his functions.

(6) There will be maximum coordination between the two sides. Both sides will maintain cooperation and coordination on matters of mutual concern.

(7) The director-general will continue to use Palestinian contractors to provide bus services and other administrative and logistical services.

(8) Palestinian policemen present at the terminal will be armed with handguns. Their deployment is set out in Appendix 5. Other Palestinian

officials present at the terminal will be unarmed.

(9) The details of management and security including those relating to the Liaison Bureau referred to in subparagraph 5 below are set out in Appendix 5.

(10) The two sides will work together in order to seek ways for additional arrangements in the Rafah terminal.

c. Except for all the arrangements included in this Article, the current procedures and arrangements applicable outside the terminal shall continue to apply throughout the passage.

d. (l) Once incoming passengers have crossed the terminal, they will proceed to the West Bank or the Gaza Strip, as appropriate, without any interference from Israeli authorities (safe passage).

(2) Outgoing passengers may proceed to the terminal without any interference from Israeli authorities after joint verification that such passengers hold the necessary documentation for exiting the area to Jordan or Egypt, as set out in this Agreement.

3. Arrangements for Entry from Egypt and Jordan Through the Palestinian Wing

a. At the entrance to the Palestinian Wing there will be a Palestinian policeman and a raised Palestinian flag.

b. Before entering the Palestinian Wing, passengers will identify their personal luggage and it will be placed on a conveyor belt. Each side will be able to inspect such luggage inside its own checking area, using its own personnel and, if necessary, may open the luggage for inspection in the presence of the owner and a Palestinian policeman.

c. Persons entering the Palestinian Wing will pass through a magnetic gate. An Israeli policeman and a Palestinian policeman will be posted on each side of this gate. In the event of suspicion, each side will be entitled to require a physical inspection to be conducted in inspection booths to be located adjacent to the gate. Passengers will be inspected by a Palestinian policeman in the presence of an Israeli policeman. Accompanying personal belongings may also be inspected at this point.

d. Having completed the above phase, persons entering the Palestinian Wing will pass through one of two lanes for the purpose of identification and document control, as follows:

(1) The first lane will be used by Palestinian residents of the West Bank and the Gaza Strip. These passengers will pass via a Palestinian counter, where their documents and identity will be checked. Their documents will be checked by an Israeli officer who will also check their identity indirectly in an invisible manner.

(2) The second lane will serve visitors to the West Bank and the Gaza Strip. These passengers will first pass via an Israeli counter, where their documents and identity will be checked. Then they will continue via a Palestinian counter, where their documents and identity will be checked. The two counters will be separated by tinted glass and a revolving door.

e. In the event of suspicion regarding a passenger in any of the two lanes described in subparagraph d. above, each side may question such passengers in its closed checking area. Suspicion justifying questioning in the closed checking area may be one of the following:

(l) the passenger was involved, directly or indirectly, in criminal or planned criminal activity, or in terrorist or planned terrorist activity, and is not a beneficiary of the amnesty provisions of this Agreement;

(2) the passenger conceals arms, explosives or related equipment;

(3) the passenger holds forged or non-valid documentation or the details included in the documentation are inconsistent with those included in the population registry (in case of a resident) or in the data base (in case of a visitor), except that questions relating to such inconsistency will initially be

raised at the counter and the passenger will be questioned in the closed checking area only if the suspicion has not been removed, or

(4) the passenger acts in an obviously suspicious behavior during the passage via the terminal.

If, at the conclusion of this questioning, the suspicion has not been removed, such passenger may be apprehended, after the other side has been notified. In case of a Palestinian suspect being apprehended by the Israeli side, a Palestinian policeman will be asked to meet with the suspect. Following notification to the Liaison Bureau, any further treatment of the apprehended person will be in accordance with Annex IV.

f. In the Palestinian Wing, each side will have the authority to deny the entry of persons who are not residents of the West Bank and the Gaza Strip.

For the purpose of this Agreement, "residents of the West Bank and the Gaza Strip" means persons who, on the date of entry into force of this Agreement, are registered as residents of these areas in the population registry maintained by the military government of the West Bank and the Gaza Strip and by the Council, as well as persons who have subsequently obtained permanent residency in these areas with the approval of Israel, as set out in this Agreement.

g. Following the above procedure, the passengers will collect their luggage and proceed to the customs area as described in Annex V, and as set out in Appendix 5.

h. The Palestinian side will provide passengers whose entry is approved with an entry permit stamped by the Palestinian side and attached to their documents.

At the conclusion of the direct and indirect checking of the documents and identity of passengers passing via the first lane and stamping their entry permits, the Palestinian officer will provide the passenger with a white card issued by the Israeli officer. A Palestinian official posted at the exit of the Palestinian Wing will verify that the passenger holds such white card and will collect the cards with indirect and invisible Israeli checking.

For passengers going through the second lane, the Israeli officer will provide the passengers with a blue card, after checking their documents and identity, and verifying their entry permits. An Israeli and a Palestinian official posted at the exit of the Palestinian Wing will verify and collect the cards. White and blue cards collected will be checked by Israeli and Palestinian officials.

In cases where either side denies the entry of a non-resident passenger, that passenger will be escorted out of the terminal and sent back to Jordan or Egypt, as appropriate, after notifying the other side.

4. Arrangements for Exit to Egypt and Jordan Through the Palestinian Wing

Passengers exiting to Egypt or Jordan through the Palestinian Wing will enter the terminal without their luggage. Thereafter, the same procedures described in paragraph 3 above will apply to them, except that the order of passing via the Israeli and Palestinian counters will be reversed.

5. Joint Liaison Bureau

a. There will be a Joint Liaison Bureau at each crossing point in order to deal with matters arising regarding passengers passing through the Palestinian Wing, issues regarding coordination, and differences regarding the implementation of these arrangements. Without derogating from Israel's responsibility for security, the bureau will also deal with incidents.

b. This bureau will be comprised of an equal number of representatives from each side and will be located at a specified location inside each terminal.

c. This bureau will be subordinate to the relevant subcommittee of the CAC.

6. Miscellaneous

a. Special arrangements will be agreed upon by the two sides regarding the passage of goods, buses, trucks and privately-owned vehicles. Pending this agreement, the current arrangements will continue to apply. The above mentioned arrangements will be agreed upon within six months from the date of signing this Agreement.

b. In order to cross through the border crossings into and out of the West Bank and the Gaza Strip, residents of these areas will use documents as detailed in Annex III

c. The Allenby Bridge terminal will operate from Sunday through Thursday, between the hours of 08:00 and 24:00, and on Fridays and Saturdays, between the hours of 08:00 and 15:00, except on Yom Kippur.

## ARTICLE IX
### Movement Into, Within and Outside the West Bank and the Gaza Strip

1. General

a. Israel declares that work to relocate the Erez crossing point currently within the Gaza Strip to a location within Israel adjacent to the Delimiting Line, is underway. Israel will make every effort to complete this work as soon as possible. A joint Israeli-Palestinian committee will decide, within one month from the signing of this Agreement, the timeframe for completing this work and all related issues. Pending the completion of this work, Israel shall retain control over this crossing point and operate it in accordance with the provisions of this Article.

b. Israelis entering the West Bank and the Gaza Strip shall carry Israeli documentation (if they are above the age of 16) and, if driving a vehicle, a driving license and vehicle registration documentation recognized in Israel. Tourists to Israel entering the West Bank and the Gaza Strip shall be subject to Palestinian laws in accordance with the provisions of this Agreement, shall carry their passports and other relevant documentation, and may be required by the Palestinian Police to identify themselves by presenting their passport or documentation, unless otherwise provided in this Article.

c. Entry of persons from the West Bank and the Gaza Strip to Israel shall be subject to Israeli laws and procedures regulating entry into Israel, and residents of these areas shall be required to carry the identity card as agreed upon in this Agreement, as well as documentation specified by Israel and notified through the CAC to the Council.

d. The provisions of this Agreement shall not prejudice Israel's right, for security and safety considerations, to close the crossing points to Israel and to prohibit or limit the entry into Israel of persons and of vehicles from the West Bank and the Gaza Strip. In addition, the provisions of this Agreement shall not prejudice the use of safe passage.

e. Tourists to the West Bank and the Gaza Strip from countries having diplomatic relations with Israel, who have passed through an international crossing, will not be required to pass any additional entry control before entry into Israel.

