# EXHIBIT A.532
## (3 of 5)

immediately publish the provisional Statement of Persons Nominated for its constituency in accordance with the Palestinian Election Law.

c. Upon publication of the provisional Statement of Persons Nominated, any person may, within 7 days, submit an objection to the CEC that a provisionally nominated candidate does not satisfy the criteria set out in paragraphs l.b, 1.c and 2 above.

d. Following the resolution of all appeals, and not later than 22 days before polling day, the DEC will publish the final Statement of Persons Nominated.

4. Nomination procedures - The position of the Ra'ees

a. The nomination of any candidate shall be submitted to the CEC on the official nomination paper, as specified in the Palestinian Election Law.

b. The CEC will publish the provisional Statement of Persons Nominated 3 days after the close of nominations.

c. Upon publication of the provisional Statement of Persons Nominated, any person may, within 2 days, submit an objection to the CEC that a provisionally nominated candidate does not satisfy the criteria set out in paragraphs l.b, 1.c and 2 above.

d. Following the resolution of all appeals (and therefore not later than 22 days before polling day) the CEC will publish the final Statement of Persons Nominated.

## ARTICLE IV
### The Election Campaign

1. General campaign provisions

a. All activities carried out by nominated candidates, or by political parties, coalitions, or groupings of electors who have nominated candidates, or for their benefit, that are directly addressed to obtain the electorate's vote, shall constitute campaign activities. Candidates and their supporters may promote their campaign by any legal means.

b. The official campaign period of the election, during which the provisions relating to the election campaign will apply, will start 22 days before polling day and close 24 hours before the polls open. Campaigning on the day before polling day, or on polling day itself, will not be permitted.

2. Rallies and meetings

a. The CEC will publish a list of venues and facilities available for election rallies and meetings, which shall include all recognized public open air meeting places and all public buildings with a recognized public meeting hall. The CEC will also publish a list of routes available for marches. These lists will be posted in each constituency in the respective

DEO. Such campaign activities shall be conducted at venues and facilities included in the lists published by the CEC.

b. Without derogating from the principle that the Palestinian Police will ensure public order during the Palestinian elections, and in order to enable the elections to proceed smoothly, without any interference, obstacle or friction, the two sides agree to deal with, and coordinate with regard to, security issues that may arise in relation to the electoral process in the relevant DCO in each constituency.

c. Security issues relating to the international observers will also be dealt with in the relevant DCO, within the framework of the trilateral Palestinian Israeli-European Union forum, as set out in Article V, paragraph 7 below.

d. Each side shall take all necessary measures with regard to persons under its authority to prevent public disorder during campaign activities, to ensure that such activities do not interfere with the free flow of traffic, and to protect the electoral process from any violence, incitement, hostile propaganda or other undemocratic interference.

e. (l) The representative of a candidate or candidates wanting to hold a rally, meeting or march must submit an application to the relevant DEO giving details of the proposed time and venue.

(2) With regard to applications to hold such a campaign activity in areas in which the Palestinian Police exercises responsibility for public order, but there is no Palestinian police station or post, the DEO shall give prior notification of the activity to the relevant DCO.

(3) With regard to applications to hold such a campaign activity outside the areas in which the Palestinian Police exercises responsibility for public order, the activity shall only take place after coordination and confirmation through the relevant DCO.

## ARTICLE V
### International Observation of Elections

1. International Standards

The election process will be open to international observation. Observation will be conducted according to accepted international standards.

2. Scope of observation

a. All stages of the electoral process will be open to observation. This includes registration of electors, the campaign, the operation of polling stations during polling, the operation of the count in each polling station, and the totaling and scrutiny (including the determination of claims made by candidates or their representatives) at district and central level.

b. The observers will be asked to assess whether all stages of the electoral process are free and fair. The activity of the observers will be limited to observation, reporting and dialogue with the relevant authorities.

c. Observer delegations may wish at any point to make comments or representations about the conduct of the elections to the CEC, which shall consider them and reply appropriately.

d. In order to facilitate the independence of the observation, the mandate and operating instructions of each international observer delegation shall be determined by that delegation in consultation with the international observer coordinating body under the common terms of reference attached as Appendix 2 to this Annex.

3. Source of observers

It is envisaged that observers will be present from all parts of the world.

a. Observer delegations will, in particular, be present from the European Union, the United Nations, the United States of America, the Russian Federation, Canada, Egypt, Japan, Jordan, Norway, South Africa, the Movement of Non-Aligned Nations, the Organization of African Unity and the Islamic Conference Organization. Observer delegations from other governments or intergovernmental organizations may be added to this list upon consultation.

b. Other observers, including those representing non-governmental organizations, will also be present.

4. Coordinating body

The European Union will act as the coordinator for the activity of observer delegations.

5. Accreditation of observers

a. All observers, both international and domestic, shall be accredited through machinery established by the CEC. Accreditation will be issued by the CEC on request and will be conditional on acceptance of the common terms of reference. The accreditation card will contain a trilingual text (Arabic, English and Hebrew).

b. The accreditation card of members of observer delegations and members of the Coordinating Body shall contain the following details:

(1) full name;

(2) country of origin;

(3) the following text: "The bearer of this card is an International Observer and is entitled to Privileges and Immunities in accordance with the Interim Agreement"; and

(4) a photograph.

c. The accreditation card of other observers shall not be the same color as the card for members of observer delegations in subparagraph b. above, and shall contain the following details:

(l) name;

(2) organization;

(3) the words "Election Observer"; .

(4) the following text: "The bearer of this card is an Election Observer entitled to all possible assistance in the conduct of his or her tasks in accordance with the Interim Agreement."; and

(5) a photograph.

6. Privileges and immunities

a. Observer delegations and members of the coordinating body (hereinafter "delegation members") shall be granted, according to international standards, the privileges and immunities necessary for the fulfillment of their activities in accordance with Appendix 3 to this Annex.

b. The names of delegation members will be supplied in advance by the CEC to Israel, following which privileges and immunities will be granted in accordance with Appendix 3 .

7. Trilateral coordination forum for logistics and security

The CEC, Israel and the European Union shall establish a trilateral forum for the purpose of dealing with issues (for example: security of observers, communications, visas, identification, and other questions of logistics) which are raised by observer delegations as requiring assistance, or which otherwise require coordination between the members of the trilateral forum. Other matters relating to the conduct of the elections may be dealt with between the CEC and the European Union bilaterally. The operational modalities of the trilateral forum will be agreed by the parties at its first meeting.

8. Freedom of movement

a. For the purposes of election observation, all measures necessary will be taken to ensure freedom of movement in all areas of operation.

b. Observers will not be accompanied by official representatives of the CEC or of Israel unless they so request.

9. Equipment of observers

a. Members of observer delegations will be identifiable by a distinctive outfit (cap, shirt, jacket etc.) and an overjacket carrying the words "INTERNATIONAL OBSERVER" in Arabic and English. Other observers will be otherwise identified.

b. Observers will not carry arms.

10. Reporting by observer delegations

During and following the election, the coordinating body, each individual observer delegation, and other observers may issue statements and hold press conferences as to their findings.

11. Domestic observers and parallel vote tabulations

Domestic observer organizations will be required to be independent of parties, coalitions and groupings of electors with nominated candidate(s) and will be accredited by the CEC on request. Domestic observer organizations will operate under the common terms of reference for domestic observers attached in Appendix 2. Any parallel vote tabulation organization will also be accredited as a domestic observer organization.

12. Provisions for journalists

Domestic and international journalists will be accredited by the CEC upon production of valid press documentation. Journalists shall enjoy freedom of the press and of movement in all areas in order to cover the electoral process. Journalists shall have access to all electoral facilities during all stages of the electoral process. The electoral authorities may request the presentation of the issued accreditation in order to facilitate this access.

## ARTICLE VI
### Election Arrangements Concerning Jerusalem

1. Election Campaigning

A subcommittee of the CAC shall be established comprising representatives of the CEC and Israel, to coordinate issues relating to election campaigning in Jerusalem. Candidates conducting campaign activities in Jerusalem shall apply for the necessary permits through the CEC. The CEC shall obtain the necessary permits from the Israeli side in the CAC subcommittee. In addition, the CEC may disqualify candidates whose election campaigning in Jerusalem fails to comply with the provisions of the Palestinian Election Law and this Agreement.

2. Polling Arrangements

a. Location

A number of Palestinians of Jerusalem will vote in the elections through services rendered in post offices in Jerusalem, in accordance with the capacity of such post offices. The relevant post offices for the purposes of these arrangements shall be:

(1) Salah-a-din post office;

(2) Jaffa Gate post office;

(3) Shuafat post office;

(4) Beit Hanina post office; and

(5) Mount of Olives post office.

b. International Observation

International observers will be present in the above post offices on the day of the elections.

c. Procedure for Voting

(1) Those Palestinians of Jerusalem who will vote in the elections through post offices in Jerusalem shall be notified of the relevant post office by Electoral Registration card provided by the CEC (hereinafter "the electors").

