# EXHIBIT A.532
## (4 of 5)

7. The Israeli side shall coordinate with the Palestinian side activities in Area C outside Settlements and military locations, which may change the existing status of this sphere.

## ARTICLE 26
### Parks

1. Powers and responsibilities in the sphere of Parks in the West Bank and the Gaza Strip will be transferred from the military government and its Civil Administration to the Palestinian side including, inter alia, the establishment, administration, supervision, protection, and development of Parks.

2. In Area C, powers and responsibilities relating to this sphere will be transferred gradually to Palestinian jurisdiction that will cover West Bank and Gaza Strip territory, except for the issues that will be negotiated in the permanent status negotiations, during the further redeployment phases, to be completed within 18 months from the date of the inauguration of the Council.

3. Each side, within the area under its responsibility, shall implement rules of behavior in Parks, and shall take necessary measures to avoid detrimental impacts on the scenery, and natural and cultural attractions.

4. The two sides shall make arrangements, including in matters relating to finance, for the mutual recognition of multi-site tickets issued by either side.

5. The above is without prejudice to the provisions of Article 32 (Religious Sites) and Article 2 (Archaeology).

6. The Israeli side shall coordinate with the Palestinian side activities in Area C, outside Settlements and military locations, which may change the existing status of this sphere.

## ARTICLE 27
### Planning and Zoning

1. Powers and responsibilities in the sphere of Planning and Zoning in the West Bank and the Gaza Strip shall be transferred from the military government and its Civil Administration to the Palestinian side. This includes initiating, preparing, amending and abrogating Planning Schemes, and other legislation pertaining to issues regulated by Planning Schemes (hereinafter: "Planning Schemes") issuing building permits and supervising and monitoring building activities.

2. In Area C, powers and responsibilities related to the sphere of Planning and Zoning will be transferred gradually to Palestinian jurisdiction that will cover West Bank and Gaza Strip territory except for the issues that will be negotiated in the permanent status negotiations, during the further redeployment phases, to be completed within 18 months from the date of the inauguration of the Council.

3. a. The Palestinian side shall ensure that no construction close to the Settlements and military locations will harm, damage or adversely affect them or the infrastructure serving them.

b. Accordingly, when the Palestinian side considers that a proposed Planning Scheme pertains to construction which may fall within subparagraph a. above (in particular: waste disposal sites; electric power stations and projects regarding sewage, hazardous materials or which may have a polluting impact), it shall provide the CAC with a copy of such a Planning Scheme prior to its entry into force.

A sub-committee established by the CAC shall, upon request by the Israeli side, discuss such Planning Scheme. Pending the decision of the committee, planning procedures shall not be concluded and no building activity shall be carried out pursuant to the said Planning Scheme.

## ARTICLE 28
### Population Registry and Documentation

1. Powers and responsibilities in the sphere of population registry and documentation in the West Bank and the Gaza Strip will be transferred from the military government and its Civil Administration to the Palestinian side.

2. The Palestinian side shall maintain and administer a population registry and issue certificates and documents of all types, in accordance with and subject to the provisions of this Agreement. To this end, the Palestinian side shall receive from Israel the population registry for the residents of the West Bank and the Gaza Strip in addition to files and records concerning them, as follows:

- Notices of births.

- Old handwritten records of births and deaths and the indexes from 1918 till 1981.

- Photographs file with all its equipment.

- All computer devices and equipment with all accessories (screens, printers and communications equipment).

3. A Joint Committee will be established to solve the reissuance of identity cards to those residents who have lost their identity cards.

4. The existing identity card of the present residents, as well as of new residents, shall be substituted by a new identity card with a new I.D. number. Such substituted identity cards shall be issued by the Palestinian side and shall bear its symbols. New identification numbers may be issued by the Palestinian side a year after the signing of this Agreement. The new identification numbers and the numbering system will be transferred to the Israeli side. All titles and values in such identity cards will be in Arabic and Hebrew, and the number of such identity cards will be in Arabic numerals (i.e. 0-9).

5. Possession of the aforementioned identity card, whether it was issued by the military government and its Civil Administration or substituted or issued by the Palestinian side, and any other necessary documents, notification of which will be given to the Palestinian side through the

CAC, shall be required for entry into Israel by residents.

6. Safe passage between the Gaza Strip and the West Bank, as provided for in Annex I, shall require the possession of the aforementioned identity card, whether it was issued by the military government and its Civil Administration or substituted or issued by the Palestinian side, and any other necessary documents, notification of which will be given to the Palestinian side through the CAC.

7. Israel recognizes the validity of the Palestinian passports/travel documents issued by the Palestinian side to Palestinian residents of the West Bank and the Gaza Strip in accordance with the Gaza-Jericho Agreement and this Agreement. Such passports/travel documents shall entitle their holders to exit abroad through the passages or through Israeli points of exit.

8. The holder of a VIP Palestinian passport/travel document will pass the international passages free of the fees and will enjoy VIP treatment in the Israeli international exit points.

9. Special VIP certificates may be issued as concluded in the Protocol regarding Arrangements with respect to Passages of October 31, 1994, and in this Agreement.

10. In order to ensure efficient passage procedures and to avoid discrepancies and with a view to enabling Israel to maintain an updated and current registry, the Palestinian side shall provide Israel, on a regular basis through the CAC, with the following information regarding passports/travel documents and identity cards:

a. With respect to passports/travel documents: full name, mother's name, ID number, date of birth, place of birth, sex, profession, passport/travel document number and date of issue and a current photograph of the person concerned.

b. With respect to identity cards: identity card number, full name, mother's name, date of birth, sex and religion and a current photograph of the person concerned.

The Palestinian side shall inform Israel of every change in its population registry, including, inter alia, any change in the place of residence of any resident.

II. To reflect the spirit of the peace process, the Palestinian side has the right, with the prior approval of Israel, to grant permanent residency in the West Bank and the Gaza Strip to:

a. investors, for the purpose of encouraging investment;

b. spouses and children of Palestinian residents, and

c. other persons, for humanitarian reasons, in order to promote and upgrade family reunification.

12. The Palestinian side shall have the right to register in the population registry all persons who were born abroad or in the Gaza Strip and West Bank, if under the age of sixteen years and either of their parents is a resident of the Gaza Strip and West Bank.

13. a. Persons from countries not having diplomatic relations with Israel who visit the Gaza Strip and the West Bank shall be required to obtain a special visitor's permit to be issued by the Palestinian side and cleared by Israel. Requests for such permits shall be filed by any relative or acquaintance of the visitor, who is a resident, through the Palestinian side, or by the Palestinian side itself. All titles and values in such permits will be in English.

b. Visitors to the Gaza Strip and the West Bank shall be permitted to remain in these areas for a period of up to three months granted by the Palestinian side and cleared by Israel. Such visitors can enter Israel during the validity of their visit permit, without any need for another permit.

The Palestinian side may extend this three months period for an additional period of up to four months. The Palestinian side will notify Israel of this extension. Any further extensions require the approval of Israel.

The Palestinian side may, upon clearance by Israel, issue visitors' permits for the purpose of study or work, for a period of one year which may be extended by agreement with Israel. In any event, the duration of such visitors' permits shall not exceed the period of validity of the said visitors' passports or travel documents. The Palestinian side may grant permanent residency to the employees upon agreement with Israel.

14. Persons from countries having diplomatic relations with Israel who visit the Gaza Strip and the West Bank shall either be required to obtain the aforementioned visitor's permit or to hold a valid passport and an Israeli visa, when required. Such visitors can enter Israel during the validity of their visit permit, without any need for another permit.

15. The Palestinian side shall ensure that visitors referred to above shall not overstay the duration of their entry permit and authorized extensions.

16. The Palestinian side shall use, in the West Bank and the Gaza Strip, Palestinian revenue stamps and shall determine their required fees.

17. The CAC will establish a subcommittee to supervise the implementation of this Article.

**ARTICLE 29**
**Postal Services**

1. This sphere includes, inter alia, the planning, formulation and implementation of policies, as well as the management and supervision of post offices, postal services and all monetary transactions and activities in postal units (publicly known as "the Postal Bank").

