# EXHIBIT A.636
## (2 of 3)

Preventive Security H.Q.

Date: 17.5.1999

To:        (Brother)Dirctor of police, Bethlehem District
               May God protect him

National Greeting;

Following instructions from his excellency the President (Arafat), al-Ru'aa
(Shepherds) TV that transmits in Bethlehem District is to be closed, because it
crossed the recognized limits for local stations.

With my revolutionary greetings,

(Your brother)
Colonel Jibreel al-Rujoub
Head of Preventive Security
Northern Governances (West Bank)

George Hazboun, Director General of the Ministry of Interior for Social Relations
in the Bethlehem District, said that the Ministry is aware of the attempts that are
made to stir up disputes between different religions and sects and explained that
the closure of *Al-Rua'a* (**Shepherds)** TV came after employees of the Ministry
had watched a recording of the play "Natreen Faraj" which ostensibly criticised
Jesus Christ. On the other hand, Assistant Deputy Minister of Interior Zakaria
Abdel-Rahim maintains that the Ministry has nothing to do with the closure of
Shepherds TV. Representatives from various religious groups and churches and
institutions from the Bethlehem area wrote to President Arafat requesting him to
reopen the station, stressing that they had not demanded its closure. They also
expressed their disagreement with the Authority's explanation that Christians in
the area requested the closure

*Farah TV ( in the Jenin area) has recently focused directly on the relationship
between the citizens of Jenin and the municipality of Jenin through providing
live coverage of the peoples' daily problems, including fluid and solid waste in
the streets and administrative problems. The TV station has prepared several
reports on this subject, but we were astonished about the position of the
municipality's representative, who said: " Farah TV is opposed to the
municipality and to the Mayor: there was a plan to harm the reputation of the
municipality". This stance has made us rethink and change our programmes
as we feared that officials might take action against us. The municipality
could, for example, carry out an inspection and make life difficult for us.*

**PHRMG interview with Fathi Saeed Hussain al-Natour, 32 years of age,**

*married, journalist from Jenin and Director of Farah TV.*

On the 16 & 17 February 1998, eight television stations were closed by the Ministry of Information on the grounds that they had violated some of the rules and orders related to their work. The Head of Police, General Ghazi Al-Jabali, has issued an order to all police directorates ordering that all proprietors of television stations should sign a commitment confirming that "they would respect the national interest and that there should be no reporting on rallies, demonstrations or on any news that might affect stability and that there should be no screening of flag-burning". He also stipulated that any stations not implementing this commitment would be closed down. *(Al-Quds newspaper, 18 February 1998)*. Nevertheless, these stations were reopened on 18 May 1998.

On 16 February 1998, the Ministry of Information had already issued a decision ordering all private radio and television stations working within the Autonomous Palestinian Areas no to "transmit any news or comments made by Palestinian officials related to developments in the Iraqi crisis and only to cover international news without comment".

*From the annual report of the PHRMG*

*8. Is there Israeli interference in the work of these stations?*
As a consequence of failing to accept the Palestinian share in the use of the air waves and frequencies, Israeli settlers also use these air waves and thus interfere with the work of the stations. Not only does this force stations to change frequency but it also prevents the Authority from issuing permits as it cannot decide on which frequency the station will run.

*" We used to transmit on an authorised wave-length, until they [the Israelis] established a supporting station in Bizgat Zaev settlement which destroyed our transmission. We had to change frequency, which meant that we had to purchase new equipment. It took us some time to transmit, which meant that we lost some of our viewers".* **PHRMG interview with Omar Nazzal, Director of Watan TV**

There is also Israeli pressure on the PA to close down stations directly or indirectly opposing Israeli interests. As an example, the Head of the Israeli army in the West Bank, Brigadier Ishaq Eitan, had asked the leader of the Palestinian national forces in the West Bank, Haj Ismail Jabr, to close down the eight television stations in February 1998 on the grounds that they transmitted news and pictures of demonstrations and flag-burning during the Iraqi crisis. When these two men met in the coordination office in Bethlehem, Haj Ismail Jabr expressed understanding of the Israeli position. *Al-Quds newspaper, 18.2.1998*

*Does the law regulate private stations?*

There is no law on the audio-visual media, but according to an administrative memorandum issued by the Minister of Information, the Palestinian press law of 1995 is considered to be a reference point for dealing with private stations. Legislation on this matter is not possible before an agreement has been reached regarding the Palestinian share in the airwaves and before such details have been registered with the International Telecommunications Association.

*PHRMG interview with al-Masri*

The following are some of the problems that have arisen because of the absence of such a law:

-       Permits issued for these stations are time bound (for a short period of time)

-       There has been interference by Ministries in each other's work;

-       There has been interference by the security services in the work of these stations with the imposition of broad red lines depending exclusively on the mood of the security official in a given area; when such limits have been exceeded, the station has been closed down.

*Why is there no private station in the Gaza Strip?*

There is no private radio or television station in the Gaza Strip. It appears that he Authority is set on maintaining the official Palestine radio and television as the only functioning stations in the Strip. PHRMG therefore contacted Maher al-Masri in the Ministry of Information who refuted such an assertion. PHRMG also contacted one of the citizens who had applied for a permit to open a private television station in the Gaza Strip.

*"We have not taken any official decision preventing the opening of stations in the Gaza Strip and we are ready to review any application presented to us and to take the correct decision if the conditions are fulfilled"*                 ***PHRMG
interview with Maher al-Masri***

The PHRMG has learnt that a person from Gaza Strip applied in June 1999 to establish a private TV station in the Gaza Strip: in October 1999 he has still not received a response.

