# EXHIBIT A.889
## (1 of 4)



PLAINTIFF'S
EXHIBIT
889

Date: July 29, 2009                                           File No.: 3052/06

**Military Court of Judea**

**Before the Honorable President of the Court: Lieutenant Colonel Zvi Lekach**
    **Judge: Lieutenant Colonel Ronen Atzmon**
    **Judge: Lieutenant Colonel Tal Band**

**The Military Prosecution**
(represented by First Lieutenant Andrei Varshchegin)

– v. –

**The Defendant: Fuad Hejazi Shubaki, Identity No. 410026173 / Prison Service**
(represented by Counsel, Adv. Avigdor Feldman)

---

**Verdict**

**The Honorable President of the Court: Lieutenant Colonel Zvi Lekach:**

The Defendant before us is charged with four [indictment] counts which concern the transfer of monies for the purpose of the purchase of materiel, in accordance with that which shall be set forth below.

**First count – Trading in war materiel**: The Defendant is accused of having traded in war materiel, starting in the year 2000 and up to the end of January 2002. It is argued that the Defendant took part in a meeting, at which Yasser Arafat instructed him and the heads of the security organizations to purchase any amount of weapons from any possible place. The Defendant, starting on the date of that meeting, acted together with others toward the purchase of large quantities of materiel. The Defendant, who headed the Palestinian Finance Office, coordinated the requisitions of members of the various organizations, which were transferred to him in the form of paperwork. In order to ascertain that the materiel for which he was paying actually existed, the Defendant required the people who applied to him to bring the weapons to his office, and for that purpose, he maintained a storeroom of materiel in Ramallah and an additional storeroom in the Gaza Strip. After the materiel was transferred to his possession, the Defendant would submit the paperwork to Yasser Arafat for approval, and after he approved it, the Defendant would also sign the requisition and would instruct his staff to transfer the money to the applicant by means of a bank transfer. During the period in question, approximately 1,000 tons of materiel were purchased for $7-10 million. The Defendant arranged for

1

Date: July 29, 2009                                          File No.: 3052/06

the transfer of the materiel to the Palestinian security organizations, knowing that a considerable part of the staff of those organizations consisted of members of the military arm of the Fatah organization, which was conducting many terrorist attacks at the time.

**Second count – Performance of a service for a prohibited organization**: It is argued that during the period set forth in the first charge of the indictment, the Defendant transferred a monthly salary in the amount of NIS 500 to members of the military squads of the al-Aqsa Martyrs Brigades in the Bethlehem area. At that time, members of the squads in question were conducting many terrorist attacks. In the month of October 2001, the Defendant received a request for the payment of 25,000 dinars from Marwan Barghouti for the purpose of purchasing materiel and materials for the production of explosive charges, and for the purpose of paying salaries to 268 members of the al-Aqsa Martyrs Brigades. The Defendant forwarded this request to Yasser Arafat, who instructed him to pay the money through the Ministry of Finance.

**Third count – Trading in war materiel**: This count sets forth the Defendant's ostensible role in the funding and organization of the arms ship *Karine A*, which was seized on January 3, 2002, carrying large quantities of materiel of various types, including rockets, mortars and machine guns. It is argued that in September 2001 the Defendant met with Fathi Ghazem, who updated him with regard to his contacts with the Iranians, with regard to the financing of the arms ship. Fathi Ghazem informed the Defendant that the Palestinian Authority would have to bear expenses in the amount of $125,000. The Defendant agreed to this, and even agreed to approach Yasser Arafat in order to obtain the financing required. At a later stage, the Defendant forwarded the demand for payment to Yasser Arafat, who signed it. The Defendant transferred Yasser Arafat's instructions by messenger to the office of Harbi Sarsur, who was in charge of fuel for the Palestinian Authority. The ship, carrying the war materiel, anchored in Yemen. The Defendant, who was in Yemen at the time, was informed of the arrival of the ship and received a report on the intention to prepare passports for two of the ship's crew. After the ship had sailed from Yemen to the Suez Canal, it was seized by Israel Defense Forces troops on January 3, 2002, in accordance with that which has been set forth above.

**Fourth count – Contact with a hostile organization outside the Area**: This Count concerns contacts which the Defendant maintained with Iranian entities, with a view to coordinating the military cooperation between Iran and the Palestinian Authority. Among other things, possibilities were discussed for setting up ammunition factories within the borders of the Palestinian Authority, transferring materiel from Lebanon via Hezbollah, and military training for members of the Palestinian Authority in Lebanon and in Iran. In addition, a document summarizing the meeting was drawn up, and was later presented by the Defendant to Yasser Arafat.

2

Date: July 29, 2009                                   File No.: 3052/06

### The scope of the "Not guilty" plea

It has not been denied that the Defendant was in charge of the financial affairs of the security organizations in the Palestinian Authority, during the period of time relevant to the indictment. However, it has been claimed that he acted with permission and with authority. It has further been claimed that some of the facts that have been set forth in the indictment are not accurate. In addition, it has been claimed that the Defendant's statements, which substantiate the overwhelming majority of the indictment, were taken from him unlawfully.

### Conducting the trial

In the early stages of this case, preliminary arguments were made but were denied in a decision which was handed down on December 4, 2006. After that decision, and following the entry of a "not guilty" plea by the Defendant, the submission of evidence began. The majority of the evidentiary material was filed by consent; that consent, however, referred only to the evidentiary material which did not directly refer to the Defendant. Thus, for example, there was no dispute that the arms ship *Karine A* was seized.

In accordance with that which has been set forth above, the indictment is principally based on the statements of the Defendant. Because the admissibility of those statements was disputed, a preliminary trial was held. The parties agreed that the decision in the preliminary trial would be handed down within the framework of the verdict in the entire case. Within the principal case, we were required to hear only one witness on behalf of the prosecution, Mahmoud Abiyat; all of the rest of the evidentiary material, with the exception of the Defendant's statements, was filed by consent. The Defendant testified for the defense.

The prosecution filed its summation in writing, and the defense, at the end of the process, delivered its summation orally – and, moreover, after a considerable delay of four months.

### The preliminary trial

### General

In accordance with that which has been set forth above, in light of an argument that has been set forth by the defense, to the effect that the Defendant's statements were taken in a manner which was not of his own free will, a preliminary trial was held. In the preliminary trial, and in light of the preliminary arguments which were raised, the three police interrogators who had taken the Defendant's statements were heard, along with three interrogators from the Israel Security Agency who had conducted most of the Defendant's interrogation. Testifying for the defense in

Date: July 29, 2009                                    File No.: 3052/06

the preliminary trial were the Defendant and Mr. Mohamed Hijazi, who was in the same cell
with the Defendant during part of the period during which he was interrogated.

