# EXHIBIT A.889
## (2 of 4)

Date: July 29, 2009                                    File No.: 3052/06

words "Rules out"; in addition, it was noted that he uses only one medication, Colatal for his stomach. These records are not in any way in line with his statements to the effect that he suffers from many problems and that he gave that information to the prison doctors. On March 15, 2006 at 6:15 p.m., he was again brought before a doctor, where the record states that the Defendant complained of constipation and heartburn and was given medication. As we can see, as soon as the Defendant complained of any problem whatsoever, not only was he not deprived of access to a doctor; he was, in fact, examined by a doctor only four hours after his previous examination by a doctor. In addition, the Defendant saw a doctor on March 19, 2006, and was given medications in that case as well. It is not superfluous to state that the medications were not "acetaminophen", as he claimed, but other medications (of three different kinds).

The Defendant was examined by a doctor and received treatment for his constipation problem on March 20, 2006 and March 21, 2006 as well. On March 22, 2006, the Defendant was brought for examination at the initiative of the prison authorities, and not at his own request; on the basis of his complaints, it was determined that his blood pressure would be monitored, and medications were prescribed for him. On the same day, at 7:00 p.m., the record states that he was again examined by a doctor "**at the request of an interrogator**".

Not only were different medications of various kinds prescribed for him; his argument, to the effect that he was given paraffin oil only once, is not in line with the medical records, which show that he was given paraffin on a number of occasions, on March 20, 2006, March 21, 2006, March 30, 2006, April 1, 2006, April 3, 2006, April 4, 2006 and April 17, 2006.

Accordingly, it appears that the Defendant's arguments with regard to the lack of medical treatment are unfounded. The Defendant received various medications as required, in accordance with his condition; he saw a doctor many times – once even at the initiative of his interrogator – and received treatment at the discretion of his doctors. It appears that his arguments with regard to medical treatment were intended to intensify the preliminary arguments and are not in any way founded on reality, and this has implications on his poor credibility before us.

**The credibility of the Defendant – the interrogation stage**

Aside from the subject of medical treatment which we have discussed above, the Defendant's attempt to state that he did not receive anything from his interrogators can be pointed out as an additional example of the Defendant's lack of credibility – an argument which was intended to provide an exaggerated portrayal of his difficult state during the interrogation. As soon as he was confronted with the things which he had received (meals, time for prayer, cigarettes, coffee, tea, a Koran, underwear), he "suddenly recalled" and confirmed that these things were indeed given to him; he added, however, that he had not asked for them to be given to him. In addition, the

Date: July 29, 2009                                           File No.: 3052/06

Defendant himself stated that everything which happened during his interrogation caused him "to explode inside", and that he had not shown this to his interrogators – in contrast with the explicit statements which were written in the transcripts, and to which the interrogators testified, to the effect that the Defendant lost his calm from time to time, and that they were accordingly forced to handcuff him. It is not logical to believe that the interrogators would invent and record a story whereby the Defendant hit himself, and that they were forced to handcuff him as a result, if this did not happen. The Defendant's argument, to the effect that he had only "exploded inside", is not in line with the records kept by the interrogators, nor with their testimony before us, and represents part of the line which he adopted in order to show that, on one hand, they had humiliated him, but, on the other, he had not given into his interrogators. In this matter, we preferred the testimony by the interrogators.

It should be stated that the impression gained from the Defendant's testimony is that of a person who is well aware of the things which were said by him, both in Court and in his interrogation by the Israel Security Agency and the police, but who nonetheless sticks to his story and maintains that injustice was done to him. That injustice, as he sees it, was not caused by the things which he said in his interrogation, but by the humiliation which was practiced upon him, as an independent factor, and not as one which affected him in his interrogation. Another factor in the "injustice" results from the statements which were written down in Hebrew, without his approval, and which were not in line with what he said. More precisely: the Defendant confirmed, in his testimony before us, that the words in his statements, which were ostensibly written down on the basis of what he had said, were translated to him, as the police interrogators had stated; nonetheless, the Defendant claimed that he does not know what was really written, because he does not know Hebrew.

We have not seen fit to believe the Defendant on this point. We did not gain the impression that the Israel Security Agency and police interrogators recorded things which were not told to them by the Defendant, or that they distorted the statements which been written down in Hebrew when they translated them to him, or that they exerted pressure on him which negated his ability to choose whether to tell his interrogators certain things. It appears that the Defendant was well aware of why he was under interrogation, and was well aware of what his interrogators were looking for, and that he behaved accordingly during his interrogation. The Defendant is aware of the fact that he made statements with regard to his activity in the context of *Karine A* – statements which are not in line with his present version, which holds that there is no relationship between him and the arms ship.

Moreover, the statements which are written down in the transcripts of the interrogation indicate that the Defendant gave a great number of details, as he testified before us, as early as the first day of the interrogation. At the same time, the Defendant did not immediately say everything he

Date: July 29, 2009                                                    File No.: 3052/06

knew, because his interrogation was a "developing interrogation", to which, over the course of time, various items concerning his activity were added. As may be seen from the transcripts, in the beginning, when they raised accusations against him, he customarily denied them; however, when they showed him evidence which refuted his denial, he began to tell what he knew. Such conduct is actually characteristic of a person who acts in a calculated manner and is willing to tell things only when he knows that, in any event, his interrogators have the information already, without volunteering additional information. Even if there had been any possibility of raising an argument, to the effect that the additional details which he gave, following the evidence which was presented to him, were given as a result of the pressure which was exerted during the interrogation, the Defendant himself has contradicted and refuted that argument.

**The credibility of the Defendant – summary**

In contrast with the credible impression made by the interrogators from the police and the Israel Security Agency, we can state that the testimony by the Defendant was not especially credible. In accordance with that which has been set forth above, according to the testimony by the Defendant himself, his "humiliation" and his "medical condition" did not in any way detract from his ability to say the things he wished to say, [and did not] cause him to say things which he did not want to say. There was no stage in which the pressure of the interrogation led him to confess anything against his will, and there was no stage at which he "broke".

On the basis of all of the evidence in the preliminary trial, we are convinced that his statements to the police interrogators were taken in a relaxed way and with no improper pressure. In contrast with the arguments raised in the preliminary argumentation, he did not attempt to make the police interrogators aware of errors which appeared in the transcripts, and none of them told him that "chaos" would break out if he did not confess. We are convinced that his interrogators made him no promises that, if he confessed, he would be released; they told him nothing about the destruction of his house (a fact which some of the interrogators had not even known until the date of the hearing before us); and accordingly, we have no choice but to reject his arguments concerning any "humiliation" or enticement and promises which caused him to say things other than of his own free will. The Defendant received full medical treatment as required, and his medical state did not change his ability to say what he had to say, of his own free will.

**Preliminary trial – The ruling**

In light of our factual conclusions with regard to the credibility of the witnesses for the prosecution, on one hand, and the lack of credibility of the witnesses for the defense, on the other, we hereby rule that the statements by the Defendant were taken of his own free will and are admissible in this trial.

