# EXHIBIT A.921


PLAINTIFF'S
EXHIBIT
921

**The Military Appellate Court**                                        **Appeal 3084/07**
**Central District**

**Before a panel:**   Colonel Aharon Mishnayot      - **Presiding Judge**
                      Colonel Eli Wolf              - **Judge**
                      Lieutenant Colonel Yaakov Lerer   - **Judge**

**The Appellant: Hilmi Abdel Karim Mohamed Hamash, Identity No. 901415984**
(Represented by Counsel, Adv. Osama Ouda)

- v. -

**The Respondent: The Military Prosecution**
(Represented by Counsel, Lieutenant Shlomi Schneider)

Appeal against the verdict of the Judea Military Court (before the Honorable Panel headed by
Major Yair Tirosh and Honorable Judges Major Ze'ev Afik and Major Amir Dahan)
in Case No. 2303/4 dated September 25, 2006
(The appeal is dismissed)

Date of the session: January 16, 2008, 9 Shevat 5768

## Verdict

### Judge Colonel E. Wolf:

The Appellant in this case was convicted on sixteen counts of indictment, which include
membership in an unlawful organization, placing a bomb that ultimately did not explode,
shooting at individuals and possession of weapons. The remaining counts are eleven charges of
causing death, which were related to a suicide attack that was carried out on January 29, 2004, on
[bus] line no. 19 in Jerusalem.

In this event, the **suicide terrorist** boarded the bus while the bus was traveling towards Paris
Square. When the bus arrived at the junction of Arlozorov and Aza Streets, the **suicide terrorist**
activated the explosive bag, which exploded. As a result of this, the deaths of 11 innocent
civilians were caused. In addition, more than 50 civilians were injured in that event to varying
degrees of severity, for which the Appellant was convicted of an additional offense of attempting
to cause intentional deaths of all those who were injured in the event.

[Stamp] **P 2: 27**

The Appellant's part in the suicide attack manifested in him having contacted a person by the name of **Ali Ja'ara** (hereinafter: the "**Suicide Terrorist**") and introducing him to military operative **Ahmed Salah** (hereinafter: the "**Handler**"), who sent him to carry out a suicide attack. The Appellant and the Handler prepared materials that were required for making an explosive bag insofar as they purchased seven kilogram of citric acid and batteries.

In addition, the Appellant, with another person, attempted to find a video camera in order to film the **Suicide Terrorist** before carrying out the attack, but were unable to do so. In the end, the **Suicide Terrorist** went out on his way without having been filmed.

In the Lower Court, there were procedural arrangements between the Prosecution and the Defense whereby the statements of a number of witnesses were admitted, but without waiving the need for verifying additional evidence – "corroborating evidence". The Lower Court convicted the Appellant of all of the offenses attributed to him and sentenced the Appellant to twelve terms of life imprisonment, eleven for causing the deaths of eleven innocent civilians and one additional term of life imprisonment for the additional offenses. The Lower Court ruled that all of the terms of life imprisonment were to be served cumulatively.

There are three subjects that we must discuss in this Appeal, according to the Defense Counsel's argument:

1. Whether corroborating evidence is needed in addition to the statements that were consensually filed to the Court and if so whether it is to be found in the evidentiary material.

2. Whether the Appellant is to be considered to be an accomplice as ruled by the Lower Court or only as an accessory.

3. Whether there is room for intervening in the sentencing.

## 1. Corroborating evidence

The Lower Court analyzed individually each offense of which the Defendant was charged, and in effect, the key evidence in each of the counts of the indictment was the statement of the Defendant. The Court found additional evidence for each count of the indictment, following which it convicted him of those counts of the indictment.

In effect, the appeal before us concentrates on the offense of causing death and the deliberation of the Lower Court whereby the Appellant is to be considered an accomplice in the killing of eleven people and the injuring of about fifty others.

The only argument of the Appellant is that in the circumstances, there was no room to convict him of causing death, but at the most of conspiring, following which there is room to reduce his sentence.

[Stamp] **P 2: 28**

The consensually filed confessions of the Appellant show the following:

A.  That the Defendant heard that the Handler was looking for a person who was prepared to commit suicide in an attack and introduced the **Suicide Bomber** to him, from whom he heard that he was unhappy and he was interested in carrying out a suicide attack.

B.  During the conversation between the **Handler** and the **Suicide Bomber**, the Defendant was also present.

C.  The Defendant purchased seven kilogram of citric acid and four batteries for the **Handler**.

D.  The **Handler** asked the Defendant for a video camera and the Defendant tried to get him this camera.

E.  The Defendant contacted the **Handler** after the attack and the **Handler** told him that it was an attack that the **Suicide Bomber** had committed.

2

[Stamp] **P 2: 28** [continued]

The argument of the Defense is that while the Appellant had done everything that had been attributed to him as set forth above for the purpose of advancing the attack; he did not know that the acts would lead to the advancement of a suicide attack.