2. Passage within the West Bank and between the West Bank and Israel.

a. Without derogating from Israel's security powers and responsibilities in accordance with this Agreement, movement of people, vehicles and goods in the West Bank, between cities, towns, villages and refugee camps, will be free and normal, and shall not need to be effected through checkpoints or roadblocks.

b. Movement between the West Bank and Israel shall be governed by the applicable laws, regulations and rules regulating the movement of

persons and vehicles between the West Bank and Israel, while respecting the importance of the economic and social life, development programs and projects, and emergency health care services of the Palestinian population.

c. The Palestinian Police shall set up checkpoints in areas under its security responsibility on roads connecting the West Bank and Israel, for the purpose of inspection and identification of Palestinian vehicles and passengers in order to prevent illegal introduction of weapons into or from Israel.

3. Passage between the Gaza Strip and Israel

a. Passage between the Gaza Strip and Israel will be via one or more of the following crossing points:

(1) the Erez crossing point;

(2) the Nahal Oz crossing point,

(3) the Sufa crossing point, and

(4) the Karni (commercial) crossing point (for goods only).

b. The Council may set up a checkpoint, within the Gaza Strip, on the road leading to the Erez crossing point and on the road leading to the Nahal Oz crossing point, at locations to be coordinated between the two sides, for the purpose of inspection and identification of passengers and vehicles. Israelis and tourists to Israel passing through these checkpoints may be only required to identify themselves by presenting Israeli documentation or a passport, as set out in subparagraph I.b above. The above requirements shall not apply to uniformed members of the Israeli military forces.

c. The Council may set up a checkpoint, within the Gaza Strip, on the road leading to the Sufa crossing point, at a location acceptable to both sides for the purpose of inspection and identification of Palestinian passengers and vehicles. Israeli vehicles may bypass this checkpoint unimpeded.

d. The Council will allow passage of Israelis and tourists to Israel between the Gaza Strip and Israel, in addition, via the following crossing points:

(I) the Karni (non-commercial) crossing point;

(2 the Kisufim crossing point;

(3) the Kerem Shalom crossing point; and

(4) the Elei Sinai crossing point.

e. Israelis, and tourists to Israel, who have passed through any of the above crossing points into the West Bank and the Gaza Strip shall not be required to undergo inspection, identification or other requirements in addition to the stated provisions for entry into the West Bank and the Gaza Strip outlined in this Article.

f. Arrangements for the movement of goods between the Gaza Strip and Israel through the crossing points are set out in Annex V.

g. A Palestinian liaison officer will be present at each of the crossing points on the Lateral Roads.

## ARTICLE X
## Safe Passage

1. General

a. There shall be a safe passage connecting the West Bank with the Gaza Strip for movement of persons, vehicles and goods, as detailed in this Article.

b. Israel will ensure safe passage for persons and transportation during

daylight hours (from sunrise to sunset) or as otherwise agreed by the JSC, but in any event not less than 10 hours a day.

c. Safe passage through Israel between the West Bank and the Gaza Strip will be effected via the following designated crossing points:

(1) the Erez crossing point (for persons and vehicles only);

(2) the Karni (commercial) crossing point (for goods only);

(3) the Tarkumya crossing point; and

(4) an additional crossing point around Mevo Horon.

d. Israel will make such passage available through the routes indicated on attachedmap No. 6.

e. Consistent with Article XXXI, paragraph 6 of the Agreement, the arrangements included in this Article are without prejudice to the permanent status negotiations.

2. Use of Safe Passage

a. As detailed below, persons using the safe passage shall carry, in addition to personal and vehicle documentation, the following documents:

(1) a safe passage card; and

(2) (for drivers only) a vehicle safe passage permit.

Arrangements for the implementation of the safe passage usage, as well as modalities for the issuance by Israel of safe passage cards and vehicle safe passage permits, shall be discussed and agreed in the JSC, in consultation with the CAC.

b. Residents of the West Bank and the Gaza Strip in possession of a permit enabling them to enter Israel will be able to use this permit as a safe passage card. c. Safe passage cards and vehicle safe passage permits shall be stamped by the Israeli authorities at the crossing point, with the time of departure from the crossing point and the estimated time of arrival.

d. Israel may deny the use of its territory for safe passage by persons who have seriously or repeatedly violated the safe passage provisions detailed in this Article.

e. Persons who are denied entry into Israel will use safe passage by means of shuttle buses which will be escorted by the Israel Police and which will operate from 7:00 AM to 2:00 PM on two days of every week. The exact date and times of such operation will be coordinated through the JSC. Applications by persons denied entry to Israel to use safe passage must be submitted to, and agreed upon in, the relevant DCO at least five days prior to the planned journey.

f. Special arrangements will apply with respect to the passage of Palestinian leaders, senior Council officials, distinguished personalities and guests of the Ra'ees of the Council. The CAC will define the scope and nature of the special arrangements, in consultation with the JSC.

g. The movement of Palestinian policemen on duty through the safe passage between the West Bank and the Gaza Strip will be coordinated through the JSC.

h. Any additional matters relating to the usage of safe passage will be coordinated through the JSC.

3. Mode of Use of Safe Passage

a. Persons and vehicles using safe passage under these arrangements shall neither break their journey nor depart from the designated routes, and shall complete the passage within the designated time stamped on their safe passage cards and permits, unless a delay is caused by a medical emergency or a technical breakdown.

b. Persons using the safe passage through Israel shall be subject to Israeli law.

c. Persons and vehicles using the safe passage shall not carry explosives, firearms or other weapons or ammunition, except for special cases that may be agreed in the JSC.

4. General Provisions Regarding the Safe Passage Routes

a. The above arrangements shall in no way affect the status of the safe passage and its routes.

b. The safe passage arrangements will not be available on Yom Kippur, Israel's Memorial Day and Israel's Independence Day.

c. Israel may, for security or safety reasons, temporarily halt the operation of a safe passage route or modify the passage arrangements while ensuring that one of the routes is open for safe passage. Notice of such temporary closure or modification shall be given to the JSC.

d. Israel shall notify the Council of incidents involving persons using safe passage routes, through the JSC.

## ARTICLE XI
### Rules of Conduct in Mutual Security Matters

1. Human Rights and the Rule of Law

Subject to the provisions of this Agreement, the Palestinian Police and the Israeli military forces shall exercise their powers and responsibilities pursuant to this Agreement with due regard to internationally-accepted norms of human rights and the rule of law, and shall be guided by the need to protect the public, respect human dignity and avoid harassment.