(2) On arrival at the post office, electors shall identify themselves to the relevant postal personnel (hereinafter "the personnel") and present their Electoral Registration card.

(3) The personnel shall provide the electors with the following:

(a) two ballot papers, one for the election of the Ra'ees, and one for the election to the Council; and

(b) two envelopes addressed to the DEO.

(4) The electors shall mark the ballot papers at the post office counter, then place them in the envelopes to be inserted in receptacles, the size

and shape of which shall be agreed between the two sides.

(5) At the end of the day, the receptacles shall be promptly delivered to the office of the relevant DEO. Such delivery shall be open to international observers. These receptacles shall be sealed prior to delivery.

(6) The DEO shall be responsible for the counting and totaling of votes cast through the arrangements set out above as part of the total election count.

## APPENDIX 1
### Agreed Format for Canvass Information

1. Computer specifications

a. The data will be provided on a DAT (2GB) tape. If possible, the data will be transferred by means of the TAR program.

b. The data will be provided in a file which accords with Microsoft Windows Arabic Standard.

c. The data will be provided in a flat file and not an export file.

2. General points

a. A table indicating the relationship between the PSC codes and the names of their respective localities will be provided.

b. An experimental input of 100 entries will be tried, not later than two weeks after the start of the canvass.

3. Format of the data

a. The file to be transferred shall be in the following format:

| Content | Type | Length |
| --- | --- | --- |
| ID Number | NUMBER | 9 |
| ID Type | NUMBER | 1 |
| Date of birth | DATE | 6-YYMMDD |
| Sex | NUMBER | 1 |
| PSC code | NUMBER | 5 |

b. The ID Number may have a length of 8 where there is no check digit. In this case, the final space should be left blank.

c. The ID Type field may contain one of three values:

1 Israeli ID (West Bank)

2 Palestinian Authority ID

3 Israeli ID (Jerusalem).

d. The Sex field may contain one of two values:

1 Male

2 Female.

e. When not fully known, dates of birth will be entered as follows:

i. When the day of the month is not known, 00 will be entered.

ii. When the month is not known, 00 will be entered.

iii. Where the entire date of birth is unknown, it will be entered as 000000.

## APPENDIX 2
### Common Terms of Reference for Observers

A. International Observers

1. Observers are invited to observe the full Palestinian election process,

from the announcement through registration, campaign, polling, counting, compiling of results and complaints procedures.

2. All bodies sending observers will be free in their choice of observers. All observers will be issued on arrival with accreditation by the CEC.

3. Any accredited observer is free to have contact with any person at any time and anywhere and to attend all election related events.

4. Israel will allow accredited observers to travel through and to get accommodation in Israel.

5. The premises, equipment and property, including papers, documents (including computerized documents), communications, correspondence and databases of observer organizations shall be respected by each side according to its applicable laws. This provision shall apply also to the property of observers created, maintained or used for the purposes of their work or duties.

6. Members of observer delegations will wear their distinctive outfit (caps, shirts, jackets etc., including the words "INTERNATIONAL OBSERVER" in Arabic and English) whenever and wherever they go on duty. Observers who are not members of observer delegations in accordance with Article V, paragraph 3.a of this Annex (hereinafter "other observers") will be otherwise identified.

7. All observers will be responsible for the arrangement of their own accommodation, equipment, means of transport, and medical and other insurance.

8. The CEC and Israel will bear no financial liability in respect of expenditure undertaken by observers, or of injury, damage or loss incurred by observers in the course of their duties or otherwise. The European Union will only bear such liability in relation to members of the coordinating body and to the European Union observers and only to the extent that it explicitly agrees so to do.

9. No restriction shall be placed on introducing foreign currency to fund the activities of observers nor on the repatriation of such funds to any country abroad nor on the free exchange of foreign currency through an authorized dealer in exchange at the market rate of exchange.

10. All necessary measures shall be taken to ensure the security of observers. Enhanced security will be provided as necessary on request.

11. All observers have the right to emergency medical assistance, including emergency evacuation as necessary. The appropriate Israeli and Palestinian authorities undertake to provide such emergency assistance and evacuation.

B. Domestic Observers

1. Domestic observers are invited to observe the full Palestinian election process, from the announcement through registration, campaign, polling, counting, compiling of results and complaints procedures.

2. All domestic observer bodies will be free in their choice of observers. Domestic observers will be issued with accreditation by the CEC.

3. Any accredited domestic observer is free to move and to have contact with any person at any time and anywhere and to attend all election related events.

4. Freedom of speech for domestic observers in regard of words spoken or written in their official capacity shall be guaranteed.

5. The premises, equipment and property, including papers, documents (including computerized documents), communications, correspondence and databases of domestic observer organizations shall be respected by each side, according to its applicable laws. This provision shall apply also to the property of domestic observers created, maintained or used for the purposes of their work or duties.

6. Israel will allow accredited domestic observers from the list provided by the CEC to travel through Israel in the course of their duties.

7. All observers will be responsible for the arrangement of their own equipment, means of transport, and medical and other insurance.

8. The CEC and Israel will bear no financial liability in respect of expenditure undertaken by observers, or of injury, damage or loss incurred by observers in the course of their duties or otherwise.

## APPENDIX 3
### Privileges and Immunities of International Observer Delegations

For the purpose of this Appendix, privileges and immunities shall be granted to all accredited members of international observer delegations, and members of the coordinating body and personnel appointed by observer delegations to perform activities related to the election observation (hereinafter "delegation members").

1. Delegation members shall:

a. be immune from personal arrest or detention, and from seizure of any personal belongings,

b. be immune from legal process in respect of words spoken or written or acts done by them in the course of the performance of their mission;

c. enjoy inviolability for all papers and documents, including computerized documentation; and

d. be permitted, for the purposes of their official communications, to use codes and to receive papers and correspondence by courier or sealed bags.

2. The inviolability and freedom of communications and correspondence to and from delegation members shall be assured.

3. The premises, including all archives and databases, property, funds and assets of delegation members shall:

a. be protected and inviolable; and

b. be immune from search, requisition, confiscation, expropriation and any other form of interference, whether by executive, administrative, judicial or legislative action.

4. Without prejudice to their privileges and immunities, it is the duty of all persons enjoying these privileges and immunities to respect the laws and regulations in force in the areas under each side's jurisdiction.

5. The coordinating body and each observer delegation will be able to acquire and use freely and efficiently, from the beginning to the end of its operation, the means of communication necessary for it to fulfill its duty. Within the framework of the trilateral forum as defined in Article V, paragraph 7 of this Annex (hereinafter "the trilateral forum"), the Israeli and Palestinian authorities will ensure access to all necessary communication lines and frequencies.

6. The coordinating body and each observer delegation will have access to either or both of:

a. special license plates and necessary permits, agreed in the trilateral forum, for cars bought or hired locally; and

b. special license plates for cars imported and re-exported.

Comprehensive motor insurance shall be acquired for each such car.

7. Any equipment, materials, articles or goods imported by the coordinating body or any observer delegation in connection with their activities shall be exempt from all custom and import taxes and duties. It is understood, however, that such exemption does not include charges for services provided at Israeli points of entry. In the event of a request to pay

storage charges resulting from an undue delay caused by Israeli authorities as certified by the trilateral forum, storage charges shall be reimbursed.

Questions relating to such imports regarding any prohibitions or restrictions in accordance with the law, shall be raised in the trilateral forum and dealt with under expedited procedures.

Each observer delegation will be allowed to import and re-export all necessary equipment, including cars, which it considers necessary to fulfill its duties. Within the framework of the trilateral forum, Israeli and/or Palestinian customs authorities will perform appropriate customs clearances through a special expedited procedure under the supervision of senior customs officials. All imported equipment, materials, articles or goods exempted from import taxes and duties will be re-exported or donated according to applicable customs procedures agreed upon between the two sides at the conclusion of the mission of the observer delegations.