2. The Palestinian side shall issue postage stamps and postal stationery (hereinafter "stamps"), date stamps and all other related materials, subject to the following provisions:

a. Stamps shall include only the terms "the Palestinian Council" or "the Palestinian Authority", the face value and the subject. Should date stamps include the name of the issuing authority, only the abovementioned terms may be used.

b. The face value shall be stated only in one of the agreed legal currencies circulating in the West Bank and the Gaza Strip as detailed in Annex V (Protocol on Economic Relations).

c. The design, symbols, wording and subjects of stamps and date stamps issued by the Palestinian side will be in the spirit of the peace.

3. In setting postal rates for international postal services, both sides shall coordinate in such a way as to prevent mutual economic harm.

4. Both sides shall ensure the efficient transmission and delivery of postal items, including parcels, destined for or originating from the other side. Similarly, they shall ensure the efficient transmission and delivery of such postal items arriving from, or destined for, foreign countries.

5. The modalities and arrangements for sending and receiving all postal items, including parcels, between the two sides will be arranged by means of a commercial agreement between the Israel Postal Authority and the Palestinian side.

6. a. The modalities and arrangements for sending and receiving postal items, including parcels, between the Palestinian side and foreign countries, will be arranged by means of commercial agreements between the

PLO, for the benefit of the Palestinian side, and the Postal Authorities of Jordan and Egypt, and a commercial agreement between the Palestinian side and the Israel Postal Authority.

b. Without derogating from the generality of paragraph 5 of Article IX of this Agreement (Foreign Relations), the status of the Palestinian side to this Agreement in the Universal Postal Union will remain as it is at present, and the Palestinian side will not be party to any action to alter or change its status.

7. The relevant customs principles detailed in Annex V (Protocol on Economic Relations) shall also apply to postal items, including parcels transmitted to the West Bank and the Gaza Strip.

## ARTICLE 30
## Public Works and Housing

l. Powers and responsibilities in the sphere of Public Works and Housing in the West Bank and the Gaza Strip shall be transferred from the military government and its Civil Administration to the Palestinian side. This sphere includes, inter alia, the maintenance and repair of roads and Housing Department affairs.

2. a. In Area C, powers and responsibilities related to the sphere of Public Works and Housing will be transferred gradually to Palestinian jurisdiction that will cover West Bank and Gaza Strip territory except for the issues that will be negotiated in the permanent status negotiations, during the further redeployment phases, to be completed within 18 months from the date of the inauguration of the Council.

b. In exercising its powers and responsibilities in Area C, the Israeli side shall, as far as possible, employ Palestinians in carrying out road works.

3. a. The Palestinian side shall maintain the roads and be guided by international standards for road maintenance and construction, and shall ensure compatibility in said standards with neighboring countries. Additionally, the Palestinian side shall carry out any necessary works in order to ensure the proper condition of road infrastructure, including the cleaning of culverts and ditches, and shall keep the roads clear and free of all physical obstacles.

b. Upon the request of the Israeli side any necessary work stipulated in sub-paragraph a above may be carried out by either one side or the two sides together after full coordination between them.

4. a. The Palestinian side shall notify the Israeli side and road users, in a reasonable time and prior to having significant activities which may disturb the regular flow of traffic on roads or which may affect infrastructure located in proximity to roads.

b. Whenever both sides consider that the above activities affect the movement on roads or the infrastructure located in proximity to such roads, these activities shall be carried out in coordination between the Israeli and Palestinian sides.

5. A professional joint committee shall be established by the CAC to deal with issues requiring coordination and cooperation in this sphere, including the coordination of road works on roads in the West Bank serving both Palestinians and Israelis.

### ARTICLE 31
### Quarries and Mines

1. Powers and responsibilities in the sphere of Quarries and Mines in the West Bank and the Gaza Strip shall be transferred from the military government and its Civil Administration to the Palestinian side including, inter alia, the licensing and supervision of the establishment, enlargement, and operation of quarries, crushing facilities and mines (hereinafter "quarries").

2. In Area C, powers and responsibilities relating to this sphere will be transferred gradually to Palestinian jurisdiction that will cover West Bank and Gaza Strip territory, except for the issues that will be negotiated in the permanent status negotiations, during the further redeployment phases, to be completed within 18 months from the date of the inauguration of the Council.

3. a. Rights of Israelis (including corporations owned by Israelis) regarding quarries situated within the areas under the territorial jurisdiction of the Palestinian side, which are not operative, may be purchased by the Palestinian side, with the consent of the Israeli concerned, through a joint committee which shall be established by the CAC for this purpose. The sum to be paid to each Israeli with regard to his rights in the said quarries shall be based upon the investments made by him in the site. The Israeli side shall freeze licenses to such quarries. Pursuant to the date of the signing of this Agreement, such quarries shall not become operative.

b. The above joint committee shall also discuss the issue of quarries operated or used by Israelis. The two sides shall respect the recommendations of this committee. Until the decision of the Committee, the Palestinian side shall not take any measures which may adversely affect these quarries.

c. The provisions of subparagraphs a. and b. will apply to quarries presently situated in Area C, as they come under the territorial jurisdiction of the Palestinian side, commensurate with the gradual transfer of powers and responsibilities in accordance with paragraph 2 above.

4. The Israeli side shall consider any request by Palestinian entrepreneurs to operate quarries in Area C on its merits.

### ARTICLE 32

**Religious Sites**

1. Responsibility over sites of religious significance in the West Bank and the Gaza Strip (hereinafter - "Holy Sites") will be transferred to the Palestinian side. In Area C, this responsibility will be transferred gradually to Palestinian jurisdiction that will cover West Bank and Gaza Strip territory except for the issues that will be negotiated in the permanent status negotiations, during the further redeployment phases, to be completed within 18 months from the date of the inauguration of the Council.

2. Both sides shall respect and protect the listed below religious rights of Jews, Christians, Moslems and Samaritans:

a. protection of the Holy Sites;

b. free access to the Holy Sites; and

c. freedom of worship and practice.

3. a. The Palestinian side shall ensure free access to, respect the ways of worship in and not make any changes to, the Jewish Holy Sites listed in List No. 1 of Schedule 4.

b. The Palestinian side shall ensure free access to, and respect the ways of worship in, the Jewish Holy Sites listed in List No. 2 of Schedule 4 .

c. Schedule 4 shall be updated commensurate with the gradual transfer of responsibility in accordance with paragraph 1.

4. The holy site of Nebi Musa shall be under the auspices of the Palestinian side for religious purposes.

5. During religious events that take place three times a year and other special occasions that shall be coordinated with the Israeli authorities, Palestinians shall have the right to religious pilgrimage to the Al-Maghtas under the Palestinian flag. Safe passage will be provided from the Jericho Area to Al-Maghtas for this purpose.

## ARTICLE 33
### Social Welfare

1. Powers and responsibilities in the sphere of Social Welfare in the West Bank and the Gaza Strip will be transferred from the military government and its Civil Administration to the Palestinian side. This sphere includes, inter alia, all social services and the registration and supervision of local and international charitable societies.

2. Charitable, voluntary and non-profit organizations and institutions, whether local or international, should act in a manner that does not violate the laws in force.

3. Israeli and Palestinian social welfare systems shall cooperate with regard to the following:

a. Probation officers and preparation of briefs in connection with juvenile offenses.

b. Exchanging social reports needed for juvenile offenders upon request.

c. Arrangements to protect confidentiality and individual privacy in the exchange of information.

4. Both sides will maintain a positive working relationship in the field of professional training.

## ARTICLE 34
### Statistics

1. This sphere includes, inter alia, all phases of planning, producing and disseminating and archiving statistics from censuses and surveys in all areas of statistics including, but not limited to, demographic, social,

economic, area, and environmental matters.

2. Israel shall transfer from the Civil Administration to the Palestinian side all the necessary material for maintaining and running the statistical system, such as:

a. The estimation procedures, forms of questionnaires, manuals, coding manuals, procedures for and results of quality control measures and analysis of surveys.

b. The statistical maps.

c. The sampling frames, including the household listings.

d. The basket of consumer goods and all related material, including the weights used for the CPI. e. Any other professional statistical materials whenever requested.

Any other professional statistical means and methods used by the military government, Civil Administration, or on their behalf, shall also be transferred to the Palestinian side.

3. a. The Israeli side shall, through a Joint Committee to be established, transfer to the Palestinian side, if requested, any primary data from censuses and surveys, carried out by the military government, Civil Administration, or on their behalf, and archived administrative records used by the military government, Civil Administration, or on their behalf.

b. The Joint Committee shall decide upon the modalities and arrangements concerning the transfer of the above-mentioned materials.