*Abuses committed against Palestinian journalists:*

Abuse of Palestinian journalists for crossing the red line has varied in its nature and intensity. The 50 violations committed between 1994 and 1999 recorded by the PHRMG were of the following nature:

| | |
|---|---|
| - Injury from gun shooting | 2% |
| - Beatings | 12% |
| - Breaking or confiscation of cameras | 6% |
| - Confiscation films or videos | 8% |
| - Summoning, stopping or detaining | 68% |
| - Raiding offices and confiscation of contents | 6% |
| - Closure of offices | 12% |
| - Signing commitments for the future | 12% |
| - Confiscation of press and / or personal IDs | 4% |

These abuses were not limited to one security service but were committed by several organs: the police, General Intelligence, National Security and Preventive Security. We would stress that two thirds of these violations took place in the Gaza Strip and that the police forces are responsible for a total of 38% of all abuses.

**Parties responsible for abuse in percentage terms**:

| | | |
|---|---|---|
| - The Police | 38% Gaza | 4% WB |
| - General Intelligence Service | 22% Gaza | 4% WB |
| - Preventive Security Service | 6% Gaza | 8% WB |
| - National Security Service | 2% Gaza | 6% WB |

Yearly breakdown of the 50 recorded violations in percentage terms:

| | |
|---|---|
| 1994 | 6% |
| 1995 | 12% |
| 1996 | 30% |
| 1997 | 20% |
| 1998 | 24% |
| 1999 | 6% |

There are no signs indicating an improvement in the situation. Abuses reached their highest level in 1996, fell in 1997, increased in 1998 and dropped a little for the first 9 months of 1999. Yet the question remains: are these figures indication enough or have past abuses led to increased self-censorship with a view to avoiding the Authority's interference altogether?

## Violations and Abuses committed by the Palestinian Security Services against journalists

**22 May 1999**

The criminal intelligence in Gaza arrested the writer of an article and the Chief Editor of al-Risala newspaper for publishing a report on the torture of a citizen in a Palestinian prison.

**9 March 1999**

A unit from General Intelligence broke into the house of journalist Fayed Abu-Shammala and confiscated videos, documents and press material. This was not the first time that Abu-Shammala has been abused: security guards at the entrance to the Presidential office had prevented him from entering to cover news in September of 1998 without providing reasons.

PHRMG interview with Abu-Shammala

**8 March 1999**

Men from the General Intelligence shot at the press office of Abdel-Salam Abu-'Askar, broke into it and attempted to smash one of its doors.

**December 1998**

Members of the Palestinian Police arrested eight journalists from the Gaza Strip, after they had covered a march organized by the Popular Front. During the march, American and Israeli flags were burnt in protest against the American-British aggression against the people of Iraq. The PA also closed television stations and local radio stations, claiming that the former had screened marches in which flags were burnt and that such screening would harm Palestinian national security. One the same day the PA closed down three press offices working for Reuters, Associated Press and the Cinema Production Centre. Journalists arrested for several hours reported that their cameras had been confiscated and that two of them had been beaten by the police. The following day, the offices were reopened.

*December 1998*

Members of National Security confiscated Ja'far Ishtayeh's camera on the grounds that he had been filming a march in support of political prisoners in the Juneid detention center.

**23 November 1998**

During the signing of the Wye River Memorandum, police forces blocked the roads leading to the house of Sheikh Ahmad Yassin, the spiritual leader of Hamas. The police detained eleven journalists working for foreign agencies who were present at Sheikh Yassin's house, because of their intention to record television interviews with him. They confiscated all cameras and films and told them that they required prior authorisation from Criminal Intelligence if they intended to conduct such interviews.

*18 November 1998*

The Political Security Department of the Palestinian Police in Gaza summoned Dr. Hamad, the Chief Editor of the weekly al-Risala (the Message). The paper reflects the point of view of al-Khalas (Salvation Party). The Police raised the matter of his paper's publications, which it described as "hot" and warned him indirectly that he should take care to avoid such "hot" subjects.

### 13 September 1998

Saber Noureddin, a journalist who works as a correspondent for the "France Agency" in Gaza was summoned by the police and detained for ten hours. The day before he had been prevented from filming a rally organized by Hamas. After refusing to hand over his camera and the film, both his personal and professional identification cards were confiscated by the police

### 29 August 1998

A group of policemen heavily beat the journalist Muneer Abu Rizeq, the editor of *Al-Hayat Al-Jadida* newspaper, using weapons, fists and feet. His tape recorder and glasses were also broken. The grounds for this action was his presence at the Military Court in Gaza attending the trial of the two brothers Mohammed and Majdi Ibrahim al-Khaledi.

### 25                           August                              1998

Members of the Preventive Security Service (PSS) beat a photographer from *Al-Hayat Al-Jadida* newspaper, Naser Naser, who was subsequently taken to hospital. The PSS confiscated his camera and broke a second one belonging to journalist Majed al-Arouri. The beating and confiscation took place because the two journalists had refused to stop filming a sit-in by human rights organizations outside the house of the martyr Imad Awadallah: the Palestinian Security Services had surrounded his house and had prevented the Awadallah family from leaving it. It is worth mentioning that the police refused to record the complaint Naser Naser made against the PSS and told him that they would only do so if it were made against an unknown party.

### 20 July 1998

The journalist Ahmad Khalil al-Mashharawi, 27 years of age, was summoned by the Intelligence Service because of a photograph he had taken of the (suddenly) bald journalist Majdi al-Turk: the security service had shaven his head. The person who interrogated him asked him: "In whose interest was this photograph taken?"