## The preliminary arguments

a.    It was argued that the Defendant had been interrogated throughout two months of
      protracted interrogations, during most of the hours of the day and night, and had been
      deprived of sleep.

b.    It was argued that the Defendant is a sick man, who requires medication for chronic
      diseases, and that his medications were not given to him, nor was he provided with an
      adequate substitute.

c.    It was argued that the Defendant was handcuffed and shackled throughout the
      interrogation, which caused him severe pain and a feeling of severe humiliation. It was
      further argued that, at times, his interrogators would leave him alone in a room, cuffed, for
      four to seven hours, which caused the Defendant to be in a state of profound pain, fear and
      anxiety.

d.    During the time he spent under interrogation, IDF troops destroyed the Defendant's house,
      uprooted many citrus trees and olive trees in his fields and destroyed a ton and a half of
      honey. The knowledge of the destruction caused the Defendant to experience anxiety and
      fear for his family's fate. The interrogators exploited this and told the Defendant that if he
      confessed, he would be allowed to go free and to assist his family members.

e.    It was argued that the Defendant had been told that, due to the fact that he was a sick old
      man and did not have many years to live, his interrogators did not wish to continue
      interrogating him and keeping him under detention for a long period of time. Accordingly,
      if he confessed, he would immediately go free. His confessions were issued subject to those
      promises and as a result of that act of enticement.

f.    It was argued that the Defendant's interrogators made false accusations against him and
      repeatedly told him that he was lying to them. The interrogators adopted methods of
      physical and emotional exhaustion. The Defendant, who is an elderly man and well
      respected in his community, felt humiliated as a result of the young interrogators' behavior
      toward him, and, in light of his grave physical condition as well, he longed for his death
      and for the moment that the interrogations would be over.

g.    It was argued that the Defendant signed his confessions in order to please his interrogators
      and without knowing what was written in the statements, which were taken down in the

4

Date: July 29, 2009                                                    File No.: 3052/06

Hebrew language, which he cannot read. The police interrogators relied on the transcripts that were recorded by the Israel Security Agency, and when he pointed out the inaccuracies and the errors in the transcripts, the police interrogators led him to understand that "chaos" would break out if he repudiated his confessions.

Let us first state that, in light of the testimony given at the preliminary trial by the Defendant himself, who did not bring up a considerable portion of the preliminary arguments, the defense, in its summation, reduced its arguments to the preliminary arguments which concerned the humiliation of the Defendant.

### The evidence at the preliminary trial

### The testimony of policeman David Mizrahi

This witness stated that he is a speaker of Arabic, which he learned at home, in his studies and at work. When he testified before us, he stated that he remembered the Defendant's facial features, but did not remember the details of the interrogation with total accuracy. The witness stated that he customarily first identifies the subject before him and afterwards identifies himself as a policeman. He reads the content of the warning out to him, and after the suspect understands the content thereof and signs it, the testimony is taken in the form of questions and answers. The testimony is taken in Arabic and is written down by him in Hebrew. At the end of each page, he reads it out to the suspect, who signs it. According to that which has been set forth in the statement, he gave the Defendant a cigarette and allowed him to smoke. The witness stated that he had gained the impression that the suspect's condition was "OK" and that he was capable of giving testimony; otherwise, he would have written a memorandum on the matter or would have noted it in the statement, and would have refrained from continuing to collect the testimony. The same applies to exceptional events in the course of the testimony. When he was asked to state examples of special events which he would have written down, had they occurred, he stated that some examples could be that the suspect complained of headaches, that he felt unwell, or that he was not capable of giving the testimony. He stated that, while taking down the statement, he notes events such as giving the suspect a drink, a cigarette and the like.

The witness stated that, in the course of the interrogation which he conducted, the atmosphere was relaxed, and the Defendant did not bring up any problem. When the Defendant asked to smoke, he was given the opportunity to do so, and nothing else exceptional happened. He further stated that, in the course of the interrogation, the Defendant sat opposite him with his legs shackled. The witness stated that he could not possibly have left the Defendant alone in a room for a long period of time, because the room in question is an interrogation room, in which there were other files, including his own personal file, and so he could not possibly have left the room.

5

Date: July 29, 2009                                          File No.: 3052/06

The witness was asked about the argument to the effect that he had told the Defendant that his house had been destroyed, olive and citrus trees had been uprooted and a ton and a half of honey had been destroyed. He answered that, up to the date of his testimony in Court, he had not even known that the Defendant had citrus trees and honey, and that he (the interrogator), in any event, had said no such thing.

The witness argued that he had never told the Defendant that he had only a few years to live and that, if he confessed, he would immediately be released. He said that this was forbidden, and that he does not use such means.

The witness stated that he had read the transcripts of the Israel Security Agency before taking the testimony and that, on the basis of the transcripts, he had read out the suspicion against him to the Defendant, and that this also constituted a guideline for the testimony which was taken.

The witness denied the argument according to which he had told the Defendant that, if he repudiated his statements to the Israel Security Agency, "chaos" would break out.

The witness was asked whether the Israel Security Agency interrogation and the police interrogation were performed in the same place, and he stated that even though they were performed in the same facility, the testimony was taken in the police interrogators' room. He stated that he did not go into the Israel Security Agency interrogation rooms, and they (the Israel Security Agency) did not go into the police interrogation rooms. He also stated that the police interrogation room looks different from the Israel Security Agency interrogation rooms.

The witness stated that he does not know how to write in Arabic, and therefore, he wrote down the statement in Hebrew, while translating to the Defendant what he had written down; he further stated that he had cautioned the Defendant in Arabic. The witness noted that he did not know how many hours the Defendant had slept before the testimony was taken, nor did he know how many days he had previously been interrogated by the Israel Security Agency and the police. The witness stated that he had before him a memorandum of the things which had been said during the Israel Security Agency interrogation before the statement was taken, but not the chain of events of the entire interrogation or all of the events which preceded it. He stated that he generally had one memorandum before him, but that he did not remember with regard to this case.

**The testimony of policeman Moshe Levi**

This witness stated, in his testimony before us, that he remembered the interrogation in a general way, but not in detail. He stated that he taken the Defendant's confessions at the Ashkelon facility, after having warned him as required by law. The interrogation was conducted in Arabic

Date: July 29, 2009                                                    File No.: 3052/06

and the statements were written in Hebrew. Afterward, he read the confessions to the Defendant in Arabic, and [the Defendant] confirmed them with his signature.