27

Date: July 29, 2009                                    File No.: 3052/06

## The principal trial

### The testimony by Mahmoud Abiyat

This witness stated that he was a member of a military squad which was led by Ataf Abiyat and was tried for offenses of murder which he committed. The witness stated that he and his fellow squad members were soldiers and they received a monthly salary at the end of each month. The witness claimed that he did not know who transferred the salary to them. The witness was confronted with a memorandum from his interrogation by the Israel Security Agency, which stated that the salaries were transferred by Fuad Shubaki. The witness claimed that he did not know Fuad Shubaki and that he had never heard that name. The witness claimed that the person who transferred the salaries to them was named Fuad Shumali, who was a clerk in the Finance Office. In his cross-examination, he stated that he had never seen the Defendant and had not received money from him, and that he did not even know who was responsible for finances in the Palestinian Authority.

### The statements by the Defendant to the police

The Defendant made eight statements to the police, aside from the many memoranda which were taken from him by the Israel Security Agency. We shall now provide a chronological survey of the statements which were taken from him and the things which he said in them – things which, as a general rule, are in line with the statements which he made in his interrogation by the Israel Security Agency.

Prosecution Exhibit No. 5 – statement by the Defendant dated March 19, 2009: In the statement in question, the Defendant spoke of his activity within the framework of the Palestine Liberation Organization (PLO) prior to the year 2000. He subsequently stated that, in 2000, there was a meeting in Yasser Arafat's office, in the presence of Abdel Razeq Majaida, Hajj Ismail Jaber, Ghazi Jibali, Salim Burdani, Mohamed Dahlan, Rashid Abu Shabak, Amin al-Hindi, Musa Arafat and Mahmoud Abu Marzuk. Yasser Arafat told them to buy any weapons which came into Gaza or the West Bank, and any of those senior officials who received an offer (to purchase weapons – Z.L.) would come to the Defendant with paperwork; the Defendant would transfer it to Yasser Arafat, and after Arafat signed, the Defendant would instruct his staff to transfer money to the senior official in question. The Defendant gave detailed examples as to the quantities and types of weapons which were purchased and the amounts of money which were paid for them.

The Defendant added that in July 2001, Fathi Ghazem and Adel Mughrabi smuggled a container from Lebanon with RPG bombs and launchers which came from Hezbollah, with the approval of Yasser Arafat, and the naval forces took them. He paid $50,000 with Arafat's approval.

28

Date: July 29, 2009                                    File No.: 3052/06

The Defendant added that he had met with Fathi Ghazem in Jordan, and that Ghazem had told him that he had met with Hezbollah operatives and with an Iranian, and had agreed with them that they would transfer three containers of weapons, loaded on a ship. He asked the Defendant to speak with Yasser Arafat about it, so that Arafat would give money. The Defendant spoke with Arafat about it, and Arafat instructed Harbi Sarsur to give money for that purpose. The Defendant also stated that he had gone to Yemen and met Taysir Ajina, who had told him that Adel Mughrabi wanted passports to be prepared for him and for Omar Akawi, and that he (Adel) had come to see the ship *Karine A*, which had arrived in Yemen with the arms.

Prosecution Exhibit No. 1 – statement by the Defendant dated March 20, 2006: In this statement, the Defendant stated that he had met with Fathi Ghazem in Jordan in 2001, and that Ghazem had told him about the contacts with the Iranians, according to which the latter were willing to pay for an arms ship. Fathi told the Defendant that he (the Defendant) would be meeting the Iranian representative in Dubai. The Defendant stated that he came to Dubai and there, together with Adel Mughrabi, he met two Iranian representatives – Abu Mohamed and Ahmed Salem. The Iranians told the Defendant and Adel that they were willing to finance the training of Palestinians in Lebanon and Iran, and that they were willing to help with money and armaments. The Defendant added that Adel wrote up a report for Arafat, and that they told the Iranians that, once they had a reply from Arafat, they would let the Iranians know. According to his argument, when Arafat saw the report, he responded angrily and said that the Iranians were liars. The Defendant, in that statement, provided further details of his contacts with the Iraqis and their consent to donate two million barrels of oil to the Palestinians as a gift.

Prosecution Exhibit No. 6 – statement by the Defendant dated March 22, 2006: In the statement in question, the Defendant provided additional details about the meeting with the Iranians. He stated that the one who made the initial contact with them was Abu Hassan al-Zeinab. The Defendant set up a meeting between him and Fathi Ghazem, and the two of them went to meet the Iranians in Dubai. Following that meeting, Fathi Ghazem told the Defendant that the Iranians wanted to meet him. The Defendant went to Dubai to buy cars and told Fathi that he would meet the Iranians afterward. The Defendant was asked why he had not told Yasser Arafat that he went to meet the Iranians, and answered: "Because Arafat liked me to bring him results, and not just chatter." The Defendant went to Dubai, and after his meeting about the cars, he went to meet the Iranians with Adel Mughrabi. Because he was tired, it was agreed that they would meet again that evening. The Defendant did meet the Iranians again that evening and asked them if they wanted to work with him and cooperate with him, and the Iranians said that they did. Adel spoke with them about military subjects, such as the need for advanced training in the manufacture of hand grenades and grenade launchers, and that they also wanted ammunition and weapons. After that, they (including the Defendant) talked about how to set up an ammunition factory within the Palestinian Authority, and the Defendant even told them that they would need money, and they

29

Date: July 29, 2009                                              File No.: 3052/06

agreed to that as well. The Iranians even stated that they would transfer weapons and ammunition from materiel storehouses which they maintained in Lebanon. One of the Iranians asked to be sent a daily summary of the Israeli media. They agreed to continue meeting, and the Defendant stated that he would ask permission from Yasser Arafat to come to the meetings. Adel wrote up the contents of the meeting and he and the Defendant signed it. When he returned to the Area, the Defendant gave the document to Yasser Arafat, who said the people in question were swindlers who wanted to kill him.

The Defendant stated that, in 2002, he heard that the *Karine A* had been seized. He understood that Yasser Arafat wanted him to "take the matter upon himself", and accordingly, he told the Board of Inquiry that Yasser Arafat had given the instructions and that he had been the contact person between Fathi Ghazem and Adel Mughrabi and Arafat. The Defendant added that he had heard from Fathi about the plan to bring in the ship as early as August 2001, two months before the meeting with the Iranians, and that the meeting with Arafat, at which they agreed on the transfer of $125,000 to Fathi for the ship project, took place after Fathi had been in Syria and Lebanon. The meeting with the Iranians in Dubai was intended to set up Palestinian-Iranian contacts and to put Fathi and Adel in contact with the [Iranian] Revolutionary Guards in Lebanon, and he and Adel had not talked about the ship with the Iranians.

Prosecutor's Exhibit No. 11 – statement by the Defendant dated March 26, 2006: In this statement, the Defendant provided details about various arms deals in which he was involved. He initially stated that a person had come to him and told him that they had found barrels with RPG rockets in the sea and that he wanted $7,000 for them. The Defendant gave an order to pay the price. The Defendant stated that he had received an offer to purchase 10 RPG rockets for $45,000, and that he had transferred the money to the party making the offer. The Defendant went on to state that this was better than having the weapons fall into the hands of Hamas or other organizations. The Defendant stated that, in 2002, Rashid Abu Shabak stole all of the arms which he had purchased, and which were in their storerooms. The Defendant went on to state that Mahmoud Abu Marzuk had contacted him in 2001 and asked for $20,000 to set up a factory for the manufacture of materiel and hand grenades, and that Arafat had instructed the Defendant to give him the money. The Defendant transferred the money and later heard that there had been an explosion in an apartment which was rented by Mahmoud Abu Marzuk.

The Defendant was asked about the purchase of boats for Fathi Ghazem and stated that Arafat had instructed him, in 2000, to transfer $150,000 for the purchase of two fishing boats. The Defendant noted that the money in question was transferred even before he transferred $125,000 to Fathi for the *Karine A*.