The **Handler**, in his confession dated March 16, 2004, on page 1 line 15, states:

> *"About two months before Ali Ja'ara committed the suicide attack, I talked to Hilmi Hamash – I told you about him – and I asked him to look for a suicide bomber for me to carry out a suicide attack."*

To the question of what Hilmi – the Appellant – did, that **Handler** answered:

> *"He said okay, but he had not yet brought me [one] and I talked to him a few times about it; after a few weeks, Hilmi told me that he would go to him again, we would speak to him, check him out and see what he was like. Hilmi agreed; went to check him out again and told me that he was okay and was prepared to carry out a suicide attack, and then he told me that Ali Ja'ara was the person who was suggesting it and we went to him, to his home, and in his home he introduced me to Ali Ja'ara...*
>
> *... And I said to him that I understood from Hilmi Hamash that he, Ali, wanted and was prepared to carry out a suicide attack and Ali said yes. I said to Ali that I would arrange the subject and we would talk, and we went..."*

And on page 2 of that confession, on line 27, he states:

> *"After Ali Ja'ara left for the attack, Hilmi Hamash called him at about 8:30-9:00 a.m. and asked me what about Ali, I said to him that the fellow had gone out to work... after that Hilmi called me again and told me that in the news they said that there had been a suicide attack in Jerusalem. And on the following day, Hilmi Hamash said to me that while there was a "Tabour" (the suspect describes in his language a morning parade for police officers) in Bethlehem in the police center and they looked for Ali Ja'ara and Hilmi did not tell them anything, and in the end they heard on the television that Ali Ja'ara had carried out the attack in Jerusalem on the bus."*

It is noted that the Appellant and the **Suicide Bomber** had worked together at the Palestinian Authority, which leads to the fact that the Appellant had covered up for the **Suicide Bomber** during a morning parade. In another confession by the **Handler** that was given on the following day (March 17, 2004), he says that on the night before the attack, he came to the Appellant and asked him to come with him to the **Suicide Bomber**, who had left for the attack in question on the following day. The Appellant did not join him because he had guests.

The Appellant himself, in his confession dated March 17, 2004, page 2, line 5, states:

> *"Ahmed Alana talked to me and told me that I was to look for someone who wanted to carry out a suicide attack or shooting attack, and I heard Ali Ja'ara on many occasions – that he had talked with people, and to all of them he said that he wanted to carry out a suicide attack, and I knew that he was a miserable person and he worked for the Palestinian Government. And then I talked to Ali and I told him that if he wanted to see and carry out a suicide attack, I knew somebody*

3

[Stamp] **P 2: 29** [continued]

A 3084/07

*who could help him, and so, after some time we went, Ahmed Salah and I, to the home of Ali Ja'ara and then we saw that Ali was alone in the house and I introduced Ahmed Alana to Ali, and he said that they knew each other, and then Ahmed told him if he was sure that he wanted to carry out a suicide attack, and he said that he was, and I wish to say that I did not know what type of suicide attack Ali would carry out and Ali also asked about what the attack that he would carry out would be, and then Ahmed told me that he would know in the future what suicide attack would be carried out, and then Ahmed said to Ali that he should prepare himself, and then I said to Ahmed that I did not want anything to do with the matter and do not want to get into this crime anymore, and initially I though that it was only a shooting attack or something like that… and afterward, Ahmed Alana said to me that it would be an attack during the next day or two and on the day that there was an attack I was at work and then I heard that there had been an attack in Jerusalem and called Ahmed Alana on his mobile phone… and I asked him what about this attack, and he said to me that it was Ja'ara's attack and then I said to him goodbye and hung up."*

In another confession by the Appellant, he describes that he introduced the **Suicide Terrorist** to another person who planned the attack, that he had gone out to look for a camera in order to film the **Suicide Terrorist** and then the **Suicide Terrorist** announced that he would leave for the attack even without a camera. A week earlier, the Appellant had gone out with another person to purchase seven kilogram of citric acid and four batteries. These items were delivered in order to prepare an explosive device. In addition, the Appellant was promised that after the attack, they would have him meet the person who prepared the explosive devices and the person who transported the suicide terrorists.

The **Handler**'s confession was filed consensually and without objection. Although there is no need for additional evidence, it can be found in the Appellant's statements, *inter alia*, as cited above. The Appellant wanted the deadly result to occur and effectively used the **Suicide Terrorist**, by exploiting his mental condition, to advance the attack, and also covered up for him when he was absent from his work at the Palestinian Authority, where he worked with the Appellant.

As has already been said in Judea and Samaria Appeal 2503/05, **Mohamed Jaffar Ismail Abu Saris v. the Military Prosecutor:**

[Stamp] **P 2: 30**

*"... In the absence of explicit consent to the contrary, the filing of the material constitutes an alternative to hearing that witness or those witnesses whose statement has been filed with the Court. This consent, it should be clarified, is unilateral consent of the Defense, whose meaning is twofold: waiver of the holding of the primary examination, owing to which the statement is considered to have been given by the witness in the courtroom; waiver of a cross-examination of the witness, which constitutes a declaration that the content of the statement is undisputed. The result of that which has been set forth above is that where additional evidence to outside statements is ordinarily required (such as corroborating evidence for the purposes of Section 10A of the Evidence Ordinance or an addition to an outside confession of the Defendant), when the material is filed consensually there is no need for such additional evidence. Logic, life experience and common sense indicate that when the content of the statement is disputed, the Defense Counsel will be left with the strongest tool possible for refuting, or at least questioning the account of the Prosecution witnesses – the cross-examination."*

The Lower Court examined each count of the indictment of which the Appellant was convicted and found, even though there was no need to do so, additional evidence. In view of that which has been set forth, the argument by the Defense concerning the need for corroborating evidence must be dismissed.

4

[Stamp] **P 2: 30** [continued]

A 3084/07

**2.**    **Whether the Appellant is considered an accomplice or an accessory**

There is no doubt that the offenses of which the Appellant has been convicted are very severe; the question is whether the Appellant is to be considered as one belonging to the inner circle of the perpetrators of the offense and sentence him as a primary perpetrator or whether he can be classified as belonging to the outer circle, following which he may be given a lighter sentence.

The distinction between an accomplice and an accessory is not always sharp and unequivocal. This Court has used the common test in Israel that assesses the "test of control" and "mastery of the offense".