2. Weapons

a. Each side shall enforce upon civilians, Palestinians or Israelis, in the West Bank and the Gaza Strip, in accordance with their security responsibility, a prohibition on possession or carrying of weapons without a license.

b. The Palestinian Police may grant licenses to possess or carry pistols for civilian use. The modalities for granting such licenses, as well as categories of persons who may be granted such licenses, will be agreed upon in the JSC.

c. Upon the assumption of security responsibility, and in accordance with the Palestinian law, the Palestinian Police shall declare a period of grace of one month, during which period holders of unlicensed weapons will be required to declare that they hold such weapons and to apply for licenses. The Palestinian Police may grant such licenses in accordance with subparagraph b. above, and will enforce the Palestinian security policy set out in Article II, paragraph 1 of this Annex, against persons who hold unlicensed weapons.

d. Israelis may carry weapons licensed in accordance with subparagraph a. above.

e. The Palestinian Police will maintain an updated register of all weapons licensed by it.

f. The Palestinian Police will prevent the manufacture of weapons as well as the transfer of weapons to persons not licensed to possess them.

g. The use of explosives in quarries and for other civilian purposes will be only in accordance with modalities and procedures agreed upon in the JSC.

3. Engagement Steps

a. For the purpose of this Article, engagement" shall mean an immediate response to an act or an incident constituting a danger to life or property that is aimed at preventing or terminating such an act or incident, or at

apprehending its perpetrators.

b. Within the territory under the security responsibility of the Council, in places where Israeli authorities exercise their security functions in accordance with this Annex and in their immediate vicinities, the Israeli authorities may carry out engagement steps in cases where an act or incident requires such action. In such cases, the Israeli authorities will take any measures necessary to bring to an end such an act or incident with a view to transferring, at the earliest opportunity, the continued handling of the incident falling within the Palestinian responsibility to the Palestinian Police. The Palestinian Police will immediately be notified, through the relevant DCO, of such engagement steps.

c. Engagement with the use of firearms in responding to such acts or incidents shall not be allowed, except as a last resort after all attempts at controlling the act or the incident, such as warning the perpetrator or shooting in the air, have failed, or are ineffective or without any promise of achieving the intended result in the circumstances. Use of firearms should be aimed at deterring or apprehending, and not at killing, the perpetrator. The use of firearms shall cease once the danger is past.

d. Any activity involving the use of firearms other than for immediate operational purposes shall be subject to prior notification to the relevant DCO.

e. If a person is injured or otherwise in need of assistance, such assistance will be provided by the side that first reaches the site. If such a person is under the security responsibility of the other side, the assisting side shall notify the relevant DCO and appropriate arrangements shall be made, pursuant to this Agreement, for treatment and hospitalization.

4. Rules of Conduct on Roads for Israelis

a. Israeli military forces and Israeli civilians may continue to use roads freely within the West Bank and the Gaza Strip.

b. On the main roads that are jointly patrolled, vehicles bearing Israeli license plates shall not be stopped except for identification, which shall be conducted by a Joint Patrol, pursuant to the provisions of Article III of this Annex. The Israeli side of such a patrol may carry out identity and vehicle documentation checks. In the event that a vehicle bearing a license plate issued by either the Council or the Civil Administration is stopped, the Palestinian side of the Joint Patrol may carry out identity and vehicle documentation checks.

c. On other roads vehicles bearing Israeli license plates shall not be stopped by the Palestinian Police, except that such vehicles may be stopped in the Gaza Strip, in Area A or in places in Area B where there is a police station or post for the purpose of identification checks of the above-mentioned documentation.

d. Israelis shall under no circumstances be apprehended or placed in custody or prison by Palestinian authorities. However, where an Israeli is suspected of having committed an offense, he or she may be detained in place by the Palestinian Police while ensuring his or her protection, in accordance with the provisions of Annex IV, until the arrival of a Joint Patrol, called immediately by the Palestinian Police, or of other Israeli representatives dispatched by the relevant DCO.

e. Israeli pedestrians may be required to produce identity documentation (if above the age of sixteen). Thereafter, they shall be treated in accordance with the provisions of this Article.

f. Uniformed members of the Israeli military forces, as well as vehicles of the Israeli military forces, shall not be stopped by the Palestinian Police in any circumstances, and shall not be subject to any identification requirements. Without derogating from the above, in the event of suspicion regarding such a person or vehicle, the Palestinian Police may notify the Israeli authorities through the relevant DCO, in order to request appropriate assistance.

g. Verification, pursuant to this Article, of the identity of persons who claim to be Israelis but cannot present appropriate identification documentation, will be confirmed by the Israeli side of a Joint Patrol, called by the Palestinian Police, or by other Israeli representatives dispatched by the relevant DCO.

## ARTICLE XII
## Security Arrangements Concerning Planning, Building and Zoning

1. General Provisions

a. Notwithstanding the provisions relating to planning, building and zoning set out elsewhere in this Agreement, the provisions of this Article shall apply with respect to the areas specified below.

b. These arrangements will be reviewed within a period of six months from the signing of this Agreement, and, thereafter, every six months, with a view to modifying them, with due consideration to Palestinian plans for establishing economic projects, and to the security concerns of both sides.

c. The limitations set out below on the construction of buildings and installations in specific areas shall not require the demolition or removal of existing buildings or installations.

2. Provisions regarding the West Bank

a. Buildings or installations shall not be constructed or erected and natural and artificial culture shall not be altered, on either side of the roads delineated in blue on map No. 7 up to a distance of 50 meters from the center of these roads.

b. Bridges or other structures will not be built which may prevent the movement on roads of vehicles of a height of up to 5.25 meters.

c. In the areas shaded in purple on map No. 7, construction will be limited to a height of 15 meters.

d. Any buildings or installations constructed or erected contrary to this paragraph shall be dismantled.

3. Provisions regarding the Gaza Strip

a. The existing buildings, installations and natural and artificial culture in the Gaza Strip within a distance of 100 meters from the Delimiting Line shall remain as they are at present.

b. Within the next 500 meters of the Security Perimeter, and within the Yellow Area, buildings or installations may be constructed, provided that:

(1) one building or installation may be constructed on each plot, the size of which shall not be less than 25 dunams; and

(2) such building or installation shall not exceed two floors, of a size not exceeding 180 sq. meters per floor.

The Council shall maintain the predominantly agricultural character of the remaining areas of the Security Perimeter.

c. Buildings or installations shall not be constructed on either side of the Lateral Roads us to a distance of 75 meters from the center of these Roads.

d. For the purpose of enforcing this Article, the United States has provided both sides with satellite photographs of the Gaza Strip depicting the buildings, installations and natural and artificial culture existing at the time of the signing of the Gaza-Jericho Agreement.

## ARTICLE XIII
## Security of the Airspace

1. Operation of aircraft for the use of the Council in the West Bank and the

Gaza Strip shall be initially as follows:

a. Two (2) transport helicopters for VIP transportation within and between the West Bank and the Gaza Strip.

b. Up to 3 helicopters for the purpose of transport missions to approved landing pads.

c. 3 fixed-wing transport aircraft with up to 35 persons capacity, for transporting persons between the West Bank and the Gaza Strip.

2. Changes in the number, type and capacity of aircraft may be discussed and agreed upon in a Joint Aviation Subcommittee of the JSC (hereinafter "the JAC").

3. The Council may immediately establish and operate in the West Bank and the Gaza Strip provisional airstrips for the helicopters and fixed wing aircraft referred to in paragraph 1 above, in accordance with arrangements and modalities to be discussed and agreed upon in the JAC.

4. All aviation activity or use of the airspace by any aerial vehicle in the West Bank and the Gaza Strip shall require prior approval of Israel. It shall be subject to Israeli air traffic control including, inter alia, monitoring and regulation of air routes as well as relevant regulations and requirements to be implemented in accordance with the Israel Aeronautical Information Publication, the relevant parts of which will be issued after consultation with the Council.