8. a. Palestinians recruited locally to perform services for the coordinating body or for an observer delegation (hereinafter "local personnel") shall, subject to the provisions of this paragraph, enjoy in the West Bank and the Gaza Strip:

(1) freedom of movement in the exercise of their duties; and

(2) immunity from prosecution in respect of words spoken or written and any act performed by them in the exercise of their duties.

b. Observer delegations and the coordinating body shall provide lists of local personnel to the CEC, which will accredit such local personnel following prior coordination with Israel. Accredited local personnel shall be issued with a certificate in Arabic, English and Hebrew, possession of which shall be necessary to enjoy the freedom of movement and immunity in subparagraph a. above.

c. The certificate will include the following text:

"The bearer of this certificate is officially attached to an international observer delegation. He or she is entitled to drive or travel in a vehicle bearing special observer delegation license plates in the course of his or her legitimate duties. He or she is entitled to limited immunity in the course of such duties, in accordance with the Interim Agreement."

d. Such local personnel shall not enjoy immunity from any legal process related to traffic offenses, or damage caused by such offenses. e. Matters regarding arrangements for entry by local personnel into Israel and for movement by local personnel between the West Bank and the Gaza Strip, including the issuance of entry certificates, will be handled within the trilateral forum by the Israeli representative to that forum, who shall, to that end, maintain ongoing contacts with the appropriate Israeli authorities with a view to expediting all related matters.

f. Local personnel shall not carry arms.

9. The coordinating body, and observer delegations, may display their flag and/or emblem on their office premises and vehicles

10. Within the framework of the trilateral forum, the Palestinian and Israeli authorities will appoint liaison officers as appropriate to ensure that all arrangements relating to requests concerning logistics and security are implemented.

Close

 Israel Ministry of Foreign Affairs

## THE ISRAELI-PALESTINIAN INTERIM AGREEMENT-Annex III

28 Sep 1995

AGREEMENT | ANNEX I | ANNEX II | ANNEX III | ANNEX IV | ANNEX V |
ANNEX VI | ANNEX VII | MAPS | MAIN POINTS

### THE ISRAELI-PALESTINIAN INTERIM AGREEMENT ON THE WEST BANK AND THE GAZA STRIP
### Annex III
### Protocol Concerning Civil Affairs

#### INDEX

ARTICLE I - Liaison and Coordination in Civil Affairs
ARTICLE II - Transfer of Civil Powers and Responsibilities
ARTICLE III - Modalities of Transfer
ARTICLE IV - Special Provisions concerning Area C

APPENDIX 1 - Powers and Responsibilities for Civil Affairs
Article 1 - Agriculture

Article 2 - Archaeology

Article 3 - Assessments

Article 4 - Banking and Monetary Issues

Article 5 - Civil Administration Employees

Article 6 - Commerce and Industry

Article 7 - Comptrol

Article 8 - Direct Taxation

Article 9 - Education and Culture

Article 10 - Electricity

Article 11 - Employment

Article 12 - Environmental Protection

Article 13 - Fisheries

Article 14 - Forests

Article 15 - Gas, Fuel and Petroleum

Article 16 - Government and Absentee Land and Immovables

Article 17 - Health

Article 18 - Indirect Taxation

Article 19 - Insurance

Article 20 - Interior Affairs

Article 21 - Labor

Article 22 - Land Registration

Article 23 - Legal Administration

Article 24 - Local Government

Article 25 - Nature Reserves

Article 26 - Parks

Article 27 - Planning and Zoning

Article 28 - Population Registry and Documentation

Article 29 - Postal Services

Article 30 - Public Works and Housing

Article 31 - Quarries and Mines

Article 32 - Religious Sites

Article 33 - Social Welfare

Article 34 - Statistics

Article 35 - Surveying

Article 36 - Telecommunications

Article 37 - Tourism

Article 38 - Transportation

Article 39 - Treasury

Article 40 - Water and Sewage

Schedule 1 - Archaeology - Archaeological Sites of Importance to the Israeli Side

Schedule 2 - Environmental Protection

Schedule 3 - Health

Schedule 4 - Religious Sites

Schedule 5 - Telecommunications - List of Approved Frequencies

Schedule 6 - Telecommunications - List of Approved TV Channels and the Locations of Transmitters

Schedule 7 - Transportation - Transportation Arrangements

Schedule 8 - Water and Sewage - Joint Water Committee

Schedule 9 - Water and Sewage - Supervision and Enforcement Mechanism

Schedule 10 - Water and Sewage - Data Concerning Aquifers

Schedule 11 - Water and Sewage - The Gaza Strip

Side Letter - Bezeq

## ARTICLE I
### Liaison and Coordination in Civil Affairs

1. Joint Civil Affairs Coordination and Cooperation Committee

a. A Joint Civil Affairs Coordination and Cooperation Committee (hereinafter "the CAC") is hereby established.

b. The CAC will function with regard to policy matters under the direction of the Joint Liaison Committee, with ongoing coordination being provided by the Monitoring and Steering Committee.

c. The CAC will deal with the following matters:

(1) Civil affairs, including issues concerning the transfer of civil powers and responsibilities from the Israeli military government and its Civil Administration to the Council.

(2) Matters arising with regard to infrastructures, such as roads, water and sewage systems, power lines and telecommunication infrastructure, which require coordination according to this Agreement.

(3) Questions regarding passage to and from the West Bank and the Gaza Strip, and safe passage between the West Bank and the Gaza Strip, including crossing points and international crossings.

(4) The relations between the two sides in civil matters, in issues such as granting of permits.

(5) Matters dealt with by the various professional subcommittees established in accordance with this Annex, which require further discussion or overall coordination.

(6) Other matters of mutual interest.

d. The CAC shall convene at least once a month, unless otherwise agreed.

e. Each side may initiate the convening of a special meeting on short notice.

f. The CAC shall determine by agreement its mode of procedure.

2. Joint Regional Civil Affairs Subcommittees

a. Two Joint Regional Civil Affairs Subcommittees will operate under the

CAC, one for the West Bank and one for the Gaza Strip (hereinafter "the RCACs").

b. The RCACs in the West Bank and in the Gaza Strip shall deal with the regional civil affairs matters in the West Bank and in the Gaza Strip respectively, detailed in paragraph l.c above, and with civil matters referred to them by the District Civil Liaison Offices.

c. Each RCAC may establish ad hoc working groups if and when the need arises.

d. Each RCAC shall convene no less than once every two weeks.

e. Matters of principle and policy not settled within the RCACs shall be passed on to the CAC.

3. District Civil Liaison Offices

a. Each side will establish and operate District Civil Liaison Offices in the West Bank (hereinafter "DCLs"). Such DCLs will be established in the following areas: Jenin, Tulkarem, Qalqilya, Nablus, Ramallah, Bethlehem, Hebron and Jericho.

b. In the Gaza Strip DCLs may be established to operate in the districts assigned for the DCOs, as specified in Annex I.

c. The DCLs shall deal with the day to day civil affairs, detailed in paragraph 1.c above, in their respective areas of operation.

d. The DCLs shall operate on a daily basis, representatives of the respective DCLs shall meet daily and the heads of the respective DCLs shall convene official meetings at least once a week.

4. General

a. Means of communication shall be set up with a view to ensuring efficient and direct contact 24 hours a day, in order to deal with any urgent matter arising in the civil affairs field.

b. The CAC and the RCACs shall be comprised of an equal number of representatives from Israel and from the Council.

c. Each side shall inform the other of its representatives to the CAC and the RCACs prior to meetings. Meetings of the CAC and the RCACs shall be organized and hosted by the two sides alternately, unless otherwise agreed.

d. The provisions of this Article shall not impede daily contacts between representatives of Israel and of the Council in all matters of mutual concern.

## ARTICLE II
### Transfer of Civil Powers and Responsibilities

Powers and responsibilities of the Israeli military government and its Civil Administration shall be transferred to and assumed by the Council in accordance with the provisions of this Annex and of Appendix I.

## ARTICLE III

**Modalities of Transfer**

l. In the first phase of redeployment, the transfer of civil powers and responsibilities will be effected concurrently with the stages of this redeployment, as detailed in Annex I, Article I.1 and Appendix 1 thereto.

2. The transfer of civil powers and responsibilities shall be coordinated through the CAC and implemented in accordance with the arrangements set out in this Annex, in a smooth, peaceful and orderly manner.

3. Preparations for the implementation of this Annex shall commence immediately upon the signing of this Agreement.

4. The Israeli authorities shall provide all necessary assistance to the Council including access to offices, registers, records, systems and equipment and all necessary information, data and statistics, required for the transfer of powers and responsibilities.

5. In accordance with the stages of transfer of powers and responsibilities, Israel will transfer from the possession of the Israeli military government and its Civil Administration to the Council, offices located in areas under Palestinian territorial jurisdiction, equipment, registers, files, computer programs, reports, archives, records, maps, scientific data, relevant licenses, installations, registrations (including registrations regarding land situated in the areas under the territorial jurisdiction of the Council) and other movable and immovable property necessary for its functioning.

6. Arrangements regarding the transfer of funds, assets, and contracts, are set out in Article 39 of Appendix 1 (Treasury).

**ARTICLE IV**
**Special Provisions concerning Area C**

1. In Area C, in the first phase of redeployment, powers and responsibilities not related to territory, as set out in Appendix 1, will be transferred to and assumed by the Council in accordance with the provisions of that Appendix.