4. Issues relating to the right to be included in the Population Registry are dealt with in Article 28 (Population Registry and Documentation).

5. The Israeli Central Bureau of Statistics and the Palestinian Central Bureau of Statistics will maintain good working relations and will cooperate in statistical matters.

## ARTICLE 35
### Surveying

1. Powers and responsibilities in the sphere of surveying in the West Bank and in the Gaza Strip shall be transferred from the military government and its Civil Administration to the Palestinian side. This sphere includes, inter alia, licensing of surveyors, carrying out of surveys and confirmation of survey maps.

2. In Area C, powers and responsibilities relating to the sphere of surveying will be transferred gradually to Palestinian jurisdiction that will cover West Bank and Gaza Strip territory, except for the issues that will be negotiated in the permanent status negotiations, during the further redeployment phases, to be completed within 18 months from the date of the inauguration of the Council.

3. Each side shall preserve and ensure the location and adequate condition of triangulation points, traverse points and bench marks, located in the West Bank and in the Gaza Strip. The Israeli side shall provide the Palestinian side with all the necessary information regarding these points and marks.

4. The two sides shall establish a Joint Committee of Experts to deal with any needs that may arise.

## ARTICLE 36
### Telecommunications

A. General

1. This sphere includes, inter alia, the management and monitoring of the use of the radio frequency spectrum, the use of the geostationary satellite orbit, the planning, formulation and implementation of telecommunications

policies, regulations and legal frameworks. The above shall be in accordance with, and subject to, the following provisions:

2. a. In Area C, although powers and responsibilities are transferred to the Palestinian side, any digging or building regarding telecommunications and any installation of telecommunication equipment, will be subject to prior confirmation of the Israeli side, through the CAC.

b. Notwithstanding paragraph a. above, the supply of telecommunications services in Area C to the Settlements and military locations, and the activities regarding the supply of such services, shall be under the powers and responsibilities of the Israeli side.

B. Principles

1. Israel recognizes that the Palestinian side has the right to build and operate separate and independent communication systems and infrastructures including telecommunication networks, a television network and a radio network.

2. Without prejudice to subparagraph D.5.c of this section, the Palestinian side has the right to establish satellite networks for various services, excluding international services.

3. The Palestinian side has the right to establish its own telecommunications policies, systems and infrastructures. The Palestinian side also has the right to choose any and all kinds of communication systems (including broadcasting systems) and technologies, suitable for its future in, inter alia, basic and value added services (including cellular telephony).

4. Operators and providers of services, presently and in the future, in the West Bank and the Gaza Strip shall be required to obtain the necessary approvals from the Palestinian side. In addition, all those operating and/or providing services, presently and in the future, in the West Bank and the Gaza Strip who wish to operate and/or provide services in Israel, are required to obtain the necessary approvals from the Israeli Ministry of Communications.

5. Both sides shall refrain from any action that interferes with the communication and broadcasting systems and infrastructures of the other side.

Specifically, the Palestinian side shall ensure that only those frequencies and channels specified in Schedule 5: List of Approved Frequencies (herein - "Schedule 5") and Schedule 6: List of Approved TV Channels and the Location of Transmitters (herein - "Schedule 6") shall be used and that it shall not disturb or interfere with Israeli radio communication activity, and Israel shall ensure that there shall be no disturbance of or interference with the said frequencies and channels.

6. A joint committee of technical experts representing both sides shall be established to address any issue arising out of this section including the growing future needs of the Palestinian side (hereinafter referred to as "the Joint Technical Committee" or "JTC"). The JTC shall meet on a regular basis for the purpose of solving all relevant problems, and as necessary in order to solve urgent problems.

C. The Electromagnetic Sphere

1. The Palestinian side has the right to use the radio frequency spectrum in accordance with principles acceptable to both sides, for present and future needs, and frequencies assigned or reassigned within the West Bank and the Gaza Strip covering all its required services within the bands L.F., M.F., H.F., V.H.F., U.H.F., S.H.F. and E.H.F. In order to satisfy the present needs of the Palestinian side, the frequencies detailed in Schedule 5 are assigned for the use of the Palestinian side in the West Bank and the Gaza Strip.

2. Future needs for frequencies shall be agreed upon by the two sides. To that end, the Palestinian side shall present its requirements through the

JTC which must fulfill these requirements within a period not exceeding one month.

Frequencies or sections of frequencies shall be assigned, or an alternative thereto providing the required service within the same band, or the best alternative thereto acceptable by the Palestinian side, and agreed upon by Israel in the JTC.

3. a. The frequencies specified in Schedule 5 shall serve, inter alia, for the transmission of a television network and a radio network.

b. The television channels and locations of transmitters to be used by the Palestinian side are specified in Schedule 6. The production studios and related broadcasting equipment shall be located in the West Bank and the Gaza Strip.

c. The radio transmitter shall be located in the area of Ramallah and Al-Bireh Cities, at the presently agreed site.

d. The Palestinian side has the right to change the location(s) of radio transmitters according to an agreement between the two sides through the JTC, to serve the Palestinian plans in achieving the best coverage.

D. Telecommunications

1. Pending the establishment of an independent Palestinian telephone network, the Palestinian side shall enter into a commercial agreement with Bezeq - The Israel Telecommunications Corp. Ltd. (herein, "Bezeq"), regarding supply of certain services in the West Bank and the Gaza Strip. In the area of international telephony, commercial agreement(s) shall be concluded with Bezeq or other duly-licensed Israeli companies.

The above shall be without prejudice to subparagraph 5.c below.

2. As long as the Palestinian network is integrated with the Israeli network, the Palestinian side shall use such telephonic equipment as is compatible with the standards adopted and applied in Israel by the Ministry of Communications, and will coordinate with the Israeli side any changes to the structure and form of telephone exchanges and transmission equipment. The Palestinian side shall be permitted to import and use any and all kinds of telephones, fax machines, answering machines, modems and data terminals, without having to comply with the above-mentioned standards (accordingly, lists Al and A2 of Annex V (Protocol on Economic Relations) will be updated). Israel recognizes and understands that for the purpose of building a separate network, the Palestinian side has the right to adopt its own standards and to import equipment which meets these standards (accordingly, lists Al and A2 of Annex V (Protocol on Economic Relations) will be updated). The equipment will be used only when the independent Palestinian network is operational.

3. a. The Palestinian side shall enable the supply of telecommunications services to the Settlements and the military installations by Bezeq, as well as the maintenance by Bezeq of the telecommunications infrastructure serving them and the infrastructure crossing the areas under the territorial jurisdiction of the Palestinian side.

b. The Israeli side shall enable the supply of telecommunications services to the geographically-dispersed areas within the West Bank and the Gaza Strip. This shall include provision, subject to the approval of the proper Israeli authorities, free of charge, of rights of way or sites in the West Bank for microwave repeater stations and cables to interlink the West Bank and to connect the West Bank with the Gaza Strip.

c. Israel recognizes the right of the Palestinian side to establish telecommunications links (microwave and physical) to connect the West Bank and the Gaza Strip through Israel. The modalities of establishing such telecommunications connections, and their maintenance, shall be agreed upon by the two sides. The protection of the said connections shall be under the responsibility of Israel.

4. Without prejudice to paragraph 3 above:

a. The Palestinian side shall take the necessary measures to ensure the protection of the telecommunication infrastructures serving Israel, the Settlements and the military installations, which are located in the areas under the territorial jurisdiction of the Palestinian side.

b. The Israeli side shall take the necessary measures to ensure the protection of the telecommunication infrastructures serving the West Bank and the Gaza Strip and which are located in areas under Israel's responsibility.

5. a. The Palestinian side has the right to collect revenue for all internal and international telecommunication services originating and terminating in the West Bank and the Gaza Strip (except Settlements and military locations).

b. Details regarding payment by the Palestinian side to Bezeq or other duly-licensed Israeli companies, and compensation by Bezeq or the said companies to the Palestinian side, referred to in subparagraph a. above, shall be agreed upon in the commercial agreement(s) between them.

c. The provisions of subparagraphs a. and b. above will be applied between the sides until such time as the two sides agree upon installation and operation of an "international gateway", as well as the international code, for the Palestinian side and the actual commencement of operation of the said gateway.

d. The Palestinian side shall enter into a discussion with Bezeq for the purpose of coming to an agreement for the use of a separate area code and numbering plan, pending the establishment of a separate Palestinian network.