### *14 May 1998*

Members of the National Security heavily beat journalist Imad al-Ifranji, who works as a correspondent for al-Quds newspaper, whilst he was covering

clashes between Palestinian youngsters and Israeli occupation forces near the *Ghosh* *Qatif* settlement in Gaza Strip.

**5 May 1998**

Two members of the General Intelligence Service arrested journalist Abbas al-Momani from a press office in the Tannous building in Ramallah. Without presenting him with an official warrant or a detention order, they asked al-Momani to accompany them. On 10 May, al-Momani escaped from prison after having been tortured but was arrested again the same day. He was finally released on 14 May after committing himself verbally not to mention the incident to anyone.

**9 April 1998**

The Palestinian police's criminal investigation unit arrested the following Reuters correspondents in Gaza: Taher Shreiteh, Nidal al-Mughrabi, Ahmad Jaddallah, Shams Shana'a and Soudah Abu-Seif. All five were asked to sign an undertaking not to work again and not to cause disputes and troubles. All five refused. Following the intervention of Zakaria al-Talmes, the Head of the Journalists Association in Gaza, on the morning of 10 April 998, it was agreed that the journalists would undertake to be careful and precise in their work and that when reporting news they would respect the Palestinian press law.

**17 March 1998**

Criminal Intelligence prevented journalist Abdel-Rahim al-Qusseini (AP) and his colleague Abdel-Rahman Khabeisseh (WTN) from filming a women's sit-in in front of the Nablus Governance office, which had been organised in support of Palestinian prisoners in Israeli and Palestinian prisons.

**17 March 1998**

The Preventive Security Service in Gaza detained Dr. Ghazi Hamad at the *"Tal al-Hawa"* detention center, because of an article he had written in *al-Istiqlal* (Independence) newspaper about the relationship between the PA and Palestinian citizens. He was released on 27 April 1998 without having been brought to trial. His release was not authorised by the Attorney General. Dr. Hamad, who was tortured during his arrest, said: "They read my articles on the relationship between the citizen and the security services and beat me heavily with wires".

**7 March 1998**

Security Services arrested journalist Nawaf al-'Amer (Nablus Press Office).

*20 February 1998*

Members of National Security arrested journalist Nasser Ishtayeh and his brother Ja'far, both of whom are reporters for two foreign agencies, on the grounds that they had filmed both a march in Balata camp in support of Iraq as well as the burning of Israeli and American flags. All the footage was confiscated. Both journalists were released after two hours following intervention by their agencies.

### December 1997

Members of National Security beat the journalist Ja'far Ishtayeh and detained him for six hours on the grounds that he had filmed a march in support of Iraq. He was asked to sign a commitment not to film scenes depicting incitement to violence, nor the burning of flags.

PHRMG        interview        with        Ja'far        Ishtayeh

On the same day, a police force broke into the Reuters office in Gaza and announced its closure for a period three months. The cause? The release of a film showing an interview with Adel Awadallah who is still accused by the Authority of taking part in the assassination of Mohey-eddin al-Sharif. The office was        reopened        on        15        April        1998.

### 26 October 1997

The journalist and human rights activist Khaled al-'Amayreh was arrested by Preventive Security in Jericho after he had published a report in the weekly newspaper Sawt al-Haq wa al-Horiyeh (Voice of Rightfulness and Freedom) - published inside the green line - on the torture of Hamas detainees. He was released the following day after midnight.

### 30 May 1997

Members of Criminal Intelligence arrested the journalist Maher Farraj after ten at night and took him to police headquarters in Gaza. After one hour he was taken to the office of Colonel Talal Abu Zeid and was asked not to publish anything potentially provoking the PA. Colonel Zeid apportioned him with the responsibility for the publication of an article written by Dr. Ayoub Otman from al-Azhar University, entitled "On the Margin of the Report by the Monitoring Committee", an article the Colonel considered as constituting incitement against the PA. He added that Mr. Farraj, as director of the newspaper, should not publish such an article. Farraj was detained until 4 am.

### 4 December 1996

The journalist Maher Farraj was summoned to the Intelligence Service in Gaza where he was asked by Colonel Mohammed al-Masri to present all reports to him before publication in al-Bilad (the Country) newspaper.

### 11 November 1996

A group of journalists were arrested and their films confiscated after they had covered a march organised by the Popular Front for the Liberation of Palestine (PFLP) following a military attack committed by the Popular Front near the village of Surda, Ramallah. The journalists lodged a complaint with President Arafat and were released. *"We understood that the President reacted positively in the favor of the journalists"* said Majed al-Arouri, one of the journalists.

**9 September 1996**

The journalist Maher Farraj was summoned to the Ministry of the Interior in Gaza by the Director of Public Affairs, Omar, who asked him not to publish anything on the al-'Ahd (the Oath) political party, a party affected by internal disputes.

**19 June 1996**

The journalist Maher Farraj, 32 years of age and director of al-Bilad (the Country) office in Gaza, was summoned to the Preventive Security headquarters where he was questioned by captain Ibrahim Abu el-Sheikh about a report published in the newspaper entitled "A thousand Shekels is the price of a permit for lorries to Gaza" and asked him to give him the source of the story. Farraj was summoned on a daily basis for one week, ending on 27 June 1996. His ID was taken away for two days for answering back to insults made against him by Abu el-Sheikh. His card was returned after the intervention of the Journalists Association in Gaza.