The witness stated that he documents exceptional events which take place in the course of an interrogation, in the statements themselves or in a separate memorandum. In the case of the Defendant, he noted in the body of the statements the fact that he gave the Defendant food and drink. He stated that the atmosphere at the interrogation was relaxed. He remembered the Defendant as a handsome, smiling man who cooperated and answered the questions which he was asked.

He remembered that the Defendant needed medication due to the state of his health – and that the medicines were supplied to him by the prison infirmary. He remembered that, on one occasion, a medic entered the room and asked to give the Defendant his daily medication. He stated that after clarifying the matter, he allowed the Defendant to take his medicine, and he documented this in the body of the statement (Confession No. 7, dated April 2, 2006, page 3, line 62).

The witness stated that, to the best of his memory, the Defendant, when he sat opposite him at the interrogation, was not in cuffs. He denied that he had told the Defendant that his house had been destroyed or that trees had been uprooted and honey had been destroyed, and he further denied that he had told the Defendant that if he confessed, he would be released, due to the state of his health and his age, or that if he repudiated things which he had stated in the Israel Security Agency interrogation, "chaos" would break out.

The witness noted that the different fonts in the printed statements resulted from the fact that a structured form was used and denied that anything had been copied from another place. He stated that, in the opening passage of the statement dated March 19, 2006, he had asked the Defendant how he was, and the Defendant had answered, "Thank God, I am all right", and this was written down. He claimed that, because the Defendant is an elderly man, he asked in order to be certain of his condition, and he documented this in the body of the statement. He stated that generally speaking, he knew about the state of the Defendant's health, but he did not exactly remember when he had found out about it. The witness noted that he did not remember that he had read anything exceptional in the Israel Security Agency transcripts prior to the interrogation. The witness insisted that, in the interrogation which he conducted, the Defendant understood that he had the right to remain silent or to tell everything. He added that at the outset of the interrogation, he introduces himself and explains to the subject where he is, and that he reads the warning after that. He always does this, for every suspect, and accordingly he did not document it in the statement, except for his personal particulars, which were recorded. He claimed that he reads everything out to the suspect, including the suspect's personal particulars, in order to ascertain that those are his particulars, as well as the warning.

Date: July 29, 2009                                      File No.: 3052/06

The witness confirmed that the interrogation took place in the police interrogation room, which is located within the Israel Security Agency interrogation facility in Ashkelon.

The witness noted that he does not remember any comment on the Defendant's medical condition in the Israel Security Agency transcripts which he read, and added that, had there been a medical problem, it would have come up. Because the statement was indeed taken, this means that the Defendant was fit to be interrogated. He did not remember an exceptional event with regard to the Defendant's medical condition, but remembered that he had given the Defendant hot and cold beverages and cigarettes, and that the Defendant had smoked a great deal.

The witness noted that the seventh statement was taken, not on February 4, 2006, as written in the statement, but on April 2, 2006, and that this was a clerical error.

**The testimony of policeman Yaakov Barazani**

This witness stated that he remembered the Defendant, but that he was relying on the written text of the statements which he had taken. He stated that he taken the statements in Arabic, wrote them down in Hebrew, and then translated them again verbally into Arabic for the Defendant. In the testimony of March 26, 2006, he accused the Defendant of things which others had said about him, and the Defendant commented on them. The witness did not find, from reading the statement, that there were unusual events in the course of the interrogation; otherwise, according to his statement, they would have been written down. In the testimony of May 14, 2006, he showed the Defendant documents and the Defendant commented on each one of them. He stated that the atmosphere in the interrogation was good, and he noted that the subject was an elderly man. The witness stated that the Defendant remembered details of the documents which were shown to him and that, in his opinion, the Defendant has a good memory.

The witness stated that had the Defendant asked to be examined by a doctor, he would have written it down in the statement and would have stopped taking the statement, because he is aware of the significance of a statement which is taken from a subject who is not in a condition which enables him to give good testimony. He noted that subjects who are brought before him are not cuffed unless it is to be feared that they are dangerous and likely to be wild. In the case of the Defendant, who was an elderly man, there was no need for this.

The witness was asked whether he told the Defendant that they had destroyed his house, uprooted trees and destroyed honey, and answered that this was the first time that he had heard that the Defendant's house had been destroyed. The witness also denied that he had told the Defendant that if he confessed, he would be released immediately because of his advanced age and medical condition. The witness noted that he had not used any means of physical or verbal pressure and emphatically denied that he had led the Defendant to understand that if he

8

Date: July 29, 2009                                          File No.: 3052/06

repudiated the confessions which he had made to the Israel Security Agency, "chaos" would break out. The witness argued that there was no need to exert force or pressure and that everything had taken place in a pleasant atmosphere.

In his cross-examination, the witness stated that he did not know how long the Defendant had been under interrogation before he interrogated him, but that there had been cases in which continuous interrogation had previously taken place, and in such cases, the interrogators waited in order to allow the subject to have rest time as provided by law. He confirmed that he relied on transcripts of the Israel Security Agency, which are written in Hebrew, and he stated that he had translated part of the memorandum for the Defendant, in which he was accused of smuggling weapons. The witness confirmed that he was the one who had asked for an extension of the detention in some cases, but he did not remember which interrogation operations were necessary, and stated that, for that purpose, it would be necessary to examine the reports which were presented to the judge who deliberated on the detention. The witness stated that he did not know who seized the documents which were shown to the Defendant within the framework of the statement of May 14, 2006, or who translated them. He stated that he himself does not read Arabic and accordingly relied on the translation, but that the Defendant was shown the original in Arabic. He further stated that he had translated the testimony by another person, which he had shown to the Defendant, into Arabic, because it was written in Hebrew and the Defendant does not read Hebrew.

**The testimony of the person known as "Yuri"**

This witness was the person in charge of the interrogation of the Defendant on behalf of the Israel Security Agency. The witness stated that he remembered the interrogation and the Defendant. He claimed that this was a complex interrogation, but that, all in all, the atmosphere was very relaxed, with a great deal of mutual respect. The witness added that the Defendant was held in a detention cell like any other detainee, but that, in the interrogation, he was treated very respectfully in accordance with his status. He stated that, throughout almost the entire period of the interrogation, the Defendant was supplied with food from the interrogators' kitchen, smoked cigarettes, and also received a response to special requests such as boxer shorts and a Koran, and there were even cases in which he asked to remain under interrogation because he was bored.

The witness rejected the argument to the effect that the Defendant had not received medical treatment, and stated that, due to the Defendant's age and his complaints, he was examined by a Prison Service doctor and was under close monitoring by the Prison Service infirmary. He added that he personally contacted the Prison Service infirmary and ensured that the Defendant was examined and his medical problems were treated at the professional discretion of the doctors. The witness stated that he had told the Defendant that there was no possibility of bringing in his

Date: July 29, 2009                                    File No.: 3052/06

medications, but that his attorney could supply a detailed list of the medications which the Defendant uses. At the same time, the witness stated that the responsibility for medical treatment rests with the prison doctor.