Date: July 29, 2009                                      File No.: 3052/06

The Defendant talked about money which he transferred for the purpose of purchasing
ammunition in Bethlehem, and that he had financed the salaries of Mahmoud Abiyat's men.
According to his argument, some of the money which he transferred was used for salaries (NIS
500 per person) and some was used to purchase ammunition.

Prosecution Exhibit No. 7 – statement by the Defendant dated March 30, 2006: The Defendant
was asked about his acquaintance with Mahmoud Zuheiri and stated that the latter was in charge
of purchasing materiel in the West Bank, and that he had purchased 1000 Kalashnikov rifles. The
Defendant noted that he had transferred the money for the purchase to Mahmoud Zuheiri, in the
amount of approximately $2 million.

The Defendant stated that he had paid Jumaa Abu Shukri $570,000 for seven Sagger missiles and
18 rifles; the rifles were defective and they returned them. According to his statement, the
missiles were kept in the *diwan* near his home in Gaza, and he later transferred them to Abdel
Razeq Majaida. The Defendant went on to provide details about various people who had brought
materiel and stated that he used to transfer the money, and that they used to keep the arms in a
storeroom within his office. According to his argument, Yasser Arafat would tell him to whom
he should transfer the materiel, and he would instruct his deputy to issue arms according to
Arafat's instructions.

The Defendant stated that Mahmoud Abu Marzuk manufactured explosive charges for Abdel
Razeq Majaida, and that he had transferred the money to Majaida so that it would be transferred
to Mahmoud Abu Marzuk. The Defendant also gave information concerning additional arms
deals.

The Defendant, in the course of the examination, was shown a document (Prosecution Exhibit
No. 8) and stated that it was a paper written by Mahmoud Abu Marzuk, which contained price
quotations for arms, and that he had settled accounts with him according to the prices listed.

Prosecution Exhibit No. 9 – statement by the Defendant dated April 2, 2006, 9:50 a.m.: At the
beginning of his interrogation, the Defendant was referred to his statement of March 19, 2006, in
which he had stated that he smuggled arms in the ship, and he confirmed that he had said that.
The Defendant was asked about the involvement of others in smuggling the arms and spoke
about it. Among other things, the Defendant stated that, in July 2001, he had given Fathi Ghazem
$50,000, on Arafat's instructions, to smuggle bombs and RPG launchers. The Defendant stated
that he paid the money for the smuggling and not for the weapons, because the weapons had
been given to them free of charge by Hezbollah.

The Defendant was asked to tell about the *Karine A* again, and stated that he had met with Fathi
Ghazem in Jordan, and that Ghazem told him that he had met in Lebanon with representatives of

31

Date: July 29, 2009                                   File No.: 3052/06

Hezbollah and of Iran. The latter had agreed to transfer three containers full of materiel to them, financed by the Iranians, and they (the Palestinians – Z.L.) would only have to pay the expenses for the ship. The Defendant stated that they were offered the opportunity to take weapons from Ahmed Jibril, but that they did not do this. When he was asked why, he said: "Because we have arms free of charge from Hezbollah and from the Iranians, so why should we take from him?" He stated that the plan was to bring ships with arms to the Ali Port, and that he and Fathi had spoken with Arafat and told him that $125,000 was needed. Yasser Arafat told the Defendant to give the money, and the Defendant said that he did not have it. Yasser Arafat told Fathi to write a requisition asking for the money, and after Fathi did so, the Defendant took the requisition to Ramallah and transferred it to Arafat, who wrote to Harbi Sarsur and told him to pay the money. Harbi transferred the money to Fathi.

The Defendant was asked to tell about the meeting with the Iranians again. According to his statement, he met with two representatives; he believed the senior representative was a man named Ahmed Salem.

Prosecution Exhibit No. 10 – statement by the Defendant dated April 2, 2006, 2:01 p.m.: (As a parenthetical note, I shall state that the date on this statement was February 4, 2006. This is an error which is clarified in Prosecution Exhibit No. 13, and the correct date is April 2, 2006. Let us not forget that the Defendant could not have been interrogated on February 4, 2006, because he was arrested only a month and a half later.)

The Defendant stated that he had set up a Procurement Committee, which had set up an armaments storeroom, in which everything the Committee purchased was stored. The Defendant was asked about the Scientific Committee and stated that the activity of that committee consisted of teaching courses in the manufacture of materiel. The role of the Committee in the West Bank was to check that the arms purchased were serviceable. The Defendant was shown a document and he stated that this was a document by the Scientific Committee, in which they asked for soldering machines and lathes. The Defendant forwarded the requisition to Arafat, and he did not know what happened to it. The Defendant stated that the Scientific Committee belonged to the Fatah, the al-Aqsa Martyrs Brigades were Fatah operatives, and Yasser Arafat used to give the al-Aqsa Martyrs Brigades money for activities "under the table".

The Defendant stated that people from his office transferred $150,000 to Fathi Ghazem in order for him to purchase two fishing boats. Even before that, the Defendant had transferred $50,000, so that [Ghazem] would give them to the Lebanese to cover the expenses of smuggling barrels of weapons, about which he had spoken previously (in the previous statement).

32

Date: July 29, 2009                                              File No.: 3052/06

The Defendant stated that Fathi Ghazem met in Lebanon with Adel Mughrabi, Hezbollah and the Revolutionary Guards of the Iranians. The Defendant asked him if he had told Arafat about it, and Fathi said that he had told him about the plan to smuggle the ship and about his meetings in that context. Fathi told the Defendant that he wanted him to talk to Arafat, because Fathi needed $125,000 for the expenses of the ship. The Defendant talked about it with Yasser Arafat, at the airport in Jordan. Yasser Arafat told the Defendant that Fathi should prepare a requisition to receive the funds. Fathi did so and, three days later, the Defendant gave Arafat the document. Arafat gave the Defendant written instructions to transfer the money to Fathi via Harbi Sarsur, and the Defendant forwarded the requisition to Harbi Sarsur by messenger and told Fathi about it.

The Defendant stated that he had transferred money to Mahmoud Zuheiri for him to buy arms "from outside" (that is, from outside the Palestinian Authority). The Defendant stated that he had a storeroom in Ramallah, in which they put all of the arms which they purchased from Mahmoud Zuheiri, and they would distribute the arms on the instructions of Yasser Arafat.

The Defendant stated that in August 2001, he purchased seven missiles from Jumaa Abu Shukri, for which he paid $75,000, and which he transferred to Abdel Razeq Majaida.

The Defendant stated that, in 2001, he was approached by an emissary from Marwan Barghouti with two papers. One of them was a requisition for the purchase of ammunition for the al-Aqsa Martyrs Brigades, in the amount of 25,000 dinars, and the second set forth the names of the fighters in each area, in order for them to be paid their monthly salary. The Defendant forwarded the papers to Yasser Arafat, for him to decide in the matter, and Yasser Arafat gave him an instruction to give Marwan Barghouti the money which he asked for. The Defendant said that he had no money, and then Arafat instructed the Ministry of Finance to transfer the money.

The Defendant stated that, when he came to Yemen, he was greeted by Taysir Ajina, who told him that Adel's and Fathi's ship had arrived. Taysir told the Defendant that they had prepared a passport for Adel Mughrabi and they also wanted to prepare a passport for Omar Akawi, the captain of the ship.