In Civil Appeal 4497/93, **Ben Mordechai v. State of Israel**, PD 54 p. 2393, pp. 252-3, the following was said concerning President Barak:

> *A co-perpetrator has functional control, along with others, over the criminal act and its development. He is its master. He is part of its joint plan… the accessory – like the abettor – is an indirect, secondary accomplice… he is not the originator or the decider of the execution and he does not control the execution. He is not the master of the perpetration… but part of it is expressed in the actions around the offense.*

In the "Butchers' Market" case (Civil Appeal 2814/95, **Johns Doe v. State of Israel**, PD 51 (3) p. 388), Honorable President Barak also related to this issue, and determined:

> *"The foundation that differentiates between the forms of participation is functional by nature. The distinction is made according to the different role that the different accomplices have in the fulfillment of the joint criminal plot.*
>
> *… The characteristic of the perpetrator is that he is the master of a criminal activity. He has the functional-material control, along with the other co-perpetrators, over the criminal action. He is part of the joint decision to commit the offense. He is part of the plan for fulfilling the prohibited criminal action. He works with the other co-perpetrators, to the effect that each of them controls – with the others – the activity as a whole. His status concerning the decision to commit the offense is as an 'insider' whose contribution is 'inside'."*

In contrast:

[Stamp] **P 2: 31**

> *"The accessory is an indirect secondary partner and he is outside the inner circle of the commission. He is an outside party. He is not the originator of the execution or an abettor of its execution. His contribution manifests in his aiding… in forming the conditions for the commission of the offense by the principal offender; his contribution is as an auxiliary measure. The accessory contributes to the commission of the offense, which is outside the scope of direct execution, although it assists in it."*

The decision as to which circle the Appellant is to be assigned is no easy one.

It has already been ruled in Judea and Samaria Appeal 1706+2040/05, **Alaa Khaled Ibrahim Madawi v. The Military Prosecutor**, that a person whose part boils down to having provided the name of a person who is prepared to carry out a suicide attack to a person who wishes to plan such an attack

5

[Stamp] **P 2: 31** [continued]

A 3084/07

is not part of the inner circle of the perpetrators of the attack, and therefore is not to be considered an accomplice in the offense. In this case the Court handed down a sentence of 25 years' imprisonment to be served. In this instance, it was the event in which a suicide terrorist who carried out the attack in Kiryat Yovel in Jerusalem in which 11 people were killed. A similar instance was in Appeal 2823/05, **Shawaa Jalal Waif Kamamaj**. Here too, it was ruled that the person who mediated between a handler who was in contact with a suicide terrorist in the Islamic Jihad when a suicide attack was eventually carried out at the Haamakim Mall in Afula in which three people were murdered would be considered to be an accessory. It shall be noted that in this instance, the prosecution agreed that he should be considered as an accessory. The appellant was sentenced in that case to 25 years' imprisonment, to be served.

If the Appellant were to make do with mediation between the attacker and the planner, according to the case law, he should have been classified as belonging to the outer circle.

In view of the additional activity of the Appellant beyond the mediation between the **Handler** and the **Suicide Bomber** as set forth above, it seems that he must be classified as an accomplice in the inner circle and at least on the edge of this circle.

In his pleas, the Defense Counsel relied on a the case of the accomplice of the Appellant, **Ali Mohamed Hamed Haliel**, against whom another indictment was filed in Judea Case 2306/04, but the offense of causing intentional death is identical in both cases, each of them having taken a different part in the event set forth above.

The accomplice was convicted of having expressed willingness to help in the inspection of the explosives.

The accomplice succeeded in acquiring materials for preparing the explosives and transferred them to the Handler. The Handler updated the accomplice that he intended to use these materials to make explosives that would be used in the execution of a suicide attack. The accomplice also explained to the Handler the manner of using the materials.

Concerning the accomplice in the Lower Court, ultimately the prosecution agreed to convict him as an accessory rather than as an accomplice.

[Stamp] **P 2: 32**

The accomplice had a part in an additional suicide attack, and was sentenced in total to 21 terms of life imprisonment, of which 11 terms of life imprisonment were for aiding in causing the deaths of the victims who are the objects of this case and one additional term of life imprisonment for the attempt to cause the death of persons in that event. In the case of the accomplice, the Court ruled that the sentences would be served concurrently.

Concerning the Appellant in the Lower Court, the prosecution argued that a distinction should be made between the Appellant and his partner, as the Appellant introduced the **Suicide Terrorist** to his handlers. The accomplice did not take part in the planning and did not recruit the **Suicide Terrorist.**

The Lower Court examined the part of the accomplice and reached the conclusion:

> *"A thorough examination that we made in the case of Ali Abu Haliel has satisfied us that the difference between the results in the verdict in the end justified the difference in the sentencing. There is no doubt that the evidentiary material that was presented before us portrays Abu Haliel in a much more problematic light, but the manner of the conduct of the trial led to a state in which for evidentiary purposes, the Court having before it the text of the indictment only and the picture that is inferred from this analysis is much less bleak than the picture that is portrayed in the evidentiary material that we were able to see."*

6

[Stamp] **P 2: 32** [continued]

There is no doubt that there is no room to accept the Defense Counsel argument that the acts of the accomplice are much more severe than those of the Appellant.

It seems that the facts before us are more similar to the case that was heard in Judea and Samaria Case 2236/07, **Fuaz Mahmoud Ali Nasser v. the Military Prosecution**, in which the appellant also had introduced the handler to the suicide terrorists due to one of the meetings between them, and was an accomplice in the manner of giving directions to the suicide terrorist through dispatches that were passed to him in a mosque.

The Lower Court ruled in that case that the mediator should be considered as an accomplice and this Court dismissed the appeal against this deliberation.

In view of all that which has been set forth above, it appears to me that the Appellant is indeed to be considered as an accomplice and not as an accessory.