5. Aircraft taking off from, and landing in the West Bank and the Gaza Strip shall be registered and licensed in Israel or in other states members of International Civil Aviation Organization (ICAO). Air crews of such aircraft shall be licensed in Israel or in such other states, provided that such licenses have been approved and recommended by the Council and validated by Israel.

6. Palestinian Civil Aviation and airline staff may be recruited locally and from abroad. The number of Palestinians recruited from abroad shall not exceed 400. This number may be changed by agreement, if necessary.

7. Aircraft referred to in this Article shall not carry firearms, ammunition, explosives or weapons systems unless otherwise approved by both sides. Special arrangements for armed guards escorting high ranking officials, will be agreed upon in the JAC.

8. The location of navigational aids and other aviation equipment will be approved by Israel through the JAC.

9. a. The Council shall ensure that only the aviation activity in accordance with this Agreement will take place in the West Bank and the Gaza Strip.

b. Further powers and responsibilities may be transferred to the Council through the JAC.

c. The Council may establish a Palestinian Civil Aviation Department to act on its behalf in accordance with the provisions in this Article and of this Agreement.

10. a. Aviation activity by Israel will continue to be operated above the West Bank and the Gaza Strip, with the same limitations applicable in Israel regarding civil and military flights over densely-populated areas.

b. Israel will notify the Council of emergency rescue operations, searches and investigation of aerial accidents in the West Bank and the Gaza Strip. Searches and investigations of civilian aircraft accidents in which Palestinians or their property are involved, will be conducted by Israel with the participation of the Council.

11. Guided by the principle that the two sides view the West Bank and Gaza Strip as a single territorial unit, as set out in Article IV of the DOP, and in order to enable the smooth operation of flights between the West Bank and the Gaza Strip:

a. The JAC will agree on special arrangements to facilitate flights of the Ra'ees of the Executive Authority of the Council between the West Bank and the Gaza Strip. The Ra'ees and his spouse, and family members of the Ra'ees, his body guards and VIPs when accompanying the Ra'ees will fly without prior inspection of their person, personal belongings, and luggage.

b. The minimum time of notification of VIPs' flights will be four hours. The notification will include the list of passengers.

c. Flights of other persons will be handled in accordance with the procedures agreed in the JAC.

12. Flights between the West Bank and the Gaza Strip may be operated through the Gaza - Tel Aviv (sea shore) corridor.

Monitoring and regulations of this air route will be discussed in the JAC.

13. Commercial, domestic and international air services to, from and between the West Bank and the Gaza Strip may be operated by Palestinian, Israeli or foreign operators approved by both sides, certified and licensed in Israel or in ICAO member states maintaining bilateral aviation relations with Israel. Arrangements for such air services, beginning with a service between Gaza and Cairo using two (2) fixed-wing aircraft with capacity up to fifty passengers each, as well as arrangements regarding the establishment and operation of airports and air terminals in the West Bank and the Gaza Strip, will be discussed and agreed upon by the two sides in the JAC.

Any such international commercial air services will be carried out in accordance with Israel's bilateral aviation agreements. The implementation phase will be discussed and agreed on in the JAC.

## ARTICLE XIV
### Security along the Coastline to the Sea of Gaza

1. Maritime Activity Zones

a. Extent of Maritime Activity Zones

The sea off the coast of the Gaza Strip will be divided into three Maritime Activity Zones, K, L, and M as shown on map No. 8 attached to this Agreement, and as detailed below:

(1) Zones K and M

(a) Zone K extends to 20 nautical miles in the sea from the coast in the northern part of the sea of Gaza and 1.5 nautical miles wide southwards.

(b) Zone M extends to 20 nautical miles in the sea from the coast, and one

(1) nautical mile wide from the Egyptian waters.

(c) Subject to the provisions of this paragraph, Zones K and M will be closed areas, in which navigation will be restricted to activity of the Israel Navy.

(2) Zone L

(a) Zone L bounded to the south by Zone M and to the north by Zone K extends 20 nautical miles into the sea from the coast.

(b) Zone L will be open for fishing, recreation and economic activities, in accordance with the following provisions:

(i) Fishing boats will not exit Zone L into the open sea and may have engines of up to a limit of 25 HP for outboard motors and up to a maximum speed of 18 knots for inboard motors. Four months after the signing of this Agreement the Maritime Coordination and Cooperation Center (hereinafter "the MC"), as referred to in paragraph 3 below, will consider raising the limit for outboard motors up to 40 hp. in accordance with the types of the boats. The boats will neither carry weapons nor

ammunition nor will they fish with the use of explosives.

(ii) Recreational boats will be permitted to sail up to a distance of 6 nautical miles from the coast unless, in special cases, otherwise agreed within the Maritime Coordination and Cooperation Center as referred to in paragraph 3 below. Recreational boats may have engines up to a limit of 10 horsepower. Marine motor bikes and water jets will neither be introduced into Zone L nor be operated therein.

(iii) Yachts may sail up to a distance of 6 nautical miles from the coast at a maximum speed of 15 knots.

(iv) Foreign vessels entering Zone L will not approach closer than 12 nautical miles from the coast except as regards activities covered in paragraph 4 below.

b. General Rules of the Maritime Activity Zones

(1) The aforementioned fishing boats and recreational boats and their skippers sailing in Zone L shall carry licenses issued by the Council, the format and standards of which will be coordinated through the JSC.

(2) The boats shall have identification markings determined by the Council. The Israeli authorities will be notified through the JSC of these identification markings.

(3) Residents of Israeli settlements in the Gaza Strip fishing in Zone L will carry Israeli licenses and vessel permits.

(4) As part of Israel's responsibilities for safety and security within the three Maritime Activity Zones, Israel Navy vessels may sail throughout these zones, as necessary and without limitations, and may take any measures necessary against vessels suspected of being used for terrorist activities or for smuggling arms, ammunition, drugs, goods, of for any other illegal activity. The Palestinian Police will be notified of such actions, and the ensuing procedures will be coordinated through the MC.

2. The Palestinian Coastal Police

a. The Palestinian Coastal police (hereinafter the "PCP") may function in Zone L, up to a distance of 6 nautical miles from the coast. In special cases, it may also exercise control over Palestinian fishing boats fishing in Zone L in an additional area of 6 nautical miles, up to the limit of 12 nautical miles from the coastline, after clearance and coordination through the MC.

b. The PCP shall have up to 10 boats, with a displacement of up to 50 tons and maximum speed of up to 25 knots

c. The boats shall carry weapons of up to a 7.62 mm caliber.

d. Boats of the PCP shall fly a Palestinian flag, have police identification markings and shall operate identification lights.

e. The two sides shall cooperate on all sea matters, including mutual help at sea, and pollution and environmental issues.

f. The boats of the Palestinian Coastal Police will initially use the Gaza Wharf.

g. Boats belonging to Israelis are solely subject to the control, authority and jurisdiction of Israel and the Israel Navy.

3. Maritime Coordination and Cooperation Center

a. The MC shall function as part of the JSC, to coordinate civil maritime activities and coastal police affairs off the coast of the Gaza Strip.

b. The MC shall function within the relevant DCO, and will determine its own rules of procedure.

c. The MC shall function 24 hours a day.

d. The MC shall be staffed by members of the Israel Navy and the PCP,

each providing a liaison officer and an assistant liaison officer.

e. A direct radio telephone link (hot line) shall be set up between the Israel Navy vessels and the PCP vessels.

f. The role of the MC is to coordinate:

(1) assistance between the PCP and the Israel Navy as may be necessary to deal with incidents arising at sea;

(2) PCP training involving the use of firearms;

(3) joint activities between the PCP and the Israel Navy when preplanning is operationally necessary;

(4) radio contact between PCP and Israel Navy vessels in the event that "hot line" communication between vessels of the two sides has not been established;

(5) search and rescue operations; and

(6) maritime activities related to an agreed port, when established in the Gaza Strip.