2. During the further redeployment phases, powers and responsibilities relating to territory, as set out in Appendix 1, will be transferred gradually to Palestinian jurisdiction that will cover West Bank and Gaza Strip territory, except for the issues that will be negotiated in the permanent status negotiations.

3. In accordance with the DOP, in Area C, the Council will have functional jurisdiction with regard to the powers and responsibilities transferred pursuant to this Annex. This jurisdiction shall not apply to issues that will be negotiated in the permanent status negotiations, as set out in Article XVII, paragraph 1 of this Agreement.

4. The transfer of powers and responsibilities in Area C shall not affect Israel's continued authority to exercise its powers and responsibilities with regard to internal security and public order, as well as with regard to other powers and responsibilities not transferred.

5. The closure of areas or the imposing of other restrictions on the movement of persons or goods in Area C, required for the implementation of the powers and responsibilities transferred to the Council in accordance with this Annex (such as for the prevention of the spreading of diseases), shall require prior Israeli consent.

6. a. The Council may appoint civilian inspectors to monitor compliance with laws and regulations within the powers and responsibilities transferred to it in Area C, in a number necessary for the fulfillment of its functions as agreed in the CAC.

b. Arrangements regarding the operation of such inspectors, including agreed identification documentation, shall be as agreed within the CAC.

c. The civilian inspectors shall not conduct activity which involves arrests or detention of persons, seizure of property or any other activity involving

the use of force.

d. These inspectors shall neither wear uniforms of a police or military nature nor carry arms.

## APPENDIX 1
### Powers and Responsibilities for Civil Affairs

In accordance with Article II of this Annex, powers and responsibilities of the Israeli military government and its Civil Administration shall be transferred to and assumed by the Council in accordance with this Annex and the following provisions:

## ARTICLE 1
### Agriculture

1. This sphere includes, inter alia, veterinary services, animal husbandry, all existing experimental stations, irrigation water (i.e. usage of irrigation water which has been allocated for this purpose), scientific data, forestry, pasture and grazing, licensing and supervision of agriculture, the farming and marketing (including export and import) of crops, fruit and vegetables, nurseries, forestry products, and animal produce.

2. Irrigation water, as well as facilities, water resources, installations and networks used in agriculture are dealt with in Article 40 (Water and Sewage).

3. Relations in the agricultural sphere between the Israeli side and the Palestinian side, including the movement of agricultural produce, are dealt with in Annex V (Protocol on Economic Relations).

4. The two sides will cooperate in training and research, and shall undertake joint studies on the development of all aspects of agriculture, irrigation and veterinary services.

5. Forestry is part of the Agriculture sphere and is dealt with in Article 14 (Forests).

## ARTICLE 2
### Archaeology

1. Powers and responsibilities in the sphere of archaeology in the West Bank and the Gaza Strip will be transferred from the military government and its Civil Administration to the Palestinian side. This sphere includes, inter alia, the protection and preservation of archaeological sites, management, supervision, licensing and all other archaeological activities.

2. In Area C, powers and responsibilities related to the sphere of Archaeology will be transferred gradually to Palestinian jurisdiction that will cover West Bank and Gaza Strip territory except for the issues that will be negotiated in the permanent status negotiations, during the further redeployment phases, to be completed within 18 months from the date of the inauguration of the Council

3. The Palestinian side shall protect and safeguard all archaeological sites, take all measures necessary to protect such sites and to prevent damage to them and take all precautions when carrying out activities, including maintenance and construction activities, which may affect such sites.

4. A Joint Committee of experts from both sides shall be established by the CAC to deal with archaeological issues of common interest.

5. The Palestinian side shall respect academic freedom and rights in this sphere.

6. Subject to academic considerations, and in accordance with the law, when the Palestinian side grants excavation licenses to archaeologists, researchers and academics, it shall do so without discrimination.

7. The Palestinian side shall ensure free access to archaeological sites, open to the public without discrimination.

8. Both sides shall inform each other, through the Joint Committee, of the discovery of new archaeological sites in the West Bank and the Gaza Strip.

9. Each side undertakes upon itself to respect sites in the West Bank and the Gaza Strip which are regarded as holy, or which hold archaeological value. Each side shall have the right to raise issues relating to those sites before the Joint Committee which will consider the issue raised and reach an agreement upon such issue.

The sites listed in Schedule I are of archaeological and historical importance to the Israeli side. The Israeli side may notify the Palestinian side of other sites which shall be added to this list. The Palestinian side will take into consideration that actions which may affect these sites shall be referred to the Joint Committee for full cooperation.

10. In areas transferred to the territorial jurisdiction of the Palestinian side, the Israeli side shall provide the Palestinian side with all archaeological records, including, inter alia, a list of all excavated sites and a detailed list and description of archaeological artifacts found since 1967.

With due consideration to the Palestinian demand that Israel shall return all archaeological artifacts found in the West Bank and the Gaza Strip since 1967, this issue shall be dealt with in the negotiations on the final status.

11. a. Both sides shall take all necessary steps to prevent the theft of archaeological artifacts.

b. Both sides shall enforce the prohibitions on illegal trading in archaeological artifacts and shall, in this context, prevent any transfer of such artifacts to Israel or abroad.

c. In this regard, and with a view to safeguarding their common interests, Israel and the Palestinian side shall cooperate, exchange information and take necessary measures to combat the theft of, and illegal trade and transport of archaeological artifacts, including between areas under the territorial jurisdiction of the two sides, coordinating such activity through the Joint Committee.

## ARTICLE 3
### Assessments

Powers and responsibilities in the sphere of Assessments in the West Bank and the Gaza Strip will be transferred from the military government and its Civil Administration to the Palestinian side. This sphere includes, inter alia, the licensing of assessors.

## ARTICLE 4
### Banking and Monetary Issues

1. This sphere includes, inter alia, issues relating to foreign currency services, regulation, licensing, supervision and inspection of banking activities, and the regulation and supervision of capital activities, and powers and responsibilities relating to monetary policies, all as formulated in Annex V (Protocol on Economic Relations).

2. The Bank of Israel (BOI) shall furnish the Palestinian Monetary Authority (PMA) with the relevant information and reports relating to the activities of the banks operating in the West Bank prior to the transfer of powers and responsibilities in this sphere.

3. The BOI and the PMA will continue to have ongoing discussions and exchange of information on matters of mutual interest, including, in particular, banking and monetary issues.

4. The BOI and PMA will cooperate in order to facilitate the movement of

"notes" between commercial banks and other financial institutions and between them and the PMA in, within and between the West Bank and the Gaza Strip.

## ARTICLE 5
### Civil Administration Employees

1. The Palestinian side will continue to employ the Palestinian employees of the Civil Administration who are currently employed without derogating from the powers and responsibilities of the Palestinian side to deal with all employee related matters. The Palestinian side shall maintain the rights, including pension rights, of present and former employees.

2. In accordance with Article XX of the Agreement (Rights, Liabilities and Obligations):

a. The Palestinian side shall assume the Civil Administration's statutory and contractual obligations towards Palestinian employees and pensioners, regarding their rights and the payment of their pensions, and Israel will cease to bear any financial responsibility in this regard.

b. If Israel is sued with regard to the aforesaid rights, the Palestinian side will reimburse Israel for the full amount awarded by any court or tribunal. The Israeli side shall notify the Palestinian side about any claim against it in this respect and shall enable the Palestinian side to participate in defending the claim.

3. a. The Palestinian side will deduct from the salaries and pensions paid in accordance with paragraph 1 above, those sums owing in respect of loan repayments to Yahav Bank for Government Employees Ltd., and will transfer these to Yahav bank through the Israeli side.

b. The Israeli side will provide the Palestinian side with a list detailing the monthly loan repayments to be deducted and transferred in respect of each employee or pension receiver under subparagraph 3.a above.

## ARTICLE 6
### Commerce and Industry

1. This sphere includes, inter alia, import and export, the planning, formulation and implementation of policies, as well as the licensing and supervision of all industrial and commercial activities, including commodities, services, weights and measures and the regulation of commerce.

2. In authorizing the establishment and operation of industrial plants, factories or concerns in the West Bank and the Gaza Strip, both sides shall ensure that there is no detrimental impact on the environment, and on the safety of the other side. Matters regarding the environment are dealt with in Article 12 (Environmental Protection).

3. The production and use of weapons, ammunition or explosives are dealt with in Article XIV of the Agreement and in Annex I.

4. The economic aspects of this sphere are dealt with in Annex V (Protocol on Economic Relations).

## ARTICLE 7
### Comptrol

Powers and responsibilities in the sphere of Comptrol in the West Bank and the Gaza Strip will be transferred from the military government and its Civil Administration to the Palestinian side.

This sphere includes, inter alia, the institution of controls and proper supervision over the activities of all offices of the Palestinian side, and the licensing of auditors.