6. The Palestinian side has the right to collect taxes on all telecommunications services billed in the West Bank and the Gaza Strip, subject to the provisions of Annex V (Protocol on Economic Relations).

7. a The Israeli side shall provide the Palestinian side with all operating, maintenance and system manuals, information regarding billing systems and all operating and computer programming protocols of all the equipment that will be transferred to the Palestinian side, subject to protection of rights of commercial confidentiality.

b. The Israeli side shall also supply the Palestinian side with all contractual agreements between the Civil Administration and all domestic and international entities in the area of telecommunications.

The timing of the provision of the above mentioned materials will be as provided for in this Annex.

c. Bezeq, in accordance with the commercial agreement, will supply the Palestinian side with all legal verification of its purported ownership of any and all movable or immovable assets in the West Bank and the Gaza Strip, that are not part of the Civil Administration's present network.

## ARTICLE 37
### Tourism

1. Powers and responsibilities in the sphere of Tourism in the West Bank and the Gaza Strip will be transferred from the military government and its Civil Administration to the Palestinian side.

This sphere includes, inter alia, regulating, licensing, classifying, and supervising tourist services, sites and industries. It also includes promoting foreign and domestic tourism and developing the Palestinian tourist sources and sites. It includes, as well, supervising the marketing, promotion and information activities related to foreign and domestic tourism.

2. In Area C, while powers and responsibilities regarding the development of visitors' interest in tourist sites and the encouragement of the

development of tourist services around them, in coordination with the Israeli side, will be transferred during the first phase of redeployment, other powers and responsibilities regarding those sites will be transferred gradually to Palestinian jurisdiction that will cover West Bank and Gaza Strip territory except for the issues that will be negotiated in the permanent status negotiations, during the further redeployment phases, to be completed within 18 months from the date of the inauguration of the Council.

3. Tourism issues are dealt with in Article X of Annex V (Protocol on Economic Relations).

4. Without derogating from the provisions of paragraph 9 of Article X of Annex V (Protocol on Economic Relations), a Joint Committee, established through the CAC, shall facilitate coordination and cooperation on day to day tourism issues.

## ARTICLE 38
### Transportation

*General*

Powers and responsibilities relating to transportation in the West Bank and the Gaza Strip will be transferred from the Israeli military government and its Civil administration to the Palestinian side subject to the following:

1. This sphere includes, inter alia, the licensing and supervision of drivers and vehicles, freight transportation, public transportation, traffic supervision, setting appropriate standards for transportation, meteorology, and others.

2. High and appropriate transportation safety standards and environmental quality shall serve as the basis for cooperation and agreement in this sphere.

3. The Palestinian side in this sphere shall follow international standards such as the European Standard, as applied in the area. Such standards and regulations shall be continuously adapted to reflect technological developments and advances as well as safety and environmental considerations.

4. The arrangements regarding the transfer of powers and responsibilities concerning maritime activity and aviation are dealt with according to the provisions of this Agreement.

*Drivers' and Vehicle Licensing*

5. Instruction, training and licensing in all fields relating to transportation, including drivers' testing, training and licensing will be conducted at a minimum, in accordance with existing standards.

6. The Palestinian side shall issue drivers' and vehicle licenses as well as license plates according to the format and standards currently in use and as set out in Schedule 7 to be attached to this Appendix as agreed upon between the sides.

7. To facilitate the entry of vehicles registered by the Palestinian side into Israel, the Palestinian side will periodically forward to the Israeli side through the CAC, updated information regarding drivers and vehicles registered by it.

*Traffic Supervision*

8. Signalization and Traffic Arrangements

a. The Palestinian side shall have powers and responsibilities regarding traffic signalization and traffic arrangements in the areas under its territorial jursdiction and shall cooperate with the Israeli side concerning related activities that may disturb traffic arrangements.

b. All traffic signalization, including the posting of road signs, markings and traffic arrangements, shall be in accordance with international

standards as applied in the area and where a written warning or message on a sign is required, such a warning or message shall be written in the Arabic, Hebrew and English languages.

9. Public Transportation Permits

a. Powers and responsibilities regarding Israeli public transportation to and between Israel and the Settlements and military locations shall be exercised by Israel.

b. Powers and responsibilities regarding Palestinian public transportation

to, between and within the West Bank and the Gaza Strip shall be exercised by the Palestinian side. Arrangements for the use of safe passage for this purpose are set out in Annex I.

10. Public Transportation Routes

a. Palestinian public transportation routes in the West Bank and Gaza Strip, except into Settlements and military locations, shall be determined by the Palestinian side.

b. Israeli public transportation routes from Israel to and between Settlements and military locations, and/or to other places in Israel, shall be determined by Israel .

c. Public transportation routes will be as short and safe as possible.

11. Bus Stops

a. Bus stops designated for the boarding and alighting of passengers in the areas under Palestinian territorial jurisdiction shall be determined by the Palestinian side.

b. Bus stops at the main junctions leading to Settlements and military locations or Palestinian villages in the West Bank will be determined in cooperation between Israeli and Palestinian traffic controllers.

c. Existing bus stops will be kept at Jewish Holy Sites.

*Vehicles and Vehicle Maintenance*

12. Israel and the Palestinian side shall cooperate for the purpose of maintaining safety standards, technical know how and professional training and shall exchange information regarding the maintenance, repair and servicing of vehicles, based on international standards as applied in the area.

13. Without derogating from other provisions of this Agreement, any vehicle prototype imported by the Palestinian side which has not been tested and approved by Israel, will be permitted to enter Israel and the West Bank and the Gaza Strip provided that such vehicle prototype is tested and approved by an authorized laboratory facility recognized by both sides, applying standards used in the European Union as applied in the area.

14. All types of vehicles and automotive products manufactured by the Palestinian side shall be tested and approved for use by an authorized laboratory recognized by both sides, prior to their entry into Israel and the West Bank or the Gaza Strip.

15. The import of vehicles by the Palestinian side shall be according to Annex V, Article III, paragraphs 10 and 11.

16. The issue of the transfer of car ownership will be discussed between the Ministries of Transportation of the two sides immediately after the signing of this Agreement.

*Freight Transportation*

17. Vehicles for transporting freight that are registered by the Palestinian side shall be permitted to enter Israel subject to the provisions regarding entry into Israel, the applicable Israeli laws and regulations governing the transportation of freight by motor vehicle, and the provisions set out in

Schedule 7.

*Transportation of Dangerous Substances*

18. a. The provisions of Article 15, paragraph 5.a. and b. on transportation of gas, fuel and petroleum shall be applicable to the transportation of all dangerous substances.

b. The above provisions shall be applicable with respect to the transportation of dangerous substances, except household gas and fuel and petroleum products for vehicles, on roads in the West Bank and Gaza Strip directly leading to Settlements and military locations.

c. In addition to the provisions of sub-paragraph a. above, the transportation within Israel and on roads in the West Bank and Gaza Strip, of dangerous substances classified as "most dangerous substances" as listed in current U.N. publications will require a permit signed by both traffic controllers.

*Public Transportation from the West Bank and the Gaza Strip to and from Jordan and Egypt*

19. Both sides agree in principle to the operation of public transportation from the West Bank and the Gaza Strip to and from Jordan and Egypt. Procedures and arrangements, including lines, will be detailed in Schedule 7.

*Meteorology*

20. Both sides agree on a wide range of cooperation in the sphere of meteorology and, in particular, regarding the updating of weather forecasts, data processing, and the transfer of information. The Israeli side shall provide meteorological services to the Palestinian side in the following fields: aviation, maritime, synoptic stations, weather forecasting, vocational training, etc.

*Subcommittee for Transportation*

21. Details regarding the implementation of the provisions of this Section, as well as all other matters regarding transportation between the two sides shall be formulated by the Subcommittee of the CAC for Transportation.

## ARTICLE 39
### Treasury

1. The transfer of the powers and responsibilities from the Civil Administration to the Council in this sphere shall include providing the available details concerning the Civil Administration's budgets, revenues, expenses and accounts.

Israel will provide the Council with all the necessary information, manuals, forms, operating procedures, etc., of the Civil Administration's financial system, which are relevant for the smooth and orderly transfer of powers and responsibilities in this sphere and for their operation by the Council.