**14 May 1996**

Three members from the General Intelligence Service broke into the Office of France Agency (AFP) in Gaza City and arrested the journalist Fayez Ibrahim Noureddin on the grounds that he had published a photograph of some youngsters pushing a donkey into the sea, with the phrase " Specialised in Donkeys!" written below the photo. Mr. Noureddin took the photo, but it had not been him who had added the phrase. Yet it is clear that his arrest followed an accusation that he had added the commentary. During his arrest one of the three persons who arrested him tied his hands behind his back, whilst the other two covered his head with a bag and pushed him violently into their vehicle. They put him on the floor of the car, kicked him heavily with their boots and insulted him. This behaviour continued until they reached their headquarters (al-Saraya) where one of them took off his boot and beat Noureddin with it. He then grabbed him by his neck and told him to curse himself.

After beating him for half an hour, they placed him between the metal door of the cell and the wall and pushed him violently. They then pushed him into the cell, and ordered him to stand with his arms in the air for two hours. They then brought a book and a pen and asked him to write his autobiography. He was taken to an interrogation room where three officials questioned him about the photograph and the person who had forced him to take it. He was asked whether he worked for French Intelligence, but Fayez refused to answer any questions: he believed that it was the Ministry of Information or the Journalists Association

who had the right to question him and not the General Intelligence. He was finally asked to sign a commitment, which he did, whilst also telling his interrogators that he would lodge a complaint against them. Their response? "If you say one word, we'll punish you". He was released at 9 pm. An official from the Preventive Security Service contacted Fayez on the same day the photograph was published and asked him to come to their premises. Fayez refused and said that if they wanted to see, they should obtain an official summons from the Attorney General.

**30 March 1996**

The Security Services abused and beat the following Nablus journalists with clubs: Abdel-Rahman Khabeiseh, Hussam al-Qadah (al-Nahar correspondent) and Abdel-Rahim al-Qusseini.

**7 March 1996**

The journalist Muhsen al-Ifranji, 29 years of age, was arrested by members of the General Intelligence Service at his house in Gaza at around 10 pm. He was questioned about essays and articles he had published in al-Quds newspaper and was asked to sign a commitment not to harm the PA's interests. Al-Ifranji was badly treated during his detention. Whilst being taken to an interrogation room, his head was put in a bag and his hands were tied behind his back. He told the PHRMG: "For 7 days I was alone in a cell and was interrogated three times a day, mainly at night. I was threatened. I had never expected to be put in such a position. I wish they would allow us to do our duty without suffering such abuse".Muhsen's detention lasted for 21 days. He was not charged and was not presented before a judge. No legal action was taken and he was released on 28 March 1996 .

**6 March 1996**

Palestinian Security Services prevented journalists from filming a student march organised by Hamas in Nablus and broke into the house of journalist Hassan al-Titi (Reuters) in order to confiscate footage of the march.

**27 February 1996**

'Ala Saftawi was arrested by a police force after midnight because of his editorial article that had appeared in the 16 February 1996 edition of al-Istiqlal (Independence) newspaper, entitled "Oath and Responsibility". The article spoke about the deteriorating security situation. During the interrogation, the police claimed that the article disrespected the President's personality. Saftawi told them: "I never meant to disrespect the President. All I wanted to do was discuss the deteriorating security situation and to warn people about it". He was detained for three days.

in 1996 the journalist (F.A) was summoned by Preventive Security following a report on the release of Hamas detainees from Palestinian prisons. He was asked by captain Ibrahim Abu-el-Sheikh as to how he had received information for that report. He was detained for five hours. The next day he was called in again by the same security service in "Tal el-Hawa" and was questioned about the same report. "They told me that it wasn't right to publish everything". He was released after one and a half  hours.

### 24 February 1996

A member of the police beat the journalist Nasser Ishtayeh, insulted him and smashed his camera on the grounds that he had been filming the transfer of caravans into "Yousef's tomb" in Nablus. This incident occurred during the disturbances triggered by the opening of the tunnel near the al-Aqsa Mosque. The policeman's security unit claimed later that the policeman's actions were justified because he had wanted to prevent Nasser Ishtayeh from entering a closed military area. Nasser told the PHRMG: "I discovered later that the site wasn't a declared closed military area and that the decision to prevent me from filming was taken by the policeman himself. I therefore filed a complaint against him at the governing office and was told later that he had been detained for 48 hours".

### February 1996

**A unit from "Intelligence, Police and Preventive Security" detained a journalist from Jenin for a period of six months without bringing charges or bringing him to trial. He was interrogated about his relations with Hamas and about his correspondence with Islamic newspapers. "They were tough, rude, used insulting language and made me stand in a specific way (shabeh) for more that three hours.        PHRMG interview February 1996**

A unit from "Intelligence, Police and Preventive Security" detained a journalist from Jenin for a period of six months without bringing charges or bringing him to trial. He was interrogated about his relations with Hamas and about his

correspondence with Islamic newspapers. "They were tough, rude, used insulting language and made me stand in a specific way *(shabeh)* for more that three hours.        *PHRMG interview*

### 8 October 1995

The journalist Mohammed Taher el-Nounou was summoned to General Intelligence offices (al-Saraya) by the official Ayman al-Kafarneh. Before responding to the summons, he passed by the Ministry of Information and told them of the matter. He subsequently went to al-Saraya and met al-Kafarneh who asked him firstly about his source of information regarding Hamas' communiqué on the delegation mediating between the PA and Hamas and secondly about its content, which had maintained that the delegation did not really represent Hamas. The report in question had been published in al-Nahar newspaper and had given al-Nounou as the source in Gaza. After some rounds of questioning, al-Kafarneh asked two men to blind-fold his eyes and he was pushed into a cell where he remained for two days. Al-Nounou told the PHRMG: "They used to let us out three times every day only for the purposes of relieving ourselves". On the morning of 10 October 1995, they questioned him again whilst he was still blind-folded and beat him. He was then taken back to his cell and then to the office of the ex-Attorney General Khaled al-Qidrah. The latter asked him "not to be a trouble-maker and not to attack the PA". He was then released.