The witness was asked to give his impression of the Defendant's condition and stated that he did not have the impression that the Defendant was not capable of being interrogated. He remembered one case in which the Defendant was very tired when he left the cell and a medic was accordingly brought into the interrogation room, and the Defendant explained that it was related to his mental state and not to his physical state on that day. The witness repeatedly pointed out that there were cases in which the Defendant had actually asked to remain in the interrogation room.

The witness was asked to comment on the question of the cuffing of the Defendant during the interrogation. He stated that as a general rule, throughout most of the interrogation, the Defendant was not in cuffs. At the same time, there were cases in which the Defendant became upset and hit himself. Against that background, he was handcuffed so as not to harm himself, and immediately after he calmed down, the cuffs were taken off. He added that, in cases in which he left the interrogation room for a few minutes, the Defendant was handcuffed to the chair, but that the handcuffs concerned were attached to a long chain which allowed his hands to move freely, including smoking. He emphasized that he never left for periods of four to seven hours, as was stated in the preliminary arguments, and that, generally speaking, the intervals in question were of a few minutes, half an hour at the most. He added that the Defendant had not complained to him about this. In answer to a question by the Court, the witness replied that the Defendant did not have a watch.

The witness was asked to comment on the argument to the effect that the Defendant was told that his house had been destroyed, trees had been uprooted and honey had been destroyed. The witness answered that this was the first time that he had heard that the Defendant had honey, nothing was said to the Defendant about his house, and the interrogation had not even touched on this subject. The witness denied that he had told the Defendant that, if he confessed, he could be released to help his family, or that he could be released due to his age and medical condition.

The witness confirmed that, in the course of the interrogation, the Defendant had been subjected to accusations on the basis of the suspicions which the interrogators had, and there were cases in which he was told that he was lying, but there had been no intention of humiliating him. According to his statement, the interrogation was conducted with a great deal of mutual respect, and on a number of occasions during the interrogation, the Defendant even commented favorably on the attitude which had been displayed toward him by the witness. The witness insisted that no use of threats or force was made, that the interrogation was conducted by means of a protracted

10

Date: July 29, 2009                                        File No.: 3052/06

dialogue, and that he remembered the atmosphere in this interrogation as being exceptionally good, relative to other interrogations which he had conducted. The Defendant cooperated in extensive portions of the interrogation, and there were days in which the very mention of the topic of a subject to the Defendant sufficed for the Defendant himself to provide a detailed version of the matter.

In his cross-examination, the witness stated that he had heard about the Defendant's detention from the media, approximately an hour before he met him at the interrogation facility. The witness further stated that the initial interrogation of the Defendant had been conducted by the interrogator known as "Hadi", and that he was not aware of it at the time, but only retroactively.

The witness stated that the size of the cell in which the Defendant was kept was standard; that there was a window, but it was closed; and that the ventilation was based on a central air conditioning system.

The witness was asked why the Defendant was interrogated continuously on March 15, 2006, starting at 10:55 a.m. and until after midnight, when the Defendant had already been interrogated toward morning, from 2:40 a.m. to 5:45 a.m. The witness answered that this was the initial stage of the interrogation; the Defendant asked to set forth his actions in chronological order, and this took time. The Defendant did not express a desire to stop the interrogation or to go to sleep; in the course of the interrogation, he ate, drank and smoked for his pleasure.

The witness was asked to comment on the statements which appear in the transcripts which were drawn up by the interrogator known as "Gino", such as "You are behaving like a little child, sitting there and lying through your teeth", and whether they preserved the subject's dignity. The witness answered that, in every interrogation, there are points of conflict and disagreement, and still, the dignity of the subject is preserved.

The witness stated that the Defendant was not prevented from meeting with an attorney, but that the entire subject of the contact with the attorney was under the responsibility of the police. To the best of his knowledge, the police notified the attorney of the Defendant's detention; however, the witness did not check this.

The defense attorney referred the witness to the memorandum dated March 19, 2006 at 4:35 p.m., in which the Defendant stated that they were laying trumped-up charges against him, and that they would do better to bring a sword and cut off his head, and asked him whether this sounded like a calm and quiet person. The witness answered that he did not have the impression that the Defendant was a calm and quiet person, but rather, a person who tended toward outbursts of anger. He added that this behavior and similar behaviors on the Defendant's part were at times

11

Date: July 29, 2009                                        File No.: 3052/06

characteristic of him, although most of the interrogation was conducted in a very positive atmosphere with a great deal of mutual respect.

The witness was asked to explain what a "persuasion talk" is, and stated that it is a conversation in which the suspect is offered a chance to reach an understanding and to confess to the charges attributed to him, and receives an explanation of the nature of the information in the possession of the interrogators. The nature of the talk depends on the subject and his nature. In the case of the Defendant, most of the talk was focused on important current events and general topics, because the Defendant was a person who had traveled to a lot of places; nonetheless, at the end, the conversation always went back to the subject of the interrogation. The witness did not exactly remember what had been said at the talk in question, which was unfruitful from the standpoint of the interrogation; nonetheless, he pointed out that, among other things, the Defendant had been told that it would be better for him to confess.

The witness was asked whether telling the Defendant "to reach an understanding with his interrogators" referred to an agreement in which the Defendant would confess and would then go home, because he was an old man. The witness stated that the Defendant was not told that he would go home, or that he was an old man. The witness stated that nothing would happen if the Defendant did not confess, but that a confession would be in his favor, because then the interrogation would be over.

The witness was asked whether great pressure was not exerted on the Defendant, in such a way as to cause him to want to harm himself, as appears in the memorandum of March 21, 2006. The witness stated that the Defendant had had a fit of rage at the beginning of the interrogation, and that afterwards he had calmed down and had gone on to hold a long, detailed and relaxed conversation.

The witness denied that he had promised the Defendant that, if it was found that the polygraph indicated he was speaking the truth, they would not continue to ask him about things in which he was shown to have been speaking the truth. It is correct that, after the examination, the focus was on other subjects; nonetheless, there was no impediment against returning to the same subjects. According to his statement, the agreement and the understanding with the Defendant only concerned cases in which he was found to be lying.