The Defendant went on to state that he transferred money to Ali Mahsin, a senior official in the Yemenite Army, as part of a partnership which was intended for the sale of tracer bullets for a profit. In the end, however, the transaction was not carried out and he got the money back.

Prosecution Exhibit No. 12 – statement by the Defendant dated May 14, 2006: At the outset of the interrogation, the Defendant was shown a document, and the Defendant stated that the document had to do with a requisition which he had received for the purchase of a lathe and cutting blades. The document had been transferred to him by Marwan Barghouti, and the

Date: July 29, 2009                                    File No.: 3052/06

Defendant had forwarded the document to Arafat. The document did not come back to him with a payment order. The Defendant remembered that the document had been accompanied by two additional papers. One of them was a requisition for the purchase of arms, and the other was a requisition for the payment of salaries to members of the al-Aqsa Martyrs Brigades, but their names did not appear on his list and so he could not pay them.

The Defendant was asked what he had to add with regard to the Sagger missiles which they purchased, and he said that an instruction had come from Arafat to pay for the missiles, because he was afraid that [other] people would buy them and use them.

### The testimony by the Defendant at the principal trial – direct examination

The Defendant began his testimony by stating that he was the head of the Finance Department in the Palestinian Authority, and that his powers were those of a clerk who received his instructions from the *Ra'is* ["Boss"], Yasser Arafat, and the deputy *Ra'is*, Abdel Razeq Majaida. According to his statement, he had no authority to make decisions on his own; rather, he only acted according to written instructions.

The Defendant confirmed that, in fact, a meeting of all those in charge of the security organizations had taken place in Yasser Arafat's office in Gaza in 2000. He stated that all of those present at the meeting, except for him, customarily met with Israeli commanders. He claimed that what was said at that meeting was that it would be necessary to collect the weapons which were held by the public and by civilians and, if necessary, they should pay for them. According to his argument, his role was to ascertain who the owners of the weapons were and what the price was and to obtain approval from the *Ra'is*, who would sign the payment order. Only after receipt of an instruction would he release the money for payment.

According to the Defendant, the weapons were taken so that they would not be used by entities such as Hamas and the Islamic Jihad, which did not recognize the Oslo agreements. The Defendant claimed that no weapons were purchased outside the confines of the Authority. The Defendant also claimed that the weapons reached a storeroom in the National Security building, where his offices were also located, but that he was not in charge of the storeroom. To the best of his knowledge, the campaign to collect weapons was known to the public. The Defendant further stated that he did not know how many weapons were purchased or how much money was paid for them. He repeated that every expenditure was approved by Yasser Arafat. The Defendant stated that he was not the one who transferred the weapons and he did not know whether they were transferred to the Tanzim.

The Defendant confirmed that he knew the people whose names appear in the first count of the indictment, including Mahmoud Zuheiri. According to his statement, the latter was

Date: July 29, 2009                                      File No.: 3052/06

seconded to his office from Ghazi Jibali, and his job was to bring the signed documents from Yasser Arafat. The Defendant claimed that he did not know whether Zuheiri's position included the purchase of the arms, and, in any event, the Defendant did not have a storeroom under his responsibility. According to his statement, the payments were made by check or in cash, and each amount was written down. The Defendant claimed that he did not see, did not buy and did not issue weapons. He only worked with the documents, and he himself was afraid of weapons. The Defendant again emphasized that he did not know how much money was paid or which weapons were purchased. The only thing he did was receive documents from the various security entities and give payment orders to people. The Defendant denied that he had purchased and distributed pistols or that he knew anything about it.

The Defendant denied having made payment to members of Fatah and denied that he had paid people in the Bethlehem area. According to his argument, there was an instruction from Yasser Arafat to pay NIS 500, but he did not know what they were being paid for. No one told him that those people belonged to the al-Aqsa Martyrs Brigades. The Defendant denied that an emissary had come to him from Marwan Barghouti or that he had seen a financial report which included expenses for the purchase of chemical materials for the production of explosives. He also denied that he had paid other financial expenses of the al-Aqsa Martyrs Brigades, or that he had received an instruction from Yasser Arafat to pay Marwan Barghouti 25,000 dinars, and in any event, he did not have such an amount to transfer.

The Defendant denied any relationship to the arms ship *Karine A*. According to his argument, he only heard about it after he was arrested in Jericho. The Defendant confirmed that he knows Fathi Ghazem, the Deputy Commander of the Palestinian Navy, and confirmed that Fathi Ghazem had given him a document from Yasser Arafat, according to which the Defendant was supposed to pay Fathi $125,000. According to the Defendant, he did not know what the payment was for and he refused to pay, because he did not have such an amount in the budget.

The Defendant confirmed that, when he was in Dubai for the purpose of purchasing vehicles, he was approached by Adel Mughrabi, who asked him to transfer a letter to Yasser Arafat. He met Adel Mughrabi together with other people and received a letter from them. He transferred it to Yasser Arafat and later found out that the content of the letter had to do with the Iranian proposal to help the Palestinian Authority, but he did not know and did not say anything about an arms ship.

The Defendant confirmed that, while he was in Yemen, he met Taysir Ajina at the Palestinian Embassy there, but he was not aware of the fact that, at that time, an arms ship had come into Hudeida Port in Yemen. He confirmed that Taysir told him that they were preparing a Yemenite passport for Adel Mughrabi, but he did not know why.

35

Date: July 29, 2009                                    File No.: 3052/06

The Defendant stated that the Palestinian Authority had received a gift of two million barrels of crude oil from Iraq, and that he had been given a proposal to make contact with the Iranians, so that they could sell the barrels for the Palestinians and divide the consideration. For this purpose, he met with the Iranian Commercial-Economic Attaché. The Defendant denied any relationship or any knowledge, on his part, with regard to any offer on behalf of the Iranians to help the Palestinians by providing training and weapons, and denied having been present at a meeting at which such a proposal was raised. The Defendant denied that he had signed the minutes of such a meeting. According to his argument, he had only transferred a letter from Adel Mughrabi to Yasser Arafat, and the latter had refused any contact with the Iranians.

**The testimony by the Defendant at the principal trial – cross-examination**

In his cross-examination, the Defendant was asked if he was familiar with the al-Aqsa Martyrs Brigades organization. He answered in the negative and said that he had only heard about them in the media. He claimed that he had also stated in his interrogation that there was no such thing as the al-Aqsa Martyrs Brigades. The Defendant was confronted with two documents which had been presented to him at his interrogation of May 14, 2006, when he had stated that he knew nothing about those documents. When he was told that he had said to the police that one of the documents was a requisition to set up a lathe shop and the second was a requisition for salaries for the al-Aqsa Martyrs Brigades, he claimed that he did not know and had not said those things.

He claimed that he was at a meeting with Yasser Arafat, at which it was decided to purchase armaments. [He attended the meeting] by virtue of his position as a finance person, and the objective was to collect weapons from civilians. According to his statement, the only thing he did was to follow the instructions issued by Yasser Arafat, who approved the purchase of each armament individually.

The Defendant was asked about RPG bombs which arrived on a ship in June 2001, and stated that he had been given an instruction to pay the fishermen who found the bombs, as a monetary reward. The Defendant stated that he did not know where the ship with the bombs had come from, and when he was told that he had said to the police that it had come from Tripoli, he claimed that he had not said that. The same thing happened when he was confronted with the claim that he had told the police and the Israel Security Agency that arms had been purchased from Lebanon and Egypt. According to his statement, the arms which were purchased by him were only purchased from civilians, so that they would not fall into the hands of Hamas, and he did not know what was written in his statements.