### 3.    The sentence

The Appellant allowed the **Suicide Terrorist** to get to know the Handler, and therefore caused the connection between the planned and the attacker; were it not for this connection, the offense could not have been carried out. Moreover, his help in obtaining the material that was required for making the bomb was also a necessary link in his participation in the actions required for the purpose of carrying out the attack. The Appellant was "in the know" concerning the intent of all of the persons involved being to carry out a suicide attack, but it is of no importance that he did not know the place in which the attack was intended to be carried out, or the exact time that was set for its execution.

Everything that was done by the Appellant was done in order to assist in and lead to the criminal outcome that was attributed. There can be just one conclusion, which is that the Appellant wanted to see to the deaths of peaceful, innocent civilians. See, for example, Judea and Samaria Appeal 2377/04, **The Military Prosecutor v. Rassam Abed Alrahman Hussein Almhamra**.

On more than one occasion, this Court has dealt with the extraordinary severity of a suicide attack that is intended to kill and injure as many innocent people as possible, who have no connection or acquaintance with the persons involved in assisting in the execution in the attack. The only "wrongdoing" of the casualties is their presence at the site that had been selected by the **Suicide Terrorist** or his accomplices as a crowded site in which the most vicious and destructive results as possible can be achieved, as far as they are concerned.

[Stamp] **P 2: 33**

A suicide attack is usually not carried out by a single person – the attacker – only, but involves and combines many other people, who include a dispatcher, a bomb-maker, transporter and a cameraman, all of whom take part in this disgusting crime.

In view of that which has been set forth, after we have seen fit to dismiss the appeal against the verdict, we have found no room to intervene in the sentence that was handed down by the Lower Court, which corresponds with the great severity of the acts that the Appellant committed.

7

[Stamp] **P 2: 33** [continued]

A 3084/07

**Presiding Judge Colonel A. Mishnayot**:

I concur.

**Judge Lieutenant Colonel Y. Lerer**:

I concur.

Decided as set forth in the verdict by Judge Colonel E. Wolf.

Handed down and announced today, September 11, 2008, 11 Elul 5768, in the presence of the Appellant, his Counsel and the Military Prosecutor.



| (-) | (-) | (-) |
|-----|-----|-----|
| Judge | President of the Court | Judge |

Stenographer: AR + SI + GV + LS + AG + MP

8

[Stamp] **P 2: 34**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

MARK I. SOKOLOW, *et al.*,

                              Plaintiffs,

        vs.

THE PALESTINE LIBERATION
ORGANIZATION, *et al.*,

                              Defendants.

No. 04 Civ. 00397 (GBD) (RLE)

### DECLARATION OF RINA NE'EMAN

Rina Ne'eman hereby certifies as follows:

1.    The attached translation from Hebrew to English is an accurate representation of the document received by Rina Ne'eman Hebrew Language Services, to the best of my knowledge and belief.  The document is designated as P 2: 27-34.

2.    I am a professional translator with a B.A. in International Relations from the Hebrew University of Jerusalem (Israel) and 30 years of translation experience.  I am fluent in Hebrew and English, and I am qualified to translate accurately from Hebrew to English.

3.    To the best of my knowledge and belief, the accompanying text is a true, full and accurate translation of the Hebrew-language document bearing the bates number, P 2: 27-34.

Dated: February 28, 2014

_____
Rina Ne'eman

ss.: New Jersey

On the 28 day of February, 2014 before me, the undersigned, personally appeared Rina Ne'eman, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is signed to this Declaration and acknowledged to me that he executed the same in his capacity, and that by his signature on this Declaration, the individual executed the Declaration.

Sworn to me this
28 day of February, 2014

Notary Public

HIBUT J MARETE
NOTARY PUBLIC
STATE OF NEW JERSEY
MY COMMISSION EXPIRES SEPT. 7, 2015
I.D.# 2332704

עי/ 3084/07

בית המשפט הצבאי לערעורים
באזור יהודה והשומרון

בפני הרכב: אלי"ם אהרון משניות – אב"ד
אלי"ם אלי וולף – שופט
סא"ל יעקב לרר – שופט

המערער: חלמי ע"א – כרים מוחמד המאש, ת"ז 901415984 (באמצעות ב"כ עו"ד אוסמה עודה)

נגד

המשיבה: התביעה הצבאית (באמצעות ב"כ סגן שלומי שניידר)

ערעור על פסק דינו של ביהמ"ש הצבאי יהודה (בפני כב' הרכב בראשות רס"ן יאיר תירוש וכב'
השופטים רס"ן זאב אפיק ורס"ן אמיר דהאן)
בתיק מס' 2303/4 מתאריך 25.9.06
(הערעור נדחה)

תאריך הישיבה: 16 בינואר 2008, ט' בשבט תתשס"ח.

## פסק דין

### השופט אלי"ם א' וולף:

המערער בתיק זה הורשע בשישה-עשר פרטי אישום, הכוללים חברות בהתאחדות בלתי מותרת,
הנחת פצצה שבסופו של דבר לא התפוצצה, ירי לעבר בני אדם והחזקת אמל"ח. יתר הפרטים הם
אחד-עשר אישומים של גרימת מוות, כשהמדובר הוא פיגוע התאבדות שבוצע ביום 29.1.04 בקו
19 בירושלים.

באירוע זה עלה **המתאבד** לאוטובוס, שעה שהאוטובוס נסע לכיוון כיכר פריז. כשהגיע האוטובוס
לצומת רחובות ארלוזורוב ועוזו הפעיל **המתאבד** את תיק הנפץ שהתפוצץ. כתוצאה מכך, נגרם
מותם של 11 אזרחים תמימים. בנוסף נפצעו באותו אירוע יותר מ-50 אזרחים בדרגות פציעה
שונות, ועל כן, הורשע המערער בעבירה נוספת של ניסיון לגרימת מוות של כל אלה שנפצעו באותו
אירוע.