4. Gaza Strip Port

a. Plans for the establishment of a port in the Gaza Strip in accordance with the DOP, its location, and related matters of mutual interest and concern, as well as licenses for vessels and crews sailing on international voyages will be discussed and agreed upon between Israel and the Council taking into consideration the provisions of Article XXX (Passages) of this Agreement. To this end a special committee will be established by the two sides.

b. The Gaza Sea Port Authority referred to in the DOP shall act on behalf of the Council in accordance with the provisions of this Agreement.

c. Pending construction of a port, arrangements for entry and exit of vessels passengers and goods by sea, as well as licenses for vessels and crews sailing on international voyages in transit to the West Bank and the Gaza Strip, shall be through Israeli ports in accordance with the relevant rules and regulations applicable in Israel and in accordance with the provisions of Annex V.

## APPENDIX 1
### Redeployment of Israeli Military Forces

A. Stages of the First Phase of Redeployment of Israeli Military Forces

Pursuant to Article I paragraph 1 of this Annex:

The first phase of Israeli military forces redeployment will commence 10 days after the signing of this Agreement. The Israeli Government intends to complete the first phase of redeployment in all areas but the city of Hebron by the end of December 1995, in which redeployment will be completed by six months after the signing of this Agreement. Within two weeks of the signing of this Agreement, the two sides will decide on a precise redeployment schedule on a district-by-district basis.

B. Phases of the Further Redeployments of Israeli Military Forces

Pursuant to Article I paragraph 9 of this Annex, the further redeployments of Israeli military forces to specified military locations will take place in phases as follows:

Phase 1

Six months after the inauguration of the Council.

Phase 2

Twelve months after the inauguration of the Council.

Phase 3

Eighteen months after the inauguration of the Council.

## APPENDIX 2
### Deployment of Palestinian Policemen

1. Pursuant to paragraph 3 b of Article IV of this Annex, the details of the deployment of the 6,000 Palestinian policemen in Areas A and B will be as follows:

(1) in the Jenin District: 1,000 policemen;

(2) in the Tulkarm District: 400 policemen;

(3) in the Qalqilia District: 400 policemen;

(4) in the Nablus District: 1,200 policemen;

(5) in the Ramallah District: 1,200 policemen;

(6) in the Bethlehem District: 850 policemen;

(7) in the Hebron District: 950 policemen including 400 policemen in the City of Hebron; and

(8) in the Jericho District: 600 policemen that will be considered part of the number of policemen allocated to the Gaza Strip in accordance with Article IV of this Annex.

2. Changes in the numbers of policemen in each district during the further redeployment phases, when the number of policemen in the West Bank will increase to 12,000, will be agreed upon in the West Bank RSC.

## APPENDIX 3
### Police Stations and Posts in Area B

1. The Palestinian Police shall establish 25 Civil Police (Al Shurta) police stations and posts in the towns, villages and other places listed below and shown on map No. 3, with personnel and equipment as follows:

a. Jenin District

(l) El-Yamun: 50 policemen, 2 vehicles, 9 rifles, 17 pistols;

(2) Meithalun: 50 policemen, 2 vehicles, 9 rifles, 17 pistols;

(3) Kafr Rai: 45 policemen, 2 vehicles, 8 rifles, 15 pistols;

(4) Jalqamus: 45 policemen, 2 vehicles, 8 rifles, 15 pistols; and

(5) Burqin: 45 policemen, 2 vehicles, 8 rifles, 15 pistols.

b. Nablus District

(l) Asiraat A-Shumaliyya: 50 policemen, 2 vehicles, 9 rifles, 17 pistols;

(2) Talouza: 45 policemen, 2 vehicles, 8 rifles, 15 pistols;

(3) Tell: 30 policemen, 2 vehicles, 5 rifles, 10 pistols;

(4) Talfit: 60 policemen, 2 vehicles, 12 rifles, 20 pistols;

(5) Tamun: 50 policemen, 2 vehicles, 9 rifles, 17 pistols; and

(6) Aqraba: 50 policemen, 2 vehicles, 9 rifles, 17 pistols.

c. Tulkarm and Qalqilya District

(1) Shuweika: 45 policemen, 2 vehicles, 8 rifles, 15 pistols;

(2) Kafr Zibad: 50 policemen, 2 vehicles, 9 rifles, 17 pistols;

(3) Anabta: 50 policemen, 2 vehicles, 9 rifles, 17 pistols; and

(4) Illar: 45 policemen, 2 vehicles, 8 rifles, 15 pistols.

d. Ramallah District

(I) Arura: 50 policemen, 2 vehicles, 9 rifles, 17 pistols;

(2) Deir Ghassana: 45 policemen, 2 vehicles, 8 rifles, 15 pistols;

(3) Khirbat Abu Falah: 45 policemen, 2 vehicles, 8 rifles, 15 pistols; and

(4) Bir Zeit: 70 policemen, 3 vehicles, 14 rifles, 23 pistols;

e. Bethlehem District

Tuqua: 50 policemen, 3 vehicles, 9 rifles, 17 pistols.

f. Hebron District

(I) Yata: 80 policemen, 3 vehicles, 15 rifles, 27 pistols;

(2) Dhahiriya: 70 policemen, 3 vehicles, 14 rifles, 23 pistols;

(3) Nuba: 45 policemen, 2 vehicles, 8 rifles, 15 pistols;

(4) Dura: 70 policemen, 3 vehicles, 14 rifles, 23 pistols; and

(5) Bani-Naiem: 45 policemen, 3 vehicles, 8 rifles, 17 pistols.

2. The rifles in each of these police stations will be used only for the purpose of guarding the police station. In special cases, where the use of rifles outside the police station is required for the exercise of public order responsibility, prior notification shall be given to the DCO.

## APPENDIX 4
### Jewish Holy Sites

Pursuant to Article V of this Annex the Jewish Holy Sites are as follows:

1. Joseph's Tomb (Nablus)

2. Shalom Al Israel synagogue (Jericho)

## APPENDIX 5
### Protocol Rewarding Arrangements with Respect to Passages (as amended)

Pursuant to paragraph 1.d of Article VIII to this Annex:

*SECTION A*
*Definitions*

For the purpose of this Protocol:

a. "The Agreement" means the Interim Agreement:

b. "Annex I" means Annex I to the Interim Agreement;

c. All other terms will have the same meaning as in the Agreement.

*SECTION B*
*Entry and Exit through the Palestinian Wing*

Pursuant to Article VIII of Annex I to the Agreement, the following arrangements will apply with respect to the terminals at the Rafah and Allenby Bridge crossings:

1. Entry from Egypt and Jordan

a. At the entrance to the Palestinian wing there will be a Palestinian policeman and a raised Palestinian flag.

b. Before entering the Palestinian wing, passengers will identify their personal luggage and it will be placed on a conveyor belt. Each side will be able to inspect such luggage inside its own checking area, using its own personnel and, if necessary, may open the luggage for inspection in the presence of the owner and a Palestinian policeman.

c. Persons entering the Palestinian Wing will pass through a magnetic

gate. An Israeli policeman and a Palestinian policeman will be posted on each side of this gate. In the event of suspicion, each side will be entitled to require a physical inspection to be conducted in inspection booths to be located adjacent to the gate. Passengers will be inspected by a Palestinian policeman in the presence of an Israeli policeman. Accompanying personal belongings may also be inspected at this point.

d. Having completed the above phase, persons entering the Palestinian wing will pass through one of two lanes for the purpose of identification and document control, as follows:

(1) the first lane will be used by Palestinian residents of the West Bank and the Gaza Strip. These passengers will pass via a Palestinian counter, where their documents and identity will be checked. Their documents will be checked by an Israeli officer who will also check their identity indirectly in an invisible manner;

(2) the second lane will serve visitors to the Gaza Strip and West Bank. These passengers will first pass via the Israeli counter, where their documents and identity will be checked. Then they will continue via the Palestinian counter, where their documents and identity will be checked. The two counters will be separated by tinted glass and a revolving door.

e. In the event of suspicion regarding a passenger in any of the two lanes described in subparagraph l.d above, each side may question such passenger in its closed checking area. Suspicion justifying questioning in the closed checking area may be one of the following:

(1) the passenger was involved, directly or indirectly, in criminal or planned criminal activity, in terrorist or planned terrorist activity and is not a beneficiary of the amnesty provisions of the Agreement;

(2) the passenger conceals arms, explosives or related equipment;

(3) the passenger holds forged or non-valid documentation or the details included in the documentation are inconsistent with those included in the population registry (in the case of a resident) or in the data base (in case of a visitor), except that questions relating to such inconsistency will initially be raised at the counter and the passenger will be questioned in the closed checking area only if the suspicion has not been removed; or

(4) the passenger acts in an obviously suspicious behavior during the passage via the terminal.

If, at the conclusion of this questioning, the suspicion has not been removed, such passenger may be apprehended, after the other side has been notified. In case of a Palestinian suspect being apprehended by the Israeli side, a Palestinian policeman will be asked to meet with the suspect. Following notification to the Liaison Bureau, any further treatment of the apprehended person will be in accordance with Annex IV to the Agreement.

f. In the Palestinian wing, each side will have the authority to deny the entry of persons who are not residents of the Gaza Strip and West Bank.

For the purpose of the Agreement and this Protocol, "residents of the Gaza Strip and West Bank" means persons who, on the date of entry into force of the Gaza-Jericho Agreement, were registered as residents of these areas in the population registry maintained by the military government of the Gaza Strip and West Bank, as well as persons who have subsequently obtained permanent residency in these areas with the approval of Israel, as set out in the Agreement.

g. Following the above procedure, the passengers will collect their luggage and proceed to the customs area where they will be dealt with as set out in Section H of this Protocol.

h. The Palestinian side will provide passengers whose entry is approved with an entry permit stamped by the Palestinian side and attached to their documents.

At the conclusion of the direct and indirect checking of the documents and

identity of passengers passing via the first lane and stamping their entry permits, the Palestinian officer will provide the passenger with a white card issued by the Israeli officer. A Palestinian official posted at the exit of the Palestinian wing will verify that the passenger holds such a white card and will collect the cards with indirect and invisible Israeli checking.

For passengers going through the second lane, the Israeli officer will provide the passengers with a blue card, after checking their documents and identity, and verifying their entry permits. An Israeli and a Palestinian official posted at the exit of the Palestinian wing will verify and collect the cards. White and blue cards collected will be checked by Israeli and Palestinian officials.

In cases where either side denies the entry of a non-resident passenger, that passenger will be escorted out of the terminal and sent back to Jordan or Egypt, as appropriate, after notifying the other side.

2. Exit to Egypt and Jordan

Passengers exiting to Egypt or Jordan through the Palestinian wing will enter the terminal without their luggage.

Thereafter, the same procedures described in paragraph 1 above will apply to them, except that the order of passing via the Israeli and Palestinian counters will be reversed.

*SECTION C*
*Control and Management of the Passages*

1. General

a. Israel will have the responsibility for security throughout the passage, including for the terminal.

b. An Israeli Director-General will have the responsibility for the management and security of the terminal (hereinafter - "the Director-General").

c. Israel will have exclusive responsibility for the management of the Israeli wing.

d. The Director-General will have two deputies who will report to him:

(1) A Palestinian deputy appointed by the Council, who will be the manager of the Palestinian wing (hereinafter - "the Manager of the Palestinian wing"); and

(2) An Israeli deputy who will be the manager of the Israeli wing (hereinafter - "the Manager of the Israeli wing").

e. The Israeli Director-General will be assisted by a professional team appointed at his discretion. Such team shall include:

(1) an officer who will assist the Director-General with respect to the general security of the terminal (hereinafter - "the security officer");

(2) an expert who will advise the Director-General and the wing managers with respect to the general administration of the terminal (hereinafter - "the administration expert"); and

(3) an expert who will be responsible for the performance of those duties which the Director-General shall require him to perform when the need arises (hereinafter - "the duty officer").

f. The Director-General may appoint any of the persons set out in paragraphs l.d.(2) and l.e above or another specialized Israeli official employed in the terminal to fulfill the role of the Director-General in his absence (hereinafter- "the substitute officer").

g. Each wing Manager will have an assistant for security and an assistant for administration. The assignments of the Palestinian assistants are set out in paragraphs 3 and 4 of this Section.

h. All assignments and functions of the Manager of the Palestinian wing,

the Assistant for administration of the Manager of the Palestinian wing and the Assistant for security of the Manager of the Palestinian wing and any other Palestinian employee shall be exercised in a manner consistent with the Agreement and with this Protocol.

2. Assignments of the Manager of the Palestinian wing

The assignments of the Manager of the Palestinian wing shall be the following:

a. employment of Palestinian staff in the Palestinian wing. The list of Palestinian candidates for employment in the Palestinian wing shall be passed by the Manager of the Palestinian wing to the Director-General for security clearance, which shall be a pre-requisite to their engagement.

The Council shall have, through the Manager of the Palestinian wing, full responsibility for all personnel matters of the Palestinians employed in the Palestinian wing including, inter alia, their salary, their social insurance and claims by such employees with respect to their employment;

b. release of Palestinian staff from employment in the Palestinian wing, whilst informing the Director-General. Upon consultation with the Manager of the Palestinian wing, the Director-General may also decide to release a Palestinian from employment in the Palestinian wing due to security reasons of substantial nature. The Manager of the Palestinian wing shall inform the employee of his release.

Other non-security related grounds for the release of Palestinian employees from employment in the Palestinian wing shall be specified in a procedure to be promulgated by the Director-General upon consultation with the Manager of the Palestinian wing and his two Assistants.

For the purpose of this Protocol, "Palestinians employed in the Palestinian wing" means all Palestinians employed in the Palestinian wing, except the Manager of the Palestinian wing;

c. general training and briefing of Palestinian employees in the Palestinian wing and handling of their work related problems;

d. supervision of the daily opening and closing of the Palestinian wing itself;

e. declaration of an emergency situation in the Palestinian wing. This assignment is without prejudice to the power of the Director-General, the substitute officer and/or the security officer to declare a state of emergency in the Palestinian wing and to act forthwith as deemed fit within their complete discretion, in full cooperation with the Manager of the Palestinian wing.

f. other powers and responsibilities assigned to him under paragraph 3 of Article VIII of Annex I;

g. professional guidance of the Palestinian document control officials with respect to the performance of their assignments;

h. appointment of a person as his substitute and appointment of a duty officer for the Palestinian wing;

i. with respect to the Rafah crossing, the Manager of the Palestinian wing shall also have the following assignments:

(1) responsibility for the efficient movement of passengers traveling abroad, from the entrance to the terminal, through the Palestinian wing and up to their embarkation on the bus or other vehicle leaving the terminal in the direction of Egypt;

(2) responsibility for the efficient movement of passengers arriving from abroad from the sheltered waiting area located near the entrance to the Palestinian wing, through the Palestinian wing and up to their embarkation on the bus or other vehicle leaving the terminal in the direction of the Gaza Strip;

(3) responsibility for the orderly functioning of the service car defined in

Section F of this Protocol with respect to the transportation of VIPs traveling abroad, from the entrance to the terminal to the entrance to the Palestinian wing;

(4) responsibility for the canteen serving passengers traveling abroad through the Palestinian and the Israeli wing;

(5) responsibility to allocate tasks to specific Palestinian service personnel employed and assigned by the Director-General to work in the Palestinian wing;

(6) responsibility to contact Palestinian contractors and to pass to the Director-General their offers regarding tenders with respect to administrative and logistical services in the terminal; and

(7) responsibility for the orderly functioning of the emergency clinic to be established in the Palestinian wing. This clinic will be staffed by a Palestinian physician and a nurse.