## ARTICLE 8

**Direct Taxation**

1. Powers and responsibilities in the sphere of Direct Taxation in the West Bank and the Gaza Strip will be transferred from the Israeli side to the Palestinian side. This sphere includes, inter alia, income tax on individuals and corporations, property taxes, municipal taxes and fees, in accordance with Article V of the Protocol on Economic Relations as replaced by Appendix I of the Supplement to the Protocol (hereinafter "Article V").

2. a. In Area C, the powers and responsibilities regarding property tax will be transferred gradually to Palestinian jurisdiction that will cover West Bank and Gaza Strip territory except for the issues that will be negotiated in the permanent status negotiations, during the further redeployment phases, to be completed within 18 months from the date of the inauguration of the Council. However, the property tax will be collected by the Israeli side, in cooperation and coordination with the Palestinian side, and the income will be transferred to the Council.

b. The powers and responsibilities of the Israeli side for levying and collection of income tax and deduction at source, with regard to Israelis (including corporations in which the majority of shares which grant rights to distribution of profits are held by Israelis) in respect of income accrued or derived in Area C outside the Settlements and military locations, will be exercised according to the Palestinian tax code and the tax collected will be remitted to the Palestinian side.

3. Tax enforcement in the West Bank and the Gaza Strip shall be in accordance with applicable laws and in accordance with the provisions of this Agreement.

4. The provisions of this Article and of Article V shall be implemented on 1.1.96. The provisions set forth in paragraphs 5-8 of Article V shall be in force until 31.12.96, and will continue for an additional period upon the mutual agreement of the two tax authorities.

## ARTICLE 9
### Education and Culture

Powers and responsibilities in the sphere of Education and Culture in the West Bank and in the Gaza Strip will be transferred from the military government and its Civil Administration to the Palestinian side. This sphere includes, inter alia, responsibility over schools, teachers, higher education, special education and private, public, non-governmental and other cultural and educational activities, institutions and programs and all movable and immovable education property.

## ARTICLE 10
### Electricity

Both sides have agreed to continue the negotiations concerning the sphere of Electricity after the signing of this Agreement, with a view to reaching an agreement within three months, based on the following merged version, pending which the existing status quo in the sphere of electricity in the West Bank and the Gaza Strip shall remain unchanged. IEC personnel and equipment shall be guaranteed free, unrestricted and secure access to the electricity grid.

(Merged Version)

1. The Israeli side shall transfer to the Palestinian side, and the Palestinian side shall assume, all powers and responsibilities in this sphere [I: in Areas A and B] [P: in the West Bank] that are presently held by the military government and its Civil Administration, including the power to set tariffs and issue licenses [P:, as well as all existing property related to this sphere and the grid, as defined in paragraph 4]. [I: In Area C, powers and responsibilities relating to this sphere will be transferred gradually to Palestinian jurisdiction that will cover West Bank and Gaza Strip territory, except for the issues that will be negotiated in the permanent status negotiations, during the further redeployment phases, to

be completed within 18 months from the date of the inauguration of the Council.]

2. The Palestinian Energy Authority (PEA) will have the authority to issue licenses and to set rules, tariffs and regulations in order to develop electricity systems [I: under the responsibility of the Palestinian side] in the West Bank. In addition, the PEA shall have the right to construct transmission lines, distribution lines, power stations and the [I: Palestinian part of the] inter-regional electricity connection [I: scheme], in the West Bank. [I: Such construction which is intended to be connected or related to the IEC grid, or which is in Area C, shall be subject to prior Israeli consent.]

3. Pending the establishment of an independent Palestinian electricity supply system or of other supply sources, the Israel Electric Company (IEC) shall continue to supply the electricity in order to meet existing and future expected demand in the West Bank. All aspects of supply of electricity to the Palestinian side by IEC shall be dealt with in a commercial agreement, similar to commercial agreements and prices agreed upon for major bulk Israeli consumers.

4. For the purpose of this Article the term "grid" shall include lines, cables, transformers, substations, circuit-breakers, switches, protection devices and metering equipment, of all different voltage levels. [P: The grid in the West Bank shall be transferred to the Palestinian side] [I: IEC will retain full responsibility for the operation, maintenance and development of the IEC grid. For this purpose IEC personnel, vehicles and equipment shall be entitled to free, unrestricted and secure access to this grid.]

5. The Israeli side shall retain full responsibility for the [I: supply of electricity to the Israeli settlements and the military locations through the IEC grid.] [P: operation and maintenance of the electricity supply systems within the Israeli settlements and the military locations.]

6. [I: Subject to the terms of the commercial agreement referred to in paragraph 3 above, which shall include, inter alia, provisions concerning safety and technical standards, dedicated feeders and segments of lines branching from feeders supplying Palestinian consumers, will be transferred to the Palestinian side.] [P: The Israeli side shall transfer to the Palestinian side all existing property related to this sphere and the grid, as defined in paragraph 4, in the West Bank.]

7. The PEA will be authorized to implement, in the grid [I: under the responsibility of the Palestinian side] [P: in the West Bank], the outcome of the technical studies currently being undertaken concerning the following:

a. The rehabilitation of existing distribution systems.

b. Upgrading of protection systems.

c. Construction of control systems.

d. Implementation of transmission and distribution schemes.

8. Both sides shall establish a Joint Electricity Subcommittee. The functions of the committee shall be to deal with the issues of mutual interest concerning electricity and to implement the provisions of this Article including, inter alia: finalization of the commercial agreement, cooperation in technical issues and arrangements concerning the transfer of agreed systems.

[P:9. In light of the proposal that was submitted by President Arafat in the last round of negotiations which was later reassured by Mr. Peres, Israeli Foreign Minister, both sides shall agree on an international arbitration company to deal with the transfer of the electrical grid in the West Bank.]

### ARTICLE 11
### Employment

1. Powers and responsibilities of the Civil Administration in the sphere of

Employment in the West Bank and the Gaza Strip will be transferred to the Palestinian side.

2. This sphere includes, inter alia, organizing and planning, from the Palestinian side, the employment of the Palestinians who work or intend to work in Israel and in the Settlements, as well as collecting information and building a data base.

3. The Palestinian side will provide the Israeli side with details of Palestinian workers seeking jobs in Israel and in the Settlements. When Israel makes positive decisions, Israel will issue the necessary permits.

4. The Israeli side will continue to provide the assistance currently granted to Palestinian workers who work in Israel or in the Settlements, regarding their social rights according to the prevailing laws.

5. A joint committee will be established after the signature of this Agreement to set the procedures and arrangements relating to this sphere and their implementation, including the matters of employment injuries.

6. Israel will provide the Palestinian side with lists of all Palestinian employees from whose wages Israel deducts health fees ("health stamp") and lists of retired Palestinian employees receiving pensions paid through the Payment Section of the Israeli Employment Service.

7. Israel will notify the Palestinian side of amendments made in the laws and regulations that relate to Palestinians employed in Israel or in the Settlements.

8. Issues relating to the placement and rights of the Palestinians employed in Israel are dealt with in Article VII of Annex V (Protocol on Economic Relations).

### ARTICLE 12
### Environmental Protection

A. Transfer of Authority

The Palestinian side and Israel, recognizing the need to protect the environment and to utilize natural resources on a sustainable basis, agreed upon the following:

1. This sphere includes, inter alia, licensing for crafts and industry, and environmental aspects of the following: sewage, solid waste, water, pest control (including anti-malaria activities), pesticides and hazardous substances, planning and zoning, noise control, air pollution, public health, mining and quarrying, landscape preservation and food production.

2. The Israeli side shall transfer to the Palestinian side, and the Palestinian side shall assume, powers and responsibilities in this sphere, in the West Bank and the Gaza Strip that are presently held by the Israeli side, including powers and responsibilities in Area C which are not related to territory.

In Area C, powers and responsibilities in this sphere related to territory (which only include environmental aspects of sewage, solid waste, pesticides and hazardous substances, planning and zoning, air pollution, mining and quarrying and landscape preservation) will be transferred gradually to Palestinian jurisdiction that will cover West Bank and Gaza Strip territory except for the issues that will be negotiated in the permanent status negotiations, during the further redeployment phases, to be completed within 18 months from the date of the inauguration of the Council.

B. Cooperation and Understandings

3. Both sides will strive to utilize and exploit the natural resources, pursuant to their own environmental and developmental policies, in a manner which shall prevent damage to the environment, and shall take all necessary measures to ensure that activities in their respective areas do

not cause damage to the environment of the other side.

4. Each side shall act for the protection of the environment and the prevention of environmental risks, hazards and nuisances including all kinds of soil, water and air pollution.