2. The Israeli side shall transfer to the Council, as soon as possible but not later than nine months after the date of the transfer of the powers and responsibilities, the remaining surplus of the Civil Administration's budget.

3. a. Israel shall provide the Council with a list of the Civil Administration departments and their immovable offices, storerooms, warehouses, etc., located in the areas under the territorial jurisdiction of the Council.

b. Where such immovables are situated on private property, including property owned by absentees, Israel shall provide the Council with the contracts made between the Civil Administration and the owners of such property.

4. a. The Civil Administration shall bring to an end all its services and development contracts, and will bear the liability directly arising from such termination.

b. Civil Administration lease or rental contracts with the Waqf, the Custodian of Absentee Property or private property owners in the areas under the territorial jurisdiction of the Council, will be transferred to the Council.

c. All land and property lease and rental contracts entered into by the Custodian of Absentee and Governmental Property relating to the areas under the territorial jurisdiction of the Council will be transferred to the Council. Israel shall give notice of such transfer to the tenants and lessees.

5. Without derogating from the above provisions, upon the transfer of powers and responsibilities, Israel will cease to bear any financial responsibility regarding contracts of the Civil Administration and the Council will bear all financial responsibility for them, in accordance with Article XX of the Agreement (Rights, Liabilities and Obligations).

## ARTICLE 40
### Water and Sewage

On the basis of good-will both sides have reached the following agreement in the sphere of Water and Sewage:

*Principles*

1. Israel recognizes the Palestinian water rights in the West Bank. These will be negotiated in the permanent status negotiations and settled in the Permanent Status Agreement relating to the various water resources.

2. Both sides recognize the necessity to develop additional water for various uses.

3. While respecting each side's powers and responsibilities in the sphere of water and sewage in their respective areas, both sides agree to coordinate the management of water and sewage resources and systems in the West Bank during the interim period, in accordance with the following principles:

a. Maintaining existing quantities of utilization from the resources, taking into consideration the quantities of additional water for the Palestinians from the Eastern Aquifer and other agreed sources in the West Bank as detailed in this Article.

b. Preventing the deterioration of water quality in water resources.

c. Using the water resources in a manner which will ensure sustainable use in the future, in quantity and quality.

d. Adjusting the utilization of the resources according to variable climatological and hydrological conditions.

e. Taking all necessary measures to prevent any harm to water resources, including those utilized by the other side.

f. Treating, reusing or properly disposing of all domestic, urban, industrial, and agricultural sewage.

g. Existing water and sewage systems shall be operated, maintained and developed in a coordinated manner, as set out in this Article.

h. Each side shall take all necessary measures to prevent any harm to the water and sewage systems in their respective areas.

i. Each side shall ensure that the provisions of this Article are applied to all resources and systems, including those privately owned or operated, in their respective areas.

*Transfer of Authority*

4. The Israeli side shall transfer to the Palestinian side, and the Palestinian side shall assume, powers and responsibilities in the sphere of water and sewage in the West Bank related solely to Palestinians, that are currently held by the military government and its Civil Administration,

except for the issues that will be negotiated in the permanent status negotiations, in accordance with the provisions of this Article.

5. The issue of ownership of water and sewage related infrastructure in the West Bank will be addressed in the permanent status negotiations.

*Additional Water*

6. Both sides have agreed that the future needs of the Palestinians in the West Bank are estimated to be between 70 - 80 mcm/year.

7. In this framework, and in order to meet the immediate needs of the Palestinians in fresh water for domestic use, both sides recognize the necessity to make available to the Palestinians during the interim period a total quantity of 28.6 mcm/year, as detailed below:

a. Israeli Commitment:

(1) Additional supply to Hebron and the Bethlehem area, including the construction of the required pipeline - 1 mcm/year.

2) Additional supply to Ramallah area - 0.5 mcm/year.

(3) Additional supply to an agreed take-off point in the Salfit area - 0.6 mcm/year.

(4) Additional supply to the Nablus area - 1 mcm/year.

(5) The drilling of an additional well in the Jenin area - 1.4 mcm/year.

(6) Additional supply to the Gaza Strip - 5 mcm/year.

(7) The capital cost of items (1) and (5) above shall be borne by Israel.

b. Palestinian Responsibility:

(1) An additional well in the Nablus area - 2.1 mcm/year.

(2) Additional supply to the Hebron, Bethlehem and Ramallah areas from the Eastern Aquifer or other agreed sources in the West Bank - 17 mcm/year.

(3) A new pipeline to convey the 5 mcm/year from the existing Israeli water system to the Gaza Strip. In the future, this quantity will come from desalination in Israel.

(4) The connecting pipeline from the Salfit take-off point to Salfit.

(5) The connection of the additional well in the Jenin area to the consumers.

(6) The remainder of the estimated quantity of the Palestinian needs mentioned in paragraph 6 above, over the quantities mentioned in this paragraph (41.4 - 51.4 mcm/year), shall be developed by the Palestinians from the Eastern Aquifer and other agreed sources in the West Bank. The Palestinians will have the right to utilize this amount for their needs (domestic and agricultural).

8. The provisions of paragraphs 6-7 above shall not prejudice the provisions of paragraph 1 to this Article.

9. Israel shall assist the Council in the implementation of the provisions of paragraph 7 above, including the following:

a. Making available all relevant data.

b. Determining the appropriate locations for drilling of wells.

10. In order to enable the implementation of paragraph 7 above, both sides shall negotiate and finalize as soon as possible a Protocol concerning the above projects, in accordance with paragraphs 18 - 19 below.

*The Joint Water Committee*

11. In order to implement their undertakings under this Article, the two

sides will establish, upon the signing of this Agreement, a permanent Joint Water Committee (JWC) for the interim period, under the auspices of the CAC.

12. The function of the JWC shall be to deal with all water and sewage related issues in the West Bank including, inter alia:

a. Coordinated management of water resources.

b. Coordinated management of water and sewage systems.

c. Protection of water resources and water and sewage systems.

d. Exchange of information relating to water and sewage laws and regulations.

e. Overseeing the operation of the joint supervision and enforcement mechanism.

f. Resolution of water and sewage related disputes.

g. Cooperation in the field of water and sewage, as detailed in this Article.

h. Arrangements for water supply from one side to the other.

i. Monitoring systems. The existing regulations concerning measurement and monitoring shall remain in force until the JWC decides otherwise.

j. Other issues of mutual interest in the sphere of water and sewage.

13. The JWC shall be comprised of an equal number of representatives from each side.

14. All decisions of the JWC shall be reached by consensus, including the agenda, its procedures and other matters.

15. Detailed responsibilities and obligations of the JWC for the implementation of its functions are set out in Schedule 8.

*Supervision and Enforcement Mechanism*

16. Both sides recognize the necessity to establish a joint mechanism for supervision over and enforcement of their agreements in the field of water and sewage, in the West Bank.

17. For this purpose, both sides shall establish, upon the signing of this Agreement, Joint Supervision and Enforcement Teams (JSET), whose structure, role, and mode of operation is detailed in Schedule 9. Water Purchases

18. Both sides have agreed that in the case of purchase of water by one side from the other, the purchaser shall pay the full real cost incurred by the supplier, including the cost of production at the source and the conveyance all the way to the point of delivery. Relevant provisions will be included in the Protocol referred to in paragraph 19 below.

19. The JWC will develop a Protocol relating to all aspects of the supply of water from one side to the other, including, inter alia, reliability of supply, quality of supplied water, schedule of delivery and off-set of debts.

*Mutual Cooperation*

20. Both sides will cooperate in the field of water and sewage, including, inter alia:

a. Cooperation in the framework of the Israeli-Palestinian Continuing Committee for Economic Cooperation, in accordance with the provisions of Article XI and Annex III of the Declaration of Principles.

b. Cooperation concerning regional development programs, in accordance with the provisions of Article XI and Annex IV of the Declaration of Principles.

c. Cooperation, within the framework of the joint Israeli-Palestinian-American Committee, on water production and development related projects agreed upon by the JWC.

d. Cooperation in the promotion and development of other agreed water related and sewage-related joint projects, in existing or future multi-lateral forums.

e. Cooperation in water-related technology transfer, research and development, training, and setting of standards.

f. Cooperation in the development of mechanisms for dealing with water-related and sewage related natural and man-made emergencies and extreme conditions.

g. Cooperation in the exchange of available relevant water and sewage data, including:

(1) Measurements and maps related to water resources and uses.