### August 1995

A gun was shot at the University Lecturer Dr. Abdel-Sattar Qassem after he had published an article in *"al-Watan"* (the Homeland) newspaper in which he criticised President Arafat and the PA. The article was entitled "Democracy in the Shadow of the President" and argued that the President did not accept individuals disagreeing with him or refusing to follow his orders.

*It is not possible for a journalist to exercise his proper role in the media, unless his material and social rights are guaranteed and unless he receives all the suitable protection he requires. The Palestinian media is not directed and the evidence shows that the Ministry of Information has licensed a large number of press establishments.* Tawfeeq Abu-Shomer, Director General of the Press Department in the Ministry of Information, in al-Quds newspaper on 1.4.1999.

On 21.5.1996, the Palestinian Journalists Association sent an open letter to members of the Palestinian Legislative Council saying: "We, the Palestinian journalists, continue to suffer whilst trying to obtain news and official information from our PA and from political parties. We continue to discover that some officials, ministers and leaders, or those below them, prefer to speak only to foreign or even Israeli reporters ". They add: " We document hereby that the various Security Services have arrested or abused more than 25 journalists for reasons related to their work. We have found that in most of the cases, such action was in no way justified to the extent that some people nowadays avoid working directly with the press whilst others prefer to work secretly for the local security services in order to obtain news: this is often harmful to our PA".

The Security Services confiscated the weekly magazine of the "Fatah" movement al-Sahl al-Falastini (The Palestinian Plain) because its carrying of an article critical of the Palestinian police. They also arrested the author of the article, Zaki al-Kilani.

12 July 1995

Colonel Mohammed al-Masri from General Intelligence summoned journalist Imad al-Ifranji who worked for al-Quds Press agency. He interrogated al-Ifranji for five days about a report that he had published. During the interrogation his head was put in a bag and finally he was forced to sign a commitment that he would never disobey the PA. Failure to do so would lead to tough punishment. Colonel al-Masri threatened to speak with the director of the al-Quds Press agency as soon as the PA had moved into the West Bank. He added that the arrest of al-Ifranji was to be seen as a message to his agency. The agency should now be aware as to which type of reports to publish. Al-Masri also threatened Imad by telling him that he would personally be held responsible for any negative report published in Gaza.

The office for Institutional Security with the General Intelligence Service in Gaza prevented journalists from the al-Hayat al-Jadida newspaper from being transferred to the General Employees Department. Among those was Hassan Douhan, 24 years of age, who had been with the newspaper for three years; Mustafa Sheikh el-Eid, 29 years of age, who had been with the newspaper for four years as head of the computer section; and the journalist Sameer Hamto, 30 years of age, who had been with the newspaper for four years. All four presently receive separate salaries from the newspaper, without benefiting from contracts, rights or insurance.

A decision was taken in December 1997 to transfer 18 employees from al-Hayat al-Jadida to the General Employees Department. The Institutions Security Office, headed by Colonel Abu Hasan 'Ajweh, excluded these four journalists from this transfer. The likely reason? Their suspected affiliation with the Islamic trends.

14 May 1995

Palestinian police closed down the premises of *al-Watan* (the Homeland) newspaper, following a decision of the State Security Court. The newspaper was prevented from appearing and one day after its arrest, a decision was taken to imprison its Editor-in-Chief Sheikh Sayed Abu-Musameh for three years on the grounds that he had published articles of an inciteful nature against the PA. A judgment in absentia was also handed down against the Editor, Dr. Ghazi Hamad, condemning him to two years imprisonment. Both judgements were not executed and Sheikh Abu-Musameh was released after eight months following a deal between the PA and Hamas.

*PHRMG interview with Dr. Ghazi Hamad*

February 1995

The following six employees from *al-Istiqlal* (the Independence) newspaper were arrested by Palestinian Intelligence: Editor-In-Chief 'Ala Saftawi, 'Atiyeh Abu Mansour, Khaled Sadeq, Zakaria al-Madhoun, Mohammed Fayyad and Nahed Kutkut. Saftawi was released after 23 days. The others remained in prison for three months.

*October 1994*

The General Intelligence Service in Gaza detained journalist Taher Shreiteh, who

works as a reporter for Reuters, for six days, on the grounds that his agency had

distributed a film on the kidnapping of the Israeli soldier Nahshon Vaxman. The

Reuters correspondents in Gaza, Shams Odeh, Sawwah Abu-Seif and Ahmad

Jadallah, were also arrested and released the same day.

April 1994

Members of Force 17 arrested the journalist Imad al-Ifranji, who at the time worked for the al-Quds Press agency, and searched his house from where they took two fax machines and a video. They interrogated him in al-Saraya for more than half an hour and took him to a military camp in Jabalya dealing with Presidential security, where they questioned him about his profession. He was taken back to al-Saraya after two days, where he stayed for a further two days. Imad told the PHRMG: "They released me after one am. I asked about the reason for my arrest but they would not say".