The witness denied that he had told the Defendant that, if he finished the interrogation, he would be transferred to the prison, where the conditions were better, and accordingly, it would be better for him to finish the interrogation. When he was referred to the memorandum dated April 9, 2006 at 1:30 p.m., Section 8, which says that the Defendant was asked if he did not want to finish his interrogation and to be transferred to the prison, where he could be visited by his

12

Date: July 29, 2009                                      File No.: 3052/06

family, the witness answered that the question which the Defendant was asked was primarily a way of telling him to finish the interrogation. The witness added that the interrogation did not focus only on the subject of the ship *Karine A*, but also on the subject of his sources of funds and his contacts with the Tanzim / Fatah. The "understanding" in question was that the Defendant would provide information, and not necessarily such that would lead to his incrimination.

**The testimony by the person known as "Hadi"**

This witness is the Israel Security Agency interrogator who interrogated the Defendant on the day of his arrival at the interrogation facility, and another time at a later stage.

The witness stated that the Defendant had been asked how he was and answered that he felt well, although he said that he was suffering from cancer. The Defendant did not complain of pain, and had he done so, [the witness] would have called a doctor or a medic. The witness stated that he had not been given medications by the Defendant's attorney, and that he did not remember that the Defendant had asked for medications. The witness was asked about the time of the first interrogation, 2:40 a.m., and answered that his team leader had demanded that he begin the interrogation, and that is what he did. He also noted that, to the best of his memory, he had not interrogated the Defendant when the latter was handcuffed or shackled, and even if he had been wearing cuffs – which, in his estimation, he had not been – he had not been wearing shackles. The witness denied that he had left the Defendant in the interrogation room for periods of four to seven hours, alone and handcuffed. The witness further denied that he had said, or that he knew that anyone had said, to the Defendant that his house had been destroyed, trees had been uprooted and honey had been destroyed. He denied that he had promised the Defendant that he would be released if he confessed.

The witness confirmed that the Defendant had been told that he was lying, and claimed that this was a legitimate contention on the part of an interrogator. He stated that there had been no use of threats or force in the interrogation and that, if the Defendant had been afraid, this was a subjective matter, but that he had not intentionally frightened him.

In his cross-examination, the witness stated that he knew who the Defendant was and he knew that he had been active in Fatah for a very long time, and was in charge of the procurement and financial system within that organization.

The witness stated that he had given the Defendant a piece of paper, written in Arabic, which set forth his rights as a detainee and an interrogation subject, but that he had not read it out to him himself. He confirmed that the first sentence which he had written in the memorandum was the first sentence which the Defendant had spoken to him, which was: "The Defendant is fed up with the story of *Karine A*."

Date: July 29, 2009                                      File No.: 3052/06

The witness was asked to describe his impression of the Defendant's condition at the first interrogation, which had taken place toward morning, and stated that he remembered that an elderly man had come in, who was relatively tired, in accordance with the time at which he arrived. They had an ordinary conversation, and he remembered that the Defendant was a heavy smoker, was given a lot of cigarettes, and that the conversation had been conducted in a positive atmosphere. He did not remember whether the Defendant was agitated or depressed, and did not remember anything else unusual. According to his statement, to the best of his understanding, the Defendant's statement that he was "fed up" is consistent with the fact that he had been under protective or preventive detention following the *Karine A* affair.

The witness insisted that his role was to seek out the truth and that, if the Defendant had given him a reasonable theory in line with the intelligence information, he would have accepted it.

The witness repeatedly stated that he did not remember whether the Defendant was wearing cuffs in the interrogations which he had conducted. However, if there was any use of cuffs, it was only if the witness felt threatened. He added that he did not remember any such thing, and that if the Defendant had shouted or acted wildly, he would have written it down.

The witness repeatedly emphasized that he had given the Defendant the piece of paper with his rights and duties, and that his rights were listed in it. He himself did not tell the Defendant that he had the right to remain silent or to be represented by an attorney.

The witness insisted that, had the Defendant complained to him about not being allowed to bring his medications into the detention facility, or that he felt unwell and was not getting assistance from the prison doctor, he would have written it down. At the same time, he stated that he knew the Defendant was a sick man. He personally was never asked about bringing medications in.

The witness repeatedly emphasized that the search for truth is "sacred" and that it was the objective. Accordingly, when the Defendant told him that he was willing "to confess everything", he explained to him that there was no point in talking that way, and that he should tell [his story] himself, without adding to it or detracting from it. He had the impression that the Defendant was not willing to confess everything and was capable of holding his own in the interrogation. The witness stated that the interrogation of the Defendant was protracted because there were subjects which required elucidation and clarification, and there were other items which he chose to deny or not to explain.

Date: July 29, 2009                                        File No.: 3052/06

**The testimony of the person known as "Gino"**

This witness was an interrogator for the Israel Security Agency who participated in the Defendant's interrogation, and stated at the very outset that, because two years had gone by since the date of the interrogation, he did not remember part of it.

The witness was confronted with the preliminary arguments and stated that the Defendant had received medical treatment from the prison infirmary. He remembered that, in one of the transcripts, the Defendant had stated that he had polyps in his stomach, and within a short time, he was taken for examination and medical treatment. The witness stated that, as an interrogator, he is not the authority with regard to the transfer of medications to the Defendant, and that the decisions on that subject are made by the prison doctor. He further stated that he did not remember any case in which the Defendant called his attention to the fact that he needed medication.

The witness denied that the Defendant's feet were shackled in the interrogations at which he was present, and added that the Defendant was handcuffed after he hit himself and after he was warned that, if he continued to hit himself, he would be handcuffed, so that he could not harm himself.

The witness claimed that there was no case in which the Defendant was left handcuffed and alone in the room for four to seven hours, and claimed that he had not told the Defendant that IDF troops had destroyed his house and had destroyed trees and honey. The witness added that he had also not told the Defendant that, if he confessed, he would go free in light of his age.

The witness stated that he had told the Defendant more than once that he was concealing information and refusing to give it to his interrogators, but he had not used violence, threats or attempts at intimidation.

In his cross-examination, the witness was asked about the meaning of the statement to the Defendant that "he had been brought to the interrogation in order to confess with honor". The witness stated that confessing really was an honor, and his objective as an interrogator was to have the subject make a true confession.

The witness stated that the subject of the interrogation was the Defendant's involvement in the matter of the ship *Karine A*, his connection to the financing and smuggling of materiel, and his connections with Iranians and others in Arab countries whose intention it was to carry out hostile terrorist activity against Israel.

15

Date: July 29, 2009                                    File No.: 3052/06

The witness stated that he had recorded in a memorandum that the Defendant "was behaving like a little child", because, notwithstanding his advanced age, he sometimes behaved childishly in the interrogation. When he was asked to explain what he meant, he answered that childish behavior is when a person is being interrogated on information and gives a cover version which exempts him from liability, even though he knows that his interrogators know what they are talking about with him.