Date: July 29, 2009                                          File No.: 3052/06

The Defendant confirmed that he had transferred $20,000 to Mahmoud Abu Marzuk, on the instructions of Yasser Arafat. He claims that he did not know what the reason was for this. When he was told that he had said to the police that it was intended for setting up a factory for the manufacture of materiel and hand grenades, he claimed that Mahmoud Abu Marzuk's house had exploded, and that he had learned afterwards that it had been used for manufacturing explosive charges.

The Defendant claimed that he did not know who Mahmoud Abiyat or Ataf Abiyat were. The Defendant was confronted with his statement to the police, according to which he transferred money to them so that they would not go to Hamas, and he claimed that he said that he had received an instruction from Yasser Arafat to transfer NIS 500 to Ataf Abiyat (the reference is to a monthly salary – Z.L.), whom he does not know personally, but whose name he knows, in contrast to his earlier statement.

The Defendant was confronted with an additional document, which had been presented to him in his interrogation, and which he claimed that he did not recognize. When he was told that, in his interrogation, he had stated that this was a document written by Mahmoud Zuheiri containing quotations for armaments, he said that he had not said that.

The Defendant stated that he was responsible for monies of the Palestinian security organizations, and that he was responsible for paying in accordance with written instructions which were given by Yasser Arafat.

The Defendant was asked by us whether he was familiar with the budget and its items, and confirmed that he was familiar with it, and that a payment order had to match an item which appeared in the budget. Accordingly, they would ask the recipients of the payments to state the purpose for which the requested money was required. If the payment order did not have an appropriate budget item, or if they refused to state the objective of the payment – the Defendant would refuse to pay, or would pass the requisition on to Yasser Arafat. He claimed that the budget item for the purchase of the arms was called "Payment for arms taken from civilians from within the State". The Defendant stated that, if he had received an exceptional instruction – for example, to pay money to a Hamas operative or to purchase textbooks for a school – he would not have performed the operation. In addition, the Defendant stated that he had a good relationship with Arafat and that there had been cases in which he had argued with Yasser Arafat about certain expenses and, in the end, Arafat had told him that he was right. He further stated that he had been praised for his methods of financial management. Only afterwards did he state that, if he had not implemented a payment order, he would have been put on trial. In a redirect examination by the defense attorney, the Defendant stated that any amount which had

Date: July 29, 2009                                                  File No.: 3052/06

to be withdrawn from the account of the Palestinian authority required the signature of the three
signatories for the account, and he alone could not withdraw "even a penny".

### Evaluation of the testimony – credibility and weight

#### The testimony by the Defendant – credibility and weight

The Defendant's testimony did not make a credible impression on us. He was obviously sticking
to a story, according to which he had nothing to do with the arms ship *Karine A*, he had nothing
to do with the contacts with the Iranians which concerned the coordination of training and the
purchase of arms by the Palestinian Authority, and with regard to the purchase of arms, he was
present at a meeting, the objective of which was to purchase arms from civilians so that they
would not be used by organizations such as Hamas.

When the Defendant was confronted with things which had been recorded or presented to him in
his interrogation, including documents which indicated that he recognized and knew why a
certain payment was made, in a way which could not be reconciled with his version in Court, he
stated that he had not said what was attributed to him in the interrogation. We cannot accept this.
It is puzzling that things which are recorded in his statements, and which are in line with his
version in Court, were in fact said by him to the police and were written down, whereas things
which are not in line with his version in Court were not said by him, but were written down by
the interrogators without his knowledge. This simplistic explanation with regard to the records
kept by the interrogators does not sound in any way credible.

Furthermore: some of his arguments are *prima facie* not credible – for example, his statement
that he was not familiar with the al-Aqsa Martyrs Brigades and that he did not know what they
were, or his argument that he did not know who Ataf Abiyat was, especially when, immediately
thereafter, he stated that money had been paid to the person in question by the office in
Bethlehem. When he recognized his mistake, he claimed that he did not know Ataf Abiyat
personally.

As we have already pointed out with regard to the preliminary trial, we are convinced that the
things which are recorded in the Defendant's statements to the police were based on his own
words and reflect things which he himself said. Accordingly, we must rule that his argument to
the effect that those things were not said by him is mendacious.

Furthermore, the Defendant's arguments to the effect that he was only following orders, and that
he did not know why some of the money was being transferred, are not in line with what he
stated at the end of his interrogation – that he always ascertained that the payment matched a
budget item, which means that he knew what the payment was intended for. His version to the

38

Date: July 29, 2009                                          File No.: 3052/06

effect that he was only following orders is not reconcilable with his statement that, if he had received an exceptional or strange payment order, he would have refused to carry it out, or with his statement in his interrogation, to the effect that he took action (with regard to the meeting with the Iranians) even before Yasser Arafat told him anything about the matter, because Arafat "wants to see results".

### The testimony by Mahmoud Abiyat – credibility and weight

The testimony given by Mahmoud Abiyat in Court, as we see it, was devoid of any credibility whatsoever, and accordingly is devoid of any weight. His argument to the effect that he had spoken, in his interrogation, of a person named Shumali and not Shubaki is an argument which was clearly intended to divert the guilt from the Defendant. We are not convinced that there is even a grain of truth in that argument. It should be stated that the Defendant said in his interrogation that he transferred money to Mahmoud Abiyat, and this is in line with Mahmoud's statement to the police. Accordingly, we prefer to accept Mahmoud Abiyat's statements to the police, rather than his testimony in Court.

### The factual infrastructure – summary

We have seen fit to prefer the content of the Defendant's statements to the police, rather than his testimony before us. Wherever there is a contradiction between the two versions, we have believed that the content of the statements to the police is preferable. The same applies to Mahmoud Abiyat's statements to the police. In light of this factual infrastructure, we must now examine the sections of the indictment which were attributed to the Defendant and to see whether his guilt arises from the evidentiary material before us.

Even before we perform an individual examination of each of the sections of the indictment, in view of the fact that the majority of the indictment is based on the Defendant's own statements, we must determine whether there is any evidentiary supplement, in the nature of an "additional item", to those statements.

In the case that is before us, we did not believe that there would be any real difficulty in this regard. An evidentiary supplement to the Defendant's statements can be found in the statement made by Mahmoud Abiyat, who confirmed the transfer of the salaries to him and to his men in Bethlehem, as the Defendant had stated. In addition, we have before us Prosecution Exhibit No. 8, which is a document which sets forth requisitions for the purchase of weapons and their price, as the Defendant stated.