חלקו של המערער בפיגוע ההתאבדות התבטא בכך שהוא פנה אל אדם בשם **עלי ג'עארה (להלן:**
**"המתאבד")** והפגיש אותו עם פעיל צבאי אחמד צלאח **(להלן: "המפעיל")**, ששלח אותו לביצוע
פיגוע התאבדות. המערער והמפעיל הכינו חומרים הדרושים לשם ייצור תיק נפץ בכך שרכשו 7
ק"ג מלח לימון ובטריות.

ע/ 3084/07

בנוסף המערער ניסה, יחד עם אחר, למצוא מצלמת וידאו כדי לצלם את **המתאבד** בטרם ביצוע הפיגוע – אולם לא הצליחו בכך. בסופו של דבר **המתאבד** יצא לדרכו מבלי שצילמו אותו.

בביהמ"ש קמא היו הסדרים דיוניים בין התביעה לסנגוריה, על פיהם התקבלו אמרות של מספר עדים, אך מבלי לוותר על הצורך בתוספת ראייתית מאמתת – "דבר לחיזוק". בימ"ש קמא הרשיע את המערער בכל העבירות המיוחסות לו וגזר על המערער שנים-עשר מאסרי עולם, אחד עשר בגין גרימת מוות של אחד עשר אזרחים תמימים ומאסר עולם נוסף בגין העבירות הנוספות. בימ"ש קמא קבע כי כל מאסרי העולם יהיו לריצוי במצטבר.

הנושאים שעלינו לדון בערעור זה לפי טענת הסנגור הינם שלושה:

1. האם יש צורך בדבר לחיזוק לאמרות שהוגשו בהסכמה לביהמ"ש והאם כן הוא נמצא בחומר הראיות.

2. האם יש לראות במערער כשותף כפי שנקבע על ידי ביהמ"ש קמא או רק כמסייע.

3. האם יש מקום להתערבות בעונש.

### 1. דבר לחיזוק

בימ"ש קמא ניתח אחת לאחת כל עבירה בה הואשם המערער, כאשר למעשה, הראייה המרכזית מכל פרטי האישום הינה אמרת הנאשם. ביהמ"ש מצא לגבי כל פרט אישום תוספת ראייתית, ובעקבות כך הרשיע אותו בכל פרטי האישום.

הערעור בפנינו מתרכז למעשה בעבירות של גרימת מוות ובקביעת בימ"ש קמא כי יש לראות במערער שותף בהריגת אחד עשר אנשים ופציעת כחמישים אחרים.

הטענה היחידה של המערער היא שעל פי הנסיבות, לא היה מקום להרשיע אותו בגרימת מוות, אלא לכל היותר בקשירת קשר, ובעקבות כך יש מקום להקל בעונשו.

מההודאות של המערער שהוגשו בהסכמה עולה:

א. כי הנאשם שמע כי המפעיל מחפש אדם המוכן להתאבד בפיגוע והכיר לו את **המתאבד**, אשר ממנו שמע כי רע לו והוא מעוניין לבצע פיגוע התאבדות.

ב. במהלך השיחה בין **המפעיל למתאבד** נכח גם הנאשם.

ג. הנאשם רכש עבור **המפעיל** מלח לימון בכמות של 7 ק"ג וארבע בטריות.

ד. **המפעיל** ביקש מהנאשם מצלמת וידאו והנאשם ניסה להשיג לו מצלמה זו.

ה. הנאשם יצר קשר עם **המפעיל** לאחר הפיגוע **והמפעיל** מסר לו כי המדובר הוא בפיגוע שעשה **המתאבד**.

ע' 3084/07

---

טענת ההגנה היא שאמנם המערער עשה את כל המיוחס לו כאמור לעיל לצורך קידום הפיגוע, אך הוא
לא ידע כי המעשים יובילו לקידום פיגוע התאבדות.

**המפעיל** בהודאתו מיום 16.3.04 , בעמוד 1 שורה 15, מספר:

> "בערך חודשיים לפני שעלי ג'עארה עשה את פיגוע ההתאבדות דיברתי עם
> חלמי המאש- סיפרתי לך עליו וביקשתי ממנו שיחפש לי מתאבד לבצע פיגוע
> התאבדות".

לשאלה מה חלמי – המערער עשה, ענה אותו **המפעיל**:

> "אמר בסדר אבל עוד לא הביא לי וידיברתי איתו כמה פעמים על זה, אחרי כמה
> שבועות סיפר חלמי שיש לו משהו אבל הוא לא בטוח בקשר אליו, אז אמרתי
> לחלמי שילך שוב אליו, נדבר איתו, נבדוק עליו ונראה איך הוא. חלמי הסכים,
> הלך לבדוק עליו שוב וסיפר לי שהוא בסדר ומוכן לבצע פיגוע התאבדות, ואז
> הוא סיפר לי שעלי ג'עארה הוא האדם שמציע והלכנו אליו לבית שלו ובבית
> שלו הכיר לי את עלי ג'עארה...
>
> ...ואמרתי לו שהבנתי מחלמי המאש שהוא עלי רוצה ומוכן לעשות פיגוע
> התאבדות ועלי אמר שכן. אמרתי לעלי שאני אסדר את הנושא ונדבר והלכנו...".