These assignments shall also apply, at a later stage, with respect to the Allenby Bridge crossing, with the necessary adjustments; and

j. within the framework of the functions assigned to him pursuant to this paragraph, the promulgation of procedures for the Palestinian employees in the Palestinian wing.

3. Assignments of the Palestinian Assistant for Security

The Palestinian Assistant for Security shall be appointed from the ranks of the Palestinian Police, shall be subordinate to the Manager of the Palestinian wing and his assignments shall be within the Palestinian wing, as follows.

a. implementation of standard security procedures promulgated by the Director-General pursuant to Paragraph 5 of this Section;

b. implementation of other security related measures pursuant to the instructions of the Director-General, the substitute officer and in emergencies or exceptional cases, the security officer;

c. in conjunction with the Manager of the Palestinian wing and after duly informing the Director-General and the security officer, training and briefing of each Palestinian employee in the Palestinian wing as to the performance of his specific security related task;

d. supervision, maintenance and storage of all handguns in the possession of Palestinian policemen present in the Palestinian wing;

e. responsibility for ensuring the due and proper execution of the procedures set out in paragraph 3 of Article VIII of Annex I;

f. ensuring the immediate arrival of a Palestinian policeman pursuant to an Israeli demand for his presence, made pursuant to paragraphs 3.b, 3.c, and/or 3.e of Article VIII of Annex I;

g. ensuring maintenance of secrecy amongst the Palestinian employees with respect to the nature of their employment, the layout of the terminal, security procedures, and all other information, the revelation of which could compromise the general security of the terminal;

h. ensuring decorum and good public order in a routine working context;

i. declaration of an emergency situation in the Palestinian wing, without prejudice to the provisions of paragraph 2.e of this Section; and

j. upon discovery of a suspicious object, immediately to notify the security officer and the Manager of the Palestinian wing. The security officer will then have complete discretion to act as he deems fit in the circumstances.

4. Assignments of the Palestinian Assistant for Administration

The Palestinian Assistant for Administration shall be subordinate to the Manager of the Palestinian wing and shall deal with matters relating to manpower, organization and logistics within the Palestinian wing, as

follows:

a. ensuring the efficient movement of passengers in the Palestinian wing,

b. implementation of standard administration procedures promulgated by the Director-General pursuant to paragraph 5 of this Section;

c. implementation of other non-security related matters pursuant to the instructions of the Manager of the Palestinian wing given upon consultation with the Director-General;

d. escorting the elderly, the ill, children and disabled;

e. ensuring orderly behavior and presentable appearance of Palestinian employees;

f. ensuring cleanliness, the presence and efficient functioning of fire fighting facilities and the supply of provisions;

g. training and briefing of each Palestinian employee in the Palestinian wing, engaged in non-security related matters with respect to the specific nature of his employment; and

h. uninterrupted functioning of the section of the conveyor belt under Palestinian supervision as set out in paragraph 3 of Article VIII of Annex I.

5. Standard Security and Administration Procedures

The Director-General upon consultation with the Israeli and Palestinian wing Managers, shall determine and shall furnish to the persons set out in Paragraphs l.d, l.e and l.g above and to the Liaison Bureau a compendium detailing standard procedures with respect to security and administration of the terminal. Such procedures shall include:

a. procedures in a state of emergency;

b. procedures with respect to inspection of persons, personal belongings and/or luggage pursuant to paragraphs 3.b, 3.c and/or 3.e of Article VIII of Annex I;

c. procedures with respect to road-markings, signs, plaques and flags in the terminal;

d. procedures with respect to handling of luggage and the loading of the conveyor belt;

e. procedures with respect to operation of the conveyor belt;

f. procedures with respect to media and public relations;

g. procedures with respect to public transportation and taxis passing through the terminal, as will be agreed upon between the two sides;

h. procedures with respect to maintenance and upkeep of the terminal;

i. procedures with respect to supply of provisions and services;

j. procedures with respect to general conduct and behavior of employees within the terminal and changing of work shifts;

k. procedures with respect to escorting the elderly, the ill, children and disabled;

l. procedures with respect to escorting VIPs;

m. procedures with respect to people denied exit or entry through the Palestinian wing; and

n. procedures with respect to comportment, personal appearance and identification tags of employees in the terminal.

The Director-General may promulgate, upon consultation with the Israeli and the Palestinian wing Managers, additional procedures not provided for in this paragraph.

All of the abovementioned procedures will be consistent with the

 Israel Ministry of Foreign Affairs

## THE ISRAELI-PALESTINIAN INTERIM AGREEMENT-Annex II

28 Sep 1995

AGREEMENT | ANNEX I | ANNEX II | ANNEX III | ANNEX IV | ANNEX V | ANNEX VI | ANNEX VII | MAPS| MAIN POINTS

### THE ISRAELI-PALESTINIAN INTERIM AGREEMENT ON THE WEST BANK AND THE GAZA STRIP
### Annex II
### Protocol Concerning Elections

#### INDEX

ARTICLE I - Basis of Elections
ARTICLE II - Right to Vote and the Electoral Register
ARTICLE III - Qualification and Nomination of Candidates
ARTICLE IV - The Election Campaign
ARTICLE V - International Observation of Elections
ARTICLE VI - Election Arrangements Concerning Jerusalem

APPENDIX 1 - Agreed Format for Canvass Information
APPENDIX 2 - Common Terms of Reference for International Observers
APPENDIX 3 - Privileges and Immunities of International Observer Delegations

#### ARTICLE I
#### Basis of Elections

*General Provisions*

1. Pursuant to Article III of the Declaration of Principles and in accordance with the provisions of this Annex, direct, free and general political elections will be held for the Council and, simultaneously, for the Ra'ees of the Executive Authority.

2. The holding of elections for the position of Ra'ees and for the Palestinian Council shall be governed by this Annex, and the Law on the Election of the Ra'ees and the Palestinian Council (hereinafter "the Election Law") and the regulations made under this law (hereinafter "the Election Regulations"). The Election Law shall be adopted by the Palestinian Authority. The Election Law and the Election Regulations shall be consistent with the provisions of this Agreement. Unless otherwise specifically provided in this Annex, all persons voting or standing as candidates in the elections shall be uniformly subject to the provisions of the Election Law and the Election Regulations.

*The Central Election Commission*

3. The Palestinian Central Election Commission (hereinafter "the CEC"), which will be appointed by the Palestinian Authority, will be responsible for the administration of the elections. The CEC will be responsible for the preparation and conduct of the elections and shall have the powers and competences necessary to fulfill these functions, as defined in the Election Law. All matters related to the elections which are not subject to specific provision in this Agreement shall be subject to determination by the Palestinian Authority or the CEC in accordance with the Election Law, the Election Regulations and any relevant procedures set out in this

Agreement. The CEC and its subordinate bodies shall be independent.