5. Both sides shall respectively adopt, apply and ensure compliance with internationally recognized standards concerning the following: levels of pollutants discharged through emissions and effluents; acceptable levels of treatment of solid and liquid wastes, and agreed ways and means for disposal of such wastes; the use, handling and transportation (in accordance with the provisions of Article 38 (Transportation)) and storage of hazardous substances and wastes (including pesticides, insecticides and herbicides); and standards for the prevention and abatement of noise, odor, pests and other nuisances, which may affect the other side.

6. Each side shall take the necessary and appropriate measures to prevent the uncontrolled discharge of wastewater and/or effluents to water sources, water systems and water bodies, including groundwater, surface water and rivers which may affect the other side, and to promote the proper treatment of domestic and industrial wastewater, as well as solid and hazardous wastes.

7. Both sides shall ensure that a comprehensive Environmental Impact Assessment (EIA) shall be conducted for major development programs, including those related to industrial parks and other programs detailed in Schedule 2.

8. Both sides recognize the importance of establishing new industrial plants in their respective areas within planned and approved industrial zones, subject to the preparation of comprehensive EIAs, and shall endeavor to ensure compliance with the above.

9. Both sides recognize the importance of taking all necessary precautions to prevent water and soil pollution, as well as other safety hazards in their respective areas, as a result of the storage and use of gas and petroleum products, and shall endeavor to ensure compliance with the above.

10. Pending the establishment of appropriate alternative sites by the Palestinian side, disposal of chemical and radioactive wastes will be only to the authorized sites in Israel, in compliance with existing procedures in these sites. The construction operation and maintenance of the alternative facilities will follow internationally accepted guidelines, and will be implemented pursuant to the preparation of EIAs.

11. Both sides shall cooperate in implementing the ways and means required to prevent noise, dust and other nuisances from quarries, which may affect the other side. To this end the Palestinian side shall take all necessary and appropriate measures, in accordance with the provisions of this Agreement, against any quarry that does not meet the relevant environmental standards.

12. Both sides recognize the importance of taking all necessary and appropriate measures in their respective areas for the monitoring and control of insect-transmitted diseases including sand flies, anopheles and all other mosquito species, and shall endeavor to ensure compliance with the above.

13. Both sides shall cooperate in implementing internationally accepted principles and standards relating to environmental issues of global concern, such as the protection of the ozone layer.

14. Israel and the Palestinian side shall cooperate in implementing principles and standards, which shall conform with internationally accepted principles and standards, concerning the protection of endangered species and of wild fauna and flora, including restriction of trade, conservation of migratory species of wildlife and preservation of existing forests and nature reserves.

15. Israel and the Palestinian side shall respectively operate an

emergency warning system in order to respond to events or accidents which may generate environmental pollution, damage or hazards. A mechanism for mutual notification and coordination in cases of such events or accidents will be established.

16. Recognizing the unsatisfactory situation of the environment in the West Bank, and further recognizing the mutual interest in improving this situation, Israel shall actively assist the Palestinian side, on an ongoing basis, in attaining this goal.

17. Each side shall promote public awareness on environmental issues.

18. Both sides shall work on appropriate measures to combat desertification.

19. Each side shall control and monitor the transfer of pesticides and any internationally banned and restricted chemicals in their respective areas.

20. Each side shall reimburse the other for environmental services granted in the framework of mutually agreed programs.

21. Both sides shall cooperate in the carrying out of environmental studies, including a profile, in the West Bank.

22. For the mutual benefit of both sides, the relevant Israeli authorities and the Palestinian Environmental Protection Authority and/or other relevant Palestinian authorities shall cooperate in different fields in the future.

Both sides will establish an Environmental Experts Committee for environmental cooperation and understandings.

## ARTICLE 13
### Fisheries

1. This sphere includes, inter alia, licensing of fishermen, marine agriculture and vessels' permits, in the Gaza Strip.

2. Security restrictions are dealt with in Article XIV (Security along the Coastline to the Sea of Gaza) of Annex I.

## ARTICLE 14
### Forests

1. Powers and responsibilities in the sphere of Forests in the West Bank and the Gaza Strip shall be transferred from the military government and its Civil Administration to the Palestinian side. This sphere includes, inter alia, the establishment, administration, supervision, protection, and preservation of all forests (planted and unplanted).

2. In Area C, powers and responsibilities related to the sphere of Forests will be transferred gradually to Palestinian jurisdiction that will cover West Bank and Gaza Strip territory except for the issues that will be negotiated in the permanent status negotiations, during the further redeployment phases, to be completed within 18 months from the date of the inauguration of the Council.

3. The Palestinian side shall safeguard, protect and preserve all forests in the West Bank and the Gaza Strip. The Palestinian side shall take all necessary measures to ensure the protection and prevention of damage to said forests.

4. The Palestinian side shall have the right to plant new forests for, inter alia, protection of soil from erosion and desertification, and landscaping purposes, bearing in mind safety and security considerations concerning main roads and infrastructure.

5. Both sides shall cooperate in matters regarding the protection and preservation of forests, including fire extinguishing and pest control, and shall exchange information on issues relating to pests, diseases and scientific research.

6. The Israeli side shall coordinate with the Palestinian side activities in Area C, outside Settlements and military locations, which may change the existing status of this sphere.

## ARTICLE 15
### Gas, Fuel and Petroleum

1. a. This sphere includes, inter alia, the planning, formulation and implementation of policies, as well as the licensing and supervision of gas, fuel and petroleum facilities. For the purposes of this paragraph, "gas, fuel and petroleum facilities" shall include, inter alia, all gas and petrol stations, installations, terminals and infrastructure, as well as agencies for the marketing, distribution, transportation, storage, sale or supply of gas, fuel or petroleum products. This sphere also includes the licensing and supervision of the import, export, and transportation in addition to the exploration, production and distribution of gas, fuel and petroleum.

b. In Area C, powers and responsibilities regarding exploration and production of oil and gas shall be transferred gradually to Palestinian jurisdiction that will cover West Bank and Gaza Strip territory except for the issues that will be negotiated in the permanent status negotiations during the further redeployment phases, to be completed within 18 months from the date of the inauguration of the Council.

2. In authorizing the establishment and operation of gas, fuel and petroleum facilities as defined in paragraph 1, the Palestinian side shall ensure that there is no detrimental impact on the environment or on the safety of Israel, the Settlements and military installations and that a safety distance from Israel, the Settlements and military installations is observed. Accordingly, the Palestinian side shall apply the American, British and/or Israeli safety and environmental standards.

3. The color of all gas cylinders in use by Palestinians in the West Bank and the Gaza Strip shall be different than that in use in Israel and by Israelis.

4. a. The Palestinian side will notify the Israeli side of any exploration and production of oil and gas carried out by the Palestinian side or with its permission.

b. Israel and the Palestinian side agree to cooperate concerning production of oil and gas in cases of joint geological structures.

5. a. All transportation of gas or fuel products, in Israel and in the West Bank and the Gaza Strip, shall be in accordance with the respective laws applying which, in any event, shall not fall short of the international requirements and standards concerning safety and environmental protection as applied by Israel. The transportation of gas and fuel products into Israel, the Settlements and military installations shall further be subject to the requirements and modalities regarding entry into Israel.

b. In order to facilitate the movement of transportation of gas or fuel products in the West Bank and the Gaza Strip -

(1) The Palestinian side will issue permits to Palestinian owners, drivers and escorts of vehicles transporting gas or fuel products. The issue of such permits shall be governed by the criteria regarding recruitment to the Palestinian police according to this Agreement. The issue of such permits is not contingent upon the approval of the Israeli side. The Palestinian side shall notify the Israeli side of the permits issued by it.

(2) The Palestinian side shall ensure that vehicles transporting gas or fuel products, as well as their parking lots, shall be guarded against any theft or unauthorized use.

The Palestinian side shall inform the Israeli side, at the earliest opportunity, of any suspected theft or unauthorized use of such vehicles.

6. The Israeli side shall cooperate with the Palestinian side with regard to

the establishment by the Palestinian side of 3-4 storage facilities for gas and petroleum, including in facilitating, inter alia, location, land and technical assistance in order to secure the purchasing needs of the Palestinians from the Israeli market.

7. Matters regarding the environment and transportation are dealt with in Article 12 (Environmental Protection) and Article 38 (Transportation), respectively.

### ARTICLE 16
### Government and Absentee Land and Immovables

1. Powers and responsibilities of the Custodian of Government and Absentee Property (hereinafter "the Custodian") in the West Bank and the Gaza Strip with regard to Government and Absentee Land and immovables, shall be transferred from the military government and its Civil Administration to the Palestinian side.

2. In Area C, powers and responsibilities relating to this sphere will be transferred gradually to Palestinian jurisdiction that will cover West Bank and Gaza Strip territory, except for the issues that will be negotiated in the permanent status negotiations, during the further redeployment phases, to be completed within 18 months from the date of the inauguration of the Council.