(2) Reports, plans, studies, researches and project documents related to water and sewage.

(3) Data concerning the existing extractions, utilization and estimated potential of the Eastern, North-Eastern and Western Aquifers (attached as Schedule 10).

*Protection of Water Resources and Water and Sewage Systems*

21. Each side shall take all necessary measures to prevent any harm, pollution, or deterioration of water quality of the water resources.

22. Each side shall take all necessary measures for the physical protection of the water and sewage systems in their respective areas.

23. Each side shall take all necessary measures to prevent any pollution or contamination of the water and sewage systems, including those of the other side.

24. Each side shall reimburse the other for any unauthorized use of or sabotage to water and sewage systems situated in the areas under its responsibility which serve the other side.

*The Gaza Strip*

25. The existing agreements and arrangements between the sides concerning water resources and water and sewage systems in the Gaza Strip shall remain unchanged, as detailed in Schedule 11.

## SCHEDULE 1
### Archaeological Sites of Importance to the Israeli Side

Pursuant to Article 2, paragraph 9 of this Appendix:

1. The Samoa Synagog/Ashtamaa
2. The Maon Synagogue/Ma,in
3. The Synagogue in Yata
4. Tel Rumeida (Tomb of Yishai and Ruth in Biblical Hebron)
5. Betar/Batir
6. The Hasmonean Palaces
7. Sebastia/Samaria
8. Elonei Mamre/Haram Er-Rameh
9. The Naaran Synagogue - Ein Diuk
10. The Jewish Cemetry in Tel Sammarat
11. The "Shalom Al Israel" Synagogue in Jericho
12. The Jewish Synagogue in Gaza City.

## SCHEDULE 2

Pursuant to Article 12, paragraph 7 of this Appendix:

1. Power plants (including gas turbines, substations and super tension lines).
2. Quarries and mines (including expansion of existing quarries and mines).
3. Waste water treatment plants including main sewers.

4. Solid waste disposal sites.
5. Hazardous waste disposal sites.
6. Plants producing, storing, or using hazardous substances.
7. Airports and landing strips.
8. Seaports, jetties and harbors.
9. Refineries.
10. Industrial parks.
11. Major dams and reservoirs.
12. Major roads.

## SCHEDULE 3

Pursuant to Article 17, paragraph 2 of this Appendix:

**Vaccinations**

The routine vaccination system carried out in the West Bank and the Gaza Strip including:

A. Vaccinations for infants:

1. Vaccination against Hepatitis B.:

I To an infant born in a hospital or in a maternity home: at the ages of

0, 1, 6, months.

II To an infant born at home: at the ages of 1, 2, 6 months.

2 . Triple vaccination against Diptheria, Pertussis and Tetanus (DPT):

Given at the ages of 2, 4, 6, l2 months.

3. Vaccination against Poliomyelitis (Polio):

Sabin vaccine (OPV) given at the ages of 4, 6, 12 months. Salk vaccine (IPV) given at the ages of 2, 4, 12 months.

Note: If, in the future, we will revert to the quadruplex vaccination method which combines DPT with the Salk vaccine against Polio, the method will be: Quadruplex (IPV + DPT): at the ages of 2, 4, 12 months.

DPT: at the age of 6 months.

4. Triple vaccination against Measles Mumps. Rubella (MMR):

Given at the age of 15 months.

(Note: it is necessary to point out that UNRWA gives an additional dose of the Measles vaccine, at the age of 9 months - within the boundaries of the refugee camps).

B) Vaccinations for children and youth:

1. Against Poliomyelitis (OPV = SABIN) at the age of 6 years.

2. Against Measles - at the age of 6 years.

3. Against Tuberculosis - given BCG (after a Tuberculin test = Mantoux test) at the age of 6 years.

(Note: It is necessary to note that UNRWA gives an additional dose of the BCG vaccine immediately after birth).

4. Vaccination against Diptheria and Tetanus - dT (at special concentration suitable for children) is given as a booster vaccination at the age of 6 years.

An additional booster vaccination - DT (at a special concentration suitable for adults) is given at the age of 15 years.

5. Against Rubella, for girls only, at the age of 12 years.

C) Vaccination against Tetanus for pregnant women:

Tetanus Toxoid vaccination is given in order to avoid Tetanus

Neonatorum.

First dose is given at the beginning of the second third of the pregnancy (in the fourth or fifth month) and a second dose before the birth (during the eighth month of pregnancy).

D) Vaccination against Hepatitis B for specific members of the population:

1. A newborn whose mother was found to be suffering with Hepatitis B during her pregnancy or is a carrier of the disease (discovered after a routine test for this disease in pregnant women) - receives vaccination against Hepatitis B. The vaccination is given a number of days after the birth and includes an active and passive vaccine: HBV and HBIG.

2. The husband of a pregnant woman who is sick or is a carrier of the disease (who was checked for Hepatitis B and found healthy) - receives an active vaccination - HBV.

3. Hospital workers, including nurses, technicians and others, who come into contact with blood intensively: in laboratories, haemodialysis units, intensive care units, operating theaters, delivery rooms and emergency rooms, as well as dentists - receive the active vaccination HBV.

E) Vaccination against Meningococcal Meningitis type A:

Given to pilgrims to Saudi Arabia, 10 days before their departure via the Jordan River bridges.

## SCHEDULE 4

Pursuant to Article 32, paragraph 3 of this Appendix:

*List No. 1*

1. Elazar's Tomb, Ittamar's Tomb and the Tomb of the 70 Elders in Awarta
2. Joshua's Tomb in Kifel-Hares
3. The Cave of Othniel ben Knaz in Hebron
4. The Eshtamoa Synagogue in Samoa
5. The Yata Synagogue
6. Batir
7. Sebastia/Samaria

*List No. 2*

1. Nun's Tomb and Caleb's Tomb in Kifel-Hares
2. The Tombs of Natan the Prophet and Gad the Seer in Halhul
3. The Naran Synagogue - Ein Duk
4. The Jewish Cemetery in Sammerat
5. The Synagogue in Gaza City

## SCHEDULE 5
## List of Approved Frequencies

Pursuant to Article 36, paragraph B.5 of this Appendix:

1. L.F.

As soon as any need arises.

2. M.F.

Broadcast network.
Ramallah - 675khz.

3. H.F.

To use it freely.

4. V.H.F.

4.1 V.H.F. - F.M. broadcast

V.H.F. - F.M. broadcast network composed of 8 locations. The specific 8

frequencies will be assigned not later than six months from the date of signing this Agreement.

4.2 V.H.F. - maritime local services

Assignment of frequencies for vessels and fixed stations is subject to the provisions of Annex I and of Article 38 (Transportation).

4.3 V.H.F. - aeronautical local services

Assignment of frequencies for airplanes and fixed stations is subject to the provisions of Annex I and of Article 38 (Transportation).

4.4 V.H.F. - mobile services

Assignment of frequencies for use for mobile and fixed services of Police, Civil and Official networks and other users, in the West Bank and the Gaza Strip is as follows:-

4.4.1 Qalqilya

| | |
|---|---|
| 1. * 150.250 | 9. 162.6125 |
| 2. * 155.6625 | 10. 162.6625 |
| 3. 150.3875 | 11. 162.6875 |
| 4. 150.425 | 12. 167.5375 |
| 5. 155.5625 | 13. 167.575 |
| 6. 162.500 | 14. 167.6125 |
| 7. 162.525 | 15. 167.650 |
| 8. 162.5625 | 16. 167.6875 |

4.4.2 Tulkarm

| | |
|---|---|
| 1. * 150.2375 | 9. 162.575 |
| 2. * 155.650 | 10. 162.625 |
| 3. 150.3125 | 11. 162.650 |
| 4. 150.3375 | 12. 162.675 |
| 5. 150.3625 | 13. 167.475 |
| 6. 155.575 | 14. 167.525 |
| 7. 155.750 | 15. 167.5875 |
| 8. 162.5125 | 16. 167.6625 |

4.4.3 Jenin

| | |
|---|---|
| 1. * 150.2125 | 9. 155.725 |
| 2. * 155.625 | 10. 155.7625 |
| 3. 150.2625 | 11. 162.475 |
| 4. 150.400 | 12. 162.550 |
| 5. 150.4375 | 13. 162.600 |
| 6. 155.5375 | 14. 167.500 |
| 7. 155.600 | 15. 167.550 |
| 8. 155.675 | 16. 167.625 |