## Incitement

Less than one month after the signing of the Wye River Agreement, President Yasser Arafat issued a special presidential decree on incitement on 19 November 1998. Subsequently, a Palestinian-American-Israeli committee, the Committee for the prevention of incitement, was formed. Its role is to monitor cases of incitement and to issue special reports and recommendations. The Wye Memorandum, signed on 22 November 1998, stipulates in its Article 3 that such a decree be issued and that such a committee be formed:

" A. Drawing on relevant international practice and pursuant to Article XXII (1) of

the Interim Agreement and the Note for the Record, the Palestinian side will issue a decree prohibiting all forms of incitement to violence or terror, and establishing mechanisms for acting systematically against all expressions or threats of violence or terror. This decree will be comparable to the existing Israeli legislation       that       deals       with       the       same       subject.

A)   A U.S.- Palestinian - Israeli committee will meet on a regular basis to monitor cases of possible incitement to violence or terror and to make recommendations and reports on how to prevent such incitement. The Israeli, Palestinian and U.S. sides will each appoint a media specialist, a law enforcement representative, an educational specialist and a current or former elected official to the committee."

This decree  is illegal and seeks to justify the curtailing of freedom of thought and expression. Its language consists of flexible phrases, which may be interpreted in different ways.

The decree itself stated that
"the following acts are considered illegal in all the Palestinian governances: inciting racial discrimination, encouraging violent actions that are against the law, showing disrespect for different religions, using violence or inciting the use of violence that harms relations with brotherly and foreign states, forming illegal societies that commit or incite the committing of crimes, stirring up the masses to change matters by illegal use of force, incitement to sedition and incitement to breach agreements between the  PLO and brotherly or foreign states".

**Why is the presidential decree on incitement considered  to be illegal?**
The preface of the presidential decree on the prevention of incitement states

|after referring to the constitutional and legal rules in force, to law # 5 for 1995 dealing with powers and legislation, to the penal law # 74 of 1936 and to its amendments, to the penal law # 16 for 1960 in use in the Palestinian Districts of the West Bank, to the PLO Code of 1979 and to decision # 1 of 1994 on the applicability of rules and orders in use prior to 5 May 1967 in the Palestinian Territories …".

It is clear that the President bases the legitimacy of this decree on all applicable laws in force prior to 1967. However, on the basis of our research and the conclusions of the workshop organized by the al-Haq organization on legislation aimed at preventing incitement, it is clear that Article 28 of the 1962 Gazan constitution confers responsibility for the issuing of laws exclusively on the Legislative Council. The Executive Authority may only issue laws in emergency cases when the Legislative Council has not been convened. Article 28 provides that

"if circumstances require the drawing up of urgent arrangements that cannot be postponed, then the Executive Council may issue decisions with the force of law related to such circumstances. These decisions must be presented to the

Legislative Council when it convenes and are to be considered valid unless the Council decides to annul them".

When the President issued the decree on 19 November 1998, the Legislative Council was in session. Consequently, the decree violates the contents of its own preface (Article 28 of the 1962 Constitution) and is to be considered illegal.

## The Triparty Committee on Incitement: its function and some of the problems is faces

In accordance with Article 3B of the Wye River Memorandum, it was agreed to form this committee. The Palestinian side of this committee is headed by President Arafat's advisor Marwan Kanafani. The task of this mission id limited to monitoring cases of incitement and the issuing reports and recommendations on the matter.

Some of the basic obstacles this committee faced included the definition of incitement. After both parties were unable to agree on a solution, the American party successfully presented the solution of judging each incident on its own merits. This solution derives from the American Supreme Court in which one of the justices remarked "… I know incitement when I see it".

The dispute concerning the definition of incitement was caused by two factors:

a)   Whether only actions could give rise to incitement or whether words could also qualify. The Palestinian argued in favour of actions only, whereas the Israeli side   insisted   that   incitement   could   also   be   verbal.

b)   Whether the source of the verbal incitement could be official or also unofficial. The Palestinian side argued in favour of only the former, whilst the Israeli side argued that the nature of the source was irrelevant. (As recorded by Marwan Kanafani, the Head of the Palestinian side to the Committee On Incitement, during the workshop "Legislation preventing incitement and ambitions to build a democratic system", organized by al-Haq on 17 February 1999)

At present, the work of the committee is limited to the exchange of complaints. For instance, the Israeli side would accuse Palestinian radio or a Palestinian of having transmitted information on a particular matter and the Palestinian side would   respond   in   kind.

Testimony of Kanafani during the al-Haq Workshop of 17 February 1999

### How does the Presidential decree and the special committee on incitement affect   press   freedom?
The Presidential decree had both obvious and less obvious consequences on the local press. Concerning the former, there has clearly been an increase in violations and abuses against journalists who write about, meet with or show interest in the political opposition, and in particular with regard to opinions critical of the U.S., Israel and the peace process. Some of the more hidden consequences include an increase in self-censorship among journalists, leading

almost inevitably to an uncritical reporting of the official point of view. Thus journalists hope to avoid questioning or the closure of their press agencies.

The very first of the abuses taking place pursuant to the Wye River Agreement was the arrest of eight individuals who were on their way to the house of Sheik Ahmad Yassin to conduct some interviews with him. Amongst the violations following the issuing of the Presidential decree features the closure of some television stations on the basis that they covered the American-British aggression against Iraq. The major negative aspect of the decree was its ambiguous use of language and its lack of definition of the term "incitement". This gave the Authority the opportunity to use the decree at any time to suppress freedom of expression.