The witness stated that the Defendant had been told that he should not "behave like a rascal", and that his meaning for the word "rascal" was a person who shouts, lies, acts dishonorably and does anything he can to save his skin.

The witness stated that he apparently knew at the time that the Defendant had been interrogated toward morning by the interrogator known as "Hadi", but that he had not seen any impediment to interrogating the Defendant until 6:00 p.m.

The witness was asked about a statement which he had made in the interrogation, which was documented in the memorandum dated March 20, 2006, in which it was written that he had told the Defendant that it was not by chance that his detention had been extended by 18 days, in light of the large amount of information which he was concealing from his interrogators. The argument was raised to him that, in this way, he was actually saying to the Defendant that the more information he concealed, the longer his detention would be. The witness answered that it was understandable that the Court had decided to extend the detention, on the basis of the information which it had before it. The witness was asked about an additional expression which he had used toward the subject, which was documented in the memorandum dated March 27, 2006, in which it was written that he had told the Defendant that "in the end, he would confess". The argument was raised to the witness that, according to common sense, this meant that until the witness confessed, the interrogation would not be over. The witness answered that that was not what was written, and eventually, the Defendant did, in fact, provide a great deal of information.

The witness was asked about the cases in which the Defendant hit himself, and said that he remembered that the Defendant had hit himself with his hands a number of times, and that they had succeeded in calming him down a number of times by asking him to stop it. The witness further stated that, in his opinion, this was childish behavior. The witness was asked whether this was not behavior which attests to the Defendant's desperation, and answered that, in his estimation, it was all a show, because, in fact, after that, the Defendant went on to provide a great deal of information.

16

Date: July 29, 2009                                          File No.: 3052/06

**The testimony by the witnesses for the prosecution at the preliminary trial – interim summary**

The testimony which was heard may be divided into testimony by members of the police and testimony by Israel Security Agency personnel. The policemen stated that the interrogation was conducted in a relaxed manner, with no problems whatsoever, and that the Defendant gave information of his own good and free will. It was further stated that the Defendant had been given food and beverages in the course of the interrogations, had not been left alone, and had not been subjected to any threats or promises in the context of his interrogation.

The witnesses on behalf of the Israel Security Agency noted that the Defendant had been treated with respect, in accordance with his status. They did not deny that, in his interrogation, there were moments of "confrontation", in which they accused the Defendant of lying and concealing information; however, they claimed that this is a natural part of an interrogation. The interrogators denied that the Defendant had been left alone in the interrogation room for long periods of time. According to their statements, there were a number of cases in which the subject have been left alone, but for brief periods of time, during which he was placed in handcuffs which were attached to a long chain. It was further stated that the Defendant was not handcuffed in the course of the interrogations, except for cases in which he hit himself and attempted to harm himself. Even in those cases, after the Defendant calmed down, the handcuffs were taken off.

The Israel Security Agency interrogators also denied that they had uttered threats against the Defendant, or that they had told him that his house had been destroyed and the like, or that anyone had promised him that, if he confessed, he would be released due to his age.

With regard to his medical condition, the Israel Security Agency interrogators stated that the Defendant had been treated in the prison infirmary and that, in light of his age, they even ensured that he would receive treatment, at the discretion of the medical personnel, of whom they were not in charge.

**The testimony by the Defendant at the preliminary trial – direct examination**

The Defendant began by stating that he suffers from high blood pressure, hemorrhoids, an ulcer and back pain.

The Defendant described that he was in prison in Jericho under American and British supervision and that, on March 14, 2006, at 8:00 a.m., the IDF instituted a siege on the Muqata in Jericho, until a bulldozer came and destroyed the building. He and others were taken to the Jericho Coordination and Liaison Facility; that evening, he was transferred to the "Russian Compound"

17

Date: July 29, 2009                                                  File No.: 3052/06

[a police facility in Jerusalem]. The Defendant told them that he was cold, because he was wearing only his pajamas. From the "Russian Compound", he was transferred to Ashkelon, and he was in handcuffs throughout that entire time.

His interrogation by the Israel Security Agency began that same night, and he was told that he had to confess everything. The Defendant stated that he had told his interrogator that there was nothing against him, that he was a person who was doing his work and following orders.

According to his argument, he was handcuffed and shackled during the interrogation, and noted that his hands were cuffed in front of him. The Defendant stated that he did not receive the medications which he takes on a regular basis, and even though he asked to see a doctor, he was told that he would only see him the next day. The Defendant claimed that he was taken to the doctor only after he pleaded many times to be taken for examination. Following the doctor's examination, he was only given medicine for his blood pressure, but no one took care of his other problems.

The Defendant pointed out that he was kept in a cell 1.5 m x 2 m in size, and that he would fall asleep quickly because he was exhausted, but woke up often because of the pain from which he suffered.

The Defendant said that he did not remember much of his interrogation. He remembered that his interrogators wanted him to confess that he had purchased the *Karine A*, but he had no connection to this. According to his argument, his interrogators spoke to him impertinently; they sometimes addressed him violently and sometimes calmly.

The Defendant claimed that his interrogators told him that they were interested in obtaining an explicit and detailed confession of everything he knew about the *Karine A* affair, and that, if he confessed, he would be able to go home. The Defendant claimed that he had told his interrogators that he was prepared to confess, but not to lie.

The Defendant stated that his attorney had told him that they had destroyed his house, uprooted trees and smashed beehives. According to his statement, the interrogators told him that they had heard about this, and this had a negative effect on him.

The Defendant was asked about his visits to the prison doctor, and stated that, even when he complained, he was given only acetaminophen. When he was told that, after he complained of digestive problems in his interrogation, he was given a medicine called "Gastro", he said that he did not remember that. In another case, the Defendant remembered that he had been given paraffin for his constipation, but said that this only happened once. According to his statement, although he received medication for his blood pressure, he felt that it was of no help to him. The

18

Date: July 29, 2009                                      File No.: 3052/06

Defendant was asked whether he told the doctor about his chronic diseases, and stated that he told him everything, and also that he had asthma, that he had difficulty breathing properly and that he suffered from tachycardia.

He also stated that the policeman who taken his statement sat with the Israel Security Agency report and asked him about it, but that he did not know what the policeman wrote, because the interrogation took place in Arabic and the record was written down in Hebrew.

The defendant was asked if he believed that he would be released if he told the interrogators what they wanted to hear, and he answered "Yes". According to his statement, his interrogators told him about another subject who had been expected to get four life sentences, but that Mohamed Dahlan had intervened in his case and they released him.