Date: July 29, 2009                                                File No.: 3052/06

In Leave for Criminal Appeal 4142/04, **Millstein v. Chief Military Prosecutor**, Supreme Court
Compendium 2006 (4), 4022, the Honorable Justice Levi considered the nature of the evidentiary
supplement of the "additional item" type and ruled as follows (in paragraph 20 of his judgment):

> "*The requirement for the 'additional item' is flexible and open in structure. The
> type of matters that are likely to satisfy that requirement varies from case to case,
> and also depends upon the credibility of the confession itself. The greater the
> weight which is ascribed to the confession in question – the smaller the weight of
> the 'item' which is required in order to verify the confession; on the other
> hand, the smaller the weight which is ascribed to the confession – the greater the
> weight of the 'item'. Accordingly, it has also been ruled that cases are likely to
> arise in which it is possible to accept an 'item' with a weight which is 'as light as
> a feather'.*"

And as the Honorable Justice Arbel stated in the same ruling (in paragraph 20 of her
judgment):

> "*The requirement for an 'additional item' – similar to the 'item of reinforcement'
> and in contrast to 'corroboration' – is a requirement for an evidentiary supplement
> 'for verification'. Accordingly, and in contrast to 'corroboration', the 'additional
> item' does not have to point to the guilt of the Defendant; rather, it is enough to
> have an item of direct or circumstantial evidence, which is external to the
> Defendant's confession, which is capable of confirming, to a certain degree,
> the content of the confession and to indicate the veracity thereof... The
> requirement for an 'additional item' is intended to remove any suspicion that the
> Defendant is taking upon himself the responsibility for an action which was
> committed by another person or which was not committed at all, and therefore, in
> principle, a very small item of evidence is sufficient to comply with that
> requirement... Accordingly, case law has stated on more than one occasion that
> the weight of this item of evidence 'can be extremely light' and can even be 'as
> light as a feather'. This is enough for the Court to be satisfied that the confession
> is not 'a mere fiction' and will convince the Court that the story which the
> Defendant told in his confession is indeed a possible story.*"

In the case that is before us, we have a confession by the Defendant, which extends over a large
number of statements, both to the police and to the Israel Security Agency. His confession
includes great detail with regard to various arms deals, including names, weapons and their
prices, and detailed comments on his negotiations with various entities in the Palestinian
Authority and with entities outside it (such as the Iranians). The inherent weight of these
statements is very high. Both the content thereof and the way in which the statements were made
indicate a high degree of credibility which should be given to them (cf. Criminal Appeal
6613/99, **Smirek v. State of Israel**, PD 56 (3) 529, in paragraph 12 of the judgment handed
down by the Honorable Justice (as her title was then) Beinisch).

Date: July 29, 2009                                          File No.: 3052/06

But not only the test of the numerous items indicate the credibility which should be ascribed to the Defendant's statements. Rather, in accordance with that which has been set forth above, these statements have external verifying supplements, in the form of the statement given by Mahmoud Abiyat and in the form of Prosecution Exhibit No. 8. Moreover, the seizure of the arms ship *Karine A* is also in line with the statements which were made by the Defendant. Let us not forget that the Defendant himself did not deny, in his testimony before us, many details which appear in his statements, including a meeting with the Iranians.

In accordance with that which has been set forth above, the independent weight of the statements is high. The additional item, in this case, points to the Defendant's involvement in at least some of the offenses, and verifies all of the Defendant's statements. More precisely: the matters which are set forth in the Defendant's statements are all related to his position and his status as the head of the Finance Department of the Palestinian Security Services. When there is an internal affinity and a pertinent relationship between the various offenses, the evidentiary supplement which exists for one offense may also extend to another offense (see Criminal Appeal 241/87, **Cohen v. State of Israel**, PD 42 (1) 743; Criminal Appeal 7758/04, **al-Qadr v. State of Israel**, Supreme Court Compendium 2007 (3) 710; Criminal Appeal 378/03, **John Doe v. State of Israel**, Supreme Court Compendium 2005 (2) 1128). Accordingly, in the case that is before us, even though an evidentiary supplement exists with regard to only some of the statements made by the Defendant, in view of the pertinent relationship of the actions which are described in the indictment to those which are set forth in his statements, the evidentiary supplements should be considered as verifying all of the things which were stated by the Defendant in his interrogations. Accordingly, even if there is no external evidentiary supplement for a specific section of the indictment, in view of the affinity among all of the charges in this case, the statements made by the Defendant are sufficient to substantiate the conviction, insofar as it arises from the statements.

Now that we have clarified the evidentiary infrastructure before us, we shall address each of the counts of the indictment.

### Count 1 of the indictment:

The arguments that have been set forth by the defense with regard to this count of the indictment are arguments both in fact and in law. First of all, as to the factual aspect, the defense did not deny that the Defendant took part in the purchase of the materiel as set forth in this count of the indictment; however, it claims that this was a purchase of material which was aimed at taking weapons from residents of the Authority so that they would be in the hands of the Palestinian Authority forces. This argument was raised by the Defendant both in Court and during his interrogation. Second, it was argued that the Defendant was entitled to

Date: July 29, 2009                                         File No.: 3052/06

benefit from the defense of "act of state" because all that he did was to act with no independent discretion, but rather, in accordance with the instructions of the chairman of the Authority, Arafat, who approved the transfer of monies from the Authority for the purpose of purchasing the arms. The Defendant's role in this case was to sign documents which approved payment. It was argued that this act is not a war crime or a crime against humanity, because it has not been proved that the Defendant knew that the arms would reach the al-Aqsa Martyrs Brigades organization, which would use them for terrorism.

It was further argued that the Defendant could avail himself of the defense of justification, because obeying the instruction by the Authority, which was aimed at taking weapons from irresponsible entities and transferring them to the responsible control of the Authority, is a legitimate act, which is governed by the defense of justification.

It appears that the arguments that have been set forth by the defense cannot be accepted, even if only on factual grounds.

In order for the defense of "act of state" to be allowed, it is necessary to show that the entity on behalf of which the Defendant operated was a state. As set forth in the ruling on the preliminary arguments, which was handed down by my colleague, the Deputy President, the Palestinian Authority is not a state, and certainly, during the period which is relevant to the indictment, it was much farther from the status of an independent authority. Accordingly, the Deputy President of the Court stated that: "This being the case, I believe that it should be ruled that the Defendant's actions pursuant to the indictment were not acts of state, as they were not committed on behalf of an entity which is a state; rather, at the very most, they were personal actions in the guise of state actions, through the use of resources of an unformed diplomatic entity."

No further support or additional evidence, which could have modified our conclusion with regard to the status of the Palestinian Authority, has been brought before us.

Secondly: the argument to the effect that the collection of the arms was intended to transfer weapons from residents, who were likely to use them for partisan purposes, to responsible entities, is unfounded. The Defendant raised this argument on a number of occasions, including in his interrogation, however, we do not have the impression that this argument is substantiated in any way whatsoever. In accordance with that which has been set forth above, we have already pointed out that our impression of the Defendant is that he is a sophisticated person, who is trying to shrug off the burden of responsibility and liability. Concurrently with the argument that the collection of the arms was intended to prevent irresponsible entities from using them, it appears that the Defendant approved the financing of actions which have absolutely nothing to do with the collection of weapons from

42

Date: July 29, 2009                                    File No.: 3052/06

irresponsible entities. Thus, for example, the subject of the financing of the setup of a factory for the production of explosives by people belonging to the Palestinian Authority itself, the financing of lathe shops, the financing of arms smuggling by outside entities such as Hezbollah and the Iranians, and so forth. If the entire objective had been the collection of "partisan" weapons, why is it necessary to finance the bringing of additional weapons which originate outside the confines of the Palestinian Authority – especially when the weapons in question are of a specifically offensive nature, such as rockets and missiles of various types? If the matter in question concerns only the purchase of weapons from civilians, why did the Defendant act to finance the costs of smuggling the weapons from Hezbollah into the hands of entities within the Palestinian Authority?