ובעמוד 2 של אותה הודאה בשורה 27 הוא מספר:

> "אחרי שעלי ג'עארה יצא לפיגוע התקשר אליו חלמי המאש בערך בשעה -8:30
> 9:00 בבוקר ושאל אותו מה עם עלי אמרתו לו שהבחור יצא לעבודה... אחרי זה
> שוב התקשר אלי חלמי וסיפר לי שסיפרו בחדשות שהיה פיגוע התאבדות
> בירושלים. ולמחרת סיפר לי חלמי המאש שבזמן שהיה "טאבור" (החשוד
> מתאר בשפתו מסדר בוקר לשוטרים) בבית לחם במרכז המשטרה וחיפשו את
> עלי ג'עארה וחלמי לא סיפר להם כלום ובסוף שמעו בטלוויזיה שעלי ג'עארה
> עשה את הפיגוע בירושלים באוטובוס."

יצוין כי המערער **והמתאבד** עבדו יחד ברש"פ, ומכאן החיפוי שנתן המערער **למתאבד** בזמן מסדר
בוקר. בהודאה נוספת של **המפעיל** שניתנה למחרת היום (17.3.04), הוא מספר שבלילה לפני
הפיגוע הוא בא למערער וביקש ממנו לבוא איתו **למתאבד** שיצא למחרת לפיגוע המדובר, המערער
לא הצטרף אליו כי היו לו אורחים.

המערער עצמו בהודאתו מיום 17.3.04 עמ' 2 משורה 5 מספר:

> "דיבר איתי אחמד אלענה ואמר לי שאחפש לו מישהו שרוצה לעשות פיגוע
> התאבדות או פיגוע ירי ואני שמעתי את עלי ג'עארה הרבה פעמים שדיבר עם
> האנשים ולכולם סיפר שהוא רוצה לעשות פיגוע התאבדות ואני ידעתי שהוא
> איש מסכן והוא היה עובד בממשלה הפלסטינית. ואני אז דיברתי עם עלי
> ואמרתי לו שאם אתה רוצה לראות ולעשות פיגוע התאבדות, אני מכיר מישהו

3

עי' 3084/07

_____

> שיכול לעזור לו בכך ואחרי כמה זמן הלכנו אני ואחמד צלאח לביתו של עלי
> ג'עאביה ואז ראינו שעלי לבדו בבית והכרתי לעלי את אחמד אלענה והוא אמר
> שהם מכירים ואז אחמד אמר לו אם הוא בטוח שרוצה לעשות פיגוע
> התאבדות והוא אמר שכן ואני רוצה להגיד שלא ידעתי מה סוג הפיגוע
> התאבדות שיעשה עלי וגם עלי שאל מה בפיגוע שיעשה ואז אמר לי אחמד
> שבעתיד ידע איזה פיגוע התאבדות יעשה ואז אמר אחמד לעלי שיכין עצמו,
> ואז אני אמרתי לאחמד שאני לא רוצה קשר לעניין ולא רוצה להיכנס לפשע
> הזה יותר, ובתחילה חשבתי שזה רק פיגוע ירי או משהו כזה... ואחרי כן אמר
> לי אחמד אלענה שיהיה פיגוע במהלך היום יומיים הבאים וביום שהיה
> הפיגוע אני הייתי בעבודה ואז שמעתי שהיה פיגוע בירושלים והתקשרתי
> לפלאפון של אחמד אלענה... ושאלתי אותו מה עם הפיגוע הזה והוא אמר לי
> שזה הפיגוע של ג'יערה ואז אני אמרתי לו להתראות וסגרתי הטלפון"

בהודאה נוספת של המערער הוא מתאר כי הפגיש בין **המתאבד** ובין אחר שתכנן את הפיגוע, כי הוא יצא לחפש מצלמה כדי לצלם את **המתאבד** ואז **המתאבד** הודיע כי יצא לפיגוע גם בלי מצלמה. שבוע קודם לכן יצא המערער עם אחר לקנות 7 ק"ג מלח לימון וארבע בטריות. פריטים אלו נמסרו כדי להכין מטען. בנוסף הובטח למערער כי לאחר הפיגוע יפגישו אותו עם מכין המטענים ועם מוביל המתאבדים.

הודאת **המפעיל** הוגשה בהסכמה וללא הסתייגות. אף שאין כל צורך בתוספת ראייתית נמצא אותה באמרותיו של המערער בין השאר כפי שצוטטו לעיל. המערער היה חפץ בתוצאה הקטלנית ולמעשה השתמש ב**מתאבד**, תוך ניצול מצבו הנפשי, לקידום הפיגוע תוך שהוא גם מחפה עליו כשנעדר מעבודתו ברש"ף, שם עבד עם המערער.

כפי שכבר נאמר בע"י איו"ש 2503/05 **מוחמד ג'אפר איסמאעיל אבו סריס נ' התוב"ץ** :

> "... בהעדר הסכמה מפורשת אחרת, הגשת החומר מהווה תחליף לשמיעת אותו
> עד או עדים אשר אמרתם הוגשה לביהמ"ש. הסכמה זו, ראוי להבהיר, הינה
> הסכמה חד-צדדית של הסנגוריה, ומשמעותה כפולה: ויתור על קיום החקירה
> הראשית באופן שרואים את האמרה כאילו נמסרה מפי העד באולם ביהמ"ש ;
> ויתור על חקירה נגדית של העד, העולה כדי הצהרה כי תוכן האמרה אינו שנוי
> במחלוקת. הפועל היוצא מן האמור לעיל הוא כי מקום בו ברגיל נדרשת תוספת
> ראייתית לאמרות חוץ (כגון דבר לחיזוק לעניין סעיף 10 א' לפקודת הראיות או
> דבר נוסף להודאת חוץ של הנאשם), הרי שמקום בו מוגש החומר בהסכמה אין
> צורך בתוספות ראייתיות אלו. ההיגיון, ניסיון החיים והשכל הישר מחייבים כי
> מקום בו תוכן האמרה שנוי במחלוקת, לא יותר סנגור על הכלי החוק ביותר
> אשר ניתן בידיו לקעקע, או למצער להציב סימני שאלה על גרסת עדי התביעה –
> החקירה הנגדית."