4. a. All of the offices of the CEC and of its subordinate bodies, including the offices of the District Election Commissions (hereinafter "the DECs") and the District Election Offices (hereinafter "the DEOs"), shall be situated in constituencies set out in the Palestinian Election Law in areas under the jurisdiction of the Council.

b. All aspects of the electoral administration (such as publication of lists of electors or candidates, and other information concerning the conduct of the elections, appeals, counting votes, and publication of results) shall take place only in the offices of the relevant DEO.

## ARTICLE II
### Right to Vote and the Electoral Register

1. Right to Vote

a. The right to vote will be universal, regardless of sex, race, religion, opinion, social origin, education, or property status. Every Palestinian who meets the qualification to vote shall have the right to be registered to vote.

b. Only a person whose name appears on the Electoral Register, as defined in paragraph 2 below, and who is 18 years old or older on the day of the elections, will have the right to vote.

c. No person may be registered as an elector in more than one polling district, as defined in paragraph 2 below.

d. The qualification to vote will be the same for the election for the Ra'ees of the Executive Authority of the Council and the election for the Council.

e. Israeli citizens shall not be entered on the Electoral Register.

f. To be qualified to be entered on the Electoral Register, a person must:

(1) be Palestinian;

(2) be 17 years old or older;

(3) have his or her abode in the polling district where he or she is registered to vote;

(4) not be disqualified under subparagraph k. below; and

(5) be entered in the population register maintained by the Palestinian Authority or the Israeli authorities (hereinafter together "the Population Register"), and thus be the holder of an identity card issued by the Palestinian Authority or the Israeli authorities.

g. Any person who:

(l) will be at least 40 years old on January 1, 1996 and can provide satisfactory evidence that he or she has actually lived in the West Bank or the Gaza Strip continuously, except for short absences, for at least 3 years immediately prior to the date of the signing of this Agreement; or

(2) will be less than 40 years old on January 1, 1996 and can provide satisfactory evidence that he or she has actually lived in the West Bank or the Gaza Strip continuously, except for short absences, for at least 4 years immediately prior to the date of the signing of this Agreement,

shall be entitled notwithstanding the fact that he or she was not previously entered in the Population Register, to be entered in the Population Register and to receive the appropriate identity card. The Palestinian Authority and Israel, through the CAC, shall together invite applications to be so entered in the Population Register. Such applications shall be submitted prior to the date of the elections to the Civil Administration or the relevant joint Israeli-Palestinian liaison body as appropriate and shall be dealt with by the Civil Administration or by both sides of such joint liaison body on an expedited basis to assist the process of registration.

h. The inclusion of any person on the Electoral Register at any address

shall be without prejudice to the question of that person's legal abode at that address.

i. In this Agreement, the word "abode" denotes the main permanent fixed address within any polling district at which, at the time of the initial registration canvass, a person actually lives.

j. In this Agreement, the word "address" denotes the community, house, street, neighborhood or other description identifying the specific abode in which a person actually lives, where such information exists.

k. The following persons will be disqualified from being entered on the Electoral Register:

(I) any person deprived of the right to vote by judicial sentence, while that sentence is in force;

(2) any person declared incapable by judicial decision; and

(3) any person detained in a psychiatric institution by judicial decision during the period of that detention.

"Judicial sentence" means a judicial verdict or sentence made by a Palestinian court.

2. The Electoral Register

a. In accordance with the provisions of this Article, the Election Law and the Election Regulations, the CEC shall compile and maintain the list of all persons registered as qualified to vote (hereinafter "the Electoral Register"). A separate section of the Electoral Register (hereinafter "an electoral register") shall be kept for each defined geographical area possessing its own polling station (hereinafter "polling district"). b. In accordance with the arrangements agreed between the two sides, the CEC will compile the initial draft register. The compilation of the register in each polling district will be the responsibility of the Polling Station Commission (hereinafter "PSC") for that district.

c. The PSC must enter on the initial draft register the name of any person who is 18 or over, is qualified to be registered in the particular polling district, is the holder of an identity card issued by the Israeli authorities or the Palestinian Authority, and provides all the required information as long as the PSC believes the information to be correct.

d. The PSC will also enter on the initial draft register the name of any person who is 17 and otherwise meets all the criteria to be entered thereon. Such a person may vote if he or she has reached his or her 18th birthday on or before polling day.

e. The initial draft register will be displayed within each polling district at the site of the PSC. It shall bear upon each sheet the following text:

"This is the initial draft of the register of the persons entitled, if they are 18 years old or more on the day of the election, to vote in this polling district in the election for the Palestinian Council and the Ra'ees of its Executive Authority. The entry on this draft register of any individual is subject to confirmation that he or she is entered in the population register maintained by the Palestinian Authority or the Israeli authorities and thus the holder of an identity card issued by the Palestinian Authority or the Israeli authorities. Any person who believes that he or she has been wrongly omitted, and any person who believes that the information published about him or her is wrong, may submit a claim to the Polling Station Commission. Any person who believes that any other person entered on the draft register is not qualified to appear on this register may submit an objection to the Polling Station Commission. The deadline for receipt of claims and objections is YYMMDD".

f. A subcommittee established by the Joint Civil Affairs Coordination and Cooperation Committee shall consider questions of registration defined in this Agreement and coordinate the implementation of the registration arrangements (hereinafter in this Article "the CAC subcommittee").

g. Within 6 weeks of the compilation of the initial draft register, and following adjudication of all claims and objections, the Palestinian side of the CAC subcommittee will provide the Israeli side with a copy of this register as amended in the computer format agreed between the two sides and set out in Appendix 1 to this Annex. Upon receipt of this information, the Israeli side in the CAC subcommittee will confirm the information contained in the initial draft register with that contained in the Population Register. Subject to compliance with the provisions of Appendix 1, and with any agreed amendments following the experimental input or otherwise, this confirmation will take place within 7 days. Persons whose details do not appear, or whose details are significantly different from those in the Population Register, shall be removed from the initial draft register, unless the Palestinian side can provide satisfactory evidence within 7 days that the person is entered in the Population Register.

h. The publication of the Electoral Register and the display of the relevant electoral register in each polling district shall follow the confirmation provided for in subparagraph g. above. Each electoral register shall bear the following text:

"This is the register of the persons entitled, if they are 18 years old or more on the day of the election, to vote in this polling district in the election of the Palestinian Council and the Ra'ees of its Executive Authority."

i. At least three days prior to its publication, the final Electoral Register shall be forwarded by the CEC to the Israeli side in the CAC subcommittee in the form, and containing the information, described in Appendix 1.

### ARTICLE III
### Qualification and Nomination of Candidates

1. Qualification to be a candidate

a. Every candidate for the Council and every candidate for the position of Ra'ees of the Executive Authority of the Council shall be a registered elector.

b. Every candidate for the Council from the various constituencies set out in the Palestinian Election Law must have a valid address in an area under the jurisdiction of the Council in the constituency for which he or she is a candidate. Every candidate for the position of the Ra'ees must have a valid address in an area under the jurisdiction of the Council. A valid address shall be that of a residential property which is owned or rented or otherwise legitimately occupied by the candidate. This valid address shall be entered in the candidate's nomination paper. Where a candidate has more than one valid address, he may enter all such addresses on his nomination paper.

c. Israeli citizens may not be candidates for election to be a member of the Council or to be the Ra'ees.

2. Nominations

The nomination of any candidates, parties or coalitions will be refused, and such nomination or registration once made will be canceled, if such candidates, parties or coalitions:

(1) commit or advocate racism; or

(2) pursue the implementation of their aims by unlawful or nondemocratic means.

3. Nomination procedures - The Council

a. Nominations shall be submitted to the DEC on the official nomination papers, as specified in the Palestinian Election Law.

b. Following the close of nominations the DEC for each constituency will