3. The Palestinian side shall respect the legal rights of Israelis (including corporations owned by Israelis) related to Government and Absentee land located in the areas under the territorial jurisdiction of the Council.

4. a. The Palestinian courts shall be empowered to deal with disputes regarding rights relating to land.

b. Notwithstanding the above, when an Israeli or a Palestinian considers that his or her rights may be affected by any enforcement, confirmation or registration proceedings, he or she may request, within 30 days from the receipt of the information by the CAC in accordance with subparagraph c. below, that the issue be brought before a Professional Joint Committee established by the two sides (hereinafter - "the Joint Committee"), prior to the carrying out of such proceedings. The Joint Committee shall convene within 14 days from the submission of the objection to deal with all the relevant aspects pertaining to the issue and decide whether to approve the carrying out of the proceedings regarding which the objection has been submitted.

Pending an approval by the Joint Committee, no enforcement, confirmation or registration, regarding which the objection has been put forward, may be carried out or registered in the Land Registry or in any other relevant registry.

c. For the purpose of this paragraph, the Palestinian side shall, at the earliest opportunity, provide the CAC with the information regarding any judgment or any request for enforcement, confirmation or registration (including First Registration of land), which may affect the rights of Israelis.

### ARTICLE 17
### Health

1. Powers and responsibilities in the sphere of Health in the West Bank and the Gaza Strip will be transferred to the Palestinian side, including the health insurance system.

2. The Palestinian side shall continue to apply the present standards of vaccination of Palestinians and shall improve them according to internationally accepted standards in the field, taking into account WHO recommendations. In this regard, the Palestinian side shall continue the vaccination of the population with the vaccines listed in Schedule 3.

3. The Palestinian side shall inform Israel of any Israeli hospitalized in a

Palestinian medical institution upon his or her admission. Arrangements for moving such hospitalized Israelis shall be agreed upon in the joint committee.

4. The Palestinian side, on the one hand, and the Israeli Ministry of Health or other Israeli health institutions, on the other, shall agree on arrangements regarding treatment and hospitalization of Palestinians in Israeli hospitals.

5. The Israeli authorities shall endeavor to facilitate the passage of Palestinian ambulances within and between the West Bank and the Gaza Strip and Israel, subject to the provisions of Annex I.

6. Israel and the Palestinian side shall exchange information regarding epidemics and contagious diseases, shall cooperate in combating them and shall develop methods for exchange of medical files and documents.

7. The health systems of Israel and of the Palestinian side will maintain good working relations in all matters, including mutual assistance in providing first aid in cases of emergency, medical instruction, professional training and exchange of information.

8. a. The Palestinian side shall act as guarantor for all payments for Palestinian patients admitted to Israeli medical institutions, on condition that they receive prior approval from the Palestinian health authorities.

b. Notwithstanding the above, in all cases of the emergency hospitalization in Israel of a sick or injured Palestinian not arranged in advance via the Ministry of Health of the Council, the Israeli hospital shall report to the Palestinian side directly and immediately, and in any case not more than 48 hours after the admission, the fact of the admission and the person's condition and diagnosis. The report shall be made by telephone and fax and the Israel Ministry of Health shall be informed at the same time.

Within 24 hours of the receipt of the said report, the Palestinian side must either give an undertaking to cover all the costs of the hospitalization or remove the patient, by its own means, to a Palestinian hospital.

Should the Palestinian side have done neither of these in the given time, the Israeli hospital shall remove the patient in an Israeli vehicle and charge all costs to the Palestinian side at the accepted Israeli rate.

In all cases, the Palestinian side shall cover all hospitalization costs from admission to discharge to the territory of the Palestinian side.

Should the Israeli hospital not report as required to the Palestinian side, the hospital itself shall bear all costs.

9. A committee established through the CAC shall facilitate coordination and cooperation on health and medical issues between the Palestinian side and Israel.

10. Imports of pharmaceutical products to the West Bank and the Gaza Strip shall be in accordance with general arrangements concerning imports and donations, as dealt with in Annex V (Protocol on Economic Relations).

## ARTICLE 18
### Indirect Taxation

1. This sphere includes, inter alia, VAT, purchase taxes on local production and import taxes, as well as any other indirect taxes, as formulated in Annex V (the Protocol on Economic Relations).

2. In order to foster regional trade between the Palestinian territories and external markets, various storage facilities can be established at the entry points at the Rafah and Allenby Bridge terminals, for temporary storage purposes (by Palestinian companies and the Palestinian Customs Department) before the customs clearance of goods. The specific locations and arrangements for the above will be agreed upon by the Joint

Economic Committee.

The administration of these storage facilities will be according to the provisions relating to freight shipments detailed in Article III of Annex V (the Protocol on Economic Relations). Detailed arrangements and procedures will be agreed upon between the two sides.

3. If there will be additional entry points in which paragraph 14.a of Article III of Annex V will be implemented, additional storage facilities as those detailed in paragraph 2 above can be established there too.

4. While ongoing permanent Israeli businesses situated in Area C outside the Settlements and military locations will be registered for VAT purposes with the Israeli side, the rules of Palestinian VAT legislation will apply to these businesses and the Israeli side will transfer to the Palestinian side the net VAT collected from these businesses after deduction of their refunds. The above will be coordinated with the Palestinian side.

For this purpose, an Israeli includes a corporation in which the majority of shares which grant rights to distribution of profits are held by Israelis.

5. Tax enforcement in the West Bank and the Gaza Strip shall be in accordance with applicable laws and in accordance with this Agreement.

## ARTICLE 19
### Insurance

1. This sphere includes, inter alia, the licensing of insurers and insurance agents, and the supervision of their activities, including supervision of insurers' deposits and funds and the road safety fund.

2. Arrangements regarding the compulsory insurance of motor vehicles and the compensation of road accident victims are dealt with in Article XI (Insurance Issues) of Annex V (Protocol on Economic Relations) (hereinafter: Article XI).

3. a. The Existing Fund, as defined in Article XI, shall be transferred to the Palestinian side. This transfer will include all the Existing Fund's assets and liabilities.

b. The Palestinian side shall be responsible for all liabilities of the Existing Fund whether arising from accidents occurring prior or subsequent to the date of transfer.

c. Accordingly, Israel will cease to bear any financial responsibility in this respect. If Israel is sued with regard to the aforesaid liabilities, the Palestinian side will reimburse Israel for the full amount awarded by any court or tribunal. The Israeli side shall notify the Palestinian side about any claim against it in this respect and shall enable the Palestinian side to participate in defending the claim.

4. With a view to assisting the Palestinian side to deal with claims against the Existing Fund, the following provisions shall apply:

a. A joint experts committee shall be established to examine claims against the existing fund (hereinafter "the joint committee")

b. Without prejudice to paragraph 3.c above, the Joint Committee shall examine and estimate whether the assets of the Existing Fund are sufficient to meet its liabilities as they stand on the day of the transfer (in the Gaza Strip and Jericho Area - the 4th of May 1994; in the West Bank - the 10th of September 1995). In the event that the Joint Committee concludes that the Existing Fund's assets are not sufficient to meet its liabilities, the Israeli side shall cover the agreed deficit, including claims incurred but not reported (IBNR).

If the Joint Committee is unable to agree on the above amount, the matter shall be referred to the JEC (Joint Economic Committee).

c. The Joint Committee shall submit recommendations to the Palestinian side concerning administrative or legal changes with a view to expediting settlement of the claims.

d. The Joint Committee shall conclude its work within three months. The two sides may agree on a one time extension for another three months.

5. Additionally, the Israeli side will provide to the Palestinian side all the necessary assistance with regard to the Existing Fund, and advice and consultation when requested.

6. All claims, including pending claims, against the Existing Fund should not be brought before or heard by any Israeli court or tribunal and should only be brought before the Palestinian Courts. To this end, the two sides may take all necessary measures, including, if possible, the enactment of legislation.

## ARTICLE 20
### Interior Affairs

1. Powers and responsibilities in the sphere of Interior Affairs in the West Bank and the Gaza Strip will be transferred from the military government and its Civil Administration to the Palestinian side. This sphere includes, inter alia licensing of newspapers and publications and censorship of films and plays.

2. Municipal affairs are dealt with in Article 24 (Local Government).

## ARTICLE 21
### Labor

1. The sphere of Labor includes, inter alia, rights of workers, labor relations, labor conciliation, safety and hygiene in work places, labor accidents and compensation, vocational and professional training courses, cooperative associations, professional work associations and trade unions, heavy machinery equipment.

2. The two sides shall establish agreed procedures for mutual recognition of professional certificates and diplomas.

3. The Palestinian side shall ensure the completion of vocational and professional training courses currently being conducted by the Civil Administration. In this regard, the Civil Administration shall transfer to the Palestinian side a proportionate amount of fees received on account of such courses, relating to the period following the date of transfer.