4.4.4 Nablus

| | |
|---|---|
| 1. * 150.225 | 14. 155.7125 |
| 2. * 150.350 | 15. 155.7375 |
| 3. * 155.6375 | 16. 155.775 |
| 4. 150.2875 | 17. |
| 5. 150.300 | |
| 6. 150.325 | |

7. 150.375
8. 150.4125
9. 150.450
10. 155.550
11. 155.5875
12. 155.6215
13. 155.700

162.4875
18.
162.5375
19.
162.5875
20.
162.6375
21.
167.4875
22.
167.5125
23.
167.5625
24. 167.600
25.
167.6375
26. 167.675

### 4.4.5 Ramallah

1. * 150.2625
2. * 150.3625
3. * 155.675
4. 150.2125
5. 150.2375
6. 150.3125
7. 150.400
8. 150.4375
9. 155.5375
10. 155.575
11. 155.600
12. 155.625
13. 155.650
14. 155.725
15. 155.7625

16. 162.475
17.
162.5125
18. 162.550
19. 162.575
20. 162.600
21. 162.625
22. 162.650
23. 162.675
24. 167.475
25. 167.500
26. 167.525
27. 167.550
28.
167.5875
29. 167.625
30.
167.6625

### 4.4.6 Bethlehem

1. * 150.2875
2. * 155.700
3. 150.325
4. 150.375
5. 150.4125
6. 150.450
7. 155.550
8. 155.5875
9. 155.6215
10. 155.7375

11.
162.4875
12.
162.5375
13.
162.5875
14.
162.6375
15.
167.4875
16.
167.5125
17.
167.5625
18. 167.600
19.
167.6375
20. 167.675

### 4.4.7 Gaza

1. * 150.3125
2. * 155.725

16. 162.475
17.

162.5125
18. 162.550
3. * 155.7625
4. 150.2125
5. 150.2375
6. 150.2625
7. 150.3625
8. 150.400
9. 150.4375
10. 155.5375
11. 155.575
12. 155.600
13. 155.625
14. 155650
15. 155.675

19. 162.575
20. 162.600
21. 162.625
22. 162.650
23. 162.675
24. 167.475
25. 167.500
26. 167.525
27. 167.550
28.
167.5875
29. 167.625
30.
167.6625

### 4.4.8 Khan Yunis

1. * 150.325
2. * 155.7375
3. 150.375
4. 150.4125
5. 150.450
6. 155.550
7. 155.5875
8. 155.6215

9. 162.4875
10.
162.5375
11.
162.5875
12.
162.6375
13.
167.4875
14.
167.5625
15.
167.6375
16. 167.675

### 4.4.9 Rafah

1. * 150.3375
2. * 155.750
3. 150.3875
4. 150.425
5. 155.5625
6. 162.500
7. 162.525
8. 162.5625

9. 162.6125
10.
162.6625
11.
162.6875
12.
167.5375
13. 167.575
14.
167.6125
15. 167.650
16.
167.6875

### 4.4.10 Jericho

1. * 150.275
2. * 155.6875
3. 150.3875
4. 150.425
5. 155.5625
6. 162.500
7. 162.525
8. 162.5625

9. 162.6125
10.
162.6625
11.
162.6875
12.
167.5375
13. 167.575
14.
167.6125
15. 167.650
16.

167.6875

4.4.11 Hebron

1. * 150.300
2. * 155.7125
3. * 155.775
4. 150.225
5. 150.250
6. 150.275
7. 150.3375
8. 150.350
9. 150.3875
10. 150.425
11. 155.5625
12. 155.6375
13. 155.6625

14. 155.6875
15. 155.750
16. 162.500
17. 162.525
18. 162.5625
19. 162.6125
20. 162.6625
21. 162.6875
22. 167.5375
23. 167.575
24. 167.6125
25. 167.650
26. 167.6875

Notice:

1. The frequencies marked with (*) are assigned for exclusive use by the Palestinian side and can serve for multi-areas networks and for trunking systems.

2. All other frequencies are for use only at the specific area since some of the frequencies are duplicated at various areas in Israel.

3. All frequencies are assigned to be used with BW=2.5KHz and Power=up to 25 watts; all values are in MHz. The frequencies marked with (*) can be used with unlimited power.

5. S.H.F.

5.1 Microwave Links

5.1.1 TV Specific Links

For long distance use at specific locations for TV transmission as detailed below:-

| Location A | Tx Freq (MHz) | Location B | Tx Freq (MHz) | Pol | B.W. (MHz) | Power (dBm) |
|---|---|---|---|---|---|---|
| Ramallah 1 | 7519 | Ramallah 2 | 7680 | II | 34TV | 27 |
| Ramallah 2 | 7624 | Talita | 7463 | V | 34TV | 27 |
| Talita | 7519 | Hebron | 7680 | H | 34TV | 27 |
| Hebron | 7624 | Gaza | 7463 | H | 34TV | 27 |
| Gaza | 7519 | Khan Yunis | 7680 | V | 34TV | 27 |
| Ramallah 2 | 7680 | Nablus | 7519 | V | 34TV | 27 |
| Nablus | 7463 | Jenin | 7624 | H | 34TV | 27 |
| Ramallah 1 | 23G | Ramallah | 23G | V | 34TV | 27 |

The Palestinian side is requested to confirm the above microwave links topology for the TV network.

5.1.2 7GHz Additional Links

The links are for long distance use at any location in the West Bank and the

Gaza Strip for radio, civil networks, Police networks, official networks and other uses. These links can be duplicated in these areas; however, frequency assignment for specific locations should be coordinated through the JTC.

The list of these links at 7GHz band, is:-

| Freq A (MHz) | Freq B (MHz) | B.W. (MHz) | Power (dBm) |
|---|---|---|---|
| 1. 6640 | 6820 | 10 | 27 |
| 2. 6720 | 7060 | 10 | 27 |

### 5.1.3 23 GHz Microwave Links

For short distance exclusive use at any location in the West Bank and the Gaza Strip for any service, the following frequencies are assigned:-

| Freq A (MHz) | Freq B (MHz) | B.W. (MHz) | Power (dBm) |
|---|---|---|---|
| 1. 21255 | 22455 | 28 | 27 |
| 2. 21295 | 22495 | 28 | 27 |
| 3. 21495 | 22695 | 28 | 27 |
| 4. 21610 | 22810 | 28 | 27 |
| 5. 22310 | 23510 | 28 | 27 |

## 6. U.H.F. Trunking

### 6.1 Police and Official Networks

The following sub-bands are assigned at 410 to 450 MHz, for exclusive use for mobile service of Police and official trunking networks, in the West Bank and the Gaza Strip.

1. 414 to 415.5 MHz
2. 424 to 425.5 MHz

### 6.2 Civil and Commercial Networks

The following sub-bands are assigned at 410 to 450 MHz, for exclusive use for mobile services of civil and commercial trunking networks in the West Bank and the Gaza Strip.

1. 412.5 to 414 MHz
2. 422.5 to 424 MHz
3. 428.5 to 430 MHz
4. 438.5 to 440 MHz

## 7. Satellite Services

Frequencies will be assigned upon specific requests, for each station, through the JTC.

## 8. GSM

Mutual participation will be agreed in the JTC according to the planning of each side, and the division of this section of frequencies will take into account the users ratio of each side.

## 9. E.H.F.

As soon as any need arises.

## SCHEDULE 6
### List of Approved TV Channels and the Locations of Transmitters

Pursuant to Article 36, paragraph B.5 of this Appendix:

| Jericho | Channel 24 |
|---|---|

| | |
|---|---|
| Nablus (Mt. Gerizim) | Channel 5 |
| Jenin | Channel 31 |
| Ramallah | Channel 25 |
| Hebron | Channel 30 |
| Gaza | Channel 31 |

## SCHEDULE 7
**Transportation Arrangements**
Pursuant to Article 38, paragraphs 6, 17 and 19 of this Appendix:

Note: To be attached.

## SCHEDULE 8
**Joint Water Committee**

Pursuant to Article 40, paragraph 15 of this Appendix, the obligations and responsibilities of the JWC shall include:

1. Coordinated management of the water resources as detailed hereunder, while maintaining the existing utilization from the aquifers as detailed in Schedule 10, and taking into consideration the quantities of additional water for the Palestinians as detailed in Article 40.