"… and consequently this decree will remain a word directed towards the Palestinian media - visual, heard and written - with the result that political freedom will deteriorate. The decree will turn the media into mouthpieces that will repeat the views of political or security officials; if it does not do so, the media will be closed and its employees will be imprisoned or made redundant, which will in turn create other unforeseeable difficulties".

> View of Tayseer al-Zobri, Director of the Palestinian Media Establishment, al-Haq Workshop of 17 February 1999

**Are their any special laws preventing incitement in other countries? Does the Presidential decree respect international human rights standards?**

There are laws concerning incitement in many parts of the world, although these laws are not singled out by the legislator and generally form part of a state's penal law.      (As an example, incitement to avoid paying taxes is a crime, as provided for under tax laws.)

> Dr. Amin Mekki, First technical advisor to the UN Commission office in al-Haq Workshop of 17 February 1999

The penal law of 1936 applicable in the Gaza Strip, to which the Presidential decree on incitement refers, includes provisions for crimes that include an element of incitement. An example is provided by a number of offences relating to public order: incitement to riot or mutiny in the armed forces, incitement to the stirring up of disputes between religions and races, incitement to civil war and incitement to spreading of false news.

The 1936 law is inconsistent with human rights principles, because it was designed primarily to endorse the Authority of the King and of the High Commissioner. It is a law that clearly requires revision.

## Television and Radio Stations:
### caught between reality and ambitions to develop
By Omar Nazzal, Director of Watan TV - Ramallah

### Establishment and expansion

During the Israeli occupation of Palestinian cities since 1967, the Israeli Authorities released permits for a number of local television stations in cities north of the West Bank, after other Arab cities in the triangle had been given such permits. These other Arab cities had managed to develop television broadcasting, both in cities occupied in 1948 as well as in other Palestinian cities, on a large scale.

when the Israeli military redeployment from Palestinian land was executed, the Palestinian Ministry of Information supervised television broadcasts and paved the way for the establishment of a number of other stations in the West Bank by granting them authority to broadcast television and radio material under limited conditions. Insodoing, the number of these stations peaked at 40, although districts in Gaza were refused such a permit, despite the large number of applications made.

### Other Experiences

As a result of the above development, the Palestinian National Authority (PNA) became the third Arab country (after Lebanon and Iraq) to permit the existence of private television and radio stations.

In Lebanon, more than 50 television and radio stations - most of them belonging to factions and political figures and forces - were established as a result of the political chaos during the previous 20 years. Over the past two years, the Lebanese government has been seeking the reorganise the sector and has approved a law decreasing the number of operating stations and limiting the freedom of expression of those that remain.

In Iraq, there is only one non-governmental station known as al-Shabab TV (Youth TV) that is run by Odai, the son of President Saddam Hussein.

Over the last few years, many private Arab satellite stations, operating from European capitals, have been established. In some sense, these stations belong to the Arab countries they represent.

In the West, there is no such thing as a government-run media and a developed and effective private media exists in its place. Even though there is no such thing as a Ministry of Information in the US, federal law prohibits the government from owning the media or influencing it in any way.

### Differences between Palestinian Stations

One cannot consider the various private stations in Palestine to be similar. Some differences are more significant than others. The most significant may be summarized as follows.

## 1.    The media message

Some stations set themselves clear goals as to the message they wish to convey. They achieve these goals via their private programmes and news coverage, including through programmes transmitted via Arab Satellite. Other stations do not seek to convey particular messages and only redirect programmes from Arab Satellite stations. The local programmes that these stations broadcast, are nothing more than games and personal dedications which lack creativity and meaning.

## 2.    National and social orientation

Related to the first point, some stations function in order to fulfill (or to contribute to the fulfilment of) national goals as well as to the building of Palestinian society by deepening outlooks and through the fostering of positive social relations (and the rejection of negative ones). In addition, these stations play a national role by exposing violations committed by Israel and by facing the Israeli media and its provocative campaigns. Other stations are completely absent, working intentionally or unintentionally for the deepening of social negativity and for a decrease in development.

## 3.    The technical level

Broadcast is in itself an easy and inexpensive method. Methods include the necessary means to transmit the sound and picture in a way that is straightforward for the viewer to grasp. The difference here only appears in terms of the geographical area desired by the broadcasting stations. All stations suffer from poor technical support. The technical equipment used is not adequate for effective television broadcasting. This situation is mainly related to the instability of these stations, an issue discussed later in this article. A number of these stations lack the most basic technical support, whether it be the instruments used for production and broadcast premises or the safety of the location.

## 4.    Employees

This is one of the most important and obvious points of weakness or strength. Employees in stations vary from the staff consisting of only the owner and his family members (including his children), through stations in which the level of education of its employees does not exceed high school-level, to those where employees are educated and qualified for technical and media work.

## 5.    Commercial advertising and income

Even in commercial advertising, there is a considerable difference between stations, whether these concern production, broadcasting, set prices or competition. There are rules and regulations regulating advertising stipulating that the length of a commercial should not exceed 60 seconds and providing that commercial advertising should not exceed 8 minutes per hour of broadcast. Commercials are also to be clear and original. There are other rules binding the party wanting to advertise and the party producing the advertisement. There are companies that specialise in commercial advertisement, whilst the role of television stations is only limited to the broadcasting of these advertisements. None of the stations follow this particular rule. In addition, some stations have obtained and still receive illegal funding in return for the production and broadcast of programmes in favour of the party providing the funds.