The Defendant stated that he did not ask the interrogators to call an attorney, and that his family were the ones who called the attorney on his behalf. The Defendant added that he asked his interrogators if he could see an attorney, and their answer was that if an attorney came and asked about him, they would let him see him.

**The testimony by the Defendant at the preliminary trial – cross-examination**

The Defendant stated that he had felt humiliated during his interrogation. He further stated that he had told his interrogators everything they wanted to hear. The Defendant was then asked at which stage of the interrogation he had "broken". The Defendant did not answer directly; instead, he claimed that, from the very beginning, he had told his interrogators that he would tell them whatever he had to say, and he had in fact told them what he knew. When he was asked if the things that he had said on the first day of his interrogation were said under pressure, he answered that he had said those things because that was what happened and because it was not a secret matter. He further stated that, in his interrogation, he had not lied at any stage, and that he had told what he knew, but that he did not know what had been written down in Hebrew.

According to his statement, his interrogators humiliated him, told him he was a liar and used "dirty" language to him. He further stated that they used to leave him alone in an empty room, in cuffs, and come back only several hours later.

The Defendant stated that, in his interrogation, he acted according to the interrogators' instructions, and that he certainly did not dictate any demands or the terms of the interrogation. When he was asked how he found the strength to tell his interrogators that "the State of Israel owed him money", he did not answer directly. The Defendant confirmed that he smoked during his interrogation and stated that he had taken cigarettes from his interrogators whenever he asked for them. The Defendant was asked what else he had been given and replied "Nothing". When he

Date: July 29, 2009                                    File No.: 3052/06

was asked specifically whether he had received a Koran, coffee, tea and underwear, he answered that he had. According to his statement, he had not asked for them; rather, his interrogators had brought them to him.

The Defendant repeated that he had been under pressure from the very first day, but emphasized that, in his interrogation, he had spoken only the truth. He further stated that he had denied any relationship to the ship *Karine A* and had insisted on that point.

In answer to questions by the Court, he stated that the things which were written down in his statements were translated for him, but that he did not know what was actually written down. The Defendant further stated that, at times, he would get upset in his interrogation ("from all that talking, a person goes crazy"), but that his irritation had only manifested as "exploding inside" and he had not shown it to his interrogators.

**The testimony by Mohamed Hijazi**

This witness stated that he was with the Defendant, in the same cell, at Ashkelon Prison in April 2006, for some two weeks. He stated that the Defendant was sick and weak and had difficulty breathing, walking or standing up. He claimed that, on many occasions, he and his cellmates had knocked on the cell door and asked for a doctor for the Defendant, because "he was going to die", and the guards had given the Defendant "at the very most, acetaminophen". He stated that a doctor had never come to the cell.

In his cross-examination, the witness stated that he was in the cell with the Defendant, to the best of his memory, starting on April 12, 2006. He claimed that, over a two-week period during which he was with the Defendant in the cell, the Defendant had only gone out to the toilet or the shower, and then added that he had also gone out to interrogations. When he was asked to comment on the fact that there were many documents by medics and doctors who had seen the Defendant during that time, he stated that, during the period when they were together, this did not happen. He went on to add that, each time the Defendant came back from an interrogation, he told them (his cellmates) about it. The witness was asked to give the names of other persons who were in prison with him at the time and answered that there were people whose names he remembered, but did not state a single name.

The witness stated that the Defendant had told him that the interrogation made him feel pressured, that he was chained to the chair all the time and treated badly. The Defendant also told him that he was suffering from cancer and he needed medications. The witness said that the Defendant had not told him about the things which he received from his interrogators, such as fruit, cigarettes and underwear.

20

Date: July 29, 2009                                              File No.: 3052/06

### The decision in the preliminary trial

It may be said that the preliminary arguments raised claims that had to do with "humiliation", the use of an unfair method of interrogation by creating unfair emotional pressure, as well as enticement and persuasion. The decision in this case is a decision which is based on fact, which is derived from our direct impression of the statements which were made before us.

### Evaluation of the testimony in the preliminary trial – credibility and weight

#### Credibility of the witnesses for the prosecution

We did not find that the witnesses for the prosecution were lacking credibility, as the defense attempted to argue. In fact, there can be no doubt that the Defendant was under interrogation, in the course of which the interrogators sought to obtain as much information as possible with regard to his activity in the financing of Palestinian terrorism.

Like any interrogation, it was not always conducted under pleasant and comfortable conditions. The Defendant was imprisoned in an interrogation facility, where he was interrogated over a protracted period of time. However, there is a discrepancy between the discomfort which is inherent in the holding of an interrogation and the use of means which are capable of depriving him of his free will and his ability to choose whether to give information which incriminates him.

As may be seen from that which has been set forth in the statements, and the Defendant did not dispute this in his testimony, in the course of his interrogation by the police, he received cigarettes and could smoke as he liked, and was given beverages and food in the course of the interrogation. Thus, for example, in the statement dated March 19, 2006, page 5, line 132, the following sentence appears: "At this stage, the suspect asked to pray, and the suspect's confession was interrupted for that purpose." Further, on page 6, line 164: "In the course of his confession, the suspect was given hot and cold beverages and cookies." In a statement dated March 20, 2006, page 1, line 18, the following sentence appears: "The suspect was given a cigarette and smoked." Further (page 2, line 19), it is written that: "The suspect was given water at his request in order to take a pill." The statement dated March 22, 2006, page 5, line 118, states that he was given hot and cold beverages and cigarettes; a similar sentence appears in the statement dated March 30, 2006, page 6, line 144. The statements which were taken on April 2, 2006 (Prosecution Exhibit No. 9 and Prosecution Exhibit No. 10) state that he was given refreshments. It is difficult to imagine a situation in which an interrogation was conducted in a heavy-handed and cruel manner, according to the arguments that have been set forth by the defense, while at the same time the Defendant was given the opportunity to pray, to smoke as much as he wanted, to eat and drink, and of course, to take medications.

21

Date: July 29, 2009                                                File No.: 3052/06

It should be stated that refreshments such as food, beverages and cigarettes were also given to the Defendant in the course of his interrogations by the Israel Security Agency. As early as his first interrogation (memorandum dated March 15, 2006, 2:40 a.m.), he was given coffee, and in the following interrogation (memorandum dated March 15, 2006, 10:55 a.m.), he was given lunch, cigarettes and coffee. It can be seen that this treatment continued throughout all of his interrogations, and almost every memorandum states that the Defendant received food, beverages and cigarettes. He was even given a Koran (memorandum dated March 16, 2006, 10:00 a.m.; memorandum dated March 21, 2006, 12:00 noon); he was allowed to go to the toilet (memorandum dated March 20, 2006, 11:40 a.m.) and was given the possibility of discussing with his interrogators problems which concerned the conditions of his imprisonment (memorandum dated April 3, 2006, 11:00 a.m., Section 1). The Defendant did not dispute these statements which appear in the transcripts. This treatment is not typically given to someone whose free will [his interrogators] are trying to crush and whom they are trying to humiliate and hurt.