The answer to these questions is clear. The collection of weapons has nothing to do with the desire to prevent those "irresponsible" entities from using them for terrorist purposes. The objective of the collection of the weapons was to transfer them to entities within the Palestinian Authority which obeyed Arafat and which made it possible to engage in warfare against Israel, its forces and its civilians. As the Defendant himself stated, in the memorandum dated March 15, 2006, 6:15 p.m., in Section 30: "**Yasser Arafat gave an instruction that all of the weapons would be purchased by the Palestinian Authority, and not by Hamas or other organizations, so that he himself would be able to control everything that happened. In this way, Yasser Arafat would be able to control the strength of the intifada.**"

As we have seen, this is no innocent and "responsible" objective; rather, it is a clear objective which was intended to enable entities of the Palestinian Authority, headed by Yasser Arafat, to use offensive firepower to control the strength of the intifada – that is: the strength of Palestinian terrorism.

It should further be stated that the argument to the effect that the Defendant did not know that the weapons had been transferred to the al-Aqsa Martyrs Brigades organization, which used it for the purposes of terrorism, is an argument which is not in line with the evidentiary material. Thus, for example, in the memorandum dated March 15, 2006, 6:15 p.m., in Section 36, the following appears: "**The subject explained that each of the security organizations purchased materiel in large quantities and the subject approved the payment. All of the al-Aqsa Martyrs organizations used the weapons which were supplied by the security forces, which carried out the massive procurement.**"

As we have seen, the Defendant knew very well that the materiel which was purchased was transferred to the al-Aqsa Martyrs Brigades, which used those weapons. Obviously, the Defendant knew what the al-Aqsa Martyrs Brigades organization was and what its activities were. His attempt to tell us that he did not know what the organization was is an untenable

43

Date: July 29, 2009                                      File No.: 3052/06

attempt to represent himself as an innocent person. We do not believe this argument. It is clear to us that the Defendant – who held a senior position in Fatah for decades and was close to Yasser Arafat – knew very well what the al-Aqsa Martyrs Brigades organization was, what its activities were, and knew very well that the organization in question was a tool in the hands of the Palestinian Authority for directing terrorism against the State of Israel and its residents.

It should further be stated that we did not gain the impression that the Defendant was a clerk who followed instructions with no discretion of his own. This results both from the senior nature of his position and from the facts which were brought before us, as well as from the statements which were made by the Defendant in Court. Thus, for example, on no small number of occasions, it transpired that the Defendant acted on his own initiative, with no approval whatsoever – and certainly with no explicit instructions – from Yasser Arafat, in the context of monetary expenditures. This was the case with regard to the "business initiatives" which were intended to make a profit for Fatah; his contacts with the Iranians, which were not known in advance by Yasser Arafat (but only retroactively); and the Defendant's own words to the effect that Yasser Arafat liked to see and to get results, and was not involved in the entire process itself from the outset. We shall also recall that the Defendant, in his own words in his testimony before us, confirmed that he did not transfer money if he did not have the appropriate amount, or if the purpose of the expenditure did not match a recognized item in the budget. This is not in line with a person who merely fulfilled every instruction by Arafat. Moreover, the Defendant stated, in his testimony before us on November 18, 2008, that if he were to receive an instruction which appeared strange to him, he would not carry out the action, and added that: "I had many disputes with the *Ra'is* on such things, and in the end, he came and told me that I was right." These words, which appeared to have been uttered with great pride on the Defendant's part, indicate that the Defendant was not merely a rubber stamp. When he thought there was a problem with this or that instruction by Arafat, he would tell him so, and would even argue with him.

In the case that is before us, and with regard to the action set forth in the indictment, the Defendant did not see fit to argue, even though we know that, had he seen fit to do so, he would have done so. The obvious conclusion is that the Defendant – by virtue of his position, *de facto* in his relationship with Yasser Arafat, and in light of his own actions, as those actions arise from the evidentiary material before us – had the discretion to approve, or not to approve, the transfer of funds. The Defendant knew very well what the purpose of the transfer of funds was, and he knew very well that the arms which were purchased with the monies in question were intended for the purposes of a terrorist organization – the al-Aqsa Martyrs Brigades.

Date: July 29, 2009                                      File No.: 3052/06

**Summary:**

From the factual standpoint, no infrastructure has been laid which enables support of the arguments that have been set forth by the defense with regard to the availability of the defense of justification, or the defense of "act of state", for the Defendant. It has been proved that the Defendant knew very well that the purchases in question were of weapons which were to be transferred to the use of a terrorist organization – the al-Aqsa Martyrs Brigades. This was not a case of the purchase of weapons with a view to taking weapons out of the hands of residents and transferring them to "responsible hands", as has been argued by the defense.

The Palestinian Authority is not a state, and in any event, the transfer of weapons for the purposes of terrorism against the citizens and residents of the State of Israel cannot take shelter under the defense of "act of state", even if a state were involved.

Second: with regard to the defense of justification, even if we were to adopt the method advanced by my colleague, the Deputy President of the Court, who is prepared to recognize the defense of justification for entities in the Palestinian Authority under certain conditions, the act in question is not a legitimate act on the part of the Authority, and the purchase of weapons which are intended for the purposes of the terrorist organization is clearly an illegal act.

Because the Defendant was a partner to the purchase of weapons as set forth in Section 1 of the indictment, we convict him with regard to that which has been set forth in this section of the indictment.

**Count 2 of the indictment:**

This count concerns the transfer of salaries to operatives in the al-Aqsa Martyrs Brigades, as well as the transfer of a requisition by Marwan Barghouti for the payment of money for materiel.

The basis for this count lies in the statements by the Defendant, but also in the statements which were made by Mahmoud Abiyat to the police. The Defendant, in fact, confessed in his interrogation that he had transferred salaries to Mahmoud Abiyat's men, and the latter confirms this matter in his statement. Accordingly, the opening passage of this Count of the indictment is based on statements by the Defendant and has been given a significant evidentiary supplement in the statement by Mahmoud Abiyat. Accordingly, and in light of the factual analysis set forth above, there is a solid basis for convicting the Defendant of that which has been set forth in the opening passage of Count 2 of the indictment, because it involved the transfer of monies to terrorist operatives.

Date: July 29, 2009                                              File No.: 3052/06

The closing passage of Count 2 of the indictment – the subject of the materiel sought by Marwan Barghouti – also appears, in detail, in the Defendant's statements, and, in essence, constitutes part of the general series of offenses which is described in Count 1 of the indictment, which involves the Defendant's share in financing various items of materiel for persons in the Palestinian Authority and for the al-Aqsa Martyrs Brigades.

With regard to the closing passage of this count of the indictment, the defense argued that the Defendant did not commit any offense, because all that he did was to forward the document to Arafat. The Defendant did not pay the amount requested, because his office did not have the budget to do so, and the payment for the requisition came from the budget of the Palestinian Ministry of Finance.

I cannot accept the argument that this was not an offense. The charge which is attributed to the Defendant is "Performance of a service for a prohibited organization". The service which the Defendant performed for the al-Aqsa Martyrs Brigades organization admittedly did not involve the transfer of money from his office; nevertheless, he did perform a service. This service included accepting the requisition and forwarding it to Arafat. The Defendant was the channel through which the requisition was handled and carried out. In accordance with that which has been set forth above, and as we have seen in the analysis of the facts in Count 1 of the indictment, the Defendant was a significant link in all of the acts of procurement and finances. Furthermore, he was also the channel through which all of the financial requisitions reached Yasser Arafat. The same holds true in this case as well. This act is a service for a proscribed organization, and accordingly, it is necessary to convict him of the charges which are attributed to him in the closing passage of this Count of the indictment as well.