בימ"ש קמא בדק כל פרט אישום בו הורשע המערער מצא, גם אם אין צורך בכך, תוספת ראייתית. לאור הנ"ל יש לדחות את טענת הסנגוריה לכל הנוגע לצורך לחיזוק.

4

עי 3084/07

## 2. האם המערער נחשב כשותף או כמסייע

אין כל ספק כי העבירות בהן הורשע המערער הן חמורות ביותר, השאלה היא אם יש לראות במערער כאחד המשתתיך למעגל הפנימי של מבצעי העבירה ולגזור עליו עונש כמבצע עקרי או שמא ניתן לסווגו כמשתייך למעגל החיצוני, בעקבות כך אולי לזכותו בעניישה מתונה יותר.

ההבחנה בין שותף למסייע לא תמיד חדה וחד משמעית. בימ"ש זה נעזר במבחן המקובל בישראל ובודק את "מבחן השליטה" ו"אדנות בעבירה".

בע"פ 4497/93 בן מרדכי נ' מדינת ישראל, פד"י נד' עמ 2393, בעמ' 3-252 נאמר על הנשיא ברק:

> *למבצע-בצוותא שליטה פונקציונאלית, יחד עם אחרים, על העשייה העבריינית*
> *והתפתחותה. הוא אדונה. הוא חלק מתבניתה המשותפת... המסייע – בדומה*
> *למשדל – הוא שותף עקיף ומשני... אין הוא יזם אין הוא מחליט על הביצוע*
> *ואין הוא שולט על הביצוע. אין הוא אדון לביצוע... אלא חלקו מתבטא בפעולות*
> *החיצוניות לעבירה."*

אף בפרשת "שוק הקצבים" (ע"פ 2814/95 פלונים נ' מדינת ישראל, פי"ד נא(3) בעמ' 388) התייחס כב' הנשיא ברק לסוגיה זו, וכך קבע:

> *"היסוד המבדיל בין צורות השותפות הוא פונקציונאלי במהותו. ההבחנה*
> *נעשית על פי התפקיד השונה שיש לשותפים השונים בהגשמת המזימה*
> *העבריינית המשותפת.*
> *... המאפיין את המבצע בצוותא הוא אדון לפעילות עבריינית. בידיו השליטה*
> *הפונקציונאלית-מהותית, יחד עם המבצעים בצוותא האחרים, על העשייה*
> *העבריינית. הוא חלק מההתחלה המשותפת לביצוע העבירה. הוא חלק*
> *מהתוכנית להגשמת הפעולה העבריינית האסורה. הוא פועל יחד עם המבצעים*
> *בצוותא האחרים, כך שכל אחד מהם שולט – יחד עם אחרים – על הפעילות*
> *כולה. מעמדו ביחס להחלטה לביצוע העבירה הוא של איש 'פנים' תרומתו היא*
> *'פנימית'."*

לעומת זאת:

> *"המסייע הוא שותף עקיף ומשני הוא מצוי מחוץ למעגל הפנימי של הביצוע*
> *הוא גורם חיצוני. אין הוא יזם הביצוע ואף לא משדל לביצוע. תרומתו*
> *מתבטאת בכך, שהוא מסייע... ביצירת התנאים לבצוע העבירה על ידי העבריין*
> *העיקרי, תרומתו היא בגדר אמצעי עזר. המסייע תורם תרומה לביצוע העבירה,*
> *שהיא מחוץ לביצוע הישיר, אם כי היא מסייעת לו!".*

אכן ההכרעה לאיזה מעגל לשייך את המערער אינה קלה.

כבר נפסק בע' איו"ש 2040/05+1706 עלאא חאלד אברהים מדווי נ' התוב"ץ כי אדם שכל חלקו מצטמצם בכך שמסר שם של אדם המוכן לבצע פיגוע התאבדות לאדם שרוצה לתכנן פיגוע שכזה

ע/ 3084/07

אינו נמנה על המועל הפנימי של מבצעי העבירה ולכן אין לראות אותו כשותף לעבירה. ביהמ"ש גזר במקרה זה 25 שנות מאסר בפועל. במקרה זה מדובר באירוע בו מחבל מתאבד שביצע את הפיגוע בקרית יובל בירושלים בו נהרגו 11 בני אדם. מקרה דומה היה בע/ 2823/05 **שוועאע ג'לאל ואיף כממג'**. גם כאן נקבע כי מי שתכנן בין מפעיל שעמד בקשר עם מחבלת מתאבדת בארגון הג'יהאד האסלאמי כשבסופו של דבר ביצעו פיגוע התאבדות בקניון העמקים בעפולה בו נרצחו שלושה בני אדם יחשב כמסייע. יצוין כי במקרה זה התביעה הסכימה כי יש לראות אותו כמסייע. על המערער נגזרו שם 25 שנות מאסר בפועל.

אילו היה המערער מסתפק בתיווך בין המפגע לבין המתכנן, הרי לפי הפסיקה היה מן הראוי לסווג אותו כמשתייך למעגל החיצוני.

לאור הפעילות הנוספת של המערער מעבר לתווך בין "**המפעיל**" "**למתאבד**" כמפורט לעיל, נראה כי יש לסווגו במעגל הפנימי לפחות בשוליים של מעגל זה.

הסנגור בטיעוניו נתלה על אילן גדול הוא שותפו של המערער **עלי מוחמד חמאס הליל** אשר נגדו הוגש כתב אישום אחר בתיק יהודה 2306/04, אך העבירה של גרימת מוות בכוונה זהה לשניהם כאשר כל אחד נטל חלק אחר באירוע המפורט לעיל.