4. The Palestinian side shall continue to hold vocational training courses, at least to the same extent as has been undertaken by the Civil Administration, inter alia, in the following professions: heavy-vehicle and public transport drivers, garage managers, vehicle technicians, vehicle testers, driving teachers and driving school managers.

5. Cooperative Associations, Professional Work Associations and Trade Unions should act in a manner that does not violate the Cooperative Associations laws, the Professional Work Associations laws and the Trade Unions laws.

6. The Palestinian side shall inform the Israeli side of any work related accident resulting in the injury of an Israeli. The Israeli side may conduct an investigation of such an accident in coordination with the Palestinian side.

7. All matters regarding the production and use of explosives and gunpowder shall be dealt with in Article XIV of this Agreement and Annex I.

## ARTICLE 22
### Land Registration

1. Powers and responsibilities in the sphere of Land Registration in the West Bank and the Gaza Strip will be transferred from the military government and its Civil Administration to the Palestinian side. This sphere includes, inter alia, registration in the Land Registry of real estate

transactions, First Registrations of land, registration of courts' decisions, registration of parcelations pursuant to the Towns, Villages and Buildings Planning Law, No. 79, of 1966, and the administration of Land Registry offices and processes.

2. In Area C, powers and responsibilities relating to this sphere will be transferred gradually to Palestinian jurisdiction that will cover West Bank and Gaza Strip territory, except for the issues that will be negotiated in the permanent status negotiations, during the further redeployment phases, to be completed within 18 months from the date of the inauguration of the Council.

3. The Palestinian side shall respect the legal rights of Israelis (including corporations owned by Israelis) related to lands located in the areas under the territorial jurisdiction of the Council.

4. a. The Palestinian courts shall be empowered to deal with disputes regarding ownership of or rights relating to land.

b. Notwithstanding the above, when an Israeli or a Palestinian considers that his or her rights may be affected by any enforcement, confirmation or registration proceedings, he or she may request, within 30 days from the receipt of the information by the CAC in accordance with subparagraph c. below, that the issue be brought before a Professional Joint Committee established by the two sides (hereinafter - "the Joint Committee"), prior to the carrying out of such proceedings. The Joint Committee shall convene within l4 days from the submission of the objection to deal with all the relevant aspects pertaining to the issue and decide whether to approve the carrying out of the proceedings regarding which the objection has been submitted.

Pending an approval by the Joint Committee, no enforcement, confirmation or registration, regarding which the objection has been put forward, may be carried out or registered in the Land Registry or in any other relevant registry.

c. For the purpose of this paragraph, the Palestinian side shall, at the earliest opportunity, provide the CAC with the information regarding any judgment or any request for enforcement confirmation or registration (including First Registration of land), which may affect the rights of Israelis.

### ARTICLE 23
### Legal Administration

l. Powers and responsibilities in the sphere of legal administration shall be transferred from the military government and its Civil Administration to the Palestinian Side.

2. This sphere includes, inter alia:

a. administration, planning and management of the Palestinian Judicial system and its different organs;

b. appointment of judges;

c. licensing and supervision of lawyers;

d. licensing and supervision of public notaries, and

e. registration of companies and intellectual property rights, including, but not limited to, patents and trademarks.

3. Registration of Companies:

a. The Israeli side shall transfer to the Palestinian side the Register of Companies in the West Bank.

b. Each side shall allow persons or legal entities of the other side to register companies in its register. c. Each side shall ensure that its Register of Companies is open to the public for information.

d. Each side will provide the other side, upon request, and on a case-by-case basis, with updated information regarding the registration of companies, share ownership, charges and other relevant information held by their respective registrars of companies.

The two sides shall agree on arrangements for the exchange of updated information regarding the registration of companies.

4. Intellectual Property Rights:

a. Intellectual property rights include, inter alia, patents, industrial designs, trademarks, copyright and related rights, geographical indications and undisclosed information.

b. (1) Each side shall use its best efforts to adopt in its legislation standards of protection of intellectual property compatible with those in the GATT Agreement on Trade Related Aspects of Intellectual Property (hereinafter "GATT-TRIPS").

(2) Each side will strive to establish an adequate system for the examination of applications for registration of intellectual property rights compatible with those in GATT-TRIPS.

c. Each side will recognize the copyright and related rights in original "literary and artistic works", including in particular, musical works, computer programs and audio and visual recordings, legally originating in the areas under the jurisdiction of the other side.

d. Each side will recognize the undisclosed information rights originating in the areas under the jurisdiction of the other side.

e. (1) In view of the free movement of industrial goods between Israel on the one hand and the West Bank and Gaza Strip on the other, each side when processing applications submitted by any resident or legal entity of the other side for the registration of patents, industrial designs, trade marks and geographic indications (hereinafter "Registered Rights"), shall expedite the examination process including publication for objections, for Registered Rights existing and in force in both areas, on the date of the transfer of powers and responsibilities in the sphere of legal administration.

(2) In the event of a dispute between the registration of Registered Rights in Israel and their registration in the West Bank and Gaza Strip the registration of each side will apply in the areas under its jurisdiction.

f. In the interest of promoting investment in the region, and in order to facilitate the protection by registration of intellectual property rights, the Palestinian side will, when processing applications for registration, take account of the fact that a particular right has been examined elsewhere.

g. Without prejudice to the provisions contained in Annex IV (Protocol concerning Legal Affairs), each side will extend its administrative and judicial protection to intellectual property right-holders of the other side. The purpose of this protection is to permit effective action against any act of infringement of intellectual property rights under this Agreement, including expeditious remedies to prevent infringements, and remedies which constitute a deterrent to future infringements.

h. The two sides will provide each other on a case-by-case basis with information regarding the registration of Registered Rights held by their respective Registrars of intellectual property rights.

i. Both sides shall ensure that their Registers are open to the public.

5. Legal issues regarding criminal and civil jurisdiction of the Palestinian courts are dealt with in Annex IV (Protocol concerning Legal Matters).

## ARTICLE 24
## Local Government

I. This sphere includes, inter alia, formulation and implementation of Local Government policies, appointment of Local Government officials, approval

of Local Government budgets, tenders, acquisitions, fees and tariffs, alteration of Local Government boundaries, creation and dissolution of Local Government, Local Government election processes, Local Government inspections and the creation of joint service councils, city councils, in their capacity as local planning committees, and the operation and maintenance of the municipal water and electricity distribution systems and pricing of these services.

The term "Local Government" in this Article includes municipal councils, village councils and all other communities which lack municipal status.

2. The Palestinian side has the right to make any and all alterations to the Local Government boundaries in the West Bank, within areas A and B as defined in this Agreement.

3. Issues relating to the provision of Local Government services to Settlements and to installations serving the Israeli military forces, are dealt with in the relevant Articles of this Appendix.

4. The Palestinian side shall give notice to the Israeli side of any Local Government elections. With a view to avoiding friction in the context of such elections, special security arrangements will be agreed in the security liaison mechanism.

5. In addition to the existing powers and responsibilities of a city council, in its capacity as local planning committee, it shall also be authorized to issue building permits for various purposes, including factories, hospitals and schools, in accordance and subject to existing detailed planning schemes in force.

6. Municipal authorities shall continue to supply water and electricity from existing systems in accordance with existing quantities and practices.

7. Matters regarding planning and zoning, water and electricity are dealt with in Article 27 (Planning and Zoning), Article 40 (Water and Sewage) and Article 10 (Electricity), respectively.

## ARTICLE 25
### Nature Reserves

1. Powers and responsibilities in the sphere of Nature Reserves in the West Bank and the Gaza Strip will be transferred from the military government and its Civil Administration to the Palestinian side and shall be assumed by it, including, inter alia, the establishment, declaration, administration, supervision, protection and preservation of Nature Reserves and of animal species, natural assets and plants.

2. In Area C, powers and responsibilities related to the sphere of Nature Reserves will be transferred gradually to Palestinian jurisdiction that will cover West Bank and Gaza Strip territory except for the issues that will be negotiated in the permanent status negotiations, during the further redeployment phases, to be completed within 18 months from the date of the inauguration of the Council.

3. The Palestinian side shall safeguard and preserve the Nature Reserves in accordance with established scientific standards.

4. The two sides shall agree on methods of cooperation regarding the protection and preservation of Nature Reserves, through a Joint Committee of Experts from the two sides. This cooperation shall include exchange of information and data regarding issues such as animal and plant diseases, pests, and scientific research.

5. The two sides shall each take appropriate measures in order to protect Nature Reserves, Protected Natural Assets and species of animals, plants and flowers of special breeds, as well as to implement rules of behavior in Nature Reserves.

6. Each side shall enforce, within the areas under its responsibility, the regulations pertaining to hunting, and in particular the prohibition on hunting of protected and endangered species.