It is understood that the above-mentioned Schedule 10 contains average annual quantities, which shall constitute the basis and guidelines for the operation and decisions of the JWC:

a. All licensing and drilling of new wells and the increase of extraction from any water source, by either side, shall require the prior approval of the JWC.

b. All development of water resources and systems, by either side, shall require the prior approval of the JWC.

c. Notwithstanding the provisions of a. and b. above, it is understood that the projects for additional water detailed in paragraph 7 of Article

40, are agreed in principle between the two sides. Accordingly, only the geo-hydrological and technical details and specifications of these projects shall be brought before the JWC for approval prior to the commencement of the final design and implementation process.

d. When conditions, such as climatological or hydrological variability, dictate a reduction or enable an increase in the extraction from a resource, the JWC shall determine the changes in the extractions and in the resultant supply. These changes will be allocated between the two sides by the JWC in accordance with methods and procedures determined by it.

e. The JWC shall prepare, within three months of the signing of this Agreement, a Schedule to be attached to this Agreement, of extraction quotas from the water resources, based on the existing licenses and permits. The JWC shall update this Schedule on a yearly basis and as otherwise required.

2. Coordinated management of water and sewage systems in the West Bank, as follows:

a. Existing water and sewage systems, which serve the Palestinian population solely, shall be operated and maintained by the Palestinian side solely, without interference or obstructions, in accordance with the provisions of Article 40.

b. Existing water and sewage systems serving Israelis, shall continue to be operated and maintained by the Israeli side solely, without interference or obstructions, in accordance with the provisions of Article 40.

c. The systems referred to in a and b above shall be defined on Maps to be agreed upon by the JWC within three months from the signing of this Agreement.

d. Plans for construction of new water and sewage systems or modification of existing systems require the prior approval of the JWC.

## SCHEDULE 9
### Supervision and Enforcement Mechanism

Pursuant to Article 40, Paragraph 17 of this Appendix:

1. Both sides shall establish, upon the signing of this Agreement, no less than five Joint Supervision and Enforcement Teams (JSETs) for the West Bank, under the control and supervision of the JWC, which shall commence operation immediately.

2. Each JSET shall be comprised of no less than two representatives from each side, each side in its own vehicle, unless otherwise agreed. The JWC may agree on changes in the number of JSETs and their structure.

3. Each side will pay its own costs, as required to carry out all tasks detailed in this Schedule. Common costs will be shared equally.

4. The JSETs shall operate, in the field, to monitor, supervise and enforce the implementation of Article 40 and this Schedule, and to rectify the situation whenever an infringement has been detected, concerning the following:

a. Extraction from water resources in accordance with the decisions of the

JWC, and the Schedule to be prepared by it in accordance with sub paragraph l.e of Schedule 8.

b. Unauthorized connections to the supply systems and unauthorized water uses;

c. Drilling of wells and development of new projects for water supply from all sources;

d. Prevention of contamination and pollution of water resources and systems;

e. Ensuring the execution of the instructions of the JWC on the operation of monitoring and measurement systems;

f. Operation and maintenance of systems for collection, treatment, disposal and reuse, of domestic and industrial sewage, of urban and agricultural runoff, and of urban and agricultural drainage systems;

g. The electric and energy systems which provide power to all the above systems;

h. The Supervisory Control and Data Acquisition (SCADA) systems for all the above systems;

i. Water and sewage quality analyses carried out in approved laboratories, to ascertain that these laboratories operate according to accepted standards and practices, as agreed by the JWC. A list of the approved laboratories will be developed by the JWC;

j. Any other task, as instructed by the JWC.

5. Activities of the JSETs shall be in accordance with the following:

a. The JSETs shall be entitled, upon coordination with the relevant DCO, to free, unrestricted and secure access to all water and sewage facilities and systems, including those privately owned or operated, as required for the fulfillment of their function.

b. All members of the JSET shall be issued identification cards, in Arabic, Hebrew and English containing their full names and a photograph.

c. Each JSET will operate in accordance with a regular schedule of site visits, to wells, springs and other water sources, water works, and sewage systems, as developed by the JWC.

d. In addition, either side may require that a JSET visit a particular water

or sewage facility or system, in order to ensure that no infringements have occurred. When such a requirement has been issued, the JSET shall visit the site in question as soon as possible, and no later than within 24 hours.

e. Upon arrival at a water or sewage facility or system, the JSET shall collect and record all relevant data, including photographs as required, and ascertain whether an infringement has occurred. In such cases, the JSET shall take all necessary measures to rectify it, and reinstate the status quo ante, in accordance with the provisions of this Agreement. If the JSET cannot agree on the actions to be taken, the matter will be referred immediately to the two Chairmen of the JWC for decision.

f. The JSET shall be assisted by the DCOs and other security mechanisms established under this Agreement, to enable the JSET to implement its functions.

g. The JSET shall report its findings and operations to the JWC, using forms which will be developed by the JWC.

## SCHEDULE 10
### Data Concerning Aquifers

Pursuant to Article 40, paragraph 20 and Schedule 8 paragraph 1 of this Appendix:

The existing extractions, utilization and estimated potential of the Eastern, North-Eastern, and Western Aquifers are as follows: Eastern Aquifer:

- In the Jordan Valley, 40 mcm to Israeli users, from wells;

- 24 mcm to Palestinians, from wells;

- 30 mcm to Palestinians, from springs;

- 78 mcm remaining quantities to be developed from the Eastern Aquifer;

- Total = 172 mcm.

North-Eastern Aquifer:

- 103 mcm to Israeli users, from the Gilboa and Beisan springs, including from wells; - 25 mcm to Palestinian users around Jenin; - 17 mcm to Palestinian users from East Nablus springs;

- Total = 145 mcm.

Western Aquifer:

- 340 mcm used within Israel;

- 20 mcm to Palestinians;

- 2 mcm to Palestinians, from springs near Nablus,

- Total= 362 mcm.

All figures are average annual estimates.

The total annual recharge is 679 mcm.

## SCHEDULE 11
### The Gaza Strip

Pursuant to Article 40, Paragraph 25:

1. All water and sewage (hereinafter referred to as "water") systems and resources in the Gaza Strip shall be operated, managed and developed (including drilling) by the Council, in a manner that shall prevent any harm to the water resources.

2. As an exception to paragraph 1., the existing water systems supplying water to the Settlements and the Military Installation Area, and the water systems and resources inside them shall continue to be operated and managed by Mekoroth Water Co.

3. All pumping from water resources in the Settlements and the Military Installation Area shall be in accordance with existing quantities of drinking water and agricultural water. Without derogating from the powers and responsibilities of the Council, the Council shall not adversely affect these quantities.

Israel shall provide the Council with all data concerning the number of wells in the Settlements and the quantities and quality of the water pumped from each well, on a monthly basis.

4. Without derogating from the powers and responsibilities of the Council, the Council shall enable the supply of water to the Gush Katif settlement area and Kfar Darom settlement by Mekoroth, as well as the maintenance by Mekoroth of the water systems supplying these locations.

5. The Council shall pay Mekoroth for the cost of water supplied from Israel and for the real expenses incurred in supplying water to the Council.

6. All relations between the Council and Mekoroth shall be dealt with in a commercial agreement.

7. The Council shall take the necessary measures to ensure the protection of all water systems in the Gaza Strip.

8. The two sides shall establish a subcommittee to deal with all issues of mutual interest including the exchange of all relevant data to the management and operation of the water resources and systems and mutual prevention of harm to water resources.

9. The subcommittee shall agree upon its agenda and upon the procedures and manner of its meetings, and may invite experts or advisers as it sees fit.


## SIDE LETTER

TO: Major General Oren Shachor
Head of the Israeli side of the
Civil Affairs Committee

September 22, 1995

Re: The Signing of a Commercial Agreement with Bezeq, Israel Telecommunications Corp. Ltd.

1. I hereby inform you that the Palestinian side commits itself to enter into negotiations with Bezeq immediately upon the signing of the Interim Agreement for the purpose of reaching a commercial agreement.

2. The commercial agreement between the Palestinian side and Bezeq will be signed within three months of the signing of the Interim Agreement.

Sincerely,

Jamil Tarifi
Head of the Palestinian side of
the Civil Affairs Committee

*Note: This letter will be attached as a side letter to the Interim Agreement.*

Close