### Broadcasting wave-lengths

Stations have faced and are still facing a serious problems, because of the lack of available waves that may be used free from interference by other waves. This problem is primarily related to the agreements made with Israel and with the agreement and coordination with the International Communication Unity (ICU).

The Taba Agreements gave Palestinians the right to use six television wave-lengths whilst leaving the door open for the use of further wave-lengths. The six wave-lengths were used by Palestinian television. Yet there was still interference by Israel and other actors. To-date, the Palestinians have been unable to obtain more wave-lengths, despite the fact that there is a desperate need for additional transmission. The negotiating committee that in charge of communications has sought permission for additional broadcasting possibilities, but to no avail. This and other committees have faced a great deal of inertia on the part of the Israelis concerning the application of the agreement. This is compounded by interference with transmission frequencies by neighboring countries as well as by countries further afield. The ICU has failed to intervene with a view to solving this problem.

A further complicating factor is the prohibition, imposed by the Ministries of Communication and Information, on the use of low frequency waves VL and VHL, whilst not prohibiting the use of UHF high frequency waves, which are already used in accordance with the ways described above.

In conclusion, most stations function on inefficient wave-lengths. This situation decreases broadcast capacity and prevents stations reaching viewers further afield. In addition, wave-lengths are exposed to interference by Israeli: local stations were forced to change their wave length more than once, a situation justifiably irritating viewers.

## Incitement

Incitement is a word that does not have one single meaning. Any individual could use this term in a way that suits their goals and interests. The following will point out the three major understandings of the word.

## 1.    Incitement as a synonym for media activity

There is no such thing as a media-outlet, whether it be governmental or private, that does not have a certain goal. Usually the media tends to rely on objective facts and uses its energy and capabilities to explain these facts in a manner that furthers its own goals. Regardless of the way in which the media seeks to bring out the truth or explain it, the consequence will always be a form of incitement in one way or another. Thus the term may be considered to be a synonym for media activity: the media cannot exist without being accused of inciting, even if this incitement is neither political nor national in character.

## 2.    Incitement according to the Israeli understanding of the term

In light of the first attempt at analysing the term, Israeli accusations that the Palestinian media engages in incitement should not come as a surprise. Both the Israeli and Palestinian media should not let themselves be affected adversely by accusations of incitement:  there is already a constant dispute between these two parties.  How can we as Palestinians fail to report on the confiscation of Palestinian homes in Jerusalem by Israeli settlers? How can we fail to call on those whose homes were confiscated to hold on to their rights and to remain in their homes? Such calls amount to incitement for Israel. Do we therefore desist from reporting?

A problematic element to the reporting is that the Palestinian media tends to exaggerate an issue in order to respond to Israeli claims. In order to dismiss accusations of incitement, the Palestinian media-outlets turn to accusing each other. Some do so by using certain expressions or by discussing issues far removed from the interests of the Palestinian public. At is at this point that the Israeli media, which is more clear and precise when engaging in incitement, becomes the winner in the incitement war: and we end up trying to justify ourselves.

## 3.    Incitement according to the PA's understanding of the term

In the eyes of the PA and of some security forces, incitement is regularly committed by private Palestinian television and radio stations. These stations have consequently become a target for the security services concerned. The closure of private stations and the taking of measures against these stations has become a matter of course whenever a sensitive incident occurs in the Palestinian Territories or even far afield, such as events in Iraq showed us. Even though the Palestinian Territories are open to all of the Arab, foreign and Israeli media, full coverage of any incident remains an unfulfilled goal. At times, the

media criticizes the Palestinian Authority in order to fulfill self-interests. This situation tarnishes the reputation of the PNA, whilst the Palestinian press and journalists become victims and are accused of incitement. Despite the fact that television and radio stations are not operating on the basis of a new draft law prepared by the PLC, Palestinian journalists do operate according to the provisions of the Palestinian Press Law. This does not, however, provide sufficient protection for these journalists.

## Development and Competition

The fact that there are twenty six television stations and seven radio stations is extraordinary. Due primarily to technical constraints, the airwaves of the Palestinian Territories cannot cater for such a large number of stations. Reasons for the excess in stations include society's need for a multi-purpose media phenomena (mental, political, cultural and artistic aspects), has been made possible because of the state of disorder in the use of frequencies and the fact that the broadcast of these stations sometimes only covers a limited area, in some cases only a small neighbourhood in one city. The second issue is related to the first: since the audience in a certain region can only watch a limited number of stations, so people sense some kind of comparison between them, and thus choose their preferred station that provides satisfaction. This state of affairs will not continue for much longer, as these stations plan to expand their geographical coverage, thus making it possible for the viewer to benefit from a larger choice of stations. If this happens, the weaker stations lacking technical facilities will disappear and new investors will be encouraged to establish stations with bigger and better resources. Such open and free competition will lead to better quality and expanded choice, benefiting the interest of the viewer. If we consider the amount of investment needed for opening such stations, the limited income of our small economy and the unsettled labor market, it is easy to conclude that the number of stations will definitely decrease in the future.

## Specialization

In such an atmosphere of competition, specialization, absent until now, will become the norm. The western experience has shown that having specialized stations (sport, economics, news and politics, childrens programmes, religion....) is successful. The viewer's needs and interests will be more satisfied. Political parties may also have a role to play with stations dedicated to getting political messages across. This happened in Lebanon for a number of years.

## Production and Protection of Ownership

In this process of development of these stations, the production of these TV stations, i.e. programs and news or even commercials, becomes a basic and vital matter. Production may develop to include Palestinian drama programmes, especially if more investment is forthcoming and if the state supports this field. It