Over and above the subject of the refreshments which were given to the Defendant, the transcripts from the Israel Security Agency interrogation do not indicate that the subject was "broken" and humiliated, in view of the fact that the Defendant commented many times on topics which are not related to the interrogation, such as general political and diplomatic topics (memorandum dated March 16, 2006, 10:00 a.m., Sections 24-25; memorandum dated March 27, 2006, 4:30 p.m., Section 1; memorandum dated April 11, 2006, 10:00 a.m., Section 12), and even told his interrogators that the State of Israel owed him $275,000 which it had taken from a closet in the Muqata (memorandum dated March 19, 2009, 4:35 p.m., Section 18). Such behavior is not typical of a person who has been broken in his interrogation and is willing to appease his interrogators and to say anything they want him to, only in order for the interrogation to end; rather, it is characteristic of a person who feels sufficiently self-confident to say what is on his mind.

It is important to emphasize that the witnesses for the prosecution did not attempt to embellish the conditions of the interrogation. They did not deny that there were short periods of time when he was left alone in the room, and that he was cuffed at those times; it was, however, argued that those intervals of time were brief. Nor did they deny that the Defendant had been cuffed after he hit himself and began to act wildly (memorandum dated March 21, 2006, 12:00 noon, Sections 2-3). Furthermore, the interrogators did not claim that the Defendant was a relaxed, calm person; rather, they said that the Defendant was a person who was quick to anger, and that he would turn his rage against himself, and accordingly, they were required to handcuff him at times. Nor did they deny that, from time to time, they addressed the Defendant in a manner which was not pleasant for him to hear – for example, they told the Defendant that he was lying, was behaving

22

Date: July 29, 2009                                                    File No.: 3052/06

like a child or a rascal – but it was not proved that they adopted humiliation as a method of interrogation.

This description by the interrogators appears credible to us. We have not found that it contains inconsistencies or contradictions, and it is in line with the statements written down in the transcripts and, to a certain degree, with the testimony by the Defendant in Court. More precisely: there is a significant discrepancy between the testimony by the Defendant in Court and the preliminary arguments which were initially raised by the defense – arguments which they abandoned at the stage of the summations following the Defendant's testimony. It may be said, even at this stage, that the impression which arises from the Defendant's testimony did not match the preliminary arguments which he raised.

### The credibility of the testimony by Mohamed Hijazi

Before we discuss the credibility of the Defendant's testimony, we shall first state that Mohamed Hijazi's credibility, as we perceived it, was quite poor. We have difficulty understanding how the witness remembered "well" everything which had happened to the Defendant, and how "they pleaded" for medical treatment for him which was not provided, but he could not say who else was imprisoned with him in the cell at the time. Nor can his statements be reconciled with the Defendant's medical file, which shows that, even during the period concerning which the witness Mohamed Hijazi testified, the Defendant was treated a number of times by the prison infirmary. It *prima facie* appears that the testimony by Mohamed Hijazi is testimony which was entirely intended to assist the Defendant at his trial, and which accordingly, at the very least, painted quite an extreme picture of the Defendant's medical condition. It should further be stated that Mohamed Hijazi said that the Defendant complained to him of having been chained to the chair – an argument which the Defendant himself did not repeat. Accordingly, we have not seen fit to attribute any weight whatsoever to the testimony by Mohamed Hijazi.

### The credibility of the Defendant – general

The Defendant unequivocally stated that, in his interrogation, he did not say anything which was not true. Notwithstanding the Prosecutor's attempt to understand at which stage the Defendant "broke" and began to tell his interrogators things which they ostensibly wanted to hear, the Defendant insisted that he provided all of the information which he had, with no problem whatsoever. The Defendant denied having linked himself to the ship *Karine A*, in contrast with that which has been set forth in the police statements.

It appears that, even though the Defendant claimed that he felt humiliated, this feeling – according to his own argument – did not influence him to say anything which he did not want to

Date: July 29, 2009                                           File No.: 3052/06

say. We shall emphasize that the Defendant did not claim that he had initially refused to tell his interrogators the truthful things which he told them, or that they had been extracted from him against his own free will. The Defendant, throughout his testimony before us, claimed that he had spoken the truth, and that he had done so willingly, because he was not ashamed of the matters involved and they did not contain any secrets.

In accordance with that which has been set forth above, the only thing which the Defendant was not willing to accept were the things which were written down in his statements; according to his argument, those things did not reflect what he had actually said, and because he cannot read Hebrew, he could not know if that is what was written. The Defendant appears to have abandoned the preliminary argument, according to which the police interrogators had threatened him with "chaos" if he did not repeat what was written down in the transcripts by the Israel Security Agency interrogators, as he did not mention this matter at all in his testimony before us.

We shall further state that the direct impression gained from the Defendant's testimony is of someone who exaggerated the strength of the humiliation which he felt and the arguments concerning the treatment which he was given, in accordance with the line of argumentation in the preliminary trial. In any event, even if he subjectively felt humiliated in the situation in which he found himself, we shall emphasize that he was not willing to confirm or to state that he had said anything which was not true, or that he had been broken in his interrogation. Our impression is that the Defendant adopted a line which was "independent" of the defense line in the trial, with regard to things which he thought it was important to tell the Court. The Defendant wanted to say that he had told only true and correct things, of his own free will, but at the same time, to say that he had suffered during his interrogation. This cannot be reconciled with the argument that his statements were taken other than of his own free will. Obviously, a situation of interrogation is not comfortable and is not pleasant, and certainly not for an elderly person who previously held a senior position. At the same time, we did not gain the impression that the Defendant, at any stage of his interrogation, felt distress which prevented him from making demands or which led him to say things other than of his own free will.

**The credibility of the Defendant – the medical treatment**

The Defendant's arguments with regard to medical treatment, or the absence thereof, are not at all in line with what appears in his medical file. Thus, for example, in a document which records his examination before his intake at the incarceration facility on March 14, 2006, a statement appears in which the Defendant "notes chronic diarrhea, takes Colatal as necessary, rules out heart disease, [high blood] sugar, high blood pressure or other problems." On March 15, 2006 at 2:19 p.m., he was examined again at Shikma Prison. In that case as well, even though he was examined by a different doctor, the section in which he was asked about past diseases states the

24