It should further be stated that the statements set forth above with regard to the defenses of "act of state" and justification, which were raised by the defense, apply even more forcefully to this count of the indictment, because, in this case, the Defendant granted assistance and a direct service to the terrorist organization known as the al-Aqsa Martyrs Brigades.

**Count 3 of the indictment:**

This count concerns the Defendant's part in the procurement of the ship *Karine A*.

According to an argument that has been set forth by the Defense, the Defendant did not commit any offense whatsoever. The money for the purchase of the ship did not come from his budget, but rather, from the budget of another office, which was headed by Harbi Sarsur. The Defendant did not initiate the bringing of the arms ship, and, at most, had indirect and not concrete knowledge of the fact that the ship would be carrying weapons. All that he did was to pass on the information about the ship to Yasser Arafat, who thought it was a plot to murder him.

46

Date: July 29, 2009                                          File No.: 3052/06

After examining the evidentiary material, we have found that the facts which are attributed to the Defendant in this count of the indictment have been proved as required. In actual fact, not even the defense disputed the fact that the facts set forth in the indictment were proven by the Defendant's statements. I shall comment that, with regard to the purchase of the ship, nothing bears out the allegation that Yasser Arafat refused this matter or thought that it was a plot. What was said by the Defendant referred to his meetings with the Iranians, which are set forth in Count 4 of the indictment, and not to the purchase of the *Karine A*, which Arafat approved with no problems whatsoever, according to the Defendant's own statements.

The central question which the defense raised is whether these acts constitute the offense of trading in war materiel.

The definition of the word "trading" in the Prohibition on Trading in War Materiel Order is as follows: "Purchase, sale, mediation, delivery, storage, transport, transfer, dispatch or repair".

This means that trading in war materiel does not only include acts of purchase and sale, but also mediation and transport of arms.

In the case that is before us, the Defendant took part in the following actions: he accepted the request by Fathi Ghazem for financing an arms ship which would come from the Iranians; it was explained to the Defendant that the weapons which would be on board the ship would be financed by the Iranians, and that the Palestinian Authority would have to finance only the ship and its expenses; the Defendant handled the request and passed it on to Yasser Arafat, who approved the conspiracy and agreed to the purchase; the Defendant was the one who transferred the requisition for payment to Arafat, who approved the transfer of the funds; when the Defendant announced that his office did not have an appropriate budget, Arafat gave an instruction for the payment to be made from the office of Harbi Sarsur, and the Defendant transferred that instruction by means of a messenger from his office; Fathi Ghazem was in contact with the Defendant for the purpose of receiving the information as to whether the order for the transfer of the funds had been issued.

These facts indicate that the Defendant was involved in the mediation and the financing of the arms deal. Even if his office did not pay the money directly, the Defendant was the one who made contact with Arafat and brought the subject of the arms deal before him for his consideration, study and decision. The Defendant was the entity which mediated between Fathi Ghazem, the Iranians and others and Yasser Arafat. The Defendant's role is accordingly not minor, but significant. It may be said that the Defendant was a significant factor in concluding the transaction, because his contacts with Arafat were of supreme importance for the purpose of executing the transaction.

Date: July 29, 2009

File No.: 3052/06

Even if the Defendant's office did not finance the transaction from the current budget, it should still be stated that the Defendant was involved "up to his neck" in this transaction, and that he constitutes an entity which took real and material action for the purpose of obtaining the financing for the purchase of the ship. Accordingly, he should be considered as having been involved in the purchase of the weapons, in the negotiations which he conducted with the Iranians from the beginning, in the purchase of means of transport of the weapons, and at the very least, in actions which constitute mediation for the purchase of the weapons.

In this case as well, it is obvious that the defenses of "act of state" and justification do not apply. In this case, the initial contact began even before Arafat knew about the subject of the arms ship, so that the Defendant certainly cannot say that his actions merely consisted of following orders.

Accordingly, the Defendant should be convicted of that which is attributed to him in this count of the indictment.

**Count 4 of the indictment:**

This count concerns negotiations which the Defendant conducted with Iranian representatives outside the Area.

The defense did not dispute, with regard to this count, that the Defendant held a meeting with people who represented themselves as Iranians, and held a general conversation with regard to possibilities for Iran's assistance to the Palestinian Authority. The defense argued that the prosecution would have to produce an evidentiary supplement of the "additional item" type in order to prove that such a meeting took place, and that the persons with whom the Defendant spoke were actually Iranians. It was further argued that, as far as the Defendant was concerned, those meetings were full of suspicion and caution and were not based on a desire to cooperate, and that, in fact, Arafat, upon receipt of a document which described the meeting, rejected the idea set forth therein.

First of all, with regard to the required evidentiary supplement, we believe that, in this case, even in the absence of any evidentiary supplement with regard to this count itself, the existence of an evidentiary supplement for other counts constitutes an evidentiary supplement for this count of the indictment as well.

As we pointed out above, a supplement of the "additional item" type is a supplement which is intended to verify the Defendant's statements. Because it is a supplement for the purposes of verification and not of embroilment, there is no necessity for the evidentiary supplement to refer to each and every one of these counts of the indictment separately, provided that there is a relationship between the various counts of the indictment in question.

48

Date: July 29, 2009                                               File No.: 3052/06

In accordance with that which has been set forth above, in the case that is before us, there is an affinity between the Defendant's actions as set forth in this count of the indictment and his actions as set forth in the previous counts of the indictment. All of them concern his work and his status as the Finance Officer in the Palestinian Authority and as a person close to Arafat. Accordingly, the evidentiary supplements which were found with regard to Counts 1 and 2 of the indictment (Prosecution Exhibit No. 8 and the statement by Mahmoud Abiyat) also constitute an evidentiary supplement with regard to this count.

Furthermore, it is necessary to reject the argument that has been set forth by the defense, to the effect that these were only contacts with no real intention. While these were apparently initial contacts, nevertheless, by the very nature and quality of initial contacts of this type, they are at times accompanied by suspicion. This does not mean that the Defendant did not want to promote the contacts thereafter; in fact, he even brought the subject of the contacts before Yasser Arafat for decision.

Let us not forget that the elements of the offense in question require only the existence of the contact between the Defendant and another entity which is part of a hostile organization. In the case that is before us, it appears, on the basis of the proven facts, that not only did the Defendant actually meet and hold contacts with operatives of an enemy country; the Defendant acted on the basis of a desire to bring about what had been agreed upon with the Iranians and "to get results" for Arafat. Accordingly, we believe that all of the elements of the offense, in this case, were fulfilled by the Defendant.

I shall further state that, in this case as well, it is obvious that the defenses of justification and "act of state" do not apply, because the Defendant did not receive any order or instruction to carry out that which is attributed to him in this Count; rather, he acted on his own initiative and on his own recognizance, and only retroactively brought the results of the meeting to Arafat for his approval.

This being the case, the Defendant should be convicted of that which is attributed to him in Count 4 of the indictment.

**Conclusion**

We have not seen fit to accept the preliminary argumentation that has been set forth on the part of the Defendant. We have seen fit to attribute full weight to his statements to the police and to the transcripts of his interrogations by the Israel Security Agency, and to prefer his statements, wherever the Defendant argued otherwise before us. In light of the content of the Defendant's statements, we believe that there is a complete factual infrastructure for proving the charges that have been attributed to the Defendant.