השותף הורשע בכך שהביע נכונות לעזור בבדיקת חומר הנפץ.

השותף הצליח להשיג חומרים לצורך הכנת חומר הנפץ והעבירם למפעיל. המפעיל עדכן את השותף כי בכוונתו להשתמש בחומרים אלה כדי ליצור חומר נפץ שישמש בביצוע פיגוע התאבדות. השותף אף הסביר למפעיל את אופן השימוש בחומרים.

לגבי השותף בביהמ"ש קמא בסופו של דבר התביעה הסכימה להרשיעו אותו כמסייע ולא כשותף.

לשותף היה חלק בפיגוע התאבדות נוסף, ובסך הכל נגזרו עליו 21 מאסרי עולם, מתוכם 11 מאסרי עולם בגין הסיוע לגרימת מותם של הקורבנות נשוא תיק זה ומאסר עולם אחד נוסף בגין לניסיון לגרום למותם של אנשים באותו אירוע בענייננו של השותף קבע ביהמ"ש כי העונשים ירוצו בחופף.

לגבי המערער בביהמ"ש קמא טענה התביעה שיש לעשות אבחנה בין המערער ושותפו, שכן המערער הפגיש את ה**מתאבד** עם מפעיליו. השותף לא לקח חלק בתכנון ולא גייס את ה**מתאבד**.

ביהמ"ש קמא בדק את חלקו של השותף והגיע למסקנה:

> *"בדיקה יסודית שערכנו בתיקו של עלי אבו הלאיל הניחה את דעתנו כי השוני בין התוצאות בהכרעת הדין הצדיק בסופו של דבר את השוני בעונשה. אין ספק, חומר הראיות שעמד בפנינו מציג את עלי אבו הלאיל באור בעייתי הרבה יותר, אך אופן ניהולו של המשפט הביא לכך שמבחינה ראייתית עמד בפני בית המשפט נוסח כתב האישום בלבד והתמונה המתבקשת מניתוח זה עוגמה הרבה פחות מהתמונה המוצגת מחומר הראיות אותו זכינו אנו לראות."*

6

ע' 3084/07

---

אין לי ספק שאין מקום לקבל את טענת הסנגור כי מעשיו של השותף חמורים בהרבה מאלה של המערער.

נראה כי העובדות שלפנינו דומות יותר למקרה שנדון בע' איו"ש 2236/07 **פואז מחמוד עלי נאצר נ' התביעה הצבאית**, גם שם המערער הגיש בע' המפעיל למתאבד עקב אחר הפגישות ביניהם, והיה שותף לאופן מתן ההנחיות למתאבד באמצעות איגרות שהועברו אליו במסגד.

ביהמ"ש קמא קבע שם כי יש לראות במתווך כשותף ובימ"ש זה דחה את הערעור על קביעה זו.

לאור כל הנ"ל, נראה לי כי אכן יש לראות את המערער כשותף ולא כמסייע.

### 3. העונש

המערער אפשר ל**מתאבד** להכיר את "המפעילי", ובכך גרם לחיבור של המתכנן והמפגע, שאלמלא חיבור זה, העבירה לא יכלה להתבצע. יתרה מזו, עזרתו בהשגת החומר הדרוש לבניית הפצצה הייתה אף היא חוליה הכרחית בהשתתפות בפעולות הנדרשות לצורך ביצוע הפיגוע. המערער היה בסוד העניינים כי כוונת כל המעורבים בדבר הייתה לבצע פיגוע התאבדות ואין כל חשיבות לכך שהוא לא ידע את המקום בו נועד הפיגוע להתבצע או אף את המועד המדויק שנקבע לביצוע.

כל מה שנעשה על ידי המערער נעשה כדי לסייע ולהביא לתוצאה המיוחסת והנפשעת. המסקנה היא אחת ויחידה שברצונו של המערער היה להביא למותם של אזרחים שלווים חפים מפשע. ראה למשל ע' איו"ש 2377/04 **התוב"ץ נ' ראסם עבד אלרחמן חוסין אלחמאמרה.**

לא אחת עמד בימ"ש זה על חומרתו המיוחדת של פיגוע התאבדות המכוונת להרוג ולפצוע כמה שיותר בני אדם חפים מפשע שאין להם כל קשר וכל הכרות עם אותם אנשים המעורבים בפגוע ומסייעים לביצועו. כל "חטאם" של הנפגעים הוא עצם הימצאותם באותו מקום שנבחר על ידי ה**מתאבד** או המסייעים לו כמקום הומה מאדם בו ניתן להגיע מבחינתם לתוצאות הקשות והחרסניות ביותר.

פיגוע התאבדות על פי רוב לא נעשה על ידי אדם בודד המפגע בלבד, אלא כרוכים ושלובים בו עוד מספר בני אדם ובכללם משלח, מכין פצצה, מוביל, מצלם, לכולם יש ליחס נטילת חלק בפשע מתועב זה.

נוכח האמור לעיל, משראינו לדחות את הערעור על הכרעת הדין לא מצאנו מקום להתערב בעונש שנגזר בבימ"ש קמא, אשר הולם את החומרה היתרה במעשים שביצע המערער.

7

ע' 3084/07

---

<u>הנשיא אל"ם א' משניות:</u>

אני מסכים.

<u>השופט סא"ל י' לרר:</u>

אני מסכים.

הוחלט כאמור, בפסק דינו של השופט אל"ם אי וולף.

ניתן והודע היום, 11 בספטמבר 2008, י"א באלול התשס"ח, בנוכחות המערער, ב"כ והתוב"ץ.

| (-) | (-) | (-) |
|-----|-----|-----|
| שופט | אב"ד | שופט |

רמי"שית : ער+שי+גו+לש+עג+מפ

8